# **EXHIBIT 1**

Page 1

1

2  IN THE UNITED STATES BANKRUPTCY COURT

   FOR THE DISTRICT OF DELAWARE

3  ------------------------------------------X

   IN RE: FTX TRADING LTD., et al.,

4

                        Debtors.

5

6                        CHAPTER 11

7  Case No. 22-11068

8  ------------------------------------------X

9

10

11                  DATE: December 11, 2025

12                  TIME: 9:00 A.M.

13

14      VIDEOTAPED EXPERT DEPOSITION of ROBERT

15  STUART LEVY, held at Sullivan & Cromwell,

16  125 Broad Street, New York, New York, before

17  Rivka Trop, a Notary Public of the State of

18  New York.

19

20

21

22

23

24

25

Page 2

1
2  A P P E A R A N C E S:
3  COUNSEL FOR JOINT LIQUIDATORS FOR THREE
4  ARROWS CAPITAL LTD:
5  LATHAM & WATKINS, LLP
         Attorneys for the Plaintiff
6  IN RE: FTX TRADING LTD., ET AL
         1271 Avenue of the Americas
7  New York, New York 10020
         BY: ZACHARY F. PROULX, ESQ.
8          JJ CRESPO, ESQ.
            ADAM GOLDBERG, ESQ. (Zoom)
9          SEBASTIAN KOKELAAR (Three Stone)
10
11
12
13  COUNSEL FOR FTX RECOVERY TRUST
14  SULLIVAN & CROMWELL
         Attorneys for the Defendant
15  125 Broad Street
         New York, New York 10004
16  BY: SAMUEL DARBY, ESQ.
            SHAMUS HOGAN, ESQ.
17          BENJAMIN S. BELLER, ESQ.
18
19
20
21
22
23
24
25

Page 3

1
2
3  ALSO PRESENT:
4          ROMAULD JOHNSON (Ogier) (Zoom)
5          DANIEL BURKITT (Ogier) (Zoom)
6
7          MICHAEL CHEUNG,
8              Videographer
9              *   *   *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1
2          THE VIDEOGRAPHER:  Good morning.
3  We are going on the record at
4  9:12 a.m., on December 11, 2025.
5  Please note that microphones are
6  sensitive and may pick up whispering
7  and private conversations.
8          Please mute your phones at this
9  time.  Audio and video recording will
10  continue to take place unless all
11  parties agree to go off the record.
12          This is media unit 1 of the video
13  recorded deposition of Robert Stuart
14  Levy in the matter of FTX Trading Ltd.,
15  et al., filed in the United States
16  Bankruptcy Court for the District of
17  Delaware, Case No. 22-11068 KBO.
18          The location of this deposition is
19  125 Broad Street, New York, New York
20  10004.
21          My name is Michael Cheung
22  representing Veritext Legal Solutions
23  and I am the videographer.  The court
24  reporter is Rivka Trop from the firm
25  Veritext Legal Solutions.

Page 5

1
2          I am not authorized to administer
3  an oath, I am not related to any party
4  in this action nor am I financially
5  interested in the outcome.
6          If there are any objections to
7  proceeding, please state them at the
8  time of your appearance.
9          Counsel and all present will now
10  state their appearances for the record
11  beginning with the noticing attorney.
12          MR. DARBY:  Good morning, this is
13  Sam Darby from Sullivan & Cromwell.  I
14  am here with my colleagues, Shamus
15  Hogan and Benjamin Beller and I
16  represent the FTX Recovery Trust.
17          MR. PROULX:  For the Joint
18  Liquidators of Three Arrows Capital
19  Ltd. Zachary Proulx of Latham &
20  Watkins, joined by my colleague J.J.
21  Crespo and separately Sebastian
22  Kokelaar.
23          THE VIDEOGRAPHER:  Will the court
24  reporter please swear in the witness
25  and then counsel may proceed.

2 (Pages 2 - 5)

Page 6

1         R.S. LEVY
2 R O B E R T   S T U A R T   L E V Y, called
3 as a witness, having been first duly sworn
4 by a Notary Public of the State of New York,
5 was examined and testified as follows:
6 EXAMINATION BY
7 MR. DARBY:
8     Q.  Please state your name for the
9 record.
10    A.  Robert Stuart Levy.
11    Q.  All right.  Good morning,
12 Mr. Levy.  Thank you for joining us today.
13 So I am Sam Darby.  I will be asking the
14 questions today.
15        Do you understand that you are
16 under oath?
17    A.  I do, yes.
18    Q.  Have you been deposed before?
19    A.  No.
20    Q.  So this is your first one?
21    A.  My first.
22    Q.  Okay.  So I will go over a few
23 ground rules for you.  The first one is
24 let's try not to speak over one another.  So
25 I ask that you let me finish my question as

Page 7

1         R.S. LEVY
2 best as you can, and I will do my best to
3 let you finish your answer, and that will
4 allow our court reporter to be able to
5 record our words accurately and not have
6 cross talk.
7        Is that understood?
8    A.  Understood.
9    Q.  So I will ask my questions, if you
10 don't under -- understand any aspect of my
11 question, please let me know that and ask.
12 If you do not ask any clarifying questions,
13 I will assume that the question was
14 understood.
15        Do you understand?
16    A.  I understand.
17    Q.  So you may hear counsel for the
18 joint liquidators object at times.  Unless
19 they instruct you not to answer, you will
20 still have to answer the question that was
21 pending.
22        Do you understand?
23    A.  I understand.
24    Q.  If you need a break today, just
25 let us know, I may ask that you let me

Page 8

1         R.S. LEVY
2 finish a line of question or we get to the
3 end of a topic, but just let us know if you
4 need a break, okay?
5    A.  I will, yeah.
6    Q.  Great.
7        Is there any reason that you
8 cannot provide complete and accurate
9 testimony today?
10    A.  No.
11    Q.  Mr. Levy, can you please explain
12 what you understand to be your role in this
13 case?
14    A.  My role in this case is to, as I
15 understand it, to give evidence, expert
16 evidence of the law of the British Virgin
17 Islands on certain issues raised in the
18 dispute in the dispute between the parties,
19 in particular in the amended proof of claim
20 and the objection that an iteration to the
21 evidence of Steve Atherton KC that I have
22 seen.
23    Q.  Did you provide your own written
24 declaration in this matter?
25    A.  I have, yes.

Page 9

1         R.S. LEVY
2        MR. DARBY:  So I would like to
3    introduce what should be marked as Levy
4    Exhibit 1, please.
5        (Whereupon, a Declaration of
6    Robert Stuart Levy was marked Levy
7    Exhibit 1 for identification as of this
8    date.)
9    Q.  Mr. Levy, is this your expert
10 declaration that you submitted on behalf of
11 the Joint liquidators?
12    A.  It looks like it.  Assuming it
13 is -- it a photocopy of the one that I
14 provided, then yes.  I have not read it.
15    Q.  I will represent that that is your
16 declaration, but counsel can, of course,
17 advise you.
18        So going forward if I refer to
19 Three Arrows Capital as 3AC, is that
20 understood?
21    A.  Yes.
22    Q.  And if I refer to the Joint
23 Liquidators of Three Arrows Capital Ltd. as
24 the Joint liquidators, is that understood?
25    A.  It is understood.

3 (Pages 6 - 9)

R.S. LEVY

Q.  And I will refer to this document as your declaration, okay?

A.  I may -- I may refer to it as my report, but I think we all know we are talking about the same document.

Q.  Excellent, thank you.

So does your declaration contain a complete statement of all opinions you are providing in this matter?

A.  My declaration contains my conclusions on a number of issues that appear to be in dispute between the parties. There are certain other opinions that I could provide in relation to the issues in dispute.  And there is certainly more detail that would go into -- in relation to some of the cases I refer to, by way of refining my opinions or providing further explanation for them.

But certainly the conclusions that I reach are conclusions that I am comfortable with and consider to represent the law of the British Virgin Islands.

Going forward, if issues -- if

R.S. LEVY

issues change, then I would want to consider those issues.  And certain issues have come to my attention as a result principally of the service of Mr. Atherton's rebuttal declaration or rebuttal report that you might want to hear about, and I am more than happy to speak to them.

Q.  Sure.  So you mentioned that there are certain other opinions you could provide in relations to the issues in dispute, what are those other opinions?

A.  Well, a number of them arise from Mr. Atherton's report.  I would be happy to speak to them, if you would like me to.

Q.  Well, let's start with this, have you changed any of your opinions that are included in that declaration?

A.  No, my conclusions remain the same.  There are a couple of points of clarification that I should draw to your attention.  Most of them are trivial.  But I think in the interest -- in the interest of giving a complete picture I should explain the first relates to a point I think that

R.S. LEVY

was taken by Mr. Atherton when he was deposed a couple of weeks ago or so.  And he pointed out correctly, that when I refer to the House of Lords being renamed the Supreme Court of the U.K., I was technically correct, I mean, he is right, in my view it is -- it is -- it is a non-point.  It has no bearing on the doctrine of stare decisis in these proceedings.  I can -- I can explain that further, but it is up to you whether you want me to.

Q.  I think I am all set on that one.  You mentioned a second one?

A.  Yes, the second one, I refer in a footnote somewhere to a decision of Mr. Justice Doyle in a case called HQP.  In the Cayman Islands which dealt with the doctrine of stare in the Cayman Islands, as I say in my declaration that the position would be the same in the British Virgin Islands.

That case has had an odd history.  In I think October of this year, following an appeal which was heard in November of

R.S. LEVY

last year, the Cayman Islands Court of Appeal overturned Mr. Justice Doyle's judgment, but not his analysis of the doctrine of stare decisis, so that remains good.

Independently of that, in another case that went to the Privy Council which was reported on I think the 16th or 26th of November of this year, a case called Al Jamiah.  The Privy Council independently looked at the doctrine of stare decisis in this Justice Doyle's judgment in HQP and said it was correct.

So while -- while it is the overall result in HQP, as we know the term, and that would obviously go to the Privy Council and counsel in the matter.  And the application for lead would be made shortly.  While that would no doubt go to the Privy Council, the analysis of the doctrine of stare decisis, which is potentially significant in this case, the analysis of the doctrine of stare decisis was not questioned by the Court of Appeal.  And

R.S. LEVY

1         R.S. LEVY
2  independently of that, in another case
3  Mr. Justice Doyle's analysis with stare
4  decisis in HQP was confirmed or approved in
5  large measure by the Privy Council in a
6  different case, Al Jamiah.
7      Q.  Got it.  So with the exception of
8  that point there, does your analysis of
9  stare decisis as it applies to this matter
10  remain unchanged?
11      A.  Yes, it does.
12      Q.  So other than those two
13  clarifications that you have provided now,
14  do the opinions expressed in your
15  declaration remain your opinions sitting
16  here today?
17      A.  The conclusions --
18       MR. PROULX:  Objection to form.
19      Q.  You can answer?
20      A.  The conclusions I have reached
21  remain my conclusions.  The reasoning I
22  could refine.  And -- and as this case plays
23  out, if called upon I can address further
24  issues, and there are as I say, there are
25  Mr. Atherton's rebuttal declaration, I can

1         R.S. LEVY
2  address, but certainly the conclusions I
3  reached remain the same.
4      Q.  So you mentioned reasoning that
5  may have changed -- strike that, please.
6       Putting aside the conclusions that
7  are included in your declaration, are there
8  any examples of reasoning set forth in your
9  declaration that you would change sitting
10  here today?
11      A.  No.  But I could expand upon them
12  easily.
13      Q.  So have you formed any additional
14  opinions since you have submitted your
15  declaration?
16      A.  I have formed certain opinions as
17  a result of seeing Mr. Atherton's rebuttal
18  declaration.  And those would inform some of
19  the points that I make in my -- in my
20  declaration.
21      Q.  What additional opinions have you
22  formed since your original declaration?
23      A.  Well, I have had called to look
24  into a point that arises in paragraph 51 of
25  Mr. Atherton's report.  I don't have it to

1         R.S. LEVY
2  hand.  But to recollection, and this is not
3  to be a memory test, so if you want to take
4  me to it.  But as I understand, the position
5  Mr. Atherton in paragraph 51 of his rebuttal
6  report takes some issue in relation to what
7  is the nature of a chose in action in
8  British Virgin Islands law.
9      As a result of that I had cause to
10  look at -- I think the book is Guest on
11  Assignment.  And there is a passage in Guest
12  on Assignment which is significant there.
13  And that also refers to the judgment of Lord
14  Hoffmann in the investors' compensation
15  scheme case, which I think is cited by one
16  of the experts in this case in support of
17  the contractual construction argument.
18      But there Lord Hoffmann deals with
19  what is the nature of a cause of -- of a --
20  of a -- of a chose in action, and draws a
21  firm conclusion that one can't separate the
22  chose from the action itself.  The chose in
23  action is a complete thing.
24      That's one point that arises from
25  paragraph 51 of Mr. Atherton's report.  If

1         R.S. LEVY
2  you got a copy of his report, it might
3  help -- help you if I put it in context.  If
4  you don't want me to look at it, that's also
5  fine.
6      Then there is -- there are other
7  points, for instance, in paragraph 53 of
8  Mr. Atherton's report.  Have a look at that.
9      Q.  You can continue, please?
10      A.  In paragraph 52 of Mr. Atherton's
11  report from recollection he says that the
12  entry into of the -- is it the May '22 terms
13  of service or TOS, whatever, however -- you
14  know what I am talking about.  And also the
15  March line of credit and MLCA were just
16  renewals to previous agreements.
17      And he also says consideration was
18  given for them.  I -- I -- I find that
19  surprising evidence for a number of reasons.
20  First, because the May 22 terms of service
21  were as I recollect governed by English law.
22  And yet the preexisting terms of service
23  were governed by Antiguan law.  So how one
24  can say that the later terms of service were
25  merely a replacement of the earlier terms of

R.S. LEVY

1
2  service is beyond me, because they are
3  substantially different.  They are saying
4  replacement which is suggesting they are
5  substantially the same, but they are
6  substantially and substantially different
7  documents.
8      Also in relation to the May 22
9  terms of service the range of assets --
10  sorry, the range of activities that are
11  covered by that is very broad.  So it -- it
12  included margin trading, spot trading,
13  futures trading, moved trading, whatever
14  that is, and a variety of different trading
15  activities, again, governed by English law.
16  But the earlier terms of service covered
17  only one particular -- I think it might have
18  been futures trading.  I could help you out,
19  if you want to show me the document.
20      So again, the later document
21  covered a completely different range of
22  activities than the earlier document.  So
23  how one can say, again, that is a -- a
24  replacement is I find odd.  And there are
25  similar points that one can make in relation

R.S. LEVY

1
2  to the LOC and is the -- the margin --
3  margin -- the MLCA, the later -- the later
4  versions -- well, two points, the March 22
5  agreements are governed, as I understand it,
6  by I think Antigua law, one legal system,
7  whereas the earlier type of document that
8  Mr. Atherton must have been referring to was
9  I think covered by Hong Kong law.  So it
10  radically changes in a legal system how can
11  that be a replacement, be considered to be a
12  replacement.  So that's one point.
13      And again, we now have two
14  documents purportedly -- well, purportedly,
15  I don't suppose anyone says these documents
16  weren't executed.  We have two documents
17  from -- in March '22.  And only one document
18  that -- that Mr. -- that Mr. Atherton says
19  have been replaced by these two documents.
20  Again, I don't see how that can be a
21  replacement.
22      Another point that arises from
23  paragraph 53 of Mr. Atherton's rebuttal
24  declaration is the suggestion that
25  consideration was given for these documents.

R.S. LEVY

1
2  Now I dare say he may be right, he may well
3  be right consideration was given to the
4  entry into those documents.  But I felt, how
5  that -- how that is relevant, what is it
6  relevant to.  If we are considering a new
7  suite of documents in the context of BVI
8  preferential transactions, then by
9  definition, so it seems to me, consideration
10  will be given for a preferential
11  transaction.  Because if it wasn't, it would
12  be an undervalued transaction.  So I -- I
13  don't see where that takes Mr. Atherton.
14  There may be other points in paragraph 52 --
15  I am sorry of paragraph 53 of Atherton's
16  affirmation.  But those are those points in
17  relation to that.
18      Mr. Atherton makes a point, it is
19  in paragraph 68.
20      MR. PROULX:  Counsel, are you --
21  are you intending to provide this
22  document to the witness or not?
23      MR. DARBY:  We will discuss it.  I
24  mean he is clearly prepared to speak to
25  additional opinions.

R.S. LEVY

1
2      MR. PROULX:  I believe he has
3  asked you, so I wanted to make sure I
4  knew his opinion.
5      THE WITNESS:  It would help.
6  Q.  Right now the focus would be like
7  do you have additional opinions rather than
8  giving them in such detail, if you have
9  other additional opinions that you have
10  formulated since your declaration, I would
11  be happy if you would list those, provide as
12  much detail that you would like, of course?
13  A.  I do have those additional
14  opinions, that's what I thought I was.
15  Q.  Yeah, you were.  You addressed two
16  of them, I don't know if there was a third
17  one or perhaps, you know?
18  A.  There are a number of them.
19  Q.  Okay?
20  A.  I mean, I would -- I think we
21  would all be assisted if I was to have
22  Mr. Atherton's report.  I don't -- I don't
23  want to misspeak or refer you to the wrong
24  one.
25  Q.  Of course, we will give you this

6 (Pages 18 - 21)

Page 22

1          R.S. LEVY
2 and then I will ask a question.  So please
3 listen to the question first?
4     A.  Okay.
5          MR. DARBY:  I would like to mark
6     what will be Levy Exhibit 2, which is
7     the declaration of Steven Atherton in
8     rebuttal.
9          (Whereupon, a declaration of
10    Steven Atherton was marked Levy Exhibit
11    2 for identification as of this date.)
12    Q.   So Mr. Levy, you just testified
13 that you had an additional opinion in
14 response to paragraph 51 of Mr. Atherton's
15 rebuttal, and you also just testified that
16 you had an additional opinion in response to
17 paragraph 53 of Mr. Atherton's rebuttal;
18 correct?
19    A.   Yes, I do, yeah.
20    Q.   And would you characterize the
21 additional opinion that you have in
22 reference to paragraph 33 -- 53 of
23 Mr. Atherton's rebuttal as having multiple
24 components to it?
25    A.   I am not sure what you mean by

Page 23

1          R.S. LEVY
2 multiple components.
3     Q.   Are there multiple opinions that
4 you have now formed additionally that
5 address that specific paragraph?
6     A.   Are there multiple opinions.  Can
7 I just have a look at this, right.
8          MR. PROULX:  Counsel, which
9     paragraph are you referring to right
10    now?
11         MR. DARBY:  It is 53.
12    Q.   For your context I will add that
13 you spoke at length about paragraph 53.
14         THE WITNESS:  Yes.
15    Q.   I am just trying to understand
16 whether you are expressing multiple
17 additional opinions there or whether that is
18 just a lot of detail for one additional
19 opinion that you have?
20    A.   I think -- I don't know whether
21 this is a matter of semantics, I -- the
22 principal opinions that I addressed were
23 that -- as I see it, it is difficult to --
24 difficult, if not impossible to say that the
25 new agreement, 22 agreement, put it that

Page 24

1          R.S. LEVY
2 way, were -- were renewals.  So that's one
3 opinion.  And but there maybe some sub
4 buckets of that big bucket.
5          And then the additional opinion
6 that I have offered related to commensurate
7 consideration, that's probably one opinion.
8 But I really -- I really don't follow --
9 I -- I don't see -- I don't personally
10 understand the multiple opinions, whatever.
11 I find that difficult.
12    Q.   That's okay, you answered my
13 question.
14         So are there other paragraphs in
15 Mr. Atherton's rebuttal declaration that
16 have caused you to reach an additional
17 opinion that is not expressed in your
18 declaration?
19         MR. PROULX:  Objection to form.
20    A.   I can answer?
21    Q.   Of course.
22    A.   Yes, if one looks at paragraph 68
23 of Mr. Atherton's rebuttal, I find it very
24 difficult, if not, again, impossible, to
25 agree with what Mr. Atherton says in 68(a)

Page 25

1          R.S. LEVY
2 and (b).  This all terms on whether or not
3 FTX would have eaten any loss suffered as a
4 result of lenders not being repaid.  It
5 seems to me that whether or not FTX was
6 obliged to suffer any loss -- was obliged
7 rather to compensate for any loss, the
8 testimony I have seen, and I have got no
9 views as to whether that testimony was
10 correct or not, but the testimony that I
11 have seen -- and I assume people tell the
12 truth unless the contrary is proven -- the
13 testimony I have seen is that they would
14 have in fact paid those losses.
15         And that seems to me to be
16 significant in terms of FTX benefiting from
17 the transactions under consideration.
18    Q.   So you mentioned reviewing, I
19 believe, transcripts in that response just
20 now; is that correct?
21    A.   Yes, I think I refer to the
22 transcripts of Mr. Bankman-Fried in my
23 initial -- sorry, my only report.
24    Q.   Have you reviewed any other
25 transcripts besides Mr. Bankman-Fried's

7 (Pages 22 - 25)

Page 26

R.S. LEVY

1    R.S. LEVY
2  transcript?
3      A.  Yes, since the -- since I
4  submitted my initial declaration I have seen
5  the transcripts of the deposition,
6  deposition, I never know which one, of Zain
7  Tackett.  I have also seen a transcript of
8  Mr. Atherton's deposition.  And I also
9  watched that live.  But I have been provided
10  with a transcript of his deposition.  And I
11  have been supplied with a transcript of the
12  deposition of Lord Neuberger.
13      Q.  So did you just testify that the
14  deposition testimony of others that you have
15  reviewed stated that FTX would in fact have
16  absorbed or eaten losses in this instance?
17      MR. PROULX:  Objection to form.
18      A.  I have seen testimony to the
19  effect and I may have my terminology wrong
20  here.  But there was some insurance or
21  back-up provision on the figure of a billion
22  dollars or more or whatever comes to mind,
23  again, I may be wrong.  And there was backup
24  provision to cover losses in a sum -- in a
25  very substantial sum of money.

Page 27

1    R.S. LEVY
2      Q.  And you understood that testimony
3  to mean that FTX would, in fact, have
4  absorbed losses?
5      A.  Well, that's what I --
6      MR. PROULX:  Objection to form.
7      A.  Well, that's what I understood the
8  testimony to mean.
9      Q.  So you referred to the transcript
10  of Mr. Bankman-Fried; right?
11      A.  Yes, although that may also have
12  been in Mr. Tackett's, I can't recall now.
13      Q.  Who is Mr. Bankman-Fried?
14      A.  Mr. Bankman-Fried was the -- was
15  one of the founding principals, as I
16  understand it, of FTX.
17      Q.  Did you know that --
18      A.  I -- I -- I -- I am not
19  saying his actual position.  But he was --
20  as I understand the position, he was the
21  moving force behind the FTX Exchange.
22      Q.  Okay.  Did you know that
23  Mr. Bankman-Fried has been convicted of
24  multiple counts of wire fraud?
25      A.  I know he has been convicted in a

Page 28

1    R.S. LEVY
2  criminal court, yes, I know that.
3      Q.  Are you aware that the judge
4  presiding over Mr. Bankman-Fried's criminal
5  trial concluded that he committed perjury on
6  multiple occasions?
7      A.  Am I aware of that?  I am not sure
8  I am aware of that.  Can you tell me what he
9  perjured himself about?
10      Q.  I can tell you that the judge said
11  he perjured himself more times than the
12  judge felt necessary to count.
13      Perjury is lying under oath;
14  correct?
15      A.  Yes, perjury.
16      Q.  And a deposition is given under
17  oath; right?
18      A.  Yeah.
19      Q.  So you mentioned you assumed that
20  people testifying under oath told the truth,
21  do you think that is a fair assumption in
22  the case of Mr. Bankman-Fried?
23      A.  I don't think it is a fair
24  assumption that just because someone has
25  perjured themselves they are

Page 29

1    R.S. LEVY
2  constitutionally incapable of ever telling
3  the truth.  So is your name Sam
4  Bankman-Fried, and he says yes, so is that a
5  lie?  So it is not for me to do this, it is
6  not part of my function to do this, one can
7  test the veracity -- test, I say this in a
8  judicial capacity, test the veracity of
9  testimony by reference to known facts,
10  documented facts, documents.
11      Q.  Sure.
12      A.  That's how courts like to do
13  things.  It is an easy way through things.
14      Also by commonsense, whether or
15  not FTX would have, I think as one of the
16  witnesses said, eaten the losses.  I don't
17  know whether that witness was telling the
18  truth or telling a lie when he said that.
19      However, testing that by reference
20  to commercial commonsense seems to me that
21  there might be grounds for thinking well,
22  maybe he is telling the truth on that
23  occasion.
24      Q.  Sure.
25      A.  Because if he is not telling the

8 (Pages 26 - 29)

1          R.S. LEVY
2  truth, I suspect the Exchange wouldn't have
3  lasted terribly long, because people would
4  stick in their money and not get anything.
5          So whether he was telling the
6  truth or not, I don't know.  But it seems to
7  me reasonable to assume when he said that
8  that there may -- this may -- may have been,
9  I don't know, it is not for me to make the
10  findings, an occasion when he wasn't
11  perjuring himself.
12      Q.   Overall do you consider
13  Mr. Bankman-Fried to be a credible witness?
14          MR. PROULX:  Objection to form.
15      A.   I -- I -- I haven't formed any
16  views as to that.
17      Q.   You don't have a view on whether a
18  multiple time perjurer could be considered a
19  credible witness?
20          MR. PROULX:  Objection to form,
21      assumes facts not in evidence.
22      A.   I -- as I said, when we started
23  this discussion, I don't think that someone
24  has got form for perjury the mere fact that
25  they have been found to have committed

1          R.S. LEVY
2  perjury on one or multiple occasions
3  necessarily means they are lying.  I mean
4  you are left with that situation, what do
5  you ask a man who always tells a lie if you
6  are in a room which door -- which door would
7  you go to leave, I mean it is a famous --
8      Q.   Sure, okay.
9          So we spoke a bit about your
10  additional opinion with regard to whether or
11  not FTX would have absorbed a loss, is that
12  fair?
13      A.   Yeah.
14      Q.   Do you have any other paragraphs
15  in the Atherton report, the rebuttal report
16  that have caused you to reach an additional
17  opinion?
18      A.   Well, there is a -- there was
19  another point on paragraph 51 if I may and I
20  am sorry to go back to it, but Mr. Atherton
21  there -- yeah, you see, about halfway down
22  that paragraph, any transaction involving
23  digital assets -- should I read it out?
24      Q.   If you could just read that
25  sentence specifically?

1          R.S. LEVY
2      A.   Should I read it out for the
3  benefit of the short hand writer?
4      Q.   If you can just read that
5  sentence.
6      A.   Any transactions involving digital
7  assets are only potentially relevant in the
8  present context (insofar as they are
9  relevant at all) to an assessment of the
10  possible quantum of the claim for damages
11  for any breach of contract on the part by --
12  on the part of, sorry, FTX, by reason of its
13  refusal or inability to deliver digital
14  assets to 3AC upon a request for such
15  delivery by 3AC.
16          Now, there are a couple of points.
17  The first point is I think Mr. Atherton -- I
18  won't say has ignored, but has certainly
19  missed the point, that insofar as 3AC had a
20  chose in action, which is the conclusion
21  that I have reached in relation to its
22  digital assets, then whether or not it has
23  got a cause of action for damages for breach
24  of contract is irrelevant, it is irrelevant
25  to the nature of the chose in action or the

1          R.S. LEVY
2  relief available for -- under the chose in
3  action.  And I dare say we will come on that
4  later.
5          But he also refers to the possible
6  quantum of a claim for damages.  And in
7  relation to that, it seems to me to be an
8  open question upon which I would want to
9  give more thought.  And I don't think it is
10  a point that either Mr. Atherton or I have
11  addressed as to well, what is the quantum of
12  damages for a -- for a preference claim.
13  Will damages be measured solely at the date
14  by reference to the values on the date of
15  the preference, what is the position if in
16  the meantime the assets that were subject to
17  the preferential transaction have increased
18  massively in value.
19          And by analogy to the assessment
20  of damages for breach of contract, it seems
21  to me that there is an argument that damages
22  might be -- could well be, in fact, but
23  let's not go higher than that, assessed by
24  reference to the values as of the date of
25  the determination of the issue relative to

Page 34

1              R.S. LEVY
2  the date of the preferential transaction.
3        And then finally --
4        Q.  If we could just ask a few
5  questions about that specific opinion
6  unless -- unless you were going to elaborate
7  on that particular -- were you going to
8  elaborate on that particular opinion?
9        A.  No, I don't think so.
10       Q.  Okay, before we move on?
11       A.  Yes.
12       Q.  So are you offering an opinion
13  on whether the quantum of damages is by
14  reference to present value or are you not
15  offering the opinion?
16       A.  I am not offering an opinion.  But
17  the same what Mr. Atherton has said, that
18  neither of us have focused on issues of
19  quantum.  But Mr. Atherton mentions quantum
20  there, it seems to me, and this was the
21  point I was actually arguing in the Virgin
22  Islands last year, no judgment on that.
23       But it seems to me there is an
24  argument that insofar as section -- sections
25  249 and 250 of the BVI Insolvency Act are

Page 35

1              R.S. LEVY
2  designed to offer, quote-unquote,
3  restorative justice, if the justice of the
4  case meant that damages should be assessed
5  other -- other than at the date of the
6  preferential transaction, then the court
7  might consider doing that. that's just a --
8  I am not offering an opinion.  That's a
9  matter that I would want to consider
10  further.
11       Q.  So is the question that you are
12  referencing there whether the court should
13  consider awarding the present day value of
14  digital assets, is that a fair summary of
15  that question?
16       MR. PROULX:  Objection to form.
17       A.  Not -- not -- not present day
18  as -- as of today, but as of the date of the
19  determine -- the judgment, yes.
20       Q.  So a future date when this case is
21  resolved?
22       A.  Yes, or it may be.  If there is --
23  there is -- there is some other date the
24  court finds to be preferential for whatever
25  reasons, once the point is argued out.

Page 36

1              R.S. LEVY
2        Q.  Understood.  So I had stopped you,
3  do you have any other additional opinions
4  you would like to discuss?
5        A.  Yes, there is one that I would
6  consider a tittle, which is English for
7  small point.
8        Q.  That's a new one for me?
9        A.  Sorry.  It is a small point.
10  Paragraph 10, if I may.
11       Q.  Sure?
12       A.  I think it is paragraph -- it is
13  where Mr. Atherton -- Mr. Atherton -- oh,
14  yes, it is paragraph 10 where
15  Mr. Atherton -- so if you see there, he says
16  that I haven't addressed the issue raised in
17  his original declaration relating to the
18  lack of clarity and lack of particularity
19  for which the articulation of the BVI claims
20  in the POC -- I think he might mean APOC,
21  but nothing turns on that -- suffers.  And
22  he is correct that I didn't address his lack
23  of particularity points.
24       I could go into this further.  But
25  as a general proposition, I had understood

Page 37

1              R.S. LEVY
2  that the lack of particularity allegations
3  related to the way the case had been brought
4  in the amended particulars of claim, which
5  is a pleading or a statement of case, as we
6  would call it.  I don't know what you call
7  it in the States, but a pleading or
8  statement of case in proceedings in the --
9  is it the US Federal Court in Delaware or
10  whatever.  And so I had -- I had understood
11  his allegations or his accusations to relate
12  to that document.
13       To the extent that that's correct,
14  then it is not for me to tell you as lawyers
15  how they should plead their case in the
16  United States.  I haven't got the faintest
17  idea I think how I would properly plead or
18  comply with the laws of pleading in the
19  United States.
20       If in fact his complaint is that
21  if one took the amended points of claim and
22  pasted them into a document with a court
23  heading in the High Court of Justice in the
24  Commercial Division of the Virgin Islands,
25  then the pleading was so hopeless that the

10 (Pages 34 - 37)

Page 38

1           R.S. LEVY
2   court would on the application of FTX strike
3   it out, I fundamentally disagree with that
4   as a proposition.  And I can explain my
5   reasons for that, if you are interested.
6       Q.   Do you have that same conclusion
7   with respect to each of the BVI law claims
8   that were stated in the proof of claim?
9       A.   Yes, I don't -- I don't believe
10  that the BVI law -- sorry, that the BVI
11  Court would strike all or any of the APOC
12  commended points of claim for lack of
13  particularity or failure to state a case.
14      Q.   Okay.  So while we are on the
15  topic of Mr. Atherton's rebuttal, are there
16  any other paragraphs or portions of Mr.
17  Atherton's rebuttal that have caused you to
18  reach an additional opinion not set forth in
19  your original declaration?
20          MR. PROULX:  Objection to form.
21      A.   From memory, no.
22      Q.   Did you write your declaration?
23      A.   Yes.
24      Q.   Did you write all of it?
25      A.   It went through a drafting

Page 39

1           R.S. LEVY
2   process.  I started with pretty much a
3   complete first draft.  As you may have
4   gathered, I have been assisted by a junior
5   in my chambers, Mr. Kokelaar.  And I have
6   spoken at length with Mr. Kokelaar on
7   occasions.  And asked Mr. Kokelaar to do
8   some research for me.  He would then feed
9   the answers to me and I will -- and I put
10  them into the report.  At some stage I asked
11  Mr. Kokelaar to tidy it up and possibly
12  insert his -- and -- and -- and insert any
13  additional materials.  He doubtless did so,
14  and I would have checked that I agreed with
15  everything that he had to say.
16          It then went through a further
17  drafting process, but that may be
18  privileged, I don't know.
19      Q.   So without asking about the
20  substance of any comments, did Latham &
21  Watkins review and provide comments to you?
22      A.   Yes.
23          MR. PROULX:  With the caveat that
24  I don't understand counsel to be asking
25  about the substance of any

Page 40

1           R.S. LEVY
2   communications you may have had with
3   Latham & Watkins, you can answer that
4   question.
5       A.   Yes.
6       Q.   Please go ahead, sorry, was yes
7   your answer?
8       A.   Yes was my answer.
9       Q.   Okay, thank you.  So you are
10  presently a King's counsel; correct?
11      A.   I am.
12      Q.   Are you based in England?
13      A.   How do you mean?
14      Q.   Is that where you go to work every
15  day?
16      A.   I go to work in my basement.
17      Q.   Where is your basement?
18      A.   Underneath my home, in the
19  basement of my house in London.  But I also
20  have a house in France where I spend
21  probably more nights a year than in London.
22      Q.   Oh, nice?
23      A.   But the basement, my office is in
24  the basement in France.
25      Q.   Okay.  Have you ever been based in

Page 41

1           R.S. LEVY
2   the BVI?
3          MR. PROULX:  Objection to form.
4       A.   I don't quite understand.  Have I
5   ever -- have I spent extensive periods of my
6   life in the BVI, the answer is yes.  Could I
7   say I ever lived in the BVI, the answer is
8   no.
9       Q.   Are you still a member of the Bar
10  of the Eastern Caribbean?
11      A.   Yes, I am.
12      Q.   And that is the Bar that applies
13  to the BVI?
14      A.   Well, each of the territ -- the
15  Eastern Caribbean Supreme Court is a
16  jurisdiction comprised of, I think, nine
17  territories.  So you have the BVI, Anguilla,
18  St. Lucia and various others.  And each of
19  those has their separate requirements for
20  admission to the Bar.
21          I am a full-time member of the Bar
22  of the British Virgin Islands.  Likewise,
23  Anguilla and likewise, St. Vincent's, but I
24  confess I have done very little work in
25  St. Vincent.

11 (Pages 38 - 41)

R.S. LEVY

1
2      Q.  Great.
3          How many times have you appeared
4  as an advocate in the case in the BVI?
5      A.  I would say countless.  I can't --
6  I think I said it in my report.  I could
7  probably go through old passports and try to
8  rejuvenate hard drives that I have removed
9  from computer since 2003.  But I would say I
10 have been -- I have appeared in court in the
11 BVI on at least -- on at least -- well, I
12 would say I have been to the BVI on at least
13 75 occasions, at least 75 occasions since I
14 was called.  I was called, I think,
15 September 2003.  And for many years when I
16 was doing -- involved in a couple of very,
17 very large cases, a case called APOC and
18 another one called Chukwueloka which were
19 very high-valued commercial disputes, I was
20 traveling there I would say at least eight
21 times a year, regular appearances at first,
22 and since then in the Court of Appeal.
23     Q.  Did you provide your curriculum
24 vitae with your declaration?
25     A.  Well, I put together a CV for

R.S. LEVY

1
2  purposes of my declaration.  I don't keep
3  and maintain a CV.
4      Q.  And you provided your declaration
5  on October 21; correct?
6      A.  If that's the date of it, yes.
7      Q.  Would the CV provided on that date
8  remain accurate today?
9      A.  Well, I am not sure in fairness to
10 you that the CV I -- I provided was accurate
11 then.  It was not fully complete.  There
12 were a number of omissions from -- from
13 that.  Not for any particular reason, other
14 than the fact that I don't maintain a CV.  I
15 don't maintain a CV because I am not looking
16 for work.  I don't tout my work -- my
17 services around people.  They either come to
18 me or they don't.  And I am not really
19 (unintelligible) whether they do.
20         But there is -- there is one very
21 big case called Akhmedov and Akhmedova, for
22 instance which was a Section 423 case in the
23 U.K. that went on for three weeks which was
24 a claim, a very nasty claim brought by the
25 ex-wife of a Russian oligarch, who -- who

R.S. LEVY

1
2  was a beneficiary of what was at one time
3  Britain's largest divorce settlement, 465
4  million pounds.  And her husband, despite
5  traveling the world on a yacht that was
6  bought from I think Roman Apanovich
7  (phonetic) or someone, didn't pay her a
8  penny.  And she was miffed by that.  And she
9  discovered that her husband had paid
10 $120 million to their son who she wasn't on
11 good terms with.  And took proceedings
12 against the son under Section 423 and was
13 successful, got paid from the son in that
14 case. so that's a big Section 423 case which
15 seems to be -- then there are a couple.
16     Q.  I will submit that we don't need
17 you to review all of the cases that are not
18 on your CV, if that's what you are planning
19 to?
20     A.  Yeah, well, there are a number of
21 commercial insolvency cases, the appearances
22 of Privy Council are not on my CV.
23     Q.  When you said it was not accurate,
24 you meant it could have been longer?
25     A.  It could have been a lot longer.

R.S. LEVY

1
2  And I also wouldn't have included all the
3  spiel about what various directors --
4  directors said about me.  But I saw
5  Mr. Atherton put in pages of that.  So I
6  thought I better do that.
7      Q.  Sure.
8      A.  And there were other acclimations
9  relating to recommendations, since filing
10 this report I have been recommended in Band
11 1 for offshore work by Legal 500.
12     Q.  Congratulations.
13         Your CV states that you specialize
14 in commercial and chancery matters?
15     A.  Yes.
16     Q.  Does that relate to insolvency
17 directly?
18     A.  Yes, many, if not most of my cases
19 relate to insolvency.  So for instance, HQP
20 was a big insolvency case, is it a big
21 insolvency case, whether particular types of
22 creditors can prove for particular types of
23 losses in an insolvent liquidation.
24     Q.  So you mentioned in your CV that
25 you are an acknowledged expert on BVI law --

Page 46

1          R.S. LEVY
2     A.  Yeah.
3     Q.  -- do you consider that correct?
4     A.  Yes, I do.
5     Q.  Speaking specifically in reference
6  to the BVI, who has acknowledged you as an
7  expert?
8     A.  I refer to the decision in Emerald
9  Bay where it was acknowledged.
10        MR. PROULX:  Counsel, for the
11     record, the document you have handed us
12     I believe as Levy 1, appears to be
13     incomplete insofar it is excerpted or
14     omitted a CV you are asking about now.
15     I just need to put that on the record.
16        MR. DARBY:  Yeah, counsel, it is
17     his declaration, it is complete.  If
18     you would like to look at your CV, I
19     will show it to you but I am done with
20     the CV after this one.
21     A.  I don't think I need to see who
22  has acknowledged it.  It was acknowledged in
23  the Emerald Bay case.  That was a case
24  relating to a -- the right of directors of
25  BVI companies to seek indemnities from the

Page 47

1          R.S. LEVY
2  company.  That was quite an important case.
3  And the fact that for better or for worse I
4  have been -- I have sat in the Court of
5  Appeal of the Eastern Caribbean Supreme
6  Court hearing -- my services were requested,
7  I suspect only in relation to appeals from
8  the Commercial Court.  I have been asked on
9  other occasions but I haven't been able to
10  for a variety of reasons.
11        But I think that speaks to the
12  fact that that not only have I been on that
13  one occasion acknowledged as being an
14  expert, by the people who are really are the
15  experts, such as the former chief justice,
16  Dame Janice Pereira has invited me -- and --
17  and subsequent acting chief justices have
18  invited me to do that leads me to think that
19  I can safely say that they probably think I
20  know a thing or two about British Virgin
21  Islands law.  And I am sufficiently an
22  expert to sit on the Cayman's Island-- sorry
23  Virgin Island's Court of Appeal.
24     Q.  Have you ever appeared as leading
25  counsel in a contested BVI insolvency trial?

Page 48

1          R.S. LEVY
2     A.  Contested BVI insolvency trial.
3  What do you mean by insolvency trial?
4     Q.  A trial with respect to claims
5  under the BVI Insolvency Act.
6     A.  I have appeared as leading counsel
7  in cases in which we are seeking the winding
8  up of BVI companies, yes.
9     Q.  And that was a contested trial?
10     A.  Yes.
11        MR. PROULX:  Objection to form.
12     Q.  Which -- case was that?
13     A.  Xi Jinping.
14     Q.  Do you mind saying that one again?
15     A.  Jinping, J-I-N-P -- it may be
16  under those Peak Hotels.  That was very
17  contested.  That went off to a Hong Kong
18  arbitration which -- following which we put
19  the company into liquidation.
20     Q.  Have you ever acted as an expert
21  witness in a U.S. proceeding?
22     A.  Yes, I have.
23     Q.  In what case?
24     A.  I provided a draft expert report
25  in a case, I think in New Jersey, called is

Page 49

1          R.S. LEVY
2  it Bitfi, something -- something of that
3  nature.  But I would imagine that's probably
4  privileged.  I would be uncomfortable
5  talking about the details of that.
6     Q.  It -- it was never filed?
7     A.  Sorry?
8     Q.  Was the expert report that you
9  drafted ever filed with the court?
10     A.  It was -- it was -- if I am -- if
11  I am permitted to say what it is, I provided
12  a very early draft of what would have become
13  or would have turned into doubtless with
14  substantial variation, a full expert report.
15     Q.  Did you -- strike that.
16        You testified earlier that you
17  have not been deposed before; right?
18     A.  Yes.
19     Q.  And so you obviously weren't
20  deposed in that case?
21     A.  No.
22     Q.  Did you testify in court in that
23  case?
24     A.  No, no.
25     Q.  Do you know what happened to that

13 (Pages 46 - 49)

Page 50

1                R.S. LEVY
2  case in terms of the outcome?
3      A.  No.
4      Q.  Is it still going?
5      A.  If it is, I haven't been told
6  about it.  They have sacked me.
7      Q.  Sure.
8          All right, and have you ever
9  testified in a U.S. court before in any
10  case?
11     A.  No.
12     Q.  Have you ever acted as an expert
13  on BVI law in proceedings in another
14  jurisdiction besides the BVI -- besides the
15  BVI?
16     A.  From recollection I have provided
17  an expert report for use -- on BVI law, for
18  use in a Hong Kong arbitration on issues of
19  BVI law.
20     Q.  Were those insolvency issues?
21     A.  To be honest, I -- I -- I can't
22  remember.
23     Q.  Do you know if that report was
24  filed publicly anywhere?
25     A.  No, I don't.  I assume it wouldn't

Page 51

1                R.S. LEVY
2  have been, because it was in an arbitration
3  and secrecy and confidentiality is the very
4  essence of arbitrations.
5      Q.  Sure.  Have you ever had an expert
6  opinion excluded by any court?
7      A.  Excluded, meaning what, sorry?
8      Q.  Meaning they declined to take your
9  opinion under advisement?
10         MR. PROULX:  Objection.
11     A.  Sorry, again, we are talking
12  different languages.  But they rejected my
13  evidence, said my evidence was wrong?
14     Q.  Either wrong or that you were not
15  qualified to give it or that for whatever
16  reason it would not be brought into
17  evidence?
18     A.  No, no, sorry.
19     Q.  Fair enough I expected the
20  procedure was different?
21     A.  We do the same thing, we just talk
22  a different language.
23     Q.  Do you have any prior experience
24  as an advocate in a case pertaining to
25  cryptocurrency?

Page 52

1                R.S. LEVY
2      A.  As an advocate, no.  But I
3  regularly provide advice in relationship to
4  cryptocurrency to a security -- to a very
5  large security trustee in the United Kingdom
6  when they are taking security over digital
7  assets.
8      Q.  And who is that client?
9          MR. PROULX:  You can answer if you
10  don't understand the identity of the
11  client to be subject to any privilege
12  or confidentiality or court orders.
13         THE WITNESS:  It is not subject to
14  the court order.  I am just reluctant,
15  because I am not sure that my client
16  would want me to say who they are.
17  They are a very substantial outfit.  I
18  suspect it is privileged.
19         MR. PROULX:  If we need to
20  consult, we could do so.
21         MR. DARBY:  To be clear, you are
22  taking the position that the identity
23  of his client is privileged?
24         MR. PROULX:  I am taking the
25  position that if he needs to consult

Page 53

1                R.S. LEVY
2  with his lawyer about whether that
3  questions is privileged or seeks
4  confidentiality, he is allowed to do
5  so.
6          THE WITNESS:  I am providing an
7  opinion either tomorrow or next Monday.
8      Q.  All right, so absent further
9  review, you are declining to identify the
10  name of a client?
11     A.  I -- if over the course of a break
12  I am able to get into touch with the
13  attorney who instructs me on those matters,
14  would it be acceptable for me to do that?  I
15  am not declining.  I am just -- I am just
16  uncomfortable as an English lawyer revealing
17  to a U.S. court who my clients are.
18     Q.  All right, we can revisit that?
19     A.  Would it be possible for me to
20  contact?
21     Q.  Yes, you may go ahead and contact
22  your client, of course?
23     A.  Thank you.
24     Q.  We are certainly not instructing
25  you or asking you to do anything with

14 (Pages 50 - 53)

1          R.S. LEVY
2  respect to your client relationship, just
3  for the record?
4     A.  Sure.
5     Q.  So have you worked on any
6  litigated cases involving cryptocurrency in
7  your career?
8     A.  Litigated cases, no.
9     Q.  Have you ever traded
10 cryptocurrency yourself?
11    A.  I do own some IBIT, which is an
12 iShares bitcoin ETF, which is traded in --
13 in the U.K.  And I also own an absolute pig
14 called AVAX.
15       Both of them, it is less than --
16 less than a tenth probably less than a --
17 less than a hundredth percent of my modest
18 portfolio.
19    Q.  Sure.  I am certainly not asking
20 about the contours of your portfolio.
21       Did you ever use the FTX Exchange?
22    A.  No.
23    Q.  Did you ever change cryptocurrency
24 on an exchange as opposed to an ETF?
25       MR. PROULX:  Objection to form.

1          R.S. LEVY
2     A.  I don't know.  I -- I -- I own a
3  bit of AVAX on Revolut, whether that's an
4  exchange, I am not sure it is an exchange.
5  I don't know.
6     Q.  Do you consider yourself an expert
7  on cryptocurrency?
8     A.  I don't consider myself an expert
9  on cryptography or trading or how they are
10 created.  But I have an understanding of
11 what cryptocurrency is as a matter of law.
12 I won't take security over it, so to that
13 extent, yes.
14    Q.  Do you consider yourself an expert
15 on how a digital asset exchange operates?
16       MR. PROULX:  Objection to form.
17    A.  On how a digital asset exchange
18 operates, no.  I am not a financial services
19 expert.  I do have my own personal
20 experience of using regular exchanges such
21 as Schwab or whatever, but nothing specific
22 to digital assets.  And I wouldn't want to
23 explain how Schwab works either.
24    Q.  Me neither.
25       Do you know who Russell Crumpler

1          R.S. LEVY
2  is?
3     A.  Yes.
4     Q.  What is your understanding of his
5  role?
6     A.  He is one of the joint liquidators
7  of 3AC.  He is an insolvency practitioner --
8  practitioner I think based in the BVI and
9  has been there for some years.
10    Q.  Have you ever worked with him
11 before this 3AC matter?
12    A.  You say with him?
13    Q.  Yes.
14    A.  I have acted in relation to many
15 liquidations in the BVI.  And Mr. Crumpler's
16 name is very familiar to me.  But I couldn't
17 pick him up from a crowd whether he has
18 actually been my instructing -- or whether
19 he has actually been the liquidator in any
20 case I have ever acted in, I can't remember,
21 because we normally get instructions from
22 instructing attorneys.
23    Q.  So you don't know if you have
24 received instructions from attorneys who
25 were acting on behalf of Mr. Crumpler?

1          R.S. LEVY
2     A.  I -- I can't remember.  It is
3  quite possible that I have.
4     Q.  You think it is possible that you
5  have acted in a capacity --
6     A.  I seem to have a recollection of
7  Mr. Crumpler sitting in back of court in a
8  hearing I was doing in a matter in November
9  of last year.  And he would have been on my
10 client's side of the proceedings, but, you
11 know.
12    Q.  Do you remember any other
13 examples?
14    A.  No.  Well, sorry, that's unfair.
15 I seem to remember, but I could be wrong, we
16 are going back some -- some years here.  I
17 seem to remember that we may -- that my
18 client, who was at Boies Schiller -- my
19 instructing client, was it Boies Schiller,
20 in the Peak Hotels case, may have consulted
21 with -- did actually consult with an
22 insolvency practitioner in -- in person in
23 the British Virgin Islands.  And that may
24 have been Mr. Crumpler, but I -- I wouldn't
25 want to risk perjuring myself in that.

15 (Pages 54 - 57)

R.S. LEVY

1
2    Q.  Can you think of any examples
3  besides those two?
4    A.  No.
5    Q.  Do you know who Christian Farmer
6  is?
7        MR. PROULX:  Objection to form.
8    A.  Sorry?
9    Q.  Christian Farmer?
10       MR. PROULX:  Objection, objection
11  to form.
12   A.  I understand Mr. Farmer is another
13  of the joint liquidators.
14   Q.  Before this 3AC, matters have you
15  ever worked with Mr. Farmer?
16   A.  His name is not familiar to me.
17  But I am bad with names, so.
18   Q.  Have you ever previously worked
19  with a matter -- excuse me -- strike that.
20       Have you ever previously worked on
21  a matter with Latham & Watkins?
22   A.  Latham & Watkins instructed me in
23  the BlockFi case.
24   Q.  What was result in the BlockFi
25  case?

R.S. LEVY

1
2    A.  To provide expert evidence of
3  British Virgin Islands law.
4    Q.  On what topics?
5    A.  From recollection it was, again,
6  on issues of preference and undervalue.
7  That's the one I mentioned a moment ago.
8    Q.  Do I have it right you testified
9  earlier that you never had a report
10  submitted to a U.S. court before; correct?
11   A.  That's correct.
12   Q.  So you had no report submitted to
13  the court in the BlockFi matter; right?
14   A.  So far as I am aware.  I would
15  certainly be very surprised if the early
16  draft finds its way into some court docket.
17   Q.  So you were engaged to provide a
18  report and that culminated with a draft
19  report, is that as far as you understand it?
20   A.  I didn't do more than provide a
21  draft report.
22   Q.  Is that the only matter in which
23  you have worked with Latham & Watkins
24  previously?
25   A.  I believe so, yes.

R.S. LEVY

1
2    Q.  Have you ever previously worked
3  with Teneo before?
4    A.  Yes, I have worked with Teneo in a
5  matter in the Cayman Islands, I believe, a
6  few years ago, the name of which escapes me.
7  But it was an insolvency matter in the
8  Cayman Islands.
9    Q.  Any other matters with Teneo?
10   A.  Not as far as I am aware that I
11  can remember here.
12   Q.  Do you have an engagement letter
13  in this matter?
14   A.  I think, yes, I have terms upon
15  which I was engaged.
16   Q.  And who engaged you?
17   A.  Latham.
18   Q.  What did you do to prepare for
19  today's deposition?
20   A.  Not sleep.
21       I read my report and read
22  Mr. Atherton's -- this was over a fairly
23  lengthy period.
24   Q.  Sure?
25   A.  I reviewed a number of the

R.S. LEVY

1
2  materials that I have been provided with and
3  had discussions with various people.
4    Q.  Who did you speak to prepare for
5  this deposition?
6        MR. PROULX:  I understand counsel
7    to be asking the identities of the
8    people you speak with, not the contents
9    of any communications you may have had
10   with counsel.
11   A.  I spoke to Mr. Kokelaar, I spoke
12  with Mr. Proulx who is on my left,
13  Mr. Crespo, and I also spoke to other
14  members at -- other attorneys at Latham.  So
15  that would have included Mr. Dan Sack, so
16  principally them.  I would also have -- I
17  had also spoken with conversations with
18  members of the legal team at Ogier in the
19  Virgin Islands.
20   Q.  So other than the folks you just
21  named, anyone else at Latham and Watkins,
22  anyone else at Ogier, did you speak with
23  anyone in preparation?
24   A.  There would have been other people
25  in the Ogier team.

16 (Pages 58 - 61)

Page 62

R.S. LEVY

1
2    Q.   Outside of the Ogier team?
3    A.   Outside, no, outside principally
4 conversations would have been with people in
5 Ogier -- sorry, in Latham and also Ogier.
6    Q.   About how many conversations did
7 you have to prepare for this deposition?
8    A.   Well, when does preparation start?
9 I mean --
10    Q.   You tell me?
11    A.   Well, I -- I -- I have spoken to
12 Ogier since I was originally instructed.
13 Sorry, not Ogier, Lathams, since I was
14 originally instructed.
15    Q.   When was that?
16    A.   I can't be certain, I -- I
17 couldn't give you a certain date.  But I
18 would imagine about six months ago,
19 something -- something like that.
20        How many conversations?  In the
21 early days, very few.  Certainly not --
22 certainly not once a week.  And on many
23 occasions possibly not once a month.
24    Q.   Why don't we focus on since your
25 report?

Page 63

R.S. LEVY

1
2    A.   Uh-huh.
3    Q.   The time period since your
4 declaration, excuse me?
5    A.   Since my declaration?
6    Q.   Yeah.
7    A.   Which was how many times have I
8 spoken to them?  Maybe by Teams, four or
9 five times.
10    Q.   All right.  So you are here today
11 offering opinions as an expert witness for
12 3AC; right?
13        MR. PROULX:  Objection to form.
14    A.   That's right.
15    Q.   Or for the Joint Liquidators?
16    A.   Right.
17    Q.   Are you testifying based on your
18 personal knowledge of any facts that
19 underlie this litigation?
20    A.   No.  I have no personal knowledge
21 of the facts underlying the litigation.
22    Q.   Are you offering testimony that
23 any particular facts are true?
24        MR. PROULX:  Objection to form.
25    A.   No.

Page 64

R.S. LEVY

1
2    Q.   So what was -- what was your
3 assignment in this matter?
4    A.   My assignment is as stated.
5    Q.   Paragraph 1; right?
6    A.   Yes.
7        MR. PROULX:  Just let the witness
8 finish his answer before continuing.
9    Q.   Go ahead, anything to add?
10    A.   Let me just read it again.  No.
11    Q.   So does paragraph 1 say that you
12 were assigned to give my opinion on certain
13 claims, the BVI claims under the laws of the
14 territory of the Virgin Islands commonly
15 known as the British Virgin Islands, the
16 BVI, made in the amended proof of claim the
17 APOC filed by the Joint Liquidators against
18 FTX Trading Ltd.
19        Did I read that right?
20    A.   You did, yes.
21    Q.   So is your declaration limited to
22 an analysis of BVI law claims?
23        MR. PROULX:  Objection to form.
24    A.   I don't know where you are going
25 with this question.  If you are going to

Page 65

R.S. LEVY

1
2 tell me that I have considered matters of
3 English law in my report, then we can see
4 how -- I am more than happy to discuss that.
5 But that English law is -- forms very much
6 part of the law of the British Virgin
7 Islands.
8    Q.   Sure?
9    A.   It is no a foreign law in the
10 sense that English law is a foreign law in
11 the United States or French law is a foreign
12 law in Italy.
13    Q.   You don't think English
14 law -- strike that.
15        Does English common law influence
16 United States law in your understanding?
17    A.   It possibly does.  But it is a
18 very clear line -- it was a long time ago,
19 sorry.  But in the British Virgin Islands,
20 but in the British Virgin Islands, the
21 English common law remains part of the law
22 of the British Virgin Islands and English
23 law.  And we can talk about English, we have
24 got different legal systems in different
25 territories of the U.K.  But broadly

17 (Pages 62 - 65)

1         R.S. LEVY
2  speaking English law forms very much part of
3  the law of the British Virgin Islands.  It
4  is exceptionally -- there is only one case,
5  and it was a case that I was involved with,
6  called Chukwueloka, it is referred to, there
7  is only one case that I am aware of that a
8  BVI court said it would be assisted by
9  hearing expert evidence of English law.  And
10  that was for a very specific reason in
11  Chukwueloka, which doesn't apply here.
12     Q.  So you have talked about English
13  common law?
14     A.  Yeah.
15     Q.  Do English statutes directly apply
16  in the BVI?
17         MR. PROULX:  Objection to form.
18     A.  Not -- not unless they are
19  directly applied.  So for instance, by
20  ordering counsel certain statutory
21  instruments made which are subordinate
22  legislation in the U.K. can apply in the
23  BVI.  And that's, in fact, certainly how it
24  certainly used to be and it probably still
25  is the case where (unintelligible) were

1         R.S. LEVY
2  regulated to Privy Council.  But you are
3  quite right, there is no direct application
4  of British statute law to the territory of
5  the Virgin Islands.
6     Q.  Okay.  So your point well taken
7  about the -- about the blend there.  I am
8  going to ask you --
9     A.  About what, sir?
10     Q.  Strike that?
11     A.  No, no, it is my deafness, it is
12  not you.
13     Q.  Do you intend to offer an opinion
14  on the existence of claims under the laws of
15  any jurisdiction besides the BVI?
16         MR. PROULX:  Objection to form.
17     A.  I don't believe I do that.
18     Q.  So you are not offering an opinion
19  on the existence of a potential English law
20  claim in this matter; is that correct?
21         MR. PROULX:  Objection to form.
22     A.  English law matter, no, I don't
23  believe I do that.
24     Q.  And you are not offering an
25  opinion on the potential existence of a

1         R.S. LEVY
2  claim under Antiguan law, are you?
3         MR. PROULX:  Objection to form.
4     A.  I don't believe I do that.  I
5  believe I am analyzing claims that could be
6  brought in the British Virgin Islands.  And
7  you are quite correct that some of those
8  claims involve my considering matters but
9  English law.  But that's what BVI courts
10  routinely do.  And it is not really a
11  foreign law as such.  See what Justice Jack
12  cited in one of the footnotes I refer to.
13  And likewise, likewise it comes to Antiguan
14  law, because it is all part of the same
15  circuit.
16     Q.  Sure.  Is it fair to say your
17  answer is that you have considered English
18  law issues because you think they influence
19  a determination of BVI law?
20         MR. PROULX:  Objection,
21     mischaracterizes the testimony.
22     A.  I am sorry, can you repeat the
23  question.
24     Q.  Yes.  Is it your testimony that
25  you considered English law issues to the

1         R.S. LEVY
2  extent that they affect BVI law?
3     A.  Yes.
4         MR. PROULX:  Objection to form.
5     A.  Yes, I -- I -- I had to consider
6  the question of, for instance, whether -- I
7  might have got them wrong in the answer,
8  forgive me, whether FTX was a creditor.  And
9  in that context I considered an English law
10  governed document namely the terms of
11  service.  But that is just to determine
12  whether as a matter of BVI law FTX was a
13  creditor of 3AC.
14     Q.  So with respect to a right created
15  by the terms of service, are you offering
16  testimony on the meaning under English law?
17         MR. PROULX:  Objection to form.
18     A.  I am saying that as a matter of
19  BVI law, FTX was a creditor of 3AC.  And
20  the -- and the way in which one arrives at
21  that conclusion, the way at which I arrived
22  at that conclusion, is by considering as a
23  matter of English law, as -- as --
24  considering a English law governed document.
25     It -- it seems to me that it is

Page 70

```
 1          R.S. LEVY
 2  impossible to say that one is an expert in
 3  BVI law without being an expert in English
 4  law.
 5      Q.  Sure?
 6      A.  Because the two -- the two go hand
 7  in hand.  And it is artificial to say -- it
 8  is -- it is somewhat artificial to say are
 9  you giving an opinion on English law because
10  it is somehow a foreign law.  That's not how
11  the BVI court system works.
12      Q.  Sure.  So to clarify my question,
13  I am not asking whether you understand
14  English law, I am not asking whether English
15  law has ever influenced BVI law?
16      A.  Yeah.
17      Q.  The first question are the terms
18  of service governed by BVI law?
19      A.  They are, yeah.
20          Sorry, the terms of service,
21  sorry, no, the terms of service are governed
22  by English law.
23      Q.  No problem?
24          MR. PROULX:  When you say terms of
25      service, counsel, which document are
```

Page 71

```
 1          R.S. LEVY
 2  you referring to?
 3      Q.  Do you know what I am referring to
 4  when I say the terms of service?
 5      A.  Yeah, the May 22.
 6      Q.  I am referring to the May 22 terms
 7  of service?
 8      A.  It helps if you just say terms of
 9  service.  Unless -- unless you or I say it
10  is something other than the May 22, I am
11  happy to go with it.
12      Q.  That absolutely works for me.
13          So are you offering an opinion in
14  this matter on the meaning of the terms of
15  service under English law?
16          MR. PROULX:  Objection to form.
17      A.  I am offering an opinion that the
18  Virgin Islands Court would conclude that as
19  a matter of Virgin Islands law FTX was a
20  creditor of 3AC.  The way the court -- the
21  way the Virgin Island Courts gets there is
22  by considering the terms of service and
23  construing them as a matter of English law.
24          So it is answering a Virgin
25  Islands question or determining a Virgin
```

Page 72

```
 1          R.S. LEVY
 2  Islands question by reference to a necessary
 3  consideration of English law.
 4      Q.  Are you offering any opinion on
 5  whether the terms of service created a
 6  particular proprietary interest for FTX
 7  customers?
 8          MR. PROULX:  Objection to form.
 9      A.  For FTX customers generally?
10      Q.  Sure, let's start there.
11      A.  Well, no, as you know, if one
12  looks at -- where is it?  Paragraphs --
13  there are certain assumptions that I am
14  asked -- I don't know when we finish this
15  line of questions would be an appropriate
16  moment for just a two-second break.
17      Q.  Why don't we go for a couple of
18  minutes and then absolutely?
19      A.  Absolutely, if that's convenient
20  with you.
21      Q.  Sure?
22      A.  There are certain assumptions that
23  I was asked to draw which appears in
24  paragraph 27.  Those are matters of English
25  law that I was asked to assume.  And I think
```

Page 73

```
 1          R.S. LEVY
 2  those are probably a result of the opinion
 3  of Dame Elizabeth Gloster.
 4          I do offer my own independent
 5  opinion, as you know, in relation to the
 6  effect of paragraph 10.1.3 on the terms of
 7  service and what that -- I am sorry, not
 8  10.1.3.
 9          8. -- is it 8.2.6 -- 8.2.3 or the
10  provision which says that you own and you
11  can direct -- let me just get there.
12          If you got the terms of service
13  there, if you are going to take them to me.
14      Q.  We will discuss them at length?
15      A.  If you want to test my memory.
16      Q.  We are not testing your memory?
17      A.  It would just speed things up for
18  you.  Is it 8.2.3?  Anyway the provision
19  that says that the customer can direct what
20  should become -- what should be done with
21  its digital assets, that clause.  And I do
22  offer an opinion as to the consequences of
23  that and that necessarily involves a
24  consideration of what that clause means as a
25  matter of English law to reach a Virgin
```

Page 74

1          R.S. LEVY
2  Islands conclusion that a chose in action
3  was created as a matter of Virgin Islands
4  law.  But again, there is nothing surprising
5  there, it seems to me or confusing about the
6  fact that I am considering matters of
7  English law, because that's what is
8  routinely done.  If you look at any Cayman
9  Islands -- not any, but if you look I would
10  imagine 95 if not more percent of the
11  judgments of the Commercial Court of the
12  Cayman Islands or appearance to the Court of
13  Appeals from the Commercial Court of the
14  Cayman islands, probably also the other
15  courts the high court, they will be replete
16  with references to English authority.
17      Q.  So let me ask it a different way?
18      A.  Sure.
19      Q.  You mentioned paragraph 27 here.
20  Do you characterize that as an assumption
21  that you were given?
22      A.  I think that's under the -- yes,
23  it is under the heading in Roman 3 that
24  starts on page 4, instructions and
25  assumptions.

Page 75

1          R.S. LEVY
2      Q.  So are you offering a view on
3  whether paragraph 27 is accurate?
4      A.  No, I assume that it is.  But it
5  has rather good providence.
6      Q.  And so if the terms of service are
7  governed by English law, is the question of
8  whether those terms of service created any
9  proprietary interest a question that is
10  governed by English law?
11      MR. PROULX:  Objection to form.
12      A.  It is a question whether those
13  terms of service the -- the -- the
14  nature of the proprietary interest that is
15  created would be determined by a BVI court
16  considering matters of English law.
17      I mean, I think it is a bit of a
18  distinction without a difference here, if I
19  may.
20      Q.  Are you offering an opinion on
21  whether the terms of service created a
22  proprietary interest under English law?
23      MR. PROULX:  Objection, asked and
24  answered.
25      A.  I -- I am offering an opinion that

Page 76

1          R.S. LEVY
2  a Virgin Island Court would find that that
3  relevant provision, whichever it is, 8 point
4  whatever, created a chose in action, which
5  is a form of property interest as a matter
6  of Virgin Islands law, just as it would be
7  in English law.
8      Q.  Is a chose in action different
9  than a trust?
10      A.  Yes.
11      Q.  Have you offered an opinion on
12  whether a trust was created under English
13  law?
14      A.  No, I haven't.  I think I was
15  asked to assume that the type of trust that
16  is mentioned in paragraph 27 which is one of
17  my assumptions.  If you see on the top of
18  page 8, four lines down, I am further
19  instructed in legal tile in respect of those
20  digital assets vested in FTX for the purpose
21  of FTX holding them as trustee.  So if there
22  is a trustee, there is by necessity a trust.
23  But that's not my independent opinion.
24  That's an assumption that I have been asked
25  to make.

Page 77

1          R.S. LEVY
2      Q.  Are you offering an opinion on
3  whether the terms of service created a
4  bailment under English law?
5      A.  No, I am not.  That's an
6  assumption, again, in that second part of
7  paragraph 27.
8      Q.  Have you read the declaration of
9  Dame Elizabeth Gloster?
10      A.  Some time ago.
11      Q.  What is your understanding of the
12  scope of her analysis?
13      MR. PROULX:  Objection to form.
14      A.  Of the scope of it.
15      Q.  What topics did she address?
16      MR. PROULX:  Objection to form.
17      A.  Well, she -- she addressed those
18  topics of the controversy between her and
19  Lord Neuberger, N-E-U-B-E-R.
20      Q.  Did you conduct the same analyses
21  yourself that Dame Elizabeth Gloster
22  described having conducted in her report?
23      MR. PROULX:  Objection to form.
24      A.  I can't sitting here recall what
25  that analysis is.  Did I conduct -- if it is

20 (Pages 74 - 77)

Page 78

R.S. LEVY

1          R.S. LEVY
2  the analysis that resulted -- let's assume
3  the assumptions that I was asked to -- that
4  I was instructed to make -- are -- are those
5  in paragraph 27, the two assumptions one
6  being the trust, the other being quasi
7  bailment, I didn't conduct any analysis.
8      Q.  So are you relying on Dame
9  Elizabeth's Gloster's analysis with respect
10  to rights created by English law?
11      MR. PROULX:  Objection to form.
12      A.  I am not relying on Dame
13  Elizabeth's analysis.  I am told to assume
14  the options in paragraph 27.  I understand
15  that I am told to assume that is correct.
16  Certainly that's what 3AC is going to be
17  arguing in the course of these proceedings.
18      MR. PROULX:  Is now a good time,
19  Sam.
20      MR. DARBY:  One more question.
21      MR. PROULX:  Sure.
22      Q.  Are you offering any opinion on
23  whether 3AC had a breach of contract claim
24  under English law?
25      MR. PROULX:  Objection to form.

Page 79

1          R.S. LEVY
2      A.  I think -- I am not sure that I
3  specifically addressed a breach of contract
4  claim under English law in my -- in my
5  opinion, I don't believe I do.
6      Q.  Okay, and you are not intending to
7  now?
8      A.  No, I am not intending to.
9      MR. DARBY:  Okay, if you would
10  still like a break, I am happy to.
11      THE WITNESS:  Do you mind?
12      MR. DARBY:  No.
13      THE WITNESS:  Thank you.
14      MR. DARBY:  We will wait for them
15  to tell us the time and go off the
16  record.  There is a little bit of
17  formality to it.
18      THE WITNESS:  But in relation --
19      MR. DARBY:  We will take us off
20  the record.
21      THE VIDEOGRAPHER:  The time is
22  10:42 a.m.  We are going off the
23  record.
24      (Whereupon, a short recess was
25  taken.)

Page 80

1          R.S. LEVY
2      THE VIDEOGRAPHER:  The time is
3  11:00 a.m.  We are going back on the
4  record.
5      Q.  All right, Mr. Levy, do you recall
6  a discussion about additional opinions you
7  had reached since your declaration?
8      A.  Yes.
9      Q.  I just have a few clarifying
10  questions on that.
11      So you testified about additional
12  opinions you had reached upon reading
13  Mr. Atherton's rebuttal declaration;
14  correct?
15      A.  Yes.
16      Q.  Aside from additional opinions you
17  have in response to that, are there any
18  other additional opinions you have reached
19  since your declaration?
20      MR. PROULX:  Objection to form.
21      A.  None that spring to mind.  But
22  that was -- I did have a number to remember
23  until you kindly handed me the document so I
24  could refresh my recollection.  None that
25  spring to mind.

Page 81

1          R.S. LEVY
2      Q.  Did you review any new cases since
3  you submitted your declaration in October?
4      A.  I reviewed certainly from -- to
5  the best of my recollection, certainly two
6  new materials.  The first was the -- the
7  first three, actually, the first was the
8  extract from Guest On Assignment that I
9  referred to which speaks of the nature of a
10  chose in action.  That refers to the
11  decision of Lord Hoffmann in the investors'
12  compensation scheme case.
13      Now I -- I didn't for purposes of
14  my review go back to see whether either Lord
15  Neuberger or Steven Atherton or Dame
16  Elizabeth or anyone else have referred to
17  the investors' compensation scheme case.
18      I imagine one or more of them
19  would have done, because it is a fame --
20  famous, it is an often cited case dealing
21  with the principles of contractual
22  construction in the U.K.
23      But I didn't look at it in any of
24  their reports or what they said about it or
25  find it any bundles of their reports as

R.S. LEVY

1
2 well.  I just looked at it either on Lexis
3 or Westlaw to confirm that he did say at
4 paragraph 915, what Guest said, what Lord
5 Hoffmann said about chose in action, the two
6 things, but one being an offspring of the
7 other.
8        And the other document that I have
9 looked at, again, not a case, but a -- an
10 authority, an academic work, which is Durham
11 on set-off, which I think was actually put
12 to Mr. Atherton in his deposition.
13       And I looked again, I looked at
14 that.
15    Q.  Okay.
16    A.  But there may have been other
17 things.  Those things -- sorry, those things
18 spring to mind.
19    Q.  Understood.  Are you finished with
20 that, I didn't mean to cut you off there?
21    A.  Yes, absolutely.
22    Q.  So when you provided your
23 declaration, you also provided an annex that
24 listed authorities, legal texts and
25 publications that you considered; correct?

R.S. LEVY

1
2    MR. PROULX:  For the record, the
3    declaration that has been provided as
4    marked.  That exhibit omits that annex
5    with the references.
6    Q.  So Mr. Levy sitting here today, do
7 you recall any other legal authorities,
8 texts or publications that you relied that
9 would not have been on that list?
10    A.  No.  That's not to say that there
11 weren't any.  I suppose it is possible,
12 because I would have looked at things, but
13 those were the documents that I -- that I
14 say -- in paragraph -- sorry, I am looking
15 to see what I said in my report.
16    Q.  I can direct you to the end of
17 paragraph 4, if that helps you?
18    A.  Sorry, thank you very much.  Yes,
19 those are the documents that I considered as
20 relevant.  Since then I have considered a
21 couple of other things.
22    Q.  So there is nothing material that
23 you are aware was left off is my question?
24    MR. PROULX:  Objection to form.
25    A.  No.

R.S. LEVY

1
2    Q.  Okay.  In annex 2, that was the
3 list of the documents that you considered
4 for your declaration; right?
5    A.  Well, I haven't got annex 2.
6    Q.  If you would like it, I am happy
7 to give it to you?
8    MR. PROULX:  And same note just
9    for the record.
10    A.  Well, if you are going to ask me
11 very specific things about it, then I will
12 have a look at it.
13    MR. DARBY:  Let's get tab 3.  This
14    should be marked as Levy Exhibit 3.
15    (Whereupon, annex of materials was
16    marked Levy Exhibit 3 for
17    identification as of this date.)
18    Q.  So Mr. Levy, is this the annex of
19 materials you provided with your
20 declaration?
21    A.  I have no reason to doubt the
22 document you just handed me.
23    Q.  Were these documents provided to
24 you by Latham & Watkins?
25    A.  Yes.

R.S. LEVY

1
2    Q.  Did you review all of these?
3    A.  I looked -- well, I can't -- I
4 can't say that I reviewed every page of all
5 of them.  I certainly read the entirety of
6 Mr. Crumpler's declaration.  I looked
7 through and I apologize for not knowing
8 whether it is he or she, but Su Zhu,
9 scrolled through that on-line, likewise with
10 Mr. Mosley, in greater detail Molina,
11 Bankman-Fried I looked at in greater detail.
12 And then I read fully the reports of Dame
13 Elizabeth, Justice of Appeal Webster.  And
14 Konstantinidis and Lyle I also looked at,
15 yes.
16    Q.  So did you review any documents
17 that are not listed in this annex or in the
18 body of your declaration?
19    MR. PROULX:  Objection to form.
20    A.  Yes, subsequent to this -- well,
21 for the purposes of this report, no.  If
22 that's your question, then we can leave it
23 there.  Subsequent to this I did receive and
24 look at in quite a bit of detail the report
25 of is it Mr. Schieg, Schieg.  I think it is

1          R.S. LEVY
2    S-C-H-I-E-G.  I looked at Schieg.
3          And I was also supplied with, as I
4    think I said earlier, the declarations of
5    the witnesses who had -- who had been
6    deposed on 3AC's side -- sorry, on FTX side.
7    So Lord Neuberger and Mr. Atherton, King's
8    Counsel.  And I think that's it, there may
9    have been others.
10    Q.    Did you review any trading data in
11    this matter?
12         MR. PROULX:  Objection to form.
13    A.    So independent documents?
14    Q.    Yeah, did you review a
15    spreadsheet?
16    A.    No.  I saw the reports -- I looked
17    at the reports of Mr. Konstantinidis and
18    Mr. Lyle.  But insofar as far as they had or
19    exhibited, I don't recall any exhibits that
20    they were.  I am not sure, I certainly
21    didn't look at them.  I haven't looked -- I
22    don't think I have looked at a single
23    spreadsheet for purposes of this case or
24    page of data or code, because none of that
25    would really mean a great deal to me.

1          R.S. LEVY
2    Q.    Understood.  So you could put that
3    to the side.  I won't be asking about that
4    any longer.
5          All right.  So I think at the
6    break we were discussing the assumptions
7    that you were asked to make as part of your
8    declaration; right?
9    A.    Yes.
10    Q.    So if you look at the report that
11    is Exhibit 1, I will direct you to paragraph
12    12 through 13, and we will go through a few
13    of those?
14    A.    I am sorry, we will go through
15    those.
16    Q.    Yeah, I will ask specific
17    questions.  All right, and so the section 3
18    is entitled instructions and assumptions;
19    correct?
20    A.    Yes.
21    Q.    And these instructions and
22    assumptions were given to you; correct?
23    A.    Yes.
24    Q.    So you are not offering an opinion
25    on the accuracy of any of these assumptions;

1          R.S. LEVY
2    correct?
3          MR. PROULX:  Objection to form.
4    A.    Well, I offer an opinion that I
5    was instructed in these terms.  But whether
6    they were -- but whether anything within
7    them was accurate or not I cannot, I cannot
8    say.  But I was told, I was told for
9    instance, paragraph 12, to assume that these
10    are the documents that I have been provided
11    with is a true and accurate copy, the point
12    made in (b) about the May 22 terms of
13    service being operative terms and that the
14    line of credit -- of the credit agreement
15    superseded the 2021 MLCA in materials
16    respects, that's what I was told.
17    Q.    Did you make any factual
18    assumptions besides those identified in your
19    declaration?
20    A.    Not so far as I am aware.  I am
21    aware, for instance, that when we are
22    talking about benefit and eating losses,
23    which I imagine we will come to, it would
24    have been to FTX's benefit to pay the
25    losses.  But I don't -- I don't make any

1          R.S. LEVY
2    factual assumptions of any significance in
3    my view.
4    Q.    Please turn to paragraph 17(a), I
5    will read it into the record, FTX customer's
6    accounts on the Exchange did not store
7    specific digital assets, but rather
8    corresponded to an electric ledger
9    maintained by FTX in which FTX recorded the
10    quantity of the digital assets, fiat
11    currency and other assets to which the
12    customer was entitled.
13         Do you see that?
14    A.    I do, yeah.
15    Q.    So sitting here today, do you have
16    any reason to question the accuracy of that?
17         MR. PROULX:  Objection to form.
18    A.    No.
19    Q.    So under this assumption, did
20    3AC's account on the FTX Exchange store
21    specific digital assets?
22    A.    Yes.
23    Q.    Under this assumption, did 3AC's
24    account on the FTX Exchange store any assets
25    at all?

23 (Pages 86 - 89)

R.S. LEVY

1    R.S. LEVY
2        MR. PROULX:  Objection to form.
3    A.  Well, as I understand it, I think
4    taking (a) without (b), and all the
5    assumptions that I was asked to make.  It
6    seems to me that what I am being told there
7    is that when a customer deposited a digital
8    asset, meaning a coin or whatever it is,
9    when a customer deposited a digital asset,
10   that for a brief period, and I think this
11   may have happened twice a day, but it
12   doesn't really matter, that for a brief
13   period was in a customer-specific wallet.
14   And that was then swept into a hot wallet.
15   And in consequence of that a ledger entry
16   for want of a better word was created, which
17   would have shown -- which would have
18   recorded that 3AC had deposited X coins and
19   had an entitlement to X coins.  Specific
20   coins, possibly not, no.
21       Q.  Is a customer account a wallet?
22       MR. PROULX:  Objection to form.
23       A.  No, I don't think a customer
24   account is a wallet.  But that is a very
25   technical point.

1    R.S. LEVY
2        Q.  Just to revisit the question, did
3    a customer account store any assets at all?
4        MR. PROULX:  Objection to form.
5        A.  It stored, as I understand it, an
6    entitlement to assets.  It stored an
7    entitlement to assets.  Because it didn't --
8    and so much is made clear by is it 8.2.6 of
9    the terms.  And also if it didn't, then what
10   on earth did the customers have?
11       Q.  Sure.  I mean I am asking about
12   the distinction between an actual
13   cryptocurrency coin or a digital asset on
14   the one hand and a number on the page on the
15   other.  So did a?
16       A.  I -- I --
17       MR. PROULX:  Is there a question?
18       MR. DARBY:  There was going to be.
19       A.  Can you tell me exactly.
20       Q.  Yeah.
21       A.  Exactly what you are talking
22   about?
23       Q.  So you are referring to
24   entitlements?
25       A.  Yeah.

1    R.S. LEVY
2        Q.  How do you store an entitlement?
3        MR. PROULX:  Objection to form.
4        A.  You store an entitlement by
5    recording on a ledger that we, the
6    Exchange -- I am not saying this is how it
7    happened.  But how do you store an
8    entitlement -- how do I store an entitlement
9    to my money in my bank?  I deposit it, and I
10   get a bank statement.  And it tells me that
11   I am entitled to X or -- X pounds or
12   dollars.
13       Q.  It is a helpful analogy.  So do
14   you understand your bank account to be a
15   room with a bunch of physical cash in it?
16       A.  No, it is not.
17       Q.  Right, so is a customer account on
18   the FTX change akin to your understanding to
19   your bank account or to the room full of
20   cash?
21       MR. PROULX:  Objection to form.
22       A.  Well, there is a room full of cash
23   or there should be a room full of digital
24   assets on the account.  So that if the
25   customer says give me three ethereum or send

1    R.S. LEVY
2    two bitcoin or lunas or whatever to this
3    specific address, that instruction would be
4    satisfied.
5        Q.  Can you turn to paragraph 17(b)?
6        A.  Of course.
7        Q.  And please feel free to read it, I
8    am going to read it into the record.
9            FTX customers could deposit
10   digital assets in fiat currency using the
11   Exchange, which was reflected in their
12   Exchange accounts.  When a customer
13   deposited fungible digital assets in this
14   manner, those assets were initially
15   segregated in customer-specific wallet
16   addresses.  However, those addresses --
17   those assets were then transferred to pooled
18   hot wallets controlled by FTX.  Those hot
19   wallets for which FTX retained the private
20   keys held on an unsegregated, commingled
21   basis the digital asset entitlements of
22   multiple customers.
23           Do you see that?
24       A.  Yes, I do.
25       Q.  And sitting here today, do you

1          R.S. LEVY
2  have any reason to question the accuracy of
3  that?
4      A.  No, I haven't been able to verify
5  that.
6      Q.  So under this assumption, did
7  digital assets deposited by 3AC remain in a
8  segregated location separate from other
9  digital assets?
10         MR. PROULX:  Objection to form.
11     A.  Sorry, did digital assets
12 deposited by 3AC remain in a segregated
13 asset separate from other customers.  The
14 answer to that is yes, read lines one to
15 four.  From what I understand, that would
16 have been for a brief period.  And then
17 lines five -- five to eight, they were then
18 transferred to hot wallets controlled by FTX
19 to which the private keys were held by FTX.
20 And those were unsegregated, commingled.
21         So they came out of the 3AC
22 separate wallet, and then were swept, poured
23 or whatever else into a larger vat or
24 whatever of digital assets.
25     Q.  So let's take a specific moment in

1          R.S. LEVY
2  time.  Do you have the understanding that
3  any digital assets remained in a segregated
4  address for 3AC at the end of the day on
5  June 12, 2022?
6          MR. PROULX:  Objection to form.
7      A.  I understand that as of the end of
8  June 12 -- I mean, I don't know what 3AC put
9  in or when.  I mean, if the question is --
10 if you assume that by the end of day any --
11 any assets that had been put in on the 12th
12 of June would have been swept, the
13 customer -- the customer-specific wallet
14 would have been swept into the pool on the
15 12th of June, then I have no reason to
16 believe that as of that -- that time,
17 assuming everything that had been put in
18 recently had been swept, that there was a
19 customer-specific wallet, no.
20     Q.  Okay.  So I will operate under
21 that assumption, but if at any point --
22     A.  I am sorry, but I think it is
23 quite specific.
24     Q.  If that becomes material to any of
25 your answers, just please clarify?

1          R.S. LEVY
2      A.  Yes.
3      Q.  So you use the word "fungible"
4  here, what does it mean for digital assets
5  to be fungible?
6          MR. PROULX:  Objection to form.
7      A.  Fungibility is the notion that in
8  relation to a particular asset or item that
9  it has no specific features and could be
10 replaced by another asset of the same
11 description.  So Heinz baked beans, I don't
12 know how they are sold by weight or
13 whatever.  But a tin of beans is a tin of
14 beans.  And if I buy a tin of beans at the
15 supermarket and it falls out or whatever, I
16 am just going to buy another tin of beans,
17 it is exactly the same.
18         And the statement here is that the
19 tokens deposited are fungible.  So one
20 bitcoin or one ethereum I am told here to
21 assume is very much like any other bitcoin
22 or ethereum.
23     Q.  So if ten bitcoin are stored in
24 the same wallet address, is it possible to
25 tell them apart?

1          R.S. LEVY
2          MR. PROULX:  Objection to form.
3      A.  I don't understand that it is
4  possible to tell them apart.  I mean,
5  whether -- whether it -- whether it would be
6  possible for a cryptographer to do so, I
7  don't know.  But the assumption that I am
8  being invited to draw here is that all these
9  coins or entitlements, all these coins are
10 swept into an unsegregated commingled basis.
11     Q.  So to your understanding, if those
12 ten bitcoins came from different sources,
13 then is it possible to tell whether a
14 specific bitcoin came from a specific
15 source?
16     A.  My understanding is that that is
17 not possible.  I am working on the
18 assumption that that's not possible as a
19 result of this.
20     Q.  Sure.
21         So this paragraph made reference
22 to private keys; correct?
23     A.  Yeah.
24     Q.  So under this assumption, did FTX
25 have possession of the digital assets that

25 (Pages 94 - 97)

Page 98

1          R.S. LEVY
2  were deposited by customers onto the
3  Exchange?
4          MR. PROULX:  Objection to form.
5      A.  Well, FTX had control of those --
6  if FTX had control of the private keys, but
7  that's not to say that it did so
8  beneficially.  And that's what I think I
9  find rather difficult about, if I may say,
10  FTX's analysis of this.
11          And it doesn't matter whether
12  people are putting ten dollars into the
13  machine or a billion dollars, except
14  probably people wouldn't litigate if it was
15  just $10, but the notion of control in a
16  sense of beneficial ownership, I find very,
17  very difficult.
18      Q.  So my --
19      A.  Sorry, to suggest, if it is what
20  is being suggested, that FTX had some sort
21  of beneficial ownership of it.
22          I find that very difficult.
23      Q.  So let's put aside the question of
24  beneficial ownership or a legal concept?
25      A.  Yeah.

Page 99

1          R.S. LEVY
2      Q.  Did FTX have the ability to access
3  the digital assets?
4          MR. PROULX:  Objection to form.
5      A.  Well, as a matter of fact, I don't
6  know, but certainly the assumption that I am
7  being invited to make in paragraph 17(b) is
8  that they held the private keys.  And the
9  private keys, as I understand the position,
10  would enable the key holder to access the
11  coin, deal with the coin.
12      Q.  Would that in your mind amount to
13  control over the digital assets in this
14  context?
15          MR. PROULX:  Objection to form.
16      A.  It would enable the person with
17  the active -- active keys to do presumably
18  anything it wanted with the digital assets.
19  But, and it is an important but, not to do
20  anything it wanted regardless of the rights
21  of the person that placed the digital asset
22  on the Exchange, otherwise you haven't got
23  an exchange.
24      Q.  Was there any practical impediment
25  to FTX taking digital coins out of --

Page 100

1          R.S. LEVY
2  digital assets out of a wallet?
3          MR. PROULX:  Objection, assumes
4      facts not in evidence.
5      A.  Any practical impediment taking
6  coins out of a wallet?
7      Q.  I am happy to clarify, if that was
8  confusing.
9      A.  I mean, there is no practical
10  impediment of someone taking my wallet out
11  with my pocket.  If -- if it has got the
12  keys, then it could do what it wants.
13      Q.  Right.
14      A.  But whether it is entitled to do
15  those things, that's a different question.
16      Q.  That is not the question I asked.
17  So the question on the table -- strike that.
18          Could 3AC have prevented FTX from
19  withdrawing digital assets from my wallet to
20  which FTX had the keys?
21          MR. PROULX:  Objection to form,
22      objection to the extent is assumes
23      facts not in evidence, objection to the
24      extent it seeks expert testimony that
25      is outside the scope.

Page 101

1          R.S. LEVY
2      A.  Could it have prevented 3AC --
3  not -- not in accordance with my
4  understanding of the terms of service, no.
5      Q.  So I am not asking about a
6  contractual right or a legal claim that
7  would happen if something happened, I am
8  asking physically which entity or person had
9  the ability to withdraw assets from wallets
10  assuming that FTX held the keys?
11          MR. PROULX:  Objection to form.
12      You can answer.
13      A.  You are asking that question
14  regardless of legal contractual entitlement,
15  yes?
16      Q.  Yes, I am asking as a practical
17  matter, do the keys mean you get to withdraw
18  the assets?
19          MR. PROULX:  Same objections as
20      previously stated.
21      A.  That is my understanding of the
22  nature of the keys.
23      Q.  Thank you.
24      A.  But it is -- it is a matter for
25  you where you go with that.  But to regard

26 (Pages 98 - 101)

Page 102

R.S. LEVY

1           R.S. LEVY
2  that independently from the contractual
3  rights that the contracting parties agreed,
4  I think would be somewhat dangerous.
5       Q.  So my question is not about a
6  right, it is about control.  Do you have any
7  reason to doubt that the person who holds
8  the keys has control of the digital assets
9  in the wallet?
10      MR. PROULX:  Objection to form,
11      objection to the extent it assumes
12      facts not in evidence, the same
13      objections as before.
14      A.  Do I have any reason to doubt,
15  sorry, the person who holds the keys?
16      Q.  I can re-ask the question.
17      A.  Sorry, do you mind, sorry.
18      Q.  Yeah.  Does having the keys give
19  you physical control over digital assets in
20  a wallet.
21      MR. PROULX:  Same objection, same
22      objections.  You can answer.
23      A.  It does not give you physical
24  control because.  It is not a physical
25  thing.

Page 103

1           R.S. LEVY
2       Q.  Strike the word physical?
3       A.  Does it give you control over the
4  asset, yes, it would enable the key holder
5  to do whatever it wanted -- rightly or
6  wrongly, in accordance with his contract or
7  in breach of his contract or fraudulently to
8  do whatever it wants.
9       Q.  And so does the person who has the
10  keys to a wallet have possession of the
11  digital assets in that wallet?
12      MR. PROULX:  Same exact objections
13      as before.
14      A.  Subject to the necessary changes
15  in my last answer the same must apply to
16  possession.  But possession doesn't mean
17  lawful entitlement.  A thief might be in
18  possession of my wallet.  I am not saying
19  that FTX is a thief.  But it is -- it is an
20  example that Lord Miller gives -- gives in
21  the different context in the Hunter Novelton
22  case when somebody steals his watch.  But if
23  someone steals my wallet, then they have
24  control over my wallet.  Certainly if they
25  are a lot bigger than me, they definitely

Page 104

R.S. LEVY

1           R.S. LEVY
2  got control of my wallet and they have got
3  possession of my wallet, and they can do
4  what they want with my wallet, none of that
5  would be lawful.
6       Q.  Thank you.  So please turn to
7  paragraph 17(c), the next one, and I will
8  read it into the record, but read it for
9  yourself, if you would like.
10      It says, FTX customers could also
11  acquire digital assets on the Exchange, such
12  as via trading with other customers.  When
13  they did so, the amounts and value of the
14  assets acquired were registered on FTX's
15  ledger as being associated with the
16  applicable customer's account.  But there
17  was no actual transfer of the acquired
18  digital assets to a wallet or address of
19  that customer.  Those assets too were stored
20  on an unsegregated, commingled basis in hot
21  wallets controlled by FTX.
22      Do you see that?
23      A.  I do, yes.
24      Q.  And sitting here today, do you
25  have any reason to question the accuracy of

Page 105

1           R.S. LEVY
2  that assumption?
3       MR. PROULX:  Objection to form.
4       A.  No, I don't.  I have not seen any
5  documents or code or whatever in so as far
6  as I could understand code, which I don't.
7  But I have not seen any documents to prove
8  it.  But I see where that's correct.
9       Q.  So under this assumption, did
10  trades on the Exchange caused digital assets
11  to move to a different wallet?
12      MR. PROULX:  Objection to form,
13      objection to the extent it assumes
14      facts not in evidence, objection to the
15      extent outside the scope.
16      A.  Under this assumption trades on
17  the Exchange with other customers would not
18  cause the physical movement of the coin.
19  But they would cause a ledger entry or
20  digital ledger entry, or some record being
21  made, that the coin is no longer associated
22  with Levy, it is associated with Murphy
23  or -- sorry.
24      Q.  Darby?
25      A.  Darby, sorry, forgive me.

27 (Pages 102 - 105)

Page 106

1          R.S. LEVY
2     Q.   A different Irish name?
3     A.   Sorry about that.  But it is no
4  longer associated with one customer, it is
5  associated with another customer, no
6  movement of coin.  But of course, if a -- if
7  the -- if the -- if the trade was with --
8  sorry, that's anticipating paragraph (d), I
9  think.  If a trade was going to be with a
10 customer on another exchange, so 3AC sells,
11 gives, or whatever, charges or whatever it
12 does, wants to sell, charge or give digital
13 assets to a customer on another exchange,
14 then that would -- that would cause the
15 removal of a coin, not I grant -- not I
16 grant you specific coin that 3AC had
17 necessarily introduced to the Exchange.  But
18 that would take the coin off -- a coin off
19 the Exchange and an equivalent ledger entry.
20    Q.   So do you have any reason to
21 believe that trades by 3AC differed from
22 trades by any other customer with respect to
23 the movement of digital assets?
24         MR. PROULX:  Objection to the
25    form.

Page 107

1          R.S. LEVY
2     A.   Well, I think the assumptions I am
3  invited or instructed rather to make in 17
4  are not specific to 3AC.  You are talking
5  about FTX customers.  So I don't -- so I
6  have no reason to believe that FTX traded,
7  received different treatment to other
8  customers or that when FTX deposited
9  account -- coins on the Exchange, their
10 coins were not treated in the same way or
11 dealt with in the same way as those that
12 would have been deposited by other
13 customers.
14    Q.   You mentioned withdrawals a moment
15 ago.  So is this assumption -- strike that,
16 please.
17         On your assumption, is it your
18 understanding that if 3AC withdrew a digital
19 asset, it would not necessarily be the same
20 digital asset that 3AC deposited?
21         MR. PROULX:  Objection to form.
22    You can answer.
23    A.   Sorry I said yes, in fact, I am
24 told to assume that.  If you look at the
25 second sentence of D, but -- but -- but --

Page 108

1          R.S. LEVY
2  but one thing is very important, and maybe
3  we will come to this later.  A customer was
4  entitled, as I understand the terms of
5  service, to satisfaction by way of coin or
6  digital token.  If I say coin, I just mean a
7  digital -- bitcoin, but the same presumably
8  applies to other digital coins or tokens.
9         The customer was entitled to
10 satisfaction by that.  The customer could
11 have refused satisfaction by way of an offer
12 of cash in lieu of coin.
13        So customers were entitled to
14 withdraw and deal with their digital assets.
15 It doesn't matter, because one bitcoin is
16 essentially the same as another bitcoin, but
17 they are entitled to a coin.
18    Q.   Okay.  Please turn to paragraph
19 19?
20    A.   Sure.
21    Q.   19A specifically, yeah.  So you
22 assume, excuse me -- strike that.
23        So these assumptions relate to the
24 state of the 3AC's accounts on at the end of
25 the day on June 12, 2022; correct?

Page 109

1          R.S. LEVY
2     A.   Yes.
3     Q.   Why that date?
4         MR. PROULX:  Objection to form.
5     A.   That's the date that I was told to
6  assume.  I understand that there were
7  substantial transactions that took place on
8  the 13th and the 14th.  So maybe that's the
9  reference date.
10    Q.   So as part of this assumption you
11 assume that the 3AC accounts, quote,
12 included a substance quantity of digital
13 assets such as bitcoin which were then
14 collectively valid at over $1 billion, end
15 quote; correct?
16    A.   Yes.
17    Q.   Do you have a more precise number
18 than over $1 billion?
19         MR. PROULX:  Objection to this
20    line of questioning and the form.
21    A.   No, I don't.  And I -- no, I
22 don't.  But for purposes of analysis it
23 would -- if it was 1 and a half, 2, 3,
24 whatever, whatever.
25    Q.   Are you familiar with the term

1          R.S. LEVY
2   "balance" in this context?
3          MR. PROULX: Objection to form.
4      A.  Balance in what context, account
5   balance?
6      Q.  Sure, let's do that?
7      A.  I am sorry, I mean you asked
8   balance, what do you mean by balance?
9      Q.  Do customers -- strike that,
10  please.
11         Is there a figure representing the
12  overall net position of a customer's account
13  on the FTX Exchange?
14         MR. PROULX: Objection to form.
15     A.  I have never used the FTX Exchange
16  and I never seen the pages.  What I do know,
17  if I -- if I can explain my understanding.
18     Q.  Sure?
19     A.  Based on the materials that I have
20  seen, which included the deposition of the
21  coder, C-O-D-E-R, of the person, and I can't
22  remember, I can't remember if it was a man
23  or a woman, I can't remember that person,
24  but I have seen their -- what I understand
25  is, and this is all consistent with my very

1          R.S. LEVY
2   limited experience of using brokerage
3   services, what I understand, because I am
4   not letting that inform this, what I
5   understand is that one of the pieces of
6   information that a customer would be able to
7   see when it accessed -- and assume this is
8   all web based, if that's correct, accesses
9   the secure Internet link as a web page or
10  maybe you enter their system, I don't know,
11  I mean, you know, whether it is like a
12  Bloomberg site where you actually have to
13  enter the site or whatever.  But anyway,
14  once a -- once a client enters the site, one
15  of the pieces of information it would
16  receive or it would see is what its overall
17  position was, which I think FTX -- FTX wants
18  to say -- wants to call the account balance.
19     Q.  Are you comfortable with that term
20  just for how you use that there?
21         MR. PROULX: Finish your answer
22     and feel free to respond to that
23     intermediary question, but then finish
24     your answer.
25     A.  Yes, I am comfortable with that

1          R.S. LEVY
2   being called the account balance or net
3   account balance.  I don't think net really
4   adds anything.  I think that's one of the
5   pieces of information that the customer
6   would see.  I don't understand it, having
7   reviewed the testimony, and also just
8   thinking about this in commonsense, I don't
9   understand it to be the position and I don't
10  think it was the evidence of the coder.  Now
11  the coder may have been lying, I don't know,
12  I have not seen the underlying data.  It
13  would surprise me if he was or she was.
14         That information was not the only
15  information that a customer would be able to
16  see.  Because if a customer went on the
17  website and just saw good morning, your
18  account balance is $100,000, that tells it
19  nothing, that tells the customer nothing,
20  other than one set of assets over there is
21  -- and there is one set of liabilities over
22  there and the difference between them is
23  100,000.  It gives the customer no idea
24  whatsoever of what is over here and what is
25  over there.  It will tell nothing about how

1          R.S. LEVY
2   many bitcoin, ethereum, luna, AVAX or
3   whatever else it has access to.  And it
4   wouldn't have any ability to trade.
5          And as I understand the testimony
6   that I have read, a customer was available
7   to determine its -- what one might call coin
8   entitlement, so to determine how many coins
9   of a particular type, bitcoin, ethereum, are
10  registered to its account and whether it --
11  and therefore determine whether it could
12  deal with them.
13     Q.  So is it your testimony that the
14  present day value of all of the assets in
15  your brokerage account doesn't tell you any
16  meaningful information?
17         MR. PROULX: Objection to form.
18     A.  In my -- yeah, well -- yeah.  If I
19  have just gone to Schwab and it says
20  Mr. Levy, you are worth $100, I should be so
21  lucky, it says I am worth $100, yeah.  I say
22  well, I -- I would like to -- if I have no
23  idea what that $100 is, I can do nothing
24  with it.  It could be comprised of a tenth
25  of a black rock shell, less than a tenth of

Page 114

1          R.S. LEVY
2  a block rock shell.  So what can -- what can
3  I do?  I just have to sit there and come in
4  every day, and say the following day I am
5  worth $102 and the following day I am worth
6  98.  It -- it -- it is certainly not enough
7  for anybody to conduct any form of meeting
8  commercial activity with valuable assets
9  just to be told your account balance is X.
10     Q.  So the account balance covers all
11 of the assets; right?
12     MR. PROULX:  Objection to form.
13     A.  As I understand, the account
14 balance it takes all of the -- on the facts
15 of this case, as I understand the account
16 balance, it represents the difference
17 between an alleged -- I don't know whether
18 this is real -- but an alleged coin
19 entitlement, digital asset entitlement,
20 value of X and a U.S. dollar liability of Y,
21 and that's all it tells you.
22     Q.  Does that tell you the dollar
23 value worth of all of the positions at the
24 account at any moment in time?
25     No, it doesn't.

Page 115

1          R.S. LEVY
2      MR. PROULX:  Objection to form.
3      You can answer the question.
4      A.  No, it doesn't, because if it --
5  if it -- if it says -- if I open my account
6  and it says Levy, you are worth $100, I
7  could have liabilities to Schwab of a
8  billion dollars, but assets in Schwab of 1
9  billion $100, it tells me nothing.  And it
10 could be -- it could be any amount.  So it
11 doesn't tell you anything.
12     Q.  Does it tell you that the assets
13 were worth more than the liabilities in the
14 hypothetical you just posited?
15     MR. PROULX:  Objection to form.
16     A.  Yes, it would.  Because if the
17 liabilities exceeded the assets, the account
18 balance would necessarily, I think, be
19 negative, I think.
20     Q.  Do you -- on the assumptions you
21 have been given, do you understand the 3AC
22 accounts to have ever had a negative account
23 balance?
24     A.  I am not -- I am not aware that I
25 was instructed that they had ever had a

Page 116

1          R.S. LEVY
2  negative account balance.  Insofar as that
3  is a useful metric, it cannot be a useful
4  trading metric.  You can't construe a
5  contract to arrive at a commercial
6  absurdity, if there is another sensible
7  commercially functioning construction.
8      Q.  Is it then your testimony that it
9  is not useful information to know whether an
10 account is an overall positive or negative
11 state?
12     A.  No.
13     MR. PROULX:  Objection to form.
14     A.  No.  It is undoubtedly useful to
15 know 3AC, whether it is in the red or in the
16 black, yeah.  But that -- it is less than
17 useless if I know that I am worth $100, but
18 don't know how to access that $100.
19     So if -- if in my account, the net
20 account balance or -- forget me, don't worry
21 about me.  If 3AC's net account balance is
22 $100, that could be made up of any -- any --
23 of -- of an infinite number of
24 countervailing assets and liabilities, yeah.
25 It could be made up of 10 and 110, minus 10

Page 117

1          R.S. LEVY
2  and whatever.  It is infinite.
3      So it would like to know, any
4  customer would like to know what they are
5  worth.  But how they access their worth, how
6  they access that worth would depend on --
7  would depend on the data that is behind
8  that.
9      Q.  So is that balance then what the
10 account is worth?
11     MR. PROULX:  Objection to form.
12     A.  It is -- that data is --
13 represents the difference between assets and
14 liabilities.
15     If you want to say is that what
16 someone is worth, then I don't suppose
17 that's a particularly objectionable way of
18 saying it.  But it is the difference between
19 assets and liabilities.
20     You can't -- you can't trade on
21 just what you are worth.  You got to trade
22 with real things.  And that's some of the
23 information that underlies this, underlies
24 that figure.
25     Q.  So in 19(b)?

30 (Pages 114 - 117)

Page 118

R.S. LEVY

2  A.  Yeah.
3  Q.  Next you assume that, quote, 3AC
4  accounts on the FTX Exchange separately had
5  a substantial negative USD balance, end
6  quote.
7      Do you see that?
8  A.  Yes.
9  Q.  What is a negative USD balance?
10  A.  Of my understanding is that 3AC
11  owed FTX, the Exchange, the amount of -- a
12  substantial US dollar balance.  And it goes
13  on to say over 600 million or whatever, but
14  it owed the Exchange that sum.
15  Q.  Do you have an understanding of
16  the actual figure for 3AC's USD balance at
17  the end of the day on June 12, 2022?
18  A.  I don't believe I have.  It may be
19  that it has been the subject of depositions
20  or maybe it is mentioned somewhere.  But I
21  don't believe I did.  It may be that it is
22  mentioned in Konstantinidis, but it is not
23  springing to mind, I am afraid.
24  Q.  Okay.  Please look at paragraph
25  21, and I will read it into the record, The

Page 119

R.S. LEVY

2  Joint Liquidators have estimated that during
3  these dates unrealized losses on unsold
4  assets withdrawals by 3AC (including
5  realized losses on those withdrawals)
6  trading fees, interest charges and funding
7  payments to futures contracts accounted for
8  a reduction of approximately $65 million in
9  the value of 3AC's assets on the Exchange.
10      Do you see that?
11  A.  Yes, I do.
12  Q.  Can a decrease in the value of a
13  balance for digital assets as the result of
14  declines in the market price for those
15  digital assets form part of an unfair
16  preference claim against the FTX Recovery
17  Trust?
18      MR. PROULX:  Objection to form.
19  A.  I -- I think I say somewhere,
20  don't I.
21  Q.  Feel free to look at paragraph 80
22  if you like.  I was going to ask you about
23  it, but you can answer however you would
24  like?
25  A.  Do you mind if I read it?

Page 120

R.S. LEVY

2  Q.  Please.  And I will read paragraph
3  80 on page 26, which says.
4  A.  80 and 81.
5  Q.  Sure, please review the context
6  you feel necessary.  So I will read,
7  paragraph 80 states, I accept that to the
8  extent the decline in the value of 3AC's
9  digital asset balance was attributable to
10  the decline in the market price of the
11  underlying digital assets that 3AC kept
12  rather than sold, then that decline in value
13  could not form part of any unfair preference
14  claim.
15      Do you see that?
16  A.  Yes.
17  Q.  Do you think that fairly
18  summarizes your position on this?
19  A.  Yes.
20  Q.  So please assume for the moment
21  that the court concludes that 3AC's only
22  relevant asset is that overall account
23  balance that we have been describing.  Do
24  you understand the assumption that I am
25  asking you to make?

Page 121

R.S. LEVY

2      MR. PROULX:  Objection to form.
3  A.  The only asset was that.
4  Q.  I appreciate that's a topic you
5  address.  I am asking you to make an
6  assumption just for the immediate question
7  which is that the court disagrees and
8  concludes that the account balance is the
9  relevant asset.
10      Do you understand what I assume?
11      MR. PROULX:  Objection to form.
12  You can answer.
13  A.  I understand that you are inviting
14  me to say that the -- to assume that the
15  unitary asset theory, the only asset that
16  3AC and presumably for that matter, any
17  other customer on this exchange had, was
18  whatever the figure was in the net account
19  balance.  I will assume it.  It seems to me
20  to be, if I may say so, bonkers.
21  Q.  Do you understand the assumption I
22  have asked you to make?
23  A.  I do understand it, yes.
24  Q.  That was the only question, just
25  to be clear.

31 (Pages 118 - 121)

1          R.S. LEVY
2          In those circumstances can a
3 decrease in the value of the account balance
4 as the result of declines in the market
5 price for digital assets form part of an
6 unfair preference claim against the FTX
7 Recovery Trust?
8          MR. PROULX:  Objection to form,
9     objection to speculation.
10     A.  Well, there hasn't been a
11 transaction.  All the -- in that scenario,
12 this is my account balance, I have done
13 nothing with it, but it just evaporated a
14 bit because it is very hot.  I don't see
15 that it can be a transaction.
16     And I think Mr. Atherton and I are
17 agreed that there has to be some sort of
18 transaction.  Because Section 244 speaks of
19 insolvency transactions.  Something merely
20 happening, a state of affairs can't amount
21 to a transaction.  But as I -- sitting here
22 I say that, I am not saying that as a matter
23 of law, but it strikes me as a proposition
24 that the mere fact that the market declines
25 is a transaction for the purpose of Section

1          R.S. LEVY
2 245 or 246 -- Section 245.
3     Q.  So switching to the topic of
4 withdrawals?
5     A.  Yeah.
6     Q.  Can the value of withdrawals from
7 the Exchange by 3AC form part of a
8 preference claim against the FTX Recovery
9 Trust?
10     MR. PROULX:  Objection to form.
11     A.  Well, these are transactions
12 that -- let's just go back, what was the
13 assumption?
14     Q.  Paragraph 81, if you would like to
15 look at it?
16     A.  No, but you told me that having
17 looked at.
18     Q.  Paragraph 21 was the assumption we
19 started from?
20     A.  21?
21     Q.  Yes, 21, sir.
22     A.  These weren't transactions that
23 involved FTX.
24     Q.  So is that a no?
25     A.  Yeah.

1          R.S. LEVY
2     MR. PROULX:  Objection to form.
3     Counsel, are we still assuming the
4     unitary asset theory is true just for
5     the sake of the record here?
6     MR. DARBY:  Would you like me to
7     read the assumption from the
8     transcript, Zach?
9     MR. PROULX:  You are welcome to
10     read it, but it is many pages up.
11     A.  Let me say I assume we are still
12 working under the unitary asset theory.
13     Q.  If that term helps you understand
14 my assumption, you are free to think of it
15 in those terms?
16     A.  Mainly that 3AC's only,
17 quote-unqute, asset was the difference
18 between liabilities and assets.
19     Q.  Yes, the assumption is that the
20 court disagrees with you that the USD
21 balance is a liability and the digital asset
22 balance is an asset, let's be clear about
23 what the assumption is.
24     Do you understand the assumption I
25 am asking you to make?

1          R.S. LEVY
2     A.  I understand --
3     Q.  We will get to that.  So you
4 understand the assumption?
5     A.  Yes.
6     Q.  Do you have any point to add about
7 the withdrawals?
8     A.  No.
9     Q.  So is it your testimony that the
10 amount of decline in the account balance
11 from withdrawals cannot form part of a
12 preference claim against the FTX Recovery
13 Trust?
14     MR. PROULX:  Objection to form,
15     calls for speculation.
16     A.  From these withdrawals, they are
17 not transactions with FTX.
18     Q.  Okay?
19     A.  Yeah.
20     Q.  Anything to add, I don't want you
21 to cut off, I am sorry?
22     A.  Yeah.
23     Q.  Let's turn to paragraph 22,
24 briefly.  So I will read a statement, FTX
25 was responsible for the liquidation of

1         R.S. LEVY
2  digital assets associated with 3AC's
3  accounts on the Exchange worth approximately
4  $82 million --
5     A.  Yeah.
6     Q.  -- which occurred late on June 14,
7  2022 defined as the liquidation.
8        Do you see that?
9     A.  I do, yes.
10    Q.  Did you evaluate the question of
11 whether FTX had the right to conduct the
12 liquidation?
13    A.  Well, on -- I do analyze the
14 reason that FTX gives for -- the potential
15 reasons that FTX gives for doing that.
16       I do look at, for instance, clause
17 10.1.3, and other provisions of the
18 contractual suite of contractual documents,
19 I do look at that, yes.
20    Q.  So you looked at the provisions,
21 is that your testimony?
22    A.  Well, looked at 10.1.3 because I
23 give evidence in relation to it.
24    Q.  So my question is, are you
25 offering an opinion on whether FTX had a

1         R.S. LEVY
2  contractual right to conduct the
3  liquidation?
4     A.  I offer a contractual opinion that
5  on the unitary asset theory FTX would not
6  have had any contractual right to affect the
7  transaction for that opinion.
8     Q.  That right would be created by
9  English law; right?
10       MR. PROULX:  Objection to form.
11    A.  I think we are going around in
12 circles there.  Because that, as I say, it
13 is impossible to be an expert on BVI law
14 without being an expert on English law.  And
15 it is impossible to apply BVI law -- it is
16 impossible to determine who a creditor is
17 according to British -- the law of the
18 British Virgins Islands without having
19 regard in certain circumstances, and this is
20 one, to documents that are governed by
21 English law.
22    Q.  Sure.
23       So the question is not about the
24 application of any right that exists to a
25 preference claim under the BVI insolvency

1         R.S. LEVY
2  act.  My question, and I will read it, is
3  that right to liquidation would be created
4  by English law, if at all; right?
5       MR. PROULX:  Objection to form.
6     A.  The right is created by a contract
7  which says -- well, to the extent that you
8  are referring to FTX, and to the extent that
9  the right, I don't know what you are
10 referring -- I am sorry, but to the extent
11 that you are referring to, say, clause
12 10.1.3 I think it is, of the terms of
13 service, that right was created, whatever it
14 means, by a contract governed by English
15 law, yes.
16    Q.  And I am not asking about how you
17 considered this issue for purposes of a BVI
18 law claim.  Did you -- do you provide an
19 opinion on whether the contract, in fact,
20 gave FTX the right to conduct the
21 liquidation?
22       MR. PROULX:  Objection to form.
23    A.  I think I do analyze clause 10.1.3
24 in my report, yeah -- I am sorry, in my
25 declaration.

1         R.S. LEVY
2     Q.  So I will reread the question.
3  Did you provide an opinion on whether the
4  contract, in fact, gave FTX the right to
5  conduct the liquidation?
6       MR. PROULX:  Objection to form.
7     A.  I -- I do provide an analysis and
8  opinion of clause 10.1.3.
9     Q.  Was that analysis about whether
10 that clause gave FTX the right to conduct
11 the liquidation?
12    A.  That -- that analysis was
13 founded -- was to address whether FTX was a
14 creditor of 3AC.
15    Q.  That's a BVI law issue; right?
16    A.  It is a BVI law issue which
17 necessarily involves -- necessarily involves
18 issues of English law.  But that happens day
19 in, day out.  There is a clear authority,
20 Justice Jack and others saying we don't
21 need, they are all English lawyers, all the
22 books on their shelves.  There is only one
23 BVI law book, I think, which is Harley's
24 book.  They are all English lawyers,
25 Halsburys lawyers, if you know what that is.

1          R.S. LEVY
2    Q.  Mr. Levy, the nexus is well
3 understood, and with respect, that's not
4 responsive to the question.  I will reask it
5 a different way.
6    A.  I am sorry, I am sorry if I am
7 being thick.
8    Q.  No, please.  Did you review any
9 facts related to FTX conducting the
10 litigation?
11       MR. PROULX:  Objection to form.
12    A.  No, I don't believe I did.  Any
13 factual documents?
14    Q.  Any facts at all.
15    A.  I reviewed FTX's objection and I
16 reviewed Mr. -- is it Coverick,
17 Mr. Coverick's declaration, and also I think
18 his deposition which would have dealt with
19 those things, but not any independent
20 consort facts separate and apart from that.
21 I only saw what he said about it and what
22 the objection said about it.
23    Q.  So do you have an opinion on
24 whether FTX breached any contract with 3AC
25 by conducting the liquidation?

1          R.S. LEVY
2    A.  I have an opinion that to the
3 extent that 3AC relies on the unitary asset
4 theory to conduct the
5 $82 million liquidation, it is not possible
6 for it to justify by clause by reference to
7 clause 10.1.3.  It is just not possible.
8    Q.  Let's remove the qualifier that
9 you put on that.
10       So put aside the unitary asset
11 theory, put aside BVI law issues, let's just
12 assume that 3AC is asserting a breach of
13 contract claim based only on the
14 liquidation, there is no preference at all,
15 do you have a view on whether FTX breached
16 any contract with 3AC?
17       MR. PROULX:  Objection to form.
18    Q.  With respect to the liquidation
19 specifically?
20    A.  Can we have a look at the terms of
21 service, they are very specific.
22       MR. DARBY:  Sure, can we get tab
23 10.
24    A.  Do you mind?
25    Q.  Did you review the terms of

1 service for this issue?
2    A.  I have reviewed the terms of
3 service.  I have looked at it many times.
4    Q.  To determine the question of
5 whether FTX had a contractual right to
6 conduct the litigation?
7    A.  Just bear with me.
8    Q.  So yeah, Mr. Levy, I am going to
9 provide you the FTX terms of service.  This
10 will be marked Levy Exhibit 4.  You are of
11 course to welcome -- yeah, you are of course
12 welcome to review it.  But I just want to be
13 clear, my question is about what you have
14 been asked to opine on and not the meaning
15 of its specifically.
16       MR. PROULX:  Is there a question
17 pending, Sam?
18       MR. DARBY:  There are several
19 questions pending that have not been
20 answered.
21    A.  In broad terms the heads of claim
22 that I address -- addressed under the
23 headings in my opinion.  And there is not,
24 so far as I remember, we can look at this

1          R.S. LEVY
2 from the index, a heading saying BVI breach
3 of contract claim.  The issue does pop up I
4 think in -- maybe not.  And so I don't
5 specifically address a breach of contract
6 claim.
7    Q.  That answers my question.
8       MR. DARBY:  Let's go ahead and
9 mark this, since I have tried to do
10 that earlier and we have been
11 continuing to talk over her.
12       THE WITNESS:  Should I take that?
13       MR. DARBY:  You should pause we
14 will both stop talking for a second.
15       (Whereupon, FTX terms of service
16 was marked Levy Exhibit 4 for
17 identification as of this date.)
18    Q.  So Mr. Levy, you have just been
19 handed the terms of service, if they will
20 help you answer the line of questions we
21 have been having now which is about the
22 scope of your analysis, I will be happy to
23 look at any provision here you consider
24 relevant.  I promise you we will be looking
25 at that document quite a bit today?

R.S. LEVY

1        R.S. LEVY
2        MR. PROULX:  There is not a
3   question pending, unless Sam, you can
4   clarify the question.
5        Q.  My question is do you have any
6   anything to add to your prior answer?
7        A.  No, I don't have in a separate
8   heading say BVI breach of contract claim.
9        Q.  Putting aside if you have a
10  separate heading, are you opining if there
11  is a BVI breach of contract claim?
12       MR. PROULX:  Objection to form.
13       A.  Not so far as I am aware.  But I
14  would like to consider my report, there is a
15  lot of material in my report.
16       Q.  Are you asking to look at it?
17       A.  If you want to draw my attention
18  to a particular opinion that I have reached.
19       Q.  I will suggest that I don't
20  understand you to be opining that there is a
21  breach of law claim under the laws of the
22  BVI?
23       A.  Breach of contract.  I shouldn't
24  have jumped over you.
25       Q.  No, you corrected me.

1        R.S. LEVY
2        So sorry for the record, I do not
3   understand you to be offering an opinion on
4   whether a BVI law breach of contract claim
5   exists, is that consistent with your
6   understanding?
7        A.  That is consistent with my
8   understanding.
9        Q.  I likewise don't understand you to
10  be offering an opinion on whether a breach
11  of contract claim exists under English law,
12  is that consistent with your understanding?
13       A.  Yes, I don't address English law
14  claims.  Those are dealt with elsewhere.
15       Q.  Thank you.  Please turn to
16  paragraph 24 of your declaration, that's the
17  one that says Exhibit 1.  While you read
18  that, you were asked to assume that between
19  June 13 and 14, 2022 the value of the assets
20  associated with 3AC's account on the
21  Exchange at all times exceeded the value of
22  the liabilities associated with 3AC's
23  accounts on the Exchange.
24       Do you see that?
25       A.  Yes.

1        R.S. LEVY
2        Q.  So is it fair if I understand that
3   assumption to be stating that 3AC accounts
4   had a positive account balance at all
5   relevant times?
6        MR. PROULX:  Objection to form.
7        A.  Well, I assume that if assets
8   exceed liabilities, then the difference is
9   going to be positive to the extent that the
10  net account balance is a relevant and
11  determinative factor of whether or not one
12  person is a creditor of the other.  But it
13  seems to me that it is not.  And I have also
14  seen that Dame Elizabeth Gloster says one
15  doesn't simply net off automatically assets
16  against liabilities, but anyway.
17       Q.  Have you heard the phrase "digital
18  asset balance" in the context of your
19  analysis?
20       A.  Yes, I think I have, yes.
21       Q.  Would you understand that to mean
22  the aggregate balance only with respect to
23  digital assets, but with respect to all
24  digital assets in a customer account?
25       MR. PROULX:  Objection to form.

1        R.S. LEVY
2        You can answer.
3        A.  I understand -- that is my kind of
4   understanding of it, yes.
5        Q.  So when you refer to the value of
6   assets in paragraph 24, is that referring to
7   the digital asset balance?
8        A.  I think that's a fair reading of
9   it.
10       Q.  And when you refer to the value?
11       A.  It may -- it may be that there
12  were other -- I am not aware that there were
13  -- that there were other cash accounts
14  holding positive balances.  I am not aware
15  that there were.  So let's assume that on
16  the one hand we are talking about digital
17  assets over here and negative cash balances
18  over there.
19       Q.  That is how I intend to use the
20  term just to be clear?
21       A.  Yeah.
22       Q.  So your reference to the value of
23  the liabilities, is that a reference to the
24  USD balance?
25       MR. PROULX:  Objection to form.

Page 138

1           R.S. LEVY
2     A.  Well, I think it is all
3  liabilities on the Exchange.
4     Q.  Are you aware of any negative
5  balances other than with respect to USD for
6  Three Arrows Capital?
7     A.  I am not -- I have not
8  independently verified whether there are --
9  whether there were any.  But no, I am not
10  aware.
11    Q.  Can you please move to paragraph
12  27 which we have already had a look at
13  today?
14        MR. DARBY:  Can we do that after,
15    thank you.
16        MR. PROULX:  Since we have that,
17    any sense how much time you want to go
18    for before lunch, we have been going
19    for over an hour?
20        MR. DARBY:  Let's do another half
21    hour and then go for lunch.
22        MR. PROULX:  The witness may need
23    a break before then, but he can tell
24    us.
25    Q.  Mr. Levy, do you need a break or

Page 139

1           R.S. LEVY
2  do you prefer to wait 15 minutes when lunch
3  will be ready?
4     A.  15 would be great.  And I can
5  gesticulate.
6     Q.  Paragraph 27 says, 3AC had a
7  beneficial equitable --
8     A.  It says I am instructed that 3AC.
9     Q.  Sure.  I am instructed that 3AC
10  had a beneficial, equitable, proprietary
11  interest in, i.e. equitable title 2, the
12  digital assets associated with its accounts
13  on the Exchange during the relevant period,
14  and that 3AC was a tenant in common of the
15  equitable interest in each shared pool of
16  digital assets into which FTX transferred
17  such assets.  I am further instructed that
18  legal title in respect of those digital
19  assets vested in FTX for the purposes of FTX
20  holding them as trustee on trust for 3AC.  I
21  am further instructed that in the
22  alternative to the foregoing trust
23  relationship, 3AC held a control based
24  proprietary interest in the digital assets
25  associated with its accounts on the Exchange

Page 140

1  equivalent to a proprietary interest in a
2  proportionate share in a common pool as
3  quasi bailor.  And that as quasi bailor, 3AC
4  would have a proprietary interest in the
5  digital assets associated with its accounts
6  on the Exchange superior to any interest FTX
7  would have had over them.
8        So I believe you testified earlier
9  that you had assumed the accuracy of this
10  rather than verified it, is that accurate or
11  did you mean something different?
12    A.  Yes, I was told to assume these
13  things.
14    Q.  Do you have any understanding of
15  why these particular types of interest were
16  listed?
17        MR. PROULX:  Objection to form,
18    objection to the extent it calls for
19    privileged information or the substance
20    of any communications that you have had
21    with counsel on this, which you should
22    not answer.
23        THE WITNESS:  So --
24        MR. PROULX:  You should not answer

Page 141

1  the latter part of that instruction,
2  otherwise you could answer the
3  question.
4     A.  Ask me a question.
5     Q.  Without telling me anything that
6  you have ever discussed Latham & Watkins or
7  any counsel on this case, do you have any
8  understanding as to why the specific types
9  of proprietary interest mentioned in this
10  paragraph are the ones that are in fact
11  mentioned?
12        MR. PROULX:  Same objection, same
13    caution.
14    A.  I assume that these interests are
15  mentioned because they are, from broad
16  recollection, the issues that Lord Neuberger
17  addressed and that Dame Elizabeth Gloster
18  considered those issues.  And her analysis
19  brought her to these conclusions.  And
20  these -- these are in broad terms, my
21  understanding is, it is a while since I read
22  Neuberger 1, there is a Neuberger 2,
23  whatever.  But it is a while since I read
24  Lord Neuberger's evidence, but these are the

36 (Pages 138 - 141)

Page 142

1          R.S. LEVY
2  issues that from recollection Lord -- Lord
3  Neuberger addressed (unintelligible) in
4  these proceedings.  And therefore it is
5  unsurprising that Dame Elizabeth Gloster
6  addressed them.  I would not say it is
7  unsurprising that she reached a different
8  conclusion.  But that accounts for these
9  assumptions.
10     Q.  Sure.  So what does a beneficial
11  equitable prop -- property interest mean in
12  this context?
13         MR. PROULX:  Objection to form to
14     the extent it seeks expert testimony,
15     outside the cope.
16     A.  It means the full right to deal
17  with the digital assets that were held in a
18  common pool by FTX holding them as trustee
19  on trusts for 3AC.
20         If I have -- if -- if a
21  beneficiary of a trust has equitable
22  proprietary interest to the entirety of
23  digital assets associated with this account,
24  it means it has the right to direct the
25  trustee how to deal with them.

Page 143

1          R.S. LEVY
2     Q.  So is the beneficiary of an
3  equitable proprietary interest a specific
4  form of a proprietary interest?
5         MR. PROULX:  The same objections.
6     A.  Is it a specific, yes, it is --
7  because it is a -- it is beneficial.  And
8  that tells you that it belongs to 3AC
9  personally.  3AC is entitled to the benefit.
10  It is equitable, which means it exists in
11  equity rather than at law.  And it is
12  proprietary, it is a form of property.
13  Normally that would mean pretty much
14  everything other than legal title.
15     Q.  What other types of proprietary
16  interest exist besides beneficial equitable
17  proprietary interest?
18         MR. PROULX:  Same exact
19     objections.
20     A.  So as a matter of BVI law you are
21  asking?
22     Q.  I am asking as a matter of the
23  terminology on the page.  I am really
24  focused on making sure we understand
25  terminology?

Page 144

1          R.S. LEVY
2     A.  Can you repeat the question, what
3  are the -- what are the --
4     Q.  I will ask it slightly
5  differently.  Are there other types of
6  proprietary interests besides beneficial
7  equitable proprietary interests?
8         MR. PROULX:  Same exact
9     objections.
10     A.  That's a very specific question
11  that I would have to think about.  But if
12  you want to put to me -- there is.  And the
13  reasons for it, I would happily discuss it
14  with you.  But it is -- it is a degree of
15  sophistication that I understand that you
16  want.  But what are you looking for?
17     Q.  Your answer, you were perfectly
18  responsive.  So need to try to guess what I
19  want.
20         So I mean, can you think of any
21  other types of interest that are relevant
22  here?
23         MR. PROULX:  Object to form.  You
24     can answer, if you understand the
25     question.

Page 145

1          R.S. LEVY
2     A.  Non-beneficial I suppose.
3     Q.  Do you consider that relevant
4  presently?
5     A.  I mean -- I mean really beneficial
6  equitable proprietary interest, I think is
7  just four words to say one thing, which is
8  an entitlement to that as against the
9  trustee, that's all it is telling you.  It
10  is wordy, but I think that's all it is
11  really telling you.  And that's all we need
12  I think for the present purposes.  Unless
13  you are -- you want me to consider some
14  other form of entitlement, which I happily
15  will.
16     Q.  So this paragraph references a
17  trust; right?
18     A.  Well, it -- it -- it -- says -- it
19  says on line 5 on page 8, Legal title in
20  respect to those digital assets vested in
21  FTX for purposes of FTX holding them as
22  trustee on trust for 3AC, closed quotes.
23     Q.  So is a trust a particular type of
24  a beneficial equitable proprietary interest?
25         MR. PROULX:  Same objections as

37 (Pages 142 - 145)

1          R.S. LEVY
2      before, objection to form, objection to
3      the extent it seeks expert testimony
4      outside the scope.
5          A. I think it is very opposite. I
6      mean, the trustee has a legal title. The
7      trustee has a legal title, but the
8      beneficiary subject to the terms of the
9      trust obviously, but the beneficiary has the
10     absolute right subject to the terms of the
11     trust to dictate to the trustee how to be
12     dealt with. So there is a principle under
13     English law the beneficiaries of a trust who
14     are sui juris, putting it in English, the
15     trustee, the beneficiaries of a trust who
16     are all of full age and capacity can dictate
17     to the trustee what he or she should do with
18     the trust property. Because collectively
19     they own it. Now there are very -- there
20     are other -- there are different types of
21     trusts. There is a discretionary trust in
22     which the beneficiaries have no entitlement
23     other than an entitlement to be considered
24     according to the terms of the trust.
25         Q. So putting aside --

1          R.S. LEVY
2          A. I am more than happy to address
3      this. But these were assumptions that I was
4      invited to make. If you want to understand,
5      I don't think I particularly pick up this
6      ball and run with it. But maybe I did.
7      Carry on, sorry.
8          Q. With respect, Mr. Levy, the issue
9      of what type of interest in digital assets
10     is required here to establish a preference
11     claim is very much a live issue.
12         So I am -- my goal here is try to
13     clarify terminology. So if my questions are
14     unclear, please do ask me to clarify?
15         MR. PROULX: I will object for the
16     record to the narrative just given, the
17     litigation expressed by counsel. And
18     note for the record that we dispute
19     those legal litigation positions.
20         MR. DARBY: If he is done with his
21     speaking objection, you can -- I will
22     ask this question.
23         THE WITNESS: Sure.
24         Q. Does a trust beneficiary have a
25     beneficial equitable proprietary interest in

1          R.S. LEVY
2      the property that is held in trust?
3          MR. PROULX: Same objections as
4      before.
5          A. It has a beneficial interest in
6      the trust -- well, subject to the terms of
7      the trust, yes.
8          If I am -- if I am the beneficiary
9      of the bare trust, the trust by which the
10     trustee merely holds the property on trust
11     for Robert Levy, I have an equitable,
12     proprietary, whatever you want to call it,
13     beneficial interest in the trust property.
14     I could just say give that to me, please.
15         Q. This paragraph references the
16     alternative of a bailment; right?
17         A. Yes.
18         Q. Is that a type of beneficial
19     equitable proprietary interest in the
20     property that was given to the bailor?
21         MR. PROULX: Same objections, you
22     can answer.
23         A. These were assumptions that I was
24     invited to make. I look at them and don't
25     think, wow, those are crazy or manifestly

1          R.S. LEVY
2      wrong. They make sense to me. I suppose
3      even if they didn't make sense to me, I
4      would have to assume them. But they make
5      sense to me.
6          Q. So is a bailment a type of
7      equitable proprietary interest?
8          MR. PROULX: Same objections.
9          A. It had a control-based proprietary
10     interest, which is equivalent to a
11     proprietary interest in a proportional share
12     in a common pool, i.e. they can say give me
13     my share of the common pool.
14         Q. So what is a tenant in common of
15     the equitable interest in each share pooled
16     of digital assets?
17         MR. PROULX: Same objections. You
18     can answer.
19         A. These are matters -- well, they
20     are matters of English law. What in English
21     law there are two ways of owning -- or there
22     are three ways, outright, a company can own
23     property outright, then what is called joint
24     tenants and then there are tenants in
25     common.

1             R.S. LEVY
2        Joint tenants own property, let's
3  say a house, and the husband -- husband and
4  wife, that's not too old fashioned, own a
5  property together.  Their name is on the
6  legal title, they are the legal title, they
7  are the legal owners.  They can own the
8  property either as joint tenants or tenants
9  in common.
10       If they own as joint tenants, they
11 both own essentially everything or nothing.
12 And on the specific feature of joint tenancy
13 is what is called the jus accrescendi,
14 J-U-S-A-C-C-R-E-S-I-N-D-I, I think, which
15 means on the death of the first of them, the
16 share -- the entirety of the interest passes
17 to the survivors, the right of survivorship.
18 That's joint tenants.  And that's often how
19 spouses, cohabitants or whatever else would
20 own real property or other assets, real
21 property being their house or off that.
22       The other form of tenancy in
23 common was different, because under a
24 tenancy in common, the interest in the
25 property is divided into shares.  So three

1             R.S. LEVY
2  individuals could -- three companies could
3  purchase a property, have it registered in
4  their names and agreed to own it as tenants
5  in common.  But by virtue of their different
6  contributions, one person may have
7  contributed 50 percent and therefore say I
8  am a tenant in common for 50 percent, and
9  the other two could be 25, 40 or whatever
10 between them.  The important distinction,
11 this is why it arises more frequently in the
12 commercial world, those people wouldn't want
13 to take a bet on who is going to die first,
14 which is why they hold it as tenants in
15 common.  Because that might encourage them
16 to murder.  That's not the reason behind it,
17 you don't want to take a bet if you are in a
18 commercial situation that someone is going
19 to die first.  So the normal way in
20 commercial -- in commercial situations in
21 which assets are held for a group of people
22 is to hold them as tenants in common
23 according to either an agreed entitlement or
24 an entitlement which would be implied by
25 law.

1             R.S. LEVY
2        So if the analysis here is there
3  is a -- there is a tenants in common
4  according to the assets associated with
5  their accounts, that means no more than
6  saying each person that is a tenant in
7  common together with 3AC would be entitled
8  to their share of the assets as we called it
9  in their digital asset entitlement.
10  Q.  Thank you for that.
11       So if I use the phrase
12 "proprietary interest"--
13  A.  Yeah.
14  Q.  -- does that cover all of the
15 concepts that are referenced in this
16 paragraph?
17       MR. PROULX:  Same objections as
18     previously given.
19  A.  3AC has a proprietary interest,
20 had a property interest, yeah.  I mean, the
21 assumption, I am assuming this comes from
22 Dame Elizabeth, is that there was a
23 proprietary interest here in both scenarios,
24 whether it is under the trust or quasi
25 bailment.

1             R.S. LEVY
2  Q.  What assets are subject to the
3  proprietary interest relevant here?
4  A.  Here is the common pool, by which
5  I understand to mean the pool into which all
6  the assets had been swept, but in which the
7  tenants in common had an entitlement
8  according to their digital asset
9  entitlement.
10       So if there is a register saying
11 that 3AC was entitled to ten bitcoin, five
12 ethereum and another company was entitled to
13 six and four, then that's the entitlement.
14 And the pool is the general pool that holds
15 those assets.
16  Q.  All right.  So just a few more
17 questions and then we can take a break?
18       MR. PROULX:  We are six minutes
19     over the 12:30 representation.  If you
20     have a question or two, that will be a
21     minute or two.
22       MR. DARBY:  I just said I did.
23       MR. PROULX:  I am going to request
24     a break in a minute or two, I am just
25     giving you a heads up.

39 (Pages 150 - 153)

1          R.S. LEVY
2          MR. DARBY:  You could request
3     whatever you want, Zach.
4     Q.  So are the conclusions set forth
5  in your declaration based on the assumption
6  of a proprietary interest in favor of 3AC?
7          MR. PROULX:  Objection, same
8     objections as before.
9     A.  It is based on the matters I was
10 asked to assume in 27, and that's equitable
11 proprietary interest in relation to the
12 first of those assumptions and the other one
13 is a control based proprietary interest.
14    Q.  I believe that was a yes, but I
15 don't want to put words in your mouth?
16    A.  Sorry, yes, yeah, a specific yes.
17    Q.  Are you relying on any assumption
18 that 3AC had a non-proprietary interest in
19 any digital assets?
20         MR. PROULX:  Objection, same
21    objections as before.
22    A.  No, the -- the only other way in
23 which I put the case in relation to the
24 chose in action.  And the chose in action is
25 just something which is capable of being

1          R.S. LEVY
2  owned, it is proprietary, it is a form of
3  property.  So no, not for the preference
4  claim.
5     Q.  Please do finish, I don't want to
6  cut you off?
7     A.  Yeah, not for the preference
8  claim.  There are -- there are -- there are
9  other claims.  But by and large those are
10 the three kind of -- well, two I am asked to
11 assume and another one is a conclusion that
12 I have reached.
13         MR. DARBY:  Okay, that's all I
14    have for now.  We can take a break.
15         THE WITNESS:  Thank you.
16         MR. DARBY:  We can go off the
17    record.
18         THE VIDEOGRAPHER:  The time is
19    12:38 p.m.  We are going off the
20    record.
21         (Luncheon recess taken.)
22         THE VIDEOGRAPHER:  The time is
23    1:34 p.m.  We are going back on the
24    record.
25    Q.  Mr. Levy, do you consider a

1          R.S. LEVY
2  preference claim under the insolvency act to
3  be restorative in nature?
4          MR. PROULX:  Objection to form.
5     A.  If you have got a copy of the
6  relevant sections of the act, but yes --
7  well, the court has a broad jurisdiction
8  under section -- Sections 249 and 250 as to
9  the relief it can grant.  And that would be
10 restorative, yes.
11    Q.  Is the principal concern of a
12 preference claim ensuring that whatever
13 assets were available for distribution for
14 creditors before the transaction remain
15 available for distribution to creditors?
16    A.  The principal that underlies the
17 preference claim is the sanctity of pari
18 passu distribution as that expression is
19 understood in both the BVI and the U.K.
20         So much is made clear to my mind,
21 particularly from an extract from the
22 Aldridge case the High Court of Australia.
23 And that indeed -- that indeed cites a
24 passage from what I understand to be a U.S.
25 house or senate committee report, whatever

1          R.S. LEVY
2  they are, but that's a clear conclusion that
3  that was drawn by the Apex Court in
4  Australia in the Aldridge case.
5     Q.  So can a preference claim be used
6  to improve the position of a debtor relative
7  to the debtor's position before the
8  transactions that are challenged as a
9  preference?
10         MR. PROULX:  Objection to form.
11    A.  The essential features, the
12 essential thing that the court will look for
13 in a preference claim is whether there has
14 been a preference.  If there has been a
15 preference, the court can take any steps
16 available to it under Sections 249 and 250.
17    Q.  So can a preference claim be used
18 to confer a windfall on a debtor?
19    A.  If there has been --
20         MR. PROULX:  Objection to form.
21    You can answer.
22    A.  If there has been a preference,
23 the court has the jurisdiction under Section
24 249 and 250.  Whether it exercises that
25 jurisdiction if it were to fall a windfall

R.S. LEVY

1
2 is another matter. But the Apex Court of
3 Australia, which is highly persuasive in the
4 BVI, is very clear, the law one has to look
5 for is whether there has been a preference.
6 For that see paragraphs 22 and 23 of
7 Aldridge.
8     Q.  Aldridge relates to an Australian
9 statute; correct?
10    A.  Yes, it does.
11    Q.  And that statute has no direct
12 application in the BVI; correct?
13    A.  That's correct.
14        MR. PROULX:  Objection to form.
15    Q.  Do you have any authorities for
16 the decision that a preference claim can be
17 used to confer a windfall on the debtor?
18        MR. PROULX:  Objection to form.
19    A.  The question you didn't ask and
20 perhaps should have asked is whether -- I
21 don't mean to be rude in that, is whether a
22 Virgin Islands court would take cognizance
23 of a decision of the High Court of Australia
24 that is the equivalent of the Supreme Court
25 of the U.K. or the Supreme Court of the

R.S. LEVY

1
2 United States.
3        And to my knowledge, the BVI court
4 would take cognizance of it and find it
5 persuasive, but would not be obliged to
6 follow it.  It is clear, as I said, in
7 Australian cases, that all one has to look
8 for is whether there has been a preference.
9    Q.  Are you aware of any other
10 Australian decision -- strike that.
11        Are you aware of any Australian
12 decision that follows the principle you just
13 articulated?
14        MR. PROULX:  Objection to form.
15    A.  I don't pretend to be an expert on
16 Australian law.  However, the decision in
17 Aldridge is cited in a number of English --
18 authorities mainstream English text,
19 including Stephen Schaw Miller's work,
20 including Tully, all of which are
21 practitioner's work, and I think Bailee
22 Shore in Groves also.
23    Q.  So Aldridge was applying Section
24 451 of the Company's Code of Victoria and
25 Section 122 of the Australian Bankruptcy Act

R.S. LEVY

1
2 of 1966; correct?
3    A.  Have you got a copy of Aldridge?
4    Q.  I do, let's go to tab 13 Aldridge.
5        (Whereupon, Aldridge was marked
6    Levy Exhibit 5 for identification as of
7    this date.)
8        MR. DARBY:  And this should be
9    marked Levy Exhibit 5.
10    Q.  Do you need me to reread the
11 question or do you have it still?
12    A.  No, I mean --
13        MR. PROULX:  Objection to form.  I
14    truly don't know what the question is.
15    But if you understand, you can answer
16    it.
17    A.  As I understand it, go ahead, read
18 the question again.
19    Q.  The question was so Aldridge was
20 applying Section 451 of the Company Code of
21 Victoria and Section 122 of the Australian
22 Bankruptcy Act 1966; correct?
23    A.  Yes.  What one gets that from kind
24 of the headnote on the third page of the
25 document you served me.  But the important

R.S. LEVY

1
2 thing to -- an important thing to take from
3 this case is that the justices concerned who
4 heard this case, not that Margareta can
5 necessarily grade justices of the Supreme
6 Court of the United Kingdom or the United
7 States.  But the reference is Gummow and
8 Gleeson, in my experience are world renown
9 in their analysis of trusts and corporate
10 matters.  One of them wrote a -- a leading
11 text on trusts.  So yeah, as -- as it
12 appears from the headnote on the third page,
13 preference, priority or advantage,
14 Bankruptcy Act 1966, Companies Code Victoria
15 451.
16    Q.  Thank you, Mr. Levy.  I mean, I
17 will say for the record, right, the question
18 was whether this case applied to a
19 particular statute.  I have tried to
20 endeavor today to let you finish your
21 answers, but you went on to explain how
22 particular justices are credible around the
23 world.  If you could try to focus on the
24 question, I think it will help us get
25 through this today.  If we get long-winded

1          R.S. LEVY
2 answers like this, then, you know, we are
3 going to reserve our right to extend the
4 time.  And I am just saying that and your
5 counsel will have an opportunity to respond.
6          MR. PROULX:  Objection to form,
7      objection to narrative, there is no
8      question pending.  The deposition will
9      proceed.
10     Q.   Okay.  So -- so Section 122 of the
11 Australian Bankruptcy Act focuses on
12 preferences where a debtor is unable to pay
13 his debts as they become due; correct?
14     A.   Yes.
15     Q.   And it also focuses on whether
16 that transfer gives a creditor a preference,
17 priority, advantage over other creditors;
18 right?
19     A.   Yes.
20     Q.   So in reference to the statutory
21 focus on a debtor's ability to pay debts as
22 they become due, that is looking at the
23 position vis-a-vis other creditors; right?
24     A.   That's one of the position --
25          MR. PROULX:  Counsel, are you

1          R.S. LEVY
2      going to be reading from this document,
3      is there a particular paragraph you are
4      reading from?
5          MR. DARBY:  I am asking a
6      question, Zach, he can answer the
7      question.  If he doesn't understand it,
8      he can ask me.
9      A.   We are looking at paragraph 11 as
10 I understand it.
11     Q.   I am not looking at any paragraph
12 right now?
13     A.   I am looking at paragraph 11.
14 Sorry, can you repeat the question?
15     Q.   Sure.
16          Does the Australian statute look
17 at the position of the creditor vis-a-vis
18 other creditors?
19     A.   It looks at whether the -- the
20 creditor or the debtor, because the prior
21 questions was, was he unable to pay his
22 debts as a full due, and that would appear
23 -- that relates to the debtor.
24     Q.   Sure.  So the provision I am
25 looking at directly, and this will be

1          R.S. LEVY
2 paragraph 11, it is the quote of the text?
3          MR. PROULX:  Thank you, Counsel.
4      Q.   I see a reference down there that
5 says, Having the effect of giving that
6 creditor a preference, priority or advantage
7 over other creditors.
8          And so my question is based on
9 that text, is this statute concerned with
10 the position of the allegedly preferred
11 creditor vis-a-vis other creditors?
12          MR. PROULX:  Objection to form.
13     A.   Yes, well, it is concerned in a
14 situation whereby the payment gives a
15 particular creditor the advantage.  And by
16 definition that would be over other
17 creditors.
18     Q.   And so the BVI Insolvency Act
19 looks at the position of the creditor
20 vis-a-vis itself; right?
21          MR. PROULX:  Objection to form.
22     A.   If we could look at the BVI
23 Insolvency Act.
24     Q.   You need to look at the BVI
25 Insolvency Act for that question?

1          R.S. LEVY
2      A.   Yes, I have not committed any
3 legislation to memory.  I think it is only
4 fair that we have a look at the legislation
5 if you are going to ask questions about it.
6          MR. DARBY:  So this should marked
7      as Levy Exhibit 6.
8          (Whereupon, BVI Insolvency Act was
9      marked Levy Exhibit 6 for
10     identification as of this date.)
11     Q.   Mr. Levy, is there a particular
12 provision of the Insolvency Act that you
13 need to look at here?
14     A.   I think you were asking me about
15 Section 245?
16     Q.   Yes.  And my question will be
17 about 245 and 1(c).
18     A.   Yes, sorry, go ahead.
19     Q.   So my question is the BVI
20 Insolvency Act looks at the position of the
21 creditor compared to -- to itself; correct?
22     A.   Yes.
23          MR. PROULX:  Objection to the
24     form.
25          You can answer.

42 (Pages 162 - 165)

R.S. LEVY

1
2     Q.   So that's a distinction between
3  the two statutory languages, isn't it?
4     A.   Well, what do you mean by it looks
5  at the position of the creditor compared to
6  himself?  The only question as I see it that
7  the court has to determine under Section --
8  sorry, Section 245(1)(c) is whether a
9  creditor has been preferred.
10    Q.   So if I read Section 245(1)(c), it
11 requires that the transaction, quote, has
12 the effect of putting the creditor into a
13 position, which in the event of the company
14 going into insolvent liquidation, will be
15 better than the position he or she would
16 have been in if the transaction had not been
17 entered into.
18        And so that appears to me a
19 comparison of the creditor's position after
20 the transactions and the creditor's position
21 in the counterfactual, if the transactions
22 had never occurred.
23        Is that a fair characterization?
24        MR. PROULX:  Objection to form.
25    You can answer.

R.S. LEVY

1
2     A.   It merely asks the question
3  whether the creditor would be in a better --
4  yes, whether the creditor would be in a
5  better position as a result of the
6  transaction that he would have been had
7  there been a hypothetical liquidation.
8     Q.   So that's a textual difference
9  from the Australian statute; correct?
10    A.   Well, are you going to suggest it
11 is a distinction that is a substantial
12 difference?
13    Q.   I am going to ask that you answer
14 the question?
15    A.   Because -- because, if one looks
16 at the analysis here at paragraph 22 of the
17 judgment of the court, the lordships are
18 very clear, they say this, The premise for
19 the conclusion reached by Chief justice
20 Brennan CJ in Sheahan, The payment in issue
21 was made by the company should not be
22 accepted further even if as in the present
23 -- as  -- as is the present case in the
24 present -- as is the case in the present
25 matter, excuse me, a payment is made by the

R.S. LEVY

1
2  company.  The question is not was -- whether
3  the payment was at the expense of other
4  general creditors.  The question is whether
5  the payment gave the recipient a preference,
6  priority or advantage.
7     Q.   Over whom?
8     A.   Sorry?
9     Q.   I apologize, you can finish your
10 answer?
11    A.   Well, an advantage as to what he
12 would -- by comparison presumably to what
13 he -- the creditor would have received on an
14 insolvency.  But this case doesn't support
15 the proposition, I think, so far as I
16 understand your proposition.  Because the
17 Court points out that the question is
18 whether the payment gave the recipient a
19 preference, priority or advantage.
20    Q.   Thank you.
21    A.   And that's -- sorry.
22    Q.   You can finish your answer.
23        MR. PROULX:  If your answer isn't
24    done, you can complete it.
25    A.   Do carry on.

R.S. LEVY

1
2     Q.   My question is whether the texts
3  of the statutes differs.  And does the texts
4  of the two statutes differ?
5     A.   Manifestly, yes.
6     Q.   Okay.  So the court in Aldridge
7  considered the funds that were transferred
8  to be the assets of the debtor; correct?
9        MR. PROULX:  Objection to form.
10    A.   You are referring to which
11 paragraph?
12    Q.   Paragraph 7 and 8.
13        And I will posit that about six
14 lines down it refers to approximately
15 400,000 held on behalf of TLL?
16    A.   Yeah.
17        These were the funds that were
18 subject to the crystalized floating charge,
19 correct, that's correct, isn't it?
20    Q.   In paragraph 8 references 400,000
21 held on behalf of Construction Engineering
22 Party Limited -- excuse me, strike that.
23        400,000 held on its behalf by
24 Construction Engineering Party Limited?
25    A.   Yeah.

Page 170

1            R.S. LEVY
2      Q.  So does anywhere in this judgment
3  suggest to you that a preference can arise
4  without a depletion of assets that belong to
5  the debtor?
6      MR. PROULX:  Objection to form.
7      A.  The question is according to
8  Aldridge whether there has been a
9  preference.  That's the only question that
10  the court has to determine.  If you want to
11  say -- if you want to say that there are
12  necessary inference of a preference claim is
13  a depletion of assets otherwise available --
14  available to other creditors, then that --
15  that -- that suffers from a vice that was
16  identified by the courts at all levels in --
17  how do you say it, of requiring to read
18  words into a statute.
19      So if that's -- if those words you
20  want to write in or read in, I would say no,
21  on its face the act doesn't require that.
22  Perhaps the court, if there was no depletion
23  of assets would take a different line when
24  it came to the granting of relief.  As a
25  matter of statute construction, one has to

Page 171

1            R.S. LEVY
2  -- one just has to read the words.  That's
3  what we call an ability in Countrywide with
4  relation to section 4.2.3.  That's how an
5  English court, Supreme Court approaches
6  statutory construction.  And that's how a
7  BVI Court will approach statutory
8  construction here.  Just read the words.
9      Q.  So is it your testimony that under
10  the BVI Insolvency Act it is not necessary
11  that the alleged transaction deplete the
12  assets or the value thereof that would
13  otherwise have been available to the
14  debtor's general body of creditors?
15      MR. PROULX:  Objection to form.
16  You can answer.
17      A.  Those words do not appear here.
18  And it is my evidence that that is not a
19  necessary incident.  In the event there was
20  no depletion of assets, then the court has a
21  jurisdiction under section to -- to fashion
22  relief under the provisions 249 and 250.
23      Because there is no reason to read
24  words into a statute.  And it is not
25  something we do in the U.K. or in the BVI.

Page 172

1            R.S. LEVY
2      Q.  So do you think that a BVI
3  preference claim can be used to put the
4  debtor into a better position than it would
5  have had if the transactions never occurred?
6      MR. PROULX:  Objection to form.
7      A.  What -- what is the factual
8  scenario that you are putting to me?
9      Q.  The factual scenario is that a
10  debtor has a thousand dollars worth of
11  assets to be distributed to its creditors,
12  can a preference claim be used to improve
13  the position of the debtor and increase the
14  amount that would have been distributed?
15      MR. PROULX:  Objection to form.
16      A.  Well, I am not sure that your
17  hypothetical really advances the situation.
18  The preference claim can be used in any
19  situation per section 245 of the BVI Act,
20  assuming the transaction falls within (a)
21  and (b), it has the effect of putting the
22  creditor into a position in which the event
23  of the company going into insolvent
24  liquidation.
25      If the company is in a better

Page 173

1            R.S. LEVY
2  position, then that's in the interest of
3  creditors as well.  Because creditors would
4  be able to -- assuming the company is
5  insolvent, but it is in a better position,
6  so it is kind of less insolvent, or what is
7  a greater pool of assets available for the
8  distribution -- distribution to the pool of
9  general creditors, the creditors are in a
10  better position.  This is a class remedy.
11      Q.  Do you consider a preference claim
12  then to be punitive in nature?
13      MR. PROULX:  Objection to form.
14      A.  I am not sure what you mean by
15  punitive.
16      Q.  Earlier you said it was
17  restorative in nature?
18      MR. PROULX:  Objection to form.
19  That mischaracterizes the testimony.
20      A.  I don't really understand what you
21  mean by punitive.  You are going to have to
22  clarify.  I don't understand who it is being
23  punished.
24      Q.  Is it your understanding that the
25  only relevant inquiry is to the creditor's

44 (Pages 170 - 173)

1          R.S. LEVY
2 status?
3          MR. PROULX:  Objection to form.
4      A.  Again, I don't understand.  I
5 mean, it seems to me it is as a matter of
6 simple English.  You have to determine A,
7 that it is an insolvency transaction, that's
8 defined in Section 244, whatever, B, it is
9 within the vulnerability period and C, it
10 has an effect of putting the creditor in a
11 position that is better than it would had
12 the company gone into insolvent liquidation.
13 There are no other tests there, none.
14     Q.  So can you turn to paragraph 48 of
15 your declaration, please.  And I will read
16 that it says, These transactions are alleged
17 to have amounted to an unfair preference
18 within the meaning of Section 2451 of the
19 BVI Insolvency Act, because they depleted
20 the assets or the value thereof that would
21 have been available to 3AC's general body of
22 creditors, and did so to the advantage of
23 FTX, because the transactions resulted in
24 repayment in full of liabilities that 3AC
25 owed to FTX.

1          R.S. LEVY
2      Do you see that?
3      A.  I do see that.
4      Q.  So are you changing your analysis?
5          MR. PROULX:  Objection to form.
6      A.  That's not my analysis.
7      Q.  What I just read is not your
8 analysis?
9      A.  Yeah.
10          MR. PROULX:  Objection to form.
11     A.  Look at footnote 18, I am citing
12 what is alleged in the -- in the amended
13 proof of claim.
14     Q.  So you don't agree with what is
15 alleged in the amended proof of claim?
16          MR. PROULX:  Objection.
17     A.  I could see what is said there,
18 whether all of that is necessary to
19 establish a preference claim as a matter of
20 BVI law is another matter.  My view is you
21 just have to read the act, you just have to
22 read the statute.
23     Q.  So your view is that if assets
24 sought in a preference claim were never
25 available to the debtor before the

1          R.S. LEVY
2 transaction, there could still be a
3 preference claim based on those assets?
4          MR. PROULX:  Objection.
5      A.  Sorry, I don't understand that
6 factual predicate, assets.  Can you repeat
7 it again.
8      Q.  Sure.
9      Let's assume that the court
10 concludes that 3AC did not have a
11 proprietary interest in any digital assets,
12 are you with the assumption?
13     A.  I don't agree with -- that that is
14 a likely or realistic assumption.
15     Q.  That's not the question?
16     A.  And do you include by that no
17 chose in action?
18     Q.  Is a chose in action a proprietary
19 interest?
20     A.  It is some -- it is a form of
21 property that is capable of being owned.
22     Q.  So is it a proprietary interest?
23     A.  It is a form of -- do I have
24 proprietary interest in?  Yes, I mean, it
25 is.

1          R.S. LEVY
2      Q.  Okay.  And so do you understand
3 the assumption, and I am not asking if you
4 agree with it, I am asking if you understand
5 the assumption I am positing, which is the
6 court concludes that 3AC did not have a
7 proprietary interest in any digital assets
8 held by the FTX Exchange?
9          MR. PROULX:  Objection to form.
10     A.  I -- I understand that assumption.
11 I think it is an assumption that is
12 vanishingly unlikely, but --
13     Q.  Again, the commentary, I am trying
14 to not to cut you off, but we are going to
15 be here a lot longer, if that's how you
16 answer questions.
17          MR. PROULX:  There is no pending
18     question.  Counsel, argumentative,
19     objection, objection narrative.
20     Continue, please, if you would like to
21     continue.
22          MR. DARBY:  If you are done with
23     your speaking objection, I will.  You
24     know that's not proper.
25          MR. PROULX:  You cannot point me

1          R.S. LEVY
2    to a speaking objection. Please feel
3    free to do so, if you would like.
4    Q.  So Mr. Levy?
5    A.  Yeah.
6    Q.  So in that scenario, can a
7    preference claim be sustained based on a
8    transaction in digital assets, if 3AC had no
9    proprietary interest in those digital
10   assets?
11         MR. PROULX:  Objection to form.
12   A.  One simply has to read the act.
13        If the creditor was put into a
14   position which in the event of the company
15   going into insolvent liquidated would be
16   better than he or she would have been in,
17   then that's a preference, that's a
18   preference.  That's the definition.
19   Q.  So the preference transaction need
20   not have any nexus to the debtor's estate,
21   is that your view?
22        MR. PROULX:  Objection to form.
23   A.  Well, I don't really understand,
24   didn't have any nexus.  It has to be a
25   transaction entered into by the company.

1          R.S. LEVY
2    That's the opening line of Section 245.
3         So if it causes the company enters
4    into a transaction which has the effect of
5    putting the creditor into a better position
6    than he or she would otherwise have been in,
7    that's a preference.
8         Again, whether the court in that
9    scenario would order relief or what form of
10   relief it would order is a different
11   question.  But I can't construe a different
12   statute parallel to the legislature could
13   have chosen to add additional words.  It
14   hasn't added additional words.
15        We know that the courts in the
16   U.K. and the BVI would be extremely
17   reluctant, or don't as a general rule, to
18   read words into a statute.  But you are
19   asking me to read words into a statute.
20   Q.  So what do you think a BVI Court
21   would have done if presented with an alleged
22   preference transaction that did not deplete
23   or diminish the assets that would have
24   otherwise been available for distribution?
25        MR. PROULX:  Objection to form,

1          R.S. LEVY
2    objection, calls for speculation.
3    A.  Well, if the company had entered
4    into a transaction which puts the creditor
5    into a position which would be better than
6    it would have been, the court being mindful
7    of the fact that this is a -- a remedy which
8    is available for a class of people, would be
9    concerned to investigate whether it should
10   restore the position so that everybody
11   should share equally, why should -- I mean
12   the court might asks itself, why should the
13   company have entered into a transaction
14   whereby it gives creditor A, X and creditors
15   B to J get nothing, what should the board do
16   in that situation, other than ensure a
17   situation whereby the pari passu principle
18   is put into effect, because that's what
19   underlies this.
20   Q.  So in --
21   A.  And there is support that I go
22   back to paragraph 22 of Aldridge, it seems
23   to be what the court says there is clear.
24   And that's clarified, if you want to have a
25   read of paragraph 29 of Aldridge, a Full

1          R.S. LEVY
2    Court of the Federal Court of Australia,
3    examined the policy considerations
4    underlining the preference positions of
5    bankruptcy laws in a number of common law
6    jurisdictions.  The case concerned
7    complexities of running accounts that are
8    not presently relevant.  The Full Court,
9    observing that, as in the United States and
10   unlike the position in England, Australian
11   preference provisions operate objectively
12   rather than by reference to the subjective
13   purpose of the debtor.
14        And it quotes the passage from the
15   1977 House Committee Report.  And if you
16   look down at footnote 14, you have that
17   report.  And I understand, I may be wrong,
18   you can correct me, that that's probably a
19   house report of United States which is in
20   turn being cited by the Supreme Court of the
21   United States.
22        And then if you read that
23   citation, the passage cited there, the House
24   Committee was saying that the operation of
25   the preference section is to determine the

46 (Pages 178 - 181)

1           R.S. LEVY
2  rate of diligence of creditors to dismember
3  the debtor before bankruptcy.  Further there
4  is a secondary to the preference section
5  that is the equality of distribution.  And
6  that's what it is all about.  So in this
7  case you have two things, you have just
8  looked to see whether there is a preference,
9  just looked to see whether there is a
10  preference.  That is the question.
11      Q.   So is it possible for a creditor
12  to do better if it hasn't received the
13  debtor's property?
14          MR. PROULX:  Objection to form.
15      A.   I am sorry, I am not fully
16  following.
17      Q.   Is there a word you don't follow?
18      A.   Sorry?
19      Q.   I am trying to help you, help make
20  it so you can follow it, is there a
21  particular word you do not understand?
22      A.   Is it possible that the creditor
23  could what, sorry?
24      Q.   Could a creditor benefit from a
25  transaction if it has not received the

1           R.S. LEVY
2  debtor's property?
3          MR. PROULX:  Objection to form.
4      A.   Yes.
5      Q.   And so would that be a preference
6  even if it had nothing to do with the
7  debtor's property?
8          MR. PROULX:  Objection to form.
9      You can answer.
10     A.   If they -- well, A, you have got
11  the situation in Invest Bank.  But if a
12  debtor instructs someone to pay off a
13  particular debt, then it seems to me -- in
14  preference to other creditors, then it seems
15  to me that using the language, it is a
16  transaction which has the effect of putting
17  the creditor into a position which is in the
18  event of company going to insolvency will be
19  better than the position on the hypothetical
20  liquidation.
21          All you can do is read -- read the
22  act.  And it may be that in that scenario
23  the court would be -- that -- that -- that
24  in the appropriate scenario the court would
25  not grant relief.  There was somebody who

1           R.S. LEVY
2  had posited for the sake of a sample 100
3  million or whatever or a billion dollars of
4  something in a -- in a -- on an exchange,
5  the idea that the court would find it
6  impossible, inappropriate to fashion relief
7  if he thought that the creditor had been
8  given a preference is to my mind fanciful.
9  But the court will just look at the section
10  and then fashion relief.  And it may be in
11  certain circumstances, I can't think of what
12  they are now, but I don't think this case is
13  among them in any analysis, and the court
14  will say no, I don't think I am going to
15  grant relief.
16     Q.   So Mr. Levy, in this hypothetical
17  liquidation you reference, is property
18  belonging to people other than the debtor
19  being distributed?
20          MR. PROULX:  Objection to form.
21     A.   This is -- this is a hypothetical.
22  But if the company has caused that to
23  happen, it is a transaction.  A transaction
24  is a word of very broad import.
25          And so if a -- if a company has

1           R.S. LEVY
2  caused that to happen, then that
3  transaction, if it has had the effect of
4  putting a creditor into a better position,
5  that seems to me to fit within the section.
6      Q.   So if the property at issue in the
7  transaction would not have been available
8  for distribution in the hypothetical where
9  the transaction never occurs, then it is
10  your view that that transaction can still
11  constitute an unfair preference; correct?
12          MR. PROULX:  Objection to form.
13     A.   My view is that the company
14  affects a transaction or enters into rather,
15  sorry.  If a company enters into a
16  transaction, which has the effect of putting
17  a creditor into a better position, then that
18  is prima fascia of preference.  And there is
19  no reason to read in additional words.  I
20  don't think these are the facts of our case,
21  by the way.  It is not my understanding of
22  our case.  And it is not the analysis that I
23  have subjected the -- the -- the -- that I
24  concluded on -- on our case.  But that's all
25  the act says.  And we don't -- what are the

47 (Pages 182 - 185)

1          R.S. LEVY
2 words does it suggest should be written into
3 this statute as preconditions to relief or
4 entitlement.
5      Q.  So besides Aldridge and the Invest
6 Bank decision that you mentioned, are there
7 any other authorities that stand for your
8 premise that there could be a preference
9 transaction that does not diminish the value
10 of assets available for distribution by the
11 debtor?
12      MR. PROULX:  Objection to form.
13      A.  I think there was an Australian
14 case, I should have mentioned, there is a
15 New Zealand case of Jones.  But it is
16 referred in Mr. Atherton's rebuttal report.
17 I think that's a similar effect.  But I
18 haven't got it down.
19      Q.  Are preference claims frequently
20 litigated under the BVI Insolvency Act?
21      A.  No, not in my -- not in my
22 experience.  And I do follow the law there.
23      Q.  The BVI Insolvency Act came into
24 force on January 1, 2004; correct?
25      A.  Yes.  Quite what there was before

1          R.S. LEVY
2 that, I can't recall.  But if -- if that's
3 the date when it came into -- it says here
4 in force 16 August of 2004 on the front page
5 of the clip you just handed me, but yeah,
6 sure.
7      Q.  Are you aware of any preference
8 claim under the BVI Insolvency Act that
9 involved digital assets?
10      A.  No.
11      Q.  Are you aware of any BVI law
12 preference claims other than those you cite
13 in your declaration?
14      A.  Any BVI, sorry?
15      Q.  Any BVI law preference claim at
16 all other than the ones you mention in your
17 declaration?
18      A.  No, I don't believe so.  There may
19 be others.
20      Q.  What is your best estimate for how
21 many preference claims under the BVI
22 Insolvency Act have successfully been proven
23 in court?
24      MR. PROULX:  Objection to form.
25      A.  I -- I shall -- I couldn't give

1          R.S. LEVY
2 such an estimate.
3      Q.  Are you aware of one?
4      A.  No.  But there -- there may be the
5 law reporting in the BVI is -- is a bit hit
6 or miss.  There is a website at eccourts.org
7 which contains published judgments from a
8 variety of jurisdictions.  Whether that is
9 full and authoritative, I am not sure.  And
10 whether it runs back to the mist of time
11 since 2004 or beyond, I don't know.
12      But what I do know is that they
13 have a strong commercial court who would
14 have no difficulty in applying this act and
15 does so routinely.
16      Q.  So are you aware of a single
17 instance in which a BVI court has awarded
18 relief pursuant to a preference claim under
19 the BVI Insolvency Act?
20      A.  I am not aware.  That's not to say
21 that they don't exist.
22      Q.  Are you aware of a single instance
23 in which any court anywhere has awarded
24 relief pursuant to a preference claim under
25 the BVI Insolvency Act?

1          R.S. LEVY
2      A.  No, that's not to say they don't
3 exist, though.
4      Q.  So are the Joint Liquidators
5 asking a U.S. Bankruptcy Court to be the
6 first court anywhere in the world to grant
7 relief pursuant to a preference claim under
8 the BVI Insolvency Act?
9      MR. PROULX:  Objection to form.
10      A.  I have -- I have no idea what the
11 answer to that question is.
12      Q.  So they could be?
13      MR. PROULX:  Same objection.
14      A.  I have -- I have -- I have no
15 idea.  But that -- that's not particularly
16 surprising.
17      The Chukwueloka a proceedings were
18 the first time in English legal history that
19 a U.K. statutory instrument which is brought
20 into effect in the U.K. as a result of the
21 directive of the European Union, namely
22 financial sources regulations, number two
23 regulations were ever litigated.  And yet
24 despite those regulations having no -- not
25 applying in the Virgin Islands, that

Page 190

1           R.S. LEVY
2  litigation was fully fought out in the
3  British Virgin Islands under English law.
4           So it wouldn't be -- it wouldn't
5  surprise me to see issues fault in foreign
6  courts, particularly in view of the nature
7  of the BVI, which is a center for
8  registration of companies controlled by
9  people all over the world.
10          But Section 245 is pretty clear.
11     Q.  So if no court anywhere has ever
12  awarded relief pursuant to a preference
13  claim under the BVI Insolvency Act, then the
14  Joint Liquidators are asking this bankruptcy
15  court to go beyond any BVI law decision;
16  correct?
17          MR. PROULX:  Objection to form.
18      Calls for speculation.
19     A.  I don't -- I don't accept that.
20  There is anything remotely special in that.
21  Either it is a preference or an
22  undervalue -- or it could be none of those
23  things.  But certainly to my mind it looks
24  very much like a preference.  Why there
25  haven't been preference claims, if there

Page 191

1           R.S. LEVY
2  haven't been, I don't know that that's
3  correct, litigated to judgment in the Virgin
4  Islands, I can't say.
5      Q.  Are you aware that the joint
6  liquidators amended proof of claim seeks
7  more than $1.5 billion in relief?
8      A.  I wasn't aware of the precise
9  number.  I don't find the number
10  particularly stunning.
11     Q.  Are you aware that the joint
12  liquidators filed a response brief on
13  November 25, 2025?
14     A.  I am, yes.
15     Q.  Are you aware that that response
16  brief purports to seek relief for more than
17  a billion dollars?
18     A.  It doesn't spring to mind.  But it
19  doesn't seem that significant.  This was an
20  exchange on which vasts amount of money was
21  traded.  The numbers are very big.  But the
22  numbers aren't huge anymore.  When I first
23  started out the claim for a million pounds
24  is vast, subsequently I have done claims for
25  several billions.  It is just the nature of

Page 192

1           R.S. LEVY
2  commerce, inflation and whatever else.
3      Q.  But you are not aware of a single
4  BVI Insolvency Act preference claim that
5  resulted in the recovery of $1; correct?
6          MR. PROULX:  Objection to form.
7      A.  I don't see that is significant as
8  to whether there was a preference in this
9  case.
10     Q.  It is a yes or no question?
11     A.  As I said, no, because -- but I
12  don't see this as significant on the facts
13  of this case.
14     Q.  You don't think it is significant
15  that there never has been a preference claim
16  for $1 and the Joint Liquidators are asking
17  for more than a billion dollars from a U.S.
18  court?
19          MR. PROULX:  Objection, asked and
20      answered.
21     Q.  You can answer?
22     A.  No.  Necessarily this case was to
23  take place in the BVI, is the BVI judge
24  seriously going to say well, there has never
25  been one before, therefore I am not going to

Page 193

1           R.S. LEVY
2  decide this, no.
3      Q.  Do you think it typical that a
4  U.S. court deal with BVI law issues as
5  frequently as a BVI court?
6          MR. PROULX:  Objection to form.
7      A.  I have no idea how often -- I
8  don't know.  I have certainly seen and heard
9  of US courts dealing with BVI law or foreign
10  law issues.  It is the nature of commerce
11  nowadays around the world to regularly deal
12  with foreign law issues, Chinese, Russian,
13  Taiwanese.  It is not surprising.
14     Q.  Do you understand that a US
15  bankruptcy court receives evidence regarding
16  the meaning of foreign law?
17     A.  Whether I have any independent
18  understanding of that, yeah, I would assume
19  that would be the case, yes.
20     Q.  And you are the BVI law expert on
21  behalf of the joint liquidators; correct?
22     A.  Yes.
23     Q.  And you cannot point to a single
24  successful preference claim under the BVI
25  Insolvency Act?

49 (Pages 190 - 193)

Page 194

1        R.S. LEVY
2        MR. PROULX: Objection,
3    argumentative, asked and answered,
4    form. You can answer again, if you
5    understand the question.
6        A. I have already answered that
7    question. However, that doesn't cause me
8    any concerns at all. Because I can read --
9    read the statute. And I understand the --
10   well, I was supplied with two assumptions
11   about which you asked me a lot of questions.
12   But the questions probably were better put
13   to those responsible for the assumptions.
14   On the basis of those assumptions and/or the
15   fact that there is a chose in action, I have
16   no difficulty concluding that this is an
17   appropriate case where there has been an
18   unfair preference.
19       Q. So just to confirm I have your
20   testimony correctly, is it your position
21   that a BVI Insolvency Act preference claim
22   need not involve the diminution of assets
23   that would be available for distribution in
24   the creditor's estate?
25       MR. PROULX: Objection to form.

Page 195

1        R.S. LEVY
2        Q. The debtor's estate, excuse me?
3        MR. PROULX: Objection, still
4    objection to form.
5        A. I think we have been over this
6    issue and I said just read the act. In an
7    appropriate case it may be that the court
8    would say under section -- I am not going to
9    exercise my jurisdiction under Sections 249
10   or 250 of the act. But if there has been a
11   preference, that's what the court looks at,
12   see this act, see Section 245 or 249 and see
13   Aldridge.
14       Q. So BVI court would have discretion
15   on what relief to reward?
16       A. Yes.
17       Q. And that discretion would be
18   declining to award relief even if the
19   elements of a claim were technically met?
20       A. I suppose it could. But that
21   would have to be decided on a -- that would
22   have to be decided on the facts as found by
23   the court. I am not going to speculate
24   about that.
25       Q. Do you think it would be more

Page 196

1        R.S. LEVY
2    likely that a BVI court would exercise
3    discretion not to grant relief, if the
4    consequence of that relief could be
5    conferring a windfall on the debtor?
6        MR. PROULX: Objection to form,
7    calls for speculation.
8        A. I don't think the debtor could
9    ever have a windfall. Because the relief is
10   available to a liquidator, and it is for the
11   benefit of the creditors. So they don't say
12   3AC in this situation, by definition if not
13   dead and buried, then certainly fatally
14   wounded never to recover. And the question
15   is what happens with the proceeds. And I am
16   not sure it is a windfall to the debtor. It
17   is not a windfall to the debtor. The money
18   goes to the Joint Liquidators for pari passu
19   distribution which is the purpose of the
20   regime.
21       Q. Can you describe your
22   understanding of the pari passu principle,
23   please?
24       A. Yes, it is that all creditors of
25   the same class should be treated equal --

Page 197

1        R.S. LEVY
2    equally and share any distribution ratably.
3        Q. And what is distributed?
4        A. Sorry?
5        Q. What is being distributed?
6        A. Funds under the control of the
7    Joint Liquidators.
8        Q. And that's whether or not it is
9    the property of the debtor?
10       MR. PROULX: Objection to form.
11       A. I don't really understand whether
12   or not it is property of the debtor. They
13   don't distribute money from their own bank
14   account, personal bank accounts. It is
15   money that is -- that sits to the creditor
16   of the insolvent estate.
17       Q. So you think Joint Liquidators can
18   distribute property of people other than the
19   debtor?
20       MR. PROULX: Objection to form,
21   objection mischaracterizes the
22   testimony.
23       A. I don't really understand the
24   premise for that. If the Joint Liquidators
25   would cover a sum as a result of a

50 (Pages 194 - 197)

Page 198

1          R.S. LEVY
2  preference claim, that falls to the estate
3  and would fall to the Statute of
4  Distribution under the Insolvency Act.
5      Q.  Can you describe the transactions
6  that form the basis for the Joint
7  Liquidators' claim?
8      A.  Those form parts of my
9  assumptions, don't they?  They are
10  described -- they are described to the best
11  of my understanding in paragraph 20, of my
12  first -- of my report -- of my declaration,
13  and that's what I was asked to assume.
14      Q.  Can you articulate what the
15  transaction is that is alleged to have
16  occurred at a preference?
17      A.  All I can do is read what I was
18  told to, read what I assumed.  They sold --
19  substantially all of the digital assets
20  associated with 3AC's accounts were sold.
21  Substantially all of the digital assets
22  associated with 3AC accounts on the FTX
23  Exchange were sold, liquidated or otherwise
24  transferred out of 3AC's account.
25      Q.  So are those transactions on the

Page 199

1          R.S. LEVY
2  Exchange?
3      A.  Well, it goes on in paragraph 23.
4      Sorry, 22 and 23 to tell me to
5  assume, for instance, in paragraph 23, it
6  says all liquidation of digital assets
7  associated with 3AC's accounts on the
8  Exchange.
9      Q.  So is your testimony that the
10  assumptions describe what is alleged to have
11  been the transaction for purposes of the
12  preference claim?
13      MR. PROULX:  Objection to form.
14      A.  The assumptions merely tell me
15  what I am to assume.  And that is what I
16  assume.
17      Q.  You conclude that they approved
18  the element of an insolvency transaction;
19  correct?
20      A.  If that occurred, then yes.
21      Q.  If what occurred?
22      A.  If the transaction -- if the
23  transactions I am invited or rather
24  instructed to assume occurred, then if the
25  other ingredients are present, they could

Page 200

1          R.S. LEVY
2  form the basis of a -- of an insolvency
3  transaction -- of a preference, yes.
4      Q.  So when did these alleged
5  preference transactions take place?
6      MR. PROULX:  Objection to form,
7      asked and answered.
8      A.  It is described as described here,
9  they took place on the 13th and 14th of
10  June 2022.
11      Q.  Who were the parties to the
12  transactions?
13      MR. PROULX:  Objection to form.
14      A.  FTX and -- sorry, 3AC and the
15  counterparty, and the counterparty -- but
16  the person who received the benefit of them
17  could only have been FTX.
18      Q.  You don't think 3AC could have
19  received a benefit from those transactions?
20      MR. PROULX:  Objection to form,
21      lack of foundation.
22      A.  I don't assume that 3AC received a
23  benefit.
24      Q.  What did 3AC sell in those
25  transactions?

Page 201

1          R.S. LEVY
2      A.  As I understand it, all the
3  digital assets.
4      Q.  Is bitcoin an example?
5      A.  It may be an example.  I don't
6  know, I mean, I mentioned it, but I
7  assume -- well, I don't -- I don't assume,
8  digital assets.
9      Q.  So if the prices of the digital
10  assets that 3AC sold on June 13 and 14
11  declined afterwards, would those
12  transactions not confer a benefit onto 3AC?
13      A.  Had declined afterwards?
14      Q.  Afterwards.
15      MR. PROULX:  Objection to --
16      objection to form, you can answer.
17      A.  The benefit -- the benefit was
18  received by FTX who had liabilities, who was
19  owed money.  But as a result of these
20  transactions, it was owed less money.  And
21  had the transactions occurred on a different
22  day, then I dare say their counting would
23  have been.  But we are concerned with the
24  transactions on this day.
25      Q.  So if we assume that 3AC sold a

51 (Pages 198 - 201)

1          R.S. LEVY
2  bitcoin for $20,000, then at the time of
3  3AC's insolvency bitcoin was trading for
4  $15,000, did that transaction not benefit
5  3AC?
6          MR. PROULX:  Objection to form,
7      assumes facts not in evidence.
8      A.  That's -- that's not the -- that's
9  not the test.  Because the test, and I think
10 Mr. Atherton and I agreed are to compare the
11 actual transaction with what the -- with
12 what the position would be had there been a
13 super-veiling insolvency.  So what the
14 position was on 3AC's actual insolvency is
15 of no relevance.
16     Q.  Do you think it would matter to
17 the discretion of a BVI court if the
18 transactions impeached as preferences
19 actually improved the position of the
20 insolvent debtor?
21         MR. PROULX:  Objection to form,
22     calls for speculation.
23     A.  Because that is pure speculation.
24 I would have to know what it -- what the
25 factual predicate is.

1          R.S. LEVY
2      Q.  Assume on June 27, 2022, the date
3  of 3AC's liquidation proceedings, that the
4  prices of the digital assets that 3AC sold
5  were in fact lower than at the time 3AC sold
6  them, do you understand that assumption?
7      A.  I understand it.  I fail to see
8  really the relevance of it.  I fail to see
9  the relevance of it, because the test is set
10 out in Section 245.  That's all the court
11 has to look at.
12     Q.  So -- so I just have this
13 straight, you don't think it is relevant if
14 the trades alleged to have been preferences
15 did not in fact diminish the assets --
16 please let me finish?
17     A.  Yes, go ahead, yes, go ahead.
18     Q.  So if the trades alleged to have
19 been preferences did not diminish the assets
20 that would have been otherwise available for
21 distribution, you don't think that's
22 relevant?
23         MR. PROULX:  Objection to form.
24     A.  Well, with respect, I am not sure
25 that you are not confusing things.  We are

1          R.S. LEVY
2  concerned with a transaction whereby --
3  let's assume argumentative, these are
4  preferences, just leave them, I know you
5  don't want to count them as that.  Let's
6  assume argumentative these are preferences,
7  and let's assume that the preferences were
8  $100 per coin or it doesn't make any
9  difference, but let's assume when the
10 company actually went into liquidation they
11 were trading at $80, yeah?
12     Q.  Okay.
13     A.  All that means is that the person
14 that received the preference, who may or may
15 not still be sitting on the assets, yeah, if
16 he sold the assets at $100 then happy days
17 for him, if they are down to 80 cents --
18 $80, then he is down $20 per item.  But you
19 still -- you still have got a core number of
20 other creditors over here who get nothing
21 and the purpose of the act -- sorry, the
22 purpose of provisions is to ensure a pari
23 passu distribution.  So whether the company
24 would have done better or worse doesn't help
25 the poor creditors who aren't receiving

1          R.S. LEVY
2  anything.
3      Q.  Why are there not --
4          MR. PROULX:  Counsel, let him
5      finish the answer.
6      A.  Under your scenario.
7      Q.  Are you ignoring the $100 that was
8  received for the sale in that hype --
9  hypothetical?
10         MR. PROULX:  Objection to form.
11     A.  Sorry?
12     Q.  You said the creditors get
13 nothing, but your hypothetical was that the
14 debtors sold the assets for $100?
15     A.  Yes, but the creditors are not --
16 the creditors are not going to receive any
17 of that here.
18     Q.  Why not?
19     A.  Huh?
20     Q.  Why not?
21     A.  Because the -- because the balance
22 is down to zero.
23         If 3AC had a proprietary claim for
24 a chose in action, they were entitled to the
25 assets back then, those would have formed

52 (Pages 202 - 205)

1        R.S. LEVY
2  part of the insolvent estate and they would
3  have been distributed.
4      Q.  To be clear, that's an assumption
5  you are making that they had a proprietary
6  interest in digital assets; correct?
7        MR. PROULX:  Objection to form,
8    mischaracterizes the testimony.  You
9    can answer.
10     A.  In relation to two -- two -- two
11  ways in which it is brought there an
12  assumption, but in the third it is an actual
13  analysis.
14     Q.  Can you explain that answer, I am
15  sorry, I didn't understand that?
16     A.  Well, you said, I assume that it
17  is a proprietary interest.  You will be
18  taking me to paragraph 17 or whatever.
19     Q.  Right?
20     A.  Where we have the assumptions
21  based on the analysis of Dame Elizabeth to
22  whom I defer.  You asked me lots of
23  questions about it, but that's her analysis.
24  She spent a lot more time thinking about it
25  than I have.  And I defer to her.

1        R.S. LEVY
2        But the third analysis is the
3  chose in action analysis which is my
4  analysis.  And I am not sure of this
5  analysis with which Mr. Atherton disagrees.
6      Q.  So earlier you testified, if 3AC
7  has a proprietary claim or a chose in
8  action, they were entitled to the assets
9  back and those would have formed part of the
10  insolvent estate and they would have been
11  distributed, do you remember saying that?
12     A.  No.  But it doesn't sound too
13  wrong to me or wrong rather.
14     Q.  And so they only would have been
15  available for distribution if 3AC had a
16  proprietary interest or a chose in action in
17  those assets; correct?
18        MR. PROULX:  Objection to form.
19     A.  Those are the three scenarios I
20  would refer to.
21     Q.  I see two there.  What is the
22  third one?
23     A.  Well, there is -- there is two
24  because of Dame Elizabeth, Dame Elizabeth
25  offers two -- two difference routes to the

1        R.S. LEVY
2  proprietary interest in the assumptions I am
3  invited to draw in paragraph 17.
4        MR. PROULX:  Counsel, given a
5    heads up, we would like a break.  So
6    finish the questioning.  Also we really
7    do need water.
8        MR. DARBY:  Sorry?
9        THE WITNESS:  Is now a convenient
10   time or?
11        MR. DARBY:  Yes, we can do now.
12       How long do you need?
13        THE VIDEOGRAPHER:  The time is
14   2:38 p.m.  We are going off the record.
15       (Whereupon, a short recess was
16   taken.)
17        THE VIDEOGRAPHER:  The time is
18   3:04 p.m.  We are going back on the
19   record.
20     Q.  All right, Mr. Levy, we were
21  discussing preferences claim when we took a
22  break, correct?
23     A.  Yes, we were.
24     Q.  Are you drawing a distinction
25  between a preference claim under Section 245

1        R.S. LEVY
2  and the remedy for a preference claim under
3  Section 249?
4        MR. PROULX:  Objection to form.
5      A.  I am not sure I fully follow --
6  follow the question.  The preference claim
7  is a set of circumstances which if
8  established entitles a claimant, plaintiff,
9  whatever you want to call it, to relief.
10  And if that light is established, if the
11  preference is established, then the court
12  can grant relief.
13       So Section 249 says, subject to
14  Section 250, where it satisfied that a
15  transaction entered into by a company is a
16  voidable transaction, and you know as well
17  as I do, voidable transaction is referred to
18  back in Section 244.
19       So I am not sure I follow the
20  question.
21     Q.  What do you consider the relevant
22  provision to be with respect to the court's
23  power to grant relief for a preference
24  claim?
25     A.  Again, I don't quite understand.

53 (Pages 206 - 209)

1          R.S. LEVY
2 The court has a broad range of powers. And
3 under sections -- under Section 249, subject
4 to Section 250, so the court can do anything
5 as set out in Section 24 -- 249.
6      Q.  Thank you. So is it under Section
7 249 where a BVI court would find its power
8 to use discretion to fashion relief?
9          MR. PROULX: Objection to form.
10     A.  Yes, the court could determine
11 what relief to grant.
12         None of those provisions is
13 mandatory.  249(1)(a) is a may, (b) is a
14 may, (c) is a may.
15     Q.  Great?
16     A.  As is 2.  It doesn't have to do
17 any of them, so subsection 2, it doesn't
18 have to do any, or presuming could do a bit
19 of each depending on the circumstances of
20 the case.
21     Q.  Sure.  So subject to the
22 limitations in Section 250 is it permissive,
23 the court can consider things?
24         MR. PROULX: Objection to form.
25     A.  Can consider things.  I am not

1          R.S. LEVY
2 sure it talks about considering things.  It
3 says can do certain things.  But the court
4 would only do those things if the court
5 considered it appropriate.
6      Q.  Would a BVI court consider it
7 appropriate to grant an award that inflates
8 the estate beyond the size of the estate at
9 the time of the preference transaction?
10         MR. PROULX: Objection to form,
11 objection, calls for speculation.
12     A.  I am not sure what predicate you
13 are asking me to assume there.
14     Q.  Sure.  Let me try it again.
15         If the estate was larger because
16 of the preference transactions, do you think
17 the court would consider that in determining
18 what relief to award?
19         MR. PROULX: Same objections.
20     A.  The court -- the court would
21 consider all the circumstances of the case.
22 But the vice is the preference, the mischief
23 is the preservation of the pari passu
24 principle.
25         So if someone has received -- if a

1          R.S. LEVY
2 creditor, a preferred creditor -- sorry for
3 speaking with my eyes shuttered, I don't
4 mean to be rude to you.  If the preferred
5 creditor has received more than it would
6 have had the company gone into liquidation
7 immediately after the transaction, the
8 question would be why, if it is a -- a
9 preference, which is the vice, it should not
10 be treated in the same manner as all
11 unsecured creditors.  And that's also one of
12 the vices that is referred to in the House
13 Committee report that we looked at earlier,
14 which is kind of rush to judgment.  But I
15 can't answer a non-specific.
16     Q.  You can't answer the question of
17 whether a court would consider the fact that
18 alleged preference transactions inflated the
19 size of the estate?
20         MR. PROULX: Same objections.
21     A.  The court can consider all the
22 facts of the case.  But one question the
23 court would have to -- would as it seems to
24 me be concerned with, is even if that is the
25 case, even if that is the case, why should

1          R.S. LEVY
2 this creditor, the preferred creditor,
3 achieve the windfall at the expense of the
4 general body of creditors.  And I think that
5 the would be a conundrum to the court.  I
6 can't say -- I mean, I would have to think
7 about it more, but I can't why you should
8 say you, you Mr. Preferred creditor over
9 there, you -- you just keep all -- all of
10 that.  And I am very sorry, unsecured
11 creditors over here, but I want Mr. Secured
12 creditor to have the benefit.
13     Q.  But if transactions are the basis
14 for a preference claim, and those same
15 transactions improved the position of the
16 debtor and therefore the general pool of
17 creditors, would the windfall not be on the
18 other side of that transaction?
19         MR. PROULX: Objection, asked and
20 answered.
21     A.  I am not sure I fully understand
22 the factual scenario.
23     Q.  Let's use a specific scenario.  If
24 we assume that 3AC did not have $1 billion
25 in digital assets because it did not have a

54 (Pages 210 - 213)

Page 214

R.S. LEVY

1         R.S. LEVY
2  proprietary interest or any right to those
3  assets, would it be a windfall to 3AC's
4  estate, and therefore its creditors, if a
5  preference claim nonetheless awarded more
6  than a billion dollars?
7      MR. PROULX:  Same objections, and
8  also compound.
9      A.  I think -- I think I understand
10 the question.  But if it had a billion
11 dollars of assets, then presumably it
12 introduced those billion dollars of assets.
13 I should only be so lucky that a billion
14 dollars of assets would somehow find their
15 way into my bank account.  But there is a
16 billion dollars of assets in there.  It put
17 them in there.  So in your factual scenario,
18 which I find difficult, and is not one of my
19 assumptions, but -- and -- and likely wrong
20 in any event.
21     But if it has introduced a billion
22 dollars, it has essentially made -- but it
23 has got no right to it, it has got whatever
24 it is you want to say the right of 3AC has
25 to be.  So by some fluke of law or drafting

Page 215

1         R.S. LEVY
2  of the terms of service or other agreements,
3  it has essentially made a gift of those
4  transactions, of that billion dollars, the
5  question is why should the person who has
6  received the preference, why should the
7  person have received the benefit of that
8  preference take that billion dollars and all
9  the other unsecured creditors not share in
10 that billion.  I find that quite a
11 surprising factual scenario.
12     Q.  Mr. Levy, is it your understanding
13 that 3AC deposited a billion dollars of
14 digital assets onto the FTX Exchange?
15     A.  Well, let's go back to my -- my
16 assumptions.
17     So my assumptions in paragraph 16
18 of my declaration is that it had multiple
19 accounts.  And there is an assumption 19 is
20 that as of the end of 12th June so let's run
21 that over to the 13th of June, 3AC's
22 accounts in the Exchange included a
23 substantial quantity of digital assets such
24 as bitcoin which were then collectively
25 valued at over a billion.  Did it deposit

Page 216

1         R.S. LEVY
2  it, I am not sure that I am invited or
3  instructed to make the assumption that it
4  personally deposited a billion dollars,
5  because the burden of the assumptions as I
6  am invited -- as I am instructed rather to
7  make are this was an exchange, a trading
8  exchange.
9      So it could have deposited any
10 number of -- or any value of coins or
11 tokens, such that by the date in question,
12 namely the end of the 12th of June, they
13 were valued at over a billion dollars.  It
14 could have started off with 600 million, it
15 could have started off with 3 million and be
16 very unlucky.
17     Q.  So however it got there, you
18 consider it relevant that 3AC had access to
19 a billion dollars worth of digital assets?
20     MR. PROULX:  Objection to form.
21     A.  Relevant to what?
22     Q.  Relevant to whether there could be
23 a preference claim with a remedy approaching
24 a billion dollars.
25     A.  I think it is highly relevant that

Page 217

1         R.S. LEVY
2  someone has a trading account in which one
3  of the components is a credit of a billion
4  dollars.  It is not deminimis, it is a vast
5  amount of money.  But it is not actually --
6  it is not actually the vastness or otherwise
7  of the sum that makes it relevant.
8      Q.  Do you have -- I didn't mean to
9  cut you off?
10     A.  No, it is fine.
11     Q.  Do you have an understanding that
12 3AC could have withdrawn a billion dollars?
13     A.  Withdrawn a billion dollars.
14     MR. PROULX:  Objection to form.
15     A.  I have an understanding, if one
16 looks at the terms of service, specifically
17 if you turn to page 10, to the extent that
18 the dollar value of digital assets was a
19 billion dollars, I consider that 3AC
20 controlled the digital assets in its
21 account.  And that subject to outages,
22 downtime and other particular policies,
23 including the terms, it could withdraw the
24 digital assets.  And it could do that either
25 by sending them to a different blockchain

55 (Pages 214 - 217)

1        R.S. LEVY
2 address controlled by you or a third party.
3     Q.   Section 8.2.6 is conditional;
4 correct?
5        MR. PROULX:  Objection to form.
6     A.   The conditions being?
7     Q.   Subject to outages, downtime and
8 other applicable policies including the
9 terms.
10    A.   Well, outages and downtime, I am
11 not sure, you will correct me if I am
12 mistaken.  Can you take me to the
13 definitions of outages or down time.
14    Q.   Have you answered the question of
15 whether you consider that conditional?
16       MR. PROULX:  Objection to form.
17    A.   No, it is -- it is -- it is not
18 conditional, it seems to me, or to the
19 extent that it is, we are dancing on the
20 head of pins.  It is saying that subjected
21 to -- well, let's deal first with outages
22 and downtime.  If that means that for some
23 reason the web goes off, some sort of
24 natural disaster, catastrophe, hacking or
25 whatever.  That's what I understand an

1        R.S. LEVY
2 outage to be unless it is a particular term
3 of art in this industry.  Subject to that or
4 downtime -- now downtime may mean various
5 trading platforms, in my understanding,
6 prohibit trading because they are -- they --
7 they are updating the software or hardware
8 or messing around with the program.  So
9 that's outages and downtime.  That's not
10 conditional, they don't have to fulfill a
11 condition of no outage or no downtime.  And
12 that's really no more than saying -- the
13 analogy is a weak and poor one -- that
14 subject to the bank being open and the
15 staff, not all of them, being off with the
16 flu and COVID, I can go into the bank and
17 withdraw money to the credit of my account.
18 So those aren't conditional.  It is merely
19 saying, as I understand it, in the normal
20 course of events.
21       You know, and downtime is perhaps
22 more significant in the context of a crypto
23 exchange.  Because as I understand it,
24 although I am not giving evidence as an
25 expert on this, as I understand it, crypto

1        R.S. LEVY
2 can be traded 24/7.  That's probably one of
3 its greatest vices.
4     Q.   Sure?
5     A.   You could trade it 3:00 in the
6 morning.  So those aren't conditions.
7     Q.   Is that it on the first two
8 conditions?
9     A.   Yeah.
10    Q.   So do you agree, yes or no, that
11 Section 8.2.6 provides that the ability of a
12 customer to withdraw your digital assets is
13 conditioned on other applicable policies
14 including the terms?
15       MR. PROULX:  Objection to form.
16    A.   I -- I see those words.  I am not
17 sure what other applicable policies means.
18 But the terms -- I -- I can see that the
19 terms may restrict.  I won't say it is
20 conditional I think it is restrictive.
21 but --
22    Q.   Okay?
23    A.   But that may be a distinction
24 about a difference.
25    Q.   So other applicable policies

1        R.S. LEVY
2 restrict the right to withdraw?
3       MR. PROULX:  Objection to form.
4     A.   I don't know what the other
5 applicable policies are.  I have seen the
6 terms.  I mean, the terms, I don't know, I
7 have seen the terms, yeah.
8     Q.   Have you reviewed the rest of the
9 terms of service to conclude that all
10 applicable policies were satisfied in the
11 event of an attempt by 3AC to withdraw?
12       MR. PROULX:  Objection to form.
13 You can answer.
14    A.   If you can tell me what applicable
15 policies means, because I can see the -- in
16 schedule 1, which is page 28 of the -- let
17 me see if I can find it now, of applicable
18 laws.
19    Q.   Let's take a look at an example
20 can you flip to Section 16.2 of the terms of
21 service.  And I will read it so that you can
22 read it in parallel with me?
23    A.   Once we do that, is it being
24 suggested to me that these are applicable
25 policies because --

1         R.S. LEVY
2    Q.  Mr. Levy --
3         MR. PROULX:  If you had a
4    completion of your previous answer, you
5    can -- you can finish your answer.
6    Q.   The question pending for the
7    record is let's take a look at an example of
8    16.2, it is not actual a question other than
9    please read along?
10   A.  I am happy to do that.  I am not
11   trying to be obstructive.
12   Q.   Well, Mr. Levy, the answers are
13   very long-winded and they are not very
14   particularly responsive.  So it is beginning
15   to be a habit and a problem.  So it is very
16   important that you listen to the question
17   and answer the one that is asked.  I will
18   continue to ask this until it is answered
19   and that's how this will have to go?
20        MR. PROULX:  Objection to the
21        narrative.  We disagree with the
22        narrative.  Please continue your
23        questions.  Please wait for the
24        questions to finish.
25   Q.  All right, so Mr. Levy, Section

1         R.S. LEVY
2    16.2, the third sentence begins, You agree
3    to maintain a sufficient amount of assets at
4    all times to meet our margin requirement, as
5    such requirements may be modified from time
6    to time.
7         These are -- that's a provision
8    within the terms of service; correct?
9    A.  Yes.
10   Q.   And the right to withdraw assets
11   that we previously discussed is limited by
12   other provisions of the terms of service;
13   correct?
14        MR. PROULX:  Objection to form,
15        objection, mischaracterizes the
16        testimony.
17   A.  The restriction is applicable
18   policies including the terms.  But I agree
19   that one has to construe this contract as a
20   whole.
21   Q.   So you agree that if other
22   provisions of the terms of service would apply to
23   restrictive withdrawal, then the right to
24   withdraw that we just reviewed would
25   similarly be limited?

1         R.S. LEVY
2         MR. PROULX:  Objection to form.
3    A.   I agree that if the terms contain
4    a condition that restrict the right, then
5    the right may be limited.  As a matter of
6    general proposition I think that's a
7    reasonable thing to say.
8    Q.   And if there were other policies
9    outside of the terms, would those similarly
10   apply to this limitation on the withdrawal
11   right we just reviewed?
12        MR. PROULX:  Objection to form,
13        objection assumes facts not in
14        evidence, objection, calls for
15        speculation.
16   A.  Well, it has to be an applicable
17   policy.  So they can't just wait and say
18   3AC -- so FTX couldn't just in the corporate
19   sense wake up one morning and say we think
20   there is an applicable policy that you can
21   only do things on a Wednesday.  I mean
22   presumably that's in there because --
23   because it is meant to mean something,
24   applicable policies.
25   Q.   So you agree that if there is an

1         R.S. LEVY
2    applicable policy, that it could limit that
3    right to withdrawal, am I -- am I
4    understanding you correctly?
5         MR. PROULX:  Objection to form.
6         You can answer.
7    A.   That's what it appears to say,
8    yes.
9    Q.   Thank you, Mr. Levy.
10        Can we take a look at section
11   12.1, please.
12        And I will read it, FTX Trading
13   may in its sole and absolute discretion and
14   at any time without liability to you or any
15   third party refuse to let you open an
16   account, suspend your account or terminate
17   your account, decline to process any
18   instruction or order submitted by you and/or
19   limit, suspend or terminate your use of one
20   or more or part of the services.
21        Do you see that?
22   A.  Yes.
23   Q.   And that's in the terms?
24   A.  That's in the terms, yes.
25   Q.   And the terms are among the

1        R.S. LEVY
2  applicable policies that could limit the
3  right to withdrawal?
4        MR. PROULX:  Objection to form,
5     objection mischaracterizes his
6     testimony.  You can answer.
7     A.  I am really not trying to be
8  difficult.  But Section 8.2.6 C says you
9  control the digital assets held in your
10  account at any time subject to outages,
11  downtime and other applicable policies
12  including the terms.
13        So I would expect to see a
14  definition of applicable policies, that --
15  that's my only point, as a matter of
16  construction.
17     Q.  I believe we discussed earlier,
18  the terms are governed by English law;
19  correct?
20     A.  The terms of service are, yeah.
21     Q.  And you are here as an expert
22  analyzing BVI law; correct?
23     A.  I think we have been through the
24  mill on this one.  I am analyzing the
25  situation -- I am analyzing the -- the

1        R.S. LEVY
2  claims as a matter of BVI law, which
3  necessarily entails an analysis of the -- of
4  this English law contract insofar as
5  relevant.
6     Q.  But you have not conducted an
7  analysis of the entirety of these terms of
8  service to determine the rights and
9  obligations they create under English law --
10
11        MR. PROULX:  Objection to form.
12  Q.  -- correct?
13        MR. DARBY:  Zach, wait until the
14     question is done.
15        MR. PROULX:  It was done.
16        MR. DARBY:  It was not done.  I am
17     looking at the realtime.
18        MR. PROULX:  The video will
19     reflect it was done.  Objection to
20     form, objection argumentative,
21     objection mischaracterizes the
22     testimony.
23        You can answer.
24  Q.  You can answer?
25  A.  Can you repeat it.

1        R.S. LEVY
2     Q.  Sure.  But you have not conducted
3  an analysis of the entirety of these terms
4  to determine the rights and obligations that
5  they create under English law; correct?
6        MR. PROULX:  Same exact
7     objections.
8        You can answer.
9     A.  That's incorrect.  I have not
10  considered every possible, because -- every
11  possible right or obligation that could
12  conceivably be created or effective as a
13  result of these terms of service.  That
14  would result in a huge treatise.
15     Q.  So Mr. Levy, you consider the
16  Invest Bank decision strong support for your
17  analysis; is that right?
18     A.  Yes, I do, yeah.
19     Q.  So Invest Bank did not involve a
20  claim under the BVI Insolvency Act; right?
21     A.  That's definitely correct, yes.
22     Q.  Invest Bank construed another
23  statute; correct?
24     A.  It construed an English statute,
25  yes.

1        R.S. LEVY
2     Q.  It construed Section 423 of the
3  U.K. Insolvency Act; correct?
4        MR. PROULX:  Objection to form.
5     A.  Amongst others.  I think it
6  construed Section 436 as well.
7     Q.  The BVI Insolvency Act does not
8  contain a provision equivalent to the U.K.
9  Insolvency Act, Section 423, does it?
10        MR. PROULX:  Objection to form.
11        You can answer.
12     A.  That's correct.
13     Q.  Nor does the BVI Insolvency Act
14  contain a definition of property equivalent
15  to the definition of property in U.K.
16  Insolvency Act, Section 436; correct?
17        MR. PROULX:  Objection to form.
18     A.  I don't think I have relied on the
19  definition of property.  The definition --
20  the material definition -- I mean, I would
21  have to look at the case.  But the material
22  definition in 436, as I remember, was a
23  definition of transaction.  There may --
24  there may well be a definition of property
25  in there.

Page 230

R.S. LEVY

1       R.S. LEVY
2       Q.   Mr. Levy, that was not the
3   question.  The question was does the BVI
4   Insolvency Act, can it contain a definition
5   of property that is equivalent to the
6   definition of property in the U.K.
7   Insolvency Act?
8           MR. PROULX:  Objection to form.
9       A.   Not -- not so far as I am aware,
10  but I would have to look.
11      Q.   Does a ruling interpreting a U.K.
12  statute bind a court in the BVI?
13      A.   There is a section of my report
14  dealing with this.  The answer is no, a
15  decision of the house -- sorry, of the
16  Supreme Court in the U.K. or the House of
17  Lords on a point of English law which is
18  similar to or the same as a BVI statute or
19  common law provision, would be highly
20  persuasive and should ordinarily be
21  followed -- and would ordinarily be followed
22  save in the circumstances outlined by
23  Justice Doyle in the Cayman decision, but
24  the law would be the same in the BVI in HQP.
25      Q.   Would a decision under English

Page 231

R.S. LEVY

1       R.S. LEVY
2   common law be viewed as more persuasive than
3   a decision under a U.K. statute?
4           MR. PROULX:  Objection to the
5       form.
6       A.   I am not sure it makes -- I am not
7   aware of any authority, it is not to say
8   that they don't exist, which would say that.
9   Because what a Virgin Islands court would do
10  is much the same as what an English court
11  would do when faced with a decision of the
12  House of Lords or whatever else, would try
13  and define for itself, jurisprudential, what
14  is the issue here.  And then it would look
15  to see how that issue as -- as defined has
16  been dealt with in other common law
17  jurisdictions.
18          But particularly, obviously,
19  because it is a British overseas territory
20  based on English law for hundreds of years,
21  particularly what the House of Lords --
22  obviously of it is a decision of the Privy
23  Council on an appeal from the Cayman Islands
24  -- from -- from the British Virgin Islands,
25  then it is binding and has to be followed.

Page 232

R.S. LEVY

1       R.S. LEVY
2   The document stare decisis is such, that had
3   it found that the issue was the same even
4   though the language of the statute was
5   different, the issue was the same, it would
6   likely -- it would -- well, it is -- it is
7   almost bound to follow -- not bound to
8   follow, but it is highly persuasive and
9   should be followed saving very limited
10  circumstances.
11      Q.   Mr. Levy, Invest Bank did not
12  address -- address a preference claim at
13  all; correct?
14          MR. PROULX:  Objection to form,
15      objection mischaracterizes a document
16      that you appear to be reading, but not
17      showing the witness.
18          MR. DARBY:  Do you want my
19      outline, Zach?
20      A.   At some stage I am hoping you are
21  going to give me the judgment Invest Bank.
22          The principal claim -- the
23  principal claim in Invest Bank was Section
24  423 transaction to fraud of creditors.
25      Q.   Sure?

Page 233

R.S. LEVY

1       R.S. LEVY
2       A.   That's what the claim was.  But in
3   the Lordship's analysis, they certainly
4   touched on transactions at an undervalue and
5   also preferences.  They certainly touched on
6   that.  So I think it would be incorrect to
7   say in the United Kingdom that certainly in
8   England -- Wales, forgive me, in England and
9   Wales, that the decision in Invest Bank was
10  in any way in some way irrelevant to
11  transactions that had a value of
12  preferences.  I think that would be
13  wrong-headed.
14      Q.   Thank you, Mr. Levy.  So based on
15  your recollection, my question is did the
16  Invest Bank case determine a preference
17  claim?  My question is not whether it is
18  relevant to a preference claim.
19          MR. PROULX:  Objection to the
20      form, objection to the refusal to show
21      the witness the document.
22      A.   No, it didn't determine a
23  preference claim.  But with respect, it is
24  not a particularly illuminating question or
25  a question that is designed to illuminate

59 (Pages 230 - 233)

Page 234

R.S. LEVY

1          R.S. LEVY
2 the debate.
3      Q.  Mr. Levy, it is not for you to
4 decide whether questions illuminate the
5 debate.  Your role is to respond to
6 questions.  So I ask that you please focus
7 on that rather than whether you wish they
8 were different questions.
9      MR. PROULX:  Objection to the
10 narrative.
11      MR. DARBY:  So here is the Invest
12 Bank decision.  This will be Levy
13 Exhibit 7.
14      (Whereupon, an Invest Bank
15 decision was marked Levy Exhibit 7 for
16 identification as of this date.)
17      Q.  Mr. Levy, I will ask you a
18 question.  You have the case, so you are
19 welcome to read it to the extent you need to
20 answer my question.
21      Can you please provide a brief
22 description of the transaction that was at
23 issue at Invest Bank?
24      A.  Yes, that appears in the headnote.
25 Is it best that I read that into the record,

Page 235

R.S. LEVY

1          R.S. LEVY
2 isn't it?
3      Q.  Let's turn to paragraph 5 rather
4 than the headnote.  Can you review paragraph
5 5 and let me know when you are done, and
6 then I will ask some questions about it?
7      A.  Yes.
8      Q.  So Mr. Levy, the debtor was
9 Mr. El-Husseiny; correct?
10      A.  Yes.
11      Q.  The transaction involved a
12 property at 9 Hyde Park Garden Mews;
13 correct?
14      A.  That's correct.
15      Q.  9 Hyde Park was owned legally and
16 beneficially by Marquee Holdings Limited;
17 correct?
18      A.  Yes.
19      Q.  And the debtor, Mr. El-Husseiny,
20 was the beneficial owner of all the shares
21 in Marquee; correct?
22      A.  Yes.
23      Q.  The debtor caused Marquee, the
24 company he owned, to transfer ownership of
25 Hyde Park to his son for no consideration at

Page 236

R.S. LEVY

1          R.S. LEVY
2 all; correct?
3      MR. PROULX:  Objection to the
4 extent it misstates the document.
5      Q.  If you would like to look at the
6 first sentence of paragraph 7 that might
7 help.  Would you like me to repeat the
8 question?
9      A.  I didn't object.  But yes go
10 repeat the question.
11      Q.  Mr. El-Husseiny, the debtor, calls
12 Marquee the company he owned to transfer
13 ownership of 9 Hyde Park to his son for no
14 consideration; correct?
15      A.  Yeah.
16      Q.  And the court found that the
17 result of this transfer that
18 Mr. El-Husseiny's holding in Marquee was
19 correspondingly reduced in value; correct?
20      A.  Yeah.
21      Q.  Is it fair to characterize the
22 transaction in Invest Bank as involving the
23 transfer of property owned by a wholly-owned
24 subsidiary of the debtor?
25      A.  Transfer -- transfer of property

Page 237

R.S. LEVY

1          R.S. LEVY
2 by a company -- by a company wholly-owned --
3 sorry, forgive me, it is getting late, I am
4 sorry, I am not trying to be --
5      Q.  Would you like me to repeat it?
6      A.  Yeah, would you repeat it.
7      Q.  Would it be fair to characterize
8 the transaction in Invest Bank to involve
9 the transfer of property by a wholly-owned
10 subsidiary of the debtor?
11      A.  It was done by a company that the
12 shares of which Mr. El-Husseiny owned, was
13 it not?
14      Q.  It was.
15      A.  So I am not sure where the --
16 where does subsidiary come in?
17      Q.  The company that Mr. El-Husseiny
18 owned was the subsidiary, Marquee?
19      A.  No, it is not a subsidiary.  It is
20 just a company that he owns.  So if I own a
21 company, the company is not my subsidiary,
22 it is a company of which -- whose shares I
23 own.
24      Q.  Fair enough.  I am used to dealing
25 with entities more than individuals.  So it

Page 238

1          R.S. LEVY
2 has involved the transfer of property by a
3 company owned by the debtor, is that a fair
4 correction?
5      A.  Yes.
6      Q.  Thank you for that.  Can you
7 please turn to paragraph 35 of this judgment
8 that appears on page 11.  I am going to ask
9 you about the first sentence of it which I
10 will read into the record.
11         A transfer by a solvent company
12 owned by a debtor of a valuable asset for no
13 or inadequate consideration necessarily
14 results in a diminution in the value of the
15 debtor's shares in the company.
16         Did I read that right?
17     A.  Yes.
18     Q.  And the debtor has a proprietary
19 interest in the shares of the company it
20 owns?
21     A.  The debtor owns the shares of --
22 the debtor here, El-Husseiny, owned the
23 shares, that's correct.
24     Q.  Those shares could have been
25 distributed to the creditors of the debtor;

Page 239

1          R.S. LEVY
2 right?
3         MR. PROULX:  Objection to form.
4      A.  No, it is unlikely the shares
5 would have been distributed to the
6 creditors.  But I think I understand the
7 point you are making, their value.
8      Q.  Sure.  And transaction reduced the
9 value of those shares because the subsidiary
10 gave -- strike that.
11         And the transaction reduced the
12 value of those shares because the company
13 owned by the debtor gave away its property
14 for nothing; correct?
15         MR. PROULX:  Objection to form.
16         You can answer.
17     A.  Yes.
18     Q.  So investment doesn't stand for
19 the proposition that a transaction need not
20 have any impact on the assets that the
21 debtor could distribute to its creditors;
22 correct?
23         MR. PROULX:  Objection to form.
24     A.  That's -- that's -- okay, I think
25 with -- I think with the greatest of

Page 240

1          R.S. LEVY
2 respect, that's not correct.  If one looks
3 at the headnote of the case, so this is how
4 the law reporter reported the case, the law
5 reporter was a Ms. Scully, the headnote
6 doesn't suggest it is a necessary element of
7 the case that there should be a diminution
8 in value of the assets of the company,
9 albeit I accept obviously what you say with
10 reference to paragraph 35.  But nowhere --
11 if this is a precondition to liability, then
12 it is very odd in a -- I find it very odd
13 that in a judgment which rejects anything
14 other than a clear reading of the words of
15 the statute and specifically rejects reading
16 in or writing in words, that the court
17 should be finding that there is another
18 precondition, or there is a condition of
19 liability under Section 423, that there
20 should be a diminution in value of the
21 assets of the debtor.
22     Q.  Thank you.
23         Please turn to paragraph 53, and I
24 am going to read the sentence that begins
25 with necessarily into the record.  Let me

Page 241

1          R.S. LEVY
2 know when you are there, I will wait?
3      A.  Yeah.
4      Q.  Okay.  Necessarily, as Mr. McGrath
5 accepted, there must be a depletion or
6 diminution in value of the assets available
7 for enforcement of claims against the
8 debtor, whether by creditors individually or
9 collectively through a formal insolvency
10 process?
11     A.  Yeah.
12     Q.  Did I read that right?
13     A.  You certainly did, yes.
14     Q.  Thank you.  Can you please turn to
15 paragraph 75 entitled Conclusion?
16     A.  You didn't ask a question.
17     Q.  I asked a question?
18     A.  Whether you read it right, yes,
19 you read it right.
20     Q.  Paragraph 75, the conclusion in
21 paragraph 75 states, A transaction within
22 Section 423(I) is not confined into a
23 dealing with an asset owned by the debtor
24 but extends to the type of transaction in
25 this case whereby the debtor enters into an

61 (Pages 238 - 241)

Page 242

1          R.S. LEVY
2  arrangement under which a company owned by
3  him or her transfers a valuable asset for no
4  consideration or at an undervalue.
5          Did I read that correctly?
6      A.  Yes.
7      Q.  And that's the conclusion?
8          MR. PROULX:  Objection to the
9      extent it mischaracterizes the
10     document.
11     A.  The conclusion, I think -- well,
12  the lordships say in the final paragraph --
13  the final sentence of 75, in our view the
14  proper approach to the construction of
15  section 423(I) is set out earlier in this
16  judgment from paragraph 33 to 37.  So this
17  is one of the cases, the Supreme Court
18  doesn't always do this, but they are saying
19  if you want to know what this case really is
20  about, have a look at 33 to 37.
21     Q.  And the provision I just read to
22  you from paragraph 35 falls in that group;
23  correct?
24     A.  It does, the concession that was
25  granted, the concession that Mr. --

Page 243

1          R.S. LEVY
2      Q.  Mr. McGrath?
3      A.  Yes, Mr. McGrath.
4      Q.  Are you suggesting that because it
5  was a concession, it doesn't reflect the
6  court's view?
7      A.  No.  But it doesn't appear to have
8  been an issue because Mr. McGrath conceded
9  the point.  I am not sure that it was
10  argued.
11     Q.  But the court's analysis includes
12  --
13     A.  The statement that you read to me
14  from paragraph -- which was it?
15     Q.  35?
16     A.  Yes, 35, it does record that
17  concession.
18     Q.  So Invest Bank is a specific
19  example of a transaction that does not
20  dispose of an asset of which a debtor has a
21  proprietary interest, but nonetheless
22  diminishes assets that are available for
23  creditors; correct?
24         MR. PROULX:  Objection to form.
25     A.  Well, breaking that down, the

Page 244

1          R.S. LEVY
2  reason Invest Bank originally cropped up
3  from recollection is that Mr. Atherton cited
4  it to say that despite the fact that under
5  Section 423 there was no need for beneficial
6  interest in the property, this was
7  irrelevant in the BVI.  In order to
8  distinguish it, you now say that -- that
9  that's what -- that's what the lordships
10  say -- say about diminution value of the
11  assets.  I am not sure Mr. Atherton cited it
12  for that.  If he did, I will stand
13  corrected.  But did -- can you report to me
14  in his report where he cited it for that
15  proposition?
16     Q.  My question has nothing to do with
17  whether Mr. Atherton cited this case?
18     A.  Okay.
19     Q.  My question was this case is a
20  specific example of a transaction that did
21  not involve the property of the debtor, but
22  nonetheless diminished the assets that would
23  be available for the debtor's creditors; is
24  that correct?
25         MR. PROULX:  Objection to form.

Page 245

1          R.S. LEVY
2          You can answer.
3      A.  By concession, yes.
4      Q.  Thank you.  Please turn to
5  paragraph 34 of your declaration?
6      A.  34(d)?
7      Q.  Yes, sir.
8          So at 34(d) of your declaration,
9  you state that, 3AC's digital asset
10  entitlements on the FTX Exchange constituted
11  at a minimum a contractual legal entitlement
12  to the value of those assets which is a
13  sufficient legal interest for a proprietary
14  restitutionary claim.
15         Do you see that?
16     A.  Yes.
17     Q.  This is part of your conclusion in
18  the context of a proprietary restitutionary
19  claim under BVI common law; correct?
20     A.  No, this is a summary of my
21  conclusions.  And those are all addressed
22  later, yes.
23     Q.  But it is in the context of a
24  proprietary restitutionary claim; correct?
25     A.  Yes.

Page 246

R.S. LEVY

1
2     Q.  Are you aware that the joint
3  liquidators have withdrawn the primary
4  restitutionary claim in the response that
5  they filed?
6         MR. PROULX:  Objection to the
7         extent it mischaracterizes the
8         document.  You can answer to the extent
9         you can.
10     A.  If you could take me to it,
11  because I did see something without
12  prejudice or whatever in relation to that
13  claim in the response brief.  And I can't
14  pretend to know what your American laws mean
15  by certain things.
16     Q.  Sure.  It was very long.  That's
17  the only question I have on that response
18  for now, so?
19     A.  If you want to read to me that
20  passage, I am happy to explain to you why I
21  don't understand.
22     Q.  I am interested in your legal
23  analysis for now, so we will move on from
24  that.
25         Do you consider this position

Page 247

R.S. LEVY

1
2  relevant as to whether the joint liquidators
3  can establish a preference claim?
4         MR. PROULX:  Objection to form.
5     A.  Well, the fact that they say
6  whatever they say about the withdrawal about
7  not pursuing the BVI proprietary restitution
8  claim to be relevant to the preference
9  claim.
10     Q.  Sorry, my question is whether the
11  statement at 34(d) regarding a contractual
12  legal entitlement, whether you consider that
13  to be relevant to a preference claim?
14     A.  No.
15     Q.  Why not?
16     A.  Sorry, do I consider a legal
17  entitlement to be relevant to a preference
18  claim?  Yes, I do.  I consider the chose in
19  action to be relevant to the preference
20  claim.
21     Q.  Can you please describe the chose
22  in action?
23     A.  The chose in action is the right
24  pursuant to clause 8.2.6 of the terms of
25  service, to direct FTX to -- just I don't

Page 248

R.S. LEVY

1
2  want to misspeak, but to direct FTX to the
3  fact that the customer, in our case 3AC,
4  wants to withdraw its digital assets by
5  sending them to a different blockchain
6  address controlled by it or a third party.
7  And that's -- that is a chose in action, the
8  same way I might have a chose in action to
9  say to my bank please send a thousand pounds
10  to Mr. Darby.
11     Q.  So a chose in action is premised
12  on the existence to the contractual right;
13  correct?
14         MR. PROULX:  Objection to form.
15     A.  It is nicely described in the
16  abstract from Guest and in Lord Hoffman's
17  speech in the investors' compensation
18  scheme.  But it is a right to deal with
19  incorporate property in the broadest terms.
20     Q.  A contractual right?
21         MR. PROULX:  Objection to form.
22     A.  Generally speaking it would arise
23  from some sort of contract, yes.
24     Q.  Is the chose in action that you
25  consider relevant?

Page 249

R.S. LEVY

1
2     A.  But a claim to damages can also be
3  a chose in action.  So if I am run over by a
4  negligent driver and I suffer a broken leg
5  or whatever, and I am entitled to damages, I
6  could sell that chose in action to somebody,
7  I could declare a trust of it, I suppose.
8  Classically, I mean, let's not get too hung
9  up about that, classically it would be a
10  contractual right to recover or deal with
11  incorporated property.
12     Q.  What is the source of the
13  contractual right that you consider relevant
14  to your chose in action analysis?
15     A.  The source?
16     Q.  I am happy to rephrase, if that's
17  confusing?
18     A.  If you wouldn't mind, sir.
19     Q.  What is the basis for your
20  conclusion that 3AC has a chose in action?
21     A.  Well, it was promised for want of
22  a better word, it was -- it agreed with FTX
23  that it, 3AC, controlled the digital assets
24  and could withdraw them.
25     Q.  So was it then premised on 8.2.6 C

63 (Pages 246 - 249)

1          R.S. LEVY
2 that we reviewed?
3     A.  Yes.
4     Q.  You testified earlier that that
5 right was restricted; correct?
6          MR. PROULX:  Objection to form,
7     objection mischaracterizes the
8     testimony.
9     A.  Well, the fact that I can't go
10 down to my bank 2:00 in the morning and
11 demand that they hand over a thousand pounds
12 to me because they are closed because of the
13 fact that everyone has COVID, there is a
14 terrible snowstorm, so there is an outage or
15 whatever, doesn't affect the fact that there
16 is a chose in action.  And the fact that
17 there are certain circumstances in which I
18 may not be able to do that, doesn't affect
19 whether there is a chose in action.  There
20 is a chose in action.
21     Q.  If those circumstances were
22 applicable to the exercise of that right,
23 does that impact the chose in action?
24          MR. PROULX:  Same objections.
25     A.  Well, you are asking me to

1          R.S. LEVY
2 speculate about certain things.  But I can
3 see that there may be, depending on what the
4 applicable policies are.  And I am -- I am
5 genuinely unclear about that, because it
6 says applicable policies including the
7 terms.  Now assuming this document is the
8 terms, then what are -- what are applicable
9 policies?  I know we surplusage it, the
10 applicable policies are the terms, because I
11 say applicable policies are the terms.  But
12 subject to that, the chose may be cut down,
13 the chose in action may be cut down such
14 that it wouldn't be exercisable in certain
15 circumstances.  But that doesn't stop it
16 being a chose in action.
17          And the fact that it can't be done
18 practically 24/7, again, wouldn't prevent it
19 being a chose in action.
20     Q.  You used the example of you asking
21 for money from your bank; correct?
22     A.  I used the example going to the
23 bank, because I can ask my bank for money
24 24/7.
25     Q.  So if instead of you going to the

1          R.S. LEVY
2 bank and asking for money at 2:00 a.m.?
3     A.  Yeah.
4     Q.  You had an account with $100 and
5 asked your bank for a billion dollars, would
6 that impact the value of your chose in
7 action?
8          MR. PROULX:  Objection to form.
9     A.  I don't understand -- I have got
10 an account with $100 and asked it for a
11 billion, when you say asked it, asked it to
12 pay me a billion?
13     Q.  Yes.
14     A.  I think I know what the answer
15 would be to that.
16          MR. PROULX:  Same objection.
17          You can answer.
18     Q.  What is the answer?
19     A.  The bank would like to say no,
20 Mr. Levy, don't be so cheeky.  But that --
21 those are the circumstances that I see in
22 this case here.
23     Q.  Sure.  Let's assume that you had
24 $284 million in the bank account and you
25 asked them for $1.011 billion, is that -- is

1          R.S. LEVY
2 that the -- what is the value of the chose
3 in action?
4          MR. PROULX:  Objection to form.
5          You can answer.
6     A.  Well, you are making certain
7 assumptions that I am not prepared to make
8 and I don't think are merited on the face of
9 documented.
10          One doesn't simply set off in the
11 non-technical sense I am sure we are going
12 to come to set off, or net off debits and
13 credits.  I think -- I think Dame Elizabeth
14 Gloster was clear as to that in her report.
15 And I anticipate or I believe that the law
16 of the BVI would be the same.
17          So if on the one hand I have a
18 account, and I am entitled to a chose in
19 action and I am entitled to satisfaction in
20 specie of -- and that's another point that
21 you have ignored.  I have a right chose in
22 action to demand the in specie delivery of
23 digital coins.
24          Then whether or not I have got the
25 liability elsewhere doesn't affect my right

1          R.S. LEVY
2  to delivery of those coins unless and until
3  an applicable policy -- a term, because I am
4  uncomfortable with applicable policies
5  unless someone can show me what it actually
6  means, unless and until there is a term
7  which prevents me doing it.
8      Q.  So Mr. Levy, it was a long answer
9  premised on balances on the FTX Exchange.
10 We were discussing a hypothetical with your
11 bank account.  So the question, and I am
12 just going to ask it again, let's assume
13 that you had 284 million in the bank account
14 and you asked them for 1.011 billion, what
15 is the value of the chose in action?
16     MR. PROULX:  Objection to form,
17     asked and answered, assumes facts not
18     in evidence.
19     A.  I think A, I can't do the math.
20     Q.  You can round, if helpful?
21     A.  It is either a lot or a little,
22 isn't it?  But that with respect is not the
23 correct analysis here.
24     Q.  So you won't answer that question?
25     A.  No --

1          R.S. LEVY
2      MR. PROULX:  Objection to form,
3      objection to characterization.  The
4      record will reflect very clearly that
5      the witness answered it.  You can
6      continue to ask it if you want, at a
7      certain point if the witness continues
8      to answer it, as he has done, I will
9      instruct him not to answer it.  You are
10     welcome to answer it again.
11     Q.  Have you answered the value of the
12 chose in action in the hypothetical?
13     A.  In your hypothetical?
14     Q.  Yeah.
15     A.  Can you write down the numbers to
16 me?
17     Q.  Let's call it $250 and a thousand
18 dollars to make a little easier?
19     A.  So where do I owe 250?
20     Q.  You have got 250 in your bank and
21 you ask them for a thousand, you have a
22 chose in action against the bank is my
23 understanding, generally, is that your
24 testimony?
25     MR. PROULX:  Objection to form.

1          R.S. LEVY
2      You can answer.
3      A.  Your -- your example is, again, I
4  am really not trying to be difficult.  But
5  banking contracts typically do include
6  rights -- contain rights of set-off,
7  automatic rights of contractual set-off.
8      But it is a different point with
9  respect that if there is a chose in action
10 for delivery of a specific -- of -- of coin
11 in specie, digital assets in specie, then I
12 can see no reason why, unless and until a
13 term is invoked, to prevent delivery of
14 that.  There is not a chose in action, the
15 value of which is -- sorry, which is
16 satisfied by delivery of the coin in specie,
17 because that's what it says.  That's the
18 right that clause 8.2.6(c) purports to
19 create or acknowledge, and that's the chose
20 in action.
21     Q.  So the chose in action is premised
22 on the right created by 8.2.6(c)?
23     MR. PROULX:  Objection to form.
24     A.  At the very least, yes.
25     Q.  And so is the value of the chose

1          R.S. LEVY
2  in action necessarily tied to the value that
3  you could assert for a breach of that
4  contractual right?
5      MR. PROULX:  Objection to form.
6      A.  The chose in action is the right
7  to delivery of digital assets in specie,
8  because that's what it says.  You have a
9  right -- you may withdraw your digital
10 assets by sending them to a different
11 blockchain.
12     If -- so far as I am aware nobody
13 has objected to the exercise of that right.
14 If there was a breach of that, then -- if
15 there was a breach of that, then it is
16 possible that the court might consider
17 awarding damages.  In an insolvency
18 situation I very much doubt that it would
19 for the reasons that were put to
20 Mr. Atherton in his section from I think
21 Durham during his deposition.
22     But the value is the coins, and
23 the coins will have a value.  The chose in
24 action isn't satisfied just by saying, oh,
25 well, your coins are worth a billion, we

Page 258

R.S. LEVY

1 will give you a billion dollars. That's not
2 how the chose is satisfied.
3
4     Because otherwise any -- any claim
5 for any chose -- chose in action, which
6 isn't satisfied, can just be reduced to a
7 money claim. But they are not money claims.
8 They are a right to incorporate real
9 property, not a right to damages for breach.
10 That's jumping one stage ahead of the -- in
11 the -- in the analysis.
12     I am sorry if my answer is long.
13 I know you don't mind me giving long
14 answers. But it is very important to be
15 clear about these things.
16     Q. Did 3AC have a contractual right
17 to obtain specific digital assets?
18     MR. PROULX: Objection to form.
19     A. On the face of this poorly drafted
20 document it would appear to be that that's
21 what is intended. Now I have seen -- I
22 think I have seen what Lord Neuberger wrote,
23 but more importantly read what he said in
24 his deposition. And I have seen what lady
25 justice -- sorry, Dame Elizabeth Gloster

Page 259

R.S. LEVY

1
2 says.
3     Because it is impossible,
4 apparently, to identify the particular coin
5 that 3AC or any other exchange customer
6 introduced, they do not have a right to any
7 specific coins, save for this. And this is
8 important, save that they are entitled to
9 coins matching that the specific coin
10 entitlement towards the ledger. So if
11 that's 50 bitcoin and 10 ethereum, the fact
12 that no one is capable of giving them the 50
13 bitcoin and the -- what is it, the 10
14 ethereum that they original introduced or
15 acquired, whatever, is nothing to the point.
16 They are entitled to their coin entitlement,
17 being 50 bitcoin and 10 ethereum.
18     Q. So you derived that view by
19 reference to Dame Elizabeth Gloster;
20 correct?
21     MR. PROULX: Objection to form.
22     You can answer.
23     A. No, I -- I derived that reference
24 to 9.2.6(c).
25     Q. Is that 8.2.6?

Page 260

R.S. LEVY

1
2     A. Sorry 8.2.6, thank you.
3     MR. PROULX: While we are pausing,
4 break in five or ten, don't interrupt
5 the flow. Feel free to ask your
6 questions.
7     MR. DARBY: We can do five.
8     MR. PROULX: So ask your
9 questions.
10     Q. So is it your position that 3AC
11 had a chose in action because it could not
12 physically possess the digital assets, but
13 it could bring a legal action to obtain
14 digital assets?
15     MR. PROULX: Objection to form,
16 compound.
17     A. Yeah, if you want to break that
18 down. 3AC had a chose in action, yes. What
19 is the chose in action? The chose in action
20 is to enforce its right to digital assets in
21 specie.
22     There was another question tied up
23 in that. I am not sure whether you
24 are getting -- whether you are -- I may be
25 wrong. I don't mean to be grand, maybe you

Page 261

R.S. LEVY

1
2 were getting confused between choses in
3 action, choses in possession, you have
4 something about possession.
5     Q. You have answered my question,
6 thank you.
7     So is it suffice to say the
8 underlying basis for the chose in action
9 analysis you have is a withdrawal right in
10 the terms of service?
11     MR. PROULX: Objection to form.
12     A. Yes. Well, it is not just a
13 withdrawal right, it is sending them to a
14 different blockchain address controlled by
15 you or a third party.
16     Q. But a blockchain address not
17 controlled by FTX; correct?
18     A. Yeah.
19     I suspect that customers on the
20 Exchange would have got pretty miffed
21 regardless of the fact that there has been
22 this pooling and sweeping, or whatever it is
23 called, of assets, would have gotten pretty
24 upset, would have got miffed, if every time
25 they said oh, please can you send one

66 (Pages 258 - 261)

Page 262

R.S. LEVY

1
2 bitcoin or one ethereum to X, FTX had said
3 no, but here is a thousand pounds or
4 whatever. I am not sure how long the
5 Exchange would have lost it.
6      Q.   Mr. Levy, there was no question
7 pending for the record there. So just I ask
8 that you wait for a question?
9      A.   Sure.
10     Q.   Let's assume the court concludes
11 that 3AC did not have a contractual right to
12 receive digital assets themselves up to the
13 amount of its digital asset balance, are you
14 with me on that hypothetical?
15         MR. PROULX: Objection to form.
16     A.   I understand that, yes.
17     Q.   Let's assume that the court
18 instead determined that 3AC only had a
19 contractual right to receive assets up to
20 the level of the account balance, the
21 overall account balance, do you understand?
22         MR. PROULX: Objection to form.
23     A.   When you say the overall level of
24 the account balance, is that -- is that
25 applying your -- the unitary asset theory?

Page 263

R.S. LEVY

1
2      Q.   It is a specific number. So I
3 don't -- I am not asking questions about
4 theories, right?
5      A.   No, in order to understand the
6 question, I want to know, are you asking me
7 to speak to a hypothetical, which I intend
8 to do. But I want to know how you arrive at
9 the -- at the hypothetical.
10     Q.   The net position of the bank, the
11 account balance that takes all balances, all
12 trades, all activity over the lifetime of
13 the account, the one dollarized number, are
14 you with me?
15         MR. PROULX: Objection to form.
16     A.   Yes, I understand that.
17     Q.   So the trades that you
18 guys -- strike that.
19         The trades that are alleged to
20 have been preference transactions, they did
21 not change the account balance; correct?
22         MR. PROULX: Objection to form.
23     A.   That's on the unitary asset
24 theory, they don't change the account
25 balance.

Page 264

R.S. LEVY

1
2      Q.   Mr. Levy, the unitary asset theory
3 is irrelevant to whether an account balance
4 existed for the overall account?
5      A.   No --
6         MR. PROULX: Objection,
7 argumentative, there is no pending
8 question.
9         MR. DARBY: If you don't let the
10 question finish, there won't be a
11 question. Did you start speaking
12 before I was done with my question,
13 yes, you did.
14         MR. PROULX: We will go back to
15 the video when this is done just like
16 you ask the witness to make sure there
17 is a question pending, I am echoing
18 your sentiment.
19     Q.   Mr. Levy, do you have an
20 understanding that the trades alleged to
21 have been a preference changed the overall
22 net position of the 3AC accounts?
23         MR. PROULX: Objection to form.
24     A.   I understand that the trades that
25 occurred on the 13th and 14th reduced

Page 265

R.S. LEVY

1
2 3AC's -- were applied to reduce in FTX's
3 favor 3AC's negative dollar balance, i.e. to
4 pay off a liability which -- which it seems
5 to me was owed to FTX and FTX alone.
6 Certainly to the extent of the loan under
7 the line of credit, I understand that a
8 liability was paid off.
9      Q.   Mr. Levy, you were answering the
10 question you would have liked to have been
11 asked?
12     A.   No.
13     Q.   The question is with respect to
14 the net position of the account, it is not
15 respect to the USD position of the account.
16 So the question is did the trades that are
17 alleged to have been --
18     A.   Can you write it down, because I
19 find it very difficult.
20     Q.   That's not how it works, Mr. Levy.
21 I will ask it more slowly?
22     A.   Can you break it down. I am happy
23 to deal with it. Can you break it down so
24 that I can really understand.
25         MR. PROULX: Clearly there are

67 (Pages 262 - 265)

1          R.S. LEVY
2    some words the witness is not
3    understanding.  I hope you respect his
4    wish to break it down and ask the
5    question more simply.
6      Q.   Mr. Levy, when 3AC sold more
7    bitcoin and received USD, did the overall
8    position of the account change?
9          MR. PROULX:  Objection to form.
10     A.   FTX received money for that, it
11   was paid off.
12     Q.   Mr. Levy, that's not responsive.
13   When 3AC sold bitcoin to Mr. Levy, and
14   Mr. Levy paid cash to 3AC --
15     A.   Yeah.
16     Q.   -- did the 3AC account position
17   change?
18         MR. PROULX:  Sam, over the course
19   of the last several questions you have
20   used account position, position,
21   account balance, negative dollar
22   balance.  There is a reason the witness
23   is struggling here.
24         MR. DARBY:  Zach, you said there
25   are words that the witness did not

1          R.S. LEVY
2    understand.  I attempted to use
3    different words in response to that.
4          MR. PROULX:  You are welcome to
5    ask your questions.  Please be really
6    respectful of the witness.
7      A.   I am really not trying to be
8    difficult.  I am more than happy to answer,
9    but I really need to understand what you are
10   getting at here.
11         So the account balance is made up
12   of what, the difference between assets and
13   liabilities on your scenario; is that
14   correct?
15     Q.   That is not the scenario.
16     A.   Okay.
17     Q.   Mr. Levy, let's assume that you
18   have one bitcoin --
19     A.   Yeah.
20     Q.   -- and bitcoin is worth $100 --
21     A.   Yeah.
22     Q.   -- do you understand that?
23     A.   Yes.
24     Q.   Let's assume that you sell that
25   one bitcoin, and you receive $100 --

1          R.S. LEVY
2      A.   Yeah.
3      Q.   -- is the value of the account the
4    same as before that trade and after that
5    trade, if none of the prices exchanged?
6      A.   Yeah.
7          MR. PROULX:  Objection to form.
8      Q.   It is not the same is your answer?
9      A.   It is, it is.  I sold assets for
10   $100 and I get a credit for $100.
11     Q.   Let's step away from the contracts
12   for just a moment and discuss what might
13   have happened as a practical matter here?
14         MR. PROULX:  This has been over
15   ten minutes now.  Is now a good time to
16   take a break?
17         MR. DARBY:  It is not.
18         Are you insisting you need a
19   break?
20         THE WITNESS:  I would like a
21   break.
22         MR. DARBY:  Can we keep it short,
23   please.
24         THE WITNESS:  How long do you
25   want?

1          R.S. LEVY
2          MR. DARBY:  Can we go off the
3    record, please.
4          THE VIDEOGRAPHER:  The time is
5    4:17 p.m.  We are going off the record.
6          (Whereupon, a short recess was
7    taken.)
8          THE VIDEOGRAPHER:  The time is
9    4:39 p.m.  We are going back on the
10   record.
11     Q.   So Mr. Levy, separate from the
12   statutory set-off, there can be a
13   contractual right to set off; correct?
14     A.   If exercised, yes.
15     Q.   Can you please turn to the terms
16   of service which is exhibit?
17     A.   I have it in front of me.
18     Q.   You have it in front of you, good.
19         I am going to ask you to look at
20   section 38.7.
21         And I will read it into the
22   record, Save as otherwise expressly provided
23   in the term, such as in Sections 29, 30, and
24   3812.A, the terms are not intended and shall
25   not be construed to create any -- excuse me,

Page 270

R.S. LEVY

1            R.S. LEVY
2  I was reading the wrong section, strike
3  that.
4            We are looking at 38.7.
5  Notwithstanding that any amount is from time
6  to time payable by FTX Trading to you, under
7  or by virtue of the terms or otherwise, you
8  shall not set off such amount against any
9  amount payable by you to FTX Trading under
10 the terms.
11           FTX Trading may set off any
12 amounts which from time to time are payable
13 by FTX Trading to you under or by virtue of
14 the terms or otherwise against any amounts
15 payable by you to FTX Trading under the
16 terms.
17           Do you see that?
18 A.  I do.
19 Q.  Does this create a right of
20 set-off in favor of FTX?
21      MR. PROULX:  Objection to form.
22 A.  This provides that in certain
23 circumstances FTX may set off amounts which
24 are from time to time due.  I note the word
25 "may."  It is not a mandatory and automatic

Page 272

R.S. LEVY

1            R.S. LEVY
2  you, you being obviously 3AC.
3            So yes, I -- I agree that it
4  appears to create a right of set-off in
5  those limited circumstances.
6  Q.  Thank you, Mr. Levy?
7  A.  More than that I can't say.
8  Q.  Do you observe any conditions in
9  38.7.2 that limit FTX's ability to exercise
10 this right?
11      MR. PROULX:  Objection to form.
12 A.  I accept that the words "may" are
13 permissive as opposed to mandatory.  But
14 there is -- there is a condition within that
15 provision, may mean it can only apply to
16 amounts for which from time to time are
17 payable by FTX Trading to 3AC by virtue --
18 under or by virtue of the terms or
19 otherwise.  So it has got to be three -- FTX
20 owing money.
21 Q.  Thank you, Mr. Levy?
22 A.  That's a condition, as I said.
23 Q.  Thank you, Mr. Levy.  So is it
24 your position that the negative US dollar
25 balance is a liability of 3AC?

Page 271

R.S. LEVY

1            R.S. LEVY
2  set-off.  That's the first thing.
3            The second thing is I have not
4  seen any evidence, that's not to say it
5  doesn't exist, but I have not seen to the
6  best of my recollection, at least sitting
7  here today, any material to say that this
8  was, in fact, exercised.
9            Third, I don't know the time at
10 which -- I don't know whether it is said
11 that this right was exercised or was, in
12 fact, exercisable, capable of being
13 exercised.  If the latter, if exercisable,
14 but not, in fact, exercised, then as I
15 explain, I think in my report -- sorry, in
16 my declaration somewhere, by reference to
17 Section 175 of the BVI Act, and the act --
18 insolvency act, any attempted set-off would
19 be stayed.
20           And finally, it is difficult to
21 know under what factual predicate we are
22 considering this.  Because it seems to me by
23 definition, if the unitary asset theory was
24 to hold, then there were never, on that
25 scenario, any sums payable by FTX Trading to

Page 273

R.S. LEVY

1            R.S. LEVY
2  A.  Yes.
3  Q.  And that liability is of 3AC to
4  FTX in your position?
5  A.  I can't see who else it would be
6  to.
7  Q.  And your position is the balances
8  for digital assets are liabilities of FTX to
9  3AC; correct?
10      MR. PROULX:  Objection to form.
11 A.  That -- that is how I understand
12 we would analyze that.  But they are
13 liabilities to, as we discussed before the
14 short break, they are liabilities to deliver
15 up a coin entitlement.
16 Q.  And what is the basis that a
17 customer was entitled to satisfaction by way
18 of coin or digital token?
19      MR. PROULX:  Object to form.
20 Q.  What is your basis to that opinion
21 that a customer was entitled to satisfaction
22 by coin or digital token?
23      MR. PROULX:  Objection to form,
24      asked and answered.
25 A.  I -- I do think with respect that

69 (Pages 270 - 273)

Page 274

1          R.S. LEVY
2 I have already answered that.  We have
3 looked at 8.2.6 at some length.  And it says
4 that you, 3AC, may withdraw digital assets
5 by sending them, not their value, but by
6 sending them to a different blockchain
7 address.  You don't send -- you don't send
8 cash to a blockchain address.
9          And that's the right you purported
10 to create.  It strikes me as pellucidly
11 clear, I believe.
12          MR. DARBY:  I will trust you on
13     that.
14     Q.  So clause 37.8.2 uses the term --
15 strike that.
16          Clause 37.8.2 uses the phrase any
17 amounts payable by FTX Trading to you under
18 or by virtue of the terms otherwise?
19          MR. PROULX:  Objection, misstates
20     the document.
21     Q.  You can answer?
22     A.  The document says FTX Trading may
23 set off any amounts which from time to time
24 are payable by FTX Trading to you under or
25 by virtue of the terms or otherwise against

Page 275

1          R.S. LEVY
2 any amounts payable by you to FTX.
3          So there is a coin entitlement.
4     Q.  So amounts payable?
5     A.  Yeah.
6     Q.  Is that limited in any way in your
7 view?
8          MR. PROULX:  Objection to form.
9     A.  Well, that would be an amount of
10 money.
11     Q.  It cannot be an amount of digital
12 assets in your view?
13     A.  That's not the natural meaning of
14 that expression, is it?
15     Q.  What do you think --
16     A.  I am sorry, I am not asking you
17 the question.  It is not a natural meaning
18 of the word, an amount.
19     Q.  You don't think you can have an
20 amount to bitcoin?
21     A.  Yes, you can have an amount of
22 bitcoin and you can have an amount of
23 Rolls-Royces in the garage.  But that's not
24 an amount of money.  Those things are
25 capable of being reduced to a dollar and

Page 276

1          R.S. LEVY
2 cents number.
3     Q.  Other than the natural meaning
4 point that you just mentioned, do you
5 observe any restriction with respect to what
6 is covered by the phrase "amount payable"?
7          MR. PROULX:  Objection to form.
8     A.  To say that it is a substantial
9 caveat, it is a substantial difference,
10 isn't it?
11     Q.  So would this section become
12 relevant in the situation where the digital
13 asset balance is treated as an asset of 3AC
14 and the negative USD balance is treated as a
15 liability of 3AC?
16          MR. PROULX:  Objection to form.
17     A.  If those -- if on the proper
18 construction of 38.7.2 those were both
19 amounts, then potentially this clause would
20 come into play.  It is not as I understand
21 it -- can't come into play in the unitary
22 asset theory.  Because on that, I am -- for
23 the reasons we have discussed.  But in that
24 scenario, if there is credit over there,
25 debit over there, then in theory, yes.  But

Page 277

1          R.S. LEVY
2 it still has got to be exercised.
3     Q.  So a trade on the Exchange would
4 involve two types of assets; right?
5          MR. PROULX:  Objection to form.
6     A.  Yeah, can you explain what you
7 mean?
8     Q.  So if you traded on the Exchange,
9 you would be selling one type of asset and
10 receiving another type of asset; correct?
11          MR. PROULX:  Objection to form.
12     A.  That is certainly, as I understand
13 it, a possible trade on the Exchange, yes.
14     Q.  Can you think of any other type of
15 trade on the Exchange?
16     A.  There are so many different things
17 going on that are referred to in the terms,
18 such as does it move assets.  I am trying to
19 remember, but, yeah, I mean, let's take that
20 scenario, a trade on the Exchange involves
21 selling or dealing with one asset for
22 another asset, I suppose -- not necessarily
23 cash, I suppose, actually.  I suppose you
24 could swap one coin that is valued at a
25 thousand for two coins that are valued for

1          R.S. LEVY
2  500 or you could go long, short, I would
3  imagine whatever you would like on this
4  stuff. But the simple sale would involve
5  converting a coin into cash.
6      Q.  And so in such a trade, the
7  balance of the asset that you sold would
8  decrease; right?
9          MR. PROULX:  Objection to form.
10     A.  The balance of the asset that you
11  sold -- if -- no, if you sold, the balance
12  of the assets sold would increase.  If I
13  have sold ten and I sell another one, the
14  balance of the asset sold would increase.
15     Q.  Let's take an example?
16     A.  Sorry, maybe I am getting it
17  wrong.
18     Q.  No, totally okay.
19         So if we assume that you have ten
20  bitcoin and $100,000 cash?
21     A.  Yes.
22     Q.  If you sell one bitcoin for
23  $20,000, would your bitcoin balance be 9
24  bitcoin?
25     A.  Yes.

1          R.S. LEVY
2      Q.  Would your USD balance be 120?
3      A.  Yes.
4      Q.  And so if you assume that that USD
5  balance is negative --
6      A.  Yeah.
7      Q.  -- in your view it would be a
8  liability; right?
9      A.  Yes.
10         MR. PROULX:  Objection to form.
11         You can answer.
12     A.  Yeah.
13     Q.  So let's take the same example,
14  you have 10 bitcoin, but you have a balance
15  of negative 100,000?
16     A.  Yes.
17     Q.  If you sold one bitcoin for
18  $20,000?
19     A.  Yeah.
20     Q.  The digital -- the bitcoin balance
21  would still be nine; correct?
22     A.  Yeah.
23     Q.  The USD balance would then be
24  negative 80,000; correct?
25     A.  Yeah.

1          R.S. LEVY
2      Q.  So doesn't that trade involve
3  offsetting an asset in a liability?
4          MR. PROULX:  Objection to form.
5          You can answer.
6      A.  No.
7      Q.  Why not?
8      A.  Well, because I am doing it.  And
9  if I am 3AC, I am just trading, I am just
10  trading.  For this set-off to work, it seems
11  to me that it is not good enough,
12  particularly given that it's
13  discretionary -- so if we assume that the
14  transactions on the 13th, some on the 13th
15  or some on the 14th, but what I understand
16  as being the 52,000 transactions, were all
17  transactions conducted by 3AC, as is alleged
18  in the deposition of Mr. Coverick, then
19  those are just trading transactions.  FTX is
20  not setting anything off, because 3AC is
21  just trading.
22     Q.  Who is 3AC trading with?
23     A.  Well, the counterparties to the
24  transaction.
25     Q.  And so the counterparty to the

1          R.S. LEVY
2  transaction would get the bitcoin in this
3  example; right?
4      A.  Yeah.
5      Q.  And 3AC would get the $20,000 in
6  this example; right?
7      A.  Yeah.
8      Q.  Does that bilateral trade
9  inherently reduce a liability to FTX?
10         MR. PROULX:  Objection to form.
11         You can answer.
12     A.  Yes, as I -- according to your
13  example, the hundred thousand, negative
14  hundred thousand is decreased to negative
15  80,000.
16         But unless FTX takes steps to set
17  off, a right to set off, and I think this is
18  something that Dame Elizabeth Gloster says
19  in her report, whether it is paragraph 99 or
20  somewhere else, unless that set-off is
21  actually exercised, then there is no
22  set-off.  The mere fact of its existence,
23  the mere fact that a contractual right is
24  contained in a suite of contractual
25  documents doesn't mean that the right was

Page 282

R.S. LEVY

1
2 exercised.  It is exercisable.  And -- but I
3 have not seen anything to suggest that that
4 right was exercised, whether in relation --
5 or certainly in relation to the,
6 quote-unquote, 52,000 trades or in relation
7 to these 2 million.  It is potentially an
8 available right.
9        But if I have got a right to buy a
10 ticket to the World Cup Final, and the fact
11 that I don't buy it, doesn't mean I can
12 complain that I don't get to see England
13 beating Germany an -- an extra time.
14    Q.   So Mr. Levy, FTX is the entity
15 that maintains the ledgers; correct?
16    A.   Yeah, as I understand it, yeah, or
17 an FTX entity.  But yeah, on the FTX side of
18 the transaction, yeah.
19    Q.   So the challenged
20 trades -- strike that.
21        So the trades are between two
22 parties that are not FTX; correct?
23        MR. PROULX: Objection to form.
24    A.   I -- I -- I assume that.  Whether
25 they -- whether there was some other

Page 283

R.S. LEVY

1
2 entities, I don't know.  Let's assume that's
3 correct, but I don't know.
4    Q.   Neither of the parties to the
5 trade maintains the ledger of balances;
6 right?
7        MR. PROULX: Objection to form.
8    A.   That's a possibility, yeah.
9    Q.   And your position is that the
10 negative US dollar balance is a liability
11 3AC owed to FTX, not to the counterparty to
12 the trade; correct?
13    A.   I am sorry, the negative US dollar
14 balance is?
15    Q.   Is A liability of 3AC to FTX and
16 not to the party that 3AC traded with;
17 correct?
18    A.   That's the way that I understand
19 the system works.
20    Q.   So is it not the case that FTX as
21 the Exchange is applying US dollar credits
22 to 3AC's liability to FTX?
23        MR. PROULX: Objection to form.
24        You can answer.
25    A.   I am sorry, did I cut you off?

Page 284

R.S. LEVY

1
2    Q.   No, you can continue?
3    A.   Is it not the case -- well, I have
4 not seen anything to suggest that they were
5 exercising the right of set-off.  I have not
6 seen anything to suggest that.
7    Q.   So Mr. Levy --
8    A.   And -- and -- and right is all
9 well and good.  As I say, rights have to be
10 exercised.  Final.  I have got to buy my ticket, I
11 have got to buy -- I have got to comply with
12 the contractual condition.
13    Q.   How could FTX exercise the right
14 under these circumstances?
15        MR. PROULX: Objection to form,
16    calls for speculation.
17    A.   How could, I don't know, I am not
18 FTX.  I am also not 3AC.  But presumably it
19 could say, putting to one side whatever it
20 may have thought about the unitary asset
21 theory, we are going to set things off.
22    Q.   It is not your position that FTX
23 has to say I declare set-off to exercise the
24 right; correct?
25        MR. PROULX: Objection to form.

Page 285

R.S. LEVY

1
2    A.   I think -- I think -- I find it
3 very difficult to see how when 3AC enters
4 into the transactions, that somehow amounts
5 to FTX exercising any right, even if it
6 pays, as it did, apparently, the proceeds of
7 those trades into -- to decrease the
8 negative balance on the US dollar account.
9 It is just not doing it.
10    Q.   So FTX maintains the records of
11 the balances; right?
12        MR. PROULX: Objection to form.
13    A.   I assume it does, yeah.
14    Q.   And so if FTX automatically
15 applies credits and debits from trades to
16 the balances of the participating customers,
17 is that not an automatic set-off?
18        MR. PROULX: Objection to form.
19        You can answer.
20    A.   This is not an automatic set-off.
21 An automatic set-off, it could have
22 provided, and it may be the case, the law --
23 you know, banking contracts -- well, the
24 difference in banking contracts there tends
25 to be a -- a set-off between accounts.  But

1          R.S. LEVY
2 the language here doesn't -- I mean, it
3 could say words to the effect every time
4 you, the customer execute a trade, any
5 amount receivable for the trade must be paid
6 into your fiat currency, whatever account.
7 And to the extent that your fiat account,
8 account balance is negative, we will set
9 that off or whatever.  But that's not the
10 language that is -- that is used here.  This
11 is a permissive provision saying it may set
12 off, not that it will.
13          And what you are putting to me is
14 some sort of mandatory set-off, which is
15 more akin to the language of Section 150,
16 which talks of an automatic self-executing
17 or whatever.  But that's not what this
18 language is saying.
19    Q.  Mr. Levy, why does a provision
20 that says FTX may set off amounts mean that
21 FTX cannot be exercising that right by
22 applying credits and debits to balances that
23 it -- it tracks?
24          MR. PROULX:  Objection to form.
25          You can answer.

1          R.S. LEVY
2    A.  Because you are converting or that
3 scenario converts permissive language to
4 automatic language, mandatory,
5 self-executing, whatever else.  And it may
6 well be.  And factually, it is probably
7 quite a difficult analysis, because I think
8 I have seen in, is it Mr. Schieg or
9 certainly Schieg or Konstantinidis, but I
10 think it may be Schieg, forgive me if I am
11 wrong, the fact that over time margin calls
12 were met and accounts complied with the
13 various requirements imposed by FTX or
14 agreed.  And it is difficult to see how if
15 this is mandatory, it doesn't happen all the
16 time.  But this is obviously -- this
17 situation obviously allows for a negative
18 account balance.  And I assume, I may be
19 wrong, but I assume that the -- that 3AC's
20 negative account balance fluctuated.  So one
21 day it may have been -- I don't know the
22 numbers, one day it may have been 500
23 million, one day it may have been 200
24 million and then another day it might have
25 been 502 million.

1          R.S. LEVY
2          Now, how are we to know when a
3 set-off is being actually exercised?  It
4 can't be exercised all the time, because
5 otherwise one would expect there never to be
6 the possibility of a negative US dollar or
7 fiat currency -- but let's talk US dollar, a
8 negative US dollar account balance.
9    Q.  Is it your testimony that a
10 provision that gives you the permissive
11 right to do something cannot be reconciled
12 with your choice to always do something as a
13 matter of routine?
14          MR. PROULX:  Objection to form.
15          If you understand the question, you can
16          answer it.
17    A.  Sorry, do I not answer?
18    Q.  You should answer, if you
19 understand that.
20          MR. PROULX:  If you understood the
21          question, you can answer it.
22    A.  I am sorry, I am not being
23 difficult.  Do ask it again, I do apologize.
24    Q.  Is it your position that a
25 position that grants you a permissive right

1          R.S. LEVY
2 to do something, cannot be reconciled with
3 your choice to do something every time?
4          MR. PROULX:  Same objection.
5    A.  I find it extremely difficult if
6 you want to say this is automatic despite
7 the language, where the situation ever could
8 have arisen, because presumably they were
9 always set off.  When do we know that they
10 are setting off, when do we know that they
11 are not setting off?  So you know -- you
12 know, I don't know what happened on the, you
13 know, on the 12th of January, I don't know
14 what the position was on the 12th of
15 January, say, 2022, what trades happened
16 then, were they set off.  If not, why not.
17 If it is an automatic, then they were, but
18 then were there subsequent trades permitted
19 that weren't set off?  It seems to me that
20 rights generally have to be exercised.
21    Q.  I think you testified earlier that
22 the composition of a balance in terms of
23 position in different assets matters; right?
24          MR. PROULX:  Objection as to form.
25    A.  I think what I have said is that

Page 290

R.S. LEVY

1           R.S. LEVY
2  merely for a customer on the Exchange, take
3  3AC as an example, merely knowing the
4  balance between what it owned and what it
5  owed is commercially meaningless.
6      Q.  Okay.  It could be meaningful with
7  respect to the specific context of what the
8  customer could take off the Exchange;
9  correct?
10         MR. PROULX: Objection to form.
11     A.  Yes, but not necessarily how it
12  could take it off the Exchange.
13     Q.  Sure?
14     A.  Because it would -- it could, if I
15  got -- sorry, if 3AC has bitcoin valued at a
16  billion or rather coin valued at a billion
17  and a negative US dollar balance of 800
18  million, so in that scenario the net value,
19  your scenario would be 200 million.  But it
20  wouldn't know how it could take that 200
21  million, you could also have long positions,
22  short positions and incur liabilities if it
23  wanted to exit.
24     Q.  So is it fair to say that your
25  position is that different types of balances

Page 291

R.S. LEVY

1           R.S. LEVY
2  can matter in different contexts?
3      A.  Well, I am not a trading expert.
4  So I don't want this to be seen as me
5  purporting to give expert evidence on trade,
6  I can't do that.  But certainly as a matter
7  of practicality of how this contract would
8  operate, I should have thought it imperative
9  that any customer of the Exchange knows the
10  precise make-up of its overall balance
11  imperative.
12         But how can it -- otherwise how
13  can it exercise its right, whatever it means
14  and whenever it is exercisable under clause
15  8.2.6(c).
16     Q.  So Mr. Levy putting aside for
17  trading purposes, could knowing the net
18  overall position of the account matter for
19  other purposes like valuation, for example?
20         MR. PROULX: Objection to form,
21     calls for speculation.  I am just going
22     to caution you.  You can answer.
23     A.  You are really asking me to
24  speculate valuation issues and other
25  non-specific purposes.  Valuation for what

Page 292

R.S. LEVY

1           R.S. LEVY
2  purposes, I don't -- I don't know.
3      Q.  So you can't answer when a US
4  dollar figure comprehensive of all positions
5  in account might matter for valuation
6  purposes in some context?
7          MR. PROULX:  Same objection.
8          You can answer.
9      A.  Valuation of what?
10     Q.  Any valuation context ever, the
11  value in account would the overall US dollar
12  matter -- strike that.
13         Can you think of any context in
14  which knowing the US dollar value of an
15  entire account might matter?
16         MR. PROULX:  Same objections.
17         You can answer.
18     A.  In commercial terms I find it
19  difficult.  It might be a nice -- it might
20  give the founders or beneficial owners of
21  3AC a nice warm, fuzzy feeling to know that
22  there is a figure somewhere that they can
23  see, the business they started for $100 has
24  now apparently got a much larger figure
25  associated with it.

Page 293

R.S. LEVY

1           R.S. LEVY
2          But I can't see it of any
3  practical significance.  It wouldn't enable
4  them to sell the company.  I am not sure it
5  would enable them to -- that any lender
6  would say oh, yes, we can see that you have
7  got this figure.
8          We don't care how you arrive at
9  it.  But there is a figure there, a pretty
10  juicy figure.  I can't see that a lender or
11  a borrower or purchaser or an investor,
12  there may be others, I don't -- I don't
13  remember.  I am afraid I find your question
14  vague.
15     Q.  So you don't think that pricing
16  all of the different types of assets in an
17  account into one figure could be useful for
18  purposes of valuing that account in the
19  context of a sale?
20         MR. PROULX:  Objection to form,
21     calls for speculation, objection to the
22     extent it seeks expert testimony
23     outside the scope.
24     A.  Sale of what, the business?
25     Q.  Sale of the business, sale of the

1          R.S. LEVY
2 specific account, sale of the unit that
3 holds the account, we can take whichever is
4 clearest for you?
5      A.  The sale of 3AC.  I -- I have been
6 engaged in numerous shareholder dissent
7 cases, they are quite big in Delaware,
8 valuing companies.  And the notion that any
9 potential buyer of 3AC that issued shares in
10 3AC or any investor would proceed with any
11 form of transaction just being provided with
12 one figure, namely, a net asset balance, I
13 find surprising.
14      Q.  So just to be very clear, you
15 don't think there is any context in which
16 understanding the US dollar net position of
17 an account with multiple types of assets
18 would be useful information?
19          MR. PROULX:  Same objections.  You
20 can answer.
21      A.  Well it, it -- if you are saying
22 could it ever be useful to have on one piece
23 of paper the net account value is a billion,
24 say, made up of multiple credits and debits
25 all over the shop, yeah, that information

1          R.S. LEVY
2 might be useful in some circumstances.  I am
3 happy to discuss them with you.  It may be
4 really a matter outside my expertise,
5 because it may strain to valuation or
6 commercial practice.  But I -- I can't
7 conceive of that information being
8 particularly valuable to anyone.
9          Certainly in my experience of
10 company valuation in litigation context, a
11 value, look at that single sheet of paper
12 saying 100 billion made up of undisclosed
13 assets and undisclosed liabilities wouldn't
14 be able to describe the value to the
15 company.
16      Q.  Mr. Levy, can you turn to
17 paragraph 158 of your declaration?
18      A.  Of course.
19      Q.  Can you take a look at the
20 sentence, that sentence at the top of page
21 49?
22      A.  Do you mind if I just read the
23 whole thing?
24      Q.  Certainly.  Let me know when you
25 are done?

1          R.S. LEVY
2      A.  Of course.  Yes, thank you.
3      Q.  So why you say do you say that FTX
4 would have absorb the negative USD balance?
5      A.  So where are you referring to?
6      Q.  The sentence that begins in this
7 scenario, FTX would have to absorb 3AC
8 negative USD balance?
9      A.  Sorry, you are at the top over
10 here.
11          Well, the predicate is if FTX, so
12 this is an opening sentence on 158 on page
13 48, the predicate is if FTX would have
14 absorbed the loss, yeah.
15          So if it would have absorbed the
16 loss, and then I say in this scenario, i.e.
17 if -- as per the top of page 49, if 3AC had
18 filed for liquidation immediately before the
19 preferential transactions and any attempt to
20 seize or liquidate the assets would have
21 been stayed under essentially section 175.
22 And if that happened, FTX would have had to
23 absorb the loss.  So the starting point is
24 if FTX wouldn't, as Bankman-Fried, said
25 perjurer, said it would, then if FTX -- if

1          R.S. LEVY
2 3AC had filed for liquidation immediately
3 before the transactions, then it wouldn't
4 have been able to enforce Section 175 of the
5 BVI Act.  And in that scenario FTX would
6 have to have absorbed 3AC's negative balance
7 as a loss.
8      Q.  So 3AC had a digital asset balance
9 on June 12, 2022; correct?
10      A.  So 3AC had a --
11      Q.  They did have a balance of digital
12 assets credited to the account; right?
13      A.  Yeah.
14      Q.  And FTX possessed those digital
15 assets; correct?
16      A.  FTX held the keys, as I understand
17 it, to wherever it was those -- the pooled
18 assets were swept into.
19      Q.  So rather than absorb the loss,
20 FTX could simply have just liquidated
21 bitcoin; correct?
22          MR. PROULX:  Objection to form,
23      calls for speculation, assumes facts
24      not in evidence.
25          You can answer.

1          R.S. LEVY
2     A.   Not if 3AC had entered into
3  liquidation.
4     Q.   Well, who has the digital assets
5  in this scenario?
6          MR. PROULX:  Objection to form.
7     A.   Well, it has control, but it would
8  be enforcing a right.  And I think we got
9  Section 175 here.  You know what Section 175
10 is, and you know what I am going to say.
11 But it wouldn't have been able to enforce,
12 it would have been stayed.  So you are
13 saying it would have just done it regardless
14 of it wasn't entitled to do that.  That's
15 the point that is being made here, wasn't it
16 entitled to do.
17    Q.   So Mr. Levy, you are assuming that
18 3AC would succeed in establishing it was
19 entitled to those digital assets in this
20 analysis; correct?
21         MR. PROULX:  Objection to form.
22    A.   No, I am -- I am assuming nothing.
23 You are -- you are putting points to me.
24    Q.   Well, in this analysis FTX has the
25 digital assets; correct?

1          R.S. LEVY
2          MR. PROULX:  Objection to form.
3     A.   Well, as -- as I have said, my
4  understanding is that FTX has control of the
5  keys, begs the question what rights it has
6  in relation to it.  But it has control of
7  the keys or whatever it is that facilitate a
8  transaction with cryptocurrencies here.
9     Q.   Sure.  So if you are invoking
10 rights, isn't that assuming that you win in
11 this case for this argument?
12         MR. PROULX:  Objection to form.
13 You can answer the question, if you
14 understand it.
15    Q.   Would you like me to rephrase?
16    A.   I think I would, yeah.
17    Q.   Doesn't your analysis assume that
18 your -- strike that.
19         Doesn't the notion that FTX would
20 have to make a claim for a USD balance and
21 did not have recourse to digital assets
22 assume that 3AC has proven it had a
23 proprietary interest in those digital
24 assets?
25         MR. PROULX:  Objection to form,

1          R.S. LEVY
2  compound.
3          You can answer it, if you
4  understand it.
5     A.   Break it down.
6     Q.   It strikes me your answer is based
7  on what legal rights 3AC could have, and my
8  question is whether that is a circular
9  analysis?
10    A.   Well, if it was just a gift of the
11 assets, if -- if -- if 3AC rather had just
12 given FTX the assets and said here you are,
13 enjoy, get on with it.  But short of that,
14 then this analysis is correct.
15    Q.   So the Joint Liquidators had to
16 file a claim in this litigation because FTX
17 has the relevant assets; correct?
18         MR. PROULX:  Objection to form.
19    A.   I -- I don't know, I don't know
20 much about the Joint Liquidators'
21 involvement in the US proceedings.
22    Q.   But 3AC is insolvent and in
23 liquidation proceedings; correct?
24    A.   Yes.
25    Q.   And 3AC has to assert a claim

1          R.S. LEVY
2  against the FTX Recovery Trust in order to
3  obtain the things it claims it is entitled
4  to; correct?
5          MR. PROULX:  Objection to form.
6          You can answer.
7     A.   I understand that that is what is
8  happening as part of this proceeding, yes.
9     Q.   So as a matter of practical
10 ability, FTX had the ability to liquidate
11 digital assets rather than to absorb a large
12 negative US dollar balance; correct?
13         MR. PROULX:  Objection to form,
14 assumes facts not in evidence.
15    A.   Well, that may be right.  But that
16 really begs the question of whether it was
17 entitled to do that.  And I am not
18 suggesting for a second that the analogy is
19 in anyway near correct.  But the person who
20 steals my wallet, so I am not accusing
21 anybody FTX of anything of that nature, but
22 the person who steals my wallet has the
23 right to take out the notes, 5-pound notes
24 that are in there.  We don't have the pound
25 notes.

1          R.S. LEVY
2     Q.  Are you aware -- are you aware of
3  any legal obligation of FTX to absorb
4  negative dollar balances?
5     A.  No, I am not, I don't think --
6     Q.  Are you aware of evidence --
7          MR. PROULX:  He wasn't finished
8     with his answer.  He will complete it.
9     A.  In commercial terms it would be
10 pretty odd -- I -- I wouldn't -- I wouldn't
11 given the Exchange (unintelligible) until
12 the Exchange did have (unintelligible).  But
13 in the scenario where people put their money
14 in and aren't repaid, I wouldn't give the
15 Exchange very long in commercial terms and
16 its commercial reputation would, I suspect,
17 be through the floor.
18    Q.  You don't think FTX would take any
19 action to risk its commercial reputation?
20         MR. PROULX:  Objection to form.
21    A.  I have no idea what steps it would
22 take.  Most -- most trading entities like to
23 have a decent commercial reputation.
24    Q.  Do you think FTX has a decent
25 commercial reputation?

1          R.S. LEVY
2          MR. PROULX:  Objection to form.
3     A.  It didn't end up happy, did it.
4     Q.  So you are assuming that FTX would
5  have absorbed a US dollar balance; is that
6  correct?
7          MR. PROULX:  Objection to form,
8     mischaracterizes the testimony.
9     A.  My predicate in paragraph 158 is
10 based on Bankman-Fried's deposition.
11    Q.  Is it based on anything other than
12 the depositions you referenced there in
13 earlier today?
14    A.  No, not from recollection.
15    Q.  So the situation where FTX might
16 have had to absorb the negative USD balance,
17 that did not arise, in fact; correct?
18         MR. PROULX:  Objection to form.
19    A.  Sorry, can you -- can you break
20 that down for me because it is getting late,
21 sorry.
22    Q.  The analysis of whether FTX might
23 have absorbed 3AC's capital negative US
24 dollar balance is a counterfactual; correct?
25    A.  Because it didn't absorb it or

1          R.S. LEVY
2  what?
3     Q.  Because the transactions you
4  alleged to have been a preference occurred;
5  correct?
6     A.  Yes.
7     Q.  So it is predicting what might
8  have happened?
9          MR. PROULX:  Objection to form.
10    You can answer the question.
11    A.  It is what it says in 158.  It is
12 said most clearly in 158, isn't it.
13    Q.  My question is whether your
14 analysis of FTX absorbing or not absorbing a
15 negative US dollar balance is speculating
16 what might have happened?
17         MR. PROULX:  Objection to form to
18    the extent that is a question.
19    A.  There is a hypothetical clearly
20 explained there if it would have, as
21 Bankman-Fried said it would have.
22    Q.  And your -- your understanding is
23 that Mr. Bankman-Fried testified that FTX,
24 in fact, would have absorbed Three Arrow
25 Capital's negative USD balance?

1          R.S. LEVY
2          MR. PROULX:  Objection to form,
3     misstates the testimony.
4     A.  I am quite happy to be taken to
5  what Mr. Bankman-Fried said on these various
6  extracts.  But certainly to my recollection,
7  I have not looked at them in the last few
8  days, but to my recollection, that is the
9  burden of what he said.
10    Q.  Couldn't FTX have just declined to
11 absorb a balance?
12         MR. PROULX:  Objection to form,
13    assumes fact not in evidence.
14    You can answer.
15    Q.  I am sorry, what is the answer?
16    A.  You are asking me to speculate
17 could it, I -- I don't know.  Commercially
18 it wouldn't look very clever, would it.
19    Q.  Could a business take an action
20 that made it not look very clever?
21    A.  Yeah, I am sure it could.
22    Q.  So it is possible that FTX would
23 not have absorbed the US dollar balance?
24         MR. PROULX:  Objection to form.
25    You can answer.

77 (Pages 302 - 305)

Page 306

1          R.S. LEVY
2     A.  Anything -- anything is possible.
3 But there has to be an element of real world
4 in any analysis.
5     Q.  Mr. Levy, the ordinary course
6 defense provides a complete defense to a
7 preference claim; correct?
8     A.  I am sorry, can I just --
9     Q.  Sure?
10    A.  I am not trying to be difficult.
11 But in broad -- in broad terms, it is a
12 matter for FTX to prove its rights in the
13 declaration, something that is somewhat
14 difficult under the circumstances of this
15 case.
16    Q.  Mr. Levy, I am not asking whose
17 burden it is, I am asking is it a defense?
18    A.  Can you tell me what page it is?
19    Q.  245, Section 245 at page 140.
20        This is a fact-specific defense;
21 right?
22        MR. PROULX:  Objection to form.
23    A.  Yes, the court will look
24 objectively according to what -- I am sorry,
25 according to what the Privy Council said in

Page 307

1          R.S. LEVY
2 Countrywide, to see what the facts are and
3 to determine whether the transaction took
4 place in the ordinary course of business.
5     Q.  So the Court could consider the
6 facts and circumstances it deems relevant;
7 correct?
8     A.  There is -- there is some
9 guidance, as you know, in Countrywide page
10 349, judgment of Justice Gault.
11    Q.  So looking at the present case, do
12 you agree that the Court can consider 3AC's
13 history as a cryptocurrency hedge fund?
14        MR. PROULX:  Objection to form.
15    A.  The Court would consider all
16 relevant factors.  What weight it places to
17 any particular thing is a different matter.
18        But I don't think the fact that it
19 was a cryptocurrency fund underneath
20 transactions involved trading crypto would
21 be enough.  A shop keeper might give a fat
22 kid an extra sweet every time he comes into
23 the shop.  But if the day before he goes
24 into the liquidation, he gives the fat kid
25 all the sweets in the shop, that's probably

Page 308

1          R.S. LEVY
2 a transaction that none the value.
3     Q.  So a preference claim under the
4 BVI Insolvency Act necessarily requires that
5 the debtor that company be rendered
6 insolvent at some point; correct?
7        MR. PROULX:  Objection to form.
8     A.  The preference claim under the BVI
9 Insolvency Act necessarily requires that the
10 company becomes insolvent at some point.
11    Q.  So that's a yes?
12    A.  Well, I know it is not the gospel,
13 but the statute was passed for a reason.
14 And under Section 245 or 246, whatever,
15 there is a requirement there should be an
16 insolvency transaction.  And under that it
17 can only be an insolvency transaction if the
18 company is insolvent at the time of the
19 transaction or the transaction causes the
20 company to become insolvent.  So not at any
21 time.
22        A company could enter into a
23 transaction today, where everything is great
24 and then as a result of some commercial
25 catastrophe, becomes insolvent in eight

Page 309

1          R.S. LEVY
2 months time.
3        THE VIDEOGRAPHER:  Counsel, 40
4 minutes remaining.
5        MR. DARBY:  Thank you.
6     A.  That wouldn't necessarily be
7 without more insolvency transaction.
8     Q.  Sure, Mr. Levy.
9        So by definition a preference
10 claim requires a company that has undergone
11 some financial distress?
12    A.  That has undergone or is
13 undergoing --
14    Q.  Sure.
15    A.  -- or imminently facing, yes.
16    Q.  And the ordinary course defense is
17 the defense to a preference claim; correct?
18    A.  Yes.
19    Q.  So do you agree that the debtor's
20 insolvency does not rule out the application
21 of the ordinary course defense?
22        MR. PROULX:  Objection to form.
23    A.  The debtor's insolvency doesn't
24 rule out, no, because it -- because it is
25 happening.  But there could be a company

Page 310

R.S. LEVY

1          R.S. LEVY
2  which is perfectly solvent, a situation
3  where a company is perfectly solvent, that
4  would be an odd situation, a company that is
5  perfectly solvent and is a going concern
6  that Countrywide says one should look for,
7  that enters into such a disastrous
8  transaction that it becomes immediately
9  insolvent.
10     Q.  Do financial difficulties always
11  preclude the ordinary course defense from
12  being established?
13         MR. PROULX:  Objection to form.
14     A.  Well, it -- it is a
15  multifaceted -- it is a multifaceted
16  investigation.  But a response -- I mean, if
17  we could get up, just as there is no --
18  nothing better than to look at the act, if
19  we are really going to look at your
20  authority, it is best to look at the
21  authority, Mr. Justice Goode sitting in the
22  Privy Council and the judgment with which
23  other distinguished Lords agreed, does
24  specifically say and point out in response
25  to abnormal financial difficulties that one

Page 311

1          R.S. LEVY
2  is looking at is the company a going
3  concern.  If the company is not a going
4  concern, then that it is likely to be
5  because it is facing financial difficulties
6  or facing imminent insolvency.
7         And then you have is it Cheyne,
8  where you have a Justice of Appeal Baptiste
9  explaining the ordinary course there can
10  mean transactions that benefit the general
11  body of creditors because the obligations of
12  directors change when the company is facing
13  immediate solvency.
14     Q.  Thank you, Mr. Levy.  Just I want
15  to make a clear for the record, it was a
16  pretty simple yes or no question.  And you
17  spoke for now what is over a page on the
18  screen.  So I just want to be clear I am
19  viewing that as what we call filibustering
20  as speaking at length and then taking up
21  time.  So you will give the answers you
22  give, your counsel will speak in a moment,
23  but I do ask that if I ask a yes or no
24  question, you respond to the question that
25  was asked, not the question that was not

Page 312

1          R.S. LEVY
2  asked?
3         MR. PROULX:  I object to the
4  narrative.  You have given a lengthy
5  speech.  I am going to give a lengthy
6  speech.  The answer was responsive.
7  The question was bad.  The witness
8  answered it to the best of his ability.
9  You can continue.
10     Q.  Are you aware that 3AC did not
11  sell out of positions on other exchanges
12  besides FTX?
13         MR. PROULX:  Objection to form.
14     A.  Yes, I -- I -- well, I have seen
15  evidence to that effect, which, if correct,
16  would confirm what you have just said.
17     Q.  Are you aware that
18  Mr. Konstantinidis found trading on these
19  exchanges to be within normal ranges?
20     A.  On those other exchanges?
21     Q.  Yes.
22         MR. PROULX:  Objection to form.
23     A.  I would like to see what he says
24  there.  But I am broadly familiar, broadly
25  recollect him saying something to that

Page 313

1          R.S. LEVY
2  effect, yes.
3     Q.  Are you aware that 3AC conducted
4  the vast majority of its trading on June 13
5  and 14 through an API?
6         MR. PROULX:  Objection to form.
7     A.  I think so, yes.
8         I am not entirely sure what an API
9  is.  I hope that's not your next question,
10  but that's an automatic, automated trading
11  system.
12     Q.  That's good enough for me.
13         Are you aware that 3AC's trading
14  on the exchanges were indicia of the
15  algorithmic trading strategies?
16     A.  No, if you want to take me to
17  something from Konstantinidis or Lyle, then
18  I would rather you did that in context.
19     Q.  That's okay.  I am just asking
20  what you are aware of presently from
21  recollection?
22     A.  That's not something I remember
23  from their reports, if you are suggesting
24  that it comes from their reports.
25     Q.  You have not seen any evidence for

79 (Pages 310 - 313)

Page 314

R.S. LEVY

1            R.S. LEVY
2 3AC's intent for its trading on June 13, and
3 14; right?
4        MR. PROULX: Objection to form.
5    Q.  Right?
6    A.  I have not seen anything in the
7 evidence as to its intent, no, that's
8 correct.  But I have seen something, and I
9 can't remember whether it is Konstantinidis
10 or Lyle when -- I think it may be
11 Konstantinidis.  But anyway, I think it is
12 Konstantinidis.  But one of them, where he
13 speaks about the volume of trading being at,
14 I think seven times the 95 percentile of
15 standard deviation.  And that is consistent
16 as I understand it.  I am not a
17 statistician, but that is so wildly out of
18 kilter with anything that happened
19 previously.  So that would be consistent
20 with some form of intent just to close down.
21        And I am also aware of other
22 evidence from one of those two gentlemen to
23 the effect that the nature of the trading, I
24 am not waiting for other trades whatever
25 else, was not consistent with other trading.

Page 315

1            R.S. LEVY
2 So to the extent that intent has to be
3 shown, and I don't accept that intent
4 does -- does have to be shown, it would
5 look, unless controverted, that however the
6 API decided to do it, there was an intention
7 just to sell out a huge amount of assets in
8 a short space of time.
9    Q.  Mr. Levy?
10    A.  It is not controverted, but I have
11 not seen any evidence to controvert that.
12    Q.  Mr. Levy, are you aware that 3AC
13 repeatedly limited the entirety of a large
14 negative USD balance in a single day before
15 June 13, 2022?
16        MR. PROULX: Objection to form.
17    A.  I don't believe I am aware of
18 that, no.
19    Q.  Is it your opinion that abnormal
20 financial difficulties alone prevent the
21 operation of the ordinary course defense
22 without regard to any other considerations?
23        MR. PROULX: Objection to form.
24    A.  Can we have a look at Countrywide,
25 because I think it is important to see that.

Page 316

1            R.S. LEVY
2 But in broad terms, a company's response to
3 abnormal financial difficulties in
4 circumstances where the company was almost
5 insolvent, almost certainly insolvent, so
6 says Mr. Schieg, I would find that very
7 difficult to see how that could be ordinary
8 course trading, especially if as per Justice
9 of Appeal Baptiste advise all about that
10 moment in time, the obligation of the
11 directors and the obligation of the company
12 was to act in the best interest of the
13 creditors as a whole.  So I would find that
14 difficult.  There may be an argument, but it
15 is not one that I find, as commonly advised,
16 terribly compelling.
17    Q.  Just to be clear on your
18 testimony, is it that you don't find it
19 compelling or is it that abnormal financial
20 decisions preclude the defense from being
21 potentially operable?
22    A.  I think it would probably be a
23 high bar to say that abnormal financial
24 conditions precluded.  Because, you know,
25 what happens if Wall Street crashes, does

Page 317

1            R.S. LEVY
2 that mean that everybody exposed to
3 positions on Wall Street will lose their
4 socks as a result of that, is necessarily
5 trading other than in the ordinary course of
6 business, probably not.  But it is the
7 response to abnormal conditions.  And if the
8 response to abnormal conditions is itself
9 unordinary or out of the ordinary course of
10 business, then that's -- that's an important
11 consideration.
12        MR. PROULX:  Is now a good time
13    for a break?
14        MR. DARBY:  One more question and
15    then we can take a break.
16        MR. PROULX:  Sure.
17    Q.  So could exiting risky
18 deteriorating positions in favor of more
19 stable positions potentially operate as an
20 act further to the company as a going
21 concern?
22        MR. PROULX:  Objection to the
23    form.
24    A.  This is a hypothetical.  I am not
25 sure that you are suggesting to me that that

Page 318

R.S. LEVY

1         R.S. LEVY
2 is what happened here, because here there
3 was a conversion of digital assets to cash
4 as I understand it.
5         But if a -- if a company wasn't
6 facing imminent insolvency and it decided to
7 set out a bitcoin and buy US treasuries,
8 i.e. risky to sound, I can't imagine that
9 would be an objectionable transaction.  So
10 that's a hypothetical.
11        MR. DARBY:  Thank you, are we good
12 to go off the record now.
13        THE VIDEOGRAPHER:  The time is
14 5:44 p.m.  We are going off the record.
15        (Whereupon, a short recess was
16 taken.)
17        THE VIDEOGRAPHER:  The time is
18 6:14 p.m.  We are going back on the
19 record.
20    Q.  All right, Mr. Levy, thank you, so
21 do you recall we were discussing very long
22 ago today the concept of whether withdrawals
23 in market price declines could be part of a
24 preference claim?
25    A.  Yes.

Page 319

1         R.S. LEVY
2    Q.  And please correct me if I get
3 this wrong, but I understood your testimony
4 to be that the amount of withdrawals from
5 the Exchange could not be part of the value
6 of a preference claim?
7         MR. PROULX:  Objection to the
8         form, misstates the testimony, omits
9         assumptions given.
10   A.  In -- in broad terms that is the
11 part that I think you took me to the varying
12 parts of my declaration.  In broad terms,
13 that's correct, I think, yes.
14   Q.  If you would like to revisit your
15 declaration, I am happy to do that?
16   A.  Yeah, would you mind, sir?
17   Q.  Of course.  So I believe, I
18 believe it is going to be in the
19 assumptions -- excuse me, I will give you a
20 paragraph number in one moment.  80 and 81
21 are the two that I was thinking of?
22   A.  Yeah.
23   Q.  So paragraph 80, I accept that to
24 the extent the decline in the value of 3AC's
25 asset balance was attributable to a decline

Page 320

1         R.S. LEVY
2 in the market price of the underlying
3 digital assets that 3AC kept rather than
4 sold, then that decline in value cannot form
5 any part of an unfair preference claim.
6         Did I read that right?
7    A.  Yes, you do.
8    Q.  Does that view apply if the
9 unitary asset theory is rejected?
10        MR. PROULX:  Objection to form.
11   A.  I think that view must be
12 predicated on the fact that in order for
13 there to be a preference, there has to be a
14 transaction of some description.  And if 3AC
15 just sat on assets as the ticket went down,
16 there has been no transaction, that's just a
17 decline in the value of its assets.  So I
18 don't see how absent a transaction there can
19 be a preference, just a market for.
20   Q.  And would your position be the
21 same if the digital asset balance is treated
22 as an asset and the USD balance is treated
23 as a liability?
24        MR. PROULX:  Objection to form.
25   A.  If the digital asset balance is

Page 321

1         R.S. LEVY
2 treated as an asset, there has to be a
3 transaction, no matter what the factual
4 predicate is.  And if there is no
5 transaction, then one doesn't even get in,
6 you know, open the door to Section 245.
7    Q.  So I am going to ask the same
8 questions, I will preview for paragraph 81?
9    A.  Yes.
10   Q.  Which states, Similarly I expect
11 that any withdrawals from the FTX Exchange
12 by 3AC for cash or digital assets for its
13 own benefit that it kept cannot form part of
14 any preference claim against FTX.
15        Do you see that?
16   A.  I do.  Well, that -- well, that
17 seems to be a transaction by 3AC for its own
18 benefit that it kept.  So if it just took X
19 coins off the Exchange and put them in
20 another exchange, then there is no
21 transaction, there is no relevant
22 transaction, because the -- sorry, it is
23 getting late, Section 245 is predicated on a
24 transaction with a creditor.  And one can't
25 be -- one can't, A, as a matter of B, one

81 (Pages 318 - 321)

Page 322

1          R.S. LEVY
2 can't really transact, one can't contract
3 with one's self, and one cannot be one's own
4 creditor or debtor.
5     Q.  So does the position you have
6 expressed in paragraph 81 apply even if the
7 court rejected the unitary asset theory?
8     MR. PROULX:  Objection to form.
9     A.  I have to see what the court would
10 determine.  But in order to answer that
11 question fully, because it is kind of an
12 unexplained predicate.  But I do say that
13 for there to be a preference, there has to
14 be a transaction with a creditor.
15     And the -- 3AC simply watching
16 assets decline in value or moving assets
17 without applying any proceeds in favor of a
18 third party, could not amount, as I see it,
19 to a transaction with a creditor or a
20 transaction with benefits a creditor.
21     Q.  And just to confirm, is that the
22 case if the USD balance is treated as a
23 liability of 3AC and the digital asset
24 balance is treated as an asset of 3AC?
25     MR. PROULX:  Objection.

Page 323

1          R.S. LEVY
2     A.  I don't see these transactions
3 have any bearing on that.
4     The fundamental point is that
5 Section 245 requires a preference to be
6 given by a company to a creditor.  So of
7 necessity to some extent it is a bipartite
8 transaction.
9     Q.  Thank you, Mr. Levy.  Do you have
10 any understanding of how arguments regarding
11 proprietary interest in digital assets were
12 previously resolved in the FTX bankruptcy
13 proceedings?
14     MR. PROULX:  Objection to the
15     form.
16     You can answer.
17     A.  Not -- not in any detail.  I have
18 seen a point Mr. Atherton makes in his
19 report about some prior determination.  I
20 don't believe I have read the prior
21 determination, so I am not really in a
22 position to comment on that.
23     Q.  Are you aware that FTX has a
24 confirmed bankruptcy plan?
25     A.  I don't know what a -- sorry, I

Page 324

1          R.S. LEVY
2 don't know what a confirmed bankruptcy claim
3 is.
4     Q.  No problem.
5     Are you aware that the court
6 concluded that digital assets and cash held
7 by FTX as of the date of FTX's bankruptcy
8 petition are property of the FTX bankruptcy
9 estates?
10     MR. PROULX:  Objection to form,
11     objection to the extent it
12     mischaracterizes the document
13     referenced.
14     A.  I haven't -- I haven't seen any
15 judgment or order, whatever it is you call
16 it there, saying that.  I have seen
17 something I think broadly reflecting that
18 in -- in the -- in a report from Lord
19 Neuberger reflecting -- I don't know if it
20 is his first or second, but in something
21 that Lord Neuberger signed.  I haven't seen
22 the underlying documents, and couldn't
23 possibly comment on what it means as a
24 matter of American procedure.
25     Q.  Okay.

Page 325

1          R.S. LEVY
2     A.  How it would play out in the BVI
3 would be a complete different thing.
4     Q.  So Mr. Levy, if digital assets are
5 properties of the FTX Exchange, that means
6 they cannot also be the property of FTX
7 customers; correct?
8     MR. PROULX:  Objection.
9     A.  That -- that invites a degree of
10 speculation, because with respect, it is an
11 overly simplistic question.  If you want to
12 put a more specific scenario to me, I am
13 happy to address it.
14     Q.  So if we assumed the Court
15 concluded that a pool of digital assets are
16 the property of the FTX Recovery Trust,
17 could a customer have a proprietary interest
18 in that same pool of digital assets?
19     MR. PROULX:  Objection to form.
20     Vague.
21     A.  I -- I need to understand the
22 scenario.  But it is certainly possible for
23 a trustee, let's say I am the trustee of a
24 property, for the beneficiary to have an
25 interest in that property.  So I mean if you

82 (Pages 322 - 325)

Page 326

1           R.S. LEVY
2  want to put the judgment to me -- I can't
3  really comment on US law judgment, what it
4  means or its effect.
5       So I am not trying to be
6  difficult, but there can be simultaneous
7  interests in property, certainly as a matter
8  of BVI law and U.K. law.
9    Q.  So you conclude that the trades
10  alleged to have been preferences put FTX in
11  a better position as a creditor of 3AC;
12  correct?
13    A.  Yes.
14    Q.  Can you articulate how those
15  transactions put FTX into a better position
16  as a creditor?
17    A.  Assuming as I do, and as I think
18  is correct, that FTX was a creditor, then as
19  a result of those trades, it was paid dollar
20  for dollar, it received dollar for dollar by
21  way of diminution of the liability.  Had FTX
22  actually gone into liquidation immediately
23  thereafter, assuming that FTX, as I
24  understand the position to be, had other
25  creditors, they would not be sharing in the

Page 327

1           R.S. LEVY
2  dollar for dollar reduction that FTX
3  received.  Therefore -- but if the
4  transactions hadn't taken place, then FTX
5  would have jumped over to the other side and
6  would have shared pari passu with the other
7  secured creditors.  And it would have
8  received less on that scenario that it
9  received as a result of the dollar for
10  dollar reduction.
11    Q.  So do you consider that benefit to
12  have accrued to FTX in its capacity as an
13  exchange?
14       MR. PROULX:  Objection to the
15       form.
16    A.  I don't really know what you mean
17  in its capacity as an exchange.  It was a
18  creditor.
19    Q.  Your view as to creditor status is
20  based on a specific position as between FTX
21  on the one hand and 3AC on the other hand;
22  correct?
23       MR. PROULX:  Objection to the
24       form, mischaracterizes the testimony.
25    A.  There can under circumstances of

Page 328

1           R.S. LEVY
2  this case have been no other creditor as I
3  see it other than FTX that would bipartite
4  transactions, whether that being the terms
5  of service or I am not sure, line of credit
6  and so on.  The only person entitled to
7  inform -- to enforce any liabilities was
8  FTX.  So there is no possibility of there
9  being any other creditor.
10    Q.  So the benefit for FTX was
11  avoiding having to absorb that loss, is that
12  your view?
13       MR. PROULX:  Objection to the
14       forms, objection to form.
15    A.  No, that's on a different -- cite
16  a different point.  The benefit to FTX in
17  the most obvious sense was that FTX was owed
18  a substantial sum of money, and received it
19  in full, full sum as I understand it.
20    Q.  Do you understand that a
21  significant portion of 3AC's negative USD
22  balance came in the form of loans from
23  customers under the margin program?
24    A.  I think there is -- there is a
25  danger of -- there are -- there are a number

Page 329

1           R.S. LEVY
2  of answers and don't shout of me if I go
3  through them, because you asked the
4  question.
5       There is a danger of asking who
6  provided the money that 3AC borrowed that
7  was comprised or found its way into 3AC's
8  hands as a result of the -- that resulted in
9  the negative US dollar balance.  Certainly a
10  sum of -- some of it, as I understand it, is
11  120 million.  That is in a document which
12  describes the lender, I think, as FTX and
13  3AC as the borrower.  So that's 120 million
14  of it.  The balance, as I understand, may,
15  and I have not seen any documents to support
16  things one way or the other, but I have seen
17  FTX's pleading the objection.  And I have
18  seen Mr. Coverick's evidence, which suggests
19  that there were unidentified pools of
20  lenders and unidentified pools of borrowers.
21  And it is impossible to match any one pool
22  of borrowers to one pool of lenders.  And
23  presumably if it is impossible to match one
24  pool of lenders -- borrowers to a pool of
25  lenders, it is equally impossible to -- or

83 (Pages 326 - 329)

Page 330

1           R.S. LEVY
2  possibly more impossible to identify one
3  specific borrower, 3AC, to any specific
4  lender or pool of lenders.
5           So if the lenders provided the
6  money and that somehow is facilitated by
7  3AC, the only person that could enforce the
8  repayment obligation, I think pretty much on
9  anyone's case, would be FTX. And it is that
10  which makes FTX a creditor.
11          As I say in my declaration, what
12  you have to look for is a creditor. And
13  then if one looks at the early section of
14  the Act, you see, I have set them out by way
15  of direct quotation IN my declaration, what
16  is a creditor, what is an asset, so on and
17  so forth, it seems to me absolutely clear
18  that FTX is a creditor within the meaning of
19  the Act.
20      Q.  So if we assume, rather than 3AC
21  going insolvent, they paid back the margin
22  loans, who would have been paid back?
23          MR. PROULX: Objection to form,
24      calls for speculation.
25      A.  Yeah, you are asking me to

Page 331

1           R.S. LEVY
2  speculate, because I don't know how it is
3  paid back. But the margin loan from memory,
4  and you will correct me, the agreement
5  describes FTX as the lender and 3AC as a
6  borrower. Now, typically that creates the
7  most obvious debtor/creditor relationship.
8  I borrowed money from my bank, I think we
9  all know who the debtor and creditor is.
10      Q.  So Mr. Levy, is it your testimony
11  you don't know who would have been paid back
12  loans that 3AC took under the margin
13  program, if we assume they did pay them
14  back?
15          MR. PROULX: Objection to form,
16      mischaracterizes the testimony.
17          You can answer.
18      A.  If you say they paid them back,
19  then the margin loan agreement describes --
20  have you got a copy of the margin loan
21  agreement?
22      Q.  I do, BUT I am going to move on
23  shortly, we have very few minutes left here?
24      A.  I don't want to get this wrong,
25  but my recollection is -- I don't want to

Page 332

1           R.S. LEVY
2  get anything wrong. But my recollection is
3  that the margin loan agreement describes FTX
4  as a lender, and if the lender -- and 3AC as
5  a borrower. So if the borrower pays back
6  the loan, typically the debt is discharged,
7  the lender gets his money back, the borrower
8  is relieved of his obligation and everybody
9  breathes a sigh of relief.
10      Q.  Mr. Levy, could there have been
11  commercial reasons why FTX would choose to
12  cover customer losses?
13          MR. PROULX: Objection to form.
14          You can answer.
15      A.  You are asking me to speculate as
16  to how a crypto fund would operate.
17      Q.  I am asking if there could be
18  reasons?
19      A.  I am sure -- I am sure there could
20  be.
21      Q.  Could they be distinct from
22  reputation related reasons?
23      A.  If you want to give me an example,
24  but this is really -- you are asking me to
25  engage in considerations of commercial

Page 333

1           R.S. LEVY
2  considerations of how exchanges operate and
3  so on and so forth. And I have thought the
4  better people to ask to deal with that
5  question might have been Mr. Lyle or
6  whatever or people with intimate experience
7  of how these things work. There may be
8  reasons, I just -- it is not my area of
9  expertise.
10      Q.  So you can't testify personally to
11  the reasons why FTX might or might not do
12  something?
13          MR. PROULX: Objection to form,
14      mischaracterizes the testimony.
15      A.  No, I -- sorry.
16          MR. PROULX: You can answer.
17      A.  I do say in my declaration that
18  there could be reputational reasons, and
19  that strikes me as fairly obvious. Because
20  if customers put in funds and aren't repaid,
21  they probably wouldn't stay on the Exchange
22  very long. And I would imagine there would
23  be quite a lot of chatter in crypto chat
24  rooms or whatever.
25      Q.  Is a reputational benefit on its

1           R.S. LEVY
2  own sufficient to sustain a preference
3  claim?
4      A.  Yes, I think -- I think it could
5  be, if it is valuable.
6      Q.  Have you ever seen that happen
7  before?
8      A.  No.  It is -- it is -- it is a
9  point which, as you know, was raised in
10  Byers versus Chen, C-H-E-N.  It is a point
11  that was raised in Byers and Chen, which has
12  got a quite interesting history of appeals.
13  And going back to the first instance in the
14  BVI, when the matter was dealt with by the
15  Privy Council, they said you didn't prove
16  our relation of it.  The reason I think it
17  was rejected on the facts, from
18  recollection, is that the transaction under
19  consideration relieved Ms. Chen of an
20  obligation to pay $9 million or so.  But I
21  think it was subsequently said that it
22  couldn't have saved her reputation, because
23  she actually owed such a vast amount of
24  money that it was a drop in the ocean.  But
25  I certainly think if somebody was relieved

1           R.S. LEVY
2  of the obligation to pay hundreds and
3  millions of dollars in a commercial context,
4  whereby if that money wasn't paid, the
5  whole -- there would be dissatisfaction
6  amongst customers, that's rather different,
7  and that it could found a claim.
8      Q.  Mr. Levy, can you pull up
9  Mr. Atherton's rebuttal declaration which
10  should be Exhibit 2.
11          Take your time to get it, I am
12  going to direct you to paragraph 105?
13      A.  Number 2, 105.
14      Q.  And so this says, While there is a
15  security registration system in the BVI,
16  registration in the BVI is voluntary and is
17  not required to perfect a security interest
18  or to render it enforceable.  As a result no
19  further steps would be required to perfect
20  the security under the law of the BVI.  And
21  whether registration of such security
22  interest has occurred merely goes to the
23  question of priority as between security
24  interest created by the company in question
25  and not the validity or enforceability of

1           R.S. LEVY
2  any relevant security interest.
3          Do you see that.
4      A.  I do see that.
5      Q.  Do you agree with that?
6      A.  I am not -- I am not sure that
7  security was addressed in -- I don't believe
8  it was addressed until after I produced my
9  report or addressed in Mr. Atherton's first
10  declaration.  I believe this is a matter
11  that was raised in the declaration of Steven
12  Houseman King's Counsel.  I think Steve
13  Atherton is referring to the Section 260 of
14  the BVI's Business Company's Act.  And in
15  broad terms I agree that there is a
16  registration authority -- I am sorry, a
17  registration provision under -- I am sorry
18  166, under the Business Company's Act in the
19  BVI, and that a failure to register would
20  not result in any particular security
21  interest being rendered void, yes.
22          MR. DARBY:  Subject to anything
23     from Mr. Proulx, I think that's all I
24     have got right now.
25          THE WITNESS:  Thank you very much.

1           R.S. LEVY
2          MR. PROULX:  We will have a couple
3     of questions.  Why don't we just take a
4     short break to regroup.  How much time
5     it left on the record for noticing
6     counsel, are we almost up?
7          THE VIDEOGRAPHER:  It is like one
8     minute left.
9          MR. DARBY:  We reserve the right
10     to revisit whatever you discuss.  But
11     obviously you want to ask your
12     question, so we will come back in five
13     minutes, ten minutes.
14          MR. PROULX:  Yes, ten minutes.
15          THE VIDEOGRAPHER:  The time is
16     6:41 p.m., we are going off the record.
17          (Whereupon, a short recess was
18     taken.)
19          THE VIDEOGRAPHER:  The time is
20     6:54 p.m.  We are going back on the
21     record.
22  EXAMINATION BY
23  MR. PROULX:
24          MR. PROULX:  Thank you.  For the
25     record, Zachary Proulx from Latham &

Page 338

1          R.S. LEVY
2     Watkins for the Joint Liquidators.
3     Q.   Mr. Levy, did you review
4  Mr. Atherton's original declaration report
5  in this matter?
6     A.   Yes, I did.
7     Q.   Did you review his rebuttal
8  declaration or report in this matter?
9     A.   Yes, I did.
10    Q.   Did you review or monitor his
11 deposition in this matter, the transcript
12 thereof?
13    A.   I watched remotely from London
14 Mr. Atherton's deposition.  And I was
15 subsequently provided with a transcript of
16 that.
17    Q.   And do you agree with all of
18 Mr. Atherton's analyses or opinions in those
19 three sources that we haven't expressly
20 discussed here today?
21    A.   That we haven't?
22    Q.   Have not been expressly discussed
23 here today?
24    A.   I take issue with a number of
25 things that Steven Atherton says.

Page 339

1          R.S. LEVY
2     Q.   If asked by FTX's or the Joint
3  Liquidator's --
4     A.   I am sorry, can you just speak a
5  little bit louder.
6     Q.   Yes, of course?
7     A.   I am sorry.
8     Q.   If asked by the FTX's or the Joint
9  Liquidator's counsel about any further
10 portions of Steven Atherton's reports or
11 deposition, not expressly discussed here
12 today, would you have opinions or analyses
13 on those additional points?
14    A.   Yes, I would.
15    Q.   You were asked at one point today,
16 I believe, whether you had reviewed any
17 cases since the submission of Mr. Atherton's
18 rebuttal report.  Do you remember that
19 question?
20    A.   I do.
21    Q.   You identified some such cases; is
22 that correct?
23    A.   Yes.  It is getting later, but I
24 certainly remember telling Mr. Darby that I
25 reviewed a New Zealand case Mr. Atherton

Page 340

1          R.S. LEVY
2  refers to.  So more specifically that, I
3  don't remember the number of the other cases
4  that have already been referred to.  I also
5  looked at Durham which was put to
6  Mr. Atherton, which it is not a case, it is
7  a book.  And I also looked at the investors'
8  compensation scheme case, and there may have
9  been other cases that I looked at.
10    Q.   In addition to those sources, did
11 you, in fact, review most or all of the
12 sources cited in Mr. Atherton's rebuttal
13 report?
14       MR. PROULX:  Objection.
15    Q.   You can answer?
16    A.   I looked at a number of the
17 sources.  Some of them were cases or sources
18 that to my recollection had been referred to
19 in his earlier report.  I didn't necessarily
20 go to all of those, because I thought I had
21 sufficient knowledge for the purposes of
22 understanding what Mr. Atherton was saying.
23 But I did look at a number of cases referred
24 to and sources.
25    Q.   If those cases were put to you by

Page 341

1          R.S. LEVY
2  FTX's or the Joint Liquidators' counsel at
3  trial, would you be prepared to speak to
4  them or portions thereof?
5       MR. PROULX:  Objection.
6     A.   Yes, I would.
7     Q.   Pull up, please, Mr. Levy, your
8  report, which is exhibit, was marked as
9  Exhibit 1, and turn to page 4?
10    A.   Yeah.
11    Q.   You will see there is a Roman
12 numeral 3 section entitled Instructions and
13 Assumptions, do you see that?
14    A.   Yes.
15    Q.   Do you recall a general discussion
16 over the course of the day about certain of
17 these instructions and assumptions?
18    A.   Yes, I believe the first session
19 this morning, certainly this morning we
20 discussed these assumptions.
21    Q.   To the extent that any of these
22 instructions or assumptions were not part of
23 independent separate analysis by you, are
24 you offering an opinion on the content of
25 these instructions and assumptions?

Page 342

R.S. LEVY

1
2    A.  No.
3        MR. DARBY:  Objection.
4    Q.  Did you -- are you aware of
5    whether expert reports have been submitted
6    in this matter by Dame Elizabeth Gloster and
7    Paul Anthony Webster KC?
8    A.  Yes, I have seen those Dame
9    Elizabeth and Paul Webster's reports or
10   declarations.
11   Q.  Also are you aware of reports
12   submitted by a Mr. Schieg and a
13   Mr. Konstantinidis?
14   A.  Yes, and I have looked at those.
15   Q.  Are you offering any opinions
16   yourself within the scope of their opinions?
17   A.  No.  I wasn't asked, for instance,
18   related to Mr. Schieg, to form any view on
19   whether, and if so when, 3AC was insolvent
20   and if so, how.  That's not an analysis I
21   undertook or am properly equipped to
22   undertake.
23       Likewise, Webster's analysis
24   related to Antiguan law which is outside the
25   scope, and very specific issues which is

Page 343

R.S. LEVY

1
2    outside the scope of my analysis.  And the
3    Dame Gloster addressed the issue as I
4    understand that I was to assume in paragraph
5    27, she goes into a detail and learned
6    analysis of that.  Given that that was
7    apparently the scope of her instruction, it
8    would be -- it was not for me to perform
9    that analysis.  She is a distinguished
10   obviously jurist.  And I wouldn't be able to
11   say everything that she said, nor was I
12   instructed to.  I was merely instructed that
13   to the extent that the two assumptions --
14   the two assumptions in paragraph 27 of my
15   declaration represent conclusions, though
16   that's not expressly stated in assumption
17   27, that's what I understand the option of
18   it to be, and I wouldn't question her work
19   or her conclusions.
20   Q.  Are you offering any opinions that
21   are in disagreement with any of the expert
22   reports we have just referenced?
23       MR. DARBY:  Objection.
24   A.  No.
25   Q.  Are you offing any disagreements

Page 344

R.S. LEVY

1
2    with any factual assumptions that these four
3    individuals made in their reports?
4        MR. DARBY:  Objection.
5    A.  No.  I am not in a position to
6    deal with the factual assumptions that
7    Konstantinidis, for instance, or Lyle, or
8    for that matter Mr. Schieg, which is
9    slightly easier for a commercial lawyer to
10   understand, but it is not for me to offer
11   the views on their factual assumptions.
12   Q.  Insofar as they analyze factual
13   matters germane to -- insofar as they
14   analyze factual matters germane to their
15   opinions that are not germane to yours, do
16   you intend to offer any testimony today
17   inconsistent with those matters?
18       MR. DARBY:  Objection.
19   A.  No.
20   Q.  Do you in fact?
21   A.  No, as far as I am aware.
22       MR. DARBY:  Objection.
23   Q.  Turn to paragraph 115 of your
24   report, please?
25   A.  Yeah.

Page 345

R.S. LEVY

1
2    Q.  Take a moment to read it and let
3    me know when you are all set?
4    A.  Yeah.
5    Q.  You reference -- I am sorry, also
6    read for full context paragraph 114 of your
7    report?
8    A.  114?
9    Q.  114, and let me know when you are
10   all set?
11   A.  Yes.
12   Q.  You reference in both of these two
13   paragraphs the law of Antigua and Barbuda,
14   do you see that?
15   A.  Yes.
16   Q.  And is that -- do you draw a
17   conclusion with respect to the laws of
18   Antigua and Barbuda relative to the LOCA and
19   MLCA?
20       MR. DARBY:  Objection.
21   A.  Yes, I -- I reached conclusions as
22   to what the terms of those agreements mean.
23   Q.  And are those agreements to your
24   understanding governed by the laws of
25   Antigua and Barbuda or some other

87 (Pages 342 - 345)

Page 346

1          R.S. LEVY
2 jurisdiction's laws?
3          MR. DARBY:  Objection.
4     A.  I believe they are governed by the
5 laws of Antigua and Barbuda.
6     Q.  Do you offer an opinion --
7     A.  I am pretty confident.
8          Yes.  I mean, if what I say in the
9 following sentence in paragraph 140 is
10 correct, but I imagine that it is, because I
11 would have checked it maybe 18 times, they
12 are governed by the laws of Antigua and
13 Barbuda.
14     Q.  Do you in fact offer opinions
15 under the laws of Antigua and Barbuda as
16 relevant to your BVI law analysis?
17          MR. DARBY:  Objection.
18     A.  The BVI law analysis, and I am
19 going to explain it incorrectly, but the BVI
20 law analysis is that the BVI courts will
21 construe contracts with the laws of England
22 and Wales and Antigua and Barbuda in
23 accordance with those laws without reference
24 to expert evidence.
25          So to the extent that I do

Page 347

1          R.S. LEVY
2 construe the laws of England and Wales or
3 Antigua and Barbuda, I do so because that's
4 precisely what -- sorry, forgive me, the
5 Virgin Islands would do.
6     Q.  Do you, in fact, in subsequent
7 paragraphs construe the laws of Antigua and
8 Barbuda subject to that response?
9          MR. DARBY:  Objection.
10     Q.  And I would direct your attention
11 to paragraphs 129 to 130, and you can let me
12 know?
13     A.  Because there is some
14 consideration in relation to the English law
15 analysis.  I was just looking through it in
16 that.  And yes, 129, 130, I do construe,
17 consider those documents which were governed
18 by the laws of Antigua and Barbuda.
19     Q.  Do you recall a discussion earlier
20 in the day, Mr. Levy, with respect to
21 private keys?
22     A.  Private keys?
23     Q.  Private keys.
24     A.  Private keys?
25     Q.  Private keys, do you recall a

Page 348

1          R.S. LEVY
2 general discussion about private keys?
3     A.  Yes -- well, yes.
4     Q.  And?
5     A.  I can't remember the specifics of
6 the discussion.
7     Q.  And I will take you back, please,
8 to paragraph 17(b) of your report?
9     A.  Sure.  Let me just read that,
10 yeah.
11     Q.  What section of your report does
12 the discussion of private keys appear in?
13          MR. PROULX:  Objection.
14     A.  This is the section Roman three,
15 Instructions and Assumptions.  This is what
16 I was instructed according to the opening --
17     Q.  Do you offer any opinions on the
18 affect of FTX holding the private keys?
19          MR. DARBY:  Objection.
20     A.  I don't believe I do.  I think
21 that's probably within the scope of --
22 that's outside the scope of my analysis.
23     Q.  Do you offer any opinions on what,
24 if any, effect holding private keys had on
25 matters of control of the digital assets?

Page 349

1          R.S. LEVY
2          MR. DARBY:  Objection.
3     A.  I don't believe I do in my report.
4     Q.  Do you offer any opinion on who
5 possessed the underlying digital assets --
6          MR. DARBY:  Objection.
7     Q.  -- associated with 3AC's accounts?
8     A.  I don't believe I do.  I think the
9 conversation I had with Mr. Darby, what does
10 it mean to possess.
11     Q.  Please finish your answer?
12     A.  It seems to me that two or more
13 people can have possessory interest or
14 interest which are consistent with the
15 notion of or aspects of, quote-unquote,
16 possession in -- in one or more assets.  But
17 I don't think I have offered opinions on
18 that.
19     Q.  Do you offer -- do you offer any
20 opinions on whether digital assets are even
21 subject to possession?
22          MR. DARBY:  Objection.
23     A.  No, I don't believe I do.
24     Q.  Do you have an understanding
25 sitting here today on whether digital assets

88 (Pages 346 - 349)

1        R.S. LEVY
2 are subject to possession?
3        MR. DARBY: Objection.
4     A.  Do I have an opinion, no, I am not
5 expressing an opinion on that here.
6     Q.  In so far as your prior testimony
7 touched on these issues, is that because you
8 are asked to speculate?
9        MR. DARBY: Objection.
10    A.  Yes.  I was trying to assist
11 Mr. Darby to engage in a discussion of these
12 matters.  But nothing I say to the extent
13 that it was speculative should be taken as
14 me providing an opinion as to any factual
15 predicate that any such speculation was
16 based on or any conclusion, insofar as the
17 predicate wasn't absolutely clear.
18    Q.  You mentioned, there was a general
19 discussion about additional factual
20 materials you reviewed since submitting your
21 original report.  Do you recall that general
22 discussion?
23    A.  Yes.
24    Q.  Do you recall a discussion about
25 which deposition transcripts you may or may

1        R.S. LEVY
2 not have received and/or reviewed after
3 submission of your original report?
4     A.  Yes.
5        MR. DARBY: Objection.
6     Q.  Do you recall which, if any,
7 depositions -- excuse me, deposition
8 transcripts by fact witnesses --
9     A.  Factual?
10    Q.  -- factual witnesses you may have
11 received and reviewed after submission of
12 your original report?
13       MR. DARBY: Objection.
14    A.  So that would exclude Lord
15 Neuberger and Steven Atherton.
16    Q.  I am happy to make a
17 representation that by fact witnesses, I am
18 excluding the experts in this matter from
19 that?
20    A.  Okay, in that case the one that
21 springs to mind is, I think, Zain Tackett.
22 I don't remember whether he was -- what I
23 did with the schedule.  Where is it, the
24 exhibit?  Yeah, certainly I looked at the
25 deposition of Zain Tackett.  There may have

1        R.S. LEVY
2 been others.  But I am afraid it is --
3     Q.  Are you familiar from your review
4 of materials you did review by an individual
5 of the name of Nishat Singh?
6        MR. PROULX: Objection.
7     A.  I believe so, forgive me, yes, I
8 believe I have received that.
9     Q.  Received what, Mr. Levy?
10    A.  What you just said, the deposition
11 of Nishad Singh.
12    Q.  You understand Mr. Nishad Singh to
13 have been deposed in this matter?
14       MR. PROULX: Objection.
15    A.  I believe so, yes.
16    Q.  And to make sure the record is
17 clear, did you receive to the best of your
18 knowledge Mr. Nishad Singh's deposition
19 transcript?
20       MR. DARBY: Objection.
21    A.  Yes.
22    Q.  Do you have an -- please turn,
23 Mr. Levy, to paragraph 158 of your report,
24 please.  Take a moment to read that.  I am
25 only going to ask you --

1        R.S. LEVY
2     A.  It is a long one.
3     Q.  I am only going to ask you
4 questions about the first half.
5     A.  The bottom of this page or the
6 first five lines?
7     Q.  That's enough for now unless you
8 need additional context.  Do you cite any
9 factual sources in support of the analysis
10 you conduct in paragraph 158?
11       MR. DARBY: Objection.
12    A.  Yes, I cite the transcript of
13 Mr. Bankman-Fried -- sorry, the deposition
14 transcript of Samuel Bankman-Fried.
15    Q.  Do you have an understanding of
16 whether or not Mr. Zain Tackett and
17 Mr. Nishad Singh provided fact testimony
18 relevant to the analysis you provide in
19 paragraph 158?
20       MR. DARBY: Objection.  It is far
21    outside of the scope of the direct
22    examination.
23    A.  I have a more distinct
24 recollection of Zain Tackett.  I confess
25 that I did look at Nishad Singh, but sitting

89 (Pages 350 - 353)

Page 354

R.S. LEVY

1          R.S. LEVY
2  here today I can't remember, I have no
3  recollection of it.  Certainly Zain Tackett
4  I have a recollection of, sorry.
5      Q.  Based on the testimony you
6  reviewed relevant to your analysis in
7  paragraph 158, did you identify any
8  individuals or entities that factually could
9  have absorbed the hypothetical losses for
10  non-repayment of 3AC's liabilities other
11  than FTX?
12      MR. DARBY:  Objection,
13    speculative, outside the scope.
14      A.  Well, I -- I saw that there was
15  some sort of back stop scheme.  I confess to
16  not fully understanding it, what that was
17  all about.  But I assume that was part of
18  the FTX structure or arranged by FTX at its
19  expense, that would have been FTX or
20  affiliated entities.
21      Q.  Sitting here today, were you shown
22  any fact evidence relating to whether FTX in
23  practice would have absorbed hypothetical
24  losses that support any individual or entity
25  other than FTX would have absorbed those

Page 356

1  preference analysis other than those
2  identified in paragraph 27?
3      MR. PROULX:  Objection.
4      A.  Well, you heard, and there is an
5  analysis in my report, that there is issues
6  that I consider there to be a chose in
7  action, which is a property, something that
8  is capable of being owned, put in trust,
9  sold and -- and most importantly trust
10  exercised.
11      Q.  Did you independently analyze
12  whether such an interest exists here?
13      MR. DARBY:  Objection.
14      A.  Yes, that's part of the analysis I
15  undertake.  Is it in paragraph -- I don't
16  remember, it is part of the analysis here.
17      (Continued on next page.)
18
19
20
21
22
23
24
25

Page 355

1          R.S. LEVY
2  losses?
3      MR. DARBY:  Objection.
4      A.  Not to the best of my
5  recollection.  Certainly as I did in
6  response to your last question.
7      Q.  Turn, please, to paragraph 27 of
8  your report.  We covered this I believe a
9  number of times today, obviously feel free
10  to refresh yourself on what it is?
11      A.  These are the two assumptions,
12  yeah.
13      Q.  Do any of the conclusions you
14  draw, legal conclusions you draw in the
15  following sections of your report depend on
16  those assumptions substantiated --
17      MR. DARBY:  Objection.
18      Q.  -- with respect to the preference,
19  start there?
20      A.  I think the preference, my view is
21  that the preference claim succeeds whether
22  or not these assumptions are correct.
23      Q.  And do you -- do you or have you
24  identified any forms of proprietary interest
25  or property interest relevant to your

Page 357

1          R.S. LEVY
2      MR. PROULX:  I have no further
3  questions subject to re-cross from
4  FTX's counsel.
5      MR. DARBY:  I don't intend to ask
6  any questions.  I am just going to
7  object to the line of questioning on
8  redirect preserve for the record
9  objections for leading questions, for
10  questions that were outside of the
11  scope and other objections as to form.
12  But I don't intend to ask you any other
13  questions today.  I just want that for
14  the record.
15      MR. PROULX:  You are welcome, of
16  course, to say what you need for the
17  record.  We dispute that any of those
18  objections would be improper or would
19  be sustained.  We reserve rights with
20  respect to the same.
21      MR. DARBY:  Okay.
22      THE VIDEOGRAPHER:  The time is
23  7:20 p.m.  We are going off the record.
24  And this concludes today's testimony
25  given by Robert Stuart Levy.

90 (Pages 354 - 357)

Page 358

```
1              R.S. LEVY
2       Total number of media used is 7
3   and will be retained by Veritext Legal
4   Solutions.
5       THE COURT REPORTER:  Mr. Proulx,
6   what is your order?
7       MR. PROULX:  Rough and two-day
8   expedite.
9       (Whereupon, at  7:20 P.M.,  the
10  Examination of this witness was
11  concluded.)
12           °   °   °   °
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 360

```
1
2          C E R T I F I C A T E
3
4   STATE OF NEW YORK        )
5                   :  SS.:
    COUNTY OF QUEENS         )
6
7       I, RIVKA TROP, a Notary Public for and
8   within the State of New York, do hereby
9   certify:
10      That the witness whose examination is
11  hereinbefore set forth was duly sworn and
12  that such examination is a true record of
13  the testimony given by that witness.
14      I further certify that I am not related
15  to any of the parties to this action by
16  blood or by marriage and that I am in no way
17  interested in the outcome of this matter.
18      IN WITNESS WHEREOF, I have hereunto set
19  my hand this 11th day of December, 2025.
20
21
22
23          RIVKA TROP
24
25
```

Page 359

```
1
2              I N D E X
3
4   EXAMINATION BY               PAGE
5   MR. DARBY               6
    MR. PROULX              337
6
7          E X H I B I T S
8
9   LEVY EXHIBITS
10
11  EXHIBIT      EXHIBIT
12  LETTER       DESCRIPTION     PAGE
13
14  Exhibit 1   Declaration of Robert   9
            Stuart Levy
15
    Exhibit 2   Declaration of Steven   22
16          Atherton
17  Exhibit 3   Annex of materials    84
18  Exhibit 4   FTX terms of service  133
19  Exhibit 5   Aldridge         160
20  Exhibit 6   BVI Insolvency Act   165
21  Exhibit 7   Invest Bank decision  234
22
23
24
25
```

Page 361

```
1   IN RE: FTX TRADING LTD., et al.
2   12/11/2025 - ROBERT STUART LEVY
3        E R R A T A  S H E E T
4   PAGE_____ LINE_____ CHANGE_____
5        _____
6   REASON_____
7   PAGE_____ LINE_____ CHANGE_____
8        _____
9   REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11       _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14       _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17       _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20       _____
21  REASON_____
22
23  _____   _____
24  ROBERT STUART LEVY       Date
25
```

91 (Pages 358 - 361)

Page 362

1   IN RE: FTX TRADING LTD., et al.

2   12/11/2025 - ROBERT STUART LEVY

3       ACKNOWLEDGEMENT OF DEPONENT

4   I, ROBERT STUART LEVY, do hereby declare

5   that I have read the foregoing transcript,

6   I have made any corrections, additions, or

7   changes I deemed necessary as noted on the

8   Errata to be appended hereto, and that the

9   same is a true, correct and complete

10  transcript of the testimony given by me.

11

12  _____  _____

13  ROBERT STUART LEVY        Date

14  *If notary is required

15

16      SUBSCRIBED AND SWORN TO BEFORE ME THIS

17      _____ DAY OF _____, 20___.

18

19

20      _____

21  NOTARY PUBLIC

22

23

24

25

Veritext Legal Solutions

212-267-6868            www.veritext.com            516-608-2400

**[& - 2]**                                                    Page 1

| **&** | **100**  113:20,21 | 329:13 | **150**  286:15 |
|---|---|---|---|
| **&**  1:15 2:5,14 | 113:23 115:6,9 | **122**  159:25 | **158**  295:17 |
| 5:13,19 39:20 | 116:17,18,22 | 160:21 162:10 | 296:12 303:9 |
| 40:3 58:21,22 | 184:2 204:8,16 | **125**  1:16 2:15 | 304:11,12 |
| 59:23 84:24 | 205:7,14 252:4 | 4:19 | 352:23 353:10 |
| 141:7 337:25 | 252:10 267:20 | **1271**  2:6 | 353:19 354:7 |
| **1** | 267:25 268:10 | **129**  347:11,16 | **16**  187:4 |
| **1**  4:12 9:4,7 | 268:10 292:23 | **12:30**  153:19 | 215:17 |
| 45:11 46:12 | 295:12 | **12:38**  155:19 | **16.2**  221:20 |
| 64:5,11 87:11 | **100,000**  112:18 | **12th**  95:11,15 | 222:8 223:2 |
| 109:14,18,23 | 112:23 278:20 | 215:20 216:12 | **160**  359:19 |
| 115:8 135:17 | 279:15 | 289:13,14 | **165**  359:20 |
| 141:23 165:17 | **10004**  2:15 | **13**  87:12 | **166**  336:18 |
| 166:8,10 | 4:20 | 135:19 160:4 | **16th**  13:9 |
| 186:24 192:5 | **10020**  2:7 | 201:10 313:4 | **17**  89:4 93:5 |
| 192:16 210:13 | **102**  114:5 | 314:2 315:15 | 99:7 104:7 |
| 213:24 221:16 | **105**  335:12,13 | **130**  347:11,16 | 107:3 206:18 |
| 341:9 359:14 | **10:42**  79:22 | **133**  359:18 | 208:3 348:8 |
| **1.011**  252:25 | **11**  1:6,11 4:4 | **13th**  109:8 | **175**  271:17 |
| 254:14 | 163:9,13 164:2 | 200:9 215:21 | 296:21 297:4 |
| **1.5**  191:7 | 238:8 | 264:25 280:14 | 298:9,9 |
| **10**  36:10,14 | **110**  116:25 | 280:14 | **18**  175:11 |
| 98:15 116:25 | **114**  345:6,8,9 | **14**  126:6 | 346:11 |
| 116:25 131:23 | **115**  344:23 | 135:19 181:16 | **19**  108:19 |
| 217:17 259:11 | **11:00**  80:3 | 201:10 313:5 | 117:25 215:19 |
| 259:13,17 | **11th**  360:19 | 314:3 | **1966**  160:2,22 |
| 279:14 | **12**  87:12 88:9 | **140**  306:19 | 161:14 |
| **10.1.3**  73:6 | 95:5,8 108:25 | 346:9 | **1977**  181:15 |
| 126:17,22 | 118:17 297:9 | **14th**  109:8 | **19a**  108:21 |
| 128:12,23 | **12.1**  225:11 | 200:9 264:25 | **1:34**  155:23 |
| **10.1.3.**  73:8 | **12/11/2025** | 280:15 | **2** |
| 129:8 131:7 | 361:2 362:2 | **15**  139:2,4 | **2**  22:6,11 84:2 |
|  | **120**  44:10 | **15,000**  202:4 | 84:5 109:23 |
|  | 279:2 329:11 |  |  |

139:11 141:23
210:16,17
282:7 335:10
335:13 359:15
**20**   198:11
204:18 362:17
**20,000**   202:2
278:23 279:18
281:5
**200**   287:23
290:19,20
**2003**   42:9,15
**2004**   186:24
187:4 188:11
**2021**   88:15
**2022**   95:5
108:25 118:17
126:7 135:19
200:10 203:2
289:15 297:9
315:15
**2025**   1:11 4:4
191:13 360:19
**21**   43:5 118:25
123:18,20,21
**22**   17:12,20
18:8 19:4,17
23:25 71:5,6
71:10 88:12
125:23 158:6
167:16 180:22
199:4 359:15
**22-11068**   1:7
4:17

**23**   158:6 199:3
199:4,5
**234**   359:21
**24**   135:16
137:6 210:5
**24/7**   220:2
251:18,24
**244**   122:18
174:8 209:18
**245**   123:2,2
165:15,17
166:8,10
172:19 179:2
190:10 195:12
203:10 208:25
306:19,19
308:14 321:6
321:23 323:5
**2451**   174:18
**246**   123:2
308:14
**249**   34:25
156:8 157:16
157:24 171:22
195:9,12 209:3
209:13 210:3,5
210:7,13
**25**   151:9
191:13
**250**   34:25
156:8 157:16
157:24 171:22
195:10 209:14
210:4,22

255:17,19,20
**26**   120:3
**260**   336:13
**26th**   13:9
**27**   72:24 74:19
75:3 76:16
77:7 78:5,14
138:12 139:6
154:10 203:2
343:5,14,17
355:7 356:3
**28**   221:16
**284**   252:24
254:13
**29**   180:25
269:23
**2:00**   250:10
252:2
**2:38**   208:14

### 3

**3**   74:23 84:13
84:14,16 87:17
109:23 216:15
341:12 359:17
**30**   269:23
**33**   22:22
242:16,20
**337**   359:5
**34**   245:5,6,8
247:11
**349**   307:10
**35**   238:7
240:10 242:22

243:15,16
**37**   242:16,20
**37.8.2**   274:14
274:16
**38.7.**   269:20
270:4
**38.7.2**   272:9
276:18
**3812.a**   269:24
**3:00**   220:5
**3:04**   208:18
**3ac**   9:19 32:14
32:15,19 56:7
56:11 58:14
63:12 69:13,19
71:20 78:16,23
90:18 94:7,12
94:21 95:4,8
100:18 101:2
106:10,16,21
107:4,18,20
109:11 115:21
116:15 118:3
118:10 119:4
120:11 121:16
123:7 129:14
130:24 131:3
131:12,16
136:3 139:6,8
139:9,14,20,23
140:4 142:19
143:8,9 145:22
152:7,19
153:11 154:6

**[3ac - 8]**                                                                  Page 3

154:18 174:24
176:10 177:6
178:8 196:12
198:22 200:14
200:18,22,24
201:10,12,25
202:5 203:4,5
205:23 207:6
207:15 213:24
214:24 215:13
216:18 217:12
217:19 221:11
224:18 248:3
249:20,23
258:16 259:5
260:10,18
262:11,18
264:22 266:6
266:13,14,16
272:2,17,25
273:3,9 274:4
276:13,15
280:9,17,20,22
281:5 283:11
283:15,16
284:18 285:3
290:3,15
292:21 294:5,9
294:10 296:7
296:17 297:2,8
297:10 298:2
298:18 299:22
300:7,11,22,25
312:10 313:3

315:12 320:3
320:14 321:12
321:17 322:15
322:23,24
326:11 327:21
329:6,13 330:3
330:7,20 331:5
331:12 332:4
342:19

**3ac's**  86:6
89:20,23
108:24 116:21
118:16 119:9
120:8,21
124:16 126:2
135:20,22
174:21 198:20
198:24 199:7
202:3,14 203:3
214:3 215:21
245:9 265:2,3
283:22 287:19
297:6 303:23
307:12 313:13
314:2 319:24
328:21 329:7
349:7 354:10

**4**

**4**  74:24 83:17
132:11 133:16
341:9 359:18
**4.2.3.**  171:4

**40**  151:9 309:3
**400,000**  169:15
169:20,23
**423**  43:22
44:12,14 229:2
229:9 232:24
240:19 241:22
242:15 244:5
**436**  229:6,16,22
**451**  159:24
160:20 161:15
**465**  44:3
**48**  174:14
296:13
**49**  295:21
296:17
**4:17**  269:5
**4:39**  269:9

**5**

**5**  145:19 160:6
160:9 235:3,5
301:23 359:19
**50**  151:7,8
259:11,12,17
**500**  45:11
278:2 287:22
**502**  287:25
**51**  15:24 16:5
16:25 22:14
31:19
**52**  17:10 20:14
**52,000**  280:16
282:6

**53**  17:7 19:23
20:15 22:17,22
23:11,13
240:23
**5636**  360:22
**5:44**  318:14

**6**

**6**  165:7,9 359:5
359:20
**600**  118:13
216:14
**65**  119:8
**68**  20:19 24:22
24:25
**6:14**  318:18
**6:41**  337:16
**6:54**  337:20

**7**

**7**  169:12
234:13,15
236:6 358:2
359:21
**75**  42:13,13
241:15,20,21
242:13
**7:20**  357:23
358:9

**8**

**8**  73:9 76:3,18
145:19 169:12
169:20

**8.2.3** 73:9,18
**8.2.6** 73:9 91:8
  218:3 220:11
  226:8 247:24
  249:25 256:18
  256:22 259:25
  260:2 274:3
  291:15
**80** 119:21
  120:3,4,7
  204:11,17,18
  319:20,23
**80,000** 279:24
  281:15
**800** 290:17
**81** 120:4
  123:14 319:20
  321:8 322:6
**82** 126:4 131:5
**84** 359:17

**9**

**9** 235:12,15
  236:13 278:23
  334:20 359:14
**9.2.6** 259:24
**915** 82:4
**95** 74:10
  314:14
**98** 114:6
**99** 281:19
**9:00** 1:12
**9:12** 4:4

**a**

**a.m.** 1:12 4:4
  79:22 80:3
  252:2
**ability** 99:2
  101:9 113:4
  162:21 171:3
  220:11 272:9
  301:10,10
  312:8
**able** 7:4 47:9
  53:12 94:4
  111:6 112:15
  173:4 250:18
  295:14 297:4
  298:11 343:10
**abnormal**
  310:25 315:19
  316:3,19,23
  317:7,8
**absent** 53:8
  320:18
**absolute** 54:13
  146:10 225:13
**absolutely**
  71:12 72:18,19
  82:21 330:17
  350:17
**absorb** 296:4,7
  296:23 297:19
  301:11 302:3
  303:16,25
  305:11 328:11

**absorbed** 26:16
  27:4 31:11
  296:14,15
  297:6 303:5,23
  304:24 305:23
  354:9,23,25
**absorbing**
  304:14,14
**abstract** 248:16
**absurdity**
  116:6
**academic** 82:10
**accept** 120:7
  190:19 240:9
  272:12 315:3
  319:23
**acceptable**
  53:14
**accepted**
  167:22 241:5
**access** 99:2,10
  113:3 116:18
  117:5,6 216:18
**accessed** 111:7
**accesses** 111:8
**acclimations**
  45:8
**accordance**
  101:3 103:6
  346:23
**account** 89:20
  89:24 90:21,24
  91:3 92:14,17
  92:19,24

  104:16 107:9
  110:4,12
  111:18 112:2,3
  112:18 113:10
  113:15 114:9
  114:10,13,15
  114:24 115:5
  115:17,22
  116:2,10,19,20
  116:21 117:10
  120:22 121:8
  121:18 122:3
  122:12 125:10
  135:20 136:4
  136:10,24
  142:23 197:14
  198:24 214:15
  217:2,21
  219:17 225:16
  225:16,17
  226:10 252:4
  252:10,24
  253:18 254:11
  254:13 262:20
  262:21,24
  263:11,13,21
  263:24 264:3,4
  265:14,15
  266:8,16,20,21
  267:11 268:3
  285:8 286:6,7
  286:8 287:18
  287:20 288:8
  291:18 292:5

292:11,15
293:17,18
294:2,3,17,23
297:12
**accounted**
119:7
**accounts** 89:6
93:12 108:24
109:11 115:22
118:4 126:3
135:23 136:3
137:13 139:12
139:25 140:6
142:8 152:5
181:7 197:14
198:20,22
199:7 215:19
215:22 264:22
285:25 287:12
349:7
**accrescendi**
150:13
**accrued** 327:12
**accuracy** 87:25
89:16 94:2
104:25 140:10
**accurate** 8:8
43:8,10 44:23
75:3 88:7,11
140:11
**accurately** 7:5
**accusations**
37:11

**accusing**
301:20
**achieve** 213:3
**acknowledge**
256:19
**acknowledged**
45:25 46:6,9
46:22,22 47:13
**acknowledge...**
362:3
**acquire** 104:11
**acquired**
104:14,17
259:15
**act** 34:25 48:5
128:2 156:2,6
159:25 160:22
161:14 162:11
164:18,23,25
165:8,12,20
170:21 171:10
172:19 174:19
175:21 178:12
183:22 185:25
186:20,23
187:8,22
188:14,19,25
189:8 190:13
192:4 193:25
194:21 195:6
195:10,12
198:4 204:21
228:20 229:3,7
229:9,13,16

230:4,7 271:17
271:17,18
297:5 308:4,9
310:18 316:12
317:20 330:14
330:19 336:14
336:18 359:20
**acted** 48:20
50:12 56:14,20
57:5
**acting** 47:17
56:25
**action** 5:4 16:7
16:20,22,23
32:20,23,25
33:3 74:2 76:4
76:8 81:10
82:5 154:24,24
176:17,18
194:15 205:24
207:3,8,16
247:19,22,23
248:7,8,11,24
249:3,6,14,20
250:16,19,20
250:23 251:13
251:16,19
252:7 253:3,19
253:22 254:15
255:12,22
256:9,14,20,21
257:2,6,24
258:5 260:11
260:13,18,19

260:19 261:3,8
302:19 305:19
356:8 360:15
**active** 99:17,17
**activities** 18:10
18:15,22
**activity** 114:8
263:12
**actual** 27:19
91:12 104:17
118:16 202:11
202:14 206:12
222:8
**actually** 34:21
56:18,19 57:21
81:7 82:11
111:12 202:19
204:10 217:5,6
254:5 277:23
281:21 288:3
326:22 334:23
**adam** 2:8
**add** 23:12 64:9
125:6,20 134:6
179:13
**added** 179:14
**addition**
340:10
**additional**
15:13,21 20:25
21:7,9,13
22:13,16,21
23:17,18 24:5
24:16 31:10,16

36:3 38:18
39:13 80:6,11
80:16,18
179:13,14
185:19 339:13
350:19 353:8
**additionally**
23:4
**additions** 362:6
**address** 14:23
15:2 23:5
36:22 77:15
93:3 95:4
96:24 104:18
121:5 129:13
132:23 133:5
135:13 147:2
218:2 232:12
232:12 248:6
261:14,16
274:7,8 325:13
**addressed**
21:15 23:22
33:11 36:16
77:17 79:3
132:23 141:18
142:3,6 245:21
336:7,8,9
343:3
**addresses**
93:16,16
**adds** 112:4
**administer** 5:2

**admission**
41:20
**advances**
172:17
**advantage**
161:13 162:17
164:6,15 168:6
168:11,19
174:22
**advice** 52:3
**advise** 9:17
316:9
**advised** 316:15
**advisement**
51:9
**advocate** 42:4
51:24 52:2
**affairs** 122:20
**affect** 69:2
127:6 250:15
250:18 253:25
348:18
**affects** 185:14
**affiliated**
354:20
**affirmation**
20:16
**afraid** 118:23
293:13 352:2
**age** 146:16
**aggregate**
136:22
**ago** 12:3 59:7
60:6 62:18

65:18 77:10
107:15 318:22
**agree** 4:11
24:25 175:14
176:13 177:4
220:10 223:2
223:18,21
224:3,25 272:3
307:12 309:19
336:5,15
338:17
**agreed** 39:14
102:3 122:17
151:4,23
202:10 249:22
287:14 310:23
**agreement**
23:25,25 88:14
331:4,19,21
332:3
**agreements**
17:16 19:5
215:2 345:22
345:23
**ahead** 40:6
53:21 64:9
133:8 160:17
165:18 203:17
203:17 258:10
**akhmedov**
43:21
**akhmedova**
43:21

**akin** 92:18
286:15
**al** 1:3 2:6 4:15
13:10 14:6
361:1 362:1
**albeit** 240:9
**aldridge**
156:22 157:4
158:7,8 159:17
159:23 160:3,4
160:5,19 169:6
170:8 180:22
180:25 186:5
195:13 359:19
**algorithmic**
313:15
**allegations**
37:2,11
**alleged** 114:17
114:18 171:11
174:16 175:12
175:15 179:21
198:15 199:10
200:4 203:14
203:18 212:18
263:19 264:20
265:17 280:17
304:4 326:10
**allegedly**
164:10
**allow** 7:4
**allowed** 53:4
**allows** 287:17

**alternative**
139:22 148:16
**amended**  8:19
37:4,21 64:16
175:12,15
191:6
**american**
246:14 324:24
**americas**  2:6
**amount**  99:12
115:10 118:11
122:20 125:10
172:14 191:20
217:5 223:3
262:13 270:5,8
270:9 275:9,11
275:18,20,21
275:22,24
276:6 286:5
315:7 319:4
322:18 334:23
**amounted**
174:17
**amounts**
104:13 270:12
270:14,23
272:16 274:17
274:23 275:2,4
276:19 285:4
286:20
**analogy**  33:19
92:13 219:13
301:18

**analyses**  77:20
338:18 339:12
**analysis**  13:4
13:21,23 14:3
14:8 64:22
77:12,25 78:2
78:7,9,13
98:10 109:22
129:7,9,12
133:22 136:19
141:19 152:2
161:9 167:16
175:4,6,8
184:13 185:22
206:13,21,23
207:2,3,4,5
227:3,7 228:3
228:17 233:3
243:11 246:23
249:14 254:23
258:11 261:9
287:7 298:20
298:24 299:17
300:9,14
303:22 304:14
306:4 341:23
342:20,23
343:2,6,9
346:16,18,20
347:15 348:22
353:9,18 354:6
356:2,6,15,17
**analyze**  126:13
128:23 273:12

344:12,14
356:12
**analyzing**  68:5
226:22,24,25
**anguilla**  41:17
41:23
**annex**  82:23
83:4 84:2,5,15
84:18 85:17
359:17
**answer**  7:3,19
7:20 14:19
24:20 40:3,7,8
41:6,7 52:9
64:8 68:17
69:7 94:14
101:12 102:22
103:15 107:22
111:21,24
115:3 119:23
121:12 133:20
134:6 137:2
140:23,25
141:3 144:17
144:24 148:22
149:18 157:21
160:15 163:6
165:25 166:25
167:13 168:10
168:22,23
171:16 177:16
183:9 189:11
192:21 194:4
201:16 205:5

206:9,14
212:15,16
221:13 222:4,5
222:17 225:6
226:6 227:23
227:24 228:8
229:11 230:14
234:20 239:16
245:2 246:8
252:14,17,18
253:5 254:8,24
255:8,9,10
256:2 258:12
259:22 267:8
268:8 274:21
279:11 280:5
281:11 283:24
285:19 286:25
288:16,17,18
288:21 291:22
292:3,8,17
294:20 297:25
299:13 300:3,6
301:6 302:8
304:10 305:14
305:15,25
312:6 322:10
323:16 331:17
332:14 333:16
340:15 349:11
**answered**
24:12 75:24
132:21 192:20
194:3,6 200:7

213:20 218:14
222:18 254:17
255:5,11 261:5
273:24 274:2
312:8
**answering**
71:24 265:9
**answers** 39:9
95:25 133:7
161:21 162:2
222:12 258:14
311:21 329:2
**anthony** 342:7
**anticipate**
253:15
**anticipating**
106:8
**antigua** 19:6
345:13,18,25
346:5,12,15,22
347:3,7,18
**antiguan** 17:23
68:2,13 342:24
**anybody** 114:7
301:21
**anymore**
191:22
**anyone's** 330:9
**anyway** 73:18
111:13 136:16
301:19 314:11
**apanovich** 44:6
**apart** 96:25
97:4 130:20

**apex** 157:3
158:2
**api** 313:5,8
315:6
**apoc** 36:20
38:11 42:17
64:17
**apologize** 85:7
168:9 288:23
**apparently**
259:4 285:6
292:24 343:7
**appeal** 12:25
13:3,25 42:22
47:5,23 85:13
231:23 311:8
316:9
**appeals** 47:7
74:13 334:12
**appear** 10:13
163:22 171:17
232:16 243:7
258:20 348:12
**appearance** 5:8
74:12
**appearances**
5:10 42:21
44:21
**appeared** 42:3
42:10 47:24
48:6
**appears** 46:12
72:23 161:12
166:18 225:7

234:24 238:8
272:4
**appended**
362:8
**applicable**
104:16 218:8
220:13,17,25
221:5,10,14,17
221:24 223:17
224:16,20,24
225:2 226:2,11
226:14 250:22
251:4,6,8,10,11
254:3,4
**application**
13:19 38:2
67:3 127:24
158:12 309:20
**applied** 66:19
161:18 265:2
**applies** 14:9
41:12 108:8
285:15
**apply** 66:11,15
66:22 103:15
127:15 223:22
224:10 272:15
320:8 322:6
**applying**
159:23 160:20
188:14 189:25
262:25 283:21
286:22 322:17

**appreciate**
121:4
**approach**
171:7 242:14
**approaches**
171:5
**approaching**
216:23
**appropriate**
72:15 183:24
194:17 195:7
211:5,7
**approved** 14:4
199:17
**approximately**
119:8 126:3
169:14
**arbitration**
48:18 50:18
51:2
**arbitrations**
51:4
**area** 333:8
**argued** 35:25
243:10
**arguing** 34:21
78:17
**argument**
16:17 33:21
34:24 299:11
316:14
**argumentative**
177:18 194:3
204:3,6 227:20

| | | | |
|---|---|---|---|
| 264:7 | 72:14,23,25 | 263:3,6 275:16 | 262:25 263:23 |
| **arguments** | 75:23 76:15,24 | 291:23 305:16 | 264:2 271:23 |
| 323:10 | 78:3 87:7 90:5 | 306:16,17 | 276:13,13,22 |
| **arisen** 289:8 | 100:16 110:7 | 313:19 329:5 | 277:9,10,21,22 |
| **arises** 15:24 | 121:22 132:15 | 330:25 332:15 | 278:7,10,14 |
| 16:24 19:22 | 135:18 154:10 | 332:17,24 | 280:3 284:20 |
| 151:11 | 155:10 158:20 | **asks** 167:2 | 294:12 297:8 |
| **arranged** | 192:19 194:3 | 180:12 | 319:25 320:9 |
| 354:18 | 194:11 198:13 | **aspect** 7:10 | 320:21,22,25 |
| **arrangement** | 200:7 206:22 | **aspects** 349:15 | 321:2 322:7,23 |
| 242:2 | 213:19 222:17 | **assert** 257:3 | 322:24 330:16 |
| **arrive** 116:5 | 241:17 252:5 | 300:25 | **assets** 18:9 |
| 263:8 293:8 | 252:10,11,11 | **asserting** | 31:23 32:7,14 |
| **arrived** 69:21 | 252:25 254:14 | 131:12 | 32:22 33:16 |
| **arrives** 69:20 | 254:17 265:11 | **assessed** 33:23 | 35:14 52:7 |
| **arrow** 304:24 | 273:24 311:25 | 35:4 | 55:22 73:21 |
| **arrows** 2:4 | 312:2 329:3 | **assessment** | 76:20 89:7,10 |
| 5:18 9:19,23 | 339:2,8,15 | 32:9 33:19 | 89:11,21,24 |
| 138:6 | 342:17 350:8 | **asset** 55:15,17 | 91:3,6,7 92:24 |
| **art** 219:3 | **asking** 6:13 | 90:8,9 91:13 | 93:10,13,14,17 |
| **articulate** | 39:19,24 46:14 | 93:21 94:13 | 94:7,9,11,24 |
| 198:14 326:14 | 53:25 54:19 | 96:8,10 99:21 | 95:3,11 96:4 |
| **articulated** | 61:7 70:13,14 | 103:4 107:19 | 97:25 99:3,13 |
| 159:13 | 87:3 91:11 | 107:20 114:19 | 99:18 100:2,19 |
| **articulation** | 101:5,8,13,16 | 120:9,22 121:3 | 101:9,18 102:8 |
| 36:19 | 120:25 121:5 | 121:9,15,15 | 102:19 103:11 |
| **artificial** 70:7,8 | 124:25 128:16 | 124:4,12,17,21 | 104:11,14,18 |
| **aside** 15:6 | 134:16 143:21 | 124:22 127:5 | 104:19 105:10 |
| 80:16 98:23 | 143:22 163:5 | 131:3,10 | 106:13,23 |
| 131:10,11 | 165:14 177:3,4 | 136:18 137:7 | 108:14 109:13 |
| 134:9 146:25 | 179:19 189:5 | 152:9 153:8 | 112:20 113:14 |
| 291:16 | 190:14 192:16 | 238:12 241:23 | 114:8,11 115:8 |
| **asked** 21:3 39:7 | 211:13 250:25 | 242:3 243:20 | 115:12,17 |
| 39:10 47:8 | 251:20 252:2 | 245:9 262:13 | 116:24 117:13 |

| | | | |
|---|---|---|---|
| 117:19 119:4,9 | 214:16 215:14 | **assigned** 64:12 | 198:13 199:5 |
| 119:13,15 | 215:23 216:19 | **assignment** | 199:15,16,24 |
| 120:11 122:5 | 217:18,20,24 | 16:11,12 64:3 | 200:22 201:7,7 |
| 124:18 126:2 | 220:12 223:3 | 64:4 81:8 | 201:25 203:2 |
| 135:19 136:7 | 223:10 226:9 | **assist** 350:10 | 204:3,6,7,9 |
| 136:15,23,24 | 239:20 240:8 | **assisted** 21:21 | 206:16 211:13 |
| 137:6,17 | 240:21 241:6 | 39:4 66:8 | 213:24 252:23 |
| 139:12,16,17 | 243:22 244:11 | **associated** | 254:12 262:10 |
| 139:19,24 | 244:22 245:12 | 104:15 105:21 | 262:17 267:17 |
| 140:6 142:17 | 248:4 249:23 | 105:22 106:4,5 | 267:24 278:19 |
| 142:23 145:20 | 256:11 257:7 | 126:2 135:20 | 279:4 280:13 |
| 147:9 149:16 | 257:10 258:17 | 135:22 139:12 | 282:24 283:2 |
| 150:20 151:21 | 260:12,14,20 | 139:25 140:6 | 285:13 287:18 |
| 152:4,8 153:2 | 261:23 262:12 | 142:23 152:4 | 287:19 299:17 |
| 153:6,15 | 262:19 267:12 | 198:20,22 | 299:22 330:20 |
| 154:19 156:13 | 268:9 273:8 | 199:7 292:25 | 331:13 343:4 |
| 169:8 170:4,13 | 274:4 275:12 | 349:7 | 354:17 |
| 170:23 171:12 | 277:4,18 | **assume** 7:13 | **assumed** 28:19 |
| 171:20 172:11 | 278:12 289:23 | 25:11 30:7 | 140:10 198:18 |
| 173:7 174:20 | 293:16 294:17 | 50:25 72:25 | 325:14 |
| 175:23 176:3,6 | 295:13 296:20 | 75:4 76:15 | **assumes** 30:21 |
| 176:11 177:7 | 297:12,15,18 | 78:2,13,15 | 100:3,22 |
| 178:8,10 | 298:4,19,25 | 88:9 95:10 | 102:11 105:13 |
| 179:23 186:10 | 299:21,24 | 96:21 107:24 | 202:7 224:13 |
| 187:9 194:22 | 300:11,12,17 | 108:22 109:6 | 254:17 297:23 |
| 198:19,21 | 301:11 315:7 | 109:11 111:7 | 301:14 305:13 |
| 199:6 201:3,8 | 318:3 320:3,15 | 118:3 120:20 | **assuming** 9:12 |
| 201:10 203:4 | 320:17 321:12 | 121:10,14,19 | 95:17 101:10 |
| 203:15,19 | 322:16,16 | 124:11 131:12 | 124:3 152:21 |
| 204:15,16 | 323:11 324:6 | 135:18 136:7 | 172:20 173:4 |
| 205:14,25 | 325:4,15,18 | 137:15 140:13 | 251:7 298:17 |
| 206:6 207:8,17 | 348:25 349:5 | 141:15 149:4 | 298:22 299:10 |
| 213:25 214:3 | 349:16,20,25 | 154:10 155:11 | 303:4 326:17 |
| 214:11,12,14 | | 176:9 193:18 | 326:23 |

**assumption**
28:21,24 74:20
76:24 77:6
89:19,23 94:6
95:21 97:7,18
97:24 99:6
105:2,9,16
107:15,17
109:10 120:24
121:6,21
123:13,18
124:7,14,19,23
124:24 125:4
136:3 152:21
154:5,17
176:12,14
177:3,5,10,11
203:6 206:4,12
215:19 216:3
343:16
**assumptions**
72:13,22 74:25
76:17 78:3,5
87:6,18,22,25
88:18 89:2
90:5 107:2
108:23 115:20
142:9 147:3
148:23 154:12
194:10,13,14
198:9 199:10
199:14 206:20
208:2 214:19
215:16,17

216:5 253:7
319:9,19
341:13,17,20
341:22,25
343:13,14
344:2,6,11
348:15 355:11
355:16,22
**atherton** 8:21
12:2 16:5 19:8
19:18 20:13,18
22:7,10 24:25
31:15,20 32:17
33:10 34:17,19
36:13,13,15
45:5 81:15
82:12 86:7
122:16 202:10
207:5 244:3,11
244:17 257:20
323:18 336:13
338:25 339:25
340:6,22
351:15 359:16
**atherton's** 11:5
11:14 14:25
15:17,25 16:25
17:8,10 19:23
20:15 21:22
22:14,17,23
24:15,23 26:8
38:15,17 60:22
80:13 186:16
335:9 336:9

338:4,14,18
339:10,17
340:12
**attempt** 221:11
296:19
**attempted**
267:2 271:18
**attention** 11:4
11:22 134:17
347:10
**attorney** 5:11
53:13
**attorneys** 2:5
2:14 56:22,24
61:14
**attributable**
120:9 319:25
**audio** 4:9
**august** 187:4
**australia**
156:22 157:4
158:3,23 181:2
**australian**
158:8 159:7,10
159:11,16,25
160:21 162:11
163:16 167:9
181:10 186:13
**authoritative**
188:9
**authorities**
82:24 83:7
158:15 159:18
186:7

**authority** 74:16
82:10 129:19
231:7 310:20
310:21 336:16
**authorized** 5:2
**automated**
313:10
**automatic**
256:7 270:25
285:17,20,21
286:16 287:4
289:6,17
313:10
**automatically**
136:15 285:14
**available** 33:2
113:6 156:13
156:15 157:16
170:13,14
171:13 173:7
174:21 175:25
179:24 180:8
185:7 186:10
194:23 196:10
203:20 207:15
241:6 243:22
244:23 282:8
**avax** 54:14
55:3 113:2
**avenue** 2:6
**avoiding**
328:11
**award** 195:18
211:7,18

**awarded**
188:17,23
190:12 214:5
**awarding**
35:13 257:17
**aware** 28:3,7,8
59:14 60:10
66:7 83:23
88:20,21
115:24 134:13
137:12,14
138:4,10 159:9
159:11 187:7
187:11 188:3
188:16,20,22
191:5,8,11,15
192:3 230:9
231:7 246:2
257:12 302:2,2
302:6 312:10
312:17 313:3
313:13,20
314:21 315:12
315:17 323:23
324:5 342:4,11
344:21

**b**

**b** 6:2 25:2
77:19 88:12
90:4 93:5 99:7
117:25 172:21
174:8 180:15
210:13 321:25

348:8 359:7
**back** 26:21
31:20 57:7,16
80:3 81:14
123:12 155:23
180:22 188:10
205:25 207:9
208:18 209:18
215:15 264:14
269:9 318:18
330:21,22
331:3,11,14,18
332:5,7 334:13
337:12,20
348:7 354:15
**backup** 26:23
**bad** 58:17
312:7
**bailee** 159:21
**bailment** 77:4
78:7 148:16
149:6 152:25
**bailor** 140:4,4
148:20
**baked** 96:11
**balance** 110:2,4
110:5,8,8
111:18 112:2,3
112:18 114:9
114:10,14,16
115:18,23
116:2,20,21
117:9 118:5,9
118:12,16

119:13 120:9
120:23 121:8
121:19 122:3
122:12 124:21
124:22 125:10
136:4,10,18,22
137:7,24
205:21 262:13
262:20,21,24
263:11,21,25
264:3 265:3
266:21,22
267:11 272:25
276:13,14
278:7,10,11,14
278:23 279:2,5
279:14,20,23
283:10,14
285:8 286:8
287:18,20
288:8 289:22
290:4,17
291:10 294:12
296:4,8 297:6
297:8,11
299:20 301:12
303:5,16,24
304:15,25
305:11,23
315:14 319:25
320:21,22,25
322:22,24
328:22 329:9
329:14

**balances**
137:14,17
138:5 254:9
263:11 273:7
283:5 285:11
285:16 286:22
290:25 302:4
**ball** 147:6
**band** 45:10
**bank** 92:9,10
92:14,19
183:11 186:6
197:13,14
214:15 219:14
219:16 228:16
228:19,22
232:11,21,23
233:9,16
234:12,14,23
236:22 237:8
243:18 244:2
248:9 250:10
251:21,23,23
252:2,5,19,24
254:11,13
255:20,22
263:10 331:8
359:21
**banking** 256:5
285:23,24
**bankman**
25:22,25 27:10
27:13,14,23
28:4,22 29:4

30:13 85:11
296:24 303:10
304:21,23
305:5 353:13
353:14
**bankruptcy** 1:2
4:16 159:25
160:22 161:14
162:11 181:5
182:3 189:5
190:14 193:15
323:12,24
324:2,7,8
**baptiste** 311:8
316:9
**bar** 41:9,12,20
41:21 316:23
**barbuda**
345:13,18,25
346:5,13,15,22
347:3,8,18
**bare** 148:9
**based** 40:12,25
56:8 63:17
110:19 111:8
131:13 139:23
149:9 154:5,9
154:13 164:8
176:3 178:7
206:21 231:20
233:14 300:6
303:10,11
327:20 350:16
354:5

**basement**
40:16,17,19,23
40:24
**basis** 93:21
97:10 104:20
194:14 198:6
200:2 213:13
249:19 261:8
273:16,20
**bay** 46:9,23
**beans** 96:11,13
96:14,14,16
**bear** 132:8
**bearing** 12:9
323:3
**beating** 282:13
**beginning** 5:11
222:14
**begins** 223:2
240:24 296:6
**begs** 299:5
301:16
**behalf** 9:10
56:25 169:15
169:21,23
193:21
**believe** 21:2
25:19 38:9
46:12 59:25
60:5 67:17,23
68:4,5 79:5
95:16 106:21
107:6 118:18
118:21 130:12

140:9 154:14
187:18 226:17
253:15 274:11
315:17 319:17
319:18 323:20
336:7,10
339:16 341:18
346:4 348:20
349:3,8,23
352:7,8,15
355:8
**beller** 2:17 5:15
**belong** 170:4
**belonging**
184:18
**belongs** 143:8
**beneficial**
98:16,21,24
139:7,10
142:10 143:7
143:16 144:6
145:2,5,24
147:25 148:5
148:13,18
235:20 244:5
292:20
**beneficially**
98:8 235:16
**beneficiaries**
146:13,15,22
**beneficiary**
44:2 142:21
143:2 146:8,9
147:24 148:8

325:24
**benefit** 32:3
88:22,24 143:9
182:24 196:11
200:16,19,23
201:12,17,17
202:4 213:12
215:7 311:10
321:13,18
327:11 328:10
328:16 333:25
**benefiting**
25:16
**benefits** 322:20
**benjamin** 2:17
5:15
**best** 7:2,2 81:5
187:20 198:10
234:25 271:6
310:20 312:8
316:12 352:17
355:4
**bet** 151:13,17
**better** 45:6
47:3 90:16
166:15 167:3,5
172:4,25 173:5
173:10 174:11
178:16 179:5
180:5 182:12
183:19 185:4
185:17 194:12
204:24 249:22
310:18 326:11

326:15 333:4
**beyond**  18:2
  188:11 190:15
  211:8
**big**  24:4 43:21
  44:14 45:20,20
  191:21 294:7
**bigger**  103:25
**bilateral**  281:8
**billion**  26:21
  98:13 109:14
  109:18 115:8,9
  184:3 191:7,17
  192:17 213:24
  214:6,10,12,13
  214:16,21
  215:4,8,10,13
  215:25 216:4
  216:13,19,24
  217:3,12,13,19
  252:5,11,12,25
  254:14 257:25
  258:2 290:16
  290:16 294:23
  295:12
**billions**  191:25
**bind**  230:12
**binding**  231:25
**bipartite**  323:7
  328:3
**bit**  31:9 55:3
  75:17 79:16
  85:24 122:14
  133:25 188:5

210:18 339:5
**bitcoin**  54:12
  93:2 96:20,21
  96:23 97:14
  108:7,15,16
  109:13 113:2,9
  153:11 201:4
  202:2,3 215:24
  259:11,13,17
  262:2 266:7,13
  267:18,20,25
  275:20,22
  278:20,22,23
  278:24 279:14
  279:17,20
  281:2 290:15
  297:21 318:7
**bitcoins**  97:12
**bitfi**  49:2
**black**  113:25
  116:16
**blend**  67:7
**block**  114:2
**blockchain**
  217:25 248:5
  257:11 261:14
  261:16 274:6,8
**blockfi**  58:23
  58:24 59:13
**blood**  360:16
**bloomberg**
  111:12
**board**  180:15

**body**  85:18
  171:14 174:21
  213:4 311:11
**boies**  57:18,19
**bonkers**  121:20
**book**  16:10
  129:23,24
  340:7
**books**  129:22
**borrowed**
  329:6 331:8
**borrower**
  293:11 329:13
  330:3 331:6
  332:5,5,7
**borrowers**
  329:20,22,24
**bottom**  353:5
**bought**  44:6
**bound**  232:7,7
**breach**  32:11
  32:23 33:20
  78:23 79:3
  103:7 131:12
  133:2,5 134:8
  134:11,21,23
  135:4,10 257:3
  257:14,15
  258:9
**breached**
  130:24 131:15
**break**  7:24 8:4
  53:11 72:16
  79:10 87:6

138:23,25
  153:17,24
  155:14 208:5
  208:22 260:4
  260:17 265:22
  265:23 266:4
  268:16,19,21
  273:14 300:5
  303:19 317:13
  317:15 337:4
**breaking**
  243:25
**breathes**  332:9
**brennan**
  167:20
**brief**  90:10,12
  94:16 191:12
  191:16 234:21
  246:13
**briefly**  125:24
**bring**  260:13
**britain's**  44:3
**british**  8:16
  10:24 12:21
  16:8 41:22
  47:20 57:23
  59:3 64:15
  65:6,19,20,22
  66:3 67:4 68:6
  127:17,18
  190:3 231:19
  231:24
**broad**  1:16
  2:15 4:19

18:11 132:22
141:16,21
156:7 184:24
210:2 306:11
306:11 316:2
319:10,12
336:15
**broadest**
248:19
**broadly** 65:25
312:24,24
324:17
**broken** 249:4
**brokerage**
111:2 113:15
**brought** 37:3
43:24 51:16
68:6 141:20
189:19 206:11
**bucket** 24:4
**buckets** 24:4
**bunch** 92:15
**bundles** 81:25
**burden** 216:5
305:9 306:17
**buried** 196:13
**burkitt** 3:5
**business**
292:23 293:24
293:25 305:19
307:4 317:6,10
336:14,18
**buy** 96:14,16
282:9,11

284:10,11
318:7
**buyer** 294:9
**bvi** 20:7 34:25
36:19 38:7,10
38:10 41:2,6,7
41:13,17 42:4
42:11,12 45:25
46:6,25 47:25
48:2,5,8 50:13
50:14,15,17,19
56:8,15 64:13
64:16,22 66:8
66:16,23 67:15
68:9,19 69:2
69:12,19 70:3
70:11,15,18
75:15 127:13
127:15,25
128:17 129:15
129:16,23
131:11 133:2
134:8,11,22
135:4 143:20
156:19 158:4
158:12 159:3
164:18,22,24
165:8,19 171:7
171:10,25
172:2,19
174:19 175:20
179:16,20
186:20,23
187:8,11,14,15

187:21 188:5
188:17,19,25
189:8 190:7,13
190:15 192:4
192:23,23
193:4,5,9,20,24
194:21 195:14
196:2 202:17
210:7 211:6
226:22 227:2
228:20 229:7
229:13 230:3
230:12,18,24
244:7 245:19
247:7 253:16
271:17 297:5
308:4,8 325:2
326:8 334:14
335:15,16,20
336:19 346:16
346:18,19,20
359:20
**bvi's** 336:14
**byers** 334:10
334:11

## c

**c** 2:2 86:2 104:7
110:21 150:14
150:14 165:17
166:8,10 174:9
210:14 226:8
249:25 256:18
256:22 259:24

291:15 334:10
360:2,2
**call** 37:6,6
111:18 113:7
148:12 171:3
209:9 255:17
311:19 324:15
**called** 6:2 12:17
13:10 14:23
15:23 42:14,14
42:17,18 43:21
48:25 54:14
66:6 112:2
149:23 150:13
152:8 261:23
**calls** 125:15
140:19 180:2
190:18 196:7
202:22 211:11
224:14 236:11
284:16 287:11
291:21 293:21
297:23 330:24
**capable** 154:25
176:21 259:12
271:12 275:25
356:9
**capacity** 29:8
57:5 146:16
327:12,17
**capital** 2:4 5:18
9:19,23 138:6
303:23

**capital's**
304:25
**care** 293:8
**career** 54:7
**caribbean**
41:10,15 47:5
**carry** 147:7
168:25
**case** 1:7 4:17
8:13,14 12:17
12:23 13:8,10
13:23 14:2,6
14:22 16:15,16
28:22 35:4,20
37:3,5,8,15
38:13 42:4,17
43:21,22 44:14
44:14 45:20,21
46:23,23 47:2
48:12,23,25
49:20,23 50:2
50:10 51:24
56:20 57:20
58:23,25 66:4
66:5,7,25
81:12,17,20
82:9 86:23
103:22 114:15
141:8 154:23
156:22 157:4
161:3,4,18
167:23,24
168:14 181:6
182:7 184:12

185:20,22,24
186:14,15
192:9,13,22
193:19 194:17
195:7 210:20
211:21 212:22
212:25,25
229:21 233:16
234:18 240:3,4
240:7 241:25
242:19 244:17
244:19 248:3
252:22 283:20
284:3 285:22
299:11 306:15
307:11 322:22
328:2 330:9
339:25 340:6,8
351:20
**cases** 10:18
42:17 44:17,21
45:18 48:7
54:6,8 81:2
159:7 242:17
294:7 339:17
339:21 340:3,9
340:17,23,25
**cash** 92:15,20
92:22 108:12
137:13,17
266:14 274:8
277:23 278:5
278:20 318:3
321:12 324:6

**catastrophe**
218:24 308:25
**cause** 16:9,19
32:23 105:18
105:19 106:14
194:7
**caused** 24:16
31:16 38:17
105:10 184:22
185:2 235:23
**causes** 179:3
308:19
**caution** 141:14
291:22
**caveat** 39:23
276:9
**cayman** 12:18
12:19 13:2
60:5,8 74:8,12
74:14 230:23
231:23
**cayman's** 47:22
**center** 190:7
**cents** 204:17
276:2
**certain** 8:17
10:14 11:3,10
15:16 62:16,17
64:12 66:20
72:13,22
127:19 184:11
211:3 246:15
250:17 251:2
251:14 253:6

255:7 270:22
341:16
**certainly** 10:16
10:21 15:2
32:18 53:24
54:19 59:15
62:21,22 66:23
66:24 78:16
81:4,5 85:5
86:20 99:6
103:24 114:6
190:23 193:8
196:13 233:3,5
233:7 241:13
265:6 277:12
282:5 287:9
291:6 295:9,24
305:6 316:5
325:22 326:7
329:9 334:25
339:24 341:19
351:24 354:3
355:5
**certify** 360:9,14
**challenged**
157:8 282:19
**chambers** 39:5
**chancery** 45:14
**change** 11:2
15:9 54:23
92:18 263:21
263:24 266:8
266:17 311:12
361:4,7,10,13

361:16,19
**changed**  11:17
  15:5 264:21
**changes**  19:10
  103:14 362:7
**changing**  175:4
**chapter**  1:6
**characterizati...**
  166:23 255:3
**characterize**
  22:20 74:20
  236:21 237:7
**charge**  106:12
  169:18
**charges**  106:11
  119:6
**chat**  333:23
**chatter**  333:23
**checked**  39:14
  346:11
**cheeky**  252:20
**chen**  334:10,11
  334:19
**cheung**  3:7
  4:21
**cheyne**  311:7
**chief**  47:15,17
  167:19
**chinese**  193:12
**choice**  288:12
  289:3
**choose**  332:11
**chose**  16:7,20
  16:22,22 32:20

32:25 33:2
74:2 76:4,8
81:10 82:5
154:24,24
176:17,18
194:15 205:24
207:3,7,16
247:18,21,23
248:7,8,11,24
249:3,6,14,20
250:16,19,20
250:23 251:12
251:13,16,19
252:6 253:2,18
253:21 254:15
255:12,22
256:9,14,19,21
256:25 257:6
257:23 258:3,5
258:5 260:11
260:18,19,19
261:8 356:7
**chosen**  179:13
**choses**  261:2,3
**christian**  58:5,9
**chukwueloka**
  42:18 66:6,11
  189:17
**circles**  127:12
**circuit**  68:15
**circular**  300:8
**circumstances**
  122:2 127:19
  184:11 209:7

210:19 211:21
230:22 232:10
250:17,21
251:15 252:21
270:23 272:5
284:14 295:2
306:14 307:6
316:4 327:25
**citation**  181:23
**cite**  187:12
  328:15 353:8
  353:12
**cited**  16:15
  68:12 81:20
  159:17 181:20
  181:23 244:3
  244:11,14,17
  340:12
**cites**  156:23
**citing**  175:11
**cj**  167:20
**claim**  8:19
  32:10 33:6,12
  37:4,21 38:8
  38:12 43:24,24
  64:16 67:20
  68:2 78:23
  79:4 101:6
  119:16 120:14
  122:6 123:8
  125:12 127:25
  128:18 131:13
  132:22 133:3,6
  134:8,11,21

135:4,11
147:11 155:4,8
156:2,12,17
157:5,13,17
158:16 170:12
172:3,12,18
173:11 175:13
175:15,19,24
176:3 178:7
187:8,15
188:18,24
189:7 190:13
191:6,23 192:4
192:15 193:24
194:21 195:19
198:2,7 199:12
205:23 207:7
208:21,25
209:2,6,24
213:14 214:5
216:23 228:20
232:12,22,23
233:2,17,18,23
245:14,19,24
246:4,13 247:3
247:8,9,13,18
247:20 249:2
258:4,7 299:20
300:16,25
306:7 308:3,8
309:10,17
318:24 319:6
320:5 321:14
324:2 334:3

335:7 355:21
**claimant** 209:8
**claims** 36:19
  38:7 48:4
  64:13,13,22
  67:14 68:5,8
  135:14 155:9
  186:19 187:12
  187:21 190:25
  191:24 227:2
  241:7 258:7
  301:3
**clarification**
  11:21
**clarifications**
  14:13
**clarified**
  180:24
**clarify** 70:12
  95:25 100:7
  134:4 147:13
  147:14 173:22
**clarifying** 7:12
  80:9
**clarity** 36:18
**class** 173:10
  180:8 196:25
**classically**
  249:8,9
**clause** 73:21,24
  126:16 128:11
  128:23 129:8
  129:10 131:6,7
  247:24 256:18

274:14,16
276:19 291:14
**clear** 52:21
  65:18 91:8
  121:25 124:22
  129:19 132:14
  137:20 156:20
  157:2 158:4
  159:6 167:18
  180:23 190:10
  206:4 240:14
  253:14 258:15
  274:11 294:14
  311:15,18
  316:17 330:17
  350:17 352:17
**clearest** 294:4
**clearly** 20:24
  255:4 265:25
  304:12,19
**clever** 305:18
  305:20
**client** 52:8,11
  52:15,23 53:10
  53:22 54:2
  57:18,19
  111:14
**client's** 57:10
**clients** 53:17
**clip** 187:5
**close** 314:20
**closed** 145:22
  250:12

**code** 86:24
  105:5,6 159:24
  160:20 161:14
**coder** 110:21
  112:10,11
**cognizance**
  158:22 159:4
**cohabitants**
  150:19
**coin** 90:8 91:13
  99:11,11
  105:18,21
  106:6,15,16,18
  106:18 108:5,6
  108:12,17
  113:7 114:18
  204:8 256:10
  256:16 259:4,9
  259:16 273:15
  273:18,22
  275:3 277:24
  278:5 290:16
**coins** 90:18,19
  90:20 97:9,9
  99:25 100:6
  107:9,10 108:8
  113:8 216:10
  253:23 254:2
  257:22,23,25
  259:7,9 277:25
  321:19
**colleague** 5:20
**colleagues** 5:14

**collectively**
  109:14 146:18
  215:24 241:9
**come** 11:3 33:3
  43:17 88:23
  108:3 114:3
  237:16 253:12
  276:20,21
  337:12
**comes** 26:22
  68:13 152:21
  307:22 313:24
**comfortable**
  10:23 111:19
  111:25
**commended**
  38:12
**commensurate**
  24:6
**comment**
  323:22 324:23
  326:3
**commentary**
  177:13
**comments**
  39:20,21
**commerce**
  192:2 193:10
**commercial**
  29:20 37:24
  42:19 44:21
  45:14 47:8
  74:11,13 114:8
  116:5 151:12

151:18,20,20
188:13 292:18
295:6 302:9,15
302:16,19,23
302:25 308:24
332:11,25
335:3 344:9
**commercially**
116:7 290:5
305:17
**commingled**
93:20 94:20
97:10 104:20
**committed** 28:5
30:25 165:2
**committee**
156:25 181:15
181:24 212:13
**common** 65:15
65:21 66:13
139:14 140:3
142:18 149:12
149:13,14,25
150:9,23,24
151:5,8,15,22
152:3,7 153:4
153:7 181:5
230:19 231:2
231:16 245:19
**commonly**
64:14 316:15
**commonsense**
29:14,20 112:8

**communicati...**
40:2 61:9
140:21
**companies**
46:25 48:8
151:2 161:14
190:8 294:8
**company** 47:2
48:19 149:22
153:12 160:20
166:13 167:21
168:2 172:23
172:25 173:4
174:12 178:14
178:25 179:3
180:3,13
183:18 184:22
184:25 185:13
185:15 204:10
204:23 209:15
212:6 235:24
236:12 237:2,2
237:11,17,20
237:21,21,22
238:3,11,15,19
239:12 240:8
242:2 293:4
295:10,15
308:5,10,18,20
308:22 309:10
309:25 310:3,4
311:2,3,12
316:4,11
317:20 318:5

323:6 335:24
**company's**
159:24 316:2
336:14,18
**compare**
202:10
**compared**
165:21 166:5
**comparison**
166:19 168:12
**compelling**
316:16,19
**compensate**
25:7
**compensation**
16:14 81:12,17
248:17 340:8
**complain**
282:12
**complaint**
37:20
**complete** 8:8
10:9 11:24
16:23 39:3
43:11 46:17
168:24 302:8
306:6 325:3
362:9
**completely**
18:21
**completion**
222:4
**complexities**
181:7

**complied**
287:12
**comply** 37:18
284:11
**components**
22:24 23:2
217:3
**composition**
289:22
**compound**
214:8 260:16
300:2
**comprehensive**
292:4
**comprised**
41:16 113:24
329:7
**computer** 42:9
**conceded** 243:8
**conceivably**
228:12
**conceive** 295:7
**concept** 98:24
318:22
**concepts**
152:15
**concern** 156:11
310:5 311:3,4
317:21
**concerned**
161:3 164:9,13
180:9 181:6
201:23 204:2
212:24

**concerns** 194:8
**concession**
   242:24,25
   243:5,17 245:3
**conclude** 71:18
   199:17 221:9
   326:9
**concluded** 28:5
   185:24 324:6
   325:15 358:11
**concludes**
   120:21 121:8
   176:10 177:6
   262:10 357:24
**concluding**
   194:16
**conclusion**
   16:21 32:20
   38:6 69:21,22
   74:2 142:8
   155:11 157:2
   167:19 241:15
   241:20 242:7
   242:11 245:17
   249:20 345:17
   350:16
**conclusions**
   10:12,21,22
   11:19 14:17,20
   14:21 15:2,6
   141:20 154:4
   245:21 343:15
   343:19 345:21
   355:13,14

**condition**
   219:11 224:4
   240:18 272:14
   272:22 284:12
**conditional**
   218:3,15,18
   219:10,18
   220:20
**conditioned**
   220:13
**conditions**
   218:6 220:6,8
   272:8 316:24
   317:7,8
**conduct** 77:20
   77:25 78:7
   114:7 126:11
   127:2 128:20
   129:5,10 131:4
   132:7 353:10
**conducted**
   77:22 227:6
   228:2 280:17
   313:3
**conducting**
   130:9,25
**confer** 157:18
   158:17 201:12
**conferring**
   196:5
**confess** 41:24
   353:24 354:15
**confident** 346:7

**confidentiality**
   51:3 52:12
   53:4
**confined**
   241:22
**confirm** 82:3
   194:19 312:16
   322:21
**confirmed** 14:4
   323:24 324:2
**confused** 261:2
**confusing** 74:5
   100:8 203:25
   249:17
**congratulations**
   45:12
**consequence**
   90:15 196:4
**consequences**
   73:22
**consider** 10:23
   11:2 30:12
   35:7,9,13 36:6
   46:3 55:6,8,14
   69:5 133:23
   134:14 145:3
   145:13 155:25
   173:11 209:21
   210:23,25
   211:6,17,21
   212:17,21
   216:18 217:19
   218:15 228:15
   246:25 247:12

   247:16,18
   248:25 249:13
   257:16 307:5
   307:12,15
   327:11 347:17
   356:7
**consideration**
   17:17 19:25
   20:3,9 24:7
   25:17 72:3
   73:24 235:25
   236:14 238:13
   242:4 317:11
   334:19 347:14
**considerations**
   181:3 315:22
   332:25 333:2
**considered**
   19:11 30:18
   65:2 68:17,25
   69:9 82:25
   83:19,20 84:3
   128:17 141:19
   146:23 169:7
   211:5 228:10
**considering**
   20:6 68:8
   69:22,24 71:22
   74:6 75:16
   211:2 271:22
**consistent**
   110:25 135:5,7
   135:12 314:15
   314:19,25

349:14
**consort** 130:20
**constitute**
185:11
**constituted**
245:10
**constitutional...**
29:2
**construction**
16:17 81:22
116:7 169:21
169:24 170:25
171:6,8 226:16
242:14 276:18
**construe** 116:4
179:11 223:19
346:21 347:2,7
347:16
**construed**
228:22,24
229:2,6 269:25
**construing**
71:23
**consult** 52:20
52:25 57:21
**consulted**
57:20
**contact** 53:20
53:21
**contain** 10:8
224:3 229:8,14
230:4 256:6
**contained**
281:24

**contains** 10:11
188:7
**content** 341:24
**contents** 61:8
**contested** 47:25
48:2,9,17
**context** 17:3
20:7 23:12
32:8 69:9
99:14 103:21
110:2,4 120:5
136:18 142:12
219:22 245:18
245:23 290:7
292:6,10,13
293:19 294:15
295:10 313:18
335:3 345:6
353:8
**contexts** 291:2
**continue** 4:10
17:9 177:20,21
222:18,22
255:6 284:2
312:9
**continued**
356:18
**continues**
255:7
**continuing**
64:8 133:11
**contours** 54:20
**contract** 32:11
32:24 33:20

78:23 79:3
103:6,7 116:5
128:6,14,19
129:4 130:24
131:13,16
133:3,5 134:8
134:11,23
135:4,11
223:19 227:4
248:23 291:7
322:2
**contracting**
102:3
**contracts** 119:7
256:5 268:11
285:23,24
346:21
**contractual**
16:17 81:21
101:6,14 102:2
126:18,18
127:2,4,6
132:6 245:11
247:11 248:12
248:20 249:10
249:13 256:7
257:4 258:16
262:11,19
269:13 281:23
281:24 284:12
**contrary** 25:12
**contributed**
151:7

**contributions**
151:6
**control** 98:5,6
98:15 99:13
102:6,8,19,24
103:3,24 104:2
139:23 149:9
154:13 197:6
226:9 298:7
299:4,6 348:25
**controlled**
93:18 94:18
104:21 190:8
217:20 218:2
248:6 249:23
261:14,17
**controversy**
77:18
**controvert**
315:11
**controverted**
315:5,10
**conundrum**
213:5
**convenient**
72:19 208:9
**conversation**
349:9
**conversations**
4:7 61:17 62:4
62:6,20
**conversion**
318:3

**converting**
278:5 287:2
**converts** 287:3
**convicted**
27:23,25
**cope** 142:15
**copy** 17:2
88:11 156:5
160:3 331:20
**core** 204:19
**corporate**
161:9 224:18
**correct** 12:7
13:14 22:18
25:10,20 28:14
36:22 37:13
40:10 43:5
46:3 59:10,11
67:20 68:7
78:15 80:14
82:25 87:19,22
88:2 97:22
105:8 108:25
109:15 111:8
158:9,12,13
160:2,22
162:13 165:21
167:9 169:8,19
169:19 181:18
185:11 186:24
190:16 191:3
192:5 193:21
199:19 206:6
207:17 208:22

218:4,11 223:8
223:13 226:19
226:22 227:12
228:5,21,23
229:3,12,16
232:13 235:9
235:13,14,17
235:21 236:2
236:14,19
238:23 239:14
239:22 240:2
242:23 243:23
244:24 245:19
245:24 248:13
250:5 251:21
254:23 259:20
261:17 263:21
267:14 269:13
273:9 277:10
279:21,24
282:15,22
283:3,12,17
284:24 290:9
297:9,15,21
298:20,25
300:14,17,23
301:4,12,19
303:6,17,24
304:5 306:7
307:7 308:6
309:17 312:15
314:8 319:2,13
325:7 326:12
326:18 327:22

331:4 339:22
346:10 355:22
362:9
**corrected**
134:25 244:13
**correction**
238:4
**corrections**
362:6
**correctly** 12:4
194:20 225:4
242:5
**corresponded**
89:8
**correspondin...**
236:19
**council** 13:8,11
13:18,21 14:5
44:22 67:2
231:23 306:25
310:22 334:15
**counsel** 2:3,13
5:9,25 7:17
9:16 13:18
20:20 23:8
39:24 40:10
46:10,16 47:25
48:6 61:6,10
66:20 70:25
86:8 124:3
140:22 141:8
147:17 162:5
162:25 164:3
177:18 205:4

208:4 309:3
311:22 336:12
337:6 339:9
341:2 357:4
**count** 28:12
204:5
**counterfactual**
166:21 303:24
**counterparties**
280:23
**counterparty**
200:15,15
280:25 283:11
**countervailing**
116:24
**counting**
201:22
**countless** 42:5
**countrywide**
171:3 307:2,9
310:6 315:24
**counts** 27:24
**county** 360:5
**couple** 11:20
12:3 32:16
42:16 44:15
72:17 83:21
337:2
**course** 9:16
21:12,25 24:21
53:11,22 78:17
93:6 106:6
132:12,12
219:20 266:18

295:18 296:2
306:5 307:4
309:16,21
310:11 311:9
315:21 316:8
317:5,9 319:17
339:6 341:16
357:16
**court** 1:2 4:16
4:23 5:23 7:4
12:6 13:2,25
28:2 35:6,12
35:24 37:9,22
37:23 38:2,11
41:15 42:10,22
47:4,6,8,23
49:9,22 50:9
51:6 52:12,14
53:17 57:7
59:10,13,16
66:8 70:11
71:18,20 74:11
74:12,13,15
75:15 76:2
120:21 121:7
124:20 156:7
156:22 157:3
157:12,15,23
158:2,22,23,24
158:25 159:3
161:6 166:7
167:17 168:17
169:6 170:10
170:22 171:5,5

171:7,20 176:9
177:6 179:8,20
180:6,12,23
181:2,2,8,20
183:23,24
184:5,9,13
187:23 188:13
188:17,23
189:5,6 190:11
190:15 192:18
193:4,5,15
195:7,11,14,23
196:2 202:17
203:10 209:11
210:2,4,7,10,23
211:3,4,6,17,20
211:20 212:17
212:21,23
213:5 230:12
230:16 231:9
231:10 236:16
240:16 242:17
257:16 262:10
262:17 306:23
307:5,12,15
322:7,9 324:5
325:14 358:5
**court's** 209:22
243:6,11
**courts** 29:12
68:9 71:21
74:15 170:16
179:15 190:6
193:9 346:20

**cover** 26:24
152:14 197:25
332:12
**covered** 18:11
18:16,21 19:9
276:6 355:8
**coverick**
130:16 280:18
**coverick's**
130:17 329:18
**covers** 114:10
**covid** 219:16
250:13
**crashes** 316:25
**crazy** 148:25
**create** 227:9
228:5 256:19
269:25 270:19
272:4 274:10
**created** 55:10
69:14 72:5
74:3 75:8,15
75:21 76:4,12
77:3 78:10
90:16 127:8
128:3,6,13
228:12 256:22
335:24
**creates** 331:6
**credible** 30:13
30:19 161:22
**credit** 17:15
88:14,14 217:3
219:17 265:7

268:10 276:24
328:5
**credited** 297:12
**creditor** 69:8
69:13,19 71:20
127:16 129:14
136:12 162:16
163:17,20
164:6,11,15,19
165:21 166:5,9
166:12 167:3,4
168:13 172:22
174:10 178:13
179:5 180:4,14
182:11,22,24
183:17 184:7
185:4,17
197:15 212:2,2
212:5 213:2,2
213:8,12
321:24 322:4
322:14,19,20
323:6 326:11
326:16,18
327:18,19
328:2,9 330:10
330:12,16,18
331:7,9
**creditor's**
166:19,20
173:25 194:24
**creditors** 45:22
156:14,15
162:17,23

163:18 164:7
164:11,17
168:4 170:14
171:14 172:11
173:3,3,9,9
174:22 180:14
182:2 183:14
196:11,24
204:20,25
205:12,15,16
212:11 213:4
213:11,17
214:4 215:9
232:24 238:25
239:6,21 241:8
243:23 244:23
311:11 316:13
326:25 327:7
**credits** 253:13
283:21 285:15
286:22 294:24
**crespo** 2:8 5:21
61:13
**criminal** 28:2,4
**cromwell** 1:15
2:14 5:13
**cropped** 244:2
**cross** 7:6 357:3
**crowd** 56:17
**crumpler** 55:25
56:25 57:7,24
**crumpler's**
56:15 85:6

**crypto** 219:22
219:25 307:20
332:16 333:23
**cryptocurren...**
299:8
**cryptocurrency**
51:25 52:4
54:6,10,23
55:7,11 91:13
307:13,19
**cryptographer**
97:6
**cryptography**
55:9
**crystalized**
169:18
**culminated**
59:18
**cup** 282:10
**currency** 89:11
93:10 286:6
288:7
**curriculum**
42:23
**customer** 73:19
89:12 90:7,9
90:13,21,23
91:3 92:17,25
93:12,15 95:13
95:13,19
104:19 106:4,5
106:10,13,22
108:3,9,10
111:6 112:5,15

112:16,19,23
113:6 117:4
121:17 136:24
220:12 248:3
259:5 273:17
273:21 286:4
290:2,8 291:9
325:17 332:12
**customer's**
89:5 104:16
110:12
**customers** 72:7
72:9 91:10
93:9,22 94:13
98:2 104:10,12
105:17 107:5,8
107:13 108:13
110:9 261:19
285:16 325:7
328:23 333:20
335:6
**cut** 82:20
125:21 155:6
177:14 217:9
251:12,13
283:25
**cv** 42:25 43:3,7
43:10,14,15
44:18,22 45:13
45:24 46:14,18
46:20

### d

**d** 106:8 107:25
110:21 150:14
245:6,8 247:11
359:2
**damages** 32:10
32:23 33:6,12
33:13,20,21
34:13 35:4
249:2,5 257:17
258:9
**dame** 47:16
73:3 77:9,21
78:8,12 81:15
85:12 136:14
141:18 142:5
152:22 206:21
207:24,24
253:13 258:25
259:19 281:18
342:6,8 343:3
**dan** 61:15
**dancing** 218:19
**danger** 328:25
329:5
**dangerous**
102:4
**daniel** 3:5
**darby** 2:16
5:12,13 6:7,13
9:2 20:23 22:5
23:11 46:16
52:21 78:20

79:9,12,14,19
84:13 91:18
105:24,25
124:6 131:22
132:19 133:8
133:13 138:14
138:20 147:20
153:22 154:2
155:13,16
160:8 163:5
165:6 177:22
208:8,11
227:13,16
232:18 234:11
248:10 260:7
264:9 266:24
268:17,22
269:2 274:12
309:5 317:14
318:11 336:22
337:9 339:24
342:3 343:23
344:4,18,22
345:20 346:3
346:17 347:9
348:19 349:2,6
349:9,22 350:3
350:9,11 351:5
351:13 352:20
353:11,20
354:12 355:3
355:17 356:14
357:5,21 359:5

**dare** 20:2 33:3
201:22
**data** 86:10,24
112:12 117:7
117:12
**date** 1:11 9:8
22:11 33:13,14
33:24 34:2
35:5,18,20,23
43:6,7 62:17
84:17 109:3,5
109:9 133:17
160:7 165:10
187:3 203:2
216:11 234:16
324:7 361:24
362:13
**dates** 119:3
**day** 35:13,17
40:15 90:11
95:4,10 108:25
113:14 114:4,4
114:5 118:17
129:18,19
201:22,24
287:21,22,23
287:24 307:23
315:14 341:16
347:20 358:7
360:19 362:17
**days** 62:21
204:16 305:8
**dead** 196:13

**deafness** 67:11
**deal** 86:25
99:11 108:14
113:12 142:16
142:25 193:4
193:11 218:21
248:18 249:10
265:23 333:4
344:6
**dealing** 81:20
193:9 230:14
237:24 241:23
277:21
**deals** 16:18
**dealt** 12:18
107:11 130:18
135:14 146:12
231:16 334:14
**death** 150:15
**debate** 234:2,5
**debit** 276:25
**debits** 253:12
285:15 286:22
294:24
**debt** 183:13
332:6
**debtor** 157:6
157:18 158:17
162:12 163:20
163:23 169:8
170:5 172:4,10
172:13 175:25
181:13 182:3
183:12 184:18

186:11 196:5,8
196:16,17
197:9,12,19
202:20 213:16
235:8,19,23
236:11,24
237:10 238:3
238:12,18,21
238:22,25
239:13,21
240:21 241:8
241:23,25
243:20 244:21
308:5 322:4
331:7,9
**debtor's** 157:7
162:21 171:14
178:20 182:13
183:2,7 195:2
238:15 244:23
309:19,23
**debtors** 1:4
205:14
**debts** 162:13
162:21 163:22
**december** 1:11
4:4 360:19
**decent** 302:23
302:24
**decide** 193:2
234:4
**decided** 195:21
195:22 315:6
318:6

**decision** 12:16
46:8 81:11
158:16,23
159:10,12,16
186:6 190:15
228:16 230:15
230:23,25
231:3,11,22
233:9 234:12
234:15 359:21
**decisions**
316:20
**decisis** 12:9
13:5,12,22,24
14:4,9 232:2
**declaration**
8:24 9:5,10,16
10:3,8,11 11:6
11:18 12:20
14:15,25 15:7
15:9,15,18,20
15:22 19:24
21:10 22:7,9
24:15,18 26:4
36:17 38:19,22
42:24 43:2,4
46:17 63:4,5
64:21 77:8
80:7,13,19
81:3 82:23
83:3 84:4,20
85:6,18 87:8
88:19 128:25
130:17 135:16

154:5 174:15
187:13,17
198:12 215:18
245:5,8 271:16
295:17 306:13
319:12,15
330:11,15
333:17 335:9
336:10,11
338:4,8 343:15
359:14,15
**declarations**
86:4 342:10
**declare** 249:7
284:23 362:4
**decline** 120:8
120:10,12
125:10 225:17
319:24,25
320:4,17
322:16
**declined** 51:8
201:11,13
305:10
**declines** 119:14
122:4,24
318:23
**declining** 53:9
53:15 195:18
**decrease**
119:12 122:3
278:8 285:7
**decreased**
281:14

**deemed** 362:7
**deems** 307:6
**defendant** 2:14
**defense** 306:6,6
306:17,20
309:16,17,21
310:11 315:21
316:20
**defer** 206:22,25
**define** 231:13
**defined** 126:7
174:8 231:15
**definitely**
103:25 228:21
**definition** 20:9
164:16 178:18
196:12 226:14
229:14,15,19
229:19,20,22
229:23,24
230:4,6 271:23
309:9
**definitions**
218:13
**degree** 144:14
325:9
**delaware** 1:2
4:17 37:9
294:7
**deliver** 32:13
273:14
**delivery** 32:15
253:22 254:2
256:10,13,16

257:7
**demand** 250:11
253:22
**deminimis**
217:4
**depend** 117:6,7
355:15
**depending**
210:19 251:3
**deplete** 171:11
179:22
**depleted**
174:19
**depletion** 170:4
170:13,22
171:20 241:5
**deponent** 362:3
**deposed** 6:18
12:3 49:17,20
86:6 352:13
**deposit** 92:9
93:9 215:25
**deposited** 90:7
90:9,18 93:13
94:7,12 96:19
98:2 107:8,12
107:20 215:13
216:4,9
**deposition** 1:14
4:13,18 26:5,6
26:8,10,12,14
28:16 60:19
61:5 62:7
82:12 110:20

130:18 162:8
257:21 258:24
280:18 303:10
338:11,14
339:11 350:25
351:7,25
352:10,18
353:13
**depositions**
118:19 303:12
351:7
**derived** 259:18
259:23
**describe**
196:21 198:5
199:10 247:21
295:14
**described**
77:22 198:10
198:10 200:8,8
248:15
**describes**
329:12 331:5
331:19 332:3
**describing**
120:23
**description**
96:11 234:22
320:14 359:12
**designed** 35:2
233:25
**despite** 44:4
189:24 244:4
289:6

**detail** 10:16
21:8,12 23:18
85:10,11,24
323:17 343:5
**details** 49:5
**deteriorating**
317:18
**determination**
33:25 68:19
323:19,21
**determinative**
136:11
**determine**
35:19 69:11
113:7,8,11
127:16 132:5
166:7 170:10
174:6 181:25
210:10 227:8
228:4 233:16
233:22 307:3
322:10
**determined**
75:15 262:18
**determining**
71:25 211:17
**deviation**
314:15
**dictate** 146:11
146:16
**die** 151:13,19
**differ** 169:4
**differed** 106:21

**difference**
75:18 112:22
114:16 117:13
117:18 124:17
136:8 167:8,12
204:9 207:25
220:24 267:12
276:9 285:24
**different** 14:6
18:3,6,14,21
51:12,20,22
65:24,24 74:17
76:8 97:12
100:15 103:21
105:11 106:2
107:7 130:5
140:12 142:7
146:20 150:23
151:5 170:23
179:10,11
201:21 217:25
232:5 234:8
248:5 256:8
257:10 261:14
267:3 274:6
277:16 289:23
290:25 291:2
293:16 307:17
325:3 328:15
328:16 335:6
**differently**
144:5
**differs** 169:3

**difficult** 23:23
23:24 24:11,24
98:9,17,22
214:18 226:8
256:4 265:19
267:8 271:20
285:3 287:7,14
288:23 289:5
292:19 306:10
306:14 316:7
316:14 326:6
**difficulties**
310:10,25
311:5 315:20
316:3
**difficulty**
188:14 194:16
**digital** 31:23
32:6,13,22
35:14 52:6
55:15,17,22
73:21 76:20
89:7,10,21
90:7,9 91:13
92:23 93:10,13
93:21 94:7,9
94:11,24 95:3
96:4 97:25
99:3,13,18,21
99:25 100:2,19
102:8,19
103:11 104:11
104:18 105:10
105:20 106:12

106:23 107:18
107:20 108:6,7
108:8,14
109:12 114:19
119:13,15
120:9,11 122:5
124:21 126:2
136:17,23,24
137:7,16
139:12,16,18
139:24 140:6
142:17,23
145:20 147:9
149:16 152:9
153:8 154:19
176:11 177:7
178:8,9 187:9
198:19,21
199:6 201:3,8
201:9 203:4
206:6 213:25
215:14,23
216:19 217:18
217:20,24
220:12 226:9
245:9 248:4
249:23 253:23
256:11 257:7,9
258:17 260:12
260:14,20
262:12,13
273:8,18,22
274:4 275:11
276:12 279:20

297:8,11,14
298:4,19,25
299:21,23
301:11 318:3
320:3,21,25
321:12 322:23
323:11 324:6
325:4,15,18
348:25 349:5
349:20,25
**diligence** 182:2
**diminish**
179:23 186:9
203:15,19
**diminished**
244:22
**diminishes**
243:22
**diminution**
194:22 238:14
240:7,20 241:6
244:10 326:21
**direct** 67:3
73:11,19 83:16
87:11 142:24
158:11 247:25
248:2 330:15
335:12 347:10
353:21
**directive**
189:21
**directly** 45:17
66:15,19
163:25

**directors** 45:3
45:4 46:24
311:12 316:11
**disagree** 38:3
222:21
**disagreement**
343:21
**disagreements**
343:25
**disagrees** 121:7
124:20 207:5
**disaster** 218:24
**disastrous**
310:7
**discharged**
332:6
**discovered**
44:9
**discretion**
195:14,17
196:3 202:17
210:8 225:13
**discretionary**
146:21 280:13
**discuss** 20:23
36:4 65:4
73:14 144:13
268:12 295:3
337:10
**discussed** 141:7
223:11 226:17
273:13 276:23
338:20,22
339:11 341:20

**discussing** 87:6
208:21 254:10
318:21
**discussion**
30:23 80:6
341:15 347:19
348:2,6,12
350:11,19,22
350:24
**discussions**
61:3
**dismember**
182:2
**dispose** 243:20
**dispute** 8:18,18
10:13,16 11:11
147:18 357:17
**disputes** 42:19
**dissatisfaction**
335:5
**dissent** 294:6
**distinct** 332:21
353:23
**distinction**
75:18 91:12
151:10 166:2
167:11 208:24
220:23
**distinguish**
244:8
**distinguished**
310:23 343:9
**distress** 309:11

**distribute**
  197:13,18
  239:21
**distributed**
  172:11,14
  184:19 197:3,5
  206:3 207:11
  238:25 239:5
**distribution**
  156:13,15,18
  173:8,8 179:24
  182:5 185:8
  186:10 194:23
  196:19 197:2
  198:4 203:21
  204:23 207:15
**district**   1:2
  4:16
**divided**   150:25
**division**   37:24
**divorce**   44:3
**docket**   59:16
**doctrine**   12:9
  12:19 13:5,12
  13:21,24
**document**   10:2
  10:6 18:19,20
  18:22 19:7,17
  20:22 37:12,22
  46:11 69:10,24
  70:25 80:23
  82:8 84:22
  133:25 160:25
  163:2 232:2,15

233:21 236:4
242:10 246:8
251:7 258:20
274:20,22
324:12 329:11
**documented**
29:10 253:9
**documents**
18:7 19:14,15
19:16,19,25
20:4,7 29:10
83:13,19 84:3
84:23 85:16
86:13 88:10
105:5,7 126:18
127:20 130:13
281:25 324:22
329:15 347:17
**doing**   35:7
42:16 57:8
126:15 254:7
280:8 285:9
**dollar**   114:20
114:22 118:12
217:18 265:3
266:21 272:24
275:25 283:10
283:13,21
285:8 288:6,7
288:8 290:17
292:4,11,14
294:16 301:12
302:4 303:5,24
304:15 305:23

326:19,20,20
326:20 327:2,2
327:9,10 329:9
**dollarized**
263:13
**dollars**   26:22
92:12 98:12,13
115:8 172:10
184:3 191:17
192:17 214:6
214:11,12,14
214:16,22
215:4,8,13
216:4,13,19,24
217:4,12,13,19
252:5 255:18
258:2 335:3
**door**   31:6,6
321:6
**doubt**   13:20
84:21 102:7,14
257:18
**doubtless**   39:13
49:13
**downtime**
217:22 218:7
218:10,22
219:4,4,9,11,21
226:11
**doyle**   12:17
230:23
**doyle's**   13:3,13
14:3

**draft**   39:3
48:24 49:12
59:16,18,21
**drafted**   49:9
258:19
**drafting**   38:25
39:17 214:25
**draw**   11:21
72:23 97:8
134:17 208:3
345:16 355:14
355:14
**drawing**
208:24
**drawn**   157:3
**draws**   16:20
**driver**   249:4
**drives**   42:8
**drop**   334:24
**due**   162:13,22
163:22 270:24
**duly**   6:3 360:11
**durham**   82:10
257:21 340:5

|   e   |

**e**   2:2,2 6:2,2
77:19,19 86:2
110:21 150:14
334:10 359:2,7
360:2,2 361:3
361:3,3
**earlier**   17:25
18:16,22 19:7

49:16 59:9
86:4 133:10
140:9 173:16
207:6 212:13
226:17 242:15
250:4 289:21
303:13 340:19
347:19
**early** 49:12
59:15 62:21
330:13
**earth** 91:10
**easier** 255:18
344:9
**easily** 15:12
**eastern** 41:10
41:15 47:5
**easy** 29:13
**eaten** 25:3
26:16 29:16
**eating** 88:22
**eccourts.org**
188:6
**echoing** 264:17
**effect** 26:19
73:6 164:5
166:12 172:21
174:10 179:4
180:18 183:16
185:3,16
186:17 189:20
286:3 312:15
313:2 314:23
326:4 348:24

**effective**
228:12
**eight** 42:20
94:17 308:25
**either** 33:10
43:17 51:14
53:7 55:23
81:14 82:2
150:8 151:23
190:21 217:24
254:21
**el** 235:9,19
236:11,18
237:12,17
238:22
**elaborate** 34:6
34:8
**electric** 89:8
**element** 199:18
240:6 306:3
**elements**
195:19
**elizabeth** 73:3
77:9,21 81:16
85:13 136:14
141:18 142:5
152:22 206:21
207:24,24
253:13 258:25
259:19 281:18
342:6,9
**elizabeth's** 78:9
78:13

**emerald** 46:8
46:23
**enable** 99:10,16
103:4 293:3,5
**encourage**
151:15
**endeavor**
161:20
**enforce** 260:20
297:4 298:11
328:7 330:7
**enforceability**
335:25
**enforceable**
335:18
**enforcement**
241:7
**enforcing**
298:8
**engage** 332:25
350:11
**engaged** 59:17
60:15,16 294:6
**engagement**
60:12
**engineering**
169:21,24
**england** 40:12
181:10 233:8,8
282:12 346:21
347:2
**english** 17:21
18:15 36:6
53:16 65:3,5

65:10,13,15,21
65:22,23 66:2
66:9,12,15
67:19,22 68:9
68:17,25 69:9
69:16,23,24
70:3,9,14,14,22
71:15,23 72:3
72:24 73:25
74:7,16 75:7
75:10,16,22
76:7,12 77:4
78:10,24 79:4
127:9,14,21
128:4,14
129:18,21,24
135:11,13
146:13,14
149:20,20
159:17,18
171:5 174:6
189:18 190:3
226:18 227:4,9
228:5,24
230:17,25
231:10,20
347:14
**enjoy** 300:13
**ensure** 180:16
204:22
**ensuring**
156:12
**entails** 227:3

**enter** 111:10,13
308:22
**entered** 166:17
178:25 180:3
180:13 209:15
298:2
**enters** 111:14
179:3 185:14
185:15 241:25
285:3 310:7
**entire** 292:15
**entirely** 313:8
**entirety** 85:5
142:22 150:16
227:7 228:3
315:13
**entities** 237:25
283:2 302:22
354:8,20
**entitled** 87:18
89:12 92:11
100:14 108:4,9
108:13,17
143:9 152:7
153:11,12
205:24 207:8
241:15 249:5
253:18,19
259:8,16
273:17,21
298:14,16,19
301:3,17 328:6
341:12

**entitlement**
90:19 91:6,7
92:2,4,8,8
101:14 103:17
113:8 114:19
114:19 145:8
145:14 146:22
146:23 151:23
151:24 152:9
153:7,9,13
186:4 245:11
247:12,17
259:10,16
273:15 275:3
**entitlements**
91:24 93:21
97:9 245:10
**entitles** 209:8
**entity** 101:8
282:14,17
354:24
**entry** 17:12
20:4 90:15
105:19,20
106:19
**equal** 196:25
**equality** 182:5
**equally** 180:11
197:2 329:25
**equipped**
342:21
**equitable** 139:7
139:10,11,15
142:11,21

143:3,10,16
144:7 145:6,24
147:25 148:11
148:19 149:7
149:15 154:10
**equity** 143:11
**equivalent**
106:19 140:2
149:10 158:24
229:8,14 230:5
**errata** 362:8
**escapes** 60:6
**especially**
316:8
**esq** 2:7,8,8,16
2:16,17
**essence** 51:4
**essential**
157:11,12
**essentially**
108:16 150:11
214:22 215:3
296:21
**establish**
147:10 175:19
247:3
**established**
209:8,10,11
310:12
**establishing**
298:18
**estate** 178:20
194:24 195:2
197:16 198:2

206:2 207:10
211:8,8,15
212:19 214:4
**estates** 324:9
**estimate**
187:20 188:2
**estimated**
119:2
**et** 1:3 2:6 4:15
361:1 362:1
**etf** 54:12,24
**ethereum** 92:25
96:20,22 113:2
113:9 153:12
259:11,14,17
262:2
**european**
189:21
**evaluate**
126:10
**evaporated**
122:13
**event** 166:13
171:19 172:22
178:14 183:18
214:20 221:11
**events** 219:20
**everybody**
180:10 317:2
332:8
**evidence** 8:15
8:16,21 17:19
30:21 51:13,13
51:17 59:2

66:9 100:4,23
102:12 105:14
112:10 126:23
141:25 171:18
193:15 202:7
219:24 224:14
254:18 271:4
291:5 297:24
301:14 302:6
305:13 312:15
313:25 314:7
314:22 315:11
329:18 346:24
354:22
**ex** 43:25
**exact** 103:12
143:18 144:8
228:6
**exactly** 91:19
91:21 96:17
**examination**
6:6 337:22
353:22 358:10
359:4 360:10
360:12
**examined** 6:5
181:3
**example**
103:20 201:4,5
221:19 222:7
243:19 244:20
251:20,22
256:3 278:15
279:13 281:3,6

281:13 290:3
291:19 332:23
**examples** 15:8
57:13 58:2
**exceed** 136:8
**exceeded**
115:17 135:21
**excellent** 10:7
**except** 98:13
**exception** 14:7
**exceptionally**
66:4
**excerpted**
46:13
**exchange** 27:21
30:2 54:21,24
55:4,4,15,17
89:6,20,24
92:6 93:11,12
98:3 99:22,23
104:11 105:10
105:17 106:10
106:13,17,19
107:9 110:13
110:15 118:4
118:11,14
119:9 121:17
123:7 126:3
135:21,23
138:3 139:13
139:25 140:7
177:8 184:4
191:20 198:23
199:2,8 215:14

215:22 216:7,8
219:23 245:10
254:9 259:5
261:20 262:5
277:3,8,13,15
277:20 283:21
290:2,8,12
291:9 302:11
302:12,15
319:5 321:11
321:19,20
325:5 327:13
327:17 333:21
**exchanged**
268:5
**exchanges**
55:20 312:11
312:19,20
313:14 333:2
**exclude** 351:14
**excluded** 51:6,7
**excluding**
351:18
**excuse** 58:19
63:4 108:22
167:25 169:22
195:2 269:25
319:19 351:7
**execute** 286:4
**executed** 19:16
**executing**
286:16 287:5
**exercisable**
251:14 271:12

271:13 282:2
291:14
**exercise** 195:9
196:2 250:22
257:13 272:9
284:13,23
291:13
**exercised**
269:14 271:8
271:11,13,14
277:2 281:21
282:2,4 284:10
288:3,4 289:20
356:11
**exercises**
157:24
**exercising**
284:5 285:5
286:21
**exhibit** 9:4,7
22:6,10 83:4
84:14,16 87:11
132:11 133:16
135:17 160:6,9
165:7,9 234:13
234:15 269:16
335:10 341:8,9
351:24 359:11
359:11,14,15
359:17,18,19
359:20,21
**exhibited** 86:19
**exhibits** 86:19
359:9

exist  143:16
188:21 189:3
231:8 271:5
existed  264:4
existence  67:14
67:19,25
248:12 281:22
exists  127:24
135:5,11
143:10 356:13
exit  290:23
exiting  317:17
expand  15:11
expect  226:13
288:5 321:10
expected  51:19
expedite  358:8
expense  168:3
213:3 354:19
experience
51:23 55:20
111:2 161:8
186:22 295:9
333:6
expert  1:14
8:15 9:9 45:25
46:7 47:14,22
48:20,24 49:8
49:14 50:12,17
51:5 55:6,8,14
55:19 59:2
63:11 66:9
70:2,3 100:24
127:13,14

142:14 146:3
159:15 193:20
219:25 226:21
291:3,5 293:22
342:5 343:21
346:24
expertise  295:4
333:9
experts  16:16
47:15 351:18
explain  8:11
11:24 12:10
38:4 55:23
110:17 161:21
206:14 246:20
271:15 277:6
346:19
explained
304:20
explaining
311:9
explanation
10:19
exposed  317:2
expressed
14:14 24:17
147:17 322:6
expressing
23:16 350:5
expression
156:18 275:14
expressly
269:22 338:19
338:22 339:11

343:16
extend  162:3
extends  241:24
extensive  41:5
extent  37:13
55:13 69:2
100:22,24
102:11 105:13
105:15 120:8
128:7,8,10
131:3 136:9
140:19 142:14
146:3 217:17
218:19 234:19
236:4 242:9
246:7,8 265:6
286:7 293:22
304:18 315:2
319:24 323:7
324:11 341:21
343:13 346:25
350:12
extra  282:13
307:22
extract  81:8
156:21
extracts  305:6
extremely
179:16 289:5
eyes  212:3

**f**

f  2:7 360:2

face  170:21
253:8 258:19
faced  231:11
facilitate  299:7
facilitated
330:6
facing  309:15
311:5,6,12
318:6
fact  25:14
26:15 27:3
30:24 33:22
37:20 43:14
47:3,12 66:23
74:6 99:5
107:23 122:24
128:19 129:4
141:11 180:7
194:15 203:5
203:15 212:17
244:4 247:5
248:3 250:9,13
250:15,16
251:17 259:11
261:21 271:8
271:12,14
281:22,23
282:10 287:11
303:17 304:24
305:13 306:20
307:18 320:12
340:11 344:20
346:14 347:6
351:8,17

353:17 354:22
**factor**  136:11
**factors**  307:16
**facts**  29:9,10
  30:21 63:18,21
  63:23 100:4,23
  102:12 105:14
  114:14 130:9
  130:14,20
  185:20 192:12
  195:22 202:7
  212:22 224:13
  254:17 297:23
  301:14 307:2,6
  334:17
**factual**  88:17
  89:2 130:13
  172:7,9 176:6
  202:25 213:22
  214:17 215:11
  271:21 321:3
  344:2,6,11,12
  344:14 350:14
  350:19 351:9
  351:10 353:9
**factually**  287:6
  354:8
**fail**  203:7,8
**failure**  38:13
  336:19
**faintest**  37:16
**fair**  28:21,23
  31:12 35:14
  51:19 68:16

136:2 137:8
  165:4 166:23
  236:21 237:7
  237:24 238:3
  290:24
**fairly**  60:22
  120:17 333:19
**fairness**  43:9
**fall**  157:25
  198:3
**falls**  96:15
  172:20 198:2
  242:22
**fame**  81:19
**familiar**  56:16
  58:16 109:25
  312:24 352:3
**famous**  31:7
  81:20
**fanciful**  184:8
**far**  59:14,19
  60:10 86:18
  88:20 105:5
  132:25 134:13
  168:15 230:9
  257:12 344:21
  350:6 353:20
**farmer**  58:5,9
  58:12,15
**fascia**  185:18
**fashion**  171:21
  184:6,10 210:8
**fashioned**
  150:4

**fat**  307:21,24
**fatally**  196:13
**fault**  190:5
**favor**  154:6
  265:3 270:20
  317:18 322:17
**feature**  150:12
**features**  96:9
  157:11
**federal**  37:9
  181:2
**feed**  39:8
**feel**  93:7 111:22
  119:21 120:6
  178:2 260:5
  355:9
**feeling**  292:21
**fees**  119:6
**felt**  20:4 28:12
**fiat**  89:10 93:10
  286:6,7 288:7
**figure**  26:21
  110:11 117:24
  118:16 121:18
  292:4,22,24
  293:7,9,10,17
  294:12
**file**  300:16
**filed**  4:15 49:6
  49:9 50:24
  64:17 191:12
  246:5 296:18
  297:2

**filibustering**
  311:19
**filing**  45:9
**final**  242:12,13
  282:10
**finally**  34:3
  271:20
**financial**  55:18
  189:22 309:11
  310:10,25
  311:5 315:20
  316:3,19,23
**financially**  5:4
**find**  17:18
  18:24 24:11,23
  76:2 81:25
  98:9,16,22
  159:4 184:5
  191:9 210:7
  214:14,18
  215:10 221:17
  240:12 265:19
  285:2 289:5
  292:18 293:13
  294:13 316:6
  316:13,15,18
**finding**  240:17
**findings**  30:10
**finds**  35:24
  59:16
**fine**  17:5
  217:10
**finish**  6:25 7:3
  8:2 64:8 72:14

| | | | |
|---|---|---|---|
| 111:21,23 | **flu** 219:16 | **foreign** 65:9,10 | 110:14 113:17 |
| 155:5 161:20 | **fluctuated** | 65:11 68:11 | 114:7,12 115:2 |
| 168:9,22 | 287:20 | 70:10 190:5 | 115:15 116:13 |
| 203:16 205:5 | **fluke** 214:25 | 193:9,12,16 | 117:11 119:15 |
| 208:6 222:5,24 | **focus** 21:6 | **forget** 116:20 | 119:18 120:13 |
| 264:10 349:11 | 62:24 161:23 | **forgive** 69:8 | 121:2,11 122:5 |
| **finished** 82:19 | 162:21 234:6 | 105:25 233:8 | 122:8 123:7,10 |
| 302:7 | **focused** 34:18 | 237:3 287:10 | 124:2 125:11 |
| **firm** 4:24 16:21 | 143:24 | 347:4 352:7 | 125:14 127:10 |
| **first** 6:3,20,21 | **focuses** 162:11 | **form** 14:18 | 128:5,22 129:6 |
| 6:23 11:25 | 162:15 | 24:19 26:17 | 130:11 131:17 |
| 17:20 22:3 | **folks** 61:20 | 27:6 30:14,20 | 134:12 136:6 |
| 32:17 39:3 | **follow** 24:8 | 30:24 35:16 | 136:25 137:25 |
| 42:21 70:17 | 159:6 182:17 | 38:20 41:3 | 140:18 142:13 |
| 81:6,7,7 | 182:20 186:22 | 48:11 54:25 | 143:4,12 |
| 150:15 151:13 | 209:5,6,19 | 55:16 58:7,11 | 144:23 145:14 |
| 151:19 154:12 | 232:7,8 | 63:13,24 64:23 | 146:2 150:22 |
| 189:6,18 | **followed** | 66:17 67:16,21 | 155:2 156:4 |
| 191:22 198:12 | 230:21,21 | 68:3 69:4,17 | 157:10,20 |
| 218:21 220:7 | 231:25 232:9 | 71:16 72:8 | 158:14,18 |
| 236:6 238:9 | **following** 12:24 | 75:11 76:5 | 159:14 160:13 |
| 271:2 324:20 | 48:18 114:4,5 | 77:13,16,23 | 162:6 164:12 |
| 334:13 336:9 | 182:16 346:9 | 78:11,25 80:20 | 164:21 165:24 |
| 341:18 353:4,6 | 355:15 | 83:24 85:19 | 166:24 169:9 |
| **fit** 185:5 | **follows** 6:5 | 86:12 88:3 | 170:6 171:15 |
| **five** 63:9 94:17 | 159:12 | 89:17 90:2,22 | 172:6,15 |
| 94:17 153:11 | **footnote** 12:16 | 91:4 92:3,21 | 173:13,18 |
| 260:4,7 337:12 | 175:11 181:16 | 94:10 95:6 | 174:3 175:5,10 |
| 353:6 | **footnotes** 68:12 | 96:6 97:2 98:4 | 176:20,23 |
| **flip** 221:20 | **force** 27:21 | 99:4,15 100:21 | 177:9 178:11 |
| **floating** 169:18 | 186:24 187:4 | 101:11 102:10 | 178:22 179:9 |
| **floor** 302:17 | **foregoing** | 105:3,12 | 179:25 182:14 |
| **flow** 260:5 | 139:22 362:5 | 106:25 107:21 | 183:3,8 184:20 |
| | | 109:4,20 110:3 | 185:12 186:12 |

187:24 189:9
190:17 192:6
193:6 194:4,25
195:4 196:6
197:10,20
198:6,8 199:13
200:2,6,13,20
201:16 202:6
202:21 203:23
205:10 206:7
207:18 209:4
210:9,24
211:10 216:20
217:14 218:5
218:16 220:15
221:3,12
223:14 224:2
224:12 225:5
226:4 227:11
227:20 229:4
229:10,17
230:8 231:5
232:14 233:20
239:3,15,23
243:24 244:25
247:4 248:14
248:21 250:6
252:8 253:4
254:16 255:2
255:25 256:23
257:5 258:18
259:21 260:15
261:11 262:15
262:22 263:15

263:22 264:23
266:9 268:7
270:21 272:11
273:10,19,23
275:8 276:7,16
277:5,11 278:9
279:10 280:4
281:10 282:23
283:7,23
284:15,25
285:12,18
286:24 288:14
289:24 290:10
291:20 293:20
294:11 297:22
298:6,21 299:2
299:12,25
300:18 301:5
301:13 302:20
303:2,7,18
304:9,17 305:2
305:12,24
306:22 307:14
308:7 309:22
310:13 312:13
312:22 313:6
314:4,20
315:16,23
317:23 319:8
320:4,10,24
321:13 322:8
323:15 324:10
325:19 327:15
327:24 328:14

328:22 330:23
331:15 332:13
333:13 342:18
357:11
**formal** 241:9
**formality** 79:17
**formed** 15:13
  15:16,22 23:4
  30:15 205:25
  207:9
**former** 47:15
**forms** 65:5 66:2
  328:14 355:24
**formulated**
  21:10
**forth** 15:8
  38:18 154:4
  330:17 333:3
  360:11
**forward** 9:18
  10:25
**fought** 190:2
**found** 30:25
  195:22 232:3
  236:16 312:18
  329:7 335:7
**foundation**
  200:21
**founded** 129:13
**founders**
  292:20
**founding** 27:15
**four** 63:8 76:18
  94:15 145:7

153:13 344:2
**france** 40:20,24
**fraud** 27:24
  232:24
**fraudulently**
  103:7
**free** 93:7
  111:22 119:21
  124:14 178:3
  260:5 355:9
**french** 65:11
**frequently**
  151:11 186:19
  193:5
**fried** 25:22
  27:10,13,14,23
  28:22 29:4
  30:13 85:11
  296:24 304:21
  304:23 305:5
  353:13,14
**fried's** 25:25
  28:4 303:10
**front** 187:4
  269:17,18
**ftx** 1:3 2:6,13
  4:14 5:16 25:3
  25:5,16 26:15
  27:3,16,21
  29:15 31:11
  32:12 38:2
  54:21 64:18
  69:8,12,19
  71:19 72:6,9

76:20,21 86:6
89:5,9,9,20,24
92:18 93:9,18
93:19 94:18,19
97:24 98:5,6
98:20 99:2,25
100:18,20
101:10 103:19
104:10,21
107:5,6,8
110:13,15
111:17,17
118:4,11
119:16 122:6
123:8,23
125:12,17,24
126:11,14,15
126:25 127:5
128:8,20 129:4
129:10,13
130:9,24
131:15 132:6
132:10 133:15
139:16,19,19
140:7 142:18
145:21,21
174:23,25
177:8 198:22
200:14,17
201:18 215:14
224:18 225:12
245:10 247:25
248:2 249:22
254:9 261:17

262:2 265:5,5
266:10 270:6,9
270:11,13,15
270:20,23
271:25 272:17
272:19 273:4,8
274:17,22,24
275:2 280:19
281:9,16
282:14,17,17
282:22 283:11
283:15,20,22
284:13,18,22
285:5,10,14
286:20,21
287:13 296:3,7
296:11,13,22
296:24,25
297:5,14,16,20
298:24 299:4
299:19 300:12
300:16 301:2
301:10,21
302:3,18,24
303:4,15,22
304:14,23
305:10,22
306:12 312:12
321:11,14
323:12,23
324:7,8 325:5
325:6,16
326:10,15,18
326:21,23

327:2,4,12,20
328:3,8,10,16
328:17 329:12
330:9,10,18
331:5 332:3,11
333:11 348:18
354:11,18,18
354:19,22,25
359:18 361:1
362:1
**ftx's** 88:24
98:10 104:14
130:15 265:2
272:9 324:7
329:17 339:2,8
341:2 357:4
**fulfill** 219:10
**full** 41:21 49:14
92:19,22,23
142:16 146:16
163:22 174:24
180:25 181:8
188:9 328:19
328:19 345:6
**fully** 43:11
85:12 182:15
190:2 209:5
213:21 322:11
354:16
**function** 29:6
**functioning**
116:7
**fund** 307:13,19
332:16

**fundamental**
323:4
**fundamentally**
38:3
**funding** 119:6
**funds** 169:7,17
197:6 333:20
**fungibility** 96:7
**fungible** 93:13
96:3,5,19
**further** 10:19
12:11 14:23
35:10 36:24
39:16 53:8
76:18 139:17
139:21 167:22
182:3 317:20
335:19 339:9
357:2 360:14
**future** 35:20
**futures** 18:13
18:18 119:7
**fuzzy** 292:21

**g**

**g** 86:2
**garage** 275:23
**garden** 235:12
**gathered** 39:4
**gault** 307:10
**general** 36:25
153:14 168:4
171:14 173:9
174:21 179:17

| | | | |
|---|---|---|---|
| 213:4,16 224:6 | 302:14 307:21 | **gloster's** 78:9 | 93:8 96:16 |
| 311:10 341:15 | 311:21,22 | **go** 4:11 6:22 | 106:9 119:22 |
| 348:2 350:18 | 312:5 319:19 | 10:17 13:17,20 | 127:11 132:9 |
| 350:21 | 332:23 | 31:7,20 33:23 | 136:9 138:18 |
| **generally** 72:9 | **given** 17:18 | 36:24 40:6,14 | 151:13,18 |
| 248:22 255:23 | 19:25 20:3,10 | 40:16 42:7 | 153:23 155:19 |
| 289:20 | 28:16 74:21 | 53:21 64:9 | 155:23 162:3 |
| **gentlemen** | 87:22 115:21 | 70:6 71:11 | 163:2 165:5 |
| 314:22 | 147:16 148:20 | 72:17 79:15 | 166:14 167:10 |
| **genuinely** | 152:18 184:8 | 81:14 87:12,14 | 167:13 172:23 |
| 251:5 | 208:4 280:12 | 101:25 123:12 | 173:21 177:14 |
| **germane** | 300:12 302:11 | 133:8 138:17 | 178:15 183:18 |
| 344:13,14,15 | 312:4 319:9 | 138:21 155:16 | 184:14 192:24 |
| **germany** | 323:6 343:6 | 160:4,17 | 192:25 195:8 |
| 282:13 | 357:25 360:13 | 165:18 180:21 | 195:23 205:16 |
| **gesticulate** | 362:10 | 190:15 203:17 | 208:14,18 |
| 139:5 | **gives** 103:20,20 | 203:17 215:15 | 232:21 238:8 |
| **getting** 237:3 | 106:11 112:23 | 219:16 222:19 | 240:24 251:22 |
| 260:24 261:2 | 126:14,15 | 236:9 250:9 | 251:25 253:11 |
| 267:10 278:16 | 162:16 164:14 | 264:14 269:2 | 254:12 269:5,9 |
| 303:20 321:23 | 180:14 288:10 | 278:2 318:12 | 269:19 277:17 |
| 339:23 | 307:24 | 329:2 340:20 | 284:21 291:21 |
| **gift** 215:3 | **giving** 11:24 | **goal** 147:12 | 298:10 310:5 |
| 300:10 | 21:8 70:9 | **goes** 118:12 | 310:19 311:2,3 |
| **give** 8:15 21:25 | 153:25 164:5 | 196:18 199:3 | 312:5 317:20 |
| 33:9 51:15 | 219:24 258:13 | 218:23 307:23 | 318:14,18 |
| 62:17 64:12 | 259:12 | 335:22 343:5 | 319:18 321:7 |
| 84:7 92:25 | **gleeson** 161:8 | **going** 4:3 9:18 | 330:21 331:22 |
| 102:18,23 | **gloster** 73:3 | 10:25 34:6,7 | 334:13 335:12 |
| 103:3 106:12 | 77:9,21 136:14 | 50:4 57:16 | 337:16,20 |
| 126:23 148:14 | 141:18 142:5 | 64:24,25 67:8 | 346:19 352:25 |
| 149:12 187:25 | 253:14 258:25 | 73:13 78:16 | 353:3 357:6,23 |
| 232:21 258:2 | 259:19 281:18 | 79:22 80:3 | **goldberg** 2:8 |
| 291:5 292:20 | 342:6 343:3 | 84:10 91:18 | |

**good**  4:2 5:12
  6:11 13:6
  44:11 75:5
  78:18 112:17
  268:15 269:18
  280:11 284:9
  313:12 317:12
  318:11
**goode**  310:21
**gospel**  308:12
**gotten**  261:23
**governed**  17:21
  17:23 18:15
  19:5 69:10,24
  70:18,21 75:7
  75:10 127:20
  128:14 226:18
  345:24 346:4
  346:12 347:17
**grade**  161:5
**grand**  260:25
**grant**  106:15
  106:16 156:9
  183:25 184:15
  189:6 196:3
  209:12,23
  210:11 211:7
**granted**  242:25
**granting**
  170:24
**grants**  288:25
**great**  8:6 42:2
  86:25 139:4
  210:15 308:23

**greater**  85:10
  85:11 173:7
**greatest**  220:3
  239:25
**ground**  6:23
**grounds**  29:21
**group**  151:21
  242:22
**groves**  159:22
**guess**  144:18
**guest**  16:10,11
  81:8 82:4
  248:16
**guidance**  307:9
**gummow**  161:7
**guys**  263:18

**h**

**h**  86:2 334:10
  359:7 361:3
**habit**  222:15
**hacking**  218:24
**half**  109:23
  138:20 353:4
**halfway**  31:21
**halsburys**
  129:25
**hand**  16:2 32:3
  70:6,7 91:14
  137:16 250:11
  253:17 327:21
  327:21 360:19
**handed**  46:11
  80:23 84:22

  133:19 187:5
**hands**  329:8
**happen**  101:7
  184:23 185:2
  287:15 334:6
**happened**
  49:25 90:11
  92:7 101:7
  268:13 289:12
  289:15 296:22
  304:8,16
  314:18 318:2
**happening**
  122:20 301:8
  309:25
**happens**
  129:18 196:15
  316:25
**happily**  144:13
  145:14
**happy**  11:8,14
  21:11 65:4
  71:11 79:10
  84:6 100:7
  133:22 147:2
  204:16 222:10
  246:20 249:16
  265:22 267:8
  295:3 303:3
  305:4 319:15
  325:13 351:16
**hard**  42:8
**hardware**
  219:7

**harley's**  129:23
**head**  218:20
**headed**  233:13
**heading**  37:23
  74:23 133:2
  134:8,10
**headings**
  132:24
**headnote**
  160:24 161:12
  234:24 235:4
  240:3,5
**heads**  132:22
  153:25 208:5
**hear**  7:17 11:7
**heard**  12:25
  136:17 161:4
  193:8 356:5
**hearing**  47:6
  57:8 66:9
**hedge**  307:13
**heinz**  96:11
**held**  1:15 93:20
  94:19 99:8
  101:10 139:23
  142:17 148:2
  151:21 169:15
  169:21,23
  177:8 226:9
  297:16 324:6
**help**  17:3,3
  18:18 21:5
  133:20 161:24
  182:19,19

204:24 236:7

**helpful** 92:13
254:20

**helps** 71:8
83:17 124:13

**hereinbefore**
360:11

**hereto** 362:8

**hereunto**
360:18

**high** 37:23
42:19 74:15
156:22 158:23
316:23

**higher** 33:23

**highly** 158:3
216:25 230:19
232:8

**history** 12:23
189:18 307:13
334:12

**hit** 188:5

**hoffman's**
248:16

**hoffmann**
16:14,18 81:11
82:5

**hogan** 2:16
5:15

**hold** 151:14,22
271:24

**holder** 99:10
103:4

**holding** 76:21
137:14 139:20
142:18 145:21
236:18 348:18
348:24

**holdings**
235:16

**holds** 102:7,15
148:10 153:14
294:3

**home** 40:18

**honest** 50:21

**hong** 19:9
48:17 50:18

**hope** 266:3
313:9

**hopeless** 37:25

**hoping** 232:20

**hot** 90:14 93:18
93:18 94:18
104:20 122:14

**hotels** 48:16
57:20

**hour** 138:19,21

**house** 12:5
40:19,20 150:3
150:21 156:25
181:15,19,23
212:12 230:15
230:16 231:12
231:21

**houseman**
336:12

**hqp** 12:17
13:13,16 14:4
45:19 230:24

**huge** 191:22
228:14 315:7

**huh** 63:2
205:19

**hundred**
281:13,14

**hundreds**
231:20 335:2

**hundredth**
54:17

**hung** 249:8

**hunter** 103:21

**husband** 44:4,9
150:3,3

**husseiny** 235:9
235:19 236:11
237:12,17
238:22

**husseiny's**
236:18

**hyde** 235:12,15
235:25 236:13

**hype** 205:8

**hypothetical**
115:14 167:7
172:17 183:19
184:16,21
185:8 205:9,13
254:10 255:12
255:13 262:14
263:7,9 304:19

317:24 318:10
354:9,23

**i**

**i.e.** 139:11
149:12 265:3
296:16 318:8

**ibit** 54:11

**idea** 37:17
112:23 113:23
184:5 189:10
189:15 193:7
302:21

**identification**
9:7 22:11
84:17 133:17
160:6 165:10
234:16

**identified**
88:18 170:16
339:21 355:24
356:3

**identify** 53:9
259:4 330:2
354:7

**identities** 61:7

**identity** 52:10
52:22

**ignored** 32:18
253:21

**ignoring** 205:7

**illuminate**
233:25 234:4

**illuminating**
233:24
**imagine** 49:3
62:18 74:10
81:18 88:23
278:3 318:8
333:22 346:10
**immediate**
121:6 311:13
**immediately**
212:7 296:18
297:2 310:8
326:22
**imminent**
311:6 318:6
**imminently**
309:15
**impact** 239:20
250:23 252:6
**impeached**
202:18
**impediment**
99:24 100:5,10
**imperative**
291:8,11
**implied** 151:24
**import** 184:24
**important** 47:2
99:19 108:2
151:10 160:25
161:2 222:16
258:14 259:8
315:25 317:10

**importantly**
258:23 356:10
**imposed**
287:13
**impossible**
23:24 24:24
70:2 127:13,15
127:16 184:6
259:3 329:21
329:23,25
330:2
**improper**
357:18
**improve** 157:6
172:12
**improved**
202:19 213:15
**inability** 32:13
**inadequate**
238:13
**inappropriate**
184:6
**incapable** 29:2
**incident** 171:19
**include** 176:16
256:5
**included** 11:18
15:7 18:12
45:2 61:15
109:12 110:20
215:22
**includes** 243:11
**including** 119:4
159:19,20

217:23 218:8
220:14 223:18
226:12 251:6
**incomplete**
46:13
**inconsistent**
344:17
**incorporate**
248:19 258:8
**incorporated**
249:11
**incorrect** 228:9
233:6
**incorrectly**
346:19
**increase** 172:13
278:12,14
**increased**
33:17
**incur** 290:22
**indemnities**
46:25
**independent**
73:4 76:23
86:13 130:19
193:17 341:23
**independently**
13:7,11 14:2
102:2 138:8
356:12
**index** 133:2
**indicia** 313:14
**individual**
352:4 354:24

**individually**
241:8
**individuals**
151:2 237:25
344:3 354:8
**industry** 219:3
**inference**
170:12
**infinite** 116:23
117:2
**inflated** 212:18
**inflates** 211:7
**inflation** 192:2
**influence** 65:15
68:18
**influenced**
70:15
**inform** 15:18
111:4 328:7
**information**
111:6,15 112:5
112:14,15
113:16 116:9
117:23 140:20
294:18,25
295:7
**ingredients**
199:25
**inherently**
281:9
**initial** 25:23
26:4
**initially** 93:14

**inquiry**  173:25
**insert**  39:12,12
**insisting**
 268:18
**insofar**  32:8,19
 34:24 46:13
 86:18 116:2
 227:4 344:12
 344:13 350:16
**insolvency**
 34:25 44:21
 45:16,19,20,21
 47:25 48:2,3,5
 50:20 56:7
 57:22 60:7
 122:19 127:25
 156:2 164:18
 164:23,25
 165:8,12,20
 168:14 171:10
 174:7,19
 183:18 186:20
 186:23 187:8
 187:22 188:19
 188:25 189:8
 190:13 192:4
 193:25 194:21
 198:4 199:18
 200:2 202:3,13
 202:14 228:20
 229:3,7,9,13,16
 230:4,7 241:9
 257:17 271:18
 308:4,9,16,17

 309:7,20,23
 311:6 318:6
 359:20
**insolvent**  45:23
 166:14 172:23
 173:5,6 174:12
 178:15 197:16
 202:20 206:2
 207:10 300:22
 308:6,10,18,20
 308:25 310:9
 316:5,5 330:21
 342:19
**instance**  17:7
 26:16 43:22
 45:19 66:19
 69:6 88:9,21
 126:16 188:17
 188:22 199:5
 334:13 342:17
 344:7
**instruct**  7:19
 255:9
**instructed**
 58:22 62:12,14
 76:19 78:4
 88:5 107:3
 115:25 139:8,9
 139:17,21
 199:24 216:3,6
 343:12,12
 348:16
**instructing**
 53:24 56:18,22

 57:19
**instruction**
 93:3 141:2
 225:18 343:7
**instructions**
 56:21,24 74:24
 87:18,21
 341:12,17,22
 341:25 348:15
**instructs**  53:13
 183:12
**instrument**
 189:19
**instruments**
 66:21
**insurance**
 26:20
**intend**  67:13
 137:19 263:7
 344:16 357:5
 357:12
**intended**
 258:21 269:24
**intending**
 20:21 79:6,8
**intent**  314:2,7
 314:20 315:2,3
**intention**  315:6
**interest**  11:23
 11:23 72:6
 75:9,14,22
 76:5 119:6
 139:11,15,24
 140:2,5,7,16

 141:10 142:11
 142:22 143:3,4
 143:16,17
 144:21 145:6
 145:24 147:9
 147:25 148:5
 148:13,19
 149:7,10,11,15
 150:16,24
 152:12,19,20
 152:23 153:3
 154:6,11,13,18
 173:2 176:11
 176:19,22,24
 177:7 178:9
 206:6,17
 207:16 208:2
 214:2 238:19
 243:21 244:6
 245:13 299:23
 316:12 323:11
 325:17,25
 335:17,22,24
 336:2,21
 349:13,14
 355:24,25
 356:13
**interested**  5:5
 38:5 246:22
 360:17
**interesting**
 334:12
**interests**
 141:15 144:6,7

326:7
**intermediary**
111:23
**internet** 111:9
**interpreting**
230:11
**interrupt** 260:4
**intimate** 333:6
**introduce** 9:3
**introduced**
106:17 214:12
214:21 259:6
259:14
**invest** 183:11
186:5 228:16
228:19,22
232:11,21,23
233:9,16
234:11,14,23
236:22 237:8
243:18 244:2
359:21
**investigate**
180:9
**investigation**
310:16
**investment**
239:18
**investor** 293:11
294:10
**investors** 16:14
81:11,17
248:17 340:7

**invited** 47:16
47:18 97:8
99:7 107:3
147:4 148:24
199:23 208:3
216:2,6
**invites** 325:9
**inviting** 121:13
**invoked** 256:13
**invoking** 299:9
**involve** 68:8
194:22 228:19
237:8 244:21
277:4 278:4
280:2
**involved** 42:16
66:5 123:23
187:9 235:11
238:2 307:20
**involvement**
300:21
**involves** 73:23
129:17,17
277:20
**involving** 31:22
32:6 54:6
236:22
**irish** 106:2
**irrelevant**
32:24,24
233:10 244:7
264:3
**ishares** 54:12

**island** 47:22
71:21 76:2
**island's** 47:23
**islands** 8:17
10:24 12:18,19
12:22 13:2
16:8 34:22
37:24 41:22
47:21 57:23
59:3 60:5,8
61:19 64:14,15
65:7,19,20,22
66:3 67:5 68:6
71:18,19,25
72:2 74:2,3,9
74:12,14 76:6
127:18 158:22
189:25 190:3
191:4 231:9,23
231:24 347:5
**issue** 16:6
33:25 36:16
128:17 129:15
129:16 132:2
133:3 147:8,11
167:20 185:6
195:6 231:14
231:15 232:3,5
234:23 243:8
338:24 343:3
**issued** 294:9
**issues** 8:17
10:12,15,25
11:2,3,3,11

14:24 34:18
50:18,20 59:6
68:18,25
129:18 131:11
141:17,19
142:2 190:5
193:4,10,12
291:24 342:25
350:7 356:6
**italy** 65:12
**item** 96:8
204:18
**iteration** 8:20

**j**

**j** 48:15 150:14
180:15
**j.j.** 5:20
**jack** 68:11
129:20
**jamiah** 13:11
14:6
**janice** 47:16
**january** 186:24
289:13,15
**jersey** 48:25
**jinping** 48:13
48:15
**jj** 2:8
**johnson** 3:4
**joined** 5:20
**joining** 6:12
**joint** 2:3 5:17
7:18 9:11,22

9:24 56:6
58:13 63:15
64:17 119:2
149:23 150:2,8
150:10,12,18
189:4 190:14
191:5,11
192:16 193:21
196:18 197:7
197:17,24
198:6 246:2
247:2 300:15
300:20 338:2
339:2,8 341:2
**jones** 186:15
**judge** 28:3,10
28:12 192:23
**judgment** 13:4
13:13 16:13
34:22 35:19
167:17 170:2
191:3 212:14
232:21 238:7
240:13 242:16
307:10 310:22
324:15 326:2,3
**judgments**
74:11 188:7
**judicial** 29:8
**juicy** 293:10
**jumped** 134:24
327:5
**jumping**
258:10

**june** 95:5,8,12
95:15 108:25
118:17 126:6
135:19 200:10
201:10 203:2
215:20,21
216:12 297:9
313:4 314:2
315:15
**junior** 39:4
**juris** 146:14
**jurisdiction**
41:16 50:14
67:15 156:7
157:23,25
171:21 195:9
**jurisdiction's**
346:2
**jurisdictions**
181:6 188:8
231:17
**jurisprudential**
231:13
**jurist** 343:10
**jus** 150:13
**justice** 12:17
13:3,13 14:3
35:3,3 37:23
47:15 68:11
85:13 129:20
167:19 230:23
258:25 307:10
310:21 311:8
316:8

**justices** 47:17
161:3,5,22
**justify** 131:6

## k

**kbo** 4:17
**kc** 8:21 342:7
**keep** 43:2 213:9
268:22
**keeper** 307:21
**kept** 120:11
320:3 321:13
321:18
**key** 99:10 103:4
**keys** 93:20
94:19 97:22
98:6 99:8,9,17
100:12,20
101:10,17,22
102:8,15,18
103:10 297:16
299:5,7 347:21
347:22,23,24
347:25 348:2
348:12,18,24
**kid** 307:22,24
**kilter** 314:18
**kind** 137:3
155:10 160:23
173:6 212:14
322:11
**kindly** 80:23
**king's** 40:10
86:7 336:12

**kingdom** 52:5
161:6 233:7
**knew** 21:4
**know** 7:11,25
8:3 10:5 13:16
17:14 21:16,17
23:20 26:6
27:17,22,25
28:2 29:17
30:6,9 37:6
39:18 47:20
49:25 50:23
55:2,5,25
56:23 57:11
58:5 64:24
71:3 72:11,14
73:5 95:8
96:12 97:7
99:6 110:16
111:10,11
112:11 114:17
116:9,15,17,18
117:3,4 128:9
129:25 160:14
162:2 177:24
179:15 188:11
188:12 191:2
193:8 201:6
202:24 204:4
209:16 219:21
221:4,6 235:5
241:2 242:19
246:14 251:9
252:14 258:13

263:6,8 271:9
271:10,21
283:2,3 284:17
285:23 287:21
288:2 289:9,10
289:11,12,12
289:13,13
290:20 292:2
292:21 295:24
298:9,10
300:19,19
305:17 307:9
308:12 316:24
321:6 323:25
324:2,19
327:16 331:2,9
331:11 334:9
345:3,9 347:12
**knowing** 85:7
290:3 291:17
292:14
**knowledge**
63:18,20 159:3
340:21 352:18
**known** 29:9
64:15
**knows** 291:9
**kokelaar** 2:9
5:22 39:5,6,7
39:11 61:11
**kong** 19:9
48:17 50:18
**konstantinidis**
85:14 86:17

118:22 287:9
312:18 313:17
314:9,11,12
342:13 344:7

**l**

**l** 6:2
**lack** 36:18,18
36:22 37:2
38:12 200:21
**lady** 258:24
**language** 51:22
183:15 232:4
286:2,10,15,18
287:3,4 289:7
**languages**
51:12 166:3
**large** 14:5
42:17 52:5
155:9 301:11
315:13
**larger** 94:23
211:15 292:24
**largest** 44:3
**lasted** 30:3
**late** 126:6
237:3 303:20
321:23
**latham** 2:5 5:19
39:20 40:3
58:21,22 59:23
60:17 61:14,21
62:5 84:24
141:7 337:25

**lathams** 62:13
**law** 8:16 10:24
16:8 17:21,23
18:15 19:6,9
38:7,10 45:25
47:21 50:13,17
50:19 55:11
59:3 64:22
65:3,5,6,9,10
65:10,11,12,14
65:15,16,21,21
65:23 66:2,3,9
66:13 67:4,19
67:22 68:2,9
68:11,14,18,19
68:25 69:2,9
69:12,16,19,23
69:24 70:3,4,9
70:10,14,15,15
70:18,22 71:15
71:19,23 72:3
72:25 73:25
74:4,7 75:7,10
75:16,22 76:6
76:7,13 77:4
78:10,24 79:4
122:23 127:9
127:13,14,15
127:17,21
128:4,15,18
129:15,16,18
129:23 131:11
134:21 135:4
135:11,13

143:11,20
146:13 149:20
149:21 151:25
158:4 159:16
175:20 181:5
186:22 187:11
187:15 188:5
190:3,15 193:4
193:9,10,12,16
193:20 214:25
226:18,22
227:2,4,9
228:5 230:17
230:19,24
231:2,16,20
240:4,4 245:19
253:15 285:22
326:3,8,8
335:20 342:24
345:13 346:16
346:18,20
347:14
**lawful** 103:17
104:5
**laws** 37:18
64:13 67:14
134:21 181:5
221:18 246:14
345:17,24
346:2,5,12,15
346:21,23
347:2,7,18
**lawyer** 53:2,16
344:9

| | | | |
|---|---|---|---|
| **lawyers** 37:14 | 355:14 358:3 | 30:1 31:1 32:1 | 118:1 119:1 |
| 129:21,24,25 | **legally** 235:15 | 33:1 34:1 35:1 | 120:1 121:1 |
| **lead** 13:19 | **legislation** | 36:1 37:1 38:1 | 122:1 123:1 |
| **leading** 47:24 | 66:22 165:3,4 | 39:1 40:1 41:1 | 124:1 125:1 |
| 48:6 161:10 | **legislature** | 42:1 43:1 44:1 | 126:1 127:1 |
| 357:9 | 179:12 | 45:1 46:1,12 | 128:1 129:1 |
| **leads** 47:18 | **lender** 293:5,10 | 47:1 48:1 49:1 | 130:1,2 131:1 |
| **learned** 343:5 | 329:12 330:4 | 50:1 51:1 52:1 | 132:1,9,11 |
| **leave** 31:7 | 331:5 332:4,4 | 53:1 54:1 55:1 | 133:1,16,18 |
| 85:22 204:4 | 332:7 | 56:1 57:1 58:1 | 134:1 135:1 |
| **ledger** 89:8 | **lenders** 25:4 | 59:1 60:1 61:1 | 136:1 137:1 |
| 90:15 92:5 | 329:20,22,24 | 62:1 63:1 64:1 | 138:1,25 139:1 |
| 104:15 105:19 | 329:25 330:4,5 | 65:1 66:1 67:1 | 140:1 141:1 |
| 105:20 106:19 | **length** 23:13 | 68:1 69:1 70:1 | 142:1 143:1 |
| 259:10 283:5 | 39:6 73:14 | 71:1 72:1 73:1 | 144:1 145:1 |
| **ledgers** 282:15 | 274:3 311:20 | 74:1 75:1 76:1 | 146:1 147:1,8 |
| **left** 31:4 61:12 | **lengthy** 60:23 | 77:1 78:1 79:1 | 148:1,11 149:1 |
| 83:23 331:23 | 312:4,5 | 80:1,5 81:1 | 150:1 151:1 |
| 337:5,8 | **letter** 60:12 | 82:1 83:1,6 | 152:1 153:1 |
| **leg** 249:4 | 359:12 | 84:1,14,16,18 | 154:1 155:1,25 |
| **legal** 4:22,25 | **letting** 111:4 | 85:1 86:1 87:1 | 156:1 157:1 |
| 19:6,10 45:11 | **level** 262:20,23 | 88:1 89:1 90:1 | 158:1 159:1 |
| 61:18 65:24 | **levels** 170:16 | 91:1 92:1 93:1 | 160:1,6,9 |
| 76:19 82:24 | **levy** 1:15 4:14 | 94:1 95:1 96:1 | 161:1,16 162:1 |
| 83:7 98:24 | 6:1,10,12 7:1 | 97:1 98:1 99:1 | 163:1 164:1 |
| 101:6,14 | 8:1,11 9:1,3,6,6 | 100:1 101:1 | 165:1,7,9,11 |
| 139:18 143:14 | 9:9 10:1 11:1 | 102:1 103:1 | 166:1 167:1 |
| 145:19 146:6,7 | 12:1 13:1 14:1 | 104:1 105:1,22 | 168:1 169:1 |
| 147:19 150:6,6 | 15:1 16:1 17:1 | 106:1 107:1 | 170:1 171:1 |
| 150:7 189:18 | 18:1 19:1 20:1 | 108:1 109:1 | 172:1 173:1 |
| 245:11,13 | 21:1 22:1,6,10 | 110:1 111:1 | 174:1 175:1 |
| 246:22 247:12 | 22:12 23:1 | 112:1 113:1,20 | 176:1 177:1 |
| 247:16 260:13 | 24:1 25:1 26:1 | 114:1 115:1,6 | 178:1,4 179:1 |
| 300:7 302:3 | 27:1 28:1 29:1 | 116:1 117:1 | 180:1 181:1 |

| | | | |
|---|---|---|---|
| 182:1 183:1 | 247:1 248:1 | 308:1 309:1,8 | 116:24 117:14 |
| 184:1,16 185:1 | 249:1 250:1 | 310:1 311:1,14 | 117:19 124:18 |
| 186:1 187:1 | 251:1 252:1,20 | 312:1 313:1 | 135:22 136:8 |
| 188:1 189:1 | 253:1 254:1,8 | 314:1 315:1,9 | 136:16 137:23 |
| 190:1 191:1 | 255:1 256:1 | 315:12 316:1 | 138:3 174:24 |
| 192:1 193:1 | 257:1 258:1 | 317:1 318:1,20 | 201:18 267:13 |
| 194:1 195:1 | 259:1 260:1 | 319:1 320:1 | 273:8,13,14 |
| 196:1 197:1 | 261:1 262:1,6 | 321:1 322:1 | 290:22 295:13 |
| 198:1 199:1 | 263:1 264:1,2 | 323:1,9 324:1 | 328:7 354:10 |
| 200:1 201:1 | 264:19 265:1,9 | 325:1,4 326:1 | **liability** 114:20 |
| 202:1 203:1 | 265:20 266:1,6 | 327:1 328:1 | 124:21 225:14 |
| 204:1 205:1 | 266:12,13,14 | 329:1 330:1 | 240:11,19 |
| 206:1 207:1 | 267:1,17 268:1 | 331:1,10 332:1 | 253:25 265:4,8 |
| 208:1,20 209:1 | 269:1,11 270:1 | 332:10 333:1 | 272:25 273:3 |
| 210:1 211:1 | 271:1 272:1,6 | 334:1 335:1,8 | 276:15 279:8 |
| 212:1 213:1 | 272:21,23 | 336:1 337:1 | 280:3 281:9 |
| 214:1 215:1,12 | 273:1 274:1 | 338:1,3 339:1 | 283:10,15,22 |
| 216:1 217:1 | 275:1 276:1 | 340:1 341:1,7 | 320:23 322:23 |
| 218:1 219:1 | 277:1 278:1 | 342:1 343:1 | 326:21 |
| 220:1 221:1 | 279:1 280:1 | 344:1 345:1 | **lie** 29:5,18 31:5 |
| 222:1,2,12,25 | 281:1 282:1,14 | 346:1 347:1,20 | **lieu** 108:12 |
| 223:1 224:1 | 283:1 284:1,7 | 348:1 349:1 | **life** 41:6 |
| 225:1,9 226:1 | 285:1 286:1,19 | 350:1 351:1 | **lifetime** 263:12 |
| 227:1 228:1,15 | 287:1 288:1 | 352:1,9,23 | **light** 209:10 |
| 229:1 230:1,2 | 289:1 290:1 | 353:1 354:1 | **liked** 265:10 |
| 231:1 232:1,11 | 291:1,16 292:1 | 355:1 356:1 | **likely** 176:14 |
| 233:1,14 234:1 | 293:1 294:1 | 357:1,25 358:1 | 196:2 214:19 |
| 234:3,12,15,17 | 295:1,16 296:1 | 359:9,14 361:2 | 232:6 311:4 |
| 235:1,8 236:1 | 297:1 298:1,17 | 361:24 362:2,4 | **likewise** 41:22 |
| 237:1 238:1 | 299:1 300:1 | 362:13 | 41:23 68:13,13 |
| 239:1 240:1 | 301:1 302:1 | **lexis** 82:2 | 85:9 135:9 |
| 241:1 242:1 | 303:1 304:1 | **liabilities** | 342:23 |
| 243:1 244:1 | 305:1 306:1,5 | 112:21 115:7 | **limit** 225:2,19 |
| 245:1 246:1 | 306:16 307:1 | 115:13,17 | 226:2 272:9 |

**limitation**
  224:10
**limitations**
  210:22
**limited**  64:21
  111:2 169:22
  169:24 223:11
  223:25 224:5
  232:9 235:16
  272:5 275:6
  315:13
**line**  8:2 17:15
  65:18 72:15
  85:9 88:14
  109:20 133:20
  145:19 170:23
  179:2 265:7
  328:5 357:7
  361:4,7,10,13
  361:16,19
**lines**  76:18
  94:14,17
  169:14 353:6
**link**  111:9
**liquidate**
  296:20 301:10
**liquidated**
  178:15 198:23
  297:20
**liquidation**
  45:23 48:19
  125:25 126:7
  126:12 127:3
  128:3,21 129:5

129:11 130:25
  131:5,14,18
  166:14 167:7
  172:24 174:12
  183:20 184:17
  199:6 203:3
  204:10 212:6
  296:18 297:2
  298:3 300:23
  307:24 326:22
**liquidations**
  56:15
**liquidator**
  56:19 196:10
**liquidator's**
  339:3,9
**liquidators**  2:3
  5:18 7:18 9:11
  9:23,24 56:6
  58:13 63:15
  64:17 119:2
  189:4 190:14
  191:6,12
  192:16 193:21
  196:18 197:7
  197:17,24
  198:7 246:3
  247:2 300:15
  300:20 338:2
  341:2
**list**  21:11 83:9
  84:3
**listed**  82:24
  85:17 140:17

**listen**  22:3
  222:16
**litigate**  98:14
**litigated**  54:6,8
  186:20 189:23
  191:3
**litigation**  63:19
  63:21 130:10
  132:7 147:17
  147:19 190:2
  295:10 300:16
**little**  41:24
  79:16 254:21
  255:18 339:5
**live**  26:9
  147:11
**lived**  41:7
**llp**  2:5
**loan**  265:6
  331:3,19,20
  332:3,6
**loans**  328:22
  330:22 331:12
**loc**  19:2
**loca**  345:18
**location**  4:18
  94:8
**london**  40:19
  40:21 338:13
**long**  30:3 65:18
  161:25 208:12
  222:13 246:16
  254:8 258:12
  258:13 262:4

268:24 278:2
  290:21 302:15
  318:21 333:22
  353:2
**longer**  44:24,25
  87:4 105:21
  106:4 177:15
**look**  15:23
  16:10 17:4,8
  23:7 46:18
  74:8,9 81:23
  84:12 85:24
  86:21 87:10
  107:24 118:24
  119:21 123:15
  126:16,19
  131:20 132:25
  133:23 134:16
  138:12 148:24
  157:12 158:4
  159:7 163:16
  164:22,24
  165:4,13
  175:11 181:16
  184:9 203:11
  221:19 222:7
  225:10 229:21
  230:10 231:14
  236:5 242:20
  269:19 295:11
  295:19 305:18
  305:20 306:23
  310:6,18,19,20
  315:5,24

330:12 340:23
353:25
**looked** 13:12
82:2,9,13,13
83:12 85:3,6
85:11,14 86:2
86:16,21,22
123:17 126:20
126:22 132:4
182:8,9 212:13
274:3 305:7
340:5,7,9,16
342:14 351:24
**looking** 43:15
83:14 133:24
144:16 162:22
163:9,11,13,25
227:17 270:4
307:11 311:2
347:15
**looks** 9:12
24:22 72:12
163:19 164:19
165:20 166:4
167:15 190:23
195:11 217:16
240:2 330:13
**lord** 16:13,18
26:12 77:19
81:11,14 82:4
86:7 103:20
141:17,25
142:2,2 248:16
258:22 324:18

324:21 351:14
**lords** 12:5
230:17 231:12
231:21 310:23
**lordship's**
233:3
**lordships**
167:17 242:12
244:9
**lose** 317:3
**loss** 25:3,6,7
31:11 296:14
296:16,23
297:7,19
328:11
**losses** 25:14
26:16,24 27:4
29:16 45:23
88:22,25 119:3
119:5 332:12
354:9,24 355:2
**lost** 262:5
**lot** 23:18 44:25
103:25 134:15
177:15 194:11
206:24 254:21
333:23
**lots** 206:22
**louder** 339:5
**lower** 203:5
**lucia** 41:18
**lucky** 113:21
214:13

**luna** 113:2
**lunas** 93:2
**lunch** 138:18
138:21 139:2
**luncheon**
155:21
**lying** 28:13
31:3 112:11
**lyle** 85:14
86:18 313:17
314:10 333:5
344:7

**m**

**machine** 98:13
**made** 13:19
64:16 66:21
88:12 91:8
97:21 105:21
116:22,25
156:20 167:21
167:25 214:22
215:3 267:11
294:24 295:12
298:15 305:20
344:3 362:6
**mainstream**
159:18
**maintain** 43:3
43:14,15 223:3
**maintained**
89:9
**maintains**
282:15 283:5

285:10
**majority** 313:4
**make** 15:19
18:25 21:3
30:9 76:25
78:4 87:7
88:17,25 90:5
99:7 107:3
120:25 121:5
121:22 124:25
147:4 148:24
149:2,3,4
182:19 204:8
216:3,7 253:7
255:18 264:16
291:10 299:20
311:15 351:16
352:16
**makes** 20:18
217:7 231:6
323:18 330:10
**making** 143:24
206:5 239:7
253:6
**man** 31:5
110:22
**mandatory**
210:13 270:25
272:13 286:14
287:4,15
**manifestly**
148:25 169:5
**manner** 93:14
212:10

**march** 17:15
19:4,17
**margareta**
161:4
**margin** 18:12
19:2,3 223:4
287:11 328:23
330:21 331:3
331:12,19,20
332:3
**mark** 22:5
133:9
**marked** 9:3,6
22:10 83:4
84:14,16
132:11 133:16
160:5,9 165:6
165:9 234:15
341:8
**market** 119:14
120:10 122:4
122:24 318:23
320:2,19
**marquee**
235:16,21,23
236:12,18
237:18
**marriage**
360:16
**massively**
33:18
**match** 329:21
329:23

**matching** 259:9
**material** 83:22
95:24 134:15
229:20,21
271:7
**materials** 39:13
61:2 81:6
84:15,19 88:15
110:19 350:20
352:4 359:17
**math** 254:19
**matter** 4:14
8:24 10:10
13:18 14:9
23:21 35:9
55:11 56:11
57:8 58:19,21
59:13,22 60:5
60:7,13 64:3
67:20,22 69:12
69:18,23 71:14
71:19,23 73:25
74:3 76:5
86:11 90:12
98:11 99:5
101:17,24
108:15 121:16
122:22 143:20
143:22 158:2
167:25 170:25
174:5 175:19
175:20 202:16
224:5 226:15
227:2 268:13

288:13 291:2,6
291:18 292:5
292:12,15
295:4 301:9
306:12 307:17
321:3,25
324:24 326:7
334:14 336:10
338:5,8,11
342:6 344:8
351:18 352:13
360:17
**matters** 45:14
53:13 58:14
60:9 65:2 68:8
72:24 74:6
75:16 149:19
149:20 154:9
161:10 289:23
344:13,14,17
348:25 350:12
**mcgrath** 241:4
243:2,3,8
**mean** 12:7
20:24 21:20
22:25 27:3,8
31:3,7 36:20
40:13 48:3
62:9 75:17
82:20 86:25
91:11 95:8,9
96:4 97:4
100:9 101:17
103:16 108:6

110:7,8 111:11
136:21 140:12
142:11 143:13
144:20 145:5,5
146:6 152:20
153:5 158:21
160:12 161:16
166:4 173:14
173:21 174:5
176:24 180:11
201:6 212:4
213:6 217:8
219:4 221:6
224:21,23
229:20 246:14
249:8 260:25
272:15 277:7
277:19 281:25
282:11 286:2
286:20 310:16
311:10 317:2
325:25 327:16
345:22 346:8
349:10
**meaning** 51:7,8
69:16 71:14
90:8 132:15
174:18 193:16
275:13,17
276:3 330:18
**meaningful**
113:16 290:6
**meaningless**
290:5

**means** 31:3
73:24 128:14
142:16,24
143:10 150:15
152:5 204:13
218:22 220:17
221:15 254:6
291:13 324:23
325:5 326:4
**meant** 35:4
44:24 224:23
**measure** 14:5
**measured**
33:13
**media** 4:12
358:2
**meet** 223:4
**meeting** 114:7
**member** 41:9
41:21
**members** 61:14
61:18
**memory** 16:3
38:21 73:15,16
165:3 331:3
**mention** 187:16
**mentioned** 11:9
12:14 15:4
25:18 28:19
45:24 59:7
74:19 76:16
107:14 118:20
118:22 141:10
141:12,16

186:6,14 201:6
276:4 350:18
**mentions** 34:19
**mere** 30:24
122:24 281:22
281:23
**merely** 17:25
122:19 148:10
167:2 199:14
219:18 290:2,3
335:22 343:12
**merited** 253:8
**messing** 219:8
**met** 195:19
287:12
**metric** 116:3,4
**mews** 235:12
**michael** 3:7
4:21
**microphones**
4:5
**miffed** 44:8
261:20,24
**mill** 226:24
**miller** 103:20
**miller's** 159:19
**million** 44:4,10
118:13 119:8
126:4 131:5
184:3 191:23
216:14,15
252:24 254:13
282:7 287:23
287:24,25

290:18,19,21
329:11,13
334:20
**millions** 335:3
**mind** 26:22
48:14 79:11
80:21,25 82:18
99:12 102:17
118:23 119:25
131:24 156:20
184:8 190:23
191:18 249:18
258:13 295:22
319:16 351:21
**mindful** 180:6
**minimum**
245:11
**minus** 116:25
**minute** 153:21
153:24 337:8
**minutes** 72:18
139:2 153:18
268:15 309:4
331:23 337:13
337:13,14
**mischaracteri...**
68:21 173:19
197:21 206:8
223:15 226:5
227:21 232:15
242:9 246:7
250:7 303:8
324:12 327:24
331:16 333:14

**mischief**
211:22
**missed** 32:19
**misspeak** 21:23
248:2
**misstates** 236:4
274:19 305:3
319:8
**mist** 188:10
**mistaken**
218:12
**mlca** 17:15
19:3 88:15
345:19
**modest** 54:17
**modified** 223:5
**molina** 85:10
**moment** 59:7
72:16 94:25
107:14 114:24
120:20 268:12
311:22 316:10
319:20 345:2
352:24
**monday** 53:7
**money** 26:25
30:4 92:9
191:20 196:17
197:13,15
201:19,20
217:5 219:17
251:21,23
252:2 258:7,7
266:10 272:20

275:10,24
302:13 328:18
329:6 330:6
331:8 332:7
334:24 335:4
**monitor** 338:10
**month** 62:23
**months** 62:18
309:2
**morning** 4:2
5:12 6:11
112:17 220:6
224:19 250:10
341:19,19
**mosley** 85:10
**mouth** 154:15
**move** 34:10
105:11 138:11
246:23 277:18
331:22
**moved** 18:13
**movement**
105:18 106:6
106:23
**moving** 27:21
322:16
**multifaceted**
310:15,15
**multiple** 22:23
23:2,3,6,16
24:10 27:24
28:6 30:18
31:2 93:22
215:18 294:17

294:24
**murder** 151:16
**murphy** 105:22
**mute** 4:8

**n**

**n** 2:2 48:15
77:19 150:14
334:10 359:2
**name** 4:21 6:8
29:3 53:10
56:16 58:16
60:6 106:2
150:5 352:5
**named** 61:21
**names** 58:17
151:4
**narrative**
147:16 162:7
177:19 222:21
222:22 234:10
312:4
**nasty** 43:24
**natural** 218:24
275:13,17
276:3
**nature** 16:7,19
32:25 49:3
75:14 81:9
101:22 156:3
173:12,17
190:6 191:25
193:10 301:21
314:23

**near** 301:19
**necessarily**
31:3 73:23
106:17 107:19
115:18 129:17
129:17 161:5
192:22 227:3
238:13 240:25
241:4 257:2
277:22 290:11
308:4,9 309:6
317:4 340:19
**necessary**
28:12 72:2
103:14 120:6
170:12 171:10
171:19 175:18
240:6 362:7
**necessity** 76:22
323:7
**need** 7:24 8:4
44:16 46:15,21
52:19 129:21
138:22,25
144:18 145:11
160:10 164:24
165:13 178:19
194:22 208:7
208:12 234:19
239:19 244:5
267:9 268:18
325:21 353:8
357:16

**needs** 52:25
**negative**
115:19,22
116:2,10 118:5
118:9 137:17
138:4 265:3
266:21 272:24
276:14 279:5
279:15,24
281:13,14
283:10,13
285:8 286:8
287:17,20
288:6,8 290:17
296:4,8 297:6
301:12 302:4
303:16,23
304:15,25
315:14 328:21
329:9
**negligent** 249:4
**neither** 34:18
55:24 283:4
**net** 110:12
112:2,3 116:19
116:21 121:18
136:10,15
253:12 263:10
264:22 265:14
290:18 291:17
294:12,16,23
**neuberger**
26:12 77:19
81:15 86:7

141:17,23,23
142:3 258:22
324:19,21
351:15
**neuberger's**
141:25
**never**  26:6 49:6
59:9 110:15,16
166:22 172:5
175:24 185:9
192:15,24
196:14 271:24
288:5
**new**  1:16,16,18
2:7,7,15,15
4:19,19 6:4
20:6 23:25
36:8 48:25
81:2,6 186:15
339:25 360:4,8
**nexus**  130:2
178:20,24
**nice**  40:22
292:19,21
**nicely**  248:15
**nights**  40:21
**nine**  41:16
279:21
**nishad**  352:11
352:12,18
353:17,25
**nishat**  352:5
**non**  12:8 145:2
154:18 212:15

253:11 291:25
354:10
**normal**  151:19
219:19 312:19
**normally**  56:21
143:13
**notary**  1:17 6:4
360:7 362:14
362:21
**note**  4:5 84:8
147:18 270:24
**noted**  362:7
**notes**  301:23,23
301:25
**noticing**  5:11
337:5
**notion**  96:7
98:15 294:8
299:19 349:15
**notwithstandi...**
270:5
**novelton**
103:21
**november**
12:25 13:10
57:8 191:13
**nowadays**
193:11
**number**  10:12
11:13 17:19
21:18 43:12
44:20 60:25
80:22 91:14
109:17 116:23

159:17 181:5
189:22 191:9,9
204:19 216:10
263:2,13 276:2
319:20 328:25
335:13 338:24
340:3,16,23
355:9 358:2
**numbers**
191:21,22
255:15 287:22
**numeral**
341:12
**numerous**
294:6

**o**

**o**  6:2 110:21
**oath**  5:3 6:16
28:13,17,20
**object**  7:18
144:23 147:15
236:9 273:19
312:3 357:7
**objected**
257:13
**objection**  8:20
14:18 24:19
26:17 27:6
30:14,20 35:16
38:20 41:3
48:11 51:10
54:25 55:16
58:7,10,10

63:13,24 64:23
66:17 67:16,21
68:3,20 69:4
69:17 71:16
72:8 75:11,23
77:13,16,23
78:11,25 80:20
83:24 85:19
86:12 88:3
89:17 90:2,22
91:4 92:3,21
94:10 95:6
96:6 97:2 98:4
99:4,15 100:3
100:21,22,23
101:11 102:10
102:11,21
105:3,12,13,14
106:24 107:21
109:4,19 110:3
110:14 113:17
114:12 115:2
115:15 116:13
117:11 119:18
121:2,11 122:8
122:9 123:10
124:2 125:14
127:10 128:5
128:22 129:6
130:11,15,22
131:17 134:12
136:6,25
137:25 140:18
140:19 141:13

| | | | |
|---|---|---|---|
| 142:13 146:2,2 | 213:19 216:20 | 279:10 280:4 | 343:23 344:4 |
| 147:21 154:7 | 217:14 218:5 | 281:10 282:23 | 344:18,22 |
| 154:20 156:4 | 218:16 220:15 | 283:7,23 | 345:20 346:3 |
| 157:10,20 | 221:3,12 | 284:15,25 | 346:17 347:9 |
| 158:14,18 | 222:20 223:14 | 285:12,18 | 348:13,19 |
| 159:14 160:13 | 223:15 224:2 | 286:24 288:14 | 349:2,6,22 |
| 162:6,7 164:12 | 224:12,13,14 | 289:4,24 | 350:3,9 351:5 |
| 164:21 165:23 | 225:5 226:4,5 | 290:10 291:20 | 351:13 352:6 |
| 166:24 169:9 | 227:11,19,20 | 292:7 293:20 | 352:14,20 |
| 170:6 171:15 | 227:21 229:4 | 293:21 297:22 | 353:11,20 |
| 172:6,15 | 229:10,17 | 298:6,21 299:2 | 354:12 355:3 |
| 173:13,18 | 230:8 231:4 | 299:12,25 | 355:17 356:4 |
| 174:3 175:5,10 | 232:14,15 | 300:18 301:5 | 356:14 |
| 175:16 176:4 | 233:19,20 | 301:13 302:20 | **objectionable** |
| 177:9,19,19,23 | 234:9 236:3 | 303:2,7,18 | 117:17 318:9 |
| 178:2,11,22 | 239:3,15,23 | 304:9,17 305:2 | **objections**   5:6 |
| 179:25 180:2 | 242:8 243:24 | 305:12,24 | 101:19 102:13 |
| 182:14 183:3,8 | 244:25 246:6 | 306:22 307:14 | 102:22 103:12 |
| 184:20 185:12 | 247:4 248:14 | 308:7 309:22 | 143:5,19 144:9 |
| 186:12 187:24 | 248:21 250:6,7 | 310:13 312:13 | 145:25 148:3 |
| 189:9,13 | 252:8,16 253:4 | 312:22 313:6 | 148:21 149:8 |
| 190:17 192:6 | 254:16 255:2,3 | 314:4 315:16 | 149:17 152:17 |
| 192:19 193:6 | 255:25 256:23 | 315:23 317:22 | 154:8,21 |
| 194:2,25 195:3 | 257:5 258:18 | 319:7 320:10 | 211:19 212:20 |
| 195:4 196:6 | 259:21 260:15 | 320:24 322:8 | 214:7 228:7 |
| 197:10,20,21 | 261:11 262:15 | 322:25 323:14 | 250:24 292:16 |
| 199:13 200:6 | 262:22 263:15 | 324:10,11 | 294:19 357:9 |
| 200:13,20 | 263:22 264:6 | 325:8,19 | 357:11,18 |
| 201:15,16 | 264:23 266:9 | 327:14,23 | **objectively** |
| 202:6,21 | 268:7 270:21 | 328:13,14 | 181:11 306:24 |
| 203:23 205:10 | 272:11 273:10 | 329:17 330:23 | **obligation** |
| 206:7 207:18 | 273:23 274:19 | 331:15 332:13 | 228:11 302:3 |
| 209:4 210:9,24 | 275:8 276:7,16 | 333:13 340:14 | 316:10,11 |
| 211:10,11 | 277:5,11 278:9 | 341:5 342:3 | 330:8 332:8 |

334:20 335:2
**obligations**
227:9 228:4
311:11
**obliged** 25:6,6
159:5
**observe** 272:8
276:5
**observing**
181:9
**obstructive**
222:11
**obtain** 258:17
260:13 301:3
**obvious** 328:17
331:7 333:19
**obviously**
13:17 49:19
146:9 231:18
231:22 240:9
272:2 287:16
287:17 337:11
343:10 355:9
**occasion** 29:23
30:10 47:13
**occasions** 28:6
31:2 39:7
42:13,13 47:9
62:23
**occurred** 126:6
166:22 172:5
198:16 199:20
199:21,24
201:21 264:25

304:4 335:22
**occurs** 185:9
**ocean** 334:24
**october** 12:24
43:5 81:3
**odd** 12:23
18:24 240:12
240:12 302:10
310:4
**offer** 35:2
67:13 73:4,22
88:4 108:11
127:4 344:10
344:16 346:6
346:14 348:17
348:23 349:4
349:19,19
**offered** 24:6
76:11 349:17
**offering** 34:12
34:15,16 35:8
63:11,22 67:18
67:24 69:15
71:13,17 72:4
75:2,20,25
77:2 78:22
87:24 126:25
135:3,10
341:24 342:15
343:20
**offers** 207:25
**office** 40:23
**offing** 343:25

**offsetting** 280:3
**offshore** 45:11
**offspring** 82:6
**ogier** 3:4,5
61:18,22,25
62:2,5,5,12,13
**oh** 36:13 40:22
257:24 261:25
293:6
**okay** 6:22 8:4
10:3 21:19
22:4 24:12
27:22 31:8
34:10 38:14
40:9,25 67:6
79:6,9 82:15
84:2 95:20
108:18 118:24
125:18 155:13
162:10 169:6
177:2 204:12
220:22 239:24
241:4 244:18
267:16 278:18
290:6 313:19
324:25 351:20
357:21
**old** 42:7 150:4
**oligarch** 43:25
**omissions**
43:12
**omits** 83:4
319:8

**omitted** 46:14
**once** 35:25
62:22,23
111:14,14
221:23
**one's** 322:3,3
**ones** 141:11
187:16
**open** 33:8
115:5 219:14
225:15 321:6
**opening** 179:2
296:12 348:16
**operable**
316:21
**operate** 95:20
181:11 291:8
317:19 332:16
333:2
**operates** 55:15
55:18
**operation**
181:24 315:21
**operative** 88:13
**opine** 132:15
**opining** 134:10
134:20
**opinion** 21:4
22:13,16,21
23:19 24:3,5,7
24:17 31:10,17
34:5,8,12,15,16
35:8 38:18
51:6,9 53:7

64:12 67:13,18
67:25 70:9
71:13,17 72:4
73:2,5,22
75:20,25 76:11
76:23 77:2
78:22 79:5
87:24 88:4
126:25 127:4,7
128:19 129:3,8
130:23 131:2
132:24 134:18
135:3,10
273:20 315:19
341:24 346:6
349:4 350:4,5
350:14
**opinions** 10:9
10:14,19 11:10
11:12,17 14:14
14:15 15:14,16
15:21 20:25
21:7,9,14 23:3
23:6,17,22
24:10 36:3
63:11 80:6,12
80:16,18
338:18 339:12
342:15,16
343:20 344:15
346:14 348:17
348:23 349:17
349:20

**opportunity**
162:5
**opposed** 54:24
272:13
**opposite** 146:5
**option** 343:17
**options** 78:14
**order** 52:14
179:9,10
225:18 244:7
263:5 301:2
320:12 322:10
324:15 358:6
**ordering** 66:20
**orders** 52:12
**ordinarily**
230:20,21
**ordinary** 306:5
307:4 309:16
309:21 310:11
311:9 315:21
316:7 317:5,9
**original** 15:22
36:17 38:19
259:14 338:4
350:21 351:3
351:12
**originally**
62:12,14 244:2
**outage** 219:2
219:11 250:14
**outages** 217:21
218:7,10,13,21
219:9 226:10

**outcome** 5:5
50:2 360:17
**outfit** 52:17
**outline** 232:19
**outlined** 230:22
**outright** 149:22
149:23
**outside** 62:2,3
62:3 100:25
105:15 142:15
146:4 224:9
293:23 295:4
342:24 343:2
348:22 353:21
354:13 357:10
**overall** 13:16
30:12 110:12
111:16 116:10
120:22 262:21
262:23 264:4
264:21 266:7
291:10,18
292:11
**overly** 325:11
**overseas**
231:19
**overturned**
13:3
**owe** 255:19
**owed** 118:11,14
174:25 201:19
201:20 265:5
283:11 290:5
328:17 334:23

**owing** 272:20
**own** 8:23 54:11
54:13 55:2,19
73:4,10 146:19
149:22 150:2,4
150:7,10,11,20
151:4 197:13
237:20,23
321:13,17
322:3 334:2
**owned** 155:2
176:21 235:15
235:24 236:12
236:23,23
237:2,9,12,18
238:3,12,22
239:13 241:23
242:2 290:4
356:9
**owner** 235:20
**owners** 150:7
292:20
**ownership**
98:16,21,24
235:24 236:13
**owning** 149:21
**owns** 237:20
238:20,21

**p**

**p** 2:2,2 48:15
**p.m.** 155:19,23
208:14,18
269:5,9 318:14

318:18 337:16
337:20 357:23
358:9
**page**   74:24
76:18 85:4
86:24 91:14
111:9 120:3
143:23 145:19
160:24 161:12
187:4 217:17
221:16 238:8
295:20 296:12
296:17 306:18
306:19 307:9
311:17 341:9
353:5 356:18
359:4,12 361:4
361:7,10,13,16
361:19
**pages**   45:5
110:16 124:10
**paid**   25:14 44:9
44:13 265:8
266:11,14
286:5 326:19
330:21,22
331:3,11,18
335:4
**paper**   294:23
295:11
**paragraph**
15:24 16:5,25
17:7,10 19:23
20:14,15,19

22:14,17,22
23:5,9,13
24:22 31:19,22
36:10,12,14
64:5,11 72:24
73:6 74:19
75:3 76:16
77:7 78:5,14
82:4 83:14,17
87:11 88:9
89:4 93:5
97:21 99:7
104:7 106:8
108:18 118:24
119:21 120:2,7
123:14,18
125:23 135:16
137:6 138:11
139:6 141:11
145:16 148:15
152:16 163:3,9
163:11,13
164:2 167:16
169:11,12,20
174:14 180:22
180:25 198:11
199:3,5 206:18
208:3 215:17
235:3,4 236:6
238:7 240:10
240:23 241:15
241:20,21
242:12,16,22
243:14 245:5

281:19 295:17
303:9 319:20
319:23 321:8
322:6 335:12
343:4,14
344:23 345:6
346:9 348:8
352:23 353:10
353:19 354:7
355:7 356:3,16
**paragraphs**
24:14 31:14
38:16 72:12
158:6 345:13
347:7,11
**parallel**   179:12
221:22
**pari**   156:17
180:17 196:18
196:22 204:22
211:23 327:6
**park**   235:12,15
235:25 236:13
**part**   29:6 32:11
32:12 65:6,21
66:2 68:14
77:6 87:7
109:10 119:15
120:13 122:5
123:7 125:11
141:2 206:2
207:9 225:20
245:17 301:8
318:23 319:5

319:11 320:5
321:13 341:22
354:17 356:15
356:17
**participating**
285:16
**particular**   8:19
18:17 34:7,8
43:13 45:21,22
63:23 72:6
96:8 113:9
134:18 140:16
145:23 161:19
161:22 163:3
164:15 165:11
182:21 183:13
217:22 219:2
259:4 307:17
336:20
**particularity**
36:18,23 37:2
38:13
**particularly**
117:17 147:5
156:21 189:15
190:6 191:10
222:14 231:18
231:21 233:24
280:12 295:8
**particulars**
37:4
**parties**   4:11
8:18 10:13
102:3 200:11

282:22 283:4
360:15
**parts** 198:8
319:12
**party** 5:3
169:22,24
218:2 225:15
248:6 261:15
283:16 322:18
**passage** 16:11
156:24 181:14
181:23 246:20
**passed** 308:13
**passes** 150:16
**passports** 42:7
**passu** 156:18
180:17 196:18
196:22 204:23
211:23 327:6
**pasted** 37:22
**paul** 342:7,9
**pause** 133:13
**pausing** 260:3
**pay** 44:7 88:24
162:12,21
163:21 183:12
252:12 265:4
331:13 334:20
335:2
**payable** 270:6
270:9,12,15
271:25 272:17
274:17,24
275:2,4 276:6

**payment**
164:14 167:20
167:25 168:3,5
168:18
**payments**
119:7
**pays** 285:6
332:5
**peak** 48:16
57:20
**pellucidly**
274:10
**pending** 7:21
132:18,20
134:3 162:8
177:17 222:6
262:7 264:7,17
**penny** 44:8
**people** 25:11
28:20 30:3
43:17 47:14
61:3,8,24 62:4
98:12,14
151:12,21
180:8 184:18
190:9 197:18
302:13 333:4,6
349:13
**percent** 54:17
74:10 151:7,8
**percentile**
314:14
**pereira** 47:16

**perfect** 335:17
335:19
**perfectly**
144:17 310:2,3
310:5
**perform** 343:8
**period** 60:23
63:3 90:10,13
94:16 139:13
174:9
**periods** 41:5
**perjured** 28:9
28:11,25
**perjurer** 30:18
296:25
**perjuring**
30:11 57:25
**perjury** 28:5,13
28:15 30:24
31:2
**permissive**
210:22 272:13
286:11 287:3
288:10,25
**permitted**
49:11 289:18
**person** 57:22
99:16,21 101:8
102:7,15 103:9
110:21,23
136:12 151:6
152:6 200:16
204:13 215:5,7
301:19,22

328:6 330:7
**personal** 55:19
63:18,20
197:14
**personally** 24:9
143:9 216:4
333:10
**persuasive**
158:3 159:5
230:20 231:2
232:8
**pertaining**
51:24
**petition** 324:8
**phones** 4:8
**phonetic** 44:7
**photocopy** 9:13
**phrase** 136:17
152:11 274:16
276:6
**physical** 92:15
102:19,23,24
103:2 105:18
**physically**
101:8 260:12
**pick** 4:6 56:17
147:5
**picture** 11:24
**piece** 294:22
**pieces** 111:5,15
112:5
**pig** 54:13
**pins** 218:20

**place** 4:10
109:7 192:23
200:5,9 307:4
327:4
**placed** 99:21
**places** 307:16
**plaintiff** 2:5
209:8
**plan** 323:24
**planning** 44:18
**platforms**
219:5
**play** 276:20,21
325:2
**plays** 14:22
**plead** 37:15,17
**pleading** 37:5,7
37:18,25
329:17
**please** 4:5,8 5:7
5:24 6:8 7:11
8:11 9:4 15:5
17:9 22:2 40:6
89:4 93:7
95:25 104:6
107:16 108:18
110:10 118:24
120:2,5,20
130:8 135:15
138:11 147:14
148:14 155:5
174:15 177:20
178:2 196:23
203:16 222:9

222:22,23
225:11 234:6
234:21 238:7
240:23 241:14
245:4 247:21
248:9 261:25
267:5 268:23
269:3,15 319:2
341:7 344:24
348:7 349:11
352:22,24
355:7
**poc** 36:20
**pocket** 100:11
**point** 11:25
12:8 14:8
15:24 16:24
19:12,22 20:18
31:19 32:17,19
33:10 34:21
35:25 36:7,9
67:6 76:3
88:11 90:25
95:21 125:6
177:25 193:23
226:15 230:17
239:7 243:9
253:20 255:7
256:8 259:15
276:4 296:23
298:15 308:6
308:10 310:24
323:4,18
328:16 334:9

334:10 339:15
**pointed** 12:4
**points** 11:20
15:19 17:7
18:25 19:4
20:14,16 32:16
36:23 37:21
38:12 168:17
298:23 339:13
**policies** 217:22
218:8 220:13
220:17,25
221:5,10,15,25
223:18 224:8
224:24 226:2
226:11,14
251:4,6,9,10,11
254:4
**policy** 181:3
224:17,20
225:2 254:3
**pool** 95:14
139:15 140:3
142:18 149:12
149:13 153:4,5
153:14,14
173:7,8 213:16
325:15,18
329:21,22,24
329:24 330:4
**pooled** 93:17
149:15 297:17
**pooling** 261:22

**pools** 329:19,20
**poor** 204:25
219:13
**poorly** 258:19
**pop** 133:3
**portfolio** 54:18
54:20
**portion** 328:21
**portions** 38:16
339:10 341:4
**posit** 169:13
**posited** 115:14
184:2
**positing** 177:5
**position** 12:20
16:4 27:19,20
33:15 52:22,25
99:9 110:12
111:17 112:9
120:18 157:6,7
162:23,24
163:17 164:10
164:19 165:20
166:5,13,15,19
166:20 167:5
172:4,13,22
173:2,5,10
174:11 178:14
179:5 180:5,10
181:10 183:17
183:19 185:4
185:17 194:20
202:12,14,19
213:15 246:25

**[position - preference]**                                         Page 60

| | | | |
|---|---|---|---|
| 260:10 263:10 | **possibility** | **powers**  210:2 | **predicting** |
| 264:22 265:14 | 283:8 288:6 | **practical**  99:24 | 304:7 |
| 265:15 266:8 | 328:8 | 100:5,9 101:16 | **preexisting** |
| 266:16,20,20 | **possible**  32:10 | 268:13 293:3 | 17:22 |
| 272:24 273:4,7 | 33:5 53:19 | 301:9 | **prefer**  139:2 |
| 283:9 284:22 | 57:3,4 83:11 | **practicality** | **preference** |
| 288:24,25 | 96:24 97:4,6 | 291:7 | 33:12,15 59:6 |
| 289:14,23 | 97:13,17,18 | **practically** | 119:16 120:13 |
| 290:25 291:18 | 131:5,7 182:11 | 251:18 | 122:6 123:8 |
| 294:16 320:20 | 182:22 228:10 | **practice**  295:6 | 125:12 127:25 |
| 322:5 323:22 | 228:11 257:16 | 354:23 | 131:14 147:10 |
| 326:11,15,24 | 277:13 305:22 | **practitioner** | 155:3,7 156:2 |
| 327:20 344:5 | 306:2 325:22 | 56:7,8 57:22 | 156:12,17 |
| **positions** | **possibly**  39:11 | **practitioner's** | 157:5,9,13,14 |
| 114:23 147:19 | 62:23 65:17 | 159:21 | 157:15,17,22 |
| 181:4 290:21 | 90:20 324:23 | **precise**  109:17 | 158:5,16 159:8 |
| 290:22 292:4 | 330:2 | 191:8 291:10 | 161:13 162:16 |
| 312:11 317:3 | **potential**  67:19 | **precisely**  347:4 | 164:6 168:5,19 |
| 317:18,19 | 67:25 126:14 | **preclude** | 170:3,9,12 |
| **positive**  116:10 | 294:9 | 310:11 316:20 | 172:3,12,18 |
| 136:4,9 137:14 | **potentially** | **precluded** | 173:11 174:17 |
| **possess**  260:12 | 13:22 32:7 | 316:24 | 175:19,24 |
| 349:10 | 276:19 282:7 | **precondition** | 176:3 178:7,17 |
| **possessed** | 316:21 317:19 | 240:11,18 | 178:18,19 |
| 297:14 349:5 | **pound**  301:23 | **preconditions** | 179:7,22 181:4 |
| **possession** | 301:24 | 186:3 | 181:11,25 |
| 97:25 103:10 | **pounds**  44:4 | **predicate**  176:6 | 182:4,8,10 |
| 103:16,16,18 | 92:11 191:23 | 202:25 211:12 | 183:5,14 184:8 |
| 104:3 261:3,4 | 248:9 250:11 | 271:21 296:11 | 185:11,18 |
| 349:16,21 | 262:3 | 296:13 303:9 | 186:8,19 187:7 |
| 350:2 | **poured**  94:22 | 321:4 322:12 | 187:12,15,21 |
| **possessory** | **power**  209:23 | 350:15,17 | 188:18,24 |
| 349:13 | 210:7 | **predicated** | 189:7 190:12 |
| | | 320:12 321:23 | 190:21,24,25 |

192:4,8,15
193:24 194:18
194:21 195:11
198:2,16
199:12 200:3,5
204:14 208:25
209:2,6,11,23
211:9,16,22
212:9,18
213:14 214:5
215:6,8 216:23
232:12 233:16
233:18,23
247:3,8,13,17
247:19 263:20
264:21 304:4
306:7 308:3,8
309:9,17
318:24 319:6
320:5,13,19
321:14 322:13
323:5 334:2
355:18,20,21
356:2
**preferences**
162:12 202:18
203:14,19
204:4,6,7
208:21 233:5
233:12 326:10
**preferential**
20:8,10 33:17
34:2 35:6,24
296:19

**preferred**
164:10 166:9
212:2,4 213:2
213:8
**prejudice**
246:12
**premise** 167:18
186:8 197:24
**premised**
248:11 249:25
254:9 256:21
**preparation**
61:23 62:8
**prepare** 60:18
61:4 62:7
**prepared** 20:24
253:7 341:3
**present** 3:3 5:9
32:8 34:14
35:13,17
113:14 145:12
167:22,23,24
167:24 199:25
307:11
**presented**
179:21
**presently** 40:10
145:4 181:8
313:20
**preservation**
211:23
**preserve** 357:8
**presiding** 28:4

**presumably**
99:17 108:7
121:16 168:12
214:11 224:22
284:18 289:8
329:23
**presuming**
210:18
**pretend** 159:15
246:14
**pretty** 39:2
143:13 190:10
261:20,23
293:9 302:10
311:16 330:8
346:7
**prevent** 251:18
256:13 315:20
**prevented**
100:18 101:2
**prevents** 254:7
**preview** 321:8
**previous** 17:16
222:4
**previously**
58:18,20 59:24
60:2 101:20
152:18 223:11
314:19 323:12
**price** 119:14
120:10 122:5
318:23 320:2
**prices** 201:9
203:4 268:5

**pricing** 293:15
**prima** 185:18
**primary** 246:3
**principal** 23:22
156:11,16
232:22,23
**principally**
11:4 61:16
62:3
**principals**
27:15
**principle**
146:12 159:12
180:17 196:22
211:24
**principles**
81:21
**prior** 51:23
134:6 163:20
323:19,20
350:6
**priority** 161:13
162:17 164:6
168:6,19
335:23
**private** 4:7
93:19 94:19
97:22 98:6
99:8,9 347:21
347:22,23,24
347:25 348:2
348:12,18,24
**privilege** 52:11

| | | | |
|---|---|---|---|
| **privileged** | **proceeds** | 229:14,15,19 | 155:2 176:11 |
| 39:18 49:4 | 196:15 285:6 | 229:24 230:5,6 | 176:18,22,24 |
| 52:18,23 53:3 | 322:17 | 235:12 236:23 | 177:7 178:9 |
| 140:20 | **process** 39:2,17 | 236:25 237:9 | 205:23 206:5 |
| **privy** 13:8,11 | 225:17 241:10 | 238:2 239:13 | 206:17 207:7 |
| 13:17,20 14:5 | **produced** | 244:6,21 | 207:16 208:2 |
| 44:22 67:2 | 336:8 | 248:19 249:11 | 214:2 238:18 |
| 231:22 306:25 | **program** 219:8 | 258:9 324:8 | 243:21 245:13 |
| 310:22 334:15 | 328:23 331:13 | 325:6,16,24,25 | 245:18,24 |
| **probably** 24:7 | **prohibit** 219:6 | 326:7 355:25 | 247:7 299:23 |
| 40:21 42:7 | **promise** 133:24 | 356:8 | 323:11 325:17 |
| 47:19 49:3 | **promised** | **proportional** | 355:24 |
| 54:16 66:24 | 249:21 | 149:11 | **proulx** 2:7 5:17 |
| 73:2 74:14 | **proof** 8:19 38:8 | **proportionate** | 5:19 14:18 |
| 98:14 181:18 | 64:16 175:13 | 140:3 | 20:20 21:2 |
| 194:12 220:2 | 175:15 191:6 | **proposition** | 23:8 24:19 |
| 287:6 307:25 | **prop** 142:11 | 36:25 38:4 | 26:17 27:6 |
| 316:22 317:6 | **proper** 177:24 | 122:23 168:15 | 30:14,20 35:16 |
| 333:21 348:21 | 242:14 276:17 | 168:16 224:6 | 38:20 39:23 |
| **problem** 70:23 | **properly** 37:17 | 239:19 244:15 | 41:3 46:10 |
| 222:15 324:4 | 342:21 | **proprietary** | 48:11 51:10 |
| **procedure** | **properties** | 72:6 75:9,14 | 52:9,19,24 |
| 51:20 324:24 | 325:5 | 75:22 139:10 | 54:25 55:16 |
| **proceed** 5:25 | **property** 76:5 | 139:24 140:2,5 | 58:7,10 61:6 |
| 162:9 294:10 | 142:11 143:12 | 141:10 142:22 | 61:12 63:13,24 |
| **proceeding** 5:7 | 146:18 148:2 | 143:3,4,12,15 | 64:7,23 66:17 |
| 48:21 301:8 | 148:10,13,20 | 143:17 144:6,7 | 67:16,21 68:3 |
| **proceedings** | 149:23 150:2,5 | 145:6,24 | 68:20 69:4,17 |
| 12:10 37:8 | 150:8,20,21,25 | 147:25 148:12 | 70:24 71:16 |
| 44:11 50:13 | 151:3 152:20 | 148:19 149:7,9 | 72:8 75:11,23 |
| 57:10 78:17 | 155:3 176:21 | 149:11 152:12 | 77:13,16,23 |
| 142:4 189:17 | 182:13 183:2,7 | 152:19,23 | 78:11,18,21,25 |
| 203:3 300:21 | 184:17 185:6 | 153:3 154:6,11 | 80:20 83:2,24 |
| 300:23 323:13 | 197:9,12,18 | 154:13,18 | 84:8 85:19 |

| | | | |
|---|---|---|---|
| 86:12 88:3 | 153:18,23 | 217:14 218:5 | 279:10 280:4 |
| 89:17 90:2,22 | 154:7,20 156:4 | 218:16 220:15 | 281:10 282:23 |
| 91:4,17 92:3 | 157:10,20 | 221:3,12 222:3 | 283:7,23 |
| 92:21 94:10 | 158:14,18 | 222:20 223:14 | 284:15,25 |
| 95:6 96:6 97:2 | 159:14 160:13 | 224:2,12 225:5 | 285:12,18 |
| 98:4 99:4,15 | 162:6,25 164:3 | 226:4 227:11 | 286:24 288:14 |
| 100:3,21 | 164:12,21 | 227:15,18 | 288:20 289:4 |
| 101:11,19 | 165:23 166:24 | 228:6 229:4,10 | 289:24 290:10 |
| 102:10,21 | 168:23 169:9 | 229:17 230:8 | 291:20 292:7 |
| 103:12 105:3 | 170:6 171:15 | 231:4 232:14 | 292:16 293:20 |
| 105:12 106:24 | 172:6,15 | 233:19 234:9 | 294:19 297:22 |
| 107:21 109:4 | 173:13,18 | 236:3 239:3,15 | 298:6,21 299:2 |
| 109:19 110:3 | 174:3 175:5,10 | 239:23 242:8 | 299:12,25 |
| 110:14 111:21 | 175:16 176:4 | 243:24 244:25 | 300:18 301:5 |
| 113:17 114:12 | 177:9,17,25 | 246:6 247:4 | 301:13 302:7 |
| 115:2,15 | 178:11,22 | 248:14,21 | 302:20 303:2,7 |
| 116:13 117:11 | 179:25 182:14 | 250:6,24 252:8 | 303:18 304:9 |
| 119:18 121:2 | 183:3,8 184:20 | 252:16 253:4 | 304:17 305:2 |
| 121:11 122:8 | 185:12 186:12 | 254:16 255:2 | 305:12,24 |
| 123:10 124:2,9 | 187:24 189:9 | 255:25 256:23 | 306:22 307:14 |
| 125:14 127:10 | 189:13 190:17 | 257:5 258:18 | 308:7 309:22 |
| 128:5,22 129:6 | 192:6,19 193:6 | 259:21 260:3,8 | 310:13 312:3 |
| 130:11 131:17 | 194:2,25 195:3 | 260:15 261:11 | 312:13,22 |
| 132:17 134:2 | 196:6 197:10 | 262:15,22 | 313:6 314:4 |
| 134:12 136:6 | 197:20 199:13 | 263:15,22 | 315:16,23 |
| 136:25 137:25 | 200:6,13,20 | 264:6,14,23 | 317:12,16,22 |
| 138:16,22 | 201:15 202:6 | 265:25 266:9 | 319:7 320:10 |
| 140:18,25 | 202:21 203:23 | 266:18 267:4 | 320:24 322:8 |
| 141:13 142:13 | 205:4,10 206:7 | 268:7,14 | 322:25 323:14 |
| 143:5,18 144:8 | 207:18 208:4 | 270:21 272:11 | 324:10 325:8 |
| 144:23 145:25 | 209:4 210:9,24 | 273:10,19,23 | 325:19 327:14 |
| 147:15 148:3 | 211:10,19 | 274:19 275:8 | 327:23 328:13 |
| 148:21 149:8 | 212:20 213:19 | 276:7,16 277:5 | 330:23 331:15 |
| 149:17 152:17 | 214:7 216:20 | 277:11 278:9 | 332:13 333:13 |

333:16 336:23 337:2,14,23,24 337:25 340:14 341:5 348:13 352:6,14 356:4 357:2,15 358:5 358:7 359:5

**prove** 45:22 105:7 306:12 334:15

**proven** 25:12 187:22 299:22

**provide** 8:8,23 10:15 11:10 20:21 21:11 39:21 42:23 52:3 59:2,17 59:20 128:18 129:3,7 132:10 234:21 353:18

**provided** 9:14 14:13 26:9 43:4,7,10 48:24 49:11 50:16 61:2 82:22,23 83:3 84:19,23 88:10 269:22 285:22 294:11 329:6 330:5 338:15 353:17

**providence** 75:5

**provides** 220:11 270:22 306:6

**providing** 10:10,19 53:6 350:14

**provision** 26:21 26:24 73:10,18 76:3 133:23 163:24 165:12 209:22 223:7 229:8 230:19 242:21 272:15 286:11,19 288:10 336:17

**provisions** 126:17,20 171:22 181:11 204:22 210:12 223:12,22

**public** 1:17 6:4 360:7 362:21

**publications** 82:25 83:8

**publicly** 50:24

**published** 188:7

**pull** 335:8 341:7

**punished** 173:23

**punitive** 173:12 173:15,21

**purchase** 151:3

**purchaser** 293:11

**pure** 202:23

**purported** 274:9

**purportedly** 19:14,14

**purporting** 291:5

**purports** 191:16 256:18

**purpose** 76:20 122:25 181:13 196:19 204:21 204:22

**purposes** 43:2 81:13 85:21 86:23 109:22 128:17 139:19 145:12,21 199:11 291:17 291:19,25 292:2,6 293:18 340:21

**pursuant** 188:18,24 189:7 190:12 247:24

**pursuing** 247:7

**put** 17:3 23:25 39:9 42:25 45:5 46:15 48:18 82:11

87:2 95:8,11 95:17 98:23 131:9,10,11 144:12 154:15 154:23 172:3 178:13 180:18 194:12 214:16 257:19 302:13 321:19 325:12 326:2,10,15 333:20 340:5 340:25 356:9

**puts** 180:4

**putting** 15:6 98:12 134:9 146:14,25 166:12 172:8 172:21 174:10 179:5 183:16 185:4,16 284:19 286:13 291:16 298:23

**q**

**qualified** 51:15

**qualifier** 131:8

**quantity** 89:10 109:12 215:23

**quantum** 32:10 33:6,11 34:13 34:19,19

**quasi** 78:6 140:4,4 152:24

**queens** 360:5
**question** 6:25
7:11,13,20 8:2
22:2,3 24:13
33:8 35:11,15
40:4 64:25
68:23 69:6
70:12,17 71:25
72:2 75:7,9,12
78:20 83:23
85:22 89:16
91:2,17 94:2
95:9 98:23
100:15,16,17
101:13 102:5
102:16 104:25
111:23 115:3
121:6,24
126:10,24
127:23 128:2
129:2 130:4
132:5,14,17
133:7 134:3,4
134:5 141:4,5
144:2,10,25
147:22 153:20
158:19 160:11
160:14,18,19
161:17,24
162:8 163:6,7
163:14 164:8
164:25 165:16
165:19 166:6
167:2,14 168:2

168:4,17 169:2
170:7,9 176:15
177:18 179:11
182:10 189:11
192:10 194:5,7
196:14 209:6
209:20 212:8
212:16,22
214:10 215:5
216:11 218:14
222:6,8,16
227:14 230:3,3
233:15,17,24
233:25 234:18
234:20 236:8
236:10 241:16
241:17 244:16
244:19 246:17
247:10 254:11
254:24 260:22
261:5 262:6,8
263:6 264:8,10
264:11,12,17
265:10,13,16
266:5 275:17
288:15,21
293:13 299:5
299:13 300:8
301:16 304:10
304:13,18
311:16,24,24
311:25 312:7
313:9 317:14
322:11 325:11

329:4 333:5
335:23,24
337:12 339:19
343:18 355:6
**questioned**
13:25
**questioning**
109:20 208:6
357:7
**questions** 6:14
7:9,12 34:5
53:3 72:15
80:10 87:17
132:20 133:20
147:13 153:17
163:21 165:5
177:16 194:11
194:12 206:23
222:23,24
234:4,6,8
235:6 260:6,9
263:3 266:19
267:5 321:8
337:3 353:4
357:3,6,9,10,13
**quite** 41:4 47:2
57:3 67:3 68:7
85:24 95:23
133:25 186:25
209:25 215:10
287:7 294:7
305:4 333:23
334:12

**quotation**
330:15
**quote** 35:2
109:11,15
118:3,6 124:17
164:2 166:11
282:6 349:15
**quotes** 145:22
181:14

**r**

**r** 2:2 6:2,2,2
77:19 110:21
150:14 360:2
361:3,3
**r.s.** 6:1 7:1 8:1
9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1

**[r.s. - r.s.]**                                                        Page 66

| | | | |
|---|---|---|---|
| 63:1 64:1 65:1 | 143:1 144:1 | 211:1 212:1 | 279:1 280:1 |
| 66:1 67:1 68:1 | 145:1 146:1 | 213:1 214:1 | 281:1 282:1 |
| 69:1 70:1 71:1 | 147:1 148:1 | 215:1 216:1 | 283:1 284:1 |
| 72:1 73:1 74:1 | 149:1 150:1 | 217:1 218:1 | 285:1 286:1 |
| 75:1 76:1 77:1 | 151:1 152:1 | 219:1 220:1 | 287:1 288:1 |
| 78:1 79:1 80:1 | 153:1 154:1 | 221:1 222:1 | 289:1 290:1 |
| 81:1 82:1 83:1 | 155:1 156:1 | 223:1 224:1 | 291:1 292:1 |
| 84:1 85:1 86:1 | 157:1 158:1 | 225:1 226:1 | 293:1 294:1 |
| 87:1 88:1 89:1 | 159:1 160:1 | 227:1 228:1 | 295:1 296:1 |
| 90:1 91:1 92:1 | 161:1 162:1 | 229:1 230:1 | 297:1 298:1 |
| 93:1 94:1 95:1 | 163:1 164:1 | 231:1 232:1 | 299:1 300:1 |
| 96:1 97:1 98:1 | 165:1 166:1 | 233:1 234:1 | 301:1 302:1 |
| 99:1 100:1 | 167:1 168:1 | 235:1 236:1 | 303:1 304:1 |
| 101:1 102:1 | 169:1 170:1 | 237:1 238:1 | 305:1 306:1 |
| 103:1 104:1 | 171:1 172:1 | 239:1 240:1 | 307:1 308:1 |
| 105:1 106:1 | 173:1 174:1 | 241:1 242:1 | 309:1 310:1 |
| 107:1 108:1 | 175:1 176:1 | 243:1 244:1 | 311:1 312:1 |
| 109:1 110:1 | 177:1 178:1 | 245:1 246:1 | 313:1 314:1 |
| 111:1 112:1 | 179:1 180:1 | 247:1 248:1 | 315:1 316:1 |
| 113:1 114:1 | 181:1 182:1 | 249:1 250:1 | 317:1 318:1 |
| 115:1 116:1 | 183:1 184:1 | 251:1 252:1 | 319:1 320:1 |
| 117:1 118:1 | 185:1 186:1 | 253:1 254:1 | 321:1 322:1 |
| 119:1 120:1 | 187:1 188:1 | 255:1 256:1 | 323:1 324:1 |
| 121:1 122:1 | 189:1 190:1 | 257:1 258:1 | 325:1 326:1 |
| 123:1 124:1 | 191:1 192:1 | 259:1 260:1 | 327:1 328:1 |
| 125:1 126:1 | 193:1 194:1 | 261:1 262:1 | 329:1 330:1 |
| 127:1 128:1 | 195:1 196:1 | 263:1 264:1 | 331:1 332:1 |
| 129:1 130:1 | 197:1 198:1 | 265:1 266:1 | 333:1 334:1 |
| 131:1 132:1 | 199:1 200:1 | 267:1 268:1 | 335:1 336:1 |
| 133:1 134:1 | 201:1 202:1 | 269:1 270:1 | 337:1 338:1 |
| 135:1 136:1 | 203:1 204:1 | 271:1 272:1 | 339:1 340:1 |
| 137:1 138:1 | 205:1 206:1 | 273:1 274:1 | 341:1 342:1 |
| 139:1 140:1 | 207:1 208:1 | 275:1 276:1 | 343:1 344:1 |
| 141:1 142:1 | 209:1 210:1 | 277:1 278:1 | 345:1 346:1 |

347:1 348:1
349:1 350:1
351:1 352:1
353:1 354:1
355:1 356:1
357:1 358:1
**radically**  19:10
**raised**  8:17
36:16 334:9,11
336:11
**range**  18:9,10
18:21 210:2
**ranges**  312:19
**ratably**  197:2
**rate**  182:2
**rather**  21:7
25:7 75:5 89:7
98:9 107:3
120:12 140:11
143:11 181:12
185:14 199:23
207:13 216:6
234:7 235:3
290:16 297:19
300:11 301:11
313:18 320:3
330:20 335:6
**reach**  10:22
24:16 31:16
38:18 73:25
**reached**  14:20
15:3 32:21
80:7,12,18
134:18 142:7

155:12 167:19
345:21
**read**  9:14 31:23
31:24 32:2,4
60:21,21 64:10
64:19 77:8
85:5,12 89:5
93:7,8 94:14
104:8,8 113:6
118:25 119:25
120:2,6 124:7
124:10 125:24
128:2 135:17
141:22,24
160:17 166:10
170:17,20
171:2,8,23
174:15 175:7
175:21,22
178:12 179:18
179:19 180:25
181:22 183:21
183:21 185:19
194:8,9 195:6
198:17,18
221:21,22
222:9 225:12
234:19,25
238:10,16
240:24 241:12
241:18,19
242:5,21
243:13 246:19
258:23 269:21

295:22 320:6
323:20 345:2,6
348:9 352:24
362:5
**reading**  80:12
137:8 163:2,4
232:16 240:14
240:15 270:2
**ready**  139:3
**real**  114:18
117:22 150:20
150:20 258:8
306:3
**realistic**  176:14
**realized**  119:5
**really**  24:8,8
43:18 47:14
68:10 86:25
90:12 112:3
143:23 145:5
145:11 172:17
173:20 178:23
197:11,23
203:8 208:6
219:12 226:7
242:19 256:4
265:24 267:5,7
267:9 291:23
295:4 301:16
310:19 322:2
323:21 326:3
327:16 332:24
**realtime**  227:17

**reask**  130:4
**reason**  8:7
32:12 43:13
51:16 66:10
84:21 89:16
94:2 95:15
102:7,14
104:25 106:20
107:6 126:14
151:16 171:23
185:19 218:23
244:2 256:12
266:22 308:13
334:16 361:6,9
361:12,15,18
361:21
**reasonable**
30:7 224:7
**reasoning**
14:21 15:4,8
**reasons**  17:19
35:25 38:5
47:10 126:15
144:13 257:19
276:23 332:11
332:18,22
333:8,11,18
**rebuttal**  11:5,6
14:25 15:17
16:5 19:23
22:8,15,17,23
24:15,23 31:15
38:15,17 80:13
186:16 335:9

338:7 339:18
340:12
**recall**   27:12
77:24 80:5
83:7 86:19
187:2 318:21
341:15 347:19
347:25 350:21
350:24 351:6
**receivable**
286:5
**receive**   85:23
111:16 205:16
262:12,19
267:25 352:17
**received**   56:24
107:7 168:13
182:12,25
200:16,19,22
201:18 204:14
205:8 211:25
212:5 215:6,7
266:7,10
326:20 327:3,8
327:9 328:18
351:2,11 352:8
352:9
**receives**   193:15
**receiving**
204:25 277:10
**recently**   95:18
**recess**   79:24
155:21 208:15
269:6 318:15

337:17
**recipient**   168:5
168:18
**recollect**   17:21
312:25
**recollection**
16:2 17:11
50:16 57:6
59:5 80:24
81:5 141:17
142:2 233:15
244:3 271:6
303:14 305:6,8
313:21 331:25
332:2 334:18
340:18 353:24
354:3,4 355:5
**recommendat...**
45:9
**recommended**
45:10
**reconciled**
288:11 289:2
**record**   4:3,11
5:10 6:9 7:5
46:11,15 54:3
79:16,20,23
80:4 83:2 84:9
89:5 93:8
104:8 105:20
118:25 124:5
135:2 147:16
147:18 155:17
155:20,24

161:17 208:14
208:19 222:7
234:25 238:10
240:25 243:16
255:4 262:7
269:3,5,10,22
311:15 318:12
318:14,19
337:5,16,21,25
352:16 357:8
357:14,17,23
360:12
**recorded**   4:13
89:9 90:18
**recording**   4:9
92:5
**records**   285:10
**recourse**
299:21
**recover**   196:14
249:10
**recovery**   2:13
5:16 119:16
122:7 123:8
125:12 192:5
301:2 325:16
**red**   116:15
**redirect**   357:8
**reduce**   265:2
281:9
**reduced**   236:19
239:8,11 258:6
264:25 275:25

**reduction**
119:8 327:2,10
**refer**   9:18,22
10:2,4,18 12:4
12:15 21:23
25:21 46:8
68:12 137:5,10
207:20
**reference**   22:22
29:9,19 33:14
33:24 34:14
46:5 72:2
97:21 109:9
131:6 137:22
137:23 161:7
162:20 164:4
181:12 184:17
240:10 259:19
259:23 271:16
345:5,12
346:23
**referenced**
152:15 303:12
324:13 343:22
**references**
74:16 83:5
145:16 148:15
169:20
**referencing**
35:12
**referred**   27:9
66:6 81:9,16
186:16 209:17
212:12 277:17

340:4,18,23
**referring** 19:8
23:9 71:2,3,6
91:23 128:8,10
128:11 137:6
169:10 296:5
336:13
**refers** 16:13
33:5 81:10
169:14 340:2
**refine** 14:22
**refining** 10:18
**reflect** 227:19
243:5 255:4
**reflected** 93:11
**reflecting**
324:17,19
**refresh** 80:24
355:10
**refusal** 32:13
233:20
**refuse** 225:15
**refused** 108:11
**regard** 31:10
101:25 127:19
315:22
**regarding**
193:15 247:11
323:10
**regardless**
99:20 101:14
261:21 298:13
**regime** 196:20

**register** 153:10
336:19
**registered**
104:14 113:10
151:3
**registration**
190:8 335:15
335:16,21
336:16,17
**regroup** 337:4
**regular** 42:21
55:20
**regularly** 52:3
193:11
**regulated** 67:2
**regulations**
189:22,23,24
**rejected** 51:12
320:9 322:7
334:17
**rejects** 240:13
240:15
**rejuvenate**
42:8
**relate** 37:11
45:16,19
108:23
**related** 5:3 24:6
37:3 130:9
332:22 342:18
342:24 360:14
**relates** 11:25
158:8 163:23

**relating** 36:17
45:9 46:24
354:22
**relation** 10:15
10:17 16:6
18:8,25 20:17
32:21 33:7
47:7 56:14
73:5 79:18
96:8 126:23
154:11,23
171:4 206:10
246:12 282:4,5
282:6 299:6
334:16 347:14
**relations** 11:11
**relationship**
52:3 54:2
139:23 331:7
**relative** 33:25
157:6 345:18
**relevance**
202:15 203:8,9
**relevant** 20:5,6
32:7,9 76:3
83:20 120:22
121:9 133:24
136:5,10
139:13 144:21
145:3 153:3
156:6 173:25
181:8 203:13
203:22 209:21
216:18,21,22

216:25 217:7
227:5 233:18
247:2,8,13,17
247:19 248:25
249:13 276:12
300:17 307:6
307:16 321:21
336:2 346:16
353:18 354:6
355:25
**relied** 83:8
229:18
**relief** 33:2
156:9 170:24
171:22 179:9
179:10 183:25
184:6,10,15
186:3 188:18
188:24 189:7
190:12 191:7
191:16 195:15
195:18 196:3,4
196:9 209:9,12
209:23 210:8
210:11 211:18
332:9
**relies** 131:3
**relieved** 332:8
334:19,25
**reluctant** 52:14
179:17
**relying** 78:8,12
154:17

**remain** 11:19
14:10,15,21
15:3 43:8 94:7
94:12 156:14
**remained** 95:3
**remaining**
309:4
**remains** 13:5
65:21
**remedy** 173:10
180:7 209:2
216:23
**remember**
50:22 56:20
57:2,12,15,17
60:11 80:22
110:22,22,23
132:25 207:11
229:22 277:19
293:13 313:22
314:9 339:18
339:24 340:3
348:5 351:22
354:2 356:17
**remotely**
190:20 338:13
**removal** 106:15
**remove** 131:8
**removed** 42:8
**renamed** 12:5
**render** 335:18
**rendered** 308:5
336:21

**renewals** 17:16
24:2
**renown** 161:8
**repaid** 25:4
302:14 333:20
**repayment**
174:24 330:8
354:10
**repeat** 68:22
144:2 163:14
176:6 227:25
236:7,10 237:5
237:6
**repeatedly**
315:13
**rephrase**
249:16 299:15
**replaced** 19:19
96:10
**replacement**
17:25 18:4,24
19:11,12,21
**replete** 74:15
**report** 10:5
11:6,14 15:25
16:6,25 17:2,8
17:11 21:22
25:23 31:15,15
39:10 42:6
45:10 48:24
49:8,14 50:17
50:23 59:9,12
59:18,19,21
60:21 62:25

65:3 77:22
83:15 85:21,24
87:10 128:24
134:14,15
156:25 181:15
181:17,19
186:16 198:12
212:13 230:13
244:13,14
253:14 271:15
281:19 323:19
324:18 336:9
338:4,8 339:18
340:13,19
341:8 344:24
345:7 348:8,11
349:3 350:21
351:3,12
352:23 355:8
355:15 356:6
**reported** 13:9
240:4
**reporter** 4:24
5:24 7:4 240:4
240:5 358:5
**reporting**
188:5
**reports** 81:24
81:25 85:12
86:16,17
313:23,24
339:10 342:5,9
342:11 343:22
344:3

**represent** 5:16
9:15 10:23
343:15
**representation**
153:19 351:17
**representing**
4:22 110:11
**represents**
114:16 117:13
**reputation**
302:16,19,23
302:25 332:22
334:22
**reputational**
333:18,25
**request** 32:14
153:23 154:2
**requested** 47:6
**require** 170:21
**required**
147:10 335:17
335:19 362:14
**requirement**
223:4 308:15
**requirements**
41:19 223:5
287:13
**requires**
166:11 308:4,9
309:10 323:5
**requiring**
170:17
**reread** 129:2
160:10

research  39:8
reserve  162:3
  337:9 357:19
resolved  35:21
  323:12
respect  38:7
  48:4 54:2
  69:14 76:19
  78:9 106:22
  130:3 131:18
  136:22,23
  138:5 139:18
  145:20 147:8
  203:24 209:22
  233:23 240:2
  254:22 256:9
  265:13,15
  266:3 273:25
  276:5 290:7
  325:10 345:17
  347:20 355:18
  357:20
respectful
  267:6
respects  88:16
respond  111:22
  162:5 234:5
  311:24
response  22:14
  22:16 25:19
  80:17 191:12
  191:15 246:4
  246:13,17
  267:3 310:16

310:24 316:2
  317:7,8 347:8
  355:6
responsible
  125:25 194:13
responsive
  130:4 144:18
  222:14 266:12
  312:6
rest  221:8
restitution
  247:7
restitutionary
  245:14,18,24
  246:4
restorative
  35:3 156:3,10
  173:17
restore  180:10
restrict  220:19
  221:2 224:4
restricted
  250:5
restriction
  223:17 276:5
restrictive
  220:20 223:23
result  11:4
  13:16 15:17
  16:9 25:4
  58:24 73:2
  97:19 119:13
  122:4 167:5
  189:20 197:25

201:19 228:13
  228:14 236:17
  308:24 317:4
  326:19 327:9
  329:8 335:18
  336:20
resulted  78:2
  174:23 192:5
  329:8
results  238:14
retained  93:19
  358:3
revealing  53:16
review  39:21
  44:17 53:9
  81:2,14 85:2
  85:16 86:10,14
  120:5 130:8
  131:25 132:13
  235:4 338:3,7
  338:10 340:11
  352:3,4
reviewed  25:24
  26:15 60:25
  81:4 85:4
  112:7 130:15
  130:16 132:3
  221:8 223:24
  224:11 250:2
  339:16,25
  350:20 351:2
  351:11 354:6
reviewing
  25:18

revisit  53:18
  91:2 319:14
  337:10
revolut  55:3
reward  195:15
right  6:11 12:7
  20:2,3 21:6
  23:7,9 27:10
  28:17 46:24
  49:17 50:8
  53:8,18 59:8
  59:13 63:10,12
  63:14,16 64:5
  64:19 67:3
  69:14 80:5
  84:4 87:5,8,17
  92:17 100:13
  101:6 102:6
  114:11 126:11
  127:2,6,8,9,24
  128:3,4,6,9,13
  128:20 129:4
  129:10,15
  132:6 142:16
  142:24 145:17
  146:10 148:16
  150:17 153:16
  161:17 162:3
  162:18,23
  163:12 164:20
  206:19 208:20
  214:2,23,24
  221:2 222:25
  223:10,23

224:4,5,11
225:3 226:3
228:11,17,20
238:16 239:2
241:12,18,19
247:23 248:12
248:18,20
249:10,13
250:5,22
253:21,25
256:18,22
257:4,6,9,13
258:8,9,16
259:6 260:20
261:9,13
262:11,19
263:4 269:13
270:19 271:11
272:4,10 274:9
277:4 278:8
279:8 281:3,6
281:17,23,25
282:4,8,9
283:6 284:5,8
284:13,24
285:5,11
286:21 288:11
288:25 289:23
291:13 297:12
298:8 301:15
301:23 306:21
314:3,5 318:20
320:6 336:24
337:9

**rightly** 103:5
**rights** 78:10
99:20 102:3
227:8 228:4
256:6,6,7
284:9 289:20
299:5,10 300:7
306:12 357:19
**risk** 57:25
302:19
**risky** 317:17
318:8
**rivka** 1:17 4:24
360:7,23
**robert** 1:14
4:13 6:10 9:6
148:11 357:25
359:14 361:2
361:24 362:2,4
362:13
**rock** 113:25
114:2
**role** 8:12,14
56:5 234:5
**rolls** 275:23
**roman** 44:6
74:23 341:11
348:14
**romauld** 3:4
**room** 31:6
92:15,19,22,23
**rooms** 333:24
**rough** 358:7

**round** 254:20
**routes** 207:25
**routine** 288:13
**routinely** 68:10
74:8 188:15
**royces** 275:23
**rude** 158:21
212:4
**rule** 179:17
309:20,24
**rules** 6:23
**ruling** 230:11
**run** 147:6
215:20 249:3
**running** 181:7
**runs** 188:10
**rush** 212:14
**russell** 55:25
**russian** 43:25
193:12

| s |
|---|

**s** 2:2,17 6:2
86:2 150:14,14
359:7 361:3
**sack** 61:15
**sacked** 50:6
**safely** 47:19
**sake** 124:5
184:2
**sale** 205:8
278:4 293:19
293:24,25,25
294:2,5

**sam** 5:13 6:13
29:3 78:19
132:18 134:3
266:18
**sample** 184:2
**samuel** 2:16
353:14
**sanctity** 156:17
**sat** 47:4 320:15
**satisfaction**
108:5,10,11
253:19 273:17
273:21
**satisfied** 93:4
209:14 221:10
256:16 257:24
258:3,6
**save** 230:22
259:7,8 269:22
**saved** 334:22
**saving** 232:9
**saw** 45:4 86:16
112:17 130:21
354:14
**saying** 18:3
27:19 48:14
69:18 92:6
103:18 117:18
122:22 129:20
133:2 152:6
153:10 162:4
181:24 207:11
218:20 219:12
219:19 242:18

257:24 286:11
286:18 294:21
295:12 298:13
312:25 324:16
340:22
**says** 17:11,17
19:15,18 24:25
29:4 36:15
73:10,19 92:25
104:10 113:19
113:21 115:5,6
120:3 128:7
135:17 136:14
139:6,8 145:18
145:19 164:5
174:16 180:23
185:25 187:3
199:6 209:13
211:3 226:8
251:6 256:17
257:8 259:2
274:3,22
281:18 286:20
304:11 310:6
312:23 316:6
335:14 338:25
**scenario**
122:11 172:8,9
178:6 179:9
183:22,24
205:6 213:22
213:23 214:17
215:11 267:13
267:15 271:25

276:24 277:20
287:3 290:18
290:19 296:7
296:16 297:5
298:5 302:13
325:12,22
327:8
**scenarios**
152:23 207:19
**schaw** 159:19
**schedule**
221:16 351:23
**scheme** 16:15
81:12,17
248:18 340:8
354:15
**schieg** 85:25,25
86:2 287:8,9
287:10 316:6
342:12,18
344:8
**schiller** 57:18
57:19
**schwab** 55:21
55:23 113:19
115:7,8
**scope** 77:12,14
100:25 105:15
133:22 146:4
293:23 342:16
342:25 343:2,7
348:21,22
353:21 354:13
357:11

**screen** 311:18
**scrolled** 85:9
**scully** 240:5
**sebastian** 2:9
5:21
**second** 12:14
12:15 72:16
77:6 107:25
133:14 271:3
301:18 324:20
**secondary**
182:4
**secrecy** 51:3
**section** 34:24
43:22 44:12,14
87:17 122:18
122:25 123:2
156:8 157:23
159:23,25
160:20,21
162:10 165:15
166:7,8,10
171:4,21
172:19 174:8
174:18 179:2
181:25 182:4
184:9 185:5
190:10 195:8
195:12 203:10
208:25 209:3
209:13,14,18
210:3,4,5,6,22
218:3 220:11
221:20 222:25

225:10 226:8
229:2,6,9,16
230:13 232:23
240:19 241:22
242:15 244:5
257:20 269:20
270:2 271:17
276:11 286:15
296:21 297:4
298:9,9 306:19
308:14 321:6
321:23 323:5
330:13 336:13
341:12 348:11
348:14
**sections** 34:24
156:6,8 157:16
195:9 210:3
269:23 355:15
**secure** 111:9
**secured** 213:11
327:7
**security** 52:4,5
52:6 55:12
335:15,17,20
335:21,23
336:2,7,20
**see** 19:20 20:13
23:23 24:9
31:21 36:15
46:21 65:3
68:11 76:17
81:14 83:15
89:13 93:23

104:22 105:8
111:7,16 112:6
112:16 118:7
119:10 120:15
122:14 126:8
135:24 158:6
164:4 166:6
175:2,3,17
182:8,9 190:5
192:7,12
195:12,12,12
203:7,8 207:21
220:16,18
221:15,17
225:21 226:13
231:15 245:15
246:11 251:3
252:21 256:12
270:17 273:5
282:12 285:3
287:14 292:23
293:2,6,10
307:2 312:23
315:25 316:7
320:18 321:15
322:9,18 323:2
328:3 330:14
336:3,4 341:11
341:13 345:14
**seeing**  15:17
**seek**  46:25
191:16
**seeking**  48:7

**seeks**  53:3
100:24 142:14
146:3 191:6
293:22
**seem**  57:6,15
57:17 191:19
**seems**  20:9 25:5
25:15 29:20
30:6 33:7,20
34:20,23 44:15
69:25 74:5
90:6 121:19
136:13 174:5
180:22 183:13
183:14 185:5
212:23 218:18
265:4 271:22
280:10 289:19
321:17 330:17
349:12
**seen**  8:22 25:8
25:11,13 26:4
26:7,18 105:4
105:7 110:16
110:20,24
112:12 136:14
193:8 221:5,7
258:21,22,24
271:4,5 282:3
284:4,6 287:8
291:4 312:14
313:25 314:6,8
315:11 323:18
324:14,16,21

329:15,16,18
334:6 342:8
**segregated**
93:15 94:8,12
95:3
**seize**  296:20
**self**  286:16
287:5 322:3
**sell**  106:12
200:24 249:6
267:24 278:13
278:22 293:4
312:11 315:7
**selling**  277:9,21
**sells**  106:10
**semantics**
23:21
**senate**  156:25
**send**  92:25
248:9 261:25
274:7,7
**sending**  217:25
248:5 257:10
261:13 274:5,6
**sense**  65:10
98:16 138:17
149:2,3,5
224:19 253:11
328:17
**sensible**  116:6
**sensitive**  4:6
**sentence**  31:25
32:5 107:25
223:2 236:6

238:9 240:24
242:13 295:20
295:20 296:6
296:12 346:9
**sentiment**
264:18
**separate**  16:21
41:19 94:8,13
94:22 130:20
134:7,10
269:11 341:23
**separately**  5:21
118:4
**september**
42:15
**seriously**
192:24
**served**  160:25
**service**  11:5
17:13,20,22,24
18:2,9,16
69:11,15 70:18
70:20,21,25
71:4,7,9,15,22
72:5 73:7,12
75:6,8,13,21
77:3 88:13
101:4 108:5
128:13 131:21
132:2,4,10
133:15,19
215:2 217:16
221:9,21 223:8
223:12 226:20

227:8 228:13
247:25 261:10
269:16 328:5
359:18
**services** 43:17
47:6 55:18
111:3 225:20
**session** 341:18
**set** 12:13 15:8
38:18 82:11
112:20,21
154:4 203:9
209:7 210:5
242:15 253:10
253:12 256:6,7
269:12,13
270:8,11,20,23
271:2,18 272:4
274:23 280:10
281:16,17,20
281:22 284:5
284:21,23
285:17,20,21
285:25 286:8
286:11,14,20
288:3 289:9,16
289:19 318:7
330:14 345:3
345:10 360:11
360:18
**setting** 280:20
289:10,11
**settlement** 44:3

**seven** 314:14
**several** 132:19
191:25 266:19
**shamus** 2:16
5:14
**share** 140:3
149:11,13,15
150:16 152:8
180:11 197:2
215:9
**shared** 139:15
327:6
**shareholder**
294:6
**shares** 150:25
235:20 237:12
237:22 238:15
238:19,21,23
238:24 239:4,9
239:12 294:9
**sharing** 326:25
**sheahan** 167:20
**sheet** 295:11
**shell** 113:25
114:2
**shelves** 129:22
**shop** 294:25
307:21,23,25
**shore** 159:22
**short** 32:3
79:24 208:15
268:22 269:6
273:14 278:2
290:22 300:13

315:8 318:15
337:4,17
**shortly** 13:19
331:23
**shout** 329:2
**show** 18:19
46:19 233:20
254:5
**showing** 232:17
**shown** 90:17
315:3,4 354:21
**shuttered**
212:3
**side** 57:10 86:6
86:6 87:3
213:18 282:17
284:19 327:5
**sigh** 332:9
**signature**
360:22
**signed** 324:21
**significance**
89:2 293:3
**significant**
13:23 16:12
25:16 191:19
192:7,12,14
219:22 328:21
**similar** 18:25
186:17 230:18
**similarly**
223:25 224:9
321:10

**simple** 174:6
278:4 311:16
**simplistic**
325:11
**simply** 136:15
178:12 253:10
266:5 297:20
322:15
**simultaneous**
326:6
**singh** 352:5,11
352:12 353:17
353:25
**singh's** 352:18
**single** 86:22
188:16,22
192:3 193:23
295:11 315:14
**sir** 67:9 123:21
245:7 249:18
319:16
**sit** 47:22 114:3
**site** 111:12,13
111:14
**sits** 197:15
**sitting** 14:15
15:9 57:7
77:24 83:6
89:15 93:25
104:24 122:21
204:15 271:6
310:21 349:25
353:25 354:21

**situation** 31:4
 151:18 164:14
 172:17,19
 180:16,17
 183:11 196:12
 226:25 257:18
 276:12 287:17
 289:7 303:15
 310:2,4
**situations**
 151:20
**six** 62:18
 153:13,18
 169:13
**size** 211:8
 212:19
**sleep** 60:20
**slightly** 144:4
 344:9
**slowly** 265:21
**small** 36:7,9
**snowstorm**
 250:14
**socks** 317:4
**software** 219:7
**sold** 96:12
 120:12 198:18
 198:20,23
 201:10,25
 203:4,5 204:16
 205:14 266:6
 266:13 268:9
 278:7,11,11,12
 278:13,14

**279:17 320:4**
 356:10
**sole** 225:13
**solely** 33:13
**solutions** 4:22
 4:25 358:4
**solvency**
 311:13
**solvent** 238:11
 310:2,3,5
**somebody**
 103:22 183:25
 249:6 334:25
**somewhat** 70:8
 102:4 306:13
**son** 44:10,12,13
 235:25 236:13
**sophistication**
 144:15
**sorry** 18:10
 20:15 25:23
 31:20 32:12
 36:9 38:10
 40:6 47:22
 49:7 51:7,11
 51:18 57:14
 58:8 62:5,13
 65:19 68:22
 70:20,21 73:7
 82:17 83:14,18
 86:6 87:14
 94:11 95:22
 98:19 102:15
 102:17,17

105:23,25
 106:3,8 107:23
 110:7 125:21
 128:10,24
 130:6,6 135:2
 147:7 154:16
 163:14 165:18
 166:8 168:8,21
 176:5 182:15
 182:18,23
 185:15 187:14
 197:4 199:4
 200:14 204:21
 205:11 206:15
 208:8 212:2
 213:10 230:15
 237:3,4 247:10
 247:16 256:15
 258:12,25
 260:2 271:15
 275:16 278:16
 283:13,25
 288:17,22
 290:15 296:9
 303:19,21
 305:15 306:8
 306:24 321:22
 323:25 333:15
 336:16,17
 339:4,7 345:5
 347:4 353:13
 354:4
**sort** 98:20
 122:17 218:23

248:23 286:14
 354:15
**sought** 175:24
**sound** 207:12
 318:8
**source** 97:15
 249:12,15
**sources** 97:12
 189:22 338:19
 340:10,12,17
 340:17,24
 353:9
**space** 315:8
**speak** 6:24 11:8
 11:15 20:24
 61:4,8,22
 263:7 311:22
 339:4 341:3
**speaking** 46:5
 66:2 147:21
 177:23 178:2
 212:3 248:22
 264:11 311:20
**speaks** 47:11
 81:9 122:18
 314:13
**special** 190:20
**specialize**
 45:13
**specie** 253:20
 253:22 256:11
 256:11,16
 257:7 260:21

specific  23:5
34:5 55:21
66:10 84:11
87:16 89:7,21
90:13,19 93:3
93:15 94:25
95:13,19,23
96:9 97:14,14
106:16 107:4
131:21 141:9
143:3,6 144:10
150:12 154:16
212:15 213:23
243:18 244:20
256:10 258:17
259:7,9 263:2
290:7 291:25
294:2 306:20
325:12 327:20
330:3,3 342:25
specifically
31:25 46:5
79:3 108:21
131:19 132:16
133:5 217:16
240:15 310:24
340:2
specifics  348:5
speculate
195:23 251:2
291:24 305:16
331:2 332:15
350:8

speculating
304:15
speculation
122:9 125:15
180:2 190:18
196:7 202:22
202:23 211:11
224:15 284:16
291:21 293:21
297:23 325:10
330:24 350:15
speculative
350:13 354:13
speech  248:17
312:5,6
speed  73:17
spend  40:20
spent  41:5
206:24
spiel  45:3
spoke  23:13
31:9 61:11,11
61:13 311:17
spoken  39:6
61:17 62:11
63:8
spot  18:12
spouses  150:19
spreadsheet
86:15,23
spring  80:21,25
82:18 191:18
springing
118:23

springs  351:21
ss  360:4
st  41:18,23,25
stable  317:19
staff  219:15
stage  39:10
232:20 258:10
stand  186:7
239:18 244:12
standard
314:15
stare  12:9,19
13:5,12,22,24
14:3,9 232:2
start  11:16
62:8 72:10
264:11 355:19
started  30:22
39:2 123:19
191:23 216:14
216:15 292:23
starting  296:23
starts  74:24
state  1:17 5:7
5:10 6:4,8
38:13 108:24
116:11 122:20
245:9 360:4,8
stated  26:15
38:8 64:4
101:20 343:16
statement  10:9
37:5,8 92:10
96:18 125:24

243:13 247:11
states  1:2 4:15
37:7,16,19
45:13 65:11,16
120:7 159:2
161:7 181:9,19
181:21 241:21
321:10
stating  136:3
statistician
314:17
status  174:2
327:19
statute  67:4
158:9,11
161:19 163:16
164:9 167:9
170:18,25
171:24 175:22
179:12,18,19
186:3 194:9
198:3 228:23
228:24 230:12
230:18 231:3
232:4 240:15
308:13
statutes  66:15
169:3,4
statutory  66:20
162:20 166:3
171:6,7 189:19
269:12
stay  333:21

**[stayed - sufficient]**

**stayed** 271:19
296:21 298:12
**steals** 103:22
103:23 301:20
301:22
**step** 268:11
**stephen** 159:19
**steps** 157:15
281:16 302:21
335:19
**steve** 8:21
336:12
**steven** 22:7,10
81:15 336:11
338:25 339:10
351:15 359:15
**stick** 30:4
**stone** 2:9
**stop** 133:14
251:15 354:15
**stopped** 36:2
**store** 89:6,20
89:24 91:3
92:2,4,7,8
**stored** 91:5,6
96:23 104:19
**straight** 203:13
**strain** 295:5
**strategies**
313:15
**street** 1:16 2:15
4:19 316:25
317:3

**strike** 15:5 38:2
38:11 49:15
58:19 65:14
67:10 100:17
103:2 107:15
108:22 110:9
159:10 169:22
239:10 263:18
270:2 274:15
282:20 292:12
299:18
**strikes** 122:23
274:10 300:6
333:19
**strong** 188:13
228:16
**structure**
354:18
**struggling**
266:23
**stuart** 1:15
4:13 6:10 9:6
357:25 359:14
361:2,24 362:2
362:4,13
**stuff** 278:4
**stunning**
191:10
**su** 85:8
**sub** 24:3
**subject** 33:16
52:11,13
103:14 118:19
146:8,10 148:6

153:2 169:18
209:13 210:3
210:21 217:21
218:7 219:3,14
226:10 251:12
336:22 347:8
349:21 350:2
357:3
**subjected**
185:23 218:20
**subjective**
181:12
**submission**
339:17 351:3
351:11
**submit** 44:16
**submitted** 9:10
15:14 26:4
59:10,12 81:3
225:18 342:5
342:12
**submitting**
350:20
**subordinate**
66:21
**subscribed**
362:16
**subsection**
210:17
**subsequent**
47:17 85:20,23
289:18 347:6
**subsequently**
191:24 334:21

338:15
**subsidiary**
236:24 237:10
237:16,18,19
237:21 239:9
**substance**
39:20,25
109:12 140:20
**substantial**
26:25 49:14
52:17 109:7
118:5,12
167:11 215:23
276:8,9 328:18
**substantially**
18:3,5,6,6
198:19,21
**substantiated**
355:16
**succeed** 298:18
**succeeds**
355:21
**successful**
44:13 193:24
**successfully**
187:22
**suffer** 25:6
249:4
**suffered** 25:3
**suffers** 36:21
170:15
**suffice** 261:7
**sufficient** 223:3
245:13 334:2

340:21

**sufficiently**
47:21

**suggest** 98:19
134:19 167:10
170:3 186:2
240:6 282:3
284:4,6

**suggested**
98:20 221:24

**suggesting** 18:4
243:4 301:18
313:23 317:25

**suggestion**
19:24

**suggests** 329:18

**sui** 146:14

**suite** 20:7
126:18 281:24

**sullivan** 1:15
2:14 5:13

**sum** 26:24,25
118:14 197:25
217:7 328:18
328:19 329:10

**summarizes**
120:18

**summary** 35:14
245:20

**sums** 271:25

**super** 202:13

**superior** 140:7

**supermarket**
96:15

**superseded**
88:15

**supplied** 26:11
86:3 194:10

**support** 16:16
168:14 180:21
228:16 329:15
353:9 354:24

**suppose** 19:15
83:11 117:16
145:2 149:2
195:20 249:7
277:22,23,23

**supreme** 12:5
41:15 47:5
158:24,25
161:5 171:5
181:20 230:16
242:17

**sure** 11:9 21:3
22:25 28:7
29:11,24 31:8
36:11 43:9
45:7 50:7 51:5
52:15 54:4,19
55:4 60:24
65:8 68:16
70:5,12 72:10
72:21 74:18
78:21 79:2
86:20 91:11
97:20 108:20
110:6,18 120:5
127:22 131:22

139:9 142:10
143:24 147:23
163:15,24
172:16 173:14
176:8 187:6
188:9 196:16
203:24 207:4
209:5,19
210:21 211:2
211:12,14
213:21 216:2
218:11 220:4
220:17 228:2
231:6 232:25
237:15 239:8
243:9 244:11
246:16 252:23
253:11 260:23
262:4,9 264:16
290:13 293:4
299:9 305:21
306:9 309:8,14
313:8 317:16
317:25 328:5
332:19,19
336:6 348:9
352:16

**surplusage**
251:9

**surprise** 112:13
190:5

**surprised**
59:15

**surprising**
17:19 74:4
189:16 193:13
215:11 294:13

**survivors**
150:17

**survivorship**
150:17

**suspect** 30:2
47:7 52:18
261:19 302:16

**suspend** 225:16
225:19

**sustain** 334:2

**sustained** 178:7
357:19

**swap** 277:24

**swear** 5:24

**sweeping**
261:22

**sweet** 307:22

**sweets** 307:25

**swept** 90:14
94:22 95:12,14
95:18 97:10
153:6 297:18

**switching**
123:3

**sworn** 6:3
360:11 362:16

**system** 19:6,10
70:11 111:10
283:19 313:11
335:15

| | | | |
|---|---|---|---|
| **systems** 65:24 | 302:22 305:19 | 62:10 65:2 | **teneo** 60:3,4,9 |
| **t** | 313:16 317:15 | 79:15 91:19 | **tenth** 54:16 |
| **t** 6:2,2,2 359:7 | 335:11 337:3 | 96:25 97:4,13 | 113:24,25 |
| 360:2,2 361:3 | 338:24 345:2 | 112:25 113:15 | **term** 13:16 |
| 361:3 | 348:7 352:24 | 114:22 115:11 | 109:25 111:19 |
| **tab** 84:13 | **taken** 12:2 67:6 | 115:12 138:23 | 124:13 137:20 |
| 131:22 160:4 | 79:25 155:21 | 199:4,14 | 219:2 254:3,6 |
| **table** 100:17 | 208:16 269:7 | 221:14 306:18 | 256:13 269:23 |
| **tackett** 26:7 | 305:4 318:16 | **telling** 29:2,17 | 274:14 |
| 351:21,25 | 327:4 337:18 | 29:18,22,25 | **terminate** |
| 353:16,24 | 350:13 | 30:5 141:6 | 225:16,19 |
| 354:3 | **takes** 16:6 | 145:9,11 | **terminology** |
| **tackett's** 27:12 | 20:13 114:14 | 339:24 | 26:19 143:23 |
| **taiwanese** | 263:11 281:16 | **tells** 31:5 92:10 | 143:25 147:13 |
| 193:13 | **talk** 7:6 51:21 | 112:18,19 | **terms** 17:12,20 |
| **take** 4:10 16:3 | 65:23 133:11 | 114:21 115:9 | 17:22,24,25 |
| 51:8 55:12 | 288:7 | 143:8 | 18:9,16 25:2 |
| 73:13 79:19 | **talked** 66:12 | **ten** 96:23 97:12 | 25:16 44:11 |
| 94:25 106:18 | **talking** 10:6 | 98:12 153:11 | 50:2 60:14 |
| 133:12 151:13 | 17:14 49:5 | 260:4 268:15 | 69:10,15 70:17 |
| 151:17 153:17 | 51:11 88:22 | 278:13,19 | 70:20,21,24 |
| 155:14 157:15 | 91:21 107:4 | 337:13,14 | 71:4,6,8,14,22 |
| 158:22 159:4 | 133:14 137:16 | **tenancy** 150:12 | 72:5 73:6,12 |
| 161:2 170:23 | **talks** 211:2 | 150:22,24 | 75:6,8,13,21 |
| 192:23 200:5 | 286:16 | **tenant** 139:14 | 77:3 88:5,12 |
| 215:8 218:12 | **team** 61:18,25 | 149:14 151:8 | 88:13 91:9 |
| 221:19 222:7 | 62:2 | 152:6 | 101:4 108:4 |
| 225:10 246:10 | **teams** 63:8 | **tenants** 149:24 | 124:15 128:12 |
| 268:16 277:19 | **technical** 90:25 | 149:24 150:2,8 | 131:20,25 |
| 278:15 279:13 | 253:11 | 150:8,10,18 | 132:3,10,22 |
| 290:2,8,12,20 | **technically** | 151:4,14,22 | 133:15,19 |
| 294:3 295:19 | 12:6 195:19 | 152:3 153:7 | 141:21 146:8 |
| 301:23 302:18 | **tell** 25:11 28:8 | **tends** 285:24 | 146:10,24 |
| | 28:10 37:14 | | 148:6 215:2 |

| | | | |
|---|---|---|---|
| 217:16,23 | **testified** 6:5 | **testing** 29:19 | **thereof** 171:12 |
| 218:9 220:14 | 22:12,15 49:16 | 73:16 | 174:20 338:12 |
| 220:18,19 | 50:9 59:8 | **tests** 174:13 | 341:4 |
| 221:6,6,7,9,20 | 80:11 140:9 | **text** 159:18 | **thick** 130:7 |
| 223:8,12,18,22 | 207:6 250:4 | 161:11 164:2,9 | **thief** 103:17,19 |
| 224:3,9 225:23 | 289:21 304:23 | **texts** 82:24 | **thing** 16:23 |
| 225:24,25 | **testify** 26:13 | 83:8 169:2,3 | 47:20 51:21 |
| 226:12,18,20 | 49:22 333:10 | **textual** 167:8 | 102:25 108:2 |
| 227:7 228:3,13 | **testifying** 28:20 | **thank** 6:12 10:7 | 145:7 157:12 |
| 247:24 248:19 | 63:17 | 40:9 53:23 | 161:2,2 224:7 |
| 251:7,8,10,11 | **testimony** 8:9 | 79:13 83:18 | 271:2,3 295:23 |
| 261:10 269:15 | 25:8,9,10,13 | 101:23 104:6 | 307:17 325:3 |
| 269:24 270:7 | 26:14,18 27:2 | 135:15 138:15 | **things** 29:13,13 |
| 270:10,14,16 | 27:8 29:9 | 152:10 155:15 | 73:17 82:6,17 |
| 272:18 274:18 | 63:22 68:21,24 | 161:16 164:3 | 82:17,17 83:12 |
| 274:25 277:17 | 69:16 100:24 | 168:20 210:6 | 83:21 84:11 |
| 289:22 292:18 | 112:7 113:5,13 | 225:9 233:14 | 100:15 117:22 |
| 302:9,15 | 116:8 125:9 | 238:6 240:22 | 130:19 140:14 |
| 306:11 316:2 | 126:21 142:14 | 241:14 245:4 | 182:7 190:23 |
| 319:10,12 | 146:3 171:9 | 260:2 261:6 | 203:25 210:23 |
| 328:4 336:15 | 173:19 194:20 | 272:6,21,23 | 210:25 211:2,3 |
| 345:22 359:18 | 197:22 199:9 | 296:2 309:5 | 211:4 224:21 |
| **terrible** 250:14 | 206:8 223:16 | 311:14 318:11 | 246:15 251:2 |
| **terribly** 30:3 | 226:6 227:22 | 318:20 323:9 | 258:15 275:24 |
| 316:16 | 250:8 255:24 | 336:25 337:24 | 277:16 284:21 |
| **territ** 41:14 | 288:9 293:22 | **theories** 263:4 | 301:3 329:16 |
| **territories** | 303:8 305:3 | **theory** 121:15 | 333:7 338:25 |
| 41:17 65:25 | 316:18 319:3,8 | 124:4,12 127:5 | **think** 10:5 |
| **territory** 64:14 | 327:24 331:10 | 131:4,11 | 11:23,25 12:13 |
| 67:4 231:19 | 331:16 333:14 | 262:25 263:24 | 12:24 13:9 |
| **test** 16:3 29:7,7 | 344:16 350:6 | 264:2 271:23 | 16:10,15 18:17 |
| 29:8 73:15 | 353:17 354:5 | 276:22,25 | 19:6,9 21:20 |
| 202:9,9 203:9 | 357:24 360:13 | 284:21 320:9 | 23:20 25:21 |
| | 362:10 | 322:7 | 28:21,23 29:15 |

| | | | |
|---|---|---|---|
| 30:23 32:17 | 177:11 179:20 | 326:17 328:24 | 155:10 207:19 |
| 33:9 34:9 | 184:11,12,14 | 329:12 330:8 | 272:19 304:24 |
| 36:12,20 37:17 | 185:20 186:13 | 331:8 334:4,4 | 338:19 348:14 |
| 41:16 42:6,14 | 186:17 192:14 | 334:16,21,25 | **ticket**  282:10 |
| 44:6 46:21 | 193:3 195:5,25 | 336:12,23 | 284:10 320:15 |
| 47:11,18,19 | 196:8 197:17 | 348:20 349:8 | **tidy**  39:11 |
| 48:25 56:8 | 200:18 202:9 | 349:17 351:21 | **tied**  257:2 |
| 57:4 58:2 | 202:16 203:13 | 355:20 | 260:22 |
| 60:14 65:13 | 203:21 211:16 | **thinking**  29:21 | **tile**  76:19 |
| 68:18 72:25 | 213:4,6 214:9 | 112:8 206:24 | **time**   1:12 4:9 |
| 74:22 75:17 | 214:9 216:25 | 319:21 | 5:8 30:18 |
| 76:14 79:2 | 220:20 224:6 | **third**  21:16 | 41:21 44:2 |
| 82:11 85:25 | 224:19 226:23 | 160:24 161:12 | 63:3 65:18 |
| 86:4,8,22 87:5 | 229:5,18 233:6 | 206:12 207:2 | 77:10 78:18 |
| 90:3,10,23 | 233:12 239:6 | 207:22 218:2 | 79:15,21 80:2 |
| 95:22 98:8 | 239:24,25 | 223:2 225:15 | 95:2,16 114:24 |
| 102:4 106:9 | 242:11 252:14 | 248:6 261:15 | 138:17 155:18 |
| 107:2 111:17 | 253:8,13,13 | 271:9 322:18 | 155:22 162:4 |
| 112:3,4,10 | 254:19 257:20 | **thought**  21:14 | 188:10 189:18 |
| 115:18,19 | 258:22 271:15 | 33:9 45:6 | 202:2 203:5 |
| 119:19 120:17 | 273:25 275:15 | 184:7 284:20 | 206:24 208:10 |
| 122:16 124:14 | 275:19 277:14 | 291:8 333:3 | 208:13,17 |
| 127:11 128:12 | 281:17 285:2,2 | 340:20 | 211:9 218:13 |
| 128:23 129:23 | 287:7,10 | **thousand** | 223:5,6 225:14 |
| 130:17 133:4 | 289:21,25 | 172:10 248:9 | 226:10 261:24 |
| 136:20 137:8 | 292:13 293:15 | 250:11 255:17 | 268:15 269:4,8 |
| 138:2 144:11 | 294:15 298:8 | 255:21 262:3 | 270:5,6,12,12 |
| 144:20 145:6 | 299:16 302:5 | 277:25 281:13 | 270:24,24 |
| 145:10,12 | 302:18,24 | 281:14 | 271:9 272:16 |
| 146:5 147:5 | 307:18 313:7 | **three**  2:3,9 5:18 | 272:16 274:23 |
| 148:25 150:14 | 314:10,11,14 | 9:19,23 43:23 | 274:23 282:13 |
| 159:21 161:24 | 315:25 316:22 | 81:7 92:25 | 286:3 287:11 |
| 165:3,14 | 319:11,13 | 138:6 149:22 | 287:16 288:4 |
| 168:15 172:2 | 320:11 324:17 | 150:25 151:2 | 289:3 307:22 |

**[time - transaction]**                                              Page 83

308:18,21
309:2 311:21
315:8 316:10
317:12 318:13
318:17 335:11
337:4,15,19
357:22
**times**  7:18
28:11 42:3,21
63:7,9 132:4
135:21 136:5
223:4 314:14
346:11 355:9
**tin**  96:13,13,14
96:16
**title**  139:11,18
143:14 145:19
146:6,7 150:6
150:6
**tittle**  36:6
**tll**  169:15
**today**  6:12,14
7:24 8:9 14:16
15:10 35:18
43:8 63:10
83:6 89:15
93:25 104:24
133:25 138:13
161:20,25
271:7 303:13
308:23 318:22
338:20,23
339:12,15
344:16 349:25

354:2,21 355:9
357:13
**today's**  60:19
357:24
**together**  42:25
150:5 152:7
**token**  108:6
273:18,22
**tokens**  96:19
108:8 216:11
**told**  28:20 50:5
78:13,15 88:8
88:8,16 90:6
96:20 107:24
109:5 114:9
123:16 140:13
198:18
**tomorrow**  53:7
**took**  37:21
44:11 109:7
200:9 208:21
307:3 319:11
321:18 331:12
**top**  76:17
295:20 296:9
296:17
**topic**  8:3 38:15
121:4 123:3
**topics**  59:4
77:15,18
**tos**  17:13
**total**  358:2
**totally**  278:18

**touch**  53:12
**touched**  233:4
233:5 350:7
**tout**  43:16
**towards**  259:10
**tracks**  286:23
**trade**  106:7,9
113:4 117:20
117:21 220:5
268:4,5 277:3
277:13,15,20
278:6 280:2
281:8 283:5,12
286:4,5 291:5
**traded**  54:9,12
107:6 191:21
220:2 277:8
283:16
**trades**  105:10
105:16 106:21
106:22 203:14
203:18 263:12
263:17,19
264:20,24
265:16 282:6
282:20,21
285:7,15
289:15,18
314:24 326:9
326:19
**trading**  1:3 2:6
4:14 18:12,12
18:13,13,14,18
55:9 64:18

86:10 104:12
116:4 119:6
202:3 204:11
216:7 217:2
219:5,6 225:12
270:6,9,11,13
270:15 271:25
272:17 274:17
274:22,24
280:9,10,19,21
280:22 291:3
291:17 302:22
307:20 312:18
313:4,10,13,15
314:2,13,23,25
316:8 317:5
361:1 362:1
**transact**  322:2
**transaction**
20:11,12 31:22
33:17 34:2
35:6 122:11,15
122:18,21,25
127:7 156:14
166:11,16
167:6 171:11
172:20 174:7
176:2 178:8,19
178:25 179:4
179:22 180:4
180:13 182:25
183:16 184:23
184:23 185:3,7
185:9,10,14,16

186:9 198:15
199:11,18,22
200:3 202:4,11
204:2 209:15
209:16,17
211:9 212:7
213:18 229:23
232:24 234:22
235:11 236:22
237:8 239:8,11
239:19 241:21
241:24 243:19
244:20 280:24
281:2 282:18
294:11 299:8
307:3 308:2,16
308:17,19,19
308:23 309:7
310:8 318:9
320:14,16,18
321:3,5,17,21
321:22,24
322:14,19,20
323:8 334:18
**transactions**
20:8 25:17
32:6 109:7
122:19 123:11
123:22 125:17
157:8 166:20
166:21 172:5
174:16,23
198:5,25
199:23 200:5

200:12,19,25
201:12,20,21
201:24 202:18
211:16 212:18
213:13,15
215:4 233:4,11
263:20 280:14
280:16,17,19
285:4 296:19
297:3 304:3
307:20 311:10
323:2 326:15
327:4 328:4
**transcript**  26:2
26:7,10,11
27:9 124:8
338:11,15
352:19 353:12
353:14 362:5
362:10
**transcripts**
25:19,22,25
26:5 350:25
351:8
**transfer**  104:17
162:16 235:24
236:12,17,23
236:25,25
237:9 238:2,11
**transferred**
93:17 94:18
139:16 169:7
198:24

**transfers**  242:3
**traveling**  42:20
44:5
**treasuries**
318:7
**treated**  107:10
196:25 212:10
276:13,14
320:21,22
321:2 322:22
322:24
**treatise**  228:14
**treatment**
107:7
**trial**  28:5 47:25
48:2,3,4,9
341:3
**tried**  133:9
161:19
**trivial**  11:22
**trop**  1:17 4:24
360:7,23
**true**  63:23
88:11 124:4
360:12 362:9
**truly**  160:14
**trust**  2:13 5:16
76:9,12,15,22
78:6 119:17
122:7 123:9
125:13 139:20
139:22 142:21
145:17,22,23
146:9,11,13,15

146:18,21,24
147:24 148:2,6
148:7,9,9,10,13
152:24 249:7
274:12 301:2
325:16 356:9
356:10
**trustee**  52:5
76:21,22
139:20 142:18
142:25 145:9
145:22 146:6,7
146:11,15,17
148:10 325:23
325:23
**trusts**  142:19
146:21 161:9
161:11
**truth**  25:12
28:20 29:3,18
29:22 30:2,6
**try**  6:24 42:7
144:18 147:12
161:23 211:14
231:12
**trying**  23:15
177:13 182:19
222:11 226:7
237:4 256:4
267:7 277:18
306:10 326:5
350:10
**tully**  159:20

turn 89:4 93:5
104:6 108:18
125:23 135:15
174:14 181:20
217:17 235:3
238:7 240:23
241:14 245:4
269:15 295:16
341:9 344:23
352:22 355:7
turned 49:13
turns 36:21
twice 90:11
two 14:12 19:4
19:13,16,19
21:15 47:20
58:3 70:6,6
72:16 78:5
81:5 82:5 93:2
149:21 151:9
153:20,21,24
155:10 166:3
169:4 182:7
189:22 194:10
206:10,10,10
207:21,23,25
207:25 220:7
277:4,25
282:21 314:22
319:21 343:13
343:14 345:12
349:12 355:11
358:7

type 19:7 76:15
113:9 145:23
147:9 148:18
149:6 241:24
277:9,10,14
types 45:21,22
140:16 141:9
143:15 144:5
144:21 146:20
277:4 290:25
293:16 294:17
typical 193:3
typically 256:5
331:6 332:6

**u**

u 6:2 77:19
150:14
u.k. 12:6 43:23
54:13 65:25
66:22 81:22
156:19 158:25
171:25 179:16
189:19,20
229:3,8,15
230:6,11,16
231:3 326:8
u.s. 48:21 50:9
53:17 59:10
114:20 156:24
189:5 192:17
193:4
uh 63:2

unable 162:12
163:21
unchanged
14:10
unclear 147:14
251:5
uncomfortable
49:4 53:16
254:4
under 6:16
7:10 25:17
28:13,16,20
33:2 44:12
48:5,16 51:9
64:13 67:14
68:2 69:16
71:15 74:22,23
75:22 76:12
77:4 78:24
79:4 89:19,23
94:6 95:20
97:24 105:9,16
124:12 127:25
132:23 134:21
135:11 146:12
150:23 152:24
156:2,8 157:16
157:23 166:7
171:9,21,22
186:20 187:8
187:21 188:18
188:24 189:7
190:3,13
193:24 195:8,9

197:6 198:4
205:6 208:25
209:2 210:3,3
210:6 227:9
228:5,20
230:25 231:3
240:19 242:2
244:4 245:19
265:6 270:6,9
270:13,15
271:21 272:18
274:17,24
284:14 291:14
296:21 306:14
308:3,8,14,16
327:25 328:23
331:12 334:18
335:20 336:17
336:18 346:15
undergoing
309:13
undergone
309:10,12
underlie 63:19
underlies
117:23,23
156:16 180:19
underlining
181:4
underlying
63:21 112:12
120:11 261:8
320:2 324:22
349:5

**underneath**
40:18 307:19
**understand**
6:15 7:10,15
7:16,22,23
8:12,15 16:4
19:5 23:15
24:10 27:16,20
39:24 41:4
52:10 58:12
59:19 61:6
70:13 78:14
90:3 91:5
92:14 94:15
95:7 97:3 99:9
105:6 108:4
109:6 110:24
111:3,5 112:6
112:9 113:5
114:13,15
115:21 120:24
121:10,13,21
121:23 124:13
124:24 125:2,4
134:20 135:3,9
136:2,21 137:3
143:24 144:15
144:24 147:4
153:5 156:24
160:15,17
163:7,10
168:16 173:20
173:22 174:4
176:5 177:2,4

177:10 178:23
181:17 182:21
193:14 194:5,9
197:11,23
201:2 203:6,7
206:15 209:25
213:21 214:9
218:25 219:19
219:23,25
239:6 246:21
252:9 262:16
262:21 263:5
263:16 264:24
265:7,24 267:2
267:9,22
273:11 276:20
277:12 280:15
282:16 283:18
288:15,19
297:16 299:14
300:4 301:7
314:16 318:4
325:21 326:24
328:19,20
329:10,14
343:4,17
344:10 352:12
**understanding**
55:10 56:4
65:16 77:11
92:18 95:2
97:11,16 101:4
101:21 107:18
110:17 118:10

118:15 135:6,8
135:12 137:4
140:15 141:9
141:22 173:24
185:21 193:18
196:22 198:11
215:12 217:11
217:15 219:5
225:4 255:23
264:20 266:3
294:16 299:4
304:22 323:10
340:22 345:24
349:24 353:15
354:16
**understood** 7:7
7:8,14 9:20,24
9:25 27:2,7
36:2,25 37:10
82:19 87:2
130:3 156:19
288:20 319:3
**undertake**
342:22 356:16
**undertook**
342:21
**undervalue**
59:6 190:22
233:4 242:4
**undervalued**
20:12
**undisclosed**
295:12,13

**undoubtedly**
116:14
**unexplained**
322:12
**unfair** 57:14
119:15 120:13
122:6 174:17
185:11 194:18
320:5
**unidentified**
329:19,20
**unintelligible**
43:19 66:25
142:3 302:11
302:12
**union** 189:21
**unit** 4:12 294:2
**unitary** 121:15
124:4,12 127:5
131:3,10
262:25 263:23
264:2 271:23
276:21 284:20
320:9 322:7
**united** 1:2 4:15
37:16,19 52:5
65:11,16 159:2
161:6,6 181:9
181:19,21
233:7
**unlucky** 216:16
**unordinary**
317:9

**unquote** 35:2
124:17 282:6
349:15
**unrealized**
119:3
**unsecured**
212:11 213:10
215:9
**unsegregated**
93:20 94:20
97:10 104:20
**unsold** 119:3
**unsurprising**
142:5,7
**updating** 219:7
**upset** 261:24
**usd** 118:5,9,16
124:20 137:24
138:5 265:15
266:7 276:14
279:2,4,23
296:4,8 299:20
303:16 304:25
315:14 320:22
322:22 328:21
**use** 50:17,18
54:21 96:3
111:20 137:19
152:11 210:8
213:23 225:19
267:2
**used** 66:24
110:15 157:5
157:17 158:17

172:3,12,18
237:24 251:20
251:22 266:20
286:10 358:2
**useful** 116:3,3
116:9,14
293:17 294:18
294:22 295:2
**useless** 116:17
**uses** 274:14,16
**using** 55:20
93:10 111:2
183:15

**v**

**v** 6:2
**vague** 293:14
325:20
**valid** 109:14
**validity** 335:25
**valuable** 114:8
238:12 242:3
295:8 334:5
**valuation**
291:19,24,25
292:5,9,10
295:5,10
**value** 33:18
34:14 35:13
104:13 113:14
114:20,23
119:9,12 120:8
120:12 122:3
123:6 135:19

135:21 137:5
137:10,22
171:12 174:20
186:9 216:10
217:18 233:11
236:19 238:14
239:7,9,12
240:8,20 241:6
244:10 245:12
252:6 253:2
254:15 255:11
256:15,25
257:2,22,23
268:3 274:5
290:18 292:11
292:14 294:23
295:11,14
308:2 319:5,24
320:4,17
322:16
**valued** 42:19
215:25 216:13
277:24,25
290:15,16
**values** 33:14,24
**valuing** 293:18
294:8
**vanishingly**
177:12
**variation** 49:14
**variety** 18:14
47:10 188:8
**various** 41:18
45:3 61:3

219:4 287:13
305:5
**varying** 319:11
**vast** 191:24
217:4 313:4
334:23
**vastness** 217:6
**vasts** 191:20
**vat** 94:23
**veiling** 202:13
**veracity** 29:7,8
**verified** 138:8
140:11
**verify** 94:4
**veritext** 4:22,25
358:3
**versions** 19:4
**versus** 334:10
**vested** 76:20
139:19 145:20
**vice** 170:15
211:22 212:9
**vices** 212:12
220:3
**victoria** 159:24
160:21 161:14
**video** 4:9,12
227:18 264:15
**videographer**
3:8 4:2,23 5:23
79:21 80:2
155:18,22
208:13,17
269:4,8 309:3

318:13,17
337:7,15,19
357:22
**videotaped**
1:14
**view**   12:7 30:17
75:2 89:3
131:15 175:20
175:23 178:21
185:10,13
190:6 242:13
243:6 259:18
275:7,12 279:7
320:8,11
327:19 328:12
342:18 355:20
**viewed**  231:2
**viewing**  311:19
**views**  25:9
30:16 344:11
**vincent**  41:25
**vincent's**  41:23
**virgin**  8:16
10:24 12:21
16:8 34:21
37:24 41:22
47:20,23 57:23
59:3 61:19
64:14,15 65:6
65:19,20,22
66:3 67:5 68:6
71:18,19,21,24
71:25 73:25
74:3 76:2,6

158:22 189:25
190:3 191:3
231:9,24 347:5
**virgins**  127:18
**virtue**  151:5
270:7,13
272:17,18
274:18,25
**vis**  162:23,23
163:17,17
164:11,11,20
164:20
**vitae**  42:24
**void**  336:21
**voidable**
209:16,17
**volume**  314:13
**voluntary**
335:16
**vulnerability**
174:9

**w**

**wait**  79:14
139:2 222:23
224:17 227:13
241:2 262:8
**waiting**  314:24
**wake**  224:19
**wales**  233:8,9
346:22 347:2
**wall**  316:25
317:3

**wallet**  90:13,14
90:21,24 93:15
94:22 95:13,19
96:24 100:2,6
100:10,19
102:9,20
103:10,11,18
103:23,24
104:2,3,4,18
105:11 301:20
301:22
**wallets**  93:18
93:19 94:18
101:9 104:21
**want**  11:2,7
12:12 16:3
17:4 18:19
21:23 33:8
35:9 52:16
55:22 57:25
73:15 90:16
104:4 117:15
125:20 132:13
134:17 138:17
144:12,16,19
145:13 147:4
148:12 151:12
151:17 154:3
154:15 155:5
170:10,11,20
180:24 204:5
209:9 213:11
214:24 232:18
242:19 246:19

248:2 249:21
255:6 260:17
263:6,8 268:25
289:6 291:4
311:14,18
313:16 325:11
326:2 331:24
331:25 332:23
337:11 357:13
**wanted**  21:3
99:18,20 103:5
290:23
**wants**  100:12
103:8 106:12
111:17,18
248:4
**warm**  292:21
**watch**  103:22
**watched**  26:9
338:13
**watching**
322:15
**water**  208:7
**watkins**  2:5
5:20 39:21
40:3 58:21,22
59:23 61:21
84:24 141:7
338:2
**way**  10:18 24:2
29:13 37:3
59:16 69:20,21
71:20,21 74:17
107:10,11

**[way - works]**                                        Page 89

108:5,11
117:17 130:5
151:19 154:22
185:21 214:15
233:10,10
248:8 273:17
275:6 283:18
326:21 329:7
329:16 330:14
360:16
**ways** 149:21,22
206:11
**weak** 219:13
**web** 111:8,9
218:23
**website** 112:17
188:6
**webster** 85:13
342:7
**webster's** 342:9
342:23
**wednesday**
224:21
**week** 62:22
**weeks** 12:3
43:23
**weight** 96:12
307:16
**welcome** 124:9
132:12,13
234:19 255:10
267:4 357:15
**went** 13:8
38:25 39:16

43:23 48:17
112:16 161:21
204:10 320:15
**westlaw** 82:3
**whatsoever**
112:24
**whereof** 360:18
**whichever** 76:3
294:3
**whispering** 4:6
**wholly** 236:23
237:2,9
**wife** 43:25
150:4
**wildly** 314:17
**win** 299:10
**winded** 161:25
222:13
**windfall** 157:18
157:25 158:17
196:5,9,16,17
213:3,17 214:3
**winding** 48:7
**wire** 27:24
**wish** 234:7
266:4
**withdraw**
101:9,17
108:14 217:23
219:17 220:12
221:2,11
223:10,24
248:4 249:24
257:9 274:4

**withdrawal**
223:23 224:10
225:3 226:3
247:6 261:9,13
**withdrawals**
107:14 119:4,5
123:4,6 125:7
125:11,16
318:22 319:4
321:11
**withdrawing**
100:19
**withdrawn**
217:12,13
246:3
**withdrew**
107:18
**witness** 5:24
6:3 20:22 21:5
23:14 29:17
30:13,19 48:21
52:13 53:6
63:11 64:7
79:11,13,18
133:12 138:22
140:24 147:23
155:15 208:9
232:17 233:21
255:5,7 264:16
266:2,22,25
267:6 268:20
268:24 312:7
336:25 358:10
360:10,13,18

**witnesses** 29:16
86:5 351:8,10
351:17
**woman** 110:23
**word** 90:16
96:3 103:2
182:17,21
184:24 249:22
270:24 275:18
**words** 7:5
145:7 154:15
170:18,19
171:2,8,17,24
179:13,14,18
179:19 185:19
186:2 220:16
240:14,16
266:2,25 267:3
272:12 286:3
**wordy** 145:10
**work** 40:14,16
41:24 43:16,16
45:11 82:10
159:19,21
280:10 333:7
343:18
**worked** 54:5
56:10 58:15,18
58:20 59:23
60:2,4
**working** 97:17
124:12
**works** 55:23
70:11 71:12

**[works - zoom]**                                          Page 90

265:20 283:19
**world**  44:5
151:12 161:8
161:23 189:6
190:9 193:11
282:10 306:3
**worry**  116:20
**worse**  47:3
204:24
**worth**  113:20
113:21 114:5,5
114:23 115:6
115:13 116:17
117:5,5,6,10,16
117:21 126:3
172:10 216:19
257:25 267:20
**wounded**
196:14
**wow**  148:25
**write**  38:22,24
170:20 255:15
265:18
**writer**  32:3
**writing**  240:16
**written**  8:23
186:2
**wrong**  21:23
26:19,23 51:13
51:14 57:15
69:7 149:2
181:17 207:13
207:13 214:19
233:13 260:25

270:2 278:17
287:11,19
319:3 331:24
332:2
**wrongly**  103:6
**wrote**  161:10
258:22

### x

**x**  1:3,8 90:18
90:19 92:11,11
114:9,20
180:14 262:2
321:18 359:2,7
**xi**  48:13

### y

**y**  6:2 114:20
**yacht**  44:5
**yeah**  8:5 21:15
22:19 28:18
31:13,21 44:20
46:2,16 63:6
66:14 70:16,19
71:5 86:14
87:16 89:14
91:20,25 97:23
98:25 102:18
108:21 113:18
113:18,21
116:16,24
118:2 123:5,25
125:19,22
126:5 128:24
132:9,12

137:21 152:13
152:20 154:16
155:7 161:11
169:16,25
175:9 178:5
187:5 193:18
204:11,15
220:9 221:7
226:20 228:18
236:15,20
237:6 241:3,11
252:3 255:14
260:17 261:18
266:15 267:19
267:21 268:2,6
275:5 277:6,19
279:6,12,19,22
279:25 281:4,7
282:16,16,17
282:18 283:8
285:13 294:25
296:14 297:13
299:16 305:21
319:16,22
330:25 341:10
344:25 345:4
348:10 351:24
355:12
**year**  12:24 13:2
13:10 34:22
40:21 42:21
57:9
**years**  42:15
56:9 57:16

60:6 231:20
**york**  1:16,16,18
2:7,7,15,15
4:19,19 6:4
360:4,8

### z

**zach**  124:8
154:3 163:6
227:13 232:19
266:24
**zachary**  2:7
5:19 337:25
**zain**  26:6
351:21,25
353:16,24
354:3
**zealand**  186:15
339:25
**zero**  205:22
**zhu**  85:8
**zoom**  2:8 3:4,5

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# **EXHIBIT 2**

Page 1

1          IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE DISTRICT OF DELAWARE

3                     Chapter 11

4              CASE NO.: 22-11068 (KBO)

5

6   In re:

7   FTX TRADING LTD., et al.,

8   DEBTORS.

9   - - - - - - - - - - - - - - - - - - - - - -x

10

11

12        DEPOSITION OF RUSSELL CRUMPLER

13              NEW YORK, NEW YORK

14          TUESDAY, SEPTEMBER 23, 2025

15                   9:18 a.m.

16

17

18

19

20

21

22

23   REPORTED BY:  DANIELLE GRANT

24

25

Page 2

SEPTEMBER 23, 2025
9:18 A.M.

Deposition of RUSSELL CRUMPLER, held at the offices of Sullivan & Cromwell LLP, 125 Broad Street, New York, New York pursuant to Notice before DANIELLE GRANT, a Shorthand Reporter and Notary Public of the State of New York.

Page 3

APPEARANCES:
SULLIVAN & CROMWELL, LLP
Attorneys for the FTX Recovery Trust
125 Broad Street
New York, New York 10004
BY: BRIAN GLUECKSTEIN, ESQ.
gluecksteinb@sullcrom.com

BENJAMIN BELLER, ESQ.
bellerb@sullcrom.com
ISAAC FOOTE, ESQ.
footei@sullcrom.com

LATHAM & WATKINS LLP
Attorneys for the JOINT LIQUIDATORS OF THREE ARROWS CAPITAL, LTD. (In Liquidation)
1271 Avenue of the Americas
New York, New York 10020
BY: CHRISTOPHER HARRIS, ESQ.
christopher.harris@lw.com
ADAM GOLDBERG, ESQ.
adam.golberg@lw.com

ZIJUN ZHAO, ESQ.
zinjun.zhao@lw.com

ALSO PRESENT:
RONALD MARRAZZO, Videographer
JACOB VERSTEEGH
DANIEL BURKITT
CHRISTOPHER FARMER

Page 4

FEDERAL STIPULATIONS

IT IS STIPULATED AND AGREED by and between the attorneys for the respective parties herein that the filing, sealing, and certification of the within deposition be waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed to before the court.

- oOo -

Page 5

VIDEOGRAPHER: Good morning. We're now going on the record. The time is approximately 9:18 a.m. It is the 23rd of September 2025. Please note that the microphones are sensitive and may pick up whispering and private conversations. Please mute your phones at this time. Audio and video recording will continue to take place unless all parties agree to go off the record. This is the video-recorded deposition of Russell Crumpler in the matter of FTX Trading, Ltd., et al. This case is filed in the United States Bankruptcy Court for the District of Delaware, Docket Number is 22-11068 KBO.

The location of this deposition is Sullivan & Cromwell, located at 125 Broad Street, New York City. My name is Ron Marrazzo representing Veritext Legal Solutions and our court

Page 6

1   reporter is Danielle Grant from
2   the firm Veritext Legal Solutions.
3   I am not related to any party in
4   this action nor am I financially
5   interested in its outcome.
6       If there are any objections to
7   this proceeding, please state them
8   at the time of your appearance.
9   All counsel present and remotely
10  will be noted in the written
11  transcript. We can now swear in
12  the witness and proceed.
13  R U S S E L L     C R U M P L E R, called as
14      a witness, having been first duly
15      sworn by Danielle Grant, a Notary
16      Public within and for the State of
17      New York, was examined and testified
18      as follows:
19  EXAMINATION BY
20  MR. GLUECKSTEIN:
21      Q   Good morning, Mr. Crumpler.
22  My name is Brian Glueckstein with
23  Sullivan & Cromwell on behalf of FTX
24  Recovery Trust. I know you've been
25  deposed before. Just a couple of ground

Page 7

1   rules for the record.
2       The court reporter, as you
3   know, will be taken down everything we say
4   this morning. Let's try please not to
5   speak over each other. I'll let you -- if
6   you let me finish my questions, I'll let
7   you finish your answers.
8       Does that make sense?
9       A   It does. Yes.
10      Q   If you don't understand one of
11  my questions or if what I'm asking is not
12  clear to you, please ask and I will try to
13  clarify. If you don't, I will assume
14  you've understood the questions that I
15  asked.
16      Is that clear?
17      A   That's clear. Yes.
18      Q   Your counsel may interject
19  from time to time with objections. Unless
20  he instructs you not to answer, you will
21  be obligated to answer my question.
22      Is that understood?
23      A   Yes, that's understood.
24      Q   Is there any reason that you
25  are not able to provide complete and

Page 8

1   accurate testimony today?
2       A   No, there's not.
3       Q   Mr. Crumpler, do you
4   understand that you're testifying both in
5   your personal capacity and as a
6   representative on behalf of Three Arrows
7   Capital, Limited?
8       A   Yes, I do.
9       Q   Okay. And, if I refer to
10  Three Arrows Capital Limited as 3AC for --
11  over the course of the deposition today,
12  will you understand that reference?
13      A   Yes, I will.
14      Q   Thank you.
15      And just so the record is
16  clear, Mr. Crumpler, if I'm attempting to
17  ask for your testimony on behalf of Three
18  Arrows Capital Limited, I will do my best
19  to make that clear in the question. Okay?
20      A   Okay.
21      Q   Okay.
22      MR. GLUECKSTEIN: Let me mark
23  as Exhibit 1.
24      (Whereupon, the Notice of
25      Deposition of Three Arrows

Page 9

1       Capital, LTD., Pursuant to Fed
2       R. Civ. P. 30(b)(6) was marked
3       as Crumpler Exhibit No. 1 for
4       identification, as of this
5       date.)
6       Q   Mr. Crumpler, I've handed you
7   what's been marked as Exhibit 1, which is
8   the notice of deposition of Three Arrows
9   Capital, Limited, pursuant to Federal
10  Rules of Civil Procedure 30(b)(6).
11      Have you seen this notice
12  before?
13      A   Yes, I have.
14      Q   And if you could turn to
15  page 7 of the notice, the section that's
16  the middle of the page that begins
17  "Deposition Topics."
18      Do you see that?
19      A   I do.
20      Q   There are 20 topics listed
21  there in that section.
22      Do you see those?
23      A   I do. Yes.
24      Q   Have you reviewed that list of
25  topics prior to your deposition today?

3 (Pages 6 - 9)

Page 10

1    A   I have.
2    Q   And are you prepared to
3  testify on behalf of Three Arrows Capital
4  with respect to each of those topics
5  today?
6        MR. HARRIS:  Just object for
7        the record that we served
8        objections and responses that
9        clarified the topics on which he
10       would be prepared, and so those
11       are the topics on which he is
12       prepared.
13   Q   And subject to your counsel
14  representation with respect to objections,
15  are you otherwise prepared to testify with
16  respect to each of the topics in the
17  notice?
18   A   Subject to what my counsel has
19  just said, then yes.
20   Q   Mr. Crumpler, you have been
21  deposed twice before; is that correct?
22   A   Yes, that's correct.
23   Q   Including last year in this
24  litigation, correct?
25   A   That's correct.

Page 11

1    Q   Mr. Crumpler, what did you do
2  to prepare for today's deposition?
3    A   I've had a number of meetings
4  with my counsel over the course of three
5  different days, and I have reviewed
6  relevant documents to prepare myself for
7  the deposition topics.
8    Q   Those meetings that you had
9  with your counsel, was that your counsel
10  from Latham & Watkins?
11   A   My counsel from
12  Latham & Watkins, and then with -- with
13  some of those meetings without Ogier
14  present.  They might be the counsel on the
15  3AC matter.
16   Q   Was there anybody other than
17  your counsel from Latham and Ogier present
18  at any of your preparatory meetings?
19   A   Yeah.  Some of my colleagues
20  from Teneo.
21   Q   Anybody else?
22   A   No.
23   Q   Did you review documents
24  during the course of those preparatory
25  meetings?

Page 12

1    A   Yes, I did.
2    Q   Do you -- do you recall which
3  documents you reviewed?
4    A   I don't have a specific list
5  of the documents I reviewed.
6    Q   Do you recall the types of
7  documents that you reviewed?
8    A   So some of the filings that
9  have been made with respect to our claims
10  against FTX, some of the previous
11  documents that would have been provided by
12  FTX to Three Arrows in the course of our
13  sort of relationship, should we say, with
14  FTX.  Specifically, the testimony of
15  Su Zhu during his examination in the
16  Singapore court and other documents
17  relevant to the preposition for these
18  topics -- the preparation, not
19  preposition.  Sorry.
20   Q   Outside of the meetings where
21  your counsel was present, did you review
22  any documents today in preparation for your
23  testimony today as a representative of
24  Three Arrows Capital?
25   A   Only the sorts of documents

Page 13

1  I've already listed.
2    Q   Did you review any documents
3  on your own in connection with preparing
4  for your testimony today that were not
5  provided to FTX in the discovery process?
6    A   To the best of my knowledge, I
7  have not reviewed any documents that have
8  not been provided to FTX.
9    Q   During the course of preparing
10  to serve as a 30(b)(6) corporate
11  representative witness today, did you take
12  any notes while reviewing those documents?
13   A   I have not taken any notes
14  whilst reviewing the documents with -- and
15  I make one slight exception to that.
16  That's, again, the right word.  I
17  apologize if it was not.  When I was
18  provided with a physical copy of the
19  Su Zhu examination, one of my colleagues
20  had tagged every mention of FTX.  I'm just
21  following the -- in the back of that
22  examination, much like a deposition here.
23  You get a list of different words that had
24  been mentioned.
25        So someone had marked those

4 (Pages 10 - 13)

Page 14

1  words, you know, with the -- with one of
2  the sorts of tags you have in your folder
3  there.  But beyond that, I have not marked
4  up any documents.  No one has marked up
5  any documents to give to me.
6      Q    You referred to Mr. Zhu's
7  testimony.
8          Can you explain what you are
9  referring to in that regard?
10     A    So Mr. Zhu, who is obviously a
11  Singapore citizen, at the time that he was
12  coming to the end of his incarceration for
13  matters related to the -- his
14  non-cooperation with the 3AC estate, he
15  was examined by the Singapore court in the
16  Singapore court by our Singapore counsel,
17  WongPartnership.  That was over the course
18  of two days; I believe over the 12th or
19  13th or maybe 13th or 14th of December.
20         I suspect that those dates are
21  not too relevant.  So a two-day
22  examination with respect to really 3AC
23  overall, and so that's what I referred to.
24     Q    You refer to that, the 12,
25  13 December, what year was that?

Page 15

1      A    Apologies.  That would have
2  been 2023 -- 2023.  Yes.





Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 22

Page 23

Page 24

Page 25

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400



Page 26

Page 28

10    Q    And you were appointed joint
11  liquidator of 3AC on June 27, 2022,
12  correct?
13    A    Yes, that's correct.
14    Q    And you were appointed
15  alongside Mr. Chris Farmer as you're both
16  being joint liquidators for 3AC, correct?
17    A    Yes, that's correct.
18    Q    Is there a division of
19  responsibility between you and Mr. Farmer
20  with respect to the 3AC engagement?
21    A    There is not a formal division
22  of responsibility.
23    Q    Is there a practical division
24  of responsibility as to how you manage the
25  matter day-to-day?

Page 27

Page 29

1    A    There are elements which he
2  will have more of a focus on and elements
3  that I will have more of a focus on, yes.
4    Q    What elements are you -- are
5  you more focused on yourself?
6    A    So typically, I'm more focused
7  on the matters such as this where we're
8  involved in litigation or disputes against
9  numerous parties.  Whereas typically, you
10  know, Mr. Farmer will be more involved in
11  matters such as, you may -- the asset
12  sales, asset realizations, you know, when
13  it comes to doing the actual blockchain
14  analysis, if one likes, that's more
15  Mr. Farmers' role than mine.  But the
16  reality is we take decisions collectively
17  and we're well informed of the specifics
18  of what each other are doing.
19    Q    Has Mr. Farmer been involved
20  in the investigation into 3AC's claims
21  against FTX?
22    A    Yes, he has.
23    Q    And have you been involved in
24  that investigation?
25    A    Yes, I have.

Page 30

1    Q   Has there been any division
2  between you as to the scope of work with
3  respect specifically to 3AC's claims
4  against FTX?
5    A   There's no -- there's been no
6  formal division, but in terms of detail,
7  then, you know, in terms of, you know,
8  looking at precise numbers, checking the
9  calculations of the broader team, those
10 sorts of steps, that's been more Chris.
11 In terms of understanding the legal
12 analysis, that's a joint effort as between
13 the two of us.
14   Q   Prior to your appointment as a
15 joint liquidator for 3AC, did you have
16 experiences as liquidator for any
17 companies in the cryptocurrency industry?
18   A   Prior to my appointment as a
19 liquidator for 3AC, did I have experience
20 in the -- in the crypto industry
21 liquidating crypto companies, no, I did
22 not.
23   Q   Do you personally have any
24 expertise relating to cryptocurrencies?
25   A   I mean, without sounding

Page 31

1  flippant, after three years of being the
2  liquidator of the second largest collapse
3  in crypto space from 2022, then I would
4  say I do, yes.
5    Q   And that expertise is based on
6  your work in this engagement --
7    A   In this engagement and a --
8  and a small number of other matters on
9  the -- in this space.
10   Q   Do you personally have any
11 experience relating to futures trading?
12         MR. HARRIS:  Object to the
13     form.
14   A   Yeah, but can you explain what
15 you mean by "experience," please.
16   Q   Do you have any expertise in
17 managing a liquidation where the client
18 was involved in futures trading?
19   A   I have acted as joint
20 liquidator of at least one other entity,
21 and I suspect more, where a degree of
22 futures trading had occurred.  And I have
23 acted in a management role.  When I say
24 "management role," I mean within a
25 liquidation team of entities that were

Page 32

1  involved in, you know, contracts that had
2  elements of things that happened in the
3  future.
4         So I -- I use that definition
5  broadly.  And so, for example, I was the
6  manager, to use our internal then-KPMG
7  designation, and then senior manager with
8  a significant amount of effectively
9  project management responsibility for the
10 liquidations of the Bear Stearns
11 high-yield leverage fund and the Bear
12 Stearns enhanced leverage fund -- I may
13 get those names slightly wrong -- which
14 were two Cayman entities that were placed
15 into liquidation in 2007 at what I would
16 still argue was the start of the credit
17 crisis.  I say -- I always say it came a
18 year early and that they were the sort of
19 real bellwethers of it starting.
20         And so within the context of
21 winding down those operations and the
22 context of there being contracts that, you
23 know, had elements of things that would
24 happen in the future, then yes.  I mean,
25 that's me trying to be as broad as

Page 33

1  possible in answering your question.
2    Q   What stage of the liquidation
3  process of 3AC are you currently in?
4    A   Can you define what you mean
5  by "stage"?
6    Q   Where are you in the process
7  in terms of completing the liquidation of
8  3AC?
9    A   So the initial part of the
10 liquidation process is very much --
11 particularly when we're -- you effectively
12 have no books and records and no
13 corporation.  It's very -- what on earth
14 has been going on, how do we find out
15 what's been going on?
16         And so understanding that this
17 description, meaning these things that
18 don't go from one to another, there is
19 always an element of blurring between one
20 stage and another, that is, in effect,
21 Stage 1.  You know, your Stage 2 is
22 securing, collecting in, and realizing
23 assets.  And that's very much an ongoing
24 stage.  It's more of an area of work.
25         Stage 1, we through, you know,

9 (Pages 30 - 33)

Page 34

1  collecting in, realizing, protecting,
2  securing assets is a stage that is largely
3  complete.  And by "assets," I mean, you
4  know, our crypto investments where we have
5  got SAFUs and SAFTs that we've either
6  taken part in the token generation events,
7  and then we have got the tokens into our
8  custody platforms.  We've realized them
9  when they've become unlocked, and we're
10  able to sort of, yeah, get value and then
11  really turn those into U.S. dollars, or we
12  have got an equity interest in something
13  that we've worked a -- we've worked a sale
14  or worked for the issues as to why we
15  can't sell it.
16          So that process of
17  realizations is well along the way.  There
18  are still things to go.



Page 35

18          So in terms of asset
19  realizations, we've done most of it, but
20  there is a lot to go.  We've got a lot of
21  value of crypto where we have control of
22  the coins and the tokens, but they are --
23  they're still locked.  They're not --
24  they're not able to be sold because we
25  were early entrants into a protocol.

Page 36

1          And so by being an early
2  entrant, you don't just get to sell it
3  when you want to sell it when you have
4  other stages where you're dealing with
5  creditors.  So you have the process of
6  collecting in creditor claims.  It's
7  not -- it's not a dissimilar process as
8  the U.S., but there is -- there are some
9  important differences.
10          So we get our creditor claims
11  in.  We have to work through each claim,
12  adjudicate those claims, which involves
13  either very straight interpretation of
14  what someone is claiming, have they got
15  the supporting documentation, or in some
16  cases a much more complex analysis because
17  of the size and nature of those
18  relationships.
19          So, you know, our relationship
20  with Genesis, DCG, is a -- is a publicly
21  well-known example of where it got very
22  complex and very litigious as to what
23  their claims should be into our estate.
24          Claim adjudication is largely
25  complete.  There are a few -- less than

Page 37

1  five -- claims where we have some dispute
2  with respect to whether or not they should
3  be admitted in part or in full.  That is
4  ongoing.
5          However, the other part of
6  the -- this is why it's not a
7  straightforward answer as to what stage
8  we're in.  You know, another part, another
9  stage is then making distributions to
10  creditors.  And this is where there is an
11  important difference between a BVI
12  liquidation and a Westminster-style
13  liquidation, if you like, and a U.S.
14  bankruptcy process in that there is no
15  claims bar date.
16          So we can get to the point
17  where we can have a reserve for claims
18  that we are alive and aware to but haven't
19  been adjudicated, but we can start making
20  distributions.  So we started making
21  distributions in, I think, 2004.  It may
22  be in late 2023.  But in a sense, by the
23  by, we've now made five separate
24  distributions to creditors.
25          And the reserve I just

10 (Pages 34 - 37)

Page 38

1 mentioned -- so those bits where --
2 because we didn't want to hold up -- we
3 didn't think -- the last thing we should
4 be doing as liquidators is having the sort
5 of hubris to assume we can make more
6 money --
7        (Whereupon, the court reporter
8        requested clarification.)
9        THE WITNESS:  The hubris.
10       A    The -- the arrogance to assume
11 we can make more money getting time
12 deposit interest rates or whatever on the
13 money we hold than our creditors who are
14 desperate to get their money back.  So we
15 need to get the money to them, you know,
16 in as timely a manner as possible and then
17 catch up those that come later and those
18 whose adjudications come later.
19       So we've -- we've now done
20 five distributions with more, we hope, to
21 follow.  You know, and we don't do it
22 in -- quite on a quarterly basis, but
23 we're trying to get money out as we get to
24 certain levels of free cash to push out
25 the door to creditors.

Page 39

1        And if someone was to come
2 along later, and this is the key
3 difference:  If a brand-new creditor came
4 out of the woodwork, if Cisco, for
5 example, suddenly had a valid claim
6 against Three Arrows, they can still put
7 their claim in right up until the point
8 the liquidation ceases, you know, the
9 liquidation comes to an abrupt close.
10       And then when you get to the
11 distribution -- assuming it's a valid
12 claim, when you get to the distribution
13 following the admittance of that claim,
14 then they are affected -- to the extent
15 there's assets left in the estate, they're
16 caught up.  So if everyone else has been
17 distributed in 40 percent of that point in
18 time, those new -- that new creditor has
19 to be caught up.  And then you go back to
20 pari passu.  I think that's probably the
21 same term you have in the U.S. but, yeah,
22 treating everybody of the same class
23 equally.  You go back to that with respect
24 to the rest.
25       We don't have that firm bar

Page 40

1 date that exists in a U.S. bankruptcy
2 proceeding.  So it allows us to get on
3 with the distribution process in a
4 slightly easier fashion, I guess, than
5 perhaps you guys are used to seeing.  And
6 it would be the same with respect to FTX
7 if FTX ultimately had an unsecured claim
8 in our estate.  There is no -- there is no
9 sort of hindrance to the presentation of
10 that claim.  Let's put it that way.
11       So we are in the process of
12 making distributions to creditors.
13 Hopefully, the next one will happen in
14 relatively short order.  We have to make a
15 notice.  So we have to fully publish a
16 notice of creditor to -- in, I think, ours
17 go in the BVI Gazette.  The Singapore
18 Straits Times, I think that's the
19 publication we use in Singapore.  I don't
20 recall if we notice in the U.S.
21       But we have to bring it to the
22 attention of both existing creditors and
23 anyone who's -- might be out there that we
24 don't know about.
25       So you notify, and you say:

Page 41

1 On or after this date, there will be
2 another distribution.
3        And it's valid for, I think,
4 six months after the notice. ████████
   █████████████████████████████████
   ████████████████████  And then you have
8 got the whole other bit of the estate, the
9 other stage or the process, which is the
10 investigations into what happened.  And,
11 in our case, they are, you know, in a
12 sense recreation of the 3AC in terms of
13 its, you know, financial information,
14 et cetera.
15       And from that, what steps
16 should we be -- and under obviously
17 appropriate legal advice, what steps
18 should we be contemplated and taking as
19 liquidators to bring the estate back to
20 that point.  Our job is to bring the
21 estate back to the point where anyone who,
22 at the point of liquidation, should have
23 been a creditor of the company is
24 effectively treated in the same way.  So
25 that's the -- that's our overriding

11 (Pages 38 - 41)

Page 42

1   objective, bring it all back and bringing
2   in those funds.
3          So when we sit and litigate
4   against the founders, you know, we don't
5   do that out of malice ████████████
    ████████████████████████████████████
          We do that because we see
8   that they, after careful legal analysis --
9   and that's obviously the key -- we
10  don't -- we don't take spurious steps.
11         But after careful legal
12  analysis, we take a step to say:  All
13  right.  You, the founders, have caused
14  this damage.  We -- you may not have, in
15  the case of the founders, over a billion
16  dollars.  But that's the damage we assess
17  that you have caused.
18         I say "we," obviously, Teneo
19  has done the -- produced some work and
20  then the lawyers have worked out whether
21  or not what claims may or may not -- may
22  or may not exist with respect to those --
23  that financial information.  You've caused
24  this damage to the fund.  We think it's
25  worthwhile us pursuing that because of

Page 43

1   a -- the merits with respect to those
2   claims and the likely recoveries.  You
3   need to bring assets back into the -- give
4   us assets to bring them back into the
5   estate to get the creditors to the best
6   position possible.
7          And that's -- you know, so --
8   and that is a process which is -- again,
9   that stage, that investigation,
10  litigation, recovery from non-asset
11  sources -- non-owned asset sources, if you
12  like, is ongoing.  We have had a variety
13  of different bits of litigation that have
14  run their course or prelitigation that
15  have been resolved during the life of
16  Three Arrows, and there are a variety of
17  different claims and processes, you --
18  which are ongoing, some of which are part
19  of the courts, some of which are -- well,
20  I think the phrase is probably
21  prelitigation correspondence.
22         And we move forward.  And,
23  indeed, we try and always do these things
24  very efficiently.  We have got a quite
25  unique order out to the BVI court that

Page 44

1   allows us to settle disputes less than
2   $10 million in value effectively without
3   reference to the court.  So that just --
4   again, it's about speeding up the process,
5   being efficient, getting to resolution.
6   And that's, you know, another bit that has
7   just allowed us to sort of move various
8   smaller disputes on with a -- with a bit
9   more pace.  If that -- that's a -- that's
10  a explanation to your -- a long-winded
11  explanation to your question of what stage
12  we're at.
13    Q   That's very helpful.
14    A   I don't know if that help.
15    Q   Thank you.  That's very
16  helpful.
17         With respect to the five
18  distributions that you have said have
19  occurred to date, approximately how much
20  of the principal amount of valid admitted
21  claims have been paid to date?
22    A   So there is a -- there's a --
23  it's important to sort of -- if one added
24  up the number we -- ████████████████████

Page 45

████████████████████████████████
████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
█ ████████████████████████████
█████████████████████████████████
██████████████████████████████████████
██████████████████████████████████
█████████████████████████████████████
████████████████████████████████████████
█ ████████████████████████████
████████████████████████████████████████
███████████████████████████████████
██████████████████████████████████████



Page 46

2     Q    Do you have -- you said
3  there's five -- less than five claims or
4  so still be allowed.
5         Do you have a projection of
6  the total claims pool ultimately of
7  allowed claims -- the amount of allowed
8  claims in dollars?
9     A    As things stands right now --
10  and it's important in the context of
11  claims where we are pursuing, in the
12  general sense, antecedent transaction, you
13  know, claims, so clearly FTX is in that
14  process, you know, and not knowing where
15  we get to with respect to the end of
16  our -- of our dispute.

21     Q    Does the -- do the joint
22  liquidators currently have a projection of
23  ultimate distributable value that will be
24  available out of the Three Arrows
25  liquidation?

Page 47

1     A    Sorry.
2         Could you just repeat the
3  question?
4     Q    Do the joint liquidators
5  currently have an estimate of total
6  distributable value that will come out of
7  the Three Arrows liquidation?
8     A    We do.  Yes.
9     Q    What is that estimate?
10     A    So it's very important to
11  stress that that -- we have an estimate.
12  It's clearly highly volatile, and it's not
13  volatile because, within that testament,
14  we are pricing in anything to do with
15  litigation.  So our estimate is based on
16  the assets we hold.  And where we hold
17  assets that people are maybe challenging
18  our ownership of those assets, but they're
19  in our hands.
20         We will normally value those
21  assets when we make our estimate unless we
22  really think we have a weak legal
23  argument.  But we don't use -- we don't
24  put in there the potential benefit of,
25  say, for example, recoveries from the

Page 48

1  founders.  So using that as a -- and
2  understanding the assets we hold and
3  cannot yet realize, cannot yet turn to
4  U.S. dollars are highly volatile because
5  they're either, you know, crypto tokens --
6  and we all -- we all know what can happen
7  to crypto tokens -- or they are assets
8  that are related to the -- to the digital
9  crypto environment.
10         So, yeah, we have -- I don't
11  know the exact number,

Page 49

2     A    That's correct.  Yes.
3     Q    Would it include contested
4  claims such as your claim against FTX?
5     A    It does not, no.
6     Q    So any recovery from this
7  claim against FTX would be incremental to
8  those projections?
9     A    Yes.  That's correct.
10  Obviously depending -- and, again, one
11  can't over-project the outcomes, because
12  there is a variety of different claims
13  that have been put forward with respect to
14  FTX.  But some of those outcomes, as I've,
15  you know, alluded to, may result in FTX
16  being a creditor as well.
17         So there's a -- one would have
18  to -- it's quite a careful and difficult
19  analysis to say, Well, what would happen
20  here or there?
21         But as a general point, yes,
22  it's correct, it excludes any recoveries
23  or net recoveries from FTX.
24     Q    What is the current cash
25  position of the 3AC estate?

13 (Pages 46 - 49)

Page 50

1    A    That's not something I have
2  checked in preparation for this
3  deposition. ███████████████
███████████████████████████████
███████████████    But I stress
6  that I have not -- you know, I've not
7  checked that position recently.  And when
8  I gave the new distribution numbers to
9  date, that's not -- I've not looked at it
10  to the point where -- I'm relying on what
11  my team have told me. ████████████
████████████████████████████████
████████████████████████████████
████████████████████
16    Q    How are you compensated for
17  your work on behalf of 3AC?
18    A    Interesting question.  So the
19  way I am compensated isn't directly with
20  respect to my work on 3AC.  So whilst I
21  understand -- I believe -- my
22  understanding is that, in the U.S.A., a
23  bankruptcy trustee may at times have a
24  percentage recovery, so they may get a
25  percentage of the assets recovered.  And

Page 51

1  that comes to them and I assume their firm
2  directly.  That's not how it works with
3  us.
4         So the -- as a joint
5  liquidator, I receive an hourly rate,
6  which is an hourly rate that then passes
7  to my firm.  You know, I don't
8  unfortunately get that hourly rate myself.
9  It would be lovely if I did, although
10  we're a lot cheaper than U.S. lawyers.
11         THE WITNESS:  Sorry.  No
12     disrespect to anybody.
13    A    And so my team and myself and,
14  indeed, our legal advisors, you -- with
15  respect to 3AC, are all on an hourly rate.
16  So I was just being careful to think if we
17  had any contingency fee arrangements in
18  place.  I don't -- I don't think we do.
19  So we're all on hourly rates.  Those rates
20  are collected in by Teneo with respect to
21  us, and then my personal compensation is
22  based on my sort of salary -- my
23  contractual salary.
24         And then a -- we're not a
25  partnership in the -- in the sense of, you

Page 52

1  know, a traditional U.S. partnership, we
2  work in a law firm or elsewhere.  I'm then
3  compensated effectively based on the
4  performance of Teneo overall.
5    Q    Is Teneo entitled to any sort
6  of success fee or other supplemental
7  compensation with respect to 3AC
8  engagement based on any metrics?
9    A    No, not at this point in time.
10    Q    So Teneo's personnel,
11  including yourself, are all paid just
12  simply on an hourly rate?
13    A    Yes.  In terms of what we earn
14  from this day, I'm not --
15    Q    Correct.
16    A    -- paid.  Yeah.  God, I would
17  hate to calculate my hourly -- my personal
18  hourly rate.  It would be appalling.
19  But --
20    Q    I understand that.
21    A    -- you see -- you see why I
22  say, yeah, we're not.  The only hesitancy
23  I make is it's not -- it's possible that,
24  with respect to something on the Three
25  Arrows estate, we could, with the sanction

Page 53

1  of the court, apply for permission to go
2  onto a contingency fee, you know,
3  depending on the sort of things we're
4  looking at.  So it happens on matters that
5  we work on, where we might be looking for
6  litigation funding for something, for
7  example, and we might agree with the
8  litigation funder that, you know, we
9  would -- the colloquial phrase we use
10  "come along for the ride."
11         So we might say:  We forego
12  some of our hourly rates or even all of
13  our hourly rate in return for an upside.
14  And so that's not -- it's unusual but not
15  unheard of that we do those sorts of fee
16  arrangements.  At this point in time, with
17  respect to Three Arrows, we don't have
18  any -- have any of those fee arrangements
19  in place, but it's possible.  It would be
20  speculation as to whether we would ever
21  have one in the future.
22    Q    You don't currently have any
23  sort of alternative fee arrangement with
24  respect to the claim against FTX, correct?
25    A    That's correct.

14 (Pages 50 - 53)

Page 54

1    Q   Is there anybody currently
2 employed by the 3AC liquidating estate who
3 was employed by Three Arrows prior to the
4 commencement of the liquidation?
5    A   So is there anybody employed
6 by the 3AC estate currently who was
7 previously employed by Three Arrows
8 pre-liquidation?
9    Q   Correct.
10    A   No, there's not.
11    Q   Have you or anybody on behalf
12 of the joint liquidators been in contact
13 with anybody who was employed by 3AC
14 pre-liquidation with respect to the claims
15 against FTX?
16        MR. HARRIS:  Object to the
17    form.
18    A   So with specific respect to
19 the claims we have against FTX, then no,
20 we have not been in contact with anybody.
21 Obviously, we've talked to what -- Su Zhu
22 was examined.  We talked about that, but
23 that was not with specific respect to the
24 FTX claims or the relationship.  It -- we
25 have to be clear, spoken on a very limited

Page 55

1 basis to certain other employees of the
2 wider Three Arrows Group.
3        So I'm -- this is why I'm
4 trying to answer with care, but also not
5 be, you know, unhelpful.  And I'll come
6 back to what we mean by the wider Three
7 Arrows Group in a minute.  We've respect
8 to -- so we've spoken to certain employees
9 of the wider Three Arrows Group with
10 respect to Three Arrows in general, but we
11 have not spoken to any of those parties
12 with respect to the claims we have against
13 FTX, and to the best of my knowledge,
14 certainly since that -- the amended claim
15 has been presented -- if that's -- if
16 that's the right word -- to FTX.
17        To be clear about my points
18 around employees, Three Arrows itself was
19 a corporate structure.  So Three Arrows
20 didn't have any employee.  It never had an
21 employee.  So I've -- instead of being
22 difficult, have interpreted that question
23 broadly, and different entities often with
24 similar titles will have employed
25 individuals who were responsible for

Page 56

1 different aspects of managing that entity
2 and the things that it did -- that Three
3 Arrows did.  So that's how I have broadly
4 interpreted your question.
5    Q   Okay.  I appreciate that.
6        But just so the record is
7 complete then, did you speak with -- you
8 or anybody else on behalf of the joint
9 liquidators, speak with anybody who was
10 employed by any affiliate of Three Arrows
11 Capital prior to the liquidation of 3AC
12 with respect to matters related to the FTX
13 claims?
14    A   We -- without going --
15 without -- so the answer is post us filing
16 our claims against FTX, no.  And, with
17 respect to conversations we have had with
18 former employees of the wider Three Arrows
19 Group, their affiliates to use your
20 phrase, then the conversations that I
21 recollect certainly touch on how a claim
22 against FTX might work.  They were more
23 about gathering information in general and
24 things in relation to FTX may therefore
25 have, you know, been part of those

Page 57

1 conversations, but they were never the
2 focus of those conversations.
3    Q   Okay.  Who do you -- who
4 specifically do you recall having
5 conversations with, at any point, who was
6 employed by 3AC or any of its affiliates
7 that you're thinking of in your prior
8 answers here?
9    A   So, specifically, I would be
10 thinking of Su Zhu, who remarkably, beyond
11 his examination, we've managed to get for
12 a 90-minute -- slightly less than
13 90-minute conversation with him in
14 August 2022, so some -- I think some six
15 weeks after the company went into
16 liquidation.  And the -- my instantaneous
17 recollection of that conversation is I
18 don't think, beyond maybe saying FTX was
19 an exchange that Three Arrows interacted
20 with, provided any details whatsoever with
21 respect to the FTX relationship.
22        We had a conversation in
23 September 2003.  I think the Su Zhu one
24 was, from my -- from memory, on the 12th
25 of August.  I don't -- the conversation we

15 (Pages 54 - 57)

1 had with Kyle Davies may have been late
2 August actually. It was either late
3 August or early September. My
4 recollection of dates was September, but I
5 know I was in -- I was in Scottland at the
6 time. So it probably was late August with
7 Kyle Davies. And that's in 2023.
8        The only time FTX came up in
9 that conversation at all -- and I remember
10 this much more clearly -- is because the
11 entire point of that conversation was to
12 get us access to a different exchanges, to
13 different -- and I use exchange broadly --
14 but for different accesses to, you know,
15 custodies, exchanges, et cetera, that we
16 haven't been given access to.
17        At that point in time, we
18 already had access to FTX, so it came up
19 in the context of, Well, we've got FTX,
20 move on. And both Kyle and his lawyer
21 flatly refused to talk about anything
22 other than our access to these different
23 accounts, and it had taken us two months
24 to get them to the point of agreeing to do
25 that. I should say we still have not

1 examined -- been able to examine Kyle
2 Davies. He is still unable to return to
3 Singapore.
4        Because where Su Zhu was
5 incarcerated for effectively not
6 cooperating with us and had a four-month
7 jail sentence of which he served his --
8 it's funny. The press talks about, Oh, he
9 only did two months. He did normal time.
10 There's a -- you do two and a bit months
11 effectively and then you get out of a
12 four-month sentence. That's the way it
13 works in Singapore. Su Zhu did his last
14 roughly two weeks under house arrest,
15 because he managed to persuade the
16 Singapore court that, to prepare for his
17 examination which happened whilst he was
18 still under -- yet under house arrest, he
19 needed to be at home to prepare for it.
20        So if you see a disparity
21        between two months in jail and
22        four months in jail, that's why
23        it's a -- it's a story that is --
24        that he tells. Kyle Davies, we --
25        well, we know he was in Taipei on

1 or around the 10th of August. We
2 don't know exactly where he is.
3 He -- we have not spoken to him in
4 detail. The other person who
5 we've spoken to is a gentleman
6 called Josh Brown. Josh Brown was
7 the -- to use a general term, the
8 IT manager, the guy in charge of
9 IT. I don't remember his exact
10 title. He set up -- he set up the
11 systems and we spoke to him.
12        The main conversation we had
13 with him was an informal meeting
14 with him in 2023, roughly
15 November. That was face to face,
16 and then there was some subsequent
17 conversations with him and his
18 counsel.
19        Where FTX same up in that --
20 and he was the systems guy, right?
21        So, you know, he's someone who
22 really sort of set up the way in
23 which Three Arrows -- I think
24 phrase is APIs -- and I can never
25 remember what API says -- means.

1 I'm pretty sure it's in my -- in
2 the amended proof of claim, and is
3 one of those things. I can't do
4 five light switches together.
5 It's like that. So API, he
6 basically sets up all those API,
7 those the interfaces between FTX,
8 between Binance, between others
9 that sucked the information in, in
10 a real time basis, into Three
11 Arrows and, you know, it went from
12 there.
13        So to the extent we talked to
14 him about FTX, that was to do with
15 how we got information really from
16 FTX and where that information
17 went as opposed to transactions.
18 And he was clear. He -- you
19 know -- well, he was beyond clear.
20 He had no idea and how bad the
21 situation was at Three Arrows and
22 was surprised, as were a number of
23 the staff. But he was not
24 involved in actual trading, just,
25 you know, understood the accounts

Page 62

1   from that perspective.
2        And then the other -- using
3   the term "employee" very broadly,
4   because I'm not sure he would ever
5   class himself as one, although he
6   had an employee contract with a
7   affiliated entity, is Arthur
8   Cheong.  And he was the portfolio
9   manager of the DeFiance
10  sub-portfolio of Three Arrows.
11  And in terms of -- and we've had
12  ongoing discussion with him, but
13  that is pretty much restricted to
14  the assets in that portfolio,
15  which still are there or --
16  yeah -- are largely there, because



Page 63

9                           But he's not
10  someone who, you know, had general
11  knowledge of what was going on
12  with the main entity of Three
13  Arrows or he doesn't profess to.
14       And, therefore, to the extent
15  we have discussed FTX with him,
16  it -- and I have not had those
17  discussions personally, but it's
18  limited to the DeFiance FTX
19  accounts.  And I suspect we'll
20  come on to that -- those -- those
21  particular accounts later.  When I
22  say "DeFiance FTX accounts," to be
23  clear, DeFiance was not a separate
24  legal entity.  It was a portfolio
25  within -- within Three Arrows, and

Page 64

18       MR. HARRIS:  Just to remind
19  the witness that, when the court
20  reporter asked you, all you
21  have -- she just wants you to
22  repeat the words you said --
23       THE WITNESS:  I --
24       MR. HARRIS:  -- so she --
25       THE WITNESS:  -- I apologize.

Page 65

1       MR. HARRIS:  -- can put it
2   down correctly --
3       THE WITNESS:  Yeah.
4       MR. HARRIS:  -- and then
5   counsel will ask you more
6   questions if he wants.
7       THE WITNESS:  Yeah.
8    A   So they are -- to my -- the --
9   to my recollection, they are the people
10  that, as liquidators of Three Arrows, you
11  know, the people who were employed by
12  affiliates of Three Arrows.  And I
13  should -- there is one I've missed -- I'll
14  come back to it -- that we've spoken to.
15  The only other person I have spoken to
16  personally was Eric.  I'm having a mental
17  block as to his surname, but you'll see,
18  in response to our interrogatories, he's
19  on that list of people who --
20   Q   Just is Mr. Eric Emmer
21  (phonetic)?
22   A   No.  The other Eric, Eric Mack
23  (phonetic), I think.
24   Q   Okay.  Eric Mack?
25       Yeah.

17 (Pages 62 - 65)

1    A   Yes.  So I had a -- what was
2   agreed to be a very informal meeting with
3   him in Hong Kong in November 2023.  And
4   part of the agreement to have that meeting
5   was, you know, no notes, nothing else.
6   And, at that meeting, I don't -- I don't
7   think we discussed FTX at all.
8    Q   Have you or anybody on behalf
9   of the joint liquidators had any contact
10  with Ninjing Zhang?
11   A   No.  We can't find him.
12   Q   Have you attempted to contact
13  Mr. Zhang?
14   A   We have.
15   Q   Yes?
16   A   Yes.
17   Q   And you have not been able to
18  establish contact?
19   A   We have not.
20   Q   As a joint liquidator, you
21  would have -- you were involved and have
22  been involved in the joint liquidators'
23  decisions relating whether to file claims
24  or take positions in the FTX bankruptcy,
25  correct?

1    A   Yes, that's correct.
2    Q   Would that have been your
3   decision whether to make a filing into the
4   FTX case?
5    A   It's a collective decision,
6   the -- myself and my joint liquidator will
7   reach.  And we, obviously, act on a joint
8   and several basis anyway, but with
9   something of this magnitude, it's a
10  collective decision we would reach based
11  on the advice we have been given and with
12  appropriate sanction from the court.
13   Q   Since your prior deposition in
14  November 2024, what has -- what have the
15  joint liquidators done to investigate
16  their claims against FTX?
17       MR. HARRIS:  Objection.  I
18       just counsel the witness not to
19       reveal any attorney work product
20       or attorney-client communications.
21       So, if there's other things you
22       can discuss the investigation,
23       feel free to discuss those, but
24       don't reveal work that your
25       counsel did or that counsel

1       directed anyone to do, including
2       Teneo.
3    A   So we've continued to review
4   the documents -- and I use that in the
5   broadest sense -- available to us.  And
6   where new documents or new explanations
7   have been provided to us, we've obviously
8   reviewed those explanations.  The
9   principal source -- almost the entire
10  source of anything new have been from FTX
11  itself and that discovery process.
12       I keep thinking about whether
13  I'm using the right word or not, but that
14  discovery disclosure process is obviously
15  ongoing and our analysis has to change and
16  adapt to that ongoing process.  Documents
17  keep being provided to us.  I think the
18  last -- the last declaration we got was on
19  Friday evening, so our analysis remains
20  ongoing.
21       THE WITNESS:  Am I able to get
22       some more water?
23       MR. HARRIS:  Is this a good
24       time for a break?
25       MR. GLUECKSTEIN:  Yeah.

1       Why don't we take a short
2       break?
3       We've been going for a while.
4       VIDEOGRAPHER:  Okay.  The time
5   is 10:29 a.m.  We're going off the
6   record.
7       (Whereupon, at 10:29 a.m., a
8       recess was taken to 10:40
9       a.m.)
10       (The proceeding resumed with
11       all parties present.)
12       VIDEOGRAPHER:  Time is
13  approximately 10:40 a.m.  We're
14  back on the record.
15   Q   Mr. Crumpler, before the
16  break, we were talking about discussions
17  that your representatives -- the joint
18  liquidators had with former 3AC employees,
19  one of whom you mentioned was Mr. Brown,
20  Josh Brown I believe who you said was an
21  IT person?
22   A   Yes, that's correct.
23   Q   And you mentioned that he was
24  involved or you had discussions about the
25  API systems of 3AC; is that correct?

18 (Pages 66 - 69)

Page 70

1     A    That's correct.  Yes.
2     Q    What information did you learn
3  from Mr. Brown about the API as it relates
4  to interfacing with FTX?
5     A    So my discussion, to the best
6  of my recollection, with respect to that
7  API was actually that the FTX API was
8  always a tricky one.  And one will see
9  that reflected, I think, in the challenges
10  at times the administrator had with
11  respect to FTX, line items in particular.
12  But beyond that, nothing specific other
13  than, you know, he set up the system to
14  sort of draw that information out of FTX.
15  And I'm not in any way going to be
16  claim -- or claim to be an expert of how
17  that happens.
18        It's well beyond my sort of
19  basic sort of IT skills to do that.  But
20  yeah, he was the guy that set up the
21  system so that they -- that they would
22  take information from FTX and elsewhere
23  and present it in a way that the -- those
24  managing Three Arrows were able to see the
25  positions of Three Arrows, and we

Page 71

1  understand had the snapshot of how Three
2  Arrows looked overall financially at any
3  point in time with a reasonable degree of
4  accuracy.
5     Q    Do the joint liquidators still
6  have access to the FTX API interface such
7  that you can see what 3AC saw?
8     A    No.
9     Q    Are there any archived
10  versions of the API or other information
11  that would allow to you view that API?
12     A    So we attempted in our -- both
13  in our discussion with Josh Brown and in
14  the -- our attempts to recover information
15  with respect to Three Arrows, we
16  considered whether or not it would be
17  possible to recreate that information.
18  And, indeed, we only found out about this
19  particular sort of set of programs and
20  the -- and the server that it sat on quite
21  late on in the process.
22        We were never told about it.
23  And the reason we suspect we were never
24  told about it is that the founder of Three
25  Arrows have no desire for us to be able to

Page 72

1  say, Look, you were able to see the
2  financial position of Three Arrows at any
3  point in time.  And they've actually
4  denied that they could see that.
5        However, through talking to
6  Josh Brown and through then a sort of
7  disclosure-type applications in Singapore,
8  where that server was held, we were able
9  to have -- and you get an application.  I
10  genuinely forget the name of the company
11  that hosted that server, but
12  understandably, they want the protection
13  of a court order to be able to hand over
14  that data.  But once we got that data and
15  accessed that server, what we realized is
16  there not really anything on it that's
17  useful.
18        Because what it was is a
19  real-time interface, so it's giving you
20  point-in-time information.  It's not
21  storing -- you think about -- I mean, FTX,
22  for example, you guys -- this is an
23  observation.
24        There was 49 million line
25  items of data, right?

Page 73

1        So you can't store every
2  iteration of point-in-time data that's
3  ever happened, if you multiply that out by
4  other exchanges.  You just can't keep all
5  the information in a realistic way.  So
6  it's not there historically.  And we -- we
7  discussed the possibility of recreating
8  it, but the conclusion, both our IT guys
9  and the position that Josh Brown presented
10  to us as well as -- you just can't do it,
11  partly because you would have to rely on
12  all of these different parties -- I'll
13  sort of come to FTX in a minute -- having
14  that accurate historic data -- we talked
15  about the volume of it -- and having a API
16  that still works that you can still -- or
17  that interface that still works and still
18  can be switched on, you know, X number of
19  years after the event, and bearing in mind
20  that lots of different parties, FTX
21  included at this point in time.
22        So by the time we had spoken
23  to Josh, FTX was in a process, okay?
24        Or a lot of the other people
25  we dealt with, all the entities we dealt

19 (Pages 70 - 73)

Page 74

1  with, are in processes; Voyager, Genesis,
2  Humana.  So that information -- even if
3  you could theoretically dive into
4  everyone's historical records, suck out
5  the data from a particular date in time
6  and be sure that that was accurate, a lot
7  of those points are interrupted by
8  bankruptcy or other liquidation
9  proceedings around the world.
10       So the short answer is no, the
11  historic information isn't there because
12  it was about a real time or caused a
13  real-time way of looking at the financial
14  positions and, B, even if they were there,
15  it's arguable that you -- it's very
16  questionable as to whether you could
17  recreate it anyway.
18     Q   Did Mr. Brown provide you any
19  information about what types or fields of
20  data were visible on the API interface
21  with FTX?
22     A   No, he did not.  Not --
23  certainly to the best of my knowledge, he
24  did not, not to me directly.
25     Q   You described it as -- or you

Page 75

1  used the term "tricky," has a "tricky
2  interface."
3       Can you expand on what you
4  mean by that?
5     A   So the reason I used that term
6  is a observation made to us by Josh Brown.
7  I don't have specific reason from his
8  perspective as to why.  But also, from
9  when we were in discussions with Ascent,
10  the administrator of Three Arrows -- the
11  one that came to, you know, preparing
12  NAV packs, et cetera.
13       (Whereupon, the court reporter
14       requested clarification.)
15       THE WITNESS:  Ascent is the
16       administrator of Three Arrows.
17     A   I think it was, like -- so
18  Ascent who -- you know, who were engaged
19  by Three Arrows to be, you know, the party
20  that prepared the NAV packs at the end of
21  each month.  What one can see, from the
22  Ascent data, is that they -- and I don't
23  know if they were pulling their API -- I
24  believe they were pulling their data from
25  Three Arrows who was pulling from FTX.  It

Page 76

1  may be the case that they had a direct
2  interface with FTX itself.  I don't know
3  the answer to that.
4       But it was always very -- it
5  was -- they were -- their commentaries,
6  These are the always numbers that are hard
7  to reconcile; you know, I think for the
8  May NAV packs, they only had information
9  up to, you know, partway through the
10  month, so it was always the difficult area
11  was FTX.  And that's the observations that
12  were made to us.  I can't technically tell
13  you why it was difficult, because, again,
14  I'm not -- I say I can't remember what API
15  stands for let alone set one up.
16     Q   Prior to going to liquidation,
17  3AC was an active trader not only on the
18  FTX exchange, but other exchanges,
19  correct?
20     A   Prior to Three Arrows going
21  into liquidation, it's correct to say
22  that, at different points in time, Three
23  Arrows had different trading relationships
24  on different exchanges both -- when I say
25  "different," yes, activity but different

Page 77

1  volumes, content, et cetera.  By the time
2  Three Arrows went into liquidation, indeed
3  by the time -- by the middle of June and
4  even before that, the principal exchange
5  by a long way that Three Arrows was using
6  for that -- for that trading aspect of
7  their business was FTX.
8     Q   Were there any other exchanges
9  in 2022 where 3AC -- other than FTX, where
10  3AC was an active trader?
11     A   I'm happy or able to answer
12  that question with respect to May and June
13  sort of post the lunar collapse, where 3AC
14  transitioned to using FTX as its primary
15  trading exchange.  There were relations --
16  trading relationships to a much smaller
17  lower dollar value with Deribit.  You
18  know, whether or not you class Deribit as
19  an exchange is a different -- you know,
20  but for the sake of your question, you
21  know, Deribit was the other party in that
22  bracket where they were, you know, non- --
23  you know, just using an exchange that I
24  need to buy some bitcoin so here's some
25  Eth-type ways.

20 (Pages 74 - 77)

1      (Whereupon, the court reporter
2      requested clarification.)
3      THE WITNESS:  Sorry.
4    A   So --
5      COURT REPORTER:  I need to --
6    A   -- just using an exchange
7  where you have, say, some bitcoin to buy
8  some Eth, which is a ETF, you know, so a
9  purely transactional basis.  Beyond that,
10  the only exchange that we're aware of, and
11  certainly into June 2022, that there were
12  more complex trading arrangements with
13  Deribit.
14    Q   So 3AC had, as you put it, a
15  trading account where they conducted their
16  more complex trading on FTX during the
17  period of May and June 2022, correct?
18    A   That's correct.  Yes.
19    Q   And 3AC understood that, in --
20  by trading on the FTX account, it had
21  agreed to abide by the FTX terms of
22  service, correct?
23      MR. HARRIS:  Objection.  Calls
24      for a legal conclusion.
25      MR. GLUECKSTEIN:  I'm asking

1  for their understanding.
2    A   I --
3      MR. HARRIS:  You can answer,
4      just don't reveal any attorney
5      advice or work product in doing
6      so.
7    A   I cannot speculate as to what
8  3AC did or didn't understand in May or
9  June 2022.
10      (Whereupon, a Document,
11      Bates-stamped
12      FTX_3AC_000013695 was marked
13      as Crumpler Exhibit No. 2 for
14      identification, as of this
15      date.)
16    Q   Mr. Crumpler, I've handed you
17  a document that the reporter has marked as
18  Exhibit 2, which is entitled "FTX Terms of
19  Service," dated May 13, 2022.  There's a
20  Bates number on it FTX_3AC ending in
21  13695.
22      Do you see that?
23    A   I do.
24    Q   Have you seen this document
25  before?

1    A   Yes, I have.
2    Q   Do you see, on the first page
3  of the document, there's a paragraph that
4  starts in the middle?
5      It begins:  By registering for
6  a platform account or using the service,
7  you agree that you have read, understand,
8  and accept the terms.
9      And it goes on from there.
10      Do you see that?
11    A   I do.
12    Q   Does Three -- does Three
13  Arrows Capital dispute that it was bound
14  by the FTX terms of service that's been
15  marked as Exhibit 2 with respect to its
16  trading activity?
17      MR. HARRIS:  Objection.  Calls
18      for a legal conclusion.
19      I instruct the witness not to
20      reveal any attorney-client
21      communication or attorney advice.
22      If you have some other basis to
23      answer, you can do so.
24    A   It -- this just calls for a
25  legal conclusion.

1    Q   Okay.  So other than advice
2  from counsel, you don't have -- as the
3  joint liquidator for 3AC, you don't have a
4  position as to whether 3AC was bound by
5  the FTX terms of service, correct?
6    A   I rely on the advice of my
7  counsel.
8    Q   What is Three Arrows Capital's
9  understanding of what comprises the
10  account balance -- their account balance
11  on the FTX exchange?
12      MR. HARRIS:  Object to the
13      form of the question.
14    A   Can you rephrase the question,
15  please?
16    Q   What is Three Arrows Capital's
17  understanding of what is included in their
18  account balance on the FTX exchange?
19      MR. HARRIS:  Still object to
20      the form.
21    A   The -- what is included in our
22  account balance or otherwise is subject to
23  legal conclusions.
24    Q   I'm not asking for a legal
25  answer.  I'm trying to understand.

21 (Pages 78 - 81)

Page 82

1    FTX held an account on the
2  FTX -- 3AC held an account on the FTX
3  exchange?
4    A  Uh-huh.  Yes.
5    Q  It was provided an account
6  balance with respect to those accounts.
7    What was included in that
8  balance at any point in time?
9    MR. HARRIS:  Object to form.
10   To the extent you're referring to
11   something called an "account
12   balance" that's in a document, I'm
13   going to object that it calls for
14   a legal conclusion.  I just don't
15   understand.
16   MR. GLUECKSTEIN:  Yeah.  Let's
17   look at this.  All right.
18   (Whereupon, a Document,
19   Bates-stamped 3AC_FTX_00558861
20   was marked as Crumpler Exhibit
21   No. 3 for identification, as
22   of this date.)
23   Q  Mr. Crumpler, I've handed you
24  a document that's from Ningxin Zhang
25  dated -- dated July 6, 2020.  It's a Bates

Page 83

1  number produced by 3AC, 3AC FTX 558861.
2    Do you have that in front of
3  you?
4    A  I do.  Yes.
5    Q  Have you seen this particular
6  email before?
7    A  I don't recollect seeing this
8  particular email before, but obviously
9  it's something we've disclosed to you.
10   Q  Okay.  If you look at the
11  second page of this email, there is a
12  screenshot from the FTX exchange.
13   Do you see that?
14   A  I do, yes.
15   Q  And there is a -- there's is
16  a -- in the middle of that interface
17  screenshot, there is an entry there that
18  says:  Total net USD value.
19   And it listed as $872,362.59.
20  This is the screenshot on a page ending in
21  6682.
22   Do you see that?
23   A  I do.  Yes.
24   Q  What is 3AC's understanding of
25  what compromise -- what comprised the

Page 84

1  total net USD value at this point in time
2  or any point in time as shown to the user
3  on the FTX interface?
4    MR. HARRIS:  Object to the
5    form.  And objection.  Compound.
6    A  Can you repeat the question,
7  please?
8    Q  With respect to the entry on
9  this FTX user interface that says:  Total
10  net USD value.
11   Do you see that?
12   A  Yes.
13   Q  What comprises the total net
14  USD value of the 3AC account that is
15  reflected in that number?
16   MR. HARRIS:  Object to the
17   form.
18   A  So all I can do is speculate
19  based on what is in front of me.  That is
20  a wallet.  I don't know if that's all the
21  wallets.  I don't know what is behind the
22  USD net value figure that's presented
23  there.  And I don't know what would happen
24  if one was to click on the "view all
25  account balances" designation, even if

Page 85

1  that's -- that looks like a clickable
2  function that's below it.  So I simply
3  cannot tell you what makes up the net USD
4  value that's shown there.  The records
5  from FTX may well be able to show that
6  information.
7    Q  Do you have any understanding
8  of what the term "total net USD value" as
9  used by FTX meant with respect to a
10  customer account?
11   A  Certainly not in the context
12  of what's before me.  This is also 2020,
13  so I have no idea if this is the same sort
14  of information that was available in 2022.
15   Q  What is 3AC's understanding of
16  what was available in June of 2022 and
17  presented to 3AC with respect to its
18  account balance at any point in time?
19   MR. HARRIS:  Object to the
20   form.
21   A  We -- I think to take the
22  second part of your question~-- right?~--
23  "what was presented to 3AC in June 2022,"
24  we don't -- we simply don't have that
25  information.

22 (Pages 82 - 85)

Page 86

1    Q   Is your testimony sitting here
2  today, after the discovery process that
3  you referenced earlier, that you still
4  don't know what was presented to 3AC in
5  June of 2022?
6    A   We do not have -- we do not
7  know and have not finished our analysis of
8  all the data and documentation and it --
9  and details presented to us by FTX during
10  the course of our dispute.  That analysis
11  is ongoing, and where appropriate, subject
12  to legal conclusions.
13    Q   Understanding your analysis is
14  ongoing, as you sit here today as a
15  representative of Three Arrows Capital,
16  you don't have a view as to what account
17  balance information was available to 3AC
18  in June of 2022?
19        That's your testimony?
20    A   My testimony is that that view
21  is subject to legal analysis and is an
22  ongoing analysis due to the disclosure and
23  ongoing disclosure from FTX.  And,
24  obviously, I use that word "disclosure,"
25  as I said before, in a broad sense.

Page 87

1    Q   Okay.  I'm not asking you for
2  your counsel's legal analysis of the
3  account balance.
4        I'm asking you, as a factual
5  matter as the joint liquidator of 3AC,
6  whether you have a factual understanding
7  of what information was available to 3AC
8  in June 2022 with respect to its accounts?
9        MR. HARRIS:  Object to the
10        form.
11    A   We are building, though, a
12  factual understanding of the information
13  that FTX has provided us with respect to
14  what occurred upon and how the accounts
15  were -- what occurred upon those accounts.
16    Q   As you sit here today, you
17  don't -- you -- because that analysis is
18  ongoing, you don't have a view, correct?
19        MR. HARRIS:  Object to the
20        form.
21    A   My view is ongoing -- or the
22  development of our view is ongoing and
23  subject -- it isn't just the case that one
24  could look at, you know, a series of
25  numbers and reach a conclusion.  It

Page 88

1  requires legal analysis as to how those
2  numbers should be interpreted and,
3  therefore, it's subject to legal
4  conclusion.
5    Q   Do you dispute that, as of
6  June 12, 2024, 3AC had bitcoin, Eth, and
7  other digital assets credited to its 3AC
8  accounts?
9    A   I agree that, as of June 12,
10  2020 --
11    Q   Sorry.  2022.
12    A   -- '22 -- no problem.  Sorry.
13  As of June 12, 2022, I agree that Three
14  Arrows owned bitcoin, Eth, and other
15  digital currency, and that was -- can be
16  seen on FTX's accounts -- or FTX's
17  records.
18    Q   Okay.  And were those digital
19  currencies a part of the account balance
20  that would have been credited to 3AC with
21  respect to those accounts?
22        MR. HARRIS:  Object to the
23        form.
24    A   Those digital currencies were
25  assets own by FTX on the FTX platform.  As

Page 89

1  to how they were incorporated into an FTX
2  balance -- an account balance calculated
3  by FTX, then our analysis is ongoing
4  subject to legal conclusion.
5        MR. HARRIS:  Okay.  I don't
6        want to suggest an answer.
7        You said they're owned by FTX.
8        If that's your testimony, fine
9        but...
10        THE WITNESS:  No, my testimony
11        is not.  It's specifically --
12        MR. HARRIS:  Okay.
13        THE WITNESS:  -- not owned by
14        FTX.  Let me correct that if I
15        may.
16    A   I -- my testimony is that they
17  were owned by Three Arrows in accordance
18  with the terms of service.
19        Can I make a quick aside?
20        When you -- we talk about
21  getting dates wrong.  I think I said
22  earlier that we spoke with Kyle Davies in
23  2023.  It was 2022.
24    Q   Do you understand that, in
25  June of 2022, 3AC also had a U.S. dollars

23 (Pages 86 - 89)

Page 90

1  balance within its FTX account?
2      A   Yes, that's my understanding.
3      Q   Is -- do you agree that, when
4  3AC sells a digital currency such as
5  bitcoin and exchanges it for U.S. dollars,
6  that its account balance is unaffected?
7          MR. HARRIS:  Object to the
8      form to the extent that involves
9      legal advice.
10         I instruct the witness not to
11     reveal any attorney-client
12     communications or legal advice.
13     A   So where I can't agree is
14  where we are in a debate as to what
15  "account balance" actually means.  So it
16  would be very dependent on what we agree
17  or otherwise whatever FTX means by
18  "account balance" or what a governing
19  document means by "account balance."
20     Q   Let's put aside the term
21  "account balance."
22         If you have one bitcoin and
23  you sell that bitcoin for dollars --
24     A   Yes.
25     Q   -- and you're paid -- your

Page 91

1  bitcoin is converted into dollars.
2      A   Yes.
3      Q   And you have the same amount
4  of money.
5          MR. HARRIS:  Object to the
6      form.
7      A   I have previously held -- if
8  I've sold a bitcoin or a bitcoin has been
9  liquidated and that sale, to use the
10  general term, has resulted in U.S. dollars
11  or it's been for U.S. dollars, then yes, I
12  would have U.S. dollars equivalent to
13  whatever was agreed with whom -- with
14  whomever was selling that bitcoin.
15     Q   And, if you had a -- if you --
16  if that bitcoin existed at whatever the
17  market price is of that bitcoin and you
18  convert it into U.S. dollars,
19  economically, that transaction is neutral,
20  correct?
21     A   In a very general sense, yes.
22     Q   What is 3AC's understanding of
23  the margin program that existed on the FTX
24  exchange in June of 2022?
25         MR. HARRIS:  Objection.

Page 92

1          To the extent that calls for
2      legal advice, I remind the witness
3      not to reveal that.  But if you
4      have another basis you can
5      answer...
6      A   Our understanding -- I'm
7  sorry.
8          Could you just repeat the
9  question, please?
10     Q   What is 3AC's understanding of
11  the margin program that existed on the FTX
12  exchange in June of 2022?
13     A   Our understanding and analysis
14  is ongoing subject to the ongoing
15  disclosure and discovery exercise with
16  FTX.  We received further information as
17  late as Sunday with respect to the margin
18  program.
19     Q   Okay.  So as -- sitting here
20  today as the representative of Three
21  Arrows Capital, you do not have an
22  understanding of the FTX margin program
23  that existed in June 2022 --
24         MR. HARRIS:  Well --
25     Q   -- right?

Page 93

1          MR. HARRIS:  -- exclude from
2      your answer legal advice or any
3      legal opinions or work product
4      that has been shared with you.  So
5      to the extent you have some
6      another understanding, you can
7      share that.
8      A   My understanding is based on
9  the legal advice I've received and the
10  ongoing legal analysis and conclusions.
11     Q   Three Arrows Capital
12  participated in FTX's margin program in
13  June of 2022, correct?
14     A   Yes, I believe that to be
15  correct.
16     Q   Do you have a general
17  understanding of what "trading on margin"
18  means?
19     A   If you're asking me in my
20  personal capacity, then yes, I do.
21     Q   What is your understanding of
22  what trading on margin is?
23     A   In very simplistic terms, it
24  means that you are, in a sense, leveraging
25  your ability to trade by -- and increasing

24 (Pages 90 - 93)

Page 94

1  your exposure to something by -- and
2  what's the best way of phrasing this? --
3  allowing a third party to provide you with
4  margin, with -- effectively with a loan to
5  allow you to trade with.
6      Q    And trading on margin would
7  allow the trader to access additional
8  liquidity in connection with its trading
9  activities, correct?
10      A    It would allow a trader --
11  and, again, in very general terms and
12  without specific reference to the FTX
13  relationship.  Between Three Arrows and
14  FTX, it would allow a trader to trade; to
15  use your phrase, access liquidity but
16  really access a larger pool of assets.
17      Q    Okay.  And, with respect to
18  Three Arrows trading on the FTX exchange,
19  Three Arrows Capital opted into the margin
20  program in order to utilize it, correct?
21          MR. HARRIS:  Objection.
22          I just advise the witness not
23      to reveal any attorney advice or
24      attorney communications.  If you
25      have another basis, you can

Page 95

1      answer.
2      A    I'm not sure what you mean by
3  "opt in."  I do not know what steps Three
4  Arrows took to opt in or otherwise other
5  than where we have legal advice or legal
6  conclusions can be drawn.
7          (Whereupon, a Document,
8          Bates-stamped
9          FTX_3AC_000045694 was marked
10          as Crumpler Exhibit No. 4 for
11          identification, as of this
12          date.)
13      Q    Mr. Crumpler, the court
14  reporter has handed you a document that
15  has been marked as Exhibit 5 -- I'm
16  sorry -- Exhibit 4, which is a document
17  produced by FTX entitled "Spot Margin
18  Trainer Explainer," ends in Bates
19  Number 45694.
20          Do you see that?
21      A    I do.  Yes.
22      Q    Have you seen this document
23  before, Mr. Crumpler?
24      A    I have seen this document
25  before.  Let me just check that I've --

Page 96

1  yes.  I've seen this document before.
2      Q    Okay.  And we agreed a few
3  moments ago that 3AC did utilize trading
4  on margin in its activities in FTX,
5  correct?
6      A    Yes.  That's correct.
7      Q    Okay.  And so you see, in the
8  middle of the first page here, there's a
9  section that says:  How to enable margin
10  trading.
11          Do you see that?
12      A    I do.
13      Q    Okay.  And it says:  To enable
14  margin trading and borrowing, visit your
15  settings page or the borrowing page.  If
16  you turn margin trading and borrowing on,
17  then your account will attempt to borrow
18  any spot assets that it is short.
19          Do you see that?
20      A    I do.  Yes.
21      Q    Okay.  So I'm asking whether
22  you have an understanding of whether 3AC,
23  in order to utilize the margin trading
24  program at FTX, turned on and enabled the
25  margin trading program?

Page 97

1          MR. HARRIS:  Objection.
2          I just remind the witness not
3      to reveal attorney-client advice,
4      but you can answer.
5      A    So, obviously, this is a
6  document that I understand has only
7  recently been provided to us, so our
8  analysis of it is ongoing and subject to
9  legal conclusions.  I also point out this
10  is a 2022 document, so I don't know what
11  happened with respect to Three Arrows and
12  FTX's involvement prior to this, whether
13  or not something had already been set,
14  whether or not Three Arrows had to make a
15  step on the 22nd -- the 4th of April,
16  2022, et cetera, because I simply wasn't
17  there at the time.
18          So most of my answer, subject
19  to legal conclusions and advice, I'll just
20  point out that, that this is a
21  point-in-time document that's only
22  recently provided to us, so our analysis
23  of it is ongoing.
24      Q    Okay.  Understanding that your
25  analysis is ongoing, as you sit here

25 (Pages 94 - 97)

Page 98

1  today, Three Arrows Capital, you can't
2  point -- Three Arrows Capital cannot point
3  to any evidence that the FTX margin
4  trading program did not operate as set
5  forth in what's been marked as Exhibit 4,
6  correct?
7       MR. HARRIS:  Object to the
8     form of the question.
9       Also instruct the witness not
10    to reveal any attorney-client
11    advice or attorney work product.
12    A    Our analysis of the spot
13  margin trading program, its relationship
14  to Three Arrows and FTX is ongoing and
15  subject to legal conclusion.
16    Q    So you don't have any
17  evidence, sitting here today, that what's
18  set forth in this document marked as
19  Exhibit 4 as to the process for spark --
20  spot trading on the FTX exchange is
21  incorrect?
22       MR. HARRIS:  Object to the
23    form of the question.
24       And I will, again, instruct
25    the witness not to reveal

Page 99

1     attorney-client advice or attorney
2     work product.  If you have another
3     basis, you can answer.
4     A    I could accept that, if a new
5  client came along on the 5th of April 2022
6  and assuming that their accounts were set
7  up to operate in the way that this
8  explainer suggests, they would have to opt
9  in or opt out.  Beyond that, our analysis,
10  with respect to the Three Arrows-FTX
11  relationship, which existed prior to this
12  date, is ongoing and subject to legal
13  considerations and conclusions.
14    Q    Mr. Crumpler, you understand
15  that the margin trading program allowed
16  3AC to open long BTC-PERP contracts
17  without the cash to do so, correct?
18       MR. HARRIS:  Object to form.
19    A    Can you define what you mean
20  "without the cash to do so"?
21    Q    Trading on margin allowed 3AC
22  to open long PERP contracts on margin
23  without the cash to stand behind -- in
24  their account to stand behind those
25  contracts, correct?

Page 100

1       MR. HARRIS:  Object to the
2     form.
3     A    I understand in a general
4  sense that the concept of trading in
5  margin allows someone to trade at a level
6  beyond the cash that they're holding or
7  cash equivalents that they are holding.
8     Q    And 3AC paid interest on its
9  borrowings under the margin program,
10  correct?
11    A    So was that, did 3AC pay
12  interest?
13    Q    It's your understanding that
14  3AC paid interest --
15    A    It's my under --
16    Q    -- for utilization of margin
17  on the FTX exchange, correct?
18    A    It's my understanding from the
19  records provided to us by FTX that
20  interest was charged to Three Arrows.
21    Q    And isn't it correct that
22  Three Arrows Capital accumulated the BTC
23  balance it had in June of 2022 in part by
24  borrowing under the margin program?
25       MR. HARRIS:  Object to the

Page 101

1     form.  Instruct the witness not to
2     reveal any attorney work product.
3       But you can answer otherwise.
4     A    The -- our exact answer or
5  conclusion as just to how Three Arrows was
6  able to accumulate its bitcoin and other
7  holdings on the FTX platform and the
8  relationship between if the governing
9  documents and the way the platform
10  operated in Three Arrows is subject to
11  ongoing analysis of the documents provided
12  to us by FTX and legal conclusions.
13    Q    So as you sit here today, you
14  don't have an answer to the question --
15  you don't -- of whether 3AC accumulated
16  its bitcoin balance in June of 2022 by
17  borrowing under the margin program?
18       MR. HARRIS:  I'll just repeat
19    my prior objections.
20    A    As I sit here today, our
21  analysis of the position as between FTX
22  and Three Arrows is ongoing subject to the
23  ongoing disclosure and discovery process
24  and information, some of which has come to
25  us very late from FTX, and therefore, our

26 (Pages 98 - 101)

Page 102

1  conclusion and our current position is
2  subject to change, ongoing, and subject to
3  legal analysis and conclusions.
4      Q   Understanding it's subject to
5  change, what is your current position with
6  respect to whether 3AC accumulated its
7  bitcoin balance in June of 2022 by
8  borrowing under the margin program?
9          MR. HARRIS:  Same objection.
10         Just remind the witness not to
11      reveal any attorney work product.
12     A   Our current position is based
13  on the legal advice we have received and
14  therefore subject to legal conclusions.
15     Q   Isn't it true that Three
16  Arrows Capital accumulated its negative
17  USD balance that it had at the end of
18  June 12, 2022, in part by borrowing under
19  the margin program?
20         MR. HARRIS:  Same objections.
21     A   The same point, subject to
22  ongoing analysis of the data provided to
23  FTX and the legal advice associated with
24  that analysis and therefore subject to
25  legal conclusions.

Page 103

1      Q   And, Mr. Crumpler, do you have
2  an understanding of what a perpetual
3  futures contract is?
4      A   At a high level, I have an
5  understanding of what a futures contract
6  is.
7      Q   What is your understanding of
8  what a futures contract is?
9      A   A futures contract is the
10  contract between normally two parties, but
11  at some point in the future, one party
12  will deliver to or pay for an asset at a
13  price that's typically fixed at the time,
14  or with reference to time, the contract is
15  entered into.
16     Q   Mr. Crumpler, if you still
17  have in front of you, can you go back to
18  Exhibit 2?  It's the FTX terms of service?
19     A   Sure.
20     Q   And if you could, turn to page
21  that ends in -- of that exhibit -- 13729,
22  Schedule 5?
23     A   Yes, I'm -- I'm on that page.
24     Q   You see that.  And if you
25  could -- if you see in the middle of the

Page 104

1  page there, there is, in the -- in the box
2  where it says, Specified service, specific
3  terms.
4      Q   Do you see that?
5      A   I see the box you're referring
6  to, yes.
7      Q   Yeah.  The second paragraph
8  there is language that states:  Perpetual
9  futures contracts represent obligations to
10  buy or sell a digital asset at a specific
11  price at any time while the contract
12  remains open.  Perpetual futures contracts
13  do not have an expiry date but instead
14  continuously roll over, i.e., every hour.
15  Each perpetual futures contract has a
16  funding payment where longs pay shorts
17  equal to one hour TWAP premium 24.
18     Q   Do you see that?
19     A   I do.
20     Q   Okay.  And does 3AC have an
21  understanding that is -- that this is what
22  FTX was entering into when it entered into
23  perpetual futures contracts with its
24  customers?
25         MR. HARRIS:  Objection.  Calls

Page 105

1  for a legal conclusion.
2          Instruct the witness not to
3      reveal any attorney work product
4      or attorney advice.  If you have
5      some other basis, you can answer.
6      A   Sorry.
7      Q   I'm sorry, just to clarify, I
8  meant whether -- does 3AC have a
9  understanding that this is what FTX was
10  offering in terms of perpetual futures
11  contract to its customers?
12         MR. HARRIS:  Same objections
13      and same instruction.
14     A   Not beyond the fact that it
15  calls for a legal conclusion.
16     Q   Okay.  So sitting here today,
17  do you have -- does 3AC have any
18  understanding of what FTX perpetual
19  futures contracts were in June of 2022?
20         MR. HARRIS:  Objection.  Calls
21      for a legal conclusion.
22         Instruct the witness not to
23      reveal attorney advice or attorney
24      work product.  If you have a
25      different basis, you can answer.

Page 106

1      A   I don't.  My -- 3AC's
2  understanding is based on legal advice and
3  legal conclusions.
4      Q   So I just want to be entirely
5  clear.  I understand and I'm not asking
6  you with any of these questions to reveal
7  legal advice.  I'm trying to understand
8  Three Arrows Capital factual understanding
9  of what its trading relationship and
10 products were as entered into in June of
11 2022.  So all of my questions are only
12 asking for your factual understanding.  If
13 you don't have one, then you can tell me.
14     A   My --
15         MR. HARRIS:  Hold on.  Wait.
16     There is not a question to answer.
17         THE WITNESS:  Okay.
18     Q   All right.  So I'm going -- so
19 same question.  I'm again asking as a
20 factual matter whether Three Arrows
21 Capital has an understanding as to what
22 its perpetual futures contracts were with
23 FTX in June of 2022?
24         MR. HARRIS:  So same
25     objection.  Calls for a legal

Page 107

1      conclusion what a contract is.
2         If you have a -- some basis to
3      answer without giving legal advice
4      and revealing attorney work
5      product, you can do so.
6      A   I don't have a basis to answer
7  because the factual position is intimately
8  intertwined with the legal  -- illegal
9  analysis of what all the contracts,
10 terminology, et cetera, means.  So it's
11 all based on legal conclusion.
12     Q   When Three Arrows Capital
13 owned a position on the FTX exchange, it
14 did not pay any amount for the contract
15 itself other than trading fees, correct?
16     A   Our analysis of information
17 provided to us by FTX, I think what was
18 paid when and where is ongoing.  So we
19 don't have a conclusion with respect to
20 that at this point in time.  We keep
21 getting further information from FTX.
22 That is also potentially subject to legal
23 analysis and conclusion.
24     Q   As you sit here today, Three
25 Arrows Capital cannot point to any

Page 108

1  evidence that opening a perpetual futures
2  position changed its account balance,
3  correct?
4         MR. HARRIS:  Object to the
5     form.
6         Instruct the witness not to
7     reveal any attorney work product
8     or communications.  If you have
9     another basis, you can answer.
10     A   My only answer is, at this
11 point in time, we still haven't determined
12 what -- we're not even certain what FTX
13 means by account balance.  So therefore, I
14 cannot answer that question.
15     Q   Does Three Arrows Capital,
16 sitting here today, have an understanding
17 as to whether entering into a futures
18 position on the FTX exchange changed its
19 economic position with respect to its
20 economic entitlements?
21         MR. HARRIS:  Object to the
22     form.
23     A   Could you repeat the question,
24 please.
25     Q   Does Three Arrows Capital,

Page 109

1  sitting here today, understand whether
2  entering into a futures position on the
3  FTX exchange changed its economic position
4  in its FTX account?
5         MR. HARRIS:  Same objection.
6     A   Our broad understanding is
7  that entering into a transaction will have
8  an impact on Three Arrows' economic
9  position.
10     Q   Okay.  I'm asking specifically
11 with respect to entering into a perpetual
12 futures position on the FTX exchange.
13         Did that change Three Arrows
14 Capital's economic position?
15         MR. HARRIS:  Same objection.
16     A   To the extent that Three
17 Arrows then -- the assets that Three
18 Arrows had an entitlement to on the
19 exchange increased, then yes, I agree.
20 There is obviously ongoing analysis, both
21 the information provided to us and the
22 legal advice being obtained with respect
23 to that information as to the conclusions
24 one reaches as to the other side, whether
25 there's liabilities, et cetera, so subject

28 (Pages 106 - 109)

Page 110

1  to legal conclusion.
2      Q    A futures position itself is
3  not an asset, correct?
4          MR. HARRIS:  Objection.  Calls
5      for a legal conclusion.  To the
6      extent you can answer, go ahead.
7          I would instruct the witness
8      not to reveal attorney advice or
9      work product, but if you have
10     another basis, you can answer.
11     A    Whether a futures position is
12  any -- is an asset is -- absolutely calls
13  for a legal conclusion.
14     Q    So in your role as a
15  liquidator and as a financial
16  professional, you don't have a view
17  outside of legal advice as to whether a
18  futures position is an asset?
19         MR. HARRIS:  Same objections.
20     A    There are certainly
21  circumstances where a futures position, if
22  one takes the broadest definition of it,
23  could be recorded as an asset in the
24  company.
25     Q    Okay.  Can you explain to me

Page 111

1  how that could be so?
2      A    Because you have a right to
3  something in the future.
4      Q    You have a potential
5  contingent right to something in the
6  future, correct?
7      A    And again, we're getting into
8  legal terminology as to what all those
9  different words mean.  So the balance is
10  subject to legal conclusions.
11     Q    So as you sit here today,
12  then, I assume 3AC does not have an
13  understanding as to whether futures
14  contracts were listed as part of the
15  account balance on the FTX exchange,
16  correct?
17         MR. HARRIS:  Object to form
18     and object to the extent its
19     calling for a legal conclusion.
20         I instruct the witness not to
21     reveal attorney work product.
22     Otherwise, you can answer.
23     A    Our position is that the
24  futures contracts were assets of Three
25  Arrows as listed on the FTX exchange as

Page 112

1  to -- as to all of the reasons as to why,
2  that's subject to legal advice and
3  conclusions.
4      Q    Your position is that futures
5  contracts were assets of Three Arrows as
6  listed on the FTX exchange; that's your
7  testimony?
8      A    The -- as provided to us -- so
9  when I say "listed on the exchange," to be
10  clear, the information we have in
11  calculating the value of the assets -- the
12  terminology we use, I think, in the
13  amended complaint is "lost assets" -- is
14  based on information provided to us by
15  FTX.  It's that 49-million line items of
16  data together with a degree of explanation
17  as to -- a small degree of explanation as
18  to what -- what one's to do calculate that
19  position.
20         So we get to an asset position
21  which was very close to the asset position
22  that, I think, A & M calculated themselves
23  using the same data that says that our
24  assets on the exchange, Three Arrows'
25  assets on the exchange which included the,

Page 113

1  I think, using your terminology, perpetual
2  futures positions.  Including those was
3  something like $1.596 billion on the 12th
4  of -- at the very end of the day, UTC
5  time, on the 12th of June.
6      Q    Is the basis for -- is the
7  basis for that answer anything other than
8  information that you claim was produced or
9  provided by FTX?
10         MR. HARRIS:  Objection.
11     Remind the witness not to
12     reveal attorney work product or
13     advice, but otherwise you can
14     answer.
15     A    Sorry.  Could you repeat the
16  question.  I want to make sure I'm careful
17  and -- or correct in my answer.
18     Q    We're certainly going to talk
19  about your proof of claim, but you just
20  referenced it in your last answer --
21     A    Uh-huh.
22     Q    -- and explained your view as
23  to an asset position of Three Arrows
24  Capital.
25         And my question is whether the

Page 114

1  basis for your prior answer of that
2  testimony is anything other than
3  information that you assert was produced
4  or provided by FTX?
5        MR. HARRIS:  Objection.
6     Remind the witness not to reveal
7     attorney work product or advice.
8     A  Yeah.  Okay.  So the vast
9  majority of our calculation is to that
10  value was based on information provided to
11  us by FTX.  There was -- and I think
12  you'll see it in response to some of the
13  interrogatories.  You'll see that where --
14  to calculate the number where we had to go
15  to, you know, publicly available sources
16  in some instances to work out the value of
17  a token, I believe we used CoinGecko and
18  CoinList, the exact names are in the
19  response to our interrogatories.
20        So the genesis of our
21  calculation was absolutely the FTX
22  information.  To a -- to a degree we had
23  to verify certain pricing information from
24  publicly available third sources.  And I
25  reiterate the point that when we did our

Page 115

1  maths, or whether my team did their maths,
2  it was very, very close to the maths and
3  analysis performed by A & M as presented
4  in the end of 2023 and 2024.
5        (Whereupon, the court reporter
6        requested clarification.)
7        THE WITNESS:  Math.  Sorry,
8        yes.  Maths.  I apologize.  The --
9        we put an "S" on the end in the
10        UK.
11     Q  Mr. Crumpler, the FTX terms of
12  service require customers, including Three
13  Arrows Capital, to comply with a
14  maintenance margin requirement, correct?
15        MR. HARRIS:  Objection.  Calls
16        for a legal conclusion.
17        Instruct the witness not to
18        reveal attorney advice or work
19        product.  If you have some other
20        basis, you can answer.
21     A  I'm afraid it calls for legal
22  conclusions.
23     Q  Does 3AC have any
24  understanding, as a factual matter, what
25  FTX meant when it referenced a

Page 116

1  "maintenance margin requirement" in
2  connection with its trading platform?
3        MR. HARRIS:  Same objection
4        and same instructions.
5     A  The factual position is
6  intimately intertwined with the legal
7  advice we have received and are receiving
8  and the analysis that's ongoing.  I mean,
9  my understanding is that the documents
10  provided to us as late as Sunday last
11  week -- or sorry -- Friday -- I
12  apologize -- end of day Friday last week
13  talked to what FTX's understanding of the
14  "margin maintenance" means.
15        We certainly haven't had time
16  to finish our analysis of that, and the
17  facts are absolutely -- to the extent the
18  facts are there and relevant, they're
19  absolutely intertwined with any legal
20  analysis and legal conclusions with
21  respect to what it all means.
22     Q  So to answer my question, as a
23  factual matter that -- you do not have an
24  understanding -- Three Arrows Capital does
25  not have an understanding of what FTX

Page 117

1  meant by a "maintenance margin
2  requirement" --
3     A  So the --
4        MR. HARRIS:  Same --
5     Q  -- in connection with its
6  trading account?
7        MR. HARRIS:  -- same
8        objection.
9     A  Subject to further and ongoing
10  analysis of the information provided to us
11  by FTX and continuing to be provided to us
12  by FTX and the legal advice and legal
13  conclusions with respect to that
14  information.
15     Q  Mr. Crumpler, do you still
16  have Exhibit 2 in front of you?
17     A  Is --
18     Q  That's the terms of service.
19     A  Yes, I do.  Sorry.  Yes.
20     Q  Can you turn to page Bates
21  number in the right-hand corner ending
22  13697?
23        So there is a section at the
24  bottom of that page -- that begins at the
25  bottom of page there, 2.5.2, that

30 (Pages 114 - 117)

Page 118

1 continues on to the next page.
2       Do you see that?
3    A  I do.
4       Just let me read it if that's
5 okay?
6       Okay.  I have read that.
7    Q   In Section 2.3.2 -- sorry --
8 2.5.2, the one we were just looking at, on
9 the -- on the second page there on
10 page 698, it provides in part:  If your
11 account is under the minimum margin
12 requirements, your position may be
13 liquidated at a loss and you may lose all
14 of your assets in your account.
15       Do you see that language?
16    A  I see that language.
17    Q   All right.  Did 3AC -- well,
18 is it your understanding that 3AC was
19 bound by that language in Exhibit 2?
20       MR. HARRIS:  Objection.  Calls
21    for a legal conclusion.
22       Instruct the witness not to
23    reveal attorney advice or
24    communications.  If you have some
25    other basis to answer, you can.

Page 119

1    A   Our understanding as to
2 whether or not Three Arrows is bound by
3 that language --
4       (Whereupon, the court reporter
5       requested clarification.)
6       THE WITNESS:  Arrows.
7    A   So 3AC's understanding of
8 whether or not it was and is bound by that
9 language is subject to legal analysis and
10 legal conclusions.
11    Q   Okay.  And does Three Arrows
12 Capital have an understanding as to what
13 FTX was conveying in that sentence where
14 it says "minimum margin requirements" as a
15 factual matter?
16       MR. HARRIS:  Same objections.
17    A   As a factual matter, FTX
18 still -- is still disclosing to us what
19 "minimum margin requirements" actually
20 mean.  We were originally told, I believe
21 in a deposition in -- a while ago that FTX
22 couldn't calculate what a minimum margin
23 requirement was with respect to Three
24 Arrows.  We were served with a further
25 declaration.  Again, if I've got my legal

Page 120

1 terminology wrong, I apologize.  But I
2 think it was a further declaration on
3 Friday last week attempting to show how
4 the minimum margin calculation might have
5 been calculated.
6       Our analysis of that document
7 is ongoing.  But even our very initial
8 looking at it suggests that we get a
9 slightly different answer.
10       So I do understand what FTX
11 means by "minimum margin requirements"?
12       I'm not sure FTX does.
13    Q   What do you mean when you say
14 that your -- based on your initial review,
15 you get a slightly different answer?
16    A   My team has informed me that,
17 with respect to the declaration provided
18 to us late in the day on Friday, whatever
19 the date was last Friday -- so, you know,
20 a matter of days ago -- their initial
21 analysis, which is clearly subject to much
22 further investigation, may well require
23 additional legal advice and legal
24 conclusions.  But their initial analysis,
25 as presented, gets to a different answer

Page 121

1 than the one provided in that document.
2       Now, our position on that is
3 clearly subject to change, potentially
4 material change, as that document was only
5 provided to us via our counsel on Friday
6 evening last week.
7    Q   What is the answer that your
8 team has given you --
9    A   I don't -- all I've been told
10 is that they can't make it match.
11    Q   And you're not aware of any
12 details of how so or in what magnitude?
13    A   I'm not.  No.
14       (whereupon, a Document,
15       Bates-stamped
16       FTX-3AC_000000758 was marked
17       as Crumpler Exhibit No. 5 for
18       identification, as of this
19       date.)
20       THE WITNESS:  Thank you.
21    Q   Mr. Crumpler, you have been
22 handed a document that's been marked as
23 Exhibit 5, which is a document entitled
24 "FTX Line of Credit," and its Bates number
25 on the first page is FTX-3AC 758.

31 (Pages 118 - 121)

Page 122

1  Do you see that?
2  A  I see you've handed me one
3  document of that Bates number.  In terms
4  of one document, it's a printout of one
5  document, though there are two separate
6  agreements within that document.
7  Q  Can you explain why it's your
8  position that there are two separate
9  agreements within that document?
10  A  No.
11  MR. HARRIS:  Objection to the
12  extent it calls for a legal
13  conclusion.
14  Otherwise, you can answer.
15  A  I will make the factual point,
16  with respect to the physical document I'm
17  holding that is titled "FTX Line of
18  Credit," which is on Bates Number 758.
19  But if one turns to the second
20  page, and at the -- and if -- then you go
21  to the second page of Bates number 759 and
22  work about two-thirds of the way down that
23  page under Bullet Point Number 10, it
24  says:  In witness hereof -- or whereof --
25  sorry, not hereof -- the parties hereto

Page 123

1  have executed this line of credit
2  agreement by their duly authorized
3  officers and representatives.
4  And then immediately following
5  that, it says FTX -- as a title, "FTX
6  Institutional Customer Margin and Line of
7  Credit Agreement."
8  So that appears to be a
9  separate agreement, which has its own
10  signature page if one goes all the way to
11  Bates Number 763.  I can read through it
12  in more detail to see if there are any
13  other points to make with respect to that.
14  Q  So is it your factual
15  understanding that the signature pages on
16  the last page of this document only apply
17  to what you're referring to as the
18  "Institutional Customer Margin and Line of
19  Credit"?
20  MR. HARRIS:  Objection.
21  And remind the witness not to
22  reveal any attorney-client advice
23  or work product.  If you have
24  another basis, you can answer.
25  A  It is a fact that a signature

Page 124

1  does not appear on beneath the statement
2  on Bates Number 759.
3  In witness whereof the parties
4  hereto have executed this line of credit
5  agreement by their duly authorized
6  officers and representatives.
7  Q  I'm just trying to understand,
8  as a factual matter, whether it's your
9  position that the signature page does not
10  apply to the entirety of this document?
11  MR. HARRIS:  Objection to the
12  extent it calls for a legal
13  conclusion.
14  Remind the witness not to
15  reveal attorney-client advice, but
16  if you have a different basis, you
17  can answer.
18  A  Factually, my conclusion is
19  there is a signature with respect -- a
20  signature from Three Arrows Capital only.
21  There is no signature from FTX on this
22  document.  It is blank.  There is a
23  signature from Three Arrows Capital
24  Limited, only, a Docusign by Kyle Davies,
25  which we don't dispute, with respect to

Page 125

1  the FTX institutional customer margin and
2  line of credit agreement, which begins
3  three-quarters of the way down the page on
4  Bates number 759.
5  Q  And it's Three Arrows
6  Capital's position that that signature
7  does not apply to the line of credit
8  reflected on the first page and a half of
9  this document?
10  MR. HARRIS:  Objection to the
11  extent it calls for a legal
12  conclusion.
13  I instruct the witness not to
14  reveal attorney-client advice.
15  And if you have a different basis,
16  you can answer.
17  A  It's my personal position that
18  factually, yes, that's correct.  This is
19  not a signed -- that first agreement has
20  not been signed.  The balance, I defer --
21  I don't defer to, that's completely the
22  wrong phrase.  As to the impact or
23  otherwise of that, I defer to legal advice
24  and its legal conclusions.
25  MR. GLUECKSTEIN:  Mark this

32 (Pages 122 - 125)

Page 126

1    please.
2        (Whereupon, a Document,
3        Bates-stamped 3AC_FTX_00551650
4        was marked as Crumpler Exhibit
5        No. 6 for identification, as
6        of this date.)
7    Q    Now, Mr. Crumpler, the
8  document we were just looking at,
9  Exhibit 5, at least on the first page with
10 respect to the line of credit is dated
11 30 March 2022, correct?
12   A    Yes, that's correct.
13   Q    The court reporter has just
14 handed you a document that's been marked
15 as Exhibit 6.
16   A    Yes, I have that.
17   Q    Okay.  And this is a document
18 that is also entitled, on the first page,
19 "FTX Line of Credit," and is a Bates
20 number on the bottom right of
21 3AC_FTX_551650.
22       Do you see that?
23   A    I do.  Yes.
24   Q    Okay.  And, again, this is --
25 the date on this document, at least with

Page 127

1  respect to the line of credit, is
2  28th April of 2021.
3        Do you see that at the top of
4  the page?
5    A    I do see that.
6    Q    Okay.  If you go to the back
7  to the last of this -- end of this
8  document, there is a signature there.
9        Do you recognize that?
10   A    I recognize that signature,
11 yes.
12   Q    And whose signature that?
13   A    That is the signature of
14 Su Zhu, who was one of the founders of
15 Three Arrows.  His title here is director.
16 I would have to check.  I assume that is
17 correct that he is a director at this
18 point in time.  Su Zhu and Kyle Davies
19 is -- what is the word? -- they changed at
20 different points when they were on the
21 boards of directors.  My assumption that
22 is not a factual statement is that that
23 says he is a director, so assume that he
24 at that point in time.  But I can't
25 factually confirm that.  That is, of

Page 128

1  course, as with document Exhibit Number 5,
2  that signature is with respect to the
3  second agreement contained within this
4  bundle of papers -- within this Exhibit 6.
5    Q    That was going to be my next
6  question, Mr. Crumpler.
7        So this document is arranged
8  the same way as the prior document we
9  looked at, in that the first page and a
10 half refers to the FTX line of credit and
11 then goes on to discuss the FTX
12 institutional customer margin and line of
13 credit agreement, correct?
14       MR. HARRIS:  Object to the
15    form.
16   A    I -- that is my understanding,
17 that this -- yes, this document starts
18 with respect to the FTX line of credit,
19 and then three-quarters of the way down at
20 Bates number 551651, it been -- it
21 becomes, if that's the right phrase -- but
22 then we start with the second agreement,
23 the FTX institutional customer margin and
24 line of credit agreement.  And it's that
25 second agreement, which you can see a

Page 129

1  signature from Three Arrows Capital,
2  Limited, Su Zhu on the page ending 655,
3  but again no signature from FTX.
4    Q    Okay.  And it is your opinion
5  that, with respect to this document,
6  Exhibit 6, that Mr. Zhu's signature would
7  only apply to the institutional customer
8  margin and line of credit agreement and
9  not the FTX line of credit on the first
10 page, correct?
11       MR. HARRIS:  Objection.  Calls
12    for a legal conclusion.
13       Instruct the witness not to
14    reveal attorney-client advice or
15    work product.  But if you have
16    any -- another basis, you can
17    answer.
18   A    So, in my personal capacity,
19 when I look at this document exactly like
20 when I looked at Exhibit 5, I see
21 three-quarters of the way down the second
22 page -- so ending 1651 in terms of the
23 Bates numbers -- a line that says:  In
24 witness whereof, the parties have executed
25 this line of credit agreement by their

33 (Pages 126 - 129)

Page 130

1 duly authorized officers and
2 representatives.
3       But I do not see a signature
4 box at that point in time, as in my
5 impersonal opinion, I would expect to see
6 a signature box there prior to getting
7 into what seems to -- appears to be a
8 completely separate agreement that happens
9 to be on the same bits of paper, and that
10 that separate agreement is signed by -- or
11 appears to be signed by Three Arrows and
12 not by FTX. Beyond that, it calls for
13 legal conclusions.
14   Q   Okay. If you can go back to
15 Exhibit 5, Mr. Crumpler?
16       Okay. If we would focus on
17 that for a moment?
18   A   Yeah. I have it in front of
19 me.
20   Q   Thank you.
21       The -- in the first paragraph
22 of this document is the discussion of: A
23 line of credit is hereby established in
24 the amount of USD $120 million for the
25 benefit of the borrower.

Page 131

1       Do you see that?
2   A   I do, yes.
3   Q   And 3AC, in June of 2022, in
4 fact did utilize a $120 million line of
5 credit, correct?
6       MR. HARRIS: I'll object to
7       the form.
8   A   Our conclusions with respect
9 to exactly how the relationship between
10 FTX and Three Arrows operated were ongoing
11 based on ongoing analysis of the discovery
12 and information provided to us by FTX.
13   Q   So, as you sit here today,
14 understanding your investigation is
15 ongoing, 3AC does not have a position as
16 to whether it utilized a $120 million line
17 of credit from -- in connection with its
18 FTX account in June of 2022?
19       MR. HARRIS: Same objection.
20   A   It's very clear, from FTX's
21 records, that FTX has a position that that
22 line of credit was utilized. Our analysis
23 and final conclusions on that are subject
24 to legal advice and ongoing. We certainly
25 don't dispute that that line of credit

Page 132

1 appears to have existed in the minds of
2 FTX. The consequences of that and the
3 impacts of that are subject to ongoing
4 legal analysis and conclusions.
5   Q   Yeah. I'm not asking about
6 the impact of that.
7       I'm asking about whether or
8 not 3AC utilized a $120 million line of
9 credit in June of 2022?
10       MR. HARRIS: Object to the
11       form.
12   A   Our analysis of the FTX
13 records and the conclusions we reached
14 with respect to those records is ongoing.
15 We were provided with 49 million line
16 items of data that allow us to work to an
17 asset value and a liability value that may
18 or may not be associated with those
19 assets. But that data, to the best of my
20 knowledge, doesn't say "and this is coming
21 off a line of credit."
22   Q   How about with respect to
23 Three Arrows Capital's own records?
24       Do Three Arrows Capital's own
25 records reflect a $120 million line of

Page 133

1 credit in connection with the FTX account
2 in June of 2022?
3   A   The line of credit, with
4 respect to FTX's own records, is shown as
5 a line item in the NAV packs of Threee
6 Arrows.
7   Q   So the answer is yes, that
8 3AC's records do show a $120 million line
9 of credit that existed in favor of 3AC in
10 at least May of 2022, correct?
11       MR. HARRIS: Object to the
12       form of the question.
13   A   The records of Three Arrows --
14 so the records, as pulled together, to use
15 a loose terminology, by the administrators
16 show that there was a line -- a record
17 that there was a line of credit or
18 understood to be a line of credit and
19 understood at that time to be a line of
20 credit for the benefit of Three Arrows
21 with FTX. As to whether or not that line
22 of credit was properly established,
23 whether it's valid, et cetera, that calls
24 for legal conclusions.
25   Q   Three Arrows Capital, in fact,

34 (Pages 130 - 133)

Page 134

1  received a benefit of the $120 million
2  line of credit while trading on the FTX
3  exchange in June of 2022, correct?
4       MR. HARRIS: Object to the
5    form. It calls for -- object. It
6    calls for a legal conclusion.
7       I instruct the witness not to
8    reveal any attorney work product
9    in answering. If you have a
10   different basis, you can disclose
11   that.
12      A   As to whether or not Three
13   Arrows received the benefit of that line
14   of credit is subject to ongoing legal
15   analysis and legal conclusions.
16      Q   So you don't have a few one
17   way or the other, sitting here today?
18      MR. HARRIS: Same objections.
19      A   My view is intimately
20   intertwined with the legal advice I've
21   received.
22      Q   You would agree that a
23   $120 million line of credit would have
24   allowed 3AC to take leverage positions
25   while trading on the exchange, correct?

Page 135

1       MR. HARRIS: Object to the
2    form.
3       A   And I would agree that a
4  potential line of credit, whatever level,
5  may have depending on the terms of that
6  line of credit and its applicability,
7  allow 3AC or, indeed, another party to do
8  certain types of trading and undertake
9  certain types of activities. As to what
10 the purported line of credit with respect
11 to FTX and Three Arrows allowed Three
12 Arrows to do on the FTX platform, that's
13 subject to legal advice and legal
14 conclusions.
15      Q   And 3AC had, in fact, fully
16 drawn on a $120 million line of credit in
17 connection with its trading activities on
18 FTX's exchange in June of 2022, correct?
19      MR. HARRIS: Can you -- can
20   you -- hold on.
21      Objection to the extent it
22   calls for a legal conclusion.
23      And instruct the witness not
24   to reveal attorney work product,
25   but you can answer otherwise if

Page 136

1    you have a basis.
2       A   That's simply not an answer I
3  can -- can agree or otherwise with without
4  referencing the attorney advice and legal
5  conclusions.
6       Q   Okay. So you don't have a
7  nonlegal answer to that question -- I just
8  want to be clear for the record --
9  correct?
10      A   I do not have an answer that
11 is not entwined with the legal advice I've
12 received.
13      Q   Okay. If we can go back to
14 Exhibit 5 here that we were looking at.
15      A   Yes, I've got that in front of
16 me.
17      Q   This document says in
18 paragraph 3: The lender reserves the
19 right to remove the line of credit at any
20 time and for any reason.
21      Do you see that?
22      A   Yes, I see that.
23      Q   Okay. And is it 3A's -- 3AC's
24 position that -- that the terms of this
25 line of credit are not applicable to it in

Page 137

1  June of 2022?
2       MR. HARRIS: Objection. Calls
3    for a legal conclusion.
4       And instruct the witness not
5    to reveal attorney advice or work
6    product.
7       A   That calls for a legal
8  conclusion.
9       Q   So you don't have a view
10 outside of advice you have gotten from
11 counsel?
12      A   No, I don't.
13      Q   Paragraph 5 of this agreement
14 down below says: Throughout the lifetime
15 of the line of credit, at least
16 200 percent of the line of credit,
17 collateral must be maintained in the
18 borrower's FTX account.
19      Do you see that?
20      A   I do see that.
21      Q   So in the event that this line
22 of credit was applicable to Three Arrows
23 Capital in June of 2022, it would have
24 been required to maintain an account
25 balance of at least $240 million if it had

35 (Pages 134 - 137)

Page 138

1  fully drawn on the letter of credit,
2  correct?
3        MR. HARRIS:  Objection.  Calls
4     for a legal conclusion and
5     misstates the record.
6        Instruct the witness not to
7     reveal any attorney advice.  If
8     you have some other basis, you can
9     answer.
10    A    Could you repeat the question,
11 please.
12    Q    In the event that this line of
13 credit was applicable to Three Arrows
14 Capital in June of 2022, Three Arrows
15 Capital would have been required to
16 maintain an account balance of at least
17 $240 million if it had fully drawn on the
18 line of credit, correct?
19       MR. HARRIS:  Objection.  Calls
20    for a legal conclusion and
21    misstates the record.
22       I instruct the witness not to
23    reveal attorney advice.
24    A    The -- I can't answer that
25 without referring to legal conclusions and

Page 139

1  analysis.
2     Q    Did Three Arrows Capital's FTX
3  account ever fall below $240 million in
4  June of 2022?
5        MR. HARRIS:  Object to the
6     form of the question.
7        And to the extent it's calling
8     for a legal conclusion, I instruct
9     the witness not to reveal attorney
10    advice.
11       MR. GLUECKSTEIN:  I'm only
12    asking a factual question of
13    whether FTX Capital -- Three
14    Arrows Capital's FTX account ever
15    fell below 240 million in June of
16    2022?
17       MR. HARRIS:  I think that is a
18    legal question.  But I'll just
19    repeat my objection.
20       MR. GLUECKSTEIN:  You can
21    repeat your objection.  He can
22    answer the question whether -- if
23    he says he can't, he can take your
24    advice.  I'm asking a factual
25    question.  Your opinion,

Page 140

1     Mr. Harris, is not relevant.
2     A    On a factual basis, based on
3  the information provided to us by FTX,
4  then later in June 2022 to get my years
5  correct, then the account balance is the
6  assets that Three Arrows owned on the FTX
7  platform fell below $240 million.
8     Q    Does Three Arrows Capital
9  understand or have a position as to when
10 in June of 2022 its account fell below
11 $240 million?
12       MR. HARRIS:  Object to the
13    form.
14       I think that's calling -- to
15    the extent that's calling for a
16    legal conclusion, I object and
17    instruct the witness not to reveal
18    attorney work product.
19    A    Based on the documentation
20 provided to us by FTX and our analysis of
21 that documentation, which of course is
22 ongoing because we keep getting more
23 documents from FTX -- but based on that
24 documentation and our analysis of it, by
25 the close -- certainly by the close of

Page 141

1  June 14th, UTC time, then the assets Three
2  Arrows held on the FTX platform were below
3  $240 million.
4     Q    You say by the close of June
5  14th UTC time.
6        Did it, in fact -- as a
7     factual matter, did the -- did the Three
8  Arrows Capital account fall below
9  240 million at a date earlier than that?
10       MR. HARRIS:  Same objections.
11    A    To provide a factual answer, I
12 would need to refer back, I believe, to
13 the amended proof of claim.  There is data
14 within that proof of claim.  So I would
15 like to have a look at that data to
16 confirm the asset position at the close
17 of -- close of the UTC date on the 13th of
18 June, 2022.
19    Q    When you describe the asset
20 position, how are you interpreting that
21 term yourself --
22    A    The --
23    Q    -- in connection with your
24 testimony?
25    A    The assets owned by Three

Page 142

1  Arrows and held on the FTX platform.
2      Q   Okay.
3          MR. HARRIS:  Well, I don't
4  want to interrupt, but I don't
5  know we're --
6          If you're giving us lunch, if
7  so, thank you.
8          MR. GLUECKSTEIN:  We are.
9          MR. HARRIS:  Okay.
10         MR. GLUECKSTEIN:  All right.
11  I think this is actually a good
12  spot to take lunch.  I was going
13  to suggest that anyways.
14         VIDEOGRAPHER:  Okay.  It's
15  12:08 p.m.  We're going off the
16  record.
17         (Whereupon, at 12:08 p.m., a
18         recess was taken to 12:51
19         p.m.)
20         (The proceeding resumed with
21         all parties present.)
22         VIDEOGRAPHER:  The time is
23  12:51 p.m.  We're back on the
24  record.
25         (Whereupon, a Proof of Claim

Page 143

1          was marked as Crumpler Exhibit
2          No. 7 for identification, as
3          of this date.)
4          MR. GLUECKSTEIN:  Mr. Crumpler
5  , you have been handed what's been
6  marked as Exhibit Number 7, which
7  is a proof of claim received March
8  27, 2025 in the FTX trading case
9  that was filed by Three Arrows
10  Capital.
11     Q   Do you see that?
12     A   Sorry.  Excuse me.  Yes, I do.
13     Q   What is this document?
14     A   This is the amended proof of
15  claim that we've submitted into the FTX
16  bankruptcy estate.
17     Q   Are you familiar with this
18  document and its contents?
19     A   I am, yes.
20     Q   Did you have a role in
21  preparing this document?
22     A   I had a role in reviewing what
23  was, you know, put into the document but
24  yes.
25     Q   Was the document drafted by

Page 144

1  others on your team at Teneo?
2      A   No.  The document was drafted
3  by our lawyers.
4      Q   By your lawyers?
5      A   Yes.
6      Q   And you reviewed the contents?
7      A   Yes.
8      Q   And on page 4 of the claim
9  form, there is a signature there.
10         Do you see that?
11     A   I do.
12     Q   Is that your signature?
13     A   Yes, that's my signature.
14     Q   So you signed this proof of
15  claim and authorized it to be submitted on
16  behalf of the joint liquidators of 3AC,
17  correct?
18     A   That's correct, yeah.
19     Q   At the time you executed and
20  submitted this proof of claim in March of
21  2025, did you understand its contents to
22  be true and accurate as of that time?
23     A   As of that time and on our
24  review, then, yes, I did.  I say that with
25  care because in reviewing the document

Page 145

1  today -- oh, so in preparation for today,
2  I do notice that there are two -- I'm not
3  sure if there was transposition or
4  calculation errors that were in one of
5  the --
6          (Whereupon, the court reporter
7          requested clarification.)
8          THE WITNESS:  Transposition,
9          really sort of the way they've
10         been taken from another document
11         in one of the paragraphs.
12     Q   Okay.  And so as you sit here
13  today on behalf of Three Arrows Capital,
14  is there anything in this document that
15  you believe is inaccurate or that you
16  would change?
17     A   There are two numbers in the
18  document --
19     Q   Okay.  Can you point me to --
20     A   -- that I would change.
21     Q   -- to what those would be, if
22  you know?
23     A   Yes.  If one goes to paragraph
24  49.  And you'll see in paragraph 49 that
25  when you get to the bottom half of

37 (Pages 142 - 145)

Page 146

1  paragraph 49, there are nine large
2  numbers.  And so you have the first set of
3  three large numbers are the balances owing
4  under the six largest master loan
5  agreements that Three Arrows had.
6       And then the final three large
7  numbers are the deficits with respect to
8  what we would define as liquid assets
9  on -- on three -- and it's all on three
10 particular dates, 12th, 13th, and 14th of
11 June.  The middle three numbers, which
12 really are a function of the -- are part
13 of the same calculation, if one likes.
14      The first number of
15 1.565 billion is correct.  And then an
16 error has crept into the second number,
17 the 1.938 billion and the third number,
18 the 1.681 billion.
19      So the correct numbers can be
20 arrived at by taking -- so for the -- so
21 if you like, if you have the numbers -- if
22 you add number one, two, three, four,
23 five, six, seven, eight and nine, we
24 reference the numbers --
25      Q   Uh-huh.

Page 147

1       A   -- numbers five and number six
2  are incorrect.  So number five, the
3  correct number is a -- is effectively a
4  product of taking the three, four, six,
5  two, number three, and deducting number
6  seven, which gets you to roughly
7  300 million.  And then the correct number
8  for number six you get from taking
9  number -- I'm sorry -- number three, let's
10 say, number two take away number -- number
11 two take away number eight -- I
12 apologize -- gets you to the correct
13 number for number one, two, three, four,
14 five.
15      And number three take away
16 number nine gets you to the correct number
17 for what is number six, so roughly
18 300 million and then roughly, I think, 80
19 million are the correct numbers there.
20 There has been an error in the -- in the
21 addition and in the -- the inclusion in
22 this statement.
23      Q   Thank you.  And those numbers,
24 as reflected for what you're making
25 corrections in paragraph 49 relate to the

Page 148

1  liquid assets held by Three Arrows Capital
2  in June of 2022, correct?
3       A   That's correct, yes.
4       Q   Okay.  And did you indicate
5  that there is another change in the
6  document that you believe should be made?
7       A   No.  That -- when I said the
8  two changes, it was with respect to those
9  numbers.
10      Q   Okay.  So other than with
11 respect to the two calculation revisions
12 that you just walked us through in
13 paragraph 49, is there anything else in
14 the Three Arrows Capital amended proof of
15 claim that's been marked as Exhibit 7 that
16 you believe to be inaccurate, as you sit here
17 today?
18      A   Excuse me.  As we sit here
19 today, there is not anything that I
20 believe is inaccurate.  However, our
21 analysis is ongoing given we continue to
22 receive documents or have depositions to
23 go, et cetera, with respect to FTX and
24 from FTX.  And therefore, those documents
25 together with our ongoing legal analysis

Page 149

1  may of course, you know, adjust some of
2  the positions taken or the factual
3  statements made.
4       Q   Okay.  As you sit here today
5  as a representative of Three Arrows
6  Capital, as a result of your ongoing
7  investigation, is there anything in your
8  proof of claim that you believe should be
9  revised?
10      A   Our investigation is, as you
11 quite rightly say, ongoing.  Our
12 conclusions with respect to that
13 investigation are ongoing because we
14 continue to receive discovery and
15 disclosure from FTX.  And therefore,
16 whether or not there is anything that
17 requires revision in here, you know, is to
18 be determined.
19      Q   Okay.  But as you sit here
20 today, there is nothing that you believe
21 needs to be revised other than the
22 calculations we just walked through in
23 paragraph 49, correct?
24      A   A substantive -- a substantive
25 revision which I've just pointed out to

38 (Pages 146 - 149)

Page 150

1  you, which was an error in -- an error in
2  our -- in the translation of -- effect of
3  the spreadsheet on to a piece of paper, I
4  don't see anything substantive, as I sit
5  here today, with the caveat that our
6  review of the data provided to us by FTX,
7  which has continued to be provided to us
8  for disclosure and discovery, is ongoing.
9  And the consequences of our review and the
10  legal analysis of that data may well
11  impact the position that we take.
12       So I can't -- I cannot -- I
13  cannot give you a hundred percent answer
14  without making that qualification.
15    Q   Okay.  At -- but at this time,
16  you're not seeking to make any further
17  amendments or revisions to your proof of
18  claim that has been submitted in
19  connection with the FTX bankruptcy case
20  pending in Delaware, correct?
21    A   As I sit here right now, I'm
22  not seeking to make any amendments to the
23  claim as is in front of us.  That doesn't
24  mean that, when we have completed our
25  ongoing review of discovery, disclosure,

Page 151

1  et cetera, that's been provided to us by
2  FTX, that we may not -- that we may -- may
3  require some amendments to what we have
4  said and that will be subject to legal
5  review and analysis.
6    Q   Just --
7    A   And, as of right now, I am not
8  telling you there's anything different in
9  it.
10    Q   Okay.  And just so that I'm
11  clear, is your ongoing factual
12  investigation limited in source to the
13  material produced by FTX, or is there
14  other -- any other component to your
15  factual investigation?
16       MR. HARRIS:  Object to the
17    form.
18    A   Could you repeat the question,
19  please?
20    Q   Is your ongoing factual
21  investigation that you have referenced a
22  number of times today limited in its
23  source to the material produced by FTX or
24  are there other components to that
25  investigation?

Page 152

1    A   That -- whilst the majority of
2  our ongoing factual investigation relies
3  upon what FTX has disclosed to us and
4  provided to us, there are other sources
5  of, you know, information which we
6  continue to revise and review -- not
7  revise -- apologies -- review in the
8  context primarily of the information
9  provided to us by FTX.
10    Q   And, again, I'm just asking
11  about factual investigation, not any legal
12  analysis that you're working on with your
13  counsel.
14       What are those other sources
15  of facts that remain open in your
16  investigation other than what's been
17  produced by FTX?
18    A   Can you explain to me what you
19  mean by "remain open"?
20    Q   Are there -- what other -- you
21  stated that your majority of your ongoing
22  investigation relies upon the information
23  that's been disclosed by FTX.
24    A   That's correct.
25    Q   What constitutes the remainder

Page 153

1  of that factual investigation?
2       MR. HARRIS:  I'll just remind
3    the witness not to reveal any
4    analyses that are being done at
5    the direction of counsel.
6       THE WITNESS:  Yep.
7       MR. HARRIS:  To the extent
8    there are other analyses you
9    can -- you know, or discovery, you
10    can share that.
11    A   So I -- in answering that,
12  I'll try and give you an example.  If --
13  and so I'm being careful not to say it's
14  just about what FTX gives us.  Because if
15  FTX gives us something that points to the
16  value of a token at a point in time, but
17  that value either is not within the FTX
18  data or we need to confirm that value,
19  then clearly we'll confirm that using a
20  third-party source.
21       We will also compare what
22  we -- and continue to compare where
23  appropriate what FTX is telling us -- so
24  what you're telling us in that continuing
25  disclosure -- with the limited amount of

39 (Pages 150 - 153)

1  information we have from Three Arrows'
2  general records to see if that impacts our
3  analysis. But we're not actively seeking
4  information from third parties that you're
5  not aware of.
6      Q   Okay. If you could,
7  Mr. Crumpler, turn to paragraph 40 of your
8  proof of claim, which appears on page 15
9  of the document -- I'm sorry -- of the
10 appendix to that document?
11     A   Okay.
12     Q   Are you there?
13     A   I'm there. Yes.
14     Q   Okay. In paragraph 40 of
15 your -- of the Three Arrows Capital proof
16 of claim, among other things, you allege
17 that the 3AC debtor digital and other
18 assets on the FTX platform amounted to
19 $1,596,291,633.02 by the end of the day on
20 June 12, 2022.
21         Do you see that?
22     A   Yes, I do.
23     Q   Okay. And so my question is
24 what -- in calculating that number, what
25 comprises that number as set forth in

1  paragraph 40 of your proof of claim?
2      A   So that number is made up from
3  the total assets owned by Three Arrows and
4  held on more generically called the "FTX
5  platform."
6      Q   Okay. So when you say "assets
7  owned by Three Arrows and held on the FTX
8  platform," what are you defining as an
9  asset for purposes of this calculation?
10     A   Both -- yeah. And the sort of
11 spot positions, so assets which were
12 not -- you know, to use the phrase that
13 you used earlier in perpetual futures
14 contracts and the perpetual futures
15 contacts -- contracts, again, using the
16 terminology that FTX has employed.
17     Q   Okay. And so you have
18 included -- you have included in this
19 number the value, as you have calculated
20 it, of perpetual futures contracts; is
21 that right?
22     A   Yes. That's correct. The
23 same -- in doing so reached the same value
24 that FTX had originally reached in the
25 post-petition state, whether in the

1  Alvarez & Marsal presentations or I
2  believe in earlier depositions. I
3  understand you have changed that position
4  now, and which is, of course, is why,
5  again, our analysis is ongoing. But that
6  is the number that we say is the value of
7  assets -- the total assets that Three
8  Arrows owned and held on the FTX platform
9  at the end of the day UTC time on June the
10 12th, 2022.
11     Q   Okay. And when you say --
12 when you say that these are the values
13 that FTX had originally reached, what is
14 the source of that information then that
15 you are relying on?
16     A   So the -- and when I say
17 "values," I say we -- our calculations
18 come very close or came very close to
19 those original values. A number of
20 sources -- and this may not be exhaustive
21 in terms of my answer -- but when A & M
22 performed their own -- so Alvarez & Marsal
23 performed their own calculations I believe
24 you see a very similar number in certainly
25 the September 2004 presentation. I

1  think -- I think its October 2003
2  presentations that have been disclosed to
3  us.
4          Again, I might have the date
5  slightly wrong. And I -- and I believe in
6  maybe Bates Document Number 38 or
7  something like that, which has changed,
8  that's where, you know, those numbers were
9  originally included as well. They will be
10 I suspect other bits and pieces that's in
11 there, but they're the principal areas.
12 In terms of how we calculate it, yeah that
13 obviously involved -- and we've talked
14 about this in the past -- a very complex
15 analysis of 49 million line items of data
16 with limited assistance, to be -- to be
17 fair, as to how we get there.
18         It relied in part or largely
19 on values provided by FTX within that
20 data. And then where values were not
21 within that data, why there wasn't a
22 market price, we obtained a -- yeah -- a
23 publicly available market price and
24 calculated the 1.596 billion number, which
25 was very, very close to -- exceedingly

40 (Pages 154 - 157)

Page 158

1  close to the number calculated by the
2  advisors to FTX.
3      Q   Mr. Crumpler --
4      (Whereupon, the court reporter
5      requested clarification.)
6      THE WITNESS:  By the advisors
7  to FTX.  Yes.
8      COURT REPORTER:  Sorry.
9      Q   Mr. Crumpler, you referenced
10  in your testimony and you referenced in
11  para -- in Footnote 20 of this
12  paragraph -- footnoted to this paragraph,
13  a document FTX 38?
14      A   Yes.
15      Q   See that?
16      A   That's correct.
17      Q   Are you aware that, as a
18  result of its own investigation, FTX has
19  since amended that document and produced
20  an amended version of FTX 38?
21      A   I am aware, yes, and thus my
22  observation that our analysis of that
23  amended document, information provided to
24  us by FTX, some of which is coming very
25  late in the day is ongoing and, therefore,

Page 159

1  our full factual conclusions have not yet
2  been reached.
3      Q   And are you aware,
4  Mr. Crumpler, that Mr. Stephen Coverick of
5  Alvarez & Marsal, who is financial advisor
6  to FTX, submitted a declaration in
7  connection with his dispute back in June
8  of 2025 that opines on these numbers as
9  well?
10      Are you aware of that?
11      A   I am aware of that.  Yes.
12      Q   Have you reviewed that
13  declaration?
14      A   I don't recollect whether I've
15  reviewed every detail of that declaration.
16      Q   As a result of the data put
17  forward in the revised version of FTX 38,
18  does that change the calculation with
19  respect to 3AC's assets in paragraph 40 of
20  your proof of claim?
21      MR. HARRIS:  Objection.
22      To the extent that involves
23      legal advice, I remind the witness
24      not to reveal any legal advice or
25      analysis performed at the

Page 160

1      direction of counsel, but you can
2      otherwise answer.
3      A   Analysis of the information
4  provided to us by FTX, including the
5  revisions to document with the Bates
6  Number 38, is ongoing, and to the extent
7  it may or may not alter our number as to
8  the asset value, that is a matter for not
9  just analysis but analysis that will be
10  performed at the request of counsel and is
11  subject to legal conclusions.
12      Q   Have you performed, as a
13  factual matter, any calculations using the
14  amended version of FTX -- the Bates Number
15  to FTX 38 and determined how that might
16  impact the asset number presented in
17  paragraph 40?
18      MR. HARRIS:  You can answer.
19      I just -- exclude any calculations
20      that were done under the direction
21      of counsel, but otherwise you can
22      answer.
23      A   Any -- any revised
24  calculations we have been performed -- we
25  have performed or that the Teneo team has

Page 161

1  been performed have been at the direction
2  of counsel.
3      Q   Notwithstanding the submission
4  of Mr. Coverick's declaration and the
5  production of the amended FTX 38 document,
6  3AC's position, as of today, remains that
7  the asset number is approximately
8  $1.59 billion, correct?
9      A   That's correct.  Yes.
10      Q   You testified that you were
11  aware that Mr. Coverick had submitted a
12  declaration containing information that is
13  relevant to these calculations, correct?
14      A   That's correct.
15      Q   Okay.  But you don't recall
16  whether you have actually reviewed Mr. co
17  VIC's numbers in that declaration, which
18  was submitted more than three months ago
19  on June 20th of 2025; is that right?
20      A   I have not personally reviewed
21  those numbers.  To the extent that my
22  team, so the Teneo team, has worked with
23  respect to those numbers in amending,
24  reviewing, looking at the potential
25  consequences of those numbers, that has

41 (Pages 158 - 161)

Page 162

1 been at the direction of counsel.
2     Q    And, again, as a -- as a
3 factual matter -- now asking you as
4 your -- in your capacity as a
5 representative of Three Arrows Capital,
6 which includes anything that's been done
7 by anyone -- is there any -- as a result
8 of Mr. Coverick's declaration, there
9 are -- nonetheless are no changes to the
10 asset number that you're setting forth in
11 paragraph 40 of your proof of claim,
12 correct?
13         MR. HARRIS:  Object to the
14     characterization.  And I refer to
15     our objections.
16         And instruct the witness not
17     to reveal any attorney work
18     product, but otherwise you can
19     answer.
20     A    To the extent that there may
21 or may not be any future amendment to our
22 understanding of the asset values, which
23 stands as it is there today, that is
24 subject to work being performed at the
25 direction of counsel and legal

Page 163

1 conclusions.
2     Q    Mr. Crumpler, is there a
3 reason why you chose not to review the
4 detailed calculations put forth by
5 Mr. Coverick that go to the amounts at
6 issue in the 3AC claim that was filed
7 almost three months -- more than three
8 months ago at this point?
9         MR. HARRIS:  Object to the
10     form.
11     A    Whilst I have skimmed that
12 declaration, I don't recall every piece
13 of -- every word within it.  I have read
14 it.  I'm not familiar today with its exact
15 contents.  I have a team at Teneo who, at
16 the direction of counsel, are working
17 through whether or not we accept that
18 position, whether or not there are
19 amendments with respect to that position,
20 whether it changes any of our analysis,
21 et cetera.
22         But that is all at the
23 direction of counsel and it's subject to
24 legal conclusions.
25     Q    Mr. Crumpler, why is it that

Page 164

1 Three Arrows Capital included in its asset
2 calculation number of 1.59 billion the
3 notional amounts of futures contracts?
4         MR. HARRIS:  Objection.
5     Instruct the witness not to
6     reveal attorney advice or work
7     product, but you can otherwise
8     answer.
9     A    The -- beyond a simple
10 calculation as to what the assets that
11 Three Arrows held in the FTX platform are,
12 the reason for inclusion or otherwise of
13 particular line items are subject to legal
14 advice.
15     Q    If we look back at
16 paragraph 40 of your declaration -- or I'm
17 sorry -- of your proof of claim --
18     A    Yes.
19     Q    -- that we're looking at --
20         (Whereupon, the court reporter
21     requested clarification.)
22         THE WITNESS:  Sorry.
23     Q    -- paragraph 40 -- that
24 sentence of paragraph 40 of your proof of
25 claim continues on to say "it's negative,"

Page 165

1 meaning 3AC USD balance was ostensibly
2 $1,332,681,172.34.
3         Do you see that?
4     A    I do see that.  Yes.
5     Q    What -- why did 3AC present
6 that number as its negative USD balance in
7 paragraph 40?
8     A    Because following our
9 calculations with respect to the data
10 provided to us by FTX at that time, we
11 were advised by counsel that was the
12 appropriate number to include.
13     Q    If you can look at
14 paragraph 42 of the proof of claim,
15 Mr. Crumpler?
16     A    Yep.  Yes.
17     Q    Okay.  And at the end of
18 paragraph 42, there is a chart.
19         Do you see that, sir?
20     A    I do.
21     Q    Okay.  And the first line in
22 that chart has values as of June 12, 2022.
23         Do you see that?
24     A    I do, yes.
25     Q    And these -- these are

42 (Pages 162 - 165)

Page 166

1  calculations that 3AC performed and is
2  offering with respect to balls, correct?
3      A    Based on the data provided to
4  us by FTX, yes, that's correct.
5      Q    So the first column there
6  shows total value of assets, as you
7  characterize them, on June 12th, and
8  that's the number we were just talking
9  about of approximately 1.596 billion,
10  correct?
11      A    Yes, that's -- that's the
12  total value of 3AC's assets on the FTX
13  platform at -- right at the close of the
14  12th of June, UTC time, 2022.
15      Q    And the second column, you
16  reflect the total negative USD balance,
17  which is the 1.332 number that we --
18  1.332 billion approximate number that we
19  were just speaking about I reflected in
20  paragraph 40, correct?
21      A    That second column reflects a
22  number based on the information provided
23  by FTX that we believe is comparable to
24  what FTX claims it would be owed at that
25  point in time without admitting -- and I

Page 167

1  think that you'll see language in the
2  proof of claim -- without admitting that
3  we reached a legal conclusion as to
4  whether or not the totality of that number
5  is due.
6      Q    And what is the basis for your
7  statement that it's -- that that negative
8  USD balance is comparable to the amount
9  it, meaning FTX, would be owed at that
10  point in time?
11      A    What I mean by that is that
12  we -- using the data provided by FTX, and
13  that is our calculation of what we believe
14  that FTX believes it would be owed at that
15  point in time.  That point around belief
16  is, of course, subject to -- that's a
17  factual analysis of the spread -- not even
18  the spreadsheets, the data provided to us.
19  It is not our legal analysis as to whether
20  or not that balance or part of that
21  balance if that balance is legally owed
22  to FTX, that is subject to legal
23  conclusions.
24      Q    And what is the basis for,
25  regardless of the number, your assertion

Page 168

1  that any of this balance might be owed to
2  FTX as opposed to somebody else?
3          MR. HARRIS:  Objection.  Calls
4      for a legal conclusion.
5          Instruct the witness not to
6      reveal any attorney advice or
7      attorney work product.  To the
8      extent you have another basis, you
9      can answer.
10      A    It's subject to legal
11  conclusions.
12      Q    And just so I'm clear, I'm
13  just -- those are your words, that it's a
14  balance owed to FTX.
15          So you're saying the basis for
16  that statement is based on legal
17  conclusions or advice from your lawyers?
18      A    Yes, that's correct.
19      Q    Okay.  Just looking back at
20  paragraph 42 in the chart, you then
21  present a net balance of $263,610,460.69
22  for June 12, 2022, correct?
23      A    Yes, that's correct.
24      Q    And that net balance is the
25  assets -- the negative USD balance

Page 169

1  subtracted from the total value of assets
2  to calculate what you characterize as the
3  net balance in the account as of the end
4  of day that day, correct?
5      A    It is -- technically, I think
6  you add the negative balance.  But yes,
7  it's taking the negative balance as
8  calculated by us as to what we believe FTX
9  believes was owed to it and adding that to
10  the total value of assets that Three
11  Arrows held on the FTX platform, again
12  using FTX's, you know, numbers in the
13  large part to get to a net balance.
14      Q    And thank you for the
15  clarification.  But -- and assuming, just
16  for purposes of this discussion, that the
17  numbers presented here, understanding that
18  you haven't endorsed the negative USD
19  balance number, assuming that's correct,
20  then the net balance in the Three Arrows
21  account as of June 12th was $263,610,460
22  as you're presenting it in the proof of
23  claim, correct?
24      A    Without making any admission
25  as to what "net balance" means with

Page 170

1  respect to any of the points around FTX's
2  assertion around account balance, margin
3  requirements, or anything like that,
4  without drawing any legal conclusions,
5  then if you add those two numbers
6  together, you get to that net balance.
7      Q   Okay.  But this -- the
8  document we're looking at now is your
9  proof of claim that was submitted in
10  connection with the FTX proceedings, and
11  you have characterized the $263 million
12  number as a net balance, correct?
13     A   That is correct.  That is not
14  us accepting that some of the terminology
15  deployed by FTX is correct, and it's not
16  accepting that that net balance is
17  reflective of some of the terminology when
18  we refer to account balances, et cetera,
19  is correct.
20         It's correct to say that, On
21  our calculations, that appears to be the
22  net.  With all the other caveats I have
23  said preceding this, that is on an
24  accounting basis the net position.  On a
25  pure-numbers-on-a-spreadsheet basis

Page 171

1  without giving any legal analysis as to
2  what that may or may not mean and what
3  other things might impact that net balance
4  number, for example, whether or not the
5  entirety of that negative U.S. balance is
6  a validly owed debt owing to FTX.
7      Q   Okay.  And with respect to
8  June 13th and 14th as presented here, you
9  similarly present a net balance number of
10  5.3 million and negative 22 million,
11  respectively, for June 13th and 14th of
12  2022, correct?
13     A   Calculated in the -- exactly
14  the same way.  So it's a function of the
15  two sets of numbers.
16     Q   And in paragraph 42, prior to
17  the chart, you acknowledge that after --
18  you state that FTX admitted at the
19  beginning of June 12th the 3AC debtor's
20  net balance -- net balance was in the high
21  200s -- millions of dollars, correct?
22     A   Yes, that's -- that's correct.
23  I'm just -- before -- let me qualify that.
24  Let me just read the footnote in relation
25  to that.

Page 172

1      Q   Feel free.
2      A   Yes.  So, Mr. Glueckstein, if
3  one refers to the Footnote 21 that comes
4  at the end of paragraph 42 and end of the
5  statement:  FTX admitted at the beginning
6  of June 12th the 3AC debtor's debt balance
7  was in the high two-hundred millions, you
8  will see that that is an answer provided
9  to us by Mr. Glueckstein during his
10  deposition.
11     Q   I did not testify during his
12  deposition.
13     A   Sorry.  I apologize.  That's
14  your objection to form.  That's a
15  deposition transcript.  I apologize,
16  Mr. Glueckstein.
17     Q   I understand the point.
18     A   I think you understand the
19  point I'm making.
20     Q   If you can turn, sir, to
21  paragraph 27 of your -- of 3AC's proof of
22  claim.
23     A   Yep, I read that.
24     Q   Okay.  So within that
25  paragraph, there are a number of things

Page 173

1  that are alleged, but one of them is what
2  you're defining as the "unknown alleged
3  liability."
4         Do you see that?
5      A   I do see that.
6      Q   And that seems to refer to
7  other liabilities that would support the
8  remaining 701,394,039 negative USD balance
9  left in the June 12th USD balance.
10        That's how you're defining
11  that, correct?
12     A   That's correct, yes.
13     Q   Okay.  Is it 3AC's position
14  today that what you have defined as the
15  "unknown alleged liability" remains
16  unexplained?
17        MR. HARRIS:  Object to the
18        form.
19        And I also instruct the
20        witness not to reveal attorney
21        advice.  But otherwise, you can
22        answer.
23     A   That's subject to advice --
24  attorney advice and legal conclusions.
25     Q   Do you know whether an

44 (Pages 170 - 173)

Page 174

1  explanation was provided in in
2  Mr. Coverick's declaration of June 20th
3  that you have not reviewed in detail?
4       MR. HARRIS:  Object to the
5       form.
6    A  I am aware that explanations
7  has been -- have been provided.  Analysis
8  of those explanations, I should stress,
9  are legal analysis and that of our lawyers
10 of those explanations is ongoing.
11   Q  My question is as a factual
12 matter as the unknown alleged liability as
13 set forth in paragraph 27, the proof of
14 claim, does that remain unexplained, as we
15 sit here today?
16      MR. HARRIS:  Object to the
17      form.
18      And instruct the witness not
19      to reveal attorney advice or work
20      product.  If you have a different
21      basis, you can answer.
22   A  Could you repeat the question,
23 please.
24   Q  As a factual matter, is the
25 unknown alleged liability, as set forth in

Page 175

1  paragraph 27, does that remain
2  unexplained, as we sit here today, with
3  the -- all the information that 3AC has
4  available to it?
5       MR. HARRIS:  Same objections.
6    A  Whether or not explanation is
7  provided to us subsequent to the provision
8  to the -- to the filing of this amended
9  proof of claim, result in an ex --
10 satisfactory explanation or need an
11 explanation of these numbers is subject to
12 ongoing review and legal analysis.
13   Q  I understand there is an
14 ongoing analysis as to whether you accept
15 those explanations.
16      My question is whether you
17 have been provided one?
18   A  We have been provided with
19 explanations.  Whether those explanations
20 are full and correct and accurate is to be
21 determined.
22   Q  And what is your understanding
23 of the explanation that has been provided
24 with respect to the unknown alleged
25 liability as you defined it?

Page 176

1    A  That's --
2       MR. HARRIS:  Objection.  Just
3       remind the witness not to reveal
4       attorney advice.
5       You can answer otherwise.
6    A  Any understanding we have is
7  intertwined with legal advice and
8  analysis.
9    Q  So you do not have an
10 understanding of the factual explanation
11 that's been provided by FTX with respect
12 to the unknown alleged liability as you
13 define it in paragraph 27?
14   A  Any understanding I have of
15 the factual explanation provided is
16 intertwined with legal analysis as to how
17 one should look at those facts, et cetera,
18 and therefore is subject to legal
19 conclusion.
20   Q  Continuing in paragraph 27,
21 the proof of claim.
22   A  Uh-huh.  Yes.
23   Q  The sentence that follows
24 says:  To the extent FTX took actions,
25 whether seizing lost assets, as you define

Page 177

1  it, or failing to provide proceeds for the
2  sales of any lost assets based on the
3  unknown alleged liability, FTX is liable
4  for several torts under value transaction
5  claims and other liability theories as
6  explained below.
7       That's what you have alleged
8  there, correct?
9    A  That is -- you've read out
10 what we said there.  Then yes, that's
11 correct.
12   Q  And so, as we sit here today,
13 September 23, 2025, is it 3AC's position
14 that, as a factual matter, FTX did, in
15 fact, take any such actions in June 2022
16 as described by that sentence in paragraph
17 27?
18      MR. HARRIS:  Object to the
19      form of the question.
20      Also instruct the witness not
21      to reveal attorney advice.  But
22      otherwise, you can answer.
23   A  We stand by the wording, what
24 you have read out with respect to that
25 sentence, and our advice and our analysis

1  of it is ongoing.  Obviously, there are
2  certain steps that FTX have already
3  admitted to.
4      Q    And what steps are those?
5      A    So I think it's -- I think
6  it's common ground that the liquidations
7  that took place on the 14th of June,
8  $82 million of them were definitely at the
9  action, or if "action" is the wrong word,
10  at the -- at the -- if FTX took those
11  steps.
12      Q    And that's the $82 million
13  that's referenced in the documents of
14  liquidation?
15      A    That's the $82 million that's
16  referenced in various documents through
17  the course of, you know, this proof of
18  claim and other -- and other sources
19  including communications between people at
20  FTX.
21      Q    Okay.  And so my question is,
22  as we sit here today, is Three Arrows
23  Capital aware of any facts that FTX took
24  any other actions other than with respect
25  to the $82 million liquidation that is

1  implicated by the sentence in
2  paragraph 27?
3          MR. HARRIS:  Object to the
4      form of the question.
5          Again, I remind the witness
6      not to reveal attorney advice, but
7      otherwise, you can answer.
8      A    Our analysis of the
9  information being provided to us on an
10  ongoing basis by FTX through the discovery
11  and disclosure process and still to come
12  through depositions is ongoing.  It's
13  intertwined with legal advice and is
14  subject to legal conclusions.
15      Q    This assertion in the proof of
16  claim simply says:  To the extent FTX took
17  actions.
18          Correct?
19      A    Correct.
20      Q    Okay.  And so understanding
21  that it might discover something other
22  than -- beyond what you know today, as you
23  sit here today, have you identified any
24  factual actions that FTX took with respect
25  to any of the things that you alleged

1  could have happened in paragraph 27?
2          MR. HARRIS:  Object to the
3      form.
4          And again, instruct the
5      witness not to reveal attorney
6      advice, but otherwise, you can
7      answer.
8      A    To the extent FTX took
9  actions, that is subject to ongoing legal
10  advice and analysis.
11      Q    Here -- but I -- you're unable
12  to point me to any action or any document
13  or any fact that reflects FTX taking such
14  action, as we sit here today, correct?
15          MR. HARRIS:  Same objections.
16      A    Same point.  Any factual
17  position that I would seek to point you to
18  is subject to legal advice and legal
19  analysis.
20      Q    You identified -- over the
21  course of this discussion, we talked about
22  the $82 million liquidation that's
23  discussed in the various documents,
24  correct?
25      A    Correct.  Yes.

1      Q    But with respect to the
2  $82 million liquidation, 3AC received the
3  proceeds from -- from that liquidation,
4  correct?
5      A    Please define what you mean by
6  "received the proceeds."
7      Q    FTX didn't take them, correct?
8          MR. HARRIS:  Object to the
9      form.
10      A    And again, whether FTX took
11  them depends on legal analysis, legal
12  conclusions, and one gets into what were
13  the liabilities that FTX had, what did FTX
14  do with those assets.  They were not
15  passed outside of the FTX environment to
16  Three Arrows.
17      Q    It is correct that the
18  liquidation of the $82 million in crypto
19  currency assets was credited to the Three
20  Arrows Capital USD balance, correct?
21          MR. HARRIS:  Object to the
22      form.
23      A    Our analysis of the FTX
24  positions and discovery and data provided
25  to us, which is ongoing, suggests that the

1  $82 million was credited to the negative
2  balance that we have calculated that we
3  believe FTX believes was owing to it at
4  that point in time.  And it is not us
5  admitting that that amount -- that amount
6  was owed to FTX.  That is subject to legal
7  conclusions and advice.
8         But when one reviews the data
9  provided by FTX, then the factual
10  conclusion we would reach is that that
11  $82 million was accredited to what FTX
12  believes was owed to it at that time.
13      Q   As you sit here today, is
14  Three Arrows Capital aware of any seizure
15  of lost assets, as you define it in
16  paragraph 27, by FTX, putting aside the
17  $82 million liquidation we just discussed?
18         MR. HARRIS:  Object to the
19         form.
20         Instruct the witness not to
21         reveal attorney advice, but,
22         otherwise, you can answer.
23      A   Can I ask what you mean by the
24  word "seizure"?
25      Q   I'm reading the, you know,

1  words that you have in the proof of claim.
2      A   Fair enough.  The analysis as
3  to whether or not FTX seized assets is, of
4  course, dependent.  And I use the word
5  "seized" as in took assets that they were
6  not entitled to take from those assets of
7  Three Arrows held on the FTX platform.  So
8  the analysis of whether or not FTX seized
9  assets is, of course, intricately
10  integrated as to whether or not FTX was
11  owed money by Three Arrows and what that
12  liability was, what steps had been done to
13  settle that liability, and that is, of
14  course, all subject to legal advice and
15  legal conclusions.
16      Q   Whether it was appropriate or
17  inappropriate, are you aware factually of
18  any assets being seized -- again, putting
19  aside the liquidation of the 83 million
20  in -- by FTX out of the Three Arrows
21  Capital account in June of 2022?
22         MR. HARRIS:  Object to the
23         form.
24         I remind the witness not to
25         reveal attorney advice, but

1         otherwise you can answer.
2      A   So to try and answer this from
3  a different position, it is to be
4  determined and it is, indeed, my
5  understanding of FTX's position -- so let
6  me rephrase that.  It's my understanding
7  of FTX's position that they did not
8  liquidate the assets of Three Arrows apart
9  from the $82 million that I think is
10  common ground were liquidated in some form
11  or another forgetting about legal analysis
12  around liability.  It's FTX position, as I
13  understand it, that FTX did not liquidate
14  those position.
15         Our understanding is partly --
16  is due -- is -- or the development of our
17  understanding, if that's the right phrase,
18  is subject to legal analysis and legal
19  conclusions.  I would point out that the
20  evidence we have -- the only evidence that
21  we really have, with respect to outside of
22  the FTX environment, is testimony of Su
23  Zhu.  And we've talked about the
24  credibility of that testimony and Su Zhu,
25  as a, you know, credible person, what his

1  motivations might be, et cetera.
2         His position is some of it was
3  liquidated by Three Arrows, some of it was
4  seized by FTX.  I do not make a assertion
5  or a conclusion or anything else as to
6  whether I accept Mr. Zhu's position,
7  whether it's correct or not.  But what's
8  clear is there are ongoing analysis,
9  ongoing depositions, ongoing legal advice
10  required for us to reach what would be
11  ultimately a legal conclusion as to
12  whether or not and to the extent to which
13  FTX seized the lost assets in whole or in
14  part.
15      Q   I'm certainly aware of what
16  FTX's position is.  I'm trying to
17  understand whether Three Arrows Capital
18  has identified any factual evidence that
19  is contrary to those positions, not
20  getting into the legal analysis, with
21  respect to the issue of whether see --
22  lost -- quote, lost assets were seized by
23  FTX in June of 2022?
24         MR. HARRIS:  Same instruction,
25         but you can answer.

Page 186

1      A    As I've already said, we can
2  refer back to Su Zhu's testimony and the
3  caveats one puts around that.  With
4  respect to other steps that may or may not
5  have been taken -- that may or not have
6  been taken by Three Arrows, by FTX, or
7  others, that is subject to ongoing review
8  of the data provided to us and disclosure
9  provided to us by FTX through discovery,
10  which is not yet complete.  So we've not
11  reached a conclusion and that analysis is
12  subject to legal advice and is very
13  intertwined with it.
14      Q    You have referred,
15  Mr. Crumpler, a number of times in your
16  testimony to the assertion that -- of FTX,
17  that the negative USD balance were amounts
18  owed to FTX.
19          Are you aware that FTX has put
20  forward a position that the negative
21  balance was owed to other customers and
22  not FTX?
23      A    I'm aware of that.  Yes.
24      Q    You are aware of that?
25          Paragraph 40, if we can turn

Page 187

1  back to, which we were looking at earlier
2  in your proof of claim?
3      A    Yes.  I'm back there.
4      Q    That paragraph goes on to
5  discuss what you define as the "June 13th
6  takings."
7          Do you see that?
8      A    I do.
9      Q    And that seems to allege:
10  Through a series of liquidations,
11  seizures, or other transfers on June 13th.
12          Do you see that?
13      A    I do.
14      Q    Okay.  Does your definition in
15  this proof of claim of the June 13th
16  takings include actions taken by 3AC
17  itself?
18          MR. HARRIS:  Object to the
19      form.
20      A    To the extent it is ultimately
21  determined that Three Arrows took any
22  actions on June the 13th, and those
23  actions being outside of the actions
24  referenced in paragraph 43, then it would
25  include those actions that may or may not

Page 188

1  ultimately be termed -- to be determined
2  to have been taken by Three Arrows.
3          And I hope my caveating of
4  that is very clear.  I'm not admitting
5  that Three Arrows took any actions, but to
6  the extent it is ultimately determined
7  they did, it would be included in that
8  definition, outside of the 60 -- the
9  roughly $65 million that's referred to in
10  paragraph 43.
11      Q    As we sit here today, can
12  Three Arrows Capital point to any evidence
13  that any of the liquidation seizures or
14  transfers on June 13, 2022 were conducted
15  by FTX?
16          MR. HARRIS:  Objection.  Asked
17      and answered.
18          And also remind the witness
19      not to reveal attorney work
20      product, but otherwise you can
21      answer.
22      A    So, with the exception of the
23  $65 million referred to in paragraph 43,
24  which I'm happy to discuss if you want in
25  due course, the whether or not or how

Page 189

1  those liquidations, seizures, and
2  transfers took place is subject to -- the
3  factual position is intertwined with legal
4  advice and analysis is subject to ongoing
5  legal work and conclusions.
6      Q    The factual component of that
7  work, as you sit here today then, then is
8  your testimony you do not know?
9      A    No, that's not my testimony.
10  My testimony is it's subject to legal
11  advice.
12      Q    I'm not asking for the legal
13  advice.
14          I'm asking whether you have
15  seen any factual evidence that FTX
16  performed any of the series of liquidation
17  seizures or transfers that are referred to
18  in paragraph 40?
19          MR. HARRIS:  Object to the
20      form.
21      A    My testimony is the facts as
22  we see them are knowledge to legal advice
23  and legal interpretation.
24      Q    The next sentence talks about
25  another series of liquidations, seizures,

48 (Pages 186 - 189)

Page 190

1 or transfers that you describe as the
2 "June 14th takings."
3        Do you see that?
4     A  I do.  Yes.
5     Q  Okay.  And same question.
6        With respect to the June 14th
7 seizure, liquidations, or transfers that
8 you're referring to in this proof of
9 claim, can you point to any factual
10 evidence that FTX conducted and took any
11 of those actions?
12     A  So we can absolutely point to
13 the factual evidence with respect to the
14 $82 million, whether that's
15 contemporaneous correspondence within
16 FTX -- I think Zane Tackit (phonetic)
17 being the main person involved in that.
18 And that's, obviously, things that have
19 been disclosed to us by you or other
20 sources.  That is with respect to the
21 $82 million.
22        With respect to the balance,
23 the interpretation of what we can
24 understand factually, from review of all
25 the documents, disclosure, et cetera, that

Page 191

1 has been provided to us by FTX, is both
2 ongoing and subject to legal advice.
3     Q  Okay.  So the $82 million
4 liquidation, those facts are not subject
5 to legal advice but any other fact about
6 any liquidation, seizure, or transfer on
7 this day is subject to legal
8 interpretation?
9        I'm --
10        MR. HARRIS:  Objection?
11     Q  -- just trying to understand.
12     A  Yeah.  So --
13        MR. HARRIS:  Wait.  Hold on.
14        Objection.  That's an improper
15        arguing with the witness.  I think
16        you're asking a legal question of
17        him.
18        To the extent you have some a
19        nonlegal basis to answer that
20        question, please do.
21     A  With respect to the
22 $82 million, I am not in any suggesting we
23 haven't been advised legally with respect
24 to that $82 million.  But it -- from our
25 perspective factually, it's very clear,

Page 192

1 from the communication record and I
2 believe has been admitted by FTX, that
3 they caused that liquidation.
4        With respect to the balance of
5 the $296 million that was liquidated,
6 seized, or transferred on June the 14th,
7 2022, the factual position the analysis is
8 intertwined with the legal understanding
9 and analysis and advice, and so I -- it's
10 subject to legal conclusions.
11     Q  Okay.  Mr. Crumpler, let's
12 look at paragraph 43 of the proof of
13 claim, please.
14        And you referenced this
15 earlier, this number of $64,849,838.
16        Do you see that?
17     A  I do see that, yes.
18     Q  Okay.  And you state here --
19 3AC states here in its proof of claim that
20 that amount was on account of:  Unrealized
21 losses, withdrawals by the 3AC debtor,
22 including realized losses on those
23 withdrawals, trading fees, interest
24 charges, and funding payments on futures
25 contracts.

Page 193

1        Do you see that?
2     A  Yes, I do see that.
3     Q  Can you explain for me what
4 you did to calculate that number and what
5 is included in that number, beyond what is
6 written here?
7     A  Sure.  So, obviously, it's
8 important to make reference to Footnote 22
9 in responding to that question, because
10 that shows that, for -- the majority of
11 that calculation was based on information
12 provided to us by FTX or certainly a
13 significant part of it.  Beyond that, if,
14 for example, we didn't have specific
15 pricing data within that FTX disclosure
16 within those 49 million line items of data
17 that was sort of -- got somewhat dumped on
18 us, we would have gone to publicly
19 available sources.
20        I think I referenced some
21 earlier, CoinGecko, coinlist.com.  I won't
22 have those names completely correct, but
23 it's in -- it's in our interrogatories.
24 So that would have been part of how we
25 calculated that number.

49 (Pages 190 - 193)

Page 194

1    Q   Okay.  Other than pricing --
2   the third-party pricing data and
3   information provided by FTX, is there any
4   other source of data that is included in
5   the calculation of that number in
6   paragraph 43?
7    A   So we would have seen where,
8   with respect to withdrawals, that that --
9   you know, those withdrawals coming into --
10  into Three Arrows addresses.
11   Q   And how did you see -- or what
12  records did you review to determine the
13  withdrawals into Three Arrows?
14   A   So we've determined the
15  withdrawals through a combination of
16  reviewing the data provided to us by FTX,
17  and the account -- so I say "account," I
18  mean correctly the wallet addresses that
19  were and are Three Arrows' wallet
20  addresses that received those tokens when
21  they -- when they were withdrawn from the
22  FTX estate.
23   Q   As part of your investigation
24  into the claims against FTX, did Three
25  Arrows Capital conduct a blockchain

Page 195

1   analysis of the -- with -- blockchain
2   analysis with respect to movements in and
3   out of the Three Arrows Capital FTX
4   account?
5    A   Yes.
6    Q   And is that analysis the
7   source of the withdrawal information that
8   you just referred to in your previous
9   answer?
10   A   As I sit here today, my
11  recollection is that the main sourc is
12  seeing the account that it has gone into.
13  So in a sense, it's part of that analysis.
14  It's part of having information with
15  respect to those.  And I say "accounts" in
16  the broader sense, the wallets -- the
17  wallets, the addresses as to where those
18  tokens were sent.  So it's not just us
19  going on the blockchain and going, Oh,
20  look, that's where it's gone.  You know,
21  it's reconciling with other information
22  that we have.
23   Q   How much of the $64.8 million
24  reflected in paragraph 43 is due -- was
25  due to withdrawals by Three Arrows

Page 196

1   Capital?
2    A   My recollection is just --
3   just under $60 million.
4    Q   Do you know who on behalf of
5   Three Arrows Capital executed those
6   withdrawals?
7    A   We don't have that
8   information.
9    Q   What are you referring to when
10  you write in this sentence "funding
11  payments on futures contracts"?
12   A   So funding payments on futures
13  contracts means -- and, again, if the
14  precision of my language is not -- is not
15  as precise as it should be, I apologize --
16  that it means with respect to amounts that
17  are owing to ensure that those futures
18  contracts function.  And those are
19  payments that are due in accordance with
20  the terms of those contracts.
21        So, in this instance, a -- I
22  think the number -- the number, with
23  respect to the final three categories' --
24  trading fees, interest charges, funding
25  payments -- three amounts that go to FTX,

Page 197

1   I think the total number, with respect to
2   those three categories, was in the region
3   of $500,000.
4    Q   So, for example, if you had a
5   futures contract with a long position and
6   the value decreased and you owed money on
7   that contract, that would be a funding
8   payment under this definition?
9    A   My understanding of that
10  definition -- of the definition of
11  "funding payments on futures contracts" is
12  the cost with respect to having the
13  contract versus the economic impact of
14  that contract.
15   Q   Got it.  Thank you for that
16  clarification.
17        MR. GLUECKSTEIN:  All right.
18  Why don't we take a short break
19  and I'm going to see if I can make
20  it a little cooler in here, too?
21        VIDEOGRAPHER:  The time is
22  1:59 p.m., and we're going off the
23  record.
24        (Whereupon, at 1:58 p.m., a
25  recess was taken to 2:15 p.m.)

50 (Pages 194 - 197)

1      (The proceeding resumed with
2      all parties present.)
3      VIDEOGRAPHER:  Time is
4   approximately 2:15 p.m.  We're
5   back on the record.
6      Q   Mr. Crumpler, I have put in
7   front of what's titled:  Declaration of
8   Stephen P. Coverick.  It's a report of the
9   FTX Recovery Trust objection to the
10  amended proof of claim filed by joint
11  liquidators of Three Arrows Capital.  This
12  was filed in this litigation in the FTX
13  bankruptcy case Docket 30934 on June 20,
14  2025.
15     Do you see that?
16     A   I do, yes.
17     Q   And we referenced this
18  document a bit earlier today.
19     This is a document that you
20  testified you have seen but have not
21  reviewed in detail, correct?
22     A   That's correct.  So I've read
23  it, but I have not -- I have not, you
24  know, checked every number in it and
25  followed every calculation for it.

1      Q   Okay.  I do want to direct
2   your attention to a few numbers in here.
3   If you could turn to page 20 of the -- oh,
4   I'm sorry -- page 21 of the declaration.
5   There is a table there, the top of the
6   page, Table 3 entitled:  3AC Withdrawals,
7   June 13-June 14, 2022.
8      Do you see that?
9      A   Sorry.  Could you -- I
10  apologize.  Could you repeat that.
11     Q   I'm sorry.  Page 21 --
12     A   Yep.
13     Q   -- Table 3.
14     A   Okay.
15     Q   The title of that table is:
16  3AC Withdrawals, June 13-June 14, 2022.
17     Do you see that?
18     A   I do, yes.
19     Q   Okay.  And that chart lists
20  certain withdrawals that Mr. Coverick has
21  set -- has set forward here as having been
22  undertaken by Three Arrows Capital, the
23  total $60 million.
24     Do you see that at the bottom
25  right-hand row?

1      A   I do, yes.
2      Q   Okay.  My question is:  Well,
3   first of all, have you reviewed these
4   calculations prior to reviewing them with
5   me now?
6      A   I'm -- my understanding is
7   that these calculations equate to the --
8   the -- my reference to that slightly less
9   than $60 million -- and I mean slightly
10  less -- that you'll see in paragraph, I
11  think, 43 of the proof of claim.
12     I think that component, part
13  of the $65 million that we say is not part
14  of the lost assets of Three Arrows.
15     Q   Okay.  So you -- so you
16  generally agree, then, with the
17  information that's set forth here in
18  Table 3 with respect to $60 million in
19  withdrawals undertaken by Three Arrows
20  Capital in the relevant period, correct?
21     A   We certainly agree that, yep,
22  that is $60 million give or take that
23  appears to have come to Three Arrows, yes.
24     Q   Okay.  If you could sort of
25  turn to the previous page, paragraph --

1   page 20, there is a table at the top of
2   the page there, Table 1, entitled:
3   Decline in value of assets held in 3AC
4   accounts from market movements.
5      Do you see that?
6      A   I see the table, yes.
7      Q   Okay.  And that table sets out
8   facts as put forth by FTX about market
9   declines with respect to certain
10  cryptocurrency assets totaling $148
11  million of losses in the 3AC account.
12     Do you see that?
13     MR. HARRIS:  Object to the
14     form.  And object to the extent
15     that you're asking a legal
16     conclusion.
17     A   I can see that table reflects
18  what I understand to be FTX's analysis as
19  to the price movement of various crypto
20  assets and their calculated impact on
21  3AC's positions.
22     Q   Okay.  Does -- does Three
23  Arrows Capital dispute the $148 million
24  lost number that's presented in Table 1?
25     MR. HARRIS:  Objection.  Calls

Page 202

1    for a legal conclusion.
2         Instruct the witness not to
3    reveal attorney advice or work
4    product.  If you have another
5    basis, you can answer.
6    Q   I want to be clear, I am
7  not -- there is nothing about this that's
8  a legal question.  I'm asking whether you
9  agree with the calculation of the losses
10 of $148 million with respect to the
11 digital asset balance of Three Arrows
12 Capital as reflected.
13        MR. HARRIS:  Well, you gave a
14    speech about whether it's a legal
15    conclusion.  I'll respond to that
16    speech, which is determining
17    whether something is a loss is, in
18    fact, a legal conclusion.
19   Q   Mr. Crumpler?
20   A   I'm not going to provide a
21 legal conclusion.
22   Q   I'm not asking you to.
23        But do you have an answer to
24 my question as to whether you agree with
25 the $148 million number is a result of

Page 203

1  price declines to the 3AC account during
2  this period?
3         MR. HARRIS:  Objection to the
4     extent it calls for a legal
5     conclusion.
6         If you have another basis, you
7     can answer.
8    A   And without referencing any
9  legal conclusions as to what lost or
10 otherwise might mean, we cannot agree that
11 there was a decline of $148 million
12 without conclusion of both our depositions
13 and understanding and discovery of FTX and
14 a Mr. Coverick, in particular, were
15 understanding how those numbers were
16 specifically calculated and then
17 referencing it to our own calculations.
18   Q   Do you have your own
19 calculations with respect to market
20 decline amounts during this period that
21 are different from Mr. Coverick's?
22   A   Our calculations and analysis
23 with respect to both the data provided to
24 us by FTX and publicly available data are
25 ongoing.

Page 204

1    Q   If you look further down that
2  page, Mr. Crumpler, there is another table
3  there, Table 2, entitled:  Decline in USD
4  balance of 3AC accounts, perpetual futures
5  contracts.
6         Do you see that?
7    A   I do see that.
8    Q   And that reflects in that
9  table a 17 percent decline during the two
10 days in question.
11        Do you see that?
12   A   I do see that.
13   Q   Okay.  Does 3AC disagree with
14 the fact that there was a 17 percent
15 decline in the value of BTC-PERPs on
16 June 13th and 14th of 2022?
17        MR. HARRIS:  Object to the
18    form.
19   A   And repeating my previous
20 statement or analysis of the data and
21 information provided to us by FTX to get
22 relevant extent of data when it comes to
23 PERPs, we would need to calculate that
24 information.  And indeed, our ability to
25 calculate it is ongoing.  And so at this

Page 205

1  point in time, I don't agree or disagree
2  with that number.
3    Q   As you sit here today, as a
4  representative of 3AC, you don't have an
5  alternative number to present on the value
6  of declines in BTC-PERPs during the
7  relevant period, correct?
8         MR. HARRIS:  Object to the
9    form.
10   A   As we sit here today, our
11 analysis of the data provided to us by FTX
12 and obtained from other sources is ongoing
13 and subject to refinement.
14        (Whereupon, the Declaration of
15    Steven P. Coverick was marked
16    as Crumpler Exhibit No. 8 for
17    identification, as of this
18    date.)
19   Q   If you could turn, sir,
20 please, to page 22, Mr. Coverick's
21 declaration.  It's been marked Exhibit 8.
22 There is a table, Table 5, in the middle
23 of that page titled 3ATC -- sorry -- 3AC
24 trades, June 13th and 14th of 2022.
25        Do you see that?

52 (Pages 202 - 205)

Page 206

1    A   I do see that, yes.
2    Q   Does 3AC dispute that it made
3  trades on June 13th and 14th of 2022 in
4  the amounts listed in that table?
5        MR. HARRIS:  Object to the
6    form.
7    A   Yes.
8    Q   And why is that?
9    A   Because our analysis is the
10  data provided us by FTX, and full
11  discovery and disclosure processes are
12  ongoing.  And as we previously talked
13  about during this deposition, the
14  determination as to whether 3AC made some
15  or all of the trades, indeed even what a
16  trade is, is ongoing.
17    Q   So you don't know one way or
18  the other, as you sit here today, whether
19  Mr. Coverick's numbers presented in
20  Table 5 are correct, right?
21        MR. HARRIS:  Object to the
22    form.
23    A   Yes, that's correct.  We may
24  know further after his deposition
25  tomorrow.

Page 207

1    Q   Is 3AC in possession of any
2  factual information about who at 3AC made
3  trades on the FTX account on June 13th of
4  14th of 2022?
5    A   The -- with the important
6  caveat that we do not know who made the
7  trades.  I'm using "trades" broadly to
8  mean seizures, liquidations, sales,
9  transfers of assets to the different parts
10  of the FTX sort of, you know, empire, if
11  one likes.  Then to -- even to the extent
12  that we can see that there are withdrawals
13  from the 3AC account, which we've talked
14  about in -- with respect to this document
15  and others.
16        We cannot see from our records
17  who made -- or who instructed -- if it was
18  indeed 3AC, who instructed for those
19  withdrawals to be made.  And it's not
20  clear from the FTX records as to whether
21  or not an instruction came from a specific
22  person for 3AC.  Indeed, the records
23  disclosed to us by FTX whether those
24  log-in records or activity records even
25  themselves seem inconsistent.

Page 208

1    Q   Would you elaborate on
2  which -- what inconsistency you have seen
3  in those records that you have reviewed?
4    A   So our review of these
5  records, which have only recently been
6  provided to us, I think we have a login --
7  again, I get the slight terminology wrong,
8  description wrong.  I apologize.  But we
9  have -- we have been provided with login
10  records, and we have been provided with
11  activity records.  And the login records
12  seem to say one thing.  The activity
13  records seem to say the other.
14        We don't know why that is.  It
15  could be for a number of different
16  reasons.  It could be due to error and
17  presentation of data.  It could be due to
18  the meaning different things, you know, a
19  login could simply be that that's someone
20  looking at the account.  It could be the
21  API looking at the account for all I know.
22  It doesn't mean that 3AC has taken a step.
23        An activity record suggests --
24  and again, this is just a personal view
25  subject to further analysis and questions

Page 209

1  suggests that someone has taken a step as
2  an activity, those records seem to suggest
3  a lot less has taken place.
4        There are lots of
5  inconsistencies to be explored, and that's
6  a process, obviously, that is ongoing with
7  respect to our analysis of the records
8  provided to us and will be subject to
9  further queries that we have.
10    Q   Focusing back on Table 5,
11  understanding that you don't have a
12  position as to who executed any trade, any
13  particular trade, you would agree that if
14  $611 million of bitcoin were sold and $611
15  million of cash credited to the USD
16  account, the net economic impact on 3AC's
17  account is zero, correct?
18        MR. HARRIS:  Object to the
19    form.
20    A   So if $611 million of, in this
21  case, BTC was sold, and that was the
22  market value that it should have been sold
23  for and if an equivalent amount was owing
24  to FTX with respect to that $611
25  million -- and there's lots of ifs in

Page 210

1  there, but I'm very deliberately putting
2  those ifs in there -- if that all happened
3  and if all of the other arguments around
4  who owes what to who are correct, i.e.,
5  that was FTX's liability, then I would
6  agree the impact is zero.
7      Q    Mr. Crumpler, can we go back
8  to your proof of claim, which I think was
9  marked as Exhibit 7.
10     A    Yep.  I've got it in front of
11  me.
12     Q    If you can turn to paragraph
13  51 of your proof of claim, which is on
14  page 20.
15         Are you there?
16     A    Yeah, paragraph 51 under title
17  3.
18     Q    Yes, sir.
19     A    Or subtitle 3, I guess.
20     Q    Okay.  The first sentence
21  there in that paragraph says:  As a result
22  of the June takings, FTX was repaid
23  essentially all of its liabilities from
24  the 3AC debtor, resulting in approximately
25  100 percent recovery to FTX.

Page 211

1         Do you see that; that's your
2  assertion there?
3      A    Yes, I do.
4      Q    What was FTX repaid, as 3AC
5  uses the term -- that term in paragraph
6  51?
7      A    So taking into account -- and
8  this is important -- the sentence in
9  brackets that comes after the first
10  sentence, i.e., Indeed as discussed above,
11  FTX appears to be paid vastly more than
12  any established liabilities.
13         Then what that first
14  sentence -- what we mean by that first
15  sentence is that as a result of the June
16  takings, as previously defined in the
17  proof of claim, any potential liability to
18  FTX was extinguished.
19     Q    Okay.  And what were the
20  liabilities from the 3AC debtor that you
21  are referring to in that reference?
22     A    So I'm referring to the
23  calculation that we performed based on the
24  information provided to us by FTX and a
25  degree of third-party market dates around

Page 212

1  pricing to get to the number we show in
2  paragraph -- in the table in paragraph 42
3  as to our estimate of what we believe FTX
4  believes it was entitled to as its
5  liability.
6         So it is not admitting that
7  that was the liability that Three Arrows
8  owed to FTX.  It's us calculating the
9  number that we believe would be the
10  maximum liability that FTX believes it is
11  entitled to.
12         I mean, it's not us accepting
13  that that liability is correct and exists.
14     Q    And what evidence or
15  information are you relying on to support
16  the argument that FTX was repaid for
17  liabilities?
18         MR. HARRIS:  Object to the
19     extent it's calling for a legal
20     conclusion.
21         But otherwise, you can answer.
22     A    Could you repeat the question,
23  please.
24     Q    Sure.  What evidence or
25  factual information is 3AC relying on when

Page 213

1  it asserts that FTX was repaid essentially
2  all of its liabilities?
3      A    Well, in many ways, the
4  principal piece of evidence we're relying
5  on is that FTX has never made a claim in
6  the liquidation estate of Three Arrows.
7      Q    Anything else?
8      A    So based on the calculations
9  that we've made using the data provided by
10  FTX, and on the assumption, which is a big
11  assumption, that the negative U.S.-dollar
12  balances are correctly and legally
13  attributable as amounts owing by Three
14  Arrows to FTX, then we see that that
15  negative U.S.-dollar balance with all of
16  those caveats around legal entitlement
17  reduces by the 14th of June -- close of
18  day, 14th of June, UTC time, and to
19  negative -- what is it? -- $23,505,083.92.
20     Q    I want to focus on the
21  parenthetical that you referenced,
22  Mr. Crumpler, that follows the sentence I
23  read into the record.
24     A    I'm sorry.  I jumped back.
25  Which paragraph, did you say?

54 (Pages 210 - 213)

Page 214

1     Q   Sorry.
2         In paragraph 51, you reference
3  the parenthetical that followed the
4  sentence we were just discussing that
5  says:  Indeed, as discussed above, FTX
6  appears to have been paid vastly more than
7  any established liabilities.
8         Do you see that?
9     A   I do.
10    Q   Okay.  And, when you say
11  "vastly more than any established
12  liabilities," you're referring to the
13  unknown alleged liability that we talked
14  about earlier today; is that right?
15    A   I am, in part, referring in
16  that -- to that; I'm, in part, referring
17  to the overall establishment of
18  liabilities that FTX -- that Three Arrows
19  had to FTX and beyond that at the -- it's
20  legal conclusions and analysis.
21    Q   And paragraph 51 does not take
22  into account the calculations and
23  explanations provided by Mr. Coverick in
24  his June 20th declaration, correct?
25    A   What do --

Page 215

1         MR. HARRIS:  Object to the
2     form.
3     A   Given that our proof of
4  claim -- our amended proof of claim was
5  submitted in I think March 2025 and
6  Mr. Coverick's declaration was submitted
7  in June, then no, of course not.
8     Q   As we established earlier, you
9  have not sought to make any changes to any
10  of the statements, including those in
11  paragraph 51 as a result of Mr. Coverick's
12  declaration, correct?
13    A   Our analysis of Mr. Coverick's
14  declaration and other information
15  disclosed and provided to us by FTX is
16  ongoing, and the impact of that analysis
17  will be subject to further legal
18  determination and conclusions.
19    Q   All right.
20        MR. GLUECKSTEIN:  Why don't we
21     take a five-minute break?
22     I think we're about done.
23        VIDEOGRAPHER:  Okay.  The time
24     is 2:37 p.m.  We're off the
25     record.

Page 216

1         (Whereupon, at 2:37 p.m., a
2     recess was taken to 2:58 p.m.)
3         (The proceeding resumed with
4     all parties present.)
5         VIDEOGRAPHER:  Time is
6  approximately 2:58 p.m.  We're
7  back on the record.
8         MR. GLUECKSTEIN:  All right.
9  Thank you, Mr. Crumpler.
10     I have no further questions
11  for Mr. Crumpler or 3AC today.  I
12  want to note that the FTX Recovery
13  Trust is reserving all rights to
14  seek a further deposition of
15  Mr. Crumpler, given how many
16  questions today he was either
17  unable or unwilling to answer due
18  to the ongoing investigation, as
19  he characterized it.  But we have
20  nothing further today.
21        MR. HARRIS:  Just for the
22  record, we strongly disagree with
23  that characterization.  The
24  ongoing investigation is triggered
25  entirely by the extremely tardy

Page 217

1  and not yet finished discovery of
2  FTX in addition to FTX's
3  insistence that third-party
4  discovery be adjourned until
5  recently.  So I find it ironic to
6  hear a complaint that we are not
7  yet completed with our
8  investigation, but we'll reserve
9  our rights.
10        MR. GLUECKSTEIN:  Your rights
11  can be reserved as are ours.
12        VIDEOGRAPHER:  Okay.
13        MR. GLUECKSTEIN:  I think
14  we're done for today.
15        VIDEOGRAPHER:  The time is
16  2:59 p.m.  This concludes today's
17  testimony.  We're off the record.
18
19     (Time noted:  2:59 p.m.)
20
21
22
23
24
25

55 (Pages 214 - 217)

Page 218

1    ---------------------INDEX-----------------------
2    WITNESS        EXAMINATION BY        PAGE
3    RUSSELL CRUMPLER    MR. GLUECKSTEIN        6
4
5    ------------------EXHIBITS----------------------
6    FOR IDENTIFICATION  DESCRIPTION        PAGE
     Exhibit No. 1     Notice of Deposition     9
7                      of Three Arrows
                       Capital, LTD.,
8                      Pursuant to Fed R.
                       Civ. P. 30(b)(6)
9
     Exhibit No. 2     Document,          79
10                     Bates-stamped
                       FTX_3AC_000013695
11
     Exhibit No. 3     Document,          82
12                     Bates-stamped
                       3AC_FTX_00558861
13
     Exhibit No. 4     Document,          95
14                     Bates-stamped
                       FTX_3AC_000045694
15
     Exhibit No. 5     Document,          121
16                     Bates-stamped
                       FTX-3AC_000000758
17
     Exhibit No. 6     Document,          126
18                     Bates-stamped
                       3AC_FTX_00551650
19
     Exhibit No. 7     Proof of Claim     143
20
     Exhibit No. 8     Declaration of Steven  205
21                     P. Coverick
22
23        ---- ***** ----
24
25

Page 220

1
2        INSTRUCTIONS TO WITNESS
3
4        Please read your deposition over
5    carefully and make any necessary
6    corrections.  You should state the reason
7    in the appropriate space on the errata
8    sheet for any corrections that are made.
9        After doing so, please sign the
10   errata sheet and date it.
11       You are signing same subject to
12   the changes you have noted on the errata
13   sheet, which will be attached to your
14   deposition.
15       It is imperative that you return
16   the original errata sheet to the deposing
17   attorney within thirty (30) days of
18   receipt of the deposition transcript by
19   you.  If you fail to do so, the deposition
20   transcript may be deemed to be accurate
21   and may be used in court.
22
23
24
25

Page 219

1            CERTIFICATE
2    STATE OF NEW YORK )
3             )ss:
4    COUNTY OF RICHMOND)
5        I, DANIELLE GRANT, a Certified
6    Shorthand Reporter and Notary Public
7    within and for the State of New York, do
8    hereby certify:
9        That RUSSELL CRUMPLER, the
10   witness whose deposition is hereinbefore
11   set forth, was duly sworn by me and that
12   such deposition is a true record of the
13   testimony given by such witness.
14       I further certify that I am not
15   related to any of the parties to this
16   action by blood or marriage and that I
17   am in no way interested in the outcome
18   of this matter.
19       In witness whereof, I have
20   hereunto set my hand this 23rd day of
21   September, 2025.
22
                 *Danielle Grant*
23   _____
24       DANIELLE GRANT
25

Page 221

1    In re: FTX TRADING LTD., et al., DEBTORS.
2    9/23/2025 - RUSSELL CRUMPLER
3        ACKNOWLEDGEMENT OF DEPONENT
4    I, RUSSELL CRUMPLER, do hereby declare
5    that I have read the foregoing transcript,
6    I have made any corrections, additions, or
7    changes I deemed necessary as noted on the
8    Errata to be appended hereto, and that the
9    same is a true, correct and complete
10   transcript of the testimony given by me.
11
12   _____  _____
13   RUSSELL CRUMPLER        Date
14   *If notary is required
15
16   SUBSCRIBED AND SWORN TO BEFORE ME THIS
17   _____ DAY OF _____, 20___.
18
19
20   _____
21   NOTARY PUBLIC
22
23
24
25

Page 222

1    In re: FTX TRADING LTD., et al., DEBTORS.
2    9/23/2025 - RUSSELL CRUMPLER
3         E R R A T A  S H E E T
4    PAGE_____ LINE_____ CHANGE_____
5    _____
6    REASON_____
7    PAGE_____ LINE_____ CHANGE_____
8    _____
9    REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____  _____
24   RUSSELL CRUMPLER        Date
25

Page 223

1    In re: FTX TRADING LTD., et al., DEBTORS.
2    9/23/2025 - RUSSELL CRUMPLER
3         E R R A T A  S H E E T
4    PAGE_____ LINE_____ CHANGE_____
5    _____
6    REASON_____
7    PAGE_____ LINE_____ CHANGE_____
8    _____
9    REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____  _____
24   RUSSELL CRUMPLER        Date
25

57 (Pages 222 - 223)

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# **EXHIBIT 3**

**Excerpts of Transcript of September 23, 2025 Deposition of Russell Crumpler**

| # | Question | Answer |
|---|----------|--------|
| 1. | "Since your prior deposition in November 2024 . . . what have the joint liquidators done to investigate their claims against FTX?" (67:13-16.) | "[W]e've continued to review the documents . . . available to us. . . . [D]iscovery disclosure process is obviously ongoing and our analysis has to change and adapt to that ongoing process. . . . [O]ur analysis remains ongoing." (68:3-20.) |
| 2. | "Does . . . Three Arrows Capital dispute that it was bound by the FTX terms of service that's been marked as Exhibit 2 with respect to its trading activity?" (80:12-16.) | "It – this just calls for a legal conclusion." (80:24-25.) |
| 3. | "So other than advice from counsel, you don't have -- as the joint liquidator for 3AC, you don't have a position as to whether 3AC was bound by the FTX terms of service, correct?" (81:1-5.) | "I rely on the advice of my counsel." (81:6-7.) |
| 4. | "What is Three Arrows Capital's understanding of what is included in their account balance on the FTX Exchange?" (81:16-18.) | "The -- what is included in our account balance or otherwise is subject to legal conclusions." (81:21-23.) |
| 5. | "What is 3AC's understanding of what was available in June of 2022 and presented to 3AC with respect to its account balance at any point in time?" (85:15-18.) | "I think to take the second part of your question . . . 'what was presented to 3AC in June 2022,' we don't -- we simply don't have that information." (85:21-25.) |
| 6. | "Is your testimony sitting here today, after the discovery process that you referenced earlier, that you still don't know what was presented to 3AC in June of 2022?" (86:1-5.) | "We do not have -- we do not know and have not finished our analysis of all the data and documentation and . . . details presented to us by FTX during the course of our dispute. That analysis is ongoing, and where appropriate, subject to legal conclusions." (86:6-12.) |
| 7. | "As you sit here today . . . because that analysis [as to what was presented to 3AC with respect to its Account Balance in June 2022] is ongoing, you don't have a view, correct?" (87:16-18.) | "[T]he development of our view is ongoing and subject -- it isn't just the case that one could look at, you know, a series of numbers and reach a conclusion. It requires legal analysis as to how those numbers should be interpreted and, therefore, it's subject to legal conclusion." (87:21-88:4.) |

| # | Question | Answer |
|---|---|---|
| 8. | "[W]ere those digital currencies [BTC, ETH, and others] a part of the account balance that would have been credited to 3AC with respect to those accounts?" (88:18-21.) | "Those digital currencies were assets own[ed] by [3AC] on the FTX platform. As to how they were incorporated into an FTX balance -- an account balance calculated by FTX, then our analysis is ongoing subject to legal conclusion." (88:24-89:4.) |
| 9. | "What is 3AC's understanding of the margin program that existed on the FTX exchange in June of 2022?" (92:10-12.) | "Our understanding and analysis is ongoing subject to the ongoing disclosure and discovery exercise with FTX." (92:13-16). |
| 10. | "So as -- sitting here today as the representative of Three Arrows Capital, you do not have an understanding of the FTX margin program that existed in June 2022 . . . right?" (92:19-25.) | "My understanding is based on the legal advice I've received and the ongoing legal analysis and conclusions." (93:8-10.) |
| 11. | "[W]ith respect to Three Arrows trading on the FTX exchange, Three Arrows Capital opted into the margin program in order to utilize it, correct?" (94:17-20.) | "I'm not sure what you mean by 'opt in.' I do not know what steps Three Arrows took to opt in or otherwise other than where we have legal advice or legal conclusions can be drawn." (95:2-6.) |
| 12. | "So I'm asking whether you have an understanding of whether 3AC, in order to utilize the margin trading program at FTX, turned on and enabled the margin trading program?" (96:21-25.) | "[O]ur analysis of [Exhibit 4, FTX_3AC_000045694] is ongoing and subject to legal conclusions. I also point out this is a 2022 document, so I don't know what happened with respect to Three Arrows and FTX's involvement prior to this, whether or not something had already been set, whether or not Three Arrows had to make a step on the 22nd -- the 4th of April, 2022, et cetera, because I simply wasn't there at the time." (97:7-17.) |
| 13. | "Understanding that your analysis is ongoing, as you sit here today . . . Three Arrows Capital cannot point to any evidence that the FTX margin trading program did not operate as set forth in what's been marked as Exhibit 4, correct?" (97:24-98:6.) | "Our analysis of the spot margin trading program, its relationship to Three Arrows and FTX is ongoing and subject to legal conclusion." (98:12-15.) |

| # | Question | Answer |
|---|----------|--------|
| 14. | "So you don't have any evidence, sitting here today, that what's set forth in this document marked as Exhibit 4 as to the process for . . . spot trading on the FTX exchange is incorrect?" (98:16-21.) | "I could accept that, if a new client came along on the 5th of April 2022 and assuming that their accounts were set up to operate in the way that this explainer suggests, they would have to opt in or opt out.  Beyond that, our analysis, with respect to the Three Arrows-FTX relationship, which existed prior to this date, is ongoing and subject to legal considerations and conclusions." (99:4-13.) |
| 15. | "And isn't it correct that Three Arrows Capital accumulated the BTC balance it had in June of 2022 in part by borrowing under the margin program?" (100:21-24.) | "[O]ur exact answer or conclusion as just to how Three Arrows was able to accumulate its bitcoin and other holdings on the FTX platform and the relationship between if the governing documents and the way the platform operated in Three Arrows is subject to ongoing analysis of the documents provided to us by FTX and legal conclusions." (101:4-12.) |
| 16. | "So as you sit here today, you don't have an answer to the question . . . of whether 3AC accumulated its bitcoin balance in June of 2022 by borrowing under the margin program?" (101:13-17.) | "As I sit here today, our analysis of the position as between FTX and Three Arrows is ongoing subject to the ongoing disclosure and discovery process and information, some of which has come to us very late from FTX, and therefore, our conclusion and our current position is subject to change, ongoing, and subject to legal analysis and conclusions." (101:20-102:3) |
| 17. | "Understanding it's subject to change, what is your current position with respect to whether 3AC accumulated its bitcoin balance in June of 2022 by borrowing under the margin program?" (102:4-8.) | "Our current position is based on the legal advice we have received and therefore subject to legal conclusions." (102:12-14.) |
| 18. | "Isn't it true that Three Arrows Capital accumulated its negative USD balance that it had at the end of June 12, 2022, in part by borrowing under the margin program?" (102:15-19.) | "The same point, subject to ongoing analysis of the data provided [by] FTX and the legal advice associated with that analysis and therefore subject to legal conclusions." (102:21-25.) |
| 19. | "[D]oes 3AC have a understanding that [Schedule 5 of the Terms of Service] is what FTX was offering in terms of perpetual futures contract to its customers?" (105:8-11.) | "Not beyond the fact that it calls for a legal conclusion." (105:14-15.) |
| 20. | "So sitting here today . . . does 3AC have any understanding of what FTX perpetual futures contracts were in June of 2022?" (105:16-19.) | "3AC's understanding is based on legal advice and legal conclusions." (106:1-3.) |

| # | Question | Answer |
|---|----------|--------|
| 21. | "I'm again asking as a factual matter whether Three Arrows Capital has an understanding as to what its perpetual futures contracts were with FTX in June of 2022?" (106:19-23.) | "I don't have a basis to answer because the factual position is intimately intertwined with the legal – [legal] analysis of what all the contracts, terminology, et cetera, means. So it's all based on legal conclusion." (107:6-11.) |
| 22. | "When Three Arrows Capital owned a position on the FTX exchange, it did not pay any amount for the contract itself other than trading fees, correct?" (107:12-15.) | "Our analysis of information provided to us by FTX, I think what was paid when and where is ongoing. So we don't have a conclusion with respect to that at this point in time. We keep getting further information from FTX. That is also potentially subject to legal analysis and conclusion." (107:16-23.) |
| 23. | "As you sit here today, Three Arrows Capital cannot point to any evidence that opening a perpetual futures position changed its account balance, correct?" (107:24-108:3.) | "My only answer is, at this point in time, we still haven't determined what -- we're not even certain what FTX means by account balance. So therefore, I cannot answer that question." (108:10-14.) |
| 24. | "Does Three Arrows Capital, sitting here today, understand whether entering into a futures position on the FTX exchange changed its economic position in its FTX account?" (108:25-109:4.) | "To the extent that Three Arrows then -- the assets that Three Arrows had an entitlement to on the exchange increased, then yes, I agree. There is obviously ongoing analysis, both the information provided to us and the legal advice being obtained with respect to that information as to the conclusions one reaches as to the other side, whether there's liabilities, et cetera, so subject to legal conclusion." (109:16-110:1) |
| 25. | "A futures position itself is not an asset, correct?" (110:2-3.) | "Whether a futures position is . . . an asset . . . absolutely calls for a legal conclusion." (110:11-13.) |
| 26. | "[If you have a futures position,] [y]ou have a potential contingent right to something in the future, correct?" (111:4-6.) | "And again, we're getting into legal terminology as to what all those different words mean. So the balance is subject to legal conclusions." (111:7-10.) |
| 27. | "So as you sit here today, then, I assume 3AC does not have an understanding as to whether futures contracts were listed as part of the account balance on the FTX exchange, correct?" (111:11-16.) | "Our position is that the futures contracts were assets of Three Arrows as listed on the FTX exchange . . . as to all of the reasons as to why, that's subject to legal advice and conclusions." (111:23-112:3.) |
| 28. | "[T]he FTX terms of service require customers, including Three Arrows Capital, to comply with a maintenance margin requirement, correct?" (115:11-14.) | "I'm afraid it calls for legal conclusions." (115:21-22) |

| # | Question | Answer |
|---|----------|--------|
| 29. | "Does 3AC have any understanding, as a factual matter, what FTX meant when it referenced a 'maintenance margin requirement' in connection with its trading platform?" (115:23-116:2.) | "The factual position is intimately intertwined with the legal advice we have received and are receiving and the analysis that's ongoing.  I mean, my understanding is that the documents provided to us as late as Sunday last week -- or sorry -- Friday -- I apologize -- end of day Friday last week talked to what FTX's understanding of the 'margin maintenance' means.  We certainly haven't had time to finish our analysis of that, and the facts are absolutely -- to the extent the facts are there and relevant, they're absolutely intertwined with any legal analysis and legal conclusions with respect to what it all means." (116:5-21.) |
| 30. | "[A]s a factual matter . . . Three Arrows Capital does not have an understanding of what FTX meant by a 'maintenance margin requirement' . . . in connection with its trading account?" (116:22-117:6.) | "Subject to further and ongoing analysis of the information provided to us by FTX and continuing to be provided to us by FTX and the legal advice and legal conclusions with respect to that information." (117:9-14.) |
| 31. | "[I]s it your understanding that 3AC was bound by that language in Exhibit 2 [Terms of Service, § 2.5.2]?" (118:18-19.) | "So 3AC's understanding of whether or not it was and is bound by that language is subject to legal analysis and legal conclusions." (119:7-10.) |
| 32. | "And it's Three Arrows Capital's position that that signature does not apply to line of credit reflected on the first page and a half of this document?" (125:5-9.) | "It's my personal position that factually, yes, that's correct. This is not a signed -- that first agreement has not been signed.  The balance, I defer -- I don't defer to, that's completely the wrong phrase.  As to the impact or otherwise of that, I defer to legal advice and its legal conclusions." (125:17-24.) |
| 33. | "And 3AC, in June of 2022, in fact did utilize a $120 million line of [credit], correct?" (131:3-5.) | "Our conclusions with respect to exactly how the relationship between FTX and Three Arrows operated were ongoing based on ongoing analysis of the discovery and information provided to us by FTX." (131:8-12.) |
| 34. | "3AC's records do show a $120 million line of credit that existed in favor of 3AC in at least May of 2022, correct?" (133:8-10.) | "The records of Three Arrows -- so the records, as pulled together, to use a loose terminology, by the administrators show that there was a line -- a record that there was a line of credit or understood to be a line of credit and understood at that time to be a line of credit for the benefit of Three Arrows with FTX.  As to whether or not that line of credit was properly established, whether it's valid, et cetera, that calls for legal conclusions." (133:13-24.) |

| # | Question | Answer |
|---|----------|--------|
| 35. | "Three Arrows Capital, in fact, received a benefit of the $120 million line of credit while trading on the FTX exchange in June of 2022, correct?" (133:25-134:3.) | "As to whether or not Three Arrows received the benefit of that line of credit is subject to ongoing legal analysis and legal conclusions." (134:12-15.) |
| 36. | "So you don't have a [view] one way or the other [regarding whether 3AC in fact received a benefit of the $120 million line of credit while trading on the Exchange in June 2022], sitting here today?" (134:16-17.) | "My view is intimately intertwined with the legal advice I've received." (134:19-21.) |
| 37. | "You would agree that a $120 million line of credit would have allowed 3AC to take leverage positions while trading on the exchange, correct?" (134:22-25.) | "And I would agree that a potential line of credit, whatever level, may have depending on the terms of that line of credit and its applicability, allow 3AC or, indeed, another party to do certain types of trading and undertake certain types of activities. As to what the purported line of credit with respect to FTX and Three Arrows allowed Three Arrows to do on the FTX platform, that's subject to legal advice and legal conclusions." (135:3-14.) |
| 38. | "And 3AC had, in fact, fully drawn on a $120 million line of credit in connection with its trading activities on FTX's exchange in June of 2022, correct?" (135:15-18.) | "That's simply not an answer I can -- can agree or otherwise with without referencing the attorney advice and legal conclusions." (136:2-5.) |
| 39. | "And is it . . . 3AC's position that . . . the terms of this line of credit are not applicable to it in June of 2022?" (136:23-137:1.) | "That calls for a legal conclusion." (137:7-8.) |
| 40. | "In the event that this line of credit was applicable to Three Arrows Capital in June of 2022, Three Arrows Capital would have been required to maintain an account balance of at least $240 million if it had fully drawn on the line of credit, correct?" (138:12-18.) | "I can't answer that without referring to legal conclusions and analysis." (138:24-139:1.) |

| # | Question | Answer |
|---|----------|--------|
| 41. | "As you sit here today as a representative of Three Arrows Capital, as a result of your ongoing investigation, is there anything in your proof of claim that you believe should be revised?" (149:4-9.) | "Our investigation is, as you quite rightly say, ongoing.  Our conclusions with respect to that investigation are ongoing because we continue to receive discovery and disclosure from FTX.  And therefore, whether or not there is anything that requires revision in here, you know, is to be determined." (149:10-18.) |
| 42. | "As a result of the data put forward in the revised version of FTX 38, does that change the calculation with respect to 3AC's assets in paragraph 40 of your proof of claim?" (159:16-20.) | "Analysis of the information provided to us by FTX, including the revisions to document with the Bates Number 38, is ongoing, and to the extent it may or may not alter our number as to the asset value, that is a matter for not just analysis but analysis that will be performed at the request of counsel and is subject to legal conclusions." (160:3-11.) |
| 43. | "Have you performed, as a factual matter, any calculations using the amended version of FTX -- the Bates Number to FTX 38 and determined how that might impact the asset number presented in paragraph 40?" (160:12-17.) | "Any -- any revised calculations we have been performed -- we have performed or that the Teneo team has been performed have been at the direction of counsel." (160:23-161:2.) |
| 44. | "[Y]ou don't recall whether you have actually reviewed Mr. [Coverick's] numbers in that declaration, which was submitted more than three months ago on June 20th of 2025; is that right?" (161:15-19.) | "I have not personally reviewed those numbers.  To the extent that my team, so the Teneo team, has worked with respect to those numbers in amending, reviewing, looking at the potential consequences of those numbers, that has been at the direction of counsel." (161:20-162:1.) |
| 45. | "[W]hy is it that Three Arrows Capital included in its asset calculation number of [$]1.59 billion the notional amounts of futures contracts?" (163:25-164:3.) | "[B]eyond a simple calculation as to what the assets that Three Arrows held in the FTX platform are, the reason for inclusion or otherwise of particular line items are subject to legal advice." (164:9-14.) |
| 46. | "[W]hat is the basis for, regardless of the number, your assertion that any of this [negative USD] balance might be owed to FTX as opposed to somebody else?" (167:24-168:2.) | "It's subject to legal conclusions." (168:10-11.) |
| 47. | "Is it 3AC's position today that what you have defined as the 'unknown alleged liability' remains unexplained?" (173:13-16.) | "That's subject to advice -- attorney advice and legal conclusions." (173:23-24.) |

| # | Question | Answer |
|---|----------|--------|
| 48. | "Do you know whether an explanation was provided [in] Mr. Coverick's declaration of June 20th that you have not reviewed in detail?" (173:25-174:3.) | "I am aware that explanations has been -- have been provided. Analysis of those explanations, I should stress, are legal analysis and that of our lawyers of those explanations is ongoing." (174:6-10.) |
| 49. | "As a factual matter, is the unknown alleged liability, as set forth in paragraph 27, does that remain unexplained, as we sit here today, with the -- all the information that 3AC has available to it?" (174:24-175:4.) | "Whether or not explanation is provided to us subsequent to the provision to the -- to the filing of this amended proof of claim, result in an ex -- satisfactory explanation or need an explanation of these numbers is subject to ongoing review and legal analysis." (175:6-12.) |
| 50. | "I understand there is an ongoing analysis as to whether you accept those explanations. My question is whether you have been provided one?" (175:13-17.) | "We have been provided with explanations. Whether those explanations are full and correct and accurate is to be determined." (175:18-21.) |
| 51. | "And what is your understanding of the explanation that has been provided with respect to the unknown alleged liability as you defined it?" (175:22-25.) | "Any understanding we have is intertwined with legal advice and analysis." (176:6-8.) |
| 52. | "So you do not have an understanding of the factual explanation that's been provided by FTX with respect to the unknown alleged liability as you define it in paragraph 27?" (176:9-13.) | "Any understanding I have of the factual explanation provided is intertwined with legal analysis as to how one should look at those facts, et cetera, and therefore is subject to legal conclusion." (176:14-19.) |
| 53. | "And so my question is, as we sit here today, is Three Arrows Capital aware of any facts that FTX took any other actions other than with respect to the $82 million liquidation that is implicated by the sentence in paragraph 27?" (178:21-179:2.) | "Our analysis of the information being provided to us on an ongoing basis by FTX through the discovery and disclosure process and still to come through depositions is ongoing. It's intertwined with legal advice and is subject to legal conclusions." (179:8-14.) |
| 54. | "[A]s you sit here today, have you identified any factual actions that FTX took with respect to any of the things that you alleged could have happened in paragraph 27?" (179:22-180:1.) | "To the extent FTX took actions, that is subject to ongoing legal advice and analysis." (180:8-10.) |

| # | Question | Answer |
|---|----------|--------|
| 55. | "[Y]ou're unable to point me to any action or any document or any fact that reflects FTX taking such action, as we sit here today, correct? (180:11-14.) | "Same point. Any factual position that I would seek to point you to is subject to legal advice and legal analysis." (180:16-19.) |
| 56. | "FTX didn't take [the proceeds from the Liquidation], correct?" (181:7.) | "[W]hether FTX took them depends on legal analysis, legal conclusions, and one gets into what were the liabilities that FTX had, what did FTX do with those assets. They were not passed outside of the FTX environment to Three Arrows." (181:10-16.) |
| 57. | "It is correct that the liquidation of the $82 million in crypto currency assets was credited to the Three Arrows Capital USD balance, correct?" (181:17-20.) | "Our analysis of the FTX positions and discovery and data provided to us, which is ongoing, suggests that the $82 million is credited to the negative balance that we have calculated that we believe FTX believes was owing to it at that point in time. And it is not us admitting that that amount -- that amount was owed to FTX. That is subject to legal conclusions and advice. But when one reviews the data provided by FTX, then the factual conclusion we would reach is that that $82 million was accredited to what FTX believes was owed to it at that time." (181:23-182:12.) |
| 58. | "As you sit here today, is Three Arrows Capital aware of any seizure of lost assets, as you define it in paragraph 27, by FTX, putting aside the $82 million liquidation we just discussed?" (182:13-17.) | "The analysis as to whether or not FTX seized assets is, of course, dependent. And I use the word 'seized' as in took assets that they were not entitled to take from those assets of Three Arrows held on the FTX platform. So the analysis of whether or not FTX seized assets is, of course, intricately integrated as to whether or not FTX was owed money by Three Arrows and what that liability was, what steps had been done to settle that liability, and that is, of course, all subject to legal advice and legal conclusions." (183:2-15.) |
| 59. | "I'm trying to understand whether Three Arrows Capital has identified any factual evidence that is contrary to those positions, not getting into the legal analysis, with respect to the issue of whether . . . quote, lost assets were seized by FTX in June of 2022?" (185:16-23.) | "As I've already said, we can refer back to Su Zhu's testimony and the caveats one puts around that. With respect to other steps that may or may not have been taken -- that may or not have been taken by Three Arrows, by FTX, or others, that is subject to ongoing review of the data provided to us and disclosure provided to us by FTX through discovery, which is not yet complete. So we've not reached a conclusion and that analysis is subject to legal advice and is very intertwined with it." (186:1-13.) |

| # | Question | Answer |
|---|----------|--------|
| 60. | "As we sit here today, can Three Arrows Capital point to any evidence that any of the liquidation seizures or transfers on June 13, 2022 were conducted by FTX?" (188:11-15.) | "So, with the exception of the $65 million referred to in paragraph 43, which I'm happy to discuss if you want in due course, the whether or not or how those liquidations, seizures, and transfers took place is subject to -- the factual position is intertwined with legal advice and analysis is subject to ongoing legal work and conclusions." (188:22-189:5.) |
| 61. | "I'm not asking for the legal advice.  I'm asking whether you have seen any factual evidence that FTX performed any of the series of liquidation seizures or transfers that are referred to in paragraph 40?" (189:12-18.) | "My testimony is the facts as we see them are [subject] to legal advice and legal interpretation." (189:21-23.) |
| 62. | "With respect to the June 14th seizure, liquidations, or transfers that you're referring to in this proof of claim, can you point to any factual evidence that FTX conducted and took any of those actions?" (190:6-11.) | ". . . . With respect to the balance [other than the $82 million Liquidation], the interpretation of what we can understand factually, from review of all the documents, disclosure, et cetera, that has been provided to us by FTX, is both ongoing and subject to legal advice." (190:22-191:2.) |
| 63. | "So the $82 million liquidation, those facts are not subject to legal advice but any other fact about any liquidation, seizure, or transfer on [June 14, 2022] is subject to legal interpretation?" (191:3-8.) | "With respect to the balance of the $296 million that was liquidated, seized, or transferred on June the 14th, 2022, the factual position the analysis is intertwined with the legal understanding and analysis and advice, and so I -- it's subject to legal conclusions." (192:4-10.) |
| 64. | "[D]o you have an answer to my question as to whether you agree with the $148 million number is a result of price declines to the 3AC account during this period?" (202:23-203:2.) | "And without referencing any legal conclusions as to what lost or otherwise might mean, we cannot agree that there was a decline of $148 million without conclusion of both our depositions and understanding and discovery of FTX and [ ]Mr. Coverick, in particular, were understanding how those numbers were specifically calculated and then referencing it to our own calculations." (203:8-17.) |
| 65. | "Do you have your own calculations with respect to market decline amounts during this period that are different from Mr. Coverick's?" (203:18-21.) | "Our calculations and analysis with respect to both the data provided to us by FTX and publicly available data are ongoing." (203:22-25.) |

| # | Question | Answer |
|---|----------|--------|
| 66. | "Does 3AC dispute that it made trades on June 13th and 14th of 2022 in the amounts listed in [Table 5 of the Coverick Declaration]?" (206:2-4.) | "Yes. . . . Because our analysis is the data provided us by FTX, and full discovery and disclosure processes are ongoing.  And as we previously talked about during this deposition, the determination as to whether 3AC made some or all of the trades, indeed even what a trade is, is ongoing."  (206:7, 9-16.) |
| 67. | "As we established earlier, you have not sought to make any changes to any of the statements, including those in paragraph 51 as a result of Mr. Coverick's declaration, correct?"  (215:8-12.) | "Our analysis of Mr. Coverick's declaration and other information disclosed and provided to us by FTX is ongoing, and the impact of that analysis will be subject to further legal determination and conclusions." (215:13-18.) |

# **EXHIBIT 4**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

     -against-                              S6 22-cr-0673 (LAK)

SAMUEL BANKMAN-FRIED,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**<u>Verdict Form</u>**

Please indicate your verdict with a check mark (✓)

<u>COUNT ONE</u>
Wire Fraud (FTX Customers)

Guilty ___✓___        Not Guilty _____

<u>COUNT TWO</u>
Conspiracy to Commit Wire Fraud (FTX Customers)

Guilty ___✓___        Not Guilty _____

<u>COUNT THREE</u>
Wire Fraud (Lenders to Alameda Research)

Guilty ___✓___        Not Guilty _____

<u>COUNT FOUR</u>
Conspiracy to Commit Wire Fraud (Lenders to Alameda Research)

Guilty ___✓___        Not Guilty _____

1

COUNT FIVE
Conspiracy to Commit Securities Fraud

Guilty ___✓___        Not Guilty _____

COUNT SIX
Conspiracy to Commit Commodities Fraud

Guilty ___✓___        Not Guilty _____

COUNT SEVEN
Conspiracy to Commit Money Laundering

Guilty ___✓___        Not Guilty _____

If you checked "Guilty" for Count Seven, is your unanimous verdict based on concealment money laundering, wire fraud proceeds money laundering, or both?

Concealment _____        Wire Fraud Proceeds _____        Both ___✓___

Dated:    *November 2* , 2023

Signatures:



2

# **EXHIBIT 5**

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          22 CR 673 (LAK)

 5   SAMUEL BANKMAN-FRIED,

 6              Defendant.                  Sentence
     ------------------------------x

 7                                          New York, N.Y.
 8                                          March 28, 2024
                                            9:30 a.m.
 9

10   Before:

11
                        HON. LEWIS A. KAPLAN,
12
                                            District Judge
13
                             APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  DANIELLE R. SASSOON
          NICOLAS ROOS
17        DANIELLE KUDLA
          SAMUEL RAYMOND
18        THANE REHN
          Assistant United States Attorneys
19
     MUKASEY YOUNG LLP
20        Attorneys for Defendant
     BY:  MARC L. MUKASEY
21        TORREY K. YOUNG
          THOMAS E. THORNHILL
22
     Also Present:
23   Luke Booth, FBI
     Kristin Allain, FBI
24

25
```

1             (Case called)

2             THE DEPUTY CLERK:  Government, are you ready?

3             MR. ROOS:  Yes, good morning, your Honor.  Nicholas

4    Roos, Daniel Sassoon, Sam Raymond, Thane Rehn, and Danielle

5    Kudla for the United States.  We're joined at the table

6    immediately behind us by Special Agents Kristin Allain and Luke

7    Booth from the FBI.

8             THE COURT:  Good morning.

9             THE DEPUTY CLERK:  Defendant, are you ready?

10            MR. MUKASEY:  We are.  Good morning, your Honor.  Marc

11   Mukasey for the defendant, Sam Bankman-Fried, who is present in

12   court to my left.  Next to him is my partner Torrey Young, who

13   may share some of the duties today if necessary, and Tom

14   Thornhill.

15            THE COURT:  Good morning.

16            Mr. Mukasey, have you and Mr. Bankman-Fried had the

17   presentence report for the necessary period and both read it?

18            MR. MUKASEY:  Yes, Judge.

19            THE COURT:  Mr. Bankman-Fried, did you read the entire

20   presentence report, including, among other things, the proposed

21   conditions of supervised release at the end of any sentence of

22   imprisonment that might be imposed?

23            THE DEFENDANT:  Yes, your Honor.

24            THE COURT:  Thank you.

25            The presentence report will be sealed and made

1    available to counsel in the event of an appeal.

2         I know that there are differences between the parties

3    in relation to the guideline computation, but are there any

4    other objections to the presentence report that, in the view of

5    counsel, are material and need to be resolved?

6         MR. MUKASEY:  No, Judge.

7         MR. ROOS:  No, your Honor.

8         THE COURT:  Then apart from the guideline issues,

9    which I'm going to take up next, I adopt the presentence report

10   and the guideline computation and range it contains.

11        Now, there are quite a number of disagreements about

12   the guidelines.  They've been briefed fully, to say the least,

13   by the lawyers.  We'll start with the government's contention

14   that there should be a 30-level upward adjustment for a loss in

15   excess of $550 million and the defendant's contention that

16   there was no loss.

17        Anybody want to be heard on this?

18        MR. MUKASEY:  Judge, we're going to rest on our

19   papers.

20        MR. ROOS:  And unless your Honor has any questions for

21   us, we'll do the same.

22        THE COURT:  Thank you.

23        I'm reminded that I just want to put on the record

24   that one of my new law clerks, that is, law clerk post-trial,

25   was previously an associate at WilmerHale.  WilmerHale

1    represents Caroline Ellison.  He didn't work on the matter

2    there and he's not working on this matter here, but I just

3    wanted to let everybody know.

4            If you rest on the papers, then I will rule.

5            I define "loss" for this purpose solely with reference

6    to the text of the guideline and without regard to the

7    commentary.  I do that without expressing a view one way or the

8    other as to whether the guideline should be construed as

9    suggested in the commentary to the sentencing guideline.

10           I reject entirely the defendant's argument that there

11   was no actual loss.  The defendant's argument hinges on what

12   amounts to an assumption that customers of FTX are going to be

13   made whole in the bankruptcy.  Even if that were true, they

14   would not be entitled to a reduction of the loss amount by

15   virtue of crediting any bankruptcy recovery against loss for

16   reasons stated by the government at pages 39 and 40 of the

17   government's memorandum.

18           Any case and without limiting the generality of my

19   reasons for rejecting the argument, I do so both on the law and

20   on the facts.  The defendant's assertion that FTX customers and

21   creditors will be paid in full is misleading, it is logically

22   flawed, it is speculative.

23           It is misleading because the defendants equate loss

24   for guidelines purposes with the dollar value of claims allowed

25   in the bankruptcy case as of the bankruptcy petition date.

1   They equate that with loss as a foreseeable consequence of

2   defendant's crimes, and that simply is wrong at least to a very

3   substantial number of customers.  It's certainly wrong as to

4   investors and as to lenders who were injured parties as a

5   result of these claims.

6          In my view, it's logically flawed, also.  The crimes

7   here included, though they were not limited to taking FTX

8   customer money to which the defendant had no right and using it

9   for his own purposes.  Those purposes included speculative

10  investments by Alameda, which the defendant and one of his

11  colleagues wholly owned, and a variety of other things.  The

12  fact that a combination of success in some of those investments

13  persistence by the current leadership of FTX bankruptcy estate

14  in clawing back stolen assets, and a fortuitous, but radical

15  runup in the value of some cryptocurrencies might result in

16  benefit to some creditors.  It bears no real logical

17  relationship to the gravity of the crimes that were committed.

18         To put it in more colloquial terms, a thief who takes

19  his loot to Las Vegas and successfully bets the stolen money is

20  not entitled to a discount on the sentence by using his

21  Las Vegas winnings to pay back all or part of what he stole if

22  and when he gets caught.

23         Finally, for the reasons very well articulated by

24  Mr. Rehn in the submission on behalf of the debtor's estate,

25  even the premise that customers will be paid dollar-for-dollar

1   for the dollarized losses as of the petition date is pretty

2   speculative, even at this stage.

3          So, my finding is that the loss amount readily exceeds

4   $550 million, which is the top bracket in the loss table in

5   Section 2B1.1 of the sentencing guidelines.  I find that there

6   was a loss to investors of $1.7 billion, a loss to Alameda

7   lenders of $1.3 billion, and a loss to FTX customers of

8   approximately $8 billion.

9          Now, I recognize, first of all, that for guideline

10  computation purposes, anything above $550 million is, again, to

11  put it colloquially and without minimizing the seriousness, is

12  gravy.  Once you hit $550 million, the rest of it has no effect

13  on the guidelines computation.

14         The second thing I would say is that the loss table,

15  which is one of the significant driving forces of the guideline

16  computation, that I am obliged by law to do, though it is not

17  binding on me, is a debatable proposition.  Any number of my

18  colleagues have criticized it on various grounds.  As I

19  understand its genesis, there's really no empirical basis for

20  the brackets assigned or for the assignment of different losses

21  to different brackets.  I share many of those criticisms and

22  concerns with my colleagues.  I have never regarded myself,

23  once Booker was decided, as in any way bound by guideline

24  computations that depend on the loss table in 2B1.1.  I do not

25  regard myself as bound by it now.

1          I'm going to vary downward from the guideline range

2     that will be computed as a result of this process we're going

3     through right now, and I think any disagreement concerning the

4     loss amount and how you get to it and all of that ultimately is

5     going to prove quite immaterial to the sentence in this case.

6          Now, the next point on which there's a disagreement is

7     with respect to the government's proposal for a six-level

8     upward adjustment based on substantial hardship to 25 or more

9     victims.  I know that defense disagrees with that.

10         Does anyone want to address this orally?

11         MR. MUKASEY:  I would just note for the record, Judge,

12    that at the time that we submitted our sentencing memorandum,

13    I'm fairly certain we had not received most, if not all of the

14    victim impact letters, so we took the position we did at the

15    time.  I don't want to withdraw the objection, I just want to

16    explain, in light of what's rolled in since our sentencing

17    memo, why we took that position.

18         THE COURT:  So you're not withdrawing the position,

19    but you're really signaling me that you fully understand

20    there's not much merit to it.  You don't have to answer that

21    question.  The objection is overruled.

22         The next one on the list is a proposed two-point

23    enhancement for, I'll refer to it loosely as fraud intention

24    with bankruptcy.

25         Anyone want to be heard any further on that?

1          MR. MUKASEY:  No, Judge.

2          MR. ROOS:  No.

3          THE COURT:  I adopt the government's position on that.

4          The next one is the proposed two-point adjustment for

5     the use of sophisticated means.

6          Anyone want to be heard on that?

7          (Pause)

8          Hearing none, I agree with the government's position

9     on that, as well.

10          The next proposed enhancement is a two-point upward

11    adjustment for obtaining over $1 million in revenue from one or

12    more financial institutions.

13          Anyone want to be heard orally on that?

14          (Pause)

15          Hearing none, I agree with the government's position

16    on that.

17          There is a two-point upward adjustment for conviction

18    under Section 1956 of the criminal code.

19          I take it that's entirely not controversial; right?

20          MR. ROOS:  Correct.

21          MR. MUKASEY:  Correct.

22          THE COURT:  So that adjustment will be made.

23          There is a proposed four-point upward adjustment for

24    the defendant's alleged leadership role in these crimes.

25          Is there anything anyone wants to say with respect to

1  that proposed objection?

2          (Pause)

3          Hearing none, that adjustment will be made.

4          There's a proposed upward adjustment of two points for

5  the defendant's abuse of a position of trust.  I've read your

6  papers.

7          Anything else anybody wants to say?

8          MR. ROOS:  No, your Honor.

9          MR. MUKASEY:  No, Judge.

10          THE COURT:  I will make that adjustment.

11          We come now to the proposed adjustment for obstruction

12  of justice.  Subject to anything further anybody wants to say

13  on it, I propose to make that adjustment.

14          After further consideration, I conclude by a

15  preponderance of the evidence that Mr. Bankman-Fried's text to

16  the man I remember as having been the former general counsel of

17  FTX U.S., which was the subject of quite a lot of discussion at

18  the time I revoked bail, did in fact constitute attempted

19  witness tampering.  And so, the adjustment is warranted on that

20  ground alone.

21          In addition, after considering your submissions, I

22  make three specific perjury findings based on trial testimony,

23  again, subject to anything you want to say, and if I'm mistaken

24  in some regard, I will fess up.

25          The legal standard is that an adjustment for

obstruction in the form of perjured trial testimony is

appropriate where a defendant willfully and materially

committed perjury, which is the intentional giving of false

testimony as to a material matter.  I find, subject to anything

counsel says after I complete this, that Mr. Bankman-Fried gave

perjured testimony at trial as to material matters in at least

the following respects:

First, he falsely testified that until the fall of

2022, he had no knowledge that Alameda had spent FTX customer

deposits.  I refer to page 2761 of the transcript at lines 7 to

16;

Second, I find that he testified falsely, that he

first learned that Alameda had a roughly $8 billion liability

to FTX in October 2022.  Transcript references page 2473, line

9, through 2477, line 7;

Finally, he falsely testified that he did not know

that repayment of called third-party loans to Alameda, in or

about mid June 2022, would require Alameda to borrow more

customer funds from FTX.  Transcript references page 2721, line

21, to 2722, line 4.

Now, counsel want to address any of those four points?

MR. MUKASEY:  I'm sorry, Judge?

THE COURT:  Do you wish to address any of those four

points?

MR. MUKASEY:  I do not wish to address those four

1    points.

2                    THE COURT:  Okay.  Mr. Roos.

3                    MR. ROOS:  No, your Honor.

4                    THE COURT:  I also think it appropriate, to be clear,

5    that I have limited my findings with respect to obstruction to

6    what I thought necessary and prudent to justify the two-point

7    adjustment.  This does not necessarily exhaust my view as to

8    occasions when the defendant obstructed justice by perjury and

9    otherwise in relation to this case.

10                   Accordingly, the total base offense level is 60.

11   Under the sentencing guidelines, once you cross 43, the

12   adjusted offense level is adjusted back to 43.  The guideline

13   imprisonment range is life in prison.  Since that would exceed

14   the statutory maximum, the maximum possible sentence in this

15   case is 1320 months.

16                   With the modifications inherent now in my rulings on

17   the computation of the guideline range, I adopt the presentence

18   investigation report in all respects.

19                   Now, are there victims of the offense who wish to

20   address the Court?  If so, how many?

21                   MR. ROOS:  So, your Honor, two things.

22                   First, just on the guidelines computation, and my

23   apologies if I missed it, I think one of the enhancements that

24   was not contested, but is included in your Honor's calculation

25   of an offense level of 60 before the reduction is the one set

 1    forth at paragraph 81 of the PSR, which is sophisticated money

 2    laundering in addition to the 1956.

 3              THE COURT:  Yes.  I inadvertently omitted that.

 4              MR. ROOS:  Your Honor, in response to your question,

 5    we understand there is one victim here, Sunil Kavuri, who

 6    wishes to speak.

 7              THE COURT:  Okay.  Mr. Kavuri.  Please take a spot

 8    there at the lectern.

 9              MR. KAVURI:  Thank you, your Honor.

10              Your Honor, I'm here to say a word on behalf of FTX

11    victim, and I'm here from London not just for myself, but on

12    behalf of over 200 victims who have sent impact statements to

13    yourself as well as the thousands of creditors across the world

14    who haven't got the opportunity to come and speak to you.  So,

15    yeah, I would like to thank you very much, Judge Kaplan, for

16    allowing me to speak today.

17              So, yeah, my lawyers sent you my victim letter last

18    week.  I hope you read it.  I would want to come over here and

19    speak to you in person.  It's a real privilege and honor to

20    stand here before you today.  You did a fantastic job in trial

21    and I thank you greatly and so do a lot of other creditors

22    around the world.

23              I followed the FTX trial live.  I live the FTX

24    nightmare every day for almost two years, every day, every

25    night, a lot of crying, sleepless nights.  I have a new baby

1    son and another toddler.  And I have spoken to tens of

2    thousands of victims just like myself who had their dreams

3    destroyed as a result of this bankrupt -- this FTX fraud.  My

4    house, the money which I wanted to spend on a family home,

5    taken away, as well as my children's education.

6         I'd like to address one key point.  The harmed

7    customers, lenders, and investors -- and Sam was vindicated

8    when the bankruptcy estate concluded all victims will be paid

9    in full.  And that they continue to do this constantly.

10   They've done it in the media constantly, saying I personally

11   suffered zero damage, other creditors suffered zero damage, FTX

12   customers, that we all will be paid in full.  And I -- I

13   definitely dispute this.  I suffered every day, every week for

14   the past two years, and we still continue to suffer from how

15   this FTX fraud has been handled.  Simply put, this is a

16   continuous lie that we are all made whole.

17        So I'll go into several points why this has occurred.

18        First of all, the bankruptcy estate is assuming or

19   mischaracterization of us as unsecured creditors.  We're not

20   unsecured creditors.  Our assets were our property.  We gave

21   it -- it's held in constructive trust in FTX.  We had property

22   rights.  And you can't just take a property, sell it for a

23   profit, and keep the profit.  That's not how it works.  This is

24   not the law.  The petition date ruling is not the law as I

25   understand it.  Otherwise, someone can just steal my house,

1    sell it for a profit, and give back how much -- the price at

2    which they stole my house for and say, okay, you're made whole

3    at the petition date, we'll keep the profits.  This is not how

4    it works in my view, and I don't believe this is not how it

5    works in your court.

6          So, I'll give you three examples as a result of what

7    has destroyed creditor value for us in addition to the FTX

8    fraud.

9          So, Sullivan Cromwell and bankruptcy estate has

10   trampled over our property rights.  The terms of service, which

11   you rightly ruled was our property, our crypto and Fiat

12   deposits were rightly ours in your court of law.  They have

13   liquidated billions of dollars of crypto assets, and I'll give

14   you clear examples which has cost us, as creditors, customers,

15   billions of dollars.

16         The first example is Sui, so there is a token, and

17   Mysten Labs.  The Sullivan Cromwell and bankruptcy estates sold

18   it for $100 million at 11 cents, it's now trading at $2, and

19   they gave away the free ones, which cost the bankruptcy estate

20   $1.5 billion to $2 billion loss.

21         The second biggest -- I don't say this lightly because

22   this is seemingly intentionally to destroy our value.  It

23   saddens me because this is the pain we're living through every

24   day now as we thought this would end after the bankruptcy, but

25   literally I'm seeing this, this is what happened.  So, at the

1    bankruptcy, I believe FTX had about 50 million worth of Solana

2    tokens, which, at current market price, is close to

3    $10 billion.  This is just Solana.

4         So what happened was that they resent -- they started

5    selling Solana, the token, at the 70-percent discount to the

6    market prevailing market price.  So Solana's is trading at

7    current market price, is about $180, they're selling it about

8    $60, each Solana and, unfortunately, they're selling it to

9    their own clients.

10        So Solomon Cromwell has a conflict of interest with

11   Galaxy and Katerra, and they sold it, which is destroying

12   customer value.  So -- which is estimated, was a loss at

13   $4.5 billion for myself and customers, and this is our

14   property.  We own -- it's our property.  We're not unsecured

15   creditors, we're customers who own these digital assets.

16        And the third, the really, really -- there's a third

17   thing, another one, which, obviously, were the Thane documents,

18   so you know.  So the third one is Anthropic.  So in this court,

19   as you rightly ruled, our customer deposits were used to

20   acquire the Anthropic -- the AI company, and Peter Easton has

21   provided testimony for that.

22        So customers should -- it's our property.  However,

23   when Sullivan Cromwell wants to sell it -- so I objected with

24   other creditors, and I know thousands of other creditors

25   supported my objection, and I know this, that couldn't stop

them from selling it, and now saying that Anthropic is their

own property, the FTX -- they're saying it's his property.

It's not FTX's property, it's customers' property, and they

sold it anyway.  So this has caused significant losses for

myself in addition to the FTX bankruptcy -- in addition to the

FTX bankruptcy.

THE COURT:  Sir, I appreciate the points you are

making, but I'm here to sentence Mr. Bankman-Fried, not to

address what the bankruptcy estate should or shouldn't have

done.  I accept your broad point that the assertion that FTX

customers will be made whole is, for one of any better phrase

at the moment, incorrect.  I agree with you on that.  The

points you are now raising, it seems to me, are issues for the

bankruptcy court.  If you wish to raise them there, I don't

have anything to do with that.

MR. KAVURI:  Right.  Okay.  Great.  Thank you.

I guess the reason I pulled it up is because you

rightly ruled these assets are owned in your court, so -- and

profit was clearly owned by customers.

Anyway, so we continue to suffer, all the creditors

continue to suffer not only monetary loss, but emotional and

mental distress.  So I'm in contact with thousands of other FTX

victims.  I speak to them daily.  I get hundreds of messages

daily and people are on medication recovering, mental health

issues, depression, and obviously sadly, really sadly, at least

1    three people I've heard of have committed suicide as a result

2    of this FTX fraud.

3            So why -- so when this FTX bankruptcy -- so I guess

4    I'll carry on.  So why I personally feel is that how it relates

5    to Sam, obviously, it's hurt me and, emotionally, it's caused

6    me great stress, and I've spent probably 70 to 80 percent of my

7    time over the last two years helping other FTX creditors,

8    customers around the world.  So -- and this is without any pay,

9    I'm not getting paid by debtors or anyone else.  I'm doing this

10   just because I would like to help others to maximize recovery.

11   I do feel that there were other former aiders and abettors in

12   addition to Sam.  So I do feel that for customers to be made

13   whole, other coconspirators, former aiders and abettors, they

14   have to be held accountable.  And I do believe that will help

15   us in restitution, as well.

16           So, for example, a lot of the assets which were seized

17   by the government rightly so, the money which went for

18   customers to, like, for example, the Robinhood stake and all

19   these other assets which were used -- using customer deposit,

20   they have to go to the victims directly under the class action

21   loss, not to the bankruptcy stake, which have specifically --

22   is transferring assets from customers to other unsecured

23   creditors.

24           THE COURT:  I think it would be helpful if you could

25   bring your remarks to a close soon.

1              MR. KAVURI:  Yeah, that's it.

2              THE COURT:  Thank you very much.

3              Anyone else?

4              MR. MOSKOWITZ:  Your Honor, I would like to.  May it

5    please the Court, your Honor, my name is Adam Moskowitz.  I'm

6    an honor to be appointed colead counsel for the multi-district

7    litigation FTX.  We have talked to hundreds of thousands of

8    customers in the past year, so I just wanted to give you one

9    point they asked me to come make.  We gave you about 230 impact

10   statements and I think it expresses their desire, their

11   interest.

12             I want to make one point, and I'm glad your Honor was

13   on the MBL panel for nine years.  We're trying to help the

14   victims, that's what we're doing.  And I attended the trial,

15   which was wonderful, here in New York.  I did that because

16   we're also cooperating with the FTX insiders and with Sam and

17   his team.  Yesterday, in federal court in Miami, we moved for

18   preliminary approval of our settlement with the insiders, and

19   their cooperation has been incredibly helpful.  And we filed 71

20   claims against people.

21             I just want to say that Sam and his team since that

22   date have been helpful to us.  It's not my job to decide his

23   guilt or innocence, but as the class action counsel, my job is

24   to find the most recovery for the victims who've lost billions,

25   and his help, as well as the help of the insiders, has been

1   very helpful.

2          And all I think is, if people help in these class

3   action recoveries, there should be some consideration for that.

4   I can't tell you how much or I can't tell you what, but I do

5   like the fact that people know if they help the class action

6   find recovery, there may be something in it for them.  And I

7   would respectfully ask on behalf of many of our victims that

8   you at least just honorably respectfully consider that.

9          THE COURT:  Thank you.

10          MR. MOSKOWITZ:  Thank you.

11          THE COURT:  Anyone else?

12          (Pause)

13          Now, ordinarily, I enumerate on the record the various

14   papers that I have considered in preparing to pass sentence.

15   I'm going to depart in a certain respect.  As of 9 o'clock last

16   night, this morning, submissions with respect to this sentence

17   to me have totaled 1,929 pages.  I can thank the defendant for

18   451 pages and the government for about the same, exclusive of

19   victim impact statements, and then there were a whole bunch of

20   victim impact statements.

21          Now, whatever there is either is or will be on the

22   public record, save the presentence report.  So I'm not going

23   to waste your time or mine listing about the way I usually do.

24   It was in the nature of an avalanche.

25          At this point, I'll recognize Mr. Mukasey on behalf of

1   his client.

2            MR. MUKASEY:  Thank you, your Honor.

3            Judge, I just want to preface my remarks today by

4   saying that I don't want anything that I say today to be taken

5   as disrespect for the jury service or the verdict that they

6   returned.  Obviously we disagree with the verdict, we're going

7   to appeal the verdict, but nothing we say here today should be

8   taken as any disrespect for the jury's hard work.

9            And with respect to the victims, those that are here,

10  those that are not here, we've read the victim impact

11  statements.  We have listened to the comments today.  We think

12  we understand the intensity of the pain of the victims and we

13  understand with sort of crystal clarity that people have

14  suffered financially, emotionally, and otherwise, and everyone

15  at the defense table's sympathies are with the victims, and I

16  truly mean that down to my core.

17           I also appreciate, Judge, that my team is young and

18  Mr. Thornhill did not live through the prior proceedings with

19  most of the people who are here in the well of the courtroom,

20  but I am confident that we have a very strong hold on the

21  record and also a keen appreciation of the atmospherics, if you

22  will.

23           So I want to start out, Judge, by talking a little bit

24  about the nature and seriousness of the offense here.  The

25  government points in their brief to some truly vile defendants.

1    They point to James Nicholson, who looked widows in the eye and

2    stole their life savings at the same time. They talk about

3    Carl Greenwood, who was recently sentenced by Judge Ramos, who

4    referred to his victims as "marks" and "idiots." They referred

5    to Bernie Madoff, who looked Holocaust survivors in the eye and

6    took their money.

7        These defendants are what I would consider stone cold

8    financial assassins. They targeted innocent people, they

9    trained their sights on vulnerable victims. That level of

10    depravity and cruelty and blameworthiness is nowhere that I saw

11    in the testimony in this case, it's nowhere that I saw in the

12    materials that I reviewed in this case, and it's nowhere in

13    Sam's history as a person, which I'll talk about in a minute,

14    because I don't think it's anywhere in Sam's heart.

15        Sam is on the opposite end of the culpability scale

16    that they talk about for fraud crimes. He's not the defendant

17    who looks someone in the eye while he took money out of their

18    pocket. And I submit there's nothing in this case, Judge, that

19    shows that Sam wanted to personally inflict pain or hurt or

20    harm on anyone in any way.

21        It's the bottom line about the nature and seriousness

22    of the offense. It's obviously a serious offense, but Sam was

23    not a ruthless financial serial killer who set out every

24    morning to hurt people. There was nothing predatory or

25    rapacious or venal or mercenary or exploitive about his

1    conduct, and that's, as I'm going to get into, because Sam

2    Bankman-Fried doesn't make decisions with malice in his heart,

3    he makes decisions with math in his head.

4         What I mean by that, Judge, is it's necessary to

5    understand who he is as a person.  Obviously, when you want to

6    find out who someone is as a person, you start out with their

7    mom.  I'm mindful of his mother's observation that any effort

8    to understand Sam truly, which is what I think we have to do

9    here today, and any chance of truthfully understanding him

10   through the lens of sort of normal behavior and motivation is

11   probably going to end up misunderstanding Sam.

12        I think that's exactly what happened here.  The real

13   Sam Bankman-Fried, the real person, his real motivations were

14   misapprehend and misunderstood, and I suspect that that

15   happened because it's pretty easy to slot people into kind of

16   an old fashioned familiar story.  And in this case, the old

17   fashioned familiar story of the arrogant, greedy swindler who

18   thought he could get away with fleecing the hard earned money

19   of innocent people and use it to satisfy his own hedonistic

20   pleasures, if you punctuate that with a supposedly sensational

21   lust for power and you top it off with a bankruptcy, well, that

22   makes it all look really bad and you got yourself a pretty good

23   story.

24        The only problem is, I would submit, it's sort of a

25   crock.  The perception is not the reality here.  There's a

1   radical difference between the public persona that I just

2   described and the real person.  Maybe the best evidence of that

3   is that Sam never scurried away with billions of dollars in a

4   Swiss bank account or under his mattress or in his personal

5   pockets, and I think he's firm in his belief that he may well

6   have been able to solve what he viewed as a black swan

7   liquidity crisis.  He didn't flee, he stayed until the end.  He

8   tried to help John Ray, he was rebuffed.  He tried to help the

9   bankruptcy team, he was rebuffed.  He tried to do whatever he

10  could, he offered to give more, and I'm sure he'll tell you

11  more about how much it means to him that people get repaid.

12          If you ask anybody who really knows Sam, not the

13  dehumanized one-size-fits-all trial caricature of Sam, but

14  anybody who really knows Sam, they'll say he's not a greedy,

15  power-hungry feign.  There's no one I've come across who truly

16  knows him who says this tragedy came about because he was

17  greedy or covetous or materialistic or mean or nasty or

18  voracious.

19          Really, he's an awkward math nerd.  He thinks in

20  probabilities about everything.  He speaks in expected value

21  calculations.  He loves video games and veganism, and he's

22  compassionate to animals and children.  And he has a tireless

23  work ethic.  Even on his legal matters, he has a tireless work

24  ethic and a completely, and I don't say this lightly, a

25  completely off-the-charts, mind-blowing intellect.

1          A lot has been made in the popular media about how Sam

2   loves puzzles.  I mention that because Sam himself is sort of a

3   beautiful puzzle.  He's at once hyperrational, but not cold or

4   robotic.  He's super focused on some things, but completely

5   absent minded about other things.  He can parse words better

6   than a talmudic scholar, but he can completely misread the

7   surroundings.  He can concentrate like a laser beam, but also

8   be fidgeting at 100 miles an hour.  He was a billionaire, but

9   completely unconcerned about material possessions.

10         And I submit that's not an image that he crafted in

11  2019 or 2020 to try to sell FTX.  The letters that I've seen

12  are unanimous that from a very young age, Sam wanted to do good

13  in the world.  In middle school, when most people are thinking

14  about, you know, peanut butter sandwiches and baseball games,

15  he was thinking about his ethical obligations to the global

16  population.  In high school, he dedicated himself to the idea

17  that each of us has a strong obligation to alleviate suffering

18  in the world.  In college, he spent a whole bunch of time

19  helping animals.  And his first job on Wall Street has been

20  well documented.  He gave away his earnings to charity, a

21  charity that was working on disease prevention in Africa.

22  That's as a young man.  That's about, I think, through age 21.

23  My point here is a simple one:  Sam's devotion to others

24  predated Alameda, it predated FTX.  It was not a cocktail party

25  affectation that he took on when he became a billionaire.  It's

1   the truth.

2          Another truth about Sam is that even though he started

3   two legit successful crypto firms, he never even set out to be

4   the king of crypto.  He never sought out the fancy apartment or

5   coasted the private jet.  He was out there to have the largest

6   positive impact in the world.

7          Now, I want to be clear, that's not to be taken at all

8   as an ends justified means argument.  That's by no means what

9   happened here.  That would do more harm than good to the

10  altruistic movement and that would defeat the positive purpose.

11  So this was not an ends justify the means run.

12          I think you can see the bona fide nature, Judge, of

13  his dedication to philanthropy, the integrity of his commitment

14  in giving not in the people that the government put up at trial

15  to sort of make him look vain and image conscious like Tom

16  Brady and Steph Curry and Katy Perry.  You see who's actually

17  standing by Sam now, it's not those people.  The people

18  standing by him now are the scientists, the humanitarians, the

19  global health providers, the people who saw closeup that he was

20  committed and passionate and steadfast, even at a young age.

21  And even now that he's broke and ruined and has no more to

22  give, they're still standing up to his commitment to giving.

23  And I hope that tells the Court that it was not pretension or

24  artifice or posing.  Sam Bankman-Fried made a real authentic

25  commitment to doing good, and his commitment to doing good made

1    other people commit to doing good.

2            I'm just going to point real quick to exhibit A24 to

3    our main brief, the letter written by someone who left their

4    career as a trader on Wall Street to work for the FTX

5    Foundation.  He said:  "If it weren't for Sam, I would

6    certainly be working a comfortable job on Wall Street and

7    thinking that the best way I could make a difference in the

8    world was to write a check every December.  My time at the FTX

9    Foundation has left me with the conviction that the

10   unconventional thinking can transform the way that we discover

11   new medicines, and now I don't expect that I'll ever go back to

12   working as a trader.  Sam believed I could do more good than I

13   could believe.  I'm glad that he did.  I trusted him on that.

14   I'm grateful.  His impact on my life has pushed me to raise my

15   sights higher than they were before."  To me, that's an

16   extraordinary statement, Judge, about Sam and the amazing

17   impact he has had, he continues to have, and he will have in

18   the future if given the chance.

19           To me, it's also sort of the tip of the iceberg

20   because, as we've submitted, Sam's done a whole lot of things

21   that people who just want to sit around and be rich and fat and

22   happy don't do, like organizing conferences on head trauma,

23   like vaccine delivery, and digital mental health discussions.

24   That's not what you do if you're just happy being rich.  And if

25   people still think that Sam's commitment to lifting people up

1    and helping people out is a sham, I'm told that he has been

2    tutoring people with no fanfare at the MDC for high school

3    diplomas, you don't do that to hone your image, you do that to

4    help.

5          I'm going to submit, Judge, that Sam possesses this

6    generosity of spirit, this compassion, this empathy because he

7    knows the other side all too well from his own life.  He knows

8    quite well what it's like to be in pain, to be misunderstood,

9    to come across as unlikeable, to practice making eye contact

10   the right way, to be unsure of his emotions, to have a hard

11   time making connections.  Sam's always been socially

12   uncomfortable.  He's experienced bouts of depression.  His

13   mother says there's a terrific sadness at his core, and that's

14   been a constant presence in his life.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          MR. MUKASEY:  Years ago, before anybody would claim

2     that Sam had ulterior motives or was trying to craft an image,

3     he wrote in a journal that he doesn't feel pleasure or

4     happiness, that he feels an aching hole in his brain where

5     happiness should be.  I find that crushing.  The truth is,

6     though, his own happiness has always been subordinated to the

7     happiness of those less fortunate in the world.

8          And this person, my client, who people may think lives

9     to take for himself, actually lives to give to others.  And I

10    think the person that best ties this together is his brother.

11    His brother comes the closest to solving this beautiful puzzle

12    that is Sam Bankman-Fried.  His brother says:  Sam would be

13    uncomfortable giving me a hug, but I know he would give me a

14    kidney if I needed it.  I think that's extraordinary.

15         Sam is an incredibly kindhearted and generous person

16    who may not always demonstrate all the social norms, but is

17    giving and selfless beyond most norms.

18         Those are the personal history and characteristics of

19    Samuel Bankman-Fried.

20         I want to address a comment your Honor made this

21    morning.  He made it in the context of the obstruction

22    enhancement.  I think it goes to specific deterrence, which has

23    to be a concern here.

24         We addressed the government's specific deterrence

25    argument as unfounded alarmism, but I know the Court probably

1     shares this specific deterrence concern based on the bail

2     issues, for example.

3           Let me say this.  Sam has lost everything.  Losing the

4     people in your life and being publicly shamed by the entire

5     globe, to me, seems like enough deterrence.  On top of that, he

6     has probably been in the worst federal jail in the country for

7     the past seven months.  And while the government says a

8     significant prison term is necessary to deter him from future

9     crimes, a significant prison term, I say this.  Every day in

10    prison is significant.  Every night in a four-by-four iron box

11    is significant.  Every strip search, every 4 a.m. wakeup call,

12    every time you have to use the bathroom in front of your

13    cellmate, that's significant.  Every time you can't get your

14    medication, it's significant.  So Sam certainly doesn't need

15    more time to feel the significance of prison as a deterrent.

16    And even the PSR, and I think I have made my feelings known

17    about the PSR, even the PSR doesn't seem to suggest that Sam is

18    going to commit more crimes.  So I submit this prosecution has

19    achieved specific deterrence.

20          I don't propose to lecture the Court at all about the

21    concept and theories behind general deterrence.  We cited in

22    our papers studies that show increasing the severity of

23    punishment does quite little to deter crime, but I've always

24    thought anecdotally, with respect to general deterrence, if

25    you're the kind of person that's not going to want to go to

 1    federal prison and is beaten and abused and understood and

 2    taken advantage of, you are going to be deterred by the idea of

 3    going for a day or a week or a month, or a year.  That's who

 4    general deterrence speaks to.

 5           I also understand, Judge, there has to be a perception

 6    that justice is done and people get their just deserts.  I'm

 7    mindful of comments that I know you have made that when you

 8    impose a sentence, it should be a sentence that the average

 9    person in the street, knowing what happened, would accept as

10    fair and reasonable and sensible and wouldn't want to make them

11    rise up and say the system is crazy.

12           I know this is a different kind of case that I'm about

13    to talk about, but I'm reminded of the case of Stefan Irving.

14    I think probably you, me, and Dan Gitner are the only people

15    who remember Stefan Irving, but Stefan Irving was a

16    pediatrician who was a recidivist child sexual predator

17    convicted in the state, then rearrested for traveling, by the

18    feds, to Mexico to sexually assault prepubescent boys.  To make

19    matters worse, he had been the pediatrician at a New York

20    school district, so God knows what else he had been up to.

21           I know it's a different kind of case, and I know

22    Irving was a bit of an older guy, but I respectfully submit

23    that if you're judging by the average person in the street, no

24    reasonable person would say that Sam is even half as dangerous

25    or irredeemable or incorrigible or as bad as Stefan Irving, who

1    got 21 years.

2         But, obviously, I have no idea what it's like to

3    impose sentence on another person, and I know you've obviously

4    been doing it for a long time.  I think I read somewhere that

5    you said that the longer you sit up there, the harder it gets.

6    That's probably because people have the power to change.  You

7    just don't know.

8         People overcome.  Judge Underhill has written about

9    it.  There is a lot of work about it.  It doesn't take a

10   decade.  I'm asking the Court not to destroy the prime of this

11   complicated, brilliant, gentle, complex, kind young man's life.

12   Don't deprive him of the opportunity to meet a partner or have

13   a baby or work at a charity or teach kids or use his beautiful

14   mind.  If the government thinks he's greedy, sentence him to

15   work hard and give it all the way.  Victims want their money

16   back, and they should get it, all of it.

17        I'll close with this.  I read that a few years ago

18   Judge Koeltl wrote an article about Judge Weinfeld, and I

19   gather Judge Koeltl clerked for Judge Weinfeld.  He said that

20   Judge Weinfeld sort of had a policy that he would sentence

21   white-collar defendants to some term of imprisonment because he

22   thought that was necessary for deterrence.  But there was one

23   defendant in a white-collar case before Judge Weinfeld who had

24   led a life that the judge thought was characterized by acts of

25   quiet charity, long before it was in that defendant's interest

1    to do so.  Judge Weinfeld did not sentence him to prison.  He

2    broke his policy.  Apparently, Judge Weinfeld said that the

3    bread that that defendant had spread on the waters had now

4    returned to him.

5          In the same vain, Judge, we hope that one can't be as

6    kindhearted as Sam has been without receiving a harvest of

7    kindheartedness in return.  His life is hanging in the balance

8    here.

9          We ask that you sentence Sam today, Judge, with an

10   open mind and a compassionate heart.

11         THE COURT:  Thank you.

12         Mr. Bankman-Fried, you have the right to speak before

13   you're sentenced.  Is there anything you would like to say?

14         THE DEFENDANT:  Yes, your Honor.

15         Thank you, your Honor.

16         I appreciate a lot of what Marc said about me.  I also

17   don't know that the most important thing here today is my

18   emotional life or hypothetical future kids.  It's that we are

19   standing here today and there are millions of people who

20   haven't been paid.  That's what matters far more.

21         There are customers who -- I agree with most of what

22   Sunil said about what they have gone through about, obviously,

23   having money they didn't think they would lose, and now, even

24   when they are hoping they may get it back, being deprived of

25   the gains from what they had.  They have been waiting, I guess,

1   for a year and a half.

2          And what matters also is the colleagues that I had who

3   worked for FTX who poured themselves into the company for

4   years, then watched me throw away everything that they had

5   built.

6          I know a lot of people feel really let down, and they

7   were right, they were, were very let down.  I'm sorry about

8   that.  I'm sorry about what happened at every stage, things I

9   should have done and said, things I shouldn't have.  I failed

10  everyone that I care about and everything I care about too.

11         I remember the colleagues, obviously.  They are the

12  ones that I knew best and was closest to here who followed --

13  the company followed me across the earth, across continents,

14  burning the midnight oil, working until 2 a.m., 4 a.m.,

15  dedicated to FTX.  I remember -- there are so many of them, but

16  Natalie, who in a year taught herself to run an entire media

17  department and when it came to think about hiring a team, it

18  was clear she was already doing ten people's jobs better than

19  anyone else I had seen at any place I had seen.  I gave my

20  brother -- who had a crazy idea of a way to save maybe millions

21  of lives.  He worked tirelessly on it for years.  After a few

22  years he called me one day.  It was actually -- looked like it

23  was going to happen, like it was going to work.

24         From far earlier on, Gary sent me a message one day, a

25  link.  He had been quiet for the past couple of months.  It is

a link to a crypto exchange that he built over those few
months. Over the next couple of years the industry -- the
whole industry rebuilt itself in the image of what Gary had
made cross margin a lot of other -- so many things about what
he felt became the industry standard.

I remember back earlier on, 2018, Alameda was in
danger of falling apart. I got a message one day. Explained
what I needed to do to fix things in a way that I hadn't been
able to see myself. There was an anonymous message, but it had
sort of a combination of empathy and logic in it that made it
clear it had to be from Nishad. He was famously humble and
that often hid how brilliant he was as well.

Caroline is 20 something, mostly self taught, running
a billion dollar company, making a billion dollars a year
trading. She asked me for advice sometimes on her reviews of
employees. And when I read through those, I learned more from
one review that she wrote than I ever did from people she was
reviewing. It was incredibly impressive. A lot of other
people who probably don't want me to say their names right now,
but they all built something really beautiful. They threw
themselves into it. And then I threw all of that away.

It haunts me every day. I made a series of bad
decisions. They weren't selfish decisions. They weren't
selfless decisions. They were bad decisions.

And those culminated with a bunch of other factors

 1   along with the liquidity crisis for Alameda in November of

 2   2018.  It wasn't bankrupt.  FTX wasn't bankrupt.  Alameda

 3   wasn't bankrupt.  There were no losses to socialize to

 4   customers.

 5        But my mismanagement, among other things, meant that

 6   most of Alameda's gains had been lost, most of what it had ever

 7   made.  It was more leverage, more levered than it should have

 8   been, and that we had to liquidate an $8 billion collateral, we

 9   had to liquidate to pay off its debts, to meet the run on at

10   FTX that was developing, and then shutting Alameda down.  It

11   would have meant customers were paid in full.  May have taken a

12   couple of weeks.  FTX would have survived.  Alameda wouldn't

13   have.  Would have been shut down.  It would have been a huge

14   disappointment for everyone who had built Alameda and an

15   unpleasant few weeks for FTX for its customers and its

16   partners, and there are a lot of mistakes that I made that led

17   to that.

18        That's also not how this story ended, of course,

19   because I wasn't done screwing up.  Customers, obviously, they

20   weren't paid back that week.  They still haven't been.  It has

21   been a year and a half.  Withdrawals, they didn't resume.  They

22   still have them.  They never will because FTX isn't going to

23   resume.  FTX didn't survive that.  Obviously, Alameda didn't

24   either.

25        Customers, creditors, lenders, over the last year and

1    a half, they have not been paid back.  They have been given

2    conflicting claims.  That's caused a lot of damage.

3          They could have been paid back.  There were enough

4    assets, there are enough assets to pay back all customers, all

5    creditors in full at current prices, at prices at the time,

6    with interest.  And paying -- what Sunil said was absolutely

7    right.  They do deserve that.  They don't just deserve to get

8    back sort of some simile of the value they had.  They deserved

9    to get that a year and a half ago, in November 2022, and they

10   deserve now to get the actual assets they had, the value that

11   those are worth now.  There are enough assets for that.  There

12   always have been.

13         It's not because of a rise in the price of crypto.

14   That hasn't hurt, certainly, or recoveries or things like that.

15   There always was enough value to do that, and that should have

16   happened in November 2022.  It didn't, obviously.

17         It's just not about the money for customers, as Sunil

18   said.  He pointed to the gains they are missing out on.  He

19   pointed to the emotional pain to -- it must be an excruciating

20   feeling waiting every day not knowing what's going to happen,

21   feeling like you may have lost everything.  It was present

22   throughout the letters, and outside the letters throughout

23   things customers have told me, things I have read since shortly

24   after the collapse.

25         Marcello in his letter talked about the impact on his

1    physical health, Alasantro about the impact of his family

2    relationship, and pretty much everyone talked about the piece

3    of mind they have not had this last year and a half.

4         Basic question, I guess, of why they have not been

5    paid back now.  There are enough assets.  There always were

6    enough assets to do it.  There was, to be fair, a liquidity

7    crisis.  And that was, in part, my doing.  That was a mess and

8    it was going to -- was going to be a messy and tense November

9    2022.  But we are not in November 2022.  We are not in 2022 or

10   in 2023 anymore.

11        This isn't the time or place to tell that full story

12   for why they are still waiting, for why they are not sure if

13   they are going to get petition-date value or current values.

14        But a good place to start with is Dan Friedberg's

15   affidavit that he filed a bit over a year ago in bankruptcy

16   court.  It was a brief affidavit.  I don't think he made a lot

17   of friends for filing that.  I suspect he made some enemies.

18        There are a few people who have stood up for customers

19   over the last year and a half.  The JPLs in the Bahamas have

20   been working pretty tirelessly for them below the radar often.

21   Adam Moskowitz has been fighting for them in court.  I am

22   grateful for what they have been doing.  Christina Rolle, the

23   head regulator in the Bahamas, FTX's -- the regulator who was

24   FTX's head regulator when it was still a thing, a few days -- I

25   guess about a day after the bankruptcy filing, there was a hack

1   on the estate's assets.  I was in the Bahamas then that day.

2   Christina Rolle came to FTX's headquarters to make sure that

3   the assets were protected, to make sure that they ended up in

4   custody, that they couldn't be further depleted.  She wasn't

5   going to leave until that was done.  She was going to

6   participate in it, made sure it happened, made sure that the

7   focus was on customers on what mattered for them.  I think this

8   was a Friday or Saturday night, and she was there until 3 a.m.

9   making sure that happened.  It was inspiring.

10          But there have been some people who have stood up for

11  customers who have done more than was expected of them, mostly

12  customers who have been failed.  They have been failed by more

13  people than I can count, not least of which myself.  It has

14  been excruciating to watch all of this unfold in slow motion.

15  Customers don't deserve any of that pain.

16          I was the CEO of the FTX.  I was its leader.  That

17  means that I was responsible for what happened to it.  At the

18  end of the day I was responsible.  I was responsible that it

19  went well.  It doesn't matter why things go bad when you're

20  responsible for something.  It's on you.  I was responsible for

21  FTX and it collapses on me.

22          I am not the one who matters the most at the end of

23  the day.  What matters is the customers, the creditors, the

24  employees, people who suffered a lot because of this.

25          Some of them wrote letters for me for sentencing.  It

1    was incredibly moving.  It meant a lot to me.

2        I know Ross said in his letter that there was a cost

3    to them being written, cost to the letter writers.  I know he

4    is right about that.  I have seen people pay that cost over the

5    last year and a half.  And even if I were worthy of the

6    letters, I am not sure that they are worth that cost because,

7    at the end of the day, my useful life is probably over.  It has

8    been over for a while now, from before my arrest.  I have long

9    since given everything that I had to give, and I would do

10   anything to be out there right now trying to help, but I know

11   that's not going to happen, and I can't really do that from

12   prison.  I can't really help, whether I get a 30-year sentence

13   or four or five, at the end of the day.

14       I know how people see me.  I know how the prosecution

15   sees me.  I know how the Court sees me, the media.  I

16   understand why.  I keep coming back to that Ryne Miller

17   message, I know you referenced it earlier today, that the

18   former general counsel of FTX US -- at least former general

19   counsel of the bankruptcy estate.  I don't know if he still is.

20   I thought it was clear at the time that I was trying, and

21   obviously failing completely, to help the estate to --

22   basically, it's desperate for them to pay back customers, to

23   stop stalling on it.  It still seems clear to me that that's

24   what I meant.  But it's not how the prosecutors, it's not how

25   the media saw it, the Court.  It's not how a lot of people saw

1   it.  That's that.

2          There is -- I do want to apologize to -- I want to try

3   something Sunil said about the filings that we had made.  I

4   understand what he meant when he said that he found them

5   offensive, that it seemed like they were implying that there

6   was no pain to customers, that we were denying that there was.

7   That's not what I meant.  I mean, now that he says that, I can

8   see -- I can certainly see how he can read it that way.  I

9   think, more than that, I can see how their focus may not have

10  been entirely in the right place.  I think they far undersold

11  the extent to which has been -- ultimately, customers have been

12  suffering.  I don't think the reasons for that and the process

13  for that are very well understood.  I think it's a story that

14  mostly hasn't been told.  I think it's -- hasn't been told

15  correctly.  But I didn't at all mean to minimize that.  It's

16  not what I intended, but I also think that was also something

17  that was missing from what I have said over the course of this

18  process.  I'm sorry for that.

19          At the end of the day, there is -- there is maybe

20  self-reliance to some of this.  It looks like customers

21  hopefully will finally be paid.  They should be paid in full,

22  not just petition-date value, but current value of assets.

23  There is plenty of assets to do that.  There is billions more

24  than is necessary.  It has been true for the whole time.  It's

25  true of customers.  It's true of lenders as well and investors.

1    I'm hopeful and optimistic that that's finally going to happen.

2    I guess I wish I had been able to do more to help that.  I

3    think I failed at that.  I'm not sure why, but I do think I

4    did.

5            I guess there is a big opportunity in the world to do

6    what the world thought I would do, what it hoped I would do, at

7    least for a while, what I hoped I would do for the world, not

8    what I ended up doing.  And 300 people that I used to work

9    with, incredibly talented, selfless, impressive people were

10   looking for something to do.  If that happens, if they do what

11   they could for the world, then hopefully I'll be able to see

12   their success, not just my own failures each night.

13           Thank you, your Honor.

14           THE COURT:  Thank you.

15           Who is going to speak for the government?

16           MR. ROOS:  Yes, your Honor.

17           Samuel Bankman-Fried stole over $8 billion in customer

18   money, as your Honor found earlier today, and I emphasize stole

19   because it was not a liquidity crisis or an act of

20   mismanagement or poor oversight from the top.  It was the theft

21   of billions of dollars from customers spread all over the

22   world.  It was not a bloodless financial loss on paper.  It was

23   a loss, as the victim-impact statements note, that affected

24   people significantly in their lives and caused extreme

25   emotional and personal damage.

1          And since the government submitted its submission,

2     there have been, I think, at least 100 additional victim

3     letters that have been filed.  Since we didn't have a chance to

4     comment on all of those in our sentencing submission, I want to

5     identify a few things in them for the Court's attention that I

6     think exemplify the harm in this case.

7          One of those harms is the financial harm and the

8     defendant says, you know, there is an untold story.  The

9     financial harm was immediate.  It was a theft.  There was

10    suddenly no money.  And over and over, the victim-impact

11    statements make clear that they lost their life savings, they

12    were financially damaged, they didn't know how they could go on

13    with their lives financially, and they have not been made

14    whole.

15         What really stuck out to me was what these statements

16    also say about the emotional toll to the victims here.  I was

17    struck by not just how life altering the defendant's crimes and

18    fraud were to these individuals, but how it affected so many

19    different types of people in different walks of life.

20         To give your Honor three examples, we have Fabrizio

21    Cossutta, who lives in Portugal.  The day before FTX declared

22    bankruptcy, his daughter was born.  He wrote to the Court

23    about -- on the special day of his daughter's birth, he was

24    marred by the ominous specter of financial instability.  His

25    losses, in his words, have been severe and enduring, casting a

 1   shadow over his family's financial security and his daughter's

 2   future.  It caused stress.  It caused anxiety.  It strained the

 3   bonds of his family.

 4        That's not just an act of mismanagement.  It's not a

 5   process that's playing out.  It's a real harm to the victims.

 6   Take someone in the middle of their life.  Your Honor received

 7   a letter from a victim, age 23, who lives in Morocco.  He is

 8   the oldest of a family of five.  His father suffers from

 9   physical and mental problems, leaving the father unable to care

10   for the family.  The eldest son is the victim.  That

11   responsibility, in his words, fall heavily on his shoulders.

12   And he was trying for years to balance caring and providing for

13   his family, while also going to school in order to, to use his

14   words, secure a better life for his family and his own future.

15   So he kept money on FTX not to make a wild investment or to

16   loan it out to the defendant, but for the security of it, and

17   the fraud has set him back.  It's compromised his education,

18   it's compromised his family security, and it has caused

19   emotional distress that he wrote about in his letter.

20        One more.  A couple in the later stages of their life,

21   both in their late sixties, they invested their life savings,

22   Sneh Patel and her husband.  They lost sleep.  They were

23   embarrassed and ashamed for being what they described as

24   gullible, depressed.  They had to work to support themselves.

25   They had to return back to work after they retired.  They

1    suffered physically as a result.  They are uncertain whether

2    they will have to work for the rest of their lives.

3              Mr. Mukasey said this crime is different than the

4    other crimes described in the government's sentencing

5    submission because Mr. Bankman-Fried did not look people in the

6    eyes as he was stealing their money.  I disagree.  It's because

7    nowadays a defendant can look people in the eyes through

8    Twitter, through social media, through the Internet.  And

9    that's exactly what happened here.  He told them their money

10   was safe.  He said trust me.  He put himself in the forefront

11   and he caused these people losses.  It's not the result of a

12   process or an unwinding or a liquidity crisis.  It caused

13   immediate harm and that's attributable to his fraud.

14             The second point I want to make, as your Honor

15   considers the sentence here, it's not just about the $8 billion

16   fraud on customers.  As your Honor found, the defendant took

17   $1.7 billion from investors based on lies.  Those investments

18   are now worthless.  A billion dollar fraud from investors alone

19   would necessitate a large prison sentence.  Some of the other

20   cases outlined in the government's submission were just crimes

21   on investors and for less than a billion dollars and resulted

22   in a sentence of 40 or more years.

23             The defendant obtained over a billion dollars from

24   lenders based on false documents and lies and those loans were

25   not repaid.  Two of the lenders went bankrupt.  The companies

1  were destroyed.  Their employees lost their jobs.  And this too

2  would have been a basis for the Court to impose a severe

3  sentence on its own.

4        The evidence also showed at trial that the defendant

5  committed the largest election crime in United States history.

6  He paid a massive bribe, one of the largest individual bribes

7  in United States history.  He lied to banks.  He unlawfully

8  transmitted money.  He interfered, as your Honor found, with

9  the bankruptcy collection, asset collection process.  He

10  obstructed justice.  He committed perjury.

11        It's hard to understand in some ways how a person

12  could be responsible for all of these significant crimes in

13  such a relative short amount of time.  The criminality here,

14  it's massive in scale.  It was pervasive in all aspects of the

15  business.  This was not, as was suggested, a great business

16  that had a problem at the end.  This was a business that was

17  pervaded with criminality throughout, and it was all

18  destructive, and the sentence, we submit, has to reflect that.

19        Then the final point I want to make, your Honor, is

20  the danger that the defendant poses and the risks that he will

21  commit crimes again in the future.  Our submission outlines

22  good reasons to believe the defendant could commit crimes

23  again:  The number of crimes he committed, the commission of

24  criminality while on pretrial release, the efforts he took to

25  rehabilitate and rebrand his image, his own writings reveal a

 1    plan to relaunch FTX or something similar, to change his image,

 2    to revive his story.

 3          The Court is, of course, aware of the defendant's

 4    false statements during the commission of the crimes, after the

 5    commission of the crimes, postbankruptcy, and then on the

 6    witness stand.  And then of course you have the defendant's

 7    cost-benefit philosophy that would allow him to justify doing

 8    like this again in the future.

 9          And Mr. Mukasey said, this the not a defendant who

10    acts with malice.  He acts with mathematics.  While the line

11    sounds good, it's troubling because what it says is that if

12    Mr. Bankman-Fried thought the mathematics would justify it, he

13    would do it again.

14          Now, I don't want to repeat everything we have

15    written, but I do want to point out the following about what we

16    heard today and what was in some of the reply briefs.

17          The replies point to general statements about the

18    typical low risk of recidivism.  They note that

19    Mr. Bankman-Fried has said he screwed up.  And today, of

20    course, we heard Mr. Bankman-Fried talk about mismanagement, a

21    painful few weeks, that he made a mistake.

22          What we did not hear is accepting responsibility for

23    lying, for stealing, or for fraud.  He recognizes errors were

24    made.  He does not recognize, though, that they were because of

25    wrongs he committed.  He didn't swear off doing it again.  As a

 1   matter of fact, I was struck at the end by the comments that

 2   there is an opportunity here, that there is an opportunity that

 3   someone, maybe his former coworkers, maybe someone else, could

 4   relaunch FTX, or something of an equivalent and, without the

 5   mismanagement or the liquidity crisis, things could work out.

 6   And that, I submit, tells the Court exactly where things could

 7   have.  We cannot see into the future.

 8          But the defendant's statements today express not one

 9   of acceptance of responsibility but one of recognizing errors

10   that, had they not been committed, could have let him get away

11   with it for longer, so a sentence here is necessary of at least

12   40 years to ensure that the defendant cannot do it again.

13          One final comment.

14          Mr. Mukasey, in his writings and today, asserted that

15   the government has painted Mr. Bankman-Fried as a villain or a

16   monster, and never once have we said that.  That's attacking a

17   straw man.  And at the same time they have said that the

18   defendant is virtuous, that people who really know him know he

19   doesn't mean these types of things.

20          I'm reminded by something that the author Diana

21   Henriques wrote about a similar argument that was made by

22   Bernie Madoff.  I think these words apply here.  He is not

23   inhumanely monstrous.  He is monstrously human.  He was greedy

24   to use people's money and advance his own ambition, arrogantly

25   sure of his capacity to pull it off, smugly dismissive of the

1    skeptics, the critics, the rule of law, and his victims.

2           And the fact that Mr. Bankman-Fried spent the money on

3    investments, rather than sports cars, or whatever you might

4    expect for someone classically greedy, does not make him not

5    greedy or does not express a motive of greed.  The fact that he

6    had ambitions that seem altruistic does not make him not

7    ambitious, is not a motive for doing these things.

8           The defendant is not a monster, but he is someone who

9    committed gravely serious crimes that affected hundreds of

10   thousands or more people in indescribable ways.  There is a

11   real possibility that, given the opportunity, he would consider

12   doing it again.

13          So justice and all of the other 3553(a) factors

14   require a sentence of 40 to 50 years.  Thank you.

15          THE COURT:  Thank you, Mr. Roos.

16          I have, of course, considered the sentencing

17   guidelines and the 3553 factors.  I want to make some comments

18   before I get to the actual sentence about things that, to me,

19   are salient.

20          Much that was said, a good deal of it on paper rather

21   than here this morning, about the defendant's background is

22   undisputed.  He had an exceptionally privileged background.  He

23   was raised by loving and devoted parents.  He had every

24   advantage that they could confer on him.  Went to the best

25   private schools.  He went to MIT.  He is extremely smart.  And

 1    he suffers from autism, which is a condition that affects

 2    different afflicted persons very differently frequently.  He, I

 3    gather, is what one would call a very high-achieving autistic

 4    person, which means, among other things, that he's capable of

 5    huge accomplishments, and he has frequently asocial awkwardness

 6    and a way of interacting with people that's unusual and

 7    sometimes off-putting.  I take that all as a given.

 8         After school he went to Jane Street, a very successful

 9    investment firm, where he was extremely successful, made a lot

10    of money, gave a lot of it away.  I remember testimony at trial

11    that I think is relevant here.  I frankly don't remember

12    whether it was the defendant's testimony or someone else's.

13    But I remember learning, I think, that the people at Jane

14    Street were encouraged to play quantitative games, bets to

15    analyze options in terms of expected value, about which I am

16    going to have something to say later, and Samuel Bankman-Fried

17    was all the way in on that.

18         He has been exceptionally ambitious and aware of his

19    talents through his entire life, as far as I can see.

20         Ms. Ellison testified he was very ambitious.  He

21    talked about wanting Alameda and eventually FTX to be

22    successful and to end up being huge companies that did a wide

23    variety of things.  He was also very interested in politics and

24    talked about wanting to use his money to have influence on

25    politics.  He said at one point he thought there was a 5

1    percent chance he would become president some day.

2         The behavior in this case demonstrates brilliantly the

3    accuracy of that testimony.  Mr. Roos talked about the biggest

4    political financial crime in history, I think that's the way

5    you put it, but something like that.  And indeed

6    Mr. Bankman-Fried did that too, in addition to destroying FTX.

7    And he did it because he wanted to be a hugely, hugely

8    politically influential person in this country.

9         And lest anyone think that his attention was devoted

10   all to the left end of the spectrum, it wasn't.  I don't know

11   how the numbers worked out in terms of contributions on each

12   side, but he set up a vehicle for making political donations to

13   the right through straws that wouldn't come back to him.  But

14   the goal was just the same as the donations the other way.  It

15   was influence for Samuel Bankman-Fried.

16        Some of this at one point might have been attributed

17   to his having presented himself as the good guy all in favor of

18   appropriate regulation of the crypto industry which, in the

19   United States, relatively speaking, was unregulated, at least

20   in the way that the securities industry and the commodities

21   futures industry are regulated.  In my judgment, that was an

22   act, and he admitted it, ultimately.

23        Shortly after the bankruptcy, I believe on November 16

24   or 15, he was interviewed by a reporter named Kelsey Piper,

25   whom he knew well and with whom he had talked before.  And in

1    the course of a much longer conversation Ms. Piper said to

2    Mr. Bankman-Fried:  You said a lot of stuff about how you

3    wanted to make regulations, just good ones.  Was that pretty

4    much just PR too?

5            "THE DEFENDANT:  There is no one really out there

6    making sure good things happen and bad things don't.  Usually,

7    there is only one toggle:  Do more or do less.  Yeah.  Just PR.

8    Fuck regulators.  They make everything worse.  They don't

9    protect the customers at all."

10           The goal was power and influence.

11           We mentioned a moment ago, and Mr. Roos certainly did,

12   and appropriately so, expected value and how -- I think Mr.

13   Mukasey did as well, how this is an individual who was a math

14   nerd who looked at decisions in terms of math, expected value.

15   You might say cost-benefit analysis, but that's not their

16   terminology.

17           I am going to read you something else that Caroline

18   Ellison said:

19   "Q.  During your time working with the defendant, how, if at

20   all, did he describe his approach to risk taking?

21   "A.  He described himself as truly risk neutral, meaning that

22   most people are risk averse, meaning that they would rather not

23   take a risk if they don't have to, or they try to avoid risks.

24   But he said that he was totally comfortable taking a risk as

25   long as he thought it was a positive EV, EV meaning expected

1     value.

2     "Q.  What do you mean by positive EV?

3     "A.  EV stands for expected value, so that was a term that we

4     used a lot when talking about trading.  So, yeah, positive EV

5     just means that sort of, on average, you expect it to pay off

6     well, even if maybe there are lots of cases where you will end

7     up with zero, or you'll end up losing lots of money, because

8     there are like some cases where you make a lot of money.

9     "Q.  Did the defendant ever give any example to describe his

10    approach to risk taking?

11    A.  Yeah.  He talked about being willing to take large coin

12    flips, like a coin flip where if it comes up tails you might

13    lose $10 million.  But if it comes up heads, you make slightly

14    more than $10 million.

15    "Q.  Did he ever give other coin-flip examples?

16    "A.  Yeah.  I guess he also talked about this in the context of

17    thinking about what was good for the world, saying that he

18    would be happy to flip a coin if it came up tails and the world

19    was destroyed.  As long as if it came up heads, the world would

20    be like more than twice as good.

21              (Continued on next page)

22

23

24

25

1      THE COURT:  In other words, a man willing to flip a

2   coin as to the continued existence of life and civilization on

3   earth, if the chances were imperceptively greater that it would

4   come out without that catastrophic outcome, that's really a

5   leitmotif in my judgment of this entire case.

6      Mr. Bankman-Fried knew for a protracted period that

7   Alameda was spending large sums of FTX customer funds on risky

8   investments, political contributions, Bahamas real estate, and

9   other things in circumstances in which FTX was seriously

10  exposed to downside of market deterioration, loan calls, and

11  other risks.  He knew that FTX customer funds were not to be

12  used for those purposes, they were not his to use, and that his

13  use of them was not only wrong.  It was flatly inconsistent

14  with the image of safety and security that he vigorously and

15  endlessly portrayed for himself and his company to the world

16  and to prospective investors and customers.  He was betting on

17  expected value.

18      In the head of this mathematical wizard, his own

19  counsel tells us, in substance, that he was viewing the cost of

20  getting caught, discounted by probability or improbability,

21  against the gain of getting away without getting caught, given

22  the probabilities.  That was the game.  It started at least as

23  early as Jane Street and it continued to the very end.  It's

24  his nature.  And you don't have to take my word for it —

25  everybody has said that.

1          So that's one point I think appropriate to make.

2          Another thing that I think is important in this

3    equation are the protestations of sorrow about the losses to

4    and the disruptions of customers that were caused.

5    Mr. Bankman-Fried, no doubt, very well advised and

6    appropriately so, says, "mistakes were made."  I think one of

7    his pithier expressions was, "I fucked up," but never a word of

8    remorse for the commission of terrible crimes.

9          Now, Mr. Bankman-Fried has the right to put the

10   government to its proof, to plead not guilty, go to trial, and

11   see if the government can prove his guilt beyond a reasonable

12   doubt.  I don't hold that against him.  I want to be very clear

13   about that.  Everybody's got that right.  But, at the end of

14   the day, I keep coming back to Ms. Ellison's testimony that I

15   read to you a few minutes ago.  He knew it was wrong, he knew

16   it was criminal, he regrets he made a very bad bet about the

17   likelihood of getting caught, but he's not going to admit

18   anything, as is his right.

19          A word about specific deterrence.

20          There is absolutely no doubt that Mr. Bankman-Fried's

21   name right now is pretty much mud around the world, but one of

22   the things he is is persistent, and another of the things he is

23   is a great marketing guy.  Mr. Roos is right that the outlines

24   of Sam Bankman-Fried's revised version of his story are clear

25   to everybody as we sit here.  The same skills and drive that

1    had him, even after his arrest, pitching his story to a huge

2    number of media people — and he had every right to do that, we

3    had a big discussion of that in the bail context — demonstrates

4    that he knows how to do it and the will is there.  The mistakes

5    were made, other people are to blame, the bankruptcy people

6    screwed up, this lawyer had a conflict of interest, that lawyer

7    the other thing.  It doesn't take much of an imagination to see

8    the outlines of the campaign.  I certainly am not prescient, I

9    make no such claim.  But there is a risk that this man will be

10   in a position to do something very bad in the future, and it's

11   not negligible risk, not a negligible risk at all.  So, in

12   part, my sentence will be for the purpose of disabling him, to

13   the extent that can appropriately be done, for a significant

14   period of time.

15        We had some talk about general deterrence.

16   Mr. Mukasey is a very fine defense lawyer.  I think it is fair

17   to say I've seen him on both sides of the bar for his entire

18   career, and I've heard these arguments about general deterrence

19   probably deployed by him against and in favor of defendants,

20   but I can't swear to that.  I've certainly heard a lot of good

21   lawyers deploy those arguments both ways.  But the argument

22   just isn't all that persuasive.  I appreciate that part of the

23   premise of substantial punishment for the purpose of general

24   deterrence makes assumptions about the mental processes by

25   which people decide to commit crimes that are, for many crimes

1    and many people, just not sensible assumptions.  The

2    assumptions maybe have more validity in white collar cases

3    where people, I think more often than we can give credit for,

4    think about the risk of getting caught and what getting caught

5    means before embarking on criminal behavior of certain kinds,

6    but that's ultimately not here or there for me.  What's here or

7    there for me, Mr. Mukasey already alluded to.

8            At the end of the day, the criminal justice system in

9    this country or any country can enjoy the support of the

10   population, which is essential to its functioning in more ways

11   than I could describe, only if on the whole people think it

12   works fairly that guilty people get their just deserts, that

13   innocent people aren't wrongly convicted, and that they can get

14   their arms around the case as they hear about it -- say, "well,

15   I might have decided that a little differently, but it sounds

16   reasonable, it sounds fair."  That's what we depend on.  If

17   that's not happening, we're back to trial by combat, folks, or

18   something like it.  And so, the judgment has to adequately

19   reflect the seriousness of the crime, and this was a very

20   serious crime.

21           Naturally, folks, I have misplaced a piece of paper

22   that I need, so bear with me while I find it.

23           The defendant will rise for the imposition of

24   sentence, please.

25           As I said at the beginning, I've considered all of the

1    3553 factors, the Sentencing Reform Act, the sentencing

2    guidelines, the presentence report, and the enormously

3    voluminous submissions of the lawyers, not just voluminous, but

4    good submissions.  I know that the probation department has

5    recommended a sentence of 105 years and the government a

6    sentence of 40 to 50 years.

7         I've concluded that the sentences recommended by the

8    probation department and the government would be substantially

9    greater than is necessary to serve the purposes of the

10   Sentencing Reform Act.  Nobody should misunderstand, I'm not

11   saying that the defendant didn't commit very serious crimes, I

12   am not diminishing in any way the enormous harm that he did,

13   the brazenness of his actions, his exceptional flexibility with

14   the truth, his apparent lack of any real remorse, and the need

15   to deter others engaging in comparable behavior.

16        I also want to add one further thought.  I did not

17   think it a fruitful use of time to spell out every time I

18   thought Mr. Bankman-Fried testified willfully and knowingly

19   falsely at trial.  There are more than the ones I've

20   articulated, but that suffices.

21        And when he wasn't outright lying, he was often

22   evasive, hairsplitting, dodging questions and trying to get the

23   prosecutor to reword questions in ways that he could answer in

24   ways he thought less harmful than a truthful answer to the

25   question that was posed would have been.  I've been doing this

1    job for close to 30 years.  I've never seen a performance quite

2    like that.  All of that said, I am not going to impose a

3    sentence of 40 years, let alone 105 years.

4           It is the judgment of this Court, Mr. Bankman-Fried,

5    that you be committed to the custody of the Attorney General of

6    the United States for a term of imprisonment of 240 months on

7    each of Counts One through Four, and Count Seven.  The terms on

8    Counts One, Two, and Seven shall be served concurrently with

9    each other.  The term on each of Counts Three and Four shall be

10   served concurrently with each other.  The first 180 months of

11   the terms on each of Counts Three and Four shall be served

12   concurrently with the terms on Counts One, Two, and Seven.  The

13   balance of 60 months on the terms of each of Counts Three and

14   Four shall be served consecutively to the terms on Counts One,

15   Two, and Seven.  It is further adjudged that you be committed

16   to the custody of the Attorney General of the United States for

17   a term of imprisonment of 60 months on each of Counts Five and

18   Six.  The terms on Counts Five and Six shall be served

19   concurrently with each other, consecutively to those on Counts

20   One, Two, and Seven, and concurrently with the 60-month

21   portions of the terms on Counts One, Two, and Seven, and

22   concurrently with the 60-month portions on the terms on Counts

23   Three and Four that are to be served consecutively to the terms

24   on Counts One, Two, and Seven.  The foregoing results in an

25   aggregate term of imprisonment of 300 months.

1          You thereafter shall serve a term of three years on

2    supervised release, and you shall pay the mandatory assessment

3    of $700.

4          The term of supervised release shall be subject to the

5    mandatory, the standard, and the special conditions set forth

6    at pages 56 to 58 of the presentence report, which you

7    indicated you have read.

8          Does any counsel want me to read the conditions

9    verbatim?

10          Mr. Mukasey.

11          MR. MUKASEY:  No need, Judge.

12          MR. ROOS:  No, your Honor.

13          THE COURT:  It is further adjudged, Mr. Bankman-Fried,

14    that you forfeit to the United States the sum of

15    $11,020,000,000, including the specific property identified in

16    the preliminary order of forfeiture that I will be signing

17    today, all on the terms and conditions there set forth.  I

18    decline to order restitution due to the complexity of the case

19    and the number of victims.  I instead grant the government's

20    motion to authorize the United States to compensate victims

21    with finally forfeited assets through a recognition process as

22    restitution would be impractical in this case.

23          I strongly recommend to the Bureau of Prisons that

24    defendant be designated initially to a medium security facility

25    or any lower security institution the BOP considers

1   appropriate, and I do so for two reasons.  First, I have no

2   reason to believe that the defendant would initiate any act of

3   violence against another prisoner or any BOP staff, and he

4   therefore does not require the close confinement of a maximum

5   facility institution that, in part, is designed to prevent such

6   acts.  Second, defendant's notoriety.  His association with

7   vast wealth — regardless of his present and actual financial

8   resources — and his autism and social awkwardness are likely to

9   make him more than usually vulnerable to misconduct by other

10  inmates in the environment of a maximum security facility.  I

11  further recommend that the designated facility be as close to

12  the San Francisco Bay area as possible for the purpose of

13  facilitating family visitation.

14          I advise you, Mr. Bankman-Fried, that you have the

15  right to appeal from the judgment imposing this sentence.  If

16  you wish to appeal from the judgment, you must file a written

17  notice of appeal to the clerk of the district court no later

18  than 14 days after the date of the judgment is entered, which

19  could be as soon as today.  In the event you wish to appeal and

20  can't afford to pay the fees necessary to do so, you have the

21  right to apply for permission to appeal as a poor person.  If

22  that application were granted, you'd be permitted to appeal

23  without payment of the fees.  And if you couldn't afford

24  counsel, counsel would be appointed at public expense to

25  represent you on appeal.

1          You may be seated.

2          Now, I also suspend the mandatory drug testing

3     condition because I regard the defendant as a low risk of

4     substance abuse.

5          All of that said, I invite counsel, if they think I

6     made a demonstrable error of fact than something you just wish

7     I'd come out differently on, but a factual error that you think

8     is material to bring to my attention, and if I agree with you,

9     I'll change it.

10          Mr. Mukasey.

11          MR. MUKASEY:  Nothing from us, Judge.

12          THE COURT:  Mr. Roos.

13          MR. ROOS:  Just two very minor matters from us, your

14     Honor.

15          One, just in light of a circuit precedent, would you

16     also just allocute the defendant that he doesn't need you to

17     read the conditions out loud.

18          THE COURT:  All right.  I thought counsel had the

19     ability to do that, but, Mr. Bankman-Fried, would you like me

20     to read the conditions to which I referred out loud to you all

21     in court?

22          THE DEFENDANT:  No.

23          THE COURT:  Thank you.

24          MR. ROOS:  Thank you, your Honor.

25          The other item would just be to the extent there are

1    open counts or underlying indictments, the government would

2    move to dismiss them.

3            THE COURT:  They're dismissed.

4            Are there any other requests by the defendant for

5    recommendations?

6            MR. MUKASEY:  Judge, we may submit, a little later

7    this afternoon, some particular language that I understand is

8    perhaps persuasive to the Bureau of Prisons with respect to

9    designation.  I think your Honor made all the right noises in

10   your reading of the proposed recommendation, but we may be

11   able -- in fact, I think I can hand up to Andy some of the

12   language that may tick the right toggles for us.

13           THE COURT:  Let me see it.  Show it to Mr. Roos first.

14           MR. MUKASEY:  It's probably the formal version of

15   perhaps the more colloquial things that you said.

16           THE COURT:  I will do something close to this, but not

17   exactly like this.

18           MR. MUKASEY:  If the 10-day --

19           THE COURT:  Well, that's one of the things I was

20   proposing to leave out.  Why is --

21           MR. MUKASEY:  We're on the same page.  I don't think

22   that that kind of deadline is necessary.

23           THE COURT:  And giving the Bureau of Prisons deadlines

24   is only an invitation for missed deadlines.

25           MR. MUKASEY:  Thank you, your Honor.

1           THE COURT:  There's no objection, I take it, Mr. Roos?

2           MR. ROOS:  No, your Honor.

3           THE COURT:  Anything else we can usefully accomplish

4    this afternoon?

5           MR. MUKASEY:  No, thank you.

6           THE COURT:  Okay.  I thank counsel on both sides for

7    all 18 or 1900 pages.

8                                   *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# **EXHIBIT 6**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

IN RE: FTX TRADING LTD, et al.,    )
                                   )
                    Debtors.       )
                                   ) CHAPTER 11
                                   )
Case No. 22-11068 (KBO)            )
_____)


C O N F I D E N T I A L


DEPOSITION OF SAM BANKMAN-FRIED

Thursday, October 16, 2025


Reported By:  Joanna B. Brown, CSR, RPR, CRR, RMR
              CSR No. 8570



Page 2

```
 1        IN THE UNITED STATES BANKRUPTCY COURT
 2           FOR THE DISTRICT OF DELAWARE
 3
 4
   IN RE: FTX TRADING LTD, et al.,  )
 5                                  )
                                    )
 6       Debtors.   )
                    ) CHAPTER 11
 7                  )
   Case No. 22-11068 (KBO)          )
 8 _____)
 9
10
11
12
13
14
15       Deposition of SAMUEL BANKMAN-FRIED, taken on
16 behalf of the Joint Liquidators of Three Arrows
17 Capital, Ltd., at 1299 South Seaside Avenue, San Pedro,
18 California, beginning at 7:58 a.m. and ending at
19 2:32 p.m., on Thursday, October 16, 2025, before
20 JOANNA B. BROWN, Certified Shorthand Reporter No. 8570,
21 RPR, CRR, RMR.
22
23
24
25
```

Page 3

```
 1          A P P E A R A N C E S
 2 COUNSEL FOR JOINT LIQUIDATORS FOR THREE ARROWS CAPITAL,
   LTD.:
 3
        LATHAM & WATKINS LLP
 4      BY:  CHRISTOPHER R. HARRIS, ESQ.
        1271 Avenue of the Americas
 5      New York, New York 10020-1300
        (212) 906-1200
 6      christopher.harris@lw.com
           -and-
 7
 8      LATHAM & WATKINS LLP
        BY:  ERIN HALEY, ESQ.
 9      12670 High Bluff Drive
        San Diego, California 92130
10      (858) 523-5400
        erin.haley@lw.com
11
   COUNSEL FOR FTX RECOVERY TRUST:
12
        SULLIVAN & CROMWELL
13      BY:  BRIAN D. GLUECKSTEIN, ESQ.
        CHRISTOPHER J. DUNNE, ESQ.
14      125 Broad Street
        New York, New York 10004
15      (212) 558-4000
        gluecksteinb@sullcrom.com
16      dunnec@sullcrom.com
17 FOR THE DEPONENT:
18      MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
        BY:  JEREMY D. MISHKIN, ESQ.
19      1735 Market Street, 20th Floor
        Philadelphia, Pennsylvania 19103-7505
20      (215) 772-7246
        jmishkin@mmwr.com
21
22
23
24
25
```

Page 4

```
 1          I N D E X
 2 EXAMINATION OF:            PAGE
   SAMUEL BANKMAN-FRIED
 3
 4
 5   BY MR. HARRIS        7, 245
 6   BY MR. GLUECKSTEIN      212
 7
 8          E X H I B I T S
 9 DEPOSITION            PAGE
10 Exhibit 1  Testimony of Sam Bankman-Fried    18
       Co-Founder and CEO of FTX
11     February 9, 2022
12 Exhibit 2  Private-ftx-accounting: 11/02/2021,  32
       Bates No. THREE_ARROWS_00322562
13
14 Exhibit 3  FTX Trading, Ltd, Profit and Loss    34
       January - June 2021, Bates
15     No. THREE_ARROWS_00322564
16 Exhibit 4  FTX Trading, Ltd, Balance Sheet    42
       As of June 30, 2021, Bates
17     No. THREE_ARROWS_00322565
18 Exhibit 5  FTX Digital Markets Limited        76
       Safeguarding of Assets &
19     Digital Token Management Policy, Bates
       Nos. FTX_3AC_000044442 -
20     FTX_3AC_000044450
21 Exhibit 6  Digital Assets and Registered    79
       Exchanges Act 2020, Bates
22     Nos. FTX_3AC_000046107 -
       FTX_3AC_000046109
23
   Exhibit 7  June 2, 2020, email to Kyle Davies  104
24     from FTX OTC Portal, Bates
       No. 3AC-FTX-00536147
25
```

Page 5

```
 1          E X H I B I T S
 2 DEPOSITION            PAGE
 3 Exhibit 8  Declaration of Steven P. Coverick  155
       in Support of the FTX Recovery
 4     Trust's Objection to the Amended
       Proof of Claim Filed by Joint
 5     Liquidators of Three Arrows Capital
 6 Exhibit 9  FTX Liquidation Process Flowchart:  172
       FTX Research
 7
   Exhibit 10  Ftx-admin-activity: 06/13/2022,    191
 8     Bates Nos. THREE_ARROWS_00319561 -
       THREE_ARROWS_00319790
 9
   Exhibit 11  Short Message Report, Bates    197
10     Nos. FTX_3AC_000001594 -
       FTX_3AC_000001596
11
   Exhibit 12  Email chain with the most recent  203
12     email dated June 17, 2022, to
       Ryne Miller from Daniel Friedberg,
13     Bates Nos. FTX_3AC_000013568 -
       FTX_3AC_000013569 and two unnumbered
14     pages
15 Exhibit 13  Email chain with the most recent  207
       email dated June 17, 2022, to
16     Ryne Miller from Daniel Friedberg,
       Bates Nos. FTX_3AC_000013573 -
17     FTX_3AC_000013575
18 Exhibit 14  Ftx-dev:  07/05/2022, Bates    209
       Nos. THREE_ARROWS_00056952 -
19     THREE_ARROWS_00056970
20 Exhibit 15  United States of America v.    225
       Samuel Bankman-Fried "Verdict Form"
21
   Exhibit 16  United States of America v.    228
22     Samuel Bankman-Fried "Sentence"
23 Exhibit 17  United States of America v.    233
       Zixiao Gary Wang, et al. "Brief
24     For Defendant-Appellant"
25
```



Page 6

1            E X H I B I T S
2   DEPOSITION                    PAGE
3   Exhibit 18  United States of America v.   237
         Samuel Bankman-Fried "Exhibit C"
4
    Exhibit 19  United States of America v.   241
5        Samuel Bankman-Fried "Exhibit D"
6
7        PREVIOUSLY MARKED EXHIBITS
8   DEPOSITION                    PAGE
9   Exhibit 13  Complete Futures Specs, Bates   143
         Nos. FTX_3AC_000045026
10
    Exhibit 15  FTX Terms of Service, Bates    65
11       Nos. FTX_3AC_000013695 -
         FTX_3AC_000013756
12
    Exhibit 18  Spot Margin Trading Explainer,  108
13       Bates Nos. FTX_3AC_000045694 -
         FTX_3AC_000045712
14
    Exhibit 20  FTX Line of Credit, Bates     133
15       Nos. FTX_3AC_000000758 -
         FTX_3AC_000000763
16
    Exhibit 22  "Liquidations," Bates        163
17       Nos. FTX_3AC_000045167 -
         FTX_3AC_00004186
18
    Exhibit 39  Spreadsheet, Bates           93
19       No. Tackett_3AC_000000361
20
21
22        UNANSWERED QUESTIONS
23        PAGE   LINE
24            (None.)
25

Page 7

1        San Pedro, California; Thursday, October 16, 2025
2               7:58 a.m.
3
4        (SAMUEL BANKMAN-FRIED,
5        deponent, was sworn and examined
6        and testified as follows:)
7
8        (Let it be known that SAMUEL BANKMAN-FRIED
9   appeared before me on Thursday, October 16, 2025, at
10  1299 South Seaside Avenue, San Pedro, California.
11  Christopher R. Harris, Esq.; Erin Haley, Esq.;
12  Brian D. Glueckstein, Esq.; Christopher J. Dunne, Esq.;
13  and Jeremy D. Mishkin, Esq., appeared before me, and
14  the following record was made before Joanna B. Brown,
15  CSR No. 8570.)
16       THE REPORTER:  Would you raise your right
17  hand, please.
18       You do solemnly state, under penalty of
19  perjury, that the evidence you shall give in this
20  matter will be the truth, the whole truth, and nothing
21  but the truth?
22       THE WITNESS:  I do.
23            EXAMINATION
24  BY MR. HARRIS:
25   Q   Good morning, sir.  I'm Chris Harris from a

Page 8

1   law firm called Latham & Watkins, and we represent the
2   liquidators of Three Arrows Capital.  You've heard of
3   Three Arrows Capital?
4    A   Yes.
5    Q   Well, thank you for giving us the time.  We
6   have a dispute between FTX and Three Arrows about what
7   happened at FTX and what happened with the assets that
8   were at Three Arrows; and so that's why we are here, to
9   see if you have anything helpful to share with us.  So
10  let me just ask a few preliminary things just to make
11  sure I understand.
12       Have you ever been deposed before?
13   A   No.
14   Q   Okay.  So let me explain the ground rules.
15  The most important one is if I ask anything you don't
16  understand, can you just tell me, and I will -- it's my
17  job to come up with a clear question.  So let me know.
18       Your counsel might object.  If so, unless he
19  tells you otherwise, you should go ahead and answer.
20  He'll let you know if there is some reason not to.
21       We should try and not talk over each other, or
22  the court reporter won't be able to get it down.  So
23  I'll try to wait for you to finish your answers before
24  I ask you a question; and, likewise, you should wait
25  for me to finish before you answer.

Page 9

1        And the way it will go is I'll ask a series of
2   questions, and then, when I'm done, the lawyers for FTX
3   might ask you some questions as well, and that's sort
4   of the general process.
5        I'll also be showing you documents, and they
6   will be marked with stickers so we can identify what
7   they are.  So any questions about that?
8    A   Not as of now.
9    Q   Okay.  Is there any reason you can't testify
10  fully and truthfully today?
11   A   Many.
12   Q   Anything you'd like to share about why that
13  is?
14   A   It would be impossible for me to share all of
15  them.  If you'd like, I can give you one or two of
16  them --
17   Q   Sure.
18   A   -- but there are many I couldn't get to.
19   Q   Okay.
20   A   One example is I don't and for a while have
21  not had access to most of the relevant records; and so
22  there are going to be many questions that I could
23  quickly and efficiently answer were I to have such
24  access, would I have had when I was running the
25  company; but as of now, I will be unable to given

MAGNA ▶
LEGAL SERVICES

1  the -- that the context here does not call for
2  speculation but for confident answers. And we are
3  discussing events many years ago, and I have no ability
4  to go and do research on it. I'm sure there will be
5  many cases where I cannot give you a completely
6  confident answer.
7      Q   That's fair. And, again, we understand that,
8  and we are just trying to see what your memory is
9  today. And so if you don't remember, that's totally
10 fine; and if you would need to see documents to answer,
11 you can just point that out. So we are just here to do
12 our best given these circumstances.
13         Just to begin, when was the last time you
14 spoke to anyone at FTX?
15     A   I'm not sure what you mean by "at FTX."
16     Q   Anyone who is still employed by FTX or by the
17 FTX Recovery Trust.
18         MR. MISHKIN: Objection. Vague.
19         Go ahead.
20         THE WITNESS: I honestly don't know who is
21 employed by the trust.
22 BY MR. HARRIS:
23     Q   Do you know the last time you spoke to any of
24 the lawyers for FTX?
25         MR. MISHKIN: By that, you mean the current

1  lawyers for FTX?
2          MR. HARRIS: Yes. The current lawyers for FTX
3  after the bankruptcy, someone who represents FTX.
4          MR. MISHKIN: Right.
5          THE WITNESS: Are you referring to a
6  conversation or a whole dialogue with intermediaries
7  or --
8          MR. HARRIS: Either one.
9          MR. MISHKIN: Well, he's not going to testify
10 to what he said to his lawyers.
11 BY MR. HARRIS:
12     Q   I'm not looking for conversations with your
13 lawyers. I'm looking for conversations with FTX after
14 the bankruptcy.
15         When was the last time you remember that
16 happening?
17     A   I can't recall ever having had a casual
18 conversation rather than a legal one with them after
19 the bankruptcy filing. I'm not entirely sure that that
20 is what the scope of your question is, but I can't
21 recall any incidents that are consistent with my best
22 guess at interpreting it.
23     Q   Okay. Did you do anything to prepare for
24 today's deposition?
25         MR. MISHKIN: Other than talking to counsel?

1  BY MR. HARRIS:
2      Q   Well, if the answer is talking to counsel,
3  that would be the answer.
4      A   I -- other than talking to counsel and
5  thinking and things like that and asking questions
6  about how depositions work, no.
7      Q   Okay. How long would you say you've -- and I
8  don't want to know what you said with your counsel, but
9  just how long do you think you spent with your counsel
10 this morning?
11     A   An hour.
12     Q   Just a couple of terms I'm going to use that
13 you probably are familiar with. I'm going to be
14 talking about FTX, and by that, I'm talking about
15 FTX Trading Limited and its affiliates.
16         Does that term make sense to you?
17     A   No. There's a time where "yes" would have
18 been the answer.
19     Q   Okay.
20     A   It's been twisted by so many people since
21 then. Would you be including Alameda Research if you
22 say "FTX"?
23     Q   I will not be.
24     A   All right. Would you be including the debtors
25 as an entity?

1      Q   No, because my questions are all going to be
2  before the bankruptcy filing.
3      A   All right. FTX U.S. or FTX International or
4  both?
5      Q   Both.
6      A   And you are aware that there is -- well, there
7  was a point at which they were separate chains of
8  companies.
9      Q   Yes. So if I ask the question and you think
10 you need to break it up, just please let me know, and
11 we'll break it up to make it clearer.
12     A   Understood.
13     Q   And Three Arrows, I might say "3AC" sometimes.
14 I'm talking about Three Arrows Capital.
15         You said you are familiar with that company?
16     A   Not the details of it, but yes.
17     Q   Okay. Okay. I'm going to start just by
18 asking some general questions about how FTX operated,
19 and later on, I'll ask you questions about Three Arrows
20 to see what you knew about it.
21         So, first off, policies, were you involved in
22 helping design FTX's policies?
23         MR. MISHKIN: Objection. Vague as to what
24 "involved" means.
25         THE WITNESS: I agree.

MAGNA
LEGAL SERVICES

BY MR. HARRIS:

1   Q   Did FTX have policies?

2   A   Yes.

3   Q   What kind of policies do you have in mind?

4   A   There were many.  We had -- I could start
listing random policies, but I don't think that would
be helpful here, necessarily.

5   Q   Maybe just some examples would be helpful.

6   A   There are varying levels of formality of
policies, for instance -- and this is sort of a
clarification question; right? --

7   Q   Okay.

8   A   -- if I were to post internally -- if I were
to post on a Slack channel "Hey, guys, I'm concerned
that we are not being efficient enough at processing
this type of application.  So please communicate
clearly when you've completed your review of an
application so that we make sure that none fall through
the crack," would that be considered a policy of FTX's
if I was the CEO, or are you referring to documents
signed by legal counsel or what?

9   Q   It would be helpful for me to just hear the
possible things that, I guess, might be a possibility,
not all messages like Slack messages or something else.

10   A   Yep.

1   Q   What else comes to mind that might be an
operative policy?

2   A   So taking certain bribes -- without
necessarily endorsing the phrase "operative policy," I
don't want to be imputed to, you know, have said that
any of these things meant any particular level of that;
but, rather, listing things that I could imagine being
responsive to a certain broader version of that query,
there are things like what I just talked about --
right? -- messages from a manager to people they are
managing or to others at the company with suggestions
or directions.

        Those could have come over a variety of
formats.  A Slack message would be one way it could
have been delivered, but there are others.  That would
be one type of policy, or I don't know if you want to
call it "policy," but whatever.

3   Q   Kind of direction?

4   A   A direction of some sort.

        There were examples of explainers that we
posted online.  Many of those were on either Zendesk or
later the FTX Help section or on the trading pages or
on other parts of the website.  There were documents
that lawyers signed off on.  There were communications
with entities like auditors, and I'm not sure exactly

1   what from those would fall under this banner.

2   Q   Okay.

3   A   I'm sure there are other, sort of, things like
there were various terms of service and other similar
documents.

4   Q   Okay.

5   A   I'm sure there are a lot of other things that
could potentially fall under this heading.

6   Q   Okay.  I've also seen something called
"Key Principles."  Are you familiar with that document?

        That's actually one of your congressional
testimonies.

        MR. GLUECKSTEIN:  Object to the form.

        THE WITNESS:  Excuse me.  What?

        MR. GLUECKSTEIN:  Object to the form.

        MR. MISHKIN:  There was an objection to the
question.  Go ahead.  You can answer if you can.

        THE WITNESS:  I am aware of the existence of a
set of documents that were sometimes referred to as
that without saying that I'm aware of the details of
all of them or anything like that.

BY MR. HARRIS:

7   Q   Sure.  Okay.  Just to walk through some of
those, were you involved helping draft the explainers?

        MR. GLUECKSTEIN:  Objection to the form.

1        MR. MISHKIN:  Objection to the use of the word
"involved," but go ahead.

2        THE WITNESS:  Some of them in varying ways,
others less so or not at all.

3   BY MR. HARRIS:

4   Q   Did you have any role in helping prepare the
terms of service?

5   A   Any role is quite vague of a statement.

6   Q   Did you review them before they were
finalized?

7   A   Which terms of service?

8   Q   The terms of service for the trading platform.

9   A   The trading platform, are you referring to --
there are still a number of documents that could be
described as such.

10   Q   Okay.  Why don't I hold that question.

11   A   Yeah.

12   Q   I'll show you the document, and then I'll ask
you that way.

13   A   All right.

14   Q   Let me -- why don't I start with the
"Key Principles."  I mentioned it to you.  So why don't
I show it to you.  Okay.

        So how this is going to work, I give the court
reporter a document.  She puts a sticker on it, and

MAGNA
LEGAL SERVICES

1  then she gives it to you.  And that's our exhibit.
2  Everyone gets copies.
3       (Deposition Exhibit 1 was marked for
4       identification and is attached hereto.)
5  BY MR. HARRIS:
6    Q   Okay.  So you've been handed a document that
7  has a sticker on it, Exhibit 1.  It's marked Exhibit 1.
8  It says at the top "Testimony of Sam Bankman-Fried"
9  before a U.S. Senate hearing.  I'm not going to ask you
10 all about it, but there's an attachment to it that I
11 did want to ask you about on page 29.  It starts on page 29.  It
12 says "Exhibit C."  It's called "FTX's Key Principles
13 for Ensuring Investor Protections on Digital-Asset
14 Platforms."
15      Do you remember that document at all?
16   A   I remember what this is.
17   Q   Did you help prepare this?
18   A   "Help" is a vague word.  I believe I was made
19 aware of its existence and had some conversations that
20 may have led to the drafting of some parts of it but
21 was not deeply involved in all parts of it.
22   Q   Okay.  Okay.  My question is going to be on a
23 particular part.  If you go to page 33 -- well, let me
24 just say, this, the document, the "Key Principles," was
25 this available publicly somehow.  So, like, FTX's

1  customers could see it.
2    A   At what point in time?
3    Q   While the Exchange was operating.
4    A   I'm not sure.  It may have been made public at
5  some point.  If so, I'm not sure when or where.
6    Q   Okay.  All right.  So, at the bottom of that
7  page, there's a section No. 3.  It's called "Ensuring
8  Appropriate Ledgering and Disclosures of Assets to
9  Protect Against Misuse."
10      Do you see that?
11   A   Yes.
12   Q   Okay.  So my question is going to be about a
13 couple of statements under that Principle No. 3.
14      The top paragraph, do you see it starts
15 "Another key investor-protection principle"?
16   A   Okay.
17   Q   Do you see that the last sentence in that
18 paragraph says "The basic concept here is that there
19 should be controls in place to ensure the custodian has
20 books and records that keep track of and identify which
21 customer owns what...."
22      Do you see that, sir?
23   A   Sorry.  Repeat what you said.
24   Q   Yeah.  So the last sentence in this top
25 paragraph says "The basic concept here" --

1    A   Oh, okay.
2    Q   -- "is that there should be controls in place
3  to ensure the custodian has books and records that keep
4  track of and identify which customer owns what...."
5    A   I see that sentence.
6    Q   Okay.  And so the custodian that's referred to
7  there is FTX; right?
8    A   I don't believe so.
9    Q   Okay.  Some other entity, you think, is being
10 referred to or it's being referred to all digital
11 exchanges?
12      MR. MISHKIN:  Objection.  Vague as to the
13 question.
14      THE WITNESS:  This document was, in large
15 part, a set of prospective policies that a regulator
16 might attempt to enact for the digital ecosystem as a
17 whole.  I don't believe that I personally wrote that
18 sentence.  So I can't comment on the intent --
19   Q   Okay.
20   A   -- of whoever did; but my reading of it is
21 that it is written as a hypothetical to a regulator
22 regime that did not exist at the time and how a
23 regulator might think about creating such a regime to
24 do with custodians as a general matter.
25   Q   Okay.  All right.  Well, let's focus on FTX,

1  then.  So, if you can, look at the next sentence.
2    A   All right.
3    Q   It says:  "In keeping with this principle, FTX
4  provides a user experience that enables any user to
5  easily view account balances for all assets, for all of
6  its platforms, in real time."
7       Do you see that?
8    A   I see that.
9    Q   Okay.  And then it says:  "By logging in to
10 the customer's account of FTX, the customer can
11 immediately view the types of assets they own held in
12 custody by FTX."
13      Do you see that?
14   A   I see that.
15   Q   Okay.  And is that an accurate statement, that
16 the customer, by logging in to their account, could
17 view the types of assets they own?
18      MR. MISHKIN:  At what point in time?
19      MR. HARRIS:  While the exchange was in
20 operation.
21      THE WITNESS:  I think it had varying levels of
22 clarity for different platforms and for different parts
23 of the platform, in particular FTX U.S. versus FTX
24 International, looking at spot versus margin trading
25 and other parts of it.  I think that -- well, I'll



1  leave it at that for now.
2  BY MR. HARRIS:
3    Q    Okay.  For spot trading, is it accurate that
4  the customer could view the types of assets they own?
5    A    They could easily view their account balances.
6  You'll have to define what it means to own something
7  and for it to be held in custody for me to say whether
8  that is how I would phrase that.
9    Q    Well, when you were the CEO of FTX, did you
10 view the customers' assets as assets that they owned?
11       MR. MISHKIN:  Objection.  Form.
12       THE WITNESS:  What do you mean by "owned"?
13 BY MR. HARRIS:
14   Q    There's various legal definitions.  I'm just
15 trying to get -- see what your understanding was.  That
16 word is in a lot of FTX documents, and I'm just trying
17 to see what you understood, sir.
18   A    I understood that as a general matter, putting
19 aside -- for many -- in many cases at least, that the
20 customer could view the -- effectively the debts of
21 some platform, the platform varying depending on which
22 one they are accessing to that customer, broken down by
23 type of assets, potentially, with debts from that
24 customer to the platform.  I think, to give you a more
25 competent answer, I would need to know, if you take out

1  a mortgage on the house, do you own that house, for
2  instance?  Their definition is easier.
3    Q    Okay.  Do you agree with the statement "their
4  assets were held in the custody of FTX"?
5        MR. MISHKIN:  Objection.  He's just told you
6  there are many different variations.  I'm not sure
7  that's a fair follow-up question.
8        You can answer to the extent you are able.
9        THE WITNESS:  For some types of assets and
10 some platforms, they weren't ambiguously held.  Well,
11 no, I don't even -- "custody" is a word that has so
12 many different definitions.  In some cases, it refers
13 to, for instance, a qualified custodian under U.S.
14 regulatory rules.  In other contexts, it might refer to
15 a different regime in different countries.  I can't
16 answer that without knowing what you mean by the word
17 "custody."
18 BY MR. HARRIS:
19   Q    Okay.  Why don't we -- we'll get back to that.
20 I'll show you some of the, kind of, legal documents and
21 see if you understand it in that context.
22       I assume, by providing this information to
23 Congress, you were doing your best to be truthful and
24 accurate; right?
25   A    Yes.

1    Q    And you wouldn't have knowingly provided a
2  false statement to Congress; right?
3    A    That's correct.
4    Q    So by providing this information, talking
5  about the assets, the customer billing held in custody
6  by FTX, that was your best effort to provide
7  information to Congress; right?
8        MR. MISHKIN:  Objection.  Form.  I think it's
9  a mischaracterization.  He just explained it to you,
10 but he can answer it.
11       MR. HARRIS:  I know you are not meaning to,
12 but you are supposed to just limit your objections to
13 object to the form.  You are not supposed to give the
14 explanation of your objection.
15       MR. MISHKIN:  I'll represent my client as I
16 need to.
17       THE WITNESS:  I believe that, at a high level,
18 the document would be helpful and was not aware of any
19 specific parts of it at the time which I thought were
20 false.
21 BY MR. HARRIS:
22   Q    Going on to the explainers, what do you mean
23 by that term?
24   A    There are a number of different things it
25 could have meant.  The help pages would be one example

1  of such a thing, but there were also sometimes pop-ups
2  on the website and other things that could potentially
3  fall under that category.
4    Q    Are Three Arrows documents that were generally
5  provided to the customers to help them understand the
6  operation of the Exchange?
7    A    Often.
8    Q    Were they generally made available to
9  customers?
10   A    Are you drawing some distinction between that
11 question and the previous?
12   Q    Not really.  I'm just trying to see if
13 customers could see them or not.
14   A    Often.
15   Q    Are there explainers that were not available
16 for customers?
17   A    I'm not sure exactly what you mean by
18 "explainers."  We had explainers for staff members, for
19 instance, which would explain how they were supposed to
20 perform certain duties or how certain interior parts of
21 the Exchange might operate or something like that.
22   Q    Are you aware of any explainers that were
23 available internally that were inconsistent with the
24 public statements that were made to customers?
25       MR. MISHKIN:  Objection.  Form.



1     THE WITNESS: Not intentionally so.
2   BY MR. HARRIS:
3     Q   A couple of other background topics:
4   financial statements, FTX prepared financial
5   statements; right?
6     A   Yes.
7     Q   What was the purpose of preparing them?
8     MR. MISHKIN: Objection. Form.
9     THE WITNESS: The purpose of -- there are
10  multiple things that could fall under that category.
11  As one example, we had annual financial audits by
12  third-party accounting -- or auditing firms, the
13  purpose of which was to have completed our GAAP audits,
14  which was information which, I believe, was desired by
15  various parties, internal and external. But there
16  might be other statements as well that you are
17  referring to. I'm not sure.
18  BY MR. HARRIS:
19    Q   And who were the auditing firms that FTX used?
20    A   Internationally, Prager and Metis.
21  Domestically, in the United States, I can't recall.
22    Q   I saw the name Robert Lee & Associates.
23        Was that an audit firm, or was that
24  accountants that helped FTX?
25    A   Accounting firm.

1     Q   Okay. So Robert Lee helped FTX prepare the
2   financial statements or helped with other accounting
3   issues?
4     MR. MISHKIN: Objection. Form.
5     THE WITNESS: The organization Robert Lee
6   rather than the person, I presume, you mean?
7   BY MR. HARRIS:
8     Q   Yes.
9     A   They helped with various accounting issues. I
10  can't competently recall exactly which ones those were.
11    Q   In the 2022 time period, did FTX also have an
12  internal finance department?
13    A   You are going to have to be more specific when
14  you say "FTX." There were departments like that; but
15  it's worth noting that there were -- there's FTX
16  International. There's FTX U.S. To some extent, there
17  are even separate functions necessary for subsidiaries
18  or affiliates of FTX International.
19    Q   Okay.
20    A   There's also Alameda, which, I presume, you
21  are not including here.
22    Q   Correct.
23    A   So, I mean, I think, effectively, the answer
24  is, yes, there were finance departments.
25    Q   So were there accountants at some FTX entities

1   that prepared the financial statements?
2     A   There were accountants at some FTX entities
3   that prepared some financial statements. I don't know
4   what you mean by the "financial statements."
5     Q   Okay. And I believe you said for the FTX
6   International, Prager and Metis audited the financial
7   statements?
8     A   They performed an audit.
9     Q   Okay. And FTX U.S. also had audited financial
10  statements?
11    A   Yes.
12    Q   Did you have any role in preparing the
13  financial statements either for FTX U.S. or FTX
14  International?
15    A   "Any role" is quite vague. I was CEO.
16    Q   Did you review them before they were
17  finalized?
18    A   Review what?
19    Q   The draft financial statements.
20    A   I certainly reviewed parts of them. I'm not
21  sure that -- the draft financial statements is an
22  unambiguous concept, but I believe I reviewed, in some
23  cases, at least things that could be described as such.
24    Q   Are you familiar with what a balance sheet is?
25    A   At a high level, yes.

1     Q   Are you aware that the balance sheets for
2   FTX International and FTX U.S. did not include the
3   customers' assets on those balance sheets?
4     MR. MISHKIN: Objection. Form.
5     MR. GLUECKSTEIN: Object to the form.
6     THE WITNESS: I'm not sure how you are
7   defining the "customers' assets."
8   BY MR. HARRIS:
9     Q   Okay. Well, say I opened up an account at
10  FTX.
11    A   All right.
12    Q   I deposited some U.S. dollars. I used it to
13  buy bitcoin. Are you aware that FTX's balance sheets
14  did not include the bitcoin I bought on FTX's balance
15  sheet?
16    MR. GLUECKSTEIN: Object to the form.
17    THE WITNESS: In many cases and at a high
18  level, I'm aware of what you are talking about; but
19  there are a lot of complications and nuance, some of
20  which I'm not aware of or don't know the details
21  involved with that.
22  BY MR. HARRIS:
23    Q   Are you aware of any instance in which a
24  digital asset that an FTX customer bought on the
25  Exchange was included on FTX's own balance sheet?

1    MR. MISHKIN:  Objection to form.
2    MR. GLUECKSTEIN:  Object to the form.
3    THE WITNESS:  Can you please repeat the
4  question.
5    MR. HARRIS:  Sure.
6    Would you read it back, please.
7    (The record was read as follows:  "Are
8    you aware of any instance in which a
9    digital asset that an FTX customer
10    bought on the Exchange was included
11    on FTX's own balance sheet?")
12    THE WITNESS:  I'm not sure.  Maybe.
13  BY MR. HARRIS:
14    Q   Is there a particular instance you have in
15  mind when you say "maybe"?
16    MR. MISHKIN:  Objection.  Form.
17    THE WITNESS:  There are a few.
18  BY MR. HARRIS:
19    Q   What are you thinking of?
20    A   This is not going to be an exhaustive list.
21  This is going to be only what I can think of off the
22  top of my head.  There may well be other things that I
23  could recall but have not right now.  To start off
24  with, I'm not sure exactly what you mean by "included
25  on the balance sheet."  If there were, for instance,

1  notes on the balance sheet that referenced certain
2  things, I don't know whether that would be included.
3    Q   I don't mean a reference in the notes of the
4  balance sheet.  I mean in an actual line item in the
5  balance sheet if that helps.
6    A   I'm not sure exactly what appears as a line
7  item on the balance sheet; but if you looked at, for
8  instance, U.S. dollar transactions that then became
9  fungible with stablecoin transactions -- and I'm not
10  sure if stablecoins are being included as digital
11  assets in your mind or stablecoin transactions that
12  would then become fungible with U.S. dollar
13  transactions -- various -- I believe that various
14  consequences of those might impact -- have impacted the
15  balance sheet in one way or another with respect to
16  either assets or liabilities depending on the details.
17    There may have been something involving
18  finances, investment, and BNB tokens early on.  I'm not
19  sure there was on one of the balance sheets, but that's
20  an example of something that may have been.
21    There may have been line items that referenced
22  pending deposits or gas fees, both of which could
23  impact digital assets.  There may be others as well.
24    Q   All right.  Why don't we look at a particular
25  financial statement.  That might be easier.

1    MR. MISHKIN:  Are we done with Exhibit 1?
2    MR. HARRIS:  Yes.
3    (Deposition Exhibit 2 was marked for
4    identification and is attached hereto.)
5  BY MR. HARRIS:
6    Q   Okay.  You've been handed what's marked
7  Exhibit 2, and it's an email from Ruben Pekary, who
8  apparently works at Robert Lee & Associates, and it's
9  to a group that included Jayesh Peswani.
10    Do you remember Ruben Peswani?
11    Is that name familiar to you?
12    A   I -- yes.
13    Q   Do you remember that he worked at Robert Lee &
14  Associates, the accounting firm you mentioned?
15    A   Yes.
16    Q   And who is Jayesh Peswani?
17    A   He worked at FTX on financial matters.
18    Q   Okay.  And do you see Mr. Pekary's email?
19  It says "Please see attached for 2021 financials as of
20  Q2."
21    Do you see that?
22    A   I see that.
23    Q   Okay.  And then, in his email further down on
24  the page, he says [as read] "In the master expense file
25  I noticed that we had approximately 8 million in an

1  account called 'negative_account_balance' for the
2  purposes of zero'ing out negative accounts."
3    Do you see that?
4    A   Yes.
5    Q   Do you recall what a negative account balance
6  was, that term, what it meant?
7    MR. MISHKIN:  Objection.  Form.
8    THE WITNESS:  At a high level.
9  BY MR. HARRIS:
10    Q   And what's that?
11    A   In this context -- let me read it.
12    I can't confidently say what he's talking
13  about.
14    Q   Okay.  Do you recall generally that FTX did
15  not allow users to have negative account balances?
16    MR. MISHKIN:  Objection.  Form.
17    THE WITNESS:  What do you mean by a "negative
18  account balance"?
19  BY MR. HARRIS:
20    Q   That if you summed all of the assets that they
21  owned and liabilities, positive and negative, that the
22  net number of all of those combined needed to be above
23  zero?
24    A   In many cases, yes.
25    Q   Do you think it's referring to that there was

1  some, I guess, small number of accounts that had a
2  negative account balance?
3        MR. MISHKIN:  Objection.  Form.  Foundation.
4        THE WITNESS:  That seems like a good guess.
5  BY MR. HARRIS:
6    Q   Okay.  So the email had, like, three
7  attachments.  I just wanted to show a couple of them to
8  you because they are financial statements as of Q2
9  2001.  So can we look at 2B.
10        MR. MISHKIN:  What are you marking this as?
11        MR. HARRIS:  I think it's 3.
12        (Deposition Exhibit 3 was marked for
13        identification and is attached hereto.)
14  BY MR. HARRIS:
15    Q   Okay.  So we are marking this as Exhibit 2B --
16  I'm sorry -- 3, which is an attachment to Exhibit 2,
17  and it's called "FTX Trading, Ltd, Profit and Loss
18  January - June 2021."
19        And let me know when you've had a chance to
20  look at it.  I'm sure you don't remember all of these
21  numbers, but do you remember this general form of a
22  profit and loss statement for FTX?
23    A   It looks vaguely familiar.
24    Q   So -- and who would have prepared these for
25  FTX?

1        Would it have been Robert Lee & Associates, or
2  would it have been an internal accountant at FTX?
3        MR. MISHKIN:  Objection.  Form.
4        THE WITNESS:  I'm not sure.
5  BY MR. HARRIS:
6    Q   You see there's a section called "Income"?
7  And the first item under it -- I'm actually looking on
8  page 1.  Yeah.  And the first item under it is called
9  "Backstop fund revenue."
10        Do you see that?
11    A   Yes.
12    Q   The backstop fund, is that a reference to
13  what's also called the "insurance fund" sometimes?
14    A   I believe so.
15    Q   And how did the insurance fund end up
16  generating -- or the backstop fund end up generating
17  revenue?
18        MR. MISHKIN:  Objection.  Form.
19        THE WITNESS:  As a general matter, the
20  backstop fund would sometimes gain or lose funds as a
21  result of liquidating.  There may be other things that
22  impacted it as well.  I can't recall all of them.
23  BY MR. HARRIS:
24    Q   If you look further down, there's a section
25  called "Trading Expenses," and there's a line item

1  "Backstop fund expense."
2        Do you see that?
3    A   Yes.
4    Q   So is that referencing when the backstop or
5  insurance fund would lose money in a liquidation like
6  you mentioned?
7    A   That seems like a reasonable guess, but I
8  don't recall seeing this particular document before.
9    Q   So how is it that the backstop fund would lose
10  money in a liquidation?
11        Explain how that would happen.
12        MR. MISHKIN:  Objection.  Form.
13        THE WITNESS:  This answer may have changed in
14  some ways over time, and I can't give an exhaustive
15  answer to that.  One example of such a thing that might
16  have been able to do it at some points in time would
17  have been if there was an account which was liquidated
18  in such a way that it ended up with a net loss that
19  there was no way to be compensated or covered by that
20  or related entities or any other mechanism being placed
21  and, as such, some other party, maybe FTX, might have
22  been required to.
23  BY MR. HARRIS:
24    Q   So when you say an account was liquidated,
25  what does that mean?

1    A   It can mean various things, and I'm not sure
2  that it actually requires -- necessarily requires
3  liquidation.  There may be other circumstances that
4  could do this as well, but when an account -- I'm not
5  sure exactly -- sorry -- how you are defining this, and
6  I don't know the interaction, as a definitional matter,
7  between this and an account that would end up negative
8  for some other reason and in some other way.
9        But -- but if -- in some cases, if an account
10  ended up -- if a party ended up with negative net value
11  and no realistic way for that to change, then it could
12  cause a loss to some party, potentially FTX,
13  potentially.
14    Q   Were there, like, rules on when that loss
15  would be absorbed by FTX as opposed to some other party
16  other than the customer?
17        MR. MISHKIN:  Objection to form.
18        MR. GLUECKSTEIN:  Objection to form.
19        THE WITNESS:  Can you -- I missed the word at
20  the end of that question.
21  BY MR. HARRIS:
22    Q   Sure.  So we were talking about an instance
23  where --
24    A   Yep.
25    Q   -- there's a loss --

1    A    Yep.
2    Q    -- and the customer can't absorb it.
3    A    Yep.
4    Q    And you mentioned, then, therefore, it could
5  be absorbed by FTX --
6    A    Yep.
7    Q    -- or someone else.
8    A    Yep.
9    Q    So I'm wondering if there's a rule that would
10  determine whether FTX would absorb that loss or some
11  other entity or entities.
12    A    There were a lot of definitional issues in
13  that.  In some cases, yes, and in some ways, yes.
14  However, the definition of what is a loss to begin
15  with.  I'm not sure what you are using when there are
16  assets.  These prices are changing in realtime, and
17  there are cases where a party might take on a position
18  which might or might not be a loss, and I don't know
19  how that would interact with your question.
20    Q    All right.  I'll come back to this, and maybe
21  we'll walk through some of the liquidation documents.
22    A    All right.
23    Q    Maybe that will clear the way.  Let me just
24  ask you this:  Do you see -- if you look at the
25  "Backstop fund expense" line item here --

1    A    Yep.
2    Q    -- it looks like the expenses for April and
3  May are in the 5 to $6 million range.
4    A    I see that.
5    Q    Any memory of what was causing those expenses
6  in this time period?
7    A    Market volatility.
8    Q    And how would market volatility cause the
9  backstop fund to take an expense?
10    A    One example of such a thing could be if there
11  is an account that had a leveraged position on it, then
12  market volatility could lead to a significant change in
13  the net value of that account and could potentially
14  lead to a net negative value with nothing that could
15  cover it.
16    Q    Just a couple other line items I wanted to ask
17  you about.  Up on top, on the "Income" portion, the
18  sixth item is "Future fill fees."
19        Do you see that?
20    A    Yes.
21    Q    And it looks like, for the first half of the
22  year, it was 293 million.
23        Do you see that?
24    A    Uh-huh.
25    Q    What are future fill fees?

1    A    In general, they are the fees that FTX as a
2  company charged and made on trades of futures.
3    Q    And that was FTX's largest source of income;
4  is that right?
5    A    Yes.
6    Q    So, generally, the larger the volume of
7  futures trades, the larger income FTX would have?
8        MR. MISHKIN:  Objection.  Form.
9        THE WITNESS:  All else equal, obviously, yes.
10  BY MR. HARRIS:
11    Q    Did FTX ever trade against the user's futures
12  positions?
13        MR. MISHKIN:  Objection.  Form.  Foundation.
14        THE WITNESS:  FTX acted as an intermediary for
15  many trades.  I'm not sure I can recall a situation off
16  the top of my head where it acted in a role that wasn't
17  as an intermediary of some sort, but I'm not sure I'm
18  thinking exhaustively there.
19  BY MR. HARRIS:
20    Q    You don't remember an instance where FTX was
21  doing proprietary trading against a user's futures
22  positions?
23        MR. MISHKIN:  Objection.  Form.  Foundation.
24        THE WITNESS:  That's correct.  I don't.
25  ///

1  BY MR. HARRIS:
2    Q    I think the next largest "Income" line item is
3  "Spot fill fees."
4        Do you see that one, which is about
5  50 million?
6    A    I see that.
7    Q    What were "spot fill fees"?
8    A    Fees that FTX would charge on trades of spot
9  assets.
10    Q    And then right above that is a line item
11  "OTC Portal."
12    A    Yep.
13    Q    What was the "OTC Portal"?
14    A    A facility where users could do OTC trading --
15  "over the counter" is what it stands for -- generally
16  referred, though not always, to larger transactions.
17    Q    And what role would FTX play if users were
18  doing over-the-counter trading?
19    A    As a general matter, it was an intermediary
20  and charged a fee and a private platform.
21    Q    So it custodied those assets as well that were
22  transacted through the OTC Portal?
23        MR. MISHKIN:  Objection.  Form.  Foundation.
24        THE WITNESS:  It may have played a role in
25  custodying them, so many parties to potential

MAGNA >
LEGAL SERVICES

1  transactions.
2  BY MR. HARRIS:
3      Q   So if an FTX customer acquired a digital asset
4  through the OTC Portal, would that be held in FTX's
5  wallets?
6          MR. MISHKIN:  Objection.  Form.
7          THE WITNESS:  I'm not sure.
8          MR. HARRIS:  Are we done with these?
9          MR. HARRIS:  Yes.  I'm going to show you
10  another exhibit.  We are done with that one.
11         (Deposition Exhibit 4 was marked for
12         identification and is attached hereto.)
13  BY MR. HARRIS:
14     Q   Okay.  You've been handed Exhibit 4, which is
15  another attachment to Exhibit 2.  This one is called
16  "FTX Trading, Ltd, Balance Sheet As of June 30, 2021."
17         Let me know when you've had a chance to look
18  at it.
19     A   I've had a chance to look at it, not obviously
20  to read it in detail.
21     Q   And just, again, generally, does this look
22  like the form of the kind of balance sheets that FTX
23  prepared?
24     A   It looks similar to the form of various
25  internal documents that I would sometimes interact with

1  that would sometimes be prepared.
2      Q   Okay.  I've been asking you questions about
3  balance sheets, and you were understandably saying it's
4  hard to answer.  So I want to show you it's an actual
5  one, and maybe this will make this easier to answer,
6  but you'll let me know.  So, if you look at page 1,
7  there's an "ASSETS" section.
8          Do you see that?
9      A   I do.
10     Q   Okay.  And if you look under "Other Current
11  Assets," there's a line item for "Digital Assets."
12         Do you see that?
13     A   I see that.
14     Q   Okay.  And you see the amount started at
15  37 million in January of 2021 and went up to
16  403 million -- I'm sorry -- went up to 414 million as
17  of June 2021?
18         Do you see that?
19     A   I see that.
20     Q   So this line item for "Digital Assets," did
21  that line item include the assets of FTX's customers,
22  or are those -- is this line item the assets that FTX
23  itself owns?
24         MR. MISHKIN:  Objection.  Form.  Foundation.
25         THE WITNESS:  I can speculate, but I didn't

1  write this document.
2  BY MR. HARRIS:
3      Q   Well, what do you think, then?
4          MR. MISHKIN:  Objection.  Are you asking him
5  to speculate?  I want to make it clear.
6          MR. HARRIS:  He was the CEO of FTX.
7          MR. MISHKIN:  He just told you he had to
8  speculate.  Do you want him to speculate?
9          MR. HARRIS:  Yes, I want him -- his best.
10         MR. MISHKIN:  As long as you make it clear
11  that he's speculating.
12  BY MR. HARRIS:
13     Q   So based on the numbers here and your
14  understanding of how FTX operated, do you believe this
15  line item included the assets owned by FTX's customers?
16         MR. MISHKIN:  Objection.  Form and foundation.
17         THE WITNESS:  I'm not sure what this document
18  is.  I'm not sure if -- this was not a final financial
19  statement that was audited, obviously.  This is an
20  internal draft.  I'm not sure exactly what they are
21  referring to with this label.
22  BY MR. HARRIS:
23     Q   Just to be clear, there were audited final
24  financial statements for FTX Trading, Ltd; is that
25  right?

1      A   Yes, that's correct.
2      Q   And there were also audited financial
3  statements for FTX U.S.; right?
4      A   That's correct.
5      Q   If this line item is only talking about FTX's
6  own proprietary digital assets, do you have an
7  understanding why that amount would have increased so
8  much from January to June in 2021?
9          MR. MISHKIN:  Objection to form.
10         THE WITNESS:  Let me give you an example of
11  such a thing that could have caused something like
12  this.  I'm not saying that's what this is, but as an
13  example, there was a finance investment that was made
14  in FTX that involved the token BNB.  That token's value
15  would change over time.  I'm not sure if that's what
16  this line is referring to.
17  BY MR. HARRIS:
18     Q   It's possible finance, you are saying, paid
19  for its investment by providing that token?
20     A   Well, it didn't pay for its finance by
21  providing a token.  I'm not sure if that's what this
22  line is referring to or not.
23     Q   Okay.
24     A   But that's an example of such a thing for
25  there to cause there to be -- there are multiple line

MAGNA ▶
LEGAL SERVICES

1  items that reference that in here, and I'm not sure
2  whether or not this is one of them because this -- if
3  there were labels and descriptions of these, it
4  certainly is not included on this printout that I have
5  here, and this is not what the final balance sheets
6  look like.  This was an internal working draft that I
7  don't think I was shown.
8      Q   Okay.  That's helpful.  Let me ask another
9  possibility.
10     Did FTX ever, in the liquidation process, take
11 over the accounts of a customer whose account had gone
12 negative and needed to be liquidated?
13     MR. MISHKIN:  Objection.  Form.
14     THE WITNESS:  Let me give you what I think
15 will answer the question you are asking, but you can
16 tell me if I have incorrectly interpreted your
17 question.
18     MR. HARRIS:  Okay.
19     THE WITNESS:  To my -- to my memory, I'm not
20 aware of a case where FTX, as part of such a process,
21 excluding, however you want to describe what happened,
22 beginning in November 2022.
23 BY MR. HARRIS:
24     Q   I'll tell you this.
25     A   Yep.

1      Q   All of my questions, you can --
2      A   Assume so?
3      Q   -- assume we are talking about before
4  November 2022.
5      A   That is good to know.  I cannot think of a
6  case where FTX did other than taking over the old net
7  asset value of a liquidating account.  In other words,
8  I cannot recall a case right now where it took over,
9  other than as an intermediary, positions of actively
10 changing value.
11     Q   When you say "other than as an intermediary,"
12 you mean other than to pass along to some other entity?
13     A   That's correct.
14     Q   To make sure I understand, you don't remember
15 an instance where FTX acquired the assets of a customer
16 and then held them?
17     MR. MISHKIN:  Objection.  Form.
18     THE WITNESS:  As part of a -- something like
19 the liquidation process, I presume, you mean?
20     MR. HARRIS:  Yes.
21     THE WITNESS:  Yeah, I cannot recall such a
22 case.
23     MR. HARRIS:  Okay.  A couple other background
24 topics.
25     MR. MISHKIN:  Are we done with this exhibit?

1      MR. HARRIS:  Yes.
2      MR. MISHKIN:  I'm just trying to keep it
3  clean.
4      MR. HARRIS:  Thank you.  Yes.
5  BY MR. HARRIS:
6      Q   And I know some of these questions will sound
7  dumb.  We are in a strange situation where
8  Three Arrows, we have no employees left, and so there's
9  no one at the company -- there is no one left who can
10 tell us how --
11     A   I understand.
12     Q   -- things worked.  So I'm asking questions
13 that I'm sure will sound nonsensical.
14     A   It may not be helpful.
15     Q   Sure.
16     A   But just to say it, I think there are a lot of
17 times where the questions are quite broad and vague.
18 And a lot of my hesitance in answering them is that
19 there are so many ways that they could be interpreted
20 and so many cases that they might or might not include,
21 that it's difficult for me to give blanket statements.
22     And my impression is this is a forum where you
23 are not looking for -- where I need to ensure that, as
24 best I can, that even in all technicalities and
25 educations, the statements I'm making are correct, and

1  that leads to a lot of my, sort of, "It depends"-type
2  answers, but I think there are cases where maybe, in
3  this -- to the extent your goal is actually to figure
4  out what happened with respect to Three Arrows, there
5  are more specific questions that I could give you
6  cleaner answers.
7      Q   Okay.  That's fair, and I don't want you to
8  say something that's not accurate.
9      A   Yep.
10     Q   So you should continue to answer the way --
11     A   Yep.
12     Q   -- it is accurate.  If you have suggestions on
13 a better question, I'm always open for them.
14     A   I understand.
15     Q   So please go ahead.
16     A   I understand.
17     Q   Okay.  So here's my question:  So when an FTX
18 customer has an account, I assume they have some sort
19 of login and password they use to access that account;
20 is that right?
21     A   Yes.  And, additionally, it comes together,
22 credible information.
23     Q   Could an FTX employee log onto a customer's
24 account?
25     A   It's complicated.  There are -- at various

1  points, we had facilities whereby an employee could
2  view a customer's account.  It's not the same as how a
3  cus- -- it's not exactly the same as a customer logging
4  onto their own account but included, from a viewing
5  perspective, much of that information.
6       Q  So why would an FTX employee want to view the
7  account from the customer's perspective?
8       A  As an example, let's say a customer sent a
9  support ticket in saying that -- disputing their
10  account balance.  It would then be necessary for the
11  employee to review the transactions that that customer
12  had completed.
13       And I'll say further that one experience that
14  we had was it is often difficult to understand exactly
15  what a customer support ticket was referencing unless
16  you are able to view it from the same layout that the
17  customer would.  Often, that clarified which number a
18  customer was talking about.
19       Q  Okay.  That's helpful.
20       Was there any mechanism where an FTX employee
21  could log on to a customer's account and therefore
22  execute trades on behalf of the customer?
23       A  I believe that FTX needed ways to bring trades
24  between customers.  I don't believe that that was
25  related to logging on or viewing the customer's account

1  from their perspective; but there were tools for
2  printing trades when that needed to happen, and they
3  were obviously always tracked, displayed as such both
4  to the customer and internally.
5       Q  What does that mean "print trades"?
6       A  Sorry.  Finance.  Print to the tape.  Caused
7  to happen.
8       Q  Okay.  And why would -- why would FTX need to
9  print trade as opposed to the customer or counterparty
10  doing the trade?
11       A  So let me give you a few examples.  There are
12  potentially other examples as well.  One is, if there
13  is a customer support ticket, the customer claimed that
14  for some reason some trade -- they should have been
15  permitted to participate in some trade but weren't able
16  to because of some technical glitch, and either because
17  we agreed with them or because, just out of, sort of,
18  an abundance of deference to the customer, decided that
19  they should be retroactively be given that, we would
20  then have to effect a trade in their account as per
21  their request.  That's one example, maybe the most
22  common example, where that would happen.  Oh, sorry.
23  Never mind.
24       Q  I was just wondering, is there somewhere in
25  the logs or the trading history that would reflect that

1  this was effected by an FTX employee --
2       A  Absolutely.
3       Q  -- than by a customer?
4       And what would the notation be?
5       A  I can't recall the exact syntax that we used;
6  but one of the columns specified whether this was
7  happening and, I believe, specified the employee who
8  had done it as well.
9       Q  And that column would specify if this was a
10  situation where the FTX employee had logged on the
11  customer account to execute the trade?
12       MR. GLUECKSTEIN: Object to form.
13       MR. MISHKIN: Object to form.
14       THE WITNESS: I'm not sure logging on and
15  executing the trade are related to each other.
16       MR. HARRIS: Okay.
17       THE WITNESS: But it would specify if it had
18  been effected by an FTX employee rather than by a
19  standard order.
20  BY MR. HARRIS:
21       Q  But you don't recall what the notation was --
22       A  No.
23       Q  -- or the column was?
24       A  I don't recall the name of it, no.
25       Q  Okay.  A couple of questions about the code

1  for the FTX exchange.  I understand you did not play a
2  role --
3       A  No.
4       Q  -- in developing the code.
5       Did you ever become aware of any discrepancies
6  between how the code operated and what FTX's stated
7  policies were?
8       MR. MISHKIN: Objection. Form. Foundation.
9       THE WITNESS: There were times when I became
10  aware of discrepancies between how the code operated
11  and how I or the company would ideally like it to
12  operate, and as such, bugging [ph] is an example of
13  such a thing.
14  BY MR. HARRIS:
15       Q  So how about -- were you ever aware of an
16  instance where there is a discrepancy between how the
17  code operated and what the terms of service said?
18       MR. MISHKIN: Objection. Form.
19       MR. GLUECKSTEIN: Objection. Form.
20       MR. MISHKIN: Foundation.
21       THE WITNESS: I'm unsure.
22  BY MR. HARRIS:
23       Q  If there was such an instance, what would you
24  want to happen?
25       Would you fix the terms, or you'd fix the

MAGNA
LEGAL SERVICES

1  code?
2      MR. MISHKIN:  Objection.  Form.  Foundation.
3      MR. GLUECKSTEIN:  Object to the form.
4      THE WITNESS:  I can't answer more about the
5  specifics.
6  BY MR. HARRIS:
7      Q    Okay.  Do you recall what are the different
8  ways that FTX employees communicated with each other?
9      I don't mean talking.  I mean electronic
10  means.
11      A    I mean, there were a number.
12      Q    Can you tell me the different formats that
13  people used.
14      A    Well, I'm not sure why talking isn't included
15  in your list, and it makes me unsure what to include
16  and what not to include.
17      Q    I'm not talking talking because I don't have a
18  record of it.  I'm asking this because we were trying
19  to find any records you have --
20      A    Right.
21      Q    -- of what happened, and so I'm trying to
22  figure out what are the means that people could have
23  used.
24      A    Talking, phone calls, text -- no, not usually
25  text, but it could have happened -- Slack, Telegram,

1  Signal, others.
2      Q    Was there any kind of rules or recommendations
3  on when to use what method?
4      MR. MISHKIN:  Objection.  Form.
5      THE WITNESS:  There were, for instance,
6  policies related to official records.
7  BY MR. HARRIS:
8      Q    What were the policies on official records?
9      MR. MISHKIN:  Object to the form.
10      THE WITNESS:  I have unsuccessfully asked to
11  receive a copy of such policy numerous times.
12  BY MR. HARRIS:
13      Q    All right.  Do you remember what they said
14  about what kind of format should actually be used for
15  official records?
16      A    Not in detail.
17      Q    Generally?
18      A    Generally, certain types of records had to be
19  stored for certain periods of time.  It just depended
20  on the jurisdiction.  It just depended on the type of
21  record.  I'm not sure what was -- I take that back.  As
22  a general matter, like, transaction histories would be
23  stored indefinitely.
24      Q    How about ways of communicating with customers
25  or through electronic means?

1      Was there -- was it all of those same methods?
2      A    And more.
3      Q    Okay.
4      A    And in general, a lot of those depended on
5  what the customer preferred.
6      Q    Were there any prohibitions like FTX employees
7  should not use Slack or some other method for
8  communicating with customers?
9      A    I can't think of any prohibitions.  Let me
10  give one just caveat to that, which is that -- or one
11  note, which is that there was a formal system for
12  customers to log customer support tickets, which was --
13  that was to cover, like, maybe a formal message to the
14  company, how they could do it.  Those were all logged
15  in and kept in internal services and displayed both to
16  the customer and the company, both the tickets and the
17  responses to them.  Customers didn't always choose to
18  use that system, but it was available to them.
19      Q    I'm going to shift into Three Arrows.
20      Do you remember -- did you have any
21  communications with people at Three Arrows?
22      A    Did I have any?  Yes.  I wouldn't say I
23  frequently did.
24      Q    Okay.  What do you remember?
25      MR. MISHKIN:  Objection.  Form.

1  BY MR. HARRIS:
2      Q    Do you remember communicating with
3  Kyle Davies?
4      A    I had at least some communications over the
5  years with both Su Zhu and Kyle Davies.  Much of it was
6  sort of inconsequential, like saying hi to each other
7  when we ran into each other at a conference or
8  something like that.  Maybe if there's something more
9  specific you are looking for here --
10      Q    Do you remember -- do you remember if you had,
11  like, email or Slack or a Telegram message, anything
12  like that, with them?
13      A    I don't recall myself personally having had
14  electronic communication with them.  I'm not saying
15  confidently that I didn't.  It's just that I don't
16  recall that I did.  I know -- and I don't know who, but
17  there are employees of FTX who would communicate with
18  them sometimes.  I know that we had a chat group with
19  them.
20      Q    Okay.
21      A    I don't recall what platform this chat group
22  used, and for all I know, there were multiple; or there
23  were, sort of, more, like, sort of -- there may have
24  been higher-traffic ones that I wasn't bothered to be
25  added to as well.  And I'm not sure whether I was,

MAGNA
LEGAL SERVICES

1  myself, added to these; but for most of the high-volume
2  customers, there would be either a Telegram group or a
3  Signal group or a Slack group or something like that
4  for quicker communication.
5      Q   And you may have answered this already, but do
6  you remember whether you were part of the Three Arrows
7  chat group?
8      A   I don't remember for sure whether I was part
9  of it or whether I was just, like, shown messages from
10 it when necessary.
11     Q   Okay.  It sounds like you remember seeing
12 messages from it, but you don't remember whether you
13 were involved?
14     A   Whether I was in it or whether somebody just
15 screenshotted it and forwarded a question on it.
16     Q   Okay.  Do you remember who was the main client
17 contact for FTX with Three Arrows?
18     A   No.  I can -- just, like, I can give you names
19 of people whose -- a few people whose roles mean that
20 they may very well have been.
21     Q   Right.
22     A   But it's worth reviewing that for some
23 customers because they had some long-standing
24 relationship with some employee at FTX, and, thus, that
25 person would act as the main intermediary.  And for

1  someone like them, that could very well be true and
2  generally like Zane, Vince, Ryan.  Any one of them were
3  in roles that could have been that for Three Arrows,
4  but I actually don't remember for Three Arrows in
5  particular --
6      Q   Okay.
7      A   -- who was.  Likely, there was one developer
8  who they were in direct contact with.  It may have been
9  Nishad, but I'm not sure that it was.
10     Q   Okay.  I saw a name Burg.  Who was that?
11     A   That would be from earlier on.
12     Q   Who is Burg?
13     A   Burgess is the last name.  He is a pretty good
14 guess for who would have been that person in, for
15 instance, 2019 or 2020.
16     Q   Okay.
17     A   But -- oh, shit.  Sorry.  There are two
18 Burgesses.  They are brothers as well.  And the one I
19 suspect you are referring to left the company at some
20 point.
21     Q   What was his first name?
22     A   One of them, there is -- Michael was one of
23 them.
24     Q   Okay.  Okay.  But, for instance, I don't
25 believe that he was still with the company as of

1  June 2022 for that to be relevant --
2      A   Yes.
3      Q   -- hypothetically speaking.
4      A   Yes.
5      Q   Okay.  Just to round out my general questions.
6      A   Yep.
7      Q   Okay.  So am I understanding correctly that
8  when a customer has a digital asset and then deposited
9  it onto the exchange, it would go into, like, a unique
10 address for that customer?
11     A   So as a general customer -- and this is
12 putting aside, sort of, complicated cases, and it's
13 also different for different blockchains.  So,
14 actually, let me take a step back.
15         Do you happen to know if you are talking about
16 Bitcoin or about Ethereum or about some other
17 blockchain?
18     Q   Is it different for Bitcoin?
19     A   Yes.
20     Q   Okay.  So let's start with Bitcoin, then.
21     A   All right.
22     Q   I own some Bitcoin elsewhere, and I decided I
23 want to --
24     A   Yep.
25     Q   -- transfer it to your -- FTX.

1      A   So let me first actually make a statement
2  which is true with almost all digital assets, which is
3  that each customer would have one or multiple deposit
4  addresses.  Those addresses would be unique to them,
5  and that is -- as a general matter was how we
6  determined who had deposited and who to credit.
7          However, the assets would not generally
8  stay -- or not necessarily stay in that deposit address
9  that was specific to the customer.  Rather, they
10 were -- customers would be constantly depositing and
11 withdrawing digital assets.  The tokens were fungible
12 with each other.  Customers would also be lending and
13 borrowing them.
14         And so, on some blockchains, that meant that
15 many would end up in what's called an "omnibus wallet,"
16 so one or a small number of wallets aggregating those
17 assets for all customers of the Exchange.
18         Bitcoin is actually a little bit more
19 complicated, how it functions, and I don't know all of
20 the details; but, in general, bitcoin transfers would
21 often involve many wallets together, sending contents
22 to a place; but it shares a property that customers
23 would have a specific deposit address or multiple for
24 their accounts but that assets would not be expected to
25 remain at that specific address.

1    Q    Okay.  We talked about an omnibus wallet.
2    Would that be specific to a particular kind of asset?
3    Like, one wallet would only hold Bitcoin, for instance,
4    Ethereum, or --
5    A    Morally speaking, the answer is yes.  I can
6    give you a more complicated answer if you wanted one.
7    Q    Sure.  What would the more complicated answer
8    be?
9    A    So an Ethereum address would hold not just
10   Ethereum but also potentially ERC-20 tokens, which are
11   tokens that were issued on the Ethereum blockchain but
12   are distinct from itself.
13   Q    Okay.
14   A    And we may have had multiple addresses.  We
15   have split out each (inaudible) year 20 tokens at
16   various points; but as a general matter, we would --
17   parties in general would often use these Ethereum
18   addresses to host multiple ERC-20 tokens.  You could
19   distinguish, obviously, how much of each token was at
20   such an address.
21   Q    Okay.  So what was the purpose of using an
22   omnibus wallet?
23   A    The basic answer is -- there are more
24   complicated answers.  Let me give you a scenario which
25   explains the basics of it.  Two customers, Alice and

1    Bob, Alice deposited 10 Ethereum, then sells three of
2    them to Bob, for instance, for who knows what, for
3    bitcoins, whatever.
4         Without an omnibus-type system, you would then
5    have to transfer those Ethereum tokens from Alice's
6    address to Bob's address, the three tokens, but they
7    are blockchain events when everyone does that.  Those
8    fees may be a penny.  They might be a dollar.  They
9    might be $5.  But, either way, for an exchange
10   processing millions to billions of trades every day, it
11   would be prohibitive costwise to do a wallet
12   transfer -- a blockchain transfer with every trade that
13   happened on the platform.  This is how all Bitcoin
14   exchanges work -- all centralized blockchains work.
15   Q    So a high-level purpose of these omnibus
16   wallets was to avoid these transaction fees?
17   A    Yes.
18   Q    Let me ask you this:  When Alice deposited
19   that 10 Ethereum --
20   A    Yep.
21   Q    -- at FTX, did FTX view that as her giving FTX
22   ownership of the Ethereum?
23        MR. MISHKIN:  Objection.  Form.
24        MR. GLUECKSTEIN:  Object to the form.
25        THE WITNESS:  It's a complicated question.

1    It depends on the specifics and especially when it
2    comes to margin trading and futures trading.
3    BY MR. HARRIS:
4    Q    Why does the involvement of margin trading
5    affect this question?
6    A    Because assets were frequently being borrowed.
7    And so the consistent principle that holds is the
8    liabilities between FTX and its customers in both
9    directions.  But when it came to margin and futures
10   trading, first of all, assets were often being lent out
11   between customers; and second of all, assets were often
12   being posted as collateral for a position rather than
13   held separately from it.
14   Q    To make sure I understand --
15   A    Yes.
16   Q    -- when you said the liabilities between FTX
17   and its customers in both directions, what did you mean
18   by that?
19   A    Well, for instance, someone's account balance
20   might be plus 10 bitcoins negative for Ethereum.  In
21   that case, there would be a liability from FTX to the
22   customer of 10 bitcoins and from the customer to FTX of
23   four Ethereum.
24   Q    Thank you.  All right.  I promised I would
25   show you the terms of service, but do you need a break?

1    We've been going a while.
2         MR. MISHKIN:  Let's take a couple of minutes.
3         THE WITNESS:  Yeah, maybe a couple of minutes.
4         MR. HARRIS:  All right.
5         (Off the record.)
6         (Deposition Exhibit 15 was previously
7         marked in the Coverick deposition, a copy
8         of which is attached hereto.)
9    BY MR. HARRIS:
10   Q    Okay.  You've been handed a document.  It's
11   called Exhibit 15, Coverick, because it's from another
12   deposition already.  Take a look at it.  It's called
13   "FTX Terms of Service," and we talked about terms of
14   service earlier, and this is what I was referring to
15   earlier when I said "terms of service."
16   A    Understood.
17   Q    Do you recognize this document, generally?
18   A    Generally, yes.
19   Q    Let me just ask, is there another terms of
20   service you are familiar with?
21   A    Yes.
22   Q    Is it just an earlier version of this, or is
23   there another terms of service out there that operated
24   at the same time?
25   A    The potential transition from one terms of

**MAGNA**
LEGAL SERVICES

1  service to another was complicated, and this is one of
2  those two relevant documents but not the other one.
3      Q   Okay.
4      A   There are also other things that could be
5  called "terms of service" at various entities.
6      Q   The other one you were thinking of was the
7  earlier version of this?
8      A   Yes.
9      Q   Okay.  Okay.  So I'm just going to be asking
10 you about this one, not the earlier one.
11     A   Understand I'm making no representations
12 whether this applied in a particular case or not.
13     Q   Yes.  Understood.  I believe, if I understand,
14 your testimony was that Mr. Sun [ph] drafted this, not
15 you; right?
16     A   I did not draft it.  Either Mr. Sun did, or he
17 was involved with other people who did.  I don't know
18 what his internal process looked like.
19     Q   Okay.  Did you review it before it was
20 finalized?
21     A   Parts of it at least.
22     Q   Okay.  All right.  The section I'm going to
23 ask you about is on page 10.  There's a Section 8.2 --
24     A   Shocker.
25     Q   -- called "Digital Assets."  And do you think

1  this is one of the sections that you would have
2  reviewed, 8.2?
3      A   In some ways and not in others.
4      Q   Okay.  What do you mean by that?
5      A   There are details of this section and language
6  that I do not recall.
7      Q   All right.  Well, let me ask you about the
8  particular parts that I'm interested in.
9      A   All right.
10     Q   And you can tell me about them or not.
11         Do you see the Section 8.2.6?  And it starts
12 with saying "All Digital Assets are held in your
13 Account on the following basis."
14         Do you see that?
15     A   I do.
16     Q   Okay.  And then Section (A) says "Title to
17 your Digital Assets shall at all times remain with you
18 and shall not transfer to FTX Trading."
19         Do you see that?
20     A   I see that.
21     Q   And then it says "As the owner of
22 Digital Assets in your Account, you shall bear all risk
23 of loss of such Digital Assets."
24         Do you see that?
25     A   I see that.

1      Q   So what did you take that to mean, the "Title
2  to your Digital Assets shall at all times remain with
3  you"?
4          MR. GLUECKSTEIN:  Objection.  Calls for a
5  legal conclusion.
6          THE WITNESS:  Yeah, I'm not sure if you are
7  asking for a legal definition.
8  BY MR. HARRIS:
9      Q   I'm not.  I'm trying to figure out what was
10 trying to be conveyed to customers.
11         So were you trying to convey to customers that
12 a customer will own and have title to the digital
13 assets?
14         MR. MISHKIN:  Objection to form.
15         MR. GLUECKSTEIN:  Objection to form.
16         THE WITNESS:  Potentially, in some cases, in
17 some contexts there were, to be enacted with some
18 customers.  I know there were a lot of caveats, and,
19 unfortunately, they are necessary.
20 BY MR. HARRIS:
21     Q   Okay.  Do you recall ever, in any format, FTX
22 telling a customer that it would not -- the customer
23 would not own the digital asset?
24         MR. MISHKIN:  Objection.  Form.
25         THE WITNESS:  I'm not sure exactly how you are

1  defining those concepts.  I'm aware of things that --
2  for some definitions of that.  Well, I'll just say it
3  depends on the definition of these terms.
4  BY MR. HARRIS:
5      Q   Do you recall a document where FTX ever used
6  words that said -- told the customer that they will not
7  own a digital asset acquired on the FTX Exchange?
8          MR. MISHKIN:  Objection to form.
9          THE WITNESS:  Again, I'm not sure what you
10 mean by "own."  In a context with margin trading? with
11 collateral? with futures contracts? with borrowing and
12 lending?
13 BY MR. HARRIS:
14     Q   In any of those contexts, do you recall a
15 statement given to a customer saying that the customer
16 did not own an asset attributed to it on the Exchange?
17         MR. MISHKIN:  Objection form.
18         MR. GLUECKSTEIN:  Object to the form.
19         THE WITNESS:  If you scope that broadly, I can
20 answer.
21 BY MR. HARRIS:
22     Q   What do you have in mind?
23     A   Well, for instance, you could look at
24 Section 8.3.
25     Q   What in 8.3 do you have in mind?

**MAGNA** ▶
LEGAL SERVICES

1    A   So that's one example.  "Once we received fiat
2   currency that you load into your" --
3        THE REPORTER:  I'm sorry.  I'm having trouble
4   hearing.
5        THE WITNESS:  "Once we receive fiat currency
6   that you load into your Account, we may issue you with
7   an equivalent amount of electronic money
8   ('E-Money')" -- this is 8.3.2 -- "denominated in the
9   relevant fiat currency, which represents the fiat
10  currency that you have loaded," I'm not sure how you
11  are defining "own."  I'm not sure what you are talking
12  about the customer having owned.
13  BY MR. HARRIS:
14      Q   Let me -- let me ask you a better question.
15  I just want to ask about digital assets and not fiat
16  currency.
17      A   Digital assets, and you are aware that
18  stablecoins and fiat currency were fungible with each
19  other on FTX International.
20          So are you not referring to that as well?
21      Q   I'm not referring to that.
22      A   Well, for instance, again, I'm not sure how
23  you are defining any of these terms; but I'll point you
24  to Sections 16.4 and 16.3 for that matter.
25      Q   In your mind, what does that have to do with

1   who owns the digital assets?
2       A   Well, again, I'm not sure what you mean by the
3   word "own."  And I'll again raise the case of a house
4   with a mortgage on it and the question of who in that
5   case you would say owns the house.  You risk the loss
6   of an unpaid principal being an example -- a phrase.
7   If the borrower defaults on a loan, we cannot make any
8   guarantees to any users using the services that get
9   defaulted.
10          Even if you have not suffered any liquidations
11  or losses, your account balance may be subject to
12  clawback due to losses of proprietary risks would be
13  another assumption.  Without knowing how you are
14  defining those words, I can't tell you whether this
15  conflicts with your definitions.
16      Q   Okay.
17      A   There are -- this is not an exhaustive list of
18  things that I think would require one to more carefully
19  define such terms and the scopes in which they are
20  being used, but it is an example of some.
21      Q   Well, let me -- while we are here, I might as
22  well ask you, 16.3, you pointed it out where it says:
23  "When you lend Assets to other Users, you risk the loss
24  of an unpaid principal if the borrower defaults...."
25          What does "principal" mean there?

1       A   Amount borrowed.
2       Q   The amount borrowed by the --
3       A   -- other users.
4       Q   By the other users.  Okay.
5       A   There are others that might be relevant in a
6   hypothetical context like our Backstop Liquidity
7   Provider Program may come into play, but there's no
8   assurance saying that such program should be sufficient
9   or effective in liquidating your position.
10      Q   So, in 16.2, FTX is warning the margin lender
11  user that they may lose the amount borrowed by the
12  margin?
13      A   Borrower.
14      Q   Borrower?
15      A   That's right.  In 16.4, it's referring to
16  multiple types of accounts including accounts that
17  might be subject to liquidation.
18      Q   So 16.4 is a warning to -- not to margin
19  lenders but to --
20      A   Borrowers or leveraged traders of various
21  sorts --
22      Q   Okay.
23      A   -- or more broadly to those on a platform with
24  lending, borrowing, and margin trading.
25      Q   Okay.  Because anyone who participated on a

1   platform that had margin lending or trading could be at
2   risk of offering socialized losses?
3       A   Depending on the context.
4       Q   Just going back to 8.2.6 --
5       A   All right.
6       Q   -- I'm looking at 8.2.6(A).
7           Was FTX trying to be truthful to its users
8   when it said "Title to your Digital Assets shall at all
9   times remain with you"?
10          MR. MISHKIN:  Objection.  Form.
11          MR. GLUECKSTEIN:  Objection.  Calls for a
12  legal conclusion.
13          THE WITNESS:  I was certainly never attempting
14  to misstate it.
15  BY MR. HARRIS:
16      Q   The same question for Section (B), was FTX
17  trying to be truthful when it told users "None of the
18  Digital Assets in your Account are the property of, or
19  shall or may be loaned to, FTX Trading"?
20          MR. MISHKIN:  Objection.  Form.
21          MR. GLUECKSTEIN:  Objection.  Form.
22          THE WITNESS:  I was not attempting to mislead.
23  BY MR. HARRIS:
24      Q   The same question for Section (C), was FTX
25  trying to be truthful to users when it told them "You

MAGNA
LEGAL SERVICES

1  control the Digital Assets held in your Account"?
2      MR. GLUECKSTEIN: Object to form.
3      THE WITNESS: I was not trying to mislead.
4  BY MR. HARRIS:
5      Q  I wanted to look at Schedule 2 to this. It's
6  on page 31. There's a section. It's called --
7  Schedule 2 is called "Service Schedule," "Specified
8  Service," "Spot Market," and then there's a row of
9  "Service Provider."
10     Do you see that?
11     A  Yes.
12     Q  Okay. And then it says the service provider
13  is "FTX Digital Markets Limited."
14     Do you see that?
15     A  Yes.
16     Q  And then that's -- if you look at the next few
17  schedules, Schedule 3, "Spot Margin Trading";
18  Schedule 4, "OTC"; Schedule 5, "Futures"; Schedule 6,
19  "Volatility Market" -- for all of those, the service
20  provider is FTX Digital Markets.
21     Do you see that?
22     A  I see that.
23     Q  And what do you remember Digital --
24  FTX Digital Markets was?
25     A  It was a Bahamian -- a regulated Bahamian

1  entity.
2      Q  And why was it selected as the service
3  provider?
4      A  I can tell you that it was -- I think the
5  Bahamas was where much of our office had been moving
6  and where we had one of the places where we had become
7  regulated; but I can't tell you for sure what was going
8  on in the mind of the person or people who wrote this,
9  why they chose that.
10     Q  Okay.
11     A  I could speculate, but ...
12     Q  Do you recall what FTX Digital Markets did as
13  the service provider?
14     A  I'm not sure what you mean by that.
15     Q  What is a service provider?
16     Like, did they actually run the Exchange?
17     Is that what their service was?
18     A  I believe the answer to that is complicated
19  and was still under review and still in the process of
20  potentially being implemented as of November 2022.
21     Q  Okay. Were you involved in the operations of
22  FTX Digital Markets?
23     A  Some parts of it.
24     Q  Do you remember if FTX Digital Markets had its
25  own financial statements?

1      A  I'm not sure if it had official ones. I'm
2  sure that there was -- internal drafts were used for
3  various entities.
4      MR. MISHKIN: Are we done with this exhibit?
5      MR. HARRIS: Yeah. Thanks.
6      (Deposition Exhibit 5 was marked for
7      identification and is attached hereto.)
8  BY MR. HARRIS:
9      Q  All right. You were handed Exhibit 5, which
10  is called "FTX Digital Markets Limited Safeguarding of
11  Assets & Digital Token Management Policy." Take a look
12  at it.
13     My first question is going to be do you
14  recognize this?
15     A  I've seen it before.
16     Q  Okay. And if it's helpful, page 2 is
17  essentially called "Document History," and it's dated
18  August 2021. And there's a "Review & Approvals"
19  section, and it says "Ryan Salame, CEO," the 16th of
20  August 2021.
21     So what was the purpose of this document?
22     A  I'm not sure.
23     Q  Do you think you had a role in drafting it?
24     A  I can't recall.
25     Q  If you look at page 4, the section called

1  "INTRODUCTION" at the top, it says "This policy
2  outlines FDM's approach to the safeguarding of assets."
3      Do you see that?
4      A  Yes.
5      Q  So was this an attempt to, kind of, accurately
6  describe how FDM would safeguard customer assets?
7      MR. MISHKIN: Objection to form. Foundation.
8      THE WITNESS: That's what it appears to say.
9  BY MR. HARRIS:
10     Q  And the policies that FDM would use in trying
11  to safeguard those assets; is that right?
12     MR. MISHKIN: Object to form and foundation.
13     THE WITNESS: You are just asking me to read
14  it. I can read it, but --
15  BY MR. HARRIS:
16     Q  I'm hoping you have some knowledge of what FDM
17  was trying to do and what is reflected.
18     A  This particular document is not one I have a
19  contemporary memory of.
20     Q  Okay. Any reason to think this -- Mr. Salame
21  would not be doing his best to accurately describe what
22  FDM's goals were?
23     MR. MISHKIN: Objection. Form. Foundation.
24     THE WITNESS: I think you would -- I can think
25  of a reason, but I will note that that says nothing

1   about the scope or intent of this document or the
2   entity at the time that this was written.
3   BY MR. HARRIS:
4       Q   I'm not sure I understood.  Could you say that
5   again.
6           MR. MISHKIN:  We have to go off the record for
7   a minute.
8           (Off the record.)
9           MR. HARRIS:  Let me just try a different
10  question.
11          THE WITNESS:  Yes.
12  BY MR. HARRIS:
13      Q   So I'm going to go through this, and I'm going
14  to point to things and try to find out if this is an
15  accurate description of what FTX was trying to do.
16          MR. MISHKIN:  FTX?
17          THE WITNESS:  FTX, yeah.
18  BY MR. HARRIS:
19      Q   FTX or FTX Digital Markets.  Let me ask this.
20  Let me try a different question.
21          You were the owner of FTX Digital Markets;
22  right?
23      A   Sort of.  I was an owner of a parent company
24  of it.
25          MR. HARRIS:  Okay.  Let me just -- I'm going

1   to ask you more questions about that.  So why don't we
2   mark this as Exhibit 6.
3           (Deposition Exhibit 6 was marked for
4           identification and is attached hereto.)
5   BY MR. HARRIS:
6       Q   Okay.  You've been handed Exhibit 6, which is
7   an "Application for Registration as Digital Asset
8   Business."
9       A   All right.
10      Q   "Name of Applicant:  FTX Digital Markets
11  Limited."  If you look on the second page, there's a
12  Row No. 14, and you --
13      A   All right.
14      Q   -- signed it as chairman.
15          Do you see that?
16      A   Yep.
17      Q   And then, if you look at the first page,
18  Row 4, there's questions under Row 4 and responses on
19  the right side, and the response lists you as
20  beneficial owner, director, and chairman.
21          Do you see that?
22      A   Yes.
23      Q   Okay.  So is that accurate?
24          You were the beneficial owner, director, and
25  chairman of FTX Digital Markets?

1       A   At least a beneficial owner, but yes.
2       Q   Okay.  Just going back, then, to
3   Exhibit 5, which is the "FTX Digital Markets Limited
4   Safeguarding of Assets & Digital Token Management
5   Policy," so I'm going to ask you about some statements
6   in Exhibit 5, and I'm just trying to find out if these
7   are accurate statements to the best of your memory.
8   So, if you can, look at back at the policy.
9       A   All right.  Sorry.  The "policy" being?
10      Q   Exhibit 5.
11      A   All right.
12      Q   So, if you can, go to page 5.
13      A   Yep.
14      Q   There's a section called "OBJECTIVE," and then
15  it says "This policy's objective are to," and then it
16  has four bullets.
17          Do you see that?
18      A   Sorry.
19      Q   I'm sorry.  It's on page 4.
20      A   4.
21      Q   I probably said the wrong page.  Sorry.
22      A   All right.
23      Q   A section called "OBJECTIVE," and then it says
24  "This policy's objective are to," and then it has four
25  bullets.

1           Do you see that?
2       A   Yes.
3       Q   Are these an accurate description of some of
4   FDM's policy objectives?
5           MR. MISHKIN:  Objection.  Form.  Foundation.
6           THE WITNESS:  I have no reason to think that
7   as of 2021, when this was drafted, it wasn't -- at
8   least I have no specific reason to think it wasn't an
9   accurate description of the intent of the drafters of
10  this document according to their understanding at the
11  time of what FDM was.
12  BY MR. HARRIS:
13      Q   Beyond this document, did FDM have any other
14  policies about safeguarding of customer assets?
15      A   Are you referring to FDM-specific and not
16  including general FTX policies?
17      Q   Let's start with just FDM, yes.
18      A   I can't recall other policies specific to FDM.
19      Q   And then you mentioned other general FTX
20  policies.  Were there other general FTX policies about
21  safeguarding customer assets?
22      A   I mean, there were the various terms of
23  service.  There were -- but I'm not sure exactly what
24  would fall under this category.  There may be other
25  things involved.

MAGNA
LEGAL SERVICES

1    Q   Okay.  I should have warned you I have more
2  questions about this policy.  So can you go to page 5
3  of it.
4    A   All right.
5    Q   Okay.  So, page 5, there's a section called
6  "FDM's RESPONSIBILITIES."
7        Do you see it?
8    A   All right.
9    Q   And then there's an underlined section that
10 says "FDM's key roles and responsibilities in relation
11 to safeguarding of assets are outlined below."
12       Do you see that?
13   A   Yes.
14   Q   And the first bullet under there is
15 "Appropriately account for the difference between its
16 own assets and its customers' assets."
17       Do you see that?
18   A   I see that.
19   Q   And what do you understand that bullet to
20 mean?
21       MR. MISHKIN:  Object to the form and
22 foundation.
23       MR. GLUECKSTEIN:  Object to the form.
24       THE WITNESS:  All I can do would be to
25 speculate about the intent of whoever drafted this

1  document.
2  BY MR. HARRIS:
3    Q   Let me ask about the second bullet.
4        Does "All third-party providers will be aware
5  that customer assets do not represent assets of FDM" --
6  do you see that?
7    A   I see that.
8    Q   What does the reference to "third-party
9  providers" mean?
10       MR. MISHKIN:  Object to form and foundation.
11       THE WITNESS:  All I would be doing is
12 speculating.
13 BY MR. HARRIS:
14   Q   Were there third-party providers that FDM
15 used?
16   A   I'm not sure.
17   Q   Third-party providers that FTX used?
18   A   Yes.
19   Q   For handling of customer assets?
20       MR. MISHKIN:  Objection to form.
21       MR. GLUECKSTEIN:  Form.
22       THE WITNESS:  A definitional issue.
23 BY MR. HARRIS:
24   Q   What are you referring to by saying a
25 "definitional issue"?

1    A   It is complicated in the context of fiat
2  currency, for instance, which I don't know if you are
3  still scoping out of your questions or not.
4    Q   Let's do for now, yes.
5    A   So, barring fiat assets, I'm not entirely sure
6  on the technological side whether there were
7  third-party tools used by the developer at various
8  points, and there were a number of different parts of
9  FTX platform OTC being one that was structured quite
10 differently.  So I can't make a blank statement for all
11 of them.
12   Q   Can you say why it would be important for a
13 third-party provider to be aware that the customer
14 assets do not represent assets of FDM?
15       MR. MISHKIN:  Object to the form.
16       THE WITNESS:  All I could do is speculate.
17 BY MR. HARRIS:
18   Q   Well, what's your speculation?
19       MR. MISHKIN:  Object to the form.
20       THE WITNESS:  One could imagine, talking about
21 the use of someone like Fireblocks or BitGo, players in
22 the digital asset custody space -- again, I'm just
23 speculating here on what such a sentence could mean.
24 I don't particularly think that would have been
25 applicable to operations I'm aware of, of actual

1  operations.
2  BY MR. HARRIS:
3    Q   Okay.
4    A   But, again, I'm just trying to speculate on
5  the meaning of a sentence I didn't write.
6    Q   Okay.
7    A   A bank, one could have envisioned there in
8  theory.  Again, this is just speculation.
9    Q   Any reason to believe this second bullet is
10 not an accurate description of one of FDM's roles and
11 responsibilities?
12       MR. MISHKIN:  Object to form --
13       MR. GLUECKSTEIN:  Objection to form.
14       MR. MISHKIN:  -- and foundation.
15       THE WITNESS:  I don't have a reason to believe
16 this second bullet is not an accurate description of
17 what outlines the roles and responsibilities.  It means
18 a potential misrepresentation of whatever the
19 activities, which I believe may have been nonexistent
20 as of the time of the publishing of this document.
21       I'm not saying they necessarily -- I don't
22 know exactly what the state FDM was in in 2021; but I'm
23 not aware of it, of any particular activities it had at
24 that point.
25 ///

MAGNA ▶
LEGAL SERVICES

1    BY MR. HARRIS:
2      Q    All right.  Do you see the third bullet?  It
3    says "All third party providers are aware that customer
4    assets are held in trust."
5        Do you see that?
6      A    I see that.
7      Q    What do you make that to mean?
8        MR. MISHKIN:  Objection to form and
9    foundation.
10       THE WITNESS:  I can give you the same set of
11   speculation on this if speculating is what you are
12   interested in here.
13   BY MR. HARRIS:
14     Q    Well, let's hear it.  Sure.
15       MR. MISHKIN:  Objection.  Form.  Foundation.
16       MR. GLUECKSTEIN:  Object to the form.
17       THE WITNESS:  One could imagine a situation in
18   which a hypothetical for currency exchange had some
19   deal with a bank or "digital asset in custody" provider
20   whereby there was some set of assets that were held for
21   customers, whatever exactly that was intended to mean,
22   again, without saying that that has any relationship,
23   without making any statements about any particular
24   activities of FDM as of 2021.
25   ///

1    BY MR. HARRIS:
2      Q    Any reason to believe this statement wasn't
3    someone's best attempt to be accurate about FDM's
4    responsibilities?
5        MR. MISHKIN:  Objection.  Form.  Foundation.
6        THE WITNESS:  I have no specific reason to
7    think that it was intending to be inaccurate by whoever
8    wrote this as of 2021, FDM.
9    BY MR. HARRIS:
10     Q    Did you view FTX as holding customer assets in
11   trust?
12       MR. MISHKIN:  Objection.  Form.
13       MR. GLUECKSTEIN:  Object to the form.
14       THE WITNESS:  Can you define what you mean by
15   "trust."
16   BY MR. HARRIS:
17     Q    To protect and safeguard.
18       MR. MISHKIN:  Objection.  Form.
19       MR. GLUECKSTEIN:  Same objection.
20       THE WITNESS:  To protect from what?
21   BY MR. HARRIS:
22     Q    From seizure by someone else or theft?
23     A    In many ways, yes, but it is a broad
24   statement.  And there are times when different
25   interpretations of it come into conflict with each

1    other, and there are also many different roles that
2    FTX played, different types of users and accounts, and
3    it would make more sense in respect to some of them
4    than in respect to others.
5      Q    Do you recall -- I don't know if you answered
6    this already -- ever having provided comments on this
7    policy?
8        MR. MISHKIN:  Exhibit 5?
9        MR. HARRIS:  Exhibit 5.
10       THE WITNESS:  I don't recall having done --
11   sorry.  At least prior to November 2022, I don't recall
12   having done so.  I can't confidently say it didn't.
13   BY MR. HARRIS:
14     Q    Does anything about it, we just looked at,
15   seem inaccurate to you?
16       MR. MISHKIN:  Object to the form.
17       MR. GLUECKSTEIN:  Object to the form.
18       THE WITNESS:  Much of it seems that it needs
19   to be fleshed out, especially in the context of margin
20   trading or futures trading or other similar activities.
21   BY MR. HARRIS:
22     Q    Do you know if this document was available to
23   customers to review?
24     A    Not to my knowledge.
25     Q    What do you think the purpose of it was, then?

1        MR. MISHKIN:  Object to form.  Foundation.
2        THE WITNESS:  I could speculate.
3    BY MR. HARRIS:
4      Q    Okay.  What do you think it was?
5        MR. MISHKIN:  Object to form and foundation.
6        THE WITNESS:  I could speculate that it may
7    have been part of a regulatory application or some
8    original draft of a policy for some pilot program under
9    a new entity or something like that; but, again, I
10   can't confidently tell you what the draft of it did or
11   didn't intend to do or as of when.
12   BY MR. HARRIS:
13     Q    Are you familiar with the FTX user
14   interphase, like, what a user could see when they log
15   onto their account?
16     A    As a general matter, yes.
17     Q    Was there a separate balance shown for each
18   kind of digital asset?
19     A    You mean a separate balance for Bitcoin versus
20   Ethereum, for instance?
21     Q    Yes.
22     A    Yes.
23     Q    And why did FTX set it up that way?
24       Why would that be useful to the customer?
25     A    The customer presumably would want to know

MAGNA ▶
LEGAL SERVICES

Page 90

1  whether they had invested in Bitcoin or in Ethereum,
2  for instance.
3     Q   Would it show -- the Bitcoin balance page,
4  would it show just spot purchases, or would it show
5  futures on it or --
6     A   It depends on the nature of the account.  It
7  would show in various ways spot and margin trading.
8  I -- there was some page that showed futures positions
9  as well, and I'm not sure whether you are referring to
10 that page or not.
11    Q   Okay.  So if I had a -- if I looked at my
12 Bitcoin page, would it show my Bitcoin futures on it?
13    A   It went a Bitcoin -- sorry.  I don't know what
14 you mean by "Bitcoin page."  It was more there was a
15 page for balances, a page for positions, and those
16 pages would generally be for all assets.
17    Q   Okay.
18    A   They would split them out in different
19 privileges by assets.
20    Q   Was there a page that would show the overall
21 digital balance?
22    A   There's a page that showed the overall
23 balance.  I don't know that it showed an overall
24 balance, excluding fiat currency or anything like that.
25 I'm not sure if that was intended by your question when

Page 91

1  you said "digital assets."
2     Q   I was intending to exclude fiat currency.
3     A   There were pages that were balanced by tokens.
4  So you could secretly add up whichever subset of those
5  you wanted.  Also, know that there were pages that
6  showed for subaccounts versus your account overall.
7     Q   Okay.  Was there some feature where you could
8  show -- you could look at your U.S. dollar balance?
9     A   Yes, although there are multiple different
10 numbers you could be referring to there.
11    Q   Okay.  What are the different U.S. dollar
12 balance numbers?
13    A   So, first of all, there are subaccounts versus
14 overall account; and second of all, there are many
15 different parts of the platform that you install your
16 scoping gauge whether you are talking about how the
17 spot uses collateral, borrowed, staked, or other
18 things.
19    Q   Was there an overall U.S. dollar balance?
20    A   A net?
21    Q   Yes.
22    A   And to clarify, do you mean net asset value,
23 dollar as in all assets, or do you mean excluding
24 assets other than U.S. dollar?
25    Q   I mean excluding assets other than the U.S.

Page 92

1  dollar.
2     A   Yes, I believe there was.
3     Q   What was -- so I want to use the right term.
4  So what was that -- what's the right term for the
5  balance of just U.S. dollars --
6     A   Yeah.
7     Q   -- excluding other assets?
8     A   What you said was fine, U.S. dollar balance
9  with a specific case of dollars.  The terminology gets
10 a little complicated because net is also quoted in
11 dollar terms.
12    Q   But you could find out your U.S. dollar
13 balance?
14    A   Yes, that's right.
15    Q   And then, separately, you could find out your
16 net account balance?
17    A   That's right.
18    Q   And you could also find out your balance for
19 different types of digital assets?
20    A   Yes.
21    Q   And this is one of these questions I'm asking
22 because we don't have someone who is at Three Arrows
23 who can answer these for me.
24    A   Yeah.  Yep.
25       MR. HARRIS:  So let me show you -- this one

Page 93

1  was already marked Exhibit 39 to someone's deposition.
2  Okay.
3       (Deposition Exhibit 39 was previously
4       marked for identification, a copy
5       of which is attached hereto.)
6  BY MR. HARRIS:
7     Q   So I will just represent to you that the
8  FTX Recovery Trust produced this to us as a standalone
9  document, but the name of the file suggests it was a
10 snapshot taken on June 14th, 2022, I think, of the
11 Exchange platform.
12       But does this format look familiar to you?
13    A   The format looks familiar, yes.
14    Q   Okay.  What are you -- what does it look like
15 to you?
16    A   Give me a second.  I can't tell what the
17 scoping of this is, whether it refers to a subaccount
18 or an overall account and, if so, which account it
19 referred to or when this was as of or anything like
20 that.  However, it has some of the margin-related
21 calculations for the sub or overall account at some
22 point in time.
23    Q   So I think this is a snapshot of either the
24 overall or subaccount for Three Arrows on June 14th.
25 I'm not sure of that, but I'll just represent to you



1  just assume that's what it is.  Okay?
2        It looks to me like there's a number of tabs
3  at the top, and it appears that the "COLLATERAL
4  EXPLAINER" tab was selected.
5     A   Yep.  I agree.
6     Q   Is that what it seems like to you?  Okay.
7        And then it looks like, under that, you could
8  either select "Initial" or "Maintenance."
9     A   I agree.
10    Q   What do those two things refer to, "Initial"
11 or "Maintenance"?
12    A   So "Initial" refers to how much margin is
13 required to open a position.  "Maintenance" requires
14 the point of which that position would typically be
15 liquidated.
16    Q   And so this is telling --
17       (Interruption by the guard.)
18       MR. MISHKIN:  The court reporter is the guide.
19       MR. HARRIS:  If you can't hear, stop.
20       MR. MISHKIN:  Can I just ask for a
21 clarification?
22       MR. HARRIS:  Yeah.
23       MR. MISHKIN:  You have said this was produced
24 by the FTX Trust.
25       MR. HARRIS:  Yes.

1        MR. MISHKIN:  I notice this Bates label is
2  Tackett_3AC.
3        MR. HARRIS:  So I believe they got it from
4  Mr. Tackett and then turned it to us.
5        MR. GLUECKSTEIN:  I believe that's correct.
6        MR. MISHKIN:  Oh, thank you.
7        MR. HARRIS:  So we are also guessing.
8        MR. GLUECKSTEIN:  That is the chain of
9  custody.
10       MR. HARRIS:  Okay.
11       MR. GLUECKSTEIN:  It was produced to us by
12 Mr. Tackett, and we produced it to counsel.
13       MR. MISHKIN:  Thank you.
14 BY MR. HARRIS:
15    Q   So, if I understand right, this page indicates
16 the amount of collateral that's needed to be maintained
17 in order to avoid triggering a liquidation; is that
18 right?
19    A   I can't tell whether their "Initial" or
20 "Maintenance" is selected here.  Sorry.  I don't
21 remember which darker version it means.
22    Q   Okay.  Do you see -- all right.  There's a
23 row.  Maybe it's the second paragraph.  It says
24 "Collateral" -- first, it says "Total USD value of
25 positive spot balances" --

1     A   Yep.
2     Q   -- equals 239.8 million.
3     A   Yep.
4     Q   What do you think that means?
5        MR. MISHKIN:  Object to the form.  Foundation.
6        THE WITNESS:  Again, I would like to introduce
7  some skepticism about whether this is scoped to the
8  thing that you would necessarily want it to be scoped
9  to; but within terms of specific subaccount versus
10 overall account and in terms of at what point this was
11 snapshotted, I can't obviously verify if this is real.
12 I'm just looking at -- there's no labeling here.
13       MR. HARRIS:  Right.
14       THE WITNESS:  I just see some text and numbers
15 on a page, which, you know -- and, you know -- so for
16 some hypothetical situation that likely doesn't
17 represent exactly the relevant one, which I can't
18 verify because you don't have access to the records,
19 that would refer to the net asset value of something
20 like nonfutures positions that the account had a
21 positive value in.
22 BY MR. HARRIS:
23    Q   Okay.  And I know you can't say whether these
24 numbers are accurate or not --
25    A   Yep.

1     Q   -- or what account they are talking about, but
2  the term "Collateral contributed by positive spot
3  balances" --
4     A   Sorry.  A collateral --
5     Q   Sorry.  Wrong term.  "Total USD value of
6  positive spot balances," that term likely refers to the
7  net asset value of non- --
8     A   Spot assets for which the account had more
9  than zero.
10    Q   Okay.  The next term on this is "Collateral
11 contributed by positive spot balances equals" -- the
12 number they have here is 199.6 million.
13    A   Yep.
14    Q   What do you think that term "Collateral
15 contributed by positive spot balances equals" means?
16       MR. MISHKIN:  Objection.  Form and foundation.
17       THE WITNESS:  Again, I have no idea on the
18 context here but some sort of liquidating haircut
19 applied to the first.
20 BY MR. HARRIS:
21    Q   Okay.  Then the next term is "Total collateral
22 used by outstanding futures positions."
23       What do you think that phrase means?
24       MR. MISHKIN:  Objection.  Form and foundation.
25       THE WITNESS:  I think it's a pretty clear

1  sentence.  It would help me if there is a word there
2  that you wanted me to define or something.
3  BY MR. HARRIS:
4     Q   All right.  Here's my -- how would a futures
5  position use collateral?
6     A   So, as a general matter, FTX wanted to be in a
7  position where if customers put on a futures position
8  and that position gets to that customer, FTX did not
9  think that there was a high likelihood of an ultimate
10  net loss for the Exchange.
11        As such, it wanted to be in a position where
12  if there was a negative -- if there was a loss realized
13  on that, there is some reason to think that that party
14  would be able to cover that loss, and the most
15  straightforward way of doing so would be by posting
16  collateral.
17     Q   So FTX required customers to post some
18  collateral in exchange for getting to do a futures
19  position?
20     A   I think that's a slightly stronger statement
21  than the one I made.  That was the most common way that
22  it would happen, though, yes.
23     Q   And why, again, was it important for a
24  customer -- why was it important to FTX that a customer
25  post collateral when they enter in the futures?

1     A   So what I would say is that FTX's ultimate
2  goal was to attempt to avoid a situation where it had a
3  significant ultimate loss.  If a customer put on a
4  futures position, had a loss on it, and there was no
5  reason for FTX to think that there were assets that it
6  could claim to cover that loss, then FTX and/or its
7  customers might end up having to carry that loss.
8        So, in an attempt to avoid such a situation,
9  one such method would have been the customer posting
10  collateral to cancel out potential losses on a futures
11  position.
12     Q   A futures position has a contingent liability
13  associated with it?
14     A   Depending on market moves.
15     Q   It has a contingent asset associated with it
16  also?
17     A   There are multiple ways to account for them.
18  The standard way people account for them, although
19  there is a difference of opinion on unreal payout, it's
20  generally treated as a futures position by not exactly
21  being an asset or a liability, per se, but, rather, a
22  possible future gain or loss of value depending on
23  market moves.
24     Q   Okay.
25     A   Sorry.  Just to be frank, if what I'm saying

1  is actually confusing, I am happy to go through
2  examples and be much more specific on what it generally
3  means; but, like, there's no need to waste everyone's
4  time on that if you know what I'm saying.
5     Q   I think I understand what you are saying.  I'm
6  going to show you the futures explainer in a second --
7     A   Yep.
8     Q   -- and that may help get it more clear.
9     A   Much of my caveats have to do with corner
10  cases where I'm saying situations and things like that
11  and so giving a much more clear and concise one, if you
12  wanted, like, a hypothetical --
13     Q   Okay.
14     A   -- typical example, or something like that.
15     Q   Just to round out the term, the next
16  row has a term "Total collateral used by outstanding
17  spot margin borrows."
18        What do you make that term to mean?
19        MR. MISHKIN:  Object.  Form and foundation.
20        THE WITNESS:  Again, just speculating here --
21  and I have no idea the context of this, and I will note
22  that there are lots of pieces of context that would not
23  be apparent from this, even potentially to those who
24  had produced it.  And so it would take a thorough
25  review to become confident that one had included all

1  such contingencies; but if I were going through an
2  example account -- right? -- that I had created with no
3  complications associated with it and I knew that I
4  didn't have to worry about any of these contingencies,
5  I would say that that was effectively the amount of
6  assets that we required to ensure the negative asset
7  positions that an account had.
8  BY MR. HARRIS:
9     Q   What does that mean, the amount of assets
10  required to ensure the negative asset positions?
11     A   Let me give you an example, which I think will
12  clarify what I mean in a simple case.  And, again,
13  like, if you wanted a fully general answer to that, I
14  would have to get to lines of credit and a lot of other
15  things that would complicate this answer.
16     Q   Okay.
17     A   But -- and I can't do that here because I just
18  don't have that information in this -- whatever this
19  specific case is, but as a hypothetical case --
20  right? -- you could imagine a customer has a bitcoin
21  balance of negative 10 bitcoins when bitcoin is trading
22  at, say, $25,000 per token.  That would result in
23  negative 250,000 net value of that bitcoin position.
24        And we might ask for 300,000, for instance, of
25  assets to ensure against both the negative value of

MAGNA
LEGAL SERVICES

1    that position and the potential risk associated with
2    it, potentially becoming more negative if markets
3    moved.
4        Q    Okay.  So, in that instance, the 300,000 would
5    be the collateral used by outstanding spot margin
6    borrows?
7        A    I think that's correct.
8        Q    Okay.  And then the last phrase you use is
9    "available collateral."  What do you take that phrase
10   to mean?
11          MR. MISHKIN:  Objection.  Form.  Foundation.
12          THE WITNESS:  It's just netting out the above
13   numbers is what it appears to be doing; or, rather,
14   it's netting out the positive collateral of the spot
15   balances with the collateral used by the futures and
16   the negative spot balances.
17   BY MR. HARRIS:
18       Q    Am I right that if that available collateral
19   drops below zero, something is triggered in the FTX
20   system?
21          MR. MISHKIN:  Objection.  Form.  Foundation.
22          THE WITNESS:  In many cases, that would be the
23   case.  Again, I can't comment on a particular case; but
24   as a general default matter where there are no other
25   contexts, then yes.

1    BY MR. HARRIS:
2        Q    Again, just looking at this page again, the
3    top row of tabs, there's a tab you can select called
4    "BALANCES"?
5        A    Yes.
6        Q    And I think you explained this already, but
7    what would that pull up, normally?
8          MR. MISHKIN:  Objection.  Form and foundation.
9          THE WITNESS:  Well, again, it depends on
10   whether this is looking at a subaccount or an overall
11   account, but it would pull up the -- I mean, the
12   quantities of various assets owed to or by the
13   customer.
14   BY MR. HARRIS:
15       Q    And is that further, then, divided by the kind
16   of asset?
17       A    Yes.
18       Q    Okay.  All right.  I want to ask you about
19   what notifications a customer gets when they do a
20   transaction --
21       A    Yep.
22       Q    -- if you remember this level of detail.
23          So if I'm a customer on the Exchange --
24       A    Yep.
25       Q    -- and I want to purchase bitcoin --

1        A    Uh-huh.
2        Q    -- do I get some notification that that
3    transaction has happened other than just the balance
4    changing in my --
5        A    I'm not sure exactly what you mean by
6    "notification."  As an example, if you go to the
7    "FILLS" tab on your account, you will generally see an
8    entry for that transaction having happened.  Depending
9    on your account settings, there may have been options
10   that it can be emailed, for instance; but I can't
11   remember exactly what options there were.
12       Q    Okay.
13          (Deposition Exhibit 7 was marked for
14          identification and is attached hereto.)
15          THE WITNESS:  I see this.
16   BY MR. HARRIS:
17       Q    Okay.  So this is from -- it's an email from
18   FTX OTC Portal, June 2, 2020, to Kyle Davies, who is at
19   Three Arrows, and the subject is "Trade Confirmation
20   for Three Arrows Capital."
21          So you described a little about what the OTX
22   portal --
23       A    The OTC Portal.
24       Q    I'm sorry.  The OTC Portal.  Are you aware
25   that customers received trade confirmations for

1    transactions through the OTC Portal?
2        A    I'm not sure if it was -- if it always
3    happened or if it's an option or if that changed over
4    time; but as a general matter, yes.
5        Q    Okay.  And you see it says [as read] "Hello
6    Three Arrows Capital Ltd.  You bought and (FTX sold)
7    5 bitcoin," and it has the price and the total cash.
8          Do you see that?
9        A    I see that.
10       Q    Is it your understanding these were, like,
11   automatically generated notifications for the OTC
12   Portal?
13       A    Yes.
14       Q    And did you say there is a feature where a
15   customer, if they instead use the FTX exchange, they
16   could receive similar notifications?
17       A    I believe there was, but I actually can't
18   recall exactly what events there were options for
19   notifications on it which were automatic.
20       Q    Okay.  All right.  I want to ask more details
21   about the margin lending program.  So who at FTX came
22   up with the idea to add that as a capability on the
23   platform?  Was that your idea?
24       A    I'm not sure who specifically did, and I'm
25   also not sure exactly which set of things you are

**MAGNA** ▶
LEGAL SERVICES

1  referring to, whether you mean margin trading in
2  general or specific parts of a lending facility or
3  something.
4      Q    Okay.  I'm referring to spot margin trading.
5      Does that help narrow things?
6      A    No.  And it's another concept that is related
7  to but not exactly the same as the first concept.  So I
8  was involved in some discussions around it.  Like,
9  there are others as well.  It was a group decision.
10     Q    Well, what -- why did FTX decide to have a
11 spot margin trading program?
12     A    As a general matter -- and, again, let me say
13 FTX decided that -- well, there are a number of users
14 who wanted to have a way to short-sell assets through
15 means other than futures.
16     Q    And so this was to help their customers do
17 those kinds of transactions they wanted to do?
18     A    To borrow or short-spot assets, yes.
19     Q    Okay.  Did having the program help FTX stay
20 competitive in the market for digital exchanges?
21         MR. MISHKIN:  Objection.  Form.
22         THE WITNESS:  I'm not sure what the process
23 is, exactly.
24 BY MR. HARRIS:
25     Q    Was there any way that FTX offered for

1  customers to borrow assets from other customers outside
2  of the peer-to-peer margin program?
3      A    I'm not sure exactly how you are scoping
4  those, potentially; but there are questions of scoping
5  them.
6  BY MR. HARRIS:
7      Q    What are the potential ones you are thinking
8  of?
9      A    So there -- I mean -- sorry.  Let me back up.
10         As a general matter, borrowers were -- with
11 the exception of USD -- as far as I can recall, there
12 are generally between customers in terms of ultimate
13 balances mitigated by FTX as an intermediary, which is
14 to say that, as a general matter -- and there may have
15 been some small exceptions that I can't think of to
16 this; but as a general matter, FTX was not itself
17 taking positions in digital assets but, rather, keeping
18 track of individual customer and net customer -- net
19 small customer balances in various assets.
20         There were customers who were positive; there
21 were customers who were negative; but there were a
22 number of complications including with respect to fiat
23 currencies and stablecoins, also with respect to lines
24 of credit and other things.
25     Q    Okay.  I just want to make sure that I --

1  because I had asked if there is some way that FTX
2  enabled for customers to borrow assets of other
3  customers outside the peer-to-peer margin program.  I
4  wasn't sure if --
5      A    You said "by the peer-to-peer margin program."
6  You meant spot margin trading?
7      Q    Yes.
8      A    I'm not sure if this is what you are asking,
9  but as a general matter, I think that -- I can't think
10 of cases where there were -- customers borrowed funds
11 that didn't show up as borrows or as lines of credit on
12 their account.
13         MR. HARRIS:  Okay.  Why don't I show -- let
14 me -- let's mark the spot margin trading.  I already
15 marked it.  This is exhibit Coverick 18 is what it
16 says.
17         (Deposition Exhibit 18 was previously
18         marked, a copy of which is attached hereto.)
19 BY MR. HARRIS:
20     Q    Okay.  You've been handed what's been labeled
21 already Exhibit 18, Coverick.  It's called "Spot Margin
22 Trading Explainer."  It says it's dated April 4, 2022.
23         Take a look at it, but my first question is
24 going to be if you recognize it.
25     A    I'm not sure if I recognize exactly this

1  version of it, but I recognize -- or give me a second
2  to read through this.  At a high level, yes, but this
3  was an article that was constantly being updated.
4      Q    Okay.  Is there any other document that
5  governed how this Spot Margin Trading Program worked
6  besides this one?
7      A    Yeah.
8         MR. GLUECKSTEIN:  Object to the form.
9         THE WITNESS:  There were a few that could be
10 taken into consideration.
11 BY MR. HARRIS:
12     Q    What else were there?
13     A    There were multiple explainer pages that
14 related in one way or another to margin trading.
15     Q    Okay.
16     A    There are also the trading pages themselves.
17     Q    What does that mean, the trading pages?
18     A    Like the pages where you would actually do
19 trades, like, the market pages on FTX.
20     Q    Okay.
21     A    There were things like that, previous
22 exhibits, the collateral explainer page.  There were
23 various terms of service documents that had things that
24 referenced them.  There were blog posts that referenced
25 it --

1      Q   Okay.
2      A   -- and maybe other things as well.  I'm not
3  sure exactly what you are wanting.
4      Q   Okay.  All right.  So let me ask some
5  questions about that --
6      A   Yep.
7      Q   -- so I understand how that works.
8          So if a customer wanted to borrow an asset, a
9  digital asset or U.S. dollars, it would need to enable
10  the margin lending feature in their account -- is that
11  right? -- or margin borrowing feature?
12     A   In most cases, yes.  There are things like
13  lines of credit, which are causing me to not
14  necessarily say that was true in all cases, but I
15  believe that's true in most cases.
16     Q   Okay.  So let's put aside line of credit now.
17  I'll get to that.
18     A   All right.
19     Q   So you don't have a line of credit.  And I'm
20  an FTX customer, and I want to borrow either fiat
21  currency or a digital asset.  I would need to enable
22  that feature on the account?
23     A   In most cases, yes.  There are still other
24  exceptions as well.
25     Q   Okay.  And I could then obtain a loan of that

1  asset whether --
2          If I satisfied the margin requirements, I
3  could obtain a loan of that asset?
4      A   Potentially, yes.
5      Q   And this was run through the code base; is
6  that right?
7      A   In general.
8      Q   So if I'm a customer and I want to borrow
9  U.S. dollars, the code base does not identify a
10  particular customer lender that provided the dollars to
11  me; right?
12     A   Not to my knowledge, although I didn't write
13  the code base; so I'm not sure exactly.
14     Q   Likewise, if I wanted to borrow bitcoin, to
15  your knowledge, the code base didn't identify a
16  particular --
17     A   To my knowledge, that's right.
18     Q   -- lender?  Okay.  So if I borrowed $10 --
19  U.S. dollars on the margin lending program and I wanted
20  to pay it back, I could transfer $10 onto my FTX
21  account to repay the margin loan?
22     A   In general, yes.
23     Q   That $10 wouldn't, then, be transferred to the
24  account of a particular customer lender; right?
25         MR. MISHKIN:  Object to the form.

1          THE WITNESS:  Not necessarily.
2  BY MR. HARRIS:
3      Q   It would not necessarily be transferred to it?
4      A   That's right.  I'm not sure how you are
5  defining that.
6      Q   How about if I borrowed one bitcoin and I
7  decided to repay the borrowing?
8      A   Right.
9      Q   Would that bitcoin then be allocated to a
10  particular user or lender?
11     A   To my knowledge, it wouldn't be specifically
12  that bitcoin allocated to specifically one lender.
13     Q   Okay.  Do you know whether -- again, if I want
14  to borrow, whether it's dollars or a digital asset,
15  whether that loan to me occurs before the margin
16  lenders have their account debited --
17         MR. MISHKIN:  Objection.
18  BY MR. HARRIS:
19     Q   -- to know which happens first or if they are
20  simultaneous or --
21     A   I don't think that's a well-defined question.
22  I will say that your account balances generally affect
23  you immediately, update to reflect a trade that you
24  did.  So, for instance, if you started out with
25  10 bitcoins and to no dollars and then you purchased an

1  11th bitcoin for $100,000, your account balance would
2  quickly -- would, in general, quickly update to show
3  plus 11 bitcoins, negative $100,000.
4      Q   When that happened, did that necessarily mean
5  that there was a margin lender whose accounts went
6  negative -- went down by one bitcoin?
7          MR. MISHKIN:  Object to form.
8          THE WITNESS:  I'm not sure what you mean by
9  "went down by one bitcoin."  It would mean that the
10  total quantity of -- well, sorry.  Bitcoins are not
11  being lent.  They are dollars; right?
12  BY MR. HARRIS:
13     Q   Sorry.  You are right.  Yes.  I borrowed -- if
14  I'm the tenth person with 10 bitcoins, I borrowed the
15  dollars, yes.
16     A   Right.  It would mean that the total number of
17  dollars collectively borrowed by users would have
18  increased.  And that -- like, that doesn't lead to a
19  decrease in the net balance owed to any other customer;
20  right?
21         Like, it's not like any other customer sees
22  their net account value decrease --
23     Q   Okay.
24     A   -- as a result of that, either immediately or
25  eventually.  So, from a net account value perspective,

1   borrowing did not ever lead to, yeah, a decreased
2   value, necessarily.
3     Q   If I am the one who borrowed the -- I guess it
4   was $10,000 in our example.
5     A   100,000, but whatever.
6     Q   If I borrowed $100,000 and then I repay it --
7     A   Yep.
8     Q   -- that doesn't -- that doesn't eliminate the
9   loan that a particular user provided; right?
10     MR. MISHKIN:  Objection.  Form.
11     THE WITNESS:  It's not identified with a
12   particular user.  It decreases the total amount of
13   dollars being borrowed; but it's not like we say that
14   is going to carry or something like that.  It's done on
15   a net basis rather than a --
16   BY MR. HARRIS:
17     Q   Okay.  All right.  I'm going to ask you some
18   questions about the "Spot Margin Training Explainer,"
19   at least this version as of April 2022.
20     A   Yep.
21     Q   If you look on the second page, there's a
22   section that says "How does margin work for borrowing?"
23     A   All right.
24     Q   It says "Your spot margin positions are
25   cross-margined with your future positions; there is no

1   separate spot margin requirement you have to monitor."
2     Do you see that?
3     A   Yep.
4     Q   Then it says:  "Generally, the way the futures
5   margin works is that each contract has a margin
6   requirement (initial margin fraction to open a position
7   and maintenance margin fraction to avoid liquidation),
8   and you need a total collateral value which meets those
9   thresholds."
10     Do you see that?
11     A   Yes, ma'am.
12     Q   And that's -- I think you explained to us why
13   FTX wanted --
14     A   Yep.
15     Q   -- margin to allow the people to do future
16   trading?
17     A   Yep.
18     Q   Then you say "Spot" -- I'm sorry.  Then the
19   explainer says "Spot margin is similar.  The position
20   size of a spot margin position is the notional size of
21   any short (negative) balances you have."
22     Do you see that?
23     MR. MISHKIN:  Let's go off the record for a
24   moment.
25     (Off the record.)

1   BY MR. HARRIS:
2     Q   Forget the question.  Let me go back to the
3   prior paragraph about futures margin.
4     Is that calculated based off the notional size
5   of the futures positions?
6     MR. GLUECKSTEIN:  Object to the form.
7     THE WITNESS:  As opposed to?  That's an input
8   into it, yes.
9   BY MR. HARRIS:
10     Q   And why is the notional size relative to the
11   amount of margin FTX would want?
12     A   As a general matter -- and, again, there are
13   lots of details; but as a general matter, if one
14   customer had a $10,000 bitcoin futures long position
15   and some customer had a $100,000 bitcoin futures long
16   position, if bitcoin goes down 1 percent, that first
17   customer has just lost $100, and the second customer
18   has just lost $1,000.
19     So, all else equal, the size of the futures
20   positions is correlated to the amount that the account
21   might gain or lose if the markets move and lost the
22   amount of insurance that we would be holding for it.
23     Q   And let's -- could futures positions be lent
24   out under the margins program?
25     A   No.  Futures positions are always just, like,

1   one positive for one negative adding up to zero across
2   the platform.
3     Q   Okay.  And if a customer borrowed an asset
4   under this program, could it withdraw the asset?
5     A   Potentially.  It depends on the details of the
6   account, status, and things like that but, potentially,
7   yes.
8     Q   And you would withdraw it before it repaid the
9   asset program?
10     A   That's correct.  As an example, as a general
11   matter, were there not anything blocking this and
12   marketing conditions permitting, a customer could have
13   deposited ten bitcoins and then withdrawn into a blank
14   account and then withdrawn one on that blank account
15   and ended up with negative 1.
16     Q   How about the lending customer?
17     Could they withdraw the loaned assets?
18     A   There are complications here; but as a general
19   matter, we attempted to allow withdrawals of lent
20   assets.  Obviously, they would no longer be lending
21   them if they were withdrawn.
22     Q   So, if that happens, a customer had lent an
23   asset and then they withdrew it, would some borrowing
24   customer have the asset taken away from them?
25     A   There is also a risk of that happening.

MAGNA ▶
LEGAL SERVICES

1    However, in general, when you looked at -- there's a
2    thing that we attempted and generally succeeded at
3    avoiding by having between interest-earning and
4    collateral-based customers more supply than borrowing
5    demand.
6        Q    All right.  If you go to -- there's a -- I
7    think it's the fourth page.  There's a section called
8    "Lending."
9        A    All right.
10       Q    Are you there?
11       A    Yep.
12       Q    It starts out "To lend an asset out you
13   specify the quantity you want to lend."
14       A    Uh-huh.
15       Q    So that first paragraph, the end of it, it
16   says "lenders bear no counterparty risk:  FTX
17   guarantees interest payments for however long your
18   funds are borrowed even if the borrower gets
19   liquidated."
20            Do you see that?
21       A    I see that.
22       Q    So what was FTX trying to convey with that
23   sentence?
24       A    So my interpretation of what whoever wrote
25   that sentence was attempting to convey was that the

1    lender does not bear a particular risk to a particular
2    borrower who happens to borrow.  Rather, all of the
3    risk is mediated by FTX.
4            And so long as FTX is able to cover any
5    losses, we wouldn't be socializing losses to, like, the
6    particular lenders who happen to lend to a particular
7    customer, who happened to blow out.
8        Q    If I'm understanding correctly, there weren't
9    particular lenders to particular customers; right?
10       A    That's right.
11       Q    And maybe this is related.  On the next page,
12   there's a section called "Risk."
13            Do you see that?
14       A    Yes.
15       Q    And it starts by saying "FTX's risk engine
16   will attempt to liquidate any users before they could
17   get negative net account balance."
18       A    Yep.
19       Q    And then it says "using spot margin opens you
20   up to liquidation risk."
21       A    Yep.
22       Q    So that's the risk to the margin borrower;
23   right?
24       A    Really, it's the risk to both.
25       Q    How is that?

1        A    So the first order one is what you said, to
2    the borrower.  However, if FTX is unable to backstop a
3    loss because it's too large, then there's always the
4    risk that it would be socialized to other users.  I
5    don't believe that was ever invoked, but ...
6        Q    And the next sentence -- and maybe this is
7    what you were getting to -- says "FTX and its backstop
8    fund will attempt to protect other users against other
9    accounts."
10       A    Yeah.
11       Q    And that's -- and the backstop fund, that's
12   the same thing as the insurance fund we were talked
13   about earlier?
14       A    Generally, yes.  At the very least, I don't
15   think there's duties that were specific to anything.
16       Q    Okay.  Do you recall if there was -- now my
17   questions are before November 2022.
18       A    Yep.
19       Q    Do you recall if there was an instance where a
20   customer borrower didn't repay its loans?
21       A    If a different borrower -- are you saying a
22   case where a customer got liquidated, basically?
23       Q    I guess so.
24       A    Yes, plenty.
25       Q    Are there any particular notable ones you

1    remember where there was a large-dollar one?
2        A    Any such case?
3        Q    What's the one you are thinking of?
4        A    No.  I'm sorry.  Three Arrows.
5        Q    Any others?
6        A    No.  We -- I can think of a few others; but
7    there were, I would guess, thousands.
8        Q    What was the next largest one after
9    Three Arrows?
10       A    The one I can think of right now, there was a
11   case involving MobileCoin and BTMX.
12            MR. HARRIS:  Why don't we take a break so you
13   can eat.
14            (Off the record.)
15   BY MR. HARRIS:
16       Q    So just to make sure we have the terms right,
17   you said MobileCoin, and then what was the name of the
18   currency?
19       A    BTMX.  Bravo, Tango, Mike, X-ray.
20       Q    BTMX.  Can you tell me what you remember about
21   that liquidation, like, what happened with that one?
22       A    Yeah.  There were a number of things going on.
23   Sure, it's the high summary of it.  There's a user on
24   FTX.  I say "user."  It was split between multiple
25   subaccounts -- ultimately multiple accounts, but

Page 122

1   there's a user who acquired a large margin position in
2   various semiliquid and illiquid cryptocurrencies, along
3   the cryptocurrencies, the liquid ones.
4       As those currencies went significantly off
5   imprints by a factor of, I want to say, 10 maybe, some
6   large factor, it was a 9-figure position, I believe;
7   and we noticed this user had discussions internally
8   about it.
9       I, at the time, was unsure whether or not they
10   were acting in good faith. A concern which was raised
11   was that they might have been manipulating the markets.
12   I use that with a lower case "m." I'm not trying to
13   cast a legal judgment on it, certainly not trying to
14   speak in the lingo of any particular agency or anything
15   like that.
16       But whether the market rise was caused by this
17   person buying it and whether they were doing so in an
18   attempt to exploit the margin systems on FTX, there
19   were employees who believed that we should liquidate
20   this account.
21       I believe that we reached out to the user to
22   alert them that we were concerned about their account's
23   risk and going to potentially impose further risk
24   restrictions on the account.
25       Their behavior was hostile. I made the

Page 123

1   decision that because they were an otherwise valuable
2   customer, that I was going to wait and see and monitor
3   the account myself unless or until we got confirmation
4   that either there was activity we didn't want on the
5   platform going on there or that, from a risk
6   perspective, we had to act.
7       I was sloppy in how I did so in that
8   particular case. I left open a parameter. I
9   prohibited withdrawals from the account but forgot to
10   prohibit the account from transferring assets to other
11   accounts on FTX. The account proceeded to transfer a
12   significant quantity to other accounts.
13     Q  When you say the account of the illiquid asset
14   or --
15     A  I don't remember exactly but, I think, more
16   liquid assets to other accounts that I believe that
17   same user ultimately owned and then withdrew from those
18   accounts, further increasing the risk of the account
19   after I had thought that I had put a cap on it, at
20   which point, we liquidated the account.
21     Q  And so what was the liquidation process?
22     A  It was a -- I don't remember the details of
23   how it was implemented; but at a high level, it gets
24   passed to the backstop liquidity providers at that
25   point.

Page 124

1     Q  So what does -- so the account has long
2   certain assets. It also has borrows?
3     A  Borrows, that's right.
4     Q  So what gets transferred to the backstop?
5     A  Both -- both the long and -- both the
6   positives and the negatives. And one way to frame this
7   is we stick the position on the BLPs, and it's their
8   responsibility to deal with that position, that risk
9   however they see fit; but then FTX and its users are no
10   longer at risk from it.
11     Q  And when you do that transfer --
12     A  Yep.
13     Q  -- the account still has a net -- net value at
14   that time?
15     A  In general, the hope is to do BLP transfers
16   from an account that still has a net positive market to
17   market, which doesn't necessarily mean that the BLPs
18   will end up winning from that. It's possible they will
19   use more than that value in closing down that position.
20       In this particular case, I believe that it
21   still had a net positive net asset value when that
22   transfer happened but, for the documents and things, a
23   fairly large position and fairly illiquid things, which
24   was going to be difficult, to say the least, to close
25   out without access.

Page 125

1     Q  So when you transfer an account --
2     A  Yep.
3     Q  -- that has a positive, at least on paper,
4   asset value, does the user get some credit for the
5   positive value they no longer have?
6     A  Excuse me. Sorry. It depends, but the -- if
7   we trans- -- if the transfer did not result in a lower
8   net asset value of the original user's account, that
9   would be baking in zero loss to closing down the
10   positions.
11       So we'll necessarily reduce the net asset
12   value of the original user to do this, and in some
13   cases, that would be to potentially the entirety or maybe
14   more than -- or maybe ideally more than the entirety of
15   what was left in the account.
16       Perhaps another way of phrasing this is let's
17   say that we decide that, for a particular position, we
18   would need $10,000 of net positive value. That's
19   stopping this position to be able to hand it off to
20   BLPs.
21       Then one could set parameters such that the
22   liquidation occurs when the original account has $20
23   left, in which case, it would be left with 10,000, or
24   when it has 10,000 left, in which case, it would be
25   left with nothing.

Page 126

1       The second would actually be the -- in some
2 sense more generous to that original user.  It would be
3 delaying the liquidation as long as possible, which is
4 another way of saying only doing it when the account
5 barely has enough left to manage that risk.
6     Q   Okay.
7     A   So -- excuse me.  Sorry -- we would attempt to
8 liquidate as a general matter, usually, such that there
9 was still positive value left in the original account;
10 but if the position grew too large or the market moved
11 too quickly, sometimes that would not be possible.
12     Q   So if you liquidate at a time where there's
13 still positive value --
14     A   Yep.
15     Q   -- but you've transferred all of the assets
16 and liabilities --
17     A   Yep.
18     Q   -- to the BLP --
19     A   Yep.
20     Q   -- how exactly is -- just in terms of
21 accounts, how is there a positive value still?
22     Do they --
23     A   Oh, there might not.  Sorry.  If we transfer
24 all of the values, then there isn't; but we might, in
25 some cases, get away with transferring not quite all of

Page 127

1 the assets.  Leaving some value depends on the market
2 conditions besides the position and other things.
3     Q   Is there code written to automate this process
4 of transferring to a BLP?
5     A   There is code -- there was code for it, which
6 got modified periodically, which attempted to do so as
7 a default matter; but in large or unique cases, that
8 code was sometimes not sufficient.
9     Q   Why would it be not sufficient?
10     A   Well, to give one example, in the case of the
11 MobileCoin/BTMX case, ultimately, our conclusion was we
12 believed that the user had, in fact, been intentionally
13 influencing the price of the market so as to increase
14 the value market to market of their collateral, that it
15 was an artificial market price because of that and that
16 the code underestimated the risk of such a position and
17 there was a risk of loss to some other party if we did
18 not step in.
19     There are other cases where we go in the
20 opposite direction where I delay the liquidation on an
21 account longer than the code would say because, looking
22 at the specifics, we believe it to be overly
23 conservative.
24     There are cases where there's a bug in the
25 system where -- we've had cases where the liquidation

Page 128

1 engine got delayed just because there is too much
2 activity going on in the markets, and so we had to
3 intervene to -- I process liquidations more promptly.
4     Q   I think I remember that, in the MobileCoin
5 liquidation, that the BLP was Alameda; is that right?
6     A   Yeah.  I think -- I don't know if it was the
7 only BLP or the primary one, but yeah.
8     Q   I believe you explained it, you made that
9 decision because you didn't want the losses to be
10 socialized to the user community in general?
11     A   Or the other BLPs.  And another way of
12 phrasing that and how I thought about it in my mind at
13 the time was, by intervening myself, I had decided that
14 I was going to delay a liquidation on that account
15 longer than some of the other employees believed was
16 prudent and that I was going to monitor it from a risk
17 perspective so as to attempt to prevent any losses to
18 FTX or any of its customers, including its BLPs, while
19 allowing the account to remain on the hope that it was
20 both solvent and not a bad actor.
21     Q   Okay.
22     A   I screwed that up.  I missed a parameter,
23 which resulted in a position that was significantly
24 riskier than other BLPs would have been comfortable
25 accepting, and so because it was my screw-up that got

Page 129

1 it there and I had personally been -- made myself
2 responsible for ensuring that it went well, I decided
3 it was appropriate that, effectively, I personally, or
4 an entity that I owned, should have to deal with the
5 consequences of that, which is the taking over what was
6 a potentially toxic position.
7     Q   Okay.  Do you remember how much those losses
8 ultimately were on that position?
9     A   I'm not sure that's a very well-defined
10 question because markets move over time.  So it could
11 have been positive or negative depending on when you
12 mark to.  It was a, I believe, mid-90s account, and so
13 I think we were looking at low to mid-nine figures of
14 potential consequence from it.
15     Q   Was that potential loss ultimately liquidated
16 so Alameda or whoever it was took a loss on it or not?
17     A   I'm not sure exactly what, ultimately, Alameda
18 did.  I think Alameda did not consider it an attractive
19 position when it took it over, but I'm not sure.  Yeah,
20 I don't know.  I think, at that point, I passed it off
21 to other people to actually manage.
22     Q   All right.  We talked about margins.  We
23 talked about lines of credit.  So what was the purpose
24 of FTX issuing a line of credit to a customer?
25     A   There were a few different contexts which they

Page 130

1 were issued usually, or at least in the case, that most
2 quickly come to mind. It was a case where there was
3 some -- at least some entrusted counterparty who I
4 would be able to do more volume on the Exchange if they
5 were to lend money. And so we, sort of, gave them an
6 extra borrow in order -- and sometimes we would tie it
7 to them being an active participant on the Exchange.
8    Q   And for all of my questions about lines of
9 credit, you can put Alameda aside. I'm just talking
10 about non-Alameda customers.
11    A   Yep.
12    Q   So the line of credit, was that effectively a
13 loan from FTX itself as opposed to the user margin
14 program?
15    A   What's the difference between those two
16 exactly?
17       It's an interesting question because,
18 ultimately, FTX was acting as the guaranteeing party
19 for peer-to-peer borrowers as well. So it was a loan,
20 you know, which ultimately was guaranteed by FTX. If
21 it was a loan -- FTX itself would only lend dollars.
22 So it didn't want to take the position of digital
23 assets.
24    Q   So FTX was -- so the lines of credit were only
25 for U.S. dollars?

Page 131

1    A   I think that's -- to my knowledge, yes.
2    Q   Is there a reason why a customer would prefer
3 to use a line of credit as opposed to a margin
4 borrowed?
5    A   I let customers effectively increase the
6 ledger on the Exchange. It depends on the specific
7 account; but, in general, we would give lines of credit
8 that were often larger than the amount that they could
9 have borrowed on margin. Another way to put that would
10 be let them put on a larger position than they
11 otherwise would have been able to.
12    Q   Do you know how FTX determined the size of the
13 line of credit they would grant a customer?
14    A   I'm not aware of any specific formula for it.
15 Factors that went into it included the creditworthiness
16 of the customer in question and the nature of their
17 activity on the Exchange.
18    Q   Do you remember that Three Arrows had a line
19 of credit?
20    A   I remember discussing one of Three Arrows. I
21 don't remember the conclusion of those discussions.
22    Q   Were you involved in the decision whether to
23 give them a line of credit?
24    A   I'm not sure. I may have been.
25    Q   Do you remember the Three Arrows line of

Page 132

1 credit increased over time?
2    A   No. It doesn't surprise me, but ...
3    Q   Do you recall lines of credit came with an
4 interest rate?
5    A   Yep.
6    Q   Do you know if the interest rate on the line
7 of credit was different than the interest on a margin
8 borrowed?
9    A   My memory is that they were usually similar
10 but not identically the same. I believe that, for a
11 line of credit, we typically would just stick a fixed
12 interest rate rather than a floating rate determined by
13 supply and demand. But I believe that we often set it,
14 again, depending on the circumstances to somewhere in
15 the single-digit percents per year, which would be
16 consistent with like what the U.S. dollar peer-to-peer
17 interest rate generally was at that point in time.
18    Q   Again putting Alameda aside --
19    A   Yep.
20    Q   -- are lines of credit memorialized in a
21 document with each customer?
22    A   Usually.
23       MR. HARRIS: I'm going to show you the
24 Three Arrows one and see if it strikes any memories.
25 ///

Page 133

1       (Deposition Exhibit 20 was previously
2 marked, a copy of which is attached hereto.)
3 BY MR. HARRIS:
4    Q   Okay. So this was already marked Exhibit 20.
5 It's "FTX Line of Credit" on page 1. It goes on to
6 page 2. Then you'll see, kind of in the middle or
7 near the bottom of page 2, there's another heading that
8 says "FTX Institutional Customer Margin and LINE of
9 Credit Agreement."
10       Do you see that?
11    A   Uh-huh.
12    Q   So it looks to me like the first part of this,
13 the part called "FTX Line of Credit," the first page
14 and a half feels like a customized document between
15 FTX and Three Arrows.
16       Does that seem right?
17       MR. MISHKIN: Objection. Form. Foundation.
18       MR. GLUECKSTEIN: Form.
19       THE WITNESS: I'm not sure how customized it
20 is.
21 BY MR. HARRIS:
22    Q   Is it based off of, like, a form?
23       MR. MISHKIN: Objection. Foundation.
24       THE WITNESS: There were various templates at
25 various points in time. It looks like it may have

MAGNA
LEGAL SERVICES

1  been.
2  BY MR. HARRIS:
3      Q   Do you recall having any role in determining
4  the terms of the "FTX Line of Credit"?
5      A   You mean --
6      Q   Like the size or the interest rate?
7      A   Sorry.  You mean for Three Arrows in
8  particular or --
9      Q   Yes, for Three Arrows.
10     A   I don't recall, but it wouldn't surprise me
11  either way.
12     Q   Okay.  If it wasn't you, do you have any idea
13  who would have been involved in whatever negotiations
14  there were over this?
15     A   Sorry.  I think I know you asked me.  Just
16  repeat it.  Did you say who would have been?
17     Q   (Inaudible response.)
18     A   You mean from FTX's side?
19     Q   Yes.
20     A   I'd give the same list of people that I did
21  earlier.  So Zane, Vince, Ryan are people who might
22  have been involved, and Burgess at earlier points in
23  time, but there are other people that could have been
24  as well.
25     Q   Okay.  If you see on the first page of this --

1      A   Yep.
2      Q   -- there's a paragraph 5.
3      A   Yep.
4      Q   "Throughout the lifetime of the Line of
5  Credit, at least 200% of the Line of Credit
6  ('Collateral') must be maintained in the Borrower's
7  FTX account," do you see that?
8      A   I do.
9      Q   Do you know what recourse FTX would have if
10  Three Arrows breached that requirement?
11         MR. MISHKIN:  Objection.  Form.
12         MR. GLUECKSTEIN:  Objection.  Calls for a
13  legal conclusion.
14         THE WITNESS:  I believe that liquidation of
15  Three Arrows' account and/or seizure of relevant assets
16  could potentially be involved.
17  BY MR. HARRIS:
18     Q   Do you know if that's what happened?
19         MR. MISHKIN:  Objection.  Form.
20         MR. GLUECKSTEIN:  Object to the form.
21         THE WITNESS:  My memory is that something in
22  that vein happened, but I honestly don't recall the
23  details.
24  BY MR. HARRIS:
25     Q   Okay.  Do you recall if FTX used, like, a

1  liquidation for any other customers when they didn't
2  satisfy the line of credit margin requirements?
3      A   I can't recall off the top of my head any
4  cases where's the solvency of -- any other cases where
5  the solvency of their receiver large line of credit was
6  falling precipitously, called into question, and their
7  account balance was -- fell precipitously.  I'm not
8  sure there are no other cases; but I can't recall any
9  other cases where the relevant conditions were
10  triggered to begin with.
11     Q   Okay.  The second half of this --
12     A   Yep.
13     Q   -- exhibit is this thing called "FTX
14  Institutional Customer Margin and LINE of Credit
15  Agreement."
16     A   Yep.
17     Q   Is that an FTX template?
18     A   It looks very much like one, but I can't state
19  confidently whether there are any modifications.
20     Q   Do you have any understanding what's the
21  relationship between these two parts or documents?
22         MR. MISHKIN:  Objection.  Form.
23         THE WITNESS:  I can give a decent guess, but I
24  can't tell you confidently because I don't remember
25  drafting this particular document.  But I know that, in

1  some similar cases, we would have a general template
2  that was often written in somewhat denser language and
3  were proceeded by some more plain English explainer of
4  particular terms sculpted to a particular case, and
5  this looks sort of like that to me.  Again, I can't
6  confidently say that's what's happening here.
7  BY MR. HARRIS:
8      Q   All right.  Let me ask a question about
9  futures.
10     A   Yep.
11     Q   So we've been trying to find what are, like,
12  the documents that, sort of, governed the terms of the
13  futures contracts that FTX offered.  I've seen a
14  complete futures specs explainer --
15     A   Yep.
16     Q   -- which I'm going to show this to you.
17         Is there anything else out there that we
18  should look at to determine the terms of the futures?
19     A   That's a good place to start.  I don't know
20  what you mean by "terms" exactly.  Legalese, you might
21  not find there.  Details, exceptions, you might not
22  find there.  I don't know what version you have, but
23  that is a decent place to start for a general overview
24  of it, yes.
25     Q   Were there any contracts signed, like, when

1  you would buy a future?  Was there --
2      A   There wasn't, like, a specific contract per
3  future.  You may -- I don't remember exactly when, but
4  you may have had to check a box to agree to various
5  terms once for your account to engage in futures
6  trading; and then, obviously, there are terms of
7  service and other documents like that.
8      Q   Was there a counterparty to each future?
9          Like, if I had that account and I say "I want
10  to get a bitcoin future" --
11     A   Right.
12     Q   -- is there a counterparty to my contract?
13     A   I just mediated them as the counterparty on
14  both sides but was not, in general, the ultimate
15  beneficiary, so to speak, on either side.
16         Usually, you have a buyer and a seller for any
17  futures trade with FTX sitting in between both of them;
18  but it would not usually end up mattering from whom you
19  had purchased or to whom you had sold the futures
20  contract.  It's not like it was a bilateral agreement.
21     Q   So it wasn't a particular -- if I buy a
22  bitcoin future, there's no one that sold me that
23  bitcoin future?
24     A   Well, there is someone who happens to sell on
25  that same transaction because every trade has to have a

1  buyer and a seller; but your futures contract is not
2  marked as, like, being a specific version of a bitcoin
3  futures contract, which is the version that was
4  purchased from this particular counterpart or anything
5  like that.  They were generally just marked as having
6  FTX as the intermediary counterparty for all of them.
7      Q   So there had to be an equivalent number of
8  futures sellers?
9      A   Or buyers or contracts sold as bought.  If you
10  added up all futures positions, you would get zero
11  across the Exchange.
12     Q   But there's no relationship between the
13  buyers -- the particular buyer and particular --
14     A   There's none preserved beyond the execution of
15  a trade.
16     Q   Okay.  And when -- I understand the contracts
17  generally were perpetuals.
18     A   There were two main types and then a long
19  string of others, perpetuals being the highest volume,
20  and then second to that were quarterly futures.
21     Q   When they were settled, the payments would go
22  to FTX?
23     A   Perpetuals or leases?
24     Q   Let's go to perpetuals for this.  How often
25  were they settled?

1      A   Do you know how perpetual features work as a
2  general matter?
3      Q   My understanding is they last perpetually, but
4  you mark to market with a payment of some number of
5  seconds.
6      A   It is financially similar, although not quite
7  identical, to as if 124th of it expired, and then it
8  was reopened, setting the market price every hour.
9      Q   Okay.
10     A   So, every hour, there would be an interest
11  payment between the longs and the shorts on the
12  perpetual futures related to the differences between
13  the futures price and underlying index price.  FTX
14  would mediate those payments, but the net paid and
15  received would be the same.
16     Q   When you say "FTX mediated the payments," the
17  payments went to FTX?
18     A   They went to FTX and then forwarded them on to
19  the other side.  I do not believe that FTX usually took
20  a cut of that fee payment -- or that interest payment.
21     Q   So the payment obligation was to FTX, not to a
22  particular other customer?
23         MR. GLUECKSTEIN:  Object to the form.
24         THE WITNESS:  Mechanically, that's how it
25  worked.  I'm not sure if you mean "obligation" in a

1  legal sense.
2  BY MR. HARRIS:
3      Q   In terms of the user interface, what could a
4  customer see about their futures contracts?
5      A   In general, they could see their position, the
6  trades that led to that position, the history of
7  interest payments.  They could see the underlying index
8  price, the current price of that futures contract,
9  maybe other things, but those are the primary ones.
10     Q   Perpetuals, can those -- can the perpetual
11  futures contracts be tokenized?
12     A   Not directly.  I don't know if you are asking
13  about, like, leverage tokens or something or if you are
14  asking about something else; but you couldn't, for
15  instance, withdraw a futures position as a token.
16     Q   Okay.  Do you know -- was the -- if I had a
17  futures position with the initial amount, was that
18  included in my U.S. dollar balance in some way?
19     A   There are two different but equivalent ways of
20  calculating the same ultimate U.S. dollar balance, and
21  the answer to that question depends on which internal
22  mnemonic you are using to calculate it.
23         So the U.S. dollar balance ultimately
24  reflected the net value of your account mark to market.
25  Sorry.  Do you mean specific U.S. dollars?

1    Q   Just U.S. dollars, excluding all of the other
2  assets.
3    A   So what's the best way to put this?
4        Excluding details like what's happened in the
5  last five seconds in the market, generally, your U.S.
6  dollar balance would reflect gains or losses on your
7  open futures positions.  I don't know if that's the
8  question you are asking or if you are asking something
9  else.
10   Q   A gain to loss, but it would not reflect the
11 notional value; is that right?
12   A   Let me give you an example.  If you were to
13 deposit 100 U.S. dollars, you buy one bitcoin future
14 with a notional value of $120,000, your account balance
15 at that point in time would be 100,000 U.S. dollars.
16 That purchase would not have -- that futures trade
17 would not have affected your U.S. dollar balance.
18   Q   Okay.
19   A   If bitcoin then went up to $130,000, your U.S.
20 dollar balance would increase to $110,000.
21   Q   That doesn't answer my question.
22   A   Great.
23   Q   Could futures contracts be liquidated by FTX?
24   A   Yes.
25   Q   Could they be taken over by FTX?

1    A   By the backstop liquidity.
2    Q   By the backstop liquidated?
3    A   Mediated by FTX.
4        MR. HARRIS:  Okay.  I want to show you the
5  "Futures" -- "Complete Futures Specs" explainer.
6        (Deposition Exhibit Coverick 13 was previously
7        marked, a copy of which is attached hereto.)
8  BY MR. HARRIS:
9    Q   Okay.  So this one has already been marked
10 Coverick 13.  It's called "Complete Futures Specs."
11 This one is dated April 11, 2022.  Take a look at it.
12   A   All right.
13   Q   Is this document familiar to you?
14   A   As a general matter, yes.  There are many
15 versions of it, and I can't comment on this specific
16 version of it; but as a general matter, yes.
17   Q   Okay.  Do you see, the second page, there's a
18 section called "Contract Specifications"?
19       It's right near the top.
20   A   Yes.
21   Q   And then it says "See here," and it looks like
22 here a little grayed-out contract.
23   A   Yes.
24   Q   What do you think that's a link to?
25   A   Some other page on the help desk.

1    Q   Okay.  So there would be some other page on
2  the help desk that would have the contract
3  specifications?
4    A   Or it could be a subset of this page.  It
5  could be (inaudible) revised.
6    Q   Okay.
7    A   Looking through this, I believe it was to a
8  different page.
9    Q   You think it's to --
10   A   Not to one -- not to any of them here.
11   Q   Okay.  All right.  So if we go back to the
12 first page --
13   A   Yep.
14   Q   -- there's a section called "Expiration."
15   A   Yep.
16   Q   And then the third paragraph says:  "For
17 instance, say that you deposited $10,000 of collateral
18 and used it to buy 10 BTC quarterly futures."
19   A   Yes.
20   Q   So customers understood they could buy futures
21 on the FTX exchange?
22   A   Yep.
23   Q   I wanted to ask about some of these terms
24 that are on page 2.  Right underneath "Contract
25 Specifications," there's a section called "Accounts,"

1  and then it defines some terms.
2    A   Yes.
3    Q   The first is "Position notional"?
4    A   Yes.
5    Q   It says "Position size times MP"?
6    A   Yep.
7    Q   And "MP" is market price?
8    A   Mark price.  Similar, but --
9    Q   Okay.  Then there's one called "Zero price
10 (ZP)"?
11   A   Yes.
12   Q   What is that used for?  Do you recall?
13   A   That was generally the price set -- a future
14 would have to go to to set an account's net asset value
15 to zero.
16   Q   Was that price used when there was a
17 liquidation occurring?
18   A   It was one of the factors involved in
19 calculating the liquidation but not the only one.
20   Q   If you go to the fourth page, there's a
21 section called "Liquidations."
22   A   All right.  Yep.
23   Q   Under "Liquidations," it says here "See here
24 for more details"?
25   A   Yes.  It's a link to a different page.

1    Q   You don't remember what that page was?
2    A   Not the details of it, no.
3    Q   So it describes in Step 1 automated
4  liquidation of futures positions?
5    A   Yep.
6    Q   And a trigger for that is if the maintenance
7  margin fraction is less than its maintenance margin; is
8  that right?
9    A   That the -- one second.  Yes.  If the margin
10  fraction is less than the maintenance margin.
11    Q   Okay.  And then there's Step 2.  It says "If
12  account falls even closer to bankruptcy, the backstop
13  liquidity provider system will kick in."
14       Do you see that?
15    A   Yep.
16    Q   And then the second paragraph under that says
17  "When an account is getting auto-closed, it will have
18  its position closed down at the bankruptcy price."
19    A   Yep.
20    Q   What did bankruptcy price refer to?
21    A   I believe -- give me one second.  I believe
22  that's the same as zero price.
23    Q   So the user --
24    A   Would be at zero at that point.
25    Q   -- would have a zero account?

1    A   That's right.
2    Q   So if they previously had some positive net
3  asset value, that would be wiped out?
4    A   That's right.
5    Q   And at the bottom of the page, it talks about,
6  sort of, the speed at which this could happen.
7    A   Yep.
8    Q   It sounds like this is a very fast process.
9    A   It depends.  In some cases, this would be a
10  fraction of a second.  In other cases, it would be
11  hours.
12    Q   Under -- I'm sorry.  Under Step 3, it says
13  "If an account does go bankrupt, the backstop liquidity
14  fund will pay out to bring the account balance back to
15  zero."
16       Do you see that?
17    A   Yep.
18    Q   When it says "payout," payout to whom?
19    A   To the user, basically.  So, in this example,
20  if a user's account ends up with a negative net asset
21  value, then -- and there's no other way for us to
22  collect on that, then something has to take that back
23  up to zero.  It still has to be paid into that user's
24  account until it is worth zero.  This is below zero,
25  and that would be the BLP one in this case.

1    Q   Okay.  You wouldn't actually make a payment to
2  the user, but you wouldn't be attempting to collect the
3  debt?
4    A   That's effectively correct.
5    Q   And FTX would be absorbing that loss?
6    A   That's correct.
7    Q   Is there a way for someone at FTX to manually
8  tell the engine to start liquidating futures?
9    A   A particular position, that is?
10    Q   (Inaudible response.)
11    A   For developers, yes.
12    Q   If you look at the next page, there's a
13  section that says "Specifically" --
14    A   Yes.
15    Q   -- and it has some numbers.
16       A couple of paragraphs under that, it says
17  "BLPs have a max capacity per minute and per hour."
18    A   Yep.
19    Q   It says "Position is closed against BLPs in
20  proportion to remaining capacity."
21       What is that referring to?
22    A   BLP backs off liquidity providers.  We are
23  allowed to set certain parameters related to their
24  account, which is, they were allowed to say, for
25  instance, "We are not willing to take on more than

1  $10 million per hour of a liquidating account."
2       And so this is describing us liquidating an
3  account without -- and passing on BLPs without
4  overloading those fields.
5    Q   And are they allowed to decline even if it's
6  within their capacities?
7    A   No.
8    Q   Then the next sentence says "If BLP total
9  capacity is insufficient, the remaining size is closed
10  against users with large opposing positions."
11       What does it mean "users with large opposing
12  positions"?
13    A   That this is something which I think was
14  rarely or never actually triggered, but this is saying
15  that, in theory, if you have a position of, say, a
16  $10 billion futures position and all of the BLPs put
17  together are willing to take $5 billion -- let's say
18  6 billion -- then the other 4 billion, we have the
19  right to close those down against other users who had
20  the positions in the opposite direction rather than
21  passing them to the BLPs.
22    Q   So what would that -- so, for that
23  4 billion --
24    A   Yes.
25    Q   -- what would it mean to "close down the

1  positions"?
2      A   Well, it would mean that if they were -- if,
3  for instance, the liquidating users were short bitcoin
4  users and the others were long, it would close down the
5  longs as if they were BLPs.
6      Q   Without getting payments made?
7      A   Well, when you say "payments," these are
8  futures positions.  So, as phrased here, it would be
9  closing them down at the market price, effectively --
10     Q   Okay.
11     A   -- or, rather, at something at least as good
12  as the market price to those other users.
13     Q   So the other users would at least be getting
14  the market price?
15     A   Yeah.
16     Q   You don't recall that ever happening; right?
17     A   That's right.  It's possible it happened for
18  small sides, an illiquid product.  And at this point,
19  I have forgotten; but I don't remember anywhere it
20  happened.
21     Q   Do you recall what kinds of futures positions
22  Three Arrows had in 2022?
23     A   I recall that it had significant Bitcoin and
24  ETH positions.  I'm not sure if it had others as well.
25  Sorry.  Let me take that back.  I recall that it had

1  significant futures or margins positions in Bitcoin or
2  ETH.  I don't recall whether they were spot margins or
3  whether they were futures.  I think they were
4  futures -- futures were involved, but I can't say that
5  confidently.
6      Q   Does the -- if we are in this step where BLPs
7  are insufficient --
8      A   Yep.
9      Q   -- and so you are going to close down
10  positions, how would that work for a spot position?
11     A   So this document is only about futures.
12     Q   Right.
13     A   The --
14     Q   There's a different process for spots?
15     A   Different but similar.  It would work sort of
16  analogously, but this document doesn't spell it out.
17     Q   I guess what I'm confused about is --
18     A   Yep.
19     Q   -- say I'm short Bitcoin --
20     A   Yep.
21     Q   -- and I have --
22     A   Sorry.  Spot or Bitcoin futures?
23     Q   Spot Bitcoin.
24     A   All right.
25     Q   -- and I'm going bankrupt and your BLPs won't

1  take it on --
2      A   Yep.
3      Q   -- and you -- instead of FTX absorbing the
4  loss, it's going to socialize them.
5          Who would it socialize that with?
6      A   You are conflating two different -- sorry.
7  This -- every one conflates different factors unless
8  you think of it.  Split out loss from position.  So one
9  question you can ask is let's say there's a position
10  which has zero net asset value mark to market or maybe
11  small positive, but it's a large futures position or a
12  large margins position, and there's risk with taking it
13  over.  What this is about here is that.  It's about the
14  size of the position, not about there being losses --
15     Q   Okay.
16     A   -- mark to market.
17         A separate concern one could have is, after
18  having completed this process, you end up with a
19  negative number of dollars left in the account, an
20  actual loss mark to market and how FTX would deal with
21  that.
22         So ask your question again, but clarify which
23  of those two concepts you are talking about.
24     Q   Okay.  I was talking about the second one
25  where there was an actual loss --

1      A   So that -- yep.  So that brings you back to
2  this Step 3 here --
3      Q   Okay.
4      A   -- which is, funds permitting, FTX and/or its
5  backstop liquidity fund would attempt to cover such a
6  loss.
7      Q   And if the backstop liquidity providers are
8  not willing to take on a position --
9      A   Take on a position?
10     Q   -- that would mean either the fund would
11  absorb it --
12     A   The fund wouldn't absorb the position.  So in
13  this -- sorry.  Which I don't know ever got triggered.
14     Q   Okay.
15     A   Other users would absorb the position, but
16  they'd absorb it at the current market price or better.
17     Q   So they are not taking on a loss as well?
18     A   A loss.  They are just having a forcible
19  position closure.
20     Q   Okay.
21     A   And then, after that process was completed, if
22  the requirement that the other users not began a losing
23  mark-to-market position meant there were a negative
24  number of dollars leftover in a liquidated account,
25  then FTX, with the backstop liquidity fund, funds

MAGNA
LEGAL SERVICES

1  permitting, would cover that negative number of U.S.
2  dollars.
3     Q   Okay.  So the goal was never to impose a loss
4  on other users?
5     A   Yes.  Unless one had no choice.
6     Q   So, if FTX could, it was going to avoid
7  imposing loss on other users?
8     A   That's right, obviously could -- there are
9  questions of exactly how many dollars FTX would have
10  committed to do so.  I think it publicly committed to
11  at least north of a hundred million dollars.  In
12  practice, I think it would have been willing to admit
13  to significantly more than that.
14     Q   Do you have a sense how much it would be
15  willing to admit?
16     A   It depends on the nature of what happened.
17  In particular, if there was, like, an error that
18  occurred, a mistaken print or something that had to be
19  reversed, I wouldn't count that as a loss stuck onto
20  another user.  I would count that as a correction of an
21  erroneous gain.
22        Assuming that you think of things in those
23  terms, it depends on the circumstance; but I
24  anticipate -- I anticipated at the time that, you know,
25  the number was probably more like a billion.

1     Q   My understanding, it was important to FTX that
2  it hadn't had to socialize losses; is that right?
3     A   That's right.
4     Q   So you would have done what you could to avoid
5  that if you could?
6     A   I -- in general, yes.
7        (Deposition Exhibit 8 was marked for
8        identification and is attached hereto.)
9  BY MR. HARRIS:
10     Q   Okay.  You've been handed Exhibit 8, and I
11  imagine you've never seen this before.  It's a
12  declaration by an employee --
13     A   I have never seen it before.
14     Q   Okay.  It's an employee of Alvarez & Marsal,
15  which is a financial advisor to FTX when they were a
16  debtor and now the recovery trust.
17        Feel free to take all the time you want with
18  it.  I really just wanted to try to see if you agreed
19  with some statements you made in here.  The ones I'm
20  going to look at are paragraphs 34 to 37.  I don't know
21  if you need more time to familiarize yourself.
22     A   Let me figure out the answer to that question.
23  Other than small quibbles with the phrasing of parts of
24  it, as far as I've, so far, processed -- you said
25  paragraphs 34 to 37?

1     Q   Yes.
2     A   At a high level, I agree with -- well, I
3  can't, I guess, confidently say what the author
4  intended with them, but they seem broadly reasonable to
5  me.
6     Q   Okay.  The quibbles you have in mind, what
7  were those?
8     A   So "It could not be sold or otherwise
9  transferred for consideration" would be an example.
10  It's -- maybe one way of phrasing it is "It could be
11  sold for its duration of value of approximately zero."
12        There are a number of times where I think
13  there's ambiguity here between something not having a
14  concept of value or having a value, and that value is
15  close to zero --
16     Q   Okay.
17     A   -- or could be positive or negative.  Those
18  are the flavor of, like, ambiguities, I guess, in the
19  phrasing here.
20     Q   Okay.  If I understand right, your view would
21  be that the perpetual futures could have a value, but
22  it was likely de minimus?
23     A   That's -- to the extent that -- well, I don't
24  know.  It would depend on how you would define "value"
25  to begin with.  For instance, twice its value mark to

1  market, I mean, I guess you could try to define it such
2  as to include the unorganized P&L over the last ten
3  seconds or something, which might be like a hundredth
4  of a percent or something like that, again definitional
5  issues here; but to the extent one tried to assign a
6  value to them, that value would generally be on a very
7  small scale like that.
8        If there's a very large, very recent market
9  move, then it becomes a more important consideration
10  whether one is baked, unrealized P&L, which is not
11  here.
12     Q   Okay.  For that MobileCoin example you had,
13  are those --
14     A   Well, those were not futures.
15     Q   Can you think of any futures that moved very
16  quickly?
17     A   Yeah.  I mean, I don't remember which current
18  we had futures on; but during the Terra Luna crash,
19  there were very, very large, rapid market movements.
20     Q   Any other quibbles you have from this?
21     A   As a general matter for describing how things
22  usually worked, no.  There are a number of statements
23  that, again, I think are generally and usually true;
24  but I could come up with weird corner cases where they
25  didn't apply.  And so I, sort of, don't want to say

1  that, definitely, everything here is a hundred percent
2  true a hundred percent of the time, just that this is
3  generally consistent with how I would describe it.
4     Q   Okay.  I think we are done with that one.
5  All right.  I think we've discussed that a customer
6  could hold multiple different kinds of digital assets
7  on the Exchange; right?
8     A   Yep.
9     Q   And they could be long in one and short in
10 another?
11    A   Yep.
12    Q   They could be positive or negative in U.S.
13 dollars?
14    A   Yep.
15    Q   You could have a margin loan?
16    A   Yep.
17    Q   And for the most part, if you add the values
18 of all of those assets plus and minus, you would have a
19 net account value; right?
20    A   Uh-huh.
21    Q   Which was generally supposed to be positive
22 for customers?
23    A   Usually.  Again, things like line and stuff,
24 credit, make this complicated; but, usually, yes.
25    Q   Was it your understanding that all of those

1  positions, the different digital assets, the margin
2  loan, was actually fictitious, and the only thing that
3  it actually -- the customer actually had was the net
4  account balance?
5        MR. MISHKIN:  Objection.  Form.
6        MR. GLUECKSTEIN:  Objection.  Form.
7        THE WITNESS:  I'm not sure what you mean by
8  that.
9  BY MR. HARRIS:
10    Q   Does that question make sense to you?
11    A   Sorry.  You are saying that the margin loan
12 was fictitious?
13    Q   Yes.  There was no loan.  There were no
14 assets.  All the customer had was a net account
15 balance.
16       MR. MISHKIN:  Objection.  Form.
17       MR. GLUECKSTEIN:  Object to the form.
18       THE WITNESS:  I have no idea what it would
19 mean for a loan to be fictitious.  Are you saying --
20 you are going to have to clarify what you mean by that.
21 BY MR. HARRIS:
22    Q   Okay.  When you set up this exchange, did you
23 intend to allow customers to hold assets, digital
24 assets?
25    A   What do you mean by "hold"?

1     Q   Have an entitlement to a digital asset?
2     A   I'm not sure what you mean by "entitlement."
3  Maybe I can say it this way:  I intended for customers
4  to be able to deposit assets, that there would be a
5  representation of the assets that they would be owed by
6  the Exchange, that they could attempt to withdraw those
7  assets' liquidity permitting that they could, in some
8  cases, use them as collateral for futures trading or
9  later margin trading.  I don't know if that answers
10 your question.
11    Q   So if instead all a customer had was an
12 entitlement to whatever the net asset balance was --
13    A   And by "net" -- sorry -- do you mean split by
14 asset or --
15    Q   No.
16    A   -- do you mean just the overall U.S. number?
17    Q   Just the overall USD.  Is that your
18 understanding of how it worked, that the customer was
19 only entitled to the overall asset balance?
20       MR. MISHKIN:  Objection.
21       THE WITNESS:  That was not my understanding,
22 but I'm not sure how you are defining "entitlement."
23 BY MR. HARRIS:
24    Q   Would you agree with me that if a customer
25 didn't actually have an entitlement to any digital

1  assets, it wouldn't be able to loan them out through
2  the margin program?
3        MR. MISHKIN:  Objection.  Form.
4        THE WITNESS:  You still have to define what
5  "entitlement" means.
6  BY MR. HARRIS:
7     Q   If, in fact, they have no --
8     A   Maybe I can ask you a question.
9     Q   Yes.
10    A   If I lend you a paper clip, do you have
11 entitlement to that paper clip?
12    Q   I think, at the time you loan it to me, I
13 would.  So that's what I would mean by "entitlement."
14    A   Sorry.  Would I have -- I lend you a paper
15 clip.  Do I then, after having handed it to you -- by a
16 loan, would you agree that, at some vague later time
17 you will return, are you defining me as having
18 entitlement to that paper clip?
19    Q   Possibly, I guess.
20    A   So how would you feel if I answered "possibly"
21 to all of your questions?
22    Q   I take it these are confusing questions;
23 right?
24    A   I think you are trying to use a word and to
25 avoid defining it.

Page 162

1    Q    So if someone were to take the position that
2    the way the FTX exchange operated was that a customer
3    has had no assets, margin lenders had no liabilities
4    and, instead, the only relationship between FTX and its
5    customers was the net account balance, does that sound
6    accurate to you?
7            MR. MISHKIN:  Objection to the form.
8            THE WITNESS:  That is not certainly how I
9    would describe it.
10   BY MR. HARRIS:
11   Q    I want to show you the liquidations explainer.
12   Let me -- before I do, let me just ask, generally, I've
13   heard references to the liquidation engine and the risk
14   engine.  Are they the same thing?
15   A    Related concepts.  I guess I would refer to
16   the liquidation engine as a part of the risk engine or
17   something like that.
18   Q    We talked a little about that three-step
19   process.
20   A    Yeah.
21   Q    Is that the same thing as the liquidation
22   engine?
23   A    Is that the same thing as it?
24        I mean, I think that is a general, high-level
25   description of how the risk engine often operated.

Page 163

1    Q    Okay.  And why did FTX create this risk
2    entity?
3    A    Well, we had millions of customers, and
4    markets were moving sometimes in the span of seconds.
5    There's no ability to manage every one of those
6    accounts manually.
7    Q    And what was the risk that you were trying to
8    prevent by having this system?
9    A    The core risk and most important risk was the
10   risk that an account would end up with -- was that
11   there would be -- a user would end up with negative net
12   value and unable to recover it and that that would
13   cause socialized losses.
14        (Deposition Exhibit 22 was previously
15        marked, a copy of which is attached hereto.)
16   BY MR. HARRIS:
17   Q    I'm handing you what was already marked
18   Exhibit 22.  It's called "Liquidations," and this one
19   is also dated April 4, 2022.
20        Take a look at it, but my first question is
21   going to be if you are familiar with the document.
22   A    I'm familiar with some of its content.  I'm
23   not sure I'm familiar with this version of this
24   document, though.
25   Q    Okay.  It went through several different

Page 164

1    versions.
2    A    "Several" would be an understatement.
3    Q    Did you, like, have some role in helping
4    prepare some versions of this?
5    A    I'm not sure if I did.
6    Q    Did you have a role in developing the
7    liquidation engine itself?
8    A    Yeah.  Sorry.  It depends on what you mean by
9    "developing."
10   Q    I don't mean the coding.  I mean --
11   A    The ideas behind it, yes.
12   Q    Okay.  Including, like, the three-step
13   process?
14   A    I don't know if I necessarily specifically
15   thought of it in terms of divided in those three steps,
16   but including the ideas in those steps, yes.
17   Q    Okay.  If you look at the first page --
18   A    Yes.
19   Q    -- it starts with some "Notes."  No. 1 is
20   "While FTX aims to reduce the likelihood of clawbacks,
21   they are still possible"; right?
22   A    Yes.
23   Q    I think you described there's always that
24   risk.
25   A    Yep.

Page 165

1    Q    Then, after the "Notes," it says "FTX
2    significantly reduces the likelihood of clawbacks by
3    using a three-tiered liquidation model"; right?
4        Then I want to, kind of, go through those
5    different three tiers or steps.
6        Just to make sure I understand, this process
7    applies both to futures contracts and also margin loans
8    and --
9    A    Similar processes apply.  I don't know what
10   you mean by this exactly, and I'm not sure what this
11   document is scoped to; but there are similar processes
12   for spot margin and futures.
13   Q    Okay.  And it mentions clawbacks.
14        Was there any code written to implement a
15   clawback?
16   A    I'm not sure.  I don't believe that we ever
17   had to actually effect a clawback, and were we to do
18   so, it would be after much deliberation, and
19   potentially, I don't know.
20   Q    You are not aware of some code having been
21   drafted already to implement it?
22   A    I don't know.
23   Q    Okay.  Okay.  So let me just walk through
24   these steps as they are described here, and if there's
25   something in here that you think is inaccurate, that

**MAGNA** ▶
LEGAL SERVICES

1    would be helpful also.
2        A    When you say "inaccurate," do you mean
3    something which I think is, sort of, like, a poor
4    description of what usually happens or something which
5    does not carefully describe all possible things that
6    could happen?
7        Q    Mainly a poor description.
8        A    Of what usually happens?
9        Q    Of what usually happens.
10       A    Understood.  Okay.
11       Q    Okay.  If you can, look at the second page.
12   Under "Step 1" --
13       A    Yep.
14       Q    -- it says "If the account's margin fraction
15   is less than maintenance margin but above auto-close
16   margin fraction, then...."
17       A    Yep.
18       Q    Then it describes an automatic system.
19           So is that the typical trigger for the Step 1
20   automatic process?
21           MR. MISHKIN:  Objection.  Form.
22           THE WITNESS:  That is often -- sorry.  That
23   would often trigger -- be a trigger for liquidation.
24   BY MR. HARRIS:
25       Q    Are there other triggers for this that you can

1    remember happening for this automatic liquidation?
2        A    I can imagine cases where the margin fraction
3    jumps straight through Step 1 down below --
4            THE REPORTER:  I'm sorry.  "Down below" --
5            THE WITNESS:  -- auto-close margin fraction.
6    ACMF, yes, is the acronym for it.  Where, below, it
7    says "verify," it matches the situation to choose the
8    brand, or you can change -- it's the change in
9    parameters in the Exchange that shifts the status of
10   account.
11   BY MR. HARRIS:
12       Q    What does that mean, "change in parameters"?
13       A    Changing the amount of margin required --
14       Q    Okay.
15       A    -- for a position, for instance.  You can
16   imagine something involving a line of credit; but if
17   you, sort of, restrict this to, like, sort of, slow
18   moving markets, liquid assets, small account, no
19   unusual parameters, then this would be the common way
20   that it would be done.
21       Q    The common trigger is the margin fraction
22   falling below --
23       A    Falling below maintenance margin.
24       Q    You said something about a line of credit.
25       A    Yeah.

1        Q    What do you mean a line of credit could
2    trigger?
3        A    Let's say that there is an account that,
4    hypothetically speaking, had a line of credit of
5    $120 million, a net account value, including that line
6    of credit, of $180 million and required $100 million of
7    collateral to support its positions.  If that line of
8    credit were to be revoked, the account would jump from
9    above maintenance margin probably to being below
10   auto-close margin fraction by virtue of that
11   120 million line of credit no longer being applicable.
12   There are other examples.  That's one example one could
13   imagine.
14       Q    So, in that example, the trigger was still the
15   margin factor was too low?  The cause of the margin
16   factor being too low would be the elimination of the
17   line of credit?
18       A    That's right.
19       Q    So can you -- can you think of any examples
20   causing this automatic liquidation that don't involve
21   the margin factor being too low -- the margin fraction
22   being too low?
23           MR. MISHKIN:  Objection.  Form.
24           THE WITNESS:  Sorry.  Are you asking me about
25   hypothetical examples or about things that I can

1    remember happening?
2            MR. HARRIS:  Things you can remember
3    happening.
4            THE WITNESS:  If parameters are changing,
5    exchange parameters, then saying "What is the
6    maintenance margin requirement?" that's a notion that
7    changes over time.  So below what that parameter will
8    be, has become, should be something like "that may have
9    been the cause of some" --
10           I'm not sure I can think of a time off the top
11   of my head as of, say, July 2022 where that had
12   happened.  I'm not confident that there are no other
13   cases I'm forgetting, but ...
14   BY MR. HARRIS:
15       Q    In this Step 1 we are looking at?
16       A    Yep.
17       Q    When the auto liquidation happens, are these
18   being liquidated at the market price or some other
19   price?
20       A    They are being liquidated basically at the
21   market price.  They are being liquidated by actual
22   order sent to the order book and so at whatever the,
23   you know, fill price is on those trades.
24       Q    Okay.  Then Step 2 is triggered if the margin
25   fraction is less than the ACMF?

1    A    Yes.
2    Q    Okay.  And the third paragraph talks about
3   BLPs having a maximum capacity per minute an hour, and
4   you told me about that already.
5         And then it says "If BLPs total capacity is
6   insufficient, the remaining size is closed against
7   users with large opposing positions," and we talked
8   about what that meant for futures contracts.
9         What about for other kinds of assets?
10        How would that work for spot positions?
11        MR. GLUECKSTEIN:  Object to the form.
12        THE WITNESS:  I don't remember off the top of
13   my head.
14   BY MR. HARRIS:
15    Q    For someone who had a short position?
16    A    Yeah.  I write in either position, and I don't
17   remember the terms on that.
18    Q    Do you know if FTX already had policies in
19   place to determine how they would decide who were the
20   users that it would be closed against?
21    A    I'm not sure.  I don't know that this ever
22   happened.
23    Q    Okay.  The next paragraph says "Liquidated
24   account closes at ZP."  I think that's that term we
25   looked at.

1    A    Zero price.
2    Q    Zero price.  Okay.  And the zero price is
3   generally less than the market price?
4    A    If the account sells positive in that asset
5   value, yes.
6    Q    Okay.
7    A    Zero price is the price at which the account
8   would have zero net asset value.
9    Q    So we found a positive net asset value --
10    A    Then market price.
11    Q    So if the account is -- if an account that's
12   being closed in a positive value --
13    A    Yep.
14    Q    -- then the accountholder is going to be
15   set --
16    A    -- to zero.
17    Q    Okay.  Then Step 3 is "Whenever an account
18   hits the auto-close margin fraction, the backstop
19   liquidity fund steps in."
20        And it says "If the account isn't yet
21   bankrupt" -- and "bankrupt" means it has a --
22    A    -- zero asset value.
23    Q    So this is saying, if the account still has a
24   positive value, then the backstop liquidity fund gains
25   one-third of the remaining value?

1    A    Yes.
2    Q    And then the -- who gains the other
3   two-thirds?
4    A    The BLP.
5    Q    Okay.  And then the last paragraph says
6   "Customers will only have their positions auto-closed
7   if an account hits auto-close margin fraction and the
8   backstop liquidity providers are out of capacity."
9        When it's talking about customers here, it's
10   talking about other customers?
11    A    Other customers.  Other unrelated customers.
12    Q    Okay.  I'm flipping pages quickly.
13    A    Yep.
14        (Deposition Exhibit 9 was marked for
15        identification and is attached hereto.)
16   BY MR. HARRIS:
17    Q    Okay.  You were handed Exhibit 9, which is a
18   printout from an archive web page.  It says "FTX
19   Liquidation Process Flowchart."
20    A    Uh-huh.
21    Q    I don't know if this helps.  The very last
22   page of it has your name on it.
23    A    All right.
24    Q    So do you recognize what this is?
25    A    At a high level, yes.

1    Q    Okay.  What would you describe it as?
2    A    A series of flow charts of what happens in
3   very specific liquidation scenarios.
4    Q    Okay.  I want to talk about the last scenario.
5    A    Which?  The price gap, you mean?
6    Q    The price gap, yes.
7    A    All right.
8    Q    So is this referring to a scenario where the
9   account has -- the net account value has gone negative?
10    A    Give me a second.
11    Q    Sure.  You may need to go back and read the
12   whole scenario to understand.
13    A    All right.  Sorry.  Rephrase the question.
14    Q    Yeah.  And I misled you.  I actually want to
15   talk about the prior scenario first.
16    A    All right.  So this is "Orderly Liquidation."
17    Q    "Orderly Liquidation."  And I'm really
18   interested in the bottom of that page where it says
19   BTC drops another 2 percent.
20    A    All right.
21    Q    So, here, we are in the world where it says
22   "Account A has dropped below auto Close Margin
23   Fraction."
24    A    All right.  Got it.
25    Q    Okay.  And it says "The account's entire

1  position and balances are being sold to the Backstop
2  Liquidity Providers and Insurance Fund."
3      A   Yes.
4      Q   And then it has this chart.  It says
5  "Account A," and there's an arrow to "Backstop LP" and
6  an arrow to "Insurance Fund."
7      A   Yep.
8      Q   And then it says "Position," and then
9  two-thirds of assets to Backstop LP, one-third of
10 assets to Insurance Fund.  I just want to make sure I
11 understand.
12         Does this mean the entire position goes to the
13 backstop liquidity fund --
14     A   Yes.
15     Q   -- or one-third of the asset value?
16     A   Goes to the Insurance Fund, yes.
17     Q   I said that wrong.  The entire position is
18 going to the Backstop LP?
19     A   Sorry.  The entire position is going to the
20 backstop and two-thirds as well; but none of the
21 position goes to, whatever you want to call it,
22 insurance backstop fund.
23     Q   Then now I want to go to the last one, which
24 is "Price Gap."
25     A   All right.  Yep.

1      Q   And I just want to make sure I understand what
2  these arrows mean.
3      A   Yep.
4      Q   So there's an arrow from "Insurance Fund" to
5  "Account A," which is debt?
6      A   Yes.
7      Q   What is that referring to?
8      A   Account A now has a negative asset value,
9  negative $25,000 in particular, and at the end of the
10 day, something has to cover that.  And this scenario,
11 which is assuming we are not getting anything else from
12 Person A, and so, in this case, the Insurance Fund is
13 going to cover that $25,000 loss.
14     Q   Okay.  And then there's an arrow from
15 "Insurance Fund" to BLP that says "Hedging cost."
16     A   Yep.  That's right.  So the BLPs are supposed
17 to get this position that's better than zero price, in
18 other words, better than market price because,
19 otherwise, it's a losing proposition for them because
20 they still have to hedge out of this position that they
21 are being forcibly given.
22         And so in order to keep them incentivized to
23 be part of the BLP program, the Insurance Fund covers
24 this -- I don't know if it's exactly the two-thirds --
25 I don't remember exactly what it is, but it's some

1  amount maybe, like a percent or something.
2      Q   So the Insurance Fund would both have to
3  absorb the loss from the account and also have to pay a
4  hedging cost?
5      A   That's right.
6      Q   Is it fair to say FTX set up some extensive
7  procedures to try to avoid clawbacks?
8      A   Yes.
9      Q   Those included having margin requirements and
10 the liquidation engine with these various steps?
11     A   Yes.
12     Q   Remember, we asked you about this hypothetical
13 world where, in fact, users didn't have assets and
14 didn't loan their assets out and, instead, all they had
15 was a net account balance?
16     A   Yeah.
17     Q   Okay.  If that was the world, if the account
18 balance was getting to zero, couldn't FTX just close
19 the account and avoid any losses?
20         MR. MISHKIN:  Objection.  Form.
21         THE WITNESS:  I'm confused about this
22 hypothetical.  Maybe with some concrete, like,
23 hypothetical example because you are saying that they
24 don't have assets, does that mean they only have
25 dollars, or they don't have dollars?

1  BY MR. HARRIS:
2      Q   All they have is whatever the net asset value
3  is.
4      A   Which is a dollar figure?
5      Q   Which would be a dollar figure.
6      A   But then how is the net asset value changing
7  of the account if it doesn't have any positions or
8  tokens with market prices that deviate?
9      Q   Say what an FTX customer really had was some
10 synthetic derivative measured by whatever lever they
11 chose to pick by saying "Let's pretend I own bitcoin,
12 and let's pretend I own dollars"?
13         MR. MISHKIN:  Object to form.
14         THE WITNESS:  Are you saying a futures
15 contract?  That is how some people might define a
16 bitcoin futures contract.  A financial instrument with
17 a financial settlement depending on the price of a
18 bitcoin at a future point in time that does not involve
19 physical transference or withdraw ability or ownership
20 of any bitcoins, is that what you are talking about?
21 BY MR. HARRIS:
22     Q   So let's imagine that every single FTX user --
23     A   Yep.
24     Q   -- whether they said they are buying spot or
25 bitcoin or said they were doing a margin loan --

Page 178

1    A   Yep.
2    Q   -- or said they were buying a future, in fact,
3  all they were buying was a synthetic derivative that's
4  measured by these inputs.
5       MR. MISHKIN: Objection. Form.
6  BY MR. HARRIS:
7    Q   In that instance, couldn't you just shut down
8  the accounts when it comes close to zero without the
9  need for margin requirements, for instance?
10      MR. MISHKIN: Objection. Form.
11      MR. GLUECKSTEIN: Object to the form.
12      THE WITNESS: Would I be amiss to think of
13  this as a hypothetical where FTX didn't offer spot
14  trading to begin with and only had futures trading?
15  BY MR. HARRIS:
16   Q   You are talking about FTX as it was actually
17  run?
18   A   But not as it was actually run.
19   Q   So what I described to you does not describe
20  to you how it was actually run?
21   A   Not if you are using reasonable definitions of
22  the words you refuse to define.
23   Q   If -- if, in fact, all people had -- every FTX
24  customer just had this synthetic derivative whose value
25  was triggered by reference to the assets --

Page 179

1    A   Right.
2    Q   -- that they chose to pretend to invest in,
3  could FTX have avoided all losses just by shutting down
4  their accounts when they get to zero?
5       MR. GLUECKSTEIN: Objection to form.
6       MR. MISHKIN: Object to the form.
7       THE WITNESS: The only way I can make sense of
8  your question is if I rephrase it as pretend that FTX
9  only offered futures contracts, as far as I'm aware,
10  that has the properties that you are talking about and
11  doesn't involve trying to figure out what it means to
12  have a fictitious contract, which I still haven't
13  gotten a definition for, or to say that you offer spot;
14  but, in fact, it's something else.
15      I can answer your question if there were only
16  futures contracts. Should I? Is that helpful for you,
17  or are you trying to get at something else? because, if
18  so, you are going to have to better define what it
19  means -- what this switcheroo going on actually is.
20  BY MR. HARRIS:
21   Q   Let's try your suggestion. If FTX only
22  offered futures contracts --
23   A   Right.
24   Q   -- could it have voided the need for margin
25  requirements?

Page 180

1    A   No.
2    Q   Why is that?
3    A   So let's say, hypothetically, you have a user
4  who deposits $100,000, and then by -- let's say bitcoin
5  is trading at 120 grand on other exchanges that has
6  spot markets, not this hypothetical FTX. This user
7  deposits 100 grand and then buys 3 bitcoin futures
8  contracts. That's 360 grand notional of contracts;
9  right?
10      These are not spot assets. There's no
11  delivery involved, no physical delivery. They are just
12  financial instruments with future payoffs or losses;
13  right?
14      If the underlying price of bitcoin were to
15  drop to, say, zero dollars, this hypothetical trigger
16  would have lost $360,000 on their futures trade but had
17  only deposited 100,000 collateral.
18      So if there's no further recourse against
19  them, if they have no further assets they can get to,
20  then it seems like they are at negative $260,000; and,
21  once again, there is a risk engine failure of some
22  sort.
23      So eliminating spot assets does not obligate
24  the need for retention if you still have futures
25  contracts with prices set over time.

Page 181

1    Q   I'm just trying to figure out how to
2  articulate what positions have been expressed in this
3  litigation you are not a part to. So I don't expect
4  you to --
5    A   I see. So I'm trying -- there's some third
6  party's framing of this that I'm -- which --
7    Q   Yes.
8    A   -- you can't necessarily explain because you
9  are not that third party?
10   Q   Yes.
11   A   I see.
12   Q   Let me try a different topic.
13   A   Yep.
14   Q   Other than Three Arrows --
15   A   Yep.
16   Q   -- did FTX ever have any other customers that
17  filed for bankruptcy?
18   A   Assuming we are cutting things off above
19  November '22?
20   Q   Yes.
21   A   Sorry. It had customers who later filed for
22  bankruptcy, but I can't think of a case where it had a
23  customer that had a significant open position on FTX
24  when it became bankrupt.
25   Q   Can you think of any -- and, again, everything

MAGNA
LEGAL SERVICES

1  is before November 2022.
2      A   Yep.
3      Q   Can you think of any customers that filed for
4  bankruptcy while that customer had a large-end loan
5  due?
6      A   I'm not sure the answer is no, but I can't
7  think of any off the top of my head.  I'm not sure if
8  Celsius or one of the other bar-lending firms may --
9  some of them had trading operations on FTX, and I'm not
10  sure whether any of those had residual assets; but I do
11  not believe that there were any such cases where FTX
12  saw itself as having significant exposure.
13     Q   Okay.  Do you know what FTX would have done if
14  its customer who had a margin loan that it hadn't paid
15  back yet would have done if a customer filed for
16  bankruptcy with a loan outstanding?
17         MR. MISHKIN:  Objection.  Form.
18         THE WITNESS:  Does this customer have a
19  negative or positive net asset on FTX?
20         MR. HARRIS:  It has a positive net asset.
21         MR. MISHKIN:  Objection form.
22         THE WITNESS:  It would depend on the details,
23  but I would tell you that everything that I could
24  imagine FTX doing, depending on the details, have
25  been to liquidate that customer's account using the

1  assets that they have to cover their liabilities.
2  BY MR. HARRIS:
3      Q   And what if the bankruptcy law prevented FTX
4  from liquidating the customers' accounts?  What would
5  FTX do then?
6         MR. MISHKIN:  Objection.  Form.  Legal
7  conclusion.
8         MR. GLUECKSTEIN:  Same objection.
9         THE WITNESS:  The bankruptcy law to which FTX
10  was -- so in what way was the -- would this bankruptcy
11  law have been preventing that?
12  BY MR. HARRIS:
13     Q   What if the law -- the place where the
14  customer filed for bankruptcy said it is -- no one is
15  allowed to touch that customer's assets until the
16  bankruptcy court decided what to do with it?
17         MR. MISHKIN:  Objection.  Form.  Calls for a
18  legal conclusion.
19         MR. GLUECKSTEIN:  Objection.  Form.
20         THE WITNESS:  I would have to look into laws
21  in question.  In addition, I'm not sure what you mean
22  by the "customer's assets."  I can tell you that --
23         Can I speak with my attorney for a second?
24         MR. HARRIS:  Sure.  Yes.
25         (Off the record.)

1         (The record was read as follows:  "What
2  if the law -- the place where the customer
3  filed for bankruptcy said it is -- no one
4  is allowed to touch that customer's
5  assets until the bankruptcy court decided
6  what to do with it?")
7         MR. GLUECKSTEIN:  I'm going to object to that.
8  Calls for --
9         MR. MISHKIN:  Yeah.  My objection was on the
10  record.
11         THE WITNESS:  I can't answer that question
12  without invoking an analysis of a law that is
13  hypothetical, the details of which haven't been
14  defined, it would be undefinable here, and without
15  noting that FTX was bound by numerous other
16  jurisdictions of laws and regulations and agreements as
17  well, which would further complicate some such
18  hypothetical analysis.
19  BY MR. HARRIS:
20     Q   Do you think FTX would try and collect on the
21  margin loaned you?
22         MR. MISHKIN:  Under those hypothetical
23  circumstances described?
24         MR. HARRIS:  Yes.
25         MR. MISHKIN:  Objection.  Form.  Objection.

1  Legal conclusion.
2         MR. GLUECKSTEIN:  Same objection.
3         THE WITNESS:  I can't answer questions about
4  this hypothetical undefined law.
5  BY MR. HARRIS:
6      Q   I think you said this, but you don't recall
7  this ever happening, but a customer filed for
8  bankruptcy while it owed a margin loan?
9      A   Nor do I believe it happened in the
10  Three Arrows case.
11     Q   You are right.  It didn't.
12         You don't recall this ever happening?
13     A   Prior to November 2022, that's correct.
14     Q   Okay.  So I said I'd finally get to talking
15  about Three Arrows in more detail, see what you
16  remember of what happened.
17         So just for context, in the first half of
18  2022, were you following the news in the crypto
19  industry generally?
20     A   Generally, but I was also busy.  I can't claim
21  I saw everything.
22     Q   Okay.  You were certainly aware of the
23  Terra Luna crash --
24     A   Yep.
25     Q   -- in early May of 2022?

**MAGNA**
LEGAL SERVICES

1    A   Yep.
2    Q   And were you aware that Three Arrows had
3  exposure to Terra Luna?
4    A   I had a passing awareness of it but don't
5  recall having thought deeply about any such
6  implications prior to 2022.
7    Q   So you don't recall.
8        Do you recall in May 2022 anyone talking about
9  possible problems at Three Arrows?
10   A   I can't specifically recall it, but there was
11  a lot of news coming out over those periods. I can't
12  remember exactly when everything happened.
13   Q   Do you remember general chatter in the
14  industry that Three Arrows might be in trouble in May?
15   A   I don't specifically recall it happening in
16  May. I'm not saying it necessarily didn't, just that
17  the chatter that I can recall is from June.
18   Q   Okay. So how about in early June now?
19       Do you remember at that point there starting
20  to be rumors about Three Arrows?
21   A   I don't specifically recall rumors about them
22  from prior to the subsequent bitcoin crash down to
23  around $20,000. Again, I'm not necessarily sure there
24  weren't any. I just don't specifically recall them
25  having happened prior to mid-June.

1    Q   The bitcoin crash you are talking about, was
2  that -- do you remember if that was before or after the
3  liquidation of Three Arrows' assets?
4    A   You mean FTX liquidation; right?
5        FTX's liquidation of the account?
6    Q   Yes.
7    A   Contemporaneous.
8    Q   Okay. Meaning it was that day?
9    A   It was more than a one-day period. It was,
10  like, a three-day-ish period.
11   Q   The crash you are talking about?
12   A   Yes.
13   Q   Okay. And that crash was contemporaneous with
14  FTX's liquidation of Three Arrows' assets?
15   A   Yes.
16   Q   And --
17   A   Sorry. I just want to be clear. FTX's
18  liquidation of Three Arrows' account?
19   Q   Account.
20   A   I'm not sure I would use the phrase
21  "Three Arrows' assets." That's sort of making it a
22  definitional decision.
23   Q   Was there a point in time where people at FTX
24  started monitoring Three Arrows' account value on a
25  daily basis?

1    A   I'm aware of that happening starting that
2  three-ish-day period.
3    Q   And do you recall what's the three-ish-day
4  period you are talking about?
5        If that helps, the days I'm aware of --
6    A   Yep.
7    Q   -- June 13th --
8    A   Yep.
9    Q   -- Three Arrows had about a billion dollars in
10  its account of digital assets, and then most of it was
11  sold on the 13th. And then, on the 14th, some more
12  were sold, and finally, there was an $82 million
13  liquidation of almost all that was left.
14   A   That sounds like approximately the right
15  period. I can't remember exactly, but that's about
16  right.
17   Q   So to back up, then, do you remember before --
18   A   That period?
19   Q   -- that big -- right -- so in the days leading
20  up to it --
21   A   Yep.
22   Q   -- were people tracking the value of the
23  Three Arrows account?
24   A   I don't recall them doing so. I can't
25  confidently say they weren't, but I don't recall it.

1    Q   Do you remember hearing any rumors about
2  Three Arrows being in trouble before that -- those
3  days?
4    A   There were no rumors that I can recall I can
5  confidently place having been prior to those three
6  days, but I can't remember exactly what days things ...
7    Q   Okay. So as I said, on the 13th, there was a
8  very large sale of the assets --
9    A   Yep.
10   Q   -- in the Three Arrows account.
11   A   Understood.
12   Q   Do you have any knowledge of who ordered,
13  triggered, or caused those sales?
14   A   There are multiple people involved in the
15  discussion around it. I don't remember who clicked any
16  particular buttons.
17   Q   All right. Well, who were the people involved
18  you remember?
19   A   I don't have a detailed episodic memory of
20  this; but I believe myself, Nishad, probably Zane,
21  maybe others as well.
22   Q   So what do you remember being discussed?
23   A   I remember it being discussed what to do about
24  Three Arrows' positions account, that, as crypto fell,
25  their account was falling precipitously in value such

MAGNA ▶
LEGAL SERVICES

1  that it was becoming a significant risk, especially
2  given the line of credit and given the size of the
3  positions involved.  I don't remember if they were spot
4  or futures positions off the top of my head --
5    Q    Okay.
6    A    -- or what the breakdown was, rather, for
7  those.  And -- yeah.  But, ultimately, their account
8  was at least partially liquidated.
9    Q    Do you remember if some of the sales of
10  assets, to your knowledge, were caused by Three Arrows
11  as opposed to by -- on the FTX side?
12    A    I don't recall whether they, themselves, sold
13  assets.  That, I can't.
14    Q    You do recall there were some sales that were
15  triggered by FTX.  You don't recall whether there were
16  also sales --
17    A    That's right.
18    Q    Okay.  Do you recall at some point the line of
19  credit was closed?
20    A    I believe it was, but I can't say with a
21  hundred percent confidence that it was closed rather
22  than disregarded or some -- I don't know with respect
23  to it exactly.
24    Q    Is there a difference between closing and
25  disregarding?

1    A    No.  And I'm sorry.  I don't mean to -- let me
2  rephrase that.  That is my guess, but I don't recall
3  specifically, confidently what happened.
4    Q    Okay.
5        (Deposition Exhibit 10 was marked for
6        identification and is attached hereto.)
7        MR. GLUECKSTEIN:  I apologize.
8        THE WITNESS:  Oh, boy.
9        MR. HARRIS:  I'm not going to ask you about
10  all of it.
11  BY MR. HARRIS:
12    Q    Okay.  You've been handed what we've marked as
13  Exhibit 10.  It's a whole stack of logins.  There's
14  just two of them that relate to Three Arrows.  So I'm
15  going to tell you the page numbers, and I'm just trying
16  to see if you can help me understand what they mean.
17        So the two that relate to Three Arrows, if you
18  look at the bottom, there's this numbering system.
19    A    Yeah.
20    Q    The pages that -- you can look at whatever you
21  want in here, but the page that mention Three Arrows is
22  783 through 787.
23    A    All right.
24    Q    So, on page 783, there's a reference to
25  ariana@ftx.com logged in as kyle@threearrowscap.com,

1  and then, on 787, there's a reference to zane@ftk.com
2  logged in as kyle@threearrowscap.com.
3        First referring to Ariana, do you remember who
4  that would have been?
5    A    I don't remember her specific job title.
6    Q    And Zane would be Zane Tackett?
7    A    Yes.
8    Q    So you have an understanding why Zane Tackett
9  or Ariana would have logged on as Kyle Davies on the
10  13th?
11    A    I mean, I can't be in his mind.  I can tell
12  you what the most likely reasons would have been --
13    Q    Okay.
14    A    -- which I don't remember exactly where in the
15  chronology this is; but in order to monitor the risk of
16  Three Arrows' account would be what I would guess the
17  most likely reason is to view the position size in that
18  asset value.
19    Q    Couldn't FTX view those without logging onto
20  Mr. Davies' account?
21    A    What do you mean "FTX"?  FTX isn't a person.
22    Q    Okay.  Couldn't employees at FTX have systems
23  to look at --
24    A    So this is that system.
25    Q    So the only way for an FTX employee to know

1  the customer's account balances would be to log on as a
2  customer?
3    A    Yes.  But, to be clear, logged on as a
4  customer is not the same thing as a customer logging
5  in.  It's generally a view-only portal to be able to
6  view the account from the customer's perspective.
7    Q    Okay.
8    A    Developers have other ways to monitor it --
9    Q    Okay.
10    A    -- or people -- anyone with database access
11  would have got it other ways but without database
12  access.  This is the admin portal is what this was
13  called, was how you could view users' accounts.
14    Q    All right.  So I'm going to represent -- well,
15  actually, maybe this is an easier way.  If you go back
16  to Exhibit 8, which was that Coverick declaration I
17  know you hadn't seen before --
18    A    Yep.
19    Q    -- if you go to page 23 --
20    A    All right.
21    Q    Actually, I'm sorry.  Go back to page 22.
22    A    All right.
23    Q    If you look at this Table 5 --
24    A    Yep.
25    Q    -- it shows trades that happened on June 13th

Page 194

1  and June 14th.
2      A    All right.
3      Q    I take it you don't know who ordered which of
4  these trades?
5      A    No.
6      Q    If you -- Three Arrows had a large number of
7  futures trades, I think about 500 of notional value --
8      A    Of what?  Of futures, you said?
9      Q    Yeah.  -- and they were all essentially
10  liquidated on the 13th, you don't know who caused the
11  liquidation of those?
12      A    Like, which employee, you mean?
13      Q    Whether it was done by FTX or done by
14  Three Arrows.
15      A    I don't recall.
16      Q    Okay.  There's this section in this
17  declarations section the "Margin Liquidation on
18  June 14, 2022."  It starts on No. 74.
19      A    All right.
20      Q    And it talks about -- paragraph 76 says "FTX
21  commenced the Liquidation at 10:21 p.m. that same day."
22  It was on the 14th.
23      A    All right.
24      Q    Just before the first liquidation transaction,
25  3AC had a total account balance of approximately

Page 195

1  7 million.  And then, on the next page, it talks about
2  the 82 million liquidation occurred in two steps.
3      A    Yep.
4      Q    Do you know why the liquidation happened this
5  way?
6          Why did FTX liquidate 81 million before
7  canceling the line of credit?
8      A    Were it to have been done in the other
9  direction, piecing together between my memory and
10  assuming what is here is true, canceling the line of
11  credit would have immediately caused the liquidation
12  engine to kick in and to liquidate the assets anyway,
13  and so as long as we were looking at it manually, it
14  would allow a slightly more safer -- a safer approach.
15      Q    What do you mean by "safer"?
16      A    The liquidation engine was not necessarily
17  designed with a large immediate decrease of account net
18  asset value coming from the rescinding of a line of
19  credit, causing the triggering of liquidations in mind.
20  The parameters weren't developed with that in mind.
21  They are developed with the market changes in mind.
22      Q    Okay.
23      A    And in general, there are risks associated
24  with having an automated system operating outside of
25  expected parameters.

Page 196

1      Q    What kinds of risks are you thinking of?
2      A    So, as an example, of the type of risks one
3  could imagine there would be overwhelming the liquidity
4  of either a market or the BLPs for a particular asset
5  such that because there was no sort of ramp-up period,
6  you would get, sort of, prices that deviated quite a
7  bit from the market price if one weren't careful, and
8  that could cause wild swings in the market price of a
9  liquid asset, which could cause a feedback loop.
10          There have been issues in the past involving
11  feedback loops and the liquidation engine.  I'm not
12  saying specifically that would have happened here.  I'm
13  saying that is the type of risk that, like, I would
14  have thought of when I thought of blindly trusting the
15  liquidation engine in a highly unusual scenario that it
16  wasn't specifically designed for --
17      Q    Okay.
18      A    -- and as compared to someone manually
19  overseeing the process, which is not practical for
20  every single liquidation that happens, but was going to
21  be necessary in this case anyway.
22      Q    And it was necessary because of the size of
23  the portfolio?
24      A    Because of the size of the portfolio, because
25  of the involvement of a line of credit, yep.  I think

Page 197

1  those are the main two reasons.
2      Q    Do you recall that these assets that were sold
3  in the liquidation were sold to Alameda?
4      A    I'm not sure.  I expect their past backstop
5  liquidity providers.  I'm not sure which BLPs they are
6  passed to.
7      Q    So does this liquidation, what we looked at
8  earlier as, like, a Step 2 liquidation?
9      A    Yes.
10      Q    Where the portfolio was acquired by the
11  backstop liquidity providers?
12      A    Let me look.  I may have spoken too quickly
13  there.  That is what I -- I -- I believe that they were
14  the Step 2 BLP style liquidations.  I'm not sure that
15  there weren't also some Step 1.  I can't remember
16  confidently either way --
17      Q    Okay.
18      A    -- but at least some of this was Step 2.
19      Q    I have a chat that might trigger a memory.
20      A    All right.
21          (Deposition Exhibit 11 was marked for
22          identification and is attached hereto.)
23  BY MR. HARRIS:
24      Q    Okay.  So you've been given Exhibit 11, which
25  is called "Short Message Report."  The date range is

MAGNA ►
LEGAL SERVICES

1 June 14, 2022, a chat message among a bunch of people,
2 including yourself.
3        At times it's always hard to decipher.
4 Sometimes they are EMT.  Sometimes they are somebody
5 else.
6    A   Yeah.
7    Q   So take that with a grain of salt.
8        Do you see the discussion between a bunch of
9 people including Mr. Tackett and yourself?  And you see
10 what -- this here says is 2:42 a.m.  Mr. Tackett
11 writes.  "@Nishad Singh they're now $20mm in the hole
12 and stopped responding."
13       So do you remember this conversation
14 happening?
15   A   At a high level.
16   Q   Okay.  What do you remember was happening at
17 this time?
18   A   I remember that their account was crashing
19 close to zero and that they were not giving us any
20 color on their situation and were showing no signs of
21 being about to top up their account.
22   Q   Okay.  Had a request been made to top up the
23 account?
24   A   I'm not sure I was the one making it, but I
25 believe I communicated to whoever was communicating to

1 them that they should figure out as far as coloring,
2 what's going on, alert them that their account is in
3 dangerous territory and might be liquidated and that,
4 you know, were there not to be a top-up on it, that was
5 a likely outcome.
6    Q   And topping up would be transferring assets --
7    A   Depositing, yeah.
8    Q   -- into the assets.  Okay.  Then you see,
9 6:17 a.m., Zane Tackett.
10   A   Yep.
11   Q   There's something under his name.  It looks
12 like it's a Twitter post he's pasting.  And somewhere
13 in the middle of it, it says "We may be hearing the
14 same rumors."
15       Do you see that?
16   A   I see that.
17   Q   And then do you recall what that's talking
18 about?
19   A   I can guess; but, no, I don't recall.
20   Q   The next page, you ask "Is there an easy way
21 to see all of the LoCs for an account?"
22       And then Richard Chang says "I think there's
23 something to this 3AC rumor."
24   A   Yep.
25   Q   And who is Mr. Chang?

1    A   He was an employee with institutional
2 counterparties.
3    Q   That would not include Three Arrows; right?
4    A   It would potentially include Three Arrows.  He
5 wouldn't have been exactly -- he would be more likely
6 to deal with a bar lending firm, but he would have been
7 with the counterpart 3AC.
8    Q   And then you respond "Yuuup."
9        Do you see that?
10   A   Yes.
11   Q   What are you referring to?
12   A   That, given everything we had been seeing, it
13 looked like there likely was something to the 3AC
14 rumor.
15   Q   What was the rumor at that time?
16   A   That they'd taken a hit.
17   Q   Do you think people were thinking they were
18 insolvent?
19       MR. MISHKIN:  Objection to form.
20       THE WITNESS:  I'm not sure.
21 BY MR. HARRIS:
22   Q   Do you remember -- do you remember thinking
23 that?
24       MR. MISHKIN:  Objection to form.
25       THE WITNESS:  I remember thinking that it

1 seemed that, likely, they were about to top up their
2 account.
3 BY MR. HARRIS:
4    Q   Do you remember thinking they might not be
5 able to satisfy their liabilities?
6        MR. MISHKIN:  Object to form.
7        THE WITNESS:  Which liabilities?
8 BY MR. HARRIS:
9    Q   Well, like the margin loans?
10   A   You mean the liabilities on FTX in particular?
11   Q   Yes, yes.
12   A   I remember thinking that, right around then,
13 they had just about enough in the account of positive
14 balances to satisfy the negative balances, that if we
15 liquidated right then, we could do so with minimal loss
16 but that there is a risk that that would cease to be
17 the case if we didn't act promptly and that I had no
18 confidence that there was going to be help coming in to
19 their account from outside anytime soon.
20   Q   So, if you didn't liquidate, there was a risk
21 they might not be able to pay their margin loan, for
22 instance?
23   A   I would say there's a risk that they might
24 not -- so when you say "pay their margin loans," do you
25 mean with the assets on FTX or also with assets off of

MAGNA ▶
LEGAL SERVICES

Page 202

1   FTX?
2       Q    With assets on FTX.
3       A    Yes, that is correct.
4       Q    Did you also think there might be a risk they
5   wouldn't be able to pay the margin loan with --
6   including assets off FTX?
7       A    I thought there was significant risk they
8   would not pay it.  I don't know about "be able to."
9   But the fact that we had asked them and alerted them
10  and they stopped responding was a strong signal to me
11  that we could not count on them depositing anything
12  further to FTX to cover their account balance or to go
13  negative.
14      Q    Okay.  Then Mr. Chang, a couple hours -- a few
15  hours later, said "Do we have a legal right to delete
16  the LOC?  If so we should probably do so in case they
17  try to withdraw more from the accont [sic]?"
18          Then you said "We've turned off withdrawals."
19          What do you mean by that?
20      A    Prohibited their account from withdrawals.
21      Q    And that's, like, a manual --
22      A    It's a button.  Yes.  As a button, were they
23  not to have a line of credit, they would certainly not
24  have been able to withdraw.
25      Q    So if you had already turned off a line of

Page 203

1   credit, that would have automatically stopped them --
2       A    That's right.
3       Q    -- from withdrawing?
4       A    Yes.
5       Q    Do you know -- is there -- I understand that
6   on the 24th these manual liquidations happened.
7       A    Yep.
8       Q    Was there a way for --
9       A    Sorry.  Not the 24th.
10      Q    I'm sorry.  The 14th.
11      A    Yes.
12      Q    And you don't know whether the asset sales
13  that happened on the 13th also were done through some
14  manual --
15      A    I can't remember.
16      Q    Okay.
17      A    There would be record of that at FTX.  I just
18  don't have them.
19          (Deposition Exhibit 12 was marked for
20          identification and is attached hereto.)
21  BY MR. HARRIS:
22      Q    Okay.  So Exhibit 12 is an email chain, and
23  I'll just tell you what this is.  The first page is as
24  it was produced to us.  It's very hard to read.  It's
25  extremely faint on the first page.

Page 204

1       A    Oh.
2       Q    So the next pages are just reprinting it in a
3   more legible way.
4       A    Okay.
5       Q    So that's what it is.  So if you look at the
6   more legible version of it --
7       A    Yep.
8       Q    -- you see Mr. Tackett emails Kyle Davies at
9   Three Arrows on June 14th, I think, late in the
10  evening -- no -- in the morning.  Sorry.  It says:
11  "3AC, Your account is in an undesirable state.  We've
12  tried to reach you several times:  consider this
13  something like a final warning."
14          Do you see that?
15      A    Yep.
16      Q    Do you recall if, like, the FTX group that you
17  talked about helped them draft this email?
18      A    I'm not sure.  It is roughly at a high level
19  in line with what I expected to be communicated, but I
20  don't recall whether there was involvement in this
21  specific warning.
22      Q    Okay.  And you see it talks about how there's
23  a "Line of Credit Agreement," your account has
24  13 million in value, short on the obligation to
25  maintain assets, you didn't respond to an increase.

Page 205

1   And the next page says [as read] "We will remove your
2   $120m line of credit in whichever comes sooner:  6pm
3   Eastern, your account reaching $3m in value."
4           Do you see that?
5       A    Yes.
6       Q    Am I understanding this right that he's
7   saying, at the latest, we are going to remove the line
8   of credit by 6:00 p.m.?
9       A    Yep.
10      Q    But, if your account goes down to 3 million,
11  we'll remove it earlier?
12      A    Yep.
13      Q    And then, at the end of it, he writes "And
14  depending on the state of that leverage, your account
15  may be liquidated."
16          Do you see that?
17      A    Yep.
18      Q    And what did it mean at that point "your
19  account may be liquidated"?
20      A    Well, if you look at the account without the
21  line of credit, it was already below its margin
22  requirements, meaning it was already in a state where
23  all liquidation would likely be taking place.
24      Q    All right.  And then he writes:  "These are
25  busy times.  We know that you are likely overwhelmed

MAGNA ▶
LEGAL SERVICES

Page 206

1   with short-term responsibilities.  Separate from this
2   discussion, if you wanted to discuss financial relief
3   options for your firm as a whole, we would be open to a
4   conversation there."
5        What was Mr. Tackett offering there?
6        MR. MISHKIN:  Objection.  Form.
7        THE WITNESS:  I can speculate.
8        MR. HARRIS:  Right.
9        THE WITNESS:  Reading what he said, it seems
10  like he was offering to talk about a bailout if he
11  needed one, but I don't -- I can't speak to Zane's
12  state of mind.
13  BY MR. HARRIS:
14      Q   Had FTX talked about a possible bailout?
15      A   I don't recall them having done so.
16      Q   Or talking about a possible bailout?
17      A   I don't recall having done so.
18      Q   Is this an offer that FTX had ever made to
19  other customers who were troubled?
20      A   To other parties in crypto, to some of the
21  borrower lending firms.
22      Q   But you don't recall making an offer to
23  another customer of FTX?
24      A   I don't recall having done so.  I'm not sure
25  it hadn't happened, but I don't recall having done so.

Page 207

1       Q   And why would it be in FTX's interest to offer
2   a bailout to a customer?
3       A   Two reasons.  First of all, this is all
4   potential.  Maybe it wouldn't have; right?  But
5   potential reasons, number one, one could imagine a
6   world in which it could have been a good investment in
7   which, for a relatively low valuation, one could
8   acquire a relatively large fraction of a company that
9   was in financial distress but had a promising future;
10  and, number two, one could imagine a world where doing
11  so would help stabilize the crypto ecosystem.
12      Q   Is FTX a large enough player that had had an
13  interest in stabilizing the ecosystem?
14      A   Yes.  They had 10 percent of the exchange
15  volume, approximately.
16      (Deposition Exhibit 13 was marked for
17       identification and is attached hereto.)
18  BY MR. HARRIS:
19      Q   All right.  You were handed Exhibit 13, which
20  is an email chain between yourself and Olga Kharif at
21  Bloomberg News.  It's dated June 16th, 2022.
22      A   Yep.
23      Q   She's asking you some questions about 3AC;
24  right?
25      A   Yep.

Page 208

1       Q   And you respond -- your first response is
2   "There aren't any outstanding debts or lines of credit
3   with 3AC"; right?
4        And then she follows up and says "Do they have
5   a trading account with FTX?"
6        And then you clarify that your prior answer
7   could be on the record; but, then, off the record, you
8   say "They do have a trading account but it doesn't have
9   any active positions."
10       Do you see that?
11      A   Yes.
12      Q   Do you recall why you wanted that part to be
13  off the record?
14      A   Just in an abundance of caution around
15  customer relationships.
16      Q   Okay.  And then, on the first page, you had a
17  further, again, off-the-record response --
18      A   Yes.
19      Q   -- where you say "We didn't formally fully
20  sever but we did cut down"?
21      A   Yes.
22      Q   What did you mean by "we did cut down"?
23      A   I honestly can't really remember.  I can guess
24  at what I meant there.  I don't recall what I was
25  thinking at the time.

Page 209

1       Q   Okay.
2       A   But, you know, the account was liquidated but
3   not closed, maybe.
4       Q   So, in late June, Three Arrows entered into
5   liquidation.
6        Do you recall having any contact with the
7   joint liquidators after they were appointed?
8       A   I don't recall meeting them, no.
9       (Deposition Exhibit 14 was marked for
10      identification and is attached hereto.)
11  BY MR. HARRIS:
12      Q   Okay.  All right.  Exhibit 14 is an excerpt
13  from the "ftx-dev" chat.  There's only a few entries in
14  here that are about Three Arrows.  So if you -- they
15  are on the pages that end 963 and 964.
16      A   All right.
17      Q   Okay.  So the parts that I think are about
18  Three Arrows start from Ashley Bethel, July 5th, and
19  she says:  "Hello, I'm encountering an error when
20  trying to download a Historical Account Snapshot.  Can
21  I get some assistance, please?"
22       Then Zane Tackett has some responses.
23      A   Sorry.  What -- this is --
24      Q   I'm sorry.
25      A   What's the date on that here?

MAGNA
LEGAL SERVICES

1    Q   The date format?
2    A   Yeah.  Is this year, month, day, or month,
3  day, year?
4    Q   I believe it is month, day, year.
5    A   Month, day, year.  So that would be July 5th?
6    Q   2022, yes.
7    A   That seems correct.
8    Q   Okay.  All right.  So Ashley Bethel says:
9  "I'm encountering an error when trying to download a
10  Historical Account Snapshot."
11       And then Zane Tackett has a response at the
12  top of the next page.  It says "Bit of a special case
13  here" and asks "Why are we pulling a historical
14  snapshot for them?"
15       Now she says "Legal Request requires a
16  snapshot of their account on 27 June 2022 due to their
17  liquidation."
18       My only question, do you know what Mr. Tackett
19  was referring to when he says "Bit of a special case
20  here"?
21       MR. MISHKIN:  Objection.  Form.
22       THE WITNESS:  No, I'm not sure.
23  BY MR. HARRIS:
24    Q   So as it turns out, before they filed --
25  before Three Arrows filed for liquidation on the 27th,

1  all of those assets were sold.  The margin loan and
2  line of credit were closed out.
3       I'm wondering, if that hasn't happened, so if,
4  instead, like, on June 13th, before all of those sales
5  happened -- so there's still that million dollar -- a
6  billion dollars of digital assets in the account,
7  there's still all of this negative U.S. dollar from the
8  margin loans and line of credit, if instead
9  Three Arrows had filed for bankruptcy, then what do you
10  think FTX would have done?
11       MR. MISHKIN:  Objection.  Form.  Foundation.
12       THE WITNESS:  I can't speculate on it.  I also
13  am not sure that those numbers are correct for the
14  value of assets in the account.
15  BY MR. HARRIS:
16    Q   They might not be.  So put aside the numbers,
17  but if Three Arrows had a bunch of digital assets in
18  the account and they had a bunch of negative U.S.
19  dollar liabilities in their -- in the margin loan and
20  the line of credit and they filed for bankruptcy, what
21  would FTX have done?
22       MR. MISHKIN:  Objection to form.  Foundation.
23       MR. GLUECKSTEIN:  Form.  Calls for a legal
24  conclusion.
25       THE WITNESS:  I can't speculate on the legal

1  context there.  I can name a lot of factors that would
2  be at play, but I can't speculate on that.
3  BY MR. HARRIS:
4    Q   Do you think FTX would have done what it could
5  to avoid triggering a clawback?
6       MR. MISHKIN:  Objection to form.  Foundation.
7  Legal conclusion.
8       MR. GLUECKSTEIN:  Same objections.
9       THE WITNESS:  Absent any legal considerations,
10  which is obviously the caveat here, as a general
11  matter, obviously, you want to avoid the risk of
12  clawback, but I can't comment specifically on this
13  hypothetical.
14       MR. HARRIS:  Okay.  I'm done with my
15  questions.  Thank you.  I know you tried your best to
16  answer my not-always-clear questions.  And I think the
17  counsel have questions.
18       MR. MISHKIN:  Can we take a break?
19       MR. HARRIS:  Of course.  Yes.
20       (Off the record.)
21            EXAMINATION
22  BY MR. GLUECKSTEIN:
23    Q   Good afternoon, Mr. Bankman-Fried.  I'm
24  Brian Glueckstein with Sullivan & Cromwell on behalf of
25  the FTX Recovery Trust.  I want to follow up on a few

1  things that Mr. Harris was just asking you about.
2       If you could, look back at Exhibit 10 we
3  looked at a little while ago.  It was the thin one
4  here.  It was the login information.
5    A   All right.
6    Q   Do you have that in front of you, sir?
7       I just want to -- I think I understood your
8  testimony, but I want to be clear.
9       This reflects administrative activity by FTX
10  employees; correct?
11    A   That's correct.
12    Q   And you testified, I believe, that any logins
13  through this method would have only been view-only of a
14  customer's account; is that correct?
15    A   I believe that's right.  I can't remember
16  exactly how the portal worked, but I believe that this
17  was view-only.  There's a separate system for affecting
18  transactions, which would leave a log that clarified
19  that they were administrative transactions.
20    Q   And you anticipated my next question.
21       It's your understanding that the logins
22  reflected here in Exhibit 10 do not reflect transaction
23  activity taken by any employee of FTX as reflected in
24  this document?
25    A   That's right.

MAGNA
LEGAL SERVICES

1    Q   Thank you, sir.  If we could look at -- we
2   were just looking at what was -- we were talking -- we
3   talked to Mr. Harris about the events of mid-June 2022,
4   and we were looking at what was Exhibit 12.
5        Do you still have it in front of you
6   somewhere?  It was an email from Mr. Tackett.
7    A   I've got it.
8    Q   Okay.  And that email that was sent by
9   Mr. Tackett to Mr. Davies at Three Arrows is dated
10  June 14th, 2022; correct?
11   A   Yep.
12   Q   And then, that email, Mr. Tackett forwarded
13  that email to you and others subsequent to that;
14  correct?
15   A   Yes.
16   Q   And the email from Mr. Tackett on June 14th,
17  as you testified, was putting Three Arrows on notice of
18  what was going to happen if certain steps were not
19  taken to add assets and bring their account into
20  compliance with its margin and other requirements;
21  correct?
22   A   That is correct.
23   Q   Prior to this time of June 14th of 2022 -- I'm
24  sorry.  If we look at the same time, I think we looked
25  at another chat prior to that, which was Exhibit 11.

1   Can you look at that as well.  It's the short -- it
2   might be that one.
3    A   I've got it.
4    Q   This was the internal chat with you and others
5   at FTX also on June 14th of 2022; correct?
6    A   That's correct.
7    Q   And you indicate in response to Mr. Chang's
8   question about whether there was a legal right to
9   delete the letter of credit.  He opined that, if so,
10  we should probably do so in case they try to withdraw
11  more from the account.
12       Do you see that?
13   A   Yep.
14   Q   And you have said, "We've turned off
15  withdrawals"?
16   A   Yep.
17   Q   Was it your understanding at that time that
18  Three Arrows Capital was themselves withdrawing assets
19  out of the Three Arrows accounts?
20   A   I don't recall whether they actually were, but
21  I recall agreeing with Richard's worry that, were they
22  to do so, it would increase the risks of their account.
23  And given that it was already in a state where it would
24  be triggering liquidations without the line of credit,
25  it should not be allowed to further decrease its

1   margin.
2    Q   Is it fair to say that, at this time on
3   June 14th, you and the others on your team at FTX were
4   considering whether to liquidate Three Arrows' account
5   given the circumstances that it was currently facing?
6    A   Yes.
7    Q   Prior to this -- the time that's reflected in
8   these documents, the date of these documents of
9   June 14th, 2022, you are not aware of anybody at FTX
10  taking any actions to liquidate any assets from the
11  Three Arrows accounts, are you?
12   A   No, I'm not aware of any.  Let me just clarify
13  with that.  I can't specifically recall what happened
14  on the 13th versus the 14th in my memory.  Prior to
15  this series of events, I don't recall any actions
16  having been taken.
17   Q   Thank you.  You are not aware of FTX -- you
18  don't have any recollection of FTX, on June 13th, prior
19  to these discussions about whether to liquidate the
20  account, liquidating significant spot asset positions
21  out of Three Arrows Capital's account; correct?
22   A   I have no memory of that happening.  I can't
23  remember which order when things happened.  FTX -- it
24  feels long to answer that question.
25   Q   If any such liquidations happened, the records

1   of the exchange would show how and when --
2    A   Absolutely.
3    Q   -- and by who liquidated those accounts; is
4   that correct?
5    A   That is correct.
6    Q   That would be the fills log?
7    A   It would be in -- that's right.
8    Q   Now, you talked -- we asked some questions and
9   you testified earlier today about what's referred to as
10  a variety of different ways but including the backstop
11  funds.  Do you remember that testimony?
12   A   Yes.
13   Q   You testified that it was FTX's objective for
14  customers not to bear losses and the need to socialize
15  those losses; correct?
16   A   That's correct.
17   Q   It is true that -- and I believe you testified
18  that there was not an unlimited amount that FTX would
19  have been willing to backstop out of that fund;
20  correct?
21   A   That is correct.
22   Q   And so at some number which we did not face,
23  but at some point, presumably, FTX would have been
24  unwilling or could have been unwilling to backstop a
25  position, in which case the customers would have had to

1   bear those losses; correct?
2      A   That's correct.
3         MR. HARRIS:  Object to the form.
4   BY MR. GLUECKSTEIN:
5      Q   And whether or not to backstop a potential
6   loss out of a customer's account was solely within the
7   discretion of FTX; correct?
8      A   That is my understanding, yes.
9      Q   Can you explain just in your words what the --
10  we've talked a little bit about it, but what the
11  exchange code base is.
12     A   Yeah.  So the code base was the underlying
13  computer code that ran FTX both as a back-end platform
14  and as a front-facing user interface or set of user
15  interfaces across different devices.  I'm happy to go
16  into more detail various parts of it, although -- about
17  the, sort of, high-level event.
18     Q   No.  I appreciate that.  The code base
19  ultimately is what made the exchange function; correct?
20     A   That's correct.
21     Q   And the record of how the exchange operated in
22  practice was governed by what was written into the code
23  base; correct?
24        MR. HARRIS:  Object to the form.
25        THE WITNESS:  It was governed, I would say, by

1   the interaction between what was written in the code
2   base, the value stored in various databases, and the
3   input from users.
4   BY MR. GLUECKSTEIN:
5      Q   Irrespective of any written policy or other
6   stated objective of FTX, ultimately, the functionality
7   of the exchange is reflected by what's in the code
8   base; correct?
9         MR. HARRIS:  Object to the form.
10        THE WITNESS:  By default unless that code were
11  to be changed.
12  BY MR. GLUECKSTEIN:
13     Q   Correct.  So if you wanted to -- if you saw
14  something in the code base where you wanted to change
15  how some particular piece of the exchange operated, you
16  would have developed the right modifications of the
17  code; right?
18     A   That's correct.
19     Q   We talked a lot over the course of the day at
20  various times about the users -- the customers' account
21  balance.  Do you remember those discussions, sir?
22     A   Yes.
23     Q   And we've talked about at times positive
24  account balances as a result of assets credited to the
25  account; correct?

1      A   Yes.
2      Q   And also that certain portions of the account
3   could be negative, either individual assets or the U.S.
4   portion of their account; correct?
5      A   Yes.
6      Q   And those balances, positive and negative,
7   were what was added together to determine the overall
8   customer value; correct?
9      A   The overall net asset value.
10     Q   The net asset value.  So just to take a very
11  simple hypothetical, if there was a market transaction
12  where a customer sold one bitcoin for $25,000, that
13  transaction would decrease the customer's digital
14  account balance by the one-bitcoin value of $25,000;
15  correct?
16     A   And it would increase the U.S. dollar-specific
17  balance by the requisite approximately $25,000 less
18  fees and market spread and things like that.
19     Q   Exactly.  That was my next question.
20        And then they would reduce the negative
21  balance less any fees or transaction costs for that
22  transaction; correct?
23     A   The negative -- did this customer have a
24  negative balance?
25     Q   If -- whether negative or positive, what would

1   happen is the $25,000 --
2      A   Yep.
3      Q   -- would then be transferred into its U.S.
4   dollar --
5      A   That's correct.
6      Q   -- side of the ledger?
7      A   That's correct.
8      Q   Ultimately, that transaction, but for the
9   transaction costs of the trade, would be neutral with
10  respect to the overall account balance for that
11  customer's account; correct?
12     A   Yeah.  And up to future moves in the market
13  price of that asset.
14     Q   Thank you.  If we could, go back and take a
15  look at what was a document that had been marked as
16  Exhibit 20, which is the "FTX Line of Credit" for
17  Three Arrows Capital in the documents, sir.
18     A   Got it.
19     Q   It's your understanding as discussed this
20  morning -- it's your understanding, Mr. Bankman-Fried,
21  that this document was intended to be a single document
22  setting forth the terms of the line of credit that was
23  offered to Three Arrows Capital; correct?
24        MR. HARRIS:  Objection.  Calls for a legal
25  conclusion.

1       THE WITNESS:  The contractual terms in
2  general, yes.
3  BY MR. GLUECKSTEIN:
4      Q   This particular version of the document,
5  Mr. Bankman-Fried, is signed by Kyle Davies on behalf
6  of Three Arrows Capital.
7       Do you see that there?
8      A   I do.
9      Q   And he signed it by DocuSign; correct?
10     A   Yep.
11     Q   And you are familiar with DocuSign?
12     A   I am.
13     Q   And you are familiar that, when somebody signs
14  DocuSign, there's a signing imprint that appears at the
15  top of each page?
16     A   Yep.
17     Q   Do you see that appearing on each page of this
18  document --
19     A   Yep.
20     Q   -- with respect to Mr. Davies's signature?
21     A   Yep.
22     Q   This document, this version of the document
23  at least, is not signed by anybody on behalf of
24  FTX Trading.
25      Do you see that?

1      A   I see that.
2      Q   Do you recall whether this document was ever
3  signed by yourself or anybody else on behalf of FTX?
4      A   I don't specifically recall.  Generally, they
5  would be, but ...
6      Q   And it's not unusual for yourself in
7  particular to have signed documents at some point after
8  the fact in these types of situations; correct?
9      A   Especially in a situation like this, or let me
10  say, many hypothetical -- many situations where another
11  party would unilaterally sign a document, send it to us
12  with their signature, or it's blank, so that we could
13  sign it, in which case, there would necessarily be some
14  lag between the other party having signed it and us
15  having signed it.
16     Q   And during that lag period that you referred
17  to, that didn't prevent FTX in acting under the terms;
18  correct?
19      MR. HARRIS:  Objection to form.
20      THE WITNESS:  Presuming that the context of
21  that discussion was that both parties had indicated to
22  each other their agreement of this and that it was
23  going to be going into effect and that the other party
24  had signed, that is correct.
25  ///

1  BY MR. GLUECKSTEIN:
2      Q   And with respect to this line of credit in
3  particular, Exhibit 20, it's your understanding that
4  FTX did establish a $120 million line of credit in
5  favor of Three Arrows Capital after March of 2022;
6  correct?
7      A   I believe that's correct.  There would be logs
8  of this as well in FTX's database.
9      Q   This document, it was referenced in your
10  testimony earlier today about paragraph 5 we looked at
11  in this document.
12     A   Yep.
13     Q   And that paragraph refers to the amount of
14  collateral that must be -- the level of the account
15  that must be maintained, at least 20 percent,
16  throughout the lifetime of the line of credit; correct?
17     A   Yep.
18      MR. HARRIS:  Object to the form.
19  BY MR. GLUECKSTEIN:
20     Q   And paragraph 3 of this document also states
21  that "The Lender reserves the right to remove the Line
22  of Credit at any time and for any reason."
23      Do you see that?
24     A   I do.
25     Q   So that gives -- is your understanding correct

1  that that gives FTX the right to remove the line of
2  credit irrespective of the amount of assets in the
3  account for any reason that you so choose?  Correct?
4      A   That is my understanding.
5      Q   Mr. Bankman-Fried, starting on October 3rd of
6  2023, following indictment, you were tried on seven
7  charges in the United States District Court for the
8  Southern District of New York; correct?
9      A   Yep.
10     Q   And following that trial, on November 2nd of
11  2023, a 12-person jury found you guilty on seven
12  charges; correct?
13     A   I'm not sure if that is the exact date but
14  around that.
15      (Deposition Exhibit 15 was marked for
16      identification and is attached hereto.)
17  BY MR. GLUECKSTEIN:
18     Q   A document has been put in front of you,
19  Mr. Bankman-Fried, that's been marked as Exhibit 15,
20  which is the verdict form from the trial.
21      Are you familiar with this document, sir?
22     A   I'm familiar with its contents.
23     Q   And this document reflects that a jury found
24  you guilty in Count 1 of wire fraud with respect to FTX
25  customers; is that correct?

**MAGNA**
LEGAL SERVICES

Page 226

1     A   Yep.
2     Q   And it also reflects that, with respect to
3  Count 2, you were found guilty of conspiracy to commit
4  wire fraud as to FTX customers; correct?
5     A   Yes.
6     Q   With respect to Count 3, you were found
7  guilty of wire fraud with respect to lenders to
8  Alameda Research; correct?
9     A   Yep.
10    Q   With respect to Count 4, you were fount guilty
11 of conspiracy to commit wire fraud to lenders to
12 Alameda Research; correct?
13    A   Yes.
14    Q   With respect to Count 5, you were found guilty
15 of conspiracy to commit securities fraud; is that
16 correct?
17    A   Yes.
18    Q   With respect to Count 6, you were found guilty
19 of conspiracy to commit commodities fraud; is that
20 correct?
21    A   Yes.
22    Q   With respect to Count 7, you were found guilty
23 of conspiracy to commit money laundering; correct?
24    A   Yep.
25    Q   In March of 2024, Judge Kaplan of the

Page 227

1  United States District Court, Southern District of
2  New York, imposed a criminal sentence upon you;
3  correct?
4     A   Around that, yes.
5     Q   And the court sentenced you to 300 months
6  imprisonment on account of these charges; correct?
7     A   No.  Sorry.  This is a technicality on which I
8  am saying no.  I was sentenced to that long.  It's on
9  account of these charges that the sentence was not, in
10 whole, based, but I don't know that that's particularly
11 relevant here.
12    Q   That's a fair clarification.
13        You were sentenced to approximately 25 years
14 in prison; correct?
15    A   Yes.
16    Q   And you are serving that sentence currently at
17 the Terminal Island facility, which is where we are
18 conducting this deposition; correct?
19    A   Yes.
20    Q   The Court also ordered you to forfeit
21 approximately $11 billion as part of his order;
22 correct?
23    A   Are you referring to the money judgment or
24 something else?
25    Q   Let me take a quick look.  This doesn't have

Page 228

1  to be a memory test.
2        MR. GLUECKSTEIN:  Mark this, please.
3        (Deposition Exhibit 16 was marked for
4        identification and is attached hereto.)
5  BY MR. GLUECKSTEIN:
6     Q   Sir, if you'd turn to -- this is what's been
7  marked as Exhibit 16 is the transcript, March 28, 2024,
8  of your sentencing hearing.
9        Do you see that, sir?
10    A   I see that.
11    Q   And since I promised this is not a memory
12 test, if you could, turn to page 59.
13    A   Yes.
14    Q   And in the middle of that page, the Court
15 states, starting at line 13:  "It is further adjudged,
16 Mr. Bankman-Fried, that you forfeit to the
17 United States the sum of $11,020,000,000, including the
18 specific property identified in the preliminary order
19 of forfeiture that I will be signing today...."
20        It goes on from there.
21        Do you see that, sir?
22    A   I see that.
23    Q   Does that refresh your recollection that the
24 Court ordered you to forfeit approximately $11 billion
25 to the United States?

Page 229

1     A   I agree that this is what the transcript says.
2  I do not -- I said that without necessarily agreeing
3  that that is the accurate phrasing of how my sentence
4  was implemented.  I don't know that this is relevant.
5  I just, out of an abundance of caution, especially
6  given my upcoming appeal, which touches on this point
7  in particular, among others, I want to avoid agreeing
8  to what I believe to be a -- well, not how I would
9  describe the judgment that was passed.
10    Q   And you are talking specifically with respect
11 to the monetary judgment?
12    A   Yes.
13    Q   And just so the record is complete, how would
14 you describe it?
15    A   I don't have it in front of me right now; but
16 at a high level, it was a money judgment rather than
17 restitution or a forfeiture of existing assets.  I
18 don't -- I don't want to confidently say that this is
19 an inaccurate description of it.  There are legal terms
20 here that that would involve getting into ongoing
21 disputes within the Second Circuit about defining
22 around forfeiture and things like that.
23    Q   That's fine.  I'm certainly not asking you to
24 corroborate with legal positions as part of this.
25    A   Yep.

MAGNA
LEGAL SERVICES

Page 230

1    Q   Mr. Bankman-Fried, you testified in your own
2  defense at your criminal trial; correct?
3    A   Yes.
4    Q   And including the sentence that we read, the
5  Court found that you gave perjury trial testimony;
6  correct?
7    A   I'm --
8    MR. HARRIS:  Object to the form.
9    MR. MISHKIN:  Object.  Aside from the
10  transcript reading what it reads?
11    MR. GLUECKSTEIN:  Let's look at it, then.
12    MR. MISHKIN:  Okay.
13  BY MR. GLUECKSTEIN:
14    Q   Let's look at page 10 of the transcript.
15  Starting at line 4, the Court states, starting on
16  line 4:  "I find, subject to anything counsel says
17  after I complete this, that Mr. Bankman-Fried gave
18  perjured testimony at trial as to material matters in
19  at least the following respects:
20        "First, he falsely testified that until the
21  fall of 2022, he had no knowledge that Alameda had
22  spent FTX customer deposits.  I refer to page 2761 of
23  the transcript at lines 7 to 16.
24        "Second, I find that he testified falsely,
25  that he first learned that Alameda had a roughly

Page 231

1  $8 billion liability to FTX in October 2022.
2  Transcript references page 2473, line 9, through 2477,
3  line 7.
4        "Finally, he falsely testified that he did not
5  know that repayment of called third-party loans to
6  Alameda, in or about mid June 2022, would require
7  Alameda to borrow more customer funds from FTX.
8  Transcript references page 2721, line 21, to 2722,
9  line 4."
10        Did I read that correctly, Mr. Bankman-Fried?
11    A   You did read that correctly.
12    Q   Do you recall the Court making that finding at
13  the time he imposed the sentence on you?
14    A   Yes.
15    Q   Let me direct you to page 57 of the
16  transcript, sir.  Starting at line 16, the Court is
17  again addressing your sentencing, and the Court says,
18  starting on line 16:  "I did not think that it a
19  fruitful use of time to spell out every time I thought
20  Mr. Bankman-Fried testified willfully and knowingly
21  falsely at trial.  There are more than the ones I've
22  articulated, but that suffices.
23        "And when he wasn't outright lying, he was
24  often evasive, hairsplitting, dodging questions and
25  trying to get the prosecutor to reword questions in

Page 232

1  ways he could answer in ways he thought less harmful
2  than a truthful answer to the question that was posed
3  would have been.  I've been doing this job for close to
4  30 years.  I've never seen a performance quite like
5  that."
6        Do you see those words?
7        Did I read those correctly?
8    A   You did, and I strongly disagree with him.
9    Q   You are entitled to strongly disagree with
10  him. I'm asking if I read them correctly.
11    A   I'm assuming you are reading the transcript
12  all day.
13    Q   We are going to.  I will ask my questions.
14    A   All right.
15    Q   Do you recall whether the Court --
16        Do you recall the Court making that statement
17  at your sentencing hearing?
18    A   Yes.
19    Q   Mr. Bankman-Fried, you have appealed your
20  conviction; correct?
21    A   Yes.
22    Q   And that appeal is currently pending in the
23  United States Court of Appeals, for the Second Circuit;
24  correct?
25    A   Yes.

Page 233

1        (Deposition Exhibit 17 was marked for
2        identification and is attached hereto.)
3  BY MR. GLUECKSTEIN:
4    Q   Mr. Bankman-Fried, you've been handed a copy
5  of a document that's been marked as Exhibit 17.  This
6  is a copy of a brief that was filed on your behalf with
7  respect to that criminal appeal; correct?
8    A   Yes.
9    Q   Did you review this document before it was
10  filed?
11    A   Yes.
12    Q   And your counsel filed this document with the
13  Circuit Court of Appeals on your behalf and at your
14  direction; correct?
15    A   They filed it on my behalf.  I'm not sure what
16  you mean by at my direction and contents.  I don't
17  think this is a meaningful objection.  This is the
18  appeal that was filed on my behalf.
19    Q   And you were aware that it was being filed;
20  correct?
21    A   Yes.
22    Q   And you were aware of the contents before it
23  was filed; correct?
24    A   Yes.
25    Q   If you'd turn to page 65 of the brief, sir.

MAGNA ▶
LEGAL SERVICES

Page 234

1    A   All right.
2    Q   Section IV of your appeal brief is entitled
3   "THE DISTRICT COURT ERRONEOUSLY REFUSED TO ORDER
4   DISCOVERY FROM THE FTX DEBTORS AND THEIR COUNSEL, WHO
5   WERE AN ARM OF THE PROSECUTION."
6        Do you see that?
7    A   Yes.
8    Q   In the middle of the second paragraph of that
9   page 65, your appeal brief states:  "John Ray and
10   Sullivan & Cromwell, who took control of the company
11   three days into the liquidity crisis, provided
12   extraordinary assistance to the government."
13        Do you see that?
14    A   Yes.
15    Q   And you agree with that statement; correct?
16    A   I think the only possible -- there's a
17   definitional question of exactly how many days.  It
18   wasn't liquidity.  I think three is a reasonable answer
19   there.  One could give slightly different answers.  I'm
20   not saying I disagree with it.  Just, I can imagine
21   some sort of quibbling over that.  Other than that,
22   yes, I do.
23    Q   If you'd turn to page 66, which is the next
24   page of your brief, the first full paragraph your brief
25   states:  "The Debtors were not mere spectators.  They

Page 235

1   took control of FTX -- a solvent company -- from
2   Bankman-Fried and forced it into a bankruptcy filing,
3   before spending the next year loudly and repeatedly
4   claiming FTX was completely worthless because
5   Bankman-Fried, a 'villain,' had stolen all the money
6   because of 'hubris, incompetence, and greed.
7        "This infected the public sentiment, charging
8   decisions, witness testimony, judicial rulings, and
9   sentencing -- and they waited until after Bankman-Fried
10   was evicted to admit that customers and creditors would
11   get back their money."
12        Do you --
13    A   Yes.
14    Q   You agree with that statement as set forth
15   here in your appeal brief; correct?
16    A   Essentially, yes.
17    Q   You believe that the debtors, quote, vilified
18   you?
19    A   Yes.
20    Q   If you'd turn to page 73 of your brief, sir.
21   There's a Subsection B here on this page in bold print
22   that's titled "The Debtors And Their Counsel Functioned
23   As Members Of The Prosecution Team."
24        Do you see that?
25    A   Yes.

Page 236

1    Q   And you believe that to be true -- correct? --
2   that the debtors and their counsel functioned as
3   members of the prosecution team?
4    A   Yes.
5    Q   Page 74 of your brief, there's the first full
6   paragraph there.  Your counsel wrote on your behalf:
7   "This was not an ordinary instance of corporate
8   cooperation.  The Debtors and S&C helped initiate the
9   prosecution by identifying allegedly culpable
10   individuals and potential witnesses.  They collected
11   and 'review[ed] documents,' 'interview[ed] witnesses,'
12   'gather[ed] facts' at the government's request, and
13   posed questions on topics the government told them to
14   inquire about, all to distill the evidence for the
15   government and help 'develop prosecutorial strategy.'"
16        It cites a case, Stewart case 433 F.3d at 299.
17   "They did not merely 'provide information to the
18   government'; they carried out 'investigative duties'
19   and played [a critical] role in the investigation [and]
20   in determining investigation [and] trial strategy,'
21   pointing the government to new allegations and avenues
22   of inquiry."
23        Did I read that correctly?
24    A   Yep.
25    Q   You agree with that statement; right,

Page 237

1   Mr. Bankman-Fried?
2    A   That's actually yes.
3    Q   Mr. Bankman-Fried, is it then fair to say that
4   you believe the debtors and their counsel and the
5   Chapter 11 process are the reason you are incarcerated
6   right now?
7        MR. HARRIS:  Object to the form.
8        THE WITNESS:  I think they are one of the
9   significant reasons, yes.
10        (Deposition Exhibit 18 was marked for
11        identification and is attached hereto.)
12   BY MR. GLUECKSTEIN:
13    Q   I've handed you what's been marked as
14   Exhibit 18, which was filed in your criminal case as an
15   exhibit to the government's sentencing memorandum.  I
16   understand this to be a Google document the government
17   obtained from an email account.
18        Are you familiar with this document, sir?
19    A   Give me one second to consult with counsel.
20        MR. GLUECKSTEIN:  Sure.
21        THE WITNESS:  Can I take this?
22        MR. GLUECKSTEIN:  Yes.
23        (Off the record.)
24        MR. MISHKIN:  I'm sorry.  Was there a question
25   pending?  I don't think there was.

MAGNA ▶
LEGAL SERVICES

Page 238

1    THE WITNESS: I think there was. Was it do I
2  recognize this document?
3    MR. MISHKIN: Right. Sorry.
4    THE WITNESS: Yes, I do recognize this
5  document.
6  BY MR. GLUECKSTEIN:
7    Q   Okay. And this document, sir -- in this
8  document, you posed various ideas for restoring your
9  image; correct?
10    MR. MISHKIN: Objection.
11    THE WITNESS: I object to the "restoring the
12  image" part, and, also, I don't think "proposed" is
13  quite the word, listed out but without the necessary --
14  without necessarily having the affirmative viewpoint
15  implied by "proposed." It depends on which ones you
16  are talking about.
17  BY MR. GLUECKSTEIN:
18    Q   Understood. In this document, which is a
19  series of notes --
20    A   Yeah.
21    Q   Is that a fair representation?
22    A   Yeah.
23    Q   -- you include, among other things -- Item 4
24  states "Leak out this document to press." There's a
25  document that's hyperlinked to there. Do you see that?

Page 239

1    A   Yep.
2    Q   Do you recall what document that was?
3    A   Not precisely but in broad terms.
4    Q   And what in broad terms do you recall?
5    A   In broad terms, it was discussing the ways in
6  which I believe that the FTX Chapter 11 process has
7  been destructive to all of the major stakeholders; that
8  it has been driven in bad faith by its lawyers and
9  leadership; that it was started on deceptive and
10  fraudulent bases by those lawyers and leadership to
11  begin with; has generally done far more to -- on loose
12  grounds to harm than good; should not have existed in
13  the first place; and was beset by conflicting agendas
14  of those who participated in the Chapter 11 process.
15    Q   And that's consistent with the sub-bullet
16  point where you say "SullCrom, lawyers, and Chapter 11
17  are broken"; is that correct?
18    A   That is correct.
19    Q   Item 5, you write: "Focus almost exclusively
20  on the fact that we could give value back to customers
21  and the Chapter 11 team is destroying it."
22    Do you see that?
23    A   Yes.
24    Q   And that was your view at the time you wrote
25  this document?

Page 240

1    A   It was my view at the time. It's my view
2  today.
3    Q   Item 6, you write: "Focus on the fact that
4  the Chapter 11 team has no idea how to run FTX, it's
5  colonial, run by a cartel of lawyers."
6    Do you see that?
7    A   Yep.
8    Q   And that was your opinion at the time you
9  wrote this document; correct?
10    A   At the time and still today.
11    Q   Item 9 on this list, you write: "Go strong
12  with a message of 'I have funding ready to make
13  customers whole, if only the Chapter 11 team would care
14  about customers.'"
15    Do you see that?
16    A   Yes.
17    Q   And that was your opinion at the time you
18  wrote this document?
19    A   Yes, and today.
20    Q   Item 10, you have a separate item here that
21  says: "Go strong with the message 'I'm really glad the
22  Chapter 11 team has stepped in, they're great, and even
23  better I have funding that can help make customers more
24  whole while the Chapter 11 team does what is needed to
25  clean things up.'"

Page 241

1    Do you see those words?
2    A   I do.
3    Q   You wrote those words, but you don't believe
4  those words; correct?
5    A   No, I do not believe those words.
6    Q   And you wrote those words as a potential
7  way -- proposed idea of a way to restore your image;
8  correct?
9    A   No. I wrote those words mostly sarcastically.
10  This falls under the "bad ideas" part of the header of
11  this document. It was mostly meant as a, sort of,
12  strongman that, obviously, I'm not going to say that;
13  but, in theory, if one actually believed it -- I don't
14  know. It was my best attempt to come up with, like,
15  how could I come up with a constructive message that
16  was positive rather than negative towards the debtors?
17    But I did not ultimately say that or anything
18  like it because I did not ever become convinced that it
19  had any real truth to it or, rather, that the first
20  part of it did. I think the middle part of it has
21  truth to it but not the initial premise.
22    (Deposition Exhibit 19 was marked for
23    identification and is attached hereto.)
24  BY MR. GLUECKSTEIN:
25    Q   Sir, you've about handed what's been marked as

MAGNA ▶
LEGAL SERVICES

Page 242

1    Exhibit 19, which has been submitted as "Exhibit D."
2    It's the government's sentencing memorandum, which is
3    another Google document obtained from your email
4    account; correct?
5        A    Something like that.
6        Q    This again has a series of your notes that you
7    wrote down; correct?
8        A    Yes.
9        Q    Turn to the bottom of the second page -- well,
10   the first page of your notes, the second page of the
11   document, there is, I guess, under 7d, "Enemies."
12       Do you see that that carries over to the next
13   page?
14       A    7e?
15       Q    At the bottom of the page.
16       A    Oh, I'm sorry.  I'm confused with the letter
17   here.
18       Q    The last entry on there.
19       A    I understand what you say.
20       Q    It says "Enemies" there, sir.
21       A    Yes.
22       Q    There's some entries on the next page.
23   Item iii there is "John Ray."
24       Do you see that?
25       A    Yes.

Page 243

1        Q    John Ray became CEO of the FTX group and
2    managed it through the Chapter 11 process; correct?
3        A    Yes.
4        Q    And I take it you refer to him as an enemy
5    because he cooperated with the government in
6    prosecuting you; correct?
7        A    I call him an enemy because he lied repeatedly
8    and viciously about me while destroying billions of
9    dollars of value for FTX and its numerous stakeholders
10   while also cooperating improperly and in bad faith with
11   the government so as to prosecute me for things I'm
12   innocent of.
13       Q    In the middle of that page, you say -- you
14   have some notes there where it says "Random
15   narratives."
16       A    Yep.
17       Q    It says "SBF died for our sins."
18       Do you see that?
19       A    I do.
20       Q    What do you mean by that?
21       A    I'm honestly not entirely sure I recall.
22       Q    On the -- on the next page of this document,
23   the last page of the document, you have an entry there,
24   Item 3.  It says [as read] "S&C:  Wed leak" -- "Wed, I
25   think, stands for Wednesday -- "Friday hearing."

Page 244

1        Do you see that, sir?
2        A    I do.
3        Q    And that's a reference to you leaking
4    information in advance of a hearing before the
5    United States Bankruptcy Court; correct?
6        A    No.
7        Q    What's your understanding of that reference?
8        A    That there is going to be some hearing on
9    Friday and some discussion of some leak, I want to say;
10   but I don't believe that it was me leaking something.
11   I can't recall exactly what it was.
12       Q    Further down the page, you have a list of
13   "Things I could write."
14       Do you see that?
15       A    Yeah.
16       Q    And Item 7 is "S&C as The Original Sin."
17       Do you see that?
18       A    Yes.
19       Q    I take it in regard "S&C as The Original Sin"
20   because of S&C's debtors cooperating with the
21   investigation of you; correct?
22       A    That's not quite how I would phrase it, but
23   that Wolfram was a but-for cause of the Chapter 11
24   process happening in the first place, certainly
25   happening as it did of improper indictments not just

Page 245

1    against myself but against others as well and of
2    massive value obstruction for stakeholders.
3        MR. GLUECKSTEIN:  Thank you, sir.  I have no
4    further questions.
5        MR. HARRIS:  Just I'm going to follow up.
6        FURTHER EXAMINATION
7    BY MR. HARRIS:
8        Q    Did your reviews about Mr. Ray, yourself, and
9    Cromwell cause you to come to any of the testimony you
10   gave today?
11       A    Give me a second to go back through that
12   testimony in my mind.
13       Q    I'm really focused on the questions I asked
14   you.  Is there anything --
15       A    Right.
16       Q    -- that I asked you where you answered
17   differently because of your views about Sullivan &
18   Cromwell or Mr. Ray?
19       A    I can't recall a question where it did.  I
20   can't rule out the possibility that there's some stray
21   question I'm forgetting.  It -- my answers were the
22   honest ones.  I wish the world were different in so
23   many ways, but it is what it is.  And however poorly I
24   might think that the FTX debtors are, utilizing the
25   funds at their disposal, that doesn't change my views

MAGNA
LEGAL SERVICES

Page 246

1  of what happened and why with the recourse.
2      Q   The last question, is there anything about
3  your views of Mr. Ray or Sullivan & Cromwell that would
4  cause you to favor Three Arrows Capital?
5      A   It depends what you mean by "favor" them.
6  What I will say is the following:  It would certainly
7  cause me, on the margin, to be much less excited for --
8  than I otherwise would be for funds to end up under the
9  control of the debt- --- the FTX debtors rather than
10  Three Arrows' debtors; but at the end of the day,
11  again, it doesn't change the truth of what happened,
12  and it doesn't change -- I don't think it changed any
13  of my answers.  I don't think that, like --
14      At the end of the day, it doesn't mean that I
15  want the FTX holders to use assets to fund altogether,
16  so not in a way that I think materially changed my
17  answers to the questions around Three Arrows.
18      MR. HARRIS:  Thank you, sir.
19      THE WITNESS:  Yep.
20      MR. MISHKIN:  We are going to reserve reading
21  and signing.  This deposition is complete.
22      MR. GLUECKSTEIN:  Yes.  We are going to mark
23  this "Confidential" under the terms of the protective
24  order in the case.
25      THE REPORTER:  And counsel both need copies?

Page 247

1      MR. GLUECKSTEIN:  Yes, ma'am.
2      MR. HARRIS:  Yes.
3      (Deposition session concluded at 2:32 p.m.)
4                  -oOo-
5
6
7      I certify (or declare) under penalty of
8  perjury under the laws of the State of California that
9  the foregoing is true and correct.
10
11  Executed at _____ on _____.
                    (Place)          (Date)
12
13  _____
              (Signature of Deponent)
14
15
16
17
18
19
20
21
22
23
24
25

Page 248

1          DEPOSITION OFFICER'S CERTIFICATE
2  STATE OF CALIFORNIA )
                       ) ss.
3  COUNTY OF ORANGE   )
4
5      I, Joanna B. Brown, hereby certify:
6      I am a duly qualified Certified Shorthand
7  Reporter in the State of California, holder of
8  Certificate Number CSR 8570 issued by the Court
9  Reporters Board of California and which is in full
10  force and effect. (Fed. R. Civ. P. 28(a)).
11      I am authorized to administer oaths or
12  affirmations pursuant to California Code of Civil
13  Procedure, Section 2093(b) and prior to being examined,
14  the witness was first duly sworn by me.
15  (Fed R. Civ. P. 28(a), 30(f)(1)).
16      I am not a relative or employee or attorney or
17  counsel of any of the parties, nor am I a relative or
18  employee of such attorney or counsel, nor am I
19  financially interested in this action.
20  (Fed R. Civ. P. 28).
21      I am the deposition officer that
22  stenographically recorded the testimony in the
23  foregoing deposition, and the foregoing transcript is a
24  true record of the testimony given by the witness.
25  (Fed. R. Civ. P. 30(f)(1)).

Page 249

1      Before completion of the deposition, review of
2  the transcript [ ] was [ ] was not requested.  If
3  requested, any changes made by the deponent (and
4  provided to the reporter) during the period allowed,
5  are appended hereto. (Fed. R. Civ. P. 30(e)).
6
7
8  Dated: _____
9
10
11      _____
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**A**

**ability**
10:3 163:5 177:19

**able**
8:22 23:8 36:16
50:16 51:15 98:14
119:4 125:19 130:4
131:11 160:4 161:1
193:5 201:5,21
202:5,8,24

**above**
33:22 41:10 102:12
166:15 168:9
181:18

**Absent**
212:9

**Absolutely**
52:2 217:2

**absorb**
38:2,10 153:11,12,15
153:16 176:3

**absorbed**
37:15 38:5

**absorbing**
148:5 152:3

**abundance**
51:18 208:14 229:5

**accepting**
128:25

**access**
9:21,24 49:19 96:18
124:25 193:10,12

**accessing**
22:22

**accont**
202:17

**according**
81:10

**accountant**
35:2

**accountants**
26:24 27:25 28:2

**accountholder**
171:14

**accounting**

26:12,25 27:2,9
32:14

**accounts**
33:2 34:1 46:11
61:24 72:16,16 88:2
113:5 120:9 121:25
123:11,12,16,18
126:21 144:25
163:6 178:8 179:4
183:4 193:13
215:19 216:11
217:3

**account's**
122:22 145:14
166:14 173:25

**accurate**
21:15 22:3 23:24
49:8,12 78:15 79:23
80:7 81:3,9 85:10
85:16 87:3 96:24
162:6 229:3

**accurately**
77:5,21

**ACMF**
167:6 169:25

**acquire**
207:8

**acquired**
42:3 47:15 69:7
122:1 197:10

**acronym**
167:6

**across**
117:1 139:11 218:15

**act**
4:21 58:25 123:6
201:17

**acted**
40:14,16

**acting**
122:10 130:18
223:17

**action**
248:19

**actions**

216:10,15

**active**
130:7 208:9

**actively**
47:9

**activities**
85:19,23 86:24 88:20

**activity**
123:4 128:2 131:17
213:9,23

**actor**
128:20

**actual**
31:4 43:4 84:25
152:20,25 169:21

**actually**
16:11 35:7 37:2 49:3
55:14 59:4 60:14
61:1,18 75:16 100:1
105:17 109:18
126:1 129:21 148:1
149:14 159:2,3,3
160:25 165:17
173:14 178:16,18
178:20 179:19
193:15,21 215:20
237:2 241:13

**add**
91:4 105:22 158:17
214:19

**added**
57:25 58:1 139:10
220:7

**adding**
117:1

**addition**
183:21

**additionally**
49:21

**address**
60:10 61:8,23,25
62:9,20 63:6,6

**addresses**
61:4,4 62:14,18

**addressing**

231:17

**adjudged**
228:15

**admin**
193:12

**administer**
248:11

**administrative**
213:9,19

**admit**
154:12,15 235:10

**advance**
244:4

**advisor**
155:15

**affect**
64:5 112:22

**affected**
142:17

**affecting**
213:17

**affiliates**
12:15 27:18

**affirmations**
248:12

**affirmative**
238:14

**after**
11:3,13,18 121:8
123:19 152:17
153:21 161:15
165:1,18 187:2
209:7 223:7 224:5
230:17 235:9

**afternoon**
212:23

**again**
10:7 42:21 69:9
70:22 71:2,3 78:5
84:22 85:4,8 86:22
89:9 96:6 97:17
98:23 100:20
101:12 102:23
103:2,2,9 106:12
112:13 116:12



132:14,18 137:5
152:22 157:4,23
158:23 180:21
181:25 186:23
208:17 231:17
242:6 246:11
**against**
19:9 40:11,21 101:25
120:8 148:19
149:10,19 170:6,20
180:18 245:1,1
**agency**
122:14
**agendas**
239:13
**aggregating**
61:16
**ago**
10:3 213:3
**agree**
13:25 23:3 94:5,9
138:4 156:2 160:24
161:16 229:1
234:15 235:14
236:25
**agreed**
51:17 155:18
**agreeing**
215:21 229:2,7
**agreement**
133:9 136:15 138:20
204:23 223:22
**agreements**
184:16
**ahead**
8:19 10:19 16:17
17:2 49:15
**aims**
164:20
**al**
1:5 2:5 5:23
**Alameda**
12:21 27:20 128:5
129:16,17,18 130:9
132:18 197:3 226:8

226:12 230:21,25
231:6,7
**alert**
122:22 199:2
**alerted**
202:9
**Alice**
62:25 63:1,18
**Alice's**
63:5
**allegations**
236:21
**allegedly**
236:9
**allocated**
112:9,12
**allow**
33:15 115:15 117:19
159:23 195:14
**allowed**
148:23,24 149:5
183:15 184:4
215:25 249:4
**allowing**
128:19
**almost**
61:2 188:13 239:19
**along**
47:12 122:2
**already**
58:5 65:12 88:6 93:1
103:6 108:14,21
133:4 143:9 163:17
165:21 170:4,18
202:25 205:21,22
215:23
**also**
9:5 16:9 25:1 27:11
27:20 28:9 35:13
45:2 60:13 61:12
62:10 66:4 88:1
91:5 92:10,18 95:7
99:16 105:25
107:23 109:16
117:25 124:2

163:19 165:7 166:1
176:3 185:20
190:16 197:15
201:25 202:4
203:13 211:12
215:5 220:2 224:20
226:2 227:20
238:12 243:10
**although**
91:9 99:18 111:12
140:6 218:16
**altogether**
246:15
**Alvarez**
155:14
**always**
41:16 49:13 51:3
56:17 105:2 116:25
120:3 164:23 198:3
**am**
16:18 60:7 100:1
102:18 114:3 205:6
211:13 222:12
227:8 248:6,11,16
248:17,18,21
**ambiguities**
156:18
**ambiguity**
156:13
**ambiguously**
23:10
**Amended**
5:4
**America**
5:20,21,23 6:3,4
**Americas**
3:4
**amiss**
178:12
**among**
198:1 229:7 238:23
**amount**
43:14 45:7 70:7 72:1
72:2,11 95:16 101:5
101:9 114:12

116:11,20,22 131:8
141:17 167:13
176:1 217:18
224:13 225:2
**analogously**
151:16
**analysis**
184:12,18
**and/or**
99:6 135:15 153:4
**annual**
26:11
**another**
19:15 31:15 42:10,15
46:8 65:11,19,23
66:1 71:13 106:6
109:14 125:16
126:4 128:11 131:9
133:7 154:20
158:10 173:19
206:23 214:25
223:10 242:3
**answer**
8:19,25 9:23 10:6,10
12:2,3,18 16:17
22:25 23:8,16 24:10
27:23 36:13,15 43:4
43:5 46:15 49:10
54:4 62:5,6,7,23
69:20 75:18 92:23
101:13,15 141:21
142:21 155:22
179:15 182:6
184:11 185:3 208:6
212:16 216:24
232:1,2 234:18
**answered**
58:5 88:5 161:20
245:16
**answering**
48:18
**answers**
8:23 10:2 49:2,6
62:24 160:9 234:19
245:21 246:13,17



MAGNA ▶
LEGAL SERVICES

**anticipate**
154:24
**anticipated**
154:24 213:20
**anybody**
216:9 222:23 223:3
**anyone**
10:14,16 72:25 186:8
193:10
**anything**
8:9,15 9:12 11:23
16:21 57:11 88:14
90:24 93:19 117:11
120:15 122:14
137:17 139:4
175:11 202:11
230:16 241:17
245:14 246:2
**anytime**
201:19
**anyway**
195:12 196:21
**anywhere**
150:19
**apologize**
191:7
**apparent**
100:23
**apparently**
32:8
**appeal**
229:6 232:22 233:7
233:18 234:2,9
235:15
**appealed**
232:19
**Appeals**
232:23 233:13
**appeared**
7:9,13
**appearing**
222:17
**appears**
31:6 77:8 94:3
102:13 222:14

**appended**
249:5
**applicable**
84:25 168:11
**Applicant**
79:10
**application**
14:16,18 79:7 89:7
**applied**
66:12 97:19
**applies**
165:7
**apply**
157:25 165:9
**appointed**
209:7
**appreciate**
218:18
**approach**
77:2 195:14
**appropriate**
19:8 129:3
**Appropriately**
82:15
**Approvals**
76:18
**approximately**
32:25 156:11 188:14
194:25 207:15
220:17 227:13,21
228:24
**April**
39:2 108:22 114:19
143:11 163:19
**archive**
172:18
**aren't**
208:2
**Ariana**
192:3,9
**ariana@ftx.com**
191:25
**ARM**
234:5
**around**

106:8 186:23 189:15
201:12 208:14
225:14 227:4
229:22 246:17
**arrow**
174:5,6 175:4,14
**arrows**
2:16 3:2 5:5 8:2,3,6,8
13:13,14,19 25:4
48:8 49:4 56:19,21
58:6,17 59:3,4
92:22 93:24 104:19
104:20 105:6 121:4
121:9 131:18,20,25
132:24 133:15
134:7,9 135:10,15
150:22 175:2
181:14 185:10,15
186:2,9,14,20 187:3
187:14,18,21,24
188:9,23 189:2,10
189:24 190:10
191:14,17,21
192:16 194:6,14
200:3,4 204:9 209:4
209:14,18 210:25
211:9,17 214:9,17
215:18,19 216:4,11
216:21 221:17,23
222:6 224:5 246:4
246:10,17
**article**
109:3
**articulate**
181:2
**articulated**
231:22
**artificial**
127:15
**Ashley**
209:18 210:8
**aside**
22:19 60:12 110:16
130:9 132:18
211:16 230:9

**ask**
8:10,15,24 9:1,3 13:9
13:19 17:18 18:9,11
38:24 39:16 46:8
63:18 65:19 66:23
67:7 70:14,15 71:22
78:19 79:1 80:5
83:3 94:20 101:24
103:18 105:20
110:4 114:17 137:8
144:23 152:9,22
161:8 162:12 191:9
199:20 232:13
**asked**
55:10 108:1 134:15
176:12 202:9 217:8
245:13,16
**asking**
12:5 13:18 43:2 44:4
46:15 48:12 54:18
66:9 68:7 77:13
92:21 108:8 141:12
141:14 142:8,8
168:24 207:23
213:1 229:23
232:10
**asks**
210:13
**asset**
29:24 30:9 42:3 47:7
60:8 62:2 68:23
69:7,16 79:7 84:22
86:19 89:18 91:22
96:19 97:7 99:15,21
101:6,10 103:16
110:8,9,21 111:1,3
112:14 117:3,4,9,23
117:24 118:12
123:13 124:21
125:4,8,11 145:14
147:3,20 152:10
160:1,12,14,19
171:4,8,9,22 174:15
175:8 177:2,6
182:19,20 192:18



195:18 196:4,9
203:12 216:20
220:9,10 221:13
**assign**
157:5
**assistance**
209:21 234:12
**associated**
99:13,15 101:3 102:1
195:23
**Associates**
26:22 32:8,14 35:1
**assume**
23:22 47:2,3 49:18
94:1
**assuming**
154:22 175:11
181:18 195:10
232:11
**assumption**
71:13
**assurance**
72:8
**attached**
18:4 32:4,19 34:13
42:12 65:8 76:7
79:4 93:5 104:14
108:18 133:2 143:7
155:8 163:15
172:15 191:6
197:22 203:20
207:17 209:10
225:16 228:4 233:2
237:11 241:23
**attachment**
18:10 34:16 42:15
**attachments**
34:7
**attempt**
20:16 77:5 87:3 99:2
99:8 119:16 120:8
122:18 126:7
128:17 153:5 160:6
241:14
**attempted**

117:19 118:2 127:6
**attempting**
73:13,22 118:25
148:2
**attorney**
183:23 248:16,18
**attractive**
129:18
**attributed**
69:16
**audit**
26:23 28:8
**audited**
28:6,9 44:19,23 45:2
**auditing**
26:12,19
**auditors**
15:25
**audits**
26:11,13
**August**
76:18,20
**author**
156:3
**authorized**
248:11
**auto**
169:17 173:22
**automate**
127:3
**automated**
146:3 195:24
**automatic**
105:19 166:18,20
167:1 168:20
**automatically**
105:11 203:1
**auto-close**
166:15 167:5 168:10
171:18 172:7
**auto-closed**
146:17 172:6
**available**
18:25 25:8,15,23
56:18 88:22 102:9

102:18
**Avenue**
2:17 3:4 7:10
**avenues**
236:21
**avoid**
63:16 95:17 99:2,8
115:7 154:6 155:4
161:25 176:7,19
212:5,11 229:7
**avoided**
179:3
**avoiding**
118:3
**aware**
13:6 16:18,20 18:19
24:18 25:22 29:1,13
29:18,20,23 30:8
46:20 53:5,10,15
69:1 70:17 83:4
84:13,25 85:23 86:3
104:24 131:14
165:20 179:9
185:22 186:2 188:1
188:5 216:9,12,17
233:19,22
**awareness**
186:4
**away**
117:24 126:25
**a.m**
2:18 7:2 198:10
199:9

———————
**B**
———————
**B**
1:23 2:20 4:8 5:1 6:1
7:14 73:16 235:21
248:5
**back**
23:19 30:6 38:20
55:21 60:14 73:4
80:2,8 107:9 111:20
116:2 144:11
147:14,22 150:25

153:1 173:11
182:15 188:17
193:15,21 213:2
221:14 235:11
239:20 245:11
**background**
26:3 47:23
**backs**
148:22
**backstop**
35:9,12,16,20 36:1,4
36:9 38:25 39:9
72:6 120:2,7,11
123:24 124:4 143:1
143:2 146:12
147:13 153:5,7,25
171:18,24 172:8
174:1,5,9,13,18,20
174:22 197:4,11
217:10,19,24 218:5
**back-end**
218:13
**bad**
128:20 239:8 241:10
243:10
**Bahamas**
75:5
**Bahamian**
74:25,25
**bailout**
206:10,14,16 207:2
**baked**
157:10
**baking**
125:9
**balance**
4:15 28:24 29:1,3,13
29:14,25 30:11,25
31:1,4,5,7,15,19
33:5,18 34:2 42:16
42:22 43:3 46:5
50:10 64:19 71:11
89:17,19 90:3,21,23
90:24 91:8,12,19
92:5,8,13,16,18



101:21 104:3 113:1
113:19 119:17
136:7 141:18,20,23
142:6,14,17,20
147:14 159:4,15
160:12,19 162:5
176:15,18 194:25
202:12 219:21
220:14,17,21,24
221:10

**balanced**
91:3

**balances**
21:5 22:5 33:15
90:15 95:25 97:3,6
97:11,15 102:15,16
103:4 107:13,19
112:22 115:21
174:1 193:1 201:14
201:14 219:24
220:6

**bank**
85:7 86:19

**Bankman-Fried**
1:15 2:15 4:3,10 5:20
5:22 6:3,5 7:4,8
18:8 212:23 221:20
222:5 225:5,19
228:16 230:1,17
231:10,20 232:19
233:4 235:2,5,9
237:1,3

**bankrupt**
147:13 151:25
171:21,21 181:24

**bankruptcy**
1:1 2:1 11:3,14,19
13:2 146:12,18,20
181:17,22 182:4,16
183:3,9,10,14,16
184:3,5 185:8 211:9
211:20 235:2 244:5

**banner**
16:1

**bar**

200:6

**barely**
126:5

**barring**
84:5

**bar-lending**
182:8

**base**
111:5,9,13,15 218:11
218:12,18,23 219:2
219:8,14

**based**
44:13 116:4 133:22
227:10

**bases**
239:10

**basic**
19:18,25 62:23

**basically**
120:22 147:19
169:20

**basics**
62:25

**basis**
67:13 114:15 187:25

**Bates**
4:12,14,16,19,21,24
5:8,9,13,16,18 6:9
6:10,13,14,16,18
95:1

**bear**
67:22 118:16 119:1
217:14 218:1

**became**
31:8 53:9 181:24
243:1

**because**
13:1 34:8 46:2 51:16
51:16,17 54:17,18
58:23 64:6 65:11
72:25 92:10,22
96:18 101:17 108:1
120:3 123:1 127:15
127:21 128:1,9,25
129:10 130:17

136:24 138:25
175:18,19 176:23
179:17 181:8 196:5
196:22,24,24 235:4
235:6 241:18 243:5
243:7 244:20
245:17

**become**
31:12 53:5 75:6
100:25 169:8
241:18

**becomes**
157:9

**becoming**
102:2 190:1

**been**
8:12 12:18,20 15:15
18:6 19:4 31:17,20
31:21 32:6 35:1,2
36:16,17,22 42:14
43:2 51:14 52:18
57:24 58:20 59:3,8
59:14 65:1,10 75:5
79:6 84:24 85:19
89:7 99:9 104:9
107:15 108:20,20
122:11 127:12
128:24 129:1,11
131:11,24 134:1,13
134:16,22,23
137:11 143:9
154:12 155:10
165:20 169:9 181:2
182:25 183:11
184:13 189:5
191:12 192:4,12
195:8 196:10
197:24 198:22
200:5,6,12 202:24
207:6 213:13
216:16 217:19,23
217:24 221:15
225:18,19 228:6
232:3,3 233:4,5
237:13 239:7,8

241:25 242:1

**before**
2:19 7:9,13,14 8:12
8:23,25 13:2 17:9
18:9 28:16 36:8
47:3 66:19 76:15
112:15 117:8
119:16 120:17
155:11,13 162:12
182:1 187:2 188:17
189:2 193:17
194:24 195:6
210:24,25 211:4
233:9,22 235:3
244:4 249:1

**began**
153:22

**begin**
10:13 38:14 136:10
156:25 178:14
239:11

**beginning**
2:18 46:22

**behalf**
2:16 50:22 212:24
222:5,23 223:3
233:6,13,15,18
236:6

**behavior**
122:25

**behind**
164:11

**being**
14:15 15:7 20:9,10
31:10 36:20 64:6,10
64:12 71:20 75:20
80:9 84:9 99:21
109:3 113:11
114:13 130:7 139:2
139:19 152:14
168:9,11,16,21,22
169:18,20,21
171:12 174:1
175:21 189:2,22,23
198:21 233:19



248:13
**believe**
18:18 20:8,17 24:17
26:14 28:5,22 31:13
35:14 44:14 50:23
50:24 52:7 59:25
66:13 75:18 85:9,15
85:19 87:2 92:2
95:3,5 105:17
110:15 120:5 122:6
122:21 123:16
124:20 127:22
128:8 129:12
132:10,13 135:14
140:19 144:7
146:21,21 165:16
182:11 185:9
189:20 190:20
197:13 198:25
210:4 213:12,15,16
217:17 224:7 229:8
235:17 236:1 237:4
239:6 241:3,5
244:10
**believed**
122:19 127:12
128:15 241:13
**below**
82:11 102:19 147:24
167:3,4,6,22,23
168:9 169:7 173:22
205:21
**beneficial**
79:20,24 80:1
**beneficiary**
138:15
**beset**
239:13
**besides**
109:6 127:2
**best**
10:12 11:21 23:23
24:6 44:9 48:24
77:21 80:7 87:3
142:3 212:15

241:14
**Bethel**
209:18 210:8
**better**
49:13 70:14 153:16
175:17,18 179:18
240:23
**between**
8:6 25:10 37:7 50:24
53:6,10,16 64:8,11
64:16 82:15 107:12
118:3 121:24
130:15 133:14
136:21 138:17
139:12 140:11,12
156:13 162:4
190:24 195:9 198:8
207:20 219:1
223:14
**beyond**
81:13 139:14
**big**
188:19
**bilateral**
138:20
**billing**
24:5
**billion**
149:16,17,18,18,23
154:25 188:9 211:6
227:21 228:24
231:1
**billions**
63:10 243:8
**bit**
61:18 196:7 210:12
210:19 218:10
**bitcoin**
29:13,14 60:16,18,20
60:22 61:18,20 62:3
63:13 89:19 90:1,3
90:12,12,13,14
101:20,21,23
103:25 105:7
111:14 112:6,9,12

113:1,6,9 116:14,15
116:16 138:10,22
138:23 139:2
142:13,19 150:3,23
151:1,19,22,23
177:11,16,18,25
180:4,7,14 186:22
187:1 220:12
**bitcoins**
63:3 64:20,22 101:21
112:25 113:3,10,14
117:13 177:20
**BitGo**
84:21
**blank**
84:10 117:13,14
223:12
**blanket**
48:21
**blindly**
196:14
**blockchain**
60:17 62:11 63:7,12
**blockchains**
60:13 61:14 63:14
**blocking**
117:11
**blog**
109:24
**Bloomberg**
207:21
**blow**
119:7
**BLP**
124:15 126:18 127:4
128:5,7 147:25
148:22 149:8 172:4
175:15,23 197:14
**BLPs**
124:7,17 125:20
128:11,18,24
148:17,19 149:3,16
149:21 150:5 151:6
151:25 170:3,5
175:16 196:4 197:5

**Bluff**
3:9
**BNB**
31:18 45:14
**Board**
248:9
**Bob**
63:1,2
**Bob's**
63:6
**bold**
235:21
**book**
169:22
**books**
19:20 20:3
**borrow**
106:18 107:1 108:2
110:8,20 111:8,14
112:14 119:2 130:6
231:7
**borrowed**
64:6 72:1,2,11 91:17
108:10 111:18
112:6 113:13,14,17
114:3,6,13 117:3
118:18 131:4,9
132:8
**borrower**
71:7,24 72:13,14
118:18 119:2,22
120:2,20,21 206:21
**borrowers**
72:20 107:10 130:19
**Borrower's**
135:6
**borrowing**
61:13 69:11 72:24
110:11 112:7 114:1
114:22 117:23
118:4
**borrows**
100:17 102:6 108:11
124:2,3
**both**



13:4,5 31:22 51:3
56:15,16 57:5 64:8
64:17 101:25
119:24 124:5,5,5
128:20 138:14,17
165:7 176:2 218:13
223:21 246:25
**bothered**
57:24
**bottom**
19:6 133:7 147:5
173:18 191:18
242:9,15
**bought**
29:14,24 30:10 105:6
139:9
**bound**
184:15
**box**
138:4
**boy**
191:8
**brand**
167:8
**Bravo**
121:19
**breached**
135:10
**break**
13:10,11 64:25
121:12 212:18
**breakdown**
190:6
**Brian**
3:13 7:12 212:24
**bribes**
15:3
**brief**
5:23 233:6,25 234:2
234:9,24,24 235:15
235:20 236:5
**bring**
50:23 147:14 214:19
**brings**
153:1

**broad**
3:14 48:17 87:23
239:3,4,5
**broader**
15:8
**broadly**
69:19 72:23 156:4
**broken**
22:22 239:17
**brothers**
59:18
**Brown**
1:23 2:20 7:14 248:5
**BTC**
144:18 173:19
**BTMX**
121:11,19,20
**bug**
127:24
**bugging**
53:12
**bullet**
82:14,19 83:3 85:9
85:16 86:2
**bullets**
80:16,25
**bunch**
198:1,8 211:17,18
**Burg**
59:10,12
**Burgess**
59:13 134:22
**Burgesses**
59:18
**Business**
79:8
**busy**
185:20 205:25
**button**
202:22,22
**buttons**
189:16
**but-for**
244:23
**buy**

29:13 138:1,21
142:13 144:18,20
**buyer**
138:16 139:1,13
**buyers**
139:9,13
**buying**
122:17 177:24 178:2
178:3
**buys**
180:7

___

**C**

**C**
1:13 3:1 6:3 18:12
73:24
**calculate**
141:22
**calculated**
116:4
**calculating**
141:20 145:19
**calculations**
93:21
**California**
2:18 3:9 7:1,10 247:8
248:2,7,9,12
**call**
10:1 15:17 174:21
243:7
**called**
8:1 16:9 18:12 19:7
33:1 34:17 35:6,8
35:13,25 42:15
61:15 65:11,12 66:5
66:25 74:6,7 76:10
76:17,25 80:14,23
82:5 103:3 108:21
118:7 119:12
133:13 136:6,13
143:10,18 144:14
144:25 145:9,21
163:18 193:13
197:25 231:5
**calls**

54:24 68:4 73:11
135:12 183:17
184:8 211:23
221:24
**came**
64:9 105:21 132:3
**can**
8:16 9:6,15 10:11
16:17,17 21:1,10
23:8 24:10 30:3,21
34:9 37:1,19 40:15
43:25 46:15 47:1
48:9,24 54:12 58:18
58:18 62:5 67:10
69:19 75:4 77:14,24
80:8,12 82:2,24
84:12 86:10 87:14
92:23 94:20 103:3
104:10 107:11
121:6,10,13,20
130:9 136:23
141:10,10 152:9
157:15 160:3 161:8
166:11,25 167:2,8
167:15 168:19,19
168:25 169:2,10
179:7,15 180:19
181:25 182:3
183:22,23 186:17
189:4,4 191:16,20
192:11 199:19
206:7 208:23
209:20 212:1,18
215:1 218:9 234:20
237:21 240:23
**cancel**
99:10
**canceling**
195:7,10
**cannot**
10:5 47:5,8,21 71:7
**can't**
9:9 11:17,20 20:18
23:15 26:21 27:10
33:12 35:22 36:14



38:2 52:5 54:4 56:9
71:14 75:7 76:24
81:18 84:10 88:12
89:10 93:16 94:19
95:19 96:11,17,23
101:17 102:23
104:10 105:17
107:15 108:9 136:3
136:8,18,24 137:5
143:15 151:4 156:3
181:8,22 182:6
184:11 185:3,20
186:10,11 188:15
188:24 189:6
190:13,20 192:11
197:15 203:15
206:11 208:23
211:12,25 212:2,12
213:15 216:13,22
244:11 245:19,20
**cap**
123:19
**capability**
105:22
**capacities**
149:6
**capacity**
148:17,20 149:9
170:3,5 172:8
**Capital**
2:17 3:2 5:5 8:2,3
13:14 104:20 105:6
215:18 221:17,23
222:6 224:5 246:4
**Capital's**
216:21
**care**
240:13
**careful**
196:7
**carefully**
71:18 166:5
**carried**
236:18
**carries**

242:12
**carry**
99:7 114:14
**cartel**
240:5
**case**
1:7 2:7 46:20 47:6,8
47:22 64:21 66:12
71:3,5 92:9 101:12
101:19,19 102:23
102:23 120:22
121:2,11 122:12
123:8 124:20
125:23,24 127:10
127:11 130:1,2
137:4 147:25
175:12 181:22
185:10 196:21
201:17 202:16
210:12,19 215:10
217:25 223:13
236:16,16 237:14
246:24
**cases**
10:5 22:19 23:12
28:23 29:17 33:24
37:9 38:13,17 48:20
49:2 60:12 68:16
100:10 102:22
108:10 110:12,14
110:15,23 125:13
126:25 127:7,19,24
127:25 136:4,4,8,9
137:1 147:9,10
157:24 160:8 167:2
169:13 182:11
**cash**
105:7
**cast**
122:13
**casual**
11:17
**category**
25:3 26:10 81:24
**cause**

37:12 39:8 45:25
163:13 168:15
169:9 196:8,9
244:23 245:9 246:4
246:7
**caused**
45:11 51:6 122:16
189:13 190:10
194:10 195:11
**causing**
39:5 110:13 168:20
195:19
**caution**
208:14 229:5
**caveat**
56:10 212:10
**caveats**
68:18 100:9
**cease**
201:16
**Celsius**
182:8
**centralized**
63:14
**CEO**
4:10 14:20 22:9
28:15 44:6 76:19
243:1
**certain**
15:3,8 25:20,20 31:1
55:18,19 124:2
148:23 214:18
220:2
**certainly**
28:20 46:4 73:13
122:13 162:8
185:22 202:23
229:23 244:24
246:6
**Certificate**
248:1,8
**Certified**
2:20 248:6
**certify**
247:7 248:5

**chain**
5:11,15 95:8 203:22
207:20
**chains**
13:7
**chairman**
79:14,20,25
**chance**
34:19 42:17,19
**Chang**
199:22,25 202:14
**change**
37:11 39:12 45:15
167:8,8,12 219:14
245:25 246:11,12
**changed**
36:13 105:3 219:11
246:12,16
**changes**
169:7 195:21 249:3
**changing**
38:16 47:10 104:4
167:13 169:4 177:6
**Chang's**
215:7
**channel**
14:14
**Chapter**
1:6 2:6 237:5 239:6
239:14,16,21 240:4
240:13,22,24 243:2
244:23
**charge**
41:8
**charged**
40:2 41:20
**charges**
225:7,12 227:6,9
**charging**
235:7
**chart**
174:4
**charts**
173:2
**chat**



57:18,21 58:7
197:19 198:1
209:13 214:25
215:4
**chatter**
186:13,17
**check**
138:4
**choice**
154:5
**choose**
56:17 167:7 225:3
**chose**
75:9 177:11 179:2
**Chris**
7:25
**Christopher**
3:4,13 7:11,12
**christopher.harris...**
3:6
**chronology**
192:15
**Circuit**
229:21 232:23
233:13
**circumstance**
154:23
**circumstances**
10:12 37:3 132:14
184:23 216:5
**cites**
236:16
**Civ**
248:10,15,20,25
249:5
**Civil**
248:12
**claim**
5:4 99:6 185:20
**claimed**
51:13
**claiming**
235:4
**clarification**
14:11 94:21 227:12

**clarified**
50:17 213:18
**clarify**
91:21 101:12 152:22
159:20 208:6
216:12
**clarity**
21:22
**clawback**
71:12 165:15,17
212:5,12
**clawbacks**
164:20 165:2,13
176:7
**clean**
48:3 240:25
**cleaner**
49:6
**clear**
8:17 38:23 44:5,10
44:23 97:25 100:8
100:11 187:17
193:3 213:8
**clearer**
13:11
**clearly**
14:17
**clicked**
189:15
**client**
24:15 58:16
**clip**
161:10,11,15,18
**close**
124:24 149:19,25
150:4 151:9 156:15
173:22 176:18
178:8 198:19 232:3
**closed**
146:18 148:19 149:9
170:6,20 171:12
190:19,21 209:3
211:2
**closer**
146:12

**closes**
170:24
**closing**
124:19 125:9 150:9
190:24
**closure**
153:19
**code**
52:25 53:4,6,10,17
54:1 111:5,9,13,15
127:3,5,5,8,16,21
165:14,20 218:11
218:12,13,18,22
219:1,7,10,14,17
248:12
**coding**
164:10
**collateral**
64:12 69:11 91:17
94:3 95:16,24 97:2
97:4,10,14,21 98:5
98:16,18,25 99:10
100:16 102:5,9,14
102:15,18 109:22
115:8 127:14 135:6
144:17 160:8 168:7
180:17 224:14
**collateral-based**
118:4
**collect**
147:22 148:2 184:20
**collected**
236:10
**collectively**
113:17
**colonial**
240:5
**color**
198:20
**coloring**
199:1
**column**
52:9,23
**columns**
52:6

**combined**
33:22
**come**
8:17 15:13 38:20
72:7 87:25 130:2
157:24 241:14,15
245:9
**comes**
15:1 49:21 64:2
178:8 205:2
**comfortable**
128:24
**coming**
186:11 195:18
201:18
**commenced**
194:21
**comment**
20:18 102:23 143:15
212:12
**comments**
88:6
**commit**
226:3,11,15,19,23
**committed**
154:10,10
**commodities**
226:19
**common**
51:22 98:21 167:19
167:21
**communicate**
14:16 57:17
**communicated**
54:8 198:25 204:19
**communicating**
55:24 56:8 57:2
198:25
**communication**
57:14 58:4
**communications**
15:24 56:21 57:4
**community**
128:10
**companies**



**company**
9:25 13:15 15:11
  40:2 48:9 53:11
  56:14,16 59:19,25
  78:23 207:8 234:10
  235:1
**compared**
196:18
**compensated**
36:19
**competent**
22:25
**competently**
27:10
**competitive**
106:20
**complete**
6:9 137:14 143:5,10
  229:13 230:17
  246:21
**completed**
14:17 26:13 50:12
  152:18 153:21
**completely**
10:5 235:4
**completion**
249:1
**compliance**
214:20
**complicate**
101:15 184:17
**complicated**
49:25 60:12 61:19
  62:6,7,24 63:25
  66:1 75:18 84:1
  92:10 158:24
**complications**
29:19 101:3 107:22
  117:18
**computer**
218:13
**concept**
19:18,25 28:22 106:6
  106:7 156:14
**concepts**

69:1 152:23 162:15
**concern**
122:10 152:17
**concerned**
14:14 122:22
**concise**
100:11
**concluded**
247:3
**conclusion**
68:5 73:12 127:11
  131:21 135:13
  183:7,18 185:1
  211:24 212:7
  221:25
**concrete**
176:22
**conditions**
117:12 127:2 136:9
**conducting**
227:18
**conference**
57:7
**confidence**
190:21 201:18
**confident**
10:2,6 100:25 169:12
**Confidential**
246:23
**confidently**
33:12 57:15 88:12
  89:10 136:19,24
  137:6 151:5 156:3
  188:25 189:5 191:3
  197:16 229:18
**confirmation**
104:19 123:3
**confirmations**
104:25
**conflates**
152:7
**conflating**
152:6
**conflict**
87:25

**conflicting**
239:13
**conflicts**
71:15
**confused**
151:17 176:21
  242:16
**confusing**
100:1 161:22
**Congress**
23:23 24:2,7
**congressional**
16:11
**consequence**
129:14
**consequences**
31:14 129:5
**conservative**
127:23
**consider**
129:18 204:12
**consideration**
109:10 156:9 157:9
**considerations**
212:9
**considered**
14:19
**considering**
216:4
**consistent**
11:21 64:7 132:16
  158:3 239:15
**conspiracy**
226:3,11,15,19,23
**constantly**
61:10 109:3
**constructive**
241:15
**consult**
237:19
**contact**
58:17 59:8 209:6
**contemporaneous**
187:7,13
**contemporary**

77:19
**content**
163:22
**contents**
61:21 225:22 233:16
  233:22
**context**
10:1 23:21 33:11
  69:10 72:6 73:3
  84:1 88:19 97:18
  100:21,22 185:17
  212:1 223:20
**contexts**
23:14 68:17 69:14
  102:25 129:25
**contingencies**
101:1,4
**contingent**
99:12,15
**continue**
49:10
**contract**
115:5 138:2,12,20
  139:1,3 141:8
  143:18,22 144:2,24
  177:15,16 179:12
**contracts**
69:11 137:13,25
  139:9,16 141:4,11
  142:23 165:7 170:8
  179:9,16,22 180:8,8
  180:25
**contractual**
222:1
**contributed**
97:2,11,15
**control**
74:1 234:10 235:1
  246:9
**controls**
19:19 20:2
**conversation**
11:6,18 198:13 206:4
**conversations**
11:12,13 18:19



MAGNA
LEGAL SERVICES

convey
68:11 118:22,25
conveyed
68:10
conviction
232:20
convinced
241:18
cooperated
243:5
cooperating
243:10 244:20
cooperation
236:8
copies
18:2 246:25
copy
55:11 65:7 93:4
108:18 133:2 143:7
163:15 233:4,6
core
163:9
corner
100:9 157:24
corporate
236:7
correct
24:3 27:22 40:24
45:1,4 47:13 48:25
95:5 102:7 117:10
148:4,6 185:13
202:3 210:7 211:13
213:10,11,14
214:10,14,21,22
215:5,6 216:21
217:4,5,15,16,20,21
218:1,2,7,19,20,23
219:8,13,18,25
220:4,8,15,22 221:5
221:7,11,23 222:9
223:8,18,24 224:6,7
224:16,25 225:3,8
225:12,25 226:4,8
226:12,16,20,23
227:3,6,14,18,22

230:2,6 232:20,24
233:7,14,20,23
234:15 235:15
236:1 238:9 239:17
239:18 240:9 241:4
241:8 242:4,7 243:2
243:6 244:5,21
247:9
correction
154:20
correctly
60:7 119:8 231:10,11
232:7,10 236:23
correlated
116:20
corroborate
229:24
cost
175:15 176:4
costs
220:21 221:9
costwise
63:11
couldn't
9:18 141:14 176:18
178:7 192:19,22
counsel
3:2,11 8:18 11:25
12:2,4,8,9 14:21
95:12 212:17
230:16 233:12
234:4 235:22 236:2
236:6 237:4,19
246:25 248:17,18
count
154:19,20 202:11
225:24 226:3,6,10
226:14,18,22
counter
41:15
counterpart
139:4 200:7
counterparties
200:2
counterparty

51:9 118:16 130:3
138:8,12,13 139:6
countries
23:15
COUNTY
248:3
couple
12:12 19:13 26:3
34:7 39:16 47:23
52:25 65:2,3 148:16
202:14
course
212:19 219:19
court
1:1 2:1 8:22 17:24
94:18 183:16 184:5
225:7 227:1,5,20
228:14,24 230:5,15
231:12,16,17
232:15,16,23
233:13 234:3 244:5
248:8
cover
39:15 56:13 98:14
99:6 119:4 153:5
154:1 175:10,13
183:1 202:12
covered
36:19
Coverick
5:3 65:7,11 108:15
108:21 143:6,10
193:16
covers
175:23
Co-Founder
4:10
crack
14:19
crash
157:18 185:23
186:22 187:1,11,13
crashing
198:18
create

163:1
created
101:2
creating
20:23
credible
49:22
credit
6:14 61:6 101:14
107:24 108:11
110:13,16,19 125:4
129:23,24 130:9,12
130:24 131:3,7,13
131:19,23 132:1,3,7
132:11,20 133:5,9
133:13 134:4 135:5
135:5 136:2,5,14
158:24 167:16,24
168:1,4,6,8,11,17
190:2,19 195:7,11
195:19 196:25
202:23 203:1
204:23 205:2,8,21
208:2 211:2,8,20
215:9,24 221:16,22
224:2,4,16,22 225:2
credited
219:24
creditors
235:10
creditworthiness
131:15
criminal
227:2 230:2 233:7
237:14
crisis
234:11
critical
236:19
Cromwell
3:12 212:24 234:10
245:9,18 246:3
cross-margined
114:25
CRR



1:23 2:21
**crypto**
185:18 189:24
206:20 207:11
**cryptocurrencies**
122:2,3
**CSR**
1:23,23 7:15 248:8
**culpable**
236:9
**currencies**
107:23 122:4
**currency**
70:2,5,9,10,16,18
84:2 86:18 90:24
91:2 110:21 121:18
**current**
10:25 11:2 43:10
141:8 153:16
157:17
**currently**
216:5 227:16 232:22
**cus**
50:3
**custodian**
19:19 20:3,6 23:13
**custodians**
20:24
**custodied**
41:21
**custody**
21:12 22:7 23:4,11
23:17 24:5 84:22
86:19 95:9
**custodying**
41:25
**customers**
19:1 22:10 25:5,9,13
25:16,24 29:3,7
43:21 44:15 50:24
55:24 56:8,12,17
58:2,23 61:10,12,17
61:22 62:25 64:8,11
64:17 68:10,11,18
82:16 86:21 88:23

98:7,17 99:7 104:25
106:16 107:1,1,12
107:20,21 108:2,3
108:10 118:4 119:9
128:18 130:10
131:5 136:1 144:20
158:22 159:23
160:3 162:5 163:3
172:6,9,10,11,11
181:16,21 182:3
183:4 206:19
217:14,25 219:20
225:25 226:4
235:10 239:20
240:13,14,23
**customer's**
21:10 49:23 50:2,7
50:21,25 182:25
183:15,22 184:4
193:1,6 213:14
218:6 220:13
221:11
**customized**
133:14,19
**cut**
140:20 208:20,22
**cutting**
181:18

— **D** —

**D**
1:13 3:13,18 4:1 6:5
7:12,13 242:1
**daily**
187:25
**dangerous**
199:3
**Daniel**
5:12,16
**darker**
95:21
**database**
193:10,11 224:8
**databases**
219:2

**date**
197:25 209:25 210:1
216:8 225:13
247:11
**dated**
5:12,15 76:17 108:22
143:11 163:19
207:21 214:9 249:8
**Davies**
4:23 57:3,5 104:18
192:9,20 204:8
214:9 222:5
**Davies's**
222:20
**day**
63:10 175:10 187:8
194:21 210:2,3,4,5
219:19 232:12
246:10,14
**days**
188:5,19 189:3,6,6
234:11,17
**de**
156:22
**deal**
86:19 124:8 129:4
152:20 200:6
**debited**
112:16
**debt**
148:3 175:5 246:9
**debtor**
155:16
**debtors**
1:6 2:6 12:24 234:4
234:25 235:17,22
236:2,8 237:4
241:16 244:20
245:24 246:9,10
**debts**
22:20,23 208:2
**decent**
136:23 137:23
**deceptive**
239:9

**decide**
106:10 125:17
170:19
**decided**
51:18 60:22 106:13
112:7 128:13 129:2
183:16 184:5
**decipher**
198:3
**decision**
106:9 123:1 128:9
131:22 187:22
**decisions**
235:8
**declaration**
5:3 155:12 193:16
**declarations**
194:17
**declare**
247:7
**decline**
149:5
**decrease**
113:19,22 195:17
215:25 220:13
**decreased**
114:1
**decreases**
114:12
**deeply**
18:21 186:5
**default**
102:24 127:7 219:10
**defaulted**
71:9
**defaults**
71:7,24
**Defendant-Appella...**
5:24
**defense**
230:2
**deference**
51:18
**define**
22:6 71:19 87:14



98:2 156:24 157:1
161:4 177:15
178:22 179:18
**defined**
184:14
**defines**
145:1
**defining**
29:7 37:5 69:1 70:11
70:23 71:14 112:5
160:22 161:17,25
229:21
**definitely**
158:1
**definition**
23:2 38:14 68:7 69:3
179:13
**definitional**
37:6 38:12 83:22,25
157:4 187:22
234:17
**definitions**
22:14 23:12 69:2
71:15 178:21
**DELAWARE**
1:2 2:2
**delay**
127:20 128:14
**delayed**
128:1
**delaying**
126:3
**delete**
202:15 215:9
**deliberation**
165:18
**delivered**
15:15
**delivery**
180:11,11
**demand**
118:5 132:13
**denominated**
70:8
**denser**

137:2
**department**
27:12
**departments**
27:14,24
**depend**
156:24 182:22
**depended**
55:19,20 56:4
**depending**
22:21 31:16 73:3
99:14,22 104:8
129:11 132:14
177:17 182:24
205:14
**depends**
49:1 64:1 69:3 90:6
103:9 117:5 125:6
127:1 131:6 141:21
147:9 154:16,23
164:8 238:15 246:5
**deponent**
3:17 7:5 247:13
249:3
**deposed**
8:12
**deposit**
61:3,8,23 142:13
160:4
**deposited**
29:12 60:8 61:6 63:1
63:18 117:13
144:17 180:17
**depositing**
61:10 199:7 202:11
**deposition**
1:15 2:15 4:9 5:2 6:2
6:8 11:24 18:3 32:3
34:12 42:11 65:6,7
65:12 76:6 79:3
93:1,3 104:13
108:17 133:1 143:6
155:7 163:14
172:14 191:5
197:21 203:19

207:16 209:9
225:15 227:18
228:3 233:1 237:10
241:22 246:21
247:3 248:1,21,23
249:1
**depositions**
12:6
**deposits**
31:22 180:4,7 230:22
**derivative**
177:10 178:3,24
**describe**
46:21 77:6,21 158:3
162:9 166:5 173:1
178:19 229:9,14
**described**
17:15 28:23 104:21
164:23 165:24
178:19 184:23
**describes**
146:3 166:18
**describing**
149:2 157:21
**description**
78:15 81:3,9 85:10
85:16 162:25 166:4
166:7 229:19
**descriptions**
46:3
**design**
13:22
**designed**
195:17 196:16
**desired**
26:14
**desk**
143:25 144:2
**destroying**
239:21 243:8
**destructive**
239:7
**detail**
42:20 55:16 103:22
185:15 218:16

**detailed**
189:19
**details**
13:16 16:20 29:20
31:16 61:20 67:5
105:20 116:13
117:5 123:22
135:23 137:21
142:4 145:24 146:2
182:22,24 184:13
**determine**
38:10 137:18 170:19
220:7
**determined**
61:6 131:12 132:12
**determining**
134:3 236:20
**develop**
236:15
**developed**
195:20,21 219:16
**developer**
59:7 84:7
**developers**
148:11 193:8
**developing**
53:4 164:6,9
**deviate**
177:8
**deviated**
196:6
**devices**
218:15
**dialogue**
11:6
**did**
11:23 14:2 17:6,9
18:11,17 20:20,22
22:9 27:11 28:12,16
29:2,14 33:14 35:15
40:11 43:20 46:10
47:6 53:1,5 56:20
56:22,23 57:16
63:21 64:17 66:16
66:16,17,19 68:1



69:16 75:12,16
81:13 87:10 89:10
89:23 98:8 105:14
105:24 106:10,19
112:24 113:4 114:1
123:7 125:7 127:17
129:18,18 134:16
134:20 146:20
159:22 163:1 164:3
164:5,6 181:16
195:6 202:4 205:18
208:20,22,22
217:22 220:23
224:4 231:4,10,11
231:18 232:7,8
233:9 236:17,23
241:17,18,20
244:25 245:8,19
**didn't**
43:25 45:20 56:17
57:15 85:5 88:12
89:11 101:4 108:11
111:12,15 120:20
123:4 128:9 130:22
136:1 157:25
160:25 176:13,14
178:13 185:11
186:16 201:17,20
204:25 208:19
223:17
**died**
243:17
**Diego**
3:9
**difference**
82:15 99:19 130:15
190:24
**differences**
140:12
**different**
21:22,22 23:6,12,15
23:15 24:24 54:7,12
60:13,13,18 78:9,20
84:8 87:24 88:1,2
90:18 91:9,11,15

92:19 120:21
129:25 132:7
141:19 144:8
145:25 151:14,15
152:6,7 158:6 159:1
163:25 165:5
181:12 217:10
218:15 234:19
245:22
**differently**
84:10 245:17
**difficult**
48:21 50:14 124:24
**digital**
4:18,18,21 20:10,16
29:24 30:9 31:10,23
42:3 43:11,20 45:6
60:8 61:2,11 66:25
67:12,17,22,23 68:2
68:12,23 69:7 70:15
70:17 71:1 73:8,18
74:1,13,20,23,24
75:12,22,24 76:10
76:11 78:19,21 79:7
79:10,25 80:3,4
84:22 86:19 89:18
90:21 91:1 92:19
106:20 107:17
110:9,21 112:14
130:22 158:6 159:1
159:23 160:1,25
188:10 211:6,17
220:13
**Digital-Asset**
18:13
**direct**
59:8 231:15
**direction**
15:18,19 127:20
149:20 195:9
233:14,16
**directions**
15:12 64:9,17
**directly**
141:12

**director**
79:20,24
**disagree**
232:8,9 234:20
**Disclosures**
19:8
**DISCOVERY**
234:4
**discrepancies**
53:5,10
**discrepancy**
53:16
**discretion**
218:7
**discuss**
206:2
**discussed**
158:5 189:22,23
221:19
**discussing**
10:3 131:20 239:5
**discussion**
189:15 198:8 206:2
223:21 244:9
**discussions**
106:8 122:7 131:21
216:19 219:21
**displayed**
51:3 56:15
**disposal**
245:25
**dispute**
8:6
**disputes**
229:21
**disputing**
50:9
**disregarded**
190:22
**disregarding**
190:25
**distill**
236:14
**distinct**
62:12

**distinction**
25:10
**distinguish**
62:19
**distress**
207:9
**District**
1:2 2:2 225:7,8 227:1
227:1 234:3
**divided**
103:15 164:15
**document**
16:10 17:18,25 18:6
18:15,24 20:14
24:18 36:8 44:1,17
65:10,17 69:5 76:17
76:21 77:18 78:1
81:10,13 83:1 85:20
88:22 93:9 109:4
132:21 133:14
136:25 143:13
151:11,16 163:21
163:24 165:11
213:24 221:15,21
221:21 222:4,18,22
222:22 223:2,11
224:9,11,20 225:18
225:21,23 233:5,9
233:12 237:16,18
238:2,5,7,8,18,24
238:25 239:2,25
240:9,18 241:11
242:3,11 243:22,23
**documents**
9:5 10:10 14:20
15:23 16:5,19 17:14
22:16 23:20 25:4
38:21 42:25 66:2
109:23 124:22
136:21 137:12
138:7 216:8,8
221:17 223:7
236:11
**DocuSign**
222:9,11,14



**dodging**
231:24
**does**
10:1 12:16 36:25
42:21 51:5 63:7
64:4 70:25 71:25
83:4,8 88:14 93:12
93:14 101:9 106:5
109:17 111:9
114:22 119:1 124:1
125:4 133:16
147:13 149:11
151:6 159:10 162:5
166:5 167:12
174:12 176:24
177:18 178:19
180:23 182:18
197:7 228:23
240:24
**doesn't**
96:16 113:18 114:8,8
124:17 132:2
142:21 151:16
177:7 179:11 208:8
227:25 245:25
246:11,12,14
**doing**
23:23 40:21 41:18
51:10 77:21 83:11
98:15 102:13
122:17 126:4
177:25 182:24
188:24 207:10
232:3
**dollar**
31:8,12 63:8 91:8,11
91:19,23,24 92:1,8
92:11,12 132:16
141:18,20,23 142:6
142:17,20 177:4,5
211:5,7,19 221:4
**dollars**
29:12 92:5,9 110:9
111:9,10,19 112:14
112:25 113:11,15

113:17 114:13
130:21,25 141:25
142:1,13,15 152:19
153:24 154:2,9,11
158:13 176:25,25
177:12 180:15
188:9 211:6 243:9
**dollar-specific**
220:16
**Domestically**
26:21
**done**
9:2 32:1 42:8,10
47:25 52:8 76:4
88:10,12 114:14
155:4 158:4 167:20
182:13,15 194:13
194:13 195:8
203:13 206:15,17
206:24,25 211:10
211:21 212:4,14
239:11
**down**
8:22 22:22 32:23
35:24 113:6,9
116:16 124:19
125:9 146:18
149:19,25 150:4,9
151:9 167:3,4 178:7
179:3 186:22
205:10 208:20,22
242:7 244:12
**download**
209:20 210:9
**draft**
16:24 28:19,21 44:20
46:6 66:16 89:8,10
204:17
**drafted**
66:14 81:7 82:25
165:21
**drafters**
81:9
**drafting**
18:20 76:23 136:25

**drafts**
76:2
**drawing**
25:10
**Drive**
3:9
**driven**
239:8
**drop**
180:15
**dropped**
173:22
**drops**
102:19 173:19
**due**
71:12 182:5 210:16
**duly**
248:6,14
**dumb**
48:7
**Dunne**
3:13 7:12
**dunnec@sullcrom....**
3:16
**duration**
156:11
**during**
157:18 223:16 249:4
**duties**
25:20 120:15 236:18

——————————
E
——————————
**E**
1:13 3:1,1 4:1,8 5:1
6:1
**each**
8:21 52:15 54:8 57:6
57:7 61:3,12 62:15
62:19 70:18 87:25
89:17 115:5 132:21
138:8 222:15,17
223:22
**earlier**
59:11 65:14,15,22
66:7,10 120:13

**drafts**
134:21,22 197:8
205:11 217:9
224:10
**early**
31:18 185:25 186:18
**easier**
23:2 31:25 43:5
193:15
**easily**
21:5 22:5
**Eastern**
205:3
**easy**
199:20
**eat**
121:13
**ecosystem**
20:16 207:11,13
**educations**
48:25
**effect**
51:20 165:17 223:23
248:10
**effected**
52:1,18
**effective**
72:9
**effectively**
22:20 27:23 101:5
129:3 130:12 131:5
148:4 150:9
**efficient**
14:15
**efficiently**
9:23
**effort**
24:6
**either**
11:8 15:21 28:13
31:16 51:16 58:2
63:9 66:16 93:23
94:8 110:20 113:24
123:4 134:11
138:15 153:10
170:16 196:4



MAGNA
LEGAL SERVICES

197:16 220:3
**electronic**
54:9 55:25 57:14
70:7
**eliminate**
114:8
**eliminating**
180:23
**elimination**
168:16
**else**
14:24 15:1 38:7 40:9
87:22 109:12
116:19 137:17
141:14 142:9
175:11 179:14,17
198:5 223:3 227:24
**elsewhere**
60:22
**email**
4:23 5:11,12,15,15
32:7,18,23 34:6
57:11 104:17
203:22 204:17
207:20 214:6,8,12
214:13,16 237:17
242:3
**emailed**
104:10
**emails**
204:8
**employed**
10:16,21
**employee**
49:23 50:1,6,11,20
52:1,7,10,18 58:24
155:12,14 192:25
194:12 200:1
213:23 248:16,18
**employees**
48:8 54:8 56:6 57:17
122:19 128:15
192:22 213:10
**EMT**
198:4

**enable**
110:9,21
**enabled**
108:2
**enables**
21:4
**enact**
20:16
**enacted**
68:17
**encountering**
209:19 210:9
**end**
35:15,16 37:7,20
61:15 99:7 118:15
124:18 138:18
152:18 163:10,11
175:9 205:13
209:15 246:8,10,14
**ended**
36:18 37:10,10
117:15
**ending**
2:18
**endorsing**
15:4
**ends**
147:20
**Enemies**
242:11,20
**enemy**
243:4,7
**engage**
138:5
**engine**
119:15 128:1 148:8
162:13,14,16,22
162:25 164:7
176:10 180:21
195:12,16 196:11
196:15
**English**
137:3
**enough**
14:15 126:5 201:13

207:12
**ensure**
19:19 20:3 48:23
101:6,10,25
**ensuring**
18:13 19:7 129:2
**enter**
98:25
**entered**
209:4
**entire**
173:25 174:12,17,19
**entirely**
11:19 84:5 243:21
**entirety**
125:13,14
**entities**
15:25 27:25 28:2
36:20 38:11 66:5
76:3
**entitled**
160:19 232:9 234:2
**entitlement**
160:1,2,12,22,25
161:5,11,13,18
**entity**
12:25 20:9 38:11
47:12 75:1 78:2
89:9 129:4 163:2
**entries**
209:13 242:22
**entrusted**
130:3
**entry**
104:8 242:18 243:23
**envisioned**
85:7
**episodic**
189:19
**equal**
40:9 116:19
**equals**
96:2 97:11,15
**equivalent**
70:7 139:7 141:19

**ERC-20**
62:10,18
**Erin**
3:8 7:11
**erin.haley@lw.com**
3:10
**erroneous**
154:21
**ERRONEOUSLY**
234:3
**error**
154:17 209:19 210:9
**especially**
64:1 88:19 190:1
223:9 229:5
**Esq**
3:4,8,13,13,18 7:11
7:11,12,12,13
**essentially**
76:17 194:9 235:16
**establish**
224:4
**et**
1:5 2:5 5:23
**ETH**
150:24 151:2
**Ethereum**
60:16 62:4,9,10,11
62:17 63:1,5,19,22
64:20,23 89:20 90:1
**evasive**
231:24
**even**
23:11 27:17 48:24
71:10 100:23
118:18 146:12
149:5 240:22
**evening**
204:10
**event**
218:17
**events**
10:3 63:7 105:18
214:3 216:15
**eventually**



113:25
**ever**
8:12 11:17 40:11
46:10 53:5,15 68:21
69:5 88:6 114:1
120:5 150:16
153:13 165:16
170:21 181:16
185:7,12 206:18
223:2 241:18
**every**
63:10,12 138:25
140:8,10 152:7
163:5 177:22
178:23 196:20
231:19
**everyone**
18:2 63:7
**everyone's**
100:3
**everything**
158:1 181:25 182:23
185:21 186:12
200:12
**evicted**
235:10
**evidence**
7:19 236:14
**exact**
52:5 225:13
**exactly**
15:25 25:17 27:10
30:24 31:6 37:5
44:20 50:3,14 68:25
81:23 85:22 86:21
96:17 99:20 104:5
104:11 105:18,25
106:7,23 107:3
108:25 110:3
111:13 123:15
126:20 129:17
130:16 137:20
138:3 154:9 165:10
175:24,25 186:12
188:15 189:6

190:23 192:14
200:5 213:16
220:19 234:17
244:11
**EXAMINATION**
4:2 7:23 212:21
245:6
**examined**
7:5 248:13
**example**
9:20 24:25 26:11
31:20 36:15 39:10
45:10,13,24 50:8
51:21,22 53:12 70:1
71:6,20 100:14
101:2,11 104:6
114:4 117:10
127:10 142:12
147:19 156:9
157:12 168:12,14
176:23 196:2
**examples**
14:8 15:20 51:11,12
100:2 168:12,19,25
**exception**
107:11
**exceptions**
107:15 110:24
137:21
**excerpt**
209:12
**exchange**
19:3 21:19 25:6,21
29:25 30:10 53:1
60:9 61:17 63:9
69:7,16 75:16 86:18
93:11 98:10,18
103:23 105:15
130:4,7 131:6,17
139:11 144:21
158:7 159:22 160:6
162:2 167:9 169:5
207:14 217:1
218:11,19,21 219:7
219:15

**exchanges**
4:21 20:11 63:14
106:20 180:5
**excited**
246:7
**exclude**
91:2
**excluding**
46:21 90:24 91:23,25
92:7 142:1,4
**exclusively**
239:19
**excuse**
16:14 125:6 126:7
**execute**
50:22 52:11
**Executed**
247:11
**executing**
52:15
**execution**
139:14
**exhaustive**
30:20 36:14 71:17
**exhaustively**
40:18
**exhibits**
6:7 109:22
**exist**
20:22
**existed**
239:12
**existence**
16:18 18:19
**existing**
229:17
**expect**
181:3 197:4
**expected**
61:24 195:25 204:19
**expense**
32:24 36:1 38:25
39:9
**expenses**
35:25 39:2,5

**experience**
21:4 50:13
**Expiration**
144:14
**expired**
140:7
**explain**
8:14 25:19 36:11
181:8 218:9
**explained**
24:9 103:6 115:12
128:8
**explainer**
6:12 94:4 100:6
108:22 109:13,22
114:18 115:19
137:3,14 143:5
162:11
**explainers**
15:20 16:24 24:22
25:15,18,18,22
**explains**
62:25
**explanation**
24:14
**exploit**
122:18
**exposure**
182:12 186:3
**expressed**
181:2
**extensive**
176:6
**extent**
23:8 27:16 49:3
156:23 157:5
**external**
26:15
**extra**
130:6
**extraordinary**
234:12
**extremely**
203:25
**E-Money**



70:8

**F**

**F**
1:13
**face**
217:22
**facilities**
50:1
**facility**
41:14 106:2 227:17
**facing**
216:5
**fact**
127:12 161:7 176:13
178:2,23 179:14
202:9 223:8 239:20
240:3
**factor**
122:5,6 168:15,16,21
**factors**
131:15 145:18 152:7
212:1
**facts**
236:12
**failure**
180:21
**faint**
203:25
**fair**
10:7 23:7 49:7 176:6
216:2 227:12 237:3
238:21
**fairly**
124:23,23
**faith**
122:10 239:8 243:10
**fall**
14:18 16:1,8 25:3
26:10 81:24 230:21
**falling**
136:6 167:22,23
189:25
**falls**
146:12 241:10

**false**
24:2,20
**falsely**
230:20,24 231:4,21
**familiar**
12:13 13:15 16:10
28:24 32:11 34:23
65:20 89:13 93:12
93:13 143:13
163:21,22,23
222:11,13 225:21
225:22 237:18
**familiarize**
155:21
**far**
107:11 155:24,24
179:9 199:1 239:11
**fast**
147:8
**favor**
224:5 246:4,5
**FDM**
77:6,10,16 81:11,13
81:17,18 83:5,14
84:14 85:22 86:24
87:8
**FDM's**
77:2,22 81:4 82:6,10
85:10 87:3
**FDM-specific**
81:15
**feature**
91:7 105:14 110:10
110:11,22
**features**
140:1
**February**
4:11
**Fed**
248:10,15,20,25
249:5
**fee**
41:20 140:20
**feedback**
196:9,11

**feel**
155:17 161:20
**feels**
133:14 216:24
**fees**
31:22 39:18,25 40:1
41:3,7,8 63:8,16
220:18,21
**fell**
136:7 189:24
**few**
8:10 30:17 51:11
58:19 74:16 109:9
121:6 129:25
202:14 209:13
212:25
**fiat**
70:1,5,9,9,15,18 84:1
84:5 90:24 91:2
107:22 110:20
**fictitious**
159:2,12,19 179:12
**fields**
149:4
**figure**
49:3 54:22 68:9
155:22 177:4,5
179:11 181:1 199:1
**figures**
129:13
**file**
32:24 93:9
**filed**
5:4 181:17,21 182:3
182:15 183:14
184:3 185:7 210:24
210:25 211:9,20
233:6,10,12,15,18
233:19,23 237:14
**filing**
11:19 13:2 235:2
**fill**
39:18,25 41:3,7
169:23
**fills**

**104:7 217:6**
**final**
44:18,23 46:5 204:13
**finalized**
17:10 28:17 66:20
**finally**
185:14 188:12 231:4
**finance**
27:12,24 45:13,18,20
51:6
**finances**
31:18
**financial**
26:4,4,11 27:2 28:1,3
28:4,6,9,13,19,21
31:25 32:17 34:8
44:18,24 45:2 75:25
155:15 177:16,17
180:12 206:2 207:9
**financially**
140:6 248:19
**financials**
32:19
**find**
54:19 78:14 80:6
92:12,15,18 137:11
137:21,22 230:16
230:24
**finding**
231:12
**fine**
10:10 92:8 229:23
**finish**
8:23,25
**Fireblocks**
84:21
**firm**
8:1 26:23,25 32:14
200:6 206:3
**firms**
26:12,19 182:8
206:21
**first**
13:21 35:7,8 39:21
59:21 61:1 64:10



76:13 79:17 82:14
91:13 95:24 97:19
106:7 108:23
112:19 116:16
118:15 120:1
133:12,13 134:25
144:12 145:3
163:20 164:17
173:15 185:17
192:3 194:24
203:23,25 207:3
208:1,16 230:20,25
234:24 236:5
239:13 241:19
242:10 244:24
248:14
**fit**
124:9
**five**
142:5
**fix**
53:25,25
**fixed**
132:11
**flavor**
156:18
**fleshed**
88:19
**flipping**
172:12
**floating**
132:12
**Floor**
3:19
**flow**
173:2
**Flowchart**
5:6 172:19
**focus**
20:25 239:19 240:3
**focused**
245:13
**follow**
212:25 245:5
**following**

7:14 67:13 185:18
225:6,10 230:19
246:6
**follows**
7:6 30:7 184:1 208:4
**follow-up**
23:7
**force**
248:10
**forced**
235:2
**forcible**
153:18
**forcibly**
175:21
**foregoing**
247:9 248:23,23
**forfeit**
227:20 228:16,24
**forfeiture**
228:19 229:17,22
**Forget**
116:2
**forgetting**
169:13 245:21
**forgot**
123:9
**forgotten**
150:19
**formal**
56:11,13
**formality**
14:9
**formally**
208:19
**format**
55:14 68:21 93:12,13
210:1
**formats**
15:14 54:12
**formula**
131:14
**forth**
221:22 235:14
**forum**

48:22
**forwarded**
58:15 140:18 214:12
**found**
171:9 225:11,23
226:3,6,14,18,22
230:5
**foundation**
34:3 40:13,23 41:23
43:24 44:16 53:8,20
54:2 77:7,12,23
81:5 82:22 83:10
85:14 86:9,15 87:5
89:1,5 96:5 97:16
97:24 100:19
102:11,21 103:8
133:17,23 211:11
211:22 212:6
**fount**
226:10
**four**
64:23 80:16,24
**fourth**
118:7 145:20
**fraction**
115:6,7 146:7,10
147:10 166:14,16
167:2,5,21 168:10
168:21 169:25
171:18 172:7
173:23 207:8
**frame**
124:6
**framing**
181:6
**frank**
99:25
**fraud**
225:24 226:4,7,11,15
226:19
**fraudulent**
239:10
**free**
155:17
**frequently**

56:23 64:6
**Friday**
243:25 244:9
**Friedberg**
5:12,16
**from**
4:24 5:12,16 7:25
15:10 16:1 22:23
32:7 45:8 50:4,7,16
51:1 58:9,12 59:11
62:12 63:5 64:13,21
64:22 65:11,25
87:20,22 95:3
100:23 104:17,17
107:1 113:25
117:24 123:5,9,10
123:17 124:10,16
124:18 128:16
129:14 130:13
134:18 138:18
139:4 152:8 157:20
168:8 172:18 175:4
175:11,14 176:3
183:4 186:17,22
193:6 195:18 196:7
201:19 202:17,20
203:3 206:1 209:13
209:18 211:7 214:6
214:16 215:11
216:10 219:3
225:20 228:20
230:9 231:7 234:4
235:1 237:17 242:3
**front**
213:6 214:5 225:18
229:15
**front-facing**
218:14
**fruitful**
231:19
**FTX's**
13:22 14:19 18:12,25
29:13,14,25 30:11
40:3 42:4 43:21
44:15 45:5 53:6



99:1 119:15 134:18
187:5,14,17 207:1
217:13 224:8
**Ftx-admin-activity**
5:7
**ftx-dev**
5:18 209:13
**FTX_3AC_000000...**
6:15
**FTX_3AC_000000...**
6:15
**FTX_3AC_000001...**
5:10
**FTX_3AC_000001...**
5:10
**FTX_3AC_000013...**
5:13
**FTX_3AC_000013...**
5:13
**FTX_3AC_000013...**
5:16
**FTX_3AC_000013...**
5:17
**FTX_3AC_000013...**
6:11
**FTX_3AC_000013...**
6:11
**FTX_3AC_000041...**
6:17
**FTX_3AC_000044...**
4:19
**FTX_3AC_000044...**
4:20
**FTX_3AC_000045...**
6:9
**FTX_3AC_000045...**
6:17
**FTX_3AC_000045...**
6:13
**FTX_3AC_000045...**
6:13
**FTX_3AC_000046...**
4:22
**FTX_3AC_000046...**
4:22

**full**
234:24 236:5 248:9
**fully**
9:10 101:13 208:19
**function**
218:19
**functionality**
219:6
**functioned**
235:22 236:2
**functions**
27:17 61:19
**fund**
35:9,12,13,15,16,20
36:1,5,9 38:25 39:9
120:8,11,12 147:14
153:5,10,12,25
171:19,24 174:2,6
174:10,13,16,22
175:4,12,15,23
176:2 217:19
246:15
**funding**
240:12,23
**funds**
35:20 108:10 118:18
153:4,25 217:11
231:7 245:25 246:8
**fungible**
31:9,12 61:11 70:18
**further**
32:23 35:24 50:13
103:15 122:23
123:18 180:18,19
184:17 202:12
208:17 215:25
228:15 244:12
245:4,6
**future**
39:18,25 99:22
114:25 115:15
138:1,3,8,10,22,23
142:13 145:13
177:18 178:2
180:12 207:9

221:12
**futures**
6:9 40:2,7,11,21 64:2
64:9 69:11 74:18
88:20 90:5,8,12
97:22 98:4,7,18,25
99:4,10,12,20 100:6
102:15 106:15
115:4 116:3,5,14,15
116:19,23,25 137:9
137:13,14,18 138:5
138:17,19 139:1,3,8
139:10,20 140:12
140:13 141:4,8,11
141:15,17 142:7,16
142:23 143:5,5,10
144:18,20 146:4
148:8 149:16 150:8
150:21 151:1,3,4,4
151:11,22 152:11
156:21 157:14,15
157:18 160:8 165:7
165:12 170:8
177:14,16 178:14
179:9,16,22 180:7
180:16,24 190:4
194:7,8
**F.3d**
236:16

---

**G**

**GAAP**
26:13
**gain**
35:20 99:22 116:21
142:10 154:21
**gains**
142:6 171:24 172:2
**gap**
173:5,6 174:24
**Gary**
5:23
**gas**
31:22
**gather[ed**

236:12
**gauge**
91:16
**gave**
130:5 230:5,17
245:10
**general**
9:4 13:18 20:24
22:18 34:21 35:19
40:1 41:19 55:22
56:4 60:5,11 61:5
61:20 62:16,17
81:16,19,20 89:16
98:6 101:13 102:24
105:4 106:2,12
107:10,14,16 108:9
111:7,22 113:2
116:12,13 117:10
117:18 118:1
124:15 126:8
128:10 131:7 137:1
137:23 138:14
140:2 141:5 143:14
143:16 155:6
157:21 162:24
186:13 195:23
212:10 222:2
**generally**
25:4,8 33:14 40:6
41:15 42:21 55:17
55:18 59:2 61:7
65:17,18 90:16
99:20 100:2 104:7
107:12 112:22
115:4 118:2 120:14
132:17 139:5,17
142:5 145:13 157:6
157:23 158:3,21
162:12 171:3
185:19,20 193:5
223:4 239:11
**generated**
105:11
**generating**
35:16,16



**generous**
126:2
**get**
8:22 9:18 22:15
23:19 71:8 100:8
101:14 104:2
110:17 119:17
125:4 126:25
138:10 139:10
175:17 179:4,17
180:19 185:14
196:6 209:21
231:25 235:11
**gets**
18:2 92:9 98:8
103:19 118:18
123:23 124:4
**getting**
98:18 120:7 146:17
150:6,13 175:11
176:18 229:20
**give**
7:19 9:15 10:5 17:24
22:24 24:13 36:14
45:10 46:14 48:21
49:5 51:11 56:10
58:18 62:6,24 86:10
93:16 101:11 109:1
127:10 131:7,23
134:20 136:23
142:12 146:21
173:10 234:19
237:19 239:20
245:11
**given**
9:25 10:12 51:19
69:15 175:21 190:2
190:2 197:24
200:12 215:23
216:5 229:6 248:24
**gives**
18:1 224:25 225:1
**giving**
8:5 63:21 100:11
198:19

**glad**
240:21
**glitch**
51:16
**Glueckstein**
3:13 4:6 7:12 16:13
16:15,25 29:5,16
30:2 37:18 52:12
53:19 54:3 63:24
68:4,15 69:18 73:11
73:21 74:2 82:23
83:21 85:13 86:16
87:13,19 88:17 95:5
95:8,11 109:8 116:6
133:18 135:12,20
140:23 159:6,17
170:11 178:11
179:5 183:8,19
184:7 185:2 191:7
211:23 212:8,22,24
218:4 219:4,12
222:3 224:1,19
225:17 228:2,5
230:11,13 233:3
237:12,20,22 238:6
238:17 241:24
245:3 246:22 247:1
**gluecksteinb@sull...**
3:15
**go**
8:19 9:1 10:4,19
16:17 17:2 18:23
49:15 60:9 78:6,13
80:12 82:2 100:1
104:6 115:23 116:2
118:6 127:19
139:21,24 144:11
145:14,20 147:13
165:4 173:11
174:23 193:15,19
193:21 202:12
218:15 221:14
240:11,21 245:11
**goal**
49:3 99:2 154:3

**goals**
77:22
**goes**
116:16 133:5 174:12
174:16,21 205:10
228:20
**going**
9:22 11:9 12:12,13
13:1,17 17:24 18:9
18:22 19:12 24:22
27:13 30:20,21 42:9
56:19 65:1 66:9,22
73:4 75:7 76:13
78:13,13,25 80:2,5
100:6 101:1 108:24
114:14,17 121:22
122:23 123:2,5
124:24 128:2,14,16
132:23 137:16
151:9,25 152:4
154:6 155:20
159:20 163:21
171:14 174:18,19
175:13 179:18,19
184:7 191:9,15
193:14 196:20
199:2 201:18 205:7
214:18 223:23,23
232:13 241:12
244:8 245:5 246:20
246:22
**gone**
46:11 173:9
**good**
7:25 34:4 47:5 59:13
122:10 137:19
150:11 207:6
212:23 239:12
**Google**
237:16 242:3
**got**
95:3 120:22 123:3
127:6 128:1,25
153:13 173:24
193:11 214:7 215:3

221:18
**gotten**
179:13
**governed**
109:5 137:12 218:22
218:25
**government**
234:12 236:13,15,18
236:21 237:16
243:5,11
**government's**
236:12 237:15 242:2
**grain**
198:7
**grand**
180:5,7,8
**grant**
131:13
**grayed-out**
143:22
**great**
142:22 240:22
**greed**
235:6
**grew**
126:10
**ground**
8:14
**grounds**
239:12
**group**
32:9 57:18,21 58:2,3
58:3,7 106:9 204:16
243:1
**guaranteed**
130:20
**guaranteeing**
130:18
**guarantees**
71:8 118:17
**guard**
94:17
**guess**
11:22 14:23 34:1,4
36:7 59:14 114:3



120:23 121:7
136:23 151:17
156:3,18 157:1
161:19 162:15
191:2 192:16
199:19 208:23
242:11
**guessing**
95:7
**guide**
94:18
**guilty**
225:11,24 226:3,7,10
226:14,18,22
**guys**
14:14

___

**H**

**H**
4:8 5:1 6:1
**hadn't**
155:2 182:14 193:17
206:25
**haircut**
97:18
**hairsplitting**
231:24
**Haley**
3:8 7:11
**half**
39:21 133:14 136:11
185:17
**hand**
7:17 125:19
**handed**
18:6 32:6 42:14
65:10 76:9 79:6
108:20 155:10
161:15 172:17
191:12 207:19
233:4 237:13
241:25
**handing**
163:17
**handling**

83:19
**happen**
36:11 51:2,7,22
53:24 60:15 98:22
119:6 147:6 166:6
214:18 221:1
**happened**
8:7,7 46:21 49:4
54:21,25 63:13
104:3,8 105:3 113:4
119:7 121:21
124:22 135:18,22
142:4 150:17,20
154:16 169:12
170:22 185:9,16
186:12,25 191:3
193:25 195:4
196:12 203:6,13
206:25 211:3,5
216:13,23,25 246:1
246:11
**happening**
11:16 52:7 117:25
137:6 150:16 167:1
169:1,3 185:7,12
186:15 188:1
198:14,16 216:22
244:24,25
**happens**
112:19 117:22 119:2
138:24 166:4,8,9
169:17 173:2
196:20
**happy**
100:1 218:15
**hard**
43:4 198:3 203:24
**harm**
239:12
**harmful**
232:1
**has**
18:7 19:19 20:3
23:11 49:18 60:8
80:16,24 86:22

93:20 99:12,15
100:16 101:20
104:3 105:7 115:5
116:17,18 124:1,2
124:13,16 125:3,22
125:24 126:5
138:25 143:9
147:22,23 148:15
152:10 162:3 169:8
171:21,23 172:22
173:9,9,22 174:4
175:8,10 179:10
180:5 182:20
204:23 209:22
210:11 225:18
239:6,8,11 240:4,22
241:20 242:1,6
**hasn't**
211:3
**haven't**
179:12 184:13
**having**
11:17 57:13 70:3,12
88:6,10,12 99:7
104:8 106:19 118:3
134:3 139:5 152:18
153:18 156:13,14
161:15,17 163:8
165:20 170:3 176:9
182:12 186:5,25
189:5 195:24
206:15,17,24,25
209:6 216:16
223:14,15 238:14
**he**
8:18 11:10 24:9,10
32:13,17,24 44:6,7
44:7 59:13,25 66:16
200:1,4,5,6 205:13
205:24 206:9,10,10
210:19 215:9 222:9
230:20,21,24,25
231:4,4,13,23,23
232:1,1 243:5,7
**head**

30:22 40:16 136:3
169:11 170:13
182:7 190:4
**header**
241:10
**heading**
16:8 133:7
**hear**
14:22 86:14 94:19
**heard**
8:2 162:13
**hearing**
18:9 70:4 189:1
199:13 228:8
232:17 243:25
244:4,8
**hedge**
175:20
**hedging**
175:15 176:4
**held**
21:11 22:7 23:4,10
24:5 42:4 47:16
64:13 67:12 74:1
86:4,20
**Hello**
105:5 209:19
**help**
15:22 18:17,18 24:25
25:5 98:1 100:8
106:5,16,19 143:25
144:2 191:16
201:18 207:11
236:15 240:23
**helped**
26:24 27:1,2,9
204:17 236:8
**helpful**
8:9 14:7,8,22 24:18
46:8 48:14 50:19
76:16 166:1 179:16
**helping**
13:22 16:24 17:6
164:3
**helps**



31:5 172:21 188:5
**her**
63:21 192:5
**here**
8:8 10:1,11 14:7
19:18,25 27:21
38:25 44:13 46:1,5
57:9 71:21 84:23
86:12 95:20 96:12
97:12,18 100:20
101:17 117:18
137:6 143:21,22
144:10 145:23,23
150:8 152:13 153:2
155:19 156:13,19
157:5,11 158:1
165:24,25 172:9
173:21 184:14
191:21 195:10
196:12 198:10
209:14,25 210:13
210:20 212:10
213:4,22 227:11
229:20 235:15,21
240:20 242:17
**hereby**
248:5
**hereto**
18:4 32:4 34:13
42:12 65:8 76:7
79:4 93:5 104:14
108:18 133:2 143:7
155:8 163:15
172:15 191:6
197:22 203:20
207:17 209:10
225:16 228:4 233:2
237:11 241:23
249:5
**here's**
49:17 98:4
**hesitance**
48:18
**Hey**
14:14

**He'll**
8:20
**he's**
11:9 23:5 33:12
44:11 199:12 205:6
**hi**
57:6
**high**
3:9 24:17 28:25
29:17 33:8 98:9
109:2 121:23
123:23 156:2
172:25 198:15
204:18 229:16
**higher-traffic**
57:24
**highest**
139:19
**highly**
196:15
**high-level**
63:15 162:24 218:17
**high-volume**
58:1
**him**
44:4,8,9 232:8,10
243:4,7
**his**
11:10 32:23 44:9
59:21 66:18 77:21
192:11 199:11
227:21
**historical**
209:20 210:10,13
**histories**
55:22
**history**
51:25 76:17 141:6
**hit**
200:16
**hits**
171:18 172:7
**hold**
17:16 62:3,9 158:6
159:23,25

**holder**
248:7
**holders**
246:15
**holding**
87:10 116:22
**holds**
64:7
**hole**
198:11
**honest**
245:22
**honestly**
10:20 135:22 208:23
243:21
**hope**
124:15 128:19
**hoping**
77:16
**host**
62:18
**hostile**
122:25
**hour**
12:11 140:8,10
148:17 149:1 170:3
**hours**
147:11 202:14,15
**house**
23:1,1 71:3,5
**how**
12:6,7,9 13:18 17:24
20:22 22:8 25:19,20
29:6 35:15 36:9,11
37:5 38:19 39:8
44:14 48:10 50:2
53:6,10,11,15,16
55:24 56:14 61:5,19
62:19 63:13 68:25
70:10,22 71:13 77:6
91:16 94:12 98:4
107:3 109:5 110:7
112:4,6 114:22
117:16 119:25
123:7,23 126:20,21

128:12 129:7
131:12 133:19
139:24 140:1,24
151:10 152:20
154:9,14 156:24
157:21 158:3
160:18,22 161:20
162:8,25 170:10,19
177:6,15 178:20
181:1 186:18
193:13 204:22
213:16 217:1
218:21 219:15
229:3,8,13 234:17
240:4 241:15
244:22
**however**
38:14 46:21 61:7
93:20 118:1,17
120:2 124:9 245:23
**hubris**
235:6
**hundred**
154:11 158:1,2
190:21
**hundredth**
157:3
**hyperlinked**
238:25
**hypothetical**
20:21 72:6 86:18
96:16 100:12
101:19 168:25
176:12,22,23
178:13 180:6,15
184:13,18,22 185:4
212:13 220:11
223:10
**hypothetically**
60:3 168:4 180:3

**I**

**idea**
97:17 100:21 105:22
105:23 134:12



159:18 240:4 241:7
**ideally**
53:11 125:14
**ideas**
164:11,16 238:8
241:10
**identical**
140:7
**identically**
132:10
**identification**
18:4 32:4 34:13
42:12 76:7 79:4
93:4 104:14 155:8
172:15 191:6
197:22 203:20
207:17 209:10
225:16 228:4 233:2
237:11 241:23
**identified**
114:11 228:18
**identify**
9:6 19:20 20:4 111:9
111:15
**identifying**
236:9
**iii**
242:23
**illiquid**
122:2 123:13 124:23
150:18
**image**
238:9,12 241:7
**imagine**
15:7 84:20 86:17
101:20 155:11
167:2,16 168:13
177:22 182:24
196:3 207:5,10
234:20
**immediate**
195:17
**immediately**
21:11 112:23 113:24
195:11

**impact**
31:14,23
**impacted**
31:14 35:22
**implement**
165:14,21
**implemented**
75:20 123:23 229:4
**implications**
186:6
**implied**
238:15
**important**
8:15 84:12 98:23,24
155:1 157:9 163:9
**impose**
122:23 154:3
**imposed**
227:2 231:13
**imposing**
154:7
**impossible**
9:14
**impression**
48:22
**imprint**
222:14
**imprints**
122:5
**imprisonment**
227:6
**improper**
244:25
**improperly**
243:10
**imputed**
15:5
**inaccurate**
87:7 88:15 165:25
166:2 229:19
**inaudible**
62:15 134:17 144:5
148:10
**incarcerated**
237:5

**incentivized**
175:22
**incidents**
11:21
**include**
29:2,14 43:21 48:20
54:15,16 157:2
200:3,4 238:23
**included**
29:25 30:10,24 31:2
31:10 32:9 44:15
46:4 50:4 54:14
100:25 131:15
141:18 176:9
**including**
12:21,24 27:21 72:16
81:16 107:22
128:18 164:12,16
168:5 198:2,9 202:6
217:10 228:17
230:4
**income**
35:6 39:17 40:3,7
41:2
**incompetence**
235:6
**inconsequential**
57:6
**inconsistent**
25:23
**incorrectly**
46:16
**increase**
127:13 131:5 142:20
204:25 215:22
220:16
**increased**
45:7 113:18 132:1
**increasing**
123:18
**indefinitely**
55:23
**index**
140:13 141:7
**indicate**
14:10 23:2,13 25:19

215:7
**indicated**
223:21
**indicates**
95:15
**indictment**
225:6
**indictments**
244:25
**individual**
107:18 220:3
**individuals**
236:10
**industry**
185:19 186:14
**infected**
235:7
**influencing**
127:13
**information**
23:22 24:4,7 26:14
49:22 50:5 101:18
213:4 236:17 244:4
**initial**
94:8,10,12 95:19
115:6 141:17
241:21
**initiate**
236:8
**innocent**
243:12
**input**
116:7 219:3
**inputs**
178:4
**inquire**
236:14
**inquiry**
236:22
**insolvent**
200:18
**install**
91:15
**instance**
14:10 23:2,13 25:19



29:23 30:8,14,25
31:8 37:22 40:20
47:15 53:16,23 55:5
59:15,24 62:3 63:2
64:19 69:23 70:22
84:2 89:20 90:2
101:24 102:4
104:10 112:24
120:19 141:15
144:17 148:25
150:3 156:25
167:15 178:7,9
201:22 236:7
**instead**
105:15 152:3 160:11
162:4 176:14 211:4
211:8
**institutional**
133:8 136:14 200:1
**instrument**
177:16
**instruments**
180:12
**insufficient**
149:9 151:7 170:6
**insurance**
35:13,15 36:5 116:22
120:12 174:2,6,10
174:16,22 175:4,12
175:15,23 176:2
**intend**
89:11 159:23
**intended**
86:21 90:25 156:4
160:3 221:21
**intending**
87:7 91:2
**intent**
20:18 78:1 81:9
82:25
**intentionally**
26:1 127:12
**interact**
38:19 42:25
**interaction**

37:6 219:1
**interest**
118:17 132:4,6,7,12
132:17 134:6
140:10,20 141:7
207:1,13
**interested**
67:8 86:12 173:18
248:19
**interesting**
130:17
**interest-earning**
118:3
**interface**
141:3 218:14
**interfaces**
218:15
**interior**
25:20
**intermediaries**
11:6
**intermediary**
40:14,17 41:19 47:9
47:11 58:25 107:13
139:6
**internal**
26:15 27:12 35:2
42:25 44:20 46:6
56:15 66:18 76:2
141:21 215:4
**internally**
14:13 25:23 51:4
122:7
**International**
13:3 21:24 27:16,18
28:6,14 29:2 70:19
**Internationally**
26:20
**interphase**
89:14
**interpretation**
118:24
**interpretations**
87:25
**interpreted**

46:16 48:19
**interpreting**
11:22
**Interruption**
94:17
**intervene**
128:3
**intervening**
128:13
**interview[ed**
236:11
**into**
56:19 57:7 60:9 70:2
70:6 72:7 87:25
109:10 116:8
117:13 131:15
136:6 147:23
183:20 199:8 209:4
214:19 218:16,22
221:3 223:23
229:20 234:11
235:2
**introduce**
96:6
**INTRODUCTION**
77:1
**invest**
179:2
**invested**
90:1
**investigation**
236:19,20 244:21
**investigative**
236:18
**investment**
31:18 45:13,19 207:6
**Investor**
18:13
**investor-protection**
19:15
**invoked**
120:5
**invoking**
184:12
**involve**

61:21 168:20 177:18
179:11 229:20
**involved**
13:21,24 16:24 17:2
18:21 29:21 45:14
58:13 66:17 75:21
81:25 106:8 131:22
134:13,22 135:16
145:18 151:4
180:11 189:14,17
190:3
**involvement**
64:4 196:25 204:20
**involving**
31:17 121:11 167:16
196:10
**irrespective**
219:5 225:2
**Island**
227:17
**isn't**
54:14 126:24 171:20
192:21
**issue**
70:6 83:22,25
**issued**
62:11 130:1 248:8
**issues**
27:3,9 38:12 157:5
196:10
**issuing**
129:24
**item**
31:4,7 35:7,8,25
38:25 39:18 41:2,10
43:11,20,21,22
44:15 45:5 238:23
239:19 240:3,11,20
240:20 242:23
243:24 244:16
**items**
31:21 39:16 46:1
**its**
12:15 18:19 21:6
45:19,20 64:8,17



73:7 75:24 82:15,16
99:6 120:7,20 124:9
128:18,18 146:7,18
153:4 156:11,25
162:4 163:22 168:7
182:14 188:10
205:21 214:20
215:25 221:3
225:22 239:8 243:9

**itself**
43:23 62:12 107:16
130:13,21 164:7
182:12

**it's**
8:16 12:20 18:7,12
19:7 20:10 24:8
27:15 32:7,8 33:25
34:11,17 43:3,4
45:18 48:21 49:25
50:2,3 57:15 58:22
60:12 63:25 65:10
65:11,12 72:15 74:5
74:6 76:16,17 80:19
95:23 97:25 99:19
102:12,14 104:17
105:3 106:6 108:21
108:22 112:14
113:21 114:11,13
114:14 118:7
119:24 120:3
121:23 124:7,18
130:17 133:5
138:20 143:10,19
144:9 145:25 149:5
150:17 152:4,11,13
155:11,14 156:10
163:18 167:8 172:9
172:9 175:19,24,25
179:14 191:13
193:5 198:3 199:12
202:22 203:24,24
207:21 213:21
215:1 221:19,20
223:6,12 224:3
227:8 240:1,4 242:2

**IV**
234:2

**I'd**
134:20 185:14

**I'll**
8:23 9:1,5 13:19
17:18,18 21:25
23:20 24:15 36:20
46:24 50:13 69:2
70:23 71:3 93:25
110:17 203:23

**I've**
16:9 42:19 43:2
76:15 137:13
155:24 162:12
214:7 215:3 231:21
232:3,4 237:13

---

**J**

**J**
3:13 7:12

**January**
4:14 34:18 43:15
45:8

**Jayesh**
32:9,16

**Jeremy**
3:18 7:13

**jmishkin@mmwr....**
3:20

**Joanna**
1:23 2:20 7:14 248:5

**job**
8:17 192:5 232:3

**John**
234:9 242:23 243:1

**joint**
2:16 3:2 5:4 209:7

**Judge**
226:25

**judgment**
122:13 227:23 229:9
229:11,16

**judicial**
235:8

**July**
169:11 209:18 210:5

**jump**
168:8

**jumps**
167:3

**June**
4:14,16,23 5:12,15
34:18 42:16 43:17
45:8 60:1 93:10,24
104:18 186:17,18
188:7 193:25 194:1
194:18 198:1 204:9
207:21 209:4
210:16 211:4
214:10,16,23 215:5
216:3,9,18 231:6

**jurisdiction**
55:20

**jurisdictions**
184:16

**jury**
225:11,23

---

**K**

**Kaplan**
226:25

**KBO**
1:7 2:7

**keep**
19:20 20:3 48:2
175:22

**keeping**
21:3 107:17

**kept**
56:15

**key**
16:10 17:22 18:12,24
19:15 82:10

**Kharif**
207:20

**kick**
146:13 195:12

**kind**
14:4 15:18 23:20

**July**
42:22 55:2,14 62:2
77:5 89:18 103:15
133:6 165:4

**kinds**
106:17 150:21 158:6
170:9 196:1

**knew**
13:20 101:3

**know**
8:17,20 10:20,23
12:8 13:10 15:5,16
22:25 24:11 28:3
29:20 31:2 34:19
37:6 38:18 42:17
43:6 47:5 48:6
57:16,16,18,22
60:15 61:19 66:17
68:18 84:2 85:22
88:5,22 89:25 90:13
90:23 91:5 96:15,15
96:23 100:4 112:13
112:19 128:6
129:20 130:20
131:12 132:6
134:15 135:9,18
136:25 137:19,22
140:1 141:12,16
142:7 153:13
154:24 155:20
156:24 160:9
164:14 165:9,19,22
169:23 170:18,21
172:21 175:24
182:13 190:22
192:25 193:17
194:3,10 195:4
199:4 202:8 203:5
203:12 205:25
209:2 210:18
212:15 227:10
229:4 231:5 241:14

**knowing**
23:16 71:13

**knowingly**
24:1 231:20



**knowledge**
77:16 88:24 111:12
  111:15,17 112:11
  131:1 189:12
  190:10 230:21
**known**
7:8
**knows**
63:2
**Kyle**
4:23 57:3,5 104:18
  192:9 204:8 222:5
**kyle@threearrows...**
191:25 192:2

**L**

**L**
1:13
**label**
44:21 95:1
**labeled**
108:20
**labeling**
96:12
**labels**
46:3
**lag**
223:14,16
**language**
67:5 137:2
**large**
20:14 120:3 122:1,6
  124:23 126:10
  127:7 136:5 149:10
  149:11 152:11,12
  157:8,19 170:7
  189:8 194:6 195:17
  207:8,12
**larger**
40:6,7 41:16 131:8
  131:10
**largest**
40:3 41:2 121:8
**large-dollar**
121:1

**large-end**
182:4
**last**
10:13,23 11:15 19:17
  19:24 59:13 102:8
  140:3 142:5 157:2
  172:5,21 173:4
  174:23 242:18
  243:23 246:2
**late**
204:9 209:4
**later**
13:19 15:22 160:9
  161:16 181:21
  202:15
**latest**
205:7
**Latham**
3:3,8 8:1
**laundering**
226:23
**law**
8:1 183:3,9,11,13
  184:2,12 185:4
**laws**
183:20 184:16 247:8
**lawyers**
9:2 10:24 11:1,2,10
  11:13 15:24 239:8
  239:10,16 240:5
**layout**
50:16
**lead**
39:12,14 113:18
  114:1
**leadership**
239:9,10
**leading**
188:19
**leads**
49:1
**leak**
238:24 243:24 244:9
**leaking**
244:3,10

**learned**
230:25
**leases**
139:23
**least**
22:19 28:23 57:4
  66:21 80:1 81:8
  88:11 114:19
  120:14 124:24
  125:3 130:1,3 135:5
  150:11,13 154:11
  190:8 197:18
  222:23 224:15
  230:19
**leave**
22:1 213:18
**Leaving**
127:1
**led**
18:20 141:6
**ledger**
131:6 221:6
**Ledgering**
19:8
**Lee**
26:22 27:1,5 32:8,13
  35:1
**left**
48:8,9 59:19 123:8
  125:15,23,23,24,25
  126:5,9 152:19
  188:13
**leftover**
153:24
**legal**
11:18 14:21 22:14
  23:20 68:5,7 73:12
  122:13 135:13
  141:1 183:6,18
  185:1 202:15
  210:15 211:23,25
  212:7,9 215:8
  221:24 229:19,24
**Legalese**
137:20

**legible**
204:3,6
**lend**
71:23 118:12,13
  119:6 130:5,21
  161:10,14
**lender**
72:10 111:10,18,24
  112:10,12 113:5
  119:1 224:21
**lenders**
72:19 112:16 118:16
  119:6,9 162:3 226:7
  226:11
**lending**
61:12 69:12 72:24
  73:1 105:21 106:2
  110:10 111:19
  117:16,20 118:8
  200:6 206:21
**lent**
64:10 113:11 116:23
  117:19,22
**less**
17:4 146:7,10 166:15
  169:25 171:3
  220:17,21 232:1
  246:7
**let**
7:8 8:10,14,17,20
  13:10 17:21 18:23
  33:11 34:19 38:23
  42:17 43:6 45:10
  46:8,14 51:11 56:9
  60:14 61:1 62:24
  63:18 65:19 67:7
  70:14,14 71:21 78:9
  78:19,20,25 83:3
  92:25 101:11
  106:12 107:9
  108:13 110:4 116:2
  131:5,10 137:8
  142:12 150:25
  155:22 162:12,12
  165:23 181:12



191:1 197:12
216:12 223:9
227:25 231:15
**letter**
215:9 242:16
**let's**
20:25 50:8 60:20
65:2 81:17 84:4
86:14 108:14
110:16 115:23
116:23 125:16
139:24 149:17
152:9 168:3 177:11
177:12,22 179:21
180:3,4 230:11,14
**level**
15:6 24:17 28:25
29:18 33:8 103:22
109:2 123:23 156:2
172:25 198:15
204:18 224:14
229:16
**levels**
14:9 21:21
**lever**
177:10
**leverage**
141:13 205:14
**leveraged**
39:11 72:20
**liabilities**
31:16 33:21 64:8,16
126:16 162:3 183:1
201:5,7,10 211:19
**liability**
64:21 99:12,21 231:1
**lied**
243:7
**lifetime**
135:4 224:16
**likelihood**
98:9 164:20 165:2
**likely**
59:7 96:16 97:6
156:22 192:12,17

199:5 200:5,13
201:1 205:23,25
**likewise**
8:24 111:14
**limit**
24:12
**Limited**
4:18 12:15 74:13
76:10 79:11 80:3
**line**
6:14,23 31:4,6,21
35:25 38:25 39:16
41:2,10 43:11,20,21
43:22 44:15 45:5,16
45:22,25 110:16,19
129:24 130:12
131:3,13,18,23,25
132:6,11 133:5,8,13
134:4 135:4,5 136:2
136:5,14 158:23
167:16,24 168:1,4,5
168:7,11,17 190:2
190:18 195:7,10,18
196:25 202:23,25
204:19,23 205:2,7
205:21 211:2,8,20
215:24 221:16,22
224:2,4,16,21 225:1
228:15 230:15,16
231:2,3,8,9,16,18
**lines**
101:14 107:23
108:11 110:13
129:23 130:8,24
131:7 132:3,20
208:2 230:23
**lingo**
122:14
**link**
143:24 145:25
**liquid**
122:3 123:16 167:18
196:9
**liquidate**
119:16 122:19 126:8

126:12 182:25
195:6,12 201:20
216:4,10,19
**liquidated**
36:17,24 46:12 94:15
118:19 120:22
123:20 129:15
142:23 143:2
153:24 169:18,20
169:21 170:23
190:8 194:10 199:3
201:15 205:15,19
209:2 217:3
**liquidating**
35:21 47:7 72:9
97:18 148:8 149:1,2
150:3 183:4 216:20
**liquidation**
5:6 36:5,10 37:3
38:21 46:10 47:19
72:17 95:17 115:7
119:20 121:21
123:21 125:22
126:3 127:20,25
128:5,14 135:14
136:1 145:17,19
146:4 162:13,16,21
164:7 165:3 166:23
167:1 168:20
169:17 172:19
173:3,16,17 176:10
187:3,4,5,14,18
188:13 194:11,17
194:21,24 195:2,4
195:11,16 196:11
196:15,20 197:3,7,8
205:23 209:5
210:17,25
**liquidations**
6:16 71:10 128:3
145:21,23 162:11
163:18 195:19
197:14 203:6
215:24 216:25
**liquidators**

2:16 3:2 5:5 8:2
209:7
**liquidity**
72:6 123:24 143:1
146:13 147:13
148:22 153:5,7,25
160:7 171:19,24
172:8 174:2,13
196:3 197:5,11
234:11,18
**list**
30:20 54:15 71:17
134:20 240:11
244:12
**listed**
238:13
**listing**
14:6 15:7
**lists**
79:19
**litigation**
181:3
**little**
61:18 92:10 104:21
143:22 162:18
213:3 218:10
**LLP**
3:3,8,18
**load**
70:2,6
**loaded**
70:10
**loan**
71:7 110:25 111:3,21
112:15 114:9
130:13,19,21
158:15 159:2,11,13
159:19 161:1,12,16
176:14 177:25
182:4,14,16 185:8
201:21 202:5 211:1
211:19
**loaned**
73:19 117:17 184:21
**loans**



120:20 165:7 201:9
201:24 211:8 231:5
**LOC**
202:16
**LoCs**
199:21
**log**
49:23 50:21 56:12
89:14 193:1 213:18
217:6
**logged**
52:10 56:14 191:25
192:2,9 193:3
**logging**
21:9,16 50:3,25
52:14 192:19 193:4
**login**
49:19 213:4
**logins**
191:13 213:12,21
**logs**
51:25 224:7
**long**
12:7,9 44:10 116:14
116:15 118:17
119:4 124:1,5 126:3
139:18 150:4 158:9
195:13 216:24
227:8
**longer**
117:20 124:10 125:5
127:21 128:15
168:11
**longs**
140:11 150:5
**long-standing**
58:23
**look**
21:1 31:24 34:9,20
35:24 38:24 42:17
42:19,21 43:6,10
46:6 65:12 69:23
74:5,16 76:11,25
79:11,17 80:8 91:8
93:12,14 108:23

114:21 137:18
143:11 148:12
155:20 163:20
164:17 166:11
183:20 191:18,20
192:23 193:23
197:12 204:5
205:20 213:2 214:1
214:24 215:1
221:15 227:25
230:11,14
**looked**
31:7 66:18 88:14
90:11 118:1 170:25
197:7 200:13 213:3
214:24 224:10
**looking**
11:12,13 21:24 35:7
48:23 57:9 73:6
96:12 103:2,10
127:21 129:13
144:7 169:15
195:13 214:2,4
**looks**
34:23 39:2,21 42:24
93:13 94:2,7 133:12
133:25 136:18
137:5 143:21
199:11
**loop**
196:9
**loops**
196:11
**loose**
239:11
**lose**
35:20 36:5,9 72:11
116:21
**losing**
153:22 175:19
**loss**
4:13 34:17,22 36:18
37:12,14,25 38:10
38:14,18 67:23 71:5
71:23 98:10,12,14

99:3,4,6,7,22 120:3
125:9 127:17
129:15,16 142:10
148:5 152:4,8,20,25
153:6,17,18 154:3,7
154:19 175:13
176:3 201:15 218:6
**losses**
71:11,12 73:2 99:10
119:5,5 128:9,17
129:7 142:6 152:14
155:2 163:13
176:19 179:3
180:12 217:14,15
218:1
**lost**
116:17,18,21 180:16
**lot**
16:7 22:16 29:19
38:12 48:16,18 49:1
56:4 68:18 101:14
186:11 212:1
219:19
**lots**
100:22 116:13
**loudly**
235:3
**low**
129:13 168:15,16,21
168:22 207:7
**lower**
122:12 125:7
**LP**
174:5,9,18
**Ltd**
1:5 2:5,17 3:2 4:13
4:15 34:17 42:16
44:24 105:6
**Luna**
157:18 185:23 186:3
**lying**
231:23

_____
**M**
_____
**m**

122:12
**made**
7:14 18:18 19:4 25:8
25:24 40:2 45:13
98:21 122:25 128:8
129:1 150:6 155:19
198:22 206:18
218:19 249:3
**main**
58:16,25 139:18
197:1
**Mainly**
166:7
**maintain**
204:25
**maintained**
95:16 135:6 224:15
**maintenance**
94:8,11,13 95:20
115:7 146:6,7,10
166:15 167:23
168:9 169:6
**major**
239:7
**make**
8:10 12:16 13:11
14:18 43:5 44:5,10
47:14 61:1 64:14
71:7 84:10 86:7
88:3 100:18 107:25
121:16 148:1
158:24 159:10
165:6 174:10 175:1
179:7 240:12,23
**makes**
54:15
**making**
48:25 66:11 86:23
187:21 198:24
206:22 231:12
232:16
**manage**
126:5 129:21 163:5
**managed**
243:2



**Management**
4:19 76:11 80:4
**manager**
15:10
**managing**
15:11
**manipulating**
122:11
**manual**
202:21 203:6,14
**manually**
148:7 163:6 195:13
196:18
**many**
9:11,18,22 10:3,5
12:20 14:5 15:21
22:19,19 23:6,12
29:17 33:24 40:15
41:25 48:19,20
61:15,21 87:23 88:1
91:14 102:22
143:14 154:9
223:10,10 234:17
245:23
**March**
224:5 226:25 228:7
**margins**
116:24 129:22 151:1
151:2 152:12
**margin-related**
93:20
**mark**
79:2 108:14 129:12
140:4 141:24 145:8
152:10,16,20
156:25 228:2
246:22
**marked**
6:7 9:6 18:3,7 32:3,6
34:12 42:11 65:7
76:6 79:3 93:1,4
104:13 108:15,18
133:2,4 139:2,5
143:7,9 155:7
163:15,17 172:14

191:5,12 197:21
203:19 207:16
209:9 221:15
225:15,19 228:3,7
233:1,5 237:10,13
241:22,25
**market**
3:19 39:7,8,12 74:8
74:19 99:14,23
106:20 109:19
122:16 124:16,17
126:10 127:1,13,14
127:14,15 140:4,8
141:24 142:5 145:7
150:9,12,14 152:10
152:16,20 153:16
157:1,8,19 169:18
169:21 171:3,10
175:18 177:8
195:21 196:4,7,8
220:11,18 221:12
**marketing**
117:12
**markets**
4:18 74:13,20,24
75:12,22,24 76:10
78:19,21 79:10,25
80:3 102:2 116:21
122:11 128:2
129:10 163:4
167:18 180:6
**marking**
34:10,15
**mark-to-market**
153:23
**Marsal**
155:14
**massive**
245:2
**master**
32:24
**matches**
167:7
**material**
230:18

**materially**
246:16
**matter**
7:20 20:24 22:18
35:19 37:6 41:19
55:22 61:5 62:16
70:24 89:16 98:6
102:24 105:4
106:12 107:10,14
107:16 108:9
116:12,13 117:11
117:19 126:8 127:7
140:2 143:14,16
157:21 212:11
**mattering**
138:18
**matters**
32:17 230:18
**max**
148:17
**maximum**
170:3
**may**
18:20 19:4 30:22
31:17,20,21,23
35:21 36:13 37:3
39:3 41:24 48:14
57:23 58:5,20 59:8
62:14 63:8 70:6
71:11 72:7,11 73:19
81:24 85:19 89:6
100:8 104:9 107:14
131:24 133:25
138:3,4 169:8
173:11 182:8
185:25 186:8,14,16
197:12 199:13
205:15,19
**maybe**
14:8 30:12,15 36:21
38:20,23 43:5 49:2
51:21 56:13 57:8
65:3 95:23 110:2
119:11 120:6 122:5
125:13,14 141:9

152:10 156:10
160:3 161:8 176:1
176:22 189:21
193:15 207:4 209:3
**ma'am**
115:11 247:1
**McCRACKEN**
3:18
**meaning**
24:11 85:5 187:8
205:22
**meaningful**
233:17
**means**
13:24 22:6 54:10,22
55:25 85:17 95:21
96:4 97:15,23 100:3
106:15 161:5
171:21 179:11,19
**meant**
15:6 24:25 33:6
61:14 108:6 153:23
170:8 208:24
241:11
**measured**
177:10 178:4
**Mechanically**
140:24
**mechanism**
36:20 50:20
**mediate**
140:14
**mediated**
119:3 138:13 140:16
143:3
**meeting**
209:8
**meets**
115:8
**members**
25:18 235:23 236:3
**memorandum**
237:15 242:2
**memorialized**
132:20



**memories**
132:24
**memory**
10:8 39:5 46:19
  77:19 80:7 132:9
  135:21 189:19
  195:9 197:19
  216:14,22 228:1,11
**mention**
191:21
**mentioned**
17:22 32:14 36:6
  38:4 81:19
**mentions**
165:13
**mere**
234:25
**merely**
236:17
**message**
5:9 15:14 56:13
  57:11 197:25 198:1
  240:12,21 241:15
**messages**
14:24,24 15:10 58:9
  58:12
**method**
55:3 56:7 99:9
  213:13
**methods**
56:1
**Metis**
26:20 28:6
**Michael**
59:22
**mid**
231:6
**middle**
133:6 199:13 228:14
  234:8 241:20
  243:13
**mid-June**
186:25 214:3
**mid-nine**
129:13

**mid-90s**
129:12
**might**
8:18 9:3 13:13 14:23
  15:1 20:16,23 23:14
  25:21 26:16 31:14
  31:25 36:15,21
  38:17,18,18 48:20
  48:20 63:8,9 64:20
  71:21 72:5,17 99:7
  101:24 116:21
  122:11 126:23,24
  134:21 137:20,21
  157:3 177:15
  186:14 197:19
  199:3 201:4,21,23
  202:4 211:16 215:2
  245:24
**Mike**
121:19
**Miller**
5:12,16
**million**
32:25 39:3,22 41:5
  43:15,16,16 96:2
  97:12 149:1 154:11
  168:5,6,6,11 188:12
  195:1,2,6 204:24
  205:10 211:5 224:4
**millions**
63:10 163:3
**mind**
14:4 15:1 30:15
  31:11 51:23 69:22
  69:25 70:25 75:8
  128:12 130:2 156:6
  192:11 195:19,20
  195:21 206:12
  245:12
**minimal**
201:15
**minimus**
156:22
**minus**
158:18

**minute**
78:7 148:17 170:3
**minutes**
65:2,3
**mischaracterization**
24:9
**mislead**
73:22 74:3
**misled**
173:14
**misrepresentation**
85:18
**missed**
37:19 128:22
**misstate**
73:14
**mistaken**
154:18
**Misuse**
19:9
**mitigated**
107:13
**mnemonic**
141:22
**MobileCoin**
121:11,17 128:4
  157:12
**MobileCoin/BTMX**
127:11
**model**
165:3
**modifications**
136:19 219:16
**modified**
127:6
**moment**
115:24
**monetary**
229:11
**money**
36:5,10 70:7 130:5
  226:23 227:23
  229:16 235:5,11
**monitor**
115:1 123:2 128:16

192:15 193:8
**monitoring**
187:24
**MONTGOMERY**
3:18
**month**
210:2,2,4,5
**months**
227:5
**Morally**
62:5
**more**
22:24 27:13 49:5
  54:4 56:2 57:8,23
  61:18 62:6,7,23
  71:18 72:23 79:1
  82:1 88:3 90:14
  97:8 100:2,8,11
  102:2 105:20 118:4
  123:15 124:19
  125:14,14 126:2
  128:3 130:4 137:3
  145:24 148:25
  154:13,25 155:21
  157:9 185:15 187:9
  188:11 195:14
  200:5 202:17 204:3
  204:6 215:11
  218:16 231:7,21
  239:11 240:23
**morning**
7:25 12:10 204:10
  221:20
**mortgage**
23:1 71:4
**most**
5:11,15 8:15 9:21
  51:21 58:1 98:14,21
  110:12,15,23 130:1
  158:17 163:9
  188:10 192:12,17
**mostly**
241:9,11
**move**
116:21 129:10 157:9



MAGNA ▶
LEGAL SERVICES

**moved**
102:3 126:10 157:15
**movements**
157:19
**moves**
99:14,23 221:12
**moving**
75:5 163:4 167:18
**MP**
145:5,7
**much**
45:8 50:5 57:5 62:19
75:5 88:18 94:12
100:2,9,11 128:1
129:7 136:18
154:14 165:18
246:7
**multiple**
26:10 45:25 57:22
61:3,23 62:14,18
72:16 91:9 99:17
109:13 121:24,25
158:6 189:14
**must**
135:6 224:14,15
**my**
8:16 11:21 13:1
18:22 19:12 20:20
24:15 30:22 40:16
46:19,19 47:1 48:18
48:22 49:1,17 60:5
76:13 88:24 90:11
90:12 98:4 100:9
104:4 108:23
111:12,17,20
112:11 118:24
120:16 128:12,25
130:8 131:1 132:9
135:21 136:3
138:12 140:3
141:18 142:21
155:1 160:21
163:20 169:11
170:13 182:7
183:23 184:9 190:4

191:2 195:9 210:18
212:14,16 213:20
216:14 218:8
220:19 225:4 229:3
229:6 232:13
233:15,16,18 240:1
240:1 241:14
245:12,21,25
246:13,16
**myself**
57:13 58:1 123:3
128:13 129:1
189:20 245:1

---

**N**

**N**
1:13,13 3:1 4:1
**name**
26:22 32:11 52:24
59:10,13,21 79:10
93:9 121:17 172:22
199:11 212:1
**names**
58:18
**narratives**
243:15
**narrow**
106:5
**nature**
90:6 131:16 154:16
**near**
133:7 143:19
**necessarily**
14:7 15:4 37:2 61:8
85:21 96:8 110:14
112:1,3 113:4 114:2
124:17 125:11
164:14 181:8
186:16,23 195:16
223:13 229:2
238:14
**necessary**
27:17 50:10 58:10
68:19 196:21,22
238:13

**need**
10:10 13:10 22:25
24:16 48:23 51:8
64:25 100:3 110:9
110:21 115:8
125:18 155:21
173:11 178:9
179:24 180:24
217:14 246:25
**needed**
33:22 46:12 50:23
51:2 95:16 206:11
240:24
**needs**
88:18
**negative**
33:2,5,15,17,21 34:2
37:7,10 39:14 46:12
64:20 98:12 101:6
101:10,21,23,25
102:2,16 107:21
113:3,6 115:21
117:1,15 119:17
129:11 147:20
152:19 153:23
154:1 156:17
158:12 163:11
173:9 175:8,9
180:20 182:19
201:14 202:13
211:7,18 220:3,6,20
220:23,24,25
241:16
**negatives**
124:6
**negative_account_...**
33:1
**negotiations**
134:13
**net**
33:22 36:18 37:10
39:13,14 47:6 91:20
91:22 92:10,16
96:19 97:7 98:10
101:23 107:18,18

113:19,22,25
114:15 119:17
124:13,13,16,21,21
125:8,11,18 140:14
141:24 145:14
147:2,20 152:10
158:19 159:3,14
160:12,13 162:5
163:11 168:5 171:8
171:9 173:9 176:15
177:2,6 182:19,20
195:17 220:9,10
**netting**
102:12,14
**neutral**
221:9
**never**
51:23 73:13 149:14
154:3 155:11,13
232:4
**new**
3:5,5,14,14 89:9
225:8 227:2 236:21
**news**
185:18 186:11
207:21
**next**
21:1 41:2 74:16
97:10,21 100:15
119:11 120:6 121:8
148:12 149:8
170:23 195:1
199:20 204:2 205:1
210:12 213:20
220:19 234:23
235:3 242:12,22
243:22
**Nishad**
59:9 189:20 198:11
**non**
97:7
**none**
6:24 14:18 73:17
139:14 174:20
**nonexistent**



MAGNA
LEGAL SERVICES

85:19
**nonfutures**
96:20
**nonsensical**
48:13
**non-Alameda**
130:10
**nor**
185:9 248:17,18
**normally**
103:7
**north**
154:11
**Nos**
4:19,22 5:8,10,13,16
5:18 6:9,11,13,15
6:17
**notable**
120:25
**notation**
52:4,21
**note**
56:11 77:25 100:21
**notes**
31:1,3 164:19 165:1
238:19 242:6,10
243:14
**nothing**
7:20 39:14 77:25
125:25
**notice**
95:1 214:17
**noticed**
32:25 122:7
**notification**
104:2,6
**notifications**
103:19 105:11,16,19
**noting**
27:15 184:15
**notion**
169:6
**notional**
115:20 116:4,10
142:11,14 145:3

180:8 194:7
**not-always-clear**
212:16
**November**
46:22 47:4 75:20
88:11 120:17
181:19 182:1
185:13 225:10
**now**
9:8,25 22:1 30:23
47:8 84:4 110:16
120:16 121:10
155:16 174:23
175:8 186:18
198:11 210:15
217:8 229:15 237:6
**nuance**
29:19
**number**
17:14 24:24 33:22
34:1 50:17 54:11
61:16 84:8 94:2
97:12 106:13
107:22 113:16
121:22 139:7 140:4
152:19 153:24
154:1,25 156:12
157:22 160:16
194:6 207:5,10
217:22 248:8
**numbering**
191:18
**numbers**
34:21 44:13 91:10,12
96:14,24 102:13
148:15 191:15
211:13,16
**numerous**
55:11 184:15 243:9

_____
**O**
_____
**O**
1:13
**oaths**
248:11

**object**
8:18 16:13,15 24:13
29:5,16 30:2 52:12
52:13 54:3 55:9
63:24 69:18 74:2
77:12 82:21,23
83:10 84:15,19
85:12 86:16 87:13
88:16,17 89:1,5
96:5 100:19 109:8
111:25 113:7 116:6
135:20 140:23
159:17 170:11
177:13 178:11
179:6 184:7 201:6
218:3,24 219:9
224:18 230:8,9
237:7 238:11
**objections**
24:12 212:8
**objective**
80:14,15,23,24
217:13 219:6
**objectives**
81:4
**obligate**
180:23
**obligation**
140:21,25 204:24
**obstruction**
245:2
**obtain**
110:25 111:3
**obtained**
237:17 242:3
**obviously**
40:9 42:19 44:19
51:3 62:19 96:11
117:20 138:6 154:8
212:10,11 241:12
**occurred**
154:18 195:2
**occurring**
145:17
**occurs**

112:15 125:22
**October**
1:16 2:19 7:1,9 225:5
231:1
**off**
13:21 15:24 30:21,23
40:15 65:5 78:6,8
115:23,25 116:4
121:14 122:4
125:19 129:20
133:22 136:3
148:22 169:10
170:12 181:18
182:7 183:25 190:4
201:25 202:6,18,25
208:7,13 212:20
215:14 237:23
**offer**
178:13 179:13
206:18,22 207:1
**offered**
106:25 137:13 179:9
179:22 221:23
**offering**
73:2 206:5,10
**office**
75:5
**officer**
248:21
**OFFICER'S**
248:1
**official**
55:6,8,15 76:1
**off-the-record**
208:17
**often**
25:7,14 50:14,17
61:21 62:17 64:10
64:11 131:8 132:13
137:2 139:24
162:25 166:22,23
231:24
**oh**
20:1 51:22 59:17
95:6 126:23 191:8



204:1 242:16
**old**
47:6
**Olga**
207:20
**omnibus**
61:15 62:1,22 63:15
**omnibus-type**
63:4
**once**
70:1,5 138:5 180:21
**ones**
27:10 57:24 76:1
  107:7 120:25 122:3
  141:9 155:19
  231:21 238:15
  245:22
**one-bitcoin**
220:14
**one-day**
187:9
**one-third**
171:25 174:9,15
**ongoing**
229:20
**online**
15:21
**only**
30:21 45:5 62:3
  126:4 128:7 130:21
  130:24 145:19
  151:11 159:2
  160:19 162:4 172:6
  176:24 178:14
  179:7,9,15,21
  180:17 192:25
  209:13 210:18
  213:13 234:16
  240:13
**onto**
49:23 50:4 60:9
  89:15 111:20
  154:19 192:19
**oOo**
247:4

**open**
49:13 94:13 115:6
  123:8 142:7 181:23
  206:3
**opened**
29:9
**opens**
119:19
**operate**
25:21 53:12
**operated**
13:18 44:14 53:6,10
  53:17 65:23 162:2
  162:25 218:21
  219:15
**operating**
19:3 195:24
**operation**
21:20 25:6
**operations**
75:21 84:25 85:1
  182:9
**operative**
15:2,4
**opined**
215:9
**opinion**
99:19 240:8,17
**opposed**
37:15 51:9 116:7
  130:13 131:3
  190:11
**opposing**
149:10,11 170:7
**opposite**
127:20 149:20
**option**
105:3
**options**
104:9,11 105:18
  206:3
**ORANGE**
248:3
**order**
52:19 95:17 120:1

130:6 169:22,22
  175:22 192:15
  216:23 227:21
  228:18 234:3
  246:24
**ordered**
189:12 194:3 227:20
  228:24
**Orderly**
173:16,17
**ordinary**
236:7
**organization**
27:5
**original**
89:8 125:8,12,22
  126:2,9 244:16,19
**OTC**
4:24 41:11,13,14,22
  42:4 74:18 84:9
  104:18,23,24 105:1
  105:11
**others**
15:11,15 17:4 31:23
  55:1 67:3 72:5 88:4
  106:9 121:5,6
  139:19 150:4,24
  189:21 214:13
  215:4 216:3 229:7
  245:1
**otherwise**
8:19 123:1 131:11
  156:8 175:19 246:8
**OTX**
104:21
**our**
10:12 18:1 26:13
  72:6 75:5 114:4
  127:11 243:17
**out**
10:11 22:25 33:2
  49:4 51:17 54:22
  60:5 62:15 64:10
  65:23 68:9 71:22
  78:14 80:6 84:3

88:19 90:18 92:12
  92:15,18 99:10
  100:15 102:12,14
  112:24 116:24
  118:12,12 119:7
  122:21 124:25
  137:17 147:3,14
  151:16 152:8
  155:22 161:1 172:8
  175:20 176:14
  179:11 181:1
  186:11 199:1
  210:24 211:2
  215:19 216:21
  217:19 218:6 229:5
  231:19 236:18
  238:13,24 245:20
**outcome**
199:5
**outlined**
82:11
**outlines**
77:2 85:17
**outright**
231:23
**outside**
107:1 108:3 195:24
  201:19
**outstanding**
97:22 100:16 102:5
  182:16 208:2
**over**
8:21 15:13 36:14
  41:15 45:15 46:11
  47:6,8 57:4 105:3
  129:5,10,19 132:1
  134:14 142:25
  152:13 157:2 169:7
  180:25 186:11
  219:19 234:21
  242:12
**overall**
90:20,22,23 91:6,14
  91:19 93:18,21,24
  96:10 103:10



160:16,17,19 220:7
220:9 221:10
**overloading**
149:4
**overly**
127:22
**overseeing**
196:19
**overview**
137:23
**overwhelmed**
205:25
**overwhelming**
196:3
**over-the-counter**
41:18
**owed**
103:12 113:19 160:5
185:8
**own**
21:11,17 22:4,6 23:1
29:25 30:11 45:6
50:4 60:22 68:12,23
69:7,10,16 70:11
71:3 75:25 82:16
177:11,12 230:1
**owned**
22:10,12 33:21 44:15
70:12 123:17 129:4
**owner**
67:21 78:21,23 79:20
79:24 80:1
**ownership**
63:22 177:19
**owns**
19:21 20:4 43:23
71:1,5

---

**P**

**P**
3:1,1 5:3 248:10,15
248:20,25 249:5
**page**
4:2,9 5:2 6:2,8,23
18:11,23 19:7 32:24

35:8 43:6 66:23
74:6 76:16,25 79:11
79:17 80:12,19,21
82:2,5 90:3,8,10,12
90:14,15,15,20,22
95:15 96:15 103:2
109:22 114:21
118:7 119:11 133:5
133:6,7,13 134:25
143:17,25 144:1,4,8
144:12,24 145:20
145:25 146:1 147:5
148:12 164:17
166:11 172:18,22
173:18 191:15,21
191:24 193:19,21
195:1 199:20
203:23,25 205:1
208:16 210:12
222:15,17 228:12
228:14 230:14,22
231:2,8,15 233:25
234:9,23,24 235:20
235:21 236:5 242:9
242:10,10,13,15,22
243:13,22,23
244:12
**pages**
5:14 15:22 24:25
90:16 91:3,5 109:13
109:16,17,18,19
172:12 191:20
204:2 209:15
**paid**
45:18 140:14 147:23
182:14
**paper**
125:3 161:10,11,14
161:18
**paragraph**
19:14,18,25 95:23
116:3 118:15 135:2
144:16 146:16
170:2,23 172:5
194:20 224:10,13

224:20 234:8,24
236:6
**paragraphs**
148:16 155:20,25
**parameter**
123:8 128:22 169:7
**parameters**
125:21 148:23 167:9
167:12,19 169:4,5
195:20,25
**parent**
78:23
**part**
18:23 20:15 46:20
47:18 58:6,8 89:7
133:12,13 158:17
162:16 175:23
181:3 208:12
227:21 229:24
238:12 241:10,20
241:20
**partially**
190:8
**participant**
130:7
**participate**
51:15
**participated**
72:25 239:14
**particular**
15:6 18:23 21:23
30:14 31:24 36:8
59:5 62:2 66:12
67:8 77:18 85:23
86:23 102:23
111:10,16,24
112:10 114:9,12
119:1,1,6,6,9,9
120:25 122:14
123:8 124:20
125:17 134:8
136:25 137:4,4
138:21 139:4,13,13
140:22 148:9
154:17 175:9

189:16 196:4
201:10 219:15
222:4 223:7 224:3
229:7
**particularly**
84:24 227:10
**parties**
26:15 41:25 62:17
206:20 223:21
248:17
**parts**
15:23 18:20,21 21:22
21:25 24:19 25:20
28:20 66:21 67:8
75:23 84:8 91:15
106:2 136:21
155:23 209:17
218:16
**party**
36:21 37:10,12,15
38:17 86:3 98:13
127:17 130:18
181:9 223:11,14,23
**party's**
181:6
**pass**
47:12
**passed**
123:24 129:20 197:6
229:9
**passing**
149:3,21 186:4
**password**
49:19
**past**
196:10 197:4
**pasting**
199:12
**pay**
45:20 111:20 147:14
176:3 201:21,24
202:5,8
**payment**
140:4,11,20,20,21
148:1



**payments**
118:17 139:21
140:14,16,17 141:7
150:6,7
**payoffs**
180:12
**payout**
99:19 147:18,18
**Pedro**
2:17 7:1,10
**peer-to-peer**
107:2 108:3,5 130:19
132:16
**Pekary**
32:7
**Pekary's**
32:18
**penalty**
7:18 247:7
**pending**
31:22 232:22 237:25
**Pennsylvania**
3:19
**penny**
63:8
**people**
12:20 15:10 54:13,22
56:21 58:19,19
66:17 75:8 99:18
115:15 129:21
134:20,21,23
177:15 178:23
187:23 188:22
189:14,17 193:10
198:1,9 200:17
**per**
51:20 99:21 101:22
132:15 138:2
148:17,17 149:1
170:3
**percent**
116:16 157:4 158:1,2
173:19 176:1
190:21 207:14
224:15

**percents**
132:15
**perform**
25:20
**performance**
232:4
**performed**
28:8
**Perhaps**
125:16
**period**
27:11 39:6 187:9,10
188:2,4,15,18 196:5
223:16 249:4
**periodically**
127:6
**periods**
55:19 186:11
**perjured**
230:18
**perjury**
7:19 230:5 247:8
**permitted**
51:15
**permitting**
117:12 153:4 154:1
160:7
**perpetual**
140:1,12 141:10
156:21
**perpetually**
140:3
**perpetuals**
139:17,19,23,24
141:10
**person**
27:6 58:25 59:14
75:8 113:14 122:17
175:12 192:21
**personally**
20:17 57:13 129:1,3
**perspective**
50:5,7 51:1 113:25
123:6 128:17 193:6
**Peswani**

32:9,10,16
**ph**
53:12 66:14
**Philadelphia**
3:19
**phone**
54:24
**phrase**
15:4 22:8 71:6 97:23
102:8,9 187:20
244:22
**phrased**
150:8
**phrasing**
125:16 128:12
155:23 156:10,19
229:3
**physical**
177:19 180:11
**pick**
177:11
**piece**
219:15
**pieces**
100:22
**piecing**
195:9
**pilot**
89:8
**place**
19:19 20:2 61:22
137:19,23 170:19
183:13 184:2 189:5
205:23 239:13
244:24 247:11
**placed**
36:20
**places**
75:6
**plain**
137:3
**platform**
17:12,13 21:23 22:21
22:21,24 41:20
57:21 63:13 72:23

73:1 84:9 91:15
93:11 105:23 117:2
123:5 218:13
**platforms**
18:14 21:6,22 23:10
**play**
41:17 53:1 72:7
212:2
**played**
41:24 88:2 236:19
**player**
207:12
**players**
84:21
**please**
7:17 13:10 14:16
30:3,6 32:19 49:15
209:21 228:2
**plenty**
120:24
**plus**
64:20 113:3 158:18
**point**
10:11 13:7 19:2,5
21:18 59:20 70:23
78:14 85:24 93:22
94:14 96:10 123:20
123:25 129:20
132:17 142:15
146:24 150:18
177:18 186:19
187:23 190:18
205:18 217:23
223:7 229:6 239:16
**pointed**
71:22
**pointing**
236:21
**points**
36:16 50:1 62:16
84:8 133:25 134:22
**policies**
13:21,22 14:2,4,6,10
20:15 53:7 55:6,8
77:10 81:14,16,18



81:20,20 170:18
**policy**
4:19 14:19 15:2,4,16
15:17 55:11 76:11
77:1 80:5,8,9 81:4
82:2 88:7 89:8
219:5
**policy's**
80:15,24
**poor**
166:3,7
**poorly**
245:23
**pop-ups**
25:1
**portal**
4:24 41:11,13,22
42:4 104:18,22,23
104:24 105:1,12
193:5,12 213:16
**portfolio**
196:23,24 197:10
**portion**
39:17 220:4
**portions**
220:2
**posed**
232:2 236:13 238:8
**position**
38:17 39:11 64:12
72:9 94:13,14 98:5
98:7,7,8,11,19 99:4
99:11,12,20 101:23
102:1 115:6,19,20
116:14,16 122:1,6
124:7,8,19,23
125:17,19 126:10
127:2,16 128:23
129:6,8,19 130:22
131:10 141:5,6,15
141:17 145:3,5
146:18 148:9,19
149:15,16 151:10
152:8,9,11,12,14
153:8,9,12,15,19,23

162:1 167:15
170:15,16 174:1,8
174:12,17,19,21
175:17,20 181:23
192:17 217:25
**positions**
40:12,22 47:9 90:8
90:15 96:20 97:22
101:7,10 107:17
114:24,25 116:5,20
116:23,25 125:10
139:10 142:7 146:4
149:10,12,20 150:1
150:8,21,24 151:1
151:10 159:1 168:7
170:7,10 172:6
177:7 181:2 189:24
190:3,4 208:9
216:20 229:24
**positive**
33:21 95:25 96:21
97:2,6,11,15 102:14
107:20 117:1
124:16,21 125:3,5
125:18 126:9,13,21
129:11 147:2
152:11 156:17
158:12,21 171:4,9
171:12,24 182:19
182:20 201:13
219:23 220:6,25
241:16
**positives**
124:6
**possibility**
14:23 46:9 245:20
**possible**
14:23 45:18 99:22
124:18 126:3,11
150:17 164:21
166:5 186:9 206:14
206:16 234:16
**possibly**
161:19,20
**post**

14:13,14 98:17,25
199:12
**posted**
15:21 64:12
**posting**
98:15 99:9
**posts**
109:24
**potential**
41:25 65:25 85:18
99:10 102:1 107:7
129:14,15 207:4,5
218:5 236:10 241:6
**potentially**
16:8 22:23 25:2
37:12,13 39:13
51:12 62:10 68:16
75:20 100:23 102:2
107:4 111:4 117:5,6
122:23 125:13
129:6 135:16
165:19 200:4
**practical**
196:19
**practice**
154:12 218:22
**Prager**
26:20 28:6
**precipitously**
136:6,7 189:25
**precisely**
239:3
**prefer**
131:2
**preferred**
56:5
**preliminary**
8:10 228:18
**premise**
241:21
**prepare**
11:23 17:6 18:17
27:1 164:4
**prepared**
26:4 28:1,3 34:24

42:23 43:1
**preparing**
26:7 28:12
**preserved**
139:14
**press**
238:24
**presumably**
89:25 217:23
**presume**
27:6,20 47:19
**Presuming**
223:20
**pretend**
177:11,12 179:2,8
**pretty**
59:13 97:25
**prevent**
128:17 163:8 223:17
**prevented**
183:3
**preventing**
183:11
**previous**
25:11 109:21
**previously**
6:7 65:6 93:3 108:17
133:1 143:6 147:2
163:14
**price**
105:7 127:13,15
140:8,13,13 141:8,8
145:7,8,9,13,16
146:18,20,22 150:9
150:12,14 153:16
169:18,19,21,23
171:1,2,2,3,7,7,10
173:5,6 174:24
175:17,18 177:17
180:14 196:7,8
221:13
**prices**
38:16 177:8 180:25
196:6
**primary**



128:7 141:9
**principal**
71:6,24,25
**principle**
19:13,15 21:3 64:7
**Principles**
16:10 17:22 18:12,24
**print**
51:5,6,9 154:18
235:21
**printing**
51:2
**printout**
46:4 172:18
**prior**
88:11 116:3 173:15
185:13 186:6,22,25
189:5 208:6 214:23
214:25 216:7,14,18
248:13
**prison**
227:14
**private**
41:20
**Private-ftx-accoun...**
4:12
**privileges**
90:19
**probably**
12:13 80:21 154:25
168:9 189:20
202:16 215:10
**problems**
186:9
**Procedure**
248:13
**procedures**
176:7
**proceeded**
123:11 137:3
**process**
5:6 9:4 46:10,20
47:19 66:18 75:19
106:22 123:21
127:3 128:3 147:8

151:14 152:18
153:21 162:19
164:13 165:6
166:20 172:19
196:19 237:5 239:6
239:14 243:2
244:24
**processed**
155:24
**processes**
165:9,11
**processing**
14:15 63:10
**produced**
93:8 94:23 95:11,12
100:24 203:24
**product**
150:18
**profit**
4:13 34:17,22
**program**
72:7,8 89:8 105:21
106:11,19 107:2
108:3,5 109:5
111:19 116:24
117:4,9 130:14
161:2 175:23
**prohibit**
123:10
**prohibited**
123:9 202:20
**prohibitions**
56:6,9
**prohibitive**
63:11
**promised**
64:24 228:11
**promising**
207:9
**promptly**
128:3 201:17
**Proof**
5:4
**properties**
179:10

**property**
61:22 73:18 228:18
**proportion**
148:20
**proposed**
238:12,15 241:7
**proposition**
175:19
**proprietary**
40:21 45:6 71:12
**prosecute**
243:11
**prosecuting**
243:6
**prosecution**
234:5 235:23 236:3,9
**prosecutor**
231:25
**prosecutorial**
236:15
**prospective**
20:15
**protect**
19:9 87:17,20 120:8
**Protections**
18:13
**protective**
246:23
**provide**
24:6 236:17
**provided**
24:1 25:5 88:6
111:10 114:9
234:11 249:4
**provider**
72:7 74:9,12,20 75:3
75:13,15 84:13
86:19 146:13
**providers**
83:4,9,14,17 86:3
123:24 148:22
153:7 172:8 174:2
197:5,11
**provides**
21:4

**providing**
23:22 24:4 45:19,21
**prudent**
128:16
**public**
19:4 25:24 235:7
**publicly**
18:25 154:10
**publishing**
85:20
**pull**
103:7,11
**pulling**
210:13
**purchase**
103:25 142:16
**purchased**
112:25 138:19 139:4
**purchases**
90:4
**purpose**
26:7,9,13 62:21
63:15 76:21 88:25
129:23
**purposes**
33:2
**pursuant**
248:12
**put**
98:7 99:3 110:16
123:19 130:9 131:9
131:10 142:3
149:16 211:16
225:18
**puts**
17:25
**putting**
22:18 60:12 132:18
214:17
**P&L**
157:2,10
**p.m**
2:19 194:21 205:8
247:3



## Q

**qualified**
23:13 248:6
**quantities**
103:12
**quantity**
113:10 118:13
123:12
**quarterly**
139:20 144:18
**query**
15:8
**question**
8:17,24 11:20 13:9
14:11 16:17 17:16
18:22 19:12 20:13
23:7 25:11 30:4
37:20 38:19 46:15
46:17 49:13,17
58:15 63:25 64:5
70:14 71:4 73:16,24
76:13 78:10,20
90:25 108:23
112:21 116:2
129:10 130:17
131:16 136:6 137:8
141:21 142:8,21
152:9,22 155:22
159:10 160:10
161:8 163:20
173:13 179:8,15
183:21 184:11
210:18 213:20
215:8 216:24
220:19 232:2
234:17 237:24
245:19,21 246:2
**questions**
6:22 9:2,3,7,22 12:5
13:1,18,19 43:2
47:1 48:6,12,17
49:5 52:25 60:5
79:1,18 82:2 84:3
92:21 107:4 110:5
114:18 120:17

130:8 154:9 161:21
161:22 185:3
207:23 212:15,16
212:17 217:8
231:24,25 232:13
236:13 245:4,13
246:17
**quibbles**
155:23 156:6 157:20
**quibbling**
234:21
**quick**
227:25
**quicker**
58:4
**quickly**
9:23 113:2,2 126:11
130:2 157:16
172:12 197:12
**quite**
17:8 28:15 48:17
84:9 126:25 140:6
196:6 232:4 238:13
244:22
**quote**
235:17
**quoted**
92:10
**Q2**
32:20 34:8

## R

**R**
3:1,4 7:11 248:10,15
248:20,25 249:5
**raise**
7:16 71:3
**raised**
122:10
**ramp-up**
196:5
**ran**
57:7 218:13
**random**
14:6 243:14

**range**
39:3 197:25
**rapid**
157:19
**rarely**
149:14
**rate**
132:4,6,12,12,17
134:6
**rather**
11:18 15:7 27:6
52:18 61:9 64:12
99:21 102:13
107:17 114:15
119:2 132:12
149:20 150:11
190:6,21 229:16
241:16,19 246:9
**Ray**
234:9 242:23 243:1
245:8,18 246:3
**RE**
1:5 2:5
**reach**
204:12
**reached**
122:21
**reaching**
205:3
**read**
30:6,7 32:24 33:11
42:20 77:13,14
105:5 109:2 173:11
184:1 203:24 205:1
230:4 231:10,11
232:7,10 236:23
243:24
**reading**
20:20 206:9 230:10
232:11 246:20
**reads**
230:10
**ready**
240:12
**real**

21:6 96:11 241:19
**realistic**
37:11
**realized**
98:12
**really**
25:12 119:24 155:18
173:17 177:9
208:23 240:21
245:13
**realtime**
38:16
**reason**
8:20 9:9 37:8 51:14
77:20,25 81:6,8
85:9,15 87:2,6
98:13 99:5 131:2
192:17 224:22
225:3 237:5
**reasonable**
36:7 156:4 178:21
234:18
**reasons**
192:12 197:1 207:3,5
237:9
**recall**
11:17,21 26:21 27:10
30:23 33:5,14 35:22
36:8 40:15 47:8,21
52:5,21,24 54:7
57:13,16,21 67:6
68:21 69:5,14 75:12
76:24 81:18 88:5,10
88:11 105:18
107:11 120:16,19
132:3 134:3,10
135:22,25 136:3,8
145:12 150:16,21
150:23,25 151:2
185:6,12 186:5,7,8
186:10,17,21,24
188:3,24,25 189:4
190:12,14,15,18
191:2 194:15 197:2
199:17,19 204:16



204:20 206:15,17
206:22,24,25
208:12,24 209:6,8
215:20,21 216:13
216:15 223:2,4
231:12 232:15,16
239:2,4 243:21
244:11 245:19
**receive**
55:11 70:5 105:16
**received**
70:1 104:25 140:15
**receiver**
136:5
**recent**
5:11,15 157:8
**recognize**
65:17 76:14 108:24
108:25 109:1
172:24 238:2,4
**recollection**
216:18 228:23
**recommendations**
55:2
**record**
7:14 30:7 54:18
55:21 65:5 78:6,8
115:23,25 121:14
183:25 184:1,10
203:17 208:7,7,13
212:20 218:21
229:13 237:23
248:24
**recorded**
248:22
**records**
9:21 19:20 20:3
54:19 55:6,8,15,18
96:18 216:25
**recourse**
135:9 180:18 246:1
**recover**
163:12
**recovery**
3:11 5:3 10:17 93:8

155:16 212:25
**reduce**
125:11 164:20
220:20
**reduces**
165:2
**refer**
23:14 94:10 96:19
146:20 162:15
230:22 243:4
**reference**
31:3 35:12 46:1 83:8
178:25 191:24
192:1 244:3,7
**referenced**
31:1,21 109:24,24
224:9
**references**
162:13 231:2,8
**referencing**
36:4 50:15
**referred**
16:19 20:6,10,10
41:16 93:19 217:9
223:16
**referring**
11:5 14:20 17:13
26:17 33:25 44:21
45:16,22 59:19
65:14 70:20,21
72:15 81:15 83:24
90:9 91:10 106:1,4
148:21 173:8 175:7
192:3 200:11
210:19 227:23
**refers**
23:12 93:17 94:12
97:6 224:13
**reflect**
51:25 112:23 142:6
142:10 213:22
**reflected**
77:17 141:24 213:22
213:23 216:7 219:7
**reflects**

213:9 225:23 226:2
**refresh**
228:23
**refuse**
178:22
**REFUSED**
234:3
**regard**
244:19
**regime**
20:22,23 23:15
**Registered**
4:21
**Registration**
79:7
**regulated**
74:25 75:7
**regulations**
184:16
**regulator**
20:15,21,23
**regulatory**
23:14 89:7
**relate**
191:14,17
**related**
36:20 50:25 52:15
55:6 106:6 109:14
119:11 140:12
148:23 162:15
**relation**
82:10
**relationship**
58:24 86:22 136:21
139:12 162:4
**relationships**
208:15
**relative**
116:10 248:16,17
**relatively**
207:7,8
**relevant**
9:21 60:1 66:2 70:9
72:5 96:17 135:15
136:9 227:11 229:4

**relief**
206:2
**remain**
61:25 67:17 68:2
73:9 128:19
**remaining**
148:20 149:9 170:6
171:25
**remember**
10:9 11:15 18:15,16
32:10,13 34:20,21
40:20 47:14 55:13
56:20,24 57:2,10,10
58:6,8,11,12,16
59:4 74:23 75:24
95:21 103:22
104:11 121:1,20
123:15,22 128:4
129:7 131:18,20,21
131:25 136:24
138:3 146:1 150:19
157:17 167:1 169:1
169:2 170:12,17
175:25 176:12
185:16 186:12,13
186:15,19 187:2
188:15,17 189:1,6
189:15,18,22,23
190:3,9 192:3,5,14
197:15 198:13,16
198:18 200:22,22
200:25 201:4,12
203:15 208:23
213:15 216:23
217:11 219:21
**remove**
205:1,7,11 224:21
225:1
**reopened**
140:8
**repaid**
117:8
**repay**
111:21 112:7 114:6
120:20



MAGNA
LEGAL SERVICES

repayment
231:5
repeat
19:23 30:3 134:16
repeatedly
235:3 243:7
rephrase
173:13 179:8 191:2
Report
5:9 197:25
Reported
1:23
reporter
2:20 7:16 8:22 17:25
70:3 94:18 167:4
246:25 248:7 249:4
Reporters
248:9
represent
8:1 24:15 83:5 84:14
93:7,25 96:17
193:14
representation
160:5 238:21
representations
66:11
represents
11:3 70:9
reprinting
204:2
request
51:21 198:22 210:15
236:12
requested
249:2,3
require
71:18 231:6
required
36:22 94:13 98:17
101:6,10 167:13
168:6
requirement
115:1,6 135:10
153:22 169:6
requirements

111:2 136:2 176:9
178:9 179:25
205:22 214:20
requires
37:2,2 94:13 210:15
requisite
220:17
rescinding
195:18
research
5:6 10:4 12:21 226:8
226:12
reserve
246:20
reserves
224:21
residual
182:10
respect
31:15 49:4 88:3,4
107:22,23 190:22
221:10 222:20
224:2 225:24 226:2
226:6,7,10,14,18,22
229:10 233:7
respects
230:19
respond
200:8 204:25 208:1
responding
198:12 202:10
response
79:19 134:17 148:10
208:1,17 210:11
215:7
responses
56:17 79:18 209:22
responsibilities
82:6,10 85:11,17
87:4 206:1
responsibility
124:8
responsible
129:2
responsive

15:8
restitution
229:17
restore
241:7
restoring
238:8,11
restrict
167:17
restrictions
122:24
result
35:21 101:22 113:24
125:7 219:24
resulted
128:23
retention
180:24
retroactively
51:19
return
161:17
revenue
35:9,17
reversed
154:19
review
14:17 17:9 28:16,18
50:11 66:19 75:19
76:18 88:23 100:25
233:9 249:1
reviewed
28:20,22 67:2
reviewing
58:22
reviews
245:8
review[ed
236:11
revised
144:5
revoked
168:8
reword
231:25

RHOADS
3:18
Richard
199:22
Richard's
215:21
rise
122:16
risk
67:22 71:5,23 73:2
102:1 117:25
118:16 119:1,3,12
119:15,20,22,24
120:4 122:23,23
123:5,18 124:8,10
126:5 127:16,17
128:16 152:12
162:13,16,25 163:1
163:7,9,9,10 164:24
180:21 190:1
192:15 196:13
201:16,20,23 202:4
202:7 212:11
riskier
128:24
risks
71:12 195:23 196:1,2
215:22
RMR
1:23 2:21
Robert
26:22 27:1,5 32:8,13
35:1
role
17:6,8 28:12,15
40:16 41:17,24 53:2
76:23 134:3 164:3,6
236:19
roles
58:19 59:3 82:10
85:10,17 88:1
roughly
204:18 230:25
round
60:5 100:15



**row**
74:8 79:12,18,18
    95:23 100:16 103:3
**RPR**
1:23 2:21
**Ruben**
32:7,10
**rule**
38:9 245:20
**rules**
8:14 23:14 37:14
    55:2
**rulings**
235:8
**rumor**
199:23 200:14,15
**rumors**
186:20,21 189:1,4
    199:14
**run**
75:16 111:5 178:17
    178:18,20 240:4,5
**running**
9:24
**Ryan**
59:2 76:19 134:21
**Ryne**
5:12,16

──────────────
          **S**
**S**
3:1 4:8 5:1 6:1
**safeguard**
77:6,11 87:17
**safeguarding**
4:18 76:10 77:2 80:4
    81:14,21 82:11
**safer**
195:14,14,15
**said**
11:10 12:8 13:15
    15:5 19:23 28:5
    53:17 55:13 64:16
    65:15 69:6 73:8
    80:21 91:1 92:8

94:23 108:5 120:1
    121:17 155:24
    167:24 174:17
    177:24,25 178:2
    183:14 184:3 185:6
    185:14 189:7 194:8
    202:15,18 206:9
    215:14 229:2
**Salame**
76:19 77:20
**sale**
189:8
**sales**
189:13 190:9,14,16
    203:12 211:4
**salt**
198:7
**Sam**
1:15 4:10 18:8
**same**
50:2,3,16 56:1 65:24
    73:16,24 86:10
    87:19 106:7 120:12
    123:17 132:10
    134:20 138:25
    140:15 141:20
    146:22 162:14,21
    162:23 183:8 185:2
    193:4 194:21
    199:14 212:8
    214:24
**Samuel**
2:15 4:3 5:20,22 6:3
    6:5 7:4,8
**San**
2:17 3:9 7:1,10
**sarcastically**
241:9
**satisfied**
111:2
**satisfy**
136:2 201:5,14
**saw**
26:22 59:10 182:12
    185:21 219:13

**say**
12:7,22 13:13 18:24
    22:7 27:14 29:9
    30:15 33:12 36:24
    47:11 48:16 49:8
    50:8,13 56:22 69:2
    71:5 77:8 78:4
    84:12 88:12 96:23
    99:1 101:5,22
    105:14 106:12
    107:14 110:14
    112:22 114:13
    115:18 121:24
    122:5 123:13
    124:24 125:17
    127:21 134:16
    137:6 138:9 140:16
    144:17 148:24
    149:15,17 150:7
    151:4,19 152:9
    156:3 157:25 160:3
    166:2 168:3 169:11
    176:6 177:9 179:13
    180:3,4,15 188:25
    190:20 201:23,24
    208:8,19 216:2
    218:25 223:10
    229:18 237:3
    239:16 241:12,17
    242:19 243:13
    244:9 246:6
**saying**
16:20 43:3 45:12,18
    50:9 57:6,14 67:12
    69:15 72:8 83:24
    85:21 86:22 99:25
    100:4,5,10 119:15
    120:21 126:4
    149:14 159:11,19
    169:5 171:23
    176:23 177:11,14
    186:16 196:12,13
    205:7 227:8 234:20
**says**
18:8,12 19:18,25

21:3,9 32:19,24
    67:16,21 71:22
    74:12 76:19 77:1,25
    80:15,23 82:10 86:3
    95:23,24 105:5
    108:16,22 114:22
    114:24 115:4,19
    118:16 119:19
    120:7 133:8 143:21
    144:16 145:5,23
    146:11,16 147:12
    147:18 148:13,16
    148:19 149:8 165:1
    166:14 167:7 170:5
    170:23 171:20
    172:5,18 173:18,21
    173:25 174:4,8
    175:15 194:20
    198:10 199:13,22
    204:10 205:1 208:4
    209:19 210:8,12,15
    210:19 229:1
    230:16 231:17
    240:21 242:20
    243:14,17,24
**SBF**
243:17
**scale**
157:7
**scenario**
62:24 173:4,8,12,15
    175:10 196:15
**scenarios**
173:3
**Schedule**
74:5,7,7,17,18,18,18
**schedules**
74:17
**scope**
11:20 69:19 78:1
**scoped**
96:7,8 165:11
**scopes**
71:19
**scoping**



84:3 91:16 93:17
107:3,4
**screenshotted**
58:15
**screwed**
128:22
**screw-up**
128:25
**sculpted**
137:4
**se**
99:21
**Seaside**
2:17 7:10
**second**
64:11 79:11 83:3
85:9,16 91:14 93:16
95:23 100:6 109:1
114:21 116:17
126:1 136:11
139:20 143:17
146:9,16,21 147:10
152:24 166:11
173:10 183:23
229:21 230:24
232:23 234:8
237:19 242:9,10
245:11
**seconds**
140:5 142:5 157:3
163:4
**secretly**
91:4
**section**
15:22 19:7 35:6,24
43:7 66:22,23 67:5
67:11,16 69:24
73:16,24 74:6 76:19
76:25 80:14,23 82:5
82:9 114:22 118:7
119:12 143:18
144:14,25 145:21
148:13 194:16,17
234:2 248:13
**sections**

67:1 70:24
**securities**
226:15
**seeing**
36:8 58:11 200:12
**seem**
88:15 133:16 156:4
**seemed**
201:1
**seems**
34:4 36:7 88:18 94:6
180:20 206:9 210:7
**seen**
16:9 76:15 137:13
155:11,13 193:17
232:4
**sees**
113:21
**seizure**
87:22 135:15
**select**
94:8 103:3
**selected**
75:2 94:4 95:20
**sell**
138:24
**seller**
138:16 139:1
**sellers**
139:8
**sells**
63:1 171:4
**semiliquid**
122:2
**Senate**
18:9
**send**
223:11
**sending**
61:21
**sense**
12:16 88:3 126:2
141:1 154:14
159:10 179:7
**sent**

50:8 169:22 214:8
**sentence**
5:22 19:17,24 20:5
20:18 21:1 84:23
85:5 98:1 118:23,25
120:6 149:8 227:2,9
227:16 229:3 230:4
231:13
**sentenced**
227:5,8,13
**sentencing**
228:8 231:17 232:17
235:9 237:15 242:2
**sentiment**
235:7
**separate**
13:7 27:17 89:17,19
115:1 152:17 206:1
213:17 240:20
**separately**
64:13 92:15
**series**
9:1 173:2 216:15
238:19 242:6
**service**
6:10 16:4 17:7,11,12
53:17 64:25 65:13
65:14,15,20,23 66:1
66:5 74:7,8,9,12,19
75:2,13,15,17 81:23
109:23 138:7
**services**
56:15 71:8
**serving**
227:16
**session**
247:3
**set**
16:19 20:15 86:10,20
89:23 105:25
125:21 132:13
145:13,14 148:23
159:22 171:15
176:6 180:25
218:14 235:14

**setting**
140:8 221:22
**settings**
104:9
**settled**
139:21,25
**settlement**
177:17
**seven**
225:6,11
**sever**
208:20
**several**
163:25 164:2 204:12
**shall**
7:19 67:17,18,22
68:2 73:8,19
**share**
8:9 9:12,14
**shares**
61:22
**she**
17:25 18:1 208:4
209:19 210:15
**sheet**
4:15 28:24 29:15,25
30:11,25 31:1,4,5,7
31:15 42:16
**sheets**
29:1,3,13 31:19
42:22 43:3 46:5
**She's**
207:23
**shift**
56:19
**shifts**
167:9
**shit**
59:17
**Shocker**
66:24
**short**
5:9 115:21 150:3
151:19 158:9
170:15 197:25



204:24 215:1
**Shorthand**
2:20 248:6
**shorts**
140:11
**short-sell**
106:14
**short-spot**
106:18
**short-term**
206:1
**should**
8:19,21,24 19:19
20:2 49:10 51:14,19
55:14 56:7 72:8
82:1 122:19 129:4
137:18 169:8
179:16 199:1
202:16 215:10,25
239:12
**show**
17:18,23 23:20 34:7
42:9 43:4 64:25
90:3,4,4,7,12,20
91:8 92:25 100:6
108:11,13 113:2
132:23 137:16
143:4 162:11 217:1
**showed**
90:8,22,23 91:6
**showing**
9:5 198:20
**shown**
46:7 58:9 89:17
**shows**
193:25
**shut**
178:7
**shutting**
179:3
**sic**
202:17
**side**
79:19 84:6 134:18
138:15 140:19

190:11 221:6
**sides**
138:14 150:18
**sign**
223:11,13
**signal**
55:1 58:3 202:10
**signature**
222:20 223:12
247:13
**signed**
14:21 15:24 79:14
137:25 222:5,9,23
223:3,7,14,15,24
**significant**
39:12 99:3 123:12
150:23 151:1
181:23 182:12
190:1 202:7 216:20
237:9
**significantly**
122:4 128:23 154:13
165:2
**signing**
222:14 228:19
246:21
**signs**
198:20 222:13
**similar**
16:4 42:24 88:20
105:16 115:19
132:9 137:1 140:6
145:8 151:15 165:9
165:11
**simple**
101:12 220:11
**simultaneous**
112:20
**Sin**
244:16,19
**since**
12:20 228:11
**Singh**
198:11
**single**

177:22 196:20
221:21
**single-digit**
132:15
**sins**
243:17
**sir**
7:25 19:22 22:17
213:6 214:1 219:21
221:17 225:21
228:6,9,21 231:16
233:25 235:20
237:18 238:7
241:25 242:20
244:1 245:3 246:18
**sitting**
138:17
**situation**
40:15 48:7 52:10
86:17 96:16 99:2,8
167:7 198:20 223:9
**situations**
100:10 223:8,10
**sixth**
39:18
**size**
115:20,20 116:4,10
116:19 131:12
134:6 145:5 149:9
152:14 170:6 190:2
192:17 196:22,24
**skepticism**
96:7
**Slack**
14:14,24 15:14 54:25
56:7 57:11 58:3
**slightly**
98:20 195:14 234:19
**sloppy**
123:7
**slow**
167:17
**small**
34:1 61:16 107:15,19
150:18 152:11

155:23 157:7
167:18
**snapshot**
93:10,23 209:20
210:10,14,16
**snapshotted**
96:11
**socialize**
152:4,5 155:2 217:14
**socialized**
73:2 120:4 128:10
163:13
**socializing**
119:5
**sold**
105:6 138:19,22
139:9 156:8,11
174:1 188:11,12
190:12 197:2,3
211:1 220:12
**solely**
218:6
**solemnly**
7:18
**solvency**
136:4,5
**solvent**
128:20 235:1
**somebody**
58:14 198:4 222:13
**somehow**
18:25
**someone**
11:3 38:7 59:1 84:21
87:22 92:22 138:24
148:7 162:1 170:15
196:18
**someone's**
64:19 87:3 93:1
**something**
14:24 16:9 22:6
25:21 31:17,20
45:11 47:18 49:8
57:8,8 58:3 89:9
96:19 98:2 100:14



102:19 106:3
114:14 135:21
141:13,14 142:8
147:22 149:13
150:11 154:18
156:13 157:3,4
162:17 165:25
166:3,4 167:16,24
169:8 175:10 176:1
179:14,17 199:11
199:23 200:13
204:13 219:14
227:24 242:5
244:10
**sometimes**
13:13 16:19 25:1
35:13,20 42:25 43:1
57:18 126:11 127:8
130:6 163:4 198:4,4
**somewhat**
137:2
**somewhere**
51:24 132:14 199:12
214:6
**soon**
201:19
**sooner**
205:2
**sorry**
19:23 34:16 37:5
43:16 51:6,22 59:17
70:3 80:9,18,19,21
88:11 90:13 95:20
97:4,5 99:25 104:24
107:9 113:10,13
115:18 121:4 125:6
126:7,23 134:7,15
141:25 147:12
150:25 151:22
152:6 153:13
159:11 160:13
161:14 164:8
166:22 167:4
168:24 173:13
174:19 181:21

187:17 191:1
193:21 203:9,10
204:10 209:23,24
214:24 227:7
237:24 238:3
242:16
**sort**
9:3 14:10 15:19 16:3
40:17 49:1,18 51:17
57:6,23,23 60:12
78:23 97:18 130:5
137:5,12 147:6
151:15 157:25
166:3 167:17,17
180:22 187:21
196:5,6 218:17
234:21 241:11
**sorts**
72:21
**sound**
48:6,13 162:5
**sounds**
58:11 147:8 188:14
**source**
40:3
**South**
2:17 7:10
**Southern**
225:8 227:1
**space**
84:22
**span**
163:4
**speak**
122:14 138:15
183:23 206:11
**speaking**
60:3 62:5 168:4
**special**
210:12,19
**specific**
24:19 27:13 49:5
57:9 61:9,23,25
62:2 81:8,18 87:6
92:9 96:9 100:2

101:19 106:2
120:15 131:6,14
138:2 139:2 141:25
143:15 173:3 192:5
204:21 228:18
**specifically**
105:24 112:11,12
148:13 164:14
186:10,15,21,24
191:3 196:12,16
212:12 216:13
223:4 229:10
**specifications**
143:18 144:3,25
**specifics**
54:5 64:1 127:22
**specified**
52:6,7 74:7
**specify**
52:9,17 118:13
**specs**
6:9 137:14 143:5,10
**spectators**
234:25
**speculate**
43:25 44:5,8,8 75:11
82:25 84:16 85:4
89:2,6 206:7 211:12
211:25 212:2
**speculating**
44:11 83:12 84:23
86:11 100:20
**speculation**
10:2 84:18 85:8
86:11
**speed**
147:6
**spell**
151:16 231:19
**spending**
235:3
**spent**
12:9 230:22
**split**
62:15 90:18 121:24

152:8 160:13
**spoke**
10:14,23
**spoken**
197:12
**spot**
6:12 21:24 22:3 41:3
41:7,8 74:8,17 90:4
90:7 91:17 95:25
97:2,6,8,11,15
100:17 102:5,14,16
106:4,11 108:6,14
108:21 109:5
114:18,24 115:1,18
115:19,20 119:19
151:2,10,22,23
165:12 170:10
177:24 178:13
179:13 180:6,10,23
190:3 216:20
**spots**
151:14
**spread**
220:18
**Spreadsheet**
6:18
**ss**
248:2
**stabilize**
207:11
**stabilizing**
207:13
**stablecoin**
31:9,11
**stablecoins**
31:10 70:18 107:23
**stack**
191:13
**staff**
25:18
**staked**
91:17
**stakeholders**
239:7 243:9 245:2
**standalone**



93:8
**standard**
52:19 99:18
**stands**
41:15 243:25
**start**
13:17 14:5 17:21
30:23 60:20 81:17
137:19,23 148:8
209:18
**started**
43:14 112:24 187:24
239:9
**starting**
186:19 188:1 225:5
228:15 230:15,15
231:16,18
**starts**
18:11 19:14 67:11
118:12 119:15
164:19 194:18
**state**
7:18 85:22 136:18
204:11 205:14,22
206:12 215:23
247:8 248:2,7
**stated**
53:6 219:6
**statement**
17:8 21:15 23:3 24:2
31:25 34:22 44:19
61:1 69:15 84:10
87:2,24 98:20
232:16 234:15
235:14 236:25
**statements**
19:13 25:24 26:4,5
26:16 27:2 28:1,3,4
28:7,10,13,19,21
34:8 44:24 45:3
48:21,25 75:25 80:5
80:7 86:23 155:19
157:22
**states**
1:1 2:1 5:20,21,23

6:3,4 26:21 224:20
225:7 227:1 228:15
228:17,25 230:15
232:23 234:9,25
238:24 244:5
**status**
117:6 167:9
**stay**
61:8,8 106:19
**stenographically**
248:22
**step**
60:14 127:18 146:3
146:11 147:12
151:6 153:2 166:12
166:19 167:3
169:15,24 171:17
197:8,14,15,18
**stepped**
240:22
**steps**
164:15,16 165:5,24
171:19 176:10
195:2 214:18
**Steven**
5:3
**Stewart**
236:16
**stick**
124:7 132:11
**sticker**
17:25 18:7
**stickers**
9:6
**still**
10:16 17:14 59:25
75:19,19 84:3
110:23 124:13,16
124:21 126:9,13,21
147:23 161:4
164:21 168:14
171:23 175:20
179:12 180:24
211:5,7 214:5
240:10

**stolen**
235:5
**stop**
94:19
**stopped**
198:12 202:10 203:1
**stopping**
125:19
**stored**
55:19,23 219:2
**straight**
167:3
**straightforward**
98:15
**strange**
48:7
**strategy**
236:15,20
**stray**
245:20
**Street**
3:14,19
**strikes**
132:24
**string**
139:19
**strong**
202:10 240:11,21
**stronger**
98:20
**strongly**
232:8,9
**strongman**
241:12
**structured**
84:9
**stuck**
154:19
**stuff**
158:23
**style**
197:14
**Su**
57:5
**sub**

93:21
**subaccount**
93:17,24 96:9 103:10
**subaccounts**
91:6,13 121:25
**subject**
71:11 72:17 104:19
230:16
**submitted**
242:1
**Subsection**
235:21
**subsequent**
186:22 214:13
**subset**
91:4 144:4
**subsidiaries**
27:17
**sub-bullet**
239:15
**succeeded**
118:2
**such**
9:23 17:15 20:23
25:1 28:23 36:15,18
36:21 39:10 45:11
45:24 46:20 47:21
51:3 53:12,13,23
55:11 62:20 67:23
71:19 72:8 84:23
98:11 99:8,9 101:1
121:2 125:21 126:8
127:16 153:5 157:1
182:11 184:17
186:5 189:25 196:5
216:25 248:18
**suffered**
71:10
**suffices**
231:22
**sufficient**
72:8 127:8,9
**suggestion**
179:21
**suggestions**



15:11 49:12
**suggests**
93:9
**SullCrom**
239:16
**Sullivan**
3:12 212:24 234:10
  245:17 246:3
**sum**
228:17
**summary**
121:23
**summed**
33:20
**Sun**
66:14,16
**supply**
118:4 132:13
**support**
5:3 50:9,15 51:13
  56:12 168:7
**supposed**
24:12,13 25:19
  158:21 175:16
**surprise**
132:2 134:10
**suspect**
59:19
**swings**
196:8
**switcheroo**
179:19
**sworn**
7:5 248:14
**syntax**
52:5
**synthetic**
177:10 178:3,24
**system**
56:11,18 63:4 102:20
  127:25 146:13
  163:8 166:18
  191:18 192:24
  195:24 213:17
**systems**

122:18 192:22
**S&C**
236:8 243:24 244:16
  244:19
**S&C's**
244:20

─────────
          **T**
─────────
**T**
1:13 4:8 5:1 6:1
**tab**
94:4 103:3 104:7
**Table**
193:23
**tabs**
94:2 103:3
**Tackett**
95:4,12 192:6,8
  198:9,10 199:9
  204:8 206:5 209:22
  210:11,18 214:6,9
  214:12,16
**Tackett_3AC**
95:2
**Tackett_3AC_000...**
6:19
**take**
22:25 38:17 39:9
  46:10 55:21 60:14
  65:2,12 68:1 76:11
  100:24 102:9
  108:23 121:12
  130:22 143:11
  147:22 148:25
  149:17 150:25
  152:1 153:8,9
  155:17 161:22
  162:1 163:20 194:3
  198:7 212:18
  220:10 221:14
  227:25 237:21
  243:4 244:19
**taken**
2:15 93:10 109:10
  117:24 142:25

200:16 213:23
  214:19 216:16
**taking**
15:3 47:6 107:17
  129:5 152:12
  153:17 205:23
  216:10
**talk**
8:21 173:4,15 206:10
**talked**
15:9 62:1 65:13
  120:12 129:22,23
  162:18 170:7
  204:17 206:14
  214:3 217:8 218:10
  219:19,23
**talking**
11:25 12:2,4,14,14
  13:14 24:4 29:18
  33:12 37:22 45:5
  47:3 50:18 54:9,14
  54:17,17,24 60:15
  70:11 84:20 91:16
  97:1 130:9 152:23
  152:24 172:9,10
  177:20 178:16
  179:10 185:14
  186:8 187:1,11
  188:4 199:17
  206:16 214:2
  229:10 238:16
**talks**
147:5 170:2 194:20
  195:1 204:22
**Tango**
121:19
**tape**
51:6
**team**
216:3 235:23 236:3
  239:21 240:4,13,22
  240:24
**technical**
51:16
**technicalities**

48:24
**technicality**
227:7
**technological**
84:6
**Telegram**
54:25 57:11 58:2
**tell**
8:16 46:16,24 48:10
  54:12 67:10 71:14
  75:4,7 89:10 93:16
  95:19 121:20
  136:24 148:8
  182:23 183:22
  191:15 192:11
  203:23
**telling**
68:22 94:16
**tells**
8:19
**template**
136:17 137:1
**templates**
133:24
**ten**
117:13 157:2
**tenth**
113:14
**term**
12:16 24:23 33:6
  92:3,4 97:2,5,6,10
  97:14,21 100:15,16
  100:18 170:24
**Terminal**
227:17
**terminology**
92:9
**terms**
6:10 12:12 16:4 17:7
  17:11,12 53:17,25
  64:25 65:13,13,15
  65:19,23,25 66:5
  69:3 70:23 71:19
  81:22 92:11 96:9,10
  107:12 109:23



121:16 126:20
134:4 137:4,12,18
137:20 138:5,6
141:3 144:23 145:1
154:23 164:15
170:17 221:22
222:1 223:17
229:19 239:3,4,5
246:23
**Terra**
157:18 185:23 186:3
**territory**
199:3
**test**
228:1,12
**testified**
7:6 213:12 214:17
217:9,13,17 230:1
230:20,24 231:4,20
**testify**
9:9 11:9
**testimonies**
16:12
**testimony**
4:10 18:8 66:14
213:8 217:11
224:10 230:5,18
235:8 245:9,12
248:22,24
**text**
54:24,25 96:14
**than**
11:18,25 12:4 27:6
37:16 47:6,9,11,12
52:3,18 64:12 88:4
91:24,25 97:9 98:21
104:3 106:15
114:15 118:4
124:19 125:14,14
127:21 128:15,24
131:8,10 132:7,12
146:7,10 148:25
149:20 154:13
155:23 166:15
169:25 171:3

175:17,18 181:14
187:9 190:22
229:16 231:21
232:2 234:21
239:12 241:16
246:8,9
**thank**
8:5 48:4 64:24 95:6
95:13 212:15 214:1
216:17 221:14
245:3 246:18
**Thanks**
76:5
**theft**
87:22
**their**
21:16 22:5 23:2,3
50:4,9 51:1,20,21
61:24 75:17 81:10
89:15 95:19 106:16
108:12 110:10
112:16 113:22
122:22,25 124:7
127:14 131:16
136:5,6 141:4,5
148:23 149:6 172:6
176:14 179:4
180:16 183:1
189:25 190:7 197:4
198:18,20,21 199:2
201:1,5,19,21,24
202:12,20 210:16
210:16 211:19
214:19 215:22
220:4 223:12,22
234:4 235:11,22
236:2 237:4 245:25
**them**
9:15,16 11:18 16:21
17:3,9 25:5,13 26:7
28:16,20 34:7 35:22
41:25 46:2 47:16
48:18 49:13 51:17
56:17,18 57:12,14
57:18,19 59:1,2,22

59:23 61:4,13 63:2
67:10 73:25 84:11
88:3 90:18 99:17,18
107:5 109:24
117:21,24 122:22
130:5,7 131:10,23
138:13,17 139:6
140:18 144:10
149:21 150:9 152:4
152:5 156:4 157:6
160:8 161:1 175:19
175:22 180:19
182:9 186:21,24
188:24 191:14
199:1,2 202:9,9,11
203:1,18 204:17
206:15 209:8
210:14 232:10
236:13 246:5
**themselves**
109:16 190:12
215:18
**theory**
85:8 149:15 241:13
**therefore**
38:4 50:21
**there's**
12:17 18:10 19:7
22:14 27:15,16,20
35:6,24,25 37:25
38:9 43:7,11 48:8
57:8 66:23 72:7
74:6,8 76:18 79:11
79:18 80:14 82:5,9
90:22 94:2 95:22
96:12 100:3 103:3
114:21 118:1,6,7
119:12 120:3,15
121:23 122:1
126:12 127:24
133:7 135:2 138:22
139:12,14 143:17
144:14,25 145:9,20
146:11 147:21
148:12 151:14

152:9,12 156:13
157:8 163:5 164:23
165:24 174:5 175:4
175:14 180:10,18
181:5 191:13,18,24
192:1 194:16
199:11,22 201:23
204:22 209:13
211:5,7 213:17
222:14 234:16
235:21 236:5
238:24 242:22
245:20
**these**
10:12 15:6 34:20,24
38:16 42:8 46:3
48:6 58:1 62:17
63:15,16 69:3 70:23
80:6 81:3 92:21,23
96:23 101:4 105:10
136:21 144:23
150:7 161:22
165:24 169:17
175:2 176:10 178:4
180:10 194:4 197:2
203:6 205:24 216:8
216:8,19 223:8
227:6,9
**they'd**
153:16 200:16
**they're**
198:11 240:22
**thin**
213:3
**thing**
25:1 36:15 39:10
45:11,24 53:13 96:8
118:2 120:12
136:13 159:2
162:14,21,23 193:4
**things**
8:10 12:5 14:23 15:6
15:7,9 16:3,7 24:24
25:2 26:10 28:23
30:22 31:2 35:21



37:1 48:12 66:4
69:1 71:18 78:14
81:25 91:18 94:10
100:10 101:15
105:25 106:5
107:24 109:21,23
110:2,12 117:6
121:22 124:22,23
127:2 141:9 154:22
157:21 158:23
166:5 168:25 169:2
181:18 189:6 213:1
216:23 220:18
229:22 238:23
240:25 243:11
244:13
**thinking**
12:5 30:19 40:18
66:6 107:7 121:3
196:1 200:17,22,25
201:4,12 208:25
**third**
86:2,3 144:16 170:2
181:5,9
**third-party**
26:12 83:4,8,14,17
84:7,13 231:5
**thorough**
100:24
**those**
15:13,21 16:1,24
27:10 29:3 31:14
33:22 39:5 41:21
43:22 56:1,4,14
61:4,16 63:5,7 66:2
69:1,14 71:14 72:23
74:19 77:11 90:15
91:4 94:10 100:23
106:17 107:4 115:8
122:4 123:17 129:7
130:15 131:21
140:14 141:9,10
149:4,19 150:12
152:23 154:22
156:7,17 157:13,14

158:18,25 160:6
163:5 164:15,16
165:4 169:23 176:9
182:10 184:22
186:11 189:2,5,13
190:7 192:19
194:11 197:1 211:1
211:4,13 217:3,15
218:1 219:21 220:6
232:6,7 239:10,14
241:1,3,4,5,6,9
**though**
41:16 98:22 163:24
**thought**
24:19 123:19 128:12
164:15 186:5
196:14,14 202:7
231:19 232:1
**thousands**
121:7
**three**
2:16 3:2 5:5 8:2,3,6,8
13:13,14,19 25:4
34:6 48:8 49:4
56:19,21 58:6,17
59:3,4 63:1,6 92:22
93:24 104:19,20
105:6 121:4,9
131:18,20,25
132:24 133:15
134:7,9 135:10,15
150:22 164:15
165:5 181:14
185:10,15 186:2,9
186:14,20 187:3,14
187:18,21,24 188:9
188:23 189:2,5,10
189:24 190:10
191:14,17,21
192:16 194:6,14
200:3,4 204:9 209:4
209:14,18 210:25
211:9,17 214:9,17
215:18,19 216:4,11
216:21 221:17,23

222:6 224:5 234:11
234:18 246:4,10,17
**three-day-ish**
187:10
**three-ish-day**
188:2,3
**three-step**
162:18 164:12
**three-tiered**
165:3
**THREE_ARROW...**
5:18
**THREE_ARROW...**
5:19
**THREE_ARROW...**
5:8
**THREE_ARROW...**
5:8
**THREE_ARROW...**
4:12
**THREE_ARROW...**
4:14
**THREE_ARROW...**
4:16
**thresholds**
115:9
**through**
14:18 16:23 38:21
41:22 42:4 55:25
78:13 100:1 101:1
105:1 106:14 109:2
111:5 144:7 161:1
163:25 165:4,23
167:3 191:22
203:13 213:13
231:2 243:2 245:11
**throughout**
135:4 224:16
**Thursday**
1:16 2:19 7:1,9
**thus**
58:24
**ticket**
50:9,15 51:13
**tickets**

56:12,16
**tie**
130:6
**tiers**
165:5
**time**
8:5 10:13,23 11:15
12:17 19:2 20:22
21:6,18 24:19 27:11
36:14,16 39:6 45:15
55:19 65:24 78:2
81:11 85:20 93:22
100:4 105:4 122:9
124:14 126:12
128:13 129:10
132:1,17 133:25
134:23 142:15
154:24 155:17,21
158:2 161:12,16
169:7,10 177:18
180:25 187:23
198:17 200:15
208:25 214:23,24
215:17 216:2,7
224:22 231:13,19
231:19 239:24
240:1,8,10,17
**times**
48:17 53:9 55:11
67:17 68:2 73:9
87:24 145:5 156:12
198:3 204:12
205:25 219:20,23
**title**
67:16 68:1,12 73:8
192:5
**titled**
235:22
**today**
9:10 10:9 217:9
224:10 228:19
240:2,10,19 245:10
**today's**
11:24
**together**



49:21 61:21 149:17
195:9 220:7
**token**
4:19 45:14,19,21
62:19 76:11 80:4
101:22 141:15
**tokenized**
141:11
**tokens**
31:18 61:11 62:10,11
62:15,18 63:5,6
91:3 141:13 177:8
**token's**
45:14
**told**
23:5 44:7 69:6 73:17
73:25 170:4 236:13
**too**
120:3 126:10,11
128:1 168:15,16,21
168:22 197:12
**took**
47:8 129:16,19
140:19 234:10
235:1
**tools**
51:1 84:7
**top**
18:8 19:14,24 30:22
39:17 40:16 77:1
94:3 103:3 136:3
143:19 169:10
170:12 182:7 190:4
198:21,22 201:1
210:12 222:15
**topic**
181:12
**topics**
26:3 47:24 236:13
**topping**
199:6
**top-up**
199:4
**total**
95:24 97:5,21 100:16

105:7 113:10,16
114:12 115:8 149:8
170:5 194:25
**totally**
10:9
**touch**
183:15 184:4
**touches**
229:6
**towards**
241:16
**toxic**
129:6
**track**
19:20 20:4 107:18
**tracked**
51:3
**tracking**
188:22
**trade**
40:11 51:9,10,14,15
51:20 52:11,15
63:12 104:19,25
112:23 138:17,25
139:15 142:16
180:16 221:9
**traders**
72:20
**trades**
40:2,7,15 41:8 50:22
50:23 51:2,5 63:10
109:19 141:6
169:23 193:25
194:4,7
**trading**
1:5 2:5 4:13,15 6:12
12:15 15:22 17:12
17:13 21:24 22:3
34:17 35:25 40:21
41:14,18 42:16
44:24 51:25 64:2,2
64:4,10 67:18 69:10
72:24 73:1,19 74:17
88:20,20 90:7
101:21 106:1,4,11

108:6,14,22 109:5
109:14,16,17
115:16 138:6 160:8
160:9 178:14,14
180:5 182:9 208:5,8
222:24
**Training**
114:18
**trans**
125:7
**transacted**
41:22
**transaction**
55:22 63:16 103:20
104:3,8 138:25
194:24 213:22
220:11,13,21,22
221:8,9
**transactions**
31:8,9,11,13 41:16
42:1 50:11 105:1
106:17 213:18,19
**transcript**
228:7 229:1 230:10
230:14,23 231:2,8
231:16 232:11
248:23 249:2
**transfer**
60:25 63:5,12,12
67:18 111:20
123:11 124:11,22
125:1,7 126:23
**transference**
177:19
**transferred**
111:23 112:3 124:4
126:15 156:9 221:3
**transferring**
123:10 126:25 127:4
199:6
**transfers**
61:20 124:15
**transition**
65:25
**treated**

99:20
**trial**
225:10,20 230:2,5,18
231:21 236:20
**tried**
157:5 204:12 212:15
225:6
**trigger**
146:6 166:19,23,23
167:21 168:2,14
180:15 197:19
**triggered**
102:19 136:10
149:14 153:13
169:24 178:25
189:13 190:15
**triggering**
95:17 195:19 212:5
215:24
**triggers**
166:25
**trouble**
70:3 186:14 189:2
**troubled**
206:19
**true**
59:1 61:2 110:14,15
157:23 158:2
195:10 217:17
236:1 247:9 248:24
**trust**
3:11 10:17,21 86:4
87:11,15 93:8 94:24
155:16 212:25
**trusting**
196:14
**Trust's**
5:4
**truth**
7:20,20,21 241:19,21
246:11
**truthful**
23:23 73:7,17,25
232:2
**truthfully**



9:10
**try**
8:21,23 78:9,14,20
155:18 157:1 176:7
179:21 181:12
184:20 202:17
215:10
**trying**
10:8 22:15,16 25:12
48:2 54:18,21 68:9
68:10,11 73:7,17,25
74:3 77:10,17 78:15
80:6 85:4 118:22
122:12,13 137:11
161:24 163:7
179:11,17 181:1,5
191:15 209:20
210:9 231:25
**turn**
228:6,12 233:25
234:23 235:20
242:9
**turned**
95:4 202:18,25
215:14
**turns**
210:24
**twice**
156:25
**twisted**
12:20
**Twitter**
199:12
**two**
5:13 9:15 59:17
62:25 66:2 94:10
130:15 136:21
139:18 141:19
152:6,23 191:14,17
195:2 197:1 207:3
207:10
**two-thirds**
172:3 174:9,20
175:24
**type**

14:16 15:16 22:23
49:1 55:20 196:2,13
**types**
21:11,17 22:4 23:9
55:18 72:16 88:2
92:19 139:18 223:8
**typical**
100:14 166:19
**typically**
94:14 132:11

———————————
**U**
**Uh-huh**
39:24 104:1 118:14
133:11 158:20
172:20
**ultimate**
98:9 99:1,3 107:12
138:14 141:20
**ultimately**
121:25 123:17
127:11 129:8,15,17
130:18,20 141:23
190:7 218:19 219:6
221:8 241:17
**unable**
9:25 120:2 163:12
**unambiguous**
28:22
**UNANSWERED**
6:22
**undefinable**
184:14
**undefined**
185:4
**under**
7:18 16:1,8 19:13
23:13 25:3 26:10
35:7,8 43:10 75:19
79:18 81:24 82:14
89:8 94:7 116:24
117:4 145:23
146:16 147:12,12
148:16 166:12
184:22 199:11

223:17 241:10
242:11 246:8,23
247:7,8
**underestimated**
127:16
**underlined**
82:9
**underlying**
140:13 141:7 180:14
218:12
**underneath**
144:24
**understand**
8:11,16 10:7 23:21
25:5 47:14 48:11
49:14,16 50:14 53:1
64:14 66:11,13
82:19 95:15 100:5
110:7 139:16
156:20 165:6
173:12 174:11
175:1 191:16 203:5
237:16 242:19
**understandably**
43:3
**understanding**
22:15 44:14 45:7
60:7 81:10 105:10
119:8 136:20 140:3
155:1 158:25
160:18,21 192:8
205:6 213:21
215:17 218:8
221:19,20 224:3,25
225:4 244:7
**understatement**
164:2
**understood**
13:12 22:17,18 65:16
66:13 78:4 144:20
166:10 189:11
213:7 238:18
**undesirable**
204:11
**unfortunately**

68:19
**unilaterally**
223:11
**unique**
60:9 61:4 127:7
**United**
1:1 2:1 5:20,21,23
6:3,4 26:21 225:7
227:1 228:17,25
232:23 244:5
**unless**
8:18 50:15 123:3
152:7 154:5 219:10
**unlimited**
217:18
**unnumbered**
5:13
**unorganized**
157:2
**unpaid**
71:6,24
**unreal**
99:19
**unrealized**
157:10
**unrelated**
172:11
**unsuccessfully**
55:10
**unsure**
53:21 54:15 122:9
**until**
123:3 147:24 183:15
184:5 230:20 235:9
**unusual**
167:19 196:15 223:6
**unwilling**
217:24,24
**up**
8:17 13:10,11 29:9
35:15,16 36:18 37:7
37:10,10 39:17
43:15,16 61:15
89:23 91:4 99:7
103:7,11 105:22



107:9 108:11 117:1
117:15 119:20
124:18 128:22
138:18 139:10
142:19 147:20,23
152:18 157:24
159:22 163:10,11
176:6 188:17,20
198:21,22 199:6
201:1 208:4 212:25
221:12 240:25
241:14,15 245:5
246:8
**upcoming**
229:6
**update**
112:23 113:2
**updated**
109:3
**upon**
227:2
**us**
8:5,9 48:10 93:8 95:4
95:11 115:12
147:21 149:2
198:19 203:24
223:11,14
**USD**
95:24 97:5 107:11
160:17
**use**
12:12 17:1 49:19
55:3 56:7,18 62:17
77:10 84:21 92:3
98:5 102:8 105:15
122:12 124:19
131:3 160:8 161:24
187:20 231:19
246:15
**used**
26:19 29:12 52:5
54:13,23 55:14
57:22 69:5 71:20
76:2 83:15,17 84:7
97:22 100:16 102:5

102:15 135:25
144:18 145:12,16
**useful**
89:24
**user**
21:4,4 72:11 89:13
89:14 112:10 114:9
114:12 121:23,24
122:1,7,21 123:17
125:4,12 126:2
127:12 128:10
130:13 141:3
146:23 147:19
148:2 154:20
163:11 177:22
180:3,6 218:14,14
**users**
33:15 41:14,17 71:8
71:23 72:3,4 73:7
73:17,25 88:2
106:13 113:17
119:16 120:4,8
124:9 149:10,11,19
150:3,4,12,13
153:15,22 154:4,7
170:7,20 176:13
193:13 219:3,20
**user's**
40:11,21 125:8
147:20,23
**uses**
91:17
**using**
38:15 62:21 71:8
119:19 141:22
165:3 178:21
182:25
**usually**
54:24 126:8 130:1
132:9,22 138:16,18
140:19 157:22,23
158:23,24 166:4,8,9
**utilizing**
245:24
**U.S**

13:3 18:9 21:23
23:13 27:16 28:9,13
29:2,12 31:8,12
45:3 91:8,11,19,24
91:25 92:5,8,12
110:9 111:9,19
130:25 132:16
141:18,20,23,25
142:1,5,13,15,17,19
154:1 158:12
160:16 211:7,18
220:3,16 221:3

_____
**V**
_____
**v**
5:20,21,23 6:3,4
**vague**
10:18 13:23 17:8
18:18 20:12 28:15
48:17 161:16
**vaguely**
34:23
**valuable**
123:1
**valuation**
207:7
**value**
37:10 39:13,14 45:14
47:7,10 91:22 95:24
96:19,21 97:5,7
99:22 101:23,25
113:22,25 114:2
115:8 124:13,19,21
125:4,5,8,12,18
126:9,13,21 127:1
127:14 141:24
142:11,14 145:14
147:3,21 152:10
156:11,14,14,14,21
156:24,25 157:6,6
158:19 163:12
168:5 171:5,8,9,12
171:22,24,25 173:9
174:15 175:8 177:2
177:6 178:24

187:24 188:22
189:25 192:18
194:7 195:18
204:24 205:3
211:14 219:2 220:8
220:9,10,14 239:20
243:9 245:2
**values**
126:24 158:17
**variations**
23:6
**variety**
15:13 217:10
**various**
16:4 22:14 26:15
27:9 31:13,13 37:1
42:24 49:25 62:16
66:5 72:20 76:3
81:22 84:7 90:7
103:12 107:19
109:23 122:2
133:24,25 138:4
176:10 218:16
219:2,20 238:8
**varying**
14:9 17:3 21:21
22:21
**vein**
135:22
**verdict**
5:20 225:20
**verify**
96:11,18 167:7
**version**
15:8 65:22 66:7
95:21 109:1 114:19
137:22 139:2,3
143:16 163:23
204:6 222:4,22
**versions**
143:15 164:1,4
**versus**
21:23,24 89:19 91:6
91:13 96:9 216:14
**very**



58:20 59:1 120:14
129:9 136:18 147:8
157:6,8,8,15,19,19
172:21 173:3 189:8
203:24 220:10
**viciously**
243:8
**view**
21:5,11,17 22:4,5,10
22:20 50:2,6,16
63:21 87:10 156:20
192:17,19 193:6,13
239:24 240:1,1
**viewing**
50:4,25
**viewpoint**
238:14
**views**
245:17,25 246:3
**view-only**
193:5 213:13,17
**vilified**
235:17
**villain**
235:5
**Vince**
59:2 134:21
**virtue**
168:10
**voided**
179:24
**volatility**
39:7,8,12 74:19
**volume**
40:6 130:4 139:19
207:15

---
### W
**wait**
8:23,24 123:2
**waited**
235:9
**walk**
16:23 38:21 165:23
**WALKER**

3:18
**wallet**
61:15 62:1,3,22
63:11
**wallets**
42:5 61:16,21 63:16
**Wang**
5:23
**want**
12:8 15:5,16 18:11
43:4 44:5,8,9 46:21
49:7 50:6 53:24
60:23 70:15 89:25
92:3 96:8 103:18,25
105:20 107:25
110:20 111:8
112:13 116:11
118:13 122:5 123:4
128:9 130:22 138:9
143:4 155:17
157:25 162:11
165:4 173:4,14
174:10,21,23 175:1
187:17 191:21
212:11,25 213:7,8
229:7,18 244:9
246:15
**wanted**
34:7 39:16 62:6 74:5
91:5 98:2,6,11
100:12 101:13
106:14,17 110:8
111:14,19 115:13
144:23 155:18
206:2 208:12
219:13,14
**wanting**
110:3
**warned**
82:1
**warning**
72:10,18 204:13,21
**wasn't**
40:16 57:24 81:7,8
87:2 108:4 134:12

138:2,21 196:16
231:23 234:18
**waste**
100:3
**Watkins**
3:3,8 8:1
**way**
9:1 15:14 17:19
31:15 36:18,19 37:8
37:11 38:23 49:10
63:9 89:23 98:15,21
99:18 106:14,25
108:1 109:14 115:4
124:6 125:16 126:4
128:11 131:9
134:11 141:18
142:3 147:21 148:7
156:10 160:3 162:2
167:19 179:7
183:10 192:25
193:15 195:5
197:16 199:20
203:8 204:3 241:7,7
246:16
**ways**
17:3 36:14 38:13
48:19 50:23 54:8
55:24 67:3 87:23
90:7 99:17 141:19
193:8,11 217:10
232:1,1 239:5
245:23
**web**
172:18
**website**
15:23 25:2
**Wed**
243:24,24
**Wednesday**
243:25
**weird**
157:24
**well**
8:5 9:3 11:9 12:2
13:6 18:23 20:25

21:25 22:9 23:10
26:16 29:9 30:22
31:23 35:22 37:4
41:21 44:3 45:20
51:12 52:8 54:14
57:25 58:20 59:1,18
64:19 67:7 69:2,23
70:20,22 71:2,21,22
84:18 86:14 90:9
103:9 106:9,10,13
110:2,24 113:10
127:10 129:2
130:19 134:24
138:24 150:2,7,24
153:17 156:2,23
157:14 163:3
174:20 184:17
189:17,21 193:14
201:9 205:20 215:1
224:8 229:8 242:9
245:1
**well-defined**
112:21 129:9
**went**
43:15,16 90:13 113:5
113:6,9 122:4 129:2
131:15 140:17,18
142:19 163:25
**weren't**
23:10 51:15 119:8
186:24 188:25
195:20 196:7
197:15
**we'll**
13:11 23:19 38:21
125:11 205:11
**we've**
65:1 127:25 137:11
158:5 191:12
202:18 204:11
215:14 218:10
219:23
**whatever**
15:17 63:3 85:18
86:21 101:18 114:5



134:13 160:12
169:22 174:21
177:2,10 191:20
**what's**
32:6 33:10 35:13
61:15 84:18 92:4
108:20 121:3
130:15 136:20
137:6 142:3,4 188:3
199:2 209:25 217:9
219:7 228:6 237:13
241:25 244:7
**when**
9:2,24 10:13 11:15
14:17 19:5 22:9
27:13 30:15 34:19
36:4,24 37:4,14
38:15 42:17 47:11
49:17 51:2 53:9
55:3 57:7 58:10
60:8 63:7,18 64:1,9
64:16 65:15 71:23
73:8,17,25 81:7
87:24 89:11,14
90:25 93:19 98:25
101:21 103:19
113:4 118:1 123:13
124:11,21 125:1,22
125:24 126:4
129:11,19 136:1
137:25 138:3
139:16,21 140:16
145:16 146:17
147:18 150:7
155:15 159:22
166:2 169:17 172:9
178:8 179:4 181:24
186:12 196:14
201:24 209:19
210:9,19 216:23
217:1 222:13
231:23
**Whenever**
171:17
**where**

10:5 12:17 19:5
37:23 38:17 40:16
40:20 41:14 46:20
47:6,8,15 48:7,17
48:22,23 49:2 50:20
51:22 52:10 53:16
69:5 71:22 75:5,6,6
91:7 98:7,11 99:2
100:10 102:24
105:14 108:10
109:18 120:19,22
121:1 126:12
127:19,20,24,25,25
130:2 136:4,9 151:6
152:25 156:12
157:24 167:2,6
169:11 173:8,18,21
176:13 178:13
181:22 182:11
183:13 184:2
187:23 192:14
197:10 205:22
207:10 208:19
215:23 219:14
220:12 223:10
227:17 239:16
243:14 245:16,19
**whereby**
50:1 86:20
**where's**
136:4
**whether**
22:7 31:2 38:10 46:2
52:6 57:25 58:6,8,9
58:12,14,14 66:12
71:14 84:6 90:1,9
91:16 93:17 95:19
96:7,23 103:10
106:1 111:1 112:13
112:14,15 122:9,16
122:17 131:22
136:19 151:2,3
157:10 177:24
182:10 190:12,15
194:13 203:12

204:20 215:8,20
216:4,19 218:5
220:25 223:2
232:15
**whichever**
91:4 205:2
**while**
9:20 19:3 21:19 65:1
71:21 128:18
164:20 182:4 185:8
213:3 240:24 243:8
243:10
**who**
10:16,20 11:3 26:19
32:7,16 34:24 48:9
52:7 57:16,17 58:16
59:7,8,10,12,14
61:6,6 63:2 66:17
71:1,4 72:25 75:8
92:22,23 100:23
104:18 105:21,24
106:14 107:20,21
114:3 119:2,6,7
122:1,19 130:3
134:13,16,21
138:24 149:19
152:5 170:15,19
172:2 180:4 181:21
182:14 189:12,15
189:17 192:3 194:3
194:10 199:25
206:19 217:3 234:4
234:10 239:14
**whoever**
20:20 82:25 87:7
118:24 129:16
198:25
**whole**
7:20 11:6 20:17
173:12 191:13
206:3 227:10
240:13,24
**whom**
138:18,19 147:18
**whose**

46:11 58:19,19 113:5
178:24
**why**
8:8 9:12 17:16,21,22
23:19 31:24 45:7
50:6 51:8,8 54:14
64:4 75:2,9 79:1
84:12 89:23,24
98:23,24 106:10
108:13 115:12
116:10 121:12
127:9 131:2 163:1
180:2 192:8 195:4,6
207:1 208:12
210:13 246:1
**wild**
196:8
**will**
7:20 8:16 9:1,6,25
10:4 12:23 38:23
43:5 46:15 48:6,13
68:12 69:6 77:25
83:4 93:7 100:21
101:11 104:7
112:22 119:16
120:8 124:18,18
146:13,17 147:14
161:17 169:7 172:6
205:1 228:19
232:13 246:6
**willfully**
231:20
**willing**
148:25 149:17 153:8
154:12,15 217:19
**winning**
124:18
**wiped**
147:3
**wire**
225:24 226:4,7,11
**wish**
245:22
**withdraw**
117:4,8,17 141:15



160:6 177:19
202:17,24 215:10
**withdrawals**
117:19 123:9 202:18
202:20 215:15
**withdrawing**
61:11 203:3 215:18
**withdrawn**
117:13,14,21
**withdrew**
117:23 123:17
**within**
96:9 149:6 218:6
229:21
**without**
15:3 16:20 23:16
63:4 71:13 86:22,23
124:25 149:3,3
150:6 178:8 184:12
184:14 192:19
193:11 205:20
215:24 229:2
238:13,14
**witnesses**
236:10,11
**Wolfram**
244:23
**wondering**
38:9 51:24 211:3
**won't**
8:22 151:25
**word**
17:1 18:18 22:16
23:11,16 37:19 71:3
98:1 161:24 238:13
**words**
47:7 69:6 71:14
175:18 178:22
218:9 232:6 241:1,3
241:4,5,6,9
**work**
12:6 17:24 63:14,14
114:22 140:1
151:10,15 170:10
**worked**

32:13,17 48:12 109:5
140:25 157:22
160:18 213:16
**working**
46:6
**works**
32:8 110:7 115:5
**world**
173:21 176:13,17
207:6,10 245:22
**worry**
101:4 215:21
**worth**
27:15 58:22 147:24
**worthless**
235:4
**wouldn't**
24:1 56:22 111:23
112:11 119:5
134:10 148:1,2
153:12 154:19
161:1 200:5 202:5
207:4
**write**
44:1 85:5 111:12
170:16 239:19
240:3,11 244:13
**writes**
198:11 205:13,24
**written**
20:21 78:2 127:3
137:2 165:14
218:22 219:1,5
**wrong**
80:21 97:5 174:17
**wrote**
20:11 75:8 87:8
118:24 236:6
239:24 240:9,18
241:3,6,9 242:7

**X**

**X**
4:1,8 5:1 6:1
**X-ray**

121:19

**Y**

**yeah**
17:17 19:24 35:8
47:21 65:3 68:6
76:5 78:17 92:6,24
94:22 109:7 114:1
120:10 121:22
128:6,7 129:19
150:15 157:17
162:20 164:8
167:25 170:16
173:14 176:16
184:9 190:7 191:19
194:9 198:6 199:7
210:2 218:12
221:12 238:20,22
244:15
**year**
39:22 62:15 132:15
210:2,3,4,5 235:3
**years**
10:3 57:5 227:13
232:4
**yet**
171:20 182:15
**York**
3:5,5,14,14 225:8
227:2
**yourself**
155:21 198:2,9
207:20 223:3,6
245:8
**you'd**
9:12,15 53:25 228:6
233:25 234:23
235:20
**you'll**
22:6 43:6 133:6
**you've**
8:2 12:7 14:17 18:6
32:6 34:19 42:14,17
65:10 79:6 108:20
126:15 155:10,11

191:12 197:24
233:4 241:25
**Yuuup**
200:8

**Z**

**Zane**
59:2 134:21 189:20
192:6,6,8 199:9
209:22 210:11
**Zane's**
206:11
**zane@ftk.com**
192:1
**Zendesk**
15:21
**zero**
33:23 97:9 102:19
117:1 125:9 139:10
145:9,15 146:22,24
146:25 147:15,23
147:24,24 152:10
156:11,15 171:1,2,2
171:7,8,16,22
175:17 176:18
178:8 179:4 180:15
198:19
**zero'ing**
33:2
**Zhu**
57:5
**Zixiao**
5:23
**ZP**
145:10 170:24

**$**

**$1,000**
116:18
**$10**
111:18,20,23 149:1
149:16
**$10,000**
114:4 116:14 125:18
144:17



**$100**
116:17 168:6
**$100,000**
113:1,3 114:6 116:15
180:4
**$11**
227:21 228:24
**$11,020,000,000**
228:17
**$110,000**
142:20
**$120**
168:5 224:4
**$120m**
205:2
**$120,000**
142:14
**$130,000**
142:19
**$180**
168:6
**$20**
125:22
**$20mm**
198:11
**$20,000**
186:23
**$25,000**
101:22 175:9,13
220:12,14,17 221:1
**$260,000**
180:20
**$3m**
205:3
**$360,000**
180:16
**$5**
63:9 149:17
**$6**
39:3
**$8**
231:1
**$82**
188:12

---
**0**
---

**06/13/2022**
5:7
**07/05/2022**
5:18

---
**1**
---

**1**
4:10 18:3,7,7 32:1
35:8 43:6 116:16
117:15 133:5 146:3
164:19 166:12,19
167:3 169:15
197:15 225:24
**10**
5:7 63:1,19 64:20,22
66:23 101:21
112:25 113:14
122:5 144:18 191:5
191:13 207:14
213:2,22 230:14
240:20
**10,000**
125:23,24
**10:21**
194:21
**100**
142:13 180:7
**100,000**
114:5 142:15 180:17
**10004**
3:14
**10020-1300**
3:5
**104**
4:23
**108**
6:12
**11**
1:6 2:6 5:9 113:3
143:11 197:21,24
214:25 237:5 239:6
239:14,16,21 240:4
240:13,22,24 243:2
244:23

**11th**
113:1
**11/02/2021**
4:12
**12**
5:11 203:19,22 214:4
**12-person**
225:11
**120**
168:11 180:5
**124th**
140:7
**125**
3:14
**12670**
3:9
**1271**
3:4
**1299**
2:17 7:10
**13**
5:15 6:9 143:6,10
204:24 207:16,19
228:15
**13th**
188:7,11 189:7
192:10 193:25
194:10 203:13
211:4 216:14,18
**133**
6:14
**14**
5:18 79:12 194:18
198:1 209:9,12
**14th**
93:10,24 188:11
194:1,22 203:10
204:9 214:10,16,23
215:5 216:3,9,14
**143**
6:9
**15**
5:20 6:10 65:6,11
225:15,19
**155**

**5:3**
**16**
1:16 2:19 5:21 7:1,9
228:3,7 230:23
231:16,18
**16th**
76:19 207:21
**16.2**
72:10
**16.3**
70:24 71:22
**16.4**
70:24 72:15,18
**163**
6:16
**17**
5:12,15,23 233:1,5
**172**
5:6
**1735**
3:19
**18**
4:10 6:3,12 108:15
108:17,21 237:10
237:14
**19**
6:4 241:22 242:1
**191**
5:7
**19103-7505**
3:19
**197**
5:9
**199.6**
97:12

---
**2**
---

**2**
4:12,23 32:3,7 34:16
42:15 74:5,7 76:16
104:18 133:6,7
144:24 146:11
169:24 173:19
197:8,14,18 226:3
**2B**



34:9,15
**2nd**
225:10
**2:32**
2:19 247:3
**2:42**
198:10
**20**
6:14 62:15 133:1,4
221:16 224:3,15
**20th**
3:19
**200%**
135:5
**2001**
34:9
**2019**
59:15
**2020**
4:21,23 59:15 104:18
**2021**
4:14,16 32:19 34:18
42:16 43:15,17 45:8
76:18,20 81:7 85:22
86:24 87:8
**2022**
4:11 5:12,15 27:11
46:22 47:4 60:1
75:20 88:11 93:10
108:22 114:19
120:17 143:11
150:22 163:19
169:11 182:1
185:13,18,25 186:6
186:8 194:18 198:1
207:21 210:6,16
214:3,10,23 215:5
216:9 224:5 230:21
231:1,6
**2023**
225:6,11
**2024**
226:25 228:7
**2025**
1:16 2:19 7:1,9

**203**
5:11
**207**
5:15
**209**
5:18
**2093(b)**
248:13
**21**
231:8
**212**
3:5,15 4:6
**215**
3:20
**22**
6:16 163:14,18
181:19 193:21
**22-11068**
1:7 2:7
**225**
5:20
**228**
5:21
**23**
193:19
**233**
5:23
**237**
6:3
**239.8**
96:2
**24th**
203:6,9
**241**
6:4
**245**
4:5
**2473**
231:2
**2477**
231:2
**25**
227:13
**250,000**
101:23

**27**
210:16
**27th**
210:25
**2721**
231:8
**2722**
231:8
**2761**
230:22
**28**
228:7 248:20
**28(a)**
248:15
**28(a))**
248:10
**29**
18:11
**293**
39:22
**299**
236:16

---
**3**
---

**3**
4:13 19:7,13 34:11
34:12,16 74:17
147:12 153:2
171:17 180:7
205:10 224:20
226:6 243:24
**3AC**
13:13 194:25 199:23
200:7,13 204:11
207:23 208:3
**3AC-FTX-00536147**
4:24
**3rd**
225:5
**30**
4:16 42:16 232:4
**30(e)**
249:5
**30(f)(1))**
248:15,25

**300**
227:5
**300,000**
101:24 102:4
**31**
74:6
**32**
4:12
**33**
18:23
**34**
4:13 155:20,25
**360**
180:8
**37**
43:15 155:20,25
**39**
6:18 93:1,3

---
**4**
---

**4**
4:15 42:11,14 74:18
76:25 79:18,18
80:19,20 108:22
149:18,23 163:19
226:10 230:15,16
231:9 238:23
**403**
43:16
**414**
43:16
**42**
4:15
**433**
236:16

---
**5**
---

**5**
4:18 39:3 74:18 76:6
76:9 80:3,6,10,12
82:2,5 88:8,9 105:7
135:2 193:23
224:10 226:14
239:19
**5th**



209:18 210:5
**50**
41:5
**500**
194:7
**523-5400**
3:10
**558-4000**
3:15
**57**
231:15
**59**
228:12

— **6** —

**6**
4:21 74:18 79:2,3,6
149:18 226:18
240:3
**6pm**
205:2
**6:00**
205:8
**6:17**
199:9
**65**
6:10 233:25 234:9
**66**
234:23

— **7** —

**7**
4:5,23 104:13 195:1
226:22 230:23
231:3 244:16
**7d**
242:11
**7e**
242:14
**7:58**
2:18 7:2
**73**
235:20
**74**
194:18 236:5

**76**
4:18 194:20
**772-7246**
3:20
**783**
191:22,24
**787**
191:22 192:1
**79**
4:21

— **8** —

**8**
5:3 32:25 155:7,10
193:16
**8.2**
66:23 67:2
**8.2.6**
67:11 73:4
**8.2.6(A)**
73:6
**8.3**
69:24,25
**8.3.2**
70:8
**81**
195:6
**82**
195:2
**8570**
1:23 2:20 7:15 248:8
**858**
3:10

— **9** —

**9**
4:11 5:6 172:14,17
231:2 240:11
**9-figure**
122:6
**906-1200**
3:5
**92130**
3:9
**93**

6:18
**963**
209:15
**964**
209:15



# **EXHIBIT 7**

Page 1

1   IN THE UNITED STATES BANKRUPTCY COURT

    FOR THE DISTRICT OF DELAWARE

2   Chapter 11

    Case No. 22-11068 (KBO)

3   (Jointly Administered)

    - - - - - - - - - - - - - - - - - - -x

4   In re:

5   FTX TRADING LTD., et al.,

6           Debtors.

    - - - - - - - - - - - - - - - - - - -x

7

8              October 31, 2025

              6:03 a.m.

9

10

11    VIDEOTAPED ZOOM DEPOSITION of ZANE

12   TACKETT, a Non-Party Witness in the

13   above-entitled action, located in

14   Thailand, taken before Dawn Matera, a

15   Certified Shorthand Reporter and Notary

16   Public of the State of New York.

17

18

19            *    *    *

20

21

22

23

24

25

Page 2

1 APPEARANCES:
2
3 SULLIVAN & CROMWELL LLP
  Attorneys for the FTX Recovery Trust
4   125 Broad Street
    New York, New York 10004
5   Telephone: (212) 558-4000
6 BY: BRIAN D. GLUECKSTEIN, ESQ.
    gluecksteinb@sullcrom.com
7
  BY: BENJAMIN S. BELLER, ESQ.
8   bellerb@sullcrom.com
9 BY: SAMUEL G. DARBY, ESQ.
    sdarby@sullcrom.com
10
  BY: SIENNA LIU, ESQ.
11   sliu@sullcrom.com
12
13 LATHAM & WATKINS, LLP
  Attorneys for Joint Liquidators of 3AC
14   1271 Avenue of the Americas
    New York, New York 10020
15
  BY: ZACHARY F. PROULX, ESQ.
16   zachary.proulz@lw.com
17 BY: JUAN JOSE CRESPO, ESQ.
    jj.crespo@lw.com
18
  BY: ADAM GOLDBERG, ESQ.
19   adam.goldberg@lw.com
20 BY: NACIF TAOUSSE, ESQ.
    nacif.taousse@lw.com
21
22
23
24
25

Page 3

1 APPEARANCES (Continued):
2
  STEPTOE
3 Attorneys for the Witness
    1330 Connecticut Avenue, NW
4   Washington, D.C. 20036
5 BY: GALEN KAST, ESQ.
    gkast@steptoe.com
6
  BY: SOPHIA BREGGIA, ESQ.
7   sbreggia@steptoe.com
8
9
10 Also Present:
11 MJ Zimdahl, Videographer
12 Jacob Vresteegh, Teneo
13 Jamie Malley, Teneo
14
15        *    *    *
16
17
18
19
20
21
22
23
24
25

Page 4

1        THE VIDEOGRAPHER:  Good morning,
2 good afternoon.  We are going on the
3 record today at 6:03 a.m. Eastern Time
4 on October 31st, 2025.  Please note
5 this deposition is being conducted
6 virtually.  Quality of the recording
7 depends on the quality of the camera
8 and internet connection of
9 participants.  What is seen from the
10 witness and heard on the screen is
11 what will be recorded.  Audio and
12 video recording will continue to take
13 place until all parties agree to go
14 off the record.
15        This is the video-recorded
16 deposition of Zane Tackett taken in
17 the matter of FTX Trading, LTD, et al.
18 This deposition is being conducted
19 remotely using virtual technology.
20        My name is MJ Zimdahl.  I am a
21 videographer on behalf of Veritext.
22 The court reporter is down Matera also
23 from Veritext.  I am not authorized to
24 administer an oath.  I am not related
25 to any party in this action nor am I

Page 5

1 financially interested in the outcome.
2        All appearances will be noted on
3 the stenographic record and will the
4 court reporter please swear in the
5 witness so that counsel may proceed.
6 Z A N E   T A C K E T T, the Witness
7 herein, having first been duly sworn by
8 the Notary Public, was examined and
9 testified as follows:
10 EXAMINATION BY MR. GLUECKSTEIN:
11    Q.   Good afternoon to you, good
12 morning by us, Mr. Tackett.  My name is
13 Brian Glueckstein.  I am with Sullivan &
14 Cromwell.  And we represent the FTX
15 Recovery Trust.  We thank you for
16 appearing today.
17        MR. GLUECKSTEIN:  I want to note
18 at the outset that this deposition is
19 being conducted remotely by video
20 conference by agreement of the
21 parties.  And the parties in this
22 matter have stipulated the court
23 reporter may administer the oath that
24 you just took remotely in accordance
25 with the Federal Rules of Civil

2 (Pages 2 - 5)

Page 6

1 Procedure.
2   Q.  Can you just state your full
3 name for the record, sir.
4       MR. PROULX:  Brian, I just need
5 to interject and lodge an objection.
6 That is of course subject to actual
7 adherence to the stipulation today,
8 but otherwise no objections to that
9 stipulation.
10      MR. GLUECKSTEIN:  Yeah, and to
11 be clear, the stipulation is just an
12 agreement on division of time for this
13 deposition and that it's being
14 videotaped, which it is being done.
15 Is that correct, Mr. Proulx?
16      MR. PROULX:  That is correct.
17 If in fact the stipulation is adhered
18 to, yes.
19   Q.  Mr. Tackett, can you just state
20 your name for the record, please?
21   A.  Zane Cole Tackett.
22   Q.  And just a couple of ground
23 rules as we get started this morning.  We
24 are appearing remotely, so nonetheless,
25 the court reporter is taking down

Page 7

1 everything that we are saying.  So if you
2 would, please, just allow me to ask my
3 questions and then you can answer so that
4 we are not talking over each other, we
5 can get a complete and clear record this
6 morning.  Is that okay?
7   A.  Yes, that is okay.
8   Q.  If you have any questions to my
9 question or don't understand my question,
10 please ask for clarification.  If you
11 don't and you answer my question, I will
12 assume that you understood the question.
13 Is that clear, sir?
14   A.  That is fair.
15   Q.  From time to time, other
16 counsel on the line this morning may
17 object to a question that is posed.
18 Nonetheless, you will still need to
19 answer that question unless you're
20 instructed by your counsel not to do so.
21 Is that clear, sir?
22   A.  That is clear.
23   Q.  We will, at times, during the
24 deposition today, take short breaks.  If
25 at any point you need a break for any

Page 8

1 reason, feel free to ask.  I would just
2 ask that you complete an answer to any
3 question that is pending before we take
4 any such break.  Is that okay, sir?
5   A.  That is okay.  And with that
6 being said, actually, let me lock my door
7 real quick just to make sure someone
8 doesn't come in on accident.  Is that all
9 right?
10   Q.  Sure, yes.
11   A.  All right, done.
12   Q.  Thank you.  Just, sir, is there
13 any reason today that you're aware of
14 that you would not be able to provide
15 complete and accurate testimony to the
16 questions that you are going to be asked?
17   A.  No, sir.
18      MR. GLUECKSTEIN:  Sam, can we
19 look at tab 1.
20      (Tackett Exhibit 1, Tackett
21 subpoena, was so marked for
22 identification, as of this date.)
23      MR. DARBY:  Absolutely, one
24 moment.
25   Q.  Mr. Tackett, as exhibits are,

Page 9

1 or documents are introduced for your
2 viewing today, they should pop up on the
3 screen that you have there and you should
4 be able to view the exhibits; do you see
5 that?
6   A.  On the Exhibit Share?
7   Q.  Yes, sir.
8   A.  I am refreshing it right now.
9 Okay.  Something just showed up.  Tackett
10 1, tab 1.  Tackett subpoena.
11      MR. PROULX:  Before you can
12 proceed, Brian, I have a message, it
13 looks like you don't have permission
14 for this resource, so that is what I
15 am seeing on my screen.  Obviously I
16 need to be able to see the exhibits
17 that you're showing today.
18      MR. GLUECKSTEIN:  Yes, you do.
19 You're saying on the Exhibit Share?
20      MR. PROULX:  Correct, I am
21 logged in.  No issue there.
22      (Off the record.)
23   A.  I have the subpoena up, FYI.
24      MR. PROULX:  And I am just
25 relogging in.

3 (Pages 6 - 9)

1      MR. GLUECKSTEIN:  Let's just
2  wait for Mr. Proulx.
3      A.   I just want to confirm I have
4  it open.
5      Q.   Mr. Tackett, you have in front
6  of you what's been marked as Exhibit 1.
7  You are in fact appearing today for this
8  deposition voluntarily, correct?
9      A.   Yes, sir.
10     Q.   But you understand that you are
11  appearing pursuant to a subpoena that was
12  issued in this case that's been marked as
13  Tackett Exhibit 1, which is in front of
14  you; is that correct, sir?
15     A.   I am not sure on the
16  intricacies, you know, of, like if I need
17  to because of this or if I am doing it
18  voluntarily.  But I was informed of the
19  attempt to serve and came forward and
20  said I was happy to speak with you guys.
21     Q.   Great.  And have you seen this
22  subpoena before, sir, and received a copy
23  of it?
24     A.   I don't believe so.  I don't
25  know.  Yeah, no, I haven't seen this

1  subpoena before.
2      Q.   But nonetheless, you're
3  prepared to give testimony in this matter
4  today voluntarily, correct?
5      A.   That is correct, yes, sir.
6      Q.   Have you ever been deposed
7  before, Mr. Tackett?
8      A.   By the government, not in this
9  matter.  I was deposed as part of the
10  fallout of FTX.
11     Q.   And that was by the U.S.
12  federal government?
13     A.   Yeah.  That was by the FBI,
14  SEC, CFTC, SDNY and DOJ, but I guess all
15  of those kind of all under DOJ, but,
16  yeah, those were the parties on that
17  deposition.
18     Q.   And that was in connection with
19  the FTX matter?
20     A.   Yes, sir.
21     Q.   Do you recall when that was
22  that you gave that deposition?
23     A.   That would have been about
24  February 25th, 2023.
25     Q.   Mr. Tackett, did you do

1  anything to prepare for today's
2  deposition?
3      A.   I had a call with my lawyers.
4      Q.   Did you do anything else
5  besides having a call with your counsel?
6      A.   No, sir.
7      Q.   Mr. Tackett, you received an
8  educational degree, bachelor's degree
9  from the University of Colorado in 2013;
10  is that correct?
11     A.   No, sir, that is incorrect.
12     Q.   Can you summarize your
13  educational history, then, please?
14     A.   I have a high school diploma.
15  After I graduated from high school I
16  moved to Beijing for, or I moved to China
17  for a year-and-a-half.  I got a
18  certificate of language study in China.
19  While I was in high school I did a
20  semester at University of Colorado
21  through a dual enrollment program.  I did
22  one semester after I graduated upon
23  returning from China after a
24  year-and-a-half.  And then I dropped out.
25  Moved back to China.  And then started

1  working at OKEx Crypto and haven't done
2  any studying since then.
3      So I did study at University of
4  Colorado in 2013, spring semester.  I do
5  not have a degree from University of
6  Colorado or any other university or
7  higher education.
8      Q.   Understood, thank you, sir.
9  Can you please just quickly walk through
10  and summarize your work history?
11     A.   Sure.  So as I mentioned I
12  started at OKEx, a Chinese crypto
13  exchange.  I was, basically the white
14  guy at the company, the one that dealt
15  with all of the international-facing
16  things.  I was the first non-Chinese
17  employee.  So basically anything
18  English-facing or international-facing I
19  was responsible for.
20     So the company grew.  We
21  obviously hired more international and
22  then I became more specifically focused
23  on biz dev and sales.  And I was at OKEx
24  from April 2014 to March 2015.  I then
25  quit and joined Bitfinex, where I was

Page 14

1 director of community and product
2 development.
3        I was responsible for a lot of
4 the outward-facing interactions at
5 Bitfinex. I handled, you know, our
6 Reddit communications, our Twitter
7 communications and I also did sales and
8 client management there.
9        I quit Bitfinex on November
10 19th, 2016 and joined B2C2. B2C2 is one
11 of the largest market makers in crypto at
12 the time. I was the head of OTC sales
13 and the first employee there.
14        I worked at B2C2 until 2019,
15 May or June of 2019, and then resigned
16 from B2C2, and during Covid, I believe in
17 March, March 2020, I joined FTX doing
18 much the same, sales and product
19 development and focused on the VIP
20 clients. And then became the head of
21 institutional sales at FTX.
22        I also ran the MLB and
23 baseball-focused partnerships, so the
24 MLB/Shohei Ohtani, David Ortiz
25 partnerships, as well as helped out on

Page 15

1 some of the other partnerships that FTX
2 had.
3    Q.    Thanks, sir. When you joined
4 FTX in 2020, what was the scope of your
5 work? You mentioned you worked with the
6 VIP clients. Can you explain what that
7 means?
8    A.    Sure. So VIP clients are the
9 high volume or, you know, important
10 clients of the firm. And so I dealt with
11 a lot of the market makers or high volume
12 traders.
13        My focus was one, ensuring that
14 the clients that we had onboarded were
15 taken care of and satisfied with the
16 service they were receiving. Working
17 with those clients on incorporating
18 feedback into the website and improving
19 the product. And then also identifying
20 clients that are not yet on the exchange
21 that we would like to have trade with us
22 and onboard them.
23        And then I would also deal with
24 the account management after they were
25 onboarded.

Page 16

1    Q.    And what types of work were you
2 doing with clients when you say you
3 worked on account management after they
4 were onboarded?
5    A.    Just making sure, you know,
6 that everything that they needed was
7 handled and that, you know, if there were
8 any issues with the platform, that we
9 notify them. If they were -- if they had
10 product feedback or were, you know,
11 routinely running into an issue working
12 with developers, to make sure that either
13 the issue that they were facing was fixed
14 or that the feature that they needed to
15 do more volume was incorporated into the
16 product.
17        But basically interacting with
18 the clients and the devs to make sure we
19 built a product that the clients wanted
20 and would lead to them trading more and
21 making sure the clients are pleased.
22    Q.    As part of your work at FTX,
23 did you work with Three Arrows Capital as
24 a customer of FTX?
25    A.    Yes.

Page 17

1    Q.    And did you work with them from
2 the time you joined in March of 2020?
3    A.    I would have been added to the
4 chat, but usually you have a -- I
5 wouldn't say dedicated account manager,
6 but the person who onboarded you or the
7 person you speak with most would be kind
8 of your go-to.
9        But then we would have
10 everybody in the chat. And so if
11 somebody asked something, you know, like
12 an easy question, like where are your API
13 docs, we have better coverage and we have
14 multiple employees in the chat so that
15 they could provide easily accessible
16 information such as that in a timely
17 manner.
18    Q.    Was Three Arrow Capital already
19 a customer of FTX at the time you came on
20 board in 2020?
21    A.    As far as I am aware, yes.
22    Q.    What's your understanding of
23 what the relationships was between FTX
24 and Three Arrows Capital when you joined
25 FTX in 2020?

5 (Pages 14 - 17)

Page 18

1   A.   I would say a somewhat standard
2 exchange/client relationship.  They
3 traded on the exchange.  So we wanted to
4 make sure they were well taken care of
5 and happy with the service and, yeah, and
6 treated like we would any other VIP or
7 institutional client or had the
8 relationship that we would have with any
9 other institutional client.
10   Q.   Was Three Arrows Capital
11 considered a VIP customer, as you use
12 that term, of FTX at the time you joined
13 in 2020?
14   A.   Yes.  Again, assuming that they
15 were onboarded, I am not sure exactly
16 when they were onboarded, but Three
17 Arrows Capital would solidly fall into
18 the VIP client base.
19   Q.   And why is it that you say that
20 they would fall into the VIP client base?
21   A.   So there is kind of a couple
22 different broad definitions for VIP.  One
23 is the fee tiers.  So we have fee tiers
24 that are based on volume.  If you do
25 enough volume to reach the VIP fee tiers,

Page 19

1 you are automatically a VIP.
2         Another would be how much FTT
3 you hold.  If you have large FTT
4 holdings, you could automatically get VIP
5 tiers.
6         And lastly, is funds on
7 exchange or if it's a big brand name.  So
8 even if, you know, you're, let's just for
9 the purpose of an example, say J.P.
10 Morgan, even if J.P. Morgan doesn't hold
11 a lot of FTT or trade a lot in volume,
12 they would still be considered a VIP just
13 because of who they are.
14         And so VIP is like a broader
15 term, but 3AC being a large player in the
16 crypto space definitely would be
17 considered a VIP client.
18   Q.   And what did being a VIP client
19 provide the customer?
20   A.   That would depend on how they
21 classify as a VIP.  Like I said, there
22 are multiple different things that could
23 get you VIP status.
24         So one would be lower fee
25 tiers.  If you are hitting the VIP tiers

Page 20

1 in volume or if you hold enough FTT, if
2 you're just a big name, we're not going
3 to give you discounted fees or anything
4 like that, you had to be doing enough
5 volume or hold the requisite amount of
6 FTT.  But basically, it would give you
7 better customer support, because instead
8 of having to go through the ticket system
9 or e-mails, we would great a Telegram
10 channel or, you know, depending on who
11 the client is, a group chat basically,
12 because it could be on Signal, it could
13 be on WhatsApp, it could be on Telegram.
14         And then we would add people
15 from multiple different time zones so we
16 have better coverage and that way we just
17 have, you know, a bit higher level
18 dedicated support than a client, a
19 non-VIP client would have.
20   Q.   And did you remain employed by
21 FTX up until the time of FTX's bankruptcy
22 filing in November of 2022?
23   A.   I quit FTX before bankruptcy
24 was officially filed.  I believe
25 bankruptcy was filed Friday morning -- it

Page 21

1 was filed on the 11th, which I believe
2 was a Friday.  And I quit two days before
3 then, if my memory is correct.  But I
4 quit before bankruptcy was officially
5 declared but after the fiasco was started
6 and was made clear.
7         Once I learned some of the --
8 some of the things that came out and how
9 I was lied to by Sam and Nishad, I put in
10 a group chat with both of them that I
11 officially resigned, but that I would
12 stick around to help my clients.
13   Q.   Understood.  You think that was
14 on or about November 9th, about two days
15 prior to the bankruptcy filing, after the
16 disclosure of some of the facts that had
17 previously been unknown regarding FTX at
18 that time?
19         MR. PROULX:  Objection to form.
20   A.   Yes.
21   Q.   Sorry, was that a yes, sir?
22   A.   I believe you're asking me and
23 I said correct.
24   Q.   Up until the time that you
25 resigned from FTX, did you work

6 (Pages 18 - 21)

Page 22

1 throughout that period on the 3AC account
2 with them as a customer?
3      A.   When I joined it would have
4 been on a much more hands-off basis,
5 because Burg and Kevin were handling
6 them, so they would have been the main
7 contact.
8          After I took over as the head
9 of institutional sales, then, yes, I
10 would have been in contact with them and
11 been working with them.
12     Q.   Okay.  So when you joined there
13 were others who were primarily managing
14 the 3AC account; is that correct?
15     A.   Correct.
16     Q.   And you say Burg, who is that?
17     A.   Michael Burgess.
18     Q.   And was he the primary
19 relationship person for the 3AC account
20 when you joined FTX?
21     A.   I believe so.
22     Q.   And you mentioned somebody by
23 the name of Kevin, who is that?
24     A.   He is somebody who worked very
25 closely with Burg.  He was basically like

Page 23

1 Burg's number two, I guess, so a lot of
2 times he would work hand and hand with
3 Burg on clients that they manage.
4      Q.   And when Mr. Burgess was
5 managing the account after you joined FTX
6 in 2020, what was your role with respect
7 to the 3AC account?
8      A.   As I mentioned earlier, we
9 would put, you know, basically the entire
10 VIP team into the group chats.  This
11 gives us better coverage.  And so if they
12 asked simple questions that anybody can
13 answer, that you don't need to have an
14 actual discussion with your account
15 manager about, I would assist however I
16 could.
17          So if they asked, for example,
18 where they could find the API docs,
19 obviously they don't really need to have
20 a conversation with Burg about that, so I
21 would just put in docs.FTX.com or answer
22 simple customer support questions as
23 needed.
24     Q.   That would have been a
25 dedicated chat with personnel from FTX

Page 24

1 and personnel from the customer, in this
2 case 3AC, where you could communicate
3 directly; is that correct?
4      A.   That is correct.
5      Q.   Did there come a point where
6 Mr. Burgess moved out the 3AC account and
7 you took the lead on that account?
8      A.   Yes, sir.  Around October 2021.
9      Q.   And how did your
10 responsibilities with respect to the
11 Three Arrows Capital account change after
12 October of 2021?
13     A.   Going back to my previous
14 statement of how we handled clients,
15 there would be the entire VIP team in a
16 chat, but you would have one person where
17 things were going wrong or you needed to
18 have a discussion with somebody, you
19 would call them instead of being somebody
20 was just in the chat to provide simple
21 customer support questions, I then became
22 that person for them.
23          So I went from just being
24 another person on the VIP team that is
25 there to assist to being the main person

Page 25

1 that would deal with any major issues or
2 any discussions that they would need to
3 have with FTX.
4      Q.   After you assumed the lead role
5 with respect to managing the Three Arrows
6 account in October of 2021, how often
7 would you interact with personnel from
8 Three Arrows Capital?
9      A.   No idea.
10     Q.   Would it just be periodic,
11 periodic inquiries to you or would there
12 be any sort of regular touchpoints with
13 representatives of the customer?
14     A.   I had the group chat, so, you
15 know, so usually it would be if they
16 reach out to us, asking for support on an
17 issue, or if we put something in the
18 chat, we would oftentimes send out
19 questionnaires to try to better
20 understand the needs of our clients.  We
21 also would send out announcements via the
22 VIP bot.
23          Yeah, so, basically on an
24 as-needed basis.  There wasn't, you know,
25 like a weekly check-in or anything like

7 (Pages 22 - 25)

Page 26

1 that. It was more on an as-needed basis.
2    Q.   Do you recall what criteria
3 Three Arrows Capital satisfied to be a
4 VIP customer of the various that you
5 outlined early?
6    A.   They held significant funds on
7 the platform. They traded -- they did
8 significant amounts of volume and they
9 were also a big name.
10        I am not sure if they met any
11 of the FTT holding requirements, but I
12 also wouldn't be surprised if they
13 qualified in that manner as well.
14    Q.   Was the chat that you referred
15 to the primary method by which you
16 communicated with representatives from
17 Three Arrows Capital?
18    A.   Yes, sir.
19    Q.   Were there other methods of
20 communication that you were used to
21 communicate with representatives of 3AC?
22    A.   I am sure communications went
23 over e-mail. But definitely by far the
24 primary method was the Telegram channel.
25    Q.   Did you ever have phone calls

Page 27

1 with representatives with 3AC, to your
2 recollection?
3    A.   I am confident I did. No
4 specific instances that are currently
5 ringing a bell, but I wouldn't be
6 surprised if I had calls with them.
7    Q.   Do you recall who you dealt
8 with on behalf of FTX -- strike that.
9        Do you recall who at Three
10 Arrows Capital you interacted with
11 respect to the 3AC account during your
12 time at FTX?
13    A.   I mean, I know Su Zhu had come
14 to Bahamas and I talked to him there, and
15 somebody else on their team had also come
16 to the Bahamas. I think it was a company
17 that they acquired, something not the 3AC
18 team proper.
19        But outside of that, who I
20 would speak with in the chats, no, I
21 don't recall. I don't recall any names.
22    Q.   Do you recall, was that an in-
23 person meeting with Mr. Zhu when he came
24 to the Bahamas?
25    A.   Yes, to Crypto Bahamas in 2022.

Page 28

1 Yes, I think Crypto Bahamas would have
2 been 2022.
3    Q.   Do you remember generally what
4 the topic of discussion was with Mr. Zhu
5 at that meeting?
6    A.   No, it was just a "Hey, how are
7 you doing, how's life." I am not sure, I
8 don't remember or don't recall any
9 specific business or topics of
10 discussion.
11    Q.   Did you have any -- do you
12 recall how Three Arrows Capital executed
13 trades on the FTX exchange? Did they do
14 so through the customer portal or did
15 they have their own API, if you recall?
16        MR. PROULX: Objection to form.
17    A.   No, I don't recall exactly how.
18 I don't recall exactly how. However, I
19 believe they would have been trading
20 through the API.
21    Q.   Mr. Tackett, do you have a
22 recollection of Three Arrows Capital
23 itself collapsing in June of 2022?
24        MR. PROULX: Objection to form.
25    A.   Yes.

Page 29

1    Q.   Do you have any understanding
2 or did you have any understanding at the
3 time as to why 3AC collapsed and went
4 into liquidation?
5        MR. PROULX: Objection to form.
6    A.   Yeah, I believe it was tied
7 with the Luna meltdown or Luna/Terra
8 meltdown.
9    Q.   Can you elaborate on that, if
10 you could?
11    A.   Sure. So Luna/Terra was a
12 cryptocurrency that basically tried to
13 function as an algorithmic stable coin.
14 Grew to like $60 billion in market cap
15 between UST and Luna. And then as it
16 started to collapse, it brought the
17 crypto market as a whole down with it,
18 causing the price of Bitcoin and all
19 other crypto assets to kind of nosedive.
20 In addition to itself becoming
21 essentially worthless.
22    Q.   And do you have an
23 understanding of why that affected Three
24 Arrows Capital in particular?
25    A.   No. I don't know exactly what

8 (Pages 26 - 29)

Page 30

1 their holdings were, but as a crypto
2 firm, it affected, you know, most players
3 by the price of crypto going down
4 drastically in a short period of time.
5    Q.    During your time at FTX, did
6 you view Three Arrows Capital as a
7 sophisticated user of the FTX exchange?
8    A.    Absolutely.
9    Q.    Did you have the impression
10 that Three Arrows understood the risks
11 they were taking with their positions on
12 the exchange?
13         MR. PROULX: Objection to form.
14    A.    I wouldn't understand how a
15 firm of their standing wouldn't have in-
16 depth knowledge of the risks that they
17 are undertaking through the trading
18 activities, especially with their
19 background in traditional finance.
20    Q.    Mr. Tackett, are you familiar
21 with what a customer could see when they
22 log into their account on the FTX
23 exchange during the time when the
24 exchange was operating?
25    A.    You would have to be much more

Page 31

1 specific because FTX is a very broad
2 website. There is, you know, hundreds of
3 different pages that they could
4 potentially see.
5    Q.    When they log into their
6 account, they log into their account as a
7 customer account, there was a user
8 interface that they had access to,
9 correct?
10    A.    Correct.
11    Q.    And a customer could see its
12 various holdings on a token-by-token
13 basis on that portal, correct?
14    A.    Correct.
15    Q.    And each individual asset type
16 reflected a balance, correct?
17         MR. PROULX: Objection to form.
18 Leading.
19    A.    Correct.
20    Q.    Is that correct, sir?
21    A.    Yes, that is correct.
22    Q.    And did each spot token have a
23 balance visible on that interface?
24    A.    Yes. It would break down all
25 of your holdings.

Page 32

1    Q.    And there would be a visible
2 entry for VI currency as well?
3    A.    Yes, it would.
4    Q.    So an individual asset could
5 potentially have a positive balance
6 reflected in the account, correct?
7    A.    Correct.
8    Q.    And an individual asset could
9 potentially have a negative balance as
10 well, correct?
11    A.    Tokens that were enabled for
12 spot margin could, yes. Tokens that were
13 enabled for spot margin could.
14    Q.    Can you explain what you mean
15 by enabled for spot margin?
16    A.    Sure. There were assets that
17 weren't available to borrow; because it's
18 not available to borrow you could not
19 sell or withdraw beyond your own balance.
20         Assets that were in the spot
21 margin program you could borrow and then
22 therefore go negative, so you could sell
23 in excess of your account balance, and
24 you would be borrowing the difference or
25 the negative amount from the spot margin

Page 33

1 market. And so in those specific assets,
2 you could have a negative balance.
3    Q.    And a customer that logs into
4 their account could see the net balance
5 of their accounts including all of their
6 sub-accounts, correct?
7         MR. PROULX: Objection, leading.
8    A.    That is correct, yes, sir.
9    Q.    Do you recall that amount being
10 visible to the customer as something
11 called a total net USD value?
12         MR. PROULX: Objection, form.
13 Same objection.
14    A.    Yes, it would have a total net
15 USD value at the top of the balance page
16 or the wallet page.
17    Q.    Mr. Tackett, I just want to
18 take an example. We assume there was a
19 trade where a customer sold one Bitcoin
20 for $25,000. And let's put aside the
21 trading fees that would be associated
22 with that. They just sold the Bitcoin
23 for $25,000. Are you with me so far?
24    A.    Yes.
25    Q.    That would result in a credit

9 (Pages 30 - 33)

Page 34

1  of that sale of $25,000 in USD, correct?
2      A.   Correct.  Along with the
3  corresponding debit of 1 BTC.
4      Q.   And so the debit and that
5  credit would have the same notional
6  amount at that time, correct, $25,000
7  credited to USD and a 1 Bitcoin debit to
8  the asset, correct?
9          MR. PROULX:  Objection to form.
10  Leading.  Compound.
11     A.   That is correct.  The proceeds
12  of the trade would be credited and
13  debited correspondingly.
14     Q.   So then ultimately for that
15  transaction, again putting aside the
16  transaction costs, would that transaction
17  be neutral with respect to the overall
18  account balance for the customer?
19         MR. PROULX:  Objection to form.
20     A.   To be clear, you're saying
21  neutral to the account balance.  You
22  didn't say neutral to the account value.
23         It would not be neutral to the
24  account balance because your balance
25  would go from being 1 BTC, zero USD from

Page 35

1  25,000 USD, zero BTC, so it would not
2  affect the value at that exact moment,
3  assuming that Bitcoin didn't move at the
4  time of the trade or at the time that
5  you're looking at it.
6      Q.   As a general matter, would a
7  large negative balance in one asset in a
8  customer's account limit a customer's
9  ability to withdraw other assets from
10  which they had a positive balance?
11         MR. PROULX:  Objection to form.
12     A.   It would depend on their
13  overall collateralization requirements
14  and their collateralization value.
15         When you say a big negative
16  balance, you would have to be more
17  specific, because you would need to know
18  how, exactly how big of a negative
19  balance and which asset that balance is
20  in, because you would have to put it into
21  the formulas for collateral contribution.
22     Q.   Can you explain generally what
23  you mean by the formulas of collateral
24  contribution?
25     A.   Sure.  So different assets have

Page 36

1  different, you know, levels of liquidity
2  in the markets.  And so if you have an
3  outsized position in a very low liquidity
4  token, the balance required or collateral
5  required for that position would be
6  higher.
7          So this would be the IMF for
8  initial margin fraction and MMF for
9  maintenance margin fraction.  And how big
10  the position would need to be before
11  basically getting, before impacting what
12  the collateralization requirements are,
13  depends on IMF or MMF of that particular
14  asset.
15         So for example, if I wanted to
16  have a really large BTC position, I could
17  open a much larger BTC position before my
18  collateral requirements increased due or
19  IMF or MMF than I could in a lower
20  liquidity token, like let's say Bitcoin
21  cash.
22     Q.   And those we refer to as
23  initial margin fraction and a maintenance
24  margin fraction, how are those set for
25  the customer?

Page 37

1      A.   They are not set per customer.
2  They are set exchange-wide.  So we
3  wouldn't negotiate IMF or MMF with the
4  individual customer, it was an
5  exchange-wide rule.
6          So we would choose -- not we,
7  but, you know, the devs or whoever FTX
8  would determine the IMF, MMF, would do it
9  on a per-asset basis and then that would
10  impact any client who held positions or
11  balances in that asset.
12     Q.   And if the MMF for a particular
13  asset was not met, would that impact the
14  customer's ability to withdraw assets
15  from their account?
16     A.   Yes.  The IMF would be the more
17  relevant number here.  The MMF would be
18  for being liquidated.  The IMF would be
19  for opening more positions.
20         So if you're trying to withdraw
21  an asset that was already negative, that
22  would be increasing the position size
23  which would require initial margin and
24  not maintenance margin, so IMF would be
25  the more relevant asset there or the more

10 (Pages 34 - 37)

1 relevant number thing to look at.
2     Q.   If the IMF for a particular
3 asset is not satisfied, would the
4 customer be able to withdraw an asset
5 from the account?
6         MR. PROULX:  Objection to form.
7     Q.   Out of the account, sir?
8         MR. PROULX:  Objection to form.
9     A.   If it would trigger a borrow in
10 that asset, you would not be able to;
11 however you could still withdraw positive
12 assets as long as you're above your
13 maintenance margin requirements, as far
14 as I am aware.
15     Q.   If your maintenance margin
16 requirement for a particular asset is not
17 met, what would be the result?
18     A.   Liquidation.
19     Q.   Liquidation of the entire
20 account or a particular position?
21     A.   It depends on where you land.
22 The way the FTX worked is it would look
23 at the account as a whole.
24         If the account as a whole or
25 account, meaning individual, not under --

1 like one account could have many
2 sub-accounts, liquidations were handled
3 in an automated fashion within silos of
4 each sub-account.  And so if you don't
5 meet your maintenance margin requirement
6 in a particular sub-account, it would
7 look at if you would be -- if you would
8 meet your maintenance margin
9 requirements, if a partial liquidation
10 happened.  If you could be brought back
11 within your maintenance margin
12 requirements by a partial liquidation,
13 the system would partially liquidate you.
14 If it could not, it would liquidate the
15 entire account.
16         MR. GLUECKSTEIN:  Sam, could we
17 pull up tab 3, please.
18         MR. DARBY:  Sure, one moment.
19         (Tackett Exhibit 2, Document
20     Bates stamped Tackett_3AC 361, was so
21     marked for identification, as of this
22     date.)
23     A.   I am going to try to go back to
24 Exhibit Share to try to pull up the new
25 exhibit.

1     Q.   I think you're able to zoom in,
2 Mr. Tackett, yourself.
3     A.   Yes, the collateral explainer,
4 yeah.
5     Q.   So what's been marked as
6 Exhibit 2 is a document Bates stamped
7 TACKETT_3AC 361, which is a collateral
8 explainer screenshot it looks like.
9         Do you recognize this document,
10 sir?
11     A.   Yes.
12     Q.   Can you describe what it is,
13 please.
14     A.   It would be operated on a cross
15 margin system that looks at the account
16 as a whole.  It could sometimes be
17 unclear where IMF is basically being hit
18 on position size and where your
19 collateral is being taken up.  Due to
20 this kind of lack of transparency of
21 where the collateral is being utilized,
22 we came up with the collateral explainer.
23 This would give you the total USD value
24 on the spot balances, as you see there.
25         And then the more important

1 thing would be the collateral contributed
2 by positive spot balances because that is
3 where it would show you if IMF is
4 starting to come into play, because if
5 you have an outsized position in a
6 particular asset, we would start to
7 increase the haircut, essentially, that
8 you get on the collateral contribution,
9 because if the liquidation were to happen
10 and FTX had to liquidate your position in
11 that asset, your spot position, the
12 larger the holding, the more impact it
13 has on the market.  And so you need to
14 have a protection as the position gets
15 bigger, that we're still able to move out
16 of it.  And so this would show the
17 collateral contribution by positive spot
18 balances.
19         If this screenshot was of the
20 full page, and you scrolled down further,
21 it would also do this on an asset-by-
22 asset basis.  So you could see, you know,
23 Bitcoin, I have 100 Bitcoin and that is
24 contributing this much to my collateral,
25 and then if IMF is being, you know, hit

11 (Pages 38 - 41)

Page 42

1 there, you would be able to see it very
2 clearly on the collateral explainer page.
3         Total collateral used by
4 outstanding spot -- the next one is total
5 collateral used by outstanding futures
6 positions. So, again --
7     Q.   I'm sorry, sir, I think there
8 was one in between. Can you explain the
9 difference between -- you addressed the
10 positive spot balance. You have the
11 total spot balance and then collateral
12 contributed by positive spot balances.
13 Can you explain the difference between
14 the two?
15     A.   Yeah, that is what I was just
16 explaining, how if you -- if this had
17 been a full page, you could see on an
18 asset-by-asset basis how much collateral
19 is being contributed to your -- from your
20 particular assets that you held in your
21 account. So the total USD value of
22 positive spot balances would be your
23 positive spot balances times the market
24 price. And that's how we reach that.
25         However, you could have a

Page 43

1 massive position in an asset that doesn't
2 count as collateral. So I could
3 theoretically have 1 billion USD value of
4 positive spot balances and zero
5 collateral contribution by those spot
6 balances. So the one below explains how
7 much collateral is contributed by your
8 spot balances.
9         And then this also helps to
10 clarify where IMF would be coming in and,
11 you know, if you're having a huge
12 position in one spot asset, the amount of
13 collateral that contributes, if it's
14 hitting the IMF, would start to be
15 reduced or haircut, essentially.
16     Q.   There is a line entry that says
17 "Total collateral used by outstanding
18 futures positions"?
19     A.   Yes.
20     Q.   Can you explain that one?
21     A.   So total collateral used by
22 outstanding futures positions explains
23 how much of the collateral that you have
24 is being used to maintain your open
25 futures positions. So when you open a

Page 44

1 futures position, you obviously need to
2 collateralize it. So this shows how much
3 of that is being utilized by those
4 futures positions.
5         Again, if this was a screenshot
6 of the entire page and you scrolled down,
7 it would also show it on a future or on a
8 position-by-position basis. So you could
9 see how much collateral each particular
10 position is taking up.
11     Q.   Sorry?
12     A.   I was going to say I could go
13 to "Total collateral used by outstanding
14 spot margin borrows" if you like now.
15     Q.   Yes, please.
16     A.   So, again, when you borrow from
17 the spot margin market you also have to
18 collateralize this. So if you have a
19 negative balance, that essentially is a
20 spot margin borrow in the system, and so
21 shows how much of your collateral is
22 being used by your spot margin borrows.
23 So again, it's a margin trade, so this is
24 showing where that margin is being
25 allocated, to which particular positions.

Page 45

1         And if you scroll down on that
2 page, again, it would break it down on an
3 asset-by-asset basis and you could see if
4 IMF is coming into play.
5     Q.   Finally, there is an available
6 collateral total there at the bottom.
7 What does that represent?
8     A.   So that shows how much
9 available collateral you have in your
10 account.
11         There is one thing that I do
12 need to specifically point out, because
13 this is 3AC's collateral explainer, is it
14 not?
15     Q.   That was going to be a question
16 I asked you after you explained this.
17 But why don't you finish your explanation
18 of the available collateral and then we
19 can talk about this.
20     A.   I will just speak generally
21 then. I am assuming this is 3AC's. But
22 in general, if we have a client that has
23 futures positions, spot margin borrows,
24 their own assets, and then we give them a
25 line of credit, this didn't differentiate

12 (Pages 42 - 45)

Page 46

1 the collateral contribution from line of
2 credit assets, or the collateral needed
3 for your line of credit.  This only shows
4 the amount of collateral needed for spot
5 margin borrows and for futures positions.
6 So this isn't the collateral requirement
7 for your position, isn't inclusive of the
8 credit line nor does it differentiate the
9 assets as coming from your own balances
10 or coming from credit line.
11      So if I have, let's say that in
12 this screenshot there was $120 million
13 from a line of credit, there wouldn't be
14 an additional section that says, you
15 know, collateral needed for line of
16 credit or collateral contributed from
17 line of credit.  The line of credit is
18 essentially treated as any other asset
19 within the account for the purpose of
20 this collateral explainer page.
21      Q.   Any line of credit requirements
22 or credits would be -- would appear
23 separate from these calculations; is that
24 right?
25      A.   That is correct.

Page 47

1      Q.   With respect to this particular
2 screenshot, I believe this is a document
3 that you located or provided to us, is it
4 not?
5      A.   I wouldn't be surprised if it
6 is.  Yeah.  I am not -- I don't remember
7 the specific screenshot.
8      Like I do remember the
9 collateral explainer from them, but the
10 numbers and things like that, you know, I
11 don't have those memorized, so.
12      Q.   And that was going to be my
13 next question, is whether you had a
14 recollection in providing this, whether
15 this was a screenshot of the Three Arrows
16 accounts at any particular point in time?
17      A.   Yeah, it seems very, very
18 similar to what we were seeing.  It is
19 what I recall as being the 3AC situation
20 or the 3AC standing at the time of their
21 collapse or blowup or however you want to
22 refer to.
23      Q.   You referenced -- we can put
24 that aside for now.
25      Sir, you referenced earlier in

Page 48

1 your explanations liquidating an account;
2 do you recall that?
3      A.   When I was talking about the
4 maintenance margin fraction, yes, I
5 remember.
6      Q.   Yes.  Can you explain what it
7 means to liquidate positions in a
8 customer's account?
9      MR. PROULX:  Objection to form.
10      A.   Yes, I can, but I would like to
11 clarify that there are multiple types of
12 liquidations that, you know, that a
13 client with a line of credit might face.
14      But normally the way it would
15 work on a normal client or a standard
16 account with no line of credit or
17 anything like that, or basically for any
18 futures in spot margin positions,
19 ignoring line of credit, the way it would
20 work is if you fall below your
21 maintenance margin requirement, a partial
22 liquidation would occur if that would
23 bring you back in your maintenance margin
24 requirements.
25      If partial liquidation would

Page 49

1 not bring you back within your
2 maintenance margin requirements, the
3 entire account would be liquidated and it
4 would be handed off to a backstop
5 liquidity provider, is where it would
6 work where partial liquidations would go
7 onto the book.  So you would see partial
8 liquidations hit the order book, whereas
9 an entire liquidation, it would be handed
10 off to a backstop liquidity provider.
11      If the BLP capacity was full,
12 then it would be handed over to ADLs,
13 auto-deleveraging, and if auto-
14 deleveraging still wasn't able to
15 successfully close out the position, then
16 it would go to socialized losses.  But I
17 don't think socialized losses ever
18 occurred on FTX, but that is the
19 liquidation process.
20      Q.   And would that process happen
21 automatically or would there be instances
22 where it would be initiated by FTX?
23      A.   If you didn't meet your
24 maintenance margin requirements on your
25 positions, the system did it

13 (Pages 46 - 49)

Page 50

1  automatically.
2      Q.   Are there additional --
3      A.   Sorry, let me clarify.  If you
4  didn't reach it on your futures or spot
5  margin positions specifically, yes;
6  ignoring any lines of credit or a line of
7  credit liquidation.
8      Q.   And that's exactly where I was
9  going to go, sir.  Are there additional
10 circumstances in which a liquidation
11 might occur when a customer had a benefit
12 of a line of credit?
13     A.   Yes, the liquidations would
14 still occur in an automated fashion.  If
15 you were below your maintenance margin
16 requirements, even if you had a line of
17 credit, and when I say maintenance margin
18 requirements, I am specifically referring
19 to maintenance margin for futures and
20 spot margin positions.
21         However, in addition to the
22 margin required for those, you also are
23 required to have the agreed-upon
24 collateral for your line of credit.  And
25 then if you don't reach -- if you're not

Page 51

1  at that level, that collateralization
2  level for the line of credit, then it
3  would be a manual process.  It wouldn't
4  be something that the system did
5  automatically.
6      Q.   So separate from maintaining
7  maintenance margin requirements, a
8  customer had to comply with its
9  collateral requirements under the line of
10 credit agreement, correct?
11         MR. PROULX:  Objection to form.
12 Leading.
13     A.   Correct.
14     Q.   And in a scenario where those
15 collateral requirements were not met,
16 then FTX would manually liquidate an
17 account, if necessary?
18         MR. PROULX:  Same objection.
19     A.   The trigger for the liquidation
20 would be manual, like it wouldn't be
21 something the system does automatically
22 to start it.
23         I don't know how the
24 liquidation process actually happened and
25 if it was something that was only a

Page 52

1  manual process or the actual, like the
2  actual process of closing down the
3  positions.  I don't know if that was
4  automated or not.  But, yes, it would be
5  a manual -- the liquidation would be
6  started by a manual process.
7      Q.   And upon liquidation, what
8  would happen to the customer's account?
9          MR. PROULX:  Objection to form.
10     A.   Can you clarify what you mean
11 by liquidation?  Do you mean liquidation
12 on a futures or a spot margin
13 liquidation, or are you referring
14 specifically to a line of credit
15 liquidation?
16     Q.   So let's take it in turn.  So
17 if there is a liquidation, an automatic
18 liquidation with respect to a futures or
19 spot margin position, what would the
20 impact be on the customer?
21         MR. PROULX:  Objection to form.
22     A.   Again, it would depend on the
23 level of liquidation.  If a partial
24 liquidation could be done, we would close
25 down a portion of their futures position.

Page 53

1  As the position is smaller in size, the
2  maintenance requirement, the maintenance
3  margin requirements also are reduced.  If
4  bringing them back within their
5  maintenance margin requirements is
6  possible, only the portion of the
7  positions that is needed to do that would
8  be closed.  And then your account balance
9  wouldn't really change from this
10 liquidation if it's solely on a futures
11 position because they are just closing
12 down the position.
13         If it's a whole account
14 liquidation, there is no point at which
15 they could be brought back within their
16 margin requirements.  Then the account as
17 a whole would be handed over to the
18 backstop liquidity provider.
19         Spot margin liquidations would
20 affect account balances because spot
21 margin deals specifically with the
22 account balance.  And so once a spot
23 margin liquidation happened, it would
24 basically sell the positive asset that
25 you have to bring to reduce the negative

14 (Pages 50 - 53)

Page 54

1  asset.  So let's say you are borrowing
2  USD with Bitcoin as collateral, it would
3  sell some of the Bitcoin in your account
4  to reduce the USD, the negative USD
5  amount.  Again, if this could be done in
6  a manner that would keep them within
7  their maintenance margin requirements, it
8  would be done on a partial basis.  If
9  that couldn't be done, then all of the
10 positive spot assets would be sold off to
11 try to cover the negative balances to
12 ensure that the lenders or the spot
13 margin system doesn't incur any losses.
14     Q.   If there is a spot margin
15 liquidation where positive assets are
16 sold to reduce negative, the overall
17 value of the account would remain
18 unchanged, correct?
19     MR. PROULX:  Objection to form.
20  Leading.
21     A.   The overall -- if it's a
22 partial liquidation, overall value should
23 stay roughly the same.  If it's an entire
24 liquidation, then, no, it would impact
25 the value as well, yeah.

Page 55

1          But the way the FTX worked, is
2  we had realtime -- realtime P&L
3  settlement.  So if I open a futures
4  position and I start to lose money on it,
5  that negative USD or the USD balance
6  would basically be updated tick by tick.
7  So as the price changes, the USD is
8  credited or debited from the account.
9          So if I opened a position that
10 went against me, I would see my USD value
11 changing and then once that USD value got
12 so negative that a liquidation would be
13 required, the futures position would be
14 closed down, but I would still have my --
15 the balance would remain largely
16 unchanged if it's a partial liquidation
17 because the P&L has already been
18 realized.
19     Q.   Were customers generally
20 allowed to have a negative overall
21 balance in their account?
22     MR. PROULX:  Objection to form.
23     A.   No.
24     Q.   And why was that?
25     A.   Because that would hurt the

Page 56

1  health of the exchange.
2     Q.   Can you elaborate on that?
3     A.   Yeah, if you have an overall
4  negative account balance, that means
5  those funds have to be coming from
6  somewhere.  So if you are overall
7  negative, that means that whoever is on,
8  you know, whatever position you opened
9  that brought you that negative, let's say
10 it's futures, that means whoever the
11 winner is, there isn't enough funds to
12 pay off the winner when you're the loser.
13 They need to match up.  And so you're not
14 allowed to go into an overall negative
15 balance.
16     Q.   And were the liquidation
17 triggers that we have been discussing
18 protections against a customer having a
19 negative balance?
20     MR. PROULX:  Objection to form.
21     A.   Yeah.
22     Q.   Were there other protections
23 the exchange had in place to protect
24 against a customer going negative?
25     A.   Liquidation would definitely be

Page 57

1  the main one.  We did -- there were
2  like -- the exchange would look at, you
3  know, the position size of like we -- we
4  would look at how large positions were in
5  individual assets to see if there are any
6  outsized positions in particular assets,
7  and if there are, you know, make sure the
8  IMF or MMF of that asset is in line with
9  what it should be, market conditions
10 essentially, and make sure there aren't
11 any outsized positions that if the
12 occasion or if the necessity came up to
13 liquidate would hurt the exchange or
14 cause the exchange to have issues
15 liquidating those assets.
16         But the main way this was
17 enforced was through automated
18 liquidations.
19     Q.   As was mentioned, FTX provided
20 lines of credit to certain customers who
21 traded on the exchange, correct?
22     A.   Correct.
23     Q.   Any such line of credit would
24 increase a customer's ability to trade on
25 margin; is that right?

15 (Pages 54 - 57)

Page 58

1    MR. PROULX: Objection to form.
2    A.   Essentially, yes. It would
3 increase their account balance by the
4 amount that was, the amount of the credit
5 line.
6    Q.   Could a customer withdraw from
7 the exchange the amount of the line of
8 credit?
9    MR. PROULX: Objection to form.
10    A.   You would need to be more
11 specific on the details or the state of
12 the account at that time.
13    As an example, if you had,
14 let's say $200 million worth of Bitcoin
15 and I gave you a $5 million line of
16 credit USD, you could not then withdraw,
17 you know, the 5 million of USD without
18 triggering a spot margin borrow using the
19 BTC as collateral. But you could
20 withdraw, you know, $5 million worth of
21 Bitcoin or you could use the Bitcoin to
22 borrow USD to withdraw. But you couldn't
23 withdraw the line of credit itself, no.
24    Q.   The customers who receive lines
25 of credit on FTX, do they enter contracts

Page 59

1 with respect to those lines of credit?
2    A.   I don't know of any clients
3 that had lines of credit that didn't have
4 a contract, so, yes.
5    Q.   Were there typically collateral
6 requirements specified with respect to
7 the provision of a line of credit to the
8 customer?
9    MR. PROULX: Objection to form.
10    A.   Every line of credit granted
11 had a collateral requirement, yes.
12    Q.   If a customer breached those
13 collateral requirements, could the FTX --
14 could FTX decide to remove the line of
15 credit?
16    A.   Yes.
17    Q.   We have been talking some
18 already today about customers trading on
19 margin. FTX did in fact offer a margin
20 trading program, correct?
21    A.   Yes.
22    Q.   And in fact --
23    A.   To be clear, when you say a
24 margin trading program, it wasn't a
25 specific program. FTX was a margin

Page 60

1 trading platform. Its original purpose
2 was as a futures platform, which is a
3 form of margin trading.
4    Q.   When a customer participated or
5 when a customer traded on margin, they
6 borrowed assets from other customers,
7 correct?
8    MR. PROULX: Objection to form.
9    Leading.
10    A.   It depends if you're trading
11 futures; because it's a derivative, you
12 don't need to borrow from other -- from
13 other customers.
14    If you're doing spot margin
15 trading, then, yes, it would be coming
16 from the spot margin market, which was
17 made up by loans from other users on the
18 exchange.
19    Q.   And focusing on spot margin --
20 sorry, spot margin trading, what's your
21 understanding of who customers borrow
22 from in executing?
23    A.   Lenders. Other people that
24 would opt to lend these assets, and they
25 would choose the minimum rate that they

Page 61

1 would lend that asset out at and then
2 there would be an hourly auction to
3 determine what the lending rate is for
4 all outstanding borrowers on the
5 platform.
6    Q.   And were those pools of lenders
7 or one-to-one lending relationship with
8 the customer?
9    MR. PROULX: Objection to form.
10    A.   It would be a pool.
11    Q.   Sorry, could you repeat that
12 answer?
13    A.   It would be a pool.
14    Q.   Did the customer who was
15 borrowing on margin know who the lender
16 was that it was acquiring from?
17    A.   No.
18    Q.   With respect to futures
19 trading, as you've explained, the FTX
20 exchange offered customers the
21 opportunity to trade in futures,
22 including perpetual futures, correct?
23    A.   Correct.
24    Q.   Were futures positions assets
25 in a customer's account?

16 (Pages 58 - 61)

Page 62

1       MR. PROULX:  Objection to form.
2    A.   No.
3    Q.   What is your understanding of a
4 perpetual futures contract?
5    A.   Are you asking me how -- what
6 is my understanding of how a perpetual
7 futures contract works or you're asking
8 me how it would be represented in the
9 account?
10    Q.   Let's start with how it would
11 be represented in the account.
12    A.   It would be shown under a
13 position.  It would show the size.  It
14 would show the mark price of that trading
15 pair.  It would show the P&L.  It would
16 show the entry price.  And that's how it
17 would be displayed in the account.
18       And then on the collateral
19 explainer, you could also see what the
20 collateralization or the collateral
21 requirement and how much collateral that
22 position was taking up.
23    Q.   Perpetual future contracts
24 included a reference price, correct?
25    A.   You need to be more clear.  A

Page 63

1 reference price?  Are you referring to a
2 mark price or are you referring to an
3 index price?
4    Q.   Could you explain your
5 understanding of the difference?
6    A.   An index price would be based
7 on multiple -- well, it depends on the
8 asset, but the index would usually be
9 made up of multiple trading venues.  The
10 most liquid for that asset.  There are
11 times when FTX was the only venue.  So
12 the index, you know, kind of had to be
13 the FTX spot price.  But it would use a
14 median, I believe, of other venues or,
15 you know, the most traded pairs for that
16 particular pair.
17       And then the mark price was
18 solely based on FTX's market and that
19 would be the median of the bid/ask last,
20 I believe.
21    Q.   So to open a perpetual futures
22 position, the customer did not buy the
23 underlying digital asset, correct?
24       MR. PROULX:  Objection to form.
25    A.   Correct.

Page 64

1    Q.   The notional amount of the
2 asset of which a futures contract is
3 opened is not included in the total of a
4 customer's account balance, correct?
5       MR. PROULX:  Objection to form.
6    Leading again.
7    A.   That is correct.  The futures
8 position is not -- is not -- doesn't
9 contribute or isn't accounted for in the
10 account balance.  The only way that a
11 futures position impacts the account
12 balance is P&L.
13    Q.   Mr. Tackett, during your time
14 you were involved with the Three Arrows
15 account at FTX, Three Arrows benefited
16 from a line of credit issued by FTX,
17 correct?
18       MR. PROULX:  Objection to form.
19    A.   You would have to ask them.  A
20 line of credit is usually seen as
21 beneficial, yes.  Whether or not it was
22 beneficial to them, I guess that's
23 subjective.
24    Q.   That's fair.  A line of credit
25 was issued by FTX to Three Arrows

Page 65

1 Capital, correct?
2    A.   At their request, yes.
3    Q.   And there was a line of credit
4 issued by FTX to Three Arrows Capital
5 that was in effect in June of 2022,
6 correct?
7    A.   There was a line of credit in
8 effect throughout, until the 3AC account
9 was liquidated.
10    Q.   Do you recall how much 3AC's
11 line of credit was?
12    A.   120 million, I believe.
13       MR. GLUECKSTEIN:  Sam, can we
14    pull up tab 4.
15       MR. DARBY:  Sure.
16       (Tackett Exhibit 3, Document
17    Bates stamped Tackett_3AC 158, was so
18    marked for identification, as of this
19    date.)
20       MR. DARBY:  You all should have
21    that now.
22    A.   I am pulling it up now.  All
23 right.  I have it open.
24    Q.   Okay.  So Mr. Tackett, what's
25 visible, should be visible now, is what's

17 (Pages 62 - 65)

Page 66

1 been marked as Exhibit 3 to your
2 deposition, which has been marked as
3 Bates stamped in the case Tackett_3AC
4 starting at Bates number 158. And do you
5 recognize what this is?
6     A.   Looks like a Telegram chat.
7     Q.   And does this appear to be an
8 exported chat of the Telegram of a group
9 that you referenced earlier between FTX
10 and Three Arrows?
11    A.   Yes, sir.
12    Q.   Do you have a recollection of
13 who the participants were in a Telegram
14 chat between FTX and Three Arrows?
15    A.   If I looked through it, I can
16 recognize names. I don't know everybody
17 that's in the chat.
18    Q.   Okay. We are going to look at
19 some portions of this, and we can do
20 that, then, as we go.
21    A.   Okay.
22    Q.   You touched on this earlier,
23 but can you just explain, please, what
24 this Telegram chat was used for between
25 FTX and Three Arrows Capital?

Page 67

1     A.   Yes, anything they need. So if
2 they have any questions, this would be
3 the quickest way to get an answer. If
4 they are running into technical issues,
5 this is the quickest way to get technical
6 support.
7          We would also use this to
8 notify clients of upcoming changes. We
9 would use this to reach out to clients to
10 get feedback on new product ideas.
11 Anything like that.
12    Q.   Do you have any sense, from
13 even the start of this chat, what time
14 zone is reflected here?
15    A.   No. This, having come from me,
16 would be my time zone. But I don't know
17 where I was when I sent this to you. And
18 Telegram, I believe, automatically
19 updates the time zone based on where I am
20 at the time. So even if a message was
21 sent at midnight UTC, if I am in
22 Thailand, it would show up as 7 a.m.
23    Q.   Right. So at the time you
24 provided this export to the FTX Recovery
25 Trust, Telegram would have updated these

Page 68

1 times, correct?
2     A.   Based on where I was at the
3 time of export, I believe so, yes.
4     Q.   Okay. So if you were in
5 Thailand, as you are now, at the time
6 that you did this export, it would show
7 up at seven hours ahead of UTC, right?
8     A.   Yes.
9     Q.   It appears to us that's what
10 this is, but it is helpful for us that
11 this is seven hours ahead of UTC, but
12 that's helpful clarification that this is
13 updated at the time of export, thank you.
14    A.   Yes, so it would be based on
15 where I was at the time of export.
16    Q.   And you located this Telegram
17 chat in your records and provided this to
18 counsel for FTX, correct?
19    A.   Yes, I believe so.
20    Q.   At the top of this page says
21 "Three Arrows asterisks FTX" and there is
22 a link to previous messages. So this is
23 a continuation of an ongoing Telegram
24 chat; is that right?
25    A.   I am pretty sure that in the

Page 69

1 export, if you would have clicked
2 previous messages, it would have loaded
3 previous messages.
4          Usually the Telegram messages
5 are done in HTML, so you can load them
6 and it will only show, you know, so many
7 messages at a time, and then you can hit
8 previous messages to scroll back further.
9 And depending on where you are, go
10 further the opposite direction.
11         MR. GLUECKSTEIN: And just so --
12 we'll come back to this in one
13 second -- but just so the record is
14 complete, Sam, can we just pull up tab
15 13, just to identify it, quickly.
16         (Tackett Exhibit 4, Document
17 Bates stamped Tackett_3AC 91, was so
18 marked for identification, as of this
19 date.)
20    A.   You want me to open tab 13?
21         MR. DARBY: One moment.
22    Q.   Once it's popped up.
23    A.   I mean, once it's popped up.
24         MR. DARBY: Okay. I just loaded
25 that there, guys.

18 (Pages 66 - 69)

Page 70

1    A.   Okay.  Pulling it up now.
2    Q.   Just so the record is clear,
3  this is another, what's been marked as
4  Exhibit 4, is what appears to be another
5  export of a Telegram chat earlier in time
6  beginning July 6th, 2020.  It has Bates
7  number Tackett_3AC starting at 91.
8        Do you recognize this, sir, as
9  another Telegram export that you located
10  and provided to FTX?
11    A.   Yeah, it looks like it.
12    Q.   And would this be the same
13  Telegram chat, just the earlier portion
14  of the messages that we were just
15  speaking about?
16        MR. PROULX:  Objection to form.
17    A.   Yeah.
18    Q.   Thank you, sir.  Can we go back
19  to Exhibit 3.
20        Are you there, sir?
21    A.   It's loading right now.  And
22  it's up.
23    Q.   Okay.  If you could go to page
24  10, and you can either type 10 either
25  right at the top, it's the page that ends

Page 71

1  in Bates number 167 in the bottom right.
2    A.   Okay.  I am there.
3    Q.   And there is a -- at the top of
4  the page, as part of the chat, there is
5  an entry from somebody with just the
6  initial of K.  It says, "Morning.  Would
7  like to explore expanding our credit
8  line."
9        Do you see that?
10    A.   Yup.
11    Q.   And this is from, if you go
12  back one page, it looks like this chat is
13  from the 10th of August 2021?
14    A.   Yup.
15    Q.   Do you have any understanding
16  of who K was in these chats?
17    A.   Well, if you look at the next
18  message, it says, "Hi," and he tags
19  @KyleD1, so I am assuming that Kyle D
20  would be Kyle Davies.
21    Q.   Is Kyle Davies somebody that
22  you dealt with on the Three Arrows
23  account?
24    A.   I didn't speak with him a ton.
25  This is still when Burg was managing

Page 72

1  them.  But Kyle is somebody that I spoke
2  with at 3AC, yes.
3    Q.   And who was Kyle Davies, what
4  was his role at 3AC?
5        MR. PROULX:  Objection to form.
6    A.   Co-founder, if I am not
7  mistaken, along with Su Zhu.
8    Q.   And the response to that entry
9  from Mr. Davies is somebody by the name
10  of Tristan.  Do you know who that is?
11    A.   Yes, Tristan Ivory.
12    Q.   And was he at FTX?
13    A.   He was.
14    Q.   And what was his role at FTX at
15  this time in 2021?
16    A.   General helper person.  He wore
17  a lot of hats.  He would end up becoming
18  the head of strategy of FTX U.S. I
19  believe this is earlier in his -- this is
20  about one year into his stint at FTX.  I
21  am not sure exactly what his role or what
22  his title would have been.  But he helped
23  with DD, he helped with account
24  management, he helped with a lot of
25  different things.

Page 73

1    Q.   And the other person who
2  responds to this portion of the chain is
3  somebody by the name of Burg, is that
4  Michael Burgess who you referred to
5  earlier?
6    A.   Yes, sir.
7    Q.   If we can go a bit further in
8  this chat, to what I believe is page 51,
9  and it's Bates number in the bottom right
10  ending in 208.
11    A.   Got it.
12    Q.   Are you there, sir?
13    A.   Yes.
14    Q.   So there is a message, if you
15  go back one page, it appears this is from
16  the 28th of March 2022.
17    A.   Uh-huh.
18    Q.   And there is a message at the
19  top of that page, the page 208, that is
20  from Zane -- I assume that's you?
21    A.   Yes, sir.
22    Q.   And you say, "Hey guys, just
23  checked your account and noticed you're
24  way above the collateralization
25  requirement for the LOC.  I remember when

Page 74

1 Burg was discussing with you that we
2 offered a lower interest rate for higher
3 collateralization and you took the higher
4 interest rate for lower
5 collateralization."
6        Do you see that?
7    A.   Yup.
8    Q.   Do you recall writing that at
9 this time?
10   A.   Mmm-hmm, I do.
11   Q.   What prompted you to reach out
12 to 3AC on this issue at that time in
13 March of 2022?
14   A.   I believe this was related to a
15 review of lines of credit that we were
16 doing.
17        One aspect of this was making
18 sure that people were hitting the volume
19 ratios that were needed, that they were
20 still in the correct fee tier and that
21 they were meeting their collateralization
22 ratios.  And we were repapering our LOC
23 agreements.  So it was a good time to do
24 this review.
25        And basically we had to make

Page 75

1 sure if you weren't hitting your volume
2 ratios, that we would update the interest
3 rate to reflect that.  If you were doing
4 a higher volume ratio than we had agreed
5 upon at the time, then we would
6 correspondingly lower the interest rate.
7 And same thing with collateralization
8 ratios.
9        So it was basically an
10 exchange-wide review of outstanding lines
11 of credit to make sure they accurately
12 reflect the standing of the account at
13 that time and we were repapering the
14 agreements anyways.
15   Q.   What do you mean by "we were
16 repapering the agreements" at this time?
17   A.   There was an updated line of
18 credit agreement that the lawyers wanted
19 us to use, so we were going through and
20 updating the lines of credit using the
21 updated or the new line of credit
22 agreement.  It was basically a more
23 exhaustive agreement.
24   Q.   And you continue on in your
25 message there, "Since you're keeping a

Page 76

1 fair bit more collateral, wanted to
2 revisit this and see if you would be up
3 to repaper the agreement with higher
4 collateralization ratio and lower
5 interest rate."
6        Do you see that, sir.
7    A.   Mmm-hmm, I do.
8    Q.   Why were you proposing a higher
9 collateral ratio and a lower interest
10 rate?
11   A.   Well, if they agreed to keep,
12 you know, let's say 100 million as
13 collateral, just for example, 100 million
14 is not the actual number, this is purely
15 for example purposes.  And they were
16 right at that collateralization ratio,
17 then that means that, you know, they are
18 not leaving any money on the table with
19 the interest rate.  They are paying, you
20 know, basically what they should.  But if
21 they are far in excess of that and never
22 getting close to hitting or getting close
23 to, you know, the collateral requirement,
24 then it would be cheaper for them and it
25 would reduce the interest rate if they

Page 77

1 upped the collateral requirement.
2        So it was just an option to see
3 if they wanted to reduce their interest
4 rate on the line of credit.
5    Q.   On the 29th of March, just
6 continuing in this chat, there is a
7 response by user Ningxin, do you see
8 that?
9    A.   Ningxin.
10   Q.   Yes.  And do you recall who
11 that person was.
12   A.   I don't know them personally
13 but I know that Ningxin was often in the
14 chat.
15   Q.   And was Ningxin a
16 representative of Three Arrows Capital?
17   A.   I believe so, yes.  They worked
18 at 3AC, yes.  I don't know if they were
19 an official representative or, you know,
20 a director, whatever, but they did
21 represent 3AC in that chat.
22   Q.   And do you know whether Ningxin
23 was somebody who had access to the Three
24 Arrows account?
25   A.   I believe they did, yes.

20 (Pages 74 - 77)

Page 78

1    Q.   Did this person conduct trades
2 on the Three Arrows account, to your
3 recollection?
4         MR. PROULX: Objection to form.
5    A.   I don't know.
6    Q.   So the response to you is, "Hi,
7 may I have details of the collat and
8 interest numbers? Happy to take a look."
9         And you then respond, "I
10 believe we offered you 200 percent
11 collateral at 5 percent and you're at 125
12 percent and 8 percent."
13        Do you see that?
14   A.   Mmm-hmm, I do.
15   Q.   Can you explain what the
16 difference, if that change was made,
17 would be to -- from Three Arrows
18 Capital's account perspective?
19   A.   Sure. So when we looked at
20 lines of credit, basically the way we
21 determined the interest rate was three
22 buckets: Your fee tier, your volume
23 ratio, your volume that you're doing in
24 ratio to the line of credit, and
25 collateralization requirement. And you

Page 79

1 could basically choose, you know, what
2 collateralization ratio you wanted.
3         And you could lower your -- you
4 could lower your interest rate by
5 choosing a higher collateral requirement,
6 or you could pay more but have a lower
7 collateral requirement. And so we had
8 offered them 200 percent
9 collateralization ratio at a 5 percent
10 interest and they were at 125 percent
11 collateralization ratio but at 8 percent
12 interest.
13        So if they did change that, it
14 would raise the amount of requirement, or
15 the amount of collateral required for the
16 line of credit, but it would reduce the
17 interest payment that they need -- they
18 need to make on that line of credit.
19   Q.   And just so the record is
20 clear, can you please just explain when
21 you say 200 percent collateral, what you
22 mean by that?
23   A.   You would need to have
24 collateral in excess of 200 percent of
25 the line of credit.

Page 80

1    Q.   So there is a question to you
2 then about how flexible it would be to
3 change back to 125 percent in the future;
4 do you see that?
5    A.   Yup.
6    Q.   And then going further down,
7 Ningxin says, "Nice! Yeah, sure, we
8 would like to change to 200 percent
9 collateral with 5 percent interest for
10 now."
11        Do you see that?
12   A.   Yes, I do.
13   Q.   And then you respond to
14 somebody @AllisonNX, "Can you please
15 update the docs?"
16        Do you see that?
17   A.   Yes.
18   Q.   Do you recall who Allison was
19 who was in this chat with you?
20   A.   Yes, she was part of the VIP
21 team and handled a lot of the Asians
22 clients. She is Chinese, Chinese
23 speaker, worked on Asian hours, so
24 handled a lot of Asia or was active VIP
25 support for a lot of the Asian clients.

Page 81

1    Q.   Do you recall what her last
2 name was?
3    A.   Allison is not her real name.
4 She's Chinese. Allison is her English
5 name.
6    Q.   Got it. If you go ahead two
7 pages to page 53, 210 in the bottom
8 right-hand corner.
9    A.   Yup.
10   Q.   And you say -- we're now, if we
11 go back a page, it's 31st of March, 2022.
12 And you say, "The interest rate has been
13 updated to 5 percent." And you then have
14 a link to a document that was transmitted
15 in the chat; do you see that?
16   A.   Yeah.
17   Q.   Do you recall anything else
18 outside of what's reflected in this chat
19 in the March 2022 time frame around a
20 revised line of credit agreement for
21 Three Arrows Capital?
22        MR. PROULX: Objection to form.
23   A.   No. The only other thing that
24 I remember is that we also came up with
25 something that maybe had a line of credit

21 (Pages 78 - 81)

Page 82

1 explainer that kind of clarified a bit
2 more on how interest was charged for
3 lines of credit. And that was done
4 around the same time when we did the,
5 when we did the repapering of the
6 agreements.
7     Q.    Was that with respect to
8 interest calculations generally or
9 specific to Three Arrows Capital?
10    A.    Generally. I believe it would
11 be in one of the -- if you scroll down a
12 bit further on that page, there is an FTX
13 VIP both. I believe it would be in one
14 of these announcements.
15    Q.    And that would have been a
16 document that was available to customers?
17 Would that have been on the FTX website?
18    A.    No.
19    Q.    Would that have been sent out
20 to customers on an individual basis?
21    A.    Correct. It would have been
22 sent out through the FTX VIP bot, which
23 was a bot that we had in all the Telegram
24 channels for our VIP clients, and it
25 would have been accessible there.

Page 83

1     Q.    Is there anything else that you
2 remember in this time frame of March 2022
3 regarding a revised line of credit for
4 Three Arrows Capital?
5         MR. PROULX: Objection to form.
6 A.    No, sir.
7         MR. GLUECKSTEIN: Let's look at
8 tab 5, Sam, if we can pull that up.
9         MR. DARBY: Yes, sir.
10        THE WITNESS: While that's being
11 pulled up, do you mind if we take a
12 quick break?
13        MR. GLUECKSTEIN: We have been
14 going for a while, why don't we take a
15 five minute or so break. Go ahead and
16 we can pick back up.
17        THE VIDEOGRAPHER: The time is
18 7:45 Eastern, we are off the record.
19        (Off the record.)
20        THE VIDEOGRAPHER: The time is
21 7:55 a.m. Eastern, we are back on the
22 record.
23 BY MR. GLUECKSTEIN:
24    Q.    Thank you, Mr. Tackett. We
25 were just, before the break, going to

Page 84

1 pull up what's now been marked as Exhibit
2 5 to your deposition, which is a document
3 that starts with Bates number Tackett 3AC
4 085.
5         (Tackett Exhibit 5, Document
6     Bates stamped Tackett 3AC 085, was so
7     marked for identification, as of this
8     date.)
9     Q.    Do you recognize this document,
10 sir?
11    A.    It's pulling up, one second. I
12 do, this is the line of credit agreement.
13    Q.    I will represent to you that
14 this is the copy that was linked to that
15 chat that we were just looking at in
16 Exhibit 3 earlier.
17        MR. PROULX: And just objecting
18    to the extent that we haven't seen
19    substantiation of that representation.
20    Q.    You do recognize this as the
21 line of credit that was entered into with
22 Three Arrows Capital in March of 2022,
23 sir, correct?
24    A.    I do.
25    Q.    Do you recall who prepared this

Page 85

1 agreement?
2     A.    You would have to be more clear
3 on who prepared this agreement.
4     Q.    Who at FTX, who at FTX drafted
5 and provided this form of agreement?
6         MR. PROULX: Object to the form.
7     A.    There's two different aspects
8 of this. One is the lawyers wrote the
9 boilerplate of it and then, two, I
10 believe it was Allison who would have
11 changed, you know, the specifics of this
12 agreement. So that would be the size,
13 for example, the 120 million, that would
14 be the interest rate and that would be
15 the collateralization requirement.
16        And so I believe Allison
17 entered those specifics in and the
18 lawyers drafted the agreement as a whole,
19 which was then edited on a client-per-
20 client, case-by-case basis.
21    Q.    Is this document, which has
22 been marked as Exhibit 5, a format of a
23 line of credit that you saw with other
24 customers as well?
25        MR. PROULX: Objection to form.

22 (Pages 82 - 85)

Page 86

1    A.   This would be the -- sorry, I
2  just went back -- this line of credit
3  agreement was used for every line of
4  credit with the three things that I just
5  pointed out, being the ones that were
6  often changed.  Sometimes there might be
7  other small details changed, but, yeah,
8  this is by and large the line of credit
9  agreement that was used across the board.
10    Q.   What is your understanding of
11  what is represented in paragraph 5 in
12  this agreement, on the first page, with
13  Bates stamp N885?
14        MR. PROULX:  Objection to form
15    and to the extent it calls for a legal
16    conclusion.
17    Q.   I am just asking for your
18  understanding, sir, as the account
19  manager familiar with the line of credit
20  as to what is shown in paragraph 5?
21    A.   So paragraph 5 is where we
22  would put the collateralization
23  requirement.
24        So paragraph 5 basically states
25  that they need to keep 200 percent of the

Page 87

1  line of credit amount as collateral in
2  the account and that if they failed to do
3  so, then we can start charging 10 percent
4  per day interest on the shortfall.
5    Q.   What's understanding of what
6  FTX is permitted to do if the customer
7  3AC did not comply with the requirements
8  in paragraph 5 of the line of credit?
9        MR. PROULX:  Same objections.
10    A.   Well, there is, in the line of
11  credit agreement, if you look at
12  paragraph 3, we reserve the right to
13  remove the line of credit at any time for
14  any reason.  So in line with that, we
15  have the option of removing the line of
16  credit, but we can also charge an
17  interest rate on the shortfall in the
18  interim.
19    Q.   In fact, it's your
20  understanding based on paragraph 3 that
21  you can remove the line of credit at any
22  time even if the collateral requirements
23  were being met, correct?
24        MR. PROULX:  Same objections and
25    leading.

Page 88

1    A.   That's correct.  And we would
2  make that clear to the clients on the
3  call.
4    Q.   Paragraph 4, what is reflected
5  on paragraph 4 of the line of credit on
6  the first page?
7        MR. PROULX:  Same objection.
8    Q.   Sorry, you can go ahead and
9  answer.
10    A.   The interest rate.  And as I
11  explained, we changed the way that we
12  charged interest, and it's only
13  calculated at the time that the portion
14  of the credit is being utilized.  If you
15  have a line of credit in the account and
16  you weren't using it as collateral, we
17  wouldn't charge you interest.
18        And this is all explained in
19  the LOC explainer that would have gone
20  out in the FTX VIP bot.  And if you can't
21  withdraw the LOC from the exchange, and
22  it can't be used for spot trading, to be
23  clear, can't be used for spot trading,
24  but could be used for collateral for spot
25  margin trading.

Page 89

1    Q.   And the agreement reflects the
2  200 percent collateral, 5 percent
3  interest rate, which is the change to
4  terms that we had just looked at in the
5  chat, that you had proposed to Three
6  Arrows Capital before this doc was
7  prepared, right?
8        MR. PROULX:  Object to the form
9    to the extent it calls for a legal
10    conclusion.
11        MR. GLUECKSTEIN:  Sorry, you can
12    answer, sir.
13    A.   Yes, this is the line of credit
14  agreement that followed that discussion
15  from 3AC.
16    Q.   If you turn to page 2 of this
17  document, in the middle of the page there
18  is a bold heading there in the middle of
19  the page, it says "FTX Institutional
20  Customer Line of Credit Agreement"; do
21  you see that?
22    A.   Yes, I do.
23    Q.   Do you have any understanding
24  of why that appears in the middle of this
25  document in that manner?

23 (Pages 86 - 89)

1    A.   Yes, so it basically kept the
2  line of credit agreement roughly the same
3  as the previous versions on, you know,
4  the broad, the broad bit of how a line of
5  credit works.
6        So if you look at the top part
7  and compare it with the earlier line of
8  credit agreements, they are roughly the
9  same.  But then this also provides more
10  details and terms, exactly, on, you know,
11  on how the line of credit works and the
12  specific terms of them.  And this was
13  something that our lawyers wanted
14  included in the line of credit
15  agreements.
16        So as I mentioned earlier, when
17  we did -- when we did a review in early
18  2022 where we repapered a lot of the
19  agreements, this was basically, a large
20  part of that is to get the updated
21  agreement out and signed.  Even if we
22  didn't adjust any collateralization
23  requirements or interest rates or
24  anything like that, we still repapered
25  the agreements and had them sign this new

1  updated agreement or extended agreement,
2  whatever you want to refer to it as.
3    Q.   And this format of the Three
4  Arrows repapered agreement, as you use
5  it, is consistent with the format that
6  you used for other customers at that
7  time?
8        MR. PROULX:  Objection it form.
9    A.   Yes, the exact same.
10    Q.   If you turn to the last page of
11  this document, which is Bates stamped 90
12  in the bottom right?
13    A.   Yes, I am there.
14    Q.   You see this document was
15  signed by Kyle Davies at Three Arrow
16  Capital?
17        MR. PROULX:  Objection to form.
18    A.   I do see that, yes.
19    Q.   And it appears that DocuSign
20  was used to sign this document; is that
21  right?
22    A.   Correct.
23    Q.   Are you familiar with DocuSign,
24  sir?
25    A.   Yes.

1    Q.   Is that something that you used
2  in the past?
3    A.   Yes, we sometimes used it with
4  LOCs.
5    Q.   Do you see at the top of the
6  page, of each page, there is what's
7  identified as a DocuSign envelope ID; do
8  you see that?
9    A.   I do see that.
10    Q.   Do you have an understanding of
11  what that reflects?
12    A.   I assume -- well, no, actually,
13  no.  I can make an assumption, but I
14  don't know the specifics of how DocuSign
15  deals with ID'ing documents.
16    Q.   Have you -- you say DocuSign
17  was used for other LOC agreements with
18  FTX, correct?
19    A.   Correct.
20    Q.   Do you recall when someone
21  signs DocuSign that header appears on
22  every page of the document?
23    A.   No, I don't.
24    Q.   This version of LOC does not
25  have a signature for FTX Trading; do you

1  see that?
2    A.   I do see that.
3    Q.   Do you have any understanding
4  of why this document was not executed, at
5  least this version of it is not executed
6  by FTX?
7        MR. KAST:  Objection to form.
8    A.   As far as I wouldn't be able to
9  countersign one of these.  Usually Sam
10  would be the person that our
11  counterparties would want a signature
12  from.  And so it may have been sent to
13  Sam, and he signed it.  And you know,
14  once Sam signed it, the DocuSign would
15  automatically e-mail the other parties of
16  the agreement.
17        And so this may have been sent
18  to Sam for signing.  And waiting for him
19  to sign it, but, you know, Sam wasn't the
20  quickest to respond to me.
21    Q.   Did FTX extend the line of
22  credit to Three Arrows Capital consistent
23  with the terms of this agreement?
24        MR. PROULX:  Objection to the
25  form.

24 (Pages 90 - 93)

Page 94

1    A.    The amount did not change.
2  They already had a $120 million line of
3  credit before, before the specific
4  agreement came into play.  But what was
5  updated was the collateralization
6  requirement and the interest rate.  The
7  interest rate was also updated in the
8  system.
9    Q.    What do you mean the interest
10  rate was updated in the system?
11    A.    Around this point, as I
12  explained earlier, we moved to a
13  different way of charging interest on
14  credit lines, so we could put in the
15  admin panel the interest rates for the
16  system to calculate that.
17    Q.    As the account manager for the
18  Three Arrows accounts for FTX, after
19  March 31st, 2022, did you understand this
20  agreement to be in effect?
21        MR. PROULX:  Objection to form
22  and to the extent it calls for a legal
23  conclusion.
24    A.    Yes.
25    Q.    And is it your understanding

Page 95

1  that after the date of this agreement,
2  interest was charged at Three Arrows
3  Capital at the lower rate of 5 percent?
4    A.    It would have been based on
5  their utilization, yes.  So if they
6  weren't -- if the credit line wasn't
7  being utilized, they wouldn't have been
8  charged anything.
9    Q.    Understood, but any drawn
10  amount of the line of credit would have
11  been drawn at the revised interest rate?
12    A.    Correct.
13    Q.    Do you have an understanding,
14  after this period of March 2022, how much
15  the line of credit was drawn by Three
16  Arrows Capital?
17    A.    It would depend on the date.
18  Near the end, they were overall red.  So
19  that would mean that the entirety of the
20  line of credit was being used.
21    Q.    When you say at the end, you
22  mean June of 2022?
23    A.    Correct.
24    Q.    So at least as of June of 2022
25  it was your understanding that the

Page 96

1  entirety of credit was drawn at 120
2  million?
3        MR. PROULX:  Objection to form.
4  Lack of foundation.
5    Q.    Is that correct, sir?
6    A.    You guys cut out real quick.
7  That seems like correct.  Can you repeat
8  the question?
9    Q.    Absolutely.  So at least as of
10  June of 2022, is it your understanding
11  that Three Arrows Capital had drawn the
12  entirety of the $120 million line of
13  credit?
14        MR. PROULX:  Same objections.
15    A.    Yes.  And I believe this would
16  have been -- this would have been
17  demonstrated by when we tried to reduce
18  the line of credit, the small amount that
19  said the system would liquidate them,
20  which would indicate that the line of
21  credit was being used in its entirety or
22  nearly in its entirety, because I think I
23  tried to decrease the LOC by 5 million or
24  something and I got warnings they would
25  be liquidated, which would indicate that

Page 97

1  the entire -- that the entire LOC was
2  being drawn upon, which would be drawn on
3  the account balances, yes.
4        (Tackett Exhibit 6, Document
5    Bates stamped FTX 3AC 13940, was so
6    marked for identification, as of this
7    date.)
8        (Tackett Exhibit 7, Document
9    Bates stamped FTX 3AC 13950, was so
10    marked for identification, as of this
11    date.)
12        MR. DARBY:  I have introduced
13  Exhibit 6 and 7, so they are both
14  loaded for you now.
15    A.    I have it.
16    Q.    This is an e-mail chain, top
17  e-mail is dated September 26th of 2022,
18  FTX 3AC 13940.  This appears to be an
19  e-mail chain between you and
20  representatives of an entity called 2
21  Sigma; do you see that?
22    A.    Yes.
23    Q.    Do you recall who 2 Sigma was?
24    A.    Yes, 2 Sigma is a trading firm.
25    Q.    Was 2 Sigma somebody that you

25 (Pages 94 - 97)

Page 98

1 were looking at as a client of FTX?
2     A.   They were somebody that we were
3 onboarding, yes.
4     Q.   Somebody you were onboarding,
5 you say?
6     A.   Yeah, I don't remember them
7 trading in large size.  I believe they
8 were just doing testing and onboarding.
9     Q.   I would like to just look at a
10 couple of things in this e-mail exchange
11 from your e-mail of September 20th, 2022,
12 it starts at the bottom of that page and
13 continues on for a couple of pages.
14         It appears that you're
15 responding to some questions of some
16 representatives of Two Sigma in this
17 e-mail chain; is that consistent with
18 your understanding?
19     A.   Yes.
20     Q.   In this e-mail chain in the
21 bottom of the first page, there is a
22 question:  "Are both agreements needed or
23 would we execute one or the other?"  And
24 then you give a response there; do you
25 see that?

Page 99

1     A.   Yes.
2     Q.   And you say essentially, the
3 bit at the top covers the material
4 information for the details of the LOC
5 and the latter section goes into nitty-
6 gritty details of the agreement; do you
7 see that, sir?
8     A.   Yes.
9     Q.   And is that explaining what
10 just testified to about the form of the
11 line of credit agreement being a simple
12 agreement with multiple parts?
13         MR. PROULX: Objection to the
14     form or to the extent it calls for a
15     legal conclusion.
16     A.   Both agreements, and because I
17 sent them over like a simplified version,
18 which is just the top part and then the
19 full version, yeah.
20     Q.   If we can look at Exhibit 7,
21 really quickly.  Do you see that?
22     A.   Yes.
23     Q.   Is this a draft agreement that
24 you're referring to that we were just
25 discussing?

Page 100

1         MR. PROULX:  Object to form.
2     A.   Yes.
3     Q.   If you can go back to Exhibit
4 6, please.
5     A.   Okay.  I am at 6.
6     Q.   And at the bottom of the second
7 page of your e-mail response, it's Bates
8 number 13941.
9     A.   Okay.
10     Q.   There is a question there that
11 appears to be, it says, "Cure period for
12 failure to pay post-margin request of 1BD
13 cure for failure to pay a post margin
14 which runs from FTX notice to us of a
15 failure to meet such obligation."
16         Do you see that?
17     A.   Mmm-hmm.
18     Q.   And then it appears that you
19 put a response there at the top of the
20 following page; do you see that?
21     A.   Yes.
22     Q.   And it begins with the
23 paragraph, "You are required to monitor
24 your collateral or meet your collateral
25 requirements without notice to FTX."

Page 101

1         Do you see that?
2     A.   I do.
3     Q.   Can you explain what you're
4 conveying in response to the question
5 about a cure period being unavailable to
6 the customer in this circumstance?
7         MR. PROULX:  Objection.
8     Misstates the document.
9     Q.   Can you explain your answer
10 there, sir?
11     A.   What I am explaining here, is
12 that you have 24 hours to top up by
13 default.
14         What I mean by that
15 specifically is that before we start
16 charging the 10 percent interest, they
17 have 24 hours to top up before we would
18 move forward with charging the interest
19 rate on a downfall or anything like that.
20 But we can't agree to needing 24 hours
21 notification before we liquidate.  One,
22 just because of the way the system works
23 and, you know, like we experienced with
24 the Luna crash, things can happen very
25 quickly in a 24/7 market, so we can't

26 (Pages 98 - 101)

Page 102

1  give them 24 hours to top up their
2  collateral without being liquidated.
3       Q.   And was that policy as conveyed
4  here to Two Sigma, a general policy of
5  FTX at the time?
6           MR. PROULX:  Objection to form.
7       A.   Yes.
8       Q.   Moving on to the e-mail,
9  another comment from a potential customer
10 here, "Liquidations of positions should
11 only occur after AOA has failed to meet a
12 margin call and upon notice, not simply
13 for failure to meet minimum maintenance
14 requirements."
15          Do you see that, sir?
16      A.   Yes.
17      Q.   And then is the paragraph that
18 follows your response to that suggestion?
19      A.   Yes.
20      Q.   And that begins with
21 "Liquidation of positions happens when
22 your maintenance margin read inclusive of
23 funds granted as part of the LOC, e.g.,
24 you have 1 million, your own capital
25 account, we give you 1 million LOC.  Your

Page 103

1  maintenance margin would be 2 million
2  (goes below your maintenance margin
3  requirement) this is fully automated, we
4  do not have non-liquidating accounts so
5  we wouldn't be able to offer you a cure
6  period of the ability to top up before
7  getting liquidated."
8           Do you see that?
9       A.   Yes, I do.
10      Q.   And was your answer there
11 consistent with how the FTX exchange
12 operated at the time in 2022?
13      A.   Yes.  Every client abided by
14 these rules.
15      Q.   You go on to say, "Just to be
16 clear, this is separate from your
17 collateral requirements for the LOC.
18 This is regarding a liquidation due to
19 collateral for your open positions being
20 inefficient."
21          Do you see that?
22          MR. PROULX:  Objection.
23 Misstates the document.
24      Q.   I can try that sentence again,
25 just so the record is clear.

Page 104

1           You go on to say, "Just to be
2  clear, this is separate from your
3  collateral requirements for the LOC.
4  This is regarding a liquidation due to
5  your collateral for your open positions
6  being insufficient."
7           Do you see that?
8       A.   Yes.
9       Q.   And as we discussed earlier,
10 the collateral requirements for the LOC
11 are separate and apart from the
12 maintenance margin requirements?
13      A.   Yes.
14      Q.   Can a customer be in a breach
15 of its LOC collateral requirements
16 without breaching its maintenance margin
17 requirements?
18          MR. PROULX:  Objection, calls
19 for a legal conclusion.
20      A.   For example, if we give you $1
21 million LOC and you don't have any
22 positions that you need to maintain, you
23 know, 25 percent collateral, that means
24 if you dipped below 1.25 million, you
25 would not be meeting your LOC margin

Page 105

1  requirements even if you didn't have a
2  single position open.
3       Q.   Okay.  We can put that aside.
4           Mr. Tackett, do you have a
5  recollection of what happened generally
6  with the 3AC accounts on the FTX exchange
7  during the June 2022 time period?
8           MR. PROULX:  Objection to form.
9       A.   Yes.
10      Q.   Can you please describe your
11 recollection?
12      A.   Yes.  So Luna started melting
13 down.  It started like, USD started to
14 depeg.  There was a lot of volatility in
15 the markets.  Crypto as a whole started
16 to crash.  You know, obviously, as an
17 exchange operator, you need to be very
18 aware of what was happening at a time
19 like this.
20          And so we pay extra attention
21 to the monitoring tools that we have, for
22 example, the LOC Slackbot and making sure
23 that people are meeting their collateral
24 requirements.  And so all the mayhem that
25 was happening off of the back of Luna

27 (Pages 102 - 105)

1 collapsing, we were looking at our
2 clients basically, account balances and
3 the Slackbot that we had showed where
4 clients were on their LOC, if they were
5 meeting their collateral requirement, if
6 there was a -- if there was a gap, how
7 big that gap was, et cetera.
8        We noticed that 3AC was
9 massively below their collateral
10 requirement. They were also withdrawing
11 more USD, so they weren't depositing,
12 they were withdrawing. And then this
13 triggered, you know, a review basically.
14 And we started looking at their account.
15        Once we saw the state of the
16 account, that obviously gave us cause for
17 concern, especially with all the
18 different rumors that were out and
19 swirling in the market. You know, it's a
20 very large player, obviously you have
21 access to a lot of information because
22 clients are, you know, hitting you up or
23 sharing what they are hearing and things
24 like that.
25        We were also hearing that 3AC

1 might be in trouble. We looked at the
2 account. We saw that it was massively
3 underwater. And we were talking to them
4 about, you know, kind of reducing the LOC
5 or reducing their position sizes so that
6 they could free up their funds as they
7 were trying to withdraw more money.
8        And then they stopped
9 responding and we had to move forward in
10 liquidating their account.
11    Q.    Thank you, sir. And we are
12 going to talk about some of those
13 details.
14        Can we pull back up Exhibit 3
15 to your deposition, which is that
16 Telegram chat that we started looking at?
17    A.    Okay. We'll pull it up.
18 Exhibit 3, tab 4.
19    Q.    Exhibit 3, tab 4, correct. Can
20 you turn to the Bates number 209 in the
21 right-hand corner?
22    A.    Got it.
23    Q.    In the middle of that page, the
24 chat starts on the 14th of June of 2022;
25 do you see that?

1    A.    Yes.
2    Q.    And again, as we established
3 earlier, the times that we see here would
4 be the times that were calculated or
5 changed as of the time of the export or
6 when to provide this file to us, correct?
7    A.    Yes.
8    Q.    And so at least for purposes of
9 the timeline here, we see there was a
10 message that comes in for Ningxin that
11 says, "Hi team, could we change the
12 credit line to 125 percent collat and 8
13 percent interest?"
14        Do you see that?
15    A.    Mmm-hmm.
16    Q.    And that was the original line
17 of credit terms that had been changed in
18 March of 2022, correct?
19        MR. PROULX: Objection to form.
20    A.    Sorry, can you repeat the
21 question?
22    Q.    Was the request here seeking to
23 revert the Three Arrows line of credit
24 terms to the earlier terms prior to the
25 March 2022 document?

1        MR. PROULX: Objection to form.
2    A.    Yes.
3    Q.    And the message goes on to say,
4 "Just checking why we can't withdraw
5 funds, we have 28 million of available
6 collateral."
7        Do you see that?
8    A.    I do.
9    Q.    And you respond there a couple
10 of minutes later saying, "Don't think it
11 would be LOC as the limit isn't applied
12 by the system."
13        Do you see that?
14    A.    Yes.
15    Q.    What did you mean by that
16 statement?
17    A.    If you have a -- sorry, would
18 you like to finish?
19    Q.    No, go ahead.
20    A.    If you have a 200 percent
21 collateralization requirement, that isn't
22 something that we input into the system,
23 and so, that isn't something to input
24 into the system, therefore barring you
25 from going below that, right?

Page 110

1    So like if I have a 100 million
2  LOC and I have 100 million in my account
3  with 100 percent collateralization
4  requirement, I can still withdraw some of
5  my collateral, my own money.  I can't
6  withdraw the LOC, but I can withdraw $50
7  million of my own collateral and the
8  system doesn't enforce the
9  collateralization requirement of the LOC.
10    So what I am saying is, if, in
11  the example I gave, let's say I have 100
12  million of my own money, $100 million LOC
13  and I go to withdraw, because I agreed to
14  100 percent collateral, it wouldn't bar
15  me from withdrawing any of my own 100
16  million.  It would have -- the withdrawal
17  process would look the same if it was 25
18  percent collateral requirement or 100
19  percent collateral requirement or a 1000
20  percent collateral requirement.  The LOC
21  collateral requirement doesn't impact the
22  withdrawal system.
23    Q.   You respond then, "Due to the
24  size of the LOC, no.  Since you have such
25  a large LOC, we need it to be

Page 111

1  overcollateralized."
2    Do you see that?
3    A.   I do.
4    Q.   And what were you conveying
5  there?
6    A.   I personally wouldn't be
7  comfortable with lowering the agreement
8  to 125 percent at this time.  I think
9  with the market the way it was and the
10  account help the way it was, it wouldn't
11  make sense to -- it wouldn't be a wise
12  move to do that.
13    Q.   The question back to you is,
14  "Overcollat by how much?"  And you
15  respond "200 percent," right?
16    A.   Yes.
17    Q.   So you're conveying -- are you
18  conveying that the 200 percent in the
19  existing LOC terms needs to remain in
20  place?
21    MR. PROULX:  Objection to form.
22  Leading.
23    A.   Correct.
24    Q.   You further say, "Your LOC, the
25  order of magnitude is higher than others

Page 112

1  on the platform."
2    Do you see that?
3    A.   Yes.
4    Q.   What were you conveying there?
5    A.   3AC was by far, by far the
6  largest line of credit that we had
7  granted to any clients of the system.
8    I guess later it came out that
9  Alameda had a larger one, but for any
10  clients that I was aware of that had
11  LOCs, I think the next largest might have
12  been 25, 30 million.  And that might have
13  only been, you know, months later.
14    I think at the time they might
15  be like six times larger than the next
16  largest LOC.
17    Q.   So continuing then on this
18  exchange, you're asked if a change could
19  be made.  You say, "No, we cannot, unless
20  you want to reduce the size."
21    Do you see that, continuing
22  onto the next page?
23    A.   Yes.
24    Q.   Ningxin responds, "Yes, sure,
25  we can reduce size.  Actually, can remove

Page 113

1  the LOC."
2    Do you see that?
3    A.   I do.
4    Q.   And you initially respond,
5  "Yes."
6    And then you follow up 23
7  minutes later by saying, "I cannot.  It
8  would likely liquidate you."
9    Do you see that?
10    A.   I do.
11    Q.   Do you recall that exchange and
12  why your answer changed over that period
13  of time?
14    MR. PROULX:  Objection to form.
15    A.   Yes, I do recall this.  And,
16  no, to clarify, my answer didn't change.
17  I didn't have an issue with them removing
18  the LOC.  And when they are saying can we
19  actually remove the LOC, I am saying,
20  yeah, sure, if you guys want to move
21  forward without having an LOC, that's
22  fine.  However, I cannot, because I am
23  getting, me personally, I could go in and
24  I could edit line of credits on my side.
25  However, if it would lead to a

29 (Pages 110 - 113)

Page 114

1 liquidation, at that point, I think we
2 needed a dev to do it.
3      And so I believe I went into
4 change the LOC size and that said that
5 would liquidate them and yeah. And so
6 like again at 6:43, I said to even pull
7 the LOC, you need to add a lot of
8 collateral to prevent being liquidated.
9      So again, we don't have an
10 issue with them getting rid of the line
11 of credit but it's just that doing so
12 would instantly liquidate them on their
13 positions because they would no longer
14 have sufficient collateral. And I don't
15 think that would, you know, the client
16 would want.
17   Q.   Before that statement you just
18 referenced, you respond, "You need to top
19 up a lot of capital BTW, you're massively
20 under the collateral requirements for the
21 LOC."
22      Do you see that?
23   A.   Yup.
24   Q.   Was this the first that you
25 were learning of them being out of

Page 115

1 compliance with the collateral
2 requirements, personally?
3      MR. PROULX: Objection to form.
4   A.   I want to be clear, this did
5 happen over three years ago, so the exact
6 order of things might be, you know, not
7 crystal clear. But basically, it could
8 have been triggered by this or it could
9 have been also looking at the Slackbot,
10 also might have been a part of it.
11      But, yes, it is around this
12 time that I started to realize that,
13 yeah, their account is in a very bad
14 place.
15   Q.   What do you mean by the
16 Slackbot, what does that refer to?
17   A.   We had a bot on Slack that
18 would look at the account balance of the
19 accounts that had LOCs. The
20 collateralization requirement and the --
21 the line of credit, the account balance
22 and any shortfall if there was and how
23 big that shortfall was. So Luna blowing
24 up, it became something that we kept a
25 closer eye on.

Page 116

1   Q.   You then respond, "We are
2 reducing positions now." And you then go
3 on, "I can pull a portion of the LOC for
4 now if you would like."
5      Do you see that?
6   A.   Yeah.
7   Q.   If you go down the chain, you
8 go on to say at 6:45 as reflected here,
9 "Pulling the LOC, you're going to go more
10 negative USD, which might increase the
11 collateral requirements."
12      Do you see that?
13   A.   Mmm-hmm.
14   Q.   Can you please explain what you
15 meant by that statement?
16   A.   Yeah, sure. So this is coming
17 into IMF again. The larger you have in a
18 particular position, the more collateral
19 we would require and so there was already
20 massively negative USD, so the formula is
21 coming into play here. And then when
22 that starts to come into play, any
23 increase could increase the collateral
24 ratio that you would need for that
25 position.

Page 117

1      And so because they were
2 already massively negative USD, if I
3 start withdrawing the line of credit,
4 which is a positive USD balance, so I
5 would essentially be debiting their
6 account USD, it would increase the
7 negative USD amount and then the
8 collateralization ratio they need for
9 that USD balance might be increased
10 because of the IMF.
11   Q.   Is that what you meant when you
12 said, "Because you're massively negative
13 USD, so IMF is likely coming into play
14 here"?
15   A.   The way that IMF works is
16 basically you have an IMF ratio, and then
17 you take the max of whatever the standard
18 is or the IMF, so when you look at this
19 equation, if they are not hitting the
20 level at which IMF starts to come into
21 play, it's basically the standard
22 collateralization requirement.
23      So, you know, if you're at 20 X
24 leverage, initial margin for $100
25 position would be $5. But then once you

Page 118

1 start to get larger, the IMF can start to
2 come into play, so it can be whatever is
3 higher, you know, 5 percent, or whatever
4 the formula outputs for, you know, that
5 position using the IMF. And if that, if
6 the output of that formula is higher than
7 5 percent, then you might have to have
8 the higher collateral ratio.
9     Q. So continuing on in the chat,
10 you attempt to do a $10 million
11 reduction, and you say "You're getting an
12 error," correct?
13     A. Yes.
14     Q. And Ningxin says, "Can you
15 please try 5 million?" And you respond
16 at 7 o'clock saying, "So just FYI, your
17 account value collateral is
18 $113,438,132.47. You have an LOC of 120
19 million, which means you're underwater on
20 the LOC in general. The reason you can't
21 withdraw is because your account right
22 now is technically under water."
23         Do you see that?
24     A. Mmm-hmm.
25     Q. Can you please explain what you

Page 119

1 were conveying in that message?
2     A. So you can't withdraw the LOC,
3 so even if you lose all of your money,
4 you couldn't withdraw beyond that ticket,
5 you know, the LOC itself. But you can go
6 negative through futures positions or
7 spot positions, spot margin positions.
8         So you looked at the account
9 value collateral, which was 113 million,
10 and with a line of credit of 120 million
11 that means they don't even have the
12 amount that the line -- like we gave them
13 120 million and I am seeing 113 million
14 in the account. They need to keep 200
15 percent of the line of credit in
16 collateral, so you would have 120 million
17 which is the LOC plus the 200 percent you
18 need to keep, so it's like, you know, 360
19 million you need to have in the account.
20         So I am saying even without
21 looking at the collateral requirement for
22 the LOC, you're under water overall.
23 Like they weren't even meeting their LOC
24 number, that's what I was saying in that
25 message.

Page 120

1     Q. And as a result of that
2 position they were unable to withdraw any
3 assets from the account; is that right?
4         MR. PROULX: Objection to form.
5     Leading.
6     A. That is my understanding,
7 correct. Because once you have a
8 negative balance overall, you can't
9 withdraw more.
10     Q. Can you explain what you mean
11 by that?
12     A. Yeah, so once the account goes
13 negative or is below what the LOC is, you
14 can't continue to pull down further than
15 that.
16         So, you know, anything under
17 120 million, the system would say no,
18 because it's looking at you have 120
19 million from our LOC, and you can't
20 withdraw from that, and so if you're
21 below that number, you're not going to be
22 able to withdraw because you're below,
23 like your account is essentially
24 negative.
25     Q. So then in response to a

Page 121

1 suggestion that they seek the collateral
2 at 199 million, you respond, "That's the
3 collateral contributed by spot assets.
4 That's not the collateral value, though."
5         Do you see that?
6     A. Yeah.
7     Q. And can you explain what you
8 were conveying there?
9     A. To be honest, I think I would
10 need to see that screenshot to be able to
11 fully understand, when he says, "I see
12 our collateral as 199 million," I'm not
13 sure if he's looking at or put the
14 collateral explainer or looking at the
15 net USD value. So I would need to see
16 specifically what is in that screenshot
17 to understand my response or to be able
18 to expand on what my response is in
19 reference to.
20     Q. What you had conveyed above,
21 the numbers that you were seeing was not
22 199 at the time, it was the $113 million
23 number; is that right?
24         MR. PROULX: Objection to form.
25     A. Yeah.

Page 122

1    Q.   Then you respond further to
2  this chain --
3    A.   Oh, sorry, I might -- okay.
4  Yeah, all right.  Never mind, I
5  understand.
6        So he's saying, "I see our
7  account collateral as 199 million."  So
8  if you looked at the collateral
9  explainer, you would see the total amount
10  contributed by spot assets, right.  And
11  he's saying that he's seeing that they
12  have 199 million contributed by spot
13  assets.  But that's ignoring any
14  negative.  They are negative 85 million.
15  So if you are 199 million worth of
16  collateral and you have negative $85
17  million balance, that would put you at
18  about 113 million.
19        So, sure, their spot assets,
20  the positive spot assets were
21  contributing $200 million worth of
22  collateral towards their balance, but
23  when you subtract the negative assets,
24  the 85 million spot margin borrow, plus
25  any additional, which I am not sure if

Page 123

1  they had or not, that gives you the total
2  collateral value of the account, right?
3  You take the positives minus the
4  negatives, and you end up with your
5  collateral value.  You can't just look at
6  the positives and ignore the negative
7  balances.
8    Q.   Thank you.  So after six
9  minutes later, you don't get any further
10  response, you then write, "Can someone
11  from your team give me a call.  We need
12  to discuss the situation."
13        Do you see that?
14    A.   Yeah.
15    Q.   Do you recall, did anybody call
16  you at that time?
17    A.   No.
18    Q.   In fact, it looks like more
19  than two hours go by and you then respond
20  again, "I need a response here guys, you
21  are now 20 million in a hole."
22        Do you see that?
23    A.   I do.
24    Q.   What are you conveying when you
25  say 20 million in the hole in this

Page 124

1  context?
2    A.   So if you look up above, I am
3  saying their account value is 113 million
4  and you have 120 million worth of LOC, so
5  they are already below that.
6        And then basically I am saying
7  right now I am seeing that your account
8  is $3 million short or negative 3
9  million.  It looks positive because you
10  have 120 LOC, but if we took out that
11  LOC, your account balance would be
12  negative 3 million.  When I say 20
13  million, you're now 20 million in the
14  hole, I mean, your shortfall, your
15  account balance is essentially negative
16  20 million right now.  Sure, with 120
17  million we gave you, you might be in the
18  green, but you owe us that money, so
19  inclusive of that, you're like negative
20  20 million.
21    Q.   Is that increase from 3 million
22  to 20 million negative a result of
23  continued deteriorations of their
24  positions in the account?
25        MR. PROULX:  Objection to form.

Page 125

1    A.   That's the only thing that
2  would make sense.  I don't remember
3  exactly what their positions were, but
4  the only way it could get worse is due to
5  the positions that they would be holding.
6    Q.   You further respond at 9:49, "I
7  would really recommend responding here at
8  Ningxin TAC, lack of response gives us
9  more cause for concern than anything."
10        Do you see that?
11    A.   Yup.
12    Q.   Do you recall getting any
13  response at that time from anybody on
14  behalf of Three Arrows Capital?
15    A.   No.
16    Q.   The next message in the chain
17  is much later in the day at 21:56, as
18  time stamped here; do you see that?
19    A.   Yup.
20    Q.   And you write a message and you
21  say "Ningxin TAC," that's Ningxin who you
22  have been corresponding with on behalf of
23  3AC, correct?
24    A.   Correct.
25    Q.   And @KyleD1, that's Kyle

32 (Pages 122 - 125)

Page 126

1 Davies, as you testified earlier,
2 correct?
3    A.   Yup.
4    Q.   And you write, "We have to turn
5 off withdrawals on your account until we
6 get a response from you.  You're
7 currently basically flat, you need to
8 increase your USD balance by a sizable
9 amount.  If we pull the LOC, you would be
10 negative 83 million or so, which would
11 likely cause you to be liquidated.  We
12 don't want to do that.  But the bare
13 minimum you can do is just respond to us
14 and provide an update, which you aren't
15 doing, which is a cause of for concern."
16       Do you see that?
17    A.   I do.
18    Q.   Do you recall why you sent that
19 message?
20    A.   Yes, because we weren't getting
21 a response.  We saw them trying to
22 withdraw money, but let's say they can't
23 withdraw because they are too negative.
24 Then the market goes up a tiny bit and
25 they withdraw more.  And then the market

Page 127

1 goes back down, now they are an even
2 worse position, so instead of allowing
3 them to do that, until we talk with them,
4 we had to turn withdrawals off entirely,
5 to make sure that in that scenario there
6 was a quick bounce or something like
7 that, they don't pull as much as they can
8 and leave the account in a worse state.
9       So we turned off withdrawals.
10 And I am just, you know, trying to get a
11 response.  And try to make clear that the
12 alternative is worse, them being
13 liquidated.  And we obviously don't want
14 to do something, like we want our clients
15 to be in the best health possible because
16 that causes them to trade as much as
17 possible.
18       So, yeah, really looking for
19 just communication here, but we couldn't
20 get that.
21    Q.   About an hour later, at 22:53,
22 you send a longer message that begins
23 "Your account is in an undesirable state.
24 We tried to reach you several times.
25 Consider this something as a final

Page 128

1 warning."
2       He then goes on to explain
3 certain circumstances with respect to the
4 account; is that right?
5       MR. PROULX:  Objection to form.
6    A.   Mmm-hmm.  That is right.
7    Q.   What were you conveying to 3AC
8 in this message?
9    A.   The earlier messages were being
10 nice and hi, guys, can we talk about
11 this, just want to have a chat.  Like we
12 have the right to do things, but we don't
13 want to do that and please just get back
14 to us.  And the lack of response is
15 worse, you know, that's causing more
16 concern than if you just talked to us.
17       Once they don't respond, we
18 really have to give them a final warning
19 and say, hey, like, look, because this is
20 getting so bad, we are going to have to
21 continue to move forward with other
22 options unless we hear from you.  This is
23 kind of, like I said, consider this
24 something like a final warning.
25       And you can see in this

Page 129

1 message, further, "We notice last night
2 around 4 a.m. Eastern Time you did not
3 respond to our inquiries and withdrew
4 even more from your account, thereby
5 actively becoming even more delinquent on
6 an obligation and acting against the
7 spirit of the agreement."
8       That goes to what I was talking
9 about with having to turn off the
10 withdrawals on the account.
11    Q.   So is it your understanding
12 that during the period of time that 3AC
13 was not responding to your messages, that
14 they were withdrawing assets from the
15 account?
16    A.   Correct.
17    Q.   And your next message then
18 appears at 4:15, six or so hours later,
19 and you say, "Would really prefer if you
20 can resolve via discussion.  We are not
21 left a lot of choices if we can't hear
22 back from you.  We will be pulling the
23 LOC in 45 minutes."
24       Do you see that?
25    A.   I do.

33 (Pages 126 - 129)

Page 130

1    Q.   And so from your perspective,
2  what were you conveying there, when you
3  say "will be pulling the LOC in 45
4  minutes"?
5    A.   So basically they had a bunch
6  of positions that were relying on our
7  line of credit to be maintained.  Once we
8  pulled that line of credit, that
9  collateral is no longer there, which
10  means they are not having their
11  maintenance margin requirements for their
12  positions, which would leave them to be
13  liquidated.  Because you don't want to
14  get liquidated.  It's better to close
15  down the position on your own than to get
16  liquidated.  It would leave your account
17  in a better state.
18       So we are basically saying,
19  hey, look, in 45 minutes, we are going to
20  pull the LOC, which might cause
21  liquidations, but, yeah, we are going to
22  have to pull the line of credit because
23  we are not reaching back and then whatever
24  happens to that account because of that,
25  happens.

Page 131

1    Q.   What's your understanding of
2  what the process would be to pull the
3  line of credit, as you suggested here?
4    A.   It was an internal discussion
5  between me and Nishad, and I am pretty
6  sure Sam was aware, I'm not sure how
7  active he was in that discussion.  Ryan
8  Salame as well was in the chat.  But
9  essentially once the LOC is pulled, they
10  would not be within their collateral
11  requirements for their positions, which
12  would then lead their account to being
13  liquidated and, yeah, basically blowing
14  up the account.
15       (Tackett Exhibit 8, Document
16    Bates stamped FTX 3AC 1594, was so
17    marked for identification, as of this
18    date.)
19    Q.   What has been marked as Exhibit
20  8 is a message chain Bates stamped at the
21  bottom starting FTX 3AC 1594.  Is this a
22  Slack message channel?
23    A.   This looks like Signal.  I
24  thought it was Signal, but FTX LLC kind
25  of sounds like Slack, looking at it looks

Page 132

1  more like Slack, but I don't know.
2       My recollection was it was a --
3  no, the fact that Richard Chung was in it
4  means it was Slack, I believe.
5    Q.   Would this have been a Slack
6  chat amongst personnel at FTX?
7    A.   Yeah.
8    Q.   If you look at page 2 of this,
9  there is a message in the middle from you
10  and Nishad Singh, "They're now 20 million
11  in the hole and stopped responding"; do
12  you see that?
13    A.   I do.
14    Q.   And do you understand that to
15  be, this to be around the same time when
16  you conveyed to 3AC that they were $20
17  million in the hole in the prior message
18  that we were just looking at?
19       MR. PROULX:  Objection to form
20    and to the extent that it misstates
21    the document.
22    A.   I would assume so, yes.  It
23  would make sense that when I discovered
24  that, I would also share that with
25  Nishad.

Page 133

1    Q.   And Sam responds, Sam
2  Bankman-Fried responds, "Which they?"
3  And you respond "3AC" and he says "Oof."
4       Do you recall having any
5  discussions, either by message or
6  otherwise, with Mr. Bankman-Fried about
7  the 3AC situation in this time frame of
8  June 14th of -- 13th or 14th of 2022?
9    A.   There is a Signal chat, I am
10  quite certain, yeah, I am pretty sure I
11  gave you guys a Signal chat with Ryan,
12  Sam and Nishad that Sam was in.
13       Granted, I didn't talk a lot
14  with Sam at this point.  Sam was not a
15  fan of me.  So I am assuming my
16  interactions happened with Nishad.
17    Q.   Why do you say Sam was not a
18  fan of you?
19    A.   I quit FTX in July before the
20  blowup and part of my, like they sent me
21  a contract to rejoin and they said, you
22  want more money, we will give you money.
23  You want more dev resources, we will give
24  more dev resources.  You want more access
25  to me, basically said if you come back,

1 you will not talk to me. Don't expect to
2 talk to me. I won't talk to you. Expect
3 to talk to Nishad.
4    Q.   And what was the timing on
5 that, that was prior to the events we are
6 talking about now?
7    A.   That was July of 2022.
8    Q.   July of -- we are talking June
9 2022, now. I want to make sure we are
10 clear on when you left and came back.
11    A.   Yeah, so -- yeah, but even
12 then, right, part of the reason why I
13 quit was that Sam, I couldn't talk to
14 Sam. He wouldn't respond to me. So this
15 was right before I quit. So Sam wasn't
16 very responsive to me.
17    Q.   And just so that I am clear,
18 after these events in July of 2022, you
19 in fact left FTX, but then rejoined?
20    A.   Correct.
21    Q.   Until November 9th or so of
22 2022?
23    A.   Correct.
24    Q.   How long had you left FTX in
25 that period in between?

1    A.   Three weeks. I had a vacation
2 at that time. So I took one week of -- I
3 resigned, had my week of vacation. But
4 it wasn't public. It never came public
5 that I left. I think it ended up being
6 three weeks that I was away. Maybe four.
7    Q.   And other than the Signal chat
8 that you referenced earlier, do you
9 remember any other communications at this
10 time with Nishad Singh about the 3AC
11 situation?
12       MR. PROULX: Objection to form.
13    A.   There might have been other
14 discussions in Slack, I am not sure.
15 There could have been other threads about
16 it, you know, in the other LOC channel,
17 the one that had like the shortfalls, but
18 I don't have anything specific.
19    Q.   Just continuing on this Slack
20 chat that we are looking at here, Exhibit
21 8, on the last page, you referenced
22 Richard Chang. He responds, "I think
23 there is something to this 3AC rumor."
24       Do you see that?
25    A.   Yes.

1    Q.   Who is Mr. Chang?
2    A.   He was a dev, I believe, not a
3 dedicated -- yeah, developer, I think.
4    Q.   This chat ends with Sam saying,
5 "We turned off withdrawals"; do you see
6 that?
7    A.   Yes.
8    Q.   Do you have a recollection of
9 the process was made to turn off
10 withdrawals of 3AC account?
11    A.   I would assume it would be
12 discussions taking place here, the
13 activity that we saw of them withdrawing
14 additional funds and the Signal chat that
15 we had, and I could just say, by far, the
16 biggest issue here is the lack of
17 response, right?
18       Like if a client responds to us
19 and says, hey, you know, I know our
20 account is in a bad state, but like give
21 us an hour and we will come back to you,
22 you know, and tell us a timeline that we
23 can top up and what we want to do, we can
24 work with that. If you just simply stop
25 responding to us, then that confirms all

1 of our worst fears.
2       It's the exact same thing that
3 happened to FTX. Sam didn't say anything
4 publicly, which caused everything to
5 snowball and everyone to freak out.
6 Whereas if he had just come out and talk
7 with people, the amount of harm done is
8 massively reduced.
9    Q.   Were you personally involved in
10 the decision to turn off withdrawals of
11 the 3AC account?
12    A.   I believe in the Signal chat,
13 yes, I believe so or at least supportive
14 of the idea.
15       MR. GLUECKSTEIN: I just want to
16 take a quick look, if we can pull up,
17 Sam, at tab 9.
18       MR. PROULX: Brian, if you are
19 between documents, I could use a quick
20 break.
21       MR. GLUECKSTEIN: Let's go off
22 the record and take a five minute or
23 so break. That would be great.
24       THE VIDEOGRAPHER: The time is
25 9:05 Eastern and we are off the

35 (Pages 134 - 137)

Page 138

1    record.
2        (Off the record.)
3        THE VIDEOGRAPHER:  The time is
4    9:21 a.m. Eastern and we are back on
5    the record.
6 BY MR. GLUECKSTEIN:
7    Q.    Mr. Tackett, I think we're
8 going to pull up tab 9, if we could, Sam.
9        (Tackett Exhibit 9, Document
10   Bates stamped FTX_3AC_000000764, was
11   so marked for identification, as of
12   this date.)
13       MR. GLUECKSTEIN:  We have the
14   native version of this also, Sam.
15   Q.    So if we could, we marked, just
16 so the record is clear, Mr. Tackett,
17 what's been marked as Exhibit 9 is an
18 e-mail, June 14th, 2022, from yourself to
19 kyle@threearrowscap.com; do you see that
20 header up there?
21   A.    Yes, Exhibit 9.
22   Q.    Is that Kyle Davies that this
23 e-mail was sent to, by you?
24   A.    Kyle at Three Arrows Capital to
25 zane@FTX.com, yes.

Page 139

1        (Tackett Exhibit 10, E-mail of
2    Exhibit 9 in native format, was so
3    marked for identification, as of this
4    date.)
5    Q.    If we go to what was marked as
6 Exhibit 10, just for completeness, that
7 e-mail the way it's produced is obviously
8 very hard to read, but we have the same
9 in its native form, which will be easier
10 for you to review which has been marked
11 as the record as Exhibit 10.
12       MR. PROULX:  Counsel, I am happy
13   to accept the representation that this
14   is a native.  No problem there.
15       MR. GLUECKSTEIN:  Thank you,
16   sir.
17   Q.    Mr. Tackett, I just want to
18 very quickly understand, looks to me that
19 this e-mail is very similar to the
20 messages that you had sent in a Telegram
21 chat that we reviewed earlier, is that
22 your understanding?
23   A.    Yes, sir.
24   Q.    And can you just explain why
25 you sent this e-mail to Kyle Davies via

Page 140

1 e-mail at this time on June 14th, 2022?
2    A.    Just to make sure that the
3 notice was delivered to the account
4 holder as well as the Telegram chat, to
5 remove any avoidance of doubt that we
6 notified them.
7    Q.    Thank you, sir.
8    A.    And the account was under that
9 e-mail, so that was the relevant e-mail
10 to reach out to.
11   Q.    So did you consider that to be
12 the formal notice to Three Arrows Capital
13 regarding the state of their account and
14 actions that you might take?
15   A.    Yes.  I consider it to be a
16 form of notice, I don't know if you said
17 an or the.
18   Q.    A form of notice?
19   A.    Yes.
20       MR. GLUECKSTEIN:  If we can move
21   now, I want to move things along here,
22   what will be Exhibit 11, but tab 10,
23   Sam, if you can pull it up.
24       MR. DARBY:  Yes, good to go.
25       (Tackett Exhibit 11, Document

Page 141

1    Bates stamped FTX 3AC 44619, was so
2    marked for identification, as of this
3    date.)
4    A.    It's loaded.
5    Q.    What has been marked as Exhibit
6 11 is an e-mail containing screenshots
7 that have been Bates marked and produced
8 in the case at FTX 3AC 44619.  Do you see
9 that?
10   A.    Mmm-hmm.
11   Q.    The next two pages is a
12 screenshot of what appears to be a Signal
13 chat; is that right?
14   A.    Correct.
15   Q.    And you provided counsel for
16 FTX the Signal chats screenshots,
17 correct?
18   A.    Yes, sir.
19   Q.    And was this the Signal chat
20 that you referred to earlier in your
21 testimony that you said occurred around
22 this time and others at FTX?
23   A.    Yes, sir.
24   Q.    Do you recall who was involved
25 in this Signal chat on June 14th, 2022,

Page 142

1 besides yourself?
2    A.   I see Nishad and Ryan and I
3 would assume Sam was in there.  I am not
4 seeing a message from him specifically,
5 but, yeah.
6    Q.   And this would have been a
7 group that you created in Signal.  Was it
8 creating for this purpose, to discuss the
9 3AC situation or were you already
10 corresponding on other matters in this
11 chat?
12       MR. PROULX:  Objection, form,
13    compound, leading.
14    A.   I believe it was created to
15 discuss the specific situation.
16    Q.   So after you start the chain,
17 there is a series of responses from NS;
18 is that Nishad?
19    A.   Yes.
20    Q.   And in his third message from
21 the top he says, "They'd end up very
22 levered long crypto (plus crypto minus
23 USD) if we took away their full LOC right
24 now: Minus 80 million USD, 10 million
25 USD in crypto collateral so if things

Page 143

1 moved they could get liquidated."
2       Do you see that?
3    A.   Mmm-hmm.
4    Q.   Do you have an understanding of
5 what exactly Nishad was conveying to you
6 in that message?
7       MR. PROULX:  Objection.  Calls
8    for speculation?
9    A.   I can respond?
10    Q.   Yes, please do.
11    A.   Yeah.  Basically saying that
12 the LOC that we gave provides positive
13 USD, so if we remove the LOC, that would
14 put them further in the red on the
15 negative USD balance, which could cause
16 them to get liquidated.
17    Q.   And Nishad goes on and asks,
18 "Can we ask them to bring the USD value
19 up to 120 million?"
20       Do you see that?
21    A.   Yes.
22    Q.   And you respond to that
23 message, "They aren't responding,"
24 meaning 3AC, correct?
25    A.   Correct.

Page 144

1    Q.   And then you then pose the
2 question, it looks like 9:50, "Should we
3 turn off withdrawals?"
4       Do you see that?
5    A.   Yes.
6    Q.   So was it your recommendation
7 at this time that withdrawals should be
8 turned off on the 3AC account?
9       MR. PROULX:  Objection to form.
10    A.   I don't know if this is me
11 recommending that, but, yes, at that time
12 I did, that was my position.
13    Q.   Then further down the chain,
14 Nishad responds "Disabled withdrawals."
15       Do you see that?
16    A.   Yup.
17    Q.   Is it your understanding that
18 Nishad is the person who actually
19 disabled the withdrawals on the Three
20 Arrows account?
21    A.   Yes.
22    Q.   And then further down in the
23 Signal chat you then say, "Should we take
24 further steps at 10 o'clock?"
25       Do you see that?

Page 145

1    A.   Mmm-hmm.
2    Q.   What were you contemplating or
3 suggesting as further steps at that time?
4       MR. PROULX:  Objection to form.
5    A.   Start to pull the LOC because
6 they had gone massively negative.  Hadn't
7 deposited.  Had withdrawn additional
8 funds when the opportunity presented
9 itself.  They are not trying to put their
10 account in a good state.  They are
11 actually doing the opposite.
12       And so at that point, are we
13 just waiting for the situation to get
14 worse and, you know, taking that risk or
15 should we start to be proactive in
16 minimizing our own risk and start to pull
17 the LOC.
18    Q.   Ultimately, was the Three
19 Arrows Capital LOC pulled?
20    A.   I don't know.  Yeah, I am not
21 sure if it ended up getting pulled or if
22 it was all just part of the liquidation.
23 I don't know if they were two separate
24 events or if they kind of got jumbled
25 into one.

37 (Pages 142 - 145)

Page 146

1    Q.    Can you explain what you mean
2  by "part of the liquidation"?
3    A.    Well, I know that their account
4  was liquidated.
5    Q.    Okay.  What do you recall about
6  the liquidation of their account?
7    A.    I remember talking with Nishad
8  about it.  And that, yeah, without any --
9  without any input from 3AC or any, you
10  know, response letting us know that they
11  will bring their account in good health,
12  you know, their collateral was crypto,
13  their negative balances were USD, which
14  means that they are long crypto, short
15  dollar.  If the market keeps going down,
16  that means we are going to eat that.
17        They are clearly not
18  responding.  They are clearly not going
19  to top up.  So, you know, take actions to
20  protective ourselves from basically
21  having a massive hole.  So start to
22  liquidate their account and bring it into
23  good standing, if possible, or if not,
24  you know, follow liquidation.
25    Q.    Do you recall whether that

Page 147

1  liquidation occurred manually by FTX?
2        MR. PROULX:  Objection to form.
3    A.    So this is something that,
4  again, I think the details matter on.
5  It's not automated in the sense that it
6  wasn't like the system saw they were
7  under their maintenance margin
8  requirement and it started to liquidate
9  them.
10        What I am not sure was a manual
11  process is when Nishad or Sam hit
12  whatever they hit to liquidate, I don't
13  know if the system then goes forward with
14  the liquidation and automated process or
15  if the entire process is then going,
16  okay, this position liquidate, next
17  position liquidate.  So I don't know if
18  the actual process of the liquidation was
19  manual or automated.  But I do know the
20  trigger for the account to be liquidated
21  was a manual process.
22    Q.    That liquidation occurred after
23  the discussion that had taken place on
24  June 14th, 2022 in Exhibit 11, correct?
25        MR. PROULX:  Objection to form.

Page 148

1    A.    Yes.
2    Q.    Do you have a recollection of
3  generally how much was in the Three
4  Arrows account at the time of that
5  liquidation?
6        MR. PROULX:  Objection to form.
7    A.    No, I don't have specifics.  I
8  remember that a majority of their
9  collateral was in GBTC and FE.  And they
10  had a massive negative USD position.
11    Q.    Are you aware of FTX
12  liquidating any positions out of the
13  Three Arrows Capital's account prior to
14  the liquidation that occurred on or after
15  June 14th, 2022.
16    A.    No.  There may have been
17  automated liquidations.  I don't believe
18  there was any manual liquidations before
19  this date.
20    Q.    Are you aware of any automated
21  liquidations out of the 3AC account prior
22  to this date?
23    A.    No.  But like automated
24  liquidations are something very routine
25  and especially when clients have a lot of

Page 149

1  sub-accounts.  You know, you can have 100
2  million in one of your sub-accounts and
3  5,000 in one of your sub-accounts and
4  that sub-account gets liquidated, so it's
5  not a big negative or anything on the
6  firm if they do have a liquidation.  So
7  it's not really something that we would
8  be particularly concerned about if they
9  did.
10    Q.    As you sit here today, you're
11  not aware of any such automated
12  liquidations, correct?
13    A.    Correct.
14    Q.    During the period we have been
15  talking about, June 12th, 13th, 14th of
16  2022, after you became aware of the state
17  of the Three Arrows account, were you
18  monitoring their account?
19    A.    Yes.
20    Q.    How were you monitoring the
21  Three Arrows account in this time frame?
22    A.    Looking through the admin panel
23  to see what their account balances were.
24  And checking to see the deposit and
25  withdrawal record.

38 (Pages 146 - 149)

Page 150

1    Q.    And the first thing you said is
2 looking through the admin panel; can you
3 please explain what that is?
4    A.    FTX employees, like myself,
5 that dealt with clients, were able to
6 access an admin panel, which would allow
7 us to see customer balances, positions.
8 Basically we could log in and see the
9 website as the user would be seeing it in
10 a read-only state.
11        And then we could do other
12 things on the admin panel, like disable
13 withdrawals, grant credit lines, remove
14 credits lines, so on and so forth.
15    Q.    With your access to the admin
16 panel, you know, read-only state, would
17 you only be able to execute trades out of
18 that account?
19    A.    No, that wouldn't be read-only.
20    Q.    And then you said you otherwise
21 were monitoring withdrawals; what did
22 that entail?
23    A.    So like I said before, when
24 their account, you know, popped up a bit
25 positive, they continued to withdraw

Page 151

1 money instead of 240 million short on the
2 collateral needed for the credit line, we
3 should be topping up.  The moment they
4 could withdraw, because they no longer
5 had a negative balance, excluding the
6 LOC, they continued to withdraw, which
7 isn't a sign of -- isn't a sign of trying
8 to, you know, bring your account back
9 into a healthy state.  It's the opposite.
10    Q.    Mr. Tackett, if you could just
11 very briefly turn back to Exhibit 3,
12 which was the Telegram chat.
13    A.    Okay.  I am there.
14    Q.    If you can turn to Bates number
15 221, let me see if I can turn you to the
16 page in document, part of the chat that
17 we looked at earlier.
18    A.    I am there.
19        MR. PROULX:  Counsel, I just
20 missed that, did you say 221?
21        MR. GLUECKSTEIN:  Bates 221,
22 yes, sir.
23        MR. PROULX:  Thank you for the
24 clarification.
25    Q.    This is part of the chat that

Page 152

1 we looked at earlier, I just wanted to
2 ask you one follow-up.  In the middle of
3 that page, in your discussion back to
4 3AC, you say, "Just to highlight the
5 issue here..."  Do you see the part of
6 the chat that starts there at 7:16?
7    A.    Yes.
8    Q.    "Just to highlight the issue
9 here, per the agreement we signed, you
10 need to keep 200 percent collateral for
11 the LOC.  Any shortfall of that which
12 isn't topped up within 24 hours is
13 charged 10 percent per day.  Not only are
14 you not within your collateral
15 requirements, you are negative
16 $3,145,735.41 under water as of right
17 now."
18        Do you see that?
19    A.    Yup.
20    Q.    And can you just explain when
21 you write there, the negative number, the
22 negative 3.1 million under water, what
23 you are referring to?
24    A.    It's essentially saying that if
25 we withdrew the 120 million LOC, their

Page 153

1 account balance would be negative
2 $3,145,735.41.
3    Q.    And at this time the LOC
4 remains in place, as they were negative 3
5 million to the 120 million, but their
6 overall account balance at this time
7 remained positive, correct?
8        MR. PROULX:  Objection to form.
9    A.    No, incorrect.  Their account
10 balance was positive because of the LOC,
11 is my understanding based on this
12 message.  Like it's saying that the only
13 reason they see a positive number when
14 they log into the platform is because we
15 gave them 120 million dollars.  Take away
16 that 120 million and they are negative.
17    Q.    Understood.  But at this time,
18 when they had logged in, they would have
19 seen a positive number as a result of the
20 FTX LOC being in place, correct?
21    A.    Correct.  But I also don't
22 believe for a minute that someone logging
23 in on the 3AC team would see 120 million
24 and they would think, oh, great, we have
25 $120 million.

39 (Pages 150 - 153)

Page 154

1    It's crystal clear they have an
2 LOC.  They are well aware they had an
3 LOC.  The LOC had been in place for a
4 very long time.  They are well aware that
5 that is not their money.  I don't think
6 they are logging in and thinking that
7 they are positive.
8    Q.   Throughout this period in June
9 of 2022, is it your view that FTX treated
10 3AC's account fairly?
11    MR. PROULX:  Objection.
12    A.   100 percent, absolutely.
13    Q.   Can you explain your
14 perspective on that?
15    A.   Yeah, so, you can look at the
16 messages.  I am even saying, like, hey,
17 look, I just want -- I just want a
18 response from you guys.  We aren't going
19 to charging you 10 percent a day, we are
20 trying to work with them.
21    And I would say actually we
22 kind of went further, because 3AC was a
23 big bank, I would say for most of my
24 clients, the moment they hit a negative
25 balance, I would have just liquidated the

Page 155

1 account, because then you're really
2 taking a gamble at that point and, yeah,
3 so I would say we actually gave them more
4 breathing room than we would most other
5 clients in part because of the size of
6 their account, in part because of the
7 brand 3AC.  We gave them plenty of time
8 to respond, they didn't respond.
9    I would say we treated them
10 very fairly.
11    Q.   Thank you, sir.
12    A.   Also, when they had withdrawn
13 when we are asking them to top up.
14 Again, that's showing that they are not
15 trying to bring their account back into a
16 healthy state.  They are actually trying
17 to -- they are doing anything they can to
18 get more money out.  Which is a terrible
19 sign as an exchange operator.
20    I think the fair thing to do is
21 the moment we saw them withdrawing
22 additional funds would be to liquidate
23 them and close them out completely.  But
24 instead of doing that, we gave them more
25 time.

Page 156

1    Q.   Thank you very much, sir.
2    MR. GLUECKSTEIN:  That's all the
3 questions I have for you today.  I
4 appreciate your time, Mr. Tackett.  I
5 know counsel for Three Arrows has
6 questions for you pursuant to our
7 agreement.  So I think it makes sense
8 to take a short break and then when we
9 come back Mr. Proulx will have some
10 questions for you.
11    MR. PROULX:  We're fine to do
12 just that.  We'll need a little bit of
13 reset on the exhibit sharing.
14    Zane, I'm assuming you'll need a
15 dinner break at some point so you're
16 good to go for the remainder of the
17 day; is that right?
18    THE WITNESS:  Um, my tummy's
19 growling, I would like some food.  I
20 don't know if it's done yet, but yes.
21    MR. PROULX:  We're happy to give
22 you as much time as you need here.
23 Counsel, Mr. Kast, I defer to you and
24 your client as to how much time you
25 need for a break.

Page 157

1    THE REPORTER:  Let's go off the
2 record.
3    THE VIDEOGRAPHER:  The time is
4 9:44 a.m. Eastern, let's go off the
5 record.
6    (Off the record.)
7    (Lunch recess taken.)
8    THE VIDEOGRAPHER:  The time is
9 10:34 a.m. Eastern, we are back on the
10 record.
11 EXAMINATION BY MR. PROULX:
12    Q.   Mr. Tackett, I don't think I
13 got a chance to properly introduce myself
14 at the beginning.  We didn't take live
15 appearances.  My name is Zach Proulx, I
16 am with the law firm Latham & Watkins.
17 We represent the joint liquidators of
18 Three Arrows Capital estate.  We do not
19 represent Three Arrows.  We do not
20 represent the founders of Three Arrows,
21 some of whom we discussed here today.
22 Just wanted -- I am happy to make that
23 representation.
24    I guess my question to you is,
25 do you understand who we represent here

40 (Pages 154 - 157)

Page 158

1 and who we don't represent for that
2 matter, too?
3    A.   I do.
4    Q.   Are you aware that our clients,
5 the joint liquidators, are actually in
6 litigation with the founders of Three
7 Arrows right now?
8    A.   No.  I know that there have
9 been some issues during the 3AC process
10 and they haven't been exactly
11 forthcoming.
12    Q.   And actually, on that exact
13 point, our clients have had to attempt
14 through their own diligence to recreate
15 the books and records of Three Arrows
16 Capital precisely because the founders of
17 Three Arrows Capital have not been
18 forthcoming with our clients.  And this
19 is why we're here today, because we are
20 just trying to understand what happened.
21 And we appreciate your voluntary
22 participation in this deposition.  And
23 just wanted to thank you for your time.
24    A.   Appreciate the background and
25 my pleasure.

Page 159

1    Q.   Just to confirm, we've never
2 spoken; is that right?
3    A.   Not to my knowledge.
4    Q.   And you have never spoken with
5 any of my colleagues at Latham & Watkins
6 about this dispute that the joint
7 liquidators have with FTX; is that right?
8    A.   Not as far as I am aware.
9    Q.   You heard counsel for the FTX
10 Recovery Trust give some ground rules
11 today.  You are doing great, so I am
12 going to skip over them.  You are a pro
13 already at this stuff.
14        Just for the record, continuing
15 on for the rest of the day, there is no
16 reason you can't testify truthfully and
17 accurately, right?
18    A.   No, sir, there is no reason.
19    Q.   You're represented by counsel
20 here today; is that right?
21    A.   Yes, sir.
22    Q.   And who is that counsel?
23    A.   Galen.
24    Q.   And he's with the law firm
25 Steptoe; is that right?

Page 160

1    A.   Yes, sir.
2    Q.   I know you said earlier that
3 you had spoken with your counsel in
4 preparation for this deposition.  I am
5 not going to ask you about those
6 communications.  I am just going to ask
7 you what sort of documents you took a
8 look at to get ready for this deposition.
9 Do you recall any?
10    A.   We may have looked at some.  I
11 don't know specifics.
12    Q.   Any specific documents jump to
13 mind?
14    A.   To be honest, no, sir.  I had
15 the call with Steptoe this morning.  They
16 actually woke me up.  I was pretty tired
17 when we did that.  I think just went over
18 ground rules.
19    Q.   I completely understand and let
20 me maybe make your life a little easier,
21 and ask it specifically you took a look
22 at the joint liquidators, what is called
23 proof of claim, that our clients filed in
24 the bankruptcy?
25    A.   No, sir.

Page 161

1    Q.   And what about the objection, a
2 legal brief or a legal document that FTX
3 filed in opposition to our proof of
4 claim; did you read that?
5    A.   No, sir.
6    Q.   Have you spoken with anyone in
7 the last year about this dispute we are
8 having, the joint liquidators are having
9 with FTX other than counsel here?
10    A.   I did speak with S&T.
11    Q.   We'll come back to that.
12 Anyone either currently or formerly with
13 FTX itself, have you spoken about these
14 issues?
15    A.   Not the issue itself.  I have
16 spoken about the annoyance of me still
17 having to deal with FTX things in
18 relation to this, with ex-FTX colleagues.
19    Q.   Understood.  Did they offer
20 their own views on any of the substance
21 of this dispute or any Three Arrows
22 specific issues?
23    A.   Not related to this itself.
24 More so just to the pain of having to
25 continuously deal with FTX fallout.

41 (Pages 158 - 161)

Page 162

1   Q.   Understood.  Actually, the very
2   first document you were shown today was
3   called a subpoena.  It's a legal
4   document.  And do you know if the FTX
5   Recovery Trust served you with that
6   document?
7       A.   I don't believe I have been
8   served, to the best of my knowledge.
9       Q.   Let's talk a little more about
10  background.  You gave a great explanation
11  earlier.  I don't have many questions on
12  it.  I am just going to focus solely on
13  the FTX work.  We don't need your
14  educational or prior employment history.
15  I don't know if I heard what title you
16  had at FTX, apologies if I missed that.
17  What was your title?
18      A.   At the time when FTX blew up,
19  it was head of institutional sales.
20  Before that I didn't have a title.  I
21  just did, sales guy, sales PD.
22      Q.   I know we discussed a few of
23  them here today already.  But what were
24  some other general responsibilities you
25  had as the head of institutional sales?

Page 163

1       A.   My main responsibilities were
2   targeting clients that weren't actively
3   trading on FTX and getting them onboarded
4   to trade.  Identifying clients that are
5   onboarded, but aren't doing, you know,
6   volumes that are commensurate with, you
7   know, their standing in the industry and
8   seeing how we can get them to increase
9   their volumes.  Making sure that the
10  clients that are trading large volumes
11  are taken care of, pleased with the
12  service they are getting and working with
13  them to improve our product.  And then
14  working with the devs on my side to get,
15  you know, the improvements to the
16  platform that the clients wanted to see
17  get those done.
18      Q.   And you refer to working with
19  the devs, those are the developers?
20      A.   Correct.
21      Q.   And are you a developer or were
22  you a developer yourself?
23      A.   No, sir.
24      Q.   Are you a coder or computer
25  programmer?

Page 164

1       A.   No, sir.
2       Q.   But you worked with folks who
3   are, who were the programmers?
4       A.   Yes, sir.
5       Q.   So never asked to like weigh in
6   on the code that FTX used to run its
7   exchange?
8       A.   No, sir.
9       Q.   There was some reference, I
10  believe some explanatory documents that
11  FTX may have published, perhaps
12  internally, perhaps to its customers.
13  Were you responsible as head of
14  institutional sales for preparing or
15  commenting on any of those?
16      A.   Yes, sir.
17      Q.   Do you recall which ones?
18      A.   They are too numerous to
19  mention.  I mean there is lots of things.
20      Q.   Any that relates to lines of
21  credit, specifically?
22      A.   Yes, the LOC explainer.
23      Q.   I am going to introduce a
24  document here.  We marked an Exhibit as
25  78.  Just let me know when you've got

Page 165

1   that available to you.
2           (Tackett Exhibit 66, Document
3       entitles FTX_3AC_000013689, was so
4       marked for identification, as of this
5       date.)
6       A.   Exhibit 78 - Exhibit 66?
7       Q.   Yeah, you know what, I actually
8   am going to remove that and try uploading
9   one more time.
10          Thanks for bearing with me.
11  There should be a new version that is
12  uploaded that just says Exhibit 66.
13      A.   Got it.
14      Q.   This was previously marked at
15  another deposition as 66, hence the
16  change here.  My question to you is this
17  one of the documents that you would have
18  edited or commented on?  This for the
19  record is entitled "Lines of Credit on
20  FTX."
21      A.   Yes, sir.
22      Q.   Do you recall, I don't believe
23  I see a date here -- do you recall in
24  what time period you worked on this
25  document?

Page 166

1    A.   I believe it was around the
2  time we did the re-papering.  It could
3  have been after that, though.  I am not
4  positive.
5    Q.   Who else other than yourself
6  was involved in preparing this document?
7    A.   The VIP team.
8    Q.   I understand the testimony is
9  that you assumed primary responsibility
10  for the Three Arrows relationship at a
11  certain point in time.
12       At that point in time, did you
13  have like a second in command or a number
14  2 to service the Three Arrows account on
15  the VIP team?
16    A.   No, it was mostly, it didn't
17  really work like one, two, three.  It
18  worked like there is me.  And then
19  everybody else helped.  But then we have
20  two people, Graham and Levin, who were
21  responsible for the more technical
22  aspects.  And then we had regional
23  people, so we had people, you know, in
24  the U.S. that handled coverage for U.S.
25  hours.  We had people in Europe that

Page 167

1  covered European hours and people in Asia
2  that covered Asian hours.  It's not like
3  one, two, three.  You have one and then
4  everybody works as a team.
5    Q.   I just introduced another
6  exhibit.  This is 65.  It's been
7  previously marked as well in connection
8  with a different deposition.  Let me know
9  when you have this one available to you.
10       (Tackett Exhibit 65, Document
11       Bates stamped FTX_3AC 16098, was so
12       marked for identification, as of this
13       date.)
14    A.   Okay.  I got it.
15    Q.   And this for the record is
16  titled "Lines of Credit," obviously.
17  Please take a spin through.
18       My question is going to be, do
19  you recognize this document?
20    A.   No, I have never seen this
21  before in my life.  I have never even
22  heard, like small LOCs, I wasn't aware
23  that there were one or $100 LLCs out
24  there.
25    Q.   Have any sense of who might

Page 168

1  have worked on this document.
2    A.   I am going to guess that it was
3  Sam.  This seems like quite old.
4    Q.   And I will note for the record
5  that there are some comment bubbles that
6  might be indicative of draft format.  I
7  am not making that representation,
8  though.
9    A.   Sorry, could you repeat that?
10    Q.   It was just a comment for the
11  record, we're seeing some comment bubbles
12  in the right-hand margin of this
13  document.
14    A.   Yeah.  I haven't seen this.
15  Again, I am not sure if this was ever
16  published or anything or if this was an
17  internal document.  Yeah, I haven't seen
18  that before.
19    Q.   No problem.  You can put that
20  aside.  I appreciate you trying to help
21  on this one.  Let me ask you this, was
22  there any broad topics that you would not
23  have weighed in on in terms of
24  explanatory documents that FTX prepared?
25       MR. GLUECKSTEIN:  Object to the

Page 169

1    form.
2    A.   By and large retail-focused
3  documents.  Although, I guess in the end
4  I did end up working on the FAC.  But,
5  yeah, I didn't do that much on the retail
6  side.
7    Q.   When you say retail side, what
8  does that refer to?
9    A.   Small users.  Users that are in
10  fee tiers, you know, like 1 through 4, 1
11  through 3.
12    Q.   What about any explanatory
13  documents relating to FTX's margin
14  lending program, would you have commented
15  on any of those?
16    A.   Could have, may have.
17    Q.   Are you familiar with FTX
18  having a terms of service in effect while
19  you were affiliated with them?
20    A.   Yes.  And those terms of
21  service were updated once we moved to FTX
22  digital markets, away from FTX trading.
23    Q.   Do you know approximately what
24  time period that update occurred in?
25    A.   Sometime in 2022.  I would say

43 (Pages 166 - 169)

Page 170

1 summer 2022. Maybe spring.
2     Q.   I will bring up a document
3 titled "Terms of Service." You can let
4 me know if this is the one that you have
5 in mind. So this will be Exhibit 15 and
6 it's been previously marked.
7        (Exhibit 15, Document Bates
8        stamped FTX_3AC 13695, was previously
9        marked for identification.)
10    A.   I don't think so. Because this
11 says "FTX Trading LTD," whereas the
12 updated terms of service would have FTX
13 Digital Markets and this is under Antigua
14 not Bahamas.
15    Q.   Just for the record, this
16 document is titled "FTX Terms of Service"
17 dated May 13, 2022 and references FTX
18 Trading Limited in the first paragraph.
19        Are you familiar with a
20 separate terms of service in existence
21 for FDMs, for FTX Digital Markets, during
22 your tenure with FTX?
23    A.   Yes.
24    Q.   And was that separate terms of
25 service finalized?

Page 171

1    A.   Yes.
2    Q.   Did that separate terms of
3 service govern the FTX.com exchange?
4    A.   Yes, it did.
5    Q.   Do you recall any ways in which
6 it differed materially than the terms of
7 service in effect for FTX Trading Ltd. as
8 of May 2022?
9        MR. GLUECKSTEIN: Objection.
10 Calls for a legal conclusion.
11    A.   I would say that it had a
12 number of differences. As to the
13 specifics, I don't know. You would have
14 to look at the actual terms of service.
15    Q.   Do you recall any reasons for a
16 variation between those two versions of
17 the terms of service?
18        MR. GLUECKSTEIN: Objection to
19 form.
20    A.   I believe to adhere to certain
21 aspects of operating in Bahamas under the
22 new licensure, the new licensing.
23    Q.   We'll come back to that. But
24 just to confirm, were you involved in
25 drafting or weighing in on the terms of

Page 172

1 service we have up in front of us right
2 here at Exhibit 15?
3    A.   No, sir.
4    Q.   Okay. And what about, same
5 question as applied to the later terms of
6 service for FTX Digital Markets, did you
7 have any involvement in drafting or
8 weighing in on those?
9    A.   By and large no.
10    Q.   You say by and large no, was
11 there certain times that you were
12 involved?
13    A.   Certain clients dealing with
14 onboarding might have specific issues
15 with certain parts of the terms of
16 service. And depending on who the client
17 is, we might work with them on modifying
18 certain aspects of it.
19    Q.   Did the FTX Digital Markets'
20 terms of service govern both the FTX U.S.
21 and both FTX.com exchanges once it went
22 into effect?
23    A.   I believe it was limited to
24 FTX.com, since those related to the
25 Bahamian entity FTX Digital Market,

Page 173

1 whereas FTX.US is under West Realm
2 Shires.
3    Q.   You can put that to the side
4 for the moment.
5        Did you have any involvement at
6 FTX as head of digital sales in weighing
7 in on or preparing or reviewing any
8 financial statements that FTX prepared?
9    A.   No. I would share the
10 financial statements with clients as
11 needed to onboard certain clients we
12 would have to do that.
13    Q.   What about, the same question
14 for any balance sheets that FTX may have
15 prepared?
16        MR. GLUECKSTEIN: Object to the
17 form.
18    A.   Same answer.
19    Q.   Do you recall Three Arrows in
20 particular ever requesting those
21 financial statements or balance sheets?
22    A.   No, I do not.
23    Q.   Who reported to you as head of
24 institutional sales?
25    A.   The VIP team.

44 (Pages 170 - 173)

Page 174

1    Q.    So you were at the head of the
2  VIP team?
3    A.    Correct.
4    Q.    And who, if anyone, did you
5  report to in your role?
6    A.    Technically or in practice?
7    Q.    Let's take them in turn.  So
8  let's first be formal and technical about
9  it.
10    A.    I believe technically I
11 reported to Constance, Constance Wang.
12    Q.    Who was Constance Wang?
13    A.    The co-CEO, I believe was her,
14 her title of FTX Digital Markets along
15 with Ryan Salame.
16    Q.    And did she, in fact, in
17 practice oversee you in that role?
18    A.    No, not really.
19    Q.    And who in practice, if anyone,
20 oversaw your role as head of
21 institutional sales?
22    A.    Sam to a small degree.  But in
23 effect I was pretty much allowed to do, I
24 was pretty hands off.
25    Q.    We introduced a new exhibit.

Page 175

1  This one is marked as 78.  And it's
2  entitled "FTX Org Chart."  This was a
3  publicly-available document not produced
4  in discovery in this action.  It's large.
5  Feel free to zoom in on it and take a
6  moment to take a look at it.
7        (Tackett Exhibit 78, Document
8        entitles FTX Org Chart, was so marked
9        for identification, as of this date.)
10    A.    I am pretty sure I remember the
11 article that this came from.  It hasn't
12 loaded yet.  I think this was the one
13 that -- yeah, I am familiar with this.
14    Q.    My question is going to be,
15 does this revolve around the technical
16 lines of reporting around and when?
17        MR. GLUECKSTEIN:  I am going to
18    object to this and object to the
19    history of the document since it
20    wasn't produced in this case.
21    Q.    You can answer the question.
22 Let's start with the lines of reporting
23 around yourself.  I am asking as a
24 technical matter if that reflects
25 accurately the lines of reporting, and if

Page 176

1  so when?
2    A.    As I mentioned, technically
3  Constance was who I reported to.  But in
4  practice, I didn't really report to
5  anybody.  This is also missing the FTXE
6  West Team as being under me.  I mean I
7  guess probably it's going to be under
8  Brett or something.  So like Nate Clancy,
9  Chase Branham, Sebastian, they worked
10 under me.  Yeah, I mean, Brett wasn't
11 even there when we left.  I don't know
12 when this would be -- like I guess this
13 would have been accurate at some point,
14 maybe, for me.  It's also missing Quinton
15 under me.  Yeah.
16    Q.    Earlier today you spoke about
17 someone whose English name was Allison.
18 I see there is an Allison Chen underneath
19 you; is that the same person?
20    A.    Yeah.
21    Q.    You can put this aside.  Over
22 the course of the day, you talked about
23 use of various messaging services, Slack,
24 Telegram, Signal and would love a better
25 sense, if you're able to provide, as to,

Page 177

1  let's start with just for internal use
2  purpose, when you would use one versus
3  another?
4    A.    Not a lot of rhyme or reason
5  for one over the other.  I guess a lot of
6  stuff, if it was coming directly from
7  clients and only to be discussed within
8  the VIP team, would stay on Telegram,
9  because it's a pain in the ass to have to
10 copy from Telegram and then paste and
11 then put who wrote it into slack and
12 everything.  Whereas I can just click
13 forward and it goes to my VIP chat.
14        So like if it was stuff related
15 to clients in that sense, usually my team
16 would keep it on Telegram.  If it needed
17 people that weren't on Telegram, or if I
18 needed to interact with the devs, a lot
19 of times it would go to Slack.  That
20 ended up becoming Signal later on,
21 because I had trouble getting responses
22 on Slack and people were like you should
23 use Signal.  So then I used Signal,
24 because people responded better.
25    Q.    That's really helpful, thank

45 (Pages 174 - 177)

Page 178

1  you. And for each of these, did you use
2  them both on a phone, in a laptop or one
3  or the other in certain cases?
4      A.  No, both.
5      Q.  Earlier we talked about certain
6  communications you may have had or not
7  had with Kyle Davies and Su Zhu of Three
8  Arrows. Do you recall those
9  conversations?
10     A.  Sorry, do I remember the
11  conversations that I may or may not have
12  had or do I remember the conversation
13  today about potential conversations that
14  I had?
15     Q.  That was a bad question.
16  Thanks for clarifying. I was referring
17  to the second of the two.
18     A.  I do remember speaking with you
19  guys about potential conversations that I
20  had, yes.
21     Q.  I apologize if you already
22  addressed this, but do you recall how
23  many times you spoke directly with Kyle
24  Davies of Three Arrows?
25     A.  No, not many.

Page 179

1      Q.  Okay. Were all of the
2  conversations during your tenure as the
3  head of the FTX/Three Arrows relationship
4  or were some before or after that tenure?
5      A.  I am pretty sure I met Kyle
6  Davies and Su in Tokyo in, I don't know,
7  2018, 2019, when I was at B2C2, they came
8  to our office.
9      Q.  Did you stay in touch with them
10  between that point in time and the point
11  in time in which they became customers of
12  FTX?
13     A.  Not really, no.
14     Q.  What is the last time you had
15  any direct communications, whether
16  electronic or verbal, with either Kyle or
17  Su Zhu?
18     A.  The last message I would have
19  sent to them would have been the one in
20  the chat about, you know, you guys need
21  to top up and, you know, the messages
22  that we reviewed earlier that ended with,
23  we're going to move forward with pulling
24  the LOC in 45 minutes.
25         When Kyle Davies and Su started

Page 180

1  OX.FUN, Kyle Davies reached out to me
2  asking if I wanted to work with him. I
3  did not respond for obvious reasons. The
4  last message in our chat before that was
5  me asking him to get on a call regarding
6  their shortfall of the LOC.
7      Q.  You referred to not responding
8  to Kyle because of obvious reasons. Just
9  so the record is clean, what were those
10  obvious reasons?
11     A.  To put it blunt because he's a
12  piece of shit. I think what he had to
13  say in the fallout of 3AC on, you know,
14  in the New York Times article and the
15  callousness that she showed toward the
16  damage and the harm that they did was
17  reprehensible. And then they started
18  another scam, which was the OX.FUN. Went
19  ahead and scammed their users. Stole
20  money from another exchange, which
21  ironically happened with that exchange's
22  participation, that would be Mark Lamb of
23  CoinFLEX and OX.FUN, or whatever it ended
24  up becoming.
25     Q.  Fair to say you have a bad

Page 181

1  relationship with Kyle and Su Zhu?
2      A.  No, I don't -- well, with Su,
3  yes. Su went after me on Twitter and
4  spread lies that I was talking shit about
5  3AC in 2018, when 3AC was actually a
6  client of mine. And he said I was
7  helping Alameda. So it wouldn't make
8  sense for me to talk down to a client in
9  support of a competitor. He also
10  slandered Ryan Salame, saying Ryan did
11  the same thing. But Ryan also didn't
12  work at FTX at that time. So Kyle and I
13  really don't have a relationship. I have
14  a very negative opinion of him. Su and I
15  don't have a good relationship.
16     Q.  We are going to show you a
17  document that's been marked as Exhibit
18  79.
19         (Tackett Exhibit 79, Tweet posts
20     by @Tackett Zane, was so marked for
21     identification, as of this date.)
22     Q.  You referred to, I believe, a
23  few tweets or posts that you may have
24  engaged in relative to Su Zhu, and is
25  this one of them?

46 (Pages 178 - 181)

Page 182

1    A.    This is the exact tweet --
2  well, I am both tweeting the thread of
3  the exact tweet I was referring to
4  earlier where Su was saying that Ryan and
5  I did stuff before we even worked at the
6  company.
7    Q.    That frustrated you, right?
8    A.    Yes.  I am not a big fan of
9  people spreading lies about me.
10   Q.    We are going to show you
11 Exhibit 80 in just a moment here.
12       (Tackett Exhibit 80, Tweet posts
13       by @Tackett Zane, was so marked for
14       identification, as of this date.)
15   Q.    And for the record, both
16 Exhibit 79 and 80 are publicly-available
17 Twitter posts by @Tackett Zane.
18       First question on Exhibit 80
19 is, does this reflect a compilation of
20 public Twitter posts you've or re-posts
21 you've made?
22   A.    I am still working on getting
23 it up.  Give me a sec.
24   Q.    Take your time.
25   A.    Is this like a massive bio or

Page 183

1  something.
2    Q.    I can represent that we used a
3  service called Page Vault that just
4  compiled, all recent as of the time of
5  this document, posts or re-posts you had.
6    A.    There I am talking about Terra
7  money, its ads in Washington.  Yes, this
8  looks like my Twitter.
9    Q.    Cool, awesome.  And we won't go
10 through it all.  I just wanted to align
11 with the last notes you made, if you can
12 flip to page 12.
13   A.    Okay.
14   Q.    And when I say page 12, I am
15 referring to the pagination in the lower
16 right-hand corner that says 12 of 26.
17   A.    Got you.
18   Q.    It was ambiguous.  I just
19 wanted to clarify that.
20   A.    Hold on a second.
21   Q.    And then on November 15th,
22 2022, you post a tweet stating "It's
23 unfortunate to see @Zhu_Su make up
24 stories in an attempt to regain standing
25 in the community," and you continue on.

Page 184

1  Do you see that?
2    A.    Yes.
3    Q.    And is that one of the posts
4  that you had referred to earlier as, that
5  arose from a commentary that Su Zhu made
6  of you?
7    A.    That is the post; yes, sir.
8       MR. PROULX:  We will introduce
9  Exhibit 81 in just a moment.
10       (Tackett Exhibit 81, e-mail
11       exchange, was so marked for
12       identification, as of this date.)
13   Q.    And for the record while you're
14 pulling it up, this is an e-mail exchange
15 between yourself with Benjamin
16 Beller from Sullivan and Cromwell.  The
17 top e-mail is dated December 9th, 2024.
18   A.    Yeah.
19   Q.    Do you recall this exchange?
20   A.    Yeah.
21   Q.    The posts we just looked at and
22 commentary you offer regarding Su Zhu,
23 are the reasons you told S&C you didn't
24 want to help Three Arrows in this matter?
25   A.    No, the reason why I wouldn't

Page 185

1  want to help Three Arrows is because they
2  were clearly in the wrong and were at a
3  negative account balance, which means
4  that they have no right to claim that
5  they were unjustly liquidated.
6       If your account is negative,
7  yeah -- if your account is negative,
8  like, you're well beyond where we would
9  have, be well within our rights to
10 liquidate you.
11   Q.    Do you understand -- please
12 finish your answer, sorry about that.
13   A.    And I was going to say and the
14 line of credit agreement clearly states
15 that we can pull the LOC at any time.
16   Q.    Do you understand someone to
17 assert that Three Arrows was unjustly
18 liquidated?
19   A.    Sorry, can you repeat that?
20   Q.    Sure, you just referred to
21 someone potentially claiming that Three
22 Arrows was unjustly liquidated.  Do you
23 understand someone to be claiming that?
24   A.    Yes, I understand that to be
25 the matter at hand here.

47 (Pages 182 - 185)

Page 186

1    Q.   Do you understand that the
2 joint liquidators, not Three Arrows, but
3 the joint liquidators of Three Arrows to
4 assert something called a preference
5 claim against the FTX Recovery Trust?
6        MR. GLUECKSTEIN:  Objection.
7    Calls for a legal conclusion.
8    A.   Sorry, am I aware that that's
9 happening, is that what you're asking?
10   Q.   Are you aware that the joint
11 liquidators have asserted something
12 called a preference claim against the FTX
13 Recovery Trust?
14       MR. GLUECKSTEIN:  Objection.
15   Calls for a legal conclusion.
16   A.   No, I am not aware of the
17 specifics.
18   Q.   While we have this document up,
19 you received input from Sullivan and
20 Cromwell regarding your involvement in
21 this dispute, right?
22       MR. GLUECKSTEIN:  Object to the
23   form.
24   A.   Sorry, again, can you repeat
25 that?  I received what from Sullivan and

Page 187

1 Cromwell.
2    Q.   Did you receive any input from
3 Sullivan and Cromwell about your
4 obligations or involvement in this
5 litigation, in this e-mail exchange?
6        MR. GLUECKSTEIN:  Object to the
7    form.
8    A.   When you say input, I am not
9 quite sure what specifically you're
10 referring to.  They did contact me
11 regarding this matter.
12   Q.   Just maybe we can be more
13 concrete.  That's a good point.  Let's
14 look at page 5 of this document.
15   A.   That's ending in 15844?
16   Q.   Absolutely.  Yes, thank you.
17       The very first paragraph of
18 this page, this is a part of an e-mail
19 exchange from Benjamin Beller.  It states
20 "Just to be clear, it is 3AC that is
21 sending the subpoena not the FTX debtors,
22 and you are under no obligation to do
23 anything on the deposition until you are
24 properly served with the subpoena which
25 won't happen while you are traveling."

Page 188

1        You saw that?
2    A.   I did.
3    Q.   And that the next paragraph on
4 that same page says that "They can't
5 force you to do anything until they have
6 properly served the subpoena on you in
7 the U.S."
8        Do you see that part, too?
9 It's at the very end of the next
10 paragraph.
11   A.   Yes.
12   Q.   Did you see that as advice from
13 Sullivan and Cromwell about your
14 obligations?
15   A.   No, not really.
16   Q.   How did you interpret those
17 statements?
18   A.   That I don't have to do
19 anything, because I wasn't properly
20 served in the U.S. and that this would be
21 at my own behest.
22   Q.   The previous part of that same
23 sentence we were just looking at says,
24 "Part of that coordination would mean
25 that we can help you navigate the

Page 189

1 deposition."
2        Did you see that?
3    A.   I do.
4    Q.   Did they, in fact, offer that?
5        MR. GLUECKSTEIN:  Object to the
6    form.
7    A.   I would need more clarity on
8 what you mean by navigate.
9    Q.   Did S&C help you navigate the
10 deposition in any way?
11       MR. GLUECKSTEIN:  Object to the
12   form.
13   A.   No, I mean I guess Galen would
14 be the one who helped set up the meeting:
15 No.  I don't know how I would say they
16 helped.  They reached out.  I said I was
17 happy to help.  And, yeah.
18   Q.   We'll come back to this, you
19 can put it aside for the moment.  I am
20 going to pull up in a minute a previously
21 marked document.  So this will be a
22 previously marked document at Exhibit 39.
23       (Exhibit 39, Document Bates
24   stamped Tackett_3AC_000361, was
25   previously marked for identification.)

48 (Pages 186 - 189)

Page 190

1    Q.    And this is actually the same
2  document, I am happy to represent, we
3  were discussing earlier in the day.  This
4  is Tackett_3AC_000361.  Do you recall
5  looking at this earlier?
6    A.    Yes.
7    Q.    Do you know when the data in
8  this document was accurate as of?
9    A.    I don't know the exact date,
10  no.
11    Q.    Do you have an imprecise date
12  in mind for when this data is accurate as
13  of?
14    A.    I would guess sometime around
15  the collapse.
16    Q.    The collapse of FTX?
17    A.    Of 3AC.
18    Q.    When you say the collapse of
19  3AC, what time period are you referring
20  to then?
21    A.    That would be June 2022.
22    Q.    Okay.  You mentioned earlier
23  that if you were to scroll down in this
24  document, you would see more
25  asset-by-asset positions.  Do you recall

Page 191

1  that testimony?
2    A.    No, I didn't say if you were to
3  scroll down on this document.  I said if
4  you were to scroll down on this web page.
5    Q.    That's a very fair
6  clarification.  I should have been more
7  precise about that.
8        What sort of asset by asset
9  positions would you see if you were to
10  scroll down on that web page?
11    A.    I don't know.  Well, I know
12  that you would have seen a massive
13  negative USD amount.  You would have seen
14  a large BTCE position and you would have
15  seen a large FE position.
16        Sorry, did I say DBTC or did I
17  say BTCE?  Scratch that.  You would have
18  seen a large negative USD.  You would
19  have seen a large GBTC position.  And you
20  would have seen a large FE position.
21    Q.    And when you refer to those
22  positions, do you have Three Arrows
23  specific positions in mind?
24    A.    Yes, yes.  This is specifically
25  related to the assets that 3AC held or

Page 192

1  had a negative balance of.  The USD was
2  negative, GBTC and FE were positive.
3    Q.    And how do you know this
4  document relates to Three Arrows,
5  specifically?
6    A.    Well, when I took a picture and
7  sent it to them, I am pretty sure I got
8  it from one of the chats regarding 3AC.
9  Also, it does add up with my
10  recollection.
11        Total collateral used by
12  authentic futures position, not that big.
13  Total collateral used by outstanding spot
14  margin borrows, very large.  They had a
15  massive negative USD position.  So that
16  kind of adds up with that.  Yeah.
17    Q.    What is available collateral,
18  the last line item in this screen shot?
19    A.    The amount of collateral that's
20  available.
21    Q.    Available for what?
22    A.    For positions.
23    Q.    For positions under margin
24  requirements or for positions under other
25  requirements on the exchange?

Page 193

1    A.    This would specifically relate
2  it to futures or spot margin positions.
3  And again, I do feel like it is necessary
4  to point out that this does not include
5  or that rather this is inclusive of the
6  $120 million.  So it doesn't reflect that
7  120 million LOC as a liability.  It shows
8  it as contributing to this balance and
9  contributing to the available.
10    Q.    Was the line of credit, in
11  fact, a liability?
12    A.    That's money that was in their
13  account that was debt, it's not their own
14  capital, so yes.
15    Q.    Why did you save this
16  particular document or the larger
17  document that contain this screen shot?
18    A.    Probably because I was sending
19  it to somebody internally showing them
20  what was going on with the 3AC account.
21    Q.    Did you just more generally
22  save, save documents that you still have
23  from your tenure at FTX?
24    A.    Yes.
25    Q.    Was that because you were

49 (Pages 190 - 193)

1 instructed to do so or is it just your
2 personal practice?
3    A.    Both.
4    Q.    Who instructed you to do that?
5    A.    Well, when I was originally
6 served my subpoena by the FBI, SDNY, FTC,
7 CFTC, all those good three letter
8 agencies, part of it was not destroying
9 any evidence or deleting any of the fee
10 documents and information that I have.
11    Q.    And did you comply with that
12 instruction?
13    A.    Yes, although I believe that
14 Steptoe got the subpoena thrown out
15 because it was ordering me to appear in
16 Court in like three days when I lived in
17 Thailand and it was telling me to appear
18 in Court in the U.S. So I don't believe
19 those were necessarily binding.  But I do
20 keep work-related things, anyways.
21    Q.    So the word "collateral" as
22 used in the line items here, what does
23 that consist of exactly?
24        MR. GLUECKSTEIN:  Object to the
25    form.

1    A.    You need to be more clear on
2 what you're asking for.  Are you saying
3 what assets make up that collateral or
4 how are those numbers reached or can you
5 be specific on what you're asking?
6    Q.    Yeah, I appreciate that
7 clarification.  Happy to try to do so.
8 Thank you, Mr. Tackett.
9        So I understand, let's just
10 refer to the most recent testimony.  I
11 understand that some or all of these
12 balances are inclusive of the line of
13 credit amount; is that right?
14    A.    Yes, I believe so.
15    Q.    Which ones here are inclusive
16 of the line of credit amount?
17    A.    Total USD value of positive
18 spot balances.  Collateral contributed by
19 positive spot balances.  And available
20 collateral.
21    Q.    So let's just take the second
22 of that bunch, collateral contributed by
23 positive spot balances.  So 120 million
24 of that, roughly, is a component of that
25 199; is that right?

1    A.    That would be my understanding,
2 yes.
3    Q.    And so the remaining 79 million
4 and change, what does that consist of?
5    A.    As I mentioned, I remember they
6 had a large GBTC and FE position or a
7 large GBTC and FE held in their account
8 as positive spot balances.
9    Q.    Does this collateral
10 contributed by positive spot balances
11 reflect any offsetting of any borrowing
12 of those BTC or other digital coins that
13 you mentioned?
14        MR. GLUECKSTEIN:  Object to the
15    form.
16    A.    Are what do you mean by
17 offsetting, are you asking if they were
18 borrowing GBTC?
19    Q.    Sure.  You know, in addition to
20 however many BTC positive spot Three
21 Arrows had at the time, it also had
22 exactly one BTC borrowed.  Would the
23 total amount of BTC that gets fed into
24 this positive spot balances be the
25 difference between those two or would

1 they only consist of assets?
2    A.    The BTC and GBTC are totally
3 different assets.  BTC is bitcoin.  GBTC
4 was BTC that is part of the Grayscale
5 Trust.  So they have different collateral
6 contributions.  So if you have one BTC
7 positive, or that's one GBTC and minus
8 one bitcoin, that doesn't mean that it
9 just nets out to zero, because they are
10 treated as totally different assets on
11 the platform.
12    Q.    Why are they treated as totally
13 different assets on the platform?
14    A.    Because GBTC doesn't have the
15 same fungibility as BTC.  All BTC are
16 fungible.  BCC and GBTC aren't fungible.
17 GBTC is bitcoin that's held in a
18 Grayscale Trust.  Couldn't be redeemed.
19 You're much more limited than what you
20 can do with GBTC than you are with BTC.
21    Q.    So those particular assets
22 don't net off against each other for
23 purposes of some kind of overall?
24    A.    No.  FTX doesn't do any
25 portfolio margining where we would look

1 at offsetting positions for the purpose
2 of collateral requirements.
3    Q.   Does collateral, as used in
4 this document, consist of any negative
5 balances?
6        MR. GLUECKSTEIN:  Object to the
7    form.
8    A.   So there is collateral used
9 multiple times here.  Total collateral
10 used by outstanding spot margin borrowed,
11 that would be related to the negative
12 balances that you're seeing.  So those
13 are the spot margin borrowed.
14    Q.   And to be clear, are we looking
15 at the second-to-last line item on this
16 document?
17    A.   Yes.
18    Q.   Is that the same thing as
19 saying that this customer had negative
20 121 million and change in spot margin
21 borrows?
22    A.   No.  That is not what that is
23 saying.
24    Q.   Sorry, help me understand the
25 difference.

1    A.   So if you have a negative
2 balance, at minimum you need to have 110
3 percent collateral on that negative
4 balance.  So, you know, if I have
5 negative $100,000 worth of bitcoin, I
6 need to have at least $110,000 worth of
7 collateral on the exchange for that
8 borrow.  Spot margin was 10X leverage.
9 Because you're withdrawing it, you need
10 to have 110, otherwise you would be
11 negative.
12        And then also, the way that IMF
13 works, the larger particular spot margin
14 borrow, it can require a lot more
15 collateral.  As such, their requirement
16 could grow to 150 percent.  It's not
17 static at 110 percent.  So, no, that
18 number doesn't directly represent the
19 amount borrowed.  It represents the
20 amount of collateral required for those
21 outstanding borrows.
22    Q.   I think -- thank you for that
23 -- I think I understand.  Let me just
24 maybe just with your example, try to
25 drill down on that to make sure I do.

1        So you said if you have a
2 negative 100,000 worth of bitcoin, you
3 would need to have at least 110,000 worth
4 of collateral for that borrow, correct?
5    A.   Correct.
6    Q.   That 110,000 worth of
7 collateral needed for that borrow, that
8 is, when you use the term "collateral"
9 there, that is only positive collateral,
10 right, in other words, that 110 isn't
11 offset by some kind of negative
12 collateral, right?
13        MR. GLUECKSTEIN:  Object to the
14    form.
15    A.   I am not sure what you mean by
16 offset.  So the way that it would work is
17 that you have $110,000 which means you
18 can borrow up to about 100,000.  They are
19 not necessarily offsetting.  You just
20 have a position and then you have the
21 collateral to back that position.
22    Q.   And the collateral backing that
23 position, let me try this again, that is
24 only positive assets, yes?
25    A.   Yes.

1    Q.   Why did FTX collapse?
2        MR. GLUECKSTEIN:  Objection.
3    A.   For many reasons.  The biggest
4 one is that Sam misappropriated user
5 funds and put it into venture investments
6 and then paid back Genesis with user
7 funds.  That's basically the crux of it.
8 And then he decided to be an absolute
9 idiot and instead of talking and just
10 telling people, he went silent and again
11 silence is the worst thing that a client
12 or platform or anybody, silence is just
13 the ultimate bad thing, so everybody
14 thought the worst, and then, yeah.
15    Q.   When you refer to
16 misappropriation of user funds, what are
17 the user funds you're referring to there?
18    A.   The funds that users held on
19 the exchange.
20    Q.   That would include fiat
21 currency?
22    A.   Yes.
23    Q.   That would include digital,
24 positive digital assets?
25    A.   Yes.

51 (Pages 198 - 201)

1    Q.   Why was it a misappropriation
2 to take those digital assets and fiat
3 currency away from customers?
4        MR. GLUECKSTEIN:  Object to the
5 form and also calls for a legal
6 conclusion.
7    A.   Because it's the user's money.
8 It should not be given to a lending desk.
9    Q.   Why is it the user's money?
10       MR. GLUECKSTEIN:  Object to the
11 form.  Calls for a legal conclusion.
12   A.   Because it's theirs.
13   Q.   There is another document that
14 I want to go to here.  This is Exhibit
15 82.  And while it's loading, for the
16 record, this is a document
17 Tackett_3AC_zeros followed by 338.
18       (Tackett Exhibit 82, Document
19 Tackett_3AC 338, was so marked for
20 identification, as of this date.)
21   A.   Okay.
22   Q.   The first question is simply,
23 do you recognize this?
24   A.   No.  Well, I recognize that
25 it's the order form on FTX.  The specific

1 photo I do not recognize.
2    Q.   And I can make a
3 representation, this came from what we
4 understand are documents that you
5 provided to FTX in this matter, so when
6 you say it's the order form on FTX, what
7 do you mean by that, what's an order
8 form?
9    A.   Where you would submit an order
10 on the exchange.
11   Q.   This is part of the user
12 interface?
13   A.   Correct.
14   Q.   And was this document Three
15 Arrows specific in some way?
16   A.   You're saying that I provided
17 this document?
18   Q.   That that is our understanding.
19 I can only go based on the information
20 that we have been provided, which is yes.
21   A.   I don't know.  I don't remember
22 providing this.  I don't know.
23   Q.   We will put aside whether this
24 is Three Arrows-specific or not.  You do
25 recognize this as an order form; do I

1 understand that correctly?
2    A.   Yes.
3    Q.   And it says "Buy BTC" at the
4 top or "Sell BTC" at the top; do you see
5 that?
6    A.   Yes.
7    Q.   What did it mean to buy BTC on
8 the FTX exchange?
9    A.   It means that you would buy BTC
10 on the FTX exchange.
11   Q.   Buy from where?
12   A.   From the order book from other
13 users.
14   Q.   Once a customer buys BTC
15 successfully using the order book, what
16 happens then to the BTC that they bought?
17   A.   That would be credited to their
18 account.
19   Q.   And is it among their funds at
20 that point?
21       MR. GLUECKSTEIN:  Object to the
22 form.  Calls for a legal conclusion.
23   A.   It would be represented as
24 funds in their account, yes.
25   Q.   In the bottom of this document,

1 there are a couple of sections.  One is
2 about BTC balances and borrows.  The next
3 is about U.S. dollar balances and
4 borrows.  Do you see that?
5    A.   Yes.
6    Q.   What does the USD balances and
7 borrows represent in that middle section
8 of this document?
9    A.   The USD balance refers to their
10 USD balance.  The USD balance available
11 refers to the total amount of USD that is
12 available for them to use assuming they
13 use the spot margin market.  The USD
14 borrowed refers to how much USD they
15 borrowed.  And the estimated USD borrow
16 rate represents the estimated USD borrow
17 rate for that hour or for the upcoming
18 hour.
19   Q.   We'll take that in turn.  The
20 USD balance total, does that correspond
21 only with USD holdings specifically or
22 does it also translate the value of all
23 other holdings into USD?
24       MR. GLUECKSTEIN:  Object to the
25 form.

Page 206

1   A.   That's specifically USD.
2   Q.   Why break it out to a
3  specifically USD values?
4   A.   I didn't say USD values.  I
5  said specifically USD.
6   Q.   I apologize, thank you for that
7  clarification.
8      Why break it down to
9  specifically USD and not include just an
10  overall USD value?
11   A.   Because you're on a BTC USD
12  order book.  So it shows your BTC and it
13  shows your USD.  The two sides of the
14  pair that you're trading.  If you were on
15  SBTC, it would show S and BTC.  It's the
16  relative assets for the pair that you're
17  trading.
18   Q.   Okay.  And were there similar
19  order forms for each digital asset that
20  the exchange made available for purchase?
21   A.   There were similar order forms
22  for every pair that was traded on the
23  exchange.
24   Q.   Going back to the user funds
25  that were misappropriated in the

Page 207

1  bankruptcy, did anyone ever tell you at
2  FTX that FTX had misappropriated those
3  funds in that way?
4      MR. GLUECKSTEIN:  Object to the
5  form.
6   A.   To clarify that, you said the
7  funds that were misappropriated during
8  the bankruptcy.  I don't know the funds
9  were misappropriated during the
10  bankruptcy.  I think you mean the funds
11  that were misappropriated leading to the
12  bankruptcy.
13   Q.   That's exactly what I meant,
14  thank you for that clarification.  All of
15  my questions unless I say otherwise are
16  going to be prior to the bankruptcy, we
17  might use the term "prepetition."  But,
18  yes, not the bankruptcy itself, prior to.
19      So did anyone at FTX tell you
20  that FTX was doing this?
21      MR. GLUECKSTEIN:  Object to the
22  form.
23   A.   No.
24   Q.   Did FTX tell its customers it
25  was doing this?

Page 208

1      MR. GLUECKSTEIN:  Object to the
2  form.
3   A.   No.
4   Q.   Did anyone at FTX invoke any
5  provisions of its terms of service as a
6  basis for doing this?
7      MR. GLUECKSTEIN:  Object to the
8  form.
9   A.   I wouldn't know.
10   Q.   No one told you that the reason
11  we did, we took these user funds is
12  because a terms of service allowed us to?
13   A.   No one told me they took user
14  funds, but it saves me a lot of money.
15   Q.   I think none of us would have
16  been here today.
17   A.   Yeah.
18   Q.   Did anyone tell you whether FTX
19  intended to hold user funds in custody
20  for the users?
21      MR. GLUECKSTEIN:  Objection.
22  Calls for a legal conclusion.
23   A.   Is this speaking generally?
24   Q.   Yeah.
25   A.   Yes, FTX would be custodying

Page 209

1  the assets that users deposited.
2   Q.   What is that understanding
3  based on?
4   A.   Why do I understand that FTX
5  would be custodying user funds?
6   Q.   Yeah.
7   A.   Because I am aware of the
8  wallet architecture and the way that
9  exchanges work.
10   Q.   What about the wallet
11  architecture supports the view that FTX
12  custodied the funds?
13   A.   We provide deposit addresses to
14  users on the platform that they would
15  send money to, because they are sending
16  money to us.  We would be custodying it.
17  I know we didn't use a custodian like
18  BitGo or Fireblocks or anything like
19  that -- sorry, Fireblocks isn't a
20  custodian.  And that we did, we custodied
21  in-house.
22   Q.   We talked about Ryan Salame a
23  few times over the course of the day.
24  Let me just first ask a silly question,
25  which is, am I pronouncing his last name

53 (Pages 206 - 209)

Page 210

1 correctly, Salame?
2    A.   Nobody really knows.  Yeah.
3 Salame.  Some people say salami.  But,
4 yeah, Salame.
5    Q.   I want to use whatever you use.
6 You know him, I don't.  So what should we
7 go with today?
8    A.   Salame works.
9    Q.   Okay.  Perfect.  We will do
10 that.  You have a view about how Ryan
11 Salame was as an executive of FTX?
12    A.   Ryan was an exemplary employee.
13 He's an exemplary person.  I think what
14 happened to him is an absolute travesty
15 and a complete miscarriage of justice.
16 Absolutely horseshit.  He was an
17 excellent employee at FTX.  And he didn't
18 really work at FTX when it blew up.  But
19 yeah.
20    Q.   When did he stop working at
21 FTX?
22    A.   I think he stayed on for a bit
23 after he got to the Bahamas to help FTX
24 get to the Bahamas.  But by 2022, he
25 was -- by 2022, he was very much out the

Page 211

1 door.  He wasn't very active with FTX.
2    Q.   And just to clarify, when
3 you're referring to leaving FTX and going
4 out the door of FTX, you're referring to
5 specifically FTX trading, right?
6    A.   No, I am using FTX broadly
7 here, as Ryan was still technically an
8 employee.  But he had tried to resign
9 several times.  And, you know, I would
10 often joke with him, and he would, you
11 know, ask me about something, hey, Ryan,
12 some of us still have to work here,
13 because he was essentially checked out --
14 and now that I answered it, I just
15 spilled some drink on the floor, do you
16 mind if I grab something.
17    Q.   Take the time.  Go off the
18 record.  We will stay on video.
19        THE VIDEOGRAPHER:  The time is
20 11:46 a.m. eastern and we are off the
21 record.
22        (Off the record.)
23        THE VIDEOGRAPHER:  The time is
24 11:47 a.m. Eastern, we are back on the
25 record.

Page 212

1 BY MR. PROULX:
2    Q.   I think we were talking about
3 Ryan Salame's tenure at FTX trading
4 and/or FTX Digital Markets.  Did you
5 understand him to be affiliated with one
6 or both of those entities?
7    A.   He was affiliated with both.
8 He was more closely affiliated with FDM.
9    Q.   Why was that?
10    A.   Because he was the co-CEO of
11 FDM.
12    Q.   And I am sure I have this
13 somewhere, but maybe you recall quicker
14 than me, roughly when did he step into
15 that position with FDM.
16    A.   I believe he moved to the
17 Bahamas in September of 2021.  So it
18 would be about that.
19    Q.   And were you in the Bahamas
20 with him for some period of time after
21 that?
22    A.   Yes.
23    Q.   You guys had a good personal
24 relationship?
25    A.   He's a very close friend of

Page 213

1 mine.
2    Q.   And professional, too?
3    A.   Yes, our relationship started
4 professionally.  I was at B2C2.  He was
5 at Circle.  He joined FTX.  He helped me
6 get my job at FTX.
7    Q.   We've uploaded a new exhibit
8 purely for labeling purposes.  It's
9 Exhibit 0.  But it's been premarked as
10 Exhibit 6, so I will refer to it as
11 Exhibit 6.
12        (Exh 6, Document Bates stamped
13    FTX_3AC_000044442, was previously
14    marked for identification.)
15    Q.   Feel free to take a look at
16 that and while it's loading, I will
17 represent this is a document titled "FTX
18 Digital Markets Limited Safeguarding of
19 Assets and Digital Token Management
20 Policy."
21    A.   Yeah.  I see it.
22    Q.   Produced by FTX ending in Bates
23 number 4442.  Are you familiar with this
24 document?  Take the minute to skim
25 through it.

54 (Pages 210 - 213)

Page 214

1    A.    I am.
2    Q.    Why are you familiar with it?
3    A.    Because this is something that
4    we often gave clients in the onboarding
5    process.
6    Q.    The IP clients or clients
7    across the board?
8    A.    Yeah, the IP clients.
9    Q.    Would you have given this one
10   to Three Arrows?
11   A.    Yes.  Are you saying
12   theoretically would I or are you saying
13   did I?
14   Q.    Let's start did you, if you can
15   recall.
16   A.    I don't remember giving this to
17   3AC, no.
18   Q.    But would you as a matter of
19   practice have given it to clients in
20   Three Arrows's shoes?
21   A.    Upon request, yes.
22   Q.    Any reason to doubt that you
23   gave this document to Three Arrows in
24   this case?
25        MR. GLUECKSTEIN:  Objection.

Page 215

1    Misstates the testimony.
2    A.    It's usually something that
3    happens during the onboarding process.
4    It's not oftentimes that, you know,
5    you're well in a relationship with a
6    client and then out of the blue they ask
7    for it.  So I didn't deal with the
8    onboarding of 3AC.  Also, I don't
9    remember 3AC asking for it, so.
10   Q.    Okay.  Possible you gave it to
11   them, but you're not sure?
12        MR. GLUECKSTEIN:  Object to the
13   form.
14   A.    Totally possible.  I don't
15   remember it happening, no.  There is no
16   reason why I wouldn't provide it upon
17   request.
18   Q.    On page 2 of this document
19   there is a section that says Review and
20   Approvals; do you see that?
21   A.    Yes.
22   Q.    And the name under Review and
23   Approvals is Ryan Salame, CEO and it says
24   "Date approved," I am guessing that's
25   August 16th, 2021.  Do you see all of

Page 216

1    that?
2    A.    Yup.
3    Q.    Did you work with Ryan in
4    reviewing or approving this document?
5    A.    No.
6    Q.    Did you speak with Ryan about
7    this document, just to understand what it
8    says?
9    A.    Nope.
10   Q.    But you reviewed it, of course,
11   before providing it to those clients that
12   it was provided to?
13   A.    Yup.
14   Q.    On page 4 of this document,
15   there is a section that says "Objective"
16   and under that "This policies objectives
17   are two," let me know when you're there?
18   A.    I am there.
19   Q.    Okay.  And it refers to one of
20   the policy objectives being to explain
21   how FDM will manage its digital tokens
22   under its custody?
23   A.    Yes.
24   Q.    On page 5, the next page, there
25   is a section that says "FDM's

Page 217

1    Responsibilities."
2    A.    Yup.
3    Q.    And under Key Roles and
4    Responsibilities, there are five or six
5    bullets.  The third of which says "All
6    third-party providers are aware that
7    customer assets are held in trust."  Do
8    you see that?
9    A.    Yup.
10   Q.    Did you understand that to be
11   accurate?
12        MR. GLUECKSTEIN:  Object to the
13   form.
14   A.    No.
15   Q.    Why not?
16   A.    So one is that -- well, to be,
17   actually, to be totally honest, I am not
18   even sure what that technically means,
19   held in trust.  Yeah, so I know that like
20   we were told that, you know, some client
21   accounts have funds in FBO, for benefit
22   of accounts, and they were trying to do
23   like segregated banking accounts for some
24   clients with, I believe, PrimeTrust.  I
25   don't know if that ever happened.  And

55 (Pages 214 - 217)

Page 218

1 then the crypto assets, I was not aware
2 of them being held in trust.
3    Q.   The next -- I am sorry, the
4 bullet right above that one says,
5 "All third-party providers will be aware
6 that customer assets do not represent
7 assets of FDM."  Do you see that?
8    A.   Yes.
9    Q.   Was that your understanding of
10 the policy?
11       MR. GLUECKSTEIN:  Objection.
12    A.   Yes.
13    Q.   Was that accurate?
14       MR. GLUECKSTEIN:  Object to the
15 form.
16    A.   I don't know.  I don't know
17 if -- they did end up saying that
18 customer assets were assets of FDM.
19    Q.   Was that FTX's policy that they
20 were not, though, right?
21    A.   It was FTX's policy that they
22 were not, yeah.
23    Q.   Let's go back, please, to
24 Exhibit 80, this is the compilation of
25 Twitter posts that we had looked at

Page 219

1 earlier.
2       And then on page 14 in here I
3 am referring to like the lower right-hand
4 pagination 14 of 26.
5    A.   Got you.
6    Q.   I'm trying to be better about
7 being clear about that.  Toward the
8 bottom of this page you have a tweet on
9 November 10th, 2022 that says "Per our
10 Bahamian HQ's regulation and regulators,
11 we have begun to facilitate withdrawals
12 of Bahamian funds."
13       Do you see that?
14    A.   Yes.
15    Q.   "As such, you may have seen
16 some withdrawals processed by FTX
17 recently, as we complied with the
18 regulators."  Do you see that?
19    A.   Yes.
20    Q.   Who were you writing to with
21 this tweet?
22    A.   Clients, users, anybody that
23 was affected by what was happening.
24    Q.   And was FTX regulated by
25 Bahamian regulations at this time?

Page 220

1       MR. GLUECKSTEIN:  Object to the
2 form.
3    A.   As far as I am aware, yes.  I
4 was told that we were, yes.
5    Q.   Do you know when it began to be
6 regulated by those regulations in
7 Bahamas?
8       MR. GLUECKSTEIN:  Objection.
9 Calls for a legal conclusion.
10    A.   I believe it did from the onset
11 of FTX Digital Markets.  As to when those
12 users were moved over from facing FTX
13 trading to facing FTX Digital Markets,
14 that's a different question.
15    Q.   I appreciate that
16 clarification.  When you refer to the
17 onset of FTX Digital Markets, do you have
18 a very rough time period in mind for when
19 that onset was?
20    A.   Safeguarding digital assets was
21 for FDM and that shows that Ryan signed
22 it in August 2021.  So I would assume
23 sometime around there is when that
24 subpoena when, you know, the regulation
25 with the Bahamas came about.  Not that

Page 221

1 those were applicable to our users,
2 because they were still facing FTX
3 trading at that time but.
4    Q.   And do you understand whether
5 the regulations put restrictions around
6 the way in which FTX was required to
7 treat customer assets?
8       MR. GLUECKSTEIN:  Objection.
9 Cause for a legal conclusion.
10    A.   No, I am not, I am not clear on
11 the specifics of what the requirements of
12 the Bahamas regulations or licensing was.
13    Q.   You're not a lawyer, right?
14    A.   Correct.  I am also ignorant as
15 to the specifics of the Bahamas
16 licensing.  If you wanted to ask me
17 about, you know, other specific licensing
18 requirements, I might know.  But as to
19 what the Bahamas requires, I do not.
20    Q.   Are you familiar with any other
21 licensing requirements that apply to FTX
22 in June of 2022?
23       MR. GLUECKSTEIN:  Objection.
24    A.   In the U.S., yes, the
25 requirements for money transmission

56 (Pages 218 - 221)

Page 222

1  licenses, and things like that.
2      Q.   Understood.  Understood.  We
3  may come back to that.
4      A.   Okay.
5      Q.   Earlier in the day you were
6  asked a couple of questions about FTX's
7  margin program and borrowing under that
8  program.  Do you recall that general
9  discussion?
10     A.   I do recall that discussion.
11     Q.   And just so I am using the same
12 language as you, and hopefully the same
13 pronunciation in some cases, what term do
14 you use to describe that program?
15     A.   The spot margin program?
16     Q.   Sure.
17     A.   Spot margin.
18     Q.   Okay.  So I will refer to spot
19 margin.
20     A.   Spot margin/margin lending.  If
21 you're on the lending side, you would
22 probably use margin lending.  If you're
23 on the trading side, you would probably
24 use spot margin.
25     Q.   I think I understand.  If I am

Page 223

1  ever saying it wrong, please just feel
2  free to correct me; okay?
3      A.   Will do.
4      Q.   And you were asked a question
5  by S&C about when a customer participated
6  in that program who they were borrowing
7  from; do you recall that question?
8      A.   I do.
9      Q.   Okay.  And you said it depends
10 on whether you're trading futures or
11 other types of positions; do you recall
12 that?
13         MR. GLUECKSTEIN:  Object to the
14     form.
15     A.   No, because we were speaking
16 specifically on spot margin.  From the
17 futures you're not borrowing from anybody
18 because it's derivative product.  In spot
19 margin you're borrowing from somebody.
20     Q.   And in your view that somebody
21 was another user of the exchange?
22     A.   I know that FTX/Alameda would
23 sometimes participate in the margin, spot
24 margin market itself.  But by and large,
25 yes, you're interacting with other spot

Page 224

1  margin market participants.
2      Q.   When you say interacting,
3  you're not interacting directly, are you?
4      A.   No.  They would look at the
5  lenders and you would look at what the
6  minimum rate would be to satisfy all
7  outstanding borrows.  And then that would
8  determine the borrow rate for that
9  period.  So it's done from a pool, not
10 individual from individual.
11     Q.   And do you understand the pool
12 process of margin, spot margin borrowing,
13 to involve code or architecture on the
14 exchange?
15         MR. GLUECKSTEIN:  Object to the
16     form.
17     A.   Yeah, I am not really clear
18 what you're asking.  Yes, obviously there
19 was code running on the exchange that was
20 operating in the spot margin market.
21     Q.   And were you familiar with
22 that, the code that operated those spot
23 margin market?
24     A.   I am not a developer, so I
25 wouldn't be familiar with any code of

Page 225

1  FTX.
2      Q.   You didn't run that code
3  personally?
4      A.   I am not quite sure what you're
5  asking, because if you go on FTX.com,
6  technically you're running code when you
7  use a website.
8      Q.   Right.  You didn't -- go ahead,
9  please.
10     A.   I was just going to say, I
11 engaged in the spot margin market.  I
12 went out.  I used it.  I have been on the
13 website.
14     Q.   Right.  You don't know what the
15 code provides in terms of identification
16 of lenders, do you?
17     A.   No, I don't.
18     Q.   Identification of borrowers?
19     A.   No.
20     Q.   Whether the lends and borrowers
21 were simultaneous?
22         MR. KAST:  Object to the form.
23     A.   What do you mean whether the
24 lends or borrowers are simultaneous?
25     Q.   If pursuant to the code that

57 (Pages 222 - 225)

Page 226

1  operated this spot margin program, the
2  lending and borrowing of assets in the
3  spot margin program were simultaneous
4  with one another.
5       MR. GLUECKSTEIN: Object to the
6  form.
7    A.  No, I am not clear, but I know
8  that the auction would basically occur
9  every hour, and that's when the rate was
10  determined.
11   Q.  Do you have an understanding of
12  whether assets move between wallets when
13  borrowed or lent pursuant to the spot
14  margin program?
15   A.  When you say wallets, do you
16  mean internal wallets within FTX or do
17  you mean within user account wallets or
18  user account balances on the platform?
19   Q.  Do you have an understanding of
20  whether it moved in either scenario?
21       MR. GLUECKSTEIN: Object to the
22  form.
23   A.  Well, they would move on the
24  exchange and how they are represented in
25  the accounts.  So if I borrowed, I would

Page 227

1  get a negative in my account.  If I lent,
2  it would show up as being lent.  There
3  wasn't an on chain activity tied to the
4  borrow or borrower loans, so that it
5  wasn't tied to on-chain movements between
6  wallets.
7    Q.  That negative, that might
8  result in an account or a positive, as
9  the case may be, that was something
10  affected by FTX via its ledger, right?
11   A.  Yes, the debiting and crediting
12  would be done through the ledger on FTX.
13   Q.  Are you aware of any instance
14  where an individual who lent assets,
15  pursuant to the spot margin program, was
16  not repaid or recredited for the lending
17  of those assets?
18       MR. GLUECKSTEIN: Objection.
19   A.  No, I am not aware of any such
20  instances.
21   Q.  Even though I believe you
22  testified earlier that there were
23  occasions where customers accrued an
24  overall negative account balance that
25  participated in the spot margin program?

Page 228

1       MR. GLUECKSTEIN: Object to the
2  form.  Misstates the testimony.
3    A.  I didn't say that it happened
4  to people specifically on the spot margin
5  market.  I said that you're not allowed
6  to have negative balances on the
7  exchange.  Yes, negative balances did
8  occur.  In that instance, usually FTX
9  would just eat the loss.
10       MR. PROULX: Let's take a break
11  here.  Five minutes, does that work
12  for you, Zane.
13       Off the record.
14       THE VIDEOGRAPHER:  The time is
15  12:05 p.m. Eastern, we are off the
16  record.
17       (Off the record.)
18       THE VIDEOGRAPHER:  The time is
19  12:15 p.m., Eastern, we are back on
20  the record.
21  BY MR. PROULX:
22   Q.  Mr. Tackett, earlier in the day
23  you were asked some questions about
24  futures contracts.  Do you recall that
25  discussion, generally speaking?

Page 229

1    A.  You would have to be more
2  specific.  We had a lot of conversations
3  around futures.  But, yes, I do remember
4  discussing futures earlier today.
5    Q.  Happy to be more specific,
6  thank you for that.  You were given some
7  testimony about something called the mark
8  price and something called the index
9  price, do you recall that, that specific
10  testimony?
11   A.  I do.
12   Q.  I am still struggling a little
13  bit to understand the difference between
14  the two.  Can you help me better
15  understand it?
16   A.  Sure.  To simplify it, the mark
17  price is the reference price on FTX.  So
18  if you want to know what price we are
19  using at FTX for a specific asset, that's
20  the mark price.  The index price is the,
21  what FTX, basically, considers to be the
22  price of this asset across exchanges,
23  across the industry as a whole.  So the
24  FTX price is the price on FTX, on the FTX
25  market.  The index price is the price

58 (Pages 226 - 229)

Page 230

1 that's usually made up by an index of
2 several exchanges, and then you calculate
3 the price from that.
4     Q.    Thank you for that.  Maybe it
5 will be a little more concrete.
6         Under what scenarios would some
7 metric or measurement on the FTX exchange
8 use the mark price versus the index
9 price?
10    A.    For P&L we use mark price.  For
11 settlement we use index price.
12    Q.    And why the difference?
13    A.    Because an index is much harder
14 to manipulate than a single market.  It's
15 made up of multiple markets.  So it's
16 more of a fair market value for an asset.
17 Whereas, you know, a single market is
18 much easier to move.  So like you don't
19 want to use that as your index.  But you
20 also can't be using an index for your P&L
21 settlement, because you need to be using
22 the price on the exchange you're trading.
23 So, for example, if I open a futures
24 position for a future that's six months
25 out, the future might be trading at a

Page 231

1 very heavy premium to the current price
2 of BTC USD.
3         So for the price of BTC for
4 USD, look at the index.  For the price of
5 your P&L, you would be looking at mark
6 price because that's the relevant price
7 on the product that you're trading.  And
8 then that futures contract, eventually,
9 the price would converge over time
10 towards the index, because it's going to
11 settle with the index price, and not the
12 mark price.
13    Q.    I am aware of something called
14 funding payments in this context.
15    A.    Yes.  What I was just referring
16 to was a dated future.  Funding payments
17 would be related to a perpetual future.
18 And that would be based off the index --
19 well, that would be based off of the mark
20 price and the index.  It would be the
21 difference between the two.  And then,
22 basically, on an annualized funding rate.
23    Q.    What does the index price
24 represent to you, of a perpetual futures
25 contract?

Page 232

1     A.    The index price would basically
2 represent where that asset is trading
3 across exchanges as a whole, versus just
4 on a particular market such as FTX or
5 Binance.
6     Q.    The market value of entering
7 into that asset, of holding that asset or
8 something else?
9         MR. GLUECKSTEIN:  Object to the
10 form.
11    A.    I don't know what you mean by
12 the market price of holding that asset.
13 But it would be the price, the fair
14 market or the fair value of that price
15 across the industry as a whole.  So there
16 might be slight variations between
17 exchange A and exchange B and exchange C.
18 The index would try to provide, you know,
19 something that shows, as a whole, this
20 asset is traded at roughly this price.
21    Q.    Does the value of that asset
22 roughly approximate the index price?
23        MR. GLUECKSTEIN:  Object to the
24 form.
25    A.    I am not quite sure what you're

Page 233

1 asking.  The price of that asset would be
2 different on different markets on
3 different venues.  But when you need to
4 settle, you need to construct a fair
5 price.  If you only use one, change, it's
6 liable to manipulation.  So you try to
7 use multiple exchanges to make it harder
8 to manipulate and provide a more fair
9 value.
10    Q.    And fair value of what?
11    A.    Of the asset that is being
12 referenced in the index.
13    Q.    I am going to show you a
14 document that has been marked as Exhibit
15 83.
16    A.    Exhibit what?
17    Q.    83.  It should be available in
18 just one moment.
19        (Tackett Exhibit 83, Document
20     Bates stamped ending in FTX 75, was so
21     marked for identification, as of this
22     date.)
23    Q.    For the record, this is a
24 document entitled "Loan and Security
25 Agreement."  It's quoting language made

59 (Pages 230 - 233)

Page 234

1 and dated as of 22 October 2021, produced
2 by FTX ending in 775.
3    A.  Yes, I see it.
4    Q.  So this documents purports to
5 be entered into by and between Three
6 Arrows Capital Ltd. and FTX Trading Ltd.
7 at the top of the document; do you see
8 that?
9    A.  Yes.
10    Q.  First question is, are you
11 familiar with this document?
12    A.  I believe that this is the,
13 it's related to the line of credit that
14 we gave them.
15    Q.  I know you clarified this when
16 you were answering some questions
17 earlier, but remind me, when you stepped
18 into the primary relationship position
19 with, with Three Arrows and whether or
20 not it was before or after this 22
21 October 2021 date?
22    A.  I stepped in when Burg stepped
23 away.
24    Q.  And do you recall whether that
25 was before or after the date on the top

Page 235

1 of this document?
2    A.  I don't.  It was right around
3 this.
4    Q.  Well, do you recall preparing,
5 commenting on or sending Three Arrows
6 this particular document?
7    A.  I do remember that they, I do
8 remember something around them having a
9 non-standard agreement because of the
10 size of it.  And I do remember discussing
11 with Burg the collateralization
12 requirements, that they would need a high
13 collateralization ratio for that size.
14    Q.  There is this, if you go to
15 page 4 under Section 2.1(A), Advances.
16 It refers to "An aggregate principal
17 amount not to exceed the total line of
18 credit commitment."
19       Do you see that?
20    A.  Let me look at that, Advances.
21 Okay.
22    Q.  The total line of credit
23 commitment appears to be defined on that
24 same page, like around the middle and
25 skipping over some text, "in aggregate

Page 236

1 principal amount not to exceed U.S.
2 dollar 10 million U.S. dollar.
3    A.  I see 100 million U.S. dollars.
4    Q.  I misread that, thank you for
5 that clarification.  100 million U.S.
6 dollars, correct.
7       Do you understand this document
8 to reflect a line of credit, an earlier
9 in time line of credit before that which
10 we were discussing the first part of the
11 day?
12    A.  I remember this to be the
13 original line of credit that Burg drew
14 up, or Burg had a part in drawing up.  I
15 don't think Burg actually wrote this, but
16 yeah.
17    Q.  Do you recall when Three Arrows
18 line of credit face amount or total
19 amount first increased to $120 million?
20    A.  I do not, but I am quite
21 confident you would be able to find it in
22 the Three Arrows Capital chat.
23    Q.  Let me actually pull up the
24 document we were referring to earlier
25 today.  So you should have available to

Page 237

1 you a new Exhibit 20.
2       (Tackett Exhibit 20, Line of
3    credit document, was so marked for
4    identification, as of this date.)
5    A.  Yes.
6    Q.  And I am happy to represent
7 this is the exact same document we were
8 referring to earlier today.  This is just
9 a version that we have already stamped as
10 Exhibit 20.  That's the only difference.
11       The question is, do you have an
12 understanding of whether the Three Arrows
13 line of credit face amount increased to
14 120 million at any point before the date
15 of this document, which --
16    A.  Yes -- sorry to jump in.
17    Q.  I spoke over you, please go
18 ahead.
19    A.  It is my understanding that
20 this was just a repapering of, this is
21 just a repapering of the existing line of
22 credit.  And I do remember there being
23 instances of people having multiple lines
24 of credit with multiple agreements and I
25 do remember part of the repapering was

60 (Pages 234 - 237)

Page 238

1  getting them to just, what's that called,
2  condense, collect them and put them all
3  in one place.  So it may have been the
4  case that they had another $20 million
5  line, like they could have had 20 million
6  and then we discussed 100 million.  And
7  so now they had the 20 million and the
8  100 million and this is repapering it as
9  120 million in total.
10  Q.  Okay.  I believe earlier you
11  testified that as a whole lawyers drafted
12  this agreement we have up as Exhibit 20;
13  is that right?
14  A.  Correct.
15  Q.  But certain figures could be
16  inserted by your team, such as the
17  interest percentage, right?
18  A.  Correct.
19  Q.  Who were those lawyers who
20  would have drafted this agreement as a
21  whole?
22  A.  So the top part is largely the
23  same as what it was for other line of
24  credit agreements.  That would have been
25  earlier lawyers.  The second part, the

Page 239

1  FTX institutional customer margin and
2  line of credit agreement, I believe was
3  largely done by Can Sun or at the
4  direction of Can Sun.  So they could have
5  been using some of the lawyers working
6  underneath him.  But I believe it was
7  largely done by Can.
8  Q.  What was Can Sun, and was what
9  his role at FTX?
10  A.  I don't know his specific
11  title.  And Can was one of the higher-ups
12  on the lawyer side.  Like I think,
13  basically, like him and Dan were at the
14  top of the legal side and by the end of
15  FTX, Can was doing more than Dan as far
16  as I am aware on the actual like
17  lawyering.
18  Q.  When you say Dan, is that Dan
19  Friedberg?
20  A.  Yeah, Can was doing more than
21  Dan -- Dan being Dan Friedberg -- yeah.
22  Q.  Did you ever discuss this
23  document in particular with Can Sun or
24  Dan Friedberg?
25  A.  When you say this document in

Page 240

1  particular, are you referring to the
2  Three Arrows document or the line of
3  credit document?
4  Q.  Let's start by being more
5  specific and saying the Three Arrows
6  version of this document.
7  A.  Not that I can recall.
8  Q.  More generally, do you recall
9  discussions with Can or Dan regarding the
10  terms of service?
11  A.  Yes.  Sorry, sorry.  I
12  answered.
13  Q.  We are going out of order, we
14  will come back to your point, but let's
15  talk about the terms of service for a
16  moment.
17  Do you recall discussions with
18  them about what particular provisions in
19  it may have meant?
20  A.  I do recall having discussions
21  with Can about the FDM terms of service.
22  MR. GLUECKSTEIN:  I am going to
23  interject here, to the extent that the
24  witness is going to be asked testimony
25  that relays privileged advice of FTX,

Page 241

1  that is FTX's privilege, we have not
2  waived it and he is not to offer that
3  testimony.
4  MR. PROULX:  To be clear, I
5  haven't asked about the content of
6  those discussions quite yet.
7  MR. GLUECKSTEIN:  You're about
8  to.  So I am interjecting my objection
9  and my direction.
10  Q.  Do you recall having
11  discussions with Can or Dan about the FTX
12  Trading Ltd. terms of service?
13  A.  Yeah, I am sure I have some
14  conversations with him about that as
15  well, but more limited than the FDM.
16  Q.  Do you recall any of those
17  discussions with respect to the FTX
18  Trading Ltd. terms of service relating to
19  any provisions in it regarding ownership
20  of digital assets?
21  A.  Of digital assets, no.
22  Q.  Let's then move back to the
23  pressing question, do you recall any
24  conversations with Can or Dan about the
25  document we have in front of us, about

61 (Pages 238 - 241)

Page 242

1 the line of credit about customers more
2 generally, do you recall such
3 discussions?
4    A.   Yes.
5    Q.   Did any of those discussions
6 relate to the meaning of the requirement
7 in terms of sum and substance in
8 paragraph 5 on the first page, mainly
9 what must be maintained by way of quote,
10 unquote "collateral" in the borrower's
11 FTX account?
12        MR. GLUECKSTEIN:  Object to the
13    form.
14    A.   No, that was pretty clear.  I
15 don't know where the confusion would be,
16 where the confusion would be found there.
17 It's pretty clear you need to have
18 collateral.  Collateral is pretty clearly
19 defined and represented on the website.
20    Q.   And does that collateral
21 include negative positions as well,
22 negative collateral?
23        MR. GLUECKSTEIN:  Object to the
24    form.
25    A.   Yes.  Negative balances would

Page 243

1 impact your collateral.
2    Q.   You said that was pretty
3 clearly defined and represented on the
4 website.  Do you have in mind a
5 particular document that represented that
6 on the website?
7        MR. GLUECKSTEIN:  Object to the
8    form.
9    A.   Collateral explainer.  Fitting
10 name even.
11    Q.   What is that?
12    A.   Fitting name even.
13    Q.   Let's go to that document then.
14 You should have Exhibit 18 in a moment.
15 While this is loading, you should have
16 Exhibit 18, which is Spot Margin Trading
17 Explainer ending in Bates stamp 45694.
18        (Tackett Exhibit 18, Document
19    ending in Bates stamp 45694, was so
20    marked for identification, as of this
21    date.)
22    A.   Got it.
23    Q.   Is this the collateral
24 explainer you had in mind or is that a
25 different document?

Page 244

1    A.   No, this is not -- the
2 collateral explainer is the page that we
3 were looking at that showed a screen shot
4 that had collateral contributed by spot
5 balances.  Collateral taken up in spot
6 margin positions.  Collateral taken up in
7 futures positions.  That's the collateral
8 explainer.
9    Q.   Let's turn to that.  That's
10 Exhibit 39.  It's already been
11 introduced.
12    A.   Yeah.
13    Q.   So you see I just opened up a
14 document that I believe is consistent
15 with that grayed out on the very first
16 line of substantive text "Spot margin
17 trading explainer."  Do you see that?
18    A.   I am sorry, let's go to the
19 collateral explainer.
20    Q.   Right.  So do you have up
21 Exhibit 39?
22    A.   I do.
23    Q.   Okay.  And then the very second
24 sentence of the text below the header
25 says "For more details on how trading and

Page 245

1 margin works, see the spot margin trading
2 explainer."  Do you see that part?
3    A.   Yes.  And to be clear, I
4 believe the rest of that would say
5 futures or something.  You can see the
6 beginning of another hyperlink.
7    Q.   But when you refer to
8 collateral explainer, you're not
9 referring to a separate document, you're
10 referring to the screen shot we have up
11 in front of us?
12    A.   I am referring to that page
13 that the screen shot is taken from.
14    Q.   Okay.
15    A.   There is more than just what is
16 appearing in this screen shot.
17    Q.   Right.  So assuming this
18 applies to Three Arrows, which one of
19 these fields corresponds to quote,
20 unquote "collateral" as that term is used
21 in Section 5 of the line of credit
22 agreement?
23    A.   Available collateral.
24    Q.   Available collateral?
25    A.   Yeah.

62 (Pages 242 - 245)

1    Q.   How are you drawing that
2  connection?
3    A.   Because if the collateral for
4  the LOC can't be collateral that's
5  already tied up for something else.  This
6  needs to be an excess of whatever other
7  collateral is currently being tied up.
8  So if I look in your account and you're
9  already maxed out at 20X leverage, and
10  then you ask for more money, and I see
11  zero available collateral then I wouldn't
12  view that as having sufficient collateral
13  for an additional -- for additional funds
14  through a line of credit.
15    Q.   Let me, thank you for that.
16  Let me ask the question this way.
17         What is the, you know, in
18  description terms, what is the formula
19  that results in available collateral,
20  that last line on this document.
21         MR. GLUECKSTEIN:  Object to the
22    form.
23    A.   So it would depend on multiple
24  things.  One if you're on initial and one
25  if you're on maintenance.  Then it

1  wouldn't be looking at your initial
2  margin versus your maintenance margin.
3  You would also need to put in for each
4  asset, you would need to put it into the
5  IMF formula, to see if the IMF is
6  starting to kick in, which would, you
7  know, could change how much
8  collateral a spot margin takes up or how
9  much collateral a spot asset contributes.
10         And then it would look at the
11  collateral contributed by positive spot
12  balances, minus the total collateral used
13  by outstanding futures positions, minus
14  the total collateral used by outstanding
15  spot margin borrows, and that would equal
16  your available collateral.
17    Q.   I am reading over the
18  testimony, just to make sure I
19  understand.  Thanks for the moment here.
20         Was that formula ever presented
21  to recipients of lines of credit, to your
22  knowledge?
23    A.   The IMF and MMF formulas?
24    Q.   The formulas to get to
25  available collateral in the last line of

1  the collateral explainer screen shot.
2    A.   Yes, everything that you would
3  need to reach that value was readily
4  available to any client of FTX, because
5  it would all be in the help desk.
6    Q.   Which help desk document, I am
7  sorry?
8    A.   I don't know off the top of my
9  head, it would be probably trading specs,
10  because that's where IMF and MMF are, if
11  I had to guess.  Futures trading specs, I
12  think was the name of the page.  Actually
13  now that I think about it, that might be
14  the cutoff screen shot, the link in a
15  spot margin explainer and then it could
16  be future contract specs.
17    Q.   IMF, you referred to this a
18  couple of times today, this is a
19  requirement associated with opening new
20  positions on the exchange; is that right?
21    A.   Correct.
22    Q.   And as applied to Three Arrows,
23  Three Arrows wasn't opening new positions
24  to your knowledge, in the June 12th
25  through 14th period; is that correct?

1    A.   That is technically incorrect.
2    Q.   What's the technicality that
3  makes it incorrect?
4    A.   It had open futures positions,
5  when you get P&L from open futures
6  positions, if that P&L is negative, you
7  would have negative USD debited or you
8  would have negative USD balance debited
9  from your account.  And then as those
10  funds are debited, that is a spot margin
11  borrow of USD.  So any negative balance
12  that you see on the exchange is a spot
13  margin borrow.  So if you're losing money
14  from futures positions, and your USD
15  continues to go negative, then that is
16  continuing to open spot margin positions,
17  essentially.
18    Q.   Let's then move back to a
19  document, Exhibit 20, which is the line
20  of credit document.
21    A.   Yes.  Give me a sec.
22    Q.   Take your time.
23    A.   Okay, got it.
24    Q.   And we were most recently
25  talking about that Section 5, but before

1 then we were talking about communications
2 that you may have had with Can Sun and
3 Dan regarding certain provisions in this
4 document. And I believe you testified
5 that you did not find that particular
6 provision unclear. Were there other
7 provisions that you found unclear that
8 you discussed with them?
9     MR. KAST: Object to the form.
10    A.   The one thing that could be
11 unclear is how the interest rate
12 utilization is calculated. That's why we
13 came up with the line of credit explainer
14 that then explains how that's calculated.
15    Q.   And how is it calculated?
16    A.   It looks at how much of the
17 line of credit is being used to avoid
18 liquidation. How much USD is being used
19 for spot margin borrows. And there might
20 have been some other things that went
21 into it. I can't recall exactly.
22    Q.   But the point of time at which
23 it looks to the utilization of the line
24 of credit, is that at 030 UTC each day?
25    A.   Yes.

1     Q.   It's not looking to utilization
2 over the course of the prior day and some
3 average, you know, utilization for
4 example; is that right?
5     A.   I don't believe so, no.
6     Q.   So it's not charging interest
7 in arrears?
8     MR. GLUECKSTEIN: Object to the
9     form.
10    A.   I don't believe so, no.
11 Although, before this we used to have to
12 collect interest payments manually. So
13 we would have to calculate it, and then
14 we move to the utilization method. And
15 the exchange would calculate it. But
16 this did need us to reach out to client
17 and ask them to settle their interest
18 payments, which I guess you could say is
19 backwards looking.
20    Q.   Sure, but for purposes of the
21 Three Arrows relationship after this
22 particular line of credit was in effect,
23 that is not the case; is that correct?
24    MR. GLUECKSTEIN: Object to
25    form.

1     A.   Once we moved to automated
2 interest payments, then it would no
3 longer -- we would no longer be
4 collecting -- we wouldn't be looking
5 backwards to collect interest. It would
6 be -- the system would be doing it on a
7 daily basis.
8     Q.   In June of 2022, had you
9 implemented that automatic system?
10    A.   I believe so, yes.
11    Q.   You talked earlier about a slat
12 Bot that tracks certain metrics related
13 to certain lines of credit; did I hear
14 that correctly?
15    A.   Yes.
16    Q.   What is a Slackbot and have we
17 seen that today in any of the documents
18 we looked at?
19    A.   I don't believe we have. And
20 what a Slackbot is, it's a bot that runs
21 on Slack. And so it would be looking at
22 the outstanding lines of credit that we
23 have. The margin requirements for them.
24 And then showing if there is a shortfall
25 or not.

1     Q.   Would you have saved that
2 Slackbot that may have related to the
3 Three Arrows account?
4     A.   Don't believe so. I believe
5 I've handed over everything I found from
6 Three Arrows.
7     Q.   But would there have been such
8 a Slackbot?
9     A.   What?
10    Q.   Would there have been a Three
11 Arrows specific Slackbot document?
12    A.   No, it wouldn't be specific to
13 Three Arrows. It was for lots of clients
14 with LOCs. It ran in an automated
15 fashion, so it just put it out at a
16 certain schedule. And I got kicked out
17 of Slack without notice from FTX. So,
18 you know, my, I don't have retention of
19 Slack messages or anything like that.
20    Q.   Totally understood. Just
21 trying to figure out what in theory
22 exists, right.
23    A.   That's okay.
24    Q.   So this is a document that's
25 omnibus across or aggregates in some way

Page 254

1 multiple users' lines of credit metrics?
2    A.   Yes.
3    Q.   Three Arrows being one of them?
4    A.   Correct.
5    Q.   Staying with this Exhibit 20,
6 are there any provisions in that second
7 part of the document beginning on page 2
8 and then continuing to the end that you
9 found unclear or ambiguous --
10    A.   No.
11    Q.   -- any that you raised with Can
12 Sun or Dan Friedberg?
13    A.   Not to my recollection, no.
14    Q.   There is this term
15 "indebtedness," I am on page 2.  It's
16 like on the second paragraph under that
17 second heading of the document.  Do you
18 see where I am looking?
19    A.   Yes.  "Together the Indebtedness
20 is set forth herein"?
21    Q.   Exactly.  The term capital I,
22 "Indebtedness"; do you see that?
23    A.   Yes.
24    Q.   This term is used in a couple
25 of places later on in the document, I am

Page 255

1 wondering if you know what that means?
2        MR. GLUECKSTEIN:  Objection.
3    Calls for a legal conclusion.
4    A.   I wouldn't be able to give you
5 the exact definition of it, no.
6    Q.   Do you know of any documents
7 that would have presented to Three Arrows
8 or another recipient of a line of credit,
9 the amount of the indebtedness as used in
10 this document?
11        MR. GLUECKSTEIN:  Object to the
12    form.
13    A.   Can you repeat your question?
14    Q.   I know we have been going for a
15 while.  I will try to keep the questions
16 even punchier.
17        Do you know of any documents
18 that would have told Three Arrows or
19 other recipients of a line of credit what
20 its indebtedness was?
21    A.   This document itself, no?
22    Q.   Numerically.
23    A.   Yes.  This document itself, no?
24 This USD 120 amount, 120 million.
25    Q.   So that's you interpret

Page 256

1 indebtedness to just refer to the face
2 amount of the line of credit?
3    A.   Well, I assume if they are
4 further short beyond that, then it could
5 be in excess of it.
6    Q.   When you say further short
7 beyond that, what does that mean?
8    A.   If you went negative beyond
9 your LOC, that it could be more than what
10 is just, more than just what is written
11 here.
12    Q.   And then to be precise, because
13 I know this is all confusing, but what
14 does it mean then when negative, how does
15 one when negative beyond a line of
16 credit?
17        MR. GLUECKSTEIN:  Object to the
18    form.
19    A.   If your account balance is
20 below that of the line of credit, then
21 you would be short whatever the line, you
22 know, whatever the line of credit plus
23 that shortfall.
24        So if I put 120 million in your
25 account and you have 115 million then you

Page 257

1 owe me 125 million.
2    Q.   You owe who?
3    A.   FTX.
4    Q.   Section 2 on the next page
5 here.
6    A.   Yes, payment upon demand?
7    Q.   Yes, this also uses that term
8 "Indebtedness" with a capital I.
9        I will just read it, "Customer
10 shall at all times be liable for the
11 payment upon demand of the principal, if
12 applicable, plus any debit balance or
13 other obligations owing under this
14 agreement.  At any time FTX may 'hall'
15 the indebtedness upon notice to
16 customer."
17        Do you see that?
18    A.   Yeah, which is essentially what
19 I was just saying.  The LOC principle
20 plus any further negative amounts.
21    Q.   And that's negative relative to
22 the face amount of the line of credit,
23 not negative overall account balance; is
24 that right?
25    A.   Well, it would include both,

65 (Pages 254 - 257)

Page 258

1 because if you're negative on your LOC,
2 that would mean you also have gone
3 negative on your account balance, because
4 that means the only funds that are
5 remaining is our funds and you're
6 negative. So your account balance is,
7 essentially, negative.
8    Q.   Did FTX make a demand in the
9 case of Three Arrows to haul its
10 indebtedness?
11    A.   Yes.
12    Q.   And when was that?
13    A.   I believe you were saying it
14 was on June 14th, no?
15    Q.   Any earlier point in time to
16 your knowledge in which FTX called any
17 indebtedness that Three Arrows may have
18 had?
19    A.   I mean I guess you could say
20 when we collected interest payments that
21 may be hauling some of the indebtedness,
22 which would have happened beforehand.
23    Q.   Well, the first line of this
24 provision refers to being liable for the
25 payment upon demand. Did FTX regularly

Page 259

1 send some kind of written demand notice
2 for interest payments?
3    A.   That's exactly what I am
4 saying. "Customer shall at all times be
5 liable for the payment upon demand of the
6 principal, if applicable, plus any debit
7 balance."
8       So we did reach out, we did
9 collect interest payments from clients,
10 as well. So the principal isn't
11 applicable, but the interest payment, I
12 believe, you could say any debit balance.
13    Q.   We talked a lot about the, what
14 happened on the 14th. We will come back
15 to that in a little bit.
16       But are you aware that a
17 substantial amount of assets were sold
18 out of 3AC's accounts on June 13th, 2022,
19 as well?
20    A.   So as we mentioned before, the
21 times that are based on this would be
22 Thailand times. So even though it shows
23 as June 14th, so like looking at it now,
24 it shows, you know, 6 a.m. on June 14th,
25 that would be June 13th, depending on

Page 260

1 were you are. So it's not clear what
2 you're saying is the same event or not.
3    Q.   Do you have a document up in
4 front of you right now that you're
5 looking at?
6    A.   We have the one we were looking
7 at earlier, what was it, the exhibit,
8 hold on, Exhibit Share is loading.
9    Q.   I just want to make sure we are
10 all looking at the same thing here.
11    A.   What's the first one they had
12 us do, the group chat, what was that,
13 Exhibit 3.
14    Q.   Okay.
15    A.   Page 15, right? This is the
16 earlier one. Exhibit 4. Which one is
17 it?
18    Q.   Why don't we put that aside. I
19 think I know what you are talking about.
20 We can come back to it if I ask you
21 specific questions on it.
22       Let me ask you this: Prior to
23 the liquidation that FTX conducted of
24 Three Arrows' accounts, did FTX sell or
25 liquidate any of the assets that are

Page 261

1 associated with Three Arrows accounts?
2    A.   Sorry, can you repeat that?
3    Q.   Sure. Prior to the liquidation
4 that we are talking about here that FTX
5 conducted on Three Arrows' accounts that
6 was done manually, did FTX take any
7 action to sell or liquidate assets in
8 Three Arrows' accounts?
9    A.   I am not aware of any manual
10 procedures that happened. But as I
11 mentioned before, when you have many
12 sub-accounts, each sub-account acts as an
13 independent silo. So if they were short
14 of margin on any of those independent
15 sub-accounts, they could have faced
16 automated liquidations. And that
17 wouldn't surprise me at all considering
18 the state of the market and the state of
19 3AC on those days.
20    Q.   You're not sure what amount, if
21 any, of the assets that were sold out of
22 Three Arrows' accounts were
23 auto-liquidated prior to the manual
24 liquidation.
25       MR. GLUECKSTEIN: Objection.

66 (Pages 258 - 261)

Page 262

1    A.   Correct, I am unsure.
2    Q.   Now let's turn to the document
3 I think you were just referencing.  We
4 are going to introduce a new version of
5 it.  And this will be Exhibit 84.  I
6 believe it's an identical telegram
7 exchange to what was shown to you earlier
8 ending in Bates number 158.  Let me know
9 when you have that available.
10        (Tackett Exhibit 84, Document
11    Bates stamped ending in 158, was so
12    marked for identification, as of this
13    date.)
14    A.   I have it up.  What page number
15 do you want me to go to?
16    Q.   Sure.  Let's try 62.
17    A.   Okay, got it.
18    Q.   Make that 63.
19    A.   Okay.
20    Q.   Thanks for your patience, make
21 that 64, and we are good.
22    A.   All right.  Get to the good
23 stuff.
24    Q.   Yeah.  I'm skipping over stuff,
25 shortcutting this, I know we talked about

Page 263

1 this earlier, so trying to streamline
2 here.
3        At the top of this page, ending
4 in 221 --
5    A.   Yes.
6    Q.   -- you say "So I am getting an
7 error that says 'account does not have
8 enough balances.'  I can override that,
9 but it might liquidate you."
10        Do you see that?
11    A.   Yup.
12    Q.   Who had authority to override
13 those sort of errors, as a general
14 matter?
15    A.   I believe I could do it on my
16 end, if I am not mistaken.  But otherwise
17 Nishad definitely would have been able
18 to.
19    Q.   Is there a list somewhere of
20 the Three Arrows personnel that would
21 have been recipients of this Telegram
22 exchange?
23    A.   I wouldn't be surprised if it's
24 in the export that I gave, but I am not
25 sure.  I mean I can easily find out that

Page 264

1 information.  And I think this also shows
2 removals and additions to the chat, so
3 you would be able to, basically, be able
4 to rebuild it based on the removals.
5    Q.   We will not have you do that
6 here today for sure.  That methodology
7 that should have occurred to us, but
8 didn't.  So thank you for that.  All
9 right.  Let's put that aside for a
10 moment.
11        We are going to look at a
12 different version of a document
13 previously produced in half a second.
14 There's a new document available, it's
15 Exhibit 34.
16        (Tackett Exhibit 34, Document
17    Bates stamped FTX_3AC_000013568, was
18    so marked for identification, as of
19    this date.)
20    A.   Okay.  It's up.
21    Q.   And you have basically seen the
22 bottom part of this already, that was the
23 hard to read light text and I am happy to
24 represent that like S&C, we have
25 extracted the text so it's actually

Page 265

1 legible on the last two pages of this
2 document, which I am happy to look at
3 together.
4        So the question is, why did you
5 forward this exchange to Nishad, Dan
6 Friedberg, Sam and Can Sun?
7    A.   They probably asked me to, if I
8 had to guess.
9    Q.   Do you have an understanding of
10 what they said when they may have asked
11 you to?
12    A.   No, I don't have any direct
13 recollection.
14    Q.   Earlier you were asked why you
15 sent this e-mail to Kyle Davies at the
16 bottom of this portion of the chain.
17    A.   Mmm-hmm.
18    Q.   And you answered, I am quoting
19 from the rough transcript, "To remove any
20 avoidance of doubt that we notified
21 them."
22        Do you recall that testimony?
23    A.   Yeah.
24    Q.   Why was it important to you to
25 remove any doubt about whether Three

67 (Pages 262 - 265)

Page 266

1  Arrows received notice of FTX's
2  intentions?
3      A.   Because I didn't want them to
4  be able to say something along the lines
5  of, like, but it wasn't delivered to the
6  e-mail that the account is over or
7  something like that.  Or oh, I didn't see
8  that telegram message, you know.
9          You know, the formal
10 communication with an account should
11 happen through its, should at least be
12 posted to its e-mail.  And so I wanted to
13 make sure that the e-mail was sent to the
14 e-mail on file for that account.
15     Q.   And is that because you
16 understood that notice was required of
17 the intent to liquidate?
18         MR. GLUECKSTEIN:  Objection.
19 Calls for a legal conclusion.
20     A.   No, again, I believe according
21 to paragraph 5 or Section 3 of the LOC,
22 it says that we can pull it at any time
23 for any reason whatsoever.
24         So it wasn't my understanding
25 that notice needed to be provided.  But,

Page 267

1  you know, it's best to do your best to
2  give notice on large events such as that.
3      Q.   But this e-mail was to Kyle
4  Davies wasn't only about removing the
5  line of credit, it was also about a
6  potential liquidation of the account,
7  right?
8      A.   Well, the removing of line of
9  credit would trigger liquidation, because
10 it didn't have sufficient collateral to
11 maintain their positions.
12         MR. PROULX:  Let's take a short
13 break here.  Five minutes is fine with
14 us.
15         THE VIDEOGRAPHER:  The time is
16 1:05 p.m., Eastern and we are off the
17 record.
18         (Off the record.)
19         THE VIDEOGRAPHER:  The time is
20 1:16 p.m., Eastern, we are back on the
21 record.
22 BY MR. PROULX:
23     Q.   Thank you, go ahead.
24     A.   One thing I wanted to clear up,
25 at the end before we hopped off, you said

Page 268

1  this was the e-mail that was regarding
2  liquidating their account.  But I see in
3  the e-mail that we removed the line of
4  credit and because of that, that would
5  result in them in being levered loan
6  crypto and depending on the state of that
7  leverage, the account may be liquidated.
8      Q.   I appreciate that
9  clarification.  Yeah, you were providing
10 notice to Three Arrows, were you not,
11 that a possible outcome of this situation
12 was liquidation by FTX of Three Arrows'
13 accounts?
14     A.   Yes, that without the line of
15 credit that was sitting in their account,
16 they did not have sufficient funds to
17 maintain the positions that they held.
18 And so by liquidating their position, or
19 by pulling the LOC, that would, that
20 could very well result in liquidation of
21 their account.
22     Q.   Understood.  And when exactly
23 was the line of credit sitting in their
24 account until?
25     A.   Well, in the other chat, there

Page 269

1  you go, 6 p.m. Eastern time.
2      Q.   Up until that point in time,
3  the collateral available under the line
4  of credit was still available to Three
5  Arrows; is that correct?
6      A.   I believe so, yes.
7      Q.   Okay.  Looking back then at the
8  Exhibit 20, this is the line of credit
9  document.
10     A.   Let me pull that up.
11     Q.   Please.
12     A.   Okay.
13     Q.   Now I am not going to ask you
14 to interpret any of the provisions.  My
15 question is different.  My question is
16 simply:  Did you represent to anyone or
17 did anyone represent to you the provision
18 or provisions in this document pursuant
19 to which FTX liquidated Three Arrows'
20 account?
21         MR. GLUECKSTEIN:  Object to the
22 form.
23     A.   So you're saying was it made
24 clear to me what they were in breach of
25 in this contract that would lead to them

68 (Pages 266 - 269)

Page 270

1  being liquidated?
2      Q.   Happy to try that question,
3  absolutely.
4      A.   Yeah, so being short of the
5  collateral requirement.
6      Q.   And that's which paragraph or
7  which section are you looking at for that
8  one?
9      A.   So in Section 5, it maintains
10 that the borrower needs to maintain
11 collateral of 200 percent.  And then also
12 3, that we reserve the right to remove
13 the line of credit at any time for any
14 reason.  And furthermore, that we can
15 request, you know, if we are worried
16 about the health of a client, that we can
17 request certain documents.  And the
18 complete radio silence from 3AC led to
19 them being liquidated because we weren't
20 able to assess the health of the client.
21 And so pursuant to Section 3, we removed
22 the line of credit.
23     Q.   I may have missed it, were you
24 referring to a specific provision when
25 you referenced requesting certain

Page 271

1  documents from a client?
2      A.   Documents of certain
3  information, we wanted to get on a call
4  to assess what was going on with 3AC.  If
5  we could get on a call with 3AC and, you
6  know, they would talk to us and say, hey,
7  you know, we are working on it and give
8  us, give us a bit more pop-up collateral
9  then that could have avoided this
10 scenario.  But because we weren't going
11 to obtain any information whatsoever from
12 3AC, that led us moving forward with the
13 liquidation and the removal of the line
14 of credit and the liquidation.
15     Q.   Understood.  I was just
16 wondering if you had in mind a particular
17 provision in here that gave FTX the right
18 to request, you know, documents or
19 information and would require Three
20 Arrows to provide that stuff?
21     A.   Number one the lender reserves
22 the right to request from borrower at any
23 time any information it deems necessary
24 in order to assess the borrowers
25 continued eligibility to receive and

Page 272

1  maintain a line of credit.
2      Q.   Okay.  Let's turn quickly back
3  to Exhibit 84, this is a lengthy telegram
4  exchange.  And this time I am hopeful I
5  will give you the right page number off
6  the bat, so let's try 65.
7      A.   I am working on pulling it up.
8  Okay.
9      Q.   The second line from yourself
10 says, "If we pulled the LOC it would be
11 negative 83 million or so."  Do you see
12 that?
13     A.   The second line on page 85?
14     Q.   65.
15     A.   Sorry, the second line on page
16 -- yeah, "If we pulled the LOC you would
17 be negative 83 million or so"?
18     Q.   Yeah.  Do you see that?
19     A.   Yeah.
20     Q.   Do you know how much on June
21 14th the aggregate price at which the
22 liquidated assets were sold for?
23     A.   When you do a liquid -- so, no,
24 I should clarify by saying no.  But I
25 would also add that the price that assets

Page 273

1  are liquidated at, would be the, what is
2  it the zero price, I believe, is the
3  technical term that we used in the docs.
4  And that has, that has a special formula
5  that you can get to arrive at the price.
6  It isn't necessarily the market price
7  that you would see at the zero price for
8  that calculation.
9      Q.   You can definitely pull up some
10 documents that we need to, but just
11 descriptively, generally speaking, is the
12 zero price the price at which assets are
13 sold, such that the end result is that
14 the user has a zero dollar overall net
15 account balance?
16     A.   I am not sure that would be the
17 right way to describe it.  To be honest
18 the zero price was somewhat confusing.
19 We did end up changing this after the
20 Luna meltdown because we did have some
21 people complain that it wasn't very
22 clear.  So we did end up updating the way
23 that that was calculated or the way that
24 it was displayed, rather.
25     Q.   Let's take a look at Exhibit

69 (Pages 270 - 273)

Page 274

1 85.  For the record in the meantime, this
2 is titled "Account Margin Management
3 Ending in 844488."  Let me know when you
4 have that up in front of you.
5     A.  I do.
6         [Tackett Exhibit 85, Document
7     Bates stamped FTX_3AC_000044488, for
8     identification, as of this date.]
9     Q.  Zero price is defined -- well,
10 let me ask, are you familiar with this
11 document?
12    A.  Yes.
13    Q.  Do you recall at what point in
14 time or times that this document was in
15 effect?
16    A.  We did end up updating our help
17 desk over the summer, I believe, of 2022,
18 and I don't know when this was taken
19 from, if this would be -- let me look a
20 little bit more.
21    Q.  Just so you know where I am
22 going next.  I am going to point you to
23 page 6 and the definition of zero price
24 there.
25    A.  So I believe that this would

Page 275

1 have been the older one, because I
2 believe we ended up moving the position
3 zero price -- oh, no, so this might be
4 the new one, because there is position
5 zero price there.  The fill price of
6 bankrupted account would receive for a
7 particular position.  Yeah, this might be
8 the updated version.  I am not certain,
9 though.
10    Q.  Whatever this version was,
11 effective as of the definition of zero
12 price here is that the actual sale price,
13 even if not the market price, that
14 results in the relevant account's overall
15 account balance being zero?
16    A.  That is what that says, yes.
17    Q.  And do you have an
18 understanding of whether this one would
19 have been in effect in June of 2022?
20    A.  I can't remember if this is the
21 updated one or not.  To be honest, if I
22 had to guess, I think this is the updated
23 version, which wouldn't have been in
24 effect, because if my memory serves, we
25 moved away from just having zero price to

Page 276

1 also having position zero price.  And
2 that was after the Luna blowup, and so I
3 think -- hold on, I am pretty sure this
4 is the, this is the updated version that
5 would not have been in effect when 3AC
6 was liquidated.
7     Q.  Okay.  Let's try a different
8 document then.  So we'll show you Exhibit
9 22, instead.
10    A.  Okay.  Let me go grab that.
11        (Exhibit 22, Document Bates
12    stamped ending in 45167, was
13    previously marked for identification.)
14    Q.  And that is been previously
15 marked as Exhibit 22.  It's an FTX
16 produced document, ending in 45167 titled
17 "Liquidations."
18    A.  Okay.
19    Q.  Are you familiar with this
20 document?
21    A.  Yes.
22    Q.  Do you have an understanding of
23 whether this document was, in effect, in
24 the June 2022 time period?
25        MR. GLUECKSTEIN:  Object to the

Page 277

1    form.
2     A.  So I don't see this one
3 referencing PVP, so I believe that this
4 one --
5     Q.  Take a look at the bottom of
6 page -- I am sorry, please finish, I
7 didn't mean to cut you off.
8     A.  So I think this would have been
9 the one that was in effect, because I am
10 just seeing zero price and not PVP.
11    Q.  So then take a look at the
12 bottom of page 2.
13    A.  Yeah.
14    Q.  And under the heading step 2,
15 where step 2 refers to the, as I
16 understand it, the function provided by
17 the backstop liquidity providers or BLPs,
18 are you familiar with that term?
19    A.  Yes.
20    Q.  And then the third-to-last
21 paragraph in the bottom it says
22 "Liquidated account closes at ZP"; do you
23 see that?
24    A.  Yes.
25    Q.  And ZP is zero price there?

70 (Pages 274 - 277)

1    A.    Mmm-hmm.
2    Q.    And then it provides
3 specifically the formula that ZP is
4 assuming; do you see that there?
5    A.    Yes.
6    Q.    And that is not two-thirds
7 market price plus one-third market price,
8 right?
9    A.    No.  That's not market price
10 that's mark price.  That's two liquid
11 times zero price plus one-third times
12 mark price.
13    Q.    Okay.  Do you have an
14 understanding of whether that would be,
15 given that we are factoring in the zero
16 price as a component of this, more or
17 less than the overall market price of the
18 assets sold?
19    A.    I believe it would depend if it
20 was long or short.
21    Q.    And if you're long?
22    A.    I think I would have to go back
23 to the previous document we were looking
24 at --
25    Q.    Okay.

1    A.    -- because I think if you're
2 long, it would be below.  If you're
3 short, it would be above.
4    Q.    If you want to take a look at
5 the previous document, that's Exhibit 85.
6 By all means please feel free, but I just
7 want to make sure that understanding is
8 correct.
9        (Witness reviews document.)
10    A.    Yeah, I think that's right.
11    Q.    Thank you.  You can put that
12 document to the side for a moment.
13        Who are the backstop liquidity
14 providers?
15    A.    There are a number of backstop
16 liquidity providers.
17    Q.    Was Alameda Research one of
18 them?
19    A.    Yes.
20    Q.    Do you know if Alameda Research
21 was the backstop liquidity provider that
22 took over Three Arrows' accounts in
23 connection with its liquidation on June
24 14th?
25    A.    I do not.  However, the way

1 that BLP usually works is it's done on a
2 pro rata basis, based on your share of
3 the overall backstop liquidity provider,
4 so let's see what I am looking for,
5 capacity, it's done pro rata based on the
6 BLP capacity.  So if you represent 5
7 percent of overall BLP capacity, you
8 would receive 5 percent of the
9 liquidation or BLP handoff.
10    Q.    Putting aside for the moment
11 who the backstop liquidity providers were
12 that received that handoff, do you have
13 an understanding of who the counterparty
14 to the FTX initiated liquidation was on
15 June 14th?
16    A.    No.
17    Q.    FTX has represented in this
18 litigation that it was also Alameda; do
19 you have any reason to dispute that?
20    A.    No.
21    Q.    FTX has also represented that
22 the approximate total actual value, not
23 necessarily market value, of the assets
24 sold by FTX on June 14th, was 82 million.
25 Do you any reason to doubt that?

1    A.    I am curious what you mean by
2 actual value versus market value.
3    Q.    By actual value, I mean the
4 size of each position sold by the price
5 at which it was actually sold to the
6 counterparty.
7    A.    The price that each position
8 was sold -- sorry, repeat that?
9    Q.    Sure.  By actual value or price
10 sold, I mean the, you know, the quantity
11 of each position sold, multiplied by the
12 price at which that, that asset or
13 position was sold.
14        MR. GLUECKSTEIN:  Objection.
15    A.    And so you're saying that the
16 amount that, the amount of positions that
17 were closed were equal to $82 million?
18    Q.    Yes, I am saying FTX has
19 represented that.  And I am asking if
20 that strikes you as incorrect or correct?
21        MR. GLUECKSTEIN:  Objection.
22    A.    I would also say that sold is
23 probably not the right word here, because
24 if they were short, it would have been
25 bought back.  Just saying sold probably

71 (Pages 278 - 281)

1 isn't the right term but the amount
2 liquidated.  No, I don't have any reason
3 to dispute that.
4    Q.   Now, please turn back to
5 Exhibit 84.  This is the lengthy telegram
6 in which we are just going to look at one
7 page here --
8    A.   Okay.
9    Q.   -- specifically, page 65 again.
10 6-5.  And that same line, second line
11 from the top, "If you pulled the LOC, you
12 would be negative 83 million or so."  Do
13 you see that again?
14    A.   Yes.
15    Q.   And I am just wondering if
16 there is any correlation or relationship
17 between the amount negative Three Arrows
18 would be here, as you represented, and
19 the 82 million that FTX has represented
20 were actually sold?
21       MR. GLUECKSTEIN:  Object to the
22    form.
23    A.   So you're saying the 82 million
24 of positions was sold, but this message
25 is specifically about balance?

1    Q.   Yes.
2    A.   So I am not sure how related
3 those are.
4    Q.   No reason to think they are
5 related?
6    A.   No.  Not without more
7 information.
8    Q.   Do you have an understanding of
9 how FTX selected the specific assets that
10 it did to be liquidated on June 14th?
11       MR. GLUECKSTEIN:  Object to the
12    form.
13    A.   I would assume just the
14 account, what assets are in the account.
15    Q.   Do you have a sense of who
16 would have made that decision, what
17 assets to liquidate?
18    A.   Nishad and Sam.
19    Q.   Do you recall any
20 communications around this time the price
21 at which Nishad or anyone else should
22 liquidate the assets?
23    A.   No.
24    Q.   Did the liquidation include the
25 closure of any futures contracts that

1 Three Arrows had entered into by that
2 point and were open?
3    A.   If they had any open futures
4 contracts at the time of liquidation, it
5 would.
6    Q.   But you're not sure whether --
7    A.   I don't know their exact
8 position at the time of liquidation, no.
9    Q.   Okay.  If any other customers
10 liquidated pursuant to a line of credit
11 issue, do you recall seeing specific
12 prices given to the person that
13 liquidated to liquidate those assets at?
14       MR. GLUECKSTEIN:  Object to the
15    form.
16    A.   No.  I do know that during the
17 Luna blowup, there were other clients who
18 had confusion around the zero price that
19 they were liquidated at.
20    Q.   I am going to show you Exhibit
21 86.
22       (Tackett Exhibit 86, Document
23    Bates stamped ending in 44622, was so
24    marked for identification, as of this
25    date.)

1    Q.   This is an e-mail exchange
2 between yourself and Samuel Darby from
3 Sullivan and Cromwell.  The top e-mail is
4 dated September 27th, 2025, ending in
5 44622, produced by FTX.
6    A.   Okay.
7    Q.   The first question is are you
8 familiar with this e-mail exchange?
9    A.   Yup.
10    Q.   Okay.  And you are familiar
11 with it because you were a participant in
12 it?
13    A.   Yes.
14    Q.   Now, if you flip to page 3 --
15    A.   Yup.
16    Q.   -- and this is the same, what I
17 believe you testified was a Signal chat
18 that you had testified to earlier; do you
19 recognize this?
20    A.   Yup.
21    Q.   First question is, did this
22 Signal chat extend before June 14th,
23 2022?
24    A.   It doesn't appear that way.  It
25 says June 14th, 2022 you created the

Page 286

1 group.  You being me.
2    Q.    And like taking the other
3 bookend, do you recall any continuation
4 of this Signal chain after Ryan Salame's
5 last e-mail on the second page of it?
6    A.    No, not really.
7    Q.    The first line of this Signal
8 chat refers to hearing rumors about 3AC's
9 financial condition; do you see that?
10    A.    Yeah.
11    Q.    You testified earlier in the
12 day about other rumors.  And my first
13 question is, when do you first start to
14 hear these rumors about 3AC's financial
15 condition?
16    A.    I don't have an exact date or
17 time.  I would just say around the Luna
18 blowup.
19    Q.    And why is that?
20    A.    Because they had been very
21 involved in the Luna trade.  And then,
22 you know, if you're not hearing any
23 responses from people, that's usually not
24 a good sign.  And so then people start to
25 talk.  And then counterparties reach out

Page 287

1 to other counterparties to get
2 information and rumors start to spread.
3    Q.    And do you understand that
4 other folks at FTX, by and large,
5 generally understood the connection
6 between the Luna crash and Three Arrows?
7    A.    You would have to be more
8 specific with what you're asking.
9    Q.    Sure.  You said that Three
10 Arrows had been very involved in the Luna
11 trade, right?
12    A.    Mmm-hmm.
13    Q.    Did other folks at FTX have a
14 general understanding, to your
15 understanding, of the Three Arrows
16 involvement in the Luna trade?
17    A.    I would assume so.  I can't
18 speak to other's knowledge.  But, you
19 know, we were all active in the crypto
20 space.  And we were all on Twitter.  And
21 Su Zhu wasn't exactly a quiet person.
22    Q.    That's fair.  Do you recall any
23 specific discussions prior to everything
24 that went down with the liquidation, any
25 specific discussions with people at FTX

Page 288

1 regarding Three Arrows' condition between
2 the Luna crash and June 14th?
3        MR. GLUECKSTEIN:  Object to the
4    form.
5    A.    No.
6    Q.    Do you recall any Signal chats
7 with Nishad Singh, in particular, late
8 May/early June, about 3AC's financial
9 troubles?
10    A.    Other than the ones in the
11 chat, not really -- sorry, outside of the
12 one in the Exhibit Share, not really.
13    Q.    Let's turn back to, briefly, to
14 Exhibit 81.
15    A.    Okay.
16    Q.    Flip to page 7 of that
17 document, this is your e-mail exchange,
18 one of your e-mail exchanges with
19 Sullivan and Cromwell.
20    A.    Yes.
21    Q.    You were asked a question,
22 roughly in the middle of this page, with
23 a black bullet point that says "In early
24 June 3AC had approximately 1.5 billion of
25 assets on the account and then it

Page 289

1 decreases, essentially, to zero dollars.
2 What do you understand happened to those
3 assets?"
4        Do you see that question?
5    A.    Yes.
6    Q.    And your response, "They
7 withdrew a lot, they lost a lot on open
8 positions, they lost a lot from their
9 collateral-losing value (crypto dumped)."
10        Do you see that?
11    A.    Yes.
12    Q.    Did you understand that Three
13 Arrows had approximately 1.5 billion of
14 assets on its account in the early June
15 time period?
16        MR. GLUECKSTEIN:  Object to the
17    form.
18    A.    It wouldn't surprise me.  I
19 knew that they had a large balance on
20 FTX.
21    Q.    Okay.  And in early June, then,
22 you understood Three Arrows' state to
23 have been deteriorated based on the
24 things you list on the next bullet point;
25 is that correct?

73 (Pages 286 - 289)

Page 290

1    A.   Yeah.  Yes.
2    Q.   Put this one aside and let's
3 turn then back, please, to Exhibit 86.
4 This is the other e-mail exchange you
5 have going with Sullivan and Cromwell.
6    A.   Okay.  What page?
7    Q.   Yeah, that's a good question.
8 Let's turn back to the Signal chat.
9    A.   All right.
10    Q.   Page 3.  The same Signal chat
11 we were looking at.  Looking at about
12 two-thirds of the way down there is a
13 message from Ryan Salame that says "Yah,
14 we have decent evidence it's real."  Do
15 you have an understanding of what he was
16 referring to there?
17    A.   I believe the next message
18 clarifies.
19    Q.   And what is your understanding
20 of that clarification?
21    A.   "Ben is friends with an
22 employee there who basically said even
23 internally they have no idea what's going
24 on.  Management not responding to them."
25    Q.   Had you heard about that

Page 291

1 situation before Ryan's message in this
2 chat?
3    A.   Not that I am aware of.  Like I
4 said there were rumors going around about
5 lack of response and things like that.
6    Q.   Understood.  The top of the
7 next page, "NS," Nishad Singh, says "The
8 extreme thing to do would be to liquidate
9 the account now, but I agree I think that
10 we shouldn't for now."
11        Do you have an understanding of
12 why he thought that was the extreme thing
13 to do?
14        MR. GLUECKSTEIN:  Object to the
15    form.
16    A.   Because it's a lot of money
17 with a very important client.
18    Q.   Any other reasons?
19    A.   No.  I mean, I think he
20 explains, it will leave them very levered
21 if we removed the LOC which would then
22 liquidate the account.  And that's a big
23 decision.
24    Q.   It's so big that towards the
25 bottom Ryan Salame refers to "I will

Page 292

1 leave it alone then, but since this
2 probably ends up in Court docs, we should
3 be strategic."
4        Do you see that?
5    A.   Yes.
6    Q.   Did you discuss with him
7 outside of the context of this chat, his
8 concerns in that regard?
9        MR. GLUECKSTEIN:  Object to the
10    form.
11    A.   No.
12    Q.   Do you have an understanding of
13 why he thought or at least wrote that
14 this probably ends up in Court?
15    A.   Because it's a lot of money at
16 stake.
17    Q.   Any other reason?
18    A.   Not that I am aware of.  Or one
19 other thing that I can think of is that
20 this is then blowing up, that it's going
21 to end up in bankruptcy and bankruptcy
22 involves a lot of Courts.
23    Q.   Do you mean bankruptcy of Three
24 Arrows Capital or bankruptcy of FTX?
25    A.   Three Arrows.

Page 293

1    Q.   Above on that same page Ryan,
2 likely or four down says "They moved all
3 of the collateral they could to an
4 account called Vault."
5        Do you know who --
6    A.   One more thing I just
7 remembered regarding the rumors is the
8 on-chain movements.  People like it was
9 clear that they were scrambling to get
10 crypto to repay their DeFi loans which
11 also, shows that something is up.  So I
12 just remembered that regarding the rumors
13 and that was one thing I saw a lot being
14 mentioned, is how much they were pulling
15 from different sources to repay DeFi
16 loans.
17    Q.   Okay.  I completely appreciate
18 the clarification.  Not a problem at all.
19 Thank you for confirming.
20        You said it was clear that they
21 were scrambling.  Was it clear to just
22 you or others as well?
23    A.   I believe others.
24    Q.   Others at FTX?
25    A.   Across the industry.

74 (Pages 290 - 293)

Page 294

1    Q.   Turning back to the question I
2  had about that Signal chat we were
3  looking at, it's like third down from
4  Ryan Salame, "They moved all the
5  collateral they could to an account they
6  called 'Vault.'"  Do you see that?
7    A.   Yes.
8    Q.   And who is the they to your
9  understanding in that statement?
10    A.   3AC.
11    Q.   Do you know what Vault means,
12  is that a term of art or an FTX-owned
13  thing.
14    A.   I believe that would be a
15  sub-account that they named Vault.
16    Q.   A sub-account within the FTX
17  exchange?
18    A.   Yeah.  Yeah.  Within FTX.
19    Q.   Do you ever recall seeing a
20  communication of some sort, Signal or
21  otherwise, in which Nishad was instructed
22  to manually liquidate the Three Arrows'
23  account?
24    A.   No.
25    Q.   There has been testimony in

Page 295

1  this case that such a communication may
2  have existed.  You don't have any
3  thoughts on hearing about such a
4  communication, even?
5        MR. KAST:  Object to the form.
6    A.   No.
7    Q.   The ones that we looked at
8  today, are you aware of any other
9  realtime communications regarding what
10  went down with Three Arrows' accounts on
11  the 13th and 14th?
12        MR. GLUECKSTEIN:  Object to the
13    form.
14    A.   Not that I recall.
15    Q.   Do you have a reason to believe
16  that there might be additional
17  communications out there that we haven't
18  talked about yet?
19    A.   Yeah, I wouldn't be surprise if
20  there was some discussion with Sam and
21  Nishad that I wasn't privy to.
22    Q.   And do you think that would
23  have been because you would have been
24  excluded from the communication or they
25  normally communicated separately?

Page 296

1    A.   Like I said, Sam wasn't the
2  biggest fan of talking to me and Sam and
3  Nishad sat next to each other in the
4  office.  So if they were in the office it
5  was pretty easy for them to chat.
6  Especially, you know, nearing this point,
7  it might time at FTX, I was dealing a lot
8  more with Nishad than Sam.  And like I
9  said, I had a hard time talking with Sam.
10    Q.   Understood.  When Nishad and
11  Sam would communicate, do you know how
12  they would normally communicate, whether
13  Signal or text or whatever?
14    A.   Signal is common.  Like I said,
15  they were next to each other in the
16  office.  Also Slack.
17    Q.   This should be a new exhibit
18  up.  It's 27.
19        (Tackett Exhibit 27, Document
20    Bates stamped ending in 1394, was so
21    marked for identification, as of this
22    date.)
23    Q.   This is a short message report,
24  potentially a Slack exchange, date range
25  6/29/2022, produced by FTX, ending in

Page 297

1  1394.  Do you recognize this document?
2    A.   Loading.
3    Q.   Sure.  Take your time.
4    A.   Okay.
5    Q.   I am happy to report that we
6  are beyond now chronologically the June
7  14th period.  I know you spent a lot of
8  time on that.  I appreciate you walking
9  through what happened there.
10    A.   This doesn't appear to be a
11  chat I'm in.
12        MR. PROULX:  Counsel, any
13    objection to the witness answering
14    some questions on this document or
15    not?
16        MR. GLUECKSTEIN:  You can ask
17    him a question.  He's made clear he's
18    not on the chat.  I mean, he shouldn't
19    be speculating.  You can ask him your
20    question.
21        MR. PROULX:  I am asking solely
22    from a confidential designation
23    perspective.
24        MR. GLUECKSTEIN:  No, I don't.
25        MR. PROULX:  Okay, thank you.

75 (Pages 294 - 297)

1    Q.    Who is Jim Outen, if you know?
2    A.    I don't know.
3    Q.    In the very first paragraph of
4 this document he appears to express some
5 confusion about lines of credit and what
6 he writes as "In some context assessing a
7 collateral ratio based on a line of" --
8 strike that -- "a letter of credit and
9 not assets deposited at the exchange,
10 that seems to be a significant shift in
11 messaging."
12        Do you see that?
13    A.    Yeah.
14    Q.    Do you have any idea what
15 concern he may have been expressing
16 there?
17        MR. GLUECKSTEIN:  Object to the
18    form.
19    A.    Sounds like he's saying that we
20 are allowing people to get more leverage
21 than we publicly disclosed through lines
22 of credit.
23    Q.    And did they obtain that via
24 the overall amount of the line of credit,
25 is that the issue or is it a different

1 metric that he may be concerned about?
2    A.    I mean, to me it seems like
3 he's a bit confused about what's going
4 on.
5    Q.    Okay.
6    A.    We are in some context
7 assessing a collateral ratio, but the
8 collateral ratio is just what we define
9 for the bucket on determining interest
10 rate.
11    Q.    There is a suggestion that
12 someone named @JulieSchoening or
13 Schoening delicately ask around/ask Zane
14 about it.  Who is that person, if you
15 know, and did they ask you about it?
16        MR. GLUECKSTEIN:  Objection to
17    form.
18    A.    Julie was dealing with the CFTC
19 application.  And Julie and I had a lot
20 of discussions around lines of credit.
21    Q.    Any discussions about the Three
22 Arrows line of credit in particular?
23    A.    Not that I remember.  It was
24 more around how lines of credit work in
25 general.  Yeah, because I think she was

1 taking, basically, with the system that
2 we had on Dotcom and proposing that to
3 CFTC, so she wanted to better understand
4 how the Dotcom side worked.  And I was
5 explaining lines of credit to her.
6    Q.    What is a LOC collateral ratio,
7 to your understanding?
8    A.    Line of credit collateral ratio
9 is how much collateral you need for a
10 line of credit relevant to the size of
11 the line of credit.  So we had a few
12 different buckets.  It originally started
13 with 25 percent of the minimum and then
14 we bumped it up to 50 percent and we had
15 like three different buckets, I believe.
16 Maybe four.
17        MR. PROULX:  We were going to
18    take a final break here.  Happy to be
19    at five minutes, if anyone needs more
20    time, I will let you know, but I don't
21    have many more questions for you.
22        THE VIDEOGRAPHER:  The time is
23    2:01 p.m., Eastern and we are off the
24    record.
25        (Off the record.)

1        THE VIDEOGRAPHER:  The time is
2    2:10 p.m., Eastern, ad we are back on
3    the record.
4 BY MR. PROULX:
5    Q.    Mr. Tackett, much earlier in
6 the day we were talking about Su Zhu and
7 Kyle Davies and your relationship or lack
8 thereof with them.  Do you recall that?
9    A.    Yes.
10    Q.    And I believe you spoke briefly
11 about, and feel free to clarify, one of
12 the two inviting you or suggesting you
13 become involved with a post-3AC venture
14 that they may have had; do I have that
15 right?
16    A.    Kyle Davies, yes.
17    Q.    Which venture was that?
18    A.    OX.FUN.
19    Q.    Do you recall Kyle Davies also
20 having any involvement in something
21 called OPNX?
22    A.    It's the same thing.
23    Q.    What is that?
24    A.    OPNX turned into OX.FUN, or
25 whatever.

Page 302

1    Q.   And what is that FUN,
2  OPNX/OX.FUN?
3    A.   It's an exchange that they
4  launched.
5    Q.   To your knowledge, is it still
6  in operation?
7    A.   I think OPNX had to turn into
8  OX.FUN and even then, I am not sure if
9  that's operating.  It was like a complete
10  clusterfuck.
11    Q.   We've read some negative
12  things, too.  I would love to hear more
13  about why you characterize it that way?
14    A.   So part of the issue was
15  CoinFLEX.  CoinFLEX had their own issue
16  with Roger Ver.  And I don't know how
17  Mark Lamb and Kyle and all that came to
18  being with Su and them, but my
19  understanding is basically that they took
20  all of the assets from CoinFLEX and
21  transferred them over to OPNX, but didn't
22  take any of the liabilities, so just
23  shafted all of the CoinFLEX customers and
24  investors, like myself, and used it to
25  launch this new exchange.  And then they

Page 303

1  got Leslie Lamb, who is Mark's wife to be
2  the CEO and then tried to hide that she
3  was the CEO, and then there were some
4  lawsuits.  And then OPNX tried to sue
5  Mike Dudas, or something, over saying
6  something.  And the exchange never really
7  got any traction.  And I don't know, it'S
8  just like, I don't know, it was just a
9  clusterfuck.  Like, yeah, they disappear.
10  Shows no remorse for their actions.  Says
11  that jail is great.  Everybody should go
12  to jail.  Kyle is like yeah, I went off
13  to Bali and had a great time and it was
14  so much fun.  And then they decided to
15  start this new venture.  I don't know.
16  They are like they're return arc was just
17  abysmal.
18    Q.   Are you aware of whether Su Zhu
19  was in prison because he failed to
20  cooperate with our clients?
21    A.   Yeah.
22    Q.   Did you tell Kyle your views on
23  the situation when you made that overture
24  or did you decline or not respond, what
25  did you say in response?

Page 304

1    A.   I didn't respond to him.
2    Q.   I believe you explained earlier
3  that you are being represented by Mr.
4  Kast of the Steptoe firm in connection
5  with this deposition; is that correct?
6    A.   That is correct.
7    Q.   Do you know who, if anyone, is
8  paying or reimbursing your legal fees for
9  participating in this deposition?
10    A.   That's a good question.  I hope
11  FTX is.  But I don't know.  But I had
12  discussed with it being done in London.
13  And then I couldn't go to London because
14  the airport in Ibiza got flooded and then
15  I haven't discussed it since then.
16    Q.   Is it your expectation that FTX
17  will cover the cost of Steptoe's fees in
18  this matter?
19    A.   My sincere hope.  FTX has cost
20  me enough money already.
21    Q.   Any conditions that FTX or
22  Sullivan and Cromwell put on any such
23  reimbursement of your legal fees?
24        MR. GLUECKSTEIN:  Object to
25    form.

Page 305

1    A.   No.  Not that I am aware of or
2  that I can recall.  And I would add that
3  I told them from the beginning I am happy
4  to do it, because 3AC is in the wrong
5  here.
6    Q.   Was one of the conditions that
7  you, in fact, do appear for deposition?
8        MR. GLUECKSTEIN:  Object to the
9    form.
10    A.   I don't understand, if I didn't
11  appear for the deposition, what legal
12  costs would they be covering?
13    Q.   Preparation for it, for
14  example?
15    A.   Preparation for a deposition
16  that doesn't happen?
17    Q.   Just speaking in hypotheticals,
18  as you rightly noted.
19    A.   No.  No, not that I can
20  remember.
21    Q.   How many conversations have you
22  had with any lawyers at Sullivan and
23  Cromwell regarding this deposition or the
24  dispute with 3AC?
25    A.   Probably more than they would

77 (Pages 302 - 305)

Page 306

1 have liked to have had. I am not very
2 good at responding to people. So it took
3 them a number of e-mails and I said I
4 would be happy to help. But then, you
5 know, I went off and did some stuff and
6 it took a while to respond. And then I
7 was like, I am happy to help. And then
8 took a while to respond. So it took them
9 a number of e-mails to get this done.
10    Q.    And what about telephone calls?
11    A.    Five.
12    Q.    When was the most recent one?
13    A.    A few months ago with S&C, I
14 think, a couple of months ago, July
15 maybe.
16    Q.    Do you recall who specifically
17 at 3AC you communicated with on that
18 call?
19    A.    I believe Mr. Darby.
20    Q.    Any other lawyers from S&C you
21 have spoken with directly about the 3AC
22 litigation or this deposition?
23    A.    I would have to check.
24    Q.    None jump to mind?
25    A.    No. I am a little tired right

Page 307

1 now. So my quick thinking is not in
2 tiptop shape.
3    Q.    Did S&C tell you why they
4 wanted you to testify at a deposition?
5    A.    Because I have information on
6 the matter at hand.
7    Q.    And what else did they say
8 about why they wanted you to testify at a
9 deposition?
10    A.    I mean, I don't really think
11 that they told me a whole lot about why.
12 They told me, hey, there is this thing.
13 I was like yeah, sure, I am happy to chat
14 about it. I don't think I required a lot
15 of convincing or reasoning.
16    Q.    I am just asking -- I am not
17 asking about any convincing. I am just
18 simply asking about whether you recall
19 them expressing to you about why they
20 wanted you to appear?
21        MR. GLUECKSTEIN: Objection.
22    A.    Because I managed the account
23 and have information on the matter.
24    Q.    You provided the S&C law firm
25 with documents related to the 3AC

Page 308

1 dispute; is that right?
2    A.    Mmm-hmm, yes.
3    Q.    Okay. Did you personally
4 locate those, or did you work with
5 counsel to locate and get those over to
6 S&C?
7    A.    Personally located them.
8    Q.    And you checked the phone to
9 no?
10    A.    Phone and laptop.
11    Q.    I am sorry, what was that?
12    A.    Phone and laptop.
13    Q.    And you found documents in both
14 devices that were turned over or just one
15 of the two?
16    A.    Both.
17    Q.    And did you find them by
18 running search terms or some other way?
19    A.    Yeah. Well, I knew obviously
20 the 3AC chat on Telegram would have a lot
21 of information. And then also searched
22 on Signal.
23    Q.    When was the last time you
24 provided any of those documents you just
25 discussed to S&C?

Page 309

1    A.    I think it was around July,
2 around the time I had the last call with
3 them. I can't remember what prompted it.
4 I was looking for something else on my
5 phone, and I saw the 3AC chat about the,
6 that I had with Nishad and Ryan. Then
7 checked and that wasn't in the initial
8 batch of things that I provided S&C, so I
9 sent that over, as well.
10    Q.    And you also e-mailed S&C, we
11 have taken a look at a couple of them
12 today?
13    A.    Yes.
14    Q.    When was the last time you
15 personally, not through your counsel, you
16 personally e-mailed any lawyers from S&C
17 regarding this dispute?
18    A.    Probably around July/August.
19    Q.    Do you recall any in September
20 or October?
21    A.    No, but by then I had gotten
22 with Steptoe, so any communication would
23 be going through them.
24        MR. PROULX: Mr. Tackett, thank
25    you for your time. We will conclude

Page 310

1  our questions here, subject to any
2  recross based on any questions that
3  Brian may have.  We really do
4  appreciate your participation,
5  especially at this late hour for you,
6  thank you.
7        THE WITNESS:  My pleasure.
8        MR. GLUECKSTEIN:  Given the
9  time, Mr. Tackett, we are comfortable
10  concluding the deposition.  And let
11  you get to bed.  We appreciate you
12  voluntarily appearing today for this
13  deposition.
14        THE WITNESS:  My pleasure, thank
15  you guys.
16        THE VIDEOGRAPHER:  Anything else
17  for the record?  The time is 2:22
18  p.m., Eastern, and that concludes the
19  deposition.  Thank you everyone.
20
21        (Whereupon, at 2:22 p.m., the
22  deposition was concluded.)
23
24
25

Page 311

1              I N D E X
2
3  WITNESS           EXAMINATION BY        PAGE
4  ZANE TACKETT         Mr. Glueckstein       5
                        Mr. Proulx         157
5
6
7              E X H I B I T S
8
9
10  TACKETT      DESCRIPTION          PAGE
11  Exhibit 1    Tackett subpoena       8
12  Exhibit 2    Document Bates stamped TACKETT_3AC    39
13        361
14  Exhibit 3    Document Bates stamped Tackett_3AC    65
15        158
16  Exhibit 4    Document Bates stamped Tackett_3AC    69
17        91
18  Exhibit 5    Document Bates stamped Tackett 3AC    84
19        085
20  Exhibit 6    Document Bates stamped FTX 3AC    97
21        13940
22  Exhibit 7    Document Bates stamped FTX 3AC    97
23        13950
24  Exhibit 8    Document Bates stamped FTX 3AC    131
25        1594

Page 312

1  Exhibit 9    Document Bates stamped       138
2        FTX_3AC_000000764
3  Exhibit 10   E-mail of Exhibit 9 native format    139
4  Exhibit 11   Document Bates stamped FTX 3AC    140
5        44619
6  Exhibit 66   Document Bates stamped       165
7        FTX_3AC_000013689
8  Exhibit 65   Document Bates stamped FTX_3AC    167
9        16098
10  Exhibit 15   Document Bates stamped FTX_3AC    170
11        13695
12  Exhibit 78   Document entitled FTX Org Chart    175
13  Exhibit 79   Tweet posts by@Tackett Zane    181
14  Exhibit 80   Tweet posts by@Tackett Zane    182
15  Exhibit 81   e-mail exchange          184
16  Exhibit 39   Document Bates stamped       189
17        Tackett_3AC_000361
18  Exhibit 82   Document Tackett_3AC 338      202
19  Exh 6        Document Bates stamped       213
20        FTX_3AC_000044442
21  Exhibit 83   Document Bates stamped ending in    233
22        FTX 75
23  Exhibit 20   Line of credit document      237
24  Exhibit 18   Document ending in Bates stamp    243
25        45694

Page 313

1  Exhibit 84   Document Bates stamped ending in    262
2        158
3
4  Exhibit 85   Document Bates stamped       264
5        FTX_3AC_000044488
6  Exhibit 34   Document Bates stamped       264
7        FTX_3AC_000013568
8  Exhibit 22   Document Bates stamped ending in    276
9        45167
10  Exhibit 86   Document Bates stamped ending in    284
11        44622
12  Exhibit 27   Document Bates stamped ending in    296
13        1394
14
15
16
17
18
19
20
21
22
23
24
25

79 (Pages 310 - 313)

Page 314

1        CERTIFICATION
2
3      I, DAWN MATERA, a Notary Public for
4  and within the State of New York, do
5  hereby certify:
6      That the witness whose testimony as
7  herein set forth, was duly sworn by me;
8  and that the within transcript is a true
9  record of the testimony given by said
10 witness.
11     I further certify that I am not
12 related to any of the parties to this
13 action by blood or marriage, and that I
14 am in no way interested in the outcome of
15 this matter.
16     IN WITNESS WHEREOF, I have hereunto
17 set my hand this 2nd day of November,
18 2025.
19
20        *Dawn Matera*
21  _____
22        DAWN MATERA
23          *   *   *
24
25

Page 316

1  In re: FTX TRADING LTD., et al.
2  10/31/2025 - ZANE TACKETT
3      ACKNOWLEDGEMENT OF DEPONENT
4      I, ZANE TACKETT, do hereby declare
5  that I have read the foregoing transcript,
6  I have made any corrections, additions, or
7  changes I deemed necessary as noted on the
8  Errata to be appended hereto, and that the
9  same is a true, correct and complete
10 transcript of the testimony given by me.
11
12  _____   _____
13  ZANE TACKETT         Date
14  *If notary is required
15
16     SUBSCRIBED AND SWORN TO BEFORE ME THIS
17     _____ DAY OF _____, 20___.
18
19
20  _____
21  NOTARY PUBLIC
22
23
24
25

Page 315

1  In re: FTX TRADING LTD., et al.
2  10/31/2025 - ZANE TACKETT
3      E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23  _____  _____
24  ZANE TACKETT         Date
25

80 (Pages 314 - 316)

| & | | | |
|---|---|---|---|
| **&**  2:3,13 5:13 157:16 159:5 | 118:10 139:1,6 139:11 140:22 142:24 144:24 152:13 154:19 236:2 312:3 | **113,438,132....** 118:18 | **131**  311:24 |
| **0** | | **115**  256:25 | **1330**  3:3 |
| **0**  213:9 | **10/31/2025** 315:2 316:2 | **11:46**  211:20 | **13695**  170:8 312:11 |
| **000000764** 138:10 312:2 | **100**  41:23 76:12,13 110:1 110:2,3,11,12 110:14,15,18 117:24 149:1 154:12 167:23 236:3,5 238:6 238:8 | **11:47**  211:24 | **138**  312:1 |
| **000013568** 264:17 313:7 | | **11th**  21:1 | **139**  312:3 |
| **000013689** 165:3 312:7 | | **12**  183:12,14,16 | **1394**  296:20 297:1 313:13 |
| **000044442** 213:13 312:20 | | **120**  46:12 65:12 85:13 94:2 96:1,12 118:18 119:10 119:13,16 120:17,18 124:4,10,16 143:19 152:25 153:5,15,16,23 153:25 193:6,7 195:23 236:19 237:14 238:9 255:24,24 256:24 | **13940**  97:5,18 311:21 |
| **000044488** 274:7 313:5 | | | **13941**  100:8 |
| **000361**  189:24 190:4 312:17 | **100,000**  199:5 200:2,18 | | **13950**  97:9 311:23 |
| **030**  250:24 | **1000**  110:19 | | **13th**  133:8 149:15 259:18 259:25 295:11 |
| **085**  84:4,6 311:19 | **10004**  2:4 | | |
| **1** | **10020**  2:14 | | **14**  219:2,4 |
| **1**  8:19,20 9:10 9:10 10:6,13 34:3,7,25 43:3 102:24,25 104:20 169:10 169:10 311:11 | **10:34**  157:9 | **121**  198:20 | **140**  312:4 |
| | **10th**  71:13 219:9 | **125**  2:4 78:11 79:10 80:3 108:12 111:8 257:1 | **14th**  107:24 133:8,8 138:18 140:1 141:25 147:24 148:15 149:15 248:25 258:14 259:14 259:23,24 272:21 279:24 280:15,24 283:10 285:22 285:25 288:2 295:11 297:7 |
| | **10x**  199:8 | | |
| | **11**  1:2 140:22 140:25 141:6 147:24 312:4 | | |
| | **110**  199:2,10,17 200:10 | **1271**  2:14 | |
| **1.25**  104:24 | **110,000**  199:6 200:3,6,17 | **12:05**  228:15 | |
| **1.5**  288:24 289:13 | | **12:15**  228:19 | |
| | **113**  119:9,13 121:22 122:18 124:3 | **12th**  149:15 248:24 | **15**  170:5,7 172:2 260:15 312:10 |
| **10**  70:24,24 87:3 101:16 | | **13**  69:15,20 170:17 | |

**150**   199:16
**157**   311:4
**158**   65:17 66:4
  262:8,11
  311:15 313:2
**15844**   187:15
**1594**   131:16,21
  311:25
**15th**   183:21
**16098**   167:11
  312:9
**165**   312:6
**167**   71:1 312:8
**16th**   215:25
**170**   312:10
**175**   312:12
**18**   243:14,16,18
  312:24
**181**   312:13
**182**   312:14
**184**   312:15
**189**   312:16
**199**   121:2,12,22
  122:7,12,15
  195:25
**19th**   14:10
**1:05**   267:16
**1:16**   267:20
**1bd**   100:12

**2**

**2**   39:19 40:6
  89:16 97:20,23
  97:24,25 103:1

132:8 166:14
215:18 254:7
254:15 257:4
277:12,14,15
311:12
**2.1**   235:15
**20**   117:23
  123:21,25
  124:12,13,16
  124:20,22
  132:10,16
  237:1,2,10
  238:4,5,7,12
  249:19 254:5
  269:8 312:23
  316:17
**200**   58:14
  78:10 79:8,21
  79:24 80:8
  86:25 89:2
  109:20 111:15
  111:18 119:14
  119:17 122:21
  152:10 270:11
**20036**   3:4
**2013**   12:9 13:4
**2014**   13:24
**2015**   13:24
**2016**   14:10
**2018**   179:7
  181:5
**2019**   14:14,15
  179:7

**202**   312:18
**2020**   14:17
  15:4 17:2,20
  17:25 18:13
  23:6 70:6
**2021**   24:8,12
  25:6 71:13
  72:15 212:17
  215:25 220:22
  234:1,21
**2022**   20:22
  27:25 28:2,23
  65:5 73:16
  74:13 81:11,19
  83:2 84:22
  90:18 94:19
  95:14,22,24
  96:10 97:17
  98:11 103:12
  105:7 107:24
  108:18,25
  133:8 134:7,9
  134:18,22
  138:18 140:1
  141:25 147:24
  148:15 149:16
  154:9 169:25
  170:1,17 171:8
  183:22 190:21
  210:24,25
  219:9 221:22
  252:8 259:18
  274:17 275:19
  276:24 285:23

285:25
**2023**   11:24
**2024**   184:17
**2025**   1:8 4:4
  285:4 314:18
**208**   73:10,19
**209**   107:20
**20th**   98:11
**20x**   246:9
**210**   81:7
**212**   2:5
**213**   312:19
**21:56**   125:17
**22**   234:1,20
  276:9,11,15
  313:8
**22-11068**   1:2
**221**   151:15,20
  151:21 263:4
**22:53**   127:21
**23**   113:6
**233**   312:21
**237**   312:23
**24**   101:12,17,20
  102:1 152:12
**24/7**   101:25
**240**   151:1
**243**   312:24
**25**   104:23
  110:17 112:12
  300:13
**25,000**   33:20,23
  34:1,6 35:1

**25th**   11:24
**26**   183:16
219:4
**262**   313:1
**264**   313:6
**26th**   97:17
**27**   296:18,19
313:12
**276**   313:8
**27th**   285:4
**28**   109:5
**284**   313:10
**28th**   73:16
**296**   313:12
**29th**   77:5
**2:01**   300:23
**2:10**   301:2
**2nd**   314:17

**3**

**3**   39:17 65:16
66:1 70:19
84:16 87:12,20
107:14,18,19
124:8,8,12,21
151:11 153:4
169:11 260:13
266:21 270:12
270:21 285:14
290:10 311:14
**3,145,735.41**
152:16
**3,145,735.41.**
153:2

**3.1**   152:22
**30**   112:12
**31**   1:8
**31st**   4:4 81:11
94:19
**338**   202:17,19
312:18
**34**   264:15,16
313:6
**360**   119:18
**361**   39:20 40:7
311:13
**39**   189:22,23
244:10,21
311:12 312:16
**3ac**   2:13 19:15
22:1,14,19
23:7 24:2,6
26:21 27:1,11
27:17 29:3
39:20 40:7
47:19,20 65:8
65:17 66:3
69:17 70:7
72:2,4 74:12
77:18,21 84:3
84:6 87:7
89:15 97:5,9
97:18 105:6
106:8,25 112:5
125:23 128:7
129:12 131:16
131:21 132:16
133:3,7 135:10

135:23 136:10
137:11 138:10
141:1,8 142:9
143:24 144:8
146:9 148:21
152:4 153:23
154:22 155:7
158:9 165:3
167:11 170:8
180:13 181:5,5
187:20 189:24
190:4,17,19
191:25 192:8
193:20 202:17
202:19 213:13
214:17 215:8,9
261:19 264:17
270:18 271:4,5
271:12 274:7
276:5 288:24
294:10 301:13
305:4,24
306:17,21
307:25 308:20
309:5 311:12
311:14,16,18
311:20,22,24
312:2,4,7,8,10
312:17,18,20
313:5,7
**3ac's**   45:13,21
65:10 154:10
259:18 286:8
286:14 288:8

**4**

**4**   65:14 69:16
70:4 88:4,5
107:18,19
129:2 169:10
216:14 235:15
260:16 311:16
**4442**   213:23
**44619**   141:1,8
312:5
**44622**   284:23
285:5 313:11
**45**   129:23
130:3,19
179:24
**45167**   276:12
276:16 313:9
**45694**   243:17
243:19 312:25
**4:15**   129:18

**5**

**5**   58:15,17,20
78:11 79:9
80:9 81:13
83:8 84:2,5
85:22 86:11,20
86:21,24 87:8
89:2 95:3
96:23 117:25
118:3,7,15
187:14 216:24
242:8 245:21
249:25 266:21

**[5 - access]**

270:9 280:6,8
311:4,18
**5,000**   149:3
**50**   110:6
300:14
**51**   73:8
**53**   81:7
**558-4000**   2:5
**5777**   314:20

**6**

**6**   97:4,13 100:4
100:5 213:10
213:11,12
259:24 269:1
274:23 311:20
312:19
**6-5**   282:10
**6/29/2022**
296:25
**60**   29:14
**62**   262:16
**63**   262:18
**64**   262:21
**65**   167:6,10
272:6,14 282:9
311:14 312:8
**66**   165:2,6,12
165:15 312:6
**69**   311:16
**6:03**   1:8 4:3
**6:43**   114:6
**6:45**   116:8

**6th**   70:6

**7**

**7**   67:22 97:8,13
99:20 118:16
288:16 311:22
**75**   233:20
312:22
**775**   234:2
**78**   164:25
165:6 175:1,7
312:12
**79**   181:18,19
182:16 196:3
312:13
**7:16**   152:6
**7:45**   83:18
**7:55**   83:21

**8**

**8**   78:12 79:11
108:12 131:15
131:20 135:21
311:11,24
**80**   142:24
182:11,12,16
182:18 218:24
312:14
**81**   184:9,10
288:14 312:15
**82**   202:15,18
280:24 281:17
282:19,23
312:18

**83**   126:10
233:15,17,19
272:11,17
282:12 312:21
**84**   262:5,10
272:3 282:5
311:18 313:1
**844488**   274:3
**85**   122:14,16,24
272:13 274:1,6
279:5 313:4
**86**   284:21,22
290:3 313:10

**9**

**9**   137:17 138:8
138:9,17,21
139:2 312:1,3
**90**   91:11
**91**   69:17 70:7
311:17
**97**   311:20,22
**9:05**   137:25
**9:21**   138:4
**9:44**   157:4
**9:49**   125:6
**9:50**   144:2
**9th**   21:14
134:21 184:17

**a**

**a.m.**   1:8 4:3
67:22 83:21
129:2 138:4
157:4,9 211:20

211:24 259:24
**abided**   103:13
**ability**   35:9
37:14 57:24
103:6
**able**   8:14 9:4
9:16 38:4,10
40:1 41:15
42:1 49:14
93:8 103:5
120:22 121:10
121:17 150:5
150:17 176:25
236:21 255:4
263:17 264:3,3
266:4 270:20
**above**   1:13
38:12 73:24
121:20 124:2
218:4 279:3
293:1
**absolute**   201:8
210:14
**absolutely**   8:23
30:8 96:9
154:12 187:16
210:16 270:3
**abysmal**
303:17
**accept**   139:13
**access**   31:8
77:23 106:21
133:24 150:6
150:15

**accessible**
17:15 82:25
**accident** 8:8
**accordance**
5:24
**account** 15:24
16:3 17:5 22:1
22:14,19 23:5
23:7,14 24:6,7
24:11 25:6
27:11 30:22
31:6,6,7 32:6
32:23 33:4
34:18,21,22,24
35:8 37:15
38:5,7,20,23,24
38:25 39:1,4,6
39:15 40:15
42:21 45:10
46:19 48:1,8
48:16 49:3
51:17 52:8
53:8,13,16,20
53:22 54:3,17
55:8,21 56:4
58:3,12 61:25
62:9,11,17
64:4,10,11,15
65:8 71:23
72:23 73:23
75:12 77:24
78:2,18 86:18
87:2 88:15
94:17 97:3

102:25 106:2
106:14,16
107:2,10 110:2
111:10 115:13
115:18,21
117:6 118:17
118:21 119:8
119:14,19
120:3,12,23
122:7 123:2
124:3,7,11,15
124:24 126:5
127:8,23 128:4
129:4,10,15
130:16,24
131:12,14
136:10,20
137:11 140:3,8
140:13 144:8
144:20 145:10
146:3,6,11,22
147:20 148:4
148:13,21
149:4,17,18,21
149:23 150:18
150:24 151:8
153:1,6,9
154:10 155:1,6
155:15 166:14
185:3,6,7
193:13,20
196:7 204:18
204:24 226:17
226:18 227:1,8

227:24 242:11
246:8 249:9
253:3 256:19
256:25 257:23
258:3,6 261:12
263:7 266:6,10
266:14 267:6
268:2,7,15,21
268:24 269:20
273:15 274:2
275:6,15
277:22 283:14
283:14 288:25
289:14 291:9
291:22 293:4
294:5,15,16,23
307:22
**account's**
275:14
**accounted** 64:9
**accounts** 33:5,6
39:2 47:16
94:18 103:4
105:6 115:19
149:1,2,3
217:21,22,23
226:25 259:18
260:24 261:1,5
261:8,12,15,22
268:13 279:22
295:10
**accrued** 227:23
**accurate** 8:15
176:13 190:8

190:12 217:11
218:13
**accurately**
75:11 159:17
175:25
**acknowledge...**
316:3
**acquired** 27:17
**acquiring**
61:16
**acting** 129:6
**action** 1:13
4:25 175:4
261:7 314:13
**actions** 140:14
146:19 303:10
**active** 80:24
131:7 211:1
287:19
**actively** 129:5
163:2
**activities** 30:18
**activity** 136:13
227:3
**acts** 261:12
**actual** 6:6
23:14 52:1,2
76:14 147:18
171:14 239:16
275:12 280:22
281:2,3,9
**actually** 8:6
51:24 92:12
112:25 113:19

144:18 145:11
154:21 155:3
155:16 158:5
158:12 160:16
162:1 165:7
181:5 190:1
217:17 236:15
236:23 248:12
264:25 281:5
282:20
**ad** 301:2
**adam** 2:18
**adam.goldberg**
2:19
**add** 20:14
114:7 192:9
272:25 305:2
**added** 17:3
**addition** 29:20
50:21 196:19
**additional**
46:14 50:2,9
122:25 136:14
145:7 155:22
246:13,13
295:16
**additions** 264:2
316:6
**addressed** 42:9
178:22
**addresses**
209:13
**adds** 192:16

**adhere** 171:20
**adhered** 6:17
**adherence** 6:7
**adjust** 90:22
**adls** 49:12
**admin** 94:15
149:22 150:2,6
150:12,15
**administer**
4:24 5:23
**administered**
1:3
**ads** 183:7
**advances**
235:15,20
**advice** 188:12
240:25
**affect** 35:2
53:20
**affected** 29:23
30:2 219:23
227:10
**affiliated**
169:19 212:5,7
212:8
**afternoon** 4:2
5:11
**agencies** 194:8
**aggregate**
235:16,25
272:21
**aggregates**
253:25

**ago** 115:5
306:13,14
**agree** 4:13
101:20 291:9
**agreed** 50:23
75:4 76:11
110:13
**agreement** 5:20
6:12 51:10
75:18,22,23
76:3 81:20
84:12 85:1,3,5
85:12,18 86:3
86:9,12 87:11
89:1,14,20
90:2,21 91:1,1
91:4 93:16,23
94:4,20 95:1
99:6,11,12,23
111:7 129:7
152:9 156:7
185:14 233:25
235:9 238:12
238:20 239:2
245:22 257:14
**agreements**
74:23 75:14,16
82:6 90:8,15
90:19,25 92:17
98:22 99:16
237:24 238:24
**ahead** 68:7,11
81:6 83:15
88:8 109:19

180:19 225:8
237:18 267:23
**airport** 304:14
**al** 1:5 4:17
315:1 316:1
**alameda** 112:9
181:7 223:22
279:17,20
280:18
**algorithmic**
29:13
**align** 183:10
**allison** 80:18
81:3,4 85:10
85:16 176:17
176:18
**allisonnx** 80:14
**allocated** 44:25
**allow** 7:2 150:6
**allowed** 55:20
56:14 174:23
208:12 228:5
**allowing** 127:2
298:20
**alternative**
127:12
**ambiguous**
183:18 254:9
**americas** 2:14
**amount** 20:5
32:25 33:9
34:6 43:12
46:4 54:5 58:4
58:4,7 64:1

79:14,15 87:1
94:1 95:10
96:18 117:7
119:12 122:9
126:9 137:7
191:13 192:19
195:13,16
196:23 199:19
199:20 205:11
235:17 236:1
236:18,19
237:13 255:9
255:24 256:2
257:22 259:17
261:20 281:16
281:16 282:1
282:17 298:24
**amounts**  26:8
257:20
**announcements**
25:21 82:14
**annoyance**
161:16
**annualized**
231:22
**answer**  7:3,11
7:19 8:2 23:13
23:21 61:12
67:3 88:9
89:12 101:9
103:10 113:12
113:16 173:18
175:21 185:12

**answered**
211:14 240:12
265:18
**answering**
234:16 297:13
**antigua**  170:13
**anybody**  23:12
123:15 125:13
176:5 201:12
219:22 223:17
**anyways**  75:14
194:20
**aoa**  102:11
**apart**  104:11
**api**  17:12 23:18
28:15,20
**apologies**
162:16
**apologize**
178:21 206:6
**appear**  46:22
66:7 194:15,17
285:24 297:10
305:7,11
307:20
**appearances**
2:1 3:1 5:2
157:15
**appearing**  5:16
6:24 10:7,11
245:16 310:12
**appears**  68:9
70:4 73:15
89:24 91:19

92:21 97:18
98:14 100:11
100:18 129:18
141:12 235:23
298:4
**appended**
316:8
**applicable**
221:1 257:12
259:6,11
**application**
299:19
**applied**  109:11
172:5 248:22
**applies**  245:18
**apply**  221:21
**appreciate**
156:4 158:21
158:24 168:20
195:6 220:15
268:8 293:17
297:8 310:4,11
**approvals**
215:20,23
**approved**
215:24
**approving**
216:4
**approximate**
232:22 280:22
**approximately**
169:23 288:24
289:13

**april**  13:24
**arc**  303:16
**architecture**
209:8,11
224:13
**arose**  184:5
**arrears**  251:7
**arrive**  273:5
**arrow**  17:18
91:15
**arrows**  16:23
17:24 18:10,17
24:11 25:5,8
26:3,17 27:10
28:12,22 29:24
30:6,10 47:15
64:14,15,25
65:4 66:10,14
66:25 68:21
71:22 77:16,24
78:2,17 81:21
82:9 83:4
84:22 89:6
91:4 93:22
94:18 95:2,16
96:11 108:23
125:14 138:24
140:12 144:20
145:19 148:4
148:13 149:17
149:21 156:5
157:18,19,20
158:7,15,17
161:21 166:10

166:14 173:19
178:8,24 179:3
184:24 185:1
185:17,22
186:2,3 191:22
192:4 196:21
203:15,24
214:10,23
234:6,19 235:5
236:17,22
237:12 240:2,5
245:18 248:22
248:23 251:21
253:3,6,11,13
254:3 255:7,18
258:9,17
260:24 261:1,5
261:8,22
263:20 266:1
268:10,12
269:5,19
271:20 279:22
282:17 284:1
287:6,10,15
288:1 289:13
289:22 292:24
292:25 294:22
295:10 299:22
**arrows's**
214:20
**art** 294:12
**article** 175:11
180:14

**asia** 80:24
167:1
**asian** 80:23,25
167:2
**asians** 80:21
**aside** 33:20
34:15 47:24
105:3 168:20
176:21 189:19
203:23 260:18
264:9 280:10
290:2
**asked** 8:16
17:11 23:12,17
45:16 112:18
164:5 222:6
223:4 228:23
240:24 241:5
265:7,10,14
288:21
**asking** 21:22
25:16 62:5,7
86:17 155:13
175:23 180:2,5
186:9 195:2,5
196:17 215:9
224:18 225:5
233:1 281:19
287:8 297:21
307:16,17,18
**asks** 143:17
**aspect** 74:17
**aspects** 85:7
166:22 171:21

172:18
**ass** 177:9
**assert** 185:17
186:4
**asserted** 186:11
**assess** 270:20
271:4,24
**assessing** 298:6
299:7
**asset** 31:15
32:4,8 34:8
35:7,19 36:14
37:9,11,13,21
37:25 38:3,4
38:10,16 41:6
41:11,21,22
42:18,18 43:1
43:12 45:3,3
46:18 53:24
54:1 57:8 61:1
63:8,10,23
64:2 190:25,25
191:8,8 206:19
229:19,22
230:16 232:2,7
232:7,12,20,21
233:1,11 247:4
247:9 281:12
**assets** 29:19
32:16,20 33:1
35:9,25 37:14
38:12 42:20
45:24 46:2,9
54:10,15 57:5

57:6,15 60:6
60:24 61:24
120:3 121:3
122:10,13,19
122:20,23
129:14 191:25
195:3 197:1,3
197:10,13,21
200:24 201:24
202:2 206:16
209:1 213:19
217:7 218:1,6
218:7,18,18
220:20 221:7
226:2,12
227:14,17
241:20,21
259:17 260:25
261:7,21
272:22,25
273:12 278:18
280:23 283:9
283:14,17,22
284:13 288:25
289:3,14 298:9
302:20
**assist** 23:15
24:25
**associated**
33:21 248:19
261:1
**assume** 7:12
33:18 73:20
92:12 132:22

136:11 142:3
220:22 256:3
283:13 287:17
**assumed**  25:4
166:9
**assuming**  18:14
35:3 45:21
71:19 133:15
156:14 205:12
245:17 278:4
**assumption**
92:13
**asterisks**  68:21
**attempt**  10:19
118:10 158:13
183:24
**attention**
105:20
**attorneys**  2:3
2:13 3:3
**auction**  61:2
226:8
**audio**  4:11
**august**  71:13
215:25 220:22
309:18
**authentic**
192:12
**authority**
263:12
**authorized**
4:23
**auto**  49:13,13
261:23

**automated**
39:3 50:14
52:4 57:17
103:3 147:5,14
147:19 148:17
148:20,23
149:11 252:1
253:14 261:16
**automatic**
52:17 252:9
**automatically**
19:1,4 49:21
50:1 51:5,21
67:18 93:15
**available**  32:17
32:18 45:5,9
45:18 82:16
109:5 165:1
167:9 175:3
182:16 192:17
192:20,21
193:9 195:19
205:10,12
206:20 233:17
236:25 245:23
245:24 246:11
246:19 247:16
247:25 248:4
262:9 264:14
269:3,4
**avenue**  2:14 3:3
**average**  251:3
**avoid**  250:17

**avoidance**
140:5 265:20
**avoided**  271:9
**aware**  8:13
17:21 38:14
105:18 112:10
131:6 148:11
148:20 149:11
149:16 154:2,4
158:4 159:8
167:22 186:8
186:10,16
209:7 217:6
218:1,5 220:3
227:13,19
231:13 239:16
259:16 261:9
291:3 292:18
295:8 303:18
305:1
**awesome**  183:9

**b**

**b**  232:17 311:7
**b2c2**  14:10,10
14:14,16 179:7
213:4
**bachelor's**  12:8
**back**  12:25
24:13 39:10,23
48:23 49:1
53:4,15 69:8
69:12 70:18
71:12 73:15

80:3 81:11
83:16,21 86:2
100:3 105:25
107:14 111:13
127:1 128:13
129:22 130:23
133:25 134:10
136:21 138:4
151:8,11 152:3
155:15 156:9
157:9 161:11
171:23 189:18
200:21 201:6
206:24 211:24
218:23 222:3
228:19 240:14
241:22 249:18
259:14 260:20
267:20 269:7
272:2 278:22
281:25 282:4
288:13 290:3,8
294:1 301:2
**background**
30:19 158:24
162:10
**backing**  200:22
**backstop**  49:4
49:10 53:18
277:17 279:13
279:15,21
280:3,11
**backwards**
251:19 252:5

**bad** 115:13
128:20 136:20
178:15 180:25
201:13
**bahamas** 27:14
27:16,24,25
28:1 170:14
171:21 210:23
210:24 212:17
212:19 220:7
220:25 221:12
221:15,19
**bahamian**
172:25 219:10
219:12,25
**balance** 31:16
31:23 32:5,9
32:19,23 33:2
33:4,15 34:18
34:21,24,24
35:7,10,16,19
35:19 36:4
42:10,11 44:19
53:8,22 55:5
55:15,21 56:4
56:15,19 58:3
64:4,10,12
115:18,21
117:4,9 120:8
122:17,22
124:11,15
126:8 143:15
151:5 153:1,6
153:10 154:25

173:14,21
185:3 192:1
193:8 199:2,4
205:9,10,10,20
227:24 249:8
249:11 256:19
257:12,23
258:3,6 259:7
259:12 273:15
275:15 282:25
289:19
**balances** 37:11
40:24 41:2,18
42:12,22,23
43:4,6,8 46:9
53:20 54:11
97:3 106:2
123:7 146:13
149:23 150:7
195:12,18,19
195:23 196:8
196:10,24
198:5,12 205:2
205:3,6 226:18
228:6,7 242:25
244:5 247:12
263:8
**bali** 303:13
**banking** 217:23
**bankman**
133:2,6
**bankruptcy** 1:1
20:21,23,25
21:4,15 160:24

207:1,8,10,12
207:16,18
292:21,21,23
292:24
**bankrupted**
275:6
**bar** 110:14
**bare** 126:12
**barring** 109:24
**base** 18:18,20
**baseball** 14:23
**based** 18:24
63:6,18 67:19
68:2,14 87:20
95:4 153:11
203:19 209:3
231:18,19
259:21 264:4
280:2,5 289:23
298:7 310:2
**basically** 13:13
13:17 16:17
20:6,11 22:25
23:9 25:23
29:12 36:11
40:17 48:17
53:24 55:6
74:25 75:9,22
76:20 78:20
79:1 86:24
90:1,19 106:2
106:13 115:7
117:16,21
124:6 126:7

130:5,18
131:13 133:25
143:11 146:20
150:8 201:7
226:8 229:21
231:22 232:1
239:13 264:3
264:21 290:22
300:1 302:19
**basis** 22:4
25:24 26:1
31:13 37:9
41:22 42:18
44:8 45:3 54:8
82:20 85:20
208:6 252:7
280:2
**bat** 272:6
**batch** 309:8
**bates** 39:20
40:6 65:17
66:3,4 69:17
70:6 71:1 73:9
84:3,6 86:13
91:11 97:5,9
100:7 107:20
131:16,20
138:10 141:1,7
151:14,21
167:11 170:7
189:23 213:12
213:22 233:20
243:17,19
262:8,11

264:17 274:7
276:11 284:23
296:20 311:12
311:14,16,18
311:20,22,24
312:1,4,6,8,10
312:16,19,21
312:24 313:1,4
313:6,8,10,12
**bcc** 197:16
**bearing** 165:10
**becoming**
29:20 72:17
129:5 177:20
180:24
**bed** 310:11
**began** 220:5
**beginning** 70:6
157:14 245:6
254:7 305:3
**begins** 100:22
102:20 127:22
**begun** 219:11
**behalf** 4:21
27:8 125:14,22
**behest** 188:21
**beijing** 12:16
**believe** 10:24
14:16 20:24
21:1,22 22:21
28:19 29:6
47:2 63:14,20
65:12 67:18
68:3,19 72:19

73:8 74:14
77:17,25 78:10
82:10,13 85:10
85:16 96:15
98:7 114:3
132:4 136:2
137:12,13
142:14 148:17
153:22 162:7
164:10 165:22
166:1 171:20
172:23 174:10
174:13 181:22
194:13,18
195:14 212:16
217:24 220:10
227:21 234:12
238:10 239:2,6
244:14 245:4
250:4 251:5,10
252:10,19
253:4,4 258:13
259:12 262:6
263:15 266:20
269:6 273:2
274:17,25
275:2 277:3
278:19 285:17
290:17 293:23
294:14 295:15
300:15 301:10
304:2 306:19
**bell** 27:5

**beller** 2:7
184:16 187:19
**bellerb** 2:8
**ben** 290:21
**beneficial**
64:21,22
**benefit** 50:11
217:21
**benefited** 64:15
**benjamin** 2:7
184:15 187:19
**best** 127:15
162:8 267:1,1
**better** 17:13
20:7,16 23:11
25:19 130:14
130:17 176:24
177:24 219:6
229:14 300:3
**beyond** 32:19
119:4 185:8
256:4,7,8,15
297:6
**bid** 63:19
**big** 19:7 20:2
26:9 35:15,18
36:9 106:7
115:23 149:5
154:23 182:8
192:12 291:22
291:24
**bigger** 41:15
**biggest** 136:16
201:3 296:2

**billion** 29:14
43:3 288:24
289:13
**binance** 232:5
**binding** 194:19
**bio** 182:25
**bit** 20:17 73:7
76:1 82:1,12
90:4 99:3
126:24 150:24
156:12 210:22
229:13 259:15
271:8 274:20
299:3
**bitcoin** 29:18
33:19,22 34:7
35:3 36:20
41:23,23 54:2
54:3 58:14,21
58:21 197:3,8
197:17 199:5
200:2
**bitfinex** 13:25
14:5,9
**bitgo** 209:18
**biz** 13:23
**black** 288:23
**blew** 162:18
210:18
**blood** 314:13
**blowing** 115:23
131:13 292:20
**blowup** 47:21
133:20 276:2

284:17 286:18
**blp** 49:11 280:1
280:6,7,9
**blps** 277:17
**blue** 215:6
**blunt** 180:11
**board** 17:20
86:9 214:7
**boilerplate**
85:9
**bold** 89:18
**book** 49:7,8
204:12,15
206:12
**bookend** 286:3
**books** 158:15
**borrow** 32:17
32:18,21 38:9
44:16,20 58:18
58:22 60:12,21
122:24 199:8
199:14 200:4,7
200:18 205:15
205:16 224:8
227:4 249:11
249:13
**borrowed** 60:6
196:22 198:10
198:13 199:19
205:14,15
226:13,25
**borrower**
227:4 270:10
271:22

**borrower's**
242:10
**borrowers** 61:4
225:18,20,24
271:24
**borrowing**
32:24 54:1
61:15 196:11
196:18 222:7
223:6,17,19
224:12 226:2
**borrows** 44:14
44:22 45:23
46:5 192:14
198:21 199:21
205:2,4,7
224:7 247:15
250:19
**bot** 25:22 82:22
82:23 88:20
115:17 252:12
252:20
**bottom** 45:6
71:1 73:9 81:7
91:12 98:12,21
100:6 131:21
204:25 219:8
264:22 265:16
277:5,12,21
291:25
**bought** 204:16
281:25
**bounce** 127:6

**brand** 19:7
155:7
**branham** 176:9
**breach** 104:14
269:24
**breached** 59:12
**breaching**
104:16
**break** 7:25 8:4
31:24 45:2
83:12,15,25
137:20,23
156:8,15,25
206:2,8 228:10
267:13 300:18
**breaks** 7:24
**breathing**
155:4
**breggia** 3:6
**brett** 176:8,10
**brian** 2:6 5:13
6:4 9:12
137:18 310:3
**brief** 161:2
**briefly** 151:11
288:13 301:10
**bring** 48:23
49:1 53:25
143:18 146:11
146:22 151:8
155:15 170:2
**bringing** 53:4
**broad** 2:4
18:22 31:1

90:4,4 168:22
**broader** 19:14
**broadly** 211:6
**brought** 29:16
39:10 53:15
56:9
**btc** 34:3,25
35:1 36:16,17
58:19 196:12
196:20,22,23
197:2,3,4,6,15
197:15,20
204:3,4,7,9,14
204:16 205:2
206:11,12,15
231:2,3
**btce** 191:14,17
**btw** 114:19
**bubbles** 168:5
168:11
**bucket** 299:9
**buckets** 78:22
300:12,15
**built** 16:19
**bullet** 218:4
288:23 289:24
**bullets** 217:5
**bumped** 300:14
**bunch** 130:5
195:22
**burg** 22:5,16
22:25 23:3,20
71:25 73:3
74:1 234:22

235:11 236:13
236:14,15
**burg's** 23:1
**burgess** 22:17
23:4 24:6 73:4
**business** 28:9
**buy** 63:22
204:3,7,9,11
**buys** 204:14

**c**

**c** 5:6 232:17
**calculate** 94:16
230:2 251:13
251:15
**calculated**
88:13 108:4
250:12,14,15
273:23
**calculation**
273:8
**calculations**
46:23 82:8
**call** 12:3,5
24:19 88:3
102:12 123:11
123:15 160:15
180:5 271:3,5
306:18 309:2
**called** 33:11
97:20 160:22
162:3 183:3
186:4,12 229:7
229:8 231:13

238:1 258:16
293:4 294:6
301:21
**callousness**
180:15
**calls** 26:25 27:6
86:15 89:9
94:22 99:14
104:18 143:7
171:10 186:7
186:15 202:5
202:11 204:22
208:22 220:9
255:3 266:19
306:10
**camera** 4:7
**cap** 29:14
**capacity** 49:11
280:5,6,7
**capital** 16:23
17:18,24 18:10
18:17 24:11
25:8 26:3,17
27:10 28:12,22
29:24 30:6
65:1,4 66:25
77:16 81:21
82:9 83:4
84:22 89:6
91:16 93:22
95:3,16 96:11
102:24 114:19
125:14 138:24
140:12 145:19

157:18 158:16
158:17 193:14
234:6 236:22
254:21 257:8
292:24
**capital's** 78:18
148:13
**care** 15:15 18:4
163:11
**case** 1:2 10:12
24:2 66:3
85:20,20 141:8
175:20 214:24
227:9 238:4
251:23 258:9
295:1
**cases** 178:3
222:13
**cash** 36:21
**cause** 57:14
106:16 125:9
126:11,15
130:20 143:15
221:9
**caused** 137:4
**causes** 127:16
**causing** 29:18
128:15
**ceo** 174:13
212:10 215:23
303:2,3
**certain** 57:20
128:3 133:10
166:11 171:20

172:11,13,15
172:18 173:11
178:3,5 238:15
250:3 252:12
252:13 253:16
270:17,25
271:2 275:8
**certificate**
12:18
**certification**
314:1
**certified** 1:15
**certify** 314:5,11
**cetera** 106:7
**cftc** 11:14
194:7 299:18
300:3
**chain** 73:2
97:16,19 98:17
98:20 116:7
122:2 125:16
131:20 142:16
144:13 227:3,5
265:16 286:4
293:8
**chance** 157:13
**chang** 135:22
136:1
**change** 24:11
53:9 78:16
79:13 80:3,8
89:3 94:1
108:11 112:18
113:16 114:4

**[change - clear]**                                     Page 14

165:16 196:4
198:20 233:5
247:7 315:4,7
315:10,13,16
315:19
**changed** 85:11
86:6,7 88:11
108:5,17
113:12
**changes** 55:7
67:8 316:7
**changing** 55:11
273:19
**channel** 20:10
26:24 131:22
135:16
**channels** 82:24
**chapter** 1:2
**characterize**
302:13
**charge** 87:16
88:17
**charged** 82:2
88:12 95:2,8
152:13
**charging** 87:3
94:13 101:16
101:18 154:19
251:6
**chart** 175:2,8
312:12
**chase** 176:9
**chat** 17:4,10,14
20:11 21:10

23:25 24:16,20
25:14,18 26:14
66:6,8,14,17,24
67:13 68:17,24
70:5,13 71:4
71:12 73:8
77:6,14,21
80:19 81:15,18
84:15 89:5
107:16,24
118:9 128:11
131:8 132:6
133:9,11 135:7
135:20 136:4
136:14 137:12
139:21 140:4
141:13,19,25
142:11 144:23
151:12,16,25
152:6 177:13
179:20 180:4
236:22 260:12
264:2 268:25
285:17,22
286:8 288:11
290:8,10 291:2
292:7 294:2
296:5 297:11
297:18 307:13
308:20 309:5
**chats** 23:10
27:20 71:16
141:16 192:8
288:6

**cheaper** 76:24
**check** 25:25
306:23
**checked** 73:23
211:13 308:8
309:7
**checking** 109:4
149:24
**chen** 176:18
**china** 12:16,18
12:23,25
**chinese** 13:12
13:16 80:22,22
81:4
**choices** 129:21
**choose** 37:6
60:25 79:1
**choosing** 79:5
**chronologica...**
297:6
**chung** 132:3
**circle** 213:5
**circumstance**
101:6
**circumstances**
50:10 128:3
**civil** 5:25
**claim** 160:23
161:4 185:4
186:5,12
**claiming**
185:21,23
**clancy** 176:8

**clarification**
7:10 68:12
151:24 191:6
195:7 206:7
207:14 220:16
236:5 268:9
290:20 293:18
**clarified** 82:1
234:15
**clarifies** 290:18
**clarify** 43:10
48:11 50:3
52:10 113:16
183:19 207:6
211:2 272:24
301:11
**clarifying**
178:16
**clarity** 189:7
**classify** 19:21
**clean** 180:9
**clear** 6:11 7:5
7:13,21,22
21:6 34:20
59:23 62:25
70:2 79:20
85:2 88:2,23
103:16,25
104:2 115:4,7
127:11 134:10
134:17 138:16
154:1 187:20
195:1 198:14
219:7 221:10

| | | | |
|---|---|---|---|
| 224:17 226:7 | 80:25 82:24 | 224:25 225:2,6 | 77:1 78:11 |
| 241:4 242:14 | 88:2 106:2,4 | 225:15,25 | 79:5,7,15,21,24 |
| 242:17 245:3 | 106:22 112:7 | **coder** 163:24 | 80:9 87:1,22 |
| 260:1 267:24 | 112:10 127:14 | **coin** 29:13 | 88:16,24 89:2 |
| 269:24 273:22 | 148:25 150:5 | **coinflex** 180:23 | 100:24,24 |
| 293:9,20,21 | 154:24 155:5 | 302:15,15,20 | 102:2 103:17 |
| 297:17 | 158:4,13,18 | 302:23 | 103:19 104:3,5 |
| **clearly** 42:2 | 160:23 163:2,4 | **coins** 196:12 | 104:10,15,23 |
| 146:17,18 | 163:10,16 | **cole** 6:21 | 105:23 106:5,9 |
| 185:2,14 | 172:13 173:10 | **collapse** 29:16 | 109:6 110:5,7 |
| 242:18 243:3 | 173:11 177:7 | 47:21 190:15 | 110:14,18,19 |
| **click** 177:12 | 177:15 214:4,6 | 190:16,18 | 110:20,21 |
| **clicked** 69:1 | 214:6,8,19 | 201:1 | 114:8,14,20 |
| **client** 14:8 18:2 | 216:11 217:24 | **collapsed** 29:3 | 115:1 116:11 |
| 18:7,9,18,20 | 219:22 253:13 | **collapsing** | 116:18,23 |
| 19:17,18 20:11 | 259:9 284:17 | 28:23 106:1 | 118:8,17 119:9 |
| 20:18,19 37:10 | 303:20 | **collat** 78:7 | 119:16,21 |
| 45:22 48:13,15 | **close** 49:15 | 108:12 | 121:1,3,4,12,14 |
| 85:19,20 98:1 | 52:24 76:22,22 | **collateral** 35:21 | 122:7,8,16,22 |
| 103:13 114:15 | 130:14 155:23 | 35:23 36:4,18 | 123:2,5 130:9 |
| 136:18 156:24 | 212:25 | 40:3,7,19,21,22 | 131:10 142:25 |
| 172:16 181:6,8 | **closed** 53:8 | 41:1,8,17,24 | 146:12 148:9 |
| 201:11 215:6 | 55:14 281:17 | 42:2,3,5,11,18 | 151:2 152:10 |
| 217:20 248:4 | **closely** 22:25 | 43:2,5,7,13,17 | 152:14 192:11 |
| 251:16 270:16 | 212:8 | 43:21,23 44:9 | 192:13,17,19 |
| 270:20 271:1 | **closer** 115:25 | 44:13,21 45:6 | 194:21 195:3 |
| 291:17 | **closes** 277:22 | 45:9,13,18 | 195:18,20,22 |
| **clients** 14:20 | **closing** 52:2 | 46:1,2,4,6,15 | 196:9 197:5 |
| 15:6,8,10,14,17 | 53:11 | 46:16,20 47:9 | 198:2,3,8,9 |
| 15:20 16:2,18 | **closure** 283:25 | 50:24 51:9,15 | 199:3,7,15,20 |
| 16:19,21 21:12 | **clusterfuck** | 54:2 58:19 | 200:4,7,8,9,12 |
| 23:3 24:14 | 302:10 303:9 | 59:5,11,13 | 200:21,22 |
| 25:20 59:2 | **code** 164:6 | 62:18,20,21 | 242:10,18,18 |
| 67:8,9 80:22 | 224:13,19,22 | 76:1,9,13,23 | 242:20,22 |

243:1,9,23
244:2,4,5,6,7
244:19 245:8
245:20,23,24
246:3,4,7,11,12
246:19 247:8,9
247:11,12,14
247:16,25
248:1 267:10
269:3 270:5,11
271:8 289:9
293:3 294:5
298:7 299:7,8
300:6,8,9
**collateralizati...**
35:13,14 36:12
51:1 62:20
73:24 74:3,5
74:21 75:7
76:4,16 78:25
79:2,9,11
85:15 86:22
90:22 94:5
109:21 110:3,9
115:20 117:8
117:22 235:11
235:13
**collateralize**
44:2,18
**colleagues**
159:5 161:18
**collect** 238:2
251:12 252:5
259:9

**collected**
258:20
**collecting**
252:4
**colorado** 12:9
12:20 13:4,6
**come** 8:8 24:5
27:13,15 41:4
67:15 69:12
116:22 117:20
118:2 133:25
136:21 137:6
156:9 161:11
171:23 189:18
222:3 240:14
259:14 260:20
**comes** 108:10
**comfortable**
111:7 310:9
**coming** 43:10
45:4 46:9,10
56:5 60:15
116:16,21
117:13 177:6
**command**
166:13
**commensurate**
163:6
**comment** 102:9
168:5,10,11
**commentary**
184:5,22
**commented**
165:18 169:14

**commenting**
164:15 235:5
**commitment**
235:18,23
**common**
296:14
**communicate**
24:2 26:21
296:11,12
**communicated**
26:16 295:25
306:17
**communication**
26:20 127:19
266:10 294:20
295:1,4,24
309:22
**communicati...**
14:6,7 26:22
135:9 160:6
178:6 179:15
250:1 283:20
295:9,17
**community**
14:1 183:25
**company** 13:14
13:20 27:16
182:6
**compare** 90:7
**competitor**
181:9
**compilation**
182:19 218:24

**compiled** 183:4
**complain**
273:21
**complete** 7:5
8:2,15 69:14
210:15 270:18
302:9 316:9
**completely**
155:23 160:19
293:17
**completeness**
139:6
**compliance**
115:1
**complied**
219:17
**comply** 51:8
87:7 194:11
**component**
195:24 278:16
**compound**
34:10 142:13
**computer**
163:24
**concern** 106:17
125:9 126:15
128:16 298:15
**concerned**
149:8 299:1
**concerns** 292:8
**conclude**
309:25
**concluded**
310:22

concludes
  310:18
concluding
  310:10
conclusion
  86:16 89:10
  94:23 99:15
  104:19 171:10
  186:7,15 202:6
  202:11 204:22
  208:22 220:9
  221:9 255:3
  266:19
concrete
  187:13 230:5
condense 238:2
condition 286:9
  286:15 288:1
conditions 57:9
  304:21 305:6
conduct 78:1
conducted 4:5
  4:18 5:19
  260:23 261:5
conference
  5:20
confident 27:3
  236:21
confidential
  297:22
confirm 10:3
  159:1 171:24
confirming
  293:19

confirms
  136:25
confused 299:3
confusing
  256:13 273:18
confusion
  242:15,16
  284:18 298:5
connecticut 3:3
connection 4:8
  11:18 167:7
  246:2 279:23
  287:5 304:4
consider
  127:25 128:23
  140:11,15
considered
  18:11 19:12,17
considering
  261:17
considers
  229:21
consist 194:23
  196:4 197:1
  198:4
consistent 91:5
  93:22 98:17
  103:11 244:14
constance
  174:11,11,12
  176:3
construct 233:4
contact 22:7,10
  187:10

contain 193:17
containing
  141:6
contemplating
  145:2
content 241:5
context 124:1
  231:14 292:7
  298:6 299:6
continuation
  68:23 286:3
continue 4:12
  75:24 120:14
  128:21 183:25
continued 3:1
  124:23 150:25
  151:6 271:25
continues
  98:13 249:15
continuing
  77:6 112:17,21
  118:9 135:19
  159:14 249:16
  254:8
continuously
  161:25
contract 59:4
  62:4,7 64:2
  133:21 231:8
  231:25 248:16
  269:25
contracts 58:25
  62:23 228:24
  283:25 284:4

contribute 64:9
contributed
  41:1 42:12,19
  43:7 46:16
  121:3 122:10
  122:12 195:18
  195:22 196:10
  244:4 247:11
contributes
  43:13 247:9
contributing
  41:24 122:21
  193:8,9
contribution
  35:21,24 41:8
  41:17 43:5
  46:1
contributions
  197:6
converge 231:9
conversation
  23:20 178:12
conversations
  178:9,11,13,19
  179:2 229:2
  241:14,24
  305:21
conveyed 102:3
  121:20 132:16
conveying
  101:4 111:4,17
  111:18 112:4
  119:1 121:8
  123:24 128:7

130:2 143:5
**convincing**
  307:15,17
**cool** 183:9
**cooperate**
  303:20
**coordination**
  188:24
**copy** 10:22
  84:14 177:10
**corner** 81:8
  107:21 183:16
**correct** 6:15,16
  9:20 10:8,14
  11:4,5 12:10
  21:3,23 22:14
  22:15 24:3,4
  31:9,10,13,14
  31:16,19,20,21
  32:6,7,10 33:6
  33:8 34:1,2,6,8
  34:11 46:25
  51:10,13 54:18
  57:21,22 59:20
  60:7 61:22,23
  62:24 63:23,25
  64:4,7,17 65:1
  65:6 68:1,18
  74:20 82:21
  84:23 87:23
  88:1 91:22
  92:18,19 95:12
  95:23 96:5,7
  107:19 108:6

108:18 111:23
118:12 120:7
125:23,24
126:2 129:16
134:20,23
141:14,17
143:24,25
147:24 149:12
149:13 153:7
153:20,21
163:20 174:3
200:4,5 203:13
221:14 223:2
236:6 238:14
238:18 248:21
248:25 251:23
254:4 262:1
269:5 279:8
281:20 289:25
304:5,6 316:9
**corrections**
  316:6
**correctly** 204:1
  210:1 252:14
**correlation**
  282:16
**correspond**
  205:20
**corresponding**
  34:3 125:22
  142:10
**correspondin...**
  34:13 75:6

**corresponds**
  245:19
**cost** 304:17,19
**costs** 34:16
  305:12
**counsel** 5:5
  7:16,20 12:5
  68:18 139:12
  141:15 151:19
  156:5,23 159:9
  159:19,22
  160:3 161:9
  297:12 308:5
  309:15
**count** 43:2
**counterparties**
  93:11 286:25
  287:1
**counterparty**
  280:13 281:6
**countersign**
  93:9
**couple** 6:22
  18:21 98:10,13
  109:9 205:1
  222:6 248:18
  254:24 306:14
  309:11
**course** 6:6
  176:22 209:23
  216:10 251:2
**court** 1:1 4:22
  5:4,22 6:25
  194:16,18

292:2,14
**courts** 292:22
**cover** 54:11
  304:17
**coverage** 17:13
  20:16 23:11
  166:24
**covered** 167:1
  167:2
**covering**
  305:12
**covers** 99:3
**covid** 14:16
**crash** 101:24
  105:16 287:6
  288:2
**created** 142:7
  142:14 285:25
**creating** 142:8
**credit** 33:25
  34:5 45:25
  46:2,3,8,10,13
  46:16,17,17,21
  48:13,16,19
  50:6,7,12,17,24
  51:2,10 52:14
  57:20,23 58:4
  58:8,16,23,25
  59:1,3,7,10,15
  64:16,20,24
  65:3,7,11 71:7
  74:15 75:11,18
  75:20,21 77:4
  78:20,24 79:16

79:18,25 81:20
81:25 82:3
83:3 84:12,21
85:23 86:2,4,8
86:19 87:1,8
87:11,13,16,21
88:5,14,15
89:13,20 90:2
90:5,8,11,14
93:22 94:3,14
95:6,10,15,20
96:1,13,18,21
99:11 108:12
108:17,23
112:6 114:11
115:21 117:3
119:10,15
130:7,8,22
131:3 150:13
151:2 164:21
165:19 167:16
185:14 193:10
195:13,16
234:13 235:18
235:22 236:8,9
236:13,18
237:3,13,22,24
238:24 239:2
240:3 242:1
245:21 246:14
247:21 249:20
250:13,17,24
251:22 252:13
252:22 254:1

255:8,19 256:2
256:16,20,22
257:22 267:5,9
268:4,15,23
269:4,8 270:13
270:22 271:14
272:1 284:10
298:5,8,22,24
299:20,22,24
300:5,8,10,11
312:23
**credited** 34:7
  34:12 55:8
  204:17
**crediting**
  227:11
**credits** 46:22
  113:24 150:14
**crespo** 2:17
**criteria** 26:2
**cromwell** 2:3
  5:14 184:16
  186:20 187:1,3
  188:13 285:3
  288:19 290:5
  304:22 305:23
**cross** 40:14
**crux** 201:7
**crypto** 13:1,12
  14:11 19:16
  27:25 28:1
  29:17,19 30:1
  30:3 105:15
  142:22,22,25

146:12,14
218:1 268:6
287:19 289:9
293:10
**cryptocurrency**
  29:12
**crystal** 115:7
  154:1
**cure** 100:11,13
  101:5 103:5
**curious** 281:1
**currency** 32:2
  201:21 202:3
**current** 231:1
**currently** 27:4
  126:7 161:12
  246:7
**custodian**
  209:17,20
**custodied**
  209:12,20
**custody** 208:19
  216:22
**custodying**
  208:25 209:5
  209:16
**customer** 16:24
  17:19 18:11
  19:19 20:7
  22:2 23:22
  24:1,21 25:13
  26:4 28:14
  30:21 31:7,11
  33:3,10,19

34:18 36:25
37:1,4 38:4
50:11 51:8
52:20 56:18,24
58:6 59:8,12
60:4,5 61:8,14
63:22 87:6
89:20 101:6
102:9 104:14
150:7 198:19
204:14 217:7
218:6,18 221:7
223:5 239:1
257:9,16 259:4
**customer's**
  35:8,8 37:14
  48:8 52:8
  57:24 61:25
  64:4
**customers**
  55:19 57:20
  58:24 59:18
  60:6,13,21
  61:20 82:16,20
  85:24 91:6
  164:12 179:11
  202:3 207:24
  227:23 242:1
  284:9 302:23
**cut** 96:6 277:7
**cutoff** 248:14

## d

**d** 2:6 71:19
311:1
**d.c.** 3:4
**daily** 252:7
**damage** 180:16
**dan** 239:13,15
239:18,18,21
239:21,21,24
240:9 241:11
241:24 250:3
254:12 265:5
**darby** 2:9 8:23
39:18 65:15,20
69:21,24 83:9
97:12 140:24
285:2 306:19
**data** 190:7,12
**date** 8:22 39:22
65:19 69:19
84:8 95:1,17
97:7,11 131:18
138:12 139:4
141:3 148:19
148:22 165:5
165:23 167:13
175:9 181:21
182:14 184:12
190:9,11
202:20 215:24
233:22 234:21
234:25 237:4
237:14 243:21

262:13 264:19
274:8 284:25
286:16 296:22
296:24 315:24
316:13
**dated** 97:17
170:17 184:17
231:16 234:1
285:4
**david** 14:24
**davies** 71:20,21
72:3,9 91:15
126:1 138:22
139:25 178:7
178:24 179:6
179:25 180:1
265:15 267:4
301:7,16,19
**dawn** 1:14
314:3,22
**day** 87:4
125:17 152:13
154:19 156:17
159:15 176:22
190:3 209:23
222:5 228:22
236:11 250:24
251:2 286:12
301:6 314:17
316:17
**days** 21:2,14
194:16 261:19
**dbtc** 191:16

**dd** 72:23
**deal** 15:23 25:1
161:17,25
215:7
**dealing** 172:13
296:7 299:18
**deals** 53:21
92:15
**dealt** 13:14
15:10 27:7
71:22 150:5
**debit** 34:3,4,7
257:12 259:6
259:12
**debited** 34:13
55:8 249:7,8
249:10
**debiting** 117:5
227:11
**debt** 193:13
**debtors** 1:6
187:21
**december**
184:17
**decent** 290:14
**decide** 59:14
**decided** 201:8
303:14
**decision** 137:10
283:16 291:23
**declare** 316:4
**declared** 21:5
**decline** 303:24

**decrease** 96:23
**decreases**
289:1
**dedicated** 17:5
20:18 23:25
136:3
**deemed** 316:7
**deems** 271:23
**default** 101:13
**defer** 156:23
**defi** 293:10,15
**define** 299:8
**defined** 235:23
242:19 243:3
274:9
**definitely** 19:16
26:23 56:25
263:17 273:9
**definition**
255:5 274:23
275:11
**definitions**
18:22
**degree** 12:8,8
13:5 174:22
**delaware** 1:1
**deleting** 194:9
**deleveraging**
49:13,14
**delicately**
299:13
**delinquent**
129:5

**delivered** 140:3
266:5
**demand** 257:6
257:11 258:8
258:25 259:1,5
**demonstrated**
96:17
**depeg** 105:14
**depend** 19:20
35:12 52:22
95:17 246:23
278:19
**depending**
20:10 69:9
172:16 259:25
268:6
**depends** 4:7
36:13 38:21
60:10 63:7
223:9
**deponent** 316:3
**deposed** 11:6,9
**deposit** 149:24
209:13
**deposited**
145:7 209:1
298:9
**depositing**
106:11
**deposition** 1:11
4:5,16,18 5:18
6:13 7:24 10:8
11:17,22 12:2
66:2 84:2

107:15 158:22
160:4,8 165:15
167:8 187:23
189:1,10 304:5
304:9 305:7,11
305:15,23
306:22 307:4,9
310:10,13,19
310:22
**depth** 30:16
**derivative**
60:11 223:18
**describe** 40:12
105:10 222:14
273:17
**description**
246:18 311:10
**descriptively**
273:11
**designation**
297:22
**desk** 202:8
248:5,6 274:17
**destroying**
194:8
**details** 58:11
78:7 86:7
90:10 99:4,6
107:13 147:4
244:25
**deteriorated**
289:23
**deteriorations**
124:23

**determine** 37:8
61:3 224:8
**determined**
78:21 226:10
**determining**
299:9
**dev** 13:23
114:2 133:23
133:24 136:2
**developer**
136:3 163:21
163:22 224:24
**developers**
16:12 163:19
**development**
14:2,19
**devices** 308:14
**devs** 16:18 37:7
163:14,19
177:18
**differed** 171:6
**difference**
32:24 42:9,13
63:5 78:16
196:25 198:25
229:13 230:12
231:21 237:10
**differences**
171:12
**different** 18:22
19:22 20:15
31:3 35:25
36:1 72:25
85:7 94:13

106:18 167:8
197:3,5,10,13
220:14 233:2,2
233:3 243:25
264:12 269:15
276:7 293:15
298:25 300:12
300:15
**differentiate**
45:25 46:8
**digital** 63:23
169:22 170:13
170:21 172:6
172:19,25
173:6 174:14
196:12 201:23
201:24 202:2
206:19 212:4
213:18,19
216:21 220:11
220:13,17,20
241:20,21
**diligence**
158:14
**dinner** 156:15
**diploma** 12:14
**dipped** 104:24
**direct** 179:15
265:12
**direction** 69:10
239:4 241:9
**directly** 24:3
177:6 178:23
199:18 224:3

306:21
**director** 14:1
  77:20
**disable** 150:12
**disabled**
  144:14,19
**disappear**
  303:9
**disclosed**
  298:21
**disclosure**
  21:16
**discounted**
  20:3
**discovered**
  132:23
**discovery**
  175:4
**discuss** 123:12
  142:8,15
  239:22 292:6
**discussed** 104:9
  157:21 162:22
  177:7 238:6
  250:8 304:12
  304:15 308:25
**discussing**
  56:17 74:1
  99:25 190:3
  229:4 235:10
  236:10
**discussion**
  23:14 24:18
  28:4,10 89:14

129:20 131:4,7
  147:23 152:3
  222:9,10
  228:25 295:20
**discussions**
  25:2 133:5
  135:14 136:12
  240:9,17,20
  241:6,11,17
  242:3,5 287:23
  287:25 299:20
  299:21
**displayed**
  62:17 273:24
**dispute** 159:6
  161:7,21
  186:21 280:19
  282:3 305:24
  308:1 309:17
**district** 1:1
**division** 6:12
**doc** 89:6
**docs** 17:13
  23:18 80:15
  273:3 292:2
**docs.ftx.com**
  23:21
**document**
  39:19 40:6,9
  47:2 65:16
  69:16 81:14
  82:16 84:2,5,9
  85:21 89:17,25
  91:11,14,20

92:22 93:4
  97:4,8 101:8
  103:23 108:25
  131:15 132:21
  138:9 140:25
  151:16 161:2
  162:2,4,6
  164:24 165:2
  165:25 166:6
  167:10,19
  168:1,13,17
  170:2,7,16
  175:3,7,19
  181:17 183:5
  186:18 187:14
  189:21,22,23
  190:2,8,24
  191:3 192:4
  193:16,17
  198:4,16
  202:13,16,18
  203:14,17
  204:25 205:8
  213:12,17,24
  214:23 215:18
  216:4,7,14
  233:14,19,24
  234:7,11 235:1
  235:6 236:7,24
  237:3,7,15
  239:23,25
  240:2,3,6
  241:25 243:5
  243:13,18,25

244:14 245:9
  246:20 248:6
  249:19,20
  250:4 253:11
  253:24 254:7
  254:17,25
  255:10,21,23
  260:3 262:2,10
  264:12,14,16
  265:2 269:9,18
  274:6,11,14
  276:8,11,16,20
  276:23 278:23
  279:5,9,12
  284:22 288:17
  296:19 297:1
  297:14 298:4
  311:12,14,16
  311:18,20,22
  311:24 312:1,4
  312:6,8,10,12
  312:16,18,19
  312:21,23,24
  313:1,4,6,8,10
  313:12
**documents** 9:1
  92:15 137:19
  160:7,12
  164:10 165:17
  168:24 169:3
  169:13 193:22
  194:10 203:4
  234:4 252:17
  255:6,17

270:17 271:1,2
271:18 273:10
307:25 308:13
308:24
**docusign**  91:19
91:23 92:7,14
92:16,21 93:14
**doing**  10:17
14:17 16:2
20:4 28:7
60:14 74:16
75:3 78:23
98:8 114:11
126:15 145:11
155:17,24
159:11 163:5
207:20,25
208:6 239:15
239:20 252:6
**doj**  11:14,15
**dollar**  146:15
205:3 236:2,2
273:14
**dollars**  153:15
236:3,6 289:1
**door**  8:6 211:1
211:4
**dotcom**  300:2,4
**doubt**  140:5
214:22 265:20
265:25 280:25
**downfall**
101:19

**draft**  99:23
168:6
**drafted**  85:4,18
238:11,20
**drafting**  171:25
172:7
**drastically**  30:4
**drawing**
236:14 246:1
**drawn**  95:9,11
95:15 96:1,11
97:2,2
**drew**  236:13
**drill**  199:25
**drink**  211:15
**dropped**  12:24
**dual**  12:21
**dudas**  303:5
**due**  36:18
40:19 103:18
104:4 110:23
125:4
**duly**  5:7 314:7
**dumped**  289:9

**e**

**e**  5:6,6 20:9
26:23 93:15
97:16,17,19
98:10,11,17,20
100:7 102:8
138:18,23
139:1,7,19,25
140:1,9,9

141:6 184:10
184:14,17
187:5,18
265:15 266:6
266:12,13,14
267:3 268:1,3
285:1,3,8
286:5 288:17
288:18 290:4
306:3,9 309:10
309:16 311:1,7
312:3,15 315:3
315:3,3
**e.g.**  102:23
**earlier**  23:8
47:25 66:9,22
70:5,13 72:19
73:5 84:16
90:7,16 94:12
104:9 108:3,24
126:1 128:9
135:8 139:21
141:20 151:17
152:1 160:2
162:11 176:16
178:5 179:22
182:4 184:4
190:3,5,22
219:1 222:5
227:22 228:22
229:4 234:17
236:8,24 237:8
238:10,25
252:11 258:15

260:7,16 262:7
263:1 265:14
285:18 286:11
301:5 304:2
**early**  26:5
90:17 288:8,23
289:14,21
**easier**  139:9
160:20 230:18
**easily**  17:15
263:25
**eastern**  4:3
83:18,21 129:2
137:25 138:4
157:4,9 211:20
211:24 228:15
228:19 267:16
267:20 269:1
300:23 301:2
310:18
**easy**  17:12
296:5
**eat**  146:16
228:9
**edit**  113:24
**edited**  85:19
165:18
**education**  13:7
**educational**
12:8,13 162:14
**effect**  65:5,8
94:20 169:18
171:7 172:22
174:23 251:22

274:15 275:19
275:24 276:5
276:23 277:9
**effective**
275:11
**either** 16:12
70:24,24 133:5
161:12 179:16
226:20
**elaborate** 29:9
56:2
**electronic**
179:16
**eligibility**
271:25
**employed**
20:20
**employee** 13:17
14:13 210:12
210:17 211:8
290:22
**employees**
17:14 150:4
**employment**
162:14
**enabled** 32:11
32:13,15
**ended** 135:5
145:21 177:20
179:22 180:23
275:2
**ends** 70:25
136:4 292:2,14

**enforce** 110:8
**enforced** 57:17
**engaged** 181:24
225:11
**english** 13:18
81:4 176:17
**enrollment**
12:21
**ensure** 54:12
**ensuring** 15:13
**entail** 150:22
**enter** 58:25
**entered** 84:21
85:17 234:5
284:1
**entering** 232:6
**entire** 23:9
24:15 38:19
39:15 44:6
49:3,9 54:23
97:1,1 147:15
**entirely** 127:4
**entirety** 95:19
96:1,12,21,22
**entities** 212:6
**entitled** 1:13
165:19 175:2
233:24 312:12
**entitles** 165:3
175:8
**entity** 97:20
172:25
**entry** 32:2
43:16 62:16

71:5 72:8
**envelope** 92:7
**equal** 247:15
281:17
**equation**
117:19
**errata** 316:8
**error** 118:12
263:7
**errors** 263:13
**especially**
30:18 106:17
148:25 296:6
310:5
**esq** 2:6,7,9,10
2:15,17,18,20
3:5,6
**essentially**
29:21 41:7
43:15 44:19
46:18 57:10
58:2 99:2
117:5 120:23
124:15 131:9
152:24 211:13
249:17 257:18
258:7 289:1
**established**
108:2
**estate** 157:18
**estimated**
205:15,16
**et** 1:5 4:17
106:7 315:1

316:1
**europe** 166:25
**european** 167:1
**event** 260:2
**events** 134:5,18
145:24 267:2
**eventually**
231:8
**everybody**
17:10 66:16
166:19 167:4
201:13 303:11
**evidence** 194:9
290:14
**ex** 161:18
**exact** 35:2 91:9
115:5 137:2
158:12 182:1,3
190:9 237:7
255:5 284:7
286:16
**exactly** 18:15
28:17,18 29:25
35:18 50:8
72:21 90:10
125:3 143:5
158:10 194:23
196:22 207:13
250:21 254:21
259:3 268:22
287:21
**examination**
5:10 157:11
311:3

| | | | |
|---|---|---|---|
| **examined**  5:8 | 204:8,10 | **exemplary** | 218:24 233:14 |
| **example**  19:9 | 206:20,23 | 210:12,13 | 233:16,19 |
| 23:17 33:18 | 223:21 224:14 | **exh**  213:12 | 237:1,2,10 |
| 36:15 58:13 | 224:19 226:24 | 312:19 | 238:12 243:14 |
| 76:13,15 85:13 | 228:7 230:7,22 | **exhaustive** | 243:16,18 |
| 104:20 105:22 | 232:17,17,17 | 75:23 | 244:10,21 |
| 110:11 199:24 | 248:20 249:12 | **exhibit**  8:20 9:6 | 249:19 254:5 |
| 230:23 251:4 | 251:15 262:7 | 9:19 10:6,13 | 260:7,8,13,16 |
| 305:14 | 263:22 265:5 | 39:19,24,25 | 262:5,10 |
| **exceed**  235:17 | 272:4 285:1,8 | 40:6 65:16 | 264:15,16 |
| 236:1 | 288:17 290:4 | 66:1 69:16 | 269:8 272:3 |
| **excellent** | 294:17 296:24 | 70:4,19 84:1,5 | 273:25 274:6 |
| 210:17 | 298:9 302:3,25 | 84:16 85:22 | 276:8,11,15 |
| **excess**  32:23 | 303:6 312:15 | 97:4,8,13 | 279:5 282:5 |
| 76:21 79:24 | **exchange's** | 99:20 100:3 | 284:20,22 |
| 246:6 256:5 | 180:21 | 107:14,18,19 | 288:12,14 |
| **exchange**  13:13 | **exchanges** | 131:15,19 | 290:3 296:17 |
| 15:20 18:2,3 | 172:21 209:9 | 135:20 138:9 | 296:19 311:11 |
| 19:7 28:13 | 229:22 230:2 | 138:17,21 | 311:12,14,16 |
| 30:7,12,23,24 | 232:3 233:7 | 139:1,2,6,11 | 311:18,20,22 |
| 37:2,5 56:1,23 | 288:18 | 140:22,25 | 311:24 312:1,3 |
| 57:2,13,14,21 | **excluded** | 141:5 147:24 | 312:3,4,6,8,10 |
| 58:7 60:18 | 295:24 | 151:11 156:13 | 312:12,13,14 |
| 61:20 75:10 | **excluding** | 164:24 165:2,6 | 312:15,16,18 |
| 88:21 98:10 | 151:5 | 165:6,12 167:6 | 312:21,23,24 |
| 103:11 105:6 | **execute**  98:23 | 167:10 170:5,7 | 313:1,4,6,8,10 |
| 105:17 112:18 | 150:17 | 172:2 174:25 | 313:12 |
| 113:11 155:19 | **executed**  28:12 | 175:7 181:17 | **exhibits**  8:25 |
| 164:7 171:3 | 93:4,5 | 181:19 182:11 | 9:4,16 |
| 180:20 184:11 | **executing** | 182:12,16,18 | **existed**  295:2 |
| 184:14,19 | 60:22 | 184:9,10 | **existence** |
| 187:5,19 | **executive** | 189:22,23 | 170:20 |
| 192:25 199:7 | 210:11 | 202:14,18 | **existing**  111:19 |
| 201:19 203:10 | | 213:7,9,10,11 | 237:21 |

exists  253:22
expand  121:18
expanding  71:7
expect  134:1,2
expectation
  304:16
experienced
  101:23
explain  15:6
  32:14 35:22
  42:8,13 43:20
  48:6 63:4
  66:23 78:15
  79:20 101:3,9
  116:14 118:25
  120:10 121:7
  128:2 139:24
  146:1 150:3
  152:20 154:13
  216:20
explained
  45:16 61:19
  88:11,18 94:12
  304:2
explainer  40:3
  40:8,22 42:2
  45:13 46:20
  47:9 62:19
  82:1 88:19
  121:14 122:9
  164:22 243:9
  243:17,24
  244:2,8,17,19
  245:2,8 248:1

248:15 250:13
explaining
  42:16 99:9
  101:11 300:5
explains  43:6
  43:22 250:14
  291:20
explanation
  45:17 162:10
explanations
  48:1
explanatory
  164:10 168:24
  169:12
explore  71:7
export  67:24
  68:3,6,13,15
  69:1 70:5,9
  108:5 263:24
exported  66:8
express  298:4
expressing
  298:15 307:19
extend  93:21
  285:22
extended  91:1
extent  84:18
  86:15 89:9
  94:22 99:14
  132:20 240:23
extra  105:20
extracted
  264:25

extreme  291:8
  291:12
eye  115:25

**f**

f  2:15
fac  169:4
face  48:13
  236:18 237:13
  256:1 257:22
faced  261:15
facilitate
  219:11
facing  13:15,18
  13:18 14:4
  16:13 220:12
  220:13 221:2
fact  6:17 10:7
  59:19,22 87:19
  123:18 132:3
  134:19 174:16
  189:4 193:11
  305:7
factoring
  278:15
facts  21:16
failed  87:2
  102:11 303:19
failure  100:12
  100:13,15
  102:13
fair  7:14 64:24
  76:1 155:20
  180:25 191:5

230:16 232:13
  232:14 233:4,8
  233:10 287:22
fairly  154:10
  155:10
fall  18:17,20
  48:20
fallout  11:10
  161:25 180:13
familiar  30:20
  86:19 91:23
  169:17 170:19
  175:13 213:23
  214:2 221:20
  224:21,25
  234:11 274:10
  276:19 277:18
  285:8,10
fan  133:15,18
  182:8 296:2
far  17:21 26:23
  33:23 38:13
  76:21 93:8
  112:5,5 136:15
  159:8 220:3
  239:15
fashion  39:3
  50:14 253:15
fbi  11:13 194:6
fbo  217:21
fdm  212:8,11
  212:15 216:21
  218:7,18
  220:21 240:21

241:15
**fdm's** 216:25
**fdms** 170:21
**fe** 148:9 191:15
191:20 192:2
196:6,7
**fears** 137:1
**feature** 16:14
**february** 11:24
**fed** 196:23
**federal** 5:25
11:12
**fee** 18:23,23,25
19:24 74:20
78:22 169:10
194:9
**feedback** 15:18
16:10 67:10
**feel** 8:1 175:5
193:3 213:15
223:1 279:6
301:11
**fees** 20:3 33:21
304:8,17,23
**fiasco** 21:5
**fiat** 201:20
202:2
**fields** 245:19
**figure** 253:21
**figures** 238:15
**file** 108:6
266:14
**filed** 20:24,25
21:1 160:23

161:3
**filing** 20:22
21:15
**fill** 275:5
**final** 127:25
128:18,24
300:18
**finalized**
170:25
**finally** 45:5
**finance** 30:19
**financial** 173:8
173:10,21
286:9,14 288:8
**financially** 5:1
**find** 23:18
236:21 250:5
263:25 308:17
**fine** 113:22
156:11 267:13
**finish** 45:17
109:18 185:12
277:6
**fireblocks**
209:18,19
**firm** 15:10 30:2
30:15 97:24
149:6 157:16
159:24 304:4
307:24
**first** 5:7 13:16
14:13 86:12
88:6 98:21
114:24 150:1

162:2 170:18
174:8 182:18
187:17 202:22
209:24 234:10
236:10,19
242:8 244:15
258:23 260:11
285:7,21 286:7
286:12,13
298:3
**fitting** 243:9,12
**five** 83:15
137:22 217:4
228:11 267:13
300:19 306:11
**fixed** 16:13
**flat** 126:7
**flexible** 80:2
**flip** 183:12
285:14 288:16
**flooded** 304:14
**floor** 211:15
**focus** 15:13
162:12
**focused** 13:22
14:19,23 169:2
**focusing** 60:19
**folks** 164:2
287:4,13
**follow** 113:6
146:24 152:2
**followed** 89:14
202:17

**following**
100:20
**follows** 5:9
102:18
**food** 156:19
**force** 188:5
**foregoing**
316:5
**form** 21:19
28:16,24 29:5
30:13 31:17
33:12 34:9,19
35:11 38:6,8
48:9 51:11
52:9,21 54:19
55:22 56:20
58:1,9 59:9
60:3,8 61:9
62:1 63:24
64:5,18 70:16
72:5 78:4
81:22 83:5
85:5,6,25
86:14 89:8
91:8,17 93:7
93:25 94:21
96:3 99:10,14
100:1 102:6
105:8 108:19
109:1 111:21
113:14 115:3
120:4 121:24
124:25 128:5
132:19 135:12

139:9 140:16
140:18 142:12
144:9 145:4
147:2,25 148:6
153:8 169:1
171:19 173:17
186:23 187:7
189:6,12
194:25 196:15
198:7 200:14
202:5,11,25
203:6,8,25
204:22 205:25
207:5,22 208:2
208:8 215:13
217:13 218:15
220:2 223:14
224:16 225:22
226:6,22 228:2
232:10,24
242:13,24
243:8 246:22
250:9 251:9,25
255:12 256:18
269:22 277:1
282:22 283:12
284:15 288:4
289:17 291:15
292:10 295:5
295:13 298:18
299:17 304:25
305:9
**formal** 140:12
174:8 266:9

**format** 85:22
91:3,5 139:2
168:6 312:3
**formerly**
161:12
**forms** 206:19
206:21
**formula** 116:20
118:4,6 246:18
247:5,20 273:4
278:3
**formulas** 35:21
35:23 247:23
247:24
**forth** 150:14
254:20 314:7
**forthcoming**
158:11,18
**forward** 10:19
101:18 107:9
113:21 128:21
147:13 177:13
179:23 265:5
271:12
**found** 242:16
250:7 253:5
254:9 308:13
**foundation**
96:4
**founder** 72:6
**founders**
157:20 158:6
158:16

**four** 135:6
293:2 300:16
**fraction** 36:8,9
36:23,24 48:4
**frame** 81:19
83:2 133:7
149:21
**freak** 137:5
**free** 8:1 107:6
175:5 213:15
223:2 279:6
301:11
**friday** 20:25
21:2
**fried** 133:2,6
**friedberg**
239:19,21,24
254:12 265:6
**friend** 212:25
**friends** 290:21
**front** 10:5,13
172:1 241:25
245:11 260:4
274:4
**frustrated**
182:7
**ftc** 194:6
**ftt** 19:2,3,11
20:1,6 26:11
**ftx** 1:5 2:3 4:17
5:14 11:10,19
14:17,21 15:1
15:4 16:22,24
17:19,23,25

18:12 20:21,23
21:17,25 22:20
23:5,25 25:3
27:8,12 28:13
30:5,7,22 31:1
37:7 38:22
41:10 49:18,22
51:16 55:1
57:19 58:25
59:13,14,19,25
61:19 63:11,13
64:15,16,25
65:4 66:9,14
66:25 67:24
68:18,21 70:10
72:12,14,18,20
82:12,17,22
85:4,4 87:6
88:20 89:19
92:18,25 93:6
93:21 94:18
97:5,9,18 98:1
100:14,25
102:5 103:11
105:6 131:16
131:21,24
132:6 133:19
134:19,24
137:3 138:10
141:1,8,16,22
147:1 148:11
150:4 153:20
154:9 159:7,9
161:2,9,13,17

161:18,25
162:4,13,16,18
163:3 164:6,11
165:3,20
167:11 168:24
169:17,21,22
170:8,11,12,16
170:17,21,22
171:7 172:6,19
172:20,25
173:6,8,14
174:14 175:2,8
179:3,12
181:12 186:5
186:12 187:21
190:16 193:23
197:24 201:1
202:25 203:5,6
204:8,10 207:2
207:2,19,20,24
208:4,18,25
209:4,11
210:11,17,18
210:21,23
211:1,3,4,5,6
212:3,4 213:5
213:6,13,17,22
219:16,24
220:11,12,13
220:17 221:2,6
221:21 223:22
225:1 226:16
227:10,12
228:8 229:17

229:19,21,24
229:24,24
230:7 232:4
233:20 234:2,6
239:1,9,15
240:25 241:11
241:17 242:11
248:4 253:17
257:3,14 258:8
258:16,25
260:23,24
261:4,6 264:17
268:12 269:19
271:17 274:7
276:15 280:14
280:17,21,24
281:18 282:19
283:9 285:5
287:4,13,25
289:20 292:24
293:24 294:12
294:16,18
296:7,25
304:11,16,19
304:21 311:20
311:22,24
312:2,4,7,8,10
312:12,20,22
313:5,7 315:1
316:1
**ftx's** 20:21
63:18 169:13
218:19,21
222:6 241:1

266:1
**ftx.com** 138:25
171:3 172:21
172:24 225:5
**ftx.us** 173:1
**ftxe** 176:5
**full** 6:2 41:20
42:17 49:11
99:19 142:23
**fully** 103:3
121:11
**fun** 302:1
303:14
**function** 29:13
277:16
**funding** 231:14
231:16,22
**funds** 19:6 26:6
56:5,11 102:23
107:6 109:5
136:14 145:8
155:22 201:5,7
201:16,17,18
204:19,24
206:24 207:3,7
207:8,10
208:11,14,19
209:5,12
217:21 219:12
246:13 249:10
258:4,5 268:16
**fungibility**
197:15

**fungible** 197:16
197:16
**further** 41:20
69:8,10 73:7
80:6 82:12
111:24 120:14
122:1 123:9
125:6 129:1
143:14 144:13
144:22,24
145:3 154:22
256:4,6 257:20
314:11
**furthermore**
270:14
**future** 44:7
62:23 80:3
230:24,25
231:16,17
248:16
**futures** 42:5
43:18,22,25
44:1,4 45:23
46:5 48:18
50:4,19 52:12
52:18,25 53:10
55:3,13 56:10
60:2,11 61:18
61:21,22,24
62:4,7 63:21
64:2,7,11
119:6 192:12
193:2 223:10
223:17 228:24

229:3,4 230:23
231:8,24 244:7
245:5 247:13
248:11 249:4,5
249:14 283:25
284:3

**fyi**   9:23 118:16

**g**

**g**   2:9
**galen**   3:5
  159:23 189:13
**gamble**   155:2
**gap**   106:6,7
**gbtc**   148:9
  191:19 192:2
  196:6,7,18
  197:2,3,7,14,16
  197:17,20
**general**   35:6
  45:22 72:16
  102:4 118:20
  162:24 222:8
  263:13 287:14
  299:25
**generally**   28:3
  35:22 45:20
  55:19 82:8,10
  105:5 148:3
  193:21 208:23
  228:25 240:8
  242:2 273:11
  287:5

**genesis**   201:6
**getting**   36:11
  76:22,22 103:7
  113:23 114:10
  118:11 125:12
  126:20 128:20
  145:21 163:3
  163:12 177:21
  182:22 238:1
  263:6
**give**   11:3 20:3,6
  40:23 45:24
  98:24 102:1,25
  104:20 123:11
  128:18 133:22
  133:23 136:20
  156:21 159:10
  182:23 249:21
  255:4 267:2
  271:7,8 272:5
**given**   202:8
  214:9,19 229:6
  278:15 284:12
  310:8 314:9
  316:10
**gives**   23:11
  123:1 125:8
**giving**   214:16
**gkast**   3:5
**glueckstein**   2:6
  5:10,13,17
  6:10 8:18 9:18
  10:1 39:16
  65:13 69:11

83:7,13,23
89:11 137:15
137:21 138:6
138:13 139:15
140:20 151:21
156:2 168:25
171:9,18
173:16 175:17
186:6,14,22
187:6 189:5,11
194:24 196:14
198:6 200:13
201:2 202:4,10
204:21 205:24
207:4,21 208:1
208:7,21
214:25 215:12
217:12 218:11
218:14 220:1,8
221:8,23
223:13 224:15
226:5,21
227:18 228:1
232:9,23
240:22 241:7
242:12,23
243:7 246:21
251:8,24 255:2
255:11 256:17
261:25 266:18
269:21 276:25
281:14,21
282:21 283:11
284:14 288:3

289:16 291:14
292:9 295:12
297:16,24
298:17 299:16
304:24 305:8
307:21 310:8
311:4
**gluecksteinb**
  2:6
**go**   4:13 17:8
  20:8 32:22
  34:25 39:23
  44:12 49:6,16
  50:9 56:14
  66:20 69:9
  70:18,23 71:11
  73:7,15 81:6
  81:11 83:15
  88:8 100:3
  103:15 104:1
  109:19 110:13
  113:23 116:2,7
  116:8,9 119:5
  123:19 137:21
  139:5 140:24
  156:16 157:1,4
  177:19 183:9
  202:14 203:19
  210:7 211:17
  218:23 225:5,8
  235:14 237:17
  243:13 244:18
  249:15 262:15
  267:23 269:1

276:10 278:22
303:11 304:13
**goes**  99:5 103:2
109:3 120:12
126:24 127:1
128:2 129:8
143:17 147:13
177:13
**going**  4:2 8:16
20:2 24:13,17
30:3 39:23
44:12 45:15
47:12 50:9
56:24 66:18
75:19 80:6
83:14,25
107:12 109:25
116:9 120:21
128:20 130:19
130:21 138:8
146:15,16,18
147:15 154:18
159:12 160:5,6
162:12 164:23
165:8 167:18
168:2 175:14
175:17 176:7
179:23 181:16
182:10 185:13
189:20 193:20
206:24 207:16
211:3 225:10
231:10 233:13
240:13,22,24

255:14 262:4
264:11 269:13
271:4,10
274:22,22
282:6 284:20
290:5,23 291:4
292:20 299:3
300:17 309:23
**goldberg**  2:18
**good**  4:1,2 5:11
5:11 74:23
140:24 145:10
146:11,23
156:16 181:15
187:13 194:7
212:23 262:21
262:22 286:24
290:7 304:10
306:2
**gotten**  309:21
**govern**  171:3
172:20
**government**
11:8,12
**grab**  211:16
276:10
**graduated**
12:15,22
**graham**  166:20
**grant**  150:13
**granted**  59:10
102:23 112:7
133:13

**grayed**  244:15
**grayscale**  197:4
197:18
**great**  10:21
20:9 137:23
153:24 159:11
162:10 303:11
303:13
**green**  124:18
**grew**  13:20
29:14
**gritty**  99:6
**ground**  6:22
159:10 160:18
**group**  20:11
21:10 23:10
25:14 66:8
142:7 260:12
286:1
**grow**  199:16
**growling**
156:19
**guess**  11:14
23:1 64:22
112:8 157:24
168:2 169:3
176:7,12 177:5
189:13 190:14
248:11 251:18
258:19 265:8
275:22
**guessing**
215:24

**guy**  13:14
162:21
**guys**  10:20
69:25 73:22
96:6 113:20
123:20 128:10
133:11 154:18
178:19 179:20
212:23 310:15

**h**

**h**  311:7 315:3
**haircut**  41:7
43:15
**half**  12:17,24
264:13
**hall**  257:14
**hand**  23:2,2
81:8 107:21
168:12 183:16
185:25 219:3
307:6 314:17
**handed**  49:4,9
49:12 53:17
253:5
**handled**  14:5
16:7 24:14
39:2 80:21,24
166:24
**handling**  22:5
**handoff**  280:9
280:12
**hands**  22:4
174:24

**happen**  41:9
49:20 52:8
101:24 115:5
187:25 266:11
305:16
**happened**
39:10 51:24
53:23 105:5
133:16 137:3
158:20 180:21
210:14 217:25
228:3 258:22
259:14 261:10
289:2 297:9
**happening**
105:18,25
186:9 215:15
219:23
**happens**
102:21 130:24
130:25 204:16
215:3
**happy**  10:20
18:5 78:8
139:12 156:21
157:22 189:17
190:2 195:7
229:5 237:6
264:23 265:2
270:2 297:5
300:18 305:3
306:4,7 307:13
**hard**  139:8
264:23 296:9

**harder**  230:13
233:7
**harm**  137:7
180:16
**hats**  72:17
**haul**  258:9
**hauling**  258:21
**head**  14:12,20
22:8 72:18
162:19,25
164:13 173:6
173:23 174:1
174:20 179:3
248:9
**header**  92:21
138:20 244:24
**heading**  89:18
254:17 277:14
**health**  56:1
127:15 146:11
270:16,20
**healthy**  151:9
155:16
**hear**  128:22
129:21 252:13
286:14 302:12
**heard**  4:10
159:9 162:15
167:22 290:25
**hearing**  106:23
106:25 130:23
286:8,22 295:3
**heavy**  231:1

**held**  26:6 37:10
42:20 191:25
196:7 197:17
201:18 217:7
217:19 218:2
268:17
**help**  21:12
111:10 168:20
184:24 185:1
188:25 189:9
189:17 198:24
210:23 229:14
248:5,6 274:16
306:4,7
**helped**  14:25
72:22,23,24
166:19 189:14
189:16 213:5
**helper**  72:16
**helpful**  68:10
68:12 177:25
**helping**  181:7
**helps**  43:9
**hereto**  316:8
**hereunto**
314:16
**hey**  28:6 73:22
128:19 130:19
136:19 154:16
211:11 271:6
307:12
**hi**  71:18 78:6
108:11 128:10

**hide**  303:2
**high**  12:14,15
12:19 15:9,11
235:12
**higher**  13:7
20:17 36:6
74:2,3 75:4
76:3,8 79:5
111:25 118:3,6
118:8 239:11
**highlight**  152:4
152:8
**hired**  13:21
**history**  12:13
13:10 162:14
175:19
**hit**  40:17 41:25
49:8 69:7
147:11,12
154:24
**hitting**  19:25
43:14 74:18
75:1 76:22
106:22 117:19
**hmm**  74:10
76:7 78:14
100:17 108:15
116:13 118:24
128:6 141:10
143:3 145:1
265:17 278:1
287:12 308:2
**hold**  19:3,10
20:1,5 183:20

208:19 260:8
276:3
**holder** 140:4
**holding** 26:11
41:12 125:5
232:7,12
**holdings** 19:4
30:1 31:12,25
205:21,23
**hole** 123:21,25
124:14 132:11
132:17 146:21
**honest** 121:9
160:14 217:17
273:17 275:21
**hope** 304:10,19
**hopeful** 272:4
**hopefully**
222:12
**hopped** 267:25
**horseshit**
210:16
**hour** 127:21
136:21 205:17
205:18 226:9
310:5
**hourly** 61:2
**hours** 68:7,11
80:23 101:12
101:17,20
102:1 123:19
129:18 152:12
166:25 167:1,2

**house** 209:21
**how's** 28:7
**hq's** 219:10
**html** 69:5
**huge** 43:11
**huh** 73:17
**hundreds** 31:2
**hurt** 55:25
57:13
**hyperlink**
245:6
**hypotheticals**
305:17

**i**

**ibiza** 304:14
**id'ing** 92:15
**idea** 25:9
137:14 290:23
298:14
**ideas** 67:10
**identical** 262:6
**identification**
8:22 39:21
65:18 69:18
84:7 97:6,10
131:17 138:11
139:3 141:2
165:4 167:12
170:9 175:9
181:21 182:14
184:12 189:25
202:20 213:14
225:15,18

233:21 237:4
243:20 262:12
264:18 274:8
276:13 284:24
296:21
**identified** 92:7
**identify** 69:15
**identifying**
15:19 163:4
**idiot** 201:9
**ignorant**
221:14
**ignore** 123:6
**ignoring** 48:19
50:6 122:13
**imf** 36:7,13,19
37:3,8,16,18,24
38:2 40:17
41:3,25 43:10
43:14 45:4
57:8 116:17
117:10,13,15
117:16,18,20
118:1,5 199:12
247:5,5,23
248:10,17
**impact** 37:10
37:13 41:12
52:20 54:24
110:21 243:1
**impacting**
36:11
**impacts** 64:11

**implemented**
252:9
**important** 15:9
40:25 265:24
291:17
**imprecise**
190:11
**impression**
30:9
**improve**
163:13
**improvements**
163:15
**improving**
15:18
**include** 193:4
201:20,23
206:9 242:21
257:25 283:24
**included** 62:24
64:3 90:14
**including** 33:5
61:22
**inclusive** 46:7
102:22 124:19
193:5 195:12
195:15
**incorporated**
16:15
**incorporating**
15:17
**incorrect** 12:11
153:9 249:1,3
281:20

**increase**  41:7
  57:24 58:3
  116:10,23,23
  117:6 124:21
  126:8 163:8
**increased**
  36:18 117:9
  236:19 237:13
**increasing**
  37:22
**incur**  54:13
**indebtedness**
  254:15,19,22
  255:9,20 256:1
  257:8,15
  258:10,17,21
**independent**
  261:13,14
**index**  63:3,6,8
  63:12 229:8,20
  229:25 230:1,8
  230:11,13,19
  230:20 231:4
  231:10,11,18
  231:20,23
  232:1,18,22
  233:12
**indicate**  96:20
  96:25
**indicative**
  168:6
**individual**
  31:15 32:4,8
  37:4 38:25

57:5 82:20
  224:10,10
  227:14
**industry**  163:7
  229:23 232:15
  293:25
**inefficient**
  103:20
**information**
  17:16 99:4
  106:21 194:10
  203:19 264:1
  271:3,11,19,23
  283:7 287:2
  307:5,23
  308:21
**informed**  10:18
**initial**  36:8,23
  37:23 71:6
  117:24 246:24
  247:1 309:7
**initially**  113:4
**initiated**  49:22
  280:14
**input**  109:22
  109:23 146:9
  186:19 187:2,8
**inquiries**  25:11
  129:3
**inserted**  238:16
**instance**  227:13
  228:8
**instances**  27:4
  49:21 227:20

237:23
**instantly**
  114:12
**institutional**
  14:21 18:7,9
  22:9 89:19
  162:19,25
  164:14 173:24
  174:21 239:1
**instructed**  7:20
  194:1,4 294:21
**instruction**
  194:12
**insufficient**
  104:6
**intended**
  208:19
**intent**  266:17
**intentions**
  266:2
**interact**  25:7
  177:18
**interacted**
  27:10
**interacting**
  16:17 223:25
  224:2,3
**interactions**
  14:4 133:16
**interest**  74:2,4
  75:2,6 76:5,9
  76:19,25 77:3
  78:8,21 79:4
  79:10,12,17

80:9 81:12
  82:2,8 85:14
  87:4,17 88:10
  88:12,17 89:3
  90:23 94:6,7,9
  94:13,15 95:2
  95:11 101:16
  101:18 108:13
  238:17 250:11
  251:6,12,17
  252:2,5 258:20
  259:2,9,11
  299:9
**interested**  5:1
  314:14
**interface**  31:8
  31:23 203:12
**interim**  87:18
**interject**  6:5
  240:23
**interjecting**
  241:8
**internal**  131:4
  168:17 177:1
  226:16
**internally**
  164:12 193:19
  290:23
**international**
  13:15,18,21
**internet**  4:8
**interpret**
  188:16 255:25
  269:14

**intricacies**
10:16
**introduce**
157:13 164:23
184:8 262:4
**introduced** 9:1
97:12 167:5
174:25 244:11
**investments**
201:5
**investors**
302:24
**inviting** 301:12
**invoke** 208:4
**involve** 224:13
**involved** 64:14
137:9 141:24
166:6 171:24
172:12 286:21
287:10 301:13
**involvement**
172:7 173:5
186:20 187:4
287:16 301:20
**involves** 292:22
**ip** 214:6,8
**ironically**
180:21
**issue** 9:21
16:11,13 25:17
74:12 113:17
114:10 136:16
152:5,8 161:15
284:11 298:25

302:14,15
**issued** 10:12
64:16,25 65:4
**issues** 16:8 25:1
57:14 67:4
158:9 161:14
161:22 172:14
**item** 192:18
198:15
**items** 194:22
**ivory** 72:11

**j**

**j.p.** 19:9,10
**jacob** 3:12
**jail** 303:11,12
**jamie** 3:13
**jim** 298:1
**jj.crespo** 2:17
**job** 213:6
**joined** 13:25
14:10,17 15:3
17:2,24 18:12
22:3,12,20
23:5 213:5
**joint** 2:13
157:17 158:5
159:6 160:22
161:8 186:2,3
186:10
**jointly** 1:3
**joke** 211:10
**jose** 2:17

**juan** 2:17
**julie** 299:18,19
**julieschoening**
299:12
**july** 70:6
133:19 134:7,8
134:18 306:14
309:1,18
**jumbled**
145:24
**jump** 160:12
237:16 306:24
**june** 14:15
28:23 65:5
95:22,24 96:10
105:7 107:24
133:8 134:8
138:18 140:1
141:25 147:24
148:15 149:15
154:8 190:21
221:22 248:24
252:8 258:14
259:18,23,24
259:25 272:20
275:19 276:24
279:23 280:15
280:24 283:10
285:22,25
288:2,8,24
289:14,21
297:6
**justice** 210:15

**k**

**k** 5:6 71:6,16
**kast** 3:5 93:7
156:23 225:22
250:9 295:5
304:4
**kbo** 1:2
**keep** 54:6 76:11
86:25 119:14
119:18 152:10
177:16 194:20
255:15
**keeping** 75:25
**keeps** 146:15
**kept** 90:1
115:24
**kevin** 22:5,23
**key** 217:3
**kick** 247:6
**kicked** 253:16
**kind** 11:15 17:7
18:21 29:19
40:20 63:12
82:1 107:4
128:23 131:24
145:24 154:22
192:16 197:23
200:11 259:1
**knew** 289:19
308:19
**know** 10:16,25
14:5 15:9 16:5
16:7,10 17:11

19:8 20:10,17
23:9 25:15,24
27:13 29:25
30:2 31:2
35:17 36:1
37:7 41:22,25
43:11 46:15
47:10 48:12
51:23 52:3
56:8 57:3,7
58:17,20 59:2
61:15 63:12,15
66:16 67:16
69:6 72:10
76:12,17,20,23
77:12,13,18,19
77:22 78:5
79:1 85:11
90:3,10 92:14
93:13,19
101:23 104:23
105:16 106:13
106:19,22
107:4 112:13
114:15 115:6
117:23 118:3,4
119:5,18
120:16 127:10
128:15 132:1
135:16 136:19
136:19,22
140:16 144:10
145:14,20,23
146:3,10,10,12

146:19,24
147:13,17,19
149:1 150:16
150:24 151:8
156:5,20 158:8
160:2,11 162:4
162:15,22
163:5,7,15
164:25 165:7
166:23 167:8
169:10,23
170:4 171:13
176:11 179:6
179:20,21
180:13 189:15
190:7,9 191:11
191:11 192:3
196:19 199:4
203:21,22
207:8 208:9
209:17 210:6
211:9,11 215:4
216:17 217:19
217:20,25
218:16,16
220:5,24
221:17,18
223:22 225:14
226:7 229:18
230:17 232:11
232:18 234:15
239:10 242:15
246:17 247:7
248:8 251:3

253:18 255:1,6
255:14,17
256:13,22
259:24 260:19
262:8,25 266:8
266:9 267:1
270:15 271:6,7
271:18 272:20
274:3,18,21
279:20 281:10
284:7,16
286:22 287:19
293:5 294:11
296:6,11 297:7
298:1,2 299:15
300:20 302:16
303:7,8,15
304:7,11 306:5
**knowledge**
30:16 159:3
162:8 247:22
248:24 258:16
287:18 302:5
**knows** 210:2
**kyle** 71:19,20
71:21 72:1,3
91:15 125:25
138:19,22,24
139:25 178:7
178:23 179:5
179:16,25
180:1,8 181:1
181:12 265:15
267:3 301:7,16

301:19 302:17
303:12,22
**kyled1** 71:19
125:25

**l**

**labeling** 213:8
**lack** 40:20 96:4
125:8 128:14
136:16 291:5
301:7
**lamb** 180:22
302:17 303:1
**land** 38:21
**language** 12:18
222:12 233:25
**laptop** 178:2
308:10,12
**large** 19:3,15
35:7 36:16
57:4 86:8
90:19 98:7
106:20 110:25
163:10 169:2
172:9,10 175:4
191:14,15,18
191:19,20
192:14 196:6,7
223:24 267:2
287:4 289:19
**largely** 55:15
238:22 239:3,7
**larger** 36:17
41:12 112:9,15

116:17 118:1
193:16 199:13
**largest** 14:11
112:6,11,16
**lastly** 19:6
**late** 288:7
310:5
**latham** 2:13
157:16 159:5
**launch** 302:25
**launched** 302:4
**law** 157:16
159:24 307:24
**lawsuits** 303:4
**lawyer** 221:13
239:12
**lawyering**
239:17
**lawyers** 12:3
75:18 85:8,18
90:13 238:11
238:19,25
239:5 305:22
306:20 309:16
**lead** 16:20 24:7
25:4 113:25
131:12 269:25
**leading** 31:18
33:7 34:10
51:12 54:20
60:9 64:6
87:25 111:22
120:5 142:13
207:11

**learned** 21:7
**learning**
114:25
**leave** 127:8
130:12,16
291:20 292:1
**leaving** 76:18
211:3
**led** 270:18
271:12
**ledger** 227:10
227:12
**left** 129:21
134:10,19,24
135:5 176:11
**legal** 86:15
89:9 94:22
99:15 104:19
161:2,2 162:3
171:10 186:7
186:15 202:5
202:11 204:22
208:22 220:9
221:9 239:14
255:3 266:19
304:8,23
305:11
**legible** 265:1
**lend** 60:24 61:1
**lender** 61:15
271:21
**lenders** 54:12
60:23 61:6
224:5 225:16

**lending** 61:3,7
169:14 202:8
222:20,21,22
226:2 227:16
**lends** 225:20,24
**lengthy** 272:3
282:5
**lent** 226:13
227:1,2,14
**leslie** 303:1
**letter** 194:7
298:8
**letting** 146:10
**level** 20:17 51:1
51:2 52:23
117:20
**levels** 36:1
**leverage**
117:24 199:8
246:9 268:7
298:20
**levered** 142:22
268:5 291:20
**levin** 166:20
**liabilities**
302:22
**liability** 193:7
193:11
**liable** 233:6
257:10 258:24
259:5
**licenses** 222:1
**licensing**
171:22 221:12

221:16,17,21
**licensure**
171:22
**lied** 21:9
**lies** 181:4 182:9
**life** 28:7 160:20
167:21
**light** 264:23
**liked** 306:1
**likely** 113:8
117:13 126:11
293:2
**limit** 35:8
109:11
**limited** 170:18
172:23 197:19
213:18 241:15
**line** 7:16 43:16
45:25 46:1,3,8
46:10,13,15,17
46:17,21 48:13
48:16,19 50:6
50:12,16,24
51:2,9 52:14
57:8,23 58:5,7
58:15,23 59:7
59:10,14 64:16
64:20,24 65:3
65:7,11 71:8
75:17,21 77:4
78:24 79:16,18
79:25 81:20,25
83:3 84:12,21
85:23 86:2,3,8

86:19 87:1,8
87:10,13,14,15
87:21 88:5,15
89:13,20 90:2
90:4,7,11,14
93:21 94:2
95:6,10,15,20
96:12,18,20
99:11 108:12
108:16,23
112:6 113:24
114:10 115:21
117:3 119:10
119:12,15
130:7,8,22
131:3 151:2
185:14 192:18
193:10 194:22
195:12,16
198:15 234:13
235:17,22
236:8,9,13,18
237:2,13,21
238:5,23 239:2
240:2 242:1
244:16 245:21
246:14,20
247:25 249:19
250:13,17,23
251:22 255:8
255:19 256:2
256:15,20,21
256:22 257:22
258:23 267:5,8

268:3,14,23
269:3,8 270:13
270:22 271:13
272:1,9,13,15
282:10,10
284:10 286:7
298:7,24
299:22 300:8
300:10,11
312:23 315:4,7
315:10,13,16
315:19
**lines** 50:6 57:20
58:24 59:1,3
74:15 75:10,20
78:20 82:3
94:14 150:13
150:14 164:20
165:19 167:16
175:16,22,25
237:23 247:21
252:13,22
254:1 266:4
298:5,21
299:20,24
300:5
**link** 68:22
81:14 248:14
**linked** 84:14
**liquid** 63:10
272:23 278:10
**liquidate** 39:13
39:14 41:10
48:7 51:16

57:13 96:19
101:21 113:8
114:5,12
146:22 147:8
147:12,16,17
155:22 185:10
260:25 261:7
263:9 266:17
283:17,22
284:13 291:8
291:22 294:22
**liquidated**
37:18 49:3
65:9 96:25
102:2 103:7
114:8 126:11
127:13 130:13
130:14,16
131:13 143:1
143:16 146:4
147:20 149:4
154:25 185:5
185:18,22
261:23 268:7
269:19 270:1
270:19 272:22
273:1 276:6
277:22 282:2
283:10 284:10
284:13,19
**liquidating**
48:1 57:15
103:4 107:10
148:12 268:2

268:18
**liquidation**
29:4 38:18,19
39:9,12 41:9
48:22,25 49:9
49:19 50:7,10
51:19,24 52:5
52:7,11,11,13
52:15,17,18,23
52:24 53:10,14
53:23 54:15,22
54:24 55:12,16
56:16,25
102:21 103:18
104:4 114:1
145:22 146:2,6
146:24 147:1
147:14,18,22
148:5,14 149:6
250:18 260:23
261:3,24 267:6
267:9 268:12
268:20 271:13
271:14 279:23
280:9,14
283:24 284:4,8
287:24
**liquidations**
39:2 48:12
49:6,8 50:13
53:19 57:18
102:10 130:21
148:17,18,21
148:24 149:12

261:16 276:17
**liquidators**
2:13 157:17
158:5 159:7
160:22 161:8
186:2,3,11
**liquidity** 36:1,3
36:20 49:5,10
53:18 277:17
279:13,16,21
280:3,11
**list** 263:19
289:24
**litigation** 158:6
187:5 280:18
306:22
**little** 156:12
160:20 162:9
229:12 230:5
259:15 274:20
306:25
**liu** 2:10
**live** 157:14
**lived** 194:16
**llc** 131:24
**llcs** 167:23
**llp** 2:3,13
**load** 69:5
**loaded** 69:2,24
97:14 141:4
175:12
**loading** 70:21
202:15 213:16
243:15 260:8

297:2
**loan** 233:24
268:5
**loans** 60:17
227:4 293:10
293:16
**loc** 73:25 74:22
88:19,21 92:17
92:24 96:23
97:1 99:4
102:23,25
103:17 104:3
104:10,15,21
104:25 105:22
106:4 107:4
109:11 110:2,6
110:9,12,20,24
110:25 111:19
111:24 112:16
113:1,18,19,21
114:4,7,21
116:3,9 118:18
118:20 119:2,5
119:17,22,23
120:13,19
124:4,10,11
126:9 129:23
130:3,20 131:9
135:16 142:23
143:12,13
145:5,17,19
151:6 152:11
152:25 153:3
153:10,20

154:2,3,3
164:22 179:24
180:6 185:15
193:7 246:4
256:9 257:19
258:1 266:21
268:19 272:10
272:16 282:11
291:21 300:6
**locate** 308:4,5
**located** 1:13
47:3 68:16
70:9 308:7
**lock** 8:6
**locs** 92:4
112:11 115:19
167:22 253:14
**lodge** 6:5
**log** 30:22 31:5
31:6 150:8
153:14
**logged** 9:21
153:18
**logging** 153:22
154:6
**logs** 33:3
**london** 304:12
304:13
**long** 38:12
134:24 142:22
146:14 154:4
278:20,21
279:2

**longer** 114:13
127:22 130:9
151:4 252:3,3
**look** 8:19 38:1
38:22 39:7
57:2,4 66:18
71:17 78:8
83:7 87:11
90:6 98:9
99:20 110:17
115:18 117:18
123:5 124:2
128:19 130:19
132:8 137:16
154:15,17
160:8,21
171:14 175:6
187:14 197:25
213:15 224:4,5
231:4 235:20
246:8 247:10
264:11 265:2
273:25 274:19
277:5,11 279:4
282:6 309:11
**looked** 66:15
78:19 89:4
107:1 119:8
122:8 151:17
152:1 160:10
184:21 218:25
252:18 295:7
**looking** 35:5
84:15 98:1

106:1,14
107:16 115:9
119:21 120:18
121:13,14
127:18 131:25
132:18 135:20
149:22 150:2
188:23 190:5
198:14 231:5
244:3 247:1
251:1,19 252:4
252:21 254:18
259:23 260:5,6
260:10 269:7
270:7 278:23
280:4 290:11
290:11 294:3
309:4
**looks**  9:13 40:8
40:15 66:6
70:11 71:12
123:18 124:9
131:23,25
139:18 144:2
183:8 250:16
250:23
**lose**  55:4 119:3
**loser**  56:12
**losing**  249:13
289:9
**loss**  228:9
**losses**  49:16,17
54:13

**lost**  289:7,8
**lot**  14:3 15:11
19:11,11 23:1
72:17,24 80:21
80:24,25 90:18
105:14 106:21
114:7,19
129:21 133:13
148:25 177:4,5
177:18 199:14
208:14 229:2
259:13 289:7,7
289:8 291:16
292:15,22
293:13 296:7
297:7 299:19
307:11,14
308:20
**lots**  164:19
253:13
**love**  176:24
302:12
**low**  36:3
**lower**  19:24
36:19 74:2,4
75:6 76:4,9
79:3,4,6 95:3
183:15 219:3
**lowering**  111:7
**luna**  29:7,7,11
29:15 101:24
105:12,25
115:23 273:20
276:2 284:17

286:17,21
287:6,10,16
288:2
**lunch**  157:7
**lw.com**  2:16,17
2:19,20

**m**

**made**  21:6
60:17 63:9
78:16 112:19
136:9 182:21
183:11 184:5
206:20 230:1
230:15 233:25
269:23 283:16
297:17 303:23
316:6
**magnitude**
111:25
**mail**  26:23
93:15 97:16,17
97:19 98:10,11
98:17,20 100:7
102:8 138:18
138:23 139:1,7
139:19,25
140:1,9,9
141:6 184:10
184:14,17
187:5,18
265:15 266:6
266:12,13,14
267:3 268:1,3

285:1,3,8
286:5 288:17
288:18 290:4
312:3,15
**mailed**  309:10
309:16
**mails**  20:9
306:3,9
**main**  22:6
24:25 57:1,16
163:1
**maintain**  43:24
104:22 267:11
268:17 270:10
272:1
**maintained**
130:7 242:9
**maintaining**
51:6
**maintains**
270:9
**maintenance**
36:9,23 37:24
38:13,15 39:5
39:8,11 48:4
48:21,23 49:2
49:24 50:15,17
50:19 51:7
53:2,2,5 54:7
102:13,22
103:1,2 104:12
104:16 130:11
147:7 246:25
247:2

| | | | |
|---|---|---|---|
| **major** 25:1 | 290:24 | 39:11 40:15 | 227:15,25 |
| **majority** 148:8 | **manager** 17:5 | 44:14,17,20,22 | 228:4 239:1 |
| **make** 8:7 16:12 | 23:15 86:19 | 44:23,24 45:23 | 243:16 244:6 |
| 16:18 18:4 | 94:17 | 46:5 48:4,18 | 244:16 245:1,1 |
| 57:7,10 74:25 | **managing** | 48:21,23 49:2 | 247:2,2,8,15 |
| 75:11 79:18 | 22:13 23:5 | 49:24 50:5,15 | 248:15 249:10 |
| 88:2 92:13 | 25:5 71:25 | 50:17,19,20,22 | 249:13,16 |
| 111:11 125:2 | **manipulate** | 51:7 52:12,19 | 250:19 252:23 |
| 127:5,11 | 230:14 233:8 | 53:3,5,16,19,21 | 261:14 274:2 |
| 132:23 134:9 | **manipulation** | 53:23 54:7,13 | **margining** |
| 140:2 157:22 | 233:6 | 54:14 57:25 | 197:25 |
| 160:20 181:7 | **manner** 17:17 | 58:18 59:19,19 | **mark** 62:14 |
| 183:23 195:3 | 26:13 54:6 | 59:24,25 60:3 | 63:2,17 180:22 |
| 199:25 203:2 | 89:25 | 60:5,14,16,19 | 229:7,16,20 |
| 233:7 247:18 | **manual** 51:3,20 | 60:20 61:15 | 230:8,10 231:5 |
| 258:8 260:9 | 52:1,5,6 | 88:25 100:12 | 231:12,19 |
| 262:18,20 | 147:10,19,21 | 100:13 102:12 | 278:10,12 |
| 266:13 279:7 | 148:18 261:9 | 102:22 103:1,2 | 302:17 |
| **makers** 14:11 | 261:23 | 104:12,16,25 | **mark's** 303:1 |
| 15:11 | **manually** 51:16 | 117:24 119:7 | **marked** 8:21 |
| **makes** 156:7 | 147:1 251:12 | 122:24 130:11 | 10:6,12 39:21 |
| 249:3 | 261:6 294:22 | 147:7 168:12 | 40:5 65:18 |
| **making** 16:5,21 | **march** 13:24 | 169:13 192:14 | 66:1,2 69:18 |
| 74:17 105:22 | 14:17,17 17:2 | 192:23 193:2 | 70:3 84:1,7 |
| 163:9 168:7 | 73:16 74:13 | 198:10,13,20 | 85:22 97:6,10 |
| **malley** 3:13 | 77:5 81:11,19 | 199:8,13 | 131:17,19 |
| **manage** 23:3 | 83:2 84:22 | 205:13 222:7 | 138:11,15,17 |
| 216:21 | 94:19 95:14 | 222:15,17,19 | 139:3,5,10 |
| **managed** | 108:18,25 | 222:20,20,22 | 141:2,5,7 |
| 307:22 | **margin** 32:12 | 222:24 223:16 | 164:24 165:4 |
| **management** | 32:13,15,21,25 | 223:19,23,24 | 165:14 167:7 |
| 14:8 15:24 | 36:8,9,23,24 | 224:1,12,12,20 | 167:12 170:6,9 |
| 16:3 72:24 | 37:23,24 38:13 | 224:23 225:11 | 175:1,8 181:17 |
| 213:19 274:2 | 38:15 39:5,8 | 226:1,3,14 | 181:20 182:13 |

184:11 189:21
189:22,25
202:19 213:14
233:14,21
237:3 243:20
262:12 264:18
276:13,15
284:24 296:21
**market**  14:11
15:11 29:14,17
33:1 41:13
42:23 44:17
57:9 60:16
63:18 101:25
106:19 111:9
126:24,25
146:15 172:25
205:13 223:24
224:1,20,23
225:11 228:5
229:25 230:14
230:16,17
232:4,6,12,14
261:18 273:6
275:13 278:7,7
278:9,17
280:23 281:2
**markets**  36:2
105:15 169:22
170:13,21
172:6,19
174:14 212:4
213:18 220:11
220:13,17

230:15 233:2
**marriage**
314:13
**massive**  43:1
146:21 148:10
182:25 191:12
192:15
**massively**
106:9 107:2
114:19 116:20
117:2,12 137:8
145:6
**match**  56:13
**matera**  1:14
4:22 314:3,22
**material**  99:3
**materially**
171:6
**matter**  4:17
5:22 11:3,9,19
35:6 147:4
158:2 175:24
184:24 185:25
187:11 203:5
214:18 263:14
304:18 307:6
307:23 314:15
**matters**  142:10
**max**  117:17
**maxed**  246:9
**mayhem**
105:24
**mean**  27:13
32:14 35:23

52:10,11 69:23
75:15 79:22
94:9 95:19,22
101:14 109:15
115:15 120:10
124:14 146:1
164:19 176:6
176:10 188:24
189:8,13
196:16 197:8
200:15 203:7
204:7 207:10
225:23 226:16
226:17 232:11
256:7,14 258:2
258:19 263:25
277:7 281:1,3
281:10 291:19
292:23 297:18
299:2 307:10
**meaning**  38:25
143:24 242:6
**means**  15:7
48:7 56:4,7,10
76:17 104:23
118:19 119:11
130:10 132:4
146:14,16
185:3 200:17
204:9 217:18
255:1 258:4
279:6 294:11
**meant**  116:15
117:11 207:13

240:19
**measurement**
230:7
**median**  63:14
63:19
**meet**  39:5,8
49:23 100:15
100:24 102:11
102:13
**meeting**  27:23
28:5 74:21
104:25 105:23
106:5 119:23
189:14
**meltdown**  29:7
29:8 273:20
**melting**  105:12
**memorized**
47:11
**memory**  21:3
275:24
**mention**  164:19
**mentioned**
13:11 15:5
22:22 23:8
57:19 90:16
176:2 190:22
196:5,13
259:20 261:11
293:14
**message**  9:12
67:20 71:18
73:14,18 75:25
108:10 109:3

119:1,25
125:16,20
126:19 127:22
128:8 129:1,17
131:20,22
132:9,17 133:5
142:4,20 143:6
143:23 153:12
179:18 180:4
266:8 282:24
290:13,17
291:1 296:23
**messages** 68:22
69:2,3,4,7,8
70:14 128:9
129:13 139:20
154:16 179:21
253:19
**messaging**
176:23 298:11
**met** 26:10
37:13 38:17
51:15 87:23
179:5
**method** 26:15
26:24 251:14
**methodology**
264:6
**methods** 26:19
**metric** 230:7
299:1
**metrics** 252:12
254:1

**michael** 22:17
73:4
**middle** 89:17
89:18,24
107:23 132:9
152:2 205:7
235:24 288:22
**midnight** 67:21
**mike** 303:5
**million** 46:12
58:14,15,17,20
65:12 76:12,13
85:13 94:2
96:2,12,23
102:24,25
103:1 104:21
104:24 109:5
110:1,2,7,12,12
110:16 112:12
118:10,15,19
119:9,10,13,13
119:16,19
120:17,19
121:2,12,22
122:7,12,14,15
122:17,18,21
122:24 123:21
123:25 124:3,4
124:8,9,12,13
124:13,16,17
124:20,21,22
126:10 132:10
132:17 142:24
142:24 143:19

149:2 151:1
152:22,25
153:5,5,15,16
153:23,25
193:6,7 195:23
196:3 198:20
236:2,3,5,19
237:14 238:4,5
238:6,7,8,9
255:24 256:24
256:25 257:1
272:11,17
280:24 281:17
282:12,19,23
**mind** 83:11
122:4 160:13
170:5 190:12
191:23 211:16
220:18 243:4
243:24 271:16
306:24
**mine** 181:6
213:1
**minimizing**
145:16
**minimum**
60:25 102:13
126:13 199:2
224:6 300:13
**minus** 123:3
142:22,24
197:7 247:12
247:13

**minute** 83:15
137:22 153:22
189:20 213:24
**minutes** 109:10
113:7 123:9
129:23 130:4
130:19 179:24
228:11 267:13
300:19
**misappropria...**
201:4 206:25
207:2,7,9,11
**misappropria...**
201:16 202:1
**miscarriage**
210:15
**misread** 236:4
**missed** 151:20
162:16 270:23
**missing** 176:5
176:14
**misstates** 101:8
103:23 132:20
215:1 228:2
**mistaken** 72:7
263:16
**mj** 3:11 4:20
**mlb** 14:22,24
**mmf** 36:8,13,19
37:3,8,12,17
57:8 247:23
248:10
**mmm** 74:10
76:7 78:14

100:17 108:15
116:13 118:24
128:6 141:10
143:3 145:1
265:17 278:1
287:12 308:2
**modifying**
172:17
**moment**  8:24
35:2 39:18
69:21 151:3
154:24 155:21
173:4 175:6
182:11 184:9
189:19 233:18
240:16 243:14
247:19 264:10
279:12 280:10
**money**  55:4
76:18 107:7
110:5,12 119:3
124:18 126:22
133:22,22
151:1 154:5
155:18 180:20
183:7 193:12
202:7,9 208:14
209:15,16
221:25 246:10
249:13 291:16
292:15 304:20
**monitor**  100:23
**monitoring**
105:21 149:18

149:20 150:21
**months**  112:13
230:24 306:13
306:14
**morgan**  19:10
19:10
**morning**  4:1
5:12 6:23 7:6
7:16 20:25
71:6 160:15
**move**  35:3
41:15 101:18
107:9 111:12
113:20 128:21
140:20,21
179:23 226:12
226:23 230:18
241:22 249:18
251:14
**moved**  12:16
12:16,25 24:6
94:12 143:1
169:21 212:16
220:12 226:20
252:1 275:25
293:2 294:4
**movements**
227:5 293:8
**moving**  102:8
271:12 275:2
**multiple**  17:14
19:22 20:15
48:11 63:7,9
99:12 198:9

230:15 233:7
237:23,24
246:23 254:1
**multiplied**
281:11

| n |
| --- |

**n**  5:6 311:1
**n885**  86:13
**nacif**  2:20
**nacif.taousse**
2:20
**name**  4:20 5:12
6:3,20 19:7
20:2 22:23
26:9 72:9 73:3
81:2,3,5
154:23 157:15
176:17 209:25
215:22 243:10
243:12 248:12
**named**  294:15
299:12
**names**  27:21
66:16
**nate**  176:8
**native**  138:14
139:2,9,14
312:3
**navigate**
188:25 189:8,9
**near**  95:18
**nearing**  296:6

**nearly**  96:22
**necessarily**
194:19 200:19
273:6 280:23
**necessary**
51:17 193:3
271:23 316:7
**necessity**  57:12
**need**  6:4 7:18
7:25 9:16
10:16 23:13,19
25:2 35:17
36:10 41:13
44:1 45:12
56:13 58:10
60:12 62:25
67:1 79:17,18
79:23 86:25
104:22 105:17
110:25 114:7
114:18 116:24
117:8 119:14
119:18,19
121:10,15
123:11,20
126:7 152:10
156:12,14,22
156:25 162:13
179:20 189:7
195:1 199:2,6
199:9 200:3
230:21 233:3,4
235:12 242:17
247:3,4 248:3

251:16 273:10
300:9
**needed**  16:6,14
23:23 24:17
25:24 26:1
46:2,4,15 53:7
74:19 98:22
114:2 151:2
173:11 177:16
177:18 200:7
266:25
**needing**  101:20
**needs**  25:20
111:19 246:6
270:10 300:19
**negative**  32:9
32:22,25 33:2
35:7,15,18
37:21 44:19
53:25 54:4,11
54:16 55:5,12
55:20 56:4,7,9
56:14,19,24
116:10,20
117:2,7,12
119:6 120:8,13
120:24 122:14
122:14,16,23
123:6 124:8,12
124:15,19,22
126:10,23
143:15 145:6
146:13 148:10
149:5 151:5

152:15,21,22
153:1,4,16
154:24 181:14
185:3,6,7
191:13,18
192:1,2,15
198:4,11,19
199:1,3,5,11
200:2,11 227:1
227:7,24 228:6
228:7 242:21
242:22,25
249:6,7,8,11,15
256:8,14,15
257:20,21,23
258:1,3,6,7
272:11,17
282:12,17
302:11
**negatives**  123:4
**negotiate**  37:3
**net**  33:4,11,14
121:15 197:22
273:14
**nets**  197:9
**neutral**  34:17
34:21,22,23
**never**  76:21
122:4 135:4
159:1,4 164:5
167:20,21
303:6
**new**  1:16 2:4,4
2:14,14 39:24

67:10 75:21
90:25 165:11
171:22,22
174:25 180:14
213:7 237:1
248:19,23
262:4 264:14
275:4 296:17
302:25 303:15
314:4
**nice**  80:7
128:10
**night**  129:1
**ningxin**  77:7,9
77:13,15,22
80:7 108:10
112:24 118:14
125:8,21,21
**nishad**  21:9
131:5 132:10
132:25 133:12
133:16 134:3
135:10 142:2
142:18 143:5
143:17 144:14
144:18 146:7
147:11 263:17
265:5 283:18
283:21 288:7
291:7 294:21
295:21 296:3,8
296:10 309:6
**nitty**  99:5

**non**  1:12 13:16
20:19 103:4
235:9
**nope**  216:9
**normal**  48:15
**normally**  48:14
295:25 296:12
**nosedive**  29:19
**notary**  1:15 5:8
314:3 316:14
316:21
**note**  4:4 5:17
168:4
**noted**  5:2
305:18 316:7
**notes**  183:11
**notice**  100:14
100:25 102:12
129:1 140:3,12
140:16,18
253:17 257:15
259:1 266:1,16
266:25 267:2
268:10
**noticed**  73:23
106:8
**notification**
101:21
**notified**  140:6
265:20
**notify**  16:9
67:8
**notional**  34:5
64:1

**november**  14:9
  20:22 21:14
  134:21 183:21
  219:9 314:17
**ns**  142:17 291:7
**number**  23:1
  37:17 38:1
  66:4 70:7 71:1
  73:9 76:14
  84:3 100:8
  107:20 119:24
  120:21 121:23
  151:14 152:21
  153:13,19
  166:13 171:12
  199:18 213:23
  262:8,14
  271:21 272:5
  279:15 306:3,9
**numbers**  47:10
  78:8 121:21
  195:4
**numerically**
  255:22
**numerous**
  164:18
**nw**  3:3

**o**

**o'clock**  118:16
  144:24
**oath**  4:24 5:23
**object**  7:17
  85:6 89:8

  100:1 168:25
  173:16 175:18
  175:18 186:22
  187:6 189:5,11
  194:24 196:14
  198:6 200:13
  202:4,10
  204:21 205:24
  207:4,21 208:1
  208:7 215:12
  217:12 218:14
  220:1 223:13
  224:15 225:22
  226:5,21 228:1
  232:9,23
  242:12,23
  243:7 246:21
  250:9 251:8,24
  255:11 256:17
  269:21 276:25
  282:21 283:11
  284:14 288:3
  289:16 291:14
  292:9 295:5,12
  298:17 304:24
  305:8
**objecting**  84:17
**objection**  6:5
  21:19 28:16,24
  29:5 30:13
  31:17 33:7,12
  33:13 34:9,19
  35:11 38:6,8
  48:9 51:11,18

  52:9,21 54:19
  55:22 56:20
  58:1,9 59:9
  60:8 61:9 62:1
  63:24 64:5,18
  70:16 72:5
  78:4 81:22
  83:5 85:25
  86:14 88:7
  91:8,17 93:7
  93:24 94:21
  96:3 99:13
  101:7 102:6
  103:22 104:18
  105:8 108:19
  109:1 111:21
  113:14 115:3
  120:4 121:24
  124:25 128:5
  132:19 135:12
  142:12 143:7
  144:9 145:4
  147:2,25 148:6
  153:8 154:11
  161:1 171:9,18
  186:6,14 201:2
  208:21 214:25
  218:11 220:8
  221:8,23
  227:18 241:8
  255:2 261:25
  266:18 281:14
  281:21 297:13
  299:16 307:21

**objections**  6:8
  87:9,24 96:14
**objective**
  216:15
**objectives**
  216:16,20
**obligation**
  100:15 129:6
  187:22
**obligations**
  187:4 188:14
  257:13
**obtain**  271:11
  298:23
**obvious**  180:3
  180:8,10
**obviously**  9:15
  13:21 23:19
  44:1 105:16
  106:16,20
  127:13 139:7
  167:16 224:18
  308:19
**occasion**  57:12
**occasions**
  227:23
**occur**  48:22
  50:11,14
  102:11 226:8
  228:8
**occurred**  49:18
  141:21 147:1
  147:22 148:14
  169:24 264:7

**october**   1:8 4:4
  24:8,12 25:6
  234:1,21
  309:20
**offer**   59:19
  103:5 161:19
  184:22 189:4
  241:2
**offered**   61:20
  74:2 78:10
  79:8
**office**   179:8
  296:4,4,16
**official**   77:19
**officially**   20:24
  21:4,11
**offset**   200:11
  200:16
**offsetting**
  196:11,17
  198:1 200:19
**oftentimes**
  25:18 215:4
**oh**   122:3
  153:24 266:7
  275:3
**ohtani**   14:24
**okay**   7:6,7 8:4
  8:5 9:9 22:12
  65:24 66:18,21
  68:4 69:24
  70:1,23 71:2
  100:5,9 105:3
  107:17 122:3

146:5 147:16
  151:13 167:14
  172:4 179:1
  183:13 190:22
  202:21 206:18
  210:9 215:10
  216:19 222:4
  222:18 223:2,9
  235:21 238:10
  244:23 245:14
  249:23 253:23
  260:14 262:17
  262:19 264:20
  269:7,12 272:2
  272:8 276:7,10
  276:18 278:13
  278:25 282:8
  284:9 285:6,10
  288:15 289:21
  290:6 293:17
  297:4,25 299:5
  308:3
**okex**   13:1,12,23
**old**   168:3
**older**   275:1
**omnibus**
  253:25
**onboard**   15:22
  173:11
**onboarded**
  15:14,25 16:4
  17:6 18:15,16
  163:3,5

**onboarding**
  98:3,4,8
  172:14 214:4
  215:3,8
**once**   21:7 53:22
  55:11 69:22,23
  93:14 106:15
  117:25 120:7
  120:12 128:17
  130:7 131:9
  169:21 172:21
  204:14 252:1
**ones**   86:5
  164:17 195:15
  288:10 295:7
**ongoing**   68:23
**onset**   220:10,17
  220:19
**oof**   133:3
**open**   10:4
  36:17 43:24,25
  55:3 63:21
  65:23 69:20
  103:19 104:5
  105:2 230:23
  249:4,5,16
  284:2,3 289:7
**opened**   55:9
  56:8 64:3
  244:13
**opening**   37:19
  248:19,23
**operated**   40:14
  103:12 224:22

226:1
**operating**
  30:24 171:21
  224:20 302:9
**operation**
  302:6
**operator**
  105:17 155:19
**opinion**   181:14
**opnx**   301:21,24
  302:2,7,21
  303:4
**opportunity**
  61:21 145:8
**opposite**   69:10
  145:11 151:9
**opposition**
  161:3
**opt**   60:24
**option**   77:2
  87:15
**options**   128:22
**order**   49:8
  111:25 115:6
  202:25 203:6,7
  203:9,25
  204:12,15
  206:12,19,21
  240:13 271:24
**ordering**
  194:15
**org**   175:2,8
  312:12

[original - paragraph]                                    Page 48

original  60:1
  108:16 236:13
originally
  194:5 300:12
ortiz  14:24
otc  14:12
outcome  5:1
  268:11 314:14
outen  298:1
outlined  26:5
output  118:6
outputs  118:4
outset  5:18
outside  27:19
  81:18 288:11
  292:7
outsized  36:3
  41:5 57:6,11
outstanding
  42:4,5 43:17
  43:22 44:13
  61:4 75:10
  192:13 198:10
  199:21 224:7
  247:13,14
  252:22
outward  14:4
overall  34:17
  35:13 54:16,21
  54:22 55:20
  56:3,6,14
  95:18 119:22
  120:8 153:6
  197:23 206:10

227:24 257:23
273:14 275:14
278:17 280:3,7
298:24
overcollat
  111:14
overcollatera...
  111:1
override  263:8
  263:12
oversaw  174:20
oversee  174:17
overture
  303:23
owe  124:18
  257:1,2
owing  257:13
own  28:15
  32:19 45:24
  46:9 102:24
  110:5,7,12,15
  130:15 145:16
  158:14 161:20
  188:21 193:13
  302:15
owned  294:12
ownership
  241:19
ox.fun  180:1,23
  301:24 302:2,8
ox.fun.  180:18
  301:18

**p**

p&l  55:2,17
  62:15 64:12
  230:10,20
  231:5 249:5,6
p.m.  228:15,19
  267:16,20
  269:1 300:23
  301:2 310:18
  310:21
page  33:15,16
  41:20 42:2,17
  44:6 45:2
  46:20 68:20
  70:23,25 71:4
  71:12 73:8,15
  73:19,19 81:7
  81:11 82:12
  86:12 88:6
  89:16,17,19
  91:10 92:6,6
  92:22 98:12,21
  100:7,20
  107:23 112:22
  132:8 135:21
  151:16 152:3
  183:3,12,14
  187:14,18
  188:4 191:4,10
  215:18 216:14
  216:24,24
  219:2,8 235:15
  235:24 242:8

244:2 245:12
248:12 254:7
254:15 257:4
260:15 262:14
263:3 272:5,13
272:15 274:23
277:6,12 282:7
282:9 285:14
286:5 288:16
288:22 290:6
290:10 291:7
293:1 311:3,10
315:4,7,10,13
315:16,19
pages  31:3 81:7
  98:13 141:11
  265:1
pagination
  183:15 219:4
paid  201:6
pain  161:24
  177:9
pair  62:15
  63:16 206:14
  206:16,22
pairs  63:15
panel  94:15
  149:22 150:2,6
  150:12,16
papering  166:2
paragraph
  86:11,20,21,24
  87:8,12,20
  88:4,5 100:23

102:17 170:18
187:17 188:3
188:10 242:8
254:16 266:21
270:6 277:21
298:3
**part** 11:9 16:22
71:4 80:20
90:6,20 99:18
102:23 115:10
133:20 134:12
145:22 146:2
151:16,25
152:5 155:5,6
187:18 188:8
188:22,24
194:8 197:4
203:11 236:10
236:14 237:25
238:22,25
245:2 254:7
264:22 302:14
**partial** 39:9,12
48:21,25 49:6
49:7 52:23
54:8,22 55:16
**partially** 39:13
**participant**
285:11
**participants**
4:9 66:13
224:1
**participate**
223:23

**participated**
60:4 223:5
227:25
**participating**
304:9
**participation**
158:22 180:22
310:4
**particular**
29:24 36:13
37:12 38:2,16
38:20 39:6
41:6 42:20
44:9,25 47:1
47:16 57:6
63:16 116:18
173:20 193:16
197:21 199:13
232:4 235:6
239:23 240:1
240:18 243:5
250:5 251:22
271:16 275:7
288:7 299:22
**particularly**
149:8
**parties** 4:13
5:21,21 11:16
93:15 314:12
**partnerships**
14:23,25 15:1
**parts** 99:12
172:15

**party** 1:12 4:25
217:6 218:5
**past** 92:2
**paste** 177:10
**patience**
262:20
**pay** 56:12 79:6
100:12,13
105:20
**paying** 76:19
304:8
**payment** 79:17
257:6,11
258:25 259:5
259:11
**payments**
231:14,16
251:12,18
252:2 258:20
259:2,9
**pd** 162:21
**pending** 8:3
**people** 20:14
60:23 74:18
105:23 137:7
166:20,23,23
166:25 167:1
177:17,22,24
182:9 201:10
210:3 228:4
237:23 273:21
286:23,24
287:25 293:8
298:20 306:2

**percent** 78:10
78:11,12,12
79:8,9,10,11,21
79:24 80:3,8,9
81:13 86:25
87:3 89:2,2
95:3 101:16
104:23 108:12
108:13 109:20
110:3,14,18,19
110:20 111:8
111:15,18
118:3,7 119:15
119:17 152:10
152:13 154:12
154:19 199:3
199:16,17
270:11 280:7,8
300:13,14
**percentage**
238:17
**perfect** 210:9
**period** 22:1
30:4 95:14
100:11 101:5
103:6 105:7
113:12 129:12
134:25 149:14
154:8 165:24
169:24 190:19
212:20 220:18
224:9 248:25
276:24 289:15
297:7

**periodic** 25:10
25:11
**permission**
9:13
**permitted** 87:6
**perpetual**
61:22 62:4,6
62:23 63:21
231:17,24
**person** 17:6,7
22:19 24:16,22
24:24,25 27:23
72:16 73:1
77:11 78:1
93:10 144:18
176:19 210:13
284:12 287:21
299:14
**personal** 194:2
212:23
**personally**
77:12 111:6
113:23 115:2
137:9 225:3
308:3,7 309:15
309:16
**personnel**
23:25 24:1
25:7 132:6
263:20
**perspective**
78:18 130:1
154:14 297:23

**phone** 26:25
178:2 308:8,10
308:12 309:5
**photo** 203:1
**pick** 83:16
**picture** 192:6
**piece** 180:12
**place** 4:13
56:23 111:20
115:14 136:12
147:23 153:4
153:20 154:3
238:3
**places** 254:25
**platform** 16:8
26:7 60:1,2
61:5 112:1
153:14 163:16
197:11,13
201:12 209:14
226:18
**play** 41:4 45:4
94:4 116:21,22
117:13,21
118:2
**player** 19:15
106:20
**players** 30:2
**please** 4:4 5:4
6:20 7:2,10
12:13 13:9
39:17 40:13
44:15 66:23
79:20 80:14

100:4 105:10
116:14 118:15
118:25 128:13
143:10 150:3
167:17 185:11
218:23 223:1
225:9 237:17
269:11 277:6
279:6 282:4
290:3
**pleased** 16:21
163:11
**pleasure**
158:25 310:7
310:14
**plenty** 155:7
**plus** 119:17
122:24 142:22
256:22 257:12
257:20 259:6
278:7,11
**point** 7:25 24:5
45:12 47:16
53:14 94:11
114:1 133:14
145:12 155:2
156:15 158:13
166:11,12
176:13 179:10
179:10 187:13
193:4 204:20
218:4 237:14
240:14 250:22
258:15 269:2

274:13,22
284:2 288:23
289:24 296:6
**pointed** 86:5
**policies** 216:16
**policy** 102:3,4
213:20 216:20
218:10,19,21
**pool** 61:10,13
224:9,11
**pools** 61:6
**pop** 9:2 271:8
**popped** 69:22
69:23 150:24
**portal** 28:14
31:13
**portfolio**
197:25
**portion** 52:25
53:6 70:13
73:2 88:13
116:3 265:16
**portions** 66:19
**pose** 144:1
**posed** 7:17
**position** 36:3,5
36:10,16,17
37:22 38:20
40:18 41:5,10
41:11,14 43:1
43:12 44:1,8,8
44:10 46:7
49:15 52:19,25
53:1,11,12

55:4,9,13 56:8
57:3 62:13,22
63:22 64:8,11
105:2 107:5
116:18,25
117:25 118:5
120:2 127:2
130:15 144:12
147:16,17
148:10 191:14
191:15,19,20
192:12,15
196:6 200:20
200:21,23
212:15 230:24
234:18 268:18
275:2,4,7
276:1 281:4,7
281:11,13
284:8
**positions** 30:11
37:10,19 42:6
43:18,22,25
44:4,25 45:23
46:5 48:7,18
49:25 50:5,20
52:3 53:7 57:4
57:6,11 61:24
102:10,21
103:19 104:5
104:22 114:13
116:2 119:6,7
119:7 124:24
125:3,5 130:6

130:12 131:11
148:12 150:7
190:25 191:9
191:22,23
192:22,23,24
193:2 198:1
223:11 242:21
244:6,7 247:13
248:20,23
249:4,6,14,16
267:11 268:17
281:16 282:24
289:8
**positive** 32:5
35:10 38:11
41:2,17 42:10
42:12,22,23
43:4 53:24
54:10,15 117:4
122:20 124:9
143:12 150:25
153:7,10,13,19
154:7 166:4
192:2 195:17
195:19,23
196:8,10,20,24
197:7 200:9,24
201:24 227:8
247:11
**positives** 123:3
123:6
**possible** 53:6
127:15,17
146:23 215:10

215:14 268:11
**post** 100:12,13
183:22 184:7
301:13
**posted** 266:12
**posts** 181:19,23
182:12,17,20
182:20 183:5,5
184:3,21
218:25 312:13
312:14
**potential** 102:9
178:13,19
267:6
**potentially**
31:4 32:5,9
185:21 296:24
**practice** 174:6
174:17,19
176:4 194:2
214:19
**precise** 191:7
256:12
**precisely**
158:16
**prefer** 129:19
**preference**
186:4,12
**premarked**
213:9
**premium** 231:1
**preparation**
160:4 305:13
305:15

**prepare** 12:1
**prepared** 11:3
84:25 85:3
89:7 168:24
173:8,15
**preparing**
164:14 166:6
173:7 235:4
**prepetition**
207:17
**present** 3:10
**presented**
145:8 247:20
255:7
**pressing**
241:23
**pretty** 68:25
131:5 133:10
160:16 174:23
174:24 175:10
179:5 192:7
242:14,17,18
243:2 276:3
296:5
**prevent** 114:8
**previous** 24:13
68:22 69:2,3,8
90:3 188:22
278:23 279:5
**previously**
21:17 165:14
167:7 170:6,8
189:20,22,25
213:13 264:13

276:13,14
**price** 29:18
30:3 42:24
55:7 62:14,16
62:24 63:1,2,3
63:6,13,17
229:8,9,17,17
229:18,20,20
229:22,24,24
229:25,25
230:3,8,9,10,11
230:22 231:1,3
231:4,6,6,9,11
231:12,20,23
232:1,12,13,14
232:20,22
233:1,5 272:21
272:25 273:2,5
273:6,7,12,12
273:18 274:9
274:23 275:3,5
275:5,12,12,13
275:25 276:1
277:10,25
278:7,7,9,10,11
278:12,16,17
281:4,7,9,12
283:20 284:18
**prices** 284:12
**primarily**
22:13
**primary** 22:18
26:15,24 166:9
234:18

**primetrust**
217:24
**principal**
235:16 236:1
257:11 259:6
259:10
**principle**
257:19
**prior** 21:15
108:24 132:17
134:5 148:13
148:21 162:14
207:16,18
251:2 260:22
261:3,23
287:23
**prison** 303:19
**privilege** 241:1
**privileged**
240:25
**privy** 295:21
**pro** 159:12
280:2,5
**proactive**
145:15
**probably** 176:7
193:18 222:22
222:23 248:9
265:7 281:23
281:25 292:2
292:14 305:25
309:18
**problem**
139:14 168:19

293:18
**procedure** 6:1
**procedures**
261:10
**proceed** 5:5
9:12
**proceeds** 34:11
**process** 49:19
49:20 51:3,24
52:1,2,6
110:17 131:2
136:9 147:11
147:14,15,18
147:21 158:9
214:5 215:3
224:12
**processed**
219:16
**produced**
139:7 141:7
175:3,20
213:22 234:1
264:13 276:16
285:5 296:25
**product** 14:1
14:18 15:19
16:10,16,19
67:10 163:13
223:18 231:7
**professional**
213:2
**professionally**
213:4

**program** 12:21
32:21 59:20,24
59:25 169:14
222:7,8,14,15
223:6 226:1,3
226:14 227:15
227:25
**programmer**
163:25
**programmers**
164:3
**prompted**
74:11 309:3
**pronouncing**
209:25
**pronunciation**
222:13
**proof** 160:23
161:3
**proper** 27:18
**properly**
157:13 187:24
188:6,19
**proposed** 89:5
**proposing** 76:8
300:2
**protect** 56:23
**protection**
41:14
**protections**
56:18,22
**protective**
146:20

**proulx** 2:15 6:4
6:15,16 9:11
9:20,24 10:2
21:19 28:16,24
29:5 30:13
31:17 33:7,12
34:9,19 35:11
38:6,8 48:9
51:11,18 52:9
52:21 54:19
55:22 56:20
58:1,9 59:9
60:8 61:9 62:1
63:24 64:5,18
70:16 72:5
78:4 81:22
83:5 84:17
85:6,25 86:14
87:9,24 88:7
89:8 91:8,17
93:24 94:21
96:3,14 99:13
100:1 101:7
102:6 103:22
104:18 105:8
108:19 109:1
111:21 113:14
115:3 120:4
121:24 124:25
128:5 132:19
135:12 137:18
139:12 142:12
143:7 144:9
145:4 147:2,25

148:6 151:19
151:23 153:8
154:11 156:9
156:11,21
157:11,15
184:8 212:1
228:10,21
241:4 267:12
267:22 297:12
297:21,25
300:17 301:4
309:24 311:4
**provide** 8:14
17:15 19:19
24:20 108:6
126:14 176:25
209:13 215:16
232:18 233:8
271:20
**provided** 47:3
57:19 67:24
68:17 70:10
85:5 141:15
203:5,16,20
216:12 266:25
277:16 307:24
308:24 309:8
**provider** 49:5
49:10 53:18
279:21 280:3
**providers**
217:6 218:5
277:17 279:14
279:16 280:11

**provides** 90:9
143:12 225:15
278:2
**providing**
47:14 203:22
216:11 268:9
**provision** 59:7
250:6 258:24
269:17 270:24
271:17
**provisions**
208:5 240:18
241:19 250:3,7
254:6 269:14
269:18
**public** 1:16 5:8
135:4,4 182:20
314:3 316:21
**publicly** 137:4
175:3 182:16
298:21
**published**
164:11 168:16
**pull** 39:17,24
65:14 69:14
83:8 84:1
107:14,17
114:6 116:3
120:14 126:9
127:7 130:20
130:22 131:2
137:16 138:8
140:23 145:5
145:16 185:15

189:20 236:23
266:22 269:10
273:9
**pulled** 83:11
130:8 131:9
145:19,21
272:10,16
282:11
**pulling** 65:22
70:1 84:11
116:9 129:22
130:3 179:23
184:14 268:19
272:7 293:14
**punchier**
255:16
**purchase**
206:20
**purely** 76:14
213:8
**purports** 234:4
**purpose** 19:9
46:19 60:1
142:8 177:2
198:1
**purposes** 76:15
108:8 197:23
213:8 251:20
**pursuant** 10:11
156:6 225:25
226:13 227:15
269:18 270:21
284:10

put 21:9 23:9
  23:21 25:17
  33:20 35:20
  47:23 86:22
  94:14 100:19
  105:3 121:13
  122:17 143:14
  145:9 168:19
  173:3 176:21
  177:11 180:11
  189:19 201:5
  203:23 221:5
  238:2 247:3,4
  253:15 256:24
  260:18 264:9
  279:11 290:2
  304:22
putting 34:15
  280:10
pvp 277:3,10

**q**

qualified 26:13
quality 4:6,7
quantity
  281:10
question 7:9,9
  7:11,12,17,19
  8:3 17:12
  45:15 47:13
  80:1 96:8
  98:22 100:10
  101:4 108:21
  111:13 144:2

157:24 165:16
167:18 172:5
173:13 175:14
175:21 178:15
182:18 202:22
209:24 220:14
223:4,7 234:10
237:11 241:23
246:16 255:13
265:4 269:15
269:15 270:2
285:7,21
286:13 288:21
289:4 290:7
294:1 297:17
297:20 304:10
questionnaires
25:19
questions 7:3,8
  8:16 23:12,22
  24:21 67:2
  98:15 156:3,6
  156:10 162:11
  207:15 222:6
  228:23 234:16
  255:15 260:21
  297:14 300:21
  310:1,2
quick 8:7 83:12
  96:6 127:6
  137:16,19
  307:1
quicker 212:13

quickest 67:3,5
  93:20
quickly 13:9
  69:15 99:21
  101:25 139:18
  272:2
quiet 287:21
quinton 176:14
quit 13:25 14:9
  20:23 21:2,4
  133:19 134:13
  134:15
quite 133:10
  168:3 187:9
  225:4 232:25
  236:20 241:6
quote 242:9
  245:19
quoting 233:25
  265:18

**r**

r 315:3,3
radio 270:18
raise 79:14
raised 254:11
ran 14:22
  253:14
range 296:24
rata 280:2,5
rate 60:25 61:3
  74:2,4 75:3,6
  76:5,10,19,25
  77:4 78:21

79:4 81:12
85:14 87:17
88:10 89:3
94:6,7,10 95:3
95:11 101:19
205:16,17
224:6,8 226:9
231:22 250:11
299:10
rates 90:23
  94:15
rather 193:5
  273:24
ratio 75:4 76:4
  76:9,16 78:23
  78:24 79:2,9
  79:11 116:24
  117:8,16 118:8
  235:13 298:7
  299:7,8 300:6
  300:8
ratios 74:19,22
  75:2,8
reach 18:25
  25:16 42:24
  50:4,25 67:9
  74:11 127:24
  140:10 248:3
  251:16 259:8
  286:25
reached 180:1
  189:16 195:4
reaching
  130:10

**read** 102:22
139:8 150:10
150:16,19
161:4 257:9
264:23 302:11
316:5
**readily** 248:3
**reading** 247:17
**ready** 160:8
**real** 8:7 81:3
96:6 290:14
**realize** 115:12
**realized** 55:18
**really** 23:19
36:16 53:9
99:21 125:7
127:18 128:18
129:19 149:7
155:1 166:17
174:18 176:4
177:25 179:13
181:13 188:15
210:2,18
224:17 286:6
288:11,12
303:6 307:10
310:3
**realm** 173:1
**realtime** 55:2,2
295:9
**reason** 8:1,13
87:14 118:20
134:12 153:13
159:16,18

177:4 184:25
208:10 214:22
215:16 266:23
270:14 280:19
280:25 282:2
283:4 292:17
295:15 315:6,9
315:12,15,18
315:21
**reasoning**
307:15
**reasons** 171:15
180:3,8,10
184:23 201:3
291:18
**rebuild** 264:4
**recall** 11:21
26:2 27:7,9,21
27:21,22 28:8
28:12,15,17,18
33:9 47:19
48:2 65:10
74:8 77:10
80:18 81:1,17
84:25 92:20
97:23 113:11
113:15 123:15
125:12 126:18
133:4 141:24
146:5,25 160:9
164:17 165:22
165:23 171:5
171:15 173:19
178:8,22

184:19 190:4
190:25 212:13
214:15 222:8
222:10 223:7
223:11 228:24
229:9 234:24
235:4 236:17
240:7,8,17,20
241:10,16,23
242:2 250:21
265:22 274:13
283:19 284:11
286:3 287:22
288:6 294:19
295:14 301:8
301:19 305:2
306:16 307:18
309:19
**receive** 58:24
187:2 271:25
275:6 280:8
**received** 10:22
12:7 186:19,25
266:1 280:12
**receiving** 15:16
**recent** 183:4
195:10 306:12
**recently** 219:17
249:24
**recess** 157:7
**recipient** 255:8
**recipients**
247:21 255:19
263:21

**recognize** 40:9
66:5,16 70:8
84:9,20 167:19
202:23,24
203:1,25
285:19 297:1
**recollection**
27:2 28:22
47:14 66:12
78:3 105:5,11
132:2 136:8
148:2 192:10
254:13 265:13
**recommend**
125:7
**recommendat...**
144:6
**recommending**
144:11
**record** 4:3,14
5:3 6:3,20 7:5
9:22 69:13
70:2 79:19
83:18,19,22
103:25 137:22
138:1,2,5,16
139:11 149:25
157:2,5,6,10
159:14 165:19
167:15 168:4
168:11 170:15
180:9 182:15
184:13 202:16
211:18,21,22

211:25 228:13
228:16,17,20
233:23 267:17
267:18,21
274:1 300:24
300:25 301:3
310:17 314:9
**recorded** 4:11
4:15
**recording** 4:6
4:12
**records** 68:17
158:15
**recovery** 2:3
5:15 67:24
159:10 162:5
186:5,13
**recreate** 158:14
**recredited**
227:16
**recross** 310:2
**red** 95:18
143:14
**reddit** 14:6
**redeemed**
197:18
**reduce** 53:25
54:4,16 76:25
77:3 79:16
96:17 112:20
112:25
**reduced** 43:15
53:3 137:8

**reducing** 107:4
107:5 116:2
**reduction**
118:11
**refer** 36:22
47:22 91:2
115:16 163:18
169:8 191:21
195:10 201:15
213:10 220:16
222:18 245:7
256:1
**reference** 62:24
63:1 121:19
164:9 229:17
**referenced**
47:23,25 66:9
114:18 135:8
135:21 233:12
270:25
**references**
170:17
**referencing**
262:3 277:3
**referred** 26:14
73:4 141:20
180:7 181:22
184:4 185:20
248:17
**referring** 50:18
52:13 63:1,2
99:24 152:23
178:16 182:3
183:15 187:10

190:19 201:17
211:3,4 219:3
231:15 236:24
237:8 240:1
245:9,10,12
270:24 290:16
**refers** 205:9,11
205:14 216:19
235:16 258:24
277:15 286:8
291:25
**reflect** 75:3,12
182:19 193:6
196:11 236:8
**reflected** 31:16
32:6 67:14
81:18 88:4
116:8
**reflects** 89:1
92:11 175:24
**refreshing** 9:8
**regain** 183:24
**regard** 292:8
**regarding**
21:17 83:3
103:18 104:4
140:13 180:5
184:22 186:20
187:11 192:8
240:9 241:19
250:3 268:1
288:1 293:7,12
295:9 305:23
309:17

**regional** 166:22
**regular** 25:12
**regularly**
258:25
**regulated**
219:24 220:6
**regulation**
219:10 220:24
**regulations**
219:25 220:6
221:5,12
**regulators**
219:10,18
**reimbursement**
304:23
**reimbursing**
304:8
**rejoin** 133:21
**rejoined**
134:19
**relate** 193:1
242:6
**related** 4:24
74:14 161:23
172:24 177:14
191:25 194:20
198:11 231:17
234:13 252:12
253:2 283:2,5
307:25 314:12
**relates** 164:20
192:4
**relating** 169:13
241:18

| | | | |
|---|---|---|---|
| **relation**  161:18 | 135:9 146:7 | **repaper**  76:3 | 218:6 231:24 |
| **relationship** | 148:8 175:10 | **repapered** | 232:2 237:6 |
| 18:2,8 22:19 | 178:10,12,18 | 90:18,24 91:4 | 264:24 269:16 |
| 61:7 166:10 | 196:5 203:21 | **repapering** | 269:17 280:6 |
| 179:3 181:1,13 | 214:16 215:9 | 74:22 75:13,16 | **representation** |
| 181:15 212:24 | 215:15 229:3 | 82:5 237:20,21 | 84:19 139:13 |
| 213:3 215:5 | 235:7,8,10 | 237:25 238:8 | 157:23 168:7 |
| 234:18 251:21 | 236:12 237:22 | **repay**  293:10 | 203:3 |
| 282:16 301:7 | 237:25 275:20 | 293:15 | **representative** |
| **relationships** | 299:23 305:20 | **repeat**  61:11 | 77:16,19 |
| 17:23 | 309:3 | 96:7 108:20 | **representatives** |
| **relative**  181:24 | **remembered** | 168:9 185:19 | 25:13 26:16,21 |
| 206:16 257:21 | 293:7,12 | 186:24 255:13 | 27:1 97:20 |
| **relays**  240:25 | **remind**  234:17 | 261:2 281:8 | 98:16 |
| **relevant**  37:17 | **remorse**  303:10 | **report**  174:5 | **represented** |
| 37:25 38:1 | **remotely**  4:19 | 176:4 296:23 | 62:8,11 86:11 |
| 140:9 231:6 | 5:19,24 6:24 | 297:5 | 159:19 204:23 |
| 275:14 300:10 | **removal**  271:13 | **reported** | 226:24 242:19 |
| **relogging**  9:25 | **removals**  264:2 | 173:23 174:11 | 243:3,5 280:17 |
| **relying**  130:6 | 264:4 | 176:3 | 280:21 281:19 |
| **remain**  20:20 | **remove**  59:14 | **reporter**  1:15 | 282:18,19 |
| 54:17 55:15 | 87:13,21 | 4:22 5:4,23 | 304:3 |
| 111:19 | 112:25 113:19 | 6:25 157:1 | **represents** |
| **remainder** | 140:5 143:13 | **reporting** | 199:19 205:16 |
| 156:16 | 150:13 165:8 | 175:16,22,25 | **request**  65:2 |
| **remained**  153:7 | 265:19,25 | **reprehensible** | 100:12 108:22 |
| **remaining** | 270:12 | 180:17 | 214:21 215:17 |
| 196:3 258:5 | **removed**  268:3 | **represent**  5:14 | 270:15,17 |
| **remains**  153:4 | 270:21 291:21 | 45:7 77:21 | 271:18,22 |
| **remember**  28:3 | **removing** | 84:13 157:17 | **requesting** |
| 28:8 47:6,8 | 87:15 113:17 | 157:19,20,25 | 173:20 270:25 |
| 48:5 73:25 | 267:4,8 | 158:1 183:2 | **require**  37:23 |
| 81:24 83:2 | **repaid**  227:16 | 190:2 199:18 | 116:19 199:14 |
| 98:6 125:2 | | 205:7 213:17 | 271:19 |

**required** 36:4,5
50:22,23 55:13
79:15 100:23
199:20 221:6
266:16 307:14
316:14
**requirement**
38:16 39:5
46:6 48:21
53:2 59:11
62:21 73:25
76:23 77:1
78:25 79:5,7
79:14 85:15
86:23 94:6
103:3 106:5,10
109:21 110:4,9
110:18,19,20
110:21 115:20
117:22 119:21
147:8 199:15
242:6 248:19
270:5
**requirements**
26:11 35:13
36:12,18 38:13
39:9,12 46:21
48:24 49:2,24
50:16,18 51:7
51:9,15 53:3,5
53:16 54:7
59:6,13 87:7
87:22 90:23
100:25 102:14

103:17 104:3
104:10,12,15
104:17 105:1
105:24 114:20
115:2 116:11
130:11 131:11
152:15 192:24
192:25 198:2
221:11,18,21
221:25 235:12
252:23
**requires**
221:19
**requisite** 20:5
**research**
279:17,20
**reserve** 87:12
270:12
**reserves** 271:21
**reset** 156:13
**resign** 211:8
**resigned** 14:15
21:11,25 135:3
**resolve** 129:20
**resource** 9:14
**resources**
133:23,24
**respect** 23:6
24:10 25:5
27:11 34:17
47:1 52:18
59:1,6 61:18
82:7 128:3
241:17

**respond** 78:9
80:13 93:20
109:9 110:23
111:15 113:4
114:18 116:1
118:15 121:2
122:1 123:19
125:6 126:13
128:17 129:3
133:3 134:14
143:9,22 155:8
155:8 180:3
303:24 304:1
306:6,8
**responded**
177:24
**responding**
98:15 107:9
125:7 129:13
132:11 136:25
143:23 146:18
180:7 290:24
306:2
**responds** 73:2
112:24 133:1,2
135:22 136:18
144:14
**response** 72:8
77:7 78:6
98:24 100:7,19
101:4 102:18
120:25 121:17
121:18 123:10
123:20 125:8

125:13 126:6
126:21 127:11
128:14 136:17
146:10 154:18
289:6 291:5
303:25
**responses**
142:17 177:21
286:23
**responsibilities**
24:10 162:24
163:1 217:1,4
**responsibility**
166:9
**responsible**
13:19 14:3
164:13 166:21
**responsive**
134:16
**rest** 159:15
245:4
**restrictions**
221:5
**result** 33:25
38:17 120:1
124:22 153:19
227:8 268:5,20
273:13
**results** 246:19
275:14
**retail** 169:2,5,7
**retention**
253:18

**return** 303:16
**returning**
12:23
**revert** 108:23
**review** 74:15
74:24 75:10
90:17 106:13
139:10 215:19
215:22
**reviewed**
139:21 179:22
216:10
**reviewing**
173:7 216:4
**reviews** 279:9
**revised** 81:20
83:3 95:11
**revisit** 76:2
**revolve** 175:15
**rhyme** 177:4
**richard** 132:3
135:22
**rid** 114:10
**right** 8:9,11 9:8
46:24 57:25
65:23 67:23
68:7,24 70:21
70:25 71:1
73:9 76:16
81:8 87:12
89:7 91:12,21
107:21 109:25
111:15 118:21
120:3 121:23

122:4,10 123:2
124:7,16 128:4
128:6,12
134:12,15
136:17 141:13
142:23 152:16
156:17 158:7
159:2,7,17,20
159:25 168:12
172:1 182:7
183:16 185:4
186:21 195:13
195:25 200:10
200:12 211:5
218:4,20 219:3
221:13 225:8
225:14 227:10
235:2 238:13
238:17 244:20
245:17 248:20
251:4 253:22
257:24 260:4
260:15 262:22
264:9 267:7
270:12 271:17
271:22 272:5
273:17 278:8
279:10 281:23
282:1 287:11
290:9 301:15
306:25 308:1
**rightly** 305:18
**rights** 185:9

**ringing** 27:5
**risk** 145:14,16
**risks** 30:10,16
**roger** 302:16
**role** 23:6 25:4
72:4,14,21
174:5,17,20
239:9
**roles** 217:3
**room** 155:4
**rough** 220:18
265:19
**roughly** 54:23
90:2,8 195:24
212:14 232:20
232:22 288:22
**routine** 148:24
**routinely** 16:11
**rule** 37:5
**rules** 5:25 6:23
103:14 159:10
160:18
**rumor** 135:23
**rumors** 106:18
286:8,12,14
287:2 291:4
293:7,12
**run** 164:6
225:2
**running** 16:11
67:4 224:19
225:6 308:18
**runs** 100:14
252:20

**ryan** 131:7
133:11 142:2
174:15 181:10
181:10,11
182:4 209:22
210:10,12
211:7,11 212:3
215:23 216:3,6
220:21 286:4
290:13 291:25
293:1 294:4
309:6
**ryan's** 291:1

**s**

**s** 2:7 206:15
311:7 315:3
**s&c** 184:23
189:9 223:5
264:24 306:13
306:20 307:3
307:24 308:6
308:25 309:8
309:10,16
**s&t** 161:10
**safeguarding**
213:18 220:20
**salame** 131:8
174:15 181:10
209:22 210:1,3
210:4,8,11
215:23 290:13
291:25 294:4

salame's 212:3
286:4
salami 210:3
sale 34:1
275:12
sales 13:23
14:7,12,18,21
22:9 162:19,21
162:21,25
164:14 173:6
173:24 174:21
sam 8:18 21:9
39:16 65:13
69:14 83:8
93:9,13,14,18
93:19 131:6
133:1,1,12,12
133:14,14,17
134:13,14,15
136:4 137:3,17
138:8,14
140:23 142:3
147:11 168:3
174:22 201:4
265:6 283:18
295:20 296:1,2
296:8,9,11
samuel 2:9
285:2
sat 296:3
satisfied 15:15
26:3 38:3
satisfy 224:6

save 193:15,22
193:22
saved 253:1
saves 208:14
saw 85:23
106:15 107:2
126:21 136:13
147:6 155:21
188:1 293:13
309:5
saying 7:1 9:19
34:20 109:10
110:10 113:7
113:18,19
118:16 119:20
119:24 122:6
122:11 124:3,6
130:18 136:4
143:11 152:24
153:12 154:16
181:10 182:4
195:2 198:19
198:23 203:16
214:11,12
218:17 223:1
240:5 257:19
258:13 259:4
260:2 269:23
272:24 281:15
281:18,25
282:23 298:19
303:5
says 43:16
46:14 68:20

71:6,18 80:7
89:19 100:11
108:11 118:14
121:11 133:3
136:19 142:21
165:12 170:11
183:16 188:4
188:23 204:3
215:19,23
216:8,15,25
217:5 218:4
219:9 244:25
263:7 266:22
272:10 275:16
277:21 285:25
288:23 290:13
291:7 293:2
303:10
sbreggia 3:7
sbtc 206:15
scam 180:18
scammed
180:19
scenario 51:14
127:5 226:20
271:10
scenarios 230:6
schedule
253:16
schoening
299:13
school 12:14,15
12:19

scope 15:4
scrambling
293:9,21
scratch 191:17
screen 4:10 9:3
9:15 192:18
193:17 244:3
245:10,13,16
248:1,14
screenshot 40:8
41:19 44:5
46:12 47:2,7
47:15 121:10
121:16 141:12
screenshots
141:6,16
scroll 45:1 69:8
82:11 190:23
191:3,4,10
scrolled 41:20
44:6
sdarby 2:9
sdny 11:14
194:6
search 308:18
searched
308:21
sebastian 176:9
sec 11:14
182:23 249:21
second 69:13
84:11 100:6
166:13 178:17
183:20 195:21

198:15 238:25
244:23 254:6
254:16,17
264:13 272:9
272:13,15
282:10 286:5
**section** 46:14
99:5 205:7
215:19 216:15
216:25 235:15
245:21 249:25
257:4 266:21
270:7,9,21
**sections** 205:1
**security** 233:24
**see** 9:4,16
30:21 31:4,11
33:4 40:24
41:22 42:1,17
44:9 45:3 49:7
55:10 57:5
62:19 71:9
74:6 76:2,6
77:2,7 78:13
80:4,11,16
81:15 89:21
91:14,18 92:5
92:8,9 93:1,2
97:21 98:25
99:7,21 100:16
100:20 101:1
102:15 103:8
103:21 104:7
107:25 108:3,9

108:14 109:7
109:13 111:2
112:2,21 113:2
113:9 114:22
116:5,12
118:23 121:5
121:10,11,15
122:6,9 123:13
123:22 125:10
125:18 126:16
128:25 129:24
132:12 135:24
136:5 138:19
141:8 142:2
143:2,20 144:4
144:15,25
149:23,24
150:7,8 151:15
152:5,18
153:13,23
163:16 165:23
176:18 183:23
184:1 188:8,12
189:2 190:24
191:9 204:4
205:4 213:21
215:20,25
217:8 218:7
219:13,18
234:3,7 235:19
236:3 244:13
244:17 245:1,2
245:5 246:10
247:5 249:12

254:18,22
257:17 263:10
266:7 268:2
272:11,18
273:7 277:2,23
278:4 280:4
282:13 286:9
289:4,10 292:4
294:6 298:12
**seeing** 9:15
47:18 119:13
121:21 122:11
124:7 142:4
150:9 163:8
168:11 198:12
277:10 284:11
294:19
**seek** 121:1
**seeking** 108:22
**seems** 47:17
96:7 168:3
298:10 299:2
**seen** 4:9 10:21
10:25 64:20
84:18 153:19
167:20 168:14
168:17 191:12
191:13,15,18
191:19,20
219:15 252:17
264:21
**segregated**
217:23

**selected** 283:9
**sell** 32:19,22
53:24 54:3
204:4 260:24
261:7
**semester** 12:20
12:22 13:4
**send** 25:18,21
127:22 209:15
259:1
**sending** 187:21
193:18 209:15
235:5
**sense** 67:12
111:11 125:2
132:23 147:5
156:7 167:25
176:25 177:15
181:8 283:15
**sent** 67:17,21
82:19,22 93:12
93:17 99:17
126:18 133:20
138:23 139:20
139:25 179:19
192:7 265:15
266:13 309:9
**sentence**
103:24 188:23
244:24
**separate** 46:23
51:6 103:16
104:2,11
145:23 170:20

170:24 171:2
245:9
**separately**
295:25
**september**
97:17 98:11
212:17 285:4
309:19
**series** 142:17
**serve** 10:19
**served** 162:5,8
187:24 188:6
188:20 194:6
**serves** 275:24
**service** 15:16
18:5 163:12
166:14 169:18
169:21 170:3
170:12,16,20
170:25 171:3,7
171:14,17
172:1,6,16,20
183:3 208:5,12
240:10,15,21
241:12,18
**services** 176:23
**set** 36:24 37:1,2
189:14 254:20
314:7,17
**settle** 231:11
233:4 251:17
**settlement** 55:3
230:11,21

**seven** 68:7,11
**several** 127:24
211:9 230:2
**shafted** 302:23
**shape** 307:2
**share** 9:6,19
39:24 132:24
173:9 260:8
280:2 288:12
**sharing** 106:23
156:13
**sheets** 173:14
173:21
**shift** 298:10
**shires** 173:2
**shit** 180:12
181:4
**shoes** 214:20
**shohei** 14:24
**short** 7:24 30:4
124:8 146:14
151:1 156:8
256:4,6,21
261:13 267:12
270:4 278:20
279:3 281:24
296:23
**shortcutting**
262:25
**shortfall** 87:4
87:17 115:22
115:23 124:14
152:11 180:6
252:24 256:23

**shortfalls**
135:17
**shorthand** 1:15
**shot** 192:18
193:17 244:3
245:10,13,16
248:1,14
**show** 41:3,16
44:7 62:13,14
62:15,16 67:22
68:6 69:6
181:16 182:10
206:15 227:2
233:13 276:8
284:20
**showed** 9:9
106:3 180:15
244:3
**showing** 9:17
44:24 155:14
193:19 252:24
**shown** 62:12
86:20 162:2
262:7
**shows** 44:2,21
45:8 46:3
193:7 206:12
206:13 220:21
232:19 259:22
259:24 264:1
293:11 303:10
**side** 113:24
163:14 169:6,7
173:3 222:21

222:23 239:12
239:14 279:12
300:4
**sides** 206:13
**sienna** 2:10
**sigma** 97:21,23
97:24,25 98:16
102:4
**sign** 90:25
91:20 93:19
151:7,7 155:19
286:24
**signal** 20:12
131:23,24
133:9,11 135:7
136:14 137:12
141:12,16,19
141:25 142:7
144:23 176:24
177:20,23,23
285:17,22
286:4,7 288:6
290:8,10 294:2
294:20 296:13
296:14 308:22
**signature** 92:25
93:11 314:20
**signed** 90:21
91:15 93:13,14
152:9 220:21
**significant** 26:6
26:8 298:10
**signing** 93:18

signs 92:21
silence 201:11
  201:12 270:18
silent 201:10
silly 209:24
silo 261:13
silos 39:3
similar 47:18
  139:19 206:18
  206:21
simple 23:12,22
  24:20 99:11
simplified
  99:17
simplify 229:16
simply 102:12
  136:24 202:22
  269:16 307:18
simultaneous
  225:21,24
  226:3
sincere 304:19
singh 132:10
  135:10 288:7
  291:7
single 105:2
  230:14,17
sir 6:3 7:13,21
  8:4,12,17 9:7
  10:9,14,22
  11:5,20 12:6
  12:11 13:8
  15:3 21:21
  24:8 26:18

31:20 33:8
38:7 40:10
42:7 47:25
50:9 66:11
70:8,18,20
73:6,12,21
76:6 83:6,9
84:10,23 86:18
89:12 91:24
96:5 99:7
101:10 102:15
107:11 139:16
139:23 140:7
141:18,23
151:22 155:11
156:1 159:18
159:21 160:1
160:14,25
161:5 163:23
164:1,4,8,16
165:21 172:3
184:7
sit 149:10
sitting 268:15
  268:23
situation 47:19
  123:12 133:7
  135:11 142:9
  142:15 145:13
  268:11 291:1
  303:23
six 112:15
  123:8 129:18
  217:4 230:24

sizable 126:8
size 37:22
  40:18 53:1
  57:3 62:13
  85:12 98:7
  110:24 112:20
  112:25 114:4
  155:5 235:10
  235:13 281:4
  300:10
sizes 107:5
skim 213:24
skip 159:12
skipping
  235:25 262:24
slack 115:17
  131:22,25
  132:1,4,5
  135:14,19
  176:23 177:11
  177:19,22
  252:21 253:17
  253:19 296:16
  296:24
slackbot
  105:22 106:3
  115:9,16
  252:16,20
  253:2,8,11
slandered
  181:10
slat 252:11
slight 232:16

sliu 2:11
small 86:7
  96:18 167:22
  169:9 174:22
smaller 53:1
snowball 137:5
socialized
  49:16,17
sold 33:19,22
  54:10,16
  259:17 261:21
  272:22 273:13
  278:18 280:24
  281:4,5,8,10,11
  281:13,22,25
  282:20,24
solely 53:10
  63:18 162:12
  297:21
solidly 18:17
somebody
  17:11 22:22,24
  24:18,19 27:15
  71:5,21 72:1,9
  73:3 77:23
  80:14 97:25
  98:2,4 193:19
  223:19,20
somewhat 18:1
  273:18
sophia 3:6
sophisticated
  30:7

**sorry** 21:21
42:7 44:11
50:3 60:20
61:11 86:1
88:8 89:11
108:20 109:17
122:3 168:9
178:10 185:12
185:19 186:8
186:24 191:16
198:24 209:19
218:3 237:16
240:11,11
244:18 248:7
261:2 272:15
277:6 281:8
288:11 308:11
**sort** 25:12
160:7 191:8
263:13 294:20
**sounds** 131:25
298:19
**sources** 293:15
**space** 19:16
287:20
**speak** 10:20
17:7 27:20
45:20 71:24
161:10 216:6
287:18
**speaker** 80:23
**speaking** 70:15
178:18 208:23
223:15 228:25

273:11 305:17
**special** 273:4
**specific** 27:4
28:9 31:1 33:1
35:17 47:7
58:11 59:25
82:9 90:12
94:3 135:18
142:15 160:12
161:22 172:14
191:23 195:5
202:25 203:15
203:24 221:17
229:2,5,9,19
239:10 240:5
253:11,12
260:21 270:24
283:9 284:11
287:8,23,25
**specifically**
13:22 45:12
50:5,18 52:14
53:21 101:15
121:16 142:4
160:21 164:21
187:9 191:24
192:5 193:1
205:21 206:1,3
206:5,9 211:5
223:16 228:4
278:3 282:9,25
306:16
**specifics** 85:11
85:17 92:14

148:7 160:11
171:13 186:17
221:11,15
**specified** 59:6
**specs** 248:9,11
248:16
**speculating**
297:19
**speculation**
143:8
**spent** 297:7
**spilled** 211:15
**spin** 167:17
**spirit** 129:7
**spoke** 72:1
176:16 178:23
237:17 301:10
**spoken** 159:2,4
160:3 161:6,13
161:16 306:21
**spot** 31:22
32:12,13,15,20
32:25 40:24
41:2,11,17
42:4,10,11,12
42:22,23 43:4
43:5,8,12
44:14,17,20,22
45:23 46:4
48:18 50:4,20
52:12,19 53:19
53:20,22 54:10
54:12,14 58:18
60:14,16,19,20

63:13 88:22,23
88:24 119:7,7
121:3 122:10
122:12,19,20
122:24 192:13
193:2 195:18
195:19,23
196:8,10,20,24
198:10,13,20
199:8,13
205:13 222:15
222:17,18,20
222:24 223:16
223:18,23,25
224:12,20,22
225:11 226:1,3
226:13 227:15
227:25 228:4
243:16 244:4,5
244:16 245:1
247:8,9,11,15
248:15 249:10
249:12,16
250:19
**spread** 181:4
287:2
**spreading**
182:9
**spring** 13:4
170:1
**stable** 29:13
**stake** 292:16
**stamp** 86:13
243:17,19

312:24
**stamped** 39:20
40:6 65:17
66:3 69:17
84:6 91:11
97:5,9 125:18
131:16,20
138:10 141:1
167:11 170:8
189:24 213:12
233:20 237:9
262:11 264:17
274:7 276:12
284:23 296:20
311:12,14,16
311:18,20,22
311:24 312:1,4
312:6,8,10,16
312:19,21
313:1,4,6,8,10
313:12
**standard** 18:1
48:15 117:17
117:21 235:9
**standing** 30:15
47:20 75:12
146:23 163:7
183:24
**start** 41:6
43:14 51:22
55:4 62:10
67:13 87:3
101:15 117:3
118:1,1 142:16

145:5,15,16
146:21 175:22
177:1 214:14
240:4 286:13
286:24 287:2
303:15
**started** 6:23
12:25 13:12
21:5 29:16
52:6 105:12,13
105:13,15
106:14 107:16
115:12 147:8
179:25 180:17
213:3 300:12
**starting** 41:4
66:4 70:7
131:21 247:6
**starts** 84:3
98:12 107:24
116:22 117:20
152:6
**state** 1:16 6:2
6:19 58:11
106:15 127:8
127:23 130:17
136:20 140:13
145:10 149:16
150:10,16
151:9 155:16
261:18,18
268:6 289:22
314:4

**statement**
24:14 109:16
114:17 116:15
294:9
**statements**
173:8,10,21
188:17
**states** 1:1 86:24
185:14 187:19
**static** 199:17
**stating** 183:22
**status** 19:23
**stay** 54:23
177:8 179:9
211:18
**stayed** 210:22
**staying** 254:5
**stenographic**
5:3
**step** 212:14
277:14,15
**stepped** 234:17
234:22,22
**steps** 144:24
145:3
**steptoe** 3:2
159:25 160:15
194:14 304:4
309:22
**steptoe's**
304:17
**steptoe.com** 3:5
3:7

**stick** 21:12
**stint** 72:20
**stipulated** 5:22
**stipulation** 6:7
6:9,11,17
**stole** 180:19
**stop** 136:24
210:20
**stopped** 107:8
132:11
**stories** 183:24
**strategic** 292:3
**strategy** 72:18
**streamline**
263:1
**street** 2:4
**strike** 27:8
298:8
**strikes** 281:20
**struggling**
229:12
**study** 12:18
13:3
**studying** 13:2
**stuff** 159:13
177:6,14 182:5
262:23,24
271:20 306:5
**su** 27:13 72:7
178:7 179:6,17
179:25 181:1,2
181:3,14,24
182:4 183:23
184:5,22

287:21 301:6
302:18 303:18
**sub** 33:6 39:2,4
39:6 149:1,2,3
149:4 261:12
261:12,15
294:15,16
**subject** 6:6
310:1
**subjective**
64:23
**submit** 203:9
**subpoena** 8:21
9:10,23 10:11
10:22 11:1
162:3 187:21
187:24 188:6
194:6,14
220:24 311:11
**subscribed**
316:16
**substance**
161:20 242:7
**substantial**
259:17
**substantiation**
84:19
**substantive**
244:16
**subtract**
122:23
**successfully**
49:15 204:15

**sue** 303:4
**sufficient**
114:14 246:12
267:10 268:16
**suggested**
131:3
**suggesting**
145:3 301:12
**suggestion**
102:18 121:1
299:11
**sullcrom.com**
2:6,8,9,11
**sullivan** 2:3
5:13 184:16
186:19,25
187:3 188:13
285:3 288:19
290:5 304:22
305:22
**sum** 242:7
**summarize**
12:12 13:10
**summer** 170:1
274:17
**sun** 239:3,4,8
239:23 250:2
254:12 265:6
**support** 20:7
20:18 23:22
24:21 25:16
67:6 80:25
181:9

**supportive**
137:13
**supports**
209:11
**sure** 8:7,10
10:15 13:11
15:8 16:5,12
16:18,21 18:4
18:15 26:10,22
28:7 29:11
32:16 35:25
39:18 57:7,10
65:15 68:25
72:21 74:18
75:1,11 78:19
80:7 105:22
112:24 113:20
116:16 121:13
122:19,25
124:16 127:5
131:6,6 133:10
134:9 135:14
140:2 145:21
147:10 163:9
168:15 175:10
179:5 185:20
187:9 192:7
196:19 199:25
200:15 212:12
215:11 217:18
222:16 225:4
229:16 232:25
241:13 247:18
251:20 260:9

261:3,20
262:16 263:25
264:6 266:13
273:16 276:3
279:7 281:9
283:2 284:6
287:9 297:3
302:8 307:13
**surprise** 261:17
289:18 295:19
**surprised**
26:12 27:6
47:5 263:23
**swear** 5:4
**swirling** 106:19
**sworn** 5:7
314:7 316:16
**system** 20:8
39:13 40:15
44:20 49:25
51:4,21 54:13
94:8,10,16
96:19 101:22
109:12,22,24
110:8,22 112:7
120:17 147:6
147:13 252:6,9
300:1

**t**

**t** 5:6,6,6 311:7
315:3,3
**tab** 8:19 9:10
39:17 65:14

69:14,20 83:8
107:18,19
137:17 138:8
140:22
**table** 76:18
**tac** 125:8,21
**tackett** 1:12
4:16 5:12 6:19
6:21 8:20,20
8:25 9:9,10
10:5,13 11:7
11:25 12:7
28:21 30:20
33:17 39:19,20
40:2,7 64:13
65:16,17,24
66:3 69:16,17
70:7 83:24
84:3,5,6 97:4,8
105:4 131:15
138:7,9,16
139:1,17
140:25 151:10
156:4 157:12
165:2 167:10
175:7 181:19
181:20 182:12
182:13,17
184:10 189:24
190:4 195:8
202:17,18,19
228:22 233:19
237:2 243:18
262:10 264:16

274:6 284:22
296:19 301:5
309:24 310:9
311:4,10,11,12
311:14,16,18
312:13,14,17
312:18 315:2
315:24 316:2,4
316:13
**tags** 71:18
**take** 4:12 7:24
8:3 33:18
52:16 78:8
83:11,14
117:17 123:3
137:16,22
140:14 144:23
146:19 153:15
156:8 157:14
167:17 174:7
175:5,6 182:24
195:21 202:2
205:19 211:17
213:15,24
228:10 249:22
261:6 267:12
273:25 277:5
277:11 279:4
297:3 300:18
302:22
**taken** 1:14 4:16
15:15 18:4
40:19 147:23
157:7 163:11

244:5,6 245:13
274:18 309:11
**takes** 247:8
**talk** 45:19
107:12 127:3
128:10 133:13
134:1,2,2,3,13
137:6 162:9
181:8 240:15
271:6 286:25
**talked** 27:14
128:16 176:22
178:5 209:22
252:11 259:13
262:25 295:18
**talking** 7:4 48:3
59:17 107:3
129:8 134:6,8
146:7 149:15
181:4 183:6
201:9 212:2
249:25 250:1
260:19 261:4
296:2,9 301:6
**taousse** 2:20
**targeting** 163:2
**team** 23:10
24:15,24 27:15
27:18 80:21
108:11 123:11
153:23 166:7
166:15 167:4
173:25 174:2
176:6 177:8,15

238:16
**technical** 67:4
67:5 166:21
174:8 175:15
175:24 273:3
**technicality**
249:2
**technically**
118:22 174:6
174:10 176:2
211:7 217:18
225:6 249:1
**technology**
4:19
**telegram** 20:9
20:13 26:24
66:6,8,13,24
67:18,25 68:16
68:23 69:4
70:5,9,13
82:23 107:16
139:20 140:4
151:12 176:24
177:8,10,16,17
262:6 263:21
266:8 272:3
282:5 308:20
**telephone** 2:5
306:10
**tell** 136:22
207:1,19,24
208:18 303:22
307:3

**telling** 194:17
201:10
**teneo** 3:12,13
**tenure** 170:22
179:2,4 193:23
212:3
**term** 18:12
19:15 200:8
207:17 222:13
245:20 254:14
254:21,24
257:7 273:3
277:18 282:1
294:12
**terms** 89:4
90:10,12 93:23
108:17,24,24
111:19 168:23
169:18,20
170:3,12,16,20
170:24 171:2,6
171:14,17,25
172:5,15,20
208:5,12
225:15 240:10
240:15,21
241:12,18
242:7 246:18
308:18
**terra** 29:7,11
183:6
**terrible** 155:18
**testified** 5:9
99:10 126:1

227:22 238:11
250:4 285:17
285:18 286:11
**testify** 159:16
307:4,8
**testimony** 8:15
11:3 141:21
166:8 191:1
195:10 215:1
228:2 229:7,10
240:24 241:3
247:18 265:22
294:25 314:6,9
316:10
**testing** 98:8
**text** 235:25
244:16,24
264:23,25
296:13
**thailand** 1:14
67:22 68:5
194:17 259:22
**thank** 5:15 8:12
13:8 68:13
70:18 83:24
107:11 123:8
139:15 140:7
151:23 155:11
156:1 158:23
177:25 187:16
195:8 199:22
206:6 207:14
229:6 230:4
236:4 246:15

264:8 267:23
279:11 293:19
297:25 309:24
310:6,14,19
**thanks** 15:3
165:10 178:16
247:19 262:20
**theirs** 202:12
**theoretically**
43:3 214:12
**theory** 253:21
**thereof** 301:8
**thing** 38:1 41:1
45:11 75:7
81:23 125:1
137:2 150:1
155:20 181:11
198:18 201:11
201:13 250:10
260:10 267:24
291:8,12
292:19 293:6
293:13 294:13
301:22 307:12
**things** 13:16
19:22 21:8
24:17 47:10
72:25 86:4
98:10 101:24
106:23 115:6
128:12 140:21
142:25 150:12
161:17 164:19
194:20 222:1

246:24 250:20
289:24 291:5
302:12 309:8
**think** 21:13
27:16 28:1
40:1 42:7
49:17 96:22
109:10 111:8
112:11,14
114:1,15 121:9
135:5,22 136:3
138:7 147:4
153:24 154:5
155:20 156:7
157:12 160:17
170:10 175:12
180:12 199:22
199:23 207:10
208:15 210:13
210:22 212:2
222:25 236:15
239:12 248:12
248:13 260:19
262:3 264:1
275:22 276:3
277:8 278:22
279:1,10 283:4
291:9,19
292:19 295:22
299:25 302:7
306:14 307:10
307:14 309:1
**thinking** 154:6
307:1

| | | | |
|---|---|---|---|
| **third** 142:20 | 149:17,21 | 295:10 299:21 | 111:8 112:14 |
| 217:5,6 218:5 | 156:5 157:18 | 300:15 | 113:13 115:12 |
| 277:20 278:7 | 157:19,20 | **threearrowsc...** | 121:22 123:16 |
| 278:11 294:3 | 158:6,15,17 | 138:19 | 125:13,18 |
| **thirds** 278:6 | 161:21 166:10 | **thrown** 194:14 | 129:2,12 |
| 290:12 | 166:14,17 | **tick** 55:6,6 | 132:15 133:7 |
| **thought** 131:24 | 167:3 173:19 | **ticket** 20:8 | 135:2,10 |
| 201:14 291:12 | 178:7,24 179:3 | 119:4 | 137:24 138:3 |
| 292:13 | 184:24 185:1 | **tied** 29:6 227:3 | 140:1 141:22 |
| **thoughts** 295:3 | 185:17,21 | 227:5 246:5,7 | 144:7,11 145:3 |
| **thread** 182:2 | 186:2,3 191:22 | **tier** 74:20 78:22 | 148:4 149:21 |
| **threads** 135:15 | 192:4 194:7,16 | **tiers** 18:23,23 | 153:3,6,17 |
| **three** 16:23 | 196:20 203:14 | 18:25 19:5,25 | 154:4 155:7,25 |
| 17:18,24 18:10 | 203:24 214:10 | 19:25 169:10 | 156:4,22,24 |
| 18:16 24:11 | 214:20,23 | **time** 4:3 6:12 | 157:3,8 158:23 |
| 25:5,8 26:3,17 | 234:5,19 235:5 | 7:15,15 14:12 | 162:18 165:9 |
| 27:9 28:12,22 | 236:17,22 | 17:2,19 18:12 | 165:24 166:2 |
| 29:23 30:6,10 | 237:12 240:2,5 | 20:15,21 21:18 | 166:11,12 |
| 47:15 64:14,15 | 245:18 248:22 | 21:24 27:12 | 169:24 179:10 |
| 64:25 65:4 | 248:23 251:21 | 29:3 30:4,5,23 | 179:11,14 |
| 66:10,14,25 | 253:3,6,10,13 | 34:6 35:4,4 | 181:12 182:24 |
| 68:21 71:22 | 254:3 255:7,18 | 47:16,20 58:12 | 183:4 185:15 |
| 77:16,23 78:2 | 258:9,17 | 64:13 67:13,16 | 190:19 196:21 |
| 78:17,21 81:21 | 260:24 261:1,5 | 67:19,20,23 | 211:17,19,23 |
| 82:9 83:4 | 261:8,22 | 68:3,5,13,15 | 212:20 219:25 |
| 84:22 86:4 | 263:20 265:25 | 69:7 70:5 | 220:18 221:3 |
| 89:5 91:3,15 | 268:10,12 | 72:15 74:9,12 | 228:14,18 |
| 93:22 94:18 | 269:4,19 | 74:23 75:5,13 | 231:9 236:9 |
| 95:2,15 96:11 | 271:19 279:22 | 75:16 81:19 | 249:22 250:22 |
| 108:23 115:5 | 282:17 284:1 | 82:4 83:2,17 | 257:14 258:15 |
| 125:14 135:1,6 | 287:6,9,15 | 83:20 87:13,22 | 266:22 267:15 |
| 138:24 140:12 | 288:1 289:12 | 88:13 91:7 | 267:19 269:1,2 |
| 144:19 145:18 | 289:22 292:23 | 102:5 103:12 | 270:13 271:23 |
| 148:3,13 | 292:25 294:22 | 105:7,18 108:5 | 272:4 274:14 |

276:24 283:20
284:4,8 286:17
289:15 296:7,9
297:3,8 300:20
300:22 301:1
303:13 308:23
309:2,14,25
310:9,17
**timeline**  108:9
136:22
**timely**  17:16
**times**  7:23 23:2
42:23 63:11
68:1 108:3,4
112:15 127:24
172:11 177:19
178:23 180:14
198:9 209:23
211:9 248:18
257:10 259:4
259:21,22
274:14 278:11
278:11
**timing**  134:4
**tiny**  126:24
**tiptop**  307:2
**tired**  160:16
306:25
**title**  72:22
162:15,17,20
174:14 239:11
**titled**  167:16
170:3,16
213:17 274:2

276:16
**today**  4:3 5:16
6:7 7:24 8:13
9:2,17 10:7
11:4 59:18
149:10 156:3
157:21 158:19
159:11,20
162:2,23
176:16 178:13
208:16 210:7
229:4 236:25
237:8 248:18
252:17 264:6
295:8 309:12
310:12
**today's**  12:1
**together**
254:19 265:3
**token**  31:12,12
31:22 36:4,20
213:19
**tokens**  32:11,12
216:21
**tokyo**  179:6
**told**  184:23
208:10,13
217:20 220:4
255:18 305:3
307:11,12
**ton**  71:24
**took**  5:24 22:8
24:7 74:3
124:10 135:2

142:23 160:7
160:21 192:6
208:11,13
279:22 302:19
306:2,6,8,8
**tools**  105:21
**top**  33:15 68:20
70:25 71:3
73:19 90:6
92:5 97:16
99:3,18 100:19
101:12,17
102:1 103:6
114:18 136:23
142:21 146:19
155:13 179:21
184:17 204:4,4
234:7,25
238:22 239:14
248:8 263:3
282:11 285:3
291:6
**topic**  28:4
**topics**  28:9
168:22
**topped**  152:12
**topping**  151:3
**total**  33:11,14
40:23 42:3,4
42:11,21 43:17
43:21 44:13
45:6 64:3
122:9 123:1
192:11,13

195:17 196:23
198:9 205:11
205:20 235:17
235:22 236:18
238:9 247:12
247:14 280:22
**totally**  197:2,10
197:12 215:14
217:17 253:20
**touch**  179:9
**touched**  66:22
**touchpoints**
25:12
**toward**  180:15
219:7
**towards**  122:22
231:10 291:24
**tracks**  252:12
**traction**  303:7
**trade**  15:21
19:11 33:19
34:12 35:4
44:23 57:24
61:21 127:16
163:4 286:21
287:11,16
**traded**  18:3
26:7 57:21
60:5 63:15
206:22 232:20
**traders**  15:12
**trades**  28:13
78:1 150:17

trading   1:5
4:17 16:20
28:19 30:17
33:21 59:18,20
59:24 60:1,3
60:10,15,20
61:19 62:14
63:9 88:22,23
88:25 92:25
97:24 98:7
163:3,10
169:22 170:11
170:18 171:7
206:14,17
211:5 212:3
220:13 221:3
222:23 223:10
230:22,25
231:7 232:2
234:6 241:12
241:18 243:16
244:17,25
245:1 248:9,11
315:1 316:1
traditional
30:19
transaction
34:15,16,16
transcript
265:19 314:8
316:5,10
transferred
302:21

translate
205:22
transmission
221:25
transmitted
81:14
transparency
40:20
traveling
187:25
travesty   210:14
treat   221:7
treated   18:6
46:18 154:9
155:9 197:10
197:12
tried   29:12
96:17,23
127:24 211:8
303:2,4
trigger   38:9
51:19 147:20
267:9
triggered
106:13 115:8
triggering
58:18
triggers   56:17
tristan   72:10
72:11
trouble   107:1
177:21
troubles   288:9

true   314:8
316:9
trust   2:3 5:15
67:25 159:10
162:5 186:5,13
197:5,18 217:7
217:19 218:2
truthfully
159:16
try   25:19 39:23
39:24 54:11
103:24 118:15
127:11 165:8
195:7 199:24
200:23 232:18
233:6 255:15
262:16 270:2
272:6 276:7
trying   37:20
107:7 126:21
127:10 145:9
151:7 154:20
155:15,16
158:20 168:20
217:22 219:6
253:21 263:1
tummy's
156:18
turn   52:16
89:16 91:10
107:20 126:4
127:4 129:9
136:9 137:10
144:3 151:11

151:14,15
174:7 205:19
244:9 262:2
272:2 282:4
288:13 290:3,8
302:7
turned   127:9
136:5 144:8
301:24 308:14
turning   294:1
tweet   181:19
182:1,3,12
183:22 219:8
219:21 312:13
312:14
tweeting   182:2
tweets   181:23
twitter   14:6
181:3 182:17
182:20 183:8
218:25 287:20
two   21:2,14
23:1 42:14
81:6 85:7,9
98:16 102:4
123:19 141:11
145:23 166:17
166:20 167:3
171:16 178:17
196:25 206:13
216:17 229:14
231:21 265:1
278:6,10
290:12 301:12

308:15
type 31:15
70:24
types 16:1
48:11 223:11
typically 59:5

**u**

u.s. 11:11 72:18
166:24,24
172:20 188:7
188:20 194:18
205:3 221:24
236:1,2,3,5
uh 73:17
ultimate
201:13
ultimately
34:14 145:18
um 156:18
unable 120:2
unavailable
101:5
unchanged
54:18 55:16
unclear 40:17
250:6,7,11
254:9
under 11:15
38:25 51:9
62:12 114:20
118:22 119:22
120:16 140:8
147:7 152:16

152:22 170:13
171:21 173:1
176:6,7,10,15
187:22 192:23
192:24 215:22
216:16,22
217:3 222:7
230:6 235:15
254:16 257:13
269:3 277:14
underlying
63:23
underneath
176:18 239:6
understand 7:9
10:10 25:20
30:14 94:19
121:11,17
122:5 132:14
139:18 157:25
158:20 160:19
166:8 185:11
185:16,23,24
186:1 195:9,11
198:24 199:23
203:4 204:1
209:4 212:5
216:7 217:10
221:4 222:25
224:11 229:13
229:15 236:7
247:19 277:16
287:3 289:2,12
300:3 305:10

understanding
17:22 29:1,2
29:23 60:21
62:3,6 63:5
71:15 86:10,18
87:5,20 89:23
92:10 93:3
94:25 95:13,25
96:10 98:18
120:6 129:11
131:1 139:22
143:4 144:17
153:11 196:1
203:18 209:2
218:9 226:11
226:19 237:12
237:19 265:9
266:24 275:18
276:22 278:14
279:7 280:13
283:8 287:14
287:15 290:15
290:19 291:11
292:12 294:9
300:7 302:19
understood
7:12 13:8
21:13 30:10
95:9 153:17
161:19 162:1
222:2,2 253:20
266:16 268:22
271:15 287:5
289:22 291:6

296:10
undertaking
30:17
underwater
107:3 118:19
undesirable
127:23
unfortunate
183:23
united 1:1
university 12:9
12:20 13:3,5,6
unjustly 185:5
185:17,22
unknown 21:17
unquote 242:10
245:20
unsure 262:1
upcoming 67:8
205:17
update 75:2
80:15 126:14
169:24
updated 55:6
67:25 68:13
75:17,21 81:13
90:20 91:1
94:5,7,10
169:21 170:12
275:8,21,22
276:4
updates 67:19
updating 75:20
273:22 274:16

**uploaded**
165:12 213:7
**uploading**
165:8
**upped** 77:1
**ups** 239:11
**usd** 33:11,15
34:1,7,25 35:1
40:23 42:21
43:3 54:2,4,4
55:5,5,7,10,11
58:16,17,22
105:13 106:11
116:10,20
117:2,4,6,7,9
117:13 121:15
126:8 142:23
142:24,25
143:13,15,18
146:13 148:10
191:13,18
192:1,15
195:17 205:6,9
205:10,10,11
205:13,14,15
205:16,20,21
205:23 206:1,3
206:4,5,9,10,11
206:13 231:2,4
249:7,8,11,14
250:18 255:24
**use** 18:11 58:21
63:13 67:7,9
75:19 91:4

137:19 176:23
177:1,2,23
178:1 200:8
205:12,13
207:17 209:17
210:5,5 222:14
222:22,24
225:7 230:8,10
230:11,19
233:5,7
**used** 26:20 42:3
42:5 43:17,21
43:24 44:13,22
66:24 86:3,9
88:22,23,24
91:6,20 92:1,3
92:17 95:20
96:21 164:6
177:23 183:2
192:11,13
194:22 198:3,8
198:10 225:12
245:20 247:12
247:14 250:17
250:18 251:11
254:24 255:9
273:3 302:24
**user** 30:7 31:7
77:7 150:9
201:4,6,16,17
203:11 206:24
208:11,13,19
209:5 223:21
226:17,18

273:14
**user's** 202:7,9
**users** 60:17
169:9,9 180:19
201:18 204:13
208:20 209:1
209:14 219:22
220:12 221:1
254:1
**uses** 257:7
**using** 4:19
58:18 75:20
88:16 118:5
204:15 211:6
222:11 229:19
230:20,21
239:5
**ust** 29:15
**usually** 17:4
25:15 63:8
64:20 69:4
93:9 177:15
215:2 228:8
230:1 280:1
286:23
**utc** 67:21 68:7
68:11 250:24
**utilization** 95:5
250:12,23
251:1,3,14
**utilized** 40:21
44:3 88:14
95:7

**v**

**vacation** 135:1
135:3
**value** 33:11,15
34:22 35:2,14
40:23 42:21
43:3 54:17,22
54:25 55:10,11
118:17 119:9
121:4,15 123:2
123:5 124:3
143:18 195:17
205:22 206:10
230:16 232:6
232:14,21
233:9,10 248:3
280:22,23
281:2,2,3,9
289:9
**values** 206:3,4
**variation**
171:16
**variations**
232:16
**various** 26:4
31:12 176:23
**vault** 183:3
293:4 294:6,11
294:15
**venture** 201:5
301:13,17
303:15

**venue** 63:11
**venues** 63:9,14
  233:3
**ver** 302:16
**verbal** 179:16
**veritext** 4:21,23
**version** 92:24
  93:5 99:17,19
  138:14 165:11
  237:9 240:6
  262:4 264:12
  275:8,10,23
  276:4
**versions** 90:3
  171:16
**versus** 177:2
  230:8 232:3
  247:2 281:2
**vi** 32:2
**video** 4:12,15
  5:19 211:18
**videographer**
  3:11 4:1,21
  83:17,20
  137:24 138:3
  157:3,8 211:19
  211:23 228:14
  228:18 267:15
  267:19 300:22
  301:1 310:16
**videotaped**
  1:11 6:14
**view** 9:4 30:6
  154:9 209:11

210:10 223:20
  246:12
**viewing** 9:2
**views** 161:20
  303:22
**vip** 14:19 15:6
  15:8 18:6,11
  18:18,20,22,25
  19:1,4,12,14,17
  19:18,21,23,25
  20:19 23:10
  24:15,24 25:22
  26:4 80:20,24
  82:13,22,24
  88:20 166:7,15
  173:25 174:2
  177:8,13
**virtual** 4:19
**virtually** 4:6
**visible** 31:23
  32:1 33:10
  65:25,25
**volatility**
  105:14
**volume** 15:9,11
  16:15 18:24,25
  19:11 20:1,5
  26:8 74:18
  75:1,4 78:22
  78:23
**volumes** 163:6
  163:9,10
**voluntarily**
  10:8,18 11:4

310:12
**voluntary**
  158:21
**vresteegh** 3:12

| w |
| --- |

**wait** 10:2
**waiting** 93:18
  145:13
**waived** 241:2
**walk** 13:9
**walking** 297:8
**wallet** 33:16
  209:8,10
**wallets** 226:12
  226:15,16,17
  227:6
**wang** 174:11
  174:12
**want** 5:17 10:3
  33:17 47:21
  69:20 91:2
  93:11 112:20
  113:20 114:16
  115:4 126:12
  127:13,14
  128:11,13
  130:13 133:22
  133:23,24
  134:9 136:23
  137:15 139:17
  140:21 154:17
  154:17 184:24
  185:1 202:14

210:5 229:18
  230:19 260:9
  262:15 266:3
  279:4,7
**wanted** 16:19
  18:3 36:15
  75:18 76:1
  77:3 79:2
  90:13 152:1
  157:22 158:23
  163:16 180:2
  183:10,19
  221:16 266:12
  267:24 271:3
  300:3 307:4,8
  307:20
**warning** 128:1
  128:18,24
**warnings** 96:24
**washington** 3:4
  183:7
**water** 118:22
  119:22 152:16
  152:22
**watkins** 2:13
  157:16 159:5
**way** 20:16
  38:22 48:14,19
  55:1 57:16
  64:10 67:3,5
  73:24 78:20
  88:11 94:13
  101:22 111:9
  111:10 117:15

125:4 139:7
189:10 199:12
200:16 203:15
207:3 209:8
221:6 242:9
246:16 253:25
273:17,22,23
279:25 285:24
290:12 302:13
308:18 314:14
**ways** 171:5
**we've** 159:1
213:7 302:11
**web** 191:4,10
**website** 15:18
31:2 82:17
150:9 225:7,13
242:19 243:4,6
**week** 135:2,3
**weekly** 25:25
**weeks** 135:1,6
**weigh** 164:5
**weighed** 168:23
**weighing**
171:25 172:8
173:6
**went** 24:23
26:22 29:3
55:10 86:2
114:3 154:22
160:17 172:21
180:18 181:3
201:10 225:12
250:20 256:8

287:24 295:10
303:12 306:5
**west** 173:1
176:6
**whatsapp**
20:13
**whatsoever**
266:23 271:11
**whereof** 314:16
**white** 13:13
**wide** 37:2,5
75:10
**wife** 303:1
**winner** 56:11
56:12
**wise** 111:11
**withdraw**
32:19 35:9
37:14,20 38:4
38:11 58:6,16
58:20,22,23
88:21 107:7
109:4 110:4,6
110:6,13
118:21 119:2,4
120:2,9,20,22
126:22,23,25
150:25 151:4,6
**withdrawal**
110:16,22
149:25
**withdrawals**
126:5 127:4,9
129:10 136:5

136:10 137:10
144:3,7,14,19
150:13,21
219:11,16
**withdrawing**
106:10,12
110:15 117:3
129:14 136:13
155:21 199:9
**withdrawn**
145:7 155:12
**withdrew**
129:3 152:25
289:7
**witness** 1:12
3:3 4:10 5:5,6
83:10 156:18
240:24 279:9
297:13 310:7
310:14 311:3
314:6,10,16
**woke** 160:16
**wondering**
255:1 271:16
282:15
**word** 194:21
281:23
**words** 200:10
**wore** 72:16
**work** 13:10
15:5 16:1,22
16:23 17:1
21:25 23:2
48:15,20 49:6

136:24 154:20
162:13 166:17
172:17 180:2
181:12 194:20
200:16 209:9
210:18 211:12
216:3 228:11
299:24 308:4
**worked** 14:14
15:5 16:3
22:24 38:22
55:1 77:17
80:23 164:2
165:24 166:18
168:1 176:9
182:5 300:4
**working** 13:1
15:16 16:11
22:11 163:12
163:14,18
169:4 182:22
210:20 239:5
271:7 272:7
**works** 62:7
90:5,11 101:22
117:15 167:4
199:13 210:8
245:1 280:1
**worried** 270:15
**worse** 125:4
127:2,8,12
128:15 145:14
**worst** 137:1
201:11,14

**worth**  58:14,20
  122:15,21
  124:4 199:5,6
  200:2,3,6
**worthless**
  29:21
**write**  123:10
  125:20 126:4
  152:21
**writes**  298:6
**writing**  74:8
  219:20
**written**  256:10
  259:1
**wrong**  24:17
  185:2 223:1
  305:4
**wrote**  85:8
  177:11 236:15
  292:13

**x**

**x**  1:3,6 117:23
  311:1,7

**y**

**yah**  290:13
**yeah**  6:10
  10:25 11:13,16
  18:5 25:23
  29:6 40:4
  42:15 47:6,17
  54:25 56:3,21
  70:11,17 80:7
  81:16 86:7

98:6 99:19
113:20 114:5
115:13 116:6
116:16 120:12
121:6,25 122:4
123:14 127:18
130:21 131:13
132:7 133:10
134:11,11
136:3 142:5
143:11 145:20
146:8 154:15
155:2 165:7
168:14,17
169:5 175:13
176:10,15,20
184:18,20
185:7 189:17
192:16 195:6
201:14 208:17
208:24 209:6
210:2,4,19
213:21 214:8
217:19 218:22
224:17 236:16
239:20,21
241:13 244:12
245:25 257:18
262:24 265:23
268:9 270:4
272:16,18,19
275:7 277:13
279:10 286:10
290:1,7 294:18

294:18 295:19
298:13 299:25
303:9,12,21
307:13 308:19
**year**  12:17,24
  72:20 161:7
**years**  115:5
**york**  1:16 2:4,4
  2:14,14 180:14
  314:4
**yup**  71:10,14
  74:7 80:5 81:9
  114:23 125:11
  125:19 126:3
  144:16 152:19
  216:2,13 217:2
  217:9 263:11
  285:9,15,20

**z**

**z**  5:6
**zach**  157:15
**zachary**  2:15
**zachary.proulz**
  2:16
**zane**  1:11 4:16
  6:21 73:20
  138:25 156:14
  181:20 182:13
  182:17 228:12
  299:13 311:4
  312:13,14
  315:2,24 316:2
  316:4,13

**zero**  34:25 35:1
  43:4 197:9
  246:11 273:2,7
  273:12,14,18
  274:9,23 275:3
  275:5,11,15,25
  276:1 277:10
  277:25 278:11
  278:15 284:18
  289:1
**zeros**  202:17
**zhu**  27:13,23
  28:4 72:7
  178:7 179:17
  181:1,24
  183:23 184:5
  184:22 287:21
  301:6 303:18
**zimdahl**  3:11
  4:20
**zone**  67:14,16
  67:19
**zones**  20:15
**zoom**  1:11 40:1
  175:5
**zp**  277:22,25
  278:3

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# **EXHIBIT 8**

**Document Produced in Native Format**

Confidential

# EXHIBIT 9

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

--------------------------------------X

IN RE:  FTX TRADING LTD, et al.

               Debtors.

                     Chapter 11

                     Case No.  22-11068 (JTD)

--------------------------------------

       \*\*\* C O N F I D E N T I A L \*\*\*

        \*\* VIDEOTAPED DEPOSITION\*\*

            NILS MOLINA

       Tuesday, September 30, 2025

Reported by:

Angela M. Shaw-Crockett, CCR, CRR, RMR, CSR

Job 1401103



Page 2

```
2
3                Tuesday, September 30, 2025
4                    9:11 a.m.
5
6        VIDEOTAPED deposition of Nils Molina , held at
7    Latham & Watkins, 1271 Avenue of the Americas,
8    New York, New York, before Angela (Angie) M.
9    Shaw-Crockett, a Certified Court Reporter,
10   Certified Realtime Reporter, Registered Merit
11   Reporter and Notary Public of the States of New
12   York, New Jersey, and Connecticut.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1               N. Molina - Confidential
2                     I N D E X
3    Examination of:                    Page
4    Nils Molina
5
6                  C O N T E N T S
7    MR. SACK                            7
8    MR. SACK                            122
9
10                 E X H I B I T S
11        (Retained by the court reporter)
12   DEPOSITION        EXHIBIT              PAGE
13   Exhibit 37  LinkedIn profile          15
14   Exhibit 38  Handwritten notes         68
15   Exhibit 39  Tackett_3AC_000000361       99
16   Exhibit 40  3AC-FTX-00558861           112
17   Exhibit 41  Native transaction data spreadsheet  135
18   Exhibit 42  Native spreadsheet        144
19   Exhibit 43  Native spreadsheet        152
20   Exhibit 44  Slack messages           154
21   Exhibit 45  FTX help document         175
22   Exhibit 46  Slack messages           217
23
24
25
```

Page 3

```
1              N. Molina - Confidential
2     A P P E A R A N C E S :
3    ATTORNEY FOR FTX TRADING LTD.:
4    SULLIVAN & CROMWELL LLP
         125 Broad Street
5        New York, New York  10004-2498
6    BY:  CHRISTOPHER J. DUNNE, ESQ.
         BENJAMIN S. BELLER, ESQ.
7        NAM T. LUU, ESQ.
         dunnec@sullcrom.com
8        bellerb@sullcrom.com
         luun@sullcrom.com
9
10   ATTORNEY FOR DEFENDANTS:
     THREE ARROWS CAPITAL
11
     LATHAM & WATKINS LLP
12       200 Clarendon Street
         Boston, Massachusetts 02116
13
     BY:  DANIEL WAYLAND SACK, ESQ.
14       daniel.sack@lw.com
15       -and-
16   LATHAM & WATKINS LLP
         1271 Avenue of the Americas
17       New York, New York  10020
18   BY:  ZIJUN ZHAO, ESQ.
         ADAM J. GOLDBERG, ESQ.
19       zijun.zhao@lw.com
         adam.goldberg@lw.com
20
21   ALSO PRESENT: Jeremy Kovacs, The Videographer
22       **      **      **
23
24
25
```

Page 5

```
1              N. Molina - Confidential
2              E X H I B I T S (CONT'D)
3         (Retained by the court reporter)
4    Exhibit 47  Digital message            222
5    Exhibit 48  FTX customer support slack messages  229
6
7
8          PREVIOUSLY MARKED EXHIBITS
9
10   Exhibit 15  FTX_3AC_000013695          104
11
     Exhibit 18  Spot Margin Trading Explainer    197
12       document
13   Exhibit 21  Spreadsheet               123
14
15
16   REQUESTS
17   165 - 13  Principal LOC formula and field that would
             encompass the word "REST"
18
19
20                 RULING
21   69-25
22
23
24
25
```



2  (Pages 2 to 5)

1          N. Molina - Confidential
2      THE VIDEOGRAPHER:  Good morning.  We are
3  now on the record.  This begins videotape
4  number 1 in the deposition of Nils Molina in
5  the matter of In Re: FTX Trading Limited,
6  et al., case number 22-11068.  Today is
7  Tuesday, September 30, 2025, and the time is
8  9:11 a.m. Eastern.
9      This deposition is being taken at
10  Latham~&~Watkins, 1275 Avenue of the Americas,
11  New York, New York 10020, at the request of
12  Latham & Watkins.
13      The videographer is Jeremy Kovacs of Magna
14  Legal Services and the Court Reporter is
15  Angie Shaw-Crockett of Magna Legal Services.
16      Will counsel and all parties present
17  please state their appearances and whom they
18  represent.
19      MR. SACK:  Good morning.  My name is
20  Daniel Sack from Latham & Watkins.  I, along
21  with my colleagues, Zijun Zhao and Adam
22  Goldberg, also from Latham & Watkins, represent
23  the joint liquidators of Three Arrows Capital.
24      MR. DUNNE:  And Christopher Dunne,
25  Benjamin Beller, and Nam Luu from Sullivan &

1          N. Molina - Confidential
2  Cromwell for FTX and the witness.
3      THE VIDEOGRAPHER:  Would the Court
4  Reporter please swear the witness, and then we
5  may begin.
6  Nils Molina , having been first duly sworn by a Notary
7  Public of the State of New York, was examined and
8  testified as follows:
9  EXAMINATION
10  BY MR. SACK:
11      Q.  Good morning, Mr. Molina.
12      A.  Good morning.
13      Q.  Would you please state your full name for
14  the record?
15      A.  Nils Molina.
16      Q.  Have you been deposed before?
17      A.  No.
18      Q.  Okay.  So I'm going to lay down some
19  ground rules for us as we get started here.
20      Because this is being transcribed, I'm
21  going to ask that when I ask you a question, you
22  answer audibly.
23      Does that make sense?
24      A.  Yes.
25      Q.  I'll also ask that you avoid phrases like

1          N. Molina - Confidential
2  "uh-huh," that are little bit hard to understand or
3  pick up from the Court Reporter.
4      Are you with me so far?
5      A.  Yes.
6      Q.  Great.
7      Also, because it's being taken down by the
8  Court Reporter, I ask that we not speak over each
9  other.  Sometimes I pause in between my question for
10  a good amount of time.  I just ask that you let me
11  finish my question, and I'll let you finish your
12  answer before the next person speaks.
13      Sound good?
14      A.  Yes.
15      Q.  Okay.  Are you being represented by
16  counsel today?
17      A.  I think so.
18      Q.  What do you mean you think so?
19      A.  I would say yes.  I just don't know
20  exactly what the word -- the phrase means.
21      Q.  That's fair.
22      Do you have a lawyer -- I'm sorry -- for
23  today's deposition?
24      A.  Yeah.  I think so, yes.
25      Q.  Okay.  And did you meet with those -- are

1          N. Molina - Confidential
2  those the lawyers present in the room today?
3      A.  Yes.
4      Q.  Okay.  Great.
5      And did you meet with them before today's
6  deposition?
7      A.  Yes.
8      Q.  Okay.  We'll come back to that in a little
9  bit.  But I just want to say that the lawyers in the
10  room may object to a certain question.
11      Unless the lawyers instruct you not to
12  answer the question, you should still answer any
13  question that I've asked you, okay?
14      A.  Okay.
15      Q.  All right.  If it comes up, we'll tackle
16  it head on.
17      MR. DUNNE:  We'll sort it out.
18      MR. SACK:  Yeah.  We'll sort it out.
19  BY MR. SACK:
20      Q.  The other thing is this is your day.  So
21  if you need a break at any time, you'll let me know
22  and we can take a break.
23      The only thing I'll ask is that if I have
24  a question pending, so if I've asked you a question
25  and you haven't answered, that you answer my

**MAGNA**
LEGAL SERVICES

Page 10

1              N. Molina - Confidential
2    question before we go on that break.
3              Does that make sense?
4         A.   Yes.
5         Q.   Okay.  Lastly, if I ask a question and
6    it's unclear to you -- that will sometimes happen --
7    please just ask me to rephrase, and I'll do my best
8    to make it a question that's more understandable.
9    But if you don't ask me to rephrase, I'm just going
10   to assume that you understood my question.
11             Does that make sense?
12        A.   Yes.
13        Q.   Okay.  Great.
14             Is there any reason you can't testify
15   truthfully today, for example, because you're on a
16   medication or something else that makes it hard for
17   you to tell the truth?
18        A.   No.
19        Q.   Okay.  So you mentioned that you may have
20   lawyers who are in the room today.  How -- you said
21   you met with them before today's deposition.
22             How often did you meet with them before
23   today's deposition?
24        A.   Several times.
25        Q.   Several, like how many?

Page 11

1              N. Molina - Confidential
2         A.   I would say around five times, maybe one
3    or two more.
4         Q.   Okay.  How long were these meetings?
5         A.   They were usually around two hours.
6         Q.   Okay.  And when was the first meeting you
7    had?
8         A.   I think it was about two or three weeks
9    ago.
10        Q.   Okay.  Besides the lawyers, did you speak
11   to anyone else about today's deposition?
12        A.   No.
13        Q.   Did you review any documents to prepare
14   for today's deposition?
15        A.   Yes.
16        Q.   What kinds of documents?
17             MR. DUNNE:  I'm going to allow you to
18   answer that question as posed, what kinds of
19   documents.  Please don't disclose what
20   individual documents you looked at.
21             THE WITNESS:  Yeah.
22        A.   PDF documents.
23   BY MR. SACK:
24        Q.   I think maybe a little bit more
25   generalized than that is what I'm looking for.

Page 12

1              N. Molina - Confidential
2             Were those data documents, pieces of code,
3    things of that nature?
4         A.   They were sort of statements or written
5    documents.
6         Q.   Okay.  Like, was any of that testimony?
7         A.   Maybe one was.
8         Q.   Okay.  Did any -- did those documents help
9    you review as you prepared for today's deposition?
10             MR. DUNNE:  Objection to form.
11             You can answer, Nils.
12        A.   Maybe a little bit.
13   BY MR. SACK:
14        Q.   Did you take any notes in preparation for
15   your deposition today?
16        A.   A few.
17        Q.   Okay.  What was on those notes?
18             MR. DUNNE:  Objection.  I'm going to
19   instruct him not to answer.  That's
20   attorney-client privilege.
21             MR. SACK:  About notes that he took?
22             MR. DUNNE:  Yes.
23   BY MR. SACK:
24        Q.   Were those based on conversations with
25   your lawyer?

Page 13

1              N. Molina - Confidential
2         A.   Yes.
3         Q.   Okay.  Fine.
4             During today's depositions we're going to
5    be referring to FTX a lot during the deposition.
6    When I refer to FTX, I'm referring to each of
7    FTX Trading Limited and its debtor affiliates.  I'm
8    also including the FTX Recovery Trust within that
9    definition.
10             Do you understand what I mean now when I'm
11   going to use the term "FTX"?
12        A.   Yes.
13        Q.   Okay.  You're, of course, welcome to
14   clarify which precise entity or entities that you're
15   referring to in an answer, but unless you tell me
16   otherwise, we're going to be using that definition
17   of FTX during each time, okay?
18        A.   Yes.
19        Q.   We'll also be referring to Three Arrows or
20   3AC or Three Arrows Capital.
21             By these terms I'm referring specifically
22   to Three Arrows Capital Limited.
23             Any questions about that terminology?
24        A.   No.
25        Q.   Where are you currently employed?

MAGNA
LEGAL SERVICES

1           N. Molina - Confidential
2      A.  I'm employed at FTX Recovery Trust.
3      Q.  The recovery trust.
4          Before January of 2025, who was your
5  employer?
6      A.  The FTX entity at that time.
7      Q.  Was that sort of generally many or several
8  FTX entities or just one in particular?
9      A.  I believe just one.
10      Q.  Was that FTX Trading Limited?
11      A.  I don't know the exact name of the entity.
12      Q.  Okay.  But an FTX entity?
13      A.  Correct.
14      Q.  How long have you been working at FTX in
15  some form or another?
16      A.  For -- for about four years.
17      Q.  So since about 2021?
18      A.  Correct.
19      MR. SACK:  Zijun, you wanna grab tab 1A?
20      MR. DUNNE:  And this is 37?
21      MR. SACK:  Yes.  This is 37.
22          Would you please remark this as
23  Exhibit 37.
24          (Exhibit 37 was received and marked for
25  identification, as of this date.)

1           N. Molina - Confidential
2  BY MR. SACK:
3      Q.  Do you recognize what I've handed you?
4      A.  Yes.
5      Q.  What is it?
6      A.  Looks like information from my LinkedIn
7  profile.
8      Q.  Okay.  On that profile at the top, it says
9  "Nils Molina."
10          That's you, right?
11      A.  Correct.
12      Q.  And then under Experience, it says "other:
13  software engineer, August 2021 to the present."
14          Do you see that?
15      A.  Yes.
16      Q.  Is that referring to your work at FTX?
17      A.  Yes.
18      Q.  Is there a reason why you listed it as
19  "other" and not FTX?
20      A.  I guess I -- well, I wasn't applying for
21  jobs, so I didn't see a reason to put FTX there.
22      Q.  Okay.  But in the next lines you have
23  Google, for example, and later down, you have
24  Dropbox.
25          So why did you list those and not FTX?

1           N. Molina - Confidential
2      A.  Well, when I was at those jobs, I was
3  applying for other jobs.  So I put those names there
4  because -- just to make it easier to sort of get the
5  right kind of attention --
6      Q.  Did you --
7      A.  -- with getting more jobs.
8      Q.  Sorry.  I didn't mean to interrupt you.
9          Did you think that listing FTX would give
10  you the wrong sorts of attention?
11      MR. DUNNE:  Objection.
12      A.  Well, I wasn't looking for attention.  So
13  I wasn't looking for attention in general.
14  BY MR. SACK:
15      Q.  Did you not want people to know that you
16  worked at FTX?
17      MR. DUNNE:  Objection.
18      A.  In general, I didn't sort of want to talk
19  to potential employers, you know, recently.  So, for
20  those potential employers or recruiters, I didn't
21  really want them to know that.
22      MR. SACK:  Okay.
23      A.  Or talk to them at all.
24      MR. SACK:  Thank you.
25          You can put that document to the side.

1           N. Molina - Confidential
2  BY MR. SACK:
3      Q.  What kind of business was FTX before the
4  bankruptcy, if I use the term -- sorry.  Let me
5  strike that question.
6          Do you understand what the term
7  "pre-petition" means if I use that term?
8      A.  Yes.
9      Q.  So what was your understanding of the type
10  of business FTX was pre-petition?
11      MR. DUNNE:  I'm just going to object and
12  note that there are a lot of FTX entities.  So
13  if there's one specifically you'd like to have
14  him opine on.
15  BY MR. SACK:
16      Q.  I'll say the FTX entity that you were
17  working for.
18      A.  Could you repeat the question?
19      Q.  Yeah.
20          What kind of business did you understand
21  the FTX entity that you worked for to be
22  pre-petition?
23      A.  A crypto exchange.
24      Q.  Okay.  Is an exchange a software program?
25      A.  A good deal of it is.

MAGNA
LEGAL SERVICES

1           N. Molina - Confidential
2      Q.   What parts of it are and what parts
3  aren't?
4      A.   Well, having worked at the Exchange, I saw
5  that there were sort of different departments or
6  parts of the business, and sort of one part of the
7  business was writing software programs for the
8  Exchange, but there were other ones as well, such as
9  talking to customers and so on.
10     Q.   What was your position at FTX?
11     A.   Software engineer.
12     Q.   Was that the only position you held at FTX
13 or did you hold other positions as well?
14     A.   I believe that was my only position.
15     Q.   Can you describe what your role and
16 responsibility was at FTX as a software engineer?
17     A.   I wrote code for the Exchange and
18 troubleshooted code belonging to the Exchange.
19     Q.   Anything else?
20     A.   Generally, what I did all was sort of
21 connected to the code at the Exchange, so not
22 really.
23     Q.   Who did you -- who, if anyone, did you
24 report to at FTX in your role as software engineer?
25     A.   I reported -- initially, I believe I

1           N. Molina - Confidential
2  reported to Brett Harrison, the president of FTX US,
3  and Nishad Singh, an engineering manager at FTX.
4  And later on, I may have also reported to Adam
5  Yedidia, although I don't know what -- who my formal
6  manager was in the -- later on.
7      Q.   That's okay.
8           So at least informally you reported to
9  Mr. Yedidia?
10     A.   I would say Mr. Yedidia and Nishad Singh
11 towards the end.
12     Q.   What was Mr. Yedidia's role or title at
13 FTX, if you know?
14     A.   I believe it was software engineer.
15     Q.   So was he just a more senior software
16 engineer than you?
17     A.   In that context, yes.  At FTX, I would say
18 yes.
19     Q.   Did you have any direct interactions with
20 Mr. Singh?
21     A.   Yes.
22     Q.   What form did those communications take
23 place?  Were those in person, over the phone,
24 emails, all of the above?
25     A.   I don't know if I emailed him, but I did

1           N. Molina - Confidential
2  chat with him a lot, I had virtual meetings, and I
3  met with him in person a few times.
4      Q.   And when you say "chat," are you referring
5  to an electronic communication, like a Slack
6  communication or something of that nature?
7      A.   Correct.
8      Q.   How often would you say you communicated
9  with Mr. Singh?
10     A.   Several times a week.
11     Q.   What kind of things did you communicate
12 with Mr. Singh about?
13     A.   The code that I was working on.
14     Q.   And what kinds of things did you talk to
15 Mr. Harrison about?
16     A.   Also the code that I was working on.
17     Q.   And just for completeness, what kinds of
18 things did you talk to Mr. Yedidia about?
19     A.   Also the code I was working on.
20     Q.   You said that you spoke to Mr. Singh
21 generally a few times a week.
22          How often did you speak to Mr. Harrison?
23     A.   In the first several months, several times
24 a week as well.  Later on, sort of in 2022, less.
25 And then, eventually, he left the company.  And so I

1           N. Molina - Confidential
2  wouldn't talk to him regularly.
3      Q.   And how about Mr. Yedidia?  How often did
4  you speak with him?
5      A.   I also spoke with him several times a
6  week.
7      Q.   On these chat platforms you mentioned you
8  spoke to Mr. Singh on, what chat platforms did you
9  use?
10     A.   I used Slack and Signal.
11     Q.   Any others?
12     A.   Not that I recall.
13     Q.   Did you ever text Mr. Singh?
14     A.   I don't remember.
15     Q.   Were these chats that you had with
16 Mr. Singh -- were they private messages?  Were they
17 group messages, a combination of both?
18     A.   Combination of both.
19     Q.   How often would you private message
20 Mr. Singh?
21     A.   Several times a week for most of the --
22 most of the time pre-petition.
23     Q.   Was that also true of your chats with
24 Mr. Harrison and Mr. Yedidia?
25     A.   Yes.  Although, for -- again, for Brett

1              N. Molina - Confidential
2  Harrison, less later on.
3       Q.  Understood.
4         Before FTX filed for bankruptcy, did you
5  have any interactions with Samuel Bankman-Fried?
6       A.  Yes.
7       Q.  What were those interactions like?
8       A.  Not very extensive and not very technical.
9       Q.  What kinds of things would they be about?
10      A.  I think maybe general chat about the --
11  about crypto, about the crypto industry.
12      Q.  Were they related to the work you were
13  doing as a software engineer at FTX?
14      A.  I don't remember if I had conversations of
15  that nature with him.
16      Q.  When you say that you would have general
17  chats about the crypto industry with
18  Mr. Bankman-Fried, what kinds of things would you
19  talk about?
20      A.  I have some general recollection of
21  chatting with him about maybe some headline news or
22  kind of other just general news that was being
23  reported on in crypto.
24      Q.  Anything in particular that you remember
25  about the news stories you were talking about with

1              N. Molina - Confidential
2  Mr. Bankman-Fried?
3       A.  I have some general recollection.  I
4  chatted with him about Robinhood once, the company
5  Robinhood.  But other than that -- other than that I
6  don't remember any specific news story.
7       Q.  And what was that news story about
8  Robinhood about?
9       A.  I don't remember.
10      Q.  Were these conversations with
11  Mr. Bankman-Fried private or in a group setting?
12      A.  Mostly in a group setting.
13      Q.  When you said that you would talk to him
14  about market news, did the LUNA collapse ever come
15  up in your conversations?
16      A.  Not as I recall.
17      Q.  Before FTX filed for bankruptcy, did you
18  have any interactions with Caroline Ellison?
19      A.  Yes.
20      Q.  What was the nature of those
21  conversations?
22      A.  Informal.
23      Q.  Were they about or related to your work as
24  a software engineer at FTX?
25      A.  Not as I recall.

1              N. Molina - Confidential
2       Q.  What about Ryan Salame?
3       A.  Yes.  I interacted with him.
4         MR. DUNNE:  He pronounces it Salame
5  (pronunciation).
6         MR. SACK:  I appreciate that.  Thank you.
7  BY MR. SACK:
8       Q.  How often did you interact with
9  Mr. Salame?
10      A.  I only remember interacting with him once,
11  but -- so I would say a small number of times.
12      Q.  What do you remember about that
13  interaction with Mr. Salame?
14      A.  I remember shaking his hand and saying hi.
15      Q.  So just an introduction?
16      A.  Yes.
17      Q.  And before FTX filed for bankruptcy, did
18  you have any conversations with Zane Tackett?
19      A.  Yes.
20      Q.  Were those interactions anything beyond an
21  introduction?
22      A.  Yes.
23      Q.  How often did you interact with
24  Mr. Tackett?
25      A.  Probably a few times.  Maybe -- maybe a

1              N. Molina - Confidential
2  handful of times.
3       Q.  What was the nature of those interactions
4  with Mr. Tackett?
5       A.  I have a general recollection that when
6  there were problems with the Exchange, sometimes he
7  would ping me or chat with me about the problems.
8       Q.  What kind of problems did Mr. Tackett talk
9  to you about regarding the Exchange?
10      A.  I generally recall they may have involved
11  crypto deposits and withdrawals.
12      Q.  Besides crypto deposits and withdrawals,
13  any other problems with the Exchange you recall
14  talking to Mr. Tackett about?
15      A.  Not that I recall specifically.
16      Q.  So then, focusing specifically on the
17  conversations you had with Mr. Tackett about
18  crypto -- about problems with crypto deposits and
19  withdrawals, what kind of problems do you recall
20  speaking about?
21      A.  Most likely a deposit or withdrawal not
22  completing, but I don't recall specifically more
23  than that.
24      Q.  Do you recall when you had this
25  conversation with Mr. Tackett about problems with

MAGNA ▶
LEGAL SERVICES

1             N. Molina - Confidential
2   crypto deposits and withdrawals?
3       A.   Beyond 2022 pre-petition, I don't know
4   when.
5       Q.   And just so I'm clear, you started at FTX
6   in around 2021?
7       A.   Yes.
8       Q.   So somewhere between 2021 when you started
9   at FTX and pre-petition 2022?
10      A.   I think it was in 2022 because the work I
11  did -- I don't think the work I did in 2021 would
12  have elicited that sort of conversation so -- so I
13  would say probably in 2022.
14      Q.   What kind of work were you doing in 2021,
15  then, that this wouldn't have come up?
16      A.   I don't think I was working very much on
17  crypto deposits and withdrawals in 2021.
18      Q.   What were you working on?
19      A.   I was working on features for the
20  Exchange.
21      Q.   Okay.  I want to come back to kind of what
22  you were doing in 2021.  But, for now, just focusing
23  on the problems with crypto deposits and withdrawals
24  you were talking with Mr. Tackett about, do you
25  recall what specifically the issue was with --

1             N. Molina - Confidential
2   think you said a deposit or withdrawal not going
3   through?
4       A.   Not specifically.
5       Q.   Were they -- were the problems that you
6   were talking about specific to individual customers,
7   or were they sort of a more widespread problem?
8            MR. DUNNE:  Objection, lack of foundation.
9       A.   I don't remember which category.
10  BY MR. SACK:
11      Q.   How often were there problems with crypto
12  deposits and withdrawals that you recall?
13      A.   I would say every month there were --
14  there was probably at least a few issues.
15      Q.   And was it your responsibility to address
16  those issues?
17      A.   Addressing some of the issues was one
18  thing that I did.
19      Q.   I think you mentioned that the work you
20  did at FTX differed in 2021 versus in 2022; is that
21  right?
22      A.   To some extent.
23      Q.   Can you walk me through the kinds of
24  issues or features that you were working on,
25  starting when you first started at FTX?

1             N. Molina - Confidential
2            MR. DUNNE:  You're talking pre-petition
3   2022, I take it.
4            MR. SACK:  Yes, I'm sorry.
5   BY MR. SACK:
6       Q.   Pre-petition when you first started -- I
7   guess this is 2021 -- at FTX?
8       A.   I worked with some code related to KYC,
9   which means "Know Your Customer."  I did some work
10  related to US taxes.  I did some work related to
11  NFTs.  And that's -- those are the specific things I
12  remember from 2021.
13      Q.   So Know Your Customer, US taxes, and
14  non-fungible tokens?
15      A.   Yes.
16      Q.   At some point you suggested that the kinds
17  of things or focuses you had at FTX changed.
18           When was that change?
19      A.   I wouldn't say there was a specific point,
20  just -- I just think over time I would get -- I
21  would look at different new parts of the code
22  naturally.
23      Q.   Okay.  What other parts of the code did
24  you look at?
25      A.   Later on, or especially later on, I would

1             N. Molina - Confidential
2   look at crypto deposits and withdrawals, FTX US
3   stocks, or kind of stock trading-related code, and
4   transaction analysis code.
5       Q.   Besides those three that you mentioned,
6   crypto deposits and withdrawals, FTX US stocks, and
7   transaction analysis, anything else?
8       A.   Not that I recall right now.
9       Q.   What do you mean you did transaction
10  analysis?
11      A.   I wrote some code or -- and rewrote -- as
12  well as rewrote some code that enabled customers to
13  get information about their historical balance.
14      Q.   Can you tell me what a historical balance
15  is?
16      A.   Yes.  An historical balance would be
17  tokens associated with an account at a previous
18  point in time.
19      Q.   Do you recall why -- sorry.  Strike that.
20           How did it come to be that you wrote or
21  rewrote this code about historical account balance?
22      A.   Initially, I was looking at writing code
23  for US taxes, and in order to understand the taxes
24  associated with accounts in the U.S., I wanted to
25  understand transactions better.  So just in order to

MAGNA
LEGAL SERVICES

1          N. Molina - Confidential
2   get a -- get a better understanding of that, I
3   explored that direction a little bit.
4        Q.  I'm trying to understand if you were -- if
5   someone asked you to develop this historical account
6   balance code or if that was something you came to on
7   your own and decided it was important?
8        A.  I think part of it was coming to it on my
9   own.  I don't remember if at some point I was asked
10  to do specific things related to it.
11       Q.  You've used the term "transactions" quite
12  a bit.
13          What kind of transactions are maintained
14  or logged on the FTX Exchange -- or sorry.  Strike
15  that.
16          What kinds of transactions were logged on
17  to FTX Exchange pre-petition?
18       A.  Generally, any transaction that would
19  change the tokens or the amounts.  Tokens associated
20  with an account would be logged in the FTX database,
21  as well as transactions that would change futures
22  positions for an account.
23       Q.  What kinds of things would change the
24  tokens or the amount of tokens associated with an
25  account?

1          N. Molina - Confidential
2        A.  Trades, deposits, withdrawals, forms of
3   interest payments.
4        Q.  Anything else?
5        A.  I believe there were other things, but
6   right now, I don't remember specifically what -- the
7   other things.
8        Q.  How familiar were you with the code
9   relating to these types of transactions?
10       A.  Somewhat familiar, depending on, you know,
11  the type of transaction.
12       Q.  I think you mentioned several:  Trades,
13  deposits, withdrawals, forms of interest payments.
14          How familiar were you with the codes
15  relating to trades?
16       A.  I was familiar with part of it.
17       Q.  What part of it?
18       A.  I don't know if I remember exactly.
19  But -- well, I was familiar with how it looked like
20  in the data -- how trades looked like in the data
21  and how that was used to create historical balances
22  and potentially other things that I don't remember
23  exactly.
24       Q.  How familiar were you with the code
25  relating to deposits and withdrawals?

1          N. Molina - Confidential
2        A.  Somewhat familiar as well.
3        Q.  And what about the code with respect to
4   forms of interest payments?
5        A.  Somewhat familiar also.
6        Q.  While you were at FTX, were you ever a
7   part of a Slack chat named FTX Customer Support?
8        A.  I don't remember.
9        Q.  Did you ever do work relating to customer
10  support at FTX?
11       A.  I think a little bit that could be
12  related.
13       Q.  What kinds of things do you remember doing
14  that could have been related to FTX customer
15  support?
16       A.  When a customer had an issue that related
17  to code that I had worked with, I would -- on rare
18  occasions, I would communicate with that customer.
19       Q.  Has your role at FTX changed post
20  petition?
21       A.  Yes.
22       Q.  How did it change?
23       A.  I would say I'm writing less code than
24  before, and the code that I write and work with is
25  not related to a functioning exchange.

1          N. Molina - Confidential
2        Q.  What kinds of code are you writing now?
3          MR. DUNNE:  You can describe this
4   generally Nils.
5        A.  Tools that look at FTX data.
6   BY MR. SACK:
7        Q.  Okay.  You mentioned pre-petition --
8   excuse me -- pre-petition that you were -- had some
9   level of familiarity with code relating to trade.
10          Did that relate to margin trading?
11       A.  To some extent, yes.
12       Q.  How about futures trading?
13       A.  To some extent, yes.
14       Q.  Spot trading?
15       A.  To some extent, yes.
16       Q.  Were you involved in developing codes and
17  features relating to liquidation of assets?
18          MR. DUNNE:  Objection to form.
19       A.  What do you mean by -- or, I'm just
20  thinking what you mean by "related to."
21  BY MR. SACK:
22       Q.  Yeah.  I'd say -- well, let me ask it this
23  way, first:  Did you ever design code that -- or
24  rewrite code that was directly responsible for the
25  liquidating of a customer's assets?

1              N. Molina - Confidential
2       A.   Not that I recall.
3       Q.   Did you ever look at that code?
4       A.   Not as I recall.
5       Q.   Were there pieces of code that you wrote
6  that were indirectly related to -- strike that.
7            Did you understand how the code relating
8  to liquidation at FTX worked?
9       A.   Only at a general level.
10      Q.   What was your general understanding of how
11 that code worked?
12      A.   That when a customer -- that some customer
13 accounts could take on a risk of liquidation, and if
14 they took on that risk of liquidation, then they
15 could be liquidated as market conditions changed.
16      Q.   Okay.  And are you aware of how the code
17 implemented that feature at FTX?
18      A.   Right now, I have some awareness of that,
19 yes.
20      Q.   Okay.  What's your awareness of how that
21 worked through the code?
22      A.   I have seen that the code implements logic
23 for deciding when an account should be liquidated
24 and has a few ways of carrying out a liquidation.
25      Q.   Okay.  At a general level, what was the

1              N. Molina - Confidential
2  logic that determined whether an account should be
3  liquidated at FTX?
4            MR. DUNNE:  Objection to form.
5       A.   For each account, there was a liquidation
6  threshold, and when an account was below the
7  liquidation threshold, generally, it would be
8  liquidated by the code.
9  BY MR. SACK:
10      Q.   Were there any exceptions to -- sorry.
11 Strike that.
12           Was the liquidation automatic?
13      A.   The code would automatically liquidate
14 accounts in general.
15      Q.   You're saying in general it would
16 automatically liquidate them.
17           When wouldn't it automatically liquidate
18 them, if ever?
19      A.   I believe there were a couple of
20 exceptions in the code, where even if the
21 liquidation threshold was met by an account, the
22 account would not be liquidated.
23      Q.   What do you recall about those exceptions
24 to the automatic liquidation?
25      A.   I generally recall there were not many

1              N. Molina - Confidential
2  exceptions.  And specifically, accounts that were
3  allowed to be negative, I think, were excluded from
4  liquidation.
5       Q.   Besides accounts that were allowed to be
6  negative, were there any other exceptions that you
7  can recall for the automatic liquidation provision,
8  or exceptions -- excuse me -- to the automatic
9  liquidation provision?
10      A.   Not that I recall.
11      Q.   Are you familiar with 3AC, Three Arrows
12 Capital?
13      A.   Yes.
14      Q.   What do you know about 3AC?
15      A.   I know that they did trading.  They did
16 crypto trading.  Then they became bankrupt and now
17 they're in some litigation with FTX.
18      Q.   Do you know if 3AC had an allow-negative
19 exception to liquidation provision?
20      A.   I don't know.
21      Q.   If 3AC didn't have an allow-negative
22 exception to the liquidation provision, is it your
23 understanding that it would have been --
24           (Reporter clarification request.)
25      Q.   If 3AC did not have an allow-negative --

1              N. Molina - Confidential
2  strike that.
3            If the allow-negative feature was not
4  turned on or logged for 3AC, is it your
5  understanding that it would have been automatically
6  liquidated if it fell below the liquidation
7  threshold?
8            MR. DUNNE:  Objection to form.
9       A.   Most likely, yes, because exceptions were
10 limited as I recall generally.
11           MR. SACK:  Right.
12 BY MR. SACK:
13      Q.   So besides the allow-negative exception,
14 you don't recall any others?
15      A.   Not specifically.
16      Q.   Do you recall any generally?
17      A.   I think there might have been another one
18 or two, but I don't recall specifically what they
19 were.  And I generally believe that they were not
20 very common.
21      Q.   And when we talk about exceptions to this
22 automatic liquidation provision, are you referring
23 to accounts with specific settings that meant that
24 they wouldn't be liquidated, or were there
25 account-specific exceptions?

1           N. Molina - Confidential
2        MR. DUNNE:  Objection to form.
3        A.  I would say it could be either -- either
4   one of those could be possible, but I don't recall
5   specifically what the exceptions were.
6   BY MR. SACK:
7        Q.  I think, earlier, when we were talking
8   about the liquidation provision, you said there were
9   maybe two or more possible ways that that was
10  handled.
11       Do you recall saying that?
12       MR. DUNNE:  Objection to form.
13       A.  I recall saying there was more than one
14  way a liquidation would be carried out by the code.
15       MR. SACK:  Thank you.
16  BY MR. SACK:
17       Q.  What were the multiple ways a liquidation
18  would be carried out by the code?
19       A.  Some of the code dealt with making trades
20  involving spot tokens, which could be crypto or
21  fiat.  Some other code dealt with trades involving
22  futures, future positions.  And the code involving
23  futures positions had a couple or a few different
24  ways to cause those trades to be made.
25       Q.  Okay.  I think I'm not totally

1           N. Molina - Confidential
2   understanding how what you just said connects to
3   liquidation.
4        Could you, you know, draw the connection a
5   little bit more explicitly for me?
6        A.  Yes.  When an account is liquidating, then
7   the liquidation engine will liquidate the account.
8   And by that, I mean, it will cause trades,
9   liquidation trades, to be executed on the account.
10  And I was talking to the code that causes these
11  trades to be made.  And we could call that the
12  "liquidation engine."
13       Q.  That's helpful.
14       So when we talk about liquidation engine,
15  it's the mechanism that causes the trades to happen
16  that will liquidate those assets or parts of the
17  account?
18       A.  Yes.  I think that's fair to say
19  generally, yes.
20       Q.  If there's a better way to say it, feel
21  free to, you know, supply that.
22       A.  I would just say that liquidation engine
23  maybe isn't a formal term.  So it could also include
24  other logic related to liquidations, like selecting
25  whether an account should be liquidated or not,

1           N. Molina - Confidential
2   potentially.
3        Q.  I see.
4        So one part of it is about maybe what we
5   were talking about earlier, about selecting whether
6   and when to liquidate an account, and another part
7   would be about, perhaps, implementing the
8   liquidation itself?
9        A.  Yes.
10       Q.  Okay.  Are you familiar with any
11  liquidation that may have happened with 3AC's
12  accounts?
13       A.  Yes.
14       Q.  What do you recall about those
15  liquidations or that liquidation?
16       A.  I recall that sometime in June 2022, there
17  were transactions in the data that looked like they
18  were a liquidation of an account associated with
19  Three Arrows Capital.
20       Q.  Were you familiar with that liquidation as
21  it was happening or shortly after it happened -- or,
22  strike that.
23       When did you first become familiar with
24  the 3AC liquidation that you just described?
25       A.  After bankruptcy.  Probably 2024 or 2025.

1           N. Molina - Confidential
2        Q.  When you say there were transactions in
3   the data that looked like they were liquidation of
4   an account, is there a way to know for sure whether
5   it was part of a liquidation?
6        A.  I would say from the transactions, one can
7   be pretty certain it was a liquidation.
8        Q.  And just to be clear, a liquidation was
9   part of FTX's liquidation engine; that is, it would
10  come from FTX, the liquidation?
11       MR. DUNNE:  Objection to form.
12       A.  Well, I would say the liquidation would
13  come from FTX.
14  BY MR. SACK:
15       Q.  Do you recall how much of 3AC's accounts
16  was liquidated during this time period that you
17  looked at?
18       MR. DUNNE:  Objection to form.
19       A.  Not specifically.
20  BY MR. SACK:
21       Q.  Do you recall generally about how much
22  sort of in asset value we're talking about?
23       MR. DUNNE:  Objection.
24       A.  Beyond that it wasn't very small, beyond
25  that it was a significant amount, not much more than

MAGNA
LEGAL SERVICES

1              N. Molina - Confidential
2    that.
3    BY MR. SACK:
4        Q.   Do you recall whether it was over a
5    million dollars?
6              MR. DUNNE:  Objection to form.
7        A.   I think it was.  Not totally sure, but I
8    think it was.
9    BY MR. SACK:
10       Q.   What to you is a significant amount of
11   money to be liquidated?
12       A.   I would say probably well over -- well
13   over a million.
14       Q.   This liquidation that we were talking
15   about related to 3AC, do you know if that was
16   related to one or multiple 3AC accounts?
17       A.   I believe the transactions I looked at
18   mostly or entirely involved one account.
19       Q.   You mentioned that you did work relating
20   to historical account balance.
21            Did you look at the historical account
22   balance of 3AC at any point in time?
23       A.   Yes.
24       Q.   And to be clear, I'm not asking -- if
25   counsel asked you to do it, I don't want to know

1              N. Molina - Confidential
2    what counsel told you.  I just want to know why you
3    did it.
4        A.   I was asked by Alvarez & Marsal.
5        Q.   Who or what is Alvarez & Marsal?
6        A.   They're a company -- I believe a
7    consulting company, working for FTX after
8    bankruptcy.
9        Q.   If we used the term "A&M" to mean
10   Alvarez & Marsal, will you understand that's what
11   we're referring to?
12       A.   Yes.
13       Q.   When did A&M ask you to do a -- to look at
14   a -- the historical balance or balances for 3AC?
15            MR. DUNNE:  Nils, you're doing a good job
16       being careful in responding, but just take
17       these one question at a time.  He's asking you
18       specifically when.  That's fine.  I'm allowing
19       you to answer that question.
20       A.   Can you repeat the question?
21            MR. SACK:  Yeah, no problem.
22   BY MR. SACK:
23       Q.   I was just asking when A&M asked you to
24   look at the historical account balance or balances
25   for 3AC?

1              N. Molina - Confidential
2        A.   I would say starting early 2023.
3        Q.   Actually, I think maybe we've been going
4    for about an hour now.  Do you want to take a five,
5    ten-minute break?
6              MR. DUNNE:  Sounds good.
7              THE VIDEOGRAPHER:  We're going off the
8        record.  The time is 10:11 a.m.
9              (Recess.)
10            THE VIDEOGRAPHER:  We are back on the
11       record.  The time is 10:31 a.m.
12   BY MR. SACK:
13       Q.   Mr. Molina, thank you for coming back on
14   the record.  I just want to remind you that you're
15   under oath, just as you were before we took our
16   break.
17            Does that make sense?
18       A.   Yes.
19       Q.   Great.
20            Before we took our break, I think we were
21   talking a little bit about the liquidation relating
22   to 3AC's account or accounts.
23            Do you recall us talking about that?
24       A.   Yes.
25       Q.   Do you know if at or around the time of

1              N. Molina - Confidential
2    that liquidation, 3AC had an API or a bot that was
3    capable of doing transactions on the FTX Exchange?
4        A.   I think I recall Three Arrows Capital used
5    an API.
6        Q.   How do you -- sorry.
7            What gave you that impression?
8        A.   When looking at transaction data for
9    Three Arrows Capital, I saw words relating to an API
10   in some of those transactions.
11       Q.   What do you mean you saw words relating to
12   an API in some of those transactions?
13       A.   I think I saw the word "REST," which would
14   relate to an API called "REST."  So the transaction
15   had information related to an API in it.
16       Q.   Where would you see this word "REST"?
17       A.   I believe in some of the transactions for
18   Three Arrows Capital such as trades.
19       Q.   Maybe you could just break it down a
20   little bit more for me.
21            Where would you see language relating to a
22   transaction?
23       A.   In the FTX database.
24       Q.   And what was kept on the FTX database?
25       A.   For each transaction there was information

MAGNA
LEGAL SERVICES

1              N. Molina - Confidential
2    related to the transaction.
3        Q.   Such as what?
4        A.   Such as the time, recorded as a time
5    stamp, and often quantities and prices and other
6    information about the transaction.
7        Q.   And how would you -- strike that.
8              How could a customer view this same
9    information that you're talking about now, or was
10   that only available to you because you worked at
11   FTX?
12       A.   Some of the information in the FTX
13   database was available to customers but not all of
14   it.
15       Q.   Okay.  When I asked about whether 3AC had
16   an API or a bot capable of doing transactions, you
17   indicated that sometimes you saw this word "REST,"
18   and that indicated to you that potentially they were
19   using an API or a bot; is that right?
20       A.   Yes.
21       Q.   Did you -- thinking specifically about the
22   transactions relating to the liquidation that we
23   were talking about, do you know whether those
24   reflected an API or a bot doing transactions?
25       A.   I don't think they did.

1              N. Molina - Confidential
2        Q.   And what gave you that impression?
3        A.   I don't think I saw that language or
4    information related to API in there.
5        Q.   Did FTX have the capacity of using an API
6    or bot to conduct transactions?
7        A.   I think so.
8        Q.   What makes you think so?
9        A.   I mean, FTX owned -- had accounts on the
10   Exchange.  So they could use the API for those
11   accounts.
12            MR. DUNNE:  You said FTX.  Did you mean
13   3AC?
14       A.   Oh.
15            MR. SACK:
16       Q.   I was asking about FTX.
17            MR. DUNNE:  I'm sorry.  I misheard your
18   question.
19            MR. SACK:  That's okay.
20            BY MR. SACK:
21       Q.   If the word "REST" did not appear on the
22   transaction language you were mentioning looking at
23   before, would that indicate to you that no API was
24   used?
25            MR. DUNNE:  Objection.

1              N. Molina - Confidential
2        A.   Not necessarily.
3    BY MR. SACK:
4        Q.   How else could the language indicate that
5    an API or a bot was used?
6        A.   I don't know exactly.
7        Q.   So just to be clear, the only language
8    that you know of -- strike that.
9              I just want to understand what you're
10   saying.  So correct me if I'm misstating what you
11   said.
12            The only way that you currently know of to
13   know whether an API or a bot was used was if the
14   word "REST" was there?
15            MR. DUNNE:  Objection.
16       A.   That I know of, that I can remember, yes.
17   BY MR. SACK:
18       Q.   When a customer wants to transact on the
19   FTX Exchange, could they have the transactions
20   spread out over a long period of time?
21            MR. DUNNE:  Objection to form.
22       A.   Yes.
23   BY MR. SACK:
24       Q.   How would they do that?
25       A.   They could -- they could send requests

1              N. Molina - Confidential
2    over a period of time, would be one way.
3        Q.   Let me reask my question.
4              Besides manually conducting transactions
5    over a long period of time, was there some other way
6    to conduct multiple transactions over a period of
7    time?
8            MR. DUNNE:  Objection, lack of foundation.
9        A.   There was a way you could do something
10   that could result in transactions over time.
11   BY MR. SACK:
12       Q.   Like what?
13       A.   You could create a limit order, which,
14   over time, results in trades.
15       Q.   What's a limit order?
16       A.   A limit order is an order placed on a
17   market that has a price you are willing to trade at.
18       Q.   And just to be clear, how does that let
19   you conduct a number of transactions over a period
20   of time without manually conducting the
21   transactions?
22       A.   It could result in transactions spread
23   over time because the price could be accepted by
24   other people over time.
25       Q.   Do you recall looking at any specific

MAGNA
LEGAL SERVICES

1        N. Molina - Confidential
2    document where you saw the word "REST" in 3AC's
3    transactions?
4        A.  Specific document, no, I don't recall.
5        Q.  So you just have a general recollection
6    that somewhere along the way you saw the word "REST"
7    and a 3AC account?
8        MR. DUNNE:  Objection.
9        A.  General recollection, yes.
10   BY MR. SACK:
11       Q.  If there were a limit order, how would
12   that be indicated on the FTX Exchange?
13       MR. DUNNE:  Objection to form.
14       A.  It would be in the FTX database as an
15   order.
16   BY MR. SACK:
17       Q.  How would it differ in kind from other
18   orders that -- yeah.
19       A.  I don't know.
20       Q.  What other kinds of orders were there
21   besides limit or limited orders?
22       A.  I have a general recollection that you
23   could send an order that immediately is executed,
24   and I don't think that's usually called a "limit
25   order."

1        N. Molina - Confidential
2        Q.  And I think you said that if there were a
3    limit order, it would be logged somewhere on the FTX
4    database.
5        How would that have been logged?
6        MR. DUNNE:  Objection.
7        A.  There were tables in the FTX database
8    called orders.  So I think it would be in one of
9    those tables.
10   BY MR. SACK:
11       Q.  Okay.  And just to be clear, you mentioned
12   an order that immediately happened as compared to
13   this limit or limited order we were talking about.
14       Would the distinction between those two
15   types of orders be logged on that table you were
16   just talking about?
17       A.  I think so.  I -- I don't know.  I don't
18   know.
19       Q.  Okay.  Are you aware of any way of telling
20   whether or not an order placed was a limited order
21   or a limit order versus an order that immediately
22   took place?
23       A.  I don't know.
24       Q.  Just to be clear, if a customer puts an
25   order that's not a limit order, the trade is

1        N. Molina - Confidential
2    executed immediately and not over time; is that
3    right?
4        MR. DUNNE:  Objection.
5        A.  I would say part of the issue is I didn't
6    really work with the language of limit orders.  So I
7    may be using the wrong term.
8        What I am saying is that if it is
9    executed immediately, it doesn't sound to me like a
10   limit order.  And that's one way something might not
11   look like a limit order.
12   BY MR. SACK:
13       Q.  And I guess I'm trying to figure out, how
14   you would be able to tell?
15       A.  Yeah.  So yeah, I was saying I don't know
16   specifically.  I would assume -- I would think there
17   could be a way of telling from the data.
18       Q.  But you don't know?
19       A.  I don't know much specifically about the
20   orders data.
21       Q.  Okay.  And I just want to circle back to
22   the question I was asking a moment ago.  I'm not
23   sure you quite answered it.
24       I think I was asking if a customer puts in
25   an order that's not a limit order, as best you

1        N. Molina - Confidential
2    understand, that trade would be executed immediately
3    and not over time?
4        MR. DUNNE:  Objection to form.
5        A.  I wouldn't necessarily say that.
6    BY MR. SACK:
7        Q.  Why not?
8        A.  Because I'm not very familiar with all of
9    the types of orders so I don't know if there's a
10   hard-set rule about that.
11       Q.  Okay.  But let me frame it this way.  If
12   it were a limit order, it's your understanding that
13   it would be executed over a greater period of time?
14       MR. DUNNE:  Objection to form.
15       A.  I was saying it could.  I think it could.
16   Not necessarily.
17   BY MR. SACK:
18       Q.  Is it possible a limit order would be
19   executed immediately?
20       MR. DUNNE:  Objection to form.
21       A.  I don't know because the term "limit
22   order," I don't know kind of formally how it's used.
23   BY MR. SACK:
24       Q.  Well, as best you understand "limit
25   order."

**MAGNA** ▶
LEGAL SERVICES

1          N. Molina - Confidential
2          MR. DUNNE:  Objection.
3          A.   As best I understand, normally not
4    immediately.
5    BY MR. SACK:
6          Q.   We might come back to talk more about
7    these transactions in the liquidation engine.  I
8    want to talk about what other "engines," as you used
9    that term, you recall being present in the FTX code.
10         What other engines or modules do you
11   recall?
12         MR. DUNNE:  Objection to form.
13         A.   Engines or modules, you're asking?
14         MR. SACK:  Yeah.
15   BY MR. SACK:
16         Q.   Are those the same term as you understand
17   them, "engine" and "module"?
18         A.   I wouldn't really use "engine" for other
19   parts of the code.
20         Q.   Just to be clear, you'd only use engine
21   for liquidation?
22         A.   I think so.  I can't -- another context
23   doesn't come to mind right now for engine.
24         Q.   Okay.  Is the term "module" something you
25   used when you were working on FTX code?

1          N. Molina - Confidential
2          A.   I think so.
3          Q.   How did you use that term?
4          A.   Just a part of the code base.
5          Q.   Are there other specific -- sorry.
6          Are there any specific types of modules
7    that you can recall working on or being present in
8    the FTX code?
9          A.   I recall being familiar with a few modules
10   or parts of code.  I don't know what you mean by
11   "types of modules."
12         Q.   Sorry.  Maybe I'm just not using the
13   language as you might, but I'm trying my best to.
14         What modules do you recall working on or
15   seeing in the FTX code?
16         A.   You know, modules for processing crypto
17   deposits or withdrawals, for analyzing transactions,
18   for KYC, Know Your Customer, onboarding.  Really,
19   any code feature would be in the module in the code
20   base.
21         Q.   Do you recall any module talking about
22   trading in general?
23         MR. DUNNE:  Objection to form.
24         A.   I have a general recollection there were
25   modules relating to trading.

1          N. Molina - Confidential
2    BY MR. SACK:
3          Q.   Do you recall -- are you familiar with the
4    margin trading program that FTX had?
5          A.   Yes.
6          Q.   What do you recall about that?
7          A.   I recall code that implemented the spot
8    margin program.
9          Q.   What do you recall about that code?
10         A.   I recall the code identified accounts that
11   were borrowing tokens and accounts that were lending
12   tokens.
13         Q.   Okay.  And do you recall a code relating
14   to matching the accounts that were borrowing and the
15   accounts that were lending tokens?
16         A.   I recall code that collected all of the --
17   looked at all of the borrowers, looked at all of the
18   borrowers and looked at all of the lenders and did
19   calculations involving the two groups.
20         Q.   What kinds of calculations?
21         A.   I recall code that determined an interest
22   rate specific to a token that was applied to those
23   groups.
24         Q.   Any other pieces of the code that you
25   recall -- or sorry.

1          N. Molina - Confidential
2          Any other calculations you recall?
3          A.   No.
4          Q.   Do you recall how the code sequenced the
5    borrowing and the lending as part of the margin
6    trading program?
7          MR. DUNNE:  Objection to form.
8          A.   I don't know if I saw sequencing because
9    the code -- the code would look at the groups, but I
10   don't recall sequencing between those groups in the
11   code.
12   BY MR. SACK:
13         Q.   Do you know whether -- sorry.
14         You said there was code that matched the
15   borrower with lenders, potentially -- or let me
16   reask that question.
17         You mentioned that there was this matching
18   part of the code that connected a borrower or
19   borrowers to a lender or lenders; is that right?
20         MR. DUNNE:  Objection.
21         A.   I didn't really say "matching."  There was
22   kind of calculation involving both groups.  Yeah,
23   calculation or comparison between -- using
24   information from the two groups.
25

1              N. Molina - Confidential
2    BY MR. SACK:
3        Q.  Okay.  And then what would happen after
4    those calculations were run, according to the code?
5        A.  There would be -- an interest rate would
6    be determined specific to a token and it would be
7    applied to members of both groups.
8        Q.  Okay.  And if someone wanted to borrow
9    money, or a digital asset, where would that digital
10   asset come from?
11           MR. DUNNE:  Objection to form.
12           A.  What do you mean by "come from"?
13   BY MR. SACK:
14       Q.  If someone wants to borrow one bitcoin,
15   through the margin trading program, in what way or
16   how do they receive that one bitcoin?
17           MR. DUNNE:  Objection.
18       A.  The code would describe the account as
19   borrowing one bitcoin and -- but it wouldn't specify
20   beyond that -- or, you know, more information beyond
21   that for that specific borrower.
22   BY MR. SACK:
23       Q.  And if someone were borrowing more than
24   one digital asset, is it possible that they would --
25   sorry, let me ask the full set of that question.

1              N. Molina - Confidential
2           Someone borrows one bitcoin, you say it's
3    marked in their account as having borrowed one
4    bitcoin.
5           Where, if anywhere, is it marked that
6    someone lent one bitcoin?
7        A.  The code that looks at borrowers and
8    lenders would -- would identify the borrows and
9    identify the lenders -- identify tokens being lent
10   by accounts, and it would mark certain tokens as
11   being lent.
12       Q.  Was there any way to tell which account
13   had lent the specific asset another account had
14   borrowed through the margin trading program?
15           MR. DUNNE:  Objection.
16       A.  I would say generally no, since -- yeah,
17   the groups -- it would be a group of borrows and a
18   group of lends.
19   BY MR. SACK:
20       Q.  What do you mean it would be a group of
21   borrows and a group of lends?
22           Could you say more on that?
23       A.  Yeah.  I was describing a group of borrows
24   and group of lends, and the question was kind of an
25   individual borrow.  So, yeah, I don't think I can

1              N. Molina - Confidential
2    speak to an individual borrow.
3        Q.  When you say "group of borrows" and "group
4    lends," are you referring to multiple accounts
5    borrowing and multiple accounts lending or something
6    else?
7        A.  Multiple accounts or potentially multiple
8    accounts borrowing and lending.
9        Q.  And you said -- when I asked you whether
10   there was a way to tell which account had lent a
11   specific asset, you said generally, no, there was no
12   way to tell which account had lent that specific
13   asset.
14           Was there something -- some circumstances
15   where you could?
16       A.  Well, you could see a list of accounts --
17   for a given asset, you could see a list of accounts
18   lending that asset or that token -- sorry.
19           For a given token, you could see a list of
20   accounts lending that token.  So I guess if there
21   were only one account there, then maybe you could
22   talk about -- you could talk about an individual
23   account.
24       Q.  To the best of your recollection, was
25   there ever only one account borrowing or lending a

1              N. Molina - Confidential
2    specific token?
3           MR. DUNNE:  Objection.
4        A.  I can't say.  I don't remember if there
5    was one way or the other.
6    BY MR. SACK:
7        Q.  So sitting here today, you think it's
8    possible that only one account might be borrowing or
9    lending a specific token at a time on the
10   FTX Exchange?
11           MR. DUNNE:  Object to form.
12       A.  Yeah.  I can't say if -- if that was -- if
13   that happened or not.  I think it was probably
14   possible for that to happen in theory.
15   BY MR. SACK:
16       Q.  Do you know how many users were trading on
17   the FTX Exchange at any given time?
18       A.  Not exactly.
19       Q.  Do you know how many accounts were
20   participating in the margin lending program at any
21   given time?
22       A.  Not exactly.
23       Q.  Did the code permit a lender on the margin
24   trading program to stop participating in the lending
25   program if they wanted to do so?

MAGNA ▶
LEGAL SERVICES

1          N. Molina - Confidential
2     A.  I think so.
3     Q.  You think so.
4         What makes you unsure?
5     A.  I don't know if I looked specifically at
6 the code where lenders could stop lending out.  So I
7 just don't recall seeing that specific code.
8     Q.  Okay.  If the code did permit a lender to
9 stop participating in the lending program, did the
10 code then permit the lender to withdraw the specific
11 asset that they had lent in the program?
12        MR. DUNNE:  Objection to form.
13     A.  If a token was not being lent by a lender
14 then, in general, it could be used normally.
15 BY MR. SACK:
16     Q.  I think maybe I didn't frame my question
17 carefully enough because I'm not sure that that was
18 answering what I was getting at.
19         I'm saying if someone wanted to stop
20 participating in the lending program and said, "I
21 want to take back the assets I lent," would they be
22 able to withdraw the specific assets that they had
23 lent as part of the margin trading program?
24        MR. DUNNE:  Objection to form.
25     A.  From what I saw in the code, if -- if an

1          N. Molina - Confidential
2 asset was not being lent -- was not marked as being
3 lent, then in general, it would be able to be -- the
4 code would not restrict it from being withdrawn.
5 BY MR. SACK:
6     Q.  I'm saying if I were -- if I were a lender
7 and I lent ten bitcoin through the margin trading
8 program, and the next day I said, "I want to stop
9 participating in the margin lending program; I want
10 my ten bitcoin back," could I get those specific ten
11 bitcoin that I had lent back into my account?
12        MR. DUNNE:  Objection.
13     A.  Yeah.  I think you're describing a few
14 steps.  And I can say if the token is not marked as
15 lent, then I believe, in general, it could be
16 withdrawn.
17 BY MR. SACK:
18     Q.  I'm saying had the token been lent, could
19 I get that token back?
20        MR. DUNNE:  Objection.
21     A.  So my general understanding is that a
22 lender -- or I generally think that a lender can
23 stop lending.
24        MR. SACK:  Okay.
25     A.  And then if they were no longer then

1          N. Molina - Confidential
2 lending the token, from what I can tell in the code,
3 the token could be used normally.
4 BY MR. SACK:
5     Q.  Okay.  Maybe let's break it down a little
6 bit.
7         Sounds like someone could lend a token,
8 right, through the margin trading program; is that
9 right?
10     A.  Yes.
11     Q.  Let's say -- let me refer to it this way:
12 Imagine I were lending you $10 and I gave you a
13 $10-bill.  If I wanted to stop lending you the $10,
14 you could hand me back the $10-bill, right?
15     A.  Yes.
16     Q.  And I would have received back the exact
17 same set of $10 that I lent to you, right?
18     A.  Yes.
19     Q.  I'm asking about something similar on the
20 margin trading program.
21         If I had ten bitcoin into the margin
22 trading program, would I be able to get those same
23 exact ten bitcoin back if they had already been lent
24 out?
25        MR. DUNNE:  Objection.  Incomplete

1          N. Molina - Confidential
2 hypothetical, and among other problems.
3     A.  If a lender lends ten bitcoin and then the
4 ten bitcoin is no longer lent, then the lender --
5 then those ten bitcoin in the lender's -- associated
6 with the lender's account, as far as I can tell from
7 the code, could be used normally.
8 BY MR. SACK:
9     Q.  Would the lender get back the same bitcoin
10 that they had put in?
11        MR. DUNNE:  Objection.
12     A.  I don't really know what you mean by
13 "same."
14 BY MR. SACK:
15     Q.  Just like in my dollar bill example, I got
16 the same $10-bill back.  Would I get the same ten
17 bitcoin back if I had lent bitcoin?
18        MR. DUNNE:  Objection.
19     A.  I think in this example, there would be
20 ten bitcoin associated with the account, and from
21 what I can tell in the code, there would still be
22 ten bitcoin associated with the account.
23 BY MR. SACK:
24     Q.  Okay.  There would be -- so just to pick
25 up where we were just talking, there would still be

1          N. Molina - Confidential
2    ten bitcoin associated with the account, but it's
3    not necessarily true that would be the same bitcoin
4    that the lender --
5          (Reporter clarification request.)
6      Q.   Just picking up where we left off, you
7    said there would be ten bitcoin associated with the
8    lender's account.
9          I'm asking whether it would necessarily be
10   true that those would be the same ten bitcoin that
11   the lender had put into the margin trading program
12   that had been lent out?
13         MR. DUNNE:  Objection.
14     A.   I don't think I can say if it was the same
15   or not.  I can just say there would be ten bitcoin
16   associated with the account because that's sort of
17   what I would see in the code and the data for the
18   account.
19   BY MR. SACK:
20     Q.   Okay.  Have you met with an individual
21   named Robert Gordon?
22     A.   Not as I recall.
23     Q.   Okay.  Do you recall preparing some -- or
24   meeting with an individual in preparation for a
25   30(b)(6) deposition for FTX?

1          N. Molina - Confidential
2          MR. DUNNE:  You can answer that with
3    respect to your memory.
4      A.   Yeah, I don't know -- yeah, I don't --
5    because I'm not aware of that -- or what kind of
6    depositions have happened.
7          MR. SACK:  That's fair.
8    BY MR. SACK:
9      Q.   Do you recall just meeting with anyone at
10   FTX to help them prepare for a deposition besides
11   your own?
12     A.   No.
13     Q.   Okay.  You don't recall meeting with
14   anyone in August of 2024 in preparation for a
15   deposition?
16         MR. DUNNE:  Objection, asked and answered.
17     A.   I think I met with people around that time
18   but no, not specifically.
19         MR. SACK:  I now want to show you a
20   document that I'm going to premark for
21   identification as Exhibit 38.  It bears the
22   Bates number FTX_3AC_000012 -- sorry.  Strike
23   that.
24         It bears 000013959.
25         (Exhibit 38 was received and marked for

1          N. Molina - Confidential
2    identification, as of this date.)
3          THE WITNESS:  Could we do a break in about
4    15 minutes?  No rush on it though.
5          MR. SACK:  You got it.
6    BY MR. SACK:
7      Q.   Do you recognize what's been handed to
8    you?
9          MR. DUNNE:  Nils, I'll instruct you to
10   exclude from your answer to that question any
11   information you may have gained in preparation
12   for your deposition.
13     A.   No.
14   BY MR. SACK:
15     Q.   I'll represent to you that these are
16   handwritten notes that were produced to us by FTX as
17   part of this litigation, from a man named Patrick
18   McGrath.
19         Do you recognize the name Patrick McGrath?
20     A.   No.
21     Q.   Do you see at the top of this document --
22   you might have to flip it upside down.  I think it
23   was produced upside down.
24     A.   (Witness complies.)
25     Q.   Great.

1          N. Molina - Confidential
2          It says Nils, 8/29/2024; do you see that?
3      A.   Yes.
4      Q.   Does this refresh your recollection about
5    whether you had a meeting with anyone on August --
6    or on or around August 29, 2024?
7      A.   No.
8      Q.   Did you have a chance to look through the
9    contents of this document?
10         MR. DUNNE:  You want him to take a look at
11   it now?
12         MR. SACK:  Yes.
13   BY MR. SACK:
14     Q.   Please, go ahead.
15         MR. DUNNE:  Take a look at it, Nils.
16         (Witness complies.)
17     A.   Yes.
18   BY MR. SACK:
19     Q.   You've had a chance to look at it.
20         Did looking through the document refresh
21   your memory at all?
22     A.   I have a general recollection of
23   discussing some of these topics with A&M at the
24   general time.
25     Q.   + Okay.  What do you remember generally

1             N. Molina - Confidential
2    talking with them about?
3             MR. DUNNE:  Objection.  I'll instruct him
4    not to answer.  We're not going to be getting
5    into his discussion with A&M.  If you have a
6    question on a specific fact or subject matter,
7    you can frame it in that way.
8             MR. SACK:  Sure thing.
9    BY MR. SACK:
10    Q.  On the first page, you'll see there's
11    language that says "account value."
12        Do you see that heading?
13    A.  Yes.
14    Q.  And then there's a bullet "Position size
15    times each future."
16        How did you understand how to value
17    futures?
18             MR. DUNNE:  Objection.
19    A.  I don't -- I don't know if I would --
20    would generally value futures but -- so...
21    BY MR. SACK:
22    Q.  Do you know how the FTX platform -- strike
23    that.
24        Is it right that the FTX platform or
25    Exchange provided a way for users to see the value

1             N. Molina - Confidential
2    of certain assets in their account?
3    A.  Yes.  I wouldn't use the word "assets,"
4    but yes.
5    Q.  What word would you use?
6    A.  I would just use tokens in their account.
7    Q.  Okay.  It would show the FTX platform or
8    Exchange brought out a way for users to see the
9    tokens in their account?
10    A.  Yes.
11    Q.  Would it also show to them anything
12    related to futures contracts?
13    A.  Yes.
14    Q.  What would it show?
15    A.  There would be a way for a customer to see
16    their positions in each future.
17    Q.  Was there also an overall account balance
18    that was visible to a customer on the FTX Exchange
19    or platform?
20             MR. DUNNE:  Objection to form.
21    A.  Yes.  I would say overall account balance,
22    but -- yeah, overall total account balance, there
23    was something like that.
24    BY MR. SACK:
25    Q.  What term would you use instead of

1             N. Molina - Confidential
2    "overall account balance"?
3    A.  I know when a customer logged in, they
4    would see net USD.  So I would say that would be
5    kind of the total account net USD balance or
6    total -- but we could just say -- call it "total
7    account balance."
8    Q.  Okay.  Great.
9        Would the total account balance reflect or
10    incorporate anything relating to that customer's
11    futures positions?
12    A.  The code for calculating that total
13    account balance wouldn't really use the positions
14    but, over time, positions could impact or change the
15    balance.
16    Q.  I guess in what way would the number of
17    the total account balance reflect any open futures
18    contract positions?
19             MR. DUNNE:  Objection to form.
20    A.  I know that an open futures position would
21    be associated with a price in the future, and when
22    that price changed, that would affect the account's
23    balance.
24    BY MR. SACK:
25    Q.  I guess I'm not totally sure I understand

1             N. Molina - Confidential
2    your answer.  Would an open futures position be
3    reflected in the overall account balance or not?
4             MR. DUNNE:  Objection.
5    A.  The code for calculating the overall
6    account balance wouldn't really look at the
7    positions, as I said previously.
8    BY MR. SACK:
9    Q.  So as best you can recall, looking at this
10    document, where it says "Position size times each
11    future," under Account Value, what do you understand
12    that to mean?
13             MR. DUNNE:  Objection, lack of foundation.
14    Calls for speculation.
15    A.  Yeah, I don't really have a general
16    impression or sense of what that means.  I would --
17    obviously, I think it's referring to kind of future
18    positions from the words there.
19    BY MR. SACK:
20    Q.  But based on your own understanding of the
21    code and the 3AC platform, what did "position size
22    times future" mean to you, if anything?
23             MR. DUNNE:  Objection.
24    A.  Could you repeat?  Position size times
25    what?

Page 74

```
 1          N. Molina - Confidential
 2   BY MR. SACK:
 3       Q.  Times each future?
 4          MR. DUNNE:  Objection.
 5       A.  To me, that doesn't really make sense
 6   because each future doesn't refer to something
 7   specific.
 8   BY MR. SACK:
 9       Q.  What do you mean, "each future doesn't
10   refer to something specific"?
11       A.  I think position size times each future
12   doesn't exactly make sense because it doesn't make
13   sense mathematically to me.
14       Q.  Why not?
15       A.  Because I don't -- I don't know exactly,
16   or what each future refers to.  So it's really not
17   very precise.
18       Q.  If it had said time -- sorry.
19          I'm just trying to understand what would
20   help you clarify.
21          If it said "each future's contract," would
22   that clarify for you?
23          MR. DUNNE:  Objection.
24       A.  No.
25
```

Page 75

```
 1          N. Molina - Confidential
 2   BY MR. SACK:
 3       Q.  When you say each future doesn't refer to
 4   something specific, what do you mean by that?
 5       A.  I'm just -- I'm thinking -- yeah, I just
 6   can't -- I can't really draw conclusions on what
 7   that means because I don't know what each future
 8   refers to in the context of that line.
 9       Q.  Right.
10          I'm just -- taking a step outside the
11   document, if I were to just say we're multiplying
12   each futures contract times the size of that futures
13   contract, what would that mean to you?
14          MR. DUNNE:  Objection.
15       A.  It wouldn't make much sense to me.
16   BY MR. SACK:
17       Q.  Okay.  So if we had the number of open
18   futures contracts for a certain position, and we
19   multiplied that times the price of the futures
20   contract, would that -- what would that mean to you?
21          MR. DUNNE:  Objection.
22       A.  To me, that product --
23          MR. SACK:  Yeah.
24       A.  -- of two numbers sounds like it would be
25   called "notional of the position."
```

Page 76

```
 1          N. Molina - Confidential
 2   BY MR. SACK:
 3       Q.  What does the term "notional of the
 4   position" mean?
 5       A.  It means the product of price times
 6   quantity of a position.
 7       Q.  Okay.  And would that notional be
 8   reflected on the FTX Exchange for a particular
 9   customer?
10          MR. DUNNE:  Objection.
11       A.  I think -- I think there may have been a
12   way for a customer to see notional, but I don't --
13   I'm not sure.
14   BY MR. SACK:
15       Q.  Do you know if the notional was
16   incorporated into that overall account balance we
17   were talking about?
18          MR. DUNNE:  Objection, asked and answered.
19       A.  Yeah.  The code wouldn't -- the code that
20   calculates that wouldn't use that product in that
21   calculation.
22   BY MR. SACK:
23       Q.  Looking further on this document, I'm
24   looking at the third page.
25          MR. DUNNE:  Where is that?
```

Page 77

```
 1          N. Molina - Confidential
 2          MR. SACK:  Ending in Bates number 961.
 3          THE WITNESS:  We're kind of close to a
 4   one-minute break soon?
 5          MR. SACK:  That sounds great.  If I ask
 6   just a couple of questions on this, we can take
 7   a break.
 8          THE WITNESS:  Sure.  Great.
 9          MR. SACK:  Sounds great.  Thanks for
10   reminding me about the break.
11   BY MR. SACK:
12       Q.  I see that it says, about three-quarters
13   through the page: "randomly create trades if
14   couldn't finish."
15          Do you see that?
16       A.  Yes.
17       Q.  Do you have any sense of what that might
18   be referring to?
19          MR. DUNNE:  Objection, lack of foundation.
20          MR. SACK:  Do you want to keep our
21   objections to form?
22          MR. DUNNE:  No.  I will object as I see
23   fit.  If you have a problem with "calls for
24   speculation" or "lack of foundation" --
25          MR. SACK:  I think "form" is the proper
```

MAGNA
LEGAL SERVICES

Page 78

1              N. Molina - Confidential
2      objection to be used here.
3              MR. DUNNE: Noted.
4              MR. SACK: Thank you.
5      A.  I don't know what that means there or what
6      that refers to.
7      BY MR. SACK:
8      Q.  Based on your experience as a software
9      engineer at FTX, do you recall when or if trades
10     would be randomly created if something couldn't
11     finish?
12             MR. DUNNE: Objection.
13     A.  I don't recall code that would -- or,
14     yeah, I don't really know what that means.  And I
15     don't recall code that would randomly create trades.
16     BY MR. SACK:
17     Q.  Earlier, we were talking about the margin
18     trading program.  Was it ever possible that a trade
19     couldn't finish because there weren't the
20     appropriate number of lenders for a particular
21     borrower's ask?
22             MR. DUNNE: Objection.
23     A.  I don't -- I don't recall code that would
24     prevent a trade from happening because of that.
25

Page 79

1              N. Molina - Confidential
2      BY MR. SACK:
3      Q.  So if there weren't a sufficient number of
4      lenders, the trade would still go through for a
5      particular ask from a borrower?
6              MR. DUNNE: Objection.
7      A.  I don't -- I don't recall any code that
8      would prevent the trade from going through due to
9      lenders.
10     BY MR. SACK:
11     Q.  Just so I understand, a borrower then
12     could always borrow through the margin trading
13     program, even if there weren't necessarily lenders
14     who matched up to it; is that right?
15             MR. DUNNE: Objection, lack of foundation.
16     A.  I wouldn't say a borrower could always
17     borrow.
18     BY MR. SACK:
19     Q.  And in your experience, most of the time
20     were there -- could a borrower ever borrow on the
21     FTX Exchange through the margin trading platform,
22     even if there weren't a lender who could supply the
23     tokens that they had asked for?
24             MR. DUNNE: Objection, lack of foundation,
25         calls for speculation.

Page 80

1              N. Molina - Confidential
2      A.  I wouldn't say a borrower could always
3      borrow.
4      BY MR. SACK:
5      Q.  Could they ever borrow in that
6      circumstance?
7              MR. DUNNE: Same objections.
8              THE WITNESS: Yeah.  I'm sorry.  I hope I
9      can take a break soon.  I'll answer the
10     question though.
11             MR. SACK: Yeah, thank you.  Then we can
12     take a break.
13             MR. DUNNE: Why don't we just deal with
14     this last question and then take a break.
15             MR. SACK: Yeah.
16     A.  Yeah.  I don't see -- I didn't see any
17     restrictions in the code where it would look at
18     lenders in deciding whether a borrow or a trade
19     could be placed.
20             MR. SACK: Okay.  Thank you.  I appreciate
21     that.  Sorry to have held you up.
22             THE WITNESS: Sorry.  I had too much
23     coffee.
24             MR. SACK: No, I understand.
25     Let's go off the record.

Page 81

1              N. Molina - Confidential
2              THE VIDEOGRAPHER: We are going off the
3      record.  The time is 11:29 a.m.
4          (Recess.)
5              THE VIDEOGRAPHER: We are back on the
6      record.  The time is 11:42 a.m.
7      BY MR. SACK:
8      Q.  Welcome back, Mr. Molina.  I think where
9      we left off right before the break, we were talking
10     about the borrowing code in the margin trading
11     program.
12             Do you remember us talking about that?
13     A.  Yes.
14     Q.  Was the borrowing code separate from the
15     lending code in the margin trading program?
16             MR. DUNNE: Objection to form.
17     A.  I'd say the code associating with
18     borrowing -- there was codes associated with borrows
19     and there was codes associating with lends.  And
20     some of it was in a similar place, and some of it
21     was in different places.
22     BY MR. SACK:
23     Q.  That makes sense.  I think before we left
24     off you were saying you didn't see any restrictions
25     in the borrowing code that would look at -- at the



1           N. Molina - Confidential
2  lenders; is that right?
3           MR. DUNNE:  Objection to form.
4      A.  I believe I spoke about code for checking
5  whether a trade could be made that affected borrow.
6  I think that might have been the context of it.
7  BY MR. SACK:
8      Q.  Yeah.  And I guess when we're talking
9  about that, can we just call that the "borrowing
10  code" if that's okay?
11      A.  Code that would cause a borrow?
12      Q.  Yeah.  Code that would cause a borrow,
13  sure.  So for that code that would cause a borrow, I
14  think you were saying that that didn't look to
15  whether there were pools of lenders; is that right?
16           MR. DUNNE:  Objection.
17      A.  I don't think it would look at -- I don't
18  think it would look at the lenders, this list of
19  lenders specifically.
20  BY MR. SACK:
21      Q.  What would it look at?
22      A.  It would look at whether a token is
23  eligible to be lent -- or to be borrowed, sorry.
24  Whether the token is eligible to be borrowed, and
25  also restrictions on the account performing the

1           N. Molina - Confidential
2  transaction -- is what I recall.
3      Q.  Okay.  When you say it would look -- that
4  the code that would allow a borrow would look to
5  whether a token was eligible to be borrowed, what
6  does that mean?
7      A.  In the database for each token, there was
8  a -- an entry specifying -- a field specifying
9  whether the token was eligible to be borrowed at the
10  current time.
11      Q.  And what would determine whether that
12  entry indicated that a token was eligible to be
13  borrowed?
14      A.  I believe it was a true/false field in the
15  database for the token, stating whether or not the
16  token was eligible for borrowing.
17      Q.  And what would make that field read
18  "true"?
19      A.  I don't know, as I wasn't involved in
20  setting up that field for the different tokens.
21      Q.  Just so I understand, when you refer to
22  tokens, what are you referring to?
23      A.  I'm referring to spot tokens, which could
24  be either crypto tokens or fiat currencies.
25      Q.  And then when you say you would look at

1           N. Molina - Confidential
2  the field for each token, what might that look like?
3           Would it just say something, for example,
4  like "bitcoin, true" or something different than
5  that?
6      A.  It would be, as you said, "bitcoin," and
7  then "true" would be one way it could show up.
8      Q.  And so the bitcoin in this example would
9  refer to what in particular?
10      A.  Bitcoin would be the token.
11      Q.  I think you said besides looking at
12  whether a token was eligible to be borrowed, you
13  also looked at restrictions on the account
14  performing the transaction to determine whether a
15  borrow was capable of happening; is that right?
16      A.  Yes.
17      Q.  How would one know if there was a
18  restriction on the account such that it would not be
19  able to conduct a borrow?
20      A.  The code would look at the account
21  information, and using the account information,
22  determine if the account could cause more borrow or
23  open more borrow.
24      Q.  Why might an account not be able to cause
25  more borrow?

1           N. Molina - Confidential
2      A.  First, if the account were not marked as
3  eligible for borrowing, then it wouldn't be able to
4  open more borrow.  And also, if the account does not
5  have enough collateral for borrowing, then it
6  wouldn't be able to borrow more.
7      Q.  On that field you were saying that would
8  mark whether a token was eligible to be borrowed,
9  would that field be referring to specific
10  identifiable assets or just a token overall?
11           MR. DUNNE:  Objection to form.
12      A.  I was saying a token overall, such as
13  bitcoin.
14  BY MR. SACK:
15      Q.  Okay.  But besides those two things, the
16  restriction on the account or a token being
17  ineligible to be borrowed, otherwise, as you
18  understand the code, a borrow would take place?
19           MR. DUNNE:  Objection to form.
20      A.  I don't recall the code having other
21  things to prevent a borrow from being opened.
22  BY MR. SACK:
23      Q.  I want to --
24      A.  Yeah, as part of the transaction, in a
25  given transaction.

MAGNA
LEGAL SERVICES

1             N. Molina - Confidential
2     Q.   Got it.
3          I now want to talk about the lending code,
4  or maybe to use -- try and match the terminology you
5  were using, the code that would allow for a lend to
6  take place.
7          Did that code -- were there any
8  restrictions in that code based on borrowers or
9  pools of borrowers?
10         MR. DUNNE:  Objection to form.
11    A.   I don't know.
12 BY MR. SACK:
13    Q.   Were you more familiar with the borrowing
14 code, the code that would allow one to borrow, than
15 the code that would allow one to lend?
16    A.   I think so, yes.
17    Q.   Why is that?
18    A.   I think I looked at the lending code less.
19    Q.   As best you can recall, how did the
20 lending code operate at a general level?
21    A.   Lenders could mark their balances and
22 tokens as eligible to be lent, and when a token
23 balance for the account was being lent, it would be
24 marked as lent.
25    Q.   And what would determine whether that lend

1             N. Molina - Confidential
2  would take place?
3          MR. DUNNE:  Objection to form.
4     A.   I don't remember specifically.
5  BY MR. SACK:
6     Q.   What do you remember generally?
7     A.   I can't really say beyond kind of what
8  I've said.  I don't know if I can really remember
9  more about that.
10    Q.   Okay.  So thinking back to the code that
11 would allow one to borrow and the code that would
12 allow one to lend -- sorry, let me start over if
13 that's okay.  I'm sorry.
14         Looking at the code that would allow one
15 to borrow, if someone had placed a borrow and
16 neither of the two conditions we talked about was at
17 issue, so there was no -- I think I'm going to say a
18 long paragraph and then get to my question, but I
19 just want to make sure we're on the same page.
20         I'm going to start over.
21         You said for a borrow to go through, as
22 long as someone placed a borrow, the borrow would
23 happen unless there was a restriction on the
24 specific account trying to place the borrow, or
25 there was a -- the token they were trying to borrow

1             N. Molina - Confidential
2  was not marked to be borrowed.
3          Is that a fair summary of what you said
4  earlier?
5          MR. DUNNE:  Objection.
6     A.   I would say those are the two restrictions
7  I remember seeing in the code.
8  BY MR. SACK:
9     Q.   Yeah.  So I guess if the code didn't have
10 a restriction about lenders, or pools of lenders,
11 where would the borrow have come from?
12         MR. DUNNE:  Objection.  Calls for
13    speculation.
14 BY MR. SACK:
15    Q.   To be clear, I'm just asking about what
16 you remember from the code.
17    A.   Uh-huh.
18    Q.   Yeah.
19         MR. DUNNE:  Objection.
20    A.   You're asking -- if you're -- just to
21    clarify, you're talking about a borrow having
22    happened?
23         MR. SACK:  Yeah.
24 BY MR. SACK:
25    Q.   I'm saying if the borrow happened, where

1             N. Molina - Confidential
2  would the borrow come from?
3          MR. DUNNE:  Objection.
4     A.   I would say -- I would -- the code and the
5  data would mark it as a borrow, but I can't say
6  where it comes from.
7  BY MR. SACK:
8     Q.   So just to expand on that, I guess, it
9  wouldn't necessarily be the case that there would be
10 a specific lender or pool of lenders, then, that the
11 borrow would be connected to at that moment in time?
12         MR. DUNNE:  Objection.
13    A.   What do you mean "that moment in time"?
14         MR. SACK:  Yeah.  My fault.  Let me ask it
15    a better way.
16 BY MR. SACK:
17    Q.   At the moment that the borrow was marked
18 as having happened, would there necessarily have
19 been a corresponding lender or pool of lenders for
20 whom there would be a corresponding mark of a token
21 having been lent?
22         MR. DUNNE:  Objection.
23    A.   The code that looks at borrowers and
24 lenders would, as part of it, mark all of the
25 borrows and mark all of the lends.  So you would

1        N. Molina - Confidential
2  collectively see the borrows and the lends written
3  out into the database from that code.
4  BY MR. SACK:
5        Q.  That makes sense.  I think, earlier you
6  were saying that the borrowing code didn't have a
7  restriction related to lenders.
8        So I guess I want to know how those two
9  pieces connected according to the code.
10       MR. DUNNE:  Objection.
11  BY MR. SACK:
12       Q.  If they did at all.  Maybe they didn't.
13       A.  Yeah.  The code that checks if the
14  transaction is allowed, I don't recall it looking at
15  lenders.  And then there was other code which would
16  look at all the borrowers and all the lenders.
17       Q.  What do you mean there's another code that
18  would look at all of the other borrowers and all the
19  other lenders?
20       A.  I'm saying that that code would kind of
21  run regularly, and that's different than the code
22  that looks at restrictions on the borrow.
23       Q.  I see.
24       And I'm just I'm trying to learn here
25  today.  So I'm sorry if I'm not getting it

1        N. Molina - Confidential
2  100 percent of the time.
3        So those two -- you described sort of like
4  two sets of code.  There was a code that would cause
5  a borrow -- or maybe three sets -- a code that would
6  cause a borrow, a code that would cause a lend, and
7  then sort of a separate code that would look at all
8  borrowers and lenders; is that right?
9        MR. DUNNE:  Objection.
10       A.  Generally, yes, I think -- yes, I think
11  cause a borrow -- we were talking about the
12  transaction that causes a borrow.
13       MR. SACK:  Yeah.
14  BY MR. SACK:
15       Q.  So about that third set of code that we
16  were just talking about that would look to all of
17  the borrowers or all of the lenders or all the pools
18  of borrowers and pools of lenders, how, if at all,
19  did that connect to the other two types of code we
20  were talking about?
21       MR. DUNNE:  Objection.
22       A.  So the code that validates the transaction
23  that causes a borrow, when a borrow is caused, the
24  database would indicate kind of a borrowed -- a
25  borrowed balance.  And then, separately, the code

1        N. Molina - Confidential
2  that looks at all of the borrows and all the lends
3  would look at borrowed balance.  So that's my memory
4  of the connection between the two pieces of code.
5        MR. SACK:  Thanks.
6  BY MR. SACK:
7        Q.  And I guess, about the timing of those two
8  pieces of code, it sounded like what you were
9  saying -- but I just want to be clear -- was that
10  the cause-to-borrow code would happen, and then how
11  soon or long after that would the pools of borrowers
12  and pools of lenders code kick in?
13       A.  The pools of borrowers, pools of lenders
14  code would kick in after -- afterwards.  And I
15  believe it would run regularly during the day.
16       Q.  Got it.
17       And how regularly?
18       A.  I think it was every hour is my memory of
19  it.
20       Q.  Okay.
21       A.  But I'm not totally sure.
22       Q.  Totally understood.
23       And I just want to make sure I get -- how
24  frequently would the code that would allow a
25  transaction to cause a borrow take place.

1        N. Molina - Confidential
2        MR. DUNNE:  Objection.
3        A.  That would be -- that would occur when the
4  transaction is made.
5        MR. SACK:  Got it.
6  BY MR. SACK:
7        Q.  Just so I'm clear, the code that allows
8  for a transaction to cause a borrow would happen
9  basically immediately, and the code that would match
10  the pools of lenders and the pools of borrowers
11  occurred every hour; is that right?
12       MR. DUNNE:  Objection.
13       A.  Yes.  As I remember.
14       MR. SACK:  Great.
15  BY MR. SACK:
16       Q.  I want to switch gears a little bit if
17  that's okay.
18       Were you involved in how and where FTX
19  stored digital assets deposited into or available
20  through the Exchange?
21       MR. DUNNE:  Objection.
22       A.  To some extent.  Not very much, but
23  indirectly, I would say.
24  BY MR. SACK:
25       Q.  Yeah.  What do you remember about that?



Page 94

1           N. Molina - Confidential
2      A.   I wrote and looked at code that would do
3   some processing of deposits and withdrawals, which
4   involved identifying the deposit or withdrawal in
5   the context of crypto addresses owned by FTX.
6      Q.   Can you tell us what a crypto address is?
7      A.   For a given crypto token, a given crypto
8   token will be located on a given crypto block chain
9   specific to that token.  And the block chain will
10  contain addresses.  And each address would be
11  associated with a quantity of that token.
12     Q.   You said you wrote the code that would do
13  some processing of the deposits and withdrawals
14  relating to crypto addresses owned by FTX.
15         What in particular was the code that you
16  were writing about?
17         MR. DUNNE:  Objection.
18     A.   Yeah.  Just identifying when an address
19  kind of belonging to FTX received a crypto token as
20  a deposit and also writing code that, using a crypto
21  address managed by FTX, would cause a withdrawal to
22  be initiated or cause a withdrawal.
23  BY MR. SACK:
24     Q.   And when you say the crypto addresses
25  managed by FTX or belonging to FTX, what kinds of

Page 95

1           N. Molina - Confidential
2   addresses are you talking about there?
3      A.   I'm talking about certainly an address
4   managed by FTX that was specific to a customer for
5   deposits on one hand, and on the other hand,
6   addresses managed by FTX which were used for
7   withdrawals.
8      Q.   You said about an "address managed by FTX
9   that was specific to a customer for deposits."
10         I guess I want to know more about what
11  that means.
12         If a customer deposited an asset onto the
13  FTX platform, would a customer be managing that --
14  the account where that asset was deposited?
15         MR. DUNNE:  Objection to form.
16     A.   When a token was -- crypto token was
17  deposited to FTX, it would be deposited to an
18  address managed by FTX.
19  BY MR. SACK:
20     Q.   When you say "crypto deposited to FTX,"
21  what does that mean?
22     A.   A customer would be given instructions for
23  how to deposit to FTX, and that would mean that they
24  would send a token, using those instructions, to an
25  address managed by FTX.  And FTX would process that

Page 96

1           N. Molina - Confidential
2   as a deposit, which would affect the balances of
3   that account.
4      Q.   And what instructions would that customer
5   have been given?
6          MR. DUNNE:  Objection to form.
7      A.   I know for some tokens they would be given
8   an address generated by FTX's code, which they would
9   use as a destination for sending their token.  And
10  that address would be managed by FTX.  It may have
11  been slightly different for other tokens, but I
12  don't remember other kinds of instructions.
13  BY MR. SACK:
14     Q.   And like where do you remember seeing
15  these instructions?
16     A.   I have general recollection that there was
17  a button called "deposit" on the website next to the
18  name of the coin.  And when you clicked it, it would
19  show these instructions.
20     Q.   So generally from the website.
21         Anywhere else?
22     A.   Not that I recall.
23     Q.   Do you remember if there were any policies
24  or manuals that FTX had that talk about this kind of
25  thing?

Page 97

1           N. Molina - Confidential
2          MR. DUNNE:  Objection to form.
3      A.   Not that I recall.
4   BY MR. SACK:
5      Q.   As you were working on that -- as you were
6   working on that code, how did you know what may
7   be -- for lack of a better term, what rules to put
8   in place, or how did you know what you should be
9   doing, I guess?
10         MR. DUNNE:  Objection.
11         MR. SACK:  Let me reask the question if
12     that's okay.  I think that's fair.
13         THE WITNESS:  Yes.
14  BY MR. SACK:
15     Q.   What guidance, if any, did you receive on
16  how you should be implementing the code relating to
17  ownership on the FTX Exchange?
18         MR. DUNNE:  Objection.
19     A.   I don't know that ownership was really,
20  really explicit in any of the code that I worked
21  with, so I don't think I can say that.
22  BY MR. SACK:
23     Q.   I thought you said that your code related
24  to accounts that FTX managed or owned?
25     A.   Yes.

MAGNA
LEGAL SERVICES

1              N. Molina - Confidential
2     Q.   Do you remember saying that?
3     A.   Yes.
4     Q.   Okay.  What guidance did you have about
5   that?
6     A.   Yes.  I just meant FTX had the -- kind of
7   managed the crypto address.  And "own" may not have
8   been the most precise word to use there.
9     Q.   Got it.
10         In your view, did customers ever own
11  assets --
12         MR. DUNNE:  Objection.
13  BY MR. SACK:
14    Q.   -- on the FTX Exchange?
15         MR. DUNNE:  Objection.
16    A.   That's not really something that was a
17  part of my job or role to determine.  I don't know
18  if I can answer that precisely.
19  BY MR. SACK:
20    Q.   Okay.  Were you ever responsible for code
21  that would treat a -- the assets allocated to a
22  customer's account differently than in a way
23  allocated to an FTX account?
24    A.   Well, tokens could be associated with a
25  customer account.  Tokens could also be associated

1              N. Molina - Confidential
2   with an account belonging to FTX.  Beyond that
3   general idea, I don't recall any distinctions in the
4   code between the two.
5     Q.   Okay.  Are you familiar with the user
6   interface a customer might see when using or trying
7   to access the FTX platform?
8     A.   Yes.
9     Q.   Were you responsible for any of the code
10  relating to that interface?
11    A.   Yes.
12    Q.   Sorry.  I'm just going to show you an
13  exhibit.
14         MR. SACK:  Sorry.  Give me one second.
15         I'm now going to premark for
16         identification document 39.  And the Court
17         Reporter will kindly hand this to you in a
18         moment.
19         (Exhibit 39 was received and marked for
20  identification, as of this date.)
21  BY MR. SACK:
22    Q.   Is this part of the interface on the
23  FTX Exchange that we were just talking about?
24    A.   It's looks like it.
25    Q.   I think right before I handed you that

1              N. Molina - Confidential
2   document, you had just said that you had been
3   responsible for at least part of the code relating
4   to that interface.
5         What specifically?
6     A.   I remember I wrote some of the code that
7   displayed balances for accounts and some of the code
8   for -- that displayed other features that I worked
9   on.
10    Q.   Okay.  So you said you recognized this
11  document generally.  It looks similar to the
12  FTX Exchange that you remember; is that right?
13    A.   Yes.  It looks similar.
14    Q.   Sorry.  The user interface, I should have
15  said, not the FTX Exchange.
16         I see that there's a column up at the top.
17  It says "Balances."
18         Do you see that?
19    A.   Yes.
20    Q.   Is that the type of code that you just
21  said that you were partly responsible for designing
22  the interface for?
23         MR. DUNNE:  Objection.
24    A.   It's related to it, yes.
25

1              N. Molina - Confidential
2   BY MR. SACK:
3     Q.   And in what way is it related?
4     A.   As I recall, clicking on balances would
5   show some of the balances.  And some of the user
6   interface code that I wrote would affect how that
7   was displayed.
8     Q.   Can you paint a picture for me about what
9   it would look like if a user clicked "Balances" on
10  this type of page?
11         MR. DUNNE:  Objection.
12  BY MR. SACK:
13    Q.   What would a user see if they clicked on
14  Balances?
15    A.   As I recall, they would see a list of
16  tokens and balances associated with that token.
17    Q.   And those would be the tokens associated
18  with that customer's account?
19    A.   Correct.
20    Q.   So how many different balances might be
21  reflected on that Balances page?
22    A.   I don't know how many.  I know it would
23  depend on the account.
24    Q.   What would it depend on?
25    A.   I know in general, the non- -- usually,

**MAGNA**
LEGAL SERVICES

1           N. Molina - Confidential
2    the nonzero balances of an account would be
3    displayed.  And that depends on the account.
4        Q.  So just depending on how many tokens, for
5    example, that that customer had, or assets of a
6    token that that customer had?
7        A.  I think that's the gist of what would be
8    displayed, yes.  But it possibly could display some
9    zero balances too, if I remember correctly.
10       Q.  So even -- just so I understand, even if a
11   customer didn't have assets in a particular -- of a
12   particular token, it might just say, like, "zero"
13   instead?
14       A.  Correct.  Correct.
15       Q.  Okay.  You can put that document off to
16   the side for just a second.
17           During your day-to-day work at FTX, were
18   you ever informed by management or anyone else about
19   how FTX would treat or handle assets associated with
20   a customer's account?
21       MR. DUNNE:  Are you referring to
22   pre-petition?
23       MR. SACK:  Pre-petition, yes.
24       A.  Beyond what the code did, not that I
25   recall.

1           N. Molina - Confidential
2    BY MR. SACK:
3        Q.  Do you know -- how did you write the code
4    that you were talking about earlier, about either, I
5    guess -- let me start over.
6           How did you write the code relating to the
7    account balance interface or the addresses managed
8    by FTX if you didn't know how FTX treated assets
9    associated with a customer's account?
10       MR. DUNNE:  Objection, mischaracterizes
11   his testimony.
12       A.  Well, I know assets or tokens associated
13   with an account were displayed to the accounts.  And
14   I know that deposits and withdrawals would modify
15   that number.  And that kind of was my general
16   understanding from seeing the way the code was
17   written.  So I used that general understanding as I
18   was writing the code.
19   BY MR. SACK:
20       Q.  So just so I understand, the way you came
21   to understand FTX's -- the way FTX treated certain
22   assets or accounts was based on your own review of
23   the code that existed before you started modifying
24   it?
25       MR. DUNNE:  Objection.

1           N. Molina - Confidential
2        A.  I think looking at the code went into my
3    general understanding of how the code would treat
4    tokens associated with an account.
5        MR. SACK:  I realize we're getting close
6    to 12:30.  Do we want to take a lunch break and
7    then come back?
8        MR. DUNNE:  Well, I guess that's, for the
9    most part, up to Nils.
10          (To the witness) I would do it when you
11   feel comfortable.  I'm happy to keep going for
12   my part.  Up to you, Nils.  You want to go
13   until maybe like 12:45?  That would be another
14   hour or so on the record.
15       MR. SACK:  Yeah, sure.  Let's go for
16   another 20 minutes or so.
17       MR. DUNNE:  20 minutes or so?
18       MR. SACK:  Yeah.  That would be good.
19       I'm going show you a document that's been
20   previously marked as Exhibit 15.
21       (Exhibit 15 was PREVIOUSLY received and marked for
22   identification, as of this date.)
23   BY MR. SACK:
24       Q.  Go ahead and take a moment to look through
25   it and let me know when you've had a chance to do

1           N. Molina - Confidential
2    that.
3           And I'll just note for the record that
4    this is a document bearing Bates number
5    FTX_3AC_000013695.
6        A.  (Witness reviews document.)
7        Q.  You all set?
8        A.  Yes.
9        Q.  Great.
10          Have you seen this document before?
11       A.  I think to some extent.
12       Q.  Do you remember seeing this document
13   pre-petition when you were working on the FTX code?
14       A.  I don't know if I saw this version.  I
15   think I may have seen a document like this, some
16   version at that time.
17       Q.  So some other version, maybe another
18   terms-of-service type document?
19       A.  Yes.
20       Q.  Okay.  And in what context do you remember
21   looking at that document?
22       A.  I don't really remember.  I don't
23   remember.
24       Q.  Okay.  Earlier, you were talking a little
25   bit about how you were -- you helped write some of

MAGNA
LEGAL SERVICES

1           N. Molina - Confidential
2    the code relating to how FTX managed its addresses;
3    is that right?
4           MR. DUNNE:  Objection.
5        A.   The code related to addresses managed by
6    FTX.
7           MR. SACK:  Sorry.  Thank you for that.
8    BY MR. SACK:
9        Q.   Are you familiar with the concept of
10   commingling of assets?
11       A.   Yes.  I believe so.
12       Q.   What does that mean to you?
13       A.   I don't know the legal definition.
14       Q.   To be clear, I'm not asking you any legal
15   definition.
16       A.   Okay.
17       Q.   Yeah.
18       A.   I think commingling would mean that in one
19   location you'd have tokens that were associated with
20   different accounts -- is what I believe that could
21   refer to.
22       Q.   And just to be clear, did you have this
23   understanding about commingling pre-petition?
24       A.   Yes.  I believe I had a general
25   understanding like that.

1           N. Molina - Confidential
2        Q.   Yeah.  Were you responsible for any --
3    sorry.  Strike that question.
4           Do you know whether any of the addresses
5    managed by FTX involved commingling of assets?
6           MR. DUNNE:  Objection.
7    BY MR. SACK:
8        Q.   Pre-petition?
9        A.   Yeah.  Again, it might depend on exactly
10   what "commingling" means in terms of if we're
11   talking about different accounts --
12       Q.   Yeah.
13       A.   -- in one place.  I believe some addresses
14   had tokens from different accounts in them.
15       Q.   Were you responsible for any of the code
16   relating to that commingling?
17          MR. DUNNE:  Objection to form.
18       A.   I think, not really, as I remember.
19   BY MR. SACK:
20       Q.   Did you ever review or look over the code
21   that did relate to that commingling?
22          MR. DUNNE:  Pre-petition?
23          MR. SACK:  Pre-petition.  Sorry.  And I
24   think let's just assume, unless I say
25   otherwise, that I'm -- I'll specify I'm talking

1           N. Molina - Confidential
2    about post-petition, but otherwise, let's just
3    assume that my questions are all asking you
4    about pre-petition.
5           MR. DUNNE:  Thanks, Dan.  I think that's a
6    good idea.
7           MR. SACK:  Yes.
8        A.   I would say to some extent, yes, if we
9    talk about commingling, it's different accounts in
10   one location.
11   BY MR. SACK:
12       Q.   To what extent did the code you looked
13   over or review relate to that commingling?
14       A.   I recall seeing code that talked about
15   sweeping.  And sweeping would move tokens from an
16   address that would often be specific to an account
17   to an address that was not specific to an account.
18   So that's what I remember in terms of code relating
19   to commingling.
20       Q.   Do you know why the code allowed for
21   commingling?
22          MR. DUNNE:  Objection.
23       A.   It's not really something I can speak
24   about because I kind of didn't write that code
25   initially.

1           N. Molina - Confidential
2    BY MR. SACK:
3        Q.   And you said you recalled seeing code
4    about sweeping.  And so sweeping is -- actually, let
5    me just ask you.
6           Can you tell me what sweeping is?
7        A.   Moving tokens from one address that would
8    often be specific to a customer to an address that
9    would often not be specific to a customer and both
10   addresses managed by FTX.
11       Q.   Do you know if FTX relayed to customers
12   that their assets could be swept into commingled
13   accounts?
14          MR. DUNNE:  Objection.
15       A.   Well, part of it, I don't know really the
16   exact definition of "commingled" in this case.
17   BY MR. SACK:
18       Q.   And sorry.  I don't want to make any
19   confusion.  I'm just using "commingling" the exact
20   same way you defined it earlier in our conversation.
21       A.   Okay.  So different accounts in one
22   address, one crypto address?
23       Q.   Exactly.
24       A.   I don't know if that was relayed to
25   customers or not by FTX, that different account

MAGNA ▶
LEGAL SERVICES

1          N. Molina - Confidential
2    tokens from different accounts could be in one
3    crypto address.
4         Q.    So thinking back to that user interface
5    that we were talking about on the FTX platform, if
6    it's helpful, you can go ahead and look at that
7    exhibit I showed you earlier.
8         For any specific -- sorry.  Strike that
9    question.
10        I think, earlier, we had also been
11   talking -- at two points we talked about -- sorry.
12        Starting over.  I clearly need lunch.
13        We were talking about balances -- this
14   Balances column earlier, and you said that it might
15   reflect multiple balances.  And earlier, we had
16   talked about, in some instances, an overall account
17   balance.
18        Where, if anywhere, would the overall
19   account balance be reflected?
20        A.    When you were viewing Balances, you would
21   see something like "net USD," and the net USD would
22   have a particular dollar value next to it.  And that
23   dollar value is what I meant when I talked about
24   total account net USD balance.
25        Q.    Listed on the same page would also be

1          N. Molina - Confidential
2    these other balances, right?
3         A.    As I recall, yes.
4         Q.    And I just -- I don't have the ability to
5    actually look at that Balances page myself, so I'm
6    just sort of asking how that overall account balance
7    would be seen by a user according to the code you
8    remember working on.
9         Would it be at the bottom of the page, at
10   the top of the page?
11        Where would it be located?
12        A.    I believe it was -- sorry.  I believe it
13   was at the top.
14        Q.    At the top.
15        And was it in the same font or size as the
16   other balances or different?
17        A.    I believe it was a different font.  I
18   believe it was larger.
19        Q.    And would that overall account balance be
20   a sum or total of the other account balances, or
21   would there be other inputs in there?
22        A.    It would basically be the sum of price
23   times quantity for each of those balances.
24        Q.    That were listed also on the balances
25   page?

1          N. Molina - Confidential
2         A.    Yes.  In general, yes.
3         MR. SACK:  I'm now going to hand to the
4    Court Reporter Exhibit 40.
5         (Exhibit 40 was received and marked for
6    identification, as of this date.)
7    BY MR. SACK:
8         Q.    Take a moment go ahead and look at that
9    document, and let me know when you've had a chance
10   to look through it.
11        A.    (Witness reviews document.)
12        I've looked through it.
13        Q.    Do you recognize this document?
14        A.    No.
15        Q.    Do you recognize the images in the
16   document?
17        A.    To some extent.
18        Q.    To what extent do you recognize those
19   images?
20        A.    They look similar to what would be
21   displayed on the FTX website at some point in time.
22        Q.    You mentioned earlier that you designed
23   some of the code for the user interface.
24        Was this -- do these images reflect some
25   of the code that you designed or implemented?

1          N. Molina - Confidential
2         A.    Not as I recall.  I don't think -- I don't
3    think the code I wrote would change these images
4    specifically.
5         Q.    But you've seen something similar to this
6    as you were working on the FTX interface?
7         A.    Yes.
8         MR. DUNNE:  Let him finish his question
9    first.
10        THE WITNESS:  Oh, sorry.  Sorry.
11        MR. SACK:  That's okay.  No problem.
12        A.    Yes.
13   BY MR. SACK:
14        Q.    Do you see on the left-hand side, there's
15   a row that says "Leveraged Tokens"?
16        A.    Yes.
17        Q.    Do you know what that's referring to?
18        A.    I think so.
19        Q.    What do you understand that to be
20   referring to?
21        A.    I believe there were certain tokens on the
22   Exchange that were classified as leveraged tokens in
23   the code.
24        Q.    And what does it mean to be a leveraged
25   token?

MAGNA
LEGAL SERVICES

1           N. Molina - Confidential
2      MR. DUNNE:  Objection.
3      A.   The Exchange had a list of tokens.  Some
4  of these tokens were called "leverage tokens."  And
5  they would not be crypto tokens like bitcoin or
6  ethereum.  Instead, they would be tokens that I
7  believe were created by FTX and there was listed in
8  the databases, or it was indicated as being a
9  leveraged token.
10          So I just had some general understanding
11  of it.
12  BY MR. SACK:
13     Q.   And how do you understand a leveraged
14  token to be different from another token besides the
15  fact that they were created by FTX?
16     MR. DUNNE:  Objection.
17     A.   I think.  I think I had a general
18  recollection of maybe some of the names of them, but
19  I can't say with precision kind of how they worked.
20  But I think generally had some notion of, I guess,
21  leverage or kind of value was based on leverage in
22  some way, or price was based in some way on
23  leverage.
24  BY MR. SACK:
25     Q.   I notice another row.  It says

1           N. Molina - Confidential
2  "Positions."
3          What does that show, as best you can
4  recall?
5      A.   I think that -- I don't recall that button
6  being there in that position when I worked on the
7  code.  It looks like it would display positions, but
8  when I was working on the code, there was not, as I
9  recall, a Positions button there, but there was a
10  Positions button elsewhere, which if you clicked on
11  it, it would show the account's positions.
12     Q.   Okay.  So you're saying to the best of
13  your understanding, they just moved the position --
14  sorry.  That was a bad use of the word "position."
15         They moved the location of the Positions
16  tab?
17     MR. DUNNE:  Objection, lack of foundation.
18     A.   Well, when I worked on the code, there was
19  a Positions button somewhere on the page, not there,
20  as I recall.
21  BY MR. SACK:
22     Q.   And what -- the Positions tab that you
23  remember, what kind of positions did it display?
24     A.   It would display the positions -- the
25  futures positions of an account.

1           N. Molina - Confidential
2      Q.   I also see on that same image we were
3  looking at -- do you see -- it's a little bit grayed
4  out, just because of the black-and-white nature of
5  the photo, but do you see where it says "View all
6  account balances"?
7      A.   Yes.
8      Q.   And then, also, below that there's like a
9  tab that says "Balances."
10         Do you see that as well?
11     A.   Yes.
12     Q.   What would the -- let's start with the
13  all-capitalized-letters "Balances," what would a
14  user see if they were to click on that Balances tab?
15     MR. DUNNE:  Objection, lack of foundation.
16     A.   I think clicking on the Balances button
17  would show the balances associated with the account.
18  BY MR. SACK:
19     Q.   What would be, to the best of your
20  understanding, included in those balances?
21         Balances of what?
22     MR. DUNNE:  Objection.
23     A.   Token balances, where tokens could be
24  crypto token or if you got currency.
25

1           N. Molina - Confidential
2  BY MR. SACK:
3      Q.   What about futures positions?  Would that
4  be reflected on the balances tab?
5      MR. DUNNE:  Objection.
6      A.   When I worked on the website --
7      MR. SACK:  Yeah.
8      A.   -- the positions, as I recall, were not
9  displayed on the balances tab, the positions
10  themselves.
11  BY MR. SACK:
12     Q.   Okay.  Were individual spot tokens
13  displayed on the balances tab?
14     A.   From what I remember, yes.
15     Q.   And how were they displayed?  Were they
16  displayed separately by token?
17     A.   From what I recall, yes.
18     Q.   Were they displayed separately by amount?
19         I'm just trying to figure out how -- what
20  details would have been given on that Balances page.
21         So would they have been displayed
22  separately by token?  By amount?
23     A.   There would be a list of tokens, and for
24  each token, an amount which is the amount of that
25  token associated with the account balance, and each

MAGNA
LEGAL SERVICES

1           N. Molina - Confidential
2  token was displayed, I believe, as a row.
3      Q.   Okay.  Would the price also be reflected
4  on that Balances page?
5      A.   I don't remember.
6      Q.   Do you remember if the values of those
7  tokens were displayed on the Balances page?
8          MR. DUNNE:  Objection.
9      A.   I don't remember.
10 BY MR. SACK:
11     Q.   Looking to the View all Account Balances
12 button, it looks like, at the top, do you know what
13 a user would see if they clicked on the View All
14 Account Balances button?
15     A.   I don't remember that button, so I don't
16 think I can speculate -- I don't think I have much
17 of a basis to speculate on that button.  I don't
18 remember the button.
19         MR. SACK:  Okay.  I think we're right
20     about that -- oh, just kidding.  But in a
21     moment we will take lunch.
22 BY MR. SACK:
23     Q.   Do you know why FTX would display
24 individual token balances on that all-capitals
25 Balance button if it also displayed the overall net

1           N. Molina - Confidential
2  USD balance?
3          MR. DUNNE:  Objection.
4      A.   My general understanding of users using
5  the Exchange is that they would sometimes want to
6  know how much of each token was associated with
7  their account.  And that was not represented by the
8  total net USD value.
9          MR. SACK:  All right.  I think it's
10     probably a good time for us to take a break.
11         MR. DUNNE:  You did it to us again.
12         MR. SACK:  I know.  I really like tricking
13     you.  First the bathroom; now this.
14 BY MR. SACK:
15     Q.   Why would it be important for a user to
16 understand how much of each token was associated
17 with their account?
18         MR. DUNNE:  Objection.
19     A.   I mean, that's not necessarily something
20 I'm an expert in or kind of know more than anyone
21 else but, you know, base -- you could do -- the
22 transactions you could make depend on the balances
23 you have.  So that would help the user understand
24 what transactions it could make on their account.
25

1           N. Molina - Confidential
2  BY MR. SACK:
3      Q.   Just so I understand, then, is it the
4  balances of some tokens or assets might allow or
5  prevent a user from making other transactions --
6  sorry, yeah.
7          That's the end of the question.
8          MR. DUNNE:  Do you want to just ask it one
9      more time?
10         MR. SACK:  I'm going to ask it in the form
11     of a question this time, yeah.
12 BY MR. SACK:
13     Q.   Is it the case that the balances of some
14 assets or tokens might allow or prevent a user from
15 making other transactions on the 3AC platform -- I'm
16 sorry -- on the FTX platform?
17         I really need lunch.  I apologize.
18     A.   Yes.
19     Q.   Okay.  You said earlier you were
20 responsible for programming some of the user
21 interface.
22         If you programmed it, why did you add that
23 information?
24         MR. DUNNE:  Objection, mischaracterizes
25     his testimony.

1           N. Molina - Confidential
2      A.   Yeah.  I don't think I added that
3  information.  I don't think I added the information
4  of balances on the Balances tab.
5  BY MR. SACK:
6      Q.   Sorry.  Then maybe I misunderstood.
7          What information did you add to the
8  balances tab?
9      A.   I changed some of how it was displayed.
10 Some of the code for that interface I changed and
11 improved, but the balances were displayed there
12 before I started working on that.
13     Q.   Okay.  I understand now.
14         MR. SACK:  For real, I think we should
15     take a lunch break.
16         MR. DUNNE:  Agreed.
17         THE VIDEOGRAPHER:  We're going off the
18     record.  The time is 12:49 p.m.
19         (At 12:49 p.m. a luncheon recess was
20     taken.)
21         (At 1:35 p.m. the deposition resumes.)
22
23
24
25

MAGNA
LEGAL SERVICES

1    N. Molina - Confidential
2    ********************************************
3    A F T E R N O O N   S E S S I O N
4    ********************************************
5    THE VIDEOGRAPHER:  We are back on the
6    record the time is 1:35 p.m.  Thanks.
7    CONTINUED EXAMINATION
8    BY MR. SACK:
9    Q.  Welcome back, Mr. Molina.
10    I want to pick up very briefly where we
11   left off.  I think we were just talking about,
12   before the break, your understanding of why multiple
13   different balances were listed on the balances tab.
14    Do you remember that discussion we had?
15   A.  Yes.
16   Q.  And I think one of the things you said was
17   that that information might impact or be helpful for
18   someone trying to make certain transactions on the
19   FTX platform; is that right?
20   A.  Correct.
21   Q.  Why can't a customer always just look to
22   the overall account balance, to make certain types
23   of transactions?
24   A.  I would say it depends on the account and
25   the transaction.  For some accounts and

1    N. Molina - Confidential
2    transactions, the specific tokens the account has
3    affects whether the transaction can be done.
4    Q.  I now want to talk about some of the --
5    some of the data that might be on the FTX platform,
6    or I think you said there's someplace where the
7    data about all of the transactions is perhaps
8    stored.
9    What is that place?
10   A.  I could call it the FTX database.
11   Q.  Okay, perfect.  So I want to show you a
12   couple documents and you can tell me whether or not
13   they come from that database, and if they do, or
14   don't, what you understand them to reflect.
15   MR. SACK:  I'm now going to hand you
16   what's been marked as Exhibit 21.
17   (Exhibit 21 was PREVIOUSLY received and marked for
18   identification, as of this date.)
19   BY MR. SACK:
20   Q.  So why don't you go ahead and take a look
21   through it.  And you can tell me after you've had
22   enough time to review it.
23   MR. SACK:  And I'll just note for the
24   record that this document begins with Bates
25   number FTX_3AC_000000054.

1    N. Molina - Confidential
2    MR. DUNNE:  While Nils is looking at this,
3    this obviously was a native document.  Is this
4    an excerpt?  Do you want to explain what this
5    was?  Or is it the whole thing?
6    MR. SACK:  I think this might be the whole
7    thing for this particular document, yeah.
8    MR. DUNNE:  Okay.
9    A.  I've finished looking here.
10   BY MR. SACK:
11   Q.  Great.
12    Have you seen the data in this document
13   before?
14   A.  I think I have to some extent.
15   Q.  Yeah, what do you understand this document
16   to be?
17   A.  I understand it to be data derived -- or
18   two sets of data derived from the FTX database.
19   Q.  Do you know if you pulled this data from
20   the database?
21   A.  I think I've viewed data from this data in
22   the database, at least a good deal of it.
23   Q.  Okay.  Great.
24    I want to look at -- I think you'll see
25   there's a footer on the first page that says,

1    N. Molina - Confidential
2    "loc_changes."  And then, it looks like the rest of
3    the pages say "loc_interest_charges."
4    Do you see that?
5    A.  Yes.
6    Q.  So looking at the pages with that second
7    footer, can you tell me what the "principal" column
8    is reflecting?
9    MR. DUNNE:  Objection to form.
10   A.  I think I remember LOC interest charges
11   being a table in the FTX database, and I think that
12   was a column in the table, from what I remember.
13   BY MR. SACK:
14   Q.  Okay.  And just so I'm clear, what does
15   LOC stand for?
16   A.  In the context of loc_interest_charges
17   table in the FTX database?
18   Q.  Yeah.
19   A.  It would stand for line of credit.
20   Q.  Okay.
21    And are you familiar for what account or
22   accounts this document is relating to?
23   A.  It looks like the data on this document is
24   referring to the account with the account ID
25   2338882.

**MAGNA** ▶
**LEGAL SERVICES**

1          N. Molina - Confidential
2      Q.  Do you see under user name, it says,
3  "Kyle@threearrowscap.com"?
4      A.  Yes.
5      Q.  Does that suggest to you that this
6  document relates to a Three Arrows Capital account?
7          MR. DUNNE:  Objection.
8      A.  I think it looks like it relates to Three
9  Arrows Capital account.
10  BY MR. SACK:
11     Q.  So going back to that principal column,
12  what is encompassed in principal on the LOC interest
13  charges document?
14         MR. DUNNE:  Objection to form.
15     A.  Yeah.  In order -- so the table related to
16  interest payments or charges on line of credit and
17  the principal was multiplied by some factor to
18  obtain the size of interest payment.  So principal
19  is what was multiplied to obtain the size.
20  BY MR. SACK:
21     Q.  Okay.  And what does the "size" column
22  show?
23     A.  If I remember correctly, the size is the
24  amount of the interest payment in dollars.
25     Q.  Okay.  And so I'm just trying to

1          N. Molina - Confidential
2  understand the connection between the size and the
3  principal, which I think you maybe were talking
4  about a little bit before.
5          So how is that size or interest
6  calculated, again?
7      A.  For what I recall in the code, the
8  principal was multiplied by some rate to obtain the
9  size.
10     Q.  Okay.  I want to look at maybe the last
11  page of the document.
12         Are you with me?
13     A.  Yes.
14     Q.  Great.
15         So you said that the principal column
16  reflects the line of credit; is that right?
17     A.  No.
18     Q.  Sorry.  What does that -- how does the
19  line of credit relate to the principal amount?
20     A.  The code would -- the code would look at
21  the account line of credit and the account's
22  balances.  And from that, it would determine this
23  principal amount.  And yeah, and there was some
24  formula in the code for determining that principal
25  amount based on the line of credit and the account's

1          N. Molina - Confidential
2  balances.
3      Q.  Okay.  So sitting here today, I guess I'm
4  just trying to understand how one would get to that
5  principal amount, and you're saying it's a
6  combination of things including a line of credit?
7      A.  Yes.
8      Q.  Okay.  How would one determine how that
9  principal amount was calculated?
10     A.  I have a general understanding that, if --
11  if the value of the account or the total account
12  balance were lower then the line of credit, then
13  there would often be a principal.  And that if it
14  were -- but honestly, the formula changed over time.
15  So I don't -- I don't remember the formula at these
16  times.
17     Q.  Okay.  So how would one find what the
18  formula was at this period in time?
19     A.  Yeah.  There was a file with code in it,
20  which added rows to this table,
21  loc_interest_charges, and that code file included a
22  function for calculating the principal for a given
23  account at a given time.
24     Q.  And do you have access to that file now?
25     A.  Yes.  Recently, I've had access to it.

1          N. Molina - Confidential
2      Q.  Okay.  And what do you recall about that
3  file sitting here today?
4      A.  I recall that looking at the history of
5  the file, the formula changed over time for
6  calculating the principal.  And yeah.  And that --
7  the kind of the structure of that formula, kind of
8  related to something like comparing the value of the
9  account with the line of credit, something of that
10  nature, so that if the account value went down a lot
11  the principal could go up a lot.  It had something
12  of that nature.
13     Q.  So some sort of comparison between the
14  line of credit and some aspect of the account
15  balance?
16         MR. DUNNE:  Objection to form.
17     A.  It had something of that pattern or
18  structure in it.
19  BY MR. SACK:
20     Q.  Okay.  And I think you said it changed
21  over time.
22         When do you recall it changing?
23     A.  I recall it -- the formula being changed
24  in 2022, maybe around July or something like that.
25     Q.  So I see that this spreadsheet goes up to

MAGNA ▸
LEGAL SERVICES

1          N. Molina - Confidential
2    June of 2022.  If it -- sorry -- yeah, June of 2022.
3    You said you remember a change in July.  What about
4    any changes before July of 2022?
5         A.   I don't remember exactly if there were any
6    or not before that time.
7         Q.   Setting aside the formula used to
8    calculate the principal, sort of what is -- not
9    just -- I need you to -- so not just thinking about
10   a specific formula, what is the sort of like content
11   that principal is getting at in this document?
12             MR. DUNNE:  Objection.
13        A.   I can kind of tell you patterns of the
14   formula, but at no point in time did I kind of work
15   with creating the formula, so I can't speak to the
16   exact intention of it, although I can kind of speak
17   to the general patterns of the formula.
18   BY MR. SACK:
19        Q.   Yeah.  What are the some of the general
20   patterns of the formula?
21        A.   Yeah, as I was saying, kind of something
22   like that comparison.  So if the account value was
23   very low, then the principal could be higher.
24        Q.   Does it show the amount -- does the
25   principal field show the utilized amount of the line

1          N. Molina - Confidential
2    of credit?  Like, how much the customer had used of
3    that line of credit?
4             MR. DUNNE:  Objection.
5         A.   Yeah, I can't say -- I can't say that.
6    Or, yeah I mean, to me I think utilization is kind
7    of a broad term.
8    BY MR. SACK:
9         Q.   Why don't we change it to drawn then.  How
10   much the customer had drawn from the line of credit?
11            MR. DUNNE:  Objection.
12        A.   Yeah, I may have had some kind of general
13   impression from the code that it could correlate to
14   that, but I wouldn't be able to say that it was the
15   amount drawn.
16   BY MR. SACK:
17        Q.   Okay.  So but based on your general
18   understanding, I think you said you noticed some
19   patterns in the code.
20             Was it your understanding that that
21   principal field reflected, generally, the amount of
22   the line of credit that was drawn by a customer?
23             MR. DUNNE:  Objection.  Asked and
24   answered.
25        A.   Yeah, I can't -- yeah, I can't make that

1          N. Molina - Confidential
2    conclusion.  So no, that's not my understanding of
3    it.
4    BY MR. SACK:
5         Q.   Well, you said they correlated.  In what
6    ways did they correlate?
7         A.   Well, in terms of the pattern that you're
8    comparing some notion of account value with the line
9    of credit, if the account value is, for example,
10   lower than the line of credit, you would -- as it
11   gets lower, you would generally see the principal
12   going up from -- was my impression of the formula.
13        Q.   You said that the formula changed in July
14   of 2022?
15        A.   Around that.
16        Q.   Around then, yeah, no problem.  I
17   appreciate that clarification.
18             Do you know why the formula was changed?
19        A.   No.
20        Q.   I'm also looking at the document and I see
21   that on the date field, where towards the end, I see
22   it mostly going day-by-day.  But then, I don't see a
23   row for 2020-06-12.
24             Do you follow what I'm saying?
25        A.   Yes.

1          N. Molina - Confidential
2         Q.   Do you know why that row is not there?
3         A.   No.
4         Q.   Is it your understanding, based on your
5    general understanding of the principal field, that
6    at least some part of the line of credit was drawn
7    by this Three Arrows Capital customer on
8    June 14, 2022?
9             MR. DUNNE:  Objection.
10        A.   I would just have to ask what you mean by
11   "drawn," because I just think of it in terms of the
12   balances and the line of credit.  So if you could
13   clarify drawn, I can probably answer better.
14   BY MR. SACK:
15        Q.   I mean to say that the customer had -- was
16   utilizing, in some way, the line of credit that they
17   had.
18        A.   So and by "utilizing the line of credit,"
19   I don't really have a definition of utilizing a line
20   of credit, so it would be a bit speculative to
21   answer it.  I mean, I can answer technical details
22   about it, but I can't really speculate.
23        Q.   I think earlier you were saying you had
24   some general understandings about how line of credit
25   correlated with the principal field that we're

MAGNA
LEGAL SERVICES

1           N. Molina - Confidential
2  looking at now.  And I'm asking, based on those
3  understandings, whether a positive principal amount
4  would indicate to you that the customer was
5  utilizing or drawing against that line of credit?
6      A.  It indicates to me that some notion of the
7  account value was lower than some notion of the line
8  of credit.
9      Q.  And what does that mean exactly?
10     A.  So some calculation relating to the
11 account value provided a result -- or some
12 calculation related to the balances and the account
13 provided a result that was lower than the line of
14 credit.  And unfortunately, that's kind of a very
15 general statement because that's what I remember.
16     Q.  Okay.  But you said that you do remember
17 seeing some code that might shed light on that
18 relationship?
19     A.  Correct.
20     Q.  And you said you saw that recently?
21     A.  Yes.  This year, last few months.
22     Q.  Okay.  Great.  So I think we can put this
23 document to the side then for now.
24     A.  (Witness complies.)
25     Q.  I think my colleague is going to put a

1           N. Molina - Confidential
2  document on some of these laptops we have here just
3  to make it easier for us to all look at the document
4  because it's quite large.
5      MR. DUNNE:  Should we put one of these in
6      front of Nils?
7      MR. SACK:  That would be wonderful if you
8      wouldn't mind helping with that.
9      MR. DUNNE:  Sure.
10     So Dan, you're basically going to screen
11     share it on the Zoom; is that how it's going to
12     work?
13     MR. SACK:  Yes.
14 BY MR. SACK:
15     Q.  This is going to be what was previously
16 marked as Exhibit 41.  Sorry, I apologize.  This is
17 going to be marked freshly as Exhibit 41.  It was
18 not previously marked.
19     (Exhibit 41 was received and marked for
20 identification, as of this date.)
21 BY MR. SACK:
22     Q.  This is the first 100,000 rows of --
23     MR. DUNNE:  You didn't print that?
24     MR. SACK:  I'm sorry.  I saved a tree.
25

1           N. Molina - Confidential
2  BY MR. SACK:
3      Q.  Of a document bearing the Bates number
4  FTX_3AC, it looks like maybe 000000002, transaction
5  data spreadsheet.
6      You can let me know when you have that in
7  front of you, Mr. Molina.
8      A.  Yes.
9      Q.  Feel free to make it bigger if you need
10 to, or ask us to make it bigger, and let me know
11 after you've had a chance to review it.
12     A.  (Witness reviews document.)
13     MR. DUNNE:  To be clear, he can't scroll
14     through it.
15     MR. SACK:  Sorry.  I don't know if he has
16     the ability to scroll through it but my
17     colleagues Zijun can scroll for you or enlarge.
18     I am handing just a slip sheet for that
19     document to the court reporter.
20     MR. DUNNE:  Can you read that okay, Nils?
21     THE WITNESS:  Yes.
22     A.  Yes.  I'm ready.
23 BY MR. SACK:
24     Q.  Great.
25     Have you seen this document before?

1           N. Molina - Confidential
2  Sorry.  It's an excerpt, so taking for granted it's
3  an excerpt, have you seen the document that
4  encompasses this excerpt?
5      A.  I don't believe I've seen this document.
6      Q.  Have you seen this data before?
7      A.  I believe I've looked at data like this,
8  yes.
9      Q.  And when you've looked at data like this
10 before, are these the fields up at the top that you
11 would typically see?
12     MR. DUNNE:  Objection to form.
13     A.  A few of them, yes.
14 BY MR. SACK:
15     Q.  Which ones?
16     A.  Well, size, price, art, are pretty
17 familiar to me.  And some of the other ones like
18 side and fill ID, I think I remember also, although,
19 they might have looked slightly different when I saw
20 them in the FTX database.
21     Q.  Understood.  I see there's the column with
22 fill's information in it.  There's one labeled fill
23 ID, one labeled fill type.
24     What is fills or fill data?
25     A.  Fill data is the trade data for FTX

MAGNA ▶
LEGAL SERVICES

1           N. Molina - Confidential
2   accounts.
3       Q.  Do you know where this data was -- or
4   sorry -- let me rephrase that.
5       Do you know what time period that this
6   data represents from the FTX database?
7       A.  From what I can see here, I don't see an
8   indication of the time stamp because I think the
9   column, the time stamp column looks like it's
10  hidden.  So I can't say.
11      Q.  So let me go ahead and try and make that a
12  little bit wider so we can all see it.
13      Are you able to see that more clearly now?
14      A.  Yes, now I can see the time stamps.
15      Q.  And at least these first rows we can see
16  on the screen appear to be from mid to late 2020; is
17  that right?
18      A.  Correct.
19          MR. DUNNE:  Could I -- would you guys mind
20  making this a little bit bigger for me?
21          MR. SACK:  Of course.  Is that more
22  visible for you?
23          MR. DUNNE:  Yes, much better.
24          MR. SACK:  Okay.
25

1           N. Molina - Confidential
2   BY MR. SACK:
3       Q.  This spreadsheet contains an "order type"
4   column I believe.  Or maybe not.  In this excerpt it
5   has an order ID.
6       Do you know what the order ID reflects?
7       A.  I believe that identified -- or yes.
8       Q.  What does it show?
9       A.  I believe it identified the ID of the
10  order associated with the fill.
11      Q.  Okay.  What does an order -- sorry --
12  could there be multiple different types of orders?
13      A.  I don't -- I don't remember if there were
14  different types of orders in the database.
15      Q.  I want to -- I'm just going to move this
16  over to the right a little bit.
17      Do you see that there's a "volume" column?
18      A.  Yes.
19      Q.  As you understood volume as it relates to
20  transactions on the Exchange or assets on the
21  Exchange, how do you understand volume to be
22  calculated?
23      A.  I don't remember volume being calculated
24  in the code.
25      Q.  If you were to try to calculate volume

1           N. Molina - Confidential
2   outside of the code, would you understand that to be
3   price times size?
4           MR. DUNNE:  Objection.
5       A.  I think so, yes.
6   BY MR. SACK:
7       Q.  Do you know why some of them -- some of
8   the entries in the volume column say "one" and
9   others say "zero"?
10      A.  No.
11      Q.  Would information either on this
12  spreadsheet or other fields that you could draw from
13  the FTX database show who had made the order?
14      A.  The fill -- I know the fill would be
15  associated with an account, and that could indicate
16  who with made the trade.  I don't really remember
17  the orders themselves, if they had additional
18  information about that.
19      Q.  So just for example, if FTX were to
20  initiate an order or a trade on its own account for
21  a customer, would there be -- when I say "on its own
22  account," I think I'm using that term in a way
23  that's perhaps confusing.  Let me rephrase the
24  question.
25      If FTX were to initiate an order or trade

1           N. Molina - Confidential
2   of its own volition for a customer, would there be
3   any way to tell that by looking at the FTX database?
4           MR. DUNNE:  Objection.
5       A.  I don't know.
6   BY MR. SACK:
7       Q.  Well, I'm asking you based on your
8   knowledge of the FTX database.  Are you aware of any
9   method yourself for determining that?
10          MR. DUNNE:  Objection.  Asked and
11  answered.
12      A.  I mean, I'm not aware how that was
13  typically done, so I don't know.  Yeah.
14  BY MR. SACK:
15      Q.  Are you aware of other people looking at
16  FTX ever looking for that kind of information
17  pre-petition?
18      A.  What information?
19      Q.  Looking for information about which entity
20  initiated a particular transaction or order?
21      A.  No.  Not aware.  That's not something I've
22  worked with, so I don't know.
23      Q.  Did you ever prepare a document with 3AC's
24  data for -- sorry.  Strike that.
25      Earlier we were talking about a meeting or

1              N. Molina - Confidential
2    meetings you may have had with A&M in -- right, in
3    August of 2024.
4           Do you remember us talking about that?
5           MR. DUNNE:  Objection to form.
6       A.   I remember talking about meetings around
7    that time.
8    BY MR. SACK:
9       Q.   Yeah.
10           Do you ever recall whether you pulled data
11   from the FTX database in connection with those
12   meetings?
13          MR. DUNNE:  Objection.
14      A.   The question was how -- if or how?
15   BY MR. SACK:
16      Q.   Yeah.  Whether you recall doing that in
17   connection with those meetings?
18      A.   I think I looked at data relating to the
19   account in 2024, I think I did.  So does that answer
20   the question, or what was the question?
21      Q.   Yeah, that helps.  I just want to know if
22   you were the one that might have pulled this data
23   for A&M?
24          MR. DUNNE:  What's in this Exhibit?
25          MR. SACK:  Yes.

1              N. Molina - Confidential
2           MR. DUNNE:  Yeah.
3       A.   I don't believe this particular exhibit I
4    created?
5    BY MR. SACK:
6       Q.   Okay.  And just to be clear, when I say
7    "this exhibit," obviously, again, I know it's an
8    excerpt, but I just meant the overall data.
9       A.   Yes.
10      Q.   Just wanted to make sure that we're on the
11   same page.
12           What data do you recall pulling around
13   that time, if not this?
14      A.   I think I looked at trades in the FTX
15   database, which they have overlap with some of the
16   information here and historical balances for the
17   account.  I think I looked at that, certainly this
18   year, and I think last -- maybe last year as well.
19      Q.   Okay.  I think we can take down this
20   exhibit.  But do you recall performing any
21   calculations with your -- well, you said you didn't
22   pull this data, either this data or the other data
23   that you pulled?
24          MR. DUNNE:  Objection.
25      A.   Yeah, I mean, I was asked questions about

1              N. Molina - Confidential
2    the data, and I worked via A&M.  And to answer those
3    questions I kind of worked with that data.
4    BY MR. SACK:
5       Q.   What did A&M ask?
6           MR. DUNNE:  He's not going to answer that.
7           MR. SACK:  Are A&M attorneys?
8           MR. DUNNE:  A&M is consultants working for
9    the debtors in connection with litigation, and
10   he will not be answering any questions
11   concerning work he did at the request of or for
12   A&M or counsel.  If you have data you'd like to
13   ask him about, that's fine.  He's been
14   answering those questions, but that question he
15   will not be answering.
16          MR. SACK:  I note your objection.  I won't
17   ask him about it, but we reserve the right to
18   revisit this issue if we need to.
19          If we can pull up tab 23.
20          We're going to mark this document as
21   Exhibit 42.
22          (Exhibit 42 was received and marked for
23   identification, as of this date.)
24   BY MR. SACK:
25      Q.   It's a document bearing the Bates number

1              N. Molina - Confidential
2    FTX_3AC_000000038.
3           MR. SACK:  I'm going to put it up on the
4       screen because, again, it's another large
5       document.
6    BY MR. SACK:
7       Q.   Again, let me know how we can make that
8    easier for you to review, and let me know after
9    you've had a chance to conduct that review.
10      A.   I've looked at it.  I've reviewed it.
11      Q.   Do you recognize this document?
12      A.   No.
13      Q.   Do you recognize any of the fields at the
14   top of this document?
15      A.   To some extent, although I don't know
16   exactly what they mean in this context.
17      Q.   Would you -- strike that.
18           Do they resemble or even match fields that
19   were available on the FTX database?
20      A.   They resemble data that could be derived
21   from the FTX database.
22      Q.   Earlier when we were talking you had
23   mentioned that there was perhaps a field that would
24   indicate that -- indicate the word "REST."
25           Do you remember us talking about that?

MAGNA
LEGAL SERVICES

1    N. Molina - Confidential
2    A.  Yes.
3    Q.  Do you know what field that term "REST"
4  would fall under on the FTX database?
5    A.  I don't remember.
6    Q.  If you were asked to look for it, do you
7  think you would be able to find it?
8    A.  Given access to that in the FTX database,
9  yes.
10    Q.  Okay.
11        It's obviously quite a large document, so
12  I'm not going to ask you about every row and column,
13  but do you see the column labeled "ticker"?
14    A.  Yes.
15    Q.  What does the ticker column indicate?
16        MR. DUNNE:  Objection.
17    A.  It looks like the name of a token.
18  BY MR. SACK:
19    Q.  So for example, I see one labeled "alpha."
20        Do you know what that token would be?
21    A.  I don't remember a token called "alpha,"
22  but it look likes a token called "alpha."
23    Q.  Okay.
24        I see a field labeled "airdrops" on the
25  FTX database.  What did you understand the airdrops

1    N. Molina - Confidential
2  field to show?
3    A.  I remember there was a table called, I
4  think, "airdrops," containing tokens airdropped to
5  users and this affected the balance of a user.  So
6  it looks like it relates to that table.
7    Q.  Just so I understand, what is an airdrop
8  as you understand it?
9    A.  From my understanding, an airdrop would
10  increase the balance in a token in a user's account.
11    Q.  I see a column named "binary option
12  fills."
13        Do you see that one?
14    A.  Yes.
15    Q.  What does that represent?
16        MR. DUNNE:  Objection, lack of foundation.
17  BY MR. SACK:
18    Q.  Have you ever seen a field like that on
19  the FTX database?
20    A.  I think so.
21    Q.  And what did you understand that field to
22  be on the FTX database?
23    A.  Something like trades relating to binary
24  options, is my general understanding.
25        MR. DUNNE:  And Dan, just so you know, so

1    N. Molina - Confidential
2  I don't have to end up making a ton of
3  objections.  He's testified he's not familiar
4  with this.  That question was fine, as tied to
5  the FTX database.
6        MR. SACK:  Sure, thanks.
7  BY MR. SACK:
8    Q.  And what is your understanding of what a
9  binary option is?
10    A.  I don't know beyond seeing that phrase in
11  the code.  But I don't know what it meant.
12    Q.  Have you -- I understand that you don't
13  remember seeing this document in particular.  Do you
14  recall discussing these terms -- sorry.  Strike that
15  question.
16        You've mentioned that some of the
17  headings, the field headings in this document,
18  resemble field headings that you might have seen on
19  the FTX database; is that right?
20    A.  Resembles data in the FTX database.
21    Q.  Yeah.  Sorry.  When you say it resembles
22  data in the FTX database, what do you mean?
23    A.  Yeah, some labels -- labels on tables in
24  the FTX database.
25    Q.  Okay.

1    N. Molina - Confidential
2        Did you discuss the descriptions of these
3  fields with Mr. Gordon at any point in time?  Not
4  necessarily on this document, I just mean the fields
5  that are on this document.
6        MR. DUNNE:  You can answer that yes or no,
7    if you know.
8    A.  Yeah.  I don't remember.
9  BY MR. SACK:
10    Q.  Have you ever discussed, with a gentleman
11  named Mr. Coverick, the fields that are in this
12  document, to the extent that they were also
13  reflected on the FTX database?
14        MR. DUNNE:  Same instruction, Nils.
15    A.  Yeah, I don't know.
16  BY MR. SACK:
17    Q.  So you don't remember if you spoke to --
18  let me back up.
19        Did you ever speak to a man named
20  Mr. Coverick?
21    A.  No, not as I recall.
22    Q.  Did you speak to anyone at A&M about the
23  fields that we're talking about, to the extent that
24  they're reflected on the FTX database?
25        MR. DUNNE:  Again, you may answer yes or

MAGNA
LEGAL SERVICES

1           N. Molina - Confidential
2   no, if you recall.
3       A.  Yes.
4   BY MR. SACK:
5       Q.  Who were those people?
6       A.  I've spoken with A&M consultants
7   including, Louis Konig and Peter Quan, about some of
8   this.
9       Q.  And what was that first name, Louis?
10      A.  Louis Konig.
11      Q.  Konig, okay.
12          When were these conversations?
13      A.  Starting early 2023.
14      Q.  And when most recently?
15      A.  For these fields, I don't remember.
16      Q.  Not necessarily for these fields, but any
17  other fields that you remember from the FTX
18  database.
19      A.  About a month ago.
20      Q.  About how many times did you talk with
21  these individuals about these or other fields from
22  the FTX database?
23      A.  A few dozen times, around.  Maybe a bit
24  more counting chat messages.
25      Q.  When you say "chat," earlier we had talked

1           N. Molina - Confidential
2   about Slack?
3       A.  Yes.
4       Q.  That kind of thing, or email, text?  What
5   kind of forms are these chats?
6       A.  Yeah.  Just like a -- I think like the
7   Google Chat or I think was what we used.
8       Q.  Google Chat?
9       A.  Yes.
10      Q.  Would you also email these individuals?
11      A.  Yes.
12      Q.  Would you have videoconferencing of any
13  kind with these individuals?
14      A.  Yes.
15      Q.  Phone calls?
16      A.  Well, audio conference, so similar to
17  phone call.
18      Q.  Yeah, okay.  And just to be clear, were
19  these conversations about these fields with respect
20  to the 3AC account or accounts?
21      A.  Sometimes.
22      MR. SACK:  I'm going to take down this
23  document, and I'm going to put up -- we
24  received an amended copy of this document from
25  FTX, bearing the Bates label FTX_3AC  -- I

1           N. Molina - Confidential
2   think it's going to be seven or eight zeros,
3   38_amended.
4       MR. DUNNE:  New exhibit number for this
5   one?
6       MR. SACK:  Yes.  This is going to be
7   Exhibit 43, please.
8       (Exhibit 43 was received and marked for
9   identification, as of this date.)
10  BY MR. SACK:
11      Q.  So once that's up, same process.  I'll
12  give you some time to review.  Let us know if we can
13  make it easier for you to look at it, and then we'll
14  talk about it in a little bit.  Sorry, it's another
15  large document so it's just going to take a minute
16  to load.
17          Can you see this document now?
18      A.  Yes.
19      MR. DUNNE:  Would you mind blowing that up
20  just a little bit?
21      MS. ZHAO:  Yes.
22      MR. DUNNE:  Thank you.  That's great.
23      A.  I've looked at it.
24  BY MR. SACK:
25      Q.  Okay.  Great.  I just didn't want to rush

1           N. Molina - Confidential
2   you.
3          Have you seen this document before?
4       A.  No, I don't believe so.
5       Q.  Are the -- we were talking about the field
6   labels on the prior version of this document,
7   document 38, that was Exhibit 42, I believe.
8          Do you see that there are also field
9   headings on this document as well?
10      A.  Yes.
11      Q.  Do those similarly resemble field entries
12  from the FTX database?
13      MR. DUNNE:  Objection.
14      A.  They do seem to resemble labels in the FTX
15  database.
16  BY MR. SACK:
17      Q.  If you wanted to pull these fields
18  yourself to create this type of database, could you
19  have?
20      MR. DUNNE:  Objection.
21      A.  I don't know because I don't know exactly
22  what they mean in the context of this document.
23  BY MR. SACK:
24      Q.  Do you know if anything changed in the --
25  in the code base since November of 2022, that might

MAGNA
LEGAL SERVICES

Page 154

1           N. Molina - Confidential
2   affect the data that you pulled with respect to any
3   field from the FTX database?
4           MR. DUNNE:  Objection.
5       A.  Sorry.  Could you repeat the question?
6   BY MR. SACK:
7       Q.  Yeah, no problem.
8       Are you aware of any changes in the code
9   base since November of 2022, that might affect the
10  data pulled for any of the fields on the FTX
11  database?
12          MR. DUNNE:  Objection to form.
13      A.  I'm not aware of the FTX code being
14  changed since late 2022.
15          MR. SACK:  I'm going to take down this
16      exhibit now.  We're going to mark this as
17      Exhibit 44.
18      (Exhibit 44 was received and marked for
19  identification, as of this date.)
20          MR. DUNNE:  Okay if I move this laptop now
21      out of the way?
22          MR. SACK:  Yes.  Thank you.
23      For the record, this document bears the
24      starting Bates number FTX_3AC_000013826.
25

Page 155

1           N. Molina - Confidential
2   BY MR. SACK:
3       Q.  Let me know after you've had a chance to
4   look it over.
5       A.  (Witness reviews document.)
6       I've looked at it.
7       Q.  Do you recognize the document?
8       A.  No.
9       Q.  Have you seen these types of
10  communications before?
11      A.  In terms of Slack messages, yes.
12      Q.  Yes.  Thank you for that.  I did mean
13  Slack messages.  So in this Slack message on the
14  front page, there's a label in bold that says
15  "FTX-MM."
16      Do you see that?
17      A.  Yes.
18      Q.  Do you know what MM stands for?
19      A.  I think -- I think market maker, but I'm
20  not sure.
21      Q.  And what would -- or sorry.  What does
22  "market maker" mean?
23          MR. DUNNE:  Objection.
24      A.  I think it means somebody that does a lot
25  of trading on an exchange.

Page 156

1           N. Molina - Confidential
2   BY MR. SACK:
3       Q.  So market maker was -- sorry.  Let me
4   strike that.
5       Was that -- you said, "Market maker means
6   somebody that does a lot of trading on an exchange."
7   Is that by number of transactions or by volume of
8   transactions?  Sort of, how is that term understood
9   by you?
10          MR. DUNNE:  Objection.
11      A.  I said, "a lot of trading."  And by that I
12  would mean both the number and amount of trades
13  would be large.
14  BY MR. SACK:
15      Q.  On that first page, do you understand
16  FTX-MM to be a list or a group of some kind?
17      A.  I think it was a Slack.  Or it looks like
18  it was a Slack channel.
19      Q.  A channel, okay.  And still looking at
20  that first page, there's a list of names in the
21  Slack channel.  Do you see yours in the bottom
22  third?  It's in alphabetical order by first name.
23      A.  Yes.
24      Q.  Okay.
25      So looking at the document -- one moment.

Page 157

1           N. Molina - Confidential
2       Sort of the first message in that Slack
3   thread, do you see it purports to be from David Ma,
4   dated June 15, 2022, at 8:27 in the morning?
5       A.  Yes.
6       Q.  And then, it appears to be forwarding
7   perhaps a Twitter message.
8       Do you see that?
9       A.  Yes.
10      Q.  And in the Twitter message from David Ma,
11  it's -- it looks like it's from someone named Danny
12  on Twitter.
13      Do you see that?
14      A.  Yes.
15      Q.  And it looks like the message that Mr. Ma
16  forwarded says:
17      "We trade in one of 3AC trading accounts.
18  This morning they took about $1 million out of our
19  accounts.  I hope you pay us back ASAP."
20      Do you see that?
21      A.  Yes.
22      Q.  And then, in the next message, do you see
23  that Mr. Ma sort of directs the next message to a
24  Keith Lennox?
25      A.  Yes.

MAGNA
LEGAL SERVICES

N. Molina - Confidential

1  
2     Q.   And he says:
3         "Seems you might be looking into this
4  already.  I won't reply or add anyone for now."
5     A.   Yes.
6     Q.   Do you recall this exchange?
7     A.   No.
8     Q.   Do you know who Cheese is on the next
9  line?
10    A.   Beyond somebody who was associated for FTX
11 for a period of time, no.
12    Q.   Okay.  And Cheese, also seems like that
13 person's name might be Jon, says:
14        "This surely depends on their managed
15 account agreement with 3AC?"
16        Do you see that?
17    A.   Yes.
18    Q.   Do you know what Cheese/Jon meant when he
19 said that?
20    A.   No.
21    Q.   Do you see the next line, it says:
22        "@Zane Tackett is handling the situation
23 with them."
24        Do you see that?
25    A.   Yes.

N. Molina - Confidential

1  
2     Q.   Do you remember how Mr. Tackett was
3  handling the situation with 3AC?
4     A.   That's not something I worked with at the
5  time, so I don't know.
6     Q.   Do you see in the next line Mr. Lennox
7  writes:
8         "Probably best to wait for Zane before
9  saying anything to 8Blocks.  I don't have any
10 context on the -- looks like maybe there's some code
11 that got garbled there -- but, on the 3AC-8Blocks
12 relationship or that specific withdrawal."
13        Do you see that?
14    A.   Yes.
15    Q.   Do you know what Mr. Lennox was referring
16 to when he talked about saying anything to 8Blocks?
17    A.   No.
18    Q.   Do you see on the next page, there's a
19 message at 4:50 p.m. from Mr. Tackett that says "We
20 had to liquidate 3AC on their LOC"?
21    A.   Yes.
22    Q.   Do you recall FTX liquidating 3AC on their
23 LOC?
24    A.   I looked at data relating to 3AC
25 liquidation.

N. Molina - Confidential

1  
2     Q.   Okay.
3         And when did you understand, based on that
4  data, FTX liquidated 3AC on their LOC?
5     A.   I don't know what "on their LOC means," so
6  I can't answer if -- with that phrase included
7  because I don't know what it means.
8     Q.   Sure, no problem.
9         You said you looked at data regarding
10 when -- sorry -- regarding FTX liquidating 3AC; is
11 that right?
12    A.   Yes.
13    Q.   Okay.  So specifically as it relates to
14 the LOC, when do you recall FTX liquidating 3AC's
15 line of credit?
16        MR. DUNNE:  Objection.
17    A.   Yeah, I don't -- I don't know what you
18 mean by "liquidating a line of credit."
19 BY MR. SACK:
20    Q.   You had said that you had looked at data
21 regarding liquidating the -- liquidating the line of
22 credit.  No you didn't.
23    A.   My apologies.  I mean, liquidating Three
24 Arrows Capital.
25        MR. DUNNE:  It's just the use of the term

N. Molina - Confidential

1  LOC.
2         MR. SACK:  Okay.  I appreciate that.
3  BY MR. SACK:
4     Q.   What do you understand the term
5  "liquidating" to mean?
6     A.   Liquidating, I understand that in the
7  context of FTX, meaning, that trades are caused --
8  FTX would cause trades to be executed on the account
9  that is being liquidated.
10    Q.   FTX would cause?
11    A.   Trades would be placed on the liquidating
12 account, and that would constitute a liquidation.
13    Q.   Do you recall how much -- sorry -- strike
14 that.
15        When do you recall that liquidation that
16 you looked into having taken place?
17    A.   Around middle of June 2022.
18    Q.   Can you get more specific for me?  A day?
19    A.   I don't recall the date.
20    Q.   What did you look at to determine when
21 that liquidation took place?
22    A.   I looked at the time stamps of the
23 transactions.
24    Q.   What transactions?

MAGNA
LEGAL SERVICES

1              N. Molina - Confidential
2      A.  Transactions that looked to be liquidation
3  trades.
4      Q.  Okay.  And what about them looked to you
5  to be liquidation trades?
6      A.  I recall specifically seeing the word
7  "liquidation" somewhere in the data.  As well as a
8  general impression that they were liquidation
9  trades.
10     Q.  So I'm curious about that word
11 "liquidation."  What field or fields, if any, would
12 that term "liquidation" have appeared in, in the FTX
13 database?
14     A.  I don't remember the field or location of
15 the word.
16     Q.  Was it in a field, though?
17     A.  It was somewhere in the data that I saw
18 for transactions.
19     Q.  Yeah.  I guess I'm just trying to figure
20 out what data one would look to if we were trying to
21 find that term "liquidation" ourself.
22     A.  Yeah, the transaction data.
23     Q.  I really apologize.  I'm not trying to be,
24 you know, sort of go in a loop on this.  I'm just
25 trying to make sure I understand.  Where precisely

1              N. Molina - Confidential
2  in the transaction data would one look for this
3  term?
4      A.  The transactions involved trades, so would
5  look at the fills table, which contains the
6  transaction data for the trades.  And there was -- I
7  think that would be the main place.  I think there
8  were other related tables, like there's a table
9  called "liquidations," but I don't remember all of
10 the related tables.
11     Q.  Okay.  And these tables, where were they
12 on the FTX database or elsewhere?
13     A.  They were on the FTX database.
14     Q.  And so what kind of information was kept
15 on the liquidation tables on the FTX database?
16     A.  I don't remember.
17     Q.  Okay.  What do you remember being on the
18 liquidation tables on the FTX database?
19     A.  I remember I think there was a time stamp
20 and most likely the accounts and IDs related to
21 fills, but I don't recall beyond that.
22     Q.  I think earlier when I asked you what made
23 you think that the data you were looking at was a
24 liquidation, you said you had looked at -- you saw
25 the word "liquidation," and then I think you said

1              N. Molina - Confidential
2  also maybe there was some general sense you had just
3  from looking at the data itself that indicated to
4  you it was a liquidation.
5          Do you remember saying something to that
6  effect?
7      A.  Yes.
8      Q.  What was it about the data that gave you
9  that general sense?
10     A.  I don't remember.
11     Q.  So it's just kind of a vibe situation?
12         MR. DUNNE:  Objection.
13     A.  No.  A look through the relevant data.
14 BY MR. SACK:
15     Q.  Okay.
16         MR. SACK:  We've been going a little over
17 an hour.
18         MR. DUNNE:  I was going to ask if you were
19 at a natural stopping point.
20         MR. SACK:  Why don't we take a break.  I
21 know -- let's go off the record first.
22         THE VIDEOGRAPHER:  We're going off the
23 record.  The time is 2:46 p.m.
24     (Recess.)
25         THE VIDEOGRAPHER:  We are back on the

1              N. Molina - Confidential
2  record.  The time is 2:59 p.m.
3          MR. SACK:  Now that we're back on the
4  record, I just wanted to ask.  I don't believe
5  we received the principal LOC formula that
6  Mr. Molina was talking about or the field that
7  would encompass the word "REST" that Mr. Molina
8  was talking about.  So we're formally
9  requesting that information now to the extent
10 we don't have it already.
11         MR. DUNNE:  We'll take that up off line.
12         MR. SACK:  Okay.  Great.
13 BY MR. SACK:
14     Q.  Thanks, Mr. Molina, for being here still.
15         I wanted to quickly jump back to the
16 document ending in -- the document with the Bates
17 number ending 54.  Do you recall what Exhibit No.
18 that was?  That's Exhibit 21.
19         Do you have that in front of you?  I think
20 that was the one Excel file that was in paper copy.
21 If not, I can grab another copy for you.
22     A.  There's no sticker on it.
23     (A discussion was held off the record.)
24 BY MR. SACK:
25     Q.  I want to look at that last page again of

MAGNA
LEGAL SERVICES

1            N. Molina - Confidential
2  the document.
3       A.  Okay.
4       Q.  And we were talking about this earlier,
5  about the size column.
6          Do you remember that?
7       A.  Yes.
8       Q.  I think you told me that that size column
9  reflected interest calculations based on the
10 principal?
11      A.  Yes.
12      Q.  Just looking at that very last entry, the
13 last row, there's a column -- sorry.  Excuse me.
14         There's one row labeled 2022-06-14.
15         Do you see that?
16      A.  Yes.
17      Q.  I'm curious about how the interest was
18 calculated on that date in particular.  Was it
19 calculated prospectively forward or backward?  So
20 what I mean by that is, was the interest that's
21 reflected in the size column reflecting interest for
22 the day prior, from June 13, the full day,
23 reflecting June 14, sort of reflecting some
24 combination of the two or something else?
25         MR. DUNNE:  Objection.

1            N. Molina - Confidential
2       A.  I believe it would reflect the state of
3  the account at that point in time, which looks like
4  it's 14th.
5  BY MR. SACK:
6       Q.  I understand that.  I guess, I don't know
7  like when we're calculating interest, what time
8  period the interest is being calculated for.  So do
9  you know what day or days the interest in that size
10 column was calculating?
11      A.  Well, I know it looks likes it was
12 calculated at the 14th of June.  And we also see
13 from the row above, the previous one was calculated
14 at the 13th of June, so we see that the interest
15 seems to be calculated regularly, if that answers
16 your question.
17      Q.  I don't know that it does, but I
18 appreciate you trying here.
19         I guess when we're calculating interest,
20 it happens over -- we're calculating interest over a
21 period of time, right?
22         Is that a yes?
23      A.  Yes.
24      Q.  I guess I want to know what period of time
25 the size entry on June 14, 2022, is calculating

1            N. Molina - Confidential
2  interest for.  Over what period of time?
3          MR. DUNNE:  Objection.
4  BY MR. SACK:
5       Q.  If you know.
6       A.  I know it's charged at that point in time.
7  The code doesn't talk about, as far as I remember,
8  periods of time.  It just -- at that instant in
9  time, it will calculate an interest payment and make
10 that -- charge that payment.
11      Q.  So I see that there's a time entry, for
12 example, next to the date column.
13         Do you see that?  Or maybe it's part of
14 the date column.
15      A.  Yes.
16      Q.  So are you saying that the interest in the
17 size column would have been calculated at, in this
18 case, 3051 on June 14, 2022?
19      A.  Yes.  Approximately.
20      Q.  And to your knowledge, that would have
21 reflected the interest accrued between that time and
22 the time on the prior -- in the column above --
23 sorry -- in the row above?
24      A.  I don't have reason to disagree with that.
25 I don't recall the code explicitly saying that, but

1            N. Molina - Confidential
2  I don't have reason to disagree.
3       Q.  Okay.  I think that's all I wanted to ask
4  about with respect to this document.  So thank you
5  for letting me come back to it.
6          I think when we were talking before the
7  break, you had mentioned at some point that the code
8  base had changed in or around July of 2022.
9          Do you remember saying something to that
10 effect?
11      A.  Yes.
12      Q.  In what way did the code base change in
13 that time period?
14      A.  From what I recall, the formula we were
15 talking about earlier involving principal, I believe
16 it was changed around that time in the code from
17 what I remember.
18      Q.  And do you know why it had been changed?
19      A.  No.
20      Q.  What do you recall about the formula with
21 respect to principal changing at that time?
22      A.  I recall the -- I mean, I don't recall
23 exactly.  I just recall a couple words in the
24 change.  Like I think "borrow" was in the change,
25 but beyond that, I don't remember.

MAGNA
LEGAL SERVICES

1           N. Molina - Confidential
2      Q.  What would the word -- what did you
3  understand the word "borrow" to mean in the portion
4  of the source code relating to principal?
5           MR. DUNNE:  Objection.
6      A.  I think somehow -- well, as I recall,
7  borrow would refer to balances marked as borrows in
8  some way.
9  BY MR. SACK:
10     Q.  Okay.  And how did you understand that to
11 relate to the principal field?
12     A.  I don't recall exactly.
13     Q.  What do you recall generally?
14     A.  That the word was somehow in the formula
15 at some point in time in July.
16     Q.  Do you know which person --
17     A.  Around.
18     Q.  I'm sorry.  I didn't mean to cut you off.
19     A.  Around July.  Around that month.
20     Q.  Do you know which person or persons made
21 that change?
22     A.  I think so.
23     Q.  Who do you think it was?
24     A.  I think if -- I think it was Nishad if I
25 remember correctly.

1           N. Molina - Confidential
2           (Reporter clarification request.)
3      A.  Nishad.  N-I-S-H-A-D.
4  BY MR. SACK:
5      Q.  And just to be clear, that's Nishad Singh?
6      A.  Correct.
7      Q.  Who besides Nishad Singh would have --
8  strike that.
9           Did Nishad Singh have authority or access
10 to change the code?
11     A.  Yes.
12     Q.  Who, besides Mr. Singh, had access or
13 authority to change the code, the FTX code?
14     A.  Most of the developers on FTX had access
15 to changing the code.
16     Q.  I appreciate that and thanks fors parsing
17 my question a little bit.
18           Who would have had authority to do it?
19     A.  I don't think there was a formal authority
20 for each code module, but people had had some sort
21 of informal understanding of what code they should
22 be working on.
23     Q.  Is it the case that Mr. Singh's -- excuse
24 me -- that Mr. Singh was the one working on or
25 primarily responsible for the LOC interest

1           N. Molina - Confidential
2  calculation code?
3           MR. DUNNE:  Objection.
4      A.  As I recall, he wrote a lot of the code,
5  but I don't know if he was the one principally
6  involved with the whole idea of it or the whole kind
7  of business aspect of it.
8  BY MR. SACK:
9      Q.  Why do you recall Mr. Singh as being the
10 one to have made the change to code we were just
11 discussing?
12          MR. DUNNE:  Objection.
13     A.  I remember looking at the code and looking
14 at the historical changes to the code, which showed
15 the author of each change.
16 BY MR. SACK:
17     Q.  I see.  And so -- just want to connect all
18 of the dots.  So you recall seeing Mr. Singh's name
19 next to the changes reflecting the code change that
20 we've been discussing?
21     A.  Yes.  That's what I remember.
22     Q.  Do you recall anyone else besides
23 Mr. Singh as having the authority to change --
24 sorry -- as having the primary responsibility for
25 the portion of the code relating to LOC interest

1           N. Molina - Confidential
2  calculations?
3      A.  I don't recall another person in those --
4  writing that code from what I saw.
5      Q.  Okay.
6           We were just looking at document 54 a
7  second ago and earlier this afternoon.
8           Do you know whether that document reflects
9  the pre-July 2022 code or the post-July 2022 code?
10     A.  I think most of it would reflect the
11 pre-July code because the calculations would have
12 reflected the code at the time of the calculation,
13 and most of these would be before the code change
14 based on the time stamps.  And potentially, all of
15 them were before the change because I think the
16 change was in July, but I'm not certain about the
17 month.
18     Q.  Do you recall that change being
19 specifically after the 3AC liquidation that we were
20 talking about earlier?
21     A.  I think so.  But I'm not sure.
22     Q.  I just want to clarify on my question just
23 a moment ago.  You said that you think that
24 document 54 reflects the pre-July 2022 code because
25 the calculations were done pre-July of 2022; is that

MAGNA
LEGAL SERVICES

1          N. Molina - Confidential
2    right?
3          A.   Yeah.  It looks like most or all were done
4    before the code change.
5          Q.   I just wanted to make sure I understand.
6    If someone were -- if someone were to pull the data
7    today, the calculations would not be run anew, they
8    would reflect the calculations as they had been
9    conducted at the time indicated in the document; is
10   that your understanding?
11         A.   For this document, yes.
12         Q.   Was it different -- do you have a
13   different understanding for other documents?
14         A.   I don't know.  I don't know because I
15   don't know all of the documents.
16         Q.   Fair enough.  At least, were there any
17   fields in particular that you remember -- that you
18   can recall in the FTX database that would have
19   changed depending on when you pull the data?
20         A.   No, I don't recall any.
21         Q.   So just this principal one that we've been
22   talking about today?
23         A.   I'm saying this -- yeah, I'm saying this
24   would not change depending on when you pull it.
25         Q.   My fault.  Thank you for clarifying.

1          N. Molina - Confidential
2          MR. SACK:  I'm going to show you a new
3    document that I'm going to mark as Exhibit 45.
4          (Exhibit 45 was received and marked for
5    identification, as of this date.)
6    BY MR. SACK:
7          Q.   It bears the Bates number
8    FTX_3AC_000013853.
9          A.   (Witness reviews document.)
10         I've reviewed it.
11         Q.   Have you seen this document before?
12         MR. DUNNE:  Exclude from your answer
13   anything that you may have been shown in prep.
14         A.   I don't remember seeing this document.
15   BY MR. SACK:
16         Q.   Sitting here today, do you know what this
17   document is?
18         A.   Somewhat.
19         Q.   Okay.  What do you understand it to be?
20         A.   It looks likes an FTX help document.
21         Q.   Do you know the purpose of these FTX help
22   documents?
23         MR. DUNNE:  Objection.
24         A.   Not particularly, besides being a help
25   document posted on FTX.

1          N. Molina - Confidential
2    BY MR. SACK:
3          Q.   Did you ever use or refer to these help
4    documents, this one or others pre-petition?
5          A.   I don't remember if I ever referred to
6    them.
7          Q.   Do you know if any of your colleagues ever
8    referred to them pre-petition?  And by "colleagues"
9    I'm referring specifically to other software
10   engineers.
11         A.   I think probably they did, but I don't
12   remember instances where they did.
13         Q.   I want to look at the second page of the
14   document, sort of in this flowchart.  Do you see
15   where it says:
16         "We first close positions down carefully
17   with rate-limited liquidation orders in the market."
18         Sorry.  Let's first read the sentence that
19   precedes the flowchart.  It says:
20         "FTX significantly reduces the likelihood
21   of clawbacks by using three-tiered liquidation
22   model."  And then the first line in the flowchart
23   is:
24         "We first close positions down carefully
25   with rate-limited liquidation orders in the market."

1          N. Molina - Confidential
2          Do you see that?
3          A.   Yes.
4          Q.   What are the clawbacks referred to in that
5    prefatory sentence?
6          MR. DUNNE:  Objection, lack of foundation.
7          A.   I don't really know.
8    BY MR. SACK:
9          Q.   Are you familiar with the term
10   "clawbacks," as it's used by FTX employees?
11         MR. DUNNE:  Objection.
12         A.   Not very familiar, just -- just general
13   kind of impression of the word but not familiar
14   specifically.
15   BY MR. SACK:
16         Q.   Yeah, so based on your time at FTX, what
17   did you understand a clawback to be?
18         A.   From just general impression of the word,
19   reducing or kind of taking something or kind of,
20   affecting the account in a way that reduces
21   something on the account.
22         Q.   When you say "taking something" or "kind
23   of affecting the account in a way that reduces
24   something," what's the "something" we're talking
25   about?

MAGNA
LEGAL SERVICES

1          N. Molina - Confidential
2      A.   Just a something associated with the
3   account.  And what comes to mind yeah, balances and
4   positions, potentially other things.
5      Q.   Did you see in that first bubble we read
6   together, it says:
7          "We first close positions down carefully
8   with rate-limited liquidations orders in the
9   market."
10         Are you familiar with rate-limited
11  liquidation orders?
12         MR. DUNNE:  Objection.
13     A.   I wouldn't say so, no.
14  BY MR. SACK:
15     Q.   Do you recall seeing the code reflect
16  rate-limited liquidation orders?
17         MR. DUNNE:  Objection, form.
18     A.   No.
19  BY MR. SACK:
20     Q.   The second block in the flowchart says:
21         "We have a unique backstop liquidity
22  provider program which jumps in to provide accounts
23  in danger of bankruptcy."
24         Do you see that?
25     A.   Yes.

1          N. Molina - Confidential
2      Q.   Do you know what the unique backstop
3   liquidity provider program was?
4      A.   I remember seeing backstop liquidity
5   provider in the code and the liquidations code.
6      Q.   And what, to your understanding of the
7   code, did that portion of the code do?
8      A.   The one way, as I recall from the code,
9   one way that futures positions on an account could
10  be liquidated was by transferring them to a backstop
11  liquidity provider.
12     Q.   Okay.  And what is a backstop liquidity
13  provider?
14     A.   It is an account on FTX that has been
15  marked as a backstop liquidity provider, is what I
16  saw in the code.
17     Q.   Understood.  Do you have an understanding
18  just outside of the code, more generally, what a
19  backstop liquidity provider is?
20     A.   No.
21     Q.   And when do you recall that backstop
22  liquidity provider program as kicking in according
23  to the code?
24         MR. DUNNE:  Objection to form.
25     A.   I recall that the code that liquidated

1          N. Molina - Confidential
2   positions, it looked at the position and the
3   account, and based on some logic, decided whether or
4   not to use backstop liquidity provider to liquidate
5   the position.
6   BY MR. SACK:
7      Q.   Sitting here today you can't remember what
8   that logic specified?
9      A.   No.
10     Q.   Looking at the third block in the
11  flowchart, it says:
12         "We leverage the insurance fund to prevent
13  customer losses."
14         Do you see that?
15     A.   Yes.
16     Q.   Are you familiar with the insurance fund?
17     A.   I recall seeing changes to the insurance
18  fund specified in the code, and that's the extent of
19  my familiarity with it.
20     Q.   Just so I'm clear, besides noting that
21  there were changes that were made, you don't recall
22  what the insurance fund did before or after the
23  change?
24     A.   No.
25     Q.   When do you -- do you recall when that

1          N. Molina - Confidential
2   change that you saw was made?
3      A.   And what I mean is, I saw the code
4   referred to a change in the insurance fund.  So the
5   code referred to the insurance fund increasing or
6   the insurance fund decreasing, is what I meant.  So
7   the code would specify increases or decreases in the
8   insurance fund in a few places.
9      Q.   I see.  So you didn't see a change in the
10  code itself, you saw that the code was looking for
11  changes?
12     A.   Referring to changes.
13     Q.   I see.  And do you recall what it would do
14  if it saw a positive change in the insurance fund?
15     A.   I recall the code would have something
16  called "insurance fund change" and it could be
17  positive or negative, but I don't recall the code
18  doing anything with that number.
19     Q.   Just so I'm clear.  When you say "you
20  don't recall the code doing anything with that,"
21  does that mean sitting here today, you recall that
22  the code did nothing with that, or that you just
23  can't remember what it was doing with it?
24     A.   I think it didn't do anything with it, but
25  I'm not sure.

MAGNA
LEGAL SERVICES

1           N. Molina - Confidential
2      Q.   Okay.
3           When you saw the changes -- sorry, excuse
4  me.
5           When you were looking at the insurance
6  code, the code -- strike that.
7           When you were looking at the code relating
8  to the insurance fund, were you looking at that
9  post-petition or was this pre-petition?
10     A.   Post-petition.
11     Q.   Do you know if the insurance fund would
12 profit if the there was a positive change indicated
13 on the insurance fund?
14          MR. DUNNE:  Objection to form.
15     A.   I don't really have -- I don't really know
16 anything beyond there would be a positive number
17 next to insurance fund change in the code.
18 BY MR. SACK:
19     Q.   Do you know how liquidation would affect
20 the insurance fund?
21          MR. DUNNE:  Objection.
22     A.   I think I remember one way is what I
23 remember.
24 BY MR. SACK:
25     Q.   What's the way you remember?

1           N. Molina - Confidential
2      A.   I remember that liquidations involving
3  backstop liquidity provider would have -- would have
4  information about insurance fund change referenced
5  in the code.
6      Q.   I'm not sure I'm following 100 percent but
7  I'm trying to.
8           Are you saying -- where would the code
9  reference the change that you just spoke about with
10 respect to litigation -- excuse me -- liquidation?
11     A.   The code, as I recall, would have a
12 function called insurance fund change.  And that
13 function would produce a number, which could be
14 positive or negative.  And I recall that this
15 function would be -- would be relevant for
16 liquidations involving backstop liquidity provider.
17     Q.   I guess in what -- you said there was one
18 way that you remember it being connected to the
19 liquidations, how did you make that connection?
20     A.   Well, I remember reading code for
21 liquidations, and some of the code involved backstop
22 liquidity provider.  And that part of code that
23 involved backstop liquidity provider, I saw that it
24 was connected to that function I talked about.
25     Q.   Understood.  Sitting here today, do you

1           N. Molina - Confidential
2  know how that would impact the liquidation code or
3  how the liquidation code impacted that?
4      A.   To some extent, yes.
5      Q.   Okay.  How would it?
6      A.   As I recall, the backstop liquidity
7  provider would have some price associated with the
8  transaction, and the liquidating account would also
9  have a price associated with the transaction.  And
10 if these prices were different, this would be
11 related to the change in insurance fund or insurance
12 fund's change.
13     Q.   When you say "the price associated with
14 the transaction," what do you mean?
15     A.   By "transaction," I mean the transactions
16 that caused the position to be transferred from the
17 liquidating account to the backstop liquidity
18 provider.  And by "price," I mean the price in that
19 transaction, which would be visible in the FTX
20 database.
21     Q.   Okay.  Just so I'm clear.  So if the price
22 associated with the transaction for the liquidating
23 account -- sorry.  Strike that.
24          How would there be a price associated with
25 the transaction for a liquidating account?

1           N. Molina - Confidential
2      A.   The transaction that transfers the
3  position away from the liquidating account, that
4  transaction would -- would be a fill, and that fill
5  would have a price in it.
6      Q.   Okay.  When we were talking about
7  transaction on a liquidating account, those were
8  transactions initiated by FTX; is that right?
9          MR. DUNNE:  Objection.
10     A.   Yes.  I think that's right.
11 BY MR. SACK:
12     Q.   And so FTX would be the one to determine
13 the price for the transaction or not?
14          MR. DUNNE:  Objection.
15     A.   From the code that I saw, the code had
16 a -- had some logic to determine the price.
17 BY MR. SACK:
18     Q.   Give me one moment.
19          Where did the FTX Exchange get pricing
20 data for the different tokens it had?  Sorry.
21 Excuse me.
22          Where did the FTX Exchange get pricing
23 data of different tokens?
24          MR. DUNNE:  Objection.
25     A.   I recall there was some code to calculate

**MAGNA** ▶
LEGAL SERVICES

1              N. Molina - Confidential
2    the fair price of each token on the Exchange,
3    including fiat and crypto tokens.  And from what I
4    remember, that code was -- used some formula based
5    on pricing from different sources is what I
6    remember.  It was a bunch of code for it.
7    BY MR. SACK:
8        Q.  Do you remember what sources the code drew
9    from?
10       A.  I remember it would depend on the token
11   and could be the FTX Exchange or other exchanges.
12       Q.  Do you recall whether one of the sources
13   was market data feeds?
14       A.  For the fair prices of tokens, I think it
15   used data in some cases from other exchanges.  I
16   don't know if it's a feed, but it's kind of a data
17   or API data.
18       Q.  Were all of the sources exchanges or was
19   there any other type of source that you can recall?
20       A.  I only recall exchanges.
21       Q.  Okay.  For futures contracts traded on
22   FTX, do you know what the pricing source for those
23   were?
24       A.  I believe the price for a future was
25   generally based on the FTX's market for that future.

1              N. Molina - Confidential
2        Q.  And where was that information kept?
3        A.  The FTX database had the current price of
4    each future.
5        Q.  Is that in one of the fields on the FTX
6    database that we were talking about earlier?
7        A.  I think it was a field and on a table in
8    the FTX database.  I don't think -- I don't know if
9    we've looked at the table today, though.  There was
10   a table with it, as I recall.
11       Q.  Do you remember if the table had a name of
12   any kind?
13       A.  Yes.
14       Q.  What was the name?
15       A.  I think the futures table had a price in
16   it.  The table was called "futures."
17       Q.  All right.  So it was a table called
18   "futures," and it had information about how 3AC --
19   excuse me.
20            How FTX had priced the futures; is that
21   right?
22       A.  I think so.
23       Q.  Do you know whether FTX stored that
24   pricing information over the long term?
25       A.  No.

1              N. Molina - Confidential
2        Q.  No, you don't know, or you know that they
3    didn't do that?
4        A.  No.  I don't know that they stored futures
5    pricing over the long term.
6        Q.  I guess maybe one way of thinking about it
7    is, if you were looking for the pricing on a given
8    date and time, from the FTX database would you be
9    able to do that?
10       A.  Yes.  Now I'm remembering that, in the FTX
11   database, there was enough information to figure out
12   what the market price of a future was at a previous
13   point in time.
14       Q.  Do you recall what sources the FTX
15   database used to come to that pricing?
16       A.  I recall a couple tables that might have
17   that information but I don't know -- your question
18   was, that FTX used to come up with historical
19   prices?
20       Q.  Right.  That they used to calculate prices
21   at a given time.
22       A.  Remembering now, I think there was some
23   code that calculated historical prices for futures,
24   I'm remembering now, and I think it might have been
25   a table called "candles," but I think that's all I

1              N. Molina - Confidential
2    can remember about that code.
3        Q.  Do you know why it was called "candles"?
4        A.  Just beyond general knowledge of what
5    candle means in trading, no.
6        Q.  What does candle mean in trading to you?
7        A.  I think candle is something you can see on
8    a price chart indicating price moving up or down.
9        Q.  If you were to look for that data today,
10   would you be able to find it?
11       A.  In the FTX database, I think so, yes.
12       Q.  I think when I asked my question about the
13   sources that FTX used for pricing, you said there
14   were a couple of tables that may have that
15   information.
16            What were those tables?
17       A.  Yes.  So one would be candles, which I
18   talked about.
19       Q.  Right.
20       A.  But also the trade data itself would
21   contain prices in it, so you could use that to
22   determine historical market price.
23       Q.  Do you know whether the FTX source code
24   used the trade data itself when coming up with a
25   price for futures?

1              N. Molina - Confidential
2      A.   What was the question?
3      Q.   Yeah.  No problem.
4           It was, do you know whether the FTX source
5    code used the trade data itself when coming up with
6    a price for futures?
7           MR. DUNNE:  Objection to form.
8      A.   The price for a future was generally the
9    current price for it.  So that current price would
10   be updated regularly based on what had been traded
11   on the market, based on prices traded in the market.
12   So I don't know if it was directly from the trade
13   data or indirectly.
14   BY MR. SACK:
15     Q.   I guess I'm just asking on the -- based on
16   the source code itself, you said that there were a
17   couple of tables it could have drawn from.  I guess
18   I just want clarity on whether you know whether it
19   drew from both or either of the candles table and
20   the trade data that we were talking about?
21     A.   No.  I was just talking about historical
22   pricing.  And I think I remember some function for
23   historical prices that use candles, but this was --
24   this is separate from the current price.
25     Q.   Okay.  I guess I want to make sure I fully

1              N. Molina - Confidential
2    understand.  Would the current price -- for example,
3    on any given day there's a price, and then the price
4    at some point changes; is that right?
5      A.   Yes.
6      Q.   If you wanted to look at, today, at the
7    price before it changed, how would one do that?
8      A.   Today?  One could look at the FTX
9    database, and I would suggest those two tables as
10   far as I know.
11     Q.   Sorry.  I didn't mean to cut you off.  So
12   they would look at this historical data tables or
13   inputs that you were talking about; is that what
14   you're suggesting?
15     A.   Who would?
16     Q.   Or one trying to determine what the --
17   what the price for futures was at a given date and
18   time in the past?
19          MR. DUNNE:  Objection to form.
20     A.   Yeah.  I think that's something one could
21   do.
22   BY MR. SACK:
23     Q.   Did FTX ever do that itself, to your
24   knowledge?
25          MR. DUNNE:  Objection.

1              N. Molina - Confidential
2      A.   All I can remember is there was a function
3    that looked at candles to get a historical price for
4    a future.
5    BY MR. SACK:
6      Q.   And where was that code that was looking
7    at the historical data?
8      A.   I remember seeing it near the code that
9    calculated historical balances for an account.
10     Q.   I think you told me that you might have
11   been the one responsible for doing historical
12   account balances; is that right?
13          MR. DUNNE:  Objection.
14     A.   I said I wrote some of that code and
15   rewrote some of the code.
16   BY MR. SACK:
17     Q.   Right.  Was this piece that we're talking
18   about now, about the historical pricing for futures,
19   was that part of the code that you wrote or rewrote?
20     A.   I don't remember.
21     Q.   Do you remember looking at that --
22   sorry --
23          Who, if not you, at FTX would have written
24   that code?
25          MR. DUNNE:  Objection.

1              N. Molina - Confidential
2      A.   Another developer at FTX.
3    BY MR. SACK:
4      Q.   For perpetual swaps on FTX, what was the
5    pricing source?
6      A.   By "perpetual swaps," do you mean
7    perpetual future.
8      Q.   That's right.
9      A.   I believe the price of a perpetual future
10   was updated regularly based on recent market price
11   on the FTX Exchange.
12     Q.   And if you were trying to find historical
13   information about the price for perpetual swaps,
14   where would one find that on the FTX database?
15          MR. DUNNE:  Objection.
16     A.   Same answer as for futures in general.
17   BY MR. SACK:
18     Q.   Just want to make sure I understand it
19   would use the same -- there was code suggesting that
20   it would use candles and other -- another table
21   relating to trade exchange data?
22     A.   Well, I think there was code that -- some
23   code like that, yes, and that would apply for
24   futures and perpetual futures.
25     Q.   Okay.

MAGNA ▶
LEGAL SERVICES

1          N. Molina - Confidential
2          Were the external feeds or data that was
3    used as some of the inputs for some of the pricing
4    that we've talked about during the past five,
5    ten minutes, were those external feeds reflected on
6    the Exchange code base?
7      A.   Yes.
8      Q.   In what way were they reflected?
9      A.   I generally recall code that looked at
10   data from other exchanges to -- related to token, to
11   prices of tokens.
12     Q.   Okay.  What portions of the code do you
13   recall looked at the other exchanges besides some of
14   the ones that we've talked about?
15     A.   Well, modules in the code.  I don't know
16   specifically.
17     Q.   Were the external feeds reflected on any
18   sort of ledger that FTX kept?
19     A.   By "ledger," you mean data or database?
20     Q.   That's right.
21     A.   I think so, yes.
22     Q.   And what ways was it reflected on the
23   ledger?
24     A.   I think there was a table with some of
25   those prices in it.

1          N. Molina - Confidential
2      Q.   Do you know if FTX used an external price
3    oracle to achieve this?  Are you familiar with that
4    term?
5      A.   Somewhat familiar, yes.
6      Q.   What do you understand that term to mean?
7      A.   I understand that for a future, an oracle
8    price would relate to the price of some
9    corresponding token.
10     Q.   And what is oracle?
11     A.   I think oracle refers to some truth or
12   source of truth.
13     Q.   Do you know what oracle FTX used?
14     A.   I think the -- I think the oracle that we
15   are talking about is some price determined by FTX.
16     Q.   Sir, I think I was asking whether FTX used
17   an external oracle, and then you're telling me the
18   oracle was determined -- was the price determined by
19   FTX.  Can you explain how those two ideas are
20   conflicted?
21     A.   The oracle price was -- was -- I believe
22   there was code to calculate an oracle price in the
23   FTX code base.
24     Q.   And I think I'm asking you whether, to
25   calculate that oracle price, FTX relied on any

1          N. Molina - Confidential
2    external oracle pricing?
3      A.   I don't know if I looked at that code
4    ever, so I don't -- so I don't know personally.
5      Q.   Okay.
6          I think earlier when you were talking
7    about the ledger, do you remember we were talking
8    about a moment ago?
9      A.   Yes.
10     Q.   And I think you said that the ledger has a
11   table reflecting some of the external inputs we were
12   talking about.
13         Do you recall that conversation?
14     A.   Yes.
15     Q.   I think you said that it reflected some of
16   those external prices.
17         Do you recall which external prices it
18   reflected and which ones it did not?
19     A.   I recall seeing -- I recall looking at the
20   table and seeing many prices on there, but I can't
21   say what was there or not there in detail.
22     Q.   Got it.
23         So you didn't -- you just didn't comb
24   through it to check what may have not been there?
25     A.   Correct.

1          N. Molina - Confidential
2      Q.   Okay.  Does the ledger reword all of the
3    pricing information determined by -- excuse me.
4          Does the ledger reward all of the pricing
5    information determined by FTX at all times?
6          MR. DUNNE:  Objection to form.
7          MR. SACK:  Sorry.  I think I said reward.
8    I meant to say record.
9    BY MR. SACK:
10     Q.   Does the ledger record all of the pricing
11   info determined by FTX at all times?
12     A.   I don't -- I don't know.
13         MR. SACK:  Okay.  I now want to show you
14   another document.  It was previously entered as
15   Exhibit 18.  It's a document bearing starting
16   Bates number FTX_3AC_000045694.
17         (Exhibit 18 was PREVIOUSLY received and marked for
18   identification, as of this date.)
19   BY MR. SACK:
20     Q.   Take a moment to look at this document,
21   and let me know when you've had a chance to look
22   through it.
23     A.   (Witness reviews document.)
24         I've looked through it.
25     Q.   Have you seen this document before,

1          N. Molina - Confidential
2    outside of, you know, any prep sessions with
3    counsel?
4        A.   Maybe not this version, but yes.
5        Q.   So do you recall doing that
6    pre-petition -- seeing that version of this document
7    or similar document pre-petition?
8        A.   I don't exactly remember if I saw this one
9    before, pre-petition.
10       Q.   Okay.  What do you understand this
11   document to be?
12       A.   I understand it to be a help document
13   describing aspects of the spot margin program.
14       Q.   Do you know if any of your colleagues in
15   the software engineer -- engineering group, reviewed
16   this document -- versions of this document as they
17   were preparing the source code?
18       A.   I would think so, but I don't know.
19       Q.   Did you review any -- so we've talked now
20   about this document and another sort of explainer
21   document.  Were there any other explainer-type
22   documents, besides the ones that I've shown you
23   today, that you did review pre-petition as you were
24   working on the source code?
25       A.   I believe so.

1          N. Molina - Confidential
2        Q.   What were those helper/explainer documents
3    relating to?
4        A.   I think one was talking about collateral.
5    I don't remember other specific ones, but I think I
6    looked at other ones.
7        Q.   Do you recall why you looked at the
8    collateral explainer document?
9        A.   I don't know if it was called "collateral
10   explainer," but I think it was about collateral.
11   And I was asked questions about from A&M about, you
12   know, topics related to -- to the title of that help
13   document.
14       Q.   Outside of those conversations with A&M
15   though, did you -- had you reviewed that explainer
16   document?
17       A.   Not as far as I recall.
18       Q.   And these conversations with A&M, were
19   they pre-petition or Post-petition?
20       A.   Post-petition.
21       MR. SACK:  I think I'm in a good place to
22   maybe take a short break.
23       MR. DUNNE:  We've been going an hour.
24       MR. SACK:  Yeah.  We can go off the
25   record, please.

1          N. Molina - Confidential
2        THE VIDEOGRAPHER:  We are going off the
3    record.  The time is 3:59 p.m.
4        (Recess.)
5        THE VIDEOGRAPHER:  We are back on the
6    record.  The time is 4:15 p.m.
7    BY MR. SACK:
8        Q.   Welcome back, Mr. Molina.
9             I think right before the break we were
10   looking at this spot margin trading explainer, and
11   you said you may have looked at, maybe not this
12   exact document, but a different version or something
13   similar.
14            Do you recall that testimony?
15       A.   Yes.
16       Q.   So I want to look now at the second page
17   of the document ending in Bates number 695.  You'll
18   see that it says there's a section called, "How does
19   margin work for borrowing."
20            Do you see that?
21       A.   Yes.
22       Q.   It says:
23            "Your spot margin positions are
24   cross-margined with you futures positions; there is
25   no separate spot margin requirement you have to

1          N. Molina - Confidential
2    monitor.  Generally, the way that futures margin
3    works is that each contract has a margin
4    requirement, initial margin fraction to open a
5    position and maintenance margin fraction to avoid
6    liquidation."
7             Do you see that?
8        A.   Yes.
9        Q.   What do you understand "maintenance margin
10   fraction" to mean?
11       MR. DUNNE:  Objection, lack of foundation.
12   BY MR. SACK:
13       Q.   Have you heard that term before?
14       A.   Yes, I believe so.
15       Q.   And what did you understand "maintenance
16   margin fraction" to mean?
17       A.   I understood it to mean maintenance margin
18   fraction requirement, meaning, some threshold that
19   determines whether or not a liquidation would
20   happen.
21       Q.   So what's the fraction part of the
22   requirement?
23       A.   Fraction meant that maintenance margin
24   requirement was divided by something else.
25       Q.   And what was it divided by?

MAGNA
LEGAL SERVICES

1          N. Molina - Confidential
2      A.  I don't remember right now.  The code
3  specified it.
4      Q.  So just to be clear, what was the
5  numerator in that fraction?
6      A.  I believe maintenance margin requirement.
7      Q.  Okay.
8          And you're saying, sitting here today you
9  can't recall what the denominator of that fraction
10 was?
11     A.  Yes.
12     Q.  Do you have a general sense of what it
13 might have been?
14     A.  Yes.
15     Q.  And what's that general sense?
16     A.  I think it was quantity times price.
17     Q.  Quantity of what, times price of what?
18     A.  Quantity of the position or balance, times
19 the price of the token or a future.
20     Q.  And to your understanding, that's what the
21 code you had mentioned earlier about this
22 maintenance margin fraction indicated?
23     A.  Yes.  It indicated the formula for it or
24 calculation for it.
25     Q.  And so to your understanding, what

1          N. Molina - Confidential
2  would -- if the fraction equaled one, so the
3  numerator and denominator were the same -- sorry.  I
4  sound like a math teacher -- what would that have
5  indicated based on the source code?
6      A.  I don't really know.  It's not something
7  that I really remember.
8      Q.  Do you have a sense of what a number less
9  than one would have indicated based on the source
10 code?
11         MR. DUNNE:  Objection.
12     A.  No.
13 BY MR. SACK:
14     Q.  Have you heard of the term "MMF weight"
15 before?
16     A.  Yes.
17     Q.  What do you understand the term "MMF
18 weight" to mean?
19     A.  I remember, or I think, MMF weight or a
20 term very close to that, I think it was MMF weight,
21 was used in the formula to calculate the maintenance
22 margin requirement of -- of an account.  I don't
23 remember if I saw it in the code or a help document
24 or both.
25     Q.  If you saw it in an -- excuse me.

1          N. Molina - Confidential
2      If you saw it in a help document, do you know
3  which help document it would have been in?
4      A.  No.
5      Q.  Before the break, I had asked you if you
6  had looked at any explainer documents before today's
7  deposition, outside of your conferences with
8  counsel, and you mentioned a collateral document.
9  Were there any other explainer documents that you
10 looked at?
11     A.  I think I looked at other ones, but I
12 don't remember their names or I don't really
13 remember what was in them.
14     Q.  You don't have a general memory of what
15 some of these explainer/helper documents were about?
16     A.  There might have been more things about
17 tokens and parameters related to tokens.
18     Q.  Anything else?
19     A.  No I don't remember other ones.
20     Q.  Did you look at any of these explainer
21 documents pre-petition?
22     A.  I have general recollection that I looked
23 at a couple or some or more help documents before
24 petition.
25     Q.  Do you remember when you looked at them?

1          N. Molina - Confidential
2      A.  Not -- no, other than when I worked at FTX
3  pre-petition.
4      Q.  Do you recall why you had looked at them?
5      A.  No.
6      Q.  Do you recall what they were about?
7      A.  No.
8      Q.  Turning back to the MMF weight term that
9  we were discussing a moment ago, was the MMF weight
10 the same for all tickers at the same time?
11     A.  I don't think it was, but it's not
12 something I remember exactly.  But it would be in
13 some document or code, but I don't remember exactly.
14     Q.  What document or code would that
15 information be in?
16     A.  I remember seeing -- seeing something like
17 MMF weight in a document or in code related to
18 maintenance margin requirement.
19     Q.  If it were in the code, would you be able
20 to look that up today?
21     A.  Yes.
22     Q.  To the best of your recollection, did the
23 Exchange code base store an MMF weight alongside
24 other product parameters?
25         MR. DUNNE:  Objection to form.

Page 206

1          N. Molina - Confidential
2      A.  I don't know.  I don't know.  From what I
3  remember of the code, I don't remember that part.
4  BY MR. SACK:
5      Q.  For specific products, do you know whether
6  the MMF weight was set to a certain number at a
7  given time?
8      A.  I don't know.
9      Q.  Would you be able to tell that by looking
10  at the source code if the MMF weight term was used
11  on the source code?
12          MR. DUNNE:  Objection.
13      A.  I would -- I think in the source code, I
14  would be able to see if MMF weight were used or not.
15  BY MR. SACK:
16      Q.  And you'd be able to tell what that weight
17  was for a given ticker at a given moment in time?
18      A.  I don't know if I would be able to tell at
19  any moment in time but -- and also, one might also
20  need to look at the database to determine the value
21  of that parameter.  And I don't know if there would
22  be any point in time, but at some point in time,
23  yes.
24      Q.  I'm sorry.
25      A.  At some point in time, yes, with the help

Page 207

1          N. Molina - Confidential
2  of the database.
3      Q.  Would the MMF weight value have been
4  recorded on the ledger that you were talking about?
5      A.  And this assuming -- I mean, assuming it
6  was being used, which I don't remember.  Assuming it
7  was being used, some form of that -- well yeah,
8  honestly, I don't know if it would be in the
9  database or not, assuming it was in use in the code.
10      Q.  According to the code that you saw about
11  the MMF weight -- sorry.  I know you don't recall if
12  you saw it in a precising the code or in an
13  explainer document.
14          Do you recall whether whatever source you
15  looked to, reflected that the MMF weight term was
16  dynamic?
17      A.  No, I don't recall.
18      Q.  Do you recall whether it indicated that
19  MMF weight was determined by an algorithm?
20      A.  No, I don't recall.
21      Q.  Pre-petition, do you recall any
22  instruction to you or other members of the software
23  engineering team about MMF weight?
24      A.  No.  I don't recall whether or not there
25  were any such discussions.

Page 208

1          N. Molina - Confidential
2      Q.  Before the break, you had mentioned that
3  you had looked at a collateral explainer/helper type
4  document.
5          Do you remember mentioning that earlier?
6      A.  Yes.
7      Q.  What do you recall the explainer or helper
8  document about collateral, saying about collateral?
9      A.  I recall it talked about different
10  parameters, which would depend on the token in
11  question or depend on the token.  And I think some
12  document describes I think, formulas involving those
13  parameters.  Maybe it was the same one, maybe it was
14  a different document.
15      Q.  Sorry.  I missed one of the words.  You
16  said, I think some document described, I think,
17  formers?
18      A.  Formulas.
19      Q.  Formulas involving those parameters.
20  Okay.  Thank you.
21          Did you look to the source code to see if
22  that explainer or helper document about collateral
23  was accurately describing how the FTX source code
24  worked?
25          MR. DUNNE:  Objection.

Page 209

1          N. Molina - Confidential
2      A.  I recall looking at the code and comparing
3  it to help documents.
4  BY MR. SACK:
5      Q.  Okay.  And what do you recall about that
6  comparison?
7      A.  I recall that it was mostly similar,
8  mostly the same between the two.
9      Q.  In what ways was it different?
10      A.  I think I recall that there was one thing
11  that was not in the code but may have been in the
12  document.
13      Q.  Do you recall what that was?
14      A.  No.
15      Q.  Do you have a general sense of what might
16  have been different between those two?
17          MR. DUNNE:  Objection.
18      A.  I recall there was something saying "to
19  do" in the code, indicating something was -- needed
20  to be done in the code.  So I had the impression
21  something was missing in the code and it was
22  indicated in the comment in the code.
23  BY MR. SACK:
24      Q.  I see.
25      A.  But I don't remember -- I don't remember

MAGNA
LEGAL SERVICES

1          N. Molina - Confidential
2    exactly what it was.
3        Q.  So just so I understand, you saw there was
4    like, someone had left like a placeholder.  Like
5    we've got to do something, implant some code as it
6    relates to collateral, that wasn't actually done?
7          MR. DUNNE:  Objection.
8        A.  Well, I recall that comment, that "to do."
9    I think it was related to maybe the difference
10   between the two.
11   BY MR. SACK:
12       Q.  I'm sorry.  The difference between the two
13   what?
14       A.  Between the document and the code, is my
15   recollection.
16       Q.  And can you recall at all what the "to do"
17   was about?
18       A.  Somewhat.
19       Q.  What do you recall about it?
20       A.  I think it was related to one or more of
21   the formulas for calculating some quantity related
22   to collateral or maintenance requirement.
23       Q.  Do you recall anything more specific about
24   what the "to do" was at -- excuse me.
25          Do you recall anything more specific about

1          N. Molina - Confidential
2    what the "to do" concerned about those formulas?
3        A.  No.
4        Q.  If you were to look for that note in the
5    source code, the "to do" today, would you be able to
6    find it?
7        A.  Probably.
8        Q.  Is there anything else you recall about
9    your comparison between the source code and the
10   collateral explainer/helper document that you
11   reviewed?
12       A.  No.
13       Q.  So we've talked a lot today about some of
14   these explainer/helper documents.  We've looked at a
15   few.
16          Do you know who authored those documents?
17       A.  No.
18       Q.  Do you know who authored any one of them?
19       A.  No.
20       Q.  Do you know who authored any
21   helper/explainer documents that we didn't look at
22   today?
23       A.  No.
24       Q.  Did you review these helper documents
25   pre-petition to help guide you as you were writing

1          N. Molina - Confidential
2    or implementing source code?
3        A.  Pre-petition I don't remember looking at
4    the help documents for a specific purpose such as
5    writing code.
6        Q.  I think earlier you said that some of the
7    areas that you focused on when you were writing or
8    implementing code was crypto deposits and
9    withdrawals; is that right?
10       A.  Yes.
11       Q.  So what guided your implementation or
12   writing of the source code about withdrawals and
13   deposits if not these explainer documents?
14       A.  My understanding of how to write new, sort
15   of a new features for crypto deposits and
16   withdrawals was largely informed by the existing
17   features as implemented in the code.
18       Q.  Was it guided by anything else besides the
19   preexisting code?
20       A.  Maybe also using the website,
21   experimenting with the website, which is based on
22   the code itself, so I would say not that I remember.
23       Q.  When you say "the website," what website
24   are you referring to?
25       A.  The FTX website.

1          N. Molina - Confidential
2        Q.  Who asked you, if anyone, to develop new
3    features for the FTX source code?
4        A.  The people I worked with I think would
5    occasionally implement new features.
6        Q.  The people you worked with, like who?
7        A.  Like Brett Harrison and Nishad Singh.
8        Q.  Just to be clear, those people who we
9    mentioned earlier who you may have reported to at
10   various times, they would be the ones to ask you to
11   implement potentially new source code?
12       A.  Sometimes, yes.
13       Q.  Do you recall what kinds of things they
14   asked you to develop new source code for?
15       A.  I think I would -- I don't recall most of
16   what they asked, but I probably recall a few things.
17       Q.  What are the few things that you do
18   recall?
19       A.  I recall Brett Harrison asked me to look
20   into generating tax information for U.S. residents,
21   and -- I don't recall specific requests from Nishad,
22   but I know he made several or a few.
23       Q.  Do you recall generally what those asks
24   were about?
25       A.  Not really.  Probably related to what I

MAGNA
LEGAL SERVICES

1           N. Molina - Confidential
2    was working on.  But other than that, no.
3        Q.  So besides the new types -- sorry -- the
4    new source code that Nishad Singh or Brett Harrison
5    asked you to do, I'm just trying to figure out if --
6    did they ever -- excuse me.  Would Nishad Singh or
7    Brett Harrison or someone else ever guide you
8    about -- sorry.  This is a very long question.  I'm
9    going to start it over.
10          You mentioned that the prior source code
11   guided you as to how to implement or develop source
12   code, except for the occasions when Mr. Singh or
13   Mr. Harrison asked you to develop new source code;
14   is that a fair summary of what you had said?
15          MR. DUNNE:  Objection.
16       A.  I don't know if it's either/or.  I think
17   the work that I did could be informed by both
18   conversations with coworkers as well as what I saw
19   in the existing code.  So it could be both working
20   together to inform.
21   BY MR. SACK:
22       Q.  How often would you talk to colleagues to
23   determine what to add or how to revise the
24   preexisting source code on the FTX platform?
25       A.  I think every day I would talk a little

1           N. Molina - Confidential
2    bit with at least one, maybe two coworkers about
3    something.
4        Q.  Was there any formal guidance?
5        A.  What do you mean by "formal"?
6        Q.  Were there any, for example, formal plans
7    for creating or revising source code, meetings
8    specific to revising the source code, things of that
9    nature?
10       A.  I don't recall meetings to plan out what
11   to do or written plans.  Just conversations over
12   time.
13       Q.  So how would you know what to do on any
14   given day in terms of developing or writing a source
15   code?
16       A.  I always knew many potential things to do
17   that would be helpful to the Exchange.  So I would
18   pick one of those things each day, or one or more of
19   those things each day.  And that list of things
20   would evolve as I talked to others and looked at
21   code.
22       Q.  And how did you determine what potential
23   things you thought would be helpful to the Exchange?
24       A.  Through conversations and general
25   understanding of the Exchange and its code.

1           N. Molina - Confidential
2        Q.  I was asking specifically now about your
3    work implementing and developing source code
4    relating to crypto withdrawals and deposits.  Just
5    to be clear, is that the same philosophy and general
6    approach true for other areas or source codes that
7    you worked on?
8        A.  Yes.
9        Q.  How, if at all, did you know whether the
10   source code you were changing or revising tracked
11   documents or other information that FTX had relayed
12   to its customers?
13          MR. DUNNE:  Objection.
14       A.  I don't recall thinking about whether
15   something tracked public documents about the
16   Exchange.
17   BY MR. SACK:
18       Q.  Was there anyone at FTX, to your
19   knowledge, responsible for making sure that the code
20   tracked the public documents about the Exchange?
21          MR. DUNNE:  Objection.
22       A.  Not as far as I know.
23          MR. SACK:  I don't think I really have
24   much more.  I think it might be helpful for me
25   if we take a slightly longer break, in that

1           N. Molina - Confidential
2    case, and then come back maybe in 20 minutes,
3    if that works for everyone?
4           MR. DUNNE:  Okay.
5           MR. SACK:  We can go off the record.
6           THE VIDEOGRAPHER:  We are going off the
7    record.  The time is 4:45 p.m.
8           (Recess.)
9           THE VIDEOGRAPHER:  We are back on the
10   record.  The time is 5:09 p.m.
11          MR. SACK:  Welcome back, Mr. Molina.
12   I want to now show you another document.
13   We're going to mark that now as Exhibit 46.
14          (Exhibit 46 was received and marked for
15   identification, as of this date.)
16   BY MR. SACK:
17       Q.  It bears beginning Bates number
18   FTX_3AC_000000106.
19          So take a minute look through this
20   document let me know when you've had a chance to
21   review it.
22       A.  (Witness reviews document.)
23          I've reviewed the document.
24       Q.  Great.
25          Do you know what this document is?

1           N. Molina - Confidential
2     A.   It looks like messages from Slack.
3     Q.   Outside of your conversations with counsel
4  in preparation for today's deposition, did you
5  recall seeing this before?
6     A.   No.
7     Q.   Do you see your name on the list of
8  individuals in the channel or channels that are
9  included here?
10    A.   Yes.
11    Q.   I want to direct you to the Slack message
12  on January 5, 2022, at 3:58 a.m., from Leven Liu.
13         Do you see that?
14    A.   Yes.
15    Q.   Who is Leven Liu?
16    A.   I think she was an employee at FTX, but
17  I'm not totally sure.
18    Q.   Were individuals who were not FTX
19  employees on the FTX Slack channels?
20    A.   I think they could be.  I'm not totally
21  sure.
22    Q.   Okay.  Do you see that message where it
23  says:
24         "Hi team, Three Arrows" -- then,
25  there's -- looks like an email address that has a

1           N. Molina - Confidential
2  domain of threearrowscap.com -- "are getting 'not
3  enough balance' error on main account when placing
4  spot orders even with 'margin' toggled.  The only
5  weird stuff we've observed is they're having
6  negative USD balance and all the free collateral
7  having is LOC.  Will this be the case?  Could you
8  shed more light on this?"
9         Do you see that?
10    A.   Yes.
11    Q.   And then, it looks like there's an "@" or
12  the message is directed in part, at least, to
13  Nishad Singh and Adam Yedidia.
14         Do you see that?
15    A.   Yes.
16    Q.   What did you understand the phrase "margin
17  toggled" to mean?
18         MR. DUNNE:  Objection.
19    A.   I think it was something related to
20  placing spot orders, but I don't remember seeing
21  that -- that button specifically.
22  BY MR. SACK:
23    Q.   Do you remember anything in the source
24  code about toggling margin?
25    A.   No.

1           N. Molina - Confidential
2     Q.   A few messages later at 5:13 a.m., there's
3  a message from Sam Bankman-Fried that says:
4         "Might be that IMF is too high here, we
5  should take it down."
6         Do you see that?
7     A.   Yes.
8     Q.   Do you know what IMF stands for there?
9     A.   I think so, yes.
10    Q.   What do you think it relates to?
11    A.   I think it relates to "initial margin
12  fraction."
13    Q.   What is initial margin fraction?
14    A.   It's -- it's related to how much -- it's
15  related to the threshold that determines whether an
16  account can open new positions or new borrows.
17    Q.   How does IMF relate to MMF, which we were
18  talking about earlier?
19    A.   IMF would be related to opening new
20  positions or new borrows, and MMF would be related
21  to liquidation.
22    Q.   At the bottom of the page, there's a
23  message from Ms. Liu that says:
24         "They had around 12mm free collateral and
25  placed an order for 1 EETH/USD with margin toggled,

1           N. Molina - Confidential
2  and got 'not enough balance'."
3         Do you see that?
4     A.   Yes.
5     Q.   And then, in the next line, it says:
6         "Aha, they tried again after we gave them
7  collateral, it works now."
8         What did you understand that to mean?
9     A.   I don't know.
10    Q.   Do you recall something similar to this
11  happening with other FTX customers?
12    A.   No.  I didn't work with managing the
13  collateral and customer accounts so that's not
14  something I recall happening.
15    Q.   Later in the chat, just a few messages
16  later at 6:54 a.m., Mr. Bankman-Fried writes:
17         "We changed some IMF factors, see above."
18         Do you see that?
19    A.   Yes.
20    Q.   Does -- to your knowledge, were FTX
21  employees able to manually change the IMF or MMF
22  factors?
23    A.   These factors -- some of these factors
24  that determined thresholds were specified in the
25  database and/or the code and some employees had

MAGNA ▶
LEGAL SERVICES

1           N. Molina - Confidential
2   access to modifying the code and the database.
3       Q.   Do you know which employees had access to
4   change factors for IMF?
5       A.   I think -- I think many developers would
6   be able to change the database and/or the code.
7       Q.   Is that the same for the MMF factors?
8       A.   I don't recall whether or not there were
9   MMF factors.  So I can't say.
10      Q.   Okay.  You can put that to the side for
11  now.  Thank you.
12      A.   (Witness complies.)
13          MR. SACK:  I have another document I want
14      to show you.  This is going to be Exhibit 47.
15          (Exhibit 47 was received and marked for
16  identification, as of this date.)
17  BY MR. SACK:
18      Q.   It's a document bearing Bates number
19  FTX_3AC_000017224.
20      A.   (Witness reviews document.)
21      I've reviewed it.
22      Q.   Great.  Do you recognize this document?
23      A.   No, I don't -- I don't -- no.
24      Q.   What does the document appear to be, to
25  you?

1           N. Molina - Confidential
2          MR. DUNNE:  Objection.
3       A.   It looks like a message, some electronic
4   message from Ashley Bethel addressed to me, asking
5   about the historical account snapshot feature.
6   BY MR. SACK:
7       Q.   Do you recall if you replied to this
8   message?
9       A.   No.
10      Q.   I see that Ashley Bethel emailed from an
11  FTXdigitalmarkets.com email address.  How often did
12  you do work with or work for FTX Digital Markets?
13      A.   I don't -- I don't think I talked to
14  people employed by FTX Digital Markets very often.
15  But yeah, so not very often I think.
16      Q.   When we were talking about the source code
17  earlier, and the work you did on it, you mentioned
18  that the -- and I don't want to paraphrase you
19  incorrectly, so correct me if I've got it wrong --
20  you said that code overlapped with the website; is
21  that correct?  Or maybe you can educate me on how
22  those are connected?
23          MR. DUNNE:  Objection.
24      A.   Which code are you talking about?
25

1           N. Molina - Confidential
2   BY MR. SACK:
3       Q.   The FTX code.
4       A.   The FTX code was very much related to the
5   website, yes.
6       Q.   And I just want to be clear which FTX
7   website.  Was it a dot com, a dot US website, both
8   of those, neither of those?
9       A.   Both.
10      Q.   Were there major differences in the source
11  code for the dot com and the dot US domain addresses
12  on the FTX website?
13      A.   Much of the source codes were used for
14  both websites.  Some of the source code was only
15  used for one or the other.
16      Q.   Do you recall what pieces of source code
17  were only used for the dot US domain versus the
18  dot com domain?
19          MR. DUNNE:  Objection.
20      A.   I recall some features specific to FTX
21  US were in the code base and that code would have
22  only applied to the FTX US website.
23  BY MR. SACK:
24      Q.   What features in particular?
25      A.   I recall FTX US stocks was one, and also

1           N. Molina - Confidential
2   that customer onboarding was a bit different for
3   US customers.  You know, the "know your customer"
4   process, KYC process, had some code only for FTX US.
5       Q.   And besides the FTX US stocks and the
6   customer onboarding, do you recall any other
7   differences between the source codes used for the
8   dot US and dot com FTX domain addresses?
9       A.   I recall there was some differences in the
10  UI code, obviously, including the name of the
11  website.  I think the NFT feature, non-fungible
12  token feature, at some point became -- some of the
13  code would only work on FTX US so only applied to
14  FTX US.  And in terms of differences in general, I
15  know that some features were also only available on
16  FTX.com.
17      Q.   Sorry.  And what were those features that
18  were only available on FTX.com?
19      A.   I know futures were only available on
20  FTX.com.
21      Q.   Anything else?
22      A.   I know generally there were other ones.
23  Other ones are not coming to mind right now.  I know
24  there were a few others.
25      Q.   Anything relating to collateral, margin

**MAGNA** ▶
LEGAL SERVICES

1           N. Molina - Confidential
2    requirements, spot trading, any of those topics that
3    we've talked about today?
4        A.  I know that since futures were only on
5    FTX.com, the collateral management related to
6    futures was obviously only applicable to FTX.com.
7    But other than that, there was shared code for spot.
8        Q.  You said that the user interface may have
9    been slightly different between the two.  I just
10   want to be clear, earlier you were talking about
11   some user interface on the balances page and things
12   of that nature, would you -- do you know if those
13   were different -- those specific pages that we were
14   talking about earlier today, do you know whether
15   those pages differed between the dot US and dot com
16   interfaces?
17       A.  I know many of them were very similar and,
18   for example, the balance is one, would use much of
19   the same code between the two websites.
20       Q.  I just want to make sure I understand.
21   Are you saying there have been any major
22   differences between the two user interfaces?
23           MR. DUNNE:  Objection.
24       A.  It depends on what part of the website
25   we're talking about.  Speaking about the balances

1           N. Molina - Confidential
2    page?
3    BY MR. SACK:
4        Q.  Yes.  The balances in particular.  Thank
5    you.
6        A.  I would say I don't think there were major
7    differences in the balances page between the two
8    websites.
9        Q.  You said that you're still retained by FTX
10   today; is that right?
11       A.  Yes.
12       Q.  How much are you being paid per year by
13   FTX?
14       A.  I think salary -- if you want the salary
15   number?
16       Q.  Yes, please.
17       A.  I think it's about $200,000 a year.
18       Q.  Does that include any bonus or benefits
19   that you might receive?
20       A.  I believe I also receive benefits, so that
21   does not include benefits.  And bonus, I earned a
22   bonus earlier in the year, but I no longer have
23   bonuses.
24       Q.  What was the bonus related to?
25       A.  There was a bonus earned at emergence from

1           N. Molina - Confidential
2    bankruptcy, which has passed.
3        Q.  It was a bonus earned out of emergence
4    from bankruptcy?
5        A.  Yes.
6        Q.  Has your total compensation increased at
7    all in the past or since the bankruptcy?
8        A.  You mean, total compensation from FTX?
9        Q.  Yeah, aside from the bonus that you spoke
10   about?
11       A.  Well, a bonus would usually be part of
12   total compensation.
13       Q.  Right.  I'm saying, did your yearly salary
14   increase?
15       A.  Before bankruptcy, my salary was
16   considered a smaller portion of my total
17   compensation, and I think the larger portion of my
18   total compensation would be in the form of bonuses.
19   My salary itself I believe, has increased since
20   bankruptcy.
21       Q.  What was it before bankruptcy?
22       A.  A little bit lower than now, so I don't
23   know beyond a rough range.
24       Q.  Okay.  I want to show you one last
25   document and then I think we'll call it a day.

1           N. Molina - Confidential
2        A.  Sure.
3           MR. SACK:  So I'm going to hand you what's
4    been marked as Exhibit 48.
5           (Exhibit 48 was received and marked for
6    identification, as of this date.)
7    BY MR. SACK:
8        Q.  Document bearing Bates number
9    FTX_3AC_000000128.
10       A.  (Witness reviews document.)
11           I've looked at the document.
12       Q.  Great.
13           Do you recognize the document?
14       A.  No.
15       Q.  Are you familiar with this FTX customer
16   support Slack channel?
17       A.  I think -- I think I generally recall a
18   channel like that.
19       Q.  And do you see your name among the list of
20   individuals on the Slack channel?
21       A.  Yes.
22       Q.  So looking at this document, there is a --
23   I wanted to direct you to a Slack message at
24   6:14 a.m. on June 21, 2022, from Ms. Liu.
25           Do you see where it says, towards the

1            N. Molina - Confidential
2  bottom of the page:
3            "A small bump.  Three Arrows is still on
4  the leaderboard."
5       A.  Yes.
6       Q.  Do you have an understanding of what the
7  leaderboard was?
8       A.  No.
9       Q.  Had you heard others at FTX use the term
10  "leaderboard"?
11      A.  I don't recall other people using that
12  term at FTX.
13      Q.  I think earlier we were talking about
14  high-volume traders on the FTX Exchange.  Are you
15  aware of any connection between the leaderboard and
16  that group of traders?
17           MR. DUNNE:  Objection.
18      A.  No, I mean I don't know really what
19  leaderboard refers to, so no.
20  BY MR. SACK:
21      Q.  Give me one second, I apologize.
22           I apologize.  I can't find the exhibit
23  number right now.
24           Earlier we were looking at some images
25  from the FTX platform.  They have this big

1            N. Molina - Confidential
2  black-and-white imagery.  I'm not trying to make you
3  fish, but if you can find it, it's an email.  It's a
4  document --
5           MS. ZHAO:  Exhibit 40.
6           MR. SACK:  Thank you so much.  Thank you
7  for that.
8  BY MR. SACK:
9       Q.  So looking at the images of the FTX
10  platform that we were looking at earlier, do you see
11  on the side there, one of the rows is labeled
12  "leaderboard"?
13      A.  Yes.
14      Q.  Please let me know what did that tab show?
15      A.  I don't remember that button being present
16  on the website, so I don't know.
17      Q.  Earlier you were telling me about the
18  pieces of source code you had maybe primary
19  involvement with.  Which FTX software engineer or
20  engineers had primary involvement of the source code
21  relating to collateral?
22      A.  I know Gary Wang had some involvement with
23  that.  I know he wrote some of that code.  I don't
24  know exactly who else wrote code for it, for
25  collateral.

1            N. Molina - Confidential
2       Q.  What about the software engineers at FTX
3  primarily responsible for the source code for
4  futures contracts, who were those people or person?
5       A.  I know Gary Wang wrote a lot of code
6  related to futures, including, you know, yeah just
7  generally.  I don't know exactly who else wrote code
8  for futures.
9       Q.  Who were the software engineers at FTX
10  primarily responsible for the source code related to
11  margin trading?
12      A.  That I don't know exactly which developers
13  wrote that code.
14           MR. SACK:  I think with that, I have no
15  further questions.  I just want to note that
16  counsel made a number of instructions to you as
17  a witness not to answer based on information
18  that you had.  The objection is noted.  I also
19  note there were some information that we talked
20  about that FTX has or has easy access to that
21  we have not yet received.  So I'm just -- we're
22  just going to reserve all rights with respect
23  to those two pieces.  Otherwise, no further
24  questions.
25           MR. DUNNE:  Likewise, with the reservation

2  of rights, and we have no questions either.
3           MR. SACK:  Great.
4           THE VIDEOGRAPHER:  This concludes today's
5  deposition of Nils Molina.  The time is
6  5:38 p.m.
7           MR. DUNNE:  And we'll read and sign.  I
8  guess I don't know if I should have designated
9  it while we were on the record, but we
10  designate it confidential.
11           MR. SACK:  Okay.  Fair enough.
12
13      (Time noted:  5:38 p.m.)
14
15
16  _____
17           NILS MOLINA
18
19  Subscribed and sworn to
20  before me this     day
21  of       2025.
22  _____
23
24
25

MAGNA ▶
LEGAL SERVICES

Page 234

```
 1
 2              CERTIFICATE
 3
 4   STATE OF NEW YORK )
 5              :  ss
 6        I, Angela M. Shaw-Crockett, a Certified Court
 7   Reporter, Registered Merit Reporter and Notary Public within
 8   and for the States of New York, New Jersey and Connecticut,
 9   do hereby certify:
10        That NILS MOLINA, the witness whose deposition is
11   herein before set forth, was duly sworn by me and that such
12   deposition is a true record of the testimony given by such
13   witness.
14        I further certify that I am not related to any of
15   the parties to this action by blood or marriage and that I
16   am in no way interested in the outcome of this matter.
17        In witness whereof, I have hereunto set my hand
18   this 2nd day of October, 2025.
19
20        ----------------------------------------
             ANGELA M. SHAW-CROCKETT, CCR, CRR, RMR, CSR
21           LICENSE NO. XI00218400
22
23
24
25
```

Page 235

```
 1
 2   NAME OF CASE:  In Re:  FTX Trading Limited, et al.
 3   DATE OF DEPOSITION:  September 30, 2025
 4   NAME OF WITNESS:  Nils Molina
 5   Reason Codes:
 6     1. To clarify the record.
       2. To conform to the facts.
 7     3. To correct transcription errors.
 8   Page _____ Line _____ Reason _____
     From _____ to _____
 9
10   Page _____ Line _____ Reason _____
     From _____ to _____
11
12   Page _____ Line _____ Reason _____
     From _____ to _____
13
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
16   Page _____ Line _____ Reason _____
     From _____ to _____
17
18   Page _____ Line _____ Reason _____
     From _____ to _____
19
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
22   Page _____ Line _____ Reason _____
     From _____ to _____
23
24   _____
             NILS MOLINA
25
```

MAGNA
LEGAL SERVICES

**A**

**ability**
111:4 136:16
**able**
52:14 62:22 63:3
64:22 84:19,24 85:3
85:6 131:14 138:13
146:7 188:9 189:10
205:19 206:9,14,16
206:18 211:5
221:21 222:6
**above**
19:24 167:13 168:22
168:23 221:17
**accepted**
49:23
**access**
99:7 128:24,25 146:8
171:9,12,14 222:2,3
232:20
**according**
58:4 90:9 111:7
179:22 207:10
**accounts**
29:24 34:13 35:14
36:2,5 37:23 40:12
41:15 42:16 44:22
47:9,11 56:10,11,14
56:15 59:10 60:4,5
60:7,8,16,17,20
61:19 97:24 100:7
103:13,22 106:20
107:11,14 108:9
109:13,21 110:2
122:25 125:22
138:2 151:20
157:17,19 163:20
178:22 221:13
**account's**
72:22 115:11 127:21
127:25
**account-specific**
37:25
**accrued**
168:21

**accurately**
208:23
**achieve**
195:3
**action**
234:15
**actually**
44:3 109:4 111:5
210:6
**Adam**
3:18 6:21 19:4
219:13
**adam.goldberg@l...**
3:19
**add**
120:22 121:7 158:4
214:23
**added**
121:2,3 128:20
**additional**
140:17
**address**
27:15 94:6,10,18,21
95:3,8,18,25 96:8
96:10 98:7 108:16
108:17 109:7,8,22
109:22 110:3
218:25 223:11
**addressed**
223:4
**addresses**
94:5,10,14,24 95:2,6
103:7 106:2,5 107:4
107:13 109:10
224:11 225:8
**Addressing**
27:17
**affect**
72:22 96:2 101:6
154:2,9 182:19
**affected**
82:5 147:5
**affecting**
177:20,23
**affects**
123:3

**affiliates**
13:7
**after**
40:21,25 43:7 58:3
92:11,14 123:21
136:11 145:8 155:3
173:19 180:22
221:6
**afternoon**
173:7
**afterwards**
92:14
**again**
21:25 107:9 119:11
127:6 143:7 145:4,7
149:25 165:25
221:6
**against**
134:5
**ago**
11:9 52:22 150:19
173:7,23 196:8
205:9
**Agreed**
121:16
**agreement**
158:15
**Aha**
221:6
**ahead**
69:14 104:24 110:6
112:8 123:20
138:11
**airdrop**
147:7,9
**airdropped**
147:4
**airdrops**
146:24,25 147:4
**al**
1:5 6:6 235:2
**algorithm**
207:19
**all**
6:16 9:15 16:23
18:20 19:24 46:13

53:8 56:16,17,17,18
69:21 89:24,25
90:12,16,16,18,18
91:7,16,17,17,18
92:2,2 105:7 108:3
116:5 118:11,13
119:9 123:7 135:3
138:12 163:9 169:3
172:17 173:14
174:3,15 186:18
187:17 188:25
192:2 197:2,4,5,10
197:11 205:10
210:16 216:9 219:6
228:7 232:22
**allocated**
98:21,23
**allow**
11:17 83:4 86:5,14
86:15 87:11,12,14
92:24 120:4,14
**allowed**
36:3,5 90:14 108:20
**allowing**
43:18
**allows**
93:7
**allow-negative**
36:18,21,25 37:3,13
**all-capitalized-lett...**
116:13
**all-capitals**
118:24
**along**
6:20 50:6
**alongside**
205:23
**alpha**
146:19,21,22
**alphabetical**
156:22
**already**
64:23 158:4 165:10
**also**
3:21 6:22 7:25 8:7
13:8,19 19:4 20:16



20:19 21:5,23 32:5
39:23 71:11,17
82:25 84:13 85:4
94:20 98:25 110:10
110:25 111:24
116:2,8 118:3,25
132:20 137:18
149:12 151:10
153:8 158:12 164:2
167:12 184:8
189:20 206:19,19
212:20 224:25
225:15 227:20
232:18
**although**
19:5 21:25 130:16
137:18 145:15
**Alvarez**
43:4,5,10
**always**
79:12,16 80:2 122:21
215:16
**am**
136:18 234:14,16
**amended**
151:24
**Americas**
2:7 3:16 6:10
**among**
65:2 229:19
**amount**
8:10 30:24 41:25
42:10 117:18,22,24
117:24 126:24
127:19,23,25 128:5
128:9 130:24,25
131:15,21 134:3
156:12
**amounts**
30:19
**analysis**
29:4,7,10
**analyzing**
55:17
**and/or**
221:25 222:6

**anew**
174:7
**Angela**
1:20 2:8 234:6,20
**Angie**
2:8 6:15
**another**
14:15 37:17 40:6
54:22 59:13 90:17
104:13,16 105:17
114:14,25 145:4
152:14 165:21
173:3 193:2,20
197:14 198:20
217:12 222:13
**answer**
7:22 8:12 9:12,12,25
11:18 12:11,19
13:15 43:19 67:2
68:10 70:4 73:2
80:9 98:18 133:13
133:21,21 142:19
144:2,6 149:6,25
160:6 175:12
193:16 232:17
**answered**
9:25 52:23 67:16
76:18 131:24
141:11
**answering**
62:18 144:10,14,15
**answers**
167:15
**any**
9:12,21 10:14 11:13
12:6,8,14 13:23
19:19 21:11 22:5
23:6,18 24:18 25:13
30:18 35:10 36:6
37:14,16 40:10
42:22 49:25 51:19
55:6,19,21 56:24
57:2 59:12 61:17,20
68:10 72:17 77:17
79:7 80:16 81:24
86:7 96:23 97:15,20

99:3,9 106:14 107:2
107:4,15 109:18
110:8 130:4,5 141:3
141:8 143:20
144:10 145:13
149:3 150:16
151:12 154:2,8,10
159:9 162:11
174:16,20 176:7
186:19 187:12
191:3 194:17
195:25 198:2,14,19
198:21 204:6,9,20
206:19,22 207:21
207:25 211:18,20
215:4,6,13 225:6
226:2,21 227:18
230:15 234:14
**anyone**
11:11 18:23 67:9,14
69:5 102:18 119:20
149:22 158:4
172:22 213:2
216:18
**anything**
18:19 22:24 24:20
29:7 31:4 71:11
72:10 73:22 153:24
159:9,16 175:13
181:18,20,24
182:16 204:18
210:23,25 211:8
212:18 219:23
225:21,25
**anywhere**
59:5 96:21 110:18
**API**
45:2,5,9,12,14,15
46:16,19,24 47:4,5
47:10,23 48:5,13
186:17
**apologies**
160:23
**apologize**
120:17 135:16
162:23 230:21,22

**appear**
47:21 138:16 222:24
**appearances**
6:17
**appeared**
162:12
**appears**
157:6
**applicable**
226:6
**applied**
56:22 58:7 224:22
225:13
**apply**
193:23
**applying**
15:20 16:3
**appreciate**
24:6 80:20 132:17
161:3 167:18
171:16
**approach**
216:6
**appropriate**
78:20
**Approximately**
168:19
**are**
6:2 8:2,4,15,25 10:20
13:25 17:12 18:2
20:4 28:11 30:13
33:2 34:16 36:11
37:22 40:10 44:10
49:17 51:19 54:16
55:5,6 56:3 60:4
68:15 81:2,5 83:22
88:6 95:2 99:5
102:21 106:9 108:3
122:5 125:21
127:12 130:19
137:10,16 138:13
141:8,15 144:7
149:5,11 151:5
153:5,8 154:8 161:8
164:25 168:16
177:4,9 178:10



180:16 183:8 195:3
195:15,19 200:2,5
200:23 212:24
213:17 217:6,9
218:8 219:2 223:22
223:24 225:23
226:21 227:12
229:15 230:14
**areas**
212:7 216:6
**aren't**
18:3
**around**
11:2,5 26:6 44:25
67:17 69:6 129:24
132:15,16 142:6
143:12 150:23
161:18 169:8,16
170:17,19,19
220:24
**Arrows**
3:10 6:23 13:19,20
13:22 36:11 40:19
45:4,9,18 126:6,9
133:7 160:24
218:24 230:3
**art**
137:16
**ASAP**
157:19
**Ashley**
223:4,10
**aside**
130:7 228:9
**ask**
7:21,21,25 8:8,10
9:23 10:5,7,9 33:22
43:13 58:25 77:5
78:21 79:5 89:14
109:5 120:8,10
133:10 136:10
144:5,13,17 146:12
164:18 165:4 169:3
213:10
**asked**
9:13,24 30:5,9 42:25

43:4,23 46:15 60:9
67:16 76:18 79:23
131:23 141:10
143:25 146:6
163:22 189:12
199:11 204:5 213:2
213:14,16,19 214:5
214:13
**asking**
42:24 43:17,23 47:16
52:22,24 54:13
64:19 66:9 88:15,20
106:14 108:3 111:6
134:2 141:7 190:15
195:16,24 216:2
223:4
**asks**
213:23
**aspect**
129:14 172:7
**aspects**
198:13
**asset**
41:22 58:9,10,24
59:13 60:11,13,17
60:18 62:11 63:2
95:12,14
**assets**
33:17,25 39:16 62:21
62:22 71:2,3 85:10
93:19 98:11,21
102:5,11,19 103:8
103:12,22 106:10
107:5 109:12 120:4
120:14 139:20
**associated**
29:17,24 30:19,24
40:18 65:5,20,22
66:2,7,16 72:21
81:18 94:11 98:24
98:25 101:16,17
102:19 103:9,12
104:4 106:19
116:17 117:25
119:6,16 139:10
140:15 158:10

178:2 184:7,9,13,22
184:24
**associating**
81:17,19
**assume**
10:10 52:16 107:24
108:3
**assuming**
207:5,5,6,9
**attention**
16:5,10,12,13
**ATTORNEY**
3:3,10
**attorneys**
144:7
**attorney-client**
12:20
**audibly**
7:22
**audio**
151:16
**August**
15:13 67:14 69:5,6
142:3
**author**
172:15
**authored**
211:16,18,20
**authority**
171:9,13,18,19
172:23
**automatic**
35:12,24 36:7,8
37:22
**automatically**
35:13,16,17 37:5
**available**
46:10,13 93:19
145:19 225:15,18
225:19
**Avenue**
2:7 3:16 6:10
**avoid**
7:25 201:5
**aware**
34:16 51:19 67:5

141:8,12,15,21
154:8,13 230:15
**awareness**
34:18,20
**away**
185:3
**A&M**
43:9,13,23 69:23
70:5 142:2,23 144:2
144:5,7,8,12 149:22
150:6 199:11,14,18
**a.m**
2:4 6:8 44:8,11 81:3
81:6 218:12 220:2
221:16 229:24

**B**

**B**
4:10 5:2
**back**
9:8 26:21 44:10,13
52:21 54:6 62:21
63:10,11,19 64:14
64:16,23 65:9,16,17
81:5,8 87:10 104:7
110:4 122:5,9
126:11 149:18
157:19 164:25
165:3,15 169:5
200:5,8 205:8 217:2
217:9,11
**backstop**
178:21 179:2,4,10,12
179:15,19,21 180:4
183:3,16,21,23
184:6,17
**backward**
166:19
**bad**
115:14
**balance**
29:13,14,16,21 30:6
42:20,22 43:14,24
71:17,21,22 72:2,5
72:7,9,13,15,17,23
73:3,6 76:16 86:23



91:25 92:3 103:7
110:17,19,24 111:6
111:19 117:25
118:25 119:2
122:22 128:12
129:15 147:5,10
202:18 219:3,6
221:2 226:18
**balances**
31:21 43:14,24 86:21
96:2 100:7,17 101:4
101:5,9,14,16,20,21
102:2,9 110:13,14
110:15,20 111:2,5
111:16,20,23,24
116:6,9,13,14,16,17
116:20,21,23 117:4
117:9,13,20 118:4,7
118:11,14,24
119:22 120:4,13
121:4,4,8,11 122:13
122:13 127:22
128:2 133:12
134:12 143:16
170:7 178:3 192:9
192:12 226:11,25
227:4,7
**Bankman-Fried**
22:5,18 23:2,11
220:3 221:16
**bankrupt**
36:16
**bankruptcy**
17:4 22:4 23:17
24:17 40:25 43:8
178:23 228:2,4,7,15
228:20,21
**base**
55:4,20 119:21
153:25 154:9 169:8
169:12 194:6
195:23 205:23
224:21
**based**
12:24 73:20 78:8
86:8 103:22 114:21

114:22 127:25
131:17 133:4 134:2
141:7 160:3 166:9
173:14 177:16
180:3 186:4,25
190:10,11,15
193:10 203:5,9
212:21 232:17
**basically**
93:9 111:22 135:10
**basis**
118:17
**Bates**
67:22 77:2 105:4
123:24 136:3
144:25 151:25
154:24 165:16
175:7 197:16
200:17 217:17
222:18 229:8
**bathroom**
119:13
**bearing**
105:4 136:3 144:25
151:25 197:15
222:18 229:8
**bears**
67:21,24 154:23
175:7 217:17
**became**
36:16 225:12
**because**
7:20 8:7 10:15 16:4
26:10 37:9 46:10
49:23 53:8,21 57:8
62:17 66:16 67:5
74:6,12,15 75:7
78:19,24 108:24
116:4 133:11
134:15 135:4 138:8
145:4 153:21 160:7
173:11,15,24
174:14
**become**
40:23
**been**

7:6,16 14:14 32:14
36:23 37:5,17 44:3
51:5 63:18 64:23
66:12 68:7 76:11
82:6 89:19,21 96:5
96:11 98:8 100:2
104:19 110:10
117:20,21 123:16
144:13 164:16
168:17 169:18
172:20 174:8,21
175:13 179:14
188:24 190:10
192:11 196:24
199:23 202:13
204:3,16 207:3
209:11,16 226:9,21
229:4
**before**
2:8 7:16 8:12 9:5
10:2,21,22 14:4
17:3 22:4 23:17
24:17 32:24 44:15
44:20 47:23 81:9,23
99:25 103:23
105:10 121:12
122:12 124:13
127:4 130:4,6
136:25 137:6,10
153:3 155:10 159:8
169:6 173:13,15
174:4 175:11
180:22 191:7
197:25 198:9 200:9
201:13 203:15
204:5,6,23 208:2
218:5 228:15,21
233:20 234:11
**begin**
7:5
**beginning**
217:17
**begins**
6:3 123:24
**being**
6:9 7:20 8:7,15 22:22

43:16 54:9 55:7,9
59:9,11 62:13 63:2
63:2,4 85:16,21
86:23 114:8 115:6
125:11 129:23
139:23 154:13
161:10 163:17
165:14 167:8 172:9
173:18 175:24
183:18 207:6,7
227:12 231:15
**believe**
14:9 18:14,25 19:14
31:5 35:19 37:19
42:17 43:6 45:17
63:15 82:4 83:14
92:15 106:11,20,24
107:13 111:12,12
111:17,18 113:21
114:7 118:2 137:5,7
139:4,7,9 143:3
153:4,7 165:4 167:2
169:15 186:24
193:9 195:21
198:25 201:14
202:6 227:20
228:19
**Beller**
3:6 6:25
**bellerb@sullcrom....**
3:8
**belonging**
18:18 94:19,25 99:2
**below**
35:6 37:6 116:8
**benefits**
227:18,20,21
**Benjamin**
3:6 6:25
**besides**
11:10 25:12 29:5
36:5 37:13 49:4
50:21 67:10 84:11
85:15 114:14 171:7
171:12 172:22
175:24 180:20



194:13 198:22
212:18 214:3 225:5
**best**
10:7 52:25 53:24
54:3 55:13 60:24
73:9 86:19 115:3,12
116:19 159:8
205:22
**Bethel**
223:4,10
**better**
29:25 30:2 39:20
89:15 97:7 133:13
138:23
**between**
8:9 26:8 51:14 57:10
57:23 92:4 99:4
127:2 129:13
168:21 209:8,16
210:10,12,14 211:9
225:7 226:9,15,19
226:22 227:7
230:15
**beyond**
24:20 26:3 41:24,24
58:20,20 87:7 99:2
102:24 148:10
158:10 163:21
169:25 182:16
189:4 228:23
**big**
230:25
**bigger**
136:9,10 138:20
**bill**
65:15
**binary**
147:11,23 148:9
**bit**
8:2 9:9 11:24 12:12
30:3,12 32:11 39:5
44:21 45:20 64:6
93:16 105:25 116:3
127:4 133:20
138:12,20 139:16
150:23 152:14,20

171:17 215:2 225:2
228:22
**bitcoin**
58:14,16,19 59:2,4,6
63:7,10,11 64:21,23
65:3,4,5,9,17,17,20
65:22 66:2,3,7,10
66:15 84:4,6,8,10
85:13 114:5
**black-and-white**
116:4 231:2
**block**
94:8,9 178:20 180:10
**blood**
234:15
**blowing**
152:19
**bold**
155:14
**bonus**
227:18,21,22,24,25
228:3,9,11
**bonuses**
227:23 228:18
**borrow**
58:8,14 59:25 60:2
79:12,17,20 80:3,5
80:18 82:5,11,12,13
83:4 84:15,19,22,23
84:25 85:4,6,18,21
86:14 87:11,15,15
87:21,22,22,24,25
88:11,21,25 89:2,5
89:11,17 90:22 91:5
91:6,11,12,23,23
92:25 93:8 169:24
170:3,7
**borrowed**
59:3,14 82:23,24
83:5,9,13 84:12
85:8,17 88:2 91:24
91:25 92:3
**borrower**
57:15,18 58:21 79:5
79:11,16,20 80:2
**borrowers**

56:17,18 57:19 59:7
86:8,9 89:23 90:16
90:18 91:8,17,18
92:11,13 93:10
**borrower's**
78:21
**borrowing**
56:11,14 57:5 58:19
58:23 60:5,8,25
61:8 81:10,14,18,25
82:9 83:16 85:3,5
86:13 90:6 200:19
**borrows**
59:2,8,17,21,23 60:3
81:18 89:25 90:2
92:2 170:7 220:16
220:20
**Boston**
3:12
**bot**
45:2 46:16,19,24
47:6 48:5,13
**both**
21:17,18 57:22 58:7
109:9 156:12
190:19 203:24
214:17,19 224:7,9
224:14
**bottom**
111:9 156:21 220:22
230:2
**break**
9:21,22 10:2 44:5,16
44:20 45:19 64:5
68:3 77:4,7,10 80:9
80:12,14 81:9 104:6
119:10 121:15
122:12 164:20
169:7 199:22 200:9
204:5 208:2 216:25
**Brett**
19:2 21:25 213:7,19
214:4,7
**briefly**
122:10
**broad**

3:4 131:7
**brought**
71:8
**bubble**
178:5
**bullet**
70:14
**bump**
230:3
**bunch**
186:6
**business**
17:3,10,20 18:6,7
172:7
**button**
96:17 115:5,9,10,19
116:16 118:12,14
118:15,17,18,25
219:21 231:15

------

**C**

**C**
1:11 3:2 4:6
**calculate**
130:8 139:25 168:9
185:25 188:20
195:22,25 203:21
**calculated**
127:6 128:9 139:22
139:23 166:18,19
167:8,12,13,15
168:17 188:23
192:9
**calculates**
76:20
**calculating**
72:12 73:5 128:22
129:6 167:7,10,19
167:20,25 210:21
**calculation**
57:22,23 76:21
134:10,12 172:2
173:12 202:24
**calculations**
56:19,20 57:2 58:4
143:21 166:9 173:2



173:11,25 174:7,8

**call**
39:11 72:6 82:9
123:10 151:17
228:25

**called**
45:14 50:24 51:8
75:25 96:17 114:4
146:21,22 147:3
163:9 181:16
183:12 187:16,17
188:25 189:3 199:9
200:18

**calls**
73:14 77:23 79:25
88:12 151:15

**came**
30:6 103:20

**can**
9:22 12:11 16:25
18:15 27:23 29:14
33:3 36:7 41:6
43:20 48:16 55:7
59:25 63:14,22 64:2
65:6,21 66:14,15
67:2 70:7 73:9 77:6
80:9,11 82:9 86:19
87:8 94:6 97:21
98:18 101:8 102:15
108:23 109:6 110:6
115:3 118:16 123:3
123:12,21 125:7
130:13,16 133:13
133:21 134:22
136:6,17,20 138:7
138:12,14,15
143:19 144:19
145:7 149:6 152:12
152:17 161:19
165:21 174:18
186:19 189:2,7
192:2 195:19
199:24 210:16
217:5 220:16
222:10 223:21
231:3

**candle**
189:5,6,7

**candles**
188:25 189:3,17
190:19,23 192:3
193:20

**can't**
10:14 54:22 61:4,12
75:6,6 87:7 89:5
114:19 122:21
130:15 131:5,5,25
131:25 133:22
136:13 138:10
160:6 180:7 181:23
196:20 202:9 222:9
230:22

**capable**
45:3 46:16 84:15

**capacity**
47:5

**Capital**
3:10 6:23 13:20,22
36:12 40:19 45:4,9
45:18 126:6,9 133:7
160:24

**careful**
43:16

**carefully**
62:17 176:16,24
178:7

**Caroline**
23:18

**carried**
38:14,18

**carrying**
34:24

**case**
1:8 6:6 89:9 109:16
120:13 168:18
171:23 217:2 219:7
235:2

**cases**
186:15

**category**
27:9

**cause**

38:24 39:8 82:11,12
82:13 84:22,24 91:4
91:6,6,11 92:25
93:8 94:21,22 161:9
161:11

**caused**
91:23 161:8 184:16

**causes**
39:10,15 91:12,23

**cause-to-borrow**
92:10

**CCR**
1:20 234:20

**certain**
9:10 41:7 59:10 71:2
75:18 103:21
113:21 122:18,22
173:16 206:6

**certainly**
95:3 143:17

**CERTIFICATE**
234:2

**Certified**
2:9,10 234:6

**certify**
234:9,14

**chain**
94:8,9

**chance**
69:8,19 104:25 112:9
136:11 145:9 155:3
197:21 217:20

**change**
28:18 30:19,21,23
32:22 72:14 113:3
130:3 131:9 169:12
169:24,24 170:21
171:10,13 172:10
172:15,19,23
173:13,15,16,18
174:4,24 180:23
181:2,4,9,14,16
182:12,17 183:4,9
183:12 184:11,12
221:21 222:4,6

**changed**

28:17 32:19 34:15
72:22 121:9,10
128:14 129:5,20,23
132:13,18 153:24
154:14 169:8,16,18
174:19 191:7
221:17

**changes**
130:4 154:8 172:14
172:19 180:17,21
181:11,12 182:3
191:4

**changing**
129:22 169:21
171:15 216:10

**channel**
156:18,19,21 218:8
229:16,18,20

**channels**
218:8,19

**Chapter**
1:7

**charge**
168:10

**charged**
168:6

**charges**
125:10 126:13,16

**chart**
189:8

**chat**
20:2,4 21:7,8 22:10
25:7 32:7 150:24,25
151:7,8 221:15

**chats**
21:15,23 22:17 151:5

**chatted**
23:4

**chatting**
22:21

**check**
196:24

**checking**
82:4

**checks**
90:13



**Cheese**
158:8,12
**Cheese/Jon**
158:18
**Christopher**
3:6 6:24
**circle**
52:21
**circumstance**
80:6
**circumstances**
60:14
**Clarendon**
3:12
**clarification**
36:24 66:5 132:17
    171:2
**clarify**
13:14 74:20,22 88:21
    133:13 173:22
    235:6
**clarifying**
174:25
**clarity**
190:18
**classified**
113:22
**clawback**
177:17
**clawbacks**
176:21 177:4,10
**clear**
26:5 41:8 42:24 48:7
    49:18 51:11,24
    54:20 88:15 92:9
    93:7 106:14,22
    125:14 136:13
    143:6 151:18 171:5
    180:20 181:19
    184:21 202:4 213:8
    216:5 224:6 226:10
**clearly**
110:12 138:13
**click**
116:14
**clicked**

96:18 101:9,13
    115:10 118:13
**clicking**
101:4 116:16
**close**
77:3 104:5 176:16,24
    178:7 203:20
**codes**
31:14 33:16 81:18,19
    216:6 224:13 225:7
    235:5
**coffee**
80:23
**coin**
96:18
**collapse**
23:14
**collateral**
85:5 199:4,8,9,10
    204:8 208:3,8,8,22
    210:6,22 211:10
    219:6 220:24 221:7
    221:13 225:25
    226:5 231:21,25
**colleague**
134:25
**colleagues**
6:21 136:17 176:7,8
    198:14 214:22
**collected**
56:16
**collectively**
90:2
**column**
100:16 110:14 125:7
    125:12 126:11,21
    127:15 137:21
    138:9,9 139:4,17
    140:8 146:12,13,15
    147:11 166:5,8,13
    166:21 167:10
    168:12,14,17,22
**com**
224:7,11,18 225:8
    226:15
**comb**

196:23
**combination**
21:17,18 128:6
    166:24
**come**
9:8 23:14 26:15,21
    29:20 41:10,13 54:6
    54:23 58:10,12
    88:11 89:2 104:7
    123:13 169:5
    188:15,18 217:2
**comes**
9:15 89:6 178:3
**comfortable**
104:11
**coming**
30:8 44:13 189:24
    190:5 225:23
**comment**
209:22 210:8
**commingled**
109:12,16
**commingling**
106:10,18,23 107:5
    107:10,16,21 108:9
    108:13,19,21
    109:19
**common**
37:20
**communicate**
20:11 32:18
**communicated**
20:8
**communication**
20:5,6
**communications**
19:22 155:10
**company**
20:25 23:4 43:6,7
**compared**
51:12
**comparing**
129:8 132:8 209:2
**comparison**
57:23 129:13 130:22
    209:6 211:9

**compensation**
228:6,8,12,17,18
**completeness**
20:17
**completing**
25:22
**complies**
68:24 69:16 134:24
    222:12
**concept**
106:9
**concerned**
211:2
**concerning**
144:11
**concludes**
233:4
**conclusion**
132:2
**conclusions**
75:6
**conditions**
34:15 87:16
**conduct**
47:6 49:6,19 84:19
    145:9
**conducted**
174:9
**conducting**
49:4,20
**conference**
151:16
**conferences**
204:7
**conflicted**
195:20
**conform**
235:6
**confusing**
140:23
**confusion**
109:19
**connect**
91:19 172:17
**connected**
18:21 57:18 89:11



90:9 183:18,24
223:22
**Connecticut**
2:12 234:8
**connection**
39:4 92:4 127:2
142:11,17 144:9
183:19 230:15
**connects**
39:2
**considered**
228:16
**constitute**
161:13
**consultants**
144:8 150:6
**consulting**
43:7
**contain**
94:10 189:21
**containing**
147:4
**contains**
139:3 163:5
**content**
130:10
**contents**
69:9
**context**
19:17 54:22 75:8
82:6 94:5 105:20
125:16 145:16
153:22 159:10
161:8
**CONTINUED**
122:7
**contract**
72:18 74:21 75:12,13
75:20 201:3
**contracts**
71:12 75:18 186:21
232:4
**CONT'D**
5:2
**conversation**
25:25 26:12 109:20

196:13
**conversations**
12:24 22:14 23:10,15
23:21 24:18 25:17
150:12 151:19
199:14,18 214:18
215:11,24 218:3
**copy**
151:24 165:20,21
**correct**
14:13,18 15:11 20:7
48:10 101:19
102:14,14 122:20
134:19 138:18
171:6 196:25
223:19,21 235:7
**correctly**
102:9 126:23 170:25
**correlate**
131:13 132:6
**correlated**
132:5 133:25
**corresponding**
89:19,20 195:9
**could**
17:18 32:11,14 34:13
34:15 38:3,4,20
39:4,11,23 45:19
46:8 47:10 48:4,19
48:25,25 49:9,10,13
49:22,23 50:23
52:17 53:15,15
59:22 60:15,16,17
60:19,21,22 62:6,14
63:10,15,18 64:3,7
64:14 65:7 68:3
72:6,14 73:24 79:12
79:16,20,22 80:2,5
80:19 82:5 83:23
84:7,22 86:21 98:24
98:25 102:8 106:20
109:12 110:2
116:23 119:21,22
119:24 123:10
129:11 130:23
131:13 133:12

138:19 139:12
140:12,15 145:20
153:18 154:5 179:9
181:16 183:13
186:11 189:21
190:17 191:8,20
214:17,19 218:20
219:7
**couldn't**
77:14 78:10,19
**counsel**
6:16 8:16 42:25 43:2
144:12 198:3 204:8
218:3 232:16
**counting**
150:24
**couple**
35:19 38:23 77:6
123:12 169:23
188:16 189:14
190:17 204:23
**course**
13:13 138:21
**court**
1:2 2:9 4:11 5:3 6:14
7:3 8:3,8 99:16
112:4 136:19 234:6
**Coverick**
149:11,20
**coworkers**
214:18 215:2
**create**
31:21 49:13 77:13
78:15 153:18
**created**
78:10 114:7,15 143:4
**creating**
130:15 215:7
**credit**
125:19 126:16
127:16,19,21,25
128:6,12 129:9,14
131:2,3,10,22 132:9
132:10 133:6,12,16
133:18,20,24 134:5
134:8,14 160:15,18

160:22
**Cromwell**
3:4 7:2
**cross-margined**
200:24
**CRR**
1:20 234:20
**crypto**
17:23 22:11,11,17,23
25:11,12,18,18 26:2
26:17,23 27:11 29:2
29:6 36:16 38:20
55:16 83:24 94:5,6
94:7,7,8,14,19,20
94:24 95:16,20 98:7
109:22 110:3 114:5
116:24 186:3 212:8
212:15 216:4
**CSR**
1:20 234:20
**curious**
162:10 166:17
**currencies**
83:24
**currency**
116:24
**current**
83:10 187:3 190:9,9
190:24 191:2
**currently**
13:25 48:12
**customer**
5:5 28:9,13 32:7,9,14
32:16,18 34:12,12
46:8 48:18 51:24
52:24 55:18 71:15
71:18 72:3 76:9,12
95:4,9,12,13,22
96:4 98:25 99:6
102:5,6,11 109:8,9
122:21 131:2,10,22
133:7,15 134:4
140:21 141:2
180:13 221:13
225:2,3,6 229:15
**customers**



18:9 27:6 29:12
46:13 98:10 109:11
109:25 216:12
221:11 225:3
**customer's**
33:25 72:10 98:22
101:18 102:20
103:9
**cut**
170:18 191:11

---

**D**

**D**
1:11 4:2
**Dan**
108:5 135:10 147:25
**danger**
178:23
**Daniel**
3:13 6:20
**daniel.sack@lw.com**
3:14
**Danny**
157:11
**data**
4:17 12:2 31:20,20
33:5 40:17 41:3
45:8 52:17,20 66:17
89:5 123:5,7 124:12
124:17,18,19,21,21
125:23 136:5 137:6
137:7,9,24,25,25
138:3,6 141:24
142:10,18,22 143:8
143:12,22,22,22
144:2,3,12 145:20
148:20,22 154:2,10
159:24 160:4,9,20
162:7,17,20,22
163:2,6,23 164:3,8
164:13 174:6,19
185:20,23 186:13
186:15,16,17 189:9
189:20,24 190:5,13
190:20 191:12
192:7 193:21 194:2

194:10,19
**database**
30:20 45:23,24 46:13
50:14 51:4,7 83:7
83:15 90:3 91:24
123:10,13 124:18
124:20,22 125:11
125:17 137:20
138:6 139:14
140:13 141:3,8
142:11 143:15
145:19,21 146:4,8
146:25 147:19,22
148:5,19,20,22,24
149:13,24 150:18
150:22 153:12,15
153:18 154:3,11
162:13 163:12,13
163:15,18 174:18
184:20 187:3,6,8
188:8,11,15 189:11
191:9 193:14
194:19 206:20
207:2,9 221:25
222:2,6
**databases**
114:8
**date**
14:25 68:2 99:20
104:22 112:6
123:18 132:21
135:20 144:23
152:9 154:19
161:20 166:18
168:12,14 175:5
188:8 191:17
197:18 217:15
222:16 229:6 235:3
**dated**
157:4
**David**
157:3,10
**day**
9:20 63:8 92:15
161:19 166:22,22
167:9 191:3 214:25

215:14,18,19
228:25 233:20
234:18
**days**
167:9
**day-by-day**
132:22
**day-to-day**
102:17
**deal**
17:25 80:13 124:22
**dealt**
38:19,21
**debtor**
13:7
**debtors**
1:6 144:9
**decided**
30:7 180:3
**deciding**
34:23 80:18
**decreases**
181:7
**decreasing**
181:6
**DEFENDANTS**
3:10
**defined**
109:20
**definition**
13:9,16 106:13,15
109:16 133:19
**DELAWARE**
1:3
**denominator**
202:9 203:3
**departments**
18:5
**depend**
101:23,24 107:9
119:22 186:10
208:10,11
**depending**
31:10 102:4 174:19
174:24
**depends**

102:3 122:24 158:14
226:24
**deposed**
7:16
**deposit**
25:21 27:2 94:4,20
95:23 96:2,17
**deposited**
93:19 95:12,14,17,17
95:20
**deposition**
1:13 2:6 4:12 6:4,9
8:23 9:6 10:21,23
11:11,14 12:9,15
13:5 66:25 67:10,15
68:12 121:21 204:7
218:4 233:5 234:10
234:12 235:3
**depositions**
13:4 67:6
**deposits**
25:11,12,18 26:2,17
26:23 27:12 29:2,6
31:2,13,25 55:17
94:3,13 95:5,9
103:14 212:8,13,15
216:4
**derived**
124:17,18 145:20
**describe**
18:15 33:3 58:18
**described**
40:24 91:3 208:16
**describes**
208:12
**describing**
59:23 63:13 198:13
208:23
**descriptions**
149:2
**design**
33:23
**designate**
233:10
**designated**
233:8



MAGNA
LEGAL SERVICES

**designed**
112:22,25
**designing**
100:21
**destination**
96:9
**detail**
196:21
**details**
117:20 133:21
**determine**
83:11 84:14,22 86:25
98:17 127:22 128:8
161:21 185:12,16
189:22 191:16
206:20 214:23
215:22
**determined**
35:2 56:21 58:6
195:15,18,18 197:3
197:5,11 207:19
221:24
**determines**
201:19 220:15
**determining**
127:24 141:9
**develop**
30:5 213:2,14 214:11
214:13
**developer**
193:2
**developers**
171:14 222:5 232:12
**developing**
33:16 215:14 216:3
**didn't**
15:21 16:8,18,20
36:21 52:5 57:21
62:16 80:16 81:24
82:14 88:9 90:6,12
102:11 103:8
108:24 135:23
143:21 152:25
160:22 170:18
181:9,24 188:3
191:11 196:23,23

211:21 221:12
**differ**
50:17
**differed**
27:20 226:15
**difference**
210:9,12
**differences**
224:10 225:7,9,14
226:22 227:7
**different**
18:5 28:21 38:23
81:21 83:20 84:4
90:21 96:11 101:20
106:20 107:11,14
108:9 109:21,25
110:2 111:16,17
114:14 122:13
137:19 139:12,14
174:12,13 184:10
185:20,23 186:5
200:12 208:9,14
209:9,16 225:2
226:9,13
**differently**
98:22
**digital**
5:4 58:9,9,24 93:19
223:12,14
**direct**
19:19 218:11 229:23
**directed**
219:12
**direction**
30:3
**directly**
33:24 190:12
**directs**
157:23
**disagree**
168:24 169:2
**disclose**
11:19
**discuss**
149:2
**discussed**

149:10
**discussing**
69:23 148:14 172:11
172:20 205:9
**discussion**
70:5 122:14 165:23
**discussions**
207:25
**display**
102:8 115:7,23,24
118:23
**displayed**
100:7,8 101:7 102:3
102:8 103:13
112:21 117:9,13,15
117:16,18,21 118:2
118:7,25 121:9,11
**distinction**
51:14
**distinctions**
99:3
**DISTRICT**
1:2,3
**divided**
201:24,25
**documents**
11:13,16,19,20,22
12:2,5,8 123:12
174:13,15 175:22
176:4 198:22 199:2
204:6,9,15,21,23
209:3 211:14,16,21
211:24 212:4,13
216:11,15,20
**does**
7:23 10:3,11 44:17
49:18 69:4 76:3
83:6 85:4 95:21
106:12 113:24
115:3 125:14 126:5
126:21 127:18,18
130:24,24 134:9
139:8,11 142:19
146:15 147:15
155:21,24 156:6
167:17 181:21

189:6 197:2,4,10
200:18 220:17
221:20 222:24
227:18,21
**doesn't**
52:9 54:23 74:5,6,9
74:12,12 75:3 168:7
**doing**
22:13 26:14,22 32:13
43:15 45:3 46:16,24
97:9 142:16 181:18
181:20,23 192:11
198:5
**dollar**
65:15 110:22,23
**dollars**
42:5 126:24
**domain**
219:2 224:11,17,18
225:8
**done**
123:3 141:13 173:25
174:3 209:20 210:6
**dot**
224:7,7,11,11,17,18
225:8,8 226:15,15
**dots**
172:18
**down**
7:18 8:7 15:23 45:19
64:5 68:22,23
129:10 143:19
151:22 154:15
176:16,24 178:7
189:8 220:5
**dozen**
150:23
**draw**
39:4 75:6 140:12
**drawing**
134:5
**drawn**
131:9,10,15,22 133:6
133:11,13 190:17
**drew**
186:8 190:19



**Dropbox**
15:24
**due**
79:8
**duly**
7:6 234:11
**dunnec@sullcrom....**
3:7
**during**
13:4,5,17 41:16
    92:15 102:17 194:4
**dynamic**
207:16

**E**

**E**
1:11 3:2,2 4:2,6,10
    5:2 122:3,3
**each**
8:8 13:6,17 35:5
    45:25 70:15 71:16
    73:10 74:3,6,9,11
    74:16,21 75:3,7,12
    83:7 84:2 94:10
    111:23 117:24,25
    119:6,16 171:20
    172:15 186:2 187:4
    201:3 215:18,19
**earlier**
38:7 40:5 78:17 88:4
    90:5 103:4 105:24
    109:20 110:7,10,14
    110:15 112:22
    120:19 133:23
    141:25 145:22
    150:25 163:22
    166:4 169:15 173:7
    173:20 187:6 196:6
    202:21 208:5 212:6
    213:9 220:18
    223:17 226:10,14
    227:22 230:13,24
    231:10,17
**early**
44:2 150:13
**earned**

227:21,25 228:3
**easier**
16:4 135:3 145:8
    152:13
**Eastern**
6:8
**easy**
232:20
**educate**
223:21
**EETH/USD**
220:25
**effect**
164:6 169:10
**eight**
152:2
**either**
38:3,3 83:24 103:4
    140:11 143:22
    190:19 233:2
**either/or**
214:16
**electronic**
20:5 223:3
**elicited**
26:12
**eligible**
82:23,24 83:5,9,12
    83:16 84:12 85:3,8
    86:22
**Ellison**
23:18
**else**
10:16 11:11 18:19
    29:7 31:4 48:4 60:6
    96:21 102:18
    119:21 166:24
    172:22 201:24
    204:18 211:8
    212:18 214:7
    225:21 231:24
    232:7
**elsewhere**
115:10 163:12
**email**
151:4,10 218:25

223:11 231:3
**emailed**
19:25 223:10
**emails**
19:24
**emergence**
227:25 228:3
**employed**
13:25 14:2 223:14
**employee**
218:16
**employees**
177:10 218:19
    221:21,25 222:3
**employer**
14:5
**employers**
16:19,20
**enabled**
29:12
**encompass**
5:17 165:7
**encompassed**
126:12
**encompasses**
137:4
**end**
19:11 120:7 132:21
    148:2
**ending**
77:2 165:16,17
    200:17
**engine**
39:7,12,14,22 41:9
    54:7,17,18,20,23
**engineer**
15:13 18:11,16,24
    19:14,16 22:13
    23:24 78:9 198:15
    231:19
**engineering**
19:3 198:15 207:23
**engineers**
176:10 231:20 232:2
    232:9
**engines**

54:8,10,13
**enlarge**
136:17
**enough**
62:17 85:5 123:22
    174:16 188:11
    219:3 221:2 233:11
**entered**
197:14
**entirely**
42:18
**entities**
13:14 14:8 17:12
**entity**
13:14 14:6,11,12
    17:16,21 141:19
**entries**
140:8 153:11
**entry**
83:8,12 166:12
    167:25 168:11
**equaled**
203:2
**error**
219:3
**errors**
235:7
**especially**
28:25
**ESQ**
3:6,6,7,13,18,18
**et**
1:5 6:6 235:2
**ethereum**
114:6
**even**
35:20 79:13,22
    102:10,10 145:18
    219:4
**eventually**
20:25
**ever**
21:13 23:14 32:6,9
    33:23 34:3 35:18
    60:25 78:18 79:20
    80:5 98:10,20



102:18 107:20
141:16,23 142:10
147:18 149:10,19
176:3,5,7 191:23
196:4 214:6,7
**every**
27:13 92:18 93:11
146:12 214:25
**everyone**
217:3
**evolve**
215:20
**exact**
14:11 64:16,23
109:16,19 130:16
200:12
**exactly**
8:20 31:18,23 48:6
61:18,22 74:12,15
107:9 109:23 130:5
134:9 145:16
153:21 169:23
170:12 198:8
205:12,13 210:2
231:24 232:7,12
**Examination**
4:3 7:9 122:7
**examined**
7:7
**example**
10:15 15:23 65:15,19
84:3,8 102:5 132:9
140:19 146:19
168:12 191:2 215:6
226:18
**Excel**
165:20
**except**
214:12
**exception**
36:19,22 37:13
**exceptions**
35:10,20,23 36:2,6,8
37:9,21,25 38:5
**excerpt**
124:4 137:2,3,4

139:4 143:8
**exchange**
17:23,24 18:4,8,17
18:18,21 25:6,9,13
26:20 30:14,17
32:25 45:3 47:10
48:19 50:12 61:10
61:17 70:25 71:8,18
76:8 79:21 93:20
97:17 98:14 99:23
100:12,15 113:22
114:3 119:5 139:20
139:21 155:25
156:6 158:6 185:19
185:22 186:2,11
193:11,21 194:6
205:23 215:17,23
215:25 216:16,20
230:14
**exchanges**
186:11,15,18,20
194:10,13
**exclude**
68:10 175:12
**excluded**
36:3
**excuse**
33:8 36:8 166:13
171:23 182:3
183:10 185:21
187:19 197:3
203:25 210:24
214:6
**executed**
39:9 50:23 52:2,9
53:2,13,19 161:9
**exhibit**
4:12,13,14,15,16,17
4:18,19,20,21,22
5:4,5,10,11,13
14:23,24 67:21,25
99:13,19 104:20,21
110:7 112:4,5
123:16,17 135:16
135:17,19 142:24
143:3,7,20 144:21

144:22 152:4,7,8
153:7 154:16,17,18
165:17,18 175:3,4
197:15,17 217:13
217:14 222:14,15
229:4,5 230:22
231:5
**EXHIBITS**
5:8
**existed**
103:23
**existing**
212:16 214:19
**expand**
89:8
**experience**
15:12 78:8 79:19
**experimenting**
212:21
**expert**
119:20
**explain**
124:4 195:19
**explainer**
5:11 198:20 199:8,10
199:15 200:10
204:6,9,20 207:13
208:7,22 212:13
**explainer-type**
198:21
**explainer/helper**
204:15 208:3 211:10
211:14
**explicit**
97:20
**explicitly**
39:5 168:25
**explored**
30:3
**extensive**
22:8
**extent**
27:22 33:11,13,15
93:22 105:11 108:8
108:12 112:17,18
124:14 145:15

149:12,23 165:9
180:18 184:4
**external**
194:2,5,17 195:2,17
196:2,11,16,17

**F**

**F**
1:11 122:3
**fact**
70:6 114:15
**factor**
126:17
**factors**
221:17,22,23,23
222:4,7,9
**facts**
235:6
**fair**
8:21 39:18 67:7 88:3
97:12 174:16 186:2
186:14 214:14
233:11
**fall**
146:4
**familiar**
31:8,10,14,16,19,24
32:2,5 36:11 40:10
40:20,23 53:8 55:9
56:3 86:13 99:5
106:9 125:21
137:17 148:3 177:9
177:12,13 178:10
180:16 195:3,5
229:15
**familiarity**
33:9 180:19
**far**
8:4 65:6 168:7
191:10 199:17
216:22
**fault**
89:14 174:25
**feature**
34:17 37:3 55:19
223:5 225:11,12



**features**
26:19 27:24 33:17
  100:8 212:15,17
  213:3,5 224:20,24
  225:15,17
**feed**
186:16
**feeds**
186:13 194:2,5,17
**feel**
39:20 104:11 136:9
**fell**
37:6
**few**
12:16 20:3,21 24:25
  27:14 34:24 38:23
  55:9 63:13 134:21
  137:13 150:23
  181:8 211:15
  213:16,17,22 220:2
  221:15 225:24
**fiat**
38:21 83:24 186:3
**field**
5:17 83:8,14,17,20
  84:2 85:7,9 130:25
  131:21 132:21
  133:5,25 145:23
  146:3,24 147:2,18
  147:21 148:17,18
  153:5,8,11 154:3
  162:11,14,16 165:6
  170:11 187:7
**fields**
137:10 140:12
  145:13,18 149:3,4
  149:11,23 150:15
  150:16,17,21
  151:19 153:17
  154:10 162:11
  174:17 187:5
**figure**
52:13 117:19 162:19
  188:11 214:5
**file**
128:19,21,24 129:3,5

165:20
**filed**
22:4 23:17 24:17
**fill**
137:18,22,23,24,25
  139:10 140:14,14
  185:4,4
**fills**
137:24 147:12 163:5
  163:21
**fill's**
137:22
**find**
128:17 146:7 162:21
  189:10 193:12,14
  211:6 230:22 231:3
**fine**
13:3 43:18 144:13
  148:4
**finish**
8:11,11 77:14 78:11
  78:19 113:8
**finished**
124:9
**first**
7:6 11:6 20:23 27:25
  28:6 33:23 40:23
  70:10 85:2 113:9
  119:13 124:25
  135:22 138:15
  150:9 156:15,20,22
  157:2 164:21
  176:16,18,22,24
  178:5,7
**fish**
231:3
**fit**
77:23
**five**
11:2 44:4 194:4
**flip**
68:22
**flowchart**
176:14,19,22 178:20
  180:11
**focused**

212:7
**focuses**
28:17
**focusing**
25:16 26:22
**follow**
132:24
**following**
183:6
**follows**
7:8
**font**
111:15,17
**footer**
124:25 125:7
**form**
12:10 14:15 19:22
  33:18 35:4 37:8
  38:2,12 41:11,18
  42:6 48:21 50:13
  53:4,14,20 54:12
  55:23 57:7 58:11
  61:11 62:12,24
  71:20 72:19 77:21
  77:25 81:16 82:3
  85:11,19 86:10 87:3
  95:15 96:6 97:2
  107:17 120:10
  125:9 126:14
  129:16 137:12
  142:5 154:12
  178:17 179:24
  182:14 190:7
  191:19 197:6
  205:25 207:7
  228:18
**formal**
19:5 39:23 171:19
  215:4,5,6
**formally**
53:22 165:8
**formers**
208:17
**forms**
31:2,13 32:4 151:5
**formula**

5:17 127:24 128:14
  128:15,18 129:5,7
  129:23 130:7,10,14
  130:15,17,20
  132:12,13,18 165:5
  169:14,20 170:14
  186:4 202:23
  203:21
**formulas**
208:12,18,19 210:21
  211:2
**fors**
171:16
**forth**
234:11
**forward**
166:19
**forwarded**
157:16
**forwarding**
157:6
**foundation**
27:8 49:8 73:13
  77:19,24 79:15,24
  115:17 116:15
  147:16 177:6
  201:11
**four**
14:16
**fraction**
201:4,5,10,16,18,21
  201:23 202:5,9,22
  203:2 220:12,13
**frame**
53:11 62:16 70:7
**free**
39:21 136:9 219:6
  220:24
**frequently**
92:24
**freshly**
135:17
**front**
135:6 136:7 155:14
  165:19
**FTXdigitalmarket...**



223:11
**FTX's**
41:9 96:8 103:21
186:25
**FTX-MM**
155:15 156:16
**FTX.com**
225:16,18,20 226:5,6
**FTX_3AC**
136:4 151:25
**FTX_3AC_000000...**
145:2
**FTX_3AC_000000...**
123:25
**FTX_3AC_000000...**
217:18
**FTX_3AC_000000...**
229:9
**FTX_3AC_000012**
67:22
**FTX_3AC_000013...**
5:10 105:5
**FTX_3AC_000013...**
154:24
**FTX_3AC_000013...**
175:8
**FTX_3AC_000017...**
222:19
**FTX_3AC_000045...**
197:16
**full**
7:13 58:25 166:22
**fully**
190:25
**function**
128:22 183:12,13,15
183:24 190:22
192:2
**functioning**
32:25
**fund**
180:12,16,18,22
181:4,5,6,8,14,16
182:8,11,13,17,20
183:4,12 184:11
**fund's**

184:12
**further**
76:23 232:15,23
234:14
**future**
38:22 70:15 71:16
72:21 73:11,17,22
74:3,6,9,11,16 75:3
75:7 186:24,25
187:4 188:12 190:8
192:4 193:7,9 195:7
202:19
**futures**
30:21 33:12 38:22,23
70:17,20 71:12
72:11,17,20 73:2
75:12,12,18,19
115:25 117:3 179:9
186:21 187:15,16
187:18,20 188:4,23
189:25 190:6
191:17 192:18
193:16,24,24
200:24 201:2
225:19 226:4,6
232:4,6,8
**future's**
74:21

─────── G ───────
**gained**
68:11
**garbled**
159:11
**Gary**
231:22 232:5
**gave**
45:7 47:2 64:12
164:8 221:6
**gears**
93:16
**general**
16:13,18 22:10,16,20
22:22 23:3 25:5
34:9,10,25 35:14,15
50:5,9,22 55:22,24

62:14 63:3,15,21
69:22,24 73:15
86:20 96:16 99:3
101:25 103:15,17
104:3 106:24 112:2
114:10,17 119:4
128:10 130:17,19
131:12,17 133:5,24
134:15 147:24
162:8 164:2,9
177:12,18 189:4
193:16 202:12,15
204:14,22 209:15
215:24 216:5
225:14
**generalized**
11:25
**generally**
14:7 18:20 20:21
25:10 30:18 33:4
35:7,25 37:10,16,19
39:19 41:21 59:16
60:11 63:22 69:25
70:20 87:6 91:10
96:20 100:11
114:20 131:21
132:11 170:13
179:18 186:25
190:8 194:9 201:2
213:23 225:22
229:17 232:7
**generated**
96:8
**generating**
213:20
**gentleman**
149:10
**get**
7:19 16:4 28:20
29:13 30:2,2 63:10
63:19 64:22 65:9,16
87:18 92:23 128:4
161:19 185:19,22
192:3
**gets**
132:11

**getting**
16:7 62:18 70:4
90:25 104:5 130:11
219:2
**gist**
102:7
**give**
16:9 99:14 152:12
185:18 230:21
**given**
60:17,19 61:17,21
85:25 94:7,7,8
95:22 96:5,7 117:20
128:22,23 146:8
188:7,21 191:3,17
206:7,17,17 215:14
234:12
**go**
10:2 69:14 79:4
80:25 87:21 104:12
104:15,24 110:6
112:8 123:20
129:11 138:11
162:24 164:21
199:24 217:5
**goes**
129:25
**going**
7:18,21 10:9 11:17
12:18 13:4,11,16
17:11 27:2 44:3,7
67:20 70:4 79:8
81:2 87:17,20 99:12
99:15 104:11,19
112:3 120:10
121:17 123:15
126:11 132:12,22
134:25 135:10,11
135:15,17 139:15
144:6,20 145:3
146:12 151:22,23
152:2,6,15 154:15
154:16 164:16,18
164:22 175:2,3
199:23 200:2 214:9
217:6,13 222:14



229:3 232:22

**Goldberg**
3:18 6:22

**good**
6:2,19 7:11,12 8:10
8:13 17:25 43:15
44:6 104:18 108:6
119:10 124:22
199:21

**Google**
15:23 151:7,8

**Gordon**
66:21 149:3

**got**
65:15 68:5 86:2
92:16 93:5 98:9
116:24 159:11
196:22 210:5 221:2
223:19

**grab**
14:19 165:21

**granted**
137:2

**grayed**
116:3

**great**
8:6 9:4 10:13 44:19
68:25 72:8 77:5,8,9
93:14 105:9 124:11
124:23 127:14
134:22 136:24
152:22,25 165:12
217:24 222:22
229:12 233:3

**greater**
53:13

**ground**
7:19

**group**
21:17 23:11,12 59:17
59:18,20,21,23,24
60:3,3 156:16
198:15 230:16

**groups**
56:19,23 57:9,10,22
57:24 58:7 59:17

**guess**
15:20 28:7 52:13
60:20 72:16,25 82:8
88:9 89:8 90:8 92:7
95:10 97:9 103:5
104:8 114:20 128:3
162:19 167:6,19,24
183:17 188:6
190:15,17,25 233:8

**guidance**
97:15 98:4 215:4

**guide**
211:25 214:7

**guided**
212:11,18 214:11

**guys**
138:19

---

**H**

**H**
4:10 5:2

**hand**
24:14 64:14 95:5,5
99:17 112:3 123:15
229:3 234:17

**handed**
15:3 68:7 99:25

**handful**
25:2

**handing**
136:18

**handle**
102:19

**handled**
38:10

**handling**
158:22 159:3

**handwritten**
4:14 68:16

**happen**
10:6 39:15 58:3
61:14 87:23 92:10
93:8 201:20

**happened**
40:11,21 51:12 61:13
67:6 88:22,25 89:18

**happening**
40:21 78:24 84:15
221:11,14

**happens**
167:20

**happy**
104:11

**hard**
8:2 10:16

**hard-set**
53:10

**Harrison**
19:2 20:15,22 21:24
22:2 213:7,19 214:4
214:7,13

**has**
32:19 34:24 49:17
123:2 136:15 139:5
179:14 196:10
201:3 218:25 228:2
228:6,19 232:20,20

**haven't**
9:25

**having**
7:6 18:4 59:3 85:20
88:21 89:18,21
161:17 172:23,24
219:5,7

**he**
12:21 19:15 20:25
24:4 25:6 136:13,15
144:10,11,14 158:2
158:18 159:16
172:4,5 213:22
231:23

**head**
9:16

**heading**
70:12

**headings**
148:17,17,18 153:9

**headline**
22:21

**heard**
201:13 203:14 230:9

**held**

**happening**
2:6 18:12 80:21
165:23

**help**
4:21 12:8 67:10
74:20 119:23
175:20,21,24 176:3
198:12 199:12
203:23 204:2,3,23
206:25 209:3
211:25 212:4

**helped**
105:25

**helper**
208:7,22 211:24

**helper/explainer**
199:2 211:21

**helpful**
39:13 110:6 122:17
215:17,23 216:24

**helping**
135:8

**helps**
142:21

**here**
7:19 61:7 78:2 90:24
124:9 128:3 129:3
135:2 138:7 143:16
165:14 167:18
175:16 180:7
181:21 183:25
202:8 218:9 220:4

**hereby**
234:9

**herein**
234:11

**hereunto**
234:17

**he's**
43:17 144:6,13 148:3
148:3

**hi**
24:14 218:24

**hidden**
138:10

**high**
220:4



**higher**
130:23
**high-volume**
230:14
**him**
12:19 17:14 19:25
20:2,3 21:2,4,5
22:15,21 23:4,13
24:3,10 69:10 70:3
113:8 144:13,17
**his**
24:14 70:5 103:11
113:8 120:25
**historical**
29:13,14,16,21 30:5
31:21 42:20,21
43:14,24 143:16
172:14 188:18,23
189:22 190:21,23
191:12 192:3,7,9,11
192:18 193:12
223:5
**history**
129:4
**hold**
18:13
**honestly**
128:14 207:8
**hope**
80:8 157:19
**hour**
44:4 92:18 93:11
104:14 164:17
199:23
**hours**
11:5
**hypothetical**
65:2

———————
**I**
———————

**ID**
125:24 137:18,23
139:5,6,9
**idea**
99:3 108:6 172:6
**ideas**

195:19
**identifiable**
85:10
**identification**
14:25 67:21 68:2
99:16,20 104:22
112:6 123:18
135:20 144:23
152:9 154:19 175:5
197:18 217:15
222:16 229:6
**identified**
56:10 139:7,9
**identify**
59:8,9,9
**identifying**
94:4,18
**IDs**
163:20
**image**
116:2
**imagery**
231:2
**images**
112:15,19,24 113:3
230:24 231:9
**Imagine**
64:12
**IMF**
220:4,8,17,19 221:17
221:21 222:4
**immediately**
50:23 51:12,21 52:2
52:9 53:2,19 54:4
93:9
**impact**
72:14 122:17 184:2
**impacted**
184:3
**implant**
210:5
**implement**
213:5,11 214:11
**implementation**
212:11
**implemented**

34:17 56:7 112:25
212:17
**implementing**
40:7 97:16 212:2,8
216:3
**implements**
34:22
**important**
30:7 119:15
**impression**
45:7 47:2 73:16
131:13 132:12
162:8 177:13,18
209:20
**improved**
121:11
**include**
39:23 227:18,21
**included**
116:20 128:21 160:6
218:9
**including**
13:8 128:6 150:7
186:3 225:10 232:6
**Incomplete**
64:25
**incorporate**
72:10
**incorporated**
76:16
**incorrectly**
223:19
**increase**
147:10 228:14
**increased**
228:6,19
**increases**
181:7
**increasing**
181:5
**indicate**
47:23 48:4 91:24
134:4 140:15
145:24,24 146:15
**indicated**
46:17,18 50:12 83:12

114:8 164:3 174:9
182:12 202:22,23
203:5,9 207:18
209:22
**indicates**
134:6
**indicating**
189:8 209:19
**indication**
138:8
**indirectly**
34:6 93:23 190:13
**individual**
11:20 27:6 59:25
60:2,22 66:20,24
117:12 118:24
**individuals**
150:21 151:10,13
218:8,18 229:20
**industry**
22:11,17
**ineligible**
85:17
**info**
197:11
**inform**
214:20
**informal**
23:22 171:21
**informally**
19:8
**information**
15:6 29:13 45:15,25
46:6,9,12 47:4
57:24 58:20 68:11
84:21,21 120:23
121:3,3,7 122:17
137:22 140:11,18
141:16,18,19
143:16 163:14
165:9 183:4 187:2
187:18,24 188:11
188:17 189:15
193:13 197:3,5
205:15 213:20
216:11 232:17,19



**informed**
102:18 212:16
214:17
**initial**
201:4 220:11,13
**initially**
18:25 29:22 108:25
**initiate**
140:20,25
**initiated**
94:22 141:20 185:8
**inputs**
111:21 191:13 194:3
196:11
**instances**
110:16 176:12
**instant**
168:8
**instead**
71:25 102:13 114:6
**instruct**
9:11 12:19 68:9 70:3
**instruction**
149:14 207:22
**instructions**
95:22,24 96:4,12,15
96:19 232:16
**insurance**
180:12,16,17,22
181:4,5,6,8,14,16
182:5,8,11,13,17,20
183:4,12 184:11,11
**intention**
130:16
**interact**
24:8,23
**interacted**
24:3
**interacting**
24:10
**interaction**
24:13
**interactions**
19:19 22:5,7 23:18
24:20 25:3
**interest**

31:3,13 32:4 56:21
58:5 125:10 126:12
126:16,18,24 127:5
166:9,17,20,21
167:7,8,9,14,19,20
168:2,9,16,21
171:25 172:25
**interested**
234:16
**interface**
99:6,10,22 100:4,14
100:22 101:6 103:7
110:4 112:23 113:6
120:21 121:10
226:8,11
**interfaces**
226:16,22
**interrupt**
16:8
**into**
63:11 64:21 66:11
70:5 76:16 90:3
93:19 104:2 109:12
158:3 161:17
213:20
**introduction**
24:15,21
**involved**
25:10 33:16 42:18
83:19 93:18 94:4
107:5 163:4 172:6
183:21,23
**involvement**
231:19,20,22
**involving**
38:20,21,22 56:19
57:22 169:15 183:2
183:16 208:12,19
**isn't**
39:23
**issue**
26:25 32:16 52:5
87:17 144:18
**issues**
27:14,16,17,24
**its**

13:7 106:2 140:20,21
141:2 215:25
216:12
**itself**
40:8 164:3 181:10
189:20,24 190:5,16
191:23 212:22
228:19
**it's**
8:7 10:6 39:15 53:12
53:22 59:2 61:7
66:2 73:17 74:16
99:24 100:24 108:9
108:23 110:6 116:3
119:9 128:5 135:4
135:11 137:2,2
138:9 143:7 144:25
145:4 146:11 152:2
152:14,15 156:22
157:11,11 160:25
164:11 167:4 168:6
168:13 177:10
186:16,16 197:15
203:6 205:11
214:16 220:14,14
220:14 222:18
227:17 231:3,3
**I'd**
33:22 81:17
**I'll**
7:25 8:11 9:23 10:7
17:16 68:9,15 70:3
80:9 105:3 107:25
123:23 152:11
**I've**
9:13,24 15:3 87:8
112:12 124:9,21
128:25 137:5,7
141:21 145:10,10
150:6 152:23 155:6
175:10 197:24
198:22 217:23
222:21 223:19
229:11

———————————
            **J**
———————————

**J**
3:6,18
**January**
14:4 218:12
**Jeremy**
3:21 6:13
**Jersey**
2:12 234:8
**job**
1:21 43:15 98:17
**jobs**
15:21 16:2,3,7
**joint**
6:23
**Jon**
158:13
**JTD**
1:8
**July**
129:24 130:3,4
132:13 169:8
170:15,19 173:16
**jump**
165:15
**jumps**
178:22
**June**
40:16 130:2,2 133:8
157:4 161:18
166:22,23 167:12
167:14,25 168:18
229:24

———————————
            **K**
———————————

**keep**
77:20 104:11
**Keith**
157:24
**kept**
45:24 163:14 187:2
194:18
**kick**
92:12,14
**kicking**
179:22
**kidding**



118:20
**kind**
16:5 17:3,20 20:11
22:22 25:8,19 26:14
26:21 29:3 30:13
50:17 53:22 57:22
59:24 67:5 72:5
73:17 77:3 87:7
90:20 91:24 94:19
96:24 98:6 103:15
108:24 114:19,21
115:23 119:20
129:7,7 130:13,14
130:16,21 131:6,12
134:14 141:16
144:3 151:4,5,13
156:16 163:14
164:11 172:6
177:13,19,19,22
186:16 187:12
**kindly**
99:17
**kinds**
11:16,18 20:14,17
22:9,18 27:23 28:16
30:16,23 32:13 33:2
50:20 56:20 94:25
96:12 213:13
**knew**
215:16
**knowledge**
141:8 168:20 189:4
191:24 216:19
221:20
**Konig**
150:7,10,11
**Kovacs**
3:21 6:13
**KYC**
28:8 55:18 225:4
**Kyle@threearrow...**
126:3

———————
**L**
———————
**L**
1:11

**label**
151:25 155:14
**labeled**
137:22,23 146:13,19
146:24 166:14
231:11
**labels**
148:23,23 153:6,14
**lack**
27:8 49:8 73:13
77:19,24 79:15,24
97:7 115:17 116:15
147:16 177:6
201:11
**language**
45:21 47:3,22 48:4,7
52:6 55:13 70:11
**laptop**
154:20
**laptops**
135:2
**large**
135:4 145:4 146:11
152:15 156:13
**largely**
212:16
**larger**
111:18 228:17
**last**
80:14 127:10 134:21
143:18,18 165:25
166:12,13 228:24
**Lastly**
10:5
**late**
138:16 154:14
**later**
15:23 19:4,6 20:24
22:2 28:25,25 220:2
221:15,16
**Latham**
2:7 3:11,16 6:10,12
6:20,22
**lawyer**
8:22 12:25
**lawyers**

9:2,9,11 10:20 11:10
**lay**
7:18
**leaderboard**
230:4,7,10,15,19
231:12
**learn**
90:24
**least**
19:8 27:14 100:3
124:22 133:6
138:15 174:16
215:2 219:12
**ledger**
194:18,19,23 196:7
196:10 197:2,4,10
207:4
**left**
20:25 66:6 81:9,23
122:11 210:4
**left-hand**
113:14
**legal**
6:14,15 106:13,14
**lend**
64:7 86:5,15,25
87:12 91:6
**lender**
57:19 61:23 62:8,10
62:13 63:6,22,22
65:3,4,9 66:4,11
79:22 89:10,19
**lenders**
56:18 57:15,19 59:8
59:9 62:6 78:20
79:4,9,13 80:18
82:2,15,18,19 86:21
88:10,10 89:10,19
89:24 90:7,15,16,19
91:8,17,18 92:12,13
93:10
**lender's**
65:5,6 66:8
**lending**
56:11,15 57:5 60:5,8
60:18,20,25 61:9,20

61:24 62:6,9,20
63:9,23 64:2,12,13
81:15 86:3,18,20
**lends**
59:18,21,24 60:4
65:3 81:19 89:25
90:2 92:2
**Lennox**
157:24 159:6,15
**lent**
59:6,9,11,13 60:10
60:12 62:11,13,21
62:23 63:2,3,7,11
63:15,18 64:17,23
65:4,17 66:12 82:23
86:22,23,24 89:21
**less**
20:24 22:2 32:23
86:18 203:8
**let**
8:10,11 9:21 17:4
33:22 49:3,18 53:11
57:15 58:25 64:11
87:12 89:14 97:11
103:5 104:25 109:4
112:9 113:8 136:6
136:10 138:4,11
140:23 145:7,8
149:18 152:12
155:3 156:3 197:21
217:20 231:14
**letting**
169:5
**let's**
64:5,11 80:25 104:15
107:24 108:2
116:12 164:21
176:18
**level**
33:9 34:9,25 86:20
**Leven**
218:12,15
**leverage**
114:4,21,21,23
180:12
**leveraged**



113:15,22,24 114:9
114:13
**LICENSE**
234:21
**light**
134:17 219:8
**like**
7:25 10:25 12:6 15:6
17:13 20:5 22:7
31:19,20 39:24
40:17 41:3 49:12
52:9,11 64:7 65:15
71:23 75:24 84:2,4
91:3 92:8 96:14
99:24 101:9 102:12
104:13 105:15
106:25 110:21
114:5 115:7 116:8
118:12 119:12
125:2,23 126:8
129:8,24 130:10,22
131:2 136:4 137:7,9
137:17 138:9
144:12 146:17
147:6,18,23 151:6,6
156:17 157:11,15
158:12 159:10
163:8 167:3,7
169:24 174:3
193:23 203:4
205:16 210:4,4,4
213:6,7 218:2,25
219:11 223:3
229:18
**likelihood**
176:20
**likely**
25:21 37:9 163:20
**likes**
146:22 167:11
175:20
**Likewise**
232:25
**limit**
49:13,15,16 50:11,21
50:24 51:3,13,21,25

52:6,10,11,25 53:12
53:18,21,24
**limited**
6:5 13:7,22 14:10
37:10 50:21 51:13
51:20 235:2
**line**
75:8 125:19 126:16
127:16,19,21,25
128:6,12 129:9,14
130:25 131:3,10,22
132:8,10 133:6,12
133:16,18,19,24
134:5,7,13 158:9,21
159:6 160:15,18,21
165:11 176:22
221:5 235:8,10,12
235:14,16,18,20,22
**lines**
15:22
**LinkedIn**
4:13 15:6
**liquidate**
35:13,16,17 39:7,16
40:6 159:20 180:4
**liquidated**
34:15,23 35:3,8,22
37:6,24 39:25 41:16
42:11 160:4 161:10
179:10,25
**liquidating**
33:25 39:6 159:22
160:10,14,18,21,21
160:23 161:6,7,12
184:8,17,22,25
185:3,7
**liquidation**
33:17 34:8,13,14,24
35:5,7,12,21,24
36:4,7,9,19,22 37:6
37:22 38:8,14,17
39:3,7,9,12,14,22
40:8,11,15,18,20,24
41:3,5,7,8,9,10,12
42:14 44:21 45:2
46:22 54:7,21

159:25 161:13,16
161:22 162:2,5,7,8
162:11,12,21
163:15,18,24,25
164:4 173:19
176:17,21,25
178:11,16 182:19
183:10 184:2,3
201:6,19 220:21
**liquidations**
39:24 40:15 163:9
178:8 179:5 183:2
183:16,19,21
**liquidators**
6:23
**liquidity**
178:21 179:3,4,11,12
179:15,19,22 180:4
183:3,16,22,23
184:6,17
**list**
15:25 60:16,17,19
82:18 101:15 114:3
117:23 156:16,20
215:19 218:7
229:19
**listed**
15:18 110:25 111:24
114:7 122:13
**listing**
16:9
**litigation**
36:17 68:17 144:9
183:10
**little**
8:2 9:8 11:24 12:12
30:3 32:11 39:5
44:21 45:20 64:5
93:16 105:24 116:3
127:4 138:12,20
139:16 152:14,20
164:16 171:17
214:25 228:22
**Liu**
218:12,15 220:23
229:24

**LLP**
3:4,11,16
**load**
152:16
**LOC**
5:17 125:10,15
126:12 159:20,23
160:4,5,14 161:2
165:5 171:25
172:25 219:7
**located**
94:8 111:11
**location**
106:19 108:10
115:15 162:14
**loc_changes**
125:2
**loc_interest_charges**
125:3,16 128:21
**logged**
30:14,16,20 37:4
51:3,5,15 72:3
**logic**
34:22 35:2 39:24
180:3,8 185:16
**long**
11:4 14:14 48:20
49:5 87:18,22 92:11
187:24 188:5 214:8
**longer**
63:25 65:4 216:25
227:22
**look**
28:21,24 29:2 33:5
34:3 42:21 43:13,24
52:11 57:9 69:8,10
69:15,19 73:6 80:17
81:25 82:14,17,18
82:21,22 83:3,4,25
84:2,20 90:16,18
91:7,16 92:3 101:9
104:24 107:20
110:6 111:5 112:8
112:10,20 122:21
123:20 124:24
127:10,20 135:3



146:6,22 152:13
155:4 161:21
162:20 163:2,5
164:13 165:25
176:13 189:9 191:6
191:8,12 197:20,21
200:16 204:20
205:20 206:20
208:21 211:4,21
213:19 217:19
**looked**
11:20 31:19,20 40:17
41:3,17 42:17 56:17
56:17,18 62:5 84:13
86:18 94:2 108:12
112:12 137:7,9,19
142:18 143:14,17
145:10 152:23
155:6 159:24 160:9
160:20 161:17,23
162:2,4 163:24
180:2 187:9 192:3
194:9,13 196:3
197:24 199:6,7
200:11 204:6,10,11
204:22,25 205:4
207:15 208:3
211:14 215:20
229:11
**looking**
11:25 16:12,13 29:22
45:8 47:22 49:25
69:20 73:9 76:23,24
84:11 87:14 90:14
104:2 105:21 116:3
118:11 124:2,9
125:6 129:4 132:20
134:2 141:3,15,16
141:19 156:19,25
158:3 163:23 164:3
166:12 172:13,13
173:6 180:10
181:10 182:5,7,8
188:7 192:6,21
196:19 200:10
206:9 209:2 212:3

229:22 230:24
231:9,10
**looks**
15:6 59:7 89:23
90:22 92:2 99:24
100:11,13 115:7
118:12 125:2,23
126:8 136:4 138:9
146:17 147:6
156:17 157:11,15
159:10 167:3,11
174:3 175:20 218:2
218:25 219:11
223:3
**loop**
162:24
**losses**
180:13
**lot**
13:5 17:12 20:2
129:10,11 155:24
156:6,11 172:4
211:13 232:5
**Louis**
150:7,9,10
**low**
130:23
**lower**
128:12 132:10,11
134:7,13 228:22
**LTD**
1:5 3:3
**LUNA**
23:14
**lunch**
104:6 110:12 118:21
120:17 121:15
**luncheon**
121:19
**Luu**
3:7 6:25
**luun@sullcrom.com**
3:8

————————————
**M**

**M**

1:20 2:8 234:6,20
**Ma**
157:3,10,15,23
**made**
38:24 39:11 82:5
93:4 140:13,16
163:22 170:20
172:10 180:21
181:2 213:22
232:16
**Magna**
6:13,15
**main**
163:7 219:3
**maintained**
30:13
**maintenance**
201:5,9,15,17,23
202:6,22 203:21
205:18 210:22
**major**
224:10 226:21 227:6
**make**
7:23 10:3,8,11 16:4
44:17 74:5,12,12
75:15 83:17 87:19
92:23 109:18
119:22,24 122:18
122:22 131:25
135:3 136:9,10
138:11 143:10
145:7 152:13
162:25 168:9 174:5
183:19 190:25
193:18 226:20
231:2
**maker**
155:19,22 156:3,5
**makes**
10:16 47:8 62:4
81:23 90:5
**making**
38:19 120:5,15
138:20 148:2
216:19
**man**

68:17 149:19
**managed**
94:21,25 95:4,6,8,18
95:25 96:10 97:24
98:7 103:7 106:2,5
107:5 109:10
158:14
**management**
102:18 226:5
**manager**
19:3,6
**managing**
95:13 221:12
**manually**
49:4,20 221:21
**manuals**
96:24
**many**
10:25 14:7 35:25
61:16,19 101:20,22
102:4 150:20
196:20 215:16
222:5 226:17
**margin**
5:11 33:10 56:4,8
57:5 58:15 59:14
61:20,23 62:23 63:7
63:9 64:8,20,21
66:11 78:17 79:12
79:21 81:10,15
198:13 200:10,19
200:23,25 201:2,3,4
201:5,9,16,17,23
202:6,22 203:22
205:18 219:4,16,24
220:11,13,25
225:25 232:11
**mark**
59:10 85:8 86:21
89:5,20,24,25
144:20 154:16
175:3 217:13
**marked**
5:8 14:24 59:3,5 63:2
63:14 67:25 85:2
86:24 88:2 89:17



99:19 104:20,21
112:5 123:16,17
135:16,17,18,19
144:22 152:8
154:18 170:7 175:4
179:15 197:17
217:14 222:15
229:4,5
**market**
23:14 34:15 49:17
155:19,22 156:3,5
176:17,25 178:9
186:13,25 188:12
189:22 190:11,11
193:10
**Markets**
223:12,14
**marriage**
234:15
**Marsal**
43:4,5,10
**Massachusetts**
3:12
**match**
86:4 93:9 145:18
**matched**
57:14 79:14
**matching**
56:14 57:17,21
**math**
203:4
**mathematically**
74:13
**matter**
6:5 70:6 234:16
**may**
7:5 9:10 10:19 19:4
25:10 40:11 52:7
68:11 76:11 96:10
97:6 98:7 105:15
131:12 142:2
149:25 175:13
189:14 196:24
200:11 209:11
213:9 226:8
**maybe**

11:2,24 12:7,12
22:10,21 24:25,25
38:9 39:23 40:4
44:3 45:19 55:12
60:21 62:16 64:5
86:4 90:12 91:5
104:13 105:17
114:18 121:6 127:3
127:10 129:24
136:4 139:4 143:18
150:23 159:10
164:2 168:13 188:6
198:4 199:22
200:11 208:13,13
210:9 212:20 215:2
217:2 223:21
231:18
**McGrath**
68:18,19
**me**
8:4,10 9:21 10:7,9
13:15 17:4 25:7,7
27:23 29:14 33:8,22
36:8 39:5 45:20
48:10 49:3 52:9
53:11 57:15 58:25
64:11,14 74:5,13
75:15,22 77:10
87:12 89:14 97:11
99:14 101:8 103:5
104:25 109:5,6
112:9 123:12,21
125:7 127:12 131:6
134:6 136:6,10
137:17 138:4,11,20
140:23 145:7,8
149:18 155:3 156:3
161:19 166:8,13
169:5 171:24 182:4
183:10 185:18,21
187:19 192:10
195:17 197:3,21
203:25 210:24
213:19 214:6
216:24 217:20
223:4,19,21 230:21

231:14,17 233:20
234:11
**mean**
8:18 13:10 16:8 29:9
33:19,20 39:8 43:9
45:11 47:9,12 55:10
58:12 59:20 65:12
73:12,22 74:9 75:4
75:13,20 76:4 83:6
89:13 90:17 95:21
95:23 106:12,18
113:24 119:19
131:6 133:10,15,21
134:9 141:12
143:25 145:16
148:22 149:4
153:22 155:12,22
156:12 160:18,23
161:6 166:20
169:22 170:3,18
181:3,21 184:14,15
184:18 189:6
191:11 193:6
194:19 195:6
201:10,16,17
203:18 207:5 215:5
219:17 221:8 228:8
230:18
**meaning**
161:8 201:18
**means**
8:20 17:7 28:9 73:16
75:7 76:5 78:5,14
95:11 107:10
155:24 156:5 160:5
160:7 189:5
**meant**
37:23 98:6 110:23
143:8 148:11
158:18 181:6 197:8
201:23
**mechanism**
39:15
**medication**
10:16
**meet**

8:25 9:5 10:22
**meeting**
11:6 66:24 67:9,13
69:5 141:25
**meetings**
11:4 20:2 142:2,6,12
142:17 215:7,10
**members**
58:7 207:22
**memory**
67:3 69:21 92:3,18
204:14
**mentioned**
10:19 21:7 27:19
29:5 31:12 33:7
42:19 51:11 57:17
112:22 145:23
148:16 169:7
202:21 204:8 208:2
213:9 214:10
223:17
**mentioning**
47:22 208:5
**Merit**
2:10 234:7
**message**
5:4 21:19 155:13
157:2,7,10,15,22,23
159:19 218:11,22
219:12 220:3,23
223:3,4,8 229:23
**messages**
4:20,22 5:5 21:16,17
150:24 155:11,13
218:2 220:2 221:15
**met**
10:21 20:3 35:21
66:20 67:17
**method**
141:9
**mid**
138:16
**middle**
161:18
**might**
37:17 52:10 54:6



55:13 61:8 68:22
77:17 82:6 84:2,24
99:6 101:20 102:12
107:9 110:14 120:4
120:14 122:17
123:5 124:6 134:17
137:19 142:22
148:18 153:25
154:9 158:3,13
188:16,24 192:10
202:13 204:16
206:19 209:15
216:24 220:4
227:19
**million**
42:5,13 157:18
**mind**
54:23 135:8 138:19
152:19 178:3
225:23
**minute**
152:15 217:19
**minutes**
68:4 104:16,17 194:5
217:2
**mischaracterizes**
103:10 120:24
**misheard**
47:17
**missed**
208:15
**missing**
209:21
**misstating**
48:10
**misunderstood**
121:6
**MM**
155:18
**MMF**
203:14,17,19,20
205:8,9,17,23 206:6
206:10,14 207:3,11
207:15,19,23
220:17,20 221:21
222:7,9

**model**
176:22
**modify**
103:14
**modifying**
103:23 222:2
**module**
54:17,24 55:19,21
171:20
**modules**
54:10,13 55:6,9,11
55:14,16,25 194:15
**moment**
52:22 89:11,13,17
99:18 104:24 112:8
118:21 156:25
173:23 185:18
196:8 197:20 205:9
206:17,19
**money**
42:11 58:9
**monitor**
201:2
**month**
27:13 150:19 170:19
173:17
**months**
20:23 134:21
**more**
10:8 11:3,24 16:7
19:15 25:22 27:7
38:9,13 39:5 41:25
45:20 54:6 58:20,23
59:22 84:22,23,25
85:4,6 86:13 87:9
95:10 119:20 120:9
138:13,21 150:24
161:19 179:18
204:16,23 210:20
210:23,25 215:18
216:24 219:8
**morning**
6:2,19 7:11,12 157:4
157:18
**most**
21:21,22 25:21 37:9

79:19 98:8 104:9
150:14 163:20
171:14 173:10,13
174:3 213:15
**mostly**
23:12 42:18 132:22
209:7,8
**move**
108:15 139:15
154:20
**moved**
115:13,15
**moving**
109:7 189:8
**Ms**
152:21 220:23
229:24 231:5
**much**
26:16 41:15,21,25
52:19 75:15 80:22
93:22 118:16 119:6
119:16 131:2,10
138:23 161:14
216:24 220:14
224:4,13 226:18
227:12 231:6
**multiple**
38:17 42:16 49:6
60:4,5,7,7 110:15
122:12 139:12
**multiplied**
75:19 126:17,19
127:8
**multiplying**
75:11
**my**
6:19,21 8:9,11 9:25
10:7,10 15:6 18:14
19:5 30:8 49:3
55:13 62:16 63:10
63:11,21 65:15
87:18 89:14 92:3,18
98:17 103:15 104:2
104:12 108:3 119:4
132:2,12 134:25
136:16 147:9,24

160:23 171:17
173:22 174:25
180:19 189:12
210:14 212:14
228:15,16,17,19
234:17
**myself**
111:5

_____

N
_____

**Nam**
3:7 6:25
**name**
6:19 7:13 14:11
68:19 96:18 126:2
146:17 150:9
156:22 158:13
172:18 187:11,14
218:7 225:10
229:19 235:2,4
**named**
32:7 66:21 68:17
147:11 149:11,19
157:11
**names**
16:3 114:18 156:20
204:12
**native**
4:17,18,19 124:3
**natural**
164:19
**naturally**
28:22
**nature**
12:3 20:6 22:15
23:20 25:3 116:4
129:10,12 215:9
226:12
**near**
192:8
**necessarily**
48:2 53:5,16 66:3,9
79:13 89:9,18
119:19 149:4
150:16
**need**



9:21 110:12 120:17
130:9 136:9 144:18
206:20
**needed**
209:19
**negative**
36:3,6 181:17 183:14
219:6
**neither**
87:16 224:8
**net**
72:4,5 110:21,21,24
118:25 119:8
**new**
2:8,8,11,12 3:5,5,17
3:17 6:11,11 7:7
28:21 152:4 175:2
212:14,15 213:2,5
213:11,14 214:3,4
214:13 220:16,16
220:19,20 234:4,8,8
**news**
22:21,22,25 23:6,7
23:14
**next**
8:12 15:22 63:8
96:17 110:22
157:22,23 158:8,21
159:6,18 168:12
172:19 182:17
221:5
**NFT**
225:11
**NFTs**
28:11
**Nils**
1:14 2:6 4:4 6:4 7:6
7:15 12:11 15:9
33:4 43:15 68:9
69:2,15 104:9,12
124:2 135:6 136:20
149:14 233:5,17
234:10 235:4,24
**Nishad**
19:3,10 170:24 171:3
171:5,7,9 213:7,21

214:4,6 219:13
**no**
1:8 7:17 10:18 11:12
13:24 43:21 47:23
50:4 57:3 59:16
60:11,11 63:25 65:4
67:12,18 68:4,13,20
69:7 74:24 77:22
80:24 87:17 112:14
113:11 127:17
130:14 132:2,16,19
133:3 140:10
141:21 145:12
149:6,21 150:2
153:4 154:7 155:8
158:7,11,20 159:17
160:8,22 164:13
165:17,22 169:19
174:20 178:13,18
179:20 180:9,24
187:25 188:2,4
189:5 190:3,21
200:25 203:12
204:4,19 205:2,5,7
207:17,20,24
209:14 211:3,12,17
211:19,23 214:2
218:6 219:25
221:12 222:23,23
223:9 227:22
229:14 230:8,18,19
232:14,23 233:2
234:16,21
**non**
101:25
**nonzero**
102:2
**non-fungible**
28:14 225:11
**normally**
54:3 62:14 64:3 65:7
**Notary**
2:11 7:6 234:7
**note**
17:12 105:3 123:23
144:16 211:4

232:15,19
**noted**
78:3 232:18 233:13
**notes**
4:14 12:14,17,21
68:16
**nothing**
181:22
**notice**
114:25
**noticed**
131:18
**noting**
180:20
**notion**
114:20 132:8 134:6,7
**notional**
75:25 76:3,7,12,15
**November**
153:25 154:9
**now**
6:3 13:10 26:22 29:8
31:6 33:2 34:18
36:16 44:4 46:9
54:23 67:19 69:11
86:3 99:15 112:3
119:13 121:13
123:4,15 128:24
134:2,23 138:13,14
152:17 154:16,20
158:4 165:3,9
188:10,22,24
192:18 197:13
198:19 200:16
202:2 216:2 217:12
217:13 221:7
222:11 225:23
228:22 230:23
**number**
6:4,6 24:11 49:19
67:22 72:16 75:17
77:2 78:20 79:3
103:15 105:4
123:25 136:3
144:25 152:4
154:24 156:7,12

165:17 175:7
181:18 182:16
183:13 197:16
200:17 203:8 206:6
217:17 222:18
227:15 229:8
230:23 232:16
**numbers**
75:24
**numerator**
202:5 203:3
**N-I-S-H-A-D**
171:3

---

**O**

**O**
1:11 4:6 122:3,3,3
**oath**
44:15
**object**
9:10 17:11 61:11
77:22
**objections**
77:21 80:7 148:3
**observed**
219:5
**obtain**
126:18,19 127:8
**obviously**
73:17 124:3 143:7
146:11 225:10
226:6
**occasionally**
213:5
**occasions**
32:18 214:12
**occur**
93:3
**occurred**
93:11
**October**
234:18
**off**
44:7 66:6 80:25 81:2
81:9,24 102:15
121:17 122:11



164:21,22 165:11
165:23 170:18
191:11 199:24
200:2 217:5,6
**often**
10:22 20:8,22 21:3
21:19 24:8,23 27:11
46:5 108:16 109:8,9
128:13 214:22
223:11,14,15
**oh**
47:14 113:10 118:20
**onboarding**
55:18 225:2,6
**once**
23:4 24:10 152:11
**ones**
18:8 137:15,17
194:14 196:18
198:22 199:5,6
204:11,19 213:10
225:22,23
**one-minute**
77:4
**only**
9:23 18:12,14 24:10
34:9 46:10 48:7,12
54:20 60:21,25 61:8
186:20 219:4
224:14,17,22 225:4
225:13,13,15,18,19
226:4,6
**onto**
95:12
**open**
72:17,20 73:2 75:17
84:23 85:4 201:4
220:16
**opened**
85:21
**opening**
220:19
**operate**
86:20
**opine**
17:14

**option**
147:11 148:9
**options**
147:24
**oracle**
195:3,7,10,11,13,14
195:17,18,21,22,25
196:2
**order**
29:23,25 49:13,15,16
49:16 50:11,15,23
50:25 51:3,12,13,20
51:20,21,21,25,25
52:10,11,25,25
53:12,18,22,25
126:15 139:3,5,6,10
139:11 140:13,20
140:25 141:20
156:22 220:25
**orders**
50:18,20,21 51:8,15
52:6,20 53:9 139:12
139:14 140:17
176:17,25 178:8,11
178:16 219:4,20
**other**
8:9 9:20 15:12,19
16:3 18:8,13 22:22
23:5,5 25:13 28:23
31:5,7,22 36:6
38:21 39:24 46:5
49:5,24 50:17,20
54:8,10,18 55:5
56:24 57:2 61:5
65:2 85:20 90:15,18
90:19 91:19 95:5
96:11,12 100:8
105:17 111:2,16,20
111:21 120:5,15
137:17 140:12
141:15 143:22
150:17,21 163:8
174:13 176:9 178:4
186:11,15,19
193:20 194:10,13
198:21 199:5,6

204:9,11,19 205:2
205:24 207:22
214:2 216:6,11
221:11 224:15
225:6,22,23 226:7
230:11
**others**
21:11 37:14 140:9
176:4 215:20
225:24 230:9
**otherwise**
13:16 85:17 107:25
108:2 232:23
**our**
44:15,20 77:20
109:20 157:18
**ourself**
162:21
**out**
9:17,18 34:24 38:14
38:18 48:20 52:13
62:6 64:24 66:12
71:8 90:3 116:4
117:19 154:21
157:18 162:20
188:11 214:5
215:10 228:3
**outcome**
234:16
**outside**
75:10 140:2 179:18
198:2 199:14 204:7
218:3
**over**
8:8 19:23 28:20 42:4
42:12,13 48:20 49:2
49:5,6,10,14,19,23
49:24 52:2 53:3,13
72:14 87:12,20
103:5 107:20
108:13 110:12
128:14 129:5,21
139:16 155:4
164:16 167:20,20
168:2 187:24 188:5
214:9 215:11

**overall**
71:17,21,22 72:2
73:3,5 76:16 85:10
85:12 110:16,18
111:6,19 118:25
122:22 143:8
**overlap**
143:15
**overlapped**
223:20
**own**
30:7,9 67:11 73:20
98:7,10 103:22
140:20,21 141:2
**owned**
47:9 94:5,14 97:24
**ownership**
97:17,19

**P**

**P**
3:2,2
**page**
4:3,12 70:10 76:24
77:13 87:19 101:10
101:21 110:25
111:5,9,10,25
115:19 117:20
118:4,7 124:25
127:11 143:11
155:14 156:15,20
159:18 165:25
176:13 200:16
220:22 226:11
227:2,7 230:2 235:8
235:10,12,14,16,18
235:20,22
**pages**
125:3,6 226:13,15
**paid**
227:12
**paint**
101:8
**paper**
165:20
**paragraph**



87:18
**parameter**
206:21
**parameters**
204:17 205:24
208:10,13,19
**paraphrase**
223:18
**parsing**
171:16
**part**
18:6 30:8 31:16,17
32:7 40:4,6 41:5,9
52:5 55:4 57:5,18
62:23 68:17 85:24
89:24 98:17 99:22
100:3 104:9,12
109:15 133:6
168:13 183:22
192:19 201:21
206:3 219:12
226:24 228:11
**participating**
61:20,24 62:9,20
63:9
**particular**
14:8 22:24 76:8
78:20 79:5 84:9
94:15 102:11,12
110:22 124:7
141:20 143:3
148:13 166:18
174:17 224:24
227:4
**particularly**
175:24
**parties**
6:16 234:15
**partly**
100:21
**parts**
18:2,2,6 28:21,23
39:16 54:19 55:10
**passed**
228:2
**past**

191:18 194:4 228:7
**Patrick**
68:17,19
**pattern**
129:17 132:7
**patterns**
130:13,17,20 131:19
**pause**
8:9
**pay**
157:19
**payment**
126:18,24 168:9,10
**payments**
31:3,13 32:4 126:16
**PDF**
11:22
**pending**
9:24
**people**
16:15 49:24 67:17
141:15 150:5
171:20 213:4,6,8
223:14 230:11
232:4
**per**
227:12
**percent**
91:2 183:6
**perfect**
123:11
**performing**
82:25 84:14 143:20
**perhaps**
40:7 123:7 140:23
145:23 157:7
**period**
41:16 48:20 49:2,5,6
49:19 53:13 128:18
138:5 158:11 167:8
167:21,24 168:2
169:13
**periods**
168:8
**permit**
61:23 62:8,10

**perpetual**
193:4,6,7,9,13,24
**person**
8:12 19:23 20:3
170:16,20 173:3
232:4
**personally**
196:4
**persons**
170:20
**person's**
158:13
**Peter**
150:7
**petition**
32:20 204:24
**philosophy**
216:5
**phone**
19:23 151:15,17
**photo**
116:5
**phrase**
8:20 148:10 160:6
219:16
**phrases**
7:25
**pick**
8:3 65:24 122:10
215:18
**picking**
66:6
**picture**
101:8
**piece**
192:17
**pieces**
12:2 34:5 56:24 90:9
92:4,8 224:16
231:18 232:23
**ping**
25:7
**place**
19:23 51:22 81:20
85:18 86:6 87:2,24
92:25 97:8 107:13

123:9 161:17,22
163:7 199:21
**placed**
49:16 51:20 80:19
87:15,22 161:12
220:25
**placeholder**
210:4
**places**
81:21 181:8
**placing**
219:3,20
**plan**
215:10
**plans**
215:6,11
**platform**
70:22,24 71:7,19
73:21 79:21 95:13
99:7 110:5 120:15
120:16 122:19
123:5 214:24
230:25 231:10
**platforms**
21:7,8
**please**
6:17 7:4,13 10:7
11:19 14:22 69:14
152:7 199:25
227:16 231:14
**point**
28:16,19 29:18 30:9
42:22 112:21
130:14 149:3
164:19 167:3 168:6
169:7 170:15
188:13 191:4
206:22,22,25
225:12
**points**
110:11
**policies**
96:23
**pool**
89:10,19
**pools**



82:15 86:9 88:10
91:17,18 92:11,12
92:13,13 93:10,10
**portion**
170:3 172:25 179:7
228:16,17
**portions**
194:12
**posed**
11:18
**position**
18:10,12,14 70:14
72:20 73:2,10,21,24
74:11 75:18,25 76:4
76:6 115:6,13,14
180:2,5 184:16
185:3 201:5 202:18
**positions**
18:13 30:22 38:22,23
71:16 72:11,13,14
72:18 73:7,18 115:2
115:7,9,10,11,15,19
115:22,23,24,25
117:3,8,9 176:16,24
178:4,7 179:9 180:2
200:23,24 220:16
220:20
**positive**
134:3 181:14,17
182:12,16 183:14
**possible**
38:4,9 53:18 58:24
61:8,14 78:18
**possibly**
102:8
**post**
32:19
**posted**
175:25
**post-July**
173:9
**post-petition**
108:2 182:9,10
199:19,20
**potential**
16:19,20 215:16,22

**potentially**
31:22 40:2 46:18
57:15 60:7 173:14
178:4 213:11
**precedes**
176:19
**precise**
13:14 74:17 98:8
**precisely**
98:18 162:25
**precising**
207:12
**precision**
114:19
**preexisting**
212:19 214:24
**prefatory**
177:5
**premark**
67:20 99:15
**prep**
175:13 198:2
**preparation**
12:14 66:24 67:14
68:11 218:4
**prepare**
11:13 67:10 141:23
**prepared**
12:9
**preparing**
66:23 198:17
**present**
3:21 6:16 9:2 15:13
54:9 55:7 231:15
**president**
19:2
**pretty**
41:7 137:16
**prevent**
78:24 79:8 85:21
120:5,14 180:12
**previous**
29:17 167:13 188:12
**previously**
5:8 73:7 104:20,21
123:17 135:15,18

197:14,17
**pre-July**
173:9,11,24,25
**pre-petition**
17:7,10,22 21:22
26:3,9 28:2,6 30:17
33:7,8 102:22,23
105:13 106:23
107:8,22,23 108:4
141:17 176:4,8
182:9 198:6,7,9,23
199:19 204:21
205:3 207:21
211:25 212:3
**price**
49:17,23 72:21,22
75:19 76:5 111:22
114:22 118:3
137:16 140:3 184:7
184:9,13,18,18,21
184:24 185:5,13,16
186:2,24 187:3,15
188:12 189:8,8,22
189:25 190:6,8,9,9
190:24 191:2,3,3,7
191:17 192:3 193:9
193:10,13 195:2,8,8
195:15,18,21,22,25
202:16,17,19
**priced**
187:20
**prices**
46:5 184:10 186:14
188:19,20,23
189:21 190:11,23
194:11,25 196:16
196:17,20
**pricing**
185:19,22 186:5,22
187:24 188:5,7,15
189:13 190:22
192:18 193:5 194:3
196:2 197:3,4,10
**primarily**
171:25 232:3,10
**primary**

172:24 231:18,20
**principal**
5:17 125:7 126:11,12
126:17,18 127:3,8
127:15,19,23,24
128:5,9,13,22 129:6
129:11 130:8,11,23
130:25 131:21
132:11 133:5,25
134:3 165:5 166:10
169:15,21 170:4,11
174:21
**principally**
172:5
**print**
135:23
**prior**
153:6 166:22 168:22
214:10
**private**
21:16,19 23:11
**privilege**
12:20
**probably**
24:25 26:13 27:14
40:25 42:12 61:13
119:10 133:13
159:8 176:11 211:7
213:16,25
**problem**
27:7 43:21 77:23
113:11 132:16
154:7 160:8 190:3
**problems**
25:6,7,8,13,18,19,25
26:23 27:5,11 65:2
**process**
95:25 152:11 225:4,4
**processing**
55:16 94:3,13
**produce**
183:13
**produced**
68:16,23
**product**
75:22 76:5,20 205:24



products
206:5
profile
4:13 15:7,8
profit
182:12
program
17:24 56:4,8 57:6
58:15 59:14 61:20
61:24,25 62:9,11,20
62:23 63:8,9 64:8
64:20,22 66:11
78:18 79:13 81:11
81:15 178:22 179:3
179:22 198:13
programmed
120:22
programming
120:20
programs
18:7
pronounces
24:4
pronunciation
24:5
proper
77:25
prospectively
166:19
provide
178:22
provided
70:25 134:11,13
provider
178:22 179:3,5,11,13
179:15,19,22 180:4
183:3,16,22,23
184:7,18
provision
36:7,9,19,22 37:22
38:8
public
2:11 7:7 216:15,20
234:7
pull
143:22 144:19

153:17 174:6,19,24
pulled
124:19 142:10,22
143:23 154:2,10
pulling
143:12
purports
157:3
purpose
175:21 212:4
put
15:21 16:3,25 65:10
66:11 97:7 102:15
134:22,25 135:5
145:3 151:23
222:10
puts
51:24 52:24
p.m
121:18,19,21 122:6
159:19 164:23
165:2 200:3,6 217:7
217:10 233:6,13

**Q**

Quan
150:7
quantities
46:5
quantity
76:6 94:11 111:23
202:16,17,18
210:21
question
7:21 8:9,11 9:10,12
9:13,24,24 10:2,5,8
10:10 11:18 17:5,18
43:17,19,20 47:18
49:3 52:22 57:16
58:25 59:24 62:16
68:10 70:6 80:10,14
87:18 97:11 107:3
110:9 113:8 120:7
120:11 140:24
142:14,20,20
144:14 148:4,15

154:5 167:16
171:17 173:22
188:17 189:12
190:2 208:11 214:8
questions
13:23 77:6 108:3
143:25 144:3,10,14
199:11 232:15,24
233:2
quickly
165:15
quite
30:11 52:23 135:4
146:11

**R**

R
3:2 122:3
randomly
77:13 78:10,15
range
228:23
rare
32:17
rate
56:22 58:5 127:8
rate-limited
176:17,25 178:8,10
178:16
Re
1:5 6:5 235:2
read
83:17 136:20 176:18
178:5 233:7
reading
183:20
ready
136:22
real
121:14
realize
104:5
really
16:21 18:22 52:6
54:18 55:18 57:21
65:12 72:13 73:6,15

74:5,16 75:6 78:14
87:7,8 97:19,20
98:16 105:22
107:18 108:23
109:15 119:12
120:17 133:19,22
140:16 162:23
177:7 182:15,15
203:6,7 204:12
213:25 216:23
230:18
Realtime
2:10
reask
49:3 57:16 97:11
reason
10:14 15:18,21
168:24 169:2 235:5
235:8,10,12,14,16
235:18,20,22
recalled
109:3
receive
58:16 97:15 227:19
227:20
received
14:24 64:16 67:25
94:19 99:19 104:21
112:5 123:17
135:19 144:22
151:24 152:8
154:18 165:5 175:4
197:17 217:14
222:15 229:5
232:21
recent
193:10
recently
16:19 128:25 134:20
150:14
recess
44:9 81:4 121:19
164:24 200:4 217:8
recognize
15:3 68:7,19 112:13
112:15,18 145:11



145:13 155:7
222:22 229:13
**recognized**
100:10
**recollection**
22:20 23:3 25:5 50:5
50:9,22 55:24 60:24
69:4,22 96:16
114:18 204:22
205:22 210:15
**record**
6:3 7:14 44:8,11,14
80:25 81:3,6 104:14
105:3 121:18 122:6
123:24 154:23
164:21,23 165:2,4
165:23 197:8,10
199:25 200:3,6
217:5,7,10 233:9
234:12 235:6
**recorded**
46:4 207:4
**recovery**
13:8 14:2,3
**recruiters**
16:20
**reduces**
176:20 177:20,23
**reducing**
177:19
**refer**
13:6 64:11 74:6,10
75:3 83:21 84:9
106:21 170:7 176:3
**reference**
183:9
**referenced**
183:4
**referred**
176:5,8 177:4 181:4
181:5
**referring**
13:5,6,15,19,21
15:16 20:4 37:22
43:11 60:4 73:17
77:18 83:22,23 85:9

102:21 113:17,20
125:24 159:15
176:9 181:12
212:24
**refers**
74:16 75:8 78:6
195:11 230:19
**reflect**
72:9,17 110:15
112:24 123:14
167:2 173:10 174:8
178:15
**reflected**
46:24 73:3 76:8
101:21 110:19
117:4 118:3 131:21
149:13,24 166:9,21
168:21 173:12
194:5,8,17,22
196:15,18 207:15
**reflecting**
125:8 166:21,23,23
172:19 196:11
**reflects**
127:16 139:6 173:8
173:24
**refresh**
69:4,20
**regarding**
25:9 160:9,10,21
**Registered**
2:10 234:7
**regularly**
21:2 90:21 92:15,17
167:15 190:10
193:10
**relate**
33:10 45:14 107:21
108:13 127:19
170:11 195:8
220:17
**related**
22:12 23:23 28:8,10
28:10 30:10 32:12
32:14,16,25 33:20
34:6 39:24 42:15,16

45:15 46:2 47:4
71:12 90:7 97:23
100:24 101:3 106:5
126:15 129:8
134:12 163:8,10,20
184:11 194:10
199:12 204:17
205:17 210:9,20,21
213:25 219:19
220:14,15,19,20
224:4 226:5 227:24
232:6,10 234:14
**relates**
126:6,8 139:19 147:6
160:13 210:6
220:10,11
**relating**
31:9,15,25 32:9 33:9
33:17 34:7 42:19
44:21 45:9,11,21
46:22 55:25 56:13
72:10 94:14 97:16
99:10 100:3 103:6
106:2 107:16
108:18 125:22
134:10 142:18
147:23 159:24
170:4 172:25 182:7
193:21 199:3 216:4
225:25 231:21
**relationship**
134:18 159:12
**relayed**
109:11,24 216:11
**relevant**
164:13 183:15
**relied**
195:25
**remark**
14:22
**remembering**
188:10,22,24
**remind**
44:14
**reminding**
77:10

**repeat**
17:18 43:20 73:24
154:5
**rephrase**
10:7,9 138:4 140:23
**replied**
223:7
**reply**
158:4
**report**
18:24
**reported**
1:19 18:25 19:2,4,8
22:23 213:9
**reporter**
2:9,10,11 4:11 5:3
6:14 7:4 8:3,8 36:24
66:5 99:17 112:4
136:19 171:2 234:7
234:7
**represent**
6:18,22 68:15 147:15
**represented**
8:15 119:7
**represents**
138:6
**request**
6:11 36:24 66:5
144:11 171:2
**requesting**
165:9
**requests**
5:16 48:25 213:21
**requirement**
200:25 201:4,18,22
201:24 202:6
203:22 205:18
210:22
**requirements**
226:2
**resemble**
145:18,20 148:18
153:11,14
**resembles**
148:20,21
**reservation**



232:25
**reserve**
144:17 232:22
**residents**
213:20
**respect**
32:3 67:3 151:19
154:2 169:4,21
183:10 232:22
**responding**
43:16
**responsibility**
18:16 27:15 172:24
**responsible**
33:24 98:20 99:9
100:3,21 107:2,15
120:20 171:25
192:11 216:19
232:3,10
**rest**
5:17 45:13,14,16
46:17 47:21 48:14
50:2,6 125:2 145:24
146:3 165:7
**restrict**
63:4
**restriction**
84:18 85:16 87:23
88:10 90:7
**restrictions**
80:17 81:24 82:25
84:13 86:8 88:6
90:22
**result**
49:10,22 134:11,13
**results**
49:14
**resumes**
121:21
**retained**
4:11 5:3 227:9
**review**
11:13 12:9 103:22
107:20 108:13
123:22 136:11
145:8,9 152:12

198:19,23 211:24
217:21
**reviewed**
145:10 175:10
198:15 199:15
211:11 217:23
222:21
**reviews**
105:6 112:11 136:12
155:5 175:9 197:23
217:22 222:20
229:10
**revise**
214:23
**revising**
215:7,8 216:10
**revisit**
144:18
**reward**
197:4,7
**reword**
197:2
**rewrite**
33:24
**rewrote**
29:11,12,21 192:15
192:19
**right**
9:15 15:10 16:5
27:21 29:8 31:6
34:18 37:11 46:19
52:3 54:23 57:19
64:8,9,14,17 70:24
75:9 79:14 81:9
82:2,15 84:15 91:8
93:11 99:25 100:12
106:3 111:2 118:19
119:9 122:19
127:16 138:17
139:16 142:2
144:17 148:19
160:11 167:21
174:2 185:8,10
187:17,21 188:20
189:19 191:4
192:12,17 193:8

194:20 200:9 202:2
212:9 225:23
227:10 228:13
230:23
**rights**
232:22 233:2
**risk**
34:13,14
**RMR**
1:20 234:20
**Robert**
66:21
**Robinhood**
23:4,5,8
**role**
18:15,24 19:12 32:19
98:17
**room**
9:2,10 10:20
**rough**
228:23
**row**
113:15 114:25 118:2
132:23 133:2
146:12 166:13,14
167:13 168:23
**rows**
128:20 135:22
138:15 231:11
**rule**
53:10
**rules**
7:19 97:7
**RULING**
5:20
**run**
58:4 90:21 92:15
174:7
**rush**
68:4 152:25
**Ryan**
24:2

_____
**S**
_____
**S**
3:2,6 4:6,10 5:2

122:3,3,3
**said**
10:20 20:20 23:13
27:2 38:8 39:2
47:12 48:11 51:2
57:14 60:9,11 62:20
63:8 66:7 73:7
74:18,21 84:6,11
87:8,21 88:3 94:12
95:8 97:23 100:2,10
100:15,21 109:3
110:14 120:19
122:16 123:6
127:15 129:20
130:3 131:18 132:5
132:13 134:16,20
143:21 156:5,11
158:19 160:9,20
163:24,25 173:23
183:17 189:13
190:16 192:14
196:10,15 197:7
200:11 208:16
212:6 214:14
223:20 226:8 227:9
**Salame**
24:2,4,9,13
**salary**
227:14,14 228:13,15
228:19
**Sam**
220:3
**same**
46:8 54:16 64:17,22
65:9,13,16,16 66:3
66:10,14 80:7 87:19
109:20 110:25
111:15 116:2
143:11 149:14
152:11 193:16,19
203:3 205:10,10
208:13 209:8 216:5
222:7 226:19
**Samuel**
22:5
**saved**



135:24
**saw**
18:4 45:9,11,13
46:17 47:3 50:2,6
57:8 62:25 105:14
134:20 137:19
162:17 163:24
173:4 179:16 181:2
181:3,10,14 182:3
183:23 185:15
198:8 203:23,25
204:2 207:10,12
210:3 214:18
**say**
8:19 9:9 11:2 17:16
19:10,17 20:4,8
22:16 24:11 26:13
27:13 28:19 32:23
33:22 38:3 39:18,20
39:22 41:2,6,12
42:12 44:2 52:5
53:5 57:21 59:2,16
59:22 60:3 61:4,12
63:14 64:11 66:14
66:15 71:21 72:4,6
75:3,11 79:16 80:2
81:17 83:3,25 84:3
87:7,17 88:6 89:4,5
93:23 94:24 95:20
97:21 102:12
107:24 108:8
114:19 122:24
125:3 131:5,5,14
133:15 138:10
140:8,9,21 143:6
148:21 150:25
177:22 178:13
181:19 184:13
196:21 197:8
212:22,23 222:9
227:6
**saying**
24:14 35:15 38:11,13
48:10 52:8,15 53:15
62:19 63:6,18 81:24
82:14 85:7,12 88:25

90:6,20 92:9 98:2
115:12 128:5
130:21 132:24
133:23 159:9,16
164:5 168:16,25
169:9 174:23,23
183:8 202:8 208:8
209:18 226:21
228:13
**says**
15:8,12 69:2 70:11
73:10 77:12 100:17
113:15 114:25
116:5,9 124:25
126:2 155:14
157:16 158:2,13,21
159:19 176:15,19
178:6,20 180:11
200:18,22 218:23
220:3,23 221:5
229:25
**screen**
135:10 138:16 145:4
**scroll**
136:13,16,17
**second**
99:14 102:16 125:6
173:7 176:13
178:20 200:16
230:21
**section**
200:18
**seeing**
55:15 62:7 88:7
96:14 103:16
105:12 108:14
109:3 134:17
148:10,13 162:6
172:18 175:14
178:15 179:4
180:17 192:8
196:19,20 198:6
205:16,16 218:5
219:20
**seem**
153:14

**seems**
158:3,12 167:15
**seen**
34:22 105:10,15
111:7 113:5 124:12
136:25 137:3,5,6
147:18 148:18
153:3 155:9 175:11
197:25
**selecting**
39:24 40:5
**send**
48:25 50:23 95:24
**sending**
96:9
**senior**
19:15
**sense**
7:23 10:3,11 44:17
73:16 74:5,12,13
75:15 77:17 81:23
90:5 164:2,9 202:12
202:15 203:8
209:15
**sentence**
176:18 177:5
**separate**
81:14 91:7 190:24
200:25
**separately**
91:25 117:16,18,22
**September**
1:15 2:3 6:7 235:3
**sequenced**
57:4
**sequencing**
57:8,10
**Services**
6:14,15
**sessions**
198:2
**set**
58:25 64:17 91:15
105:7 206:6 234:11
234:17
**sets**

91:4,5 124:18
**setting**
23:11,12 83:20 130:7
**settings**
37:23
**seven**
152:2
**several**
10:24,25 14:7 20:10
20:23,23 21:5,21
31:12 213:22
**shaking**
24:14
**share**
135:11
**shared**
226:7
**Shaw-Crockett**
1:20 2:9 6:15 234:6
234:20
**she**
218:16
**shed**
134:17 219:8
**sheet**
136:18
**short**
199:22
**shortly**
40:21
**should**
9:12 34:23 35:2
39:25 97:8,16
100:14 121:14
135:5 171:21 220:5
233:8
**show**
67:19 71:7,11,14
84:7 96:19 99:12
101:5 104:19 115:3
115:11 116:17
123:11 126:22
130:24,25 139:8
140:13 147:2 175:2
197:13 217:12
222:14 228:24



231:14
**showed**
110:7 172:14
**shown**
175:13 198:22
**side**
16:25 102:16 113:14
134:23 137:18
222:10 231:11
**sign**
233:7
**Signal**
21:10
**significant**
41:25 42:10
**significantly**
176:20
**similar**
64:19 81:20 100:11
100:13 112:20
113:5 151:16 198:7
200:13 209:7
221:10 226:17
**similarly**
153:11
**since**
14:17 59:16 153:25
154:9,14 226:4
228:7,19
**Singh**
19:3,10,20 20:9,12
20:20 21:8,13,16,20
171:5,7,9,12,24
172:9,23 213:7
214:4,6,12 219:13
**Singh's**
171:23 172:18
**Sir**
195:16
**sitting**
61:7 128:3 129:3
175:16 180:7
181:21 183:25
202:8
**situation**
158:22 159:3 164:11

**size**
70:14 73:10,21,24
74:11 75:12 111:15
126:18,19,21,23
127:2,5,9 137:16
140:3 166:5,8,21
167:9,25 168:17
**slack**
4:20,22 5:5 20:5
21:10 32:7 151:2
155:11,13,13
156:17,18,21 157:2
218:2,11,19 229:16
229:20,23
**slightly**
96:11 137:19 216:25
226:9
**slip**
136:18
**small**
24:11 41:24 230:3
**smaller**
228:16
**snapshot**
223:5
**software**
15:13 17:24 18:7,11
18:16,24 19:14,15
22:13 23:24 78:8
176:9 198:15
207:22 231:19
232:2,9
**somebody**
155:24 156:6 158:10
**somehow**
170:6,14
**someone**
30:5 58:8,14,23 59:2
59:6 62:19 64:7
87:15,22 122:18
157:11 174:6,6
210:4 214:7
**someplace**
123:6
**something**
10:16 20:6 30:6 49:9

52:10 54:24 60:5,14
64:19 71:23 74:6,10
75:4 78:10 84:3,4
98:16 108:23
110:21 113:5
119:19 129:8,9,11
129:17,24 130:21
141:21 147:23
159:4 164:5 166:24
169:9 177:19,21,22
177:24,24 178:2
181:15 189:7
191:20 200:12
201:24 203:6
205:12,16 209:18
209:19,21 210:5
215:3 216:15
219:19 221:10,14
**sometime**
40:16
**sometimes**
8:9 10:6 25:6 46:17
119:5 151:21
213:12
**Somewhat**
31:10 32:2,5 175:18
195:5 210:18
**somewhere**
26:8 50:6 51:3
115:19 162:7,17
**soon**
77:4 80:9 92:11
**sorry**
8:22 16:8 17:4 28:4
29:19 30:14 35:10
45:6 47:17 55:5,12
56:25 57:13 58:25
60:18 67:22 74:18
80:8,21,22 82:23
87:12,13 90:25
99:12,14 100:14
106:7 107:3,23
109:18 110:8,11
111:12 113:10,10
115:14 120:6,16
121:6 127:18 130:2

135:16,24 136:15
137:2 138:4 139:11
141:24 148:14,21
152:14 154:5
155:21 156:3
160:10 161:14
166:13 168:23
170:18 172:24
176:18 182:3
184:23 185:20
191:11 192:22
197:7 203:3 206:24
207:11 208:15
210:12 214:3,8
225:17
**sort**
9:17,18 12:4 14:7
16:4,18 18:5,6,20
20:24 26:12 27:7
41:22 66:16 91:3,7
111:6 129:13 130:8
130:10 156:8 157:2
157:23 162:24
166:23 171:20
176:14 194:18
198:20 212:14
**sorts**
16:10
**sound**
8:13 52:9 203:4
**sounded**
92:8
**sounds**
44:6 64:7 75:24 77:5
77:9
**source**
170:4 186:19,22
189:23 190:4,16
193:5 195:12
198:17,24 203:5,9
206:10,11,13
207:14 208:21,23
211:5,9 212:2,12
213:3,11,14 214:4
214:10,11,13,24
215:7,8,14 216:3,6



216:10 219:23
223:16 224:10,13
224:14,16 225:7
231:18,20 232:3,10
**sources**
186:5,8,12,18 188:14
189:13
**speak**
8:8 11:10 20:22 21:4
60:2 108:23 130:15
130:16 149:19,22
**speaking**
25:20 226:25
**speaks**
8:12
**specific**
23:6 27:6 28:11,19
30:10 37:23 49:25
50:4 55:5,6 56:22
58:6,21 59:13 60:11
60:12 61:2,9 62:7
62:10,22 63:10 70:6
74:7,10 75:4 85:9
87:24 89:10 94:9
95:4,9 108:16,17
109:8,9 110:8 123:2
130:10 159:12
161:19 199:5 206:5
210:23,25 212:4
213:21 215:8
224:20 226:13
**specifically**
13:21 17:13 25:15,16
25:22 26:25 27:4
31:6 36:2 37:15,18
38:5 41:19 43:18
46:21 52:16,19 62:5
67:18 82:19 87:4
100:5 113:4 160:13
162:6 173:19 176:9
177:14 194:16
216:2 219:21
**specified**
180:8,18 202:3
221:24
**specify**

58:19 107:25 181:7
**specifying**
83:8,8
**speculate**
118:16,17 133:22
**speculation**
73:14 77:24 79:25
88:13
**speculative**
133:20
**spoke**
20:20 21:5,8 82:4
149:17 183:9 228:9
**spoken**
150:6
**spot**
5:11 33:14 38:20
56:7 83:23 117:12
198:13 200:10,23
200:25 219:4,20
226:2,7
**spread**
48:20 49:22
**spreadsheet**
4:17,18,19 5:13
129:25 136:5 139:3
140:12
**ss**
234:5
**stamp**
46:5 138:8,9 163:19
**stamps**
138:14 161:23
173:14
**stand**
125:15,19
**stands**
155:18 220:8
**start**
87:12,20 103:5
116:12 214:9
**started**
7:19 26:5,8 27:25
28:6 103:23 121:12
**starting**
27:25 44:2 110:12

150:13 154:24
197:15
**state**
6:17 7:7,13 167:2
234:4
**statement**
134:15
**statements**
12:4
**States**
1:2 2:11 234:8
**stating**
83:15
**step**
75:10
**steps**
63:14
**sticker**
165:22
**still**
9:12 65:21,25 79:4
156:19 165:14
227:9 230:3
**stock**
29:3
**stocks**
29:3,6 224:25 225:5
**stop**
61:24 62:6,9,19 63:8
63:23 64:13
**stopping**
164:19
**store**
205:23
**stored**
93:19 123:8 187:23
188:4
**stories**
22:25
**story**
23:6,7
**Street**
3:4,12
**strike**
17:5 29:19 30:14
34:6 35:11 37:2

40:22 46:7 48:8
67:22 70:22 107:3
110:8 141:24
145:17 148:14
156:4 161:14 171:8
182:6 184:23
**structure**
129:7,18
**stuff**
219:5
**subject**
70:6
**Subscribed**
233:19
**such**
18:8 45:18 46:3,4
84:18 85:12 207:25
212:4 234:11,12
**sufficient**
79:3
**suggest**
126:5 191:9
**suggested**
28:16
**suggesting**
191:14 193:19
**Sullivan**
3:4 6:25
**sum**
111:20,22
**summary**
88:3 214:14
**supply**
39:21 79:22
**support**
5:5 32:7,10,15
229:16
**sure**
41:4 42:7 52:23
62:17 70:8 72:25
76:13 77:8 82:13
87:19 92:21,23
104:15 135:9
143:10 148:6
155:20 160:8
162:25 173:21



174:5 181:25 183:6
190:25 193:18
216:19 218:17,21
226:20 229:2
**surely**
158:14
**swaps**
193:4,6,13
**swear**
7:4
**sweeping**
108:15,15 109:4,4,6
**swept**
109:12
**switch**
93:16
**sworn**
7:6 233:19 234:11

---

**T**

**T**
1:11 3:7 4:6,6,10 5:2
122:3
**tab**
14:19 115:16,22
116:9,14 117:4,9,13
121:4,8 122:13
144:19 231:14
**table**
51:15 125:11,12,17
126:15 128:20
147:3,6 163:5,8
187:7,9,10,11,15,16
187:17 188:25
190:19 193:20
194:24 196:11,20
**tables**
51:7,9 148:23 163:8
163:10,11,15,18
188:16 189:14,16
190:17 191:9,12
**Tackett**
24:18,24 25:4,8,14
25:17,25 26:24
158:22 159:2,19
**Tackett_3AC_000...**

4:15
**tackle**
9:15
**take**
9:22 12:14 19:22
28:3 34:13 43:16
44:4 62:21 69:10,15
77:6 80:9,12,14
85:18 86:6 87:2
92:25 104:6,24
112:8 118:21
119:10 121:15
123:20 143:19
151:22 152:15
154:15 164:20
165:11 197:20
199:22 216:25
217:19 220:5
**taken**
6:9 8:7 121:20
161:17
**taking**
75:10 137:2 177:19
177:22
**talk**
16:18,23 20:14,18
21:2 22:19 23:13
25:8 37:21 39:14
54:6,8 60:22,22
86:3 96:24 108:9
123:4 150:20
152:14 168:7
214:22,25
**talked**
87:16 108:14 110:11
110:16,23 150:25
159:16 183:24
189:18 194:4,14
198:19 208:9
211:13 215:20
223:13 226:3
232:19
**talking**
18:9 22:25 25:14
26:24 27:6 28:2
38:7 39:10 40:5

41:22 42:14 44:21
44:23 46:9,23 51:13
51:16 55:21 65:25
70:2 76:17 78:17
81:9,12 82:8 88:21
91:11,16,20 95:2,3
99:23 103:4 105:24
107:11,25 110:5,11
110:13 122:11
127:3 141:25 142:4
142:6 145:22,25
149:23 153:5 165:6
165:8 166:4 169:6
169:15 173:20
174:22 177:24
185:6 187:6 190:20
190:21 191:13
192:17 195:15
196:6,7,12 199:4
207:4 220:18
223:16,24 226:10
226:14,25 230:13
**tax**
213:20
**taxes**
28:10,13 29:23,23
**teacher**
203:4
**team**
207:23 218:24
**technical**
22:8 133:21
**tell**
10:17 13:15 29:14
52:14 59:12 60:10
60:12 64:2 65:6,21
94:6 109:6 123:12
123:21 125:7
130:13 141:3 206:9
206:16,18
**telling**
51:19 52:17 195:17
231:17
**ten**
63:7,10,10 64:21,23
65:3,4,5,16,20,22

66:2,7,10,15 194:5
**ten-minute**
44:5
**term**
13:11 17:4,6,7 30:11
39:23 43:9 52:7
53:21 54:9,16,24
55:3 71:25 76:3
97:7 131:7 140:22
146:3 156:8 160:25
161:5 162:12,21
163:3 177:9 187:24
188:5 195:4,6
201:13 203:14,17
203:20 205:8
206:10 207:15
230:9,12
**terminology**
13:23 86:4
**terms**
13:21 107:10 108:18
132:7 133:11
148:14 155:11
215:14 225:14
**terms-of-service**
105:18
**testified**
7:8 148:3
**testify**
10:14
**testimony**
12:6 103:11 120:25
200:14 234:12
**text**
21:13 151:4
**than**
11:25 19:16 23:5,5
25:23 32:23 38:13
41:25 58:23 84:4
86:14 90:21 98:22
119:20 132:10
134:7,13 203:9
205:2 214:2 226:7
228:22
**thank**
16:24 24:6 38:15



44:13 78:4 80:11,20
106:7 152:22
154:22 155:12
169:4 174:25
208:20 222:11
227:4 231:6,6
**thanks**
77:9 92:5 108:5
122:6 148:6 165:14
171:16
**that's**
8:21 10:8 12:19
15:10 19:7 28:11
39:13,18 43:10,18
47:19 50:24 51:25
52:10,25 66:16 67:7
82:10 87:13 90:21
92:3 93:17 97:12,12
98:16 102:7 104:8
104:19 108:5,18
113:11,17 119:19
120:7 132:2 134:14
134:15 140:23
141:21 144:13
152:11,22 159:4
165:18 166:20
169:3 171:5 172:21
180:18 185:10
188:25 191:20
193:8 194:20
202:20 221:13
**their**
6:17 29:13 59:3 71:2
71:6,9,16 86:21
96:9 109:12 119:7
119:17,24 158:14
159:20,22 160:4,5
204:12
**them**
9:5 10:21,22 16:21
16:23 35:16,18
54:17 67:10 70:2
71:11 107:14
114:18 123:14
137:13,20 140:7
158:23 162:4

173:15 176:6,8
179:10 204:13,25
205:4 211:18 221:6
226:17
**themselves**
117:10 140:17
**then**
7:4 15:12 20:25
25:16 26:15 34:14
36:16 39:6 58:3
60:21 62:10,14 63:3
63:15,25,25 65:3,4
65:5 70:14 79:11
80:11,14 83:25 84:7
85:3,5 87:18 89:10
90:15 91:7,25 92:10
104:7 116:8 120:3
121:6 125:2 128:12
128:12 130:23
131:9 132:16,22
134:23 152:13
157:6,22 163:25
176:22 191:3
195:17 217:2
218:24 219:11
221:5 228:25
**theory**
61:14
**there's**
17:13 39:20 53:9
70:10,14 90:17
100:16 113:14
116:8 123:6 124:25
137:21,22 139:17
155:14 156:20
159:10,18 163:8
165:22 166:13,14
168:11 191:3
200:18 218:25
219:11 220:2,22
**these**
11:4 13:21 21:7,15
23:10 31:9 39:10
43:17 54:7 68:15
69:23 96:15,19
111:2 112:24 113:3

114:4 128:15 135:2
135:5 137:10
138:15 148:14
149:2 150:12,15,16
150:21,21 151:5,10
151:13,19,19
153:17 155:9
163:11 173:13
175:21 176:3
184:10 199:18
204:15,20 211:14
211:24 212:13
221:23,23
**they're**
36:17 43:6 149:24
219:5
**thing**
9:20,23 27:18 70:8
96:25 124:5,7 151:4
209:10
**things**
12:3 20:11,14,18
22:9,18 28:11,17
30:10,23 31:5,7,22
32:13 85:15,21
122:16 128:6 178:4
204:16 213:13,16
213:17 215:8,16,18
215:19,19,23
226:11
**thinking**
33:20 46:21 75:5
87:10 110:4 130:9
188:6 216:14
**third**
76:24 91:15 156:22
180:10
**those**
8:25 9:2 12:8,17,24
15:25 16:2,3,20
19:22,23 22:7 23:20
24:20 25:3 27:16
28:11 29:5 35:23
38:4,24 39:16 40:14
45:10,12 46:23
47:10 51:9,14 54:16

56:22 57:10 58:4
63:10 64:22 65:5
66:10 85:15 88:6
90:8 91:3 92:7
95:24 101:17
111:23 112:18
116:20 118:6 134:2
142:11,17 144:2,14
150:5 153:11 173:3
185:7 186:22
189:16 191:9 194:5
194:25 195:19
196:16 199:2,14
208:12,19 209:16
211:2,16 213:8,23
215:18,19 223:22
224:8,8 225:17
226:2,12,13,15
232:4,23
**though**
68:4 80:10 162:16
187:9 199:15
**thought**
97:23 215:23
**thread**
157:3
**three**
3:10 6:23 11:8 13:19
13:20,22 29:5 36:11
40:19 45:4,9,18
91:5 126:6,8 133:7
160:23 218:24
230:3
**threearrowscap.com**
219:2
**three-quarters**
77:12
**three-tiered**
176:21
**threshold**
35:6,7,21 37:7
201:18 220:15
**thresholds**
221:24
**through**
27:3,23 34:21 58:15



59:14 63:7 64:8
69:8,20 77:13 79:4
79:8,12,21 87:21
93:20 104:24
112:10,12 123:21
136:14,16 164:13
196:24 197:22,24
215:24 217:19
**ticker**
146:13,15 206:17
**tickers**
205:10
**tied**
148:4
**times**
10:24 11:2 20:3,10
20:21,23 21:5,21
24:11,25 25:2 70:15
73:10,22,24 74:3,11
75:12,19 76:5
111:23 128:16
140:3 150:20,23
197:5,11 202:16,17
202:18 213:10
**timing**
92:7
**title**
19:12 199:12
**today**
6:6 8:16 9:2 10:15,20
12:15 61:7 90:25
128:3 129:3 174:7
174:22 175:16
180:7 181:21
183:25 187:9 189:9
191:6,8 198:23
202:8 205:20 211:5
211:13,22 226:3,14
227:10
**today's**
8:23 9:5 10:21,23
11:11,14 12:9 13:4
204:6 218:4 233:4
**together**
178:6 214:20
**toggled**

219:4,17 220:25
**toggling**
219:24
**token**
56:22 58:6 60:18,19
60:20 61:2,9 62:13
63:14,18,19 64:2,3
64:7 82:22,24 83:5
83:7,9,12,15,16
84:2,10,12 85:8,10
85:12,16 86:22
87:25 89:20 94:7,8
94:9,11,19 95:16,16
95:24 96:9 101:16
102:6,12 113:25
114:9,14,14 116:23
116:24 117:16,22
117:24,25 118:2,24
119:6,16 146:17,20
146:21,22 147:10
186:2,10 194:10
195:9 202:19
208:10,11 225:12
**tokens**
28:14 29:17 30:19,19
30:24,24 38:20
56:11,12,15 59:9,10
71:6,9 79:23 83:20
83:22,23,24 86:22
96:7,11 98:24,25
101:16,17 102:4
103:12 104:4
106:19 107:14
108:15 109:7 110:2
113:15,21,22 114:3
114:4,4,5,6 116:23
117:12,23 118:7
120:4,14 123:2
147:4 185:20,23
186:3,14 194:11
204:17,17
**told**
43:2 166:8 192:10
**ton**
148:2
**too**

80:22 102:9 220:4
**took**
12:21 34:14 44:15,20
51:22 157:18
161:22
**Tools**
33:5
**top**
15:8 68:21 100:16
111:10,13,14
118:12 137:10
145:14
**topics**
69:23 199:12 226:2
**total**
71:22 72:5,6,6,9,12
72:17 110:24
111:20 119:8
128:11 228:6,8,12
228:16,18
**totally**
38:25 42:7 72:25
92:21,22 218:17,20
**towards**
19:11 132:21 229:25
**tracked**
216:10,15,20
**trade**
33:9 49:17 51:25
53:2 78:18,24 79:4
79:8 80:18 82:5
137:25 140:16,20
140:25 157:17
189:20,24 190:5,12
190:20 193:21
**traded**
186:21 190:10,11
**traders**
230:14,16
**trades**
31:2,12,15,20 38:19
38:21,24 39:8,9,11
39:15 45:18 49:14
77:13 78:9,15
143:14 147:23
156:12 161:8,9,12

162:3,5,9 163:4,6
**trading**
1:5 3:3 5:11 6:5 13:7
14:10 33:10,12,14
36:15,16 55:22,25
56:4 57:6 58:15
59:14 61:16,24
62:23 63:7 64:8,20
64:22 66:11 78:18
79:12,21 81:10,15
155:25 156:6,11
157:17 189:5,6
200:10 226:2
232:11 235:2
**trading-related**
29:3
**transact**
48:18
**transaction**
4:17 29:4,7,9 30:18
31:11 45:8,14,22,25
46:2,6 47:22 83:2
84:14 85:24,25
90:14 91:12,22
92:25 93:4,8 122:25
123:3 136:4 141:20
162:22 163:2,6
184:8,9,14,15,19,22
184:25 185:2,4,7,13
**transactions**
29:25 30:11,13,16,21
31:9 40:17 41:2,6
42:17 45:3,10,12,17
46:16,22,24 47:6
48:19 49:4,6,10,19
49:21,22 50:3 54:7
55:17 119:22,24
120:5,15 122:18,23
123:2,7 139:20
156:7,8 161:24,25
162:2,18 163:4
184:15 185:8
**transcribed**
7:20
**transcription**
235:7



**transferred**
184:16
**transferring**
179:10
**transfers**
185:2
**treat**
98:21 102:19 104:3
**treated**
103:8,21
**tree**
135:24
**tricking**
119:12
**tried**
221:6
**troubleshooted**
18:18
**true**
21:23 66:3,10 83:18
    84:4,7 216:6 234:12
**true/false**
83:14
**trust**
13:8 14:2,3
**truth**
10:17 195:11,12
**truthfully**
10:15
**try**
86:4 138:11 139:25
**trying**
30:4 52:13 55:13
    74:19 87:24,25
    90:24 99:6 117:19
    122:18 126:25
    128:4 162:19,20,23
    162:25 167:18
    183:7 191:16
    193:12 214:5 231:2
**Tuesday**
1:15 2:3 6:7
**turned**
37:4
**Turning**
205:8

**Twitter**
157:7,10,12
**two**
11:3,5,8 37:18 38:9
    51:14 56:19 57:24
    75:24 85:15 87:16
    88:6 90:8 91:3,4,19
    92:4,7 99:4 110:11
    124:18 166:24
    191:9 195:19 209:8
    209:16 210:10,12
    215:2 226:9,19,22
    227:7 232:23
**type**
17:9 31:11 100:20
    101:10 105:18
    137:23 139:3
    153:18 186:19
    208:3
**types**
31:9 51:15 53:9 55:6
    55:11 91:19 122:22
    139:12,14 155:9
    214:3
**typically**
137:11 141:13

———————————
**U**
———————————

**uh-huh**
8:2 88:17
**UI**
225:10
**unclear**
10:6
**under**
15:12 44:15 73:11
    126:2 146:4
**understand**
8:2 13:10 17:6,20
    29:23,25 30:4 34:7
    43:10 48:9 53:2,24
    54:3,16 70:16 72:25
    73:11 74:19 79:11
    80:24 83:21 85:18
    102:10 103:20,21
    113:19 114:13

119:16,23 120:3
121:13 123:14
124:15,17 127:2
128:4 139:21 140:2
146:25 147:7,8,21
148:12 156:15
160:3 161:5,7
162:25 167:6 170:3
170:10 174:5
175:19 177:17
191:2 193:18 195:6
195:7 198:10,12
201:9,15 203:17
210:3 219:16 221:8
226:20
**understandable**
10:8
**understanding**
17:9 30:2 34:10
    36:23 37:5 39:2
    53:12 63:21 73:20
    103:16,17 104:3
    106:23,25 114:10
    115:13 116:20
    119:4 122:12
    128:10 131:18,20
    132:2 133:4,5 147:9
    147:24 148:8
    171:21 174:10,13
    179:6,17 202:20,25
    212:14 215:25
    230:6
**understandings**
133:24 134:3
**understood**
10:10 22:3 92:22
    137:21 139:19
    156:8 179:17
    183:25 201:17
**unfortunately**
134:14
**unique**
178:21 179:2
**UNITED**
1:2
**unless**

9:11 13:15 87:23
    107:24
**unsure**
62:4
**until**
104:13
**up**
8:3 9:15 23:15 26:15
    65:25 66:6 79:14
    80:21 83:20 84:7
    100:16 104:9,12
    122:10 129:11,25
    132:12 137:10
    144:19 145:3 148:2
    149:18 151:23
    152:11,19 165:11
    188:18 189:8,24
    190:5 205:20
**updated**
190:10 193:10
**upside**
68:22,23
**us**
7:19 19:2 28:10,13
    29:2,6,23 44:23
    68:16 81:12 94:6
    119:10,11 135:3
    136:10 142:4
    145:25 152:12
    157:19 224:7,11,17
    224:21,22,25 225:3
    225:4,5,8,13,14
    226:15
**USD**
72:4,5 110:21,21,24
    119:2,8 219:6
**use**
13:11 17:4,7 21:9
    47:10 54:18,20 55:3
    71:3,5,6,25 72:13
    76:20 86:4 96:9
    98:8 115:14 160:25
    176:3 180:4 189:21
    190:23 193:19,20
    207:9 226:18 230:9
**used**



21:10 30:11 31:21
43:9 45:4 47:24
48:5,13 53:22 54:8
54:25 62:14 64:3
65:7 78:2 95:6
103:17 130:7 131:2
151:7 177:10 186:4
186:15 188:15,18
188:20 189:13,24
190:5 194:3 195:2
195:13,16 203:21
206:10,14 207:6,7
224:13,15,17 225:7
**user**
99:5 100:14 101:5,9
101:13 110:4 111:7
112:23 116:14
118:13 119:15,23
120:5,14,20 126:2
147:5 226:8,11,22
**users**
61:16 70:25 71:8
119:4 147:5
**user's**
147:10
**using**
13:16 46:19 47:5
52:7 55:12 57:23
84:21 86:5 94:20
95:24 99:6 109:19
119:4 140:22
176:21 212:20
230:11
**usually**
11:5 50:24 101:25
228:11
**utilization**
131:6
**utilized**
130:25
**utilizing**
133:16,18,19 134:5
**U.S**
29:24 213:20

—————— V ——————

**validates**
91:22
**value**
41:22 70:11,16,20,25
73:11 110:22,23
114:21 119:8
128:11 129:8,10
130:22 132:8,9
134:7,11 206:20
207:3
**values**
118:6
**various**
213:10
**version**
105:14,16,17 153:6
198:4,6 200:12
**versions**
198:16
**versus**
27:20 51:21 224:17
**very**
22:8,8 26:16 37:20
41:24 53:8 74:17
93:22 122:10
130:23 134:14
166:12 177:12
203:20 214:8
223:14,15 224:4
226:17
**via**
144:2
**vibe**
164:11
**videoconferencing**
151:12
**videographer**
3:21 6:2,13 7:3 44:7
44:10 81:2,5 121:17
122:5 164:22,25
200:2,5 217:6,9
233:4
**videotape**
6:3
**VIDEOTAPED**
1:13 2:6

**view**
46:8 98:10 116:5
118:11,13
**viewed**
124:21
**viewing**
110:20
**virtual**
20:2
**visible**
71:18 138:22 184:19
**volition**
141:2
**volume**
139:17,19,21,23,25
140:8 156:7

—————— W ——————

**wait**
159:8
**walk**
27:23
**Wang**
231:22 232:5
**wanna**
14:19
**want**
9:9 16:15,18,21
26:21 42:25 43:2
44:4,14 48:9 52:21
54:8 62:21 63:8,9
67:19 69:10 77:20
85:23 86:3 87:19
90:8 92:9,23 93:16
95:10 104:6,12
109:18 119:5 120:8
122:10 123:4,11
124:4,24 127:10
139:15 142:21
152:25 165:25
167:24 172:17
173:22 176:13
190:18,25 193:18
197:13 200:16
217:12 218:11
222:13 223:18

**wanted**
29:24 58:8 61:25
62:19 64:13 143:10
153:17 165:4,15
169:3 174:5 191:6
229:23
**wants**
48:18 58:14
**wasn't**
15:20 16:12,13 41:24
83:19 210:6
**Watkins**
2:7 3:11,16 6:10,12
6:20,22
**way**
33:23 38:14 39:20
41:4 48:12 49:2,5,9
50:6 51:19 52:10,17
53:11 58:15 59:12
60:10,12 61:5 64:11
70:7,25 71:8,15
72:16 76:12 84:7
89:15 98:22 101:3
103:16,20,21
109:20 114:22,22
133:16 140:22
141:3 154:21
169:12 170:8
177:20,23 179:8,9
182:22,25 183:18
188:6 194:8 201:2
234:16
**WAYLAND**
3:13
**ways**
34:24 38:9,17,24
132:6 194:22 209:9
**website**
96:17,20 112:21
117:6 212:20,21,23
212:23,25 223:20
224:5,7,7,12,22
225:11 226:24



231:16
**websites**
224:14 226:19 227:8
**week**
20:10,21,24 21:6,21
**weeks**
11:8
**weight**
203:14,18,19,20
205:8,9,17,23 206:6
206:10,14,16 207:3
207:11,15,19,23
**weird**
219:5
**welcome**
13:13 81:8 122:9
200:8 217:11
**well**
15:20 16:2,12 18:4,8
18:13 20:24 29:12
30:21 31:19 32:2
33:22 41:12 42:12
42:12 53:24 60:16
98:24 103:12 104:8
109:15 115:18
116:10 132:5,7
137:16 141:7
143:18,21 151:16
153:9 162:7 167:11
170:6 183:20
193:22 194:15
207:7 210:8 214:18
228:11
**went**
104:2 129:10
**weren't**
78:19 79:3,13,22
**we'll**
9:8,15,17,18 13:19
152:13 165:11
228:25 233:7
**we're**
13:4,16 41:22 43:11
44:7 70:4 75:11
77:3 82:8 87:19
104:5 107:10

118:19 121:17
133:25 143:10
144:20 149:23
154:16 164:22
165:3,8 167:7,19,20
177:24 192:17
217:13 226:25
232:21
**we've**
44:3 164:16 172:20
174:21 187:9 194:4
194:14 198:19
199:23 210:5
211:13,14 219:5
226:3
**whatever**
207:14
**what's**
34:20 49:15 68:7
123:16 142:24
177:24 182:25
201:21 202:15
229:3
**where**
13:25 35:20 45:16,21
50:2 58:9 59:5
60:15 62:6 65:25
66:6 73:10 76:25
80:17 81:8 88:11,25
89:6 93:18 95:14
96:14 110:18
111:11 116:5,23
122:10 123:6
132:21 138:3
162:25 163:11
176:12,15 183:8
185:19,22 187:2
192:6 193:14
218:22 229:25
**whereof**
234:17
**whether**
35:2 39:25 40:5 41:4
42:4 46:15,23 48:13
51:20 57:13 60:9
66:9 69:5 80:18

82:5,15,22,24 83:5
83:9,11,15 84:12,14
85:8 86:25 107:4
123:3,12 134:3
142:10,16 173:8
180:3 186:12
187:23 189:23
190:4,18,18 195:16
195:24 201:19
206:5 207:14,18,24
216:9,14 220:15
222:8 226:14
**which**
13:14 27:9 28:9
38:20 45:13 49:13
59:12 60:10,12
83:23 90:15 94:3
95:6 96:2,8 115:10
117:24 127:3
128:20 137:15
141:19 143:15
163:5 167:3 170:16
170:20 172:14
178:22 183:13
184:19 189:17
196:17,18 204:3
207:6 208:10
212:21 220:17
222:3 223:24 224:6
228:2 231:19
232:12
**while**
32:6 124:2 233:9
**who**
10:20 14:4 18:23,23
19:5 43:5 79:14,22
140:13,16 150:5
158:8,10 170:23
171:7,12,18 191:15
192:23 211:16,18
211:20 213:2,6,8,9
218:15,18 231:24
232:4,7,9
**whole**
124:5,6 172:6,6
**whom**

6:17 89:20
**whose**
234:10
**why**
15:18,25 29:19 43:2
53:7 74:14 80:13
84:24 86:17 108:20
118:23 119:15
120:22 122:12,21
123:20 131:9
132:18 133:2 140:7
164:20 169:18
172:9 189:3 199:7
205:4
**wider**
138:12
**widespread**
27:7
**will**
6:16 10:6 39:7,8,16
43:10 77:22 94:8,9
99:17 118:21
144:10,15 168:9
219:7
**willing**
49:17
**withdraw**
62:10,22
**withdrawal**
25:21 27:2 94:4,21
94:22 159:12
**withdrawals**
25:11,12,19 26:2,17
26:23 27:12 29:2,6
31:2,13,25 55:17
94:3,13 95:7 103:14
212:9,12,16 216:4
**withdrawn**
63:4,16
**within**
13:8 234:7
**without**
49:20
**witness**
7:2,4 11:21 68:3,24
69:16 77:3,8 80:8



80:22 97:13 104:10
105:6 112:11
113:10 134:24
136:12,21 155:5
175:9 197:23
217:22 222:12,20
229:10 232:17
234:10,13,17 235:4
**wonderful**
135:7
**won't**
144:16 158:4
**word**
5:17 8:20 45:13,16
46:17 47:21 48:14
50:2,6 71:3,5 98:8
115:14 145:24
162:6,10,15 163:25
165:7 170:2,3,14
177:13,18
**words**
45:9,11 73:18 169:23
208:15
**work**
15:16 22:12 23:23
26:10,11,14 27:19
28:9,10 32:9,24
42:19 52:6 102:17
130:14 135:12
144:11 200:19
214:17 216:3
221:12 223:12,12
223:17 225:13
**worked**
16:16 17:21 18:4
28:8 32:17 34:8,11
34:21 46:10 97:20
100:8 114:19 115:6
115:18 117:6
141:22 144:2,3
159:4 205:2 208:24
213:4,6 216:7
**working**
14:14 17:17 20:13,16
20:19 26:16,18,19
27:24 43:7 54:25

55:7,14 97:5,6
105:13 111:8 113:6
115:8 121:12 144:8
171:22,24 198:24
214:2,19
**works**
201:3 217:3 221:7
**wouldn't**
21:2 26:15 28:19
35:17 37:24 53:5
54:18 58:19 71:3
72:13 73:6 75:15
76:19,20 79:16 80:2
85:3,6 89:9 131:14
135:8 178:13
**write**
32:24 103:3,6 105:25
108:24 212:14
**writes**
159:7 221:16
**writing**
18:7 29:22 32:23
33:2 94:16,20
103:18 173:4
211:25 212:5,7,12
215:14
**written**
12:4 90:2 103:17
192:23 215:11
**wrong**
16:10 52:7 223:19
**wrote**
18:17 29:11,20 34:5
94:2,12 100:6 101:6
113:3 172:4 192:14
192:19 231:23,24
232:5,7,13

———————
**X**
———————
**X**
1:4 4:2,10 5:2
**XI00218400**
234:21

———————
**Y**
———————
**yeah**

8:24 9:18 11:21
17:19 33:22 43:21
50:18 52:15,15
54:14 57:22 59:16
59:23,25 61:12
63:13 67:4,4 71:22
73:15 75:5,23 76:19
78:14 80:8,11,15,16
82:8,12 85:24 88:9
88:18,23 89:14
90:13 91:13 93:25
94:18 104:15,18
106:17 107:2,9,12
117:7 120:6,11
121:2 124:7,15
125:18 126:15
127:23 128:19
129:6 130:2,19,21
131:5,6,12,25,25
132:16 141:13
142:9,16,21 143:2
143:25 148:21,23
149:8,15 151:6,18
154:7 160:17
162:19,22 174:3,23
177:16 178:3 190:3
191:20 199:24
207:7 223:15 228:9
232:6
**year**
134:21 143:18,18
227:12,17,22
**yearly**
228:13
**years**
14:16
**Yedidia**
19:5,9,10 20:18 21:3
21:24 219:13
**Yedidia's**
19:12
**yet**
232:21
**York**
2:8,8,12 3:5,5,17,17
6:11,11 7:7 234:4,8

**your**
7:13 8:11 9:20 12:15
12:25 14:4 15:16
17:9 18:10,15,24
21:23 23:15,23
27:15 28:9,13 30:7
32:19 34:10,20
36:22 37:4 47:17
53:12 55:18 60:24
67:3,11 68:10,12
69:4,21 73:2,20
78:8 79:19 97:23
98:10 102:17
103:22 115:13
116:19 122:12
131:17,20 133:4,4
141:7 143:21
144:16 148:8
167:16 168:20
174:10 175:12
176:7 177:16 179:6
188:17 191:23
198:14 200:23
202:20,25 204:7
205:22 211:9
212:11 216:2,18
218:3,7 221:20
225:3 228:6,13
229:19
**yours**
156:21
**yourself**
141:9 153:18
**you'd**
17:13 54:20 106:19
144:12 206:16
**you'll**
9:21 70:10 124:24
200:17
**you're**
10:15 13:13,14 28:2
35:15 43:15 44:14
46:9 48:9 54:13
63:13 88:20,20,21
115:12 128:5 132:7
135:10 191:14



195:17 202:8 227:9

**you've**
30:11 69:19 104:25
112:9 113:5 123:21
136:11 137:9 145:9
148:16 155:3
197:21 217:20

---
**Z**

**Zane**
24:18 158:22 159:8
**zero**
102:9,12 140:9
**zeros**
152:2
**Zhao**
3:18 6:21 152:21
231:5
**Zijun**
3:18 6:21 14:19
136:17
**zijun.zhao@lw.com**
3:19
**Zoom**
135:11

---
**$**

**$1**
157:18
**$10**
64:12,13,17
**$10-bill**
64:13,14 65:16
**$200,000**
227:17

---
**0**

**000000002**
136:4
**000013959**
67:24
**02116**
3:12

---
**1**

**1**

6:4 220:25 235:6
**1A**
14:19
**1:35**
121:21 122:6
**10:11**
44:8
**10:31**
44:11
**100**
91:2 183:6
**100,000**
135:22
**10004-2498**
3:5
**10020**
3:17 6:11
**104**
5:10
**11**
1:7
**11:29**
81:3
**11:42**
81:6
**112**
4:16
**12mm**
220:24
**12:30**
104:6
**12:45**
104:13
**12:49**
121:18,19
**122**
4:8
**123**
5:13
**125**
3:4
**1271**
2:7 3:16
**1275**
6:10
**13**

5:17 166:22
**13th**
167:14
**135**
4:17
**14**
133:8 166:23 167:25
168:18
**14th**
167:4,12
**1401103**
1:21
**144**
4:18
**15**
4:13 5:10 68:4
104:20,21 157:4
**152**
4:19
**154**
4:20
**165**
5:17
**175**
4:21
**18**
5:11 197:15,17
**197**
5:11

---
**2**

**2**
235:6
**2nd**
234:18
**2:46**
164:23
**2:59**
165:2
**20**
104:16,17 217:2
**200**
3:12
**2020**
138:16
**2020-06-12**

132:23
**2021**
14:17 15:13 26:6,8
26:11,14,17,22
27:20 28:7,12
**2022**
20:24 26:3,9,10,13
27:20 28:3 40:16
129:24 130:2,2,4
132:14 133:8
153:25 154:9,14
157:4 161:18
167:25 168:18
169:8 173:9,9,24,25
218:12 229:24
**2022-06-14**
166:14
**2023**
44:2 150:13
**2024**
40:25 67:14 69:6
142:3,19
**2025**
1:15 2:3 6:7 14:4
40:25 233:21
234:18 235:3
**21**
5:13 123:16,17
165:18 229:24
**217**
4:22
**22-11068**
1:8 6:6
**222**
5:4
**229**
5:5
**23**
144:19
**2338882**
125:25
**29**
69:6

---
**3**

**3**



**235:7**

**3AC**
13:20 36:11,14,18,21
36:25 37:4 40:24
42:15,16,22 43:14
43:25 45:2 46:15
47:13 50:7 73:21
120:15 151:20
157:17 158:15
159:3,20,22,24
160:4,10 173:19
187:18

**3AC's**
40:11 41:15 44:22
50:2 141:23 160:14

**3AC-FTX-00558861**
4:16

**3AC-8Blocks**
159:11

**3:58**
218:12

**3:59**
200:3

**30**
1:15 2:3 6:7 235:3

**30(b)(6)**
66:25

**3051**
168:18

**37**
4:13 14:20,21,23,24

**38**
4:14 67:21,25 153:7

**38_amended**
152:3

**39**
4:15 99:16,19

**4**

**4:15**
200:6

**4:45**
217:7

**4:50**
159:19

**40**

4:16 112:4,5 231:5

**41**
4:17 135:16,17,19

**42**
4:18 144:21,22 153:7

**43**
4:19 152:7,8

**44**
4:20 154:17,18

**45**
4:21 175:3,4

**46**
4:22 217:13,14

**47**
5:4 222:14,15

**48**
5:5 229:4,5

**5**

**5**
218:12

**5:09**
217:10

**5:13**
220:2

**5:38**
233:6,13

**54**
165:17 173:6,24

**6**

**6:14**
229:24

**6:54**
221:16

**68**
4:14

**69-25**
5:21

**695**
200:17

**7**

**7**
4:7

**8**

**8Blocks**
159:9,16

**8/29/2024**
69:2

**8:27**
157:4

**9**

**9:11**
2:4 6:8

**961**
77:2

**99**
4:15



# **EXHIBIT 10**

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

---oOo---

In re:                          :
FTX TRADING LTD., et al.,        :
                                 :
            Debtors,             :
                                 :
                                 :
                                 : Case No.
                                 : 22-11068 (KBO)
_____ :



CONFIDENTIAL VIDEO-RECORDED

DEPOSITION OF NISHAD SINGH

October 28, 2025



Job No. 1426591

Stenographically reported by:
LAURA AXELSEN, CSR NO. 6173
    RMR, CCRR, CRR, CRC, RDR



Page 2

```
1              IN THE UNITED STATES BANKRUPTCY COURT
2              FOR THE DISTRICT OF DELAWARE
3                      ---oOo---
4    In re:                            :
     FTX TRADING LTD., et al.,          :
5                                       :
               Debtors,                 :
6                                       :
                                        :
7                            : Case No.
                             : 22-11068 (KBO)
8    _____ :
9
10         BE IT REMEMBERED THAT, pursuant to Subpoena
11   and on Tuesday, October 28, 2025, at
12   9:02 a.m. thereof at 505 Montgomery Street, Suite
13   2000, San Francisco, California, before me, LAURA
14   AXELSEN, a Certified Shorthand Reporter, personally
15   appeared
16              NISHAD SINGH,
17   called as a witness by the Joint Liquidators of
18   Three Arrows Capital.
19                      ---oOo---
20
21
22
23
24
25
```

Page 3

```
1                     APPEARANCES
2
3    FOR JOINT LIQUIDATORS OF
     THREE ARROWS CAPITAL:
4
5        LATHAM & WATKINS LLP
6        BY:  CHRISTOPHER HARRIS, ESQ.
7             ZIJUN ZHAO, ESQ.
8        505 Montgomery Street, Suite 2000
9        San Francisco, California 94111
10       christopher.harris@lw.com
11
12   FOR FTX RECOVERY TRUST:
13
14       SULLIVAN & CROMWELL LLP
15       BY:  CHRISTOPHER J. DUNNE, ESQ.
16            BENJAMIN S. BELLER, ESQ.
17            NAM T. LUU, ESQ.
18       125 Broad Street
19       New York, New York  10004
20       dunnec@sullcrom.com
21
22
23
24
25
```

Page 4

```
1    FOR NISHAD SINGH:
2
3        COOLEY LLP
4        BY:  RUSSELL CAPONE, ESQ.
5             ANU DHILLON, ESQ.
6        55 Hudson Yards
7        New York, New York 10001
8        rcapone@cooley.com
9
10         There also being present via Zoom:  Adam
11   Goldberg, Alexander Muksinov, Christopher Farmer,
12   Jamie Malley, Nacif Taousse, Nicholas Brooks,
13   Zachary Proulx, and present in the deposition room:
14   Vinny Bezerra, videographer
15
16
17
18
19                      ---oOo---
20
21
22
23
24
25
```

Page 5

```
1                       INDEX
2
3                                   PAGE
4    EXAMINATION BY MR. HARRIS            9
5    EXAMINATION BY MR. DUNNE            224
6    FURTHER EXAMINATION BY MR. HARRIS       230
7
8                      ---oOo---
9
10               INDEX OF EXHIBITS
11
12   EXHIBIT      DESCRIPTION          PAGE
13
14   Exhibit 54  Private-ftx-accounting:       41
15         05/05/2021
16   Exhibit 55  Ftx Trading Ltd. Balance Sheet    41
17         As of March 31, 2021
18   Exhibit 56  Private-ftx-accounting:       43
19         11/02/2021
20   Exhibit 57  FTX Trading, Ltd Trial Balance    43
21         As of June 30, 2021
22   Exhibit 58  FTX Trading, Ltd Profit and      43
23         Loss, January -June, 2021
24   Exhibit 59  FTX Trading, Ltd, Balance Sheet,   43
25         As of June 30, 2021
```



Page 6

1   Exhibit 60   Private-ftx-accounting:        66
2        05/26/2021
3   Exhibit 61   Private-ftx-accounting:        69
4        01/21/2022
5   Exhibit 62   Samuel Bankman-Fried trial,    76
6        October 16, 2023
7   Exhibit 63   E-mail dated 6/2/2020 to Kyle   82
8        Davies from FTX OTC
9        Portal[otc@ftx.com]
10  Exhibit 64   Collateral Management          99
11  Exhibit 65   Lines of Credit               120
12  Exhibit 66   Lines of Credit on FTX        125
13  Exhibit 67   Samuel Bankman-Fried trial,   135
14       October 17, 2023
15  Exhibit 68   E-mail dated 3/29/2022 to Andre   137
16       Sterley from Jayesh Peswani
17  Exhibit 69   Code, first line: from        141
18       collections import defaultdict
19  Exhibit 70   Code first line: from decimal   166
20       import Decimal
21  Exhibit 71   Short Message Report, Date Range   178
22       5/6/2020
23  Exhibit 72   Short Message Report, Date Range   197
24       6/14/2022
25  Exhibit 73   Email dated 8/26/2025 to Darby,   201

Page 7

1        Samuel G., et al., from Zane
2        Tackett; attachments
3   Exhibit 74   ftx-admin-activity: 06/13/2022   219
4   Exhibit 75   ftx-adminactions: 6/13/2022    220
5   Exhibit 76   Judgment in a Criminal Case    227
6   Exhibit 77   Exhibit B, Nishad Singh's      228
7        Sentencing Letter
8
9   PREVIOUSLY MARKED:
10       15
11       18
12       20
13       21
14       34
15       39
16       40
17       46
18       48
19
20              ---oOo---
21
22
23
24
25

Page 8

1        VIDEOGRAPHER:  Good morning.  This is the
2   start of media labeled No. 1 of the video-recorded
3   deposition of Nishad Singh in the matter of In re
4   FTX Trading Limited, et al., filed in the United
5   States Bankruptcy Court of the District of Delaware,
6   Case No. 22-11068, parens, KDO.
7        The deposition is being held at 505
8   Montgomery Street, Suite 2000, in San Francisco,
9   California, on October 28th of 2025 at
10  approximately 9:02 a.m.
11       My name is Vinny Bezerra.  I am the legal
12  video specialist from Magna Legal Services.  The
13  court reporter is Laura Axelsen in association with
14  Magna Legal Services.
15       Counsel, please introduce yourselves
16  starting with the questioning attorney.
17       MR. HARRIS:  Chris Harris of Latham &
18  Watkins for the joint liquidators of Three Arrows
19  Capital.
20       MS. ZHAO:  I'm Zijun Zhao on behalf of the
21  Joint Liquidators.
22       MR. CAPONE:  Russell Capone from Cooley
23  LLP on behalf of the witness, Nishad Singh.
24       MR. DHILLON:  Anu Dhillon, also of Cooley,
25  LLP, on behalf of Nishad Singh.

Page 9

1        MR. DUNNE:  Christopher Dunne, Ben Beller,
2   and Nam Luu from Sullivan & Cromwell for the FTX
3   Recovery Trust.
4        VIDEOGRAPHER:  Will the court reporter
5   please introduce yourself and swear in the witness.
6        THE REPORTER:  I am Laura Axelsen, CSR
7   No. 6173.
8             NISHAD SINGH
9        having been duly sworn/affirmed
10            under penalty of perjury
11             testified as follows:
12        EXAMINATION BY MR. HARRIS
13       MR. HARRIS:  Q.  Good morning, Mr. Singh.
14  As I just said, my name's Chris Harris, and I'm at a
15  law firm Latham & Watkins and we represent the joint
16  liquidators of Three Arrows Capital.  I'll probably
17  refer to them as Three Arrows or Three AC.  Is that
18  clear to you?
19       A.  Yes.
20       Q.  And then I probably also will say FTX, and
21  by that I'm talking about FTX Trading and I guess
22  its subsidiaries as well.  Is that clear to you?
23       A.  Yep, clear.
24       Q.  Just some background.  Have you ever been
25  deposed before?



1    A.  No.
2    Q.  Okay.  So let me tell you a few kind of
3  ground rules.  The most important one is if I asked
4  you a question that you don't understand, please
5  just tell me.  It's my job to ask you something
6  clear, and I'll try and do a clear question.
7       Another important thing is the court
8  reporter is taking everything down, but to do that
9  accurately, we're each going to have to pause and
10  not talk over each other.  So I'll do my best to not
11  cut off your answers and you likely should like hear
12  the end of my question and then start giving your
13  answers.
14       Another thing is when you answer you're
15  going to have to use words like say yes and no.  A
16  nod won't appear on the transcript.  So just remind
17  yourself to answer audibly.
18       If you want to take a break at any time,
19  we can do that.  The only exception to that is if
20  there's a question pending you should answer the
21  question and then we can take any breaks that you
22  like.
23       Last thing is you'll probably hear
24  different people objecting.  Unless your lawyer
25  tells you not to answer, you should go ahead and

1  answer.  But other than that, you can go ahead and
2  answer, and you can kind of put the objections
3  aside.  The lawyers and the judge will deal with
4  those at a later point.  Any questions about any of
5  that?
6    A.  That all makes sense.
7    Q.  Okay.  So just to get some more background
8  out of the way, when is the last time you spoke to
9  anyone who -- who was employed by FTX, either
10  current FTX Recovery Trust or a former FTX employee?
11    A.  Very recently in the last week.
12    Q.  Okay.  Who was that?
13    A.  Adam Yedidia.
14    Q.  And why did you speak to Mr. Yedidia?
15    A.  I was talking to him about my wedding.
16    Q.  About what?
17    A.  My wedding.
18    Q.  Your wedding.  Was that recent?
19    A.  Also the last few weeks.
20    Q.  Wow.  Congratulations.
21    A.  Thank you.
22    Q.  Have you spoken to anyone FTX about kind
23  of the matters that led up to FTX's bankruptcy
24  recently?
25    A.  At my wedding, it was referenced.  I don't

1  think any substance was discussed.
2    Q.  Okay.  When's the last time you think you
3  had like a substantive conversation with anyone
4  who -- still at FTX or used to work at FTX?
5    A.  Claire, my then girlfriend, I live with,
6  and so we talk -- it would be hard -- I'm not sure
7  if we have talked about it recently, but it would
8  make sense to me that we might have.
9    Q.  Okay.  Other than your then-girlfriend
10  now-wife, what would be the last time before then?
11    A.  Maybe months ago.
12    Q.  Okay.  Do you recall who that was with?
13    A.  No.
14    Q.  Have you spoken to anyone about -- other
15  than your counsel -- about this deposition?
16    A.  I mentioned to my place of work that I
17  have a deposition today, but not about the substance
18  of it.
19    Q.  Okay.  Have you spoken to anyone about
20  Three Arrows since, for instance, the criminal trial
21  of Mr. Bankman-Fried.
22    A.  It may have come up in proffer sessions as
23  part of my cooperation agreement with the DOJ, and
24  similarly may have come up in proffer sessions with
25  other departments and agencies, SEC and CFTC.

1    Q.  Okay.
2    A.  I don't remember if those are before or
3  after the trial.
4    Q.  Okay.  Have you spoken with FTX's counsel,
5  Sullivan & Cromwell?  Some of the lawyers are here,
6  but it might have been other people.
7    A.  No.
8    Q.  Okay.  What did you do to prepare for
9  today's deposition?
10    A.  I looked at some documents and went over
11  the format of how depositions work with my lawyers
12  and talked through some of the substance that I
13  expect might come up here today, but I'm not sure.
14    Q.  Okay.  And I don't want to go into
15  anything that you -- the substance of anything you
16  talked about with your lawyers.  Let me just see,
17  did you review the claim that Three Arrows has made
18  in the FTX bankruptcy?
19    A.  I read parts of it, but I didn't review it
20  thoroughly.
21    Q.  Okay.  Did you review the objection to
22  that claim that FTX submitted?
23    A.  Similarly, I think I have a very cursory
24  understanding of parts of it.
25    Q.  Okay.  Do you recall any other documents



1 that you reviewed?
2    A.  There were documents that reflected some
3 emails, a Signal chat, Slack threads.
4    Q.  Okay.
5    A.  I think that's the whole universe of docs.
6    Q.  Were those documents that your counsel
7 collected and provided to us?
8    A.  I'm not sure what their process was.  I
9 just know I saw the docs from my counsel.
10    Q.  Okay.  Are you aware that your counsel
11 produced documents from your files to Three Arrows?
12    A.  I don't remember.
13    Q.  Okay.  Do you remember doing any kind of
14 collection on your end to try and find documents
15 about Three Arrows to hand over?
16    A.  Yes.  I can't remember if this was
17 recently or recently and in relationship to the
18 previous proffers I'd mentioned.
19    Q.  Okay.
20    A.  But I do remember looking for documents
21 relating to Three Arrows.
22    Q.  Okay.  But you don't remember if that was
23 in relation to the government information opposed to
24 Three Arrows looking for information.
25    A.  Right.

1    Q.  Okay.
2    A.  May have been both, but I'm not sure.
3    Q.  Okay.  Do you recall what were the, like,
4 locations that you were searching to try and find
5 documents?
6    A.  Do you mean the system I was proximately
7 using or what locations those things would have been
8 populated from?
9    Q.  What they would have been populated from?
10    A.  Signal chats, email threads, exports of my
11 Google Drive from my FTX or Alameda Research
12 accounts -- G-suite accounts, that is, Slack
13 threads.
14    Q.  Okay.
15    A.  And there were also devices -- files on my
16 device that were uploaded to the system I was using
17 to query for these.  I don't know if that last
18 category had anything related to Three Arrows
19 Capital.
20    Q.  Okay.  So the ones that you do recall that
21 you mentioned, those were ones that were -- were
22 they stored on your laptop somehow or you were just
23 able to access them through systems and they were
24 stored elsewhere?
25    A.  The latter.

1    Q.  Okay.  Am I right that you joined -- and
2 I'm going to put aside your prior role when you were
3 at Alameda.  My questions are all about FTX.  So am
4 I right that you joined FTX in mid 2019?
5    A.  Yes.
6    Q.  Okay.  And you were working for FTX
7 Trading; is that right?
8    A.  I'm not sure what the entity was I was
9 working for.
10    Q.  Okay.  What was your role at FTX?
11    A.  I started out as a software engineer, and
12 then I became an engineering manager where I had a
13 few engineers that were -- that reported to me, and
14 then the director of engineering, which the same was
15 basically true, just more engineers.
16    Q.  Okay.  So by early 2022, what was your
17 role?
18    A.  I believe by then I was the engineering
19 director.
20    Q.  Okay.
21    A.  Or director of engineering.
22    Q.  And what were your responsibilities as the
23 director of engineering?
24    A.  Managing other engineers and writing code
25 myself.

1    Q.  Okay.
2    A.  And these are software engineers.
3    Q.  Okay.  Were there particular aspects of
4 the FTX platform that you were responsible for the
5 code for?
6    A.  It was pretty broad spanning, but I was
7 rarely ever the key architect for anything.
8    Q.  Okay.  Was there another individual who
9 was the key architect?
10    A.  Yes.
11    Q.  And who was that?
12    A.  Gary Wang.
13    Q.  Okay.  Were there any -- were there any
14 areas where you were the key architect?
15    A.  Plenty.  Customer support system.  The
16 ticketing is one.  Some elements of authentication.
17 The list goes on.
18    Q.  Okay.  The customer support system, that's
19 a system where customers can ask questions or
20 register complaints.  Is that what that is?
21    A.  That's right.  An inbuilt version of
22 Zendesk.
23    Q.  Okay.  So who did you -- focusing on the
24 2022 time period, at that point, who did you report
25 to?

1      A.  Sam Bankman-Fried and Gary Wang.
2      Q.  What was your relationship with
3  Mr. Bankman-Fried?
4      A.  I had known him very briefly in childhood.
5  We went to the same high school, hadn't spoken for
6  years, and after then I knew him as a colleague.  We
7  maintained a somewhat distant and professional
8  relationship.  I admired him for some time.  In
9  early '22 or maybe late '21 we started growing
10 apart.
11     Q.  Okay.  Why were you growing apart?
12     A.  Different business instincts and he was
13 gone a lot.
14     Q.  And what was your relationship with
15 Mr. Wang?
16     A.  Even more limited.  Gary is a phenomenal
17 coder and was not terribly social, and so I learned
18 and spoke to his code significantly more than to the
19 person.
20     Q.  Did you interact with Mr. -- I'm going to
21 get his name wrong -- Salame?  First off, how do you
22 pronounce that?
23     A.  It varies depend on who you are.  I would
24 call him Salame, as would most people.  The right
25 pronunciation is Salame or Salame.  Something like

1  that.  Although, I'm probably still butchering it.
2      Q.  I'll try Salame.  What was your
3  relationship with Mr. Salame?
4      A.  Honestly, with that pronunciation, I'm
5  going to get tripped up every time.  Would you mind
6  if we said Salame?
7      Q.  Salame.
8      A.  I know it's wrong.  It's what he went by
9  in practice.  We rarely ever worked together.  We
10 are in charge of pretty different spheres of things
11 at FTX or worked on different spheres of things, and
12 so I think I trusted him as an authority in his
13 areas and he likely did me for mine.
14     Q.  What did you view his areas as?
15     A.  Banking, business, relationships with
16 third parties, including large trading firms.
17     Q.  Okay.  Did you have any interaction with
18 Zane Tackett?
19     A.  Yes, plenty.
20     Q.  And what -- can you describe what -- like
21 why would you interact with him?
22     A.  Zane was the -- I believe he was the head
23 of the VIP account team, a team that managed high
24 value accounts on FTX.  They often had lots of
25 additional requests, feature requests for needs,

1  including management of lines of collateral.
2      Q.  Okay.  So was one of your areas of
3  responsibility the lines of collateral?
4      A.  And forgive me.  Lines of credit is the
5  term I meant to say.
6      Q.  Lines of credit, right?
7      A.  I wouldn't say it was an area of
8  responsibility.  I would say that fell under the VIP
9  team.
10     Q.  Okay.  Why would you interact with them --
11 with the VIP team about lines of credit, then?
12     A.  At bottom, many things were ultimately
13 reflected in the coding systems of FTX, including
14 lines of credit.
15     Q.  Okay.  So if they had issues about a line
16 of credit that impacted the code, they would come to
17 you?
18     A.  In some instances.
19     Q.  Okay.  And Three Arrows was one of the VIP
20 customers that fell within Mr. Tackett's purview; is
21 that right?
22     A.  I'm not entirely confident.  I would
23 guess -- I would assume so.
24     Q.  Did you have interactions with him about
25 Three Arrows?

1      A.  Yes.
2      Q.  I'll get back to those later.  Just to
3  back up to how you communicated with people at FTX,
4  I think you mentioned Signal chats and emails.  Did
5  you also use Telegram?
6      A.  I did very rarely.  Although, it was used
7  frequently for talking to other trading firms, if I
8  recall right.
9      Q.  Okay.  You also mentioned Slack threads?
10     A.  Correct.
11     Q.  You mentioned those within people with
12 FTX; is that right?
13     A.  And externally.  There's some support for
14 like externally linked channels.
15     Q.  So -- and in terms of the external
16 communications with customers, I think you said
17 Slack was used.  Was Signal also used?
18     A.  Yes.
19     Q.  Okay.  Were emails exchanged?
20     A.  I rarely wrote emails, but I feel
21 confident that some third parties were -- were
22 spoken to via email.
23     Q.  Okay.  It sounds like you had some
24 interactions with FTX customers, right?
25     A.  Uh-huh.

MAGNA ▶
LEGAL SERVICES

1    Q.   So what would trigger that?
2    A.   The canonical case that they have a
3    technical question or request.  They've observed
4    latency in an area of the system that's confusing to
5    them and they want to know how to avoid it.
6    Something like that.
7    Q.   What do you mean by latency?
8    A.   They might be querying FTX with using it
9    via API in a programmatic way as opposed to on the
10   website.  Performance in those areas mattered a lot
11   to -- VIP customers are highly technical customers.
12   They might have observed a performance issue on our
13   side or just been confused about something or might
14   have wanted to know what best practices are or have
15   suggestions.
16       So for any number of reasons in that realm
17   they may have ultimately ended up speaking with me
18   perhaps after speaking with Zane.
19   Q.   Were there any times that customers would
20   reach out directly to you as opposed to going
21   through Mr. Tackett or someone else first?
22   A.   Almost certainly, but instances aren't
23   jumping to mind.  It would have happened after we've
24   been well-acquainted and about technical topics.
25   Q.   Okay.  Do I have this right also in terms

1    of equity ownership when you were at FTX I guess in
2    the 2022 time period you owned about 6 or 7 percent
3    of the equity of FTX; is that right?
4    A.   That sounds right.  I forget if this is
5    pre or post dilution and so on.
6    Q.   Okay.  Now, you're familiar that FTX had
7    public-facing policies that describe the exchange
8    platform?
9    A.   Right.  I remember there were policies and
10   I remember there were documents that described the
11   exchange.  I'm not sure the extent to which the
12   policies described the exchange.
13   Q.   Okay.  Did you have any role in designing
14   the policies?
15   A.   No.
16   Q.   Okay.  You mentioned documents that
17   described the exchange.  What do you have in mind by
18   those?
19   A.   There were help desk articles.  Articles
20   that would describe how technical elements of the
21   system worked.  The liquidation engine, for example.
22   That description -- I don't know how faithfully that
23   description ever showed up in policies.
24   Q.   Okay.  And when you said -- and I use the
25   word policies and you responded, what did you have

1    in mind when I said policies?
2    A.   Ah, I was thinking about like a legal
3    documents as opposed to descriptive documents.  It
4    might be the case that from a legal perspective
5    there isn't a distinction.  I'm not sure.
6    Q.   Okay.  What -- what policies were you
7    thinking of?
8    A.   Terms of service comes to mind as a thing
9    that I'm not sure described the liquidation engine.
10   Q.   Okay.  Anything else that you would think
11   of as a policy besides the terms of service?
12   A.   I'm not a lawyer.  I'm not really sure
13   what constitutes a policy.
14   Q.   And you may know this.  Some of my
15   questions may sound very uninformed.  It's because
16   the -- at Three Arrows we don't have anyone left who
17   was at the company.  So we've been recreating all
18   this with no one who was actually there.  So some of
19   my questions may sound obvious to you, but we're
20   still trying to figure out how the system worked
21   from people who were there.
22   A.   I wish all bankruptcy companies would ask
23   questions like that.
24   Q.   And then in terms of the help desk
25   articles, I have seen things called explainers.  Is

1    that what you're thinking of?
2    A.   That sounds like exactly what I'm talking
3    about, but I don't know if that was the heading
4    under which it was.
5    Q.   Okay.
6    A.   I don't know if that's what it was
7    classified as.
8    Q.   Okay.  In terms of the help desk articles,
9    did you have any role in preparing those or editing
10   those?
11   A.   Sometimes, yes.  I remember some specific
12   instances.
13   Q.   Okay.  What are the ones you remember?
14   A.   At times, a new coin listings or new
15   futures listings.  There were parameters that
16   related to those assets.  Things that described, for
17   instance, how much holdings of an asset would
18   contribute to collateral.  There were formulas for
19   that in the code.  They'll be parameterized per
20   coin.  Those parameters would get published on -- in
21   these help desk articles and technically over API,
22   and so after listing, I would sometimes go and edit
23   those documents.
24   Q.   So each coin could have a different
25   percentage by which it contributed to the total



1  collateral value; is that right?
2      A.  That's exactly right.  There were other
3  parameters too.  That's a very relevant one.
4      Q.  Would you be the person who would decide
5  what percentage of value for coins should be
6  contributed to total collateral?
7      A.  No.
8      Q.  Who would make that decision?
9      A.  Vary by the case and varied over time.  In
10  many cases ultimately Sam Bankman-Fried would okay
11  it.  There was a, like, listing team, and I don't
12  know what their internal processes were, but they
13  would often tell me when a coin was listing and what
14  its parameters should be.
15      Q.  Okay.  Why did FTX provide like a
16  different percentage of collateral value for each
17  kind of coin?
18      A.  Different assets have different liquidity
19  profiles.
20      Q.  So generally based on the liquidity
21  profile of the coin?
22      A.  That's my understanding, but I didn't make
23  up -- I didn't make the numbers.  So I'm not
24  entirely sure if there were other factors, too.
25      Q.  Okay.  Why would the liquidity profile

1  affect what collateral value a coin should be
2  allocated?
3      A.  A few other things need to be defined
4  first to make sense of that.
5      Q.  Okay.  What do you have in mind?
6      A.  It would be useful to define what
7  mark-to-market value is.
8      Q.  Okay.
9      A.  I'll pose a toy example.  If a customer
10  has 10 Bitcoin, reasonable people will disagree on
11  how much that's worth.  They may want to establish a
12  price by which to multiply by 10 to come up with the
13  value of that portfolio.  And one option for
14  deciding its price is to market-to-market, which
15  means looking at the current prices at which the
16  asset is trading right now, ignoring liquidity,
17  ignoring how much impact selling those 10 Bitcoin
18  may have.
19      Q.  Okay.  And were there any other terms you
20  thought would be helpful to describe before we go
21  back to my question?
22      A.  If we're okay with impact as a term, then
23  no.
24      Q.  By impact, do you mean that selling could
25  itself affect the price?

1      A.  That's right.
2      Q.  Okay.  So let's go back to why is it that
3  the liquidity profile of a coin would affect how
4  much collateral value FTX wants to attribute to that
5  coin.
6      A.  Selling a coin that is illiquid, using a
7  little bit of a tautology here, these things define
8  each other, would result in more impact on a market,
9  more of a price movement.  If somebody had a
10  large -- large holdings in the illiquid coin, it
11  would be reasonable to assume that after having sold
12  those assets they would be worth a smaller fraction
13  of their original value than if that coin was more
14  liquid.
15         To account for those kinds of dynamics,
16  when estimating the value of their current holdings,
17  you might want something like a collateral
18  fraction -- I forget the actual term used -- but
19  varied by the coin depending on its liquidity.
20      Q.  So if a customer owns an illiquid coin and
21  FTX needs to liquidate it, FTX might not recover the
22  full mark-to-market value of that coin?
23      A.  Right, or whoever is selling it.
24      Q.  Okay.  And the reason FTX had these
25  different collateral fractions was because of the

1  risk that in a liquidation, because they're selling
2  these assets to the market, it might drive down the
3  price?
4      A.  Yeah, I think that's the whole reason, but
5  there may also be other reasons.  It's at least a
6  large part of it.
7      Q.  Okay.  Just to go back to the help desk
8  articles, were there any other ones that you recall
9  having a role in editing or drafting besides ones
10  about the adding new coins?
11      A.  Help desk articles related to those two
12  systems I mentioned earlier I almost certainly
13  edited or helped describe to somebody who then go
14  craft the piece.
15      Q.  I'm going to show you a few of them as we
16  go through this.  So if these are ones you think
17  that you had some role in, it would be helpful to
18  let me know.
19      A.  I think I'll be able to remember, but
20  we'll see.
21      Q.  Okay.  We talked about policies.  We
22  talked about help desk articles.  Were there any
23  internal policies for FTX employees?
24      A.  Yes.
25      Q.  Okay.  What do you have in mind?

Page 30

1    A.  I remember at various points -- I remember
2  that in an effort to become more regulated, there
3  were lots of documents that required signing from
4  employees.  I don't remember their contents, and I
5  don't remember -- I don't think I crafted any of
6  them.
7    Q.  Okay.  Do you remember ever noticing any
8  inconsistency between the internal documents that
9  required signing versus the kind of outward facing,
10 whether it's help desk articles or the terms of
11 service?
12   MR. DUNNE:  Objection to form.
13   THE WITNESS:  I don't remember -- yes,
14 although I don't remember if those were ones that
15 required signing.  I do generally remember
16 discrep- -- some discrepancies between what I
17 thought the code actually implemented and what
18 documents described either would or do exist.
19   MR. HARRIS:  Q.  Okay.  And when you say
20 discrepancies between what you thought the code
21 actually implemented and what documents described,
22 are you talking about external-facing documents or
23 internal-facing documents or both?
24   A.  Well, internal ones certainly insofar as
25 they're describing a direction for the code.

Page 31

1    Q.  Okay.  So what -- do you remember any
2  inconsistencies between what the code actually
3  implemented versus the external documents, like the
4  terms of service or the help desk articles?
5    A.  I don't remember if there were
6  differences.  I wasn't familiar with the terms of
7  service, and I don't remember if there were
8  differences there.  With the help desk articles,
9  there aren't any instances that come to mind.
10   Q.  As far as you remember, the help desk
11 articles accurately reflected what the code did?
12   A.  Yes.
13   Q.  Okay.  And was that the goal of the help
14 desk articles to tell customers what was going to be
15 implemented through the code?
16   A.  To some extent.  They're intended as
17 guides for the customers for which some, but not all
18 implementation details mattered.
19   Q.  Okay.  Just so I have it, what are the
20 inconsistencies between the code and the internal
21 documents that you're remembering?
22   A.  This is sort of a blindingly obvious
23 statement really.  I don't mean to make any -- make
24 much of this.  Just saying, you know, frequently
25 when somebody would describe a system that they

Page 32

1  wanted, they might use present tense, and that's --
2  just would not yet exist in like a proposal for
3  features.
4    Q.  Okay.  Anything else come to mind?
5    A.  There were drafts of some documents that
6  might eventually become public that I also remember
7  that -- were the intent of those documents were to
8  describe the exchange as it is that I also remember
9  not accurately reflecting what was in the code.
10   Q.  Okay.  Do you remember what those
11 inaccuracies were?
12   A.  In one instance, I remember that there was
13 a document prepared for something related to
14 licensing in Singapore that didn't describe the --
15 didn't describe some elements of the technical
16 system correctly.
17   Q.  Okay.  Anything else come to mind?
18   A.  Not immediately.
19   Q.  Okay.  All right.  I want to talk a little
20 about the code base, and I think you said you were
21 one of the people who was responsible for developing
22 the code for the exchange; is that right?
23   A.  That's right.
24   Q.  Okay.  Who besides you had authority to
25 make changes to the code?

Page 33

1    A.  Do you mind describing more about what you
2  mean by authority?
3    Q.  Is there anyone else besides you and
4  Mr. Wang who could actually alter the code?
5    A.  Tens of people.
6    Q.  Okay.  Would -- when you were doing that,
7  did you have to get approval from Mr. Wang or
8  someone else in order to make a change to the code?
9    A.  Extremely common practice, yes.  Enforced,
10 no.
11   Q.  Okay.  I've seen a phrase like super user
12 rights.  Is that phrase familiar to you?
13   A.  Yeah.  Details of that might vary by the
14 system, but the term makes sense.
15   Q.  What do you remember that as meaning?
16   A.  Oh, I'm not sure that term was used within
17 FTX technical systems.
18   Q.  Oh, okay.
19   A.  Or not that I immediately remember.
20   Q.  All right.  How about super admin rights?
21 Was that an FTX term?
22   A.  Yeah.  That was a flag that applied to
23 some employee accounts on FTX that were meant for
24 administrative purposes.
25   Q.  Okay.  So what kind of -- what did the



Page 34

1  flag signify?
2      A.  One thing I remember -- the flag was
3  intended as a thing to help the code decide the
4  behavior of the system for those users.  Employee
5  accounts frequently had an admin flag, and by
6  employee accounts here, I don't mean ones that held
7  their personal holdings.  I meant ones used for
8  administrative purposes, like responding to customer
9  support tickets.
10      A super admin flag might -- I don't
11  remember if this is exactly what it did, but it
12  might allow for monitoring the activity of the other
13  admin users.
14      Q.  Okay.  Anything else you recall that would
15  be a function that an employee would get by having
16  this super admin flag?
17      A.  Honestly, it's a really long list, and the
18  code is unambiguous about this.
19      Q.  Okay.  Did you have super admin rights?
20      A.  I did.  De facto, most developers did.
21      Q.  Okay.  The help desk articles, just going
22  back to those for a minute, they were available on
23  the FTX website for customers to view; is that
24  right?
25      A.  They were available under the FTX domain.

Page 35

1  They were hosted by a third party.
2      Q.  Okay.
3      A.  Help.FTX.com, if I'm remembering right.
4      Q.  I wanted to ask some questions about FTX
5  employees accessing a customer's account.  Is that a
6  feature you were familiar with?
7      A.  Right.
8      Q.  So why would an FTX employee need to log
9  on to a customer's account?
10      A.  The most typical case is if a customer is
11  complaining about the state of their account or
12  doesn't understand something.  Should clarify that
13  this way of logging in is read only.  The FTX
14  employee can't do anything.
15      Q.  And is the only way to see what the
16  customer's account is to log on in this read-only
17  fashion?
18      A.  No.  There are different ways to view
19  different properties of the account.
20      Q.  Okay.
21      A.  In some sense, any web UI is just a proxy
22  to the state that lives in a database.  One that
23  most faithfully represents what the customer is
24  seeing is if you also just log in in read-only mode.
25      Q.  Are there -- is there other ways to log

Page 36

1  into a customer's account that provide more than
2  read only access?
3      A.  If you happen to have their credentials.
4      Q.  By credentials, what do you mean?
5      A.  Login, email, password, 2FA code, and so
6  on.  Nothing provided to admins and super admins.
7      Q.  Okay.
8      A.  Unless given by the customer.
9      Q.  Is there some way that the FTX database
10  tracks if an FTX employee is logged on using the
11  customer's credentials?
12      A.  If I remember correctly, yes.  I'm not a
13  hundred percent sure.  I think there was a
14  login_records database table that enumerated all
15  login instances, including read-only logins from FTX
16  admins into customer accounts.
17      Q.  Okay.  So you think that database probably
18  reflects whether it was read-only access or more
19  general access?
20      A.  Good question.  Not sure if it described
21  what form of access the login was.
22      Q.  Okay.  Was customer approval required in
23  order for an FTX employee to log on to a customer's
24  account?
25      A.  Not that I remember.

Page 37

1      Q.  Okay.  Is there -- would a customer be
2  made aware of that access in some way?
3      A.  As a matter of practice, I remember
4  instances in which there -- a customer would ask
5  about a problem, and I would ask them if I could
6  take a look.  I don't think there was something
7  technically in the system that forced getting
8  their -- getting their consent or sending
9  notification.
10      Q.  Okay.  You were not in the finance
11  department, right?
12      A.  Correct.
13      Q.  Okay.  Do you recall who was in charge of
14  the finance department in, like, the early 2022 time
15  period or late 2021?
16      A.  Hmm, in charge is hard for me to be clear
17  on.  I remember people that were involved.
18      Q.  Okay.  Who do you remember being involved
19  from the finance department?
20      A.  Jen Chan.  Ryan Salame.  Sorry.  I'm
21  realizing -- could I go back to calling him Salame.
22      Q.  Yes.
23      A.  Thank you.  Ryan Salame, Caroline
24  Papadopoulos, Jayesh Peswani, Sam Bankman-Fried.
25  Gary Wang was substantially more involved than I



1 was.
2    Q.  Okay.  Did you ever provide information
3 that people in the finance department needed in
4 order to prepare financial statements?
5    A.  Yes, or I should say I provided
6 information that I assume was used for financial
7 statements, but I don't actually know all the ways
8 in which it was used.
9    Q.  Okay.  Did you have any role in reviewing
10 the financial statements?
11    A.  No, I think never.
12    Q.  Okay.  Did you have any interaction with
13 FTX's outside auditors?
14    A.  Yes.
15    Q.  What kind of interactions would you have?
16    A.  They went through a process called revenue
17 testing, as they called it.
18    Q.  Okay.
19    A.  In which they wanted to confirm that the
20 mechanisms by which FTX made revenue lined up with
21 what the code did, and so for each different way FTX
22 could collect revenue, we walked through that in
23 painstaking detail.
24    Q.  When was this testing you remember
25 happening?

1    A.  It happened twice.  I want to say once
2 early '22, once mid '21.
3    Q.  Okay.
4    A.  I'm not confident about those time
5 periods.
6    Q.  Do you recall who the auditors were?  I
7 don't mean their names, but the company.
8    A.  I remember their names and not the
9 company.
10    Q.  Okay.  Who were their names?
11    A.  Petrie was the first name of one person
12 and Andre was the first name of the other.  I'm not
13 sure at some point I remember the name of the
14 company.
15    Q.  Okay.  Do you recall that FTX Trading had
16 audited annual financial statements?
17    A.  Yes.
18    Q.  Did you ever review the final audited
19 financial statements?
20    A.  Not that I remember.
21    Q.  Okay.  Are you aware that FTX on its
22 balance sheets did not include the customer assets
23 as FTX's own digital assets?
24    A.  That makes sense to me.  I couldn't have
25 told you that.

1    Q.  Why do you say it makes sense to you?
2    A.  My layperson's understanding of a balance
3 sheet is that it reflects assets owned by the
4 company.
5    Q.  And you didn't view the customer's assets
6 as owned by FTX?
7       MR. DUNNE:  Objection to form.
8       THE REPORTER:  (Clarification.)
9       THE WITNESS:  Things like title are
10 confusing.  I'm not sure.
11       MR. HARRIS:  Q.  I understand you're not
12 a lawyer.  So I'm just -- like you said, your
13 layperson understanding.  So as a person who worked
14 at FTX, you viewed the customers as owning their
15 assets?
16       MR. CAPONE:  Objection.
17       THE WITNESS:  Similarly title is really
18 confusing to me.
19       MR. HARRIS:  Q.  Did you view FTX as
20 owning the customer's assets?
21       MR. DUNNE:  Objection.
22       THE WITNESS:  Same.
23       MR. HARRIS:  Q.  I don't know what you
24 mean by same.
25    A.  It depends on the precise definitions of

1 ownership, and I don't -- I don't know all that
2 word confers.
3    Q.  Okay.
4       THE REPORTER:  Is this 54?
5       MR. HARRIS:  I think we need to mark them
6 as 54 and 55 because they're not stapled together.
7       MR. DUNNE:  Chris, these will be 54 and
8 55?
9       (EXHIBITS 54 AND 55 WERE MARKED FOR
10       IDENTIFICATION.)
11       MR. HARRIS:  Yes.  So you've been handed
12 two documents.  One's marked 54, and one's marked
13 55.  It looks like -- I'll represent they've been
14 provided by your counsel to us in response to a
15 document request we sent.
16       MR. DUNNE:  I'm sorry, Chris.  Which is
17 which?
18       MR. HARRIS:  54 is the chat and 55 is the
19 balance sheet.
20       MR. DUNNE:  Got it.
21       MR. HARRIS:  Q.  So looks to me this is a
22 FTX group chat called private-FTX-accounting.  Do
23 you recognize that chat?  I don't mean the actual
24 words in it, but the general -- like the chat group?
25    A.  It sounds familiar.  It sounds vaguely

MAGNA ▶
LEGAL SERVICES

1  familiar.
2      Q.  Okay.
3      A.  Yeah.
4      Q.  And do you recall being involved in that
5  chat group from time to time?
6      A.  I'm not sure.  There were some Slack
7  channels in which I would sometimes get questions of
8  full numbers.  I'm not sure if this was one of them.
9      Q.  Okay.  Can you look at the chat, which is
10  Exhibit 54, and just start with the first and most
11  recent -- no, the earliest, which is the top
12  thread -- top of the thread?
13      A.  Uh-huh.
14      Q.  And you see Caroline Papadopoulos writes,
15  "Hi, please see these updated Q1 2021 drafts."
16          Do you see that?
17      A.  Yes.
18      Q.  Okay.  And then if you look at Exhibit 55,
19  it's the attachments, which is a balance sheet and
20  then a profit and loss statement.  Do you see that?
21      A.  I do.
22      Q.  Okay.  Do these look familiar to you as a
23  form that FTX used?
24      A.  Does not look familiar.
25          MR. HARRIS:  Okay.  Let me show you

1  another one of these.
2          (EXHIBIT 56 WAS MARKED FOR
3          IDENTIFICATION.)
4          MR. HARRIS:  Q.  This is going to be 56,
5  and it has three attachments will be 56, 57, 58, 59.
6  Three more.
7          VIDEOGRAPHER:  Excuse me, Counsel.  Can
8  you -- can we fix your mic?  Thank you.
9          (EXHIBITS 57-59 WERE MARKED FOR
10          IDENTIFICATION.)
11          MR. HARRIS:  Q.  All right.  You've been
12  handed Exhibits 56, which is another chat from the
13  private FTX accounting group chat, and then 57, 58,
14  59, which are attachments.  So do you -- first --
15          MR. DUNNE:  How do you want to -- which is
16  which?
17          MR. HARRIS:  Okay.  So 56 is the chat.
18          MR. DUNNE:  Yep.
19          MR. HARRIS:  57 is the FTX Trading, Ltd.,
20  Trial Balance.
21          MR. DUNNE:  Okay.
22          MR. HARRIS:  58 is the FTX Trading Profit
23  and Loss.
24          MR. DUNNE:  Yeah.
25          MR. HARRIS:  And 59 is the FTX Trading

1  Balance Sheet.
2          MR. DUNNE:  Thank you.
3          MR. HARRIS:  Q.  Let me just start with
4  56, which is -- so I'll represent to you these are
5  all documents that your counsel produced to us from
6  your files.  I'm just trying to see what you
7  remember about them.
8      A.  Uh-huh.
9      Q.  And so starting with 56, which is the chat
10  message, it comes to Ruben Pekary, who I understand
11  from his email works at Robert Lee & Associates.
12  Does Mr. Pekary's name sound familiar to you?
13      A.  Yes.
14      Q.  Okay.  What do you remember about him?
15      A.  I remember he worked with Caroline
16  Papadopoulos.
17      Q.  Okay.  And what did you remember him
18  doing?
19      A.  Matters related to accounting.
20      Q.  Okay.  Do you remember Robert Lee &
21  Associates, that firm?
22      A.  Yes.
23      Q.  What -- what was their role?
24      A.  I remember their -- they were involved in
25  tax and possibly more related to accounting.

1      Q.  Okay.  Do you think you had any
2  interactions with Mr. Pekary other than through this
3  private FTX accounting chat group?
4      A.  I remember one instance in which he called
5  me to ask a question about FTT -- locked FTT.
6      Q.  Okay.  Do you remember why he called you?
7  Like why he asked you that question?
8      A.  I expect he was directed to me.
9      Q.  Okay.  Any other instances you remember
10  interacting with him?
11      A.  It wouldn't surprise me if there were a
12  handful, but I don't remember others.
13      Q.  Okay.  If you look at his message --
14  first, he's directing this to Jayesh Peswani.  He
15  was in the finance group at FTX?
16      A.  Right.
17      Q.  He says, "Please see attached for 2021
18  financials as of Q2."
19          Do you see that?
20      A.  Yes.
21      Q.  And it has the names of three attachments,
22  which are 57, 58, 59.  Do you recognize those -- the
23  form of those attachments?
24      A.  No.
25      Q.  Okay.

MAGNA ▶
LEGAL SERVICES

1    A.  Let me double-check.  Yeah, correct, no, I
2  don't.
3    Q.  Okay.  Do you see in his message, so on
4  56, he writes, "In the master expense file, I
5  noticed that we had approximately 8 million in an
6  account called negative account balance for the
7  purposes of zeroing out negative accounts."
8      Do you see that?
9    A.  Yes.
10    Q.  Do you know what that reference is to the
11  negative account balance?
12    A.  I do not.
13    Q.  Okay.  Do you know what it means to zero
14  out negative accounts?
15    A.  I don't know for sure.
16    Q.  Do you have a -- any sense from your work
17  at FTX what that would mean?
18      MR. DUNNE:  Objection.
19      THE WITNESS:  I don't know about from my
20  work at FTX, but I have a sense from just the
21  context of reading this message.
22      MR. HARRIS:  Q.  Okay.  What would
23  your -- what would that sense be?
24    A.  That it related to amounts that FTX would
25  have to -- like, losses in a customer account at FTX

1  would cover.
2    Q.  And just generally why would there be
3  losses in a customer account?
4    A.  It could happen for different reasons.  I
5  have -- I'm not sure what it is in this particular
6  case.
7    Q.  What are the different reasons you can
8  think of why there would be losses in a customer
9  account?
10    A.  One that this might be referring to is if
11  a customer deposited Eth or aimed to deposit Eth and
12  were miscredited perhaps too much and then FTX,
13  recognizing their mistake, unwound some of that
14  deposit, leaving them with negative Eth.  I'm not
15  sure that's what this is describing, but that could
16  be one possibility.
17    Q.  Okay.  Any other possibilities that come
18  to mind?
19    A.  It's possible that liquidations would fail
20  to liquidate an account in time, and if there was a
21  bug in the liquidation system, not one
22  intentionally, could leave an account in a partially
23  underwater set up.  There's the allow-negative flag,
24  which was discussed plenty at trial, that allowed
25  for accounts to go negative.  Yeah.

1    Q.  And if the liquidation failed to liquidate
2  on time, that would be one way in which there might
3  be losses on a customer account?
4    A.  I think in early versions of the
5  liquidation engine quite early, it's possible that
6  could have happened.  I'm not sure if it actually --
7  if it ever actually did.
8    Q.  Okay.  If it did happen, that would be a
9  loss that FTX would then absorb?
10      MR. DUNNE:  Objection.
11      THE WITNESS:  Not necessarily.  It's not
12  totally obvious to me what would happen in those
13  cases.
14      MR. HARRIS:  Q.  Why is it not obvious
15  what would happen?
16    A.  In some sense, FTX will have to pay if the
17  customer doesn't respond.  In another sense, it is
18  the customer's loss, and they should -- they should
19  compensate for it.
20    Q.  Okay.  What do you mean in some sense FTX
21  would have to pay if a customer doesn't respond?
22    A.  If somebody lose it -- in the toy example,
23  somebody loses money at a card table and runs away,
24  I, as the house, have -- I'm stuck with that.  In
25  that sense, ultimately I am eating some loss.  Not

1  that it's a desirable property of the system.
2    Q.  So if an FTX customer had a loss and then
3  didn't pay extra money over to FTX to cover that
4  loss, FTX would have to absorb it?
5      MR. DUNNE:  Objection.
6      THE WITNESS:  I -- confused by some parts
7  of that premise.
8      MR. HARRIS:  Q.  What -- tell me what I
9  was confusing.
10    A.  The FTX system was built aiming to prevent
11  such cases, and so it's unclear to me when and if
12  the predicate fired.
13    Q.  Are you aware of any times where there was
14  a loss by a customer at FTX?
15    A.  Yes.
16    Q.  Were there many such instances?
17    A.  I don't know if there were many.
18    Q.  Was it more than like a dozen?
19    A.  I'm not sure.  It could be about a dozen.
20    Q.  What are the ones you can remember?
21    A.  November 11th, 2022.
22    Q.  And actually all my questions are going to
23  be -- I'm only interested in the period before FTX
24  filed for bankruptcy, if that helps.
25    A.  Yeah.

1      Q.  So any -- can you think of any instances
2  before FTX filed for bankruptcy in which there were
3  customer losses?
4      A.  By which you mean a customer ends up like
5  net negative on the system?
6      Q.  Yes.
7      A.  That situation I described with Eth, I
8  remember -- I don't remember if it was a token Eth
9  that caused this, but I remember there was something
10  akin to it where there was a mechanism for
11  depositing a coin that FTX erroneously counted and
12  so overcredited a customer with.  I don't remember
13  if that's an instance in which the customer didn't
14  pay in the end or not.
15      Q.  I don't -- I don't think I understand the
16  situation why overcrediting would necessarily
17  mean -- would result in a customer loss.
18      A.  If you give me a $10 bill and I misread it
19  as a hundred, and then you go withdraw a hundred
20  dollars from the bank.  So by the time I recognize
21  it was actually $10, someone has a loss.
22      Q.  Okay.  Other than the Eth example, do you
23  remember any other instances where there was a
24  customer loss?
25      A.  Yes.

1      Q.  What do you remember?
2      A.  It was a firm called Crypto Lotus.
3      Q.  Crypto Lotus?
4      A.  Yes.  I don't remember the details about
5  how they ended up in a state of loss, but I remember
6  that they did.
7      Q.  Okay.  When was this example?  Do you
8  remember what year?
9      A.  I don't remember.
10      Q.  Do you think it was 2022 or earlier?
11      A.  It's possible, but I don't remember.
12      Q.  Okay.  Do you remember the rough magnitude
13  of the loss?
14      A.  I think in the tens of millions, but I'm
15  not actually sure.
16      Q.  And who ended up absorbing that loss?
17      MR. DUNNE:  Objection.
18      THE WITNESS:  I am not sure.
19      MR. HARRIS:  Q.  Do you know if the
20  customer covered the loss?
21      A.  I don't know.
22      Q.  Is it possible that FTX absorbed the loss?
23      MR. DUNNE:  Objection.
24      MR. CAPONE:  Objection.
25      THE WITNESS:  It's possible, but I don't

1  know.
2      MR. HARRIS:  Q.  Within FTX, who would --
3  who made the decision what -- how to handle a
4  customer loss?
5      A.  I'm not sure.  It wasn't my area.
6      Q.  Okay.  Ultimately flow up to
7  Mr. Bankman-Fried?
8      A.  In the sense that everything did, and I'm
9  not sure if in other senses, too.
10      Q.  Was there also an incident that some
11  account or accounts invested in MobileCoin?
12      A.  I -- definitely some accounts invested in
13  MobileCoin.
14      Q.  But was there an instance of customer
15  losses as a result of some accounts having invested
16  in MobileCoin?
17      A.  I think there are definitional ambiguities
18  there.
19      Q.  Okay.  What is ambiguous in my question?
20      A.  I don't know that any customer accounts
21  ended up negative.
22      Q.  Okay.  Was there a -- was there a
23  situation where there was a concern that some
24  customer accounts would go negative because they had
25  invested in MobileCoin?

1      A.  Hmm, I don't know if that was a concern.
2      Q.  Okay.  I think you testified about some
3  instance at the criminal trial, right --
4      A.  Yeah.
5      Q.  -- about customer accounts with
6  MobileCoin?
7      A.  Yes.
8      Q.  So what do you remember about that
9  instance?
10      A.  I remember that there was either one
11  account or a suite of accounts that were engaging in
12  some form of exploitative spot margin trading that
13  took advantage of some bad parameters that Gary Wang
14  had set similar to the parameters we were talking
15  about before.  I don't remember the exact details.
16      The concern may not have been that the
17  accounts would end up under water.  It may have been
18  that in liquidating them markets -- like the
19  MobileCoin market would tank or something.
20      Q.  Okay.  And do you recall there was a
21  potential loss in the nine figures?
22      A.  I remember what Sam Bankman-Fried said the
23  loss was -- like I remember he was giving a ballpark
24  amount of loss that Alameda ended up absorbing
25  because of it.  I don't remember like if that was a

MAGNA
LEGAL SERVICES

Page 54

1  realized loss or unrealized loss or what absorbing
2  exactly meant.
3      Q.  What was the ballpark amount of loss that
4  he mentioned?
5      A.  I remember him saying either a billion or
6  high hundreds of millions of dollars.
7      Q.  And you remember that the decision was to
8  have Alameda absorb that loss rather than socialize
9  it among customers?
10     MR. DUNNE:  Objection.
11     THE WITNESS:  That's not exactly what I
12 remember.
13     MR. HARRIS:  Q.  Okay.  What do you
14 remember?
15     A.  I don't remember what the decision was.  I
16 know it resulted in Alameda shouldering something.
17 It's ambiguous to me whether or not that thing was a
18 loss or if it was just a lot of risk in the form of
19 a large MobileCoin position.
20     Q.  Okay.  Do you remember the decision was to
21 have Alameda shoulder that risk rather than have it
22 be allocated among the customer base?
23     A.  Yes.
24     MR. DUNNE:  Objection.
25     MR. HARRIS:  Q.  And I believe you said

Page 55

1  that was Mr. Bankman-Fried's decision as far as you
2  know?
3      A.  As far as I know.
4      Q.  And you don't recall any instance where
5  customer losses were socialized among the customer
6  base; is that right?
7      MR. DUNNE:  Objection.
8      THE WITNESS:  FTX's collapse.
9      MR. HARRIS:  Q.  Okay.  Before the
10 bankruptcy happened, do you recall any instances
11 where customer losses were socialized among the
12 customer base?
13     MR. DUNNE:  Objection.
14     THE WITNESS:  Don't recall any instances.
15     MR. HARRIS:  Q.  Am I right that FTX
16 called socialization of losses -- they used the term
17 clawbacks for that?
18     A.  I think that was a commonly used term for
19 it.  Clawbacks had a few different meanings in the
20 crypto world.  That's the most prominent of them, as
21 I remember.
22     Q.  Okay.  And using that term clawback, you
23 don't recall there ever being a clawback before the
24 bankruptcy, right?
25     A.  Correct.  I don't recall there being

Page 56

1  instances.
2      Q.  Okay.  Let me just look at some of the
3  things in these account statements.  See if you can
4  help me understand what may have been described in
5  them.  So if you look at I think it's 58, which is
6  the -- called profit and loss.  You see the top line
7  item under income there's something called backstop
8  fund revenue?
9      A.  Yes.
10     Q.  Is the backstop fund also sometimes called
11 the insurance fund at FTX?
12     A.  I'm not sure what this line item refers
13 to.
14     Q.  Okay.  Do you remember hearing about a
15 backstop fund?
16     A.  I remember hearing about an insurance
17 fund, and I know there was different terminology
18 used to refer to it.
19     Q.  Okay.
20     A.  Backstop fund makes sense to me as being
21 the same thing.
22     Q.  Okay.  And then if you look under
23 expenses, trading expenses, the first line item is
24 backstop fund expense.  Do you see that?
25     A.  Yes.

Page 57

1      Q.  Okay.  So what do you remember about why
2  the insurance fund or the backstop fund could
3  generate revenue or an expense for FTX?
4      MR. DUNNE:  Objection.
5      THE WITNESS:  I am not confident that this
6  is the insurance fund as I understand it.  So I can
7  speak to the insurance fund part of that question.
8      MR. HARRIS:  Q.  Okay.  So let's talk
9  about the insurance fund, then.  So what do you
10 remember about how the insurance fund could generate
11 expense or revenue for FTX?
12     A.  In the case of a specific form of
13 liquidation, one that went through the backstop
14 liquidity provider system, the insurance fund would
15 be one of three parties involved in a trade where
16 the three parties are the liquidating account, the
17 backstop liquidity provider, and the insurance fund.
18     In the case that an account did not have
19 sufficient collateral to give fair prices to the
20 backstop liquidity provider without itself remaining
21 underwater, the insurance fund would chip in.  In
22 case of where it did, the insurance fund might draw
23 some in the trade.
24     Q.  And you said fair prices, what do you mean
25 by that?

**MAGNA** ▶
**LEGAL SERVICES**

1    A.  Fair in the -- here is a technical
2  meaning.  The code established what -- what fair
3  might mean, which is some amount of distance from
4  the current price at which the liquidated asset is
5  trading such that the backstop liquidity provider
6  doesn't -- is not guaranteed to lose money upon
7  liquidating those funds.
8    Q.  So the backstop liquidity provider would
9  acquire the asset at some price that's better than
10  where asset's currently trading?
11    A.  That's right.  Better for them, worse for
12  the customer getting liquidated.  Though, in this
13  case, better is better mark-to-market, not
14  necessarily marked to where they can actually sell
15  it on average.
16    Q.  Okay.
17    A.  This amount of better aims to reflect
18  exactly how much they could -- how much impact would
19  then result from them selling on the market.
20    Q.  So the customer would get less than the
21  mark-to-market value for the asset in the event of a
22  liquidation?
23    A.  Slightly in the instances I can think of,
24  but I am not confident that's true of all instances.
25    Q.  Okay.  And how did the code determine what

1  was the discount that the customer would receive?
2    A.  I don't remember exactly.  I didn't write
3  this part of the code.  I strongly expect it relates
4  to some of the same factors we were talking about
5  earlier that parameterized different assets.  I
6  expect that there is a parameter or two that relate
7  to this.
8    Q.  Were the customer's assets liquidated at a
9  price that would essentially set the net asset value
10  to zero for the customer?
11    A.  Not in all cases.
12    Q.  In some cases?
13    A.  In some cases.  Though I don't remember if
14  that was a special target in the code or if that's
15  just an outcome that sometimes happened.
16    Q.  Okay.  Were there some cases where the
17  sales price for the assets were set at a -- at an
18  amount that left some net asset value for the
19  customer?
20    A.  Sometimes.  It depended on how liquid the
21  assets were and so on.
22    Q.  Okay.  And there was something in the code
23  that determined that, what price the assets would be
24  liquidated as; is that right?
25    A.  For the automatic liquidation engine, the

1  one that interacted with the insurance fund the way
2  that we're talking about, yes, a hundred percent in
3  the code.
4    Q.  Okay.  For manual liquidations, was that
5  not driven by the code?
6    A.  I -- ultimately, everything still was
7  driven by the code.
8    Q.  Okay.  So was the -- was there something
9  in the code that determined what the sales price
10  would be for manual liquidations?
11    A.  I'm not entirely sure what you're
12  referring to by manual liquidations.  It could mean
13  one of several things.
14    Q.  Okay.  What are the options, I guess?
15    A.  One option is when a customer and FTX
16  decide on a price outside of the -- what the
17  automatic liquidation engine would or one is
18  determined outside of that, but then the code is
19  used to sort of effectuate the trade.
20    Q.  What other options are there?
21    A.  A customer performing those trades
22  themselves.
23    Q.  Anything else?
24    A.  A customer doing so over something like
25  chat via OTC with Alameda.  Although, I don't know

1  if that overlapped with later years at FTX at all.
2    Q.  Could an FTX employee manually sell a
3  customer's assets?
4    A.  In almost all cases, no.
5    Q.  What is the exception or exceptions you
6  have in mind?
7    A.  Developers with access to do so.
8    Q.  Is there anyone besides the developer who
9  could do so?
10    A.  It might have been the case that there
11  were some admin pages on which -- through which
12  customers could do this.  I remember at least one.
13    Q.  What's the admin page you have in mind?
14    A.  The reason I created allow negative in its
15  first instance was for supporting trades of LOCs,
16  forms of FTT, and gave an admin page through which
17  FTX administrators could specify the counterparty
18  for an account and how much locked FTT they wanted
19  to buy and click a button that thereby spent the
20  customer's dollars and gave them locked forms of
21  FTT.
22    Q.  Do you know if Mr. Salame had this admin
23  access where he could manually cause sales of
24  customer's assets?
25    A.  I don't remember if he had access.  I also

MAGNA
LEGAL SERVICES

1  don't remember if this was unrestricted.  It might
2  have only -- the thing I'm talking about now may
3  have only related to FTT.
4      Q.  Just to go back to the insurance fund,
5  if -- we were talking about how it might generate
6  revenue for the -- how a liquidation might generate
7  revenue for the insurance fund.  Am I right the
8  reason it might generate revenue is because when
9  these assets are sold at a better than
10 mark-to-market price that would result in some sort
11 of gain for the insurance fund?
12     A.  Not necessarily.
13     Q.  Okay.  So why is it might result in
14 revenue for the insurance fund?
15     A.  It would have to be sufficiently better.
16 I should say it differently.  I don't remember the
17 code exactly.  The code is extremely clear and
18 unambiguous on this.  That will just answer the
19 question, whatever the code is.  I have my best
20 recollection of it.  Something like the code
21 determined what a minimal and maximal amount of edge
22 mark-to-market for each asset for the size of the
23 amount of assets getting liquidated was appropriate
24 to give the backstop liquidity provider.
25      If there was a difference between maximum

1  amount of edge to charge the liquidated customer and
2  the amount to be given to the backstop liquidity
3  provider, that difference could be deposited to the
4  insurance fund, and I expect that's what we're
5  talking about is insurance fund revenue.
6      In the case that there was -- we
7  weren't -- there wasn't sufficient capital or excess
8  in the customer account to give the backstop
9  liquidity provider a fair price, where fair here
10 means determined by the code, without it going
11 underwater, the insurance fund might chip in for the
12 difference.  Those would be the revenue and cost
13 sides of what -- what ultimately determined the
14 holdings of the insurance fund.
15     Q.  Okay.
16     MR. CAPONE:  Chris, can we take a break?
17     MR. HARRIS:  Sure.  Let me finish this.  I
18 have this one attachment, then we'll be --
19     MR. CAPONE:  Sure.
20     MR. HARRIS:  Q.  Why don't we look at
21 Tab 59 or Exhibit 59, which is the balance sheet.
22 Okay.  The question I had was on -- in the middle of
23 the page, there's a digital assets line item.  Let
24 me know if you see that.
25     A.  I do.

1      Q.  Okay.  So these are -- these figures are
2  in millions if that helps you.  And from looking at
3  it, it looks like the amount of digital assets on
4  FTX's balance sheet increased from about 38 million
5  at the beginning of the year to 414 million by June
6  2021.  Do you see that?
7      A.  Yes, but I'm confused because there are
8  two things that say digital assets with different
9  values --
10     Q.  Yes, there are.
11     A.  -- in adjacent rows.
12     Q.  Well, do you know what the two different
13 line items are?
14     A.  I do not know.
15     Q.  Okay.  And do you know why there might be
16 a negative amount for the first one?
17     A.  Do not know.
18     Q.  Okay.  Do you have any -- from being at
19 FTX, can you think of any reasons why the amount of
20 digital assets that FTX owned would have increased
21 in the first half of 2021?
22     MR. DUNNE:  Objection.
23     THE WITNESS:  Plenty of possible reasons.
24 I'm not sure what -- what is reflected here.
25     MR. HARRIS:  Q.  Like what are the

1  possible reasons you're thinking of?
2      A.  Revenue.
3      Q.  Okay.  Might generate revenue in the form
4  of digital assets?
5      A.  Yes.  If USDC and Stablecoins count as
6  digital assets.
7      Q.  Anything else comes to mind?
8      A.  No.
9      MR. HARRIS:  Okay.  All right.  Why don't
10 we break.
11     VIDEOGRAPHER:  This is the end of Media
12 No. 1.  We are off the record at 10:12 a.m.
13     (The deposition was in recess from 10:12
14 to 10:30.)
15     VIDEOGRAPHER:  This is the beginning of
16 Media No. 2.  We are back on the record at
17 10:30 a.m.
18     MR. HARRIS:  Q.  Before we broke, we had
19 been talking a little about clawbacks.  I just want
20 to make sure I understood one thing.  There was
21 nothing in the code that provided for clawbacks,
22 right?
23     A.  The code didn't implement clawbacks.
24     Q.  So if FTX only decided it wanted to do a
25 clawback, it would have to either create new code or

MAGNA ▸
LEGAL SERVICES

Page 66

1 do it manually; is that right?
2    A.  Right.
3    Q.  And so you're not aware of any rules that
4 said how they would implement a code if they decided
5 to do one?
6       MR. DUNNE:  Objection.
7       THE WITNESS:  I'm not aware of rules
8 outside of the code.
9       MR. HARRIS:  Q.  And you're not aware of
10 rules inside the code either about how to do a
11 clawback, right?
12    A.  Right -- or rather the code didn't
13 implement it.
14       (EXHIBIT 60 WAS MARKED FOR
15       IDENTIFICATION.)
16       MR. HARRIS:  Q.  Okay.  You were handed a
17 couple of new documents want to ask you about.  The
18 first one is marked Tab 60.  This is another
19 document provided by your counsel from this private
20 FTX accounting chat group.  And this was dated
21 March 26, 2021.  And this is one where you did
22 comment on, if you look on the second page.
23       MR. DUNNE:  May 26th I think you mean,
24 Chris.
25       MR. HARRIS:  Q.  Yes, thanks.  So if you

Page 67

1 see right before you comment, Mr. Bankman-Fried
2 sends a message with sort of four paragraph number
3 items in it.  Do you see that?
4    A.  Uh-huh.
5    Q.  And then you respond, "Done with code
6 reviews.  Custody is next."
7       Do you see that?
8    A.  Yes.  It's not clear to me I'm responding
9 to him.  I do see my message.
10    Q.  Okay.  Do you remember this chat exchange
11 at all?
12    A.  Not particularly.
13    Q.  Okay.  What do you think you were
14 referencing when you said done with code reviews?
15    A.  I expect that related to revenue testing
16 in which the code would be reviewed.
17    Q.  I see.  And then you said, "Custody is
18 next."  What do you think that was -- you were
19 referring to?
20    A.  Likely about reviewing the code that
21 related to wallets with the same group.
22    Q.  What does that mean the code that related
23 to wallets?
24    A.  There was code that mediated depositing
25 and withdrawing and interacting with FTX's hot

Page 68

1 wallets.
2    Q.  So depositing is when a customer has some
3 assets outside of the exchange and then they deposit
4 them onto the exchange?
5    A.  Exactly.
6    Q.  And what did you mean by hot wallets?
7    A.  Hot wallets are the -- were the industry
8 term for an omnibus wallet an exchange would have
9 from which customers could withdraw, but that they
10 did not directly deposit to.
11    Q.  Okay.  So you're talking about interacted
12 with FTX's hot wallets that would be the transfer
13 from the customer-specific wallet they deposited
14 into and then those digital assets were then
15 transferred to the FTX hot wallet.  Is that what
16 you're referring to?
17    A.  Sorry.  I lost the track of the question.
18    Q.  Okay.
19    A.  Do you mind restating it?
20    Q.  I was trying to understand when you were
21 talking about what you thought this custody is next
22 is referring to.  You said there was code that
23 referred to the hot wallets.
24    A.  Yes.
25    Q.  So there was code that dealt with FTX's

Page 69

1 custody of customer assets; is that right?
2    A.  Insofar as it related to hot wallets and
3 deposit wallets, yes.
4    Q.  Okay.  And was this review of that code
5 something you were doing on behalf of the auditors
6 or at their request?
7    A.  I don't know if it was at their request or
8 at Jayesh or someone else's request internally.
9    Q.  Do you recall why they were having you
10 do -- someone was having you do this review of the
11 code that related to FTX's custody of customer
12 assets?
13    A.  Nothing more specific than that.  It was
14 part of the technical audit.
15    Q.  Part of the what?
16    A.  The technical audit.
17       (EXHIBIT 61 WAS MARKED FOR
18       IDENTIFICATION.)
19       MR. HARRIS:  Q.  If you can look at the
20 next document, which is Tab 61.  It's another
21 exchange in this chat group.  This one's from
22 January 21st, 2022.  Do you see that?
23    A.  Yes.
24    Q.  Okay.  And it looks like it starts with
25 Mr. Peswani directing a message to you and to

MAGNA
LEGAL SERVICES

1  Mr. Wang, right?
2      A.  Uh-huh.
3      Q.  He says, "Thanks for the above.  Could we
4  get the following items to close out some of the
5  bookkeeping for 12/31."
6          Do you see that?
7      A.  Yes.
8      Q.  Okay.  And then do you recall why he was
9  asking for this transaction information?
10     A.  I don't know why he was asking for it.
11     Q.  Okay.  If you look on the next page, you
12  see in the middle of the page you send some files,
13  fills, Air Drops, transfers, deposits, withdraws.
14  Do you see that?
15     A.  Yes.
16     Q.  Are those directly exported from the code
17  base?
18     A.  They're exported from the database using
19  the code base.
20     Q.  Okay.  Do you have an understanding why
21  those would be useful to Mr. Peswani and the finance
22  group?
23     A.  Probably they were related or inputs to
24  his financials.  I don't have details beyond that.
25     Q.  Okay.  Do you know if anyone could modify

1  the data in the database that gets exported?
2      A.  Anyone could append a transfer, deposit,
3  withdrawal, or fill --
4      Q.  Okay.
5      A.  -- by performing transfer, deposit,
6  withdrawal, or fill.
7      Q.  What does that mean to append a transfer,
8  deposit, withdrawal, or fill?
9      A.  Any time I make a withdrawal, I implicitly
10  add a withdrawal to the row to the database thereby
11  modifying it.
12     Q.  Okay.  Other than actually entering a new
13  transaction, is there any other way to modify this
14  data that was exported?
15     A.  Do you mean modify the source of the data
16  from which it's exported?
17     Q.  Sure.
18     A.  Anyone with direct access to the database
19  technically had that ability.
20     Q.  Okay.  Your message after the one that
21  attached you write, "Oh, to be clear, balances are
22  in" -- and then you mentioned a couple Google Drive
23  locations.  Do you see that?
24     A.  Yes.
25     Q.  So what were you referring to by balances

1  there?
2      A.  I expect it was one more of the files that
3  isn't enumerated in the previous message.
4      Q.  Okay.  Do you recall why balances would be
5  on a Google Drive?
6      A.  No.
7          MR. HARRIS:  Okay.  All right.  You
8  mentioned the terms of service before.  So I want to
9  show you -- see if they spark any memories.  So this
10  one was previously marked.  So it already has a
11  sticker on it.  It was previously marked Exhibit 15.
12         (EXHIBIT 15 PREVIOUSLY MARKED FOR
13         IDENTIFICATION)
14         MR. HARRIS:  Q.  So this is the May 2022
15  version of the terms of service.  Do you think --
16  have you ever seen this before?
17     A.  It's possible.
18     Q.  Do you remember looking at it before?
19     A.  Not during my time at FTX.
20     Q.  But you think afterwards in one of your
21  different preparations meetings you might have?
22     A.  I may have, right.
23     Q.  Okay.  Do you know was the code designed
24  to be consistent with the terms of service?
25         MR. DUNNE:  Objection.

1          THE WITNESS:  I know what the code did.  I
2  don't know -- and the code was not itself
3  constrained by the terms of service or didn't
4  directly refer to it.
5          MR. HARRIS:  Q.  When you say the code
6  wasn't constrained by, what do you mean?
7      A.  I mean the terms of service aren't
8  themselves code.
9      Q.  All right.  Did anyone ever tell you about
10  instances where the code was inconsistent with the
11  terms of service, or did you ever become aware of
12  any instances like that?
13     A.  Not directly.
14     Q.  All right.  I'm just going to ask you
15  about one section in here, which is -- it's section
16  8.2.  It's on page 10 of the document.  All right.
17  So the section heading is 8.2 digital assets, and
18  then the part that I'm going to ask you about is
19  8.2.6.  Let me know when you see that part.
20     A.  I see it.
21     Q.  Okay.  And then do you see it says,
22  "8.2.6, all digital assets are held in your account
23  on the following basis," and then A is title,
24  "Digital assets shall at all times remain with you
25  and shall not transfer to FTX Trading.  As the owner

Page 74

1  of digital assets in your account, you shall bear
2  all risk of loss such digital assets."  You see
3  that?
4      A.  Yes.
5      Q.  Okay.  And then 8.2.6B says, "None of the
6  digital assets in your account are the property of
7  or shall be loaned to FTX Trading."
8      Do you see that?
9      A.  Yes.
10     Q.  Was that consistent with your kind of lay
11  understanding that customers owned the digit assets
12  and FTX did not?
13     MR. DUNNE:  Objection.
14     THE WITNESS:  I continue to find the legal
15  concept of ownership like just very detailed and
16  confusing.  I'm not sure how it applies --
17     MR. HARRIS:  Q.  Sure.
18     A.  -- in different cases.
19     Q.  But I'm just asking about your lay
20  understanding.
21     A.  Even there --
22     MR. DUNNE:  Objection.
23     THE WITNESS:  I'm -- ownership is still
24  ambiguous in different cases.
25     MR. HARRIS:  Q.  Okay.  Well, did anyone

Page 75

1  at FTX ever tell you that customers didn't have
2  ownership asset in their assets -- didn't have
3  ownership of their assets?
4      A.  Not that I remember.
5      Q.  Did you ever tell customers that?
6      A.  Not in those words.
7      Q.  In any other words?
8      A.  Liquidation is necessitate that customers
9  don't at all points have full control over their
10  assets.
11     Q.  Did you ever tell customers they didn't
12  own their assets?
13     A.  Not in those words.
14     Q.  Okay.  Do you remember anyone within FTX
15  ever saying that they thought customers didn't own
16  their assets?
17     A.  Don't remember.
18     Q.  Am I right that the code reflected each
19  customer's entitlement to a certain amount of each
20  type of asset?
21     MR. DUNNE:  Objection.
22     THE WITNESS:  Similarly, I don't know how
23  to interpret entitlement.
24     MR. HARRIS:  Q.  What did the code
25  reflect about customers' relationship to the assets?

Page 76

1      A.  It showed --
2      MR. DUNNE:  Objection.
3      THE WITNESS:  -- a value for each asset
4  that they -- that was in their account.
5      MR. HARRIS:  Q.  Okay.  Was there
6  anything in the code that indicated that FTX owned
7  the assets that were allocated to a customer's
8  account?
9      MR. DUNNE:  Objection to form.
10     THE WITNESS:  Liquidations implied
11  different sets of controls of assets.
12     MR. HARRIS:  Q.  Okay.  Before
13  liquidation occurred, was there anything in the code
14  that indicated that FTX owned the customer's assets?
15     MR. DUNNE:  Objection.
16     THE WITNESS:  Not sure owned was even a
17  term used on behalf of any party in the code.
18     MR. HARRIS:  Q.  Now, at the criminal
19  trial you testified the customer assets were
20  different from FTX's assets and were different from
21  Alameda's assets, right?
22     A.  I don't remember what I testified.
23     MR. HARRIS:  Okay.  Why don't we pull out
24  your transcript?
25     (EXHIBIT 62 WAS MARKED FOR

Page 77

1      IDENTIFICATION.)
2      THE REPORTER:  This is 62.
3      THE WITNESS:  Thank you.
4      MR. HARRIS:  Q.  All right.  You were
5  handed Exhibit 62, which is a copy of the transcript
6  from your testimony at Mr. Bankman-Fried's trial.
7  Have you ever reviewed this before?
8      A.  I read parts of it before.
9      Q.  What was the context where you went back
10  and reviewed parts of your transcript?
11     A.  I don't know if there was a purpose.  I
12  think I was curious if I remembered it correctly.
13     Q.  At some point someone gave you a copy of
14  it, I guess?
15     A.  Right.
16     Q.  Okay.  Do you remember in whatever you
17  reviewed ever finding something inaccurate in what
18  you testified to?
19     A.  No.
20     Q.  Sitting back and thinking about what you
21  said, is there anything you can think of that was
22  incorrect?
23     A.  No.
24     Q.  Okay.  I assume you were doing your best
25  to be as honest as you could and accurate at the

MAGNA
LEGAL SERVICES

1 time?
2    A.  I was.
3    Q.  Okay.  I wanted you to look at page 1364.
4    A.  Okay.
5    Q.  Okay.  And then at the bottom 1364 in line
6 24 -- line 25.  I'm sorry.
7    A.  Uh-huh.
8    Q.  Do you see you testified, "There is only a
9 few sources of funds that compromise what's in FTX's
10 wallets.  There's FTX's revenue, then there's
11 customer assets, less Alameda, and there is Alameda
12 assets."
13       Do you see that?
14    A.  Yes.
15    Q.  Okay.  And was that testimony accurate?
16    A.  Seems accurate to me.
17    Q.  Okay.  Do you recall you also testified
18 that collateral or liquid assets the customer owned
19 that can be used as a safety buffer?
20       MR. DUNNE:  Objection.
21       THE WITNESS:  There are couple of loose
22 terms there.
23       MR. HARRIS:  Q.  Okay.
24    A.  I don't remember exactly what I said on
25 the matter.

1    Q.  All right.  Well, let's -- if you can go
2 to page 1385.  Okay.  And then if you look at line
3 15, you see you were asked what's collateral and you
4 answered, "Real liquid funds that the customer owned
5 used as safety buffer."
6       Do you see that?
7    A.  Yes.
8    Q.  Was that accurate?
9    A.  Yes.
10    Q.  Okay.  And you see you explained on lines
11 20 to 22 that by liquid funds you meant things like
12 dollars or Bitcoin or other tokens, right?
13    A.  Yes.
14    Q.  Was that accurate?
15    A.  Yes.
16    Q.  And we started talking about this a
17 little, but when a customer deposited digital assets
18 into FTX, they would go into a unique customer
19 deposit address, right?
20    A.  Yes.
21    Q.  Okay.  And did you view that as the
22 customer giving ownership to FTX?
23       MR. DUNNE:  Objection.
24       THE WITNESS:  I knew what -- how the code
25 functioned around it.  I'm not sure I imposed a

1 separate meaning of ownership over anything.
2       MR. HARRIS:  Q.  Okay.  And then FTX
3 would then transfer that digital asset from the
4 customer-specific wallet to one of these omnibus hot
5 wallets, right?
6    A.  Exactly.
7    Q.  Okay.  And did you view that transfer as
8 depriving the customer of their ownership of a
9 digital asset?
10       MR. DUNNE:  Objection.
11       THE WITNESS:  Similarly, I remember what
12 the code didn't practice and didn't really impose
13 separate meanings of legal ownership on top of that.
14       MR. HARRIS:  Q.  Do you remember anyone
15 from FTX ever saying to you or anyone else that that
16 transfer deprived the customer of ownership of their
17 asset?
18    A.  Don't remember anyone saying that.
19    Q.  Okay.  And likewise customers could
20 purchase digital assets on the exchange, right?
21    A.  Correct.
22    Q.  Okay.  And when they purchased an asset,
23 that asset was in the omnibus wallet, right?
24       MR. DUNNE:  Objection to form.
25       THE WITNESS:  In cases I can think of,

1 yes.  There are exceptions.
2       MR. HARRIS:  Q.  What are the exceptions
3 you have in mind?
4    A.  Locked FTT comes to mind is one.
5    Q.  Where would the locked FTT be located?
6    A.  The locked forms of FTT didn't have
7 digital asset correlate.
8    Q.  So they weren't in a wallet at all?
9    A.  Right.  The FTT was, not the locked form.
10       THE REPORTER:  (Clarification.)
11       THE WITNESS:  The FTT was in -- was, but
12 not the locked form.  Was in the wallet.  Locked
13 form was not.
14       MR. HARRIS:  Q.  When customers would
15 purchase a digital asset on the exchange, was there
16 a notification sent to them?
17    A.  FTX did support trade notifications or
18 fill notifications, but they were configurable for
19 each user.  So depended on the customer and settings
20 and so on.
21    Q.  So a customer could select a setting that
22 would send them a notification?
23    A.  I believe so.  I don't remember a hundred
24 percent if it was for trades or only for other
25 activities.

MAGNA
LEGAL SERVICES

1        MR. HARRIS:  Okay.  Why don't we do
2   Tab 11.
3        (EXHIBIT 63 WAS MARKED FOR
4        IDENTIFICATION.)
5        MR. HARRIS:  And -- okay.  You've been
6   handed what's marked Exhibit 62, which is an
7   email --
8        MR. DUNNE:  63, I think.
9        MR. HARRIS:  Q.  Oh, 63.  Sorry.  Thank
10  you.  63.  It's an email from OTC@FTX.com address,
11  and this one's addressed to Kyle Davies at Three
12  Arrows Capital.
13       A.   Yes.
14       Q.   And the subject is trade confirmation
15  Three Arrows Capital.
16       A.   Yeah.
17       Q.   Is this an example of the kind of trade
18  confirmation that customer could choose to have
19  generated?
20       A.   No, this is not an example of the ones I
21  had in mind.
22       Q.   Okay.  Let's start with what you had in
23  mind.  What did you have in mind?
24       A.   Ones issued by the HKG code repo related
25  to the FTX trading platform as opposed to the FTX

1   OTC portal.
2        Q.   That's a term I haven't heard of.  What is
3   HKG code repo?
4        A.   The GitHub repository under which most FTX
5   exchange code lived was called HKG.
6        Q.   Okay.  And so it was possible for trade
7   confirmations to be generated from that portal?
8        A.   Right.
9        Q.   Okay.  Do you remember what they looked
10  like when they were generated?
11       A.   The website had a little pop-up in one of
12  the corners that gave details about the trade.  I
13  don't remember if there were other things it did.
14       Q.   Okay.  Did it -- do you know if it ever
15  generated like messages or emails or anything that
16  reflected the trade confirmation besides a pop-up?
17       A.   Not that I remember.
18       Q.   Okay.  Okay.  Now, looking at this one, do
19  you have an understanding what this Exhibit 63 is?
20       A.   Yes.
21       Q.   Okay.  What is this?
22       A.   This is a OTC trade notification given by
23  a different platform.
24       Q.   Okay.  And what's that platform?
25       A.   The OTC portal.

1        Q.   And how did the OTC portal differ from the
2   trading platform?
3        A.   Entirely different code.  Predates FTX.
4        Q.   Okay.  Were you involved at all in the OTC
5   platform?
6        A.   Minorly.
7        Q.   Okay.  When -- if people made -- if
8   customers made purchase on the OTC platform, was
9   that also custodied at FTX in the hot wallets?
10       A.   I don't remember the exact custody set up.
11       Q.   Okay.  Do you remember what -- going back
12  to the HKG code portal and the confirmations that
13  could be generated, do you remember what they said?
14       A.   No, but the -- like with most things, the
15  code is unambiguous on it.  I just don't remember.
16       Q.   Okay.  I think you did have a role in
17  designing the code for the user interface; is that
18  right?
19       A.   In many areas, yes.
20       Q.   Okay.  So I wanted to ask you some
21  questions about what the user interface showed.
22  This is an example of the ones where I don't have
23  someone who was there at the time.  So I'm going to
24  ask you what you remember.  Am I right that the user
25  interface would show for the customer a separate

1   balance for each kind of digital asset?
2        A.   Yes, though customer needs some defining.
3        Q.   What's ambiguous about customer?
4        A.   There are a couple different things that a
5   customer could mean.
6        Q.   Okay.
7        A.   Could mean the thing into which they log
8   in, which owns many sub accounts.  Could be any
9   specific sub account and looking at it in
10  particular.  Could mean, though, maybe in rare cases
11  a customer sort of configured way looking at
12  properties of many accounts each of which have many
13  sub accounts.
14       Q.   Okay.  You're saying a customer could
15  refer to just the owner of a particular sub account?
16       A.   Right.  Could.
17       Q.   Or it could refer to someone who has
18  rights to a collection of accounts?
19       A.   Right.
20       Q.   Okay.  So when a customer looks at a
21  particular sub account, they can see the balance for
22  a particular kind of digital asset; is that right?
23       A.   Right.
24       Q.   Okay.  So they could view like a Bitcoin
25  balance for that account, right?

1    A.  Right.
2    Q.  And they could also view the -- like the
3  USD balance for that account?
4    A.  Right.
5    Q.  And any of those accounts could be
6  positive or negative; is that right?
7    A.  Yes, subject to constraints in their own
8  relationships.
9    Q.  Okay.  And they could also view a net
10  account balance; is that right?
11    A.  I believe that was shown both per sub
12  account and cross sub account under the same login
13  in places in the UI.
14    Q.  And is it right that unless the allow
15  negative feature was enabled the accounts were all
16  supposed to have a positive net account balance?
17    A.  I don't know what is supposed to, but I
18  can speak to what the code did or didn't allow.
19    Q.  Okay.  What did the code allow or not
20  allow on it?
21    A.  The liquidation engine attempted to
22  prevent accounts from ever being negative.
23    Q.  Okay.  Am I right that at times, though,
24  accounts did go negative?
25    A.  Yes.

1    Q.  Okay.  So it wasn't that the code
2  prevented an account from ever being negative,
3  right?
4    MR. DUNNE:  Objection.
5    THE WITNESS:  Prevent is a little
6  ambiguous.
7    MR. HARRIS:  Q.  It was possible for a
8  code to be negative, right?
9    A.  Possible --
10    MR. DUNNE:  Objection.
11    THE WITNESS:  -- for an account to be
12  negative, yes.
13    MR. HARRIS:  I'm sorry.  Possible for an
14  account to be negative.  The code didn't -- let me
15  strike that.
16    (EXHIBIT 39 PREVIOUSLY MARKED FOR
17    IDENTIFICATION)
18    MR. HARRIS:  Q.  You've been handed what
19  was already marked Exhibit 39, and this was produced
20  to us by the FTX Recovery Trust as a stand-alone
21  document, but it appears to me as a -- some sort of
22  screenshot of the exchange platform, and I'll
23  represent to you the file name suggests it was taken
24  on June 14th, 2022.
25    Does this look to you like a screenshot

1  from the user interface?
2    A.  Yes.
3    Q.  Okay.  And you see there's a number of
4  tabs at the top?
5    A.  Yes.
6    Q.  Okay.  And it looks to me like the one
7  selected here is collateral explainer, and what is
8  that?
9    A.  I can speak to what it says, but I didn't
10  write this.  I didn't write the code for this
11  particular frame.
12    Q.  Okay.  Have you ever interacted with the
13  code for this frame?
14    A.  It's possible, but I don't remember.
15    Q.  Okay.  Do you recall what the collateral
16  explainer was?
17    MR. DUNNE:  Objection.
18    THE WITNESS:  Similarly, I can make sense
19  of it from what's here, but I don't independently
20  remember --
21    MR. HARRIS:  Q.  Okay.
22    A.  -- what it was about.
23    Q.  All right.  Well, let me see if there's
24  anything in here that triggers a memory.  See it
25  begins by saying, "The page provides an overview of

1  how your open positions and balances contribute to
2  your collateral.  For more details on how trading on
3  margin works, see the" -- then it says spot margin
4  training explainer in blue.
5    Do you see that?
6    A.  Yes.
7    Q.  Okay.  Does that suggest that you could
8  click on that it would pull up that document, the
9  spot margin trading explainer?
10    MR. DUNNE:  Objection.
11    THE WITNESS:  I think so, but I'm not
12  sure.
13    MR. HARRIS:  Q.  Okay.  Okay.  Then let
14  me just ask you some questions about what's said in
15  here and see if you have an understanding of it.  Do
16  you see the first kind of numerical item it lists is
17  total USD value positive spot balances equals
18  239.8 million.
19    Do you see that?
20    A.  Yes.
21    Q.  So what do you think that's referring to?
22    MR. DUNNE:  Objection.
23    THE WITNESS:  I can speculate.
24    MR. HARRIS:  Q.  Okay.
25    A.  Yeah.  Flagging this as speculation

1  because I didn't write the code.  This could be the
2  mark-to-market sum of non-negative holdings in the
3  sub account.
4      Q.  Okay.  Is the way the code worked that the
5  collateral value only used the positive sums of
6  assets?
7      A.  Collateral value is ambiguously defined.
8      Q.  Okay.  Was there a term total collateral
9  value in the code?
10     A.  Not by that name.
11     Q.  Is there a different name that was used
12 for it?
13     A.  The term collateral was used in the code
14 and had a precise technical definition.
15     Q.  So was -- did collateral only look at
16 positive asset values?
17     A.  No.
18         MR. DUNNE:  Objection.
19         MR. HARRIS:  Q.  So it also included
20 negative asset values?
21     A.  Yes.
22     Q.  Okay.  All right.  We'll get to that.  Do
23 you see under here it says collateral contributed by
24 positive spot balances equals 199.6 million.
25         Do you see that?

1      A.  Yes.
2      Q.  What did that -- what's your understanding
3  of what that's talking about?
4          MR. DUNNE:  Objection.
5          THE WITNESS:  I can speculate.
6          MR. HARRIS:  Q.  Okay.
7      A.  My speculation is that it's the sum of all
8  the non-negative balances in the account, but not
9  mark-to-market, instead including things like the
10 collateral factor we spoke about earlier and some
11 non-linearity factors.
12     Q.  Why do you say the non-negative valuation
13 balance?
14     A.  Because it says positive spot balances.
15     Q.  All right.  Then it says total collateral
16 used by outstanding futures positions equals 12.2
17 million.  Do you see that?
18     A.  Yes.
19     Q.  Okay.  Do you have an understanding why a
20 futures position would use collateral?
21     A.  Yes.
22     Q.  Okay.  And how is that?
23     A.  One way to think about a futures position
24 is that it represents risk.  It's a bet placed.  A
25 bet placed that can lose money should have

1  corresponding collateral associated with it such
2  that in the case of a loss there's something to
3  cover it.  So maintaining or opening such a bet
4  requires collateral.
5      Q.  Because a future has a -- owning a future
6  it has some associated risk with it, right?
7          MR. DUNNE:  Objection.
8          THE WITNESS:  One way to think about it is
9  that it is a risk.
10         MR. HARRIS:  Q.  Okay.  Like a contingent
11 liability?
12         MR. DUNNE:  Objection.
13         THE WITNESS:  Forgive me.  I don't know
14 the -- I'm not familiar with the terms.
15         MR. HARRIS:  Q.  Okay.  So what is the
16 risk that FTX is trying to address by requiring
17 collateral for a future position?
18     A.  The risk that the -- that the bet doesn't
19 pan out for the user and that they lose money.
20     Q.  And FTX wanted to have collateral to try
21 and prevent FTX or other users having to absorb that
22 lost --
23         MR. DUNNE:  Objection.
24         MR. HARRIS:  Q.  -- money?
25     A.  Right.

1      Q.  Then just to go back to the user
2  interface, these -- you see these other tabs at the
3  top?
4      A.  Yes.
5      Q.  If I clicked on balances, what would that
6  pull up?
7      A.  I believe it would pull up a table of
8  balances for I believe sub account just to say
9  holdings of currencies and coins.
10     Q.  And would it pull up a balance for each
11 different kind of currency or coin?
12     A.  Yes.  That the account had some
13 non-negative holding of -- sorry -- non-zero holding
14 of.
15     Q.  Okay.  And is there somewhere on this page
16 where I could click to see my -- my net account
17 value?
18         MR. DUNNE:  Objection.
19         THE WITNESS:  I'm not sure which page this
20 pane we're looking at was located in.
21         MR. HARRIS:  Q.  Okay.  If I wanted to
22 see my U.S. dollar balance, would that be -- could I
23 find that under the balances tab?
24         MR. DUNNE:  Objection.
25         THE WITNESS:  For the sub account for

MAGNA >
LEGAL SERVICES

Page 94

1 which this table applied, yes.
2 MR. HARRIS: Q. Okay. Why was it
3 helpful for a user to see the different balances of
4 the different kinds of assets?
5 MR. DUNNE: Objection.
6 THE WITNESS: To inform their trading.
7 MR. HARRIS: All right.
8 (EXHIBIT 40 PREVIOUSLY MARKED FOR
9 IDENTIFICATION)
10 MR. HARRIS: Q. All right. You were
11 handed another document that was previously marked.
12 This one was previously marked Exhibit 40, and it's
13 an email, and then it has -- looks to me like
14 screenshots from different parts of the user
15 interface.
16 So my question -- my questions I have are
17 really about the two screenshots, but let me just
18 ask you do these look like screenshots from
19 something in the user interface?
20 A. Yes.
21 Q. Okay. It looks like the person here has
22 entered the wallet tab. Does that seem right to
23 you?
24 A. The wallet page, yes.
25 Q. Okay. And what do you understand total

Page 95

1 net USD value to mean?
2 MR. DUNNE: Objection.
3 THE WITNESS: I don't remember exactly how
4 it was calculated.
5 MR. HARRIS: Q. Okay. Do you understand
6 what's difference between this page that we're
7 looking at a screenshot of versus the page in the
8 prior exhibit, Exhibit 39?
9 A. They have some non-overlapping info.
10 Q. Okay. So the user interface would tell
11 customers that their amounts for individual assets,
12 such as Bitcoin or USD or USDT; is that right?
13 A. Correct.
14 Q. And the code also reflects that they could
15 have a positive or negative value for each of those
16 different kinds of assets?
17 A. Yes.
18 Q. Was it your understanding the customers
19 didn't actually have any digital assets, but just
20 had a net account balance?
21 MR. DUNNE: Objection.
22 THE WITNESS: I can describe what the code
23 did and it distinguished between different
24 currencies owned or different currencies attributed
25 to different sub accounts. "Had" implies something

Page 96

1 like ownership or title that I'm not certain about.
2 MR. HARRIS: Q. Okay. Putting aside the
3 ownership issue, but the code distinguished between
4 different currencies or assets and the net asset
5 balance, right?
6 MR. DUNNE: Objection.
7 THE WITNESS: Yes.
8 MR. HARRIS: Q. Was there anything in
9 the code that indicated that, in fact, there were no
10 positive and negative balances for individual
11 assets, but just a total net account balance?
12 MR. DUNNE: Objection.
13 THE WITNESS: There were both reflections
14 of individual balances for individual assets for sub
15 accounts and calculations of different aggregates of
16 them.
17 MR. HARRIS: Q. Let me talk -- let's
18 talk a little about the margin program. Did you
19 have any role in developing the code to implement
20 the margin program?
21 A. I had a minor role in updates to it, not
22 in its original development.
23 Q. Was there already a margin program in
24 place by the time you joined FTX?
25 A. Yes.

Page 97

1 Q. What's your understanding about why FTX
2 offered that feature?
3 A. It's the whole business.
4 Q. What do you mean by that?
5 A. Futures trading requires a margin program.
6 Q. Now, FTX also had a spot margin program,
7 right?
8 A. Yes.
9 Q. Do you know why FTX offered that feature?
10 A. Similarly, it was part of the business.
11 Q. Did FTX need to offer that in order to be
12 competitive with other exchanges?
13 MR. DUNNE: Objection.
14 MR. CAPONE: Objection.
15 THE WITNESS: I'm not sure.
16 MR. HARRIS: Q. Do you know if the code
17 provided any mechanism for a customer to borrow
18 assets from other customers outside of the margin
19 program?
20 A. Allow negative was changed by someone else
21 such that that was possible for accounts that had
22 the flag.
23 Q. I just want to make sure I understand.
24 You said allow negative was changed by someone else.
25 What do you mean by that?

**MAGNA**
LEGAL SERVICES

1    A.   The version of allow negative that I
2  originally wrote did not allow for the thing you're
3  describing, but eventually it did.
4    Q.   Okay.  So at some point the allow negative
5  feature allowed a customer to borrow another
6  customer's assets outside of the margin program?
7    A.   Yes.
8    Q.   Okay.
9    A.   Though I should clarify I don't know about
10  the definition of borrow here.  Be negative in
11  assets I should say.
12    Q.   Okay.  But you don't know if that
13  reflected borrowing other customer's assets as
14  opposed to something else?
15    MR. DUNNE:  Objection.
16    THE WITNESS:  Like title, borrow is a
17  really overloaded term.
18    THE REPORTER:  (Clarification.)
19    MR. HARRIS:  Q.  Okay.  We talked about
20  some of the help desk articles that explained how
21  the exchange worked.  I've seen a spot margin
22  trading explainer and a collateral management
23  explainer.  Are there any other help desk articles
24  that you can think of that describe the margin
25  program to customers?

1    A.   Not that I can think of.  I expect there
2  might have been many.
3    Q.   Okay.  Do you think you had any role in
4  editing or helping with either of those two
5  documents?
6    A.   It's possible that one of those two
7  documents reflected those parameters that I
8  mentioned earlier that I might have edited directly.
9    Q.   All right.  I'm going to show them both to
10  you.  I just had a couple more questions before I
11  do.  Is it right that the code for the margin
12  program changed in July 2022?
13    A.   I'm not sure.
14    Q.   Okay.  Do you recall that there was some
15  change to the code that was -- occurred in the
16  months leading up to before the bankruptcy filing?
17    A.   Over FTX's history there were maybe tens
18  to thousands of updates to the code.
19    Q.   Okay.  Do you remember any change to the
20  margin program being triggered by Three Arrows
21  liquidation?
22    A.   Not that I recall.  It's possible.
23    MR. HARRIS:  Okay.  Why don't we do
24  Tab 52, the collateral management.
25    (EXHIBIT 64 WAS MARKED FOR

1    IDENTIFICATION.)
2    THE REPORTER:  This is 64.
3    MR. HARRIS:  Q.  64.  Okay.  You were
4  handed Exhibit 64, which I understand to be -- I
5  guess it's a printout from the help.FTX.com page you
6  mentioned.  It's called collateral management.  Take
7  a look and see if it looks familiar to you as one of
8  the help desk pages.
9    A.   It does look familiar.
10    Q.   Do you think you had any role in reviewing
11  or editing this explainer?
12    A.   This table that shows on the first page
13  looks like the one that I would have edited when,
14  for instance, adding a new future.
15    Q.   Okay.  If you look at the third page, see
16  that definitions and formulas.  Did those formulas
17  track what was in the code?
18    MR. DUNNE:  Objection.
19    MR. HARRIS:  Q.  Or were they intended
20  to?
21    A.   I'm not sure.  I didn't write it.
22    Q.   Okay.  If you look at the bottom of the
23  fourth page, there's a -- there's a numbering system
24  at the bottom also.  Maybe that's easier.  If you
25  look at the --

1    A.   Ah.
2    Q.   -- numbers that end -- the page that ends
3  in 47.  See that?  Okay.  All right.  So you see
4  there's a section heading bottom of that page says
5  calculating total collateral value?
6    A.   Yes.
7    Q.   Okay.  And then it says, "To start, let's
8  first calculate the collateral weight of the assets
9  you're currently holding."
10    Do you see that?
11    A.   Yes.
12    Q.   Okay.  And then -- then has an example for
13  BTC, and then it -- after a few lines it says, "That
14  means the collateral value of BTC will equal," and
15  it has a formula.  Do you see that?
16    A.   Yes.
17    Q.   So this collateral value, that's different
18  from the net account balance for an account, right?
19    A.   Possibly.
20    Q.   What are the times where it would be --
21  where it would be different or would be the same?
22    A.   I'm not sure what the definition of net
23  account balance is.
24    Q.   Okay.  That's not a term you've heard
25  before?

Page 102

1    A.  I have.  I just forget what it meant.
2    Q.  Okay.  So, I mean, earlier today we've
3  been talking about trying to ensure that a net
4  account balance doesn't go zero.  So that's what I'm
5  talking about when I say net account balance.
6    A.  Ah, in those conversations, when I was
7  referring to it then, I meant that -- I was speaking
8  like to a looser definition.
9    Q.  Okay.
10    A.  The precise way you might calculate it
11  could totally vary.
12    Q.  Okay.  So what does it -- so in terms of
13  the collateral value that's used in the code,
14  what -- is that different than the sum of the
15  positive and negative values for all of the
16  customers' assets.
17    A.  Yes.
18    Q.  And in what way is it different?
19    A.  Among other things, one of those
20  definitions may not include things like collateral
21  weight or the non-linearity introduced by these IMF
22  weights.
23    Q.  Okay.  What other differences can there
24  be?
25    A.  Collateral may only account for currencies

Page 103

1  that are collateral viable, and the other may
2  account for more, but the code makes this very
3  clear, and I'm going off of hazy memory here.
4    Q.  Okay.  If you look at the next section
5  here, so that same page ending in 48, there's a
6  section about calculating free collateral.  Do you
7  see that?  Okay.  And it kind of starts by saying,
8  "Let's calculate free collateral to understand how
9  open positions and orders affect your collateral.
10  Assume you have the following positions and open
11  orders in your account," and then it lists several
12  different assets, right?
13    A.  Some futures and some assets, yes.
14    Q.  And those are the assets that are
15  allocated the customer in their account.
16    A.  I'm reading this toy example for the first
17  time.  That's my read of it, but I'm not sure what
18  the author meant.
19    Q.  Just want to make sure I understand.  You
20  said couple of times toy example.  What does that
21  mean, toy?
22    A.  Ah, not reflective of an exact account and
23  its state in reality, but one used for the purpose
24  of demonstration.
25    Q.  Ah, okay.  And why was it important in

Page 104

1  order to understand collateral position to look at
2  each individual asset?
3    MR. DUNNE:  Objection.
4    THE WITNESS:  I don't understand the
5  alternative.
6    MR. HARRIS:  Q.  Why was it important to
7  look at each individual asset instead of just the
8  net account balance?
9    A.  The collateral is a reflection of a way to
10  calculate a net account balance.  So it must derive
11  its definition from something smaller.
12    Q.  So you couldn't determine collateral just
13  by looking at the net account balance?
14    MR. DUNNE:  Objection.
15    THE WITNESS:  Net account balance could be
16  defined in a few different ways.  Collateral is one
17  way to think about a net account balance in the
18  colloquial sense.  It must therefore be a function
19  of other things that comprise it.
20    MR. HARRIS:  Q.  Okay.  Do you know if,
21  when calculating collateral value, does the code
22  include a negative U.S. dollar balance?
23    A.  The -- the way that the code defined
24  collateral would have accounted for positive
25  balances in dollars or otherwise.

Page 105

1    Q.  Would it have accounted for a negative
2  U.S. dollar balance?
3    A.  Right.
4    Q.  So -- and I want to distinguish between
5  the collateral value and the collateral used.  Does
6  that distinction make sense?
7    A.  Yes.
8    Q.  Okay.  So just focusing on the collateral
9  value, was a negative U.S. dollar balance included
10  in the collateral value?
11    MR. DUNNE:  Objection.
12    THE WITNESS:  Yes.  To be clear, if a sub
13  account had different balances, including a negative
14  account balance, all of those would be considered in
15  determining their -- what the code called
16  collateral.
17    MR. HARRIS:  Q.  Okay.  Then there's a
18  section at the bottom of the next page called
19  handling negative USD balances.  Do you see that?
20    A.  Yes.
21    Q.  And do you understand what was meant by a
22  negative USD balance there?
23    A.  Yes.
24    Q.  Okay.  Okay.  So what's your understanding
25  of that?

MAGNA ▶
LEGAL SERVICES

1     A.   Any time a sub account had a USD balance
2   less than zero.
3     Q.   Okay.  If you look at the top of the next
4   page, the page that's 50.
5     A.   Yes.
6     Q.   Okay.  So at the very top, there's a
7   paragraph that says, "For accounts with spot margin
8   trading disabled, FTX will automatically send market
9   orders to convert the non-USD collateral into USD if
10  the USD balance is negative in any of the following
11  conditions hold," and it lists three conditions.
12       Do you see that?
13    A.   Yes.
14    Q.   And when it says automatically, does that
15  mean this is a feature in the code?
16    A.   Yes.
17    Q.   Okay.  What does it mean FTX will
18  automatically send market orders to convert to
19  non-USD collateral in the USD?
20    A.   Sell the non-USD collateral on -- on that
21  asset versus USD markets.
22    Q.   So if these conditions are satisfied, the
23  code will automatically sell the user's collateral,
24  the customer's collateral?
25    A.   Some of it.

1     Q.   Okay.
2     A.   Yeah, some of it.
3     Q.   And the first condition is if the USD
4   balance is negative, what did that mean in the code?
5     A.   If the sub account in question has USD
6   balance less than zero.
7     Q.   Okay.  And then in addition to that, you
8   required any of the following three conditions,
9   right?
10    A.   That's what this says.
11    Q.   Okay.  Do you recall why FTX would sell
12  customer assets if those conditions were satisfied?
13    A.   Yes.
14    Q.   Okay.  What was the reason?
15    A.   This was implemented before the spot
16  margin system came online.  Accounts could have
17  negative USD balances if, for instance, they were
18  collateralized in Bitcoin, but lost money on a
19  futures position.  Realized P&L for that would be
20  negative dollars.  Absent them if -- if their
21  negative USD balance wasn't rectified that would
22  functionally be a free loan from FTX of dollars.
23    Q.   And so what was the risk that FTX was
24  trying to mitigate by causing this automatic sale to
25  happen?

1     A.   In the example I gave, it would be that
2   accounts Bitcoin holdings dropping in value below
3   that of their -- the magnitude of their negative USD
4   balance.
5     Q.   So was the risk that this free loan from
6   FTX of dollars might not be repaid by the customer?
7        MR. DUNNE:  Objection.
8        THE WITNESS:  That is one risk.  Another
9   is simply that a loan in any currency has a
10  marketable valuable and it wasn't getting charged
11  otherwise.
12       MR. HARRIS:  Okay.  Why don't we look at
13  the spot margin trading explainer.  This one was
14  also previously marked Exhibit 18.
15       (EXHIBIT 18 PREVIOUSLY MARKED FOR
16       IDENTIFICATION)
17       MR. HARRIS:  Q.  Let's take a look at
18  them.  First, I'm going to ask if you recognize
19  this.
20    A.   I don't remember reading exactly these
21  words, but I remember an explainer for spot margin
22  trading existing.
23    Q.   Do you think that the explainer for spot
24  margin trading was one of the -- one of the
25  explainers that you worked on in some fashion?

1     A.   I don't know.  It's possible.  This
2   doesn't have that table I was referencing in the
3   previous -- the previous page did.
4     Q.   Right.  Did you work on code around the
5   spot margin trading program?
6     A.   It's possible.  But I certainly wasn't the
7   first to implement it.
8     Q.   Okay.
9     A.   And I don't know that I did.
10    Q.   Okay.  All right.  Let me ask you some
11  questions about this.  There's a -- if you look at
12  the second page, section called borrowing.  Do you
13  see there's the section called how does margin work
14  for borrowing?  Do you see that section?
15    A.   Yes.
16    Q.   Okay.  And then near the -- kind of
17  further down there's a paragraph says, "Note that in
18  addition to requiring margin negative spot positions
19  also decrease your account collateral value."
20       Do you see that?
21    A.   Yes.
22    Q.   So both futures trading and margin trading
23  could affect the account collateral value; is that
24  right?
25       MR. DUNNE:  Objection.

1    THE WITNESS: The account collateral value
2  didn't account for futures positions directly, but
3  trading could affect it by virtue of P&L.
4    MR. HARRIS:  Q.  Okay.  Why is it the
5  account collateral value didn't account for futures
6  positions directly?
7    A.  Collateral is what supports positions, not
8  the positions themselves.
9    Q.  So future can't serve as a form of
10  collateral?
11    A.  Right.  A future is only risk.
12    Q.  Okay.  But spot assets can serve as a form
13  of collateral?
14    A.  Yes, can.
15    Q.  Okay.  And then looking at that same
16  paragraph, it says, "Your accounts total collateral
17  is a sum over all spot tokens of," and then it has a
18  formula, I guess, or a description.
19    A.  Sorry.  Do you mind pointing me to where
20  in the page this is?
21    Q.  Yeah, it's sort of the bottom portion
22  there's a -- there's a one and then a one and then a
23  two and then a one.  Do you see those?
24    A.  Yes.
25    Q.  Is that a accurate description of how the

1  account's total collateral was calculated under the
2  code?
3    A.  Give me a moment.  It's not inconsistent
4  with my memory, but the code will be clear on this
5  one way or the other.
6    Q.  Okay.  Do you recall if the code allowed
7  futures to be lent out or borrowed?
8    A.  Not that I remember.
9    MR. DUNNE:  Objection.
10    THE REPORTER:  (Clarification.)
11    THE WITNESS:  Should clarify.  Borrow
12  paired with the term futures could mean a lot of
13  things.
14    MR. HARRIS:  Q.  Okay.  What are the
15  possibilities of what it might mean?
16    A.  I don't even know the full space of them.
17  I could imagine somebody construing a trade to mean
18  a borrow in the case of futures if you're going
19  short or something.  The exchange offered trade in
20  futures except for through trading and unlike with
21  spot balances you couldn't directly transfer
22  positions.
23    Q.  Okay.  You couldn't transfer your futures
24  position to another user?
25    A.  Except through trading.  That's my

1  recollection.
2    Q.  Okay.  Do you -- if you look at the page
3  under -- it's ended with 98 at the bottom.  Section
4  called -- well, if you go to 97 first -- sorry --
5  the section called lending.
6    A.  Yes.
7    Q.  Okay.  If you look at the third line down,
8  there's a sentence that says, "Lenders bear no
9  counterparty risk."
10    Do you see that?
11    A.  Yes.
12    Q.  Okay.  Is there anything in the code in
13  which if a margin loan was not repaid that the
14  margin -- that would impose losses on margin
15  lenders?
16    MR. DUNNE:  Objection.
17    THE WITNESS:  If the loan is unrepaid,
18  it's charged interest and can only proximately pay
19  lenders.
20    MR. HARRIS:  Q.  You said proximately
21  pay.
22    A.  Clawbacks are an alternative through which
23  a lender could eventually lose money, but just by
24  virtue of not repaying a loan in the moment there
25  isn't something in the code that I remember that

1  would then go and deduct any lender balances.
2    Q.  Okay.  And there was nothing in the code
3  that allocated one particular user lender with a
4  particular user borrower, right?
5    MR. DUNNE:  Objection.
6    THE WITNESS:  Not that I remember in the
7  spot margin program.
8    MR. HARRIS:  Q.  I want to talk about the
9  line of credit and how it's reflected in the code.
10  I think that was -- that is an area where you did
11  have some role in developing the code for line of
12  credit, right?
13    A.  Yes.
14    Q.  Okay.  What was your role?
15    A.  It predated me, and I made it a feature
16  that could apply to more accounts than just
17  Alameda's.  I believe I also wrote some code that
18  would charge interest based off of line of credit
19  usage and branding.
20    Q.  Okay.  So I think the two things you
21  mentioned was first was that you made it a feature
22  that could apply to more users than just Alameda?
23    A.  Right.
24    Q.  So before that happened, was a line of
25  credit only available to Alameda?

1     A.  That's my recollection.
2     Q.  Okay.  And whose idea do you recall was it
3  to start offering lines of credit to other
4  customers?
5     A.  I don't remember.
6     Q.  Do you recall what the reason for doing
7  that was?
8     A.  Not at the time, but -- yeah, I don't
9  remember the reason was at the time.
10    Q.  In retrospect, do you have an
11  understanding why FTX decided to start offering
12  lines of credit to other customers?
13    A.  I understand reasons -- there are reasons
14  that make sense to me today for why customers might
15  want them.
16    Q.  All right.  What do you have in mind?
17    A.  Capital efficiency.
18    Q.  What does that mean?
19    A.  A customer may want to be treated as if
20  they had more collateral in FTX than they did under
21  the assumption an implicit promise that they'd be
22  able to repay if they ended up in a situation where
23  they required more collateral.
24    Q.  Okay.  What do you mean by the assumption
25  that they would repay?

1     A.  A line of credit's a loan in some sense.
2  Loans need repayment.
3     Q.  And then the second thing you mentioned
4  was charging interest, right?
5     A.  Yes.
6     Q.  Before you made that change, there was not
7  interest charged on the line of credit; is that
8  right?
9     A.  That's what I remember, yes.
10    Q.  But when FTX started offering lines of
11  credits to other customers, it also started charging
12  interest on them?
13    A.  I don't remember if those were perfectly
14  coincident.  One might have come after the other.
15    Q.  All right.  And who determined what the
16  interest rate would be on the line of credit?
17    A.  I don't remember.
18    Q.  Is that something you were involved in?
19    A.  Not the determining of the rates, no.
20    Q.  Did the rate differ by customer?
21    A.  I believe so.
22    Q.  Whatever the rate was, it was then
23  reflected in the code itself or in the database?
24    A.  I believe the code supported it.  I don't
25  know that it was always perfectly in lockstep with

1  like discussions with customers.
2     Q.  But there was some feature in the code to
3  input an interest rate for a particular line of
4  credit?
5     A.  For one type of usage and line of credit,
6  yes.
7     Q.  What does that mean, one type of usage?
8     A.  There were rates charged for the ways in
9  which customers use and the amounts in which
10  customers use lines of credit.  There may have also
11  been separate rates discussed about different
12  scenarios relating to their line of credit.
13    Q.  Okay.  Do you recall there was also rates
14  charged for -- for the margin borrowing?
15    A.  Through -- if through the spot margin
16  lending program, yes.
17    Q.  Okay.  Were those different rates that
18  the -- would charge through the spot margin lending
19  program than were charged on the line of credit?
20    A.  They may have been the same numbers, but
21  they were like a -- they weren't sourced from the
22  same calculations.
23    Q.  Okay.  So it might be coincidentally they
24  were the same, but they're not set to be the same?
25    A.  Right.  They're not set to be the same.

1     Q.  Okay.  Did -- we talked about the negative
2  U.S. dollar balance that a customer could have?
3     A.  Yes.
4     Q.  Was one component of that the line of
5  credit if they used one?
6     A.  Oh, I forget --
7        MR. DUNNE:  Objection.
8        THE WITNESS:  -- all the definitions we
9  used before.
10       MR. HARRIS:  Q.  Before today or at the
11  time?
12    A.  No, before -- in today's discussions.
13    Q.  Okay.
14    A.  Yeah.
15    Q.  Do you recall if there's -- on the website
16  user interface we looked at there's a -- there's a
17  reflection of the negative U.S. dollar balance?
18    A.  Yes.
19    Q.  So if someone had a line of credit, would
20  that be part of the negative U.S. dollar balance?
21       MR. DUNNE:  Objection.
22       THE WITNESS:  I'm a little confused by
23  part of, but if an account had a line of credit,
24  that would show up as part of their U.S. dollar
25  balance and that would increment their dollar

**MAGNA**
LEGAL SERVICES

Page 118

1  balance relative to if they didn't have one, and it
2  would separately be noted how much of that was
3  attributable to a line of credit.
4      MR. HARRIS:  Q.  Okay.  So the user
5  interface would separately show how much of the U.S.
6  dollar balance was attributed to the line of credit?
7      A.  I believe so.
8      Q.  Okay.  You mentioned having made this
9  adjustment to allow other customers besides Alameda
10 to get a line of credit.  Do you know what were the
11 criteria which determined whether a customer could
12 get a line of credit?
13     A.  I don't know the exact criteria.
14     Q.  Was that something that was like automated
15 in the code or was individualized determination?
16     A.  There wasn't automatic granting of lines
17 of credit in the code, and so I expect it was
18 individualized.
19     Q.  Okay.  Do you know how FTX determined the
20 size of the line of credit?
21     A.  I don't know.
22     Q.  Okay.  That's not something you were
23 involved in?
24     A.  Correct.  Not involved in it.
25     Q.  Did the user interface how much of the

Page 119

1  line of credit was used at any point in time?
2      MR. DUNNE:  Objection.
3      THE WITNESS:  I don't remember if it
4  showed that.
5      MR. HARRIS:  Q.  Okay.  All right.  Let
6  me show you a --
7      A.  Is it okay if I use the restroom?
8      MR. HARRIS:  Why don't we take a break?
9      VIDEOGRAPHER:  This is the end of Media
10 No. 2.  We are off the record at 11:39 a.m.
11     (The deposition was in recess from 11:39
12 to 11:58.)
13     VIDEOGRAPHER:  This is the beginning of
14 Media No. 3.  We are back on the record at
15 11:58 p.m. -- a.m.  Sorry.
16     MR. HARRIS:  Q.  All right.  Before we
17 talk more about lines of credit, I just wanted to go
18 back to one item, which is I'd asked you before if
19 you were aware of any inconsistencies between the
20 terms of service and the code, and you had said you
21 weren't aware of any direct inconsistencies.  So
22 just to see what you remember, do you remember
23 indirect inconsistencies?
24     MR. DUNNE:  Objection to form.
25     THE WITNESS:  I guess they both describe

Page 120

1  some non-overlapping things.  I assume the TOS
2  doesn't go into depth on the things the explainers
3  do and vice versa.  And both aim to describe the
4  code, I suppose, but nothing forces them to be in
5  lockstep.
6      MR. HARRIS:  Q.  But do you remember
7  anything that you're aware of that was inconsistent
8  between the terms of service and the code?
9      A.  Not familiar after the TOS to say.
10     Q.  So nothing's coming to mind you remember
11 as an inconsistency?
12     MR. DUNNE:  Objection.
13     THE WITNESS:  Not immediately come to
14 mind.
15     MR. HARRIS:  Okay.  65.
16     (EXHIBIT 65 WAS MARKED FOR
17 IDENTIFICATION.)
18     MR. HARRIS:  Q.  Okay.  You've been
19 handed Exhibit 65, which is called lines of credit.
20 It was produced to us by the FTX Recovery Trust.
21 Take a look at it.  You see it has some comment
22 bubbles in it.  Does this document look familiar to
23 you?
24     A.  No.
25     Q.  Okay.  Let me just ask you about some

Page 121

1  statements in here and see if you have an
2  understanding of them, then.  On the first page
3  there's a section at the top called what are lines
4  of credit, and then the third paragraph in it says,
5  "The lines of credit function only for futures
6  markets.  They cannot be traded on spot markets."
7      Do you remember there was a time when that
8  was the case that the lines of credit were only for
9  futures and not for spot?
10     A.  Yes.
11     Q.  Okay.  And when was that?  When did it
12 change?
13     A.  I think I made the change that they could
14 be -- well, not that they could be directly used and
15 spent in the futures market but they weren't
16 inconsistent with also having a dollar borrow.
17     Q.  So just to make sure, this document said
18 they can only be used for futures and can't be used
19 on spot markets.  Do you remember being the case at
20 one point in time?
21     A.  Yeah, although used on spot markets is a
22 little ambiguous.
23     Q.  Okay.  Cannot be -- so what do you
24 remember about how the lines of credit would be used
25 for future markets?

MAGNA
LEGAL SERVICES

Page 122

1    A.  That they would count to your collateral
2  and in doing so, will allow you to open more --
3  larger positions.  And would serve as a buffer for
4  liquidation relative to if you didn't have them.
5    Q.  And do you remember there was a time where
6  the line of credit could not be used on spot
7  markets?
8    A.  In the sense.
9    Q.  Okay.  And what sense?
10    A.  That if you had a line of credit, and the
11  code's going to be clear on this and my memory is
12  hazy, something like you couldn't spend dollars to
13  purchase assets on spot markets if doing so would
14  bring your USD balance below that of your line of
15  credit.
16    Q.  Okay.  Do you know why that was set up
17  that way?
18    A.  No.
19    Q.  Okay.  Do you remember at some point that
20  changed?
21    A.  Yes.
22    Q.  Okay.  And why was it changed?
23    A.  It was changed to allow -- to not prevent
24  users with lines of credit from also using the spot
25  margin system.

Page 123

1    Q.  Okay.  Was that like a feature that
2  customers were asking for?
3    A.  I don't remember.  I expect so.
4    Q.  Okay.  At the bottom of this first page,
5  you see it says who can authorize LOCs?
6    A.  Uh-huh.
7    Q.  And at the top of the next page it says,
8  non-restrictive admins, i.e., admins who can change
9  account settings, including specifically Michael
10  Burgess can grant LOCs up to, I guess, $1,000.  You
11  see that?
12    A.  Uh-huh.
13    Q.  And then super admins, which is described
14  as yourself, Gary, Sam, Ryan, and others can grant
15  larger LOCs without a limit slash cap.  Do you see
16  that?
17    A.  Yes.
18    Q.  Do you recall that you were able -- you
19  were able to grant a larger LOC without a limit cap?
20    A.  Yeah, I remember now super admins had
21  access to a page through which they could do so.
22    Q.  Okay.  Do you recall if you ever --
23  personally ever did so, set up an LOC for a
24  customer?
25    A.  I remember an instance in which I helped a

Page 124

1  customer transfer existing LOC from one account to
2  another, which involved decrementing and then using
3  this page to increment for a different sub account.
4    Q.  Did you have any role -- do you remember
5  the LOCs were documented in like an agreement, a
6  written agreement?
7    A.  I remember there were agreements that
8  related to LOCs.  I don't know if like all elements
9  of them were documented.
10    Q.  Okay.  Do you recall -- you don't know
11  whether the written agreement documented everything
12  that was implemented in the code for the LOC?
13    A.  Right, or vice versa, if the code
14  reflected everything in the agreement.
15    Q.  Okay.  Did you have any role in kind of
16  editing or negotiating the written agreements?
17    A.  No.
18    Q.  Still on this document, the third page of
19  it, at the top of it it says -- it says, "We have a
20  page that tracks granted lines of credit and other
21  statistics about the account that is reviewed every
22  day by a super admin, usually Nishad."
23      Do you see that?
24    A.  Yes.
25    Q.  Do you recall that -- that fact that there

Page 125

1  was a page that tracked lines of credit?
2    A.  Yes.
3    Q.  And do you recall that they were reviewed
4  daily?
5    A.  No, I think this is just a false
6  statement.  Never reviewed it.
7    Q.  You don't recall ever reviewing that page?
8    A.  It's possible, but it was incidental and
9  not a part of my regular duties.
10    Q.  Was there anyone else who would review
11  that page?
12    A.  It was built for the VIP team to do so.
13    Q.  Who is the VIP team?
14    A.  The team that Zane Tackett headed up.
15    Q.  Do you know if the VIP team reviewed the
16  page daily?
17    A.  I don't know for sure.
18    MR. HARRIS:  Okay.  Why don't we do
19  Tab 55.
20      (EXHIBIT 66 WAS MARKED FOR
21      IDENTIFICATION.)
22    MR. HARRIS:  Q.  Okay.  You've been
23  handed Exhibit 66.  It's called lines of credit on
24  FTX.  Take a look at it, but my first questions
25  going to be if this looks to you like one of the

1   help accounts -- help website explainers.
2        A.  I'm not sure.  I think this is content
3   I've never seen, not even while I was at FTX.
4        Q.  Okay.  So once you flip through it, let me
5   just know if it does look at all familiar to you.
6        A.  Oh, I recognize one thing.  Second to last
7   page, API end points for lines of credit.  I
8   remember being asked to implement these end points.
9   So I expect that's -- they reflect code that I
10  wrote.
11       Q.  Okay.
12       A.  I don't remember this doc itself.
13       Q.  Okay.  Anything else seem familiar to you
14  like content wise in this?
15       A.  How long would you like me to spend
16  looking at it?  So far the answer is no.  I don't
17  think I've read this stuff before.
18       Q.  Okay.  All right.  Well, I'm just going to
19  ask you a few particular things in here, then, and
20  see if you have an understanding of them or not.
21  So -- so the very first page, it says at the very
22  top, "FTX offers select VIP" -- I think you told us
23  that phrase before, right?  Do you remember the next
24  phrase MM means?
25       A.  Market maker.

1        Q.  I see.  So is that generally who was
2   allowed a line of credit, either a VIP customer or a
3   market maker?
4        A.  Both are terms of art, and I don't know
5   how well they overlapped with the set of customers
6   that had lines of credit.
7        Q.  Okay.  All right.  And then the sentence
8   continues, "Which can be used as collateral for spot
9   margin and future positions in preventing
10  liquidations."
11       Is that -- is that an accurate description
12  of how function -- a line of credit functioned in
13  the code?
14       A.  Yeah, it's very clunkily described, but
15  yes.
16       Q.  What do you mean by clunkily described?
17       A.  Those aren't three distinct categories.
18  In being used as collateral for spot margin and
19  futures positions, they prevent liquidations.
20       Q.  Got it.  The next sentence says, "For any
21  outstanding LOC we will only charge interest on the
22  amount utilized to prevent liquidations."
23       Do you see that?
24       A.  Yes.
25       Q.  So focusing on how the code functioned,

1   what is that referring to?
2        A.  I don't remember how the calculation was
3   performed, but I do remember writing something
4   that -- that calculated -- there were a lot of ways
5   to view utilization.  It gave one measurement of
6   calculation of a line of credit to charge interest
7   on.
8        Q.  Okay.  So something in the code had a
9   calculation of the amount that was utilized?
10       A.  Right.
11       Q.  Okay.  And that's with the -- that
12  utilized amount was the amount that interest was
13  charged on?
14       A.  Right.
15       Q.  Okay.  So do you recall how the code
16  calculated the amount utilized?
17       A.  No.
18       Q.  Okay.
19       A.  Yeah, there are a lot of reasonable
20  degrees of freedom in that.
21       Q.  It was different than the face amount of
22  the line of credit?
23       A.  Right.  Distinct from the amount granted.
24       Q.  Okay.  Can you go to the fourth page?  If
25  you look at the top of it, there's an example, and

1   after the example then there's a description that
2   says, "In the example above, even though the LOC is
3   preventing sub account A from getting liquidated,
4   the margin fraction against all sub accounts without
5   the LOC is 8 percent, which is higher than the
6   3 percent maintenance margin requirement, therefore
7   this account is not being charged any interest on
8   their LOC."
9        Do you see that?
10       A.  Yes.
11       Q.  Okay.  So is that consistent with your
12  memory of the code that the amount utilized by the
13  LOC and therefore charged interest on was the amount
14  that was needed to prevent a liquidation?
15       MR. DUNNE:  Objection.
16       THE WITNESS:  I don't remember what the
17  code had.  It's -- I could see it having been a
18  number of different ways.  This is -- this seems
19  plausible, but I'm not sure.
20       MR. HARRIS:  Q.  Okay.  Next, there's --
21  lower on, there's a section called using LOCs on
22  spot markets.  Do you see that?
23       A.  Yes.
24       Q.  Okay.  First off, says, "Until recently,
25  users with LOCs were not able to trade into negative

**MAGNA** ►
LEGAL SERVICES

Page 130

1　USD." I think that's what we talked about earlier,
2　right?
3　　　A.　Right.
4　　　Q.　Then it says, "Now, we will allow this if
5　you have spot margin turned on and any amount your
6　USD balance is lower than that of your LOC will be
7　treated as a USD borrow in the spot margin system."
8　　　　Do you see that?
9　　　A.　Yes.
10　　　Q.　What does that mean?
11　　　　MR. DUNNE:　Objection.
12　　　　THE WITNESS:　Yeah, would you mind further
13　specifying?
14　　　　MR. HARRIS:　Q.　I can't understand it.
15　So I'm hoping you can help me as best you can to
16　explain what you think is meant by this.
17　　　　MR. DUNNE:　Objection.
18　　　　THE WITNESS:　Okay if I use a toy example?
19　　　　MR. HARRIS:　Q.　Yes.
20　　　A.　Say I'm Bob. I have one Bitcoin in my
21　account and I turn on spot margin. I can go and buy
22　some Ethereum against dollars resulting in my
23　account being positive Bitcoin as it was before and
24　then up Ethereum down dollars. The amount by which
25　I'm down dollars might constitute a spot margin

Page 131

1　borrow. Suppose now Bob has a -- $10,000 spent that
2　way. Bob gets a hundred-thousand-dollar line of
3　credit.
4　　　　These two paragraphs are describing how in
5　the previous world Bob starts with a
6　hundred-thousand-dollar line of credit and one
7　Bitcoin. The system prevented him from doing the
8　trade that he would have, without the line of
9　credit, been able to do, which is buy som Ethereum
10　dollars because doing so would bring his dollar
11　balance below the initially granted line of credit
12　to $90,000.
13　　　　After the change, he would be allowed to
14　do so, but the $10,000 spent aren't attributable to
15　being drawn from the line of credit and instead are
16　attributable to be borrowed through the spot margin
17　program. So it determined the vehicle through which
18　interest was charged.
19　　　Q.　So how much would Bob have to borrow in
20　order to trigger something being attributed to the
21　line of credit in this example?
22　　　A.　Any amount such that his balance was below
23　that of his granted line of credit -- oh, I'm sorry.
24　Can you restate the question?
25　　　Q.　How much would he have to borrow in order

Page 132

1　to trigger some amount being attributed to the line
2　of credit instead of to the spot margin program?
3　　　A.　I don't remember how the code calculated
4　it. It would depend on if the Bitcoin or line of
5　credit were first -- treated as first being used. I
6　just don't remember what the code did here.
7　　　Q.　So you don't remember whether the code
8　attributed it to first as a spot margin program as
9　opposed to using the line of credit?
10　　　A.　Those aren't the options. The option are
11　between the Bitcoin and the line of credit. And I
12　don't remember which.
13　　　Q.　Why would it be attributed to the Bitcoin?
14　　　A.　I think -- forgive me if I'm
15　misremembering, I think your question was at what
16　point would it attribute the borrowed funds to the
17　line of credit instead of the spot margin program.
18　That's similar to saying is the Bitcoin and line of
19　credit based collateral supporting the spot margin
20　borrow or is it only line of credit doing so.
21　　　Q.　I see. So you were helping me -- you were
22　explaining what is the source of the collateral
23　that's used to support the borrow?
24　　　A.　Right. Which determines if it's a line of
25　credit that's being used or the Bitcoin, which

Page 133

1　determines which interest system they're -- they're
2　under.
3　　　Q.　I see. So the effect of the line of
4　credit is really to determine what is the source of
5　the collateral you're using for the borrow?
6　　　A.　And to increase the total collateral. It
7　allows for situations that wouldn't have previously
8　been allowed for, you know, you to put on larger
9　positions and you wouldn't have otherwise been able
10　to do.
11　　　Q.　Okay. So the line of credit will be
12　triggered if your collateral is not sufficient on
13　its own to support the borrowing you want to do?
14　　　A.　There was no line of credit triggering.
15　The system that charged interest and determined how
16　much was utilized may have done that.
17　　　Q.　Okay.
18　　　A.　But I don't remember what the code
19　actually did.
20　　　Q.　So as far as you remember, the way the
21　code operated, the only usage of a line of credit
22　was whatever amount is -- charged interest; is that
23　right?
24　　　　MR. DUNNE:　Objection.
25　　　　THE WITNESS:　Lines of credit were de

MAGNA ▶
LEGAL SERVICES

Page 134

1  facto used in all collateral calculations and would
2  have stayed liquidation -- would have contributed to
3  the funds staying liquidation at all points.
4  Whether it would have a counter factual effect is
5  not obvious.  That would have been a goal of
6  something like the interest system to check.
7       MR. HARRIS:  Q.  So the line of credit
8  was used in all collateral calculations, right?
9       A.  In the primary definition of account
10  collateral users in the code to determine things
11  like if an account should get liquidated by the
12  automatic system, lines of credit were -- increase
13  that amount.
14       Q.  Okay.  And it was increased by the full
15  face value of the line of credit, right?
16       A.  Correct.
17       Q.  Okay.  I wanted to ask about the term
18  principal.  Is that -- in terms of lines of credit,
19  is that a term that appears in the code?
20       A.  I'm not sure.  Possible.
21       Q.  Okay.  Do you recall at
22  Mr. Bankman-Fried's trial you were asked some
23  questions about calculating the amount that was
24  actually drawn down on a line of credit?
25       A.  I don't remember that from the trial, but

Page 135

1  I could just be forgetting.
2       Q.  Okay.  I'm trying to understand this.  Let
3  me show you what you testified and see if this
4  sparks any memory.  So if you can go back to your
5  transcript.  Let me know when you're there.  Okay.
6  If you can go to page 1567?
7       A.  Can you repeat the number?
8       Q.  Yeah, 1567.
9       A.  I think mine ends before that.
10       Q.  Oh, okay.  Sorry.  Give you an additional
11  document.  Okay.  Sorry about that.
12       MR. DUNNE:  So this is going to be
13  exhibit --
14       MR. HARRIS:  67.
15       MR. DUNNE:  67.
16       (EXHIBIT 67 WAS MARKED FOR
17       IDENTIFICATION.)
18       MR. HARRIS:  Q.  All right.  So the page
19  I wanted to take a look at is 1567.  This is
20  Exhibit 67.
21       A.  Yes.
22       Q.  Okay.  And these questions are
23  specifically the Alameda line of credit?
24       A.  Yeah.
25       Q.  But in line 5 you were asked, "Did you

Page 136

1  have any experience in understanding the amount
2  of -- amount that was actually drawn down on the
3  line of credit?"  And then you said, "I calculated
4  how the main account was drawing on."
5       A.  Sorry.  Can you point me to the line
6  again?
7       Q.  Line 5 to 8 on page 1567.
8       A.  I see it.
9       Q.  So what were you referring to there like
10  the account being drawn -- the line of credit being
11  drawn?
12       A.  I think it was the same thing that we have
13  been referencing earlier, the basis for what would
14  get charged interest on.
15       Q.  Okay.
16       A.  I think --
17       Q.  So that would be -- the closest
18  approximation in the code to drawing on a line of
19  credit would be the amount that you're charging
20  interest on?
21       A.  I'm not sure approximation is right.  It
22  was like one -- one definition of it that was acted
23  upon.
24       Q.  Okay.
25       A.  One small thing, by the way.

Page 137

1       Q.  Yeah.
2       A.  In reading this testimony, and I trust my
3  memory from two years ago more than mine today, and
4  Gary wrote the first versions of the thing that
5  determined how much was borrowed and therefore what
6  was charged interest on.
7       Q.  Okay.
8       A.  And I probably made edits.
9       Q.  Okay.  Do you recall that the code about
10  the interest calculation was changed in July 2022?
11       A.  I don't recall.  Seems totally possible.
12       Q.  Okay.  Do you remember what any change
13  would have been, then?  Like how would it change the
14  calculation?
15       A.  Not in particular.
16       Q.  Okay.  Tab 37.
17       A.  Is it okay if I moved it?  It's okay?
18  Okay?
19       (EXHIBIT 68 WAS MARKED FOR
20       IDENTIFICATION.)
21       VIDEOGRAPHER:  Two buttons here.
22       MR. HARRIS:  Q.  Okay.  You were handed
23  Exhibit 68, which is an email from Mr. Peswani to
24  Andre Sterley at SAPRO, and he cc'd you, and subject
25  was Three Arrows LOC.  And do you remember what

MAGNA ▶
LEGAL SERVICES

1  SAPRO was?
2      A.  I think this is the -- the auditing firm
3  that Andre and Petrie were employed by.
4          THE REPORTER:  (Clarification.)
5      MR. HARRIS:  Q.  And do you recall what
6  triggered Mr. Peswani to send the Three Arrows line
7  of credit to the auditors in March 2022?
8      A.  No.
9      Q.  Do you know why he cc'd you?
10     A.  No.  There's a reason that makes sense to
11  me today, but I'm not sure that's what it actually
12  was.
13     Q.  Okay.  What's the reason that makes sense
14  today?
15     A.  Line of credit interest was a revenue item
16  for FTX.  So this would have fallen under the same
17  revenue testing I referenced earlier.
18     Q.  So it would have fallen under the revenue
19  testing that you were doing for the auditors or at
20  the request to help them?
21     A.  Right.
22         MR. HARRIS:  Okay.  Why don't we do
23  Tab 15, which is the LOC.
24         (EXHIBIT 20 PREVIOUSLY MARKED FOR
25         IDENTIFICATION)

1      MR. HARRIS:  Q.  Okay.  You were handed
2  Exhibit 20, which is -- I'll represent to you is the
3  most recent version of the Three Arrows FTX line of
4  credit document.  Take a look at it, but tell me if
5  it looks at all familiar to you?
6      A.  Vaguely familiar.
7      Q.  Okay.  So you think you have seen the line
8  of credit agreement before?
9      A.  Yes.
10     Q.  Okay.  Like do you recall why you would
11  have seen it before?
12     A.  In preparation for this meeting, and I
13  think but I am not certain around the time of
14  liquidating Three Arrows Capital.
15     Q.  Okay.  Do you know if like the line of
16  credit agreement, was that based on like a form FTX
17  had that was used for a number of customers?
18     A.  I don't know.
19     Q.  Have you seen line of credit agreements
20  for other FTX customers?
21     A.  I believe so, and I remember them being
22  formatted similarly to the extent I did see them.
23     Q.  Okay.  Looks similar to the ones you've
24  seen for other customers?
25     A.  Right.

1      Q.  Okay.  If you look at Section 5?
2      A.  Yes.
3      Q.  It says, "Throughout the lifetime of the
4  line of credit, at least 200 percent of the line of
5  credit," and then says, "Collateral must be
6  maintained in the borrower's FTX account."
7          Do you see that?
8      A.  Yes.
9      Q.  And I'll represent to you the term
10  collateral isn't defined in this.  Is there
11  something in the -- the code has -- has definitions
12  of the term collateral, right?
13     A.  Yes.
14     Q.  Okay.  And I think you've explained --
15  like testified at the criminal trial that collateral
16  was sort of the real liquid assets that the customer
17  has?
18     A.  Right.
19     Q.  Okay.
20     A.  Should clarify.  It's a scale or value
21  that's a function of those.
22     Q.  Okay.  And it would not necessarily be the
23  same thing as the net account balance?
24     A.  Right, not necessarily.
25     Q.  Okay.  Do you know if this 200 percent

1  requirement that's mentioned in Paragraph 5, was
2  that implemented in the code somewhere?
3      A.  Not that I remember.
4      Q.  So I take it there was nothing in the code
5  that would automatically trigger any liquidation
6  based on that 200 percent requirement?
7      A.  Not that I remember.
8      Q.  Okay.  All right.  I'm going to show you
9  what we think is some portions of the code related
10  to the line of credit formula.  Can we do Tab 54?  I
11  know you've been dying to look at the code.  So --
12     A.  You say that jokingly.  If only more of
13  discussions were grounded in the code I'd be a very
14  happy guy.
15         (EXHIBIT 69 WAS MARKED FOR
16         IDENTIFICATION.)
17         MR. DUNNE:  69.
18         MR. HARRIS:  Q.  69.  Okay.  You've been
19  handed Exhibit 69.  I'm going to explain.  There's a
20  version -- the first few pages that was as it was
21  produced to us and then there's identical, but it
22  was -- we printed it with line numbers.  That might
23  make it make easier to --
24     A.  Oh, yeah, that's way better.
25     Q.  Okay.  It is the same thing.  We just

Page 142

1  printed it differently. So -- okay. So I'm going
2  to ask you questions looking at the lined version of
3  this.
4      A.  Yes.
5      Q.  Okay. If you look at line 47.
6      A.  Yes.
7      Q.  There's a term principal in the code.
8      A.  Yeah.
9      Q.  Can you explain what is meant by that term
10 in the context of the code?
11         MR. DUNNE:  Objection.
12         THE WITNESS:  Sorry.
13         MR. HARRIS:  Q.  Go ahead.
14     A.  There's -- there's an interpretation that
15 makes sense to me now. I'm not sure, like, what was
16 meant by at the time by the author.
17     Q.  Okay.
18     A.  Insofar as there's interest being charged
19 that needs to attach to a principal, it makes sense
20 to me that the principal would be the amount of the
21 line of credit in use.
22     Q.  Okay. So this term LOC in use, in a
23 definition of principal, do you see that? Principal
24 equals get_LOC_in_use?
25     A.  Yes.

Page 143

1      Q.  That makes sense to you as the amount of
2  line of credit being used; is that right?
3      A.  Just the English of it makes sense to me.
4      Q.  Okay. And that is the amount on which
5  interest is being charged?
6      A.  Right.
7      Q.  Okay. And if I understand what you
8  explained earlier, the code weights assets by less
9  than one to reflect liquidity risk; is that right?
10         MR. DUNNE:  Objection.
11         THE WITNESS:  Those are all separable true
12 statements.
13         MR. HARRIS:  Q.  Okay. The code weighted
14 assets by less than one for purposes of assessing
15 the collateral; is that right?
16     A.  Yes.
17         MR. DUNNE:  Objection.
18         MR. HARRIS:  Q.  Okay. And where is that
19 reflected in the code?
20     A.  Not this file.
21     Q.  Well, that's a shame.
22     A.  Yeah.
23     Q.  Okay.
24     A.  Account dot PY is my recollection.
25         THE REPORTER:  (Clarification.)

Page 144

1         MR. HARRIS:  Q.  Does line 105 reflect
2  that weighting in any way?
3      A.  No, does not.
4      Q.  Okay. So what is this reference to coin
5  dot approx_fair?
6      A.  I'm going off memory here. I believe
7  approx fair was a reasonably recent in time by which
8  I mean on the scale of seconds or milliseconds
9  mark-to-market value for the coin on its FTX versus
10 USD market.
11     Q.  Okay.
12     A.  So not accounting for liquidity discounts.
13     Q.  Do you know -- is the calculation of
14 principal, as the term is used here, affected by a
15 user's borrowing under the spot margin program?
16     A.  Yes.
17     Q.  Okay. And where is that reflected?
18     A.  It's a little non-obvious. Line 82, size
19 equals -- and 84, account for balance dot size, that
20 quantity is negative if they're borrowing from the
21 spot margin program or have a negative balance for
22 any other reason.
23     Q.  The balance dot size amount is negative?
24     A.  Right. That quantity can be negative.
25     Q.  Okay. Does line 110 factor into that?

Page 145

1      A.  A little hard to evaluate because it's
2  the -- 110 is referencing a thing that's computed by
3  like the preceding 30 lines.
4      Q.  Okay.
5      A.  But I think, yes. But I am not sure.
6      Q.  Could a user use the line of credit to
7  accrue a negative U.S. dollar balance outside of the
8  spot margin program and then use the line of credit
9  amount to make up for the collateral deficit?
10         MR. DUNNE:  Objection.
11         THE WITNESS:  Make up for is a little
12 ambiguous. A user could have a -- hmm, I don't
13 know.
14         MR. HARRIS:  Q.  Instead of saying to
15 make up for it, to prevent a liquidation?
16     A.  Lines of credit, by virtue of giving
17 collateral, necessarily prevented liquidations.
18     Q.  Okay. And where is that reflected in
19 here?
20     A.  We'd need to look at the code that
21 determines when accounts got liquidated and how it
22 considered collateral.
23     Q.  Okay.
24     A.  Which is not here.
25     Q.  What do lines 111 to 113 reflect?

**MAGNA** ◆
LEGAL SERVICES

1    A.  Hard to say quickly.
2    Q.  Okay.  Let me ask about some other terms.
3  There's references to ticker in here and references
4  to coin in the code.  Do you recall what is the
5  difference between those two terms?
6    A.  Without having read this carefully, it was
7  a loosely held convention that ticker was the
8  string, which is to say the set of letters that
9  identified a coin, but coin was the object in the
10  FTX system that also had other properties and was
11  not just a sequence of characters.
12    Q.  What were the other properties associated
13  with the coin?
14    A.  Things like approx fair that we talked
15  about a second ago.
16    Q.  Okay.  You may have answered this already,
17  but how are the users borrowings under the spot
18  margin program affect the amount assessed as
19  principal in the code?
20    A.  It would take a more careful read of the
21  code because the code that determines the total
22  principal accounts for total balances, including
23  negative balances, I assume that it was a
24  contributing factor.
25    Q.  Okay.  Is that -- can I -- is that

1  reflected somewhere in these line items?
2    A.  In the -- in lines 82 and 84 and if you
3  play it forward.
4    Q.  Okay.
5    A.  It may also be reflected somewhere, but I
6  expect those lines to do some amount of the work.
7    Q.  Okay.  So do I understand correctly that
8  the kind of face amount of line of credit, the
9  maximum amount, is always used to -- for purposes of
10  calculating the collateral available and preventing
11  liquidations?
12    MR. DUNNE:  Objection to form.
13    THE WITNESS:  To the extent that the code
14  treated collateral -- the code defined collateral
15  for purposes of determining automatic liquidation
16  behavior, yes, the line of credit was affected it.
17    MR. HARRIS:  Q.  Okay.  If we look at
18  line 68, so it says get LOC in use.  Do you see
19  that?
20    A.  Yes.
21    Q.  Is that defining how the LOC in use is
22  calculated for a particular user?
23    A.  So it seems.
24    Q.  Okay.  In 71 to 73, what do these account
25  I.D.s correspond to?

1    A.  I don't know for certain.
2    Q.  Do you know what is the purpose of this
3  "if" statement in 71?
4    A.  Yes.
5    Q.  Okay.
6    A.  It flags whether or not it changes
7  behavior for the set of accounts considered when
8  determining the line of credit in use to include
9  those of another login or another two logins
10  possibly if the user is being calculated for is a
11  third login.
12    Q.  Is the effect of that to sort of
13  consolidate different accounts?
14    A.  Right.
15    Q.  And then 79 to 105, that group of line
16  items, are those the relevant line items for the
17  calculation of the total collateral required for an
18  account?
19    A.  It looks to me that for -- this function's
20  technical definition of the variable total
21  collateral required, those are the lines that
22  calculate it.
23    Q.  Okay.  And do you recall what was the use
24  of the total collateral required variable?
25    A.  Frankly, the code spells it out as clearly

1  as I'll be able to say it, and I find it a little
2  hard to parse this.
3    Q.  Okay.  In lines 88 and also you see
4  there's a item mult, m-u-l-t.  What is that
5  referring to?
6    A.  Seems likes it's a multiplier that changes
7  the contribution of -- to whatever these
8  calculations are for specific coins.
9    Q.  Is it right that a multiplier is 1 million
10  for SRM and MSRM?
11    A.  Not quite.
12    Q.  Okay.  What's -- what is it, then?
13    A.  It is 1 million in the case of MSRM, and
14  then proceeds to say to treat the rest of the
15  calculation as if it were SRM.
16    Q.  What's the effect of that?
17    A.  It's to say that MSRM, if it didn't have
18  an approx fair, because it didn't have a tradable
19  market itself, should be treated as equivalent to a
20  million SRM, which would have had an approx fair.
21    Q.  And then that variable MULT is one for all
22  other coins?
23    A.  That's my read of this, yes.
24    Q.  Okay.  Line 104, what's the purpose of
25  that line where size equals max size, comma,

**MAGNA**
LEGAL SERVICES

Page 150

1  negative account dot borrow?
2      A.   Account dot borrow.  This is
3  understandably confusing because the term borrow is
4  overloaded, as I mentioned.  I believe it referred
5  to the granted amount of the line of credit.  This
6  is saying -- which -- which was understood to be
7  dollar denominated.
8      Q.   Okay.
9      A.   This is saying to not treat more of the
10  negative dollar balance an account has as part of
11  the principal than is possibly explainable by the
12  granted line of credit.
13     Q.   Okay.  So if they needed more than the
14  granted line of credit to avoid liquidation, they
15  weren't going to charge interest on more than the
16  granted line of credit; is that right?
17     A.   Almost.  It didn't really relate to
18  liquidation yet necessarily.
19     Q.   Okay.
20     A.   Just it's possible this is overdetermined
21  by other parts of this code, but this prevents a
22  negative dollar balance on the account exceeding the
23  size of line of credit from creating a principal in
24  which to charge interest created in the line of
25  credit.

Page 151

1      Q.   Okay.  Line 110.
2      A.   Yeah.
3      Q.   What does this item, USD_value_size, refer
4  to?
5      A.   It's got a functional definition in the
6  preceding lines, which is hard to summarize.  And
7  I'm not sure I perfectly understand.
8      Q.   Is it essentially a sum of all the users
9  negative positions in their different accounts?
10         MR. DUNNE:  Objection.
11         THE WITNESS:  It could be.  I'm not sure.
12         MR. HARRIS:  Q.  If you look at 111 to
13  113, is the value that's returned here is that
14  ultimately the value that the code is calculating as
15  the LOC in use for the particular user?
16     A.   It's the value that's assigned to the
17  variable principal in the function we are previously
18  looking at on the prior page, line 47.
19     Q.   Okay.  Is it essentially the greater of
20  the USD value size and the additional collateral
21  required item?
22         MR. DUNNE:  Objection.
23         THE WITNESS:  Right.  It's taking the max
24  of those variables, so yes.
25         MR. HARRIS:  Q.  So what's the purpose of

Page 152

1  returning the max number of those two variables?
2      A.   I can speculate.
3      Q.   Okay.  What would your best estimate --
4         MR. DUNNE:  Objection.
5         THE WITNESS:  It seems they were two means
6  of calculating the -- the principal, and it might
7  have made sense to take the maximum instead of
8  summing them.
9         MR. HARRIS:  Q.  Do you know why it would
10  make sense to take the maximum?
11         MR. DUNNE:  Objection.
12         THE WITNESS:  I can only speculate.  I
13  don't think I wrote this code.
14         MR. HARRIS:  Q.  Okay.  Well, what would
15  your speculation be?
16         MR. DUNNE:  Objection.
17         THE WITNESS:  My speculation is that there
18  are two different ways to view what a principal
19  could be calculated as.  And it makes sense to
20  choose between them, not to sum them.
21         MR. HARRIS:  Q.  Okay.  Do you know who
22  did write those portions of the code?
23     A.   There's a function called get blame when
24  using -- with the -- kind of silly -- blame in no
25  legal sense.  Should be called get attribute that

Page 153

1  could tell you who was the latest person to touch
2  each line of the code and the full history of it.
3  My expectation is that it's Gary Wang, but I'm not
4  sure.  That will tell for sure.
5         MR. HARRIS:  Okay.  Okay.
6         (EXHIBIT 21 PREVIOUSLY MARKED FOR
7         IDENTIFICATION)
8         MR. HARRIS:  Q.  Okay.  You've been
9  handed another document that was already stamped.
10  It's stamped Exhibit 21.  And it has -- the way it
11  was produced to us had two tabs.  One was
12  LOC_changes, which is kind of the first page, and
13  then the second tab is LOC_interest_charges.
14         Have you seen like the data in this for
15  customers before?
16     A.   I don't think I've looked at this data.
17  The -- it looks to me like it reflects those two
18  database tables, though.
19     Q.   Okay.  So you're familiar with the
20  database tables even though it's not this printout?
21     A.   I remember the schema of the tables, not
22  so much their content.
23     Q.   Okay.  If we look at the second tab, which
24  is LOC interest charges, that tab?
25     A.   Yes.

**MAGNA** ›
LEGAL SERVICES

Page 154

1    Q.  Okay.  So -- and there's a column that
2  says principal.  Do you see that?
3    A.  Yes.
4    Q.  And does that relate to the principal term
5  we looked at in the code?
6    A.  Can I take a moment to look at this?
7    Q.  Yes.
8    A.  Yes, looks like it's one and the same.
9    Q.  Okay.  So this would reflect whether or
10  not the LOC was used as that term is defined in the
11  code?
12    A.  Sorry.  Could you ask the question again?
13    Q.  Yeah, the principal -- if there's an item
14  in the -- if there's an amount for the principal
15  item, that means that the LOC is being used and
16  charged interest on, right?
17        MR. DUNNE:  Objection.
18        THE WITNESS:  There are a lot of ways you
19  could think about how much is used.  This reflects
20  irregular snapshots of one calculation of that
21  usage.
22        MR. HARRIS:  Q.  Okay.  And the
23  calculation of this reflects is the kind of usage
24  that results in an interest charge?
25    A.  Right.  That's my understanding.

Page 155

1    Q.  Okay.  If you look at the second to last
2  page of this chart with dates in 2022.
3    A.  Yes.
4    Q.  So if you look kind of near the bottom,
5  there's April 28th and the principal column says
6  82 million.  Do you see that?
7    A.  Sorry.  Give me a moment.
8    Q.  Sure.
9    A.  This is the second to last page.
10    Q.  Second to last page with numbers on it,
11  yeah.
12    A.  Oh, you said -- I see an April 28th
13  entry.
14    Q.  And -- right.  And then the third column
15  from the left is the principal column, and it's
16  82 million and then --
17    A.  Yeah.
18    Q.  -- the next day it's a zero --
19    A.  Right.
20    Q.  -- do you see that?
21    A.  Yes.
22    Q.  So that would indicate that on
23  April 29th, there was no interest being charged
24  because the principal amount was zero for that day?
25        MR. DUNNE:  Objection.

Page 156

1        MR. HARRIS:  Q.  Right?
2    A.  That's my interpretation.
3    Q.  Okay.  If you look on the last page, you
4  see this has dates later in May and then in June?
5    A.  Yes.
6    Q.  Ending on June 14th.  There's no
7  column -- I'm sorry.  There's no row for June 12th.
8  Do you see that?
9    A.  Yes.
10    Q.  Do you have any idea why the database
11  wouldn't generate a row for June 12th?
12    A.  There were times when code like this that
13  ran on regular intervals would time out, and when it
14  was well implemented, it would go and recover -- go
15  and reflect the periods that it had failed to
16  previously cover.  It's possible that this code
17  didn't have that property, but that it did time out
18  on the 12th.  Something failed to run on the 12th.
19    Q.  Was there a reason why this code wouldn't
20  run on a particular day?
21    A.  Any number of reasons the code could fail
22  to run.
23    Q.  Okay.  And what comes to mind, the
24  possibilities?
25    A.  That the code was looking at the previous

Page 157

1  page, which creates the records associated with this
2  document.  Took too long.
3    Q.  Was there some feature that it would just
4  stop at a certain point in time?
5    A.  In effect.
6    Q.  Okay.  Does that mean the interest was not
7  charged on that day?
8    A.  I expect so, but I'm not confident that it
9  wasn't later charged again or something else.
10    Q.  Okay.  I mean, looking at the column next
11  to principal is size, and I believe that size
12  reflects the interest charge rate?
13        MR. DUNNE:  Objection.
14        THE WITNESS:  Yes, I think so.
15        MR. HARRIS:  Q.  And it doesn't look like
16  there was a double interest charge on the 13th,
17  correct?
18    A.  I agree.
19        MR. HARRIS:  Okay.  Why don't we break for
20  lunch now?
21        MR. CAPONE:  Okay.
22        VIDEOGRAPHER:  This is the end of Media
23  No. 3.  We are off the record at 12:54 p.m.
24        (The deposition was in recess from 12:54
25        to 1:40.)

MAGNA ▶
LEGAL SERVICES

Page 158

1    VIDEOGRAPHER:  This is the beginning of
2  Media No. 4.  We are back on the record at 1:39 p.m.
3    MR. HARRIS:  Q.  Just a few more
4  questions about the code.  One is a general
5  question, which is did developers at FTX, like
6  yourself, ever include comments in the code?
7    A.  Yes.
8    Q.  Like they might have an explanation why
9  this was implemented or why that change was made?
10    A.  Right.  Varied by the case.
11    Q.  In the code we were looking at, I didn't
12  see any comments in it.  Is there ways to print it
13  that would or would not reflect comments, do you
14  know?  Like is there a function you can toggle on
15  and off to show comments?
16    A.  Such things might exist, but I'm not sure.
17    Q.  Okay.  If there were comments, how would
18  they be shown in the code, like a hashtag and then
19  words afterwards or --
20    A.  Exactly.
21    Q.  Okay.  Couple more questions.  Was there
22  function or a something in the code where you could
23  remove a line of credit?
24    A.  Yes.
25    Q.  Okay.  How was that implemented?

Page 159

1    A.  I don't remember the details, but it would
2  have been -- it would have looked something like
3  these functions just with different functionality.
4    Q.  Okay.  And until it's removed, the line of
5  credit would be included in calculating the
6  collateral calculations?
7    A.  Yes.
8    Q.  And likewise it would be included in
9  avoiding a liquidation?
10    A.  Yes.
11    Q.  And then if we look back at Exhibit 21,
12  which is the chart that had the two spreadsheets on
13  LOC interest charges, my questions are about the
14  very last page, those last couple dates.  Looks like
15  this chart reflects that the line of credit was in
16  use on June 13th and June 14th, right?
17    A.  Yes.
18    Q.  Few more questions just going back to
19  account balance, which is something we talked about
20  earlier to clarify something.  So we were talking
21  about whether account balance included collateral
22  weight, IMF weight, and I think you had said there's
23  sort of different ways to use the term account
24  balance as a colloquial term and then might be a
25  different way it's used in the code.

Page 160

1    A.  Yes.
2    Q.  Just focusing on the use in the code, did
3  that -- did that use of the term account balance,
4  did that include factoring in the weights for
5  collateral items?
6    A.  It's totally possible that there were
7  points in the code that defined account balance in
8  that way.  I don't remember any such instances that
9  were actionable for things like liquidation.
10    Q.  Okay.  So the ones you do remember being
11  actionable didn't include the weighting and the
12  account balance?
13    MR. DUNNE:  Objection.
14    THE WITNESS:  The ones I remember, yes.
15    MR. HARRIS:  Q.  Okay.  And then in terms
16  of the account balance numbers that are presented to
17  the customers and the user interface, do you know
18  that account balance included waiting for
19  collateral?
20    A.  I don't remember.
21    Q.  Okay.  I want to talk about futures.  So
22  do you know what documents that were presented to a
23  customer governed the futures that they acquired on
24  the exchange?
25    MR. DUNNE:  Objection.

Page 161

1    THE WITNESS:  I don't know the universe of
2  docs.
3    MR. HARRIS:  Q.  When a customer entered
4  into a future, did the code match the customer with
5  the particular counterparty?
6    MR. DUNNE:  Objection.
7    THE WITNESS:  By and large, public order
8  books were used.  The code would perform the
9  matching -- using a set of rules, not itself
10  deciding ahead of time who the counterparty was.
11    MR. HARRIS:  Q.  But was the end result
12  that there was a particular counterparty for each
13  futures contract that a customer entered into?
14    A.  Yes, as far as I remember, yes.
15    Q.  Okay.  And then what would customers see
16  on the user interface about their futures contracts?
17    A.  Among other things, their open positions
18  for firms that has some non-zero total position on
19  all the future contracts for which that was true.
20    Q.  So would they see like the notional amount
21  of the futures contract?
22    A.  They would certainly see the number of
23  units denominated in number of contracts.  When you
24  say notional amount, that may be referring to the
25  equivalent dollar amount, and I don't remember

MAGNA
LEGAL SERVICES

1  exactly what was showed per future in an itemized
2  way.
3      Q.  Okay.  So if I, for instance, looked at
4  the balances for Bitcoin, would that include on that
5  page both spot and also futures positions.
6      A.  Those -- Bitcoin and Bitcoin futures
7  aren't perfectly commensurable.  If the two things
8  were shown, they would have been shown distinctly
9  and not sum together.
10     Q.  Did the user interface show the amount
11  that was gained or lost on futures positions?
12     A.  Yes, but here there are enormous
13  differences of views on how one can calculate that.
14  So it presented a interpretation.  But really
15  interpretation is a right way to see it, not the
16  definitive account.
17     Q.  What's the interpretation that the user
18  interface presented?
19     A.  I believe it's explained in one of the
20  articles.  There are different ways to mark such
21  things.
22     Q.  Okay.  Is it your understanding that the
23  way the database operated, it would settle the
24  contracts every 30 seconds and that the -- the gain
25  or loss on a contract was reflected in the U.S.

1  dollar balance every 30 seconds?
2      A.  In a literal sense, yes.
3      Q.  When you say in the literal sense, is
4  there some other sense you have in mind?
5      A.  That to customers the details of
6  settlement weren't surfaced and instead the U.S.
7  balance shown to them would also include unrealized
8  or unsettled P&L.
9      Q.  What would be unsettled P&L for a futures?
10     A.  Any amount of P&L that had accumulated
11  since the last 30-second settling event.
12     Q.  Okay.  Other than unsettled P&L, was there
13  anything about the futures that was reflected in the
14  negative U.S. dollar balance in a customer account?
15         MR. DUNNE:  Objection.
16         THE WITNESS:  To my understanding, futures
17  impact on dollar amounts remediated only through
18  P&L.
19         MR. HARRIS:  Q.  Okay.  Do you recall if
20  FTX ever communicated to customers that they did not
21  actually have futures contracts?
22     A.  I should clarify.  And fees and perpetual
23  future funding events.  I think those three -- it's
24  possible I'm forgetting more, but, yeah, those are
25  the things from futures that affected a USD balance.

1      Q.  Understood.  Do you recall if FTX ever
2  communicated to customers that they did not actually
3  have any futures contracts, but all they had was a
4  net account balance?
5          MR. DUNNE:  Objection to form.
6          THE WITNESS:  I don't recall that.
7          MR. HARRIS:  Q.  Is there anything in the
8  code that reflected that customers did not actually
9  have futures contracts --
10         MR. DUNNE:  Objection.
11         MR. HARRIS:  Q.  -- only had a net
12  account balance?
13         MR. DUNNE:  Sorry.  Objection.
14         THE WITNESS:  No, but I also don't know
15  what it would mean to have, as in own, a futures
16  position.
17         MR. HARRIS:  Q.  Could FTX liquidate a
18  customer's futures positions?
19     A.  They could -- yes.
20     Q.  So did the liquidation engine that would
21  also liquidate close-out futures contracts?
22     A.  Yes.
23     Q.  Did a liquidation engine also enable FTX
24  to transfer those futures contracts to a backstop
25  liquidity provider?

1      A.  By means of trade.
2      Q.  What do you mean by that?
3      A.  Bob couldn't be handed a futures position
4  from Alice.  Only way to change the state between
5  them was to make them perform a trade.
6      Q.  Would there be any reason from FTX's
7  perspective to perform a trade on a futures contract
8  instead of just closing it?
9          MR. DUNNE:  Objection.
10         THE WITNESS:  In my view, there's no way
11  to close it except by performing a trade.
12         MR. HARRIS:  Q.  Are you familiar with
13  perpetuals?
14     A.  Yes.
15     Q.  Okay.  They can be terminated at any time,
16  right?
17     A.  No.
18     Q.  No.  They exist in forever?
19     A.  Perpetual futures don't expire.
20     Q.  They don't expire automatically?
21     A.  Right.
22     Q.  But could a customer exit out of it?
23     A.  Right.
24     Q.  But you're saying the only way to exit out
25  of it is to engage in a trade with another customer?

**MAGNA**
LEGAL SERVICES

1    A.  Yes.
2    MR. HARRIS:  Okay.  All right.  Let me
3  show you some more script.
4    (EXHIBIT 70 WAS MARKED FOR
5    IDENTIFICATION.)
6    MR. DUNNE:  What are we on now?
7    MR. HARRIS:  Q. 70.  Okay.  You've been
8  handed Exhibit 70, which is the same formatting that
9  I described before, which is the first couple pages
10  are how it was produced to us and the next couple
11  pages are -- we printed in a way that added line
12  numbers, and my understanding is this is code that's
13  relevant to the futures positions.  Did you have any
14  role in generating this code or writing this code?
15    A.  I remember making changes to make it more
16  performant, including by instance sharding it, but I
17  did not write the original implementation or change
18  its business logic.
19    Q.  What does it mean, charting it?
20    A.  Sharding, s-h-a-r-d.
21    Q.  Okay.  What does that mean?
22    A.  Making parts of it operate in parallel to
23  make it faster.
24    Q.  Okay.  So if I understand right, other
25  than making changes to have it operate faster, you

1  don't recall making any of the other changes to this
2  portion of the code?
3    A.  I may have, but I don't remember it.
4  So --
5    Q.  Okay.  How -- if a customer entered into a
6  futures position, how would that affect their
7  account?
8    A.  There are a lot of ways.
9    Q.  Okay.  Can you run through what you can
10  think of, which would affect their account?
11    A.  At a high level, they would do so by
12  performing a trade.  They would have a corresponding
13  fill or trade be attributable to them.  That futures
14  position would demand some amount of collateral.
15  If -- at this point, so long as they had any futures
16  position on, given right circumstances in pricing,
17  they were -- they stood to be liquidated as
18  possible.
19    Q.  Any other ways you can think of that
20  affected their account?
21    A.  There are many that fall out from that.
22    Q.  Like -- like what?  What comes to mind?
23    A.  They're implied by the stuff I said
24  already and any number of ways to phrase it are
25  going to levels of detail.

1    Q.  Okay.  So what happens, for instance, to a
2  user's account when they open a BTC perpetual
3  position?  How would that be reflected in this
4  account?
5    MR. DUNNE:  Objection.
6    THE WITNESS:  Do you mind specifying more
7  about what you mean by reflected.
8    MR. HARRIS:  Q. Sure.  What balances
9  would change as a result?
10    A.  Instantaneously no balances would change
11  except for possibility charging of a fee.
12    Q.  Okay.  How about when it closed the
13  perpetual?
14    A.  The same is true.
15    Q.  So within the database, is there any
16  difference between closing a long perpetual position
17  and opening a short position?
18    MR. DUNNE:  Objection.
19    THE WITNESS:  For some futures, there were
20  asymmetries there in margin treatment.  I don't know
21  if I describe that as a distinction in the database.
22    MR. HARRIS:  Q. How about for BTC
23  perpetuals?
24    A.  I don't remember.
25    Q.  You don't recall there be being any

1  distinctions for BTC perpetuals?
2    A.  Right.  I remember in that case the
3  treatment of longs and shorts in most cases being
4  symmetrical for all the cases that are coming to
5  mind now, but, frankly, I'm speaking at a kind of
6  high level.
7    Q.  Do you know why the exchange data record
8  the opening and closing of futures contracts as buys
9  and sells?
10    A.  It didn't, not like that.
11    Q.  Didn't -- didn't use those terms?
12    A.  It's not the case that opening meant
13  buying and closing meant selling.
14    Q.  Okay.  Why did the -- why did the database
15  use the term buy and sell?
16    A.  One convention.
17    Q.  Were there other possible conventions?
18    A.  Yeah.
19    Q.  What do you have in mind?
20    A.  You could say long and short.
21    Q.  Okay.  Do you know who selected which
22  terms to use for the database?
23    A.  Pretty sure they preceded me.
24    Q.  Okay.  Okay.  Let's look at the code here
25  in Exhibit 70.  Does anything in this portion of the

1  code that's shown here result in a user's U.S.
2  dollar balance changing?
3      A.  I believe so, but this code does not
4  itself establish it.
5      Q.  Okay.  What do you have in mind?
6      A.  The sweep P&L to redis position function
7  is imported from another file that's not here.
8      Q.  What does that function do?
9      A.  I didn't write it.  I could guess, but I
10  didn't write it.
11      Q.  What would your assumption be as to what
12  that function does?
13      A.  Balances were, for performance reasons, a
14  sum of two different values maintained in two
15  different types of databases, one of which supported
16  fast updates, the redis, the other was slow updates,
17  postgresql.  Just inferring from the name, though,
18  not knowing for certain, it seems like this code in
19  the sweep P&L for position function starting on line
20  71 updates the fast updating databases values.
21      Q.  Okay.  And it's updating the U.S. dollar
22  balance in this particular section of the code?
23      A.  No, it's -- it's not directly doing that,
24  as far as I can tell.  It would have to be logic
25  within sweep P&L to redis position.  It doesn't

1  accept a U.S. dollar balance directly.  It's
2  possibly that code --
3      Q.  Okay.
4      A.  -- would itself affect the U.S. dollar
5  balance.
6      Q.  So if there is an impact on the U.S.
7  dollar balance, it would be through that function?
8      A.  Yes.
9      Q.  Okay.  On line 72, what does
10  position.unrealize_P&L refer to?
11      A.  That -- unrealized P&L would be -- like
12  the code for determining it would be defined on --
13  like in a different file.
14      Q.  Is that referring to the unrealized P&L in
15  the intervening 30 seconds?
16      A.  That is my inference.
17      Q.  Okay.  Then in line 73, what do you
18  believe position.net_cost refers to?
19      MR. DUNNE:  Objection to form.
20      THE WITNESS:  That too will be defined on
21  the position object in a different file.  My memory
22  is that it relates to the sum of all size times
23  prices that went into the corresponding trades that
24  built the position.  Signed positive if buy, signed
25  negative if sells, but I could be misremembering.

1      MR. HARRIS:  Q.  Okay.  In 77, what does
2  the sweep_P&L_2_redis_position refer to?
3      MR. DUNNE:  Objection.
4      THE WITNESS:  That is the function that I
5  am inferring, if any, of the things shown would
6  affect a dollar balance, but its logic is in a
7  different file.
8      MR. HARRIS:  Q.  Okay.  So what is done
9  with the P&L data once it's written to the redis
10  database?
11      A.  The balance is ultimately shown to users
12  where a sum of the thing to which that wrote and
13  that of a different database.  So it would affect
14  the practical balances used by the system.
15      Q.  Okay.  And that other database is the post
16  redis database?
17      A.  One of them is redis, as it's spelled
18  here, r-e-d-i-s.  The other one a post gresql, not
19  redis.  Yeah.  P-o-s-t g-r-e-s-q-l.
20      Q.  Okay.  Is there somewhere in the code that
21  reflects that every 30 seconds the P&L -- well, the
22  parties receive a credit or debit to their U.S.
23  dollar balance?
24      A.  Not sure if there's something outside of
25  this.

1      Q.  Is there something inside of this -- this
2  code in Exhibit 70?
3      A.  The function starting on line 85 suggests
4  that much of the code here is run once every 30
5  seconds.
6      Q.  So that portion starting on line 85
7  suggested some functions are run every 30 seconds;
8  is that right?
9      A.  Right.  Suggests that the sweep P&L
10  function for the given shard is run once every 30
11  seconds.  Line 93 says to do so across a series of
12  shards.
13      Q.  Right.  But you can't tell from this code
14  whether that means that there's an impact every 30
15  seconds to the U.S. dollar account?
16      A.  Right.  This code does not itself strongly
17  imply it because it depends on the particulars of
18  the sweep_P&L_2_redis_position function.
19      Q.  Okay.  Are you familiar with the term
20  reference price as it's used in futures trading?
21      A.  I'm familiar with the content of reference
22  prices, but I don't know if we're talking about
23  exactly the same thing.
24      Q.  What do you mean when you said you're
25  familiar with the term reference pricing?

MAGNA ▶
LEGAL SERVICES

1    A.  I only mean it in the most general sense
2  that when thinking about how to price some asset you
3  might refer to other prices.
4    Q.  Okay.  Is there anywhere in the code that
5  shows the reference price for futures?
6    A.  My memory is not that reference price
7  itself as a term was used in the code base, but I
8  could be wrong about that.
9    Q.  Do you know, focusing on Three Arrows,
10  what kinds of futures positions Three Arrows had on
11  the FTX exchange in June 2020?
12    A.  I don't remember.
13    Q.  Okay.  Or how many futures contracts Three
14  Arrows had?
15    A.  I don't remember.
16    Q.  We talked a little bit about clawbacks and
17  liquidations.  Is it fair to say that FTX had
18  implemented kind of extensive procedures designed to
19  prevent losses?
20    MR. DUNNE:  Objection.
21    THE WITNESS:  It implemented some
22  procedures designed to prevent losses.
23    MR. HARRIS:  Q.  Okay.  Like what
24  procedures do you have in mind?
25    A.  The automated liquidation system comes to

1  mind.
2    Q.  Okay.  And the general concept of margin
3  requirements was also imposed to try and prevent
4  losses from being -- from occurring; is that right?
5    MR. DUNNE:  Objection.
6    THE WITNESS:  Yes, although here prevent
7  could take on two meanings, and it's true for one
8  and not the other.
9    MR. HARRIS:  Q.  Okay.  What are the two
10  meanings you have in mind?
11    A.  Doesn't make it an impossibility.  It
12  serves to make it less likely.
13    Q.  So the margin requirement and the
14  automatic liquidation were intended to make losses
15  less likely; is that right?
16    A.  That's my interpretation of why they were
17  there.
18    Q.  Okay.  If the way the FTX platform
19  operated was the customers didn't actually have any
20  assets or liabilities but just had a net account
21  balance, that was the only thing they had, would
22  you -- would there still be a reason to have an
23  automatic liquidation system?
24    MR. DUNNE:  Objection.
25    THE WITNESS:  It's hard for me to even

1  imagine such a case.  All you have are balances.
2  What are you doing?  Just giving people money?
3  That's no trading.
4    MR. HARRIS:  Q.  That's not how you
5  envision the system working?
6    A.  Correct.
7    Q.  Okay.  And it's not how it appeared to
8  operate from the code?
9    MR. DUNNE:  Objection.
10    THE WITNESS:  The code had more levels of
11  detail than just total account balance.
12    MR. HARRIS:  Q.  Okay.  All right.  I'm
13  going to ask questions that are just focused on
14  Three Arrows now and see what involvement you
15  remember or not.
16    A.  Sure.
17    Q.  So did you ever have direct interactions
18  with anyone at Three Arrows like Kyle Davies or Su
19  Zhu?
20    A.  Not Kyle Davies or Su Zhu.  I met one
21  trader who worked at Three Arrows Capital at a house
22  party in Chicago.
23    Q.  Who is the trader?
24    A.  I don't remember their name.
25    Q.  Other than that one interaction, did you

1  have any like professional interactions with anyone
2  at Three Arrows?
3    A.  Not that I remember.
4    Q.  Who do you recall being the point person
5  at FTX for the Three Arrows account?
6    A.  I don't -- I don't know who was for Three
7  Arrows in particular.  There are various teams and
8  personnel on those teams that generally spoke to
9  trading firms that operated on FTX.
10    Q.  Is there anyone you're thinking that you
11  know did have interactions with Three Arrows?
12    A.  Zane Tackett, I believe, did have
13  interactions with Three Arrows.
14    Q.  Anyone else you can think of?
15    A.  There were other non-trading activities at
16  Three Arrows and Alameda together, and for those
17  there are other personnel that come to mind still
18  that likely were in contact, but I don't know for
19  sure.
20    Q.  What were the non-trading activities you
21  have in mind?
22    A.  I believe that Three Arrows and Alameda or
23  FTX co-invested in various crypto projects.
24    Q.  What crypto projects are you thinking of?
25    A.  There's only one which I remember a name,

1    LayerZero.  It's possible there were others.
2        Q.  Lair, l-a-i-r?
3        A.  L-a-y-e-r.
4            MR. HARRIS:  Okay.  All right.  Why don't
5    we do Tab 23.
6            (EXHIBIT 71 WAS MARKED FOR
7            IDENTIFICATION.)
8            MR. HARRIS:  Q.  All right.  So you've
9    been handed like a -- I believe it's a Telegram
10   group chat in the FTX customer support group.  Do
11   you remember this?  Not this specific exchange, but
12   first just generally the FTX customer support group?
13       A.  Yeah, I think this is a Slack group.
14       Q.  Slack group?
15       A.  Slack channel, and I remember the channel.
16       Q.  Okay.  And you were a member of the
17   channel?
18       A.  Yes.
19       Q.  Okay.  The questions I have are -- it's
20   pretty close to the end.  It's an email -- or it's a
21   message that starts with 3:51 p.m. from Lena Ngoy?
22       A.  Uh-huh.
23       Q.  What role did Lena Ngoy have at FTX, do
24   you remember?
25       A.  I don't remember.

1        Q.  Okay.  Do you see there's a message posted
2    from Three Arrows, "You know in the settings on the
3    exchange you can turn on charge interest so that
4    when we are below 30,000 USD you don't auto convert
5    our coins.  How is that 10 basis points daily
6    interest calculated?  Do we get charged one day as
7    soon as we are under?"
8            Do you see that question that was
9    forwarded?
10       A.  Yes, uh-huh.
11       Q.  Okay.  And then you write an answer, "Get
12   charged every minute based on how much more negative
13   you are than 30,000."
14           Do you see that?
15       A.  Yes.
16       Q.  Okay.  What does -- what did you mean by
17   that below 30,000?
18       A.  I think this is as described in a previous
19   exhibit actually.
20       Q.  Can you help -- which one are you thinking
21   of?
22       A.  One moment.
23       Q.  Yeah.
24       A.  Exhibit 64.  The page -- the page ending
25   in 3850.

1        Q.  Does this suggest that at least some of
2    Three Arrows' accounts at this point did not have
3    margin trading enabled?
4        A.  Either that or they were contemplating it
5    or I didn't understand.
6        Q.  Okay.  Any -- so this is May 2020.  Any
7    idea why this question was being asked at this time?
8        A.  I'm not sure.
9            MR. HARRIS:  Okay.  All right.  Let's do
10   Tab 14, I guess.
11           (EXHIBIT 46 PREVIOUSLY MARKED FOR
12           IDENTIFICATION)
13           MR. HARRIS:  Q.  Okay.  You've been
14   handed another exhibit that was already marked.
15   It's Exhibit 46.
16       A.  Uh-huh.
17       Q.  This is the group chat again from FTX
18   customer support?
19       A.  Yes.
20       Q.  My questions are at the very beginning of
21   the chat here, but you can look anywhere you like,
22   but my questions are Leven Liu at 3:58 a.m. sent a
23   message -- I'm sorry.
24       A.  I'm sorry.  Which page?
25       Q.  It's the first page of the messages

1    themselves.
2        A.  Thanks.  I see it.
3        Q.  Okay.  So Leven Liu at 3:58 a.m. writes,
4    "Hi, Team Three Arrows," and he references Kyle
5    Davies, Three Arrows again.  "Are getting not enough
6    balance error on main account when placing spot
7    orders even with margin toggled.  The only weird
8    stuff we've observed is they're having negative USD
9    balance and all the free collateral having is LOC.
10   Will this be the case?  Could you shed more light on
11   this?"  And it's directed to you and Adam Yedidia.
12           Do you see that?
13       A.  Yes.
14       Q.  And so what do you think this is referring
15   to that they're having negative USD balance and all
16   the free collateral having is LOC?
17       A.  I'm confu- -- I'm having a hard time
18   parsing that honestly.
19       Q.  When would a user get a not enough balance
20   error?
21       A.  Plenty of circumstances.
22       Q.  Okay.  What -- can you think of some?
23       A.  The user is trying to spend money buying
24   on a spot market with dollars such that the trade
25   would result in them having fewer dollars than their

MAGNA
LEGAL SERVICES

Page 182

1  line of credit.  Same type of thing we had talked
2  about earlier.
3      Q.  Okay.  Any other instances you can think
4  of?
5      A.  Same thing absent all the details of line
6  of credit.
7      Q.  Okay.  And then what do you think negative
8  USD balance referred to here?
9      A.  I think the sentence doesn't really parse.
10  It might refer to them already having a negative USD
11  balance despite having a line of credit also.
12  Something like that.
13      Q.  Okay.  Do you see a few lines down
14  Mr. Bankman-Fried says, "We'll take near" -- that's
15  n-e-a-r -- "down by 50 percent."
16      Do you see that?
17      A.  Yes.
18      Q.  He also said, "That should free up
19  approximately 50 million or so of collateral."
20      Do you see that?
21      A.  Yes.
22      Q.  So what did that mean to take near down by
23  50 percent?
24      A.  He's speaking about the IMF factor that he
25  addresses a few lines above, which is informed how

Page 183

1  steeply marginal amounts of a futures position would
2  demand additionally -- like an increasing amounts of
3  margin.
4      Q.  The general concept is the more larger
5  position you have the more of a haircut is applied
6  to it?
7      A.  That would be its analog for collateral.
8  Here it's that the larger position you have, the
9  more -- not as applied to it, but the more margin it
10  depends in some non-linear way.
11      Q.  Okay.  And so FTX manually modified the
12  margin requirements as they applied to 3AC in this
13  instance?
14      A.  I'm not aware of any way to do so in a
15  customer specific way.  I expect he was talking
16  about it in a global way.
17      Q.  So do you think he was proposing to make a
18  global change to accommodate this error that Three
19  Arrows was experiencing?
20      MR. DUNNE:  Objection.
21      THE WITNESS:  Yeah, I don't necessarily
22  think the two are connected except insofar as he was
23  alerted to a problem that was reflected in their
24  account and it might have informed a separate
25  decision.

Page 184

1      MR. HARRIS:  Q.  Okay.  Do you recall how
2  this issue was resolved specific to Three Arrows?
3      A.  No.
4      Q.  Do you recall any conversations about
5  this?
6      A.  No.
7      Q.  If you look at the top of the next page,
8  there's a message from Levin Lou at 5:53 a.m. you
9  write, "Aha, they tried again after we gave them
10  collateral.  It works now."
11      Do you see that?
12      A.  Yes.
13      Q.  Any idea what the reference is to we gave
14  them collateral means?
15      A.  I suspect she misunderstands.
16      Q.  What do you think the confusion was?
17      A.  It sounds like she thinks that FTX handed
18  Three Arrows Capital collateral instead of changing
19  non-linearity behavior on the amount of collateral
20  existing positions demanded.
21      Q.  Your expectation as to what happened was
22  FTX changed the IMF for all customers and that
23  resulted in change in the available collateral or
24  the collateral used for Three Arrows?
25      MR. DUNNE:  Objection.

Page 185

1      THE WITNESS:  Available collateral and
2  yes.
3      MR. HARRIS:  Q.  Okay.
4      A.  I'm drawing that inference.  I don't know
5  for a fact.
6      Q.  Okay.  I want to move now into the May
7  2022 time period.  Assume you were following the
8  crypto markets at that time?
9      A.  Honestly, no.
10      Q.  Did you hear about the Luna and Terra
11  crash in May 2022?
12      A.  Yes.
13      Q.  Okay.  This was large news in the
14  industry?
15      A.  Yes.
16      Q.  Okay.  Were you aware that Three Arrows
17  held a substantial amount of Luna.
18      A.  No.
19      Q.  Do you recall --
20      A.  I should say I might have been, but I
21  don't remember, if so.
22      Q.  Do you remember any discussions within
23  Three Arrows in the May time period about -- I'm
24  sorry -- discussions within FTX about the impact of
25  that on Three Arrows?

1    A.  Yes.
2    Q.  What do you remember?
3    A.  I remember conversations.  Although, I
4  don't know if they're fully overlapping with Signal
5  chats that you may already have about Three Arrows
6  Capital being in trouble financially.  I don't
7  remember if they related to Luna -- if they
8  discussed Luna in particular or their positions in
9  Luna.
10    Q.  Okay.  When do you think those
11  conversations started?
12    A.  I don't know.
13    Q.  Do you think they were shortly after the
14  Luna collapse?
15    A.  Stands to reason, but I don't actually
16  remember.
17    Q.  Okay.  Do you remember anyone expressing
18  the view that they thought Three Arrows was in
19  financial trouble?
20    MR. DUNNE:  Objection.
21    THE WITNESS:  I remember Zane Tackett
22  expressing that they might be.
23    MR. HARRIS:  Q.  Okay.  Was this in,
24  like, May?
25    A.  I know of one Signal chat from June.  I

1  don't remember anything from May, but it's possible
2  there were separately discussions in May.
3    Q.  Okay.  Aside from the Signal chats, do you
4  remember there being any conversations about Three
5  Arrows' financial troubles?
6    A.  Not in particular.
7    Q.  Do you have a general sense of that?
8    A.  I have a general sense of a lot of the
9  non-technical folks talking about crypto companies
10  crashing and going under during all the tumult of
11  May and June.  I don't remember if they spoke about
12  the Three Arrows in particular.
13    Q.  When you say non-technical folks, like who
14  are you thinking of?
15    A.  I should say non-engineers.  Culturally
16  engineers were pretty heads down and didn't follow
17  prices.
18    Q.  Okay.  The non-technical folks, would that
19  include people like Mr. Tackett and Mr. Salame?
20    A.  Yes.
21    Q.  Okay.  So I'm just going to ask you some
22  big picture questions and see if you know -- have
23  any memory what happened.  So I'll just represent to
24  you that in -- as of early June, Three Arrows had
25  approximately a billion dollars of digital assets

1  that were attributed to it on the FTX exchange and
2  about $500 million notional amount of futures.  And
3  then around the same time it had something less than
4  a billion of a negative U.S. dollar balance.  So do
5  you remember any of that?
6    A.  No.
7    Q.  Okay.  And then on June 13th the great
8  bulk of those digital assets were sold.  Do you have
9  any knowledge of what caused that sale of assets on
10  June 13th?
11    A.  I know of a sequence of sales.  I don't
12  know if it's the same, the one that you're
13  referencing.
14    Q.  Okay.  What's the sequence of sales that
15  you remember?
16    A.  I remember participating in manually
17  liquidating some of Three Arrows Capital's crypto
18  holdings.
19    Q.  Okay.  All right.  And so you don't
20  remember that was on the 13th or the 14th?
21    A.  Right.  The Signal chat that implies that
22  it's 14th or after.
23    Q.  Okay.
24    A.  But I don't have an independent
25  recollection.

1    Q.  What do you remember about the manual
2  liquidation?
3    A.  I remember the process by which it
4  happened.
5    Q.  Okay.  What was the process by which it
6  happened?
7    A.  I remember running a script that sold some
8  of their crypto holdings to top up on negative
9  dollar balances.
10    Q.  Okay.  Did someone like direct you to do
11  that?
12    A.  Yes.
13    Q.  And who was that?
14    A.  I don't remember who exactly.  Could have
15  been one of several people.
16    Q.  Who are the possibilities?
17    A.  Ryan Salame, Zane Tackett, Dan Friedberg,
18  Ken Sung, or Sam Bankman-Fried.  Any of them seem
19  possible to me.
20    Q.  Okay.  Someone in that group directed you
21  to run a script to sell Three Arrows Capital or
22  crypto holdings?
23    A.  Some of them sufficient to shore up their
24  negative USD balances.
25    Q.  Okay.  So what do you recall you were

1  asked to do?
2      A.  I think exactly that.  There was a
3  separate question of how to price those trades, and
4  I also remember asking about how to do so.
5      Q.  All right.  So let me -- I'll go through
6  both of those.  So you recall you were directed to
7  sell enough of the Three Arrows crypto assets to
8  cause some change to the negative U.S. dollar
9  balance; is that right?
10     A.  My memory is that it was -- I remember
11 that I did effectuate trades such that they no
12 longer had a negative USD balance.  I'm not a
13 hundred percent confident on that, but I think so.
14     Q.  Do you believe that's what you were asked
15 to do, effectuate sufficient trades to eliminate
16 Three Arrows's negative USD balance?
17     A.  In greater detail, yes.
18     Q.  And I think the second issue you pointed
19 out was the question of what price to effectuate
20 those trades at?
21     A.  Right.
22     Q.  What do you remember about that issue?
23     A.  I recall -- I remember asking how to do so
24 being given a list of prices for each asset and
25 hearing that they were generous to Three Arrows

1  Capital relative to what the liquidation system
2  would have done.
3      Q.  Okay.  Just to walk through them.  So you
4  said you were given a list.  Did someone like email
5  it to you or put it in a chat?  How did you get that
6  list?
7      A.  I believe in a chat.
8      Q.  Okay.  So you think there was some chat
9  where someone told you to apply certain prices to
10 different assets that Three Arrows had?
11     A.  Right.
12     Q.  And you remember being told that it was --
13 the prices were generous compared to what would
14 result in a liquidation; is that right?
15         MR. DUNNE:  Objection.
16         THE WITNESS:  Generous relative to what
17 would have happened if they instead got liquidated
18 by the automatic system.
19         MR. HARRIS:  Q.  I see.  Do you know how
20 those prices compare to the mark-to-market for those
21 assets?
22     A.  I don't know except that the script that I
23 believe I would have used would have ensured that
24 they are within tight bounds of the mark-to-market
25 prices.

1      Q.  Why do you say that?
2      A.  I don't remember exactly what script I
3  used.  There's a set up that today makes sense me to
4  me and that I expect I did.  I remember generally
5  using.  In which one of the functions that I would
6  use to perform the trade also performed that check
7  and ensure that the price was very close to that --
8  the current prevailing market prices.
9      Q.  So I understand that you -- you say
10 there's a set up today that makes sense to me and
11 you remember generally using, you mean you remember
12 using it in other situations?
13     A.  I remember using it in situations --
14 probably also other ones.  Probably this one.  I
15 don't remember exactly which situations -- in which
16 situations I used this or didn't.
17     Q.  Okay.  So do you remember you executed
18 other manual liquidations besides Three Arrows?
19     A.  No, I think mostly that was not me, if
20 they ever took place, but there was still reasons to
21 perform one-off trade, say, in other instances and
22 those too would have used this.
23     Q.  So you remember other instances where you
24 caused sales of a customer's assets or --
25     A.  I mean, yes, an example being buying

1  locked FTT.
2      Q.  Okay.  And is that the instance -- I'm
3  just trying to remember -- trying to learn when it
4  is you recall using this function that you set up.
5  You don't recall it specifically for Three Arrows,
6  but you recall some function, right?
7      A.  Right.  Some function used plenty of times
8  in a wide array of situations.
9      Q.  Okay.  But just to be clear, you were
10 given a price to use for these assets, right?
11     A.  I believe so.
12     Q.  So why is it you think you use the
13 function as opposed to just using the prices you
14 were given?
15     A.  The function would have been the easiest
16 way to make it happen.  That it separately validated
17 the prices -- price provided was close to that of a
18 market price was a helpful safety measure at worst.
19     Q.  So do you know which it is you did?  Did
20 you use the functions that you were provided, or did
21 you -- I'm sorry.  Did you use the prices you were
22 provided or you used some function that ran and
23 generated prices?
24     A.  I don't know for sure.  I expect and have
25 some memory that I was given prices, but that the

MAGNA
LEGAL SERVICES

Page 194

1  function I used would have ensured -- would have,
2  like, failed and rejected to do anything were it not
3  the case that provided prices were within some close
4  bound --
5       Q.  Okay.
6       A.  -- through market price.
7       Q.  Any way to tell what that bound was?
8       A.  The code might describe it.  I'm not sure.
9       Q.  So the function you're thinking of is some
10  function that's in the code itself?
11       A.  I think so, but I am not sure.
12       Q.  But you think it's different than the
13  function that applies when there's an automatic
14  liquidation?
15       A.  Oh, yes.
16       Q.  Okay.  So where would I find this function
17  in the code?
18       A.  In the code.
19       Q.  But you think it's not within the code
20  related to liquidations?
21       A.  That's right.
22       Q.  Okay.  Do you know how I would find the
23  list of prices that you were given?
24       A.  The trade history for the account will say
25  so definitively.

Page 195

1       Q.  Okay.  Trade history, you mean the fills?
2       A.  Right.  That's right.
3       Q.  There's some other document, which you
4  were actually given a list of prices, right?
5       A.  I believe so.
6       Q.  So do you know how I would find that
7  document that listed the prices?
8       A.  I don't know.  I expect this was over
9  Signal.
10       Q.  Okay.  Okay.  Do you recall that before
11  these manual liquidations happened Three Arrows had
12  a positive net account value?
13       A.  I didn't -- I don't independently recall
14  that, but there are messages that suggest that.
15       Q.  Okay.  Do you know after the liquidation
16  happened whether Three Arrows still had a positive
17  net account value?
18       A.  I vaguely remember that they did, but I'm
19  not confident.
20       Q.  Okay.  Do you recall, in addition to this
21  manual liquidation, after that then the line of
22  credit was closed?
23       A.  That makes sense to me.  But I don't
24  independently recall it.
25       Q.  And why do you say it makes sense to you?

Page 196

1       A.  There are messages and circumstances
2  implied by those messages that suggest that removing
3  Three Arrows Capital line of credit from their FTX
4  account was desirable.  The purpose of liquidating
5  them in this fashion before moving the line of
6  credit instead of in the opposite order would have
7  been to give them favorable prices to prevent
8  possibility for complaints, for instance.
9       So if these trades were performed, it
10  makes sense to me today that the logical next step
11  would be to remove the line of credit, which was the
12  source of ultimate risk to FTX.
13       Q.  When you say favorable, you mean favorable
14  to the prices that would have been imposed in the
15  automatic liquidation?
16       A.  That's right.
17       Q.  But not favorable to mark to market?
18       A.  Not necessarily, though it may also have
19  been.
20       Q.  Okay.  Do you recall an instance where you
21  did a manual sale of assets for a customer where
22  they received greater than mark to market?
23       A.  I don't recall.
24       Q.  Is that possible under the code you're
25  thinking of?

Page 197

1       A.  Yeah, from what I remember of it.
2       MR. HARRIS:  All right.  Why don't we do
3  Tab 24.
4       (EXHIBIT 72 WAS MARKED FOR
5       IDENTIFICATION.)
6       MR. HARRIS:  Q.  Okay.  You've been
7  handed Exhibit 72, which is message chain.  The
8  subject matter is FTX-LOCS.  This might be the chat
9  chain you were thinking of.  If not, let me know.
10  Maybe there's something else out there, but take a
11  look at it.
12       Is this message chain the one you were
13  thinking of?
14       A.  No.
15       Q.  No, okay.  All right.  Well, let me start
16  with this one, then.  Have you seen this discussion
17  before?
18       A.  Recently, yes.
19       Q.  Okay.  Recently like not at the time, but
20  in preparation for something?
21       A.  In preparation for this and maybe also at
22  the time, but not certainly at the time.
23       Q.  Okay.  You see this is from June 14th,
24  2022.  The time stamps are always confusing, but
25  this starts at 12:02 a.m., Mr. Tackett, and then at

**MAGNA** ▶
LEGAL SERVICES

1  2:42 a.m. he directs a message to you.  "They are
2  now 20 million in the hole and stopped responding."
3      Do you see that?
4      A.  Yes.
5      Q.  What did you understand 20 million in the
6  hole to mean?
7      A.  I have an understanding reading it now.
8  I'm not sure what I understood at the time.
9      Q.  Okay.  Sitting here today, what do you
10 take it to mean?
11     A.  That by some measure their account
12 value -- the value of their account is less than the
13 value of their line of credit by $20 million.
14     Q.  Okay.  So if the line of credit was
15 120 million, your understanding, just reading this,
16 would mean that they're now -- the value of their
17 account is under a hundred million?
18     A.  Right.  That if you included the line of
19 credit, it would be a hundred million.  If you
20 excluded it, negative 20 million.
21     Q.  Okay.  And then further down at --
22 Mr. Tackett sends a message at 6:17 a.m.  Looks like
23 he's maybe forwarding or copying a Twitter message
24 where someone named Chris Barsness writes, "We may
25 be hearing the same rumors."

1      Do you see that?
2      A.  Yes.
3      Q.  And then later on in that day at 1:17 p.m.
4  Mr. Richard Chang says, "I think there's something
5  to this 3AC rumor."
6      Do you see that?
7      A.  Yes.
8      Q.  Do you remember hearing about this at the
9  time?  People discussing rumors about Three Arrows?
10     A.  I don't today remember.
11     Q.  Okay.
12     A.  It wouldn't surprise me if I did, at the
13 time, overhear some.
14     Q.  Sitting here today, do you remember what
15 this rumor was that's being talked about in this
16 chain?
17     A.  Not this particular one.
18     Q.  Okay.  What was Mr. Chang's role?
19     A.  He also worked on the VIP team in some
20 capacity alongside Zane.
21     Q.  Okay.  You see near the bottom of this
22 chain he writes, "Do we have the legal right to
23 delete the LOC?  If so, we should probably do so in
24 case they try to withdraw more from the account."
25     Do you see that?

1      A.  Yes.
2      Q.  What do you understand him to be asking?
3      A.  I think he's asking if it's legally
4  permissible to remove their line of credit.
5      Q.  And why would that impact the ability to
6  withdraw from their account?
7      A.  It's not so much that it would impact it.
8  It might.  It's that withdrawing serves only to make
9  their financial situation worse on FTX thereby
10 further endangering FTX so long as there's an
11 outstanding line of credit.
12     Q.  Okay.  And you see Mr. Bankman-Fried
13 responds, "We've turned off withdrawals."
14     Do you see that?
15     A.  Yes.
16     Q.  And is that a feature in the code where
17 you can turn off a customer from making any further
18 withdrawals?
19     A.  Right.  Admins could change that behavior
20 for customers.
21     Q.  Okay.  So they would not need to go
22 through you necessarily to do that?
23     A.  Certain -- I forget exactly what the state
24 of the code was at this point with respect to those
25 permissions.  At various points different types of

1  accounts required different levels of internal
2  authority or permission as an FTX employee to
3  perform this action.
4      Q.  Do you remember if you were the one who
5  turned off withdrawals for Three Arrows?
6      A.  I don't recall.
7      Q.  Right above that, Mr. Tackett at
8  1:45 p.m., looks like his message he sent a web
9  link?
10     A.  Uh-huh.
11     Q.  Is that the page that monitors a user's
12 line of credit?
13     A.  I believe it's the admin page that FTX
14 employees can see that lists accounts with lines of
15 credit and their -- and some -- some summary of
16 their status.
17     Q.  Can an admin make changes to the line of
18 credit on that page?
19     A.  I don't remember.
20     MR. HARRIS:  All right.  Let me try
21 another chat chain and see if this is what you're
22 thinking of.  53.
23     (EXHIBIT 73 WAS MARKED FOR
24 IDENTIFICATION.)
25     MR. HARRIS:  Q.  Okay.  You've been

Page 202

1  handed Exhibit 73, which is screenshots of a Signal
2  message chain.  These are actually I think
3  screenshots produced by Mr. Tackett who then
4  provided them to FTX's lawyers or produced them to
5  us.  So there might be a little hard to read, but
6  hopefully you can read how it's printed.
7       Are you able to read this okay?
8  A.  Yeah, enough.
9  Q.  Okay.  Take a look.  Maybe -- is this the
10  chat chain you're thinking of?
11  A.  Yes.
12  Q.  Okay.  Great.  So this looks like it's a
13  group chat created by Mr. Tackett, right?
14  A.  Yes.
15  Q.  Okay.  And he writes, "So I'm hearing
16  rumors that 3AC is not faring well.  They have
17  120 million-dollar line of credit.  They're
18  currently negative" -- I believe that's one million
19  225,000 in the hole, and then he writes, "Yesterday
20  got to negative 20 million."
21       Do you see that?
22  A.  I do.
23  Q.  Is that -- when he talked about in the
24  hole, that's the same understanding you just
25  described before?

Page 203

1  A.  I'm inferring here.  I don't know what he
2  was thinking.
3  Q.  Okay.
4  A.  That's how I read this now.
5  Q.  Okay.  And then you write, "I'm seeing
6  them back positive in account value."
7       Do you see that?
8  A.  Yes.
9  Q.  And then you say, "They ended up very --
10  they ended up very levered long crypto.  So plus
11  crypto, minus USD."
12       Do you see that?
13  A.  Almost.  I think I'm saying they --
14  they'd, like they would end up very levered long
15  crypto.
16  Q.  So if you took away their line of credit,
17  then Three Arrows would be very long in crypto but
18  have a very large negative U.S. dollar balance?
19  A.  Yes.
20  Q.  Okay.  And, in particular, Three Arrows
21  would have a negative 80 million U.S. dollar
22  balance, right?
23  A.  Yes.
24  Q.  And then a positive 10 U.S. dollar in
25  crypto collateral, right?

Page 204

1  A.  Right, but those aren't like parts.
2  Q.  What do you mean by that?
3  A.  I think I was saying here they'd have a
4  negative $80 million U.S. balance, a positive
5  $90 million in crypto, resulting in positive 10
6  overall.
7  Q.  Okay.
8  A.  Which would all be -- and the 10 would
9  have to be comprised of crypto no matter how you
10  interpreted it.
11  Q.  I see.  So those two different items, the
12  negative U.S. $80 million account and then the
13  positive $90 million crypto, resulted in this
14  $10 million positive crypto collateral?
15  A.  I think so.
16  Q.  Okay.  And then you wrote, "So if things
17  move, they could get liquidated."
18       What did you mean by that?
19  A.  That it's possible that in the case that a
20  line of credit were immediately removed and they
21  ended up negative 80 million USD, positive
22  90 million crypto, it's possible they could be
23  immediately liquidated depending on the
24  non-linearity or haircut treatment of the 90 million
25  in crypto, which I don't know if I'm accounting for

Page 205

1  or not here.  It's certainly possible that in such
2  position if crypto decreases in price they could get
3  liquidated.
4  Q.  Okay.  So you're not sure if movement --
5  by here you meant removing the LOC or meant moving
6  in the values of the crypto?
7  A.  I think I meant movement in values of
8  crypto.
9  Q.  And then you write, "Can we ask them to
10  bring their USD value up to 120 million?  So sell
11  their crypto with the execution style they prefer
12  instead of liquidations, and then we'll remove the
13  LLC."
14       Do you see that?
15  A.  Yes.
16  Q.  So what did you mean sell their crypto
17  with the execution style they preferred instead of
18  liquidation?
19  A.  That in order to remove their line of
20  credit cleanly in such a way that they wouldn't have
21  any resulting negative USD balance, their USD value
22  would have to be equal to that of the line of credit
23  or their USD balance.  So 120 million.  One way to
24  get there is through something like manual
25  liquidation.

MAGNA
LEGAL SERVICES

1    Another way is for them to do the
2 equivalent of it themselves. Execution style means
3 with whatever means of selling they like. They're a
4 trading firm. They're in the business of execution.
5    Q.   And when you said instead of liquidation,
6 that meant --
7    A.   The third way is that the liquidation
8 engine does it for them. All three approaches are
9 fundamentally doing the same thing, which is selling
10 crypto to dollars.
11    Q.   They differ in terms of who is doing them
12 and the price at which they're sold?
13    A.   Or the approach.
14    Q.   Okay.
15    A.   Second order of X.
16    Q.   And then it looks like Mr. Tackett
17 responds, "They aren't responding, but, yeah, we
18 will ask them to do that and tell them we need to
19 reduce the LOC size."
20    Do you see that?
21    A.   Yes.
22    Q.   And then looks like you had a message, but
23 it says this message was deleted. What is that
24 function? How do you delete a message?
25    A.   On Signal, there's three little dots next

1 to some messages. You can click it and click delete
2 for everyone, which does exactly that.
3    Q.   Okay. This is asking a lot, but do you
4 remember what you had said that you deleted?
5    A.   I don't remember. I did it all the time
6 when I wrote a typo, and I sent a message in the
7 next few seconds or minute. I expect it was the
8 same thing.
9    Q.   Okay. And then Mr. Tackett writes,
10 "Should we turn off withdrawals?" And you respond,
11 "We could disable withdrawals if they don't get back
12 to us."
13    Do you see that?
14    A.   Yes.
15    Q.   And then you responded I guess a message
16 later that seems a bit aggressive. Do you see that?
17    A.   Yes.
18    Q.   What did you mean by that?
19    A.   That it removed agency from Three Arrows
20 Capital to turn off their withdrawals.
21    Q.   And then why did that seem aggressive to
22 you?
23    A.   It was my low context read at the time.
24    Q.   Okay. And looks like Mr. Tackett
25 disagreed, right?

1    A.   Yeah.
2    Q.   Okay. And then a little further down you
3 write, "Disabled withdrawals. Things are locally
4 not terrible. They're net positive, but barely."
5    Do you see that?
6    A.   Yes.
7    Q.   Says disable withdrawals. That suggests
8 that you were the one who disabled the withdrawals
9 for Three Arrows?
10    A.   I'm actually -- I'm not sure.
11    Q.   Okay.
12    A.   I could just be reporting a thing someone
13 else did.
14    Q.   Okay. And then you see Mr. Salame writes,
15 "Yeah, we have decent evidence it's real."
16    Do you think that's a reference to the
17 rumors that Three Arrows is not faring so well?
18    A.   That's my inference.
19    Q.   And then he writes, "Ben is friends with
20 an employee there who basically said even
21 internally, they have no idea what's going on.
22 Management not responding to them."
23    Do you see that?
24    A.   Yes.
25    Q.   Who do you think Ben was a reference to?

1    A.   I don't know.
2    MR. DUNNE: Objection.
3    MR. HARRIS: Q. Okay.
4    A.   Yeah, I don't know of a Ben.
5    Q.   Okay. And you respond, "Geez," right?
6    A.   Yeah.
7    Q.   What were you trying to convey?
8    MR. DUNNE: Objection.
9    THE WITNESS: Surprise. Sadness.
10    MR. HARRIS: Q. Okay. Then Mr. Tackett
11 writes, "Should we take further?" And Mr. Salame
12 says, "Like what? Call the block. LOL. Still
13 could be rumors. Just feels real strong." You see
14 that?
15    A.   Yeah.
16    Q.   Any idea what call the block meant?
17    MR. DUNNE: Objection.
18    THE WITNESS: I'm not sure.
19    MR. HARRIS: Q. Okay. And then you
20 write, "The extreme thing would be to liquidate the
21 ACC now, but I agree. I think we shouldn't for now.
22 By liquidating, I mean forcibly remove the LOC
23 leaving them pretty levered."
24    Do you see that?
25    A.   (Nods head.)

Page 210

1      Q.   This is one of those you have to say yes
2  so she can --
3      A.  I'm sorry.  Yes, yes.
4      Q.   Why did you describe forcibly removing the
5  line of credit as the extreme thing?
6      A.  It was among the extremes available.  I
7  didn't mean extreme in a subjective sense.  I meant
8  it along the scale of possible actions.
9      Q.   Okay.  Then Mr. Tackett -- first, he
10  responds to Mr. Salame's comment call the block LOL,
11  and he writes, "No.  Start to pull excess collateral
12  out."
13         Does that give you any more ideas on what
14  Mr. Salame was referring to?
15      A.  I think they're talking past each other
16  here.
17      Q.   Okay.  And Mr. Tackett also, "They have
18  some buffer before liquidation.  We could just pull
19  that much out."
20         Do you see that?
21      A.  Yeah.
22      Q.   What do you think that's referring to?
23      A.  I think his proposal does not make sense.
24      Q.   Why not?
25      A.  He's proposing withdrawing lines from the

Page 211

1  line of credit on their account out.  I don't
2  understand what that achieves.
3      Q.   Okay.  He then further down writes, "Per
4  the collateral explainer, they have 107 million
5  available collateral initial in their account.  We
6  could pull out 20 million or 50 million."
7         Again, what do you think that's talking
8  about?
9      A.  I think he's not thinking clearly here.
10      Q.   Okay.  Mr. Salame says, "We should
11  definitely make a collateral call of them and note
12  we'll have to start doing something if they don't
13  reply.  I think that's bad to do that."  You see
14  that?
15      A.  Yeah.
16      Q.   Looks like he's saying it would be bad to
17  pull out 20 or 50 million from their account?
18      MR. DUNNE:  Objection.
19      THE WITNESS:  It's a little ambiguous.
20  I'm not sure.  That's my read, though.
21      MR. HARRIS:  Q.  Okay.  And then he says,
22  "Without warning.  Comments documented reason."
23         Do you think he's referring to reducing
24  the line of credit by that amount or selling assets
25  by that amount?

Page 212

1      MR. DUNNE:  Objection.
2      THE WITNESS:  I'm not sure.
3      MR. HARRIS:  Q.  Okay.  So is there a
4  different chat message where you recall being
5  instructed to do the manual liquidation?
6      A.  Yes.
7      Q.   Okay.  Is that something you've seen
8  recently?
9      A.  No.
10      Q.   You remember it, but it's not something
11  you've seen -- something you've seen since the
12  bankruptcy happened?
13      A.  No, not that I remember.
14      Q.   Okay.  Do you recall what system it was
15  on?
16      A.  I today have an understanding of what
17  types of chat it would have made sense to have
18  happened in.
19      Q.   Okay.
20      A.  But I don't know for certain which one it
21  was.
22      Q.   All right.  Well, let's start with that.
23  What is -- what's your understanding of what types
24  of chats it would have made sense to have happened
25  in?

Page 213

1      A.  Signal chats that included Alameda traders
2  and Sam and possibly lawyers and possibly Zane or
3  Ryan.
4      Q.   And why do you say Alameda traders?
5      A.  Because the trades I performed, the
6  counterparty of them would have been Alameda.  It
7  would have been important to tell them ahead of time
8  about positions they were about to take on that
9  would have been unexplained to their systems without
10  that.
11      Q.   Okay.  Do you recall why Alameda was the
12  counterparty?
13      A.  De facto counterparty of choice,
14  especially when giving bad prices to the
15  counterparty.
16      Q.   What do you mean by that, de facto
17  counterparty of choice?
18      A.  That I believe at this point in time even
19  the liquidation engine for spot margin treated them
20  as either the only or primary backstop of 30
21  provider.  All methods, except for selling to the
22  crypto assets directly on market -- of the ones
23  available, Alameda was the -- by practice, the
24  common choice for a counterparty.
25      Q.   Okay.  So when there were losses that

Page 214

1  needed to be imposed on someone, Alameda was the
2  de facto counterparty?
3      MR. DUNNE:  Objection.
4      THE WITNESS:  That's more general than I'm
5  sure is true, but in this particular case, I don't
6  remember it being all that much of a question who
7  the counterparties should be.
8      MR. HARRIS:  Q.  Okay.  Do you remember
9  if someone told you that the counterparties should
10  be Alameda?
11     A.  Almost certainly.
12     Q.  Okay.  Who do you think would have been
13  the person or persons who would have directed you to
14  do that?
15     A.  Truly any of the people I mentioned before
16  that would have informed me to make the trades in
17  the first place.
18     Q.  Okay.
19     A.  Could have been the same one to say
20  Alameda is a counterparty.
21     Q.  So the chat message we just looked at,
22  that didn't have this direction to sell assets.  So
23  what happened, do you remember, between that
24  discussion and at some point someone directs you to
25  do these manual sales?

Page 215

1      A.  I'm not sure anything happened.  I don't
2  remember if anything happened.  I'm not sure.  It
3  would have to for those sales to make sense.
4      Q.  Okay.  Did you have to like go into their
5  account under -- like log in as Three Arrows in
6  order to do these sales?
7      A.  The script that I'm thinking of wouldn't
8  require anything like that.
9      Q.  Okay.  So there's some way to cause sales
10  to happen in customer's account without -- that's
11  not the -- that's not the liquidation engine, and it
12  is also not signing into their account?
13     A.  That's right.
14     Q.  Okay.  All right.  The manual liquidation
15  you're thinking of where that was done through
16  that -- that script that you're referencing, was
17  that done through an API?
18     MR. DUNNE:  Objection.
19     THE WITNESS:  The one I'm thinking of --
20  although I'm not a hundred percent sure it's the one
21  that was used, but the script that I'm thinking of
22  would have been done within the infrastructure of
23  FTX and so would not need to be performed over API.
24     MR. HARRIS:  Q.  Okay.  Would there be
25  something in the -- in the database that would

Page 216

1  reflect that these sales were done through that kind
2  of a script rather through some other way?
3      A.  I don't remember all the details about
4  this for the -- for the alternative -- for like the
5  thing that shows that it was this as opposed to
6  other similar methods, but something that is
7  consistent with these fills having come from that
8  source is if they're type field is OTC.
9      Q.  OTC.  If the type field is liquidation,
10  would that be inconsistent with the script you're
11  thinking of?
12     A.  I think so, but I'm not sure.  I'd to have
13  read the code to confirm.
14     Q.  Okay.
15     MR. CAPONE:  Take a break?
16     MR. HARRIS:  We can break now if you want.
17     MR. CAPONE:  Okay.
18     VIDEOGRAPHER:  This is the end of Media
19  No. 4.  We are off the record at 2:58 p.m.
20     (The deposition was in recess from 2:58 to
21     3:14.)
22     VIDEOGRAPHER:  This is the beginning of
23  Media No. 5.  We are back on the record at 3:13 p.m.
24     MR. HARRIS:  Hand you a document that was
25  previously stamped 34.  Thank you.  34.

Page 217

1      (EXHIBIT 34 PREVIOUSLY MARKED FOR
2      IDENTIFICATION)
3      MR. HARRIS:  Q.  So looks like it's
4  forwarding an email chain from Mr. Tackett to
5  Mr. Kyle Davies on June 14th.
6      A.  Yes.
7      Q.  And then he forwards it to you and Dan
8  Friedberg and Sam Bankman-Fried on June 16th.  So
9  couple days later.  Do you recall what triggered him
10  forwarding this email chain to you?
11     A.  I don't know.
12     Q.  Okay.  Do you remember any follow-up
13  discussions you had about Three Arrows after getting
14  this?
15     A.  I remember although at some point even
16  after this discussions that came in from bankruptcy
17  estate to FTX about transferring ownership or
18  control of the account.
19     Q.  And so it was something inbound from the
20  Three Arrows bankruptcy estate about getting control
21  of the Three Arrows account?
22     A.  Actually, I'm not like a hundred percent
23  sure that's what it was.  It makes sense to me today
24  given what I was asked to do.
25     Q.  What do you remember being asked to do?

MAGNA ▶
LEGAL SERVICES

Page 218

1      A.   Change the login rights to the account.
2         MR. HARRIS:  Okay.
3         (EXHIBIT 48 PREVIOUSLY MARKED FOR
4      IDENTIFICATION)
5         MR. HARRIS:  Q.  Okay.  You were handed
6   another document that was stamped before as
7   Exhibit 48.  It's an email chain from a little later
8   in June 2022, June 21st, 2022.  So the only thing I
9   want to ask you about's on the second page --
10     A.   Uh-huh.
11     Q.   -- Leven Liu writes at 6:14 a.m.  "A small
12  bump.  Three Arrows is still on the leaderboard,"
13  and you respond with a check.  What's that referring
14  to, the leaderboard?
15     A.   I know one leaderboard.  There may have
16  been multiple.  If this is speaking about the one
17  leaderboard, there was something that displayed that
18  ranked traders either by trading volume or by daily
19  P&L or something like this.  Most traders did not
20  opt in.
21     Q.   You had to opt in to be -- in order to be
22  on the leaderboard that you're thinking of?
23     A.   Yes.
24     Q.   Okay.  Any understanding why Three Arrows
25  would still be on the leaderboard at this time,

Page 219

1   June 21st, after the liquidation, do you remember?
2      A.   I forget the window over which looked at
3   volume.  Could have been lifetime.
4         MR. HARRIS:  Okay.  Let's do Tab 4.
5         (EXHIBIT 74 WAS MARKED FOR
6      IDENTIFICATION.)
7         MR. DUNNE:  This is which number now?
8         MR. HARRIS:  Q.  74.  Okay.  So 74 is
9   several pages from a very large document the way it
10  was given to us, like a thousand pages.  I just did
11  the pages that mentioned Three Arrows.  So does
12  this -- the information on here look like a familiar
13  form of information to you?
14     A.   Yes.
15     Q.   Okay.  What does it look like to you?
16     A.   There were lots of ways in which FTX
17  logged or stored information about the activity of
18  its admins when off doing various admin actions.
19  One of them was logging in as in read-only mode in
20  account.  This seems to log those instances.
21     Q.   So on the first pages, when Ariana logged
22  in as Kyle Davies and on the last pages, one where
23  Zane logged in.
24     A.   Yes.
25     Q.   This reflects to you logging in as read

Page 220

1   only; is that right?
2      A.   Yes.
3      Q.   Okay.  And any idea why Ariana and Zane
4   would have logged in for read-only purposes on
5   June 13th, so that's the date before the manual
6   liquidation?
7      A.   I don't know who Ariana is, and I can
8   infer why Zane might have, but I don't know.
9      Q.   What would your inference be?
10        MR. DUNNE:  Objection.
11        THE WITNESS:  My inference is that it
12  might relate to checking on the state of their
13  account given alerts they would have received in
14  that FTX line of credits channel about being
15  underwater, what Zane references 20 million in the
16  hole.
17        MR. HARRIS:  Okay.
18        (EXHIBIT 75 WAS MARKED FOR
19     IDENTIFICATION.)
20        MR. HARRIS:  Q.  All right.  75.  Okay.
21  This is a document that -- it was produced to us
22  called FTX admin actions and it's from June 13th,
23  2022.  Any memory of what this is referring to?
24     A.   Yes, this is the analog of the FTX admin
25  activity channel, but for mutative changes.

Page 221

1      Q.   What does that mean, mutative changes?
2      A.   Changes state in the system, not just in
3   the admin's brain.
4      Q.   Okay.  So if you look at that paging
5   system at the end of the bottom.  You look at the
6   page that ends in 87.
7      A.   Yes.
8      Q.   Looks like they were some of these
9   mutative changes.  So at 23:08:24, Ariana FTX is
10  editing Kyle at ThreeArrowsCap.com marketing as
11  trusted for ACH cards false?
12     A.   Yeah.
13     Q.   What does that mean?
14     A.   One mechanism for depositing to FTX that
15  may have only actually been supported on FTX U.S.
16  was ACH.  I don't remember what ACH cards are.  It
17  might mean ACH end cards.  Trusted users may have
18  not been required to go through some slow ramp up
19  period in which they established a good history
20  without charge-backs to the system.
21     Q.   So that was removing them as trusted for
22  that?
23     A.   Yes, although, to my recollection, this is
24  an FTX U.S. only thing.  It's possible it had no
25  effect.

MAGNA ▶
LEGAL SERVICES

1    Q.   Okay.  The next entry is Kyle's at Three
2  Arrows Capital is marking black listed for ACH cards
3  false.  Any idea what that means?
4    A.   Seems like another setting related to the
5  same type of logic.
6    Q.   Okay.  What impact do you think it would
7  have?
8    A.   Because I believe FTX.com didn't support
9  ACH deposits, I think none.
10   Q.   The next one is, I guess, setting VIP
11 level minimum equals none.  Do you see that?
12   A.   Yes.
13   Q.   What impact do you think that had?
14   A.   Some VIPs, there were different rules for
15 which accounts would get VIP treatment, which had a
16 formal meeting in the FTX system.  VIPs of different
17 levels were given different fees, for instance.  A
18 VIP level minimum specified the minimum level an
19 account could get to such that if they didn't have
20 sufficient volume to justify that level of VIPness
21 they would still be granted it.  By setting it to
22 none, Ariana is saying that this account should no
23 longer be treated as a VIP unless it meets the
24 volume requirements for it.
25   Q.   Okay.  So they would make it harder, I

1  guess, to be treated as a VIP?
2        MR. DUNNE:  Objection.
3        THE WITNESS:  Make it not de facto --
4  grandfathered in, it would have the same treatment
5  as accounts that were not grandfathered.
6        MR. HARRIS:  Q.  Okay.  The next change
7  is marking Kyle at Three Arrows cap.com as can be
8  early credited despite non-overlapping logins false.
9  What effect did that change have?
10   A.   This is another ACH cards thing.  It is
11 occurring to me these are all time stamped at the
12 same time.
13   Q.   Yeah.
14   A.   Maybe there's one modal in which he
15 changed one thing.  It happened to, behind the
16 scene, change these other things that were hidden
17 from view from her because they weren't relevant on
18 FTX.com.
19   Q.   Okay.
20   A.   Not confident that's it, though.
21       MR. HARRIS:  Okay.  I think we're done.
22 I'm going to let FTX Recovery Trust ask you
23 questions.  They may want to move over here.  So I
24 think we should take a break.
25       MR. DUNNE:  Yeah, why don't we take a

1  short -- another 10-minute break, and we'll come
2  back and sit in your guys spot.
3        VIDEOGRAPHER:  This is the end of Media
4  No. 5.  We're off the record at 3:23 p.m.
5        (The deposition was in recess from 3:23 to
6        3:37.)
7        VIDEOGRAPHER:  This is the beginning of
8  Media No. 6.  We are back on the record at 3:37 p.m.
9        EXAMINATION BY MR. DUNNE
10       MR. DUNNE:  Q.  Mr. Singh, my name is
11 Chris Dunne.  I represent the FTX Recovery Trust.
12 We met earlier.  Thank you for your time today.
13 Just going to have a few questions for you.
14       During your time at the FTX group of
15 companies, you held several positions that you
16 talked about earlier.  Do you remember that?
17   A.   Yes.
18   Q.   They were all software engineering or
19 software engineering supervisory roles, correct?
20   A.   Correct.
21   Q.   And in connection with those engineering
22 roles, your primary responsibility was writing and
23 editing code for the FTX exchange, correct?
24   A.   Or managing people that would do that,
25 yes.

1    Q.   Or managing people that would do that.
2  Thank you.  The code dictated how the exchange
3  functioned, did it not?
4    A.   Yes.
5    Q.   And the record of how the exchange
6  functioned historically in practice is therefore
7  reflected in the code, right?
8    A.   And the database.
9    Q.   And the database.  Thank you.  If you
10 wanted to change something about how the exchange
11 operated, you would have to modify the code to do
12 that, wouldn't you?
13   A.   For the areas in which the code govern the
14 exchange, yes.
15   Q.   Written policies did not directly affect
16 how the code operated, correct?
17   A.   Correct.
18   Q.   And customer-facing manuals, such as help
19 pages or explainers on the FTX website did not
20 themselves dictate how the code or the exchange
21 operated in practice, correct?
22   A.   Right.  They were downstream of the code.
23   Q.   Likewise, the terms of service did not
24 affect how the code operated, correct?
25       MR. HARRIS:  Object to the form.

**MAGNA** ›
LEGAL SERVICES

Page 226

1    THE WITNESS:  Right.  The terms of service
2  were not code.
3    MR. DUNNE:  Q.  If the code and a policy
4  were inconsistent, then the code determined how the
5  exchange actually operated, correct?
6    MR. HARRIS:  Object to the form.
7    THE WITNESS:  The code determined how the
8  code operated.
9    MR. DUNNE:  Q.  You said the code
10  determined how the code operated.  My question was
11  did the code determine how the exchange operated?
12    A.  In my view, the exchange was a system
13  determined by how the code operated, so yes.
14    Q.  Got it.  Okay.  Do you recall testifying
15  earlier about how the code did not provide a
16  mechanism for clawbacks?
17    A.  Yes.
18    Q.  Okay.  Mr. Singh, my question to you is
19  the code did not provide for FTX to absorb customer
20  losses, correct?
21    A.  The insurance fund was a mechanism through
22  which some losses could be absorbed, but not to an
23  infinite extent and not in all cases.
24    Q.  Okay.  And not other than the insurance
25  fund, correct?

Page 227

1    A.  To my knowledge, yes.
2    (EXHIBIT 76 WAS MARKED FOR
3    IDENTIFICATION.)
4    MR. DUNNE:  Q.  Mr. Singh, you've been
5  handed a document that's been marked as Exhibit 76.
6  It is a judgment in a criminal case against you from
7  the United States District Court for the Southern
8  District of New York; is that right?
9    A.  Yes, looks like it.
10    Q.  Okay.  You pleaded guilty to various
11  charges in connection with a criminal case in USDNY,
12  did you not, sir?
13    A.  Yes.
14    Q.  The charges to which you pleaded guilty
15  were the following:  You pleaded guilty to
16  conspiracy to commit wire fraud on customers, right?
17    A.  Yes.
18    Q.  And you pleaded guilty to wire fraud on
19  FTX customers, correct?
20    A.  I believe so.
21    Q.  Okay.  And you pleaded guilty to
22  conspiracy to commit commodities fraud, correct?
23    A.  Yes.
24    Q.  And you pleaded guilty to conspiracy to
25  commit the securities fraud as well, sir?

Page 228

1    A.  Yes.
2    Q.  And you also pleaded guilty to conspiracy
3  to commit money laundering; is that right?
4    A.  Yes.
5    Q.  And finally you pleaded guilty to
6  conspiracy to make unlawful political contributions
7  and defraud the federal election commission; is that
8  right?
9    A.  Yes.
10    MR. DUNNE:  You can set that one aside.
11  Thank you.
12    (EXHIBIT 77 WAS MARKED FOR
13    IDENTIFICATION.)
14    MR. DUNNE:  Q.  Mr. Singh, you have been
15  handed a document that has been marked as
16  Exhibit 77.  Just take a moment to look at it.  My
17  first question will be do you recognize this as a
18  letter that you submitted to the court in connection
19  with your sentencing?
20    A.  Yes.
21    Q.  And you recall submitting this letter, do
22  you not?
23    A.  I do.
24    Q.  And the statements in this letter were
25  true, were they not?

Page 229

1    A.  Yes.
2    Q.  Okay.  In this letter, you wrote in the --
3  one, two -- the third full paragraph on page -- the
4  pages labeled two of three --
5    A.  Uh-huh.
6    Q.  -- in this exhibit?  "Looking back, I knew
7  how Sam manipulated the truth, and yet I still
8  bought into many of his narratives.  I chose to see
9  things that were wrong as expedient or justified and
10  things that were risky as bold.  Even when I
11  expressed what I felt -- when I felt -- that I felt
12  something was reckless, if I faced disagreement, I
13  would back down from what I knew was right.  I could
14  often be persuaded to change my mind on something
15  that should have been a matter of principle.  It was
16  easier for me to tell myself I was narrowly
17  incorrect on a strategic decision than that I was
18  part of a broadly irresponsible and harmful project.
19  This kind of self delusion and hubris allowed me to
20  stay part of something that caused so much damage
21  and ran against the very things I value most."
22    Do you see that?
23    A.  Yes.
24    Q.  I read that correctly?
25    A.  Yes.

MAGNA
LEGAL SERVICES

Page 230

1      Q.   And that was -- that's a true statement,
2   correct?
3      A.   Remains true.
4      Q.   Yeah.  And you wrote in the next
5   paragraph, "And this was not just self delusion.  I
6   know that I acted in ways that were ultimately
7   criminal.  Putting myself ahead of customers and
8   using their money when they thought it was safe.
9   Helping Sam falsely claim FTX was more profitable
10  than it was.  Choosing to look away so I didn't have
11  to face the increasingly obvious truth, that I was
12  letting others use my name for their own interests.
13  I strayed so far from what I believe in.  There is
14  no excuse.  I will forever regret what I've done."
15       Do you see that?
16     A.   Yes.
17     Q.   I read that correctly, did I not?
18     A.   You did.
19     Q.   And that's -- that remains true, correct?
20     A.   Yes.
21       MR. DUNNE:  Okay.  Thank you, Mr. Singh.
22  You may set that aside.  I have no other questions,
23  but we will designate this confidential.
24       FURTHER EXAMINATION BY MR. HARRIS
25       MR. HARRIS:   Q.  I just had a couple

Page 231

1   follow-ups.  Just first on this document you were
2   just shown Exhibit 77, this last paragraph you were
3   just asked about, you were asked about this phrase
4   in your letter putting myself ahead of customers,
5   using their money when they thought it was safe.
6      A.   Yes.
7      Q.   By their money, you meant the
8   cryptocurrency and their VI currency; is that right?
9      A.   Right.
10     Q.   And by using it, what were you referring
11  to?
12     A.   That after I learned of a short fall in
13  customer funds in September 2022, I continued to
14  green light or directly make expenditures using
15  liquid funds, which necessarily deepened the hole in
16  liquid versus illiquid funds.
17     Q.   What did you mean when you said I guess
18  the customers thought their money was safe?
19     A.   It was my subjective and general
20  understanding that customers didn't believe that
21  there was a shortfall in customer funds.
22       MR. HARRIS:  Q.  Okay.  So they thought
23  their money that they had placed on the exchange was
24  safe?
25     A.   By that definition of safe.

Page 232

1      Q.   Okay.  And just to be clear, do you
2   believe you testified truthfully today, to the best
3   of your abilities?
4      A.   Yes.
5       MR. HARRIS:  Okay.  All right.  Thank you.
6       MR. DUNNE:  All right.  Go off the record.
7   No further questions for me.
8       VIDEOGRAPHER:  This concludes today's
9   testimony given by Nishad Singh.  We are off the
10  record at 3:45 p.m.
11       THE REPORTER:  Could you give me your
12  orders, please?
13       MR. HARRIS:  A rush and a rough.
14       THE REPORTER:  Rush to what day?
15       MR. HARRIS:  Two-day, I think we have
16  standing order.
17       MR. DUNNE:  And I would say the same
18  thing, Mr. Harris.
19       MR. CAPONE:  We don't need a rush.
20       THE REPORTER:  Just a regular copy?
21       MR. CAPONE:  Yeah.
22       (The deposition was concluded at 3:45
23  p.m.)
24  
              _____
25                NISHAD SINGH

Page 233

                    CERTIFICATE

1  
2  
3       I, the undersigned, a Certified Shorthand
4   Reporter, State of California, hereby certify that
5   the witness in the foregoing deposition was by me
6   first duly sworn to testify to the truth, the whole
7   truth, and nothing but the truth in the
8   within-entitled cause; that said deposition was
9   taken at the time and place therein stated; that the
10  testimony of the said witness was reported by me, a
11  disinterested person, and was thereafter transcribed
12  under my direction into typewriting; that the
13  foregoing is a full, complete, and true record of
14  said testimony; and that the witness did not request
15  an opportunity to read it and, if necessary, correct
16  said deposition and to subscribe the same.
17       I further certify that I am not of counsel
18  or attorney for either or any of the parties in the
19  foregoing deposition and caption named, nor in any
20  way interested in the outcome of the cause named in
21  said caption.
22       Executed this 30th day of October, 2023.
23  
24                _____
25                LAURA AXELSEN, C.S.R. 6173

MAGNA▶
LEGAL SERVICES

Page 234

1          ERRATA SHEET FOR THE TRANSCRIPT OF:
2          Case Name:  Ftx Trading Ltd
3          Dep.  Date: 10/28/25
4          Deponent: Nishad Singh
5     Pg.  Ln.  Now reads     Should read   Reason
6     ____  ____  _____   _____  _____
7     ____  ____  _____   _____  _____
8     ____  ____  _____   _____  _____
9     ____  ____  _____   _____  _____
10    ____  ____  _____   _____  _____
11    ____  ____  _____   _____  _____
12    ____  ____  _____   _____  _____
13    ____  ____  _____   _____  _____
14    ____  ____  _____   _____  _____
15
16          _____
17                SIGNATURE OF DEPONENT
18    SUBSCRIBED AND SWORN BEFORE ME
19    THIS____DAY OF_____, 2025
20
21    _____
22    (Notary Public)
23    MY COMMISSION EXPIRES:_____
24
25



## A

**abilities**
232:3
**ability**
71:19 200:5
**able**
15:23 29:19 114:22
123:18,19 129:25
131:9 133:9 149:1
202:7
**about's**
218:9
**above**
70:3 129:2 182:25
201:7
**absent**
107:20 182:5
**absorb**
48:9 49:4 54:8 92:21
226:19
**absorbed**
51:22 226:22
**absorbing**
51:16 53:24 54:1
**AC**
9:17
**ACC**
209:21
**accept**
171:1
**access**
15:23 36:2,18,19,21
37:2 61:7,23,25
71:18 123:21
**accessing**
35:5
**accommodate**
183:18
**accounted**
104:24 105:1
**accounting**
43:13 44:19,25 45:3
66:20 144:12
204:25
**accounts**

15:12,12 19:24 33:23
34:5,6 36:16 46:7
46:14 47:25 52:11
52:12,15,20,24 53:5
53:11,17 85:8,12,13
85:18 86:5,15,22,24
95:25 96:15 97:21
106:7 107:16 108:2
110:16 113:16
126:1 129:4 145:21
146:22 148:7,13
151:9 180:2 201:1
201:14 222:15
223:5
**account's**
111:1
**accrue**
145:7
**accumulated**
163:10
**accurate**
77:25 78:15,16 79:8
79:14 110:25
127:11
**accurately**
10:9 31:11 32:9
**ACH**
221:11,16,16,17
222:2,9 223:10
**achieves**
211:2
**acquire**
58:9
**acquired**
160:23
**across**
173:11
**acted**
136:22 230:6
**action**
201:3
**actionable**
160:9,11
**actions**
210:8 219:18 220:22
**activities**

81:25 177:15,20
**activity**
34:12 219:17 220:25
**actual**
28:18 41:23
**actually**
24:18 30:17,21 31:2
33:4 38:7 48:6,7
49:22 50:21 51:15
58:14 71:12 95:19
133:19 134:24
136:2 138:11
163:21 164:2,8
175:19 179:19
186:15 195:4 202:2
208:10 217:22
221:15 226:5
**Adam**
4:10 11:13 181:11
**add**
71:10
**added**
166:11
**adding**
29:10 100:14
**addition**
107:7 109:18 195:20
**additional**
19:25 135:10 151:20
**additionally**
183:2
**address**
79:19 82:10 92:16
**addressed**
82:11
**addresses**
182:25
**adjacent**
64:11
**adjustment**
118:9
**admin**
33:20 34:5,10,13,16
34:19 61:11,13,16
61:22 124:22
201:13,17 219:18

220:22,24
**administrative**
33:24 34:8
**administrators**
61:17
**admins**
36:6,6,16 123:8,8,13
123:20 200:19
219:18
**admin's**
221:3
**admired**
18:8
**advantage**
53:13
**affect**
27:1,25 28:3 103:9
109:23 110:3
146:18 167:6,10
171:4 172:6,13
225:15,24
**affected**
144:14 147:16
163:25 167:20
**after**
13:3 18:6 22:18,23
25:22 28:11 71:20
101:13 115:14
120:9 129:1 131:13
184:9 186:13
188:22 195:15,21
217:13,16 219:1
231:12
**afterwards**
72:20 158:19
**again**
136:6 154:12 157:9
180:17 181:5 184:9
211:7
**against**
129:4 130:22 227:6
229:21
**agencies**
12:25
**agency**
207:19



**aggregates**
96:15
**aggressive**
207:16,21
**ago**
12:11 137:3 146:15
**agree**
157:18 209:21
**agreement**
12:23 124:5,6,11,14
  139:8,16
**agreements**
124:7,16 139:19
**Ah**
24:2 101:1 102:6
  103:22,25
**Aha**
184:9
**ahead**
10:25 11:1 142:13
  161:10 213:7 230:7
  231:4
**aim**
120:3
**aimed**
47:11
**aiming**
49:10
**aims**
58:17
**Air**
70:13
**akin**
50:10
**al**
1:4 2:4 7:1 8:4
**Alameda**
15:11 16:3 53:24
  54:8,16,21 60:25
  78:11,11 113:22,25
  118:9 135:23
  177:16,22 213:1,4,6
  213:11,23 214:1,10
  214:20
**Alameda's**
76:21 113:17

**alerted**
183:23
**alerts**
220:13
**Alexander**
4:11
**Alice**
165:4
**all**
11:6 16:3 24:17,22
  31:17 32:19 33:20
  36:14 38:7 41:1
  43:11 44:5 49:22
  58:24 59:11 61:1,4
  65:9 67:11 72:7
  73:9,14,16,22,24
  74:2 75:9 77:4 79:1
  81:8 84:4 86:15
  88:23 90:22 91:7,15
  94:7,10 99:9 101:3
  102:15 105:14
  109:10 110:17
  114:16 115:15
  117:8 119:5,16
  124:8 126:5,18
  127:7 129:4 134:1,3
  134:8 135:18 139:5
  141:8 143:11
  149:21 151:8
  161:19 164:3 166:2
  169:4 171:22 176:1
  176:12 178:4,8
  180:9 181:9,15
  182:5 184:22
  187:10 188:19
  190:5 197:2,15
  201:20 204:8 206:8
  207:5 212:22
  213:21 214:6
  215:14 216:3
  220:20 223:11
  224:18 226:23
  232:5,6
**allocated**
27:2 54:22 76:7
  103:15 113:3

**allow**
34:12 61:14 86:14,18
  86:19,20 97:20,24
  98:1,2,4 118:9
  122:2,23 130:4
**allowed**
47:24 98:5 111:6
  127:2 131:13 133:8
  229:19
**allows**
133:7
**allow-negative**
47:23
**almost**
22:22 29:12 61:4
  150:17 203:13
  214:11
**along**
210:8
**alongside**
199:20
**already**
72:10 87:19 96:23
  146:16 153:9
  167:24 180:14
  182:10 186:5
**also**
4:10 8:24 9:20 11:19
  15:15 21:5,9,17
  22:25 29:5 32:6,8
  35:24 52:10 56:10
  61:25 78:17 84:9
  86:2,9 90:19 95:14
  97:6 100:24 108:14
  109:19 113:17
  115:11 116:10,13
  121:16 122:24
  146:10 147:5 149:3
  162:5 163:7 164:14
  164:21,23 175:3
  182:11,18 190:4
  192:6,14 196:18
  197:21 199:19
  210:17 215:12
  228:2
**alter**

33:4
**alternative**
104:5 112:22 216:4
**although**
19:1 21:6 30:14
  60:25 121:21 175:6
  186:3 215:20
  217:15 221:23
**always**
115:25 147:9 197:24
**am**
8:11 9:6 16:1,3 48:25
  51:18 55:15 57:5
  58:24 62:7 75:18
  84:24 86:23 139:13
  145:5 172:5 194:11
  233:17
**ambiguities**
52:17
**ambiguous**
52:19 54:17 74:24
  85:3 87:6 121:22
  145:12 211:19
**ambiguously**
90:7
**among**
54:9,22 55:5,11
  102:19 161:17
  210:6
**amount**
53:24 54:3 58:3,17
  59:18 62:21,23 63:1
  63:2 64:3,16,19
  75:19 127:22 128:9
  128:12,12,16,21,23
  129:12,13 130:5,24
  131:22 132:1
  133:22 134:13,23
  136:1,2,19 142:20
  143:1,4 144:23
  145:9 146:18 147:6
  147:8,9 150:5
  154:14 155:24
  161:20,24,25
  162:10 163:10
  167:14 184:19



185:17 188:2
211:24,25
**amounts**
46:24 95:11 116:9
163:17 183:1,2
**analog**
183:7 220:24
**Andre**
6:15 39:12 137:24
138:3
**annual**
39:16
**another**
10:7,14 17:8 43:1,12
48:17 66:18 69:20
94:11 98:5 108:8
111:24 124:2 148:9
148:9 153:9 165:25
170:7 180:14
201:21 206:1 218:6
222:4 223:10 224:1
**answer**
10:14,17,20,25 11:1
11:2 62:18 126:16
179:11
**answered**
79:4 146:16
**answers**
10:11,13
**Anu**
4:5 8:24
**anyone**
11:9,22 12:3,14,19
24:16 33:3 61:8
70:25 71:2,18 73:9
74:25 75:14 80:14
80:15,18 125:10
176:18 177:1,10,14
186:17
**anything**
13:15,15 15:18 17:7
24:10 32:4,17 34:14
35:14 60:23 65:7
76:6,13 77:21 80:1
83:15 88:24 96:8
112:12 120:7

126:13 163:13
164:7 169:25 187:1
194:2 215:1,2,8
**anywhere**
174:4 180:21
**apart**
18:10,11
**API**
22:9 25:21 126:7
215:17,23
**appear**
10:16
**APPEARANCES**
3:1
**appeared**
2:15 176:7
**appears**
87:21 134:19
**append**
71:2,7
**applied**
33:22 94:1 183:5,9
183:12
**applies**
74:16 194:13
**apply**
113:16,22 191:9
**approach**
206:13
**approaches**
206:8
**appropriate**
62:23
**approval**
33:7 36:22
**approx**
144:7 146:14 149:18
149:20
**approximately**
8:10 46:5 182:19
187:25
**approximation**
136:18,21
**approx_fair**
144:5
**April**

155:5,12,23
**architect**
17:7,9,14
**area**
20:7 22:4 52:5
113:10
**areas**
17:14 19:13,14 20:2
22:10 84:19 225:13
**aren't**
22:22 31:9 73:7
127:17 131:14
132:10 162:7 204:1
206:17
**Ariana**
219:21 220:3,7 221:9
222:22
**around**
79:25 109:4 139:13
188:3
**array**
193:8
**Arrows**
2:18 3:3 8:18 9:16,17
12:20 13:17 14:11
14:15,21,24 15:18
20:19,25 24:16
82:12,15 99:20
137:25 138:6 139:3
139:14 174:9,10,14
176:14,18,21 177:2
177:5,7,11,13,16,22
179:2 180:2 181:4,5
183:19 184:2,18,24
185:16,23,25 186:5
186:18 187:5,12,24
188:17 189:21
190:7,25 191:10
192:18 193:5
195:11,16 196:3
199:9 201:5 203:17
203:20 207:19
208:9,17 215:5
217:13,20,21
218:12,24 219:11
222:2 223:7

**Arrows's**
190:16
**art**
127:4
**articles**
23:19,19 24:25 25:8
25:21 29:8,11,22
30:10 31:4,8,11,14
34:21 98:20,23
162:20
**aside**
11:3 16:2 96:2 187:3
228:10 230:22
**ask**
10:5 17:19 24:22
35:4 37:4,5 45:5
66:17 73:14,18
84:20,24 89:14
94:18 108:18
109:10 120:25
126:19 134:17
142:2 146:2 154:12
176:13 187:21
205:9 206:18 218:9
223:22
**asked**
10:3 45:7 79:3
119:18 126:8
134:22 135:25
180:7 190:1,14
217:24,25 231:3,3
**asking**
70:9,10 74:19 123:2
190:4,23 200:2,3
207:3
**aspects**
17:3
**assessed**
146:18
**assessing**
143:14
**asset**
25:17 27:16 58:4,9
58:21 59:9,18 62:22
75:2,20 76:3 80:3,9
80:17,22,23 81:7,15



85:1,22 90:16,20
96:4 104:2,7 106:21
174:2 190:24
**assets**
25:16 26:18 28:12
29:2 39:22,23 40:3
40:5,15,20 59:5,8
59:17,21,23 61:3,24
62:9,23 63:23 64:3
64:8,20 65:4,6 68:3
68:14 69:1,12 73:17
73:22,24 74:1,2,6
74:11 75:2,3,10,12
75:16,25 76:7,11,14
76:19,20,21 78:11
78:12,18 79:17
80:20 90:6 94:4
95:11,16,19 96:4,11
96:14 97:18 98:6,11
98:13 101:8 102:16
103:12,13,14
107:12 110:12
122:13 140:16
143:8,14 175:20
187:25 188:8,9
190:7 191:10,21
192:24 193:10
196:21 211:24
213:22 214:22
**asset's**
58:10
**assigned**
151:16
**associated**
92:1,6 146:12 157:1
**Associates**
44:11,21
**association**
8:13
**assume**
20:23 28:11 38:6
77:24 103:10 120:1
146:23 185:7
**assumption**
114:21,24 170:11
**asymmetries**

168:20
**attach**
142:19
**attached**
45:17 71:21
**attachment**
63:18
**attachments**
7:2 42:19 43:5,14
45:21,23
**attempted**
86:21
**attorney**
8:16 233:18
**attributable**
118:3 131:14,16
167:13
**attribute**
28:4 132:16 152:25
**attributed**
95:24 118:6 131:20
132:1,8,13 188:1
**audibly**
10:17
**audit**
69:14,16
**audited**
39:16,18
**auditing**
138:2
**auditors**
38:13 39:6 69:5
138:7,19
**authentication**
17:16
**author**
103:18 142:16
**authority**
19:12 32:24 33:2
201:2
**authorize**
123:5
**auto**
179:4
**automated**
118:14 174:25

**automatic**
59:25 60:17 107:24
118:16 134:12
147:15 175:14,23
191:18 194:13
196:15
**automatically**
106:8,14,18,23 141:5
165:20
**available**
34:22,25 113:25
147:10 184:23
185:1 210:6 211:5
213:23
**average**
58:15
**avoid**
22:5 150:14
**avoiding**
159:9
**aware**
14:10 37:2 39:21
49:13 66:3,7,9
73:11 119:19,21
120:7 183:14
185:16
**away**
48:23 203:16 230:10
**Axelsen**
1:22 2:14 8:13 9:6
233:24
**a.m**
2:12 8:10 65:12,17
119:10,15 180:22
181:3 184:8 197:25
198:1,22 218:11

_____
**B**
_____
**B**
7:6
**back**
21:2,3 27:21 28:2
29:7 34:22 37:21
62:4 65:16 77:9,20
84:11 93:1 119:14
119:18 135:4 158:2

159:11,18 203:6
207:11 216:23
224:2,8 229:6,13
**background**
9:24 11:7
**backstop**
56:7,10,15,20,24
57:2,13,17,20 58:5
58:8 62:24 63:2,8
164:24 213:20
**bad**
53:13 211:13,16
213:14
**balances**
71:21,25 72:4 89:1
89:17 90:24 91:8,14
93:5,8,23 94:3
96:10,14 104:25
105:13,19 107:17
111:21 113:1
146:22,23 162:4
168:8,10 170:13
172:14 176:1 189:9
189:24
**ballpark**
53:23 54:3
**bank**
50:20
**Banking**
19:15
**Bankman-Fried**
6:5,13 12:21 18:1,3
26:10 37:24 52:7
53:22 67:1 182:14
189:18 200:12
217:8
**Bankman-Fried's**
55:1 77:6 134:22
**bankruptcy**
1:1 2:1 8:5 11:23
13:18 24:22 49:24
50:2 55:10,24 99:16
212:12 217:16,20
**barely**
208:4
**Barsness**



198:24
**base**
32:20 54:22 55:6,12
  70:17,19 174:7
**based**
26:20 113:18 132:19
  139:16 141:6
  179:12
**basically**
16:15 208:20
**basis**
73:23 136:13 179:5
**bear**
74:1 112:8
**became**
16:12
**because**
24:15 28:25 29:1
  41:6 52:24 53:25
  62:8 64:7 90:1
  91:14 92:5 131:10
  145:1 146:21
  149:18 150:3
  155:24 173:17
  213:5 222:8 223:17
**become**
30:2 32:6 73:11
**been**
9:9,24 13:6 15:2,7,9
  22:13,24 24:17
  41:11,13 43:11
  53:16,17 56:4 61:10
  65:19 82:5 87:18
  99:2 102:3 116:11
  116:20 120:18
  125:22 129:17
  131:9 133:8,9 134:5
  136:13 137:13
  141:11,18 153:8
  159:2 162:8 166:7
  178:9 180:13
  185:20 189:15
  193:15 196:7,14,19
  197:6 201:25 213:6
  213:7,9 214:12,19
  215:22 218:16

219:3 221:15,18
227:4,5 228:14,15
229:15
**before**
2:13 9:25 12:10 13:2
  27:20 49:23 50:2
  53:15 55:9,23 65:18
  67:1 72:8,16,18
  76:12 77:7,8 99:10
  99:16 101:25
  107:15 113:24
  115:6 117:9,10,12
  119:16,18 126:17
  126:23 130:23
  135:9 139:8,11
  153:15 166:9
  195:10 196:5
  197:17 202:25
  210:18 214:15
  218:6 220:5 234:18
**beginning**
64:5 65:15 119:13
  158:1 180:20
  216:22 224:7
**begins**
88:25
**behalf**
8:20,23,25 69:5
  76:17
**behavior**
34:4 147:16 148:7
  184:19 200:19
**behind**
223:15
**being**
4:10 8:7 37:18 42:4
  55:23,25 56:20
  64:18 86:22 87:2
  99:20 121:19 126:8
  127:18 129:7
  130:23 131:15,20
  132:1,5,25 136:10
  136:10 139:21
  142:18 143:2,5
  148:10 154:15
  155:23 160:10

168:25 169:3 175:4
177:4 180:7 186:6
187:4 190:24
191:12 192:25
199:15 212:4 214:6
217:25 220:14
**believe**
16:18 19:22 54:25
  81:23 86:11 93:7,8
  113:17 115:21,24
  118:7 139:21 144:6
  150:4 157:11
  162:19 170:3
  171:18 177:12,22
  178:9 190:14 191:7
  191:23 193:11
  195:5 201:13
  202:18 213:18
  222:8 227:20
  230:13 231:20
  232:2
**Beller**
3:16 9:1
**below**
108:2 122:14 131:11
  131:22 179:4,17
**Ben**
9:1 208:19,25 209:4
**BENJAMIN**
3:16
**besides**
24:11 29:9 32:24
  33:3 61:8 83:16
  118:9 192:18
**best**
10:10 22:14 62:19
  77:24 130:15 152:3
  232:2
**bet**
91:24,25 92:3,18
**better**
58:9,11,13,13,17
  62:9,15 141:24
**between**
30:8,16,20 31:2,20
  62:25 95:6,23 96:3

105:4 119:19 120:8
132:11 146:5
152:20 165:4
168:16 214:23
**beyond**
70:24
**Bezerra**
4:14 8:11
**big**
187:22
**bill**
50:18
**billion**
54:5 187:25 188:4
**bit**
28:7 174:16 207:16
**Bitcoin**
27:10,17 79:12 85:24
  95:12 107:18 108:2
  130:20,23 131:7
  132:4,11,13,18,25
  162:4,6,6
**black**
222:2
**blame**
152:23,24
**blindingly**
31:22
**block**
209:12,16 210:10
**blue**
89:4
**Bob**
130:20 131:1,2,5,19
  165:3
**bold**
229:10
**bookkeeping**
70:5
**books**
161:8
**borrow**
97:17 98:5,10,16
  111:11,18 121:16
  130:7 131:1,19,25
  132:20,23 133:5



150:1,2,3
**borrowed**
111:7 131:16 132:16
    137:5
**borrower**
113:4
**borrower's**
140:6
**borrowing**
98:13 109:12,14
    116:14 133:13
    144:15,20
**borrowings**
146:17
**both**
15:2 30:23 86:11
    96:13 99:9 109:22
    119:25 120:3 127:4
    162:5 190:6
**bottom**
20:12 78:5 100:22,24
    101:4 105:18
    110:21 112:3 123:4
    155:4 199:21 221:5
**bought**
229:8
**bound**
194:4,7
**bounds**
191:24
**brain**
221:3
**branding**
113:19
**break**
10:18 63:16 65:10
    119:8 157:19
    216:15,16 223:24
    224:1
**breaks**
10:21
**briefly**
18:4
**bring**
122:14 131:10
    205:10

**broad**
3:18 17:6
**broadly**
229:18
**broke**
65:18
**Brooks**
4:12
**BTC**
101:13,14 168:2,22
    169:1
**bubbles**
120:22
**buffer**
78:19 79:5 122:3
    210:18
**bug**
47:21
**built**
49:10 125:12 171:24
**bulk**
188:8
**bump**
218:12
**Burgess**
123:10
**business**
18:12 19:15 97:3,10
    166:18 206:4
**butchering**
19:1
**button**
61:19
**buttons**
137:21
**buy**
61:19 130:21 131:9
    169:15 171:24
**buying**
169:13 181:23
    192:25
**buys**
169:8

———————
**C**
———————
**calculate**

101:8 102:10 103:8
    104:10 148:22
    162:13
**calculated**
95:4 111:1 128:4,16
    132:3 136:3 147:22
    148:10 152:19
    179:6
**calculating**
101:5 103:6 104:21
    134:23 147:10
    151:14 152:6 159:5
**calculation**
128:2,6,9 137:10,14
    144:13 148:17
    149:15 154:20,23
**calculations**
96:15 116:22 134:1,8
    149:8 159:6
**California**
2:13 3:9 8:9 233:4
**call**
18:24 209:12,16
    210:10 211:11
**called**
2:17 24:25 38:16,17
    41:22 45:4,6 46:6
    51:2 55:16 56:6,7
    56:10 83:5 100:6
    105:15,18 109:12
    109:13 112:4,5
    120:19 121:3
    125:23 129:21
    152:23,25 220:22
**calling**
37:21
**came**
107:16 217:16
**can**
10:19,21 11:1,2
    17:19 19:20 42:9
    43:7,8 47:7 49:20
    50:1 56:3 57:6
    58:14,23 63:16
    64:19 69:19 77:21
    78:19 79:1 80:25

85:21 86:18 88:9,18
    89:23 91:5,25 95:22
    98:24 99:1 102:23
    110:12,14 112:18
    121:18 123:5,8,10
    123:14 127:8
    128:24 130:15,15
    130:21 131:24
    135:4,6,7 136:5
    141:10 142:9
    144:24 146:25
    152:2,12 154:6
    158:14 162:13
    165:15 167:9,9,19
    170:24 177:14
    179:3,20 180:21
    181:22 182:3
    200:17 201:14,17
    202:6 205:9 207:1
    210:2 216:16 220:7
    223:7 228:10
**cannot**
121:6,23
**canonical**
22:2
**can't**
14:16 35:14 110:9
    121:18 130:14
    173:13
**cap**
123:15,19
**capacity**
199:20
**capital**
2:18 3:3 8:19 9:16
    15:19 63:7 82:12,15
    114:17 139:14
    176:21 184:18
    186:6 189:21 191:1
    196:3 207:20 222:2
**Capital's**
188:17
**Capone**
4:4 8:22,22 40:16
    51:24 63:16,19
    97:14 157:21



216:15,17 232:19
232:21
**caption**
233:19,21
**cap.com**
223:7
**card**
48:23
**cards**
221:11,16,17 222:2
223:10
**careful**
146:20
**carefully**
146:6
**Caroline**
37:23 42:14 44:15
**case**
1:7 2:7 7:5 8:6 22:2
24:4 26:9 35:10
47:6 57:12,18,22
58:13 61:10 63:6
92:2 111:18 121:8
121:19 149:13
158:10 169:2,12
176:1 181:10 194:3
199:24 204:19
214:5 227:6,11
234:2
**cases**
26:10 48:13 49:11
59:11,12,13,16 61:4
74:18,24 80:25
85:10 169:3,4
226:23
**categories**
127:17
**category**
15:18
**cause**
61:23 190:8 215:9
233:8,20
**caused**
50:9 188:9 192:24
229:20
**causing**

107:24
**CCRR**
1:23
**cc'd**
137:24 138:9
**certain**
75:19 96:1 139:13
148:1 157:4 170:18
191:9 200:23
212:20
**certainly**
22:22 29:12 30:24
109:6 161:22
197:22 205:1
214:11
**CERTIFICATE**
233:1
**Certified**
2:14 233:3
**certify**
233:4,17
**CFTC**
12:25
**chain**
197:7,9,12 199:16,22
201:21 202:2,10
217:4,10 218:7
**Chan**
37:20
**Chang**
199:4
**change**
33:8 99:15,19 115:6
121:12,13 123:8
131:13 137:12,13
158:9 165:4 166:17
168:9,10 183:18
184:23 190:8
200:19 218:1 223:6
223:9,16 225:10
229:14
**changed**
97:20,24 99:12
122:20,22,23
137:10 184:22
223:15

**changes**
32:25 148:6 149:6
166:15,25 167:1
201:17 220:25
221:1,2,9
**changing**
170:2 184:18
**Chang's**
199:18
**channel**
178:15,15,17 220:14
220:25
**channels**
21:14 42:7
**characters**
146:11
**charge**
19:10 37:13,16 63:1
113:18 116:18
127:21 128:6
150:15,24 154:24
157:12,16 179:3
**charged**
108:10 112:18 115:7
116:8,14,19 128:13
129:7,13 131:18
133:15,22 136:14
137:6 142:18 143:5
154:16 155:23
157:7,9 179:6,12
**charges**
153:24 159:13
227:11,14
**charge-backs**
221:20
**charging**
115:4,11 136:19
168:11
**chart**
155:2 159:12,15
**charting**
166:19
**chat**
14:3 41:18,22,23,24
42:5,9 43:12,13,17
44:9 45:3 60:25

66:20 67:10 69:21
178:10 180:17,21
186:25 188:21
191:5,7,8 197:8
201:21 202:10,13
212:4,17 214:21
**chats**
15:10 21:4 186:5
187:3 212:24 213:1
**check**
134:6 192:6 218:13
**checking**
220:12
**Chicago**
176:22
**childhood**
18:4
**chip**
57:21 63:11
**choice**
213:13,17,24
**choose**
82:18 152:20
**Choosing**
230:10
**chose**
229:8
**Chris**
8:17 9:14 41:7,16
63:16 66:24 198:24
224:11
**Christopher**
3:6,15 4:11 9:1
**christopher.harris...**
3:10
**circumstances**
167:16 181:21 196:1
**claim**
13:17,22 230:9
**Claire**
12:5
**Clarification**
40:8 81:10 98:18
111:10 138:4
143:25
**clarify**



**35:12 98:9 111:11**
140:20 159:20
163:22
**classified**
25:7
**clawback**
55:22,23 65:25 66:11
**clawbacks**
55:17,19 65:19,21,23
112:22 174:16
226:16
**cleanly**
205:20
**clear**
9:18,22,23 10:6,6
37:16 62:17 67:8
71:21 103:3 105:12
111:4 122:11 193:9
232:1
**clearly**
148:25 211:9
**click**
61:19 89:8 93:16
207:1,1
**clicked**
93:5
**close**
70:4 165:11 178:20
192:7 193:17 194:3
**closed**
168:12 195:22
**closest**
136:17
**close-out**
164:21
**closing**
165:8 168:16 169:8
169:13
**clunkily**
127:14,16
**coder**
18:17
**code's**
122:11
**coding**
20:13

**coin**
25:14,20,24 26:13,17
26:21 27:1 28:3,5,6
28:10,13,19,20,22
50:11 93:11 144:4,9
146:4,9,9,13
**coincident**
115:14
**coincidentally**
116:23
**coins**
26:5 29:10 93:9
149:8,22 179:5
**collapse**
55:8 186:14
**collateralized**
107:18
**colleague**
18:6
**collect**
38:22
**collected**
14:7
**collection**
14:14 85:18
**collections**
6:18
**colloquial**
104:18 159:24
**column**
154:1 155:5,14,15
156:7 157:10
**come**
12:22,24 13:13 20:16
27:12 31:9 32:4,17
47:17 115:14
120:13 177:17
216:7 224:1
**comes**
24:8 44:10 65:7 81:4
156:23 167:22
174:25
**coming**
120:10 169:4
**comma**
149:25

**commensurable**
162:7
**comment**
66:22 67:1 120:21
210:10
**comments**
158:6,12,13,15,17
211:22
**commission**
228:7 234:23
**commit**
227:16,22,25 228:3
**commodities**
227:22
**common**
33:9 213:24
**commonly**
55:18
**communicated**
21:3 163:20 164:2
**communications**
21:16
**companies**
24:22 187:9 224:15
**company**
24:17 39:7,9,14 40:4
**compare**
191:20
**compared**
191:13
**compensate**
48:19
**competitive**
97:12
**complaining**
35:11
**complaints**
17:20 196:8
**complete**
233:13
**component**
117:4
**comprise**
104:19
**comprised**
204:9

**compromise**
78:9
**computed**
145:2
**concept**
74:15 175:2 183:4
**concern**
52:23 53:1,16
**concluded**
232:22
**concludes**
232:8
**condition**
107:3
**conditions**
106:11,11,22 107:8
107:12
**confers**
41:2
**confident**
20:22 21:21 39:4
57:5 58:24 157:8
190:13 195:19
223:20
**confidential**
1:11 230:23
**configurable**
81:18
**configured**
85:11
**confirm**
38:19 216:13
**confirmation**
82:14,18 83:16
**confirmations**
83:7 84:12
**confu**
181:17
**confused**
22:13 49:6 64:7
117:22
**confusing**
22:4 40:10,18 49:9
74:16 150:3 197:24
**confusion**
184:16



**Congratulations**
11:20
**connected**
183:22
**connection**
224:21 227:11
  228:18
**consent**
37:8
**considered**
105:14 145:22 148:7
**consistent**
72:24 74:10 129:11
  216:7
**consolidate**
148:13
**conspiracy**
227:16,22,24 228:2,6
**constitute**
130:25
**constitutes**
24:13
**constrained**
73:3,6
**constraints**
86:7
**construing**
111:17
**contact**
177:18
**contemplating**
180:4
**content**
126:2,14 153:22
  173:21
**contents**
30:4
**context**
46:21 77:9 142:10
  207:23
**contingent**
92:10
**continue**
74:14
**continued**
231:13

**continues**
127:8
**contract**
161:13,21 162:25
  165:7
**contracts**
161:16,19,23 162:24
  163:21 164:3,9,21
  164:24 169:8
  174:13
**contribute**
25:18 89:1
**contributed**
25:25 26:6 90:23
  134:2
**contributing**
146:24
**contribution**
149:7
**contributions**
228:6
**control**
75:9 217:18,20
**controls**
76:11
**convention**
146:7 169:16
**conventions**
169:17
**conversation**
12:3
**conversations**
102:6 184:4 186:3,11
  187:4
**convert**
106:9,18 179:4
**convey**
209:7
**Cooley**
4:3 8:22,24
**cooperation**
12:23
**copy**
77:5,13 232:20
**copying**
198:23

**corners**
83:12
**correct**
21:10 37:12 46:1
  55:25 80:21 95:13
  118:24 134:16
  157:17 176:6
  224:19,20,23
  225:16,17,21,24
  226:5,20,25 227:19
  227:22 230:2,19
  233:15
**correctly**
32:16 36:12 77:12
  147:7 229:24
  230:17
**correlate**
81:7
**correspond**
147:25
**corresponding**
92:1 167:12 171:23
**cost**
63:12
**could**
25:24 27:24 33:4
  37:5,21 38:22 47:4
  47:15,22 48:6 49:19
  57:2,10 58:18 60:12
  61:2,9,12,17,23
  63:3 68:9 70:3,25
  71:2 77:25 80:19
  81:21 82:18 84:13
  85:5,7,8,10,14,16
  85:17,24 86:2,5,9
  89:7 90:1 93:16,22
  95:14 102:11
  104:15 107:16
  109:23 110:3
  111:12,17 112:23
  113:16,22 117:2
  118:11 121:13,14
  122:6 123:21
  129:17 135:1 145:6
  145:12 151:11
  152:19 153:1

154:12,19 156:21
158:22 164:17,19
165:22 169:20
170:9 171:25 174:8
175:7 181:10
189:14 200:19
204:17,22 205:2
207:11 208:12
209:13 210:18
211:6 214:19 219:3
222:19 226:22
229:13 232:11
**couldn't**
39:24 104:12 111:21
  111:23 122:12
  165:3
**counsel**
8:15 12:15 13:4 14:6
  14:9,10 41:14 43:7
  44:5 66:19 233:17
**count**
65:5 122:1
**counted**
50:11
**counter**
134:4
**counterparties**
214:7,9
**counterparty**
61:17 112:9 161:5,10
  161:12 213:6,12,13
  213:15,17,24 214:2
  214:20
**couple**
66:17 71:22 78:21
  85:4 99:10 103:20
  158:21 159:14
  166:9,10 217:9
  230:25
**court**
1:1 2:1 8:5,13 9:4
  10:7 227:7 228:18
**cover**
47:1 49:3 92:3
  156:16
**covered**



51:20
**co-invested**
177:23
**craft**
29:14
**crafted**
30:5
**crash**
185:11
**crashing**
187:10
**CRC**
1:23
**create**
65:25
**created**
61:14 150:24 202:13
**creates**
157:1
**creating**
150:23
**credentials**
36:3,4,11
**credited**
223:8
**credits**
115:11 220:14
**credit's**
115:1
**criminal**
7:5 12:20 53:3 76:18
140:15 185:8 187:9
230:7
**criteria**
118:11,13
**Cromwell**
3:14 9:2 13:5
**cross**
86:12
**CRR**
1:23
**crypto**
51:2,3 55:20 177:23
177:24 185:8 187:9
188:17 189:8,22
190:7 203:10,11,15

203:17,25 204:5,9
204:13,14,22,25
205:2,6,8,11,16
206:10 213:22
**cryptocurrency**
231:8
**CSR**
1:22 9:6
**Culturally**
187:15
**curious**
77:12
**currencies**
93:9 95:24,24 96:4
102:25
**currency**
93:11 108:9 231:8
**current**
11:10 27:15 28:16
58:4 192:8
**currently**
58:10 101:9 202:18
**cursory**
13:23
**custodied**
84:9
**custody**
67:6,17 68:21 69:1
69:11 84:10
**customers**
17:19 20:20 21:16,24
22:11,11,19 31:14
31:17 34:23 40:14
54:9 61:12 68:9
74:11 75:1,5,8,11
75:15,25 80:19
81:14 84:8 95:11,18
97:18 98:25 102:16
114:4,12,14 115:11
116:1,9,10 118:9
123:2 127:5 139:17
139:20,24 153:15
160:17 161:15
163:5,20 164:2,8
175:19 184:22
200:20 227:16,19

230:7 231:4,18,20
**customer's**
35:5,9,16 36:1,11,23
40:5,20 48:18 59:8
61:3,20,24 75:19
76:7,14 98:6,13
106:24 164:18
192:24 215:10
**customer-facing**
225:18
**customer-specific**
68:13 80:4
**cut**
10:11
**C.S.R**
233:24

———— **D** ————

**daily**
125:4,16 179:5
218:18
**damage**
229:20
**Dan**
189:17 217:7
**Darby**
6:25
**data**
71:1,14,15 153:14,16
169:7 172:9
**database**
35:22 36:9,14,17
70:18 71:1,10,18
115:23 153:18,20
156:10 162:23
168:15,21 169:14
169:22 172:10,13
172:15,16 215:25
225:8,9
**databases**
170:15,20
**date**
6:21,23 220:5 234:3
**dated**
6:7,15,25 66:20
**dates**

155:2 156:4 159:14
**Davies**
6:8 82:11 176:18,20
181:5 217:5 219:22
**day**
124:22 155:18,24
156:20 157:7 179:6
199:3 232:14
233:22 234:19
**days**
217:9
**de**
34:20 133:25 213:13
213:16 214:2 223:3
**deal**
11:3
**dealt**
68:25
**debit**
172:22
**Debtors**
1:5 2:5
**decent**
208:15
**decide**
26:4 34:3 60:16
**decided**
65:24 66:4 114:11
**deciding**
27:14 161:10
**decimal**
6:19,20
**decision**
26:8 52:3 54:7,15,20
55:1 183:25 229:17
**decrease**
109:19
**decreases**
205:2
**decrementing**
124:2
**deduct**
113:1
**deepened**
231:15
**defaultdict**



6:18
**deficit**
145:9
**define**
27:6 28:7
**defined**
27:3 90:7 104:16,23
140:10 147:14
154:10 160:7
171:12,20
**defining**
85:2 147:21
**definitely**
52:12 211:11
**definition**
90:14 98:10 101:22
102:8 104:11 134:9
136:22 142:23
148:20 151:5
231:25
**definitional**
52:17
**definitions**
40:25 100:16 102:20
117:8 140:11
**definitive**
162:16
**definitively**
194:25
**defraud**
228:7
**degrees**
128:20
**Delaware**
1:2 2:2 8:5
**delete**
199:23 206:24 207:1
**deleted**
206:23 207:4
**delusion**
229:19 230:5
**demand**
167:14 183:2
**demanded**
184:20
**demonstration**

103:24
**denominated**
150:7 161:23
**Dep**
234:3
**department**
37:11,14,19 38:3
**departments**
12:25
**depend**
18:23 132:4
**depended**
59:20 81:19
**depending**
28:19 204:23
**depends**
40:25 173:17 183:10
**Deponent**
234:4,17
**deposed**
9:25
**deposit**
47:11,14 68:3,10
69:3 71:2,5,8 79:19
**deposited**
47:11 63:3 68:13
79:17
**depositing**
50:11 67:24 68:2
221:14
**deposition**
1:12 4:13 8:3,7 12:15
12:17 13:9 65:13
119:11 157:24
216:20 224:5
232:22 233:5,8,16
233:19
**depositions**
13:11
**deposits**
70:13 222:9
**deprived**
80:16
**depriving**
80:8
**depth**

120:2
**derive**
104:10
**describe**
19:20 23:7,20 27:20
29:13 31:25 32:8,14
32:15 95:22 98:24
119:25 120:3
168:21 194:8 210:4
**described**
23:10,12,17 24:9
25:16 30:18,21
36:20 50:7 56:4
123:13 127:14,16
166:9 179:18
202:25
**describing**
30:25 33:1 47:15
98:3 131:4
**description**
5:12 23:22,23 110:18
110:25 127:11
129:1
**descriptive**
24:3
**designate**
230:23
**designed**
72:23 174:18,22
**designing**
23:13 84:17
**desirable**
49:1 196:4
**desk**
23:19 24:24 25:8,21
29:7,11,22 30:10
31:4,8,10,14 34:21
98:20,23 100:8
**despite**
182:11 223:8
**detail**
38:23 167:25 176:11
190:17
**detailed**
74:15
**details**

31:18 33:13 51:4
53:15 70:24 83:12
89:2 159:1 163:5
182:5 216:3
**determination**
118:15
**determine**
58:25 104:12 133:4
134:10 226:11
**determined**
59:23 60:9,18 62:21
63:10,13 115:15
118:11,19 131:17
133:15 137:5 226:4
226:7,10,13
**determines**
132:24 133:1 145:21
146:21
**determining**
105:15 115:19
147:15 148:8
171:12
**developer**
61:8
**developers**
34:20 61:7 158:5
**developing**
32:21 96:19 113:11
**development**
96:22
**device**
15:16
**devices**
15:15
**Dhillon**
4:5 8:24,24
**dictate**
225:20
**dictated**
225:2
**didn't**
13:19 26:22,23 32:14
32:15 40:5 49:3
50:13 59:2 65:23
66:12 73:3 75:1,2
75:11,15 80:12,12



81:6 86:18 87:14
88:9,10 90:1 95:19
100:21 110:2,5
118:1 122:4 149:17
149:18 150:17
156:17 158:11
160:11 169:10,11
169:11 170:9,10
175:19 180:5
187:16 192:16
195:13 210:7
214:22 222:8,19
230:10 231:20
**differ**
84:1 115:20 206:11
**difference**
62:25 63:3,12 95:6
146:5 168:16
**differences**
31:6,8 102:23 162:13
**different**
10:24 18:12 19:10,11
25:24 26:16,18,18
28:25 35:18,19
38:21 47:4,7 55:19
56:17 59:5 64:8,12
72:21 74:18,24
76:11,20,20 83:23
84:3 85:4 90:11
93:11 94:3,4,14
95:16,23,24,25 96:4
96:15 101:17,21
102:14,18 103:12
104:16 105:13
116:11,17 124:3
128:21 129:18
148:13 151:9
152:18 159:3,23,25
162:20 170:14,15
171:13,21 172:7,13
191:10 194:12
200:25 201:1
204:11 212:4
222:14,16,17
**differently**
62:16 142:1

**digit**
74:11
**digital**
39:23 63:23 64:3,8
64:20 65:4,6 68:14
73:17,22,24 74:1,2
74:6 79:17 80:3,9
80:20 81:7,15 85:1
85:22 95:19 187:25
188:8
**dilution**
23:5
**direct**
71:18 119:21 176:17
189:10
**directed**
45:8 181:11 189:20
190:6 214:13
**directing**
45:14 69:25
**direction**
30:25 214:22 233:12
**directly**
22:20 68:10 70:16
73:4,13 99:8 110:2
110:6 111:21
121:14 170:23
171:1 213:22
225:15 231:14
**director**
16:14,19,21,23
**directs**
198:1 214:24
**disable**
207:11 208:7
**disabled**
106:8 208:3,8
**disagree**
27:10
**disagreed**
207:25
**disagreement**
229:12
**discount**
59:1
**discounts**

144:12
**discrep**
30:16
**discrepancies**
30:16,20
**discussed**
12:1 47:24 116:11
186:8
**discussing**
199:9
**discussion**
197:16 214:24
**discussions**
116:1 117:12 141:13
185:22,24 187:2
217:13,16
**disinterested**
233:11
**displayed**
218:17
**distance**
58:3
**distant**
18:7
**distinct**
127:17 128:23
**distinction**
24:5 105:6 168:21
**distinctions**
169:1
**distinctly**
162:8
**distinguish**
105:4
**distinguished**
95:23 96:3
**District**
1:2 2:2 8:5 227:7,8
**doc**
126:12
**docs**
14:5,9 161:2
**document**
32:13 41:15 66:19
69:20 73:16 87:21
89:8 94:11 120:22

121:17 124:18
135:11 139:4 153:9
157:2 195:3,7
216:24 218:6 219:9
220:21 227:5
228:15 231:1
**documented**
124:5,9,11 211:22
**documents**
13:10,25 14:2,6,11
14:14,20 15:5 23:10
23:16 24:3,3 25:23
30:3,8,18,21,22,23
31:3,21 32:5,7
41:12 44:5 66:17
99:5,7 160:22
**does**
42:24 44:12 67:22
71:7 87:25 89:7
94:22 100:9 102:12
103:20 104:21
105:5 106:14,17
109:13 114:18
116:7 120:22 126:5
130:10 144:1,3,25
151:3 154:4 157:6
166:19,21 169:25
170:3,8,12 171:9
172:1 173:16
179:16 180:1 206:8
207:2 210:13,23
219:11,15 221:1,13
**doesn't**
35:12 48:17,21 58:6
92:18 102:4 109:2
120:2 157:15
170:25 175:11
182:9
**doing**
14:13 33:6 44:18
60:24 69:5 77:24
114:6 122:2,13
131:7,10 132:20
138:19 170:23
176:2 206:9,11
211:12 219:18



**DOJ**
12:23
**dollar**
93:22 104:22 105:2,9
   117:2,17,20,24,25
   118:6 121:16
   131:10 145:7 150:7
   150:10,22 161:25
   163:1,14,17 170:2
   170:21 171:1,4,7
   172:6,23 173:15
   188:4 189:9 190:8
   203:18,21,24
**dollars**
50:20 54:6 61:20
   79:12 104:25
   107:20,22 108:6
   122:12 130:22,24
   130:25 131:10
   181:24,25 187:25
   206:10
**domain**
34:25
**done**
67:5,14 133:16 172:8
   191:2 215:15,17,22
   216:1 223:21
   230:14
**dot**
143:24 144:5,19,23
   150:1,2
**dots**
206:25
**double**
157:16
**double-check**
46:1
**down**
10:8 29:2 109:17
   112:7 130:24,25
   134:24 136:2
   182:13,15,22
   187:16 198:21
   208:2 211:3 229:13
**downstream**
225:22

**dozen**
49:18,19
**drafting**
29:9
**drafts**
32:5 42:15
**draw**
57:22
**drawing**
136:4,18 185:4
**drawn**
131:15 134:24 136:2
   136:10,11
**drive**
15:11 29:2 71:22
   72:5
**driven**
60:5,7
**dropping**
108:2
**Drops**
70:13
**duly**
9:9 233:6
**dunnec@sullcrom....**
3:20
**during**
72:19 187:10 224:14
**duties**
125:9
**dying**
141:11
**dynamics**
28:15

---
**E**

**each**
10:9,10 25:24 26:16
   28:8 38:21 62:22
   75:18,19 76:3 81:19
   85:1,12 93:10 95:15
   104:2,7 153:2
   161:12 190:24
   210:15
**earlier**
29:12 51:10 59:5

91:10 99:8 102:2
   130:1 136:13
   138:17 143:8
   159:20 182:2
   224:12,16 226:15
**earliest**
42:11
**early**
16:16 18:9 37:14
   39:2 48:4,5 187:24
   223:8
**easier**
100:24 141:23
   229:16
**easiest**
193:15
**eating**
48:25
**edge**
62:21 63:1
**edit**
25:22
**edited**
29:13 99:8 100:13
**editing**
25:9 29:9 99:4
   100:11 124:16
   221:10 224:23
**edits**
137:8
**effect**
133:3 134:4 148:12
   149:16 157:5
   221:25 223:9
**effectuate**
60:19 190:11,15,19
**efficiency**
114:17
**effort**
30:2
**either**
11:9 30:18 53:10
   54:5 65:25 66:10
   99:4 127:2 180:4
   213:20 218:18
   233:18

**election**
228:7
**elements**
17:16 23:20 32:15
   124:8
**eliminate**
190:15
**else**
22:21 24:10 32:4,17
   33:3,8 34:14 60:23
   65:7 80:15 97:20,24
   98:14 125:10
   126:13 157:9
   177:14 197:10
   208:13
**elsewhere**
15:24
**else's**
69:8
**email**
6:25 15:10 21:22
   36:5 44:11 82:7,10
   94:13 137:23
   178:20 191:4 217:4
   217:10 218:7
**emails**
14:3 21:4,19,20
   83:15
**employed**
11:9 138:3
**employee**
11:10 33:23 34:4,6
   34:15 35:8,14 36:10
   36:23 61:2 201:2
   208:20
**employees**
29:23 30:4 35:5
   201:14
**enable**
164:23
**enabled**
86:15 180:3
**end**
10:12 14:14 50:14
   53:17 65:11 101:2
   119:9 126:7,8



157:22 161:11
178:20 203:14
216:18 221:5,17
224:3
**endangering**
200:10
**ended**
22:17 51:5,16 52:21
53:24 112:3 114:22
203:9,10 204:21
**ending**
103:5 156:6 179:24
**ends**
50:4 101:2 135:9
221:6
**Enforced**
33:9
**engage**
165:25
**engaging**
53:11
**engine**
23:21 24:9 48:5
59:25 60:17 86:21
164:20,23 206:8
213:19 215:11
**engineer**
16:11
**engineering**
16:12,14,18,21,23
224:18,19,21
**engineers**
16:13,15,24 17:2
187:16
**English**
143:3
**enormous**
162:12
**enough**
181:5,19 190:7 202:8
**ensure**
102:3 192:7
**ensured**
191:23 194:1
**entered**
94:22 161:3,13 167:5

**entering**
71:12
**entirely**
20:22 26:24 60:11
84:3
**entitlement**
75:19,23
**entity**
16:8
**entry**
155:13 222:1
**enumerated**
36:14 72:3
**envision**
176:5
**equal**
101:14 205:22
**equals**
89:17 90:24 91:16
142:24 144:19
149:25 222:11
**equity**
23:1,3
**equivalent**
149:19 161:25 206:2
**ERRATA**
234:1
**erroneously**
50:11
**error**
181:6,20 183:18
**especially**
213:14
**ESQ**
3:6,7,15,16,17 4:4,5
**essentially**
59:9 151:8,19
**establish**
27:11 170:4
**established**
58:2 221:19
**estate**
217:17,20
**estimate**
152:3
**estimating**

28:16
**et**
1:4 2:4 7:1 8:4
**Eth**
47:11,11,14 50:7,8
50:22
**Ethereum**
130:22,24 131:9
**evaluate**
145:1
**even**
18:16 74:21 76:16
111:16 126:3 129:2
153:20 175:25
181:7 208:20
213:18 217:15
229:10
**event**
58:21 163:11
**events**
163:23
**eventually**
32:6 98:3 112:23
**ever**
9:24 17:7 19:9 23:23
30:7 38:2 39:18
48:7 55:23 72:16
73:9,11 75:1,5,11
75:15 77:7,17 80:15
83:14 86:22 87:2
88:12 123:22,23
125:7 158:6 163:20
164:1 176:17
192:20
**every**
19:5 124:21 162:24
163:1 172:21 173:4
173:7,10,14 179:12
**everyone**
207:2
**everything**
10:8 52:8 60:6
124:11,14
**evidence**
208:15
**exact**

53:15 84:10 103:22
118:13
**exactly**
25:2 26:2 34:11 54:2
54:11 58:18 59:2
62:17 68:5 78:24
80:6 95:3 108:20
158:20 162:1
173:23 189:14
190:2 192:2,15
200:23 207:2
**EXAMINATION**
5:4,5,6 9:12 224:9
230:24
**example**
23:21 27:9 48:22
50:22 51:7 82:17,20
84:22 101:12
103:16,20 108:1
128:25 129:1,2
130:18 131:21
192:25
**exceeding**
150:22
**except**
111:20,25 165:11
168:11 183:22
191:22 213:21
**exception**
10:19 61:5
**exceptions**
61:5 81:1,2
**excess**
63:7 210:11
**exchange**
23:7,11,12,17 32:8
32:22 67:10 68:3,4
68:8 69:21 80:20
81:15 83:5 87:22
98:21 111:19
160:24 169:7
174:11 178:11
179:3 188:1 224:23
225:2,5,10,14,20
226:5,11,12 231:23
**exchanged**



21:19
**exchanges**
97:12
**excluded**
198:20
**excuse**
43:7 230:14
**executed**
192:17 233:22
**execution**
205:11,17 206:2,4
**exhibit**
5:12,14,16,18,20,22
6:23,25 7:3,4,5,6,6
42:10,18 43:2 63:21
66:14 69:17 72:11
72:12 76:25 77:5
82:3,6 83:19 87:16
87:19 94:8,12 95:8
95:8 99:25 100:4
108:14,15 120:16
120:19 125:20,23
135:13,16,20
137:19,23 138:24
139:2 141:15,19
153:6,10 159:11
166:4,8 169:25
173:2 178:6 179:19
179:24 180:11,14
180:15 197:4,7
201:23 202:1 217:1
218:3,7 219:5
220:18 227:2,5
228:12,16 229:6
231:2
**Exhibits**
5:10 41:9 43:9,12
**exist**
30:18 32:2 158:16
165:18
**existing**
108:22 124:1 184:20
**exit**
165:22,24

**expect**
13:13 45:8 59:3,6
63:4 67:15 72:2
99:1 118:17 123:3
126:9 147:6 157:8
183:15 192:4
193:24 195:8 207:7
**expectation**
153:3 184:21
**expedient**
229:9
**expenditures**
231:14
**expense**
46:4 56:24 57:3,11
**expenses**
56:23,23
**experience**
136:1
**experiencing**
183:19
**expire**
165:19,20
**EXPIRES**
234:23
**explain**
130:16 141:19 142:9
**explainable**
150:11
**explained**
79:10 98:20 140:14
143:8 162:19
**explainer**
88:7,16 89:4,9 98:22
98:23 100:11
108:13,21,23 211:4
**explainers**
24:25 108:25 120:2
126:1 225:19
**explaining**
132:22
**explanation**
158:8
**exploitative**
53:12
**exported**

70:16,18 71:1,14,16
**exports**
15:10
**expressed**
229:11
**expressing**
186:17,22
**extensive**
174:18
**extent**
23:11 31:16 139:22
147:13 226:23
**external**
21:15 31:3
**externally**
21:13,14
**external-facing**
30:22
**extra**
49:3
**extreme**
209:20 210:5,7
**extremely**
33:9 62:17
**extremes**
210:6
**E-mail**
6:7,15

_____
**F**
_____

**face**
128:21 134:15 147:8
230:11
**faced**
229:12
**facing**
30:9
**fact**
96:9 124:25 185:5
**facto**
34:20 134:1 213:13
213:16 214:2 223:3
**factor**
91:10 144:25 146:24
182:24
**factoring**

160:4
**factors**
26:24 59:4 91:11
**factual**
134:4
**fail**
47:19 156:21
**failed**
48:1 156:15,18 194:2
**fair**
57:19,24 58:1,2 63:9
63:9 144:7 146:14
149:18,20 174:17
**faithfully**
23:22 35:23
**fall**
167:21 231:12
**fallen**
138:16,18
**false**
125:5 221:11 222:3
223:8
**falsely**
230:9
**familiar**
23:6 31:6 33:12 35:6
41:25 42:1,22,24
44:12 92:14 100:7,9
120:9,22 126:5,13
139:5,6 153:19
165:12 173:19,21
173:25 219:12
**far**
31:10 55:1,3 126:16
133:20 161:14
170:24 230:13
**faring**
202:16 208:17
**Farmer**
4:11
**fashion**
35:17 108:25 196:5
**fast**
170:16,20
**faster**
166:23,25



**favorable**
196:7,13,13,17
**feature**
19:25 35:6 86:15
97:2,9 98:5 106:15
113:15,21 116:2
123:1 157:3 200:16
**features**
32:3
**federal**
228:7
**fee**
168:11
**feel**
21:20
**feels**
209:13
**fees**
163:22 222:17
**fell**
20:8,20
**felt**
229:11,11,11
**few**
10:2 11:19 16:13
27:3 29:15 55:19
78:9 101:13 104:16
126:19 141:20
158:3 159:18
182:13,25 207:7
224:13
**fewer**
181:25
**field**
216:8,9
**figure**
24:20
**figures**
53:21 64:1
**file**
46:4 87:23 143:20
170:7 171:13,21
172:7
**filed**
8:4 49:24 50:2
**files**

14:11 15:15 44:6
70:12 72:2
**filing**
99:16
**fill**
71:3,6,8 81:18
167:13
**fills**
70:13 195:1 216:7
**final**
39:18
**finally**
228:5
**finance**
37:10,14,19 38:3
45:15 70:21
**financial**
38:4,6,10 39:16,19
186:19 187:5 200:9
**financially**
186:6
**financials**
45:18 70:24
**find**
14:14 15:4 74:14
93:23 149:1 194:16
194:22 195:6
**finding**
77:17
**finish**
63:17
**fired**
49:12
**firm**
9:15 44:21 51:2
138:2 206:4
**firms**
19:16 21:7 161:18
177:9
**first**
6:17,19 18:21 22:21
27:4 39:11,12 42:10
43:14 45:14 56:23
61:15 64:16,21
66:18 89:16 100:12
101:8 103:16 107:3

108:18 109:7 112:4
113:21 121:2 123:4
125:24 126:21
129:24 132:5,5,8
137:4 141:20
153:12 166:9
178:12 180:25
210:9 214:17
219:21 228:17
231:1 233:6
**fix**
43:8
**flag**
33:22 34:1,2,5,10,16
47:23 97:22
**Flagging**
89:25
**flags**
148:6
**flip**
126:4
**flow**
52:6
**focused**
176:13
**focusing**
17:23 105:8 127:25
160:2 174:9
**folks**
187:9,13,18
**follow**
187:16
**following**
70:4 73:23 103:10
106:10 107:8 185:7
227:15
**follows**
9:11
**follow-up**
217:12
**follow-ups**
231:1
**forced**
37:7
**forces**
120:4

**forcibly**
209:22 210:4
**foregoing**
233:5,13,19
**forever**
165:18 230:14
**forget**
23:4 28:18 102:1
117:6 200:23 219:2
**forgetting**
135:1 163:24
**forgive**
20:4 92:13 132:14
**form**
30:12 36:21 40:7
42:23 45:23 53:12
54:18 57:12 65:3
76:9 80:24 81:9,12
81:13 110:9,12
119:24 139:16
147:12 164:5
171:19 219:13
225:25 226:6
**formal**
222:16
**format**
13:11
**formatted**
139:22
**formatting**
166:8
**former**
11:10
**forms**
61:16,20 81:6
**formula**
101:15 110:18
141:10
**formulas**
25:18 100:16,16
**forward**
147:3
**forwarded**
179:9
**forwarding**
198:23 217:4,10



forwards
217:7
four
67:2
fourth
100:23 128:24
fraction
28:12,18 129:4
fractions
28:25
frame
88:11,13
Francisco
2:13 3:9 8:8
frankly
148:25 169:5
fraud
227:16,18,22,25
free
103:6,8 107:22 108:5
    181:9,16 182:18
freedom
128:20
frequently
21:7 31:24 34:5
Friedberg
189:17 217:8
friends
208:19
FTT
45:5,5 61:16,18,21
    62:3 81:4,5,6,9,11
    193:1
FTX's
11:23 13:4 38:13
    39:23 55:8 64:4
    67:25 68:12,25
    69:11 76:20 78:9,10
    99:17 165:6 202:4
ftx-adminactions
7:4
ftx-admin-activity
7:3
FTX-LOCS
197:8
FTX.com

222:8 223:18
full
28:22 42:8 75:9
    111:16 134:14
    153:2 229:3 233:13
fully
186:4
function
34:15 104:18 121:5
    127:12 140:21
    151:17 152:23
    158:14,22 170:6,8
    170:12,19 171:7
    172:4 173:3,10,18
    193:4,6,7,13,15,22
    194:1,9,10,13,16
    206:24
functional
151:5
functionality
159:3
functionally
107:22
functioned
79:25 127:12,25
    225:3,6
functions
159:3 173:7 192:5
    193:20
function's
148:19
fund
56:8,10,11,15,17,20
    56:24 57:2,2,6,7,9
    57:10,14,17,21,22
    60:1 62:4,7,11,14
    63:4,5,11,14 226:21
    226:25
fundamentally
206:9
funding
163:23
funds
58:7 78:9 79:4,11
    132:16 134:3
    231:13,15,16,21

further
5:6 109:17 130:12
    198:21 200:10,17
    208:2 209:11 211:3
    230:24 232:7
    233:17
future
92:5,5,17 100:14
    110:9,11 121:25
    127:9 161:4,19
    162:1 163:23
futures
25:15 91:16,20,23
    97:5 103:13 107:19
    109:22 110:2,5
    111:7,12,18,20,23
    121:5,9,15,18
    127:19 160:21,23
    161:13,16,21 162:5
    162:6,11 163:9,13
    163:16,21,25 164:3
    164:9,15,18,21,24
    165:3,7,19 166:13
    167:6,13,15 168:19
    169:8 173:20 174:5
    174:10,13 183:1
    188:2

────────────
            G
────────────
G
7:1
gain
62:11 162:24
gained
162:11
Gary
17:12 18:1,16 37:25
    53:13 123:14 137:4
    153:3
gave
61:16,20 77:13 83:12
    108:1 128:5 184:9
    184:13
Geez
209:5
general

36:19 41:24 158:4
    174:1 175:2 183:4
    187:7,8 214:4
    231:19
generally
26:20 30:15 47:2
    127:1 177:8 178:12
    192:4,11
generate
57:3,10 62:5,6,8 65:3
    156:11
generated
82:19 83:7,10,15
    84:13 193:23
generating
166:14
generous
190:25 191:13,16
get
11:7 18:21 19:5 21:2
    25:20 33:7 34:15
    42:7 58:20 70:4
    90:22 118:10,12
    134:11 136:14
    147:18 152:23,25
    179:6,11 181:19
    191:5 204:17 205:2
    205:24 207:11
    222:15,19
gets
71:1 131:2
getting
37:7,8 58:12 62:23
    108:10 129:3 181:5
    217:13,20
get_LOC_in_use
142:24
girlfriend
12:5
GitHub
83:4
give
50:18 57:19 62:24
    63:8 111:3 135:10
    155:7 196:7 210:13
    232:11



given
36:8 63:2 83:22
167:16 173:10
190:24 191:4
193:10,14,25
194:23 195:4
217:24 219:10
220:13 222:17
232:9
giving
10:12 53:23 79:22
145:16 176:2
213:14
global
183:16,18
go
10:25 11:1 13:14
25:22 27:20 28:2
29:7,13,16 37:21
47:25 50:19 52:24
62:4 79:1,18 86:24
93:1 102:4 112:4
113:1 119:17 120:2
128:24 130:21
135:4,6 142:13
156:14,14 190:5
200:21 215:4
221:18 232:6
goal
31:13 134:5
goes
17:17
going
10:9,15 16:2 18:20
19:5 22:20 29:15
31:14 34:21 43:4
49:22 63:10 73:14
73:18 84:11,23 99:9
103:3 108:18
111:18 122:11
125:25 126:18
135:12 141:8,19
142:1 144:6 150:15
159:18 167:25
176:13 187:10,21
208:21 223:22

224:13
Goldberg
4:11
gone
18:13
good
8:1 9:13 36:20
221:19
Google
15:11 71:22 72:5
got
41:20 127:20 145:21
151:5 191:17
202:20 226:14
govern
225:13
governed
160:23
government
14:23
grandfathered
223:4,5
grant
123:10,14,19
granted
124:20 128:23
131:11,23 150:5,12
150:14,16 222:21
granting
118:16
great
188:7 202:12
greater
151:19 190:17
196:22
green
231:14
gresql
172:18
ground
10:3
grounded
141:13
group
41:22,24 42:5 43:13
45:3,15 66:20 67:21

69:21 70:22 148:15
178:10,10,12,13,14
180:17 189:20
202:13 224:14
growing
18:9,11
guaranteed
58:6
guess
9:21 20:23 23:1
60:14 77:14 100:5
110:18 119:25
123:10 170:9
180:10 207:15
222:10 223:1
231:17
guides
31:17
guilty
227:10,14,15,18,21
227:24 228:2,5
guy
141:14
guys
224:2
g-r-e-s-q-l
172:19
G-suite
15:12

─────────────

H

had
12:3 15:18 16:12
18:4 19:24 20:15
21:23 23:6 28:9,24
29:17 32:24 34:5
39:15 45:1 46:5
49:2 52:24 53:14
55:19 61:22,25
63:22 65:18 71:19
82:21,22 83:11
90:14 93:12 95:20
95:25 96:21 97:6,21
99:3,10 100:10
105:13 106:1
114:20 117:19,23

119:20 122:10
123:20 127:6 128:8
129:17 139:17
146:10 149:20
153:11 156:15
159:12,22 163:10
164:3,11 167:15
174:10,14,17
175:20,21 176:10
182:1 187:24 188:3
190:12 191:10
195:11,16 206:22
207:4 217:13
218:21 221:24
222:13,15 230:25
231:23
hadn't
18:5
haircut
183:5 204:24
half
64:21
hand
14:15 216:24
handed
41:11 43:12 66:16
77:5 82:6 87:18
94:11 100:4 120:19
125:23 137:22
139:1 141:19 153:9
165:3 166:8 178:9
180:14 184:17
197:7 202:1 218:5
227:5 228:15
handful
45:12
handle
52:3
handling
105:19
happen
36:3 47:4 48:8,12,15
107:25 193:16
215:10
happened
22:23 39:1 48:6



55:10 59:15 113:24
184:21 187:23
189:4,6 191:17
195:11,16 212:12
212:18,24 214:23
215:1,2 223:15
**happening**
38:25
**happens**
168:1
**happy**
141:14
**hard**
12:6 37:16 145:1
146:1 149:2 151:6
175:25 181:17
202:5
**harder**
222:25
**harmful**
229:18
**has**
13:17 27:10 43:5
45:21 50:21 68:2
72:10 85:17 92:5,6
94:13,21 101:12,15
107:5 108:9 110:17
120:21 131:1
140:11,11,17
150:10 153:10
156:4 161:18
228:15
**hashtag**
158:18
**haven't**
83:2
**having**
9:9 28:11 29:9 34:15
52:19 69:9,10 92:21
118:8 121:16
129:17 146:6 181:8
181:9,15,16,17,25
182:10,11 216:7
**hazy**
103:3 122:12
**he**

18:12 19:8,13,22
44:15 45:4,6,7,8,14
45:17 46:4 53:23
54:4 61:23,25 70:3
70:8,10 131:8,13,25
137:24 138:9 181:4
182:18,24 183:15
183:17,22 198:1
199:19,22 201:8
202:15,19,23 203:1
208:19 210:9,11
211:3,21 217:7
223:14
**head**
19:22 209:25
**headed**
125:14
**heading**
25:3 73:17 101:4
**heads**
187:16
**hear**
10:11,23 185:10
**heard**
83:2 101:24
**hearing**
56:14,16 190:25
198:25 199:8
202:15
**held**
8:7 34:6 73:22 146:7
185:17 224:15
**help**
23:19 24:24 25:8,21
29:7,11,22 30:10
31:4,8,10,13 34:3
34:21 56:4 98:20,23
100:8 126:1,1
130:15 138:20
179:20 225:18
**helped**
29:13 123:25
**helpful**
27:20 29:17 94:3
193:18
**helping**

99:4 132:21 230:9
**helps**
49:24 64:2
**Help.FTX.com**
35:3 100:5
**her**
223:17
**here**
13:5,13 28:7 34:6
58:1 63:9 64:24
73:15 88:7,19,24
89:15 90:23 94:21
98:10 103:3,5 121:1
126:19 132:6
137:21 144:6,14
145:19,24 146:3
151:13 162:12
169:24 170:1,7
172:18 173:4 175:6
180:21 182:8 183:8
198:9 199:14 203:1
204:3 205:1,5
210:16 211:9
219:12 223:23
**hereby**
233:4
**he's**
45:14 182:24 198:23
200:3 210:25 211:9
211:16,23
**Hi**
42:15 181:4
**hidden**
223:16
**high**
18:5 19:23 54:6
167:11 169:6
**higher**
129:5
**highly**
22:11
**him**
11:15 18:4,6,8,24
19:12,21 20:24
37:21 44:14,17
45:10 54:5 67:9

131:7 200:2 217:9
**his**
18:18,21 19:12,14
44:11 45:13 46:3
70:24 131:10,22,23
201:8 210:23 229:8
**historically**
225:6
**history**
99:17 153:2 194:24
195:1 221:19
**HKG**
82:24 83:3,5 84:12
**hmm**
37:16 53:1 145:12
**hold**
106:11
**holding**
93:13,13 101:9
**holdings**
25:17 28:10,16 34:7
63:14 90:2 93:9
108:2 188:18 189:8
189:22
**hole**
198:2,6 202:19,24
220:16 231:15
**honest**
77:25
**honestly**
19:4 34:17 181:18
185:9
**hopefully**
202:6
**hoping**
130:15
**hosted**
35:1
**hot**
67:25 68:6,7,12,15
68:23 69:2 80:4
84:9
**house**
48:24 176:21
**hubris**
229:19



**Hudson**
4:6
**hundred**
36:13 50:19,19 60:2
    81:23 190:13
    198:17,19 215:20
    217:22
**hundreds**
54:6
**hundred-thousand...**
131:2,6

**I**

**idea**
114:2 156:10 180:7
    184:13 208:21
    209:16 220:3 222:3
**ideas**
210:13
**identical**
141:21
**IDENTIFICATION**
41:10 43:3,10 66:15
    69:18 72:13 77:1
    82:4 87:17 94:9
    100:1 108:16
    120:17 125:21
    135:17 137:20
    138:25 141:16
    153:7 166:5 178:7
    180:12 197:5
    201:24 217:2 218:4
    219:6 220:19 227:3
    228:13
**identified**
146:9
**ignoring**
27:16,17
**illiquid**
28:6,10,20 231:16
**imagine**
111:17 176:1
**IMF**
102:21 159:22
    182:24 184:22
**immediately**

32:18 33:19 120:13
    204:20,23
**impact**
27:17,22,24 28:8
    58:18 163:17 171:6
    173:14 185:24
    200:5,7 222:6,13
**impacted**
20:16
**implement**
65:23 66:4,13 96:19
    109:7 126:8
**implementation**
31:18 166:17
**implemented**
30:17,21 31:3,15
    107:15 124:12
    141:2 156:14 158:9
    158:25 174:18,21
**implicit**
114:21
**implicitly**
71:9
**implied**
76:10 167:23 196:2
**implies**
95:25 188:21
**imply**
173:17
**import**
6:18,20
**important**
10:3,7 103:25 104:6
    213:7
**imported**
170:7
**impose**
80:12 112:14
**imposed**
79:25 175:3 196:14
    214:1
**impossibility**
175:11
**inaccuracies**
32:11
**inaccurate**

77:17
**inbound**
217:19
**inbuilt**
17:21
**incident**
52:10
**incidental**
125:8
**include**
39:22 102:20 104:22
    148:8 158:6 160:4
    160:11 162:4 163:7
    187:19
**included**
90:19 105:9 159:5,8
    159:21 160:18
    198:18 213:1
**including**
19:16 20:1,13 36:15
    91:9 105:13 123:9
    146:22 166:16
**income**
56:7
**inconsistencies**
31:2,20 119:19,21,23
**inconsistency**
30:8 120:11
**inconsistent**
73:10 111:3 120:7
    121:16 216:10
    226:4
**incorrect**
77:22 229:17
**increase**
133:6 134:12
**increased**
64:4,20 134:14
**increasing**
183:2
**increasingly**
230:11
**increment**
117:25 124:3
**independent**
188:24

**independently**
88:19 195:13,24
**INDEX**
5:1,10
**indicate**
155:22
**indicated**
76:6,14 96:9
**indirect**
119:23
**individual**
17:8 95:11 96:10,14
    96:14 104:2,7
**individualized**
118:15,18
**industry**
68:7 185:14
**infer**
220:8
**inference**
171:16 185:4 208:18
    220:9,11
**inferring**
170:17 172:5 203:1
**infinite**
226:23
**info**
95:9
**inform**
94:6
**information**
14:23,24 38:2,6 70:9
    219:12,13,17
**informed**
182:25 183:24
    214:16
**infrastructure**
215:22
**initial**
211:5
**initially**
131:11
**input**
116:3
**inputs**
70:23



**inside**
66:10 173:1
**insofar**
30:24 69:2 142:18
183:22
**instance**
12:20 25:17 32:12
45:4 50:13 52:14
53:3,9 55:4 61:15
100:14 107:17
123:25 162:3
166:16 168:1
183:13 193:2 196:8
196:20 222:17
**instances**
20:18 22:22 25:12
31:9 36:15 37:4
45:9 49:16 50:1,23
55:10,14 56:1 58:23
58:24 73:10,12
160:8 182:3 192:21
192:23 219:20
**Instantaneously**
168:10
**instead**
91:9 104:7 131:15
132:2,17 145:14
152:7 163:6 165:8
184:18 191:17
196:6 205:12,17
206:5
**instincts**
18:12
**instructed**
212:5
**insurance**
56:11,16 57:2,6,7,9
57:10,14,17,21,22
60:1 62:4,7,11,14
63:4,5,11,14 226:21
226:24
**intended**
31:16 34:3 100:19
175:14
**intent**
32:7

**intentionally**
47:22
**interact**
18:20 19:21 20:10
**interacted**
60:1 68:11 88:12
**interacting**
45:10 67:25
**interaction**
19:17 38:12 176:25
**interactions**
20:24 21:24 38:15
45:2 176:17 177:1
177:11,13
**interest**
112:18 113:18 115:4
115:7,12,16 116:3
127:21 128:6,12
129:7,13 131:18
133:1,15,22 134:6
136:14,20 137:6,10
138:15 142:18
143:5 150:15,24
153:24 154:16,24
155:23 157:6,12,16
159:13 179:3,6
**interested**
49:23 233:20
**interests**
230:12
**interface**
84:17,21,25 88:1
93:2 94:15,19 95:10
117:16 118:5,25
160:17 161:16
162:10,18
**internal**
26:12 29:23 30:8,24
31:20 201:1
**internally**
69:8 208:21
**internal-facing**
30:23
**interpret**
75:23
**interpretation**

142:14 156:2 162:14
162:15,17 175:16
**interpreted**
204:10
**intervals**
156:13
**intervening**
171:15
**into**
13:14 36:1,16 68:14
79:18,18 85:7 106:9
120:2 129:25
144:25 161:4,13
167:5 171:23 185:6
215:4,12 229:8
233:12
**introduce**
8:15 9:5
**introduced**
102:21
**invested**
52:11,12,15,25
**involved**
37:17,18,25 42:4
44:24 57:15 84:4
115:18 118:23,24
124:2
**involvement**
176:14
**irregular**
154:20
**irresponsible**
229:18
**isn't**
24:5 72:3 112:25
140:10
**issue**
22:12 96:3 184:2
190:18,22
**issued**
82:24
**issues**
20:15
**item**
56:7,12,23 63:23
89:16 119:18

138:15 149:4 151:3
151:21 154:13,15
**itemized**
162:1
**items**
64:13 67:3 70:4
147:1 148:16,16
160:5 204:11
**its**
9:22 26:14 27:14
28:19 39:21 61:14
96:22 103:23
104:11 133:13
144:9 166:18 172:6
183:7 219:18
**itself**
27:25 57:20 73:2
115:23 126:12
149:19 161:9 170:4
171:4 173:16 174:7
194:10
**I'd**
14:18 119:18 141:13
216:12
**I'll**
9:16 10:6,10 19:2
21:2 27:9 29:19
41:13 44:4 87:22
139:2 140:9 149:1
187:23 190:5
**I've**
33:11 98:21 126:3,17
153:16 230:14
**I.D.s**
147:25
**i.e**
123:8

———————————
**J**
———————————
**J**
3:15
**Jamie**
4:12
**January**
5:23 69:22
**Jayesh**



6:16 37:24 45:14
69:8
**Jen**
37:20
**job**
1:21 10:5
**joined**
16:1,4 96:24
**joint**
2:17 3:3 8:18,21 9:15
**jokingly**
141:12
**judge**
11:3
**judgment**
7:5 227:6
**July**
99:12 137:10
**jumping**
22:23
**June**
5:21,23,25 64:5
  87:24 156:4,6,7,11
  159:16,16 174:11
  186:25 187:11,24
  188:7,10 197:23
  217:5,8 218:8,8
  219:1 220:5,22
**just**
9:14,24 10:5,16 11:7
  13:16 14:9 15:22
  16:15 21:2 22:13
  29:7 31:19,24 32:2
  34:21 35:21,24
  40:12 42:10 44:3,6
  46:20 47:2 54:18
  56:2 59:15 62:4,18
  65:19 73:14 74:15
  74:19 84:15 85:15
  89:14 93:1,8 94:17
  95:19 96:11 97:23
  99:10 102:1 103:19
  104:7,12 105:8
  112:23 113:16,22
  119:17,22 120:25
  121:17 125:5 126:5

126:18 132:6 135:1
141:25 143:3
146:11 150:20
157:3 158:3 159:3
159:18 160:2 165:8
170:17 175:20
176:2,11,13 178:12
187:21,23 191:3
193:3,9,13 198:15
202:24 208:12
209:13 210:18
214:21 219:10
221:2 224:13
228:16 230:5,25
231:1,2,3 232:1,20
**justified**
229:9
**justify**
222:20

---
### K

**KBO**
1:7 2:7
**KDO**
8:6
**Ken**
189:18
**key**
17:7,9,14
**kind**
10:2 11:2,22 14:13
  26:17 30:9 33:25
  38:15 74:10 82:17
  85:1,22 89:16 93:11
  103:7 109:16
  124:15 147:8
  152:24 153:12
  154:23 155:4 169:5
  174:18 216:1
  229:19
**kinds**
28:15 94:4 95:16
  174:10
**knew**
18:6 79:24 229:6,13
**knowing**

170:18
**knowledge**
188:9 227:1
**known**
18:4
**Kyle**
6:7 82:11 176:18,20
  181:4 217:5 219:22
  221:10 223:7
**Kyle's**
222:1

---
### L

**labeled**
8:2 229:4
**Lair**
178:2
**laptop**
15:22
**large**
19:16 28:10,10 29:6
  54:19 161:7 185:13
  203:18 219:9
**larger**
122:3 123:15,19
  133:8 183:4,8
**last**
10:23 11:8,11,19
  12:2,10 15:17 126:6
  155:1,9,10 156:3
  159:14,14 163:11
  219:22 231:2
**late**
18:9 37:15
**latency**
22:4,7
**later**
11:4 21:2 61:1 156:4
  157:9 199:3 207:16
  217:9 218:7
**latest**
153:1
**Latham**
3:5 8:17 9:15
**latter**
15:25

**laundering**
228:3
**Laura**
1:22 2:13 8:13 9:6
  233:24
**law**
9:15
**lawyer**
10:24 24:12 40:12
**lawyers**
11:3 13:5,11,16
  202:4 213:2
**lay**
74:10,19
**LayerZero**
178:1
**layperson**
40:13
**layperson's**
40:2
**leaderboard**
218:12,14,15,17,22
  218:25
**leading**
99:16
**learn**
193:3
**learned**
18:17 231:12
**least**
29:5 61:12 140:4
  180:1
**leave**
47:22
**leaving**
47:14 209:23
**led**
11:23
**Lee**
44:11,20
**left**
24:16 59:18 155:15
**legal**
8:11,12,14 24:2,4
  74:14 80:13 152:25
  199:22



**legally**
200:3
**Lena**
178:21,23
**lender**
112:23 113:1,3
**lenders**
112:8,15,19
**lending**
112:5 116:16,18
**lent**
111:7
**less**
58:20 78:11 106:2
107:6 143:8,14
175:12,15 188:3
198:12
**let**
10:2 13:16 29:18
42:25 44:3 46:1
56:2 63:17,23 73:19
87:14 88:23 89:13
94:17 96:17 109:10
119:5 120:25 126:4
135:2,5 146:2 166:2
190:5 197:9,15
201:20 223:22
**letter**
7:7 228:18,21,24
229:2 231:4
**letters**
146:8
**letting**
230:12
**let's**
28:2 57:8 79:1 82:22
96:17 101:7 103:8
108:17 169:24
180:9 212:22 219:4
**level**
167:11 169:6 222:11
222:18,18,20
**levels**
167:25 176:10 201:1
222:17
**Leven**

**liquid**
28:14 59:20 78:18
79:4,11 140:16
231:15,16
**liquidate**
28:21 47:20 48:1
164:17,21 209:20
**liquidated**
58:4,12 59:8,24
62:23 63:1 129:3
134:11 145:21
167:17 191:17
204:17,23 205:3
**liquidating**
53:18 57:16 58:7
139:14 188:17
196:4 209:22
**liquidation**
23:21 24:9 29:1
47:21 48:1,5 57:13
58:22 59:25 60:17
62:6 75:8 76:13
86:21 99:21 122:4
129:14 134:2,3
141:5 145:15
147:15 150:14,18
159:9 160:9 164:20
164:23 174:25
175:14,23 189:2
191:1,14 194:14
195:15,21 196:15
205:18,25 206:5,7
210:18 212:5
213:19 215:11,14
216:9 219:1 220:6
**liquidations**
47:19 60:4,10,12
76:10 127:10,19,22
145:17 147:11
174:17 192:18
194:20 195:11
205:12
**liquidators**
2:17 3:3 8:18,21 9:16
**liquidity**
26:18,20,25 27:16

**180:22 181:3 218:11
levered**
203:10,14 209:23
**Levin**
184:8
**liabilities**
175:20
**liability**
92:11
**licensing**
32:14
**lifetime**
140:3 219:3
**light**
181:10 231:14
**likely**
10:11 19:13 67:20
175:12,15 177:18
**likes**
149:6
**likewise**
80:19 159:8 225:23
**limit**
123:15,19
**limited**
8:4 18:16
**lined**
38:20 142:2
**lines**
6:11,12 20:1,3,4,6,11
20:14 79:10 101:13
114:3,12 115:10
116:10 118:16
119:17 120:19
121:3,5,8,24 122:24
124:20 125:1,23
126:7 127:6 133:25
134:12,18 145:3,16
145:25 147:2,6
148:21 149:3 151:6
182:13,25 201:14
210:25
**link**
201:9
**linked**
21:14

28:3,19 57:14,17,20
58:5,8 62:24 63:2,9
143:9 144:12
164:25
**list**
17:17 34:17 190:24
191:4,6 194:23
195:4
**listed**
195:7 222:2
**listing**
25:22 26:11,13
**listings**
25:14,15
**lists**
89:16 103:11 106:11
201:14
**literal**
163:2,3
**little**
28:7 32:19 65:19
79:17 83:11 87:5
96:18 117:22
121:22 144:18
145:1,11 149:1
174:16 202:5
206:25 208:2
211:19 218:7
**Liu**
180:22 181:3 218:11
**live**
12:5
**lived**
83:5
**lives**
35:22
**LLC**
205:13
**LLP**
3:5,14 4:3 8:23,25
**Ln**
234:5
**loan**
107:22 108:5,9
112:13,17,24 115:1
**loaned**



74:7
**Loans**
115:2
**LOC**
123:19,23 124:1,12
127:21 129:2,5,8,13
130:6 137:25
138:23 142:22
147:18,21 151:15
153:24 154:10,15
159:13 181:9,16
199:23 205:5
206:19 209:22
**locally**
208:3
**located**
81:5 93:20
**locations**
15:4,7 71:23
**locked**
45:5 61:18,20 81:4,5
81:6,9,12,12 193:1
**lockstep**
115:25 120:5
**LOCs**
61:15 123:5,10,15
124:5,8 129:21,25
**LOC_changes**
153:12
**LOC_interest_cha...**
153:13
**log**
35:8,16,24,25 36:23
85:7 215:5 219:20
**logged**
36:10 219:17,21,23
220:4
**logging**
35:13 219:19,25
**logic**
166:18 170:24 172:6
222:5
**logical**
196:10
**login**
36:5,15,21 86:12

148:9,11 218:1
**logins**
36:15 148:9 223:8
**login_records**
36:14
**LOL**
209:12 210:10
**long**
34:17 126:15 157:2
167:15 168:16
169:20 200:10
203:10,14,17
**longer**
190:12 222:23
**longs**
169:3
**look**
37:6 42:9,18,22,24
45:13 56:2,5,22
63:20 66:22 69:19
70:11 78:3 79:2
87:25 90:15 94:18
100:7,9,15,22,25
103:4 104:1,7 106:3
108:12,17 109:11
112:2,7 120:21,22
125:24 126:5
128:25 135:19
139:4 140:1 141:11
142:5 145:20
147:17 151:12
153:23 154:6 155:1
155:4 156:3 157:15
159:11 169:24
180:21 184:7
197:11 202:9
219:12,15 221:4,5
228:16 230:10
**looked**
13:10 83:9 117:16
153:16 154:5 159:2
162:3 214:21 219:2
**looking**
14:20,24 27:15 64:2
72:18 83:18 85:9,11
93:20 95:7 104:13

110:15 126:16
142:2 151:18
156:25 157:10
158:11 229:6
**looks**
41:13,21 64:3 69:24
85:20 88:6 94:13,21
100:7,13 125:25
139:5,23 148:19
153:17 154:8
159:14 198:22
201:8 202:12
206:16,22 207:24
211:16 217:3 221:8
227:9
**loose**
78:21
**loosely**
146:7
**looser**
102:8
**lose**
48:22 58:6 91:21
92:19 112:23
**loses**
48:23
**loss**
5:23 42:20 43:23
48:9,18,25 49:2,4
49:14 50:17,21,24
51:5,13,16,20,22
52:4 53:21,23,24
54:1,1,3,8,18 56:6
74:2 92:2 162:25
**losses**
46:25 47:3,8 48:3
50:3 52:15 55:5,11
55:16 112:14
174:19,22 175:4,14
213:25 226:20,22
**lost**
68:17 92:22 107:18
162:11
**lot**
18:13 22:10 54:18
111:12 128:4,19

154:18 167:8 187:8
207:3
**lots**
19:24 30:3 219:16
**Lotus**
51:2,3
**Lou**
184:8
**low**
207:23
**lower**
129:21 130:6
**Ltd**
1:4 2:4 5:16,20,22,24
43:19 234:2
**Luna**
185:10,17 186:7,8,9
186:14
**lunch**
157:20
**Luu**
3:17 9:2
**l-a-i-r**
178:2
**L-a-y-e-r**
178:3

---

**M**

**made**
13:17 37:2 38:20
52:3 84:7,8 113:15
113:21 115:6 118:8
121:13 137:8 152:7
158:9 212:17,24
**Magna**
8:12,14
**magnitude**
51:12 108:3
**main**
136:4 181:6
**maintained**
18:7 140:6 170:14
**maintaining**
92:3
**maintenance**
129:6



**make**
12:8 26:8,22,23 27:4
31:23,23 32:25 33:8
65:20 71:9 88:18
97:23 103:19 105:6
114:14 121:17
141:23 145:9,11,15
152:10 165:5
166:15,23 175:11
175:12,14 183:17
193:16 200:8
201:17 210:23
211:11 214:16
215:3 222:25 223:3
228:6 231:14
**maker**
126:25 127:3
**makes**
11:6 33:14 39:24
40:1 56:20 103:2
138:10,13 142:15
142:19 143:1,3
152:19 192:3,10
195:23,25 196:10
217:23
**making**
166:15,22,25 167:1
200:17
**Malley**
4:12
**managed**
19:23
**management**
6:10 20:1 98:22
99:24 100:6 208:22
**manager**
16:12
**managing**
16:24 224:24 225:1
**manipulated**
229:7
**manual**
60:4,10,12 189:1
192:18 195:11,21
196:21 205:24
212:5 214:25

215:14 220:5
**manually**
61:2,23 66:1 183:11
188:16
**manuals**
225:18
**many**
20:12 26:10 49:16,17
84:19 85:8,12,12
99:2 167:21 174:13
229:8
**March**
5:17 66:21 138:7
**margin**
53:12 89:3,3,9 96:18
96:20,23 97:5,6,18
98:6,21,24 99:11,20
106:7 107:16
108:13,21,24 109:5
109:13,18,22
112:13,14,14 113:7
116:14,15,18
122:25 127:9,18
129:4,6 130:5,7,21
130:25 131:16
132:2,8,17,19
144:15,21 145:8
146:18 168:20
175:2,13 180:3
181:7 183:3,9,12
213:19
**marginal**
183:1
**mark**
41:5 162:20 196:17
196:22
**marked**
7:9 41:9,12,12 43:2,9
58:14 66:14,18
69:17 72:10,11,12
76:25 82:3,6 87:16
87:19 94:8,11,12
99:25 108:14,15
120:16 125:20
135:16 137:19
138:24 141:15

153:6 166:4 178:6
180:11,14 197:4
201:23 217:1 218:3
219:5 220:18 227:2
227:5 228:12,15
**market**
28:8 29:2 53:19
58:19 106:8,18
121:15 126:25
127:3 144:10
149:19 181:24
192:8 193:18 194:6
196:17,22 213:22
**marketable**
108:10
**marketing**
221:10
**markets**
53:18 106:21 121:6,6
121:19,21,25 122:7
122:13 129:22
185:8
**market-to-market**
27:14
**marking**
222:2 223:7
**mark-to-market**
27:7 28:22 58:13,21
62:10,22 90:2 91:9
144:9 191:20,24
**master**
46:4
**match**
161:4
**matching**
161:9
**matter**
8:3 37:3 78:25 197:8
204:9 229:15
**mattered**
22:10 31:18
**matters**
11:23 44:19
**max**
149:25 151:23 152:1
**maximal**

62:21
**maximum**
62:25 147:9 152:7,10
**may**
12:22,24 15:2 22:17
24:14,15,19 27:11
27:18 29:5 53:16,17
56:4 62:2 66:23
72:14,22 102:20,25
103:1 114:19
116:10,20 133:16
146:16 147:5 156:4
161:24 167:3 180:6
185:6,11,23 186:5
186:24 187:1,2,11
196:18 198:24
218:15 221:15,17
223:23 230:22
**maybe**
12:11 18:9 85:10
99:17 100:24
197:10,21 198:23
202:9 223:14
**me**
2:13 10:2,5 12:8
13:16 16:13 19:13
20:4 22:17 26:13
29:18 37:16 39:24
40:18 41:21 42:25
43:7 44:3 45:5,8,11
46:1 48:12 49:8,11
50:18 54:17 56:2,4
56:20 63:17,24 67:8
73:19 78:16 87:14
87:21 88:6,23 89:14
92:13 94:13,17
96:17 109:10
110:19 111:3
113:15 114:14
119:6 120:25 126:4
126:15 130:15
132:14,21 135:3,5
136:5 138:11 139:4
142:15,20 143:3
146:2 148:19
153:17 155:7 166:2



169:23 175:25
189:19 190:5 192:3
192:4,10,19 195:23
196:10 197:9,15
199:12 201:20
214:16 217:23
223:11 229:16,19
232:7,11 233:5,10
234:18
**mean**
15:6 22:7 27:24
31:23 33:2 34:6
36:4 39:7 40:24
41:23 46:17 48:20
50:4,17 57:24 58:3
60:12 66:23 67:22
68:6 71:7,15 73:6,7
85:5,7,10 95:1 97:4
97:25 102:2 103:21
106:15,17 107:4
111:12,15,17
114:18,24 116:7
127:16 130:10
144:8 157:6,10
164:15 165:2
166:19,21 168:7
173:24 174:1
179:16 182:22
192:11,25 195:1
196:13 198:6,10,16
204:2,18 205:16
207:18 209:22
210:7 213:16 221:1
221:13,17 231:17
**meaning**
33:15 58:2 80:1
**meanings**
55:19 80:13 175:7,10
**means**
27:15 46:13 63:10
101:14 126:24
152:5 154:15 165:1
173:14 184:14
206:2,3 222:3
**meant**
20:5 33:23 34:7 54:2

79:11 102:1,7
103:18 105:21
130:16 142:9,16
169:12,13 205:5,5,7
206:6 209:16 210:7
231:7
**measure**
193:18 198:11
**measurement**
128:5
**mechanism**
50:10 97:17 221:14
226:16,21
**mechanisms**
38:20
**media**
8:2 65:11,16 119:9
119:14 157:22
158:2 216:18,23
224:3,8
**mediated**
67:24
**meeting**
139:12 222:16
**meetings**
72:21
**meets**
222:23
**member**
178:16
**memories**
72:9
**memory**
88:24 103:3 111:4
122:11 129:12
135:4 137:3 144:6
171:21 174:6
187:23 190:10
193:25 220:23
**mentioned**
12:16 14:18 15:21
21:4,9,11 23:16
29:12 54:4 71:22
72:8 99:8 100:6
113:21 115:3 118:8
141:1 150:4 214:15

219:11
**message**
6:21,23 44:10 45:13
46:3,21 67:2,9
69:25 71:20 72:3
178:21 179:1
180:23 184:8 197:7
197:12 198:1,22,23
201:8 202:2 206:22
206:23,24 207:6,15
212:4 214:21
**messages**
83:15 180:25 195:14
196:1,2 207:1
**met**
176:20 224:12
**methods**
213:21 216:6
**mic**
43:8
**Michael**
123:9
**mid**
16:4 39:2
**middle**
63:22 70:12
**might**
12:8 13:6,13 22:8,12
22:13 24:4 28:17,21
29:2 32:1,6 33:13
34:10,12 47:10 48:2
57:22 58:3 61:10
62:1,5,6,8,13 63:11
64:15 65:3 72:21
99:2,8 102:10 108:6
111:15 114:14
115:14 116:23
130:25 141:22
152:6 158:8,16
159:24 174:3
182:10 183:24
185:20 186:22
194:8 197:8 200:8
202:5 220:8,12
221:17
**million**

46:5 64:4,5 89:18
90:24 91:17 149:9
149:13,20 155:6,16
182:19 188:2 198:2
198:5,13,15,17,19
198:20 202:18,20
203:21 204:4,5,12
204:13,14,21,22,24
205:10,23 211:4,6,6
211:17 220:15
**millions**
51:14 54:6 64:2
**million-dollar**
202:17
**milliseconds**
144:8
**mind**
19:5 22:23 23:17
24:1,8 27:5 29:25
31:9 32:4,17 33:1
47:18 61:6,13 65:7
68:19 81:3,4 82:21
82:23,23 110:19
114:16 120:10,14
130:12 156:23
163:4 167:22 168:6
169:5,19 170:5
174:24 175:1,10
177:17,21 229:14
**mine**
19:13 135:9 137:3
**minimal**
62:21
**minimum**
222:11,18,18
**minor**
96:21
**Minorly**
84:6
**minus**
203:11
**minute**
34:22 179:12 207:7
**miscredited**
47:12
**misread**



50:18
**misremembering**
132:15 171:25
**mistake**
47:13
**misunderstands**
184:15
**mitigate**
107:24
**MM**
126:24
**MobileCoin**
52:11,13,16,25 53:6
53:19 54:19
**modal**
223:14
**mode**
35:24 219:19
**modified**
183:11
**modify**
70:25 71:13,15
225:11
**modifying**
71:11
**moment**
111:3 112:24 154:6
155:7 179:22
228:16
**money**
48:23 49:3 58:6
91:25 92:19,24
107:18 112:23
176:2 181:23 228:3
230:8 231:5,7,18,23
**monitoring**
34:12
**monitors**
201:11
**Montgomery**
2:12 3:8 8:8
**months**
12:11 99:16
**more**
11:7 16:15 18:16,18
28:8,9,13 30:2 33:1

36:1,18 37:25 43:6
44:25 49:18 69:13
72:2 89:2 99:10
103:2 113:16,22
114:20,23 119:17
122:2 137:3 141:12
146:20 150:9,13,15
158:3,21 159:18
163:24 166:3,15
168:6 176:10
179:12 181:10
183:4,5,9,9 199:24
210:13 214:4 230:9
**morning**
8:1 9:13
**most**
10:3 18:24 34:20
35:10,23 42:10
55:20 83:4 84:14
139:3 169:3 174:1
218:19 229:21
**mostly**
192:19
**move**
185:6 204:17 223:23
**moved**
137:17
**movement**
28:9 205:4,7
**moving**
196:5 205:5
**MS**
8:20
**MSRM**
149:10,13,17
**much**
25:17 27:11,17 28:4
31:24 47:12 58:18
58:18 61:18 118:2,5
118:25 131:19,25
133:16 137:5
153:22 154:19
173:4 179:12 200:7
210:19 214:6
229:20
**Muksinov**

4:11
**mult**
149:4,21
**multiple**
218:16
**multiplier**
149:6,9
**multiply**
27:12
**must**
104:10,18 140:5
**mutative**
220:25 221:1,9
**my**
8:11 9:14 10:5,10,12
11:15,17,25 12:5,16
12:23 13:11 14:9
15:10,11,15 16:3
24:14,19 26:22
27:21 40:2 46:19
49:22 52:5,19 62:19
67:9 72:19 91:7
93:16,16,22 94:16
94:16 103:17 111:4
111:25 114:1
122:11 125:9,24
130:20,22 137:2
143:24 149:23
152:17 153:3
154:25 156:2
159:13 163:16
165:10 166:12
171:16,21 174:6
175:16 180:20,22
190:10 207:23
208:18 211:20
220:11 221:23
224:10 226:10,12
226:18 227:1
228:16 229:14
230:12 231:19
233:12 234:23
**myself**
16:25 229:16 230:7
231:4
**m-u-l-t**

149:4

---

**N**

**Nacif**
4:12
**Nam**
3:17 9:2
**name**
8:11 18:21 39:11,12
39:13 44:12 87:23
90:10,11 170:17
176:24 177:25
224:10 230:12
234:2
**named**
198:24 233:19,20
**names**
39:7,8,10 45:21
**name's**
9:14
**narratives**
229:8
**narrowly**
229:16
**near**
109:16 155:4 182:14
182:22 199:21
**necessarily**
48:11 50:16 58:14
62:12 140:22,24
145:17 150:18
183:21 196:18
200:22 231:15
**necessary**
233:15
**necessitate**
75:8
**need**
27:3 35:8 41:5 97:11
115:2 145:20
200:21 206:18
215:23 232:19
**needed**
38:3 129:14 150:13
214:1
**needs**



19:25 28:21 85:2
142:19
**negative**
46:6,7,11,14 47:14
47:25 50:5 52:21,24
61:14 64:16 86:6,15
86:22,24 87:2,8,12
87:14 90:20 95:15
96:10 97:20,24 98:1
98:4,10 102:15
104:22 105:1,9,13
105:19,22 106:10
107:4,17,20,21
108:3 109:18 117:1
117:17,20 129:25
144:20,21,23,24
145:7 146:23 150:1
150:10,22 151:9
163:14 171:25
179:12 181:8,15
182:7,10 188:4
189:8,24 190:8,12
190:16 198:20
202:18,20 203:18
203:21 204:4,12,21
205:21
**negotiating**
124:16
**net**
50:5 59:9,18 86:9,16
93:16 95:1,20 96:4
96:11 101:18,22
102:3,5 104:8,10,13
104:15,17 140:23
164:4,11 175:20
195:12,17 208:4
**never**
38:11 125:6 126:3
**new**
3:19,19 4:7,7 25:14
25:14 29:10 65:25
66:17 71:12 100:14
227:8
**news**
185:13
**next**

67:6,18 68:21 69:20
70:11 103:4 105:18
106:3 123:7 126:23
127:20 129:20
155:18 157:10
166:10 184:7
196:10 206:25
207:7 222:1,10
223:6 230:4
**Ngoy**
178:21,23
**Nicholas**
4:12
**nine**
53:21
**Nishad**
1:12 2:16 4:1 7:6 8:3
8:23,25 9:8 124:22
232:9,24 234:4
**no**
1:7,21,22 2:7 8:2,6
9:7 10:1,15 12:13
13:7 23:15 24:18
26:7 27:23 33:10
35:18 38:11 42:11
45:24 46:1 61:4
65:8,12,16 72:6
77:19,23 82:20
84:14 90:17 96:9
112:8 115:19
117:12 119:10,14
120:24 122:18
124:17 125:5
126:16 128:17
133:14 138:8,10
144:3 152:24
155:23 156:6,7
157:23 158:2
164:14 165:10,17
165:18 168:10
170:23 176:3 184:3
184:6 185:9,18
188:6 190:11
192:19 197:14,15
204:9 208:21
210:11 212:9,13

216:19,23 221:24
222:22 224:4,8
230:14,22 232:7
**nod**
10:16
**Nods**
209:25
**none**
74:5 222:9,11,22
**non-engineers**
187:15
**non-linear**
183:10
**non-linearity**
91:11 102:21 184:19
204:24
**non-negative**
90:2 91:8,12 93:13
**non-obvious**
144:18
**non-overlapping**
95:9 120:1 223:8
**non-restrictive**
123:8
**non-technical**
187:9,13,18
**non-trading**
177:15,20
**non-USD**
106:9,19,20
**non-zero**
93:13 161:18
**nor**
233:19
**Notary**
234:22
**note**
109:17 211:11
**noted**
118:2
**nothing**
36:6 65:21 69:13
113:2 120:4 141:4
233:7
**nothing's**
120:10

**noticed**
46:5
**noticing**
30:7
**notification**
37:9 81:16,22 83:22
**notifications**
81:17,18
**notional**
161:20,24 188:2
**November**
49:21
**now**
23:6 27:16 62:2
76:18 83:18 97:6
123:20 130:4 131:1
142:15 157:20
166:6 169:5 176:14
184:10 185:6 198:2
198:7,16 203:4
209:21,21 216:16
219:7 234:5
**now-wife**
12:10
**number**
22:16 67:2 88:3
129:18 135:7
139:17 152:1
156:21 161:22,23
167:24 219:7
**numbering**
100:23
**numbers**
26:23 42:8 101:2
116:20 141:22
155:10 160:16
166:12
**numerical**
89:16
**n-e-a-r**
182:15

———————————
**O**
———————————
**object**
146:9 171:21 225:25
226:6



**objecting**
10:24
**objections**
11:2
**observed**
22:3,12 181:8
**obvious**
24:19 31:22 48:12,14
134:5 230:11
**occurred**
76:13 99:15
**occurring**
175:4 223:11
**October**
1:13 2:11 6:6,14 8:9
233:22
**off**
10:11 18:21 65:12
103:3 113:18
119:10 129:24
144:6 157:23
158:15 200:13,17
201:5 207:10,20
216:19 219:18
224:4 232:6,9
**offer**
97:11
**offered**
97:2,9 111:19
**offering**
114:3,11 115:10
**offers**
126:22
**often**
19:24 26:13 229:14
**oh**
33:16,18 71:21 82:9
117:6 126:6 131:23
135:10 141:24
155:12 194:15
**omnibus**
68:8 80:4,23
**once**
39:1,2 126:4 172:9
173:4,10
**ones**

15:20,21 25:13 29:8
29:9,16 30:14,24
34:6,7 49:20 82:20
82:24 84:22 139:23
160:10,14 192:14
213:22
**one's**
41:12,12 69:21 82:11
**one-off**
192:21
**online**
107:16
**only**
10:19 35:13,15 36:2
49:23 62:2,3 65:24
78:8 81:24 90:5,15
102:25 110:11
112:18 113:25
121:5,8,18 127:21
132:20 133:21
141:12 152:12
163:17 164:11
165:4,24 174:1
175:21 177:25
181:7 200:8 213:20
218:8 220:1 221:15
221:24
**onto**
68:4
**oOo**
1:3 2:3,19 4:19 5:8
7:20
**open**
89:1 103:9,10 122:2
161:17 168:2
**opening**
92:3 168:17 169:8,12
**operate**
166:22,25 176:8
**operated**
133:21 162:23
175:19 177:9
225:11,16,21,24
226:5,8,10,11,13
**opportunity**
233:15

**opposed**
14:23 22:9,20 24:3
82:25 98:14 132:9
193:13 216:5
**opposite**
196:6
**opt**
218:20,21
**option**
27:13 60:15 132:10
**options**
60:14,20 132:10
**order**
33:8 36:23 38:4
97:11 104:1 131:20
131:25 161:7 196:6
205:19 206:15
215:6 218:21
232:16
**orders**
103:9,11 106:9,18
181:7 232:12
**original**
28:13 96:22 166:17
**originally**
98:2
**OTC**
6:8 60:25 83:1,22,25
84:1,4,8 216:8,9
**OTC@FTX.com**
82:10
**other**
10:10 11:1 12:9,14
12:25 13:6,25 16:24
21:7 26:2,24 27:3
27:19 28:8 29:5,8
34:12 35:25 39:12
45:2,9 47:17 50:22
50:23 52:9 60:20
71:12,13 75:7 79:12
81:24 83:13 92:21
93:2 97:12,18 98:13
98:23 102:19,23
103:1 104:19 111:5
114:3,12 115:11,14
118:9 124:20

139:20,24 144:22
146:2,10,12 149:22
150:21 161:17
163:4,12 166:24
167:1,19 169:17
170:16 172:15,18
174:3 175:8 176:25
177:15,17 182:3
192:12,14,18,21,23
195:3 210:15 216:2
216:6 223:16
226:24 230:22
**others**
45:12 123:14 178:1
230:12
**otherwise**
104:25 108:11 133:9
**our**
22:12 179:5
**out**
11:8 16:11 22:20
24:20 46:7,14 70:4
76:23 92:19 111:7
148:25 156:13,17
165:22,24 167:21
190:19 197:10
210:12,19 211:1,6
211:17
**outcome**
59:15 233:20
**outside**
38:13 60:16,18 66:8
68:3 97:18 98:6
145:7 172:24
**outstanding**
91:16 127:21 200:11
**outward**
30:9
**over**
10:10 13:10 14:15
25:21 26:9 49:3
60:24 75:9 80:1
99:17 110:17 195:8
215:23 219:2
223:23
**overall**


MAGNA
LEGAL SERVICES

204:6
**overcredited**
50:12
**overcrediting**
50:16
**overdetermined**
150:20
**overhear**
199:13
**overlapped**
61:1 127:5
**overlapping**
186:4
**overloaded**
98:17 150:4
**overview**
88:25
**own**
39:23 75:12,15 86:7
    133:13 164:15
    230:12
**owned**
23:2 40:3,6 64:20
    74:11 76:6,14,16
    78:18 79:4 95:24
**owner**
73:25 85:15
**ownership**
23:1 41:1 74:15,23
    75:2,3 79:22 80:1,8
    80:13,16 96:1,3
    217:17
**owning**
40:14,20 92:5
**owns**
28:20 85:8

―――――――――
            **P**
―――――――――

**page**
5:3,12 61:13,16
    63:23 66:22 70:11
    70:12 73:16 78:3
    79:2 88:25 93:15,19
    94:24 95:6,7 100:5
    100:12,15,23 101:2
    101:4 103:5 105:18

106:4,4 109:3,12
110:20 112:2 121:2
123:4,7,21 124:3,18
124:20 125:1,7,11
125:16 126:7,21
128:24 135:6,18
136:7 151:18
153:12 155:2,9,10
156:3 157:1 159:14
162:5 179:24,24
180:24,25 184:7
201:11,13,18 218:9
221:6 229:3
**pages**
61:11 100:8 141:20
166:9,11 219:9,10
219:11,21,22
225:19 229:4
**paging**
221:4
**painstaking**
38:23
**paired**
111:12
**pan**
92:19
**pane**
93:20
**Papadopoulos**
37:24 42:14 44:16
**paragraph**
67:2 106:7 109:17
    110:16 121:4 141:1
    229:3 230:5 231:2
**paragraphs**
131:4
**parallel**
166:22
**parameter**
59:6
**parameterized**
25:19 59:5
**parameters**
25:15,20 26:3,14
    53:13,14 99:7
**parens**

8:6
**parse**
149:2 182:9
**parsing**
181:18
**part**
12:23 29:6 57:7 59:3
    69:4,15 73:18,19
    97:10 117:20,23,24
    125:9 150:10
    229:18,20
**partially**
47:22
**participating**
188:16
**particular**
17:3 47:5 85:10,15
    85:21,22 88:11
    113:3,4 116:3
    126:19 137:15
    147:22 151:15
    156:20 161:5,12
    170:22 177:7 186:8
    187:6,12 199:17
    203:20 214:5
**particularly**
67:12
**particulars**
173:17
**parties**
19:16 21:21 57:15,16
    172:22 233:18
**parts**
13:19,24 49:6 77:8
    77:10 94:14 150:21
    166:22 204:1
**party**
35:1 76:17 176:22
**password**
36:5
**past**
210:15
**pause**
10:9
**pay**
48:16,21 49:3 50:14

112:18,21
**Pekary**
44:10 45:2
**Pekary's**
44:12
**penalty**
9:10
**pending**
10:20
**people**
10:24 13:6 18:24
    21:3,11 24:21 27:10
    32:21 33:5 37:17
    38:3 84:7 176:2
    187:19 189:15
    199:9 214:15
    224:24 225:1
**per**
25:19 86:11 162:1
    211:3
**percent**
23:2 36:13 60:2
    81:24 129:5,6 140:4
    140:25 141:6
    182:15,23 190:13
    215:20 217:22
**percentage**
25:25 26:5,16
**perfectly**
115:13,25 151:7
    162:7
**perform**
161:8 165:5,7 192:6
    192:21 201:3
**performance**
22:10,12 170:13
**performant**
166:16
**performed**
128:3 192:6 196:9
    213:5 215:23
**performing**
60:21 71:5 165:11
    167:12
**perhaps**
22:18 47:12



**period**
17:24 23:2 37:15
49:23 185:7,23
221:19
**periods**
39:5 156:15
**perjury**
9:10
**permissible**
200:4
**permission**
201:2
**permissions**
200:25
**perpetual**
163:22 165:19 168:2
168:13,16
**perpetuals**
165:13 168:23 169:1
**person**
18:19 26:4 39:11
40:13 94:21 153:1
177:4 214:13
233:11
**personal**
34:7
**personally**
2:14 123:23
**personnel**
177:8,17
**persons**
214:13
**perspective**
24:4 165:7
**persuaded**
229:14
**Peswani**
6:16 37:24 45:14
69:25 70:21 137:23
138:6
**Petrie**
39:11 138:3
**Pg**
234:5
**phenomenal**
18:16

**phrase**
33:11,12 126:23,24
167:24 231:3
**picture**
187:22
**piece**
29:14
**place**
12:16 96:24 192:20
214:17 233:9
**placed**
91:24,25 231:23
**places**
86:13
**placing**
181:6
**platform**
17:4 23:8 82:25
83:23,24 84:2,5,8
87:22 175:18
**plausible**
129:19
**play**
147:3
**pleaded**
227:10,14,15,18,21
227:24 228:2,5
**please**
8:15 9:5 10:4 42:15
45:17 232:12
**plenty**
17:15 19:19 47:24
64:23 181:21 193:7
**plus**
203:10
**point**
11:4 17:24 39:13
77:13 98:4 119:1
121:20 122:19
132:16 136:5 157:4
167:15 177:4 180:2
200:24 213:18
214:24 217:15
**pointed**
190:18
**pointing**

110:19
**points**
30:1 75:9 126:7,8
134:3 160:7 179:5
200:25
**policies**
23:7,9,12,14,23,25
24:1,6 29:21,23
225:15
**policy**
24:11,13 226:3
**political**
228:6
**populated**
15:8,9
**pop-up**
83:11,16
**portal**
83:1,7,25 84:1,12
**Portal|otc@ftx.com**
6:9
**portfolio**
27:13
**portion**
110:21 167:2 169:25
173:6
**portions**
141:9 152:22
**pose**
27:9
**position**
54:19 91:20,23 92:17
104:1 107:19
111:24 161:18
164:16 165:3 167:6
167:14,16 168:3,16
168:17 170:6,19,25
171:21,24 183:1,5,8
205:2
**positions**
89:1 91:16 103:9,10
109:18 110:2,6,7,8
111:22 122:3 127:9
127:19 133:9 151:9
161:17 162:5,11
164:18 166:13

174:10 184:20
186:8 213:8 224:15
**position.net_cost**
171:18
**position.unrealize_...**
171:10
**positive**
86:6,16 89:17 90:5
90:16,24 91:14
95:15 96:10 102:15
104:24 130:23
171:24 195:12,16
203:6,24 204:4,5,13
204:14,21 208:4
**possibilities**
47:17 111:15 156:24
189:16
**possibility**
47:16 168:11 196:8
**possible**
47:19 48:5 51:11,22
51:25 64:23 65:1
72:17 83:6 87:7,9
87:13 88:14 97:21
99:6,22 109:1,6
125:8 134:20
137:11 150:20
156:16 160:6
163:24 167:18
169:17 178:1 187:1
189:19 196:24
204:19,22 205:1
210:8 221:24
**possibly**
44:25 101:19 148:10
150:11 171:2 213:2
213:2
**post**
23:5 172:15,18
**posted**
179:1
**postgresql**
170:17
**potential**
53:21
**practical**



172:14
**practice**
19:9 33:9 37:3 80:12
213:23 225:6,21
**practices**
22:14
**pre**
23:5
**preceded**
169:23
**preceding**
145:3 151:6
**precise**
40:25 90:14 102:10
**predated**
113:15
**Predates**
84:3
**predicate**
49:12
**prefer**
205:11
**preferred**
205:17
**premise**
49:7
**preparation**
139:12 197:20,21
**preparations**
72:21
**prepare**
13:8 38:4
**prepared**
32:13
**preparing**
25:9
**present**
4:10,13 32:1
**presented**
160:16,22 162:14,18
**pretty**
17:6 19:10 169:23
178:20 187:16
209:23
**prevailing**
192:8

**prevent**
49:10 86:22 87:5
92:21 122:23
127:19,22 129:14
145:15 174:19,22
175:3,6 196:7
**prevented**
87:2 131:7 145:17
**preventing**
127:9 129:3 147:10
**prevents**
150:21
**previous**
14:18 72:3 109:3,3
131:5 156:25
179:18
**previously**
7:9 72:10,11,12
87:16 94:8,11,12
108:14,15 133:7
138:24 151:17
153:6 156:16
180:11 216:25
217:1 218:3
**price**
27:12,14,25 28:9
29:3 58:4,9 59:9,17
59:23 60:9,16 62:10
63:9 173:20 174:2,5
174:6 190:3,19
192:7 193:10,17,18
194:6 205:2 206:12
**prices**
27:15 57:19,24
171:23 173:22
174:3 187:17
190:24 191:9,13,20
191:25 192:8
193:13,17,21,23,25
194:3,23 195:4,7
196:7,14 213:14
**pricing**
167:16 173:25
**primary**
134:9 213:20 224:22
**principal**

134:18 142:7,19,20
142:23,23 144:14
146:19,22 150:11
150:23 151:17
152:6,18 154:2,4,13
154:14 155:5,15,24
157:11
**principle**
229:15
**print**
158:12
**printed**
141:22 142:1 166:11
202:6
**printout**
100:5 153:20
**prior**
16:2 95:8 151:18
**private**
43:13 45:3 66:19
**Private-ftx-accoun...**
5:14,18 6:1,3 41:22
**probably**
9:16,20 10:23 19:1
36:17 70:23 137:8
192:14,14 199:23
**problem**
37:5 183:23
**procedures**
174:18,22,24
**proceeds**
149:14
**process**
14:8 38:16 189:3,5
**processes**
26:12
**produced**
14:11 44:5 87:19
120:20 141:21
153:11 166:10
202:3,4 220:21
**professional**
18:7 177:1
**proffer**
12:22,24
**proffers**

14:18
**profile**
26:21,25 28:3
**profiles**
26:19
**profit**
5:22 42:20 43:22
56:6
**profitable**
230:9
**program**
96:18,20,23 97:5,6
97:19 98:6,25 99:12
99:20 109:5 113:7
116:16,19 131:17
132:2,8,17 144:15
144:21 145:8
146:18
**programmatic**
22:9
**project**
229:18
**projects**
177:23,24
**prominent**
55:20
**promise**
114:21
**pronounce**
18:22
**pronunciation**
18:25 19:4
**properties**
35:19 85:12 146:10
146:12
**property**
49:1 74:6 156:17
**proposal**
32:2 210:23
**proposing**
183:17 210:25
**Proulx**
4:13
**provide**
26:15 36:1 38:2
226:15,19



226:15,19
**provided**
14:7 36:6 38:5 41:14
65:21 66:19 97:17
193:17,20,22 194:3
202:4
**provider**
57:14,17,20 58:5,8
62:24 63:3,9 164:25
213:21
**provides**
88:25
**proximately**
15:6 112:18,20
**proxy**
35:21
**public**
32:6 161:7 234:22
**public-facing**
23:7
**published**
25:20
**pull**
76:23 89:8 93:6,7,10
210:11,18 211:6,17
**purchase**
80:20 81:15 84:8
122:13
**purchased**
80:22
**purpose**
77:11 103:23 148:2
149:24 151:25
196:4
**purposes**
33:24 34:8 46:7
143:14 147:9,15
220:4
**pursuant**
2:10
**purview**
20:20
**put**
11:2 16:2 133:8
191:5
**putting**

96:2 230:7 231:4
**PY**
143:24
**P&L**
107:19 110:3 163:8,9
163:10,12,18 170:6
170:19,25 171:11
171:14 172:9,21
173:9 218:19
**P-o-s-t**
172:19
**p.m**
119:15 157:23 158:2
178:21 199:3 201:8
216:19,23 224:4,8
232:10,23

___

## Q

**quantity**
144:20,24
**query**
15:17
**querying**
22:8
**question**
10:4,6,12,20,21 22:3
27:21 36:20 45:5,7
52:19 57:7 62:19
63:22 68:17 94:16
107:5 131:24
132:15 154:12
158:5 179:8 180:7
190:3,19 214:6
226:10,18 228:17
**questioning**
8:16
**questions**
11:4 16:3 17:19
24:15,19,23 35:4
42:7 49:22 84:21
89:14 94:16 99:10
109:11 125:24
134:23 135:22
142:2 158:4,21
159:13,18 176:13
178:19 180:20,22

187:22 223:23
224:13 230:22
232:7
**quickly**
146:1
**quite**
48:5 149:11
**Q1**
42:15
**Q2**
45:18

___

## R

**ramp**
221:18
**ran**
156:13 193:22
229:21
**Range**
6:21,23
**ranked**
218:18
**rare**
85:10
**rarely**
17:7 19:9 21:6,20
**rate**
115:16,20,22 116:3
157:12
**rates**
115:19 116:8,11,13
116:17
**rather**
54:8,21 66:12 216:2
**rcapone@cooley.c...**
4:8
**RDR**
1:23
**re**
1:4 2:4 8:3
**reach**
22:20
**read**
13:19 35:13 36:2
77:8 103:17 126:17
146:6,20 149:23

202:5,6,7 203:4
207:23 211:20
216:13 219:25
229:24 230:17
233:15 234:5
**reading**
46:21 103:16 108:20
137:2 198:7,15
**reads**
234:5
**read-only**
35:16,24 36:15,18
219:19 220:4
**real**
79:4 140:16 208:15
209:13
**reality**
103:23
**realized**
54:1 107:19
**realizing**
37:21
**really**
24:12 31:23 34:17
40:17 80:12 94:17
98:17 133:4 150:17
162:14 182:9
**realm**
22:16
**reason**
28:24 29:4 61:14
62:8 107:14 114:6,9
138:10,13 144:22
156:19 165:6
175:22 186:15
211:22 234:5
**reasonable**
27:10 28:11 128:19
**reasonably**
144:7
**reasons**
22:16 29:5 47:4,7
64:19,23 65:1
114:13,13 156:21
170:13 192:20
**recall**


MAGNA
LEGAL SERVICES

12:12 13:25 15:3,20
21:8 29:8 34:14
37:13 39:6,15 42:4
53:20 55:4,10,14,23
55:25 69:9 70:8
72:4 78:17 88:15
99:14,22 107:11
111:6 114:2,6
116:13 117:15
123:18,22 124:10
124:25 125:3,7
128:15 134:21
137:9,11 138:5
139:10 146:4
148:23 163:19
164:1,6 167:1
168:25 177:4 184:1
184:4 185:19
189:25 190:6,23
193:4,5,6 195:10,13
195:20,24 196:20
196:23 201:6 212:4
212:14 213:11
217:9 226:14
228:21
**receive**
59:1 172:22
**received**
196:22 220:13
**recent**
11:18 42:11 139:3
144:7
**recently**
11:11,24 12:7 14:17
14:17 129:24
197:18,19 212:8
**recess**
65:13 119:11 157:24
216:20 224:5
**reckless**
229:12
**recognize**
41:23 45:22 50:20
108:18 126:6
228:17
**recognizing**

47:13
**recollection**
62:20 112:1 114:1
143:24 188:25
221:23
**record**
65:12,16 119:10,14
157:23 158:2 169:7
216:19,23 224:4,8
225:5 232:6,10
233:13
**records**
157:1
**recover**
28:21 156:14
**Recovery**
3:12 9:3 11:10 87:20
120:20 223:22
224:11
**recreating**
24:17
**rectified**
107:21
**redis**
170:6,16,25 172:9,16
172:17,19
**reduce**
206:19
**reducing**
211:23
**refer**
9:17 56:18 73:4
85:15,17 151:3
171:10 172:2 174:3
182:10
**reference**
46:10 144:4 173:20
173:21,25 174:5,6
184:13 208:16,25
**referenced**
11:25 138:17
**references**
146:3,3 181:4 220:15
**referencing**
67:14 109:2 136:13
145:2 188:13

215:16
**referred**
68:23 150:4 182:8
**referring**
47:10 60:12 67:19
68:16,22 71:25
89:21 102:7 128:1
136:9 149:5 161:24
171:14 181:14
210:14,22 211:23
218:13 220:23
231:10
**refers**
56:12 171:18
**reflect**
58:17 75:25 126:9
143:9 144:1 145:25
154:9 156:15
158:13 216:1
**reflected**
14:2 20:13 31:11
64:24 75:18 83:16
98:13 99:7 113:9
115:23 124:14
143:19 144:17
145:18 147:1,5
162:25 163:13
164:8 168:3,7
183:23 225:7
**reflecting**
32:9
**reflection**
104:9 117:17
**reflections**
96:13
**reflective**
103:22
**reflects**
36:18 40:3 95:14
153:17 154:19,23
157:12 159:15
172:21 219:25
**register**
17:20
**regret**
230:14

**regular**
125:9 156:13 232:20
**regulated**
30:2
**rejected**
194:2
**relate**
59:6 150:17 154:4
220:12
**related**
15:18 25:16 29:11
32:13 44:19,25
46:24 62:3 67:15,21
67:22 69:2,11 70:23
82:24 124:8 141:9
186:7 194:20 222:4
**relates**
59:3 171:22
**relating**
14:21 116:12
**relation**
14:23
**relationship**
14:17 18:2,8,14 19:3
75:25
**relationships**
19:15 86:8
**relative**
118:1 122:4 191:1,16
**relevant**
26:3 148:16 166:13
223:17
**remain**
73:24
**remaining**
57:20
**remains**
230:3,19
**remediated**
163:17
**remembered**
2:10 77:12
**remembering**
31:21 35:3
**remind**
10:16



**remove**
158:23 196:11 200:4
205:12,19 209:22
**removed**
159:4 204:20 207:19
**removing**
196:2 205:5 210:4
221:21
**repaid**
108:6 112:13
**repay**
114:22,25
**repaying**
112:24
**repayment**
115:2
**repeat**
135:7
**reply**
211:13
**repo**
82:24 83:3
**report**
6:21,23 17:24
**reported**
1:22 16:13 233:10
**reporter**
2:14 8:13 9:4,6 10:8
40:8 41:4 77:2
81:10 98:18 100:2
111:10 138:4
143:25 232:11,14
232:20 233:4
**reporting**
208:12
**repository**
83:4
**represent**
9:15 41:13 44:4
87:23 139:2 140:9
187:23 224:11
**represents**
35:23 91:24
**request**
22:3 41:15 69:6,7,8
138:20 233:14

**requests**
19:25,25
**require**
215:8
**required**
30:3,9,15 36:22
107:8 114:23
148:17,21,24
151:21 201:1
221:18
**requirement**
129:6 141:1,6 175:13
**requirements**
175:3 183:12 222:24
**requires**
92:4 97:5
**requiring**
92:16 109:18
**Research**
15:11
**resolved**
184:2
**respect**
200:24
**respond**
48:17,21 67:5 207:10
209:5 218:13
**responded**
23:25 207:15
**responding**
34:8 67:8 198:2
206:17 208:22
**responds**
200:13 206:17
210:10
**response**
41:14
**responsibilities**
16:22
**responsibility**
20:3,8 224:22
**responsible**
17:4 32:21
**rest**
149:14
**restate**

131:24
**restating**
68:19
**restroom**
119:7
**result**
28:8 50:17 52:15
58:19 62:10,13
161:11 168:9 170:1
181:25 191:14
**resulted**
54:16 184:23 204:13
**resulting**
130:22 204:5 205:21
**results**
154:24
**retrospect**
114:10
**returned**
151:13
**returning**
152:1
**revenue**
38:16,20,22 56:8
57:3,11 62:6,7,8,14
63:5,12 65:2,3
67:15 78:10 138:15
138:17,18
**review**
13:17,19,21 39:18
69:4,10 125:10
**reviewed**
14:1 67:16 77:7,10
77:17 124:21 125:3
125:6,15
**reviewing**
38:9 67:20 100:10
125:7
**reviews**
67:6,14
**Richard**
199:4
**rights**
33:12,20 34:19 85:18
218:1
**risk**

29:1 54:18,21 74:2
91:24 92:6,9,16,18
107:23 108:5,8
110:11 112:9 143:9
196:12
**risky**
229:10
**RMR**
1:23
**Robert**
44:11,20
**role**
16:2,10,17 23:13
25:9 29:9,17 38:9
44:23 84:16 96:19
96:21 99:3 100:10
113:11,14 124:4,15
166:14 178:23
199:18
**roles**
224:19,22
**room**
4:13
**rough**
51:12 232:13
**row**
71:10 156:7,11
**rows**
64:11
**Ruben**
44:10
**rules**
10:3 66:3,7,10 161:9
222:14
**rumor**
199:5,15
**rumors**
198:25 199:9 202:16
208:17 209:13
**run**
156:18,20,22 167:9
173:4,7,10 189:21
**running**
189:7
**runs**
48:23



**rush**
232:13,14,19
**Russell**
4:4 8:22
**Ryan**
37:20,23 123:14
189:17 213:3
**r-e-d-i-s**
172:18

---

**S**

**S**
3:16
**Sadness**
209:9
**safe**
230:8 231:5,18,24,25
**safety**
78:19 79:5 193:18
**said**
9:14 19:6 21:16
23:24 24:1 32:20
40:12 53:22 54:25
57:24 66:4 67:14,17
68:22 77:21 78:24
84:13 89:14 97:24
103:20 112:20
119:20 121:17
136:3 155:12
159:22 167:23
173:24 182:18
191:4 206:5 207:4
208:20 226:9
231:17 233:8,10,14
233:16,21
**Salame**
18:21,24,25,25 19:2
19:3,6,7 37:20,21
37:23 61:22 187:19
189:17 208:14
209:11 210:14
211:10
**Salame's**
210:10
**sale**
107:24 188:9 196:21

**sales**
59:17 60:9 61:23
188:11,14 192:24
214:25 215:3,6,9
216:1
**Sam**
18:1 26:10 37:24
53:22 123:14
189:18 213:2 217:8
229:7 230:9
**same**
16:14 18:5 40:22,24
56:21 59:4 67:21
86:12 101:21 103:5
110:15 116:20,22
116:24,24,25
136:12 138:16
140:23 141:25
154:8 166:8 168:14
173:23 182:1,5
188:3,12 198:25
202:24 206:9 207:8
214:19 222:5 223:4
223:12 232:17
233:16
**Samuel**
6:5,13 7:1
**San**
2:13 3:9 8:8
**SAPRO**
137:24 138:1
**satisfied**
106:22 107:12
**saw**
14:9
**say**
9:20 10:15 20:5,7,8
30:19 38:5 39:1
40:1 62:16 64:8
73:5 91:12 93:8
98:11 102:5 120:9
130:20 141:12
146:1,8 149:1,14,17
161:24 163:3
169:20 174:17
185:20 187:13,15

**says**
192:1,9,21 194:24
195:25 196:13
203:9 210:1 213:4
214:19 232:17
**saying**
31:24 54:5 75:15
80:15,18 85:14
88:25 103:7 132:18
145:14 150:6,9
165:24 203:13
204:3 211:16
222:22
**says**
45:17 70:3 73:21
74:5 88:9 89:3
90:23 91:14,15
101:4,7,13 106:7,14
107:10 109:17
110:16 112:8 121:4
123:5,7 124:19,19
126:21 127:20
129:2,24 130:4
140:3,5 147:18
154:2 155:5 173:11
182:14 199:4
206:23 208:7
209:12 211:10,21
**scale**
140:20 144:8 210:8
**scenarios**
116:12
**scene**
223:16
**schema**
153:21
**school**
18:5
**screenshot**
87:22,25 95:7
**screenshots**
94:14,17,18 202:1,3
**script**
166:3 189:7,21
191:22 192:2 215:7
215:16,21 216:2,10
**searching**

**15:4**
**SEC**
12:25
**second**
66:22 109:12 115:3
126:6 146:15
153:13,23 155:1,9
155:10 190:18
206:15 218:9
**seconds**
144:8 162:24 163:1
171:15 172:21
173:5,7,11,15 207:7
**section**
73:15,15,17 101:4
103:4,6 105:18
109:12,13,14 112:3
112:5 121:3 129:21
140:1 170:22
**securities**
227:25
**seeing**
35:24 203:5
**seem**
94:22 126:13 189:18
207:21
**seems**
78:16 129:18 137:11
147:23 149:6 152:5
170:18 207:16
219:20 222:4
**seen**
24:25 33:11 72:16
98:21 126:3 139:7
139:11,19,24
153:14 197:16
212:7,11,11
**select**
81:21 126:22
**selected**
88:7 169:21
**self**
229:19 230:5
**sell**
58:14 61:2 106:20,23
107:11 169:15



189:21 190:7
205:10,16 214:22
**selling**
27:17,24 28:6,23
29:1 58:19 169:13
206:3,9 211:24
213:21
**sells**
169:9 171:25
**send**
70:12 81:22 106:8,18
138:6
**sending**
37:8
**sends**
67:2 198:22
**sense**
11:6 12:8 27:4 33:14
35:21 39:24 40:1
46:16,20,23 48:16
48:17,20,25 52:8
56:20 88:18 104:18
105:6 114:14 115:1
122:8,9 138:10,13
142:15,19 143:1,3
152:7,10,19,25
163:2,3,4 174:1
187:7,8 192:3,10
195:23,25 196:10
210:7,23 212:17,24
215:3 217:23
**senses**
52:9
**sent**
41:15 81:16 180:22
201:8 207:6
**sentence**
112:8 127:7,20 182:9
**sentencing**
7:7 228:19
**separable**
143:11
**separate**
80:1,13 84:25 116:11
183:24 190:3
**separately**

118:2,5 187:2 193:16
**September**
231:13
**sequence**
146:11 188:11,14
**series**
173:11
**serve**
110:9,12 122:3
**serves**
175:12 200:8
**service**
24:8,11 30:11 31:4,7
72:8,15,24 73:3,7
73:11 119:20 120:8
225:23 226:1
**Services**
8:12,14
**sessions**
12:22,24
**set**
47:23 53:14 59:9,17
84:10 116:24,25
122:16 123:23
127:5 146:8 148:7
161:9 192:3,10
193:4 228:10
230:22
**sets**
76:11
**setting**
81:21 222:4,10,21
**settings**
81:19 123:9 179:2
**settle**
162:23
**settlement**
163:6
**settling**
163:11
**several**
60:13 103:11 189:15
219:9 224:15
**shall**
73:24,25 74:1,7
**shame**

143:21
**shard**
173:10
**sharding**
166:16,20
**shards**
173:12
**she**
184:15,17 210:2
**shed**
181:10
**sheet**
5:16,24 40:3 41:19
42:19 44:1 63:21
64:4 234:1
**sheets**
39:22
**shore**
189:23
**short**
6:21,23 111:19
168:17 169:20
224:1 231:12
**shortfall**
231:21
**Shorthand**
2:14 233:3
**shortly**
186:13
**shorts**
169:3
**should**
10:11,20,25 26:5,14
27:1 35:12 38:5
48:18,18 62:16
91:25 98:9,11
111:11 134:11
140:20 149:19
152:25 163:22
182:18 185:20
187:15 199:23
207:10 209:11
211:10 214:7,9
222:22 223:24
229:15 234:5
**shoulder**

54:21
**shouldering**
54:16
**shouldn't**
209:21
**show**
29:15 42:25 72:9
84:25 99:9 117:24
118:5 119:6 135:3
141:8 158:15
162:10 166:3
**showed**
23:23 76:1 84:21
119:4 162:1
**shown**
86:11 158:18 162:8,8
163:7 170:1 172:5
172:11 231:2
**shows**
100:12 174:5 216:5
**side**
22:13
**sides**
63:13
**Signal**
14:3 15:10 21:4,17
186:4,25 187:3
188:21 195:9 202:1
206:25 213:1
**SIGNATURE**
234:17
**signed**
171:24,24
**significantly**
18:18
**signify**
34:1
**signing**
30:3,9,15 215:12
**silly**
152:24
**similar**
53:14 132:18 139:23
216:6
**similarly**
12:24 13:23 40:17



75:22 80:11 88:18
97:10 139:22
**simply**
108:9
**since**
12:20 163:11 212:11
**Singapore**
32:14
**Singh**
1:12 2:16 4:1 8:3,23
8:25 9:8,13 224:10
226:18 227:4
228:14 230:21
232:9,24 234:4
**Singh's**
7:6
**sir**
227:12,25
**sit**
224:2
**Sitting**
77:20 198:9 199:14
**situation**
50:7,16 52:23 114:22
200:9
**situations**
133:7 192:12,13,15
192:16 193:8
**size**
62:22 118:20 144:18
144:19,23 149:25
149:25 150:23
151:20 157:11,11
171:22 206:19
**Slack**
14:3 15:12 21:9,17
42:6 178:13,14,15
**slash**
123:15
**Slightly**
58:23
**slow**
170:16 221:18
**small**
136:25 218:11
**smaller**

28:12 104:11
**snapshots**
154:20
**social**
18:17
**socialization**
55:16
**socialize**
54:8
**socialized**
55:5,11
**software**
16:11 17:2 224:18,19
**sold**
28:11 62:9 188:8
189:7 206:12
**som**
131:9
**somebody**
28:9 29:13 31:25
48:22,23 111:17
**somehow**
15:22
**someone**
22:21 33:8 50:21
69:8,10 77:13 84:23
85:17 97:20,24
117:19 189:10,20
191:4,9 198:24
208:12 214:1,9,24
**something**
10:5 18:25 22:6,13
28:17 32:13 35:12
37:6 50:9 53:19
54:16 56:7 59:22
60:8,24 62:20 69:5
77:17 92:2 94:19
95:25 98:14 104:11
111:19 112:25
115:18 118:14,22
122:12 128:3,8
131:20 134:6
140:11 156:18
157:9 158:22 159:2
159:19,20 172:24
173:1 182:12 188:3

197:10,20 199:4
205:24 211:12
212:7,10,11 215:25
216:6 217:19
218:17,19 225:10
229:12,14,20
**sometimes**
25:11,22 42:7 56:10
59:15,20
**somewhat**
18:7
**somewhere**
93:15 141:2 147:1,5
172:20
**soon**
179:7
**sorry**
37:20 41:16 68:17
78:6 82:9 87:13
93:13 110:19 112:4
119:15 131:23
135:10,11 136:5
142:12 154:12
155:7 156:7 164:13
180:23,24 185:24
193:21 210:3
**sort**
31:22 60:19 62:10
67:2 85:11 87:21
110:21 140:16
148:12 159:23
**sound**
24:15,19 44:12
**sounds**
21:23 23:4 25:2
41:25,25 184:17
**source**
71:15 132:22 133:4
196:12 216:8
**sourced**
116:21
**sources**
78:9
**Southern**
227:7
**space**

111:16
**spanning**
17:6
**spark**
72:9
**sparks**
135:4
**speak**
11:14 57:7 86:18
88:9
**speaking**
22:17,18 102:7 169:5
182:24 218:16
**special**
59:14
**specialist**
8:12
**specific**
25:11 57:12 69:13
85:9 149:8 178:11
183:15 184:2
**specifically**
123:9 135:23 193:5
**specified**
222:18
**specify**
61:17
**specifying**
130:13 168:6
**speculate**
89:23 91:5 152:2,12
**speculation**
89:25 91:7 152:15,17
**spelled**
172:17
**spells**
148:25
**spend**
122:12 126:15
181:23
**spent**
61:19 121:15 131:1
131:14
**spheres**
19:10,11
**spoke**



11:8 18:18 91:10
177:8 187:11
**spoken**
11:22 12:14,19 13:4
18:5 21:22
**spot**
53:12 89:3,9,17
90:24 91:14 97:6
98:21 106:7 107:15
108:13,21,23 109:5
109:18 110:12,17
111:21 113:7
116:15,18 121:6,9
121:19,21 122:6,13
122:24 127:8,18
129:22 130:5,7,21
130:25 131:16
132:2,8,17,19
144:15,21 145:8
146:17 162:5 181:6
181:24 213:19
224:2
**spreadsheets**
159:12
**SRM**
149:10,15,20
**Stablecoins**
65:5
**stamped**
153:9,10 216:25
218:6 223:11
**stamps**
197:24
**standing**
232:16
**Stands**
186:15
**stand-alone**
87:20
**stapled**
41:6
**start**
8:2 10:12 42:10 44:3
82:22 101:7 114:3
114:11 197:15
210:11 211:12

212:22
**started**
16:11 18:9 79:16
115:10,11 186:11
**starting**
8:16 44:9 170:19
173:3,6
**starts**
69:24 103:7 131:5
178:21 197:25
**state**
35:11,22 51:5 103:23
165:4 200:23
220:12 221:2 233:4
**stated**
233:9
**statement**
31:23 42:20 125:6
148:3 230:1
**statements**
38:4,7,10 39:16,19
56:3 121:1 143:12
228:24
**States**
1:1 2:1 8:5 227:7
**statistics**
124:21
**status**
201:16
**stay**
229:20
**stayed**
134:2
**staying**
134:3
**steeply**
183:1
**Stenographically**
1:22
**step**
196:10
**Sterley**
6:16 137:24
**sticker**
72:11
**still**

12:4 19:1 24:20 60:6
74:23 124:18
175:22 177:17
192:20 195:16
209:12 218:12,25
222:21 229:7
**stood**
167:17
**stop**
157:4
**stopped**
198:2
**stored**
15:22,24 219:17
**strategic**
229:17
**strayed**
230:13
**Street**
2:12 3:8,18 8:8
**strike**
87:15
**string**
146:8
**strong**
209:13
**strongly**
59:3 173:16
**stuck**
48:24
**stuff**
126:17 167:23 181:8
**style**
205:11,17 206:2
**Su**
176:18,20
**sub**
85:8,9,13,15,21
86:11,12 90:3 93:8
93:25 95:25 96:14
105:12 106:1 107:5
124:3 129:3,4
**subject**
82:14 86:7 137:24
197:8
**subjective**

210:7 231:19
**submitted**
13:22 228:18
**submitting**
228:21
**Subpoena**
2:10
**subscribe**
233:16
**SUBSCRIBED**
234:18
**subsidiaries**
9:22
**substance**
12:1,17 13:12,15
**substantial**
185:17
**substantially**
37:25
**substantive**
12:3
**such**
49:11,16 58:5 74:2
92:1,3 95:12 97:21
131:22 158:16
160:8 162:20 176:1
181:24 190:11
205:1,20 222:19
225:18
**sufficient**
57:19 63:7 133:12
189:23 190:15
222:20
**sufficiently**
62:15
**suggest**
89:7 180:1 195:14
196:2
**suggested**
173:7
**suggestions**
22:15
**suggests**
87:23 173:3,9 208:7
**suite**
2:12 3:8 8:8 53:11



**Sullivan**
3:14 9:2 13:5
**sum**
90:2 91:7 102:14
110:17 151:8
152:20 162:9
170:14 171:22
172:12
**summarize**
151:6
**summary**
201:15
**summing**
152:8
**sums**
90:5
**Sung**
189:18
**super**
33:11,20 34:10,16,19
36:6 123:13,20
124:22
**supervisory**
224:19
**support**
17:15,18 21:13 34:9
81:17 132:23
133:13 178:10,12
180:18 222:8
**supported**
115:24 170:15
221:15
**supporting**
61:15 132:19
**supports**
110:7
**suppose**
120:4 131:1
**supposed**
86:16,17
**sure**
12:6 13:13 14:8 15:2
16:8 23:11 24:5,9
24:12 26:24 33:16
36:13,20 39:13
40:10 42:6,8 46:15

47:5,15 48:6 49:19
51:15,18 52:5,9
56:12 60:11 63:17
63:19 64:24 65:20
71:17 74:16,17
76:16 79:25 89:12
93:19 97:15,23
99:13 100:21
101:22 103:17,19
121:17 125:17
126:2 129:19
134:20 136:21
138:11 142:15
145:5 151:7,11
153:4,4 155:8
158:16 168:8
169:23 172:24
176:16 177:19
180:8 193:24 194:8
194:11 198:8 205:4
208:10 209:18
211:20 212:2 214:5
215:1,2,20 216:12
217:23
**surfaced**
163:6
**surprise**
45:11 199:12 209:9
**suspect**
184:15
**swear**
9:5
**sweep**
170:6,19,25 173:9
**sweep_P&L_2_red...**
172:2 173:18
**sworn**
233:6 234:18
**sworn/affirmed**
9:9
**symmetrical**
169:4
**system**
15:6,16 17:15,18,19
22:4 23:21 24:20
31:25 32:16 33:14

34:4 37:7 47:21
49:1,10 50:5 57:14
100:23 107:16
122:25 130:7 131:7
133:1,15 134:6,12
146:10 172:14
174:25 175:23
176:5 191:1,18
212:14 221:2,5,20
222:16 226:12
**systems**
15:23 20:13 29:12
33:17 213:9
**s-h-a-r-d**
166:20

---

## T

**T**
3:17
**tab**
63:21 66:18 69:20
82:2 93:23 94:22
99:24 125:19
137:16 138:23
141:10 153:13,23
153:24 178:5
180:10 197:3 219:4
**table**
36:14 48:23 93:7
94:1 100:12 109:2
**tables**
153:18,20,21
**tabs**
88:4 93:2 153:11
**Tackett**
7:2 19:18 22:21
125:14 177:12
186:21 187:19
189:17 197:25
198:22 201:7 202:3
202:13 206:16
207:9,24 209:10
210:9,17 217:4
**Tackett's**
20:20
**take**

10:18,21 37:6 63:16
100:6 108:17 119:8
120:21 125:24
135:19 139:4 141:4
146:20 152:7,10
154:6 175:7 182:14
182:22 197:10
198:10 202:9
209:11 213:8
216:15 223:24,25
228:16
**taken**
87:23 233:9
**taking**
10:8 151:23
**talk**
10:10 12:6 32:19
57:8 96:17,18 113:8
119:17 160:21
**talked**
12:7 13:12,16 29:21
29:22 98:19 117:1
130:1 146:14
159:19 174:16
182:1 199:15
202:23 224:16
**talking**
9:21 11:15 21:7 25:2
30:22 53:14 59:4
60:2 62:2,5 63:5
65:19 68:11,21
79:16 91:3 102:3,5
159:20 173:22
183:15 187:9
210:15 211:7
**tank**
53:19
**Taousse**
4:12
**target**
59:14
**tautology**
28:7
**tax**
44:25
**team**



19:23,23 20:9,11
26:11 125:12,13,14
125:15 181:4
199:19
**teams**
177:7,8
**technical**
22:3,11,24 23:20
32:15 33:17 58:1
69:14,16 90:14
148:20
**technically**
25:21 37:7 71:19
**Telegram**
21:5 178:9
**tell**
10:2,5 26:13 31:14
49:8 73:9 75:1,5,11
95:10 139:4 153:1,4
170:24 173:13
194:7 206:18 213:7
229:16
**tells**
10:25
**tens**
33:5 51:14 99:17
**tense**
32:1
**term**
20:5 27:22 28:18
33:14,16,21 55:16
55:18,22 68:8 76:17
83:2 90:8,13 98:17
101:24 111:12
134:17,19 140:9,12
142:7,9,22 144:14
150:3 154:4,10
159:23,24 160:3
169:15 173:19,25
174:7
**terminated**
165:15
**terminology**
56:17
**terms**
21:15 22:25 24:8,11

24:24 25:8 27:19
30:10 31:4,6 72:8
72:15,24 73:3,7,11
78:22 92:14 102:12
119:20 120:8 127:4
134:18 146:2,5
160:15 169:11,22
206:11 225:23
226:1
**Terra**
185:10
**terrible**
208:4
**terribly**
18:17
**testified**
9:11 53:2 76:19,22
77:18 78:8,17 135:3
140:15 232:2
**testify**
233:6
**testifying**
226:14
**testimony**
77:6 78:15 137:2
232:9 233:10,14
**testing**
38:17,24 67:15
138:17,19
**than**
11:1 12:9,15 18:18
28:13 36:1 37:25
45:2 49:18 50:22
54:8,21 58:9,20
62:9 69:13 71:12
102:14 106:2 107:6
113:16,22 114:20
116:19 128:21
129:5 130:6 137:3
143:9,14 150:11,13
150:15 163:12
166:25 176:11,25
179:13 181:25
188:3 194:12
196:22 198:12
214:4 226:24

229:17 230:10
**Thank**
11:21 37:23 43:8
44:2 77:3 82:9
216:25 224:12
225:2,9 228:11
230:21 232:5
**thanks**
66:25 70:3 181:2
**that's**
14:5 17:18,21 22:4
25:6 26:2,3,22
27:11 28:1 29:4
32:1,23 47:15 50:13
54:11 55:20 58:9,11
58:24 59:14 63:4
83:2 89:21 91:3
100:24 101:17,24
102:4,13 103:17
106:4 107:10
111:25 114:1 115:9
118:22 126:9
128:11 130:1
132:18,23,25
138:11 140:21
141:1,24 143:21
145:2 149:23
151:13,16 154:25
156:2 166:12 170:1
170:7 175:16 176:3
176:4 182:14
190:14 194:10,21
195:2 196:16
199:15 202:18,24
203:4 208:16,18
210:22 211:7,13,20
214:4 215:10,11,13
217:23 220:5
223:20 227:5 230:1
230:19
**their**
14:8 26:12 28:13,16
30:4 34:7 35:11
36:3 37:8,8 39:7,8
39:10 40:14 44:23
44:24 47:13 69:6,7

75:2,3,9,12,16 76:4
80:8,16 86:7 94:6
95:11 103:15
105:15 107:20
108:3,3 116:12
117:24,25 129:8
151:9 153:22
161:16,17 167:6,10
167:20 172:22
176:24 181:25
183:23 186:8 189:8
189:23 196:3
198:11,12,13,16
200:4,6,9 201:15,16
203:16 205:10,11
205:16,19,21,23
207:20 211:1,5,17
213:9 215:4,12
220:12 230:8,12
231:5,7,8,18,23
**them**
9:17 15:23 20:10
22:5 29:15 30:6
37:5 41:5 42:8 44:7
47:14 53:18 55:20
56:5 58:11,19 61:20
68:4 81:16,22 96:16
99:9 107:20 108:18
111:16 114:15
115:12 120:4 121:2
122:4 124:9 126:20
138:20 139:21,22
152:8,20,20 163:7
165:5,5 167:13
172:17 181:25
182:10 184:9,14
189:18,23 191:3
196:5,7 202:4,4
203:6 205:9 206:1,8
206:11,18,18
208:22 209:23
211:11 213:6,7,19
219:19 221:21
**themselves**
60:22 73:8 110:8
181:1 206:2 225:20



**then-girlfriend**
12:9
**thereafter**
233:11
**thereby**
61:19 71:10 200:9
**therefore**
104:18 129:6,13
137:5 225:6
**therein**
233:9
**thereof**
2:12
**there's**
10:20 21:13 47:23
56:7 63:23 78:10,10
88:3,23 92:2 100:23
100:23 101:4 103:5
105:17 106:6
109:11,13,17
110:22,22 112:8
117:15,16,16 121:3
128:25 129:1,20,21
138:10 141:19,21
142:7,14,14,18
146:3 149:4 152:23
154:1,13,14 155:5
156:6,7 159:22
165:10 172:24
173:14 177:25
179:1 184:8 192:3
192:10 194:13
195:3 197:10 199:4
200:10 206:25
215:9 223:14
**these**
15:17 17:2 25:21
28:7,24 29:2,16
41:7 42:15,22 43:1
44:4 56:3 62:9 64:1
64:1 80:4 93:2,2
94:18 102:21
106:22 108:20
126:8 131:4 135:22
147:1,24 149:7
159:3 193:10

195:11 196:9 202:2
214:25 215:6 216:1
216:7 221:8 223:11
223:16
**they'd**
114:21 203:14 204:3
**They'll**
25:19
**they're**
29:1 30:25 31:16
41:6 70:18 116:24
116:25 133:1,1
144:20 167:23
181:8,15 186:4
198:16 202:17
206:3,4,12 208:4
210:15 216:8
**they've**
22:3 41:13
**thing**
10:7,14,23 24:8 34:2
34:3 54:17 56:21
62:2 65:20 85:7
98:2 115:3 126:6
136:12,25 137:4
140:23 141:25
145:2 172:12
173:23 175:21
182:1,5 206:9 207:8
208:12 209:20
210:5 216:5 218:8
221:24 223:10,15
232:18
**things**
15:7 19:10,11 20:12
24:25 25:16 27:3
28:7 40:9 56:3
60:13 64:8 79:11
83:13 84:14 85:4
91:9 102:19,20
104:19 111:13
113:20 120:1,2
126:19 134:10
146:14 158:16
160:9 161:17 162:7
162:21 163:25

172:5 204:16 208:3
223:16 229:9,10,21
**thinking**
24:2,7 25:1 65:1
77:20 174:2 177:10
177:24 179:20
187:14 194:9
196:25 197:9,13
201:22 202:10
203:2 211:9 215:7
215:15,19,21
216:11 218:22
**thinks**
184:17
**third**
19:16 21:21 35:1
100:15 112:7 121:4
124:18 148:11
155:14 206:7 229:3
**thoroughly**
13:20
**those**
11:4 13:2 14:6 15:7
15:21 21:2,11 22:10
23:18 25:9,10,16,20
25:23 27:17 28:12
28:15 29:11 30:14
32:7,10 34:4,22
39:4 45:22,23 48:12
58:7 60:21 63:12
68:14 70:16,21 75:6
75:13 86:5 95:15
99:4,6,7 100:16
102:6,19 103:14
105:14 107:12
110:23 115:13
116:17 127:17
132:10 140:21
143:11 146:5 147:6
148:9,16,21 151:24
152:1,22 153:17
159:14 162:6
163:23,24 164:24
169:11 177:8,16
186:10 188:8 190:3
190:6,20 191:20,20

192:22 196:2
200:24 204:1,11
210:1 215:3 219:20
224:21
**though**
58:12 59:13 85:2,10
86:23 98:9 129:2
153:18,20 170:17
196:18 211:20
223:20
**thought**
27:20 30:17,20 68:21
75:15 186:18 230:8
231:5,18,22
**thousand**
219:10
**thousands**
99:18
**thread**
42:12,12
**threads**
14:3 15:10,13 21:9
**three**
2:18 3:3 8:18 9:16,17
9:17 12:20 13:17
14:11,15,21,24
15:18 20:19,25
24:16 43:5,6 45:21
57:15,16 82:11,15
99:20 106:11 107:8
127:17 137:25
138:6 139:3,14
163:23 174:9,10,13
176:14,18,21 177:2
177:5,6,11,13,16,22
179:2 180:2 181:4,5
183:18 184:2,18,24
185:16,23,25 186:5
186:18 187:4,12,24
188:17 189:21
190:7,16,25 191:10
192:18 193:5
195:11,16 196:3
199:9 201:5 203:17
203:20 206:8,25
207:19 208:9,17



215:5 217:13,20,21
218:12,24 219:11
222:1 223:7 229:4
**ThreeArrowsCap....**
221:10
**through**
13:12 15:23 22:21
29:16 31:15 38:16
38:22 45:2 57:13
61:11,16 111:20,25
112:22 116:15,15
116:18 123:21
126:4 131:16,17
163:17 167:9 171:7
190:5 191:3 194:6
200:22 205:24
215:15,17 216:1,2
221:18 226:21
**Throughout**
140:3
**ticker**
146:3,7
**ticketing**
17:16
**tickets**
34:9
**tight**
191:24
**time**
10:18 11:8 12:2,10
17:24 18:8 19:5
23:2 26:9 37:14
39:4 42:5,5 47:20
48:2 50:20 71:9
72:19 78:1 84:23
96:24 103:17 106:1
114:8,9 117:11
119:1 121:7,20
122:5 139:13
142:16 144:7
156:13,17 157:4
161:10 165:15
180:7 181:17 185:7
185:8,23 188:3
197:19,22,22,24
198:8 199:9,13

207:5,23 213:7,18
218:25 223:11,12
224:12,14 233:9
**times**
22:19 25:14 49:13
73:24 86:23 101:20
103:20 156:12
171:22 193:7
**title**
40:9,17 73:23 96:1
98:16
**today**
12:17 13:13 102:2
114:14 117:10
137:3 138:11,14
192:3,10 196:10
198:9 199:10,14
212:16 217:23
224:12 232:2
**today's**
13:9 117:12 232:8
**together**
19:9 41:6 162:9
177:16
**toggle**
158:14
**toggled**
181:7
**token**
50:8
**tokens**
79:12 110:17
**told**
39:25 126:22 191:9
191:12 214:9
**too**
26:3,24 47:12 52:9
157:2 171:20
192:22
**took**
53:13 157:2 192:20
203:16
**top**
42:11,12 56:6 80:13
88:4 93:3 106:3,6
121:3 123:7 124:19

126:22 128:25
184:7 189:8
**topics**
22:24
**TOS**
120:1,9
**total**
25:25 26:6 89:17
90:8 91:15 94:25
96:11 101:5 110:16
111:1 133:6 146:21
146:22 148:17,20
148:24 161:18
176:11
**totally**
48:12 102:11 137:11
160:6
**touch**
153:1
**toy**
27:9 48:22 103:16,20
103:21 130:18
**track**
68:17 100:17
**tracked**
125:1
**tracks**
36:10 124:20
**tradable**
149:18
**trade**
57:15,23 60:19 81:17
82:14,17 83:6,12,16
83:22 111:17,19
129:25 131:8 165:1
165:5,7,11,25
167:12,13 181:24
192:6,21 194:24
195:1
**traded**
121:6
**trader**
176:21,23
**traders**
213:1,4 218:18,19
**trades**

60:21 61:15 81:24
171:23 190:3,11,15
190:20 196:9 213:5
214:16
**trading**
1:4 2:4 5:16,20,22,24
8:4 9:21 16:7 19:16
21:7 27:16 39:15
43:19,22,25 53:12
56:23 58:5,10 73:25
74:7 82:25 84:2
89:2,9 94:6 97:5
98:22 106:8 108:13
108:22,24 109:5,22
109:22 110:3
111:20,25 173:20
176:3 177:9 180:3
206:4 218:18 234:2
**training**
89:4
**transaction**
70:9 71:13
**transcribed**
233:11
**transcript**
10:16 76:24 77:5,10
135:5 234:1
**transfer**
68:12 71:2,5,7 73:25
80:3,7,16 111:21,23
124:1 164:24
**transferred**
68:15
**transferring**
217:17
**transfers**
70:13
**treat**
149:14 150:9
**treated**
114:19 130:7 132:5
147:14 149:19
213:19 222:23
223:1
**treatment**
168:20 169:3 204:24



222:15 223:4

**trial**
5:20 6:5,13 12:20
13:3 43:20 47:24
53:3 76:19 77:6
134:22,25 140:15

**tried**
184:9

**trigger**
22:1 131:20 132:1
141:5

**triggered**
99:20 133:12 138:6
217:9

**triggering**
133:14

**triggers**
88:24

**tripped**
19:5

**trouble**
186:6,19

**troubles**
187:5

**true**
16:15 58:24 143:11
161:19 168:14
175:7 214:5 228:25
230:1,3,19 233:13

**Truly**
214:15

**trust**
3:12 9:3 11:10 87:20
120:20 137:2
223:22 224:11

**trusted**
19:12 221:11,17,21

**truth**
229:7 230:11 233:6,7
233:7

**truthfully**
232:2

**try**
10:6 14:14 15:4 19:2
92:20 175:3 199:24
201:20

**trying**
24:20 44:6 68:20
92:16 102:3 107:24
135:2 181:23 193:3
193:3 209:7

**Tuesday**
2:11

**tumult**
187:10

**turn**
130:21 179:3 200:17
207:10,20

**turned**
130:5 200:13 201:5

**twice**
39:1

**Twitter**
198:23

**two**
29:11 41:12 59:6
64:8,12 94:17 99:4
99:6 110:23 113:20
131:4 137:3,21
146:5 148:9 152:1,5
152:18 153:11,17
159:12 162:7
170:14,14 175:7,9
183:22 204:11
229:3,4

**Two-day**
232:15

**type**
75:20 116:5,7 182:1
216:8,9 222:5

**types**
170:15 200:25
212:17,23

**typewriting**
233:12

**typical**
35:10

**typo**
207:6

_____
**U**
_____

**uh-huh**

21:25 42:13 44:8
67:4 70:2 78:7
123:6,12 178:22
179:10 180:16
201:10 218:10
229:5

**UI**
35:21 86:13

**ultimate**
196:12

**ultimately**
20:12 22:17 26:10
48:25 52:6 60:6
63:13 151:14
172:11 230:6

**unambiguous**
34:18 62:18 84:15

**unclear**
49:11

**under**
9:10 20:8 25:4 34:25
53:17 56:7,22 83:4
86:12 90:23 93:23
111:1 112:3 114:20
133:2 138:16,18
144:15 146:17
179:7 187:10
196:24 198:17
215:5 233:12

**undersigned**
233:3

**understand**
10:4 35:12 40:11
44:10 50:15 56:4
57:6 68:20 94:25
95:5 97:23 100:4
103:8,19 104:1,4
105:21 114:13
130:14 135:2 143:7
147:7 151:7 166:24
180:5 192:9 198:5
200:2 211:2

**understandably**
150:3

**understanding**
13:24 26:22 40:2,13

70:20 74:11,20
83:19 89:15 91:2,19
95:18 97:1 105:24
114:11 121:2
126:20 136:1
154:25 162:22
163:16 166:12
198:7,15 202:24
212:16,23 218:24
231:20

**understood**
65:20 150:6 164:1
198:8

**underwater**
47:23 57:21 63:11
220:15

**unexplained**
213:9

**uninformed**
24:15

**unique**
79:18

**United**
1:1 2:1 8:4 227:7

**units**
161:23

**universe**
14:5 161:1

**unlawful**
228:6

**unless**
10:24 36:8 86:14
222:23

**unlike**
111:20

**unrealized**
54:1 163:7 171:11,14

**unrepaid**
112:17

**unrestricted**
62:1

**unsettled**
163:8,9,12

**until**
129:24 159:4

**unwound**



47:13

**up**
11:23 12:22,24 13:13
19:5 21:3 22:17
23:23 26:23 27:12
38:20 47:23 50:4
51:5,16 52:6,21
53:17,24 84:10 89:8
93:6,7,10 99:16
114:22 117:24
122:16 123:10,23
125:14 130:24
145:9,11,15 182:18
189:8,23 192:3,10
193:4 203:9,10,14
204:21 205:10
221:18

**updated**
42:15

**updates**
96:21 99:18 170:16
170:16,20

**updating**
170:20,21

**uploaded**
15:16

**upon**
58:6 136:23

**us**
14:7 41:14 44:5
87:20 120:20
126:22 141:21
153:11 166:10
202:5 207:12
219:10 220:21

**usage**
113:19 116:5,7
133:21 154:21,23

**USD**
86:3 89:17 95:1,12
105:19,22 106:1,9
106:10,19,21 107:3
107:5,17,21 108:3
122:14 130:1,6,7
144:10 151:20
163:25 179:4 181:8

181:15 182:8,10
189:24 190:12,16
203:11 204:21
205:10,21,21,23

**USDC**
65:5

**USDNY**
227:11

**USDT**
95:12

**USD_value_size**
151:3

**use**
10:15 21:5 23:24
32:1 91:20 116:9,10
119:7 130:18
142:21,22 145:6,8
147:18,21 148:8,23
151:15 159:16,23
160:2,3 169:11,15
169:22 192:6
193:10,12,20,21
230:12

**used**
12:4 21:6,17,17
28:18 33:16 34:7
38:6,8 42:23 55:16
55:18 56:18 60:19
76:17 78:19 79:5
90:5,11,13 91:16
102:13 103:23
105:5 117:5,9 119:1
121:14,18,18,21,24
122:6 127:8,18
132:5,23,25 134:1,8
139:17 143:2
144:14 147:9
154:10,15,19
159:25 161:8
172:14 173:20
174:7 184:24
191:23 192:3,16,22
193:7,22 194:1
215:21

**useful**
27:6 70:21

**user**
33:11 81:19 84:17,21
84:24 88:1 92:19
93:1 94:3,14,19
95:10 111:24 113:3
113:4 117:16 118:4
118:25 145:6,12
147:22 148:10
151:15 160:17
161:16 162:10,17
181:19,23

**users**
34:4,13 92:21 113:22
122:24 129:25
134:10 146:17
151:8 172:11
221:17

**user's**
106:23 144:15 168:2
170:1 201:11

**using**
15:7,16 22:8 28:6
36:10 55:22 70:18
122:24 124:2
129:21 132:9 133:5
152:24 161:9 192:5
192:11,12,13 193:4
193:13 230:8 231:5
231:10,14

**usually**
124:22

**utilization**
128:5

**utilized**
127:22 128:9,12,16
129:12 133:16

**U.S**
93:22 104:22 105:2,9
117:2,17,20,24
118:5 145:7 162:25
163:6,14 170:1,21
171:1,4,6 172:22
173:15 188:4 190:8
203:18,21,24 204:4
204:12 221:15,24

---

**V**

**vaguely**
41:25 139:6 195:18

**validated**
193:16

**valuable**
108:10

**valuation**
91:12

**value**
19:24 26:1,5,16 27:1
27:7,13 28:4,13,16
28:22 58:21 59:9,18
76:3 89:17 90:5,7,9
93:17 95:1,15 101:5
101:14,17 102:13
104:21 105:5,9,10
108:2 109:19,23
110:1,5 134:15
140:20 144:9
151:13,14,16,20
195:12,17 198:12
198:12,13,16 203:6
205:10,21 229:21

**values**
64:9 90:16,20 102:15
170:14,20 205:6,7

**variable**
148:20,24 149:21
151:17

**variables**
151:24 152:1

**varied**
26:9 28:19 158:10

**varies**
18:23

**various**
30:1 177:7,23 200:25
219:18 227:10

**vary**
26:9 33:13 102:11

**vehicle**
131:17

**versa**
120:3 124:13



**version**
17:21 72:15 98:1
139:3 141:20 142:2
**versions**
48:4 137:4
**versus**
30:9 31:3 95:7
106:21 144:9
231:16
**very**
11:11 13:23 18:4
21:6 24:15 26:3
74:15 103:2 106:6
126:21,21 127:14
141:13 159:14
180:20 192:7 203:9
203:10,14,17,18
219:9 229:21
**VI**
231:8
**via**
4:10 21:22 22:9
60:25
**viable**
103:1
**vice**
120:3 124:13
**video**
8:12
**videographer**
4:14 8:1 9:4 43:7
65:11,15 119:9,13
137:21 157:22
158:1 216:18,22
224:3,7 232:8
**video-recorded**
1:11 8:2
**view**
19:14 34:23 35:18
40:5,19 79:21 80:7
85:24 86:2,9 128:5
152:18 165:10
186:18 223:17
226:12
**viewed**
40:14

**views**
162:13
**Vinny**
4:14 8:11
**VIP**
19:23 20:8,11,19
22:11 125:12,13,15
126:22 127:2
199:19 222:10,15
222:18,23 223:1
**VIPness**
222:20
**VIPs**
222:14,16
**virtue**
110:3 112:24 145:16
**volume**
218:18 219:3 222:20
222:24

---

**W**

**waiting**
160:18
**walk**
191:3
**walked**
38:22
**wallet**
68:8,13,15 80:4,23
81:8,12 94:22,24
**wallets**
67:21,23 68:1,6,7,12
68:23 69:2,3 78:10
80:5 84:9
**Wang**
17:12 18:1,15 33:4,7
37:25 53:13 70:1
153:3
**want**
10:18 13:14 22:5
27:11 28:17 32:19
39:1 43:15 65:19
66:17 72:8 97:23
103:19 105:4 113:8
114:15,19 133:13
160:21 185:6

216:16 218:9
223:23
**wanted**
22:14 32:1 35:4
38:19 61:18 65:24
78:3 84:20 92:20
93:21 119:17
134:17 135:19
225:10
**wants**
28:4
**warning**
211:22
**wasn't**
31:6 52:5 63:7 73:6
87:1 107:21 108:10
109:6 118:16 157:9
**water**
53:17
**Watkins**
3:5 8:18 9:15
**way**
11:8 22:9 35:13,15
36:9 37:2 38:21
48:2 60:1 71:13
85:11 90:4 91:23
92:8 102:10,18
104:9,17,23 111:5
122:17 131:2
133:20 136:25
141:24 144:2
153:10 159:25
160:8 162:2,15,23
165:4,10,24 166:11
175:18 183:10,14
183:15,16 193:16
194:7 205:20,23
206:1,7 215:9 216:2
219:9 233:20
**ways**
35:18,25 38:7 104:16
116:8 128:4 129:18
152:18 154:18
158:12 159:23
162:20 167:8,19,24
219:16 230:6

**web**
35:21 201:8
**website**
22:10 34:23 83:11
117:15 126:1
225:19
**wedding**
11:15,17,18,25
**week**
11:11
**weeks**
11:19
**weight**
101:8 102:21 159:22
159:22
**weighted**
143:13
**weighting**
144:2 160:11
**weights**
102:22 143:8 160:4
**weird**
181:7
**well**
9:22 30:24 64:12
74:25 79:1 88:23
112:4 121:14
126:18 127:5
143:21 152:14
156:14 172:21
197:15 202:16
208:17 212:22
227:25
**well-acquainted**
22:24
**went**
13:10 18:5 19:8
38:16 57:13 77:9
171:23
**weren't**
63:7 81:8 116:21
119:21 121:15
150:15 163:6
223:17
**We'd**
145:20



**we'll**
29:20 63:18 90:22
  182:14 205:12
  211:12 224:1
**we're**
10:9 24:19 27:22
  60:2 63:4 93:20
  95:6 173:22 223:21
  224:4
**we've**
22:23 24:17 102:2
  181:8 200:13
**whatever**
62:19 77:16 115:22
  133:22 149:7 206:3
**what's**
61:13 78:9 79:3 82:6
  83:24 85:3 88:19
  89:14 91:2 95:6
  97:1 105:24 138:13
  149:12,16,24
  151:25 162:17
  188:14 208:21
  212:23 218:13
**when**
10:14 11:8 16:2 23:1
  23:24 24:1 26:13
  28:16 30:19 31:25
  33:6 38:24 49:11
  51:7 60:15 62:8
  67:14 68:2,20 73:5
  73:19 79:17 80:22
  81:14 83:10 84:7
  85:20 100:13 102:5
  102:6 104:21
  106:14 115:10
  121:7,11,11 135:5
  145:21 148:7
  152:23 156:12,13
  161:3,23 163:3
  168:2,12 173:24
  174:2 179:4 181:6
  181:19 186:10
  187:13 193:3
  194:13 196:13
  202:23 206:5 207:6

213:14,25 219:18
  219:21 229:10,11
  230:8 231:5,17
**When's**
12:2
**where**
16:12 17:14,19 49:13
  50:10,23 52:23 55:4
  55:11 57:15,22
  58:10,14 59:16
  61:23 63:9 66:21
  73:10 77:9 81:5
  84:22 93:16 101:20
  101:21 110:19
  113:10 114:22
  122:5 143:18
  144:17 145:18
  149:25 158:22
  172:12 191:9
  192:23 194:16
  196:20,21 198:24
  200:16 212:4
  215:15 219:22
**whether**
30:10 36:18 54:17
  118:11 124:11
  132:7 134:4 148:6
  154:9 159:21
  173:14 195:16
**while**
126:3
**who**
11:9,9,12 12:4,12
  17:8,11,23,24 18:23
  24:16,18,21 26:4,8
  29:13 32:21,24 33:4
  37:13,18 39:6,10
  40:13 44:10 51:16
  52:2,3 61:8 84:23
  85:17 115:15 123:5
  123:8 125:10,13
  127:1 152:21 153:1
  161:10 169:21
  176:21,23 177:4,6
  187:13 189:13,14
  189:16 201:4 202:3

206:11 208:8,20,25
  214:6,12,13 220:7
**whoever**
28:23
**whole**
14:5 29:4 97:3 233:6
**whose**
114:2
**why**
11:14 18:11 19:21
  20:10 26:15,25 28:2
  35:8 40:1 45:6,7
  47:2,8 48:14 50:16
  57:1 62:13 63:20
  64:15,19 65:9 69:9
  70:8,10,20 72:4
  76:23 82:1 91:12,19
  94:2 97:1,9 99:23
  103:25 104:6
  107:11 108:12
  110:4 114:11,14
  119:8 122:16,22
  125:18 132:13
  138:9,22 139:10
  152:9 156:10,19
  157:19 158:8,9
  169:7,14,14 175:16
  178:4 180:7 192:1
  193:12 195:25
  197:2 200:5 207:21
  210:4,24 213:4,11
  218:24 220:3,8
  223:25
**wide**
193:8
**will**
9:4,20 11:3 27:10
  41:7 43:5 48:16
  62:18 101:14 106:8
  106:17,23 111:4
  122:2 127:21 130:4
  130:6 133:11 153:4
  171:20 181:10
  194:24 206:18
  228:17 230:14,23
**window**

219:2
**wire**
227:16,18
**wise**
126:14
**wish**
24:22
**withdraw**
50:19 68:9 199:24
  200:6
**withdrawal**
71:3,6,8,9,10
**withdrawals**
200:13,18 201:5
  207:10,11,20 208:3
  208:7,8
**withdrawing**
67:25 200:8 210:25
**withdraws**
70:13
**within**
20:20 21:11 33:16
  52:2 75:14 168:15
  170:25 185:22,24
  191:24 194:3,19
  215:22
**within-entitled**
233:8
**without**
57:20 63:10 123:15
  123:19 129:4 131:8
  146:6 211:22 213:9
  215:10 221:20
**won't**
10:16
**word**
23:25 41:2
**words**
10:15 41:24 75:6,7
  75:13 108:21
  158:19
**work**
12:4,16 13:11 46:16
  46:20 109:4,13
  147:6
**worked**



19:9,11 23:21 24:20
40:13 44:15 90:4
98:21 108:25
176:21 199:19
**working**
16:6,9 176:5
**works**
44:11 89:3 184:10
**world**
55:20 131:5
**worse**
58:11 200:9
**worst**
193:18
**worth**
27:11 28:12
**wouldn't**
20:7 45:11 133:7,9
156:11,19 199:12
205:20 215:7
225:12
**Wow**
11:20
**write**
59:2 71:21 88:10,10
90:1 100:21 152:22
166:17 170:9,10
179:11 184:9 203:5
205:9 208:3 209:20
**writes**
42:14 46:4 181:3
198:24 199:22
202:15,19 207:9
208:14,19 209:11
210:11 211:3
218:11
**writing**
16:24 128:3 166:14
224:22
**written**
124:6,11,16 172:9
225:15
**wrong**
18:21 19:8 174:8
229:9
**wrote**

21:20 98:2 113:17
126:10 137:4
152:13 172:12
204:16 207:6 229:2
230:4

---

### X

**X**
206:15

---

### Y

**Yards**
4:6
**yeah**
29:4 33:13,22 42:3
43:24 46:1 47:25
49:25 53:4 82:16
89:25 107:2 110:21
114:8 117:14
121:21 123:20
127:14 128:19
130:12 135:8,24
137:1 141:24 142:8
143:22 151:2
154:13 155:11,17
163:24 169:18
172:19 178:13
179:23 183:21
197:1 202:8 206:17
208:1,15 209:4,6,15
210:21 211:15
221:12 223:13,25
230:4 232:21
**year**
51:8 64:5
**years**
18:6 61:1 137:3
**Yedidia**
11:13,14 181:11
**Yep**
9:23 43:18
**Yesterday**
202:19
**yet**
32:2 150:18 229:7
**York**

3:19,19 4:7,7 227:8
**your**
10:11,12,24 11:18
12:9,15 13:16 14:6
14:10,11,14 15:22
16:2,10,16,22 18:2
18:14 19:2 20:2
40:12 41:14 43:8
44:5,6 46:16,23
66:19 71:20 72:20
73:22 74:1,6,10,19
76:24 77:6,10,24
89:1,2 91:2 95:18
97:1 103:9,11
105:24 109:19
110:16 111:23
113:14 122:1,14,14
129:11 130:5,6
132:15 133:12
135:4 152:3,15
162:22 170:11
184:21 198:15
212:23 220:9 224:2
224:12,14,22
228:19 231:4 232:3
232:11
**yourself**
9:5 10:17 123:14
158:6
**yourselves**
8:15
**you'll**
10:23
**you're**
10:14 23:6 25:1
31:21 40:11 60:11
65:1 66:3,9 68:11
68:16 85:14 98:2
101:9 111:18 120:7
133:5 135:5 136:19
153:19 165:24
173:24 177:10
188:12 194:9
196:24 201:21
202:10 205:4
215:15,16 216:10

218:22
**you've**
41:11 43:11 82:5
87:18 101:24
120:18 125:22
139:23 140:14
141:11,18 153:8
166:7 178:8 180:13
197:6 201:25 212:7
212:11,11 227:4

---

### Z

**Zachary**
4:13
**Zane**
7:1 19:18,22 22:18
125:14 177:12
186:21 189:17
199:20 213:2
219:23 220:3,8,15
**Zendesk**
17:22
**zero**
46:13 59:10 102:4
106:2 107:6 155:18
155:24
**zeroing**
46:7
**Zhao**
3:7 8:20,20
**Zhu**
176:19,20
**Zijun**
3:7 8:20
**Zoom**
4:10

---

### $

**$1,000**
123:10
**$10**
50:18,21 204:14
**$10,000**
131:1,14
**$20**
198:13



**$500**
188:2
**$80**
204:4,12
**$90**
204:5,13
**$90,000**
131:12

---
**0**
---

**01/21/2022**
6:4
**05/05/2021**
5:15
**05/26/2021**
6:2
**06/13/2022**
7:3

---
**1**
---

**1**
8:2 65:12 149:9,13
**1:17**
199:3
**1:39**
158:2
**1:40**
157:25
**1:45**
201:8
**10**
27:10,12,17 73:16
179:5 203:24 204:5
204:8
**10-minute**
224:1
**10/28/25**
234:3
**10:12**
65:12,13
**10:30**
65:14,17
**10001**
4:7
**10004**
3:19

**104**
149:24
**105**
144:1 148:15
**107**
211:4
**11**
82:2
**11th**
49:21
**11/02/2021**
5:19
**11:39**
119:10,11
**11:58**
119:12,15
**110**
144:25 145:2 151:1
**111**
145:25 151:12
**113**
145:25 151:13
**12th**
156:7,11,18,18
**12.2**
91:16
**12/31**
70:5
**12:02**
197:25
**12:54**
157:23,24
**120**
6:11 198:15 202:17
205:10,23
**125**
3:18 6:12
**13th**
157:16 159:16 188:7
188:10,20 220:5,22
**135**
6:13
**1364**
78:3,5
**137**
6:15

**1385**
79:2
**14**
180:10
**14th**
87:24 156:6 159:16
188:20,22 197:23
217:5
**141**
6:17
**1426591**
1:21
**15**
7:10 72:11,12 79:3
138:23
**1567**
135:6,8,19 136:7
**16**
6:6
**16th**
217:8
**166**
6:19
**17**
6:14
**178**
6:21
**18**
7:11 108:14,15
**197**
6:23
**199.6**
90:24

---
**2**
---

**2**
65:16 119:10
**2FA**
36:5
**2:42**
198:1
**2:58**
216:19,20
**20**
7:12 79:11 138:24
139:2 198:2,5,20

**202:20 211:6,17**
220:15
**200**
140:4,25 141:6
**2000**
2:13 3:8 8:8
**201**
6:25
**2019**
16:4
**2020**
174:11 180:6
**2021**
5:17,21,23,25 37:15
42:15 45:17 64:6,21
66:21
**2022**
16:16 17:24 23:2
37:14 49:21 51:10
69:22 72:14 87:24
99:12 137:10 138:7
155:2 185:7,11
197:24 218:8,8
220:23 231:13
**2023**
6:6,14
**2025**
1:13 2:11 8:9 233:22
234:19
**21**
7:13 18:9 39:2 153:6
153:10 159:11
**21st**
69:22 218:8 219:1
**219**
7:3
**22**
18:9 39:2 79:11
**22-11068**
1:7 2:7 8:6
**220**
7:4
**224**
5:5
**225,000**
202:19



**227**
7:5
**228**
7:6
**23**
178:5
**23:08:24**
221:9
**230**
5:6
**239.8**
89:18
**24**
78:6 197:3
**25**
78:6
**26**
66:21
**26th**
66:23
**28**
1:13 2:11
**28th**
8:9 155:5,12
**29th**
155:23

———————— **3** ————————
**3**
119:14 129:6 157:23
**3AC**
183:12 199:5 202:16
**3/29/2022**
6:15
**3:13**
216:23
**3:14**
216:21
**3:23**
224:4,5
**3:37**
224:6,8
**3:45**
232:10,22
**3:51**
178:21

**3:58**
180:22 181:3
**30**
5:21,25 145:3 162:24
   163:1 171:15
   172:21 173:4,7,10
   173:14 213:20
**30th**
233:22
**30,000**
179:4,13,17
**30-second**
163:11
**31**
5:17
**34**
7:14 216:25,25 217:1
**37**
137:16
**38**
64:4
**3850**
179:25
**39**
7:15 87:16,19 95:8

———————— **4** ————————
**4**
158:2 216:19 219:4
**40**
7:16 94:8,12
**41**
5:14,16
**414**
64:5
**43**
5:18,20,22,24
**46**
7:17 180:11,15
**47**
101:3 142:5 151:18
**48**
7:18 103:5 218:3,7

———————— **5** ————————
**5**

135:25 136:7 140:1
   141:1 216:23 224:4
**5/6/2020**
6:22
**5:53**
184:8
**50**
106:4 182:15,19,23
   211:6,17
**505**
2:12 3:8 8:7
**52**
99:24
**53**
201:22
**54**
5:14 41:4,6,7,9,12,18
   42:10 141:10
**55**
4:6 5:16 41:6,8,9,13
   41:18 42:18 125:19
**56**
5:18 43:2,4,5,12,17
   44:4,9 46:4
**57**
5:20 43:5,13,19
   45:22
**57-59**
43:9
**58**
5:22 43:5,13,22
   45:22 56:5
**59**
5:24 43:5,14,25
   45:22 63:21,21

———————— **6** ————————
**6**
23:2 224:8
**6/13/2022**
7:4
**6/14/2022**
6:24
**6/2/2020**
6:7
**6:14**

218:11
**6:17**
198:22
**60**
6:1 66:14,18
**61**
6:3 69:17,20
**6173**
1:22 9:7 233:24
**62**
6:5 76:25 77:2,5 82:6
**63**
6:7 82:3,8,9,10 83:19
**64**
6:10 99:25 100:2,3,4
   179:24
**65**
6:11 120:15,16,19
**66**
6:1,12 125:20,23
**67**
6:13 135:14,15,16,20
**68**
6:15 137:19,23
   147:18
**69**
6:3,17 141:15,17,18
   141:19

———————— **7** ————————
**7**
23:2
**70**
6:19 166:4,7,8
   169:25 173:2
**71**
6:21 147:24 148:3
   170:20 178:6
**72**
6:23 171:9 197:4,7
**73**
6:25 147:24 171:17
   201:23 202:1
**74**
7:3 219:5,8,8
**75**



7:4 220:18,20
**76**
6:5 7:5 227:2,5
**77**
7:6 172:1 228:12,16
 231:2
**79**
148:15

**8**
**8**
46:5 129:5 136:7
**8.2**
73:16,17
**8.2.6**
73:19,22
**8.2.6B**
74:5
**8/26/2025**
6:25
**80**
203:21 204:21
**82**
6:7 144:18 147:2
 155:6,16
**84**
144:19 147:2
**85**
173:3,6
**87**
221:6
**88**
149:3

**9**
**9**
5:4
**9:02**
2:12 8:10
**90**
204:22,24
**93**
173:11
**94111**
3:9
**97**

112:4
**98**
112:3
**99**
6:10



# **EXHIBIT 11**

CONFIDENTIAL

Page 1

1    IN THE UNITED STATES BANKRTUPCY COURT

2    FOR THE DISTRICT OF DELAWARE

3    Chapter 11

4    Case No. 22-11068 (KBO)

5    (Jointly Administered)

6    _____

7    In re:                    )

                              )

8    FTX TRADING LTD., et al.,  )

                              )

9        Debtors.              )

     _____

10

11                    CONFIDENTIAL

12          ORAL AND VIDEOTAPED DEPOSITION OF

13                  GREGORY SCHEIG

14                DECEMBER 12, 2025

15               (REPORTED REMOTELY)

16

17            ORAL AND VIDEOTAPED DEPOSITION of

18   GREGORY SCHEIG, produced as a witness at the instance

19   of the FTX Recovery Trust, and duly sworn, was taken

20   in the above-styled and -numbered cause on the 12th of

21   December, 2025, from 8:01 a.m. to 1:13 p.m., before

22   Audra B. Paty, CSR in and for the State of Texas,

23   reported by machine shorthand, in the City of

24   Southlake, County of Tarrant, State of Texas, pursuant

25   to Notice.

CONFIDENTIAL

Page 2

A P P E A R A N C E S
FOR THE FTX RECOVERY TRUST:
      Mr. Nam T. Luu
      Mr. Brian D. Glueckstein
      Ms. Sienna Liu
SULLIVAN & CROMWELL, LLP
      125 Broad Street
      New York, New York 10004
      luun@sullcrom.com
      gluecksteinb@sullcrom.com
      lius@sullcrom.com


FOR THE JOINT LIQUIDATORS OF 3AC:
      Mr. John D. Niemeyer
      Mr. Adam J. Goldberg
      Ms. Tiffany Ikeda Austin
      Mr. Nacif Taousse
LATHAM & WATKINS, LLP
      1271 Avenue of the Americas
      New York, New York 10020
      john.niemeyer@lw.com
      adam.goldberg@lw.com
      tiffany.ikeda@lw.com
      nacif.taousse@lw.com

ALSO PRESENT:
      Mr. Shamus Hogan, Law Clerk
      Mr. Christopher Farmer
      Mr. Brandon James
      Mr. Romauld Johnson, Ogier
      Mr. Daniel Burkitt, Ogier
      Ms. Gaurav Walia, Alvarez & Marsal
      Mr. Jamie Malley, Teneo
      Mr. Luis Acevedo, Videographer

Page 3

         I N D E X
WITNESS                         PAGE
GREGORY SCHEIG
EXAMINATION BY MR. LUU              5
EXAMINATION BY MR. NIEMEYER       158

REPORTER'S CERTIFICATION         165
CORRECTIONS MADE BY WITNESS      167
SIGNATURE OF WITNESS             168

EXHIBITS              IDENTIFIED
Exhibit 1   Declaration of Gregory E.
            Scheig               13

Exhibit 2   Supplemental Analysis Pages of
            Gregory E. Scheig    14
Exhibit 3   Patriot Exploration, LLC vs.
            Thompson & Knight, LLP Order   55

Exhibit 4   Transupport Incorporated vs.
            Commisioner of Internal Revenue
            Order                58

Exhibit 5   May 2022 NAV Pack Spreadsheet   83

Exhibit 6   3AC Binance Data Spreadsheet   109

Exhibit 7   FTX_3AC_000000038 Spreadsheet  124

Exhibit 8   FTX Trading Ltd. Consolidated
            Financial Statements as of
            December 31, 2021 and 2020    162

Page 4

1           REPORTER'S NOTE:
2      Quotation marks are used for reading clarity only and
3      may not necessarily reflect the exact wording on a
4      document being read or an exact conversation being
5           referenced.

Page 5

          P R O C E E D I N G S
          THE VIDEOGRAPHER:  We're on record for
the deposition of Greg Scheig.  The time is 8:01 a.m.
on December 12th, 2025.  This is in the matter of FTX
Trading Limited, et al.
          Will counsel state their appearances for
the record?
          MR. LUU:  Nam Luu, with Brian Glueckstein
and Shamus Hogan from Sullivan & Cromwell, for the FTX
Recovery Trust.
          MR. NIEMEYER:  John Niemeyer and Tiffany
Austin from Latham & Watkins, on behalf of the Joint
Liquidators of Three Arrows Capital.
          THE REPORTER:  Okay.  Is that it?
          GREG SCHEIG,
having been first duly sworn, testified as follows:
          EXAMINATION
BY MR. LUU:
     Q.  Good morning, Mr. Scheig.
     A.  Good morning.
     Q.  My name is Nam Luu and I'm an attorney of
Sullivan & Cromwell.  With me here today are Brian
Glueckstein and Shamus Hogan, also from Sullivan
Cromwell, and we represent the FTX Recovery Trust.  Do
you understand that you are under oath today?

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

1    A. Yes.
2    Q. So as you now see, the deposition is being
3  videotaped and transcribed. I ask that we not speak
4  over each other. Please let me finish my questions
5  and I will let you finish your answers; is that okay?
6    A. Agreed.
7    Q. Also, please answer questions affirmatively.
8  So no nodding or no huh-uh so that the court reporter
9  can get that correctly on the record; is that okay?
10   A. I will do my best.
11   Q. Yes. And let me know if you don't understand
12  a question or if the question is ambiguous, and we'll
13  try to clarify it. Otherwise, I will assume that you
14  have understood the question. Okay?
15   A. Okay.
16   Q. From time to time your counsel may object to
17  my questions. Unless specifically instructed
18  otherwise, you are required to answer my questions; is
19  that understood?
20   A. Yes.
21   Q. Okay. We will take multiple breaks
22  throughout this deposition today. If you need a
23  break, just let me know. We're happy to accommodate.
24  I only ask that you let me finish my line of
25  questionings and you finish answering the question

Page 7

1  before we go to a break; is that okay?
2    A. Yes.
3    Q. So as you know, this is a remote deposition.
4  So if there is any technical issues, please let us
5  know immediately. I understand that you have access
6  to the Exhibit Share platform.
7    A. Yes.
8    Q. It's blank right now, but no technical issues
9  so far?
10   A. Correct.
11   Q. Okay. Great. Is there anything that might
12  prevent you from providing complete and accurate
13  testimony today?
14   A. No.
15   Q. Okay. Is anyone present in the room with you
16  today?
17   A. No.
18   Q. Is there any material that you are consulting
19  in connection with your testimony today?
20   A. I have a printed copy of my report, and I
21  have a printed copy of the FTX 2021 annual report.
22   Q. Okay. Any computer notes?
23   A. No.
24   Q. Any hand notes or markings on your printed
25  copies of your report and FTX document that you

Page 8

1  mentioned?
2    A. No.
3    Q. Okay. Any other windows open on your
4  computer?
5    A. Outlook, my e-mail.
6    Q. Understood. If you could also, like, mute --
7  if there is anyway to, like, mute notifications on
8  your Outlook, that would be great just so we don't
9  have any noise issues.
10   A. I'll shut it down.
11   Q. Okay. Thank you.
12       Mr. Scheig, have you ever been deposed
13  before?
14   A. Yes.
15   Q. How many times approximately?
16   A. Approximately 50 to 60.
17   Q. Okay. And were you always deposed as an
18  expert?
19   A. I testified once as a fact witness.
20   Q. As a fact witness. So in your capacity as a
21  fact witness, were you a financial advisor to a party
22  or how did that work?
23   A. I was a party in the lawsuit.
24   Q. I see. I understand. Have you ever provided
25  an expert report before?

Page 9

1    A. Yes.
2    Q. About approximately how many times?
3    A. Hundreds, maybe thousands.
4    Q. Okay. Because there are hundreds or
5  thousands, if you could --
6    A. Well, let me clarify my answer, Mr. Luu.
7  Expert report for litigation, hundreds max. Valuation
8  reports over my career could be thousands.
9    Q. I see. Okay. So could you provide, like,
10  brief summary of the topics you address in those
11  reports, in those expert reports?
12   A. So I'm a valuation expert, and it's typically
13  disputes over values or damages or relative interest
14  between parties. And I've been retained to create
15  expert reports for those topics.
16   Q. Okay. How many times have you been qualified
17  by a court as an expert in litigation?
18   A. When you say "qualified by a court," do you
19  mean at trial?
20   Q. Yeah, so when you submit an expert report,
21  the court admit that expert report into evidence and
22  qualify you as an expert.
23   A. I don't have an exact number for you, sir.
24  You know, it's all of them, with the exception of the
25  ones that were excluded.

3 (Pages 6 - 9)

CONFIDENTIAL

1    Q.  Okay.  We will talk about that in a little
2  bit.  Have you -- have you testified in court before?
3    A.  Yes.
4    Q.  Approximately how many times?
5    A.  Approximately 40.
6    Q.  Okay.  And always as an expert?
7    A.  Yes.
8    Q.  Okay.  Do you ever testify in your capacity
9  as a financial advisor to a party?
10    A.  Well, I mean, when you say "financial
11  advisor," I consider myself a valuation expert, not a
12  broker of securities like some financial advisors are
13  considered.  So I'm a valuation person.  I'm not a --
14  I'm not a broker or a wealth manager.
15    Q.  Understood.  Thank you.
16        Other than this particular litigation,
17  have you ever worked on a case with the Joint
18  Liquidators of Three Arrows Capital Limited, so
19  Russell Crumpler and Christopher Farmer?
20    A.  No.
21    Q.  How about Teneo, their employer?
22    A.  No.
23    Q.  What about Lathum & Watkins?
24    A.  I don't know -- yes, I've have done
25  projects with -- I believe I have done projects where

1  Latham & Watkins was counsel.  I would have to go back
2  and figure out which ones, though.
3    Q.  Okay.  Yeah, if we could go back to that at
4  some point, but thank you.
5        Mr. Scheig, what did you do to prepare
6  for today's deposition?
7    A.  Reviewed the report, reviewed the models,
8  reviewed the supporting materials, tried to make sure
9  I could answer every question you had.
10    Q.  Thank you.
11        Did you meet with counsel at Latham &
12  Watkins?
13    A.  Yes.
14    Q.  How many times?
15    A.  I mean, over the course of the project, over
16  preparing for deposition?  Could you clarify your
17  question for me, sir?
18    Q.  For the preparation of this deposition.
19    A.  I think we had two Zoom calls.
20    Q.  Okay.  And approximately how long were zoom
21  calls?
22    A.  A couple of hours.
23    Q.  Okay.  And who was present at those meetings?
24    A.  Counsel was present and David Pryde and
25  Brandon James from my team.

1    Q.  Okay.  Did you meet with anyone else other
2  than counsel and individuals you just mentioned to
3  prepare for this deposition?
4    A.  No.
5    Q.  Okay.  Did you review any documents with
6  counsel during those meetings?
7    A.  My report.
8    Q.  Okay.  As part of the meetings with counsel,
9  did you review any documents not listed in your
10  report?
11    A.  Yes.
12    Q.  And what documents are they?
13    A.  The FTX 2021 annual report, which was
14  provided to me after I submitted my report.
15    Q.  Okay.  And that is the only document not
16  listed in your report?
17    A.  I believe so.
18    Q.  Okay.  Did that document cause you to change
19  your opinion in any way?
20    A.  No.
21    Q.  Okay.
22        MR. LUU:  Okay.  Shamus, if we could
23  please bring up tab 1.
24    A.  So is this something I need to open in the
25  exhibits window?

1        (Exhibit No. 1 marked.)
2    Q.  (BY MR. LUU)  So, yes, once a document has
3  been marked as an exhibit, I believe you will receive
4  a notification, and you can use that notification
5  to -- yeah, I think a window just popped up saying a
6  marked exhibit has been introduced.  Do you see that?
7    A.  Do I need to download or can I just view?
8    Q.  You can view exhibit.
9    A.  Okay.
10    Q.  Please let me know once you have it popped
11  up.
12    A.  It's up.  It's pretty small, but I have it
13  open.
14    Q.  Okay.  And you can also zoom in.
15    A.  Yes.
16    Q.  Mr. Scheig, are you familiar with this
17  document?
18    A.  Yes, I don't know that I'm that familiar with
19  the first page.
20    Q.  Yes.
21    A.  Because that is something for filing, but
22  starting on my report on page 4 of 244 in this PDF, I
23  am very familiar with that.
24    Q.  Okay.  So, first of all, this is your
25  declaration in this litigation, correct?

CONFIDENTIAL

1    A. Correct.
2    Q. Exhibit 1 to this declaration is your report?
3    A. Agreed.
4    Q. Right. And that report is the expert report
5 of Gregory E. Scheig CFA, CPA/AVB/CFF dated October
6 21st, 2025, correct?
7    A. Correct.
8    Q. Why are you offering this report in this
9 litigation, sir?
10    A. Counsel requested it.
11    Q. Okay. And what is the purpose of the report?
12    A. It's a solvency analysis for Three Arrows
13 Capital, and I will probably abbreviate that as 3AC
14 today during our conversations. And it's a solvency
15 analysis for Three Arrows Capital as of the date June
16 12th, 2022.
17    Q. Okay. Thank you.
18        You can put this exhibit aside.
19        MR. LUU: Shamus, could we please bring
20 up tab 5?
21        (Exhibit No. 2 marked.)
22    A. Okay. Supplemental pages. Got it.
23    Q. (BY MR. LUU) Right. Do you have it in front
24 of you, sir?
25    A. Oh, yeah, yeah, yeah. Yep. Okay. Yes, sir,

1 I see it.
2    Q. Okay. So this has been marked as Exhibit 2,
3 and I will refer to this document as the supplemental
4 exhibit pages; is that okay?
5    A. That's great.
6    Q. Sir, you submitted -- when did you provide
7 these supplemental analysis exhibit pages to Latham &
8 Watkins?
9    A. A couple of days ago.
10    Q. Do you remember specifically what day it was?
11    A. I think it would have been this week, but I
12 don't remember specifically what day.
13    Q. Okay. I will represent to you that we
14 received this document from counsel on Tuesday
15 December 9th, 2025. So about three days ago.
16    A. Okay.
17    Q. So when did you perform the analysis for
18 these pages?
19    A. The analysis for these pages was performed at
20 the time I did my expert report, and the results of
21 these pages are reflected in my expert report. What
22 was missing from my expert report, as I was going
23 through validating all the numbers preparing to
24 testify today, I realized there were a couple of
25 supporting schedules that calculated a number that was

1 in my conclusion or excluded from my expert report and
2 I sent these so all of the numbers in the expert
3 report had backup.
4    Q. Okay. Understood.
5        So let me -- just to clarify, so the
6 analysis happened before you submitted your original
7 report, correct?
8    A. Correct.
9    Q. And you reviewed the report to prepare for
10 this deposition and you noticed that certain figures
11 were missing or were not backed up?
12    A. Correct.
13    Q. The original report. Okay. Did you receive
14 any instruction from counsel to submit these
15 supplemental analysis pages?
16    A. No, I brought it to their attention and said,
17 you know, I was concerned I hadn't fully shown my work
18 on this one schedule, and they said, well, let's
19 upload the schedules so you have.
20    Q. Okay. Thank you.
21    A. And, Counselor, I do have a copy of those
22 four pages. I did not mention it in my listing of
23 things.
24    Q. That's fine. Thank you, sir, for clarifying.
25        If you could look at page 1 of this

1 document. So this --
2    A. Of the supplemental?
3    Q. -- C, correct.
4    A. I'm still on 25. Do I need to get on a
5 different one?
6    Q. I think you should --
7    A. Are we still on supplemental analysis
8 exhibits?
9    Q. Yes.
10    A. Okay.
11    Q. I'm just talking about the top-right corner.
12    A. Okay.
13    Q. Do you see Supplemental C?
14    A. Yes, Supplemental C.
15    Q. Is it correct that Supplemental C is your
16 alternative daily balance sheet test, but you used the
17 document called FTX 38 Amended instead of the original
18 FTX 38, correct?
19    A. That is correct.
20    Q. Okay. And what is the difference between the
21 original Supplemental C that was submitted as part of
22 your report and the version we have here today?
23    A. The difference is we received two different
24 data sets to analyze from FTX. The first one
25 presented the futures positions on FTX's platform as

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

1 an asset with an offsetting liability that would net
2 to zero over time.  Subsequent to our starting the
3 report, we received the amended Exhibit 38, which
4 basically was stating that an alternate presentation
5 of the futures on FTX's platform would be better
6 served by showing just the net number and not a large
7 asset and a large offsetting liability that offset.
8    Q.  I see.  Let me clarify.  I'm just asking, so
9 your original report also has a Supplemental C,
10 correct?
11    A.  Yes.
12    Q.  And I'm just trying to figure out whether or
13 not there is any difference between that original
14 Supplemental C versus this Supplemental C in the
15 supplemental analysis exhibit pages?
16    A.  There's not.
17    Q.  Okay.
18    A.  I just provided support for a couple of the
19 numbers that roll up to the conclusion.
20    Q.  Right.  And the support is -- are the
21 footnotes in the notes column, correct?
22    A.  Yes, yeah.
23    Q.  Okay.  And looking at these, all of these
24 were available in your original report, correct?
25    A.  Yes.  In my original report, one of my team

Page 19

1 members basically had an "if" statement that if the
2 loan amount was amended, it would pick one number, and
3 if the loan amount -- if the FTX futures position were
4 presented on an amended basis, it would pick one
5 number.  If it were presented on an original basis, it
6 would pick a second number.  The second number was
7 reflected in -- well, and I did not -- so because his
8 calculation had an "if" statement, I didn't know to --
9 we didn't produce a second schedule which reflected
10 the other side of the "if" statements, which says
11 we're using the amended.  So it was just out of the
12 300-page report two pages were missing.
13    Q.  I see.  Let me take a second.  Looking at the
14 testimony, you said that the second number was
15 reflected, and I did not -- so because the
16 calculation -- we didn't produce a second schedule.
17 What is the second schedule that you didn't produce?
18    A.  On this, the room C where I'm looking on the
19 exhibit screen or you don't follow me?
20       MR. NIEMEYER:  No.
21       THE WITNESS:  Okay.
22

Page 20

1
2    Q.  (BY MR. LUU)  So --
3    A.  So this just has the backup.
4    Q.  So could you state that again for the record?
5    A.  The results of Supplemental C did not change.
6 I just provided a couple of supplemental pages that
7 were excluded from the original report that rolled up
8 into the total answer in Supplemental C.
9    Q.  Okay.  So could you please scroll to the
10 second page, Exhibit I.1?
11    A.  Are we still on Supplemental C?
12    Q.  Yes.  No, no, no.  We are still on Exhibit 2
13 of this deposition, but on the second page.
14    A.  Okay.  Yes.
15    Q.  And look at the top-right corner.  That page
16 is named Exhibit I.1, correct?
17    A.  Right.
18    Q.  Okay.  Sir, Exhibit I.1 is your analysis of
19 the spot token assets associated with a 3AC account on
20 the FTX Exchange, correct?
21    A.  Yes.
22    Q.  And once again, there was an original Exhibit
23 I.1 in your report and there is an Exhibit I.1 in this
24 document, correct?
25    A.  Correct.

Page 21

1    Q.  And what is the difference between the
2 original and the amended Exhibit I.1?
3    A.  I'm not trying to stall.  It is a very
4 detailed question, and I want to give you an accurate
5 answer.
6    Q.  Take your time, sir.
7    A.  Okay, sir, I'm now ready to answer your
8 question.
9    Q.  Okay.  I'm going to ask my question again
10 just for the record; is that okay?
11    A.  Yes.
12    Q.  So what is the difference between the
13 original I.1 in your report, this version of Exhibit
14 I.1 in the supplemental analysis pages?

25    Q.  Okay.  So just to clarify, so let's look at

6 (Pages 18 - 21)

CONFIDENTIAL

1 the last column. So that's June 12th, 2022, correct?

2    A.  Yes.  Yes.

3    Q.  And on line 31, that's the USD amount,

4 correct?

5    A.  Yes.



24    Q.  And what explains the difference between the

25 two amounts?

1    A.  It was the two presentations of the -- I'll

2 have to -- I'll have to try it to find it at a break,

3 sir.  I can't tell you -- I can't answer it off the

4 top of my head.

5    Q.  Okay.  We can go back to this later, but I

6 just want -- can you also take a look at the last line

7 in this same page, so the source is

8 FTX_3AC_38_Amended, correct?

9    A.  So -- all right.  Yes.

10    Q.  And in the original Exhibit I.1 in your

11 original report, the source is FTX_3AC_38 not amended,

12 so the original version of Document 38, correct?

13    A.  Correct.

14    Q.  Okay.  Sir, could you please go to the next

15 page of this same exhibit?  So on the top-right corner

16 it should say Exhibit I.2.

17    A.  Yes.

18    Q.  And this is the pricing data for the spot

19 assets associated with the 3AC account on the FTX

20 Exchange, correct?

21    A.  Correct.

22    Q.  And is it also correct that there is no

23 changes between this document and the original version

24 of Exhibit I.2 in your report?

25    A.  Correct.  I just included it kind of as a

1 pack.

2    Q.  Okay.  Understood.  And then if you could,

3 please, scroll to the last page, and on the top-right

4 corner it should say Exhibit I.3?

5    A.  Yes.

6    Q.  So Exhibit I.3 analyzes the values of the

7 spot assets associated with the 3AC account on the FTX

8 Exchange, correct?

9    A.  Correct.

10    Q.  And to get to Exhibit I.3, you multiply the

11 quantity of the assets in Exhibit I.1 with the

12 corresponding price in Exhibit I.2, correct?

13    A.  Correct.

14    Q.  Okay.  And once again, what is the difference

15 between the original Exhibit I.3 in your report and

16 the amended version in the supplemental analysis

17 pages?

18        MR. NIEMEYER:  Objection, form.

19    A.  And, as I said, it was -- it was a

20 presentation issue where not every number was

21 supported, but I need to talk to my team at a break.

22 I don't -- I'm drawing a blank on exactly what changed

23 between these two.  I just sent the supplemental to be

24 complete and -- because the second production I was

25 worried I had not backed up a number in my report, but

1 nothing changed on my conclusions.

2    Q.  (BY MR. LUU)  Okay.  Yes, we can go back to

3 this later, but, sir, can I -- who performed the first

4 draft of this analysis?  Is it you or someone from

5 your team?

6    A.  Someone from my team.

7    Q.  Okay.  And how did you review their work

8 product?

9    A.  We met.  We discussed.

10    Q.  Did you independently rerun the analysis

11 yourself?

12    A.  No.  Well, I mean, how do you define "rerun

13 analyses"?  I hit calc.  I changed variables.  I

14 looked at sensitivities.  I didn't put every number in

15 every cell.

16    Q.  Okay.  Thank you.  You can put this exhibit

17 aside, sir.

18        MR. LUU:  Shamus, could we please pull

19 Exhibit 1 back up?

20    Q.  (BY MR. LUU)  Mr. Scheig, do you have Exhibit

21 1 back up in front of you, your report?

22    A.  I apologize.  In trying to switch exhibits, I

23 closed the window.  I need to open it again.

24    Q.  That's fine.

25    A.  Okay.

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

1    Q.  Sir, you have Exhibit 1 in front of you,
2  correct?
3    A.  I do now.
4    Q.  Okay.  So throughout this deposition, I'll
5  refer both to your original report and the
6  supplemental analysis pages that we just discussed
7  collectively as your report; is that okay?
8    A.  Agreed.
9    Q.  Okay.  So does this report contain a complete
10  statement of all opinions that you intend to provide
11  in this matter?
12    A.  With respect to the solvency of Three Arrows
13  Capital on June 12th, yes.  Counsel indicated that
14  they may ask me some questions about the FTX
15  financials at trial.
16    Q.  Okay.  Understood.
17        Does this report contain a complete
18  statement of all of the bases and reasons underlying
19  your opinions in this matter, specifically with
20  respect to the solvency of 3AC?
21    A.  Yes.
22    Q.  Are there any documents or materials that you
23  relied on to form the opinions in this report, but are
24  not cited in the report?
25    A.  No.

Page 27

1    Q.  Are you aware of any inaccuracies contained
2  in the report?
3    A.  One.
4    Q.  What is the inaccuracy?
5    A.  In the report above my signature, which is on
6  page 31 -- and I'm going by the page number in the
7  upper-right corner of the report.
8    Q.  Yeah, that's fine.
9    A.  It lists my rate as 660 per hour.  I started
10  with an old solvency report and used that to start
11  editing this solvency report, and I didn't update the
12  rate.
13    Q.  What is the current rate of your compensation
14  in this matter?
15    A.  $750 an hour.
16    Q.  Okay.  Understood.  Thank you.
17        So beyond the erroneous compensation
18  figure, there is nothing else inaccurate in your
19  report, correct?
20    A.  That's my belief.
21    Q.  Okay.  Is there anything in the report that
22  you would like to amend, correct, or clarify beyond
23  the compensation figure which is discussed?
24    A.  No.
25    Q.  Have you conducted any additional analysis or

Page 28

1  calculation for this matter since completing your
2  report counting both the original one and supplemental
3  analysis pages?
4    A.  No.
5    Q.  Okay.  Have you changed any of your opinions
6  since completing your report?
7    A.  No.
8    Q.  And have you formed any additional opinions
9  since you prepared your report?
10    A.  No.
11    Q.  Okay.  Sir, a few moments earlier you
12  mentioned that counsel intends to ask you questions at
13  trial, correct?
14    A.  Yes.
15    Q.  And am I correct that that testimony is
16  supposedly concerning the financials of FTX?
17    A.  Correct.
18    Q.  And am I -- and does that opinion in any way
19  relate to the solvency of 3AC?
20    A.  I mean, 3AC was insolvent per my analyses on
21  June 12th considering Three Arrows Capital owned the
22  assets.  If, like a read in the proof of claim,
23  Mr. Nuburger (phonetic) put forth the position that
24  FTX owned the assets, well, if FTX actually somehow --
25  the assets were theirs, that would just be less asset

Page 29

1  value available at Three Arrows Capital to help their
2  solvency.  So regardless of the treatment, they're
3  insolvent, and if FTX somehow could prove that they
4  own assets for which they are a custodian, then Three
5  Arrows Capital would be just that much more insolvent.
6    Q.  Okay.  So just to clarify, sitting here
7  today, you are not opining on the question of
8  ownership of assets on the FTX Exchange, correct?
9    A.  That's -- no, I'm here opining on the
10  solvency of Three Arrows Capital.
11    Q.  And what testimony do you intend to
12  offer at trial regarding the financial statements of
13  FTX?
14    A.  Just that in my annual -- excuse me.  In my
15  expert report, I noted about the GAAP treatment of
16  assets for a company like FTX, that I had not seen the
17  financials, and upon seeing the financials from FTX,
18  it confirmed the way the assets were presented.
19    Q.  Okay.  And what is that confirmation of how
20  the assets are presented?
21    A.  Their -- FTX's is a custodian.  They're
22  not -- they don't somehow own the assets just because
23  you trade there.
24    Q.  Okay.  Actually, could you please turn to
25  pages 14 and 15 of your report?  And once again, I'm

8 (Pages 26 - 29)

CONFIDENTIAL

1 also using the page number on the upper-left corners.
2    A.  Okay.  I'm there.
3    Q.  Okay.  Starting at the bottom of page 14 and
4 I quote, "I note that under U.S. Generally Accepted
5 Accounting Principles" -- so the GAAP principle -- "a
6 digital asset custodian's (such as FTX's) omission of
7 consumer digital assets from its own balance sheet
8 would indicate the accountants' and the auditors'
9 conclusion that the custodial firm did not control
10 such assets."  Did I read that correctly?
11    A.  Yes.
12    Q.  And once again, you are not offering a legal
13 opinion as to who owned the assets associated on the
14 FTX Exchange, correct?
15    A.  That was not my attempt.
16    Q.  Okay.
17    A.  I'm not offering a legal opinion.
18    Q.  Okay.  And at the end of that sentence that I
19 just read, you mentioned that the custodian firm did
20 not control such asset, correct?
21    A.  Correct.
22    Q.  Isn't the question of control a legal
23 opinion?
24    A.  It's an accounting opinion, too.  Control is
25 an element of accounting.

1    Q.  Okay.  And once again --
2    A.  But it probably derives from a legal opinion.
3 I'll give you that.
4    Q.  Okay.  And, once again, you are only opining
5 as to the accountant treatment, correct?
6    A.  Correct.  I'm a CPA.  I'm not an attorney.
7    Q.  Okay.  And next I'm going to -- the paragraph
8 continues -- "If the custodian (here, FTX) held the
9 assets purely in a custodial capacity and had no such
10 economic rights, parentheses (if the customer bore all
11 market risk and reward and the custodian had no right
12 to sell, pledge, or use the crypto for its own
13 benefit), end of parentheses, recognition of the
14 assets was not required on the custodian's balance
15 sheet."  Did I read that correctly?
16    A.  Yes.
17    Q.  Am I correct that you define economic rights
18 as if the customer bore all market risk and reward and
19 the custodian had no right to sell, pledge, or use the
20 crypto for its own benefit?
21        MR. NIEMEYER:  Object to form.
22    A.  That's what the report says, yes, sir.
23    Q.  (BY MR. LUU)  Okay.  And is the question of
24 economic rights also a legal question?
25    A.  I mean, it impacts accounting also, but the

1 impact to accounting probably derives from a legal
2 origin.
3    Q.  Okay.  Because, for instance, you mentioned
4 that if a customer bore all market risk, right?  Is
5 the question of who bears the risk a legal question?
6    A.  Once again, it's an element of valuation and
7 accounting also, but it probably derives from the
8 legal background.
9    Q.  Okay.  And back to this paragraph, the last
10 sentence of the paragraph reads, "An auditor's
11 unqualified opinion on those financial statements with
12 no such customer assets included on FTX's balance
13 sheet would support that they reach a conclusion that
14 FTX did not control customer assets, which would first
15 be considered assets of the customer."  Did I read
16 that correctly?
17    A.  Yes.
18    Q.  Once again, this is not a legal opinion,
19 correct?
20    A.  No, that's just my paraphrasing of GAAP,
21 Generally Accepted Accounting Principles.
22    Q.  So you're not opining on who owns the asset
23 on the FTX Exchange, correct?
24    A.  No.
25    Q.  Okay.  For the purpose of your insolvency

1 report, do you make on assumption as to who owns the
2 asset on the FTX Exchange, associated with the 3AC
3 accounts on the FTX Exchange?
4    A.  My report is framed as the assets belong to
5 Three Arrows Capital and are available to cover
6 repayment of debt and those kind of things.  So I
7 didn't penalize my analysis for FTX potentially owning
8 the assets.  My analysis is presented on the basis the
9 assets were Three Arrows Capital.
10    Q.  Okay.  And did you conduct any analysis in
11 which you did not make that assumption?
12    A.  I don't believe so.
13    Q.  Okay.  And would you -- would your analysis
14 change if 3AC did not own the assets on the FTX
15 Exchange?
16    A.  I'm not even sure how it modeled that because
17 it's such an unusual set of facts I'm not sure how I
18 would try to model it, but if somehow Three Arrows
19 Capital did not have the assets on the FTX Exchange
20 available to sell and cover liabilities as they came
21 due, then it's logical to think Three Arrows Capital
22 would just be in worse shape than it would be if they
23 had control of the assets.
24    Q.  Okay.  Understood.
25        Sir, could you go back to Exhibit 1 and

CONFIDENTIAL

1 scroll to Appendix 2? I believe that's on page 54 of
2 the PDF.
3     A. Thank you. 54 of the PDF. Okay.
4     Q. So the name of the appendix is "list of
5 documents considered," correct?
6     A. Yes.
7     Q. Is it a complete and accurate list of all
8 documents that you reviewed in drafting your report?
9     A. Yes.
10     Q. Are you aware --
11     A. I think so.
12     Q. Are you aware of anything that needs to be
13 added?
14     A. Not as I sit here.
15     Q. Did you review all of these materials cited
16 in this appendix personally?
17     A. No.
18     Q. So who reviewed them personally?
19     A. My team.
20     Q. And what are their names?
21     A. David Pryde. He's a chartered financial
22 analyst. I've worked with him about 15 years.
23 Brandon James, he's a chartered financial analyst. I
24 worked with him about ten-plus years, and they had
25 support from analysts also on the team.

1     Q. As part of that work stream, did you review
2 any of these materials personally?
3     A. Yes.
4     Q. Do you remember which documents you reviewed
5 personally?
6     A. I personally reviewed the, I'll call them,
7 "high-value items," the things that really mattered
8 for my analysis.
9     Q. And what are those high-value items?
10     A. Well, like the loans. The loans were very
11 important. And so I personally reviewed -- for the
12 primary loans, you know, I was able to review the
13 change in quantities over time.
14     Q. And the source of how those loans change over
15 time, what is the source for that information?
16     A. We had multiple sources.
17     Q. And what -- yeah, go ahead. Sorry.
18     A. The starting point for our analysis was
19 the -- what we call NAV Packs, net asset value packs,
20 produced by Ascent, Three Arrows Capital fund
21 administrator. So that was the primary source of
22 information about what was there on May 31st. In
23 order to determine whether Three Arrows Capital was
24 solvent on June 12th, we had to model the daily
25 changes and the underlying assets. We got that

1 information from multiple sources. We had term
2 sheets. We had additional information from Ascent.
3 We had e-mails and from that we went in and were able
4 to model the changes over the period from May 31st to
5 June 12th.
6     Q. Okay. So you mentioned that in addition to
7 the NAV Pack from Ascent, you also have term sheets,
8 additional information from Ascent, and those e-mails.
9 Did I read that correctly?
10     A. Yes, and there was master loan agreements and
11 a lot of information out of Ascent's accounting system
12 that they collect that we were able to then map back
13 to Three Arrows Capital.
14     Q. Okay. And is that information that Ascent
15 produced to you from their accounting system, is that
16 listed in this report?
17     A. I believe so.
18     Q. Okay. And you also mentioned e-mails. What
19 are those e-mails, from whom or between whom?
20     A. Well, it was more general response. You
21 know, you asked the information we looked at, and the
22 only -- I mean, the only e-mail -- the e-mail that was
23 top of mind was an e-mail from May 11th, but that
24 didn't impact my analysis so...

11     Q. Okay. And do you remember the Bates number
12 or the production number of that e-mail?
13     A. No.
14     Q. So once again, I take it that you did not
15 review all of these materials personally, only a
16 selective high items -- high-value items that you
17 mentioned, correct?
18     A. Correct. I have reviewed most of them, but I
19 focused on the high value items.
20     Q. Okay. And for all of those items, including
21 the high-value items, did you review each of them in
22 its entirety?
23     A. Yes.
24     Q. Okay. And looking at the appendix, are there
25 any materials that you think might have been included

CONFIDENTIAL

Page 38

1  in error?
2     A.  We had some discussions with counsel about
3  what to put on this listing, and I've had some reports
4  where I've done, where I just focus on the key
5  documents relied upon to get my answer, and I have had
6  some reports I have done for different matters where
7  they say we want you to give a catalog listing of
8  everything that you were provided that you could have
9  possibly looked at, whether it was relevant or not.
10  And this is more of the totality of all the
11  information we went through to develop a report.  It's
12  not necessarily the key docs, key documents.
13     Q.  Okay.  So related to that, so who selected
14  the materials that you reviewed in this analysis?
15     A.  I'm not sure I understand your question.
16     Q.  So you mentioned earlier that the starting
17  points of your analysis is the NAV Pack, right, and
18  you got additional documents.  So when you first
19  started on the insolvency analysis, how -- who --
20  like, which documents did you request from counsel?
21     A.  Well, it's my understanding that Sinayo
22  (phonetic) -- excuse me, Mr. Farmer and the other
23  gentleman, Mr. Crumpler, after being appointed joint
24  liquidators of Three Arrows Capital, it's my
25  understanding they, upon arriving, undertook the

Page 39

1  effort to start to gather documents from the various
2  exchanges, from FTX, from Ascent just trying to figure
3  out what they had.  They were showing up new also.
4          And so we received that initial tranche
5  of documents that they had gathered trying to figure
6  out what Three Arrows Capital's financial position was
7  at the time.  And then we went through that initial
8  group of documents, and then we said, well, you know,
9  we need some more information on this and this, and we
10  went back.  And so, in other words, Ascent sent
11  following information with additional information, and
12  over that time the data set grew.  I can't tell you
13  that every item in FTX 002 -- excuse me, not FTX -- in
14  my Appendix 2 made a material impact on my reports
15  conclusion.  We just didn't want to not include a
16  document.
17     Q.  Understood.
18     A.  We wanted to be complete.
19     Q.  Thank you.
20          So as part of your analysis, once you
21  have started, did you request any additional documents
22  from counsel that you did not receive?
23     A.  I mean, we requested a lot of different
24  documents from counsel and most of them, I think, we
25  received.  I haven't done a reconcilliation of every

Page 40

1  single item to get back -- to respond accurately.
2     Q.  Did anything jump to your memory that you
3  really wanted to have but did not receive?
4     A.  No.
5     Q.  Okay.  In preparation for your deposition
6  today, have you consulted any other materials that you
7  did not include in this report?
8     A.  With the exception of the FTX 2021 annual
9  report, no.
10     Q.  Okay.  And since the submission of your
11  report, other than the financial statements of FTX in
12  2021, did you review any additional documents or
13  materials that are not listed here?
14     A.  None that were not listed there.
15     Q.  Okay.  Sir, if you could please scroll to
16  page 31 of your report, and I believe that is page 35
17  of the PDF.
18     A.  Okay.
19     Q.  Okay.  And under the expert disclosures
20  section --
21     A.  Yes.
22     Q.  -- do you see that -- the second paragraph
23  you say, "In developing my opinions, I relied upon
24  various information provided from counsel and the
25  joint liquidators," correct?

Page 41

1     A.  Correct.
2     Q.  What is this various information that was
3  provided to you?
4     A.  Well, effectively, all of the information
5  flowed through counsel and the joint liquidators to
6  us, but it was in response to the information we were
7  requesting.  We set up a ShareFile box and they loaded
8  stuff in and then we asked for more things and they
9  would upload more documents.  And that's how we
10  developed the list of documents.
11     Q.  I understand.  So based on your testimony
12  earlier, every document that was uploaded to that file
13  sharing box or folder that you just mentioned, all of
14  them should be included in Appendix 2 of the list of
15  materials you relied on, correct?
16     A.  Correct.
17     Q.  Okay.  And to prepare for your report, other
18  than the discussion with counsel and your team and the
19  joint liquidators that we just discussed, did you
20  speak to anyone who worked at 3AC in June 2022?
21     A.  Your question was, to prepare for my report?
22     Q.  Yes.
23     A.  You mean, when I was doing my report or to
24  prepare for my deposition?  I want to make sure I am
25  on the same page with you.

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

1    Q. For your report, sir, not for the deposition.
2    A. No.
3    Q. Okay. And now, for the deposition, did you
4 talk to anyone who worked at 3AC in June 2022?
5    A. No.
6    Q. Okay. And you know who the Ascent Group is,
7 right?
8    A. Yes.
9    Q. And what is their role with respect to 3AC?
10    A. They're the fund administrator for them.
11    Q. Okay. And did you speak to anyone at Ascent?
12    A. No.
13    Q. Did you speak to anyone at Ascent who
14 prepared the NAV Packs?
15    A. No.
16        MR. LUU: Mr. Niemeyer, would now be a
17 good time for a break?
18        MR. NIEMEYER: Sure.
19        THE VIDEOGRAPHER: Off the record. 8:54
20 a.m.
21        (Recess 8:54 to 9:07.)
22        THE VIDEOGRAPHER: We're on the record.
23 The time is 9:07 a.m.
24    Q. (BY MR. LUU) Mr. Scheig, welcome back.
25    A. Thank you.

Page 43

1    Q. Earlier, before the break, we discussed the
2 preparation of your report, correct?
3    A. Correct.
4    Q. And you mentioned that Mr. Pryde and
5 Mr. James from Stout assisted you with the preparation
6 of this report?
7    A. As well as others.
8    Q. As well as the analysts, correct?
9    A. Yes.
10    Q. Who wrote the first draft of this report?
11    A. I did.
12    Q. Okay. And how did the review process or the
13 editing process happen?
14    A. As I stated, I started with a solvency report
15 I did a while ago and changed the company names and
16 started populating the different sections from the
17 topics to be discussed. Then, you know, my team and I
18 worked on populating the Three Arrows Capital specific
19 narrative for the ultimate report.
20    Q. Okay. And what was the precedent opinion you
21 used as the basis to start drafting this report?
22    A. It was a Word document that I used in a
23 previous solvency opinion for Intu.
24    Q. Intu. Okay. And what was the involvement of
25 Latham & Watkins in the drafting process of this

Page 44

1 report?
2    A. They reviewed a draft. We discussed
3 potential changes. If I agreed, I made them; if I
4 didn't, I didn't.
5    Q. Okay. Sir, could you please put back up
6 Exhibit 1, your report?
7    A. Okay.
8    Q. And could you please turn to Appendix 1, your
9 CV, and I believe it starts at page 36 of the PDF.
10    A. Okay.
11    Q. Sir, is this a complete and up-to-date copy
12 of your CV?
13    A. I believe so.
14    Q. I understand that you completed your
15 undergraduate degree at UT Austin, correct?
16    A. Correct.
17    Q. And you obtained a degree in petroleum
18 engineering?
19    A. Yes.
20    Q. And then you took an MBA also at UT Austin,
21 correct?
22    A. That is correct.
23    Q. And you mentioned that the MBA was in
24 finance. Was that a specialization or...
25    A. Yes.

Page 45

1    Q. Okay. And I believe that you were currently
2 working at Stout, correct?
3    A. Correct.
4    Q. What is your title at Stout?
5    A. Managing director.
6    Q. And what kinds of engagements do you
7 typically handle at Stout?
8    A. Litigation support matters and business
9 valuation matters for gift and estate tax planning.
10 And that's primarily where I focus my practice.
11    Q. Okay. And prior to Stout you worked at
12 several other firms, correct, including ValueScope,
13 Kroll, CBIZ Valuation Group, Deloitte, and Financo?
14    A. Correct.
15    Q. And I think your CV states that your time at
16 Deloitte and Financo proceeded your time in
17 valuation-focused roles, correct?
18    A. You're asking me did I work at Deloitte
19 before I worked at Kroll.
20    Q. No, sir, if you can take a look at the page
21 of your CV with your picture.
22    A. Yes.
23    Q. In the third paragraph --
24    A. Yes.
25    Q. -- the last sentence you say that "Preceding

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

1 his valuation-focused roles, he was a senior manager
2 at both" -- "with both Deloitte Consulting and
3 Financo, Inc. in Austin"?
4     A. Correct. Those were my first two -- two jobs
5 after completing my master's in business
6 administration.
7     Q. I see. And it says it preceded your
8 valuation-focused roles. So what were you doing at
9 Deloitte and Financo?
10     A. Primarily economic financial modeling for
11 electric utility rate cases.
12     Q. Okay. I want to talk a little bit about your
13 experience. So you mentioned that you have performed
14 a lot of valuations before, correct?
15     A. Correct.
16     Q. And I think you said that it could be up to a
17 hundred, to a thousand?
18     A. Yes.
19     Q. How many times have you prepared a solvency
20 opinion?
21     A. About a half a dozen.
22     Q. Half a dozen. And how many of that is in a
23 bankruptcy proceeding like this one?
24     A. Most of them.
25     Q. And --

Page 47

1     A. I had one for a utility matter.
2     Q. Okay. And do you usually only prepare
3 solvency reports in the context of litigation?
4     A. Yes.
5     Q. Are there any other purposes that you
6 prepared a solvency report for other than litigation?
7     A. Me personally, my experience preparing
8 solvency reports has been for litigation. Other
9 people prepare them for other reasons, but that's --
10 you asked about my experience.
11     Q. Yes. When you prepare solvency opinions, are
12 they usually contemporaneous or a particular point
13 back in time?
14     A. Particular point back in time.
15     Q. What is, like, the further -- furthest back
16 as of the date you prepared a solvency opinion?
17     A. You could do it as of any date, if you had
18 information.
19     Q. Yeah, but I'm asking in your experience what
20 the furthest date that you actually prepare a solvency
21 opinion, if you recall.
22     A. Are you asking me when I did my first one?
23     Q. No. So, for instance, this report you were
24 validating the solvency of 3AC as of June 12th, 2022?
25     A. Yes.

Page 48

1     Q. Correct? So I'm asking what is the furthest
2 as of date that you have performed a solvency opinion
3 before?
4     A. I have no idea.
5     Q. Okay. Are there any challenges of doing a
6 retroactive solvency opinion, like you are doing here,
7 versus doing a contemporaneous one?
8     A. No.
9     Q. Okay. Sir, I understand that -- you
10 understand what a cryptocurrency hedge fund is,
11 correct?
12     A. Correct.
13     Q. Have you ever worked at a hedge fund before?
14     A. No.
15     Q. What about cryptocurrency hedge fund?
16     A. No.
17     Q. Have you performed any solvency or valuation
18 opinion of a cryptocurrency hedge fund?
19     A. No.
20     Q. Or any company in the cryptocurrency industry
21 in general?
22     A. Some of the estate planning projects I've
23 done had crypto assets that were part of the estate
24 that we considered in our valuation of the estate, but
25 I haven't done a specific cryptocurrency hedge fund

Page 49

1 before.
2     Q. Okay. And approximately how many times have
3 you valuated cryptocurrency as part of the estate
4 planning process?
5     A. I don't know a specific number. A dozen,
6 plus or minus.
7     Q. Okay. So have you ever been qualified as an
8 expert by a court in any litigation involving
9 cryptocurrency before?
10     A. Not that I recall.
11     Q. Okay. Thank you.
12         Sir, earlier before the break you
13 mentioned that one of your expert opinions had been
14 previously excluded by a court, correct?
15     A. Yes.
16     Q. And what is that case?
17     A. The case was involving T. Boone Pickens
18 versus his son Michael Pickens.
19     Q. Okay. And what was the reason that the court
20 excluded your opinion?
21     A. When I did the analysis, it dealt with a
22 date. I was doing a valuation of an interest that
23 T. Boone Pickens had promised to give to his son,
24 Michael Pickens, as of -- in a project. And the
25 contract ended June 30th, the written contract, and I

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

1  was instructed by counsel that there was actually an
2  oral contract in place after June 30th extending
3  through the end of the year.
4       I adopted that assumption, did my entire
5  analysis as of year end, and the court proved that
6  that could not have been the case, therefore, the
7  valuation of this business enterprise that doubled
8  over the year, at the end of the year, would not have
9  been the same as the value mid year.
10      Q. And that was because the assumption was
11  incorrect, right?
12      A. Correct.
13      Q. And that was the assumption that counsel
14  provided to you?
15      A. Correct.
16      Q. And did you do anything in that case to
17  validate or evaluate whether the assumption that
18  counsel gave you was correct?
19      A. Well, I think at the end of the day it was
20  not correct.
21      Q. Right. But I'm asking when you received the
22  assumption, did you take it as a given or did you do
23  any independent analysis to determine whether or not
24  the assumption is a reasonable or correct one?
25      A. I took the assumption and did my analysis as

Page 51

1  of the date requested by my client, November 1 -- or
2  12-31.
3      Q. Okay.
4      A. But I did -- I did not launch an independent
5  investigation in that assumption.
6      Q. Okay. Thank you, sir.
7       And I understand that that opinion was
8  stricken by the court, right?
9      A. Yes.
10      Q. And that was under a Robinson motion,
11  correct?
12      A. Yes.
13      Q. And is that the only time that a court has
14  ever stricken your opinion either under the Daubert
15  standard, or in this case, the Robinson in the Texas
16  court?
17      A. There's one other.
18      Q. What is the other one?
19      A. The same attorney coincidentally involved in
20  Pickens' case based on my work for him on that one
21  case, he asked me to come help him on a project in
22  Florida, and he told me he was up against a time
23  crunch for a filing deadline. And he asked me to
24  produce a -- I thought of it as a placeholder report.
25  In other words, a report that says I've been selected

Page 52

1  as an expert, I plan on doing this analysis, I've
2  requested real estate appraisals, which I needed for
3  that particular analysis. When I get the information,
4  I will update my report to reflect appraised values
5  and that I had a statement in that report -- hindsight
6  is always 2020 -- that if the values come in similar
7  to the letters of intent, the damages would be this
8  much. And based on that one-page letter with not a
9  single exhibit or anything, I learned seven years
10  later that I was stricken.
11      Q. And what --
12      A. I never even formed -- in my opinion, I never
13  even formed my opinion. Just put a placeholder in
14  there for my client.
15      Q. And what case was that, sir?
16      A. Pugliese, P-U-G-L-I-E-S-E.
17      Q. And is that case listed in your CV in your
18  "prior experience" section?
19      A. I think it should be. It should be under
20  "real estate."
21      Q. Okay. Thank you, sir.
22       I would like to go through some of your
23  prior testimony in other cases. You provided an
24  expert report, a deposition testimony and trial
25  testimony, in a case called Patriot Exploration, LLC,

Page 53

1  v. Thompson & Knight, LLC, correct?
2      A. Correct. Yes.
3      Q. And that case was in the District Court, 68th
4  Judicial District, Dallas County, correct?
5      A. Correct.
6      Q. And am I understanding correctly that that
7  case also went on to appeal?
8      A. Yes, I was not involved in the appeal, but it
9  went on to appeal.
10      Q. Okay. And what was that case about, sir?
11      A. Patriot Exploration, it involved a
12  malpractice claim against the law firm where the
13  allegation was that the law firm did not do an
14  adequate job at securing title, which caused the
15  project to be delayed approximately one year. During
16  that one-year delay period, prices for oil and natural
17  gas both fell significantly. And so Patriot was suing
18  Thompson & Knight for the damages of them not being
19  able to capture oil and gas from their project at a
20  higher price when later they could capture it at a
21  lower price.
22      Q. And what was the outcome of the district
23  court proceeding that you were involved in?
24      A. The outcome of the district court proceedings
25  is, I believe, the jury ruled in our favor and granted

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

1 my number.
2    Q.  And I understood that you were engaged by
3 Patriot Exploration, correct, not the law firm?
4    A.  Correct.
5    Q.  Okay.  And did you say that you were not
6 involved in the appellate process, but you are aware
7 of the appellate process, correct?
8    A.  I know it got overturned.
9    Q.  Okay.  And did you read that opinion, sir?
10    A.  Years ago I saw it.
11    Q.  And what is your recollection of what the
12 appellate court decided?
13    A.  I would have to guess.  I would have to make
14 something up.  I can't tell you off the top of my head
15 what the appellate court decided.  What I recall is
16 that it was that Thompson Knight made some
17 arguments regarding specific actions of Patriot and
18 Thompson & Knight in that matter.  And my analysis
19 requested by counsel for the damages as compared to
20 the fair market value of the project as of the date it
21 was anticipated to be completed versus the fair market
22 value of the project with lower hydrocarbon prices one
23 year later.  And I did it on a fair market value
24 basis, and what I recall from that decision, but I'm
25 not an attorney, was that somehow Thompson & Knight

Page 55

1 somehow introduced some company specific factors that
2 don't really impact fair market value per se that they
3 succeeded in not getting sued for malpractice.
4        MR. LUU:  Okay.  Shamus, could you please
5 pull up tab 2?
6    A.  Okay.
7        (Exhibit No. 3 marked.)
8    Q.  (BY MR. LUU)  Sir, you have been introduced
9 to Exhibit 3.  So this is the appellate opinion in the
10 case Thompson & Knight, LLP, v. Patriot Exploration,
11 LLC.  So this is the appellate opinion of the case
12 that we just discussed.
13    A.  Okay.
14    Q.  So if you could please scroll to page 166
15 using the upper-right page number.  Please let me know
16 when you get there.
17    A.  Okay.
18    Q.  Sir, do you see the page starts with -- the
19 first paragraph starts with "used that model to
20 project what MexTex" blah, blah, blah?
21    A.  Yes.
22    Q.  Is that the page you're on?
23    A.  Yes.
24    Q.  If you could look to the right, the first
25 full paragraph on the right column beginning with

Page 56

1 "This, of course, is nothing more than a calculation."
2    A.  Yes.
3    Q.  Okay.  I think starting in the middle of that
4 paragraph your opinion states, "In essence, Scheig
5 assumed the Patriot interests were equivalent to a
6 pool of natural gas ready to be marketed instantly.
7 Thus, he equated the property to a volume of natural
8 gas that could be priced solely on spot market prices
9 on a given date," right?
10    A.  Correct.
11    Q.  The opinion goes on to say, "This assumption
12 ignores the actual transaction involving this case: A
13 transfer of ownership of working interest in largely
14 undeveloped mineral leases covering thousands of acres
15 of land," correct?
16    A.  Correct.
17    Q.  Sir, if you could scroll to the next page,
18 page 167.  On the left column at the paragraph with
19 page number 10 in brackets.
20    A.  Okay.
21    Q.  Please let me know when -- the court goes on
22 to say, "When an expert's opinion is based on assumed
23 facts that vary materially from the actual, undisputed
24 facts, the opinion is without probative value and
25 cannot support a verdict or judgment."  And at the end

Page 57

1 of that paragraph, the court says, "We conclude the
2 assumptions on which Scheig's opinion is based vary
3 materially from the actual undisputed facts of the
4 case, and thus, his testimony and reports are largely
5 insufficient to support the damage award."  Did I read
6 that correctly?
7    A.  You did.
8    Q.  So the court found that your opinions were
9 unreliable because it was based on erroneous
10 assumption that differ from the undisputed facts of
11 the case, correct?
12        MR. NIEMEYER:  Object to form.
13    A.  Well, that's what I was trying to describe to
14 at the first with my statement.  At the top of page
15 166, the first sentence, you know, "what MexTex or
16 another hypothetical buyer."  So, once again, I
17 prepared my report on a fair market basis, willing
18 buyer, reasonable seller, reasonable knowledge of the
19 facts, compulsion to sell hypothetical.  And as I
20 said, apparently they found something in the documents
21 I wasn't aware of that was contrary to the information
22 I was working with.
23    Q.  (BY MR. LUU)  I see.  And you were only aware
24 of that contrary fact after you submitted your report?
25    A.  Yes.  We went -- we went to trial and won.

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

1  Q. Okay. You can put this exhibit aside.
2      Sir, I understand that you also provided
3  an expert opinion in a case called Transupport,
4  Incorporated, the Commissioner of Internal Revenue in
5  the United States Tax Court, correct?
6  A. Correct.
7  Q. And what was that case about, sir?
8  A. It was a reasonable compensation matter.
9  Q. And who engaged you in that matter?
10 A. The Internal Revenue Service.
11 Q. And what were you engaged to opine on?
12 A. The reasonable compensation.
13 Q. Okay. And what did the tax court decide as
14 to your compensation calculation?
15 A. I don't recall.
16     MR. LUU: Shamus please introduce tab 6.
17     (Exhibit No. 4 marked.)
18 A. All right. I have it open.
19 Q. (BY MR. LUU) Okay. So you have been
20 introduced Exhibit 4. Sir, this is the tax court
21 opinion in the matter we just talked about,
22 Transupport, Incorporated v. Commissioner of Internal
23 Revenue. If you could please scroll to page -- to
24 page -- let me see -- to page 13 of the PDF, please.
25 A. I don't believe I've ever seen this document

Page 59

1  before.
2  Q. That's okay. You can take some time to
3  familiarize yourself with it?
4  A. Okay. I'm on page 13 of the PDF.
5  Q. Okay. And that begins with "burden of
6  proving the reasonableness of amounts in excess of
7  those allowed in the statutory notice," correct?
8  A. All right. I'm on -- I'm on page 13 of 15,
9  PDF page.
10 Q. Okay. Do you see on the left column a
11 paragraph starting, asterisk 12, brackets asterisk 34.
12 Do you see that?
13 A. Asterisk 12. Yes.
14 Q. Okay. If you can scroll to the paragraph
15 right above it.
16 A. I'm looking above 12, 34.
17 Q. Okay. The paragraph states -- "The question
18 remains, however, of whether respondents expert,
19 Scheig, has justified lowering compensation determined
20 in the statutory notice as to Foote and his sons,"
21 correct?
22 A. Yes.
23 Q. And at the end of that paragraph, the opinion
24 states, "On balance, however, the failure to secure
25 information from petitioner's officer and notably the

Page 60

1  failure to consider Foote's compensation separately
2  undermines the reliability of Scheig's conclusion as
3  to the comparison between the Foote sons and others in
4  comparable positions," correct?
5  A. That's what -- that's what this document
6  says.
7  Q. Right. And the document goes on to say,
8  "Scheig's result is unpersuasive primarily because
9  respondent has not seriously challenged the
10 compensation paid to Foote." Am I right?
11 A. That's what it says.
12 Q. And at the end of that paragraph, the opinion
13 states, "Because none of the evidence suggests that
14 reasonable compensation to the sons should decline
15 during those years, the result of Scheig's analysis is
16 unacceptable," correct?
17 A. Which -- I apologize. I was reading another
18 paragraph. Which paragraph are we on now, sir?
19 Q. We are still on 1234. You look at the very
20 last sentence starting with "because none."
21 A. Okay. "Because none." All right.
22 Q. "Because none of the evidence suggests that
23 reasonable compensation to the sons should decline
24 during those years, the results of Scheig's analysis
25 is unacceptable," correct?

Page 61

1  A. That's what it says.
2  Q. Okay. And so am I right that the court found
3  that the results of your analysis and methodology was
4  unacceptable?
5  A. Well, there were multiple --
6      MR. NIEMEYER: Object to form.
7  A. There were multiple employees and their
8  focus -- this document seems to be focused on one of
9  the employees, but it was effectively a family
10 business where they basically bonused out all of the
11 income from a C Corp to their people and, you know, I
12 remember the CFO of the company was making, I think, a
13 half million dollars a year, and he didn't know what
14 GAAP stood for.
15     So it was -- if the court had a
16 problem -- and one of their defenses in that matter
17 was they all said, oh, we all do it all. So I'm
18 really like a president and a vice president and a
19 controller and I should add up all my compensation for
20 that. And in my opinion, that wasn't unreasonable.
21 Q. The court found otherwise, correct?
22 A. Apparently so, with respect to that one
23 employee.
24 Q. Yes, sir. Thank you, sir. You can put that
25 document aside. And if you could, please, put back up

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

1 Exhibit 1 to your report.
2   A.  Okay.
3   Q.  Could you please turn to page 3, once again,
4 using the upper-left corner page number?
5   A.  Page 3, yes, sir.
6   Q.  We discussed earlier that sort of the
7 foundation of your analysis starts with the NAV Pack
8 prepared by Ascent, correct?
9   A.  Correct.
10   Q.  And the NAV Pack -- so NAV stands for net
11 asset value, correct?
12   A.  Correct.
13   Q.  Okay.  And looking at the first full
14 paragraph on page 3, this is where you start
15 describing the NAV Pack?
16   A.  Yes.
17   Q.  The document states, "As part of its services
18 to 3AC, Ascent published a monthly net asset value
19 report (generally referred to as a 'NAV Pack') through
20 May 31st, 2022, for all of 3AC's positions,
21 liabilities, and resulting net asset value ('NAV') on
22 a fair market basis.  I have reviewed the applicable
23 Ascent NAV Packs and the underlying data."  Did I read
24 that correctly?
25   A.  You did.

Page 63

1   Q.  So what did you do to review the applicable
2 NAV Packs and the underlying data?
3   A.  Well, they came in the form of a spreadsheet.
4 The spreadsheet had multiple tabs.  The first tab is
5 basically a balance sheet and there was a profit and
6 loss.  Then there was detail for all of the different
7 positions.  So when I said I reviewed it, I opened it.
8 I looked at the end number as well as the support.
9   Q.  And what is the underlying data of the NAV
10 Packs that you mentioned in that paragraph we just
11 discussed?
12   A.  The underlying data or the additional tabs
13 behind the front tab of the NAV Pack showed a balance
14 sheet.
15   Q.  I see.  So essentially the document starts
16 with a balance sheet and then the tabs following that
17 essentially describe different lines in the balance
18 sheet tab, correct?
19   A.  That is correct.
20   Q.  You reviewed both the balance sheet tab and
21 also the other tab supporting the balance sheet?
22   A.  Yes, we reviewed multiple NAV Packs over
23 time.
24   Q.  Right.  And I believe the last one is dated
25 as of May 31st, 2022, correct?

Page 64

1   A.  It's my understanding that's the last one
2 that Ascent produced.
3   Q.  I see.  What is your understanding of how
4 Ascent received the data to prepare these NAV Packs?
5   A.  Well, the different exchanges as well as
6 Three Arrows Capital.
7   Q.  So Ascent received data both from 3AC and
8 other exchanges, correct?
9   A.  That's my understanding.
10   Q.  And do you know if Ascent independently
11 verified the accuracy of that data received both from
12 3AC and other exchanges?
13   A.  I do not know Ascent's data validation
14 process.
15   Q.  And I understand as you talk about earlier
16 that you did not talk to anyone at Ascent during the
17 preparation of your expert report, correct?
18   A.  Correct.
19   Q.  Were there any limitations to using the NAV
20 Packs as the sources of primary data for your
21 analysis?
22   A.  No.
23   Q.  Okay.  Did you do anything to independently
24 verify that the data in the NAV Packs were accurate?
25   A.  Yes.

Page 65

1   Q.  What did you do, sir?
2   A.  So the NAV Pack data is prepared on a fair
3 value basis.  We went back and we had a 2020 annual
4 report for Three Arrows Capital, and we had a 2020 NAV
5 Pack detail, December 31st, 2020, NAV Pack detail.  We
6 compared the conclusion, and the balance sheet lined
7 up to the dollar.  The only difference I'll note is
8 the annual report for Three Arrows Capital was
9 prepared on more of a GAAP basis which showed initial
10 position plus unrealized gain or loss where the NAV
11 Pack just kind of showed the net of those numbers, but
12 mathematically you get to the same point.  So I
13 validated that NAV Pack and the annual report
14 independently audited of Three Arrows Capital in 2020
15 were spot on.
16   Q.  Okay.  So essentially you compare the NAV
17 Pack of December 31st, 2020, to the audited financial
18 statements and a report of 3AC, they matched up, so
19 you believed that the following NAV Packs after that
20 were also correct; is that right?
21   A.  Correct.
22   Q.  Okay.  And did you do anything else to
23 validate the figures in the NAV Pack with other
24 sources of data?
25   A.  Well, for a lot of the items we received

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

1  additional data from Ascent that supported their
2  detail in their NAV Pack that we then used that detail
3  in our solvency opinion.
4    Q. Okay. And you mentioned earlier that Ascent
5  received data both from 3AC and also other exchanges,
6  correct?
7    A. And they received data from other places.
8  Those are the only two that come to mind.
9    Q. Okay. And do you know which exchanges 3AC --
10  that Ascent -- my apologies -- Ascent received data
11  from?
12    A. I cannot answer that. I know there were
13  multiple exchanges that Three Arrows Capital traded
14  upon such as finance and others, but -- and FTX, but
15  I -- I can't opine on Ascent's processes.
16    Q. Okay. And as part of the preparation of your
17  report, did you review any data directly from the
18  exchanges, such as finance?
19    A. So some of that data would be in the detail
20  behind the Ascent NAV Pack worksheets, and we also
21  received additional data from FTX, as you know.
22    Q. Right. So other than FTX and the tabs in the
23  NAV Pack that we discussed, did you review any
24  original data directly from exchanges?
25    A. No.

Page 67

1    Q. Okay. Did you ask for such data to see
2  whether or not they were available?
3    A. No. The NAV Packs were pretty well
4  documented and looked pretty complete.
5    Q. Okay. And am I -- am I right that Ascent
6  prepared the NAV Packs from at least December 31st,
7  2020, to May 31st, 2022?
8    A. It's my understanding that they prepared them
9  monthly during that time period.
10    Q. Right. So you would agree that Ascent
11  prepared these NAV Packs during 3AC's ordinary course
12  of business where 3AC was still operational, correct?
13    A. I mean, you used the term "ordinary course of
14  business" when they were still operational. So given
15  the date -- given the fact that the NAV Pack was dated
16  May 31 and I understand 3AC declared bankruptcy around
17  the 15th, then, yes, I think the NAV Pack was prepared
18  while the company was still functioning.
19    Q. Okay. And given that ordinary course of
20  nature, the NAV Pack reflects what Ascent views as the
21  assets and liabilities of 3AC, correct?
22    A. I'm not sure I understand your question,
23  Counselor. You're saying something of ordinary course
24  in the Ascent NAV Pack?
25    Q. I'm asking as you talked about earlier

Page 68

1  because Ascent prepared the NAV Pack when 3AC was
2  still operational from at least February 1st, 2021, to
3  May 2022, right?
4    A. Correct.
5    Q. And as you mentioned, the NAV Pack starts
6  with a balance sheet tab, which includes, I
7  understand, the assets and liabilities of 3AC,
8  correct?
9    A. Correct.
10    Q. So given the fact that Ascent prepared these
11  NAV Packs from at least 2021 to 2022, the NAV Packs
12  reflect what Ascent views or considers as 3AC assets
13  or liabilities, correct?
14    A. Yes.
15    Q. Okay. Sir, I now would like to talk about
16  the AUM letters or the asset under management letters.
17    A. Okay.
18    Q. If you could turn to page 8 of your report.
19    A. Yes.
20    Q. Okay. So the first full paragraph of this
21  page it states, "As part of its operation, 3AC will
22  prepare monthly letters to lenders and investors to
23  inform them of 3AC's financial position referred to
24  'AUM letters,' short for asset under management
25  letters," correct?

Page 69

1    A. Correct.
2    Q. Sir, did you view any communications that
3  would show that these AUM letters were sent to lenders
4  and investors of 3AC?
5    A. I know I reviewed copies of the letters. I
6  don't know if I saw e-mails where the letters might
7  have been originally attached.
8    Q. Okay. You said you reviewed copies, but you
9  don't know if you saw e-mails where they might have
10  been attached, correct?
11    A. Correct.
12    Q. So essentially you just reviewed the AUM
13  letters itself, not the underlying communications, if
14  there were any?
15    A. Correct.
16    Q. And did you verify whether each AUM letter
17  was the final executed version for each month?
18    A. They were all signed, but I -- that's --
19  besides the fact that they were signed and dated,
20  that's my verification.
21    Q. Okay. And nothing else, right?
22    A. Correct. ███████████████████████
███████████████████████████████████████
███████████████.

18 (Pages 66 - 69)

CONFIDENTIAL

1    Q.  Okay.  And you mentioned earlier that you did
2  not review the underlying -- the e-mails from 3AC --
3  other communications from 3AC to the lender and
4  investor attaching the AUM letters, correct?
5    A.  I don't know if we received that
6  communication, but I did see the letter.
7    Q.  Okay.  So because of that, you cannot state
8  with certainty whether each and every one of 3AC
9  investors and lenders received the AUM letters,
10  correct?
11    A.  I have no knowledge of that.



13    Q.  Okay.  And you don't know who prepared these
14  AUM letters, correct?
15    A.  I know Mr. Davies signed them.
16    Q.  Okay.  So you're not providing an opinion on
17  the intent or the sources -- the intent of the drafter
18  of the AUM letters, correct?
19    A.  I mean, besides the obvious opinion that
20  they -- the letters were sent to inform investors and
21  lenders of the assets under management of Three Arrows
22  Capital, which is exactly what the documents states.
23    Q.  But also, once again, you did not review any
24  communications attaching any of these AUM letters,
25  correct?

1    A.  Not that I -- I don't -- no.

17    Q.  Thank you, sir.
18        Sir, if you could please turn to the next
19  page, page 10 of your report.
20        THE WITNESS:  Is this a good time for a
21  break?
22        MR. LUU:  We can take a break, yeah.
23        THE WITNESS:  Five minutes.
24        MR. LUU:  That's fine.
25        THE VIDEOGRAPHER:  Off the record.  9:49.

1        (Recess 9:49 to 9:59.)
2        THE VIDEOGRAPHER:  We're on the record.
3  The time is 9:59 a.m.
4    Q.  (BY MR. LUU)  Mr. Scheig -- Mr. Scheig, I'm
5  sorry, do you have page 10 of Exhibit 1 up?
6    A.  Let me catch up to you.  Yes.
7    Q.  And this is a section titled "Solvency
8  Analysis Framework," correct?
9    A.  Correct.
10    Q.  On page 10, you define two terms, "fair
11  value" and "present fair saleable value," correct?
12    A.  Correct.
13    Q.  You did not provide any citation to support
14  these two definitions, correct?
15    A.  Yes, these definitions are actually part of
16  my firm's boiler.  I mean, they're standard.  They're
17  accepted, but I could go back and find a cite, but I
18  did not provide one in my report.
19    Q.  And that is based on your company's
20  essentially dictionary defining these two terms?
21    A.  Well, it puts back --
22        MR. NIEMEYER:  Object to form.
23    A.  No, it puts back the -- some definition you
24  just -- question I did not provide the cite.  And, no,
25  I did not provide the site.

CONFIDENTIAL

1    Q. (BY MR. LUU)  And then in the next paragraph
2    starting with, "Given that 3AC," are you there?
3    A. Yes.
4    Q. The paragraph states, "Given that 3AC was a
5    hedge fund that bought, sold, and held crypto assets
6    and related investments, I analyzed 3AC's value in a
7    manner similar to a holding company.  This resulted in
8    the fair value and present fair saleable value
9    standards largely aligning and indicating that 3AC's
10   value should be determined by simply analyzing the
11   value of its assets and liabilities rather than
12   needing to analyze revenues, margins, growth, and
13   other factors when analyzing the standard operating
14   company."  Did I read that correctly?
15   A. You did.
16   Q. What is the basis for the framework that the
17   solvency of 3AC should be analyzed in a manner similar
18   to a holding company?
19   A. Because of the assets held by 3AC and traded
20   by 3AC.
21   Q. Could you please elaborate on that a bit
22   further?
23   A. 3AC was not a manufacturer.  They did not
24   produce widgets.  They were not a professional
25   services company.  They did not sell professional

1    services hours.  They were a hedge fund.  They traded.
2    They took positions and securities hoping they would
3    appreciate.
4    Q. Sir, and have you ever adopted this similar
5    framework in any prior solvency opinions?
6    A. Not that I recall.
7    Q. Okay.  And are you aware of any expert
8    opinions or reports evaluating the solvency of a
9    cryptocurrency hedge fund that analyzed the value of
10   that hedge fund in a manner similar to a holding
11   company?
12   A. I'm not aware.
13   Q. Okay.  And also you, likewise, did not
14   provide any citation or support for this framework,
15   right, to analyze 3AC value in a manner similar to a
16   holding company?
17   A. The support is basically all of the
18   information reviewed in this matter.  You know, the
19   assets under management letters related to NAV, which
20   is fair value of their positions.  The NAV Packs
21   calculated fair value of Three Arrows Capital
22   position, and it was a hedge fund.  This is what they
23   do.  This is the way to consider them.
24   Q. Okay.  And, sir, you picked June 12th, 2022,
25   as the measurement date, correct?

1    A. Correct.
2    Q. Why was this date selected?
3    A. It was provided to me.
4    Q. By counsel?
5    A. I selected it -- yes.
6    Q. Okay.  And what is your understanding of why
7    the date was selected?
8    A. It was a day or two before margin calls
9    started and Three Arrows Capital collapsed.
10   Q. And who made those margin calls?
11   A. Various lenders.
12   Q. And was there any other measurement dates you
13   considered?
14   A. Well, my opinion in my expert report is that
15   Three Arrows Capital was insolvent as of June 12th.
16   However, the analyses in my expert report also
17   indicate that Three Arrows Capital was insolvent as of
18   May 31st, June 1st, et cetera, through June 12th.
19   Q. Thank you.
20       Sir, am I correct that in this report you
21   performed and then describe three different insolvency
22   tests, correct?
23   A. Correct.
24   Q. And those are the balance sheet test, the
25   cash flow test, and reasonable capital test?

1    A. Correct.
2    Q. And I would like to start with the balance
3    sheet test.  If you could please go to page 10 under
4    the section "Overview - Solvency Test, The Balance
5    Sheet Test."
6    A. I am there.
7    Q. Great.  And on that page you state that you
8    "began with the NAV Pack positions reported by Ascent
9    of 3AC and then updated the daily balances leading up
10   to the measurement date for known and measurable
11   changes," correct?
12   A. Correct.
13   Q. And what are these known and measurable
14   changes?
15   A. The pricing information that we obtained from
16   CoinGecko is a known and measurable change.  The
17   cryptocurrency change values daily.  And then we
18   updated quantities of various positions and
19   liabilities based on information from Ascent,
20   information from the exchanges, information from
21   lenders.
22   Q. And, once again, how did you update the daily
23   balances?
24   A. The basic framework is, you know, May 31 is
25   our starting point.  We took the May 31 NAV Pack

CONFIDENTIAL

Page 78

1  numbers and we made an adjustment for the FTX that I'm
2  sure we'll get into and -- but that was the starting
3  point.  And then on a daily basis if we had
4  information that a quantity changed, we updated that
5  quantity.  If we had no information the quantity
6  changed, we would leave the quantity equal to the day
7  before, meaning we weren't aware that that position
8  had been traded.  And so that's how we went about the
9  process.
10  Q.  So am I -- am I understanding correctly that
11  you would adjust the quantity of the tokens and the
12  assets, if that changes, based on the data either from
13  the NAV Pack, from FTX, or other exchanges, and then
14  you also update the pricing based on the price
15  aggregator, right, and then you multiplied those
16  sources to get to the value of each day, correct?
17  A.  Correct, correct.
18  Q.  Sir, if you could please scroll to page 13 of
19  your report.
20  A.  Okay.
21  Q.  On the very first paragraph of that page you
22  state, "Based on my analysis of Ascent's
23  categorizations and analyses, as well as the nature of
24  3AC assets, I determined it was relevant to make
25  certain adjustments to and recategorizations of

Page 79

1  certain NAV Pack asset and liability categorization
2  for simplicity.  For example, Ascent's asset category
3  'cash' included not only cash, but also various crypto
4  assets that are not necessarily cash equivalents.
5  Additionally, Ascent had separate line items for
6  certain asset historical costs as well as the
7  accumulated appreciation and depreciation of those
8  same assets whereas I simply analyzed each asset on a
9  net basis in one line item that reflected the same net
10  value.  I note that this change in presentation did
11  not change the ending value of any of the assets
12  within the NAV Pack."  Did I read that correctly?
13  A.  You did.
14  Q.  And what made you determine that it was
15  relevant to make certain adjustments to and
16  recategorizations of certain NAV Pack assets and
17  liability categorizations?
18  A.  To set it up for performing the three
19  solvency tests.
20  Q.  Could you describe that a little bit further?
21  A.  Yes.  In my report -- I have a table in my
22  report I would like to refer to.  Let me find it,
23  please.  Okay.  Exhibit B of my report, which is
24  exhibits page 4.  I'm not sure which -- which PDF page
25  it is.  Okay.  Exhibit B, which is PDF page 77 of 244.

Page 80

1  Q.  Yes.
2  A.  So on this page, which basically are the
3  numbers behind the paragraph we were just talking
4  about, ████████████████████████████████████
5  ████████████████████, and then the first column to the
6  right is how we recategorize them and we put them into
7  the different categories or headings because we were
8  going to treat different numbers differently in our
9  solvency test.
10  Q.
11  ████████████████████████████████████████████
12  ████████████████████████████████████████.  The crypto
13  tokens are shown in other categories below it that
14  Ascent put in cash.  We just put them in crypto
15  tokens, but the totals remain the same.
16  Q.  Okay.  And what are some crypto assets that
17  are not necessarily cash equivalents?  Is that all of
18  them or some of them?
19  A.  Well, we just -- we made the decision that we
20  were going to call cash, in our analysis, "cash" in
21  the bank accounts, and we put the other values in the
22  crypto token account, but we did not exclude any
23  values.
24  Q.  I understand.  And looking at this Exhibit B

Page 81

1  in the column, so the Ascent recategorize column.
2  A.  Yes.
3  Q.  I understand that for the assets associated
4  with 3AC accounts on the FTX Exchange, you have under
5  "assets" liquid assets FTX spot tokens and liquid
6  assets FTX futures positions, correct?
7  A.  Correct.
8  Q.  And under "liabilities" you have FTX loans,
9  correct?
10  A.  Correct.
11  Q.  Were there any --
12  A.  That's the --
13  Q.  Go ahead.
14  A.  That's the way it was presented -- that is
15  the way it was presented in the NAV Pack.
16  Q.  Understood.  And were there any other assets
17  or liabilities based on the NAV Pack on the FTX
18  Exchange associated with the 3AC accounts?
19  A.  I'm not sure I understand your question, sir.
20  Q.  So you mentioned that you have spot tokens,
21  futures positions, and loans and you said that those
22  are the categories that were available in the NAV
23  Pack, right?
24  A.  Well, I mean, the NAV Pack had all of the
25  detail.  It didn't just have limited categories.

21 (Pages 78 - 81)

CONFIDENTIAL

1    Q. Okay. I'm talking specifically about FTX.
2    A. You're talking about the right-hand column,
3  the FTX recategorized.
4    Q. Yes.
5    A. Okay.
6    Q. No, Ascent recategorized.
7    A. Okay. A separate category. Yeah, so in a
8  sense, NAV Pack for May 31, ███████████████
   ██████ they presented the futures, looks like, on a
10  net basis, and in our recategorized, we presented them
11  on a gross basis.
12    Q. Okay.
13    A. Consistent with the original document 38 from
14  FTX.
15    Q. And you said that the FTX future positions
16  was listed on a net basis in the Ascent NAV Pack?
17    A. Well, I'm saying in the Ascent NAV Pack --
18  well, I mean, we got two views from FTX. We got 038
19  and 038 amended. And then the asset side was, I
20  think, Bates number 002. █████████████████
   ████████████████████████████
   ███████████████████████████
   █████████████████████████  So next
25  question.

1         MR. LUU: Shamus, would you please
2  introduce tab 3?
3    A. Okay.
4        (Exhibit No. 5 marked.)
5    Q. (BY MR. LUU) Sir, we just introduced a
6  document that has been marked as Exhibit 5. The
7  document bears production number 3AC-FTX-00524002.
8  And this is the May 31st, 2022, NAV Pack that we
9  received from the Joint Liquidators of 3AC. Let me
10  know once you have that in front of you?
11    A. I have it open.
12    Q. Sir, you noted that you have reviewed this
13  document, correct?
14    A. Correct.
15    Q. And let me start with tab 2.2 BS. I believe
16  that BS stands for balance sheet; is that correct?
17    A. That's my understanding.
18    Q. Okay. And this is the balance sheet tab that
19  we discussed earlier?
20    A. Correct.
21    Q. Okay. If you could please direct your
22  attention to line 8, "cash at bank"?
23    A. Yes.
24    Q. Right. So the cash at bank is listed under
25  assets, right?

1    A. Correct.
2   ████████████████████████
    ████████████████████████████
5    Q. Okay. And then under row 10, "crypto
6  staking" --
7    A. Yes.
8   ████████████████████████████
    ████████████████████████
    ██████████████████████
12  █ █████████████████
12    Q. And if you could scroll to row 43.
13    A. Yes.
14    Q. So that is under section "liabilities" of the
15  balance sheet. Row 43 is called "crypto loans
16  payable," right?
17    A. Correct.
18  ████████████████████████
    ████████████████
    ████████████████████
    ███████████
    ████████████████████████████
    █████████████

1   ████████
2    Q. Could you turn to tab 3.4, "collateral and
3  investments"?
4    A. Yes.
5    Q. Can you please scroll to row 179?
6    A. My row 179 is blank.
7    Q. Oh, sorry, sir. Row 79, not 179. My
8  apologies.
9    A. Okay.
10    Q. And the row 79 says it is "crypto staking,"
11  right?
12    A. That's what it says.
13    Q. So what is crypto staking?
14    A. Crypto staking is where rather than buying a
15  token free and clear, you can agree to stake it onto a
16  block chain and basically you're introducing what, I
17  consider, discount for lack of marketability on it
18  because you agree to leave it there and ride it out in
19  exchange for a lower price to acquire that asset, and
20  the process of staking can give new crypto tokens
21  stability.
22    Q. Okay. I understand. Thank you.
23        And then under the crypto staking
24  section, rows 82 and 83 describe 3AC's crypto staking
25  on FTX, right?

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

1    A. Yes.
2    Q. And the asset associated with that crypto
3  staking was FIDA and SRM?
4    A. Yes.
5    Q. And then if you could scroll to row 102.
6    A. Okay.
7    Q. And that row sums up the amount of crypto
8  staking that 3AC has on all exchanges as of May 31st,
9  2022, right?
10   A. I believe so. I believe that's what's
11 happening and what I'm looking at on the screen.
12 ████████████████████████████████
   ██████████████████████████
   █
16   Q. Right. And that also shows up on the tab --
17 on the balance sheet tab that we just discussed
18 earlier?
19   A. Correct.
20   Q. Okay. So if you could please go to tab 5.2,
21 "cash."
22   A. Okay.
23   Q. If you could scroll to row 206.
24   A. Yes.
25 ████████████████████████████████

Page 87

1  █
   ██████████
   █
4    Q. And that was also the same value as cash at
5  bank at row 8 of tab 2.2, "balance sheet," that we
6  discussed earlier?
7    A. Yes.
8    Q. Okay. So all of the information in this tab
9  is summed up and then listed as "cash at bank" under
10 the asset section of the balance sheet tab, correct?
11   A. Correct.
12   Q. So if you could please scroll up to starting
13 at row 170.
14   A. Okay.
15   Q. Row 170 to 196 describes the various assets
16 associated with the 3AC accounts on FTX Exchange,
17 correct?
18   A. Yeah, there are also some loans in that
19 group, too, indicated by the negative numbers.
20   Q. Okay. On row 179, the asset associated there
21 is USD, right?
22   A. Correct.
23 ████████████████████████████████
   ████████████████████████
   █████████

Page 88

1    Q. And then certain crypto assets were listed in
2  negative value, correct, including USTC, RUNE, and
3  USDT?
4    A. Correct.
5    Q. So as we talked about earlier, row 206
6  essentially sums up all of these values and then lists
7  them as an asset under "cash at bank" in the balance
8  sheet, correct?
9    A. Correct.
10   Q. So that's -- cash at bank value includes both
11 positive and negative amounts associated with the 3AC
12 accounts on FTX, right?
13   A. Correct.
14   Q. And that is listed as an asset on the balance
15 sheet, correct?
16   A. Well, it's a contra asset given it's a
17 negative sign.
18   Q. But --
19   A. They're including it -- in my opinion,
20 they're including it to show the net position. In
21 other words, if I borrowed a million, divide 2
22 million, I've got a net position of 1 million.
23   Q. Right. And essentially Ascent viewed the net
24 value of all of 3AC assets associated -- of all of the
25 assets associated with the 3AC accounts on the FTX

Page 89

1  Exchange as a net value and include that positive net
2  value under "assets" on the balance sheet, correct?
3    A. I'm not sure I followed your question, sir.
   █
   ██████████████████████████████
   █
   ████████████████████
   █████████████████████████████
   ██████████████████████████████████
   █
   ██████████████████████
   █████████████████████████████████████
   █
   ████████████
15   Q. Okay. And, sir, looking at this cash advance
16 tab, it does not list any perpetual futures contract
17 that 3AC opened on FTX, correct?
18   A. I understand your question, sir, but I'm
19 trying to figure out which number in my report you're
20 asking about, so I can make sure I'm framing the
21 question right.
22   Q. No, I'm just asking about --
23   A. We track the perpetual futures in other
24 categories, not cash so...
25   Q. I'm just asking on this tab, there is no

23 (Pages 86 - 89)

CONFIDENTIAL

1 perpetual future contract on FTX?
2    A. On FTX, perpetual futures. I don't see any
3 dash perks or dash Ps on -- under FTX.
4    Q. Okay. So there's no sign of perpetual
5 futures listed on this tab, correct?
6    A. Under "cash," no.
7    Q. Yeah. Okay. Could you turn to the very next
8 tab, "Loans, parentheses, crypto"?
9    A. Okay.
10    Q. And row 5 states, "Summary IM File," correct?
11    A. Yes.
12    Q. Do you know what Summary IM File stands for?
13    A. I do not have a definition for IM file.
14    Q. That's fine. And am I right that this tab
15 essentially describes all of the crypto loans and
16 loans that 3AC had as of May 31st, 2022, correct?
17    A. That's my understanding, yes.
18    Q. Okay. And on this row -- and on this tab,
19 there are two rows that describe loans from FTX to
20 3AC, correct?
21    A. I'm not there yet with you.
22    Q. Okay. We can go through each of them. If
23 you could scroll to row 110.
24    A. Okay. FTX 3AC. Okay.
25    Q. Right. And do you see that this row

1 describes a loan increase, right, column B, "state
2 increase"?
3    A. And it was 110?
4    Q. Yes. No, it just says "increase." It
5 doesn't state the amount.
6    A. Right, right, right. Yes, I see that now.
7    Q. Right. So row 10 -- 110 column B, an
8 increase of loan.
9    A. Correct.
10    Q. And the date is October 26th, 2021?
11    A. Right.
12    Q. And the value of the amount of that loan is
13 120 million, correct?
14    A. Correct.
15    Q. And this represents the live credit that FTX
16 extended to 3AC, correct?
17    A. I believe so.
18    Q. Okay. And then if you could scroll to row
19 328.
20    A. Same tab?
21    Q. Same tab, sir.
22    A. 328. Okay.
23    Q. Right. This -- this also describes a another
24 loan from FTX to 3AC, right, in the amount of 110
25 million?

1    A. I don't see a date or anything on it.
2    Q. You can scroll up. Staring --
3    A. I see 110 million and I see flow. I just
4 don't see any date to tell me when it occurred.
5    Q. Okay. You can scroll to row 295. That
6 essentially describes the headings for these columns,
7 but I agree there is no date.
8    A. Okay.
9    Q. Right. So essentially row 328 describes a
10 loan from FTX to 3AC in the amount of 110 million,
11 once again, correct?
12    A. Correct.
13    Q. And do you have an understanding of the
14 difference between these two amounts? The above
15 states 120 and the below states 110.
16    A. I followed you to "do you have any
17 difference" -- "any opinion on the difference between
18 these amounts," and then I lost you.
19    Q. Yeah, I'm just asking do you have any
20 understanding of the difference between these two
21 amounts.
22    A. Between 110 and 120?
23    Q. Yes, obviously not the 10 million, but, like,
24 why would there be different numbers?
25    A. My assumption is different dates and the line

1 of credit moved over time.
2    Q. Right. But is your assumption that is still
3 one line of credit?
4    A. Yes.
5    Q. Okay. And essentially it was changed from
6 110 to 120?
7    A. Yes, and it's about 130 million when I did my
8 analysis.
9    Q. 130 million?
10    A. Or maybe -- it was 130 or 103, something like
11 that, but, yes, I'm familiar with the line of credit,
12 sir.
13    Q. Okay. That's fine. Sir, if you could please
14 scroll to row 430.
15    A. Yes.
16    Q. Okay. ████████████████████████
████████████████████
████ ██████████
████ ██████████████████████
██████████████████████████
█ █████████████
24    Q. Okay. So as we talked about earlier, the
25 balance sheet tab has "cash at bank" and "crypto

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

1  staking" under assets and "crypto loans" payable under
2  liability, correct?
3      A.  Correct.
4      Q.  And that liability is summed up here in this
5  loans crypto tab, correct?
6      A.  Yes.
7      Q.  So based on this document from Ascent, the
8  only liability that purportedly was due to FTX was the
9  live credit at the amount of either 110 million or 120
10 million dollars, correct?
11     A.  No,



22     Q.  It does not list any other liability that 3AC
23 purportedly owed to FTX, correct?
24     A.  The line of credit is the only thing that
25 comes to mind.

Page 95

1      Q.  Okay.  So based on the Ascent NAV Pack as of
2  May 31st, 2022, there are three things that appear in
3  this document that describe the relationship between
4  FTX and 3AC, right?  We talked about them.  The first
5  thing is the crypto assets are listed under "cash at
6  bank" under "assets," right?
7      A.  Right.
8      Q.  And the cash at bank including crypto assets
9  do not include any perpetual futures contracts that
10 3AC opened on the FTX Exchange, correct?
11     A.  Right.  We accounted for them differently.
12     Q.  Okay.  And then the crypto staking amount is
13 then listed under "crypto staking," also under
14 "assets," right?
15     A.  Yes, the crypto staking amount is also listed
16 as an asset.
17     Q.  Right.  And that crypto staking amount does
18 not include any futures contracts that 3AC opened
19 under the FTX Exchange, correct?
20     A.  Right.  It's crypto tokens that have been
21 staked.
22     Q.  Right.  And then we talk about the live
23 credit listed under "crypto loans" payable as a
24 liability on the balance sheet, correct?
25     A.  Yes.

Page 96

1      Q.  So -- and the loans crypto amount also does
2  not include any perpetual futures contracts that 3AC
3  opened on the FTX Exchange, correct?
4      A.  I don't believe so.
5      Q.  Okay.  So as a summary, in the Ascent NAV
6  Pack, perpetual futures contracts that 3AC opened in
7  FTX are not considered either as an asset or
8  liability, correct?
9          MR. NIEMEYER:  Object to form.
10     A.  That is correct.  Ascent presented it on a
11 net position, not a gross position.
12     Q.  (BY MR. LUU)  And, once again, going back to
13 the crypto assets associated with 3AC accounts on FTX
14 Exchange, Ascent also view all of those individual
15 tokens on the net asset value, on the net basis,
16 correct?
17     A.  Net or fair value basis, yes.
18     Q.  Okay.  So including that we talk about the
19 negative amounts of certain tokens on the FTX
20 Exchange, right?
21     A.  Right.
22     Q.  And they were still rolled up together into a
23 net value, correct?
24     A.  Correct.  That's where the term "net asset
25 value" comes from, sir.

Page 97

1      Q.  Okay.  So basically the negative amount
2  associated with different tokens of 3AC -- associate
3  with the 3AC on the FTX Exchange, it was not
4  considered a liability on the balance sheet that
5  Ascent prepared, correct?
6      A.  It doesn't matter.  It all -- it all gets
7  washed out in the bottom number.  I mean, I could have
8  a negative asset or a positive liability.  At the end
9  of the day, I'm going to have the same net asset
10 value.
11     Q.  I'm just asking based on the way the NAV Pack
12 is constructed, the negative amounts associated with
13 certain tokens on the FTX Exchange, it was not listed
14 as a liability on the balance sheet?
15     A.  I don't believe so.
16     Q.  Okay.  And that was because all of these
17 individual tokens and their value, associated value,
18 were all rolled up into a net asset value listed as an
19 asset, right?
20     A.  Correct.
21     Q.  Okay.  Thank you, sir.  You can put this
22 document on the side.
23         If you could please go back to Exhibit 1,
24 your report.
25     A.  All right.  It's opening.  Okay.

25 (Pages 94 - 97)

CONFIDENTIAL

1    Q.  Sir, if you can please go to page 14 of your
2  report.
3    A.  PDF 14 or page number 14?
4    Q.  Page number 14.  The upper right corner.
5    A.  Okay.  I'm there.
6    Q.  So essentially starting on this page 14, you
7  describe your own recategorization based on your
8  preparation of this report, correct?
9    A.  Right.  Correct.
10    Q.  Sorry.  Were you saying something?
11    A.  I said "right," and then I corrected it to
12  say "correct."
13    Q.  Thank you.
14        Okay.  In the very first paragraph of
15  page 14 you state, "I considered any asset with an
16  asset value in the NAV Pack over 5 million to be a
17  'primary' asset" -- "to be a 'primary' asset and
18  performed a full review of the data related to these
19  assets to determine quantities.  This analysis is
20  presented in Exhibit H.  All other asset quantities
21  were set equal to the quantities found in the May
22  31st, 2022, NAV Pack," right?
23    A.  Right.
24    Q.  What is the basis for using the $5 million
25  threshold to consider what counts as a primary asset?

1    A.  Materiality.
2    Q.  Anything special for materiality you use as a
3  percentage or anything?
4    A.  So we pick the $5 million number as a cutoff
5  because -- A, because we had a due date where a report
6  had to be filed; and B, because it just gets back to
7  materiality.  If I wanted to determine the value of
8  NVIDIA Corp., I could go and start counting the
9  computers in an office, but that's not -- that's not
10  material to the value of NVIDIA Corp.
11  ███████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████
██████████████████████████████████████████
20    Q.  Right.  And when you say in this paragraph
21  that you performed a full review of the data,
22  essentially you were counting the percentage of how
23  much assets were under 5 million, right?
24    A.  Correct.
25        MR. NIEMEYER:  Object to form.

1    Q.  (BY MR. LUU)  Okay.  And can you, once again,
2  state for the record how many assets were considered
3  primary based on this threshold?
4    A.  Well, sir, the primary assets are shown in
5  Exhibit H of my report, but unfortunately I would have
6  to count them by hand because I don't have a tally of
7  the numerable line items.
8    Q.  Okay.  That's fine.  Sir, if you could pay
9  attention back to page 14.  I want to talk about the
10  FTX spot token section.
11    A.  Okay.
12    Q.  Okay.  And under this section you state that,
13  "While the NAV Packs reveal that 3AC held certain
14  tokens/assets on other exchanges and platforms such as
15  Binance, Bitfinex, Kraken, I was provided direct
16  information from FTX in the matter regarding 3AC spot
17  token positions held at FTX.  For this reason, I used
18  the information directly from FTX and compared it to
19  the information contained within the Ascent NAV
20  Packs."  Did I read that correctly?
21    A.  Yes.
22    Q.  And the document that you received that came
23  directly from FTX?  Am I right that is the FTX 3AC 38
24  document?
25    A.  Correct.  We got FTX 002, which is the asset

1  side; FTX 38, which is the liability side; and then
2  FTX amended which showed it on the net and we removed
3  the -- removed the asset.
4    Q.  Okay.  And when you compare the assets in FTX
5  38 to the NAV Pack, were there any differences between
6  the two data sources?
7    A.  Yes.
8    Q.  And what were the differences?
9    A.  The differences would have been in my report
10  on page -- Exhibit B in my report.  The differences
11  are in the line -- on Exhibit B in my report on the
12  right-hand side, the differences occur in the lines
13  under "assets indicated, liquid assets FTX spot tokens
14  and liquid assets FTX futures."  And then on the
15  liability side, the differences are in the FTX loans.
16  ██████████████████████████████████████████████████
███████████████████████████████████████████████  And
18  then we got some other -- looks like the other loans
19  noncallable, we got some different information from
20  FTX on that, and then due to broker and other for some
21  reason changed a million or a thousand dollars, but
22  that's all.
23    Q.  Okay.  And am I right --
24        MR. NIEMEYER:  Nam, Nam, can we take a
25  quick break here?  I'm sorry.

CONFIDENTIAL

Page 102

1    MR. LUU:  That's fine.  Five minutes?
2    MR. NIEMEYER:  Yeah.  Five is fine.
3    THE VIDEOGRAPHER:  Off the record.
4  10:41.
5    (Recess 10:41 to 10:46.)
6    THE VIDEOGRAPHER:  We're on the record.
7  The time is 10:46.
8    Q.  (BY MR. LUU)  Mr. Scheig, earlier before the
9  break I was asking about the difference between the
10  document FTX 38 and the Ascent NAV Pack, and we are
11  currently on Exhibit 4 to your expert report on
12  exhibit page 4.
13    A.  Yes.
14    Q.  Okay.  Could you please describe the
15  difference between the Ascent NAV Pack and the
16  document FTX 38 with respect to all of the assets
17  associated with the 3AC account on the FTX Exchange?
18    A.  Yes, the first -- on Exhibit B, there are
19  three columns.  The one in the middle shows Ascent
20  recategorized.  ████████████████
21  ████████████████████████████████████████
22  ████████████  We overwrote that information that
23  we got from Ascent with information provided by FTX
24  because it was determined that it was going to be a
25  more accurate indication of value.  ████████████

Page 103

1  ████████████████████████████████████
2  ████████████████████████████████
3  ████████████████████████████████████
4  ████████████████████████
5  ████████████████████████████████████
6    The difference -- the other thing that
7  changed in Exhibit B was we overwrote the prices that
8  Ascent had for the tokens with the prices for -- from
9  CoinMarketCap and CoinGecko to have a consistent
10  pricing algorithm versus we used Ascent's prices here
11  and we're using a different price going forward.
12    Q.  I understand.
13    A.  We wanted consistency.
14    Q.  Okay.  So I think you mentioned that you
15  essentially overwrote Ascent data with respect to all
16  of the assets and liabilities associated with the 3AC
17  accounts on the FTX Exchange, right?
18    A.  Correct.
19    Q.  And what is the reason for that?
20    A.  We wanted to get the most accurate number
21  possible, and I saw an e-mail that said, I think,
22  Ascent was telling 3AC that there were some potential
23  errors in the FTX trading data due to the volume of
24  trades.  And so when FTX provided us their view of
25  what the actual numbers were on their exchange, we

Page 104

1  used that.
2    Q.  And you said you reviewed an e-mail where
3  Ascent told 3AC that there was some issues with the
4  data?
5    A.  I don't remember whether 3AC asked, but,
6  yeah, there was some e-mail, you know, that was -- it
7  dealt with the frequency of trading on FTX.  And so to
8  be conservative, we used the information from FTX to
9  try to have the best, most accurate number we could.
10    Q.  I see.  And is that e-mail listed in Appendix
11  2 to your report, the list of materials considered?
12    A.  It should have been.
13    MR. LUU:  Okay.  We would just like to
14  reserve all rights, with respect to that e-mail, for
15  the record.
16    Q.  (BY MR. LUU)  Sir, I want to talk
17  specifically about how you treated the FTX futures
18  positions.  So in the second column, the Ascent
19  recategorize column, it's listed as zero, correct?
20    A.  Correct.
21    Q.  Because as we mentioned earlier, when we
22  discussed the Ascent NAV Pack, the futures positions
23  that 3AC opened on FTX were not listed as either an
24  asset or a liability, right?
25    A.  Correct.

Page 105

1    Q.  And essentially it did not show up at all on
2  this and NAV Pack, correct?
3    A.  Well, because the form of the futures was
4  perpetual futures that clear every 30 seconds, so I
5  wouldn't anticipate a large balance.
6    Q.  So can you describe for the record of how
7  perpetual futures worked on the FTX Exchange?
8    A.  That's not --
9    MR. NIEMEYER:  Object to form.
10    A.  -- my area of expertise.  I'm a solvency
11  expert, but my high-level understanding is a futures
12  contract is entered into around an asset and a price.
13  And there's one party long and one party short.  After
14  30 seconds, if the price is moved, it is cleared such
15  that the party that looses in that trade over those 30
16  seconds has less cash and, you know, and it's just --
17  it's a cash flow every 30 seconds to equalize it.
18    Q.  (BY MR. LUU)  Right.  And essentially if it
19  changes to the parties' balance or position on the FTX
20  is because of the changes in the price, right, in that
21  30 second window when the perpetual future contract
22  settles?
23    A.  Yes.
24    Q.  Right.  Essentially -- and only that change
25  in price affected the balance of the parties account

27 (Pages 102 - 105)

CONFIDENTIAL

Page 106

1  on the FTX Exchange, correct?
2           MR. NIEMEYER:  Object to form.
3      A.  I mean, quantity has got to be in there, too.
4      Q.  (BY MR. LUU)  Right.  But as we talked about
5  earlier on the Ascent NAV Pack, the quantity of
6  perpetual future that 3AC opened in FTX did not appear
7  on the Ascent NAV Pack, correct?
8      A.  Correct.  So we added them.
9      Q.  And what is your understanding -- you
10  mentioned that in your report that FTX changed its
11  position with respect to document 38, right?
12      A.  Yes, they produced an amended.
13      Q.  Okay.  And what is the difference between
14  those two versions?  What is your understanding of the
15  differences between those two documents?
16      A.  My understanding is initially for the futures
17  contracts, you know, let's say you have a $5 million
18  future contract asset and a $5 million future contract
19  liability, they net to zero.  So in a net asset value
20  presentation, they would go to zero because one is
21  positive and one is negative.  And so Ascent
22  considered it as a net number, you know, whether it's
23  5 million or 5 billion offset by 5 billion where in
24  our analysis and in the original document 38, we
25  consider it as a gross number where we showed an asset

Page 107

1  5 billion in my hypothetical and a liability of 5
2  billion in a hypothetical, still get back to zero on
3  the net asset value basis, but that's the difference
4  in the presentation between those two columns.
5      Q.  Okay.  How did you get to the 508 million
6  figure for the FTX futures position?
7      A.  That was provided for us in document 02.
8      Q.  Okay.  Sir, if you could go back to your main
9  report on page 14.
10      A.  Okay.
11      Q.  You mentioned that, "While the NAV Pack
12  reveal that 3AC held tokens/assets on other changes
13  and platforms such as Binance, Bitfinex and Kraken,"
14  correct?
15      A.  I'm on -- I'm not with you yet, sir.
16      Q.  We're still --
17      A.  Page 10 of my report.  Page 10 of my report.
18      Q.  Page 14.
19      A.  14.
20      Q.  Yes, the FTX spot tokens section.
21      A.  Okay.  Thank you.
22      Q.  Okay.  You say that, "While the NAV Packs
23  reveal that 3AC held certain tokens/assets on either
24  exchanges and platforms such as Binance, Bitfinex, and
25  Kraken," correct?

Page 108

1      A.  Yes.
2      Q.  And did you receive any primary source data
3  directly from these exchanges and platforms such as
4  Binance, Bitfinex, and Kraken?
5      A.  No.  Well, we received some additional
6  information, but, I mean, I didn't go back and
7  Ascent -- we received confirming information of the
8  exchanges that allowed us to do our roll forward after
9  May 31, but I did not go back and test whether other
10  exchanges had an issue with the spot tokens like FTX
11  did.
12      Q.  Okay.  So essentially back to Exhibit B, I
13  understand that as we talked about earlier, Ascent
14  reported the value of the 3AC account on FTX on a net
15  value basis, right?
16      A.  Correct.
17      Q.  In your recategorization, however, you split
18  that net value into assets and liabilities, correct?
19      A.  Correct.
20      Q.  And you only did that for the asset
21  associated with a 3AC account on FTX Exchanges -- on
22  the FTX Exchange and not any other exchanges, correct?
23      A.  Correct.
24      Q.  Okay.
25           MR. LUU:  Shamus, could we please pull up

Page 109

1  tab 4?
2      A.  Okay.
3           (Exhibit No. 6 marked.)
4      Q.  (BY MR. LUU)  Sir, we just introduced Exhibit
5  6.  This is a document bearing production number
6  3AC-FTX-00562700.  Are you familiar with this
7  document, sir?
8      A.  I mean, not at the moment.
9      Q.  Okay.  If it jogs your memory, you can go to
10  exhibit page 79.  That is the Exhibit H to your
11  report, and you cite this document in Footnote E.
12      A.  D like David?
13      Q.  E, sir, like 11.
14      A.  Okay.
15      Q.  Do you see footnote E, it states based on
16  3AC-FTX-00562700?
17      A.  Yes.
18      Q.  And then if you can go to exhibit page 78
19  under the Stout Reference Number 369.
20      A.  Yes.
21      Q.  Right.  So essentially that's the quantities
22  of the token GLMR on Binance, right?
23      A.  Right.
24      Q.  So do you rely on this document to calculate
25  the value -- not the value, the quantity of the token

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

1  GLMR, the 3AC held on the Binance Exchange, right?
2      A. I believe so. If we footnoted it, it would
3  have been the source.
4      Q. So in this deposition today, you don't recall
5  this document?
6      A. I've looked at thousands of documents and all
7  look remarkably similar to this one.
8      Q. Okay. If you can take a moment to
9  familiarize yourself with the document just in case it
10  jogs your memory.
11      A. This is obviously a schedule of holdings over
12  time or positions. So, okay. I have reviewed the
13  document again.
14      Q. Okay. And do you know where this document
15  comes from, which exchange it came from?
16      A. I mean, not off the top of my head. I can
17  find it, but not off the top of my head.
18      Q. Okay. If we can -- if you can try to jog
19  your memory during the break, the next break that we
20  talk about, and we can come back to this document.
21          If we can go back to Exhibit B to your
22  expert report, please.
23      A. B like boy?
24      Q. Yes, B like boy, the one with the different
25  recategorizations that we just discussed.

Page 111

1      A. Yes, sir. Yes.
2      Q. Okay. Thank you. Once again, looking at the
3  last column, the recategorized FTX positions and
4  pricing adjusted column. We talk about the value of
5  the futures positions as 508 million positive under
6  assets, right?
7      A. Right.
8      Q. If I refer to a term called the" notional
9  amount of future contract," do you have an
10  understanding of what that means?
11      A. Yes.
12      Q. And what is your understanding of what that
13  term means?
14      A. Well, it's futures positions are related to
15  an equity or commodity and the notional amount would
16  be the quantity.
17      Q. Could you please say that again?
18      A. I think it would be related to the quantity.
19      Q. The quantity of the futures, not the quantity
20  times the reference price of the underlying asset?
21      A. Well, if you're talking notional value in
22  terms of value, it would be the vail. I was still
23  thinking quantity times price looking at the schedule.
24      Q. Right. And, essentially, is that how you got
25  to the 508 million, 100 million?

Page 112

1      A. Yes.
2      Q. And you said essentially you broke out the
3  futures positions as an asset, but there's also an
4  offsetting amount as a liability of the same value?
5      A. Right. You'll see on Exhibit B that FTX
6  loans goes from 110 million up to 1.1 billion. That's
7  the additional debt recognized to association -- to
8  offset the additional assets related, recognized.
9      Q. And that 1.13 negative billion figure
10  includes the futures positions?
11      A. Yes.
12      Q. Okay. As we talked about earlier, the Ascent
13  NAV Pack does not refer to futures contracts either as
14  an asset or a liability, right?
15      A. Yes.
16      Q. And do you have an understanding that FTX's
17  position is of the futures contract on the FTX
18  Exchange and not an asset that has any value?
19      A. Yes, that's the reason we did this
20  supplemental analysis, to reflect the solvency test
21  under that assumption.
22      Q. Correct. And that is reflected by the
23  amended document 38, right?
24      A. Yes.
25      Q. So sitting here today, is your position that

Page 113

1  perpetual futures contract that 3AC opened on FTX is
2  an asset that can be used to determine a company net
3  value?
4          MR. NIEMEYER: Objection to form.
5      A. I mean, I don't hold myself out to be a
6  perpetual futures trading expert. I was focused on
7  solvency, and, you know, when I think of -- I mean,
8  the thing about a net asset value analysis, whether
9  you show a net value or you show a gross offset by a
10  negative, you're going to get to the same number. So,
11  I mean, I understand they can be presented two ways,
12  which is what FTX did in the two versions of its 38,
13  but I don't have an opinion on how best to do the
14  perpetual futures you asked about.
15      Q. (BY MR. LUU) Okay. And do you have an
16  understanding what the joint liquidators of 3AC's
17  position is on the notional value of the futures
18  contract?
19          MR. NIEMEYER: Object to form.
20      A. I don't have an opinion on what they think
21  about anything.
22      Q. (BY MR. LUU) Okay. Sir, if you could turn
23  to page 16 of your exhibit -- of Exhibit 1 of your
24  report.
25      A. Okay.

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1    Q.  Okay.  Under -- so this page discusses
2  various things, one of which is illiquid assets,
3  right?
4    A.  Yes.
5    Q.  And that illiquid assets include private
6  investments, including equities, PE, funds, and
7  others, right?
8    A.  Yes.  You said page 18?
9    Q.  16, sir.
10    A.  16.  Okay.  I'm going to turn up my volume.
11  Okay.
12    Q.  Okay.  So under the private investment
13  subsection -- are you with me?
14    A.  Yes.  Yes.



24    Q.  Did you do anything to independently verify
25  the values of these investments?

Page 115

1    A.  No, the other assets, the private investments
2  line, we -- that was one category where we didn't have
3  information on change over time.  So given that these
4  are -- I mean, typically illiquid investments that
5  would take a while to unwind, we consider them
6  illiquid.
7    Q.  I understand.  So essentially it was the
8  value listed in the NAV Pack, correct?
9    A.  Correct.
10    Q.  You mentioned that because the fund related
11  to the investment essentially is locked up for a
12  certain amount of time and that was why you consider
13  them illiquid assets, correct?
14    A.  Yes.
15    Q.  Could there be any circumstances in which
16  these investments can be reclassified as liquid under
17  different market conditions?
18    A.  Of course.  Something could happen in the
19  market that would make one of these line items on this
20  schedule available.
21    Q.  But you did not account for that possibility,
22  right?  You -- essentially you just assumed that it
23  would stay illiquid?
24    A.  Yes, for the ten-day period eval -- 12-day
25  period evaluated, we did not assume their illiquid

Page 116

1  investment values changed.
2    Q.  Okay.  And you also did not consider any
3  potential future appreciation or liquidating events
4  related to those investments in that 10-day period,
5  correct?
6    A.  Correct.
7    Q.  Okay.  If you could, please --
8    A.  But also most of these investments were
9  crypto related.  And during the period reviewed, the
10  markets fell pretty consistently 20 to 30 percent, so
11  I wouldn't expect any appreciation in them.  We showed
12  no depreciation, but we just held them constant.
13    Q.  Understood.  Thank you, sir.
14        If you could please pay attention to
15  footnote 24 on page 16.
16    A.  Okay.
17    Q.  Okay.



Page 117

1

5    Q.  As a threshold matter, the Stout Reference
6  Number 2, because there are various Stout reference
7  numbers in your report, what specifically is this
8  Stout Reference Number 2?
9    A.  So we started with the NAV Pack, which had a
10  balance sheet, and then multiple tabs --
11    Q.  Yes.
12    A.  -- with columns of information.  We -- could
13  you repeat your question?  Let me make sure I'm
14  answering the right one.
15    Q.  Right.  I just want to take a look at the
16  second sentence of that footnote.  You cite --
17    A.  Right.
18    Q.  -- to Stout Reference Number 2.
19    A.  Right.  I mean, the reference numbers --
20  Stout reference numbers were arbitrarily assigned by
21  my staff.  We just wanted to be able to, through all
22  the analyses, track an asset by a number.
23    Q.  Right.  I understand.  And my understanding
24  is that there is, like, multiple stat reference
25  numbers in the various schedules to your report,

30 (Pages 114 - 117)

CONFIDENTIAL



Page 118

1  correct?
2      A.  Yes, one for every kind of key line item in
3  the analysis.
4      Q.  Right.  So I just want to make sure that the
5  Stout Reference Number 2 essentially is consistent
6  across these schedules?
7      A.  It's supposed to be, yes.
8      Q.  Okay.

24      Q.  Okay.  And did you do anything --
25      A.  I have not reviewed any documents from that

Page 119

1  legal matter.
2      Q.  Understood.  Okay.  And I also suppose -- I
3  also assume that your -- the basis for your
4  understanding that the founder respected the supposed
5  value was also from counsel?
6      A.  Yes.
7      Q.  And also you did not review documents related
8  to that proceeding to verify that assumption, correct?
9      A.  One thing I did review to verify the
10  assumption is that in August of 2025, Bitcoin was
11  trading about 100,000 a token.

17      Q.  So essentially it's just a process of
18  inference from the futures prices, correct?
19      A.  Yes.
20      Q.  Okay.  Sir, if we can go to page 17 of your
21  report.
22      A.  Okay.
23

Page 120

1

7      Q.  Sir, did you review all individual loan
8  agreements that your report covers?
9      A.  We reviewed all the individual loan
10  agreements that we had available to update our
11  analysis going forward after May 31, 2022.
12      Q.  So who is the "we" in your sentence?
13      A.  My team.  I mean, I have personally read many
14  term sheets and master loan agreements from various
15  lenders in this matter.  I didn't want to infer that I
16  had told you about every single one of them because I
17  didn't review them all.  I reviewed the major ones.
18      Q.  What are the major ones, sir?
19      A.  Well, it would be primarily around the
20  primary lenders, significant lenders.
21      Q.  And what are the names of some of those
22  primary lenders?
23      A.  So in my report, there is an Exhibit M, like
24  Mary, and M.3 shows a summary of the conclusions of
25  that exhibit for all the loans.  And you'll see on

Page 121

1  Exhibit M.3 I've got a column that says, "prior
2  lender, yes or no."

5      Q.  Thank you, sir.
6

11      Q.  So are you giving an opinion -- a legal
12  opinion as to the nature of the call terms of these
13  agreements?
14          MR. NIEMEYER:  Object to form.
15      A.  I'm not planning on opining on legal terms of
16  the agreements.
17

24      Q.  (BY MR. LUU)  And you're not purporting to
25  give any legal opinions, correct?

31 (Pages 118 - 121)

CONFIDENTIAL

1          MR. NIEMEYER:  Objection to form.
2      A.  I am not planning on giving any legal
3  opinions.  I'm planning on discussing solvency.
4  ████████████████  ████████████
████████████████████████████
████████████████████████
█  █████████████████████
█  ██████████████████
███████████████████████████
█  █████████  ██████████████
█  █████████████████████
██████████████████████████████
███  ████████████████████████
██████████████████████████
███████████████████████
███████████████████████
23      Q.  Okay.  So that was an assumption?
24      A.  And -- that was an assumption for my solvency
25  analysis.  So I'm not preparing to offer legal

1  opinions.  ██████████████████
████████████████████████████
███████████████████████
5      Q.  Okay.  So when you analyze these callable
6  loans, do you consider whether or not the loans would
7  be able to be renegotiated or deferred?
8      A.  No.
9      Q.  Okay.  I want to talk a little bit about the
10  FTX Loans section on the same page, 17.
11      A.  Okay.
12      Q.  You state, "3AC's loans from FTX were
13  directly identifiable based on document FTX_3AC_38.
14  Nearly all of 3AC's loans with FTX were denominated in
15  USD, although I noted other smaller obligations in
16  RUNE.  The supporting analysis behind the May 31st,
17  2022, value for this liability categories is reflected
18  in Exhibit I.3," correct?
19      A.  Correct.
20      Q.  Did you review any loan agreements between
21  FTX and 3AC?
22      A.  Yes.
23      Q.  And what was that loan agreement?
24      A.  I reviewed the copy of the letter of credit.
25      Q.  The line of credit you mean?

1      A.  The line of credit.  I'm sorry.
2      Q.  Right.  And that was -- as we discussed
3  earlier was on the balance sheet prepared by Ascent.
4  It was listed as either 110 or 120 million, correct?
5      A.  Correct.
6      Q.  And you did not review any other loan
7  agreements between FTX and 3AC?
8      A.  Since we got the information directly from
9  FTX, I don't know if we went back and second guessed
10  what the information FTX was giving us.  I think
11  under -- I think we believed -- well, I think we used
12  the information FTX gave us as deemed accurate.
13      Q.  Okay.  And that document is FTX 38 or FTX 38
14  amended, correct?
15      A.  Correct.
16      Q.  And does that document describe any loans
17  that FTX provided to 3AC?
18      A.  Yes.
19          MR. LUU:  Shamus, would you please pull
20  up tab 9?
21      A.  It's still loading.
22          MR. NIEMEYER:  Same for me.
23          THE WITNESS:  Okay.
24          (Exhibit No. 7 marked.)
25      A.  Okay.  Okay.  I have Exhibit 7-9 open.

1      Q.  (BY MR. LUU)  So we just introduced an
2  exhibit and this document is Exhibit 7.  The document
3  bears production number FTX_3AC_0000000038.  Do you
4  have that in front of you?
5      A.  I do.
6      Q.  And you said that you used this document to
7  categorize the amount of loans that 3AC purportedly
8  owed to FTX, correct?
9      A.  We use this document because we understood it
10  represented the loans FTX said it was owed.
11      Q.  Right, but -- so look at row number 1.
12  That's the name of different columns in this
13  spreadsheet, correct?
14      A.  Yes.
15      Q.  Does that row include the word "loan"
16  anywhere?
17      A.  I don't see the word "loan" on it.
18      Q.  So what is the basis for your
19  recategorization of certain amount as a loan that 3AC
20  purportedly owed to FTX?
21      A.  It was based on the -- I mean, we treated
22  these as loans and tallied them up and overwrote the
23  value for the FTX loans from Ascent with this revised
24  number.
25      Q.  And what is the basis for overriding the

32 (Pages 122 - 125)

CONFIDENTIAL

1 Ascent document and treating it as a loan?
2    A. Because we understood from Ascent that there
3 could be errors in the FTX numbers given the high
4 volume of trading. Therefore, we understood also that
5 FTX had produced document 38, so we used that as the
6 best indicator of information related to FTX's
7 transactions with Three Arrows Capital.
8    Q. I understand that, but as we just discussed,
9 the word "loan" doesn't appear anywhere in this
10 document, 38, right?  So what is the basis for
11 categorizing a certain amount as a loan that 3AC
12 purportedly owed to FTX?
13    A. I mean, the basis is the quantities in here
14 times the notional currency amount is the value of the
15 loans.
16    Q. But why would you be able to call that a loan
17 if the document doesn't include the word "loan"
18 anywhere?
19    A. Because it was our understanding that this
20 was a schedule of loans.
21    Q. Who gave you that understanding, sir?
22    A. I -- I can't answer that as I sit here.
23    Q. Okay. So as a summary, the document 38
24 doesn't include the word "loan" anywhere. The only
25 loan agreement between 3AC and FTX that you reviewed

1 is the line of credit agreement in the amount of 120
2 million, correct?
3         MR. NIEMEYER:  Objection to form,
4 misstates testimony.
5    A. Yes, I personally reviewed the line of credit
6 deal with FTX, but we had other FTX information that
7 was reviewed in developing our analyses.
8    Q. (BY MR. LUU)  Right, but what information
9 would allow you to state that certain amount on the
10 FTX 38 should be categorized as a loan that 3AC
11 purportedly owed to FTX?
12    A. I'm not sure how to answer your question.
13 I'm happy to take a look at a break and go back in the
14 models and see if I can figure out an appropriate
15 answer.
16    Q. That's fine, but as of right now, you don't
17 have a basis, correct?
18    A. I'm getting to the right page. As I sit here
19 right now, I would have to go back and take a look at
20 some more stuff.
21    Q. That's fine. So if you could please go back
22 to Exhibit B to your report, which is Exhibit 1 in
23 this deposition.
24    A. Okay.
25    Q. Would you please give me one second. Okay.

1 So once again, this Exhibit B includes three main
2 columns, correct?
3    A. Correct, the NAV Pack, we recategorized the
4 NAV Pack, we kept the values constant, and then
5 updated for the additional FTX information.
6    Q. Okay.
7    A. As well as consistent pricing from a pricing
8 aggregator.
9    Q. Okay. Looking at this Exhibit B, am I
10 correct that you did not adjust the value of any
11 assets associated with the 3AC accounts on any other
12 exchanges, other than FTX?
13    A. I mean, we adjusted values on other exchanges
14 in our day-to-day change going from May 31 to June
15 12th.
16    Q. As of May 31 on Exhibit B?
17    A. As of May 31, we did not have any indication,
18 as we did with the FTX, that there was a problem with
19 a number and had we, we would have updated also.
20    Q. Okay. And so for all of these other assets
21 associated with the 3AC accounts on other exchanges
22 besides FTX, you use a net value of all such assets in
23 the same way the Ascent NAV Pack categorized those
24 assets, correct?
25         MR. NIEMEYER:  Objection to form.

1    A. The right-hand column on Exhibit B is my
2 starting point for my day-to-day analysis, not the
3 middle column.
4 
8    Q. No, right now I'm just talking about May
9 31st.
10    A. Okay.
11    Q. So as of May 31st, you separated the assets
12 associated with the 3AC account on FTX into assets and
13 liabilities based on this document, correct?
14    A. Correct.
15    Q. But you did not do that for any other assets
16 associated with the 3AC accounts on any other
17 exchanges, correct?
18    A. Correct.
19    Q. And the reason -- what is the reason for you
20 to separate the assets associated with the 3AC
21 accounts on the FTX Exchange into assets and
22 liabilities?
23    A. Because your client produced two different
24 versions of document 38, and we wanted to try to be
25 complete and consider them both.

CONFIDENTIAL

1    Q. Right. But Ascent did not separate the
2 assets associated with a 3AC account on the FTX
3 Exchange into assets and liabilities, correct?
4    A. Correct.
5    Q. They were all listed as "cash at bank" on the
6 balance sheet under "assets," correct?
7    A. With liabilities denoted as a negative
8 number, yes, correct.
9    Q. Okay. And, once again, for other exchanges
10 other than FTX, you did not categorize any negative
11 balance associated with any individual token on any
12 other exchanges as a liability, correct?
13    A. Correct. We would present it as a net number
14 getting back to the exact same conclusion, just a
15 different presentation.
16    MR. LUU: Okay. I think now is a good
17 time to take a lunch break, and then we can come back
18 in about 30 to 45 minutes.
19    MR. NIEMEYER: Greg, does that work?
20    THE WITNESS: Oh, that's fine. Counsel,
21 do you think we're going to go all day or do you think
22 we're going to wrap up before?
23    MR. LUU: I don't think it's going to be
24 all day, but we'll try to wrap up as soon as we can.
25 If you have any issues in terms of timing, please let

1 us know so we can track of the record.
2    THE WITNESS: Got a Christmas party, but
3 other than that, I'm good.
4    THE VIDEOGRAPHER: Off the record at
5 11:32.
6    (Recess 11:32 to 12:07.)
7    THE VIDEOGRAPHER: We're on the record.
8 The time is 12:07 p.m.
9    Q. (BY MR. LUU) Mr. Scheig, welcome back.
10    A. Thank you.
11    Q. I would like to go back to Exhibit 1 of this
12 deposition, which is your report in this case. If you
13 could please turn to page 18.
14    A. Okay.
15    Q. Sir, under the section head bolded as
16 "Analysis - After May 31st, 2022 (Roll Forward)." Are
17 you with me?
18    A. Yes.
19    Q. Starting on page 18 in this section, you
20 describe your roll forward analysis from May 31st,
21 2022, to June 12th, 2022, correct?
22    A. Yes.
23    Q. Sir, what is a roll forward analysis?
24    A. It was the work we were required to do to
25 come up with a view of Three Arrows Capital's

1 financial position as of June 12th.
2    Q. And how did you do that, sir?
3    A. As described in my report, we started with
4 Ascent NAV Pack values, we updated it for the revised
5 FTX information we received, and we went to -- we
6 relied upon pricing aggregators like CoinGecko for the
7 prices of the various tokens. And then every day we
8 basically analyzed, did the quantity change and did
9 the price change and that created a different value
10 which gave us a value day by day.
11    Q. And the end result of that analysis is the
12 June 12th, 2022, values, correct?
13    A. Correct.
14    Q. Okay. Sir, in footnote 26 on this page you
15 state that, "I note that some of 3AC's position
16 quantities change on a daily basis (for example,
17 crypto tokens that were often bought and sold), while
18 other asset quantities did not change as they were
19 longer-term holdings (such as the private SAFE/SAFT
20 investments). For data that was unavailable and
21 assets under 5 million. I assumed these assets
22 positions remained constant from May 31st, 2022, to
23 the measurement date." Did I read that correctly,
24 sir?
25    A. You did.

1    Q. Once again, what is the basis for using
2 assets under 5 million?
3    A. Materiality.
4    Q. And that is the same materiality threshold
5 that you described earlier in this deposition,
6 correct?
7    A. Correct.
8    Q. And for how many assets were the data
9 unavailable for?
10    A. I don't have that exact number.
11    Q. Okay. And all -- any -- were all of these
12 digital assets?
13    A. Were they what assets?
14    Q. Were all of the assets whose data was
15 unavailable, were they all digital assets?
16    A. Well, and when I say "digital assets" just to
17 clarify, it is -- we updated the pricing information.
18 We're just talking about updating the quantities --
19    Q. Yes.
20    A. -- of those digital assets. And for the
21 private investments in these various partnerships and
22 things like that, we had no information. So you'll
23 see those numbers stay static. We did not reduce
24 Three Arrows Capital for anything, but we did not
25 increase it.

CONFIDENTIAL



Page 134

1    Q.  Okay.  And for those assets whose data was
2  unavailable and whose value was under 5 million, you
3  assume that the value stayed constant, correct?
4        MR. NIEMEYER:  Object to form.
5    A.  Stay constant.  If the token -- if the
6  underlying token changed, it would change our value in
7  our analysis.
8    Q.  (BY MR. LUU)  Right.  If the price changes?
9    A.  If the price changes, we reflect it.
10    Q.  Okay.  If you could please turn to page 19 of
11  your report, in paragraph 7, starting with "regarding
12  3AC's liabilities from May 31st, 2022.  Are you with
13  me?
14    A.  Page 17 of my report.
15    Q.  Page 19, sir.
16    A.  19 of my report.  Okay.
17    Q.  Yes.  In paragraph 7 -- do you see the
18  paragraph number?
19    A.  Yes.
20

Page 135

1

20    Q.  Okay.  And, sir, did you review any
21  communications, including e-mails, related to the
22  negotiations of these additional loans?
23    A.  No.
24    Q.  Okay.  As you mentioned earlier, it doesn't
25  really matter whether or not it was a new loan or

Page 136

1  existing loan that was increased, right?
2    A.  Correct.
3

Page 137

1

20    Q.  Okay.  Sir, if you could turn to page 11 of
21  your report.
22    A.  Okay.
23    Q.  Under Section 2, "The Cash Flow Test."
24    A.  Yes.
25    Q.  And here you provide overview of the cash

35 (Pages 134 - 137)

CONFIDENTIAL

CONFIDENTIAL

Page 138

1 flow test, correct?
2    A.  Yes.
3    Q.  And the cash flow test is also known by
4 another name, right?
5    A.  The cash flow test is also known by another
6 name?
7    Q.  For instance, isn't the cash flow test also
8 known as the "ability to pay debt" test?
9    A.  I think I've heard it called that, but I
10 typically refer to it as the cash flow test.
11    Q.  Understood.  Sir, on this page 11, you listed
12 four bullet points describing "points in BVI law on
13 the cash flow test," correct?
14    A.  Correct.
15    Q.  And you received these four bullet points
16 from counsel, right?
17    A.  Yes.
18    Q.  And did you do anything to verify the
19 accuracy of these bullet points?
20    A.  No.
21    Q.  Okay.
22    A.  I'm not an attorney.
23    Q.  Understood.  And you did not include any
24 assumptions based on BVI law in either the balance
25 sheet test we discussed or the reasonable capital test

Page 139

1 later in the report, correct?
2    A.  I can't think of one.
3    Q.  Okay.  What is your understanding as to why
4 this particular cash flow test requires BVI law
5 assumptions?
6    A.  I don't have an understanding.  Counsel just
7 advised us on under BVI this is what they look at in a
8 cash flow test, and I recognize that in my report.
9    Q.  Understood.  And does instructions from
10 counsel regarding BVI law change the way you perform
11 the cash flow test in any way?
12    A.  I would say that these paragraph -- these
13 four bullets on BVI law support the framework of my
14 cash flow test, and they also support the assumption
15 made in that cash flow test.
16    Q.  Okay.  Could you turn to page 23 of your
17 report?  This is where you start describing the cash
18 flow test that you performed.
19    A.  Okay.
20

Page 140

1

12    Q.  As we discussed at the very beginning of this
13 deposition, you did not receive any communications in
14 which 3AC sent the asset under management letters to
15 its lender and investors, correct?
16        MR. NIEMEYER:  Objection to form,
17 misstates testimony.
18    A.  So there may be a communication in there.
19 I'm just saying I don't recall it as I sit here today.
20    Q.  (BY MR. LUU)  Right.  I'm just asking.  You
21 have not reviewed any of those communications,
22 correct, if they exist?
23    A.  Not that I recall.
24        MR. NIEMEYER:  Same objection.
25

Page 141

1

36 (Pages 138 - 141)

CONFIDENTIAL

1 ██████████████
2   Q.  Okay.  And, once again, you are not
3 opining -- you're not providing a legal opinion on the
4 nature of the Material Adverse Event clause in those
5 loan agreements, correct?
6   A.  No, I'm providing a solvency agreement.
7   Q.  Okay.  Understood.  As part of your
8 performance of the cash flow test, did you consider
9 whether or not lenders would first make a margin call
10 before actually calling the loan?
11   A.  I assumed it would -- I mean, I understand
12 there could be a timing difference in there, but Three
13 Arrows Capital, you know, was in a position where it
14 couldn't have done much of anything.  ████████████
██████████████████████████
█████ ████████████████████████████████
███████████████████ ████████████
████████████████████████████████████████
███████████ ██████████████████████
████████████████████████████████
█████████████████████████████████████

1 ████████████████████
█ ███████████████████████████
   ██████████
4   Q.  So you, likewise, did not consider any
5 scenarios in which 3AC might have been able to
6 restructure the loans before the loans were called,
7 correct?
8   A.  No, I did not create any other workout
9 scenarios.
10   Q.  Okay.  Is it fair to say that among the
11 various degrees of financial distress to a lend -- to
12 borrow, a scenario in which all of their lenders
13 immediately call all of the loans to that borrower is
14 among the most financially stressful for that company?
15        MR. NIEMEYER:  Objection to the form.
16   A.  I listened to your question very carefully.
17 I'm not sure exactly what you're asking me, sir.
18   Q.  (BY MR. LUU)  I'm asking that a company can
19 face various degrees of financial distress, correct?
20   A.  Correct.
21   Q.  And among those various scenarios of
22 financial distress, a scenario in which all of their
23 lenders immediately call all of their loans is among
24 the most financially stressful for that particular
25 company, correct?

1   A.  I would agree.
2 █ █████████████████████████
████████████████████████████████
█ ████████████████
█ ████████████
█ ████████████████████████████
████████████████████████
9        MR. NIEMEYER:  Object to form.
10 ███████████████████████████████████
████████████████████████████████████
█████
13   Q.  (BY MR. LUU)  Okay.  So have you made such an
14 assumption in any other solvency opinions that you
15 previously given -- gave?
16   A.  Previous solvency opinions I have given were
17 more -- were operating companies so that made -- you
18 know, manufactured or produced oil and gas and
19 basically had debt, you know, due -- we got a debt
20 issue due in six months, we've got a debt issue due in
21 12 months.  It was just -- it was a different.  It was
22 a longer-term assumption, ████████████████████
██████████████████████████████
██████████████████████████████████████
25   Q.  My question was whether or not you have made

1 that assumption in any other solvency opinions.  It's
2 a yes or no question, sir.
3   A.  I mean, it's not really an assumption if the
4 debt is due.  This is -- normally, in my previous
5 solvency opinions, I've dealt with term debt, you
6 know, a five-year loan, interest payments annually,
7 and principal at the end.  That's typically what we're
8 testing around for solvency measurement.  ████████
████████████████████████████████████████████
██████████████████████████  So it's just
11 kind of a different animal, so I handled it the way I
12 did.
13   Q.  Okay.  Sir, could you please turn to page 26
14 of your report?  So this is your description of the
15 reasonable capital test that you performed, right?
16   A.  Correct.
17   Q.  And the reasonable capital test is also known
18 by the name of the Capital Adequacy Test, right?
19   A.  I have heard it called that.
20   Q.  Thank you.  On page 26 in the second full
21 paragraph you state, "In performing" --
22   A.  Okay.
23   Q.  -- "In performing the Reasonable Capital Test
24 on 3AC, I developed a downsize (sensitivity) analysis
25 showing the impact on the company of a 20 percent



CONFIDENTIAL

Page 146

1 reduction in the value of its crypto assets to
2 ascertain whether the company would be able to
3 maintain a reasonable marginal of safety with respect
4 to its required payments and obligations." Did I read
5 that correctly?
6     A. You did.
7     Q. And then in footnote 34 supporting that
8 sentence I just read, you state, "I note that 20
9 percent is generally considered a standard sensitivity
10 level for solvency analyses. However, in the crypto
11 environment, this may be overly conservative given the
12 significant volatility of the industry and currently,
13 slash, token prices as discussed. Regardless, 3AC
14 would still fail the Reasonable Capital Test." Did I
15 read that correctly, sir?
16     A. I believe you did.
17     Q. You did not provide any citation to support
18 the assertion that 20 percent is generally considered
19 a standard sensitivity legal for solvency analysis,
20 correct?
21     A. Correct. I did not provide a cite.
22     Q. Sitting here today, can you think of any
23 established forces or academic studies that will
24 support that assertion?
25     A. I would say industry practice.

Page 147

1     Q. Okay. And we established earlier that you
2 have never prepared a solvency opinion of a
3 cryptocurrency hedge fund before, correct?
4     A. Correct.
5     Q. Or any other firms that traded in
6 cryptocurrency in general?
7     A. Correct. I testified I dealt with
8 cryptocurrency, but not a cryptocurrency trading firm.
9     Q. So in your prior experience, I think it was
10 in a estate plan, right, that you performed some
11 assets that were cryptocurrency. Did you also apply
12 20 percent sensitivity level?
13         MR. NIEMEYER: Objection, form.
14     A. No, because that was an insolvency analysis.
15     Q. (BY MR. LUU) Okay. Can you turn quickly to
16 page 7 of your report?
17     A. Okay.
18     Q. And this is a chart showing the decrease in
19 price of Bitcoin and Ether from May 31st, 2022, to
20 June 12th, 2022, right?
21     A. Correct.
22     Q. And I think in the paragraph above the chart
23 you state that, "Between May 31st, 2022, and the
24 measurement date, cryptocurrency prices declined even
25 further and at an accelerated rate, with BTC and ETH

Page 148

1 declining an additional 16 percent and 25.6 percent
2 respectively in just 12 days," right?
3     A. Right.
4     Q. So between May 31st, 2022, and the
5 measurement date, the price of digital assets,
6 including BTC and ETH declined already?
7     A. Correct.
8     Q. And you applied an additional 20 percent
9 reduction on top of that decrease in price, correct?
10     A. For the reasonable capital test, which that's
11 the difference between the reasonable capital test and
12 the cash flow test. Cash flow test, if you pass it by
13 a dollar, in theory, you're solvent. However, if you
14 can only pass the cash flow test, but if there's one
15 order missed by your procurement department, you're
16 going to fall short. The reasonable capital test
17 captures that additional margin of safety not
18 reflected in the cash flow test.
19     Q. Okay. So basically the application of a 20
20 percent -- 20 percent sensitivity level is specific to
21 the Reasonable Cash Flow Test?
22     A. Yes.
23     Q. Reasonable Capital Test. I'm sorry.
24         Isn't it true that as part of the
25 Reasonable Capital Test, it is typical to consider the

Page 149

1 company's access to capital?
2     A. Yes.
3     Q. And also the company's ability to raise
4 capital, correct?
5     A. Correct.
6



CONFIDENTIAL

Page 150



13  Q. Sir, could you please turn to page 30 of your
14  report?
15  A. Okay.
16  Q. Under the section "Subsequent Events to June
17  12, 2022," in the first bullet point of that section
18  you state, "Between June 12th and June 14th, 2022,
19  nearly all of 3AC assets on the FTX platform were sold
20  to satisfy 3AC's liabilities to FTX," correct?
21  A. Correct.
22  Q. And as a support for that sentence you cite
23  to an article from CoinDesk, right?
24  A. Yes.
25  Q. And that article discussed the objections

Page 151

1  filed by the FTX Recovery Trust to the amended proof
2  of claim filed by the Joint Liquidators of Three
3  Arrows Capital, Limited, correct?
4  A. Yes.
5  Q. Okay. So what is the basis for your
6  statement that the sales of general assets associated
7  with the 3AC accounts on FTX will make to satisfy
8  3AC's liabilities on FTX?
9  A. The article cited in Footnote 37.
10  Q. Okay. But you have not spoken to anyone who
11  worked at 3AC between June 12 and 14, 2022, correct?
12  A. No, I have not.
13  Q. So you are not providing an opinion on the
14  intent of any traders of 3AC who conducted the trades
15  that sold the digital assets for USD on the FTX
16  Exchange, correct?
17  A. Yes, I have no opinion on subsequent events,
18  but for mentioned in my report.
19  Q. Okay. So put differently, you are not
20  opining on whether the sales of a particular asset
21  associated with the 3AC accounts were made with any
22  specific intent or purposes, correct?
23  A. That wasn't part of my analysis.
24  Q. Okay. If we could please go back to the
25  supplemental exhibit pages. I believe that is Exhibit

Page 152

1  2 in this deposition.
2  A. Yes.
3  Q. Please give me one second.
4  Sir, if you could please look at Exhibit
5  I.1 of that supplemental analysis pages?
6  A. Yes.
7  Q. Before the break at the beginning of the
8  deposition, we discussed this document, right?
9  A. Yes.
10  Q. Once again, for the record, what is the
11  difference between the amended Exhibit I.1 in the
12  supplemental analysis exhibits pages and the original
13  Exhibit I.1 in your report?
14  MR. NIEMEYER: Objection to form.
15  

Page 153

1  .
3  Q. Okay. And so as part of that, the new
4  amended Exhibit I.1 reflects the net value position,
5  correct?
6  MR. NIEMEYER: Objection to form.
7  A. Correct.
8  Q. (BY MR. LUU) And the original Exhibit I.1
9  reflects the gross position?
10  A. Correct. That's why the debt in the
11  supplemental is lower than the debt in the original
12  because the debt in the original on Exhibit I.1
13  reflected additional value offset by an asset so they
14  net to about the same.
15  Q. And what is that -- one second.
16  So you said that's why the debt in the
17  supplemental is lower than the debt in the original
18  because the debt in the original Exhibit I.1
19  reflected additional value offset by an asset so they
20  net out to about the same?
21  A. Yes.
22  Q. Right? And what is that asset?
23  A. The futures positions.
24  Q. Okay. So --
25  A. The FTX futures asset.

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

1    Q.  Understood.  So ease of the amended Exhibit
2  I.1 in these supplemental analysis pages, does that
3  replace the original Exhibit I.1 in your report?
4    A.  No.  Supplemental I.1 was never produced, but
5  it was part of the conclusion within my supplemental
6  test.  So basically out of all of the spreadsheets, we
7  didn't include one schedule and I wanted to be
8  complete.
9    Q.  I understand.  Thank you, sir.
10       If you could turn quickly to Exhibit I.3.
11    A.  Okay.
12    Q.  So I think as we discussed earlier, the
13  Exhibit I.3 reflects the position values of FTX spot
14  asset analysis, right?
15    A.  Correct.
16    Q.  And you did that by multiplying the quantity
17  of the spot assets in Exhibit I.1 with the price in
18  Exhibit I.2?
19    A.  That is correct.
20    Q.  And the price in Exhibit I.2 didn't change
21  across the two versions?
22    A.  Yes.  I mean, they have nothing to do with
23  FTX changing its presentation.
24    Q.  Okay.  And looking at Exhibit I.3, am I
25  correct that the only difference between the original

Page 155

1  Exhibit I.3 and the supplemental Exhibit I.3 is back
2  to row 35, total loans?
3    A.  Correct.
4    Q.  And also line 31 USD, right?
5    A.  Right, right, which is a sub -- you know,
6  it's a component of the final number, yeah.
7    Q.  I understand.
8       Sir, could you describe what lines 32,
9  33, 34, and 35 refer to in Exhibit I.3?
10    A.  Okay.  Well, I'm going to talk about June
11  12th as a day --
12    Q.  That's fine.
13    A.  -- on this schedule I.3.  And once again,
14  Counselor, am I looking at supplemental Exhibit I.3
15  or...
16    Q.  Yes, supplemental Exhibit I.3.
17    A.  Okay.  All right.
18    Q.  Thank you, sir.
19

Page 156

1

24    Q.  Okay.  So earlier you testified that the
25  supplemental Exhibit I.3 is not supposed to replace

Page 157

1  the original Exhibit I.3, correct?
2    A.  That is correct.
3    Q.  Does the supplement --
4    A.  It was not included in my original report.
5    Q.  I understood -- understand.
6       So does the supplemental Exhibit I.3
7  change any of your analysis of the three insolvency
8  tests that were performed?
9    A.  No.  I mean, it changes the number that comes
10  out at the bottom of the page,

16    Q.  Thank you.
17       MR. LUU:  If we could please take a quick
18  break for about ten minutes, if that's okay.
19       THE VIDEOGRAPHER:  Off the record.
20  12:45.
21       (Recess 12:45 to 1:02.)
22       THE VIDEOGRAPHER:  We're on the record.
23  The time is 1:02 p.m.
24       MR. LUU:  Mr. Scheig, welcome back.
25       THE WITNESS:  Thank you.

40 (Pages 154 - 157)

CONFIDENTIAL

1          MR. LUU:  I have no further questions.  I
2  would just note that during the deposition the witness
3  referred to certain documents, such as the annual
4  report of 3AC as of December 31st, 2020, and certain
5  communications between Ascent and through 3AC
6  regarding potential issues of the data related to FTX
7  given the high volume of trading during that time.
8  And the witness testified that these documents are
9  either listed in Index 2 or should be -- I'm sorry, in
10  Appendix 2 or should be listed in Appendix 2.  The FTX
11  Recovery Trust reserves all rights with respect to
12  these documents and information.  Otherwise, we have
13  no further questions.  Thank you.
14          EXAMINATION
15  BY MR. NIEMEYER:
16     Q.  Okay.  I have a couple of questions for
17  redirect.  Mr. Scheig, earlier today you were asked
18  questions about the Ascent NAV Packs and what you did
19  to verify the information in there.  Do you recall
20  that testimony?
21     A.  Yes, I did, and I would like to clear one
22  thing up.  When you asked me -- when -- excuse me --
23  Mr. Luu asked me the question about what did you do to
24  think about are the NAV Packs a reasonable way of
25  determining the value of a company, I took it back to,

1  yes, I compared it to an annual report, but that was
2  clearly not the only validation we did.  In our report
3  said we compared Bitcoin and the NAV Pack, Bitcoin and
4  CoinGecko.  So we made many comparisons besides just
5  the overarching comparison that NAV Pack an be used
6  similar to an annual report.
7     Q.  And earlier today you were also asked whether
8  you analyzed the loans -- 3AC's loans and whether they
9  could be restructured or renegotiated right before the
10  measurement date.  Do you recall that testimony?
11     A.  Yes.
12     Q.  And you said you did not analyze whether they
13  could be restructured or renegotiated?
14     A.  No, I did not do different restructuring
15  scenario analyses, but, you know, I also -- in this
16  particular set of facts, the future pretty much
17  supports the assumptions given to me by counsel that
18  the loans would be called because virtually -- it's my
19  understanding that virtually all of the loans were
20  called within a few days after my measurement date.
21     Q.  And then earlier today also you were asked
22  about the document 38.  I believe it was Exhibit --
23     A.  6 maybe.
24     Q.  -- 7.
25     A.  7.

1     Q.  Exhibit 7 to your deposition.  And you --
2  when looking at that, you couldn't -- you were unable
3  to discuss the liabilities or loans within it.  Have
4  you had a chance to take a look at it on the break?
5     A.  Yes.
6          THE WITNESS:  And, Mr. Luu, I don't think
7  I was following your exact line of questioning.  You
8  kept asking about whether I saw the word "loan" on the
9  document.
10     A.  And no, the word loan does not -- the word
11  "loan" does not show up on the document.  You know, we
12  use the term loan as analogous to liability or
13  obligation.  So the negative numbers on document 38
14  are what we considered FTX loans.  The positive
15  numbers were positions.  So although we called it a
16  loan, I realize that FTX is not a bank per se.
17          THE WITNESS:  But I'm having -- I need to
18  change headsets.  This one's battery just died.  Can
19  you all hear me?  Okay.  Sorry about that.  My battery
20  died.
21     A.  Okay.  So on the questions, I think, document
22  38, we treated the negative numbers on document 38 as
23  a loan.  We called it a loan.  I realize FTX is not a
24  bank per se, but it was an obligation -- you know, it
25  was an amount that needed to be repaid.

1     Q.  (BY MR. NIEMEYER)  And then earlier today you
2  were asked about the four supplemental exhibits you
3  produced.  Do you remember that testimony?
4     A.  Yes.
5     Q.  Can you clarify why those four documents were
6  provided?
7     A.  They were provided not because any of my
8  opinions changed, but because one of the sheets that
9  backed up my supplemental analysis exhibit was not
10  included in my 300-and-something-page report, so I
11  just wanted to be complete.  I added a support that
12  rolled up to the original conclusion of our report.  I
13  did not change my report.
14     Q.  And the supplemental exhibits only applied to
15  your supplemental analysis based off of amended
16  document 38?
17     A.  That is correct.
18     Q.  And they have no change to your original
19  report and original analysis using original document
20  38?
21     A.  Right.  It was nothing changed.  I just did
22  not produce one page I should have.
23     Q.  And then with respect to the GAAP discussion
24  that you held with Mr. Luu earlier today, you
25  mentioned a document that you were provided after you

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1 submitted your report, correct?
2    A. Yes.
3    Q. I'm going to introduce that document right
4 now. It should be Exhibit 8.
5       (Exhibit No. 8 marked.)
6    Q. (BY MR. NIEMEYER) Let me know when you have
7 that document.
8    A. Not yet. Maybe I need to refresh. I see
9 Exhibit 7 and 9. Is that what you're talking about?
10    Q. No.
11       MR. NIEMEYER: Can we go off the record
12 for one minute?
13       MR. LUU: That's fine.
14       THE VIDEOGRAPHER: Off the record. 1:09.
15       (Recess 1:09 to 1:11.)
16       THE VIDEOGRAPHER: We're on the record.
17 The time is 1:11.
18       MR. NIEMEYER: Thank you.
19    Q. (BY MR. NIEMEYER) Mr. Scheig, I have given
20 you a document that's been marked as Exhibit 8. Let
21 me know when you have it.
22    A. I have it.
23    Q. And this is a document labeled "FTX Trading,
24 Ltd., Consolidated Financial Statements," correct?
25    A. Correct.

Page 163

1    Q. And the first Bates stamp there is -- ends in
2 FTX_3AC_000046173, correct?
3    A. Correct.
4    Q. And is this the document that you referred to
5 earlier today that you received after you submitted
6 your report?
7    A. Yes.
8    Q. And your understanding is FTX provided this
9 document after you submitted your report?
10    A. That's my understanding.
11    Q. All right. And earlier today you were
12 discussing the GAAP analysis within your -- within
13 your report and you were asked questions about whether
14 you were providing a legal opinion over control of
15 assets, correct?
16    A. Correct.
17    Q. And you said you were not providing a legal
18 opinion?
19    A. Correct. My goal is not to provide a legal
20 opinion.
21    Q. What are you opining on with respect to your
22 GAAP analysis in this document?
23    A. I'm just opining on what I observed in FTX's
24 annual report as an accountant was that the customer
25 assets are not shown on the balance sheet of FTX.

Page 164

1    Q. And you were able to confirm that by looking
2 at this document?
3    A. Correct.
4       MR. NIEMEYER: No further questions. I
5 do want to state for the record that the Joint
6 Liquidators of Three Arrows Capital are making this --
7 marking this deposition and the transcript as
8 confidential.
9       MR. LUU: Yeah, the Recovery Trust will
10 reserve all rights with respect to that designation,
11 but understood.
12       THE VIDEOGRAPHER: Mr. Luu, do you have
13 any additional questions?
14       MR. LUU: No, I do not. Thank you.
15       THE VIDEOGRAPHER: Okay. We are off the
16 record at 1:13.
17       (Deposition concluded at 1:13 p.m.)

Page 165

1 STATE OF TEXAS )
2 COUNTY OF DALLAS )
3    I, Audra B. Paty, Certified Shorthand
4 Reporter, in and for the State of Texas, certify that
5 the foregoing deposition of GREGORY SCHEIG was
6 reported stenographically by me at the time and place
7 indicated, said witness having been placed under oath
8 by me; that review was requested pursuant to Federal
9 Rule of Civil Procedure 30(e)(1); and that the
10 deposition is a true record of the testimony given by
11 the witness.
12    I further certify that I am neither counsel
13 for nor related to any party in this cause and am not
14 financially interested in its outcome.
15    Given under my hand on this the 16th day of
16 December, 2025.
17
18
   Audra B. Paty, CSR
19 Texas CSR #5987
   Expiration: 10/31/2026
20 VERITEXT LEGAL SOLUTIONS
   Firm Registration No. 571
21 300 Throckmorton, Suite 1600
   Fort Worth, Texas 76102
22 817-336-3042
23 Time used by each party:
   Mr. Luu - 3:39
24 Mr. Niemeyer - 0:11
25

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

1  John D. Niemeyer
2  john.niemeyer@lw.com
3        December 16, 2025
4  RE: In re: FTX TRADING LTD., et al.
5    12/12/2025, Gregory Scheig (#7771812)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-ny@veritext.com.
16    Return completed errata within 30 days from
17  receipt of testimony.
18    If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22        Yours,
23        Veritext Legal Solutions
24
25

Page 168

1  In re: FTX TRADING LTD., et al.
2  12/12/2025 - Gregory Scheig (#7771812)
3        ACKNOWLEDGEMENT OF DEPONENT
4    I, Gregory Scheig, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____   _____
12  Gregory Scheig            Date
13  *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15        _____ DAY OF _____, 20___.
16
17
18        _____
19        NOTARY PUBLIC
20
21
22
23
24
25

Page 167

1  In re: FTX TRADING LTD., et al.
2  12/12/2025 - Gregory Scheig (#7771812)
3        E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____   _____
24  Gregory Scheig            Date
25

43 (Pages 166 - 168)

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 12

**Document Produced in Native Format**

Confidential

# EXHIBIT 13



**VIRGIN ISLANDS**

# INSOLVENCY ACT

## Revised Edition
### showing the law as at 1 January 2020

This is a revised edition of the law, prepared by the Law Revision Commissioner under the authority of the Law Revision Act 2014.

This edition contains a consolidation of the following laws—

|  | Page |
|---|---|
| **INSOLVENCY ACT** | 3 |

Act 5 of 2003   ..   in force 16 August 2004 (S.I. 47/2004)

Amended by Acts:  11 of 2004   ..   Paragraphs 2*(a)*, 2*(b)* and 4
– in force 8 December 2006
Remainder - 1 January 2006 (S.I. 57/2004)

16 of 2004   ..   in force 1 January 2005
19 of 2006   ..   in force 15 January 2007
1 of 2008   ..   in force 1 February 2010 (S.I. 63/2009)
14 of 2019   ..   in force 24 December 2019

**SEE STATUTORY INSTRUMENTS BOOKLET**



**VIRGIN ISLANDS**

# INSOLVENCY ACT

### Revised Edition
showing the law as at 1 January 2020

This is a revised edition of the law, prepared by the Law Revision Commissioner under the authority of the Law Revision Act 2014.

This edition contains a consolidation of the following laws—

|  |  | Page |
|---|---|---|
| **INSOLVENCY ACT** |  | 3 |

Act 5 of 2003   ..   in force 16 August 2004 (S.I. 47/2004)

Amended by Acts:   11 of 2004   ..   Paragraphs 2*(a)*, 2*(b)* and 4
             – in force 8 December 2006
             Remainder - 1 January 2006 (S.I. 57/2004)

      16 of 2004   ..   in force 1 January 2005

      19 of 2006   ..   in force 15 January 2007

       1 of 2008   ..   in force 1 February 2010 (S.I. 63/2009)

      14 of 2019   ..   in force 24 December 2019

**SEE STATUTORY INSTRUMENTS BOOKLET**

Published in 2021
On the authority and on behalf of the Government of The Virgin Islands
by
The Regional Law Revision Centre Inc.

For information contact—

Attorney General's Chambers
Government of the Virgin Islands
P.O. Box 242
Road Town
Tortola, VG1110
British Virgin Islands

Tel: (284) 468 - 2960
Email: agc@gov.vg

Printed on the authority and on behalf of the Government of The Virgin Islands
by
The Regional Law Revision Centre Inc.
P.O. Box 1626, 5 Mar Building,
The Valley, AI-2640, Anguilla
Authorised Printers for this Revised Edition

# INSOLVENCY ACT

## ARRANGEMENT OF SECTIONS

PART I

PRELIMINARY PROVISIONS

SECTION
1.   Short title
2.   Interpretation
3.   Meaning of "company"
4.   Meaning of "subsidiary" and "holding company"
5.   Meaning of "connected person" and "related company"
6.   Meaning of "director"
7.   Meaning of "unlicensed financial services business"
8.   Meaning of "insolvent"
9.   Meaning of "creditor", "secured creditor" etc.
10.  Meaning of "liability"
11.  Admissible claims
12.  Non-admissible claims
13.  Meaning of "public document"


PART II

CREDITORS' ARRANGEMENTS

**Division 1**

***Interpretation***

14.  Interpretation for and scope of this Part
15.  Arrangements
16.  Remuneration of supervisor and interim supervisor
17.  Fixing of remuneration by Court
18.  Commission's rights in respect of a regulated person


**Division 2**

***Company Creditors' Arrangement***

19.  Interpretation and scope of Division


*Proposal and Interim Supervisor*

20.  Proposal for an arrangement by board
21.  Appointment of interim supervisor by board

22.    Appointment of interim supervisor, company in administration or liquidation
23.    Administrator or liquidator acting as interim supervisor
24.    Notification of appointment of interim supervisor
25.    Functions of interim supervisor and power to obtain information
26.    Amendment of proposal before creditors' meeting

### *Meeting of Creditors*

27.    Calling creditors' meeting
28.    Interim supervisor may require certain persons to attend creditors' meeting
29.    Attendance of members and directors at creditors' meeting
30.    Business to be conducted at creditors' meeting
31.    Amendment or withdrawal of proposal at creditors' meeting
32.    Report on outcome of creditors' meeting
33.    Notification of appointment of supervisor
34.    Effect of approval of proposal

### *Implementation of Arrangement*

35.    Supervisor to be given possession of assets included in arrangement
36.    Supervisor's duty to keep accounting records
37.    Supervisor to prepare and send out regular accounts and reports
38.    Completion or premature termination of arrangement

### *Modification of Arrangement*

39.    Supervisor may propose modification of arrangement
40.    Modification of arrangement

### *Applications to Court*

41.    Appointment of interim supervisor or supervisor by Court
42.    Application where arrangement approved or modified
43.    Application on grounds of unfair prejudice
44.    Application to Court by former supervisor or interim supervisor

### *Offences*

45.    False representations etc.

## Division 3

### *Individual Creditors' Arrangement*

46.    Interpretation for and scope of this Division

## Proposal

47.   Proposal
48.   Notification of appointment of interim supervisor
49.   Functions of interim supervisor and power to obtain information
50.   Amendment of proposal after appointment of interim supervisor

## Moratorium

51.   Application for moratorium order
52.   Court may grant stay
53.   Moratorium order
54.   Duty of interim supervisor to report certain matters to the Court
55.   Effect of moratorium order

## Consideration of Proposal

56.   Interim supervisor's report on debtor's proposal
57.   Extension of moratorium
58.   Calling creditors' meeting
59.   Decisions of creditors' meetings
60.   Amendment or withdrawal of proposal at creditors' meeting
61.   Report of decisions to Court
62.   Effect of approval

## Implementation of Arrangement

63.   Supervisor to be given possession of assets included in arrangement
64.   Supervisor's duty to keep accounting records
65.   Supervisor to prepare and send out regular accounts and reports
66.   Completion or premature termination of arrangement

## Modification of Arrangement

67.   Supervisor may propose modification of arrangement.
68.   Modification of arrangement

## Applications to Court

69.   Appointment of interim supervisor or supervisor
70.   Application in respect of moratorium
71.   Application where arrangement approved or modified
72.   Application on grounds of unfair prejudice

### *Miscellaneous*

73.    Register of arrangements

### *Offences*

74.    False representations etc.

## PART III

### ADMINISTRATION

### *Preliminary*

75.    Interpretation for and scope of this Part

### *Administration Orders*

76.    Meaning of administration order
77.    Court may make an administration order
78.    Application in respect of insurance companies
79.    Powers of Court on hearing of application for administration order
80.    Application where company in liquidation
81.    Effect of administration order
82.    Notification and advertisement of administration order

### *Moratorium*

83.    Moratorium period
84.    Effect of moratorium
85.    Preservation of charged and other assets
86.    Disposal of perishable assets during moratorium period

### *Administrators*

87.    General duties of administrator
88.    Duty to prepare report
89.    Duty to report to Commission
90.    General powers of administrator
91.    Power to deal with assets subject to floating charge
92.    Application to Court to deal with other charged assets
93.    Administrator as agent of company
94.    Removal and resignation of administrator
95.    Appointment of replacement administrator
96.    Remuneration of administrator
97.    Administrator to have charge over assets of company
98.    Release of administrator
99.    Statement of affairs

### *Administrator's Proposals*

100.  Administrator's proposals and creditors meeting
101.  Attendance at meeting of directors and others
102.  Consideration of proposals by creditors
103.  Amendment of proposals at creditors' meeting
104.  Modification of proposals

### *Miscellaneous*

105.  Commission's rights where company a regulated person
106.  Administrator's duty to keep accounting records
107.  Administrator to prepare and send out regular accounts and reports
108.  Notification
109.  Meetings of creditors
110.  Discharge or variation of administration order
111.  Appointment of liquidator or dissolution of company on discharge of administration order
112.  Filing copy of discharge order with Registrar

### *Protection of Interests of Creditors and Members*

113.  Application in respect of moratorium period
114.  Application on grounds of unfair prejudice

PART IV

RECEIVERSHIP

### *Preliminary*

115.  Interpretation for and scope of this Part

### *General*

116.  Persons not to be appointed or act as receiver
117.  Appointment of joint receivers
118.  Notice of appointment
119.  Notification of receivership
120.  Vacation of office
121.  Assistance to be provided by receiver vacating office
122.  Resignation of receiver
123.  Removal of receiver
124.  Co-operation with receiver
125.  Duty to report to Commission
126.  Agency
127.  Powers of receiver, other than administrative receiver
128.  General duties of receivers

129.    Powers of sale and proceeds of sale
130.    Liabilities of receivers
131.    Payment of debts out of assets subject to a floating charge
132.    Court directions
133.    Further provisions with respect to an order under section 132
134.    Remuneration of receivers
135.    Accounting records
136.    Receivership accounts to be filed with Registrar
137.    Enforcement of duty to make returns
138.    Completion of receivership

### Receivers Appointed out of Court

139.    Appointment of receiver out of court
140.    Execution of documents
141.    Invalid appointment

### Administrative Receivers

142.    Meaning of "administrative receiver"
143.    Appointment of administrative receiver by Court
144.    Powers of administrative receiver
145.    Power to dispose of charged assets
146.    Statement of affairs
147.    Report by administrative receiver
148.    Application for permission not to call meeting of creditors

### PART V

### PROVISIONS APPLICABLE TO THE LIQUIDATION OF COMPANIES AND TO THE BANKRUPTCY OF INDIVIDUALS

149.    Interpretation
150.    Insolvency set-off
151.    Validity of agreement to subordinate debt
152.    Quantification of claims in liquidation and bankruptcy
153.    Interest on claims
154.    Claim in currency other than dollars
155.    Statutory demand
156.    Application to set aside statutory demand
157.    Hearing to set aside statutory demand

PART VI

LIQUIDATION

*Preliminary*

158.   Application of this Part to Official Receiver
159.   Appointment of liquidator
160.   Duration of liquidation
161.   Appointment of liquidator by members
162.   Appointment of liquidator by court
163.   Appointment of liquidator of a foreign company
164.   Withdrawal of application
165.   Advertisement of application
166.   Substitution of applicant
167.   Court's power on hearing of an application
168.   Period within which application shall be determined
169.   Expenses of an arrangement

*Interim Relief*

170.   Appointment of provisional liquidator
171.   Rights and powers of provisional liquidator
172.   Remuneration of provisional liquidator
173.   Termination of appointment of provisional liquidator
174.   Power to stay or restrain proceedings etc.

*Effect of Liquidation*

175.   Effect of liquidation
176.   Restriction on execution or attachment
177.   Duties of officer in execution of process

*Notice of Appointment and First Meetings of Creditors*

178.   Notice of appointment of liquidator
179.   Liquidator to call first meeting of creditors
180.   Application to Court by members
181.   Application of sections 178 and 179
182.   Restrictions on powers of liquidator appointed by members
183.   Court appointed liquidator may dispense with creditors' meeting

*Liquidators*

184.   Status of liquidator
185.   General duties of liquidator
186.   General powers of liquidator
187.   Removal of liquidator

188.   Resignation of liquidator
189.   Appointment of replacement liquidator
190.   Remuneration of liquidator
191.   Notification of liquidation
192.   Vesting of assets in liquidator


*Members*

193.   Settlement of list of members
194.   Rectification of register of members
195.   Liability of members limited
196.   Liability of past members
197.   Dividends payable to member
198.   Liability where limited company becomes unlimited company
199.   Liability where unlimited company becomes limited company
200.   Liability of personal representative
201.   Effect of member or past member becoming bankrupt
202.   Status of personal representative or trustee in bankruptcy
203.   Insurance and other contracts not affected
204.   Power of liquidator to enforce liability of member or past member
205.   Summary remedy against members and past members
206.   Order under section 205 to be conclusive evidence
207.   Distribution of assets of company


*Claims*

208.   Claims having priority over floating charges
209.   Claims by unsecured creditors
210.   Variation, withdrawal and expunging of claims
211.   Claims by secured creditors
212.   Redemption of security interest by liquidator
213.   Realisation of security interest by secured creditor
214.   Surrender for non-disclosure
215.   Interest after commencement of liquidation
216.   Power to exclude creditors not claiming in time


*Disclaimer*

217.   Liquidator may disclaim onerous property
218.   When disclaimer takes effect
219.   Notice to liquidator to elect whether to disclaim
220.   Effect of disclaimer
221.   Vesting orders and orders for delivery
222.   Vesting orders in respect of leases
223.   Land subject to rentcharge
224.   Disclaimer presumed valid

*Investigation of Assets and Affairs of Company*

225.    Statement of affairs
226.    Preliminary report
227.    Duty of Official Receiver concerning report under section 226

*Miscellaneous Provisions*

228.    Liquidator to call meetings of creditors
229.    Recession of contracts by the Court
230.    Inspection of books by creditors
231.    Enforcement of liquidator's duties

*Termination of Liquidation*

232.    Termination of liquidation
233.    Order terminating liquidation
234.    Completion of liquidation
235.    Release of liquidator
236.    Dissolution


PART VII

LIQUIDATION OF INSURANCE COMPANIES

237.    Interpretation for and scope of this Part
238.    Liquidation of insurance companies
239.    Appointment of  liquidator by members
240.    Application for appointment of liquidator by Court
241.    Reduction of contracts as alternative to winding up
242.    Continuation of long term business by liquidator appointed by Court
243.    Protection of segregated funds and assets


PART VIII

VOIDABLE TRANSACTIONS

244.    Interpretation for this Part
245.    Unfair preferences
246.    Undervalue transactions
247.    Voidable floating charges
248.    Extortionate credit transactions
249.    Orders in respect of voidable transactions
250.    Limitations on orders under section 249
251.    Recoveries
252.    Remedies not exclusive

PART IX

MALPRACTICE

253.    Interpretation for this Part
254.    Summary remedy against delinquent officers and others
255.    Fraudulent trading
256.    Insolvent trading
257.    Recoveries under sections 255 and 256
258.    Ancillary orders

PART X

DISQUALIFICATION ORDERS AND UNDERTAKINGS

259.    Interpretation for this Part
260.    Disqualification orders and undertakings
261.    Application for disqualification order
262.    Hearing of application for disqualification order
263.    Matters for determining unfitness of directors
264.    Disqualification undertaking
265.    General provisions concerning disqualification orders and undertakings
266.    Variation of disqualification order or undertaking
267.    Offence provisions
268.    Liability for engaging in prohibited activity
269.    Official Receiver to appear on certain applications
270.    Register of disqualification orders
271.    Duties of office holders

PART XI

GENERAL PROVISIONS WITH REGARD TO COMPANIES
THAT ARE INSOLVENT OR IN LIQUIDATION

**Division 1**

*General*

272.    Interpretation
273.    Application to Court concerning office holder
274.    Company's books
274A.   Order to deliver assets and documents

**Division 2**

*Statement of Affairs*

275.    Interpretation for this Division
276.    Notice to be given by office holder
277.    Statement of Affairs

278.    Affidavit of concurrence
279.    Release from duty to submit statement of affairs
280.    Application for order of limited disclosure


### Division 3

### *Investigation of Insolvent Company's Affairs*

#### *Office Holder's Powers*

281.    Interpretation for this Division
282.    Power to obtain information
283.    Examination by office holder


#### *Examination Before Court*

284.    Application for examination before Court
285.    Order for examination
286.    Conduct of examination
287.    Incriminating answers and admissibility of record
288.    Offence


### Division 4

### *Offence Provisions*

289.    Fraudulent conduct


### PART XII

### BANKRUPTCY

#### *Preliminary*

290.    Interpretation
291.    Application of this Part to Official Receiver


#### *Bankruptcy Order*

292.    Meaning and duration of bankruptcy order
293.    Conditions for making of bankruptcy order
294.    Persons who may apply for a bankruptcy order
295.    Application by debtor
296.    Creditor's application
297.    Substitution of applicant
298.    Application by secured creditor
299.    Secured creditor failing to disclose security interest
300.    Hearing of creditor's application

301.   Application where individual creditors' arrangements in place
302.   Consolidation of applications
303.   Withdrawal of application
304.   Court's powers on hearing of application for bankruptcy order
305.   Appointment of bankruptcy trustee
306.   Period within which application shall be determined


*Interim Relief*

307.   Protection of assets after application for bankruptcy
308.   Effect of order under section 307
309.   Remuneration of person appointed under section 307
310.   Examination


*Effect of Bankruptcy*

311.   Effect of bankruptcy order
312.   Power to stay or restrain proceedings


*Bankrupt's Estate*

313.   Definition of bankrupt's estate
314.   Acquisition by trustee of control of bankrupt's estate
315.   Goods subject to pledge etc.
316.   Duties of bankrupt in relation to his or her assets and affairs
317.   Delivery up by other persons
318.   After-acquired assets
319.   Vesting in trustee of certain items of excess value
320.   Money provided *in lieu* of sale
321.   Time limit for notice under sections 318 or 319
322.   Income payments orders


*Bankruptcy Trustee*

323.   Bankruptcy trustee officer of Court
324.   General duties of trustee
325.   Powers of trustee
326.   Notice of appointment
327.   Appointment of trustee in place of Official Receiver
328.   Removal of trustee
329.   Resignation of trustee
330.   Appointment of replacement trustee
331.   Remuneration of trustee
332.   General control of trustee by the Court

### Administration by Trustee

333.    Meetings of creditors

### Claims and Distribution of Estate

334.    Distribution of bankrupt's estate
335.    Debts to spouse
336.    Claims by unsecured creditors
337.    Variation, withdrawal and expunging of claims
338.    Claims by secured creditors
339.    Redemption of security interest by trustee
340.    Realisation of security interest by secured creditor
341.    Surrender for non-disclosure
342.    Interest after commencement of bankruptcy
343.    Distribution by means of dividend
344.    Claims by unsatisfied creditors
345.    Distribution of assets in specie
346.    Final distribution
347.    No action for dividend
348.    Right of bankrupt to surplus
349.    Final meeting

### Prior Transactions

350.    Contracts to which bankrupt is a party
351.    Enforcements procedures
352.    Distress, etc.
353.    Unenforceability of liens on books, etc.

### General Powers of Court

354.    General control of Court
355.    Power of arrest
356.    Seizure of bankrupt's assets
357.    Re-direction of bankrupt's letters, etc.

### Disclaimer

358.    Trustee may disclaim onerous property
359.    When disclaimer takes effect
360.    Notice to trustee to elect whether to disclaim
361.    Effect of disclaimer
362.    Vesting orders and orders for delivery
363.    Vesting orders in respect of leases
364.    Land subject to rentcharge
365.    Disclaimer presumed valid

### *Investigation of Bankrupt's Affairs*

366.    Statement of assets and liabilities
367.    Preliminary report
368.    Duty of Official Receiver concerning report under section 367
369.    Application for examination of bankrupt and others
370.    Order for examination
371.    Conduct of examination
372.    Examinee shall answer questions put to him or her
373.    Examinee failing to appear for his or her examination
374.    Court's enforcement powers

### *Discharge and Annulment of Bankruptcy*

375.    Bankrupt ineligible for automatic discharge
376.    Automatic discharge
377.    Application by bankrupt concerning order for suspension of discharge
378.    Application for discharge by Court order
379.    Court order on application for discharge
380.    Effect of discharge
381.    Discharged bankrupt to give assistance
382.    Annulment of bankruptcy order
383.    Release of trustee
384.    Liability of trustee

### *Second or Subsequent Bankruptcy*

385.    Stay of distribution in case of second bankruptcy
386.    Adjustment between earlier and later bankruptcy estates

PART XIII

BANKRUPTCY OFFENCES

387.    Definitions
388.    Defence of innocent intention
389.    Non-disclosure
390.    Concealment of assets
391.    Concealment of books and papers; falsification
392.    False statements
393.    Fraudulent disposal of assets
394.    Absconding
395.    Fraudulent dealing with asset obtained on credit
396.    Obtaining credit: engaging in business
397.    Failure to keep proper accounts of business
398.    Gambling
399.    Supplementary provisions

## PART XIV

### VOIDABLE TRANSACTIONS

400.  Interpretation for this Part
401.  Unfair preferences
402.  Undervalue transactions
403.  Voidable general assignment of book debts
404.  Extortionate credit transactions
405.  Orders in respect of voidable transactions
406.  Limitations on orders under section 405
407.  Recoveries
408.  Remedies not exclusive

## PART XV

### BANKRUPTCY RESTRICTIONS ORDERS AND UNDERTAKINGS

409.  Interpretation for this Part
410.  Bankruptcy restrictions orders and undertakings
411.  Application for and hearing of application for bankruptcy restrictions order
412.  Duration of bankruptcy restrictions order
413.  Interim bankruptcy restrictions order
414.  Bankruptcy restrictions undertaking
415.  Variation of disqualification order or undertaking
416.  Offence provisions
417.  Official Receiver to appear on certain applications
418.  Register of disqualification orders
419.  Annulment of bankruptcy order

## PART XVI

### GENERAL PROVISIONS WITH REGARD TO
### INSOLVENCY PROCEEDINGS UNDER THIS ACT

#### Division 1

#### *The Creditors' Committee*

420.  Interpretation for and scope of this Division
421.  Establishment of creditors' committee
422.  Functions and powers of creditors' committee
423.  Composition of creditors' committee
424.  Resignation and termination of committee member
425.  Vacancies and appointment of new members
426.  Proceedings of creditors' committee
427.  Expenses of members
428.  Members dealing with company
429.  Formal defects

**Division 2**

*Remuneration*

430.    Remuneration of administrator, liquidator or bankruptcy trustee
431.    Application by creditors for  reduction of remuneration
432.    General principles to be applied in fixing remuneration
433.    Time for fixing remuneration and interim payments

PART XVII

NETTING AND MARKET CONTRACTS

434.    Interpretation for sections 434 and 435
435.    Enforcement of netting agreements etc.

PART XVIII

CROSS-BORDER INSOLVENCY

*General Provisions*

436.    Purpose and scope of this Part
437.    Interpretation for this Part
438.    International obligations of the Virgin Islands
439.    Public policy exception
440.    Additional assistance
441.    Application under this Part
442.    Authorisation of insolvency officer to act in a foreign country

*Access of Foreign Representatives and Creditors
to Courts in The Virgin Islands*

443.    Right of direct access
444.    Limited jurisdiction
445.    Commencement of and participation in a Virgin Islands insolvency
        proceeding by foreign representative
446.    Access of foreign creditors to a Virgin Islands proceeding
447.    Notification to foreign creditors of a Virgin Islands insolvency proceeding

*Recognition of Foreign Proceeding and Relief*

448.    Application for recognition of  foreign proceeding
449.    Presumptions concerning recognition
450.    Recognition of foreign proceedings
451.    Subsequent information
452.    Interim relief
453.    Effects of recognition of foreign main proceeding
454.    Relief that may be granted upon recognition of foreign proceeding

455.   Protection of creditors and other interested persons
456.   Actions to avoid acts detrimental to creditors
457.   Intervention by foreign representative in proceedings in the Virgin Islands

*Cooperation with Foreign Courts and*
*Foreign Representatives*

458.   Cooperation and direct communication between court of the Virgin Islands and foreign courts or foreign representatives
459.   Cooperation and direct communication between the insolvency administrator and foreign courts or foreign representatives
460.   Forms of cooperation

*Concurrent Proceedings*

461.   Commencement of a Virgin Islands insolvency proceeding after recognition of foreign main proceeding
462.   Coordination of a Virgin Islands insolvency proceeding and foreign proceeding
463.   Coordination of more than one foreign proceeding
464.   Presumption of insolvency based on recognition of foreign main proceeding
465.   Rule of payment in concurrent proceedings

PART XIX

ORDERS IN AID OF FOREIGN PROCEEDINGS

466.   Interpretation for this Part
467.   Order in aid of foreign proceeding
468.   Matters to be considered by Court in determining application under section 467
469.   Limitation on effect of application under this Part
470.   Additional assistance
471.   Application under this Part
472.   Authorisation of insolvency officer to act in foreign country

PART XX

INSOLVENCY PRACTITIONERS

*Licensing*

473.   Interpretation for this Part
474.   Prohibition on acting as insolvency practitioner without a licence
475.   Application for licence
476.   Issue of licence

477.    Persons disqualified from holding a licence

### *Control of Licensees and Enforcement*

478.    Production of accounts and records
479.    Suspension and revocation of licence
480.    Right to make representations
480A.   Directives

### *Obligations of Licensees*

481.    Filing of returns and other documents

### *Eligible Insolvency Practitioners*

482.    Eligible insolvency practitioner
483.    Appointment of overseas insolvency practitioner
484.    Commission's powers with regard to appointment of overseas insolvency practitioner
485.    Overseas practitioner sole appointee
486.    Regulations
487.    Code of Practice
487A.   Insolvency Surplus Account

### PART XXI

### OFFICIAL RECEIVER

488.    Official Receiver
489.    Deputy Official Receiver and staff
490.    Official Receiver as officer of the Court
491.    Functions of Official Receiver
492.    Right of audience

### PART XXII

### MISCELLANEOUS PROVISIONS

493.    Appointment of two or more office holders
494.    Use of prescribed forms
495.    Notices
496.    Time
497.    Resolutions
498.    Rules
499.    Insolvent partnerships
500.    Insolvent estates
501.    Offences, general provisions

502.     Rules may provide for offences and penalties
503.     Provisions of other enactments not to apply
503A.    Disapplication and modification of the Financial Services Commission Act
504.     *(Omitted)*
505.     Act binding on Crown
         SCHEDULE 1:     Powers of Administration and Administrative Receiver
         SCHEDULE 2:     Powers of Liquidator
         SCHEDULE 3:     Liquidation of Foreign Company
         SCHEDULE 4:     Powers of Bankruptcy Trustee
         SCHEDULE 5:     Offences Under this Act
         SCHEDULE 6:     Disapplication and Modification of Financial Services
                         Commission Act

# INSOLVENCY ACT

*(Acts 5 of 2003, 11 of 2004, 16 of 2004, 19 of 2006 and 1 of 2008)*

AN ACT TO REFORM THE LAW RELATING TO THE INSOLVENCY OF COMPANIES AND FOREIGN COMPANIES, LIMITED PARTNERSHIPS, PARTNERSHIPS AND INDIVIDUALS AND TO PROVIDE, IN PARTICULAR, FOR A MECHANISM FOR INSOLVENT PERSONS TO ENTER INTO ARRANGEMENTS WITH THEIR CREDITORS, AN ADMINISTRATION PROCEDURE FOR COMPANIES, THE RECEIVERSHIP OF COMPANIES AND FOREIGN COMPANIES, THE LIQUIDATION OF COMPANIES, FOREIGN COMPANIES, LIMITED PARTNERSHIPS AND PARTNERSHIPS, THE MAKING OF BANKRUPTCY ORDERS AGAINST INDIVIDUALS, THE LICENSING AND REGULATION OF INSOLVENCY PRACTITIONERS, THE PENALISATION AND REDRESS OF WRONGDOING ASSOCIATED WITH INSOLVENT PERSONS, THE DISQUALIFICATION OF DIRECTORS, THE AVOIDANCE OF CERTAIN TRANSACTIONS, CROSS BORDER INSOLVENCY ISSUES AND OTHER MATTERS CONNECTED THEREWITH.

## Commencement

*[16 August 2004]*

## PART I

### PRELIMINARY PROVISIONS

## Short title

**1.** This Act may be cited as the Insolvency Act.

## Interpretation

**2.** (1) In this Act, unless the context otherwise requires—

"administration order" has the meaning specified in section 76;

"administrative receiver" has the meaning specified in section 142;

"administrator", in relation to a company, means an administrator appointed under section 79;

"arrangement" means a company creditors' arrangement under Part II, Division 2 or an individual creditors' arrangement under Part II, Division 3, as the case may be;

"articles" means—

    *(a)* the articles of association of a company; or

    *(b)* where the context permits, in the case of a foreign company the articles of association, by-laws or such other document having the same effect by whatever name called;

"asset" includes money, goods, things in action, land and every description of property wherever situated and obligations and every description of

interest, whether present or future or vested or contingent, arising out of, or incidental to, property;

"bankrupt" means an individual against whom a bankruptcy order is made under Part XII;

"bankruptcy trustee" means the person appointed by the Court to be the trustee of the assets of a bankrupt;

"bankrupt's estate" has the meaning specified in section 313;

"board", in relation to a body corporate, means—

    *(a)* the board of directors, committee of management, council or other governing authority of the body corporate; or

    *(b)* if the body corporate has only one director, that director;

"business day" means any day other than a Saturday, Sunday or public holiday in the Virgin Islands;

"charge" includes a mortgage, a fixed charge and a floating charge, whether crystallised or not;

"chargee" means the holder of a charge and includes a person in whose favour a charge is to be given or executed under an agreement, whether on demand or otherwise;

"chattel leasing agreement" means an agreement for the bailment of goods which is capable of subsisting for more than 3 months;

"Civil Procedure Rules" means the Eastern Caribbean Supreme Court Civil Procedure Rules 2000;

"Commission" means the Financial Services Commission established under the Financial Services Commission Act; *(Amended by Act 12 of 2001)*

"Companies Act" means the Companies Act, 1885;

"company" has the meaning specified in section 3;

"connected person"—

    *(a)* in relation to a company or a foreign company has the meaning specified in section 5(1); and

    *(b)* in relation to an individual has the meaning specified in section 5(3);

"Court" means the High Court;

"court rate" means the rate of interest specified in section 7 of the Judgments Act;

"creditor" and "secured creditor" have the meanings specified in section 9;

"creditors' committee" means a committee appointed under section 421;

"director" has the meaning specified in section 6;

"disqualification order" has the meaning specified in section 260(1);

"disqualification undertaking" has the meaning specified in section 260(2);

"document" means a document in any form and includes—

*(a)* any writing or printing on any material;

*(b)* any record of information or data, however compiled, and whether stored in paper, electronic, magnetic or any non-paper based form and any storage medium or device, including discs and tapes;

*(c)* books and drawings; and

*(d)* a photograph, film, tape, negative, facsimile or other medium in which one or more visual images are embodied so as to be capable (with or without the aid of equipment) of being reproduced, and without limiting the generality of the foregoing, includes any court application, order and other legal process and any notice;

"dollar" or "$" means the lawful currency for the time being of the United States of America;

"eligible insolvency practitioner" means an insolvency practitioner who is eligible to act in relation to a company, foreign company or individual in accordance with section 482;

"floating charge" means a charge created by a company or a foreign company which is, or as created was, a floating charge;

"foreign company" means a body corporate that is incorporated, registered or formed outside the Virgin Islands but excludes a company within the meaning of section 3;

"insolvency practitioner" means a person acting in a capacity specified in section 474(1);

"insolvent"—

*(a)* in relation to a company or a foreign company, has the meaning specified in section 8(1); and

*(b)* in relation to an individual, has the meaning specified in section 8(2);

"Insurance Act" means the Insurance Act; *(Amended by Act 1 of 2008)*

"insurance company" means a company or a foreign company that holds, a licence under the Insurance Act or that at any time has held a licence under the repealed Insurance Act 1994; *(Amended by Acts 11 of 2004 and 1 of 2008)*

"interim supervisor" means the person appointed as the interim supervisor under a proposal for an arrangement;

"International Business Companies Act" means the International Business Companies Act, 1984;

"liability" has the meaning specified in section 10;

"licensed insolvency practitioner" means a person holding a licence to act as an insolvency practitioner issued under section 476;

"liquidator", in relation to a company or a foreign company, means a liquidator appointed under section 159;

"member", in relation to a company, includes—

> *(a)* a member of a company limited by guarantee; and

> *(b)* a person to whom shares in a company have been transferred or transmitted by law, even though that person is not a member of the company within the meaning of the Companies Act;

"memorandum" means—

> *(a)* the memorandum of association of a company; or

> *(b)* where the context permits, in the case of a foreign company its memorandum of association or other constituting document, by whatever name called;

"officer", in relation to a body corporate, includes a director and secretary of that body corporate but does not include an administrator, liquidator, receiver, supervisor or interim supervisor;

"Official Receiver" means the Official Receiver appointed by the Commission under section 488;

"preferential claim" means a claim of a type prescribed by the Rules as a preferential claim;

"preferential creditor" means a creditor having a preferential claim;

"prescribed" means prescribed by the Rules or the Regulations made under section 486 and "prescribed form" means a form specified in the Rules or those Regulations; *(Amended by Act 11 of 2004)*

"prescribed priority" means—

> *(a)* in a liquidation, the priority for the payment of the costs and expenses of a liquidation prescribed in the Rules; and

> *(b)* in a bankruptcy, the priority for the payment of the costs and expenses of a bankruptcy prescribed in the Rules;

"public document" has the meaning specified in section 13;

"receiver" means the receiver of the whole or any part of the assets of a company or a foreign company and includes—

> *(a)* a manager and a receiver and manager;

> *(b)* a receiver of income; and

> *(c)* an administrative receiver;

"receiver appointed out of court" means a receiver appointed in the exercise of a power conferred by a debenture or other instrument;

"Registrar" means the Registrar of Corporate Affairs appointed under section 229 of the BVI Business Companies Act; *(Substituted by Act 16 of 2004)*

"regulated person" means a person that holds a prescribed financial services licence;

"related company" means a company that is related to another company in accordance with section 5(2);

"remuneration" includes properly incurred expenses and disbursements;

"retention of title agreement" means any agreement for the sale of goods under which the seller reserves title in the goods until payment, but excludes an agreement that constitutes a charge on the goods;

"Rules" means the Insolvency Rules made under section 498 and, where appropriate, the Rules made under sections 499 and 500; *(Amended by Act 11 of 2004)*

"security interest" includes a charge and a lien;

"statement of affairs" means a statement of the affairs of a company or a foreign company complying with section 277 and "verified statement of affairs" means a statement of affairs that has been verified by affidavit;

"statement of assets and liabilities" means a statement of the assets and liabilities of an individual complying with section 366 and "verified statement of assets and liabilities" means a statement of assets and liabilities that has been verified by affidavit;

"statutory demand" means a demand made under section 155;

"subsidiary" and "holding company" have the meanings specified in section 4;

"supervisor" means the person appointed to act as the supervisor of an arrangement under Part II;

"unlicensed financial services business" has the meaning specified in section 7; and

"Virgin Islands court" means any court having jurisdiction in the Virgin Islands.

(2) References in this Act or in the Rules to the "venue" for any proceeding, attendance before the Court or for a meeting are to the time, date and place for the proceeding, attendance or meeting.

## Meaning of "company"

**3.** Unless this Act expressly provides otherwise, "company" means—

*(a)* a company incorporated under the Companies Act;

*(b)* an international business company incorporated or continued under the International Business Companies Act; or *(Amended by Act 16 of 2004)*

*(c)* a company within the meaning specified in section 3(1) of the BVI Business Companies Act. *(Amended by Act 16 of 2004)*

## Meaning of "subsidiary" and "holding company"

**4.** (1) A company is a "subsidiary" of another company, its "holding company", if that other company—

*(a)* holds a majority of the voting rights in it;

*(b)* is a member of it and has the right to appoint or remove a majority of its board;

*(c)* is a member of it and controls alone, pursuant to an agreement with other members, a majority of the voting rights in it, or if it is

a subsidiary of a company which is itself a subsidiary of that other company.

(2) For the purposes of subsection (1), "company" includes a foreign company and any other body corporate.

## Meaning of "connected person" and "related company"

**5.** (1) In relation to a company, "connected person" means any one or more of the following—

*(a)* a promoter of the company;

*(b)* a director or member of the company or of a related company;

*(c)* a beneficiary under a trust of which the company is or has been a trustee;

*(d)* a related company;

*(e)* another company one of whose directors is also a director of the company;

*(f)* a nominee, relative, spouse or relative of a spouse of a person referred to in paragraphs *(a)* to *(c)*;

*(g)* a person in partnership with a person referred to in paragraphs *(a)* to *(c)*; and

*(h)* a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

(2) A company is related to another company if—

*(a)* it is a subsidiary or holding company of that other company;

*(b)* the same person has control of both companies; and

*(c)* the company and that other company are both subsidiaries of the same holding company.

(3) In relation to an individual, "connected person" means any one or more of the following—

*(a)* a relative, spouse or relative of a spouse of the individual;

*(b)* a person in partnership with the individual;

*(c)* a relative or spouse of a person in partnership with the individual;

*(d)* a company in respect of which he or she is a connected person under subsection (1);

*(e)* a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

(4) For the purposes of this section, "company" includes a foreign company and any other body corporate.

## Meaning of "director"

**6.** (1) Subject to subsection (3), "director", in relation to a body corporate, includes—

    *(a)* a person occupying or acting in the position of director by whatever name called;

    *(b)* a person in accordance with whose directions or instructions a director or the board of a body corporate may be required or is accustomed to act; and

    *(c)* a person who exercises, or is entitled to exercise, or who controls, or is entitled to control, the exercise of powers which, apart from the memorandum or articles, would fall to be exercised by the board.

(2) Notwithstanding subsection (1)—

    *(a)* a person is not to be regarded as a director of a body corporate by reason only that a director or the board act on advice given by him or her in a professional capacity; and

    *(b)* a person acting as an insolvency practitioner in relation to a company or a foreign company is not to be regarded as a director of the company or foreign company by virtue of his or her acting in that capacity.

    (3) In Parts IX and X, "director" has the meaning specified in this section with the deletion of subsection (1)*(c)*.

## Meaning of "unlicensed financial services business"

    **7.** A person carries on unlicensed financial services business if he or she carries on an activity for which a prescribed financial services licence is required without having such a licence authorising him or her to carry on the activity.

## Meaning of "insolvent"

    **8.** (1) A company or a foreign company is insolvent if—

    *(a)* it fails to comply with the requirements of a statutory demand that has not been set aside under section 157;

    *(b)* execution or other process issued on a judgment, decree or order of a Virgin Islands court in favour of a creditor of the company is returned wholly or partly unsatisfied; or

    *(c)* either—

       (i) the value of the company's liabilities exceeds its assets; or

       (ii) the company is unable to pay its debts as they fall due.

(2) An individual is insolvent if—

    *(a)* he or she fails to comply with the requirements of a statutory demand that has not been set aside under section 157; or

    *(b)* execution or other process issued on a judgment, decree or order of a Virgin Islands court in favour of a creditor of the individual is returned wholly or partly unsatisfied.

## Meaning of "creditor", "secured creditor" etc.

**9.** (1) A person is a creditor of another person (the debtor) if he or she has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in—

    *(a)* the liquidation of the debtor, in the case of a debtor that is a company or a foreign company; or

    *(b)* the bankruptcy of the debtor, in the case of a debtor who is an individual.

(2) A creditor is a secured creditor of a debtor if he or she has an enforceable security interest over an asset of the debtor in respect of his or her claim.

(3) An unsecured creditor is a creditor who is not a secured creditor.

## Meaning of "liability"

**10.** (1) For the purposes of this Act, "liability" means a liability to pay money or money's worth including a liability under an enactment, a liability in contract, tort or bailment, a liability for a breach of trust and a liability arising out of an obligation to make restitution, and "liability" includes a debt.

(2) A liability may be present or future, certain or contingent, fixed or liquidated, sounding only in damages or capable of being ascertained by fixed rules or as a matter of opinion.

(3) For the purposes of this Act, an illegal or unenforceable liability is deemed not to be a liability.

## Admissible claims

**11.** (1) For the purposes of this section, "relevant time" means the time of the commencement of the liquidation of a company or a foreign company or the commencement of the bankruptcy of an individual, as the case may be.

(2) Subject to section 12, the following liabilities are admissible as claims in the liquidation of a company or foreign company or in the bankruptcy of an individual—

    *(a)* liabilities of the company, foreign company or individual at the relevant time;

    *(b)* liabilities of the company, foreign company or individual arising after the relevant time by virtue of any obligation incurred before the relevant time; and

    *(c)* any interest that may be claimed in accordance with this Act or the Rules.

(3) For the purposes of determining whether a liability in tort is an admissible claim in the liquidation of a company or foreign company or in the bankruptcy of an individual, the company, foreign company or individual is deemed to become subject to that liability by reason of an obligation incurred at the time the cause of action accrued.

### Non-admissible claims

**12.** The following liabilities are not admissible claims in the liquidation of a company or a foreign company or the bankruptcy of an individual—

    *(a)* an obligation arising under a confiscation order made under—

        (i)  the Drug Trafficking Offences Act; or

        (ii)  the Proceeds of Criminal Conduct Act;

    *(b)* a liability that, under any enactment or rule of law, is of a type that is not claimable, whether on grounds of public policy or otherwise; and

    *(c)* such other liabilities or claims as may be prescribed.
*(Amended by Act 11 of 2004)*

### Meaning of "public document"

**13.** (1)  Subject to subsection (3), a "public document", in relation to a person, means a document of, or purporting to be issued, published or signed by or on behalf of that person that—

    *(a)* in the case of a company or foreign company, is required or permitted to be filed with the Registrar under—

        (i)  this Act or the Rules;

        (ii)  the Companies Act;

        (iii)  the International Business Companies Act; or

        (iv)  the BVI Business Companies Act; *(Inserted by Act 16 of 2004)*

    *(b)* is issued, published or signed under, or for the purposes of, this Act or the Rules or any other enactment; or

    *(c)* is issued or signed in the course of, or for the purposes of, a particular transaction or dealing.

(2)  Without limiting subsection (1), "public document" includes a business letter, statement of account, invoice, receipt, order for goods, order for services or an official notice of, or purporting to be issued, published or signed by, or on behalf of, that person.

(3)  A document is not a public document if it is applied, or intended or required to be applied, to goods or to any container, package or wrapping within which goods are, or are intended to be, supplied for a purpose connected with the supply of those goods.

PART II

CREDITORS' ARRANGEMENTS

## Division 1

### *Interpretation*

## Interpretation for and scope of this Part

**14.** (1) In this Part—

"arrangement" has the meaning specified in section 15;

"debtor" means a company or individual proposing an arrangement;

"nominated insolvency practitioner" means the insolvency practitioner nominated as the interim supervisor under a proposal—

    *(a)* by the board of a company;

    *(b)* by the administrator or liquidator of a company, where the company is in administration or liquidation; or

    *(c)* by an individual debtor; and

"proposal" means a proposal for an arrangement.

    (2) Where the context allows, a reference in this Part—

    *(a)* to a proposal includes the proposal as amended; and

    *(b)* to the rejection of a proposal includes the deemed rejection of a proposal.

## Arrangements

**15.** (1) An arrangement is a compromise between a debtor and its or his or her creditors, the implementation of which is supervised by a supervisor acting as a trustee or otherwise.

    (2) Without limiting subsection (1), an arrangement may—

    *(a)* cancel all or any part of, or vary, a liability of the debtor;

    *(b)* vary the rights of the debtor's creditors or the terms of a debt; and

    *(c)* include any other provision that may be prescribed.

    (3) Varying a liability or the terms of a debt under subsection (2)*(a)* or *(b)* may include—

    *(a)* varying, adding or cancelling rights to interest; and

    *(b)* varying the dates upon which a liability, or part of a liability, becomes due for payment.

    (4) An arrangement shall not, except with the written agreement of the secured creditor or the preferential creditor concerned—

    *(a)* affect the right of a secured creditor of the debtor to enforce his or her security interest or vary the liability secured by the security interest; or

*(b)* result in a preferential creditor receiving less than he or she would receive in a liquidation or bankruptcy of the debtor had it commenced at the time of approval of the arrangement.

(5) An arrangement does not effect a release of any surety or co-debtor of the debtor unless the terms of the arrangement expressly provide otherwise.

### Remuneration of supervisor and interim supervisor

**16.** A supervisor and an interim supervisor is entitled to be paid remuneration for his or her services consisting of—

*(a)* any disbursements made by the interim supervisor prior to the approval of the arrangement, and any remuneration for his or her services as such agreed between himself or herself and—

(i) in the case of a company, the board or, where it is in liquidation, the administrator or liquidator; or

(ii) in the case of an individual, the debtor; and

*(b)* any fees, costs, charges or expenses which—

(i) are sanctioned by the terms of the arrangement; or

(ii) would be payable, or correspond to those which would be payable, in an administration or liquidation (in the case of a company) or in a bankruptcy (in the case of an individual).

### Fixing of remuneration by Court

**17.** (1) Notwithstanding the terms of the arrangement, on the application of a person referred to in subsection (4), the Court may review and fix the amount paid or to be paid by way of remuneration to a supervisor or an interim supervisor.

(2) Subject to subsection (3), the Court's power under subsection (1)—

*(a)* extends to fixing the remuneration for any period before the making of the order or the application for it;

*(b)* is exercisable notwithstanding that the supervisor or interim supervisor has died or ceased to act before the making of the application or the order; and

*(c)* extends to requiring the supervisor or interim supervisor or his or her personal representative to account for the excess or such part of it as may be specified in the order to the extent that an amount paid to or retained by the supervisor or interim supervisor as remuneration exceeds that fixed by the Court for the period concerned. *(Amended by Act 11 of 2004)*

(3) The power conferred by subsection (2)*(c)* may not be exercised with respect to a period before the date of the application for an order under this section unless the Court is satisfied that there are special circumstances that justify it.

(4) Application to the Court for an order under subsection (1) may be made by any of the following persons—

*Insolvency Act*

(a) the supervisor or interim supervisor; or

(b) the company or—

(i) if the company is in liquidation, its liquidator; or

(ii) if the company is in administration, its administrator.
*(Amended by Act 11 of 2004)*

(5) In fixing the remuneration of a supervisor or interim supervisor under this section, the Court shall apply the general principles specified in section 432.

## Commission's rights in respect of a regulated person

**18.** Where a proposal is made, or an arrangement approved, in respect of a regulated person—

(a) every notice or other document required to be sent to a creditor of the debtor under this Part shall also be sent to the Commission; and

(b) unless the applicant is the Commission, notice shall be given to the Commission of any application to the Court under this Part.


### Division 2

### *Company Creditors' Arrangement*

## Interpretation and scope of Division

**19.** (1) In this Division, "proposal period" means the period from the appointment of the interim supervisor to the approval or rejection by the creditors of the proposed arrangement.

(2) A foreign company may not propose or enter into an arrangement under this Division.


### *Proposal and Interim Supervisor*

## Proposal for an arrangement by board

**20.** (1) The board of a company, other than a company that is in liquidation or in administration, may propose an arrangement and nominate an interim supervisor to act in relation to the proposed arrangement if—

(a) it believes on reasonable grounds that the company is insolvent or is likely to become insolvent; and

(b) it has passed a resolution—

(i) stating its belief that the company is insolvent or is likely to become insolvent;

(ii) approving a written proposal containing the information prescribed; and

(iii) nominating an eligible insolvency practitioner to be appointed as interim supervisor.

(2) A director who votes in favour of a resolution under subsection (1) without having reasonable grounds for believing that the company is insolvent or is likely to become insolvent commits an offence.

## Appointment of interim supervisor by board

**21.** (1) Where the board of a company has passed a resolution under section 20(1)*(b)*, it shall provide the nominated insolvency practitioner with—

*(a)* a copy of the resolution passed;

*(b)* a copy of the proposal approved by the board;

*(c)* a statement of affairs made up to a date no earlier than 2 weeks prior to the date of the resolution; and

*(d)* a notice of intention to appoint the nominated insolvency practitioner as interim supervisor.

(2) The nominated insolvency practitioner may accept appointment as interim supervisor by delivering a copy of the notice referred to in subsection (1)*(d)*, endorsed in accordance with the Rules, to the board within 5 business days of the date when the resolution was passed under section 20(1)*(b)*.

(3) Subject to subsection (4), the appointment of an interim supervisor takes effect from the time when he or she delivers the endorsed notice to the board.

(4) A resolution passed under section 20(1)*(b)* lapses and is of no effect if the insolvency practitioner nominated in the resolution is not appointed in accordance with this section within 5 business days of the date when the resolution was passed.

## Appointment of interim supervisor, company in administration or liquidation

**22.** (1) Where a company is in administration or liquidation, the administrator or liquidator may make a proposal and appoint another eligible insolvency practitioner as the interim supervisor.

(2) Where the administrator or liquidator intends to appoint another eligible insolvency practitioner as interim supervisor, he or she shall provide him or her with—

*(a)* a notice of intention to appoint him or her as interim supervisor; and

*(b)* a written proposal containing the information prescribed.

(3) The nominated insolvency practitioner may accept appointment as interim supervisor by delivering the notice referred to in subsection (2)*(a)*, endorsed in accordance with the Rules, to the administrator or liquidator.

(4) The appointment of an interim supervisor under this section takes effect from the time when the endorsed notice of intention to appoint is received by the administrator or liquidator.

*Insolvency Act*

### Administrator or liquidator acting as interim supervisor

**23.** (1) An administrator or liquidator who intends to make a proposal may, instead of appointing another eligible insolvency practitioner as interim supervisor, act as the interim supervisor himself or herself.

(2) Where the administrator or liquidator intends to act as the interim supervisor himself or herself he or she shall—

> *(a)* prepare a written proposal containing the information prescribed; and

> *(b)* sign a notice of intention to act as interim supervisor.

(3) The appointment of the administrator or liquidator as interim supervisor under this section takes effect on the date of the notice of intention to act as interim supervisor.

### Notification of appointment of interim supervisor

**24.** (1) The interim supervisor shall, within 2 business days of his or her appointment—

> *(a)* file a notice of appointment as interim supervisor with the Registrar; and

> *(b)* if the company is a regulated person, file a copy of the notice of his or her appointment with the Commission.

(2) An interim supervisor who contravenes subsection (1) commits an offence.

### Functions of interim supervisor and power to obtain information

**25.** (1) The functions of an interim supervisor are—

> *(a)* to prepare a report on the proposal for the creditors;

> *(b)* to carry out any duties assigned to him or her by this Act or the Rules;

> *(c)* in the case of an interim supervisor appointed by the board or by the administrator or liquidator of a company, to undertake such functions and duties as he or she may agree to undertake with the board or with the administrator or liquidator; and

> *(d)* in the case of an interim supervisor appointed by the board of a company, to monitor the affairs of the company, including the conduct of its business, during the proposal period.

(2) Where an interim supervisor is appointed by the board or by the administrator or liquidator of a company, every officer of the company or the administrator or liquidator of the company, as the case may be, shall—

> *(a)* provide to the interim supervisor such documents, information and explanations as he or she may reasonably require for the purposes of enabling him or her to exercise his or her functions; and

*(b)* give the interim supervisor such assistance as he or she may reasonably require.

(3) On the application of the interim supervisor, the Court may make an order requiring an officer of the company to comply with subsection (2).

(4) An officer of a company who fails to comply with an order of the Court made under subsection (3) commits an offence.

### Amendment of proposal before creditors' meeting

**26.** (1) The board of a company or, in the case of a company that is in administration or liquidation, its administrator or liquidator, may amend or withdraw a proposal in accordance with the Rules—

*(a)* before the appointment of an interim supervisor;

*(b)* after the appointment of an interim supervisor but before notice of a creditors' meeting has been given under section 27; or

*(c)* after notice of a creditor's meeting has been given under section 27 but before the date fixed for the meeting.

(2) The Board of a company may not amend or withdraw a proposal unless it has passed a resolution to do so.

(3) A proposal cannot be amended or withdrawn otherwise than in accordance with this section or section 31.

*(Amended by Act 11 of 2004)*

*Meeting of Creditors*

### Calling creditors' meeting

**27.** (1) The interim supervisor shall—

*(a)* prepare a written report on the proposal complying with the Rules;

*(b)* call a meeting of creditors for a date no later than 28 days after the commencement of the proposal period for the purposes of considering whether to approve the proposal;

*(c)* send to each creditor, together with the notice of the meeting, a copy of the proposal, his or her report on the proposal and a copy of the company's statement of affairs;

*(d)* cause the creditors' meeting to be advertised;

*(e)* send a copy of the notice of the creditors' meeting, together with copies of the documents sent to creditors, to every member of the company; and

*(f)* send to every director of the company a copy of the notice of the meeting, together with copies of the documents sent to creditors.

(2) Where a proposal is amended under section 26(1)*(b)*, this section and section 28 applies to the amended proposal as if it were the original proposal.

*Insolvency Act*

Revision Date: 1 Jan 2020

(3) An interim supervisor who contravenes subsection (1) commits an offence.

### Interim supervisor may require certain persons to attend creditors' meeting

**28.** (1) If the interim supervisor considers that it is reasonable to require the presence at a creditors' meeting called under section 27 of a person specified in subsection (4), the interim supervisor may, by notice, require the person to attend the meeting.

(2) In determining whether it is reasonable to require a person to attend the creditors' meeting, the matters that the interim supervisor shall have regard to include—

*(a)* the likely benefits of the person's attendance;

*(b)* the travel and associated expenses that will be incurred by him or her in attending the meeting, unless the interim supervisor is prepared to pay those expenses;

*(c)* the distance that he or she would be required to travel to attend the meeting; and

*(d)* the time that it would take him or her to travel to and from and attend the meeting.

(3) A notice under subsection (1) requiring a person to attend a creditors' meeting shall be sent to that person at least 14 days prior to the date of the meeting and shall be accompanied by copies of the documents required to be sent to creditors under section 27(1)*(c)*.

(4) Subsection (1) applies to an officer of the company and to any person who, at any time during the 2 years prior to the date of the notice, was an officer of the company.

(5) A person commits an offence if—

*(a)* he or she receives a notice to attend a creditors' meeting under subsection (1); and

*(b)* without reasonable excuse, he or she fails to attend the meeting.

### Attendance of members and directors at creditors' meeting

**29.** (1) Subject to subsection (2), each member and director of a company is entitled to attend the creditors' meeting and, with the permission of the chairman, to address the meeting, but not to vote in that capacity at the meeting.

(2) The chairman of the creditors' meeting may, if he or she thinks fit, exclude any present or former director or other officer from attendance at the meeting, either completely or for any part of it.

(3) Subsection (2) applies whether or not the present or former director or other officer—

*(a)* is also a member; or

*(b)* has been sent a notice requiring him or her to attend the meeting.

### Business to be conducted at creditors' meeting

**30.** (1) At the meeting called under section 27, the creditors may resolve—

> *(a)* to approve the proposal, with or without amendment, and appoint the interim supervisor, or another eligible insolvency practitioner, to be the supervisor of the arrangement;

> *(b)* to adjourn the meeting to a date no later than 3 months after the commencement of the proposal period; or

> *(c)* to reject the proposal.

(2) A resolution to approve a proposal is invalid and of no effect if—

> *(a)* the proposal does not comply with section 15(4);

> *(b)* the proposal has been amended without the consent of the board or, in the case of a company in administration or liquidation, its administrator or liquidator; or

> *(c)* the proposal has been amended otherwise than in accordance with section 26 or section 31.

(3) The proposal is deemed to be rejected, and the creditors' meeting concluded, if—

> *(a)* the creditors fail to pass one of the resolutions specified in subsection (1); or

> *(b)* the creditors' meeting is not held on the date for which it was called or to which it was adjourned.

(4) On the rejection of a proposal the proposal period ends and the appointment of the interim supervisor is terminated.

(5) References in this section to a meeting include, where the meeting is adjourned, the adjourned meeting.

### Amendment or withdrawal of proposal at creditors' meeting

**31.** (1) Where, at a meeting called under section 27, the creditors wish to approve an amended proposal that has not been amended in accordance with section 26, the meeting shall be adjourned for sufficient time to enable the chairman of the meeting to give all creditors of the company not present or represented at the meeting at least 2 business days' notice—

> *(a)* of the venue of the adjourned meeting; and

> *(b)* of the amended proposal to be considered at the adjourned meeting.

(2) Where a meeting is adjourned under subsection (1), section 30 applies to the adjourned meeting—

(3) Subsection (1) does not apply if—

> *(a)* every creditor who was given notice of the meeting under section 27 is present or represented at the meeting; or

> *(b)* the chairman certifies in writing that an amendment is to correct minor errors or is otherwise not material.

(4) The board of a company or, in the case of a company that is in administration or liquidation, its administrator or liquidator, may withdraw a proposal at a creditors' meeting called under section 27 in accordance with the Rules. *(Inserted by Act 11 of 2004)*

### Report on outcome of creditors' meeting

**32.** (1) The chairman of a creditors' meeting called under section 27 shall, within 4 business days of the conclusion of the meeting, prepare a report complying with subsection (2).

(2) A report prepared under subsection (1) shall—

    *(a)* state whether the proposal was approved or rejected or withdrawn and, if approved, with what modifications, if any; *(Amended by Act 11 of 2004)*

    *(b)* set out the resolutions put to the meeting, and the decision on each one;

    *(c)* list the creditors, with their respective values, who were present or represented at the meeting; and *(Amended by Act 11 of 2004)*

    *(d) (Repealed by Act 11 of 2004)*

    *(e)* include such further information, if any, that the chairman considers should be made known to creditors.

(3) The chairman shall—

    *(a)* send a copy of his or her report to every creditor and every member of the company; and

    *(b)* file a copy of his or her report with the Registrar.

(4) For the purposes of subsection (1), a creditors' meeting is concluded if—

    *(a)* the creditors resolve either to approve or reject the proposal; or

    *(b)* the proposal is withdrawn in accordance with section 31(4) or is deemed to be rejected. *(Amended by Act 11 of 2004)*

(5) A person who contravenes subsection (1) or subsection (3) commits an offence.

### Notification of appointment of supervisor

**33.** (1) The supervisor shall, within 2 business days of his or her appointment—

    *(a)* file a notice of appointment as supervisor with the Registrar; and

    *(b)* if the company is a regulated person, file a copy of the notice of his or her appointment with the Commission.

(2) A supervisor who contravenes subsection (1) commits an offence.

### Effect of approval of proposal

**34.** (1) Where a proposal is approved at a creditors' meeting, the arrangement is binding on the company and on each member and each creditor of the company as if he or she was a party to the arrangement.

(2) For the purposes of subsection (1), a person is a creditor of the company—

> *(a)* where the company is in administration or liquidation at the time that the proposal is approved, if he or she was a creditor at the commencement of the administration or liquidation, as the case may be; or

> *(b)* in any other case, if he or she has a claim against the company that would be an admissible claim in the liquidation of the company commencing at the time of the approval of the arrangement. *(Substituted by Act 11 of 2004)*

*Implementation of Arrangement*

### Supervisor to be given possession of assets included in arrangement

**35.** (1) After the approval of an arrangement the board or, where appropriate the administrator or liquidator, shall forthwith take all necessary steps to put the supervisor into possession of the assets included in the arrangement.

(2) The supervisor shall, on taking possession of the assets included in the arrangement—

> *(a)* where, at the time of approval, the company is in administration or liquidation—

>> (i) promptly discharge any sums due to the administrator or liquidator under the Act or the Rules; or

>> (ii) provide the administrator or liquidator with a written undertaking to discharge any such sums out of the assets as soon as practicable; and

> *(b)* where, at the time of approval, the company is in liquidation, promptly discharge any sums due to the preferential creditors.

(3) The supervisor shall, out of the assets included in the arrangement—

> *(a)* discharge all guarantees properly given, or obligations properly entered into, by the administrator or liquidator for the benefit of the company or in the course of his or her duties;

> *(b)* pay the administrator's or the liquidator's outstanding remuneration; and

> *(c)* if as part of the arrangement, the administration order is to be discharged and the administrator released or the liquidation terminated by order of the Court under section 233, pay the costs of such discharge, release or termination. *(Amended by Act 11 of 2004)*

(4) The following have equally ranking charges on the assets included in the arrangement, subject to the deduction of the proper costs and expenses of realisation—

*(a)* notwithstanding his or her release or discharge, the administrator or liquidator of a company in respect of any monies payable under subsections (2) and (3); and

*(b)* each preferential creditor in respect of any monies payable to him or her under subsection (2).

(5) In this section, "liquidator" and "administrator" includes, where appropriate, a former liquidator or administrator.

## Supervisor's duty to keep accounting records

**36.** (1) Where an arrangement permits or requires the supervisor—

*(a)* to carry on the business of the company or trade on its behalf and in its name;

*(b)* to realise assets of the company; or

*(c)* otherwise to administer or dispose of any of its funds, he or she shall keep accounting records that correctly record and explain the receipts, expenditure and other transactions relating to his or her acts and dealings in and in connection with the arrangement.

(2) The supervisor shall retain the accounting records kept under subsection (1) for a period of not less than 6 years after the termination of the arrangement.

(3) A supervisor who contravenes this section commits an offence.

## Supervisor to prepare and send out regular accounts and reports

**37.** (1) The supervisor shall prepare accounts of his or her receipts and payments, if any, and reports concerning the progress and efficacy of the arrangement covering the periods specified in subsection (2).

(2) The accounts and reports prepared under subsection (1) shall cover—

*(a)* the period of 12 months following the supervisor's appointment;

*(b)* each subsequent period of 12 months; and

*(c)* where the supervisor ceases to act as supervisor—

(i) the period from the end of the period covered by the last accounts required to be prepared under this section, or if he or she acted as supervisor for less than 12 months from the date of his or her appointment, to the date of his or her ceasing to act; and

(ii) the period from the date of his or her appointment to the date of his or her ceasing to act, unless prepared in accordance with subsection (2)*(c)*(i).

(3) The supervisor shall, within 60 days of the last day of the period covered by the accounts—

*(a)* file a copy of the accounts and his or her report with the Registrar; and

*(b)* send a copy of the accounts and his or her report to—

(i) the company;

(ii) each creditor of the company who is bound by the arrangement; and *(Amended by Act 11 of 2004)*

(iii) each member of the company.

(4) The Court, on the application of the supervisor, may dispense with the sending of the accounts and report prepared under subsection (1) to the members of the company.

(5) A supervisor who contravenes this section commits an offence.

## Completion or premature termination of arrangement

**38.** (1) Where an arrangement is completed or terminated prematurely, the supervisor shall, within 28 days of its completion or termination—

*(a)* file a notice of completion or termination with the Registrar; and

*(b)* send a notice of completion or termination to the company and to each creditor of the company who is bound by the arrangement and each member of the company.
*(Amended by Act 11 of 2004)*

(2) Where an arrangement is completed or terminated prematurely, the report prepared under section 37(2)*(c)* shall explain any material difference between the implementation of the arrangement and the proposal approved by the creditors. *(Amended by Act 11 of 2004)*

(3) A supervisor who contravenes this section commits an offence.

*Modification of Arrangement*

## Supervisor may propose modification of arrangement

**39.** (1) In this section and in section 40—

*(a)* "creditor", in relation to an arrangement, means a creditor bound by that arrangement; and

*(b)* "proposal" means a proposal to modify an arrangement.

(2) If the supervisor of an arrangement considers it appropriate, he or she may propose a modification of the arrangement at a meeting of creditors called for such a purpose.

(3) The supervisor shall call a meeting of creditors under subsection (2) by sending to each creditor—

*(a)* a notice of the meeting; and

*(b)* a written report on the proposed modification complying with the Rules.

(4) The supervisor shall send a copy of the notice of the meeting and his or her report on the proposed modification to each member and director of the company.

## Modification of arrangement

**40.** (1) Unless the Rules otherwise provide, sections 28, 29, 30 and 32 and the relevant Rules apply, with suitable modifications, to a meeting called under section 39.

(2) Where a proposal to modify an arrangement is approved—

    *(a)* the modified arrangement is binding on the company and on each member and each creditor of the company as if he or she had agreed to the modification; and

    *(b)* the provisions of this Division applicable to an arrangement apply to the modified arrangement.

(3) An arrangement may not be modified otherwise than in accordance with section 39 and this section.

*Applications to Court*

## Appointment of interim supervisor or supervisor by Court

**41.** (1) The Court may, on an application made by a person and in the circumstances specified in subsection (2), order that an eligible insolvency practitioner, is appointed as supervisor or interim supervisor either in substitution for the existing supervisor or interim supervisor or to fill a vacancy.

(2) An application under subsection (1) may be made—

    *(a)* where the supervisor or interim supervisor has failed to comply with a duty imposed upon him or her under this Division or has died, by the board of the company, or where it is in administration or liquidation by the administrator or liquidator;

    *(b)* where it is impracticable or inappropriate for the existing supervisor or interim supervisor to continue to act, by the board of the company, or where it is in administration or liquidation by the administrator or liquidator, or by the supervisor or interim supervisor; or

    *(c)* where the licence of the insolvency practitioner appointed as supervisor or interim supervisor is suspended or revoked, by the Official Receiver. *(Inserted by Act 11 of 2004)*

(3) An order under subsection (1) may increase the number of persons acting as supervisor or interim supervisor or replace one or more of those persons.

## Application where arrangement approved or modified

**42.** (1) Where an arrangement is approved or modified, the Court may—

    *(a)* on an application made by a person specified in subsection (2)—

(i) give directions to the supervisor in relation to any matter arising;

(ii) confirm, reverse or modify any act or decision of the supervisor; or

(iii) make such other order as it considers fit; or

(b) on an application made by the supervisor or, if appropriate the administrator or liquidator—

(i) discharge the administration order or terminate the liquidation under section 233; and *(Amended by Act 11 of 2004)*

(ii) give such directions regarding the administration or liquidation as it considers appropriate.

(2) Application under subsection (1)*(a)* may be made by the supervisor, by any administrator or liquidator, by a creditor, director or member of the company, by a surety of a liability of the company, by a co-debtor of the company, by a person affected by the arrangement or, where the company is a regulated person, by the Commission.

(3) The Court shall not make an order under subsection (1)*(b)*—

(a) until a period of 28 days after the chairman's report is filed under section 32(3); or

(b) at any time when an application under section 43, or an appeal in respect of such an application, is outstanding or during the period within which such an appeal may be brought. *(Amended by Act 11 of 2004)*

**Application on grounds of unfair prejudice**

**43.** (1) An application may be made by a person specified in subsection (2) for an order under subsection (3) on one or both of the following grounds—

(a) that an arrangement approved or modified by the creditors unfairly prejudices the interests of a member, creditor, surety or co-debtor of the company; or

(b) that there has been a material irregularity at or in relation to the meeting at which the arrangement was approved or modified.

(2) An application for an order under subsection (3) may be made by—

(a) a member, creditor, surety or co-debtor of the company;

(b) the supervisor or the person who, immediately prior to the approval of the arrangement, acted as interim supervisor;

(c) where the company is in administration, the administrator;

(d) where the company is in liquidation, the liquidator; or

(e) where the company is a regulated person, the Commission.

(3) Where it is satisfied as to either of the grounds specified in subsection (1), the Court—

(a) may revoke or suspend—

(i) any decision approving or modifying the arrangement; or

(ii) any decision taken at a meeting at or in relation to which there was a material irregularity; and

*(b)* may give a direction to any person—

(i) for the calling of a further meeting to consider any amended proposal for an arrangement that the board or the supervisor may make;

(ii) for the calling of a further meeting to consider any amended proposal for a modification of the arrangement that the supervisor may make; or

(iii) where there has been a material irregularity, for the calling of a further creditors' meeting to reconsider the proposal for the arrangement or for the modification of an arrangement.

(4) Where at any time after giving a direction under subsection (3)*(b)*(i) or (ii), the Court is satisfied that the board, or the supervisor, does not intend to submit an amended proposal, the Court shall revoke the direction and revoke or suspend any decision approving the arrangement or the modification of an arrangement.

(5) Where the Court, on an application under this section, gives a direction under subsection (3)*(b)* or revokes or suspends a decision under subsection (3)*(a)* or (4), the Court may give such supplemental directions as it considers fit and, in particular, directions with respect to things done under the arrangement since it, or any modification, took effect.

(6) Except as provided in this section, a decision taken at a meeting called under section 27 or 39 is not invalidated by any irregularity at or in relation to the meeting.

(7) Without limiting subsection (1)*(a)*, the interests of a member, creditor, surety or co-debtor of the company are capable of being unfairly prejudiced on the grounds that the remuneration paid or to be paid to the supervisor is excessive.

(8) Subject to subsection (9), no application under this section shall be made after the arrangement has been completed or has prematurely terminated. *(Inserted by Act 11 of 2004)*

(9) A creditor who did not participate in the approval of an arrangement may make an application under this section after the completion of an arrangement if, when the arrangement was completed, he or she was unaware of the arrangement. *(Inserted by Act 11 of 2004)*

(10) An application under subsection (9) shall be made within 4 weeks of the creditor first becoming aware of the arrangement. *(Inserted by Act 11 of 2004)*

(11) For the purposes of this section, a creditor does not participate in the approval of an arrangement if, for whatever reason—

*(a)* he or she was not given notice of the meeting of creditors called to consider the proposal; and

*(b)* he or she did not attend the meeting at which the arrangement was approved, whether in person or by proxy.
*(Inserted by Act 11 of 2004)*

## Application to Court by former supervisor or interim supervisor

**44.** Where an application may be made to the Court by a supervisor or an interim supervisor under sections 41 , 42 or 43, an application may, with the leave of the Court, be made by the person who was the supervisor or interim supervisor immediately before—

*(a)* the termination of his or her appointment;

*(b)* the termination of the arrangement; or

*(c)* the termination of the proposal period, as the case may be.
*(Amended by Act 11 of 2004)*

*Offences*

## False representations etc.

**45.** An officer of a company who makes any false representation or who fraudulently does, or omits to do, anything for the purpose of obtaining the approval of the creditors of the company to an arrangement commits an offence.

## Division 3

### *Individual Creditors' Arrangement*

## Interpretation for and scope of this Division

**46.** (1) In this Division—

"debtor" means an individual who intends to make or who has made a proposal under this Division; and

"interested person" means—

*(a)* in relation to a security interest, the person entitled to the security interest or any receiver appointed under the security interest;

*(b)* in relation to an asset not belonging to a debtor which is used or occupied by or in the possession of the debtor, the owner or lessor of the asset;

*(c)* in relation to proceedings, execution or legal process, including distress, a person who is entitled to commence or continue the proceedings, execution or legal process or levy the distress; and

*(d)* in relation to a guarantee of a liability of the debtor, the person entitled to enforce the guarantee;

"proposal period" means the period from the appointment of the interim supervisor to the approval or rejection by the creditors of the proposed arrangement.

(2) An undischarged bankrupt may not make a proposal under this Division.

(3) Where the context allows, a reference in this Division to the extension of a moratorium period includes a further extension of the moratorium period.

*Proposal*

## Proposal

**47.** (1) A debtor who intends to make a proposal under this Division shall—

(a) nominate an eligible insolvency practitioner to act as interim supervisor for the purposes of the proposal; and *(Amended by Act 11 of 2004)*

(b) provide the nominated insolvency practitioner with—

(i) a copy of the proposal;

(ii) a statement of assets and liabilities made up to a date no earlier than 4 weeks prior to the date upon which it is provided to the nominated insolvency practitioner; and

(iii) a notice of intention to appoint the nominated insolvency practitioner as interim supervisor.

(2) The nominated insolvency practitioner may accept appointment as interim supervisor, by delivering to the debtor a copy of the notice referred to in subsection (1)*(b)*, endorsed in accordance with the Rules.

(3) Subject to subsection (4), the appointment of an interim supervisor takes effect from the time when he or she delivers the endorsed notice to the debtor.

(4) The appointment of an interim supervisor is not effective unless he or she accepts appointment under subsection (2) within 5 business days of the date of receiving the notice of intention to appoint him or her as interim supervisor from the debtor.

## Notification of appointment of interim supervisor

**48.** (1) The interim supervisor shall, within 2 business days of his or her appointment file a copy of the notice of his or her appointment with the Official Receiver and, if the debtor is a regulated person, with the Commission. *(Substituted by Act 11 of 2004)*

(2) An interim supervisor who contravenes subsection (1) commits an offence.

## Functions of interim supervisor and power to obtain information

**49.** (1) The functions of an interim supervisor are—

(a) to prepare a report on the proposal for the Court;

(b) to carry out any duties assigned to him or her by this Act or the Rules or by the Court;

*(c)* to undertake such functions and duties as he or she may agree with the debtor; and

*(d)* to monitor the affairs of the debtor, including the conduct of any business carried on by the debtor, during the proposal period.

(2) For the purposes of enabling the interim supervisor to exercise his or her functions, a debtor shall—

*(a)* provide to the interim supervisor such documents, information and explanations as he or she may reasonably require; and

*(b)* give the interim supervisor such assistance as he or she may reasonably require.

(3) On the application of the interim supervisor, the Court may make an order requiring a debtor to comply with subsection (2).

(4) A debtor who fails to comply with an order of the Court made under subsection (3) commits an offence.

### Amendment of proposal after appointment of interim supervisor

**50.** (1) A debtor may amend or withdraw a proposal in accordance with the Rules—

*(a)* before the appointment of an interim supervisor;

*(b)* after the appointment of an interim supervisor but before notice of a creditors' meeting has been given under section 58; or

*(c)* after notice of a creditors' meeting has been given under section 58 but before the date fixed for the meeting.

(2) A proposal cannot be amended or withdrawn otherwise than in accordance with this section or section 60.

*(Amended by Act 11 of 2004)*

*Moratorium*

### Application for moratorium order

**51.** (1) A debtor who intends to make a proposal may apply to the Court for a moratorium order under this section if—

*(a)* he or she is entitled to apply to the Court for a bankruptcy order under section 295;

*(b)* an eligible insolvency practitioner has accepted appointment as interim supervisor under the proposal in accordance with section 47;

*(c)* no previous application for a moratorium has been made by the debtor during the 12 months immediately preceding the date of the application; and

*(d)* he or she is not a regulated person.

(2) An application under subsection (1) shall be supported by an affidavit setting out the matters prescribed and exhibiting—

*(a)* a copy of the proposal provided to the interim supervisor under section 47(1)*(b)*;

*(b)* a copy of the endorsed notice of appointment of the interim supervisor; and

*(c)* a statement of assets and liabilities.

(3) The debtor shall give 2 business days notice of the hearing of an application under this section to—

*(a)* the interim supervisor; and

*(b)* any creditor who, to his or her knowledge, has applied to the Court for a bankruptcy order against him or her.

## Court may grant stay

**52.** (1) At any time when an application under section 51 for a moratorium order is pending, the Court may, on the application of the debtor or the interim supervisor, stay any action, execution or other legal process against the debtor or his or her assets.

(2) Any Virgin Islands court, or any tribunal in the Virgin Islands, in which proceedings are pending against a debtor may, on proof that an application under section 51 has been made by the debtor, either stay those proceedings or allow them to continue on such terms as it considers just.

## Moratorium order

**53.** (1) The Court may make a moratorium order on an application under section 51 if it considers that it would be appropriate to do so for the purpose of facilitating the consideration of the debtor's proposal.

(2) Unless extended by the Court under this section, a moratorium order ceases to have effect at the end of the 14th day after the date upon which it is made.

(3) If the Court makes a moratorium order under subsection (1), it shall at the same time fix a venue for consideration of the interim supervisor's report under section 56, no later than the date of expiry of the moratorium order under subsection (2).

(4) In a case where the interim supervisor has failed to submit his or her report as required by section 56, the Court may, on the application of the debtor, direct that the moratorium order shall continue or, if it has ceased to have effect, be renewed for such further period as the Court may order.

(5) The Court may, on the application of the interim supervisor, extend the period for which the moratorium order has effect so as to enable the interim supervisor to have more time to prepare and submit his or her report under section 56.

(6) The Court may, at any time, discharge the moratorium order if it is satisfied, whether by reason of a report made to it by the interim supervisor under section 54 or otherwise—

> *(a)* that the debtor has failed to comply with his or her obligations under section 49(2);
>
> *(b)* that it would not be appropriate for a meeting of creditors to be called to consider the debtor's proposal; or
>
> *(c)* that, for any other reason, it is appropriate for the moratorium order to be discharged.

(7) An order discharging the moratorium order may be made by the Court on the application of the debtor or the interim supervisor or on its own motion.

### Duty of interim supervisor to report certain matters to the Court

**54.** The interim supervisor shall report to the Court forthwith if, at any time during the period when a moratorium order is in force—

> *(a)* he or she forms the view that the proposed arrangement no longer has a reasonable prospect of being approved or implemented; or
>
> *(b)* the debtor fails to comply with his or her obligations under section 49(2).

### Effect of moratorium order

**55.** (1) In the period during which a moratorium order is in force in respect of a debtor—

> *(a)* no application for a bankruptcy order against the debtor may be presented or proceeded with;
>
> *(b)* no bankruptcy order may be made against the debtor;
>
> *(c)* no steps may be taken to enforce any security interest over the debtor's assets, except with the leave of the Court;
>
> *(d)* no steps may be taken to repossess assets that are being used or occupied by or are in the possession of the debtor, including—
>
>> (i) goods supplied under a hire purchase, conditional sale or chattel leasing agreement; and
>>
>> (ii) goods supplied subject to a retention of title agreement, except with the leave of the Court; and
>
> *(e)* no proceedings, execution or other legal process may be commenced or continued or distress levied against the debtor or his or her assets, except with the leave of the Court.

(2) On an application for leave under subsection (1)*(c)* to *(e)*, the Court may grant leave subject to such terms and conditions as it considers fit.

(3) Subsection (1) does not prevent or require the leave of the Court to be obtained for—

> *(a)* the enforcement of a security interest on assets belonging to a debtor if, before the commencement of the moratorium period, an interested person lawfully—
>
>> (i) entered into possession or assumed control of the assets; or

*Insolvency Act*    LAW OF
VIRGIN ISLANDS

Revision Date: 1 Jan 2020

(ii) entered into a binding agreement to sell the assets, for the purpose of enforcing the security interest on those assets;

*(b)* the repossession of assets being used or occupied by or in the possession of a debtor if, before the commencement of the moratorium period, an interested person lawfully entered into possession, or assumed control of those assets; or *(Amended by Act 11 of 2004)*

*(c)* the exercise by a creditor of any set-off that he or she would have been entitled to exercise under section 150 if the debtor was in bankruptcy, the bankruptcy having commenced on the date that the moratorium order was made.

*Consideration of Proposal*

**Interim supervisor's report on debtor's proposal**

**56.** (1) An interim supervisor shall, before the end of the relevant time limit specified in subsection (3), file with the Court a report including the matters prescribed in the Rules.

(2) An interim supervisor shall file with the report—

*(a)* where the debtor made an application for a moratorium order under section 51 and the proposal has since been amended, a copy of the amended proposal; or

*(b)* where the debtor has not made an application for a moratorium order, copies of the documents referred to in section 51(2)*(a)* to *(c)*.

(3) The relevant time limits for the purposes of subsection (1) are—

*(a)* where a moratorium order has been made, no less than 2 business days prior to the date of the hearing fixed under section 53(3);

*(b)* in any other case, within 14 days after the date of the appointment of the interim supervisor.

(4) The Court may, on the application of the interim supervisor, extend the period within which the interim supervisor shall submit his or her report under subsection (1) by such further period as it considers appropriate.

**Extension of moratorium**

**57.** (1) This section applies where a moratorium order is in force at the time when the interim supervisor files his or her report with the Court.

(2) If, on receiving the interim supervisor's report, the Court is satisfied that a meeting of creditors should be called to consider the debtor's proposal, the Court shall extend the period for which the moratorium order is in force for such further period as it may specify for the purpose of enabling the debtor's proposal to be considered by his or her creditors in accordance with this Division and for the result of the creditors' meeting to be reported to the Court.

## Calling creditors' meeting

**58.** (1) Unless the Court otherwise orders, where the interim supervisor has reported to the Court that a meeting of creditors should be called, he or she shall—

    *(a)* call a meeting of creditors at the venue proposed in his or her report; and

    *(b)* send to each creditor, together with the notice of the meeting, a copy of the debtor's proposal, his or her report on the proposal and a copy of the debtor's statement of assets and liabilities.

(2) An interim supervisor who contravenes subsection (1) commits an offence.

## Decisions of creditors' meetings

**59.** (1) At the meeting called under section 58, the creditors may resolve—

    *(a)* to approve the proposal, with or without amendment, and appoint the interim supervisor, or another eligible insolvency practitioner, to be the supervisor of the arrangement;

    *(b)* to adjourn the meeting to a date no later than 28 days after the date for which the meeting was originally called; or

    *(c)* to reject the proposal.

(2) A resolution to approve a proposal is invalid and of no effect if—

    *(a)* the proposal does not comply with section 15(4);

    *(b)* the proposal has been amended without the consent of the debtor; or

    *(c)* the proposal has been amended otherwise than in accordance with section 50 or section 60.

(3) The proposal is deemed to be rejected, and the creditors' meeting concluded, if—

    *(a)* the creditors fail to pass one of the resolutions specified in subsection (1); or

    *(b)* the creditors' meeting is not held on the date for which it was called or to which it was adjourned.

(4) Where a meeting of creditors is adjourned, the chairman shall forthwith file a notice of the adjournment with the Court and the Court may, on the application of the debtor or the interim supervisor, extend the period for which the moratorium order is in force for such further period as it may specify for the purpose of enabling the adjourned meeting to be held and for the result to be reported to the Court.

(5) References in this section and section 60 to a meeting include, where the meeting is adjourned, an adjourned meeting.

*Insolvency Act*  **LAW OF VIRGIN ISLANDS**

Revision Date: 1 Jan 2020

### Amendment or withdrawal of proposal at creditors' meeting

**60.** (1) Where, at a meeting held under section 59, the creditors wish to approve an amended proposal that has not been amended in accordance with section 50, the meeting shall be adjourned for sufficient time to enable the chairman of the meeting to give all creditors not present or represented at the meeting at least 2 business days notice—

    *(a)* of the venue of the adjourned meeting; and

    *(b)* of the amended proposal to be considered at the adjourned meeting.

(2) Where a meeting is adjourned under subsection (1), section 59 applies to the adjourned meeting.

(3) Subsection (1) does not apply—

    *(a)* if every creditor who was given notice of the meeting under section 58 is present or represented at the meeting; or *(Amended by Act 11 of 2004)*

    *(b)* if the chairman certifies in writing that an amendment is to correct minor errors or is otherwise not material.

(4) The debtor may withdraw a proposal at a creditors' meeting called under section 58 in accordance with the Rules. *(Inserted by Act 11 of 2004)*

### Report of decisions to Court

**61.** (1) The chairman of a creditors' meeting called under section 58 shall, within 4 business days of the date of the conclusion of the meeting—

    *(a)* file with the Court a report of the meeting complying with subsection (2);

    *(b)* file a notice of the arrangement with the Official Receiver; and

    *(c)* if the debtor is a regulated person, file notice of the arrangement with the Commission.

(2) A report filed under subsection (1)*(a)* shall—

    (a) state whether the proposal was approved or rejected or withdrawn and, if approved, with what modifications, if any; *(Amended by Act 11 of 2004)*

    *(b)* set out the resolutions put to the meeting, and the decision on each one;

    *(c)* list the creditors, with their respective values, who were present or represented at the meeting; and

    *(d)* include such further information, if any, that the chairman considers should be made known to the Court.

(3) If a report filed under subsection (1)*(a)* states that the meeting has rejected the proposal or that it was withdrawn by the debtor under section 60(4), any moratorium order in force is discharged with effect from the end of the fourth business day after the conclusion of the meeting unless the Court otherwise orders. *(Amended by Act 11 of 2004)*

(4) The chairman of the meeting shall, as soon as practicable after filing his or her report with the Court, send a notice stating the result of the meeting to all creditors of the debtor.

(5) A person who contravenes subsection (1) or subsection (4) commits an offence.

## Effect of approval

**62.** (1) Where the meeting of creditors called under section 58 approves the proposed arrangement, the arrangement—

> *(a)* takes effect as if made by the debtor at the meeting; and

> *(b)* is binding on the debtor and each creditor of the debtor as if he or she were a party to the arrangement.

(2) For the purposes of subsection (1), a person is a creditor of the debtor if he or she has a claim against the debtor that would be an admissible claim in the bankruptcy of the debtor commencing at the time of the approval of the arrangement.

(3) If—

> *(a)* when the arrangement ceases to have effect any amount payable under the arrangement to a person bound by the arrangement has not been paid; and

> *(b)* the arrangement did not come to an end prematurely, the debtor shall, at that time, become liable to pay to that person the amount payable under the arrangement.

(4) For the purposes of subsection (3), an arrangement comes to an end prematurely if, when it ceases to have effect, it has not been fully implemented in respect of all persons bound by the arrangement.

(5) Subject to section 72, any moratorium order in force in relation to the debtor immediately before the end of the period of 28 days beginning with the day on which the report with respect to the creditors' meeting was filed with the Court under section 61 ceases to have effect at the end of that period.

(6) Where proceedings on an application for a bankruptcy order have been stayed by a moratorium order which ceases to have effect under subsection (5), that application is deemed, unless the Court otherwise orders, to have been dismissed. *(Amended by Act 11 of 2004)*

*Implementation of Arrangement*

## Supervisor to be given possession of assets included in arrangement

**63.** After the approval of an arrangement the debtor shall forthwith take all necessary steps to put the supervisor into possession of the assets included in the arrangement.

## Supervisor's duty to keep accounting records

**64.** (1) Where an arrangement permits or requires the supervisor—

*(a)* to carry on the debtor's business or trade on his or her behalf or in his or her name;

*(b)* to realise assets of the debtor; or

*(c)* otherwise to administer or dispose of any of the debtor's funds,

he or she shall keep accounting records that correctly record and explain the receipts, expenditure and other transactions relating to his or her acts and dealings in and in connection with the arrangement.

(2) The supervisor shall retain the accounting records kept under subsection (1) for a period of not less than 6 years after the termination of the arrangement.

(3) A supervisor who contravenes this section commits an offence.

### Supervisor to prepare and send out regular accounts and reports

**65.** (1) The supervisor shall prepare accounts of his or her receipts and payments, if any, and reports concerning the progress and efficacy of the arrangement covering the periods specified in subsection (2).

(2) The accounts and reports prepared under subsection (1) shall cover—

*(a)* the period of 12 months following the supervisor's appointment;

*(b)* each subsequent period of 12 months; and

*(c)* where the supervisor ceases to act as supervisor—

(i) the period from the end of the period covered by the last accounts required to be prepared under this section, or if he or she acted as supervisor for less than 12 months from the date of his or her appointment, to the date of his or her ceasing to act; and

(ii) the period from the date of his or her appointment to the date of his or her ceasing to act, unless prepared in accordance with subparagraph (i).

(3) The supervisor shall, within 60 days of the last day of the period covered by the accounts—

*(a)* file a copy of the accounts and his or her report with the Court; and

*(b)* send a copy of the accounts and his or her report to—

(i) the Official Receiver; *(Amended by Act 11 of 2004)*

(ii) the debtor; and

(iii) each creditor of the debtor who is bound by the arrangement. *(Amended by Act 11 of 2004)*

(4) A supervisor who contravenes this section commits an offence.

### Completion or premature termination of arrangement

**66.** (1) Where an arrangement is completed or terminated prematurely, the supervisor shall, within 28 days of its completion or termination, file a notice of

completion or termination with the Court and send a copy of the notice to the debtor and to each creditor of the debtor who is bound by the arrangement. *(Amended by Act 11 of 2004)*

(2) Where an arrangement is completed or terminated, the report prepared under section 65(2)*(c)* shall explain any difference between the implementation of the agreement and the proposal approved by the creditors. *(Amended by Act 11 of 2004)*

(3) A supervisor who contravenes this section commits an offence.

*Modification of Arrangement*

**Supervisor may propose modification of arrangement**

**67.** (1) In this section and in section 68—

    *(a)* "creditor", in relation to an arrangement, means a creditor bound by that arrangement; and

    *(b)* "proposal" means a proposal to modify an arrangement.

(2) If the supervisor of an arrangement considers it appropriate, he or she may propose a modification of the arrangement at a meeting of creditors called for such a purpose.

(3) The supervisor shall call a meeting of creditors under subsection (2) by sending to each creditor—

    *(a)* a notice of the meeting; and

    *(b)* a written report on the proposed modification complying with the Rules.

        *(Amended by Act 11 of 2004)*

(4) The supervisor shall send a copy of the notice of the meeting and his or her report on the proposed modification to the debtor.

**Modification of arrangement**

**68.** (1) Subject to the exceptions specified in the Rules, sections 59 and 61 and the relevant Rules apply, with suitable modifications, to a meeting called under section 67.

(2) Where a proposal to modify an arrangement is approved—

    *(a)* the modified arrangement is binding on the debtor and on each creditor of the debtor as if he or she had agreed to the modification; and

    *(b)* the provisions of this Division applicable to an arrangement apply to the modified arrangement.

(3) An arrangement may not be modified otherwise than in accordance with section 67 and this section.

*Insolvency Act*

*Applications to Court*

## Appointment of interim supervisor or supervisor

**69**. (1) The Court may, on an application made by a person and in the circumstances specified in subsection (2), order that an eligible insolvency practitioner, is appointed as supervisor or interim supervisor either in substitution for the existing supervisor or interim supervisor or to fill a vacancy. *(Amended by Act 11 of 2004)*

(2) An application under subsection (1) may be made—

*(a)* where the interim supervisor has failed to submit the report required by section 56, on the application of the debtor;

*(b)* where the supervisor or interim supervisor has failed to comply with a duty imposed upon him or her under this Division or has died, by the debtor;

*(c)* where it is impracticable or inappropriate for the existing supervisor or interim supervisor to continue to act, by the debtor or by the supervisor or interim supervisor; or

*(d)* where the licence of the supervisor or interim supervisor is suspended or revoked, by the Official Receiver. *(Substituted by Act 11 of 2004)*

(3) An order under subsection (1) may increase the number of persons acting as supervisor or interim supervisor or replace one or more of those persons.

## Application in respect of moratorium

**70.** (1) Where a moratorium order is or has been in force in respect of a debtor, the Court may, on an application made by the debtor, by the supervisor or interim supervisor, by a creditor, by a person affected by the moratorium or, where the individual is a regulated person, by the Commission—

*(a)* give directions to the supervisor or interim supervisor in relation to any matter arising in connection with the moratorium;

*(b)* confirm, reverse or modify any act or decision of the supervisor or interim supervisor;

*(c)* terminate the moratorium order and make such consequential provisions as it considers fit; or

*(d)* make such other order, whether in relation to the supervisor or interim supervisor, the debtor or otherwise as it considers fit.

(2) Without limiting subsection (1)*(d)*, an order under that subsection—

*(a)* may require the debtor to refrain from doing or continuing an act complained of by the applicant, or to do an act that the applicant has complained he or she has omitted to do;

*(b)* may require the calling of a meeting of creditors for the purpose of considering such matters as the Court may direct; and

 *(c)* may make such provision as the Court considers necessary to protect the interests of one or more creditors in the period during which the moratorium order is in force.

 (3) An application under subsection (1) may be made during the period in which the moratorium order is in force or after the moratorium order has been discharged.

 (4) In making an order under this section, the Court shall have regard to the need to safeguard the interests of persons who have dealt with the debtor in good faith and for value.

## Application where arrangement approved or modified

 **71.** (1) Where an arrangement is approved or modified, the Court may, on an application made by a person specified in subsection (2)—

 *(a)* give directions to the supervisor in relation to any matter arising in connection with the arrangement;

 *(b)* confirm, reverse or modify any act or decision of the supervisor; or

 *(c)* make such other order as it considers fit.

 (2) Application under subsection (1) may be made by the supervisor, by the debtor, by a creditor of the debtor, by a surety of a liability of the debtor, by a co-debtor of the debtor, by a person affected by the arrangement or, where the individual is a regulated person, by the Commission.

## Application on grounds of unfair prejudice

 **72.** (1) An application may be made by a person specified in subsection (2) for an order under subsection (3) on one or both of the following grounds—

 *(a)* that an arrangement approved or modified by the creditors at a meeting called under section 58 unfairly prejudices the interests of a creditor, surety or co-debtor; or

 *(b)* that there has been a material irregularity at or in relation to the meeting at which the arrangement was approved or modified.

 (2) An application for an order under subsection (1) may be made by—

 *(a)* the debtor;

 *(b)* the supervisor or the person who, immediately prior to the approval of the arrangement, acted as interim supervisor;

 *(c)* a creditor, surety or co-debtor of the debtor; or

 *(d)* where the individual is a regulated person, the Commission. *(Amended by Act 11 of 2004)*

 (3) Where it is satisfied as to either of the grounds specified in subsection (1), the Court may—

 *(a)* revoke or suspend—

  (i) any decision approving or modifying the arrangement; or

*Insolvency Act*    LAW OF
VIRGIN ISLANDS

Revision Date: 1 Jan 2020

     (ii) any decision taken at a meeting at or in relation to which there was a material irregularity;

  *(b)* give a direction to any person—

     (i) for the calling of a further meeting to consider any amended proposal for an arrangement that the supervisor or the debtor may make;

     (ii) for the calling of a further meeting to consider any amended proposal for a modification of the arrangement that the supervisor may make;

     (iii) where there has been a material irregularity, for the calling of a further creditors' meeting to reconsider the proposal for the arrangement or for the modification of an arrangement.

(4) Where at any time after giving a direction under subsection (3)*(b)*(i), the Court is satisfied that the debtor does not intend to submit an amended proposal, the Court shall revoke the direction and revoke or suspend any decision approving the arrangement or the modification of the arrangement.

(5) Where the Court, on an application under this section gives a direction under subsection (3)*(b)* or revokes or suspends a decision under subsection (4), the Court may—

  *(a)* direct that any moratorium order in place be continued or, if it has ceased to have effect, be renewed for such further period as the Court may order; and

  *(b)* give such supplemental directions as it considers fit and, in particular, directions with respect to things done under the arrangement since it took effect.

(6) Except as provided in this section, a decision taken at a meeting called under section 58 or section 67 is not invalidated by any irregularity at or in relation to the meeting. *(Amended by Act 11 of 2004)*

(7) Without limiting subsection (1)*(a)*, the interests of a member, creditor, surety or co-debtor of the debtor are capable of being unfairly prejudiced on the grounds that the remuneration paid or to be paid to the supervisor is excessive. *(Amended by Act 11 of 2004)*

(8) Subject to subsection (9), no application under this section shall be made after the arrangement has been completed or has prematurely terminated. *(Inserted by Act 11 of 2004)*

(9) A creditor who did not participate in the approval of an arrangement may make an application under this section after the completion of an arrangement if, when the arrangement was completed, he or she was unaware of the arrangement. *(Inserted by Act 11 of 2004)*

(10) An application under subsection (9) shall be made within 4 weeks of the creditor first becoming aware of the arrangement. *(Inserted by Act 11 of 2004)*

(11) For the purposes of this section, a creditor does not participate in the approval of an arrangement if, for whatever reason—

  *(a)* he or she was not given notice of the meeting of creditors called to consider the proposal; and

*(b)* he or she did not attend the meeting at which the arrangement was approved, whether in person or by proxy.

*(Inserted by Act 11 of 2004)*

## *Miscellaneous*

### Register of arrangements

**73.** (1) The Official Receiver shall maintain a register of arrangements made under this Division and shall record in the register all matters that are required to be reported to him or her under this Division or under the corresponding Division in the Rules.

(2) A member of the public is entitled to inspect the register maintained under subsection (1) on payment of the prescribed fee.

## *Offences*

### False representations etc.

**74.** (1) A debtor who makes any false representation or who fraudulently does, or omits to do, anything for the purpose of obtaining the approval of his or her creditors to an arrangement commits an offence.

(2) Subsection (1) applies whether or not the proposal is approved.

PART III

ADMINISTRATION

## *Preliminary*

### Interpretation for and scope of this Part

**75.** (1) In this Part—

"interested person" means—

*(a)* in relation to a security interest, the person entitled to the security interest or any receiver appointed under the security interest;

*(b)* in relation to an asset not belonging to a company which is used or occupied by or in the possession of the company, the owner or lessor of the asset;

*(c)* in relation to proceedings, execution or legal process, including distress, a person who is entitled to commence or continue the proceedings, execution or legal process or levy the distress; and

*(d)* in relation to a guarantee of a liability of the company, the person entitled to enforce the guarantee;

"moratorium period" is the period specified in section 83(1).

*Insolvency Act*

(2) An administration order may not be made in respect of a foreign company.

*Administration Orders*

## Meaning of administration order

**76.** (1) An administration order is an order directing that, during the period for which the order is in force, the business, assets and affairs of a company shall be managed by an administrator appointed by the Court with a view to achieving one or more of the following purposes—

    *(a)* the rehabilitation of the company or of one or more companies in a group of companies of which the company is a member;

    *(b)* the survival of all or any part of the company's undertaking as a going concern;

    *(c)* a better return for the company's creditors than would result from an immediate liquidation;

    *(d)* the approval of a creditors' arrangement under Part II;

    *(e)* to facilitate an application, or the provision of cooperation, under Part XVIII or Part XIX.

(2) Where an administration order is made in respect of a company, that company is referred to in this Act as "in administration" until the discharge of the order.

(3) For the purposes of subsection (1)*(a)* a "group of companies" comprises a holding company and its subsidiaries.

(4) In subsection (3), "company" means any body corporate.

## Court may make an administration order

**77.** (1) Subject to subsections (3) and (4), section 78(2) and section 79(2), the Court may, on application by a person specified in subsection (2), make an administration order in respect of a company if—

    *(a)* it is satisfied that the company is or is likely to become insolvent; and

    *(b)* it considers that there is a reasonable prospect that the making of the order will achieve one or more of the purposes specified in section 76(1).

(2) Application for an administration order may be made by one or more of the following—

    *(a)* the company, or the board of the company; *(Amended by Act 11 of 2004)*

    *(b)* a creditor;

    *(c)* the supervisor of an arrangement in respect of the company; and

    *(d)* the Commission, where the company—

(i)  is or has been a regulated person; or

(ii)  is carrying on, or has carried on, unlicensed financial services business.

(3) An application for an administration order shall be served not less than 7 business days prior to the date fixed for the hearing—

*(a)* on any person who has appointed or is or may be entitled to appoint an administrative receiver for the company;

*(b)* if an administrative receiver has been appointed, on him or her;

*(c)* if the application is made by any person other than the company, on the company;

*(d)* if an application has been made for the appointment of a liquidator of the company, on the applicant and on any provisional liquidator of the company;

*(e) (Repealed by Act 11 of 2004)*

*(f) (Repealed by Act 11 of 2004)*

*(g)* on the Commission if—

(i)  the company is or has been a regulated person; and

(ii)  the applicant is not the Commission; and *(Amended by Act 11 of 2004)*

*(h)* on any other person prescribed by the Rules. *(Inserted by Act 11 of 2004)*

(4) Without limiting section 496(2)*(b)*, an administration order shall not be made unless service of the application has been effected on the persons specified in subsection (3)*(a)* to *(g)*. *(Amended by Act 11 of 2004)*

(4A) The Court shall not abridge the time period specified in subsection (3) in respect of a person specified in subsection (3)*(a)* without that person's consent. *(Inserted by Act 11 of 2004)*

(5) An application for an administration order may not be withdrawn except with the leave of the Court.

## Application in respect of insurance companies

**78.** (1) Where an application for an administration order is made by the Commission in respect of an insurance company, for the purposes of section 77(1)*(a)*, the insurance company is deemed to be insolvent if the total value of its assets does not exceed the total amount of its liabilities by at least the minimum margin of solvency required under the Insurance Act. *(Amended by Act 1 of 2008).*

(2) An application for an administration order may not be made in respect of an insurance company unless the Commission has consented in writing.

### Powers of Court on hearing of application for administration order

**79.** (1) Subject to subsection (2), on the hearing of an application for an administration order, the Court may—

    *(a)* make an administration order in respect of the company;

    *(b)* dismiss the application;

    *(c)* adjourn the hearing conditionally or unconditionally;

    *(d)* make any interim order or other order that it considers fit; or

    *(e)* treat the application as an application for the appointment of a liquidator and make any order that it could make under section 167.

(2) Subject to section 80, an application for an administration order shall be dismissed if—

    *(a)* the company is in liquidation;

    *(b)* the Court is satisfied that a qualifying administrative receiver has been appointed for the company who, in accordance with section 142(2) is entitled to act, unless the Court is also satisfied—

        (i) that the person by whom or on whose behalf the administrative receiver was appointed consents to the making of an order; or

        (ii) that any security interest under which the administrative receiver was appointed would, if an administration order was made, be liable to be set aside as a voidable transaction under Part VIII; or

    *(c)* in the case of an insurance company, the Commission has not consented in writing to the application being made.

(3) For the purposes of subsection (2), an administrative receiver is a qualifying administrative receiver if—

    *(a)* he or she is a licensed insolvency practitioner, whether or not he or she has been appointed to act jointly with an overseas insolvency practitioner, within the meaning of section 473; and

    *(b)* notice of his or her appointment has been filed with the Registrar under section 118(1) no later than the day before the date of the hearing of the application. *(Substituted by Act 11 of 2004)*

(4) Where the Court makes an administration order it shall, at the same time, appoint an eligible insolvency practitioner to be the administrator of the company.

(5) If the Court makes an order under subsection (1)*(c)*, it shall give directions as to the persons to whom, and how, notice is to be given.

### Application where company in liquidation

**80.** (1) The liquidator of a company may apply to the Court for an administration order.

(2) If the Court makes an administration order on the application of the liquidator of a company—

*(a)* the Court—

(i) shall discharge the order appointing the liquidator;

(ii) shall make provision for such matters as may be prescribed;

(iii) may make such consequential provision as it considers appropriate; and

(iv) shall specify which of the powers of an administrator are to be exercisable by the administrator; and

*(b)* this Part has effect with such modifications as the Court may specify.

## Effect of administration order

**81.** Where the Court makes an administration order—

*(a)* any application for the appointment of a liquidator shall be dismissed; and

*(b)* any administrative receiver of the company is deemed to have vacated office.

## Notification and advertisement of administration order

**82.** (1) Where an administration order is made, the administrator shall—

*(a)* forthwith, after the making of the order, give notice of his or her appointment to—

(i) any person who has appointed, or who is or may be entitled to appoint, an administrative receiver of the company;

(ii) any administrative receiver who has been appointed;

(iii) if an application for the appointment of a liquidator is pending, to the applicant and to any provisional liquidator that may have been appointed; and

(iv) such other person as may be prescribed by the Rules; *(Inserted by Act 11 of 2004)*

*(b)* within 5 days of the making of the order—

(i) advertise the order and his or her appointment as administrator; and

(ii) file a notice of his or her appointment together with a sealed copy of the order with the Registrar and, if the company in administration is or has been a regulated person, with the Commission; and

*(c)* within 28 days of the order, send a notice in the prescribed form to the company and to every creditor of the company.

(2) An administrator who, without reasonable excuse, fails to comply with subsection (1) commits an offence.

*Insolvency Act* **LAW OF VIRGIN ISLANDS**

*Moratorium*

## Moratorium period

**83.** (1) Subject to subsection (2), a moratorium period in respect of a company commences on the filing of an application for an administration order and terminates on—

*(a)* the dismissal of the application for an administration order; or

*(b)* if an administration order is made, upon the discharge of that order.

(2) If an application for an administration order is filed at a time when an administrative receiver of the company is in office and the person by or on whose behalf the administrative receiver was appointed has not consented to the making of an order, the moratorium period does not commence unless and until—

*(a)* that person so consents in writing;

*(b)* the administrative receiver vacates or is deemed to vacate office; or

*(c)* an administration order is made.

## Effect of moratorium

**84.** (1) Subject to subsections (3), (4) and (5), during the moratorium period—

*(a)* no order may be made and, notwithstanding paragraph *(f)*, no resolution may be passed for the appointment of a liquidator or a provisional liquidator;

*(b)* no steps may be taken to enforce any security interest over the company's assets, except with the leave of the Court or, if the company is in administration, with the consent of the administrator;

*(c)* except with the leave of the Court or, if the company is in administration, with the consent of the administrator, no steps may be taken to repossess assets that are being used or occupied by or are in the possession of the company, including—

(i) goods supplied under a hire purchase, conditional sale or chattel leasing agreement; and

(ii) goods supplied subject to a retention of title agreement;

*(d)* no proceedings, execution or other legal process may be commenced or continued or distress levied against the company or its assets except with the leave of the Court or, if the company is in administration, with the consent of the administrator;

*(e)* no share may be transferred and no alteration may be made in the status of the members of the company, whether by an amendment of the memorandum or articles or in any shareholders' or

members' agreement or otherwise, except with the leave of the Court; and

*(f)* no resolution of the members may be passed except with the leave of the Court or, if the company is in administration, with the consent of the administrator.

(2) On an application for leave under subsection (1) *(b)* to *(f)*, the Court may grant leave subject to such terms and conditions as it considers fit.

(3) During the period beginning with the commencement of the moratorium period and ending with the making of an administration order, subsection (1) does not prevent the appointment of an administrative receiver of the company, or require the leave of the Court for the appointment of an administrative receiver or limit or affect the carrying out by an administrative receiver of his or her functions.

(4) Subsection (1) does not prevent, or require the leave of the Court to be obtained for—

*(a)* the enforcement of a charge on assets belonging to a company if, before the commencement of the moratorium period, an interested person lawfully—

   (i) entered into possession or assumed control of the assets; or

   (ii) entered into a binding agreement to sell the assets, for the purpose of enforcing the charge on those assets;

*(b)* the repossession of assets being used or occupied by or in the possession of a company if, before the commencement of the moratorium period, an interested person lawfully entered into possession, or assumed control of those assets; *(Amended by Act 11 of 2004)*

*(c)* the exercise by a creditor of any set-off that he or she would have been entitled to exercise under section 150 if the company was in liquidation, the liquidation having commenced at the time that the moratorium period commenced; or *(Amended by Act 11 of 2004)*

*(d)* the filing of an application for the appointment of a liquidator under Part VI. *(Inserted by Act 11 of 2004)*

(5) Notwithstanding subsection (1)*(a)*, the Court may make an order during the moratorium period—

*(a)* appointing a liquidator on the grounds specified in section 162(1)*(c)*; or

*(b)* appointing a provisional liquidator on an application for the appointment of a liquidator on the grounds specified in section 162(1)*(c)*.

(6) On making an order under subsection (5), the Court shall either—

*(a)* discharge the administration order and make such consequential provision as it considers fit; or

*(b)* order that the appointment of the administrator shall continue to have effect.

*Insolvency Act*

(7) If the Court makes an order under subsection (6)*(b)*, it may also—

*(a)* specify which of the powers of an administrator are to be exercisable by the administrator;

*(b)* order that this Part has effect with such modifications as the Court may specify; and

*(c)* make such consequential provision as it considers fit.

## Preservation of charged and other assets

**85**. (1) During the period beginning with the commencement of the moratorium period in respect of a company and ending with the making of an administration order against it or the dismissal of the application, the company may not, without the written consent of the interested person concerned, or the leave of the Court granted under section 86, dispose of or otherwise deal with—

*(a)* any assets subject to a charge, other than a floating charge;

*(b)* any assets subject to a floating charge, otherwise than in the ordinary course of business; or

*(c)* any assets in the company's use, occupation or possession of which another person is the owner or lessor, including—

(i) goods supplied under a hire purchase, conditional sale or chattel leasing agreement; and

(ii) subject to subsection (1A), goods supplied subject to a retention of title agreement.

*(Amended by Act 11 of 2004)*

(1A) Subsection (1)*(c)*(ii) does not prevent a company disposing of or dealing with goods supplied subject to a retention of title agreement in the ordinary course of business.

*(Inserted by Act 11 of 2004)*

(2) A company that contravenes subsection (1) commits an offence.

## Disposal of perishable assets during moratorium period

**86.** (1) This section applies during the period beginning with the commencement of the moratorium period and ending with—

*(a)* the making of an administration order; or

*(b)* the dismissal of the application for an administration order.

(2) Where any assets referred to in section 85(1) are perishable assets, the Court may, on the application of the company, make an order permitting the company to dispose of those assets.

(3) Where the Court makes an order under subsection (2) permitting a company to dispose of assets that are subject to a floating charge, the holder of the security interest has the same priority in respect of any assets of the company directly or indirectly representing the assets disposed of as he or she would have had in respect of the assets subject to the security interest.

(4) It shall be a condition of an order made under subsection (2) permitting a company to dispose of assets referred to in section 85(1) that are not subject to a floating charge, that—

*(a)* the net proceeds of the disposal; and

*(b)* if those proceeds are less than such amount as the Court may determine, or as may be agreed, to be the fair market value of the assets disposed of, the sum required to make good the deficiency, shall be applied towards discharging the sums payable to the interested person concerned.

(5) Where a condition under subsection (4) relates to two or more security interests, the net proceeds of the disposal and any sum required to be paid under subsection (4)*(b)* shall be applied towards discharging the sums secured by those security interests in the order of their priorities.

(6) Where the Court makes an order under subsection (2) it may make such consequential orders as it considers fit, including—

*(a)* giving directions as to the conduct of the disposal;

*(b)* making provision for the protection of the proceeds of the disposal.

(7) Where an order is made under subsection (2), the company shall, within 14 days of the date of the order, file with the Registrar a notice in the prescribed form together with a sealed copy of the order.

(8) A company commits an offence if it—

*(a)* contravenes subsection (7), without reasonable excuse; or

*(b)* fails to comply with a condition imposed under this section.

*Administrators*

## General duties of administrator

**87.** (1) An administrator shall, on his or her appointment, take into his or her custody or under his or her control the assets to which the company in administration is or appears to be entitled.

(2) The administrator shall manage the business, assets and affairs of the company—

*(a)* in furtherance of the purposes set out in the administration order;

*(b)* after the approval of proposals under section 102, in accordance with those proposals; and

*(c)* in accordance with any directions that may be given by the Court.

(3) In performing his or her functions and undertaking his or her duties under this Act, an administrator acts as an officer of the Court. *(Substituted by Act 11 of 2004)*

(4) Whilst a company is in administration, the directors and other officers of the company remain in office and their powers, functions and duties continue except to the extent that—

*(a)* they are inconsistent with the powers, functions and duties of the administrator; or

*(b)* the administrator otherwise directs in writing.
*(Inserted by Act 11 of 2004)*

(5) Notwithstanding subsection (4), a director may exercise a power inconsistent with the powers, functions and duties of the administrator if the administrator authorises the exercise of that power in writing. *(Inserted by Act 11 of 2004)*

(6) Any power conferred on the company in administration whether by an enactment, its memorandum or articles or otherwise, which could be exercised so as to interfere with the exercise by the administrator of his or her powers, shall not be exercised without the written consent of the administrator. *(Inserted by Act 11 of 2004)*

**Duty to prepare report**

**88.** (1) The administrator of a company shall, within 60 days of the commencement of the administration, prepare a report as to whether, in his or her opinion, further enquiries are desirable with respect to—

*(a)* any matter relating to the promotion, formation or insolvency of the company or the conduct of the business or affairs of the company; and

*(b)* possible claims under sections 254 to 256.

(2) The administrator shall send a copy of the report prepared under subsection (1)—

*(a)* to each creditor of the company; and

*(b)* if in his or her report he or she states that further enquiries are desirable with respect to a matter referred to in subsection (1), to the Official Receiver.

**Duty to report to Commission**

**89.** (1) Subject to subsection (2), if it appears to the administrator of a company that the company is carrying on or has carried on unlicensed financial services business, he or she shall as soon as reasonably practicable report the matter to the Commission.

(2) Subsection (1) does not apply where the administration order was made on the application of the Commission.

(3) Where the administrator makes a report to the Commission under subsection (1) he or she shall, for the purposes of section 105, treat the company as if it was a regulated person.

**General powers of administrator**

**90.** (1) The administrator of a company may—

*(a)* remove any director of the company;

*(b)* appoint a person to be director of the company, whether to fill a vacancy or not;

*(c)* call a meeting of the members or the creditors of the company;

*(d)* require a receiver, other than a qualifying administrative receiver, to vacate office;

*(e)* do anything necessary for the management of the business, assets and affairs of the company;

*(f)* apply to the Court for directions in respect of the administration of the company;

*(g)* use the company's seal; and

*(h)* do all acts on behalf of the company and execute any deed, receipt or other document in the name of the company.

(2) Without limiting subsection (1), the administrator has the powers specified in Schedule 1.

(3) The following persons are not concerned to inquire whether the administrator is acting within his or her powers—

*(a)* a person dealing with the administrator in good faith and for value; and

*(b)* a person who acquires any interest in assets of the company in administration from a person referred to in paragraph *(a)* in good faith and for value.

(4) The acts of an administrator of a company are valid notwithstanding any defect in his or her nomination, appointment or qualifications.

(5) Where a receiver is required to vacate office under subsection (1)*(d)* the Court, on the application of the administrator or the receiver, may make such directions as it considers appropriate, including directions as to—

*(a)* the terms upon which assets are to be passed to the administrator;

*(b)* the payment of the debts of preferential creditors; and

*(c)* the payment of the remuneration of the receiver.
*(Amended by Act 11 of 2004)*

**Power to deal with assets subject to floating charge**

**91.** (1) The administrator of a company may dispose of any assets of the company that are subject only to a floating charge, whether or not the charge has crystallised.

(2) Where assets are disposed of or otherwise dealt with under subsection (1), the holder of the security interest has the same priority in respect of any assets of the company directly or indirectly representing the assets disposed of as he or she would have had in respect of the assets subject to the security interest.

**Application to Court to deal with other charged assets**

**92.** (1) The Court may, on the application of the administrator, make an order authorising the administrator to dispose of—

*Insolvency Act*   **LAW OF VIRGIN ISLANDS**

Revision Date: 1 Jan 2020

> (a) assets of the company that are subject to a security interest that is not a floating charge; and
>
> (b) assets that are being used or occupied by or in the possession of the company but of which some other person is the owner or lessor, including—
>
>> (i) goods supplied under a hire purchase, conditional sale or chattel leasing agreement; and
>>
>> (ii) goods supplied subject to a retention of title agreement, if it considers that the disposal of the assets, with or without other assets, would be likely to promote one or more of the purposes specified in the administration order.

(2) The administrator shall give 5 business days notice of an application under subsection (1) to—

> (a) the holder of the charge over; or
>
> (b) the owner or lessor of, the assets in respect of which the application is made.

(3) It shall be a condition of an order under subsection (1) that—

> (a) the net proceeds of the disposal; and
>
> (b) if those proceeds are less than such amount as the Court may determine, or as may be agreed, to be the fair market value of the assets disposed of, the sum required to make good the deficiency, shall be applied towards discharging the sums payable to the interested person concerned.

(4) Where a condition under subsection (3) relates to 2 or more security interests, the net proceeds of the disposal and any sum required to be paid under subsection (3)*(b)* shall be applied towards discharging the sums secured by those security interests in the order of their priorities.

(5) Where an order is made under subsection (1), the administrator shall—

> (a) forthwith serve a sealed copy of the order on the holder of the charge or the owner or lessor of the goods, as the case may be; and
>
> (b) within 14 days of the date of the order, file a notice in the prescribed form with the Registrar.

(6) An administrator commits an offence if he or she—

> (a) contravenes subsection (5), without reasonable excuse; or
>
> (b) fails to comply with a condition imposed under this section.

## Administrator as agent of company

**93.** When performing a function or exercising a power as administrator of a company in administration, the administrator acts as the company's agent.

### Removal and resignation of administrator

**94**. (1) The Court may, on the application of the creditors' committee, a creditor or the Official Receiver or on its own motion, remove an administrator from office. *(Amended by Act 11 of 2004)*

(2) An administrator—

(a) may resign in such circumstances as may be prescribed or with the leave of the Court; and

(b) shall resign if he or she ceases to be an eligible insolvency practitioner.

(3) Unless, in accordance with this section, he or she has previously resigned or been removed from office, an administrator ceases to hold office with effect from the date that an administration order is discharged. *(Amended by Act 11 of 2004)*

### Appointment of replacement administrator

**95.** (1) Where the administrator of a company dies or is removed or resigns under section 94 and no administrator is appointed in his or her place, the Court, on the application of a person specified in subsection (2) or on its own motion—

(a) if there is at least one administrator remaining in place, may appoint an eligible insolvency practitioner as administrator in his or her place; or

(b) if the administrator who has died or is removed or resigned was the sole administrator of the company, shall appoint an eligible insolvency practitioner in his or her place.
*(Substituted by Act 11 of 2004)*

(2) An application under subsection (1) may be made—

(a) by any continuing administrator;

(b) by the creditor's committee, if any; *(Amended by Act 11 of 2004)*

(c) where there is no administrator or no creditor's committee, by the company in administration, the board of the company or a creditor of the company; or *(Amended by Act 11 of 2004)*

(d) by the Official Receiver. *(Inserted by Act 11 of 2004)*

(3) The provisions of this Act and the Rules applicable to giving notice of and advertising an administration order apply to an order of the Court filling a vacancy under subsection (1).

### Remuneration of administrator

**96.** (1) The administrator of a company is entitled to receive remuneration for his or her services as administrator.

(2) The remuneration payable to an administrator shall be fixed applying the principles set out in section 432.

*Insolvency Act*

Revision Date: 1 Jan 2020

**Administrator to have charge over assets of company**

**97.** (1) The administrator and, where he or she has vacated office, the former administrator, has the following charges on the assets of the company in his or her possession or control or, in the case of a former administrator, that were in his or her possession or control immediately before vacating office—

> *(a)* a first ranking charge for any sums payable in respect of debts or liabilities incurred during the administration of the company, under contracts entered into by him or her or a predecessor of his or hers in the carrying out of the functions of administrator; and

> *(b)* a second ranking charge for his or her remuneration.
> *(Amended by Act 11 of 2004)*

(2) Subject to subsection (3), the charges specified in subsection (1)—

> *(a)* rank in priority to any floating charge to which the assets of the company may be subject; and

> *(b)* continue to subsist after the termination of the administration.

(3) Where a debenture or other instrument creates a fixed charge and a floating charge over the assets of a company, subsection (2)*(a)* does not apply to any assets of the company that are subject to the fixed charge.

(3A) For the purposes of subsection (1)*(a)*—

> *(a)* any action taken or omitted to be taken within the period of 14 days after an administrator's appointment shall not be taken to amount or contribute to the adoption of a contract; and

> *(b)* an administrator is deemed to have adopted a contract of employment if notice of the termination of the contract is not given within 14 days after the date of his or her appointment.
> *(Inserted by Act 11 of 2004)*

(4) A liability arising out of a contract of employment adopted by an administrator, or his or her predecessor, is a debt or liability for the purposes of subsection (1)*(a)* if—

> *(a)* it is a liability to pay a sum by way of wages or salary or a contribution to an occupational pension scheme; and

> *(b)* it is in respect of services rendered wholly or partly after the adoption of the contract, but not otherwise.
> *(Amended by Act 11 of 2004)*

(5) For the purposes of subsection (4)—

> *(a)* wages or salary payable in respect of a period of holiday or absence from work through sickness or other good cause are deemed to be wages or salary in respect of services rendered in that period;

> *(b)* a sum payable *in lieu* of holiday is deemed to be wages or salary in respect of services rendered in the period by reference to which the holiday entitlement arose; and

*(c)* that part of the liability representing payment in respect of services rendered before the adoption of the contract of employment shall be disregarded.

## Release of administrator

**98.** (1) A person who ceases to be the administrator of a company, may apply to the Court for his or her release and the Court may grant the release unconditionally or upon such conditions as it considers proper, or it may withhold it.

(2) If the Court withholds the release, it may make a compensation order against the former administrator under section 254.

(3) Subject to subsection (5), where a former administrator is released under this section, he or she is discharged from all liability in respect of any act or default of his or hers in relation to the administration of the company.

(4) An order for the release of a former administrator may be revoked by the Court if the release was obtained by fraud or the suppression or concealment of any material fact.

(5) Subsection (3) does not prevent the Court from making an order under section 254 against an administrator who has been released under this section.

(6) An administrator who obtains his or her release under this section shall file a notice in the prescribed form with the Registrar.

## Statement of affairs

**99.** (1) In this section, "relevant person" has the meaning set out in section 275.

(2) The administrator of a company may require one or more relevant persons to prepare and submit to him or her a statement of affairs.

(3) Subject to section 280, the administrator shall file with the Court each statement of affairs and each affidavit of concurrence that he or she receives.

*Administrator's Proposals*

## Administrator's proposals and creditors' meeting

**100.** (1) Subject to subsection (3), the administrator shall—

*(a)* prepare a report setting out his or her proposals for the achievement of one or more of the purposes in the administration order;

*(b)* call a meeting of creditors for a date no later than 60 days after the date of the administration order for the purpose of considering whether to approve his or her proposals;

*(c)* send a copy of his or her report, to each creditor together with the notice of the meeting;

(d) send a copy of the notice calling the meeting and his or her report to each member of the company or advertise the meeting and report in accordance with the Rules; *(Amended by Act 11 of 2004)*

(e) file a copy of the notice calling the meeting together with his or her report with the Registrar; and

(f) cause the creditors' meeting to be advertised.

(2) The report prepared by the administrator under subsection (1)*(a)* shall contain the matters prescribed by the Rules.

(3) The administrator is not required to call a meeting of creditors under subsection (1)*(b)* where—

(a) he or she is of the opinion that the company has sufficient assets to enable each creditor of the company to be paid in full; and

(b) the report prepared under subsection (1)*(a)* contains a statement that—

(i) the administrator is of the opinion that the company has sufficient assets to enable each creditor of the company to be paid in full; and

(ii) the administrator does not intend to call a meeting of creditors under this section.

(4) Notwithstanding subsection (3), if requested to do so by creditors whose debts amount to at least 10% in value of the total debts of the company, the administrator shall call a meeting of creditors to be held no later than 30 days after the date upon which he or she receives the request.

(5) A request for a meeting under subsection (4) must be delivered to the administrator in the manner and within the period prescribed.

(6) An administrator who contravenes subsection (1) commits an offence.

## Attendance at meeting of directors and others

**101.** (1) If the administrator considers that it is reasonable to require the presence at a creditors' meeting called under section 100 of a person specified in subsection (4), the administrator may, by notice, require the person to attend. *(Amended by Act 11 of 2004)*

(2) In determining whether it is reasonable to require a person to attend the creditors' meeting, the matters that the administrator shall have regard to include—

(a) the likely benefits of the person's attendance;

(b) the travel and associated expenses that will be incurred by him or her in attending the meeting, unless the administrator is prepared to pay those expenses;

(c) the distance that he or she would be required to travel to attend the meeting; and

(d) the time that it would take him or her to travel to and from and attend the meeting.

(3) A notice under subsection (1) requiring a person to attend a creditors' meeting shall be sent to that person at least 14 days prior to the date of the meeting and shall be accompanied by a copy of his or her report on his or her proposals.

(4) Subsection (1) applies to any officer of the company and any person who, at any time during the 2 years prior to the date of the notice, was an officer of the company.

(5) A person commits an offence if—

  *(a)* he or she receives a notice to attend a creditors' meeting under subsection (1); and

  *(b)* without reasonable excuse, he or she fails to attend the meeting.

## Consideration of proposals by creditors

**102.** (1) At the creditors' meeting called under section 100, the creditors may resolve to—

  *(a)* approve the administrator's proposals, with or without amendment;

  *(b)* reject the proposals; or

  *(c)* adjourn the meeting.

(2) A resolution to approve the administrator's proposals is invalid and of no effect if—

  *(a)* the proposals have been amended without the consent in writing of the administrator; or

  *(b)* the proposal has been amended otherwise than in accordance with section 103.

(3) The administrator shall, within 14 days of the conclusion of a meeting called under section 100—

  *(a)* report the result of the meeting to the Court and file a copy of that report with the Registrar; and

  *(b)* send a notice setting out the result of the meeting to every creditor.

(4) The report and notice required under subsection (3) shall have annexed to it details of—

  *(a)* the proposals considered at the meeting and of any amendments to those proposals that were considered; and

  *(b)* such proposals and amendments as were approved.

(5) If the creditors resolve not to approve the administrator's proposals or fail to pass one of the resolutions specified in subsection (1), the Court may, by order—

  *(a)* discharge the administration order and make such consequential provisions as it considers fit;

  *(b)* adjourn the hearing, conditionally or unconditionally; or

*Insolvency Act*

*(c)* make an interim order or any other order that it considers fit.

(6) An administrator who contravenes subsection (3) commits an offence.

## Amendment of proposals at creditors' meeting

**103.** (1) Where, at a meeting called under section 100, the creditors wish to approve an amended proposal, the meeting shall be adjourned for sufficient time to enable the administrator to give all creditors not present or represented at the meeting at least 2 business days notice—

*(a)* of the venue of the adjourned meeting; and

*(b)* of the amended proposal to be considered at the adjourned meeting.

(2) Where a meeting is adjourned under subsection (1), section 102 applies to the adjourned meeting.

(3) Subsection (1) does not apply if—

*(a)* every creditor who was given notice of the meeting under section 100 is present or represented at the meeting; or

*(b)* the chairman of the meeting certifies in writing that an amendment is to correct minor errors or is otherwise not material.

## Modification of proposals

**104.** (1) Where proposals have been approved under section 102 and the administrator subsequently considers that they should be substantially modified, he or she shall—

*(a)* prepare a report setting out his or her proposed modifications;

*(b)* call a meeting of creditors for the purpose of considering the report;

*(c)* send a copy of his or her report to each creditor together with the notice of the meeting;

*(d)* send a copy of the notice convening the meeting together with his or her report to each member of the company or advertise the meeting and report in accordance with the Rules; *(Amended by Act 11 of 2004)*

*(e)* file a copy of the notice calling the meeting together with his or her report with the Registrar; and

*(f)* cause the creditors' meeting to be advertised.

(2) At the creditors' meeting referred to in subsection (1), the creditors may resolve to—

*(a)* approve the administrator's proposed modifications to the proposals, with or without amendment;

*(b)* reject the proposed modifications; or

*(c)* adjourn the meeting.

(3) Section 102(2) applies to the creditors' approval of the administrator's proposed modifications to the proposal under this section and if the creditors wish to amend the administrator's proposed modifications, section 103 applies.

(4) The administrator shall, within 14 days of the date of the meeting held under subsection (1)—

(a) report the result of the meeting to the Court and file a copy of the report with the Registrar; and

(b) send a notice setting out the result of the meeting to every creditor.

(5) The report and notice required under subsection (4) shall have annexed to it details of—

(a) the modifications to the proposal considered at the meeting and of any amendments to those modified proposals that were considered; and

(b) such proposals and amendments as were approved.

(6) An administrator who contravenes subsection (4) commits an offence.

*Miscellaneous*

## Commission's rights where company a regulated person

105. Where a company in administration is or has been a regulated person—

(a) every notice or other document required to be sent to a creditor of the company under this Part shall also be sent to the Commission; and

(b) notice shall be given to the Commission of any application to the Court under this Part in respect of the company.

## Administrator's duty to keep accounting records

106. (1) An administrator shall keep accounting records that correctly record and explain the receipts, expenditure and other transactions of the company in administration.

(2) The administrator shall retain the accounting records kept under subsection (1) for a period of not less than 6 years after the termination of the administration.

(3) An administrator who contravenes this section commits an offence.

## Administrator to prepare and send out regular accounts and reports

107. (1) An administrator shall prepare—

(a) accounts of the receipts and payments of the company in administration; and

(b) a report on the progress of the administration, covering the periods specified in subsection (2).

(2) The accounts and report prepared under subsection (1) shall cover—

*(a)* the period of 6 months following his or her appointment;

*(b)* each subsequent period of 6 months; and

*(c)* where he or she ceases to act as administrator—

(i) the period from the end of the period covered by the last accounts required to be prepared under this section, or if he or she acted as administrator for less than 6 months from the date of his or her appointment, to the date of his or her ceasing to act; and

(ii) the period from the date of his or her appointment to the date of his ceasing to act, unless prepared in accordance with subparagraph (i).

(3) An administrator shall, within 60 days of the last day of the period covered by the accounts and report—

*(a)* file a copy of the accounts and report with the Court and with the Registrar;

*(b)* send a copy of the accounts and report to each member of the creditors' committee, if any; and

*(c)* if the company is or has been a regulated person file a copy of the accounts and report with the Commission. *(Amended by Act 11 of 2004)*

(4) An administrator who contravenes this section commits an offence.

## Notification

**108.** (1) Where a company is in administration, every document of a type specified in subsection (2) shall—

*(a)* state that the company is in administration; and

*(b)* specify the name of the administrator.

(2) Subsection (1) applies to—

*(a)* every public document issued by or on behalf of the company; and

*(b)* every public document issued by or on behalf of the administrator of the company on which the name of the company appears.

(2A) A failure to comply with subsection (1) does not affect the validity of the document. *(Inserted by Act 11 of 2004)*

(3) If subsection (1) is contravened the company, and each officer or administrator of the company who causes, permits or acquiesces in the contravention, commits an offence.

## Meetings of creditors

**109.** (1) The administrator shall call a meeting of creditors if—

*(a)* a meeting is requisitioned by the creditors of the company in accordance with subsection (2); or

*(b)* he or she is directed to do so by the Court.

(2) A creditors' meeting may be requisitioned in accordance with the Rules by 10% in value of the creditors of the company.

## Discharge or variation of administration order

**110.** (1) The administrator of a company may, at any time, apply to the Court for the administration order to be discharged or to be varied to add to or change the purposes specified in the administration order.

(2) An administrator shall make an application under subsection (1) if—

    *(a)* he or she considers that the purposes specified in the order have been achieved or are incapable of achievement; or

    *(b)* he or she is required to do so by a meeting of creditors.

(3) On the hearing of an application under subsection (1), the Court may discharge or vary the administration order and make such consequential provision as it considers fit, or adjourn the hearing conditionally or unconditionally, or make an interim order or any other order it considers fit, including an order under section 111.

## Appointment of liquidator or dissolution of company on discharge of administration order

**111.** (1) Where the Court makes an order for the discharge of an administration order made in respect of a company and the Court is satisfied that the company is insolvent—

    *(a)* the Court may make an order for the appointment of an eligible insolvency practitioner to be the liquidator of the company; or

    *(b)* if it is satisfied that no useful purpose would be served by the appointment of a liquidator, the Court may dissolve the company.

(2) The Court may appoint the administrator of a company to be the liquidator under subsection (1)*(a)*.

(3) An order under subsection (1)*(a)* takes effect as an order made under section 162 on the application of the company.

(4) Where an order is made for the appointment of a liquidator under this section, Part VI applies to the liquidation of the company.

## Filing copy of discharge order with Registrar

**112.** (1) Where an administration order is discharged or varied, the administrator or where the order is discharged the person who, immediately before the discharge, was the administrator of the company shall, within 14 days of the date of the order effecting the variation or discharge, file a copy of the order with the Registrar.

(2) A person who contravenes subsection (1) commits an offence.

*Insolvency Act*  LAW OF
VIRGIN ISLANDS

Revision Date: 1 Jan 2020

*Protection of Interests of Creditors and Members*

### Application in respect of moratorium period

**113.** (1) During the period beginning with the commencement of the moratorium period and ending with the making of an administration order, the Court may, on an application made by a creditor or member of the company, by a person affected by section 84 or, where the company is or has been a regulated person, by the Commission—

(a) give directions in relation to any matter arising in connection with that section; or

(b) make such other order as it considers fit.

(2) Without limiting subsection (1), an order under that subsection may—

(a) regulate the management by the directors of the company's affairs, business and assets during the remainder of the moratorium period;

(b) require the directors to refrain from doing or continuing an act complained of by the applicant, or to do an act that the applicant has complained they have omitted to do;

(c) require the calling of a meeting of creditors or members for the purpose of considering such matters as the Court may direct; and

(d) make such provision as the Court considers necessary to protect the interests of one or more creditors of the company during the moratorium period.

(3) In making an order under this section, the Court shall have regard to the need to safeguard the interests of persons who have dealt with the company in good faith and for value.

### Application on grounds of unfair prejudice

**114.** (1) At any time when an administration order is in force, an application may be made by a creditor or member of a company or, where the company is or has been a regulated person by the Commission for an order under subsection (2) on one or both of the following grounds—

(a) that the company's affairs, business and assets are being, or have been, managed by the administrator in a manner which unfairly prejudices the interests of the member or creditor; or

(b) that any actual or proposed act or omission of the administrator is or would be so prejudicial.

(2) Subject to subsections (3) and (4), where it is satisfied as to either of the grounds specified in subsection (1), the Court may make such order as it considers fit for giving relief in respect of the matters complained of, or adjourn the hearing conditionally or unconditionally, or make an interim or any other order that it considers fit.

(3) An order under subsection (2) shall not prejudice or prevent—

*(a)* the implementation of proposals approved by the creditors under section 102; or

*(b)* where the application for the order was made more than 28 days after the approval of any proposals or revised proposals under section 102 or 104, the implementation of those proposals or revised proposals.

(4) Without limiting subsection (2), an order under that subsection may—

*(a)* regulate the management by the administrator of the company's affairs, business and assets;

*(b)* require the administrator to refrain from doing or continuing an act complained of by the applicant, or to do an act that the applicant has complained he or she has omitted to do;

*(c)* require the calling of a meeting of creditors or members for the purpose of considering such matters as the Court may direct; and

*(d)* discharge the administration order and make such consequential provision as the Court considers fit.

(5) Section 91 is not to be taken as prejudicing an application to the Court under this section.

PART IV

RECEIVERSHIP

*Preliminary*

**Interpretation for and scope of this Part**

**115.** (1) In this Part, unless the context otherwise requires, "company" means the company in respect of whose assets a receiver is or may be appointed.

(2) This Part applies to a receiver appointed—

*(a)* by the Court;

*(b)* under a debenture or other instrument; or

*(c)* under or in accordance with any other enactment.

(3) Unless this Act expressly states otherwise, where, in respect of a receiver  appointed by the Court (other than as an administrative receiver), there is a conflict between this Act and the provisions of any other enactment or rule of law or the Civil Procedure Rules, the provisions of the enactment or rule of law or the Civil Procedure Rules, as the case may be, shall prevail.

(4) Where an administrative receiver is appointed in respect of a company, that company is referred to in this Act as "in administrative receivership".

*General*

### Persons not to be appointed or act as receiver

**116.** (1) Subject to subsection (2), the following persons are not eligible to be appointed as receiver in respect of a company and shall not accept appointment or act as such a receiver—

*(a)* a mortgagee of any assets of the company;

*(b)* a person who is, or within the previous 2 years has been—

(i) an officer or employee of a mortgagee of any assets of the company; or

(ii) a shareholder in or member of the company or a related company;

*(c)* a person who, pursuant to section 477 is disqualified from holding a licence;

*(d)* a person who, in an insolvency proceeding, would not be eligible to act as an insolvency practitioner in respect of the company pursuant to section 482(2);

*(e)* a body corporate;

*(ea)* the Official Receiver; and *(Inserted by Act 11 of 2004)*

*(f)* such other persons as may be prescribed.

(2) The Court may appoint—

*(a)* the Official Receiver; or

*(b)* such other person specified in subsection (1), as a receiver, other than an administrative receiver. *(Amended by Act 11 of 2004)*

(3) A person who accepts or purports to accept appointment or acts or purports to act as a receiver contrary to subsection (1) commits an offence.

### Appointment of joint receivers

**117.** (1) A power conferred by a debenture or other instrument to appoint a receiver includes the power to appoint—

*(a)* 2 or more joint receivers;

*(b)* an additional receiver to act jointly with the receiver in office; and

*(c)* a receiver to succeed a receiver who has vacated office, unless the debenture or other instrument expressly provides otherwise.

(2) Joint receivers may act jointly or severally unless the instrument under which, or the Court order by which, they are appointed expressly provides otherwise.

(3) Unless the context otherwise requires, in this Act and the Rules, "receiver" and "administrative receiver" includes 2 or more persons appointed as joint receivers or joint administrative receivers, as the case may be.

## Notice of appointment

**118.** (1) A receiver shall forthwith upon being appointed—

    *(a)* send a notice of his or her appointment to the company; and

    *(b)* file a notice of his or her appointment—

      (i) with the Registrar; and

      (ii) if the company is or has been a regulated person, with the Commission.

(2) In addition to complying with subsection (1), an administrative receiver shall—

    *(a)* subject to subsection (3), within 5 business days after being appointed, cause a notice of his or her appointment to be advertised; and

    *(b)* within 28 days after being appointed, send a notice of his or her appointment to all creditors of the company in receivership.

(3) Subsection (2)*(a)* does not apply to a receiver appointed—

    *(a)* to act jointly with an existing administrative receiver; or

    *(b)* to act in place of an administrative receiver who has died or ceased to act.

(4) A receiver who contravenes subsection (1) and an administrative receiver who contravenes subsection (2) commits an offence.

## Notification of receivership

**119.** (1) Where a company is in receivership, every document to which subsection (2) applies shall contain a statement that a receiver has been appointed.

(2) Subsection (1) applies to—

    *(a)* where the company is in administrative receivership, every public document issued by or on behalf of the company; *(Amended by Act 11 of 2004)*

    *(b)* where the company is in administrative receivership, every public document issued by or on behalf of the receiver or any liquidator of the company on which the name of the company appears; and *(Amended by Act 11 of 2004)*

    *(c)* where a receiver is appointed in relation to a specific asset or specific assets, every public document issued by or on behalf of the company, or the receiver, that relates to that asset or those assets. *(Inserted by Act 11 of 2004)*

(3) A failure to comply with subsection (1) does not affect the validity of the document.

(4) A person who contravenes subsection (1), or who causes, permits or acquiesces in a contravention of subsection (1), commits an offence.

*Insolvency Act*

## Vacation of office

**120.** (1) The office of receiver becomes vacant if the person holding the office—

    *(a)* dies;

    *(b)* resigns;

    *(c)* vacates his or her office in accordance with subsection (2); or

    *(d)* is removed from office in accordance with section 123.

(2) A receiver appointed out of court shall vacate his or her office forthwith if he or she ceases to be eligible to act as a receiver in accordance with section 116(1).

(3) Where a receiver resigns, vacates office in accordance with subsection (2) or is removed from office under section 123, he or she shall, as soon as practicable, give notice to—

    *(a)* the person who appointed him or her and any joint receiver;

    *(b)* the company; or—

      (i) if the company is in liquidation, its liquidator; and

      (ii) if the company is in administration, its administrator; and

    *(c)* the members of the creditors' committee, if any.
*(Amended by Act 11 of 2004)*

(4) A receiver appointed by the Court shall as soon as practicable notify the Court if he or she ceases to be eligible to act as a receiver in accordance with section 116(1).

(5) Where a receiver resigns, vacates office in accordance with subsection (2) or is removed from office under section 123, he or she shall, within 7 days of ceasing to hold office, give notice in the prescribed form to the Registrar and, where the company in respect of which he or she was appointed is, or has been, a regulated person, to the Commission. *(Substituted by Act 11 of 2004)*

(6) Where a receiver vacates office, unless the Court otherwise orders—

    *(a)* his or her remuneration; and

    *(b)* any indemnity to which he or she is entitled out of the assets of the company, shall be charged on and paid out of any assets of the company that are in his or her custody or under his or her control at that time in priority to any security interest held by the person by or on whose behalf he or she was appointed.

(7) A person who contravenes subsections (2), (3), (4) or (5) commits an offence.

## Assistance to be provided by receiver vacating office

**121.** (1) A person vacating the office of receiver shall provide such information and give such assistance in the conduct of the receivership as is reasonably required by any remaining joint receiver or his or her successor.

*Insolvency Act*                    87

(2) If a person vacating the office of receiver fails to provide information or give assistance as required under subsection (1) the Court may, on the application of the remaining joint receiver or successor, order the person vacating office to provide such information and give such assistance as is reasonably required within such time as is specified in the order.

(3) A person who fails to comply with an order made under subsection (2) commits an offence.

## Resignation of receiver

**122.** (1) The resignation of an administrative receiver appointed out of court is not effective unless he or she has given not less than 7 days notice of his or her intention to resign to—

> *(a)* the person who appointed him or her;

> *(b)* the company in receivership, or if it is in liquidation, its liquidator; and

> *(c)* the members of the creditors' committee, if any.

(2) Unless the Court otherwise orders, the resignation of a receiver appointed by the Court is not effective unless he or she has given at least 7 days notice of his or her intention to resign to the Court and to such other persons as may be specified by the Court.

(3) A notice given under subsection (1) shall state the date upon which the receiver intends his or her resignation to take effect.

## Removal of receiver

**123.** (1) A receiver appointed out of court, other than an administrative receiver, may be removed—

> *(a)* in accordance with the charge or other instrument under which he or she was appointed; or

> *(b)* by order of the Court.

(2) A receiver appointed by the Court and an administrative receiver may be removed by order of the Court, but not otherwise.

(3) Application to the Court for the removal of a receiver under subsection (1) or subsection (2) may be made by —

> *(a)* the company; or—

> > (i) if the company is in liquidation, its liquidator; and

> > (ii) in the case of a receiver who is not an administrative receiver, if the company is in administration, its administrator;

> *(b)* the board of the company;

> *(c)* the person by or on whose behalf the receiver was appointed;

> *(d)* a creditor of the company;

> *(da)* where the company is or has been a regulated person, by the Commission; or *(Inserted by Act 11 of 2004)*

*(e)* any other person who the Court is satisfied has a legitimate interest in the removal of the receiver.

(4) An application to the Court for the removal of a receiver under this section shall specify the grounds upon which the removal of the receiver is being sought and shall be served on the receiver at least 5 business days prior to the date fixed for the hearing of the application.

## Co-operation with receiver

**124.** (1) Where a receiver is appointed, the company and every officer of the company shall—

*(a)* make available to the receiver all books, documents and information relating to the assets in respect of which the receiver has been appointed in its or his or her possession or under its or his or her control;

*(b)* if required to do so by the receiver, verify by statutory declaration that the books, documents and information are complete and correct; and

*(c)* give the receiver such assistance as he or she may reasonably require.

(2) On the application of the receiver, the Court may make an order requiring the company or an officer of the company to comply with subsection (1).

(3) A person who fails to comply with an order of the Court made under subsection (2) commits an offence.

## Duty to report to Commission

**125.** If it appears to a receiver that the company in respect of which he or she was appointed is carrying on or has carried on unlicensed financial services business, he or she shall as soon as reasonably practicable report the matter to the Commission.

## Agency

**126.** (1) A receiver appointed out of court, other than an administrative receiver, is deemed to be the agent of the company unless the charge or instrument under which he or she was appointed expressly provides otherwise.

(2) Subject to subsection (3), an administrative receiver is deemed to be the agent of the company in receivership.

(3) If a liquidator is appointed in respect of a company in receivership, the agency of any receiver, including an administrative receiver, terminates with immediate effect.

## Powers of receiver, other than administrative receiver

**127.** (1) A receiver has the powers expressly or impliedly conferred on him or her—

*(a)* in the case of a receiver appointed out of court, by the charge or other instrument by which he or she was appointed; or

*(b)* in the case of a receiver appointed by the Court, by the Court order under which he or she was appointed.

(2) Unless the charge or other instrument under which, or Court order by which, he or she was appointed expressly provides otherwise, a receiver may—

*(a)* demand and recover, by action or otherwise, income of the assets in respect of which he or she was appointed;

*(b)* issue receipts for income recovered;

*(c)* manage, insure, repair and maintain the assets in respect of which he or she was appointed; and

*(d)* exercise, on behalf of the company, a right to inspect books or documents that relate to the assets in respect of which he or she was appointed in the possession or under the control of a person other than the company.

(3) This section does not apply to an administrative receiver.

## General duties of receivers

**128.** (1) The primary duty of a receiver is to exercise his or her powers—

*(a)* in good faith and for a proper purpose; and

*(b)* in a manner he or she believes, on reasonable grounds, to be in the best interests of the person in whose interests he or she was appointed.

(2) To the extent consistent with subsection (1), a receiver shall exercise his or her powers with reasonable regard to the interests of—

*(a)* creditors of the company;

*(b)* sureties who may be called upon to fulfil obligations of the company;

*(c)* persons claiming, through the company, an interest in assets in respect of which he or she was appointed; and

*(d)* the company.

(3) Where a receiver appointed out of court acts or refrains from acting in accordance with any directions given by the person in whose interests he or she was appointed, the receiver is not in breach of the duty specified in subsection (1)*(b)*, but is nevertheless liable for any breach of the duties specified in subsection (1)*(a)* and subsection (2).

## Powers of sale and proceeds of sale

**129.** (1) A receiver who exercises a power of sale of assets in respect of which he or she was appointed owes a duty to—

*(a)* creditors of the company;

*(b)* sureties who may be called upon to fulfil obligations of the company;

*Insolvency Act*  LAW OF
VIRGIN ISLANDS

Revision Date: 1 Jan 2020

    *(c)* persons claiming, through the company, an interest in assets in respect of which he or she was appointed; and

    *(d)* the company, to obtain the best price reasonably obtainable at the time of sale.

    (2) A receiver shall keep money relating to the assets in respect of which he or she was appointed separate from other money received in the course of, but not relating to, those assets and from other money held by him or her or under his or her control.

    (3) Notwithstanding any other enactment or rule of law to the contrary or anything contained in the debenture or other instrument by which a receiver was appointed—

    *(a)* it is not a defence in proceedings against a receiver for a breach of the duty imposed by subsection (1) that the receiver was acting as the agent of the company or under a power of attorney from the company; and

    *(b)* a receiver is not entitled to compensation or an indemnity from the assets in respect of which he or she was appointed or the company in respect of any liability incurred by the receiver arising from a breach of the duty imposed by subsection (1).

## Liabilities of receivers

**130.** (1) Subject to subsections (2) and (3), a receiver is personally liable—

    *(a)* on any contract entered into by him or her in the performance of his or her functions; and

    *(b)* for the payment of wages or salary, including amounts due for holidays and absence due to sickness or other good cause, sums payable *in lieu* of holiday and contributions to an occupational pension scheme that, during the period of the receivership, accrue under a contract of employment adopted by him or her in the performance of those functions. *(Amended by Act 11 of 2004)*

    (2) A receiver appointed out of court is not personally liable on a contract referred to in subsection (1)*(a)* to the extent that the contract excludes or limits his or her liability.

    (3) Where a receiver is appointed by the Court, other than as an administrative receiver, unless the Court orders otherwise, all contracts of employment are terminated with immediate effect and subsection (1)*(b)* does not apply.

    (4) For the purposes of subsection (1)*(b)*—

    *(a)* any action taken or omitted to be taken within the period of 14 days after a receiver's appointment shall not be taken to amount or contribute to the adoption of a contract; and

    *(b)* a receiver is deemed to have adopted a contract of employment if notice of the termination of the contract is not given within 14 days after the date of his or her appointment.

*(Substituted by Act 11 of 2004)*

(5) A receiver is entitled to an indemnity in respect of his or her liability under subsection (1) out of the assets in respect of which he or she was appointed.

(6) Nothing in this section—

   *(a)* imposes any liability on a receiver for wages or salary, including amounts due for holidays or absence due to sickness, or contributions to an occupational pension scheme, in respect of services rendered prior to the commencement of the receivership;

   *(b)* limits any right to indemnity that the receiver would have apart from this section;

   *(c)* limits the liability of a receiver on a contract entered into without authority; or

   *(d)* confers on a receiver a right to an indemnity in respect of his or her liability on a contract entered into without authority.

### Payment of debts out of assets subject to a floating charge

**131.** (1) This section applies where a receiver is appointed on behalf of the holder of a floating charge.

(2) If the company is not in liquidation, its preferential creditors shall be paid out of the assets coming into the hands of the receiver in priority to any claims for principal or interest in respect of—

   *(a)* the debenture or other instrument under which the receiver is appointed; and

   *(b)* any other debenture or other instrument of the company secured by a floating charge.

(3) Payments made under this section shall be recouped, as far as possible, out of the assets of the company available for payment of unsecured creditors.

### Court directions

**132.** (1) On the application of a person referred to in subsection (2), the Court may, in relation to any matter arising in connection with the performance of the functions of a receiver, make one or more of the following orders—

   *(a)* an order giving such directions as it considers appropriate;

   *(b)* an order declaring the rights of persons before it; and

   *(c)* such other order as it considers just.

(2) Application to the Court for an order under subsection (1) may be made by any of the following persons—

   *(a)* the receiver;

   *(b)* the person by whom or on whose behalf the receiver was appointed;

   *(c)* a person in whose interest the receiver is acting; and

*(d)* where the company in receivership is or has been a regulated person, the Commission.

## Further provisions with respect to an order under section 132

**133.** The power of the Court to make an order under section 132—

*(a)* is in addition to any other powers that may be exercised by the Court whether under this Act or any other enactment or in its inherent jurisdiction;

*(b)* may be exercised notwithstanding that the receiver may have died or ceased to act as receiver before the making of the application or the order; and

*(c)* notwithstanding anything in the Civil Procedure Rules to the contrary, includes the power to vary or amend an order that the Court has already made.

## Remuneration of receivers

**134.** (1) Subject to subsection (3), a receiver appointed under a debenture or other instrument is entitled to be paid remuneration for his or her services—

*(a)* in accordance with the terms of that debenture or other instrument; or

*(b)* as agreed with the person on whose behalf he or she was appointed.

(2) A receiver appointed by the Court or in accordance with any other enactment is entitled to be paid such remuneration as the Court may order or the other enactment may provide for. *(Amended by Act 11 of 2004)*

(3) On the application of a person referred to in subsection (6), the Court may review and fix the amount paid or to be paid by way of remuneration to a receiver in accordance with subsection (1).

(4) Subject to subsection (5), the Court's power under subsection (3) —

*(a)* extends to fixing the remuneration for any period before the making of the order or the application for it;

*(b)* is exercisable notwithstanding that the receiver has died or ceased to act before the making of the application or the order; and

*(c)* extends to requiring him or her or his or her personal representative to account for the excess or such part of it as may be specified in the order to the extent that an amount paid to or retained by a receiver as remuneration exceeds that fixed by the Court for the period concerned.

(5) The power conferred by subsection (4)*(c)* may not be exercised with respect to a period before the date of the application for an order under this section unless the Court is satisfied that there are special circumstances that justify it.

(6) An application to the Court for an order under subsection (3) may be made by any of the following persons—

*(a)* the receiver;

*(b)* the company; or—

   (i) if the company is in liquidation, its liquidator; and

   (ii) if the company is in administration, its administrator;

*(c)* a person claiming through the company an interest in the assets in respect of which the receiver was appointed; and

*(d)* if the company in receivership is or has been a regulated person, the Commission.

(7) In fixing the remuneration of a receiver under this section, the Court shall apply the general principles specified in section 432.

## Accounting records

**135.** (1) A receiver shall keep accounting records that correctly record and explain the receipts, expenditure and other transactions relating to the assets in respect of which he or she has been appointed.

(2) The accounting records kept under subsection (1) shall be retained for a period of not less than 6 years after the receivership ends.

## Receivership accounts to be filed with Registrar

**136.** (1) A receiver shall prepare accounts of his or her receipts and payments covering the periods specified in subsection (2).

(2) Accounts prepared under subsection (1) shall cover the following periods—

*(a)* the period of 12 months following the receiver's appointment;

*(b)* each subsequent period of 6 months;

*(c)* where the receiver ceases to act as receiver—

   (i) the period from the end of the period covered by the last accounts required to be filed under this section, or if he or she acted as receiver for less than 12 months from the date of his or her appointment, to the date of his or her ceasing to act; and

   (ii) the period from the date of his or her appointment to the date of his or her ceasing to act, unless filed in accordance with subparagraph (i).

(3) The accounts prepared under subsection (1) shall—

*(a)* comprise an abstract showing all receipts and payments during the period covered by the accounts; and

*(b)* within 30 days of the last day of the period covered by the accounts—

   (i) be filed with the Registrar; and

   (ii) if the company in receivership is or has been a regulated person, with the Commission.

*Insolvency Act*

(4) A receiver appointed by the Court shall, in addition to complying with subsection (3), file at Court accounts in such form, covering such periods and within such time as the Court may order.

(5) In respect of a receiver appointed by the Court—

    *(a)* the obligations imposed by this section are additional—

        (i) to any obligations or requirements concerning receivership accounts contained in the Civil Procedure Rules; and *(Amended by Act 11 of 2004)*

        (ii) to any order made with respect to receivership accounts by the Court; and

    *(b)* the Court may set aside the application of subsections (1), (2) and (3) to such extent and on such terms and conditions as it considers fit.

(6) The Registrar may, on the application of a receiver, extend the period for the filing of accounts under this section for a period of, or where he or she grants more than one extension, for an aggregate period not exceeding 3 months.

(7) A receiver who contravenes this section commits an offence.

(8) Nothing in this section affects or limits the duty of a receiver to prepare and render proper accounts imposed otherwise than by this section.

## Enforcement of duty to make returns

**137.** (1) If a receiver—

    *(a)* having made default in filing, delivering or making any return, account or other document, or in giving any notice, which a receiver is required to file, deliver, make or give under this Act or any other enactment fails to make good the default within 14 days after the service on him or her of a notice requiring him or her to do so; or

    *(b)* being a receiver appointed out of court, has, after being required at any time by the liquidator of the company to do so, failed to render proper accounts of his or her receipts and payments and to vouch them and pay over to the liquidator the amount properly payable to him or her, the Court may, on an application being made to it, order the receiver to make good the default within such time as may be specified in the order or, in respect of a default referred to in subsection (1)(*a*), may relieve the receiver of the obligation, in whole or in part.

(2) An application to the Court may be made—

    *(a)* in respect of a default referred to in subsection (1)*(a)*, by the Registrar, a member or creditor of the company, its board or, if appropriate, its liquidator or administrator or the Commission; and

    *(b)* in respect of a default referred to in subsection (1)*(b)*, by the liquidator of the company.

(3) The Court may order that the receiver pay the costs of and incidental to an application under subsection (1).

(4) This section does not affect the operation of this Act or any other enactment that may impose penalties on receivers in respect of a default of the type referred to in subsection (1).

(5) A receiver who fails to comply with an order made under this section commits an offence.

## Completion of receivership

**138.** On the completion of his or her receivership, a receiver shall forthwith—

    *(a)* give notice to—

        (i) the company, or if it is in administration or liquidation, the administrator or liquidator;

        (ii) in the case of an administrative receiver, the creditors' committee, if any; and

        (iii) if the company is or has been a regulated person, to the Commission; and

    *(b)* file a notice of completion with the Registrar and, if the company is or has been a regulated person, with the Commission.

*Receivers Appointed out of Court*

## Appointment of receiver out of court

**139.** (1) The appointment of a receiver out of court shall be made in writing.

(2) Subject to subsection (3), the appointment of a receiver out of court takes effect from the time upon which the receiver receives the written notice of appointment.

(3) The appointment of a receiver out of court is not effective unless the receiver accepts it before the end of the next business day following the day on which he or she receives the written appointment.

(4) Where 2 or more joint receivers are appointed out of court—

    *(a)* the joint appointment takes effect from the time that all joint receivers receive the written appointment; and

    *(b)* the joint appointment is not effective unless each receiver accepts the appointment in accordance with subsection (3).

(5) Where a receiver is appointed out of court, whether as a sole or joint receiver, he or she shall, if he or she accepts the appointment, within 7 days confirm his or her acceptance in writing to the person who appointed him or her.

(6) Subsection (5) does not apply where an appointment is accepted in writing.

(7) For the purposes of this section—

*Insolvency Act*

Revision Date: 1 Jan 2020

    *(a)* a person receives a written appointment if the appointment is received on his or her behalf; and

    *(b)* an acceptance or confirmation of acceptance of an appointment as a receiver under this section may be given by any person authorised for that purpose by the appointee.

(8) A written acceptance or confirmation of acceptance of an appointment of a receiver out of court shall state—

    *(a)* the time and date of receipt of the notice of appointment; and

    *(b)* the time and date of the acceptance.

## Execution of documents

**140.** Where a receiver appointed out of court, other than an administrative receiver, is authorised to execute documents in the name of or on behalf of a company, whether under a power of attorney or otherwise, that authority continues in respect of documents necessary or incidental to the receiver's powers notwithstanding that the company may go into liquidation.

## Invalid appointment

**141.** (1) Where the appointment of a person as a receiver appointed out of court is invalid the Court may, if it is satisfied that the receiver acted honestly and reasonably, order the person by whom or on whose behalf the receiver was appointed to indemnify the receiver against any liability which arises solely by reason of the invalidity of the appointment.

(2) The Court may exercise its powers under subsection (1) subject to such terms and conditions as it considers fit.

*Administrative Receivers*

## Meaning of "administrative receiver"

**142.** (1) In this Act, "administrative receiver" means a receiver of the whole, or substantially the whole, of the business, undertaking and assets of a company—

    *(a)* appointed out of court by or on behalf of the holder of a debenture or other instrument of the company secured by a floating charge, whether or not that debenture or other instrument is also secured by one or more other security interests; or

    *(b)* appointed by the Court as an administrative receiver under section 143.

(2) Where 2 or more persons have the right, under different instruments, to appoint an administrative receiver—

    *(a)* each may appoint an administrative receiver, but only one administrative receiver may act in relation to the company at any time; and

*(b)* the administrative receiver appointed on behalf of the person whose security interest ranks highest in priority, is entitled to act as administrative receiver.

## Appointment of administrative receiver by Court

**143.** (1) Where the Court appoints a receiver who would, had he or she been appointed out of Court, be an administrative receiver, the Court may, in the order under which the receiver is appointed, specify that the receiver is an administrative receiver.

(2) Where the Court appoints a receiver as an administrative receiver under subsection (1), unless and to the extent that the Court otherwise orders or that this Act provides to the contrary, the provisions of this Act that apply to administrative receivers apply to that receiver.

(3) The Court shall not appoint a receiver as an administrative receiver if there is an administrative receiver acting in relation to the company.

## Powers of administrative receiver

**144.** (1) Notwithstanding any provision in the memorandum or articles, an administrative receiver may, unless the debenture or other instrument by which he or she was appointed provides otherwise—

*(a)* execute all documents necessary or incidental to the exercise of his or her powers in the name of and on behalf of the company in receivership; and

*(b)* use the company's seal.

(2) Unless and to the extent that the debenture or other instrument by which an administrative receiver is appointed provides otherwise, the powers conferred on an administrative receiver of a company by the debenture or other instrument by which he or she was appointed include the powers specified in Schedule 1.

(3) References in Schedule 1 to the assets of the company are to that part of the assets of the company in respect of which the receiver is appointed.

(4) A person dealing with the administrative receiver of a company in good faith and for value is not concerned to enquire whether he or she is acting within his or her powers.

## Power to dispose of charged assets

**145.** (1) In this section, "relevant assets", in relation to the administrative receiver, means the assets of which he or she is or, but for the appointment of some other person as the receiver of part of the company's assets, would be the receiver.

(2) Where on an application by an administrative receiver, the Court is satisfied that the disposal, with or without other assets, of any relevant assets which are subject to a security interest would be likely to promote a more advantageous realisation of the company's assets than would otherwise be effected, the Court may by order authorise the administrative receiver to dispose of the assets as if they were not subject to the other security interest.

(3) Subsection (2) does not apply in the case of any security interest held by the person by or on whose behalf the administrative receiver was appointed, or of any security interest to which a security interest so held has priority.

(4) It shall be a condition of an order made under subsection (2) that—

    *(a)* the net proceeds of the disposal; and

    *(b)* where those proceeds are less than such amount as may be determined by the Court to be the net amount which would be realised on the sale of the assets in the open market by a willing vendor (the open market value), such sums as may be required to make good the deficiency, shall be applied towards the sums secured by the security interest.

(5) Where a condition imposed pursuant to subsection (4) relates to 2 or more security interests, that condition shall require the net proceeds of the disposal and, where paragraph *(b)* of that subsection applies, the sums mentioned in that paragraph to be applied towards discharging the sums secured by those security interests in the order of their priorities.

(6) Where, following the disposal of assets under this section, subsection (4)*(b)* applies, the administrative receiver, or any person to whom sums are to be paid under that subsection, may apply to the Court for a review of the Court's determination as to the open market value of the assets.

(7) On an application made under subsection (6), the Court may make a fresh determination as to the open market value of the assets disposed of and subsections (4) and (5) shall apply with the new open market value substituted for the original open market value.

(8) An application under subsection (6) shall be made—

    *(a)* in the case of the administrative receiver, within 14 days of the date of the disposal of the assets; or

    *(b)* in the case of a person other than the administrative receiver, within 14 days of the date that he or she is notified by the administrative receiver of the sale.

(9) The administrative receiver shall file a copy of an order made under subsection (2) or subsection (7) with the Registrar within 14 days of the date of the order.

(10) An administrative receiver who contravenes subsection (9) commits an offence.

## Statement of affairs

**146.** (1) In this section, "relevant person" has the meaning set out in section 275.

(2) An administrative receiver shall, as soon as practicable after his or her appointment, by notice, require one or more relevant persons to prepare and submit to him or her a statement of affairs of the company in administrative receivership.

### Report by administrative receiver

**147.** (1) An administrative receiver shall, within 3 months of his or her appointment, prepare and file with the Registrar and, where appointed by the Court, with the Court, a report as to—

*(a)* the events leading up to his or her appointment;

*(b)* the disposal or proposed disposal by him or her of any assets of the company and the carrying on by him or her of any business of the company;

*(c)* the amounts of principal and interest payable to the person by whom or on whose behalf he or she was appointed and the amounts payable to preferential creditors;

*(d)* the amount, if any, likely to be available for the payment of other creditors; and

*(e)* the persons who have submitted statements of affairs under section 146, and containing such other information as may be prescribed.

*(Amended by Act 11 of 2004)*

(2) A report prepared under subsection (1) shall include summaries of the statements of affairs submitted to him or her together with his or her comments thereon.

(3) The administrative receiver shall, within 14 days of filing the report prepared under subsection (1) with the Registrar—

*(a)* send a copy of the report to—

(i) the company in receivership or, if it is in liquidation, its liquidator; and

(ii) *(Repealed by Act 11 of 2004)*

(iii) where the company is or has been a regulated person, to the Commission;

*(b)* either send a copy of the report to each creditor of the company or publish a notice in the prescribed form stating the address of an office to which creditors of the company may write for a copy of the report and at which the report can be inspected during normal office hours; and *(Amended by Act 11 of 2004)*

*(c)* call a meeting of unsecured creditors.

(4) Where he or she is satisfied that the disclosure of information in a report prepared under this section would seriously prejudice the carrying out by him or her of his or her functions, the administrative receiver may omit such information from his or her report. *(Amended by Act 11 of 2004)*

(5) Where a liquidator is appointed after the administrative receiver has sent a copy of his or her report to the company under subsection (3)*(a)*, he or she shall within 7 days of the date of appointment of the liquidator send a copy of his or her report to the liquidator.

(6) This section does not apply to a receiver appointed—

*(a)* to act jointly with an existing administrative receiver; or

*(b)* to act in place of an administrative receiver who has died or ceased to act, where subsections (1), (3) and (5) have been complied with by the existing administrative receiver or by his or her predecessor.

(7) An administrative receiver who fails to comply with this section commits an offence.

## Application for permission not to call meeting of creditors

**148.** (1) An administrative receiver may apply to the Court for an order permitting him or her not to call a meeting of creditors under section 147(3)*(c)* and, subject to subsection (2), the Court may make such an order subject to such terms as it considers appropriate.

(2) The Court shall not make an order under subsection (1) unless—

*(a)* the administrative receiver has stated in his or her report prepared under 147(1) his or her intention of applying for the order;

*(b)* the report has been sent to the persons referred to in section 147(3)*(a)* not less than 14 days prior to the date of the hearing of the application; and

*(c)* where he or she publishes a notice under section 147(3)*(b)*, he or she stated his or her intention to apply for the order in that notice. *(Inserted by Act 11 of 2004)*

PART V

PROVISIONS APPLICABLE TO THE LIQUIDATION OF COMPANIES AND TO THE BANKRUPTCY OF INDIVIDUALS

## Interpretation

**149.** (1) For the purposes of this Part—

*(a)* "debtor" means a company in liquidation or an individual in bankruptcy;

*(b)* "insolvency proceeding" means in the case of a company, its liquidation and in the case of an individual, his or her bankruptcy; and

*(c)* "relevant time" means, in the case of a company, the commencement of its liquidation and, in the case of an individual, the commencement of his or her bankruptcy. *(Amended by Act 11 of 2004)*

(2) In this Part, "company" includes a foreign company. *(Inserted by Act 11 of 2004)*

### Insolvency set-off

**150.** (1) Subject to section 435 where, before the relevant time, there have been mutual credits, mutual debts or other mutual dealings between a debtor and a creditor claiming or intending to claim in the insolvency proceeding—

   *(a)* an account shall be taken of what is due from each party to the other in respect of those mutual credits, mutual debts or other mutual dealings, as at the relevant time;

   *(b)* the sum due from one party shall be set-off against the sums due from the other party; and

   *(c)* only the balance of the account, if any, may be claimed in the insolvency proceeding or is payable to the debtor, as the case may be.

*(Amended by Act 11 of 2004)*

(2) A creditor is not entitled to claim the benefit of a set-off under this section if he or she had actual notice that the debtor was insolvent—

   *(a)* at the time he or she gave credit to the debtor or received credit from the debtor; or

   *(b)* at the time he or she acquired any claim against the debtor or any part of or interest in such a claim.

(3) For the purposes of subsection (2), "insolvent" has the meaning specified in section 8 with the deletion of subsection (1)*(c)*(i) of that section.

(4) Where, before the relevant time, a creditor waives or agrees that he or she will not claim the benefit of a set-off under this section, that waiver or agreement takes effect notwithstanding subsection (1), except to the extent that a creditor who was not a party to the agreement, or has not agreed otherwise, is prejudiced.

### Validity of agreements to subordinate debt

**151.** Where, before the relevant time, a creditor acknowledges or agrees that, in the event of a shortfall of assets, he or she will accept a lower priority in respect of a debt than that which he or she would otherwise have under this Act, that acknowledgement or agreement takes effect notwithstanding the provisions of this Act, except to the extent that a creditor of the debtor who was not a party to the agreement is prejudiced.

### Quantification of claims in liquidation and bankruptcy

**152.** (1) This section applies to the quantification of a claim in the liquidation of a company or the bankruptcy of an individual.

(2) The amount of a claim shall be quantified as at the relevant time.

(3) Where a claim is subject to a contingency or, for any other reason, the amount of the claim is not certain, the liquidator, or the bankruptcy trustee, shall—

   *(a)* agree an estimate of the value of the claim as at the relevant time; or

*Insolvency Act*

Revision Date: 1 Jan 2020

*(b)* apply to the Court to determine the amount of the claim.

(4) On an application by the liquidator or the bankruptcy trustee under subsection (3)*(b)*, the Court may—

    *(a)* determine the amount of the claim itself; or

    *(b)* determine a method to be used by the liquidator or the trustee for calculating the amount of the claim.

(5) In the case of rent and other payments of a periodic nature, a claim may include any amounts due and unpaid at the relevant time and where, at the relevant time, a payment was accruing due, the claim may include so much as would have fallen due at that time if the liability had been accruing from day to day.

(6) A claim based on a liability that, at the relevant time, was not payable by the company until after the relevant time shall be discounted in accordance with the Rules.

(7) Interest may be included in a claim as provided by section 153.

## Interest on claims

**153.** (1) Subject to sections 215 and 342, a claim in the liquidation of a company or the bankruptcy of an individual shall not include an amount for interest in respect of a period after the relevant time.

(2) If it was agreed between the debtor and a creditor that the debt on which the creditor's claim is based would bear interest, the claim may include interest, at the agreed rate, up to the relevant time.

(3) A claim made by a creditor other than one referred to in subsection (2) may include interest up to the relevant time if—

    *(a)* the debt on which the claim is based is due by virtue of a written instrument and was payable at a certain time before the relevant time; or

    *(b)* if, before the relevant time, the creditor made written demand on the debtor and the demand stipulated that interest would be payable on the debt from the date of the demand until payment of the debt.

(4) The amount of interest that may be included in a claim under this section is—

    *(a)* in the case of a debt referred to in subsection (3)*(a)*, interest at the court rate for the period from the date that the debt was payable to the relevant time; and

    *(b)* in the case of a debt referred to in subsection (3)*(b)*, interest at the court rate for the period from the date of the written demand to the relevant time.

## Claim in currency other than dollars

**154.** (1) The amount of a claim based on a liability incurred or payable in a currency other than dollars shall be converted into dollars at the rate of exchange prevailing at the relevant time.

(2) For the purposes of subsection (1), the rate of exchange should be ascertained in such manner as may be prescribed.

## Statutory demand

**155.** (1) A creditor may make demand on a person for payment of a debt owed by that person to him or her.

(2) A demand under subsection (1) shall—

> *(a)* be in respect of a debt that is due and payable at the time of the demand and that is not less than the prescribed minimum;

> *(b)* be in writing and shall specify the nature of the debt and its amount;

> *(c)* be dated and shall be signed by the creditor or by a person authorised to make demand on the creditor's behalf;

> *(d)* require the person to pay the debt or to secure or compound for the debt to the reasonable satisfaction of the creditor within 21 days of the date of service of the demand on him or her or such longer period as may be prescribed; *(Amended by Act 11 of 2004)*

> *(e)* state that if the demand is not complied with, application may be made to the Court for the appointment of a liquidator or a bankruptcy trustee, as the case may be; *(Amended by Act 11 of 2004)*

> *(f)* set out the rights of the person to make application to set the demand aside under section 156; and

> *(g)* comply with and be served in accordance with the Rules.

(3) If the creditor making demand under subsection (1) is a secured creditor in respect of the debt, the full amount of the debt shall be specified in the demand, but—

> *(a)* the demand shall specify the nature of the security interest, and the value which the creditor places on it at the date of the demand; and

> *(b)* the amount claimed—

>> (i) shall be the full amount of the debt less the amount specified as the value of the security interest; and

>> (ii) shall equal or exceed the prescribed minimum.

## Application to set aside statutory demand

**156.** (1) Where a person has been served with a statutory demand he or she may apply to the Court to set it aside.

(2) An application under subsection (1) shall be made within 14 days of the date of service of the demand on him or her. *(Amended by Act 11 of 2004)*

(3) The Court may not extend the time for making or serving an application to set aside a statutory demand.

*Insolvency Act*    LAW OF
VIRGIN ISLANDS

(4) Subject to an order of the Court under section 157, the time for compliance with the demand ceases to run as from the date upon which an application under subsection (1) is filed with the Court.

(5) A person applying to set aside a statutory demand under this section shall give 7 days notice of the hearing to the creditor or, where a person is named in the demand as the person with whom communications in respect of the demand should be made, to that person.

## Hearing to set aside statutory demand

**157.** (1) The Court shall set aside a statutory demand if it is satisfied that—

*(a)* there is a substantial dispute as to whether—

(i) the debt; or

(ii) a part of the debt sufficient to reduce the undisputed debt to less than the prescribed minimum, is owing or due;

*(b)* the person on whom the statutory demand was served has a reasonable prospect of establishing a set-off, counterclaim or cross claim in an amount equal to or greater than the amount specified in the demand less the prescribed minimum; or

*(c)* the creditor holds a security interest in respect of the debt claimed and the value of the security interest is equal to or greater than the amount specified in the demand less the prescribed minimum.

(2) The Court may set aside a statutory demand if it is satisfied that substantial injustice would otherwise be caused—

*(a)* because of a defect in the demand, including a failure to comply with section 155(3); or

*(b)* for some other reason.

(3) Where the Court is satisfied that the security interest of a secured creditor has been under-valued in the statutory demand, the Court may require the creditor to amend the demand accordingly, but without prejudice to his or her right to make application for the appointment of a liquidator or for a bankruptcy order, as the case may be. *(Amended by Act 11 of 2004)*

(4) If, on hearing an application to set aside a statutory demand, the Court is satisfied that there are no grounds for setting aside the statutory demand, it may extend the time for compliance with the statutory demand.

(5) If the Court dismisses an application to set aside a statutory demand, it shall make an order authorising the creditor to make application for the appointment of a liquidator or for a bankruptcy order, as the case may be. *(Amended by Act 11 of 2004)*

(6) Having considered the evidence before it on a hearing under this section, the Court may either summarily determine the application or adjourn it giving such directions as it considers fit.

PART VI

LIQUIDATION

*Preliminary*

## Application of this Part to Official Receiver

**158.**   Where the Official Receiver is appointed as the liquidator or provisional liquidator of a company, the provisions of this Act that apply to a liquidator apply to the Official Receiver, as liquidator, unless otherwise provided.

## Appointment of liquidator

**159.**   (1) The Court may appoint the Official Receiver or an eligible insolvency practitioner as liquidator—

(a) of a company, on an application under section 162; or

(b) of a foreign company, on an application under section 163.

(2) Subject to subsection (5) and section 161, the members of a company may, by a qualifying resolution, appoint an eligible insolvency practitioner as liquidator of the company. *(Amended by Act 11 of 2004)*

(3) For the purposes of subsection (2), a resolution is a "qualifying resolution" if it is passed at a properly constituted meeting of the company by a majority of 75%, or if a higher majority is required by the memorandum or articles, by that higher majority, of the votes of those members who are present at the meeting and entitled to vote on the resolution.

(4) The members of a foreign company may not appoint a liquidator under this Part and any resolution of the members of a foreign company that purports to appoint a liquidator under this Part is void and of no effect.

(5) The members of a company that is a regulated person may not appoint a liquidator under subsection (2) unless at least 5 business days written notice of the resolution, or such shorter period of notice as the Commission may agree to accept in writing, has been given to the Commission. *(Inserted by Act 11 of 2004)*

(6) A resolution passed in contravention of subsection (5) is void and of no effect. *(Inserted by Act 11 of 2004)*

## Duration of liquidation

**160.**   The liquidation of a company commences at the time at which a liquidator is appointed as provided in section 159 and continues until it is terminated in accordance with section 232 and, throughout this period, the company is referred to in this Act as "in liquidation".

## Appointment of  liquidator by members

**161.**   (1) The members of a company may not appoint a liquidator of the company if—

(a) an application to the Court to appoint a liquidator has been filed and served but not yet determined; *(Amended by Act 11 of 2004)*

(b) a liquidator has been appointed by the Court; or

*Insolvency Act*                    LAW OF
                                                          VIRGIN ISLANDS
                                                Revision Date: 1 Jan 2020

*(c)* the person to be appointed liquidator has not consented in writing to his or her  appointment, and a resolution to appoint a liquidator in the circumstances referred to in paragraphs *(a)*, *(b)* or *(c)* is void and of no effect.

(2) Where the members resolve to appoint a liquidator under section 159(2), the company shall, as soon as practicable, give the liquidator notice of his or her appointment.

(3) The members of a company may not appoint the Official Receiver as liquidator of the company, and any resolution of the members that purports to do so is void and of no effect.

(3A) The acts of a liquidator appointed in breach of section 161(1)*(a)* carried out in good faith are valid provided that he or she is not aware of the breach. *(Inserted by Act 11 of 2004)*

(4) A company that contravenes subsection (2) commits an offence.

## Appointment of liquidator by Court

 **162.** (1) The Court may, on application by a person specified in subsection (2), appoint a liquidator of a company under section 159(1) if—

*(a)* the company is insolvent;

*(b)* the Court is of the opinion that it is just and equitable that a liquidator should be appointed; or

*(c)* the Court is of the opinion that it is in the public interest for a liquidator to be appointed.

(2) Subject to subsections (3), (4) and (5), an application under subsection (1) may be made by one or more of the following—

*(a)* the company;

*(b)* a creditor;

*(c)* a member;

*(d)* the supervisor of a creditors' arrangement in respect of the company;

*(e)* the Commission;

*(ea)* the International Tax Authority; and *(Inserted by Act 14 of 2019)*

*(f)* the Attorney General.

(3) An application under subsection (1)*(a)* by a member may only be made with the leave of the Court, which shall not be granted unless the Court is satisfied that there is a *prima facie* case that the company is insolvent.

(4) An application to appoint a liquidator under subsection (1)*(c)* may only be made by the Commission, the International Tax Authority or the Attorney General. *(Amended by Act 14 of 2019)*

(5) The Commission may only make an application to appoint a liquidator under subsection (1)*(c)* if the company concerned is, or at any time has been, a regulated person or the company is carrying on, or at any time has carried on, unlicensed financial services business. *(Amended by Act 19 of 2006)*

(5a) The International Tax Authority shall only make an application to appoint a liquidator under subsection (1)*(c)* if the company has been the subject of a determination by the International Tax Authority pursuant to section 10 of the Economic Substance (Companies and Limited Partnerships) Act to the effect that it has been carrying on a relevant activity in breach of the economic substance requirements or has been found to be in breach of the Mutual Legal Assistance (Tax Matters) Act; *(Inserted by Act 14 of 2019)*

(6) Where a creditors arrangement has terminated, the person who, immediately before the termination of the arrangement, was the supervisor is treated as the supervisor for the purposes of this section. *(Amended by Act 11 of 2004)*

(7) An applicant may, in his or her application under this section, propose an eligible insolvency practitioner as liquidator of the company.

(8) Where an order is made under section 159(1) at a time when an arrangement is in force in respect of the company, the Court may appoint the supervisor of the arrangement as liquidator of the company.

## Appointment of liquidator of a foreign company

**163.** (1) The Court may, on application by a person specified in section 162(2), appoint a liquidator of a foreign company under section 159(1) if the Court is satisfied that the company has a connection with the Virgin Islands and—

*(a)* the company is insolvent;

*(b)* the Court is of the opinion that it is just and equitable that a liquidator should be appointed;

*(c)* the Court is of the opinion that it is in the public interest for a liquidator to be appointed;

*(d)* the company is dissolved or has otherwise ceased to exist under or by virtue of the laws of the country in which it was last registered;

*(e)* the company has ceased to carry on business; or

*(f)* the company is carrying on business only for the purpose of winding up its affairs.

(2) For the purposes of subsection (1), a foreign company has a connection with the Virgin Islands only if—

*(a)* it has or appears to have assets in the Virgin Islands;

*(b)* it is carrying on, or has carried on, business in the Virgin Islands; or

*(c)* there is a reasonable prospect that the appointment of a liquidator of the company under this Part will benefit the creditors of the company.

(3) An application for the appointment of a liquidator of a foreign company may be made—

*(a)* notwithstanding that the company has been dissolved or has otherwise ceased to exist under or by virtue of the laws of any other country; and

*Insolvency Act*    **LAW OF VIRGIN ISLANDS**

Revision Date: 1 Jan 2020

> *(b)* whether or not the company is or has been registered under Part IX of the Companies Act, 1885 or Part XI of the BVI Business Companies Act. *(Amended by Act 16 of 2004)*

(3A) An application to appoint a liquidator under subsection (1)*(c)* may only be made by the Commission, the International Tax Authority or the Attorney General. *(Inserted by Act 11 of 2004 and amended by Act 14 of 2019)*

(3B) The Commission may only make an application to appoint a liquidator under subsection (1)*(c)* if the foreign company concerned is, or at any time has been, a regulated person or the company is carrying on, or at any time has carried on, unlicensed financial services business. *(Inserted by Act 11 of 2004 and amended by Act 19 of 2006)*

(3C) The International Tax Authority shall only make an application to appoint a liquidator under subsection (1)*(c)* if the foreign company has been the subject of a determination by the International Tax Authority pursuant to section 10 of the Economic Substance (Companies and Limited Partnerships) Act to the effect that it has been carrying on a relevant activity in breach of the economic substance requirements. *(Inserted by Act 14 of 2019)*

(4) Subject to the modifications and exceptions set out in Schedule 3, the provisions of this Part apply to an application to appoint a liquidator of a foreign company and to the liquidation of a foreign company.

## Withdrawal of application

**164.** An application for the appointment of a liquidator may not be withdrawn except with the leave of the Court.

## Advertisement of application

**165.** (1) Unless the Court otherwise orders, an application for the appointment of a liquidator shall be advertised—

> *(a)* if the company is the applicant, not less than 7 days before the date set for the application to be heard; or
>
> *(b)* if the company is not the applicant, not less than 7 days after service of the application on the company and not less than 7 days before the date set for the application to be heard.

(2) If the application is not advertised in accordance with this section and the Rules, the Court may dismiss it.

## Substitution of applicant

**166.** (1) In the circumstances specified in subsection (2), the Court may, by order, substitute as applicant in an application for the appointment of a liquidator, a creditor or member who is entitled to make such an application.

(2) The Court may make a substitution order under subsection (1) where the original applicant is a member or creditor of the company and the Court considers it appropriate to do so—

> *(a)* because the applicant applies to withdraw the application or consents to it being dismissed;

*(b)* because the Court considers that the application is not being diligently proceeded with;

*(c)* where the applicant is not entitled to make the application; or

*(d)* for any other reason.

## Court's power on hearing of an application

**167.** (1) On the hearing of an application for the appointment of a liquidator, the Court may—

*(a)* appoint a liquidator under section 159(1);

*(b)* dismiss the application, even if a ground on which the Court could appoint a liquidator has been proved;

*(c)* adjourn the hearing conditionally or unconditionally; or

*(d)* make any interim order or other order that it considers fit.

(2) The Court shall not refuse to appoint a liquidator of a company merely because—

*(a)* the assets of the company are subject to a security interest in respect of an amount equal to or greater than the value or amount of the assets;

*(b)* the company has no assets; or

*(c)* where the applicant is a member, if the order were made, no assets of the company would be available for distribution among the members.

(3) Where an application to appoint a liquidator is made by a member under section 162(1)*(b)*, if the Court is of the opinion that—

*(a)* the applicant is entitled to relief either by the appointment of a liquidator or by some other means; and

*(b)* in the absence of any other remedy it would be just and equitable to appoint a liquidator, it shall appoint a liquidator unless it is also of the opinion that some other remedy is available to the applicant and that he or she is acting unreasonably in seeking to have a liquidator appointed instead of pursuing that other remedy.

(4) An application for the appointment of a liquidator shall be dismissed if the company is in liquidation, a liquidator having been appointed by the members under section 159(2). *(Inserted by Act 11 of 2004)*

## Period within which application shall be determined

**168.** (1) Subject to subsection (2), an application for the appointment of a liquidator shall be determined within 6 months after it is filed.

(2) The Court may, upon such conditions as it considers fit, extend the period referred to in subsection (1) for one or more periods not exceeding 3 months each if—

*(a)* it is satisfied that special circumstances justify the extension; and

*(b)* the order extending the period is made before the expiry of that period or, if a previous order has been made under this subsection, that period as extended.

(3) If an application is not determined within the period referred to in subsection (1) or within that period as extended, it is deemed to have been dismissed.

(4) Section 496(1)*(a)* shall not apply to the time periods specified in this section. *(Inserted by Act 11 of 2004)*

### Expenses of an arrangement

**169.** Where a liquidator of a company is appointed and, at the date that the application was filed, an arrangement was being supervised by a supervisor, the remuneration of the supervisor is a first charge on the assets of the company.

*Interim Relief*

### Appointment of provisional liquidator

**170.** (1) Where an application for the appointment of a liquidator of a company has been filed but not yet determined or withdrawn, the Court may, on application by a person specified in subsection (2), appoint the Official Receiver or an eligible insolvency practitioner as provisional liquidator of the company on the grounds specified in subsection (4).

(2) Subject to subsection (3), an application under subsection (1) may be made by one or more of the following—

     *(a)* the applicant for the appointment of a liquidator;

     *(b)* the company;

     *(c)* a creditor;

     *(d)* a member;

     *(e)* the Commission;

     *(ea)* the International Tax Authority; and *(Inserted by Act 14 of 2019)*

     *(f)* any person who, under any other enactment, is entitled to apply for the appointment of a liquidator of the company.

(3) An application under subsection (1) by a member may only be made with the leave of the Court.

(4) The Court may appoint a provisional liquidator under subsection (1) if—

     *(a)* the company, in respect of which the application to appoint a liquidator has been made, consents; or

     *(b)* the Court is satisfied that the appointment of a provisional liquidator—

        (i) is necessary for the purpose of maintaining the value of assets owned or managed by the company; or

(ii)  is in the public interest.

(5) The Court may appoint a provisional liquidator on such terms as it considers fit and may, as a condition precedent to the appointment, require the applicant to deposit at Court, or otherwise secure to the satisfaction of the Court, such sum as the Court considers reasonable to cover the remuneration of the provisional liquidator. *(Amended by Act 11 of 2004)*

### Rights and powers of provisional liquidator

**171.** (1) Subject to subsection (2), a provisional liquidator has the rights and powers of a liquidator to the extent necessary to maintain the value of the assets owned or managed by the company or to carry out the functions for which he or she was appointed.

(2) The Court may limit the powers of a provisional liquidator in such manner and at such times as it considers fit.

### Remuneration of provisional liquidator

**172.** (1) The provisional liquidator of a company is entitled to be paid such remuneration as the Court may order applying the general principles specified in section 432.

(2) Subject to subsections (4) and (5), the remuneration of the provisional liquidator is payable out of the assets of the company.

(3) Where a liquidator is appointed, the remuneration of the provisional liquidator shall be paid in accordance with the prescribed priority.

(4) If a liquidator is not appointed, the Court may order the applicant for the appointment of the provisional liquidator to pay or contribute to the remuneration and expenses of the provisional liquidator if it is satisfied that the applicant—

    *(a)* misled the Court when making the application; or

    *(b)* acted unreasonably in applying for the appointment of the provisional liquidator.

(5) If the assets of the company are not sufficient to pay the remuneration of the provisional liquidator, the Court may order the shortfall, or part of the shortfall, to be paid by the applicant for the appointment of the provisional liquidator.

(6) Unless the Court otherwise orders, where subsection (4)*(a)* applies, the provisional liquidator may retain out of the company's assets such sums or assets as are, or may be, required for meeting his or her remuneration.

### Termination of appointment of provisional liquidator

**173**. (1) The Court may, on the application of the provisional liquidator or of any person specified in section 170(2) or on its own motion, terminate the appointment of a provisional liquidator.

(2) If the Court has not previously terminated the appointment of a provisional liquidator under subsection (1), it terminates on the determination by the Court of the application to appoint a liquidator.

*Insolvency Act* **LAW OF
VIRGIN ISLANDS**

Revision Date: 1 Jan 2020

(3) On the termination of the appointment of a provisional liquidator, the Court may give such directions or make such order with respect to the accounts of his or her administration, or to any other matters, as it considers appropriate.

## Power to stay or restrain proceedings etc.

**174.** Where an application for the appointment of a liquidator of a company has been filed but not yet determined or withdrawn, a person specified in section 170(2) may—

(a) where any action or proceeding is pending against the company in the Court, the Court of Appeal or the Privy Council, apply to the Court, the Court of Appeal or the Privy Council, as the case may be, for a stay of the action or proceeding; and

(b) where any action or proceeding is pending against the company in any other Virgin Islands court or tribunal in the Virgin Islands, apply to the Court for a stay of the action or proceeding.

*Effect of Liquidation*

## Effect of liquidation

**175.** (1) Subject to subsection (2), with effect from the commencement of the liquidation of a company—

(a) the liquidator has custody and control of the assets of the company;

(b) the directors and other officers of the company remain in office, but they cease to have any powers, functions or duties other than those required or permitted under this Part or authorised by the liquidator; *(Amended by Act 11 of 2004)*

(c) unless the Court otherwise orders, no person may—

(i) commence or proceed with any action or proceeding against the company or in relation to its assets; or

(ii) exercise or enforce, or continue to exercise or enforce any right or remedy over or against assets of the company;

(d) unless the Court otherwise orders, no share in the company may be transferred;

(e) no alteration may be made in the status of or to the rights or liabilities of a member, whether by an amendment of the memorandum or articles or otherwise;

(f) no member may exercise any power under the memorandum or articles, or otherwise, except for the purposes of this Act; and

(g) no amendment may be made to the memorandum or articles of the company.

(2) Subsection (1) does not affect the right of a secured creditor to take possession of and realise or otherwise deal with assets of the company over which that creditor has a security interest.

(3) Anything or matter done or purported to be done in contravention of subsection (1) is void and of no effect.

## Restriction on execution or attachment

**176.** (1) Subject to subsections (2) and (3), a creditor is not entitled to retain the benefit of any execution process, distress or attachment over or against the assets of a company in liquidation unless the execution, process or attachment is completed before the first occurring of the commencement of the liquidation and—

  *(a)* where the liquidator was appointed by the members under section 159(2), the date upon which the creditor had notice of the calling of the meeting at which the resolution was proposed; or

  *(b)* where the liquidator was appointed by Court, the date upon which the application to appoint the liquidator was filed.

(2) A person who, in good faith and for value, purchases assets of a company from an officer charged with an execution process acquires a good title as against the liquidator of the company.

(3) The Court may set aside the rights conferred on a liquidator under subsection (1) to the extent and subject to such terms as it considers fit.

(4) For the purposes of this section—

  *(a)* an execution or distraint against personal property is completed by seizure and sale;

  *(b)* an attachment of a debt is completed by the receipt of the debt; and

  *(c)* an execution against land is completed by sale, and in the case of an equitable interest, by the appointment of a receiver.

## Duties of officer in execution process

**177.** (1) Subject to subsection (6), where—

  *(a)* assets of a company are taken in an execution process; and

  *(b)* before completion of the execution process the officer charged with the execution process receives notice that a liquidator or a provisional liquidator of a company has been appointed, he or she, on being required by the liquidator or provisional liquidator to do so, deliver or transfer the assets and any money received in satisfaction or partial satisfaction of the execution or paid to avoid a sale of the assets, to the liquidator.

(2) The costs of the execution process are a first charge on any asset delivered or transferred to the liquidator under subsection (1) and the liquidator may sell all or some of the assets to satisfy that charge.

(3) Subject to subsections (4) and (6), if in an execution process in respect of a judgement for a sum exceeding $500, assets of a company are sold or money is paid to avoid a sale, the officer charged with the execution process shall retain the proceeds of sale or the money paid for a period of 14 days.

(4) If—

*Insolvency Act*

   *(a)* within the period of 14 days referred to in subsection (3), the officer has notice that—

     (i) an application for the appointment of a liquidator of the company has been filed; or

     (ii) a meeting of the members of the company has been called at which a resolution to appoint a liquidator is to be proposed; and

   *(b)* a liquidator is appointed in respect of the company, the officer shall deduct the costs of execution from the amount that he or she has retained under subsection (3) and pay the balance to the liquidator.

   (5) A liquidator to whom money has been paid under subsection (4) is entitled to retain it as against the execution creditor.

   (6) The Court may set aside the rights conferred on a liquidator under this section to the extent and subject to such terms as it considers fit.

*Notice of Appointment and First Meetings of Creditors*

## Notice of appointment of liquidator

  **178.** (1) The liquidator of a company shall, within 14 days of the date of his or her appointment—

   *(a)* advertise his or her appointment in accordance with the Rules; *(Substituted by Act 11 of 2004)*

   *(b)* file notice of his or her appointment with the Registrar;

   *(c)* serve notice of his or her appointment on the company in respect of which he or she was appointed; and

   *(d)* if he or she has been appointed in respect of a company that is or has been a regulated person, serve notice of his or her appointment on the Commission.

   (2) A liquidator who contravenes subsection (1) commits an offence.

## Liquidator to call first meeting of creditors

  **179.** (1) Subject to section 183, the liquidator of a company shall call a meeting of the creditors of the company (the first creditors' meeting) to be held within 21 days of the date of his or her appointment—

   *(a)* by sending a notice of the meeting to every creditor not less than 7 days before the date upon which the meeting is to be held; and

   *(b)* by advertising the meeting.
*(Amended by Act 11 of 2004)*

   (2) During the period before the date of the first creditors' meeting, the liquidator shall, at the request of a creditor, furnish that creditor with—

   *(a)* a list of the creditors of the company known to the liquidator; and

*(b)* such other information concerning the affairs of the company as the creditor may reasonably require and that the liquidator is reasonably able to provide.

(3) The liquidator shall attend the first creditors meeting and, if appointed by the members, shall report to the meeting on any exercise by him or her of his or her powers since his or her appointment.

(4) At the first creditors' meeting, the creditors may—

*(a)* in the case of a liquidator appointed by the members, appoint another liquidator in his or her place; or

*(b)* in the case of a liquidator appointed by the Court, resolve to make application to the Court for the appointment of another liquidator in his or her place; and

*(c)* in either case, appoint a creditors' committee.

(5) A liquidator who contravenes subsections (1), (2) or (3) commits an offence.

## Application to Court by members

**180.** Where at a meeting held under section 179 the creditors appoint a liquidator in the place of the liquidator appointed by the members, a director, member or creditor of the company may apply to the Court for an order that—

*(a)* the person appointed by the members is appointed liquidator; or

*(b)* some other insolvency practitioner is appointed as liquidator, in either case, instead of or jointly with the liquidator appointed by the creditors.

## Application of sections 178 and 179

**181.** (1) Subject to subsection (2), sections 178 and 179 do not apply to a liquidator appointed to act—

*(a)* with an existing liquidator; or

*(b)* in place of a liquidator who has died or otherwise ceased to act.

(2) Where the first liquidator of a company dies or ceases to act before sections 178 and 179 have been fully complied with, those sections apply to his or her successor and any continuing liquidator until the sections have been fully complied with.

## Restrictions on powers of liquidator appointed by members

**182.** Notwithstanding section 186, in the case of a liquidator appointed by the members of a company, during the period before the holding of the first creditors' meeting called under section 179, the powers of the liquidator are limited to—

*(a)* taking into his or her custody and control all the assets to which the company is or appears to be entitled;

*(b)* disposing of perishable goods and other assets the value of which is likely to diminish if they are not immediately disposed of;

*Insolvency Act* LAW OF
VIRGIN ISLANDS

Revision Date: 1 Jan 2020

> *(c)* doing all such things as may be necessary to protect the company's assets; and
>
> *(d)* exercising such other of the powers conferred on a liquidator by section 186 as the Court may, on his or her application, sanction.

## Court appointed liquidator may dispense with creditors' meeting

**183.** A liquidator appointed by the Court is not required to call a meeting of creditors under section 179 if—

> *(a)* he or she considers that, having regard to the assets and liabilities of the company, the likely result of the liquidation of the company and any other relevant matters that it is not necessary for a meeting to be held;
>
> *(b)* he or she gives notice to the creditors stating—
>
> > (i) that he or she does not consider it necessary for a meeting to be held;
> >
> > (ii) the reasons for his or her view; and
> >
> > (iii) that a meeting will not be called unless 10% in value of the creditors give written notice to the liquidator within 10 days of receiving the notice, that they require a meeting to be called; and
>
> *(c)* no notice requiring a meeting to be held is received by him or her.

*Liquidators*

## Status of liquidator

**184.** (1) In performing his or her functions and undertaking his or her duties under this Act, a liquidator, whether appointed by resolution of the members or by the Court, acts as an officer of the Court.

(2) A liquidator is the agent of the company in liquidation.

## General duties of liquidator

**185.** (1) The principal duties of a liquidator of a company are—

> *(a)* to take possession of, protect and realise the assets of the company;
>
> *(b)* to distribute the assets or the proceeds of realisation of the assets in accordance with this Act; and
>
> *(c)* if there are surplus assets remaining, to distribute them, or the proceeds of realisation of the surplus assets, in accordance with this Act.

(2) The liquidator shall, subject to this Act and the Rules, use his or her own discretion in undertaking his or her duties.

(2A) If it appears to the liquidator that the company has carried on unlicensed financial services business, he or she shall as soon as reasonably practicable report the matter to the Commission. *(Inserted by Act 11 of 2004)*

(2B) Where the liquidator makes a report to the Commission under subsection (2A) he or she shall—

*(a)* send to the Commission a copy of every notice or other document that he or she is required under this Part to send to a creditor or the Court; and

*(b)* notify the Commission of any application made to the Court in or in connection with the liquidation.
*(Inserted by Act 11 of 2004)*

(3) A liquidator also has the other duties imposed by this Act and the Rules and such duties as may be imposed by the Court.

## General powers of liquidator

**186.** (1) A liquidator of a company has the powers necessary to carry out the functions and duties of a liquidator under this Act and the powers conferred on him or her by this Act.

(2) Without limiting subsection (1), a liquidator has the powers specified in Schedule 2.

(3) The Court may provide that certain powers may only be exercised with the sanction of the Court—

*(a)* where the liquidator is appointed by the Court, on his or her appointment or subsequently; or

*(b)* where the liquidator is appointed by the members, at any time.

(4) Where a liquidator disposes of any assets of the company to a person connected with the company, he or she shall notify the creditors' committee, if any, of such disposition.

(5) The liquidator of a company, whether or not appointed by the Court, may at any time apply to the Court for directions in relation to a particular matter arising in the liquidation.

(6) The acts of a liquidator of a company are valid notwithstanding any defect in his or her nomination, appointment or qualifications. *(Inserted by Act 11 of 2004)*

## Removal of liquidator

**187.** (1) The Court may, on application by a person specified in subsection (2) or on its own motion, remove the liquidator of a company from office if—

*(a)* the liquidator—

(i) is not eligible to act as an insolvency practitioner in relation to the company;

(ii) breaches any duty or obligation imposed on him or her by or owed by him or her under this Act, the Rules or the Regulations made under section 486 or, in his or her capacity

*Insolvency Act*

as liquidator, under any other enactment or law in the Virgin Islands; or *(Amended by Act 11 of 2004)*

   (iii) fails to comply with any direction or order of the Court made in relation to the liquidation of the company; or

  *(b)* the Court is satisfied that—

   (i) the liquidator's conduct of the liquidation is below the standard that may be expected of a reasonably competent liquidator;

   (ii) the liquidator has an interest that conflicts with his or her role as liquidator; or

   (iii) that for some other reason he or she should be removed as liquidator.

(2) An application to the Court to remove the liquidator of a company may be made by—

  *(a)* the creditors' committee;

  *(b)* a creditor or member of the company; or

  *(c)* the Official Receiver.

(3) Where the Court removes a liquidator from office under this section—

  *(a)* if, following his or her removal, there is at least one liquidator remaining in office, the Court may appoint an eligible insolvency practitioner as liquidator in his or her place; or

  *(b)* if the liquidator removed was the sole liquidator of the company, the Court shall appoint the Official Receiver or an eligible insolvency practitioner as liquidator in his or her place.
*(Amended by Act 11 of 2004)*

(4) On the hearing of an application under this section, the Court may make any interim or other order it considers fit.

### Resignation of liquidator

**188.** (1) A liquidator of a company—

  *(a)* shall resign if he or she is no longer eligible to act as an insolvency practitioner in relation to the company; but

  *(b)* otherwise may only resign in accordance with this section.

(2) Where a liquidator resigns under subsection (1)*(a)*, he or she shall send a notice of his or her resignation to the creditors of the company to the Registrar and to the Official Receiver and, if he or she was appointed by the Court, to the Court and his or her resignation takes effect from the date that the notice is received by the Official Receiver. *(Amended by Act 11 of 2004)*

(3) A liquidator may resign in accordance with subsection (5)—

  *(a)* if he or she intends to cease to be in practice as an insolvency practitioner;

*(b)* if there is some conflict of interest or change of personal circumstances that precludes or makes impracticable the further discharge by him or her of his or her duties; or

*(c)* on the grounds of ill health.

(4) Notwithstanding subsection (3), where joint liquidators are appointed in respect of a company, one or more of the joint liquidators may resign in accordance with subsection (5) if—

*(a)* all the joint liquidators are of the opinion that it is no longer necessary or expedient for the resigning liquidator or liquidators to continue in office; and

*(b)* at least one of them will remain in office.

(5) Where the liquidator of a company intends to resign on one of the grounds referred to in subsection (3) or under subsection (4), he or she shall call a meeting of creditors for the purpose of accepting his or her resignation as liquidator.

(6) If the creditors resolve to accept the resignation of a liquidator, they may appoint an eligible insolvency practitioner as liquidator in his or her place. *(Amended by Act 11 of 2004)*

(6A) If the creditors refuse or fail to accept the resignation of the liquidator, he or she may apply to the Court for leave to resign in accordance with the Rules. *(Inserted by Act 11 of 2004)*

(7) This section does not apply to the Official Receiver when acting as the liquidator of a company.

## Appointment of replacement liquidator

**189.** (1) Where the liquidator of a company dies or resigns under section 188 and no liquidator is appointed in his or her place, the Court, on the application of a person specified in subsection (2) or on its own motion—

*(a)* if there is at least one liquidator remaining in place, may appoint an eligible insolvency practitioner as liquidator in his or her place; or

*(b)* if the liquidator who has died or resigned was the sole liquidator of the company, shall appoint the Official Receiver or an eligible insolvency practitioner in his or her place.

*(Substituted by Act 11 of 2004)*

(2) An application under subsection (1) may be made—

*(a)* by any continuing liquidator;

*(b)* by the creditors' committee, if any; or

*(c)* by the Official Receiver.

(3) Where the Official Receiver is the liquidator of a company, an eligible insolvency practitioner may be appointed in his or her place—

*(a)* on the application of the Official Receiver, by the Court; or

*(b)* with the consent of the Official Receiver, by resolution of the creditors at a meeting called by the Official Receiver for that purpose.

*(Inserted by Act 11 of 2004)*

(4) An application may be made under subsection (3) notwithstanding that the Court has refused to make an appointment on a previous application by the Official Receiver. *(Inserted by Act 11 of 2004)*

## Remuneration of liquidator

**190.** The remuneration payable to the liquidator of a company shall be fixed applying the principles set out in section 432.

## Notification of liquidation

**191.** (1) Where a company is in liquidation, every document of a type specified in subsection (2) shall—

*(a)* state that the company is in liquidation; and

*(b)* specify the name of the liquidator.

(2) Subsection (1) applies to—

*(a)* every public document issued by or on behalf of the company;

*(b)* every public document issued by or on behalf of the liquidator of the company or a receiver of the assets of that company on which, in either case, the name of the company appears.

(3) If subsection (1) is contravened the company, and each officer, receiver or liquidator of the company who causes, permits or acquiesces in the contravention, commits an offence.

## Vesting of assets in liquidator

**192.** (1) On the application of the liquidator of a company, the Court may order that all or any part of the assets of the company, or held by trustees on its behalf, shall vest in the liquidator from the date of the order.

(2) On the making of an order under subsection (1), the assets covered by the order vest in the liquidator by his or her official name.

(3) The liquidator of a company may, after giving such indemnity, if any, as the Court may direct, bring or defend in his or her official name any action or other legal proceeding which relates to the vested assets or which it is necessary to bring or defend for the purposes of liquidating the company and recovering its assets.

*Members*

## Settlement of list of members

**193.** (1) Subject to subsection (7), the liquidator of a company shall, as soon as practicable after his or her appointment, settle a list of the members of the company containing the information and in the form prescribed. *(Amended by Act 11 of 2004)*

(2) Forthwith after settling the list of members, the liquidator shall give notice to every person included in the list that he or she has done so in accordance with the Rules.

(3) If a person objects to any entry in, or exclusion from, the list of members as settled by the liquidator which is not accepted by the liquidator, he or she may apply to the Court for an order removing the entry to which he or she objects or, as the case may be, modifying the entry.

(4) An application under subsection (3) shall be made within 21 days of the service on the applicant of the liquidator's notice declining to accept the objection.

(5) The liquidator of a company is not personally liable for the costs incurred by a person in an application under subsection (3) unless the Court makes an order to that effect.

(6) The liquidator may from time to time vary or add to the list of members as previously settled by him or her and any variation or addition is subject, as regards any person affected, to the provisions of the Act and the Rules applicable to the settling of the list.

(7) The liquidator is not required to settle a list of members under this section if it appears to him or her that it will not be necessary to require any member to contribute to the assets of the company or to adjust the rights of members. *(Inserted by Act 11 of 2004)*

## Rectification of register of members

**194.** (1) If it appears to the liquidator of a company that the register of members of the company should be rectified, he or she may apply to the Court for an order under this section.

(2) On an application under subsection (1), the Court may rectify the register of members of the company.

## Liability of members limited

**195.** (1) Unless the memorandum of a company provides that the liability of a member is unlimited, the liability of a member to contribute to the assets of a company in liquidation for the payment of its liabilities, for the expenses of the liquidation and for the adjustment of the rights of the members between themselves is limited to—

    *(a)* any amount unpaid on a share held by the member, including any liability for calls; and

    *(b)* any liability expressly provided for in the memorandum or articles, including such contribution as the member of a company limited by guarantee, or by shares and guarantee, may have undertaken to make in the event of the company being wound up.

(2) Subsection (1) does not affect—

    *(a)* any liability of the member to pay or repay monies to the company imposed by a provision of this Act or the BVI Business Companies Act; or *(Amended by Act 16 of 2004)*

*(b)* any liability of a member to the company under a contract, including a contract for the issue of shares, or for any tort, breach of fiduciary duty or other actionable wrong committed by the member.

## Liability of past members

**196.** (1) For the purposes of this section, a "past member" of a company is a person who ceased to be a member of the company at any time during the period of one year before the commencement of the liquidation of the company.

(2) Unless the Court is satisfied that the members of a company are able to discharge the liabilities set out in 195(1), a past member of a company in liquidation is liable to contribute to the assets of the company for the purposes specified in that subsection to the same extent as a member.

(3) Notwithstanding subsection (2), a past member is not liable to contribute to the assets of the company in respect of any liability of the company contracted after he or she ceased to be a member.

## Dividends payable to member

**197.** A member, and a past member, of a company may not claim in the liquidation of the company for a sum due to him or her in his or her character as a member, whether by way of dividend, profits, redemption proceeds or otherwise, but such sum is to be taken into account for the purposes of the final adjustment of the rights of members and, if appropriate, past members between themselves.

## Liability where limited company becomes unlimited company

**198.** (1) This section applies where an unlimited company in liquidation was at some former time registered as a limited company.

(2) A person who ceased to be a member of a company before the company became registered as an unlimited company, and has not since become a member of the company, is liable to contribute to the assets of the company only to the extent that he or she would have been liable had the company remained registered as a limited company.

## Liability where unlimited company becomes limited company

**199.** (1) This section applies where a limited company in liquidation was at some former time registered as an unlimited company.

(2) Notwithstanding section 196, if a company referred to in subsection (1) goes into liquidation within the period of one year from the date on which it was registered as a limited company, a person who was a member of the company at the date of its registration as a limited company is liable, without limit, to contribute to the assets of the company in respect of liabilities contracted before that time.

### Liability of personal representative

**200.** The personal representatives of a member or past member who has died are liable to contribute out of his or her estate to the assets of the company under sections 195, 196, 198 and 199 to the same extent as the member.

### Effect of member or past member becoming bankrupt

**201.** The liquidator of a company is entitled to submit a claim in the bankruptcy or liquidation of any member or past member of the company in respect of any contribution that the member or past member is required to make under sections 195, 196, 198 and 199.

### Status of personal representatives or bankruptcy trustee

**202.** The personal representatives and the bankruptcy trustee of a member or past member of a company in liquidation are entitled to make any application to Court, or take any such other action, as could be made or taken by the member or past member. *(Amended by Act 11 of 2004)*

### Insurance and other contracts not affected

**203.** Nothing in this Act invalidates any provision contained in a policy of insurance or other contract whereby the liability of individual members on the policy or contract is restricted or whereby the funds of the company are alone made liable in respect of the policy or contract.

### Power of liquidator to enforce liability of member or past member

**204.** (1) The liquidator of a company may—

  *(a)* if a member is liable to calls, make calls on that member; and

  *(b)* if a member or past member is liable to the company, as a member, require him or her, by notice in writing, to discharge that liability.

(2) A call made under subsection (1)*(a)* shall be in writing and shall specify the amount of, or balance due in respect of, the call.

(3) The liability of a member under subsection (1) includes a liability of the estate of the person he or she represents.

(4) In the case of an unlimited company, a member may set-off against a liability under subsection (1)*(b)* any money due to him or her  or to the estate which he or she represents, from the company on any independent dealing or contract with the company, but not any money due to him or her as a member of the company in respect of any dividend or profit.

(5) The liquidator may enforce the liability of a member under subsection (1) only if that member is on the list of members settled by him or her under section 193.

### Summary remedy against members and past members

**205.** (1) The liquidator may apply to the Court for an order under this section if—

*Insolvency Act*

(a) a member of a company fails to comply with a call made under section 204(1)*(a)*; or

(b) a member or past member fails to satisfy a liability when required to do so under 204(1)*(b)*.

(2) On an application under subsection (1), the Court may order a member or past member to pay to the company any money due from him or her, or due from the estate of the person who he or she represents in accordance with section 204(1).

(3) In the case of any company, whether limited or unlimited, when all the creditors are paid in full, together with interest at the official rate, any money due on any account whatever to a member from the company may be allowed to him or her by way of set-off against any subsequent call.

## Order under section 205 to be conclusive evidence

**206.** An order made against a member under section 205 is, subject to any right of appeal, conclusive evidence that the money, if any, ordered to be paid is due.

## Distribution of assets of company

**207.** (1) Unless and to the extent that this Act or any other enactment provides otherwise, the assets of a company in liquidation shall be applied—

(a) in paying, in priority to all other claims, the costs and expenses properly incurred in the liquidation in accordance with the prescribed priority;

(b) after payment of the costs and expenses of the liquidation, in paying the preferential claims admitted by the liquidator in accordance with the provisions for the payment of preferential claims prescribed;

(c) after payment of the preferential claims, in paying all other claims admitted by the liquidator; and

(d) after paying all admitted claims, in paying any interest payable under section 215.

(2) Subject to section 151, the claims referred to in subsection (1)*(c)* rank equally between themselves if the assets of the company are insufficient to meet the claims in full, they shall be paid rateably.

(3) Any surplus assets remaining after payment of the costs, expenses and claims referred to in subsection (1) shall be distributed to the members in accordance with their rights and interests in the company.

(4) For the purposes of this Act, assets held by a company in liquidation on trust for another person are not assets of the company.

*Claims*

## Claims having priority over floating charges

**208.** So far as the assets of a company in liquidation available for payment of the claims of unsecured creditors are insufficient to pay—

*(a)* the costs and expenses of the liquidation in accordance with the prescribed priority, and

*(b)* the preferential creditors, those costs, expenses and claims have priority over the claims of chargees in respect of assets that are subject to a floating charge created by the company and shall be paid accordingly out of those assets.

## Claims by unsecured creditors

**209.** (1) An unsecured creditor may make a claim against a company in liquidation by submitting to the liquidator a written claim, signed by him or her or on his or her behalf.

(2) The liquidator may require an unsecured creditor who intends to submit, or who has submitted, a claim under subsection (1)—

*(a)* to verify his or her claim by affidavit;

*(b)* to provide further particulars of his or her claim; or

*(c)* to provide him or her with documentary or other evidence to substantiate the claim.

(3) Subject to subsection (6A), as soon as reasonably practicable after receiving a claim under subsection (1) from a creditor who has complied with any requirements that the liquidator may have imposed under subsection (2), the liquidator shall either admit or reject the claim in whole or in part. *(Inserted by Act 11 of 2004)*

(4) If the liquidator rejects the claim, whether in whole or in part, he or she shall as soon as practicable provide the creditor with a notice of rejection in which the reasons for the rejection of the claim shall be specified.

(5) Unless the Court otherwise orders, a creditor shall bear the costs of making a claim under this section, including the costs of complying with any requirements imposed by the liquidator under subsection (2).

(6) The liquidator shall not admit a claim against the company unless it has been made in accordance with this section.

(6A) The liquidator is not required to admit or reject claims under subsection (3) at any time when it appears to him or her that the company has insufficient assets to enable a distribution to be made to unsecured creditors. *(Inserted by Act 11 of 2004)*

(7) A person who makes or authorises the making of a claim under this section knowing that—

*(a)* the claim is false or misleading in a material matter; or

*(b)* a material fact or matter has been omitted from the claim, commits an offence.

## Variation, withdrawal and expunging of claims

**210.** (1) A claim made under section 209 may—

*(a)* be amended or withdrawn by the creditor at any time before the liquidator has admitted it; and

*Insolvency Act*

*(b)* be amended or withdrawn by agreement between the creditor and the liquidator at any time after the liquidator has admitted it.

(2) The Court, on the application of the liquidator or, where the liquidator declines to make application under this subsection, a creditor, may expunge or amend an admitted claim if it is satisfied that the claim should not have been admitted or should be reduced.

## Claims by secured creditors

**211.** (1) A secured creditor may—

*(a)* value the assets subject to the security interest and claim in the liquidation of a company as an unsecured creditor for the balance of his or her debt; or

*(b)* surrender his or her security interest to the liquidator for the general benefit of creditors and claim in the liquidation as an unsecured creditor for the whole of his or her debt, but he or she is not obliged to do either.

(2) A secured creditor may, at any time apply to the liquidator to amend the value that he or she placed on the security interest in his or her claim.

(3) If, on receiving an application under subsection (2), the liquidator is satisfied that—

*(a)* the value placed on the security interest was an estimate made in good faith on a mistaken basis; or

*(b)* the value of the security interest has subsequently changed, he or she may permit the secured creditor to amend the value that he or she places on the security interest.

(4)  If the liquidator of a company is dissatisfied with the value placed on a security interest by a secured creditor, whether under subsection (1)*(a)* or on an amendment under subsection (3), he or she may require the assets comprised in the security interest to be offered for sale.

(5) A sale under subsection (4) is to be on such terms and conditions as are agreed by the secured creditor and the liquidator or, in default, as the Court determines.

(6) If assets are offered for sale by public auction, both the secured creditor and the liquidator are entitled to bid for and purchase them.

## Redemption of security interest by liquidator

**212.** (1) Where a secured creditor has claimed in the liquidation of a company under section 211(1)*(a)*, the liquidator may at any time give notice to the creditor that he or she proposes at the expiration of 28 days from the date of the notice to redeem the security interest at the value placed on it by the creditor.

(2) A secured creditor who receives a notice under subsection (1) may, within 21 days of the date of the notice, apply to the liquidator to revise the value that he or she places on the security interest in accordance with section 211(2).

(3) At the expiration of 28 days from the date of the notice under subsection (1), the liquidator may redeem the security interest at the value placed on it by the creditor unless—

> *(a)* the secured creditor has applied to the liquidator to amend the value that he or she places on the security interest and that application has not been determined; or

> *(b)* the secured creditor has appealed to the Court against the refusal of the liquidator to permit him or her to amend the value that he or she places on his or her security interest, and that appeal has not been determined.

(4) Where, subsequent to a notice to redeem issued under subsection (1), the value placed by the secured creditor on his or her security interest is amended, whether with the consent of the liquidator or on appeal to the Court, the liquidator may only redeem the security interest at the new value.

(5) A secured creditor may, by serving a notice to elect on the liquidator, require him or her to  elect whether or not to exercise his or her power to redeem under this section.

(6) Where a notice to elect is served on a liquidator under subsection (5), he or she is not entitled to redeem the security interest unless he or she does so within 6 months of the date of service of the notice on him or her or within such extended period as the Court may allow.

### Realisation of security interest by secured creditor

**213.** (1) Where a secured creditor realises his or her security interest and there is a surplus remaining from the net amount realised after satisfaction of the debt secured, he or she shall account to the liquidator for the surplus, after making any proper payments to the holder of any other security interest over the assets subject to that charge.

(2) Where a secured creditor realises his or her security interest and the net amount realised is not sufficient to satisfy the liability secured—

> *(a)* if the creditor has previously valued his or her security interest and claimed in the liquidation for the balance under section 211(1)*(a)*, the net amount realised is substituted for the value previously placed by the creditor on the security interest; or

> *(b)* in any other case, the creditor may claim in the liquidation as an unsecured creditor for the balance of the secured liability.

(3) For the purposes of this section, the secured liability includes contractual interest payable to the secured creditor on the liability up to the time of its satisfaction.

### Surrender for non-disclosure

**214.** (1) Subject to subsection (2), if a secured creditor omits to disclose his or her security interest when submitting a claim in the liquidation of a company, he or she shall surrender his or her security interest for the general benefit of the creditors.

*Insolvency Act*

(2) The Court may, on application by a secured creditor who is required to surrender his or her security interest under subsection (1), if it is satisfied that the omission was inadvertent or the result of an honest mistake by order direct—

(a) that he or she is not required to surrender his or her security interest; and

(b) that he or she values his or her security interest and amends his or her claim accordingly.

### Interest after commencement of liquidation

**215.** (1) Interest is payable on any claim in the liquidation of a company in respect of the period after the commencement of the liquidation in accordance with this section.

(2) Any surplus remaining after the payment of all claims in the liquidation of a company shall, before being applied for any other purpose, be applied in paying interest on those claims in respect of the periods during which they have been unpaid since the commencement of the liquidation.

(3) Subject to section 151, all interest payable under this section ranks equally, whether or not the claims on which it is payable rank equally and if the assets of the company are insufficient to meet the claims in full, they shall be paid rateably.

(4) The rate of interest payable under this section is the greater of—

(a) the court rate; and

(b) the rate that would be applicable to the claim if a liquidator of the company had not been appointed.

### *Distributions*

### Power to exclude creditors not claiming in time

**216.** (1) Where the liquidator of a company has sufficient funds to make a distribution, he or she shall, subject to the retention of such sums as may be necessary for his or her remuneration and the other costs and expenses of the liquidation, by written notice sent to the creditors of the company, fix a date on or before which creditors shall submit their claims to him or her. *(Amended by Act 11 of 2004)*

(2) Where the liquidator sends a notice to creditors under subsection (1), a creditor who does not submit a claim on or before the date specified in the notice is excluded from the benefit of any distribution on or after that date that is made before he or she submits his or her claim. *(Amended by Act 11 of 2004)*

(3) Where the liquidator makes more than one distribution, subsections (1) and (2) apply to each distribution. *(Inserted by Act 11 0f 2004)*

### *Disclaimer*

### Liquidator may disclaim onerous property

**217.** (1) For the purposes of this section, "onerous property" means—

*(a)* an unprofitable contract; or

*(b)* assets of the company which are unsaleable or not readily saleable, or which may give rise to a liability to pay money or perform an onerous act.

(2) Subject to section 219, the liquidator of a company may, by filing a notice of disclaimer with the Court, disclaim any onerous property of the company even though he or she has taken possession of it, tried to sell or assign it or otherwise exercised rights of ownership in relation to it.

(3) A liquidator who disclaims onerous property shall, within 14 days of the date on which the disclaimer notice is filed, give notice to every person whose rights are, to the knowledge of the liquidator, affected by the disclaimer.

(4) A liquidator who contravenes subsection (3) commits an offence.

## When disclaimer takes effect

**218.** (1) Subject to subsection (2), a disclaimer takes effect on the date when the notice of disclaimer is filed at Court.

(2) The disclaimer of property of a leasehold nature does not take effect unless a copy of the disclaimer notice has been given, so far as the liquidator is aware of their addresses, to every person claiming under the company as underlessee or mortgagee and either—

*(a)* no application for a vesting order is made under section 221 with respect to that property before the end of a period of 14 days beginning with the day on which the last notice under this subsection was given; or

*(b)* where such an application is made, the Court directs that the disclaimer shall take effect.

(3) Where the Court gives a direction under subsection (2)*(b)*, it may also, instead of or in addition to any order it makes under section 221, make such orders with respect to fixtures, tenant's improvements and other matters arising out of the lease as it considers fit.

## Notice to liquidator to elect whether to disclaim

**219.** (1) A person interested in property or whose rights would be effected by the disclaimer of property may, by serving a notice to elect on the liquidator, require him or her to elect whether or not to disclaim the property.

(2) Where a notice to elect is served on a liquidator, he or she is not entitled to disclaim the property under section 217 unless he or she does so within 28 days of the date of service of the notice on him or her or within such extended period as the Court may allow.

## Effect of disclaimer

**220.** (1) A disclaimer of onerous property under section 217—

*(a)* operates so as to determine, with effect from the date of the disclaimer, the rights, interests and liabilities of the company in or in respect of the property disclaimed; but

*(b)* except so far as is necessary to release the company from liability, does not affect the rights or liabilities of any other person.

(2) A person suffering loss or damage as a result of a disclaimer of onerous property under section 217 may claim in the liquidation of the company as a creditor for the amount of the loss or damage.

## Vesting orders and orders for delivery

**221.** (1) Subject to section 222, if a liquidator disclaims onerous property under section 217, the Court may make an order under subsection (2) on the application of—

*(a)* a person who claims an interest in the disclaimed property; or

*(b)* a person who is under a liability in respect of the disclaimed property, that has not been discharged by the disclaimer.

(2) On an application under subsection (1), the Court may, on such terms as it considers fit, order that the disclaimed property be vested in or delivered to—

*(a)* a person entitled to the property;

*(b)* a person under a liability in respect of the property that has not been discharged by the disclaimer; or

*(c)* a trustee for a person referred to in paragraph *(a)* or *(b)*.

(3) The Court shall not make an order in respect of a person specified in subsection (2)*(b)*, or in respect of a trustee of such a person, unless it appears to the Court that it would be fair to do so for the purpose of compensating the person subject to the liability in respect of the disclaimer.

(4) The effect of any order under this section shall be taken into account in assessing the extent of the loss or damage suffered by a person for the purposes of section 220(2).

(5) Subject to subsection (6), where a vesting order is made under this section vesting property in a person, the property vests immediately without any conveyance, transfer or assignment.

(6) Where another Virgin Islands enactment—

*(a)* requires the transfer of property vested by an order under this section to be registered, and

*(b)* that enactment enables the order to be registered, on the making of a vesting order, the property vests in equity but does not vest at law until the registration requirements of the enactment have been complied with.

## Vesting orders in respect of leases

**222.** (1) Where the Court makes an order under section 221 vesting property of a leasehold nature in a person claiming under the company in liquidation as an underlessee or a mortgagee, the vesting order shall be made on terms that make that person subject—

*(a)* to the same liabilities and obligations as the company was subject to under the lease at the commencement of the liquidation; or

*(b)* to the same liabilities and obligations as that person would have been subject to if the lease had been assigned to him or her at the commencement of the liquidation.

(2) Where the property vested by an order under section 221 relates to only part of the property comprised in a lease, subsection (1) applies as if the lease comprised the property subject to the vesting order.

(3) Where no underlessee or mortgagee is willing to accept a vesting order made subject to subsection (1), the Court, by order—

*(a)* may vest the property in any person who is liable, whether personally or in a representative capacity and whether alone or jointly with the company, to perform the lessee's covenants in the lease; and

*(b)* where a vesting order is made under paragraph *(a)*, may vest the property free from all estates, encumbrances and interests created by the company.

(4) Where an underlessee or a mortgagee declines to accept a vesting order made subject to subsection (1), he or she is excluded from all interest in the property.

## Land subject to rentcharge

**223.** Where land subject to a rentcharge is disclaimed and that land vests by operation of law in any person, including the Crown, that person and his successors in title are not subject to any personal liability in respect of any sums becoming due under the rentcharge except sums becoming due after he or she, or some person claiming title under or through him or her, has taken possession or control of the land or has entered into occupation of it.

## Disclaimer presumed valid

**224.** Unless it is proved that a liquidator has breached his or her duty to give notice under section 217(3) or that he or she has otherwise breached his or her duties under this Act or the Rules with regard to disclaimer, a disclaimer of property by the liquidator is presumed to be valid and effective.

### *Investigation of Assets and Affairs of Company*

## Statement of affairs

**225.** (1) In this section, "relevant person" has the meaning specified in section 275.

(2) The liquidator or provisional liquidator of a company may require one or more relevant persons to prepare a statement of affairs of the company in accordance with Part XI, Division 2.

(3) Subject to section 280, the liquidator or provisional liquidator shall file with the Court each statement of affairs and each affidavit of concurrence that he or she receives.

*Insolvency Act*

(4) Subsection (3) does not apply to a liquidator appointed by the members of a company. *(Inserted by Act 11 of 2004)*

## Preliminary report

**226.** (1) The liquidator of a company shall, within 60 days of the commencement of the liquidation, prepare a preliminary report covering, to the best of his or her knowledge and belief, the following matters—

> *(a)* in the case of a company with share capital, the amount of capital issued, subscribed and paid up;
>
> *(b)* the assets and liabilities of the company;
>
> *(c)* if the company has failed, the causes of the failure; and
>
> *(d)* whether, in his or her opinion, further enquiries are desirable with respect to—
>
> > (i) any matter relating to the promotion, formation or insolvency of the company or the conduct of the business or affairs of the company; and
> >
> > (ii) possible claims under Part IX.

(2) The liquidator shall send a copy of the report prepared under subsection (1)—

> *(a)* to each creditor of the company; and
>
> *(b)* if in his or her report he or she states that further enquiries are desirable with respect to a matter referred to in subsection (1)*(d)*, to the Official Receiver.

(3) Subsection (2)*(b)* does not apply to the Official Receiver when he or she is acting as the liquidator of a company.

(4) The Court may, on the application of the liquidator, extend the period specified in subsection (1) on such terms and conditions as it considers fit.

## Duty of Official Receiver concerning report under section 226

**227.** Where the Official Receiver receives a report under section 226, he or she shall carry out such investigation, if any, as he or she considers appropriate.

*Miscellaneous Provisions*

## Liquidator to call meetings of creditors

**228.** (1) The liquidator shall call a meeting of the creditors of a company in liquidation if—

> *(a)* a meeting is requisitioned by the creditors of the company in accordance with subsection (2); or
>
> *(b)* he or she is directed to do so by the Court.

(2) A creditors' meeting may be requisitioned in accordance with the Rules by 10% in value of the creditors of the company.

### Recession of contracts by the Court

**229.** (1) On the application of a person who is, as against the liquidator of a company, entitled to the benefit or subject to the burden of a contract made with the company, the Court may make an order rescinding the contract on such terms as to payment by or to either party of damages for the non-performance of the contract, or otherwise as the Court considers just.

(2) Any damages payable to a person under an order made under subsection (1) may be claimed by him or her as a debt in the liquidation of the company.

### Inspection of books by creditors

**230.** (1) At any time after the appointment of a liquidator of a company, the Court may, on such terms as it considers appropriate, make an order for the inspection of specified books, records and documents of the company that are in its possession.

(2) Application for an order under subsection (1) may be made by a creditor or member of the company.

### Enforcement of liquidator's duties

**231.** (1) In this section, "specified person" means—

    *(a)* the Official Receiver;

    *(b)* a creditor of a company in liquidation; or

    *(c)* a member of a company in liquidation.

(2) If a liquidator fails to file any notice, return, account or other document, a specified person may serve a notice on the liquidator requiring him or her to remedy the default.

(3) If a liquidator fails to remedy the default specified in a notice served under subsection (1) within 14 days of service of the notice on him or her, any specified person may apply to the Court for an order that the liquidator remedy the default within such time as the Court may specify.

(4) The Court may order that the costs of and incidental to an application under this section are payable by the liquidator personally.

(5) A liquidator who fails to comply with an order made under subsection (3) commits an offence.

(6) This section does not prejudice any other provision of this Act or any other enactment.

*Termination of Liquidation*

### Termination of liquidation

**232.** The liquidation of a company terminates on the first occurring of—

    *(a)* the making by the Court of an order terminating the liquidation under section 233, or such later date as may be specified in the order;

*Insolvency Act*

(b) the filing by the liquidator of a certificate of compliance with the provisions of section 234(2), as modified by the Court under section 234(4), if appropriate; or

(c) the making by the Court of an order under section 234(4) exempting the liquidator from compliance with 234(2), or such later date as may be specified in the order.

## Order terminating liquidation

**233.** (1) The Court may, at any time after the appointment of the liquidator of a company, make an order terminating the liquidation if it is satisfied that it is just and equitable to do so.

(2) An application under this section may be made by the liquidator, a creditor, a director or a member of the company or the Official Receiver.

(3) Before making an order under subsection (1), the Court may require the liquidator to file a report with respect to any matters relevant to the application.

(4) An order under subsection (1) may be made subject to such terms and conditions as the Court considers appropriate and, on making the order or at any time thereafter, the Court may give such supplemental directions or make such other order as it considers fit in connection with the termination of the liquidation.

(5) Where the Court makes an order under subsection (1), the company ceases to be in liquidation and the liquidator ceases to hold office with effect from the date of the order or such later date as may be specified in the order.

(6) Where the Court makes an order under subsection (1), the person who applied for the order shall, within 10 days of the date of the order, file a sealed copy of the order with the Registrar.

(7) A person who contravenes subsection (6) commits an offence.

## Completion of liquidation

**234.** (1) In this section "Register" means, as appropriate—

(a) the register of international business companies maintained by the Registrar under the International Business Companies Act;

(b) the register of companies maintained by the Registrar under the Companies Act; or

(c) the Register of Companies maintained by the Registrar under the BVI Business Companies Act. *(Inserted by Act 16 of 2004)*

(2) As soon as practicable after completing his or her duties in relation to the liquidation of a company, the liquidator shall—

(a) prepare and send to every creditor of the company whose claim has been admitted and to every member of the company—

(i) his or her final report, complying with subsection (3), and a statement of realisations and distributions in respect of the liquidation; and *(Amended by Act 11 of 2004)*

    (ii)  a summary of the grounds upon which a creditor or member may object to the striking of the company from the Register; and

    *(b)*  file with the Registrar a copy of the final report and the statement of realisations and distributions sent to the creditors and members of the company. *(Amended by Act 11 of 2004)*

(3) The final report of a liquidator shall contain a statement—

    *(a)*  that all known assets of the company have been disclaimed, realised or distributed without realisation;

    *(b)*  that all proceeds of realisation have been distributed; and

    *(c)*  that there is no reason why, in his or her opinion, the company should not be struck from the Register, and dissolved.

(4) On the application of the liquidator, the Court may on such terms and conditions as it considers just—

    *(a)*  exempt the liquidator from compliance with subsection (2)*(a)*; or

    *(b)*  modify the application of the provisions of subsection (2) to the liquidator.

## Release of liquidator

**235.** (1) A person who ceases to be the liquidator, or provisional liquidator, of a company may apply to the Court for his or her release and the Court may grant the release unconditionally or upon such conditions as it considers fit, or it may withhold it.

(2) If the Court withholds the release, it may make a compensation order against the former liquidator under section 254.

(3) Subject to subsection (5), where a former liquidator is released under this section, he or she is discharged from all liability in respect of any act or default of his or her in relation to the administration of the company.

(4) An order for the release of a former liquidator may be revoked by the Court if the release was obtained by fraud or the suppression or concealment of any material fact.

(5) Subsection (3) does not prevent the Court from making an order under section 254 against a liquidator who has been released under this section.

(6) Where the Official Receiver ceases to be liquidator and another liquidator is appointed in his or her place, the Official Receiver obtains his or her release—

    *(a)*  from the appointment of the new liquidator; or

    *(b)*  such later date as the Court may determine.

(7) A liquidator who obtains his or her release under this section shall file a notice in the prescribed form with the Registrar.

*Insolvency Act*  LAW OF
VIRGIN ISLANDS

Revision Date: 1 Jan 2020

## Dissolution

**236.** The Rules shall provide for the dissolution of a company on the termination and completion of the liquidation of the company.

PART VII

LIQUIDATION OF INSURANCE COMPANIES

## Interpretation for and scope of this Part

**237.** (1) In this Part—

"property and casualty business" and "life and health business" have the meanings specified in section 2(1) of the Insurance Act;

"property and casualty insurance company" means an insurance company that is or was authorised by its licence to carry on property and casualty business only; *(Amended by Act 11 of 2004)*

"life and health insurance company" means an insurance company that is or was authorised by its licence to carry on life and health business, whether or not it is or was also authorised to carry on property and casualty business. *(Amended by Act 11 of 2004)*

*(Amended by Act 16 of 2015)*

(2) Subject to subsection (3), this Part applies, with such modifications as are necessary, to a company or a foreign company that has at no time held a licence as an insurer issued under the Insurance Act or the repealed Insurance Act, 1994 but which, immediately before the appointment of a liquidator, was required to hold a licence as an insurer issued under the Insurance Act or the repealed Insurance Act, 1994. *(Amended by Act 1 of 2008)*

(3) Section 239 does not apply to a company specified in subsection (2).*(Inserted by Act 11 of 2004)*

## Liquidation of insurance companies

**238.** (1) The provisions of this Act relating to the liquidation of companies and foreign companies are modified in respect of insurance companies to the extent specified in this Part. *(Amended by Act 11 of 2004)*

(2) The liquidator of an insurance company has a duty to obtain and consider such actuarial advice as is appropriate to enable him or her to properly conduct the liquidation of the company. *(Inserted by Act 11 of 2004)*

(3) The Cabinet may, on the advice of the Commission, make Regulations with respect to the liquidation of insurance companies. *(Inserted by Act 11 of 2004)*

(4) Subject to subsection (5), the Regulations made under subsection (3) may—

(a) modify or exclude the provisions of this Act and the Rules relating to the liquidation of companies in respect of insurance companies; and

Case 22-11068-KBO   Doc 34263-1   Filed 01/05/26   Page 1122 of 1707

**LAW OF
VIRGIN ISLANDS**

*Insolvency Act*

137

Revision Date: 1 Jan 2020

*(b)* make different provision for different persons, circumstances or cases.

*(Inserted by Act 11 of 2004)*

(5) Regulations made under subsection (3) shall not modify or exclude the provisions of this Part. *(Inserted by Act 11 of 2004)*

## Appointment of liquidator by members

**239.** (1) The members of a life and health insurance company may not appoint a liquidator under Part VI.

*(Amended by Act 16 of 2015)*

(2) The members of a property and casualty insurance company, that is not a foreign company, may only appoint a liquidator under Part VI if the Commission has given its prior written consent to the appointment.

*(Amended by Act 16 of 2015)*

(3) Any resolution of the members—

*(a)* of a life and health insurance company to appoint a liquidator under Part VI in contravention of subsection (1); or

*(b)* of a property and casualty insurance company to appoint a liquidator under Part VI in contravention of subsection (2), is void and of no effect.

*(Amended by Act 16 of 2015)*

(4) Where the members of a property and casualty insurance company appoint a liquidator in accordance with this section, without limiting section 178(1)*(a)*, the Commission may by notice in writing direct the liquidator to advertise his appointment in such manner as is specified in the notice. *(Amended by Act 11 of 2004)*

*(Amended by Act 16 of 2015)*

(5) A liquidator who fails to advertise his or her appointment in accordance with a direction of the Commission issued under subsection (4) commits an offence.

## Application for appointment of liquidator by Court

**240.** (1) For the purposes of sections 162(1)*(c)* and 163(1)*(c)*, the public interest includes the interests of the policyholders of an insurance company.

(2) For the purposes of this Act, an insurance company is deemed to be insolvent if it is not in compliance with section 12(2) of the Insurance Act. *(Substituted by Act 1 of 2008)*

(3) On an application for the appointment of a liquidator under this section or under sections 162 or 163, evidence that an insurance company has at any time prior to the date of the application been insolvent is, unless the contrary is proved, evidence that the company continues to be insolvent. *(Amended by Act 11 of 2004)*

(4) This section is in addition to, and not in substitution for, sections 162 and 163. *(Amended by Act 11 of 2004)*

*Insolvency Act*

### Reduction of contracts as alternative to winding up

**241.**  Where on an application for the appointment of a liquidator, the Court is satisfied that an insurance company is insolvent, it may reduce the amount of the insurance company's contracts on such conditions as it considers just, instead of appointing a liquidator.

### Continuation of life and health business by liquidator appointed by Court

*(Amended by Act 16 of 2015)*

**242.**  (1)  The liquidator of a life and health insurance company shall, unless the Court otherwise orders, carry on the life and health business of the company with a view to it being transferred as a going concern to another insurance company, whether in existence or to be incorporated for the purpose. *(Amended by Act 11 of 2004)*

*(Amended by Act 16 of 2015)*

(2)  In carrying on the insurance company's life and health business under subsection (1), the liquidator may agree to the variation of any contracts of insurance at the commencement of the liquidation, but he or she shall not effect any new contracts of insurance.

*(Amended by Act 16 of 2015)*

(3)  On the application of the liquidator of a life and health insurance company, the Court may by order reduce the amounts of the contracts made by the company in the course of carrying on its life and health business.

*(Amended by Act 16 of 2015)*

(4)  An order under subsection (3) may be made subject to such conditions as the Court considers appropriate.

(5)  Without limiting section 186 or Schedule 2, the liquidator of a life and health insurance company may appoint an actuary to investigate and report to him or her on the life and health business of the company and, if appropriate, to conduct actuarial valuations of the business.

*(Amended by Act 16 of 2015)*

### Protection of segregated funds and assets

**243.**  (1)  In the liquidation of a life and health insurance company, the assets of the segregated funds of the company shall first be applied to meet the company's life and health insurance liabilities attributable to such funds.

*(Amended by Act 16 of 2015)*

(2)  If the value of the assets referred to in subsection (1) exceeds the amount of the life and health insurance liabilities of the company attributable to the segregated funds, the excess is an asset of the company available for distribution in accordance with this Act.

*(Amended by Act 16 of 2015)*

(3)  Where the Court makes an order under section 254(3) in respect of a life and health insurance company requiring a person to repay, restore or account for money or other assets, to pay compensation to the company or to pay interest to the company, the Court shall, insofar as the delinquency relates to assets

belonging to the company's segregated funds, order that the money, assets or contribution is to be treated for the purposes of subsection (1) as assets of those funds.

*(Amended by Act 16 of 2015)*

PART VIII

VOIDABLE TRANSACTIONS

## Interpretation for this Part

**244.** (1) In this Part—

"insolvent liquidation" means a liquidation of a company where the assets of the company are insufficient to pay its liabilities and the expenses of the liquidation;

"insolvency transaction" has the meaning specified in subsection (2);

"officer holder" means—

(a) in the case of a company in administration, its administrator; and

(b) in the case of a company in liquidation, its liquidator;
*(Inserted by Act 11 of 2004)*

"onset of insolvency" means—

(a) the date on which the application for the administration order was filed, where a company is in administration or is in liquidation and the liquidator was appointed by the Court immediately following the discharge of an administration order; *(Amended by Act 11 of 2004)*

(b) the date on which the application for the appointment of the liquidator was filed, where a company is in liquidation and the liquidator was appointed by the Court in circumstances other than those set out in paragraph *(a)*; or

(c) the date of the appointment of the liquidator, where a company is in liquidation and the liquidator was appointed by the members;

"voidable transaction" means—

(a) an unfair preference;

(b) an undervalue transaction;

(c) a floating charge that is voidable under section 247; and

(d) an extortionate credit transaction.

"vulnerability period" means—

(a) for the purposes of sections 245, 246 and 247—

(i) in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing 2 years prior to the onset of insolvency and ending on the

appointment of the administrator or, if the company is in liquidation, the liquidator; and

(ii) in the case of a transaction entered into with, or a preference given to, any other person, the period commencing six months prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator; and

*(b)* for the purposes of section 248, the period commencing 5 years prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator;

(2) A transaction is an insolvency transaction if—

*(a)* it is entered into at a time when the company is insolvent; or

*(b)* it causes the company to become insolvent.

(3) For the purposes of subsection (2), "insolvent" has the meaning specified in section 8(1) with the deletion of paragraph *(c)*(i).

(4) This Part applies in respect of—

*(a)* a company that is in administration; and

*(b)* a company and a foreign company that is in liquidation and, where appropriate, "company" includes a foreign company.

## Unfair preferences

**245.** (1) Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction—

*(a)* is an insolvency transaction;

*(b)* is entered into within the vulnerability period; and

*(c)* has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he or she would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business.

(3) A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into by a company within the vulnerability period has the effect specified in subsection (1)*(c)* in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

## Undervalue transactions

**246.** (1) Subject to subsection (2), a company enters into an undervalue transaction with a person if—

*(a)* the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or

*(b)* the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than  the value, in money or money's worth, of the consideration provided by the company; and

*(c)* in either case, the transaction concerned—

   (i)  is an insolvency transaction; and

   (ii)  is entered into within the vulnerability period.

(2) A company does not enter into an undervalue transaction with a person if—

*(a)* the company enters into the transaction in good faith and for the purposes of its business; and

*(b)* at the time when it enters into the transaction, there were reasonable grounds for believing that the transaction would benefit the company.

(3) A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a company enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)*(a)* or subsection (1)*(b)*, unless the contrary is proved, it is presumed that—

*(a)* the transaction was an insolvency transaction; and

*(b)* subsection (2) did not apply to the transaction.

## Voidable floating charges

**247.** (1) Subject to subsection (2), a floating charge created by a company is voidable if—

*(a)* it is created within the vulnerability period; and

*(b)* it is an insolvency transaction.

(2) A floating charge is not voidable to the extent that it secures—

*(a)* money advanced or paid to the company, or at its direction, at the same time as, or after, the creation of the charge;

*(b)* the amount of any liability of the company discharged or reduced at the same time as, or after, the creation of the charge;

*(c)* the value of assets sold or supplied, or services supplied, to the company at the same time as, or after, the creation of the charge; and

*(d)* the interest, if any, payable on the amount referred to in paragraphs *(a)* to *(c)* pursuant to any agreement under which the money was advanced or paid, the liability was discharged or

*Insolvency Act*

reduced, the assets were sold or supplied or the services were supplied.

(3) For the purposes of this section, where a company creates a floating charge in favour of a connected person within the vulnerability period, unless the contrary is proved, it is presumed that the charge was an insolvency transaction.

(4) For the purposes of subsection (2)*(c)*, the value of assets or services sold or supplied is the amount in money which, at the time they were sold or supplied, could reasonably have been expected to be obtained for the sale or supply of the goods or services in the ordinary course of business and on the same terms, apart from the consideration, as those on which the assets or services were sold or supplied to the company.

### Extortionate credit transactions

**248.** A transaction entered into by a company within the vulnerability period for, or involving the provision of, credit to the company is an extortionate credit transaction if, having regard to the risk accepted by the person providing the credit—

> *(a)* the terms of the transaction are or were such as to require grossly exorbitant payments to be made (whether unconditionally or in certain contingencies) in respect of the provision of credit; or

> *(b)* the transaction otherwise grossly contravenes ordinary principles of fair trading.
>
> *(Amended by Act 11 of 2004)*

### Orders in respect of voidable transactions

**249.** (1) Subject to section 250, where it is satisfied that a transaction entered into by a company is a voidable transaction the Court, on the application of the office holder—

> *(a)* may make an order setting aside the transaction in whole or in part;

> *(b)* in respect of an unfair preference or an undervalue transaction, may make such order as it considers fit for restoring the position to what it would have been if the company had not entered into that transaction; and

> *(c)* in respect of an extortionate credit transaction, may by order provide for any one or more of the following—

>> (i) the variation of the terms of the transaction or the terms on which any security interest for the purposes of the transaction is held;

>> (ii) the payment by any person who is or was a party to the transaction to the office holder of any sums paid by the company to that person by virtue of the transaction;

>> (iii) the surrender by any person to the office holder of any asset held by him or her as security for the purposes of the transaction; and

(iv)  the taking of accounts between any persons.
*(Amended by Act 11 of 2004)*

(2) Without prejudice to the generality of subsection (1)*(b)*, an order under that paragraph may—

    *(a)* require any assets transferred as part of the transaction to be vested in the company;

    *(b)* require any assets to be vested in the company if it represents in any person's hands the application either of the proceeds of sale of assets transferred or of money transferred, in either case as part of the transaction;

    *(c)* release or discharge, in whole or in part, any security interest given by the company or the liability of the company under any contract;

    *(d)* require any person to pay, in respect of benefits received by him or her from the company, such sums to the office holder as the Court may direct; *(Amended by Act 11 of 2004)*

    *(e)* provide for any surety or guarantor whose obligations to any person were released or discharged, in whole or in part, under the transaction, to be under such new or revived obligations to that person as the Court considers appropriate;

    *(f)* provide for security to be provided for the discharge of any obligation imposed by or arising under the order, for such an obligation to be charged on any assets and for the security interest or charge to have the same priority as a security interest or charge released or discharged, in whole or in part, under the transaction;

    *(g)* provide for a person effected by an order made under subsection (1) to submit a claim in the liquidation of the company in such amount as the Court considers fit; and *(Amended by Act 11 of 2004)*

    *(h)* require the company to make a payment or transfer assets to any person affected by an order made under subsection (1).

(3) Subject to section 250, in respect of an unfair preference or an undervalue transaction, an order under subsection (1) may affect the assets of, or impose any obligation on, any person whether or not he or she is the person with whom the company in question entered into the transaction.

**Limitations on orders under section 249**

**250.** (1) This section applies to an order made under section 249(1) in respect of an unfair preference or an undervalue transaction.

(2) An order to which subsection (1) applies shall not—

    *(a)* prejudice any interest in assets that was acquired in good faith and for value from a person other than the company, or prejudice any interest deriving from such an interest; or

    *(b)* require a person who received a benefit from the transaction in good faith and for value to pay a sum to the office holder, except

where that person was a party to the transaction or, in respect of an unfair preference, the preference was given to that person when he or she was a creditor of the company. *(Amended by Act 11 of 2004)*

(3) For the purposes of subsection (2), where a person would, apart from the requirement for good faith, fall within the circumstances specified in paragraph *(a)* or *(b)*, it is presumed, unless the contrary is proved, that he or she acquired the interest or received the benefit in good faith.

(4) Subsection (3) does not apply to a person—

    *(a)* who, at the time of the transaction, had notice of—

        (i) the fact that the transaction was an unfair preference or an undervalue transaction, as the case may be; or

        (ii) the relevant proceedings as defined in subsection (5); or

    *(b)* who was, at the time of the transaction, a connected person.

(5) For the purposes of subsection (4), a person has notice of the relevant proceedings if—

    *(a)* in the case of a company in administration, he or she had notice of the filing of the application on which the administration order was made;

    *(b)* in the case of a company where a liquidator was appointed immediately following the discharge of an administration order, he or she had notice of the filing of the application on which the administration order was made or the filing of the application on which the order appointing a liquidator was made; or

    *(c)* in the case of a company where a liquidator was appointed in circumstances other than those set out in paragraph *(b)*, he or she had notice of the filing of the application on which the order appointing a liquidator was made.

## Recoveries

**251.** Any money paid to, assets recovered or other benefit received by the liquidator as a result of an order made under section 249 are deemed to be assets of the company available to pay unsecured creditors of the company.

## Remedies not exclusive

**252.** The provisions of this Part apply without prejudice to the availability of any other remedy, even in relation to a transaction that the company had no power to enter into.

PART IX

MALPRACTICE

## Interpretation for this Part

**253.**   In this Part—

> *(a)* a company or a foreign company goes into insolvent liquidation if a liquidator is appointed at a time when its assets are insufficient to pay its liabilities and the expenses of the liquidation; and
>
> *(b)* a relevant company is a company or a foreign company that has gone into insolvent liquidation.

## Summary remedy against delinquent officers and others

**254.**   (1) On the application of the liquidator of a relevant company, the Court may make an order under subsection (3) where it is satisfied that a person specified in subsection (2)—

> *(a)* has misapplied or retained, or become accountable for any money or other assets of the company; or
>
> *(b)* has been guilty of any misfeasance or breach of any fiduciary or other duty in relation to the company.

(2) An order under subsection (3) may be made against a person—

> *(a)* who is or has been an officer of the company;
>
> *(b)* who has acted as liquidator of the company;
>
> *(c)* who, in the case of a relevant company that is not a foreign company, has acted as administrator, administrative receiver, supervisor or interim supervisor of the company; or
>
> *(d)* who, not being a person falling within paragraphs *(a)* or *(b)*, is or has been concerned in the promotion, formation, management, liquidation or dissolution of the company.

(3) Where subsection (1) applies, the Court may make one or more of the following orders against the person—

> *(a)* that he or she repays, restores or accounts for the money or other assets, or any part of it;
>
> *(b)* that he or she pays to the company as compensation for the misfeasance or breach of duty such sum as the Court considers just; and
>
> *(c)* that he or she pays interest to the company at such rate as the Court considers just.

(4) The Court shall not make an order under subsection (3) unless it has given the person the opportunity—

> *(a)* to give evidence, call witnesses and bring other evidence in relation to the application; and

(b) to be represented, at his own expense, by a legal practitioner who may put to him or her, or to other witnesses, such questions as the Court may allow for the purpose of explaining or qualifying any answers or evidence given.

(5) Application may not be made for an order under this section against a liquidator or an administrator who has been released, except with the leave of the Court.

(6) Nothing in this section prevents any person from instituting any other proceedings in relation to matters in respect of which an application may be made under this section.

## Fraudulent trading

**255.** (1) On the application of the liquidator of a relevant company, the Court may make an order under subsection (2) where it is satisfied that, at any time before the commencement of the liquidation of the company, any of its business has been carried on—

(a) with intent to defraud creditors of the company or creditors of any other person; or

(b) for any fraudulent purpose.

(2) Where subsection (1) applies, the Court may declare that any person who was knowingly a party to the carrying on of the business in such manner is liable to make such contribution, if any, to the company's assets as the Court considers proper. *(Amended by Act 11 of 2004)*

## Insolvent trading

**256.** (1) On the application of the liquidator of a relevant company, the Court may make an order under subsection (2) against a person who is or has been a director of the company if it is satisfied that—

(a) at any time before the commencement of the liquidation of the company, that person knew or ought to have concluded that there was no reasonable prospect that the company would avoid going into insolvent liquidation; and

(b) he or she was a director of the company at that time.

(2) Subject to subsection (3), where subsection (1) applies, the Court may order that the person concerned makes such contribution, if any, to the company's assets as the Court considers proper.

(3) The Court shall not make an order against a person under subsection (2) if it is satisfied that after he or she first knew, or ought to have concluded, that there was no reasonable prospect that the company would avoid going into insolvent liquidation, he or she took every step reasonably open to him or her to minimise the loss to the company's creditors.

(4) For the purposes of subsections (1) and (3), the facts which a director of a company ought to know or ascertain, the conclusions which he or she ought to reach and the steps reasonably open to him or her which he or she ought to take are those which would be known or ascertained, or reached or taken, by a reasonably diligent person having both—

(a) the general knowledge, skill and experience that may reasonably be expected of a person carrying out the same functions as are carried out by that director in relation to the company; and

(b) the general knowledge, skill and experience that that director has.

(5) The reference in subsection (4) to the functions carried out in relation to a company by a director of the company includes any function which he or she does not carry out but which has been entrusted to him or her. *(Amended by Act 11 of 2004)*

(6) Nothing in this section affects section 255.

## Recoveries under sections 255 and 256

**257.** Any money paid to, assets recovered or other benefit received by the liquidator as a result of an order made under section 255 or section 256 are deemed to be assets of the company available to pay unsecured creditors of the company.

## Ancillary orders

**258.** (1) Where the Court makes an order under section 255 or section 256, it may give such directions or make such further order as it considers proper for giving effect to the order. *(Amended by Act 11 of 2004)*

(2) Without limiting subsection (1), the Court may—

(a) provide for the liability of any person under the order to be a charge on any debt or obligation due from the company to him or her, or on any mortgage or charge or any interest in a mortgage or charge on assets of the company held by or vested in him or her, or any person on his or her behalf, or any person claiming as assignee from or through the person liable or any person acting on his or her behalf; and

(b) from time to time make such further order as may be necessary for enforcing any charge imposed under this subsection.

(3) For the purposes of subsection (2), "assignee"—

(a) includes a person to whom or in whose favour, by the directions of the person made liable, the debt, obligation, mortgage or charge was created, issued or transferred or the interest created; but

(b) does not include an assignee for valuable consideration, not including consideration by way of marriage, given in good faith and without notice of any of the matters on the ground of which the declaration is made.

(4) Where the Court makes a declaration under either section 255 or 256 in relation to a person who is a creditor of the company, it may direct that the whole or any part of any debt owed by the company to that person and any interest on the debt shall rank in priority after all other debts owed by the company and after any interest on those debts.

(5) Sections 255 and 256 have effect notwithstanding that the person concerned may be criminally liable in respect of matters on the ground of which the declaration under the section is to be made.

PART X

DISQUALIFICATION ORDERS AND UNDERTAKINGS

## Interpretation for this Part

**259.** (1) In this Part "voluntary liquidator" means—

> *(a)* a liquidator appointed by the directors or members of an international business company; or

> *(b)* a voluntary liquidator within the meaning specified in section 2 of the BVI Business Companies Act.
> > *(Substituted by Act 16 of 2004)*

(2) For the purposes of this Part, a company becomes insolvent if—

> *(a)* an administration order is made in respect of the company;

> *(b)* an administrative receiver of the company is appointed;

> *(c)* a liquidator of the company is appointed at a time when its assets are insufficient to pay its liabilities and the expenses of the liquidation; or

> *(d)* a liquidator is appointed by the Court on the ground specified in section 162(1)*(c)*.

## Disqualification orders and undertakings

**260.** (1) A disqualification order is an order that a person shall not, for the period specified in the order, engage in a prohibited activity without the leave of the Court.

(2) A disqualification undertaking is an undertaking in writing given by a person to the Official Receiver that he or she will not, for the period specified in the undertaking, engage in a prohibited activity without the leave of the Court.

(3) For the purpose of this Part, a person engages in a prohibited activity if—

> *(a)* he or she is a director of a company;

> *(b)* he or she acts as the voluntary liquidator of a company;

> *(c)* he or she acts as the receiver of the assets of a company;

> *(d)* he or she acts as an insolvency practitioner; or

> *(e)* in any way, whether directly or indirectly, he or she is concerned with or takes part in the promotion, formation or management of a company; or

> *(f)* he or she undertakes any activity prescribed as a prohibited activity. *(Amended by Act 11 of 2004)*

(4) A person is a "disqualified person" for the period in which—

*(a)* a disqualification order has effect against him or her; or

*(b)* a disqualification undertaking is in place in respect of him or her.

(5) The period specified in a disqualification order, or disqualification undertaking, made against or in respect of a person, runs concurrently with the period specified in any other disqualification order or disqualification undertaking made against or in respect of that person.

### Application for disqualification order

**261.** (1) Subject to subsection (2), the Official Receiver may apply to the Court for a disqualification order against a person under section 262.

(2) An application for a disqualification order may not be made more than 6 years after the date on which the company concerned became insolvent.

### Hearing of application for disqualification order

**262.** (1) On an application under section 261, the Court may, make a disqualification order against a person—

*(a)* who has been convicted on indictment—

(i) of an offence in connection with the promotion, formation, management or dissolution of a company that is or becomes insolvent; or

(ii) of an offence under this Act that relates to a company that at any time becomes insolvent, whether the person was convicted before or after the company became insolvent;

*(b)* who has had an order under section 255 or section 256 made against him or her; or *(Amended by Act 11 of 2004)*

*(c)* who is or has been a director, voluntary liquidator or receiver of a company that is or becomes insolvent, whether while he or she was a director, voluntary liquidator or receiver or subsequently; and—

(i) has been guilty of fraud in relation to the company or of any misfeasance or breach of duty as a director, voluntary liquidator or receiver of the company;

(ii) where the Court is of the opinion that the person's conduct as director, voluntary liquidator or receiver, either taken alone or taken together with his or her conduct as a director, voluntary liquidator or receiver of any other company or companies, makes him or her unfit to be concerned in the promotion, formation or management of companies or in their liquidation or dissolution.

*(d) (Repealed by Act 11 of 2004)*

(2) For the purposes of subsection (1)*(c)*, "receiver" means a receiver other than an administrative receiver.

(3) The reference in subsection (1)*(c)*(ii) to a person's conduct as a director, voluntary liquidator or receiver of a company includes that person's conduct in relation to any matter connected with or arising out of the insolvency of that company.

(4) The Court shall, on making a disqualification order, specify the period for which the order has effect.

(5) The period referred to in subsection (4) shall commence on a date no earlier than the date of the order and no later than 28 days after the date of the order and shall not exceed 10 years.

(6) A person against whom an application for a disqualification order is made may appear and give evidence or call witnesses on the hearing of the application.

## Matters for determining unfitness of directors

**263.** Without limiting section 262(1)*(c)*(ii), in determining whether a person's conduct as a director, voluntary liquidator or receiver of a company makes him or her unfit to be concerned in the promotion, formation or management of companies or in their liquidation or dissolution, the Court shall, as respects his or her conduct as a director, voluntary liquidator or receiver of that company, have regard in particular to—

*(a)* any misfeasance or breach of any fiduciary or other duty by him or her in relation to the company;

*(b)* any misapplication or retention by him or her of, or any conduct by the director giving rise to an obligation to account for, any money or other assets of the company;

*(c)* the extent of his responsibility for the company entering into any transaction liable to be set aside under Part VIII;

*(d)* in the case of a director—

(i) where the company or the board has persistently failed to comply with the BVI Business Companies Act, as the case may be, the extent of his or her responsibility for such failure; *(Amended by Act 16 of 2004)*

(ii) the extent of his or her responsibility for the causes of the company becoming insolvent; and

(iii) the extent of his or her responsibility for any failure by the company to supply any goods or services which have been paid for (in whole or in part);

*(e)* his or her failure to comply with any obligation imposed on him or her under this Act; and

*(f)* in the case of a voluntary liquidator, any failure to comply with section 209 or 210 of the BVI Business Companies Act. *(Amended by Act 16 of 2004)*

### Disqualification undertaking

**264.** (1) A person against whom a disqualification order could be made under section 262 may offer the Official Receiver a disqualification undertaking, whether or not the Official Receiver has made an application against him or her under that section.

(2) The Official Receiver may accept an offer made to him or her under subsection (1) if he or she considers that—

(a) there is a reasonable prospect that, on the hearing of an application under section 262, the Court would make a disqualification order against the person offering the undertaking; and

(b) it is expedient and in the public interest to accept the offer.

(3) A disqualification undertaking shall specify a period, commencing on the date of the undertaking, for which the undertaking has effect.

(4) The period referred to in subsection (3) shall not exceed 10 years.

### General provisions concerning disqualification orders and undertakings

**265.** (1) A disqualification order may be made, or a disqualification undertaking accepted, on grounds which are or include matters other than criminal convictions, notwithstanding that the person concerned may be criminally liable in respect of those matters.

(2) Where the Court makes a disqualification order, or the Official Receiver accepts a disqualification undertaking, the Official Receiver shall, within 14 days of the date of the order or of his or her acceptance of the undertaking, file a notice in the prescribed form with the Registrar.

### Variation of disqualification order or undertaking

**266.** (1) The Court may, on the application of a disqualified person, vary a disqualification order or a disqualification undertaking.

(2) Without limiting subsection (1), an order under that subsection may—

(a) reduce the period for which the disqualification order, or undertaking, is in force; or

(b) in the case of a disqualification undertaking, provide for it to cease to be in force.

(3) An application for an order under subsection (1) shall be served on the Official Receiver no less than 14 days prior to the date of the hearing and the Official Receiver shall appear or be represented and is entitled to call or give evidence at the hearing.

(4) Where the Court varies a disqualification order or undertaking, the Official Receiver shall, within 14 days of the date of the order, file a notice in the prescribed form with the Registrar.

*Insolvency Act*

## Offence provisions

**267.** A disqualified person who engages in a prohibited activity commits an offence.

## Liability for engaging in prohibited activity

**268.** (1) A disqualified person incurs personal liability for the debts of a company in accordance with subsection (2) if, without the leave of the Court—

> *(a)* he or she is involved in the management of a company; or

> *(b)* as a person involved in the management of a company, he or she acts on the instructions of a person he or she knows to be a disqualified person or an undischarged bankrupt.

(2) Subject to subsection (3), the liability of a person to whom subsection (1) applies is—

> *(a)* to a liquidator of the company for every outstanding liability; and

> *(b)* to a creditor of the company for a liability to that creditor, incurred by the company at a time when subsection (1) applies to him or her.

(3) A creditor may not take action against a person under subsection (2)*(b)* if the company is in liquidation.

(4) For the purposes of subsection (1), a person is involved in the management of a company if—

> *(a)* he or she is a director of the company; or

> *(b)* he or she  is concerned, whether directly or indirectly, or takes part, in the management of the company.

(5) For the purposes of this section, a person who, as a person involved in the management of a company, has at any time acted on instructions given without the leave of the court by a person whom he or she knew at that time to be a disqualified person or to be an undischarged bankrupt is presumed, unless the contrary is shown, to have been willing at any time thereafter to act on any instructions given by that person.

## Official Receiver to appear on certain applications

**269.** The Official Receiver shall appear and call the attention of the Court to any matters which seem to him or her to be relevant, and may himself or herself give evidence or call witnesses on the hearing of—

> *(a)* an application by the Official Receiver for a disqualification order;

> *(b)* an application made by any person for leave under this Part.

## Register of disqualification orders

**270.** (1) The Registrar shall register in a Register of Disqualification Orders and Undertakings to be maintained by him or her for the purpose of—

*(a)* each disqualification order or undertaking in respect of which notice is filed under section 265; and

*(b)* each variation of a disqualification order or undertaking in respect of which notice is filed under section 266.

(2) When a disqualification order or undertaking ceases to be in force, the Registrar shall delete the entry from the Register.

(3) The Register of Disqualification Orders and Undertakings shall be open to inspection on payment of such fee as may be prescribed.

(4) No person shall be construed as having knowledge that another person is a disqualified person by virtue of an entry in the Register of Disqualification Orders.

## Duties of office holders

**271.** (1) If it appears to the liquidator, administrator or administrative receiver of a company that the conduct of a director or former director of the company, either taken alone or taken together with his or her conduct as a director of any other company or companies, makes him or her unfit to be concerned in the management of companies, he or she shall, as soon as practicable, prepare a written report in the prescribed form and send it to the Official Receiver. *(Amended by Act 11 of 2004)*

(2) The Official Receiver may by notice in writing require a liquidator, administrator or administrative receiver who has sent him or her a report under subsection (1) to—

*(a)* provide him or her with such information or explanations, or

*(b)* to produce such books, records or other documents; as he or she may reasonably require for considering or preparing an application for an order under section 262.

(3) If a liquidator, administrator or administrative receiver fails to comply with a notice issued under subsection (2), the Court may, on the application of the Official Receiver, make an order directing compliance within the period specified in the order.

(4) The Court may order that the costs of and incidental to an application under subsection (3) shall be borne by the person against whom the order is made.

(4A) A liquidator, administrator or administrative receiver who prepares a report under subsection (1) shall not disclose the report to the creditors' committee, if any, or to any person other than the Official Receiver. *(Inserted by Act 11 of 2004)*

(4B) Subsection (4A) does not prevent a liquidator, administrator or administrative receiver disclosing the report to any person properly employed or appointed by him or her, or acting for him or her, in the liquidation, administration or administrative receivership. *(Inserted by Act 11 of 2004)*

(4C) A report provided to the Official Receiver under subsection (1) shall, in the absence of fraud or malice, be absolutely privileged for the purposes of the law of defamation. *(Inserted by Act 11 of 2004)*

(4D) Subsection (4C) shall not apply to the extent that the liquidator, administrator or administrative receiver, or a person to whom the report is disclosed under subsection (4B), discloses the report to another person in breach of subsection (4A). *(Inserted by Act 11 of 2004)*

(5) A person who fails to comply with an order made under subsection (3) commits an offence.

<div align="center">

PART XI

GENERAL PROVISIONS WITH REGARD TO COMPANIES
THAT ARE INSOLVENT OR IN LIQUIDATION

**Division 1**

*General*

</div>

## Interpretation

**272.** (1) Subject to subsection (2), in this Part "office holder", in respect of a company, means its administrator, its liquidator, its provisional liquidator or its administrative receiver.

(2) In Division 3, "office holder" has the meaning specified in section 281. *(Amended by Act 11 of 2004)*

## Application to Court concerning office holder

**273.** A person aggrieved by an act, omission or decision of an office holder may apply to the Court and the Court may confirm, reverse or modify the act, omission or decision of the office holder.

## Company's books

**274.** Where a company is in administration or liquidation, all documents of the company and of the administrator or liquidator are, as between the members of the company, *prima facie* evidence of the truth of all matters purporting to be recorded in them.

## Order to deliver assets and documents

**274A.** (1) Where any person has in his or her possession or control any assets or documents to which the company appears to be entitled, the Court may, on the application of the office holder, require that person forthwith, or within such period as the Court may direct, to pay, deliver, convey, surrender or transfer the assets or documents to the office holder.

(2) Subsection (3) has effect where the office holder—

    *(a)* seizes or disposes of any asset which is not an asset of the company; and

    *(b)* at the time of seizure or disposal believes, and has reasonable grounds for believing, that he or she is entitled, whether in

pursuance of an order of the Court or otherwise, to seize or dispose of that asset.

(3) In the circumstances specified in subsection (2), the office holder—

*(a)* is not liable to any person in respect of any loss or damage resulting from the seizure or disposal except in so far as that loss or damage is caused by the office holder's own negligence; and

*(b)* has a lien on the asset, or the proceeds of its sale, for such expenses as were incurred in connection with the seizure or disposal.

*(Inserted by Act 11 of 2004)*

## Division 2

### *Statement of Affairs*

## Interpretation for this Division

**275.** (1) In this Division—

"office holder" *(Repealed by Act 11 of 2004)*

"relevant period" means the period of 2 years prior to—

*(a)* in the case of a company in administration, the date of the administration order;

*(b)* in the case of a company in liquidation, the date of the appointment of the liquidator;

*(c)* where a provisional liquidator has been appointed, the date of his or her appointment; and

*(d)* where an administrative receiver has been appointed, the date of his or her appointment;

"relevant person" means—

*(a)* a person who is or who, within the relevant period, has been an officer of the company;

*(b)* a person who is or who, within the relevant period, has been in the employment of the company and who, in the office holder's opinion is capable of providing the information required;

*(c)* a person who is or who, within the relevant period, has been an officer of or in the employment of a company which is an officer of the company; or

*(d)* a person who, within the relevant period, has promoted the formation of the company.

(2) For the purposes of the definition of "relevant person", "employment" includes employment under a contract for services.

*Insolvency Act*  **LAW OF VIRGIN ISLANDS**

### Notice to be given by office holder

**276.** (1) Where, pursuant to a provision in this Act, an office holder requires a relevant person to prepare a statement of affairs and submit it to him or her, he or she shall send a notice to that person in the prescribed form.

(2) A notice sent under subsection (1) shall specify a date by which the statement of affairs is to be delivered to him or her, which shall be no earlier than 24 days after the date upon which the notice is sent to the relevant person.

### Statement of Affairs

**277.** (1) A statement of affairs shall be in the prescribed form and contain the particulars prescribed.

(2) Without limiting subsection (1), the following particulars shall be set out in a statement of affairs—

    *(a)* the assets and liabilities of the company;

    *(b)* the names and addresses of the creditors of the company;

    *(c)* the security interests held by creditors of the company and the dates upon which the security interests were created; and

    *(d)* such further information as may be prescribed.

(3) Subject to section 278, a relevant person required by an office holder to prepare and submit a statement of affairs shall verify the statement of affairs by affidavit and submit the statement of affairs to the office holder, together with the verifying affidavit, on or before the date specified in the notice sent to him or her under section 276(1).

(4) A relevant person who, without reasonable excuse, contravenes subsection (3) commits an offence.

### Affidavit of concurrence

**278.** (1) A relevant person required by an office holder to prepare and submit a statement of affairs may, instead, submit an affidavit of concurrence complying with the Rules.

(2) A relevant person who submits an affidavit of concurrence to an office holder on or before the date specified in the notice sent to him or her does not commit an offence under section 277(4).

### Release from duty to submit statement of affairs

**279.** (1) An office holder or the Court may, in accordance with the Rules—

    *(a)* release a person from an obligation imposed on him or her to prepare and submit a statement of affairs; or

    *(b)* extend the period of time for the submission of the statement of affairs.

(2) An order of the Court under this section may be made subject to such terms and conditions as the Court considers fit.

## Application for order of limited disclosure

**280.** (1) Where an office holder considers that it would prejudice the conduct of the insolvency proceeding for the whole or part of a statement of affairs submitted to him or her to be disclosed, he or she may apply to the Court for an order of limited disclosure in respect of the statement of affairs, or any specified part of it.

(2) The Court may, on an application under subsection (1), order that the statement of affairs or, as the case may be, the specified part of it—

*(a)* in the case of an administrative receivership, is not to be open to inspection otherwise than with leave of the Court; or

*(b)* in any other case, is not filed in Court, or that it is filed separately and that it is not to be open to inspection otherwise than with leave of the Court.

(3) An order of the Court under subsection (2) may include directions as to the delivery of documents to the Registrar and the disclosure of relevant information to other persons.

### Division 3

### *Investigation of Insolvent Company's Affairs*

*Office Holder's Powers*

## Interpretation for this Division

**281.** In this Division—

"relevant period" has the meaning specified in section 275;

"office holder", in respect of a company, means its administrator, its liquidator or its provisional liquidator and, in respect of a company in administration or liquidation or in respect of which a provisional liquidator has been appointed, includes the Official Receiver; *(Amended by Act 11 of 2004)*

## Power to obtain information

**282.** (1) An office holder may, by notice in writing, require a person specified in subsection (2)—

*(a)* to provide him or her with such information concerning the company, including the promotion, formation, business, dealings, accounts, assets, liabilities or affairs as he or she reasonably requires;

*(b)* to attend on him or her at such reasonable time and at such place as may be specified in the notice; or

*(c)* to be examined on oath or affirmation by him or her, or by his or her legal practitioner, on any matter referred to in paragraph *(a)*.
*(Amended by Act 11 of 2004)*

(2) A notice under subsection (1) may be sent to—

*(a)* an officer or former officer of the company;

*(b)* a member or former member of the company;

*(c)* a person who was involved in the promotion or formation of the company;

*(d)* a person who is, or within the relevant period has been, employed by the company, including a person employed under a contract for services;

*(e)* a person who is, or at any time has been, a receiver, accountant or auditor of the company;

*(f)* a person who is or who, at any time has been, an officer of or in the employment of a company which is an officer of the company; or

*(g)* if the office holder is the Official Receiver or a liquidator or provisional liquidator to any person who has acted as administrator, liquidator or provisional liquidator of the company. *(Amended by Act 11 of 2004)*

(3) A person who receives a notice under subsection (1) and who, without reasonable excuse, fails to comply with the notice, commits an offence.

## Examination by office holder

**283.** (1) This section applies to the examination of a person under section 282(1)*(c)* by an office holder.

(2) The office holder, or the legal practitioner conducting the examination on his or her behalf, may administer an oath to, or take the affirmation of, a person to be examined.

(3) A person required to be examined is entitled to be represented by a legal practitioner.

(4) The office holder shall ensure that the examination is recorded in writing or by means of a tape recorder or other similar device.

*Examination Before Court*

## Application for examination before Court

**284.** (1) Where a company is in liquidation, an application may be made to the Court, *ex parte*, by the liquidator or by the Official Receiver, for an order that a person specified in subsection (2) appear before the Court for examination concerning the company, or a connected company, including the promotion, formation, business, dealings, accounts, assets, liabilities or affairs of the company or connected company.

(2) An application under subsection (1) may be made in respect of—

*(a)* a person specified in section 282(2); or

*(b)* any other person who the applicant considers is capable of giving information concerning the company or a connected company; or *(Amended by Act 11 of 2004)*

*(c)* any other person who the applicant knows or suspects has in his or her possession or control any asset of the company or is indebted to the company. *(Inserted by Act 11 of 2004)*

(3) An application under subsection (1) shall state whether the applicant seeks a public or a private examination.

## Order for examination

**285.** (1) In this section, "examinee" means the person to be examined before the Court.

(2) On hearing an application made under subsection 284, the Court may order the examinee to appear before the Court to be examined.

(3) An order under subsection (1)—

*(a)* shall direct the examinee to appear before the Court to be examined at a venue specified in the order;

*(b)* shall state whether the examination is to be a public or a private examination;

*(c)* may require the person concerned to produce at the examination any books, records or other documents in his or her possession or control that relate to the company, or a connected company, including the promotion, formation, business, dealings, accounts, assets, liabilities or affairs of the company or connected company;

*(d)* may provide for an alternative method of service of the order on the examinee;

*(e)* shall state the action that may be taken against a person if he or she does not appear before the Court as required by the order; and

*(f)* where the examination is to be a public examination, may require the examination to be advertised, specifying the method of such advertisement.

(4) Where the Court makes an order under subsection (2), the applicant shall, forthwith serve a sealed copy of the order on the examinee and, where the liquidator is not the Official Receiver

*(a)* if the applicant is the liquidator of the company, send a sealed copy of the order to the Official Receiver; or *(Amended by Act 11 of 2004)*

*(b)* if the applicant is the Official Receiver, send a sealed copy of the order to the liquidator of the company. *(Amended by Act 11 of 2004)*

(5) Where an order under subsection (2) is for the public examination of an examinee, the applicant shall give not less than 14 days notice of the examination to each creditor and member of the company.

(6) The Court may as part of an order made under this section, or at any subsequent time, make one or more of the following directions—

*(a)* a direction specifying the matters upon which the examinee may be examined; and

*Insolvency Act*    LAW OF
VIRGIN ISLANDS

Revision Date: 1 Jan 2020

*(b)* a direction specifying the procedures to be followed at the examination.

## Conduct of examination

**286.** (1) This section applies to an examination held pursuant to an order made under section 285.

(2) An examinee shall be examined on oath and he or she shall answer such questions as the Court may put, or allow to be put to him or her.

(3) Subject to subsection (2), an examination is conducted by the applicant, or by his or her legal practitioner, and the person examined is entitled to be represented by a legal practitioner who may put such questions to the examinee as the Court may allow for the purpose of explaining or qualifying answers given by him or her.

(4) The examinee may also be examined—

*(a)* if the applicant is the Official Receiver, by the liquidator; or

*(b)* if the applicant is the liquidator of the company, by the Official Receiver.

(5) At a public examination questions may, with the leave of the Court, be put to the examinee by any creditor or member of the company present at the examination or by the legal practitioner representing such creditor or member.

(6) An examination shall be recorded in writing and the  examinee  shall sign the record.

(7) Subject to section 287, the written record of an examination is admissible in evidence in any proceedings under this Act other than proceedings for a disqualification order under Part X. *(Amended by Act 11 of 2004)*

## Incriminating answers and admissibility of record

**287.** (1) An examinee is not excused from answering a question put to him or her by an office holder under section 282 or at an examination held pursuant to an order made under section 285 on the ground that the answer may incriminate him or her or tend to incriminate him or her.

(2) The record of an examination held under section 282 or pursuant to an order made under section 285 is not admissible as evidence in any criminal proceedings against the examinee except where he or she is charged with the offence of perjury.

## Offence

**288.** (1) A person who, without reasonable excuse, fails to attend an examination ordered to be held under section 285, commits an offence.

(2) Where a person without reasonable excuse fails at any time to attend an examination ordered to be held under section 285, or there are reasonable grounds for believing that a person has absconded, or is about to abscond, with a view to avoiding or delaying his or her examination, the Court may cause a warrant to be issued to a police officer or a prescribed officer of the Court—

*(a)* for the arrest of that person; and

   *(b)* for the seizure of any books, papers, records, money or goods in that person's possession.

         *(Amended by Act 11 of 2004)*

   (3) In such a case the Court may authorise the person arrested under the warrant to be kept in custody, and anything seized under such a warrant to be held, in accordance with the Rules, until such time as the court may order.

## Division 4

### *Offence Provisions*

## Fraudulent conduct

  **289.** (1) Where a liquidator of a company is appointed under section 159, a person who is or has been an officer of the company is deemed to have committed an offence if, at any time whilst an officer or during the period of 12 months preceding the commencement of the liquidation, he or she has—

   *(a)* made or caused to be made any gift or transfer of, or charge on, or has caused, permitted or acquiesced in the levying of any execution against the company's assets; or

   *(b)* has concealed or removed any of the company's assets since, or within, 60 days of the date of any unsatisfied judgment or order for the payment of money obtained against the company.

         *(Amended by Act 11 of 2004)*

  (2) A person is not guilty of an offence under this section—

   *(a)* by reason of conduct constituting an offence under subsection (1)*(a)* which occurred more than 5 years before the commencement of the liquidation; or

   *(b)* if he or she proves that, at the time of the conduct constituting the offence, he or she had no intent to defraud the company's creditors.

## PART XII

### BANKRUPTCY

### *Preliminary*

## Interpretation

  **290.** In this Part—

"bankrupt" means the individual against whom a bankruptcy order is made;

"bankruptcy offence" means an offence under Part XIII;

"debtor" means the individual to whom an application for a bankruptcy order relates;

"prescribed minimum" means the minimum amount of the debt for which a statutory demand may be issued under section 155; and

*Insolvency Act* **LAW OF VIRGIN ISLANDS**

Revision Date: 1 Jan 2020

"trustee" means the bankruptcy trustee of a bankrupt.

## Application of this Part to Official Receiver

**291.** Where the Official Receiver is appointed as the trustee of a bankrupt, the provisions of this Act that apply to a trustee apply to the Official Receiver, as trustee, unless otherwise provided.

*Bankruptcy Order*

## Meaning and duration of bankruptcy order

**292.** (1) A bankruptcy order is an order of the Court vesting the assets of an individual in a bankruptcy trustee appointed by the Court for the purposes of division amongst his or her creditors in accordance with this Part.

(2) The bankruptcy of an individual commences at the time at which the bankruptcy order is made and continues until it is terminated by the discharge of the bankrupt under section 376 or 379.

(3) Throughout the period referred to in subsection (2), the individual is referred to in this Act as "in bankruptcy".

## Conditions for making of bankruptcy order

**293.** (1) The Court shall not make a bankruptcy order against a debtor under this Part unless it is satisfied—

(a) that on the date that the application was filed, the debtor—

(i) was ordinarily resident in the Virgin Islands;

(ii) was personally present in the Virgin Islands;

(iii) was carrying on business in the Virgin Islands, either personally or by means of an agent or manager;

(iv) was a member of a partnership carrying on business in the Virgin Islands by means of a partner or partners or of an agent or manager; or

(v) had a place of residence or a place of business in the Virgin Islands;

*(Amended by Act 11 of 2004)*

(b) that the debtor has or appears to have assets in the Virgin Islands; or

(c) that there is a reasonable prospect that the making of a bankruptcy order will benefit the creditors of the debtor.

(2) For the purposes of subsection (1)(a)(iii) and (iv), a debtor or a partnership is deemed to be carrying on business in the Virgin Islands if liabilities incurred in the course of a business formerly carried on in the Virgin Islands remain unpaid.

### Persons who may apply for a bankruptcy order

**294.**  Application to the Court for a bankruptcy order in respect of a debtor may be made—

> *(a)* by the debtor himself or herself under section 295;
>
> *(b)* by a creditor of the debtor, or by one or more of his or her creditors jointly, under section 296; or *(Amended by Act 11 of 2004)*
>
> *(c)* by the supervisor of an arrangement or by a creditor of the debtor under section 301. *(Amended by Act 11 of 2004)*

### Application by debtor

**295.**  (1) The Court may make a bankruptcy order against a debtor on the application of the debtor himself or herself if it is satisfied—

> *(a)* that the debtor is unable to pay his or her debts as they fall due;
>
> *(b)* that the unsecured liabilities of the debtor exceed the prescribed minimum; and
>
> *(c)* that, if a bankruptcy order is made, the value of the debtor's assets available for distribution to his or her unsecured creditors will exceed the prescribed minimum.

(2) An application for a bankruptcy order filed by a debtor under subsection (1) shall be accompanied by a verified statement of his or her assets and liabilities. *(Amended by Act 11 of 2004)*

### Creditor's application

**296.**  (1) A creditor's application for a bankruptcy order shall be made in respect of a liability or liabilities where, at the time of the application—

> *(a)* the amount of the liability, or the aggregate amount of the liabilities, exceeds the prescribed minimum; and
>
> *(b)* the liability, or each of the liabilities, is for a liquidated sum payable to the applicant creditor immediately.

(2) An application under subsection (1) may not be made in respect of a liability incurred outside the Virgin Islands unless the liability is payable by the debtor to the creditor by virtue of a judgment or award enforceable by execution in the Virgin Islands.

### Substitution of applicant

**297.**  (1) In the circumstances specified in subsection (2), the Court may, by order, substitute as applicant in a creditor's application for a bankruptcy order, a creditor—

> *(a)* who has given notice of his or her intention to appear at the hearing of the application in accordance with the Rules;
>
> *(b)* who would otherwise have been entitled to make such an application on the date that the original application was made; and

*Insolvency Act*

*(c)* who consents to being substituted as the applicant.

(2) The Court may make a substitution order under subsection (1) if it considers it appropriate to do so—

*(a)* because the applicant applies to withdraw the application or consents to it being dismissed;

*(b)* because the Court considers that the application is not being diligently proceeded with;

*(c)* where the applicant is not entitled to make the application; or

*(d)* for any other reason.

### Application by secured creditor

**298.** (1) Where the applicant for a bankruptcy order is a secured creditor, he or she shall in his or her application state the full amount of the liability of the debtor to him or her and—

*(a)* state that he or she is willing, in the event of a bankruptcy order being made, to give up his or her security interest for the benefit of the other creditors of the bankrupt; or

*(b)* give an estimate of the value of his security interest and make the application in respect of the full amount of the liability of the debtor to him or her less the estimated value of his or her security interest.

(2) In a case falling within subsection (1)*(b)*, the secured creditor is treated as an unsecured creditor in respect of the unsecured liability of the debtor to him or her

### Secured creditor failing to disclose security interest

**299.** (1) Subject to subsection (2), a secured creditor who fails to disclose his or her security interest in an application for a bankruptcy order against a debtor is, in the event that a bankruptcy order is made on the application, deemed to have given up his or her security interest for the benefit of the other creditors of the bankrupt.

(2) If on the application of a secured creditor the Court is satisfied that the failure of the creditor to disclose his or her security interest was inadvertent or due to an honest mistake, it may disapply subsection (1) subject to such terms and conditions as it considers appropriate.

(3) Where subsection (1) applies, the secured creditor concerned—

*(a)* is not entitled to enforce his security interest against the estate of the bankrupt or to retain any proceeds from the realisation of the security interest; and

*(b)* shall execute such document of release as is required by the trustee or account and pay over to the trustee all proceeds from any realisation of his security interest.

(4) Where a secured creditor fails to execute a document of release as required by subsection (2)*(b)*, the trustee may apply to the Court for an order that the trustee may execute the document on his or her behalf and, where the Court

makes such an order, the execution of the document by the trustee takes effect as if executed by the secured creditor.

(5) A secured creditor who fails to account or pay to the trustee the proceeds from any realisation of his or her security interest in accordance with subsection (3)*(b)* commits an offence.

### Hearing of creditor's application

**300.** (1) Subject to subsection (2), the Court may make a bankruptcy order on an application made under section 296 if it is satisfied that the debtor is insolvent within the meaning of section 8(2) and—

> *(a)* where the debtor has failed to comply with the requirements of a statutory demand, the demand was made by the creditor making the application; or
>
> *(b)* where execution or other process has been returned unsatisfied, the debt is payable to the creditor making the application.

(2) The Court shall not make a bankruptcy order under subsection (1) unless it is satisfied that—

> *(a)* the debt, or one of the debts, in respect of which the application is made is a debt which, having been payable at the date of the application, has neither been paid nor secured nor compounded for; and
>
> *(b)* where the debtor does not appear at the hearing, he or she has been served with the application.

(3) The Court may dismiss an application made under section 296 if—

> *(a)* it is not satisfied with the proof of the liability or liabilities in respect of which the application is made;
>
> *(b)* it is not satisfied with the proof of the service of the application on the debtor;
>
> *(c)* it is satisfied that the debtor is able to discharge all his or her liabilities;
>
> *(d)* it is satisfied that the debtor has made an offer to secure or compound for a liability in respect of which the application is made, the acceptance of which would have required the dismissal of the application and that offer has been unreasonably refused by the creditor making the application; or
>
> *(e)* it is satisfied that for some other sufficient reason, a bankruptcy order ought not to be made.

(4) Nothing in section 296 or in this section limits the power of the Court, in accordance with the rules, to authorise a creditor's application to be amended by the omission of any creditor or liability.

(5) Where an application is amended under subsection (4), the Court may order that the application is proceeded with as if anything done for the purposes of this section or section 296 had been done only by or in relation to the remaining creditors or debts.

*Insolvency Act*

### Application where individual creditors' arrangement in place

**301.** (1) Where an individual creditors' arrangement has been approved under Part II and has not been completed or otherwise come to an end, the Court may make a bankruptcy order against a debtor on the application of the supervisor or a creditor bound by the arrangement if it is satisfied—

> *(a)* that the debtor has failed to comply with his or her obligations under the arrangement; or

> *(b)* that information which was false or misleading in any material particular or which contained material omissions—

>> (i) was contained in any statement of assets and liabilities or other document supplied by the debtor under Part II to any person; or

>> (ii) was otherwise made available by the debtor to his or her creditors at or in connection with a meeting summoned under that Part, or

> *(c)* that the debtor has failed to do all such things as may for the purposes of the arrangement have been reasonably required of him or her by the supervisor of the arrangement. *(Amended by Act 11 of 2004)*

(2) Where a bankruptcy order is made on an application under subsection (1), any remuneration of the supervisor is a first charge on the bankrupt's estate.

### Consolidation of applications

**302.** Where 2 or more applications for bankruptcy orders are presented against the same debtor, the Court may consolidate the proceedings or any of them on such terms as it considers fit.

### Withdrawal of application

**303**. An application for a bankruptcy order may not be withdrawn except with the leave of the Court.

### Court's powers on hearing of application for bankruptcy order

**304.** On the hearing of an application for a bankruptcy order under section 295, section 296 or section 301, the Court may—

> *(a)* make a bankruptcy order;

> *(b)* if it appears appropriate to do so on the grounds that there has been a contravention of the Rules or for any other reason, dismiss the application or stay proceedings on the application on such terms and conditions as it considers fit;

> *(c)* adjourn the hearing conditionally or unconditionally; or

> *(d)* make any interim order or other order that it considers fit.

### Appointment of bankruptcy trustee

**305.** Where the Court makes a bankruptcy order it shall appoint either the Official Receiver or an eligible insolvency practitioner to be the bankruptcy trustee of the bankrupt. *(Amended by Act 11 of 2004)*

### Period within which application shall be determined

**306.** (1) Subject to subsection (2), an application for a bankruptcy order shall be determined within 3 months after it is filed.

(2) The Court may, upon such conditions as it considers fit, extend the period referred to in subsection (1) for a period of, or where it grants more than one extension for an aggregate period not exceeding, 3 months if—

> *(a)* it is satisfied that special circumstances justify the extension; and

> *(b)* the order extending the period is made before the expiry of that period or, if a previous order has been made under this subsection, that period as extended.

(3) If an application is not determined within the period referred to in subsection (1) or within that period as extended, it is deemed to have been dismissed.

*Interim Relief*

### Protection of assets after application for bankruptcy order

**307.** (1) Where an application for a bankruptcy order has been filed in respect of a debtor but not yet determined or withdrawn, the Court may, if it considers it necessary for the protection of the debtor's assets—

> *(a)* make an order directing the Official Receiver or an eligible insolvency practitioner to take control of—
>
> > (i) the debtor's assets, or any part of them; and
> >
> > (ii) such books or other documents of the debtor as may be specified in the order; and

> *(b)* make any other order in relation to the debtor's assets.

(2) An application for an order under subsection (1) may be made by—

> *(a)* the applicant for the bankruptcy order;

> *(b)* the debtor himself or herself; or

> *(c)* any creditor of the debtor.

(3) An order under subsection (1) may be made on such terms as it considers fit and may, as a condition precedent, require the applicant to deposit at Court such sum as the Court considers reasonable to cover the remuneration of the Official Receiver or the insolvency practitioner appointed.

(4) An order under subsection (1) remains in effect until the earlier of—

> *(a)* the discharge of the order by the Court of its own motion or on the application of—

    (i) the Official Receiver or eligible insolvency practitioner appointed under subsection (1)*(a)*; or

    (ii) any person specified in subsection (2); or

*(b)* the determination or withdrawal of the application for a bankruptcy order, whereupon the appointment of the Official Receiver or insolvency practitioner is terminated.

(5) On the order ceasing to have effect, the Court may give such directions or make such order with respect to the accounts of the administration of the appointee, or to any other matter, as it considers appropriate.

### Effect of order under section 307

**308.** Whilst an order under section 307(1) is in effect, unless the leave of the Court has been obtained—

*(a)* no steps may be taken to enforce any security interest over the debtor's assets;

*(b)* no steps may be taken to repossess assets that are being used or occupied by or are in the possession of the debtor; including—

    (i) goods supplied under a hire purchase, conditional sale or chattel leasing agreement; and

    (ii) goods supplied subject to a retention of title agreement; and

*(c)* no proceedings, execution or other legal process may be commenced or continued or distress levied against the debtor or his assets.

### Remuneration of person appointed under section 307

**309.** (1) The Official Receiver or the insolvency practitioner directed to take control of a debtor's assets under section 307(1) is entitled to be paid such remuneration as the Court may order applying the general principles specified in section 432. *(Amended by Act 11 of 2004)*

(2) Subject to subsections (3) and (4), the remuneration ordered to be paid under subsection (1) is payable—

*(a)* where a bankruptcy order is not made, out of the assets of the debtor;

*(b)* where a bankruptcy order is made, out of the bankrupt's estate in accordance with the prescribed priority.

(3) If a bankruptcy order is not made, the Court may order the applicant for the order under section 307 to pay or contribute to the remuneration of the Official Receiver or insolvency practitioner directed to take control of the assets under section 307(1) if it is satisfied that the applicant—

*(a)* misled the Court when making the application; or

*(b)* acted unreasonably in making the application.

(4) If the assets of the debtor are not sufficient to pay the remuneration ordered to be paid by the Court under subsection (1), the Court may order the

shortfall, or part of the shortfall, to be paid by the applicant for the order under section 307. *(Amended by Act 11 of 2004)*

(5) Unless the Court otherwise orders, where subsection (2)*(a)* applies, the Official Receiver, or the insolvency practitioner appointed under section 307, may retain out of the debtor's assets such sums or assets as are, or may be, required for meeting his remuneration.

## Examination

**310.** The Official Receiver or the insolvency practitioner directed to take control of a debtor's assets under section 307(1) may apply for an order to examine the debtor under section 369, and sections 369 to 373 apply as if—

> *(a)* references to the Official Receiver or the trustee were to the person directed to take control of the debtor's assets; and

> *(b)* references to the bankrupt and to his or her estate were to the debtor and his or her assets.

*Effect of Bankruptcy*

## Effect of bankruptcy order

**311.** On the making of a bankruptcy order, the assets comprised in the bankrupt's estate—

> *(a)* vest in his or her trustee without any conveyance, assignment or transfer; and

> *(b)* become divisible among his or her creditors in accordance with this Act.

## Power to stay or restrain proceedings

**312.** (1) An order under subsection (2) or (3) may be made—

> *(a)* after an application for a bankruptcy order has been filed against an individual but not yet determined; or

> *(b)* whilst an individual is an undischarged bankrupt.

(2) At any time during either period specified in subsection (1)—

> *(a)* the Court may stay any action, proceeding, execution, distress or other legal process against the person or the assets of the individual concerned; and

> *(b)* any court in which proceedings are pending against any individual may either stay the proceedings or allow them to continue on such terms as it thinks fit.

(3) After the making of a bankruptcy order no person who is a creditor of the bankrupt in respect of a debt that may be claimed in the bankruptcy shall—

> *(a)* have any remedy against the assets or person of the bankrupt in respect of that debt; or

*(b)* before the discharge of the bankrupt, commence any action or other legal proceedings against the bankrupt except with the leave of the court and in such terms as the court may impose.

(4) This section—

*(a)* does not affect the right of a secured creditor to enforce his or her security; and

*(b)* is subject to section 351 (enforcement procedures) and section 352 (limited right to distress).

*Bankrupt's Estate*

## Definition of bankrupt's estate

**313.** (1) Subject to subsection (2), the bankrupt's estate comprises—

*(a)* all assets belonging to or vested in the bankrupt at the date of the bankruptcy order;

*(b)* assets claimed by the trustee under section 318 or 319; and

*(c)* the capacity to exercise and to take proceedings for exercising all such powers in or over or in respect of assets as might have been exercised by the bankrupt for his or her own benefit at the date of the bankruptcy order.

(2) Subsection (1) does not apply to—

*(a)* assets held by the bankrupt on trust for any other person;

*(b)* such tools, books, vehicles and other items of equipment as are necessary to the bankrupt for use personally by him or her in his or her employment or business;

*(c)* such clothing, bedding, furniture, household equipment and provisions as are necessary for satisfying the basic domestic needs of the bankrupt and his or her family; and

*(d)* any asset of the bankrupt which is excluded from his or her estate under any other enactment.

(3) The assets comprised in a bankrupt's estate are divisible amongst his or her creditors in accordance with this Part.

(4) Assets comprised in a bankrupt's estate are subject to the rights of any person other than the bankrupt in relation to those assets, whether as a secured creditor of the bankrupt or otherwise, but disregarding—

*(a)* any rights given up under section 298(1)*(a)*; and

*(b)* any rights which have been otherwise given up in accordance with the rules.

(5) Unless the context otherwise requires, a reference in this Part to the assets of the bankrupt means the assets comprised in the bankrupt's estate.

### Acquisition by trustee of control of bankrupt's estate

**314.** (1) A trustee shall forthwith after the making of a bankruptcy order take possession of—

    *(a)* all documents which relate to the bankrupt's estate or affairs and which belong to him or her or are under his or her control, including documents which would be privileged from disclosure in any proceedings; and

    *(b)* all assets of the bankrupt that are capable of manual delivery.

    (2) A trustee is, in relation to and for the purposes of acquiring or retaining possession of the assets of the bankrupt, in the same position as a receiver of the assets appointed by the Court, and the Court may, on his or her application, enforce the acquisition or retention accordingly.

    (3) Where any part of the bankrupt's estate consists of stock, shares or shares in a ship or any other assets transferable in the books of a company, office or person, the trustee may exercise the right to transfer the assets to the same extent as the bankrupt might have exercised it if he or she had not become bankrupt.

    (4) Where any part of the estate consists of things in action, they are deemed to have been assigned to the trustee.

    (5) Notice of the deemed assignment of things in action under subsection (4) need not be given except in so far as it is necessary, in a case where the deemed assignment is from the bankrupt himself or herself, for protecting the priority of the trustee. *(Amended by Act 11 of 2004)*

### Goods subject to pledge etc.

**315.** (1) Where any goods of a bankrupt are held by any person by way of pledge, pawn or other security, the trustee of the bankrupt may, after giving notice of his or her intention to do so, inspect the goods.

    (2) Where a person receives a notice under subsection (1), he or she is not entitled to realise his or her security unless he or she has given the trustee a reasonable opportunity to inspect the goods and, if the goods are comprised in the estate of the bankrupt, to exercise the bankrupt's right of redemption.

### Duties of bankrupt in relation to his assets and affairs

**316.** (1) Where a bankruptcy order has been made, the bankrupt shall—

    *(a)* make discovery of and deliver to his or her trustee all the assets comprised in his estate that are in his or her possession or control; and

    *(b)* deliver to his or her trustee all documents in his or her possession or control which relate to his or her assets or affairs, including any documents which, in any proceedings, would be privileged from disclosure.

    (2) Where the bankrupt is unable to deliver any assets comprised in his or her estate to his trustee, the bankrupt shall do everything reasonably required by his or her trustee to protect those assets.

*Insolvency Act*

(3) The bankrupt shall—

(a) give his or her trustee such information concerning his or her assets and affairs;

(b) attend on him or her at such times; and

(c) do all such other things, as his or her trustee may reasonably require for the purposes of carrying out his or her functions under this Act.

(4) If at any time after the time of the bankruptcy order any assets are acquired by, or devolve on, the bankrupt or there is an increase in the bankrupt's income, he or she shall, within the prescribed time period, give the trustee notice of the assets or of the increased income.

(5) Subsection (3) applies to a bankrupt after his or her discharge.

(6) If the bankrupt without reasonable excuse fails to comply with any obligation imposed by this section, he or she commits an offence.

## Delivery up by other persons

**317.** (1) Any person who holds assets to the account of, or for, the bankrupt shall pay or deliver to the trustee the assets in his or her possession or under his or her control unless he or she is, by law, entitled to retain the assets against the bankrupt or the trustee.

(2) Any person who, without reasonable excuse, fails to comply with any obligation imposed by this section, commits an offence.

## After-acquired assets

**318.** (1) Subject to sections 313(2) and 321, the trustee may by notice in writing served on the bankrupt claim for the bankrupt's estate any assets which have been acquired by, or have devolved upon, the bankrupt after the date of the bankruptcy order but prior to the date of his discharge.

(2) Subject to subsection (3), on the service of a notice under subsection (1) on the bankrupt, the assets to which the notice relates vest in the trustee as part of the bankrupt's estate and the trustee's title to those assets relates back to the time at which the assets were acquired by, or devolved upon, the bankrupt. *(Amended by Act 11 of 2004)*

(3) Where, whether before or after service of a notice under this section—

(a) a person acquires assets in good faith, for value and without notice of the bankruptcy, or

(b) a banker enters into a transaction in good faith and without such notice, the trustee is not in respect of those assets or that transaction entitled by virtue of this section to any remedy against that person or banker, or any person whose title to any assets derives from that person or banker.

(4) For the purposes of this section, a reference to "assets" does not include any asset which, as part of the bankrupt's income, may be the subject of an income payments order under section 322.

*Insolvency Act*                                                    173

### Vesting in trustee of certain items of excess value

**319.** (1) Subject to section 321, where—

*(a)* assets are excluded from the bankrupt's estate by virtue of section 313(2)*(b)* or *(c)*, and

*(b)* it appears to the trustee that the realisable value of those assets or any of them exceeds the cost of a reasonable replacement,

the trustee may, by notice in writing served on the bankrupt, claim the asset or assets for the bankrupt's estate.

(2) On the service on the bankrupt of a notice under subsection (1), the assets to which the notice relates vest in the trustee as part of the bankrupt's estate; and, except against a purchaser in good faith, for value and without notice of the bankruptcy, the trustee's title to those assets has relation back to the date of the bankruptcy order.

(3) The trustee shall apply funds comprised in the estate to the purchase by or on behalf of the bankrupt of a reasonable replacement for any assets vested in him or her under this section and the duty imposed by this subsection has priority over the obligation of the trustee to distribute the estate.

(4) For the purposes of this section, an asset is a reasonable replacement for another asset if it is reasonably adequate for meeting the needs met by the other asset.

### Money provided *in lieu* of sale

**320.** (1) A third party may offer the trustee a sum of money to enable the bankrupt to be left in possession of assets which would otherwise vest in the trustee under section 319.

(2) The trustee may accept an offer made under subsection (1) if he or she is satisfied that it is a reasonable offer and that the estate will benefit to the extent of the value of the assets in question less the cost of a reasonable replacement.

*(Substituted by Act 11 of 2004)*

### Time limit for notice under sections 318 or 319

**321.** (1) Except with the leave of the Court, a notice may not be served—

*(a)* under section 318, after the end of the period of 42 days beginning with the day on which it first came to the knowledge of the trustee that the assets in question had been acquired by, or had devolved upon, the bankrupt;

*(b)* under section 319, after the end of the period of 42 days beginning with the day on which the assets in question first came to the knowledge of the trustee.

*(Amended by Act 11 of 2004)*

(2) For the purposes of this section—

*(a)* anything which comes to the knowledge of the trustee is deemed in relation to any successor of his or her as trustee to have come to the knowledge of the successor at the same time; and

*(b)* anything which comes to the knowledge of a person before he or she is the trustee, otherwise than under paragraph *(a)*, is deemed to come to his or her knowledge on his or her appointment taking effect. *(Amended by Act 11 of 2004)*

## Income payments orders

**322.** (1) The Court may, on the application of the trustee, make an income payments order claiming for the bankrupt's estate so much of the income of the bankrupt during the period for which the order is in force as may be specified in the order.

(2) The Court shall not make an income payments order the effect of which would be to reduce the income of the bankrupt below what appears to the Court to be necessary for meeting the reasonable domestic needs of the bankrupt and his family.

(3) An income payments order shall, in respect of any payments of income to which it is to apply, either—

*(a)* require the bankrupt to pay the trustee an amount equal to so much of that payment as is claimed by the order; or

*(b)* require the person making the payment to pay so much of it as is so claimed to the trustee, instead of to the bankrupt.

(4) *(Repealed by Act 11 of 2004)*

(5) Sums received by the trustee under an income payments order form part of the bankrupt's estate.

(6) Subject to section 379(1)*(c)*(i), an income payments order shall not be made after the discharge of the bankrupt, and if made before, shall not have effect after his or her discharge.

(7) Subject to subsection (8), for the purposes of this section, the income of the bankrupt comprises every payment in the nature of income which is from time to time made to him or her or to which he or she from time to time becomes entitled, including any payment in respect of the carrying on of any business or in respect of any office or employment and any payment under a pension scheme.

(8) The Rules may provide that pension payments paid to the bankrupt up to a maximum amount specified in the Rules are exempt from subsection (7). *(Inserted by Act 11 of 2004)*

*Bankruptcy Trustee*

## Bankruptcy trustee officer of Court

**323.** In performing his or her functions and undertaking his or her duties under this Act, a bankruptcy trustee acts as an officer of the Court.

## General duties of trustee

**324.** (1) The principal duties of a trustee are—

*(a)* to take possession of, protect and realise the bankrupt's estate; and

*(b)* to distribute the bankrupt's estate in accordance with this Act.

(2) Where the trustee is not the Official Receiver, he or she has a duty—

*(a)* to provide the Official Receiver with such information,

*(b)* to produce to the Official Receiver, and permit inspection by the Official Receiver of, such documents, and

*(c)* to give the Official Receiver such other assistance, as the Official Receiver may reasonably require for the purpose of enabling him or her to carry out his functions in relation to the bankruptcy.

(3) A trustee shall, subject to this Act and the Rules, use his or her own discretion in undertaking his duties.

(3A) If it appears to the trustee that the bankrupt is carrying on or has carried on unlicensed financial services business—

*(a)* he or she shall, as soon as reasonably practicable, report the matter to the Commission; and

*(b)* for the purposes of subsection (3B), he or she shall treat the bankrupt as a regulated person.
*(Inserted by Act 11 of 2004)*

(3B) Where the bankrupt is or has been a regulated person, the trustee shall—

*(a)* send to the Commission a copy of every notice or other document that he or she is required to file with the Court or to send to a creditor of the bankrupt; and

*(b)* unless the applicant is the Commission, give the Commission notice of any application made to the Court with respect to the bankruptcy, whether the application is made by him or her or by some other person.
*(Inserted by Act 11 of 2004)*

(4) A trustee also has the other duties imposed by this Act and the Rules and such duties as may be imposed by the Court.

## Powers of trustee

**325.** (1) A trustee may—

*(a)* with the permission of the creditors' committee or court, exercise any of the powers specified in Part 1 of Schedule 4; and Schedule 4

*(b)* without that permission, exercise any of the general powers specified in Part 2 of Schedule 4.

(2) With the permission of the creditors' committee or the court, the trustee may appoint the bankrupt—

*(a)* to superintend the management of his or her estate or any part of it;

*Insolvency Act*

(b) to carry on his or her business, if any, for the benefit of his or her creditors; or

(c) in any other respect to assist in administering the estate in such manner and on such terms as the trustee may direct.

(3) A permission given for the purposes of subsection (1)*(a)* or (2) shall not be a general permission but shall relate to a particular proposed exercise of the power in question and a person dealing with the trustee in good faith and for value is not to be concerned to enquire whether any permission required in either case has been given.

(4) Subject to subsection (5), where the trustee has done anything without the permission required by subsection (1)*(a)* or (2), the Court or the creditors' committee may, for the purpose of enabling him or her to meet his or her expenses out of the bankrupt's estate, ratify what the trustee has done.

(5) The creditors' committee shall not ratify the trustee's actions under subsection (4) unless it is satisfied that the trustee acted in a case of urgency and sought the committee's ratification without undue delay.

(6) Part 3 of Schedule 4 has effect with respect to the things which the trustee is able to do for the purposes of, or in connection with, the exercise of any of his or her powers under this Part.

(7) Where the trustee, not being the Official Receiver, in exercise of the powers conferred on him or her  by any provision in this Part—

(a) disposes of any asset comprised in the bankrupt's estate to an associate of the bankrupt, or

(b) employs a solicitor, he or she shall give notice to any creditors' committee of that exercise of his or her powers.

(8) Nothing in this Act is to be construed as restricting the capacity of the trustee to exercise any of his or her powers outside the Virgin Islands.

(9) The acts of the trustee of a bankrupt are valid notwithstanding any defect in his or her nomination, appointment or qualifications. *(Inserted by Act 11 of 2004)*

## Notice of appointment

**326.** (1) A trustee shall, within 14 days of the date of his or her appointment—

(a) advertise his or her appointment in accordance with the Rules; *(Substituted by Act 11 of 2004)*

(b) serve notice of his or her appointment on the bankrupt;

(c) if he or she has been appointed in respect of an individual who is a regulated person, serve notice of his or her appointment on the Commission;

(d) send a notice of his or her appointment to every creditor of the bankrupt; and

(e) unless the Official Receiver is the trustee, file notice of his or her appointment with the Official Receiver.

(2) An advertisement under subsection (1)*(a)* and a notice under subsection (1)*(d)* shall set out the powers of the creditors under this Part to require him or her to call a meeting of creditors.

(3) A trustee who contravenes subsection (1) or (2) commits an offence.

### Appointment of trustee in place of Official Receiver

**327.** (1) When the Official Receiver is the trustee of a bankrupt's estate the Court may, on his or her application, appoint an eligible insolvency practitioner to act as trustee in his or her place.

(2) An application may be made under subsection (1) notwithstanding that the Court has refused to make an appointment on a previous application by the Official Receiver.

### Removal of trustee

**328.** (1) The Court may, on application by a person specified in subsection (2) or on its own motion, remove a trustee from office if—

*(a)* the trustee—

    (i) is not eligible to act as an insolvency practitioner in relation to the bankrupt;

    (ii) breaches any duty or obligation imposed on him or her by or owed by him or her under this Act, the Rules or the Regulations made under section 486 or, in his or her capacity as trustee, under any other enactment or law in the Virgin Islands; or *(Amended by Act 11 of 2004)*

    (iii) fails to comply with any direction or order of the Court made in relation to the bankruptcy; or

*(b)* the Court is satisfied that—

    (i) the trustee's conduct of the bankruptcy is below the standard that may be expected of a reasonably competent trustee;

    (ii) the trustee has an interest that conflicts with his or her role as trustee; or

    (iii) that for some other reason he or she should be removed as trustee.

(2) An application to the Court to remove a trustee from office may be made by—

*(a)* the creditors' committee, if any;

*(b)* a creditor of the bankrupt; or

*(c)* the Official Receiver.

(3) Where the Court removes a trustee from office under this section—

*(a)* if, following his or her removal, there is at least one trustee remaining in office, the Court may appoint an eligible insolvency practitioner as trustee in his or her place; or *(Amended by Act 11 of 2004)*

*(b)* if the trustee removed was the sole trustee of the bankrupt, the Court shall appoint the Official Receiver or an eligible insolvency practitioner as trustee in his or her place. *(Amended by Act 11 of 2004)*

(4) On the hearing of an application under this section, the Court may make any interim or other order it considers fit.

## Resignation of trustee

**329.** (1) A trustee—

*(a)* shall resign if he or she  is no longer eligible to act as an insolvency practitioner in relation to the bankrupt; but

*(b)* otherwise may only resign in accordance with this section.

(2) Where a trustee resigns under subsection (1)*(a)*, he or she shall send a notice of his or her resignation, to the creditors of the bankrupt and to the Official Receiver, who shall file a copy of the notice with the Court, and his or her resignation takes effect from the date that the notice is filed by the Official Receiver with the Court. *(Amended by Act 11 of 2004)*

(3) A trustee may resign in accordance with subsection (5)—

*(a)* if he or she intends to cease to be in practice as an insolvency practitioner;

*(b)* if there is some conflict of interest or change of personal circumstances that precludes or makes impracticable the further discharge by him or her of his or her duties; or

*(c)* on the grounds of ill health.

(4) Notwithstanding subsection (3), where joint trustees are appointed, one or more of the joint trustees may resign in accordance with subsection (5) if—

*(a)* all the joint trustees are of the opinion that it is no longer necessary or expedient for the resigning trustee or trustees to continue in office; and

*(b)* at least one of them will remain in office.
*(Amended by Act 11 of 2004)*

(5) Where a trustee intends to resign on one of the grounds referred to in subsection (3) or under subsection (4), he or she shall call a meeting of creditors for the purpose of accepting his or her resignation as trustee.

(6) If, at the meeting called under subsection (5), the creditors resolve to accept the resignation of the trustee, he or she shall send a notice of his or her resignation to the creditors of the bankrupt and to the Official Receiver, who shall file a copy of the notice with the Court, and his or her resignation takes effect from the date that the notice is filed by the Official Receiver with the Court. *(Amended by Act 11 of 2004)*

(6A) If the creditors refuse or fail to accept the resignation of the trustee, he or she may apply to the Court for leave to resign in accordance with the Rules. *(Inserted by Act 11 of 2004)*

(7) This section does not apply to the Official Receiver when acting as the trustee of a bankrupt.

## Appointment of replacement trustee

**330.** (1) Where a trustee dies or resigns under section 329, the Court, on the application of a person specified in subsection (2) or on its own motion—

    *(a)* if there is at least one trustee remaining in place, may appoint an eligible insolvency practitioner as trustee in his or her place; or

    *(b)* if the trustee who has died or resigned was the sole trustee of the bankrupt, shall appoint the Official Receiver or an eligible insolvency practitioner in his or her place. *(Substituted by Act 11 of 2004)*

(2) An application under subsection (1) may be made—

    *(a)* by any continuing trustee;

    *(b)* by the creditors' committee, if any; or

    *(c)* by the Official Receiver.

(3) Where there is a vacancy in the office of trustee, for whatever reason, the Official Receiver is trustee until the vacancy is filled.

## Remuneration of trustee

**331.** The remuneration payable to a trustee shall be fixed applying the principles specified in section 432. *(Amended by Act 11 of 2004)*

## General control of trustee by the Court

**332.** (1) A person aggrieved by an act, omission or decision of a trustee may apply to the Court and the Court may confirm, reverse or modify the act, omission or decision of the trustee.

(2) A trustee may apply to the Court for directions in relation to any particular matter arising under the bankruptcy.

*Administration by Trustee*

## Meetings of creditors

**333.** (1) A trustee may at any time call a meeting of the creditors of the bankrupt—

    *(a)* by sending a notice of the meeting by post to every creditor not less than 7 days before the date upon which the meeting is to be held; and

    *(b)* by advertising the meeting.

(2) Notwithstanding subsection (1), the trustee shall call a meeting of creditors if—

    *(a)* a meeting is requisitioned by the creditors of the bankrupt in accordance with subsection (3); or

*(b)* he or she is directed to do so by the Court.

(3) A creditors' meeting may be requisitioned in accordance with the Rules by 25% in value of the creditors of the bankrupt.

(4) The trustee may, if he or she considers it appropriate, by written notice, require the bankrupt to attend a creditors' meeting called under this section. *(Inserted by Act 11 of 2004)*

(5) The bankrupt commits an offence if—

*(a)* he or she receives a notice to attend a creditors' meeting under subsection (4); and

*(b)* without reasonable excuse, he or she fails to attend the meeting.
*(Inserted by Act 11 of 2004)*


*Claims and Distribution of Estate*

### Distribution of bankrupt's estate

**334.** (1) The bankrupt's estate shall be applied—

*(a)* in paying, in priority to all other claims, the costs and expenses properly incurred in the bankruptcy in accordance with the prescribed priority;

*(b)* after payment of the costs and expenses of the bankruptcy, in paying the preferential claims admitted by the trustee in accordance with the provisions for the payment of preferential claims prescribed;

*(c)* after payment of the preferential claims, in paying all other claims admitted by the trustee; and

*(d)* after paying all admitted claims, in paying any interest payable under section 342.

(2) Subject to section 151, the claims referred to in subsection (1)*(c)* rank equally and, if the bankrupt's estate is insufficient to meet them all in full, they shall be paid rateably. *(Amended by Act 11 of 2004)*

### Debts to spouse

**335.** Any claims in respect of credit provided by a person who was the bankrupt's spouse at the time of the bankruptcy order, whether or not he or she was the bankrupt's spouse at the time the credit was provided—

*(a)* rank in priority after the debts and interest specified in section 334(1); and

*(b)* are payable with interest at the rate specified in section 334(1)*(d)* in respect of the period during which they have been outstanding since the date of the bankruptcy order,

and the interest payable under paragraph *(b)* has the same priority as the debts on which it is payable.

## Claims by unsecured creditors

**336.** (1) An unsecured creditor may make a claim in the bankruptcy of an individual by submitting to the trustee a written claim, signed by him or her or on his or her behalf.

(2) The trustee may require an unsecured creditor who intends to submit, or who has submitted, a claim under subsection (1)—

*(a)* to verify his or her claim by affidavit;

*(b)* to provide further particulars of his or her claim; or

*(c)* to provide him or her with documentary or other evidence to substantiate the claim.

(3) Subject to subsection (7), as soon as reasonably practicable after receiving a claim under subsection (1) from a creditor who has complied with any requirements that the trustee may have imposed under subsection (2), the trustee shall either admit or reject the claim in whole or in part. *(Amended by Act 11 of 2004)*

(4) If the trustee rejects the claim, whether in whole or in part, he or she shall as soon as practicable provide the creditor with a notice of rejection in which the reasons for the rejection of the claim shall be specified.

(5) Unless the Court otherwise orders, a creditor shall bear the costs of making a claim under this section, including the costs of complying with any requirements imposed by the trustee under subsection (2).

(6) The trustee shall not admit a claim in the bankruptcy unless it has been made in accordance with this section.

(6A) The trustee is not required to admit or reject claims under subsection (3) at any time when it appears to him or her that there are insufficient assets in the bankrupt's estate to enable a distribution to be made to unsecured creditors. *(Inserted by Act 11 of 2004)*

(7) A person who makes or authorises the making of a claim under this section knowing that—

*(a)* the claim is false or misleading in a material matter; or

*(b)* a material fact or matter has been omitted from the claim,

commits an offence.

## Variation, withdrawal and expunging of claims

**337.** (1) A claim made under section 336 may—

*(a)* be amended or withdrawn by the creditor at any time before the trustee has admitted it; and

*(b)* be amended or withdrawn by agreement between the creditor and the trustee at any time after the trustee has admitted it.

(2) The Court, on the application of the trustee or, where the trustee declines to make application under this subsection, a creditor, may expunge or amend an admitted claim if it is satisfied that the claim should not have been admitted or should be reduced.

*Insolvency Act*

## Claims by secured creditors

**338.** (1) A secured creditor may—

    *(a)* value the assets subject to the security interest and claim in the bankruptcy as an unsecured creditor for the balance of his or her debt; or

    *(b)* surrender his or her security interest to the trustee for the general benefit of creditors and claim in the bankruptcy as an unsecured creditor for the whole of his or her debt,

but he or she is not obliged to do either.

(2) A secured creditor may, at any time apply to the trustee to amend the value that he or she placed on the security interest in his or her claim.

(3) If, on receiving an application under subsection (2), the trustee is satisfied that—

    *(a)* the value placed on the security interest was an estimate made in good faith on a mistaken basis; or

    *(b)* the value of the security interest has subsequently changed,

he or she may permit the secured creditor to amend the value that he or she places on the security interest.

(4) If the trustee is dissatisfied with the value placed on a security interest by a secured creditor, whether under subsection (1)*(a)* or on an amendment under subsection (3), he or she may require the assets comprised in the security interest to be offered for sale.

(5) A sale under subsection (4) is to be on such terms and conditions as are agreed by the secured creditor and the trustee or, in default, as the Court determines.

(6) If assets are offered for sale by public auction, both the secured creditor and the trustee are entitled to bid for and purchase them.

## Redemption of security interest by trustee

**339.** (1) Where a secured creditor has claimed in a bankruptcy under section 338(1)*(a)*, the trustee may at any time give notice to the creditor that he or she proposes at the expiration of 28 days from the date of the notice to redeem the security interest at the value placed on it by the creditor.

(2) A secured creditor who receives a notice under subsection (1) may, within 21 days of the date of the notice, apply to the trustee to revise the value that he or she places on the security interest in accordance with section 338(2).

(3) At the expiration of 28 days from the date of the notice under subsection (1), the trustee may redeem the security interest at the value placed on it by the creditor unless—

    *(a)* the secured creditor has applied to the trustee to amend the value that he or she places on the security interest and that application has not been determined; or

    *(b)* the secured creditor has appealed to the Court against the refusal of the trustee to permit him or her to amend the value that he or

she places on his or her security interest, and that appeal has not been determined.

(4) Where, subsequent to a notice to redeem issued under subsection (1), the value placed by the secured creditor on his or her security interest is amended, whether with the consent of the trustee or on appeal to the Court, the trustee may only redeem the security interest at the new value.

(5) A secured creditor may, by serving a notice to elect on the trustee, require him or her to elect whether or not to exercise his or her power to redeem under this section.

(6) Where a notice to elect is served on a trustee under subsection (5), he or she is not entitled to redeem the security interest unless he or she does so within six months of the date of service of the notice on him or her or within such extended period as the Court may allow.

## Realisation of security interest by secured creditor

**340.** (1) Where a secured creditor realises his or her security interest and there is a surplus remaining from the net amount realised after satisfaction of the debt secured, he or she shall account to the trustee for the surplus, after making any proper payments to the holder of any other security interest over the assets subject to that charge.

(2) Where a secured creditor realises his or her security interest and the net amount realised is not sufficient to satisfy the debt secured—

> *(a)* if the creditor has previously valued his or her security interest and claimed in the bankruptcy for the balance under section 338(1)*(a)*, the net amount realised is substituted for the value previously placed by the creditor on the security interest; or *(Amended by Act 11 of 2004)*

> *(b)* in any other case, the creditor may claim in the bankruptcy as an unsecured creditor for the balance of his or her debt.

(3) For the purposes of this section, the secured debt includes contractual interest payable to the secured creditor on the debt up to the time of its satisfaction. *(Amended by Act 11 of 2004)*

## Surrender for non-disclosure

**341.** (1) Subject to subsection (2), if a secured creditor omits to disclose his or her security interest when submitting a claim in a bankruptcy, he or she shall surrender his or her security interest for the general benefit of the creditors.

(2) The Court may, on application by a secured creditor who is required to surrender his or her security interest under subsection (1), if it is satisfied that the omission was inadvertent or the result of an honest mistake by order direct—

> *(a)* that he or she is not required to surrender his or her security interest; and

> *(b)* that he or she values his or her security interest and amends his or her claim accordingly.

**Interest after commencement of bankruptcy**

342. (1) Interest is payable on any claim in a bankruptcy in respect of the period after the commencement of the bankruptcy in accordance with this section.

(2) Any surplus remaining after the payment of all claims in the bankruptcy shall, before being applied for any other purpose, be applied in paying interest on those claims in respect of the periods during which they have been unpaid since the commencement of the bankruptcy.

(3) Subject to section 151, all interest payable under this section ranks equally, whether or not the claims on which it is payable rank equally. *(Substituted by Act 11 of 2004)*

(4) The rate of interest payable under this section is the greater of—

*(a)* the court rate; and

*(b)* the rate that would be applicable to the claim if a bankruptcy order had not been made.

**Distribution by means of dividend**

343. (1) Whenever the trustee has sufficient funds in hand for the purpose, he or she shall, subject to the retention of such sums as may be necessary for his or her remuneration and the other costs and expenses of the bankruptcy, distribute dividends among the creditors whose claims he or she has admitted. *(Amended by Act 11 of 2004)*

(2) Before distributing a dividend under subsection (1), the trustee shall send each creditor a notice—

*(a)* stating that he or she intends to distribute a dividend; and

*(b)* fixing a date on or before which creditors shall submit their claims to him or her.

*(Substituted by Act 11 of 2004)*

(3) *(Repealed by Act 11 of 2004)*

(4) *(Repealed by Act 11 of 2004)*

(5) In determining the funds available for distribution to creditors by way of a dividend, the trustee shall make provision—

*(a)* for any admissible debts which appear to him or her to be due to persons who, by reason of the distance of their place of residence, may not have had sufficient time to submit their claims;

*(b)* for any admissible debts which are the subject of claims which have not yet been determined; and

*(c)* for disputed claims.

*(Amended by Act 11 of 2004)*

### Claims by unsatisfied creditors

**344.** (1) A creditor who has not submitted his or her claim by the date fixed in the notice issued under section 343(2) is not entitled to disturb, by reason that he or she has not participated in it, the distribution of that dividend, but—

> *(a)* when that claim has been admitted, he or she is entitled to be paid out of any money for the time being available for the payment of any further dividend, any dividend or dividends which he or she has failed to receive; and

> *(b)* any dividend or dividends payable under paragraph *(a)* shall be paid before that money is applied to the payment of any such further dividend.
> *(Amended by Act 11 of 2004)*

(2) Subject to section 346, where the trustee makes more than one distribution, section 343 and subsection (1) of this section apply to each distribution. *(Inserted by Act 11 of 2004)*

### Distribution of assets in specie

**345.** (1) Without prejudice to the provisions in this Act concerning disclaimer, the trustee may, with the permission of the creditors' committee or the Court, divide in their existing form amongst the bankrupt's creditors, according to their estimated value, any assets which from their peculiar nature or other special circumstances cannot be readily or advantageously sold.

(2) A permission given for the purposes of subsection (1) shall not be a general permission but shall relate to a particular proposed exercise of the power in question and a person dealing with the trustee in good faith and for value is not to be concerned to enquire whether any permission required by subsection (1) has been given.

(3) Subject to subsection (4), where the trustee has done anything without the permission required by subsection (1), the Court or the creditors' committee may, for the purpose of enabling him or her to meet his or her expenses out of the bankrupt's estate, ratify what the trustee has done.

(4) The committee may only ratify the trustee's actions under subsection (3) if it is satisfied that the trustee acted in a case of urgency and that he or she has sought its ratification without undue delay.

### Final distribution

**346.** (1) When the trustee has realised all the bankrupt's estate or so much of it as can, in the trustee's opinion, be realised without needlessly protracting the bankruptcy, he or she shall give notice in the prescribed manner either—

> *(a)* of his or her intention to distribute a final dividend; or *(Amended by Act 11 of 2004)*

> *(b)* that no dividend, or further dividend, will be distributed. *(Substituted by Act 11 of 2004)*

(2) A notice given under subsection (1) shall require claims against the bankrupt's estate to be established by a date specified in the notice (referred to in this section as "the final date").

*Insolvency Act* **LAW OF VIRGIN ISLANDS**

(3) The Court may, on the application of any person, postpone the final date.

(4) After the final date, the trustee shall—

*(a)* defray any outstanding expenses of the bankruptcy out of the bankrupt's estate; and

*(b)* if he or she intends to distribute a final dividend, distribute that dividend without regard to the claim of any person in respect of a claim not already admitted in the bankruptcy. *(Substituted by Act 11 of 2004)*

## No action for dividend

**347.** No action lies against the trustee for a dividend, but if the trustee refuses to pay a dividend the Court may, if it thinks fit, order him or her to pay it and also to pay out of his or her own money—

*(a)* interest on the dividend at the Court rate from the time it was withheld; and

*(b)* the costs of the application.

## Right of bankrupt to surplus

**348.** (1) Subject to subsection (2), the bankrupt is entitled to any surplus remaining after payment in full of the costs, expenses and claims referred to in section 334(1).

(2) The Court may make an order directing the trustee not to distribute the surplus or any part of it to the bankrupt if, on the application of the Attorney General, it is satisfied that—

*(a)* proceedings under any enactment dealing with the confiscation of the proceeds of crime are pending; and

*(b)* the assets of the bankrupt may become subject to a confiscation order or to be required to meet some other order made in those proceedings.

(3) The Court may, on the application of the Attorney General or the bankrupt vary or revoke an order made under subsection (2).

## Final meeting

**349.** (1) Where it appears to the trustee that the administration of the bankrupt's estate in accordance with this Act is for practical purposes complete and the trustee is not the Official Receiver, he or she shall call a final general meeting of the bankrupt's creditors to receive the trustee's report of his or her administration of the bankrupt's estate.

(2) The trustee may, if he or she thinks fit, call the final general meeting at the same time as giving notice under section 346 but, if called for an earlier date, the meeting shall be adjourned (and, if necessary, further adjourned) until a date on which the trustee is able to report to the meeting that the administration of the bankrupt's estate is for practical purposes complete.

(3) In the administration of the estate it is the trustee's duty to retain sufficient sums from the estate to cover the expenses of summoning and holding the meeting required by this section.

### *Prior Transactions*

## Contracts to which bankrupt is a party

**350.** (1) Where a contract has been made with a person who subsequently becomes bankrupt, the Court may, on the application of any other party to the contract, make an order discharging obligations under the contract on such terms as to payment by the applicant or the bankrupt of damages for non-performance or otherwise as appear to the Court to be equitable.

(2) Any damages payable by the bankrupt by virtue of an order of the Court under this section are provable as a bankruptcy debt.

(3) Where an undischarged bankrupt is a contractor in respect of any contract jointly with any person, that person may sue or be sued in respect of the contract without the joinder of the bankrupt.

## Enforcements procedures

**351.** (1) Subject to section 312 and to this section, where the creditor of a bankrupt has, before the commencement of that bankruptcy—

    *(a)* issued execution against the goods or land of the bankrupt; or

    *(b)* attached a debt due to the bankrupt from another person, the creditor is not entitled, as against the bankruptcy trustee, to retain the benefit of the execution or attachment, or any sums paid to avoid it, unless the execution or attachment was completed, or the sums were paid, before the commencement of the bankruptcy.

(2) Where any goods of a person have been taken in execution, then, if before the completion of the execution notice is given to the officer charged with the execution that a bankruptcy order has been made against that person—

    *(a)* that officer shall on request deliver the goods and any money seized or recovered in part satisfaction of the execution to the trustee; but

    *(b)* the costs of the execution are a first charge on the goods or money so delivered and the trustee may sell the goods or a sufficient part of them for the purpose of satisfying the charge.

*(Amended by Act 11 of 2004)*

(3) Subject to subsection (6) below, where—

    *(a)* under an execution in respect of a judgment for a sum exceeding such sum as may be prescribed for the purposes of this subsection, the goods of any person are sold or money is paid in order to avoid a sale; and

    *(b)* before the end of the period of 14 days beginning with the day of the sale or payment the officer charged with the execution is

given notice that a bankruptcy application has been filed in relation to that person; and

(c) a bankruptcy order is or has been made on that application, the balance of the proceeds of sale or money paid, after deducting the costs of execution, shall (in priority to the claim of the execution creditor) be comprised in the bankrupt's estate.

(4) Accordingly, in the case of an execution in respect of a judgment for a sum exceeding the sum prescribed for the purposes of subsection (3), the officer charged with the execution shall—

(a) not dispose of the balance mentioned in subsection (3) at any time within the period of 14 days so mentioned or while there is pending an application for a bankruptcy order of which he or she has been given notice under that subsection; and *(Amended by Act 11 of 2004)*

(b) pay that balance, where by virtue of that subsection it is comprised in the bankrupt's estate, to the trustee.

(5) For the purposes of this section—

(a) an execution against goods is completed by seizure and sale;

(b) an execution against land is completed by seizure or by the appointment of a receiver;

(c) an attachment of a debt is completed by the receipt of the debt.

(6) The rights conferred by subsections (1) to (3) on the trustee may, to such extent and on such terms as it thinks fit, be set aside by the court in favour of the creditor who has issued the execution or attached the debt.

(7) Nothing in this section entitles the trustee to claim goods from a person who has acquired them in good faith under a sale by an officer charged with an execution.

(8) Neither subsection (2) nor subsection (3) applies in relation to any execution against assets which have been acquired by or have devolved upon the bankrupt since the commencement of the bankruptcy unless, at the time the execution is issued or before it is completed—

(a) the assets have been or are claimed for the bankrupt's estate under section 318 (after-acquired assets); and

(b) a copy of the notice given under that section has been or is served on the officer charged with the execution.

### Distress, etc.

**352.** (1) The right of any landlord or other person to whom rent is payable to distrain upon the goods and effects of an undischarged bankrupt for rent due to him or her from the bankrupt is available (subject to subsection (5) below) against goods and effects comprised in the bankrupt's estate, but only for 6 months' rent accrued due before the commencement of the bankruptcy.

(2) Where a landlord or other person to whom rent is payable has distrained for rent upon the goods and effects of an individual to whom a

bankruptcy application relates and a bankruptcy order is subsequently made on that application, any amount recovered by way of that distress which—

> *(a)* is in excess of the amount which by virtue of subsection (1) would have been recoverable after the commencement of the bankruptcy, or

> *(b)* is in respect of rent for a period or part of a period after the distress was levied, shall be held for the bankrupt as part of his or her estate.

(3) Where any person (whether or not a landlord or person entitled to rent) has distrained upon the goods or effects of an individual against whom a bankruptcy order is made before the end of the period of 3 months beginning with the distraint, so much of those goods or effects, or the proceeds of their sale, as is not held for the bankrupt under subsection (2) shall be charged for the benefit of the bankrupt's estate with the preferential debts of the bankrupt to the extent that the bankrupt's estate is for the time being insufficient for meeting those debts. *(Amended by Act 11 of 2004)*

(4) Where by virtue of any charge under subsection (3) any person surrenders any goods or effects to the trustee of a bankrupt's estate or makes a payment to such a trustee, that person ranks, in respect of the amount of the proceeds of the sale of those goods or effects by the trustee or, as the case may be, the amount of payment, as a preferential creditor of the bankrupt, except as against so much of the bankrupt's estate as is available for the payment of preferential creditors by virtue of the surrender of payment.

(5) A landlord or other person to whom rent is payable is not at any time after the discharge of a bankrupt entitled to distrain upon any goods or effects comprised in the bankrupt's estate.

(6) Nothing in this Part affects any right to distrain otherwise than for rent, and any such right is at any time exercisable without restriction against assets comprised in a bankrupt's estate, even if that right is expressed by any enactment to be exercisable in like manner as a right to distrain for rent.

(7) Any right to distrain against assets comprised in a bankrupt's estate is exercisable notwithstanding that the assets have vested in the trustee.

(8) The provisions of this section are without prejudice to a landlord's right in a bankruptcy to claim for any bankruptcy debt in respect of rent. *(Amended by Act 11 of 2004)*

**Unenforceability of liens on books, etc.**

 **353.** (1) A lien or other right to retain possession of any of the books, papers or other records of a bankrupt is unenforceable to the extent that such enforcement would deny possession of any books, papers or other records to the Official Receiver or the trustee of the bankrupt's estate. *(Amended by Act 11 of 2004)*

(2) Subsection (1) does not apply to a lien on documents which give a title to assets and are held as such.

*Insolvency Act* LAW OF
VIRGIN ISLANDS

Revision Date: 1 Jan 2020

*General Powers of Court*

## General control of Court

**354.** (1) Every bankruptcy is under the general control of the Court and, subject to anything to the contrary in this Act, the Court has full power to decide all questions of priorities and all other questions, whether of law or fact, arising in any bankruptcy.

(2) Without limiting this Part, an undischarged bankrupt or a discharged bankrupt whose estate is still being administered shall do all such things as he or she may be directed to do by the Court for the purposes of his or her bankruptcy or, as the case may be, the administration of that estate.

(3) The Official Receiver or the trustee of a bankrupt's estate may at any time apply to the court for a direction under subsection (2).

(4) A person who without reasonable excuse fails to comply with any obligation imposed on him or her by subsection (2) commits an offence.

## Power of arrest

**355.** (1) In the cases specified in subsection (2) the Court may cause a warrant to be issued to a police officer or a prescribed officer of the Court—

    *(a)* for the arrest of a debtor to whom an application for a bankruptcy order relates or of an undischarged bankrupt, or of a discharged bankrupt whose estate is still being administered; and *(Amended by Act 11 of 2004)*

    *(b)* for the seizure of any documents, money or goods in possession of a person arrested under the warrant, and may authorise a person arrested under such a warrant to be kept in custody, and anything seized under such a warrant to be held, in accordance with the Rules, until such time as the court may order. *(Amended by Act 11 of 2004)*

(2) The powers conferred by subsection (1) are exercisable in relation to a debtor or undischarged or discharged bankrupt if, at any time after the filing of the application for a bankruptcy order or the making of the bankruptcy order against him or her, it appears to the Court—

    *(a)* that there are reasonable grounds for believing that he or she has absconded, or is about to abscond, with a view to avoiding or delaying the payment of any of his or her debts or his or her appearance to an application for a bankruptcy order or to avoiding, delaying or disrupting any proceedings in bankruptcy against him or her or any examination of his or her affairs;

    *(b)* that he or she is about to remove his or her goods with a view to preventing or delaying possession being taken of them by the trustee;

    *(c)* that there are reasonable grounds for believing that he or she has concealed or destroyed, or is about to conceal or destroy, any of his or her assets or any documents which might be of use to his or

her creditors in the course of his or her bankruptcy or in connection with the administration of his or her estate;

*(d)* that he or she has, without the leave of his or her trustee, removed any assets in his or her possession which exceed in value such sum as may be prescribed for the purpose of this paragraph; or

*(e)* that he or she has failed, without reasonable excuse, to attend any examination ordered by the Court.
*(Amended by Act 11 of 2004)*

## Seizure of bankrupt's assets

356. (1) At any time after a bankruptcy order has been made, the Court may, on the application of the Official Receiver or the trustee of the bankrupt's estate, issue a warrant authorising the person to whom it is directed to seize any assets comprised in the bankrupt's estate which is, or any documents or records relating to the bankrupt's estate or affairs which are, in the possession or under the control of the bankrupt or any other person who is required to deliver the assets, books, papers or records to the Official Receiver or trustee. *(Amended by Act 11 of 2004)*

(2) Any person executing a warrant under this section may, for the purpose of seizing any assets comprised in the bankrupt's estate or any documents relating to the bankrupt's estate or affairs, break open any premises where the bankrupt or anything that may be seized under the warrant is or is believed to be and any receptacle of the bankrupt which contains or is believed to contain anything that may be so seized.

(3) If, after a bankruptcy order has been made, the Court is satisfied that any assets comprised in the bankrupt's estate or any documents relating to the bankrupt's estate or affairs are concealed in any premises not belonging to him or her, it may issue a warrant authorising any police officer or prescribed officer of the Court to search those premises for the assets or documents.

(4) A warrant under subsection (3) shall not be executed except in the prescribed manner and in accordance with its terms.

## Re-direction of bankrupt's letters, etc.

357. (1) Where a bankruptcy order has been made, the Court may from time to time, on the application of the trustee of the bankrupt's estate, order the Post Office to re-direct and send or deliver to the trustee or otherwise any mail which would otherwise be sent or delivered to the bankrupt at such place or places as may be specified by the order.

(2) An order under this section has effect for such period, not exceeding 3 months, as may be specified in the order.

*Insolvency Act*

*Disclaimer*

## Trustee may disclaim onerous property

**358.** (1) For the purposes of this section, "onerous property" means—

    *(a)* an unprofitable contract; or

    *(b)* an asset comprised in the bankrupt's estate which is unsaleable or not readily saleable, or which may give rise to a liability to pay money or perform an onerous act.

(2) Subject to sections 360 and 361(2), a trustee may, by filing a notice of disclaimer with the Court, disclaim any onerous property comprised in the bankrupt's estate even though he or she has taken possession of it, tried to sell or assign it or otherwise exercised rights of ownership in relation to it.

(3) A trustee who disclaims onerous property shall, within 14 days of the date on which the disclaimer notice is filed, give notice to every person whose rights are, to his or her knowledge, affected by the disclaimer.

(4) A trustee who contravenes subsection (3) commits an offence.

## When disclaimer takes effect

**359.** (1) Subject to subsections (2) and (4), a disclaimer takes effect on the date when the notice of disclaimer is filed at Court.

(2) The disclaimer of property of a leasehold nature does not take effect unless a copy of the disclaimer notice has been given, so far as the trustee is aware of their addresses, to every person claiming under the bankrupt as underlessee or mortgagee and either—

    *(a)* no application for a vesting order is made under section 362 with respect to that property before the end of a period of 14 days beginning with the day on which the last notice under this subsection was given; or

    *(b)* where such an application is made, the Court directs that the disclaimer is to take effect.

(3) Where the Court gives a direction under subsection (2)*(b)*, it may also, instead of or in addition to any order it makes under section 362, make such orders with respect to fixtures, tenant's improvements and other matters arising out of the lease as it considers fit.

(4) Without prejudice to subsections (1) to (3), the disclaimer of any property in a dwelling house does not take effect unless a copy of the disclaimer notice has been given, so far as the trustee is aware of their addresses, to every person in occupation of or claiming a right to occupy the dwelling house and either—

    *(a)* no application under section 362 is made with respect to the property before the end of a period of 14 days beginning with the day on which the last notice under this subsection was given; or

    *(b)* where such an application is made, the Court directs that the disclaimer is to take effect.

### Notice to trustee to elect whether to disclaim

**360.** (1) A person interested in property or whose rights would be effected by the disclaimer of property may, by serving a notice to elect on the trustee, require him or her to elect whether or not to disclaim the property.

(2) Where a notice to elect is served on a trustee, he or she is not entitled to disclaim the property under section 358 unless he or she does so within 28 days of the date of service of the notice on him or her or within such extended period as the Court may allow.

(3) The trustee is deemed to have adopted any contract which by virtue of this section he or she is not entitled to disclaim.

### Effect of disclaimer

**361.** (1) Subject to subsection (2), a disclaimer of onerous property under section 358—

> *(a)* operates so as to determine, with effect from the date of the disclaimer, the rights, interests and liabilities of the bankrupt and his or her estate in or in respect of the property disclaimed; and

> *(b)* discharges the trustee from all personal liability in respect of that property as from the date of his or her appointment, but, except so far as is necessary to release the bankrupt, the bankrupt's estate and the trustee from liability, does not affect the rights or liabilities of any other person.

(2) A notice of disclaimer shall not be given under section 358 in respect of any property that has been claimed for the estate under section 318 (after-acquired property) or 319 (personal property of bankrupt exceeding reasonable replacement value), except with the leave of the court.

(3) A person suffering loss or damage as a result of a disclaimer of onerous property under section 358 may claim in the bankruptcy of the bankrupt as a creditor for the amount of the loss or damage.

### Vesting orders and orders for delivery

**362.** (1) Subject to section 363, if a trustee disclaims onerous property under section 358, the Court may make an order under subsection (2) on the application of—

> *(a)* a person who claims an interest in the disclaimed property;

> *(b)* a person who is under a liability in respect of the disclaimed property, that has not been discharged by the disclaimer; or

> *(c)* where the disclaimed property is property in a dwelling house, any person who at the time when the bankruptcy order was made was in occupation of or entitled to occupy the dwelling house.

(2) On an application under subsection (1), the Court may, on such terms as it considers fit, order that the disclaimed property be vested in or delivered to—

> *(a)* a person entitled to the property;

(b) a person under a liability in respect of the property that has not been discharged by the disclaimer;

(c) a trustee for a person referred to in paragraph *(a)* or *(b)*; or

(d) where the disclaimed property is property in a dwelling house, any person who at the time when the bankruptcy order was made was in occupation of or entitled to occupy the dwelling house.

(3) The Court shall not make an order in respect of a person specified in subsection (2)*(b)*, or in respect of a trustee of such a person, unless it appears to the Court that it would be fair to do so for the purpose of compensating the person subject to the liability in respect of the disclaimer.

(4) The effect of any order under this section shall be taken into account in assessing the extent of the loss or damage suffered by a person for the purposes of section 361(3).

(5) Subject to subsection (6), where a vesting order is made under this section vesting property in a person, the property vests immediately without any conveyance, transfer or assignment. *(Amended by Act 11 of 2004)*

(6) Where another Virgin Islands enactment—

(a) requires the transfer of property vested by an order under this section to be registered; and

(b) that enactment enables the order to be registered, on the making of a vesting order, the property vests in equity but does not vest at law until the registration requirements of the enactment have been complied with.

### Vesting orders in respect of leases

**363.** (1) Where the Court makes an order under section 362 vesting property of a leasehold nature in a person, the vesting order shall be made on terms that make that person subject—

(a) to the same liabilities and obligations as the bankrupt was subject to under the lease on the date that the bankruptcy order was made; or

(b) to the same liabilities and obligations as that person would have been subject to if the lease had been assigned to him or her on that date.

(2) Where the property vested by an order under section 362 relates to only part of the property comprised in a lease, subsection (1) applies as if the lease comprised the property subject to the vesting order.

(3) Where no person is willing to accept a vesting order made subject to subsection (1), the Court, by order—

(a) may vest the property in any person who is liable, whether personally or in a representative capacity and whether alone or jointly with the bankrupt, to perform the lessee's covenants in the lease; and

*(b)* where a vesting order is made under paragraph *(a)*, may vest the property free from all estates, encumbrances and interests created by the bankrupt.

(4) Where a person declines to accept a vesting order made subject to subsection (1), he or she  is excluded from all interest in the property.

## Land subject to rentcharge

**364.**   Where land subject to a rentcharge is disclaimed and that land vests by operation of law in any person, including the Crown, that person and his or her successors in title are not subject to any personal liability in respect of any sums becoming due under the rentcharge except sums becoming due after he or she, or some person claiming title under or through him or her, has taken possession or control of the land or has entered into occupation of it.

## Disclaimer presumed valid

**365.**   Unless it is proved that a trustee has breached his or her duty to give notice under section 358(3) or that he or she has otherwise breached his or her duties under this Act or the Rules with regard to disclaimer, a disclaimer of property by the trustee is presumed to be valid and effective.

*Investigation of Bankrupt's Affairs*

## Statement of assets and liabilities

**366.**   (1) Where a bankruptcy order has been made against an individual otherwise than on his or her own application, the bankrupt shall submit a verified statement of his or her assets and liabilities to his or her trustee within 21 days of the date of the bankruptcy order. *(Amended by Act 11 of 2004)*

(2) A statement of assets and liabilities shall contain—

*(a)* such particulars of the bankrupt's creditors and of his or her debts and other liabilities and of his or her assets as may be prescribed; and

*(b)* such other information as may be prescribed.

(3) A trustee or the Court may, in accordance with the Rules—

*(a)* release the bankrupt from his or her duty under subsection (1); or

*(b)* extend the period of time specified in that subsection.
*(Amended by Act 11 of 2004)*

(3A) Where the trustee considers that it would prejudice the conduct of the bankruptcy for the whole or part of a statement of assets and liabilities submitted to him or her to be disclosed, he or she may apply to the Court for an order of limited disclosure in respect of the statement, or any specified part of it. *(Inserted by Act 11 of 2004)*

(3B) The Court may, on an application under subsection (3A), order that the statement of assets and liabilities or, as the case may be, the specified part of it, is not filed in Court, or that it is filed separately and that it is not to be open to inspection otherwise than with the leave of the Court. *(Inserted by Act 11 of 2004)*

*Insolvency Act* LAW OF
VIRGIN ISLANDS

(4) A bankrupt who—

*(a)* fails to submit a statement of his or her assets and liabilities in accordance with subsection (1); or

*(b)* submits a statement of his or her assets and liabilities that does not comply with the prescribed requirements, commits an offence.

## Preliminary report

**367.** (1) The trustee of a bankrupt shall, within 60 days of the date of the bankruptcy order, prepare a preliminary report stating whether, in his or her opinion, further enquiry is desirable with respect to—

*(a)* whether the bankrupt has committed a bankruptcy offence;

*(b)* whether there are any claims under Part XIV;

*(c)* any matter relating to the conduct by the bankrupt of his or her business or affairs.

(2) The trustee shall send a copy of the report prepared under subsection (1) to the Official Receiver.

(3) Subsection (2) does not apply to the Official Receiver when he or she is acting as trustee.

(4) The Court may, on the application of the trustee, extend the period specified in subsection (1) on such terms and conditions as it considers fit.

## Duty of Official Receiver concerning report under section 367

**368.** Where the Official Receiver receives a report under section 367, he or she shall carry out such investigation, if any, as he or she considers appropriate. *(Amended by Act 11 of 2004)*

## Application for examination of bankrupt and others

**369.** (1) Where a bankruptcy order is made, an application may be made to the Court, *ex parte*, by the trustee or by the Official Receiver at any time before the discharge of the bankrupt for an order that a person specified in subsection (2) appears before the Court to be examined concerning the affairs, dealings and assets of the bankrupt.

(2) An application under subsection (1) may be made in respect of one or more of the following—

*(a)* the bankrupt;

*(b)* the bankrupt's spouse or former spouse;

*(c)* any person known or believed to be indebted to the bankrupt or to have in his or her possession any asset comprised in the bankrupt's estate; and

*(d)* any person appearing to the Court to be able to give information concerning the bankrupt or the bankrupt's dealings, affairs, assets or liabilities.

(3) The examination of a bankrupt may be held in public or in private but the examination of any other person shall be held in private.

(4) Unless the Court otherwise orders, the trustee shall make an application under subsection (1) in respect of the bankrupt if notice requiring him or her to do so is given to him or her , in accordance with the Rules, by not less than 50%, in value, of the creditors of the bankrupt.

## Order for examination

**370.** (1) In this section, "examinee" means the person to be examined before the Court.

(2) On hearing an application made under subsection 369, the Court may order the examinee to appear before the Court to be examined.

(3) An order under subsection (2)—

*(a)* shall direct the examinee to appear before the Court to be examined at a venue specified in the order;

*(b)* where the examinee is the bankrupt, shall state whether the examination is to be a public or a private examination;

*(c)* may require the person concerned to produce at the examination any books, records or other documents in his or her possession or control that relate to the bankrupt or his or her dealings, affairs, liabilities or assets;

*(d)* may provide for an alternative method of service of the order on the examinee;

*(e)* shall state the action that may be taken against a person if he or she does not appear before the Court as required by the order; and

*(f)* where the examination is to be a public examination, may require the examination to be advertised, specifying the method of such advertisement.

(4) Where the Court makes an order under subsection (2), the applicant shall, forthwith serve a sealed copy of the order on the examinee and, where the trustee is not the Official Receiver—

*(a)* if the applicant is the trustee, send a sealed copy of the order to the Official Receiver; or

*(b)* if the applicant is the Official Receiver, send a sealed copy of the order to the trustee.

*(Amended by Act 11 of 2004)*

(5) Where an order under subsection (2) is for the public examination of the bankrupt, the applicant shall give not less than 14 days notice of the examination to each creditor of the bankrupt.

(6) The Court may as part of an order made under this section, or at any subsequent time, make one or more of the following directions—

*(a)* a direction specifying the matters upon which the examinee may be examined;

*(b)* a direction specifying the procedures to be followed at the examination; and

*(c)* in the case of an examinee referred to in section 369(2)*(b)*, *(c)* or *(d)* a direction that the examinee—

　(i) file with the Court an affidavit containing such matters as are specified by the Court, or

　(ii) produce at his or her examination any documents in his or her possession or under his or her control relating to the bankrupt's dealings, affairs, assets or liabilities.

## Conduct of examination

**371.** (1) This section applies to an examination held pursuant to an order made under section 370.

(2) An examinee shall be examined on oath, either orally or by interrogatories, and he or she shall answer such questions as the Court may put, or allow to be put to him or her.

(3) Subject to subsections (4) and (5), an examination is conducted by the applicant, or by his or her legal practitioner, and the person examined is entitled to be represented by a legal practitioner who may put such questions to the examinee as the Court may allow for the purpose of explaining or qualifying answers given by him or her.

(4) The examinee may also be examined—

*(a)* if the applicant is the Official Receiver, by the trustee; or

*(b)* if the applicant is the trustee, by the Official Receiver.

(5) At a public examination of the bankrupt, questions may, with the leave of the Court, be put to the examinee by any creditor present at the examination or by the legal practitioner representing such a creditor.

(6) An examination shall be recorded in writing and the examinee shall sign the record.

(7) Subject to section 372, the written record of an examination is admissible in evidence in any proceedings under this Act.

## Examinee shall answer questions put to him or her

**372.** (1) An examinee is not excused from answering a question put to him or her at an examination held pursuant to an order made under section 370 on the ground that the answer may incriminate him or her or tend to incriminate him or her.

(2) Notwithstanding subsection (1), the record of an examination held pursuant to an order made under section 370 is not admissible as evidence in any criminal proceedings against the examinee except where he or she is charged with the offence of perjury.

### Examinee failing to appear for his or her examination

**373.** (1) Where a person without reasonable excuse fails to attend an examination ordered to be held under section 370, or there are reasonable grounds for believing that the examinee has absconded, or is about to abscond, with a view to avoiding or delaying his or her examination, the Court may issue a warrant to a police officer or a prescribed officer of the Court—

*(a)* for the arrest of that person; and

*(b)* for the seizure of any books, papers, records, money or goods in that person's possession.

(2) The Court may authorise a person arrested under a warrant issued under subsection (1) to be kept in custody, and anything seized under such a warrant to be held, in accordance with the Rules, until that person is brought before the Court under the warrant or until such other time as the Court may order.

(3) A person who fails to attend an examination ordered to be held under section 370 commits an offence.

### Court's enforcement powers

**374.** (1) If it appears to the Court, on consideration of any evidence obtained under section 371, 373 or this section, that any person has in his or her possession any assets comprised in the bankrupt's estate, the Court may, on the application of the trustee, order that person to deliver the assets or any of them to the trustee at such time, in such manner and on such terms as the Court considers fit.

(2) If it appears to the Court, on consideration of any evidence obtained under section 371, 373 or this section, that any person is indebted to the bankrupt, the Court may, on the application of the trustee, order that person to pay the trustee, at such time and in such manner as the Court may direct, the whole or part of the amount due, whether in full discharge of the debt or otherwise as the Court thinks fit. *(Amended by Act 11 of 2004)*

(3) The Court may order that any person who, if within the jurisdiction of the Court, would be liable to be examined pursuant to an order made under section 370 shall be examined in the Virgin Islands or any place outside the Virgin Islands.

*Discharge and Annulment of Bankruptcy*

### Bankrupt ineligible for automatic discharge

**375.** (1) For the purposes of section 376, a bankrupt is ineligible for automatic discharge if—

*(a)* he or she has been an undischarged bankrupt at any time in the 10 years prior to the date of the bankruptcy order; or

*(b)* he or she has been convicted of a bankruptcy offence.

(2) Where a previous bankruptcy order made against a person has been annulled under section 382, the period during which that person was an

*Insolvency Act*

undischarged bankrupt by virtue of that bankruptcy order shall be ignored for the purposes of subsection (1)*(a)*.

## Automatic discharge

**376.** (1) Subject to subsection (2), a bankrupt is discharged from bankruptcy at the end of the period of 3 years commencing on the date of the bankruptcy order unless—

> (a) he or she is ineligible for automatic discharge by virtue of section 375; or
>
> (b) he or she has previously been discharged under section 379(1)*(b)* or *(c)*.

(2) On the application of a person specified in subsection (3), the Court may, on the grounds specified in subsection (4)—

> (a) extend the period referred to in subsection (1);
>
> (b) order that the period will cease to run until the fulfilment of such conditions as it may specify; or
>
> (c) order that the bankrupt is not entitled to automatic discharge.

(3) An application under subsection (2) may be made on the application of the Official Receiver or the trustee of the bankrupt.

(4) The Court may—

> (a) make an order under subsection (2)*(a)* or *(b)* if it is satisfied that the bankrupt has failed or is failing to comply with any of his or her obligations under this Act or the Rules; or
>
> (b) make an order under subsection (2)*(c)* on any of the grounds upon which it could refuse to discharge the bankrupt under section 379.

(5) An application under subsection (2)—

> (a) shall be made before the bankrupt has been discharged under subsection (1); and
>
> (b) when made, operates to suspend the period referred to in subsection (1) until after the determination of the application by the Court.

(6) The Court may not, by an order made under section 496(1), permit an application to be made under subsection (2) after the discharge of a bankrupt under subsection (1).

## Application by bankrupt concerning order for suspension of discharge

**377.** (1) Where the Court has made an order under section 376(2)*(b)* that the period for automatic discharge will cease to run, the bankrupt may apply to the Court for the order to be varied or discharged.

(2) On an application made under subsection (1), the Court may vary or discharge its order.

### Application for discharge by Court order

**378.** (1) A bankrupt may apply to the Court for his or her discharge—

    *(a)* where he or she is ineligible for automatic discharge or where the Court has made an order under section 376(2)*(c)* that he or she is not entitled to automatic discharge, at any time after 3 years from the date of the bankruptcy order; or

    *(b)* in any other case, at any time after 6 months from the date of the bankruptcy order.

(2) An application under subsection (1) shall be served on—

    *(a)* the Official Receiver; and

    *(b)* his or her trustee, if not the Official Receiver, not less than 42 days before the date fixed for the hearing.

### Court order on application for discharge

**379.** (1) Subject to subsection (3), on an application under section 378, the Court may—

    *(a)* refuse the application;

    *(b)* make an order discharging the bankrupt absolutely; or

    *(c)* make an order discharging the bankrupt subject to such conditions as it considers fit, including conditions with respect to—

        (i) any income which may subsequently become due to him or her; or

        (ii) any assets that may devolve on him or her or be acquired by him or her after his or her discharge.
*(Amended by Act 11 of 2004)*

(2) An order under subsection (1)*(c)* may be made with immediate effect or may be made effective after such period or until the fulfilment of such conditions as may be specified in the order.

(3) Where an application is made under section 378 more than 8 years after the date of the bankruptcy order, the Court shall not refuse the application unless it is satisfied that there are exceptional reasons for not granting the bankrupt his or her discharge. *(Amended by Act 11 of 2004)*

(4) Subject to subsection (3), the Court may refuse to grant a bankrupt his or her discharge if—

    *(a)* the bankrupt has failed or is failing to comply with his or her obligations under this Act or the Rules;

    *(b)* the bankrupt has, after the date of the bankruptcy order, engaged in a prohibited activity within the meaning of section 260(3);

    *(c)* the bankrupt has been convicted of a bankruptcy offence;

    *(d)* the bankrupt has failed, whether intentionally or not, to disclose to his or her trustee particulars of—

        (i) any of his or her assets;

*Insolvency Act*

    (ii)  any liability existing at the date of the bankruptcy order; or

    (iii)  any income or expected income;

*(e)*  where the bankrupt has been engaged in any business for any of the period of 3 years prior to the date of the bankruptcy order, or she has—

    (i)  failed to keep such books and accounts as would sufficiently disclose his or her business transactions and financial position whilst engaged in his or her business; or

    (ii)  having kept the books and accounts referred to in subparagraph (i), he or she has failed to preserve them;

*(f)*  the bankrupt continued to trade after knowing, or having reason to believe himself or herself to be unable to pay his or her debts as they fell due;

*(g)*  the bankrupt contracted any liability that is claimable in his or her bankruptcy without having at the time of contracting it any reasonable expectation that he or she would be able to discharge it;

*(h)*  that the bankrupt, either before or after the bankruptcy order, has committed any fraud or breach of trust;

*(i)*  that the bankrupt has entered into a voidable transaction within the meaning of section 400; or

*(j)*  for any other reason it considers it appropriate to do so.
*(Amended by Act 11 of 2004)*

## Effect of discharge

**380.** (1) Subject to this section, where a bankrupt is discharged, the discharge releases him or her from all debts claimable in the bankruptcy, but has no effect—

*(a)*  on the functions, so far as they remain to be carried out, of the trustee; or

*(b)*  on the operation, for the purposes of the carrying out of those functions, of the provisions of this Act.

(2) The discharge of a bankrupt does not affect the right—

*(a)*  of any creditor of the bankrupt to claim in the bankruptcy for any debt from which the bankrupt is released; or *(Amended by Act 11 of 2004)*

*(b)*  of any secured creditor of the bankrupt to enforce his or her security interest for the payment of a debt from which the bankrupt is released.

(3) The discharge of a bankrupt does not release the bankrupt from—

*(a)*  a liability incurred by means of a fraud or fraudulent breach of trust to which the bankrupt was a party or a liability of which he or she has obtained forbearance by fraud;

*(b)* a liability under a recognizance; or

*(c)* a liability in respect of a fine imposed for an offence.

(4) Except to such extent and subject to such conditions as the Court may otherwise order, the discharge of a bankrupt does not release the bankrupt from—

*(a)* a liability under a maintenance agreement or maintenance order or arrears payable under such an agreement or order;

*(b)* a liability to pay damages for negligence, nuisance or breach of a statutory, contractual or other duty, being damages in respect of personal injuries to any person; or

*(c)* such other liabilities, not being liabilities that may be claimed in the bankruptcy, as may be prescribed.

(5) The discharge of a bankrupt does not release any person other than the bankrupt from any liability, whether as partner or co-trustee of the bankrupt or otherwise, from which the bankrupt is released by the discharge, or from any liability as surety for the bankrupt or as a person in the nature of such a surety.

(6) In subsection (4), "personal injuries" includes death and any disease or other impairment of a person's physical or mental condition.

**Discharged bankrupt to give assistance**

**381.** (1) A discharged bankrupt shall, even though discharged, give such assistance as his or her trustee reasonably requires in the realisation and distribution of such of his or her assets as are vested in his or her trustee.

(2) A discharged bankrupt who contravenes subsection (1) commits an offence.

**Annulment of bankruptcy order**

**382.** (1) The Court may annul a bankruptcy order if at any time it appears to the court—

*(a)* that, on any grounds existing at the time the order was made, the order ought not to have been made; or

*(b)* that, to the extent required by this Act and the Rules, the claims made in the bankruptcy and the expenses of the bankruptcy have all, since the making of the order, been either paid or secured for to the satisfaction of the Court.

(2) The Court may annul a bankruptcy order whether or not the bankrupt has been discharged.

(3) Where the court annuls a bankruptcy order—

*(a)* any sale or other disposition of assets, payment made or other thing done, under any provision in this Part, by or under the authority of the trustee or by the Court is valid; but

*(b)* if any of the bankrupt's estate is then vested, under any such provision, in such a trustee, it shall vest in such person as the

Court may appoint or, in default of any such appointment, revert to the bankrupt on such terms, if any, as the court may direct.

(4) The Court may, in an order made under subsection (2), include such supplemental provisions as may be authorised by the Rules.

(5) The trustee shall vacate office if the bankruptcy order is annulled.

### Release of trustee

**383.** (1) Where the Official Receiver ceases to be the trustee of a bankrupt's estate and another person is appointed trustee in his or her place, the Official Receiver obtains his or her release—

   *(a)* from the appointment of the new trustee; or

   *(b)* such later date as the Court may determine.

(2) If the Official Receiver, while he or she is the trustee, gives notice to the Court that the administration of the bankrupt's estate in accordance with this Part is for practical purposes complete, he or she  obtains his or her release with effect from such time as the Court may determine.

(3) A person other than the Official Receiver who ceases to be trustee may apply to the Court for his or her release and the Court may grant the release unconditionally or subject to such conditions as it considers fit, or withhold it.

(4) If the Court withholds the release it may make an order against the former trustee under section 384.

(5) Where a bankruptcy order is annulled, the trustee at the time of the annulment has his or her release with effect from such time as the Court may determine.

(6) Subject to subsection (7), where a former trustee is released under this section, he or she is discharged from all liability in respect of any act or default of his or hers in relation to the administration of the estate and otherwise in relation to his or her conduct as trustee.

(7) Subsection (6) does not prevent the Court from making an order under section 384 against a trustee who has been released under this section.

(8) A trustee, other than the Official Receiver, who obtains his or her release under this section shall file a notice in the prescribed form with the Official Receiver.

### Liability of trustee

**384.** (1) Where on an application under this section the Court is satisfied—

   *(a)* that the trustee of a bankrupt's estate has misapplied or retained, or become accountable for, any money or other assets comprised in the bankrupt's estate; or

   *(b)* that a bankrupt's estate has suffered any loss in consequence of any misfeasance or breach of fiduciary or other duty by a trustee of the estate in the carrying out of his or her functions, the Court may order the trustee, for the benefit of the estate, to repay, restore or account for money or other assets, together with interest at such rate as the Court considers just, or, as the case may

require, to pay such sum by way of compensation in respect of the misfeasance or breach of fiduciary or other duty as the Court considers just.

(2) Subject to subsection (3), an application under this section may be made by the Official Receiver,  a creditor of the bankrupt or, whether or not there is, or is likely to be, a surplus for the purposes of section 348, the bankrupt himself or herself.

(3) The leave of the Court is required for the making of an application under this section if it is to be made by the bankrupt or if it is to be made after the trustee has had his or her release under section 383.

(4) Where—

(a) the trustee seizes or disposes of any asset which is not comprised in the bankrupt's estate; and

(b) at the time of the seizure or disposal the trustee believes, and has reasonable grounds for believing, that he or she is entitled, whether pursuant to an order of the court or otherwise, to seize or dispose of that asset, the trustee is not liable to any person, whether under this section or otherwise, in respect of any loss or damage resulting from the seizure or disposal except in so far as that loss or damage is caused by negligence of the trustee and the trustee has a lien on the asset, or the proceeds of its sale, for such of the expenses of the bankruptcy as were incurred in connection with the seizure or disposal.

(5) Subsection (1) does not prevent any person from instituting any other proceedings in relation to matters in respect of which an application can be made under that subsection.

*Second or Subsequent Bankruptcy*

## Stay of distribution in case of second bankruptcy

385. (1) This section and section 386 apply where a bankruptcy order is made against an undischarged bankrupt and in both sections—

"earlier bankruptcy" means the bankruptcy, or the most recent bankruptcy, from which the bankrupt has not been discharged at the time when the later bankruptcy commences;

"later bankruptcy" means the bankruptcy arising from the bankruptcy order made against an undischarged bankrupt; and

"existing trustee" means the trustee, if any, of the bankrupt's estate for the purposes of the earlier bankruptcy.

(2) Where the existing trustee has been given notice of the application for the later bankruptcy, any distribution or other disposition by him or her of any asset to which subsection (3) applies made after the giving of the notice is void except to the extent that it was made with the consent of the Court or is or was subsequently ratified by the Court.

(3) Subsection (2) applies to—

*(a)* any asset which is vested in the existing trustee under section 318;

*(b)* any money paid to the existing trustee pursuant to an income payments order under section 322; and

*(c)* any asset or money which is, or in the hands of the existing trustee represents, the proceeds of sale or application of an asset or money falling within paragraphs *(a)* or *(b)*.

## Adjustment between earlier and later bankruptcy estates

**386.** (1) With effect from the commencement of the later bankruptcy any asset to which section 385(3) applies which, immediately before the commencement of that bankruptcy, is comprised in the bankrupt's estate for the purposes of the earlier bankruptcy is to be treated as comprised in the bankrupt's estate for the purposes of the later bankruptcy.

(2) Any sum which in pursuance of an income payments order made under section 322 is payable after the commencement of the later bankruptcy to the existing trustee shall form part of the bankrupt's estate for the purposes of the later bankruptcy and the court may give such consequential directions for the modification of the order as it considers fit.

(3) Anything comprised in a bankrupt's estate by virtue of subsections (1) or (2) is so comprised subject to a first charge in favour of the existing trustee for his or her remuneration or any bankruptcy expenses incurred by him or her  in relation thereto.

(4) Except as provided in this section and in section 385, any asset which is, or by virtue of section 319 is capable of being, comprised in the bankrupt's estate for the purposes of the earlier bankruptcy, or of any bankruptcy prior to it, is not comprised in his or her estate for the purposes of the later bankruptcy.

(5) The creditors of the bankrupt in the earlier bankruptcy and the creditors of the bankrupt in any bankruptcy prior to the earlier bankruptcy, are not to be creditors of his or hers in the later bankruptcy in respect of the same liabilities but the existing trustee may claim in the later bankruptcy for—

*(a)* the unsatisfied balance of the liabilities, including any liability under this subsection, claimable against the bankrupt's estate in the earlier bankruptcy;

*(b)* any interest payable on that balance; and

*(c)* any unpaid expenses of the earlier bankruptcy.

(6) Any amount claimable under subsection (5) ranks in priority after all the other claims admitted in the later bankruptcy and after interest on those claims and, accordingly, shall not be paid unless those claims and that interest have first been paid in full.

PART XIII

BANKRUPTCY OFFENCES

## Definitions

**387.** In this Part—

    *(a)* references to assets comprised in the bankrupt's estate or to assets possession of which is required to be delivered up to the trustee include any assets specified in section 313;

    *(b)* "initial period" means the period between the filing of the application for the bankruptcy order and the commencement of the bankruptcy; and

    *(c)* a reference to a number of months or years before the application is to that period ending with the filing of the application for the bankruptcy order.

## Defence of innocent intention

**388.** (1) Subject to subsection (2), the bankrupt does not commit a bankruptcy offence if he or she proves that, at the time of the conduct constituting the offence, he or she had no intent to defraud or to conceal the state of his or her affairs.

(2) Subsection (1) does not apply to sections 390(1)*(e)*, 392*(b)*, 392*(c)*, 392*(d)*, 392*(e)*, 396(1), 397 and 398.

## Non-disclosure

**389.** (1) The bankrupt commits an offence if—

    *(a)* he or she does not to the best of his or her knowledge and belief disclose all the assets comprised in his or her estate to the trustee; or

    *(b)* he or she does not inform the trustee of any disposal of any assets which, but for the disposal, would be so comprised, stating how, when, to whom and for what consideration the asset was disposed of.

(2) Subsection (1)*(b)* does not apply to any disposal in the ordinary course of a business carried on by the bankrupt or to any payment of the ordinary expenses of the bankrupt or his or her family.

## Concealment of assets

**390.** The bankrupt commits an offence if—

    *(a)* he or she does not deliver up possession to the trustee, or as the trustee may direct, those assets comprised in his or her estate as are in his or her possession or under his or her control of which he or she is required by law so to deliver up;

    *(b)* he or she conceals any debt due to or from him or her or conceals any asset, the value of which is not less than the prescribed

*Insolvency Act*

amount and possession of which he or she is required to deliver up to the trustee;

(c) in the 12 months before the application, or in the initial period, he or she did anything which would have been an offence under paragraph *(b)* if the bankruptcy order had been made immediately before he or she did it;

(d) or she removes, or in the initial period removed, any asset the value of which was not less than the prescribed amount and possession of which he or she is or would have been required to deliver up to the trustee; or

(e) he or she without reasonable excuse fails, on being required to do so by the Official Receiver or the Court—

　(i) to account for the loss of any substantial part of his or her assets incurred in the 12 months before the application or in the initial period; or

　(ii) to give a satisfactory explanation of the manner in which such a loss was incurred.

## Concealment of books and papers; falsification

**391.** The bankrupt commits an offence if—

(a) he or she does not deliver up possession to the trustee, or as the trustee may direct, of all documents in his or her possession or control which relate to his or her estate or his or her affairs;

(b) he or she prevents, or in the initial period prevented, the production of any documents relating to his or her estate or affairs;

(c) he or she conceals, destroys, mutilates or falsifies, or causes or permits the concealment, destruction, mutilation or falsification of, any documents relating to his or her estate or affairs;

(d) he or she makes, or causes or permits the making of, any false entries in any documents relating to his or her estate or affairs;

(e) he or she disposes of, or alters or makes any omission in or causes or permits the disposal, altering or making of any omission in, any document relating to his or her estate or affairs; or

(f) in the 12 months before the application, or in the initial period, he or she did anything which would have been an offence under paragraph *(c)*, *(d)* or *(e)* if the bankruptcy order had been made before he or she did it.

## False statements

**392.** The bankrupt commits an offence if—

(a) he or she makes any false statement or any material omission in any statement made under this Act relating to his or her affairs;

*(b)* knowing or believing that a false claim has been made by any person under the bankruptcy, he or she fails to inform the trustee as soon as practicable;

*(c)* he or she attempts to account for any part of his or her assets by fictitious losses or expenses;

*(d)* at any meeting of his or her creditors in the 12 months before the application or, whether or not at such a meeting, at any time in the initial period, he or she did anything which would have been an offence under paragraph *(c)* if the bankruptcy order had been made before he or she did it; or

*(e)* he or she is, or at any time has been, guilty of any false representation or other fraud for the purposes of obtaining the consent of his or her creditors, or any of them, to an agreement with reference to his or her affairs or to his or her bankruptcy.

## Fraudulent disposal of assets

**393.** (1) The bankrupt commits an offence if—

*(a)* he or she makes or causes to be made, or has during the period of 5 years prior to the date of the bankruptcy order made or caused to be made, any gift or transfer of, or any charge on, his or her assets; or

*(b)* he or she conceals or removes, or has at any time before the commencement of the bankruptcy, concealed or removed, any of his or her assets after, or within 60 days before, the date on which a judgement or order for the payment of money has been obtained against him or her, being a judgement or order which was not satisfied before the commencement of the bankruptcy.

(2) The reference in subsection (1) to making a transfer of or a charge on any asset includes causing or conniving at the levying of any execution against that asset.

## Absconding

**394.** The bankrupt commits an offence if—

*(a)* he or she leaves, or attempts or makes preparations to leave the Virgin Islands with any assets the value of which is not less than the prescribed amount and possession of which he or she is required to deliver up to the Official Receiver or the trustee; or

*(b)* in the 6 months before the application, or in the initial period, he or she did anything which would have been an offence under paragraph *(a)* if the bankruptcy order had been made immediately before he or she did it.

## Fraudulent dealing with asset obtained on credit

**395.** (1) The bankrupt commits an offence if, in the 12 months before the application, or in the initial period, he or she disposed of any asset which he or

*Insolvency Act*

she had obtained on credit and, at the time he or she disposed of it, had not paid for.

(2) A person commits an offence if, in the 12 months before the application, or in the initial period, he or she acquired or received an asset from the bankrupt knowing or believing—

(a) that the bankrupt owed money in respect of the asset; and

(b) that the bankrupt did not intend, or was unlikely to be able, to pay the money so owed.

(3) A person does not commit an offence under subsection (1) or (2) if the disposal, acquisition or receipt of the asset was in the ordinary course of a business carried on by the bankrupt at the time of the disposal, acquisition or receipt.

(4) In determining for the purposes of this section whether any asset is disposed of, acquired or received in the ordinary course of a business carried on by the bankrupt, regard may be had, in particular, to the price paid for the asset.

(5) In this section, references to disposing of an asset include pawning or pledging it and references to acquiring or receiving an asset shall be read accordingly.

## Obtaining credit: engaging in business

396. (1) The bankrupt commits an offence if—

(a) either alone or jointly with any other person, he or she obtains credit to the extent of the prescribed amount or more without informing the person from whom he or she obtains credit that he or she is an undischarged bankrupt; *(Amended by Act 11 of 2004)*

(b) he or she engages, whether directly or indirectly, in any business under a name other than that in which he or she was made bankrupt without disclosing to all persons with whom he or she enters into any business transaction the name under which he or she was made bankrupt.

(2) The reference to the bankrupt obtaining credit includes the following cases—

(a) where goods are billed to him or her under a hire-purchase agreement, or agreed to be sold to him or her under a conditional sale agreement; and

(b) where he or she is paid in advance, whether in money or otherwise, for the supply of goods and services.

## Failure to keep proper accounts of business

397. (1) Where the bankrupt has been engaged in any business for any of the period of 2 years before the application, he or she commits an offence if he or she—

(a) has not kept proper accounting records throughout that period and throughout any part of the initial period in which he or she was so engaged; or

*(b)* has not preserved all the accounting records which he or she has kept.

(2) The bankrupt does not commit an offence under subsection (1)—

*(a)* if his or her unsecured liabilities at the commencement of the bankruptcy did not exceed the prescribed amount; or

*(b)* if he or she proves that in the circumstances in which he or she carried on business the omission was honest and excusable.

(3) For the purpose of this section, a person is deemed not to have kept proper accounting records if he or she has not kept such records as are necessary to show or explain his or her transactions and financial position in his or her business, including—

*(a)* records containing entries from day to day, in sufficient detail, of all cash paid and received;

*(b)* where the business involves dealing in goods, statements of annual stock-takings; and

*(c)* except in the case of goods sold by way of retail trade to the actual customer, records of all goods sold and purchased showing the buyers and sellers in sufficient detail to enable the goods and the buyers and sellers to be identified.

## Gambling

**398.** (1) The bankrupt commits an offence if he or she has—

*(a)* in the 2 years before the application, materially contributed to, or increased the extent of, his or her insolvency by gambling or by rash and hazardous speculations; or

*(b)* in the initial period, lost any of his or her assets by gambling or by rash and hazardous speculations.

(2) In determining for the purposes of this section whether any speculations were rash and hazardous, the financial position of the bankrupt at the time when he or she entered into them shall be taken into consideration.

## Supplementary provisions

**399.** (1) Proceedings for a bankruptcy offence may not be instituted after the annulment of the bankruptcy.

(2) Without limiting the liability of a bankrupt in respect of a subsequent bankruptcy, the bankrupt does not commit an offence under this Part in respect of anything done after his or her discharge but nothing in this Act prevents the institution of proceedings against a discharged bankrupt for an offence committed before his or her discharge.

(3) It is not a defence in proceedings for an offence under this Part that anything relied on, in whole or in part, as constituting that offence was done outside the Virgin Islands.

PART XIV

VOIDABLE TRANSACTIONS

## Interpretation for this Part

**400.** (1) In this Part—

"debtor" means the individual against whom a bankruptcy order is made;

"insolvent bankruptcy" means a bankruptcy where the assets comprised in the bankrupt's estate are insufficient to pay his or her liabilities and the expenses of the bankruptcy;

"insolvency transaction" has the meaning specified in subsection (2);

"onset of insolvency" means the date on which the application for a bankruptcy order was filed;

"voidable transaction" means—

    *(a)* an unfair preference;

    *(b)* an undervalue transaction;

    *(c)* a voidable general assignment of book debts; or

    *(d)* an extortionate credit transaction;

"vulnerability period" means—

    *(a)* for the purposes of sections 401, 402 and 403—

       (i) in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing 2 years prior to the onset of insolvency and ending on the date of the bankruptcy order; and

      (ii) in the case of a transaction entered into with, or a preference given to, any other person, the period commencing 6 months prior to the onset of insolvency and ending on the date of the bankruptcy order; and

    *(b)* for the purposes of section 404, the period commencing 5 years prior to the onset of insolvency and ending on the date of the bankruptcy order;

(2) A transaction is an insolvency transaction if—

    *(a)* it is entered into at a time when the debtor is insolvent; or

    *(b)* it causes the debtor to become insolvent.

(3) For the purposes of subsection (2), an individual is insolvent if he or she is unable to pay his or her debts as they fall due for payment. *(Amended by Act 11 of 2004)*

(4) This Part applies in respect of an individual only if a bankruptcy order is made against him or her.

## Unfair preferences

**401.** (1) Subject to subsection (2), a transaction entered into by an individual is an unfair preference given by the individual to a creditor if the transaction—

(a) is an insolvency transaction;

(b) is entered into within the vulnerability period; and

(c) has the effect of putting the creditor into a position which, in the event of the individual becoming a bankrupt, will be better than the position he or she would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business.

(3) A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a Court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into by an individual within the vulnerability period has the effect specified in subsection (1)*(c)* in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

## Undervalue transactions

**402.** (1) Subject to subsection (2), an individual enters into an undervalue transaction with a person if—

(a) he or she makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for him or her to receive no consideration; or

(b) he or she enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than  the value, in money or money's worth, of the consideration provided by him or her; and

(c) in either case, the transaction concerned—

 (i) is an insolvency transaction; and

 (ii) is entered into within the vulnerability period.

(2) An individual does not enter into an undervalue transaction with a person if—

(a) the individual enters into the transaction in good faith and for the purposes of his or her business; and

(b) at the time when he or she enters into the transaction, there were reasonable grounds for believing that the transaction would benefit him or her.

(3) A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

*Insolvency Act* **LAW OF VIRGIN ISLANDS**

Revision Date: 1 Jan 2020

(4) Where an individual enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)*(a)* or subsection (1)*(b)*, unless the contrary is proved, it is presumed that—

> *(a)* the transaction was an insolvency transaction; and

> *(b)* subsection (2) did not apply to the transaction.

## Voidable general assignment of book debts

**403.** (1) This section applies where an individual engaged in any business makes a general assignment to another of his or her existing or future book debts, or any class of them, and a bankruptcy order is subsequently made against him or her.

(2) The assignment is voidable as regards book debts which were not paid before the filing of the application for the bankruptcy order, unless the assignment has been registered under the Bills of Sale Act.

(3) For the purposes of subsections (1) and (2)—

> *(a)* "assignment" includes an assignment by way of security or charge on book debts; and

> *(b)* "general assignment" does not include—

>> (i) an assignment of book debts due at the date of the assignment from specified debtors or of debts becoming due under specified contracts; or

>> (ii) an assignment of book debts included either in a transfer of a business made in good faith and for value or in an assignment of assets for the benefit of creditors generally.

(4) For the purposes of registration under the Bills of Sale Act, an assignment of book debts is to be treated as if it were a bill of sale given otherwise by way of security for the payment of a sum of money; and the provisions of that Act with respect to the registration of bills of sale apply accordingly with such necessary modifications as may be made by rules under that Act.

## Extortionate credit transactions

**404.** A transaction entered into by an individual within the vulnerability period for, or involving the provision of, credit to him or her is an extortionate credit transaction if, having regard to the risk accepted by the person providing the credit—

> *(a)* the terms of the transaction are or were such as to require grossly exorbitant payments to be made (whether unconditionally or in certain contingencies) in respect of the provision of credit; or

> *(b)* the transaction otherwise grossly contravenes ordinary principles of fair trading.

### Orders in respect of voidable transactions

**405.** (1) Subject to section 406, where it is satisfied that a transaction entered into by an individual is a voidable transaction the Court, on the application of the bankruptcy trustee of the individual—

(a) may make an order setting aside the transaction in whole or in part;

(b) in respect of an unfair preference or an undervalue transaction, may make such order as it considers fit for restoring the position to what it would have been if the bankrupt had not entered into that transaction; and

(c) in respect of an extortionate credit transaction, may by order provide for any one or more of the following—

(i) the variation of the terms of the transaction or the terms on which any security interest for the purposes of the transaction is held;

(ii) the payment by any person who is or was a party to the transaction to the trustee of any sums paid by the bankrupt to that person by virtue of the transaction;

(iii) the surrender by any person to the trustee of any asset held by him or her as security for the purposes of the transaction; and

(iv) the taking of accounts between any persons.

(2) Without prejudice to the generality of subsection (1)*(b)*, an order under that paragraph may—

(a) require any asset transferred as part of the transaction to be vested in the trustee;

(b) require any asset to be vested in the trustee if it represents in any person's hands the application either of the proceeds of sale of an asset transferred or of money transferred, in either case as part of the transaction;

(c) release or discharge, in whole or in part, any security interest given by the bankrupt or the liability of the bankrupt under any contract;

(d) require any person to pay, in respect of benefits received by him or her from the bankrupt, such sums to the trustee as the Court may direct;

(e) provide for any surety or guarantor whose obligations to any person were released or discharged, in whole or in part, under the transaction, to be under such new or revived obligations to that person as the Court considers appropriate;

(f) provide for security to be provided for the discharge of any obligation imposed by or arising under the order, for such an obligation to be charged on any asset and for the security interest or charge to have the same priority as a security interest or charge released or discharged, in whole or in part, under the transaction;

*(g)* provide for a person affected by an order made under subsection (1) to claim in the bankruptcy of the bankrupt in such amount as the Court considers fit; and *(Amended by Act 11 of 2004)*

*(h)* require the bankrupt or trustee to make a payment or transfer an asset to any person affected by an order made under subsection (1). *(Amended by Act 11 of 2004)*

(3) Subject to section 406, in respect of an unfair preference or an undervalue transaction, an order under subsection (1) may affect the assets of, or impose any obligation on, any person whether or not he or she is the person with whom the bankrupt entered into the transaction. *(Amended by Act 11 of 2004)*

## Limitations on orders under section 405

**406.** (1) This section applies to an order made under section 405(1) in respect of an unfair preference or an undervalue transaction.

(2) An order to which subsection (1) applies shall not—

*(a)* prejudice any interest in an asset that was acquired in good faith and for value from a person other than the bankrupt, or prejudice any interest deriving from such an interest; or

*(b)* require a person who received a benefit from the transaction in good faith and for value to pay a sum to the trustee, except where that person was a party to the transaction or, in respect of an unfair preference, the preference was given to that person when he or she was a creditor of the bankrupt.

(3) For the purposes of subsection (2), where a person would, apart from the requirement for good faith, fall within the circumstances specified in paragraph *(a)* or *(b)*, it is presumed, unless the contrary is proved, that he or she acquired the interest or received the benefit in good faith.

(4) Subsection (3) does not apply to a person—

*(a)* who, at the time of the transaction, had notice of—

(i) the fact that the transaction was an unfair preference or an undervalue transaction, as the case may be; or

(ii) the relevant proceedings as defined in subsection (5); or

*(b)* who was, at the time of the transaction, a connected person.

(5) For the purposes of subsection (4), a person has notice of the relevant proceedings if he or she had notice of the application on which the bankruptcy order was made. *(Amended by Act 11 of 2004)*

## Recoveries

**407.** Any money paid to, asset recovered or other benefit received by the trustee as a result of an order made under section 405 is deemed to be an asset comprised in the bankrupt's estate that is available to pay his or her unsecured creditors.

## Remedies not exclusive

**408.** The provisions of this Part apply without prejudice to the availability of any other remedy.

PART XV

BANKRUPTCY RESTRICTIONS ORDERS AND UNDERTAKINGS

## Interpretation for this Part

**409.** In this Part—

"restricted person" means a person—

> *(a)* against whom a bankruptcy restrictions order or an interim order has effect; or
>
> *(b)* in respect of whom a bankruptcy restrictions undertaking is in place;

"voluntary liquidator" means—

> *(a)* a liquidator appointed by the directors or members of an international business company under Part XII of the BVI Business Companies Act; or
>
> *(b)* a voluntary liquidator within the meaning specified in section 2 of the BVI Business Companies Act.
> *(Substituted by Act 16 of 2004)*

## Bankruptcy restrictions orders and undertakings

**410.** (1) A bankruptcy restrictions order is an order that an individual shall not, for the period specified in the order, engage in a prohibited activity without the leave of the Court.

(2) A bankruptcy restrictions undertaking is an undertaking in writing given by an individual to the Official Receiver that he or she will not, for the period specified in the undertaking, engage in a prohibited activity without the leave of the Court.

(3) For the purpose of this Part, an individual engages in a prohibited activity if—

> *(a)* he or she is a director of a company;
>
> *(b)* he or she acts as the voluntary liquidator of a company;
>
> *(c)* he or she acts as the receiver of the assets of a company;
>
> *(d)* he or she acts as an insolvency practitioner;
>
> *(e)* in any way, whether directly or indirectly, he or she is concerned with or takes part in the promotion, formation or management of a company; or
>
> *(f)* he or she undertakes any activity prescribed as a prohibited activity.

### Application for and hearing of application for bankruptcy restrictions order

**411.** (1) The Official Receiver may apply to the Court for a bankruptcy restrictions order against a bankrupt.

(2) On an application under subsection (1), the Court may, make a bankruptcy restrictions order against a bankrupt where it considers it appropriate having regard to the conduct of the bankrupt, whether before or after the making of the bankruptcy order against him or her.

(3) Without limiting subsection (3), the Court shall in particular take into account—

     *(a)* any behaviour of the bankrupt that constitutes a bankruptcy offence, whether or not the bankrupt has been convicted of the offence; and

     *(b)* whether the bankrupt was an undischarged bankrupt at some time during the 6 years prior to the making of the bankruptcy order in respect of which the application is made.

### Duration of bankruptcy restrictions order

**412.** (1) The Court shall, on making a bankruptcy restrictions order, specify the period for which the order has effect.

(2) The period referred to in subsection (1) shall commence on a date no earlier than the date of the order and no later than 28 days after the date of the order and shall not exceed 10 years.

### Interim bankruptcy restrictions order

**413.** (1) In this section, "interim order" means an interim bankruptcy restrictions order.

(2) The Official Receiver may apply to the Court for an interim order at any time between—

     *(a)* the filing by him or her of an application for a bankruptcy restrictions order; and

     *(b)* the determination of that application.

(3) The Court may, on an application made under subsection (1), make an interim order against a bankrupt if it considers—

     *(a)* that there are *prima facie* grounds to suggest that the application for the bankruptcy restrictions order will be successful; and

     *(b)* it is in the public interest to make an interim order.

(4) An interim order shall—

     *(a)* take effect on the date that it is made; and

     *(b)* have the same effect as a bankruptcy restrictions order.

(5) An interim order shall cease to have effect—

*(a)* on the determination of the application for the bankruptcy restrictions order;

*(b)* on the acceptance of a bankruptcy restrictions undertaking made by a bankrupt; or

*(c)* on the discharge of the interim order by the Court on the application of the Official Receiver or the bankrupt.

## Bankruptcy restrictions undertaking

**414.** (1) A bankrupt may offer the Official Receiver a bankruptcy restrictions undertaking, whether or not the Official Receiver has made an application against him or her for a bankruptcy restrictions order.

(2) The Official Receiver may accept an offer made to him or her under subsection (1) if he or she considers that—

*(a)* there is a reasonable prospect that, on the hearing of an application under section 411, the Court would make a bankruptcy restrictions order against the bankrupt offering the undertaking; and

*(b)* it is expedient and in the public interest to accept the offer.

(3) A bankruptcy restrictions undertaking shall specify a period, commencing on the date of the undertaking, for which the undertaking has effect.

(4) The period referred to in subsection (3) shall not exceed 10 years.

## Variation of disqualification order or undertaking

**415.** (1) The Court may, on the application of the Official Receiver or a restricted person, vary a bankruptcy restrictions order or a bankruptcy restrictions undertaking.

(2) Without limiting subsection (1), an order under that subsection may—

*(a)* reduce the period for which the order, or undertaking, is in force; or

*(b)* provide for the order or undertaking to cease to be in force.

(3) An application made by a restricted person for an order under subsection (1) shall be served on the Official Receiver no less than 14 days prior to the date of the hearing and the Official Receiver shall appear or be represented and is entitled to call or give evidence at the hearing.

## Offence provisions

**416.** A restricted person who engages in a prohibited activity commits an offence.

## Official Receiver to appear on certain applications

**417.** The Official Receiver shall appear and call the attention of the Court to any matters which seem to him or her to be relevant, and may himself or herself give evidence or call witnesses on the hearing of—

*Insolvency Act*     LAW OF
VIRGIN ISLANDS

Revision Date: 1 Jan 2020

*(a)* an application by the Official Receiver for a bankruptcy restrictions order; or

*(b)* any other application made under this Part.

## Register of disqualification orders

**418.** (1) The Official Receiver shall register in a Register of Bankruptcy Restrictions Orders and Undertakings to be maintained by him or her for the purpose—

*(a)* each bankruptcy restrictions order and interim bankruptcy restrictions order made or bankruptcy restrictions undertaking accepted under this Part; and

*(b)* each variation of a bankruptcy restrictions order, an interim bankruptcy restrictions order or bankruptcy restrictions undertaking under this Part.

(2) When a bankruptcy restrictions order or undertaking ceases to be in force, the Official Receiver shall delete the entry from the Register.

(3) The Register of Bankruptcy Restrictions Orders and Undertakings shall be open to inspection on payment of such fee as may be prescribed.

(4) No person shall be construed as having knowledge that another person is a restricted person by virtue of an entry in the Register of Bankruptcy Restrictions Orders and Undertakings.

## Annulment of bankruptcy order

**419.** (1) Where a bankruptcy order is annulled under section 382(1)*(a)*—

*(a)* any bankruptcy restrictions order, interim order or undertaking which is in force in respect of the bankrupt shall be annulled;

*(b)* no new bankruptcy restrictions order or interim order may be made in respect of the bankrupt; and

*(c)* no new bankruptcy restrictions undertaking by the bankrupt may be accepted.

(2) Where a bankruptcy order is annulled under section 382(1)*(b)*—

*(a)* the annulment shall not affect any bankruptcy restrictions order, interim order or undertaking which is in force in respect of the bankrupt;

*(b)* the Court may make a bankruptcy restrictions order or an interim order in respect of the bankrupt on an application instituted before the annulment;

*(c)* the Official Receiver may accept a bankruptcy restrictions undertaking offered by the bankrupt before the annulment; and

*(d)* an application for a bankruptcy restrictions order may not be instituted after the annulment.

PART XVI

GENERAL PROVISIONS WITH REGARD TO
INSOLVENCY PROCEEDINGS UNDER THIS ACT

## Division 1

### *The Creditors' Committee*

## Interpretation for and scope of this Division

**420.** (1) In this Division, "office holder" means—

*(a)* in respect of a company, its administrator, its liquidator or its administrative receiver and in respect of a foreign company, its liquidator; and *(Amended by Act 11 of 2004)*

*(b)* in respect of an individual, his or her bankruptcy trustee, and a reference to an office holder is to the office holder appointed in the insolvency proceeding in respect of which the creditors' committee is appointed.

(2) This Division applies to the establishment and operation of a creditors' committee under this Act where—

*(a)* a company is in administration or in liquidation or a foreign company is in liquidation*; (Amended by Act 11 of 2004)*

*(b)* an administrative receiver has been appointed in respect of a company; or

*(c)* a bankruptcy order has been made against an individual.

(3) In this Division, where the context requires, "company" includes a foreign company. *(Amended by Act 11 of 2004)*

## Establishment of creditors' committee

**421.** (1) The creditors of a company in liquidation, administration or administrative receivership or of a bankrupt may, by resolution passed at a meeting, establish a creditors' committee—

*(a)* in the case of a company in administration, at any time after the approval of the administrator's proposals;

*(b)* in the case of a company in administrative receivership, at any time after the appointment of the administrative receiver;

*(c)* in the case of a company in liquidation, at any time after the appointment of the liquidator; and

*(d)* in the case of an individual, at any time after the bankruptcy order.

(2) A resolution to establish a creditors' committee shall also appoint the first members of the committee, each of whom shall be eligible to serve on the committee in accordance with section 423.

(3) A resolution to establish a creditors' committee in the administration, administrative receivership or liquidation of a company may only be passed—

*Insolvency Act*

   *(a)* at a meeting called under section 100, 147 or 179; or

   *(b)* at a meeting requisitioned for the purpose by at least 10% in value of the creditors of the company.

(4) A resolution to establish a creditors' committee in the bankruptcy of an individual may be passed at a meeting of the creditors called under section 333.

(5) Where an office holder is satisfied that a creditors' committee has been validly established he or she shall, within 5 business days of the passing of the resolution, file a notice to that effect—

   *(a)* in the case of an administrator, a liquidator appointed by the Court or a bankruptcy trustee, with the Court; or

   *(b)* in the case of an administrative receiver or a liquidator not appointed by the Court, with the Registrar.

(6) The notice required to be filed under subsection (5) shall specify the names and addresses of the persons appointed to the creditors' committee.

(7) The creditors' committee cannot act until the relevant notice is filed by the office holder under subsection (5).

(8) The appointment of a member of a creditors' committee may be in the form of the appointment of a designated representative of the member.

## Functions and powers of creditors' committee

**422.** (1) The functions of a creditors' committee are—

   *(a)* to consult with the office holder about matters relating to the insolvency proceeding;

   *(b)* to receive and consider reports of the insolvency holder;

   *(c)* to assist the office holder in discharging his or her functions; and

   *(d)* to discharge any other functions assigned to it under this Act or the Rules.

(2) A creditors' committee may—

   *(a)* call a meeting of creditors;

   *(b)* on giving the office holder reasonable notice, require him or her to provide the committee with such reports and information concerning the insolvency proceeding as the committee reasonably requires; and *(Amended by Act 11 of 2004)*

   *(c)* on giving the office holder not less than 5 business days notice, require him or her to attend before the committee at any reasonable time to provide it with such information and explanations concerning the insolvency proceeding as it reasonably requires.

(3) Where the creditors' committee requires the attendance of the office holder at a meeting under subsection (2)*(c)*—

   *(a)* the notice shall be signed in writing by a majority of the members of the committee; and

*(b)* the meeting shall be fixed for a business day and shall be held at such time and place as the committee may agree with the office holder.

(4) The designated representative of a committee member may sign a notice under subsection (3)*(a)* on the member's behalf.

(5) Unless expressly permitted to do so by the Act or the Rules, a creditors' committee cannot give directions to the office holder.

## Composition of creditors' committee

**423.** (1) Subject to subsection (2), a person is eligible to be a member, or the designated representative of a member, of a creditors' committee if he or she is an individual who has consented in writing to serve on the committee, and—

*(a)* in the case of a member—

(i) he or she is a creditor of the company or the bankrupt, as the case may be; or

(ii) he or she holds a general power of attorney granted by such a creditor; or

*(b)* in the case of a designated representative, he or she is authorised in writing by a person eligible to be a member to be his or her representative on the committee.

(2) A person is not eligible to be a member of the creditors' committee if his or her claim has been rejected for the purposes of his or her entitlement to vote or, in the case of a liquidation or bankruptcy, for distribution purposes, or if he or she is the legal practitioner or representative of such a creditor. *(Amended by Act 11 of 2004)*

(3) A creditors committee shall consist of not less than 3 or more than 5 individuals who are eligible to be members of the committee. *(Amended by Act 11 of 2004)*

## Resignation and termination of committee member

**424.** (1) A member of a creditors' committee may resign by giving notice in writing to the office holder.

(2) The membership of a committee member is terminated if—

*(a)* he or she becomes bankrupt or compounds or arranges with his or her creditors;

*(b)* he or she is absent from 3 consecutive meetings of the committee without the leave of the other members;

*(ba)* he or she ceases to be, or is found never to have been, a creditor; or *(Inserted by Act 11 of 2004)*

*(c)* in the case of the designated representative of a member, his or her designation as a designated representative is terminated by the member he or she represents.

*Insolvency Act* **LAW OF VIRGIN ISLANDS**

(3) A member of the committee may be removed by a resolution of creditors of which he or she has been given at least 5 business days notice, stating the object of that meeting.

(4) If a member of the creditors' committee becomes bankrupt, his or her bankruptcy trustee replaces him or her as a member of the committee. *(Inserted by Act 11 of 2004)*

## Vacancies and appointment of new members

**425.** (1) Where there is a vacancy in the membership of the committee, the continuing members of the committee, if not less than 2 in number, may continue to act.

(2) The continuing members of the committee, or where their number has fallen below 2, the office holder, may appoint a person eligible under section 423 as a member of the committee to fill a vacancy.

(3) Where there is any change in the membership of the committee, the office holder shall, within 5 business days, file a notice specifying the members of the committee following the change—

    *(a)* in the case of an administrator, a liquidator appointed by the Court or a bankruptcy trustee, with the Court; or

    *(b)* in the case of an administrative receiver or a liquidator appointed by the company, with the Registrar.

(4) The notice required to be filed under subsection (3) shall specify the names and addresses of the members of the creditors' committee.

## Proceedings of creditors' committee

**426.** The Rules shall provide for the proceedings of a creditors' committee.

## Expenses of members

**427.** (1) Subject to subsection (2), the reasonable travelling expenses of members directly incurred in attending a meeting of the creditors' committee shall be paid by the office holder out of the assets of the company, or the bankrupt's estate, as an expense of the insolvency proceeding.

(2) Where the office holder is of the opinion that a meeting of the creditors' committee called by a member was unreasonably called he or she may refuse to pay expenses under subsection (1).

(3) Where the office holder refuses to pay reasonable travelling expenses under subsection (2), the creditors may resolve that they should be paid and upon the creditors passing such a resolution, they shall be paid by the office holder out of the assets of the company, or the bankrupt's estate, as an expense of the insolvency proceeding.

## Members dealing with company

**428.** (1) In the case of the administration or administrative receivership of a company, membership of the creditors' committee does not prevent a person from dealing with the company while the office holder is acting, provided that

any transactions in the course of such dealings are entered into in good faith and for value. *(Amended by Act 11 of 2004)*

(2) The Court may, on the application of any person interested, set aside a transaction which appears to it to be contrary to the requirements of this section, and may give such consequential directions as it considers fit for compensating the company for any loss which it may have incurred in consequence of the transaction.

(3) The Rules may specify procedures for dealing with potential or actual conflicts of interest of committee members. *(Inserted by Act 11 of 2004)*

## Formal defects

**429.** The acts of a creditors' committee are valid notwithstanding any defect in the appointment, election or qualifications of any member of the committee or in the formalities of its establishment.

## Division 2

### *Remuneration*

## Remuneration of administrator, liquidator or bankruptcy trustee

**430.** (1) The remuneration of an administrator, liquidator or bankruptcy trustee is fixed—

> *(a)* by the creditors' committee, if any; or
>
> *(b)* by the Court on an application made under subsection (2).

(2) An administrator, liquidator or bankruptcy trustee may apply to the Court to fix his or her remuneration, or to fix an interim payment under section 433, if—

> *(a)* no creditors' committee is appointed;
>
> *(b)* the creditors' committee fails, for whatever reason, to fix his or her remuneration, or an interim payment; or
>
> *(c)* he or she considers that the remuneration, or an interim payment, fixed by the creditors' committee—
>
> > (i) is insufficient;
> >
> > (ii) is not in an appropriate currency; or
> >
> > (iii) is on unacceptable terms.

(3) Not less than 14 days notice of an application under subsection (2) shall be given—

> *(a)* in the case of an administrator, to the company in administration;
>
> *(b)* in the case of a bankruptcy trustee, to the bankrupt; and
>
> *(c)* in any other case—
>
> > (i) to each member of the creditors' committee; or

*Insolvency Act*   LAW OF
VIRGIN ISLANDS

Revision Date: 1 Jan 2020

    (ii) if there is no creditors' committee, to such creditors as the Court may direct.

    (4) The members of the creditors' committee or, if there is no creditors' committee, the creditors given notice of the hearing may appear and be heard at the hearing of an application made under subsection (2).

    (5) On the hearing of an application under subsection (2), the Court shall fix the remuneration of the administrator, liquidator or bankruptcy trustee at such amount as it considers appropriate.

    (6) In this section, "liquidator" does not include a provisional liquidator.

## Application by creditors for reduction of remuneration

  **431.** (1) Where the creditors' committee has fixed the remuneration of an administrator, liquidator or bankruptcy trustee, a creditor may, with the concurrence of at least 25% in value of the creditors, including himself or herself, apply to the Court for an order reducing the remuneration fixed on the grounds that it is excessive.

    (2) On an application made under subsection (1), the Court may—

      *(a)* if it considers that the applicant has not shown sufficient cause for a reduction, dismiss the application; or

      *(b)* set a venue for the application to be heard.

    (3) An application shall not be dismissed under subsection (2)*(a)* unless the Court has given the applicant the opportunity to attend the Court for an *ex parte* hearing, of which he or she has been given at least 7 days notice.

    (4) An applicant for an order under subsection (1) shall give the administrator, liquidator or bankruptcy trustee not less than 14 days notice of the date, time and place set by the Court under subsection (2).

    (5) If it considers that the remuneration of the administrator, liquidator or bankruptcy trustee fixed by the creditors' committee is excessive, the Court shall fix the remuneration to such amount as it considers appropriate.

## General principles to be applied in fixing remuneration

  **432.** (1) This section applies—

    *(a)* to the fixing of the remuneration of an administrator, liquidator or bankruptcy trustee by a creditors committee under section 430;

    *(b)* to the fixing of the remuneration of an administrator, liquidator or bankruptcy trustee by the Court under section 430(5);

    *(c)* to the fixing of the remuneration of a provisional liquidator by the Court under section 172 and of a person appointed by the Court under section 307; *(Amended by Act 11 of 2004)*

    *(d)* to the fixing of the remuneration of a receiver by the Court under section 134(2) or section 134(3);

    *(e)* to the fixing of the remuneration of a supervisor or interim supervisor by the Court under section 17; and *(Amended by Act 11 of 2004)*

*(f)* to the fixing of the remuneration of an administrator, liquidator or bankruptcy trustee by the Court under section 431. *(Amended by Act 11 of 2004)*

(2) In this section and section 28—

"fixing remuneration" includes fixing the currency of payment;

"insolvency proceeding" means the insolvency proceeding in respect of which an insolvency practitioner is appointed; and

"insolvency practitioner" means administrator, liquidator, bankruptcy trustee, receiver, supervisor or interim supervisor, as the case may be.

(3) Subject to subsection (4), the remuneration of an insolvency practitioner shall be fixed by reference to the time properly given by him or her and his or her staff in carrying out his or her duties in the insolvency proceeding.

(4) Where the insolvency practitioner so requests and the creditors' committee or the Court considers that the circumstances justify it, the remuneration of an insolvency practitioner may be fixed in whole or in part as a percentage of the value of the assets realised and the value of the assets distributed, or as a percentage of either.

(5) When fixing the remuneration of an insolvency practitioner in the circumstances specified in subsection (1) or sanctioning an interim payment under section 433(3), the creditors' committee or the Court—

*(a)* shall take into account—

(i) the need for the remuneration to be fair and reasonable;

(ii) the time properly spent by the insolvency practitioner and his or her staff in carrying out his or her duties;

(iii) the complexity of the insolvency proceeding and whether the insolvency practitioner has been required to take any responsibility of an exceptional kind or degree;

(iv) the effectiveness with which the insolvency practitioner is carrying out, or has carried out, his or her duties;

(v) the value and nature of the assets with which the insolvency practitioner has had to deal;

(vi) the hourly rates charged by other insolvency practitioners, both within and outside the Virgin Islands, in undertaking similar work; and

(vii) whether any expenses which he or she incurred were properly incurred; and

*(b)* may take into account—

(i) the commercial and personal risks accepted by the insolvency practitioner; *(Amended by Act 11 of 2004)*

(ii) the time spent by the insolvency practitioner and his or her staff outside the Virgin Islands and the amount of travelling required; and

       (iii) the standards and practice used for assessing remuneration in jurisdictions other than the Virgin Islands.

## Time for fixing remuneration and interim payments

**433.** (1) The remuneration of an office holder shall be fixed by the creditors' committee or the Court after the conclusion of the insolvency proceeding.

     (2) In fixing the remuneration of an office holder, the creditors' committee or the Court shall take account of any interim payment made under subsection (3).

     (3) Notwithstanding subsection (1), a creditors' committee or the Court may at any time set an interim payment to be made to the insolvency practitioner on account of his or her remuneration.

     (4) An interim payment may be made under subsection (3) subject to such conditions as the creditors' committee or the Court considers appropriate. *(Amended by Act 11 of 2004)*

PART XVII

NETTING AND FINANCIAL CONTRACTS

## Interpretation for sections 434 and 435

**434.** (1) In this section and section 435—

"financial contract" means a contract of a type specified in the Rules as a financial contract;

"master netting agreement" has the meaning specified in subsection (4);

"multibranch netting agreement" *(Repealed by Act 11 of 2004)*

"netting" means the termination of financial contracts, the determination of the termination values of those contracts and the set off of the termination values so determined so as to arrive at a net amount due, if any, by one party to the other where each such determination and set off is effected in accordance with the terms of a netting agreement between those parties;

"netting agreement" has the meaning specified in subsection (2);

"party" means a person constituting one of the parties to an agreement.

     (2) A netting agreement is an agreement between 2 parties only, in relation to present or future financial contracts between them the provisions of which include the termination of those contracts for the time being in existence, the determination of the termination values of those contracts and the set off of the termination values so determined so as to arrive at a net amount due.

     (3) A netting agreement may provide for—

       *(a)* a guarantee to be given to one party on behalf of the other party solely to secure the obligation of either party in respect of the financial contracts concerned; and

*(b)* the set off against the net amount due under subsection (2) and that amount only of—

  (i) any money provided solely to secure the obligation of either party in respect of the financial contracts concerned;

  (ii) the proceeds of the enforcement and realisation of any collateral in the form of—

    (I) security interests or other assets provided; or

    (II) money, security interests or other assets provided solely to secure the obligation of the guarantor under paragraph *(a)*, solely to secure the obligation of either party in respect of the financial contracts concerned.

(4) A master netting agreement is an agreement between two parties only, in relation to netting agreements between them—

*(a)* the provisions of which include the set off of the net amounts due under two or more netting agreements between them; and

*(b)* which may provide for a guarantee to be given to one party on behalf of the other party solely to secure the obligation of either party in respect of the netting agreements concerned; and

*(c)* which may provide for the set off against the net amount due under paragraph *(a)* and that amount only of—

  (i) any money provided solely to secure the obligation of either party in respect of the netting agreements concerned;

  (ii) the proceeds of the enforcement and realisation of any collateral in the form of—

    (I) security interests or other assets provided; or

    (II) money, security interests or other assets provided solely to secure the obligation of the guarantor under paragraph *(b)*, solely to secure the obligation of either party in respect of the netting agreements concerned.

## Enforcement of netting agreements etc.

**435.** (1) Notwithstanding anything contained in this Act or the Rules or in any rule of law relating to insolvency—

*(a)* the provisions relating to netting, the set off of money provided by way of security, the enforcement of a guarantee and the enforcement of a collateral arrangement and the set off of proceeds thereof, as contained within a netting agreement or a guarantee provided for in such an agreement shall be legally enforceable against a party to the agreement and, where applicable, against a guarantor or other person providing security; and

*(b)* the provisions relating to set off of the net amounts due under netting agreements, the set off of money provided by way of security, the enforcement of a guarantee and the enforcement of a collateral arrangement and the set off of the proceeds thereof, as

contained within a master netting agreement or a guarantee provided for in such an agreement shall be legally enforceable against a party to the agreement and, where applicable, against a guarantor or other person providing security.

(2) Nothing in subsection (1)—

    *(a)* prevents the application of this Act, any other enactment or rule of law which would prevent the legal enforceability of netting, set off, or enforcement in any particular case, on the grounds of fraud or misrepresentation or on any similar ground; or

    *(b)* permits the enforceability of netting, set off, or enforcement if any provision of an agreement between the two parties concerned would make netting, set off, enforcement and realisation void whether because of fraud or misrepresentation or any similar ground.

PART XVIII

CROSS-BORDER INSOLVENCY

*General Provisions*

## Purpose and scope of this Part

 436. (1) The purpose of this Part is to provide effective mechanisms for dealing with cases of cross-border insolvency so as to promote the objectives of—

    *(a)* cooperation between—

        (i) the Court and insolvency administrators of the Virgin Islands; and

        (ii) the courts and other competent authorities of foreign countries involved in cases of cross-border insolvency;

    *(b)* greater legal certainty for trade and investment;

    *(c)* fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested persons, including the debtor;

    *(d)* protection and maximisation of the value of the debtor's assets; and

    *(e)* facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

(2) This Part applies where—

    *(a)* assistance is sought in the Virgin Islands by a foreign Court or a foreign representative in connection with a foreign proceeding;

    *(b)* assistance is sought in a foreign country in connection with a Virgin Islands insolvency proceeding;

*(c)* a foreign proceeding and a Virgin Islands insolvency proceeding in respect of the same debtor are taking place concurrently; or

*(d)* creditors or other interested persons in a designated foreign country have an interest in requesting the commencement of, or participating in, a Virgin Islands insolvency proceeding.

(3) This Part does not apply to a regulated person who holds, or at any time has held, a prescribed financial services licence of a type designated by the Governor for the purposes of this section by notice published in the *Gazette*.

## Interpretation for this Part

437. (1) In this Part—

"designated foreign country" means a country or territory designated by the Governor for the purposes of this Part by notice published in the *Gazette*;

"establishment" means any place of operations where the debtor carries out a non-transitory economic activity with human means and goods or services;

"foreign ancillary proceeding" means a foreign proceeding, other than a foreign main proceeding, taking place in a country where the debtor has an establishment within the meaning of subparagraph *(f)* of this article;

"foreign court" means a judicial or other authority competent to control or supervise a foreign proceeding;

"foreign main proceeding" means a foreign proceeding taking place in the country where the debtor has the centre of his or her main interests;

"foreign proceeding" means a collective judicial or administrative proceeding in a designated foreign country, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the property and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganisation,  liquidation or bankruptcy;

"foreign representative" means a person or body, including one appointed on an interim basis, authorised in a foreign proceeding to administer the reorganisation or the liquidation of the debtor's property or affairs or to act as a representative of the foreign proceeding;

"insolvency officer" means the Official Receiver, a liquidator, provisional liquidator, bankruptcy trustee, administrator, receiver, supervisor or interim supervisor;

"Virgin Islands insolvency proceeding" means a collective judicial or administrative proceeding, including an interim proceeding, pursuant to this Act, or to any other enactment in the Virgin Islands; relating—

*(a)* to the bankruptcy, liquidation, administration or receivership of a debtor; or

*(b)* to the reorganisation of a debtor's affairs, where, in all cases, the property of the debtor is or will be realised for the benefit of secured or unsecured creditors.

*Insolvency Act* **LAW OF VIRGIN ISLANDS**

(2) In the interpretation of this Part, the Court shall have regard to its international origin and to the need to promote an application of this Part that is consistent with the application of similar laws adopted by foreign jurisdictions.

## International obligations of the Virgin Islands

**438.** To the extent that this Part conflicts with an obligation of the Virgin Islands arising out of any treaty or other form of agreement to which the Virgin Islands is a party with one or more other countries, the requirements of the treaty or agreement prevail.

## Public policy exception

**439.** Nothing in this Part prevents the Court from refusing to take an action governed by this Part if the action would be contrary to the public policy of the Virgin Islands.

## Additional assistance

**440.** Subject to section 443, nothing in this Part limits the power of the Court or an insolvency officer to provide additional assistance to a foreign representative where permitted under any other Part of this Act or under any other enactment or rule of law of the Virgin Islands.

## Application under this Part

**441.** An application under this Part shall be made to the Court in accordance with the Rules.

## Authorisation of insolvency officer to act in a foreign country

**442.** The Court may, on the application of an insolvency officer, authorise him or her to act in a foreign country on behalf of a Virgin Islands insolvency proceeding as permitted by the applicable foreign law.

*Access of Foreign Representatives and Creditors to Courts in the Virgin Islands*

## Right of direct access

**443.** (1) A foreign representative is entitled to apply to the Court under section 448 for recognition of the foreign proceeding in respect of which he or she is appointed.

(2) Subject to section 453, a foreign representative may not be granted comity or cooperation by the Court unless the foreign proceeding in respect of which he or she is appointed has been granted recognition by the Court.

(3) Upon recognition being granted to the foreign proceeding in respect of which a foreign representative is appointed, he or she may apply directly to the Court for comity or cooperation or for any other relief under this Part.

## Limited jurisdiction

**444.** The sole fact that a foreign representative makes an application under section 448 does not subject the foreign representative to the jurisdiction of the Court for any other purpose.

## Commencement of and participation in a Virgin Islands insolvency proceeding by foreign representative

**445.** A foreign representative, upon the recognition of the foreign proceeding in respect of which he or she is appointed, may—

(a) apply to commence a Virgin Islands insolvency proceeding if the conditions for commencing such a proceeding are otherwise met; and

(b) participate in a Virgin Islands insolvency proceeding regarding the debtor.

## Access of foreign creditors to a Virgin Islands proceeding

**446.** (1) Subject to subsection (2), foreign creditors have the same rights regarding the commencement of, and participation in, a Virgin Islands insolvency proceeding as creditors in the Virgin Islands.

(2) Subsection (1) does not affect the priority of claims in a Virgin Islands insolvency proceeding or the exclusion of foreign penal, revenue and social security claims from such a proceeding.

## Notification to foreign creditors of a Virgin Islands insolvency proceeding

**447.** (1) Whenever under a Virgin Islands insolvency proceeding notification is to be given to creditors in the Virgin Islands, such notification shall also be given to the known creditors that do not have addresses in the Virgin Islands.

(2) Where the address of any creditor is not known, the Court may order that appropriate steps be taken with a view to notifying that creditor.

(3) Notification to creditors under subsection (1) shall be made to the foreign creditors individually, unless the Court considers that, under the circumstances, some other form of notification would be more appropriate. No letters rogatory or other, similar formality is required.

(4) When notification of the commencement of a Virgin Islands insolvency proceeding is to be given to foreign creditors, the notification shall—

(a) indicate the time period for submitting claims and specify the place for their submission;

(b) indicate whether secured creditors need to submit their secured claims; and

(c) contain any other information required to be included in such a notification to creditors pursuant to the law of the Virgin Islands and any order of the Court.

*Insolvency Act*  LAW OF
VIRGIN ISLANDS

Revision Date: 1 Jan 2020

(5) The Rules and any order of the Court as to notice or the submission of a claim time shall provide such additional time to creditors with foreign addresses as is reasonable under the circumstances.

*Recognition of Foreign Proceeding and Relief*

## Application for recognition of foreign proceeding

**448.** (1) A foreign representative may apply to the Court for recognition of the foreign proceeding in which the foreign representative has been appointed.

(2) An application for recognition shall be accompanied by—

*(a)* a certified copy of the decision commencing the foreign proceeding and appointing the foreign representative; or

*(b)* a certificate from the foreign court affirming the existence of the foreign proceeding and of the appointment of the foreign representative; or

*(c)* in the absence of evidence referred to in paragraphs *(a)* and *(b)*, any other evidence acceptable to the Court of the existence of the foreign proceeding and of the appointment of the foreign representative.

(3) An application for recognition shall also be accompanied by a statement identifying all foreign proceedings in respect of the debtor that are known to the foreign representative.

(4) If the documents referred to in subsection (2)*(a)* and *(b)* are not in English, they shall be accompanied by a certified translation of the documents into English.

(5) The Court may require a certified translation of any other documents supplied in support of the application for recognition into English.

## Presumptions concerning recognition

**449.** (1) If the decision or certificate referred to in section 448(2) indicates that the proceeding is a foreign proceeding as defined in section 437(1)and that the person or body is a foreign representative as defined in section 437(1), the Court is entitled to so presume.

(2) The Court is entitled to presume that documents submitted in support of the application for recognition are authentic, whether or not they have been legalised.

(3) In the absence of proof to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the centre of the debtor's main interests.

## Recognition of foreign proceedings

**450.** (1) Subject to section 439, a foreign proceeding shall be recognised if—

*(a)* the proceeding is a foreign proceeding within the meaning of section 437(1);

*(b)* the person or body applying for recognition is a foreign representative within the meaning of section 437(1);

*(c)* the application meets the requirements of section 448(2); and

*(d)* the application has been made in accordance with this Part and the Rules.

(2) The foreign proceeding shall be recognised—

*(a)* as a foreign main proceeding if it is taking place in the country where the debtor has the centre of his or her main interests; or

*(b)* as a foreign ancillary proceeding if the debtor has an establishment in the foreign country.

(3) An application for recognition of a foreign proceeding shall be decided upon at the earliest possible time.

(4) The provisions of this Part do not prevent the modification or termination of recognition if it is shown that the grounds for granting it were fully or partially lacking or have ceased to exist.

## Subsequent information

**451.** After the filing of an application for recognition of a foreign proceeding, the foreign representative shall inform the Court promptly of—

*(a)* any substantial change in the status of the recognised foreign proceeding or the status of the foreign representative's appointment; and

*(b)* any other foreign proceeding regarding the same debtor that becomes known to the foreign representative.

## Interim relief

**452.** (1) Where an application for recognition of a foreign proceeding has been filed but not yet determined or withdrawn, the Court may, on the application of the foreign representative concerned, if it is satisfied that relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant such relief of a provisional nature as it considers appropriate, including—

*(a)* staying execution against the debtor's assets;

*(b)* entrusting the administration or realisation of all or part of the debtor's assets located in the Virgin Islands to the foreign representative or to another person designated by the Court, in order to protect and preserve the value of assets that, by their nature or because of other circumstances, are perishable, susceptible to devaluation or otherwise in jeopardy;

*(c)* any relief mentioned in section 454(1)*(c)*, *(d)* and *(f)*.

(2) The foreign representative in whose favour an order is made under subsection (1) shall notify the debtor of the order as soon as practicable or within such time as the Court may order.

(3) Unless extended under section 454(1)*(f)*, the relief granted under this article terminates when the Court determines the application for recognition.

(4) The Court may refuse to grant relief under this section if such relief would interfere with the administration of a foreign main proceeding.

## Effects of recognition of foreign main proceeding

**453.** (1) Upon recognition of a foreign proceeding that is a foreign main proceeding—

    *(a)* commencement or continuation of individual actions or individual proceedings concerning the property of the debtor within the Virgin Islands, rights, obligations or liabilities is stayed;

    *(b)* execution against the debtor's property within the Virgin Islands is stayed; and

    *(c)* the right to transfer, encumber or otherwise dispose of any property of the debtor within the Virgin Islands is suspended.

(2) Notwithstanding subsection (1), the Court may, on the application of any creditor or interested person, order that the stay or suspension does not apply in respect of any particular action or proceeding or in respect of any particular property, rights, obligation or liability.

(3) An order under subsection (2) may be made subject to such terms as it considers fit.

(4) Subsection (1)*(a)* does not affect the right to commence individual actions or proceedings to the extent necessary to preserve a claim against the debtor.

(5) Subsection (1) does not affect the right to request the commencement of a Virgin Islands insolvency proceeding or the right to file claims in such a proceeding.

## Relief that may be granted upon recognition of foreign proceeding

**454.** (1) Upon recognition of a foreign proceeding, whether main or ancillary, where necessary to protect the assets of the debtor or the interests of the creditors, the Court may, at the request of the foreign representative, grant any appropriate relief, including—

    *(a)* staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's property, rights, obligations or liabilities, to the extent they have not been stayed under section 453(1)*(a)*;

    *(b)* staying execution against the debtor's property to the extent it has not been stayed under section 453(1)*(b)*;

    *(c)* suspending the right to transfer, encumber or otherwise dispose of any property of the debtor to the extent this right has not been suspended under section 453(1)*(c)*;

    *(d)* providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

*(e)* entrusting the administration or realisation of all or part of the debtor's assets located in Virgin Islands to the foreign representative or another person designated by the Court;

*(f)* extending relief granted under section 452(1).

(2) Upon recognition of a foreign proceeding, whether main or ancillary, the Court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's property located in the Virgin Islands to the foreign representative or another person designated by the Court, provided that the Court is satisfied that the interests of creditors in the Virgin Islands are adequately protected.

(3) In granting relief under this section to a representative of a foreign ancillary proceeding, the Court shall be satisfied that the relief relates to property that, under the law of the Virgin Islands, should be administered in the foreign ancillary proceeding or concerns information required in that proceeding.

## Protection of creditors and other interested persons

**455.** (1) In granting or denying relief under section 452 or 454, or in modifying or terminating relief under subsection (3), the Court shall be satisfied that the interests of the creditors and other interested persons, including the debtor, are adequately protected.

(2) The Court may subject relief granted under section 452 or 454 to such conditions as it considers appropriate, including the giving of any security interest or the filing of any bond.

(3) The Court may, at the request of the foreign representative or a person affected by relief granted under section 452 or 454, or at its own motion, modify or terminate the relief.

## Actions to avoid acts detrimental to creditors

**456.** (1) Subject to subsection (2), upon recognition of a foreign proceeding, the foreign representative shall have power to apply to the Court for an order under section 249 or 405, as the case may be.

(2) The Court shall not make an order under section 249 or 405 on the application of the foreign representative of a recognised foreign proceeding unless it is satisfied that—

*(a)* in the case of an application under section 249, the foreign representative has roles and functions that are equivalent or broadly similar to the roles and functions of a liquidator appointed under this Act; and

*(b)* in the case of an application under section 405, the foreign representative has roles and functions that are equivalent or broadly similar to the roles and functions of a bankruptcy trustee appointed under this Act.

(3) When the foreign proceeding is a foreign ancillary proceeding, the Court shall be satisfied that the action relates to property that, under the law of the Virgin Islands, should be administered in the foreign ancillary proceeding.

### Intervention by foreign representative in proceedings in the Virgin Islands

**457.** Upon recognition of a foreign proceeding, the foreign representative may, if the requirements of the law of the Virgin Islands are met, intervene in any proceedings in which the debtor is a party.

*Cooperation with Foreign Courts and
Foreign Representatives*

### Cooperation and direct communication between court of the Virgin Islands and foreign courts or foreign representatives

**458.** (1) In matters referred to in section 436, the Court shall cooperate to the maximum extent possible with foreign courts or foreign representatives, either directly or through an insolvency administrator.

(2) The Court is entitled to communicate directly with, or to request information or assistance directly from, foreign courts or foreign representatives, subject to the rights of parties to notice and participation at hearings.

### Cooperation and direct communication between the insolvency administrator and foreign courts or foreign representatives

**459.** (1) In matters referred to in section 436, an insolvency administrator shall, in the exercise of his or her functions and subject to the supervision of the Court, cooperate to the maximum extent possible with foreign courts or foreign representatives.

(2) Subject to section 442, the insolvency administrator is entitled, in the exercise of his or her functions and subject to the supervision of the Court, to communicate directly with foreign courts or foreign representatives.

### Forms of cooperation

**460.** Cooperation referred to in sections 458 and 459 may be implemented by any appropriate means, including—

    *(a)* appointment of a person or body to act at the direction of the Court;

    *(b)* communication of information by any means considered appropriate by the Court;

    *(c)* coordination of the administration and supervision of the debtor's property and affairs;

    *(d)* approval or implementation by courts of agreements concerning the coordination of proceedings;

    *(e)* coordination of concurrent proceedings regarding the same debtor.

*Concurrent Proceedings*

## Commencement of a Virgin Islands insolvency proceeding after recognition of foreign main proceeding

**461.** After recognition of a foreign main proceeding, a Virgin Islands insolvency proceeding  may be commenced only if the debtor has assets in the Virgin Islands and the effects of the Virgin Islands proceeding shall be restricted to the assets of the debtor that are located in the Virgin Islands and, to the extent necessary to implement cooperation and coordination under sections 458, 459 and 460, to other property of the debtor that, under the law of the Virgin Islands, should be administered in the recognised proceeding.

## Coordination of a Virgin Islands insolvency proceeding and foreign proceeding

**462.** Where a foreign proceeding and a Virgin Islands insolvency proceeding are taking place concurrently regarding the same debtor, the Court shall seek cooperation and coordination under sections 458, 459 and 460, and the following shall apply—

    *(a)* when the Virgin Islands insolvency proceeding is taking place at the time the application for recognition of the foreign proceeding is filed—

        (i) any relief granted under section 452 or 454 shall be consistent with the Virgin Islands insolvency proceeding; and

        (ii) if the foreign proceeding is recognised in the Virgin Islands as a foreign main proceeding, section 453 does not apply;

    *(b)* when the Virgin Islands insolvency proceeding commences after recognition, or after the filing of the application for recognition, of the foreign proceeding—

        (i) any relief in effect under section 452 or 454 shall be reviewed by the Court and shall be modified or terminated if inconsistent with the Virgin Islands insolvency proceeding; and

        (ii) if the foreign proceeding is a foreign main proceeding, the stay and suspension referred to in section 453(1) shall be modified or terminated pursuant to section 453(2) if inconsistent with the Virgin Islands insolvency proceeding;

    *(c)* in granting, extending or modifying relief granted to a representative of a foreign ancillary proceeding, the Court shall be satisfied that the relief relates to property that, under the law of the Virgin Islands, should be administered in the foreign ancillary proceeding or concerns information required in that proceeding.

## Coordination of more than one foreign proceeding

**463.** In matters referred to in section 436, in respect of more than one foreign proceeding regarding the same debtor, the Court shall seek cooperation and coordination under sections 458, 459 and 460 and the following shall apply—

*Insolvency Act*

(a) any relief granted under section 452 or 454  to a representative of a foreign ancillary proceeding after recognition of a foreign main proceeding shall be consistent with the foreign main proceeding;

(b) if a foreign main proceeding is recognised after recognition, or after the filing of an application for recognition, of a foreign ancillary proceeding, any relief in effect under section 452 or 454 shall be reviewed by the Court and shall be modified or terminated if inconsistent with the foreign main proceeding;

(c) if, after recognition of a foreign ancillary proceeding, another foreign ancillary proceeding is recognised, the Court shall grant, modify or terminate relief for the purpose of facilitating coordination of the proceedings.

## Presumption of insolvency based on recognition of foreign main proceeding

**464.** In the absence of evidence to the contrary, recognition of a foreign main proceeding is, for the purpose of commencing a Virgin Islands insolvency proceeding proof that the debtor is insolvent.

## Rule of payment in concurrent proceedings

**465.** Without prejudice to secured claims or rights *in rem*, a creditor who has received part payment in respect of his or her claim in a proceeding pursuant to a law relating to insolvency in a foreign country may not receive a payment for the same claim in a Virgin Islands insolvency proceeding regarding the same debtor, so long as the payment to the other creditors of the same class is proportionately less than the payment the creditor has already received.

PART XIX

ORDERS IN AID OF FOREIGN PROCEEDINGS

## Interpretation for this Part

**466.** (1) In this Part—

"foreign proceeding" means a collective judicial or administrative proceeding in a relevant foreign country, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the property and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganisation,  liquidation or bankruptcy and "debtor" shall be construed accordingly;

"foreign representative" means a person or body, including one appointed on an interim basis, authorised in a foreign proceeding to administer the reorganisation or the liquidation of the debtor's property or affairs or to act as a representative of the foreign proceeding;

"insolvency officer" means the Official Receiver, a liquidator, provisional liquidator, bankruptcy trustee, administrator, receiver, supervisor, or interim supervisor;

"relevant foreign country" means a country, territory or jurisdiction designated by the Commission as a relevant foreign country for the purposes of this Part; and

"Virgin Islands insolvency proceeding" means a collective judicial or administrative proceeding, including an interim proceeding, pursuant to this Act, or to any other enactment in the Virgin Islands, relating—

    *(a)* to the bankruptcy, liquidation, administration or receivership of a debtor; or

    *(b)* to the reorganisation of a debtor's affairs, where, in all cases, the property of the debtor is or will be realised for the benefit of secured or unsecured creditors.

(2) Notwithstanding subsection (1), a country or territory that is designated as a designated country for the purposes of Part XVIII ceases to be a relevant foreign country from the date of its designation as a designated country.

(3) The designation of a country for the purposes of Part XVIII does not affect the validity of any order made under this Part.

## Order in aid of foreign proceeding

**467.** (1) For the purposes of this section "property" means property that is subject to or involved in the foreign proceeding in respect of which the foreign representative is authorised.

(2) A foreign representative may apply to the Court for an order under subsection (3) in aid of the foreign proceeding in respect of which he or she is authorised.

(3) Subject to section 468, upon an application under subsection (1), the Court may—

    *(a)* restrain the commencement or continuation of any proceedings, execution or other legal process or the levying of any distress against a debtor or in relation to any of the debtor's property;

    *(b)* subject to subsection (4), restrain the creation, exercise or enforcement of any right or remedy over or against any of the debtor's property;

    *(c)* require any person to deliver up to the foreign representative any property of the debtor or the proceeds of such property;

    *(d)* make such order or grant such relief as it considers appropriate to facilitate, approve or implement arrangements that will result in a co-ordination of a Virgin Islands insolvency proceeding with a foreign proceeding;

    *(e)* appoint an interim receiver of any property of the debtor for such term and subject to such conditions as it considers appropriate;

    *(f)* authorise the examination by the foreign representative of the debtor or of any person who could be examined in a Virgin Islands insolvency proceeding in respect of a debtor;

    *(g)* stay or terminate or make any other order it considers appropriate in relation to a Virgin Islands insolvency proceeding; or

*(h)* make such order or grant such other relief as it considers appropriate.

(4) An order under subsection (3) shall not affect the right of a secured creditor to take possession of and realise or otherwise deal with property of the debtor over which the creditor has a security interest.

(5) In making an order under subsection (3), the Court may apply the law of the Virgin Islands or the law applicable in respect of the foreign proceeding.

## Matters to be considered by Court in determining application under section 467

**468.** (1) In determining an application under section 467, the Court shall be guided by what will best ensure the economic and expeditious administration of the foreign proceeding to the extent consistent with—

*(a)* the just treatment of all persons claiming in the foreign proceeding;

*(b)* the protection of persons in the Virgin Islands who have claims against the debtor against prejudice and inconvenience in the processing of claims in the foreign proceeding;

*(c)* the prevention of preferential or fraudulent dispositions of property subject to the foreign proceeding, or the proceeds of such property;

*(d)* the need for distributions to claimants in the foreign proceedings to be substantially in accordance with the order of distributions in a Virgin Islands insolvency; and

*(e)* comity.

(2) An order under section 467 shall not, without the consent of the person concerned—

*(a)* affect the right of any creditor of the debtor to benefit from set-off as provided for in section 150; or

*(b)* result in a person who is a preferential creditor of the debtor, or who in a Virgin Islands insolvency proceeding in respect of the debtor would be a preferential creditor, receiving less than he or she would receive in a Virgin Islands insolvency proceeding.

(3) The Court shall not make an order under 467 that is contrary to the public policy of the Virgin Islands.

## Limitation on effect of application under this Part

**469.** (1) Subject to subsection (2), an application to the Court by a foreign representative under section 467 does not submit the foreign representative to the jurisdiction of the Court for any other purpose except with regard to the costs of the proceedings.

(2) The Court may make an order under this Part conditional on the compliance by the foreign representative with any other order of the Court.

## Additional assistance

**470.** Subject to section 443, nothing in this Part limits the power of the Court or an insolvency officer to provide additional assistance to a foreign representative where permitted under any other Part of this Act or under any other enactment or rule of law of the Virgin Islands.

## Application under this Part

**471.** An application by a foreign representative under this Part shall be made to the Court in accordance with the Rules.

## Authorisation of insolvency officer to act in foreign country

**472.** The Court may, on the application of an insolvency officer, authorise him or her to act in a foreign country on behalf of a Virgin Islands insolvency proceeding as permitted by the applicable foreign law.

PART XX

INSOLVENCY PRACTITIONERS

*Licensing*

## Interpretation for this Part

**473.** In this Part—

"Code of Practice" means the Code of Practice that the Commission is empowered to issue under section 487(1);

"Commission" means the Financial Services Commission established under the Financial Services Commission Act;

"licence" means a licence to act as an insolvency practitioner granted under section 476;

"licensee" means a licensed insolvency practitioner;

"overseas insolvency practitioner" means an individual resident outside the Virgin Islands appointed to act as an insolvency practitioner under section 483; and

"Regulations" means the Insolvency Practitioners Regulations made under section 486.

## Prohibition on acting as insolvency practitioner without a licence

**474.** (1) For the purposes of this Act, a person acts as an insolvency practitioner by acting as—

    *(a)* the administrator or administrative receiver of a company;

    *(b)* the liquidator or provisional liquidator of a company or a foreign company;

*Insolvency Act*

*(ba)* a portfolio liquidator appointed under section 152 of the BVI Business Companies Act; *(Inserted by Act 16 of 2004)*

*(c)* the interim supervisor under a proposal for an arrangement;

*(d)* the supervisor of an arrangement; or

*(e)* the bankruptcy trustee of an individual.

(2) Subject to subsection (3), no person shall act as an insolvency practitioner unless he or she holds a licence issued under section 476 that is not suspended under section 479.

(3) Subsection (2) does not apply—

*(a)* to the Official Receiver; or

*(b)* to an overseas insolvency practitioner whilst he or she is acting jointly with a licensee or with the Official Receiver.

(4) A person who contravenes subsection (2) commits an offence.

### Application for licence

**475.** (1) An individual resident in the Virgin Islands may apply to the Commission for a licence to act as an insolvency practitioner.

(2) An application under subsection (1) shall—

*(a)* contain the information and be in the form prescribed; and

*(b)* be accompanied by the documentation prescribed.

(3) The Commission may require an applicant for a licence to furnish it with such other documentation and information as it considers necessary to determine the application.

### Issue of licence

**476.** (1) The Commission may issue a licence to the applicant if it is satisfied—

*(a)* that the applicant—

   (i) is an individual resident in the Virgin Islands who is fit and proper and qualified to act as an insolvency practitioner;

   (ii) satisfies the requirements of this Act in respect of the application and will, upon issuance of the licence, be in compliance with this Act and the Regulations; and

   (iii) is not disqualified from holding a licence under section 477; and

*(b)* that issuing the licence is not against the public interest.

(2) A licence may be issued under subsection (1) subject to such terms and conditions as the Commission considers fit.

(3) The Commission shall not be required to disclose to an applicant the reasons for a decision under this section.

(4) The Commission may, upon giving reasonable notice to the licensee—

    *(a)* vary or cancel any terms or conditions imposed under subsection (1); or

    *(b)* impose new terms or conditions.

(5) The Commission shall publish the issuance of a licence under this section in the *Gazette*.

## Persons disqualified from holding a licence

**477.** An individual is disqualified from holding a licence if—

    *(a)* he or she is a bankrupt; or

    *(b)* he or she is a disqualified person within the meaning of section 260(4) or a restricted person within the meaning of section 409. *(Amended by Act 11 of 2004)*

*Control of Licensees and Enforcement*

## Production of accounts and records

**478.** (1) The Commission may, at any time during or after the completion of an insolvency proceeding, require a licensee appointed in respect of the proceeding to produce for inspection, at such place as he or she may specify—

    *(a)* his or her records and accounts in respect of the proceeding; and

    *(b)* any reports that he or she has prepared in respect of the proceeding.

(2) The Commission may cause the accounts and records produced to him or her under subsection (1) to be audited.

(3) The licensee shall give the Commission such further information, explanations and assistance in relation to the records, accounts and reports as the Commission may require.

(4) A licensee who contravenes this section commits an offence.

## Suspension and revocation of licence

**479.** (1) The Commission shall suspend or revoke the licence of a licensee if—

    *(a)* in the opinion of the Commission, the licensee is no longer a fit and proper person to hold a licence;

    *(b)* the licensee is disqualified from holding a licence; or *(Amended by Act 11 of 2004)*

    *(c)* he or she is no longer resident in the Virgin Islands. *(Inserted by Act 11 of 2004)*

(2) The Commission may suspend or revoke the licence of a licensee if the licensee—

    *(a)* is in breach of any condition of his or her licence;

*Insolvency Act* **LAW OF
VIRGIN ISLANDS**

Revision Date: 1 Jan 2020

(b) has failed to comply with his or her obligations under this Part, the Regulations or the Code of Practice; *(Amended by Act 11 of 2004)*

(c) has provided the Commission with any false, inaccurate or misleading information, whether on making application for a licence or subsequent to the issue of the licence;

(d) has committed an offence under this Act; *(Amended by Act 11 of 2004)*

(e) has failed to pay the prescribed annual fee payable within six weeks of the date upon which it fell due for payment; or

(f) he or she fails to comply with a directive issued by the Commission under section 480A. *(Inserted by Act 11 of 2004)*

(3) The Commission may revoke the licence of a licensee if requested to do so by the licensee.

(4) Subject to subsection (5), the period of suspension of a licence under subsection (1) shall not exceed 30 days.

(5) If it is satisfied that it is in the public interest to do so, the Court may, on the application of the Commission, extend the period of suspension of a licence under this section for one or more further periods not exceeding 30 days each.

(6) Before suspending or revoking a licence under subsections (1) or (2), the Commission shall give written notice to the licensee stating—

(a) the grounds upon which it intends to revoke or suspend the licence; and

(b) that unless the licensee, by written notice filed with the Commission, shows good reason why its licence should not be revoked or suspended, the licence will be revoked or suspended, as the case may be, on a date not less than 14 days after the date of the notice.

(7) Where the Commission revokes or suspends a licence under this section, it shall send a written notice to the licensee stating—

(a) that the licence has been revoked or suspended, as the case may be; and

(b) the grounds upon which and the date from which the licence has been revoked or suspended.

(8) Where the Commission revokes or suspends a licence under this section, it shall cause notice of the revocation or suspension to be published in the *Gazette*.

### Right to make representations

**480.** (1) A licensee who receives a notice given under 479(6) may, within 14 days of the date of the notice, make written representations to the Commission.

(2) The Commission shall consider the representations made to it under subsection (1) in determining whether to suspend or revoke the licence.

## Directives

**480A.** (1) Where the Commission is entitled to revoke or suspend the licence of a licensee under section 479(2), the Commission may issue one or more of the following directives—

> *(a)* that the licensee shall take all necessary steps to resign as an insolvency practitioner in respect of certain specified insolvency matters or specified types or descriptions of insolvency matters;

> *(b)* that the licensee shall not accept any new appointments as an insolvency practitioner or any new appointments of a specified type or description;

> *(c)* that the licensee shall take such other action as the Commission considers may be necessary to ensure that he or she properly fulfils his or her duties as an insolvency practitioner either generally or in respect of particular insolvency matters.

(2) Without limiting subsection (1), where it considers it necessary for the exercise of its functions or for the proper supervision of insolvency practitioners, the Commission may issue directives of a special or general nature not inconsistent with this Part.

(3) Where the Commission issues a directive of a general nature under subsection (2), it shall cause the directive to be advertised in the *Gazette*.

*(Inserted by Act 11 of 2004)*

### Obligations of Licensees

## Filing of returns and other documents

**481.** A licensee shall file with the Commission such returns and other documents as may be specified in the Regulations or the Code of Practice.

### Eligible Insolvency Practitioners

## Eligible insolvency practitioner

**482.** (1) A person is eligible to act as an insolvency practitioner in relation to a company, a foreign company or an individual if—

> *(a)* he or she is a licensed insolvency practitioner;

> *(b)* he or she has given his or her written consent to act in the prescribed form;

> *(c)* he or she is not disqualified from holding a licence under section 477;

> *(d)* he or she is not disqualified from acting—

>> (i) in the case of a company or a foreign company, under subsection (2); or

>> (ii) in the case of an individual, under subsection (3); and

*Insolvency Act*

*(e)* there is in force such security for the proper performance of his or her functions as may be specified in the Regulations.

(2) A person is disqualified from acting as an insolvency practitioner in respect of a company and a foreign company if he or she is, or at any time in the previous 3 years has been—

*(a)* the auditor of the company or an employee of such auditor; or

*(b)* a director of the company.

(3) An insolvency practitioner is disqualified from acting as an insolvency practitioner in respect of an individual if he or she is connected to the individual within the meaning of section 5(3).

## Appointment of overseas insolvency practitioner

**483.** Notwithstanding any other provision of this Act, an individual resident outside the Virgin Islands may be appointed to act as an insolvency practitioner jointly with a licensee or the Official Receiver if—

*(a)* where he or she is appointed by the Court, or in any other case the person or persons appointing him or her, is or are satisfied that—

(i) he or she has sufficient qualifications and experience to act in the insolvency proceeding in respect of which the appointment is made;

(ii) he or she has given his or her written consent to act in the prescribed form;

(iii) he or she is not disqualified from holding a licence under section 477;

(iv) he or she is not disqualified from acting in the case of a company or a foreign company, under subsection 482(2) or in the case of an individual, under subsection 482(3); and

(v) there is in force such security for the proper performance of his or her functions as may be specified in the Regulations; and

*(b)* prior written notice of his or her appointment has been given to the Commission.

## Commission's powers with regard to appointment of overseas insolvency practitioner

**484.** (1) Where an application is made to the Court for the appointment of an overseas insolvency practitioner to act as insolvency practitioner, the Commission may appear and be heard at the hearing of the application for the purpose of objecting to the appointment.

(2) Where the Commission receives notice under section 483*(b)* that an overseas insolvency practitioner is to be appointed by a person to act as an insolvency practitioner, it may give the appointer notice that it intends to apply to the Court for an order that the overseas insolvency practitioner concerned should not be appointed.

(3) Where a person receives a notice from the Commission under subsection (2), it shall not appoint the overseas insolvency practitioner concerned to act as insolvency practitioner unless—

    *(a)* the Court approves the appointment at the hearing of the Commission's application under subsection (2); or

    *(b)* the Commission approves the appointment.

(4) A person who contravenes subsection (3) commits an offence.

### Overseas practitioner sole appointee

**485.** (1) This section applies where a licensee, for any reason, ceases to act in an insolvency proceeding and an overseas insolvency practitioner appointed jointly with him or her remains as the only insolvency practitioner appointed in the insolvency proceeding.

(2) Where this section applies, the overseas practitioner shall within 3 days after becoming aware that he or she is the only person acting as insolvency practitioner in an insolvency proceeding, give notice in the prescribed form—

    *(a)* to the Court, where the Court appointed him or her, or to such person or persons as appointed him or her; and

    *(b)* to the Official Receiver.

(3) An overseas insolvency practitioner to whom subsection (1) applies is deemed not to be in contravention of section 474(2) —

    *(a)* where he or she gives notice in compliance with subsection (2), at any time during the period commencing with the date upon which he or she became the only person acting as insolvency practitioner in the insolvency proceeding and ending on the later of—

        (i) the 14th day after the date on which he or she became the only person acting as insolvency practitioner in the insolvency proceeding; or

        (ii) the seventh day after the date upon which he or she became aware that was the only person acting as insolvency practitioner in the insolvency proceeding; or

    *(b)* at any time when he or she does not know and could not be expected to have known that he or she is the only person acting in the insolvency proceeding.

### Regulations

**486.** (1) The Cabinet may, on the recommendation of the Commission, make Regulations generally for giving effect to this Part and specifically in respect of—

    *(a)* the form and contents of, and the documents that shall accompany, an application for a licence under this Part;

    *(b)* the qualifications and experience required of and examinations to be taken and passed by applicants for a licence;

> *(c)* the minimum security, including insurance cover, to be maintained by a licensee;
>
> *(d)* the records to be kept by a licensee, and the length of time such records shall be kept;
>
> *(e)* the inspection by the Commission of the records of a licensee;
>
> *(f)* documents to be filed with and returns to be made to the Commission by licensees;
>
> *(fa)* the submission to the Commission of complaints and the procedures for dealing with such complaints; *(Inserted by Act 11 of 2004)*
>
> *(g)* fees payable on application for a licence and by licensees generally; and
>
> *(h)* any other matter required or permitted by this Part to be specified in the Regulations.
>
> *(Amended by Act 11 of 2004)*

(2) The Regulations may—

> *(a)* make different provision in relation to different persons, circumstances or cases;
>
> *(b)* where a minimum standard, including a minimum level of security, is specified, authorise the Commission to impose a higher standard or a greater level of security, according to the circumstances of a particular licensee or insolvency proceeding; and
>
> *(c)* provide for offences and penalties for any prohibition or contravention or failure to comply with a requirement prescribed in the Regulations.

(3) The Regulations, and any amendment to the Regulations, shall be published in the *Gazette*.

(4) Sections 494, 495, 496 and 502 apply in respect of the Regulations. *(Inserted by Act 11 of 2004)*

## Code of Practice

**487.** (1) Subject to subsections (2) and (3), the Commission may issue a Code of Practice with respect to—

> *(a)* the criteria that will be used in assessing applications for a licence, including  the criteria for determining whether or not an individual is to be regarded as being resident in the Virgin Islands; and
>
> *(b)* the procedures to be followed by and the conduct expected of a licensee when acting as an insolvency practitioner.

(2) The Code of Practice shall not be inconsistent with the Act, the Rules or the Regulations.

(3) The Regulations may specify matters that shall or may be included in the Code of Practice, including the matters specified in section 486(1), and may limit the scope of the Code of Practice. *(Amended by Act 11 of 2004)*

(4) The Code of Practice may make different provision in relation to different persons, circumstances or cases.

(5) The Commission shall publish the Code of Practice and any amendments thereto in the *Gazette*.

## Insolvency Surplus Account

**487A.** (1) The Commission shall open and maintain an account called the Insolvency Surplus Account with a reputable bank licensed and operating in the Virgin Islands.

(2) The Commission shall pay into the Insolvency Surplus Account all monies representing the unclaimed assets of companies and bankrupts that are received by it in accordance with the Rules.

(3) The Rules may provide for the management of the Insolvency Surplus Account by the Commission, the investment of monies held in the Insolvency Surplus Account and the circumstances in which monies shall or may be paid into and out of the Insolvency Surplus Account.

*(Inserted by Act 11 of 2004)*

PART XXI

OFFICIAL RECEIVER

## Official Receiver

**488.** (1) The Commission shall appoint a suitably qualified and experienced person to be Official Receiver on such terms and conditions as it considers appropriate.

(2) The Official Receiver is an employee of the Commission.

## Deputy Official Receiver and staff

**489.** The Commission shall appoint one of its officers as Deputy Official Receiver and shall provide the Official Receiver with such other staff and resources as he or she requires to perform his or her functions under this Act and the Rules.

## Official Receiver as officer of the Court

**490.** For the purposes of the performance of his or her functions under this Act and the Rules, the Official Receiver is an officer of the Court and him or her—

*(a)* may apply to the Court for directions in connection with his or her functions; and

*(b)* shall comply with any directions given to him or her by the Court.

*Insolvency Act* **LAW OF VIRGIN ISLANDS**

Revision Date: 1 Jan 2020

## Functions of Official Receiver

**491.** (1) The Official Receiver has the duties, powers and functions imposed or conferred on him or her by this Act, any other enactment, the Rules and the Regulations. *(Amended by Act 11 of 2004)*

(2) Any assets vested in the Official Receiver on his or her dying or otherwise ceasing to hold office, vest in his or her successor without any conveyance, assignment or transfer.

(3) Subject to any provision in this Act or the Rules to the contrary, a reference to the liquidator, supervisor, interim supervisor, receiver or bankruptcy trustee includes the Official Receiver when acting in that capacity.

## Right of audience

**492.** The Official Receiver and the Deputy Official Receiver have a right of audience in insolvency proceedings before the Court.

PART XXII

MISCELLANEOUS PROVISIONS

## Appointment of 2 or more office holders

**493.** (1) Where this Act provides for the appointment of a liquidator, provisional liquidator, administrator, bankruptcy trustee, supervisor or interim supervisor, 2 or more persons may be jointly appointed to the relevant office.

(2) Where 2 or more persons are jointly appointed to an office, a function or power of the office may be performed or exercised by any one of the office holders, or by any 2 or more of them together, except so far as the order, deed, instrument or resolution appointing them otherwise provides.

## Use of prescribed forms

**494.** (1) If a document required or permitted by this Act or the Rules to be prepared or filed is of a type the form of which is prescribed by the Rules, that form shall be used with such modifications as the circumstances require.

(2) Notwithstanding subsection (1), a prescribed form shall not be varied so as to omit any information or guidance which the form gives to the intended recipient of the form.

## Notices

**495.** (1) Subject to subsection (2), all notices required or authorised to be given by or under this Act or the Rules shall be in writing.

(2) Subsection (1) does not apply where—

*(a)* this Act or the Rules provide otherwise; or

*(b)* the Court requires or permits a notice to be given in some other way.

## Time

**496.** (1) Unless this Act or the Rules expressly provide otherwise, where the Act or the Rules specify a time within which an action shall or may be done, the Court—

> *(a)* may extend the time either before or after it has expired; or

> *(b)* abridge the time, on such terms as it considers fit.

(2) Without limiting subsection (1), where it is satisfied that an application is urgent, the Court may—

> *(a)* hear the application immediately, either with or without notice to, or the attendance of, other parties; or

> *(b)* authorise a shorter period of service than that provided for by the Act or the Rules.

(3) *(Repealed by Act 11 of 2004)*

## Resolutions

**497.** (1) Anything which is required or permitted to be done under this Act or the Rules by a resolution of the creditors of a company, a bankrupt or an individual debtor, by a resolution of a creditors' committee or by a resolution of the members of a company may be done by written resolution of the creditors, creditors' committee or members in accordance with and subject to any conditions specified in the Rules. *(Substituted by Act 11 of 2004)*

(2) The Rules may specify types or classes of resolution to which subsection (1) does not apply.

(3) Subject to subsection (2)—

> *(a)* a reference in this Act or the Rules to a resolution of a creditors' or members' meeting or to anything done at a creditors' or members' meeting includes a reference to anything done by a written resolution in accordance with this section; and

> *(b)* a requirement to hold a creditors' or members' meeting is satisfied by the passing of a written resolution in accordance with this section.

## Rules

**498.** (1) The Cabinet may make Rules generally for giving effect to this Act and specifically in respect of anything required or permitted to be prescribed by this Act.

(2) The Rules may make different provision for different persons, circumstances or cases.

## Insolvent partnerships

**499.** (1) The Cabinet may make Rules specifying which provisions of this Act shall apply to insolvent partnerships and the modifications applicable to insolvent partnerships.

(2) The Rules made under subsection (1) may contain such incidental, supplemental and transitional provisions as the Cabinet considers necessary or expedient.

*(Amended by Act 11 of 2004)*

## Insolvent estates

**500.** (1) The Cabinet may make Rules specifying which provisions of this Act shall apply to the administration of insolvent estates of deceased persons and the modifications applicable to the administration of such estates.

(2) The Rules made under subsection (1) may contain such incidental, supplemental and transitional provisions as the Cabinet considers necessary or expedient.

*(Amended by Act 11 of 2004)*

## Offences, general provisions

**501.** (1) A person who commits an offence under this Act is liable on summary conviction—

   (a) if an individual, to the penalty stated against the relevant offence in column 4 of Schedule 5; or

   (b) if not an individual, to the penalty stated against the relevant offence in column 3 of Schedule 5,

and, in either case, to the daily default fine (if any) stated in column 5 of Schedule 5 for each day during which the default continues.

(2) Where an offence under this Act is committed by a body corporate, a director or officer who authorised, permitted or acquiesced in the commission of the offence also commits an offence and is liable on summary conviction—

   (a) if an individual, to the penalty stated against the relevant offence in column 4 of Schedule 5; or

   (b) if not an individual, to the penalty stated against the relevant offence in column 3 of Schedule 5, and, in either case, to the daily default fine (if any) stated in column 5 of Schedule 5 for each day during which the default continues.

## Rules may provide for offences and penalties

**502.** The Rules may provide for offences and penalties for any prohibition or contravention or failure to comply with a requirement prescribed in the Rules.

## Provisions of other enactments not to apply

**503.** Section 101 of the BVI Business Companies Act do not apply in respect of—

   (a) any document, including an application to the Court, that is required or permitted to be served or sent; or

   (b) any notice required or permitted to be given to any person, under this Act or the Rules.

*(Amended by Act 16 of 2004)*

### Disapplication and modification of the Financial Services Commission Act

**503A.** The Financial Services Commission Act is disapplied and modified with respect to the Official Receiver, licensed insolvency practitioners and former licensed insolvency practitioners to the extent specified in Schedule 6. *(Inserted by Act 11 of 2004)*

**504.** *(Omitted)*

### Act binding on Crown

**505.** This Act is binding on the Crown.

_____

## SCHEDULE 1
### *(Sections 90 and 144)*

#### POWERS OF ADMINISTRATOR AND ADMINISTRATIVE RECEIVER

1. Power to take possession of, collect and get in the assets of the company and, for that purpose, to take such proceedings as he or she considers expedient to recover possession of any assets of the company.

2. Power to sell, charge or otherwise dispose of assets of the company.

3. Power to borrow money, whether on the security of the assets of the company, or otherwise.

4. Power to appoint a solicitor or accountant or other professionally qualified person to assist him or her in the performance of his or her functions.

5. Power to commence, continue, discontinue or defend any action or other legal proceedings in the name and on behalf of the company.

6. Power to refer to arbitration any question affecting the company.

7. Power to effect and maintain insurances in respect of the business and assets of the company.

8. Power to draw, accept, make and endorse a bill of exchange or promissory note in the name and on behalf of the company.

9. Power to appoint any agent to do any business which he or she is unable to do himself or herself or which can be more conveniently done by an agent and power to employ and dismiss employees.

10. Power to do all such things (including the carrying out of works) as may be necessary for the realisation of the assets of the company.

11. Power to make any payment which is necessary or incidental to the performance of his or her functions.

12. Power to carry on the business of the company.

13. Power to establish subsidiaries of the company.

14. Power to transfer to subsidiaries of the company the whole or any part of the business and assets of the company.

15. Power to grant or accept a surrender of a lease or tenancy of any of the assets of the company, and to take a lease or tenancy of any property required or convenient for the business of the company.

16.  Power to make any arrangement or compromise on behalf of the company.

17.  Power to call up any uncalled capital of the company.

18.  Power to rank and claim in the bankruptcy, liquidation, insolvency or sequestration of any person indebted to the company and to receive dividends, and to accede to trust deeds for the creditors of any such person.

19.  Power to make or defend an application for the winding up of the company.

20.  Power to amend the Memorandum of Association and to change the situation of the company's registered office. *(Amended by Act 11 of 2004)*

21.  Power to do all things incidental to the exercise of the foregoing powers.

———————

# SCHEDULE 2

## *(Section 186)*

### POWERS OF LIQUIDATOR

1.  Power to pay any class of creditors in full.

2.  Power to make a compromise or arrangement with creditors or persons claiming to be creditors, or having or alleging that they have any claim against the company, whether present or future, certain or contingent, ascertained or not.

3.  Power to compromise, on such terms as may be agreed—

   *(a)*  calls and liabilities to calls, debts and liabilities capable of resulting in debts, and claims, whether present or future, certain or contingent, ascertained or not, subsisting or supposed to subsist between the company and any person; and

   *(b)*  questions in any way relating to or affecting the assets or the liquidation of the company, and take security for the discharge of any such call, debt, liability or claim and give a complete discharge in respect of it.

4.  Power to commence, continue, discontinue or defend any action or other legal proceedings in the name and on behalf of the company.

5.  Power to carry on the business of the company so far as may be necessary for its beneficial liquidation.

6.  Power to sell or otherwise dispose of property of the company.

7.  Power to do all acts and execute, in the name and on behalf of the company, any deeds, receipts or other document.

8.  Power to use the company's seal.

9.  Power to prove, rank and claim in the bankruptcy, liquidation, insolvency or sequestration of any member or past member for any balance against his or her estate, and to receive dividends, in the bankruptcy, liquidation, insolvency, sequestration or in respect of that balance, as a separate debt due from the bankrupt or insolvent, and rateably with the other separate creditors.

10.  Power to draw, accept, make and endorse any bill of exchange or promissory note in the name and on behalf of the company with the same effect with respect to the company's liability as if the bill or note had been drawn, accepted, made or indorsed by or on behalf of the company in the course of its business.

11.  Power to borrow money, whether on the security of the assets of the company or otherwise.

12.  Power to take out in his or her official name letters of administration to any deceased member or past member or debtor, and to do any other act necessary for obtaining payment of any money due from a member or past member or debtor, or his or her estate, that cannot conveniently be done in the name of the company. For the purpose of enabling the liquidator to take out letters of administration or do any other act under this paragraph, to be due to the liquidator himself or herself.

13.  Power to call meetings of creditors or members for—

  *(a)*  the purpose of informing creditors or members concerning the progress of or matters arising in the liquidation;

  *(b)*  the purpose of ascertaining the views of creditors or members on any matter arising in the liquidation; or

  *(c)*  such other purpose connected with the liquidation as the liquidator considers fit.

14.  Power to appoint a solicitor, accountant or other professionally qualified person to assist him or her in the performance of his or her duties.

15.  Power to appoint an agent to do any business that the liquidator is unable to do himself or herself, or which can be more conveniently done by an agent.

_____

# SCHEDULE 3

*(Section 163)*

## LIQUIDATION OF FOREIGN COMPANY

1.  Part VI applies to the liquidation of a foreign company with the modifications and exclusions specified in this Schedule.

2.  A foreign company is deemed to be insolvent if, in addition to the circumstances specified in section 8(1), it fails to comply with the requirements of a notice issued in accordance with paragraph 4.

3.  Where a person has instituted an action or other proceeding against any member of a foreign company for any debt or demand due, or claimed to be due, from the company or from him or her in his or her character as member, that person may issue a notice to the company in accordance with paragraph 4.

4.  A notice under this Schedule shall—

  *(a)*  be in writing and shall specify the action or proceeding that has been instituted;

  *(b)*  be signed by the person who instituted the action or proceeding or by a person authorised to issue the notice on his or her behalf;

  *(c)*  require the company to pay, secure or compound for the debt or demand, or to procure the action or proceeding to be stayed or to indemnify the defendant to his or her reasonable satisfaction against the action or proceeding, and against all costs, damages and expenses to be incurred by him or her because of it;

*(d)*     state that if the notice is not complied with, application may be made to the Court for the appointment of a liquidator; and

*(e)*     be served in accordance with the Rules.

5.     Unless the context otherwise requires, references in Part VI—

*(a)*     to a company are to be taken as references to a foreign company, except in sections 159, 161 and 162; and

*(b)*     to assets are to be taken as references to assets situated in the Virgin Islands.
*(Amended by Act 11 of 2004)*

———————

# SCHEDULE 4

## *(Section 325)*

### POWERS OF BANKRUPTCY TRUSTEE

#### PART I

#### POWERS EXERCISABLE WITH SANCTION

1.     Power to carry on any business so far as may be necessary for winding it up beneficially and so far as the bankruptcy trustee is able to do so without contravening any requirement imposed by or under any enactment.

2.     Power to bring, institute or defend any action or legal proceedings relating to the assets comprised in the bankrupt's estate.

3.     Power to accept as the consideration for the sale of any asset comprised in the bankrupt's estate a sum of money payable at a future time subject to such stipulations as to security or otherwise as the creditor's committee or the Court considers fit.

4.     Power to mortgage or pledge any part of the assets comprised in the bankrupt's estate for the purpose of raising money for the payment of his or her liabilities.

5.     Power, where any right, option or other power forms part of the bankrupt's estate, to make payments or incur liabilities with a view to obtaining, for the benefit of the creditors, any asset which is the subject of the right, option or power.

6.     Power to refer to arbitration, or compromise on such terms as may be agreed on, any claims or liabilities subsisting or supposed to subsist between the bankrupt and any person who may have incurred any liability to the bankrupt.

7.     Power to make such compromise or other arrangement as may be thought expedient with creditors, or persons claiming to be creditors, in respect to bankruptcy liabilities.

8.     Power to make such compromise or other arrangement as may be thought expedient with respect to any claim arising out of or incidental to the bankrupt's estate made or capable of being made on the bankruptcy trustee by any person or by the trustee on any person.

## PART 2

### GENERAL POWERS

9.   Power to sell any of the assets for the time being comprised in the bankrupt's estate, including the goodwill and book debts of any business.

10.  Power to give receipts for any money received by him or her, being receipts which effectually discharge the person paying the money from all responsibility in respect of its application.

11.  Power to prove, rank, claim and draw a dividend in respect of such debts due to the bankrupt as are comprised in his or her estate.

12.  Power to exercise, in relation to any asset comprised in the bankrupt's estate, any powers the capacity to exercise which is vested in him or her under Part XII of this Act.

13.  Power to deal with any asset comprised in the estate to which the bankrupt is beneficially entitled as tenant in tail in the same manner as the bankrupt might have dealt with it.

14.  Power to at any time summon a general meeting of the bankrupt's creditors.

## PART 3

### ANCILLARY POWERS

15.  For the purposes of, or in connection with, the exercise of any of his or her powers under Part XII of this Act, the bankruptcy trustee may, by his or her official name—

  *(a)*  hold assets of every description;

  *(b)*  make contracts;

  *(c)*  sue and be sued;

  *(d)*  enter into engagements binding on himself and herself  and, in respect of the bankrupt's estate, on his or her successors in office;

  *(e)*  employ an agent;

  *(f)*  execute any power of attorney, deed or other instrument;

and he or she may do any other act which is necessary or expedient for the purposes of or in connection with the exercise of those powers.

_____

## SCHEDULE 5

*(Section 501)*

### OFFENCES UNDER THIS ACT

| Column 1 Section of Act creating offence | Column 2 General nature of offence | Column 3 Penalty (corporate body) | Column 4 Penalty (individual) | Column 5 Daily default fine |
|---|---|---|---|---|
| 20(2) | Director voting in favour of resolution to appoint interim supervisor without having reasonable grounds for believing that company is insolvent or is likely to become insolvent | $5,000 | $4,000 | |
| 24(2) | Interim supervisor failing to file notice of appointment with Registrar | | $1,000 | $100 |
| 24(2) | Interim supervisor failing to file notice of appointment with Commission | | $1,000 | $100 |
| 25(4) | Officer of company failing to comply with Court order made under section 25(3) | $1,000 | $1,000 | $100 |
| 27(3) | Interim supervisor contravening section 27(1) | | $2,000 | |
| 28(5) | Person failing to attend creditors' meeting | $1,000 | $1,000 | |

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 |
|---|---|---|---|---|
| *Section of Act creating offence* | *General nature of offence* | *Penalty (corporate body)* | *Penalty (individual)* | *Daily default fine* |
| 32(5) | Person, as chairman of creditors' meeting, failing to prepare report of meeting | | $1,000 | $100 |
| 32(5) | Person, as chairman of creditors' meeting, failing to send report of meeting to creditors | | $1,000 | $100 |
| 32(5) | Person, as chairman of creditors' meeting, failing to file report of meeting with Registrar | | $1,000 | $100 |
| 33(2) | Supervisor failing to file notice of appointment with Registrar | | $1,000 | $100 |
| 33(2) | Supervisor failing to file notice of appointment with Commission | | $1,000 | $100 |
| 36(3) | Supervisor failing to keep accounting records in accordance with section 36(1) | | $7,500 | |

*Insolvency Act* **LAW OF VIRGIN ISLANDS**

Revision Date: 1 Jan 2020

| Column 1<br><br>*Section of Act creating offence* | Column 2<br><br>*General nature of offence* | Column 3<br><br>*Penalty (corporate body)* | Column 4<br><br>*Penalty (individual)* | Column 5<br><br>*Daily default fine* |
|---|---|---|---|---|
| 37(5) | Supervisor contravening section 37 (Supervisor to prepare and send out regular accounts and reports) | | $7,500 | |
| 38(3) | Supervisor contravening section 38 (Completion of arrangement) | | $2,000 | $100 |
| 45 | Officer of company making false representation or fraudulently doing or omitting to do anything for the purpose of obtaining the approval of the creditors of the company to an arrangement | $10,000 | $10,000, imprisonment for 2 years or both | |
| 48(2) | Interim supervisor failing to file notice of appointment with Commission | | $1,000 | $100 |

| Column 1<br><br>*Section of Act creating offence* | Column 2<br><br>*General nature of offence* | Column 3<br><br>*Penalty (corporate body)* | Column 4<br><br>*Penalty (individual)* | Column 5<br><br>*Daily default fine* |
|---|---|---|---|---|
| 49(4) | Debtor failing to comply with order of Court made under section 49(3) | | $7,500 imprisonment for one year or both | |
| 58(2) | Interim supervisor failing to call meeting of creditors | | $2,000 | |
| 58(2) | Interim supervisor failing to send to creditor documents required to be sent under section 58(1)*(b)* | | $2,000 | |
| 61(5) | Person, as chairman of creditors' meeting, failing to file any document as required under section 61(1) | | $1,000 | |
| 61(5) | Person, as chairman of creditors' meeting, failing to send notice of result of meeting to a creditor | | $1,000 | $100 |

Case 22-11068-KBO    Doc 34263-1    Filed 01/05/26    Page 1249 of 1707

*Insolvency Act* **LAW OF
VIRGIN ISLANDS**

Revision Date: 1 Jan 2020

| Column 1 Section of Act creating offence | Column 2 General nature of offence | Column 3 Penalty (corporate body) | Column 4 Penalty (individual) | Column 5 Daily default fine |
|---|---|---|---|---|
| 64(3) | Supervisor contravening section 64 (Supervisor's duty to keep accounting records) | | $7,500, imprisonment for one year or both | |
| 65(4) | Supervisor contravening section 65 (Supervisor to prepare and send out regular accounts and reports) | | $7,500, imprisonment for one year or both | |
| 66(3) | Supervisor contravening section 66 (Completion of arrangement) | | $2,000 | |
| 74(2) | Debtor making any false representation or fraudulently doing, or omitting to do, anything for the purpose of obtaining the approval of his or her creditors to an arrangement | | $10,000, imprisonment for 2 years or both | |

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 |
|---|---|---|---|---|
| *Section of Act creating offence* | *General nature of offence* | *Penalty (corporate body)* | *Penalty (individual)* | *Daily default fine* |
| 82(2) | Administrator failing to give notice of his or her appointment in accordance with section 82(1)*(a)* | | $2,000 | |
| 82(2) | Administrator failing to comply with section 82(1)*(b)* | | $1,000 | $100 |
| 82(2) | Administrator failing to send notice of appointment to company or a creditor | | $1,000 | $100 |
| 85(2) | Company contravening section 85(1) (Preservation of charged and other assets) | $7,500 | $5,000 | |
| 86(8) | Company failing to file with Registrar notice of order made under section 86(2) or sealed copy of order | $500 | $500 | $100 |
| 86(8) | Company failing to comply with condition imposed under section 86 | $5,000 | $4,000 | |

*Insolvency Act*

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 |
|---|---|---|---|---|
| *Section of Act creating offence* | *General nature of offence* | *Penalty (corporate body)* | *Penalty (individual)* | *Daily default fine* |
| 92(6) | Administrator failing to serve or file copy of order in contravention of section 92(5) | | $1,000 | $100 |
| 92(6) | Administrator failing to comply with condition imposed under section 92 | | $10,000 | |
| 100(6) | Administrator contravening section 100(1) | | $2,000 | |
| 101(5) | Person failing to attend creditors' meeting | $1,000 | $1,000 | |
| 102(6) | Administrator failing to report result of creditors' meeting to Court | | $1,000 | $100 |
| 102(6) | Administrator failing to file copy of report of creditors' meeting with Registrar | | $1,000 | $100 |
| 102(6) | Administrator failing to send notice of result of creditors' meeting to every creditor | | $1,000 | $100 |

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 |
|---|---|---|---|---|
| *Section of Act creating offence* | *General nature of offence* | *Penalty (corporate body)* | *Penalty (individual)* | *Daily default fine* |
| 104(6) | Administrator failing to report result of creditors' meeting to Court | | $1,000 | $100 |
| 104(6) | Administrator failing to file copy of report of creditors' meeting with Registrar | | $1,000 | $100 |
| 104(6) | Administrator failing to send notice of result of creditors' meeting to every creditor | | $1,000 | $100 |
| 106(3) | Administrator contravening section 106 (Administrator's duty to keep accounting records) | | $7,500, imprisonment for one year or both | |
| 107(4) | Administrator contravening section 107 (Administrator to prepare and send out regular accounts and reports) | | $7,500, imprisonment for one year or both | |
| 108(3) | Company contravening section 108(1) (Notification) | $2,000 | $1,000 | |

*Insolvency Act*    **LAW OF VIRGIN ISLANDS**

| Column 1 Section of Act creating offence | Column 2 General nature of offence | Column 3 Penalty (corporate body) | Column 4 Penalty (individual) | Column 5 Daily default fine |
|---|---|---|---|---|
| 108(3) | Officer or administrator of company causing, permitting or acquiescing in contravention by company of section 108(1) (Notification) | $2,000 | $1,000 | |
| 112(2) | Administrator or former administrator failing to file with the Registrar copy of order varying or discharging administration order | | $1,000 | $100 |
| 116(3) | Person accepting or purporting to accept appointment or acting or purporting to act as a receiver contrary to section 116(1) | $5,000 | $4,000 | |
| 118(4) | Receiver failing to send notice of appointment to company | | $1,000 | |
| 118(4) | Receiver failing to file notice of appointment in accordance with section 118(1)*(b)* | | $2,000 | |

| Column 1<br><br>*Section of Act creating offence* | Column 2<br><br>*General nature of offence* | Column 3<br><br>*Penalty (corporate body)* | Column 4<br><br>*Penalty (individual)* | Column 5<br><br>*Daily default fine* |
|---|---|---|---|---|
| 118(4) | Administrative receiver failing to advertise his or her appointment | | $1,000 | $100 |
| 118(4) | Administrative receiver failing to send notice of his or her appointment to all creditors | | $1,000 | $100 |
| 119(4) | Person contravening or causing, permitting or acquiescing in a contravention of section 119(1) | $2,000 | $1,000 | |
| 120(7) | Receiver failing to vacate his or her office forthwith if he or she ceases to be eligible to act as a receiver | | $4,000 | |
| 120(7) | Receiver failing to give notice in accordance with section 120(3) | | $2,000 | |
| 120(7) | Receiver failing to notify Court that he or she ceases to be eligible to act as a receiver | | $2,000 | |

*Insolvency Act*  **LAW OF
VIRGIN ISLANDS**

| Column 1<br><br>*Section of Act creating offence* | Column 2<br><br>*General nature of offence* | Column 3<br><br>*Penalty (corporate body)* | Column 4<br><br>*Penalty (individual)* | Column 5<br><br>*Daily default fine* |
|---|---|---|---|---|
| 120(7) | Person failing to give notice to Registrar of vacancy in the office of receiver | | $1,000 | $100 |
| 121(3) | Person failing to comply with order made under section 121(2) | $7,500 | $5,000, imprisonment for one year or both | |
| 124(3) | Person failing to comply with order made under section 124(2) | $7,500 | $5,000, imprisonment for one year or both | |
| 136(7) | Receiver contravening section 136 (Receivership accounts to be filed with Registrar) | | $4,000 | $200 |
| 137(5) | Receiver failing to comply with order made under section 137 | | $5,000, imprisonment for one year or both | |
| 145(10) | Administrative receiver failing to file copy of order made under section 145(2) or (7) with the Registrar | | $1,000 | $100 |

| Column 1<br><br>*Section of Act creating offence* | Column 2<br><br>*General nature of offence* | Column 3<br><br>*Penalty (corporate body)* | Column 4<br><br>*Penalty (individual)* | Column 5<br><br>*Daily default fine* |
|---|---|---|---|---|
| 147(7) | Administrative receiver failing to comply with section 147 (Report by administrative receiver) | | $2,000 | |
| 161(4) | Company failing to give liquidator notice of his or her appointment | $2,000 | $1,000 | |
| 178(2) | Liquidator failing to advertise his or her appointment in accordance with section 178(1)*(a)* | | $1,000 | $100 |
| 178(2) | Liquidator failing to file notice of his or her appointment with Registrar | | $1,000 | $100 |
| 178(2) | Liquidator failing to serve notice of his or her appointment on company | | $1,000 | $100 |
| 178(2) | Liquidator failing to serve notice of his or her appointment on Commission | | $1,000 | $100 |
| 179(5) | Liquidator failing to call meeting of creditors in accordance with section 179(1) | | $2,000 | |

*Insolvency Act*

| Column 1<br><br>*Section of Act creating offence* | Column 2<br><br>*General nature of offence* | Column 3<br><br>*Penalty (corporate body)* | Column 4<br><br>*Penalty (individual)* | Column 5<br><br>*Daily default fine* |
|---|---|---|---|---|
| 179(5) | Liquidator failing to furnish documents or information to creditor as required by section 179(2) | | $2,000 | |
| 179(5) | Liquidator failing to attend first creditors meeting or to report to the meeting on any exercise by him or her of his or her powers since his or her appointment | | $2,000 | |
| 191(3) | Company contravening section 191(1) (Notification of liquidation) | $2,000 | $1,000 | |
| 191(3) | Officer, receiver of liquidator of company causing, permitting or acquiescing in contravention by company of section 191(1) (Notification of liquidation) | $2,000 | $1,000 | |

| **Column 1**<br><br>*Section of Act creating offence* | **Column 2**<br><br>*General nature of offence* | **Column 3**<br><br>*Penalty (corporate body)* | **Column 4**<br><br>*Penalty (individual)* | **Column 5**<br><br>*Daily default fine* |
|---|---|---|---|---|
| 209(7) | Person making or authorising the making of a claim under section 209 knowing that the claim is false or misleading in a material matter or that a material fact or matter or matter has been omitted from the claim | $7,500 | $7,500, imprisonment for 2 years or both | |
| 217(4) | Liquidator failing to give notice of disclaimer | | $5,000 | |
| 231(5) | Liquidator failing to comply with order made under section 231(3) | | $7,500, imprisonment for one year or both | |
| 233(7) | Person failing to file sealed copy of the order terminating liquidation with Registrar | | $2,000 | |
| 239(5) | Liquidator failing to advertise his or her appointment in accordance with a direction of the Commission. | | $1,000 | $100 |
| 267 | Disqualified person engaging in prohibited activity | $10,000 | $7,500, imprisonment for 2 years or both | |

*Insolvency Act*

| Column 1 Section of Act creating offence | Column 2 General nature of offence | Column 3 Penalty (corporate body) | Column 4 Penalty (individual) | Column 5 Daily default fine |
|---|---|---|---|---|
| 271(5) | Person failing to comply with order made under section 271(3) | $10,000 | $7,500, imprisonment for one year or both | |
| 277(4) | Relevant person failing, when required, to submit statement of affairs to office holder together with the verifying affidavit | $3,000 | $2,000 | $100 |
| 282(3) | Person failing to comply with notice received under section 282(1) | $5,000 | $4,000 | |
| 288(1) | Person failing to attend examination ordered to be held under section 285 | $7,500 | $5,000, imprisonment for one year or both | |
| 289(1) | Fraudulent conduct within the meaning of section 289(1)*(a)* | $10,000 | $10,000, imprisonment for 3 years or both | |
| 289(1) | Fraudulent conduct within the meaning of section 289(1)*(b)* | $10,000 | $10,000, imprisonment for 3 years or both | |

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 |
|---|---|---|---|---|
| *Section of Act creating offence* | *General nature of offence* | *Penalty (corporate body)* | *Penalty (individual)* | *Daily default fine* |
| 299(5) | Secured creditor failing to account or pay to the trustee the proceeds from any realisation of his or her security interest in accordance with section 299(3)*(b)* | $4,000 | $3,000 | |
| 316(6) | Bankrupt failing to comply with an obligation under section 316 (Duties of bankrupt in relation to his or her assets and affairs) | | $5,000, imprisonment for one year or both | |
| 317(2) | Person failing to comply with an obligation imposed by section 317 (Delivery up by other person) | $7,5000 | $5,000, imprisonment for one year or both | |
| 326(3) | Trustee failing to advertise his or her appointment in accordance with section 326(1)*(a)* | | $1,000 | $100 |
| 326(3) | Trustee failing to serve notice of his or her appointment on bankrupt | | $1,000 | $100 |

*Insolvency Act*    **LAW OF VIRGIN ISLANDS**

| Column 1

Section of Act creating offence | Column 2

General nature of offence | Column 3

Penalty (corporate body) | Column 4

Penalty (individual) | Column 5

Daily default fine |
|---|---|---|---|---|
| 326(3) | Trustee failing to serve notice of his or her appointment on Commission | | $1,000 | $100 |
| 326(3) | Trustee failing to send notice of his or her appointment to every creditor | | $1,000 | $100 |
| 326(3) | Trustee failing to file notice of his or her  appointment with Commission | | $1,000 | $100 |
| 326(3) | Trustee issuing advertisement that does not comply with section 326(2) | | $1,000 | |
| 336(7) | Person making or authorising the making of a claim under section 336 knowing that the claim is false or misleading in a material matter; or a material fact or matter has been omitted from the claim | $7,500 | $7,500, imprisonment for 2 years or both | |

| Column 1<br><br>*Section of Act creating offence* | Column 2<br><br>*General nature of offence* | Column 3<br><br>*Penalty (corporate body)* | Column 4<br><br>*Penalty (individual)* | Column 5<br><br>*Daily default fine* |
|---|---|---|---|---|
| 354(4) | Undischarged bankrupt or discharged bankrupt whose estate is still being administered failing to do anything that he or she is directed to do by the Court in contravention of section 354(2) | | $7,500, imprisonment for 2 years or both | |
| 358(4) | Trustee failing to give notice of disclaimer to every person whose rights are, to his or her knowledge, affected by the disclaimer | | $5,000 | |
| 366(4) | Bankrupt failing to submit a statement of his or her assets and liabilities in accordance with section 366(1) | | $2,500, imprisonment for 6 months or both | |
| 366(4) | Bankrupt submitting a statement of his or her assets and liabilities that does not comply with the prescribed requirements | | $2,500, imprisonment for 6 months or both | |

*Insolvency Act*    **LAW OF
VIRGIN ISLANDS**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 |
|---|---|---|---|---|
| *Section of Act creating offence* | *General nature of offence* | *Penalty (corporate body)* | *Penalty (individual)* | *Daily default fine* |
| 373(1) | Person failing to attend examination ordered to be held under section 370 | $7,500 | $5,000, imprisonment for one year or both | |
| 381(2) | Discharged bankrupt failing to give trustee assistance in the realisation and distribution of such of his or her assets as are vested in his or her trustee | | $5,000, imprisonment for one year or both | |
| 389(1) | Bankruptcy offence (non-disclosure) | | $7,500, imprisonment for 2 years or both | |
| 390 | Bankruptcy offence (concealment of assets) contrary to paragraph *(a)*, *(b)*, *(c)*, *(d)* or *(e)* of section 390 | | $10,000, imprisonment for 3 years or both | |
| 391 | Bankruptcy offence (concealment of books and papers or falsification) contrary to paragraph *(a)*, *(b)*, *(c)*, *(d)*, *(e)* or *(f)* of section 391 | | $10,000, imprisonment for 3 years or both | |

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 |
|---|---|---|---|---|
| *Section of Act creating offence* | *General nature of offence* | *Penalty (corporate body)* | *Penalty (individual)* | *Daily default fine* |
| 392 | Bankruptcy offence (false statements) contrary to paragraph *(a)*, *(b)*, *(c)*, *(d)* or *(e)* of section 392 | | $10,000, imprisonment for 3 years or both | |
| 393 | Bankruptcy offence (fraudulent disposal of assets) contrary to paragraph *(a)* or *(b)* of section 393 | | $10,000, imprisonment for 3 years or both | |
| 394 | Bankruptcy offence (absconding) contrary to paragraph *(a)* or *(b)* of section 394 | | $10,000, imprisonment for 3 years or both | |
| 395 | Bankrupt committing bankruptcy offence of fraudulently dealing with assets obtained on credit contrary to section 395(1) | | $10,000, imprisonment for 3 years or both | |
| 395 | Person committing bankruptcy offence of fraudulently dealing with assets obtained on credit contrary to section 395(2) | | $10,000, imprisonment for 3 years or both | |

*Insolvency Act*    **LAW OF VIRGIN ISLANDS**

Revision Date: 1 Jan 2020

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 |
|---|---|---|---|---|
| *Section of Act creating offence* | *General nature of offence* | *Penalty (corporate body)* | *Penalty (individual)* | *Daily default fine* |
| 396 | Bankruptcy offence (obtaining credit; engaging in business) contrary to paragraph *(a)* or *(b)* of section 396(1) | | $7,500, imprisonment for 2 years or both | |
| 397(1) | Bankruptcy offence (failure to keep proper accounts of business) contrary to paragraph *(a)* or *(b)* of section 397(1) | | $10,000, imprisonment for 3 years or both | |
| 398 | Bankruptcy offence (gambling) contrary to paragraph *(a)* or *(b)* of section 398 | | $7,500, imprisonment for 2 years or both | |
| 416 | Restricted person engaging in prohibited activity | | $7,500, imprisonment for 2 years or both | |
| 474(4) | Person acting as an insolvency practitioner without holding a licence that is not suspended | $10,000, imprisonment for 2 years or both | $10,000, imprisonment for 2 years or both | |
| 478(4) | Licensee contravening section 478 (Production of accounts and records) | | $7,500, imprisonment for 2 years or both | |

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 |
|---|---|---|---|---|
| *Section of Act creating offence* | *General nature of offence* | *Penalty (corporate body)* | *Penalty (individual)* | *Daily default fine* |
| 484(4) | Person appointing an overseas insolvency practitioner to act as an insolvency practitioner contrary to section 484(3) | | $5,000 | |

————————

# SCHEDULE 6

*(Section 503A)*

## DISAPPLICATION AND MODIFICATION OF FINANCIAL SERVICES COMMISSION ACT

The Financial Services Commission Act is disapplied and modified with respect to the Official Receiver, licensed insolvency practitioners and former licensed insolvency practitioners to the extent specified below:

1.   Section 29 and section 49(1)*(c)* of the Financial Services Commission Act do not apply to the Official Receiver in respect of any information, document, record, statement or thing made or disclosed to him or her in the course of discharging any function or duty or exercising any power in his or her capacity as Official Receiver.

2.   Sections 30 and 31 of the Financial Services Commission Act do not apply to any person engaged in or related to the business of acting as an insolvency practitioner.

3.   Sections 32 and 33 of the Financial Services Commission Act do not apply to a licenced insolvency practitioner, a former licenced insolvency practitioner or a person carrying on business as an insolvency practitioner.

4.   Sections 34, 36, 37, 38, 39 and 40 of the Financial Services Commission Act do not apply to a licensed insolvency practitioner.

5.   Section 35 of the Financial Services Commission Act does not apply to a licensed insolvency practitioner or a former licensed insolvency practitioner.

6.   Section 41 of the Financial Services Commission Act does not apply with respect to licensed insolvency practitioners.

*(Inserted by Act 11 of 2004)*

————————

# EXHIBIT 14



Michaelmas Term
**[2012] UKSC 46**
*On appeal from: [2010] EWCA Civ 895; [2011] EWCA Civ 971*

# JUDGMENT

# Rubin and another (Respondents) *v* Eurofinance SA and others (Appellants)

# New Cap Reinsurance Corporation (In Liquidation) and another (Respondents/Cross Appellants) *v* A E Grant and others as Members of Lloyd's Syndicate 991 for the 1997 Year of Account and another (Appellants/Cross Respondents)

### before

## Lord Walker
## Lord Mance
## Lord Clarke
## Lord Sumption
## Lord Collins

## JUDGMENT GIVEN ON

## 24 October 2012

## Heard on 21, 22, 23 and 24 May 2012

| *Appellant* | *Respondent* |
|---|---|
| Marcus Staff | Robin Dicker QC |
| | Tom Smith |
| (Instructed by Brown | (Instructed by Chadbourne |
| Rudnick LLP) | & Parke LLP) |

| *Appellant* | *Respondent* |
|---|---|
| Robin Knowles QC | Gabriel Moss QC |
| Blair Leahy | Barry Isaacs QC |
| (Instructed by Edwards | (Instructed by Mayer |
| Wildman Palmer UK | Brown International LLP) |
| LLP) | |

| *Intervener* | *Intervener* |
|---|---|
| Pushpinder Saini QC | Michael Driscoll QC |
| Adrian Briggs | Rosanna Foskett |
| Shaheed Fatima | |
| Ian Fletcher | |
| Stephen Robins | |
| (Instructed by Taylor | (Instructed by Wilsons |
| Wessing) | Solicitors LLP & Wedlake |
| | Bell LLP) |

**LORD COLLINS (with whom Lord Walker and Lord Sumption agree)**

**I        Introduction**

*The appeals*

1.        There are two appeals before the court: *Rubin v Eurofinance SA* ("*Rubin*") and *New Cap Reinsurance Corpn Ltd v Grant* ("*New Cap*"). These appeals raise an important and novel issue in international insolvency law. The issue is whether, and if so, in what circumstances, an order or judgment of a foreign court (on these appeals the United States Bankruptcy Court for the Southern District of New York, and the New South Wales Supreme Court) in proceedings to adjust or set aside prior transactions, eg preferences or transactions at an undervalue ("avoidance proceedings"), will be recognised and enforced in England. The appeals also raise the question whether enforcement may be effected through the international assistance provisions of the UNCITRAL Model Law (implemented by the Cross-Border Insolvency Regulations 2006 (SI 2006/1030) ("CBIR")), which applies generally, or the assistance provisions of section 426 of the Insolvency Act 1986, which applies to a limited number of countries, including Australia.

2.        In *Rubin* a judgment of the US Federal Bankruptcy Court for the Southern District of New York ("the US Bankruptcy Court") in default of appearance for about US$10m under State and Federal law in respect of fraudulent conveyances and transfers was enforced in England at common law. In *New Cap* (in which the Court of Appeal was bound by the prior decision in *Rubin*) a default judgment of the New South Wales Supreme Court, Equity Division, for about US$8m in respect of unfair preferences under Australian law was enforced under the Foreign Judgments (Reciprocal Enforcement) Act 1933 ("the 1933 Act"), and, alternatively, pursuant to powers under section 426 of the Insolvency Act 1986.

3.        In each of the appeals it was accepted or found that the party against whom they were given was neither present (nor, for the purposes of the 1933 Act, resident) in the foreign country nor submitted to its jurisdiction (which are the relevant conditions for enforceability at common law and under the 1933 Act), but that those conditions did not apply to judgments or orders in foreign insolvency proceedings.

4.        In addition to the arguments on these two appeals, the court has had the great benefit of written submissions on behalf of parties to proceedings pending in

Gibraltar. Those proceedings are to enforce default judgments entered by the US Bankruptcy Court for some $247m in respect of alleged preferential payments to companies in the British Virgin Islands and Cayman Islands arising out of the notorious Ponzi scheme operated by Mr Bernard Madoff.

5.      It has been necessary to emphasise that the judgments in all three matters were in default of appearance, because if the judgment debtors had appeared and defended the proceedings in the foreign courts, the issues on these appeals would not have arisen. The reason is that the judgments would have been enforceable on the basis of the defendants' submission to the jurisdiction of the foreign court. Enforcement would have been at common law, or, in the *New Cap* case either under the common law, or under the 1933 Act which substantially reproduces the common law principles - there is a subsidiary issue on this appeal as to whether the 1933 Act applies to judgments in insolvency proceedings, dealt with in section IX below.

6.      Under the common law a court of a foreign country has jurisdiction to give a judgment in personam where (among other cases) the judgment debtor was present in the foreign country when the proceedings were instituted, or submitted to the jurisdiction of the foreign court by voluntarily appearing in the proceedings. In the case of the 1933 Act the foreign court is deemed to have jurisdiction where the judgment debtor submitted to the jurisdiction by voluntarily appearing in the proceedings otherwise than for the purpose (inter alia) of contesting the jurisdiction; or where the judgment debtor was resident at the time when the proceedings were instituted, or being a body corporate had an office or place of business there: section 4(2)(a)(i),(iv).

*The Dicey Rule*

7.      The general principle has been referred to on these appeals, by reference to the common law rule set out in *Dicey, Morris & Collins, Conflict of Laws* (14th edition, 2006), as "Dicey's Rule 36." This was only by way of shorthand, because the rules in the 1933 Act are not quite identical, and in any event has been purely for convenience, because the Rule has no standing beyond the case law at common law which it seeks to re-state. What was Rule 36 now appears (incorporating some changes which are not material on this appeal) as Rule 43 in the new 15th edition, and I shall refer to it as "the *Dicey* Rule." So far as relevant, Rule 43 (*Dicey, Morris and Collins, Conflict of Laws,* 15th ed, 2012, para 14R-054) states:

> "a court of a foreign country outside the United Kingdom has jurisdiction to give a judgment in personam capable of enforcement

or recognition as against the person against whom it was given in the following cases:

*First Case*—If the person against whom the judgment was given was, at the time the proceedings were instituted, present in the foreign country.

*Second Case*—If the person against whom the judgment was given was claimant, or counterclaimed, in the proceedings in the foreign court.

*Third Case*—If the person against whom the judgment was given submitted to the jurisdiction of that court by voluntarily appearing in the proceedings.

*Fourth Case*—If the person against whom the judgment was given had before the commencement of the proceedings agreed, in respect of the subject matter of the proceedings, to submit to the jurisdiction of that court or of the courts of that country."

8.    The first edition of *Dicey* in 1896 stated (Rule 80) that the foreign court would have jurisdiction if "the defendant was resident [or present?]" in the foreign country "so as to have the benefit, and be under the protection, of the laws thereof."   By the 6th edition in 1949 the formula was repeated by Professor Wortley (Rule 68) but without the doubt about presence as a basis of jurisdiction. In the 8th edition in 1958 Dr (later Professor) Clive Parry removed the phrase (then Rule 189) about the benefit and protection of the foreign country's laws. The Rule, subsequently edited by Dr Morris and then by Professor Kahn-Freund, remained in that form until the decision in *Adams v Cape Industries plc* [1990] Ch 433 (CA), which established that presence in the foreign jurisdiction, as opposed to residence, was a sufficient basis for the recognition of foreign judgments. Then, edited by myself and later by Professor Briggs, the Rule took substantially its present form in the 12th edition in 1993.

9.    The theoretical basis for the enforcement of  foreign judgments at common law is that they are enforced on the basis of a principle that where a court of competent jurisdiction has adjudicated a certain sum to be due from one person to another, a legal obligation arises to pay that sum, on which an action of debt to enforce the judgment may be maintained:  *Williams v Jones* (1845) 13 M & W 628, 633 per Parke B; *Godard v Gray* (1870) LR 6 QB 139, 147, per Blackburn J; *Adams v Cape Industries plc* [1990] Ch 433, 513; *Owens Bank Ltd v Bracco*

[1992] 2 AC 443, 484, per Lord Bridge of Harwich. As Blackburn J said in *Godard v Gray*, this was based on the mode of pleading an action on a foreign judgment in debt, and not merely as evidence of the obligation to pay the underlying liability: LR 6 QB 139, 150. But this is a purely theoretical and historical basis for the enforcement of foreign judgments at common law. It does not apply to enforcement under statute, and makes no practical difference to the analysis, nor, in my judgment, to the issues on these appeals.

10.    Consequently, if the judgments in issue on the appeals are regarded as judgments in personam within the *Dicey* Rule, then they will only be enforced in England at common law if the judgment debtors were present (or, if the 1933 Act applies, resident) in the foreign country when the proceedings were commenced, or if they submitted to its jurisdiction. It is common ground that the judgment debtors were not present or resident, respectively, in the United States or in Australia, although there is an issue as to whether the New Cap defendants submitted to the jurisdiction of the Australian court, which is dealt with in section VIII below.

*Insolvency proceedings and the international dimension*

11.    There are some general remarks to be made. First, from as early as the mid-18th century the English courts have recognised the effect of foreign personal bankruptcies declared under the law of the domicile: *Solomons v Ross* (1764) 1 H Bl 131n, where Dutch merchants were declared bankrupt in Amsterdam, and the Dutch curator was held entitled to recover an English debt in priority to an English creditor of the merchants who had attached the debt after the bankruptcy: see Nadelmann, *Conflict of Laws: International and Interstate* (1972), p 273; Blom-Cooper, *Bankruptcy in Private International Law* (1954), pp 107-108.

12.    In *Galbraith v Grimshaw* [1910] AC 508 Lord Dunedin said that there should be only one universal process of the distribution of a bankrupt's property and that, where such a process was pending elsewhere, the English courts should not allow steps to be taken in its jurisdiction which would interfere with that process (p 513):

> "Now so far as the general principle is concerned it is quite consistent with the comity of nations that it should be a rule of international law that if the court finds that there is already pending a process of universal distribution of a bankrupt's effects it should not allow steps to be taken in its territory which would interfere with that process of universal distribution."

13.     Second, in the case of corporations the English courts have exercised a winding up jurisdiction which is wider than that which at common law they have accorded to foreign courts. The court exercises jurisdiction to wind up a foreign company if there is a sufficient connection between the company and England, there are persons who would benefit from the making of a winding up order, and there are persons interested in the distribution of assets of the company who are persons over whom the court can exercise jurisdiction: see *Dicey*, 15th ed, para 30R-036. But as regards foreign liquidations, the general rule is that the English court recognises at common law only the authority of a liquidator appointed under the law of the place of incorporation (*Dicey*, 15th ed, para 30R-100). That is in contrast to the modern approach in the primary international and regional instruments, the EC Insolvency Regulation on Insolvency Proceedings (Council Regulation (EC) No 1346/2000) ("the EC Insolvency Regulation") and the Model Law, which is that the jurisdiction with international competence is that of the country of the centre of main interests of the debtor (an expression not without its own difficulties). It is ultimately derived from the civil law concept of a trader's domicile, and was adopted in substance in the draft EEC Convention of 1980 as a definition of the debtor's centre of administration: see Report by M Lemontey on the draft EEC Bankruptcy Convention, Bulletin of the European Communities, Supp 2/82, p 58; American Law Institute, *Transnational Insolvency: Global Principles for Co-operation in International Insolvency Cases* (2012), Principle 13, pp 83 et seq.

14.     Third, it is not only in recent times that there have been large insolvency proceedings with significant cross-border implications. Even before then there were the Russian Bank cases in the 1930s (arising out of the nationalisation and dissolution of the banks by the Soviet Government) and the *Barcelona Traction* case in the 1940s and 1950s (see *In re Barcelona Traction, Light and Power Co Ltd (second phase) (Belgium v Spain)* [1970] ICJ Rep 69), but there is no doubt that today international co-operation in cross-border insolvencies has become a pressing need. It is only necessary to recall the bankruptcies or liquidations of Bank of Credit and Commerce International, Maxwell Communications, or Lehman Brothers, each with international businesses, assets in many countries, and potentially competing creditors in different countries with different laws. There is not only a need to balance all these interests but also to provide swift and effective remedies to combat the use of cross-border transfers of assets to evade and to defraud creditors.

15.     Fourth, there is no international unanimity or significant harmonisation on the details of insolvency law, because to a large extent insolvency law reflects national public policy, for example as regards priorities or as regards the conditions for the application of avoidance provisions: "the process of collection of assets will include, for example, the use of powers to set aside voidable

dispositions, which may differ very considerably from those in the English statutory scheme": *In re HIH Casualty and General Insurance Ltd* [2008] UKHL 21, [2008] 1 WLR 852, para 19, per Lord Hoffmann.

16.    Fifth, there has been a trend, but only a trend, to what is called universalism, that is, the "administration of multinational insolvencies by a leading court applying a single bankruptcy law": Westbrook, "A Global Solution to Multinational Default" (2000) 98 Mich L Rev 2276, 2277. What has emerged is what is called by specialists "modified universalism."

17.    The meaning of the expression "universalism" has undergone a change since the time it was first used in the 19th century, and it later came to be contrasted with the "doctrine of unity." In 1834 Story referred to the theory that assignments under bankrupt or insolvent laws were, and ought to be, of universal operation to transfer movable property, in whatever country it might be situate, and concluded that there was great wisdom in adopting the rule that an assignment in bankruptcy should operate as a complete and valid transfer of all his movable property abroad, as well as at home, and for a country to prefer an attaching domestic creditor to a foreign assignee or to foreign creditors could "hardly be deemed consistent with the general comity of nations … [T]he true rule is, to follow out the lead of the general principle that makes the law of the owner's domicil conclusive upon the disposition of his personal property," citing *Solomons v Ross* as supporting that doctrine: *Story, Commentaries on the Conflict of Laws*, 1st ed (1834), pp 340-341, para 406.

18.    Professor Cheshire, in his first edition (Cheshire, *Private International Law*, 1935, pp 375-376), said that although English law "neglects the doctrine of unity it recognizes the doctrine of universality." What he meant was that English law was committed to separate independent bankruptcies in countries where the assets were situate, rather than one bankruptcy in the country of the domicile (the doctrine of unity), but also accepted the title of the foreign trustee to English movables provided that no bankruptcy proceedings had begun within England (universality). He cited *Solomons v Ross* for this proposition:

> "The English Courts … have consistently applied the doctrine of universality, according to which they hold that all *movable* property, no matter where it may be situated at the time of the assignment by the foreign law, passes to the trustee."

19.    In *In re HIH Casualty and General Insurance Ltd* [2008] UKHL 21, [2008] 1 WLR 852, para 30, Lord Hoffmann said:

> "The primary rule of private international law which seems to me applicable to this case is the principle of (modified) universalism, which has been the golden thread running through English cross-border insolvency law since the 18th century. That principle requires that English courts should, so far as is consistent with justice and UK public policy, co-operate with the courts in the country of the principal liquidation to ensure that all the company's assets are distributed to its creditors under a single system of distribution."

and in *Cambridge Gas Transportation Corporation v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2006] UKPC 26, [2007] 1 AC 508, para 16 he said, speaking for the Privy Council:

> "The English common law has traditionally taken the view that fairness between creditors requires that, ideally, bankruptcy proceedings should have universal application. There should be a single bankruptcy in which all creditors are entitled and required to prove. No one should have an advantage because he happens to live in a jurisdiction where more of the assets or fewer of the creditors are situated …"

20.     The US Bankruptcy Court accepted in *Re Maxwell Communication Corp*, 170 BR 800 (Bankr SDNY 1994) that the United States courts have adopted modified universalism as the approach to international insolvency:

> "… the United States in ancillary bankruptcy cases has embraced an approach to international insolvency which is a modified form of universalism accepting the central premise of universalism, that is, that assets should be collected and distributed on a worldwide basis, but reserving to local courts discretion to evaluate the fairness of home country procedures and to protect the interests of local creditors."

## II      International co-operation and assistance

21.     Jurisdiction in international bankruptcy has been the subject of multilateral international instruments at least since the Montevideo Treaty on International Commercial Law of 1889, Title X, although bilateral treaties go back much further, and the subject of international recognition and co-operation in insolvency was the subject of early discussion by the International Law Association (1879),

the Institut de droit international (1888-1912) and the Hague Conference on Private International Law (1904): Nadelmann, *op. cit*. pp 299 *et seq.*

22.    In more modern times, the European Convention on Certain International Aspects of Bankruptcy (the Istanbul Convention) was concluded under the auspices of the Council of Europe in 1990, but never came into force. The European Community/Union initiative took 40 years to come to fruition. In 1960 the European Community embarked on a project for a Bankruptcy Convention, which resulted in a draft Convention in 1980, to which there was significant opposition. But the project was renewed in 1989, and this led to the tabling of a draft Convention in 1995, which provided that it would only come into force when signed by all 15 of the then member states. The United Kingdom, however, alone of the states, did not sign the Convention (for political reasons), and it never came into force. In 1999 the project was re-launched as a Council Regulation, which resulted in the EC Insolvency Regulation in 2000.

23.    The United Nations Commission on International Trade Law ("UNCITRAL") adopted a Model Law on cross-border insolvency in 1997. The Model Law was adopted following initiatives in the 1980s by the International Bar Association and later by INSOL International (the International Association of Restructuring, Insolvency and Bankruptcy Professionals). In 1993 UNCITRAL adopted a resolution to investigate the feasibility of harmonised rules of cross-border insolvencies. In 1994 an expert committee was assembled consisting of members of INSOL and representatives of the UNCITRAL Secretariat, and following a series of reports and drafts, UNCITRAL adopted the Model Law in May 1997. The Model Law provides for a wide range of assistance to foreign courts and office-holders. It has been implemented by 19 countries and territories, including the United States and Great Britain (although by some states only on the basis of reciprocity). It was not enacted into law in Great Britain until 2006, by the CBIR.

24.    Apart from the EC Insolvency Regulation, none of these instruments deals expressly with the enforcement of judgments in insolvency proceedings. The question whether the Model Law does so by implication will be considered below in section IV.

25.    Consequently, there are four main methods under English law for assisting insolvency proceedings in other jurisdictions, two of which are part of regionally or internationally agreed schemes. First, section 426 of the Insolvency Act 1986 provides a statutory power to assist corporate as well as personal insolvency proceedings in countries specified in the Act or designated for that purpose by the Secretary of State. All the countries to which it currently applies are common law countries or countries sharing a common legal tradition with England. They

include Australia: the Co-operation of Insolvency Courts (Designation of Relevant Countries and Territories) Order 1986 (SI 1986/2123).

26.     Second, the EC Insolvency Regulation applies to insolvency proceedings in respect of debtors with their centres of main interests (COMI) within the European Union (excluding Denmark). The EC Insolvency Regulation has no role in the present appeal because none of the debtors has its centre of main interests in the European Union.

27.     Third, the CBIR came into force on 4 April 2006, implementing the Model Law. The CBIR supplement the common law, but do not supersede it. Article 7 of the Model Law provides: "Nothing in this Law limits the power of a court or British insolvency officeholder to provide additional assistance to a foreign representative under other laws of Great Britain".

28.     Article 23 of the Model Law allows avoidance claims to be made by foreign representatives under the Insolvency Act 1986, and the CBIR apply to preferences after they came into force on 4 April 2006. The UNCITRAL Guide to Enactment (to which resort may be had for the purposes of interpretation of the CBIR) also emphasises that the Model Law enables enacting states to make available to foreign insolvency proceedings the type of relief which would be available in the case of a domestic insolvency (*UNCITRAL Legislative Guide on Insolvency Law* (2005), Annex III, Ch IV, p 311, para 20(b)):

> "The Model Law presents to enacting states the possibility of aligning the relief resulting from recognition of a foreign proceeding with the relief available in a comparable proceeding in the national law."

29.     Fourth, at common law the court has power to recognise and grant assistance to foreign insolvency proceedings. The common law principle is that assistance may be given to foreign officeholders in insolvencies with an international element. The underlying principle has been stated in different ways: "recognition … carries with it the active assistance of the court": *In re African Farms Ltd* [1906] TS 373, 377; "This court … will do its utmost to co-operate with the United States Bankruptcy Court and avoid any action which might disturb the orderly administration of [the company] in Texas under ch 11": *Banque Indosuez SA v Ferromet Resources Inc* [1993] BCLC 112, 117.

30.     In *Credit Suisse Fides Trust v Cuoghi* [1998] QB 818, 827, Millett LJ said:

"In other areas of law, such as cross-border insolvency, commercial necessity has encouraged national courts to provide assistance to each other without waiting for such co-operation to be sanctioned by international convention … It is becoming widely accepted that comity between the courts of different countries requires mutual respect for the territorial integrity of each other's jurisdiction, but that this should not inhibit a court in one jurisdiction from rendering whatever assistance it properly can to a court in another in respect of assets located or persons resident within the territory of the former."

31.     The common law assistance cases have been concerned with such matters as the vesting of English assets in a foreign officeholder, or the staying of local proceedings, or orders for examination in support of the foreign proceedings, or orders for the remittal of assets to a foreign liquidation, and have involved cases in which the foreign court was a court of competent jurisdiction in the sense that the bankrupt was domiciled in the foreign country or, if a company, was incorporated there.

32.     An early case of recognition was *Solomons v Ross* 1 H B1 131n, where, as I have said, the bankruptcy was in Holland, and the bankrupts were Dutch merchants declared bankrupt in Amsterdam, and the Dutch curator was held entitled to recover an English debt: see also *Bergerem v Marsh* (1921) B&CR 195 (English member of Belgian firm submitted to Belgian bankruptcy proceedings: movable property in England vested in Belgian trustee).

33.     One group of cases involved local proceedings which were stayed or orders which were discharged because of foreign insolvency proceedings. Thus in *Banque Indosuez SA v Ferromet Resources Inc* [1993] BCLC 112 an English injunction against a Texas corporation in Chapter 11 proceedings was discharged; *cf In re African Farms Ltd* [1906] TS 373 (execution in Transvaal by creditor in proceedings against English company in liquidation in England stayed by Transvaal court), applied in *Turners & Growers Exporters Ltd v The Ship Cornelis Verolme* [1997] 2 NZLR 110 (Belgian shipowner in Belgian bankruptcy: ship released from arrest); *Modern Terminals (Berth 5) Ltd v States Steamship Co* [1979] HKLR 512 (stay in Hong Kong of execution against Nevada corporation in Chapter 11 proceedings in United States federal court in California), followed in *CCIC Finance Ltd v Guangdong International Trust & Investment Corpn* [2005] 2 HKC 589 (stay of Hong Kong proceedings against Chinese state owned enterprise in Mainland insolvency). Cases of judicial assistance in the traditional sense include *In re Impex Services Worldwide Ltd* [2004] BPIR 564, where a Manx order for examination and production of documents was made in aid of the provisional liquidation in England of an English company.

34.     Cases involving remittal of assets from England to a foreign office-holder include *In re Bank of Credit and Commerce International SA (No 10)* [1997] Ch 213 (Luxembourg liquidation of Luxembourg company); and *In re HIH Casualty and General Insurance Ltd* [2008] UKHL 21, [2008] 1 WLR 852 (the view of Lord Hoffmann and Lord Walker) (Australian liquidation of Australian insurance company); and *In re SwissAir Schweizerische Luftverkehr-Aktiengesellschaft* [2009] EWHC 2099 (Ch), [2010] BCC 667 (Swiss liquidation of Swiss company).

## III     The Cambridge Gas and HIH decisions

35.     The opinion of Lord Hoffmann, speaking for the Privy Council, in *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2006] UKPC 26, [2007] 1 AC 508 ("*Cambridge Gas*") and his speech in the House of Lords in *In re HIH Casualty and General Insurance Ltd* [2008] UKHL 21, [2008] 1 WLR 852 ("*HIH*") have played such a major role in the decisions of the Court of Appeal and in the arguments of the parties on these appeals that it is appropriate to put them in context at this point.

*Cambridge Gas*

36.     The broad facts of *Cambridge Gas* were these. In 1997 a shipping business was initiated by a Swiss businessman, Mr Giovanni Mahler. The investors borrowed $300m on the New York bond market and the business bought five gas transport vessels. The venture was a failure, and ended with a Chapter 11 proceeding in the US Bankruptcy Court in New York. The question for the Privy Council on appeal from the Isle of Man was whether an order of the New York court was entitled to implementation in the Isle of Man.

37.     The corporate structure of the business was that the investors owned, directly or indirectly, a Bahamian company called Vela Energy Holdings Ltd ("Vela"). Vela owned (through an intermediate Bahamian holding company) Cambridge Gas, a Cayman Islands company.

38.     Cambridge Gas owned directly or indirectly about 70% of the shares of Navigator Holdings plc ("Navigator"), an Isle of Man company. Navigator owned all the shares of an Isle of Man company which in turn owned companies which each owned one ship.

39.     In 2003 Navigator petitioned the US Bankruptcy Court for relief under Chapter 11 of the US Bankruptcy Code, which allows insolvent companies, under

supervision of the court and under cover of a moratorium, to negotiate a plan of reorganisation with their creditors. The petition was initiated by the investor interests, who proposed a plan to sell the ships nominally by auction but in fact to the previous investors, but the bondholders did not accept this and proposed their own plan under which the assets of Navigator would be vested in the creditors and the equity interests of the previous investors would be extinguished. The judge rejected the investors' plan and approved the creditors' plan.

40.     The mechanism which the plan used to vest the assets in the creditors was to vest the shares in Navigator in their representatives, ie, the creditors' committee. That would enable them to control the shipping companies and implement the plan.  The plan provided that upon entry of the confirmation order title to all the common stock of Navigator would vest in the creditors' committee to enable it to implement the plan. The order of the New York court confirming the plan recorded the intention of the court to send a letter of request to the Manx court asking for assistance in giving effect to "the plan and confirmation order" and such a letter was sent. The committee of creditors then petitioned the Manx court for an order vesting the shares in their representatives.

41.     At this point it is necessary to emphasise two features of the case. The first feature is that Navigator was an Isle of Man company and 70% of its common stock was owned directly or indirectly by Cambridge Gas. Under the normal principles of the conflict of laws the shares would have been situate in the Isle of Man: *Dicey*, 15th ed, para 22-045. That is why Lord Hoffmann said, at para 6, that the New York court was aware that the order vesting title to the common stock of Navigator in the creditors' committee could not automatically have effect under the law of the Isle of Man; and also why he accepted (paras 12-13) that if the judgment were a judgment in rem it could not affect title to shares in the Isle of Man.

42.     The second feature which it is necessary to emphasise is that Cambridge Gas was a Cayman Islands company which (as held by the Manx courts) had not submitted to the jurisdiction of the US Bankruptcy Court. Lord Hoffmann said, at para 8, that the position that Cambridge Gas had not submitted to the jurisdiction of the US Bankruptcy Court bore little relation to economic reality since the New York proceedings had been conducted on the basis that the contest was between rival plans put forward by the shareholders and the creditors; Vela, the parent company of Cambridge Gas, participated in the Chapter 11 proceedings; and they had been instituted by Navigator. Consequently the claim by Cambridge Gas that it had not submitted was highly technical, but there was no appeal from the decisions of the Manx courts that it had not submitted. But Lord Hoffmann also accepted that if the order of the US Bankruptcy Court were to be regarded as a judgment in personam it would not be entitled to recognition or enforcement in the Isle of Man

because "the New York court had no personal jurisdiction over Cambridge [Gas]":
para 10.

43.    Nevertheless the Privy Council held that the plan could be carried into
effect in the Isle of Man. The reasoning was as follows: first, if the judgment had
to be classified as in personam or in rem the appeal would have to be allowed, but
bankruptcy proceedings did not fall into either category:

> "[13] … Judgments in rem and in personam are judicial
> determinations of the existence of rights: in the one case, rights over
> property and in the other, rights against a person. When a judgment
> in rem or in personam is recognised by a foreign court, it is accepted
> as establishing the right which it purports to have determined,
> without further inquiry into the grounds upon which it did so. The
> judgment itself is treated as the source of the right.

> [14] The purpose of bankruptcy proceedings, on the other hand, is
> not to determine or establish the existence of rights, but to provide a
> mechanism of collective execution against the property of the debtor
> by creditors whose rights are admitted or established. …

> [15] … [B]ankruptcy, whether personal or corporate, is a collective
> proceeding to enforce rights and not to establish them. Of course, as
> Brightman LJ pointed out in *In re Lines Bros Ltd* [1983] Ch 1, 20, it
> may incidentally be necessary in the course of bankruptcy
> proceedings to establish rights which are challenged: proofs of debt
> may be rejected; or there may be a dispute over whether or not a
> particular item of property belonged to the debtor and is available for
> distribution. There are procedures by which these questions may be
> tried summarily within the bankruptcy proceedings or directed to be
> determined by ordinary action. But these again are incidental
> procedural matters and not central to the purpose of the
> proceedings."

44.    Second, the principle of universality underlay the common law principles of
judicial assistance in international insolvency, and those principles were sufficient
to confer jurisdiction on the Manx court to assist, by doing whatever it could have
done in the case of a domestic insolvency: paras 21-22. Third, exactly the same
result could have been achieved by a scheme under the Isle of Man Companies Act
1931. Fourth, it was no objection to implementation of the plan in the Isle of Man
that the shares in Navigator belonged to a person (Cambridge Gas) which was not
a party to the bankruptcy proceedings for these reasons, at para 26:

"… [A] share is the measure of the shareholder's interest in the company: a bundle of rights against the company and the other shareholders. As against the outside world, that bundle of rights is an item of property a chose in action. But as between the shareholder and the company itself, the shareholder's rights may be varied or extinguished by the mechanisms provided by the articles of association or the Companies Act. One of those mechanisms is the scheme of arrangement under section 152 [of the Isle of Man Companies Act 1931]. As a shareholder Cambridge is bound by the transactions into which the company has entered, including a plan under Chapter 11 or a scheme under section 152."

45.    At this point it is necessary to point out that the opinion in *Cambridge Gas* does not articulate any reason for holding that, in the eyes of the Manx court, the US Bankruptcy Court had international jurisdiction in either of two relevant senses.

46.    The first sense is the jurisdiction of the US Bankruptcy Court in relation to the Chapter 11 proceedings themselves. The entity which was in Chapter 11 was Navigator. The English courts exercise a wider jurisdiction in bankruptcy and (especially) in winding up than they recognise in foreign courts. At common law, the foreign court which is recognised as having jurisdiction in personal bankruptcy is the court of the bankrupt's domicile or the court to which the bankrupt submitted (*Dicey*, 15th ed, para 31R-059) and the foreign court with corresponding jurisdiction over corporations is the court of the place of incorporation (*Dicey*, 15th ed, para 30R-100). Under United States law the US Bankruptcy Court has jurisdiction over a "debtor", and such a debtor must reside or have a domicile or place of business, or property in the United States. From the standpoint of English law, the US Bankruptcy Court had international jurisdiction because although Navigator was not incorporated in the United States, it had submitted to the jurisdiction by initiating the proceedings.

47.    The second sense in which international jurisdiction is relevant is the jurisdiction over the third party, Cambridge Gas, and its shares in Navigator. Cambridge Gas was not incorporated in the United States, and it was held by the Isle of Man courts that it had not submitted to the jurisdiction of the US Bankruptcy Court (and this was, as I have said, accepted with evident reluctance by the Privy Council). The property which was the subject of the order of the US Bankruptcy Court was shares in an Isle of Man company. Consequently the property dealt with by the US Bankruptcy Court was situate, by Manx rules of the conflict of laws, in the Isle of Man, and the shareholder relationship was governed by Manx law.

48.     *Cambridge Gas* was the subject of brief comment a few months later by the Privy Council in *Pattni v Ali* [2006] UKPC 51, [2007] 2 AC 85. The decision in that case was simply that a Kenyan judgment deciding that A was bound to sell shares in a Manx company to B was entitled to recognition in the Isle of Man. It resulted in an order in personam against a person subject to the jurisdiction of the Kenyan court, and was not a judgment in rem against property in the Isle of Man and outside the jurisdiction of the Kenyan court, because the fact that a judicial determination determines or relates to the existence of property rights between parties does not in itself mean that it is in rem. Lord Mance, speaking for the Board, said, at para 23:

> "In *Cambridge Gas* ... the Board touched on the concepts of in personam and in rem proceedings, but held that the bankruptcy order with which it was concerned fell into neither category. Its purpose was simply to establish a mechanism of collective execution against the property of the debtor by creditors whose rights were admitted or established."

*HIH*

49.     The decision in *HIH* does not deal with foreign judgments. *HIH* concerned four Australian insurance companies which were being wound up in Australia and in respect of which provisional liquidators had been appointed in England. The question was whether the English court had power to direct remission of assets collected in England to Australia, notwithstanding that there were differences between the English and Australian statutory regimes for distribution which meant that some creditors would benefit from remission whilst some creditors would be worse off. The House of Lords unanimously directed that remission should take place, but the reasons differed.

50.     The reasoning of the majority (Lord Scott of Foscote and Lord Neuberger of Abbotsbury, with Lord Phillips of Worth Matravers agreeing)) was based exclusively on the statutory power to assist foreign insolvency proceedings under section 426 of the Insolvency Act 1986, but Lord Hoffmann (with whom Lord Walker agreed) also considered that such a power existed at common law.

51.     Lord Hoffmann characterised the principle of universality as a principle of English private international law that, where possible, there should be a unitary insolvency proceeding in the courts of the insolvent's domicile which receives worldwide recognition and which should apply universally to all the bankrupt's assets, at para 6:

> "Despite the absence of statutory provision, some degree of international co-operation in corporate insolvency had been achieved by judicial practice. This was based upon what English judges have for many years regarded as a general principle of private international law, namely that bankruptcy (whether personal or corporate) should be unitary and universal. There should be a unitary bankruptcy proceeding in the court of the bankrupt's domicile which receives worldwide recognition and it should apply universally to all the bankrupt's assets."

52.    Other parts of Lord Hoffmann's speech have already been quoted above, and it is only necessary for present purposes to recall that he said that (a) "the process of collection of assets will include, for example, the use of powers to set aside voidable dispositions, which may differ very considerably from those in the English statutory scheme" (at para 19) and (b) that the purpose of the principle of universality was to ensure that the debtor's assets were distributed under one scheme of distribution, and that the principle required that English courts should co-operate with the courts in the country of the principal liquidation to ensure that all the company's assets are distributed to its creditors under a single system of distribution: para 30.

*Subsequent treatment of Cambridge Gas*

53.    The decision in *Cambridge Gas* was not applied by the Supreme Court of Ireland in *In re Flightlease (Ireland) Ltd* [2012] IESC 12 (to which I shall revert) and has been subject to academic criticism. Professor Briggs has expressed the view ((2006) 77 BYIL 575, 581) that

> "the decision in [*Cambridge Gas*] is wrong, for it requires a Manx court to give effect to a confiscation order made by a foreign court of property belonging to a person who was not subject to the personal jurisdiction of the foreign court. That a Manx court could have done so itself is nothing to the point."

I shall return to the question whether it was correctly decided.

## IV    The cases before the court and the issues

*Rubin*

54.    Eurofinance SA is a company incorporated in the British Virgin Islands. It was established by Adrian Roman, the second appellant on the *Rubin* appeal. Eurofinance SA settled "The Consumers Trust" ("TCT") under a deed of trust made in 2002 under English law, with trustees resident in England, of whom two were accountants and two were solicitors.

55.    TCT was established to carry on a sales promotion scheme in the USA and Canada.  The class of beneficiaries was made up of persons who had successfully participated in the scheme by claiming validly in certain sales promotions owned and operated by Eurofinance SA.  The trustees were to hold the capital and income of TCT for the beneficiaries and subject thereto for Eurofinance SA as beneficiary in default. The promotion, known as the Cashable Voucher Programme, was entered into with participating merchants in the United States and Canada who, when they sold products or services to their customers, offered those customers a cashable voucher comprising a rebate of up to 100% of the purchase price for the product or service.  Under the terms of the voucher the rebate was to be paid to customers in three years' time provided that certain conditions were followed by the customer involving the completion by the customer of both memory and comprehension tests.

56.    The participating merchants paid TCT 15% of the face value of each cashable voucher issued by the merchant during a week. TCT retained 40% of the payments received (ie 6% of the face value of each cashable voucher). About one half of the 60% balance received from merchants was paid to Eurofinance SA (and so effectively to Adrian Roman) and the remainder was paid to others involved in the operation of the programme, such as solicitors, accountants and US lawyers. From about 2002 Adrian Roman's sons, Nicholas Roman and Justin Roman, each began to receive about 2%.  The trustees maintained bank accounts in the USA and Canada where the payments they had received from merchants were kept.

57.    Since the trustees only retained 6% of the face value of the issued vouchers, the success of the scheme necessarily involved the consumers either forgetting to redeem the vouchers or being unsuccessful in navigating the process required to be followed in order to obtain payment. When the scheme folded in 2005 the trustees held nearly US$10m in bank accounts in the United States and Canada.

58.    By about 2005 TCT's business ceased after the Attorney General of Missouri brought proceedings under Missouri's consumer protection legislation which resulted in a settlement involving a payment by the trustees of US$1,650,000 and US$200,000 in costs.

59.    When it became clear that further proceedings were likely to be brought by Attorneys General in other states, that the number of consumer claims would increase, and that TCT would not have sufficient funds to meet all the valid claims of its beneficiaries, in November 2005 Adrian Roman caused Eurofinance to apply for the appointment by the High Court of the respondents on the *Rubin* appeal, David Rubin and Henry Lan, as receivers of TCT for the purposes of causing TCT then to obtain protection under Chapter 11 of Title 11 of the United States Code ("Chapter 11"). The English court was told that Chapter 11 reorganisation proceedings would result in an automatic stay of proceedings against TCT, would enable the receivers to reject unprofitable or burdensome executory contracts, and might result in the recovery as preferential payments of sums paid to consumers and to the Missouri Attorney General.

60.    In November 2005 the respondents were appointed as receivers by order of Lewison J, and in the following month, the respondents and the trustees then caused TCT to present a voluntary petition to the US Bankruptcy Court for relief under Chapter 11. TCT was placed into Chapter 11 proceedings in New York as virtually all of its 60,000 creditors were located in the United States or Canada as were its assets. As a matter of United States bankruptcy law, TCT could be the subject matter of a petition for relief under Chapter 11 as a debtor. This is because a trust such as TCT is treated under Chapter 11 as a separate legal entity under the classification of a "business trust*".*

61.    A joint plan of liquidation for TCT was prepared, and in September 2007 Lewison J ordered that the respondents (as receivers) be at liberty to seek approval of the plan from the US Bankruptcy Court. Under the terms of the plan the respondents were appointed legal representatives of TCT and given the power to commence, prosecute and resolve all causes of action against potential defendants including the appellants. The US Bankruptcy Court approved the plan in October 2007, and appointed the respondents as "foreign representatives" of the debtor to make application to the Chancery Division in London for recognition of the Chapter 11 proceedings as a foreign main proceeding under the CBIR; and to seek aid, assistance and co-operation from the High Court in connection with the Chapter 11 proceedings, and, in particular to seek the High Court's assistance and co-operation in the prosecution of litigation which might be commenced in the US Bankruptcy Court including "the enforcement of judgments of this court that may be obtained against persons and entities residing or owning property in Great Britain …"

62.    In December 2007 proceedings were commenced in the US Bankruptcy Court by the issue of a complaint against a number of defendants including the appellants.  These claims fall within the category of "adversary proceedings" under the US bankruptcy legislation, and I will use this term to refer to them. The adversary proceedings comprised a number of claims including causes of action arising under the US Bankruptcy Code, which related to funds received by TCT from merchants which were paid out to the defendants (including the appellants), or to amounts transferred to the defendants within one year prior to the commencement of the TCT bankruptcy case including the appellants.

63.    The defendants were the appellants and other parties involved with the programme.  The appellants were served personally with the complaint commencing the adversary proceedings but did not defend, or participate, in the adversary proceedings, although it appears from a judgment of the US Bankruptcy Court that Eurofinance SA had filed a notice of appearance in the main Chapter 11 proceedings (Order of 22 July 2008, paras 42-43).

64.    On 22 July 2008 default and summary judgment was entered against the appellants in the adversary proceedings by the US Bankruptcy Court. The US Bankruptcy Court entered a judgment against the appellants on the ten counts of the complaint.

65.    In November 2008 the respondents applied as foreign representatives to the Chancery Division for, inter alia, (a) an order that the Chapter 11 proceedings be recognised as a "foreign main proceeding" (b) an order that the respondents be recognised as "foreign representatives" within the meaning of article 2(j) of the Model Law in relation to those proceedings; and (c) an order that the US Bankruptcy Court's judgment be enforced as a judgment of the English court in accordance with CPR Pts 70 and 73.

66.    Nicholas Strauss QC, sitting as a deputy judge of the Chancery Division, recognised the Chapter 11 proceedings (including the adversary proceedings) as foreign main proceedings, and the respondents as foreign representatives, but refused to enforce the judgments in the adversary proceedings because (a) at common law the English court will not enforce a judgment in personam contrary to the normal jurisdictional rules for foreign judgments; and (b) there was nothing in CBIR, articles 21(e) (realisation of assets)  and 25 (judicial co-operation), which justified the enforcement of judgments in insolvency proceedings.

67.    At first instance the respondents sought to enforce the entirety of the US Bankruptcy Court's judgment, but before the Court of Appeal they sought an order for the enforcement of those parts of the judgment which were based on state or

federal avoidance laws, including fraudulent conveyance under State Fraudulent Conveyance Laws, and under federal law, namely fraudulent transfers under section 548(a) of 11 USC; liability of transferees of avoided transfers under section 550; fraudulent transfers under section 548(b) and liability of transferees of avoided transfers under section 550.

68.    The Court of Appeal (Ward and Wilson LJJ and Henderson J) allowed an appeal, and held that the judgment was enforceable: [2010] EWCA Civ 895, [2011] Ch 133.

*New Cap*

69.    In the *New Cap* appeal the appellants are members of Lloyd's Syndicate Number 991 ("the Syndicate") for the 1997 and 1998 years of account. The respondents are a reinsurance company ("New Cap") and its liquidator, a partner in Ernst & Young in Sydney.

70.    New Cap is an Australian company, which was licensed as an insurance company in Australia under the Australian Corporations Act 2001 (Cth) ("the Australian Act"). New Cap did not conduct insurance business in any country other than Australia, and the majority of New Cap's business was generated through reinsurance brokers conducting business in Australia and the balance was generated from overseas insurance brokers.

71.    New Cap reinsured the Syndicate in relation to losses occurring on risks attaching during the 1997 and 1998 years of account under reinsurance contracts which were subject to English law, and contained London arbitration clauses and also (oddly) English jurisdiction clauses. The reinsurance contracts were placed with New Cap by the Syndicate's Australian broker, which was the sub-broker for the Syndicate's London broker.

72.    Each reinsurance contract contained a commutation clause. The Syndicate and New Cap entered into a commutation agreement to commute the reinsurances with effect from 11 December 1998. Under the commutation agreement, New Cap agreed to make a lump sum payment to the Syndicate by 31 December 1998 in consideration for its release from liability under the reinsurance contracts. The payments were calculated on the basis of a 7.5% discount and a deduction from premium. New Cap made payment pursuant to the commutation agreements in two instalments of US$2,000,000 and US$3,980,600 in January 1999. The commutation payments were made from a bank account held by New Cap at the

Sydney branch of the Commonwealth Bank of Australia to a bank account in London.

73.     The second respondent was appointed the administrator of New Cap by a resolution of its directors in April 1999. In September 1999 the creditors of New Cap resolved that New Cap be wound up and the second respondent ("the liquidator") was appointed its liquidator. Under the Australian legislation, the winding up is deemed to have commenced on the day on which the administration began.

74.     In April 2002 the liquidator caused proceedings to be commenced against the Syndicate in the Supreme Court of New South Wales alleging that because New Cap was insolvent when the commutation payments were made in January 1999, and because those payments were made within the period of six months ending on the date when the administrator was appointed, they constituted unfair preferences and were thus "voidable transactions" under Part 5.7B of the Australian Act.

75.     The Syndicate (which does not accept that the payments were preferences) refused to accept service of the Australian proceedings.  The liquidator obtained leave from the Australian court to serve the Australian proceedings on the Syndicate's English solicitors in London. The Syndicate did not enter an appearance to the proceedings, but corresponded with the liquidator's solicitors, including commenting on an Independent Expert's Report to be used by the respondents as evidence of New Cap's insolvency in all of the avoidance proceedings including the proceedings against the Syndicate.

76.     The Australian court (White J in a judgment in September 2008, and Barrett J in a judgment in July 2009) recognised that there had been no submission by the Syndicate to the jurisdiction of the Australian court in that it did not enter an appearance, but White J held that the Australian court had jurisdiction over the Syndicate because a cause of action available under the Australian Act for the recovery of a preferential payment to an overseas party made when the company is insolvent was a cause of action which arose in New South Wales for the purposes of the New South Wales provisions for service out of the jurisdiction.

77.     Barrett J gave a reasoned judgment in July 2009 holding the Syndicate liable. After the respondents had been given leave to re-open their case so that the orders made by the Australian court would more accurately reflect the differences between those appellants who were members of the Syndicate for the 1997 year of account and those appellants who were members for the 1998 year of account, the Australian court entered final judgment against the Syndicate in its absence on 11

September 2009. The Australian judgment declared that the commutation payments were voidable transactions within the meaning of part 5.7B of the Australian Act and ordered the Syndicate to repay the amount of the commutation payments to the liquidator together with interest.

78.     On the liquidator's application the Australian court issued, in October 2009, a letter of request to the High Court in England and Wales requesting that the court "act in aid of and assist" the Australian court and exercise jurisdiction under section 426 of the Insolvency Act 1986 by: (1) ordering the Syndicate to pay the sums specified in the Australian judgment; alternatively (2) allowing the liquidator to commence fresh proceedings under the Australian Act in the English Court; (3) granting such further and other relief as the High Court may consider just; and (4) making such further or other orders as may, in the opinion of the High Court, be necessary or appropriate to give effect to the foregoing orders.

79.     On 30 July 2010, the Court of Appeal handed down judgment in *Rubin*. As a result, the respondents' alternative application for permission to commence fresh proceedings against the Syndicate under the Australian Act in England pursuant to section 426 of the Insolvency Act 1986 was adjourned generally, and the respondents were granted permission to seek relief at common law as an alternative to relief under section 426.

80.     In *New Cap* Lewison J and the Court of Appeal were bound by the decision of the Court of Appeal in *Rubin.* Lewison J held: (a) the judgment was not enforceable under the Foreign Judgments (Reciprocal Enforcement) Act 1933 because, although it applied to Australian judgments, it did not apply to orders made in insolvency proceedings; but (b) the judgment was enforceable under the assistance provision of section 426 of the Insolvency Act 1986 and also at common law: [2011] EWHC 677 (Ch).

81.     The Court of Appeal (Mummery, Lloyd and Macfarlane LJJ) affirmed Lewison J's judgment on these grounds: (a) the 1933 Act applied, and registration would not be set aside for lack of jurisdiction in the foreign court, because of the *Rubin* decision; (b) section 426 could also be used and was not excluded by section 6 of the 1933 Act; (c) but section 6 would preclude an action at common law; (d) it was not necessary to decide whether the court's power of assistance at common law was exercisable where the statutory power was available: [2011] EWCA Civ 971, [2012] 2 WLR 1095.

*Picard v Vizcaya Partners Ltd*

82.    This court gave permission for intervention by a written submission on behalf of Mr Irving Picard ("the trustee"), the trustee for the liquidation in the United States under the Securities Investor Protection Act of 1970 ("SIPA") of Bernard L Madoff Investment Securities LLC ("Madoff"), which was Bernard Madoff's broking company. The trustee is seeking to enforce at common law in Gibraltar judgments of the US Bankruptcy Court against Vizcaya Partners Ltd ("Vizcaya"), a BVI company, for $180m, and against Asphalia Fund Ltd ("Asphalia"), a Cayman Islands company, for $67m, representing alleged preferential payments. He is also seeking to enforce a US Bankruptcy Court default judgment in excess of $1 billion in the Cayman Islands in *Picard v Harley International (Cayman) Ltd.* The Gibraltar and Cayman Islands proceedings have been adjourned to await the outcome of the present appeals.

83.    In *Picard v Vizcaya Partners Ltd* proceedings have been brought in Gibraltar to enforce the default judgments against Vizcaya and Asphalia because $73m is held there on behalf of Vizcaya which the trustee maintains is available to satisfy the judgments. Vizcaya and Asphalia have also, with the permission of the court, intervened by written submission.

84.    There is no agreed statement of facts relating to this aspect of the case, and nothing which is said here about the facts should be taken as representing or reflecting any finding. According to Vizcaya and Asphalia the position is as follows. Between 2002 and 2007, a bank in Europe, acting as a custodian trustee for Vizcaya, sent $327m to Madoff for investment in securities. Unknown to the bank, or to Vizcaya, or its shareholder Asphalia, Madoff had been engaged in a Ponzi scheme for some 30 years, and their money was never invested in securities. In 2008, at the time of the credit crunch and the banking crisis, the custodian trustee withdrew $180m (leaving $147m with Madoff) and $67m of the $180m was paid to Asphalia.

85.    In late 2008, the Madoff fraud came to light, and the trustee was appointed. The trustee targeted investors who had withdrawn investments from Madoff in the two years before its collapse in December 2008 as a source for recovery of "customer property" for the benefit of other investors who had not withdrawn their investments. The trustee commenced adversary proceedings in the US Bankruptcy Court alleging preference and fraudulent conveyance against Vizcaya and Asphalia under SIPA and under the Bankruptcy Code, the effect of which, they say, is that (a) as the trustee argues, a person who, on the basis that he has received "customer money" has been required to repay a preference, does not necessarily become a "customer" and thereby entitled to share with other customers in the bankruptcy; and (b) the trustee may avoid a payment made by the bankrupt to a

creditor 90 days before the commencement of the bankruptcy, irrespective of the intention with which the payment is made or received.

86.    The trustee obtained judgments in default, and Vizcaya and Asphalia say that they took no part in the New York proceedings because they had no connection with New York, and in particular (a) Asphalia was not a customer of Madoff but a shareholder of Vizcaya; (b) arguably Vizcaya was not a customer since it had appointed the bank to act as custodian trustee and it was the bank which entered into contracts with Madoff.

*The issues*

87.    The principal issue on these appeals is whether the rules at common law or under the 1933 Act regulating those foreign courts which are to be regarded as being competent for the purposes of enforcement of judgments apply to judgments in avoidance proceedings in insolvency, and, if not, what rules do apply (section V below). The other issues are whether, in the *Rubin* appeal, enforcement may be effected through the assistance provisions of the Cross-Border Insolvency Regulations 2006 (section VI) or, in the *New Cap* appeal, section 426 of the Insolvency Act 1986 (section VII); whether the judgments are enforceable as a result of the submission by the judgment debtors to the jurisdiction of the foreign courts (section VIII); and, in the *New Cap* appeal, if the judgment is enforceable, whether enforcement  is at common law or under the 1933 Act (section IX).

## V    The first issue: recognition and enforcement of foreign judgments in insolvency proceedings

*Reasoning of the Court of Appeal in Rubin and the issue on the appeal*

88.    The Court of Appeal in the *Rubin* appeal decided that a foreign insolvency judgment could be enforced in England and Wales at common law against a defendant not subject to the jurisdiction of the foreign court under the traditional rule as formulated in the *Dicey* Rule.

89.    As I have already said, on the *Rubin* appeal in the Court of Appeal the receivers sought only to enforce those parts of the judgment which in effect related to the avoidance causes of action.  The Court of Appeal held that the judgment (as narrowed) was enforceable at common law. The reasoning was as follows: (a) the judgment was final and conclusive, and for definite sums of money, and on the face of the orders was a judgment in personam; (b) it was common ground that the judgment debtors were not resident (this was a slip for "present" since the action

was at common law and not under the 1933 Act) when the proceedings were instituted, and did not submit to the jurisdiction, and so at first blush had an impregnable defence; (c) *Cambridge Gas* decided that the bankruptcy order with which it was concerned was neither in personam nor in rem, and its purpose was simply to establish a mechanism of collective execution against the property of the debtor by creditors whose rights were admitted or established: *Pattni v Ali* [2006] UKPC 51, [2007] 2 AC 85, para 23; (d) bankruptcy was a collective proceeding to enforce rights and not to establish them: *Cambridge Gas* [2006] UKPC 26, [2007] 1 AC 508, para 15; (e) the issue was whether avoidance proceedings which could only be brought by the representative of the bankrupt were to be characterised as part of the bankruptcy proceedings, ie part of the collective proceeding to enforce rights and not to establish them; (f) the adversary proceedings were part and parcel of the Chapter 11 proceedings; (g) the ordinary rules for enforcing foreign judgments in personam did not apply to bankruptcy proceedings; (h) avoidance mechanisms were integral to and central to the collective nature of bankruptcy and were not merely incidental procedural matters; (i) the process of collection of assets will include the use of powers to set aside voidable dispositions, which may differ very considerably from those in the English statutory scheme: *HIH* [2008] UKHL 21, [2008] 1 WLR 852, para 19; (j) the judgment of the US Bankruptcy Court was a judgment in, and for the purposes of, the collective enforcement regime of the insolvency proceedings, and was governed by the sui generis private international law rules relating to insolvency; (k) that was a desirable development of the common law founded on the principles of modified universalism, and did not require the court to enforce anything that it could not do, mutatis mutandis, in a domestic context; (l) there was a principle of private international law that bankruptcy should be unitary and universal, and there should be a unitary insolvency proceeding in the court of the bankrupt's domicile which receives worldwide recognition and should apply universally to all the bankrupt's assets; (m) there was a further principle that recognition carried with it the active assistance of the court which included assistance by doing whatever the English court could do in the case of a domestic insolvency; (n) there was no unfairness to the appellants in upholding the judgment because they were fully aware of the proceedings, and after taking advice chose not to participate: [2011] Ch 133, paras 38, 41, 43, 45, 48, 50, 61-62, 64. It was unnecessary to decide whether the judgment was enforceable under the CBIR: para 63.

90.    In short, Ward LJ accepted that the judgment was an in personam judgment, but he decided that the *Dicey* Rule did not apply to foreign judgments in avoidance proceedings because they were central to the collective enforcement regime in insolvency and were governed by special rules.

91.    The essential questions on this aspect of the appeals are these. Is the judgment in each case to be regarded as a judgment in personam within the scope of the traditional rules embodied in the *Dicey* Rule, or is it to be characterised as

an insolvency order which is part of the bankruptcy proceedings, ie part of the collective proceeding to enforce rights and not to establish them? Is that a distinction which has a role to play? Is there a distinction between claims which are central to the purpose of the proceedings and claims which are incidental procedural matters? As a matter of policy, should the court, in the interests of universality of insolvency proceedings, devise a rule for the recognition and enforcement of judgments in foreign insolvency proceedings which is more expansive, and more favourable to liquidators, trustees in bankruptcy, receivers and other officeholders, than the traditional common law rule embodied in the *Dicey* Rule, or should it be left to legislation preceded by any necessary consultation?

92.    Ward LJ's conclusion derives from a careful synthesis of dicta in Lord Hoffmann's brilliantly expressed opinion in *Cambridge Gas* and his equally brilliant speech in *HIH*, each of which has on these appeals been subjected to an exceptionally detailed analysis. For reasons which will be developed, I do not agree with the conclusions which Ward LJ draws.

93.    But I begin with two matters on which I accept the respondents' analysis. The first is that avoidance proceedings have characteristics which distinguish them from ordinary claims such as claims in contract or tort. The second is that, if it were necessary to draw a distinction between insolvency orders and other orders, it would not be difficult to formulate criteria for the distinction, along similar lines to that drawn by the European Court in relation to the Brussels Convention, the Brussels I Regulation (Council Regulation (EC) 44/2001) and the EC Insolvency Regulation.

*Nature of avoidance proceedings*

94.    In order to achieve a proper and fair distribution of assets between creditors, it will often be necessary to adjust prior transactions and to recover previous dispositions of property so as to constitute the estate which is available for distribution. The principle of equality among creditors which underlies the pari passu principle may require the adjustment of concluded transactions which but for the winding up of the company would have remained binding on the company, and the return to the company of payments made or property transferred under the transactions or the reversal of their effect. Systems of insolvency law use avoidance proceedings as mechanisms for adjusting prior transactions by the debtor and for recovering property disposed of by the debtor prior to the insolvency. Thus under the Insolvency Act 1986 an administrator, or liquidator, or trustee in bankruptcy may, where there has been a transaction at an undervalue, or amounting to an unlawful preference, apply for an order restoring the position to what it would have been had the transaction not taken place: sections 238 *et seq*

and 339 *et seq.* Other systems of law have similar mechanisms, but they will differ in matters such as the period during which such transactions are at risk of reversal and the role of good faith of the parties to the transaction.

95.    The underlying policy is to protect the general body of creditors against a diminution of the assets by a transaction which confers an unfair or improper advantage on the other party, and it is therefore an essential aspect of the process of liquidation that antecedent transactions whose consequences have been detrimental to the collective interest of the creditors should be amenable to adjustment or avoidance: *Fletcher, Law of Insolvency*, 4th ed (2009), para 26-002; *Goode, Principles of Corporate Insolvency Law*, 4th ed (2011), para 13-03.

96.    Thus the UNCITRAL Legislative Guide on Insolvency Law (2005) says:

> "150.    Many insolvency laws include provisions that apply retroactively from a particular date (such as the date of application for, or commencement of, insolvency proceedings) for a specified period of time (often referred to as the 'suspect' period) and are designed to overturn those past transactions to which the insolvent debtor was a party or which involved the debtor's assets where they have certain effects. …

> 151.    It is a generally accepted principle of insolvency law that collective action is more efficient in maximizing the assets available to creditors than a system that leaves creditors free to pursue their individual remedies and that it requires all like creditors to receive the same treatment. Provisions dealing with avoidance powers are designed to support these collective goals, ensuring that creditors receive a fair allocation of an insolvent debtor's assets consistent with established priorities and preserving the integrity of the insolvency estate."

97.    In *In re Condor Insurance Ltd*, 601 F 3d 319, 326 (5th Cir 2010), the Court of Appeals for the Fifth Circuit said that:

> "Avoidance laws have the purpose and effect of re-ordering the distribution of a debtor's assets … in favor of the collective priorities established by the distribution statute … [and] must be treated as an integral part of the entire bankruptcy system."

98.    In different phases of the Australian proceedings in *New Cap* Barrett J made similar points. He said that in an action for unfair preference under the Australian legislation the liquidator might obtain an order for the payment of money, but the action did not contemplate recovery in the sense applicable to damages and debts; and the proceedings sought to remedy or counter the effects of that depletion caused by the payment by New Cap: *New Cap Reinsurance Corpn v Renaissance Reinsurance Ltd* [2002] NSWSC 856, paras 23, 27. The order does not vindicate property rights which the company itself would have had prior to liquidation, but statutory rights which the liquidator has under the statutory scheme in consequence of winding up. The purpose of the order for the payment of money to a company in liquidation is not to compensate the company, but to adjust the rights of creditors among themselves in such a way as to eliminate the effects of favourable treatment afforded to one or more creditors, to the exclusion of others, in the period immediately before an insolvent administration commences: *New Cap Reinsurance Corpn v Grant* [2009] NSWSC 662, 257 ALR 740, paras 20-21.

*Difference between insolvency claims and others*

99.    I also accept that, if there were to be a separate rule for the recognition and enforcement of insolvency orders, it would not normally be difficult to distinguish between judgments in insolvency proceedings which are peculiarly the subject of insolvency law such as avoidance proceedings, and other judgments of the kind which are covered by the *Dicey* Rule.

100.    In the context of the Brussels Convention, the Brussels I Regulation and the EC Insolvency Regulation, the European Court has developed a distinction between claims which derive directly from the bankruptcy or winding up, and which are closely connected with them, on the one hand, and those which do not, on the other hand, and the distinction has been applied by the English court. In my judgment, the distinction is a workable one which could be adapted to other contexts should it be useful or necessary to do so.

101.    Claims which were regarded as bankruptcy claims have been held to include a claim under French law by a liquidator against a director to make good a deficiency in the assets of a company (*Gourdain v Nadler* (Case 133/78) [1979] ECR 733); or a claim under German law to set aside a transaction detrimental to creditors (*Seagon v Deko Marty NV (*Case C-339/07) [2009] 1 WLR 2168). Claims outside the category of bankruptcy claims have been held to include an action brought by a seller based on a reservation of title against a purchaser who was insolvent (*German Graphics Graphische Maschinen GmbH v van der Schee* (Case C-292/08) [2009] ECR I-8421) or a claim by a liquidator as to beneficial ownership of an asset (*Byers v Yacht Bull Corp* [2010] EWHC 133 (Ch), [2010] BCC 368). In *Oakley v Ultra Vehicle Design Ltd* [2005] EWHC 872 (Ch), [2006]

BCC 57, Lloyd LJ (sitting as an additional judge of the Chancery Division) said, at para 42):

> "it has been held that a claim by a liquidator to recover pre-liquidation debts, although made in the course of the winding up and so, in a sense, relating to it, does not derive directly from it and is therefore not excluded from the Brussels Convention (and therefore now not from the [Brussels I] Regulation) by article 1.2(b): see *In re Hayward decd* [1997] Ch 45, and *UBS AG v Omni Holding AG* [2000] 1 WLR 916. By contrast, proceedings by a liquidator against a director or a third party to set aside a transaction as having been effected at an undervalue or on the basis of wrongful or fraudulent trading would be claims deriving directly from the winding up and therefore excluded from the Brussels Convention and now from the [Brussels I] Regulation."

*In personam or sui generis?*

102.   I have already quoted the passage in *Cambridge Gas* in which Lord Hoffmann distinguished between judgments in rem and in personam, on the one hand, and judgments in bankruptcy proceedings, on the other, but it is necessary to repeat it at this point. He said:

> "13. … Judgments in rem and in personam are judicial determinations of the existence of rights: in the one case, rights over property and in the other, rights against a person. When a judgment in rem or in personam is recognised by a foreign court, it is accepted as establishing the right which it purports to have determined, without further inquiry into the grounds upon which it did so. The judgment itself is treated as the source of the right.
>
> 14. The purpose of bankruptcy proceedings, on the other hand, is not to determine or establish the existence of rights, but to provide a mechanism of collective execution against the property of the debtor by creditors whose rights are admitted or established. …"

103.   There is no doubt that the order of the US Bankruptcy Court in *Cambridge Gas* did not fall into the category of an in personam order. Even though the question whether a foreign judgment is in personam or in rem is sometimes a difficult one (*Dicey*, 15th ed, para 14-109), that was not a personal order against its shareholders, including Cambridge Gas. The order vested the shares in Navigator

in the creditors' committee. It did not declare existing property rights. Indeed the whole purpose of what was the functional equivalent of a scheme of arrangement was to alter property rights. But it is not easy to see why it was not an in rem order in relation to property in the Isle of Man in the sense of deciding the status of a thing and purporting to bind the world: see *Jowitt's Dictionary of English Law*, 3rd ed (2010) (ed Greenberg), p 1249.

104.    The judgments in the *Rubin* and *New Cap* appeals were based on avoidance legislation which, with some differences of substance, performs the same function as the equivalent provisions in the Insolvency Act 1986 and its predecessors. But Ward LJ in *Rubin* accepted that the judgment was in personam and the *Rubin* respondents have not sought to argue that it was not an in personam judgment. What they say is that, even if it is in personam, it is within a sui generis category of insolvency orders or judgments subject to special rules.

105.    There can be no doubt that the avoidance orders in the present appeals are in personam. In *In re Paramount Airways Ltd* [1993] Ch. 223, 238, Nicholls LJ said that the remedies under section 238 of the Insolvency Act 1986, (transactions at an undervalue) were "primarily of an in personam character," and that accords with the nature of the orders in these appeals. The form of judgment of the US Bankruptcy Court in the *Rubin* case was that "plaintiffs have judgment … against the defendants …" in the sums awarded, and the orders of the New South Wales Supreme Court in the *New Cap* case included orders that "the defendants … pay to the first plaintiff" the sums due under section 588FF(1) of the Australian Corporations Act.

*The question of principle and policy*

106.    Since the judgments are in personam the principles in the *Dicey* Rule are applicable unless the court holds that there is, or should be, a separate rule for judgments in personam in insolvency proceedings, at any rate where those judgments are not designed to establish the existence of rights, but are central to the purpose of the insolvency proceedings or part of the mechanism of collective execution.

107.    Prior to *Cambridge Gas* and the present cases, there had been no suggestion that there might be a different rule for judgments in personam in insolvency proceedings and other proceedings. There are no cases in England which are helpful. The normal rules for enforcement of foreign judgments were applied to a claim by a liquidator for moneys due to the company (*Gavin Gibson & Co Ltd v Gibson* [1913] 3 KB 379) and to a claim on a debt ascertained in bankruptcy under German law (*Berliner Industriebank Aktiengesellschaft v Jost* [1971] 2 QB 463). A

judgment of the US Bankruptcy Court in Chapter 11 proceedings for repayment of a preferential transfer was enforced in Ontario on the basis of the judgment debtor's submission to the New York court, without any suggestion that the normal rules did not apply: *Gourmet Resources International Inc v Paramount Capital Corpn* (1991) 3 OR (3d) 286, [1993] ILPr 583, app dismissed (1993) 14 OR (3d) 319 (Ont CA).

108.    The principles in the *Dicey* Rule have never received the express approval of the House of Lords or the UK Supreme Court and the leading decisions remain *Adams v Cape Industries plc* [1990] Ch 433 and the older Court of Appeal authorities which it re-states or re-interprets. But there can be no doubt that the references by the House of Lords in the context of foreign judgments to the foreign court of "competent jurisdiction" are implicit references to the common law rule: eg *In re Henderson, Nouvion v Freeman* (1890) 15 App Cas 1, 8; *Owens Bank Ltd v Bracco* [1992] 2 AC 443, 484.

109.    The *Rubin* respondents question whether the rules remain sound in the modern world. It is true that the common law rule was rejected in Canada, at first in the context of the inter-provincial recognition of judgments. The Supreme Court of Canada held that the English rules developed in the 19th century for the recognition and enforcement of judgments of foreign countries could not be transposed to the enforcement of judgments from sister provinces in a single country with a common market and a single citizenship. Instead a judgment given against a person outside the jurisdiction should be recognised and enforced if the subject matter of the action had a real and substantial connection with the province in which the judgment was given: *Morguard Investments Ltd v De Savoye* [1990] 3 SCR 1077, para 45. This approach was applied, by a majority, to foreign country judgments in *Beals v Saldanha* [2003] 3 SCR 416 (applied to the recognition of an English order convening meetings in a scheme of arrangement in *Re Cavell Insurance Co* (2006) 269 DLR (4th) 679 (Ont CA)).

110.    There is no support in England for such an approach except in the field of family law. In *Indyka v Indyka* [1969] 1 AC 33 it was held that a foreign decree of divorce would be recognised at common law if there was a "real and substantial connection" between the petitioner (or the respondent) and the country where the divorce was obtained. This rule (now superseded by the Family Law Act 1986) was in part devised to avoid "limping marriages", ie cases where the parties were regarded as divorced in one country but regarded as married in another country. It has never been adopted outside the family law sphere in the context of foreign judgments.

111.    The Supreme Court of Ireland in *In re Flightlease (Ireland) Ltd* [2012] IESC 12 declined to follow *Cambridge Gas* (and also the decision of the Court of

Appeal in *Rubin*) and also held that the *Dicey* Rule should not be rejected in favour of a real and substantial connection test. In *Flightlease* the airline Swissair was in a form of debt restructuring proceeding in Switzerland, where it was incorporated. Flightlease is an Irish company in the same group as Swissair. An application was before the Swiss courts under the Swiss federal statute on debt enforcement and bankruptcy seeking the return of money paid by Swissair to Flightlease. The proceedings had reached the stage of judgment, but the liquidators of Flightlease were concerned to know whether a Swiss judgment would be enforceable in Ireland so that they could decide whether to appear in the Swiss proceedings.

112.    The Irish Supreme Court held that the judgment would not be enforceable if Flightlease did not appear in the Swiss proceedings for these reasons: (1) the effect of the Swiss order would be to establish a liability on Flightlease to repay moneys and would therefore result in a judgment in personam; (2) it would be preferable for any change in the rules relating to the enforcement of foreign judgments to take place in the context of international consensus by way of treaty or convention given effect by legislation. In particular, the Irish Supreme Court said that it would not adopt the approach in *Cambridge Gas* because it had resulted from legislative changes in the United Kingdom (this appears to have been based on a misapprehension), and should not be adopted in Ireland in the absence of consensus among common law jurisdictions.

113.    But there is no suggestion on this appeal that the principles embodied in the *Dicey* Rule should be abandoned. Instead the *Rubin* respondents suggest that the principles should not apply to foreign insolvency orders.

114.    The respondents accept that the *Dicey* Rule applies to claims which may be of considerable significance by an officeholder in a foreign insolvency, such as a claim for breach of contract, or a tort claim, or a claim to recover debts.  It is clear that such claims may affect the size of the insolvent estate just as much, and often more, than avoidance claims. Like claims to recover money due to the insolvent estate such as restitutionary claims not involving avoidance, avoidance claims may establish a liability to pay or repay money to the bankrupt estate (as in the present cases). There is no difference of principle.

115.    The question, therefore, is one of policy. Should there be a more liberal rule for avoidance judgments in the interests of the universality of bankruptcy and similar procedures? In my judgment the answer is in the negative for the following reasons.

116.    First, although I accept that it is possible to distinguish between avoidance claims and normal claims, for example in contract or tort, it is difficult to see in the

present context a difference of principle between a foreign judgment against a debtor on a substantial debt due to a company in liquidation and a foreign judgment against a creditor for repayment of a preferential payment. The respondents suggest that a person who sells goods to a foreign company accepts the risk of the insolvency legislation of the place of incorporation. Quite apart from the fact that the suggestion is wholly unrealistic, why should the seller/creditor be in a worse position than a buyer/debtor?

117.   The second reason is that if there is to be a different rule for foreign judgments in such proceedings as avoidance proceedings, the court will have to ascertain (or, more accurately, develop) two jurisdictional rules. There are two aspects of jurisdiction which would have to be satisfied if a foreign insolvency judgment or order is to be outside the scope of the *Dicey* Rule: the first is the requisite nexus between the insolvency and the foreign court, and the second is the requisite nexus between the judgment debtor and the foreign court.

118.   In *Cambridge Gas* Navigator was an Isle of Man company, and the jurisdiction of the United States Bankruptcy Court depends on whether the "debtor" resides or has a domicile or place of business, or property, in the United States. The shares in Navigator owned by Cambridge Gas (a Cayman Islands company) were, on ordinary principles of the conflict of laws, situated in the Isle of Man, and the shareholder relationship between Navigator and Cambridge Gas was governed by Manx law. The Privy Council, as noted above, did not articulate any rule for the jurisdiction of the US Bankruptcy Court over Navigator (although it had plainly submitted to its jurisdiction) or over Cambridge Gas (which, the Manx courts had held and the Privy Council accepted, had not submitted) or over Cambridge Gas' Manx assets.

119.   Nor did the Court of Appeal in *Rubin* articulate the reasons why the English court recognised the jurisdiction of the US Bankruptcy Court over TCT, or over the appellants. The receivers appear to have proceeded originally on the basis that the United States Bankruptcy Court had jurisdiction under United States bankruptcy law because of TCT's residence and principal place of business in New York (petition, 5 December 2005), but the US Bankruptcy Court, in deciding to appoint the receivers as foreign representatives also noted that TCT's business operations were conducted primarily in the United States, the majority of its creditors, substantially all of its assets, and its centre of main interests, were all in the United States. The basis of jurisdiction of the US Bankruptcy Court under United States law over the individual defendants in *Rubin* was that they were subject both to the general jurisdiction of the court (ie connection of the defendant with the jurisdiction) and also to the specific jurisdiction of the court (ie connection of the cause of action with the jurisdiction) because they specifically sought out the United States as a place to do business and specifically sought out United States merchants and consumers with whom to do business. Accordingly,

the exercise of jurisdiction satisfied the due process requirements of the Fifth Amendment.

120.    The basis of jurisdiction in *New Cap* over New Cap itself was of course that it was incorporated in Australia. The basis of jurisdiction over the Syndicate under New South Wales law was that the cause of action against the Syndicate arose in New South Wales.

121.    The respondents do not put forward any principled suggestion for rules which will deal with the two aspects of jurisdiction. They accept, as regards the jurisdictional link between the foreign country and the insolvent estate, that English law has traditionally recognised insolvency proceedings taking place in an individual bankrupt's place of domicile, or, in the case of corporations, the place of incorporation, but (because the connection which the trustees of the TCT, or the TCT itself, had with the United States was that the trust's main business was there) they rely on what Lord Hoffmann said in *HIH* [2008] UKHL 21, [2008] 1 WLR 852, para 31:

> "I have spoken in a rather old-fashioned way of the company's domicile because that is the term used in the old cases, but I do not claim it is necessarily the best one. Usually it means the place where the company is incorporated but that may be some offshore island with which the company's business has no real connection. The Council Regulation on insolvency proceedings (Council Regulation (EC) No 1346/2000 of 29 May 2000) uses the concept of the 'centre of a debtor's main interests' as a test, with a presumption that it is the place where the registered office is situated: see article 3.1. That may be more appropriate."

122.    They propose that each of these issues be resolved, not by a black letter rule like the common law rule for enforcement of judgments, but instead by an appeal to what was said in oral argument to be the discretion of the English court to assist the foreign court.

123.    On the second aspect, the jurisdictional link between the foreign country and the judgment debtor, they accept that it is necessary for there to be an appropriate connection between the foreign insolvency proceeding and the insolvency order in respect of which recognition and enforcement is sought. They propose that, in the exercise of the discretion, the court should adopt an approach similar to that taken by the English court in deciding whether to apply provisions of the Insolvency Act 1986, such as section 238 (transactions at an undervalue), to persons abroad, relying on *In re Paramount Airways Ltd* [1993] Ch 223.

124.   That case decided that there is no implied territorial limitation to the exercise of jurisdiction over "any person." The Court of Appeal rejected the argument that the section applied only to British subjects and to persons present in England at the time of the impugned transaction. In particular the physical absence or presence of the party at the time of the transaction bore no necessary relationship to the appropriateness of the remedy. Nor was the test of "sufficient connection" with England satisfactory because it would hardly be distinguishable from the ambit of the sections being unlimited territorially: p 237. Instead, the approach was to be found in the discretion of the court, first to grant permission to serve the proceedings out of the jurisdiction, and secondly, to make an order under the section. On both aspects the court would take into account whether the defendant was sufficiently connected with England for it to be just and proper to make the order against him despite the foreign element.

125.   The *Rubin* respondents say that *In re Paramount Airways Ltd* is instructive because, if the facts of the present case were reversed such that TCT had carried on the scheme in England and had been placed into insolvency proceedings here and the appellants were resident in New York, then it can be expected that the English court would have considered that England was the correct forum in which to bring section 238 proceedings to recover payments made to the appellants and would have given permission to serve out of the jurisdiction accordingly.  They go on to say that it is implicit in this that the English court would have expected the New York court then to recognise and enforce any judgment of the English court even if the appellants had remained in New York and had not contested the proceedings; and that by the same token that the court seeks and expects the recognition and enforcement abroad of its own insolvency orders, the court should recognise and enforce in England insolvency orders made in insolvency proceedings in other jurisdictions.

126.   There is no basis for this line of reasoning. There is no necessary connection between the exercise of jurisdiction by the English court and its recognition of the jurisdiction of foreign courts, or its expectation of the recognition of its judgments abroad. It has frequently been said that the jurisdiction exercised under what used to be RSC Ord 11, r. 1 (and is now CPR Practice Direction 6B, para 3.1) is an exorbitant one, in that it was a wider jurisdiction than was recognised in English law as being possessed by courts of foreign countries in the absence of a treaty providing for recognition: see *The Siskina (Owners of cargo lately laden on board) v Distos Cia Naviera SA* [1979] AC 210, 254 per Lord Diplock; *Amin Rasheed Shipping Corpn v Kuwait Insurance Co* [1984] AC 50, 65 per Lord Diplock; *Spiliada Maritime Corpn v Cansulex Ltd* [1987] AC 460, 481 per Lord Goff of Chieveley.

127.   Outside the sphere of matrimonial proceedings (see *Travers v Holley* [1953] P 246, disapproved on this aspect in *Indyka v Indyka* [1969] 1 AC 33) reciprocity

has not played a part in the recognition and enforcement of foreign judgments at common law. The English court does not concede jurisdiction in personam to a foreign court merely because the English court would, in corresponding circumstances, have power to order service out of the jurisdiction: *In re Trepca Mines Ltd* [1960] 1 WLR 1273.

128.   In my judgment, the dicta in *Cambridge Gas* and *HIH* do not justify the result which the Court of Appeal reached. This would not be an incremental development of existing principles, but a radical departure from substantially settled law.  There is a reason for the limited scope of the *Dicey* Rule and that is that there is no expectation of reciprocity on the part of foreign countries. Typically today the introduction of new rules for enforcement of judgments depends on a degree of reciprocity. The EC Insolvency Regulation and the Model Law were the product of lengthy negotiation and consultation.

129.   A change in the settled law of the recognition and enforcement of judgments, and in particular the formulation of a rule for the identification of those courts which are to be regarded as courts of competent jurisdiction (such as the country where the insolvent entity has its centre of interests and the country with which the judgment debtor has a sufficient or substantial connection), has all the hallmarks of legislation, and is a matter for the legislature and not for judicial innovation. The law relating to the enforcement of foreign judgments and the law relating to international insolvency are not areas of law which have in recent times been left to be developed by judge-made law. As Lord Bridge of Harwich put it in relation to a proposed change in the common law rule relating to fraud as a defence to the enforcement of a foreign judgment, "if the law is now in need of reform, it is for the legislature, not the judiciary, to effect it": *Owens Bank Ltd v Bracco* [1992] 2 AC 443, 489.

130.   Furthermore, the introduction of judge-made law extending the recognition and enforcement of foreign judgments would be only to the detriment of United Kingdom businesses without any corresponding benefit. I accept the appellants' point that if recognition and enforcement were simply left to the discretion of the court, based on a factor like "sufficient connection," a person in England who might have connections with a foreign territory which were only arguably "sufficient" would have to actively defend foreign proceedings which could result in an in personam judgment against him, only because the proceedings are incidental to bankruptcy proceedings in the courts of that territory.  Although I say nothing about the facts of the *Madoff* case, it might suggest that foreigners who have bona fide dealings with the United States might have to face the dilemma of the expense of defending enormous claims in the United States or not defending them and being at risk of having a default judgment enforced abroad.

131.   Nor is there likely to be any serious injustice if this court declines to sanction a departure from the traditional rule. It would not be appropriate to express a view on whether the officeholders in the present cases would have, or would have had, a direct remedy in England, because there might be, or might have been, issues as to the governing law, or issues as to time-limits or as to good faith. Subject to those reservations, several of the ways in which the claims were put (especially those parts of the judgment which were not the subject of these proceedings) in the United States proceedings in *Rubin* could have founded proceedings by trustees in England for the benefit of the creditors (as beneficiaries of the express trust). In addition there are several other avenues available to officeholders. Avoidance claims by a liquidator of an Australian company may be the subject of a request by the Australian court pursuant to section 426(4) of the Insolvency Act 1986, applying Australian law under section 426(5). In appropriate cases, article 23 of the Model Law will allow avoidance claims to be made by foreign representatives under the Insolvency Act 1986. In the cases where the insolvent estate has its centre of main interests in the European Union, judgments will be enforceable under Article 25 of the EC Insolvency Regulation.

132.   It follows that, in my judgment, *Cambridge Gas* was wrongly decided. The Privy Council accepted (in view of the conclusion that there had been no submission to the jurisdiction of the court in New York) that Cambridge Gas was not subject to the personal jurisdiction of the US Bankruptcy Court. The property in question, namely the shares in Navigator, was situate in the Isle of Man, and therefore also not subject to the in rem jurisdiction of the US Bankruptcy Court. There was therefore no basis for the recognition of the order of the US Bankruptcy Court in the Isle of Man.

## VI    Issue 2: Rubin: Enforcement under the Cross-Border Insolvency Regulations

133.   In the *Rubin* appeal it was argued by the respondents that the judgment should also be enforced through the CBIR, implementing the UNCITRAL Model Law.

134.   The order made by the deputy judge recognised the Chapter 11 proceeding "including the Adversary Proceedings," because "bringing adversary proceedings against debtors of the bankrupt is clearly part of collecting the bankrupt's assets with a view to distributing them to creditors" and "the adversary proceedings are part and parcel of the Chapter 11 insolvency proceedings": [2010] 1 All ER (Comm) 81, paras 46, 47. The Court of Appeal was of the same view: [2011] Ch 133, para 61(2)-(3). The appellants no longer maintain that the adversary proceedings should not be recognised under the Model Law.

135.   The issue which still arises in relation to the Model Law as implemented by the CBIR is whether the court has power to grant relief recognising and enforcing the relevant parts of the judgment.

136.   Article 21 provides that:

"1. Upon recognition of a foreign proceeding, whether main or non-main, where necessary to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including –

(a)     staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities, to the extent they have not been stayed under paragraph l(a) of article 20;

(b)     staying execution against the debtor's assets to the extent it has not been stayed under paragraph l(b) of article 20;

(c)     suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under paragraph 1(c) of article 20;

(d)     providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(e)     entrusting the administration or realisation of all or part of the debtor's assets located in Great Britain to the foreign representative or another person designated by the court;

(f)     extending relief granted under paragraph 1 of article 19; and

(g)     granting any additional relief that may be available to a British insolvency officeholder under the law of Great Britain, including any relief provided under paragraph 43 of Schedule B1 to the Insolvency Act 1986."

137.    The reference to relief under paragragh 43 of Schedule B1 to the Insolvency Act 1986 is a reference to a moratorium on claims in an administration.

138.    The Guide to Enactment states, at paras 154, 156:

> "[154] The types of relief listed in article 21, paragraph 1, are typical or most frequent in insolvency proceedings; however, the list is not exhaustive and the court is not restricted unnecessarily in its ability to grant any type of relief that is available under the law of the enacting state and needed in the circumstances of the case.
>
> …
>
> [156] It is in the nature of discretionary relief that the court may tailor it to the case at hand. This idea is reinforced by article 22, paragraph 2, according to which the court may subject the relief granted to conditions that it considers appropriate."

139.    Article 25 provides (under the heading "Co-operation and direct communication between a court of Great Britain and foreign courts or foreign representatives") that:

> "1.    … the court may co-operate to the maximum extent possible with foreign courts or foreign representatives, either directly or through a British insolvency officeholder.
>
> 2.    The court is entitled to communicate directly with, or to request information or assistance directly from, foreign courts or foreign representatives."

140.    Article 27 provides that the co-operation referred to in article 25 may be implemented "by any appropriate means", including

> "(a)    appointment of a person to act at the direction of the court;
>
> (b)    communication of information by any means considered appropriate by the court;

(c)    coordination of the administration and supervision of the debtor's assets and affairs;

(d)    approval or implementation by courts of agreements concerning the coordination of proceedings;

(e)    coordination of concurrent proceedings regarding the same debtor."

141.    The respondents say that (a) the power under article 21 is to grant any type of relief that is available under the law of the relevant state, and that the fact that recognition and enforcement of foreign judgments is not specifically mentioned in article 21 as one of the forms of relief available, does not mean that such relief cannot be granted; (b) the recognition and enforcement of the judgments of a foreign court is the paradigm means of co-operation with that court; and (c) the examples of co-operation in article 27 are merely examples and are not exhaustive.

142.    But the CBIR (and the Model Law) say nothing about the enforcement of foreign judgments against third parties. As Lord Mance pointed out in argument, recognition and enforcement are fundamental in international cases. Recognition and enforcement of judgments in civil and commercial matters (but not in insolvency matters) have been the subject of intense international negotiations at the Hague Conference on Private International Law, which ultimately failed because of inability to agree on recognised international bases of jurisdiction.

143.    It would be surprising if the Model Law was intended to deal with judgments in insolvency matters by implication. Articles 21, 25 and 27 are concerned with procedural matters. No doubt they should be given a purposive interpretation and should be widely construed in the light of the objects of the Model Law, but there is nothing to suggest that they apply to the recognition and enforcement of foreign judgments against third parties.

144.    The respondents rely on United States decisions but the only case involving enforcement of a foreign judgment in fact supports the appellants' argument. The Model Law has been implemented into United States law through Chapter 15 of Title 11 of the United States Code, which has in sections 1521, 1525 and 1527 provisions which are, with modifications not relevant for present purposes, equivalent to articles 21, 25 and 27 of the CBIR. In *Re Metcalfe & Mansfield Alternative Investments* 421 BR 685 (Bankr SDNY 2010) the US Bankruptcy Court ordered that orders made by a Canadian court in relation to a plan of compromise and arrangement under the (Canadian) Companies' Creditors

Arrangement Act 1985 be enforced. That decision does not assist the respondents because the US Bankruptcy Court applied the normal rules in non-bankruptcy cases for enforcement of foreign judgments in the United States: pp 698-700. In my judgment the Model Law is not designed to provide for the reciprocal enforcement of judgments.

## VII    Issue 3: New Cap: Enforcement through assistance under section 426 of the Insolvency Act 1986

145.    In view of my conclusion in the next section (section VIII) that the Syndicate submitted to the jurisdiction of the Australian court, the issues on section 426(4) and (5) of the Insolvency Act 1986, and their relationship with section 6 of the Foreign Judgments (Reciprocal Enforcement) Act 1933 do not arise, but since the matter was fully argued I will express a view on the applicability of section 426(4) to a case such as this.

146.    Section 426(4)-(5) of the Insolvency Act 1986 provides:

> "(4)    The courts having jurisdiction in relation to insolvency law in any part of the United Kingdom shall assist the courts having the corresponding jurisdiction in any other part of the United Kingdom or any relevant country or territory.

> (5)    For the purposes of subsection (4) a request made to a court in any part of the United Kingdom by a court in any other part of the United Kingdom, or in a relevant country or territory is authority for the court to which the request is made to apply, in relation to any matter specified in the request, the insolvency law which is applicable by either court in relation to comparable matters falling within its jurisdiction.

> In exercising its discretion under this subsection, a court shall have regard in particular to the rules of private international law."

147.    The reference to the application of rules of private international law in section 426(5) is difficult and obscure: see *Dicey*, 15th ed, para 30-119; my discussion in *In re Television Trade Rentals* [2002] EWHC 211 (Ch), [2002] BCC 807, para 17, and the cases there cited; and *Al-Sabah v Grupo Torras SA* [2005] UKPC 1, [2005] 2 AC 333, para 47.  But nothing turns on it on these appeals.

148.   The question is whether section 426(4) of the 1986 Act provides a procedure by which a judgment of a court having jurisdiction in relation to insolvency law in a "relevant country or territory" may be enforced in the United Kingdom. As I have said, Australia is a relevant country.

149.   A further question arises if section 426(4) applies to the enforcement of foreign judgments and that is whether section 426 is ousted by section 6 of the Foreign Judgments (Reciprocal Enforcement) Act 1933, which provides:

> "No proceedings for the recovery of a sum payable under a foreign judgment, being a judgment to which this Part of the Act applies, other than proceedings by way of registration of the judgment, shall be entertained by any court in the United Kingdom."

150.   Both Lewison J and the Court of Appeal [2012] 2 WLR 1095 held that section 426(4) was available as a tool for the enforcement of the judgment.

151.   Section 426(4) has been given a broad interpretation: see *Hughes v Hannover Rückversicherungs-Aktiengesellschaft* [1997] 1 BCLC 497 (CA); *England v Smith* [2001] Ch 419 (CA); *HIH* [2008] UKHL 21, [2008] 1 WLR 852. It has been held that the fact that a letter of request has been made is a weighty factor, and public policy and comity favour the giving of assistance: *Hughes v Hannover*, at pp 517-518; *England v Smith*, at p 433. Thus in *England v Smith* the Australian court overseeing the liquidation of the Bond Corporation made an order for the examination of a London partner in Arthur Andersen. It issued a letter of request asking the English court to assist it by making its own order for the examination. The Court of Appeal decided that the order should be made.

152.   But, despite the respondents' argument to the contrary, *England v Smith* was not a case of the enforcement of the Australian order, but rather the making of the court's own order in aid of the Australian liquidation. In my judgment, subsections 426(4) and (5) of the 1986 Act are not concerned with enforcement of judgments. Section 426(1)-(2), by contrast, deals with enforcement of orders in one part of the United Kingdom in another part, and refer expressly to the enforcement of such orders ("shall be enforced" in section 426(1)). Section 426(4) deals with assistance not only for foreign designated countries such as Australia but also to intra-United Kingdom assistance. If section 426(4) applied to intra-United Kingdom enforcement of orders, then section 426(1) would be largely redundant, going beyond what the Court of Appeal [2012] 2 WLR 1095, para 57 described as "a degree of overlap."

153.    Sections 426(1) and (4) have their origin in sections 121 and 123 of the Bankruptcy Act 1914. Section 121 of the 1914 Act provided that orders of bankruptcy courts in one part of the United Kingdom were to be enforced in other parts. Section 122 provided that the courts exercising bankruptcy and insolvency jurisdiction in the United Kingdom and "every British court elsewhere" were to act in aid of, and be auxiliary to, each other; and, upon a request by the non-English court, could exercise the jurisdiction of either court.

154.    The Insolvency Law and Practice Report of the Review Committee (1982) (Cmnd 8558) (the "Cork Report") said (paras 1909-1913) that section 122 was the "vital section in this context", and recommended that the section should be extended to winding up. But, despite the respondents' arguments, I do not discern any recommendation which would suggest that section 426(4) applies to the enforcement of foreign judgments.

155.    Consequently the applicability of section 6 of the 1933 Act does not arise for decision, except in a context which makes little practical difference, and to which I will revert.

## VIII    Submission

156.    If the *Dicey* Rule applies the judgments in issue will be enforceable in England if the judgment debtors submitted to the jurisdiction of the foreign court.

*New Cap*

157.    The Australian court granted leave to serve these proceedings out of the jurisdiction on the Syndicate: section IV, above. The Syndicate did not enter an appearance, but its solicitors commented in writing on evidence presented to the Australian court about New Cap's insolvency and their comments were placed before the Australian judge.

158.    More relevant is the fact that from August 1999 the Syndicate submitted proofs of debt (in relation to unsettled claims and outstanding premiums for the 1997, 1998, and 1999 years of account, and not to the reinsurance contracts which are the subject of these proceedings) and attended and participated in creditors' meetings. In particular at an adjourned meeting of creditors on 16 September 2009 the Syndicate had given a proxy for that meeting to the chairman, and submitted a proof of debt and proxy form for that meeting. The Syndicate voted at a meeting of creditors in favour of a scheme of arrangement. The liquidator has admitted claims by the Syndicate for the sterling equivalent of more than £650,000, although the

liquidator is retaining the dividend in partial settlement of the costs incurred in these proceedings.

159.   The general rule in the ordinary case in England is that the party alleged to have submitted to the jurisdiction of the English court must have "taken some step which is only necessary or only useful if" an objection to jurisdiction "has been actually waived, or if the objection has never been entertained at all": *Williams & Glyn's Bank plc v Astro Dinamico Compania Naviera SA* [1984] 1 WLR 438, 444 (HL) approving *Rein v Stein* (1892) 66 LT 469, 471 (Cave J).

160.   The same general rule has been adopted to determine whether there has been a submission to the jurisdiction of a foreign court for the purposes of the rule that a foreign judgment will be enforced on the basis that the judgment debtor has submitted to the jurisdiction of the foreign court: *Adams v Cape Industries* [1990] Ch 433, 459 (Scott J); *Akai Pty Ltd v People's Insurance Co Ltd* [1998] 1 Lloyd's Rep 90, 96-97 (Thomas J); see also *Desert Sun Loan Corpn v Hill* [1996] 2 All ER 847, 856 (CA); *Akande v Balfour Beatty Construction Ltd* [1998] ILPr 110; *Starlight International Inc v Bruce* [2002] EWHC 374 (Ch), [2002] ILPr 617, para 14 (cases of foreign judgments); *Industrial Maritime Carriers (Bahamas) Inc v Sinoca International Inc (The Eastern Trader)* [1996] 2 Lloyd's Rep 585, 601 (a case involving the question whether the party seeking an anti-suit injunction in support of an English arbitration clause had waived the agreement by submitting to the jurisdiction of the foreign court).

161.   The characterisation of whether there has been a submission for the purposes of the enforcement of foreign judgments in England depends on English law.   The court will not simply consider whether the steps taken abroad would have amounted to a submission in English proceedings. The international context requires a broader approach.   Nor does it follow from the fact that the foreign court would have regarded steps taken in the foreign proceedings as a submission that the English court will so regard them. Conversely, it does not necessarily follow that because the foreign court would not regard the steps as a submission that they will not be so regarded by the English court as a submission for the purposes of the enforcement of a judgment of the foreign court. The question whether there has been a submission is to be inferred from all the facts.

162.   It is in that context that Scott J said at first instance in *Adams v Cape Industries plc* [1990] 1 Ch 433, 461 (a case in which the submission issue was not before the Court of Appeal): "If the steps would not have been regarded by the domestic law of the foreign court as a submission to the jurisdiction, they ought not … to be so regarded here, notwithstanding that if they had been steps taken in an English court they might have constituted a submission. The implication of

procedural steps taken in foreign proceedings must … be assessed in the context of the foreign proceedings."

163.    I agree with the way it was put by Thomas J in *Akai Pty Ltd v People's Insurance Company Ltd* [1998] 1 Lloyd's Rep 90, 97:

> "The court must consider the matter objectively; it must have regard to the general framework of its own procedural rules, but also to the domestic law of the court where the steps were taken. This is because the significance of those steps can only be understood by reference to that law. If a step taken by a person in a foreign jurisdiction, such as making a counterclaim, might well be regarded by English law as amounting to a submission to the jurisdiction, but would not be regarded by that foreign court as a submission to its jurisdiction, an English court will take into account the position under foreign law."

164.    The Syndicate did not take any steps in the avoidance proceedings as such which would be regarded either by the Australian court or by the English court as a submission. Were the steps taken by the Syndicate in the liquidation a submission for the purposes of the rules relating to foreign judgments?

165.    In English law there is no doubt that orders may be made against a foreign creditor who proves in an English liquidation or bankruptcy on the footing that by proving the foreign creditor submits to the jurisdiction of the English court. In *Ex p Robertson, In re Morton* (1875) LR 20 Eq 733 trustees were appointed over the property of bankrupt potato merchants in a liquidation by arrangement. A Scots merchant received payment of £120 after the liquidation petition was presented, and proved for a balance of £247 and received a dividend of what is now 20p in the pound. The trustees served a notice of motion, seeking repayment of the £120 paid out of the insolvent estate, out of the jurisdiction. The respondent objected to the jurisdiction of the English court on the ground that he was a domiciled Scotsman. On appeal from the county court, Sir James Bacon CJ held that the court had jurisdiction. He said, at pp 737-738:

> "… what is the consequence of creditors coming in under a liquidation or bankruptcy? They come in under what is as much a compact as if each of them had signed and sealed and sworn to the terms of it - that the bankrupt's estate shall be duly administered among the creditors. That being so, the administration of the estate is cast upon the court, and the court has jurisdiction to decide all questions of whatever kind, whether of law, fact, or whatever else

the court may think necessary in order to effect complete distribution of the bankrupt's estate. … [C]an there be any doubt that the Appellant in this case has agreed that, as far as he is concerned, the law of bankruptcy shall take effect as to him, and under this jurisdiction, to which he is not only subjected, but under which he has become an active party, and of which he has taken the benefit .. [The Appellant] is as much bound to perform the conditions of the compact, and to submit to the jurisdiction of the court, as if he had never been out of the limits of England."

166.   The Syndicate objected to the jurisdiction of the Australian court. Barrett J in his judgment of 14 July 2009 accepted that it had made it clear that it was not submitting to its jurisdiction, and he also accepted that as a result the judgment of the Australian court would not be enforceable in England. His judgment is concerned exclusively with the preference claims, and he did not deal with the question of submission by reference to the Syndicate's participation in the liquidation by way of proof and receipt of dividends. He decided that the court had jurisdiction because the New South Wales rules justified service out of the jurisdiction on the basis that the cause of action arose in New South Wales.

167.   I would therefore accept the liquidators' submission that, having chosen to submit to New Cap's Australian insolvency proceeding, the Syndicate should be taken to have submitted to the jurisdiction of the Australian court responsible for the supervision of that proceeding. It should not be allowed to benefit from the insolvency proceeding without the burden of complying with the orders made in that proceeding.

*Rubin*

168.   The position is different in the *Rubin* appeal. It would certainly have been arguable that Eurofinance SA had submitted to the jurisdiction of the United States District Court, for these reasons: first, it was Eurofinance SA which applied for the appointment by the High Court of Mr Rubin and Mr Lan as receivers of TCT specifically for the purpose of causing TCT then to obtain protection under Chapter 11; second, it was Eurofinance SA which represented to the English court that officeholders appointed by the United States court would be able to pursue claims against third parties; third, the judgment of the US Bankruptcy Court states that the court had personal jurisdiction over Eurofinance SA not only because it did business in the United States but also (as I have mentioned above) because it had filed a notice of appearance in the Chapter 11 proceedings (Order 22 of July 2008, paras 42-43).

169.   But the *Rubin* appellants did not appear in the adversary proceedings, and it was not argued in these proceedings that Eurofinance SA (or Mr Adrian Roman, who caused Eurofinance SA to make the application) had submitted to the jurisdiction of the US Bankruptcy Court in any other way and it is not necessary therefore to explore the matter further.

## IX      New Cap: enforcement at common law or under the 1933 Act

170.   In view of my conclusion that the Australian judgment in *New Cap* is enforceable by reason of the Syndicate's submission, a purely technical point arises on the method of enforcement. The point is whether the enforcement is to be under the 1933 Act or at common law. If insolvency proceedings are excluded from the 1933 Act, then enforcement would be at common law. If they are not excluded, then (as I have said) section 6 has the effect of excluding an action at common law on the judgment and making registration under the 1933 Act the only method of enforcement of judgments within Part I of the Act.

171.   Section 11(2) of the 1933 Act provides that the expression "action in personam" shall not be deemed to include (inter alia) proceedings in connection with bankruptcy and winding up of companies. But the effect of section 4(2)(c) is that in the case of a judgment given in an action other than an action in personam or an action in rem, the foreign court shall be deemed to have jurisdiction if its jurisdiction is recognised by the English court, ie at common law. Accordingly, the question whether insolvency proceedings are wholly excluded from the operation of the 1933 Act still arises. There is no other provision in the 1933 Act which throws any light on the point.

172.   The main object of the 1933 Act was to facilitate the enforcement of commercial judgments abroad by making reciprocity easier. The only reference to insolvency proceedings in the Report of the Foreign Judgments (Reciprocal Enforcement) Committee (1932) (Cmnd 4213), (the Greer Report), which recommended the legislation, is the statement (para 4): "It is not necessary for our present purposes to consider the effect in England of foreign judgments in bankruptcy proceedings…". The Report annexed draft Conventions which had been drawn up in consultation with experts from Belgium, France and Germany. The draft Conventions with Belgium (article 4(3), (4)) and Germany (article 4(4)) provided that the jurisdictional rules in the Convention did not apply to judgments in bankruptcy proceedings or proceedings relating to the winding up of companies or other bodies corporate, but that the jurisdiction of the original court would be recognised where such recognition was in accordance with the rules of private international law observed by the court applied to. That provision paralleled what became sections 4(2)(c) and 11(2) of the 1933 Act. The draft Convention with France did not apply to judgments in bankruptcy proceedings etc (article 2(3)), but

provided that nothing was deemed to preclude the recognition and enforcement of judgments to which the Convention did not apply: article 2(4).

173.   The Conventions concluded with countries to which the 1933 Act applied adopted similar techniques. It is unnecessary to set them out in detail. But there is no reason to suppose that bankruptcy proceedings were not regarded as being "civil and commercial matters." Thus the 1961 Convention with the Federal Republic of Germany of 1961 (the Reciprocal Enforcement of Foreign Judgments (Germany) Order) (SI 1961/1199) provided in article I(6) that the expression "judgments in civil and commercial matters" did not include judgments for fines or penalties, and had a separate provision in article II(2) that the Convention did not apply to judgments in bankruptcy proceedings or proceedings relating to the winding up of companies or other bodies corporate (although, in accordance with the usual technique, it did not rule out recognition and enforcement: Art II(3)). Other Conventions simply excluded bankruptcy proceedings from the specific jurisdictional provisions of the Convention, like the draft Conventions annexed to the Greer Report: article 4(5) of the Reciprocal Enforcement of Foreign Judgments (Austria) Order 1962 (SI 1962/1339), article 4(3) of the Reciprocal Enforcement of Foreign Judgments (Norway) Order 1962 (SI 1962/636), and article IV(3) of the Reciprocal Enforcement of Foreign Judgments (Italy) Order 1963 (SI 1973/1894).

174.   The Reciprocal Enforcement of Judgments (Australia) Order 1994 (SI 1994/1901) extended the 1933 Act to Australia, implementing the UK-Australia Agreement for the reciprocal enforcement of judgments in civil and commercial matters. The Agreement is expressed in article I(c)(i) to apply to judgments in civil and commercial matters. The Order applies Part I of the Act to judgments in respect of a "civil or commercial matter" (article 4(a)).

175.   There is no reason to conclude that the phrase "civil and commercial matters" does not include insolvency proceedings, and the history of the 1933 Act and the Conventions shows that it does. The fact that insolvency was expressly excluded from the operation of the Brussels Convention, the original and revised Lugano Conventions and the Brussels I Regulation in fact suggests that otherwise they would have been within their scope. The respondents relied on a passage in the ruling of the European Court of Justice in *Gourdain v Nadler* (Case 133/78) [1979] ECR 733, paras 3-4, as suggesting that the exclusion of bankruptcy in article 1 of the Brussels Convention was an example of a matter excluded from the concept of civil and commercial matters. But it is clear from the context (and from the opinion of Advocate General Reischl) that the court was simply saying that because the expression "civil and commercial matters" in Article 1 had to be given an autonomous meaning, so also was the case with the expression "bankruptcy". That the exclusion of bankruptcy proceedings does not affect their character as civil or commercial matters is confirmed by the recent ruling in *F-Tex SIA v Lietuvos-Anglijos UAB-Jadecloud-Vilma* (Case C-213/10) 19 April 2012, where

the court said that the Brussels I Regulation was "intended to apply to all civil and commercial matters apart from certain well-defined matters" and as a result actions directly deriving from insolvency proceedings and closely connected with them were excluded: para 29.

176.   It follows that the 1933 Act applies to the Australian judgment and that enforcement should be by way of registration under the 1933 Act.

## X    Disposition

177.   I would therefore allow the appeal in *Rubin*, but dismiss the appeal in *New Cap* on the ground that the Syndicate submitted to the jurisdiction of the Australian court.

## LORD MANCE

178.   I agree with Lord Collins' reasoning and conclusions in his judgment on these appeals, essentially for the reasons he gives, though without subscribing to his incidental observation (para 132) that the Privy Council decision in *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2006] UKPC 26, [2007] 1 AC 508 was necessarily wrongly decided. This was not argued before the Supreme Court, and I would wish to reserve my opinion upon it. *Cambridge Gas* is, on any view, distinguishable.

179.   The common law question central to these appeals is whether the Supreme Court should endorse or introduce a special rule of recognition and enforcement, one falling outside the scope of the *Dicey* Rule which Lord Collins has identified (Rule 36 in the 14th and Rule 43 in the 15th edition) and applicable to judgments in foreign insolvency proceedings setting aside voidable pre-insolvency transactions. For the principal reasons which Lord Collins gives in paras 95 to 131, I agree that we should not do so.

180.   Since much weight was placed by the respondents and the Court of Appeal upon the Board's reasoning and decision in *Cambridge Gas*, I add some observations to indicate why, as the present appellants submitted, it concerned circumstances and proceeded upon factual assumptions and a legal analysis which have no parallel in the present case.

181.  *Cambridge Gas* has attracted both Irish judicial dissent and English academic criticism, to which Lord Collins refers in paras 53 and 111-112. Giving the judgment of the Board in *Pattni v Ali* [2006] UKPC 51, [2007] 2 AC 85, I said that the purpose of the bankruptcy order with which the Board was concerned in *Cambridge Gas* "was simply to establish a mechanism of collective execution against the property of the debtor [Navigator] by creditors whose rights were admitted or established" (para 23).

182.  This analysis, admittedly, involved treating the vesting in creditors of shares *in* Navigator as no different in substance from the vesting in creditors of Navigator's shares in its ship-owning subsidiaries. But it is clear from paras 8 and 9 and again 24 to 26 of the Board's advice in *Cambridge Gas* that the Board saw no difference. It did not regard Cambridge Gas as having any interest of value to advance or protect in the shares still held nominally in its name. Their vesting in Navigator's creditors was no more than a mechanism for disposing of Navigator's assets, which did not affect or concern Cambridge Gas. The Board was therefore, in its view (and rightly or wrongly), concerned with distribution of the insolvent company's assets in a narrow and traditional sense.

183.  Amplifying this, the Board approached the situation in *Cambridge Gas* as follows. The New York court had jurisdiction over Navigator's assets, since Navigator had submitted to the New York proceedings. Cambridge Gas's shares in Navigator (located in the Isle of Man, Navigator's place of incorporation) were "completely and utterly worthless": [2007] 1 AC 508, para 9. The transfer to Navigator's creditors of Cambridge Gas's shares in Navigator had the like effect to a transfer of Navigator's assets, since Navigator was "an insolvent company, in which the shareholders ha[d] no interest of any value" (para 26). Cambridge Gas's shares in Navigator were vulnerable in the Isle of Man, under section 152 of the Companies Act 1931, to a similar scheme of arrangement to that which the New York Court intended by its Chapter 11 order. More generally, as I noted in *Stone & Rolls Ltd v Moore Stephens* [2009] UKHL 39, [2009] AC 1391, paras 236 to 238, in insolvency shareholders' interests yield to those of creditors.

184.  It was in this limited context that the Board concluded that the New York and Manx courts' orders could be regarded as doing no more than facilitating or enabling collective execution against Navigator's property.

185.  The Court of Appeal believed on the contrary that the answer to the present cases lay in the Board's general statements in *Cambridge Gas* at paras 19 to 21 regarding the nature of insolvency proceedings. It is true that proceedings to avoid pre-insolvency transactions can be related to the process of collection of assets. That is, their general purpose and effect is to ensure a fair allocation of assets between all who are and were within some specified pre-insolvency period

creditors. A dictum of Lord Hoffmann in *In re HIH Casualty and General Insurance Ltd* [2008] UKHL 21, [2008] 1 WLR 852, para 19, quoted by Lord Collins in paras 15 and 52, is to that effect, though again uttered in a different context to the present.

186.   However, the Board did not see these considerations as answering or eliminating all questions regarding the existence of jurisdiction or at least its exercise in *Cambridge Gas*. On the contrary, it went on to examine in close detail in paras 22 to 26 the limits of the assistance that a court could properly give. In rejecting the argument that the interference with the shareholding held in Cambridge Gas's name was beyond the Manx court's jurisdiction (para 26), the only reason it gave related to the nature of shares in an insolvent company. This meant, according to its advice, that Cambridge Gas had no interest of any value to protect and that registration of the shares in Navigator's creditors' name was no more than a mechanism for giving creditors access to Navigator's assets.

187.   On this basis, the decision in *Cambridge Gas* is, as Professor Adrian Briggs noted in a penetrating case-note in *The British Year Book of International Law* (2006) p575-581, less remarkable (although, as Professor Briggs also notes, it perhaps still poses problems of reconciliation with the House's decision in *Société Eram Shipping Co Ltd v Hong Kong & Shanghai Banking Corp Ltd* [2003] UKHL 30, [2004] AC 260). But, because the actual decision in *Cambridge Gas* was so narrowly focused on the nature of a shareholder's rights in an insolvent company and was not directly challenged, I prefer to leave open its correctness.

188.   Whatever view may be taken as to the validity of the Board's reasoning in *Cambridge Gas*, it is clear that it does not cover or control the present appeal. The present cases are not concerned with shares, with situations in which shares are, or are treated by the court as, no more than a key to the insolvent company's assets or even with situations in which it is clear that those objecting to recognition and enforcement of the foreign courts' orders have no interests to protect. There are, on the contrary, substantial issues as to whether there were fraudulent preferences giving rise to in personam liability in large amounts. The persons allegedly benefitting by fraudulent preferences did not appear in the relevant foreign insolvency proceedings in which judgment was given against them. They were (leaving aside any question of submission) outside the international jurisdiction of the relevant foreign courts.

189.   Lord Clarke takes a different view from Lord Collins, but does not define either the circumstances in which a foreign court should, under English private international law rules, be recognised as having "jurisdiction to entertain" bankruptcy proceedings or, if one were (wrongly in my view) to treat the whole area as one of discretion, the factors which might make it either unjust or contrary

to public policy to recognise an avoidance order made in such foreign proceedings (see paras 193, 200 and 201 of Lord Clarke's judgment). The scope of the jurisdiction to entertain bankruptcy proceedings which English private international law will recognise a foreign court as having is described in Dicey (in para 31-064 in the 14th and 15th editions) as a "vexed and controversial" question. But it would include situations in which the bankrupt or insolvent company had simply submitted to the foreign bankruptcy jurisdiction. On Lord Clarke's analysis, in such a case (of which *Rubin v Eurofinance* is an example), it would be irrelevant that the debtor under the avoidance order had not submitted, and was not on any other basis subject, to the foreign jurisdiction. It would be enough that the judgment debtor had had the chance of appearing and defending before the foreign court. For the reasons given by Lord Collins, I do not accept that this is the common law.

190.   In the light of the above, the Court of Appeal was, in my view, in error in seeing the solution to the present appeals as lying in the advice given by the Board in *Cambridge Gas*. Even on an assumption that the actual decision in *Cambridge Gas* can be supported, it cannot and should not be treated as supporting the respondents' case that fraudulent preference claims and avoidance orders in insolvency proceedings generally escape the common law rules requiring personal or in rem jurisdiction.

## LORD CLARKE

191.   I would like to pay tribute to the learning in Lord Collins' comprehensive judgment.  However, left to myself, I would dismiss the appeal in the *Rubin* case. Since I am in a minority of one, little is to be gained by my writing a long dissent. I will therefore try to explain my reasons shortly. In doing so, I adopt the terminology and abbreviations used by Lord Collins.

192.   I agree with Lord Collins and Lord Mance that the decision of the Privy Council in *Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508 is distinguishable. The facts there were quite different from those here. However, in so far as it is suggested that *Cambridge Gas* was wrongly decided, I do not agree. Moreover, I do not think that it would be appropriate so to hold because it was not submitted to be wrong in the course of the argument. To my mind the approach which should be adopted is presaged in the speech of Lord Hoffmann in *In re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852 and in his judgment in *Cambridge Gas*.

193.   As I see it, the issue is simply whether an avoidance order made by a foreign bankruptcy court made in the course of the bankruptcy proceedings, whether personal or corporate, which the court has jurisdiction to entertain, is unenforceable if it can fairly be said to be an order made either in personam or in rem. I would answer that question in the negative.  Put another way, the question is whether the English court has jurisdiction under English rules of private international law to enforce an avoidance order made in foreign bankruptcy proceedings in circumstances where, under those rules, the foreign court has jurisdiction to entertain the bankruptcy proceedings themselves. I would answer that question in the affirmative.  It is not, as I understand it, suggested here that the US court did not have jurisdiction to entertain the bankruptcy proceedings themselves.

194.   The relevant paragraphs of Lord Hoffmann's judgment in *Cambridge Gas* are in these terms (as quoted by Lord Collins at para 43 above):

> "13.  …  Judgments in rem and in personam are judicial determinations of the existence of rights: in the one case, rights over property and in the other, rights against a person. When a judgment in rem or in personam is recognised by a foreign court, it is accepted as establishing the right which it purports to have determined, without further inquiry into the grounds upon which it did so. The judgment itself is treated as the source of the right.

> 14. The purpose of bankruptcy proceedings, on the other hand, is not to determine or establish the existence of rights, but to provide a mechanism of collective execution against the property of the debtor by creditors whose rights are admitted or established. …

> 15 … [B]ankruptcy, whether personal or corporate, is a collective proceeding to enforce rights and not to establish them. Of course, as Brightman LJ pointed out in *In re Lines Bros Ltd* [1983] Ch 1, 20, it may incidentally be necessary in the course of bankruptcy proceedings to establish rights which are challenged: proofs of debt may be rejected; or there may be a dispute over whether or not a particular item of property belonged to the debtor and is available for distribution. There are procedures by which these questions may be tried summarily within the bankruptcy proceedings or directed to be determined by ordinary action. But these again are incidental procedural matters and not central to the purpose of the proceedings."

195.    The critical paragraph is para 15, which seems to me to make it clear that it is possible to have an order which is both in personam or in rem and an order of the kind referred to by Lord Hoffmann in para 14. Thus it may be incidentally necessary to establish substantive rights in the course of the bankruptcy proceedings as part of a collective proceeding to enforce rights. In such a case the order will be doing two things.  It will be both establishing the right and enforcing it. This can be seen from the examples given in para 15. Proofs of debt may be rejected, which is a process which may involve determining, for example, the substantive rights of the creditor against the debtor. Or it may be necessary to determine whether or not a particular item of property belongs to the debtor and is available for distribution. As para 15 contemplates, such procedures may be tried either summarily within the bankruptcy proceedings or by ordinary action. In either such case Lord Hoffmann describes them as incidental procedures which are not central to the purpose of the bankruptcy proceedings. As I see it, in such a case, an avoidance order may be both an order in personam or in rem and an order in the bankruptcy proceedings.

196.    I agree with Lord Collins at para 103 that it is not easy to see why the order of the US Bankruptcy Court in *Cambridge Gas* was not an order in rem. However, that does not to my mind show that *Cambridge Gas* was wrongly decided but demonstrates that it is possible to have an in rem order which is made as incidental to bankruptcy proceedings but which is enforceable at common law, provided that the bankruptcy court has jurisdiction in the bankruptcy.

197.    The approach is explained by Lord Hoffmann in *HIH* at para 30 and in *Cambridge Gas* at para 16, both of which are quoted by Lord Collins at para 19 above. In *HIH* he said:

> "The primary rule of private international law which seems to me applicable to this case is the principle of (modified) universalism, which has been the golden thread running through English cross-border insolvency law since the 18[th] century. That principle requires that English courts should, so far as is consistent with justice and UK public policy, co-operate with the courts in the country of the principal liquidation to ensure that all the company's assets are distributed to its creditors under a single system of distribution."

In Cambridge Gas he said:

> "The English common law has traditionally taken the view that fairness between creditors requires that, ideally, bankruptcy proceedings should have universal application. There should be a

> single bankruptcy in which all creditors are entitled and required to prove. No one should have an advantage because he happens to live in a jurisdiction where more of the assets or fewer of the creditors are situated. …"

198.   At paras 94 to 98 above Lord Collins discusses the nature of avoidance proceedings. I entirely agree with his analysis. Avoidance provisions requiring the adjustment of prior transactions and the recovery of previous dispositions of property so as to constitute the estate available for distribution are necessary in order to maintain the principle of equality among creditors. At para 15 Lord Collins notes that Lord Hoffmann said at para 19 of *HIH* that

> "the process of collection of assets will include, for example, the use of powers to set aside voidable dispositions, which may differ very considerably from those in the English statutory scheme."

In short, avoidance proceedings, and therefore avoidance orders, are central to the bankruptcy proceedings.  As Lord Collins puts it at para 98, avoidance proceedings are peculiarly the subject of insolvency law.

199.   I accept that to permit the enforcement of an avoidance order in circumstances of this kind would be a development of the common law. However, it seems to me that it would be a principled development. It would in essence be an application of the principle identified by Lord Hoffmann in the passage quoted above from para 30 of *HIH* that the principle of modified universalism requires that English courts should, so far as is consistent with justice and United Kingdom public policy, co-operate with the courts in the country of the principal liquidation to ensure that all the company's assets are distributed to its creditors under a single system of distribution.

200.   The position of the judgment debtor in such a case would be protected by the principle that the English court would only enforce a judgment in a case like this where to do so was consistent with justice and United Kingdom public policy. All would depend upon the facts of the particular case. In the case of *Rubin*, there would be no injustice in enforcing the judgment against the appellants.

201.   Lord Mance notes at para 189 that I do not define either the circumstances in which a foreign court should be recognised as having jurisdiction to entertain bankruptcy proceedings or the factors which would make it unjust or contrary to public policy to recognise an avoidance order made in such foreign proceedings. As I see it, these are matters which would be worked out on a case by case basis in

(as Lord Hoffmann put it in *HIH* at para 30) co-operating with the courts in the country of the principal liquidation to ensure that all the company's assets are distributed to its creditors under a single system of distribution. It would not be irrelevant that the debtor under the avoidance order had not submitted. All would depend upon the particular circumstances of the case, including the reasons why the debtor had not submitted.

202.   In essence, on the critical question, I prefer the reasoning of the Court of Appeal, which is contained in the judgment of Ward LJ, with whom Wilson LJ and Henderson J agreed. Lord Collins has concisely summarised their reasoning in paras 88 to 90, substantially as follows: (a) the judgment was final and conclusive, and for definite sums of money, and on the face of the orders was a judgment in personam; (b) it was common ground that the judgment debtors were not present when the proceedings were instituted, and did not submit to the jurisdiction, and so at first blush had an impregnable defence; (c) *Cambridge Gas* decided that the bankruptcy order with which it was concerned was neither in personam nor in rem, and its purpose was simply to establish a mechanism of collective execution against the property of the debtor by creditors whose rights were admitted or established: *Pattni v Ali* [2007] 2 AC 85, para 23; (d) bankruptcy was a collective proceeding to enforce rights and not to establish them: *Cambridge Gas* [2007] 1 AC 508, para 15; (e) the issue was whether avoidance proceedings which could only be brought by the representative of the bankrupt were to be characterised as part of the bankruptcy proceedings, ie part of the collective proceeding to enforce rights and not to establish them; (f) the adversary proceedings were part and parcel of the Chapter 11 proceedings; (g) the ordinary rules for enforcing foreign judgments in personam did not apply to bankruptcy proceedings; (h) avoidance mechanisms were integral to and central to the collective nature of bankruptcy and were not merely incidental procedural matters; (i) the process of collection of assets will include the use of powers to set aside voidable dispositions, which may differ very considerably from those in the English statutory scheme: *HIH* [2008] 1 WLR 852, para 19; (j) the judgment of the US Bankruptcy Court was a judgment in, and for the purposes of, the collective enforcement regime of the insolvency proceedings, and was governed by the sui generis private international law rules relating to insolvency; (k) that was a desirable development of the common law founded on the principles of modified universalism, and did not require the court to enforce anything that it could not do, mutatis mutandis, in a domestic context; (l) there was a principle of private international law that bankruptcy should be unitary and universal, and there should be a unitary insolvency proceeding in the court of the bankrupt's domicile which receives worldwide recognition and should apply universally to all the bankrupt's assets; (m) there was a further principle that recognition carried with it the active assistance of the court which included assistance by doing whatever the English court could do in the case of a domestic insolvency; (n) there was no unfairness to the appellants in upholding the judgment because they were fully aware of the proceedings, and after taking advice chose not to participate: see [2011] Ch 133, paras 38, 41, 43, 45, 48, 50, 61-62 and 64.

203.   That seems to me to be a correct summary of the views of the Court of Appeal. I agree with those views subject to this comment on point (c). I am not sure that in *Cambridge Gas* the Privy Council decided that the bankruptcy order with which it was concerned was neither in personam nor in rem.  It held that the purpose of the order was simply to establish a mechanism of collective execution against the property of the debtor by creditors whose rights were admitted or established. As discussed above, it may well have appreciated that it was also an order in rem. However that may be, I agree with Lord Collins at para 90 that, in short, the Court of Appeal accepted that the judgment sought to be enforced in the instant cases was an in personam judgment, but decided that the *Dicey* Rule did not apply to foreign judgments in avoidance proceedings because they were central to the collective enforcement regime in insolvency and were governed by special rules. I agree with the reasoning of the Court of Appeal. Put another way, the *Dicey* Rule should in my opinion be modified to include a fifth case in which a foreign court has jurisdiction to give a judgment in personam capable of enforcement or recognition as against the person against whom it is given. That fifth case would be if the judgment was given in avoidance proceedings as part of foreign bankruptcy proceedings which the foreign court had jurisdiction to entertain.

204.   I recognise that there are other ways of achieving such a result, as for example by an equivalent provision to the EC Insolvency Regulation: per Lord Collins at paras 99-101. I also recognise that it would be possible to adopt a more radical approach not limited to avoidance proceedings. However, so limited, I respectfully disagree with the view expressed by Lord Collins at para 128 that this development would not be an incremental development of existing principles but a radical departure from substantially settled law. For the reasons given in para 198, it would in essence be an application of the principle of modified universalism. It seems to me that in these days of global commerce, the step taken by the Court of Appeal was but a small step forward. Judgment debtors are protected by the principle that no order would be made if it were contrary to justice or United Kingdom public policy. Moreover, on the facts here, I can see no basis upon which the order made by the Court of Appeal would be either unjust or contrary to public policy. Finally, I do not think that that conclusion is undermined by any absence of reciprocity.

205.   For these reasons, I would dismiss the appeal in the *Rubin* case on the common law point.  On all other issues I agree with the judgment of Lord Collins.

# **EXHIBIT 15**



<u>Neutral Citation Number: [2023] EWCA Civ 1135</u>

Case No: CA-2023-000062

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**INSOLVENCY AND COMPANIES LIST (ChD)**
**MRS JUSTICE FALK DBE**
**[2022] EWHC 2873 (Ch)**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 09/10/2023

Before :

**LORD JUSTICE LEWISON**
**LORD JUSTICE NEWEY**
and
**LADY JUSTICE ELISABETH LAING**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **DARTY HOLDINGS SAS** | **Appellant** |
| **- and -** | |
| **GEOFFREY CARTON-KELLY** | **Respondent** |
| **(as additional liquidator of CGL Realisations Limited)** | |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Tom Smith KC and Henry Phillips** (instructed by **Sidley Austin LLP**) for the **Appellant**
**Andreas Gledhill KC and Tiran Neressian** (instructed by **Jones Day**) for the **Respondent**

Hearing dates : 26-27/09/2023
- - - - - - - - - - - - - - - - - - - - -
# Approved Judgment

This judgment was handed down remotely at 4.45pm on 09/10/2023 by circulation to the
parties or their representatives by e-mail and by release to the National Archives.

.............................

**Lord Justice Lewison:**

**Introduction**

1.  The issue on this appeal is whether the repayment by Comet Group plc ("Comet") of £115.4 million of unsecured intra-group debt to Kesa International Ltd ("KIL") on the occasion of the disposal of Comet to companies controlled by OpCapita amounted to a preference within the meaning of section 239 of the Insolvency Act 1986. The application under section 239 was brought by the liquidator of Comet (under its new name). In a judgment handed down on 17 November 2022, Falk J decided that it did. Her judgment is at [2022] EWHC 2873 (Ch), [2023] BPIR 305. The repayment took place pursuant to a sale and purchase agreement ("the SPA") dated 9 November 2011; and repayment of the debt was formally approved by the board of Comet on 3 February 2012. The transaction was completed on the same day. As part of the completion arrangements Comet agreed to repay the KIL debt. Comet entered administration on 2 November 2012, which was converted into a creditors' voluntary liquidation on 3 October 2013.

2.  This appeal is brought by Darty Holdings SAS, as successor to KIL, with the permission of Falk J. Darty sought permission to appeal on additional grounds, which I refused.

**The background facts**

3.  The judge set out the narrative extensively; but for the purposes of this appeal the following summary will suffice. At the relevant time, Comet was owned by Kesa Electricals plc ("Kesa" or "KEP") through an intermediate holding company, Kesa Holdings Limited ("KHL"). KHL additionally owned Triptych Insurance NV ("Triptych"), a Curacao-incorporated but UK tax-resident captive insurer. Triptych provided extended warranties to Comet customers. KIL was the group treasury company. Comet was financed through the provision by KIL of a £300m revolving capital facility (the "KIL RCF"). The interest rate on the KIL RCF was equal to KIL's costs of funds plus 1.27%. Conversely, at a similar time the cash-rich Triptych had entered into an intra-group loan facility with KIL, agreeing to lend it up to £70 million. Both loans were repayable on demand.

4.  Comet ran into financial difficulties with increased competition and declining footfall. It made a £3.8 million loss on ordinary activities in the year to April 2010 (FY2010), rising to £31.8 million in the year to April 2011 (FY2011). A concern developed that Comet was becoming a "drag" on KEP's earnings and share price, and an activist shareholder started agitating for Comet to be demerged. At the same time Comet's defined benefit pension scheme (the "DB Scheme") was in financial difficulty. As at 31 March 2010 the DB Scheme had an estimated deficit of around £307 million. In early 2011 a recovery plan had been agreed to address the deficit, under which Comet had agreed to contribute £6.1 million per annum.

5.  The upshot was that Kesa began looking for ways to dispose of Comet. A number of offers were made by various potential buyers; but in the end the Kesa board decided to proceed with OpCapita. Comet's prospects had worsened since 2011, with tougher

market conditions and an increased concern that it would not achieve sustainable profitability. The board minutes for 14 September 2011 also refer to an adverse change in management's view about the longer term sustainability of Comet, in part driven by the deteriorating economic environment.

6.    Heads of terms were agreed with OpCapita on 13 October 2011. In summary, these envisaged a sale of Comet and Triptych for £1. OpCapita would ensure that the purchasing vehicle (Newco) was capitalised with at least £30 million of share capital and a committed £40 million ABL facility. Kesa would retain the DB Scheme and provide £50 million of share capital to Newco. A form of "locked box" mechanism was envisaged by reference to the 30 April 2011 balance sheet, with forecast net debt owed by Comet of £26.9 million, the calculation of which included £42.5 million owed to Kesa. The target date for completion was 3 February 2012. The debt figures in the heads of terms reflected the way in which Comet's figures were presented internally, namely on a consolidated basis with its sister entity Triptych.

7.    The judge explained the structure of the transaction at [37]. She dealt first with OpCapita's structure. A three tier structure was established to make the acquisition. At the top was a limited partnership, Hailey 2 LP ("H2L"). H2L owned Hailey Holdings Limited ("HHL"), and HHL in turn owned Hailey Acquisitions Limited ("HAL"). Kesa's investment was to be at the top of the structure, in H2L, alongside OpCapita, or more accurately an investor or investors procured by it.

8.    She went on to set out a summary of the terms of the SPA. So far as relevant they were as follows. The parties to the SPA were KHL as seller of the shares, KEP, and HHL and HAL as the purchasing entities. Comet was not a party to the SPA.

9.    The SPA provided for the sale of the shares of Comet to HAL and Triptych to HHL, in each case for £1, subject to the satisfaction of certain conditions, the major ones being KEP shareholder approval and the removal of Comet from exposure to the pension scheme.

10.   Clauses 7 and 8 dealt with the arrangements for payment of inter-company loans. Clause 8 dealt with setting up the machinery for making the payments, and clause 7 dealt with the payments themselves. In other words, the chronology of events covered by clauses 7 and 8 work in reverse order. I therefore deal with them in reverse order.

11.   Under clause 8, Kesa was required to capitalise debt owed by Comet insofar as net debt would otherwise exceed £32.275 million, being the target of £26.9 million plus an additional amount to which the purchasing group agreed to be exposed. In the event the amount owing to KIL was approximately £129 million, and just under £13.6 million was capitalised, leaving £115,415,524 owed by Comet to KIL. It is the latter sum that the liquidator says was a preference.

12.   There was specific provision for Kesa to procure that a board meeting of Comet would be held at which all directors other than Mr Darke would resign and the purchasers' nominees would be appointed. Clause 8.3 provided that the newly constituted board "shall review the financial position of the Company" [i.e. Comet] in the light of a business plan for a minimum of 18 months, the ABL facility and the availability terms and conditions of the revolving credit facility to be provided by HAL (the "HAL RCF").

13.    The KIL RCF was dealt with in three tranches, Tranche A, Tranche B and Tranche C, representing three tranches of the proposed HAL RCF. Tranche A of the HAL RCF was £35 million, corresponding to capital injections of that amount by the investors into H2L, and then via HHL to HAL. Tranche B was equal to the amount owed by KIL to Triptych (the "Triptych Amount"). Tranche C covered the balancing amount owed by Comet to KIL plus additional headroom.

14.    Clauses 8.9 and 8.10 provided for the Tranche A element of £35 million to be drawn down by Comet under the HAL RCF (i.e. Tranche A) and a corresponding amount being demanded by the Kesa group (in practice KIL), whereupon Comet "shall agree to repay such amount". Prior to completion, therefore, the SPA envisaged a draw down, a demand, and an agreement to pay; but not an actual payment. The remainder of the clause dealt with Tranche B and Tranche C in a broadly similar way.

15.    Clauses 8.11-8.15 contemplated Triptych being repaid the Triptych Amount by KIL, Triptych lending the same amount to HHL and HHL lending it on to HAL. Comet would then draw an amount equal to the Triptych Amount under the HAL RCF (Tranche B), with a further demand from the Kesa group in that amount and Comet again agreeing to repay it.

16.    Clauses 8.16-8.21 dealt with Tranche C. It provided for KIL to make a £50 million capital contribution to H2L, together with an agreed additional amount of £22.66 million plus a further pensions related amount of £5.8 million, a total of £78.46 million. This amount would be passed down to HAL via HHL. There would then be a further demand for the balance owed to Kesa, with Comet again agreeing to repay it, using funds drawn from Tranche C.

17.    Thus, in relation to each tranche, the position immediately before completion would be that the money would be demanded and available, but not actually paid. Clauses 7.5 and 7.6 then dealt with the actual payments.

18.    Clause 7.5 provided that the purchasers (HAL and HHL) would procure that intercompany balances owed by Comet and Triptych, as determined as at 20 April 2011, would be repaid at completion, and the seller (KHL) would procure that intercompany balances owed by the retained Kesa group would be paid to Comet and Triptych.

19.    Clause 9 provided for completion. Clause 9.2 required the seller and purchaser respectively to do the things listed in Schedule 2. Among the seller's obligations under that Schedule were an obligation to procure a board meeting of Comet at which it would be resolved that the transfers relating to Comet's shares should be approved. The purchasers' obligations under that Schedule included making the payments required by clauses 7 and 8.

20.    Clause 9.4 provided that if the obligations under Schedule 2 had not been complied with then Kesa could (a) defer completion; (b) proceed to completion or (c) terminate the SPA.

21.    Clause 11.6 replaced an undertaking that had been included in the heads of terms to run Comet as a going concern with a much weaker statement of intent under which HHL and HAL confirmed that, on the basis of their current business plans, projections

and related assumptions, it was their "current intention" to conduct the business as a going concern for at least 18 months from completion, and to consult with KHL if it was proposed to commence insolvency proceedings within that period.

22.    Further detail about the mechanics of payment and repayment were set out in a completion agreement, whose terms the judge described at [46]. In short, the completion agreement mirrored the relevant terms of the SPA.

23.    Shareholder consent to the proposed transaction was obtained on 15 December 2011; and it was not until after that that Comet sought its own external legal advice. Mr Goldring of SJ Berwin was the solicitor who advised Comet.

24.    As envisaged by the SPA the board of Comet met on 3 February 2012. As also envisaged by the SPA the directors of Comet (apart from Mr Darke) resigned, and new directors were appointed. The meeting was presented with the completion agreement. Section 16 of the minutes of that meeting record the new board's evaluation of Comet's solvency. It records their conclusion that there was no ground on which Comet could be found to be unable to pay its debts. Section 16.6 of the minutes went on to record that if the proposed transactions were entered into, and Comet entered into insolvency proceedings within two years "no remedy would be available to the insolvency office holder" under section 239.

25.    Section 17 of the minutes recorded the new board's consideration of the completion and finance documents. Paragraph 17.3.1 recorded that the board had been advised that a number of provisions of the original drafts, would, as between a commercial lender and a corporate borrower, be subject to further negotiation. It had been possible to negotiate an improvement in some of the terms, but certain revisions were not accepted. It was also recorded that attempts to obtain finance from HSBC, Barclays and Burdale had been unsuccessful. Paragraph 17.6 recorded that the board considered the appropriateness of the company executing the documents. They reminded themselves of their fiduciary duties to the company; and paragraph 17.7 noted that without additional funding the company would inevitably run out of cash in the foreseeable future.

26.    Section 18 of the minutes approved entry into and execution of the completion agreement, which would be "for the commercial benefit of the Company and was most likely to promote the success of the Company for the benefit of its members and creditors as a whole". Section 19 approved the repayment of the KIL RCF, as set out in the completion agreement.

27.    It is not suggested (and the judge did not find) that the minutes are anything other than an accurate summary of the board's deliberations on 3 February 2012.

28.    The completion agreement was executed on 3 February 2012, the same day as the board meeting. Comet was a party to this agreement.

**Preference**

29.    Section 239 of the Insolvency Act 1986 relevantly provides:

Case 22-11068-KBO    Doc 34263-1    Filed 01/05/26    Page 1333 of 1707

Judgment Approved by the court for handing down.                    Darty Holdings SAS v Carton-Kelly

"(2)  Where the company has at a relevant time (defined in the next section) given a preference to any person, the office-holder may apply to the court for an order under this section.

(3)  Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not given that preference.

(4)  For the purposes of this section and section 241, a company gives a preference to a person if—

(a)  that person is one of the company's creditors or a surety or guarantor for any of the company's debts or other liabilities, and

(b)  the company does anything or suffers anything to be done which (in either case) has the effect of putting that person into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if that thing had not been done.

(5)  The court shall not make an order under this section in respect of a preference given to any person unless the company which gave the preference was influenced in deciding to give it by a desire to produce in relation to that person the effect mentioned in subsection (4)(b).

(6)  A company which has given a preference to a person connected with the company (otherwise than by reason only of being its employee) at the time the preference was given is presumed, unless the contrary is shown, to have been influenced in deciding to give it by such a desire as is mentioned in subsection (5)."

30.    The "relevant time" referred to in section 239 (2) is defined by section 240 (1). It is concerned with identifying the time at which a company actually gives a preference (rather than the time at which the company decides to give a preference). In the case of connected persons (which Comet and KIL were) that time is a time within the period of two years ending with the onset of insolvency; in this case the period beginning on 2 November 2010 and ending when Comet entered administration on 2 November 2012. But a time within that period is not a relevant time unless at that time the company:

"(a) is at that time unable to pay its debts within the meaning of section 123 in Chapter VI of Part IV, or

(b) becomes unable to pay its debts within the meaning of that section in consequence of the transaction or preference;

> but the requirements of this subsection are presumed to be
> satisfied, unless the contrary is shown, in relation to any
> transaction at an undervalue which is entered into by a
> company with a person who is connected with the company."

31.    The insolvency code is directed towards achieving a *pari passu* distribution of the
       insolvent estate among unsecured creditors. The rules as to preference are designed to
       preserve the sanctity of the *pari passu* principle by which creditors in a winding-up
       share rateably in the assets available for distribution: Goode Principles of Corporate
       Insolvency para 13-75. Accordingly, the justification for setting aside a disposition of
       assets made shortly before the onset of insolvency is that, by depleting the estate, the
       disposition unfairly prejudices creditors; and even where the disposition is in
       satisfaction of a debt lawfully owing by the insolvent company, by altering the
       distribution of its estate it makes a *pari passu* distribution among all the unsecured
       creditors impossible: see *Invest Bank PSC v El-Husseini* [2023] EWCA Civ 555.

32.    As a result of the statutory provisions, there is a presumption in play on the facts of
       this case, which is rebuttable. The presumption is that in deciding to repay the debt
       Comet desired to put KIL into a position which, in the event of its going into
       insolvent liquidation, would be better than the position it would have been in if the
       debt had not been repaid. The second presumption, referred to in section 240, that at
       the relevant time Comet was insolvent, does not apply because it only applies to
       transactions at an undervalue.

**The judge's reasoning**

33.    Falk J did not find it necessary to rely on the presumption. The main building blocks
       which led her to her conclusion were her findings that:

       i)      Comet was insolvent immediately before the Disposal.

       ii)     The repayment of £115.4m of the KIL RCF constituted a preference.

       iii)    Mr Enoch, and others involved in the key decision making process on the Kesa
               side, had a desire to ensure repayment of the KIL RCF, and had in
               contemplation the possibility of an insolvent liquidation of Comet.

       iv)     On the particular facts of this case, a decision was taken on behalf of Comet at
               the time the SPA was entered into on 9 November 2011, which was tainted by
               a desire to prefer. The relevant decision for the purposes of section 239 was
               that decision, and not the formal resolutions passed by the New Board on 3
               February 2012.

**The approach to the appeal**

34.    Although the various grounds of appeal assert that the judge was "wrong in law
       and/or in fact" in reaching her conclusions, I found it hard to discern any clear-cut
       points of law on which it is said that she went wrong. Mr Smith KC relied on the
       decision of the House of Lords in *Benmax v Austin Motor Co Ltd* [1955] AC 370 for
       the proposition that an appeal court is in as good a position as a trial judge to draw
       appropriate inferences from findings of primary facts. That was a case in which the

issue was whether an alleged invention disclosed by a patent was obvious. It is open to question whether the question of obviousness is one of inference, rather than an evaluative judgment: see *Actavis Group PTC EHF v Icos Corpn* [2019] UKSC 15, [2019] Bus LR 1318 at [78] to [81]. Moreover, *Benmax* was a case decided at a time when all appeals were appeals "by way of rehearing". But in my opinion the approach of an appeal court has changed markedly since the 1950s; more especially since the introduction of the CPR. That process began with *Biogen Inc v Medeva plc* [1997] RPC 1, 45 (another case of obviousness) in which Lord Hoffmann qualified the effect of the *Benmax* case which he said was really about an evaluation of facts. It continued in *Piglowska v Piglowski* [1999] 1 WLR 1360, 1372D in which he said that appellate caution applied equally to the evaluation of facts. More recently, in *Henderson v Foxworth Investments Ltd* [2014] UKSC 41, [2014] 1 WLR 2600 Lord Reed said at [67]:

> "It follows that, in the absence of some other identifiable error, such as (without attempting an exhaustive account) a material error of law, or the making of a critical finding of fact which has no basis in the evidence, or a demonstrable misunderstanding of relevant evidence, or a demonstrable failure to consider relevant evidence, an appellate court will interfere with the findings of fact made by a trial judge only if it is satisfied that his decision cannot reasonably be explained or justified."

35. The general approach which therefore applies to this appeal is the current approach that an appellate court adopts in relation to appeals on fact. There is no need for me to set out the principles (yet again). I have done so in *FAGE UK Ltd v Chobani (UK) Ltd* [2014] EWCA Civ 5, [2014] FSR 29 at [114]; *Volpi v Volpi* [2022] EWCA Civ 464, [2022] 4 WLR 48 at [2] and *McCarthy v Jones* [2023] EWCA Civ 589 at [18] and [19]. Those principles have since been applied by this court in other cases: *Kynaston-Mainwaring v GVE London Ltd* [2022] EWCA Civ 1339; *Deutsche Bank AG v Sebastian Holdings Inc* [2023] EWCA Civ 191; *Re T (Fact-Finding: Second Appeal)* [2023] EWCA Civ 475. The only point that is worth repeating is one that I made in *FAGE*:

> "Appellate courts have been repeatedly warned, by recent cases at the highest level, not to interfere with findings of fact by trial judges, unless compelled to do so. This applies not only to findings of primary fact, but also to the evaluation of those facts *and to inferences to be drawn from them*" (Emphasis added)

36. That observation has also been approved and applied in subsequent cases: *Walter Lilly & Co Ltd v Clin* [2021] EWCA Civ 136, [2021] 1 WLR 2753 at [83]; *Kynaston-Mainwaring* at [30]; *Deutsche Bank* at [50].

37. In the present case, however, there are two additional points to be made. First, the contemporaneous documentary evidence (in the shape of emails and other informal communications) was incomplete, because of wholesale deletion of emails at some stage after the disposal. The judge therefore had to do the best she could to fill in the gaps. Second, the judge heard the evidence of six witnesses of fact and two experts.

Of the six factual witnesses, the most important was Mr Enoch. He was Kesa's Group General Counsel, as well as being a director of Comet (until he resigned on 3 February 2012), and the company secretary of other companies within the Kesa group. The judge was critical of his evidence. She described him as very keen to defend Darty's position and his own actions, which led to "a somewhat combative approach and, unfortunately, an impression that questions were not always answered in a wholly open and straightforward manner." Nor did she accept that Mr Enoch's recollection of a lack of involvement in the debt repayment mechanics reflected the full picture of what occurred.

38.     But the judge also had the evidence of Mr Darke (Comet's CEO) and Mr Platt (Kesa's Chief Financial Officer) both of whom she found to be impressive witnesses.

**When was the decision made?**

39.     The liquidator's original case was that the impugned decision was taken by the (new) Comet board on 3 February 2012, when the resolutions were passed. But that case was, for practical purposes, abandoned. The case that the liquidator pursued at trial was that the relevant decision was taken on or around 9 November 2011 by Mr Enoch on behalf of Comet. But the statement of case was not amended to plead that case until part way through the trial.

40.     The statutory question is whether the impugned decision is influenced by the desire to prefer. That decision may have been made earlier than the actual giving of the preference: *Re MC Bacon Ltd* [1990] BCC 78, 88. As mentioned, the repayment of the KIL RCF took place on a 3 February 2012 following a meeting of the Comet board. It is now accepted that none of those who participated in the approval of the transaction on that day were influenced by that desire. If that was the date of the decision, then this appeal succeeds. But the liquidator argued, and the judge accepted, that Comet, acting through Mr Enoch, made the "real" or "substantive" decision on 9 November 2011; and that he was then influenced by a desire to prefer.

41.     The question under this head is: when did Comet decide to repay the KIL RCF? That, to my mind, is the key issue in this appeal. As David Richards J correctly said in *Re Stealth Construction Ltd* [2011] EWHC 1305 (Ch), [2012] 1 BCLC 297 at [63] it is a question of fact to be determined in the particular circumstances of each case. A contractual obligation to make the repayment is neither a necessary nor a sufficient condition.

42.     In *Wills v Corfe Joinery Ltd* [1997] BCC 511 the company owed money to two of its directors. In January 1994 they gave notice to the company that it was their intention to call in the loans in January 1995 and not before. That was approved and recorded in a board minute. The loans were in fact repaid by cheques drawn in February 1995, a few days before the company went into creditors' voluntary liquidation. Lloyd J held that the date of the relevant decision was made at or immediately before the cheques were drawn. Even if the company had accepted an obligation in 1994 to repay the loans in January 1995, "it was necessary for the board to review at that time whether to honour that obligation." In my judgment, the key to that decision was that a lot of

debts were repayable by the company in January 1995 and the company had to decide which ones to repay.

43.    In *Stealth Construction* the relevant parties made an oral agreement in October 2007 under which monies would be lent to the company secured by a second charge on property. That agreement was not legally binding, because of a lack of formality. Instructions were given to solicitors to draft the necessary documentation between October and December 2008. David Richards J held that the relevant decision was taken in about November 2008. As he explained, where there had been an interval of 12 months or more between the oral agreement and the execution of the charge, that would "necessarily involve a decision to proceed with the grant of the charge". The key to that case, to my mind, is that in the absence of any enforceable obligation to grant the charge, the decision to grant must have been taken at the earliest when the solicitor was instructed to prepare the necessary documentation.

44.    I do not regard either of these cases as laying down any point of principle. Each is a decision on its own facts. But I agree with Mr Gledhill KC that in both those cases there was more than one decision, and the question for the judge in each case was which was the operative decision for the purposes of section 239.

45.    The judge found that Mr Enoch, who was a director of Comet as well as being Kesa's General Counsel, led the team agreeing the terms of the transaction. He took the key role in negotiating the detailed terms of the transaction on the Kesa side. He was clearly involved in, and agreed the fundamentals, and in particular, that the various intragroup debts would be repaid. He was acting very much in an executive capacity. His job was to get the deal done. The overriding objective was to achieve a "clean break" which capped Kesa's exposure to Comet. The judge found that the remainder of the board of Comet were content to leave the details to him, although Mr Platt was also part of the "core deal team". Mr Enoch saw no conflict between his role as director of Comet and his role as Kesa's General Counsel. The judge said at [244]:

> "Individuals comprising the majority of Comet's Board… were clearly content, either consciously or by leaving the details to Mr Enoch, to enter into a transaction which contemplated Comet taking actions that, left to its own devices, might well be perceived as not being in its own interest. … Kesa was driven entirely by the desire for a clean break, whilst meeting its objective of leaving Comet with a capital structure that could allow it to continue as a going concern. No separate interest of Comet was perceived to exist."

46.    The board to which the judge was referring in this paragraph was the old board, all of whom (including Mr Enoch but excluding Mr Darke) were to be replaced before completion.

47.    In the present case, Comet had no enforceable contractual obligation to make the repayment until it entered into the agreements formally approved by the board on 3 February 2012. There was no direct evidence that the board of Comet had made the decision to repay the KIL RCF at the time of the SPA. But the judge's inference was that such a decision must have been made, otherwise the SPA would not have been drafted as it was. She decided that the SPA was explicit about what Comet would be

required to do on or before completion of the SPA. This included entering into new secured borrowings, capitalising debt and repaying all remaining intercompany balances. The SPA (to which Comet was not a party) provided that Comet "shall repay" the intra-group debt "prior to" completion, although the cash with which it would make that repayment would not be transferred until completion itself. Although the SPA contemplated that the board would "review the financial position of the Company" prior to completion, no provision was included to cover the possibility that it might find it to be unsatisfactory. Given the care usually taken in detailed documentation to cover risks of anticipated events not occurring, she inferred that the possibility of the board not falling into line was not considered to be a real risk. In reality the manner in which intragroup debts was to be dealt with was prescribed in detail in clause 8 of the SPA, and required the full participation of both Kesa and Comet. Clause 8 also required the relevant steps to be taken prior to completion, whereas clause 7.5 imposed obligations at completion. In practice it would never actually operate.

48.    She placed particular weight on her assessment of the contemporaneous documents (in particular, the terms of the SPA) and the commercial realities at the time, together with Mr Enoch's group-wide role and his failure to identify any difference of interest between Kesa and Comet.

49.    The judge found that by the time that it got to 3 February 2012 the board's "hands were tied". At best there was a binary decision whether to go ahead with the proposed transaction as a whole or to refuse to do so. Although it was theoretically possible for them to refuse to pass the necessary resolutions, if they had done so they would have been sacked and replaced by directors who would pass them.

50.    The judge concluded at [245]:

> "In the very particular circumstances of this case I consider that it would be too narrow an approach, and effectively a triumph of form over substance, to find that there was no decision by or on behalf of Comet at the time that the SPA was entered into because it was not formally a party to that document. I am not satisfied on the evidence that Mr Enoch was acting solely in his role as Kesa's General Counsel and not on behalf of Comet. Mr Enoch was a director of Comet, as well as its effective General Counsel at Board level (see [67] above), and he did not see a conflict between that role and his role as Kesa's General Counsel. He was acting in a Kesa "group" capacity, a group that at that time included Comet, an entity in respect of which he saw no separate interest from that of the rest of the group. The SPA, which Mr Enoch had been heavily involved in negotiating, was prescriptive about what Comet would be required to do and no provision was made to cover the possibility that it would fail to take the actions contemplated. The contrast with the condition related to KEP shareholder consent, with its caveat about directors' fiduciary duties, is stark."

51.    She continued at [248]:

> "By the stage the Disposal was due to complete KEP had, as the SPA contemplated, undergone the very public process of seeking and obtaining shareholder approval to the Disposal. While the carefully choreographed documentation appears to leave it to the New Board – unusually appointed immediately before rather than at completion – to take the necessary decisions on behalf of Comet, so distancing the process from Kesa, the real decisions were taken much earlier. The New Board were expected to play ball or be sacked and replaced by people who would."

52.    The judge considered whether the fact that it had not been put to Mr Enoch that he was acting for Comet on 9 November 2011 made any difference. She decided that it did not. She said at [252]:

> "I accord more weight to my assessment of the contemporaneous documents (in particular, the terms of the SPA … ) and the commercial realities at the time, together with Mr Enoch's group-wide role and his failure to identify any difference of interest between Kesa and Comet."

53.    Having then considered the minutes of the board meeting on 3 February 2012 she finally concluded at [274]:

> "In the circumstances of this case, I do not accept that the relevant decision was taken by the New Board on 3 February 2012. The substantive decision to repay the KIL RCF was taken on Comet's behalf when the SPA was signed. What occurred on 3 February was a formal, albeit necessary, step to allow that decision to be implemented. In theory the New Board could have refused to approve the Disposal and/or refused to settle the KIL RCF – just as, for example, an employee or agent asked to take a necessary step in arranging a preferential payment by a decision maker could refuse to do so (and perhaps for entirely justifiable reasons) – but in substance the decision had already been taken. What I have described as careful choreography to distance Kesa from formal decision-making was not effective."

54.    Mr Smith argued that the decision to make the repayment of the KIL RCF was made by Comet's board at the meeting on 3 February 2012, as the board minutes record. Until that time, there had been no decision to repay. Although it may have been likely, or even very likely, that the board would decide to make the repayment, that is not the relevant question. The relevant question is when the decision was actually made. The judge herself found at [256] that, at least formally, the board took the decision on that date; and that the directors at that time believed that they had a decision to make. She also concluded that, at least in theory, the board could have refused to pass the necessary resolutions approving the transactions. On the basis of those findings, the relevant decision was the board's decision on 3 February 2012. As at that date none of the directors of Comet had a desire to prefer KIL.

55.     Mr Smith also argued that, accepting all the limitations on the interference by an appeal court with findings of fact (including inferential findings) made by the trial judge, the judge's conclusion that the "real" or "substantive" decision was made earlier was wrong. There was simply no evidence to support it.  First, Comet was not a party to the SPA and therefore execution of the SPA could not itself be, or be evidence of, a decision made by Comet. Second, there was no contemporaneous evidence of any decision made by Comet at that time. Given the magnitude of the obligations that the SPA envisaged that Comet would take, and the fact that Comet was a substantial public company, it is not plausible that a decision of that nature would leave no documentary trace. Third, the structure of the contemplated transaction did not require any decision to be made by Comet when the SPA was made. It was no more than an agreement by the shareholders of Comet to sell their shares. On the contrary, the terms of the SPA envisaged that Comet would make the decision on completion. Fourth, the judge was wrong to say at [239] that no provision was made to cover the possibility that Comet might find the transaction to be unsatisfactory. Clause 9.4, which gave Kesa the right to terminate the agreement if the obligations in Schedule 2 were not fulfilled, did precisely that. Fifth, although Mr Smith did not challenge the judge's evaluative conclusion that the parties to the SPA did not consider there to be a real risk that the board of Comet would not fall into line, that did not amount to a decision by Comet. An expectation (even a strong expectation) by A that B will do something, is not a decision by B. Sixth, clauses 7.5, 8.10 and 8.15 all contain obligations to "procure" that things shall be done. Those are forward-looking obligations. If Comet had already made the decision to approve the transaction and make the payments, obligations of that kind would have been unnecessary. Seventh, Comet did not engage with the transaction at all until after shareholders' approval had been obtained on 15 December 2011, over a month after the SPA was signed. Eighth, the judge was wrong to regard payment of the KIL RCF as the only relevant part of the transaction. The KIL RCF would not have been paid unless the HAL RCF was accepted. It is clear that at the board meeting of 3 February 2012, the board considered whether to enter into the HAL RCF; and equally clear from the minutes that Comet had sought alternative means of finance before accepting the terms of the RCF. They had, in addition, proposed changes to the terms of the HAL RCF which had been accepted. Ninth, the judge did not identify what decision Mr Enoch made, or how he made it. Did he decide that Comet would pay the KIL RCF; or merely that the SPA should take the form that it did? There is a qualitative difference between authorising a single director to negotiate the terms of a proposed transaction on a "take it or leave it" basis, and a decision actually to take it. How did Mr Enoch make the decision? No act was ever identified. Tenth, if Mr Enoch had made any decision on behalf of Comet, it was not a decision that he communicated to anybody. Eleventh, the judge found that on 3 February 2012 the board took decisions and believed that they had a decision to make. Although the judge characterised it as a "binary decision", a binary decision is still a decision. She also accepted that the board could have refused to approve the transaction and/or refused to repay the KIL RCF. Even if the judge was right to say that had they refused, they would have been replaced by compliant board members, that does not detract from the fact that the decision was in the hands of the board on 3 February 2012. The judge said that the transactional documents were "carefully choreographed" but she did not say that the board meeting of 3 February 2012 was a sham or merely a charade. On the contrary, she accepted the evidence of Mr Darke that there was a difficult decision to be made.

56.     Mr Gledhill stressed the fact that the judge's decision about when the "real decisions" or the "substantive decision" were taken was an inferential finding of fact. In both *Wills* and *Stealth* the judges made findings about the date of the relevant decision in each case on the basis of inference. It is perfectly possible for an operative decision to be a conditional one. In this case the judge found that the operative decision was made in November 2011, even though it may have been conditional on approval by Comet's board.

57.     He also stressed the point that the factors that led the judge to the inferential finding that she made should not be picked off one by one. They operated cumulatively. To borrow the words of Parke B directing the jury in *R v Exall* (1866) 4 F & F 922:

> "It has been said that circumstantial evidence is to be considered as a chain, and each piece of evidence as a link in the chain, but that is not so, for then, if any one link broke, the chain would fall. It is more like the case of a rope composed of several cords. One strand of the cord might be insufficient to sustain the weight, but three stranded together may be quite of sufficient strength.
>
> Thus it may be in circumstantial evidence—there may be a combination of circumstances, no one of which would raise a reasonable conviction, or more than a mere suspicion; but the whole, taken together, may create a strong conclusion of guilt, that is, with as much certainty as human affairs can require or admit of."

58.     The features that he relied on were:

i)      The judge's finding that Mr Enoch took the leading role in agreeing the terms of the SPA.

ii)     The fact that Mr Enoch was a director of Comet coupled with the judge's finding that he "wore his Comet hat" throughout.

iii)    The fact that Mr Enoch gave an inaccurate account of how repayment of the KIL RCF came to be part of the terms of the SPA, which the judge disbelieved.

iv)     That by means of the SPA Mr Enoch brought about an elaborate transactional structure in which repayment of the KIL RCF was an essential component.

v)      The judge's finding that by the time it got to 3 February 2012 the hands of the (new) Comet board were effectively "tied".

vi)     The judge's finding that, in a case in which one company acquires the share capital of another, it was unusual to appoint a new board before completion. That, he said, was an artificial mechanism to mask a decision that had already been made.

vii)    The fact that the SPA was silent about what would happen if Comet refused to do what the SPA prescribed.

59.     I accept Mr Gledhill's point that an appeal court must be restrained in reversing a finding of fact, even an inferential finding. I accept also that, at least in principle, an operative decision may be a conditional one. But much will depend on the nature of the condition. If, for instance A agrees to buy Blackacre subject to the grant of planning permission, that can properly be characterised as an operative conditional decision. But if he agrees to buy Blackacre "subject to contract" that is not an operative decision at all. In my judgment a decision which is conditional on board approval (or ratification) does not amount to an operative decision. A further decision by the board is necessary to make the operative decision: compare *Goodwood Investments Holdings Inc v Thyssenkrupp Industrial Solutions AG* [2018] EWHC 1056 (Comm).

60.     In the course of his oral submissions, Mr Gledhill said that the old board effectively made a decision about, at the very least, whom the new board was going to be *asked to pay* at completion. But even if that submission is correct, it does not amount to a *decision* by the old board that the new board would do what they were asked to do.

61.     The judge placed particular weight on the terms of the SPA and the "commercial realities". The main points that impressed her about the terms of the SPA were the prescriptive description of what Comet "would be required to do" on or before completion of the SPA; and the lack of any specific provision covering a failure by Comet to do "what was expected of it". The latter phrase is telling. Comet was, no doubt, "expected" to do what Schedule 2 of the SPA envisaged, but as Mr Smith submitted, an expectation by A that B will do something is not a decision by B. An expectation by A that B will act in a certain way in the future, is incompatible with B's having already decided to do that thing. Second, the SPA did not actually require Comet to do anything. It required Kesa to procure that Comet would do various things, but that was in the future. Third, in saying that the SPA made no provision for a failure by Comet to do what was expected, the judge overlooked the terms of clause 9.4 of the SPA which dealt with that eventuality. Fourth, the terms of the SPA specifically provided for a future decision of the (new) Comet board. The judge was also mistaken in saying that because of the steps envisaged by clause 8 of the SPA, clause 7.5 would not come into operation. The two clauses were dealing (albeit in reverse order) with what would happen before completion in setting up the mechanics for payment, and the making of the actual payments on completion. The judge placed some reliance on the fact that the SPA made no reference to the fiduciary duties owed to Comet by its directors. But that is only significant if Comet had made a decision to repay the KIL RCF at the date of the SPA, which is the very question to be decided. If Comet had made no such decision (but was expected to in due course) then a reference to fiduciary duties was unnecessary.

62.     So far as the commercial realities are concerned, the judge may well have been right to find that by the time of the board meeting on 3 February 2012, the board had little choice but to decide to approve the transaction. As Mr Gledhill submitted, the overall transaction required Comet to enter into the HAL RCF out of which the KIL RCF was to be paid. Mr Gledhill accepted, however, that there was no reason to suppose that the (new) Comet board perceived their hands to be tied as a result of some earlier decision taken by Comet. Indeed, the board minutes record that the board had approached other potential sources of funds before deciding to enter into the completion agreement; and it is accepted that the board minutes are accurate. Those

approaches are themselves inconsistent with the conclusion that the decision to repay the KIL RCF out of the HAL RCF had already been made. Moreover, as Newey LJ said in argument, if the commercial reality were that in due course Comet would have no choice but to agree, then there would have been no need for Comet to agree at the date of the SPA.

63.     There is also an inconsistency between the judge's conclusion that, on the one hand, there *was* a decision to be made on 3 February 2012 and that the board could have refused to approve the transaction and, on the other, that the decision had already been taken.

64.     Mr Gledhill relied, as he had before the judge, on the decision of this court in *Re Drabble Bothers* [1930] 2 Ch 211. But that was a very different case. Drabble Brothers were a partnership of two brothers, George and Frederick Drabble carrying on business as builders. Frederick Drabble signed a cheque in favour of Swan & Co Ltd, a creditor in relation to a contract relating to a development in Stoke. The cheque was held to be a fraudulent preference, even though Mr Drabble himself had no intention to prefer the payee. But on the facts of that case, Frederick Drabble was not the decision-maker. The decision-maker was a man called Tiley, who did have an intention to prefer. That is clear from the judgment of Lord Hanbury MR. I quote a few extracts:

> "Tiley was the servant and agent of the bankrupts and the person in control of the financial side of the bankrupts' business in connection with the Stoke contract." (p. 232)

> "I think the evidence before the learned county court judge amounts to this, that F. Drabble retained his control over his banking account, but he himself exercised no determination as to the creditors to be paid or the amounts to be paid to them; all such details he delegated to Tiley…" (p. 234)

> "It is plain beyond all question that on all matters of finance F. Drabble was not in control at all. How much and to whom the payments were to be made had been delegated entirely to Tiley." (p. 235)

> "… when F. Drabble undertook to sign any cheque that was put before him for any amount and to any person which should be chosen and determined by Tiley, he so far delegated his authority as to make the act and intention and the knowledge of Tiley his own, because Tiley, on those details of the finance, represented his principal, and thus made his, Tiley's, intentions, the intentions of his principal." (p. 235)

65.     In other words, on the facts of that case, decisions about whom to pay were Tiley's decisions. The questions in this case were whether Mr Enoch made a decision at all, and if so, what that decision was.

66.     Mr Gledhill also took us to the facts of *MC Bacon*. In that case there were three directors of the company, Mr Creal, Mr Glover and Mr Martin Creal. The impugned

decision was a decision to grant a debenture to the bank. Mr Glover conducted the negotiations with the bank, but resigned as a director on 3 April 1987 shortly before the debenture was granted. Nevertheless, he continued to be involved in the financial affairs of the company. The debenture was granted on 20 May. Millett J found that the decision to grant the debenture was made by all three men: *MC Bacon* at 86F. Although only Messrs Creal actually executed the debenture, they were influenced by a recommendation to do so from Mr Glover. Thus, Millett J considered whether Mr Glover was influenced by a desire to prefer because if he was, then the company was similarly influenced, even though Mr Glover did not communicate any such desire to Messrs Creal. In the event, Millett J found that Mr Glover was not so influenced. But the point is that Mr Glover *was* one of the decision-makers, so his desire was relevant. Mr Gledhill's reliance on *MC Bacon* overlooked that critical finding of fact.

67.     On the question whether Mr Enoch did make a decision, it was not put to him in the course of his evidence that he made any decision on behalf of Comet. Mr Gledhill rightly said that Mr Enoch gave no evidence about it in his witness statements, but that was because at the time when he made his statements it was no part of the liquidator's case that he had made a decision on behalf of Comet on or about 9 November 2011. The judge accepted that it had not been put to Mr Enoch that he had been acting on Comet's behalf and said that she had assumed that had the point been put, he would have denied it. But that, to my mind, is no answer to the question what he was actually doing on behalf of Comet. As Mr Gledhill accepted, he could not have been acting on behalf of Comet when he actually signed the SPA which he did on behalf of the Kesa parties to the SPA (who did not include Comet). Thus, the judge's conclusion at [274] that the decision was made "when the SPA was signed" cannot be sustained.

68.     Assuming, however, that Mr Enoch did make a decision on behalf of Comet, what was the decision? Was it a decision that Comet would repay the KIL RCF; or was it no more than a decision that the terms of the SPA would be the terms that would be presented to Comet for approval? That question, too, was not explored in evidence, and the judge did not, I think, grapple with it. Mr Darke accepted in the course of his cross-examination that he played no part in the negotiation of the SPA, so the judge was probably entitled to find (as she did at [244]) that the Comet board left it to Mr Enoch to *negotiate the terms of the SPA*. But it was never put to Mr Darke (or anyone else) that Mr Enoch was authorised to *decide* that Comet would repay the KIL RCF. So, there was no evidence that the (old) Comet board were content for Mr Enoch to decide that Comet would enter into the transaction, especially since the SPA provided for the (new) Comet board to take the decision. There was, therefore, an evidential void which was not capable of supporting the judge's inferential finding in [244] that the board was content to enter into a transaction decided upon by Mr Enoch.

69.     *Chen v Ng* [2017] UKPC 27 demonstrates the dangers inherent in a trial judge making findings about matters that have not been put.

70.     In addition, if Mr Enoch made any decision on Comet's behalf at the time of the SPA, it was not a decision that he communicated to anybody. Nor was it suggested to him (or indeed to any of the witnesses) that he did. Mr Goldring, the solicitor advising Comet in the early part of 2012, said (and the judge accepted at [250]) that he got the impression the Comet was "expected" to comply with the wishes of the other transaction parties. If a decision had already been made, he knew nothing of it. If

neither the other existing board members of Comet at the date of the SPA, nor the new board members who approved the transaction on 3 February 2012, nor the solicitor advising them knew that a decision had already been made, it is difficult to see how any earlier decision by Mr Enoch could have been an operative decision by Comet; or, indeed, to have had any influence outside Mr Enoch's own mind. It would have been a decision without any impact on anything.

71.    Accepting all the points made by the judge, they do not, to my mind justify the conclusion that a decision by Comet to repay the KIL RCF had been made at the time of entry into the SPA. No doubt Kesa and OpCapita were arranging matters so that Comet would have little, if any, choice but to accept the terms on offer. But the fact that a creditor puts pressure on a debtor to repay a debt does not mean that the debtor has decided to repay it. Even if the new board had little choice but to accept the terms on offer on 3 February 2012, it does not follow that Comet had already made a decision in November 2011.

72.    I agree, therefore, with Mr Smith that there is no basis in the evidence for the judge's inferential finding that on or before the making of the SPA Mr Enoch made an operative decision on Comet's behalf that Comet would repay the KIL RCF. The only operative decision was the decision of the board on 3 February 2012; and it is accepted that the decision made on that date was not influenced by a desire to prefer.

73.    It follows, in my judgment, that this ground of appeal succeeds; and the remaining grounds of appeal do not arise.

**Result**

74.    I would allow the appeal.

**Lord Justice Newey:**

75.    I agree.

**Lady Justice Elisabeth Laing:**

76.    I also agree.

# EXHIBIT 16

# HIGH COURT OF AUSTRALIA

### GLEESON CJ,
### GAUDRON, GUMMOW, HAYNE AND CALLINAN JJ

---

G & M ALDRIDGE PTY LTD                                   APPELLANT

AND

JOHN MARTIN WALSH                                        RESPONDENT
(as Liquidator of Thompson Land Limited
(Receiver and Manager Appointed) (In
Liquidation))

*G & M Aldridge Pty Ltd v Walsh*
[2001] HCA 27
*24 May 2001*
M104/2000

### ORDER

*Appeal dismissed with costs.*

On appeal from the Supreme Court of Victoria

**Representation:**

M L Sifris for the appellant (instructed by Rockman & Rockman)

I J Hardingham QC with A P Rodbard-Bean for the respondent (instructed by
Abbott Stillman & Wilson)

Notice:  This copy of the Court's Reasons for Judgment is subject to
formal revision prior to publication in the Commonwealth Law Reports.

# HIGH COURT OF AUSTRALIA

## GLEESON CJ,
## GAUDRON, GUMMOW, HAYNE AND CALLINAN JJ

———————————————————————

ELECRAFT (AUST) PTY LTD                                    APPELLANT

AND

JOHN MARTIN WALSH                                         RESPONDENT
(as Liquidator of Thompson Land Limited
(Receiver and Manager Appointed) (In
Liquidation))

*Elecraft (Aust) Pty Ltd v Walsh*
*24 May 2001*
*M105/2000*

### ORDER

*Appeal dismissed with costs.*

On appeal from the Supreme Court of Victoria

**Representation:**

M L Sifris for the appellant (instructed by Rockman & Rockman)

I J Hardingham QC with A P Rodbard-Bean for the respondent (instructed by
Abbott Stillman & Wilson)

Notice:  This copy of the Court's Reasons for Judgment is subject to
formal revision prior to publication in the Commonwealth Law Reports.

# HIGH COURT OF AUSTRALIA

GLEESON CJ,
GAUDRON, GUMMOW, HAYNE AND CALLINAN JJ

_____

K & V PLUMBERS PTY LTD                                APPELLANT

AND

JOHN MARTIN WALSH                                    RESPONDENT
(as Liquidator of Thompson Land Limited
(Receiver and Manager Appointed) (In
Liquidation))

*K & V Plumbers Pty Ltd v Walsh*
*24 May 2001*
*M106/2000*

## ORDER

*Appeal dismissed with costs.*

On appeal from the Supreme Court of Victoria

**Representation:**

M L Sifris for the appellant (instructed by Rockman & Rockman)

I J Hardingham QC with A P Rodbard-Bean for the respondent (instructed by Abbott Stillman & Wilson)

Notice:  This copy of the Court's Reasons for Judgment is subject to formal revision prior to publication in the Commonwealth Law Reports.

# HIGH COURT OF AUSTRALIA

### GLEESON CJ,
### GAUDRON, GUMMOW, HAYNE AND CALLINAN JJ

―――――――――――――――――――

BARDEN-STEELDECK INDUSTRIES                    APPELLANT
PTY LTD

AND

JOHN MARTIN WALSH                              RESPONDENT
(as Liquidator of Thompson Land Limited
(Receiver and Manager Appointed) (In
Liquidation))

*Barden-Steeldeck Industries Pty Ltd v Walsh*
*24 May 2001*
M107/2000

## ORDER

*Appeal dismissed with costs.*

On appeal from the Supreme Court of Victoria

**Representation:**

M L Sifris for the appellant (instructed by Rockman & Rockman)

I J Hardingham QC with A P Rodbard-Bean for the respondent (instructed by
Abbott Stillman & Wilson)

> Notice:  This copy of the Court's Reasons for Judgment is subject to
> formal revision prior to publication in the Commonwealth Law Reports.

**CATCHWORDS**

**G & M Aldridge Pty Ltd v Walsh**
**Elecraft (Aust) Pty Ltd v Walsh**
**K & V Plumbers Pty Ltd v Walsh**
**Barden-Steeldeck Industries Pty Ltd v Walsh**

Companies – Winding up in insolvency – Preference – Payments made by project manager to unsecured creditors – Payments from property subject to fixed and floating charge – Payments made after crystallisation of floating charge – Chargee took no action in relation to payments – Whether payments had effect of giving creditors a preference, priority or advantage over general body of unsecured creditors.

Words and phrases – "preference, priority or advantage".

*Bankruptcy Act* 1966 (Cth), s 122(1), (2).
*Companies Code* (Vic), s 451.

1    GLEESON CJ, GAUDRON, GUMMOW, HAYNE AND CALLINAN JJ.   Four appeals were heard together.   Each raises an identical issue, arising out of the same transaction, concerning the preference provisions of the *Companies Code* (Vic) ("the Code") and the *Bankruptcy Act* 1966 (Cth) ("the Act").   The respondent to each appeal, the liquidator of Thompson Land Limited (Receiver and Manager Appointed) (In Liquidation) ("TLL"), commenced actions in the County Court of Victoria against each appellant for the recovery of amounts said to represent payments or transfers of property which were void as against the respondent by virtue of s 451 of the Code.   The actions were heard by Judge Ostrowski.   They were successful.   Appeals to the Court of Appeal of the Supreme Court of Victoria were dismissed[1].

2    The issues have narrowed as the litigation has proceeded.   Some of the points argued before Judge Ostrowski were not pursued in the Court of Appeal; and the present appeal does not cover all of the issues decided by the Court of Appeal.   The central point argued in this Court concerns the significance of a floating charge that had crystallised before the impugned transaction.   In order to explain the argument it is necessary to outline the facts and make brief reference to some of the other issues that arose at earlier stages.

3    TLL was wound up by order of the Supreme Court of Victoria on 6 September 1990.   The respondent was appointed liquidator.   The application for winding up had been filed on 15 May 1990.

4    At all material times, Australia and New Zealand Banking Group Ltd ("the Bank") was a secured creditor of TLL, the security being a mortgage debenture which gave the Bank a fixed charge over certain assets and a floating charge over all other assets of TLL.   The debenture provided for automatic crystallisation of the floating charge in certain circumstances which, it is agreed, arose on 9 March 1990.   It also empowered the Bank to appoint a receiver and manager to take possession of the secured property.   The Bank did not make such an appointment until 27 April 1990.

5    TLL was a public company.   Its shares were listed on the Stock Exchange.   In early 1990 it had recently completed the development of a new shopping centre at Dandenong known as the Capital Centre.   The Centre was occupied, and its shops were operating.   However, trade creditors of TLL, including the appellants, were having difficulty obtaining payment of debts owing to them.

---

1    *G & M Aldridge Pty Ltd v Walsh* [1999] 3 VR 601.

6          The appellants were four members of a larger group of 12 contractors who had worked on the construction of the Centre and to whom final payments were owed by TLL. They were not the only unsecured creditors of TLL. But they made common cause, and, in early March 1990, consulted the same solicitor, Mr Rockman. He, in turn, dealt with TLL's solicitors.

7          A company named Construction Engineering Pty Ltd had been appointed by TLL as the project manager for the Centre. That company, as agent for TLL, had engaged the contractors who worked on the Centre, and had attended to their payment on behalf of TLL. It appeared that, at the time Mr Rockman was consulted, Construction Engineering Pty Ltd was holding in its bank account an amount of approximately $400,000 on behalf of TLL, which represented over-payments made by TLL as advances to pay contractors. On 15 March 1990, Mr Rockman's clients entered into an agreement with TLL to the following effect. The amount of $400,000 was to be divided between the 12 contractors in proportion to the debts owing to them. TLL directed Construction Engineering Pty Ltd immediately to make the appropriate payment to each of the 12 contractors as a first instalment, or "deposit", on account of the debt. The balance of the debt was to be paid on 20 April 1990 and, as security, each contractor was assigned certain units held by TLL in the M & T Property Fund. The part payments were made by Construction Engineering Pty Ltd at the direction of TLL. The balance was never paid, and each creditor, on 20 April 1990, sold the units it was given as security for a small amount. The proceeds of sale left substantial amounts owing to each creditor. The respondent's action was to recover the part payments and the proceeds of sale of the units.

8          The Bank's charge had crystallised before the making of the part payments and the giving of the security over the units. There has been no suggestion that the assets of TLL were sufficient to pay out the Bank or that there was any surplus for unsecured creditors. At the time of the crystallisation of the charge, the assets of TLL included the sum of $400,000 held on its behalf by Construction Engineering Pty Ltd and the units in the M & T Property Fund. However, the Bank did not take, and never has taken, any steps to enforce whatever rights it had, or may later have had, in respect of those assets. Judge Ostrowski, after referring to the fact that the event which caused the charge to crystallise was a notice to pay delivered to TLL by the Bank on 9 March 1990, and that the Bank did nothing to follow up the notice until it appointed a receiver and manager on 27 April 1990, said:

"[The Bank] permitted the bank account of TLL to be operated both up and down for quite some time [after 9 March]. It negotiated with TLL concerning a refinancing of its borrowings. Indeed, it offered a $5m

refinancing which could not come to fruition because TLL could not [fulfil] the conditions attached to it. It released the units in the M & T Property Fund to serve as security for the balance payable to [the appellants] on 20 April 1990."

9      Those findings were made in response to an argument that there had been waiver, estoppel, or acquiescence which defeated any rights that the Bank might otherwise have had. The learned judge found it unnecessary to decide those questions, or to make any further findings about the action or inaction of the Bank. When regard is had to the passage just quoted, it may not be difficult to understand why the Bank has never subsequently taken any action in relation to the $400,000 or the proceeds of sale of the units. However that may be, there are no findings concerning the conduct of the Bank additional to those set out above.

10      The financial position of TLL during March, and the early part of April 1990, was the subject of considerable uncertainty at the time. That uncertainty was reflected in the issues litigated before Judge Ostrowski. On 1 March 1990, the Supreme Court of Victoria granted an injunction restraining a creditor, Landkon Pty Ltd, from filing an application for an order to wind up TLL. On 19 February 1990, the directors of TLL had signed a formal declaration of solvency, which was treated as evidence of solvency in the injunction proceedings. There was no evidence, and Judge Ostrowski made no findings, as to the reasons for the delay between the crystallisation of the Bank's charge and the appointment of a receiver and manager, or as to the extent of the Bank's knowledge of the agreement between TLL and Mr Rockman's clients, including the appellants.

11      Section 122 of the Act provided, so far as presently relevant:

> "122(1)    A conveyance or transfer of property, a charge on property, or a payment made, or an obligation incurred, by a person who is unable to pay his debts as they become due from his own money (in this section referred to as 'the debtor'), in favour of a creditor, having the effect of giving that creditor a preference, priority or advantage over other creditors, being a conveyance, transfer, charge, payment or obligation executed, made or incurred:
>
> > (a)    within 6 months before the presentation of a petition on which, or by virtue of the presentation of which, the debtor becomes a bankrupt …

> …
>
> is void as against the trustee in the bankruptcy.
>
> …
>
> (2)     Nothing in this section affects:
>
> > (a)     the rights of a purchaser, payee or encumbrancer in good faith and for valuable consideration and in the ordinary course of business."

12      Section 451 of the Code provided, so far as relevant, that a transfer of property, a charge on property, or a payment made, by a company that, if it had been a natural person, would, in the event of his becoming a bankrupt, be void as against the trustee in bankruptcy, is, in the event of the company being wound up, void as against the liquidator.  The payments made to the appellants by Construction Engineering Pty Ltd at the direction of TLL, and the transfers of the units by way of security were, it is agreed, made within the period which, by virtue of s 451 of the Code, corresponds to the period referred to in s 122(1)(a) of the Act.

13      The issues argued in the County Court were whether TLL was, on 15 March 1990, unable to pay its debts as they became due from its own money; whether the payments made by Construction Engineering Pty Ltd to the appellants and the other clients of Mr Rockman were, for the purposes of ss 122 and 451, made by TLL; whether those payments and the transfers of the units had the effect of giving the appellants a preference, priority or advantage over other creditors; and whether the appellants could claim the benefit of s 122(2)(a).

14      Judge Ostrowski resolved the first, second, and third issues in favour of the respondent.  As to the fourth issue, he found that the appellants acted in good faith, but that the payments and transfers of property were not in the ordinary course of business.

15      Only the second and third issues were argued in the Court of Appeal.  The argument on the second issue turned upon the capacity in which Construction Engineering Pty Ltd held the sum of approximately $400,000.  The Court of Appeal decided that, in the circumstances, the payments made by Construction Engineering Pty Ltd, as agent for and at the direction of TLL, of moneys it was holding on behalf of TLL, amounted to payments by TLL.  Since that matter has not been pursued in this Court, it is unnecessary to go into the reasoning of the Court of Appeal on the question.

16    It is the third issue that was pursued in this Court.  The appellants argued that they received no preference, priority or advantage over other creditors of TLL.  The reason for that was said to lie in the existence, as at 15 March 1990, of the charge to the Bank, the prior crystallisation of the charge, so that it had become a fixed charge over the amount of approximately $400,000 and the units in the M & T Property Fund, and the agreed fact that the assets the subject of the charge were insufficient to pay TLL's debt to the Bank.  It follows, according to the argument, that if TLL had been put into liquidation immediately before the transaction of 15 March 1990, there would have been no surplus available for unsecured creditors, and, in particular, the moneys held by Construction Engineering Pty Ltd on behalf of TLL, and the units, would all have gone to the Bank.  In those circumstances, it was contended, the inaction of the Bank was irrelevant.  The charge having crystallised, the moneys held by Construction Engineering Pty Ltd on behalf of TLL, and the units, were not assets available to the unsecured creditors in a winding up of TLL, and the appellants therefore received no preference, priority or advantage over other creditors.

17    To characterise the conduct of the Bank as mere inaction may involve over-simplification.  As was noted earlier, the respondent argued in the County Court that the Bank, by its conduct, waived its rights, or, by reason of estoppel or acquiescence, would have been precluded from enforcing them; and the Bank has never attempted to enforce a claim either against the appellants or the respondent in relation  to the subject matter of the present proceedings.  Neither Judge Ostrowski nor the Court of Appeal found it necessary to deal with the respondent's arguments, with the result that there are no findings of fact sufficient to enable us to deal with the question, which has not been pursued in this Court.  And there is no occasion to decide whether, consistently with the reasoning in *N A Kratzmann Pty Ltd (In Liq) v Tucker [No 2]*[2], the effect of the orders made in favour of the respondent, if upheld, would defeat any claim which the Bank might now make.  The Bank is not a party to this litigation.

18    The appellants rely upon the following passage in the judgment of Brennan CJ in *Sheahan v Carrier Air Conditioning Pty Ltd*[3]:

---

**2**    (1968) 123 CLR 295 at 301-302.

**3**    (1997) 189 CLR 407 at 424-425.

"If a fund in the hands of a debtor or a debtor's agent is charged with the payment of a secured debt that would exhaust the fund, so that no part of the fund is available for distribution among the general creditors, and a payment to a general creditor is made out of the fund with the consent of the chargee, that creditor gains no preference at the expense of other general creditors.  The effect of such a payment is not to prefer the payee among the general creditors but to prefer the payee to the secured creditor who would otherwise have been entitled to the money paid.  And, as the secured creditor has consented to the payment, no recoupment of the money paid is possible."

19    To like effect is a passage in the judgment of Finkelstein J in *Wily v St George Partnership Banking Ltd*[4].

20    The facts in *Wily* differed from those here.  The payments held not to be preferential were made not to unsecured creditors but to the bank which held a floating charge but was not fully secured.  Two payments were made in realisation of that security, to which the claims of the unsecured creditors were subject.  But the third payment was made at an earlier stage to reduce existing indebtedness.  At the time of this third and critical payment, the charge had not fixed upon the property applied in making the payment.  In the Court of Appeal in the present case, Phillips JA expressed reservations concerning the conclusion that the property applied in the third payment was not "available" for the unsecured creditors.  It is unnecessary for us to decide whether we agree with those reservations respecting the third payment.  This is because, in any event, we would not accept *Wily* as authority for a general proposition that payments out of assets not "available" to unsecured creditors can never be preferential.

21    The case of *Sheahan* concerned a secured creditor which appointed a receiver and manager to an insolvent company attempting to trade out of its difficulties.  The receiver opened an account pursuant to s 421(1) of the Corporations Law, into which he paid the proceeds of realised assets which were subject to the security.  From that account he made payments to creditors in order to encourage them to continue to supply goods and services.  Three members of the Court held that the payments were not relevantly made by the company.  Brennan CJ held that they were made by the company, but were not preferences.  It was in the course of giving his reasons for that conclusion that he made the observation quoted above.  And it was in that context that Brennan CJ referred to

---

**4**    (1999) 84 FCR 423 at 435.

the payment being made with the consent of the secured creditor who would otherwise have been entitled to receive the proceeds of the realisation of assets the subject of the security.

22        The premise for the conclusion reached by Brennan CJ in *Sheahan*, that the payment in issue was made by the company, should not be accepted. Further, even if, as is the case in the present matters, a payment is made by the company, the question is not whether the payment was "at the expense of other general creditors"[5]. The question is whether the payment gave the recipient a preference, priority or advantage.

23        It is not the case that the existence of an equitable interest in a third party, whether by way of ownership or security, in property which is transferred, or money which is paid, to an unsecured creditor necessarily denies the possibility the unsecured creditor is thereby preferred as against other unsecured creditors. That is demonstrated by so much of the decision in *Richardson v The Commercial Banking Co of Sydney Ltd*[6], as concerned a cheque for £390 which a client, Mrs Turner, handed to her insolvent solicitor, Price. The cheque represented the balance of purchase money for a property bought by Mrs Turner. Price banked it to the credit of an account which was overdrawn and in excess of security held by the bank. It was held that the bank obtained a preference.

24        Dixon, Williams and Fullagar JJ pointed out that if, in an identifiable form, the money representing the cheque had come into the hands of the official receiver, Mrs Turner would have had a tracing remedy and the money would never have been available to Price's creditors. Their Honours added that Price could be taken to have converted the cheque so that, had Mrs Turner wished, she was entitled to prove in the bankruptcy with the general creditors.

25        Dixon, Williams and Fullagar JJ, referring to s 95 of the *Bankruptcy Act* 1924 (Cth), which, so far as is relevant, corresponds to s 122 of the Act, then said[7]:

---

**5**     (1997) 189 CLR 407 at 424.

**6**     (1952) 85 CLR 110.

**7**     (1952) 85 CLR 110 at 136-137.

"On the whole it appears to us that the payment of a cheque representing trust funds into the office account, were it otherwise to operate to give a preference to the bank, would be within s 95. It is within s 95 because, although the same moneys could never but for the misappropriation have been available to the bankrupt's creditors, there would be a preference, priority or advantage effected in favour of the bank as a creditor, in making a payment to it, when other creditors must prove and other creditors suffer the disadvantage of being exposed to the competition upon the assets of the proof of the defrauded owner of the funds. If the payment to the bank is undone at the suit of that owner, that would be another matter. If it is undone at the suit of the Official Receiver, then the owner may or may not be able to follow the moneys into his hands. That is a question involving matters of law and of fact and we are not now called upon to decide it in either branch."

26     The juridical nature of a floating charge has been examined in numerous cases and by commentators. It was referred to by Brennan CJ in *Sheahan*[8], and was discussed by Gleeson CJ in *Fire Nymph v The Heating Centre (in liq)*[9]. A provision for automatic crystallisation of a floating charge, which, as in the present case, may occur some time before the secured creditor intervenes in the debtor's affairs by appointing a receiver and manager, may give rise to competing equities. It may be one thing to say, where a charge has become fixed and the subject assets have been realised, that the proceeds of realisation are, in the circumstances, unavailable to the general body of creditors in a bankruptcy or winding up. It is another thing to say that the crystallisation of a floating charge, regardless of what the chargee does or fails to do thereafter, necessarily means that assets the subject of the charge may never be dealt with in such a manner that may benefit some or all of the unsecured creditors, or that may give some of them a preference, priority or advantage over others.

27     As in the present case, a floating charge is commonly given over the whole of the undertaking and assets of a company. One of the primary objectives of a floating charge is to enable a debtor company to carry on its business as a going concern and dispose of its assets in the ordinary course of business notwithstanding the existence of the charge. In the situation of uncertainty that existed in relation to TLL between 9 March and 27 April 1990, when the

8     (1997) 189 CLR 407 at 422-423.

9     (1992) 7 ACSR 365 at 371-373.

company continued to trade, and was negotiating with the Bank as to future arrangements, an assertion that none of its assets were "available" to unsecured creditors begs the question.  There was at least a possibility that some or all of those assets might find their way to some or all of those creditors; as in fact occurred.  There was also a possibility that this might happen, with or without the knowledge of the Bank, in circumstances where the Bank either could do nothing, or might choose to do nothing, to undo that result.

28          If the assets which had been disbursed to some of the unsecured creditors were promptly recovered by the Bank, those unsecured creditors would have no preference, priority or advantage over others.  If, as here, the unsecured creditors retain the payments, they are preferred to others.  It is no answer to the conclusion that there is a preference in such a case to say that the Bank might have acted differently.  Nor is it an answer to say that there might be, or even will be, no assets that will be available for distribution between remaining unsecured creditors.  It is no answer because, first, they are preferred in the obvious sense that their debts are wholly or partly met by the debtor[10].  Secondly, they are preferred over other unsecured creditors who "suffer the disadvantage of being exposed to the competition upon the assets of the proof"[11] of the Bank in an amount greater than would be the case had the assets been applied to the Bank's debt rather than being depleted by the payment to the preferred unsecured creditors.  Unlike the circumstances considered in *Sheahan*  it cannot be said that the payments were made by the secured creditor rather than the company.

29          In *Ferrier and Knight v Civil Aviation Authority*[12], a Full Court of the Federal Court of Australia[13] examined the policy considerations underlying the preference provisions of bankruptcy laws in a number of common law jurisdictions.  The case concerned complexities of running accounts that are not presently relevant.  The Full Court, observing that, as in the United States, and unlike the position in England, Australian preference provisions operate objectively, rather than by reference to the subjective purpose of the debtor,

---

10   *Richardson v The Commercial Banking Co of Sydney Ltd* (1952) 85 CLR 110 at 136.

11   (1952) 85 CLR 110 at 137.

12   (1994) 55 FCR 28.

13   Beaumont, Gummow and Lindgren JJ.

quoted a passage from a 1977 House Committee Report[14] which had, in turn, been cited by the Supreme Court of the United States in *Union Bank v Wolas* in 1991[15]:

> "The purpose of the preference section [of *The Bankruptcy Reform Act of 1978*] is two-fold.  First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors.   Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor.   Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally.  The operation of the preference section to deter 'the race of diligence' of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section – that of equality of distribution."

30        The same policy is at work in the Australian legislation.   A primary objective is that of securing equality of distribution amongst creditors of the same class.  The pursuit of that objective has the consequential effect of deterring the "race to the courthouse" and that, in turn, enhances the prospect of enabling debtors to trade out of their difficulties without undue and discriminatory risk to creditors.

31        In the present case, the appellants were members of a larger class of unsecured creditors.   That class also included, but was not limited to, the other contractors who consulted Mr Rockman.    As between the 12 contractors (including the appellants) and the other unsecured creditors, the 12 contractors obtained a preference, priority or advantage in that the amount of approximately $400,000, and the units in the M & T Property Fund, became available to them and not to unsecured creditors generally.  And, as in *Richardson*, to the extent to which there was a shortfall to the Bank, the other creditors had to suffer the competition of the Bank in a distribution of any other assets.  The fact that there may not have been any other assets does not alter the principle.

**14**   House Committee Report No 95-595 (1977) at 177-178.

**15**   502 US 151 at 161 (1991).

32        We are not concerned with what the position would have been if the assets presently in dispute had been seized by the Bank or a receiver had been appointed.  As between the members of the class consisting of the unsecured creditors of TLL, in the events that happened, because of the decision of the Bank (perhaps for good commercial purposes) not to enforce its charge for a time, even though it had crystallised, assets were paid or transferred by TLL to some but not to others.  To say that, if the Bank had acted differently, those assets would have been applied solely for the benefit of the Bank, is not to deny that some members of the class of unsecured creditors obtained a preference, priority or advantage over others.

33        The appeals should be dismissed with costs.

# EXHIBIT 17

# Chapter 13

# *The Avoidance of Transactions on Winding-up or Administration*

Where a company goes into winding-up or administration, unperformed obligations of the company to a creditor cannot in general be enforced without the consent of the office-holder,[1] but payments, transfers or other benefits already made or conferred by the company are in principle undisturbed. This is a corollary of the rule previously enunciated[2] that only those assets which belong to the company at the time of the insolvency proceeding[3] are available for the claims of the general body of creditors. But the liquidator or administrator[4] can invoke any ground of avoidance available to the company at common law or in equity[5] and any restitutionary remedy open to the company at common law to reverse unjust enrichment,[6] and in the case of misfeasance by the officers of the company the liquidator is given a summary remedy.[7] Again, the voluntary disposition of a company's assets by way of gift or sale at a gross undervalue

**13–01**

---

[1] i.e. the liquidator or administrator.

[2] Above, paras 3–03 and 6–40 et seq.

[3] The exact cut-off point varies according to the proceeding involved.

[4] Most of the avoidance provisions apply equally to winding-up and administration, and in the text that follows "winding-up" and "liquidator" should be taken to include administration and the administrator unless otherwise indicated. There is one ground of avoidance which is not dependent on the company being in winding-up or administration, namely that the transaction is one defrauding creditors (Insolvency Act 1986 s.423) but it is convenient to include it in the present chapter.

[5] e.g. for misrepresentation. For another example, see *GHLM Trading Ltd v Maroo* [2012] 2 B.C.L.C. 369, in which a contract was held to be void under ordinary principles of agency in circumstances where the director's decision to commit the company to the contract was taken self-interestedly, in breach of fiduciary duty, and the counterparty knew of the breach (see particularly at [170]–[171], per Newey J).

[6] e.g. rescission of a contract and recovery of benefits received by the solvent party.

[7] Insolvency Act 1986 s.212. See below, para.14–15.

may be ultra vires under company law as outside its objects[8] or as an unauthorised reduction of capital.[9] These various grounds of avoidance owe nothing to insolvency law; they merely reflect the preservation of the company's pre-liquidation entitlements and limits on its powers. They are not discussed further.

However, the principle of equity towards and among creditors that underlies the anti-deprivation and *pari passu* rules of insolvency law will in certain conditions require the adjustment of concluded transactions which but for the winding-up of the company would have remained binding on the company, and the return to the company of payments made or property transferred under the transactions or the reversal of their effect.[10]

## 1. THE DIVERSE NATURE OF THE AVOIDANCE PROVISIONS

**13–02**    The mode of adjustment of these vulnerable transactions takes a variety of forms. In some cases, the transaction will be automatically rendered void, either wholly or against designated categories of third party, upon winding-up under statutory provisions which are self-executing. Thus, in a compulsory winding-up, dispositions of the company's property made after presentation of the winding-up petition are wholly void unless authorised or validated by the court,[11] and a floating charge given by an insolvent company otherwise than for specified forms of new value becomes wholly invalid if the company goes into winding-up or administration within a specified period,[12] whilst a charge given by the company which was registrable[13] but not registered is void against the liquidator and creditors,[14] but not against other classes of third party such as purchasers. In other cases, the transaction itself remains valid but the liquidator is given the right to apply for an order reversing its effect. For example, while it is common to speak of the avoidance of a preference or transaction at an undervalue, the act of preference or transfer is not avoided as such but its effects may be reversed by

---

[8] See *Aveling Barford Ltd v Perion Ltd* (1989) 5 B.C.C. 677 and cases there cited. The *ultra vires* principle is now very limited in scope. See the Companies Act 2006 s.31(1), which provides that unless a company's articles specifically restrict the objects of the company, its objects are unrestricted. See generally Paul Davies and Sarah Worthington (eds), *Gower and Davies: Principles of Modern Company Law*, 10th edn (London: Sweet & Maxwell, 2016), para.7–29.

[9] Contrary to the rule in *Trevor v Whitworth* (1887) 12 App. Cas. 409. See now Companies Act 2006 Pt 17 Ch.10; and John Armour, "Avoidance of Transactions as a 'Fraud on Creditors' at Common Law" in John Armour and Howard Bennett (eds), *Vulnerable Transactions in Corporate Insolvency* (Oxford: Hart Publishing, 2002), pp. 281 et seq.

[10] See now, in almost identical terms, the description of avoidance proceedings in *Rubin v Eurofinance SA* [2013] 1 A.C. 236 at [94] per Lord Collins.

[11] Insolvency Act 1986 s.127.

[12] Insolvency Act 1986 s.245.

[13] Under s.859A of the Companies Act 2006, which replaced s.860 of the Companies Act 2006. See below, fn.339.

[14] Companies Act 2006 s.859H.

whatever method the court thinks fit,[15] including the (re)vesting of the property transferred.[16] However, nothing will happen unless the liquidator makes an application to the court. A third category is that of the extortionate credit transaction, which is neither invalid nor necessarily wholly reversible but may be set aside, wholly or in part, or simply varied, as the justice of the case requires.[17] Again, the statutory provisions are not self-executing; they have to be invoked by the office-holder.

An entirely distinct power of avoidance is given to the Pensions Regulator (TPR) to order restoration of assets to a defined benefit occupational pension scheme where these were transferred by a transaction at an undervalue.[18] This is not discussed further.

For brevity, all of these forms of adjustment will be referred to as "avoidance" in the ensuing pages but it should be constantly borne in mind that this term is shorthand for a widely differing range of effects and reliefs. In particular, where payments or transfers of property made by the company are void, they are deemed to remain assets of the company in its own right so as to be susceptible to capture by a floating charge or fixed charge over after-acquired property of the same description, whereas recoveries resulting from a court order after application by the liquidator are considered to be held for the creditors and not for the company itself and are therefore not captured by a prior security.[19] Further, a transferee from the company under a disposition which is void *ab initio* and who then deals with the transferred asset, whether absolutely or in any other way, commits a conversion if the asset is tangible and is liable to a proprietary restitutionary claim for the proceeds whatever the nature of the asset. A transferee under a disposition that is initially valid who later deals with the asset after it has become void against a particular category of third party may incur a liability to that party for interference with his interest, as where the holder of an unregistered floating charge which has crystallised sells the asset without the consent of a person who had become the holder of a fixed security interest after expiry of the 21 days allowed for registration of the floating charge. By contrast, no wrong is committed by a person holding a good title to an asset under a disposition to him by the company the effect of which is merely reversible who deals with the asset prior to the avoidance of the disposition under the statutory provisions.

## 2. THE POLICIES UNDERLYING THE AVOIDANCE PROVISIONS

The conditions of avoidance vary according to the particular ground of avoidance involved but are for the most part dictated by a common policy, namely to protect **13–03**

---

[15] Insolvency Act 1986 ss.238, 239 and 241.
[16] Insolvency Act 1986 s.241(1)(a). Hence, it is incorrect to treat transactions within s.238 or 239 as voidable, since this would imply that they can be rescinded by the office-holder as of right.
[17] Insolvency Act 1986 s.244.
[18] Pensions Act 2004 ss.52–53.
[19] See below, paras 13–134 et seq.

the general body of creditors against a diminution of the assets available to them by a transaction which confers an unfair or improper advantage on the other party. All but two of the grounds of avoidance known to insolvency law[20] involve the unjust enrichment of a particular party at the expense of other creditors, whether they are preferential creditors or ordinary unsecured creditors.[21] Once this crucial point is grasped, much of the legislative structure falls into place. The unjust enrichment may affect other creditors in one of two ways. It may reduce the company's net asset value, as where it involves a transfer of the insolvent company's property to another party, otherwise than as a creditor, at a wholly inadequate price or a purchase of property by the company at an inflated price; or it may, without disturbing the company's net asset position, involve payment or transfer to a particular creditor in satisfaction or reduction of his debt, with the result that the creditor is put in a better position than if the company had immediately entered insolvency proceedings without the payment or transfer having been made, and the ordinary distributional rules (including, in the case of non-preferential unsecured creditors, the statutory provisions for rateable or pro rata distribution) applied. The avoidance provisions may thus be seen as neces-sary both to preserve the company's net asset value and to ensure equality of distribution, at least among classes of creditors.[22] Whether the defendant is or should be entitled to avail himself of defences and cross-claims that would be available in answer to claims of unjust enrichment at common law is a question we shall discuss later in this chapter.[23]

Section 238, which deals with transactions at an undervalue, is aimed at improper reduction of the company's net asset value and is thus conceptually linked to the common law anti-deprivation rule, while s.239 is linked to the common law *pari passu* rule and addresses unfair preferences. However, there are significant differences between the common law rules and the statutory provisions in that: (i) the former target transactions that are not yet complete at

---

[20] The two exceptions are failure to register a registrable charge and the making of a post-petition disposition of the company's property without the court's authorisation (as to which, see immediately below).

[21] In *Hollicourt (Contracts) Ltd v Bank of Ireland* [2001] Ch. 555, it was common ground that a claim under s.127 of the Insolvency Act 1986 is restitutionary in character. See the judgment of Mummery LJ at [22]. However, this is true only in the sense that the asset disposed of in breach of s.127 has to be given back. It does not follow that the purpose and effect are to reverse an unjust enrichment, for there may have been none, s.127 applying as much to transactions for full value as to those at an undervalue. Unjust enrichment is therefore not the basis of this ground of avoidance. The point is more fully discussed below in paras 13–139 et seq.

[22] See *Rubin v Eurofinance SA* [2011] Ch. 133, in which this passage was cited by Ward LJ at [55], adding (at [61]) that the statutory avoidance mechanisms under the Insolvency Act and the US Bankruptcy Code "are integral to and are central to the collective nature of bankruptcy and are not merely incidental procedural matters". The decision of the Court of Appeal was overturned on appeal but see to the same effect, albeit in more abridged form, the judgment of Lord Collins in the Supreme Court at [2013] 1 A.C. 236 at [94]–[97], endorsing (at [95]) the description of the underlying policy that appear at the beginning of this passage.

[23] Below, paras 13–139 et seq.

the time of the company's entry into insolvency proceedings,[24] while the latter operate retrospectively by providing for the reversal of transactions concluded within the prescribed statutory period prior to an insolvency proceeding[25]; and (ii) a provision in breach of the common law rules is void, whilst a transaction in breach of s.238 or s.239 is valid but its effects are reversible in the discretion of the court on the application of the office-holder. Both sets of rules are mandatory, in the sense that the company cannot generally contract out of their operation.[26]

Transaction avoidance rules are not the only means by which the deployment and distribution of the company's assets in the lead up to insolvency proceedings is regulated: the director liability rules considered in Ch.14 also perform this function. Indeed, the latter body of rules may have a more powerful deterrent effect than avoidance provisions like those in ss.238–239, for these avoidance provisions have a limited temporal scope (they apply only where the transaction at undervalue or preference occurs within a prescribed statutory period leading up to the commencement of the insolvency proceedings) and, even where applicable, have limited consequences for the counterparty—the worst that happens is that they will have to give up the benefit received.[27] But the mere authorisation of a transaction at undervalue within the meaning of s.238 or a preference caught by s.239 will not necessarily mean that a director has acted in breach of duty[28] or engaged in wrongful or fraudulent trading, and even where a director liability rule would be engaged, it will not always be enforced, weakening any deterrent effect. The transaction avoidance rules considered in this chapter and the director liability rules considered in the next can thus be understood as complementary tools for the preservation of the insolvent company's estate for the benefit of its creditors.[29] Where (as is often the case) the office-holder relies on more than one of these rules, any order made will be crafted so as to avoid double recovery by the company.[30]

There are various references in the case law to the creditor protective function of avoidance rules, including their role in ensuring some form of equality among

---

[24] As to the application of the anti-deprivation rule where the trigger for the deprivation is factual insolvency, rather than the commencement of insolvency proceedings, see above, para.7–17; as to the timing of the application of the *pari passu* rule in administration (which is later than the time at which the rule applies in liquidation), see above, para.7–04.

[25] As noted by Lord Collins in *Belmont Park Investments Pty Ltd v BNY Corporate Trustee Services Ltd* [2012] 1 A.C. 383 at [150].

[26] See *Fulham Football Club (1987) Ltd v Richards and anor* [2012] Ch. 333 at [73]–[74]; on subordination agreements and the pari passu rule, see above, para.8–08.

[27] See below, para.13–67.

[28] *GHLM Trading v Maroo*, cited above fn.5 at [168].

[29] *Larsen Oil and Gas Pte Ltd v Petrobod Ltd* [2011] 3 SLR 414 at [45] per V.K. Rajah JA (Singapore Court of Appeal); *Bilta (UK) Ltd (in liquidation) v Nazir (No.2)* [2016] A.C. 1 at [108]–[110].

[30] *Power v Hodges* [2016] B.P.I.R. 162 at [66]. The mere fact that two of these rules are found to be engaged does not necessarily give rise to the risk of double recovery, for the remedies available differ according to the underlying rule. See e.g. *E-Clear (UK) Plc (in liquidation) v Elia* [2013] 2 B.C.L.C. 455.

creditors.[31] These general descriptions do not, however, fully explain the choices made in the design of the particular avoidance rules that appear in the Insolvency Act 1986. Invocation of the policy of protecting the general body of creditors does not, for example, explain why it is necessary in all cases to avoid unregistered charges, post-petition dispositions of the company's assets for full value and in the ordinary course of business, or floating charges given by an insolvent company for new value in the form of land, debts or intellectual property rights. Nor does general reference to a policy of promoting equality among creditors explain why under s.239 it is all right for a particular creditor to gain a preference by threatening or bullying the company into making a payment but not all right if the company makes the payment voluntarily to a creditor who receives it in good faith, or why, indeed, the desire or intention of either party should be relevant rather than the mere fact that one creditor has been given an advantage over the others in the run-up to liquidation. For this, one has to resort to the historical origins of the preference rule.[32] Again, the reason why some kinds of transaction are rendered completely and automatically invalid while others are merely subject to adjustment in the discretion of the court on application by the liquidator has never been articulated; nor has it been explained why the period for which a company has to survive before an initially vulnerable transaction in favour of a party unconnected with the company becomes immune from attack is six months for a preference, 12 months for a floating charge, two years for a transaction at an undervalue, three years for an extortionate credit bargain and no time limit at all for a transaction defrauding creditors. The fact is that every ground of avoidance in the Insolvency Act is derived from earlier legislation and each ground has been individually modified at different times but without any attempt to rework the avoidance provisions into a coherent whole. A brief evaluation of the provisions is offered towards the end of the present chapter.[33]

## 3. THE MINIMUM CONDITIONS FOR AVOIDANCE

### The four conditions

**13–04**    In general, at least four conditions must be satisfied before a transaction entered into by the company can be upset under insolvency law.[34]

---

[31] See e.g. *Rubin v Eurofinance SA* [2013] 1 A.C. 236 at [94] per Lord Collins.
[32] See below, para.13–67.
[33] Below, para.13–138.
[34] For a comprehensive treatment see Rebecca Parry, James Ayliffe and Sharif Shirji, *Transaction Avoidance in Insolvencies*, 2nd edn (Oxford: Oxford University Press, 2011). We shall not discuss grounds for avoidance under the general law, e.g. for misrepresentation. These can, of course, be invoked by a liquidator or administrator in the name of the company and, as stated above, raise no questions of insolvency law as such. For the special exemptions applicable to market contracts, market charges and certain other types of contract, see below, para.13–137.

(1) the company must be in winding-up or administration;

(2) the transaction must have resulted in a diminution in the assets available to the general body of creditors;

(3) the company must have been unable to pay its debts at the time of or in consequence of the transaction; and

(4) the transaction must have been entered into within a specified time before the onset of insolvency,[35] the time varying according to the circumstances.

As stated above, these conditions, each of which is examined below, represent the minimum prerequisites for avoidance in most cases. It does not follow that where they are fulfilled the transaction will inevitably be vulnerable; usually some further elements have to be considered. Moreover, there are certain exceptional cases in which a transaction may be avoided even where one or more of the above conditions is not satisfied. These will be noted as we proceed.

## Company in winding-up or administration

As pointed out earlier,[36] the fact that a company is insolvent does not by itself **13–05** attract legal consequences.[37] The ability of creditors of an insolvent company to obtain redress for an improper diminution of its assets in favour of another party depends in general[38] upon the company being in winding-up or administration. Why should this be so? Why should not unsecured creditors be free to attack a transaction even before the advent of a formal insolvency proceeding? There are several answers to these questions.[39] First, so long as the company is conducting its business in a lawful manner, there is no justification for allowing interference by unsecured creditors in its affairs. They have no interest in the company's assets and therefore no right to complain of the way in which the company chooses to dispose of those assets. Secondly, the creditor of a company not in winding-up or administration has a more direct method of obtaining payment, namely by instituting proceedings, taking judgment and enforcing it by one or more of the available forms of execution, which include seizure and sale of the

---

[35] As defined by the Insolvency Act 1986 s.240(3).

[36] See above, para.4–01.

[37] As noted above, the fact of insolvency does have the consequence that the duties owed by directors to the company are altered so as to require enhanced regard for creditors' interests (the rule in *West Mercia Safetywear v Dodd* (1988) 4 B.C.C. 30: see below, para.14–21), but creditors have no standing outside insolvency proceedings to litigate a breach of *West Mercia* affected duty.

[38] The exceptional case is the avoidance of transactions defrauding creditors. See below, para. 13–130.

[39] See also R.M. Goode, "Is the Law Too Favourable to Secured Creditors" (1983–84) 8 Can. Bus. L.J. 53 at 71–73.

company's property and attachment of debts due to it. It is only if these measures fail, or are considered pointless because of insufficiency of the company's assets, that recourse to avoidance proceedings becomes necessary. Thirdly, different creditors may have different views as to avoidance proceedings. No single creditor or group of creditors can demand protection for himself or itself alone.[40] If, therefore, a transaction is to be set aside, it must be for the benefit of the general body of unsecured creditors. But the protection of unsecured creditors as a class requires legal machinery by which they can be brought together and given a *locus standi* and an office-holder to represent their interests. This machinery is provided by a formal collective insolvency proceeding in the shape of winding-up or administration, the interests of the class being asserted by the liquidator or administrator.

The Insolvency Act 1986 contains one ground of avoidance not dependent on winding-up or administration, namely entry into a transaction at an undervalue in order to place assets outside the reach of an existing or potential creditor.[41] Since such a provision is available to protect a particular deprived creditor, not merely creditors at large, it does not necessarily involve any collective proceeding.

### Diminution of assets available for the general body of creditors

**13–06**   As noted earlier, a diminution in the assets available to the general body of creditors may occur in one of two ways: by a reduction in the net asset value of the company itself or by a preference, that is, a payment or transfer which, although not affecting the company's net asset value, favours one particular creditor at the expense of the others.

Where a company receives full new value for a payment or transfer, creditors will rarely have cause for complaint, for there is no diminution in the company's asset worth, merely the conversion of an asset from one form into another, nor is there a preference of another creditor. The position is otherwise where the effect of the transaction is either to reduce the company's net assets or to withdraw an asset from the general body of creditors by making a payment or transfer to a particular creditor as a preference. The company's net asset value is reduced where it buys an asset at an inflated price, sells an asset for substantially less than its value, grants a tenancy which, although at a full market rent, reduces the capital value of the property let, enters into a burdensome contract or releases a debtor from liability. Even where the company's net asset value is not reduced, the general body of creditors is adversely affected by a payment or transfer which is not for new value but is for a past consideration, as in the case of payment in discharge of a past indebtedness or the giving of security for a previously

---

[40] For the exceptional case, see below and paras 13–130 et seq.
[41] Insolvency Act 1986 s.423. See below, para.13–130.

unsecured debt.[42] The absence or inadequacy of new value is by far the most important factor in the various statutory provisions rendering transactions vulnerable on liquidation or administration. Indeed, of the eight grounds of avoidance discussed in this chapter, only two are capable of applying despite the furnishing of full new value, namely non-registration of a registrable charge[43] and failure to obtain leave of the court to make a disposition of the company's assets after presentation of a winding-up petition.[44] The rationale of these two exceptions is discussed a little later.[45]

### Insolvency at time of transaction

Even where the transaction does diminish the company's assets, it will not normally be vulnerable to attack on winding-up or liquidation unless the company was unable to pay its debts[46] at the time of the transaction or became unable to do so in consequence of the transaction. In other words, the transaction must be one which prejudices those who are creditors[47] at the time the transaction is concluded. If, after entering into the transaction, the company is still able to pay its debts as they fall due, creditors are not prejudiced by a diminution in the company's assets and only the members of the company have a *locus standi* to complain of its entry into a disadvantageous transaction.

    Exceptionally, insolvency at the time of or in consequence of the transaction is not a prerequisite of avoidance of an unregistered charge,[48] an extortionate credit transaction,[49] a transaction defrauding creditors[50] or a floating charge given otherwise than for a specified form of new value in favour of a person connected with the company.[51] The first three of these exceptions are perfectly logical. As mentioned earlier, want of registration and the making of a post-petition disposition without court approval are the only grounds of avoidance having nothing to

**13–07**

---

[42] Taking security for a previously unsecured debt does not in itself reduce the company's net assets so as to constitute a transaction at an undervalue; it merely subjects a particular asset to a particular liability, and if the security is realised and the proceeds applied in discharge of the debt, both the asset (except as to any surplus) and the liability disappear from the balance sheet. See below, para.13–35.

[43] See para.13–117.

[44] See below, paras 13–121 et seq.

[45] See below, paras 13–118 and 13–121 et seq.

[46] Within the meaning of s.123 of the Insolvency Act 1986. See above, paras 4–03 et seq and, as to the use of hindsight in this context, para.4–13 (discussing *Re Husky Group Ltd* [2015] B.P.I.R. 184, *Green v El-Tai* [2015] B.P.I.R. 24, and *Evans v Jones* [2017] Ch. 1).

[47] Whether their claims are existing, contingent or prospective. See above, paras 4–26 et seq.

[48] Companies Act 2006 s.859H. See below, para.13–117.

[49] Insolvency Act 1986 s.244. See below, para.13–102.

[50] Insolvency Act 1986 s.423. See below, para.13–130.

[51] Insolvency Act 1986 s.245. See below, paras 13–105 to 13–106. Section 127 of the Insolvency Act, dealing with post-petition dispositions of the company's property not authorised by the court, is not expressed to require insolvency of the company at the time of the disposition but in practice this will almost invariably be the case, for an order on the petition, unless made exclusively on the "just and equitable ground", presupposes that the company is unable to pay its debts.

do with diminution of assets, so that the company's ability to pay its debts at the time registration should have been effected is irrelevant. The provisions relating to extortionate credit bargains are designed to avoid the inclusion of exorbitant rates of interest in proofs of debt,[52] and again the question of the company's ability to pay its debts at the time of the transaction is irrelevant for this purpose. The avoidance of transactions in fraud of creditors, being designed primarily for the protection of particular creditors, is likewise unconnected to a state of insolvency at the time of the transaction. Less clear is the reason for the exception as regards floating charges, although it is possible to find an explanation for this.[53]

### Advent of liquidation or administration within specified time

**13–08**  Even where all three features described above are present, the transaction will usually cease to be vulnerable if winding-up or administration does not supervene within a specified period[54] after the transaction was concluded. The transaction thus becomes cleansed by the passage of time, a sensible rule, for it is unfair to a contracting party (and indeed contrary to well-settled principles of property law and limitation of actions) that a party should be indefinitely exposed to a liability to restore that which he lawfully received. Moreover, the link between cause and effect, between the offending transaction and its impact on creditors, becomes ever more tenuous with the passage of time. If no creditor takes steps to wind-up the company or put it into administration within the specified period, creditors have no cause to complain of the disappearance of a ground of avoidance. But there are two exceptional cases. The failure to register a charge is not pardoned by the lapse of time, for the obvious reason that it is a continuing breach with continuing adverse consequences for innocent third parties; and avoidance of a transaction in fraud of creditors is not subject to a time limit, which no doubt reflects not only the fact that the statutory provision has a long history but also that the transaction involves the intentional removal of an asset for the purpose of defeating a creditor and is thus a species of fraud.

### *4. OTHER RELEVANT CONSIDERATIONS*

**13–09**  The four conditions mentioned earlier are only minimum prerequisites for avoidance and there are other factors that may be material in determining whether a

---

[52] Insolvency Law Review Committee, *Insolvency Law and Practice* (Cmnd. 8558), para.1381. However, they have a wider impact than this, since they empower the court to set aside the whole or part of any obligation created by the transaction and to order repayment of any sum paid by the company. See below, paras 13–102 et seq.

[53] See below, para.13–106.

[54] Ranging from six months to three years, according to the nature of the case.

transaction is vulnerable under the Insolvency Act. In particular, the application of the statutory provisions may depend on whether the other party to the transaction was a person connected with the company[55]; whether in the case of a preference the company was influenced by a desire to give a preference; whether, in the case of a charge, it was created as a fixed charge or as a floating charge; and whether the transaction was made in good faith and for the purpose of carrying on the company's business. There is also a question of whether, given the fact that the avoidance provisions are rooted in the concept of unjust enrichment, restitutionary defences and cross-claims, such as change of position and counter-restitution, are available.

## 5. THE GROUNDS FOR AVOIDANCE: A SUMMARY

A transaction may be avoided or adjusted under insolvency law or its effect **13–10** reversed on no fewer than nine distinct grounds, namely as a transaction which is:

(1) in contravention of the common law anti-deprivation rule;

(2) in contravention of the common law *pari passu* rule;

(3) a transaction at an undervalue;

(4) a preference;

(5) an extortionate credit transaction;

(6) a floating charge given otherwise than for specified forms of new value;

(7) a registrable but unregistered charge;

(8) a disposition of the company's property made without leave of or ratification by the court after presentation of a winding-up petition; and

(9) a transaction in fraud of creditors.

The first two of these have already been examined in detail in earlier chapters[56]; each of the others are now examined in turn.

---

[55] Within the meaning of s.249 of the Insolvency Act 1986.
[56] See above, Chs 7 and 8.

## 6. TRANSACTIONS AT AN UNDERVALUE[57]

### (i) Overview

**The basic provision**

**13–11**  Where a company in administration or liquidation has at a relevant time entered into a transaction with any person at an undervalue and the statutory defence referred to below is not available, the office-holder may apply to the court to order restoration of the *status quo*, with consequential relief.[58]

As we shall see, there is no possibility of overlap between the provisions relating to transactions at an undervalue and those relating to preferences. This is because s.238, relating to transactions at an undervalue, is concerned with payments or transfers that reduce the company's net asset value and thus do not cover payments or transfers to a creditor, while to the extent that a payment is made to a creditor in excess of what is due to him, he does not receive it *qua* creditor and is thus vulnerable only under s.238, not s.239.

**What constitutes a transaction at an undervalue**

**13–12**  A company enters into a transaction with a person at an undervalue if it:

(1) makes a gift to that person; or

(2) otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or

(3) enters into a transaction with that person for a consideration the value of which is significantly less than the value, in money or money's worth, of the consideration provided by the company.[59]

"Transaction" is defined as including a gift, agreement or arrangement, and references to entering into a transaction are to be construed accordingly.[60] "Arrangement" is widely construed, covering any form of agreement between the parties, formal or informal, oral or in writing.[61]

---

[57] See *Transaction Avoidance in Insolvencies* (above, fn.34), Ch.4, and see John Armour, "Transactions at an Undervalue" in Armour and Bennett (eds), *Vulnerable Transactions in Corporate Insolvency*, 2002, p.37. For the power of the Pensions Regulator to direct the restoration of assets transferred from an occupational defined benefits scheme under a transaction at an undervalue, see the Pensions Act 2004 ss.52–53.

[58] Insolvency Act 1986 ss.238, 240 and 241. "Relevant time" is defined in s.240. See below, para.13–36, text and fn.137.

[59] Insolvency Act 1986 s.238(4).

[60] Insolvency Act 1986 s.436.

[61] *Feakins v Department for Environment Food and Rural Affairs* [2007] B.C.C. 54, discussed below, para.13–42.

## Examples of transactions at an undervalue

The company enters into a transaction at an undervalue where it: **13–13**

(1) makes a gift of property;

(2) undertakes a burden (for example, binds itself to supply goods or services) for no consideration (this would usually require a deed);

(3) purchases an asset for significantly more, or sells an asset for significantly less, than its value;

(4) takes an asset on lease or hire at a rent significantly above the rental value of the asset or lets it out on lease or hire at a rent significantly below its rental value;

(5) agrees to pay for services a sum significantly more, or to charge for services a sum significantly less, than their value;

(6) allows an asset to be retained by the other party in satisfaction of a claim against the company which is significantly less than the value of the asset or takes an asset in satisfaction of a claim which is significantly more than the value of the asset;

(7) accepts in satisfaction of a debt a sum significantly less than the recoverable value of the debt; or

(8) gives a guarantee or indemnity and receives by way of benefit significantly less than the value of the benefit conferred by the guarantee or takes a guarantee or indemnity against a benefit which is significantly less in value than that of the guarantee.

In all of these cases, the company either receives nothing for what it supplies or pays significantly too much or receives significantly too little to ensure equality of exchange, and the transaction will (where entered into at the relevant time) be vulnerable under s.238 unless the statutory defence under s.238(5) is available. The same applies to the distribution of a declared dividend at a time when the company is insolvent, and this could also be attacked as a preference.[62] Most of the examples given are straightforward and require no explanation. However, it will be necessary to say something about gifts, transactions for no consideration, the benefits to be considered in valuing the consideration and the treatment of

---

[62] See below, para.13–74, fn.202. The distribution will be vulnerable as a preference to the extent that the declaration created a debt or liability on the part of the company. To the extent that the decision to distribute is properly characterised as discretionary, it will be s.238 (or s.423) that is engaged. As to the application of s.423 in this context, see *BTI 2014 Llc v Sequana SA and ors* [2017] Bus. L.R. 82 and, applying this to share buy-backs, *Dickinson v NAL Realisations (Staffordshire) Ltd* [2017] B.P.I.R. 611.

guarantees, and to explain the omission from the list of security given by the company for a previously unsecured loan.

It will be obvious that where a transaction is attacked on the ground of significant inequality of exchange, difficult questions of valuation may arise which are similar in kind to those previously discussed in relation to the test of insolvency.[63] As will be seen, what matters is the true value of a benefit received or given up, which is not necessarily its stated or face value.

### Conditions to be satisfied under s.238

**13–14**  The court cannot make an order under s.238 unless the following seven conditions are satisfied:

> (1)  the company is in liquidation or administration;
>
> (2)  application for the order is made by the liquidator or administrator, or their assignee;
>
> (3)  a transaction was concluded;
>
> (4)  the company was a party to the transaction;
>
> (5)  the transaction was at an undervalue;
>
> (6)  the transaction was entered into at a relevant time; and
>
> (7)  the company was unable to pay its debts at the time of or in consequence of entering into the transaction.

Even where all of these elements are present, the court may be precluded from making any order by reason of s.238(5) of the Act (the statutory defence). Where this defence does not apply, the court has wide powers under s.241 both as to the orders it can make to reverse the effect of the transaction and as to the persons against whom an order can be made, though in relation to the latter the particular defendant may be protected by s.241(2) of the Act. It is also necessary to consider whether a restitutionary defence or cross-claim is available based on principles of unjust enrichment.

### Onus of proof

**13–15**  In general, the onus lies on the office-holder to show that the above seven conditions are satisfied and on the defendant to make out a defence under

---

[63] Above, paras 4–32 et seq. The authorities on the tests of insolvency in s.123 are also directly relevant to s.238, for the reason that s.238 targets only transactions that occur at "the relevant time", defined to require inter alia that the company was unable to pay its debts within the meaning of s.123 at the time of the transaction or in consequence of it (s.241(2)). See below, para.13–36 and *Re Casa Estates (UK) Ltd (in liquidation)* [2014] B.C.C. 269.

s.238(5) or 241(2). But in the case of a transaction entered into by the company with a person connected with the company,[64] condition (7) is presumed to be satisfied unless the contrary is shown,[65] and there is a presumption against good faith as regards such a person in the circumstances set out in s.241(2A).[66]

### *(ii) The elements in detail*

### Company is in liquidation or administration

The statutory provisions do not apply unless the company is in liquidation or administration. The reasons for this have already been discussed.[67] **13–16**

### Application is made by the liquidator or administrator, or their assignee

Section 238 provides for the application for an order be made by the relevant office-holder. As explained earlier, the right of action provided for in s.238 is not property of the company, and as such cannot be sold by the liquidator or administrator in exercise of their power to sell company property.[68] The consequence historically was that an application under s.238 could only be brought by the liquidator or administrator. The legislature has, however, now intervened to provide a new statutory power for office-holders to assign the rights of action provided for in ss.238, 239, and 244 (along with the office-holder actions for improper trading in ss.213, 214, 246ZA and 246ZB). The new power, contained in s.246ZD of the Insolvency Act 1986, permits assignment of these rights of action, "including the proceeds of the action". In relation to the latter, it was suggested in Ch. 5 that the power to assign the proceeds or fruits of such actions does not extend to permit the liquidator or administrator to allow the assignee to control or influence the conduct of proceedings by the office-holder.[69] **13–17**

There is no power for creditors or members to bring s.238 (or other office-holder) actions, other than in their capacity as an assignee under s.246ZD. Where creditors believe that the liquidator or administrator is failing to pursue (either directly, or by way of assignment) a remedy which ought to be pursued, what they are entitled to do is to apply to the court,[70] although the court will be slow to substitute its own judgement for that of the office-holder.[71]

---

[64] See below, para.13–36, fn.137.
[65] Insolvency Act 1986 s.240(2).
[66] See below, para.13–64.
[67] Above, para.13–05.
[68] See above, para.5–06.
[69] See above, para.5–06.
[70] Under the Insolvency Act 1986 ss.167(3), 168(5) and 212(1) (liquidator) or Sch.B1 para.74 (administrator).
[71] See above, para.5–04 and see also, regarding the prospects of removing an administrator in the hope that their replacement will take a different view of the prospects of success of an avoidance action, *Finnerty v Clark* [2012] Bus. L.R. 594.

### "Transaction"

**13–18**  The word "transaction" has a very wide meaning. It is not confined to contracts[72] but extends to gifts and other arrangements which are not based on contract, and where there is a contract, "transaction" may cover not only that contract but any linked transaction, even though involving a different party.[73] In Australia, it has been established in a series of cases that "transaction" is wide enough to include: a series of steps over a period involving several parties and not always contractual consequences; a unilateral act[74]; and arrangements giving rise to an estoppel.[75] A court order directing a transfer has also been held to constitute a transaction[76] and is susceptible to avoidance under the insolvency provisions, for example, in the case of a collusive consent order for a transfer at an undervalue or by way of preference. But apart from court orders and gifts, there has to be some element of dealing, this being implicit in the word "transaction" itself and being reinforced by the references in s.238 to: (a) the "entry into" a transaction; (b) "with a person"; and (c) "on terms that provide".[77] In consequence, it has been held that the unauthorised appropriation of assets by a company director cannot constitute a "transaction" within the meaning of the section.[78] This result is somewhat counterintuitive[79]—the most egregious form of value-diminishing transfer appearing to fall outside the scope of the section—but it may have

---

[72] *Re HHO Licensing Ltd* [2008] 1 B.C.L.C. 223.

[73] See *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] 1 W.L.R. 143, discussed in more detail below, para.13–30; *Re Taylor Sinclair (Capital) Ltd, Knights v Seymour Pierce Ellis Ltd* [2001] 2 B.C.L.C. 176; and *Feakins v Department for Environment, Food and Rural Affairs* [2007] B.C.C. 54.

[74] e.g. a gift (expressly provided by the section) or a declaration of trust, as in *Ramlort Ltd v Reid* [2004] B.P.I.R. 985.

[75] *Australian Kitchen Industries Pty Ltd v Albarran* (2005) 51 A.C.S.R. 604, a decision of the New South Wales Supreme Court, in which Barrett J cited, amongst other authorities, *Re Emanuel (No.14) Pty Ltd, Macks v Blacklaw & Shadforth Pty Ltd* (1997) 14 A.L.R. 281; and *Somerset Marine Inc v New Cap Reinsurance Corp* [2003] N.S.W.C.A. 38.

[76] *Hill v Haines* [2008] Ch. 412.

[77] *Re Taylor Sinclair (Capital) Ltd, Knights v Seymour Pierce Ellis Ltd* [2001] 2 B.C.L.C. 176, per Robert Englehart Q.C. (sitting as a Deputy High Court Judge); *Re HHO Licensing Ltd* [2008] B.C.L.C. 223 per Peter Leaver QC at para.31; *Re Ovenden Colbert Printers Ltd (in liquidation)* [2013] 2 B.C.L.C. 388, and on appeal [2015] B.C.C. 615 (at [32]–[35] per Kitchin LJ with whom the other members of the court agreed (though this analysis focuses more on dealing as part of the requirement that the company must have entered into the transaction); *Re Kiss Cards Ltd* [2017] B.C.C. 489 at [8]. See further Armour, "Transactions at an Undervalue" (2003), pp.55 et seq.

[78] *Ovenden Colbert Printers Ltd (in liquidation)* [2013] 2 B.C.L.C. 388, affirmed on appeal at [2015] B.C.C. 615 (see particularly at [33]–[36], though it is not entirely clear from this whether the Court of Appeal considered there to be no transaction, or no transaction that the company could be said to have entered into). It will be otherwise if the transfer can be characterised as a gift by the company, but this will not typically be the proper characterisation in a case involving misappropriation: *Re Octavian Security Ltd (in liquidation)* [2016] EWHC 3509 (Ch); *Re Hampton Capital Ltd* [2016] 1 B.C.L.C. 374 at [36]–[38].

[79] It also weakens somewhat the suggestion (in Armour, fn.77) that the element of dealing may be defended as a strategy to encourage monitoring by the counterparty, given that the element appears to protect the fraudulent counterparty as well as the innocent one.

limited significance in practice, given the existence of a large body of complementary rules in company and insolvency law that regulate the conduct of company directors, including those considered in Ch.14.

### The company as party to the transaction

A transaction is not within the ambit of s.238 unless it is something that the company can be said to have "entered into".[80] The first step is thus to identify the relevant transaction. So in a case involving s.423 of the Act, when debtors to a bank decided to place farming assets out of its reach by forming a company of which they were the sole directors and shareholders, selling the farming stock and other agricultural assets to the company at a proper value and then procuring the grant to it of a 20-year agricultural tenancy of the farm, the relevant transactions were the sale and the tenancy agreement, not the incorporation of the company and the issue of shares in it, so that the impact of the sale and the grant of the tenancy on the value of the shares in the company was irrelevant.[81] In *Secretary of State for the Environment, Food and Rural Affairs v Feakins*,[82] the debtor was an individual and it was held that although it was not a party to the sale, it was a party to linked arrangements and thus to the relevant transaction.[83]

**13–19**

The transaction having been identified, the next question is to determine whether the company was a party to it or "involved in the transaction in issue so that it can properly be said to have entered into it".[84] While s.238 bites only on transactions to which the company is a party, it is not necessary that all parts of the transaction should involve the same counterparty; the section is capable of applying to a composite transaction in which there is a contract between the company and A, and a separate but linked contract between the company and B. Indeed, a contract to which the company is not a party at all may nevertheless constitute part of a transaction entered into by the company where this is the

---

[80] *Hunt (Liquidator of Ovendon Colbert Printers Ltd) v Hosking* [2015] B.C.C. 615 at [32] per Kitchin LJ (with whom McCombe LJ and Elias LJ agreed) and at [42] per Elias LJ.

[81] *National Westminster Bank Plc v Jones* [2002] 1 B.C.L.C. 55. The statement by Lord Scott in *Brewin Dolphin*, cited above fn.73, at [20] that "the issue in the present case is not, in my opinion, to identify the section 238(4) 'transaction'; the issue is to identify the section 238(4) 'consideration' " is not, it is thought, intended to deny the importance of identifying the relevant transaction but is simply a consequence of his conclusion that in the case before the House of Lords the various linked contracts all formed part of the transaction, so that the real question to be considered *in that case* was what constituted the consideration.

[82] *Secretary of State for the Environment, Food and Rural Affairs v Feakins* [2007] B.C.C. 54.

[83] Above.

[84] *Hunt (Liquidator of Ovendon Colbert Printers Ltd) v Hosking* [2015] B.C.C. 615 at [32] per Kitchin LJ (with whom McCombe LJ and Elias LJ agreed), holding that the requirement was not satisfied in circumstances where the transaction relied upon for the purpose of s.238 was payments made by the insolvency practitioner of one company to the insolvency practitioner of another, and the payments could not have been said to have been made by the former IP as an agent for the company.

common understanding of the parties and the company.[85] Where the company is in administrative receivership and the receiver sells property within the security in the name of the company, rather than having it sold by his debenture holder as mortgagee, that constitutes a sale by the company and if it is at an undervalue it falls within s.238. That is not simply because the receiver is the deemed agent of the company unless and until it goes into liquidation,[86] but because the sale is indeed by the company itself acting through the receiver as its directing mind and falls within the statutory provisions in just the same way as if it had been authorised by the directors prior to the receivership.[87] The position is otherwise where the debenture holder sells as mortgagee, for even if the receiver executes the conveyance on behalf of the debenture holder, it is the latter, not the company, which is the party to the sale.[88] If the sale is at undervalue, the remedy is not a claim under s.238 against the purchaser but a claim in equity against the mortgagee under the general law for breach of the mortgagee's duty to take reasonable care to obtain the best price. If the company is in liquidation at the time of the sale, the sale can be effected only by and in the name of the debenture holder, for the receiver's status as deemed agent of the company ends with its liquidation. An administrator is in a different position, for he has no property interest himself and invariably acts as the company's agent,[89] so that any disposition made by him is a disposition by the company.

### Gifts

**13–20**  A gift is a transfer of an asset for no consideration. The fact that the gift is by deed is irrelevant, for although it is sometimes said that a deed imports consideration, this does not alter the character of the transaction as a gift.

At first sight, it seems obvious that a gift by a company which goes into liquidation or administration within the requisite two-year period should be a candidate for restoration by the donee, for surely a company has no business giving away its assets. In practice, the matter is less clear cut. Most companies make payments during the course of a trading year for which they receive no consideration but which are recognised as legitimate forms of expenditure and as likely to benefit the paying company in some indirect or intangible way. Two cases in particular deserve mention, namely gratuitous payments to employees and payments to charity. It should be borne in mind that while both kinds of

---

[85] As in *Brewin Dolphin*, cited above fn.73, where part of the transaction was held to be a covenant by the company's parent to pay rent to a person from whom the company had purchased shares.

[86] Insolvency Act 1986 s.44(1)(a).

[87] *Demite Ltd v Protec Health Ltd* [1998] B.C.C. 638.

[88] *Re Brabon, Treharne v Brabon* [2001] B.C.L.C. 11, a decision on s.339 of the Act; see also, applying *Brabon* in the context of a s.238 claim, *Hunt (Liquidator of Ovendon Colbert Printers Ltd) v Hosking* [2015] B.C.C. 615, at [38].

[89] See above, para.11–96.

payment are perfectly normal and lawful within certain limits,[90] different considerations apply where the company is insolvent,[91] for it is not entitled to be so free with its money at the expense of creditors.

### *(1) Gratuitous payments to employees*

Payments are frequently made to employees to which they have no legal entitlement under the terms of their contract of employment or otherwise.[92] They include bonuses for work done or profit targets met, Christmas and other gratuities, and golden handshakes and other terminal payments. To what extent are such payments recoverable as transactions at an undervalue in the event of the employer company going into winding-up or administration? In many cases, of course, the size of the payment to any one employee would be too small to warrant the expense of proceedings, and in the case of a company continuing to trade while under administration the administrator would no doubt be reluctant to risk disturbance to industrial relations by seeking recoupment. But where the company is no longer trading and the size of the payment is substantial—as it may well be in the case of a golden handshake to a retiring senior executive—the office-holder may well consider it appropriate to try to recover the payment. **13–21**

Given the breadth of meaning of "transaction",[93] it is hard to resist the conclusion that such payments constitute transactions at an undervalue. Uncovenanted bonuses to employees are no doubt considered as emoluments rather than as gifts in normal parlance but are undoubtedly given for no consideration, however effective they may be as inducements to the work force to work even harder in the future. But such bonuses may be justifiable under s.238(5) as bona fide payments for the purpose of carrying on the company's business that could reasonably be expected to benefit the company, either because they provide positive encouragement to the workforce and enhance industrial relations or because they stave off threatened industrial action or produce a settlement. Golden handshakes and other terminal payments made without obligation to do so are much harder to justify, since they can hardly be said to be made for the purpose of carrying on the company's business, nor prima facie can they be of benefit to an insolvent company. Whether the court would consider, in the case of a company in administration which is continuing to trade, that the goodwill

---

[90] As to payments to employees made redundant on cessation or transfer of a business, see Companies Act 2006 s.247. By s.187 of the Insolvency Act 1986 any such payments decided on by the company before liquidation may be made by the liquidator but only after the company's liabilities have been fully satisfied.

[91] As stated above s.238 does not apply unless the company was insolvent at the time of the transaction in question.

[92] Non-contractual entitlements include those by way of quantum meruit on unjust enrichment grounds, as to which see in relation to company directors in particular *Ball v Hughes* [2018] 1 B.C.L.C. 58 and the authorities reviewed therein.

[93] See above, para.13–18.

created by its tangible appreciation of the services rendered by retiring employees satisfies the requirements of s.238(5) must be a matter of doubt; and if the company has ceased trading or is about to do so then even this rather flimsy basis for the payment disappears.

### (2) Payments to charity

**13–22** This may seem a rather remote case but it is raised in order to make the point that there is no general defence of receipt in good faith. Of course, a company which knows itself to be insolvent is unlikely to make a significant payment to charity; but it is by no means uncommon for the management of a company to believe that the business is sound when in truth, as the result of concealed defalcations or losses through incompetence, the company is insolvent. If in this situation a payment is made to charity, can the liquidator or administrator recover it as a transaction at an undervalue? In principle, yes, if the other conditions of s.238 are satisfied. It is no defence that the charity received the money in good faith.[94] But it is for the court to decide what order, if any, to make in the exercise of its powers under s.238, and there seems to be no reason why the court should not be able to take all of the circumstances into account, including the status and good faith of the recipient.

### Transactions under which the company receives no consideration

### (1) "Consideration"

**13–23** "Consideration" is not defined but would appear to have the normal meaning ascribed to it by the law of contract.[95] It is thus to be contrasted with objective value. Consideration is the *quid pro quo* for a promise.[96] It denotes that which a party exacts as the price of his promise. This could include detriment suffered by the other party if that was what the promisor wanted and was thus part of the

---

[94] Section 241(2) of the Insolvency Act 1986, which restricts the orders the court can make, is limited to recipients for value, and in any case will not assist the counterparty to the transaction at an undervalue: see below, para.13–41. As to change of position, see below, para.13–144.

[95] *Singla v Brown* [2008] Ch. 357, a case in which it was held that the transaction was at an undervalue but that exceptionally no order should be made. It seems to have been common ground that the first defendant had held a 49% interest in property which he had transferred to the second defendant but the question of whether there might not have been a constructive trust in favour of the second defendant for all except a nominal interest in view of the parties' common intention that the first defendant should have only a nominal interest (see *Stack v Dowden* [2007] 2 A.C. 432) does not appear to have been raised and instead the court focused on the absence of any claim for rectification.

[96] Unbargained-for benefits that are subsequently conferred on the company by the counterparty are therefore irrelevant for this purpose: *Claridge's Trustee in Bankruptcy v Claridge* [2012] 1 F.C.R. 388 at [33]; see also *Gendrot v Chadwick* [2018] B.P.I.R. 423 at [18].

bargain.[97] If he requires nothing in exchange, his promise is given without consideration. But if he exacts a counter-undertaking or the performance of a designated act, this constitutes consideration for his promise whether or not the counter-presentation has any objective value, for contract law does not concern itself with the adequacy of consideration.[98] Accordingly, anything which is valid consideration in law constitutes consideration for the purpose of s.238(4)(a). That this is the meaning of consideration is evident from the phrase "enters into a transaction . . . on terms that provide for the company to receive no consideration", which shows that the relevant question for the purpose of s.238(4)(a) is what the parties agreed, not whether the *quid pro quo* exacted had any intrinsic value. This is reinforced by the wording of s.238(4)(b), which specifically refers to the *value in money or money's worth* of the consideration and requires the *value* of the consideration provided to the company to be compared with the *value* of the consideration provided by it. So a guarantee given in consideration of an advance to a third party is not a gift or other no-consideration transaction within s.238(4)(a) but a transaction within s.238(4)(b), even if the objective value of the advance to the surety is nil. However, in that case, if the value of the guarantee is significant, the transaction will be one at an undervalue. As in general contract law, past consideration does not suffice. In the context of the statutory provisions, consideration obviously means consideration moving from the company in liquidation or administration to the other party, or from the other party to the company, not consideration moving from or to a third party. So if G Ltd gives a guarantee to C in consideration of an advance by C to G Ltd's parent, D Plc, and G Ltd then goes into winding-up, while the consideration for the guarantee is the advance by C to D Plc, the value of that consideration for the purpose of s.238 is its value to the surety, G Ltd, not its value to D Plc.[99]

The question whether consideration given by the debtor company to A which also constitutes a preference of B and is thus recoverable means that the consideration cannot be relied on to exclude the dealing with A as a transaction at an undervalue was considered by the Court of Appeal in *Re Sonatacus Ltd*[100] in a decision which is not free from difficulty. The facts were as follows. S, the sole director of Sonatacus, borrowed money from CIL through the agency of

---

[97] The mere suffering of unbargained-for detriment does not constitute consideration in general contract law, although it might in appropriate cases give rise to an estoppel. In *Agricultural Mortgage Corp Ltd v Woodward* [1994] B.C.C. 688, the Court of Appeal left open the question of whether unbargained-for detriment which is of no benefit to the promisor is to be taken into account in valuing the consideration received by the promisor for the purpose of s.238 of the Insolvency Act 1986. It is submitted that it does not, for what s.238 is concerned with is inequality of exchange, and where the promisee suffers detriment for which the promisor did not bargain and in which he has no necessary interest, this has nothing to do with the assessment of the benefit received by the promisor. Consistently with this, in *Claridge's Trustee,* above, Sales J excluded from consideration unbargained-for benefits subsequently conferred on the company by the counterparty.

[98] *Hill v Haines* [2008] Ch. 412, per Rix LJ at [79].

[99] See below, para.13–34.

[100] [2007] 2 B.C.L.C. 627.

Proweb, who advanced it on behalf of CIL. S in turn arranged for the money to be paid direct to Sonatacus by way of a loan from S to Sonatacus. So S was the debtor of CIL while Sonatacus was the debtor of S. Sonatacus later, at the direction of S, paid £50,000 to CIL, thereby discharging S's debt to CIL and Sonatacus's debt to S. Sonatacus was insolvent or became so as to the result of the transfer. Liquidators of Sonatacus claimed that the payment to CIL was a preference but, having been advised of the argument that CIL was a creditor of S, not of Sonatacus, so that the payment could not be a preference of CIL, advanced the alternative argument that it was a transaction at an undervalue, CIL having provided no consideration. The answer made to this was that the payment by Sonatacus to CIL discharged S's obligations to CIL, who thus gave full value for the payment. However, the payment was also a preference of S since it discharged his liability to CIL, and it was held by District Judge Needham that a preferential payment susceptible to challenge could not constitute consideration so as to preclude a transaction at an undervalue, being precarious in nature. Accordingly District Judge Needham made a declaration that the payment by Sonatacus to CIL was not a preference but a transaction at an undervalue. This decision was upheld on appeal by Judge Hodge, who did not consider the preference claim further.

An appeal was made to the Court of Appeal and the liquidators were given leave to bring a second appeal based in the alternative on a preference. Now the nature of the case changed again. This time the court proceeded on the basis that there was no preference of C, who was not a creditor of Sonatacus but there was a preference of S from which CIL had benefited, and since it had failed to show that it had acted in good faith an order could be made against it under s.241(1)(d) of the Act.[101] It was therefore unnecessary to consider the question of a transaction at an undervalue, though it is clear that some aspects of this aspect of the case were considered unsatisfactory. The Court of Appeal substituted for the declaration made by the district judge a declaration that the payment made by Sonatacus to CIL constituted a preference given by Sonatacus to CIL within ss. 239–241.

At least two questions arise from this case. First, the form of declaration substituted by the Court of Appeal must surely have been a slip. Sir Martin Nourse had already correctly pointed out[102] that CIL was not the creditor of the company and that it was therefore necessary for the liquidators to rely on s.241(1)(d) to obtain an order against CIL as a person benefiting from the preference given to S. Accordingly, the court should either have made an order under that section or remitted the case to the District Judge to decide what order should be made. Secondly, the Court of Appeal did not find it necessary to consider the rulings below that the consideration furnished by Sonatacus to CIL was voidable as a preference of S and therefore could not be invoked to defeat a claim that the payment to CIL was a transaction at an undervalue. This aspect

---

[101] See below, para.13–64.
[102] At [23].

of the case attracted strong criticism from two writers,[103] who have argued powerfully in a case note that if the discharge of Sonatacus's liability to S was voidable as a preference, so also was the payment to CIL by Sonatacus, who should thus be entitled to be restored to its status quo by recovery from S as a preference or from CIL under s.241. Thus, the benefit to CIL would be exactly counterbalanced by its payment obligation under s.241. Put another way, the reasons why the consideration *received* by Sonatacus (discharge of its debt to S) were precarious also made the consideration *given* by S precarious, so that there could be no transaction at an undervalue in favour of CIL. The objectionable payment would thus have no impact on CIL's balance sheet. Smith LJ saw the theoretical logic of that argument, although expressing the view that:

> " . . . in practice, the reduction in value of the discharge due to the chance that it would be set aside is not necessarily precisely counterbalanced by the chances of recovery of the money payment. The chances might be different. Although as a matter of law, the money would be recoverable if the preferential transaction were set aside, in practice it might not be; it might have disappeared. If CIL were of doubtful solvency, the transaction might not be financially neutral."[104]

However, Ho and Mokal are surely right in saying that so long as a transaction has no effect on the debtor's net asset value, s.238 is not engaged, so that if a diminution in the debtor's assets is reversed by a recovery under ss.239 and 241, it must follow that s.238 cannot apply.

### (2) Distinction between gifts and other no-consideration transactions

**13–24**  A gift by definition involves a transfer of an asset for no consideration. However, as s.238(4)(a) implies, there are other types of transaction which are unsupported by consideration but are not gifts because they do not involve the transfer of an asset. These include unperfected gift-promises (normally binding only if by deed or by way of proprietary estoppel), voluntary releases of a debt and voluntary acceptance of part-payment in satisfaction of a debt.

## Valuing benefits received or given up

### (1) The approach to the valuation

**13–25**  Prima facie the value of an asset is not less than the amount that a reasonably well-informed purchaser is prepared, in arm's-length negotiations, to pay for

---

[103] Look Chan Ho and Rizwaan Jameel Mokal, "*Barber v CI—Preference Equals Undervalue?*" (2006) 22 I.L. & P. 183.
[104] [2010] 2 B.C.L.C. 627 at [34].

it.[105] Where there is a market for assets of the type in question, in general the figure to be taken is the market value.[106] This is normally to be determined by expert evidence. The fact that the parties took reasonable steps to obtain an accurate valuation is not in itself the determining factor, for the valuation may have ignored relevant factors or taken into account factors that should not have been considered or may simply have been based on a mistaken view as to the attributes of what was being sold.[107]

Even where there is no mistake as to the quality of the subject matter, there may be significant differences among competent experts as to an asset's value. In such a case, the court has to weigh the expert testimony and do the best it can to determine the appropriate figure or alternatively the appropriate range of figures within which the value must lie. In the former case, the transaction will be a sale at an undervalue if at a price significantly below the amount so determined, even if that price was supported by one of the valuers; in the latter case, the transaction should be upheld if the price falls anywhere within the range selected,[108] but if significantly below the lowest figure of that range, it should be held a transaction at an undervalue.

*(2) From whose viewpoint?*

**13–26**  The question to be determined in each case is whether the value of the consideration given by the company significantly exceeds the value received by the company. This has to be assessed from the viewpoint of the company, not the other party.[109] So while an asset of the company may be disposed of for full value, the sale may nevertheless be a transaction at an undervalue if its effect is to reduce the value of the remaining assets held by the company and this effect was part of the bargain. In other words, the consideration provided by the company is considered to include any bargained-for detriment it suffers to its remaining assets or business, for example, because of a "ransom" power it confers on the other party.[110] Conversely, the fact that an asset has a special value to the purchaser—for example, for where it is a painting which completes his collection—is to be ignored in determining whether the company has parted with it at an undervalue; what has to be compared (leaving aside questions of

---

[105] *Brewin Dolphin*, cited above fn.73, per Lord Scott at [30]. As to the purchaser being assumed to be reasonably well-informed, see *Dickinson v NAL Realisations* [2017] B.P.I.R. 611 at [143]–[144].

[106] *Re Brabon, Treharne v Brabon* [2001] B.C.L.C. 11, per Jonathan Parker LJ at 38.

[107] *Re Brabon, Treharne v Brabon*, cited above, at 38–41.

[108] *Ramlort Ltd v Reid* [2004] B.P.I.R. 985; and *Ailyan v Smith* [2010] B.P.I.R. 289 (Ch). See below, para.13–30. This does not mean that the court is obliged to accept a range rather than fix a value: *Dickinson v NAL Realisations* [2017] B.P.I.R. 611 at [140]–[142].

[109] *Re M.C. Bacon Ltd (No.2)* [1990] B.C.L.C. 324, per Millett J at 340.

[110] *Agricultural Mortgage Corp Plc v Woodward* [1994] B.C.C. 688. But not, it is thought, unbargained-for detriment: see above, fn.97.

detriment) is the consideration received by the company and the market value of the asset rather than its ransom value.


*(3) Values to be based on the totality of the transaction*

In valuing the consideration on either side for the purpose of determining **13–27** whether there is a significant inequality of exchange—for which purpose both values must be measurable in money or money's worth[111]—it is necessary to look at the whole of the transaction and the totality of the benefits the party dealing with the company will receive, not merely the market value in isolation from other factors.

This is well illustrated by the decision of the Court of Appeal in *Agricultural Mortgage Corp Plc v Woodward.*[112]

The first defendant had borrowed money from the plaintiff and given in security a charge by way of legal mortgage of his farm. Shortly before expiry of the deadline set by the plaintiff for payment of arrears outstanding under the mortgage the first defendant granted the second defendant a tenancy of the mortgaged property at a rent which all parties to the proceedings accepted was the full market rent. However, the tenancy was a protected agricultural tenancy under the Agricultural Holdings Act 1986 and the transaction was in fact entered into by the first and second defendants with the intention of giving the second defendant security of tenure. The effect was to reduce the value of the mortgaged land from its vacant possession value of over £1 million to a value of less than £500,000, and to put the second defendant in a "ransom position" in negotiating a surrender value with the plaintiff.

Held: the fact that the second defendant was paying a full market rent did not prevent the transaction from being a transaction at an undervalue, for its effect was that the first defendant suffered a substantial diminution in the value of his land while the second defendant gained the benefit of security of tenure in the family home, the preservation of the farm business from its previous creditors and an ability to negotiate a large surrender value, so that the true value of the consideration he received was significantly greater than that received by the first defendant.

A similar decision was reached in interlocutory proceedings in *Barclays Bank Plc v Eustice.*[113]

What the decision in *Agricultural Mortgage Corp Plc v Woodward* shows is that in each case it is necessary to look at the reality of the benefit received, not merely the stated consideration. The same applies in valuing what is given up in exchange.

---

[111] *Re M.C. Bacon*, cited above fn.109.
[112] Cited above fn.110. The case involved s.423 of the Insolvency Act 1986 (transactions defrauding creditors), not s.238 but s.423 imports the requirement of s.238 that the transaction be at an undervalue.
[113] *Barclays Bank Plc v Eustice* [1995] B.C.C. 978.

*Example 1*

**13–28**    A house was sold at substantially below the unencumbered freehold value because it was an integral part of the transaction that the buyer would grant a lease back to the seller. The buyer was therefore not buying an unencumbered property. The net result was not significantly different from what it would have been if the seller had received the full unencumbered value and then paid a premium for the lease. The sale was therefore not a transaction at an under-value.[114]

*Example 2*

**13–29**    Shortly before going into liquidation, Alpha Plc agrees to accept £50,000 from Beta Ltd in settlement of a debt of £100,000 owing by Beta to Alpha. At the time of the agreement, Beta was itself in serious financial difficulty and other creditors were pressing. There was therefore a risk that Beta might go into liquidation and that Alpha would receive only a small dividend, if anything, in the winding-up. The value of what Alpha gave up in exchange for what it received should be measured as the likely recoverable value of the debt, not its face value. On this basis, the settlement is not a transaction at an undervalue.

*(4) The use of hindsight to value benefits*

**13–30**    The benefits given and received by the company must be valued as at the time of the transaction. Where one of those values is uncertain, the court may have regard to subsequent events in order to test the accuracy of the value ascribed to the benefit in question at the time of the transaction. The decision of the House of Lords in *Phillips v Brewin Dolphin Bell Lawrie Ltd*[115] provides a good example of this, as well as of what constitutes the transaction for the purpose of the valuation exercise.

> AJB agreed to sell its business to Brewin Dolphin for £1.25 million. To that end AJB transferred its business and assets to its wholly owned subsidiary BSL for £1 and then sold its shares in BSL to Brewin Dolphin in consideration of (i) the assumption by Brewin Dolphin of AJB's liability to its employees for redundancy payments, later discharged at a net cost of £325,000, (ii) a covenant by Brewin Dolphin's parent, PCG, to pay rent of £312,500 to AJB for five years under a sub-lease of computer equipment, against which was to be set a loan of £312,500 by PCG to AJB. The sub-lease was in breach of covenant, the head lease was terminated for default and PCG repudiated its liability under the sub-lease. The value of the business sold by AJB was assessed by the trial judge at £1,050,000. Later AJB went into insolvent

---

[114] *Delaney v Chen* [2011] B.P.I.R.
[115] *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] 1 W.L.R. 143.

liquidation and shortly afterwards into administrative receivership. The liqui-dator and administrative receiver (the same person) applied for an order under s.240 on the ground that the sale to Brewin Dolphin was a transaction at an undervalue within s.238.

The trial judge upheld this contention and ordered Brewin Dolphin to pay a sum which he considered to represent the undervalue. An appeal and cross-appeal to the Court of Appeal were dismissed, though on grounds different from those of the trial judge as to what constituted the transaction. The House of Lords affirmed the decision of the Court of Appeal while differing both from the trial judge and the Court of Appeal as to the reasoning and varying the order of the former by allowing a credit which he had refused.

In delivering the Opinion of the House, Lord Scott made the following points:

(1) The linked agreements together constituted the transaction. Accordingly, the issue before the court was not the transaction but the consideration. It was irrelevant who provided this. Accordingly the covenant by PCG to pay rent under the sub-lease formed part of the consideration received by AJB and had to be valued.

(2) The sub-lease was in breach of the sub-lessor's covenant under the head lease, and the court was entitled to look at subsequent events—in particular, the termination of the head lease for default by AJB and the consequent termination of the sub-lease by PCG for repudiatory breach—in order to value PCG's covenant at the time it entered into the sub-lease, and those events made it clear that the value was nil.

(3) However, Brewin Dolphin was entitled to be given credit for the amount of its loan and interest.

Lord Scott's speech has generated much debate on the use of hindsight to determine a value at the time of the transaction. But it seems clear that Lord Scott was not in truth applying a hindsight test; rather he was relying on evidence of subsequent events to show that from the outset the covenant under the sub-lease was so precarious and its value so speculative that even at the time it was entered into a bank or finance house with knowledge of the surrounding circumstances would not have attributed any value to the sub-lease covenant.[116] In this connec-tion, it is helpful to recall the distinction drawn by the accountancy profession between adjusting and non-adjusting events in determining whether a balance sheet value should be corrected by reference to subsequent facts.[117] In the present

---

[116] See at para.26. This passage was endorsed by David Richards J in *Stanley v TMK Finance Ltd* [2011] Bus. L.R. D93 at [14], in which the judge held that no application of hindsight was required to have regard to a price obtained for a property after the time at which the relevant transaction was entered into by the company, if there was no change in market conditions between the two dates and the price obtained at the sale could fairly be regarded as a reliable indicator of market value, but that the latter criterion was not satisfied on the facts.

[117] See above, para.4–35.

context, an adjusting event is one which helps to establish the value of consideration at the transaction date, while a non-adjusting event is one which simply reduces or increases such value at the time the event occurs. It is obvious that a mere decline in the value of consideration by reason of an event after the transaction date is of no relevance whatsoever in determining whether the transaction was at an undervalue. But *Brewin Dolphin* did not concern a non-adjusting event; Lord Scott relied on the post-transaction termination of the sub-lease as validating what would anyway have been the perception at the time of the sub-lease of the nil value of the sub-lessee's covenant. In accountancy terms, the termination was an adjusting event.[118]

To be contrasted with this is the case of *Ramlort Ltd v Reid*,[119] in which T, a heavy drinker, took out a unit-linked life policy providing for a sum assured of £180,000. T owned two companies which together owed £185,000 to Ramlort Ltd. T, though not legally liable for the debts, regarded himself as morally bound to see that they were paid. To that end he arranged for the sum assured to be increased to £185,000 and, while seriously ill and awaiting a liver transplant, executed a declaration of trust of the policy in favour of Ramlort in consideration of two cheques issued by Ramlort totalling £3,000. At that time the policy had a surrender value of £71. Two months later T had a liver transplant and the following day he died. The judicial factor challenged the declaration of trust as a transaction at an undervalue. The medical evidence showed that at the time the declaration of trust was executed T was gravely ill and without a transplant his illness would be terminal, while if the transplant were to be carried out he might survive, though the mortality risk was not measurable. The greater the risk of T's death, the higher the value of the policy. There was a conflict of evidence as to the value of the policy. On one view it was no more than the surrender value, on another it was a value substantially higher than £33,000. The trial judge rejected the former view as unrealistic but concluded that it was not possible to assign a precise value to the policy, which would appear to be within the range £25,000-£35,000 but with an absolute minimum of £10,000, the figure he determined to be the outgoing value. He pointed out that the fact that there might not be a market for an asset did not mean it had no value, an example being shares in a private company. Neither valuer relied on the fact of T's death as a factor in his valuation and the judge did not apply the hindsight principle. The Court of Appeal, upholding the decision apart from allowing a credit for the two cheques, also found it unnecessary to apply hindsight to the valuation.[120]

---

[118] For non-insolvency cases in which the hindsight principle has been applied, see *Gorne v Scales* [2006] EWCA Civ 311; and *Bwllfa and & Merthyr Dare Steam Collieries (1891) Ltd v Pontypridd Waterworks Co* [1903] A.C. 426. See also in the bankruptcy context *JSC Bank of Moscow v Kekhman* [2015] 1 W.L.R. 3737 at [68]–[70].

[119] *Ramlort Ltd v Reid* [2004] B.P.I.R. 985, affirming the decision of Judge Norris QC sub. nom. *Re Thoars (dec'd)* [2003] B.P.I.R. 1444.

[120] The court also held, in agreement with the trial judge, that there was nothing to preclude the court from taking a range of possible values rather than a precise figure. See above, para.13–25.

Other examples where hindsight would be inappropriate are the valuation of a lottery ticket by reference to its proving to be the winning ticket; the valuation of a policy covering a young and healthy life assured by reference to his accidental and premature death; and the valuation of residential property by reference to a subsequent increase in its market value.[121] In all of these cases the subsequent event is not one which helps to establish the value at the transaction date, for it has no relation to what a willing purchaser might be prepared to pay for the asset in question; it is simply an event which changes the situation.

### (5) Value of property sold subject to a security interest

Where property of the company is sold subject to a security interest previously given by the company, its value is the value of the equity of redemption, for to the extent of the security interest the property is not that of the company at all.[122]    **13–31**

### Guarantees[123]

Particular difficulties are raised by guarantees.[124] Company A in a group of companies gives a guarantee to secure advances already made or intended to be made by X Bank to Company B, another member of the group—usually Company A's parent, subsidiary or co-subsidiary. If Company A goes into winding-up or administration, in what circumstances, if any, will the issue of the guarantee be considered a transaction at an undervalue?    **13–32**

The first question is whether a guarantee is within s.238 at all. Undoubtedly, it is a transaction within the meaning of s.436. The difficulty in applying s.238 lies in the fact that whereas most transactions involve the transfer of property, the provision of services or the payment of money by the company and the receipt of money or property in exchange, the issue of a guarantee by the company merely involves it in a contingent liability which may never crystallise and the *quid pro quo* is the making of an advance to a third party, the principal debtor. So in contrast to the usual case, a guarantee does not at the time of its issue

---

[121] These were among the examples given on the trial of a preliminary issue by Sir Andrew Morritt V-C in *Re Thoars (dec'd)* [2003] 1 B.C.L.C. 499. For a further example, see *Tailby v HSBC Bank Plc* [2015] B.P.I.R. 143 at [72].

[122] *Re Brabon, Treharne v Brabon* [2001] 1 B.C.L.C. 11, a decision on s.339(3)(c) of the Insolvency Act.

[123] See also *Goode and Gulliffer on Legal Problems of Credit and Security*, 6th edn (London: Sweet & Maxwell, 2017), paras 8–35 et seq. The analysis in the paragraphs that follow was adopted by Treacy J in *Levy McCallum Ltd v Allen* [2007] N.I. Ch. 3, and by Registrar Derrett in *Tailby v HSBC Bank Plc* [2015] B.P.I.R. 143.

[124] The same considerations apply to indemnities, and for brevity the term "guarantee" will be used to cover both forms of transaction.

involve any form of transfer either from or to the company and, indeed, it may never pay anything or receive anything as a result of the transaction. But these are matters which go merely to the valuation of benefit and burden, they do not affect the applicability of s.238 to contracts of guarantee.

As stated earlier, a guarantee is not a gift or no-consideration transaction, even though the advance to which it relates is made to the principal debtor, not to the surety. The consideration is the making of the advance,[125] since this is the act exacted by the surety as the price of his guarantee. So the fact that the money goes to the principal debtor does not of itself render the guarantee a transaction at an undervalue. The crucial question is whether there is a broad equality of exchange, that is, whether the benefit conferred on the creditor by the issue of the guarantee is significantly greater than the value to the surety of the advance to the principal debtor. It is clear that the relevant time for measuring these respective values is the date on which the guarantee is given, not the date when the principal debtor defaults or the guarantee is called or payment is made under it. But as will be seen, this involves an assessment at the date of the guarantee of what is likely to happen when payment becomes due.

### (1) Measuring the value to the creditor

**13–33**    The value of a guarantee to the creditor varies inversely with the principal debtor's financial strength. If the principal debtor is financially strong, the creditor's dependence on the guarantee, and thus its value to him, is correspondingly reduced and may, indeed, be so small that it can be disregarded altogether. By contrast, if the principal debtor is already insolvent and the guarantee is furnished to secure a last-ditch injection of funds in the hope of reviving the principal debtor's fortunes, the risk of the guarantee being called is high and its value to the creditor may approach the full amount of the guaranteed debt. The mere fact that the principal debtor is solvent at the time of the guarantee does not by itself mean that it is of no value, for the guarantee relates to the future and what has to be measured when it is given is the likelihood of its being called when repayment falls due. A company may be technically solvent at the time of the guarantee and yet beset with so many impending troubles that its future insolvency can be predicted with a high degree of assurance.

To what extent is the value of a guarantee to the creditor reduced by the fact that he already holds security, whether from the company itself or from third

---

[125] Alternatively, the creditor's promise to make the advance. But in general creditors prefer not to commit themselves to the surety in a bilateral contract; they prefer either to make the advance, generating a unilateral contract of guarantee, or (if they change their mind) to decline to do so, in which case the guarantee does not come into force. If the guarantee is given after the making of the advance, there is a risk that the advance will be characterised as past consideration that cannot be taken into account in assessing value for the purpose of s.238 (above, para.13–23). But this will not be the position where the making of the advance and the giving of the guarantee can properly be characterised as linked events in a single transaction, as in *Tailby v HSBC Bank Plc* [2015] B.P.I.R. 143.

parties? The answer to this question is not entirely straightforward. Let us start with security taken from the debtor company itself, such as a mortgage or charge of its property. The existence of such security reduces the creditor's need for the guarantee and therefore its value to him, which may be no more than the supportive value of a belt to a man already wearing braces. So at first sight such security should be brought into the equation as a factor which reduces the likelihood that the guarantee will be called. The technical objection to this approach is that the creditor is not obliged to use the security taken from the principal debtor as his first port of call in a storm. If the principal debtor defaults, the creditor is free to pursue all or any of his remedies against all or any of the parties liable to him. He may thus, if he chooses, defer proceedings against the principal debtor and move directly against the surety. The effect of his election is that the guarantee becomes the primary support, the braces, while the security taken from the principal debtor is left to perform the subsidiary role of the belt, to which resort is made only if the braces prove inadequate. Does this mean that security taken from the principal debtor should be ignored in valuing the benefit of the guarantee to the creditor? Instinctively, we would recoil from such a conclusion, and rightly so. What matters at bottom is not the immediate but the ultimate source of satisfaction of the creditor's claim. Where lies the true incidence of liability? If the surety pays, he has a right to be subrogated to securities held by the creditor[126] and thus to take over any mortgage or charge on the company's property to secure recoupment of his payment. This remedy of subrogation is given to ensure that the burden falling upon a surety is not at the end of the day dictated by the choice of the creditor to look to him alone and exempt others from payment.[127] So even if the creditor collects payment from the surety, his claim is ultimately satisfied from security given by the principal debtor so far as resort to this by the surety is necessary for his recoupment. Our first thought therefore turns out to be correct: in valuing the benefit of the guarantee to the creditor, account must be taken not only of the principal debtor's financial strength but of any real security taken from the principal debtor by the creditor.

Next, we have to consider the relevance of security taken from other third parties. The creditor may already hold another guarantee, which may be a purely personal guarantee by another surety, a guarantee reinforced by real security from the surety or a guarantee limited to real security. This complicates life a little in that where there are two or more sureties, they bear the burden rateably in proportion to the amounts for which they are respectively liable under their guarantees, so that if one of them discharges the debt in full, his right of subrogation to securities taken from the principal debtor and from his co-sureties

---

[126] This right is given both in equity (*Craythorne v Swinburne* (1807) 14 Ves. 160; and *Forbes v Jackson* (1882) 19 Ch.D. 615) and at law under s.5 of the Mercantile Law Amendment Act 1856.

[127] *Craythorne v Swinburne*, cited above, at 162; and Joseph Story, *Equity Jurisprudence*, 1st English edn, ed. W.E. Grigsby (London: Stevens and Haynes, 1884), p.315.

is limited to what is needed to recoup him for the amount by which his payment exceeds his own due contribution.[128] The result is that in valuing the benefit to the creditor of the guarantee given by the company in winding-up or administration there must be deducted the value of the creditor's rights against co-sureties[129] up to the amount they are liable to contribute but not beyond.

In valuing the benefit of a guarantee to the creditor for the purpose of s.238, no account should be taken of the possibility that the surety itself may default in performance of its obligations under the guarantee. What has to be measured is the value of the consideration, not the likelihood of its being executed. In essence, the question is whether the company giving the guarantee is committing itself to parting with a benefit significantly greater than that which it will receive. The principle is the same as that applicable to straight supply transactions. If, for example, a company which has run out of funds agrees to buy goods for £10,000, the question whether it has thereby entered into a transaction at an undervalue is determined by asking whether the goods are worth a sum approaching that figure, not by comparing the value of the goods with the amount the creditor is likely to recover from the company when it defaults in payment of the price. The same applies to the valuation of a guarantee. If the position were otherwise, s.238 could hardly ever apply to guarantees, for *ex hypothesi* the company giving the guarantee is already unable to pay its debts.[130]

From what has been said above, it will have become obvious that valuation of a guarantee is in many cases a matter of judgment rather than science and that a broad-brush approach is needed. As a working guide, it is suggested that for the purpose of s.238 of the Insolvency Act the value of a guarantee to a creditor is the amount (if any) for which, at the time of the guarantee, a prudent creditor with full knowledge of the debtor's affairs would make provision in his accounts for default, after taking into account what he could reasonably expect to recover from securities taken from the principal debtor and from co-sureties in respect of their proportionate share of the suretyship liabilities. Alternatively, looked at from the surety's viewpoint, it is the amount for which a prudent surety with full knowledge of the debtor's affairs would make provision in his accounts after allowing for the value of securities taken from the principal debtor and contributions from co-sureties.

### (2) Measuring the value to the surety

13–34    The other side of the equation is, of course, the value of the consideration received by the surety, that is, the value to the surety of the advance provided to

---

[128] For a detailed treatment of the right of contribution among sureties, see O'Donovan and Phillips, *The Modern Contract of Guarantee*, 2nd edn (2010), at [12–119]: with detailed examples of calculations at [12–215] et seq.

[129] Which involves measuring their financial strength and the value of securities they have given to support their guarantees.

[130] This being a condition of the application of s.238. See ss.238(2) and 240(2).

the principal debtor. A member of a group of companies—in our example Company A—can in many cases reasonably expect that the infusion of funds into another member of the group (Company B) will benefit the group as a whole, including Company A. Valuing the benefit, however, is likely to be a matter of considerable difficulty. In some cases, there will be no value at all, as where Company B is already on the rocks and the giving of the guarantee for a temporary advance is merely staving off disaster. In such cases, Company A's guarantee is given solely for the benefit of Company B and will almost certainly constitute a transaction at an undervalue; indeed, the directors of Company B may well be in breach of duty to the company in authorising the issue of the guarantee in the first place, for their loyalties are owed in law solely to their company, not to the group as a whole. But where Company B's business is basically sound and the infusion of funds will enable it to expand its activities and increase its profitability for the benefit of the group as a whole, at least some value may be ascribable to the consideration given by Company A for its guarantee. This may (indeed usually will) be less than the amount of the advance to Company B but as long as it is not significantly below the ultimate burden likely to fall on Company A as the result of furnishing the guarantee, this will not be a transaction at an undervalue.

In practice, it is unlikely that a guarantee will be impeached as a transaction at an undervalue except where it is clearly of no benefit to the surety company. There are serious problems of valuation on both sides of the equation and the onus is on the office-holder who is impeaching the transaction to prove that the guarantee is a transaction at an undervalue. Hence, the difficulties of valuation lie primarily on him rather than on the creditor.

### Giving of security for a past debt not a transaction at an undervalue

Suppose that a company gives its bank security for a previously unsecured loan    **13–35**
and then goes into liquidation. Is the furnishing of security for past consideration a transaction at an undervalue? No, because it does not reduce the net assets of the company but merely attaches an existing liability to an existing asset, leaving the net balance sheet figures unchanged. This was so held by Millett J in *Re M.C. Bacon Ltd*.[131] Likewise, the realisation of the security has no impact on the net

---

[131] *Re M.C. Bacon Ltd* [1990] B.C.C. 78. In *Hill v Spread Co Trustee Ltd* [2007] 1 W.L.R. 2404, which concerned an attack on a transaction as being at an undervalue, Arden LJ, in an obiter dictum at [138], expressed disagreement with this view, saying there was nothing in s.423 that referred to a diminution in assets and that had it been necessary she would provisionally not have accepted that the grant of security did not involve the disposition of any property right. With all respect, this confuses a transaction at an undervalue with a preference and cannot be accepted. The question is whether there is a transaction at an undervalue, meaning that the company parts with more than it receives. If the company grants a security interest, it still has the right to redeem and any repayment it makes pro tanto reduces its indebtedness, so that it loses nothing. Subsequently, a differently constituted Court of Appeal correctly applied Millett J's reasoning in *M.C. Bacon*, making no reference to Arden LJ's dictum. See *Secretary of State for the Environment, Food and Rural Affairs v Feakins* [2007] B.C.C. 54, per Jonathan Parker LJ at [72].

asset position, for while the asset given in security disappears from the balance sheet, so also does the liability which it secured. A simple example will demonstrate the point. Suppose that A Ltd borrows £100,000 unsecured, uses it to buy stock and later gives a charge over its factory to secure the loan. Prior to the giving of the security, A Ltd's balance sheet, assuming that no part of the stock has yet been sold, the factory has a value (at cost) of £500,000 and that there are no other assets or liabilities, would look like this:

|  |  |  |
|---|---|---|
| *Assets* | | |
| Factory (at cost) | | £500,000 |
| Stock (at cost) | | £100,000 |
| | | £600,000 |
| | | |
| *Less liabilities* | | |
| Bank loan | £100,000 | |
| Trade creditors | £50,000 | £150,000 |
| *Net assets* | | £450,000 |

When the charge is given, it will be recorded by way of a note to the accounts (or alternatively the loan will be shown in the balance sheet as a secured loan) but the figures remain unchanged. Now suppose that on default by the company the factory is sold for £500,000 and the debt of £100,000 repaid from the proceeds, the balance of £400,000 being paid into the company's bank account. The balance sheet will now look like this:

|  |  |
|---|---|
| *Assets* | |
| Cash at bank | £400,000 |
| Stock (at cost) | £100,000 |
| | £500,000 |
| | |
| *Less liabilities* | |
| Trade creditors | £50,000 |
| *Net assets* | £450,000 |

We can see that there has been no depletion of the value of the company's assets through realisation of the security, for the payment of £100,000 from the proceeds is exactly matched by the disappearance of the bank loan from the liabilities. So the effect of giving security for a previously unsecured loan is not to reduce the company's assets but simply to allocate the asset given in security to a particular creditor instead of leaving it available for creditors generally. The proper ground of attack, then, is not that the transaction is at an undervalue but that it is a preference.[132] As Millett J pointed out,[133] all that the company loses

---

[132] See above, fn.131.
[133] *Re M C Bacon Ltd*, cited above fn.131, at 92.

in giving the security is the ability to apply the proceeds of the charged assets otherwise than in satisfaction of the charged debt, and "that is not something capable of valuation in monetary terms and is not customarily disposed of for value".[134] This comment should not be misunderstood. The point that Millett J was making was not the difficulty of valuing a detriment but the fact that detriment by itself is irrelevant, for the crucial question is whether it was incurred as part of the bargained-for consideration so as to confer on the other party a benefit capable of being valued. In *Agricultural Mortgage Corp Plc v Woodward*,[135] the fact that one party suffered a detriment by reason of a reduction in value of his property through the grant of a tenancy was not in itself material; what mattered was that the grant of the tenancy gave the tenant a protected status which placed her in a position to hold the landlord and the mortgagee to ransom in negotiating a surrender value, and the conferment of that benefit formed part of the bargained-for consideration. By contrast, the loss of a mortgagor's ability to apply the proceeds of a mortgaged asset otherwise than in satisfaction of the debt confers no additional benefit on the mortgagee for which he would expect to pay; on the contrary, it is the very remedy which the mortgage is designed to provide. One might add that, by the same token, the fact that the grant of a mortgage over an asset inhibits the company's ability to obtain credit from other sources is equally irrelevant, not simply because it is incapable of valuation but because it is not something which confers a bargained-for benefit on the mortgagee.

The position is otherwise, of course, where the company gives security for the indebtedness of a third party, for in that situation realisation of the security does not result in the discharge of any debt owed by the company, which accordingly suffers a loss of the charged asset.

## The "relevant time"

Under s.238(2) of the Insolvency Act 1986, the office-holder is not entitled to apply for an order to reverse the effect of a transaction at an undervalue unless the transaction was entered into at "a relevant time". This is defined by s.240(1) as at a time: **13–36**

    (1) in the period of two years ending with the "onset of insolvency" (defined by reference to the commencement of the insolvency proceedings)[136] but only if at that time the company was unable to pay its debts

---

[134] *Re M C Bacon Ltd*, cited above fn.131, at 92.
[135] *Agricultural Mortgage Corp Plc v Woodward* [1994] B.C.C. 688. See above, para.13–27.
[136] See s.240(3).

within the meaning of s.123 of the Act or became so in consequence of the transaction[137];

(2) between the making of an administration application in respect of the company and the making of an administration order on that application; and

(3) between the filing with the court of a notice of intention to appoint an administrator under paras 14 or 22 of Sch.B1 and the making of an appointment under that paragraph.

### The general statutory defence[138]

**13–37**  Under s.238(5) of the Insolvency Act, the court may not make an order under s.238 in respect of a transaction at an undervalue if it is satisfied that:

(a) the company which entered into the transaction did so in good faith and for the purpose of carrying on its business; and

(b) at the time it did so there were reasonable grounds for believing that the transaction would benefit the company.

This useful defence, which it is for those resisting an order to establish,[139] will protect a range of bona fide business transactions that might otherwise be vulnerable, including a transaction weighted in favour of the other party because he was in a stronger negotiating position and a disadvantageous transaction reasonably considered necessary to avoid or terminate litigation or to prevent the termination of a valuable contract or the loss of important intellectual property rights.

### *(1) Good faith*

**13–38**  The requirement of good faith must, it is thought, be related to the purpose of s.238, and is not a requirement of honesty in a general sense. So limb (a) of s.238(5) should be considered satisfied if those involved on behalf of the company genuinely thought that the transaction would promote its interests, even if they acted dishonestly in the transaction itself, for example, by buying goods

---

[137] Such inability to pay debts is presumed to be satisfied unless the contrary is shown, in relation to any transaction at an undervalue entered into by a person connected with the company (s.240(2)), that is, a person who is a director, a shadow director, an associate of such a director or shadow director or an associate of the company as defined by s.435 of the Act (s.249).

[138] Possible restitutionary defences and cross-clams are considered below, paras 13–139 et seq.

[139] *Re Barton Manufacturing Co Ltd* [1999] B.C.L.C. 740.

on behalf of the company knowing it would be unable to pay for them or by knowingly misrepresenting the condition or quality of goods they were selling for the company.

It should be noted that it is the company that must act in good faith; the good faith of the other party is irrelevant. This reflects the historical origins of preferences and transfers in fraud of creditors where the focus was on the debtor's intent to defeat the statutory provision governing distribution on bankruptcy.[140] However, it does run counter to the general principle of English law that it is the party seeking relief who must show good faith. It seems objectionable that a company, acting through its liquidator, should be able to invoke its own bad faith and own state of insolvency to undo the effects of a transaction with another party who acted in good faith and was unaware either that the company was acting in bad faith or that it was insolvent.[141]

### (2) "For the purpose of carrying on its business"

Transactions entered into by the company in the course of closing down its business should, it is thought, be considered to be "for the purpose of carrying on its business" within the above statutory provision.[142]          **13–39**

### (3) Benefit to the company

Limb (b) requires the existence of reasonable grounds for believing that the          **13–40**
transaction would benefit the company. Whether the transaction in fact benefits the company is not the question, although there may be a temptation to apply hindsight. Nor does limb (b) require that the company should in fact have believed it would benefit from the transaction; the test is an objective one—"reasonable grounds for believing"—although if the company did not believe the transaction would be of benefit, it may be hard pressed to establish that it acted in good faith as required by limb (a).

---

[140] See below, para.13–67.

[141] For a discussion of the question of whether s.238 might infringe art.1 of the First Protocol to the Human Rights Convention, set out in Sch.1 to the Human Rights Act 1998, see Janet Ulph and Tom Allen, "Transactions at an Undervalue, Purchasers and the Impact of the Human Rights Act 1998" [2004] J.B.L. 1.

[142] See *Re Sarflax Ltd* [1979] Ch. 592, in which Oliver J held that for the purpose of s.332(1) of the Companies Act 1948 (the precursor to the fraudulent trading provision now found in ss.213/246ZA of the Insolvency Act 1986) the phrase did not require a continuing trade; it sufficed that the company was engaged in the collection of assets and the distribution of their proceeds in discharge of liabilities in the course of closing down the business. In *Wallach v Secretary of State for Trade and Industry* [2007] 1 B.C.L.C. 208 Lindsay J, while not deciding the point, was attracted by the submission of counsel that the interpretation of "carrying on a business" endorsed by Oliver J applied equally to s.238.

**The protection of innocent third parties**

**13–41**   A separate statutory defence is provided by s.241(2) of the Act in favour of bona fide transferees and recipients of benefit *otherwise than from the company* in good faith, for value and without notice. This defence, which is not available to the company's counterparty to the transaction at an undervalue, will be examined in the context of orders the court can make under s.238.[143]

**The general power of the court**

**13–42**   On an application by the office-holder for an order under s.238, the court is required to make such order as it thinks fit for restoring the position to what it would have been if the company had not entered into the transaction.[144] Despite the word "shall", the expression "think fit" has the effect that it is entirely within the court's discretion whether to make an order under s.238.[145] An order can be made only if the company is in administration or winding-up and only on an application by the office-holder or their assignee. A creditor has no *locus standi* to apply for an order (other than as assignee).[146] Whether an order is made and if so the type of order are entirely within the court's discretion; the office-holder is not entitled as of right to have a transaction at an undervalue set aside or to obtain a particular form of relief. Even where the court is satisfied that the company entered into a transaction at an undervalue, it will not make an order under s.238 where the company would have found itself in an even worse position if the transaction had not been carried out.[147] The order the court is required to make is to restore the company to the position in which it would have been if it had not entered into the transaction at all; the court is not permitted to reconstruct the position to what it would have been if the company had entered into a different transaction.[148] In deciding what order to make, the court does not start with any presumption in favour of monetary compensation as opposed to

---

[143] See below, para.13–64.

[144] Insolvency Act 1986 s.238(3).

[145] *Re Paramount Airways Ltd* [1993] Ch. 223, per Sir Donald Nicholls V-C at 239, followed in *Singla v Brown* [2008] Ch. 357, where in view of the circumstances the court felt it appropriate to make no order, regardless of the presence or absence of the extra-territorial considerations relied on in *Paramount*; see similarly (in the context of s.339) *Claridge's Trustee in Bankruptcy v Claridge* [2012] 1 F.C.R. 388.

[146] See above, para.13–17. The assignment must of course be of the particular avoidance action relied upon: see *Global Corporate Ltd v Hale* [2017] EWHC 2277 (Ch), in which the most promising ground of avoidance was as a preference under s.239, but the only avoidance action assigned was that in s.238.

[147] *Re MDA Investment Management Ltd, Whalley v Doney* [2004] 1 B.C.L.C. 217. In that case, the judge found that at the time of the transaction the company was on the verge of collapse and failure to enter into the transaction would have made its position still worse.

[148] *MDA Investment Management*, cited above.

setting aside the transaction and revesting the asset transferred or, indeed, any other *a priori* assumption.[149]

The order should not leave the claimant in a better position than before. A good example is provided by *Feakins v Secretary of State for the Environment, Food and Rural Affairs*,[150] in which the facts were as follows. The debtor had engineered a situation in which a farm was sold by the bank mortgagee to the debtor's fiancée at a valuation on the basis of a sale subject to an existing tenancy which, unknown to the bank had been agreed to be surrendered, so that the fiancée was in fact buying the farm with vacant possession and thus buying at an undervalue. The Court of Appeal upheld the decision of the trial judge in rejecting the argument that the only relevant transaction was the sale by the bank and holding that a series of linked transactions which included the arrangement between the debtor and his fiancée that the former would procure the surrender of the tenancy constituted an arrangement within s.436 and a transaction at an undervalue within s.423. However, it varied the original decision by restoring the tenancy in order to prevent DEFRA (the claimant in the s.423 action) from being in a better position that it had been prior to the fraudulent transaction.

In the typical case, the company will have purchased an asset at significantly more than its value or sold an asset at significantly less than its value. The former case can be dealt with by an order for repayment of the excess to the company and the latter by an order for payment of an additional sum to make up the price to the full value of the asset sold or alternatively an order for retransfer of the asset to the company and repayment by it of the price received. But such an order will not normally be sufficient by itself to restore the position to what it would have been if the company had not entered into the transaction, for account must also be taken of any additional income or profits it would have been likely to earn if the transaction had not taken place.[151] The defendant will as a rule be entitled to counter-restitution of benefits received by the company, for example, repayment of the price it received for the property which is to be retransferred to it, compensation for the value added by any improvements made by the defendant,[152] reimbursement of the cost of performing obligations undertaken by the company, for example, to meet the redundancy costs of employees, and repayment of a loan made by the defendant to the company as part of the total transaction.[153] In the case of an order for retransfer of property to the company, counter-restitution will involve repayments by the company as a condition of the transfer. Where the order against the defendant is for payment of money, counter-

---

[149] *Ramlort Ltd v Reid* [2004] B.P.I.R. 985, per Jonathan Parker LJ at [125], approving the observation of Judge Havelock-Allan Q.C. in *Walker v W.A. Personnel Ltd* [2002] B.P.I.R. 621.

[150] *Feakins v Secretary of State for the Environment, Food and Rural Affairs* [2007] B.C.C. 54.

[151] See the examples given below, paras 13–44 to 13–49, and the discussion of restitutionary principles at para.13–139.

[152] See *Weisgard v Pilkington* [1995] B.C.C. 1108.

[153] *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] 1 W.L.R. 143. See further below, paras 13–139 et seq.

restitution will take the form of a deduction from the amount repayable to the company.[154] The relevance of general principles of the law of unjust enrichment is considered later.[155]

The general power conferred by s.238(3) to restore the company to the status quo is unfettered. The court is thus able to make various orders of a kind rather surprisingly omitted from the list of its specific powers under s.241(1).[156]

### Specific powers

**13–43**    Without prejudice to the generality of the power conferred on the court by s238(3), the court may (subject to s.241(2)) make any of the seven types of order specified in s.241(1) of the Act. The list is interesting not only for what it contains but for several significant omissions. The particular remedies given to the company through an application by the office-holder (or their assignee) are orders *in personam* directing property to be vested (or revested) in the company or money to be paid to the company and orders for the release or discharge of any security given by the company. There is no provision in s.241(1) for a transaction at an undervalue, whether it be a contract or conveyance, to be invalidated or set aside, nor is there provision for an order discharging the company from liability under a contract,[157] for example, for the excess of its commitment over the value of the consideration for the commitment. The underlying concept is that the original transaction was and remains valid but that its adverse effects are to be reversed by a conveyance (or reconveyance) or payment of a sum of money and the discharge of any security where appropriate.[158] Similarly, there is no express reference to the court's power to impose conditions in any order it makes, for example, that when property is retransferred to the company it is to repay the price originally received. Instead, there is a curiously limited power to allow proof in the winding-up "for debts or other liabilities which arose from, or were released or discharged (in whole or in part) under or by, the transaction",[159] which hardly meets the case.[160]

However, since s.241(1) is without prejudice to the generality of the court's powers under s.238, which predicates restoration of both parties to the position existing prior to the transaction, there seems to be no reason why the court should not in a proper case deal with a transaction at an undervalue by setting it aside and releasing the company, wholly or in part, from any liability incurred under it, and by making it a condition of vesting of property in the company that it is

---

[154] See *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] 1 W.L.R. 143.
[155] See below, paras 13–139 et seq.
[156] See below.
[157] Other than a security.
[158] See further below, para.13–51.
[159] Insolvency Act 1986 s.241(l)(g), discussed below, para.13–62.
[160] See below, para.13–62.

to repay any money or the value of any other benefit it received under the transaction. The susceptibility of the transaction to avoidance by the court in exercise of its powers under s.238 would, it is thought, constitute an equity binding on the defendant's liquidator or trustee in bankruptcy if the defendant were in, or were to go into, winding-up or bankruptcy.[161] The effect of s.241(1) is thus to make the transaction voidable,[162] although it has to be borne in mind that "voidable" in this context means liable to avoidance at the court's discretion rather than as of right.

The various orders listed in s.241(1) fall into the following groups.

### *(1) Orders vesting property in the company*

First, the court may require any property transferred as part of the transaction at an undervalue to be vested in the company. The generality of this provision should be noted. It is not confined to cases where the property was originally vested in the company but extends to transfers by a third party at the company's direction, as where the company agreed to buy from the third party and sub-sell to the ultimate transferee or agreed that a debt owed to the company by the third party should be discharged wholly or in part by the transfer of an asset from the third party to the transferee. Further, an order for transfer may be made not only against the original transferee (if he still has the property) but against the successor in title in whom it is currently vested. This, indeed, is made clear by the opening words of subs.(2) of s.241.[163] Again, if an order is made against a party who becomes bankrupt or goes into liquidation before complying with it, the court can direct the conveyance to be executed by the trustee or liquidator. **13–44**

Secondly, the court may require any property to be vested in the company if it represents in any person's hands the application either of the proceeds of sale of property transferred as part of the transaction at an undervalue or of money so transferred.[164] Again, an order may be made against any holder of the property, whether or not the original transferee.

Where the company received consideration for the original transfer, it would obviously be wrong to direct a retransfer of the property (or the transfer of other property acquired by the transferee with the proceeds of the original property) to the company without taking account of that consideration. So although s.241 contains no express reference to the imposing of conditions of an order under that section, it seems clear from the generality of s.238(3) that the court, when directing retransfer of property to the company, has power to impose a condition that the company shall repay the sum it received for the property or such part of

---

[161] See below, para.13–50.
[162] The view also taken by Simone Degeling, below, para.13–139.
[163] However, the court is precluded by subs.(2) of that section from making any order which would prejudice the rights of a bona fide purchaser for value without notice. See below, para.13–64.
[164] See Examples 3 and 4 below.

that sum as will ensure that the company is in no better position than if it had not entered into the transaction.

A few examples will help to illustrate the above.

### *Example 1*

**13–45**  The company sells to A for £100,000 property worth £250,000. The court can order A to reconvey the property to the company but account must be taken of the £100,000 originally paid. The order for retransfer could incorporate a condition that by way of counter-restitution the company repay the whole of the £100,000 originally received, with interest, but this would not necessarily suffice to restore the *status quo*, for in the intervening period the company has been deprived of £150,000 of value which, if it had not entered into the transaction, might have been put to income-producing use. So it might be appropriate to deduct from the amount to be repaid by way of counter-restitution the income that the company could have expected to receive from the property if it had not been sold, less the interest on the consideration it received.

### *Example 2*

**13–46**  The company sells to A for £100,000 property worth £250,000. A makes a gift of the property to his wife, B. An order can be made requiring B to convey the property to the company. Under the general power conferred by s.238(3), the court could also specify as a condition of its order that the company make a repayment to B as in Example 1.

### *Example 3*

**13–47**  The company sells Blackacre to A for £100,000. Blackacre is then worth £250,000. A subsequently resells Blackacre to B for £300,000 and uses the proceeds to buy Whiteacre for £350,000. The court can order A to convey Whiteacre to the company but as in Example 1 account must be taken of the £100,000 originally received by the company. The court could as an alternative order B to convey Blackacre back to the company but not if B had acquired Blackacre in good faith and without notice of the relevant circumstances.[165]

### *Example 4*

**13–48**  The company makes a payment of £100,000 to A for which there is no consideration. A uses the money to buy Blackacre. The court can order A to convey Blackacre to the company.

---

[165] See Insolvency Act 1986 s.241(2) and below, para.13–64.

*Example 5*

The company sells its business and factory premises to A for £1 in consideration **13–49** of A's assuming responsibility for redundancy payments due to the company's employees and discharging the company's obligations to its bankers. The business and premises are worth £1 million. A settles the redundancy claims for £249,999 and the bank's claim for £200,000. Some months later A lends the company £100,000. A also spends £150,000 improving the factory premises. The company then goes into insolvent liquidation. The court could order A to retransfer the business and factory premises to the company but could be expected to require the company, as a condition of the retransfer, to repay the £450,000 expended by A pursuant to the agreement and pay for the value added by the improvements (which is not necessarily the amount of £150,000 spent).[166] Repayment of the loan would not be a condition, this being an independent transaction not attracting a right of counter-restitution, and A would be left to prove for it in the winding-up. However, the court might instead take the view that it was unsatisfactory to dislocate the business by ordering it to be retransferred and also that it would be unfair to A to make an order which would preclude it from exercising a right of insolvency set-off.[167] Accordingly, the court might conclude that a better solution would be to allow A to retain the business and factory premises and to pay the amount of the undervalue (£1 million less £450,000, i.e. £550,000) and interest, against which A would then be able to set off his cross-claim for repayment of the loan of £100,000 and interest.

It will be seen from the above examples that the court may order the vesting **13–50** in the company of: (i) the property originally transferred; (ii) other property acquired with the proceeds of the original property; or (iii) property acquired with money paid by the company. However, in case (ii) it must be shown that the new property was acquired with the proceeds of the original property, and in case (iii) that the property was acquired with the money originally paid by the company. It may not always be easy to establish the necessary nexus between the property of which recovery is sought and the property or money originally transferred or paid by the company. To return to Example 3, suppose that on selling Blackacre A paid the £300,000 into his bank account, that this already had a credit balance of £400,000 and that A draws £350,000 out of his account to pay for Whiteacre. Is Whiteacre to be considered purchased with the proceeds of Blackacre, the £400,000 already in the account or a mixture of the two? If A were a trustee being pursued by the company for breach of trust, there would be no great difficulty in applying equitable tracing rules to arrive at a solution, using whatever presumptions were considered appropriate, for example, the rule in *Clayton's Case* that what is first in the account is the first to go out or the

---

[166] See *Weisgard v Pilkington* [1995] B.C.C. 1108, a decision on a preference but the principle is the same.

[167] This is because a money claim cannot be set off against an obligation to retransfer property. See above, para.9–26.

presumption that a trustee does not intend to commit a breach of trust and should therefore be assumed to have resorted to his own moneys before raiding the trust funds. But A is not a trustee and the purpose of s.238 is not to require A to hand over property acquired or profits made with trust moneys but simply to ensure that the company is no worse off than if it would have been if it had never entered into the transaction in the first place. So there is no point in engaging in an elaborate tracing exercise; all the court need do is to order A to pay such sum as will recompense the company for the value lost, if necessary directing that payment be secured by a charge on Whiteacre.[168]

Section 241 does not prescribe the machinery by which property is to be vested or revested in the company and this is regulated by the general law. In the case of land, the court may simply make an order *in personam* directing the estate owner to convey the land to the company. In most cases, this will suffice. If the person against whom the order is made becomes bankrupt or goes into liquidation before executing the conveyance, there seems to be no reason why the court cannot order the conveyance to be executed by the trustee in bankruptcy or liquidator, for the susceptibility of the transaction to reversal under ss.238 and 241 would appear to constitute an equity binding on the trustee or liquidator. Alternatively, the court, when making the order, may reinforce it by making a declaration that the party against whom it is made is to hold the land as trustee[169] and by using that declaration as a springboard for a vesting order under s.44 of the Trustee Act 1925.

*(2) Orders for the release or discharge of security given by the company*

**13–51**  The court may release or discharge (in whole or in part) any security given by the company. So if a mortgage secures obligations under a contract or conveyance which is held to be a transaction at an undervalue, the court may order the mortgage to be discharged. As stated earlier, the contract or conveyance itself is not set aside; the court simply reverses its effect by ordering a reconveyance or the payment of such sum as will redress the balance.

*(3) Orders to repay the value of benefits received*

**13–52**  The court may make an order requiring any person to pay, in respect of benefits received by him from the company, such sums to the office-holder as the court may direct.[170] A payment order can be made in respect of any kind of benefit

---

[168] For which a separate power is conferred by s.241(1)(f). See below, para.13–58.
[169] Trustee Act 1925 s.48.
[170] For an example, see *Re Sonatacus Ltd* [2007] B.C.C. 186. As to the application of recoveries, see below, para.13–136.

received from the company, whether money or otherwise.[171] So where property has been transferred at an undervalue, the court may, in lieu of ordering retransfer of the property, direct the transferee to repay to the company the shortfall in the consideration he gave and also (to ensure the company is placed in no worse position than if it had not entered into the transaction) interest on the shortfall or other compensation for loss suffered as the result of being deprived of it. Again, the recipient of the benefit need not, it seems, have received it directly from the company.

### Example 6

The company sells to A for £100,000 property worth £250,000. The court can **13–53** direct A to repay £150,000 and interest on that sum for the period between the time of the transfer and the time of payment in compliance with the order.

### Example 7

The company sells to A for £100,000 property worth £250,000. A makes a gift **13–54** of the property to his wife, B. An order as in Example 6 can be made against either A or B or, indeed, against both A and B.

### *(4) Orders reviving the obligations of a surety*

The court may make an order providing for any surety, or guarantor[172] whose **13–55** obligations to any person were released or discharged (in whole or in part) under the transaction to be under such new or revived obligations to that person as the court thinks fit. Such person will usually be the company itself, although it could be the transferee or a third party. Revival of the obligation in effect restores the suretyship, wholly or in part. But the court may alternatively impose a new obligation on the erstwhile surety and this need not be restricted to a suretyship obligation but could be a primary and independent obligation running parallel to that of the principal debtor.

---

[171] See e.g. *Re Husky Group Ltd* [2015] B.P.I.R. 184, where the judge ordered payment of the value of trade marks transferred in a transaction at undervalue. As the judgment makes clear, an order for payment of the value of the benefit received was of more value to the debtor company than an order re-vesting the trade marks, which in the company's liquidation could only be realised on a break-up basis (having been valued on a going concern basis for the purpose of assessing whether the transaction had been one at undervalue). The judge rejected an argument that break-up value should have been used to assess the amount payable: it was argued that even if the transaction had not been entered into the company would have ended up in liquidation anyway (so that a break-up sale was inevitable), but the judge was not satisfied of this.

[172] In English law usage, the terms "surety" and "guarantor" are often used interchangeably. But see below, para.13–96.

*Example 8*

**13–56**  The company makes an advance of £50,000 to A which is guaranteed by B. A repays £20,000 but makes no further repayments. Subsequently, the company's managing director, a close friend of A, arranges for the outstanding balance of the debt to be written off and for A to be released from liability despite the fact that he is well able to pay. In consequence, B is also discharged from liability.[173] The release of A constitutes a transaction at an undervalue. Soon afterwards, an administration order is made against the company. On the application of the administrator, the court may order A to pay the balance of the debt, with interest, and may further order that B's obligations as surety are to be revived or alternatively that he is to come under a new and independent liability for payment as a principal jointly and severally with A.

*Example 9*

**13–57**  The company agrees to buy the business and undertaking of A Ltd, which is wholly owned by the buying company's managing director. The price agreed is £10 million, although on a realistic valuation the business is worth no more than £2 million. As a condition of the sale, A Ltd releases the buying company's parent, B Plc, from its liability as guarantor of a loan of £500,000 previously made by A Ltd to the buying company. Soon after completion of the sale the buying company goes into liquidation. On the application of the liquidators, the court may set aside the sale, in exercise of its general powers under s.238(3), or make an order under s.241(1) for repayment of the excess value paid to A Ltd. The effect of either kind of order is to destroy the basis upon which B Plc was discharged from liability under its guarantee, and in these circumstances the court may consider it just to direct that B's obligations to A Ltd be revived in order to produce a full restoration of the parties to their status quo.

*(5) Orders securing obligations imposed by the orders*

**13–58**  An order may direct that security be provided for the discharge of any obligation imposed by or arising under the order, for such an obligation to be charged on any property and for the security or charge to have the same priority as a security or charge released or discharged (in whole or in part) under the transaction. Thus, where the original security was a first charge and before it was released the company had given a second charge over the same property to another creditor, the court can direct the new security to have the priority over the second charge, thus displacing its promotion to first charge resulting from the release of the original security. Assuming that the second chargee did not make any further advances after release of the original charge, such an order leaves him no worse

---

[173] Since a surety's obligation is coterminous with that of the principal debtor.

off than he was before the original charge was released. But the court cannot make an order which will prejudice rights acquired by third parties in good faith and for value.[174] So, if in reliance on the release of the original security the second chargee makes a further advance, the court cannot give the new charge priority over the second charge as regards that further advance. Similarly, if the company, without having granted a second charge, releases the original security and then gives a mortgage to another creditor to secure an advance by that creditor acting in good faith and without notice, the court cannot make an order which will displace the priority of that creditor as first mortgagee.

### Example 10

The company sells to A for £100,000 property worth £250,000 and soon after- **13–59** wards goes into liquidation. On the liquidator's application the court can order the payment by A of the shortfall of £150,000, with interest, and can direct that all or any of A's assets stand charged to secure compliance with the order.

### Example 11

The company makes an advance of £50,000 to A which is guaranteed by B. The **13–60** guarantee is secured by a charge on B's house Blackacre. A then arranges an overdraft facility with C Bank and gives C Bank a second charge on Blackacre to secure existing and future indebtedness. C Bank advances money on the security of its second charge. Subsequently, the company's managing director, a close friend of B, arranges for the company to release B from his guarantee for no consideration and to discharge the charge. This is a transaction at an under-value. The court may direct B's obligations as surety to be revived and secured by a charge on Blackacre, having the same priority over C Bank's charge as that enjoyed by the original security.

### Example 12

The facts are as in Example 11 except that after A's release and the discharge of **13–61** his mortgage and before the company goes into liquidation, A borrows a further £20,000 from C Bank and also borrows £30,000 from D, secured by a charge on Blackacre, D advancing his money in good faith and without notice. The court may direct B's obligations as surety to be revived and secured by a charge on Blackacre, having priority over C Bank's charge as to advances made by C Bank prior to the release of the original security given by A but the new charge must be made subordinate to C Bank's charge as regards the further advance of £20,000 and must also be made subordinate to the charge in favour of D.

---

[174] Insolvency Act 1986 s.241(2). See below, para.13–64.

*(6) Orders permitting proof of debt by a person affected by the order*

**13–62**   The order may provide for the extent to which any person whose property is vested by the order in the company, or on whom obligations are imposed by the order, is to be able to prove in the winding-up of the company for debts or other liabilities which arose from or were released or discharged (in whole or in part) under or by the transaction. This provision, although applicable to transactions at an undervalue as well as to preferences, is directed mainly to the latter. In the case of transactions at an undervalue, the justice of the case will usually require a condition of repayment by the company (through its liquidator or administrator) of any sum received in exchange for property ordered to be reconveyed to the company.

> *Example 13*

**13–63**   The company sells to A for £100,000 property worth £250,000 and soon after goes into liquidation. The court can order restoration of the property to the company but if it does so it should normally make it a condition of the order that the company repays the original purchase price of £100,000 with interest at the appropriate rate.[175] Alternatively, the court can order A to pay the company £150,000, being the excess value he received but allow him to prove in the liquidation for the same amount.

### Orders affecting third parties

**13–64**   Reference has already been made to the court's power under s.241 of the Act to make an order under s.238 affecting the property of, or imposing an obligation on, any person, whether or not he is the person with whom the transaction at an undervalue was entered into. But by s.241(2), such an order must not:

  (1) prejudice any interest in property which was acquired from a person other than the company and was acquired in good faith and for value, or prejudice any interest deriving from such an interest; and

  (2) require a person who received a benefit from the transaction in good faith and for value to pay a sum to the office-holder except where that person was a party to the transaction.

It is worth emphasising that this is a rule for the protection of third parties, not the company's counterparty to the transaction at an undervalue.

   Prior to its amendment by the Insolvency (No.2) Act 1994, s.241(2) required not merely that the third party should have acquired the asset in good faith and

---

[175] See *Phillips v Brewin Dolphin Bell Lawrie Ltd*, above fn.138; *Ramlort Ltd v Reid* [2004] B.P.I.R. 985.

for value but also that he should have taken it "without notice of the relevant circumstances". For this purpose, "relevant circumstances" were defined, in relation to transactions at an undervalue, as:

"(a) the circumstances by virtue of which an order under section 238 . . . could be made in respect of the transaction if the company were to go into liquidation, or an administration order were made in relation to the company, within a particular period after the transaction is entered into . . . and

(b) if that period has expired, the fact that the company has gone into liquidation or that such an order has been made."

Two problems arose from this provision. First, the definition of "relevant circumstances" was couched in such general terms as to make it unclear whether the third party was required to be without notice of any element in s.238, including the state of insolvency of the company, or merely of the fact that it had entered into a transaction at an undervalue. Secondly, a purchaser from a donee of property was placed in a difficulty where he knew that his vendor was a donee, as might happen particularly in the case of unregistered land, where the consideration or absence of consideration would be shown on search certificates unless the vendor had taken the precaution of removing it. Such a purchaser would have to rely on a declaration of solvency by his vendor.

Section 241 has now been substantially altered to give greater protection to the bona fide purchaser for value. In the first place, there is now a presumption of good faith. In keeping with the characteristically oblique style of Westminster drafting, s.241 does not express this in positive terms. Instead, it provides that, unless the contrary is shown, a person is presumed to have acquired the interest or benefit otherwise than in good faith where he had notice of the relevant surrounding circumstances and of the relevant proceedings or was connected with[176] or an associate of[177] either the company itself or the person with whom it entered into the transaction at an undervalue.[178] "The relevant surrounding circumstances" is defined more narrowly than its predecessor, and in relation to transactions at an undervalue the only relevant circumstance is the fact that the company in question entered into the transaction at an undervalue. Even this reformulation is ambiguous. Is the third party on notice merely because he was aware of the transaction and (even if he did not know) the transaction was in fact at an undervalue? Or must he also be on notice that the transaction was at an undervalue? It seems clear that the latter interpretation is that intended, for a third party can hardly be said to be acting in bad faith if he has no notice of the crucial

---

[176] See Insolvency Act 1986 s.249.
[177] See Insolvency Act 1986 s.435. The reference to an associate of the company is pleonastic, since the definition of "connected" with a company includes a person who is an associate of the company (s.249). See below, para.13–98.
[178] Insolvency Act 1986 s.241(2A).

fact rendering the transaction vulnerable. There is no direct definition of "the relevant proceedings"; what these are is to be gleaned from the provisions of s.241(3A) to (3C) laying down when a person is to be considered to have notice of relevant proceedings. This depends on whether s.238 applies by virtue of an administration order, a liquidation immediately upon discharge of an administration order or a liquidation at any other time. In the first case, what is required is that the third party has notice either of the presentation of the petition on which the administration order is made or of the fact that the order has been made. In the second case, what is required is either notice of one of the above facts or notice of the fact that the company has gone into liquidation. In the third case, the effect of the statutory provisions is that in a compulsory winding-up the third party should have notice either of the winding-up order or of the presentation of the petition on which the winding-up order is made and that in a voluntary winding-up the company has gone into liquidation, i.e. by the passing of a resolution for voluntary winding-up.

It should be noted that if a third party acquires his interest in good faith and for value, the protection he thereby acquires enures for the benefit of his successors in title, whether or not they were aware of the relevant surrounding circumstances. This principle of "sheltering", embodied in the phrase "or prejudice any interest deriving from such an interest", is well established in English law[179] and reflects the fact that a person who acquires a good title to an asset must be free to dispose of it to whomever he wishes, otherwise the marketability of his property is impaired.[180]

### Summary of protection for third parties

13–65   We are now in a position to summarise the statutory provisions for the protection of innocent third parties. Where the company has entered into a transaction by which it transfers property to another at an undervalue and a third party acquires an interest in that property, the third party is protected from an order under s.238 if but only if, he acquired his interest in good faith and for value. There is a rebuttable presumption of *want* of good faith in any of the following cases,[181] that is, where the third party, at the time of acquiring his interest:

(1) has notice of the fact that the transaction under which the company disposed of the property was a transaction at an undervalue;

(2) is connected with, or was an associate of, the company or its transferee; or

---

[179] See *Goode on Commercial Law*, edited by Ewan McKendrick, 5th edn (London: Penguin Books and LexisNexis, 2016), para.2–75.

[180] See *Goode on Commercial Law*, edited by Ewan McKendrick, 5th edn (London: Penguin Books and LexisNexis, 2016), para.2–75.

[181] And thus a rebuttable presumption of good faith where none of these cases is applicable.

    (3) has notice of the fact that the company has gone into administration or liquidation or that any petition on which an administration order or winding-up order was made has been presented.

"Notice" is broader than knowledge and covers not only facts of which a party is aware but facts which he could have discovered by proper enquiry. Thus, a person might be considered to have notice of a winding-up petition by reason of its advertisement and of a winding-up order by reason of its publication in the London Gazette.

### Recovery or disclaimer?

It may happen that a transaction at an undervalue imposes continuing obligations **13–66** on the debtor company which would enable the liquidator to disclaim the transaction as onerous property in regard to the future obligations. The office-holder may then have to elect between remedies. If the transaction is reversed as a transaction at an undervalue, then depending on the order made by the court, there may be nothing to disclaim. On the other hand, exercise of a right of disclaimer as to future obligations may have the result of reversing the imbalance in value in the original transaction, so that while it remains the case that the transaction was at an undervalue at the time it was entered into, no relief, or only reduced relief, is necessary to restore the company to its former position. This issue does not arise in administration, for the reason that the administrator has no power of disclaimer.

## 7. PREFERENCES

### (i) Overview

### The pre-1986 law

English bankruptcy law has long had provisions enabling the court to set aside **13–67** payments and transfers made in the run-up to bankruptcy in favour of a particular creditor which were designed to prefer him over other creditors. Fraudulent preferences, as they were known, were struck down by the courts on policy grounds long before legislation was enacted to deal with them. Prior to the Insolvency Act 1985, the law relating to fraudulent preferences was set out in s.44 of the Bankruptcy Act 1914,[182] which was made applicable to companies by s.320 of the Companies Act 1948. The term "fraudulent preference" was not in fact used in s.44; what the section in fact provided in essence was that every

---

[182] As amended by s.115(3) of the Companies Act 1947.

disposition of property or payment, every obligation incurred, and every judicial proceeding taken or suffered by a person unable to pay his debts with a view to giving a creditor or a surety preference over the other creditors was to be deemed fraudulent and void against the trustee in bankruptcy if the transferor, etc. became bankrupt within six months. It was not in fact necessary to show a fraudulent intent; all that was required was that the debtor should make a voluntary transfer, payment, etc. with the dominant intention of favouring a particular creditor or surety at the expense of other creditors. The debtor was not considered to act voluntarily if he made the transfer or payment under pressure from the creditor, for example, a threat of legal proceedings which genuinely influenced the debtor.

If the object of rules as to preference is to deter a creditor from "opting out" of an anticipated collective procedure by racing to enforce, thereby "undermining the advantages to be gained from a collective proceeding",[183] then it may seem odd that avoidance of a preference should be made to depend on the company's intention to give a preference, rather than on the fact of the creditor receiving one.[184] Indeed, there is no such requirement under Australian or US law, which adopt an "effects" test where it suffices that the transaction improves the creditor's position during the twilight period (subject, however, to a range of exceptions and defences).[185] The focus in the English rule on the intent (now the desire) of the debtor stems from the historical origins of fraudulent preference as an act intended to give one creditor an advantage at the expense of the general body of creditors.[186] The Cork Committee considered whether to recommend that English law be brought into line with Australian and US law but the majority view came out against this on the ground that without an intention to prefer the element of impropriety on which the existing statutory provisions were based was missing and that creditors who were active in the pursuit of payment should be allowed to retain the fruits of their diligence, particularly since they may well

---

[183] See Professor T.H. Jackson's elegant study *The Logic and Limits of Bankruptcy Law* (Cambridge, MA: Harvard University Press, 1986), Ch.6, offering an excellent treatment of legal policy relating to preferences, described from the perspective of US law but in many ways equally applicable to English law. See also D.D. Prentice, "Some Observations on the Law Relating To Preferences" in Ross Cranston (ed.), *Making Commercial Law* (Oxford: Clarendon Press, 1997), pp.439 et seq.

[184] One of the more curious features of s.44 of the Bankruptcy Act 1914 was that it did not say in terms that the transaction had to have the effect of giving the creditor a preference; it referred merely to the fact of payment, transfer, etc. and the intention of the debtor to prefer the creditor. So on a literal construction, a payment or transfer which, although intended to favour the creditor, did not in fact do so was voidable.

[185] See Gerard McCormack, "Swelling Corporate Assets: Changing What Is on the Menu" (2006) 6 J. Corp. L. Stud. 39. However, Professor McCormack considers that there is force in the criticism made by other commentators that the many exceptions to the US preference rule have come close to eliminating it. See also Vanessa Finch and David Milman, *Corporate Insolvency Law*, 3rd edn (Cambridge: Cambridge University Press, 2017), p.490.

[186] Similarly with what are now transactions at an undervalue. See *Alderson v Temple* (1768) 4 Burr. 2235; 98 E.R. 165, and above, para.13–38.

have used these to pay their own creditors.[187] The argument is unpersuasive. A stronger argument might be that rewarding diligence in this way facilitates the revelation of information about the company's financial state earlier rather than later, but it is an empirical question whether any advantages associated with this exceed the costs associated with the possibility of value-destructive "asset grabs" by the diligent.

Even an effects-based preference rule seems likely to only have a very limited deterrent effect on creditors. It is hard to see why a creditor should be deterred from taking the benefit of a preference when if he is lucky the company will survive the preference period, the liquidator might anyway take no steps to recover the preference, as already noted above,[188] even if he does the worst that happens is that the creditor will have to give up the benefit he received.[189] The better view is that the real policy is to preserve equality of distribution during the run-up to insolvency proceedings.[190] But if this is the objective, the English rule falls well short: a rule which allows the creditor who exerts greatest pressure on the debtor company the best chance of resisting a preference claim scarcely reflects a principled approach to the question of equitable distribution in insolvency.[191] Instead, English law seems to have focused on the narrower task of regulating, through the combination of the preference rule and the law on directors' duties (as affected by *West Mercia Safetywear v Dodd*),[192] how an insolvent debtor may resolve to treat its creditors:

> "As Lord Mansfield ultimately developed the idea, the debtor commits a preferential transfer before he commits an act of bankruptcy only if he exhibits a very strange sort of moral will. If the creditor puts great pressure on the debtor, the transfer does not meet that test. Rather, it is only a preferential transfer when, in effect, the debtor tries to create his own scheme of distribution. The sin of the debtor to violate a norm of commercial fellowship is captured in the idea of ratable distribution . . . Yet the obligation of loyalty to this commercial fellowship remains in the debtor, not the creditor. The creditor may hold on to the preference where he puts pressure on the debtor, as if he is not fully responsible to the commercial fellowship, but the debtor is."[193]

---

[187] Insolvency Law Review Committee, *Insolvency Law and Practice* (Cmnd. 8558, 1982), paras 1254 et seq.

[188] See para.13–03.

[189] See to similar effect Vern Countryman, "The Concept of a Voidable Preference in Bankruptcy" (1985) 38 Vand. L. Rev. 713, 748; and David Gray Carlson, "Security Interests in the Crucible of Voidable Preference" (1995) U. Ill. L. Rev. 211, 215.

[190] See Countryman, above.

[191] See the strong criticisms by R.C.C. Cuming, "Transactions at Undervalue and Preferences under the Bankruptcy and Insolvency Act: Rethinking Outdated Approaches" (2002) 37 Can. Bus. L.J. 5.

[192] *West Mercia Safetywear v Dodd* (1988) 4 BCC 30. See para.14–21 et seq. below and on *West Mercia Safetywear v Dodd* and preferences, K. van Zwieten, "Director Liability in Insolvency and its Vicinity", (2018) 38(2) Oxford Journal of Legal Studies 382.

[193] R. Weisberg, "Commercial Morality, the Merchant Character and the History of the Voidable Preference" (1986) 39(1) *Stanford Law Review* 3, 46.

**The changes effected by the Insolvency Act**

**13–68**   The Insolvency Act 1986, re-enacting the Insolvency Act 1985, introduced the following changes:

(1) References to "fraud" were dropped. This was not a change of substance.

(2) Although the vulnerable transaction is still referred to as a preference, this is defined in terms which refer not to a preference of the creditor over other creditors but to placing him in a better position on liquidation than he would have had if the transaction had not been concluded. In fact, this comes to the same thing as a preference but at least the factual improvement of the creditor's position is now expressly stated as an essential element.

(3) In place of the old "dominant intention to prefer", the statutory provisions prescribe a less stringent requirement that in giving the preference the company was influenced by a desire to produce the effect referred to in s.239(4)(b).

(4) The time limit for avoidance is extended from six months to two years in the case of a preference in favour of a person connected with the company.

**The basic provision**

**13–69**   Where an administration order has been made against a company or it goes into liquidation and the company has at a relevant time given a preference to any person, the court may, on an application by the office-holder, make such order as it thinks fit for restoring the position to what it would have been if the company had not given that preference and give consequential relief.[194]

**Conditions to be satisfied under s.239**

**13–70**   The court cannot make an order under s.239 unless the following seven conditions are satisfied:

(1) the company is in liquidation or administration;

(2) application for the order is made by the liquidator or administrator, or their assignee;

---

[194] Insolvency Act 1986 ss.239(l)–(3), 238(1), 240 and 241. See above, paras 13–42 et seq.

(3) a preference was given to a creditor, surety or guarantor;

(4) the preference was given or suffered by the company;

(5) in giving the preference the company was influenced by a desire to improve the position of the person preferred;

(6) the preference was given at a relevant time; and

(7) the company was unable to pay its debts within the meaning of s.123 of the Insolvency Act either at the time of or in consequence of entering into the transaction.[195]

Thus, there must be a factual preference, a desire to prefer and the giving of the preference at a relevant time.[196] Conditions (1), (2) and (6) have been discussed earlier in relation to transactions at an undervalue. However, the concept of "relevant time" raises additional considerations in relation to preferences which it is necessary to examine. Condition (7) was fully explored in Ch.4.

### Defences

Even where all of the above conditions are satisfied, a defence may be available under s.241(2). For the reasons set out below,[197] there would appear to be no scope for the application of general principles of unjust enrichment and no need for any general law right of counter-restitution.[198]  **13–71**

### Onus of proof

In general, the onus lies on the office-holder to establish that all of the conditions necessary for the making of an order under s.239 have been satisfied, including the fact that the company was influenced by a desire to give a preference. But there is a rebuttable presumption of such desire where the preference is in favour of a person connected with the company otherwise than by reason only of being its employee.[199] On the other hand, in contrast to the position in regard to  **13–72**

---

[195] Insolvency Act 1986 *s.*240(2). In contrast to the position in regard to transactions at an undervalue, there is no presumption of inability to pay debts in the case of a preference in favour of a person connected with the company.

[196] See *Transaction Avoidance in Insolvencies* (above, fn.34), Ch.5; Adrian Walters, "Preferences", in Armour and Bennett, *Vulnerable Transactions in Corporate Insolvency*, 2002, p.126.

[197] See para.13–139.

[198] See paras 13–145 et seq.

[199] Insolvency Act 1986 s.239(6). For a case where a director of the debtor company was also managing director of the creditor and effectively took decisions for both companies, see *Re Transworld Trading Ltd, TFS Cargo Services Ltd v Saunders* [1999] B.P.I.R. 628, where the judge declined to accept a picture of "poor Mr. Kirby as managing director of TFS exerting legitimate pressure upon himself as director of TWT".

transactions at an undervalue, there is no presumption of inability to pay debts in the case of a preference in favour of a person connected with the company.[200]

*(ii) The elements of a preference*

**What constitutes a preference**

**13–73**   By s.239(4), a company gives a preference to a person if:

(1)  that person is one of the company's creditors or a surety or guarantor for any of the company's debts or other liabilities; and

(2)  the company does anything or suffers anything to be done which (in either case) has the effect of putting that person into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if that thing had not been done.

The basic features of factual preference[201] are (i) an improvement of the creditor's position, (ii) at the expense of other creditors.

**Examples of preference of creditor**

**13–74**   A creditor's preference typically takes one of three forms, namely: a payment to the creditor[202] or to a third party by direction of the creditor[203]; the provision of security (or additional security) for past advances; and the transfer of debts or other assets in reduction or discharge of the company's liability.[204] But any other act or thing which improves the creditor's position relative to what it would be in an immediately ensuing liquidation suffices as a preference,[205] for example:

---

[200] For a case in which this seems to have been overlooked and proved fatal to the liquidators' application under s.239, see *Re Reynolds DIY Stores Ltd* [2014] B.C.C. 601.

[201] See below, para.13–78.

[202] This could include the distribution of a declared dividend to controlling shareholders if the company was insolvent at the time and the shareholders could not, as persons connected with the company (see Insolvency Act 1986 ss.249(b) and 435(7) and (10)) rebut the presumption of a desire to prefer them (see Insolvency Act 1986 s.239(6)). Where shareholders have to repay the dividend received, they will rank as deferred creditors for the amount of the dividend (Insolvency Act 1986 s.74(2)(f)).

[203] See *Re Exchange Travel (Holdings) Ltd* [1996] B.C.C. 933, per Rattee J at 948.

[204] An agreement that security shall be given only on demand by the creditor or the occurrence of some other uncertain event is not a present security but a mere contract. If the creditor subsequently demands security or the other stated contingency occurs and security is furnished, this will be regarded as given for past value (except to the extent of any new value furnished) and if given within the preference period (six months or two years, as the case may be) will be caught by s.239 if the other conditions of application are satisfied. See *Re Jackson & Bassford Ltd* [1906] 2 Ch. 467; and *Goode and Gullifer on Legal Problems of Credit and Security*, 2017, paras 1–81 and 2–15.

[205] Assuming satisfaction of the other conditions for the application of s.239.

(1) an agreement for set-off going beyond what would be allowed the creditor under the rules governing insolvency set-off[206];

(2) the conferment on the creditor of a right of set-off against a debt already owing to the company by the creditor;

(3) voluntary submission of the debtor company to an unjustified or excessive judgment;

(4) allowing payment to the creditor by a third party who has a right to be recouped by the company; and

(5) performance of a contract in favour of a creditor who had already made payment in advance when performances were also due under other contracts to other creditors in a similar position, as where a seller of goods collects payment from a number of buyers but only makes delivery to a few selected buyers.

### Preference rules confined to creditors, sureties and guarantors

Since the rules as to preference are designed to preserve the sanctity of the *pari passu* principle by which creditors in a winding-up share rateably in the assets available for distribution, they are confined to creditors of and sureties and guarantors for the company,[207] for only a creditor, surety or guarantor can prove in a winding-up.[208]     **13–75**

*"Creditor"*

Only a payment or transfer in favour of a creditor can be attacked as a preference. So a return of trust property or stolen property cannot constitute a preference, since there is no relationship of creditor and debtor.[209] Moreover, such property does not form part of the company's estate and accordingly does not affect either the company or its creditors.[210] Although the term "creditor" includes, for other     **13–76**

---

[206] The fact that such an agreement is of no effect on liquidation, being displaced by the insolvency set-off rules, does not make this example purely theoretical, for the point of time at which the efficacy of the set-off agreement has to be tested is not the date of actual liquidation but the date of the hypothetical liquidation, which as stated above would seem to be immediately after the act asserted to constitute the preference.

[207] Insolvency Act 1986 s.239(4)(a); and *Re Beacon Leisure Ltd* [1991] B.C.C. 213. As to the preference of sureties, see paras 13–93 to 13–96. See also above fn.202.

[208] A surety can prove when he has discharged the debt or that part of it for which he agreed to be responsible.

[209] *Re Wilkinson, Ex p. Stubbins* (1881) 17 Ch.D. 58; and *Sinclair v Wilson* (1855) 20 Beav. 324; 52 E.R. 627, cited in *Re Lehman Bros International (Europe) Ltd* [2010] B.C.C. 272.

[210] See further below, para.13–85.

purposes, future, prospective and contingent creditors as well as creditors to whom debts are currently payable, the preference provisions are necessarily confined to existing creditors, for it is only they who by definition will have received a payment or transfer without giving new value. It is true that a future creditor could be paid in advance of performance but that is not a preference, since he remains liable to perform and thereby give value.

### "Surety"; "guarantor"

**13–77**   These terms are examined later in the discussion of a preference in favour of a surety or guarantor.[211]

### Improvement of the creditor's position as the criterion of a preference

**13–78**   In determining whether a creditor has been preferred, the acid test is whether what is done would have the effect of disturbing the statutory order of priorities in an insolvent liquidation[212] by placing the creditor or surety or guarantor in a more favourable position than he would otherwise have had. The mere fact that the thing is done or suffered in pursuance of a court order does not, without more, prevent it from constituting a preference.[213] This re-enacts previous law in enabling the court to look behind collusive judgments.[214]

It was noted above that the former legislation contained no express requirement that the creditor should in fact have received a preference; all that had to be established was that a payment, transfer, etc., was made with a view to giving the creditor or surety a preference over the other creditors, a provision interpreted by the courts as requiring that the company's dominant intention should be to give such a preference. Section 239(4)(b) of the Insolvency Act 1986, in defining a preference, says nothing about preferring a creditor over other creditors; the test is whether what was done has the effect of putting the creditor in a better position upon winding-up than he would have been in if it had not been done. But this comes to the same thing. If the effect of a payment or transfer made or suffered by the company is to make the creditor better off on winding-up than he would otherwise have been, this can only be at the expense of other creditors. So the new test of improvement is merely another way of describing a preference, and perhaps a more satisfactory way, since it underlines the separately stated requirement that the company be insolvent at the time of the payment or transfer in

---

[211] See below, paras 13–93 to 13–96.

[212] "Insolvent liquidation" is not defined for the purpose of this section but presumably has the same meaning as in ss.214(6) and 216(7), namely liquidation at a time when the company's assets are insufficient for the payment of its debts and other liabilities and the expenses of the winding-up.

[213] Insolvency Act 1986 s.239(7).

[214] For an example, see *Re Menastar Finance Ltd* [2003] 1 B.C.L.C. 338.

question or become insolvent because of it.[215] Obviously, a payment or transfer made by a company which remains solvent after making it does not improve the creditor's position, for he would in any event have been paid in full if the company had gone into winding-up.

### (1) No preference to the extent of new value

The payment, transfer or other act under attack must relate to a past indebtedness, for to the extent that the creditor gives new value, he gains no advantage,[216] and even if he happens to be a creditor already in respect of some prior transaction, he does not receive the payment, transfer, etc. in his capacity as such but derives it from the independent, new transaction concluded for value. **13–79**

#### Example 14

C grants D Ltd an overdraft facility. Subsequently, C makes a fixed loan of £300,000 to D Ltd for the purchase of capital equipment, the loan being secured by a charge on the company's factory premises. At that time the company's account is overdrawn by £20,000. The grant of the charge does not constitute a preference for it was given not in respect of the existing indebtedness of £20,000 but to secure a new advance. The charge was therefore not taken by C in the capacity of an existing creditor.[217] **13–80**

Since a preference involves a payment, transfer or other act which, assuming the company were to go into insolvent liquidation immediately thereafter,[218] would put the creditor in a better position than if the payment or transfer had not been made or the other act performed, the preference provisions cannot apply to the extent that the creditor gives new value, for he does not take out a penny more than he puts in. So a creditor who takes security for a contemporaneous or subsequent advance does not obtain a preference, since the diminution in assets created by the security is matched by the infusion of new funds. Again, a simultaneous exchange of goods and money on a sale transaction cannot involve a preference, whether the company be the buyer or the seller.

### (2) Security in after-acquired property

The concept of new value is of particular importance in relation to a charge taken over after-acquired property to secure contemporaneous or future advances, for **13–81**

---

[215] See above, paras 13–07 and 13–70.
[216] See below, para.13–80.
[217] *See Robertson v Grigg* (1932) 47 C.L.R. 257.
[218] See below. As to whether post-liquidation assets fall within the scope of an after-acquired property clause, see above, paras 6–31 et seq.

each newly acquired asset, having been bargained for as security at the outset, is considered given in security for new value, a point I have developed else-where.[219]

### Some problems concerning new value

**13–82**  The concept of new value is easy to understand but sometimes hard to apply. Let us consider, first, the single transaction involving the provision of services for payment, and secondly, a course of dealing between the parties reflected in the operation of a running account.

### *(1) Simultaneous exchange*

**13–83**  In relation to the single transaction, we have seen that a simultaneous exchange gives rise to no preference problem. What is not clear is the degree of simultaneity that the court will expect in order to treat a payment or transfer as being for new value. Suppose, for example, that a solicitor deals with the purchase of land for a client company, renders his bill after completion and then receives payment. Has he thereby improved his position? Or can he contend that he collected his charges so closely after the provision of his services that these should be considered to constitute new value? A commonsense approach indicates that it suffices that payment is made within a time normal for a transaction not intended to involve the extension of credit. In any event, in the ordinary way the making of the payment will be pursuant to that intention and not from a desire to improve the position of the solicitor vis-à-vis other creditors.

### *(2) Mutual dealings on running account*

**13–84**  Now let us turn to the position where there is a continuous flow of dealings between parties. Must each payment be treated in isolation to see whether it would have given the creditor an advantage if the company were to go into winding-up immediately thereafter? How far can credit be given for *contra* items? The Act itself gives no guidance. There is no general exemption of transactions entered into bona fide by the creditor in the ordinary course of business. What is relevant is not the creditor's good faith but the question whether the company was influenced by a desire to confer an advantage on him, which as we shall see is a necessary prerequisite to any order under s.239 or 241. In practice, however, the two are likely to go together. Where the creditor receives a payment in good faith, it will almost invariably be the case that the

---

[219] *Goode and Gullifer on Legal Problems of Credit and Security*, 2017, para.2–13.

company makes the payment as a normal part of its business or to protect its own interests (for example, for the purpose of ensuring the continuance of supplies), not to favour the creditor to whom payment is made.

In the typical case, there is a running account between the parties to record mutual dealings. Suppose that a company whose account with its bank is overdrawn pays a cheque into the account, thus reducing the overdraft. If the company were at that time insolvent, the payment in would constitute a preference and would be vulnerable to attack if made with intent to prefer the bank. But suppose a few days later the bank honoured a further drawing. Would it be liable to repay the preference without being given credit for the fresh advance? Such a result would seem unfair in the extreme, giving a windfall to the general body of creditors. Could the fresh drawing be treated as a reversal of the preferential payment? This is one way out of the dilemma. The court makes no order because the bank has already put right the wrong. Another way of approaching the matter is to say that:

> " . . . where a payment is not in pursuance of an isolated transaction but is bound up with a series of transactions, it is the effect of the total transactions, of all the connected items, that has to be looked at".[220]

This approach by the Australian courts,[221] which has been adopted in at least one case in England,[222] has much to commend it, for even if a payment into the account was intended to be preferential, a connected payment out should be treated as negating the preference *pro tanto*, as it restores the loss of assets which is the rationale of the preference provisions. However, the preference will not be undone to the extent that the new drawing is secured by a fresh and valid security.[223]

Moreover, the fact that there is a series of mutual dealings, with debits and credits on both sides, will usually suffice to negate an intention to prefer, for it suggests either that a payment into the account was made in the expectation that further drawings would be allowed or that the bank allowed a further drawing on the understanding that it would be covered by a further payment into the account. In either case, there is no intention to prefer or, indeed, a true preference at all. Indeed, it has been said that the real question is not the labelling of the account

---

[220] *Ferrier v Civil Aviation Authority* (1995) 127 A.L.R. 472; and *M. & R Jones Shopfitting Co Pty Ltd v National Bank of Australasia Ltd* (1983) 7 A.C.L.R. 445, citing *Re Weiss* [1970] A.L.R. 654, in which all of the earlier Australian authorities are reviewed.

[221] Which has since been adopted by the legislature in what is now s.588FA(3) of the Corporations Act 2001 (Cth), re-enacting s.588FA(2) of the Corporation Law Reform Act 1992 enacted pursuant to the recommendations of the Harmer Report (Australian Law Reform Commission, *General Insolvency Inquiry*), para.655. See *Hussain v CSR Building Products Ltd* (2016) 112 ACSR 507 per Edelman J.

[222] *Wilson v Masters International Ltd* [2010] B.C.C. 834.

[223] cf. the US Bankruptcy Code s.547(c)(4). If the overdraft had been previously secured, there would not be a preference at all. See below, para.13–88.

as a running account but rather the intention that payments into the account will generate future supplies of goods, services or credit. Accordingly, it is not necessary that payments into the account should go in reduction of the ultimate debit balance; even payments made to discharge specific debit items will qualify for the application of the principle if the intention is that they should form part of a continuing relationship involving the extension of further credit. The leading authority is the decision of the High Court of Australia in *Airservices Australia v Ferrier*,[224] in which there were mutual dealings between the parties, sums paid were applied in discharge of particular debts but the debit balance substantially increased over the period of the mutual dealings. It was held by Dawson, Gaudron and McHugh JJ (Brennan CJ and Toohey J dissenting) that none of the payments except the last (which was not a trigger for new credit) was a preference. The principle was stated by the majority in the following terms:

"Since the decision of this Court in *Richardson v Commercial Banking Co of Sydney Ltd*, the term 'running account' has achieved almost talismanic significance in determining when the ultimate, rather than the immediate and isolated, effect of a payment is to be examined for the purpose of a determination under s.122 of the Bankruptcy Act. However, the significance of a running account lies in the inferences that can be drawn from the facts that answer the description of a 'running account' rather than the label itself. A running account between traders is merely another name for an active account running from day to day, as opposed to an account where further debits are not contemplated. The essential feature of a running account is that it predicates a continuing relationship of debtor and creditor with an expectation that further debits and credits will be recorded. Ordinarily, a payment, although often matching an earlier debit, is credited against the balance owing in the account. Thus, a running account is contrasted with an account where the expectation is that the next entry will be a credit entry that will close the account by recording the payment of the debt or by transferring the debt to the Bad or Doubtful Debt A/c.

If the record of the dealings of the parties fits the description of a 'running account', that record will usually provide a solid ground for concluding that they conducted their dealings on the basis that they had a continuing business relationship and that goods or services would be provided and paid for on the credit terms ordinarily applicable in the creditor's business. When that is so, a court will usually be able to conclude that the parties mutually assumed that from a business point of view each particular payment was connected with the subsequent provision of goods or services in that account. Sometimes, however, the transactions recorded in the account may be so sporadic that a court cannot conclude that there was the requisite connection between a payment and the future supply of goods even though the account was kept 'in the

---

[224] *Airservices Australia v Ferrier* (1996) 185 C.L.R. 483.

ordinary form of a running account in which debits and credits are recorded chronologically and in which payments are not shown as attributable to any particular deliveries but are brought generally into credit'. Thus, it is not the label 'running account' but the conclusion that the payments in the account were connected with the future supply of goods or services that is relevant, because it is that connection which indicates a continuing relationship of debtor and creditor. It is this conclusion which makes it necessary to consider the ultimate and not the immediate effect of individual payments."[225]

### Improvement in creditor's position must be at expense of other creditors

Since s.239 is aimed at transactions which disturb the statutory order of distribu- **13–85** tion, it follows that to be a preference within s.239 the payment or transfer must be one by which the creditor is put in a better position *at the expense of other creditors*. Accordingly it is not a preference for the company to pay a secured creditor a sum not exceeding the value of the security, for this leaves the position of other creditors unaffected.[226] By the same token, a payment or transfer is not a preference if made to the creditor by a third party, except to the extent to which the ultimate burden falls on the company's assets that would otherwise have been available to all of its creditors, as where the third party is entitled to recoupment from the company and that right is secured.

There is, however, the difficult decision of the High Court of Australia in *G & M Aldridge Pty Ltd v Walsh*,[227] in which a bank took a fixed charge over certain assets of a company, TLL, and a floating charge over the remaining assets, which included a sum standing to the credit of an account with the bank by another company as agent for TLL. The amount owed to the bank exceeded the value of the security, so that no part of the assets given in security would remain for unsecured creditors. The bank's charge crystallised. Nevertheless it continued to allow drawings on the account, including payments to certain creditors which TLL's liquidator sought to recover as preferences. Neither the Court of Appeal nor the High Court found it necessary to deal with the contention that the bank had waived its security or was otherwise estopped from enforcing it. Nevertheless the High Court rejected the contention that the payments had come not from moneys available to the company but moneys that could have been taken by the bank under its charge and upheld the decisions of the courts below allowing recovery as a preference under s.588FA of the Corporations Law.

---

[225] *Airservices Australia*, cited above fn.224, at 504–505 (footnotes omitted). See to similar effect *Re Libra Industries Pte Ltd* [1999] S.L.R.(R) 105. But a mere established past practice of making payments into a bank account unconnected with the extension of new credit does not suffice (*Liquidators of Progen Engineering Pte Ltd v Progen Holdings Ltd* [2010] S.G.C.A. 31).

[226] See below, para.13–88.

[227] (2001) 203 C.L.R. 662.

It is clear that the court was strongly influenced by the bank's conduct in allowing the company to continue operating the account despite the crystallised charge, and perhaps the perception that since it had shown no signs of enforcing its charge the moneys were in fact available to the company. What is difficult is the court's disagreement with the reasoning of Brennan CJ in *Sheahan Carrier Air Conditioning Pty Ltd*[228] to the effect that if a fund is fully charged to a secured creditor who consents to payment out of the fund to another creditor, that creditor gains no preference at the expense of other creditors, to whom no part of the fund would have been available anyway. Rejecting this proposition, the High Court held that the question was not whether the payment was "at the expense of other creditors" but whether it gave the recipient a preference, priority or advantage. However, s.588FA(1)(b) does require that the transaction under attack as a preference should result in the creditor receiving a benefit *from the company*, and it would seem to follow from the High Court's decision that this is to be construed literally as including payments and transfers passing *through* the company under a transaction to which it is a party, even if the company itself has no beneficial interest in the subject matter of the payment or transfer. The decision may, however, have turned on its own rather special facts and does not, it is thought, reflect the position under the differently worded provisions of s.239 of the Insolvency Act 1986. If a third party chooses to pay a particular creditor without this resulting in any diminution in the company's assets, the creditor's position is undoubtedly improved but the payment is not within the mischief at which the preference provisions are aimed. There would be no doubt about that if the third party made the payment direct to the creditor without involving the company. Why should it make any difference if the payment comes from a fund held by the company but impressed with a trust or charge in favour of the third party to secure an amount exceeding the value of the fund? Assuming that the burden of the payment does not ultimately fall on the company's assets, the payment is not in any real sense made by the company at all; it is merely the vehicle for the transmission of the third party's funds.[229] Again, the mere fact that the payment is made at the company's request or that it is a party to the transaction under which the payment is made by another does not by itself engage the company's assets so as to give rise to a preference. One recent English case provides clear support for this analysis.[230]

The position is otherwise, of course, where the third party is entitled to be indemnified by the company and the indemnity is secured by a charge on an asset

---

[228] (1997) 189 C.L.R. 407 at 424.

[229] See to similar effect Adrian Walters, "Unlawful preferences and proprietary rights" (2003) 119 L.Q.R. 28.

[230] *Mundy v Brown* [2011] B.P.I.R. 1056, in which Judge Raynor QC (sitting as a judge of the High Court) found that the relevant funds were held under a Quistclose trust and that this provided a complete answer to the liquidator's preference and transaction at undervalue claims: "those claims are based upon the premise that funds belonging to the company have been wrongly applied . . . However, on my analysis the funds that were applied were never the company's beneficially" (at [29]).

which exceeds in value what is owed to the chargee, so that if the security has not been released and remains intact, the payment operates to reduce the value of the company's equity of redemption. The third party's payment to the creditor is then a preference, because the ultimate effect of the transaction is that payment is being made by the company itself from the asset given in security. The same situation arises where the third party, although not secured in the technical sense, has a right of set-off or combination in respect of a separate account of the company which is in credit, for this right is an equity to which the account is subject and its exercise reduces *pro tanto* the amount of the credit balance. But if the right of indemnity is wholly unsecured there is no preference, merely the substitution of one creditor for another. So if a creditor is paid from the company's overdrawn account, increasing its overdraft still further, if the overdraft is not secured or covered by a right of set-off or combination against an account in credit, there is no preference, for the bank simply replaces the original creditor and there is no depletion of the company's assets.

There has been much discussion of direct payment clauses in construction contracts empowering the building owner, on the insolvency of the main contractor, to make payment direct to sub-contractors of sums due to them from the main contractor. The validity of such clauses has been discussed earlier in the context of the common law *pari passu* rule,[231] but the question also arises of whether a direct payment is a preference of the sub-contractor at the expense of the main contractor's creditors. Again, in the absence of a trust or equitable assignment in favour of the sub-contractor,[232] a direct payment to the latter is vulnerable as a preference if influenced by the requisite desire to improve his position.[233]

**Payment or transfer need not be by company**

Although, as stated above, the payment or transfer must ultimately come from the company's assets in order to constitute a preference, it is not necessary for the company itself to make the preferential payment or transfer; it suffices that the company "suffers" the payment or transfer to be made.[234] "Suffer" means permit or allow in circumstances where the company has control of the payment or transfer in the sense that its permission is needed to make it and can be refused,[235] and *a fortiori* if the company can require the payment or transfer to be made, it suffers it to be made.[236] There is no preference where the creditor    **13–86**

---

[231] See above, para.8–12.
[232] See above, para.6–17.
[233] See para.13–91.
[234] Insolvency Act 1986 s.239(4)(b).
[235] *Sefton v Tophams Ltd* [1967] 1 A.C. 50; *Earl of Leicester v Wells-next-the-sea UDC* [1973] Ch. 110; *Berton v Alliance Economic Investment Co Ltd* [1922] 1 K.B. 742.
[236] *Earl of Leicester v Wells-next-the UDC*, cited above, per Plowman J at 124 in a decision on "permit".

collects payment through a mechanism over which the company has no control, such as the exercise of a right of set-off by the creditor[237] or by an assignee under an assignment to which the company's consent was not required.[238]

### The hypothetical liquidation

13–87   Preference is tested by reference to a hypothetical, not an actual, liquidation. It is not necessary that the company shall in fact have gone into liquidation, for the preference provisions apply equally in administration. If the company enters administration, the question of preference still has to be tested by asking whether the effect of the payment, transfer or other act would be to put the creditor in a better position if winding-up were to supervene than he would otherwise have had. It would seem that for this purpose liquidation should be assumed to have taken place immediately after the payment, transfer or other act in question,[239] and with reference to creditors then existing, so that subsequent events (for example, the accrual of new preferential debts) should be ignored, a point which may assist a creditor who is collecting payment under a floating charge.[240]

### Payments to secured creditors

13–88   In general, payment to a secured creditor in reduction or discharge of the debt is not a preference, for the effect of the payment is to reduce or extinguish the security interest and thus *pro tanto* to increase the company's equity in the previously charged assets and make them available to other creditors. Accordingly, the payment produces no change in the value of the assets available for the general body of creditors. Moreover, if the company were to refrain from making the payment, that would not help the other creditors, for the secured creditor would still be entitled to enforce his security, assuming the giving of it had not itself been by way of preference. Thus, it has been held in Australia that a bank which in good faith and in the ordinary course of business collects a cheque for a customer and credits the proceeds to the customer's overdrawn account does not receive a preference, for the bank had a lien on the cheque to secure the overdraft and thus a security interest in the proceeds, so that the application of these in reduction of the overdraft does not alter the customer's asset position.[241]

---

[237] See below, para.13–89.

[238] *Klempka v Miller* [2010] B.C.C. 309, also known as *Re Parkside International Ltd*.

[239] The date of any actual liquidation is irrelevant as a temporal point for determining improvement of the creditor's position.

[240] See below, para.13–88.

[241] *National Australia Bank v KDS Construction Services Pty Ltd* (1987) 163 CLR 668. The position would be otherwise, of course, if the cheque were given to the bank not simply for collection but with a view to giving it an advantage it would not otherwise have enjoyed, for then the giving of the lien over the cheque to the bank will itself constitute a preference.

Similarly, where a guarantee has been given in respect of the secured debt, the surety's position is not improved to the extent of the value of the asset given in security, for the effect of this would have been to reduce the surety's liability anyway or entitle him to take over the security by way of subrogation on discharging the debt.[242]

However, there are at least four situations in which payment to a secured creditor may constitute a preference. The first is where the amount of the payment exceeds the value of the security; in that event, the payment is vulnerable to the extent of the excess. The second is where the security is one which, if winding-up had occurred immediately after the payment, would have been rendered void, for example, for want of registration, for on that hypothesis the payment reduces the net value of the company's assets.[243] The third is where the payment is made to the holder of a floating charge and at the time of the payment there were insufficient free assets to pay the preferential creditors then existing, for upon a winding-up immediately after the payment these would have had priority over the holder of the floating charge,[244] who thus derives an advantage from the payment made to him. But since (if the view expressed above is correct) the notional liquidation must be assumed to have commenced immediately after the payment to the floating chargee, only preferential debts then in existence are relevant, and the chargee will not be considered to have improved his position merely because new preferential debts come into existence at a later date. The fourth case is where payment is made to the holder of a floating charge and discharges the security, so that the general creditors lose the benefit of the prescribed part, which, on the hypothesised winding-up, would have had to be surrendered to the liquidator to form a fund available to unsecured creditors.[245]

### Exercise of right of set-off

No question of preference can arise where the creditor collects payment by exercise of a right of set-off, for this does not require the consent of the company at all, let alone a desire on its part to improve the creditor's position.[246] Payment by the company into an overdrawn account with its bank is likewise not capable of being a preference where the payment does not exceed the amount of a credit

**13–89**

---

[242] See below, para.13–94.

[243] Consistently with this, see *Re Flexi Containers* [2018] EWHC 12 (Ch) at [122] (charge rendered invalid by Insolvency Act 1986 s.245). Where the security would not have been void but merely liable to be discharged, e.g. under s.241(1)(c), the court must presumably decide whether it is likely that an order under s.241(l)(c), or an order producing a similar effect, would have been made.

[244] Insolvency Act 1986 s.175(2)(b). See above, para.8–57.

[245] Insolvency Act 1986 s.176A. See above, paras 6–37 et seq.

[246] However, a party who has received a preference cannot avoid repayment by exercising a right of set-off. See above, para.9–29.

balance held by the company on another account to which the bank could have resorted by way of combination of accounts if the payment in question had not been made, for the effect of the payment is *pro tanto* to reduce the available amount of set-off against the account in credit, so that the position of other creditors is unaffected. Where the company has a contractual right to set off against one customer's credit balance an amount due from another customer, exercise of that right is not a preference of the first customer, for it is for the company's benefit, not that of the first customer.[247]

### What does not constitute a preference

**13–90**    It will have been apparent from the above that the following transactions (inter alia) do not involve the giving of a preference:

(1) payment to a validly secured creditor of a sum not significantly exceeding the value of his security, having regard to any preferential debts then in existence ranking in priority to the security;

(2) payment to avoid loss of an asset (for example, property or equipment held on lease) or of a right (for example, under a contract) having a value not less than the amount of the payment;

(3) the exchange of an asset of the company for one of at least equal value;

(4) the grant of security for a contemporaneous or subsequent advance or other new value;

(5) payment or transfer of property to a person who is not a creditor of the company; and

(6) payment to the creditor by a third party which does not involve any call on the company's assets.

*(iii) The company's desire to prefer*

### "Influenced by a desire"

**13–91**    As stated earlier,[248] under the old law a preference was not voidable unless the company's dominant intention in making the payment, transfer, etc. to the creditor was to prefer him to the other creditors. The Insolvency Act 1986,

---

[247] *Re Exchange Travel (Holdings)*, cited above fn.203.
[248] Above, para.13–67.

re-enacting the provisions of the Insolvency Act 1985, formulates the criterion rather differently. As before, the mere fact of preference does not suffice to make the court's power's exercisable. What has to be shown in addition is that in giving the preference the company was influenced in deciding to give it by a desire to produce in relation to the preferred party the effect of putting him in a better position than he would have been in if the payment, transfer, etc. had not been made.[249]

Since preference itself is defined in terms of improvement of the creditor's position rather than in terms of preferring him to other creditors, no reference is made to an intention to prefer. Instead, the question is whether the company was influenced by a desire to improve the creditor's position compared with what it would have been on an immediate winding-up. Three questions arise. First, what is "desire"? Is it the same as intent? Or motive? Secondly, does "influenced by" require that the desire to prefer should be the sole factor, the dominant factor or some lesser degree of influence in the decision to make the payment or transfer? Thirdly, what is the relevant time at which to test the desire: the time the debenture is given or the time when the decision to give it is made? The root decision on all three questions is that of Millett J in *Re M.C. Bacon Ltd*.[250] In that case, the company had run up a substantial unsecured overdraft with its bank, which was prepared to continue its support but stipulated that in view of the serious position in which the company found itself an essential condition of this was the provision of a first mortgage debenture over the company's assets. Three months after executing the debenture, the company went into liquidation. The liquidator attacked the debenture as a transaction at an undervalue and a preference. As noted earlier, the first of these two grounds failed on the basis that the giving of security did not reduce the assets.[251] Millett J proceeded to deal with the allegation of preference in the following terms:

> "Section 44(1) has been replaced and its language has been entirely recast. Every single word of significance, whether in the form of statutory definition or in its judicial exposition, has been jettisoned. 'View', 'dominant', 'intention' and even 'to prefer' have all been discarded. These are replaced by 'influenced', 'desire' and 'to produce in relation to that person the effect mentioned in subsection (4)(b)'.
>
> I therefore emphatically protest against the citation of cases decided under the old law. They cannot be of assistance when the language of the statute has been so completely and deliberately changed.
>
> This is a completely different test. It involves at least two radical departures from the old law. It is no longer necessary to establish a *dominant* intention to

---

[249] Insolvency Act 1986 s.239(5). For the position relating to preference of a surety, see below, paras 13–93 et seq.
[250] *Re M.C. Bacon Ltd* [1990] B.C.C. 78.
[251] See above, para.13–35.

prefer. It is sufficient that the decision is *influenced* by the requisite desire. That is the first change. The second is that it is no longer sufficient to establish an *intention* to prefer. There must be a *desire* to produce the effect mentioned in the subsection.

This second change is made necessary by the first, for without it would be virtually impossible to uphold the validity of a security taken in exchange for the injection of fresh funds into a company in financial difficulties. A man is taken to intend the necessary consequences of his actions, so that an intention to grant a security to a creditor necessarily involves an intention to prefer that creditor in the event of insolvency. The need to establish that such intention was dominant was essential under the old law to prevent perfectly proper transactions from being struck down. With the abolition of that requirement intention could not remain the relevant test. Desire has been substituted. That is a very different matter. Intention is objective, desire is subjective. A man can choose the lesser of two evils without desiring either.

. . . A man is not to be taken as *desiring* all the necessary consequences of his actions. Some consequences may be of advantage to him and be desired by him; others may not affect him and be matters of indifference to him; while still others may be positively disadvantageous to him and not be desired by him but be regarded by him as the unavoidable price of obtaining the desired advantage. It will still be possible to provide assistance to a company in financial difficulties provided that the company is actuated only by proper commercial considerations. Under the new regime a transaction will not be set aside as a voidable preference unless the company positively wished to improve the creditor's position in the event of its own insolvent liquidation.

There is, of course, no need for there to be direct evidence of the requisite desire. Its existence may be inferred from the circumstances of the case just as the dominant intention could be inferred under the old law. But the mere presence of the requisite desire will not be sufficient by itself. It must have influenced the decision to enter into the transaction. It was submitted on behalf of the bank that it must have been the factor which 'tipped the scales.' I disagree. That is not what subsection (5) says; it requires only that the desire should have influenced the decision. That requirement is satisfied if it was one of the factors which operated on the minds of those who made the decision. It need not have been the only factor or even the decisive one. In my judgment it is not necessary to prove that, if the requisite desire had not been present, the company would not have entered into the transaction. That would be too high a test.

It was also submitted that the relevant time was when the debenture was created. That cannot be right. The relevant time was the time when the decision to grant it was made."[252]

---

[252] *Re M.C. Bacon Ltd* above, fn.250, at 87–88. As to the relevant time, see also *Stealth Construction* [2012] 1 B.C.L.C. 297, and *Green v El-Tai* [2015] B.P.I.R. 24 at [92]–[93].

Millett J went on to hold that the company was not motivated by a desire to improve the bank's position as creditor in the event of the company's liquidation, and that accordingly the allegation of preference had not been made out. In a subsequent case[253] the subjective nature of desire was emphasised and it was held that a payment made by the company in winding-up to its bank was not a preference where the payment was motivated by commercial considerations such as the need to obtain finance from other sources. This raises the question of how a company forms a desire. Plainly this can only be done through a human agent, who must, it is thought, be a director, general manager or other person of sufficient authority in the company that he can be said to represent its mind and will or a person acting on his instructions, as opposed to a junior employee who in paying a creditor simply fulfils a routine function.

Banks are in a somewhat special position as creditors because one of their functions is to collect cheques for customers and credit the proceeds to the customers' accounts. If an insolvent customer whose account is overdrawn pays in cheques for collection, this has the effect of improving the bank's position, for it acquires a lien on the cheque and thus a security interest in the proceeds. The payment in of the cheque is thus a preference but s.239 will not apply unless the office-holder can show that in doing this the customer was influenced by a desire to improve the bank's position rather than because the normal method of collecting cheques is to give them to one's bank for collection. The office-holder may not always find it easy to show this, particularly where the company has only one bank account, for if it is taxed with being influenced by a desire to give a preference, its response is likely to be: "What else should we have done with the cheques?"

As stated above, there is a rebuttable presumption that the preference was influenced by the requisite desire where it was given to a person who was at the time[254] connected with the company otherwise than by reason only of being its employee.[255] It has been held that rebutting this presumption requires, in practical terms, the connected party to satisfy the court on the balance of probabilities that the company was "acting solely by reference to proper commercial considerations in making the payments, and that a desire (i.e. a subjective wish) to better the position of [the payee] in the event of an insolvent liquidation did not operate on the directing mind or minds of [the company] at all".[256]

---

[253] *Re Fairway Magazines Ltd* [1992] B.C.C. 924. See also *Mundy v Brown* [2011] B.P.I.R. 1056 and *Green v El-Tai*, above (both cases in which the payments were held to have been motivated by proper commercial considerations; in the latter case, the presumption of the requisite desire in relation to connected parties applied but was held to have been rebutted).

[254] See *Re Flexi Containers* [2018] EWHC 12 (Ch), in which Judge Davis-White QC sitting as a judge of the High Court sensibly held that a resignation from directorship with retrospective effect would not have the effect of retrospectively causing the defendant to cease being a connected person for the purposes of s.239. As to the definition of a connected person, see below, para. 13–98.

[255] Section 239(6).

[256] *Wilson v Masters International Ltd* [2010] B.C.C. 834 at [76] per Mark Cawson QC; see also *Re Cosy Seal Insulation Ltd (in administration)* [2016] 2 B.C.L.C. 319.

**Good faith of creditor irrelevant**

13–92    As in the case of transactions at an undervalue,[257] the party whose desire is relevant is the company. The defence of good faith is not open to the preferred creditor or preferred surety, a point made clear by s.241(2)(b).

> "Section 239 focuses not on the conduct or state of mind of the creditor concerned, but on that of the directors or others acting for the company. In many cases, the preferred creditor will share the desire to be preferred but this need not be so."[258]

*(iv) Preference of a surety or guarantor*

**Preference of a surety**

13–93    In applying the statutory provisions to preference of a surety[259] (we shall come to the term "guarantor" in a moment), the Insolvency Act follows the old law, although as we shall see, the court's powers in relation to a preferred surety are more extensive than they were generally considered to be under the Bankruptcy Act 1914.

*(1) The fact of preference*

13–94    Where the debtor company makes a payment to its creditor in discharge or reduction of a guaranteed debt, the payment benefits not only the creditor, but the surety: the creditor because it extinguishes or reduces his claim, and the surety because it discharges or reduces his secondary liability. If the surety is fully solvent, can the creditor argue that his position has not been improved by the debtor company's payment because he would have been paid in full anyway by the surety? No, because the payment has reduced the company's assets and obviated the need to proceed against the surety.[260] By contrast, if the creditor is fully secured from another source, the payment does not improve the surety's position, for upon the hypothesised liquidation, he would either not have had to pay at all or, if required to pay, he would have been subrogated to the creditor's security, whilst if the creditor is partly secured the value of its security or the

---

[257] See above, para.13–38.

[258] *Re Stealth Construction,* cited above fn.252, the facts of which starkly illustrate this point.

[259] A person may be a surety for this purpose if he has merely charged his property as security for the principal debtor's indebtedness without assuming any personal liability (*Re Conley* [1938] 2 All E.R. 127).

[260] See Adrian Walters, "Preferences", in Armour and Bennett, *Vulnerable Transactions in Corporate Insolvency*, 2002, 126 at 149, fn.116.

proceeds of its realisation would *pro tanto* reduce the amount of the improvement in the surety's position.[261]

### (2) The desire

In making a payment, the company may be influenced by a desire to improve the **13–95** creditor's position, the surety or both the creditor and the surety.[262] The question of whether there is the requisite desire must be asked in respect of each person to whom a preference has been given.[263] A desire to prefer the creditor does not of itself indicate an intent to prefer the surety; conversely, the company may intend to prefer the surety without being in any way influenced by a desire to assist the creditor.[264] The typical case is where a company's account has been guaranteed by the directors, who at a time when the company is insolvent arrange for it to repay the bank, not out of any desire to improve the bank's position but to obtain a release from their own liability to the bank. This is a preference of the sureties because the repayment operates not merely to affect the relations between the bank and the sureties but to avoid a situation in which the sureties, having paid the bank under their guarantee, are left to prove in the winding-up in competition with other creditors for their indemnity entitlement. Discharge of the sureties therefore improves their position relative to what it would have been on a winding-up. As will be seen, the working out of the statutory provisions in relation to sureties is not free from complications.

The improvement in a surety's position must be in his capacity as such and not in some other capacity. So if a person is a surety for companies A and B and a payment is made to company A which does not improve his position as surety for company A, the fact that he secures an improvement in his capacity as surety for company B is irrelevant.[265]

### (3) "Surety"; "guarantor"

The terms "surety" and "guarantor" are nowadays used interchangeably to **13–96** denote a person who undertakes payment or other performance of an obligation owed to a creditor if the debtor defaults. The obligation is thus both secondary,

---

[261] *Re Hawkes Publishing Co Ltd* [2007] B.C.C. 937.

[262] But in this last case it remains the fact that there is only one payment, not two, so that if an order is made against both the creditor and the surety, it cannot provide in total for payment of a sum greater than is necessary to restore the amount of the preference.

[263] *Re Agriplant Services Ltd* [1997] B.C.L.C. 598, where it was held that the desire was to improve the position both of the debtor company and of the surety. As to what is the relevant time in proceedings against a surety, see below, para.13–97.

[264] Although this would not preclude the court from directing repayment by the creditor as under the previous law. See below.

[265] *Wilson v Masters International Ltd* [2010] B.C.C. 834.

in that the surety's liability is dependent on default by the principal debtor, and accessory in that it is coterminous with the principal obligation and enforceable only to the extent that the principal obligation is enforceable. However, the word "guarantee" has acquired a distinctive meaning in the context of demand guarantees (also called performance bonds), which are undertakings by a bank in favour of a designated beneficiary to pay an amount, or maximum amount, to the beneficiary on presentation of a written demand and other specified documents.[266] The purpose of the guarantee is to provide an assurance of performance by the counterparty to a transaction with the beneficiary. For example, the employer under a construction contract may require the successful bidder for the contract to procure the issue of a demand guarantee by a bank covering the contractor's performance of its obligations. As between the contractor and the employer, the guarantee can properly be called only if the beneficiary honestly believes that the contractor has committed a breach but the guarantee itself is conditioned solely on the presentation of stated documents.[267] Thus the bank's obligation is a primary obligation which has to be performed whether or not there has been default in performance of the underlying contract. The question arises whether this type of guarantee also falls within the preference rules. There are good reasons for thinking that it does. In the first place, if s.239 were confined to suretyship guarantees the addition of the words "or guarantor" would be redundant. More significantly, the issuer of the demand guarantee has the same right of indemnity against the contractor as it would have under a suretyship guarantee and is exposed to the same risk of the contractor's insolvency, a risk reduced by the amount of the contractor's performance.

### (v) A relevant time

**13–97**  Only a preference given at a relevant time is caught by the statutory provisions.[268] The meaning of "relevant time" has been discussed earlier in relation to transactions at an undervalue.[269] There is, however, a difference in that the period for transactions at an undervalue is in all cases two years ending with the onset of insolvency, whereas in the case of a preference it is two years in the case of a preference in favour of a person connected with the company, but is otherwise six months.[270] Where a guarantee has been given and there has been a preference both of the creditor and of the surety and only one of them is a person connected

---

[266] See *Goode on Commercial Law*, 2016, para.35–154; Georges Affaki and Roy Goode, *Guide to ICC Uniform Rules for Demand Guarantees* (Paris: ICC Services/Publications, 2011).

[267] And, in the case of a guarantee governed by the ICC Uniform Rules for Demand Guarantees, 2010 revision (URDG 758), a statement of breach in conformity with art.15 of the Rules.

[268] Insolvency Act 1986 s.239(2).

[269] Above, para.13–36.

[270] Insolvency Act 1986 s.240(1)(b).

with the company, it would seem that the six-month limit applies in relation to that person and cannot be circumvented by an order under s.241(1)(d).[271]

As noted above,[272] a preference is given at the time when the decision to grant it was made. This is "a question of fact to be determined in the particular circumstances of each case".[273]

## Meaning of "connected" with a company

We have already noted that the disjunctive phrase "he was connected with, or was an associate of, the company" is technically incorrect in that the definition of "connected" includes an associate.[274] Section 249 provides as follows:

**13–98**

> "For the purposes of any provision in this Group of Parts, a person is connected with a company if—
>
> (a) he is a director or shadow director of the company or an associate of such a director or shadow director, or
>
> (b) he is an associate of the company."

This definition is relevant for the purposes of ss.239(6),[275] 240(1)[276] and 241(2A).[277] The meanings of "director" and "shadow director" are discussed later.[278] "Associate" is elaborately defined in s.435 of the Act. To determine whether a person[279] is an associate of an individual, it is necessary to look at s.435(2) to (5), together covering an individual's husband, wife or civil partner, a relative[280] of the individual or of the individual's husband, wife or civil partner, a partner, employer or employee of the individual or one who is an associate via a trust within s.435(5). A company is an associate of another company if they are

---

[271] See below, para.13–100.

[272] See fn.252 and accompanying text.

[273] *Stealth Construction,* cited above fn.252, at [63] per Mr Justice David Richards.

[274] Insolvency Act 1986 s.249(b).

[275] A presumption that the giving of a preference by the company to the connected person was influenced by a desire to improve that person's position. However, for this purpose, a person connected with the company by reason only of being its employee is excluded.

[276] Extending to two years the period within which a preference given to a connected person is vulnerable to avoidance. Again, a person connected solely by reason of being an employee is excluded.

[277] Presumption of acquisition of interest or receipt of benefit otherwise than in good faith.

[278] Below, paras 14–05 and 14–06.

[279] "Person" normally includes a company, so that despite the use of the word "he" in s.435(4), an employee of the company is an associate of the company, and this includes a director (s.435(9)). See also ss.239(6) and 240(1), which make it clear that but for his exclusion under these sections an employee would be a person connected with the company. However s.435(2) obviously does not apply in relation to companies, while on the other hand some provisions (s.435(6), (7) and (9)) are relevant only to companies, so that the word "company" is used instead of "person".

[280] As defined by s.435(8).

under common control[281] and is an associate of another person if that person or that person and his associates have control of the company.[282] It will be seen that the range of persons who may be treated as connected with a company is very wide. The intention is to catch all of those whose relationship with the company is such that they either play a role in the company's management or may be privy to information about its affairs not available to outsiders. However, there is no general provision for the aggregation of different associates. So the mere fact that A is associated with B and B is associated with C does not make A associated with C unless s.435(6) applies.[283] In determining whether a person has control of the company the court looks in the first instance into who is on the register of members but where a registered member holds his shares as bare trustee for another and is required to vote in accordance with that other's instructions, it is the position of the beneficial owner, not the trustee, that has to be taken into account, the question of voting power being concerned with the relationship between the trustee and the beneficiary, not that subsisting between the trustee and the company.[284]

### (vi) Powers of the court

#### General power of the court

**13–99**  On an application by the office-holder for an order under s.239, the court, if satisfied that the section applies, is required to make such order as it thinks fit for restoring the position to what it would have been if the company had not given the preference.[285]

#### Specific powers

**13–100**  These are the same as for transactions at an undervalue and are dealt with in the same section of the Act, namely s.241(1). The earlier discussion of the court's powers under that section need not be repeated but a few additional comments on the surety's position are appropriate.

First, the court's powers in relation to sureties are considerably wider than under the previous law, which on the better view did not enable the court to make an order for payment direct against the surety[286] or to direct the revival of his

---

[281] See s.435(6).
[282] See s.435(7).
[283] *Re Kilnoore Ltd* [2006] Ch. 489.
[284] *Re Kilnoore Ltd* [2006] Ch. 489.
[285] Insolvency Act 1986 s.239(3). As to the application of recoveries, see below, para.13–136.
[286] *Re Lyons Ex p. Barclays Bank Ltd v Trustee* (1934) 152 L.T. 201, approved by Luxmoore J in *Re Conley* [1938] 2 All E.R. 127 at 139 and not following *Re G. Stanley & Co* [1925] Ch. 148.

obligations to the creditor.[287] Secondly, a payment which was made solely to prefer the surety can nevertheless be ordered to be repaid by the creditor, as under the previous law, for it remains the case that he is the recipient of a preference and of a benefit within s.241(1)(d).[288] Thirdly, a payment made solely to prefer the creditor can be ordered to be repaid by the surety, except in the unlikely event that he qualifies for protection under s.241(2)(b) as a person receiving a benefit not only in good faith but for value.

Finally, the court now has power to order that where the effect of the preference was to discharge the surety's obligation, wholly or in part, to the creditor or any other person, the surety is to be under such new or revived obligation as the court thinks appropriate.[289] Under the previous law, a creditor who received payment from the company might give the surety a discharge and release any security given by the surety, only to find himself on the receiving end of an order for repayment of the preference, so that he once again became a creditor of the company but without the benefit of the guarantee. To cover this eventuality, every well-drawn guarantee now provides that no payment shall be effective to discharge the surety to the extent that the creditor has to repay it as a preference. Creditors should continue to include such a provision in their guarantees so as not to be dependent upon the making of an order in their favour, which is entirely within the court's discretion.

One difficult question remains. In the case of a creditor or surety not connected with the company, a preference is voidable only if the onset of insolvency occurs within six months; in the case of a creditor or surety connected with the company, it is two years. Now suppose that a payment is made to the creditor nine months before the onset of insolvency and the creditor is not connected with the company, whereas the surety is a director. If the decision to pay the creditor was influenced by a desire to prefer the surety, can an order be made against the creditor under s.241(1)(d) when he himself would no longer be susceptible to a claim as a preferred party? It is thought that the answer is no[290] and that the appropriate order is one for payment direct against the surety, who on making the payment will be entitled to prove for its amount as creditor in the winding-up.

## Relationship between transactions at an undervalue and preferences

As stated earlier,[291] there can be no overlap in the impact of the statutory **13–101** provisions relating to transactions at an undervalue and those concerning preferences. That is to say, it is not possible for the same part of a payment to fall

---

[287] As to which see above, para.13–55.
[288] But see below as to the position where the creditor is not connected with the company and the payment was made more than six months before the onset of insolvency.
[289] Insolvency Act 1986 s.241(1)(e).
[290] *Contra* Prentice, "Some Observations on the Law Relating to Preferences" in Cranston (ed.), *Making Commercial Law* (1997), pp.458–459.
[291] Above, para.13–11.

simultaneously within s.238 and s.239. It may be helpful to identify more precisely the relationship between the two sets of provisions.

(1) A key distinction is that the provisions relating to transactions at an undervalue are aimed at payments, transfers or other acts which diminish the company's net asset position, whereas the provisions relating to preferences are concerned with transactions that unfairly favour one creditor at the expense of the others, whatever the impact on net assets (if any). For example, payment of a debt which does not exceed the amount due is not a transaction at an undervalue, as the net asset position is unchanged (the diminution in assets being matched by a reduction in liabilities), whilst to the extent that the payment exceeds what is due to the creditor, he does not receive it *qua* creditor and his liability, if any, arises under s.238, not s.239. This was the position in *Re HHO Licensing Ltd*[292] where the company paid an amount for services substantially in excess of their value. To the extent of the value of the services the payment was a preference under s.239, to the extent of the excess it was a transaction at an undervalue under s.238.[293] We have already seen that where the company gives security for a previously unsecured loan, there is no diminution in the company's net asset value, only a possible preference of one creditor at the expense of the others. This is because any realisation of the security by the creditor *pro tanto* reduces the company's indebtedness.[294]

(2) The provisions relating to transactions at an undervalue are concerned with the existence of a significant imbalance between a payment, transfer or other act and the consideration for which it is made or done. If the bargain is fair, the provisions do not apply. By contrast, the preference provisions are concerned not with the fairness of the original bargain but with the improvement of the creditor's position relative to other creditors on a winding-up notionally occurring immediately after the payment, transfer, etc. in question. So payment by an insolvent company of one creditor but not the others gives rise to a preference.

(3) The rules as to preference are confined to payments, transfers, etc. in favour of an existing creditor, and thus do not apply to gifts, whereas the rules as to transactions at an undervalue are aimed exclusively at transfers involving a gift element.

(4) The two sets of statutory provisions have two characteristics in common. First, both transactions at an undervalue and preferences are

---

[292] *Re HHO Licensing Ltd* [2008] 1 B.C.L.C. 223.
[293] See similarly *Re Flexi Containers*, cited above fn.254 at [129]–[130], and see also the analysis of the Court of Appeal in *Slocom Trading Ltd v Tatik Inc* [2014] EWCA Civ 831 at [77]–[97] and particularly [78].
[294] See above, para.13–35.

determined without reference to the bona fides of the payee or transferee. Secondly, both sets of provisions embody a subjective element in that the company's good faith is an ingredient of the defence to a claim to upset a transaction made at an undervalue, while the avoidance of a preference requires the company to be influenced by a desire to prefer.

(5) For policy reasons which remain unclear, the backward reach of the provisions relating to transactions at an undervalue is two years in all cases, whereas for preferences the normal period is six months and the two-year period is confined to preferences in favour of a person connected with the company otherwise than solely as its employee.

## 8. EXTORTIONATE CREDIT TRANSACTIONS

**Re-opening of extortionate credit transactions**

Under s.244 of the Insolvency Act 1986, the court may set aside or vary a **13–102** transaction for, or involving, the provision of credit to the company where the following conditions are satisfied:

(1) the company is or has been a party to the transaction[295];

(2) the company is in liquidation or administration[296];

(3) the transaction is or was extortionate; and

(4) the transaction was entered into within the three years prior to the company going into liquidation or administration.

**"Extortionate"**

For the purposes of s.244, a transaction is extortionate if, having regard to the **13–103** risk accepted by the person providing the credit:

(1) the terms of it are or were such as to require grossly exorbitant payments to be made (whether unconditionally or in certain contingencies) in respect of the provision of the credit; or

---

[295] Thus, the court's powers are exercisable both in relation to settled transactions and to those that are still current.

[296] Insolvency Act 1986 s.244(1), applying s.238(1). Like ss.238 and 239, s.244 makes provision only for the office-holder (the liquidator or administrator) to bring the application. But s.246ZD now permits the office-holder to assign the action to a third party: see above, para.13–17.

(2) it otherwise grossly contravenes ordinary principles of fair dealing.[297]

There is a rebuttable presumption that a transaction with respect to which an application is made under s.244 is extortionate.[298]

The above provisions are modelled on ss.138(1), 139(1) and 171(7) of the Consumer Credit Act 1974, which have been analysed in detail elsewhere.[299] Suffice it to say that it is not enough that the transaction was or is burdensome to the company or the terms of it severe. What has to be demonstrated is that they were extortionate within the statutory definition and this implies that they must be not merely unfair but oppressive, reflecting an imbalance in bargaining power of which the other party took improper advantage.[300] So it is not surprising that in *White v Davenham Trust Ltd*[301] Floyd J upheld the decision of Deputy Registrar Schaffer refusing to set aside under r.6.5(4)(d) of the Insolvency Rules 1986 a statutory demand served on the appellant for a sum due as surety for a company in administration in respect of a debt which the appellant alleged was arguably extortionate under s.244 of the Insolvency Act, giving rise to an arguable cross-claim, albeit for an amount substantially less than that demanded in the statutory demand. The compounded rate was somewhat in excess of 20%, increased on default to somewhat in excess of 40%. The judge agreed with the Deputy Registrar that the rate was not extortionate, given the high risk and the fact that the transaction was not a consumer transaction and was one into which the parties entered with their eyes open. He held that there was a triable issue that the increase in the rate upon default was a penalty but ruled that the demand ought not to be set aside, since even if there was an unenforceable penalty, the company would still be unarguably liable for £750,000. Moreover, the appellant was a wealthy man who could easily have paid the undisputed sum.

### Orders the court can make

**13–104** An order under s.244 with regard to any transaction may contain one or more of the following as the court thinks fit:

---

[297] Insolvency Act 1986 s.244(3).

[298] Insolvency Act 1986 s.244(3).

[299] See *Goode: Consumer Credit Law and Practice* (London: LexisNexis Butterworths, looseleaf), Ch.47. The provisions relating to extortionate credit bargains were rarely invoked with success and were repealed by the Consumer Credit Act 2006, which introduced in their place as ss.140A–140C provisions on unfair relationships, which regrettably are wholly lacking in any meaningful criteria as to when a relationship between a creditor and a debtor is to be considered unfair. However, a company is outside the protection of the Act unless it is a debtor jointly with an individual (Consumer Credit Act 1974 s.185(5)). The new provisions have no impact on s.244 of the Insolvency Act 1986.

[300] See *Paragon Finance Plc v Nash* [2002] 1 W.L.R. 685, per Dyson LJ at [67], citing *Goode: Consumer Credit Law and Practice*, para.47.22.

[301] [2011] Bus. L.R. 615, affirmed on appeal but without consideration of s.244 ([2011] Bus. L.R. 1443).

(1) a provision setting aside the whole or part of any obligation created by the transaction;

(2) a provision otherwise varying the terms of the transaction or the terms on which any security for the purpose of the transaction is held;

(3) a provision requiring any person who is or was a party to the transaction to pay to the office-holder any sums paid to that person, by virtue of the transaction, by the company; and

(4) a provision directing accounts to be taken between any persons.[302]

The court's powers are exercisable concurrently with any powers exercisable in relation to the transaction as a transaction at an undervalue.[303]

## 9. FLOATING CHARGES FOR PAST VALUE[304]

**The previous law**

There have long been statutory provisions invalidating floating charges given by an insolvent company otherwise than for new value. Prior to the Insolvency Act 1986, these were embodied in s.617 of the Companies Act 1985, re-enacting s.322 of the Companies Act 1948. The purpose of these provisions, as of other avoidance provisions, was to prevent the conferment of an unfair advantage on an existing creditor at a time when liquidation was imminent. But they have always been confined to floating charges, no doubt reflecting a view that the all-embracing nature of the floating charge had such a potentially deleterious effect on other creditors that it should be subject to a special rule.[305] The broad effect of s.617 was that if a floating charge was given by a company that was insolvent immediately after its granting, the charge became invalid except to the amount of any cash paid to the company on or after and in consideration of the charge if the company went into liquidation within the ensuing 12 months. **13–105**

**Changes in the statutory provisions**

Section 245 of the Companies Act 2006 re-enacted the substance of s.617 of the Companies Act 1985, but with important changes: **13–106**

---

[302] Insolvency Act 1986 s.244(4).

[303] Insolvency Act 1986 s.244(5).

[304] See Howard N. Bennett, "Late Floating Charges" in Armour and Bennett, *Vulnerable Transactions in Corporate Insolvency* (2002), Ch.5.

[305] The Cork Committee gave as the reason for special statutory treatment of floating charges the fact that it enabled the secured creditor to have his security reinforced by after-acquired property for which the debtor had not paid at the expense of the unpaid sellers. See *Insolvency Law and Practice*, para.1553.

(1) A floating charge is now defined as a charge which as created was a floating charge.[306] But the new definition, although highly relevant to priorities vis-à-vis preferential debts,[307] is not significant for the purpose of s.245, since the avoidance provisions have always continued to apply even after crystallisation of the floating charge.

(2) Under s.617, new value had to take the form of cash in order to exclude the section. Under s.245, virtually every normal form of new value suffices.[308]

(3) The section applies to companies in administration as well as liquidation.

(4) Where the charge is given in favour of a person connected with the company:

    (a) the period of 12 months is extended to two years; and

    (b) it is not necessary that the company shall have been insolvent at the time of or consequent upon the giving of the charge.

Presumably, the application of s.245 to floating charges given to a connected person even where the company is still solvent after giving the charge reflects a view that a connected person, as an insider, is likely to have the opportunity to be aware of impending insolvency and to take steps to protect himself at the expense of other creditors.

### Conditions necessary to attract s.245

**13–107** A floating charge[309] is void under s.245 of the Insolvency Act if the following conditions are satisfied:

(1) the company is in liquidation or administration[310];

(2) the floating charge was created at a relevant time, that is:

    (a) in favour of a person connected with the company,[311] within the period of two years ending with the onset of insolvency[312]; or

---

[306] Insolvency Act 1986 s.251.

[307] See *Goode and Gullifer on Legal Problems of Credit and Security*, 2017, paras 5–73 et seq.

[308] See below, para.13–108.

[309] i.e. a charge which as created was a floating charge (Insolvency Act 1986 s.251), even if it has crystallised prior to the winding-up or administration. For the nature of a floating charge, see *Goode on Commercial Law*, 2016, Ch.25 and *Goode and Gullifer on Legal Problems of Credit and Security*, 2017, Ch.IV. See also above, para.10–16.

[310] Insolvency Act 1986 s.245(1), applying s.238(1).

[311] In contrast to the provisions of ss.238 and 239 relating to transactions at an undervalue and preferences, there is no exclusion of a person connected with the company solely by reason of being its employee.

[312] As defined by s.245(5) of the Act.

    (b) in favour of a person not so connected, within the period of 12 months ending with the onset of insolvency; or

    (c) whether in favour of a connected or an unconnected person, between the presentation of a petition for an administration order and the making of an order on that petition;

(3) the charge was given otherwise than for what may conveniently be described as appropriate new value. For this purpose, a charge is given for appropriate new value only to the extent that the consideration for it represents an amount not exceeding the aggregate of:

    (a) the value of so much of the consideration for the creation of the charge as consists of money paid,[313] or of goods or services supplied, to the company at the same time as, or after, the creation of the charge;

    (b) the value of so much of that consideration as consists of the discharge or reduction, at the same time as, or after, the creation of the charge, of any debt of the company[314]; and

    (c) the amount of such interest (if any) as is payable on an amount under (a) or (b) in pursuance of any agreement under which the money was paid, the goods or services supplied or the debt discharged or reduced;

(4) where the charge was given to a person not connected with the company, the company was then unable to pay its debts within the meaning of s.123 of the Act or became unable to do so in consequence of the charge.[315]

## The expanded concept of new value

It will be seen that the provisions dealing with value are considerably more liberal, and indeed fairer, than under the earlier legislation, which treated cash as the only admissible form of new value and thus invalidated a floating charge given by an insolvent company to secure, for example, the price of goods supplied to the company, despite the fact that such a transaction involved no diminution whatsoever in the company's assets. Let us now take a closer look at   **13–108**

---

[313] "Money paid" is not defined but would seem to encompass cash, cheques and other negotiable instruments (if honoured) and any other form of inter-bank transfer of funds, whether by credit transfer, direct debit or other means.

[314] Whether to a third party or to the company itself, e.g. by a refinancing in discharge of a prior loan to the company. The release of a security interest without discharge or reduction of the underlying obligation is clearly not within the scope of this sub-section: *Re Lehman Brothers International (Europe) (in administration)* [2014] 2 B.C.L.C. 295 at [228].

[315] Insolvency Act 1986 s.245(4). Again, there is no exception in favour of a person connected with the company solely by reason of being its employee.

the concept of new value under s.245 and see what is and is not covered. There are four essential requirements for value if the floating charge is to escape invalidity under s.245. First, it must be given in consideration for the creation of the charge. Secondly, it must be given at the same time as or after the creation of the charge. Thirdly, it must fall into one or more of the categories of value specified in s.245(2) of the Act. Fourthly, it must be furnished to the company itself or be applied in discharge or reduction of the company's indebtedness.

### (1) Value as consideration for the charge

**13–109**     This is not new. The value must be given against the charge.[316] So if an advance is initially made on an unsecured basis and then it is decided to take security for it, the advance will not qualify for new value however soon afterwards the charge is taken.

### (2) Value must be contemporaneous or subsequent

**13–110**     Again, the statutory provisions are similar to those originally contained in s.322 of the Companies Act 1948, which required that the advance be made "at or after" the charge. There had been a curious line of authority, headed by the Court of Appeal decision in *Re Columbian Fireproofing Co Ltd*,[317] which appeared to consider an advance to be made at the time of the charge if it was made in consideration of the charge, notwithstanding a significant interval between the making of the advance and the giving of the charge,[318] particularly where the delay in taking the charge was considered excusable. However, in *Re Shoe Lace Ltd*[319] Hoffmann J, relying on a slight difference between the wording of s.245 of the 1986 Act and that of s.322 of the 1948 Act, felt able to dive over the decision in *Re Columbian Fireproofing Co Ltd* and to hold, as was clearly correct, that s.245 imposes two distinct requirements, that the advance is in consideration of the charge and that it is at or after the time the charge was taken, and that the latter requirement could not be said to have been met where the charge was taken nearly four months after the first advance it secured and eight days after the last such advance. His decision was upheld by the Court of Appeal[320] which, although ruling that there was little or no material difference in wording between s.245 and its predecessor, declined to follow *Re Columbian Fireproofing*. That case had purported to follow the decision in *Re Jackson &*

---

[316] See *Re Flexi Containers* [2018] EWHC 12 (Ch) at [122].

[317] *Re Columbian Fireproofing Co Ltd* [1910] 1 Ch. 758.

[318] In the *Columbian Fireproofing* case, the interval was 11 days; in *Re F & E Stanton Ltd* [1929] 1 Ch. 180, it was eight weeks.

[319] *Re Shoe Lace Ltd* [1992] B.C.C. 367.

[320] *Re Shoe Lace Ltd, Power v Sharp Investments Ltd* [1993] B.C.C. 609.

*Bassford Ltd*[321] but had overlooked the vitally important distinction drawn in the latter case between a debenture executed after the advance in reliance on a promise to execute it which created a present equitable right and a debenture executed after a mere contingent agreement for security which created no such right.[322] In the former case, a delay in execution of the formal debenture was immaterial, because the charge had already been created by the binding agreement and had thereupon became registrable; in the latter it had not and only came into existence when the debenture was executed.

Accordingly, the position now reached is that the requirement of contemporaneity is satisfied where there is a binding agreement for a debenture creating an immediate equitable charge and made at or before the time of making of the advance, however long afterwards the formal debenture is executed pursuant to the agreement but that in the absence of such an agreement the requirement of contemporaneity is not met "if the making of the advance precedes the formal execution of the debenture by any time whatsoever, unless the interval is so short that it can be regarded as *de minimis*—for example a 'coffee-break'".[323]

### (3)  Kinds of permitted new value

The effect of s.245 is that the most common forms of new value—money, goods, services,[324] payment of debt—now suffice to preserve the validity of the floating charge. This extension in the concept of new value represents a compromise between the views of the hardliners who considered that the old restriction to cash should be retained and the proponents of the opposing view that any form of money's worth should suffice. The Cork Committee rather cautiously recommended the addition of goods to cash but the exclusion of services.[325] In the end, services were added to the list. The result in broad terms is that admissible new value is restricted to those forms of benefit to the company which arise from day-to-day trading and finance and have a readily ascertainable value.[326] Excluded are a wide range of other assets, both tangible and intangible, including land and buildings, intellectual property rights, debts and other receivables and rights under contracts.

One of the forms of recognised new value is the supply of goods or services, and for this purpose their value is to be taken as the amount of money which at

**13–111**

---

[321] *Re Jackson & Bassford Ltd* [1906] 2 Ch. 467.

[322] See further as to this distinction *Goode and Gullifer on Legal Problems of Credit and Security*, 2017, paras 1–81 and 2–15, *Goode on Commercial Law*, 2016, paras 22–47 and 23–10, and (in the particular context of s.245) *Rehman v Chamberlain* [2012] B.C.C. 770.

[323] *Re Shoe Lace*, cited above fn.319, per Sir Christopher Slade at 619.

[324] Which in this context would, it is thought, include facilities.

[325] "Insolvency Law and Practice", para.1564.

[326] This is less true of services than of goods (see e.g. *Re Peak Hotels and Resorts Ltd* [2017] Bus. L.R. 1765 at [116]–[120]), which no doubt explains why the Cork Committee recommended that services be excluded.

the time they were supplied could reasonably have been expected to be obtained for supplying the goods or services in the ordinary course of business and on the same terms (apart from the consideration) as those on which they were supplied to the company.[327] Another is "the value of so much of the consideration as consists of the discharge or reduction . . . of any debt of the company". No distinction is drawn between an advance made by the chargee to pay off or reduce a debt due from the company to a third party and an advance made to refinance an existing indebtedness of the company to the chargee itself. Does this enable an unsecured lender to transform its status into a secured lender for a contemporaneous advance by the simple device of refinancing the unsecured loan? If so, it would drive a coach and horses through the contemporaneity requirement, for all the lender would have to do would be to make a book-keeping entry recording that the new loan had been applied in discharge of the existing loan. The answer would seem to lie in the fact that what matters is not merely the *consideration* for the giving of the charge but the *value* of that consideration. If the creditor is not effectively parting with anything then no value is given even though the refinancing constitutes good consideration in general contract law for the execution of the floating charge.[328] The position is otherwise, of course, where the charge is taken to secure payment to a third party of a debt owed by the company to the third party, for in that case the lender is parting with real money.

### (4) Benefit to company

**13–112** In order to qualify as new value under s.245, the payment of money or the supply of goods or services must be made to the company itself, not to a third party, although payment to a third party in or towards satisfaction of a debt due from the company suffices.

In order for money to be "paid . . . to the company" it must in a real sense be available to the company for its own benefit and to do with what it likes. So payment by cheque in exchange for the company's cheque of the same amount is not payment to the company, nor is a refinancing or a payment which is to be matched by a payment out by the company to other parties or which goes round a circle of payees, in either case leaving the company no better off than it was before,[329] or a payment made by the lender directly into the company's overdrawn bank account[330] or by cheque to the company on terms that the cheque is to be paid into the company's overdrawn account.[331] However, while payment into the company's overdrawn bank account does not constitute a payment to the

---

[327] Insolvency Act 1986 s.245(6).
[328] See *Re GT Whyte & Co Ltd* [1983] B.C.L.C. 311.
[329] *Re Destone Fabrics Ltd* [1941] Ch. 319.
[330] *Re Fairway Magazines Ltd* [1992] B.C.C. 924.
[331] *Re Orleans Motor Co Ltd* [1911] 2 Ch. 41.

company within para.(a) of s.245(2), it does fall within para.(b) as a payment which discharges or reduces a debt of the company. This point appears to have been overlooked in *Re Fairway Magazines Ltd*[332] where the applicant should have succeeded on this ground.

*What does not constitute new value*

It can be said from the foregoing that the following do not constitute relevant value:   **13–113**

   (1) money paid or goods or services supplied to the company prior to the creation of the charge (including for this purpose a binding agreement for the charge);

   (2) money paid prior to the creation of the charge in discharge or reduction of the company's indebtedness to a third party;

   (3) money paid or goods or services supplied to a third party (including a company which is a member of the same group as the chargor company), except where paid or supplied on or after the creation of the charge and in discharge or reduction of a debt owed to the third party by the company;

   (4) money paid or goods or services supplied in discharge of a debt due from a third party (including a member of the same group), whether before or after the creation of the charge, except so far as the company was also liable in respect of the same debt and its liability was discharged or reduced by the payment or supply; and

   (5) money paid to the company in such manner or on such conditions that it is not truly available to be used by the company for its own benefit, as where the money refinances an existing unsecured debt owed to the chargee or is to be matched by payments out to third parties or a payment to the chargee itself.

## Insolvency at time of charge

It is not necessary to show that the company was insolvent at the time of or in consequence of the charge in cases where the chargee was a person connected with the company. As previously mentioned, this reflects the fact that such a person, as an insider, is better placed than an independent creditor to be aware that a state of insolvency looms and to look after his own interests at the expense   **13–114**

---

[332] See above, fn.330.

of other creditors. Whether the chargee is to be treated as a person connected with the company is to be determined as at the time of creation of the charge.[333] If at that time the chargee was not connected to the company, the fact that he becomes a connected person subsequently is irrelevant. Conversely, if he is connected with the company at the time of creation of the charge, the fact that he later ceases to be connected does not alter his status for the purpose of s.245, while if he assigns the charge the fact that the assignee is not a connected person is irrelevant. If, on the other hand, the original chargee was not connected with the company at the time of creation of the charge, his assignee steps into the assignor's favoured position whether or not the assignee is a connected person.[334]

### Hardening of a floating charge

**13–115**  Where the company has a running account with the chargee and dealings on the account continue between them, the rule in *Clayton's Case* may have the effect of "hardening" the charge. Under the rule in *Clayton's Case* there is a presumption that in the case of a current account items credited to the account are applied to the earliest indebtedness first. Accordingly where a floating charge is taken to secure a pre-existing overdraft, sums are paid to the credit of the account and new drawings are then made, the effect of the rule is that the credits are applied to the pre-existing indebtedness, so that any new drawing constitutes new value even if the resulting balance is the same as before. In effect, the turnover of money in the account converts old value into new.

*Example 15*

**13–116**  An insolvent company has a bank overdraft of £100,000 which is unsecured. The bank, which is concerned about the position, takes a floating charge over the company's factory premises to secure both past and future advances. Subsequently, a cheque for £40,000 is paid into the account and a few days later the company draws a cheque for the same amount in favour of a supplier. The cheque for £40,000 is applied in discharge of the earliest indebtedness first, that is, the original £100,000, reducing the past indebtedness to £60,000, while the drawing in favour of the supplier represents new value by the bank, for which the floating charge is valid. Thus, although the debit balance is still £100,000 the mix has changed, in that £40,000 of past value has been converted into new value through the operation of the rule in *Clayton's Case*.[335]

The Cork Committee regarded this result as objectionable and recommended a statutory provision that all payments into the account should be treated as

---

[333] See *Flexi Containers*, cited above fn.316 at [123] (also noted above, fn.254).

[334] L. Sealy and D. Milman, *Sealy & Milman: Annotated Guide to the Insolvency Legislation*, 21st edn (London: Sweet & Maxwell, 2018), Vol.1, commentary on s.245(3)–(5).

[335] See *Re Yeovil Glove Co Ltd* [l965] Ch. 148, a decision on s.322 of the Companies Act 1948. However, the payment into the account might be vulnerable as a preference under s.239 of the Insolvency Act.

discharging debit items incurred after the creation of the floating charge.[336] It is hard to see either the logic or the fairness of such a recommendation, for which no reasoning was advanced beyond the cryptic statement that the rule in *Clayton's Case* "defeats the object of the section". This is simply not true. The statutory provisions are aimed at charges which, being given for past indebtedness, reduce the value of the estate. By allowing a new drawing without obligation to do so, the bank is genuinely extending new value. It could have kept the benefit of the payment into the account without allowing any further drawings but chose not to do so. To the extent of those new drawings, the company has received a benefit which is secured by the floating charge. The transaction is in no way within the mischief against which the statutory provisions are aimed, and the government rightly decided not to implement the Committee's recommendation. The position would, of course, be otherwise if there were no genuine new value, for example, if the bank stipulated that it would not honour a new drawing unless this was covered by a contemporaneous payment into the account, so that there was a ritual exchange of cheques and the company never had recourse to the funds drawn since these had to be simultaneously repaid.

## 10. REGISTRABLE BUT UNREGISTERED CHARGES

### Introduction

Under s.859A of the Companies Act 2006, where a charge created by a company[337] is one to which the section applies, the registrar must register the charge if within 21 days after its creation[338] the company or any person interested in the charge delivers to the registrar for registration a statement of particulars of the charge.[339] If a charge is registrable under s.859A but not registered it will be void against a liquidator or administrator[340] and any creditor of the company[341] and

**13–117**

---

[336] "Insolvency Law and Practice", paras 156–162.

[337] As opposed to a charge or security created by law, e.g. an unpaid vendor's equitable lien (*London and Cheshire Insurance Co Ltd v Laplagrene Properties Ltd* [1971] Ch. 499).

[338] Or such later time as may be allowed by the court on an application under s.859F of the Act for leave to register out of time. See below, para.13–119.

[339] Companies Act 2006 s.859A(1), (2) and as to the statement of particulars, s.859D. These sections form part of a new chapter in the Companies Act 2006 (Pt 25 Ch.A1) inserted by the Companies Act 2006 (Amendment of Part 25) Regulations 2013 Sch.1, which replace the provisions of Pt 25 Ch.1 for charges created on or after 6 April 2013 (reg.6). Section 860 imposed an obligation on the company creating a registrable charge to register it, failure to comply being an offence (s.860(4)). In contrast, there is no obligation to register imposed by s.859A, but a failure to register a registrable charge renders it void as against a liquidator, administrator and any creditor in the same way as under the old law.

[340] This means void against the company acting by its liquidator or administrator. See *Smith (Administrator of Cosslett (Contractors) Ltd v Bridgend CBC* [2002] 1 A.C. 336, in which the House of Lords reversed the rather startling decision of the Court of Appeal that an unregistered charge was void against an administrator but not against the company itself.

[341] i.e. a secured creditor or creditors in a winding-up or administration.

the sum secured by the charge will become immediately due and payable.[342] Charges of financial collateral where the chargee has possession or control are excluded from the registration requirements.[343]

### Rationale of the avoidance provisions

**13–118**  It is not at first sight obvious why non-registration should render a registrable charge void on winding-up or administration. The failure to register a charge does not cause any diminution in the company's assets—the usual ground for avoidance—which would have occurred earlier, on the making of the charge, and then only if it was taken to secure a past indebtedness. Subsequent secured creditors are protected by being given priority even without a winding-up or administration. Unsecured creditors have no rights or interest in the assets of the company and are prejudiced by want of registration only in so far as their decision to extend credit might have been different if they had known of the unregistered interest; yet the avoidance provisions apply even if there was no unsecured creditor who was both misled and influenced by the absence of registration. There is no anti-preference policy underlying the statutory provisions, for there are separate rules relating to preferences and in any event s.859H applies even if the charge was taken well outside the preference period.[344] The effect of avoidance is thus to give unsecured creditors who did not act in reliance on the want of registration an apparently unjustified windfall addition to the assets available for distribution. No doubt it is considerations such as these that led to the decision not to include a provision in the New Zealand Personal Property Securities Act 1999 rendering an unperfected security interest invalid in the debtor's bankruptcy or liquidation. New Zealand's approach in this respect stands in unique contrast to that taken in the United Kingdom, the different States in the United States and the Canadian Provinces and has been strongly criticised.[345]

---

[342] Companies Act 2006 s.859H. The charge is not void against the company itself, because the purpose of registration is to give notice of the charge to third parties; the company obviously knows that it has granted the charge. See further para.13–120.

[343] Companies Act 2006 s.859A(6)(c); Financial Collateral Arrangements (No.2) Regulations 2003 (SI 2003/3226) reg.4(4) implementing the EU Financial Collateral Directive. See *Goode and Gullifer on Legal Problems of Credit and Security*, 6th edn (London: Sweet & Maxwell, 2017), para.6–33.

[344] A preference may, of course, arise as the result of deferment of the initial grant of the security interest in order to avoid registration, e.g. by making a contingent agreement for security (see above, para.13–74, fn.204) but the act of preference in this case is not the want of registration (for nothing is registrable so long as the agreement is purely contingent) but the giving of the security at the time the contingency occurs, at which point it will constitute a security for a pre-existing indebtedness.

[345] See Michael Gedye, Ronald C.C. Cuming QC and Roderick J. Wood, *Personal Property Securities in New Zealand* (Wellington: Thomson Brookers, 2002), pp.8–10, giving a list of reasons similar to those set out below why only perfected security interests should be valid in the debtor's insolvency.

Yet there are sound policy reasons for the avoidance of unregistered securities. In the first place, the avoidance rule reflects the law's dislike of the secret security interest, which leaves the debtor's property apparently unencumbered and at common law was considered a fraud on the general creditors.[346] Secondly, the registration provisions help to curb the fabrication or antedating of security agreements on the eve of winding-up. Thirdly, although unsecured creditors have no existing interest in the company's assets outside winding-up, and thus no immediate *locus standi* to complain of want of registration, they have an inchoate interest in that upon winding-up the whole of the company's property, so far as not utilised in discharging the expenses of the winding-up and the payment of preferential claims, becomes available for the general body of creditors, so that their rights become converted from purely personal rights into rights more closely analogous to that of beneficiaries under an active trust.[347] Fourthly, there may well be unsecured creditors who were misled by the want of registration into extending credit which they would not otherwise have granted. But it would be both expensive and impracticable to expect the liquidator (or administrator) to investigate each unsecured creditor's claim to see whether he did or did not act on the assumption that the unregistered charge did not exist. So a broad-brush approach which in effect assumes detriment to unsecured creditors at large is justified. Finally, the registration provisions serve a general public notice function as well as being a perfection requirement, and the avoidance provision can be seen as an inducement, and a powerful inducement, to register. However, these policy considerations have been somewhat undermined by decisions holding (correctly in terms of legal analysis and justifiably as a matter of policy in securing finality of completed enforcement processes) that to the extent that the security has already been enforced or paid off prior to the winding-up or other invalidating event, its avoidance has no effect.[348]

### Registration out of time

The court may, on the application of the company or a person interested,[349] extend the time for registration on such terms and conditions as seem to the court just and expedient.[350] Before making such an order, the court must be satisfied that the failure to register was accidental or due to inadvertence or some other sufficient cause, or is not of a nature to prejudice the position of creditors or shareholders of the company, or that on other grounds it is just and equitable to grant relief.[351] Where these conditions are satisfied, leave is readily granted so    **13–119**

---

[346] Hence the former reputed ownership doctrine, which no longer features in our insolvency law.
[347] See above, para.3–09.
[348] See below, para.13–120.
[349] Usually the application is made by the holder of the registrable charge.
[350] Companies Act 2006 s.859F(3). See previously, in the same terms s.873 of the Companies Act 2006.
[351] Companies Act 2006 s.859F(2).

long as the company is not in liquidation and no winding-up is pending but an order will almost invariably be expressed to be subject to the intervening rights of creditors acquiring an interest in the property, such as subsequent chargees[352]; and where liquidation is imminent the court may, instead of refusing an order for an extension, grant it subject to the right of the company to apply for discharge of the order within a given period after the commencement of the winding-up.[353] An order is liable to be refused where the creditor, instead of applying promptly for an extension of time and bringing all of the facts before the court, seeks to deal with the matter by taking a new charge or series of charges.[354]

### Non-registration does not invalidate the charge against the company

**13–120**    It should be borne in mind that registration is purely a perfection requirement designed to give notice to third parties; it is not a condition of validity of the charge, which remains fully enforceable against the company prior to winding-up or administration. It follows that if the company does go into liquidation or administration the consequent avoidance of the unregistered charge has no impact on the chargee to the extent that he has already realised his security or perfected it by seizure or judicial foreclosure or has otherwise obtained payment, for to that extent his security has been satisfied and there is nothing for him to enforce.[355]

## 11. DISPOSITIONS OF PROPERTY AFTER THE COMMENCEMENT OF COMPULSORY WINDING-UP

### The statutory provisions

**13–121**    Section 127 of the Insolvency Act 1986, re-enacting s.522 of the Companies Act 1985, provides that in a winding-up by the court[356] any disposition of the

---

[352] The standard form of order was first laid down by Clauson J in *Re L.H. Charles & Co Ltd* [1935] W.N. 15, and has been followed with minor modifications ever since.

[353] See Gerard McCormack, *Registration of Company Charges* (Bristol: Jordan Publishing, 2009), pp.126 et seq.; and *Goode on Commercial Law*, 2016, para.24.54.

[354] *Re Telomatic Ltd* [1993] B.C.C. 404.

[355] *Re Row Dal Construction Pty Ltd* [1966] V.R. 249; and *N.V. Slavenburg's Bank Ltd v Intercontinental Natural Resources Ltd* [1980] 1 All E.R. 955. See also *Mace Builders (Glasgow) Ltd v Lunn* [1985] 3 W.L.R. 465, a decision to similar effect on s.321 of the Companies Act 1948.

[356] The section does not apply to dispositions made after an application for an administration order. This is because there is no equivalent to the relation back of a compulsory winding-up, so that until the administrator's appointment takes effect the directors continue to have full powers of management, including disposal of the company's assets, although dispositions made between the application for an administration order and the making of the order which are transactions at an undervalue or preferences are subject to avoidance under s.240(1)(c).

company's property[357] made after the commencement of the winding-up is void unless the court otherwise orders.[358] In this context, "the court" means the court dealing with an application under s.127 in the winding-up proceedings. The fact that the disposition has been made pursuant to an order made by another court for other purposes does not save it from invalidation,[359] and it makes no difference whether that order was or was not by consent nor whether the effect of the order was itself to transfer an interest in equity to the transferee even before imple-mentation of the order by execution of a formal conveyance.[360]

Section 127 bites on beneficial ownership, not necessarily on the legal title. Where contract and conveyance are combined, as in the case of the sale of goods, the effect of s.127 is that the invalidity of the contract also invalidates the transfer of legal title.[361] However, where the act of conveyance is distinct, the principle of abstraction applies. The conveyance being a distinct legal act, the passing of legal title is not vitiated by the invalidity of the underlying contract, so that the transferee acquires legal title but holds the transferred asset as bare trustee for the company. Thus where land is disposed of after presentation of the winding-up petition and the conveyance has been executed without leave of the court, then while the underlying disposition is void in the sense that no beneficial interest passes to the transferee, the conveyance is nevertheless effective to pass the legal title and the transferee holds it as bare trustee for the company, which is entitled to call for a reconveyance.[362] Similarly, if shares in a company have been transferred and the transfer registered, beneficial ownership remains in the company and the transferee as registered holder is a bare trustee for the company. To this extent s.127 is not wholly self-executing. The same is true of assets that have been realised or, in the case of chattels, taken out of the company's pos-session.

The same principle of abstraction applies with even greater force to the act of payment, which in the usual case will be effective to transfer not only legal title but beneficial ownership to the payee despite the fact that both parties were under the misapprehension that the payment was made in pursuance of a valid contract, and it will not give rise to a trust in favour of the company.[363] In the case of physical money (notes and coins), the free transferability of money as currency means that not only does legal title to money pass by delivery independent of the validity of the transaction under which payment is made but there can be no trust

---

[357] And any transfer of shares or alteration in the status of the company's members; but these will not be discussed.

[358] For the considerations to be taken into account and the standard form of order, see below, paras 13–129 et seq.

[359] *Re Flint* [1993] Ch. 319, a decision on comparable provisions in s.284 of the Insolvency Act relating to dispositions by an individual after presentation of a bankruptcy petition.

[360] *Re Flint* cited above.

[361] See *Goode on Commercial Law* (2016), p.119, fn.379.

[362] *Re French's Wine Bar Ltd* [1987] 3 B.C.C. 173. See below, paras 13–145 et seq as to the restitutionary remedy of the counterparty.

[363] *Westdeutsche Landesbank Girozentrale v Islington LBC* [1996] A.C. 669, per Lord Browne-Wilkinson at 708.

in favour of the company if the payee took in good faith and for value or the money has become mixed with other assets of the payee or has passed into the hands of a *bona fide* purchaser for value. All that the company has as the result of s.127 is a personal restitutionary claim for money paid on a failure (or perhaps an absence) of consideration, the effect of the invalidity of the transaction being that the company never acquired title to the asset for which it has paid.[364] Where the transfer is of bank money (value held through an account with a bank and usually transferred by novation through the banking system), a similar effect is achieved by the fact that the payee acquires a new and original right against his bank by novation as the result of the transfer. Again, any right of recovery by the company must be on the basis of a purely personal restitutionary claim for unjust enrichment.[365]

For the purposes of s.127 the winding-up is deemed to commence on the presentation of the petition on which the winding-up order was made, unless the company was already in voluntary liquidation at the time of the petition, in which case the winding-up is deemed to commence on the passing of the resolution for voluntary winding-up.[366]

The purpose of this "relation back" of the commencement of winding-up is to protect the interests of the general body of creditors by preventing a dissipation of the company's assets while the hearing of the petition is pending[367] and by ensuring that no payment or transfer is made which is preferential and would thus infringe the principle of *pari passu* distribution.[368] If the section were limited in scope to the achievement of this purpose, it would cause no great inconvenience, for it would then be providing no more than a logical extension of the undervalue and preference period to the date of the winding-up order. Unhappily, it is not so limited: it applies as much to *bona fide* business transactions as to preferences[369]; it nullifies transactions that increase the company's asset value no less than transactions which reduce that value. Indeed, it effectively paralyses the company's business, for without the court's leave not so much as a stitch of cloth can

---

[364] *Lipkin Gorman v Karpnale Ltd* [1991] 2 A.C. 548.

[365] This is a very simplified account of a complex set of issues admirably analysed by David Fox in his ground-breaking work *Property Rights in Money* (Oxford: Oxford University Press, 2008).

[366] Insolvency Act 1986 s.129.

[367] *Re Albany Building Ltd* [2007] B.C.C. 591; *Re Overnight Ltd* [2010] B.C.C. 787, where it was held that in the case of a compulsory winding-up the cause of action for fraudulent trading under s.213 of the Insolvency Act did not accrue until the winding-up order was made; *Wilson (Liquidator of 375 Live Ltd) v SMC Properties Ltd* [2016] B.C.C. 504.

[368] It is because s.127 takes care of post-petition dispositions in winding-up that s.240(l)(c) makes no reference to winding-up petitions and is confined to transactions at an undervalue and preferences between the presentation of an administration application and the making of the order on that application.

[369] Companies Act 2006 s.1079, which in stated conditions precludes a company from relying against other persons on the making of a winding-up order, or the appointment of a liquidator in a voluntary liquidation, has no effect on the operation of s.127 of the Insolvency Act, for although that section cannot be invoked until the company is in compulsory winding-up, its nullifying effect is confined to dispositions made between the presentation of the petition and the making of the winding-up order.

be disposed of, not one penny spent even to acquire an asset worth a pound, and technically the company cannot even pay cash into its bank account. Hence the importance of the company's ability to obtain authority from the court which will enable it to continue trading pending the hearing of the petition.[370]

### *"Disposition"*

The word "disposition" is not defined but must be given a wide meaning if the purpose of the section is to be achieved, particularly in view of the fact that there is no exemption in favour of transfers for full value. "Disposition" should therefore be considered to include not only any dealing in the company's tangible or intangible assets by sale, exchange, lease, charge, gift or loan but also the conferment of a possessory or other lien on an asset[371] and any other act which, in reducing or extinguishing the company's rights in an asset, transfers value to another person. On this basis, "disposition" includes an agreement by which the company surrenders a lease or gives up its contractual rights,[372] contractual set-off by which a debtor to the company is given and exercises the right to apply a cross-claim of his own against the company in diminution of his indebtedness and arguably even the extension of further credit to the company during the post-petition period which leads to the exercise of a right of transaction set-off against the company's credit balance.[373] Moreover, the section is not confined to voluntary dispositions by the company itself; it applies equally to dispositions taking effect under a court order[374] and, it is thought, post-petition payments to a creditor of the company under a garnishee order made against one of the company's debtors, the effect of which is *pro tanto* to extinguish an asset of the company, namely the debt due to it.

However, the reduction or extinction of the company's rights in an asset must be one which leads in a real, not merely a technical, sense to the transfer of value to another party, for as was pointed out by Street CJ in an Australian decision, *Re*

**13–122**

---

[370] See below, para.13–129. That s.127 is concerned to do no more than prevent a reduction in the assets of the company between winding-up petition and hearing is demonstrated by the fact that in ordering a bank or other recipient to repay moneys improperly received, the court will penalise the payee no further than is necessary to restore to the fund of assets available for distribution the amount (if any) that has been lost (*Re Gray's Inn Construction Co Ltd* [1980] 1 All E.R. 814).

[371] e.g. by delivery of a car to a garage for repair or of a cheque to a bank for collection at a time when money is owing to the bank (see below).

[372] An agreement for the compromise of such rights should be treated in the same way, as the obiter discussion in *Officeserve Technologies Ltd (in liquidation) v Anthony Mike* [2017] B.C.C. 574 suggests. But exercise by the creditor of a unilateral right to terminate an agreement would not be a disposition.

[373] See generally Philip Wood, *English and International Set-Off* (London: Sweet & Maxwell, 1989), paras 7–303 et seq. Mr Wood must be right that exercise of a right of *insolvency* set-off under the Insolvency Rules cannot be within the scope of s.127 (for if it were then in a compulsory winding-up the right of insolvency set-off given by r.490 of the Insolvency Rules would be rendered nugatory), and that the contrary decision at first instance in *Barclays Bank Ltd v TOSG Trust Fund Ltd* [1984] B.C.L.C. 1 is wrong. The court would, it is thought, be likely to validate the contractual set-off if the creditor would enjoy exactly the same rights under insolvency set-off.

[374] *Re Flint* cited above fn.359.

*Mal Bower's Macquarie Electrical Centre Pty Ltd*[375] the word disposition connotes both a disponor and a disponee. So a company which does no more than collect in a debt is not disposing of an asset, even though the effect of the payment is to extinguish the chose in action represented by the debt, for value cannot in any real sense be said to move from the creditor to the debtor.

The analysis above was considered by the Supreme Court in *Akers v Samba Financial Group*.[376] In issue was whether a transfer by a trustee of legal title over trust assets to a third party constituted a "disposition" by the beneficiary company (in liquidation) for the purposes of s.127 where the transferee was a bona fide purchaser for value without notice of the trust, such a purchaser being entitled to deal with the trust assets free of the claims of the beneficiary. Lord Mance, with whom all other members of the Court agreed, held that there was no disposition within the meaning of s.127. The relevant property for the purpose of the s.127 application was the company's beneficial interest under the trust, but this had not been disposed of; the trustee had disposed of his legal title to the trust assets, but the company's beneficial title continued. Whilst this beneficial title could not be asserted against a good faith purchaser for value without notice, this limitation did not arise out of any disposal of the company's interest: rather, it arose out of the transfer of the legal title by the trustee. The concept of a disposition under s.127 was wide enough to encompass the destruction or extinction of an interest of the company, Lord Mance expressing agreement with the further reasoning of Lord Neuberger and Lord Sumption[377] on this point, but it did require that there be some "transfer by a disponor to a disponee of the relevant property (here the beneficial interest)".[378] In Lord Neuberger's view, "disposition" was clearly "linguistically capable of applying to a transaction which involves the destruction or termination of an interest"; it was not an unnatural use of language to describe the company's equitable interest as having been "disposed of" by transfer of the assets to the bona fide purchaser; moreover, such a result would appear consistent with the policy objective underpinning s.127, namely to "ensure that, at least once a winding-up procedure has been started, a company's property is retained, particularly for the purpose of being available in order to be distributed pro rata, i.e. fairly, among its creditors". Yet he concluded that there had been no disposition of the equitable interest by the company:

> "the natural meaning of s.127 appears to me to carry with it the notion of the disponer transferring property to a disponee, and on that basis there was no disposition of [the company's] equitable interest in [the trust property] . . .

---

[375] *Re Mal Bower's Macquarie Electrical Centre Pty Ltd* [1974] 1 N.S.W.L.R. 254 at 258, cited in *Re Barn Crown Ltd* [1994] 4 All E.R. 42 at 48. See below, para.13–125.

[376] *Akers v Samba Financial Group* [2017] A.C. 424.

[377] Lord Sumption did not, however, directly address this question.

[378] *Akers v Samba Financial Group* [2017] A.C. 424 at [53]–[55] per Lord Mance.

In my view, Sir Roy Goode is right when he says that a surrender of a lease or the giving up of contractual rights by a company would be a 'disposition' within section 127, as would a surrender of a life interest . . . However, there are differences between a surrender (whether of a lease, contractual rights, or a life interest) and the loss of a beneficial interest on a transfer of the legal estate to a bona fide purchaser for value without notice of that interest. In the former case, the person who is the disponer is the same as the person who loses the property; whereas in the latter case the disponer is, *ex hypothesi*, not the person who loses the property. And, in the former case the disponee is well aware of the property which is ceasing to exist: as far as he is concerned, its extinction is the purpose of the transaction; in the latter case, the disponee is, by definition, unaware of the property which is being disposed of.

Section 127 can operate harshly so far as people dealing in good faith with a company are concerned . . .

But it would not merely be harsh, but positively unfair for a bona fide purchaser of a legal estate from a third party to find that, because of section 127, the transaction in question was liable to be held void owing to the existence of an equitable interest held by a company of which he had no notice . . . the position is very different from the surrender of a lease or of contractual rights. A person taking a surrender of a lease or contractual rights from a company knows both that he is dealing with the company and that he is dealing in the lease or the rights . . .

. . . Sir Roy's examples all involved the company as disponer . . . ".[379]

The clarification offered by *Akers* in relation to surrender is certainly to be welcomed. The facts in *Akers* are, however, far removed from a surrender of the kind discussed above. The discussion above is directed to cases in which the company gives something of value to the person to whom the surrender is made, but that process cannot strictly be said to involve a transfer of the relevant property, for the reason that the property is extinguished by the surrender. To avoid an overly formalistic application of s.127, it is suggested above that this process should be characterised as a disposition in the same way that a transfer of the relevant property would be characterised as a disposition.[380] In *Akers*, however, there was not only no transfer of the relevant property between the company in liquidation and the s.127 defendant: there was also no movement of value between them. The only value acquired by the defendant was that acquired from the trustee, and the trustee could not, by definition, transfer the relevant property to the s.127 defendant—it did not have equitable title to transfer. In these circumstances it is difficult to see how there could be said to be a

[379] *Akers v Samba Financial Group*, above fn.378, at [73]–[77] per Lord Neuberger.
[380] See to similar effect the obiter discussion of HHJ Paul Matthews (sitting as a judge of the High Court) in *Officeserve Technologies Ltd (in liquidation) v Anthony Mike* [2017] B.C.C. 574 at [89]–[90].

disposition by the company within the meaning of s.127. As Lord Sumption reasoned:

> "The reality is that the transaction . . . was simply a transfer of the [trust assets] in breach of trust, and any rights of [the company] against [the transferee] depend on the law relating to constructive trusts and not on section 127 of the Insolvency Act 1986."[381]

The conclusion that s.127 is not engaged is not necessarily surprising in policy terms. Understanding that s.127 is directed to the preservation of the debtor's assets for the benefit of its creditors does not mean that one would expect every loss of assets to be caught by the section; a balance has to be struck between pursuit of the creditor protection goal and other policy objectives, including maintaining some degree of certainty of receipt for counterparties. The latter objective is particularly important in a case like *Akers*, in which (as Lord Neuberger emphasised) the counterparty has not dealt with the company at all (if they had, they would likely not have been bona fide purchasers taking without notice of the trust, such that the issue would have fallen away).

### Only dispositions of the company's property are affected

**13–123**   Section 127 is confined to post-petition dispositions of the company's property, which includes transfers of property beneficially owned by the company and taking effect by virtue of a court order.[382] Assets held by the company are not its property to the extent of any security interest it has given over them in favour of a creditor. So if a bank in good faith and the ordinary course of business collects a cheque for its customer and credits the proceeds to the customer's overdrawn account, this does not constitute a disposition of the company's property, for the bank had a lien on the cheque and thus a security interest in the proceeds and the credit to the account merely produced a realisation of its security rights.[383] Similarly, a sale by a mortgagee is outside the scope of s.127, whether the conveyance is by the mortgagee or by the company acting through its receiver.[384] Likewise, the vesting of a company's property in a secured creditor or other party under an after-acquired property clause in the security or other instrument is outside s.127[385]; and completion of an unconditional contract for the sale of land

---

[381] *Akers v Samba*, above fn.378, above at [90] per Lord Sumption.
[382] *Re Flint* cited above fn.359. As to property owned beneficially, see also the decision in *Akers*, cited above fn.378, which is analysed on this point in para.6–04, above.
[383] *National Australian Bank v KDS Construction Services* (1987) 163 C.L.R. 668; and see *Re Margart Pty Ltd* (1984) 9 A.C.L.R. 269 at 314 (Supreme Court of New South Wales). But it is not clear why the delivery of the cheque to the bank, which gave rise to the lien in the first place, was not itself an unauthorised disposition. See further below, para.13–126.
[384] *Sowman v David Samuel Trust Ltd* [1978] 1 All E.R. 616; *Re Margart Pty Ltd*, above.
[385] See *Goode and Gullifer on Legal Problems of Credit and Security*, 2017, para.2–14.

by the company is not a disposition of the company's property, for in equity the land already belongs to the purchaser upon exchange of contracts.[386] But waiver of a condition in a conditional contract or affirmation of a contract voidable by the company might constitute a disposition within s.127.[387]

### Payments into the company's bank account

The question of whether a disposition is of the company's property raises special problems in the case of payments into the company's bank account. It is necessary to treat separately the case where the account is in credit from the case where it is overdrawn. **13–124**

*(1) Account in credit*

We may begin by distinguishing the payment of cash (notes and coins) into the account from the payment in of a cheque. Where the company pays cash into its account, the payment constitutes a disposition of its property, whether or not the account is in credit, for ownership of the notes and coins passes to the bank.[388] The company acquires a corresponding claim against the bank, which will be recorded by a credit of the payment to its account, so that the net effect of the transaction is simply to convert an asset of the company from one form, cash, into another, a claim on the bank. Hence in terms of its effect the breach will usually be a merely technical one but the position would be quite otherwise if the bank were to become insolvent before the company had withdrawn the amount credited. **13–125**

The situation is somewhat different in the case of a cheque.[389] Deposit of the cheque with the bank for the purpose of collection[390] is not in itself a disposition within s.127 where the company's account is in credit, for the bank collects purely as agent and has no interest of its own in the cheque. However, in the first edition of this book it was argued that the collection process itself involves the disposition of an asset of the company, for the bank surrenders the customer's cheque, which represents both a negotiable instrument and the embodiment of a claim against the drawer, in exchange for payment, so that one form of property belonging to the company is converted into another. In *Re Barn Crown Ltd*[391] HH

---

[386] *Re French's Wine Bar*, cited above fn.362.

[387] *Re French's Wine Bar*, cited above fn.362.

[388] The same view is taken by Adrian Walters, "Void Dispositions in Compulsory Winding-up" in Armour and Howard Bennett (eds), *Vulnerable Transactions in Corporate Insolvency*, 2002, para.8.35.

[389] Or any other kind of instrument deposited for collection.

[390] A process which does not involve the receipt of cash by the collecting bank but merely a transfer of funds from the paying bank through the books of a third bank (the Bank of England, where the paying and collecting banks are clearing banks) with whom both banks hold an account.

[391] See above, fn.375.

Judge Rich QC rejected this analysis as over-technical and not according with ordinary usage. This criticism is well founded, for merely to collect a cheque as agent does not in itself do more than the company could have done by collecting payment from the debtor in cash.[392] Judge Rich accordingly took the view that no disposition of any kind was involved. In reaching this conclusion, he drew on the judgment of McPherson J in *Re Loteka Pty Ltd*[393] which concerned the effect of payment *from* a credit account and concluded that the collection of a cheque and payment of the proceeds *into* an account in credit could be analysed in the same way.

> "In collecting payment upon a cheque the bank credits the customer's account with the amount of the cheque. If the account is already in credit, no disposition of the property of the customer takes place in favour of the bank. The amount standing to the credit of the customer is increased in return for the surrender of the cheque, which becomes a voucher for payment. It is the drawer of the cheque whose property is disposed of. All that happens between the customer and the banker is an adjustment of entries in the statement recording the accounts between them."[394]

However, this, with respect, over-simplifies the problem and equates payment *into* an account in credit with payment *from* an account that is in credit, when in reality the two cases are entirely different.[395] Let us assume that the company is owed £1 million by a debtor of undoubted financial stability from whom it receives a cheque for this amount. We can agree that the company does not make a disposition of its property by arranging for the cheque to be collected through its bank as agent rather than directly. But what happens next is that, by virtue of the banker-customer relationship, the bank proceeds to borrow the collected proceeds and credit the company's amount with the sum so borrowed. That borrowing is not a mere matter of book entry; it involves the transfer of collected funds from company to bank in exchange for a promise of repayment.[396] That transfer, it is submitted, is a disposition of the company's property in breach of s.127. In 99 cases out of 100, the breach is technical and the court can be expected to validate the transfer. The 100th case is where the bank closes its

---

[392] See above.

[393] (1989) 7 A.C.L.C. 998.

[394] [1994] 4 All E.R. 42 at 45.

[395] See below, para.13–127, as to the effect of payments out of an account.

[396] It is true that the fact that a bank collects a cheque "for" a customer does not mean that the bank's receipt is the customer's receipt; the bank receives the proceeds of the cheque as part of its own moneys but with a duty to credit the customer's account with an equivalent amount (see *Goode on Commercial Law* (2016), para.20–41). Nevertheless, it is well established that in crediting the account rather than paying the customer the cash equivalent of what it has received the bank is borrowing the money from the customer. See *Foley v Hill* (1848) 2 H.L. Cas. 28; *Joachimson v Swiss Bank Corp* [1921] 3 K.B. 110; and generally Michael Brindle and Raymond Cox, *Law of Bank Payments*, 5th edn (London: Sweet & Maxwell, 2017), paras 6–090 et seq. There is therefore a disposition in favour of the bank.

doors the day after collecting the cheque and soon afterwards goes into liquidation with only enough assets to pay unsecured creditors 10 pence in the pound. The company is now in the position where it has lent £1 million and will recover a mere £100,000 by way of dividend. The making of the loan is no longer a mere technical breach; its effect is to remove £1 million that would have been available to the company's creditors and make it available instead to the bank's creditors. The inescapable conclusion is that this constitutes a disposition of the company's property in breach of s.127. This receives support from the decision of Buckley LJ in *Re Gray's Inn Construction Co Ltd*[397]:

> "In the present case the company's account with the bank was overdrawn, so that I need not consider what the position would have been if any cheque had been paid in when the account was in credit but I doubt whether even in those circumstances it could properly be said that the payment in did not constitute a disposition of the amount of the cheque in favour of the bank."

As a final point, if the company had lent money to an ordinary borrower, this would without doubt be a disposition of the company's property. Why should it make a difference that the borrower is the company's bank? In a decision of the Irish High Court in *Re Pat Ruth Ltd*[398] Costello J held that all payments into the company's bank account were dispositions of its property for the purpose of the equivalent provision of the Irish legislation[399] and in *Re Industrial Services Co (Dublin) Ltd*[400] this was not contested. As indicated above, this will not matter in most cases, since the money paid into the account will be held by the bank and will be available as part of the company's assets. It is only if the bank is insolvent that the issue is a live one.[401]

### (2) Account overdrawn

Where the company owes money to the bank, there can be no doubt of the position. Even where the delivery of the cheque for collection is not by itself a disposition, it is clear that payment of the proceeds into the overdrawn account transfers funds from the company to the bank.[402] But in most cases, the true

**13–126**

---

[397] *Re Gray's Inn Construction Co Ltd* [1980] 1 All E.R. 814 at 818.
[398] *Re Pat Ruth Ltd* [1981] I.R.L.M. 51.
[399] Companies Act 1963 s.218.
[400] *Re Industrial Services Co (Dublin) Ltd* [2001] 2 I.R. 118.
[401] Walters, cited above fn.388, suggests (at paras 8.41–8.42) that the bank would remain liable under s.127, in the absence of a validation order, even if the company's claim on the bank had been reduced by subsequent drawings. However, to the extent that such drawings are to be regarded as coming from the sum paid into the account (applying the rule in *Clayton's Case* (1816) 1 Mer. 572), the bank will in effect have repaid the money to or at the direction of the company and thus negated the effect of the payment into the account.
[402] *Re Gray's Inn Construction*, cited above fn.397; and *Re Tain Construction Ltd, Rose v AIB Group (UK) Plc* [2003] 2 B.C.L.C. 374.

analysis is that the disposition occurs earlier, by delivery of the cheque, which confers on the bank a lien for the company's indebtedness.[403] In this situation, the crediting of the account does not give rise to any further disposition, for the bank is then exercising its rights as a secured creditor[404] and it is the delivery of the cheque to it in the first instance that constitutes the infringement of s.127. Payment of cheques into an overdrawn account may also constitute a preference of the bank.

*Withdrawals from a bank account*

**13–127**     Where a company withdraws money from a bank account which is in credit, for the purpose of s.127 that is a disposition of the company's property to the extent of the pre-existing credit balance, for the value of its claim against the bank is correspondingly reduced. It has, however, been held that where the company's money is paid into an account of a third party so as to become part of a mixed fund from which drawings are made in good faith, while the payment into the account is a disposition of the company's money, a withdrawal from it is not, even if the company could by appropriate proceedings have obtained a declaration of charge on the mixed fund.[405]

What is the position where the account is already in overdraft before the further withdrawal? Such was the case in *Re Gray's Inn Construction Co Ltd*[406] where, despite having notice both of the petition and of the winding-up order, the company's bank allowed the company to continue to operate its overdrawn account, receiving sums to the credit of the account and honouring further drawings on the account. The result was that in addition to what was held to be the unjustified payment of certain pre-liquidation debts to the bank and other creditors the company incurred a further trading loss. In invalidating some of the payments out of the account in discharge of pre-liquidation debts as well as payments into the account to the extent of the post-petition trading losses suffered by the company, the Court of Appeal entertained no doubt that the former payments were as much dispositions of the company's property as the latter. Indeed, counsel for the bank conceded the point. He was wrong to do so, for the effect of the concession was that the court was led to regard the proposition as "indisputable"[407] without qualification and without any attempt to identify the company's property which was the subject of the so-called disposition.

---

[403] *Re Keever* [1967] Ch. 182; and *Barclays Bank Ltd v Astley Industrial Trust Ltd* [1970] 2 Q.B. 527. If the bank has already advanced money against the cheque, it becomes a holder for value to the extent of the advance and to that extent collects on its own account.
[404] *National Australia Bank v KDS Construction Services*, cited above fn.383. See above, para.13–123.
[405] *Re J Leslie Engineers Co Ltd* [1976] 1 W.L.R. 292.
[406] See above, fn.397.
[407] [1980] 1 All E.R. 814, per Buckley LJ at 818.

What is the effect of a withdrawal from a company's overdrawn account where that is the only relevant fact? The short answer is that it merely increases the company's liability to the bank. If there is one thing that is still clear in the increasingly complex financial scene leading to the credit crunch, it is that a liability is not an asset and that an increase in a liability is not by itself a disposition of an asset. Section 127 cannot apply unless there is a disposition of the company's property. What, then, was the item of property supposedly disposed of in the *Gray's Inn* case? Again, the short answer is: none. The payments out of the account were all in discharge of pre-liquidation debts for goods and services supplied[408] and (since the account was at all times in overdraft[409]) did not involve the application of a single asset of the company. Not one tiny tittle of a right in tangible or intangible property was affected one iota. Not one smidgen of interference with the *pari passu* principle resulted. All that happened was that the bank used its own moneys to meet the company's cheques for what were presumably payments to suppliers and other creditors in the normal course of business,[410] so that in relation to such payments the bank became substituted as creditor for the persons to whom they were made, leaving the position of other creditors entirely unchanged. The only other item invalidated was a payment into the account, which went to reduce the pre-liquidation overdraft and was clearly a disposition of the company's property, as stated earlier.

What went wrong in the *Gray's Inn* case was that the court had a picture of trading losses in respect of which the company's assets were reduced by outflows from the account, whereas the true position was that any reduction in the assets resulted from payments into the account in reduction of the overdraft and such individual intra-day drawings as may have been matched by a temporary credit balance.

The contention, then, is that s.127 can never apply solely by reason of the drawing on an overdrawn account. In *Coutts & Co v Stock*,[411] Lightman J entertained no doubt that an increase in the company's overdraft fell outside s.127. However, it does not follow that use of an overdraft can never give rise to a disposition of the company's property. There appear to be at least three cases where it does. The first is where the bank holds security for future advances, for an increase in the overdraft automatically expands the quantum of the bank's

---

[408] See the judgment of Buckley LJ in *Re Gray's Inn Construction*, cited above fn.397, at 823.

[409] *Re Gray's Inn Construction*, cited above fn.397, at 817. The details contained in the judgment are insufficient to enable the account to be reconstructed, and it is possible that some of the items drawn on a particular day were covered by a credit balance even if at the end of the day the account was still in overdraft. But to the extent (if any) that this was the case it is irrelevant to the question here under discussion, viz. whether payments not covered by a credit balance constitute a disposition of the company's property.

[410] The judgment of Buckley LJ does not indicate the purpose for which the payments were made but does contain the statement (at 817) that the bank made sure, so far as it was able to do so, that all cheques were drawn in the ordinary course of the company's business.

[411] *Coutts & Co v Stock* [2000] 1 W.L.R. 906.

security interest, and correspondingly reduces the company's equity in the charged assets, unless these were already charged to their full value at the time of the further drawing on the account. The second is where the company has a credit balance on another account and the effect of the further drawing is to increase the amount for which the bank has a right of set-off against the credit balance. The third is where the further drawing is within the limit of an agreed overdraft which the bank is contractually committed to extending, for the effect of the drawing is to reduce the amount of the facility remaining available and thus the quantum of the chose in action vested in the company.[412]

### Consequences of unauthorised disposition

**13–128**   Section 127 provides that a post-petition disposition not sanctioned by the court is void. It says nothing about the method of recovery or the parties against whom recovery is available. This has to be determined by the general law.[413] There is no great difficulty where the disposition relates to tangible property such as land or goods. The transfer is simply of no effect and the transferee therefore has no title to it and can be ordered to return it. Again, where money is paid into the company's overdrawn account with its bank, the payment is ineffective to confer rights on the bank, and the practical effect is that the bank is not entitled to debit the company's account with the sum paid in and can be ordered to re-credit the account or make repayment in some other way. But what is the position where a cheque is drawn by the company on an account in credit and paid by the bank? Is the amount of the payment recoverable from the bank, the payee or both? In *Hollicourt (Contracts) Ltd v Bank of Ireland*,[414] the Court of Appeal, following a series of Australian decisions,[415] held that only the payee is liable. It was pointed out that the bank acts purely as an agent or intermediary of its customer, the company, and in making payment is simply carrying out its customer's instructions. The disposition is not the reduction in the company's credit balance as such but the transfer of funds to the payee, who is the only recipient of the

---

[412] See *R. v Kohn* (1979) 69 Cr. App. R. 395, in which the Court of Appeal upheld the conviction of the director of a company for theft for improperly drawing cheques on the company's account, holding that he was guilty of a theft of debts due from the bank to the company to the extent that the cheques were covered by a credit balance or by the amount of the contractually agreed overdraft facility but not beyond. However, in *Coutts & Co v Stock*, cited above fn.411, Lightman J held that the use and, indeed, partial or total exhaustion of the company's overdraft limit cannot constitute a disposition within s.127.

[413] *Re J Leslie Engineers*, cited above fn.405, per Oliver J at 298; *Re Ahmed (a debtor)* [2018] EWCA Civ 519.

[414] *Hollicourt (Contracts) Ltd v Bank of Ireland* [2001] Ch. 555.

[415] *Re Mal Bower's Macquarie Electrical Centre Pty Ltd (VIA)* (1974) 1 N.S.W.L.R. 254; *Re Loteka Pty Ltd* (1989) 1 A.C.L.R. 620; and *Tasmanian Primary Distributors Pty Ltd v R.C. & M.B. Steinhardt Pty Ltd* (1994) 13 A.C.S.R. 92.

disposition. Accordingly, any claim for recovery of money paid under the void disposition must be against the payee, not the bank.

**Authorisation by the court**

The court may authorise any disposition that would otherwise be void. Such authorisation can be given in advance of the winding-up,[416] and this should be sought wherever possible, for otherwise the party dealing with the company runs the risk that the court will refuse to validate the transaction retrospectively. The application is usually made by the company but may be made by any person having a discernible interest in the matter,[417] which obviously includes the transferee under the affected transaction. The Practice Direction for Insolvency Proceedings sets out the evidence that should be given, as a minimum, in support of the application.[418] There may be cases where prior authorisation is impracticable, for example, because time is of the essence or because the parties are unaware of the presentation of the petition. But in such cases, although the court may be sympathetic, there is no guarantee that the transaction will be validated. **13–129**

The principles upon which the court will act in dealing with applications for a validation order are discussed in some detail in *Re Gray's Inn Construction Co Ltd*,[419] *Re S & D Wright Ltd*,[420] *Denney v John Hudson & Co Ltd*,[421] *Re Tain Construction Ltd*,[422] and most recently *Express Electrical Distributors Ltd v Beavis*.[423] From these five decisions the following principles can be extracted:

(1) The discretion of the court is at large.

(2) The basic principle of *pari passu* distribution among creditors should generally be respected. The court will be reluctant to validate payments and transfers pursuant to pre-liquidation transactions where the effect would be to give a preference to a pre-liquidation creditor or would otherwise prejudice the interests of unsecured creditors.

> "The policy of the law in favour of distribution of the assets of an insolvent company in the course of the liquidation process on a pari

---

[416] *Re A.I. Levy (Holdings) Ltd* [1964] Ch. 19.
[417] *Re Argentum Reductions (UK) Ltd* [1975] 1 W.L.R. 186.
[418] *Practice Direction: Insolvency Proceedings* [2014] B.C.C. 502, para.11.8.5. The court will need to be satisfied by credible evidence that the company is solvent and able to pay its debts as they fall due or that a particular transaction or series of transactions in respect of which the order is sought will be beneficial to or will not prejudice the interests of all of the unsecured creditors as a class (para.11.8.8).
[419] *Re Gray's Inn Construction Co Ltd* [1980] 1 All E.R. 814.
[420] *Re S & D Wright Ltd* [1992] B.C.C. 503.
[421] *Denney v John Hudson & Co Ltd* [1992] B.C.L.C. 901.
[422] *Re Tain Construction Ltd* [2003] 2 B.C.L.C. 374.
[423] *Express Electrical Distributors Ltd v Beavis* [2016] 1 W.L.R. 4783.

passu basis between its unsecured creditors is a strong one, and it needs to be shown that special circumstances exist which makes a particular transaction one in the interests of the creditors as a whole before a validation order will be made to override the usual application of the *pari passu* principle."[424]

(3) But in appropriate cases such payments and transfers will be sanctioned, as where the payment of sums due to particular suppliers is necessary to ensure future supplies that will enable the company to continue trading and the court considers that the continuance of trading will be in the best interests of creditors. This is a sensible recognition of the fact, well known to administrative receivers and administrators, that it is often necessary to make certain involuntary, or "pressure", payments to particular creditors in order to protect the wider interests of the creditors as a whole.

(4) Non-preferential transactions which do not in any way diminish or dissipate the company's net assets, such as post-petition transactions for full value, will normally be validated, and *a fortiori* transactions which would increase, or have increased, the value of the company's assets or which would preserve or have preserved the assets from harm that would result in a paralysis of the company's business.[425]

(5) Where the parties were unaware that a petition had been presented and the disposition was in good faith and in the ordinary course of business, that is a powerful factor in inducing the court to exercise its discretion to validate the transaction[426] but is not sufficient by itself; it must also be shown that the transaction was one which was likely to be for the benefit of creditors generally.[427]

(6) In deciding whether a post-petition payment made to obtain delivery of goods purchased before the presentation of the petition on terms of cash against delivery is of benefit to the company the court does not look simply at the benefit, if any, to be derived from the particular goods but also takes into account the fact that the payment will enable the company to obtain further supplies and thereby continue the business and earn revenue.

---

[424] *Express Electrical*, cited above fn.423 at [20] per Sales LJ with whom Patten LJ and the Chancellor agreed.

[425] See also *Re Wiltshire Iron Co* (1868) L.R. 3 Ch. App. 443; *Re Park Ward & Co Ltd* [1926] Ch. 828; *Re Clifton Place Garage Ltd* [1970] 1 All E.R. 353; *Re A.I. Levy (Holdings)*, cited above fn.416; and *Wilson (Liquidator of 375 Live Ltd) v SMC Properties Ltd* [2016] B.C.C. 504.

[426] At least in cases not involving a preference, so that the *pari passu* principle is not engaged. See *Express Electrical*, cited above fn.423.

[427] See *Re Tain Construction*, cited above fn.422, and *Express Electrical,* cited above fn.423 at [36]–[43].

(7) The court can authorise or validate not merely a particular disposition or contract but the general continuance of trading and for that purpose the continued operation of a bank account.[428] The desirability of the company continuing to trade is inherently more speculative than that of being allowed to adhere to a particular disposition and is likely to depend on whether the sale of the business as a going concern will probably be more beneficial than the realisation of the company's assets on a break-up basis.[429] Where the court does authorise the continuance of trading, the proper course is to freeze the existing account and require all fresh dealings to be conducted through a new account.

It has also been held that the court has power to validate a transaction to a limited extent or for a limited purpose, so that where the company in liquidation had transferred property to another company which had then given a charge to a bank, the transaction could be validated to the extent of the charge to the bank.[430]

## 12. TRANSACTIONS DEFRAUDING CREDITORS

**The statutory provisions**

Where a transaction at an undervalue is entered into by the company for the purpose of putting assets beyond the reach of a person who is making or may at some time make a claim against the company or of otherwise prejudicing the interests of such a person in relation to the claim he is making or may make, the court may make an order restoring the status quo and protecting the interests of persons who are victims of the transaction.[431] This section derives from the provisions of s.172 of the Law of Property Act 1925 relating to fraudulent conveyances. In contrast to the provisions discussed earlier in this chapter, it applies whether or not the company is in liquidation or administration. The definition of a transaction at an undervalue in relation to companies is the same as under s.238(4) of the Insolvency Act, discussed earlier.[432]

**13–130**

---

[428] The standard form of s.127 order permits: (1) payments into and out of the bank accounts of the company in the ordinary course of business; and (2) dispositions of the property of the company made in the ordinary course of its business for proper value between the date of presentation of the petition and the date of judgment on the petition or a further order in the meantime (*Practice Direction 49B—Order under Section 127 of the Insolvency Act 1986*, para.7).

[429] This obviously depends to a considerable degree on whether there are reasonable prospects of the company moving into profitable trading and meanwhile having sufficient cash flow to carry on the business. Where this is so, creditors may however be better served by an administration, given the potential difficulties of preserving going concern value in liquidation (see above, para.11–02).

[430] *Re Dewrun Ltd, Royal Bank of Scotland v Bhardwaj* [2002] B.C.C. 57.

[431] Insolvency Act 1986 s.423.

[432] Above, paras 13–12 et seq.

### Conditions for making an order

**13–131**    An order can be made under s.423 only if the following conditions are satisfied:

(1) there has been a transaction at an undervalue[433];

(2) it was made for the purpose of defeating the claims of an existing or putative creditor.

It is not necessary that the company shall be in winding-up or administration, nor is there any statutory time limit.

The fact that the transaction was not entered into from any dishonest motive and that the parties acted in reliance on legal advice is no answer to a claim under s.423; it suffices that the debtor company's subjective purpose was to place the assets out of the reach of creditors or a particular creditor.[434] There is no need to show that such intention was the sole purpose of the transaction. At one time, it was thought that it had to be the predominant purpose,[435] but it now appears to be settled that a substantial purpose suffices.[436] On the other hand, it is not sufficient to show merely that the *result* of the transfer was to put assets beyond the reach of a creditor, for *result* is not to be equated with *purpose*.[437] So s.423 does not apply if the purpose of the transaction was not to place assets outside the reach of creditors but to gain a tax advantage,[438] so that removal of the assets from the reach of creditors was simply a by-product of the transaction.

### Who can apply for an order

**13–132**    Application for an order under s.423 can be made:

(1) by the liquidator or administrator of a company in winding-up or administration or by the official receiver;

---

[433] See in this connection *Agricultural Mortgage Corp Plc v Woodward* [1994] B.C.C. 688, the facts of which have been given above, para.13–27. See also *Slocom Trading Ltd v Tatik Inc* [2014] EWCA Civ 831, also noted above fn.293.

[434] *Arbuthnot Leasing International Ltd v Havelet Leasing Ltd (No.2)* [1990] B.C.C. 636.

[435] *Moon v Franklin* [1996] B.P.I.R. 196.

[436] *Random House UK v Allason* [2008] EWHC 2854 (Ch), per David Richards J at [52]; *IRC v Hashmi* [2002] 2 B.C.L.C. 489, per Arden LJ at [25]; *Papanicola v Fagan* [2010] 2 P. & C.R. DG1, per H.H. Judge Raynor Q.C. at [31]; *Re Husky Group Ltd* [2015] B.P.I.R. 184. As to the identification of the relevant purpose when the decision is taken by a board of directors, see the discussion of *BTI 2014 Llc v Sequana SA and ors* [2017] Bus. L.R. 82 in *Dickinson v NAL Realisations (Staffordshire) Ltd* [2017] B.P.I.R. 611 at [96]–[97].

[437] *IRC v Hashmi*, cited above.

[438] *Pinewood Joinery v Starelm Properties Ltd* [1994] B.C.C. 569. However, securing a tax advantage may also go hand in hand with a desire to protect the assets from creditors, as in *4 Eng Ltd v Harper* [2010] B.C.C. 746.

(2) with leave of the court, by a victim of the transaction; or

(3) where a victim of the transaction is bound by a voluntary arrangement, by the supervisor of the voluntary arrangement.[439]

The word "victim" is not confined to creditors but covers anyone who suffers actual or potential prejudice.[440] Accordingly, while the transaction must have been entered into for the purpose of defeating the claims of an existing or putative creditor, it is open to any victim within the above meaning to apply for an order, whether or not the victim is a creditor and whether or not he was someone within the scope of the company's purpose or even known to the company.[441]

### Orders that can be made

These are set out in s.425 and correspond broadly to the orders that can be made **13–133** under s.241 of the Act,[442] without prejudice to the generality of s.423, but always with a view to restoring the position to what it would have been if the transaction had not taken place[443] with the same restrictions for the protection of bona fide third parties as in s.24l(2).[444] Payment can be ordered to be made direct to the victim but if the company is insolvent the court will be minded to order return to the liquidator or administrator in order to protect the general body of creditors.[445] In any event, a person is not a victim in whose favour an order can be made if he is no worse off as the result of the transfer than he would have been if it had not been made, because payments that were made would have to have been made anyway[446] or because the property transferred was subject to a mortgage for an amount exceeding its value.[447] The list of orders set out in s.425 is not exhaustive and within the limits described above the court can make any other order it considers appropriate, for example, a declaration as to the purpose for which the asset in question was transferred,[448] an order restraining the transferee from dealing in any way with his legal or beneficial interest,[449] a declaration that the

---

[439] Insolvency Act 1986 s.424.

[440] *Hill v Spread Trustee Co Ltd* [2007] 1 W.L.R. 2404, per Arden LJ at [101]; and *Clydesdale Financial Services Ltd v Smailes* [2010] Lloyds Rep. I.R. 577, per David Richards J at [73]. The prejudice must, however, flow from the fact of the transaction being one at undervalue: *Westbrook Dolphin Square Ltd v Friends Life Ltd* [2015] 1 W.L.R. 1713; *Vasdev v Bellnorth Ltd (in liquidation)* [2017] EWHC 1395 (Ch).

[441] *Hill v Spread Trustee*, cited above, per Arden LJ at [101]; and *Giles v Rhind* [2009] Ch. 191.

[442] See above, paras 13–42 et seq.

[443] *Griffin v Awoderu* [2008] B.P.I.R. 877.

[444] *Chohan v Saggar* [1992] B.C.C. 750.

[445] *4 Eng Ltd v Harper* [2010] B.C.C. 746.

[446] *Moon v Franklin*, cited above fn.435.

[447] *Pinewood Joinery*, cited above fn.438.

[448] *Moon v Franklin*, cited above fn.435.

[449] *Moon v Franklin*, cited above fn.435.

transferee holds property on trust for the transferor,[450] or a payment into a designated account to abide the outcome of other proceedings.[451]

## 13. APPLICATION OF RECOVERIES

**13–134**    In all of these cases, the question arises as to whether the recoveries[452] form part of the company's general assets so as to be or become subject to a prior security interest granted by the company (including a security interest arising under an after-acquired property clause in a fixed or floating charge) or whether instead they are to be treated as a distinct pool of assets not belonging to the company in its own right but received by the liquidator for the benefit of the general body of creditors and therefore outside the scope of the prior security interest.[453]

### Recoveries in right of the company

**13–135**    This category comprises all cases where the company through its liquidator recovers the disposed-of asset *in specie* because of the invalidity or avoidance of the disposition or can treat it as free from a security interest because of the nullity of the security interest.

Where the disposition is wholly void, the effect is that the asset purportedly disposed of never ceased to be the property of the company and remains subject to a prior security interest. The recovery thus occurs automatically by force of law and, in contrast to other grounds of recovery, does not involve any action on the part of the liquidator (other than securing a formal reconveyance where this is necessary) or any use of the company's resources. The invalidity may arise at common law, as where the disposition is effected pursuant to a contract which is void for want of *consensus ad idem*, or by statute, as where it is a disposition made after presentation of the winding-up petition and without leave of the court[454] or is a security interest invalidated for want of registration[455] or as a floating charge which falls foul of s.245 of the Insolvency Act.[456] In all of these

---

[450] *Arbuthnot Leasing International Ltd v Havelet Leasing Ltd (No.2)* [1990] B.C.C. 636, where the declaration was expressed to be without prejudice to post-transfer creditors of the transferee.

[451] *Arbuthnot Leasing International Ltd v Havelet Leasing Ltd (No.2)* [1990] B.C.C. 636.

[452] This term is used for brevity to cover both the case where assets or their monetary value come back to the company and cases where an asset held by the company is freed from a security interest because of the invalidation of that interest.

[453] See generally D.D. Prentice, "Creditors' Interests and Directors' Duties" [1990] 10 O.J.L.S. 265; and Fidelis Oditah, "Wrongful Trading" [1990] L.M.C.L.Q. 205, 215–222; and *Legal Aspects of Receivables Financing* (London: Sweet & Maxwell, 2008), pp.214–221.

[454] Insolvency Act 1986 s.127. See above, para.13–122.

[455] Under s.858H of the Companies Act 2006.

[456] Because it is taken otherwise than for a requisite form of new value from a company which goes into winding-up within a specified statutory period. See above, paras 13–107 et seq.

cases, the effect of the invalidity is that the asset never ceased to be subject to the prior assignment or security interest. Invalidity at common law plainly has nothing to do with the particular interests of general creditors in a winding-up, so that there is no basis for giving them a special status as regards recoveries. A post-petition disposition made without the court's approval is likewise wholly void, so that the asset does not escape from the prior security interest.[457] The invalidity of a charge simply expands the company's equity in the charged asset and does not affect existing security interests. A registrable but unregistered charge is void against the liquidator and creditors. For this purpose, "creditors" includes subsequent secured creditors, whether or not the company is in winding-up, and the effect of the failure to register the prior charge is that a subsequent chargee is promoted. Similarly, the invalidity of a floating charge under s.245 does not affect existing security interests except to free them from the floating charge if it would otherwise have had priority.

### Recoveries for the benefit of creditors

All of the statutory provisions referred to above[458] involve the invalidation of dispositions by the company, thus operating to preserve or restore prior security interests in the assets the subject of the ineffective disposition. By contrast, the provisions relating to transactions at an undervalue and preferences, although often loosely referred to as rendering the transactions voidable, are not true invalidating provisions. Nothing in ss.238 or 239 refers to avoidance of transactions at an undervalue or preferences, nor do the powers conferred on the court by s.241 include the power to rescind such transactions or preferences or declare them void. Instead, they enable the court to reverse the effect of the transaction at an undervalue or preference in whatever manner it considers fit. This includes the power to order any transferred property to be vested in the company but such a power is purely remedial and does not impeach the validity of the transfer.  **13–136**

It might be thought, therefore, that it is the absence of revesting in the company as the result of the avoidance that debars the secured creditor from reaping the fruits of recoveries in the case of transactions at an undervalue and preferences. That, indeed, was the conclusion reached in relation to preferences by the High Court of Australia in *N.A. Kratzmann Pty Ltd (in liquidation) v Tucker (No.2)*,[459] in which a distinction was drawn between the avoidance of a preference in the form of a transfer of specific property, which revested in the

---

[457] *Merton v Hammond Suddards* [1996] 2 B.C.L.C. 470; *Bayley v National Australia Bank* (1995) 16 A.C.S.R. 38; and *Campbell v Michael Mount PSB* (1995) 16 A.C.S.R. 296. The contrary view was adopted in a majority decision of the Full Court of the Victoria Supreme Court in *Re Fresjac Pty Ltd* (1995) 65 S.A.S.R. 334 (Debelle J dissenting) but it is thought that the earlier cases reflect the position in English law.

[458] i.e. Companies Act 2006 s.859H; and Insolvency Act 1986 ss.127 and 245.

[459] *N.A. Kratzmann Pty Ltd (in liquidation) v Tucker (No.2)* (1968) 123 C.L.R. 295.

company *in specie* and was thus held to be captured by the prior security interest, and the avoidance of payment where there was no such revesting and the claim against the preferred creditor was a purely personal claim for repayment. However, such a distinction was never applied in English law,[460] where the avoidance of preferences has long been established to enure for the benefit of the general body of creditors.[461] The true justification for treating recoveries in respect of preferences as held for the general body of creditors is that the legislation is remedial in character, embodying a policy decision to benefit the general body of creditors and not any individual creditor, and that the claim is accordingly vested by statute in the liquidator, not in the company.[462] Moreover, the recovery does not arise by force of law but (at least in a case in which there has been no assignment) results from the liquidator's activity in making application to the court and, to that end, the use of the company's resources, so that the position is analogous to that which obtains where the liquidator carries out a contract on behalf of the company.[463] A third ground advanced by Bennett J in *Re Yager-phone Ltd*, is that assets recovered by way of preference are impressed with a trust in favour of the general body of creditors, an obiter dictum subsequently approved by Millett J in *Re M.C. Bacon Ltd*.[464]

Similar considerations apply to recoveries by the liquidator in relation to transactions at an undervalue[465] and extortionate credit bargains.[466] It follows that the defendant cannot assert a right of set-off in respect of a cross-claim against the company, for example, for repayment of a loan, for there is no mutuality and, moreover, the claim against the defendant is a post-liquidation claim and rights of set-off are determined as at the date of liquidation.[467] It follows also that directors against whom a claim is made by a liquidator under ss.214/246ZB of the Insolvency Act cannot claim contribution against insolvency practitioners for negligent advice given to the company, for the claim under these sections is vested in the liquidator, not the company, so that the

---

[460] See Oditah, *Legal Aspects of Receivables Financing*, 2008, p.220.

[461] *Re Yagerphone Ltd* [1935] Ch. 392; and *Willmott v London Celluloid Co* (1886) 31 Ch.D. 425, affirmed (1887) 34 Ch.D. 147. Prior to the Insolvency Act 1985, no statutory provisions existed for the avoidance of transactions at an undervalue. In the case of an individual s.42 of the Bankruptcy Act 1914 provided for the avoidance of settlements made within the two years preceding the bankruptcy but there was no comparable rule in winding-up.

[462] *Re M.C. Bacon Ltd (No.2)* [1990] B.C.C. 430; *Re Yagerphone* cited above; and *Willmott v London Celluloid Co*, cited above. See also *Re Oasis Merchandising Services Ltd* [1996] 1 All E.R. 1009, a decision on the application of the fruits of a claim to contribution for wrongful trading under s.214 of the Insolvency Act.

[463] See above, paras 6–32 et seq. Where the claim has been assigned (see above, para.13–17), the office-holder will of course still have used company resources to investigate the claim for the purpose of determining whether to assign and how to value what is being assigned.

[464] *Re M.C. Bacon Ltd* [1991] Ch. 127 at 137. See also Oditah, *Legal Aspects of Receivables Financing* (2008), p.219.

[465] Insolvency Act 1986 s.238.

[466] Insolvency Act 1986 s.244.

[467] A similar position is taken by Dr Rory Derham in his magisterial work *The Law of Set-Off*, 4th edn (Oxford: Oxford University Press, 2010), paras [13.08]–[13.09] and [13.17]–[13.19].

insolvency practitioners and the directors are not under a common liability for the purpose of the Civil Liability (Contribution) Act 1978.[468] By contrast, a potential contribution claim might arise in proceedings under s.212 of the Insolvency Act for breaches of duty by the directors and the insolvency practitioners.[469]

This long-established position is now reflected in the Insolvency Act 1986 s.176ZB,[470] providing that the proceeds of a claim (or of the assignment of a claim) under ss.213–214, 246ZA–246ZB, 238, 239 and 244 are "not to be treated as part of the company's net property, that is to say the amount of its property which would be available for satisfaction of claims of holders of debentures secured by, or holders of, any floating charge created by the company".[471] As explained in Ch.6, this provision was designed to "clarify the order of priority for the distribution of proceeds arising from an office-holder claim" by codifying "the legal position established by case law by providing that the proceeds of these types of claim do not form part of the company's property which is available for the satisfaction of debts owed to a creditor with floating charge security".[472] Although this provision focuses solely on the position of the floating charge holder, it was suggested in Ch.6 that, given that s.176ZB was clearly not intended to change the law, the preferable view is that the position established by the cases is preserved, such that the proceeds of office-holder actions (or of the assignment of such actions) are not generally susceptible to capture by a prior assignment or security interest of any kind.

Where the charge is not overridden by the transfer it continues to attach to the recovered property.[473] But since a floating charge will almost always be overridden by a transfer, such cases will in practice be confined to fixed charges, which fall outside s.176ZB.

## 14. EXEMPTIONS FOR MARKET AND RELATED CONTRACTS

The provisions of ss.238, 239 and 423 of the Insolvency Act 1986 do not apply to market contracts to which a recognised investment exchange or recognised clearing house is a party or to a disposition of property in pursuance of such a contract.[474]     **13–137**

---

[468] *Re International Championship Management Ltd, Cohen v Davis* [2007] B.C.C. 95.

[469] *Re International Championship Management Ltd, Cohen v Davis* [2007] B.C.C. 95.

[470] As inserted by s.119 of the Small Business, Enterprise and Employment Act 2015.

[471] Insolvency Act 1986 s.176ZB(2), subject to s.176ZB(4) (indicating that sub-s.(2) may be disapplied by a CVA under Pt I of the Insolvency Act 1986 or a compromise or arrangement under Pt 26 of the Companies Act 2006). Section 176ZB applies whether the floating charge was created before or after the coming into force of the section: s.176ZB(1).

[472] Explanatory Notes to the Small Business, Enterprise and Employment Act 2015, para.715, extracted more fully in para.6–36 above.

[473] See para.13–142 of the previous edition of this book, building on Armour, "Transactions at an Undervalue" in Armour and Bennett (eds), *Vulnerable Transactions in Corporate Insolvency* (2002), paras 2.135 et seq.; and Adrian Walters, "Preferences" in Armour and Bennett, *Vulnerable Transactions in Corporate Insolvency* (2002), paras 4.102 et seq.

[474] Companies Act 1989 s.165.

## *15. CRITIQUE OF THE AVOIDANCE PROVISIONS*

**13–138**   From the analysis given above, it will be apparent that the avoidance provisions of the Insolvency Act 1986 are long overdue for reform. Although the broad underlying policies are reasonably clear, there is little coherence in the working out of those policies in the legislation, which remains bound by its historical antecedents. The rules as to transactions at an undervalue and preferences are predicated on the assumption that the purpose of the legislation is not to preserve the debtor's estate for the benefit of creditors but, more narrowly, to avoid voluntary transfers which are not made in good faith. Hence the legislation looks not to the fact of loss of value or preference but to the state of mind of those acting on behalf of the company in entering into the transaction under attack. This is in marked contrast to the position in other jurisdictions such as Australia and the United States, where the test of preference is an objective one. The Cork Committee was divided on the issue, a minority favouring the objective test, while the latter adhered to the position that a creditor who exerts pressure should be allowed to retain the fruits of his own diligence. If there is to be any real prospect of improving the position of unsecured creditors, it is necessary to substitute an objective for a subjective test, while on the other hand allowing exemptions for transactions on reasonable commercial terms in the ordinary course of business. Moreover, the preference rules should apply to involuntary, as well as voluntary, dispositions, such as those made pursuant to a court order in contested proceedings. That would have the additional effect of avoiding the risk of unfairness to unsecured creditors that can result from the imposition of a remedial constructive trust or a constructive trust not based on the plaintiff's initial proprietary base.[475]

A strong case can be made out for repealing s.127 of the Insolvency Act, which forces a company to apply to the court in order to be able to continue its business when a petition has been presented against it which may be well founded but may equally be insupportable. There is no good reason for imposing a total statutory paralysis on a company merely because of a winding-up petition, particularly since the standard form of order under s.127 allows transactions in the ordinary course of business. It should be sufficient that leave of the court has to be obtained for any transaction not made in the ordinary course of business and on reasonable commercial terms. Finally, thought should be given to rationalising the widely differing periods within which a company must go into liquidation or administration if a transaction is to become void or liable to reversal. It is legitimate to distinguish between transactions in favour of a person connected with the company and other transactions but apart from this a case needs to be made out to show why it is necessary to have a range of time factors running from six months at one end (preferences) to eternity at the other (transactions

---

[475] See Roy Goode, "Property and Unjust Enrichment" in Andrew Burrows (ed.), *Essays on the Law of Restitution* (Oxford: Clarendon Press, 1991), pp.240–244.

defrauding creditors). On the way, opportunities that were missed in the enactment of the Insolvency Act 1986 can be taken to remove the more detailed problems identified long ago in case law.

## 16. DO COMMON LAW RESTITUTIONARY PRINCIPLES APPLY?

### The nature of the issues

Given that the policy underlying most (but not all) of the avoidance provisions is to reverse unjust enrichment, a question for consideration is whether, and to what extent, the court should apply the principles of unjust enrichment developed by the common law in deciding how its discretion should be exercised. This question is discussed in some detail by Dr Simone Degeling in a most instructive paper,[476] in which she points out that there are two symmetrical unjust enrichment claims, that of the liquidator to recover the asset transferred or its value and that of the transferee by way of counter-restitution of payments he has made and the value added by improvements to the asset, and that while the latter claim may be invoked to reduce the former, the two claims are analytically distinct in that each has to satisfy the criteria for unjust enrichment. That is an important point. Some of the statutory provisions are not themselves based on unjust enrichment and do not give rise to a restitutionary claim but the effects they produce may lead to a cross-claim by the defendant which is restitutionary in character.

**13–139**

There are two main questions to be addressed. The first is whether defences available at common law to a restitutionary claim—estoppel, bona fide purchase and change of position—can be asserted as a defence to a claim under the statutory avoidance provisions. The second is the extent to which a defendant who has a counter-restitutionary claim for unjust enrichment against the insolvent company is entitled to have it satisfied, whether by payment, set-off or otherwise, instead of being left to prove in the liquidation as an unsecured creditor. [477]

### The nature of a restitutionary remedy

Restitution is a remedy given to reverse unjust enrichment, that is, to restore gains improperly made by one person at the expense of another, typically by

**13–140**

---

[476] "Restitution for Vulnerable Transactions" in Armour and Bennett, *Vulnerable Transactions in Corporate Insolvency* (2002), Ch.9.

[477] See Roy Goode, "The Avoidance of Transactions in Insolvency Proceedings and Restitutionary Defences" in Andrew Burrows and Lord Rodger of Earlsferry (eds), *Mapping the Law: Essays in Memory of Peter Birks* (Oxford: Oxford University Press, 2006), p.299, exploring some of these issues. The present analysis departs in some respects from what was said there.

transfer of an asset from the latter's estate or "subtractive enrichment".[478] The remedy may be either proprietary or personal. However, it is necessary to distinguish a pure property claim from a claim based on subtractive unjust enrichment. In the case of the former, the claimant recovers his asset not because of any unjust enrichment of the defendant but because the asset belonged to him prior to the subtraction and still belongs to him. It was previously thought that while this was true of a claim to the original asset, it was not true of proceeds of its realisation by the defendant, for what is traced is not the thing itself but its value.[479] However, the effect of the controversial decision of the House of Lords in *Foskett v McKeown*[480] that a claim to proceeds of the claimant's asset is a pure property claim greatly restricts the scope of restitutionary proprietary remedies. The claimant, said Lord Millett, is entitled to succeed on the basis of his title under property law and not by way of reversal of unjust enrichment. Property rights are determined by fixed rules and settled principles, are not discretionary and do not depend on what is fair, just and reasonable.[481] It follows, of course, that defences to an unjust enrichment claim are not available as an answer to a claim based on title to an asset or its proceeds.

### Character of the statutory provisions

**13–141**    The statutory provisions under review are ss.127, 238, 239, 245 and 423 of the Insolvency Act 1986 and s.859H of the Companies Act 2006. These fall into three groups[482]: provisions rendering the transaction irretrievably void, namely s.245 of the Insolvency Act and s.859H of the Companies Act; provisions rendering a post-petition disposition void unless authorised or validated by the court, namely s.127 of the Insolvency Act; and provisions for the reversal of the effect of a transaction, namely ss.238, 239 and 423 of the Insolvency Act.

### Provisions rendering the transaction void

**13–142**    Except in relation to cross-claims, the first two groups referred to above can be eliminated from our enquiry because they are not based on unjust enrichment—

---

[478] There is controversy over the question of whether the law of unjust enrichment is confined to subtractive enrichment or whether it also encompasses enrichment through a wrong which does not necessarily cause a transfer from the claimant's estate. See, e.g. Andrew Burrows, *Law of Restitution*, 3rd edn (Oxford: Oxford University Press, 2011), pp.10–12 and Chs 23–27; Graham Virgo, *Principles of the Law of Restitution*, 3rd edn (Oxford: Oxford University Press, 2015), pp. 415–420. The late Professor Peter Birks originally favoured the inclusion of enrichment through wrongs but towards the end of his life abandoned this position, taking the view that restitution for wrongs did not belong to the law of unjust enrichment at all (see Birks, *Unjust Enrichment*, 2nd edn (Oxford: Clarendon Press, 2005), pp.21 et seq.). This debate need not concern us since those of the statutory provisions that have a restitutionary base all involve subtractive enrichment.

[479] Lionel Smith, *Law of Tracing* (Oxford: Clarendon Press, 1997), p.15.

[480] *Foskett v McKeown* [2001] A.C. 102.

[481] *Foskett v McKeown*, cited above, at 127.

[482] We can ignore s.244 of the Insolvency Act relating to extortionate credit bargains, which is based on a generalised concept of unfairness.

the defendant may, indeed, have given full value—and to the extent that any remedy needs to be exercised to give effect to them it is a pure property remedy, not a restitutionary remedy. In all these cases, the statutory avoidance is automatic and self-executing in that its effect is that the creditor never acquired any beneficial ownership of the property in the first instance. Only in two cases will it be necessary for the liquidator to seek recovery. The first is where the asset is land in respect of which a conveyance has been executed, for although the disposition is ineffective to pass the beneficial interest, the legal title passes by the conveyance, the transferee holding as bare trustee for the company, which is entitled to call for a reconveyance.[483] The second is where, in the case of other kinds of asset, the transferee has realised the asset or, in the case of goods, they have been removed from the company's possession. In both of these cases, the question of restoration to the company arises, and the claim of the administrator or liquidator, whether in respect of the asset or its proceeds, will then be a pure property claim, not a restitutionary claim,[484] so that defences available under the law of restitution will not apply.

In *Re Tain Construction Ltd*[485] Mr Nicholas Warren QC, sitting as a deputy High Court judge, held in relation to a claim under s.127 of the Insolvency Act that a defence of change of position could not be entirely ruled out as a defence,[486] although on the facts of that case he held it to be inapplicable. In reaching this conclusion, he relied on the fact that whereas ss.238 and 239 prescribe the remedies that the court can award, s.127 does not but leaves the remedy to the general law. However, the point that any right of recovery under s.127 would be a pure property claim and as such susceptible to defences available to a restitutionary claim does not appear to have been raised.[487] So-called "disenrichment" is not, and should not, be a factor relevant to s.127, which is concerned to preserve the company's assets for the general body of creditors. To allow change of position as a defence would be to give preferential treatment to the defendant without there necessarily being any corresponding benefit to the other creditors. Moreover, it is hard to see why the court should be expected to engage in the complexities of the change of position defence when

---

[483] *Re French's Wine Bar* at [1987] 3 B.C.C. 173.

[484] However, the creditor may have a claim for the recovery of transaction-related cross-claims. See below, paras 13–145 et seq.

[485] *Re Tain Construction Ltd* [2003] 1 W.L.R. 2791; [2003] 2 B.C.L.C. 374 sub nom. *Re Tain Construction Ltd, Rose v AIB Group (UK) Plc*.

[486] *Tain Construction*, cited above, at [41].

[487] The proprietary remedy point was acknowledged in *Clark v Meerson* [2018] EWHC 142 (Ch) but its implications for the reasoning in *Tain* on the availability of restitutionary remedies not tested, though the judge did at least make clear that it would not be correct to ask (as one would in an unjust enrichment claim) whether the defendant had been or remained enriched and if so whether that was unjust: "Statute provides that the disposition is void unless the court orders otherwise" (at [47]). See also *Re D'Eye* [2016] B.P.I.R. 883, in which Registrar Baister doubted whether a claim under s.284 of the Insolvency Act 1986 was properly characterised as one for restitution for unjust enrichment, but in view of *Tain* went on to consider whether the defence of change of position was made out on the facts.

its powers of authorisation or validation provide all the flexibility that is needed.

Similar considerations apply to avoidance under s.245 of the Insolvency Act and s.859H of the Companies Act except that the question of authorisation by the court does not arise, there being no provision for it in s.245, while as regards s.859H the court will not give leave to register an unregistered charge out of time once winding-up or administration has commenced.

### Provisions for reversal of transactions: ss.238, 239 and 423

13–143    We are left with s.238 relating to transactions at an undervalue, s.239 relating to preferences and s.423 concerning transactions defrauding creditors, all of which are restitutionary in character. The last of these, in so far as it confers remedies on the office-holder for the benefit of creditors as opposed to other victims, attracts the same considerations as s.238.

The three main defences to a restitutionary claim at common law are estoppel, bona fide purchase and change of position. Estoppel is of little importance in the law of restitution, for the facts necessary to support it are rarely present and it has anyway been largely superseded by the broader defence of change of position. The defence of bona fide purchase under ss.241(2) and 425(2) is not open to the party dealing with the company, only with that party's transferee. That leaves only the defence of change of position, to which we now turn.

### Change of position

13–144    It is worth noting two threshold objections to allowing change of position or any other restitutionary defence to a claim under s.238, 239 or 423. The first is that the sections are concerned not with the resolution of claims between private parties but with the protection of creditors in a winding-up, and they have the specific policy of protecting the value of the company's assets. The second is that where legislation contains detailed remedial provisions, it is not open to the court to invoke common law rules either to confine the discretion given to the court by the statutory provisions or to bypass restrictions on remedial relief imposed by those provisions.

There is, nevertheless, at least one High Court judgment to the effect that that change of position is a defence to a claim under the above provisions, namely *4Eng Ltd v Harper*.[488] That case involved, amongst other things, the defendant's transfer of his joint share of property into the name of his wife. Sales J concluded that, by analogy with claims based on unjust enrichment, the defendant should not be ordered to make a repayment under s.425(1)(d) if he had a bona fide

---

[488] *4Eng Ltd v Harper* [2010] 1 B.C.L.C. 176.

change of position in reliance on the security of his receipt of money in a way that would make it unfair to require him to make repayment. However, this overlooks the point made above, that while ss.238, 239 and 423 are designed to provide a restitutionary remedy they are driven by a specific policy, namely the restoration of value to the company for the benefit of its creditors, which overrides the standard rules governing unjust enrichment as between two parties to a private transaction. Change of position *per se* should not be identified as a defence to a claim under s.425, for it does nothing to mitigate the loss suffered by the general body of creditors as the result of the fraudulent transaction. We have seen that the protection given by s.425(2) to a transferee in good faith, for value and without notice of the relevant circumstances does not apply to a transferee from the debtor itself. This clearly demonstrates that the overriding concern is to ensure that asset value is not lost in the run-up to liquidation, even if this causes hardship to a wholly innocent counterparty. Acts of reliance by the creditor on the validity of the transaction should therefore be regarded as *res inter alios acta* and irrelevant to claims under the above provisions except so far as they found a right to counter-restitution (for example, for the value of improvements to the transferred property), in which case they can be invoked for that purpose, not to support a defence of change of position. For the same reason, change of position ought only exceptionally to be a factor to be taken into account by the court in the exercise of its discretion. If no protection is given even to a bona fide purchaser for value without notice, it is hard to see why a party who has changed his position should be treated differently. Sections 238(5) and 241(2), together with s.425(2), provide the only defences to a claim otherwise made out and the purpose of the discretion is not to allow the court to take account of hardship to the transferee but simply to ensure that the remedy is tailored to the purpose specified in s.238(3), namely "restoring the position to what it would have been if the company had not entered into that transaction". The court has all of the discretionary powers it needs for that purpose without locking itself into rules on change of position developed to meet common law restitutionary claims.[489] Moreover, those powers are exercisable in the interests of the creditors as a whole, so that common law principles of unjust enrichment relevant to a relationship between two parties would often be inappropriate, since they could have the effect of giving a party relying on change of position an unfair advantage over the general body of creditors.

### Counter-restitution: return of the consideration[490]

A party entering into a transaction with the insolvent company which is void or liable to be set aside under the Insolvency Act provisions will naturally expect to

**13–145**

---

[489] See *Tain Construction*, cited above fn.485.
[490] Counter-restitution for improvements is discussed below, para.13–148.

be given back the consideration he furnished under the transaction. Such a claim, which is by way of counter-restitution, will be little value if it is a purely personal claim for which he is restricted to a right of proof in the liquidation in competition with other creditors. The only ways in which the solvent party can be protected are through (a) the imposition by the court of a condition making the grant of relief by the liquidator dependent on the return of the benefits received by the company under the avoided transaction or (b) a proprietary claim. It is once again necessary to distinguish counter-restitution in cases within ss.238, 239 and 423 from that available in cases caught by s.127.

*Return of the consideration: ss.238, 239 and 423*

**13–146**   Let us take first a claim for recovery of property under s.238, 239 or 423. It should go without saying that return of the property, which is a matter of judicial discretion, will only be ordered on terms of repayment by the liquidator of the purchase price and any other consideration given for the property, for example, the assumption or discharge of the company's liabilities as part of the deal. It is not the function of s.238, 239 or 423 to give the creditors a windfall at the expense of the transferee. What is required is restoration of the status quo. This does not depend on the common law of unjust enrichment, which is concerned with relations between two parties: it is a power given to the court by the express terms of the above sections for the benefit of the general body of creditors, and its exercise will be tailored accordingly.

*Return of the consideration: s. 127*

**13–147**   In the case of transfers void under s.127 the position is somewhat different, for the section says nothing about the effects of the invalidation, nor does it confer any powers on the court to address the consequences of the invalidity, so that the matter remains governed by the common law. We can start with the case where the offending disposition consists of a sale of property by the company for an agreed price which has been paid. We have seen that s.127 is self-executing in that its effect, absent authorisation or ratification by the court,[491] is that the asset in question remains in the beneficial ownership of the company, and all the office-holder has to do is get back the legal title, which the buyer as bare trustee is duty bound to restore. But the buyer has paid the price for an asset to which he has not in the event acquired title. Clearly, he cannot have a proprietary restitutionary claim to the property he had mistakenly thought he had bought, for

---

[491] In practice, the court would no doubt in the ordinary way be willing to validate the disposition if for full value, and if it were at an undervalue a validating order could presumably still be made but subject to a condition that the shortfall was made good.

this would completely undermine s.127. It is equally clear that he has at least a personal restitutionary cross-claim for recovery of the price as paid on a total failure of consideration. But such a claim has always been regarded as purely personal, save in exceptional cases not relevant here.[492] Yet restricting the buyer to a right of proof would be unjust, for it would mean that the company has both the property and the price, and whereas if both claim and cross-claim were monetary the buyer's position would be alleviated by his right of set-off, no question of set-off can arise as between a money claim and a proprietary claim.[493] Thus, if the buyer has only a personal restitutionary claim, the effect is that the company and its other creditors, including secured creditors whose charge covers the property and the money received for it, is unjustly enriched in that the company, and through the company its creditors, are twice as well off in relation to the transaction as it would have been if the transaction had not taken place.

Fortunately the buyer is not restricted to a personal remedy, because as the transaction has not been effective he is entitled to an equitable lien on the property to secure the return of the price he has paid.[494] The same situation obtains in the converse case where it is the company that has paid money to acquire property under a transaction void under s.127 and not validated by the court. The company will have an equitable lien to secure the return of its payment. The lien carries with it the right to a declaration of charge and an order for sale and payment out of the proceeds of sale.[495]

### Counter-restitution: improvements

Suppose that the defendant received property from the company under the impeached transaction and has added value to property ordered to be retransferred, as by making improvements to it. Where return of the property is sought under s.238, 239 or 423 then again it is unnecessary to resort to rights of counter-restitution in the general law, for the court has all the discretionary powers it needs under those provisions. In the absence of unusual circumstances return of the property to the company should be ordered only on terms of payment to the transferee of the value added by the improvement.[496] Alternatively the court can

**13–148**

---

[492] Andrew Burrows, *Law of Restitution*, 3rd edn (2011), pp.399 et seq.

[493] See above, para.9–26.

[494] *Chattey v Farndale Holdings Inc* (1998) 75 P. & C.R. 298; *Rose v Watson* (1864) 10 H.L.C. 671.

[495] Kevin Gray and Susan Francis Gray, *Elements of Land Law*, 5th edn (Oxford: Oxford University Press, 2009), para.6.1.47.

[496] See *Weisgard v Pilkington* [1995] B.C.C. 1108, where the respondents were given liberty to apply for an order for payment by the liquidator of any amount shown to have been expended on improvements. As Degeling points out (above, fn.476) at para.9.71, this approach was incorrect, the appropriate figure being the value added by the improvements, not the amount expended on them. But the essential point was the willingness of the judge to recognise the availability of a restitutionary remedy.

make an order for payment of the value the property would have had without the improvement. Where the ground of impeachment is s.127 there are no relevant statutory provisions governing the consequences of invalidity and the transferee should be accorded a proprietary restitutionary claim for the value added by the improvement, as a condition of return of the property or the execution of a reconveyance to the company, in order to restore the status quo.

# EXHIBIT 18

**REDACTED
IN ITS
ENTIRETY**

# EXHIBIT 19

**REDACTED
IN ITS
ENTIRETY**

# EXHIBIT 20

1

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                         .  Chapter 11
                                    .  Case No. 22-11068 (JTD)
 4   FTX TRADING LTD., et al.,      .
                                    .  (Jointly Administered)
 5                                  .
                                    .  Courtroom No. 5
 6                                  .  824 North Market Street
               Debtors.            .  Wilmington, Delaware 19801
 7                                  .
                                    .  Monday, October 7, 2024
 8   . . . . . . . . . . . . . . .  10:00 a.m.

 9                      TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE JOHN T. DORSEY
10                UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Adam Landis, Esquire
                               LANDIS RATH & COBB LLP
13                             919 Market Street
                               Suite 1800
14                             Wilmington, Delaware 19801

15                             Brian Glueckstein, Esquire
                               Andrew Dietderich, Esquire
16                             Alexa Kranzley, Esquire
                               SULLIVAN & CROMWELL LLP
17                             125 Broad Street
                               New York, New York 10004
18

19   (APPEARANCES CONTINUED)

20   Audio Operator:          Jermaine Cooper, ECRO

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1   APPEARANCES (CONTINUED):

2   For Sunil Kavuri,
    Ahmed Abd El-Razek,
3   Pat Rabbitte:            David Adler, Esquire
                            MCCARTER & ENGLISH LLP
4                           Worldwide Plaza
                            825 Eighth Avenue
5                           31st Floor
                            New York, New York 10019
6
    For the Committee of
7   Unsecured Creditors:    Kenneth Pasquale, Esquire
                            PAUL HASTINGS LLP
8                           200 Park Avenue
                            New York, New York 10166
9
    For the SEC:            William Uptegrove, Esquire
10                          U.S SECURITIES AND EXCHANGE
                              COMMISSION
11                          950 East Paces Ferry Road, NE
                            Suite 900
12                          Atlanta, Georgia 30326

13  For the U.S. Trustee:   Benjamin Hackman, Esquire
                            OFFICE OF THE UNITED STATES TRUSTEE
14                          844 King Street, Suite 2207
                            Lockbox 35
15                          Wilmington, Delaware 19801

16  For LayerZero Group:    William Dalsen, Esquire
                            Jordan Sazant, Esquire
17                          PROSKAUER ROSE LLP
                            1 International Plaza
18                          Boston, Massachusetts 02110

19  For the Ad Hoc
    Committee of Non-Us
20  Customers of FTX.com:   Erin Broderick, Esquire
                            EVERSHEDS SUTHERLAND
21                          227 West Monroe Street
                            Suite 6000
22                          Chicago, Illinois 60606

23

24

25

1  <u>APPEARANCES (CONTINUED)</u>:

2  For the Celsius
   Litigation
3  Administrator:              Richard Levy, Esquire
                               PRYOR CASHMAN LLP
4                              7 Times Square
                               40th Floor
5                              New York, New York 10036

6  For the Bahamian
   Liquidators:                Christopher Shore, Esquire
7                              WHITE & CASE LLP
                               1221 Avenue of the Americas
8                              New York, New York 10020

9  For the Class
   Action Plaintiffs:          Andrew Entwistle, Esquire
10                             ENTWISTLE & CAPPUCCI LLP
                               230 Park Avenue
11                             3rd Floor
                               New York, New York 10169

12 For Steadview Capital
13 Mauritius Limited:          Douglas Mintz, Esquire
                               SCHULTE ROTH & ZABEL LLP
14                             555 13th Street, NW
                               Suite 6W
15                             Washington, DC 20004

16

   Pro Se Litigants:           Kihyuk Nam
17                             Lidia Favario
                               Arush Sehgal

18

19

20

21

22

23

24

25

1                              INDEX

2  MOTIONS:                                             PAGE

3  Agenda
   Item 3: Second Amended Joint Chapter 11 Plan of        15
4          Reorganization of FTX Trading Ltd. and
           its Debtor Affiliates [D.I. 26029;
5          Filed on 9/30/24]

6  Agenda
   Item 4: The Celsius Litigation administrator's
7          Motion for Relief from the Automatic
           Stay [D.I. 16815; Filed on 6/5/24]
8

9  EXAMINATIONS:                                        PAGE

10        JAMES DALOIA
          Cross-examination by Mr. Adler                17
11
          STEVEN COVERICK
12        Cross-examination by Mr. Adler                23
          Cross-examination by Mr. Dalsen               33
13
          EDGAR MOSLEY II
14        Cross-examination by Mr. Adler                41

15
   DECLARATIONS:                                        PAGE
16
   1)   James Daloia                                     16
17
   2)   Steven Coverick                                  22
18
   3)   Edgar Mosley, II                                 41
19
   4)   Lord Neuberger                                   46
20

21

22

23

24

25

1        (Proceedings commence at 10:00 a.m.)

2        (Call to order of the Court)

3            THE COURT:  Good morning, everyone.  Thank you.

4    Please be seated.

5            Mr. Landis.

6            MR. LANDIS:  Good morning, Your Honor.  May I

7    please the Court, Adam Landis from Landis Rath & Cobb on

8    behalf of FTX Trading Ltd., and its related debtors and

9    debtors-in-possession.

10           Your Honor, this morning, shortly before 9, we

11   filed our second amended agenda, in connection with this

12   hearing, reflecting -- including a revised confirmation order

13   and reflecting the resolution of one additional objection of

14   the foreign representatives of Three Arrows Capital.  We

15   would propose to proceed in order of the agenda this morning.

16   Items Nos. 1 and 2 have been resolved.  That leaves us with

17   Item No. 3 to go forward, that is confirmation of the

18   debtors' second amended plan.  We would propose to have Mr.

19   Dietderich address the Court first and then Mr. Glueckstein

20   handle the confirmation matters.

21           THE COURT:  Okay.  Thank you.

22           MR. LANDIS:  Thank you, Your Honor.

23           MR. DIETDERICH:  Thank you, Mr. Landis.  For the

24   record Andy Dietderich, Sullivan & Cromwell, for the debtors.

25           As Mr. Landis said, Your Honor, Mr. Glueckstein

1   will address our affirmative case for confirmation and the

2   remaining objections.  I would like to say, if it pleases the

3   Court, a few words on background.

4           THE COURT:  I am not they can hear you in the

5   back.  You might have to --

6           MR. DIETDERICH:  Is this better, Your Honor?

7           THE COURT:  Lift up the microphone so they're

8   closer to you.

9           MR. DIETDERICH:  How about this, testing one, two,

10  three.

11          THE COURT:  Can you hear in the back?  Okay,

12  you're good.

13          MR. DIETDERICH:  I will try my best to project.

14          THE COURT:  Okay.

15          MR. DIETDERICH:  Turning back the clock, Your

16  Honor, FTX filed on November 11th, 2022.  At the time it was

17  correctly seen as one of the most complex bankruptcy cases

18  ever attempted. It had the scope of a diversified financial

19  institution like Lehman, but with digital assets, no

20  effective regulatory system, the absence of accurate books

21  and records, competing foreign jurisdictions seeking to

22  displace this Court, and a team of founders that faced not

23  just investigation, but active criminal prosecution.

24          Less than 23 months later, we are here

25  contemplating what effectively is a fully consensual one day

1  confirmation hearing.  There are some remaining objections to

2  resolve, but what is striking is the lack of any plan

3  critical objection by any major stakeholder.  What marks the

4  resolution of this extraordinary case is not the level of

5  customer recovery merely, it is the level of consensus.

6           How did we get here? The answer is experienced

7  leadership.  At the start, Mr. Ray and the board made three

8  key decisions.  Everything else is a consequence of those

9  decisions.  The first was that former management would have

10  no role in these cases.  This meant not only excluding

11  compromised and potentially compromised employees, it meant

12  creating a new corporate organizational structure, a new

13  system of corporate governance, the migration of digital

14  assets to new custodians, new financial and tax reporting

15  systems, and new cash management and financial controls.

16           The result of this effort was credibility.  That

17  effort took time.  We were not able to say as much as we

18  wanted to say at the beginning of this case but after we had

19  done the work and were able to speak what we did say was

20  credible and there could be no restructuring without the

21  effort we spent early building the ability to produce

22  credible information.

23           The second decision we would cooperate with

24  government authorities.  At the first meeting of the company

25  the board determine that cooperating with the many government

1  investigations and compiling and providing information to

2  those investigations from a centralized repository was in the

3  economic best interest of FTX and its creditors.  We did not

4  do this just because it was the right thing to do.  We did it

5  because it was beneficial to creditors and there is no

6  decision we have made since that has created more

7  distributable value.

8          It is our posture of cooperation for the

9  government that has avoided criminal indictments of the

10  debtor.  That posture has allowed us to coordinate asset

11  recovery with governmental actors, it has positioned us to

12  conform the bankruptcy code definition of creditor with the

13  criminal law definition of victim and to stand here today

14  proposing a plan where unlike Madoff or other cases

15  substantially all value will be distributed to creditors in a

16  single centralized distribution process.

17          That posture has also avoided the assessment of

18  fines and penalties that would have reduced creditor

19  recoveries.  In fact, it has resulted in the voluntary

20  subordination of governmental claims, not just a bankruptcy

21  petition time value but to an unprecedented 9 percent post-

22  petition interest rate.  It even has resulted in the

23  subordination of federal income taxes for the prepetition and

24  the post-petition period. None of this would have been

25  possible without the initial decision to fully cooperate with

1   the government.

2          The third decision was that we would not make

3   business decisions alone.  We would do so with consensus with

4   the statutory committee and the other major stakeholders.

5   This was critical because of the difficulty of the business

6   judgments we faced.  Our assets were incredibly diverse and

7   often novel and hard to value.  Virtually all of them were

8   highly volatile.

9          What if we sold something and then it went up?

10  What if we held something and then it went down?  Mr. Ray and

11  the board's answer was not to make those decisions themselves

12  alone.  The most important example of this was the process

13  created for the liquidation of digital assets where the UCC

14  and later the ad hoc committee of customers made decisions

15  side by side with management.  Often this meant we could not

16  move as fast as we might wish.  Where we did not have

17  consensus, rather then run to Court and seek an order from

18  Your Honor we tried harder to reach agreement, but when

19  decisions were made they reflected everyone's views.

20          The number of important motions entered by this

21  Court without objection or hearing is testament to the power

22  of this approach.  Collaboration, Your Honor, is also the key

23  to understanding the plan.  Confirmation in this case is not

24  the creation of a building. It is the laying of a capstone.

25  The last piece that balancing everything and locks the other

1   pieces into place.

2           I should draw the Court's attention, before we get

3   to the plan in chief, to a few of those other pieces that

4   have been absolutely critical.  We have been thinking about

5   this day for almost two years.  The first piece was the

6   settlement with the Bahamas.  The Bahamas began this case as

7   a jurisdictional war.  Had that war been allowed to continue

8   the loss of value to creditors would have been excessive.

9   The Bahama settlement solved this problem with a novel

10  solution worked out with our friends at FTX Digital Markets.

11          That solution was the economic and procedural

12  consolidation of the Chapter 11 cases with the proceedings in

13  the Bahamas under a structure that did so by contract rather

14  than requiring extensive and expensive coordination

15  proceedings and lots of Court time.  That settlement has

16  already been approved by Your Honor and the Court in the

17  Bahamas, but its effectiveness is conditional on the

18  confirmation of the plan today.

19          A second critical stone was the global settlement

20  with customers.  That settlement resolved after many months

21  of discussion. The dispute between FTX and all of its

22  organized customer constituencies concerning whether digital

23  asset entitlements should be treated as claims or property

24  interests.  The settlement recognizes what became the

25  consensus view that customers do not have a legal interest in

1   property but that something happened here that as an

2   equitable matter suggests customers should have some priority

3   over general unsecured creditors.

4         The way the plan addresses this, consistent with

5   the general approach of substantive consolidation of the

6   debtors is to identify exchange shortfalls and create a

7   special priority intercompany claim that benefits all of the

8   customers of each exchange to the extent of that shortfall.

9   That settlement also, Your Honor, is to be finalized by

10   confirmation today.  Other important pieces were a settlement

11   with the IRS, with the CFTC, with state AG's, with the

12   liquidators in Australia, with Emergent, and with the MDL

13   Plaintiffs.  All of those settlements have an effectiveness

14   condition that is waiting for confirmation of the plan.

15         Now, Your Honor, I would like to address one

16   settlement that hasn't happened yet.  We still do not have an

17   understanding with the Department of Justice concerning the

18   over a billion dollars in forfeiture proceeds they are

19   holding in connection with the criminal prosecution of the

20   founders.  We are in discussions with the Department of

21   Justice.

22         What we have done in the meantime is to reach

23   consensus with the other parties besides FTX that have

24   competing claims against this money.  We resolved our

25   difficulties -- our differences, really, with Emergent, which

1   had a competing claim.  We resolved our differences with the

2   MDL Plaintiffs who had their own competing claim.  And we

3   have an understanding with the critical mass of the preferred

4   shareholders who also have a competing claim to this money as

5   well.

6          This raises the question I should address at the

7   outset because its one of the potentially confusing parts of

8   the plan and I want to get it right at the start of how we

9   see preferred shareholders in this case.  It makes sense to

10   clarify this.  The plan, Your Honor, is an absolute priority

11   plan.  It pays creditors and other stakeholders in accordance

12   with bankruptcy priorities.  And we do not anticipate there

13   will be any value available to preferred shareholders from

14   FTX in the plan.  We are forecasting that their distribution

15   is zero.  It may not be if we have extra money, but the

16   current forecast is the distribution is zero.

17          However, Your Honor, we are not the Department of

18   Justice.  The DOJ has the forfeiture proceeds and the DOJ, as

19   a matter of criminal law, is not bound by the absolute

20   priority rule or bankruptcy priority scheme.  Under criminal

21   law they see preferred shareholders as victims too.  So, as

22   we contemplate an arrangement with the DOJ for release of

23   forfeiture proceeds to us, we must either litigate or

24   negotiate in the criminal proceeding how much of that

25   recovery is received by the FTX estate and how much the DOJ

1  decides to allocate the preferred shareholders.

2         The plan does not incorporate this settlement.

3  There is no preferred shareholder settlement in the plan;

4  however, as part of our discussion so far with the DOJ there

5  is a possibility that the DOJ will ask FTX to, effectively,

6  be its distribution agent or its paying agent for money to be

7  distributed by the DOJ to the preferred shareholders.  Again,

8  we have a centralized distributional architecture and we

9  built that to be used by the government as well as by the

10 estate.

11        We included this possibility in the plan for

12 disclosure purposes but there is of yet no deal.  I should

13 underscore that our understanding with the preferred

14 shareholders to approach the DOJ jointly and advocate for

15 this is only that, an understanding.  With them it is not yet

16 an understanding with the DOJ.

17        Now the last thing I would like to address before

18 we go to the plan, Your Honor, is the process to building the

19 plan itself. In July 2023 the debtors filed publicly a first

20 draft of this plan expressly for the purpose of soliciting

21 comments from stakeholders.  Mr. Ray, the board and the team

22 recognized that this case was to big and to important,

23 effected too many people for us to only solicit feedback from

24 the creditor professionals who happen to be around the table

25 already.  This was a great decision.

1          We have received very meaningful feedback from

2    numerous creditors and governmental authorities that we could

3    incorporate into the plan and disclosure statement before we

4    launched.  Almost a year later, this Court approved the

5    disclosure statement.  We included in the disclosure

6    statement an unusual amount of background on the major

7    decisions reflected in the plan; in particular substantial

8    consolidation of the debtors and the comprehensive work done

9    by the debtors, the creditors committee, the ad hoc committee

10   of customers to explore strategic alternatives to the plan.

11          We launched customers and other creditors voted.

12   The voting, Your Honor, was overwhelming. The plan was

13   approved by 98 percent of voting creditors by amount and 96

14   percent of voting creditors by head count.  The turnout was

15   extremely robust.  This is not a case that had a silent

16   majority.  The majority has clearly spoken.  Over two-thirds

17   of all solicited claims around the world, Your Honor,

18   returned their ballots.

19          On behalf of Mr. Ray, the board and all of the

20   debtor professionals, this case represents some of the most

21   meaningful work of our careers. We thank the Court for its

22   guidance over this period and absent general questions I'd

23   like to hand the podium to Mr. Glueckstein and he will

24   present our case for confirmation.

25          THE COURT:  Thank you, Mr. Dietderich.  No

1  questions at this time.

2          MR. GLUECKSTEIN:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. GLUECKSTEIN:  For the record Brian

5  Glueckstein, Sullivan & Cromwell, for the debtors.

6          As Mr. Dietderich has begun discussing, we are

7  here today seeking confirmation of the debtors plan of

8  reorganization.  We filed this morning, at Docket No. 26313,

9  the most up to date form of the confirmation order that

10 incorporates a number of changes to resolve a number of

11 objections.

12         The consensus in support for the plan reflected in

13 the voting results is further illustrated by the lack of

14 objections that were filed, many of which, we are pleased to

15 report, the debtors have since been able to resolve.  The

16 list of objections and status is contained in the chart

17 attached as Exhibit 1 to our reply brief.  Your Honor, since

18 the filing we have continued to work hard to resolve

19 objections to the greatest extent possible and have since

20 resolved the objection of ELD Capital, Three Arrows Capital,

21 RQ Capital, and we have resolved all but one remaining issue

22 in the objection of the Office of the United States Trustee.

23 We will address those objections as we proceed today.

24         If it pleases the Court, we intend to first

25 address the evidentiary record for today's hearing before

1  moving to argument and addressing the remaining objections

2  thereafter which are mostly legal in nature.

3         The debtors have submitted declarations from four

4  witnesses comprising -- consisting of those witnesses direct

5  testimony and the debtors affirmative case in support of

6  confirmation.  I will now address each.

7         Your Honor, the first witness of the debtors in

8  support of confirmation is James Daloia, senior director at

9  Kroll Restructuring.  Mr. Daloia submitted a declaration at

10  Docket No. 26045, which addresses solicitation and the voting

11  results.  At this time, Your Honor, the debtors respectfully

12  move to admit Mr. Daloia's declaration into evidence in

13  support of plan confirmation.  Mr. Daloia is in the courtroom

14  and available for cross-examination.

15         THE COURT:  Is there any objection?

16      (No verbal response)

17         THE COURT:  Its admitted without objection.

18      (Daloia declaration received into evidence)

19         THE COURT:  Does anyone wish to cross the witness?

20  We have one taker.

21         MR. GLUECKSTEIN:  Mr. Daloia, can you come

22  forward.

23         THE COURT:  Mr. Daloia, if you could take the

24  stand please.  Remain standing for the oath.

25              JAMES DALOIA, DEBTOR WITNESS, SWORN

1          MR. DALOIA:  James Daloia, D-A-L-O-I-A.

2          THE COURT:  Thank you.

3                    CROSS-EXAMINATION

4   BY MR. ADLER:

5   Q     Good morning, Mr. Daloia.

6   A     Good morning.

7   Q     My name is David Adler and I represent the Kavuri

8   Plaintiffs and separately Seth Melamed, all of whom are

9   creditors of the estate.

10         I wanted to ask you questions, since you put the

11  solicitation affidavit together, you mention in the affidavit

12  that there were a number of packages that were never

13  delivered or that you learned after the fact were not

14  delivered.  Can you elaborate on the that?

15  A     There is not much to elaborate on.  It just seems like

16  it is a post office error.

17  Q     How did you determine what happened?

18  A     Using our contacts we realized that, you know, making

19  calls, doing our research, finding out that these packages

20  were just not delivered.  And taking the word of the

21  creditors that they never received a package.

22  Q     So, you don't know whether everyone received a package,

23  do you? I mean there is no way to trace it, is there?

24  A     There would be no way to tell if everyone actually

25  received their package.  We trust the post office.

1    Q    Now under the disclosure statement and solicitation

2    order the ballots were supposed to be mailed -- emailed,

3    excuse me, to the email of record of the creditors, is that

4    correct?

5    A    Yes, if one was available.

6    Q    Did you, in fact, send it to all creditors by email?

7    A    If they had a valid email that was available, yes.

8    Q    What efforts did you undertake to make sure that

9    ballots were delivered if you got something back saying that

10   the email was undeliverable?

11   A    We would go through the records again to see if there

12   was another email address and if not, we would send it to any

13   physical address that we had on record.

14   Q    Okay.  Have you filed a list, under seal, with this

15   Court, identifying all the creditors who received the ballots

16   by email?

17   A    That I am not -- I don't believe so.

18   Q    Okay.  Is there -- do you know if you have a list?

19   A    We have records of those that would have had a bounce

20   back.

21   Q    To your knowledge there is no affidavit of service on

22   file?

23   A    No, not that I know of.

24   Q    Are you aware of the issue with my client, Melamed, and

25   what happened to him?

1  A    You would have to remind me specifically because there

2  were a number of issues that we --

3  Q    He did not receive a ballot by email.

4  A    Okay.

5  Q    And the ballot package was mailed to him on Wednesday,

6  August 14th and it was mailed to his prior counsel.  Got

7  there on August 16t and the ballot was returned.  Does that

8  refresh your recollection?

9  A    There was a number of instances.  So, if you are

10  telling me that is the case I will believe it.

11  Q    Okay.  I just want to go back to the point that you are

12  aware of 50 to 75 of these instances, I think you said in

13  your declaration.

14  A    Yes, roughly.

15  Q    Okay.  And are you aware that if a creditor was a

16  voting creditor and didn't return a ballot, he or she was

17  deemed to have released certain third parties?

18  A    If that is what the release provisions say, yes.

19  Q    Does that comport with your understanding?

20  A    I believe so, but I --

21  Q    I understand.  What would happen if a creditor came

22  forward and tried to bring a claim at this point who hadn't

23  voted?

24  A    A claim? I'm sorry.

25  Q    A claim -- let me be mor precise.  What would happen if

1  a creditor came forward and asserted a claim against a

2  release party under the plan who had not voted?

3          UNIDENTIFIED SPEAKER:  Objection, Your Honor.  It

4  calls for a legal conclusion.

5          THE COURT:  Sustained.

6  BY MR. ADLER:

7  Q    Let me ask you this question: In your experience -- how

8  long have you been in the restructuring field?

9  A    About 15 years.

10 Q    Have you submitted solicitation declarations before?

11 A    Yes.

12 Q    In your experience have you ever had a case where you

13 were seeking to -- or the debtors were seeking to obtain a

14 third-party release embodied in a plan where an affidavit of

15 service had not been filed identifying the creditors who had

16 received the ballots?

17 A    Can you restate that? I'm sorry, I --

18 Q    This plan calls for -- asks for a third-party release,

19 correct?

20 A    Correct.

21 Q    In your experience, in those types of cases, have you

22 ever had a situation where such a release was requested when

23 the parties who are granting the release are not identified

24 on an affidavit of service as having received the ballot?

25 A    Not that I am aware of.  They would normally all be on

1  the affidavit of service.

2  Q      Let me back up.  In your experience have you ever put

3  together a solicitation declaration without an affidavit of

4  service being on file indicating who the creditors were and

5  how they were served?

6  A      No.  The affidavit of service would always cover those

7  parties that were served, whether it be a ballot, a notice,

8  you know, any non-voting notice whether deemed to accept or

9  reject and the vote declaration would always reference that

10  affidavit of service.

11  Q      Right.  And in this case that affidavit of service is

12  not on file, is that correct?

13  A      The affidavit of service is on file.

14  Q      With all the names of the customers and how they were

15  served?

16  A      Depending on the redaction rules within the case it

17  might say name on file, but otherwise it would have all the

18  names of the parties that were served and what they were

19  served with.

20  Q      So, the unredacted version on file, the one under seal,

21  would have all the email addresses, is that correct?

22  A      If they were on there, yes.

23          MR. ADLER:  No further questions, Your Honor.

24          THE COURT:  Redirect -- well, I should ask: Does

25  anyone else wish to cross?

1        (No verbal response)

2            THE COURT:  Okay. Mr. Glueckstein.

3            MR. GLUECKSTIEN:  No questions, Your Honor.

4            THE COURT:  Okay.  Thank you.

5            Thank you, Mr. Daloia.  You may step down.

6            THE WITNESS:  Thank you.

7        (Witness excused)

8            MR. GLUECKSTEIN:  Your Honor, the second witness

9    of the debtor in support of confirmation is Steven P.

10   Coverick, managing director at Alvarez & Marsal North

11   America, LLC.  Mr. Coverick submitted a declaration at Docket

12   No. 26041 which addresses facts relevant to the plan's

13   compliance with the bankruptcy code and approval of customer

14   priority and customer preference settlements, among other

15   things.  The debtors respectfully move to admit Mr.

16   Coverick's declaration into evidence in support of

17   confirmation. Mr. Coverick is in the courtroom and available

18   for cross-examination.

19           THE COURT:  Is there any objection?

20       (No verbal response)

21           THE COURT:  Its admitted without objection.

22       (Coverick declaration received into evidence)

23           THE COURT:  Anyone wish to cross Mr. Coverick?

24   Mr. Adler.

25           Please take the stand and remain standing for the

1  oath, sir.

2          THE COURT REPORTER:  Please raise your right hand.

3  Please state your first name and spell your last name for the

4  Court record, please.

5          MR. COVERICK:  Steven Coverick, C-O-V-E-R-I-C-K.

6           STEVEN COVERICK, DEBTOR WITNESS, SWORN

7          THE COURT:  Mr. Adler, whenever you are ready.

8                      CROSS-EXAMINATION

9  BY MR. ADLER:

10 Q    Good morning, Mr. Coverick.  My name is David Adler, I

11 represent the Kavuri Plaintiffs and Seth Melamed in this

12 proceeding.

13      I wanted to ask you a couple questions about your

14 declaration, particularly -- well, let's start off with the

15 solicitation process.  Were you involved in the solicitation

16 process at all?

17 A    I was involved in the solicitation process in a limited

18 capacity.

19 Q    But not on the day-to-day stuff that was just --

20 A    I was not involved in the individual solicitation to

21 creditors.

22 Q    My next question for you is in your declaration you say

23 the plan exculpation provisions are appropriate and should be

24 approved.  I wanted to ask you about the FTX recovery trust

25 exculpation agreement.  Do you believe that exculpation

1  should be approved?

2  A    I don't have the agreement in front of me, but I am

3  generally familiar with it.  Yes, I do believe it should be

4  approved.

5  Q    Are you aware that the exculpation covers the plan

6  administrator?

7  A    Yes.

8  Q    Does the plan administrator exist at the present

9  moment?

10 A    I believe the plan administrator is a role that would

11 be created upon effectiveness of the plan, but I also

12 understand, as defined in the plan supplement that it is the

13 same individual that is currently serving as CEO of the

14 debtors.

15 Q    Right.  But will be a new title with new powers.

16 A    That is my understanding. Yes, sir.

17 Q    Were you involved at all in discussions over the scope

18 of that exculpation?

19 A    Not in detail, but I am generally familiar and was

20 involved in the general negotiations surrounding the releases

21 and exculpations in the plan.

22 Q    So, its Paragraph 8 of the, just so the record is

23 clear, plan administrator agreement.  Its in the second

24 amended plan supplement, Docket No. 26226-2 filed on October

25 3rd.  Paragraph 8 is the exculpation provision and the

1    exculpation has a change to it that was made from the last

2    amended -- last plan supplement where the carve outs to the

3    exculpation originally were fraud, gross negligence or

4    willful misconduct.  That has now been changed in the latest

5    version to simply willful misconduct.  Are you aware of that?

6    A    I generally recall the change, but I am not a lawyer,

7    so I am not familiar with the specific reasons why the change

8    may have been made.

9    Q    Okay.  You believe that this exculpation is appropriate

10    based on your experience?

11    A    Yes, sir.

12    Q    How about the wind down entities.  What are they under

13    Paragraph 8 of the exculpation?

14    A    I'm sorry, I don't have it in front of me.

15    Q    Generally speaking, do you know what the winddown

16    entities are under the plan?

17    A    Yes, sir, I do.

18    Q    Generally speaking, what are the winddown entities?

19    A    The winddown entities generally consist of the

20    remaining debtor entities that will provide assets into the

21    FTX recovery trust upon effectiveness of the plan.

22    Q    Right.  Are they being consolidated?

23    A    Substantially consolidated under the plan, that is

24    correct.

25    Q    Right.  Do the winddown entities presently exist as

1  that term is defined under the plan?

2  A    The entities that comprise the general definition of

3  winddown entities, those do currently exist.

4  Q    I also wanted to ask you some questions about crypto in

5  kind.  Were you involved in efforts by the debtors to make

6  distributions to creditors in kind?

7  A    I have been involved in the general discussions and

8  negotiations with the major stakeholders in this case

9  surrounding the mechanisms under which the debtors may be

10  able to make plan distributions.

11  Q    Can you tell us what efforts were made to attempt to

12  distribute in kind?

13  A    So, in general, the plan does not provide for in kind

14  distributions. That was a topic that was discussed at length

15  with major stakeholders in the case including the official

16  committee of unsecured creditors, the ad hoc committee, as

17  well as other stakeholders.  There were a number of factors

18  involved in the decision to make cash distributions pursuant

19  to the plan. I would be happy to elaborate on some of those

20  decisions if that is helpful.

21      One, the debtors do not have the cryptocurrency that

22  would be required to make in kind distributions and, in fact,

23  never had the cryptocurrency and the proportions in which

24  customers believed they had in their accounts.  The

25  cryptocurrency that the debtors did have has largely been

1 liquidated pursuant to the asset monetization order that was

2 entered, I believe, approximately a year ago in consultation

3 with the official committee of unsecured creditors and the ad

4 hoc committee.

5      So, the most important factor is the debtors simply

6 don't have the crypto to distribute in kind.  That would mean

7 the debtors would have to purchase that cryptocurrency on the

8 open market in order to make in kind distributions.  There is

9 a number of complicating factors that were considered with

10 regard to what that purchase would require, what the

11 logistics of such a complex distribution would be and in

12 consulting with the unsecured creditors committee and the ad

13 hoc committee, we determined, collaboratively, that it would

14 not be feasible and would, in fact, result in potentially

15 inequitable creditor recoveries for members of the same

16 class.

17      Further, we determined it would be exorbitantly

18 expensive to undertake such a large purchase. It would

19 require the purchase of billions of dollars of cryptocurrency

20 on the open market, there would be new professionals that

21 would have to be retained or additional administrative costs

22 that would be incurred to safeguard those assets while

23 waiting to make those distributions.

24      There would be, what we generally refer to as, slippage

25 where the debtors would effectively have to set a record date

1  and calculate the exact amount of cryptocurrencies that would

2  have to be purchased for a given distribution.  Once that

3  quantity was set at a record date the debtors would then have

4  to go purchase billions of dollars of cryptocurrencies in

5  those quantities which would, in consultation with our

6  investment fiduciary, Galaxy, we have been informed would

7  result in a runup in the market.

8      So, in other words, we would have to overpay for those

9  same quantities which would come at a detriment to other

10 creditors in the case.  So, those were the major factors in

11 addition to the fact that, in my understanding, there is

12 nothing in the bankruptcy code that requires a debtor to make

13 in kind distributions.

14 Q    Were you aware of the fact that customers who received

15 cash when they had crypto may have a taxable event?

16 A    I am not a tax professional, but I have --

17 Q    Neither am I.

18 A    -- discussed the topic with the debtors tax

19 professionals. I understand that to be a very complicated

20 topic and one that is predicated on the individual

21 circumstances of each customer, which jurisdiction they sit

22 in, the underlying nature of their entitlement. Its very

23 complicated and I am aware that there is not a conclusive

24 opinion amongst the tax professionals in this case that in

25 kind distributions would or would not eliminate tax exposure

1  of a customer.

2  Q      Fair enough for non-tax advice.

3         You mentioned that this consideration of distributing

4  crypto in kind was done internally.  Were efforts made to

5  reach out to third parties to act as an agent for the

6  customer for crypto distributions?

7  A      There have been many efforts and those efforts are

8  still ongoing to identify distribution agents that would be

9  required to make distributions under the plan.  There were

10  discussions with those distribution agents as to what their

11  capabilities may be with regard to cryptocurrencies.  As I

12  understand, in the plan -- I actually forget if it's the plan

13  or the disclosure statement, but the debtors mention that

14  they're exploring the possibility of making some

15  distributions in stablecoin.  So, that is a topic that has

16  been discussed with some of those potential distribution

17  agents.  So, yes, there were many discussions.

18  Q      Were you involved in any of the other crypto

19  bankruptcies that have been filed since 2022?

20  A      No, sir.  Not personally.

21  Q      Okay.  I will represent to you that in BlockFi it had

22  simply cash and it managed to retain in Coinbase as its agent

23  to convert the cash distribution to crypto for customers who

24  wanted to receive in kind.  Was any attempt made to do that

25  in this case?

1  A     I am aware of the general distribution scheme in

2  BlockFi. I did not serve as financial advisor to BlockFi, so

3  I can't speak to the factors that led to them making that

4  decision. I understand the cases to be very different cases,

5  the nature of the customer base to be very different, the

6  scope of the customer base, general size of the creditor

7  population.  So, again, I would just cite the factors that I

8  am aware of as to why the FTX debtors made the decision not

9  to do in kind distributions, but I can't speak to how BlockFi

10  came to that conclusion.

11  Q     Okay.  Were efforts made to -- or were discussions had

12  with Coinbase or PayPal?

13  A     As I mentioned, we had discussions with a number of

14  parties.  You know, due to the ongoing nature of those

15  discussions I think there's competitive concerns with

16  disclosing any individual names of distribution agents that

17  we have spoken to.

18  Q     Last topic is the fees to be paid to the various

19  entities created on the effective date.  So, we have the plan

20  administrator, we have the board for the FTX recovery trust,

21  we have the advisory committee, we have the Delaware

22  litigation trustee, and nowhere in the plan supplement is

23  compensation disclosed for those entities.  Can you tell me

24  why?

25  A     Well, I don't entirely agree with that.  In the plan

1  supplement we included a winddown budget.  That winddown

2  budget was prepared by the debtors, approved by the debtors

3  current board of directors and includes a level of detail as

4  to what is included in the winddown budget.  One of those

5  items lists governance which includes all of the plan

6  administrator, the recovery trust board, creditor advisory

7  committee, etc., and that estimate and total is included in

8  the winddown budget.

9  Q    Is it broken down on a line-by-line basis?

10 A    No, sir, it is not.

11 Q    Okay. How did you go about making those estimates

12 without knowing the compensation to be paid?

13 A    Well, I don't think we can know with certainty what

14 compensation would be paid to the plan administrator

15 specifically because that will be set by the winddown board

16 and that board does not exist today.  So, we could not

17 discuss it with that board; however, we did use an analysis

18 of run rates of the existing compensation.  We reviewed it

19 with both the individual that is slated to be serving as the

20 plan administrator and eventually the current board of the

21 debtors who all felt that the estimate that was included in

22 the winddown budget was reasonable.

23 Q    Can you give me a range of what that estimate was for

24 various entities?  Let's take the board of directors for the

25 FTX recovery trust.  Do you recall what the --

1  A      The total of all the governance costs in the winddown

2  budget is, I believe, I don't have it in front of me, but if

3  I recall its $34 million in total for the three-year

4  projected winddown period.  I don't have memorized the

5  individual line items behind that, but that is something that

6  my team did put together when preparing the winddown budget.

7  Q      So, the estimate from you was $34 million in total for

8  the winddown governance?

9  A      Yes, sir.

10 Q      Last question, what is the joint board?

11 A      The joint board, I would have to look at the

12 definition. I'm sorry, sometimes we speak in general terms.

13 Q      I ask because I thought I might have misread it the

14 first time, but its referenced in the compensation provision,

15 I believe, of the FTX recovery trust that the board -- the

16 FTX recovery trust board will receive the same compensation

17 as the joint board.

18 A      Okay.

19 Q      I have not seen the joint board defined anywhere in the

20 plan supplement documents.

21 A      Understood. I don't have it in front of me, but I can -

22 - I believe I understand what it means. I believe its

23 referring to the debtors existing board of directors, but I

24 can't be certain.  I would need to see the definitions in

25 front of me.

1  Q    What is the current compensation of the debtors board

2  of directors?

3  A    I believe each member of the board of directors has a

4  compensation of $50,000 a month.

5  Q    Are there any other fees that will be payable at any

6  point to the board other than the stipend?

7  A    No, sir, not that I'm aware of.

8  Q    So, there aren't incentive fees upon emergence from

9  bankruptcy or anything of that nature?

10  A    No, sir, not that I'm aware of.

11          MR. ADLER:  That's all I have, Your Honor.

12          THE COURT:  Thank you.

13          Does anyone else want to cross?

14          MR. DALSEN:  May I proceed, Your Honor?

15          THE COURT:  Yes.

16          MR. DALSEN:  Thank you, Your Honor.

17                      CROSS-EXAMINATION

18  BY MR. DALSEN:

19  Q    Good morning, Mr. Coverick.

20  A    Good morning.

21  Q    We met before.  My name is William Dalsen from

22  Proskauer Rose. I represent the LayerZero Group.

23          Now we met previously when you were deposed in this

24  proceeding, is that right?

25  A    Yes, sir.

1  Q     And at that deposition you testified on behalf of FTX

2  Trading Ltd. and its affiliated debtors and debtors-in-

3  possession, correct?

4  A     Yes, sir.

5  Q     And if I refer to FTX Trading Ltd. and its affiliated

6  debtors and debtors-in-possession as simple FTX is that okay

7  with you?

8  A     Yes, sir.

9  Q     Thank you.

10       At that deposition you were prepared to testify on

11  behalf of FTX as to the customer preference settlement,

12  correct?

13  A     That's correct.

14  Q     Out of curiosity, before you took the stand, somebody

15  handed you something in a manila envelope. Is that before

16  you?

17  A     It is.

18  Q     What is it?

19  A     It's my declaration.

20  Q     Got it.  Thank you.

21       Mr. Coverick, you are familiar with the second amended

22  joint Chapter 11 plan of reorganization of FTX Trading Ltd.

23  and its affiliated debtors that is the subject of this

24  hearing today, correct?

25  A     Correct.

1  Q     Do you have a copy of the plan with you?

2  A     I do no

3              MR. DALSEN:  Your Honor, may I approach the

4  witness?

5              THE COURT:  Yes.

6  BY MR. DALSEN:

7  Q     Mr. Coverick, I have handed you what was Exhibit 2 from

8  your deposition.  Can you tell us what this is?

9  A     It is the second amended joint Chapter 11 plan of

10 reorganization of FTX Trading Ltd. and its debtor affiliates.

11 Q     And if I just call that the plan, would that be okay

12 with you?

13 A     Yes, sir.

14 Q     Okay.  And now you are familiar with the plan because

15 you reviewed it and because you were involved in the

16 negotiations and formation of the plan, right?

17 A     That is correct.

18 Q     You are also familiar with the customer preference

19 settlements in the plan, correct?

20 A     That is correct.

21 Q     And you are familiar with the customer preference

22 settlement because you reviewed it and you were involved in

23 this negotiation, correct?

24 A     Correct.

25 Q     If you could turn to page 50 of this exhibit, I just

1  handed to you, the plan, and specifically I want to ask you

2  about Section 5.5.  Just let me know when you are there.

3  A     I'm there.

4  Q     Section 5.5 of the plan is a description of the

5  customer preference settlement, correct?

6  A     Correct.

7  Q     If you turn to page 51, please, which is also still

8  Section 5.5, let me know when you are there.

9  A     I'm there.

10  Q     Do you see the first full paragraph beginning the

11  debtors shall not designate?

12  A     I do.

13  Q     And this paragraph contains what you would call the

14  objective set of criteria under which all preference claims

15  should be reviewed, correct?

16  A     That is correct.

17  Q     The debtors did not use any criteria other then those

18  listed in this Paragraph of Section 5.5 to identify which

19  customer preference actions to exclude, correct?

20  A     That is correct.

21  Q     I want to ask you about the application of these

22  criteria now in Section 5.5.  Sir, debtors counsel reviewed

23  each customer preference claim to determine whether it met

24  one of those criteria in Section 5.5, is that right?

25  A     That's correct.

1 Q     Specifically, debtors counsel reviewed the base of

2 potential preference claims against the list of criteria and

3 for any claims that met one of the criteria they were

4 included in the plan supplement, is that right?

5 A     On the list of excluded customer preference actions,

6 yes.

7 Q     You had no direct involvement with the process of

8 reviewing claims against the set of criteria included in the

9 plan, correct?

10 A     No, that is a process that was conducted by debtors

11 counsel.

12 Q     You did not discuss with debtors counsel the specific

13 consideration of individual claims on the list of excluded

14 customer preference actions, correct?

15 A     That is correct.

16 Q     The FTX board of directors did not review each

17 individual claim that was set to be designated as an excluded

18 customer preference action, correct?

19 A     To the best of my knowledge that is correct.

20 Q     In fact, the FTX board did not review any particular

21 customer preference action that was designated as an excluded

22 customer preference action in the plan supplement, correct?

23 A     On an individual basis I believe that is correct.

24 Q     You were not involved with the attorneys at debtors

25 counsel who conducted the review of these claims, right?

1  A      No.  As I stated, that was a process conducted by

2  debtors counsel.

3  Q      And you personally did not decide whether any customer

4  preference action should be excluded under these criteria on

5  the second paragraph of Section 5.5, correct?

6  A      Correct.

7  Q      The debtors designated LayerZero Labs as an excluded

8  customer preference action because the debtors do have a

9  filed complaint against the LayerZero Group, correct?

10 A      Correct.

11 Q      And its your understanding that LayerZero Labs,

12 therefore, meets the criteria listed in Section 5.5(b) of the

13 plan to be an excluded customer preference action, correct?

14 A      Correct.

15 Q      Other than referring to the adversary complaint filed

16 against the LayerZero Group, there is nothing more you can

17 tell the Court about why LayerZero Labs was excluded under

18 Section 5.5 because you were not involved with the attorneys

19 at debtors counsel who conducted the review of claims,

20 correct?

21 A      Again, to be clear, I pointed to the adversary

22 complaint as containing the relevant information for why

23 LayerZero Labs and the LayerZero Group in general met the

24 criteria.  There is a lot of information in that complaint. I

25 am not a lawyer, so I can't speak to the legalities or merits

1  of the items included in the complaint, but I pointed to the

2  complaint as the supporting document, as well as the many

3  underlying documents behind that complaint as the reason for

4  why I believe LayerZero Labs and LayerZero Group met the

5  criteria for being on the list.

6  Q     You did not draft that complaint, correct?

7  A     I did not.

8  Q     You do not refer to that complaint in your declaration,

9  correct?

10  A     I do not.

11  Q     You did not review the documents underlying the

12  adversary complaint to draft that complaint, correct?

13  A     Not to draft the complaint, no.

14  Q     You did not know all of the documents that debtors

15  counsel used to draft the complaint, correct?

16  A     I don't have them memorized, but I am aware of their

17  general existence.

18  Q     Mr. Ari Litan is also on the excluded customer

19  preference list because the debtors have a cause of action

20  against him, correct?

21  A     Correct.

22  Q     Skip & Goose, another of my clients, is also on the

23  excluded customer preference list because the debtors have

24  filed a cause of action that includes Skip & Goose, correct?

25  A     Correct.

1  Q     And there are no other facts or information you can

2  share with us as to why the debtors determined that Skip &

3  Goose would be excluded from the customer preference

4  settlement, correct?

5  A     Again, I point to all of the facts and statements in

6  the adversary complaint that include Mr. Litan and Skip &

7  Goose's defendants.

8           MR. DALSEN:  I will pass the witness, Your Honor.

9           THE COURT:  Thank you.

10          Does anyone else want to cross?

11     (No verbal response)

12          THE COURT:  Mr. Glueckstein, go ahead.

13          MR. GLUECKSTEIN:  No questions, Your Honor.

14          THE COURT:  Thank you.  You may step down, sir.

15     (Witness excused)

16          THE COURT:  Mr. Dalsen, did you sign in on the

17 sign-in sheet? I don't see your name listed.

18          MR. DALSEN:  (Indiscernible).

19          MR. GLUECKSTEIN:  Thank you, Your Honor.

20 Continuing with the debtors case in support of confirmation,

21 our third witness, Your Honor, is Edgar W. Mosley II,

22 managing director at Alvarez & Marsal North America, LLC.

23 Mr. Mosley submitted a declaration at Docket No. 26044 which

24 addresses facts relevant to the debtors operations of the FTX

25 exchanges, the debtors positions as to the estate, and

1 substantive consolidation, among other things.

2          Your Honor, the debtors respectfully move to admit

3 Mr. Mosley's declaration and attached exhibits which are

4 Exhibits 2 through 6 on our exhibit list that we submitted in

5 advance of the hearing into evidence in support of

6 confirmation.  Mr. Mosley is in the courtroom and available

7 for cross-examination.

8          THE COURT:  Anyone object to the introduction of

9 the declaration and the exhibits?

10     (No verbal response)

11          THE COURT:  They are admitted without objection.

12     (Mosley declaration received into evidence)

13          THE COURT:  Anyone wish to cross?

14          Mr. Mosley, come forward.

15          THE COURT REPORTER:  Please raise your right hand.

16 Please state your full name and spell your last name for the

17 Court record, please.

18          MR. MOSLEY:  Edgar Mosley, II, M-O-S-L-E-Y.

19           EDGAR MOSLEY, II, DEBTOR WITNESS, SWORN

20          THE COURT:  Mr. Adler, whenever you are ready.

21                    CROSS-EXAMINATION

22 BY MR. ADLER:

23 Q    Good morning, Mr. Mosley.  My name is David Adler, I

24 represent the Kavuri Plaintiffs and Mr. Seth Melamed.

25     I just had a few questions for you today which was were

1  you involved in the operational aspects of FTX post-petition?

2  A    I was.

3  Q    Were you involved at all in the discussions about

4  trying to make a crypto in kind distribution to creditors?

5  A    Yes, I was.

6  Q    Can you tell me or tell the Court what those

7  discussions consisted of?

8  A    Consistent with Mr. Coverick's testimony, I was

9  involved in many of the same meetings and discussions with

10  the unsecured creditors, the ad hoc committee as well as

11  management and the board.

12  Q    Are you aware, was there any attempt to reach out to an

13  exchange?

14  A    To reach out to an exchange?

15  Q    To convert the cash distribution to a creditor and to a

16  crypto distribution?

17  A    As Mr. Coverick stated, we are, as the debtors, still

18  considering all of our options and the plan does leave open

19  the potential of distributing via stablecoins.  So, yes, its

20  ongoing and we are talking to multiple parties about being a

21  distribution agent.

22  Q    Approximately how many?

23  A    I don't remember what the original list is.  I think we

24  are down to four or five parties at this point.

25  Q    Is it a competitive process?

1    A      Yes, it is.

2    Q      Are you seeking to retain that exchange as an agent for

3    the distribution?

4    A      We are seeking to retain distribution agents to make

5    distributions on behalf of the estate.  Does that answer your

6    question?

7    Q      Well, are they prepared to make distributions in

8    stablecoin?

9    A      We are looking at all options and some of those parties

10   will be able to make distributions in stablecoins.

11   Q      Is there a term sheet with any of those parties?

12   A      I am not certain as to whether or not there is a term

13   sheet right now.  I don't recall if there is a term sheet

14   right now.

15   Q      Is there a memorandum of understanding or something

16   more preliminary to a term sheet?

17   A      There are discussions at this point.

18   Q      But nothing in writing is what you are saying, correct?

19   A      I am saying that I don't recall whether or not we have

20   one.

21   Q      Were you involved in the discussions with respect to

22   the scope of the exculpation provision in the plan

23   administrator agreement?

24   A      Broadly.  I am clearly not as close to it as counsel,

25   management or Mr. Coverick, but broadly, yes.

1          MR. GLUECKSTEIN:  Your Honor, (indiscernible). We

2   would object at this point.  Mr. Mosley -- this is outside

3   the scope of Mr. Mosley's direct testimony which has been put

4   into evidence by his declaration.

5          THE COURT:  Mr. Adler, you outside the scope.

6          MR. ADLER:  My response is that he stated that he

7   was involved in the day-to-day operations of FTX and I am

8   trying to determine, you know, how that relates to the plan

9   process and specifically the plan supplement.

10         MR. GLUECKSTEIN:  Your Honor, Mr. Adler did not

11  notice Mr. Mosley as a hostile witness for this hearing. He

12  is appearing as a witness on cross-examination on his direct

13  which was submitted by his declaration.  Frankly, the prior

14  testimony was outside the scope as well, we let it go, but

15  now we are moving from more topics that are outside the scope

16  of his declaration.

17         THE COURT:  I will give you a little leeway, Mr.

18  Alder, but let's keep it tight.

19  BY MR. ADLER:

20  Q    Are you on the board of directors of the debtors right

21  now?

22  A    I am not.

23  Q    Okay.  Will you be on the board of directors of the FTX

24  Recovery Trust?

25  A    Not to my knowledge.

1          MR. ADLER:  No further questions.

2          THE COURT:  Thank you.

3          Redirect?

4          MR. GLUECKSTEIN:  No redirect.

5          THE COURT:  Okay.  Thank you.

6          You may step down, sir.  Thank you.

7     (Witness excused)

8          MR. GLUECKSTEIN:  Okay.  Your Honor Your Honor,

9  continuing with the Debtors' case, our fourth and final

10  witness this morning is the Right Honorable Lord Neuberger of

11  Abbotsbury, who is a former judge on the English Court of

12  Appeal and what became the U.K. Supreme Court.  He was later

13  appointed Master of the Rolls on that court as a senior Court

14  of Appeal judge in the United Kingdom.

15          Lord Neuberger is also a leading expert on U.K.

16  law issues.  We're lucky to have him here with us in the

17  courtroom today.

18          Lord Neuberger submitted a declaration at Docket

19  26042, pursuant -- in accordance with Rule 44.1 of the

20  Federal Rules of Civil Procedure to aid the Court with issues

21  as to the meaning and effect of the FTX.com in terms of

22  service, which are at the heart of the customer property

23  arguments being settled to the customer property settlement

24  contained in the plan.

25          Your Honor, at this time, the Debtors respectfully

1   move to admit Lord Neuberger's declaration into evidence in

2   support of confirmation.  Lord Neuberger is also available

3   for cross-examination.

4          THE COURT:  Okay.  Is there any objection?

5      (No verbal response)

6          THE COURT:  The declaration is admitted, without

7   objection.

8        (Neuberger Declaration received in evidence)

9          THE COURT:  Anyone wish to cross?

10      (No verbal response)

11          THE COURT:  No cross, thank you.

12          MR. GLUECKSTEIN:  Your Honor -- thank you, Your

13   Honor.  At this point, neither the Debtors, or as far as I'm

14   aware, the Court, have been provided notice of any witnesses

15   or evidence by any other party, so that seems it should close

16   the evidentiary record for the confirmation hearing.

17          THE COURT:  Did you have any other, because I know

18   you admitted Exhibits 1 through 6 and there were 17 exhibits

19   on your exhibit list.

20          MR. GLUECKSTEIN:  The remainder of the exhibits,

21   Your Honor, were filings in the case.  We would just ask the

22   Court to take judicial notice of those exhibits.

23          THE COURT:  Okay.  Thank you.  All right.

24          MR. GLUECKSTEIN:  Thank you, Your Honor.

25          Then proceeding, with respect to our confirmation

1   case, and Mr. Dietderich covered a number of points and I

2   won't repeat them, the plan satisfies, Your Honor, and the

3   Debtors submit, all of the requirements of the Bankruptcy

4   Code and is overwhelmingly supported by each class that was

5   entitled to vote.  As noticed, the plan provides for

6   recoveries on allowed claims that are projected to be paid in

7   full, plus interest, to all customers and non-governmental

8   creditors.

9          This result was inconceivable when the FTX Group

10  collapsed into bankruptcy less than two years ago.

11  Mr. Daloia's declaration details that every voting class

12  accepted the plan at 95 percent or more.

13         Mr. Coverick's declaration, now in evidence,

14  explains why the plan satisfies the requirements of the

15  Bankruptcy Code necessary for confirmation and also addresses

16  the Debtors' process and rationale for entering into the

17  customer priority settlement, that is an essential pillar of

18  the global settlement of claims in the plan.

19         The customer priority settlement provides a

20  negotiated resolution of arguments made that customers have

21  some form of property rights in the Debtors' assets that,

22  otherwise, would have required protracted litigation to

23  resolve on a final basis.  As detailed in our confirmation

24  memorandum of law, and supported by the declarations now in

25  evidence of Mr. Mosley and Lord Neuberger, the Debtors

1   maintain that well-settled case law establishes that all of

2   the Exchange assets are presumptively part of the Debtors'

3   estates because they were commingled together and that the

4   customers could never satisfy their burden to both, one,

5   prove that they have any property rights, pursuant to any

6   trust or availment of relationship and, two, trace any assets

7   that they claim to own, any of the assets that are currently

8   part of the Debtors' estates.

9          The unrefuted evidence in the record from Lord

10  Neuberger and Mr. Mosley conclusively establish the Debtors'

11  positions and should put an end to the narrative still being

12  peddle by a few individual customers that they could have

13  property interests in the Debtors' assets.  Those few still

14  advancing such arguments have claims arising from purchased

15  or traded digital assets on the FTX.com Exchange and,

16  therefore, as Mr. Mosley explains in his admitted

17  declaration, never had anything, other than a book entry

18  reflecting what was owed to them and, thus, no assets in any

19  deposit addresses at any time.

20         Nonetheless, as Mr. Mosley details in his

21  testimony, after the good faith, arm's-length negotiations,

22  the Debtors, the Official Committee, both the Ad Hoc

23  Committee and the Class Action Claimants who had asserted

24  customer property claims, all agreed to the customer priority

25  settlement in recognition of the arguments advanced by

1  customers and the fact that litigation of all such issues to

2  final judgment would be complex, burdensome, uncertain, and

3  could have delayed the conclusion of these cases and

4  distributions to creditors.  The plan and this result is now

5  also supported by the putative class representatives in the

6  multidistrict litigation pending in Florida.  The customer

7  priority settlement is reasonable and satisfies the standard

8  for approval, pursuant to Bankruptcy Rule 9019.

9           Your Honor, the settlements previously approved by

10  this Court, Mr. Dietderich walked there many of them,

11  including with the CFTC, the IRS, and other governmental

12  entities, facilitated the creation of the Supplemental

13  Remission Fund that's in the plan, which has the potential to

14  further increase customer and other eligible creditor

15  recoveries, and the formation of the Wind-down Trust through

16  the substantive consolidation of the Debtors, completes a

17  plan that the Debtors and virtually all of their stakeholders

18  have all agreed is the best possible option for resolving

19  these Chapter 11 cases and maximizing recoveries for

20  creditors and it should be confirmed.

21           There are, however, Your Honor, a few holdout

22  objections.  As I noted at the outset, the Debtors have

23  worked to resolve, through changes to the plan and the

24  confirmation order, as many objections as possible and was

25  largely successful.  We addressed, substantively, the

1  remaining objections filed in the Debtors' reply filed at

2  Docket 26039.  Those objections that remain raise mostly

3  discrete, parochial issues by which the objector seeks to

4  hold everyone else hostage for their own personal benefit and

5  do not actually implicate the terms of the plan, and we

6  submit none have merit.

7          Unless the Court wishes to proceed differently, I

8  will generally address the remaining objections one at a time

9  by objector, but before I do, Your Honor, does the Court wish

10  to hear from any of the plan supporters at this point before

11  we get into the objections or later in the hearing?

12          THE COURT:  If anyone wants to make a statement

13  now, that would be fine.  And I think just to we move things

14  along, as we're going through the objections, I know there

15  are some overlapping objections, so I want to make sure

16  parties who have an overlapping objection, with regard to

17  whatever objection you are raising first or second or third,

18  they have the opportunity to respond --

19          MR. GLUECKSTEIN:  Yes, Your Honor.

20          THE COURT:  -- to make their arguments.

21          Do any other plan supporter wish to make an

22  opening statement?

23          MR. PASQUALE:  Good morning, Your Honor.

24          Ken Pasquale from Paul Hastings for the Official

25  Committee of Unsecured Creditors.

1           Your Honor, the Committee is very pleased to

2    support confirmation of the plan today and looks forward to

3    distributions being promptly made to customers and all

4    creditors of the Debtors upon confirmation.  We join in all

5    the substantive arguments set forth by the Debtors and join

6    in the request that the remaining objections be overruled.

7           When these cases began nearly two years ago, the

8    landscape for creditor recoveries was extremely uncertain.

9    The extent of the fraud by the Debtors' prepetition

10   management team was not yet known and cryptocurrency values

11   were extremely depressed.  The Committee, during those first

12   few months, was focused on leveraging market opportunities

13   and expediting these bankruptcy cases to a conclusion.

14          It was with those goals in mind that in the summer

15   of 2023, the Committee filed a motion asking this Court to

16   order plan mediation.  The Court never had to rule on that

17   motion because the Debtors, the Committee, the Ad Hoc Group,

18   and the other stakeholders soon thereafter began good faith

19   plan discussions, which were quite difficult at times, but

20   because of the professionalism of many in this courtroom,

21   those meetings resulted in a number of the agreements upon

22   which the plan today is founded, including, as you just

23   heard, the customer priority settlement.

24          There were plenty of bumps and disagreements

25   between the parties along the way, but we were able to

1   resolve those disputes, as Mr. Dietderich said, without

2   bringing them to the Court's attention and I think we're all

3   very proud to be able to say that today and to be able to

4   have done that.

5          It is a testament, again, to the parties in this

6   room that the plan not only held together, but resulted in

7   important components that maximized recoveries to creditors,

8   including providing post-petition interest to creditors at

9   the 9 percent consensus rate, the Supplemental Remission

10  Fund, those going to most creditors, and the establishment of

11  the Creditor Advisory Committee to assist in post-effective

12  date management of the estates.

13         Certainly, we benefited from a bull crypto market

14  over the last year, but it is because of the hard work of the

15  Debtors, the Committee, and the other stakeholders that we

16  were able to take advantage of those markets to maximize the

17  monetization of the Debtors' digital assets and to put these

18  cases in a position to not only conclude, but to conclude

19  while returning a par-plus recovery to unsecured creditors.

20         The Committee and all of its professionals extend

21  our sincere thanks to the Court, to the Court's staff for its

22  attention to these cases over these nearly two years and we

23  look forward to the day, soon to come, upon confirmation we

24  hope today, that creditors will begin to receive their plan

25  distributions.

1          Thank you, Your Honor.

2          THE COURT:  Thank you, Mr. Pasquale.

3          Anyone else?

4          MR. SHORE:  Good morning, Your Honor.

5          Chris Shore from White & Case, on behalf of the

6   Joint Official Liquidators of FTX DM as foreign

7   representatives of, in the FTX DM proceedings and FTX DM as a

8   creditor of the U.S. Debtors.

9          We also rise in support of this Chapter 11 plan,

10  which in our view, is a truly remarkable achievement by

11  Mr. Ray and his team of professionals, along with the various

12  directors on the joint board.

13         I'll also turn back in time.  We were one of the

14  few parties that appeared at that first day hearing when

15  Mr. Bromley laid out his state of the estate PowerPoint.  And

16  I'll be maybe more graphic than Mr. Dietderich, it was a

17  very, very dark presentation for creditors.

18         Despite Mr. Bromley's brave face, it was entirely

19  unclear what assets the Debtors had and whether they were

20  even safe with ongoing hacks occurring during that first day

21  hearing in real time.  The best the Debtors could come up

22  with on an org chart, which is typically one of the first

23  slides in any first day presentation was a vague spaghetti of

24  silos, grouping diverse businesses into one synthetic Debtor

25  with a joint board.

1            There was no, virtually no management; most had

2    been kicked out, had already lawyered-up, and ultimately

3    would be convicted of their crimes and everybody in the

4    courtroom was worried about the possibility that the Debtors,

5    themselves, would be indicted.  But have no fear, Mr. Bromley

6    deadpanned, it would all be sorted out once the corporate

7    records consisting of files of Slack messages, thumbs-up

8    emojis, furniture receipts, and Amazon QuickBooks printouts

9    were knitted together in the Debtors' schedule, and from our

10   perspective, there was a brewing first day dispute that

11   machinery referenced about what, if anything, was going to

12   proceed in this court versus the Bahamian Court.  And if I

13   remember Mr. Bromley's remarks correctly, out of all the

14   uncertainty and chaos in the first days, the one thing the

15   Debtors were sure of was that DM had no assets, had no

16   operations, and that the Bahamian proceedings were

17   illegitimate.

18            We've come a very, very long way.  We are here

19   today with a plan with overwhelming support that pays allowed

20   dollarized claims in full with interest.  And for the JOLs,

21   an approved settlement distribution scheme that recognizes

22   the jurisdictional importance of both insolvency regimes and

23   allows for rapid, coordinated distributions to the customers

24   of the FTX Enterprise, whether they elected to have their

25   claims liquidated in the Bahamas or, here, in this court.

1          And for that reason, the JOLs, two of whom were

2    able to make it here today, wholeheartedly support entry of

3    the confirmation order and whatever ruling Your Honor may

4    render today, we extend all of our thanks to the Court and

5    its staff for all of its attention and good care to our

6    respected legal views, and most importantly, for creating an

7    environment in which global consensus could take root.  So,

8    thank you, Your Honor.

9          THE COURT:  Thank you, Mr. Shore.

10         Good morning.

11         MS. BRODERICK:  Good morning, Your Honor.

12         May I please the Court?  Erin Broderick of

13   Eversheds Sutherland on behalf of the Ad Hoc Committee of

14   Non-U.S. Customers of FTX.com.

15         The Ad Hoc Committee represents holders of

16   approximately $6 billion in claims, spanning 34 countries,

17   with claim amounts as small as a couple hundred dollars to

18   hundreds of millions of dollars.  The Ad Hoc Committee was

19   established in December of 2022 with an initial focus on

20   advancing customer property rights.

21         Those issues have been addressed at length by the

22   Debtors and other parties throughout these cases, but to

23   summarize briefly, the applicable legal standards, as well as

24   the factual realities of FTX prepetition operations,

25   including the misappropriation of customer assets, presents a

1   very difficult case and empiric victory at the end of the day

2   for customers on a "property of the estate" determination.

3          That said, however, the customers plain reading of

4   the terms of service and the reliance on assurances that

5   their assets will be safe and returned to them, has not been

6   dismissed or overlooked by anyone in this courtroom.  Indeed,

7   that was the foundation of the Ad Hoc Committee's negotiation

8   with the Debtors, the Official Committee, and other parties

9   in the case and ultimately resulted in the plan before the

10  Court that has several creative mechanisms to enhance

11  customer recoveries within the confines of the Bankruptcy

12  Code and in balance with the interest and rights of other

13  stakeholders.

14         We're very proud of the role that the Ad Hoc

15  Committee played in developing the plan.  We spearheaded the

16  customer preference settlement construct, which was critical

17  in providing certainty to allow customers to sell their

18  claims at the highest amount in the last year since the

19  settlement was announced.

20         We fiercely advocated for the 9 percent post-

21  petition interest rate implemented in the plan and the Ad Hoc

22  Committee's arguments and appeal to the equitable

23  prioritization of customer claims was central to the

24  subordination of governmental claims and creation of the CFT

25  Supplemental Remission Fund.  These plan components represent

1   not only sound legal reasoning, but consensus that was built

2   on collaboration in ensuring that customers receive the best

3   treatment possible within the constraints of these cases.

4           Our presence has not been front and center in

5   these cases, but that is not reflective of disengagement;

6   rather, it's a testament to the extremely constructive and

7   cooperative relationship that we've had with the Debtors, the

8   Official Committee, the JOLs, and other parties in the case.

9           In short, the Debtors' second amended plan

10  represents culmination of almost two years of extremely hard

11  work, skilled balancing of competing interests, and

12  unwavering dedication to provide the best treatment possible

13  for creditors.  The Ad Hoc Committee enthusiastically

14  supports confirmation of the plan and respectfully requests

15  that Your Honor enter the confirmation order.  Thank you.

16          THE COURT:  Thank you, Ms. Broderick.

17          MR. ENTWISTLE:  Good morning, Your Honor.

18          THE COURT:  Good morning.

19          MR. ENTWISTLE:  May I please the Court?  Andrew

20  Entwistle, Entwistle & Cappucci, for the Class Action

21  Plaintiffs.

22          As Your Honor's aware, we filed the adversary

23  proceeding at the outset of this bankruptcy back in December

24  of 2022 on behalf of customers.  And, at that time, as you've

25  heard today, or been reminded today, although, I don't know

1    that anyone can forget, the customers stood in a position

2    that was, indeed, dark.  The likelihood of recovery by them

3    of anything on day one here was pretty bleak and we've worked

4    tirelessly with the Debtors throughout this proceeding to try

5    and resolve a number of issues that have led to the

6    recoveries that you've heard of here today and, obviously,

7    both sets of customers both, the FTX.com and the FTX U.S.

8    customers, have supported this plan, you know, in extremely

9    high numbers.  Over almost 90 percent of the U.S. customers,

10   by vote; 97 percent by dollars.  And 97 percent, I think, by

11   vote for the FTX dot -- or 95 percent for the FTX.com

12   customers and 97 percent, by dollars, have supported the

13   plan.

14            There's a good reason for that.  The customers are

15   recovering 100 cents on the dollar, plus the other amounts

16   that are in the plan.  But that doesn't come about in a

17   vacuum.  As you've heard from Ms. Broderick and others, the

18   Committee, we worked together in many ways; at odds, in other

19   ways.  There were -- we did extensive due diligence with the

20   Debtors on behalf of the customers.  There were four days of

21   hard-fought negotiations in 2022, as Your Honor is aware,

22   that led to the plan agreement that resolved the property

23   issues.

24            We fought hard on behalf, particularly on behalf

25   of the U.S. creditors, who had slightly different property

1    claims because of the law in California that affected those

2    claims, as opposed to that for the FTX.com claims.  Through

3    those negotiations, the result of which is the plan

4    supplemental agreement that takes the property settlement

5    into account.

6           None of that could have been accomplished without

7    the cooperation of the Committee, Mr. Ray, the Debtors, and

8    the Ad Hoc Committee as we worked through that process, which

9    was highly contentious at times, as you might imagine, in

10   order to get an equitable resolution for all customers, the

11   U.S. customers and the dot com customers.

12          And while I am aware that there are a couple of

13   customers out there that are still insisting on a property-

14   driven resolution by objection, that just wasn't possible

15   here.  As Your Honor's aware, the law, even the best of the

16   cases that one might argue from the U.S. point of view, is

17   far from settled and would there have been, in our view, a

18   very difficult argument to have advanced before the Court

19   successfully, although, credible.

20          The law, as we've heard, with regard to the dot

21   com customers is even less-settled and more difficult.  But

22   more importantly, as you've heard today, the Debtors didn't

23   have in-kind property to distribute to customers and we would

24   always have been fighting or always fighting for a solution

25   that would have helped through that process, recognizing that

1   bankruptcy law that applies to the claims here.  But an in-

2   kind property solution just wasn't feasible or practical as

3   we went through the in-depth due diligence and worked with

4   the Debtors' professionals to evaluate that situation.

5            That's what led, ultimately, to the final

6   resolution that's before the Court on the property issues

7   and, as a result, the customer adversary Plaintiffs

8   wholeheartedly support the plan and we'd ask that Your Honor

9   approve it and the property settlement that's baked into it,

10  in order to, as the Committee noted, advance the process here

11  so that we can start to get these distributions back out to

12  customers.

13           We thank Your Honor and your staff for all of your

14  time.  We've been before you on lots of different issues over

15  time, as you know, in trying to resolve some of the other

16  issues that are part of the adversary case; in particular,

17  the claims against some of the prior management of the

18  company.  At least one piece of that, we've successfully

19  resolved with the Debtors against Ms. Ellison; that'll come

20  before your Court, before Your Honor in due course.  Much of

21  the rest continues.  We're also working with them, as you

22  know, on the negotiations with the DOJ, which hopefully, will

23  come to a great fruition for the estate, as well.

24           But thank you, Your Honor, and your staff, again,

25  for all your time and hard work in this case and, again, we

1   wholeheartedly support the plan.  Thank you.

2           THE COURT:  Thank you.

3           MR. MINTZ:  Good morning, Your Honor.

4           THE COURT:  Good morning.

5           MR. MINTZ:  Doug Mintz of Schulte Roth & Zabel, on

6   behalf of a group of preferred equity holders.  Our group

7   filed an updated 2019 last night at Docket 23154.

8           Our clients are among the preferred equity holders

9   and preferred equity holders, like many of the folks in this

10  courtroom, are victims of all that came before the

11  bankruptcy.  We are among several constituents that spent

12  time negotiating with the Debtors regarding treatment of the

13  preferred equity holders, particularly, as it pertains to the

14  Department of Justice's Remission Fund and Victims Fund.

15          The parties worked hard and fruitfully over the

16  last few months to reach the resolution that Mr. Dietderich

17  described earlier and filed a plan supplement agreement

18  documenting that on the docket at 25932.  Each of our

19  constituents have signed onto that plan support agreement and

20  we support that settlement, which treats preferred as they

21  should be treated, as victims here, and look forward to

22  working with the Debtors to reach a resolution with the

23  Department of Justice on the treatment of the Remission Fund

24  going forward.

25          We thank the Court for its time.  We thank Mr. Ray

1  and Mr. Dietderich for their hard work on this case and look

2  forward to further resolution.  Thank you.

3             THE COURT:  Okay.  Thank you, Mr. Mintz.

4             Anyone else in support?

5             Okay.  Mr. Dietderich?

6             MR. GLUECKSTEIN:  Thank you, again, Your Honor.

7             Brian Glueckstein for the Debtors.  So I --

8             THE COURT:  I'm sorry, I called you

9  Mr. Dietderich.  Sorry.

10            MR. GLUECKSTEIN:  No problem.

11            We will proceed -- I will proceed at this point to

12  address the remaining objections, Your Honor, and we'll just

13  kind of move through them.  I will group my remarks where

14  there is overlap to ensure that any objector who wants to

15  weigh in on the issue has an opportunity to.

16            Your Honor, the first, just starting in order, the

17  first objection to which, then there, are some joinders, all

18  on a *pro se* basis, filed by Mr. Nam and those supporting his

19  objection are really objecting to the valuation of the FTT

20  utility token.  That is styled as a classification objection,

21  Your Honor.

22            These objectors want to receive value for claims

23  on account of FTT tokens.  They wrongly argue that the

24  Court's final order entered in February 2024, after the

25  presentation of evidence and setting the value of claims

1  based on FTT at zero, should not be binding or somehow should

2  be revisited.

3         This is not permitted at this juncture, Your

4  Honor, and there is no basis, we submit, to do so.  The

5  evidence presented at that time on the estimation hearing by

6  the Debtors' experts, explain that FTT has no fundamental

7  value because it has no utility outside of an operating

8  FTX.com Exchange.  There is no and there will be no restarted

9  FTX.com Exchange.  We now know that conclusively.

10         Based on the evidence presented at that time, the

11  Court held that FTT was valued appropriately at zero.  No

12  evidence to the contrary was presented at that evidentiary

13  hearing and while it would not be permissible, none is

14  offered now.  The Court's estimation order is binding and

15  cannot be collaterally attacked.

16         The evidence presented at the estimation hearing,

17  including that FTT had unique equity-like features, such as

18  token burn, voting, and governance rights, and the fact that

19  FTT derived its value from FTX's future cash flows, supported

20  the classification of FTT as an equity class in the plan.  No

21  objector can point to any evidence, then or now, as to why

22  classification is wrong.  Of course, given the claims have

23  been conclusively value to be worth zero, the classification

24  on the facts as they now exist with no restarted Exchange

25  makes it somewhat of an academic exercise.

1        We submit, Your Honor, that the plan appropriately

2    treats and classifies FTT and these objections should be

3    overruled.

4            THE COURT:  Okay.  Thank you.

5            Mr. Nam, I see you raised your hand on Zoom.

6            MR. NAM:  Your Honor?

7            THE COURT:  Yes, go ahead.

8            MR. NAM:  This is Kihyuk Nam and my translator

9    (indiscernible).  I would like just to speak, Your Honor.

10            Thank you for giving me the opportunity to speak.

11   My name is Kihyuk Nam and I have filed an objection against

12   the Debtors that unfairly treats FTT holders.  I'm proceeding

13   with this objection on behalf of myself and my family.  And

14   my family members are not familiar with English and legal

15   procedures.  I have legally acquired their lot of claims and

16   represent them legally.

17            So, today, I stand here before you as a direct

18   victim affected by the Debtors' decisions.  I reviewed the

19   estimation valuation with my family members and I even sent a

20   letter to Your Honor requesting reconsideration of the FTT

21   valuation.

22            Well before the reorganization plan was released

23   when we received the estimation motion, the Debtor cannot

24   clearly stated, We at FTX will restart operations, so we

25   hoped that the value of FTT might recover in one way or

1  another.  Additionally, we noted that paragraph 7 of the

2  estimation order reserved rights regarding the classification

3  of FTT, so we waited until the situation became clear.

4          Subsequently, the plan to restart FTX was

5  abandoned and in the reorganization plan, FTT was valued at

6  zero dollars and classified in the lowest class, 17, making

7  the unfair treatment of FTT holders (indiscernible),

8  therefore, I proceeded to file objection to the current plan,

9  Your Honor.

10          In the Debtors' response to my objection, they

11  referred to paragraph 6 of the estimation order, stating that

12  classification of a claim is distinct from its value, stating

13  that and argued that I misread the reorganization order;

14  however, paragraph 7 of the estimation order begins with,

15  "Notwithstanding anything to the contrary in the motion or

16  this order," indicating that paragraph 7 takes precedence,

17  therefore, the scope of the reserved classification

18  (indiscernible) in paragraph 7, cannot be remedy by

19  paragraph 6.

20          Moreover, when interpreting the classification of

21  paragraph 7, FTT was valued at zero dollars because it was

22  classified as equity.  Since the classification of FTT had a

23  decisive impact on its value, classification and its value

24  cannot be conceded separately.

25          According to the Exhibit 5 of the estimation

1  motion in Document 5203, the price of FTT at the time of

2  bankruptcy was $2.69 and the asset liquidation discount rate

3  was only (indiscernible) point 13 percent.  Even after

4  applying this discount rate, the value exceeded $2.00, but a

5  100 percent FTT discount was applied, reducing its value to

6  zero dollars.

7         Moreover, according to 11 U.S.C. 502(j) of the

8  U.S. Bankruptcy Code, a claim that has been allowed or

9  disallowed may be reconsidered for just cause.  This provides

10  the legal basis for reexamining the classification and

11  valuation of FTT, considering the change of circumstances and

12  the importance of fair treatment.

13         Your Honor, the Debtor processed with FTT at zero

14  dollars.  I think that FTT lost its fundamental value due to

15  FTX's bankruptcy; however, cryptocurrencies, in general, they

16  have no intrinsic value and are priced based on market

17  sentiment.  The Dogecoin and other (indiscernible) coins

18  avoid being valued at zero because they have intrinsic value,

19  applying a different standard only to FTT is not fair, in

20  fact, FTT is still actively traded, as you know, on various

21  ETRADE markets today and is trading as similar or something,

22  sometimes higher prices than at the time of bankruptcy.

23         Your Honor, (indiscernible) the Debtors claims

24  that FTT is a (indiscernible), but FTT is a utility token,

25  not an (indiscernible).  The features which the Debtor

1  mentions are similar to securities, are general

2  characteristics of utility tokens and are unrelated to

3  ownership of (indiscernible).

4          Moreover, regardless of whether FTT is inactive,

5  it was trading as a discount asset on the FTX Exchange, so

6  general investors did not receive it as an equity.  Based on

7  this perception, it's unfair that we receive no compensation

8  simply because we chose FTT.  Even though we purchased Debtor

9  assets in the same manner as other investors just before the

10 bankruptcy.

11         Your Honor, last thing, circumstances have

12 significantly changed after the estimation order.  FTX's

13 assets have substantially recovered and most victims are

14 expected to receive over 140 percent compensation based on

15 the petition date.  I understand that the Debtor has even

16 decided to indemnify shareholders.

17         In this situation, is it truly fair to maintain

18 the general value only assigned to FTT?  Your Honor, I

19 respectfully request your wise judgment so victims like us

20 may receive fair treatment.

21         Your Honor, thank you for giving me the time to

22 speak.

23         THE COURT:  Thank you.

24         Mr. Dietderich -- Mr. Glueckstein -- I keep on

25 calling you Mr. Dietderich.

1          (Laughter)

2          MR. GLUECKSTEIN:  We're obviously next to each

3    other and so sometimes we do get confused.  It's no problem,

4    Your Honor.

5          Just a few things in response to Mr. Nam.  Just so

6    that the record is clear on how the estimation order that

7    Your Honor entered and in relation these provisions relate,

8    paragraph 6 of the estimation order that's now a final order,

9    long ago, provides that the only circumstance in which the

10   valuation of the FTT token would be reconsidered would be if

11   the plan that was submitted to Your Honor for consideration

12   was modified, such that there was an operating exchange

13   utilizing FTT as a utility token following confirmation.

14         So we had discussions with certain objectors at

15   the time and the question was, well, we were still in

16   discussions about what might happen, what hypothetically

17   could happen with respect to a restart exchange or a post-

18   effective date exchange.  In that circumstance, if we were to

19   modify our plan, because an exchange was going to be

20   restarted, then the question of value, based on the

21   characteristics of FTT might be different and there was a

22   reservation of rights to reopen that question.

23         In such circumstance, there's a separate provision

24   in paragraph 7 that talks about the classification and to

25   reserve rights of creditors to object to classification.  As

1   I said in my opening remarks, if the value of the token is

2   not greater than zero, it doesn't have practical, real-world

3   effect in any event, but we do believe that for the reasons

4   why the estimation order was entered, based on the

5   evidentiary record at the time, that there's a basis for the

6   classification, with a good basis for classification as it

7   sets forth in the plan.

8           There were references to Section 502(j).  To be to

9   be clear, there's no claims that have been disallowed here.

10  All that happened and through the estimation order is

11  valuation of the claims; that's what that estimation hearing

12  was about.

13          And I, respectfully, don't believe there's any

14  change in circumstances here, certainly, no motion has been

15  made to reopen that order, but there's certainly no change in

16  circumstances here in the perspective of the Debtors, as it

17  pertains to the FTT token.

18          And just finally, just so that there's no

19  confusion in the record, as Mr. Dietderich did address at the

20  outset of the hearing this morning, the Debtor has not made

21  any decision and the Debtor is not forecasting any

22  distributions to shareholders on account of their interests

23  in these bankruptcy cases.  The issue with respect to the DOJ

24  is separate and deals with assets that are outside the

25  estate.

1          So for all those reasons, Your Honor, we would

2   submit that the Court's order, with respect to the valuation

3   of FTT is long ago, final, and that the classification, as to

4   the nature of those claims in our plan is appropriate.

5          THE COURT:  Okay.  Thank you.

6          All right.  On this objection, I am going to

7   overrule the objection.  I did hold an estimation hearing in

8   which I determined the value of FTT tokens at zero, based on

9   the evidence that was submitted to me.

10          There was no contrary evidence submitted at that

11   time and I have no evidence today that the value of FTT

12   tokens would be anything other than zero.  So, and FTT tokens

13   were inextricably intertwined with the Debtors; it was a

14   token traded by the Debtors and since the Debtor is not re-

15   establishing an exchange, there simply is no basis upon which

16   the FTT tokens could increase in value or create some value

17   now or in the future.  So for those reasons, I will overrule

18   the objection.

19          MR. GLUECKSTEIN:  Thank you, Your Honor.

20          The next objection that I will address is the

21   objection that was filed by the Celsius plan administrator.

22   The Celsius --

23          THE COURT:  Before we do Celsius, we've been going

24   for an hour and a half, why don't we --

25          MR. GLUECKSTEIN:  Sure.

1           THE COURT:  -- take a 10-minute recess.

2           MR. GLUECKSTEIN:  Absolutely.

3           THE COURT:  And we'll come back, let's come back

4   at a quarter of.

5           MR. GLUECKSTEIN:  Thank you, Your Honor.

6           THE COURT:  Thank you.

7       (Recess taken at 11:36 a.m.)

8       (Proceedings resumed at 11:45 a.m.)

9           THE CLERK:  All rise.  In.

10          THE COURT:  Thank you, everyone.

11          Mr. Glueckstein?

12          MR. GLUECKSTEIN:  Thank you, Your Honor.

13          It's still morning, so good morning.  Brian

14  Glueckstein for the Debtors.

15          Your Honor, moving to our next objection that

16  remains outstanding, that is the objection of the Celsius

17  plan administrator.  That objection, Your Honor, relates to

18  the Debtors' pending claim objection that is *sub judice* with

19  the Court, addressing Celsius', as we submit, time-barred

20  attempt to assert subsequent transferee claims under

21  Section 550 of the Bankruptcy Code, related to 497 different

22  Celsius customers, who are alleged to have transferred assets

23  to the accounts of the FTX Exchanges.

24          Of course, if the Debtors' claim objection is

25  ultimately sustained, all of these other issues become moot.

1  But with respect to the objection today, Your Honor, the

2  first objection that the plan administrator interposes is a

3  classification objection under Section 1122.  And on its

4  merits, the plan objection, we submit, fails.

5          Celsius argues that the Debtors must modify the

6  definition of customer entitlement claims to include its

7  subsequent transferee claims asserted under Section 550 of

8  the Bankruptcy Code, which Celsius, itself, acknowledges or

9  asserted against the Debtors.

10          Celsius is not a customer.  It has no rights of

11  its own to participate in the customer priority settlement

12  that we discussed at length this morning, or receive the

13  benefits that were negotiated and are provided to the

14  Debtors' customers holding claims to compensate holders for

15  value of assets held in account on the FTX Exchanges.

16          The subsequent transferee liability that Celsius

17  seeks to establish would result from a judgment against the

18  Debtors and for which the Debtors would be responsible,

19  ultimately, for satisfying.  While that would present some

20  issues for the Debtors in terms of allowance of any related

21  customer entitlement claims, that liability would simply be a

22  general unsecured claim, owing from the Debtors to Celsius,

23  and is properly classified as such; in fact, as we sit here

24  today, there remains significant uncertainty, whether any or

25  all of the subsequent transferee claims actually correspond

1  to customer liabilities of the Debtors, as of the petition

2  date in the same or lesser amounts or in any amount at all.

3        Celsius is not challenging how the plan generally

4  distinguishes between customer entitlement claims and general

5  unsecured claims, with customer entitlement claims separately

6  classified to provide the benefits of the customer priority

7  settlement detailed in the plan.

8        As we discussed in our papers, in our reply

9  papers, Celsius itself adopted a similar distinction in its

10 own bankruptcy plan, distinguishing between claims held by

11 customers in Celsius accounts from all other unsecured

12 claims, which would include subsequent transferee claims.

13       The Debtors' classification of claims satisfies

14 Section 1122(a) of the Bankruptcy Code on the facts of these

15 cases.  If Celsius is permitted to pursue its claims, it

16 would be pursuing those claims against the Debtor and those

17 are properly classified as general unsecured claims.

18       Celsius next argues that the Debtors must somehow

19 commit now, that it will not make any distributions to its

20 own creditors until both, Celsius' subsequent transferee

21 claims against the Debtors and the initial transferee claims

22 Celsius says it has asserted in New York are resolved.  There

23 is no basis whatsoever to require such a result; never mind,

24 legislated in our plan.

25       What Celsius is trying to do without saying it, is

1   obtain prejudgment garnishment as to the distributions that

2   would be owed to FTX Exchange customers with allowed claims

3   on the basis of Celsius purporting to have claims against

4   those customers.

5        Settled law provides that prejudgment garnishment

6   is generally not available against a Debtor because it unduly

7   burdens and complicates the administration of the estate.

8        And here, Your Honor, Celsius has not even made a

9   proper request for such relief for the Court to consider.

10  Their fallback position seems to be that the Debtors must

11  establish some specific reserve for their time-barred

12  subsequent transferee claims now at the plan confirmation

13  stage and we submit that is not correct.  No change to the

14  definition of disputed claims, as they suggest, is required.

15       To the extent the Court permits Celsius to assert

16  their subsequent transferee claims and/or their preference

17  claim against the coined Debtor, the Debtors will need to

18  consider those claims in considering and establishing their

19  disputed claims reserve, as contemplated by the plan.  But

20  there's no requirement for some special reserve for Celsius

21  and certainly no reserve is needed prior to the effectiveness

22  of the plan or the Court's ruling on the pending claims

23  objection.

24       On the disputed claims reserve issue, Your Honor,

25  which was also the focus of the Three Arrows Capital

 1  objection, which we have now resolved, we believe the Debtors

 2  have satisfied Section 1123(a)(4) by providing for a disputed

 3  claims reserve in Section 8.5 of the plan and that nothing

 4  more is required in the plan itself.

 5          But as we explained in our papers, Your Honor, the

 6  reality is, the establishment and size of the disputed claims

 7  reserve contemplated by the plan in this case will be the

 8  subject of a separate motion that the Debtors intend to file

 9  with this Court and everyone's rights, including Celsius,

10  Three Arrows, and anyone else, are fully reserved with

11  respect to that motion and it's ultimately the size of the

12  disputed claims reserve that will be proposed.

13          We have added language, Your Honor, in new

14  paragraph 168 of the confirmation order in the version of the

15  order filed this morning, making this point clear and it was

16  that language that resolved the 3AC objection on this basis.

17  Certainly, that language, to the extent Celsius is continuing

18  to push the reserve issue at this time, should cover, more

19  than cover that issue as well.

20          But nonetheless, Your Honor, we, for all of those

21  reasons and those set forth in our papers, we submit that the

22  Celsius objection should be overruled.  Thank you.

23          MR. LEVY:  Good morning, Your Honor.  Richard Levy

24  of Pryor Cashman, on behalf of the Celsius litigation

25  administrator.

1          As when I was before you last time, Your Honor,

2   I'm going to refer to Celsius and the Celsius litigation

3   administrator as "Celsius"; I think it'll be easier for the

4   record.

5          Your Honor, I want to make clear at the outset

6   that we are not arguing that the plan should fail; we are

7   arguing that there is a defect in the plan that should be

8   addressed.  And to resolve that defect, we've suggested

9   several means in our responsive papers.  I'll get into that

10  in a little bit.

11         I'm going to suggest that there's yet another

12  basis that you'll see from the argument, Your Honor, that can

13  resolve this issue.  Not only are we misclassified and should

14  be otherwise classified, we could be separately classified.

15  Let's talk about this as we go through the argument.

16         I want to approach this from a dual perspective,

17  Your Honor.  The customer entitlement claims are in

18  Classes 5(a) and 5(b).  The general unsecured claims in which

19  the Debtors propose to classify us are in Class 6.  If our

20  claims are more in the nature of customer claims, directly or

21  indirectly, they should be in Class 5; perhaps, in their own

22  subclass of Class 5.  But given their nature, they surely

23  don't belong in Class 6.

24         Your Honor, we although that Section 1122 requires

25  that the plan provide for classification and equal treatment

1  of the members of each of those classes.  That requires that

2  substantially different claims can't be placed in the same

3  class and must be placed in a class with other claims of

4  similar nature or, perhaps, in a separate class.

5          The essential issue is not the person who holds

6  the claim, but it's the legal character of the claim as it

7  relates to the assets of the Debtor, and that's the Grace

8  case in Third Circuit 2012 -- '13 -- and in other cases.

9          The customer entitlement claims are based on

10 persons; persons who had an account with FTX.  That's the

11 only element that results in their classification in Class 5.

12 It says nothing, Class 5 said nothing -- says nothing about

13 any other means in which a claimant could have a connection

14 to or a claim against FTX based on a relationship to the

15 account, and that's what we are urging in our complaint,

16 proposed complaint, which underlies our proof of claim, that

17 we, in fact, have a relationship to that account.

18         It was Celsius property that was preferentially

19 transferred to holders of claims now in FTX to fund or to

20 increase the funding of their account at FTX.

21         THE COURT:  Well, let me ask you about that.

22         What's the basis for your argument that the funds

23 that were transferred from customers who withdrew their funds

24 from the Earn accounts prior to the petition date at Celsius,

25 what's the basis for Celsius to having any property interest

1  in those funds?

2         MR. LEVY:  In the Earn accounts, Your Honor, Judge

3  Glenn has concluded that that was property of the Celsius

4  estate.

5         THE COURT:  No, what he concluded was that funds

6  that were in the accounts as of the petition date were

7  property of the Debtors' estate.  He said nothing about funds

8  that had been withdrawn prepetition.

9         MR. LEVY:  Well, Your Honor, that's something we

10 may have to deal with going forward.

11        THE COURT:  You're definitely going to have to

12 deal with it going forward.

13        MR. LEVY:  It seems to me if it's in the account

14 at the petition date, it's the same principal, previously.

15        THE COURT:  Well, what's the basis for that?

16        MR. LEVY:  Because --

17        THE COURT:  Give me a basis.  Give me something to

18 hang my hat on that says that you can assert a property right

19 over funds that were withdrawn from the Celsius Earn accounts

20 by the customers.

21        MR. LEVY:  Your Honor, I would argue that those

22 were Celsius funds even before the petition date for the same

23 reasons that Judge Glenn concluded that they were Celsius

24 property.  The nature of the --

25        THE COURT:  But not once they're withdrawn.  Once

1    the customer withdraws the funds --

2              MR. LEVY:  Pardon me, Your Honor?

3              THE COURT:  Once the customer withdraws the funds

4    from the account, they revert back to the customer's

5    property.

6              How could, prepetition, how could Celsius have

7    said to a customer who withdrew their funds:  That money is

8    ours.  We still have a property interest in those funds.

9              Explain that to me.

10             MR. LEVY:  I'm going to say, Judge, that based on

11   Judge Glenn's reasoning, it's the same reasoning that would

12   apply to prior transfers out from Celsius.  The account funds

13   were never the property of the customer; they were property

14   of Celsius under the account documents and contract.

15             THE COURT:  They had bare legal title.

16             MR. LEVY:  Pardon me?

17             THE COURT:  They had bare legal title; the

18   customer still had an interest in those funds and they had

19   the right to withdraw them under their terms of service.

20             MR. LEVY:  It's still Celsius' property, as the

21   Earn ruling says.

22             THE COURT:  So if someone who withdrew their funds

23   from the Celsius account two years ago, two years before they

24   filed for bankruptcy, Celsius could go to that customer and

25   say, Hey, by the way, that's our property and we want it

1  back?

2          MR. LEVY:  I suppose that's a possibility.

3          THE COURT:  I don't think so.  I don't think so.

4          (Laughter)

5          THE COURT:  Go ahead.

6          MR. LEVY:  So, Your Honor, our theory, as we've

7  just discussed, is that there's a property interest in the

8  settlement, in the Celsius case -- in the Celsius estate that

9  tracks through to the customers at FTX.  They funded their

10 account using property in which Celsius had a property

11 interest.  They're going to receive a distribution.

12          Celsius has a claim that is based on the fact that

13 that account at FTX was funded with property in which Celsius

14 asserts a property interest and if upheld under Section 551,

15 that attribute remains at Celsius.  And we would have an

16 entitlement to be treated, in effect, as a customer.

17          We have a claim.  We have an indirect link.  I'll

18 agree, it's indirect at the moment, but indirect and direct

19 doesn't necessarily answer the question.

20          Also from the Grace case, Your Honor, in the 2013

21 decision by the Third Circuit, the question in that case was

22 whether indirect asbestos claimants who had claims for

23 indemnity and contribution were properly classified in the

24 same class as direct asbestos claims.

25          THE COURT:  What did you, when you filed your

1   proofs of claim, which proof-of-claim form did you use?

2           MR. LEVY:  Pardon me, Your Honor?

3           THE COURT:  Which proof-of-claim form did you use

4   when you filed your claims against the Debtors?

5           MR. LEVY:  We used the custom.  We used the class,

6   the general unsecured claim, because that's all I could.

7           We were not a person who held an account.  There's

8   no question about that.  But we're claiming that we have an

9   interest relating to that account.

10           And the point that's made in the Third Circuit

11   case in Grace is that indirect and direct claims relating to

12   asbestos liabilities were properly classified in the same

13   class and that there was no basis for carve the indirect out.

14   The key language in that case, Your Honor, I'll find it in a

15   moment.

16       (Pause)

17           THE COURT:  Well, while you're doing that --

18           MR. LEVY:  Pardon me?

19           THE COURT:  While you're doing that, I'd like to

20   know the answer to the question of, what evidence have you

21   introduced to me today?

22           MR. LEVY:  What happens?

23           THE COURT:  What evidence have you introduced in

24   this hearing today that would lead me to conclude that

25   Celsius has an interest as a customer in the FTX accounts?

1         MR. LEVY:  Your Honor, we have a filed proof of

2   claim, which includes the basis of our argument, and we've

3   explained that as a matter of what we rest our position on.

4   I don't think there's any dispute about that.

5         Your Honor, the Third Circuit says, "Both direct

6   and indirect claims under the asbestos plan exhibit a similar

7   effect on Grace's bankruptcy, they seek recovery for actions

8   related to Grace's asbestos liability."

9         By analogy, we seek recovery based on FTX's

10  liability relating to the existence of a customer account.

11        The Third Circuit goes on and says, although

12  Montana and the Crown (ph) must first -- those were the

13  indirect claimants -- must first be held liable for failure

14  to warn before they can bring such a claim, that makes no

15  difference to Grace, the debtor, as its liability for such a

16  claim depends solely on asbestos-related activities.

17        Same argument, by analogy, here.  FTX's liability

18  depends upon an account; not a person holding an account, an

19  account.  And our money, as we assert in our complaint, finds

20  its way into FTX to fund or increase the funding of an

21  account for which we will now be able to claim, should we win

22  in the avoidance proceeding, that that creates liability for

23  a subsequent transfer.

24        Your Honor, the point that is concluded in the

25  Grace case is that a reasonable classification of

1  indemnification and contribution, together with direct

2  asbestos personal injury claims, those were all properly

3  classified, and that's what we're asserting should happen

4  here, Your Honor.  Classification cannot be used to place

5  claims of substantially different character in the same

6  class.  I'm arguing, Your Honor, that our claims are not

7  substantially different because they arise from the account

8  relationship, the account existence, and not from the person

9  who holds the account.

10      (Pause)

11      MR. LEVY:  Forgive me, Your Honor, I'm trying to

12  skip down so I don't have to repeat myself.

13      Your Honor, to honor the purpose and meaning of

14  classification, it seems to me that the approaches that we've

15  suggested to the debtor are proper.  One, include us in Class

16  5, but, two, we shouldn't be in Class 6.  Our claims are

17  significantly different from any other creditor in Class 6,

18  to my knowledge.  Now, I have not looked at the thousands of

19  claims, but I doubt that anybody else is asserting a claim

20  based on liability through an account.  For that reason,

21  Judge, we don't belong in Class 6.  We belong perhaps in our

22  own class under Class 5.

23      So, Your Honor, I think I've explained the basic

24  theory here that the attributes of the claim are what should

25  govern classification and the attributes of the claim here

1  require that we be classified along with the customers so

2  that we are properly treated under the plan.

3         Let me turn to Mr. Glueckstein's comments and a

4  couple of other points that come up along the way.  As we

5  pointed out at the hearing on September 12th, Judge, one of

6  the big issues that arises from what we are talking about

7  here is the risk of potential dual exposure to the FTX

8  estate.  They may make distributions to customers and they

9  have a year to object to those customers under their Earn

10  plan.  So maybe they're going to do something that will delay

11  things and in fact that would be one procedural mechanism

12  that would work.  We've got a claim, the customers have a

13  claim, put it all in front of one proceeding instead of

14  having the risk of dual exposure to the estate, which I can't

15  imagine any judge or any debtor would want to face.

16         Mr. Glueckstein says that we're trying to seek

17  prejudgment garnishment.  I think Your Honor recognizes what

18  garnishment is as opposed to what we're asking, which is in

19  effect a holdback or a reserve.  We are not seeking the

20  imposition of a property interest against the debtors'

21  property or against the potential distributions to be made.

22  So we are not seeking garnishment at all or attachment.

23         You know, Your Honor, the cases that the debtor

24  relies on for this Chapter 7 case is they're not Chapter 13

25  cases.  They've said in their opposition to us, Your Honor,

1  in their response that we are a creditor of a creditor and we

2  don't have any standing to be heard.  I dispute that, Your

3  Honor.  We have a claim under Section 101.5 of the Bankruptcy

4  Code.  We have a right to payment, direct or indirect, that

5  makes us a creditor.  We're not dependent on the rights of

6  the -- we are not -- we have a claim, it will require certain

7  facts and circumstances to progress to further proceedings,

8  but we have a claim.  We are not a creditor of a creditor; we

9  are ultimately a creditor of FTX.

10           I think, Your Honor, that that's all I need to

11  say, unless Your Honor has further questions.

12           THE COURT:  No questions.  Thank you.

13           MR. LEVY:  Thank you, Your Honor.

14           MR. GLUECKSTEIN:  Thank you, Your Honor, just a

15  few points in response.  Maybe I'll take them in reverse

16  order.

17           On this last point, as Your Honor knows, the

18  debtors don't believe they have a claim against the debtors,

19  they believe -- we believe those claims are time-barred, and

20  we reiterated that point in our papers.  Obviously, if Your

21  Honor were to agree and sustain the claims objection that is

22  pending and rule that their claims cannot be brought against

23  the debtors in subsequent transferee claims, the only claim

24  they have vis-a-vis the debtor would be against the initial

25  transferee.

1            This issue of they're just trying to have us

2      reserve so that we don't pay out on the claim twice, we will

3      -- if their claims are allowed to proceed, we will have to

4      address that issue, Your Honor.  Obviously, the debtors have

5      no intention of making payments out at times when we have

6      issues that need to be resolved, but the suggestion that

7      Celsius can come in and say, well, you can't make any

8      distributions to creditors if the debtors determine those are

9      allowed claims, there's no basis for Celsius to say we can't

10     pay those claims.

11            And so, okay, the reserve issue, I understand the

12     reserve issue, we'll have to deal with a reserve if their

13     claims are allowed to proceed in one way or another, it

14     doesn't mean we believe we need to reserve on those claims

15     separately or in their entirety, but we'll deal with that

16     issue when we come to it.  But what they're asking is not

17     about a reserve, what they're asking, and we just heard it

18     again, is that somehow the debtor should be forced to hold

19     distributions until they reserve whatever litigation claims

20     they have in their court in New York.  There's no basis, none

21     has been cited to Your Honor to force the debtors to do that

22     at this stage.

23            Now, with respect to this argument that we've now

24     heard -- this is the most we've heard elaborated on it --

25     that somehow -- the argument now is that Celsius has an

1  actual property interest in the funds that were deposit --

2  allegedly deposited by their customers, who withdrew those

3  funds from the Celsius exchange from their account.  The

4  allegation is they deposited the money into an FTX account,

5  and now what they're arguing is that they had some property

6  interest in those funds at the time they were deposited.

7  And, as Your Honor correctly points out, there's no basis for

8  that whatsoever.  There's been no evidence put on about that,

9  there's been nothing cited to that would lead to that result.

10        And why are they doing this?  They're doing this

11  because they want to be classified as a customer claim.  In

12  the event that their claims are allowed to proceed against

13  the debtor under Section 550 of the Bankruptcy Code, they

14  want the benefits of the customer priority settlement.  They

15  are not a customer.  Whatever funds were deposited, to the

16  extent funds were deposited into the FTX exchange accounts by

17  the Celsius customers, those funds, like all other customer

18  deposits, were comingled with the debtors' assets and with

19  other customer assets and there are no property rights.  That

20  has now been conclusively determined by the evidence before

21  Your Honor today from Mr. Mosley and from Lord Neuberger.

22        So what they're trying to do is say, okay, but

23  wait a minute, we have this idea that we have a property

24  right that we're going to collect on through the customer who

25  deposited that money in the FTX exchange, there's no basis

1  for that whatsoever.  What it really sounded like they were

2  saying this morning is they have some kind of turnover action

3  or they want their funds back, and that's not what they've

4  done.

5           They have brought -- what they are seeking to

6  file, what they filed in their late proof of claim and what

7  they have sought to file in their draft complaint against the

8  debtors is a subsequent transferee liability claim against

9  the debtors pursuant to Section 550 of the Bankruptcy Code,

10 and there is no question, we deal with this in our papers,

11 that if that liability is established, that is a liability

12 that the debtors will have to deal with, that is a general

13 unsecured claim.  What they are not in any way, shape, or

14 form -- and we just heard it, Celsius admits they're not a

15 customer, they were not a customer of the exchange -- they

16 want to rely on this language that there was a relationship

17 to the account and that somehow their subsequent transferee

18 claim must be classified with the creditors -- with the

19 customers.

20           We submit, Your Honor, that the facts of this case

21 and the facts of this plan are clear:  The reason why the

22 customers are separately classified from the general

23 unsecured creditors is a result of the nature of the claims

24 that they have and the benefits that are being provided to

25 the customers as a result of the negotiated customer priority

1   settlement.  There is nothing about any of that that touches

2   on Celsius' subsequent transferee claims against the debtors.

3   And to the extent that they want to establish liability in

4   the Southern District of New York against the initial

5   transferees -- and we talked about this at the hearing last

6   month -- and they think they can come here and have some

7   theory to have the debtors -- somehow collect against the

8   debtors on that judgment, they can try to do that; we don't

9   think that will work, but they could try to do that.  But

10  what they cannot do is elevate their claim and elevate their

11  standing into the shoes of the customer.  They're not the

12  customer.

13          And so the classification for purposes of a plan

14  today, we submit, Your Honor, is correct.  Any issues with

15  respect to a disputed claims reserve have now been made clear

16  that we're going to be addressing those in terms of the

17  amount of that reserve in the aggregate with Your Honor

18  separately, and there is no basis whatsoever to force the

19  debtors to have Celsius, the Celsius administrator legislate

20  how the debtors are going to address their claims

21  reconciliation process.

22          Thank you, Your Honor.

23          THE COURT:  Thank you.

24          All right, I am going to overrule this objection

25  as well.

1    First of all, let me say I had hoped that I would

2 be in a position to have issued a ruling on the question of

3 whether or not Celsius' proof of claim was timely filed, but

4 I will do so as soon as possible in the future.  But as for

5 purposes of today, to reclassify them under 1122 because they

6 assert that they have a property interest in the accounts of

7 certain FTX customers, I simply have no evidence to support

8 that.  The proof of claim that was filed is not sufficient,

9 it only gives me the bare facts that customers of Celsius,

10 prior to the filing of the Celsius bankruptcy, withdrew funds

11 from their Earn accounts and deposited them into the FTX

12 accounts.  That's the only allegation that's in there, and

13 it's only an allegation, it's not any evidence.

14    So I have no basis to conclude that Celsius has

15 any interest whatsoever in any FTX customer account and, for

16 that reason, their classification under 1122 is correct.

17 They are a noncustomer general unsecured creditor of the

18 estate for purposes of the plan.

19    Debtors -- or the argument that the debtors must

20 not release funds to these FTX customers in connection with

21 distributions under the plan, the objection fails for the

22 same reason.  I have no basis to conclude at this point that

23 Celsius has any property interest whatsoever in those

24 customers' accounts.  The only thing Judge Glenn said in his

25 opinion in Celsius was that funds that were in the accounts

1   as of the petition date became property of the debtors'

2   estate.  He did not address the question of what happened

3   prior -- funds that were withdrawn prior to the petition date

4   of the Celsius case and, therefore, it has no impact on my

5   ability to say FTX customers should not get paid when the

6   distributions are made.

7          So, for those reasons, I will overrule the

8   objection, and we'll deal with the question about whether the

9   Celsius proof of claim is valid in the near future.

10          MR. GLUECKSTEIN:  Thank you very much, Your Honor.

11          So continuing forward with the remaining

12   objections, I plan to next address the remaining piece of the

13   objection filed by the Office of the United States Trustee.

14   The one issue that remains unresolved -- and I would like to

15   note, and we appreciate the engagement and we worked very

16   constructively with the Office of the United States Trustee

17   to resolve all but one issue in their objection based on the

18   revised -- the revisions to the plan and the revised

19   confirmation order.  The one issue that we have not resolved

20   that remains open is their challenge to the consensual third

21   party releases contained in Section 10.4 of the plan and the

22   corresponding injunction in Section 10.8.  This releases

23   issue was also raised in the Kavuri parties' objection as

24   well.

25          Your Honor, the argument being made is that the

1   opt-out release structure approved by this Court to obtain

2   consensual releases from the holders of claims is not

3   permissible.  Importantly, Your Honor, nobody is challenging

4   the scope of the releases being inappropriate, nobody is

5   challenging who is being released as inappropriate.  In fact,

6   the third party releases in this case are extraordinarily

7   narrow.

8           First, the releases do not release any causes of

9   action arising out of conduct that occurred prepetition, or

10  claims otherwise preserved for the wind-down trust, and are

11  limited to address plan formation and the business of these

12  Chapter 11 cases.  The releases also have carveouts for

13  fraud, gross negligence, and willful misconduct.

14           Second, the releases do not include a release for

15  any insider or employees of the debtors before Mr. Ray and

16  his team took over, an overlap with those covered by

17  exculpation in many respects.  There are, however, certain

18  parties benefitting from the releases who were integral to

19  the plan formation process, namely the ad hoc committee and

20  the joint liquidators of FTX Digital Markets.  Thus, the opt-

21  out releases in this case are narrowly tailored to the unique

22  facts and circumstances presented.

23           The debtors also provided, after discussions in

24  connection with the disclosure statement, with the United

25  States Trustee at that time in connection with approval of

1   the solicitation procedures, that releases are deemed --

2   releases for classes who are deemed to reject the plan

3   required opt-in releases, and so opt-in releases were

4   solicited for those classes as part of our process.

5           The voluntary release here is an important, albeit

6   limited, part of the plan.  The releases here, we submit, are

7   thus quite distinguishable from the general releases provided

8   in many plans.  Nonetheless, the objection asserts that the

9   releases are not consensual because they contain an opt-out

10  structure.  We submit this is wrong both before and after the

11  U.S. Supreme Court's decision in Purdue.

12          The U.S. Trustee's Office has for a long time

13  advocated against opt-out releases.  This is not an issue

14  arising from the Purdue decision.  But as the U.S. Trustee

15  acknowledges, prior to Purdue, Your Honor, along with many

16  other courts in this district have consistently held that

17  voluntary opt-out releases are consensual or can be

18  consensual on the right facts and are thus permissible.  This

19  Court is well aware of the reasoning on which those cases are

20  based that consent to the release can be inferred by failing

21  to opt out of the releases through a ballot election.

22          Notice is a very important component to those

23  decisions where creditors have an opportunity to opt out or

24  otherwise express their views on the proposed release.  On

25  the facts here, it is hard to imagine more notice having been

1    provided to creditors.  This case is one of highest profile

2    cases in history, it is regularly reported on in publications

3    around the world.  The debtors sent ballots with opt-out

4    materials to almost one million creditors in the voting

5    classes.  Those were accompanied by clear and thorough

6    materials explaining the releases and the opt-out process

7    that were approved by this Court.  In addition, the debtors

8    published notice of the releases and the need to opt out of

9    it if a creditor in the voting class did not want to grant

10   the releases in national and international publications,

11   including the New York Times and CoinDesk.com.

12          The debtors submit this robust notice is akin to

13   the type of noticing provided in class action cases pursuant

14   to Rule 23 of the Federal Rules of Civil Procedure, which

15   indisputably use and are permitted to use opt-out noticing.

16          The argument that somehow the Purdue decision up-

17   ended the ability for this Court to approve on appropriate

18   facts opt-out releases is baseless.  The Supreme Court's

19   decision in Purdue itself expressly cautioned that nothing in

20   the decision, "should be construed to call into question

21   consensual third party releases," and later stated, "or

22   express a view as to what qualifies as a consensual release."

23          Thus, if this Court were to believe that the

24   debtors' opt-out releases are consensual on the facts of this

25   case, then nothing in Purdue dictates a different result.

1  Courts in this circuit and elsewhere have recognized this

2  fact and have since the Purdue decision confirmed plans

3  containing opt-out structures for third party releases,

4  including in the Invitae case, BowFlex, and Robertshaw, all

5  of which are discussed in detail in our reply papers.  In the

6  Robertshaw case, Judge Lopez in the Southern District of

7  Texas noted that Purdue did not change the law on consensual

8  opt-out releases.

9         Your Honor, the U.S. Trustee and the Kavuri

10  parties each cite to the In re Chassix Holdings decision from

11  2015 for the proposition that opt-out releases are not

12  permitted, but that decision, which of course is not binding

13  on Your Honor, has been thoroughly considered by this Court

14  in the past when confirming plans containing opt-out

15  releases, and that case notes that the circumstances could

16  justify different outcomes on particular facts and

17  circumstances.  And we do submit that the facts of this case

18  support the very limited releases that are contained in this

19  plan.

20         Finally, Your Honor, we do discuss in our reply

21  brief and note we are of course aware that Judge Goldblatt

22  recently issued a decision in the In re Smallhold case

23  expressing a view that creditors need to take affirmative

24  steps to indicate consent following Purdue.  That decision,

25  which of course is not directly binding on the Court, we do

1  believe is inconsistent with _Purdue_ and, critically,

2  distinguishable on its facts.

3          Here, as noted, notice was widely sent via both

4  direct and publication notice, featuring the releases in the

5  highest profile pending Chapter 11 case.  And the releases,

6  as discussed, are very limited.

7          I also note that Judge Goldblatt in his opinion

8  did not expressly rule on opt-outs for those who did receive

9  ballots but did not return them, and also noted that, if the

10  protections of Rule 23 class actions were provided, the

11  results might be different.

12          We submit, Your Honor, all things considered,

13  given the limited scope of the releases here, the facts and

14  circumstances of this case, the noticing that was provided to

15  creditors, that the releases in the debtors' plan here are

16  reasonable, consensual, and should be approved.

17          THE COURT:  Thank you.

18          MR. GLUECKSTEIN:  Thank you.

19          MR. HACKMAN:  Good afternoon, Your Honor.

20          THE COURT:  Good afternoon.

21          MR. HACKMAN:  May it please the Court, Ben Hackman

22  for the U.S. Trustee.

23          Our office filed a confirmation objection at

24  Docket Item 23610 and our objection raised --

25          THE COURT:  You might need to speak up a little

1  for the folks in the back.

2          MR. HACKMAN:  I'm sorry, Your Honor.  Our office

3  filed a confirmation objection at Docket Item 23610 and our

4  objection raised ten issues with confirmation.  We have

5  resolved nine of those issues, and we thank debtors' counsel

6  for working with us.  Our only open issue is, does the plan

7  contain nonconsensual third party releases, and we

8  respectfully submit the answer is yes.

9          Our position is that third party releases that are

10  based on inaction such as a failure to opt-out are

11  nonconsensual, and third party releases that are

12  nonconsensual are foreclosed after the Supreme Court's ruling

13  in Purdue.

14          The second amended plan filed at Docket Item 26029

15  defines releasing parties to include creditors who are

16  unimpaired, creditors who are eligible to vote, but do not

17  return a ballot, and people who vote to accept or reject, but

18  do not opt out.  And that's in Article 2.1.172.  Our position

19  is that contract principles govern whether a release is

20  nonconsensual and that, under contract law, silence does not

21  equal consent except in limited circumstances not applicable

22  here.

23          As the Restatement Second of Contracts states in

24  Section 69, comment (c), the mere fact that an offeror states

25  that silence will constitute acceptance does not deprive the

1  offeree of his privilege to remain silent without accepting.

2  Here, people who are unimpaired, in unimpaired classes, are

3  not being asked to vote, their silence or inaction should not

4  equal consent to a third party release.

5       As the Bankruptcy Court for the Southern District

6  of New York wrote in the Chassix decision, it is difficult to

7  understand how a creditor can be unimpaired if it is

8  releasing its claims against third parties.  We submit that

9  the only way for creditors in unimpaired classes to consent

10  to the FTX plan's third party release is by opting into them.

11  The same thing goes for people who are eligible to vote, but

12  do not return a ballot.

13       The debtors' customer base in this case, as I

14  understand it, is spread out all over the world.  The

15  presentation the debtors made at the first day hearing, which

16  is filed at Docket Item 115, indicates that customers were

17  located in more than 24 countries, including 22 percent in

18  the Cayman Islands, 11 percent in the Virgin Islands, eight

19  percent in China, eight percent Great Britain, six percent

20  Singapore, five percent Bermuda, four percent Korea, four

21  percent the United Arab Emirates, and so on.  We're not sure

22  how many of the customer base, how many people in the

23  customer bases read and write English, or how many of them

24  are familiar with the U.S. legal system generally or the U.S.

25  bankruptcy system in particular.  I believe Mr. Daloia during

1   his testimony today indicated that he would not have a way to

2   tell if anyone, any particular person received a solicitation

3   package.  We submit that consent should not be inferred based

4   on a creditor or customer's inaction.

5         We recognize that this plan's third party releases

6   are limited, they do not extend to conduct that occurred

7   prepetition, as I read the document, they do not apply to

8   gross negligence, willful misconduct, fraud, or criminal

9   acts.  It seems to us that the third party releases largely

10  overlap with the plan's exculpation.  Having said that, we

11  agree with Judge Goldblatt's observation in the Smallhold

12  decision, which Mr. Glueckstein referenced, that

13  nonconsensual third party -- the nonconsensual third party

14  release is now per se unlawful.  And if a third party release

15  is nonconsensual, then no matter how narrow it is, it should

16  not be approved.

17        The debtors' reply in support of confirmation in

18  paragraphs 73 to 74 discusses the Smallhold decision.  We are

19  not suggesting that that decision is binding on Your Honor.

20  If Your Honor is inclined to consider the Smallhold analysis,

21  we agree -- we disagree with the debtors' argument that

22  Smallhold is inapplicable here.  The debtors argue that FTX

23  is distinguishable because creditors are being paid in full

24  and Smallhold did not address a situation where creditors

25  were being paid in full, but Smallhold did address releases

1   by unimpaired classes whose creditors are being paid in full.

2       The debtors argue that Smallhold is inapplicable

3   because they are people who were eligible to vote, but did

4   not return a ballot, were not releasing parties, but I think

5   it's clear what Judge Goldblatt was saying in that decision.

6   He wrote, "Whatever one might think about the propriety of

7   third party releases in the world before Purdue Pharma, this

8   Court concludes that in light of that decision there is no

9   longer a basis to argue with the conclusion in cases like

10  Washington Mutual, Emerge Energy, Sun Edison, or Chassix.

11  While the undersigned had previously been comfortable for the

12  reasons described in Arsenal, concluding that creditors that

13  failed to opt out may be deemed to consent to a plan's third

14  party release, the Court no longer believes it is appropriate

15  to do so."

16      That's page 26 of Judge Goldblatt's opinion.

17      I wanted to mention two other things about our

18  objection, Your Honor.  First, in paragraph 47, we had cited

19  to the Restatement Second of Contracts, paragraph 69.  The

20  quoted text in the citation is accurate, but the citation

21  itself is incomplete.  It should say Restatement Second of

22  Contracts, Section 69, comment (a).

23      The second point, Your Honor, is in paragraph 59

24  of our objection.  We cited to Judge Goldblatt's bench ruling

25  in TPC Group, Inc. to support the principle that voting to

1    accept does not necessarily manifest consent to a third party

2    release.  I flag that because, as I read the Smallhold

3    decision, I'm not sure if Judge Goldblatt would still adhere

4    to that view.  I don't want to speak for the Court, but I

5    flag it as potentially being a change in how the Court views

6    that issue.

7              To conclude, Your Honor, we respectfully submit

8    that contract principles govern whether a release is

9    nonconsensual; that, under contracts law, failing to respond

10   to an offer is generally not acceptance; and, similarly,

11   failing to respond to a plan solicitation is not consent.

12   People who took no action in response to the solicitation

13   materials should not be deemed to consent to the third party

14   releases.  We submit that consent by inference or silence

15   should not be permitted.  We acknowledge that the releases

16   are narrow in scope, they do not apply to conduct occurring

17   prepetition, they have various exceptions similar to

18   exculpation, but no matter how narrow they are in scope, if

19   they are nonconsensual, they are not permitted after Purdue.

20             So, we would respectfully submit that the Court

21   would be justified in requiring more than a failure to opt

22   out to establish consent in this case.

23             Unless Your Honor has any questions, that's all I

24   have.

25             THE COURT:  Well, let me ask you a question.  In

1   the context of a class action litigation, named plaintiffs in

2   that class action agree to a settlement with the defendants,

3   that settlement is a contract, isn't it?

4           MR. HACKMAN:  Your Honor, I'm not a class action

5   lawyer --

6           THE COURT:  Well, any settlement between two

7   parties is a contract, is it not?

8           MR. HACKMAN:  I would not dispute that, Your

9   Honor.

10          THE COURT:  Okay.  So, in the context of a class

11  action, class action plaintiffs, which may be only one or a

12  few people, enter into a settlement agreement with the

13  defendants on behalf of hundreds, thousands, tens of

14  thousands of people who also have claims for the same thing

15  against that defendant.  And a notice gets sent out to those

16  class action plaintiffs that says this is the settlement

17  we've entered into, you are one of the claim -- you have a

18  claim or a potential claim against the debtor -- or against

19  the defendant, if you want to opt out of this settlement and

20  pursue your own cause of action against that defendant, you

21  have the right to do so, but you've got to sign this form and

22  send it back to us; if you don't, you're deemed to have

23  consented and now you're part of the class, and you're going

24  to get whatever distribution there is under the terms of the

25  settlement.

1          How is that different from how it works in the

2    plan context where we have a committee with fiduciary duties

3    to all customers and other creditors in this case, with a

4    small number of customers and creditors who are participants

5    and sit on the creditors committee, who enter an agreement

6    with the debtors on a plan of reorganization that includes

7    something that says we're going to release claims against

8    third parties, send out notice to those parties and say, if

9    you don't want to participate in this, you have the right to

10   opt out, but you've got to sign this form and send it back;

11   if you don't, you're bound by the releases?  How is that any

12   different from what happens in a class action?

13          MR. HACKMAN:  Your Honor, I would submit that in

14   this case -- you know, Rule 23(b)(3) requires the Court to

15   find that there are -- that questions of law or fact common

16   to class members predominate over any questions affecting

17   only individual members, and that a class action is superior

18   to other available methods for fairly and efficiently

19   adjudicating the controversy, I don't think it would be

20   accurate to say that there are common questions of law or

21   fact to class members, assuming for the sake of argument that

22   the 23(b)(3) protections are a relevant factor.

23          So you have U.S. versus dot.com customer claims,

24   our office appointed an official committee to represent all

25   unsecured creditors, but there was a second ad hoc committee

1   of non-U.S. customers, presumably because different people

2   were in different situations.  As I read Mr. Cleary's Phase 2

3   report, the examiner did not find evidence that the FTX U.S.

4   customer assets were misappropriated in the same manner as

5   the FTX.com customer assets, that's --

6           THE COURT:  But they were still misappropriated --

7   not in the same manner, but they were still misappropriated.

8   Customer funds are gone.  There's no question that all the

9   customers are in the same boat.

10          MR. HACKMAN:  I believe his investigation had also

11  showed that there was little, if any, intentional comingling

12  of customer fiat currency with corporate fiat currency.

13          The shortfall at the dot.com exchange was very

14  different in size than the shortfall on the U.S. exchange.  I

15  believe it was $8 billion on the dot.com exchange versus $141

16  million on the U.S. exchange.  Beyond that, there's a

17  difference in treatment in this plan between larger customers

18  and convenience class customers.  Some customers deposited

19  cryptocurrency assets on the exchanges that are subject to

20  English trust arguments that the debtors are advancing today,

21  others deposited non-fungible tokens who are simply receiving

22  those NFTs back, and then still others such as FTT token

23  holders are getting nothing.

24          There's also the issue of different customers are

25  in different situations in terms of their preference

1   exposure.  And, as a simple bankruptcy matter, an official

2   committee is not appointed to advocate for a particular

3   creditor's interest, it's there to advocate for a class of

4   creditors, the unsecured creditors as an overall body.

5           There are -- I believe there were two million

6   customer accounts with net positive balances as of the

7   petition date in this case spread out over more than 20

8   countries, and I think it's unlikely that there would be

9   common questions of law or fact among all customers and

10  creditors.

11          THE COURT:  Okay.  Thank you, Mr. Hackman.

12          MR. HACKMAN:  Thank you, Your Honor.

13          THE COURT:  Anyone else wish to speak on the third

14  party releases?

15          Mr. Adler.

16          MR. ADLER:  Good afternoon, Your Honor, David

17  Adler on behalf of the Kavuri parties, and Mr. Malamed (ph).

18          I join completely -- we join completely in the

19  comments made by the U.S. Trustee.  I think that one of the

20  concerns here, which is reflected in the declaration of Mr.

21  Daloia, is in paragraph 8, which references that after the

22  voting deadline approximately 84 creditors contacted Kroll,

23  explaining that they received their solicitation package and

24  ballot near or after the voting deadline.  So I had a little

25  bit of a colloquy with Mr. Daloia on that.  The real concern

1  is what about all the people, the two million people who were

2  sent notice, what proportion of them did not receive anything

3  and did not bother to contact Kroll because they were unaware

4  of it because they never received it.

5          The debtors reference notice by publication.  I

6  think that is insufficient, and I also think that -- in

7  looking at the issue of whether mere silence can equal

8  acceptance, in some circumstances -- when Judge Bernstein

9  considered it in Sun Edison, he was just looking at New York

10  law, I believe, but we have customers all over the world, I

11  don't know what the laws of South Korea are on silence and

12  whether it's acceptance or not.  It's --

13          THE COURT:  Well, the plan is governed by U.S.

14  law, it's governed by U.S. Bankruptcy law.

15          MR. ADLER:  Well, I suppose that's an argument,

16  but if the customer never transacted in the United States,

17  there could be some more related issues than just looking at

18  Delaware law or U.S. law on whether silence is equivalent to

19  an acceptance.  Even within U.S. law, there's obviously a

20  multitude of different case law on that issue.

21          So the problem, I think, is the fact that the

22  customers are scattered across the world, some of them most

23  likely never received any solicitation materials whatsoever

24  and have not come forward, and they're being -- they're

25  releasing claims against third parties as part of this plan.

1  The debtor is not getting a discharge, but these other

2  parties are getting the equivalent of a discharge, a release.

3  So I think that's another issue that the Court should be

4  mindful of --

5        THE COURT:  Well, I've always taken the position

6  when considering third party releases that if a creditor or,

7  in this case, a customer of a creditor comes forward later

8  and says, hey, I never got notice, I didn't get the notice, I

9  didn't see the publications, I had no idea this was going on,

10  I'll listen to them and I'll consider that, and maybe give

11  them an opt-out on the release and say you can go ahead and

12  do whatever you want to do.

13        I can say, based on my experience and in

14  discussions with some of the other judges about their

15  experience, we've never seen someone come back later and say

16  I didn't get notice, I didn't get an opportunity to opt out,

17  I want that opportunity, but it's available.  If someone can

18  come forward and say I didn't get it, I'll listen to what

19  they have to say and make a decision on a case-by-case basis.

20        MR. ADLER:  I think that is appropriate, Your

21  Honor.

22        And I just wanted to address the class action

23  question that you posed to the U.S. Trustee.  From my limited

24  perspective, in those cases, generally, the creditor base is

25  not known.  So the only method you can do is notice by

1  publication --

2          THE COURT:  Sometimes they're known.

3          MR. ADLER:  Sometimes they're known, but a lot of

4  times --

5          THE COURT:  I just got one not too long ago where

6  someone sent me a notice and said, hey, you bought such-and-

7  such, saying you're a member of this class.

8          MR. ADLER:  I get them from Toyota all the time

9  and I don't even remember owning a Toyota.  But be that as it

10 may, Your Honor, you know, I think it's a mechanism that

11 exists in those cases where there's a lot of unknown

12 creditors, certainly not the entire universe is known, and I

13 think in those cases there's much more disclosure about the

14 noticing process.

15          Here, what concerns us is the fact that there's an

16 affidavit of solicitation that's on file, it doesn't list --

17 I mean, everything is sealed.  So, you know, it -- and I

18 think, Your Honor, in the perfect world, the releases would

19 be confined to those who turned in the ballots and checked

20 off the box, but I understand Your Honor may have different

21 views on it, but I think, given the multitude of creditors

22 and countries in this proceeding that it's difficult, you

23 know, to know who actually received the notice versus who

24 didn't.  All we know of are the people who received notice,

25 but received it late.

1             So do you have any questions for me?

2             THE COURT:  No, that's it.  Thank you.

3             MR. ADLER:  Thank you.

4             THE COURT:  Does anyone else wish to be heard?

5             MR. ENTWISTLE:  Your Honor, I'll be very brief,

6    Andrew Entwistle with Entwistle & Cappucci on behalf of the

7    adversary class plaintiffs.

8             Just to respond to your questions regarding what

9    happens in class actions, you have it exactly right.  There's

10   notice that goes out, it's very similar to the type of notice

11   here, and in most of those cases, as you have acknowledged

12   yourself has received, there are two kinds of notice.

13   There's notice by publication, which we had here, there's

14   also notice that goes out directly to identifiable class

15   members, and also to transfer agents or other folks that

16   manage funds for groups.

17             Now, in this case, obviously, we have notice that

18   went out in a number of different contexts, not only for the

19   plan, but also with regard to the customer notice, which was

20   the customer priority settlement, which we discussed at

21   length.  There were a large number of publications and

22   notices, releases, press releases by both the debtors; we

23   published some ourselves on behalf of class members.  The ad

24   hoc committee and the UCC all put notices out with regard to

25   the settlements just to advise customers about what was

1  happening.  They also got notices, at least from us, to the

2  extent we could publish information, with regard to the opt-

3  out process, to the extent they wanted to opt out.  But the

4  notice that happened here is very much like what would have

5  happened if we had had a 7023-type class before Your Honor

6  with regard to these settlements.  It's exactly what was

7  contemplated, I think, in terms of the notice to the plan.

8           And of course notice is never perfect, right?  And

9  to the extent there were some questions earlier with regard

10  to the notice process, there are always a couple of folks

11  that -- you know, you can't say that everybody got it, all

12  you can do is say who you sent it to, I think that's what

13  happened here.  I think the record is really well developed

14  in terms of the solicitation that went out, particularly to

15  the millions of customers that were on record, which were

16  easily identifiable here, and to, obviously, subsequent

17  holders of those funds and the like, as well as the other

18  creditors.

19           So I really just wanted to stand up and respond to

20  that part of Your Honor's question earlier today to the

21  extent that it was helpful.

22           THE COURT:  All right, thank you, appreciate it.

23           MR. ENTWISTLE:  Thank you, Your Honor.

24           THE COURT:  I thought somebody raised their hand

25  briefly online, was there someone who wanted to be heard?

1  Was there -- Mr. Arush Sehgal.  Go ahead, Mr. Sehgal.

2          MR. SEHGAL:  Hi, I'm Arush Sehgal, one of the

3  creditors.  I do also just agree with what was said by the

4  gentleman earlier that I didn't have a chance to -- well, my

5  voting packet arrived after the voting deadline had passed,

6  and I did intend to opt out of releases and I didn't -- I

7  didn't understand how to do it because I wasn't confident on

8  what to vote or how to vote.  I just wanted to add that.  If

9  given the opportunity to opt out, I would.

10          THE COURT:  Okay, anything else?  Thank you.

11          Mr. Glueckstein.

12          MR. GLUECKSTEIN:  Thank you, Your Honor, just a

13  few points in rebuttal.

14          Just as a starting point, Your Honor, Mr. Hackman,

15  you know, suggested this idea that there's some per se rule

16  that was created by Purdue whereby it is just now the law of

17  the land that opt-out releases cannot be approved, and we

18  disagreed with that premise.  As I noted earlier and as we

19  discussed at length in our papers, Purdue actually says the

20  complete opposite.

21          And so, once you get past that idea that there

22  isn't some per se unlawful rule, Your Honor has the ability

23  to form your own view -- it doesn't have to be one-size-fits-

24  all -- on the facts and circumstances of the case as to

25  whether the opt-out mechanisms that were proposed are

1  appropriate here under the circumstances.  And in doing so we

2  can't lose sight of the fact of what these third party

3  releases are.

4          There was a whole bunch of discussion about types

5  of claims and are customers similarly situated.  Your Honor,

6  we're not releasing any prepetition claims or any claims for

7  prepetition conduct.  So the question, honestly, of what

8  happened on the FTX exchange versus the dot.com exchange,

9  whether there was different misconduct by certain executives

10 or insiders versus others, none of those claims are being

11 released, they're outside the scope of the release.  The only

12 thing that is within the scope of the release in this case,

13 right, has to do with the business of the case and plan

14 formation.  It's a limited scope of parties.  All of those

15 parties are somewhere in this courtroom or on the Zoom.  Your

16 Honor has jurisdiction over those claims.

17         What we're talking about here are claims that

18 third parties would have to bring against parties who

19 participated in the plan formation process and the

20 proceedings before Your Honor.  If those claims were going to

21 be asserted, Your Honor would have jurisdiction over those

22 claims.  And so what these releases are doing is ensuring

23 that those claims, to the extent somebody did not opt out,

24 are being released and they're being -- there's estoppel

25 around the case.  It does start to sound a lot like the

1  grounds for exculpation, but the parties who are the

2  beneficiaries incrementally of these releases are not

3  eligible for exculpation.  The U.S. Trustee's Office made

4  that point clear and we worked through that with them, and

5  they are not in the exculpation provision that's in the plan

6  that we're asking Your Honor to approve.

7         So this is not a situation where it might be where

8  we had a general release of all prepetition officers and

9  directors, where some of the questions -- some of the

10  responses to Your Honor's question about class action might

11  become relevant.  I would submit, though, the real question

12  on class action is the noticing, and Your Honor has that a

13  hundred percent correct.  And as I said in my remarks

14  earlier, the issue here is there could not hardly be a

15  suggestion that more notice could be provided of these

16  releases to more people.  The estate has spent a fortune

17  noticing this plan, filing a publication notice, all within a

18  rubric that was approved by Your Honor in connection with our

19  solicitation procedures.

20         So what we have here are the same -- effectively

21  the same post-petition claims that all the creditors would

22  have that we're saying, if you didn't check the box and opt

23  out of the release that you had an opportunity to do, you're

24  going to be bound by those releases.  And I think certainly

25  the Rule 23 class action noticing, I would submit, is

1  available more broadly because there certainly is no per se

2  rule.

3        But for Your Honor to approve the releases in this

4  case, you can look at it in the context of what is actually

5  being released, who's being released, and for what.  And for

6  all of those claims, to the extent any creditor actually has

7  a direct claim against any of these parties for the business

8  of the case, Your Honor has jurisdiction over those claims,

9  and we submit that the release and the opportunity to opt out

10  is appropriate.

11        THE COURT:  Let me ask you a quick question, Mr.

12  Glueckstein.  Did anybody opt out that submitted those?

13        MR. GLUECKSTEIN:  Yes.

14        THE COURT:  How many did the debtor receive?  If

15  you have a general number, you don't have to give me an exact

16  number, if you know.

17        MR. GLUECKSTEIN:  Let me see if I can get one -- I

18  will get one.  There are certainly opt-outs.

19        And while we're getting that number, Your Honor, I

20  would just say on this point of the solicitation or errors in

21  the solicitation, to the extent that postal service delivery

22  caused the issues that are referenced in the declaration that

23  was admitted into evidence today, as noted in there, we've

24  corrected those issues, we've given people an opportunity.

25        Mr. Adler's clients submitted their ballots, they

1  I believe opted out of the releases.  So he doesn't even have

2  standing to be advocating on this point generally, but from

3  -- where irregularities were identified with respect to this

4  issue, we've addressed those issues, and that's in the record

5  and evidence before the Court.

6        THE COURT:  Were you aware of Sehgal's argument

7  that he did not receive notice and wanted to opt out, but

8  didn't have the opportunity?

9        MR. GLUECKSTEIN:  I personally am not aware of the

10  circumstances of his situation, so that's something we could

11  look into.

12        THE COURT:  Okay.

13        MR. GLUECKSTEIN:  So we think, ballpark, we have

14  somewhere in the neighborhood of between three and 4,000

15  creditors who opted out of the releases, who returned an opt-

16  out election.

17        THE COURT:  Okay.  Thank you.

18        All right.  The Supreme Court decision in Purdue

19  Pharma determined that nonconsensual third parties releases

20  are not permissible in the context of a bankruptcy plan of

21  reorganization.  The Court specifically left open the

22  question of what constitutes consent and declined to address

23  that issue.  So the lower courts now are going to try to have

24  to figure that out.

25        In my view, the Supreme Court was not saying that

1    third party consensual releases through an opt-out process

2    are per se improper.  I think opt-out releases remain a valid

3    way for a debtor to be able to obtain releases through the

4    plan process and do so on a consensual basis because the

5    parties are given the opportunity to opt out; if they don't

6    opt out or if they don't return a ballot at all, then they're

7    presumed to have opted out.  And I don't have any issues with

8    that process per se.  As Mr. Glueckstein pointed out, it is

9    done on a case-by-case basis.

10          And, in this case, I'm satisfied that the opt-out

11   process was appropriate.  The releases are very narrowly

12   tailored, they do not include opt-outs for conduct that

13   occurred prepetition, it's limited in the scope of the number

14   of people who are subject to the releases, and parties were

15   given individual notice through the notification process,

16   over a million, as Mr. Adler pointed out, received a ballot

17   and an opportunity to opt out, and there was also an

18   extensive publication notice.  And both of those ways of

19   giving notice to parties are acceptable in the context of

20   class action litigation, and I don't see why it would be any

21   different here under the facts and circumstances of this

22   case.  I think the creditors and the customers are in the

23   same position as every other customer and claimant.  They are

24   getting -- they're going to get paid; some are going to get

25   paid, according to the plan, they'll get paid in full, some

1  will not get paid in full, but they all were given the same

2  opportunity to opt out.

3        So I'm satisfied at this point that those opt-out

4  releases are appropriate and I will overrule the objection,

5  and, again, based on the facts and circumstances of this

6  case.

7        Now, Mr. Sehgal, I hope I'm pronouncing your name

8  correctly, you should --

9        MR. SEHGAL:  Thank you, yes.

10       THE COURT:  -- you should reach out to debtors'

11 counsel and see if you can work out something with them on

12 whether you got notice, if you didn't get notice in a timely

13 fashion in order for you to opt out, and whether they're

14 willing to agree to allow you to opt out at this point.  If

15 they are not, then you are going to be in a position where

16 you will have to file an action against whomever it is you

17 think you have a cause of action against -- and, again, this

18 is only -- this doesn't deal with prepetition conduct, so

19 it's only things that happened after the bankruptcy was filed

20 -- you would have to file a cause of action against them, an

21 adversary proceeding in the Bankruptcy Court, and raise -- or

22 defend against an argument by the party that you sue that you

23 opted out of those releases, and I'll deal with that at that

24 time.  But at this point I'm not going to say that you're

25 entitled to opt out at this time because I just don't know

1   the facts and circumstances of what you received and when you

2   received it and how you received it, and whether you had a

3   proper opportunity to opt out.  Okay?

4          MR. SEHGAL:  Yes, thank you.

5          THE COURT:  Do the debtors have contact

6   information for Mr. Sehgal?

7          MR. GLUECKSTEIN:  Yes, we do, Your Honor.

8          THE COURT:  Okay.  So they'll be reaching out to

9   you, Mr. Sehgal, to address the issue.  Okay?

10         How much -- how many more objections do we have?

11  Do we need to take a lunch break now and --

12         MR. GLUECKSTEIN:  Yeah, happy to, Your Honor.

13  Just so to preview, we have the remainder of Mr. Adler's

14  objection for his clients, I was going to address that next,

15  so we can either do that before or after the lunch break, and

16  then we have three objections after that.

17         THE COURT:  Okay.  So let's go ahead and take our

18  break now.  How much time do you want to have for lunch?

19         MR. GLUECKSTEIN:  I think we can be -- we can be

20  quite short, Your Honor, whatever you think.

21         THE COURT:  We can do -- come back at a quarter

22  'til 2:00?

23         MR. GLUECKSTEIN:  Sure, that's more than

24  sufficient.

25         THE COURT:  Okay.  We'll do a 45-minute recess for

1  lunch and we'll come back at quarter 'til 2:00.  Thank you.

2            MR. GLUECKSTEIN:  Thank you, Your Honor.

3        (Recess taken at 12:56 p.m.)

4        (Proceedings resume at 1:46 p.m.)

5            THE COURT:  Good afternoon, everyone.  Thank you.

6  Please be seated.  Mr. Glueckstein?

7            MR. GLUECKSTEIN:  Good afternoon.  Brian

8  Gluckstein for the Debtors.  I think that brings us where we

9  left off before the lunch break.  I'm going to address what I

10 think are the remaining pieces of the objection filed by Mr.

11 Adler's clients, the Kavuri group, and it was joined or filed

12 by one of his other clients, Mr. Melamed.

13           The first issue, Your Honor, is this argument that

14 the debtor's plan somehow must provide for in-kind

15 distributions of digital assets.  There is no legal basis in

16 the Bankruptcy Code or anywhere else to require the debtors

17 to provide in their plan for in-kind distributions on account

18 of claims based on digital assets.

19           As established by Mr. Mosley and throughout the

20 record of these Chapter 11 cases, the Debtors could never

21 have made in-kind distributions because there was a massive

22 shortfall of digital assets held on the petition date

23 compared to customer liabilities.

24           The Debtors have also spent the better part of the

25 last two years monetizing and maximizing the value of their

1   assets in accordance with orders issued by this Court,

2   including the coin monetization order.  The Debtors have

3   taken great steps to avoid the volatile market fluctuations

4   and other risks in speculating in digital assets during the

5   pendency of these Chapter 11 cases.

6          Mr. Coverick testified this morning, including on

7   cross examination, about the prohibitive factors to in-kind

8   distributions that the Debtors, or anybody else for that

9   matter, would face.

10         The Debtor's focus remains on getting

11  distributions made to creditors as soon as practicable, which

12  any creditor, of course, can then use to invest in digital

13  assets as they so choose.

14         There's some suggestion to some tax ramifications,

15  or somehow some tax ramifications of individual creditors as

16  a basis to impose this requirement.  Of course, there's no

17  evidence before the Court or tax opinion before the Court as

18  to any individual creditor's tax liabilities as a result of

19  receiving distributions from this estate.

20         And of course, those questions would vary, and the

21  answers to those questions would vary by jurisdiction, with

22  distributions being made to creditors around the world.

23         Your Honor, furthermore, there's no basis for the

24  Kavuri parties to suggest that somehow a Chapter 7 trustee

25  might do so in the context of this argument that we somehow

1   don't pass the best interest tests on this basis.  Chapter 7

2   trustee, of course, would face the same hurdles, and many

3   more because the conversion would negatively impact all

4   creditors who would lose the benefits of the plan and related

5   settlements.

6          The suggestion is also inconsistent with the

7   mandate of a Chapter 7 trustee whose role is to liquidate and

8   distribute assets, not take risky actions purchasing digital

9   assets for the benefit of a few.

10          The second issue that was raised that has not been

11  addressed has to do with the disclosures around the

12  liquidating trust.  Kavuri parties assert that the debtors do

13  not satisfy the best interest test of Section 1129(a)(7)

14  because of inadequate disclosure regarding the liquidating

15  trust.  The Kavuri parties, we submit, are wrong.

16          The debtors have disclosed a wind-down budget and

17  was testified across examination this morning by Mr.

18  Coverick, was addressed in his declaration, and submitted

19  their liquidation analysis with the disclosure statement that

20  was approved by this Court.

21          There's no credible argument that the compensation

22  of the plan administrator and the wind-down trust board,

23  which are projected and contained in the wind-down budget

24  that is disclosed and has been available since the filing of

25  a planned supplement, well in advance of voting deadline

1  would cost more than Chapter 7 liquidation at this point.

2          Beyond that, Your Honor, the debtor's disclosure

3  satisfies the requirements of Section 1129(a)(5) because they

4  include the identity and affiliations of the post-emergent

5  board and of the plan administrator.

6          There is, we submit, and we brief this in our

7  papers, there's no compensation disclosure requirement

8  because the requirement of Section 1129 applies to directors

9  and officers of the reorganized debtor, and here there are

10  none.  We are establishing a trust, but beyond that, to the

11  extent 1129(a)(5)(b) does apply, the debtors have made

12  sufficient disclosure of the identities and affiliations of

13  the wind-down trust directors and officers and the nature of

14  their compensation, which is what's required by statute.

15          The wind-down budget also estimates all costs of

16  the wind-down trust, including its cost of governance, as Mr.

17  Coverick explained this morning on cross examination.

18          Further details on the compensation of the plan

19  administrator are not yet available and not yet knowable

20  because the trust, of course, does not yet exist and the

21  board that will ultimately make that determination is not yet

22  seated.

23          I think with those points, we covered the releases

24  issue.  I'll reserve any comment if Mr. Adler raises other

25  points that I can address.

1              THE COURT:  Okay, thank you.

2              Mr. Adler.

3              MR. ADLER:  Good afternoon, Your Honor.  David

4    Adler from McCarter & English, on behalf of the Kavuri

5    plaintiffs and Seth Melamed.

6              I'll address the crypto in-kind argument first.

7    As I asked on cross examination today, every crypto case that

8    I've seen has a distribution in-kind.  And I understand, and

9    I'm not faulting the debtor on the fact that they monetize

10   their assets, the crypto, at the beginning of the case.

11   That's not the argument.

12             The argument is that when the money is going out,

13   why can't it pass through an exchange at that point and be

14   converted in-kind so that the customer receives back the same

15   type of crypto that they originally had put in.  And it does,

16   I believe, make a difference in some jurisdictions.

17             I'll say it, I'm not a tax lawyer, but from what I

18   understand, if you had five Bitcoin on the platform and you

19   get back two Bitcoin, that's a distribution in-kind that is

20   not a taxable event.  You get back stablecoin or cash, that's

21   a taxable event, as far as my limited knowledge goes.

22             So the point that I was trying to make today was

23   to see what efforts the debtors have done to move that

24   process along.  Now, it's been done in Celsius, it's been

25   done in BlockFi, and it seems to me that it could be an

1   optional process where the customer makes an election as to

2   whether they want to receive it through an exchange or not.

3   A customer can actually pay for it.

4           But, you know, we're talking about here today, and

5   it's a good thought, that the creditors are going to receive

6   140, 150 cents on the dollar.  What I think a lot of the

7   crypto customers look at is they had X Bitcoin on the

8   platform.

9           Let's say they had ten Bitcoin on the platform.

10  That ten Bitcoin today would be worth $650,000.  Given the

11  Bankruptcy Code and Your Honor's digital estimation ruling,

12  that is capped at $16,000.  So they have a claim for

13  $160,000, and if they get 140 percent on that, let's say

14  that's $200,000.  Now, they're getting that in cash.  If

15  their basis is low, they're going to have a taxable event

16  associated with that.

17          I just think it's the right thing to do to

18  minimize pain to the customers, especially given the fact

19  that when FTX filed, that was the low point in the crypto

20  market, and it essentially has gone up since November 10,

21  2022.

22          And really what I wanted to see was where the

23  process was.  And it looked -- from what I heard, there

24  wasn't much of a process.  And I think really it is something

25  that should be done in fairness to the people who had crypto;

1    that was their property.

2           They may not be able to get Your Honor to compel

3    the return of it or the proceeds from it, but it was their

4    property that was taken, and in exchange, they're getting

5    back not their property, and maybe having a taxable event

6    associated with it.  So that's my response on that point.

7           With respect to disclosure of compensation, I

8    heard the number of $34 million as a wind-down budget.  I

9    don't know.  I've been in cases where the compensation is set

10   under the plan supplement for the board, for the plan

11   administrator.

12          I don't know why it can't be set now, but if Your

13   Honor is inclined not to have them disclose it, what the

14   members are getting paid, what I would ask for is that in the

15   operating reports that get filed post confirmation, that

16   there just be breakdown of the individual line items for each

17   of the different committees.

18          And I do want to say that there are, as I count

19   them, four different entities that are getting paid post

20   confirmation.  There's the advisory committee, there's the

21   plan administrator, there's the FTX recovery trustee board of

22   directors.  There's the Delaware litigation trustee.  So

23   there are a lot of different entities that will be getting

24   paid, and each of them will have their own set of

25   professionals.

1              And I just think that, to me, the $34 million

2    number sounded a little low, but I would like to see that

3    those numbers be disclosed going forward, you know, after

4    confirmation, because that was the first time I heard that

5    number.

6              THE COURT:  Well, let's go back to the first

7    issue.  How, I mean, any case where you have a debtor holding

8    assets that are subject to fluctuation, you're going to --

9    people are going to say, well, I want my money back as a -- I

10   want it back in cash as the date of the petition date,

11   because the value of that property is now less than was

12   before.

13             And others are going to say, well, I want the

14   value of the property as it is today.  So I want the property

15   back.  But what in the code, can you answer Mr. Glueckstein's

16   question?  What in the code says I have to make the debtors

17   do that?

18             MR. ADLER:  I think that it is consistent with

19   good faith to try and give the customers back that which they

20   originally put in.

21             THE COURT:  But how?  I mean, I don't have any --

22   you didn't put on any evidence to show me how that would

23   work.  I mean, how would -- and I have testimony from Mr.

24   Mosley that it would not be able to work because of the vast

25   amount of -- over a million customers who submitted claims,

1 all different kinds of tokens.  Some have gone up, some have

2 gone down.

3           You mentioned today the value of Bitcoin.  Ten

4 Bitcoin would be $66,000 today.  A month and a half ago it

5 would have been $77,000.  It's gone down.  If the debtors

6 start buying up billions of dollars' worth of coin, the price

7 is going to go up and then they can't buy as much, and people

8 aren't going to get as much in distribution.  And I have no

9 answer to that.

10           MR. ADLER:  I'm not asking for the debtors to buy

11 it, okay?  I don't want the debtors to buy it.  I just want

12 the debtors to be able to distribute on a customer's behalf

13 to an exchange where that exchange can convert it into the

14 crypto to be placed into the customer's account.

15           All I want is an exchange after the debtor's

16 distributed.  Debtors are not going to buy crypto.  They

17 distribute it to Coinbase.  Let's use Binance, distributed to

18 Binance.  And what shows up in the customer's account is the

19 in-kind of what they originally put on.

20           THE COURT:  Explain to me how.  I don't understand

21 how that would work.  How would that possibly work?

22           MR. ADLER:  It worked in Celsius.  Coinbase was

23 retained.  They distributed Bitcoin, they distributed E.

24 Those people who got Stablecoins, they were allowed to

25 convert, I believe, at the time it got to Coinbase.  I mean,

1  there's -- and I believe the same process is going on right

2  now in BlockFi, where customers can sign up and basically let

3  Coinbase be an agent, and the distribution passes through

4  them such that what they receive is ultimately what they put

5  in.

6         THE COURT:  But every case is different, and I

7  don't know how much coin, what types of coin were in the

8  BlockFi and the other cases.  Every case is different.  I

9  know in this case, there were over 1,300 different types of

10 coin.

11         MR. ADLER:  You are correct, Your Honor.  I think

12 that it's -- I'm going to say this.  I think it is the

13 equitable thing to do to try and minimize tax events to those

14 people who have been injured.

15         THE COURT:  All right.  Okay.  Thank you.

16         Mr. Glueckstein?  Oh, nope.  Nobody else?

17         MR. GLUECKSTEIN:  Thank you, Your Honor.  Just a

18 couple of points.  The unrefuted testimony, there's been --

19 the only evidence that's been presented to the Court in

20 connection with this hearing on this issue was the testimony

21 from Mr. Coverick and then also some testimony from Mr.

22 Mosley on cross examination on what the debtors were doing

23 and why they didn't do it with respect to this issue of

24 allowing just all tokens to be the subject of in-kind

25 distributions.

1          Mr. Adler's arguments, respectfully, are wrong

2   with respect to what has happened in the other crypto cases,

3   which are not relevant, as Your Honor notes, and certainly

4   the suggestion that the reason why we should do this is to

5   somehow minimize tax liability.  What we just heard was now

6   Mr. Adler saying, we're not looking for the debtors to

7   actually acquire the crypto and make in-kind distributions.

8   We can just facilitate in-kind distributions through a

9   distribution agent.

10          I'm not a tax lawyer either, but there is no way

11  in any country in the world that that is going to satisfy

12  some sort of tax requirement that's going to give some tax

13  benefit to the customer.  The purchaser of the crypto at that

14  point is going to be the third-party distribution agent.

15          But regardless, there's no requirement for any of

16  this in the Bankruptcy Code.  And to the extent that what

17  these objectors are arguing is that somehow the basis for

18  their argument in which this was raised doctrinally, was a

19  best interest test objection.  And the idea that somehow

20  these debtors are not providing maximum value through this,

21  there's no evidence of that whatsoever.  None.  No evidence

22  in the record.

23          In fact, what we heard from Mr. Coverick, both in

24  his declaration and on cross-examination, is that trying to

25  do this, if the debtor were to embark on such a process,

1  would have a number of negative consequences for creditors.

2  A significant majority of the customers in this case, hold

3  fiat and stablecoin claims.

4              And so the idea that the estate, either through a

5  distribution agent or itself, is going to speculate at this

6  juncture in trying to deliver cryptocurrency, the business

7  judgment of the Debtor has been that we're not going to do

8  that.

9              And so we also heard from Mr. Mosley and Mr.

10 Coverick that the Debtors are in discussions, continuing

11 discussions, in a competitive process with the distribution

12 agents to provide distribution services to the Debtors the

13 terms of which are still to be determined.  And that one of

14 the things which is clear in the plan that the debtors are

15 exploring is the possibility of an election for stablecoin

16 distributions.

17             But none of these issues are plan issues.  And

18 just to be clear, the suggestion from Mr. Adler that he wants

19 to suggest what is best for the creditors of this estate with

20 no evidence from the podium, when he's representing a grand

21 total of four creditors, there's no basis to make these

22 proclamations.  There is absolutely no requirement that the

23 Debtors change the distribution architecture that he assigned

24 it to in the Bankruptcy Code or otherwise that would require

25 a change here.

1          So we submit on that issue.  There is absolutely

2   no reason, equitably, legally, or otherwise, to force the

3   Debtor to do something different than the process they're

4   currently on in exploring how they're going to make

5   distributions to creditors.

6          On the disclosure issue, we covered this.  The

7   wind-down budget more than satisfies our obligations under

8   the Bankruptcy Code.  What is required in the plan and the

9   plan supplement documents satisfy all of those requirements.

10  That is the standard that needs to be passed for confirmation

11  today.  There's no continuing obligation of disclosure on the

12  post-emergence Debtor.

13         Clearly, through the voting process and this

14  approval process, the other creditors have either

15  affirmatively supported this architecture, including the

16  board's and the plan administrator.  They'll be working post-

17  emergence or otherwise, if not objected to it.

18         So we would ask, Your Honor, that the remaining

19  portions of these creditor's objections be overruled.

20         THE COURT:  Thank you.  I am going to overrule

21  these objections.  There's nothing in the code that would

22  require the Debtors to provide in-kind distribution to

23  customers and creditors.  And the evidence, the only evidence

24  I have is that doing what Mr. Adler's clients are asking me

25  to do would actually be harmful to the creditors, not

1  beneficial.

2         If I had other evidence, I could consider it, but

3  I don't have any.  So the only thing I can say is the Debtors

4  have exercised their business judgment.  This looks like the

5  best way to handle distributions.  The evidence I have

6  supports that conclusion, and therefore, I will overrule the

7  objections.

8         MR. GLUECKSTEIN:  Thank you, Your Honor.  I think

9  we have three remaining.  The next objection that I will

10  address is the objection that was filed by the LayerZero

11  group.  There's two main components to this objection.

12         First, they dispute their exclusion from the

13  customer preference settlement as somehow being in violation

14  of Section 1123(a)(4) as unfair discrimination issue under

15  the plan.

16         And two, there's a challenge in their papers, at

17  least, to the ability to include language with respect to

18  502(d) in the plan.

19         With respect to the customer preference

20  settlement, Your Honor, I want to address what the customer

21  preference settlement is and what the evidence actually shows

22  with respect to the customer preference.

23         As in every case, the debtors at some point need

24  to make a decision as to how they are going to handle

25  preference claims, which are going to be preserved, which are

1  going to be pursued, which are going to be settled, and on

2  what terms.

3          As Mr. Coverick explained in his testimony, in his

4  declaration, the Debtors had extensive discussions with their

5  creditor constituencies, including the official committee and

6  the ad hoc committee, about how to handle customer preference

7  claims.  No customer, including those in the LayerZero group,

8  have some right to a settlement of preference claims.

9          The Debtors in their business judgment, on the

10  other hand, do have the right to retain any or all of the

11  preference claims and pursue them to maximize the value of

12  these estates.

13          As Mr. Coverick made clear, as a result of

14  discussions with creditors, given the projected recoveries

15  for allowed customer claims, along with other factors, the

16  debtors decided they would make settlement offers to most,

17  but not all, of those customers with preference exposure.

18          And to protect the estate, the Debtors negotiated

19  with the official committee, and the ad hoc committee, and

20  other stakeholders certain general categories of customer

21  preference defendants that the Debtors believe, again in

22  their business judgment, are appropriate to retain and not to

23  provide settlement offers at this time.

24          There's nothing unusual about that.  And there's

25  nothing about these determinations that permit the target of

1    those lawsuits, including the LayerZero group parties, to

2    come before this Court and argue, as they're doing today,

3    that the Debtors are required to provide them a settlement

4    offer.

5            On the face of that argument, it makes no sense.

6    So what did they do?  In order to manufacture standing, to do

7    so, the LayerZero parties wrongly argue that offering the

8    customer preference settlement to some but not all customers

9    violates Section 1123(a)(4) of the Bankruptcy Code.  We

10   submit that this argument is baseless.

11           As Mr. Coverick made clear in his declaration, the

12   customer preference settlement is not plan or claim treatment

13   provided on account of customer entitlement claims.  Your

14   Honor, that is the operative testimony from the Debtor's

15   perspective, and it's unrefuted, not the application of the

16   factors, which we'll get to in a minute, to LayerZero.

17           The question here for the Court is, is this plan

18   treatment or not?  And the facts and circumstances of what

19   this settlement is, where it came from, and why it appears in

20   the plan where it does are all in Mr. Coverick's testimony,

21   and those portions of his testimony are unrefuted with any

22   other evidence.

23           Your Honor, the customer preference settlement is

24   completely separate.  It was negotiated separately.  It was

25   discussed separately in the disclosure statement and in the

1   plan.  This settlement is no different than other settlements

2   in this case and others that are being implemented through

3   the plan process as permitted expressly by Section 1123(b)(3)

4   of the Bankruptcy Code, but are separate settlements from the

5   treatment of claims against the Debtors that are provided for

6   in the plan.

7          The customer preference settlement consists of the

8   Debtors making offers to certain creditors who then had the

9   opportunity to consider the offer's terms and whether or not

10  to accept them on an individual creditor basis.  To accept

11  the Debtor's offer, the customer needed to elect into the

12  settlement, agreed to the Debtor's proposed stipulated claim

13  amount, which was of critical importance to the Debtor, and

14  to vote in favor of the plan.

15         As Mr. Coverick details in his declaration, there

16  was significant administrative savings for the Debtors by

17  obtaining stipulated claims amounts and not needing to

18  reconcile those claims later.  The Debtors did utilize the

19  solicitation process to make these settlement offers.  That

20  was clear back at the time the solicitation procedures were

21  approved.

22         And we did that because we were already spending

23  significant time and money sending materials to close to one

24  million voting creditors, and it was the most efficient thing

25  to do.  Otherwise, we'd have to separately solicit offers and

 1  acceptance of the preference elements to many of those same

 2  creditors.

 3         But of course, every potential preference claim is

 4  different, has potentially different defenses to it and

 5  constitutes a claim by the Debtors against the customer that

 6  is completely unrelated to the customer's claims against the

 7  Debtors, which are the claims that are being addressed

 8  through the classes in the plan.

 9         The preference settlement offer is not on account

10  of any claims against the Debtors and outside the scope of

11  the plan's treatment of claims.  And once that's established,

12  there can be no unfair discrimination and Section 1123(a)(4)

13  is inapplicable.

14         What LayerZero is really saying is they don't

15  believe the Debtors in their business judgment had a basis to

16  exclude them from receiving an offer to settle preference

17  claims.  But that argument holds no water outside of the

18  context of 1123(a)(4).  There is simply no legal basis

19  whatsoever for LayerZero to require the Debtors to make them

20  a settlement offer.

21         The criteria set forth for excluded customer

22  preference actions were established, again, as explained in

23  Mr. Coverick's testimony, after extensive discussions with

24  the creditor's committees to protect the Debtors and to

25  ensure that offers were not made to settle certain types of

1   customer preference actions too early in the process.

2          The customer preference defendants are not the

3   counterparties or the intended beneficiaries of those

4   criteria that we've heard so much about.  As Mr. Coverick

5   testified, the Debtors evaluated the potential preference

6   claims against the criteria set forth in Section 5.5 of the

7   plan and in exercising their business judgment, decided to

8   place certain actions on the list of excluded customer

9   preferences actions.

10          With respect to each of the LayerZero defendants,

11   the basis for their inclusion on the excluded customer

12   preference action list is self-evident by the public record

13   and confirmed by Mr. Coverick.

14          The Debtor's criteria simply provide that the

15   Debtors determined in their business judgment that there is a

16   reasonable basis to conclude that, among other things, any

17   debtor has a cause of action or defense against the recipient

18   of the preference or any of its affiliates other than a

19   preference claim.  That's the relevant portion of that

20   provision that we've been discussing and that is at issue

21   with LayerZero.

22          Each of the LayerZero parties are already named as

23   defendants in an adversary proceeding in which the Debtors

24   have alleged multiple causes of action based on allegations

25   that LayerZero benefited from transactions with Alameda

1  Ventures using misappropriated FTX group funds, and then took

2  advantage of the FTX group's desperate need for cash in the

3  hours leading up to their collapse.

4          Those claims, all of them, are in their early

5  stages of being litigated and discovery is ongoing in the

6  adversary proceeding that is pending before Your Honor.

7          For purposes of making offers to settle preference

8  claims, it is perfectly reasonable for the Debtors to retain

9  all of their rights against those litigation defendants and

10 resolve any and all claims there in that adversary

11 proceeding.

12         LayerZero's attempt to use the Debtor's offer of

13 customer preference settlements to other customers to force

14 the Debtors and now request this Court to force the Debtors

15 to release claims that are the subject of pending litigation

16 and where other claims might still be asserted post discovery

17 should be rejected.

18         What we're really doing here, Your Honor, just to

19 put a fine point on it, is what they are asking this Court to

20 do is to strike Counts 5 through 8 and 10 of the pending

21 adversary proceeding complaint.  They want them stricken.

22 They don't want to defend those causes of action, and their

23 basis for doing that is that we have made offers of

24 settlement of preferences to other customers in connection

25 with plan solicitation.

1            The other issue that they've raised involves

2    Section 502(d).  LayerZero seems to take issue with Section

3    8.3.2 of the plan, which contains familiar language stating

4    that claims shall be deemed temporarily disallowed pursuant

5    to Section 502(d) of the Bankruptcy Code until a cause of

6    action asserted by the Debtors is resolved.

7            The Debtors have pled claims pursuant to Section

8    502(d) of the adversary proceeding against the LayerZero

9    parties.  The plan provision does not permanently disallow or

10   do anything to prejudge the claims in that adversary

11   proceeding.

12           Rather, the plan provision recognizes the

13   indisputable case law holding that Section 502(d) can be

14   applied on an interim basis to allow the allowance of the

15   claim where the creditor is subject to an avoidance action.

16   That's exactly where LayerZero, all three of the LayerZero

17   parties sit.

18           The language in Section 502 (d) of the code is

19   mandatory.  Courts are clear that because the focus is on the

20   creditor and not the claim, any avoidable transfer may

21   require disallowance of all of that creditor's claims until

22   resolved.  Courts regularly recognize, we cite cases in our

23   papers and as was discussed by the Court in Enron and

24   elsewhere, that where there's a pending avoidance action,

25   defendant's claims continue to be disputed claims and

1   distributions are temporarily prevented.

2          This language that's in our plan has been approved

3   by this Court and others in this district and numerous other

4   cases, including in SIO 2 and Cred, amongst others.  It has

5   the exact effect of the pending adversary proceeding on the

6   allowance of the defendant's claim.

7          So we don't see any issue, either generally on

8   this point, and certainly with respect to LayerZero parties,

9   again, they are subject to litigation.  But what we're asking

10  to do, Your Honor, is overrule the subjection.  Let's allow

11  the adversary proceeding against the LayerZero parties to

12  resolve all of these matters, which is what should happen in

13  any event during due course through the litigation.

14          THE COURT:  Okay.  Thank you.

15          MR. GLUECKSTEIN:  Thank you.

16          MR. SAZANT:  Good afternoon, Your Honor.  Jordan

17  Sazant of Proskauer Rose on behalf of the LayerZero group,

18  which is comprised of LayerZero Labs Limited, Ari Litan, and

19  Skip & Goose, LLC.

20          When these cases began nearly two years ago, the

21  ashes of FTX were still smoldering, and the Debtor's advisors

22  and new officers had to roll up their sleeves and locate

23  billions of dollars of assets all over the world in

24  cyberspace.  And these cases presented a few critical and

25  difficult questions for the Debtors and for the Court and for

1 everyone else involved.

2         Who owned the assets held by FTX, the Debtors or

3 their customer depositors?  And regardless of that answer,

4 given the $9 billion shortfall on the FTX exchanges, how to

5 fairly allocate and distribute the value among the Debtor's

6 millions of customer depositors worldwide.

7         So the Debtors come before the Court with much

8 fanfare and touting the plan as this overwhelmingly

9 successful culmination of their efforts.

10         And the Debtors propose that the plan shall

11 constitute a good-faith compromise, settlement and resolution

12 of all claims, interests and causes of action against the

13 Debtors, including, among other things, issues relating to

14 the tracing of assets of individual debtors, the effects and

15 consequences of the .com TOS and U.S. TOS, and whether

16 exchange assets are property of the Debtor's estate.  That's

17 at the confirmation brief of Paragraph 52.

18         And so through this global settlement, the plan

19 provides for the substantive consolidation of the Debtor's

20 estates, the prioritization of returning assets to customers,

21 and liquidates and distributes the assets to customers in the

22 form of cash.

23         All customers, regardless of their claim currency

24 denomination are expected to recover approximately 130

25 percent of their petition date value of the property, and a

1  complete waiver of preference actions for customers who

2  withdrew their assets prior to the petition date.

3        My clients, however, are one of the few exceptions

4  to that rule, as they find themselves among the excluded

5  minority to whom the waiver of customer preference actions

6  does not apply.  As a result, the plan cannot be confirmed

7  for three independent reasons.

8        First, the plan violates Section 1123(a)(4) by

9  providing unequal treatment through a waiver of preference

10  claims only to those favored creditors who also agreed to

11  stipulate to their claim amounts and to vote to support the

12  plan and denying those recoveries to the excluded customer

13  preference actions.

14        The Debtors argue that the customer preference

15  waiver is not plan or claim treatment, but we will show why

16  that's incorrect.

17        Second, even if the customer preference waiver

18  doesn't constitute plan or claim treatment, the plan still

19  cannot be confirmed because it's offered in bad faith as

20  applied to at least two of the three members of the LayerZero

21  group.

22        While the Debtors purport to apply exclusive and

23  objective criteria to determine which customers should be

24  excluded from the customer preference settlement, as we've

25  already seen today, and as we'll discuss further, none of

1  those criteria are applicable to Mr. Litan or to Skip &

2  Goose.

3          And then third, the plan violates applicable

4  bankruptcy law by withholding distributions from liquidated

5  claims and invalidly treating them as disputed solely on

6  account of asserted preference actions that have not yet been

7  litigated to conclusion.

8          So for these reasons, which we'll take in order,

9  we believe the plan cannot be confirmed or, at the very

10 least, can only be with an amended excluded customer

11 preference actions exhibit that removes Mr. Litan and Skip &

12 Goose.

13         So we'll start with the unequal treatment under

14 1123(a)(4).  One of the fundamental underpinnings of the

15 Bankruptcy Code is that similarly situated creditors must be

16 treated equally.  Specifically, Section 1123(a)(4) of the

17 Bankruptcy Code requires that a plan provide the same

18 treatment for each claim or interest of a particular class

19 absent fee subject creditor's agreement otherwise.

20         As Your Honor noted at last week's hearing, one

21 can simply look to the terms of the plan and the plan

22 supplement and see clearly the discrepancies in treatment.

23 All creditors in Class 5 receive 130 percent of the petition

24 date value of their claim, and some receive the preference

25 waiver while others do not.

1          So the only question then is whether the portion

2     of recoveries associated with the waiver of preference

3     actions constitutes treatment on account of such creditor's

4     claims.  The Debtors respond that it does not because it's

5     described and contained in a separate section of the plan,

6     and they argue that the settlement offer is not on account of

7     creditor's claims against the Debtors, but rather a

8     settlement of a Debtor's claim against the subject creditor.

9          But that's only part of the story when it comes to

10    the customer preference settlement.  They also argue that the

11    only testimony before the Court is Mr. Coverick's declaration

12    that this is not planned treatment.  But that is not an

13    evidentiary question.  That is a legal question for the Court

14    and a conclusion for you to make.

15         So sure, the settlement offer proposes to resolve

16    the Debtor's potential preferences and preference actions

17    against creditors by waiving such claims, but the waiver of

18    claims isn't the settlement offer.  Otherwise, the Debtors

19    could simply have applied the objective criteria, waived

20    those claims, and moved on.

21         But instead, the settlement has two requirements.

22    You must agree to settle with the Debtors as to the

23    calculation of your claim, settling the claim against the

24    estate, and you must agree to vote that claim in favor of the

25    plan.  And worse yet, by tying the customer preference waiver

1  offer to a vote in favor of the plan, the Debtors ask this

2  Court to permit the -- to bind the excluded minority to

3  lesser treatment.

4          It's difficult to conceive of anything more

5  fundamentally tied to a creditor's claim than a settlement

6  that resolves its amount and its vote.  The Debtors focus

7  solely on the settlement's resolution of the Debtor's causes

8  of action while ignoring entirely the creditor's agreements

9  under the settlement.

10          And while courts have approved plenty of plans

11  which have provided the payment of fees or other

12  consideration to certain creditors in the class in exchange

13  for backstop commitments, to exit financing, or assisting in

14  structuring transactions or other similar tangential reasons,

15  that's not the case here at all.  None of these customers are

16  providing any separate value.

17          Instead, this case is similar to the Adelphia

18  bankruptcy cases where the Bankruptcy Court in the Southern

19  District of New York originally confirmed a plan providing

20  valuable releases and exculpations to creditors who voted in

21  favor of that plan and withheld such benefits from creditors

22  who opposed.

23          On appeal, the District Court for the Southern

24  District of New York stated that there is no doubt here that

25  in return for approving the plan, some claimants will receive

1  a more valuable settlement than others, i.e., additional

2  benefits on top of their pro rata distributions.

3         While such an outcome may be permissible where the

4  added benefit is given for truly collateral reasons, i.e.,

5  independent from their status as claimants, here, the benefit

6  is given in exchange for the claimants' affirmative vote for

7  the plan, an added benefit that is tied directly to the plan

8  itself and given to some claimants in a class but not all.

9         Such an inducement may well have led some

10 claimants to approve the plan when they otherwise may have

11 rejected it, and as a result, creditors opposing the plan may

12 have been prejudiced by a quid pro quo exchange of plan

13 approval for valuable releases and exculpation.

14         Section 1123(a)(4) guarantees that each class

15 member will be treated equally regardless of how it votes on

16 a plan where the receipt of valuable benefits in a plan is

17 conditioned on a vote to accept that plan, there is a very

18 real possibility of dissuading or silencing opposition to the

19 plan.

20         The Adelphia court granted a stay pending appeal

21 of that plan on grounds that there was substantial likelihood

22 that it would be overturned as a result.  However, that plan

23 was ultimately consummated because the appealing creditors

24 could not post the bond that was ordered.  And that's at 361

25 BR 337, and the quote is from Pages 363 to 64.

1          So here the benefit of the customer preference

2     waiver is granted not only on account of a creditor's vote in

3     favor of the plan, but also on account of stipulating to the

4     amount of the claim that's calculated by the Debtors and sent

5     out in the ballot.  Those are not the same tangential reasons

6     or added benefits.  This is part of the resolution of

7     customer claims and can't be offered prejudicially to the

8     majority of creditors at the exclusion of the disfavored

9     creditors.

10          Lastly, I just wanted one point from the Debtor's

11    reply.  The Debtor's reply on this point cites to the Energy

12    Future Holdings case for the proposition that the customer

13    preference waiver is outside the scope of the plan's

14    treatment of claims, and to argue that the provisions of

15    Section 1123(a)(4) do not apply to the Court's evaluation of

16    the customer preference waiver.

17          But the EFH case is clearly distinguishable.  The

18    Debtors quote EFH to state that under its plain language,

19    Section 1123(a)(4) applies only to a plan of reorganization

20    and therefore not to pre-confirmation settlements.  But this

21    is not a pre-planned settlement.  This offer's embedded

22    within the plan, was solicited through the plan ballots, and

23    requires a vote in favor of the plan.

24          It's not a 9019 settlement in the early stages of

25    the case, and notably the proposed confirmation order, which

1   I've checked the one file this morning, contains the same

2   language, it contains proposed findings by the Court that the

3   terms of the customer preference settlement are independently

4   fair, equitable, and reasonable and approves such terms

5   pursuant to Section 1123 of the Bankruptcy Code.

6           So if the Court agrees with our argument that the

7   customer preference waiver constitutes claim treatment under

8   the strictures of the Bankruptcy Code because of its

9   inextricable link to creditor's claim amounts and votes, then

10  the inquiry can end there, and the plan cannot be confirmed

11  due to the unequal treatment provided to creditors of the

12  same class.

13          But even if the Court disagrees and holds that the

14  customer preference waiver does not constitute claim

15  treatment despite the other terms of the settlement, then the

16  plan still cannot be confirmed until Ari Litan and Skip &

17  Goose are removed from the excluded customer preference

18  actions exhibit because, as applied to them, this plan is

19  internally inconsistent and offered in bad faith.

20          The Debtors represent that the customer preference

21  waiver is offered to all creditors who fall within the

22  objective set of criteria that it agreed upon with the UCC

23  and the ad hoc group.  And there are a specific set of five

24  criteria in Section 5.5 of the plan that apply to potentially

25  exclude a creditor from the benefits of the customer

1    preference settlement waiver.

2           And as we've just heard from the Debtor's witness,

3    they cannot point to any evidence that any of the criteria

4    have been met as to Mr. Litan and Skip & Goose.  The only

5    potential evidence cited by the Debtors and their declarant

6    is the adversary complaint, which, as you noted earlier, with

7    respect to the Celsius proof of claim, the adversary

8    complaint itself contains no evidence and is only mere

9    allegations.

10          And even if these allegations are credited,

11   they're insufficient to satisfy the objective criteria that

12   the Debtors state that they're appealing to.  These criteria

13   are, first, that the recipient was an insider of the Debtor.

14   Mr. Litan and Skip & Goose were not insiders of the Debtors

15   and there are no such allegations in the complaint.

16          The recipient was a current or former employee of

17   the Debtor.  Mr. Litan and Skip & Goose were not employees of

18   the Debtors and there are no such allegations in the

19   complaint.

20          The recipient may have had actual or constructive

21   knowledge of the commingling and misuse of customer deposits.

22   Mr. Litan and Skip & Goose had no knowledge of the Debtor's

23   fraud before it became public, and the Debtors make no such

24   allegations in the complaint.

25          The recipient either changed its KYC information

1  to receive preferential withdrawals or received assistance

2  from Debtor employees, which neither of which Mr. Litan or

3  Skip & Goose did, and no allegations are contained in the

4  complaint alleging such.

5        And finally, any debtor has a cause of action

6  other than a preference claim against the creditor or an

7  affiliate.

8        And so again, the Debtors point only to the

9  complaint that was filed against the LayerZero group in the

10 adversary proceeding as justification for excluding each of

11 the LayerZero group's members.  But the Debtors have also

12 confirmed that there's no other basis for including the

13 LayerZero group.  They are focused on the complaint.  And the

14 witness has said all allegations underlying the complaint are

15 what they are relying on.

16       And a review of the complaint shows only non-

17 preference causes of action asserted against LayerZero Labs

18 Limited.  And not that the complaint even contains any

19 allegations of such, but just to confirm, neither Mr. Litan

20 nor Skip & Goose are affiliates of LayerZero Labs, so they

21 would not qualify under the cause of action against an

22 affiliate category either.  Mr. Litan was merely an employee,

23 is now a contracted consultant, and holds no voting rights in

24 LayerZero Labs, and just to confirm, neither does Skip &

25 Goose.

1          Either the objective criteria described in Section

2    5.5 of the plan have meaning and must be applied as written

3    or they do not.  But the inclusion of Mr. Litan and Skip &

4    Goose on the excluded customer preference actions exhibit is

5    explicitly contrary to the terms of the plan and can only be

6    explained as a bad-faith attempt by the Debtors to extract

7    litigation leverage over LayerZero labs in the adversary

8    proceeding.

9          And so, for this reason, even if the selective

10   application of the customer preference waiver is permissible

11   under the Bankruptcy Code, the plan cannot be confirmed

12   without an amended plan supplement that removes Mr. Litan and

13   Skip & Goose from the excluded customer preference actions

14   list.

15         Notably, Paragraph 19 of the proposed confirmation

16   order contains a proposed finding that the plan supplement,

17   which includes the excluded customer preference actions list,

18   complies with the terms of the plan, and that finding simply

19   cannot be sustained by the Court under the current record

20   because the excluded customer preference actions list and

21   Section 5.5 and the objective criteria listed therein are

22   internally inconsistent with one another.

23         And then, finally, to address our last argument on

24   the disallowance of liquidated claims, the plan also provides

25   for the withholding of distributions to creditors on account

1 of all claims that are held by a creditor against whom the

2 debtors believe they have avoidance actions.

3          The disallowance and withholding of distributions

4 on account of otherwise allowable claims pursuant to Section

5 502(d) is not permissible in this district prior to an actual

6 judicial determination of liability on the defendant's part.

7 And we've cited to cases in this district holding the same,

8 including In Re Lids Corp at 260 BR 680.

9          The Debtor's reply argues that a delay in

10 distributions on otherwise allowable claims pending

11 adjudication of the adversary proceeding is permissible and

12 provided for in the Bankruptcy Code.  But it's telling that

13 the Debtor's reply brief cites only to non-Third Circuit

14 cases.

15          So while the Debtors may be correct on the law in

16 other districts, precedent in this district is clear that

17 preventing distribution on otherwise allowed claims as a

18 result of mere allegations of avoidable transactions is

19 improper and cannot be approved.

20          So for all these reasons, we believe that the plan

21 cannot be approved as it provides for unequal treatment to

22 Class 5 creditors as a result of the customer preference

23 waiver.  But even if you disagree with that, we believe that

24 the plan cannot be approved as currently constructed with the

25 plan supplement, including Mr. Litan and Skip & Goose as

1  excluded customer preference actions because that violates

2  the terms of the plan in Section 5.5 itself.

3              Unless Your Honor has any questions?

4              THE COURT:  No questions.  Thank you, Mr. Sazant.

5              MR. SAZANT:  Thank you.

6              MR. GLUECKSTEIN:  Thank you, Your Honor.  Brian

7  Glueckstein.  A few points in rebuttal.  Counsel suggests

8  that the inclusion of these parties on the excluded

9  preference list is, in their words, litigation leverage.  I

10 can hardly think of more of a litigation leverage play than

11 asking this Court to dismiss without adjudication Counts 5,

12 6, 7, 8, and 10 of a pending adversary proceeding complaint

13 that is pending before Your Honor.

14             The issue with respect to -- the suggestion here

15 is that we point to the complaint, the existence of the

16 complaint, as a reason to exclude.  That is true.  Point to

17 the allegations in the complaint.  That is also true.

18             There's a bunch of representations made from the

19 podium by counsel about Mr. Litan, his relationship to

20 LayerZero.  Lots of these facts are disputed.  None of them

21 have been adjudicated.  They are all going to be adjudicated

22 in the context of a complex adversary proceeding with a bunch

23 of transactions amongst three different parties who were

24 named as defendants by the Debtors in that action that

25 include LayerZero Labs, Mr. Litan, and Skip & Goose.

1          THE COURT:  Mr. Litan says there's no claims

2     against Mr. Litan and Skip & Goose other than preference

3     claims in the complaint.

4          MR. GLUECKSTEIN:  There's no claims that have been

5     asserted in that complaint, as of now, against those two

6     defendants, other than the preference claim.  That is true.

7     That case is in the very early stages of discovery.  And the

8     standard for the people that are on the excluded list is not

9     what we -- the criteria that we've negotiated and have

10    included in the plan, again, our position is for the benefit

11    of the estate, in consultation with our creditors, so that

12    we're not prematurely releasing claims, is that we have a

13    reasonable basis to believe we have claims.

14          It doesn't mean that we have asserted them all.

15    It doesn't mean that every complaint has been filed.  It

16    doesn't mean that every count of every complaint necessarily

17    has been filed.  This is an evolving process.

18          All we're saying, when we take a step back, is the

19    Debtors are not prepared at this time to make a settlement

20    offer to these parties because we have a complex piece of

21    litigation that is in discovery.  Our investigations against

22    them, against other parties on that excluded preference list,

23    remain ongoing.

24          And so the suggestion that we have to look at, and

25    we can compare this standard, which again, we would submit

1  they're not the party to evaluate whether we've complied with

2  the carve-out or the criteria set forth in this.  They are a

3  defendant in the litigation.

4          The question, which is why this all dials back to,

5  is if we accept the proposition for a moment that this is not

6  plan treatment, none of this is relevant because they're not

7  entitled as a litigation defendant to get a settlement offer

8  at any particular point in time from the Debtor.  We included

9  in the plan, as Section 1123(b) allows us to do, provision

10 that incorporates a settlement that's being implemented

11 through the plan.

12         Mr. Coverick not only stated in his declaration

13 that his understanding, not as a legal matter, that, of

14 course, is for Your Honor to decide, but his understanding as

15 the business representative of the Debtors, where he

16 described his presence at meetings where these issues were

17 discussed, is that this is not a treatment on account of

18 claims.  That is the testimony.  Sections 26, 27, Paragraphs

19 26, 27, 28, 29 of Mr. Coverick's declaration addressed these

20 issues.

21         Counsel argues, well, there's no separate value

22 being provided by the creditors for the settlement of the

23 preference claims, and so therefore it must be plan

24 treatment.  That's not true.  Paragraph 28 of Mr. Coverick's

25 declaration, he addresses very clearly that the Debtors

1  benefit from not needing to reconcile the amount of each

2  customer's claim for those accepting and opting into the

3  customer preference settlement.

4         We could not force people to accept their

5  stipulated claim.  If they want to litigate their claim

6  amount, they had the right to do that.  They didn't need to

7  take the settlement.  But to the extent that creditors opted

8  into the settlement and agreed to the Debtor's stipulated

9  claim amount, that ends the process of reconciling the

10 amounts of those claims for many creditors.

11        That's a significant benefit to the Debtors.

12 That's the testimony from Mr. Coverick in Paragraph 28 of his

13 declaration.  That testimony is unrefuted.

14        What the record before Your Honor shows is that a

15 settlement was offered to creditors that was solicited in

16 connection with the plan process, but that election was

17 separate from the plan process, that settlement is described

18 separately in the plan and in the disclosure statement at the

19 time the solicitation procedures were approved by this Court.

20        And as we set forth, we are asking, we are asking

21 for approval of that settlement separately, both in

22 connection -- pursuant to 1123(b) and Section 9019 of the

23 Bankruptcy Code.  And we briefed in our papers why we believe

24 the settlement on its terms, vis a vis the Debtor and the

25 customers, is an appropriate settlement of the customer

1    claims.

2            But the business judgment of the Debtor was to

3    exclude certain -- in consultation with the creditors, to

4    exclude certain creditors at this time from the settlement.

5    And out of everybody who's on that list, out of everybody

6    who's on that list of excluded customer preference actions,

7    these parties we have actually sued.  There is pending

8    litigation before Your Honor, and we intend to pursue that

9    litigation until it's resolved.

10            And again, what they are asking Your Honor to do

11    today is say, on one hand, this is somehow plan treatment and

12    they just get it.  But of course, I don't think they really

13    believe that because what they're saying is, well, even if

14    it's not, you know, we're going to try to apply and argue

15    that because, at this time, we have only asserted preference

16    claims against two of those defendants that somehow Your

17    Honor must summarily dismiss numerous causes of action

18    pending adversary proceeding.

19            And we submit, Your Honor, that there's no basis

20    to do that.  There's no requirement to do that because what

21    we have here is a settlement of preference actions.  The

22    benefit of those creditors who were offered that settlement,

23    who accepted it that's being implemented through the plan.

24    That's all it is.  We could have waited to do this.  We could

25    have made settlement offers with respect to preference

1  actions after confirmation.  We did it here.

2         And as explained in Mr. Coverick's declaration, we

3  did it here for efficiency, to ensure that we were maximizing

4  the opportunity while we were going out to creditors to get

5  the waiver -- to get the stipulated amounts agreed, and to

6  not have to do another mailing to close to a million people

7  once we had these terms agreed to.

8         Those who are excluded doesn't mean that the

9  Debtor is never going to settle their preference claims.  All

10  it meant is that the Debtors were not ready at this stage, at

11  the process when solicitation went out over this summer of

12  2024, to make that settlement offer at this time.

13         And so we would ask that this objection be

14  overruled, and that the plan, of course, be confirmed, and

15  that any issues with respect to the LayerZero parties be

16  addressed in the adversary proceeding in the context of that

17  litigation.

18         THE COURT:  Can you address Mr. Sazant's argument

19  about 502(d), that courts in this district have said you

20  can't?

21         MR. GLUECKSTEIN:  I can, Your Honor.  So the

22  language that we have in the plan has been, as I noted in my

23  early remarks, has been included in numerous plans.  And what

24  this idea, the context in which the cases that they're citing

25  to are different.

1          The questions there was in the context of

2   permanent disallowance, permanent disallowance for the

3   avoidance claims.  That's what Judge Wallace was talking

4   about in those cases, prior to the avoidance actions being

5   fully resolved.

6          What we submit is the state of the law with

7   respect to 502(d), including in this district, and why the

8   language that appears in our plan has appeared in other

9   plans, not only by Your Honor, approved by Your Honor, but

10  other judges in this district, is that the plan language

11  serves as a temporary disallowance until the cause of action

12  is resolved.

13         Of course, if the creditor -- if the avoidance

14  action is resolved favorably to the creditor, then we no

15  longer have a basis to withhold the distribution, at least on

16  that grounds.

17         But until that claim is resolved in the underlying

18  litigation with respect to the adversary proceeding, it is

19  perfectly appropriate.  It's consistent with the cases in

20  this district, and that's why, again, this language appears

21  in many plans for the Debtors not to pay out that

22  distribution until litigation is resolved.

23         Beyond that here, again, this is a situation

24  where, this is not a case where the creditor is standing here

25  saying that the plan provision is problematic and is

1  affecting their rights.  We've asserted a Section 502(d)

2  claim in the adversary proceeding.

3          That claim is pending.  It's there.  They haven't

4  moved to dismiss that claim.  They haven't moved to dismiss

5  that claim in the adversary proceedings, saying it can't be

6  maintained.  They didn't move to dismiss it all.  They

7  answered the complaint.

8          So, again, with respect to these parties, these

9  plan issues are manufactured.  These aren't issues that

10  impact their rights in any way.  There is a litigation that

11  is pending.  That litigation needs to be resolved on its

12  merits in due course.

13          THE COURT:  Okay.  Thank you.

14          MR. GLUECKSTEIN:  Thank you, Your Honor.

15          THE COURT:  All right.  I'm going to overrule the

16  objection.  I think the Debtors are correct that this is a

17  separate settlement.  It's not related to the plan itself.

18  The fact that they solicited through the plan to obtain

19  approval of the settlement from the creditors is not

20  something that would make this settlement a part of the plan

21  itself.

22          I think 1123(d)(3) allows for individual

23  settlements, and these are individual settlements on behalf

24  of the Debtors, who are the ones who are releasing their

25  claims against creditors, not the creditor releasing claims

1 against the Debtors.  So there's no disparate treatment here

2 amongst the members of this particular class.

3          Under the 502(d) issue, I agree, again, with Mr.

4 Gluckstein that the cases that are cited by the defendants

5 here or the movants here relate to a permanent disallowance

6 of claims.  This is a temporary disallowance until resolution

7 of the other claims against these particular creditors and

8 therefore does not violate 502(d), which explicitly allows

9 for temporary disallowance.  So for those reasons, I will

10 overrule the objection.

11          MR. GLUECKSTEIN:  Thank you very much, Your Honor.

12 I think that brings us to our last two objections, which I'm

13 just going to group together for efficiency, but fully

14 recognize they're separate objections.  There are two

15 objections --

16          THE COURT:  Mr. Shore -- so finish real quick.

17          MR. GLUECKSTEIN:  The -- both of these are --

18          THE COURT:  Hold on one second, Mr. Glueckstein.

19          Mr. Sazant, did you --

20          MR. SAZANT:  I'm sorry, I didn't mean to

21 interrupt.  But I just wanted to ask a question.  We had also

22 raised the objection that Mr. Litan and Skip & Goose did not

23 meet the requirements to be excluded from the -- and you

24 didn't rule explicitly on that.

25          THE COURT:  Right.

1           MR. SAZANT:  So I just wanted to know --

2           THE COURT:  Okay.  And I will do so.  I think as

3   Mr. Glueckstein explained, it wasn't the fact that the

4   complaint itself had been filed, the settlement is that the

5   Debtor can settle claims if they believe they don't have

6   anything other than a preference action against particular

7   defendants.

8           Mr. Glueckstein has indicated that they believe

9   they do have other claims against these two defendants and,

10  in fact, these are the only parties, as Mr. Glueckstein

11  points that have actually been sued.  Others are also on the

12  list who haven't been sued yet.

13          So that's just part of the settlement process.  So

14  I'll overrule that objection, as well.

15          MR. SAZANT:  Thank you, Your Honor.

16          THE COURT:  Mr. Adler?  You're going to have come

17  forward because I'm not sure we're getting this on the

18  record.

19          MR. ADLER:  I just want it to be clear that, Your

20  Honor, we haven't deal with the exculpation objection that I

21  made, so we have to come back to that at some point.

22          MR. GLUECKSTEIN:  I don't know how we're coming

23  back.  Your Honor, we addressed Mr. Adler's client's

24  objection.  You heard argument from him on whatever points he

25  had open.  You overruled his objection.  I don't know what --

1           THE COURT:  I think that was on the release --

2    third party releases.  But is there a separate objection on

3    the exculpation clauses?

4           MR. GLUECKSTEIN:  There is, Your Honor. Well, then

5    again, if Mr. Adler wants to address it, he should have

6    addressed it with his objection.  If Your Honor is inclined

7    to hear it, then we should hear it.

8           MR. ADLER:  I was getting up responding to Mr.

9    Glueckstein, who had raised the board fees and the crypto

10   (inaudible).

11          THE COURT:  I'll give you the opportunity, Mr.

12   Adler.  Do you want to -- Mr. Glueckstein, do you want to

13   deal with these last two first?  I'll go back to Mr. Adler.

14   Do you want to just --

15          MR. GLUECKSTEIN:  Sure, that's fine.  That's fine,

16   Your Honor.  The last two objections are objections that were

17   filed pro se by individual creditors, both very late,

18   including one that was filed just last week, days before the

19   hearing.

20          So defer to Your Honor whether the Court is

21   inclined to consider these very late objections in any event.

22   But I will address them.  Individuals Samuel Gunawan and

23   Linda Favario, who both filed objections arguing that they

24   have rights in the Debtor's property akin to the customer

25   property arguments, variations of them that we have been

1  addressing and we addressed this morning and that are the

2  subject of the customer priority settlement.

3         These objections, Your Honor, merely selectively

4  quote from the FTX.com terms of service to claim some

5  ownership interest in the Debtor's assets.

6         As discussed earlier and in the record this

7  morning, the unrefuted evidentiary record established by Mr.

8  Mosley is that the Debtors immediately commingled any digital

9  assets deposited on the FTX exchanges in the ordinary course,

10 and the tracing of those assets to any customer would be

11 impossible.

12        Neither of these objections present any evidence

13 that they could trace any claimed assets to those held by the

14 Debtors.  In addition, any customer who simply purchased,

15 traded, or sold or traded digital assets on exchanges never

16 had any tokens or coins in any account or in their possession

17 of control.

18        At all times, as Mr. Mosley makes clear, the

19 exchange assets were held in addresses and accounts owned and

20 controlled by the Debtors, and were commingled with the

21 Debtors and other assets.

22        Lord Neuberger, in his declaration, which was

23 admitted into evidence this morning, provides a very detailed

24 analysis of the relevant English law provisions and the law

25 that's relevant to the terms of Service, considered the terms

1    of service in that context, and ultimately concludes that the

2    FTX.com exchange customers are unsecured creditors.  That

3    testimony is unrefuted.

4              Of course, as we've been discussing over the

5    course of the day today, the Debtors have, nonetheless,

6    agreed to the customer priority settlement, which benefits

7    customers with priorities of payments of assets being

8    distributed as set forth in the plan.  So the settlement of

9    those claims and the benefits of that settlement are being

10   seen by all creditors, all customers, on account of their

11   claims as treated under the plan.

12             So to the extent that the Court is inclined to

13   consider either objection, we submit the Court should

14   overrule both of these objections on their merits.

15             THE COURT:  Thank you.  Are any of the -- yes, I

16   see Ms. Favario is on the line.

17             MS. FAVARIO:  Yes, Your Honor.

18             THE COURT:  Can you turn on your camera please,

19   Ms. Favario?

20             MS. FAVARIO:  I'm doing it.  Give me a second.

21   Sorry.  Okay, here I am.

22             THE COURT:  Thank you.

23             MS. FAVARIO:  Thank you so much, Your Honor, for

24   giving me the chance to speak.  My apologies, because English

25   is not my native language, so my English is a little bit

1  exotic.  I will read my notes, so I will try to avoid to

2  waste your time just trying to argue my points.  I will just

3  read my notes for being quick.

4           THE COURT:  Can you first address the issue of why

5  you filed your objection late?  It was past the deadline to

6  file objections.

7           MS. FAVARIO:  Because I didn't know at all that I

8  could file an objection by myself without a lawyer.  I don't

9  have money for paying a lawyer.  And when I discovered was

10  too late.  And I tried, simple as that.  I just tried.  And I

11  hoped that Your Honor could read it and the public could read

12  it.  I'm sorry, I'm very naive.  Bankruptcy is not my thing.

13  I'm learning.  Actually, I'm learning a lot.

14           THE COURT:  Unfortunately, yeah.

15           MS. FAVARIO:  Yes.  So in any case, I'm extremely

16  grateful for you give me the chance to speak.  So I'm FTX.com

17  customers, and the money that I had on that platform was the

18  money I received as a compensation for a car crash that left

19  me disfigured.

20           When I was 19 years old, I had a 20 operation on

21  my face.  Looks kind of okay now, but still full of scars.

22  So this money was the only the money that I had left after

23  the operation were the only thing, the only way to give me a

24  whole day age with dignity.  Because I work as a life model.

25  So I earn between 15 and 20 pounds per hour.  And this gives

1  me just a chance to survive with dignity, but not to pay

2  attention.  So these money were my future.

3        When I saw them disappear under my eyes on the 11,

4  after the 11 November, I was first confused and disappointed

5  and then quite suicidal.  I'm also neurodivergent.  So if

6  things don't make sense, I just panic.  And in that moment,

7  nobody was giving me any sort of answer.  No one was giving

8  me any explanation.

9        Then at some point after about one year during the

10 winter 2023, I found this community on X that gave me some

11 answer.  Mainly I found this community that breaks down quite

12 complex English -- U.S. bankruptcy documents and make it

13 understandable for people as me that they have a bad English.

14       So that I start to feel a little bit more relieved

15 about thinking, well, actually, maybe something positive can

16 happen.  Then there has been the SBF trial and in the U.S.

17 criminal court, the U.S. Criminal court actually cited the

18 same FTX term of service.  And the U.S. government

19 successfully argued that customer assets were not the

20 property of FTX, but instead the property of the customers.

21       But now the proposed plans seem to ignore the

22 original and ambiguous of service, framing the assets as a

23 part of the debt towards the estate.  And I think to argue

24 now, after 22 months, that these assets are Debtor assets, I

25 don't know, seems inconsistent with the criminal court

1  findings and SBF conviction.

2          So the FTX.com term of service clearly and

3  unequivocally establish ownership rights and they say title

4  to your digital assets shall at all time remain with you and

5  should not transfer to FTX Trading.  None of these digital

6  assets in your account are the property or of or should or

7  may be loaned to FTX Trading.  FTX Trading does not represent

8  or trade digital assets in user accounts as belonging to FTX

9  Trading.

10          So this language seems to me quite clear.  I

11  didn't need any explanation about these sort of things even

12  before when I start panicking.  So this language seems quite

13  clear to me that the digital assets on the FTX.com belong to

14  the customer, not to the Debtors, and the term of service

15  grant to customer legal title to their assets.

16          So after 22 months, the Debtors have avoided these

17  most critical issues in the case, and it has not been

18  something that Your Honor has had the ability to rule on.

19  And that is important for the rule of law, I believe.  It is

20  important for contract and property rights.

21          This court, I think for what is my understanding,

22  has not had the chance to rule on these, the most critical

23  issues in the case and as a result, hundreds of thousands of

24  customers have been left feeling helpless.

25          And let's remember that, as you can hear from my

1  beautiful, exotic English, a lot of customers, the majority

2  actually of them, they are not from U.S., and very often they

3  don't even speak English, so they don't have money left to

4  hire a lawyer to explain clearly what's going on in their

5  language, in a language that they can understand.

6          And finally, it seems kind of incredible that the

7  Debtors now claim that commingling of assets and poor record

8  keeping can override the explicit term of service that

9  establish ownership rights.  Debtors may assert that the

10 failure to segregate assets justify treating customer assets

11 as a part of the estate, but this is a failure on their part,

12 not ours.

13         Under this plan, my contractual rights and my

14 ownership rights have been trampled.  My property rights have

15 been disregarded.  If the plan will be approved without

16 sorting out before the matter of term of service, and this

17 term of service will be ignored, the FTX bankruptcy will set,

18 I think, a dangerous practical precedent for property and

19 contractual rights.

20         Property rights is a human right.  Right to

21 property is protected by the Fifth Amendment of the U.S.

22 Constitution that says no person should be deprived of life,

23 liberty, or property without due process of law, nor should

24 private property be taken for public use without just

25 compensation.

1          And last quote is from one of your founding

2   fathers, Thomas Jefferson, that in a letter wrote, the true

3   foundation of republican government is the equal right of

4   every citizen in his person and property and in their

5   management.  Thank you so much for listening to me.

6          THE COURT:  Thank you, Ms. Favario.  And your

7   English is very good.  Thank you.

8          MS. FAVARIO:  Thank you.

9          THE COURT:  Anyone else wish to be heard?  Who's

10  online?  Any other objectors?  Okay.

11         MR. KYUSONG:  Your Honor, if allowed, may I take

12  the floor?

13         THE COURT:  Who's speaking, please?

14         MR. KYUSONG:  My name is Eun Kyusong (phonetic)

15  from Advanced Legal PC who have assisted some Korean and

16  Korean-American unsecured creditors in this case.

17         THE COURT:  Have you filed an objection to the

18  plan of reorganization?

19         MR. KYUSONG:  No.  Actually, a 75-year-old Korean-

20  American lady reached out to me last Friday.  So I have some

21  concern to share with you.  Is that okay?

22         THE COURT:  Unfortunately, yes, it is.  Because

23  we're way too late for new objections.

24         MR. KYUSONG:  I will be brief.

25         THE COURT:  No, it's not just about being brief.

1   It's about whether you have missed the deadline and waived

2   your right to it object or waived the right of whoever this

3   individual is to object.  Number one.

4          Number two, I don't know that you are an attorney.

5   You say you're representing somebody, but you can't represent

6   someone unless you are an attorney and you have to have local

7   counsel.  So there's all kinds of issues with the fact that

8   this was done late.

9          So unfortunately, I'm going to have to tell you

10  that I cannot hear you with regard to any issues that you

11  might want to raise.  Okay?

12          MR. KYUSONG:  I'm attorney in the registered New

13  York.  In New York.  And I'm speaking about my client based

14  on -- this is claim litigation.  So your jurisdiction is

15  allowing attorney in other state to speak, right?

16          THE COURT:  Well, if it's a claim litigation, you

17  can do that later.  Right now we're dealing with plan

18  objections, and I don't have a plan objection from whomever

19  it is you are saying you represent.  So at this point, I

20  cannot hear you.  You'll have to wait until you get to the

21  claims administration process.

22          MR. KYUSONG:  Okay.  All right.

23          THE COURT:  Thank you.

24          MR. KYUSONG:  Thank you, Your Honor.

25          THE COURT:  Let's see someone else raise their

1  hand.  Mr. Uptegrove?  Mr. Uptegrove, can you hear me?  I

2  can't hear you.  You can hear me, but I can't hear you.

3          MR. UPTEGROVE:  Apologies, Your Honor.  William

4  Uptegrove, on behalf of the United States Securities and

5  Exchange Commission.  I just wanted to address our

6  reservation of rights that we filed.  I can do that later,

7  but I just -- you were asking for people on Zoom that had

8  filed something, so I wanted to make sure that I raised my

9  hand before --

10          THE COURT:  Only with regard to these objections,

11  but -- and I can tell you, reservations of rights are -- all

12  rights are always, always reserved.  I don't need -- I don't

13  need parties to stand up and say I reserve my rights.

14  Otherwise, I'm going to be here for the rest of the afternoon

15  having people say we reserve our rights.

16          MR. UPTEGROVE:  Yeah.  Your Honor, we just wanted

17  to make clear for the record that we were -- what we put in

18  our reservation of rights that the SEC is not opining as to

19  the legality under the federal security laws of any of the

20  transactions outlined in the plan.  That's all we wanted to

21  do.  So thank you, Your Honor.

22          THE COURT:  All right, thank you.  Anyone else?

23  Okay, Mr. Glueckstein

24          MR. GLUECKSTEIN:  Thank you, Your Honor.  Just

25  really briefly, in response to Ms. Favario, we understand the

1  concern she's expressing, and we just want to be clear that

2  the Debtors here are distributing all of the assets of this

3  estate.  We're distributing every asset that we are able to

4  find.

5          We are providing a waterfall plan that's going to

6  continue to allow assets to flow if we are able to bring in

7  more assets to augment this estate.  As was outlined over the

8  course of the day, starting with Mr. Dieterich's remarks this

9  morning, we have a planned structure here that is as

10  favorable as we think we can make it.

11          We've done a lot of hard work to get there in

12  terms of trying to really maximize the recoveries to

13  customers, including with the settlements we've negotiated

14  that have allowed for the supplemental remission fund value

15  to potentially flow to those creditors as well.

16          So we understand the concerns.  We do believe that

17  customers are being fairly compensated and then some, given

18  what we're able to accomplish under the Bankruptcy Code.

19          With respect to the specific objections to the

20  terms of service, customer property, those issues have been

21  conclusively addressed over the course of the hearing today.

22  The evidence in the record, including the conclusions on how

23  to interpret those from Lord Neuberger, are unrefuted.

24          The evidence before, Your Honor, we submit,

25  establishes not only that the 1919 settlement standard with

1  respect to the customer priority settlement is satisfied, but

2  that there is no evidence in the record to refute the Debtors

3  assertions with respect to the property propositions and the

4  terms of service interpretation as before the Court.

5          So with respect to the actual objection that was

6  filed, we do ask that that, as well as the objection from Mr.

7  Gunawan, who it seems is not appearing, be (inaudible).

8          THE COURT:  Okay, thank you.  All right, I am

9  going to overrule the objections.  Ms. Favario, the Debtors

10 have put on evidence to show and made legal arguments to show

11 that the funds, regardless of what is included in the terms

12 of service, became property of the Debtor's estate once those

13 funds became commingled with everybody else's funds.

14         And in order to show that you would have a

15 particular interest in any particular piece of property,

16 including any particular cryptocurrency that you might have

17 on the exchange, it would require evidence of tracing to show

18 that the funds that you included or the crypto that you

19 deposited are directly traceable back to some particular

20 point in the Debtor's assets.  And I don't have any evidence

21 of that.

22         So at this point, I think it is a foregone

23 conclusion at this point that the funds that were in the

24 accounts, despite what might be included in the terms of

25 service, are property of the Debtor's estate at this time.

1  All the crypto has been liquidated at this point.

2            If you have a claim and the Debtors are objecting

3  to your claim, you will receive a payment.  We've had

4  referred testimony today and others have argued about how the

5  payments are going to be up to 130 and 140 percent of the

6  value of your claim based on what it was at the time of the

7  filing of the bankruptcy.

8            So for those reasons, Ms. Favario, I'm going to

9  overrule your object.

10           MR. GLUECKSTEIN:  Thank you, Your Honor.  Just so

11  the record is clear, is the Court also overruling Mr.

12  Gunawan's objection?

13           THE COURT:  Yes, and Mr. Gunawan's objection as

14  well.

15           MR. GLUECKSTEIN:  Okay, thank you.  That's from

16  the Debtor's perspective, I thought we could address all the

17  objections.  I understand Mr. Adler thinks there's an

18  outstanding issue.  To the extent Your Honor is inclined to

19  hear that, or anybody else who thinks there are outstanding

20  objections, I think we're at that point of the day.

21           THE COURT:  Okay.  Let's go to Mr. Adler and hear

22  his objection on the exculpation provision.

23           MR. ADLER:  Good afternoon, Your Honor.  David

24  Adler from McCarter & English on behalf of the (inaudible)

25  parties (inaudible).  We objected on August 16th to the

1    exculpation provision under both the plan and the litigation

2    for the plan administration agreement, for the FTX recovery

3    trust.

4           I've taken a look at the changes that have been

5    made to Section 10.7 of the plan, and they have put in the

6    language that limits the exculpation to the petition date to

7    the effective date.  I think there might be a typo because at

8    the end in (c), it just references the effective date but not

9    occurring on or after the petition date.

10           I do think that it would be -- we said it in our

11   objection that exculpation should be limited to the committee

12   and the Debtor and no other parties.  To the extent the Court

13   wants to include other parties, we think it might be helpful

14   to have a list somewhere as a plan supplement of exculpated

15   parties so that everyone knows who's being exculpated.  That

16   was on the plan.

17           On the litigation on the plan administration

18   agreement, paragraph 8.  And this is from document 262262,

19   filed on October 3.  I'm on page 4 of 9.  Paragraph 8 is

20   exculpation.  And I had asked during the examinations one of

21   the witnesses about the plan administrator.

22           Paragraph 8 is giving the plan administrator, who

23   does not yet exist, an exculpation.  And when you read this

24   provision of the agreement, this amounts to essentially an

25   advance waiver, advance release.

1          So we're going to rely on Mallinckrodt, Your

2   Honor, that basically, Your Honor ruled that entities that

3   don't exist, you know, at the time the plan is confirmed, are

4   not entitled to the benefit of exculpation.  And we think

5   that paragraph 8, which is essentially advance release,

6   should be stricken from the -- from the FTX recovery -- from

7   the plan administration agreement.

8          THE COURT:  Okay, thank you.

9          MR. ADLER:  Thank you.

10          THE COURT:  Mr. Glueckstein?  Do you need a

11   minute?

12          MR. GLUECKSTEIN:  Your Honor, instructing

13   exculpation 10.7 of the plan, as Mr. Adler correctly notes,

14   we have revised that language in consultation with the U.S.

15   Trustee's Office with respect to the scope of that provision.

16   They were comfortable with it.  We don't believe that a list

17   of people needs to be included with that.  This language is

18   standard language that's included, the Court has included

19   frequently to pick up the title types of professionals and

20   advisors, representatives that are exculpated.  The

21   definition of exculpated parties is contained in the plan.

22          So from our perspective, the language as revised

23   in response to the U.S. Trustee complies with all legal

24   obligations and should be approved.

25          With respect to the form of the plan

1  administration agreement, that is, you know, that is

2  disclosed, and the plan supplement is ultimately an agreement

3  that is going to be entered into and executed by the Debtor's

4  recovery trust in Allen Hill (phonetic).  And the terms of

5  that are negotiating a contract from the perspective of not

6  only the plan administrator, but of the Debtor's perspective

7  of setting up the recovery trust, we think that the terms,

8  including an exculpation provision in this agreement, is in

9  the business judgment of the Debtor is appropriate, and so

10  they intended to move forward with it.

11          We are, of course, asking for approval of the form

12  of the agreement on behalf of the current Chapter 11 Debtor,

13  but it is contemplated to be a three-way agreement that will

14  govern only post-effectiveness activities.

15          THE COURT:  Can I see a copy of that section?  I

16  don't have it in front of me?

17          MR. GLUECKSTEIN:  Yes, Your Honor.  May I

18  approach, Your Honor?

19          THE COURT:  Yes, please.

20          MR. GLUECKSTEIN:  Section 8.

21          THE COURT:  Okay.  Thank you.  Anything else?

22          MR. GLUECKSTEIN:  No, Your Honor.  Well, the only

23  thing I would just to -- so the record is complete, we of

24  course, are asking for approval of the form of these

25  agreements on behalf of the Debtor so that they could be

1  moved forward and executed on.

2         They're not -- we're obviously not prejudging

3  anything that's going to happen or conduct of anybody or any

4  actions taken by the plan administrator post-effectiveness.

5  Of course, if somebody believes that there is something that

6  gives rise to a claim, they would have the ability to bring

7  that at the appropriate time.

8         THE COURT:  Okay.  All right.  I'm satisfied from

9  reading that language.  I think it's appropriate at this

10 point.  It's only a proposed agreement that has not yet been

11 executed and is subject to, I presume, negotiation once the

12 plan administrator is identified.  So I will overrule the

13 objection.

14        Also, under the exculpation under the plan, I

15 think is also appropriate based on the U.S. Trustee's

16 revisions that they requested, I think those are appropriate,

17 and therefore I will also overrule that objection.

18        Anything else, Mr. Glueckstein?

19        MR. GLUECKSTEIN:  No, I don't.  Unless there are -

20 - I guess we just confirm that there are no other outstanding

21 objections that the Court has not addressed.

22        THE COURT:  Okay.  Did we miss any of the

23 objections from anybody?  Going once, going twice.  Okay.  No

24 one has spoken, so I guess we are done with objections.

25        MR. GLUECKSTEIN:  Okay.  I had a couple comments

1   with respect to the order, Your Honor, but I think I really

2   want to address that now or after.

3             THE COURT:  Do we have -- I'm sorry, I couldn't

4   hear you.

5             MR. GLUECKSTEIN:  I'm sorry.  Sorry, Your Honor,

6   just two things with respect to the Debtor's proposed form of

7   order.  I have one and I think Mr. Dietderich has one that's

8   just been coming in as things are evolving here.

9             I just wanted to note for the record, we were

10  asked to note for the record by the U.S. Department of

11  Justice that there are provisions that we have included in

12  the plan that were negotiated.  Sorry.  In the confirmation

13  order that are negotiated provisions starting with Section

14  153, paragraph 153 of the order that were multi-agency

15  negotiations amongst the DOJ and other the various

16  governmental units that resolved any concerns any of those

17  government entities had.

18            So that's why they're not here today.  They asked

19  us to put that on the record, and I think Mr. Dietderich has

20  one late point on the board.

21            MR. DIETDERICH:  Thank you, Mr. Gluckstein.  Your

22  Honor, one last --

23            THE COURT:  Can I call you Mr. Glueckstein just to

24  make it even.

25            MR. DIETDERICH:  Thank you, Mr. Dieterich.  Yes,

1   Your Honor, one last comment also from our -- from the

2   federal government, back to my earlier remarks.  There's a

3   few creditors that have raised a question about language

4   recently added by the SEC.  It's Section 154, the proposed

5   form of order.

6           That language says that beneficial interest in the

7   consolidated wind-down trust will not be certificated and

8   cannot be transferred, sold, pledged, or otherwise disposed

9   of or offered for sale.  This language is intended, of

10  course, to address the application of the U.S. securities

11  laws and came from the Securities and Exchange Commission.

12          I just wanted to note for the record, in response

13  to some of these creditor inquiries, it is not intended to

14  prevent the ordinary operation of the claims trading market.

15  And of course the Debtor will honor claims trades and make

16  distributions to the applicable holders of claims on the

17  record dates as otherwise provided in the plan.

18          THE COURT:  Okay.

19          MR. DIETDERICH:  And that's it.

20          THE COURT:  Did the SEC want to have anything to

21  say about that one?  Anyone here for the SEC or online?  Mr.

22  Uptegrove?

23          MR. UPTEGROVE:  Yes, Your Honor.  William

24  Uptegrove for the United States Securities and Exchange

25  Commission.  Counsel is absolutely correct, though we concur

1  with what he restated on the record.

2          THE COURT:  Okay, thank you.

3          MR. DIETDERICH:  Thank you, Mr. Uptegrove.

4          THE COURT:  All right, anything else?

5          MR. DIETDERICH:  That concludes our presentation.

6          THE COURT:  All right, well, I guess we've

7  resolved all the objections, so I will approve the plan of

8  reorganization.

9          I do want to take a look at the proposed form of

10 order, revised form of order, because it came in early this -

11 - or, you know, late this morning, actually just a little

12 less than an hour before the hearing.  So I want to take a

13 look at it.  I will take a look at that.  Is that the final-

14 final version or are we going to have other potential

15 changes?

16         MR. DIETDERICH:  It's final-final.

17         MR. GLUECKSTEIN:  That's it, Your Honor.  And that

18 has limited changes that address primarily language we agreed

19 to add on the disputed claims reserve, which I addressed this

20 morning, formalizing the fact that we filed a motion on that.

21 (Inaudible), but we'll obviously let Your Honor take a look

22 at it.

23         THE COURT:  All right, I'll take a look and as

24 soon as I get through it, we'll get it entered for you.

25         MR. DIETDERICH:  Thank you very much, Your Honor.

1             THE COURT:  Thank you.  Well, I just want to say

2    congratulations, and I think this is a model case for how to

3    deal with a complex, very complex Chapter 11 bankruptcy

4    proceeding.  And I applaud everybody who was involved in the

5    negotiation process and resolving of objections and getting

6    this down to just a few plan objections at the time of the

7    hearing.

8             I think you did -- you all did a lot of hard work

9    and I greatly appreciate it.  So thank you all very much.

10            MR. DIETDERICH:  Thank you.

11            THE COURT:  Okay.  I guess that's it for the these

12   Debtors today, right?  Do we have anything else?

13            MR. LANDIS:  Thank you, Your Honor.  For the

14   record, Adam Landis from Landis, Rath & Cobb.  Seems a little

15   anticlimactic, but we do have a number four item on our

16   agenda, which is the Celsius litigation administrator's

17   motion for relief from the automatic stay.  We've listed all

18   the responses received, and also there's a similar motion in

19   the Chapter 15 case that has been filed.

20            THE COURT:  All right, that one I'm going to

21   continue to hold in abeyance until I rule on the issue of

22   whether or not Celsius has an appropriate claim or not.  I

23   think it would be premature at this point to have argument on

24   lifting the stay until I know whether there's something lift

25   the stay for.

1       MR. LANDIS:  We were at pains to list this on the

2   agenda, Your Honor, but the Debtors certainly appreciate you

3   are adjourning that until the underlying matter is resolved.

4       THE COURT:  Okay, thank you.

5       MR. LEVY:  Your Honor.  Richard Levy for the

6   Celsius litigation administrator.  I was in the back of the

7   room and unfortunately could not hear you clearly when you

8   spoke to Mr. Landis.

9       THE COURT:  I was saying that because I still

10  haven't ruled on the issue of whether or not the claim that

11  you filed is appropriate or not.  I'm going to hold this in

12  abeyance until I make that ruling, and then we'll have -- so

13  I know whether I even need to have a hearing on whether to

14  lift the stay.  And then we'll go from there so.

15      MR. LEVY:  So that, Your Honor, would relate only

16  to the U.S. cases.  We still have the Chapter 15 case.

17      THE COURT:  We'll deal with that.  Are we dealing

18  with that with your agenda, Mr. Shore?

19      MR. SHORE:  Yes, Your Honor.

20      THE COURT:  Okay, so we'll deal with that when we

21  get to Mr. Shore's agenda.

22      MR. LEVY:  I didn't hear Mr. Shore.

23      THE COURT:  He said yes.  That's on the agenda for

24  discussion in connection with that case as opposed to --

25      MR. LEVY:  So that's going to be carried to

1  another date as well?

2         THE COURT:  No, no, we're going to talk about it

3  today once we get to it.

4         MR. LEVY:  Okay.  Sorry, Your Honor.  Thank you.

5         THE COURT:  No problem.

6         MR. LANDIS:  Your Honor, again, for the record,

7  Adam Landis of Landis, Rath & Cobb, on behalf of the Debtors.

8  That does conclude the agenda for the FTX Trading case today.

9         THE COURT:  Okay, thank you, Mr. Landis.

10         All right, Mr. Shore.

11         MR. SHORE:  Well, Your Honor, we have only one

12  thing on -- again, Chris Shore from White & Case for the

13  Chapter 15 Debtor.

14         We have only one item on the agenda today, which

15  is the lift stay motion, and I would just turn over, unless

16  Your Honor wants to take a break, turn over the podium to the

17  Celsius administrator, and they can make their argument, and

18  I will respond.

19         THE COURT:  Okay.  Do we have any evidence on this

20  issue or is it all legal argument?

21         MR. SHORE:  We had put in the evidence at the last

22  hearing with respect to the other declarations.  The Celsius

23  administrator, I believe, wants to move in one objection or,

24  sorry, one sur sur reply declaration.  And I'd like to be

25  heard on that when we address it.

1          THE COURT:  Okay.  So no new evidence from the

2  joint administrators?

3          MR. SHORE:  Correct.

4          THE COURT:  Okay, thank you.  All right.  Mr.

5  Levy?

6          MR. LEVY:  Good afternoon, Your Honor.  Richard

7  Levy, Pryor Cashman for the Celsius litigation administrator.

8  As a preliminary matter, Your Honor --

9          THE COURT:  Now I'm having trouble hearing you,

10  Mr. Levy, can you pull him a little closer?  Try it there and

11  see if that works.

12          MR. LEVY:  Is that better?

13          THE COURT:  That's better, yes.  Thank you.

14          MR. LEVY:  Thank you, Judge.  Sorry, Your Honor.

15  You have trouble hearing me, I have trouble hearing you, and

16  I have a hearing problem, which makes it all -- I apologize,

17  Your Honor.

18          THE COURT:  We'll get through it.

19          MR. LEVY:  Your Honor, as a preliminary matter, to

20  complete the evidentiary record at the last hearing, Your

21  Honor granted us an opportunity to file a sur reply affidavit

22  declaration from -- excuse me -- from Bahamian counsel, which

23  we did at Docket No. 190.  The affidavit of the declaration

24  of Tara Cooper Burnside, a member of the firm of Higgs &

25  Johnson in the Bahamas.  And I can proffer that, Your Honor,

1  if you need anything more than a simply --

2        THE COURT:  No, I've seen it.  So let me just ask

3  you, Mr. Shore, are you objecting to (inaudible)?

4        MR. SHORE:  I do have an objection to a couple of

5  paragraphs.  I can either address that now or let counsel go

6  and just carry that objection.  I just ask you to strike, I

7  think, five paragraphs.

8        THE COURT:  All right, let's leave -- you finish

9  up, and then we'll go from there.

10        MR. LEVY:  Thank you, Your Honor.  Your Honor,

11  when we were here a couple of weeks ago, we began the

12  discussion of whether or not this application should be

13  granted relief from the stay by Your Honor with respect to a

14  proposed subsequent transferee litigation against the Celsius

15  -- excuse me -- against the FTX U.S. -- the FTX DM.  I

16  apologize, Your Honor.  I'm trying to find ones that are

17  (inaudible).  I apologize.

18        THE COURT:  Take your time.

19        MR. LEVY:  Picking up from where we were, Your

20  Honor, at that time.  Your Honor, I've left this out of my

21  notes back at my seat.  May I go back?

22        THE COURT:  Certainly.

23        MR. LEVY:  Thank you, Judge.  Your Honor, can I

24  ask for the Court's indulgence?  Could we have a five-minute

25  break while I get everything in order?

1          THE COURT:  Sure.  Let's make it ten, and we'll

2    come back at 3:30.

3          MR. LEVY:  Very good.

4          THE COURT:  Thank you.

5          (Off the record at 3:22 p.m.)

6          (On the record at 3:31 p.m.)

7          THE BAILIFF:  All rise.

8          THE COURT:  Thank you.  Please be seated.  I

9    forgot something.  All right.

10          MR. LEVY:  Is this good?  Judge, can you hear me

11    here?

12          THE COURT:  Yes.  Thank you.

13          MR. LEVY:  Judge, Richard Levy for Pryor Cashman

14    in behalf of the Celsius litigation administrator.  Thank you

15    for the break, Judge.  I appreciate that.

16          To finalize the admission of Ms. Cooper's -- Ms.

17    Burnside's declaration, Judge, I believe she is on the line.

18    Both parties, I understand, have waived or the other party

19    has waived cross examination.  But if the Court has any

20    questions, she will be available.

21          THE COURT:  Okay, so we resolved the issues that

22    Mr. Shore wanted to strike some of the declaration?

23          MR. SHORE:  No, but that does not require any

24    cross examination to establish.

25          THE COURT:  Okay, so I'll -- the declaration is

1  submitted without objection, then, subject to Mr. Shore's

2  wanting to strike certain provisions.

3          MR. LEVY:  Judge, when we were here last time, you

4  were asking the question why should you be deciding this

5  matter?  The submission by Ms. Burnside makes clear why you

6  should be deciding it.  And I will further amplify why you

7  should be deciding it and why you should be deciding it now.

8          To put a finer point on it, even with our having

9  filed lift stay motions in both the United States and

10  Bahamian courts, we are bound to do so because we're dealing

11  with dueling Debtors in both of those jurisdictions.  Because

12  there are Debtors on both sides of the aisle, lift stay

13  relief is required from both of those courts.  We need relief

14  from this court in order to sue in our United States claims

15  because we seek to pursue a judgment under the United States

16  Bankruptcy Law in a United States Bankruptcy Court.

17          Now, we filed a proof of claim in the Bahamas

18  because we had to in order to participate in the Bahamas case

19  if we wanted to receive a distribution in that case.

20          However, Your Honor, as was pointed out in the

21  proof of debt filed as Joint Official Liquidator's Exhibit 4,

22  we make very clear that instead of submitting to the

23  jurisdiction of the Court for purposes of determination of

24  our claim by the Joint Liquidators, we are asking for relief

25  from the stay in order to proceed with a proceeding, a court

1   adjudication of the issues that we have raised in our draft

2   complaint which arise under Sections 547 and 550 of the

3   United States Bankruptcy.

4           While we may have submitted to the jurisdiction of

5   the court in the Bahamas for various purposes, that does not

6   mean that the United States lift stay proceeding cannot or

7   should not go forward.  The fact that the -- excuse me -- it

8   cannot go forward.  And in fact, as a practical matter, it

9   should.  Let me explain why.

10          To the extent that we seek to proceed on our proof

11  of debt through a proceeding and not through Joint Official

12  Liquidators' adjudication, we need an indication from both

13  courts that we can do so.

14          Your Honor would be asked in the first instance to

15  grant relief from the automatic stay so that we can pursue

16  the litigation.  We know we have to go back to the Bahamian

17  court.  We have a lift stay proceeding already pending in

18  that court.  It's not teed up anywhere near we are in this,

19  but if Your Honor were to grant us relief, we think that that

20  would have exceedingly probative value for the Bahamian court

21  for this reason.

22          We are asking for relief under United States

23  Bankruptcy Law.  That's something that's relatively alien in

24  my understanding.  And I think Ms. Burnside could probably

25  amplify this.  U.S. preference law, bankruptcy law, is not

1  something that comes before the Bahamian courts with any

2  regularity.  They deal with local law.  But we're asking for

3  a proceeding to happen here in the United States where the

4  Bahamian state does not even apply.

5          But be that as it may, we need both courts to say,

6  yes, go ahead and proceed.  And we believe it would be more

7  efficient for Your Honor to make the initial ruling which

8  says, hopefully, yes, you can proceed with your United States

9  preference claim.

10          I want to know for sure that the Bahamian court

11  will go along with that.  And that may take a while because

12  the Bahamian system is somewhat slower than Your Honor's

13  courtroom.

14          It would be very similar, Your Honor, in a

15  situation I talked about last time I was here where a court

16  facing a lift stay proceeding says, yes, I want to let

17  another court handle the determination of the claim, the

18  adjudication allowance, the liquidation of the claim.  That's

19  effectively what we are asking the Bahamian court to do.

20          But I don't think the Bahamian court will be as

21  influenced on whether or not to grant that relief, unless

22  Your Honor tells us, which we ask, that, yes, you can proceed

23  on it here.  And frankly, Your Honor, the United States

24  courts are way more familiar with American bankruptcy.

25          It's hard to believe that a Bahamian court not

1 well versed in American bankruptcy law would take unto itself

2 that determination.

3          On the flip side, as I said, it makes sense for a

4 Bahamian law based controversy to be decided.  It makes sense

5 for a Bankruptcy Law-based controversy to be decided by the

6 United States court that's fully versed in the body of law.

7          Now, Your Honor, in her declaration, Ms. Roll

8 (phonetic), her sur reply declaration, Ms. Roll suggested

9 that it was doubtful, and I use that word doubtful that a

10 Bahamian court would recognize a claim based on Sections 547

11 and 550 because Bahamian preference law is different.

12          That's not the point.  The point is a claim

13 predicated on United States Bankruptcy Law which we request

14 to be adjudicated in the United States and then taken back to

15 the Bahamian court for consideration in connection with the

16 allowance of our proof of debt, that's what matters.  We're

17 asking for the Bahamian court, hopefully with Your Honor's

18 prior approval that we can proceed with an American

19 bankruptcy litigation.  The Bahamian court will say sure, go

20 ahead and do that.  Come back and see me in the Bahamas when

21 you've got your case completed.

22          Your Honor, in effect, doesn't have to do anything

23 more today other than say yes, you can proceed under the

24 automatic stay.  We know we have to deal with the Bahamian

25 court before we can go farther with where we are.

1          To be clear, we recognize that at the end of the

2     process, we have to bring any U.S. judgment back to the

3     Bahamian court in order to participate in the proceeding at

4     that time.  We are not trying to do an end run around the

5     Bahamian court, and we are certainly not trying to do

6     anything untoward in this court.  We are simply asking for

7     what is our right, I believe, under the circumstances, relief

8     from the automatic stay.

9          Now there are good and plenty reasons why Your

10    Honor should do that, in addition to the fact that a Bahamian

11    court is not a court of U.S. Bankruptcy Law.  What we have

12    asked for is permission to proceed in front of Judge Glenn in

13    New York for a couple of reasons.

14         He is well versed in the proceedings.  He has all

15    of the experience in the Celsius case.  He has all of the

16    Celsius proceedings centralized before him.  It would be

17    efficient for that court to continue to hear all matters

18    relating to that proceeding.  And once again, Judge, we still

19    have to go back to the Bahamas if and when we prevail in that

20    proceeding.

21         I think, Judge, that's about all I need to say at

22    the moment unless Your Honor has questions.

23         THE COURT:  I just want to be clear what relief

24    you're asking me for.  You want me to lift the stay?  Say

25    yes, I'm going to lift the stay to allow you to proceed with

1   your adversary proceeding in New York.

2          MR. LEVY:  Yes, Your Honor.

3          THE COURT:  So why -- I mean, this is a Bahamian

4   entity that's in a liquidation proceeding in the Bahamas with

5   assets located in the Bahamas.  Number one, why does U.S.

6   Bankruptcy Law even apply?  And number two, why should I --

7   why shouldn't I allow the Bahamian court to decide whether

8   they want to hear it or whether they want Judge Glenn to hear

9   it?

10         MR. LEVY:  This is not a usual ancillary

11  proceeding.  This is a case now that involves a Chapter 11

12  plan under which distributions are going to be made to the DM

13  customers with U.S. assets based on transactions that those

14  parties engaged in.  Celsius was a U.S.-based entity.  The

15  transfers came from U.S.-based entities.

16         As we pointed out, Your Honor, the judge in New

17  York has made various determinations and is administering the

18  stay and that's where we submit it should be determined.

19         I'm not asking Your Honor to do anything more

20  today than say, yes, you can proceed.  Just make sure you do

21  it right with the Bahamian court.  And I believe, Your Honor,

22  that a Bahamian court may have some question about whether or

23  nothing not to allow a proceeding under U.S. Bankruptcy Law

24  to proceed separately than the proceeding there.  But a

25  Bahamian judge doesn't deal with bankruptcy every day.

1          THE COURT:  Well, why can't I just say, okay, I'll

2     lift the automatic stay but it's up to the court in the

3     Bahamas to decide whether they're going to hear it or Judge

4     Glenn is going to hear it?

5          MR. LEVY:  Not exactly what I anticipated to hear

6     from Your Honor.  That certainly gets us over the first

7     hurdle, which is to get relief from the automatic stay

8     subject to our going to the Bahamian court to make a further

9     determination.

10          I believe, Your Honor, that recognizing what I

11     will call the primacy of U.S. Bankruptcy jurisdiction, it's

12     better for a U.S. Bankruptcy Court to be hearing it, even if

13     Your Honor grants us that relief.  I can't tell you that the

14     behavior court is going to say, no, I'm not going to let you

15     go back to New York.  At least let us have the relief that

16     we've asked subject to going to the Bahamas and doing what we

17     have to do next.

18          THE COURT:  And again, I don't know if you

19     answered my question.  Maybe you did.  I just didn't catch

20     it.

21          MR. LEVY:  I'm sorry Judge.  I didn't hear you.

22          THE COURT:  I have -- one of my questions that I

23     asked, I'm not sure.  You may have answered it and I just

24     didn't catch it.  But why does U.S. Bankruptcy Law apply to

25     Celsius's claims against a Bahamian entity in the Bahamas?

1       MR. LEVY:  The transfers came from Celsius, a

2  United States-based entity.

3       THE COURT:  Well, they came -- these, again, are

4  the same type of situation where customers withdrew funds,

5  pre-petition and then deposited them in the Bahamas?

6       MR. LEVY:  I can't say that for sure, Judge.  I

7  don't know all those details.  I do know that the money came

8  out of Celsius United States.  That took --

9       THE COURT:  Kind of an important issue.

10      MR. LEVY:  Pardon me?

11      THE COURT:  Kind of an important issue to know.

12      MR. LEVY:  It is, Judge.  And as far as I'm

13 concerned, Judge, the 500 or so cases, the transfers emanate

14 from the United States.  That's a basis for jurisdiction just

15 as it's a basis for bankruptcy venue.  Where are the assets

16 located.  Here, the transfers came from the United States.

17      THE COURT:  But the assets, from what I

18 understand, and maybe you can correct me if I'm wrong and Mr.

19 Shore will address it too, the assets, as far as I

20 understand, are in the Bahamas.  That there's this joint

21 agreement between the U.S. Debtors and the Bahamian Debtors

22 that a claimant can say I want my claim decided in the U.S.

23      MR. LEVY:  Well, that's an interesting question,

24 Your Honor, because I don't think any of us knows yet exactly

25 how many entities who were claimants accepted U.S.

1  jurisdiction versus Bahamian court jurisdiction.  That's

2  something that may have to get sorted out.

3       But let me posit this to Your Honor.  Your Honor

4  grants us leave from the automatic stay and says, go ahead,

5  go litigate in front of Judge Glenn.  Judge Glenn hears the

6  proceeding on the initial claims that have left -- that left

7  Celsius and are now in the hands of the former Celsius

8  customers who are FTX customers.

9       We get a judgment.  We get a judgment saying

10  you're right.  You now have initial transfers that have been

11  avoided.  They were avoided in the United States -- based on

12  United States law.  We have to go back to the Celsius court.

13  We have to ask for permission to enforce that judgment in the

14  Bahamian proceeding, and we will continue to pursue our

15  subsequent transfer remedies against anybody anywhere who is

16  subject to jurisdiction.

17       THE COURT:  All right.  Okay.  Let me hear from

18  you.

19       MR. LEVY:  Your Honor, I'll reserve in case you

20  have further questions.

21       THE COURT:  Thank you.

22       Mr. Shore?

23       MR. SHORE:  Thank you Your Honor.  Chris Shore

24  from White & Case on behalf of the JOLs.

25       As I said, I have one evidentiary issue, and then

1  I want to address each of Your Honor's questions that you

2  just asked.  Let me deal with the evidentiary issue first.

3          We ended last hearing with the Court authorizing a

4  sur reply, no question.  And I stood up and I said I want to

5  make clear this is a sur reply to address the issues that

6  were raised for the first time in the sur reply of Ms. Roll-

7  Capp.  Nobody said anything otherwise.

8          Then we got the Burnside declaration, and we

9  object to paragraphs 6 through 11 as improper sur sur reply

10  and ask the Court to strike them.  These paragraphs concern

11  the jurisdictional scope of the Bahamian stay and how it

12  applies to claimants in the Bahamian proceedings.

13          Let me set up the record on this first to explain

14  why I think this issue should have been raised long before

15  last week when they filed this sur reply.  Celsius filed its

16  motion on June 5th.  It's Docket 155 in the 15.  The JOLs

17  filed their opposition on July 8, which included two

18  declarations that the declaration of Ms. Roll-Capp, which is

19  in evidence, was at 166.

20          At paragraphs 7 through 12 of that declaration,

21  which was filed in July, Ms. Roll-Capp describes the effect

22  of the Bahamas stay on Celsius and she concludes at paragraph

23  11, if the Celsius litigation administrator has claims

24  against FTXDM, Bahamian law requires that he first seek to

25  lift the Bahamas stay or seek leave from the Bahamas court.

1  That was a -- evidence that was submitted to the Court on

2  July 8th.

3           On September 4tj, Celsius filed its reply at

4  Docket 173 in the 15, and that response is silent as to the

5  lift stay point.  They did not attempt to, at that time,

6  rebut anything that was said in Ms. Roll-Capp's declaration

7  with respect to the extent of the stay.  Five paragraphs.

8           Then on September 10th, we filed the supplemental

9  Roll-Capp declaration at 181.  In one paragraph, paragraph 5,

10 Ms. Roll-Capp declares, as I stated in my initial

11 declaration, and she summarizes what she said, which was to

12 emphasize the point of the following paragraphs, which is

13 that, having read our opposition, Celsius decided to actually

14 go seek lift stay not until September, as opposed to seeking

15 stay from this court in July.

16          So now on September 4th -- or no, sorry, not at

17 September 4th -- Ms. Burnside seeks to establish that the

18 stay only applies in the Bahamas.  That was testimony that

19 should have been provided in connection with the reply.  It

20 is not appropriate to have it come in as sur sur reply at

21 this point.

22          And I want to make clear why the record needs

23 protecting here from just people lobbing in new stuff at the

24 last second.  In the paragraphs at issue, Ms. Burnside quotes

25 extensively to Vocaline (phonetic).  In that block quote,

1  that court made clear, this is not the case where the person

2  sought to be restrained from proceedings abroad has made

3  himself a party to the proceedings, such as, for example,

4  filing a proof of claim.

5         But this case is that case.  We're not dealing

6  with what happens, what is the extent of a stay in a case in

7  which the party has not submitted to the jurisdiction.  We're

8  dealing with a case in which the party has submitted

9  jurisdiction.

10         So just as Mr. Levy came last time with --

11         MR. LEVY:  Levy.

12         MR. SHORE:  Levy.  Sorry.  Came with his own

13  cases, we could go back and forth all day.  I've got the

14  cases here that deal with the instance in which a party has

15  submitted to the jurisdiction of the Court, and they stand

16  for the obvious proposition.

17         If you go into a court and you seek to have your

18  claim adjudicated in that court, which is trying to provide

19  radical distribution to all, you're not free to just go

20  around the world and seek to have dozens, hundreds of other

21  courts adjudicate your claim without seeking relief from the

22  court to which you submitted your claim.

23         So the point, the whole point here is I think you

24  should just strike 6 to 11.  The record exists as it existed

25  when the opposition to the motion was submitted months ago.

1              THE COURT:  Okay, let me ask Mr. Levy if he wants

2    to respond to that.

3              MR. LEVY:  Sure, Your Honor.  I note, Your Honor,

4    that in as much as Mr. Shore wants to remove those

5    paragraphs, he's arguing from them even before we've gotten

6    to that point.  Your Honor, this was an affidavit by Ms.

7    Burnside to explain the full panoply of what she perceives to

8    be the issue here.  Whether Your Honor can rule, whether the

9    Bahamian court should rule.

10             I dispute the question of whether or not this is

11   something that needed to be -- needed to be handled

12   previously.  We got Ms. Burnside.  Ms. -- sorry, Ms. Roll's

13   supplemental affidavit two days before the hearing.  The key

14   issue was now in front of Your Honor at that hearing as I

15   started to present cases and Your Honor said, I need to hear

16   more.  I need to understand what's going on.  And we said we

17   would not go beyond the confines of Ms. Roll's supplemental

18   declaration.  We have not done that, Judge.

19             We have limited ourselves to Ms. Roll's

20   supplemental declaration, the points that were made, and

21   these are important points, Your Honor, in considering which

22   court has jurisdiction or should have jurisdiction to act

23   first.  We think the provision should remain before the

24   Court.

25             THE COURT:  Mr. Shore?

1     MR. SHORE:  I'm not disputing they're important

2  points.  All I'm saying is if they had an important point to

3  make, it should have been made in the normal sequence in

4  responding to the objection which was filed months ago, not a

5  week before the hearing.

6     THE COURT:  All right, I'm not going to strike

7  them, but I'll take them for what they're worth.  I did read

8  the declaration, so I'm familiar with what Ms. Burnside had

9  to say.  So we'll just leave it at that for now.

10     MR. SHORE:  Okay.  I have two points to make on

11  the objection to lift the stay in the Chapter 15 recognition

12  order.  One is the question of sequencing.  Which court

13  should decide the two pending lift stays, first?  And second,

14  the lack of cause at this point to lift the stay in the 15.

15     Point one, we believe this court should let the

16  Bahamas court decide first where the Celsius avoidance claim

17  gets liquidated and then have this court follow on at a later

18  date.  Either leave the stay in place or follow the direction

19  of the Bahamian court.

20     And I want to start with the actual state of play

21  because I think it's kind of getting lost, and it gets

22  sometimes lost because these motions were -- or the companion

23  lift stay against the U.S. Debtors was pending.

24     FTXDM has an ongoing liquidation in the Bahamas,

25  which is the recognized foreign main proceeding with the JOLs

 1  as recognized foreign representatives.  The Celsius

 2  administrator contends that he has claims against FTXDM, not

 3  against the U.S. Debtors.  That's the subject of the late

 4  claim, but against FTXDM based upon these alleged facts.

 5          During the Celsius preference period customers of

 6  Celsius directed that Celsius move their crypto and cash in

 7  excess of $350 million to accounts at either the U.S. Debtors

 8  or FTXDM in the name of those customers that were listed in

 9  that sealed spreadsheet.

10          Wherefore, the Celsius administrator argues, FTXDM

11  is liable to him for those transfers as a subsequent

12  transferee.  Okay.  And now he's filed that claim in the

13  Bahamian liquidation.  That is, the liquidator has asserted a

14  proof of claim for monies that he alleges were transferred to

15  FTXDM accounts for customers removing their cash and crypto

16  from the Celsius platform during the preference period.

17          But he's insisting that rather than having the

18  Bahamian court liquidate that claim, he should be able to

19  liquidate that claim in the New York Bankruptcy Court.

20          We oppose and believe that the claim must be

21  liquidated in the Bahamas, and here's the current state of

22  play.  I think we all agree that two courts must act.  This

23  court must lift the Chapter 15 stay that's applicable to

24  Bahamian court to lift its stay.  Or, and I want to pause

25  here, address a supplemental anti-suit injunction.

1          So when we filed our opposition to the stay, the

2    Celsius administrator responded by filing a lift stay motion,

3    months after they filed the lift stay motion in this court,

4    essentially acknowledging that they needed to get relief of

5    the Bahamian court, as Ms. Roll-Capp had pointed out.

6          They then filed the sur reply, the sur reply

7    taking the position that regardless of what the JOLs were

8    saying, they believed that the stay of the Bahamian court

9    only applied within the territorial jurisdiction of the

10   Bahamas, taking the position they were free to go anywhere in

11   the world and seek to recover assets of FTXDM without relief

12   from the Bahamian court.

13         So we have now filed a belt and suspenders anti-

14   suit injunction action against them in the Bahamas to ensure

15   that pending further order of the Court, they're not free to

16   go around the world and seek to have their claims liquidated

17   anywhere else, which would be a stay violation.  So that's

18   the current state of play.

19         So now, we have a lift stay pending against the

20   JOLs here in New York.  We have a lift stay pending in the

21   Bahamas.  We have an anti-suit injunction application pending

22   in the Bahamas, and we think that the Bahamian court should

23   get the first shot at deciding, then have this court address,

24   to answer your sequencing point.

25         We don't believe it would be appropriate for Your

1   Honor to rule on the Chapter 15 lift stay and then send it

2   back to the Bahamian court to address the lifting of the

3   Bahamian stay.

4           And this is fundamentally a question of comity

5   between this court, not the New York Bankruptcy Court, but

6   this court as the Chapter 15 court and the Bahamian court as

7   to how to best protect their common debtor and their

8   creditors.

9           I don't want to spend too much time on comity,

10  other than to say it's -- I've always found it to be a do

11  unto other courts as you would have done to yourself.  This

12  is a question of a claim being asserted against the Bahamian

13  Debtor in a different proceeding.  And I believe Your Honor

14  would be rightfully upset if what happened here is the

15  Celsius administrator had gone to the Bahamian court and

16  asked the Bahamian court to rule on whether or not their

17  claims against the U.S. Debtors were timely or valid or

18  anything else.  This is fundamentally a core responsibility

19  of the Bahamian court to allow or disallow claims against the

20  Bahamian Debtor.

21          But I want to, you know, beyond that general

22  concept of comity in which a Chapter 15 court routinely

23  defers to an appropriate, sound decision of a court in the

24  foreign main proceeding, there's a very specific reason why

25  we're asking the Bahamian court to address this, and I'm

1  going to have to back up for just a second.

2            You heard earlier today in the confirmation

3  hearing the discussion of a customer claim and how that was

4  defined in the classification scheme of the Chapter 11

5  Debtor's plan.  We also have a customer/noncustomer

6  delineation in the global settlement agreement which Your

7  Honor approved and which the Bahamian court has approved and

8  which will go effective when the U.S. Debtor's Chapter 11

9  plan goes effective.

10            There is a definition of FTX customer entitlement

11 claim that's at page 8 of the GSA which is attached to JOL-1.

12 And it makes very clear that a customer claim are monies that

13 were deposited on the exchange in the name of the creditors.

14 Celsius is not alleging that the customers were -- or that

15 they were a customer of the Debtors.  Their argument is

16 customers of the Debtors moved our money.  So they do not fit

17 the entitlement of customer claims which will receive

18 depending on where you elect essentially the same treatment,

19 whether you're in the Bahamas or the U.S.

20            THE COURT:  How did they file it in the Bahamas?

21 Is it similar here?  We had customer claims and noncustomer

22 claims.  It had a different proof of claim form.

23            MR. SHORE:  They filed a noncustomer claim.

24 They're contending that they have a customer claim.  But I

25 don't -- when we're talking about cause and likelihood of

1 success, I, for the life of me, don't understand their

2 argument.

3          THE COURT:  Is it the same issue that they claim

4 they have an ownership interest in the customer's account?

5          MR. SHORE:  It's not in their lift stay motion.

6          THE COURT:  Okay.

7          MR. SHORE:  So I don't know.  The issue of a

8 noncustomer claim is as follows.  Under the approved GSA, the

9 Bahamian Debtors have $15 million to pay noncustomer claims,

10 and in those noncustomer claims include all the trade of all

11 the Bahamian operations of the Debtors that existed as of the

12 petition date.  That amount was set as part of the process

13 long before Celsius ever decided to come forward and say

14 they've got a 350-plus million dollar claim.  But that is now

15 final.

16          And so one of two things is going to happen.  If

17 that claim is allowed in the amount they want, the trade will

18 get wiped out in the Bahamas, just diluted down to nothing.

19 Or there will be potentially residual money which will flow

20 back to the United States estates through the mechanisms of

21 the GSA.

22          If that's going to be the effect of the allowance

23 of this claim, it would seem to me that the Bahamian court is

24 the best court in the first instance to address who's going

25 to be liquidating that claim and in what timeframe.

1          If what's going to happen here is the noncustomer

2    entitlement pool is going to be held up while this claim is

3    litigated in a New York Bankruptcy Court pursuant to the

4    Federal Rules of Civil Procedure and the Federal Rules of

5    Evidence, the Bahamian court should be the one deciding

6    whether or not we can all sit around and wait for that to

7    happen or whether this gets addressed in the Bahamian

8    proceedings.

9          So to answer your question, why shouldn't I just

10   lift the stay and send it back to the Bahamian court, it's

11   because from a comity perspective, it's more appropriate, we

12   believe, for Your Honor to say, you know what?  Why don't I

13   hear from the Bahamian court on issues that are central to

14   its estate, and then I'll decide whether or not it's an

15   appropriate order, which I will recognize in the Chapter 15,

16   or I'm going to go a different way and lift the stay, or I'm

17   going to go a different way and not lift the stay, however

18   you want to do it.

19         But it seems from a sequencing perspective in a

20   15, it's better to have the foreign main proceeding court

21   address that originally.

22         To the extent, though, that we're going to get in

23   to the merits of the lift stay motion in the 15, I've got

24   four reasons why you should not lift the stay.

25         First, the Bahamian court's always going to have

1  to act here.  Lifting the stay doesn't take away the need for

2  the Bahamian court to deal with the anti-suit injunction with

3  the lift stay motion or, as counsel just pointed out,

4  domesticating the judgment.

5           Lifting the stay though, point two, is going to

6  create another forum in which we're going to have to do

7  battle with them over a $15 million capped recovery.  We

8  should be looking for ways to streamline the process, not to

9  fall into the trap that all U.S. people want to do is

10 litigate.  We don't.

11          We're trying to resolve a limited pool situation

12 and exploding this into necessary proceedings in the Bahamas

13 and allowing a preference litigation to go forward in New

14 York doesn't seem an appropriate way to conserve resources

15 here.

16          But more importantly, if you look at the Rexing

17 (phonetic) factors, there are some key issues here that Your

18 Honor would have to rule on, which in fairness should be done

19 by the Court.  In order to lift the stay, you're going to

20 have to find that the DM estate is not prejudiced.

21          But the question of prejudice to the DM estate,

22 particularly laying out what I just did with respect to the

23 treatment of noncustomer claims, I don't know that you're in

24 a position to address that as well as the Bahamian court or

25 that you have the record from which you can make that

1   conclusion.

2            And think about likelihood of success on the

3   merits.  Counsel stood up and said this is easy, it's just a

4   preference action.  Preference action to go forward in New

5   York.  New York court can deal with this, but we all know

6   from our experience in this case that it's not that easy.

7            Think about one issue, the ownership of the

8   assets.  Under the DM terms of service.  Is the DM estate an

9   initial transferee?  That is, that the money was transferred

10  to them.  Is it a subsequent transferee?  What happens with

11  respect to commingling?

12           Your Honor is appropriately making those decisions

13  for the U.S. Debtors.  But opining on, without a record in

14  front of you that they have a likelihood of success that

15  they'll be able to show that the Bahamian Debtor was a

16  subsequent transferee, that is, the title to those assets

17  went to the customers and that somehow we took it later, I

18  don't know how you go about addressing those concepts.

19           Same with the issue of can they get an attachment?

20  They have a likelihood that they're going to be able to get

21  this customer money at a later date.  How does Your Honor

22  rule on this record with respect to the ability of the

23  Bahamian court to garnish creditor distributions?

24           And then finally, I don't think there's any rush

25  here.  Why does this have to be decided now?  Again, we have

1   the motions pending in the Bahamian court.  Counsel pointed

2   out in her supplemental sur sur reply declaration that the

3   Court's expected to act.

4          The only issue that counsel raised was, well,

5   we're further along in this proceeding.  But the reason

6   they're further along in this proceeding is because instead

7   of filing their lift stay application on June 5th in the

8   Bahamian court, just like they did here, we're just further

9   behind in sequence.

10         So they can't -- they can't create the problem and

11  say we should be proceeding here in New York because we

12  didn't file our lift stay motion until two months after we

13  were supposed to.

14         So I think at this point, again, primarily, I

15  think this is a question of comity that Your Honor should

16  just be deferring to the Court.  We can come back quickly to

17  Your Honor after the Bahamian court decides whether or not to

18  leave lift the stay to see where that claim is going to be

19  liquidated and we can handle it quickly with Your Honor.

20         I'm not going to necessarily have a problem while

21  reserving rights if the Bahamian court says I'm lifting the

22  stay and allow it to go forward in New York, and I'm going to

23  have a hard time arguing to Your Honor that you should stop

24  it.

25         But by the same token, if the Bahamian court says

1  I'm not lifting the stay, even if Your Honor were inclined

2  under U.S. law, if this was a Chapter 11 debtor to allow it

3  to proceed in the New York court, I think really you should

4  be deferring in that case to the Court, reserving your right

5  to find that in recognizing that order there was some defect

6  in due process or something like that that you wouldn't want

7  to recognize that order.

8          So I think sequencing, let's go first.  But if

9  you're inclined to take it up, let's go first in the Bahamas.

10 But if you're inclined to take it up, I'd ask that you deny

11 it.

12         THE COURT:  Okay.  Thank you.

13         Mr. Levy?

14         MR. LEVY:  One moment, Your Honor.

15         THE COURT:  Yep.

16         MR. LEVY:  Thank you, Your Honor.  Let me be

17 brief, Your Honor, but the first thing I do want to say is

18 that the anti-suit injunction is news.  We haven't been

19 served with it.  We know little, if anything, about it other

20 than what Mr. Shore has explained today.  Another 11th hour

21 tactic to try to delay this proceeding.

22         In any event, I have told Your Honor that we know

23 we have to go back to the Bahamas at some point for final

24 allowance of our claim, which we hope the merits of will be

25 litigated in the United States.  We know that the stay in

1    Bermuda -- in the Bahamas is not extraterritorial.  The fact

2    that they filed an anti-suit injunction this morning, I

3    gather it was this morning, just proves the fact that the

4    Bahamian stay doesn't extend beyond the shores of the

5    Bahamas.

6              Now, this is a non-routine case.  Mr. Shore would

7    have you believe that courts always defer in a Chapter 15

8    situation in comity rules.  This is not a routine case.  This

9    is a case in which distributions are being made under

10   different plans to customers of DM, the Bahamian Debtor, and

11   money is already going out the door.

12             We now have a -- it's almost ready to go out the

13   door.  We now have a confirmed plan through the gentleman

14   sitting to my right.  The efforts of the Debtors.  That's

15   going to start.

16             In the meantime, whatever rights we may have that

17   we can demonstrate to a court with jurisdiction to hear our

18   claim, we run the risk that the remedy is being frustrated

19   merely by the passage of time.

20             I will note, Your Honor, one of the last things

21   Mr. Shore said was who do we really have a right to recover

22   against?  It's clear in our papers, Your Honor, that the

23   progression is Celsius to initial transferees, the customers.

24   We win.  We have rights against them, but we also have rights

25   to go down the chain.  How FTXDM held its assets, we'll get

1  to that point if we need to.  We have a right to look to any

2  initial -- to all of the initial transferees and all of the

3  subsequent transferees that we can find, recognizing under

4  Section 550, we only get one single recovery per transferee,

5  per initial transfer.  So we'll get to that point, Judge.

6  　　　　　But those points belong with the Court having

7  jurisdiction over the adjudication of a proceeding, which we

8  believe should be the United States court.  Under comity

9  rules, I don't think that that necessarily applies here,

10  Judge, because we are asking the Bahamian court to let us

11  come back here just as we are asking you to endorse our

12  application.

13  　　　　　And this is a dual court situation because we have

14  two debtors.  We need, Your Honor's imprimatur.  We need the

15  Bahamian imprimatur.  There's no harm for Your Honor to rule

16  on this at this point and let us take that ruling back to the

17  Bahamian court to say, look, we have a U.S. judge recognizing

18  that the claims on which we plan to sue are U.S. claims under

19  the Bankruptcy Code which the Bahamian courts do not

20  administer.

21  　　　　　Ms. Roll, when I was speaking earlier, said she

22  doubted that a Bahamian court would recognize a U.S.

23  preference claim.  She didn't have any citation to

24  (inaudible).  It was her doubt.  It was not an absolute

25  statement that it will never happen.

1          And I suggest, Your Honor, that because we don't

2    intend to use the Joint Liquidators' adjudication process, if

3    the Bahamian court will let us take on a proceeding, it's

4    going to be handled by a court here.  And that court's

5    judgment, hopefully in our favor, we will take back for the

6    adjudication process.

7          Your Honor, I think that's all I have.  Unless you

8    have questions.

9          THE COURT:  Okay.  No questions.  Thank you.

10         MR. LEVY:  Thank you, Judge.

11         THE COURT:  All right.  I'm not going to lift the

12   stay at this point.  I don't -- I just don't have enough

13   information, I think, and I think a lot of this is going to

14   be connected to what I do with the U.S. Debtors if I'm going

15   to lift the stay for them.  And I'm not going to make that

16   decision until I decide whether Celsius actually even has a

17   claim against the U.S. Debtors.

18         So there's a lot of steps here that need to be

19   happening before I get to a decision about whether I'm going

20   to lift the stay to allow something to go forward in New York

21   that might have an impact on this case and my decisions about

22   the U.S. Debtors as well as their Haitian Debtors.

23         So at this point I'm not going to rule.  I'm going

24   to hold this in abeyance until I rule on the question of,

25   one, whether Celsius has a claim against the U.S. Debtors

1  and, two, whether I would lift the stay against the U.S.

2  Debtors and allow the case to go forward in New York or

3  whether to allow it to go forward here.

4          And I think once I make those decisions, then we

5  can follow along with what happens with the Bahamian Debtors

6  at the end of the day.

7          MR. LEVY:  Your Honor, one housekeeping matter

8  that I should have addressed while I was at the podium, my

9  local counsel reminds me that as the movant in this matter

10  and subject to Your Honor's having taken, will take it under

11  advisement, carry it without a decision because obviously the

12  decision may affect us, given that we have a tolling

13  agreement.

14          I should move the admission of all declarations

15  and exhibits into the record so that it is complete before

16  Your Honor.

17          THE COURT:  Which declarations are we talking

18  about?

19          MR. LEVY:  The Roll declarations.  They're in the

20  exhibit list, Your Honor.  But the exhibit lists, Your Honor,

21  that were filed for this proceeding.

22          THE COURT:  Weren't they admitted in the first

23  hearing?

24          MR. LEVY:  It's at Docket No. 192 is the full list

25  of exhibits and declarations.

1          THE COURT:  I think all of them have been admitted

2    at this point, they were either admitted the first hearing --

3          MR. LEVY:  Your Honor, Ms. Burnside's declaration.

4    That was --

5          THE COURT:  That, I said, was submitted.

6          MR. LEVY:  Yes.

7          THE COURT:  So everything's in already.

8          MR. LEVY:  Thank you, Judge.

9          THE COURT:  Okay.  All right.  Anything else?

10   Okay, well, thank you all very much.  As I said, I will try

11   and get these rulings out as quickly as possible, because I

12   know we need to start moving things forward and get these

13   issues resolved.  So I thank you all for your patience, and

14   we are adjourned.

15         MR. GLUECKSTEIN:  Thank you, Your Honor.

16         (End of Proceedings.)

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2          We certify that the foregoing is a correct

3   transcript from the electronic sound recording of the

4   proceedings in the above-entitled matter to the best of our

5   knowledge and ability.

6

7   /s/ William J. Garling                  October 8, 2024

8   William J. Garling, CET-543

9   Certified Court Transcriptionist

10  For Reliable

11

12  /s/ Tracey J. Williams                  October 8, 2024

13  Tracey J. Williams, CET-914

14  Certified Court Transcriptionist

15  For Reliable

16

17

18

19

20

21

22

23

24

25