# EXHIBIT 21

# Document Produced in Native Format

Confidential

# **EXHIBIT 22**

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

- - -

In re:  FTX Trading Ltd., et al.

        Debtors.

                  Chapter 11

                  Case No.

                  22-11068 (JTD)

- - -

September 24, 2025

- - -

       Videotaped deposition of
STEVEN P. COVERICK, conducted at Latham &
Watkins, 1271 Avenue of the Americas, New
York, New York, commencing at 10:00 a.m.
EDT, on the above date.

          Magna Legal Services
           866-624-6221
           www.MagnaLS.com

                 Marie Foley
                 RMR, CRR



Page 2

1
2  APPEARANCES:
3
4  ON BEHALF OF FTX TRADING LTD.:
5  SULLIVAN & CROMWELL LLP
6  BY: BRIAN D. GLUECKSTEIN, ESQUIRE
7     SAMUEL G. DARBY, ESQUIRE
8     125 Broad Street
9     New York, New York  10004-2498
10    PHONE: 212.558.1635
11    EMAIL: gluecksteinb@sullcrom.com
12
13
14 ON BEHALF OF THREE ARROWS CAPITAL:
15 LATHAM & WATKINS LLP
16 BY: ZACHARY F. PROULX, ESQUIRE
17    ZIJUN ZHAO, ESQUIRE
18    NACIF TAOUSSE, ESQUIRE
19    ADAM GOLDBERG, ESQUIRE
20    1271 Avenue of the Americas
21    New York, New York  10020
22    PHONE: 212.906.1200
23    EMAIL: zachary.proulx@lw.com
24
25

Page 3

1
2  ALSO PRESENT:
3     Chase Brantley - Alvarez and Marsal
4     Gaurav Walia - Alvarez and Marsal
5     Russell Crumpler - Teneo
6
7
8  ALSO PRESENT REMOTELY:
9     Christopher Harris - Latham & Watkins
10    Benjamin S. Beller - Sullivan Cromwell
11    Sienna Liu - Sullivan Cromwell
12
13
14 VIDEOGRAPHER:
15    Sammy Verni
16
17
18
19
20
21
22
23
24
25

Page 4

1
2
3        - - -
4     TRANSCRIPT INDEX
5             PAGE
6  APPEARANCES....................... 2 - 3
7  INDEX OF EXHIBITS................ 5 - 7
8  EXAMINATION OF STEVEN P. COVERICK:
9  BY: MR. PROULX................... 11
10 AFTERNOON SESSION................ 145
11 EVENING SESSION.................. 311
12 SIGNATURE PAGE................... 407
13 ERRATA........................... 408
14 REPORTER'S CERTIFICATE........... 409
15
16 EXHIBITS WITH ORIGINAL TRANSCRIPT
17
18        - - -
19
20
21
22
23
24
25

Page 5

1
2
3        - - -
4     E X H I B I T S
5     - - -
6  NO.      DESCRIPTION        PAGE
6  Coverick   Notice of Deposition of    19
7  Exhibit 8  Steven P. Coverick
8
9  Coverick   Declaration of Steven P.   61
10 Exhibit 9  Coverick in Support of
11           Confirmation of the Second
12           Amended Joint Chapter 11
13           Plan of Reorganization
14           of FTX Trading Ltd. and Its
15           Debtor Affiliates
16
17 Coverick   Declaration of Steven P.   65
18 Exhibit 10 Coverick in Support of the
19           FTX Recovery Trust's
20           Objection to the Amended
21           Proof of Claim Filed By
22           Joint Liquidators of Three
23           Arrows Capital
24
25



Page 6

```
 1
 2                    - - -
 3              E X H I B I T S
 4                    - - -
 5      NO.      DESCRIPTION      PAGE
 6   Coverick    Supplemental Declaration of   69
 7   Exhibit 11  Steven P. Coverick in
 8                 Support of the FTX Recovery
 9                 Trust's Objection to the
10                 Amended Proof of Claim Filed
11                 By Joint Liquidators of
12                 Three Arrows Capital
13
14   Coverick    Objection of the FTX      128
15   Exhibit 12  Recovery Trust to the
16                 Amended Proof of Claimed
17                 Filed By the Joint
18                 Liquidators of Three Arrows
19                 Capital
20
21   Coverick    Complete Futures Specs April  180
22   Exhibit 13  11, 2022,
23                 Bates FTX_3AC_000045026-067
24
25
```

Page 7

```
 1
 2                    - - -
 3              E X H I B I T S
 4                    - - -
 5      NO.      DESCRIPTION      PAGE
 6   Coverick    Updated Analysis - Three     198
 7   Exhibit 14  Arrows Capital
 8                 September 4, 2024,
 9                 Bates FTX_3AC_000013874-911
10
11   Coverick    FTX Terms of Service     216
12   Exhibit 15  May 13, 2022,
13                 Bates FTX_3AC_000013695-756
14
15   Coverick    Exhibit 16 email from FTX    285
16   Exhibit 16  OTC Portal 3/20/2020,
17                 Bates 3AC-FTX-00534514
18
19   Coverick    Email from FTX OTC Portal    285
20   Exhibit 17  6/2/2020,
21                 Bates 3AC-FTX-00536147
22
23   Coverick    Spot Margin Trading      344
24   Exhibit 18  Explainer April 4, 2022,
25                 Bates FTX 3AC 000045694-712
```

Page 8

```
 1
 2   DEPOSITION SUPPORT INDEX
 3
 4   DIRECTION TO WITNESS NOT TO ANSWER
 5    Page  Line
 6    - -none- -
 7
 8
 9   REQUEST FOR PRODUCTION OF DOCUMENTS
10    Page  Line
11     58   3
12    334   3
13
14
15   STIPULATIONS
16    Page  Line
17    - -none- -
18
19
20   QUESTIONS MARKED
21    Page  Line
22    - -none- -
23
24
25
```

Page 9

```
 1
 2                    - - -
 3              10:09 a.m. EDT
 4                    - - -
 5         THE VIDEOGRAPHER:  We are now on
 6   the record.  This begins videotape
 7   number 1 in the deposition of Steven
 8   Coverick in the matter of FTX Trading
 9   Limited, et al.
10         Today is September 24th, 2025,
11   and the time is 10:09 a.m.
12         This deposition is being taken
13   at 1271 Avenue of the Americas, New
14   York, New York, at the request of
15   Latham Watkins.
16         The videographer is Sammy Verni
17   of Magna Legal Services and the court
18   reporter is Marie Foley of Magna Legal
19   Services.
20         Will counsel and all parties
21   present state their appearances and
22   whom they represent.
23         MR. PROULX:  For the Joint
24   Liquidators of Three Arrows Capital
25   Limited, Zachary Proulx of Latham and
```



Page 10

1
2    Watkins.  I'm joined by my colleagues
3    Zijun Zhao, Adam Goldberg and
4    Nacif Taousse, as well as client
5    representatives from the joint
6    liquidators of Three Arrows Capital.
7        MR. GLUECKSTEIN:  Brian
8    Glueckstein, Sullivan and Cromwell on
9    behalf of the FTX Recovery Trust and
10   the witness.  Joined with me today is
11   Sam Darby and other representatives
12   from Alvarez and Marsal.
13       THE VIDEOGRAPHER:  Will the
14   court reporter please swear in the
15   witness.
16       THE STENOGRAPHER:  If I could
17   ask you to raise your right hand,
18   please.
19       Do you swear or affirm the
20   testimony you give will be the truth,
21   the whole truth, and nothing but the
22   truth today?
23       THE WITNESS:  Yes.
24       THE STENOGRAPHER:  Thank you.
25           - - -

Page 11

1
2    STEVEN P. COVERICK, the Witness herein,
3        having been first duly sworn by a
4        Notary Public in and of the State of
5        New York, was examined and testified
6        as follows:
7    EXAMINATION BY
8    MR. PROULX:
9        Q.   Mr. Coverick, good morning.
10   Thank you for starting at 10 a.m. this
11   morning instead of 9 a.m.
12       You're located in Dallas?
13       A.   I am.
14       Q.   Well, I hope you had a good trip
15   up here.
16       Have you been deposed before?
17       A.   I have.
18       Q.   Okay.
19       Was that in the -- by LayerZero
20   in this bankruptcy proceeding?
21       A.   Yes, it was.
22       Q.   Have you had any other
23   depositions?
24       A.   No.
25       Q.   In that deposition, were you

Page 12

1
2    being deposed in an individual or
3    representative capacity, if you know?
4        A.   I believe it was in my
5    individual capacity, but I'm -- I'm not
6    certain.
7        Q.   So, you have been deposed
8    before.  I won't go -- then go over all
9    the rules of the road, but I'll focus on a
10   few perhaps highlights just to make sure
11   we're all aligned on how this will proceed
12   today.
13       I ask that you answer audibly,
14   no nodding, no mm-hms.
15       Is that understood?
16       A.   Yes.
17       Q.   Okay.  You passed the first
18   test.
19       I'll do my best not to speak
20   over you.  I would in turn ask that you do
21   the same so the court reporter can keep a
22   client record for both of our clients'
23   sakes.
24       Is that understood?
25       A.   Yes, sir.

Page 13

1
2        Q.   Counsel may object, but unless
3    they instruct you not to answer a
4    question, you are required to answer my
5    questions.
6        Do you understand that?
7        A.   Yes, sir.
8        Q.   We want to be hospitable today.
9    If you need break at any point, let me
10   know.  We ask that we finish the pending
11   line of questioning, but otherwise happy
12   to accommodate your needs.
13       Is that understood?
14       A.   Yes.
15       Q.   Ask for clarification if you
16   don't understand any of my questions.  If
17   you don't, I'm going to assume that you
18   understand what I'm asking.
19       Is that understood?
20       A.   Yes.
21       Q.   Any reason you can't testify
22   truthfully, fully, and accurately today?
23       A.   No.
24       Q.   Are you represented by counsel
25   in this deposition?

MAGNA ▶
LEGAL SERVICES

Page 14

1
2      A.   Sullivan and Cromwell.
3      Q.   And is that in a personal
4  capacity?
5      A.   It's my understanding that it's
6  in a personal capacity as I'm testifying
7  in my personal capacity and then on behalf
8  of FTX as well.
9      Q.   Do you personally have a
10  engagement letter with Sullivan and
11  Cromwell?
12      A.   I do not.
13      Q.   I'm sure both of us are going to
14  be referring to this plain old FTX during
15  this deposition today.  When I'm referring
16  to FTX I'm referring to FTX Trading
17  Limited and each of its debtor affiliates.
18  These are your clients, as I understand
19  them, in the bankruptcy proceeding.
20          Is that understood?
21      A.   Would that also include the FTX
22  Recovery Trust?
23      Q.   That's a great question.  I'm
24  going to also include the FTX Recovery
25  Trust.  I assume that's who you're

Page 15

1
2  representing as well --
3      A.   Currently.
4      Q.   -- as a financial advisor?
5      A.   Correct.
6      Q.   So you've represented both over
7  the course of your engagement, both sets
8  of entities?
9      A.   That's correct.
10      Q.   So I'm going to be referring to
11  all of them, if you need clarification at
12  any point, obviously feel free to let me
13  know, but that's how I'm going to be using
14  FTX here today.
15          We'll also be talking about
16  Three Arrows or 3AC perhaps, Three Arrows
17  Capital Limited.  When I am using those
18  terms, I am referring to Three Arrows
19  Capital Limited, the entity for whom the
20  joint -- joint liquidators are currently
21  representing in BBI proceedings.
22          Do you understand that
23  definition of 3AC?
24      A.   Yes, sir.
25      Q.   Let's start with some

Page 16

1
2  housekeeping.
3          You've been marked -- you've
4  been handed, excuse me, an exhibit that's
5  previously marked as Exhibit 1 in
6  connection with a prior deposition in this
7  case.  This is titled a Notice of
8  Deposition pursuant -- excuse me.  Notice
9  of Deposition of the FTX Recovery Trust
10  Pursuant to Federal Rule of Civil
11  Procedure 30(b)(6).
12          Are you familiar with this
13  document?
14      A.   I am.
15      Q.   You reviewed it in advance of
16  this deposition?
17      A.   Yes, sir, I did.
18      Q.   What is your understanding, if
19  any, as to the topics on which you've been
20  designated a representative to speak to
21  today?
22      A.   I understand that these are the
23  topics that I might be questioned on
24  during this deposition.
25      Q.   Are there any topics that you've

Page 17

1
2  been instructed you're not the corporate
3  representative of FTX with respect to?
4      A.   I understand there was an
5  objection to some of the topics provided
6  by counsel to FTX.  I don't -- I don't
7  have memorized all those objections to, I
8  believe there's 49 topics.
9      Q.   If you turn to page 6 of this
10  document, you'll see topics 3 and 4
11  listed.  Paraphrasing, the Mosley
12  declaration and FTX's commingling and/or
13  misuse of customer deposits.
14          Are you prepared to speak to
15  those topics as the corporate designee
16  today?
17      A.   In my -- in my declaration I
18  expressly rely on the Mosley declaration.
19  I also am prepared to talk about how it
20  relates to the other topics listed in this
21  Notice of Deposition.
22      Q.   And prepared in your capacity as
23  a corporate designee of the recovery
24  trust, to your understanding?
25      A.   Yes.

**MAGNA**
LEGAL SERVICES

Page 18

1
2      Q.   Okay.
3           Any topics you are not prepared
4   to speak to today in your capacity as a
5   designee of the FTX Recovery Trust?
6      A.   Not that I can specifically
7   point out now, but if a question comes up
8   that I'm not prepared to answer, I'll let
9   you know.
10          MR. GLUECKSTEIN:  And I want the
11      record to be clear Mr. Coverick is --
12      is appearing in his corporate capacity
13      subject to the responses and
14      objections of the FTX Recovery Trust
15      that have been interposed.
16          Mr. Coverick has also not been
17      designated with respect to topics 3
18      and 4, as counsel has been made aware
19      prior to this deposition.
20          MR. PROULX:  And for the record,
21      counsel has not been made aware that
22      Mr. Coverick was not designated for
23      those topics.  Counsel was made aware
24      that Mr. Mosley was made aware for
25      those topics.  There's a distinction.

Page 19

1
2
3          (Coverick Exhibit 8, Notice of
4      Deposition of Steven P. Coverick, was
5      marked for identification, as of this
6      date.)
7          MR. PROULX:  And also for the
8      record, I want to note that the FTX
9      Recovery Trust has not moved for a
10      protective order with respect to any
11      of these topics.  We reserve all
12      rights as to the implications of
13      that -- of the -- the failure to move
14      for a protective order.
15          MR. GLUECKSTEIN:  Your
16      position's noted.  Our objections
17      stand.
18   BY MR. PROULX:
19      Q.   Mr. Coverick, you've been handed
20   what's been marked as Exhibit 8.  This is
21   titled Notice of Deposition of Steven P.
22   Coverick.
23          Have you seen this document
24   before?
25      A.   Yes, sir, I have.

Page 20

1
2      Q.   Okay.
3           And do you understand that this
4   is naming you to be deposed in your
5   individual capacity?
6      A.   I do.
7      Q.   Okay.
8           To keep the record clean today,
9   I'm going to be asking all of my questions
10  to you in a representative capacity.  If
11  I'm ever intending to ask you a question
12  in an individual capacity only, I'd
13  preface -- preference -- excuse me,
14  preface that.
15          Do you understand that?
16      A.   Yes.
17      Q.   Mr. Coverick, what did you do,
18  if anything, to prepare for this
19  deposition today?
20      A.   I reviewed a number of -- of
21  documents.  Those include 3AC's original
22  proof of claim, the amended proof of claim
23  that 3AC filed, FTX's objection to that
24  proof of claim, my declaration, as well as
25  my supplemental declaration and all

Page 21

1
2   attached exhibits to those declarations.
3   I also reviewed the other declarations
4   attached, or related to FTX's objection to
5   3AC's claim, including the Beller
6   declaration and all the exhibits, the
7   Atherton declaration, as well as the
8   declaration from Lord Neuberger's.  I also
9   reviewed what I believe are the relevant
10  documents that have been produced to 3AC.
11  I am not certain I reviewed all of the
12  documents produced to 3AC, as it's quite a
13  voluminous production, but I believe I
14  reviewed the relevant ones.
15      Q.   Okay.
16          And when you say you reviewed
17  what you believe are the relevant
18  documents, is that a determination that
19  you made or that someone else made as to
20  relevance?
21      A.   It's a determination that I made
22  when preparing my declaration and
23  preparing for the deposition.
24      Q.   And did you make that
25  determination in connection with anybody

MAGNA ▶
LEGAL SERVICES

Page 22

1
2  else?
3      A.  I made that determination in
4  consultation with my team at Alvarez and
5  Marsal, as well as conversations with
6  counsel.
7          I'm sorry, I think you asked me
8  what I did to prepare and I only spoke to
9  the documents.  I also held multiple
10  meetings with my team at Alvarez and
11  Marsal as well as with counsel at Sullivan
12  and Cromwell.
13      Q.  About how many meetings are we
14  talking about?
15      A.  Somewhere between five and ten.
16      Q.  And over the course of what
17  period are we talking?
18      A.  Since the Notice of Deposition
19  was filed through yesterday.
20      Q.  I won't hold you to any sort of
21  specific number, but in terms of total
22  hours, any sense of how long those
23  meetings lasted for?
24      A.  The meetings, many of which were
25  conducted over phone calls or -- or Zoom,

Page 23

1
2  took place throughout the course of
3  multiple days.  If I had to estimate, I
4  would say somewhere between 10 and 20
5  hours.
6      Q.  You said, I believe, that you
7  consulted with your team at Alvarez and
8  Marsal as part of this process.
9          Who was -- who was on your team
10  that you consulted with?
11      A.  So, on the FTX engagement that
12  A&M, and when I say A&M, if it's okay, I'm
13  referring to Alvarez and Marsal for short.
14      Q.  Thank you.  Works for me.
15      A.  The -- there are over 150 to
16  upwards of 200 employees at any point in
17  time, depending on the needs of the
18  estate, that are working on the FTX
19  matter.  A small subset of those employees
20  helped me prepare for this deposition.
21  Primarily that includes Kumanan
22  Ramanathan, who is the head of A&M's
23  crypto practice and working on the FTX.
24  It includes several members of our
25  restructuring team, including Gaurav

Page 24

1
2  Walia, Chase Brantley, and then some
3  more -- some more junior employees,
4  including Lylian He, Harrison McGregor,
5  and Miles Tresser.
6      Q.  Thank you for that.  And are Mr.
7  Walia and Brantley here today?
8      A.  They are present, yes.
9      Q.  Did you consult with Edgar
10  Mosley as part of your preparation?
11      A.  Mr. Mosley is my partner at
12  Alvarez and Marsal.  We often refer to
13  ourselves as the co-leads of A&M's
14  engagement with FTX.  I have spoken with
15  Mr. Mosley about the fact that I'm being
16  deposed.  He's generally aware of 3AC
17  claim and the 3AC objection existing, but
18  he's not intimately involved with what we
19  would refer to as this workstream for our
20  team.  So I have spoken with him about the
21  fact that I'm being deposed, but he was
22  not involved in my preparation.
23      Q.  Are you aware that Mr. Mosley
24  has been deposed in connection with the
25  litigation we're here for today?

Page 25

1
2      A.  Yes, sir, I am.
3      Q.  And did you listen in to or
4  review a transcript of that deposition?
5      A.  I did review the transcript for
6  the deposition.
7      Q.  Are you aware that Mr. Russell
8  Crumpler was deposed by FTX in connection
9  with this litigation?
10      A.  Yes, sir.
11      Q.  And did you listen in to or
12  review a transcript of that deposition?
13      A.  I did not.
14      Q.  Was that deposition summarized
15  to you in any way?
16      A.  I understood -- I -- I spoke
17  with counsel about the deposition
18  occurring, but I do not have explicit
19  details and did not go through the
20  transcript.
21      Q.  And I just want to jump in to
22  preempt an objection.  I'm not asking
23  about the content of any communication you
24  may have had with counsel about -- about
25  that particular declaration.

MAGNA ▶
LEGAL SERVICES

Page 26

1
2    A.   Okay.
3    Q.   Have you spoken with Nils Molina
4  in connection with your deposition here
5  today?
6    A.   I have never spoken with Nils
7  Molina.
8    Q.   Is Nils Molina currently
9  employed by FTX, to your knowledge?
10   A.   That's my understanding, yes.
11   Q.   What about Mr. John Ray, did you
12 speak with him in connection with this
13 deposition?
14   A.   I speak with John Ray regularly
15 about the general business of the estate.
16 He's aware that I'm being deposed.  He is
17 aware of the -- the claim from 3AC and our
18 objection to that claim, but he is not
19 involved in the details and he was not
20 involved in my preparation or any of the
21 details related to the declaration or the
22 objection.
23   Q.   What, if any, role does Mr. Ray
24 currently have with respect to FTX?
25   A.   I believe Mr. Ray's current

Page 27

1
2  title is plan administrator of the FTX
3  Recovery Trust.  He pre-plan effectiveness
4  was the CEO and the CRO of FTX, of the FTX
5  Group.
6    Q.   To your knowledge, what is the
7  plan administrator of the FTX Recovery
8  Trust, what are their responsibilities or
9  mandate?
10   A.   As a general matter, the -- the
11 responsibilities and role of the trust,
12 which the plan administrator oversees,
13 includes predominantly three things.  One
14 is monetizing any assets of the estate,
15 including assets that the estate holds and
16 can be sold, as well as pursuing
17 litigation on behalf of the trust.
18          The second is adjudicating
19 claims and resolving any disputes
20 surrounding claims, ensuring the
21 appropriate requirements are met before
22 claims are allowed.
23          And then finally, making
24 distributions of the monetized assets to
25 holders of allowed claims.

Page 28

1
2          And Mr. Ray oversees all of
3  those activities.
4    Q.   Did you review any of Mr. Ray's
5  work, declarations, or testimony in
6  connection with your deposition here
7  today?
8          MR. GLUECKSTEIN:  Object to the
9  form.
10   A.   I reviewed the two, what I
11 believe are referred to as the Ray reports
12 that are referenced in Mr. Mosley's
13 declaration.
14          I have not reviewed any other
15 report of Mr. Ray's or declaration of Mr.
16 Ray's that I can recall in -- in
17 connection with this matter.
18   Q.   What -- what general topics do
19 those two declarations you referenced
20 speak to?
21   A.   In general, it's my
22 understanding that they relate to the
23 commingling of assets and the
24 misappropriation of assets of the
25 pre-petition FTX Group.

Page 29

1
2    Q.   Commingling and misappropriation
3  by FTX or by someone else?
4    A.   By FTX.
5    Q.   Did you speak with Robert Gordon
6  in connection with your deposition
7  preparation?
8    A.   Mr. Gordon reports to me on FTX.
9  I was aware that he was involved in the
10 original analysis of 3AC's claim.  I was
11 aware that he was deposed in -- in
12 connection with that claim, but I have
13 not -- so, I spoke with him at the time
14 about the fact that he was being deposed.
15 I was focused on other matters for the
16 estate at the time and did not get
17 involved in the details of that -- of that
18 issue.
19          I have not spoken with him about
20 3AC since I began preparing my declaration
21 and -- and not in connection with prep --
22 preparing for this deposition.
23   Q.   And just so the record's clear,
24 when you talk about preparing your
25 declaration, are you referring to the

1
2  declaration you submitted on June 20th in
3  connection with the claim objection by
4  FTX?
5      A.   That's correct.  I'm -- I'm
6  referring to anything related to either
7  declaration or preparation for this
8  deposition.
9      Q.   By either declaration, are you
10  also referring to your supplemental
11  declaration recently filed by the FTX
12  Recovery Trust?
13      A.   Yes, sir.
14      Q.   Okay.  I ask because you have
15  submitted other declarations in connection
16  with the FTX bankruptcy; is that correct?
17      A.   That's correct.
18      Q.   Do you characterize yourself as
19  the -- lead A&M advisor with respect
20  to the Three Arrows litigation issues?
21      A.   I do.
22      Q.   Is -- is Mr. Gordon still on
23  the -- that team?
24      A.   No.  Mr. Gordon is the lead of
25  what we often refer to informally as the

1
2  accounting team within the broader A&M FTX
3  team.  He is currently focused on other
4  workstreams for the estate, whereas I am
5  the one focused on the -- the matters
6  relating to 3AC.
7      Q.   You mentioned that Mr. Gordon
8  was previously deposed in connection with
9  the Three Arrows litigation; is that
10  correct?
11      A.   Yes, sir.
12      Q.   Was there a time at which Mr.
13  Gordon was on the Three Arrows litigation
14  team for A&M?
15          MR. GLUECKSTEIN:  Object to the
16  form.
17  BY MR. PROULX:
18      Q.   You can answer.
19      A.   Yes.
20      Q.   And was there a point in time in
21  which he left that team?
22      A.   I wouldn't characterize it as
23  leaving a team.  We continuously evaluate
24  the resources that our team has available
25  in connection with the needs of the estate

1
2  and assign those resources appropriately.
3          At the time, myself and other
4  resources were focused on other matters
5  for the estate, given the state that the
6  case was in at that time, and Mr. Gordon
7  was determined to have the most relevant
8  knowledge at the time, and so he was
9  focused on it at the time.
10          Now that the case has evolved
11  and is -- has an effective plan, Mr.
12  Gordon's focused on other matters, and I
13  have taken the lead with regard to 3AC.
14      Q.   When did you take the lead with
15  regard to -- to 3AC?
16      A.   I don't recall the exact month,
17  but it was sometime after the effective
18  date.
19      Q.   And the effective date, was that
20  in January of 2025?
21      A.   Yes, sir.
22      Q.   Did you review Mr. Gordon's
23  deposition transcript in connection with
24  this litigation as part of your deposition
25  preparation?

1
2      A.   I did review Mr. Gordon's
3  transcript.
4      Q.   Did you review Mr. Gordon's
5  transcript in preparation of your
6  declarations in this litigation, separate
7  and apart from your deposition
8  preparation?
9      A.   I did review Mr. Gordon's
10  transcript in connection with preparing
11  for this deposition.
12          And to be clear about my earlier
13  answer, I was including, when I said
14  anything produced to 3AC, I was including
15  documents like the transcripts that I'm
16  aware 3AC's in possession of.
17      Q.   What are some other documents
18  that were produced to Three Arrows that
19  you recall reviewing in preparation for
20  this deposition?
21      A.   There are many.  Some of them
22  include extracts which represent primary
23  source data from the Amazon Web Services
24  database that held the exchange ledger.
25  There's a series of communications, I

**MAGNA** ▶
LEGAL SERVICES

1
2  understand, that have been produced.
3  There's a series of help pages from the
4  FTX website as it formerly existed that
5  have been produced.
6       Those are just some of the
7  documents I'm aware of, but I -- I do not
8  have committed to memory all of the
9  documents that have been produced.
10      Q.   In reviewing Mr. Gordon's
11  deposition transcript in connection with
12  this deposition or otherwise, is there any
13  testimony that he gave that you consider
14  inaccurate?
15      A.   Our understanding of 3AC's
16  account history and the nature of the
17  claim being asserted, especially given the
18  fact that the claim was amended, has
19  evolved since Mr. Gordon's testimony. My
20  understanding is Mr. Gordon's testimony
21  was based on what I would characterize as
22  early-stage preliminary analysis of the
23  claim and was also predicated on certain
24  methodologies that were used for other
25  purposes in the case. So there are things

1
2  I'm aware of in his testimony that I have
3  a more accurate view of today than Mr.
4  Gordon did at the time.
5       Q.   Could you provide an example?
6       A.   Yes.  I -- I don't have his
7  transcript in front of me, so I'm
8  summarizing.  I would be happy to answer
9  questions that are more specific, but one
10  topic that I'm aware of being discussed in
11  his deposition is the inclusion of a -- an
12  amount of notional futures value that was
13  included in the negative USD balance of
14  the account which, as I just testified to,
15  is predicated on a different methodology
16  used for a different purpose than how we
17  evaluate the claim or how the exchange
18  operated in general.
19      Q.   Any other examples -- and we'll
20  go into some of the details over the
21  course of our couple days here, but any
22  other examples of instances where your
23  methodology of FTX diverged from Mr.
24  Gordon's on behalf of FTX?
25      MR. GLUECKSTEIN:  Object to

1
2       form; misstates the testimony.
3  BY MR. PROULX:
4       Q.   You can answer.
5       A.   Again, I don't have the
6  transcript in front of me, so I don't want
7  to speculate as to the specifics.  I
8  obviously don't have the transcript
9  committed to memory.
10      Another example of something
11  that I understand was discussed in some
12  form was the inclusion of certain deposits
13  in 3AC's account balance or the exclusion
14  of those deposits in 3AC's account
15  balance.  That is another general topic
16  that I'm aware our analysis has produced a
17  refined view of.
18      Q.   When you say certain deposits,
19  could you provide a little more detail as
20  to what you mean by that?
21      A.   Sure.
22      There were two deposits
23  specifically in March of 2022 that
24  totalled to approximately $24 million that
25  have been under review given the fact that

1
2  they in the exchange ledger were noted in
3  one field as "cancelled" but otherwise
4  included in the account balance at all
5  times the exchange ledger was operated.
6       Q.   And how has your understanding
7  of that particular issue refined?  What
8  was the position before, if not what
9  you've just articulated?
10      MR. GLUECKSTEIN:  Object to the
11      form.
12      A.   In -- in the early stages of the
13  analysis, our team noticed that a field in
14  the exchange letter -- in the exchange
15  ledger noted those deposits as cancelled,
16  and at points in time excluded those
17  deposits from the account balance.  And to
18  be clear, I'm referring to our team, the
19  A&M team's post-petition analysis of the
20  account in relation to the claim filed by
21  3AC.
22      As we've conducted further
23  analysis, we have determined that that 24
24  million, approximately $24 million of
25  deposits had always been included in 3AC's

1
2   account balance in the exchange ledger
3   from the moment those deposits were
4   entered on the ledger through the petition
5   date.  So our current understanding of
6   those two specific transactions was
7   that -- is that they were always included
8   in 3AC's account balance and continue to
9   be included in 3AC's account balance as of
10  and through the petition date.
11       Q.   Is that reflected in any refined
12  data that FTX produced to Three Arrows?
13       A.   Yes.  There is a document that I
14  understand was recently produced that
15  makes that adjustment.
16       Q.   Did you help Mr. Gordon prepare
17  for his own deposition in connection with
18  this litigation?
19       A.   I did not.
20       Q.   Any other -- at a general level
21  to start, any other methodological
22  differences between your analysis in this
23  litigation and the analysis testified to
24  by Mr. Gordon?
25       MR. GLUECKSTEIN:  Object to the

1
2   form; misstates the testimony.
3       A.   Again I would need a more
4   specific example or question.  I would
5   need to see the transcript in front of me.
6       So my answer cannot be
7   all-inclusive.  Those are the -- those are
8   two of the categories that I can recall
9   from memory.
10      Q.   At a level of a category,
11  generally speaking, you can't recall any
12  other categories?
13      A.   I generally recall, when
14  reviewing his transcript, that there
15  are -- there were certain things that were
16  said based on Mr. Gordon's knowledge at
17  the time that I and my team have developed
18  further knowledge on since that early date
19  in the analysis of the claim.  I -- I
20  cannot specifically recall what each of
21  those items were.
22      Q.   But there may be other specific
23  items where FTX now deems Mr. Gordon's
24  testimony inaccurate?
25      MR. GLUECKSTEIN:  Object to the

1
2       form; misstates the testimony yet
3       again.
4       A.   Once again, if there was a
5   specific question about something he said,
6   I will answer it to the best of my
7   capability, but I -- I cannot by memory
8   summarize or remember everything in the
9   transcript.
10      Q.   You're not ruling that out?
11      MR. GLUECKSTEIN:  Object to the
12      form.
13      A.   Can you please clarify I'm not
14  ruling that out.
15      Q.   Sure.
16      You're not ruling out the
17  presence of other inaccuracies in his
18  position?
19      MR. GLUECKSTEIN:  Object to the
20      form.
21      A.   Once again, if there was a
22  specific question, I will answer it to the
23  best of my ability.
24      Q.   Did you consult with any current
25  or former FTX employees in connection with

1
2   this dep -- deposition?
3       A.   I did not.
4       Q.   So you didn't speak with
5   anyone -- to anyone with firsthand
6   knowledge of the actions and activities
7   you discuss in your declarations with
8   respect to the June 2022 time period?
9       A.   I would not characterize my
10  preparation that way.
11      Q.   Did you attempt to speak with
12  anyone -- to anyone with that firsthand
13  knowledge?
14      MR. GLUECKSTEIN:  Object to the
15      form.
16      A.   Again, I do not characterize
17  firsthand knowledge the way that I -- I
18  believe you're implying.  I went through a
19  process to develop, analyze, and verify
20  everything in my declaration, as well as
21  the things I believe I'm being asked to
22  potentially testify to in this deposition.
23      Q.   I'm not trying to be unclear as
24  to what I mean by firsthand knowledge.
25      You -- you weren't involved in

**MAGNA**
LEGAL SERVICES

1
2  the contemporaneous transactions that
3  occurred in June 2022, were you?
4      A.   I was not employed by FTX in
5  June of 2022, nor did I know anyone that
6  was.
7      Q.   Do you know if -- if anyone at
8  Alvarez and Marsal attempted to speak with
9  anyone who had such knowledge as part of
10  the deposition preparation?
11      MR. GLUECKSTEIN:  Object to the
12  form.
13      A.   I do know that my team has
14  spoken with FTX employees that were
15  employed at that time as a part of their
16  verification process to understand
17  relevant aspects of our analysis.
18      Q.   Which employees were those?
19      A.   I don't know every employee that
20  has spoken with a former FTX or current
21  FTX employee.
22      I do know that Mr. Walia, who I
23  referenced as helping me prepare for this
24  deposition and helping me prepare my
25  declaration, spoke with him.  I believe

1
2  other members of the team have spoken with
3  FTX employees at certain points in time,
4  but I -- I do not maintain a ledger of all
5  conversations my team has.
6      Q.   Sure.  Now I'm asking
7  specifically about the identities of the
8  FTX employees you just referenced.
9      Who are those, to the best of
10  your knowledge?
11      A.   The best of my knowledge is the
12  individual I just mentioned, Mr. Walia.
13      Q.   Mr. Walia is an FTX employee?
14      A.   No, Mr. Walia is an A&M
15  employee.
16      Q.   Yes.
17      And who are the FTX employees
18  that either Mr. Walia or anyone else at
19  Alvarez and Marsal spoke with in
20  connection with this litigation?
21      A.   Mr. Molina.
22      Q.   Who is Mr. Molina?
23      A.   Mr. Molina, I believe his -- his
24  full name is Nils Molina, is an employee
25  of FTX that is involved and was involved

1
2  pre-petition with the code base of the
3  exchange.
4      Q.   Is Mr. Molina still employed or
5  associated with FTX in some capacity?
6      A.   I believe he is still an
7  employee of FTX.
8      Q.   What is his title, to your
9  knowledge?
10      A.   I don't know his exact title.
11      Q.   Any other current or former FTX
12  employees that you or Alvarez and Marsal
13  contacted or attempted to contact in
14  connection with the Three Arrows
15  litigation?
16      A.   Again, in connection with this
17  matter being the 3AC claim and FTX's
18  objection to that claim, I have never
19  spoken with a current or former FTX
20  employee regarding this dispute.
21      The only FTX employee I'm aware
22  of my team speaking with in connection
23  with this dispute is Mr. Nils Molina.
24      Q.   And without revealing the
25  substance of any communications you had

1
2  with counsel, did counsel inform you of
3  the fact of whether or not they
4  communicated with any FTX -- former FTX
5  employees in connection with this
6  litigation?
7      A.   I'm sorry, can you repeat the
8  question?
9      Q.   Sure.  Yeah, that was a
10  mouthful.  I'm just trying to be careful
11  that I'm not asking you about your
12  communications with counsel.
13      I'm simply asking if you've been
14  informed by counsel in connection with
15  your preparation about information that
16  they received from any former FTX
17  employees.
18      MR. GLUECKSTEIN:  Caution the
19  witness not to reveal any discussions
20  or communications with counsel.  If
21  you have an answer outside of that,
22  you can provide it.
23      A.   I am aware that counsel has had
24  some discussions with current and former
25  employees of FTX.

1
2    Q.    And which employees were those?
3    Again without inquiring about the
4    substance of the communications with
5    counsel.
6    A.    I -- to be clear, I don't know
7    the substance of those communications, and
8    the two individuals that I'm aware of are
9    Mr. Nils Molina and a Mr. Zane Tackett.
10   Q.    And who is Mr. Zane Tackett?
11   A.    It's my understanding that Mr.
12   Tackett was a pre-petition employee of
13   FTX.
14   Q.    Do you know his role as a
15   pre-petition employee of FTX?
16   A.    I know in general that he had
17   some level of involvement with customer
18   accounts, but I was not present at the
19   time of Mr. Tackett's employment, so I
20   cannot purport to understand the entirety
21   of his role.
22   Q.    You haven't spoken with Mr.
23   Tackett personally at any point?
24   A.    I've never spoken with -- with
25   Mr. Tackett.

1
2    Q.    Any other employees that
3    counsel -- your counsel informed you that
4    they contacted?
5    A.    Not that I remember.
6    Q.    With respect to this litigation?
7    A.    Not that I can recall.
8    Q.    We talked little bit earlier
9    about the FTX Recovery Trust in contrast
10   to the FTX debtors.
11        What is the relationship, if
12   any, currently between the FTX Recovery
13   Trust and the post-petition debtors?
14        MR. GLUECKSTEIN:  Object; calls
15   for a legal conclusion.
16   A.    I'm not a lawyer, so I can't
17   speak to the legal nature of the
18   relationship, but my general
19   businessperson's understanding is that the
20   FTX debtors were, prior to the effective
21   date, were debtors in possession under
22   Chapter 11.
23        The FTX debtors had a plan
24   confirmed by the bankruptcy court.  That
25   plan went effective in January of 2025.

1
2    That plan resulted in the creation of the
3    FTX Recovery Trust and the transfer of all
4    assets and liabilities from the FTX
5    debtors to the FTX Recovery Trust.
6    Q.    Do those assets include the
7    debtors' documents?
8    A.    I believe so.  I don't know.
9    I'm not a lawyer, and I'm not intimately
10   involved with the transfer of -- the legal
11   transfer of anything from the debtors to
12   the recovery trust.
13   Q.    Putting aside any legal
14   transfer, are you aware of whether the
15   post-petition debtors were in -- were in
16   possession of any documents that the FTX
17   Recovery Trust is not currently?
18   A.    Not that I'm aware of.
19   Q.    Do you see your mandate or role
20   or responsibilities as having changed upon
21   the creation of the FTX Recovery Trust
22   relative to before that point?
23   A.    Yes.
24   Q.    How so?
25   A.    The nature of our engagement and

1
2    the stage of the engagement is -- is
3    different than it was prior to plan
4    effectiveness.
5        Prior to plan effectiveness, our
6    roles included negotiating and assisting
7    the negotiation of a plan with creditors,
8    going through the related court processes.
9    Earlier stages involve preparing first-day
10   pleadings and related analysis, providing
11   testimony when necessary regarding the
12   evolution of the plan and the eventual
13   confirmation and the effectiveness of the
14   plan.
15        Our engagement with the FTX
16   Recovery Trust, while similar in many
17   ways, is now focused on the implementation
18   of that plan.  So again, the three major
19   categories of work and business that the
20   FTX Recovery Trust is involved in, which
21   again includes asset monetization, claims
22   adjudication, and distributions to allowed
23   claim holders.
24   Q.    Do you still represent the
25   post-petition FTX debtors?

**MAGNA**
LEGAL SERVICES

1
2          MR. GLUECKSTEIN:  Objection;
3     calls for a legal conclusion.
4          A.   I'm not sure I appreciate the
5     legal nuance of -- of that question.
6          I -- I do know that, again, all
7     assets and liabilities, to my knowledge,
8     transferred from the pre-petition
9     debtor -- or, the pre-effective FTX
10     debtors to the FTX Recovery Trust.
11          I'm also aware that many of the
12     legal entities that were debtors in the
13     Chapter 11 case are currently in the
14     process of being wound down, and my team
15     assists with that process.  When I say
16     wound down, I'm referring to traditional
17     legal entity dissolutions.  We had an
18     engagement -- we, A&M, had an engagement
19     letter with FTX Trading Limited and its
20     affiliates from, I believe, November 11th
21     through the effective date.  We then
22     entered into a new engagement letter with
23     the FTX Recovery Trust following the
24     effective date.
25          Q.   Was that new engagement letter

1
2     publicly filed, to your knowledge?
3          A.   I do not believe so.
4          Q.   Do you know if -- if the -- the
5     dissolution process that I think you
6     referred to has been completed with
7     respect to the post-petition FTX debtors?
8          A.   It has not.
9          Q.   Do you still see the
10     post-petition FTX debtors as among your
11     clients?
12          A.   Again, I'm not sure I can speak
13     to the legal nuance of that relationship.
14          It's my understanding that all
15     assets and liabilities of the debtors
16     transferred to the trust.  It's also my
17     understanding that the trust and the plan
18     administrator are responsible for the
19     dissolution of those entities.  We have an
20     engagement letter, we, A&M, have an
21     engagement letter with the FTX Recovery
22     Trust and the plan administrator to advise
23     him on anything he needs related to his
24     business.
25          Q.   I'm not asking for any legal

1
2     nuance whatsoever.  I'm asking the
3     straightforward question.
4          Who are your clients today?
5          A.   Our current engagement letter is
6     with the FTX Recovery Trust.
7          Q.   Is that your only client
8     currently?
9          A.   Is that --
10          Q.   With respect to the FTX
11     litigation.
12          A.   Once again --
13          MR. GLUECKSTEIN:  Object to the
14     form.
15          A.   Once again, I do not know.  I'm
16     not a lawyer and cannot speak to the legal
17     nuance of how our relationship and
18     engagement with the FTX Recovery Trust
19     technically relates to the pre-petition
20     debtors.
21          I'm also not -- I'm not familiar
22     with the applicable and governing laws
23     around how that client relationship
24     changes.
25          Again, our client is the FTX

1
2     Recovery Trust and the plan administrator,
3     and we provide advice and services to the
4     FTX Recovery Trust and the plan
5     administrator.
6          Q.   How long have you been employed
7     by A&M for?
8          A.   Since 2016.
9          Q.   What is your current title or
10     position at A&M?
11          A.   I'm a managing director.
12          Q.   Any professional licenses?
13          A.   I -- I have two designations, I
14     would refer to them as.  I hold the
15     chartered financial analyst designation
16     from the CFA Institute and I'm also
17     recognized as a certified turnaround
18     professional by the Turnaround Management
19     Association.
20          Q.   Are either of those designations
21     cryptocurrency specific?
22          A.   They are not specifically
23     related to cryptocurrency solely, but some
24     of the curriculum in those -- in the exams
25     required to achieve those designations

**MAGNA ▶**
LEGAL SERVICES

1
2  does include references and topics related
3  to cryptocurrency.
4      Q.   Prior to the FTX engagement, did
5  you have any experience in cryptocurrency
6  restructuring matters?
7      A.   Other than my experience over
8  the last three years as the co-lead of
9  A&M's engagement with FTX, I have not had
10 any professional cryptocurrency
11 experience.
12     Q.   And just to be clear, when you
13 refer to the last three years, you're
14 referring to this specific engagement, the
15 FTX engagement?
16     A.   Yes, I'm referring in general
17 the FTX engagement.  And when I say three
18 years, I think it's slightly under three
19 years.  Our engagement began in November
20 of 2022, so I'm -- I'm probably a month or
21 two shy of three years.
22     Q.   Ever published on any
23 cryptocurrency issues?
24     A.   I've not.
25     Q.   Did you learn about

1
2  cryptocurrency issues in connection with
3  this engagement?
4      A.   I have learned a lot about
5  cryptocurrency in the last nearly three
6  years on this engagement.
7      Q.   Okay.
8           Ever serve as an expert witness
9  on cryptocurrency issues?
10     A.   No, sir.
11     Q.   Ever serve as an expert witness
12 more generally in any sort of litigation
13 or arbitration or other legal proceeding?
14     A.   I cannot recall -- I've done a
15 number of declarations.  I cannot recall
16 one of them including a -- technically an
17 expert report.  It's possible a prior
18 engagement may have included an expert
19 report, but I -- I cannot recall if it was
20 a -- just a declaration or an expert
21 report, but I have not done any expert
22 reports on FTX.
23     Q.   Okay.
24           And that includes the
25 declarations you submitted in this

1
2  litigation, they're not expert reports?
3      A.   Correct.
4      Q.   Other than the Three Arrows
5  litigation, what other general workstreams
6  within A&M's engagement for FTX do you
7  lead?
8      A.   Every workstream, as -- as we
9  often refer to them, related to FTX, the
10 FTX engagement -- every workstream the A&M
11 team is involved with on FTX rolls up to
12 me.
13     Q.   Does it roll up from you to
14 anyone else at A&M?
15     A.   As an informal internal matter,
16 Mr. Mosley is designated as what we at A&M
17 refer to as the lead MD, or the lead
18 managing director on the engagement.  What
19 that means is he's the one who signs --
20 signed the engagement letter.
21           From an operating perspective,
22 Mr. Mosley and I work together to manage
23 the business of A&M related to the estate.
24     Q.   On a day-to-day basis, how often
25 do you communicate with Mr. John Ray

1
2  regarding the FTX case?
3      A.   It varies.  Oftentimes multiple
4  times a day, sometimes less.
5      Q.   Is -- does he oversee each of
6  the workstreams you've just described
7  that's within your mandate?
8      A.   As the plan administrator, Mr.
9  Ray oversees all business of the estate.
10     Q.   Is he closely involved in that
11 business?
12     A.   Some more than others.  He's not
13 closely involved in every claim dispute,
14 for example.  He's generally made aware of
15 the status of all matters by his advisors.
16     Q.   Is he involved in this
17 particular claim dispute?
18     A.   He is not.
19     Q.   Current -- not currently or not
20 ever?
21     A.   He has never been intimately
22 involved with this claim dispute.
23           MR. PROULX:  So I'll represent I
24 haven't seen the new engagement letter
25 that you referenced A&M had with the

**MAGNA**
LEGAL SERVICES

1
2    FTX Recovery Trust.
3         I'd make a request on the record
4    to counsel to please produce that
5    document to us so we can review.
6    BY MR. PROULX:
7    Q.    What is the compensation
8    structure pursuant to that engagement?
9         MR. GLUECKSTEIN:  We'll take
10    that under advisement.  We're not
11    agreeing to produce that.
12    A.    Our compensation arrangement
13    with FTX is what I would refer to as a
14    rates-times-hours compensation structure.
15    Every A&M employee has an assigned hourly
16    rate.  They track their hours worked
17    related to the engagement, and we bill
18    those hours times the applicable rate for
19    each person.
20    Q.    Has the compensation structure
21    changed any way relative to the publicly
22    filed engagement letter on behalf of the
23    post-petition debtors?
24    A.    Other than the fact that we
25    update our rates charged on an annual

1
2    basis, no.
3    Q.    And in connection with your work
4    on this litigation specifically, does that
5    compensation structure apply as well?
6    A.    To A&M, yes.
7    Q.    And to you specifically?
8    A.    My specific compensation is set
9    by Tony Alvarez and Brian Marsal who are
10    the cofounders of Alvarez and Marsal.
11    Q.    Aside from the hourly rate
12    structure you just described, you're not
13    receiving any additional compensation for
14    testifying here today?
15    A.    No, sir.
16    Q.    Thank you.
17         MR. PROULX:  Do you need a
18    break?
19         THE WITNESS:  I'm -- I'm good.
20         MR. PROULX:  Counsel, you good?
21         MR. GLUECKSTEIN:  Yeah.
22         MR. PROULX:  Okay.
23    BY MR. PROULX:
24    Q.    Prior to the two declarations
25    you submitted in connection with this

1
2    litigation, have you submitted other
3    declarations in the FTX case more
4    generally?
5    A.    Yes.
6    Q.    And what were those other
7    declarations?
8    A.    I -- I don't have all of them
9    committed to memory.  Some of them
10    involved claim objections, some were in
11    connection with plan confirmation, and I'm
12    sure there were others, but I -- I don't
13    have them all memorized.
14    Q.    With respect to the plan
15    confirmation declaration you alluded to,
16    what general subjects did that declaration
17    speak to?
18    A.    In general, it focused on the --
19    the requirements for confirmation of a
20    bankruptcy plan, including those
21    requirements in -- in Section 1129 of the
22    Bankruptcy Code.
23         It also related to certain
24    objections to plan confirmation.
25    Q.    Did it speak to the

1
2    classification of claims and interests
3    under the plan?
4    A.    It did.
5    Q.    You're familiar with that
6    subject?
7    A.    Yes.
8         (Coverick Exhibit 9, Declaration
9    of Steven P. Coverick in Support of
10    Confirmation of the Second Amended
11    Joint Chapter 11 Plan of Reorganization
12    of FTX Trading Ltd. and Its Debtor
13    Affiliates, was marked for
14    identification, as of this date.)
15    BY MR. PROULX:
16    Q.    You've been marked -- excuse me.
17    You've been handed what's been marked
18    Exhibit Number 9.
19         What is this document?
20    A.    This looks like my declaration I
21    just referenced in support of confirmation
22    of the plan.
23    Q.    At paragraphs 21 to 23 of this
24    document, it's on page 11, you talk about
25    a global settlement and a customer

1
2  priority settlement.
3          Do you see that?
4      A.   I do.
5      Q.   Let's start with the global
6  settlement.
7          What's that?
8          MR. GLUECKSTEIN:  Objection;
9  calls for a legal conclusion.
10         You can answer if you -- to your
11  understanding.
12     A.   The global settlement as defined
13 in my declaration is a settlement in
14 consideration of distributions and other
15 benefits provided pursuant to the plan,
16 provisions of the plan, or good faith
17 compromise of all claims, interests,
18 controversies relating to --
19         (Stenographer instruction.)
20     A.   Relating to the contractual,
21 legal, and subordination rights that
22 holder of a claim may have with respect to
23 any allowed claim or any distribution to
24 be made on account of such allowed claim.
25         I would just -- I apologize for

1
2  reading it, but that is my understanding
3  of the global settlement.
4      Q.   Thank you for that.  I just want
5  to make sure the court reporter got that.
6          And for the record, you were
7  just verbatim reading your declaration --
8      A.   Yes, sir.
9      Q.   And how does the customer
10 priority settlement differ from the global
11 settlement, if at all?
12     A.   The customer priority settlement
13 as a general matter is part of the global
14 settlement and relates to the negotiated
15 compromise of how certain claims are
16 prioritized over other claims.  In effect
17 today is really a priority of distribution
18 speed given the projected recoveries that
19 were included in the disclosure statement.
20     Q.   Did the customer priority
21 settlements resolve in any way disputes
22 with respect to ownership of digital
23 assets on the FTS -- on the FTX exchange?
24     A.   I'm -- I'm not a lawyer, so I
25 can't speak to any legal conclusions or

1
2  determinations, but my understanding is
3  that the -- the confirmed plan settled all
4  disputes related to the ownership of
5  customer assets or estate assets.
6      Q.   And the customer priority
7  settlement specifically?
8      A.   The customer priority settlement
9  was part of the plan and part of the
10 compromise to settle those disputes.
11     Q.   In paragraph 24 on the next
12 page, I'll -- I'll just read this one in
13 verbatim in this case:  It is apparent
14 that litigation of such issues to final
15 judgment would be complex, burdensome,
16 uncertain.
17         In the next sentence you
18 reference disputes with respect to the
19 meaning of US DOT and dot-com TOS.
20         Do you see that?
21     A.   I do.
22     Q.   What did you mean by complex,
23 burdensome, and uncertain?
24         MR. GLUECKSTEIN:  Object to the
25 form.

1
2      A.   I mean that litigation on a
3  matter as complex as the issues that were
4  being discussed during the negotiation of
5  the plan would be expensive and take time.
6  And as with all litigation, my general
7  understanding is there's some level of
8  uncertainty.
9      Q.   Those complex issues include the
10 ownership dispute you reference here?
11     A.   The complex issues include
12 everything related to FTX's pre-petition
13 activities.
14     Q.   Including the handling of
15 customer assets on the FTX exchange?
16     A.   Correct.
17     Q.   And the ownership thereof?
18     A.   Correct.
19         (Coverick Exhibit 10,
20 Declaration of Steven P. Coverick in
21 Support of the FTX Recovery Trust's
22 Objection to the Amended Proof of
23 Claim Filed By Joint Liquidators of
24 Three Arrows Capital, was marked for
25 identification, as of this date.)

Page 66

1
2    BY MR. PROULX:
3        Q.   You've been handed what's marked
4    as Exhibit Number 10.
5            What is this document?
6        A.   This appears to be my
7    declaration in support of the recovery
8    trust's objection to 3AC's claim, but it
9    also appears to not include the exhibits
10   attached to those -- to -- to the
11   declaration, but it appears to be the --
12   the written declaration itself.
13       Q.   Thank you for that
14   clarification.  Just for the sake of size,
15   we excerpted those exhibits.  You're
16   absolutely correct.  We'll likely be
17   speaking about those over the course of --
18   of our two days together, but in terms of
19   the declaration itself, this is
20   everything?  Sorry, the -- the -- other
21   than the exhibits, does this include your
22   entire declaration, just for the record?
23           MR. GLUECKSTEIN:  Object to the
24   form.
25       A.   I haven't been able to run a

Page 67

1
2    compare on it, but it does appear to be
3    the entirety of my operating room
4    declaration.  It obviously does not
5    include the supplemental declaration that
6    was filed more recently.
7        Q.   Thank you.  Thank you for that
8    clarification.
9            And were you assisted by anyone
10   at A&M in preparing this declaration?
11       A.   Yes, the same team I referenced
12   that helped me prepare for the deposition
13   assisted in performing the analysis that
14   has been produced in this declaration.
15       Q.   Has anyone on the A&M -- was
16   anyone on the A&M team involved in the
17   preparation of this declaration that is --
18           MR. PROULX:  Bad question.  Let
19   me strike that.
20       Q.   Anyone involved in this
21   declaration that is no longer at A&M?
22       A.   I don't believe so.  And to be
23   clear, I interfaced or spoke with the
24   people I referenced earlier.  There are
25   also a number of employees that I do not

Page 68

1
2    interact with and -- and, frankly, could
3    not name off memory that I know assisted
4    those individuals in -- in preparing the
5    analysis that's produced in this
6    declaration.  I can't say for certain if
7    there could be some support person that I
8    didn't interact with directly that may not
9    be at A&M anymore, but I'm not aware of
10   anyone that's not.
11       Q.   Fair to say that the core team
12   is the same?
13       A.   The core team is the same.
14       Q.   Okay.  Appreciate that.
15           Since submitting this dec --
16   when was this declaration submitted?
17       A.   I believe it says my birthday,
18   June 20th.
19       Q.   Since submitting this
20   declaration on your birthday, have you
21   become aware of any amendments that need
22   to be made to the declaration for purposes
23   of accuracy?
24       A.   No amendments for purposes of
25   accuracy.  Although there was supplemental

Page 69

1
2    disclosure in my supplemental declaration.
3        Q.   This document was fully
4    accurate -- as factually accurate as
5    submitted?
6        A.   To the best of my knowledge,
7    yes.
8            (Coverick Exhibit 11,
9    Supplemental Declaration of Steven P.
10   Coverick in Support of the FTX
11   Recovery Trust's Objection to the
12   Amended Proof of Claim Filed By Joint
13   Liquidators of Three Arrows Capital,
14   was marked for identification, as of
15   this date.)
16   BY MR. PROULX:
17       Q.   And you're of course welcome to
18   do anything you like with the documents,
19   but suggest to you keep that one on the
20   side.
21       A.   Sure.
22       Q.   The one we just looked at.  I'm
23   guessing we'll be coming back to that
24   throughout the day.  I just want to make
25   your life a little easier.

**MAGNA**
LEGAL SERVICES

18  (Pages 66 to 69)

1
2    A.   Thank you.
3    Q.   So you've just been handed a new
4  document marked 11.
5       What is this?
6    A.   This is my supplemental
7  declaration in support of the recovery
8  trust's objection to 3AC's claim which is
9  filed on September 19th of 2025.
10    Q.   Are these the additional
11  disclosures that you just referenced?
12    A.   Yes, sir.
13    Q.   How many days ago was this
14  submitted?
15    A.   I believe today is September
16  24th, so that would be five days ago.
17    Q.   How long is it?
18    A.   I'm sorry, can you --
19    Q.   How long is the declaration, the
20  supplemental declaration?
21       MR. GLUECKSTEIN:  Object to the
22  form.
23    A.   In terms of page count?
24    Q.   Yeah.
25    A.   It appears to be five pages with

1
2  an exhibit that is 15 pages long.  So in
3  total 20 pages.
4    Q.   And does this supplemental
5  declaration purport to explain
6  methodologies you employed in connection
7  with your original declaration?
8       MR. GLUECKSTEIN:  Object to the
9  form.
10    A.   The declaration provides
11  supplemental information related to how
12  figures in my declaration were calculated.
13    Q.   Does this supplemental
14  declaration reflect any different
15  methodologies than you employed in your
16  original declaration?
17    A.   No, sir.
18    Q.   Does this supplemental
19  declaration rely on any additional data
20  that was not available to you in preparing
21  the original declaration?
22    A.   I'm sorry, can I actually
23  clarify my last answer?
24    Q.   Yes.
25    A.   My declaration includes figures

1
2  that were directly derived from queries
3  using Python programming script to
4  calculate numbers directly off of the
5  exchange database in a manner consistent
6  with how the code base of the exchange
7  operated.
8       As part of my process to verify
9  those numbers, because I am not a computer
10  programmer and I do not know the Python
11  code myself.
12       (Pause.)
13       MR. GLUECKSTEIN:  Go ahead.
14    A.   Part of my process to validate
15  those numbers included asking my team to
16  use the data that had been produced to 3AC
17  to recalculate those same figures.  In
18  other words, it was a check that was used
19  off of the data provided which represents
20  extracts from the exchange database.
21       When my team does analysis on
22  claims or otherwise, it is typically done
23  off -- directly off of the raw database
24  that's stored in AWS.  The steps laid out
25  in the supplemental declaration are

1
2  entirely consistent with that methodology
3  but using the documents that were produced
4  to 3AC to arrive at those same numbers.
5       I just want to clarify that
6  there is a difference in -- in the
7  process.
8    Q.   Does that -- does the underlying
9  data with respect to the process
10  difference you referred to, did that
11  change at all between the original
12  declaration and the supplemental
13  declaration?
14    A.   No, sir, not that I'm aware of.
15    Q.   Was the Python programming
16  script you referenced produced to Three
17  Arrows?
18    A.   I do not know.
19    Q.   Is there any aspect of this --
20  of your supplemental declaration that
21  wasn't -- that could not have been
22  disclosed as of June 20th?
23    A.   I do not believe I was able to
24  disclose it prior to filing because I
25  between June 20th and September 19th

MAGNA
LEGAL SERVICES

1
2  worked with my team to better understand
3  my own knowledge, or to better develop my
4  own knowledge of details within the
5  specific calculation steps.  When the
6  original declaration was prepared, I went
7  through the same process, but did not
8  attempt to commit everything to memory.
9  And so my team worked with me to develop
10  this declaration to ensure that those --
11  those steps were documented accurately and
12  those steps, once I was comfortable were
13  documented accurately, were disclosed in
14  this declaration, but these steps as
15  they're written in my declaration did not
16  exist in this form around June 20th when
17  the original declaration was filed.
18      Q.   I'm totally confused what you
19  just said.
20          What do you mean that the steps
21  did not exist?  Are you saying that
22  different steps were taken by your team or
23  you on June 20th in stating the
24  conclusions and methodology described in
25  your original declaration?

1
2          MR. GLUECKSTEIN:  Objection;
3  misstates testimony.
4      A.   No, that's not what I'm saying.
5          I'm saying that the document
6  that was filed did not exist in its
7  current form prior to being filed.
8      Q.   What document?
9      A.   The supplemental declaration.
10      Q.   So it was in the works at that
11  point in time?
12          MR. GLUECKSTEIN:  Object to the
13  form.
14      A.   Again to be very clear, the
15  process used to calculate the numbers in
16  my declaration did not change.  The steps
17  as they are documented in this declaration
18  are consistent with the steps my team took
19  to help me get comfortable with the
20  numbers and the accuracy of the numbers
21  included in the declaration.
22          All I am saying is that the
23  actual writing of the -- of those steps in
24  this form was done more recently.
25      Q.   And was there anything that

1
2  precluded those steps from being disclosed
3  if consistent with your original
4  declaration on June 20th?
5      A.   General constraints on my time
6  and ability to prepare for the deposition
7  and prepare -- just prepare for the
8  deposition.
9      Q.   You -- in connection with your
10  original declaration, you hadn't reviewed
11  the Python script that was used for
12  purposes of employing the methodology used
13  there?
14          MR. GLUECKSTEIN:  Object to the
15  form.
16      A.   Again, as I testified, I am not
17  a computer programmer and I'm not familiar
18  with Python code.  Throughout the pendency
19  of the case, I have had to develop
20  independent verification of things
21  relating to Python code because that was
22  the code base of the exchange.  One way
23  that I do that is for my team to extract
24  information from the database into a
25  format that I am able to better

1
2  understand, such as Microsoft Excel
3  spreadsheets, and I --
4      Q.   So the --
5      A.   And I have my team prove to me
6  that the output of the calculations being
7  done with the Python code is consistent
8  with doing more traditional Excel formulas
9  off of extracted data from the database
10  into Microsoft Excel.
11      Q.   So your independent verification
12  and ability to better understand your
13  original declaration is continued through
14  disclosure of your supplemental
15  declaration?
16      A.   No.  My independent verification
17  happened prior to submitting my original
18  declaration.
19          My memorization or intimate
20  knowledge with the details of every step
21  of those complex calculations was improved
22  throughout the course of me preparing for
23  my deposition.
24      Q.   Your understanding involved --
25  evolved over that time?

MAGNA
LEGAL SERVICES

1
2      MR. GLUECKSTEIN:  Object to the
3  form; misstates his testimony.
4      A.   I did not say it evolved.
5           As with any complex analysis,
6  only so much of it can be committed to
7  memory, and I spent more time remembering
8  or better understanding the steps that my
9  team had previously taken me through so
10  that I could competently testify to those
11  facts.
12     Q.   Do you now fully understand
13  those steps?
14          MR. GLUECKSTEIN:  Object to the
15  form.
16     A.   As I state in my declaration, I
17  understand these steps to be accurate.  I
18  supervised my team as they documented
19  these steps.  I reviewed the steps being
20  formed in Microsoft Excel to get to the
21  same numbers that are in my declaration.
22          I did not perform those steps
23  myself.  That's not my role on the A&M
24  team.  I don't perform analysis in Excel
25  directly.  I rely on my team to do that.

1
2      Q.   The constraints on your time
3  that precluded, in your view, disclosure
4  of this declaration on June 20th, those
5  took three hours -- excuse me, three
6  months to resolve?
7          MR. GLUECKSTEIN:  Object to the
8  form; argumentative.
9      A.   My preparation for this
10  deposition was -- is not my only role for
11  the FTX Recovery Trust.
12     Q.   Are you aware that you --
13  counsel has made you available for an
14  additional hour of testimony with respect
15  to your supplemental declaration after the
16  two days we have together here?
17     A.   I understand scheduling has been
18  discussed.  I'm not aware of the exact
19  outcome of those discussions.
20     Q.   Are you aware, not of the
21  specific date of a possible additional
22  hour of testimony, but the fact that
23  you -- counsel has made you available for
24  an additional hour of testimony on an
25  additional date with respect to your

1
2  supplemental declaration?
3      A.   I heard that mentioned at the
4  beginning of this deposition.  So I'm
5  aware from you saying it that it was
6  discussed.
7      Q.   And prior to the deck -- this
8  deposition, offline counsel and I
9  discussed the need to schedule that
10  additional hour of testimony on a -- on an
11  additional date which counsel will take up
12  offline and I'm sure will get back to you
13  on.
14     A.   Okay.
15     Q.   I also represent on the record
16  that the joint liquidators and their
17  advisors are themselves still reviewing
18  your supplemental declaration.
19          Do you understand that?
20     A.   I -- I understand what you just
21  said.  I did not know that prior to this
22  moment.
23     Q.   Does that surprise you?
24          MR. GLUECKSTEIN:  Object to the
25  form.

1
2      A.   I don't have any reaction to it.
3          MR. PROULX:  Let's take a break
4  there.
5          THE VIDEOGRAPHER:  11:27 a.m.
6  Off the record.
7          (Recess taken.)
8          THE VIDEOGRAPHER:  11:44 a.m.
9  Back on the record.
10  BY MR. PROULX:
11     Q.   Mr. Coverick, before the break,
12  we were discussing your general role for
13  A&M with respect to the FTS -- FTX case;
14  is that right?
15     A.   Yes, sir.
16     Q.   And you said, paraphrasing here,
17  that various litigation workstreams roll
18  up through you; is that correct?
19     A.   Correct.  It doesn't mean that
20  I'm intimately familiar with every
21  litigation workstream, but in general I'm
22  responsible for overseeing the entire A&M
23  team.
24     Q.   Are there any other large
25  creditor litigations with which you are


MAGNA
LEGAL SERVICES

1
2  intimately familiar?
3      A.   No, I've not spent a material
4  amount of time on any other specific
5  creditor litigation.  I'm aware that there
6  are still disputed claims, we still have a
7  disputed claim reserve on account of those
8  claims, but I have not become intimately
9  involved with any of those disputes to
10  date.
11      Q.   Do you consider yourself
12  intimately involved with the Three Arrows
13  litigation dispute?
14      A.   I do.
15      Q.   Okay.
16          What is the -- in terms of the
17  other creditor disputes, what is the one
18  that you are next most knowledgeable of?
19          MR. GLUECKSTEIN: Object to the
20      form.
21      A.   There are large sponsorship
22  claims, for example, that I've had some
23  involvement in the -- in the negotiation
24  of the amount of those claims.  That's an
25  example.

1
2      Q.   What's a sponsorship claim?
3      A.   This would be a claim for monies
4  related to sponsorship agreements with
5  FTX.  So for example, there were certain
6  celebrities that FTX had sponsorship
7  agreements with that have filed claims on
8  account of those sponsorship agreements,
9  and I've had some level of involvement in
10  the discussion about those claims.
11      Q.   Are you generally involved in
12  any other creditor litigation involving
13  preference claims?
14      A.   I am not intimately familiar
15  with any other preference claim dispute as
16  of today.
17      Q.   So, I suggested you keep your
18  original declaration on the side.  We'll
19  turn back to that for a moment.
20      A.   Okay.
21      Q.   When I'm saying "original
22  declaration," to be clear, I'm referring
23  to the one you filed on June 20th.
24          Is that understood?
25      A.   Understood.

1
2      Q.   Okay.
3          So look at paragraph 7, for
4  example.
5      A.   Okay.
6      Q.   You define something in this
7  paragraph as the, quote, account balance.
8          Do you see that?
9      A.   Yes, sir.
10      Q.   How do you, in your own words,
11  or in FTX's words, define account balance?
12      A.   I would reference the language
13  used in my declaration, which is the
14  aggregate balance of all asset
15  entitlements associated with a customer
16  account.
17      Q.   What's an aggregate balance?
18      A.   It would represent the summation
19  of all credits and debits related to that
20  account made on the exchange letter --
21  ledger with applicable pricing applied.
22      Q.   What's the exchange ledger?
23      A.   The exchange ledger is a
24  database that is stored on an Amazon Web
25  Services server that was used to record

1
2  every transaction conducted on the
3  exchange.
4      Q.   Is it still being stored there,
5  or was it served -- stored there at the
6  relevant time?
7      A.   The -- the exchange ledger is
8  still stored on an Amazon Web Services
9  environment.
10      Q.   Is that the same environment
11  that was used relative to the -- relative
12  to the pre-petition debtors and the
13  pre-petition FTX exchange?
14      A.   As a technical matter, the
15  original environment was preserved and
16  a -- a duplicate environment, a mirror
17  environment with the exact same data
18  was -- was created for purposes of
19  performing analysis, and the reason for
20  that is to ensure the preservation of the
21  original data as it existed on the
22  petition date.
23      Q.   And when did that duplication or
24  preservation occur?
25      A.   Sometime shortly after the

Page 86

1
2  bankruptcy filing.
3      Q.   Bankruptcy filing was in
4  November of 2022?
5      A.   That's correct.
6      Q.   All right.  Continuing on, you
7  refer to asset entitlements in the same
8  paragraph 7.
9           What's an asset entitlement?
10     A.   It generally references
11 entitlements related to the value of
12 certain positions in either what we refer
13 to often as fiat currency, which is
14 traditional -- which represents the -- the
15 value of traditional currencies like U.S.
16 dollars, as well as entitlements related
17 to the value of cryptocurrencies.
18     Q.   And is an entitlement something
19 that an FTX exchange customer had at the
20 time pre-petition, or that they have now
21 in a post-petition context, or both?
22          MR. GLUECKSTEIN:  Object to the
23     form.
24     A.   I would reference my testimony
25 that I just gave, that an entitlement is

Page 87

1
2  the value of the debits and credits
3  related to the relevant cryptocurrency
4  and -- and fiat currency positions in a
5  customer's account.  That was true while
6  the exchange operated, and today customer
7  claims as defined in the plan are valued
8  as of the petition date.  So at the time,
9  they would have been valued at whatever
10 that time is; now they're valued as of the
11 petition date according to the Bankruptcy
12 Code and the confirmed plan.
13     Q.   If a customer had a -- an
14 entitlement, as you're using that term,
15 prior to the bankruptcy, did they retain
16 that entitlement following the bankruptcy?
17     A.   It depends on the period you're
18 referencing.  When you say "prior to the
19 bankruptcy," it would depend on changes in
20 pricing of the applicable entitlement and
21 any other transactions that occurred in
22 their account prior to the petition date.
23     Q.   Subject to those changes in
24 pricing, is there any material difference
25 in the definition of an entitlement

Page 88

1
2  pre-petition versus post-petition?
3          MR. GLUECKSTEIN:  Object to the
4     form; misstates testimony.
5     A.   Again, pre-petition, a
6  customer's entitlement against the
7  exchange would reflect the cumulative
8  credits and debits that were recorded on
9  the exchange ledger through that date with
10 applicable pricing as of whatever the date
11 in question was.
12          On the petition date where
13 claims were frozen in accordance with the
14 confirmed plan, the same thing would be
15 true with the exception of using prices as
16 specified in the court order estimating
17 the value of customer entitlements.
18     Q.   And let's talk pre-petition for
19 the moment.
20          When you refer to asset
21 entitlements, what is it an entitlement to
22 exactly?
23     A.   When I refer to entitlements,
24 I'm referring to the aggregate value of a
25 customer account; in other words, the

Page 89

1
2  account balance.  Their entitlement, a
3  customer's entitlement represents that
4  value as expressed in U.S. dollars.
5     Q.   So an entitlement is only
6  something that manifests in the form of
7  U.S. dollars, in your view, in FTX's view?
8     A.   As of the petition date, that's
9  correct.
10          While the exchange was
11 operating, customers could also withdraw
12 other assets from the exchange.  They
13 could directly withdraw certain
14 cryptocurrencies from the exchange to
15 the -- to the extent they had an available
16 balance in their account to do so.
17     Q.   So pre-petition, a customer
18 entitlement could include the asset
19 itself, if not U.S. dollar -- in U.S.
20 dollars?
21          MR. GLUECKSTEIN:  Object to the
22     form; misstates the testimony.
23 BY MR. PROULX:
24     Q.   Is that correct?
25     A.   Again, I think the original

MAGNA ▶
LEGAL SERVICES

1
2  question related to account balance, which
3  I defined as the aggregate balance of all
4  asset entitlements.  The account balance
5  when the exchange was operating was
6  expressed in U.S. dollars on the website
7  FTX.com.
8        As a part of the transactions or
9  credits and debits that I testified were
10  recorded on the exchange ledger, that
11  would include credits and debits related
12  to deposits, withdrawals, and other trades
13  that the customer may have made, as well
14  as transfers that the customer account may
15  have received or sent.
16      Q.   I'm not asking about the account
17  balance.  I'm just asking you about your
18  use of the word entitlements here.
19        Pre-petition, could an
20  entitlement include a entitlement to a
21  digital asset other than U.S. dollars?
22      A.   I'm sorry, I -- I answered that
23  question.  It included the value of the
24  asset you're -- whatever asset you're
25  referencing.  So for example, their

1
2  entitlement -- if I can use an example, if
3  someone had one bitcoin in their account
4  balance on the exchange ledger, their
5  account balance or the entitlement to that
6  account balance would represent the
7  current value of one bitcoin.
8      Q.   In U.S. dollars?
9      A.   Correct, when it comes to the
10  account balance.
11        They could also withdraw that
12  value in a variety of different forms,
13  including, in that example, they could
14  withdraw a bitcoin.  Not all
15  cryptocurrency was available for
16  withdrawal, but bitcoin, FTX, was, or they
17  could withdraw that value in U.S. dollars.
18      Q.   Pre-petition then, just to make
19  sure I'm understanding correctly,
20  entitlements included the ability to
21  withdraw an asset that was credited to
22  that account?
23      A.   For certain assets, correct.
24      Q.   Which assets?
25      A.   I don't have the entire list

1
2  memorized.  There were thousands of
3  cryptocurrencies that traded on the
4  exchange.
5      Q.   Let me ask it this way.
6        What kind of assets were traded
7  on the exchange that could not be
8  withdrawn as a customer entitlement
9  pre-petition?
10      A.   Again I don't have all of the
11  assets that traded on the exchange
12  memorized, but I could reference some
13  categories.  One category could be what
14  are referred to as locked tokens.  So
15  these are tokens that you -- a customer
16  could gain an entitlement to through a
17  trade or a transfer or other transactions
18  but could not trade themselves and could
19  not withdraw; they were locked in their
20  account balance.
21        Another category is there were
22  certain products that traded on the
23  exchange like what are referred to as
24  tokenized stocks that only existed on the
25  exchange ledger.  These are -- these are

1
2  entitlements that traded on the exchange
3  ledger but were never minted on the
4  blockchain and therefore could not be
5  withdrawn from the account.
6        I'm sure there are other
7  examples.  I -- I do not have the entire
8  product list --
9      Q.   So --
10      A.   -- committed to memory.
11      Q.   I'm sorry, I didn't mean to
12  speak over you there.
13        So if a customer had a
14  pre-petition entitlement to one bitcoin,
15  to use your example, and wanted to
16  withdraw that one bitcoin, would their
17  entitlement also entitle them to the
18  value -- U.S. dollar value of that
19  bitcoin?
20      A.   Sure.  It depends on -- it
21  depends on how you want to view the
22  value -- value has to be expressed in a
23  denominator.  You can express value in
24  U.S. dollars.  Other people may express
25  value in another currency or even a

1
2  cryptocurrency like bitcoin.
3      Q.   So was that pre-petition
4  entitlement, in the case of a customer who
5  had a positive one bitcoin balance, either
6  to the bitcoin itself or to the U.S.
7  dollar value of that bitcoin?
8      A.   A customer could extract the
9  value of that bitcoin subject to having
10 availability in their account.  When I
11 refer to availability in their account, it
12 depends on other factors as to how they
13 built that position in their account, but
14 they could extract that value from the
15 exchange in a variety of manners.  They
16 could withdraw the one bitcoin; they could
17 convert that bitcoin to U.S. dollars and
18 withdraw stable coin from the account, for
19 example, or receive a deposit in their
20 bank account of traditional fiat U.S.
21 dollars.
22      There's a variety of ways
23 customers could extract their available
24 balance from the exchange while this was
25 operating prior to a short period of time

1
2  just before the petition date.
3      Q.   And subject to the limitations
4  you've just referenced, the customer
5  entitlement include -- included any
6  available method of extraction?
7      A.   I'm sorry, can you repeat the
8  question?
9      Q.   You said that a customer could
10 extract value in a variety of manners.
11      Did the customer entitlement
12 include each variety that was available to
13 them?
14      MR. GLUECKSTEIN:  Object to the
15   form.
16      A.   If a customer had asset value
17 available in their account that was
18 available to be withdrawn, there are
19 multiple ways they could extract that
20 value from the exchange.  The facts and
21 circumstances around the specific assets
22 they had available would -- would need to
23 apply to answer that question.  It depends
24 on the -- the remaining composition of
25 that customer account.

1
2      Q.   And each of those available ways
3  was an entitlement that customer had?
4      MR. GLUECKSTEIN:  Object to the
5   form.
6      A.   Again, I -- I define
7  entitlements as the positions that
8  customers built in their accounts when
9  aggregated together defined as the account
10 balance.
11      I'm also testifying that
12 customers traditionally had the ability to
13 withdraw assets from the exchange in a
14 variety of manners subject to having an
15 available account balance.
16      Q.   Who -- when a customer had a
17 pre-petition asset entitlement as you're
18 using that term, who are they entitled to
19 receive something from?  FTX?
20      MR. GLUECKSTEIN:  Object to the
21   form.
22      A.   FTX held assets related to
23 customer accounts.  When a customer would
24 initiate a withdrawal, that withdrawal
25 would come from either bank accounts or

1
2  cryptocurrency addresses in the possession
3  of FTX.
4      Q.   Did a customer entitlement
5  ever -- pre-petition, were customer
6  entitlements ever received from bank
7  accounts or crypto addresses owned by or
8  possessed by other customers?
9      A.   That's not how an exchange like
10 FTX operates.
11      An exchange connects customers
12 with one another.  The FTX exchange was in
13 possession of assets related to customer
14 deposits.  If a customer withdrew assets,
15 those assets would either come from FTX
16 bank accounts or cryptocurrency addresses
17 in the possession of the FTX Group.
18      Q.   Were customer entitlements, as
19 FTX is using that term, pre-petition,
20 tracked in some way by FTX?
21      A.   Yes.  As I mentioned before,
22 customer entitlements were recorded and
23 tracked on the exchange ledger.
24      Q.   And that exchange ledger, that
25 used the AWS service, for purposes of

1
2  tracking, or is that --
3      A.   It was --
4      Q.   Is that a different
5  functionality?
6      A.   Sorry for speaking over you.
7          It was stored on a server hosted
8  by Amazon Web Services.
9      Q.   So the ledger is what did the
10 tracking, and it was stored on a server
11 maintained by AWS; is that correct?
12     A.   I think that's a correct
13 representation, yes.
14     Q.   Was QuickBooks used in any way
15 by FTX pre-petition for entitlement
16 tracking?
17     A.   QuickBooks was FTX -- the
18 accounting system that FTX used for
19 corporate accounting.  It was not used to
20 track account balances on the exchange.
21     Q.   Have you seen the master ledger?
22         MR. GLUECKSTEIN:  Object to the
23 form.
24     A.   I have seen extracts and I have
25 seen images of the exchange ledger, yes.

1
2      Q.   Through a website?  How did you
3  see them?
4      A.   On one of my employee's
5  computers.  Throughout the pendency of the
6  case, there were different times that I
7  needed to view the ledger.
8      Q.   What software or service, if
9  any, was that employee using to present to
10 you the ledger?
11     A.   I'm not familiar with the exact
12 software that the exchange ledger would be
13 viewed on any point in time.
14     Q.   What types of transactions were
15 tracked via that ledger -- via that master
16 ledger?
17     A.   All transactions that were
18 conducted on the exchange.
19     Q.   I'm referring not to
20 transactions, but to asset entitlements.
21         So what type of asset
22 entitlements were tracked?
23     A.   Asset --
24         MR. GLUECKSTEIN:  Object to the
25 form.

1
2      A.   Asset entitlements are comprised
3  of all transactions on the exchange.
4          So again, the ledger tracks all
5  transactions that comprise the account
6  balance.
7      Q.   Including futures transactions?
8      A.   The ledger tracks all futures
9  transactions, correct.
10     Q.   All digital assets such as
11 bitcoin transactions?
12     A.   The ledger tracks all bitcoin
13 transactions.  But just to make my
14 testimony clear, not all transactions
15 result in a change in the account balance.
16     Q.   What's an example of a
17 transaction that might not result in a
18 change to the account balance, as you
19 define it?
20     A.   Sure.  I -- I give quite a few
21 examples of this in my declaration, but a
22 very simple example would be if a customer
23 had an account balance comprised of one
24 bitcoin and at a given minute, that
25 bitcoin was worth let's just say $50,000.

1
2  If they sold that bitcoin at that point,
3  that would be a transaction recorded on
4  the exchange ledger, but their account
5  balance would remain unchanged.  The
6  composition of that account balance would
7  change.  Prior to the transaction
8  occurring, it would reflect an entitlement
9  to one bitcoin valued at $50,000.  After
10 the transaction occurring, immediately
11 after, it would reflect U.S. dollars of
12 $50,000, but the account balance would not
13 change.
14         Similarly, futures on the
15 exchange did not have intrinsic value.
16 They were a contract of differences
17 between two customers.  So if a customer
18 opened a futures position, absent
19 relatively de minimis trading fees that
20 are incurred during every transaction that
21 are paid to the exchange, there would be
22 no change in the account balance for at
23 least 30 seconds until the first
24 settlement period for that future.  So
25 there are type -- those are the types of

Page 102

1
2    transactions that are recorded on the
3    exchange ledger but do not change the
4    account balance.
5        Q.    To use your examples, in the
6    first instance when a customer had one
7    bitcoin prior to selling it, did they have
8    an entitlement to that bitcoin?
9        A.    They have an entitlement to the
10   value of that bitcoin.
11       Q.    After sale they have an
12   entitlement to what, the value of that
13   bitcoin?
14       A.    Well, after the sale
15   transaction, they would have an
16   entitlement to the value of the U.S.
17   dollars they received for selling that
18   bitcoin in that specific example.
19           And just to be abundantly clear,
20   there are trading fees that are incurred
21   every time a transaction's incurred.  So
22   it's not entirely accurate to say that the
23   account balance doesn't change, but I
24   think you understand the point.
25       Q.    And again, just so the record's

Page 103

1
2    clear, prior to the sale of that bitcoin
3    in your example, the customer also had an
4    entitlement to the bitcoin itself by
5    withdrawing it?
6           MR. GLUECKSTEIN:  Objection to
7    the form.
8        A.    I did not say that.  I said that
9    an entitlement to the value of that
10   bitcoin, their account balance would be
11   comprised of the value of one bitcoin.  If
12   there was nothing else in the account, no
13   other aspects to the account, the customer
14   prior to that transaction would have the
15   ability to withdraw bitcoin.  Following
16   the transaction, they would have the
17   ability to withdraw U.S. dollars.
18       Q.    Does the customer have to sell
19   the bitcoin to withdraw U.S. dollars in
20   your example where all that's in the
21   account is one bitcoin?
22       A.    There are other ways, there are
23   other transactions that the customer could
24   potentially extract U.S. dollars without
25   selling the bitcoin.

Page 104

1
2        Q.    How?
3        A.    Well, I don't have every
4    potential transaction memorized, but one
5    example would be that customers, whether
6    it's bitcoin or not, you can lend
7    different assets on the exchange to other
8    customers.  So it's possible that a
9    customer could lend -- again this would --
10   this would require understanding every
11   aspect to the account, but there is the
12   potential to lend an asset, receive U.S.
13   dollars, and withdraw those U.S. dollars
14   subject to the applicable margin
15   requirements on the exchange.
16       Q.    That in your -- that additional
17   example first requires a transaction to
18   lend that asset out; is that correct?
19       A.    Yes.  You could not withdraw
20   U.S. dollars if you did not have a U.S.
21   dollar entitlement in your account at that
22   time.
23       Q.    So, we've been talking about
24   U.S. dollars and entitlements.
25           Is one of the assets that the

Page 105

1
2    master ledger tracked fiat currencies
3    entitlements?
4        A.    It did not track that as a
5    category specifically, but it did track --
6    it's often referred to as tickers and it's
7    referred to as a ticker on the exchange
8    ledger.  It tracked U.S. dollars as well
9    as other stable coins and other
10   currencies, but it did not -- there -- I
11   am not aware that there was a field in the
12   exchange ledger that summed up all fiat
13   entitlements.  Although they would have
14   all been included in the account balance.
15       Q.    So in paragraph 9, maybe a page
16   or two later, you define something called
17   U.S. dollar balance, or USD balance, to be
18   the aggregate balance of all fiat
19   currency.
20           Do you see that?
21       A.    I do.  The preceding sentence
22   says that you can do that for purposes of
23   analysis.  So that's something I'm doing
24   for purposes of analysis within the
25   context of the claim being asserted by

Page 106

1
2    3AC. I'm not saying that that is how it
3    was aggregated in the exchange ledger.
4        Q.   But just so I'm clear, for
5    purposes of your analysis, you're
6    considering other fiat currencies beyond
7    USD as within the USD balance as you're
8    defining it?
9        A.   Yes, for purposes of analysis
10    with regard to the 3AC claim, that's
11    correct.
12        Q.   You mentioned one way in which a
13    customer can increase their sub-balance of
14    fiat currency is to sell a bitcoin, for
15    example, if they're allowed and available
16    to do so?
17        A.   That is one way.
18        Q.   Once it's sold that one bitcoin,
19    what rights, if any -- what entitlements,
20    if any, does it have to that previously
21    sold bitcoin?
22        A.   Once again, a customer could
23    conduct a number of transactions.  They
24    could do another trade to be able to
25    withdraw a bitcoin if they wanted to.

Page 107

1
2        But again, as I testified, to
3    withdraw a bitcoin from the exchange while
4    it was operating, you needed to have a
5    bitcoin in your account balance as -- as
6    recorded on the exchange ledger, and to
7    withdraw U.S. dollars, again absent all
8    the other considerations like margin
9    requirements, et cetera, you would need
10    a -- a U.S. dollar balance available to be
11    able to withdraw U.S. dollars.
12        Q.   Could a U.S. dollar balance be
13    negative?
14        A.   Yes.
15        Q.   Was that -- could a digital
16    asset balance such as bitcoin, could that
17    balance be negative?
18        A.   Yes, that's my understanding.
19        Q.   When a U.S. dollar balance was
20    negative, was that negative amount of that
21    sub-balance owed in any way?
22        MR. GLUECKSTEIN:  Object to the
23    form.
24        A.   There are different
25    circumstances that a U.S. dollar balance

Page 108

1
2    could be negative.  One of the
3    circumstances is by participating in the
4    borrowing program on the exchange.  If a
5    customer participated in the borrowing
6    program, they would owe the other
7    customers that participated in the lending
8    pool of that program.
9        Q.   Is that a debt?
10        MR. GLUECKSTEIN:  Object to the
11    form; calls for a legal conclusion.
12        A.   I'm not a lawyer, so I can't
13    opine on the legal definition of debt.
14    The exchange defined these as borrowers,
15    and the terms of service, although I'm not
16    a lawyer and can't interpret the terms of
17    service, my businessperson understanding
18    specify that the lenders bore the risk of
19    defaults on those borrows.
20        Q.   But that balance was not allowed
21    to stay negative forever.  At some point,
22    it had to zero out or become positive?
23        A.   That would defend -- that would
24    depend on the facts and circumstances of
25    the customer account.

Page 109

1
2        Q.   Are there ways to incur a
3    negative U.S. dollar balance other than
4    participation in a margin program?
5        A.   There are other ways to -- to
6    build a negative USD balance.
7        Q.   What's an example?
8        A.   An example would be that FTX
9    from time to time extended lines of credit
10    to customers, and it is possible that
11    utilizing a line of credit could cause a
12    customer to have a negative USD balance.
13        Q.   Was that negative USD balance in
14    that scenario owed by that customer?
15        A.   So, everything within an account
16    balance has to be taken in context of the
17    entire account.  You cannot have a
18    negative USD balance without positive
19    balances to other asset entitlements.  So,
20    the extent that it was owed is a legal
21    conclusion that I'm not qualified to -- weigh
22    in on, but you could not develop a
23    negative balance in U.S. dollars without
24    having a positive balance in other asset
25    entitlements.  And one operating rule of

MAGNA
LEGAL SERVICES

1
2    the exchange, or policy of the exchange
3    is:  the aggregation of those balances
4    which represents the singular account
5    balance could not be negative.  Said
6    differently, a customer account was not
7    allowed to be in a debtor position to the
8    exchange at any point in time.
9         Q.   In your example of -- of
10   incurring a negative U.S. dollar balance
11   by virtue of a line of credit outside the
12   context of a margin program, are there any
13   examples where that negative balance was
14   brought back to zero?
15        A.   I'm sorry, can you repeat the
16   question?
17             MR. GLUECKSTEIN:  Object to the
18   form.
19   BY MR. PROULX:
20        Q.   With respect to any customer who
21   may have had a line of credit that
22   resulted in a negative U.S. dollar balance
23   outside the context of a margin program,
24   any circumstances where that negative U.S.
25   dollar balance was repaid?

1
2         A.   I don't have the facts and
3    circumstances and transaction history of
4    every customer account committed to
5    memory.  That would not be possible.
6         Q.   In that scenario, who does that
7    customer repay that negative U.S. dollar
8    balance to at some point?
9             MR. GLUECKSTEIN:  Object to the
10   form.
11        A.   Again, I never said that they
12   repaid the amount.  I said that you could
13   not incur a negative U.S. dollar balance
14   without having positive balances in other
15   assets.
16             Again, a customer account was
17   not permitted to have a negative balance.
18   Therefore, the USD balance.  If it was
19   negative, must be more than offset by the
20   balances in other assets.  A customer
21   account was not permitted to have a
22   negative balance, so a customer account
23   could not owe the exchange in aggregate.
24             And I think your question said
25   if they weren't participating in the

1
2    margin program, then that's -- that's the
3    extent of my answer.  They didn't owe a
4    net amount to anyone.
5         Q.   Did a customer's U.S. dollar
6    balance always change inversely with its
7    digital asset balance, a term you define
8    on page -- paragraph 9 of your
9    declaration?
10        A.   For purposes of how we have
11   aggregated what we call sub-balances for
12   purposes of this analysis, the U.S. dollar
13   balance would fluctuate in conjunction
14   with the digital asset balance.
15        Q.   On a one-to-one basis?
16        A.   I'm sorry, can you clarify the
17   question?
18        Q.   You referred generally to a U.S.
19   dollar balance fluctuating in conjunction
20   with a digital asset balance.  I want to
21   be a little more specific by what you mean
22   by fluctuate in conjunction with.
23        A.   So, I think I have to answer
24   this question with examples.
25             If a customer conducted a buy

1
2    transaction or a sell transaction of a
3    digital asset on the exchange, that would
4    result in the one-to-one movement of the
5    U.S. dollar balance with the digital asset
6    balance.  So for example, let's say
7    bitcoin's worth $50,000 hypothetically.
8    If a customer had one bitcoin in their
9    account balance worth $50,000 and they
10   sold that bitcoin, their digital asset
11   balance would go from $50,000 to zero.
12   Their U.S. dollar balance would go from
13   zero to $50,000, again absent trading
14   fees.
15             There are other types of
16   transactions that can change the USD
17   balance other than the buying and selling
18   of digital assets on the exchange.  And I
19   think your question was, was it always
20   one-to-one and my answer is not -- not
21   necessarily, because there were other
22   types of transactions that could change
23   the U.S. dollar balance.
24        Q.   Is that -- is an example of such
25   a transaction a deposit by that customer

MAGNA
LEGAL SERVICES

1
2  of a bitcoin, for example?
3      A.   Well, it would not be -- the
4  deposit of a bitcoin in and of itself
5  would not change the U.S. dollar balance.
6      Q.   I think I misspoke.  I was
7  referring -- I meant to refer to the
8  digital asset balance.  A deposit of one
9  bitcoin, would that change a customer's
10  digital asset balance?
11      A.   Yes.
12      Q.   Would that also immediately
13  after that deposit change that customer's
14  U.S. dollar balance?
15      A.   It depends.
16      Q.   When might that have changed the
17  U.S. dollar balance from your one deposit
18  of one bitcoin?
19      A.   In that example, if a customer
20  deposited a bitcoin in their account --
21  I'm trying to think of a hypothetical.
22  But the -- as a general matter, depositing
23  a bitcoin in the account would only change
24  the bitcoin balance in that account.
25      Q.   What about withdrawing 50,000

1
2  U.S. dollars if they were available to
3  that customer; would that transaction
4  alone change the customer's positive
5  digital asset balance?
6      A.   In isolation, withdrawing U.S.
7  dollars from the account would not change
8  the balance of any digital asset position
9  in the account.
10      Q.   So the two sub-balances as you
11  define them don't always move in a
12  one-to-one correspondence?
13      A.   As I testified, there are other
14  types of transactions that can change the
15  U.S. dollar balance.
16      Q.   You talked about stable coin a
17  few moments ago.
18          What's -- what's that?
19      A.   A stable coin is traditionally
20  referred to as cryptocurrencies that are
21  intended to mimic the value of traditional
22  fiat currency.
23      Q.   Are those tracked as separate
24  tickers from the relevant fiat currency?
25      A.   My understanding is in certain

1
2  instances, there were certain stable coins
3  that were pegged to the value of the U.S.
4  dollar that were included in the U.S.
5  dollar balance and there were certain
6  stable coins that were not included in the
7  U.S. dollar balance.
8      Q.   Are you familiar with the term
9  "e-money"?
10      A.   I am.
11      Q.   What's that?
12      A.   My understanding is that e-money
13  is a way that U.S. dollars or fiat
14  currencies were described once they were
15  deposited on to the exchange.
16          In other words, that it was
17  electronically recorded as opposed to
18  being stored somewhere in cash.
19      Q.   Does FTX take the position that
20  as of June 12th, Three Arrows had any
21  e-money in its FTX accounts?
22      A.   To the extent that calls for a
23  legal conclusion, I'm not qualified to
24  provide one.
25          Can you repeat the question?

1
2      Q.   Factually, did Three Arrows have
3  any e-money in its U.S. -- in its FTX
4  accounts according to the master ledger?
5      A.   On what date?
6      Q.   June 12th, 2022.
7      A.   On June 12th, 2022, Three Arrows
8  Capital had a negative U.S. dollar balance
9  in their account, and so to the extent
10  that's what you're referring to as
11  e-money, no, they did not.
12      Q.   I -- I'm not making any
13  representation as to what e-money is.  I'm
14  asking you based on your definition.
15          Is that a "no"?
16      A.   I'm saying I'm not qualified to
17  give a legal conclusion on the difference
18  between e-money or U.S. dollar
19  entitlements as reflected on the exchange
20  ledger.
21      Q.   How, if at all, did the exchange
22  ledger track future contract positions?
23      A.   It tracked them separately from
24  any asset entitlements.  In fact, on
25  the -- on the actual interface or -- or

1
2  website, they were -- they were listed --
3  any futures positions a customer had
4  opened were listed on a separate tab that
5  was called the Positions tab.
6       Inherently, and specifically
7  on -- on the FTX exchange, futures are
8  costless contracts to enter into.
9  Similarly when they're exited, there is no
10 consideration paid or received.  They're
11 simply a contract which represents
12 effectively a bet on future pricing of
13 that contract.
14     Q.   And I'm not asking what they
15 were.  I'm just asking how they were
16 tracked by the master ledger.
17     A.   I'm not sure I can answer that
18 question without describing what -- what
19 they were.
20     Q.   How do you know that they were
21 costless to enter into?
22     A.   Again, and as a global comment
23 on everything I say, I will keep repeating
24 it if needed, I am excluding transaction
25 fees that may have been paid to the

1
2  exchange as a global comment.  My
3  understanding is almost all, if not all,
4  trades incurred transaction fees when --
5  when they were conducted.  That's one of
6  the ways the exchange generated revenue.
7       I know that futures are costless
8  because when a customer opened the
9  future -- a futures position on the
10 exchange, their account balance did not
11 exchange.  Similarly, when they closed or
12 exited a position, their account balance
13 did not change.
14       The reason for that is that
15 every 30 seconds, the difference in price
16 of that future contract, what's often
17 referred to as a reference price, would
18 reflect a -- would -- would result in a
19 gain or loss being immediately credited
20 into the user's U.S. dollar balance.
21     Q.   And that purported lack of
22 crediting or -- or changes to the U.S.
23 dollar balance upon entry into a futures
24 contract reflected in any particular
25 document you're referencing in that

1
2  answer?
3     A.   I'm sorry, can you repeat your
4  question?
5     Q.   Sure.
6       What document, if any, reflects
7  the lack of movement, according to you, of
8  a U.S. dollar balance upon entering into a
9  futures contract?
10       MR. GLUECKSTEIN:  Object to the
11 form.
12     A.   So, the account balance was
13 calculated at any point in time using
14 Python code to -- to populate the
15 information displayed on a user's account
16 on the website.  There are certain things
17 that the exchange ledger tracked every
18 time they happened.  For example, a trade
19 where a bitcoin was bought or sold, every
20 one of those trades would be recorded.
21       There are other things that are
22 not stored every time they happen.  A good
23 example of that is the change in pricing
24 of any given asset; pricing in the
25 cryptocurrency markets change every

1
2  second.  It would be far too voluminous to
3  store every second price for every
4  cryptocurrency that was traded on the
5  exchange.
6       Because of that, the exchange
7  ledger as it currently exists in a
8  database does not calculate and store the
9  value of an account balance at every point
10 in time in the account's history.  You
11 would need to perform math consistent with
12 the math laid out in my supplemental
13 declaration to -- to do those
14 calculations.
15     Q.   I was asking a much simpler
16 question than that.  I was just asking
17 what document shows that U.S. dollar
18 balances don't change upon entering into a
19 futures contract.
20       Is that just are you generally
21 referencing the master ledger in that
22 answer, or something else?
23       MR. GLUECKSTEIN:  Object to the
24 form.
25     A.   I'm generally referencing my

Page 122

1
2  knowledge of how the exchange operated, my
3  knowledge of how future contracts are
4  structured on the FTX exchange, my team's
5  review of the code base of the FTX
6  exchange.
7      Q.   You referenced futures contracts
8  being presented to customers in some way
9  on the exchange earlier.
10         Do you recall that testimony?
11     A.   I do.
12     Q.   And that was in a Positions tab,
13 is it -- is that the term you used?
14     A.   Correct.
15     Q.   And what -- what -- how, if at
16 all, in that Positions tab was the value
17 of a futures contract presented to the
18 customer?
19     A.   I don't have the exact
20 composition of the website memorized.  I
21 understand that it listed out the
22 different futures positions that the
23 customer held, the quantity of those, and
24 the reference price of those contracts.
25 The reference price being the thing that

Page 123

1
2  determines the gain or loss on that
3  contract in every 30-second period.
4      Q.   When you say this presentation
5  to customers, quote, listed out the
6  different futures positions that the
7  customer held, is this simply listing out
8  the number of contracts they had in a
9  certain futures position, the value of
10 those contracts?  What did it list out
11 exactly?
12     A.   Again --
13         MR. GLUECKSTEIN:  Object to the
14    form.
15     A.   Again, as I just testified, I
16 don't have the image of what the website
17 looked like completely memorized.  That's
18 not something that my team expressly
19 relies on for any analysis.
20         I do know that the Positions tab
21 listed the tickers of the future contracts
22 that a customer had open.  It listed the
23 quantity of the customer contracts.  I
24 know it listed the reference price of
25 those future contracts.  I also recall

Page 124

1
2  that it had a couple of -- a button to
3  close the future contract position.
4      Q.   Did it list out the notional
5  value of the futures positions?
6      A.   I don't recall.
7      Q.   Have you seen that presentation
8  in that tab personally, examples of it?
9      A.   I have seen images of the FTX
10 website, yes.
11     Q.   And have you seen images
12 personally of that tab that you were just
13 testifying to?
14     A.   I have personally seen images of
15 that tab over the pendency of my
16 involvement with FTX.
17     Q.   Did a customer have a
18 sub-balance reflected on that tab as to
19 the futures positions?
20     A.   I -- I don't recall.
21     Q.   What other tabs were presented
22 to customers who logged in to the FTX
23 exchange?
24     A.   I don't recall every tab that
25 was displayed on -- on the interface.  I

Page 125

1
2  know there was a tab that displayed their
3  account balance.  I know there was a tab
4  that displayed -- I believe there was a
5  tab that displayed their borrowing or
6  lending positions.  I know there were
7  other tabs in addition to the -- the
8  Positions tab, but I do not have the
9  entire website committed to memory.
10     Q.   You referenced personally
11 reviewing a tab in preparation for this
12 deposition or litigation reflecting the
13 value of or other measurements with
14 respect to futures contracts.
15         We request that counsel produce
16 the images of that tab that Mr. Coverick
17 reviewed.
18         MR. GLUECKSTEIN:  That
19 completely misstates his testimony.
20 He testified very clearly that he
21 reviewed over the course of his
22 three-year engagement with FTX and not
23 specifically in connection with this
24 litigation.
25         Counsel, I would request that

1
2      you stop mischaracterizing his
3   testimony.
4          MR. PROULX:  Well, let's make
5      sure the record is -- is clean.
6   BY MR. PROULX:
7      Q.   Mr. Coverick, when is the last
8   time that you reviewed that tab?
9      A.   I do not recall.
10     Q.   Was it within the last six
11  months?
12     A.   I do not recall.
13     Q.   Was it in connection with this
14  litigation?
15     A.   No.
16         MR. PROULX:  Counsel, the
17     request stands.
18  BY MR. PROULX:
19     Q.   Was the customer presented with
20  the amount, if any, of U.S. dollar
21  entitlements that it had on the exchange?
22     A.   I am generally aware that a
23  customer could view their USD balance on
24  the exchange.
25     Q.   Where was that reflected with

1
2   respect to the interface the customer saw
3   on the exchange?
4      A.   That would be reflected on the
5   same page that reflected their entire
6   account balance as a subcomponent of their
7   account balance.
8      Q.   Where, if anywhere, was a
9   customer, to use a simple example,
10  presented with their bitcoin balance on
11  the exchange?
12     A.   As a subcomponent of their
13  account balance, I know at a minimum it
14  was included on that same page.
15     Q.   When you were before testifying
16  as to those different tabs and the
17  contents that the customer saw on them, is
18  that the same thing you're speaking about
19  in paragraph 8 of your declaration where
20  you refer to the, quote, user interface?
21     A.   When I refer to the user
22  interface in my declaration, I'm referring
23  to the FTX.com website in general.
24     Q.   And your testimony with respect
25  to the Futures tab and then the account

1
2   balance information and sub-balance, is
3   that all within the, quote/unquote, user
4   interface that's within the confines of
5   your declaration here?
6      A.   I'm testifying that the -- the
7   tab or page that included positions was
8   part of the FTX website that I'm also
9   referring to as the user interface.
10     Q.   You talked about --
11         MR. PROULX:  Strike that.
12         (Coverick Exhibit 12, Objection
13     of the FTX Recovery Trust to the
14     Amended Proof of Claimed Filed By the
15     Joint Liquidators of Three Arrows
16     Capital, was marked for
17     identification, as of this date.)
18  BY MR. PROULX:
19     Q.   So, you've been handed what's
20  been marked as Exhibit Number 12.  This is
21  the Objection to the FTX Recovery Trust to
22  the Amended Proof of Claim Filed By the
23  Joint Liquidators of Three Arrows Capital
24  Ltd.
25         Are you familiar with this

1
2   document?
3      A.   I am familiar with the objection
4   of the recovery trust to the claim filed
5   by 3AC.  I have not reviewed this entire
6   impact that's just been put in front of
7   me.  It looks to be consistent with that
8   claim objection.  I'm not sure if it has
9   all of the attachments to the objection,
10  but I -- I do recognize at a minimum
11  the -- the -- the cover page.
12     Q.   I appreciate that.  Just to make
13  sure the record is clean and I'm not
14  misstating any testimony here, is this a
15  document you reviewed in preparation for
16  your deposition?
17     A.   Yes, sir.
18     Q.   Thank you.
19     A.   I did.
20     Q.   Are you aware that this
21  objection cites your declaration, original
22  declaration, in a number of instances?
23     A.   I am aware of that, yes.
24     Q.   Paragraph 6 of this dec --
25  excuse me, of this objection refers to the

1
2  account balance as being a, quote,
3  headline figure.
4        What does that mean?
5     A.   In general, headline figure,
6  while it's not a defined term in the
7  objection, would represent the fact that
8  FTX dis -- FTX.com displayed an account
9  balance expressed in U.S. dollars at the
10 top of a customer's account page.
11    Q.   And when you say at the top,
12 you've personally seen it being at the
13 top?
14    A.   I have.
15    Q.   Are you familiar with how,
16 pre-petition, the FTX exchange calculated
17 the account balance presented to customers
18 you just testified to?
19    A.   Yes.  It's in a manner
20 consistent with the calculations described
21 in my supplemental declaration, with the
22 caveat that those are not the exact
23 calculations the exchange used because
24 those are calculations to be performed on
25 the extracts from the database that were

1
2  provided to 3AC, but they are calculations
3  that are materially consistent with the
4  code base of the exchange.
5     Q.   Are there any asset
6  entitlements, a term we discussed earlier,
7  that are not reflected in some way in an
8  account balance?
9     A.   Can you repeat the question?
10    Q.   Sure.
11        We were looking back at
12 paragraph 7 of your declaration.  Feel
13 free to flip back to that, and that
14 referred to something called asset
15 entitlements.  You also defined account
16 balance in that same paragraph.
17        I'm asking are there any asset
18 entitlements that are not a component part
19 of an account balance?
20    A.   Again, I don't have every
21 product that the exchange offered to be
22 traded memorized, but I suppose an example
23 of something that would not -- would not
24 have value in the account balance could be
25 something that doesn't have a material

1
2  price such as, like, an NFT potentially.
3  But I'm not aware of -- I can't recall or
4  think of something specifically that
5  wouldn't have a value included in the
6  account balance that's otherwise an asset
7  entitlement.
8     Q.   Was the -- pre-petition, was the
9  account balance denominated in U.S.
10 dollars and presented to customers in that
11 denomination?
12    A.   Yes.
13    Q.   Is account balance the same
14 thing as account collateral?
15    A.   No.
16        Well, in -- to be clear, if
17 you're asking with respect to the
18 maintenance margin requirement which is
19 the -- the one place I'm aware of that
20 refers -- I think on some help pages it
21 refers to account collateral as part of
22 that requirement, then that is different
23 from the account balance.
24        There are other requirements on
25 the exchange, for example 3AC's line of

1
2  credit, that had different requirements
3  that used the account balance when
4  determining compliance with required
5  margins.
6     Q.   Does collateral underlie an --
7  I'm trying to understand the relationship
8  in FTX's view between account balance and
9  account collateral.
10        Is an account collateral a
11 component part of an account balance?
12        MR. GLUECKSTEIN:  Object to the
13 form.
14    A.   So, in general, I -- I don't
15 have the entire formula committed to
16 memory, but it is outlined in my
17 supplemental declaration.  But in general
18 conceptually, account collateral was
19 generally lower

Page 134

1
2     than the account balance.  That is
3   because the exchange applied a series of
4   factors to positions in the account
5   balance to account for various things that
6   I cite in my declaration including
7   liquidity of a particular asset or other
8   risks.
9          So in other words, a riskier
10  asset entitlement within an account
11  balance would -- would generate a lower
12  amount of account collateral as compared
13  to its other -- otherwise market value
14  versus a -- an asset with -- that's
15  generally viewed as more liquid or less
16  risky.
17     Q.   Are you testifying here to
18  something called the margin trading
19  account value?
20     A.   That is what I'm describing.
21     Q.   Okay.
22          More -- more generally, what's
23  collateral, in your view, outside of
24  the -- in any context, not necessarily in
25  the margin trading context?

Page 135

1
2     A.   Well, in -- in the context of
3   how the exchange operated, which is what
4   I'm testifying to, collateral -- account
5   collateral and margin trading account
6   value are used interchangeably.  They're
7   two different words that are used in
8   different places.  For example, I -- I am
9   aware that certain help pages referred to
10  it as collateral.  In my declaration and
11  I -- I believe in the objection we define
12  it as margin trading account value.
13     Q.   So collateral in FTX's view is a
14  term that only has meaning in the margin
15  trading context?
16     A.   I did not say that.  I think
17  there are other legal interpretations of
18  the term "collateral."  I'm not a lawyer,
19  and I can't opine on those other
20  interpretations.  But I am saying with
21  context of -- in context of the
22  maintenance margin requirement, margin
23  trading account value and collateral
24  are -- are referenced interchangeably in
25  different documents.

Page 136

1
2     Q.   Are you familiar with -- outside
3   of that context, are you familiar with any
4   instances in which the FTX exchange talked
5   about collateral?
6     A.   I wasn't an employee of FTX
7   pre-petition, so I don't know what they
8   talked about.
9     Q.   Based on your review of FTX
10  policy documents and documents produced in
11  this litigation, do you recall seeing any
12  examples of FTX discussing or defining
13  collateral outside of the margin trading
14  context?
15     A.   I think over 60 million
16  documents have been collected in this
17  case.  I don't -- I don't have them all
18  memorized.
19          I can't recall in this moment
20  another example of collateral being
21  discussed, but that certainly does not
22  mean I haven't seen it at some point or
23  that it doesn't exist.
24     Q.   I'm happy to keep going, but I
25  wanted to check in with our witness and

Page 137

1
2   counsel as to whether or not you'd like a
3   lunch break now.
4     A.   From my perspective, I'm good to
5   keep going.
6     Q.   Let's do another 15 minutes.
7          Did Three Arrows have digital
8   assets in or allocated to its FTX accounts
9   in June of 2022?
10    A.   So, assets were not stored in
11  customer accounts.  Again, as I have
12  testified I think a few times today, an
13  account balance is derived of debits and
14  credits as stored on the -- as recorded on
15  the exchange ledger with applicable
16  pricing applied.
17          Accounts were not boxes, if you
18  will, that someone put something in.  So
19  they did not -- accounts did not store any
20  cryptocurrency or fiat currency.
21    Q.   But Three Arrows had an
22  entitlement to digital assets as of June
23  2022?
24    A.   Three Arrows had an account
25  balance in June 2022.

MAGNA
LEGAL SERVICES

1
2      Q.   Did any customers on the FTX
3  exchange have entitlements to digital
4  assets in June of 2022?
5      A.   Many customers had account
6  balances in June of 2022.
7      Q.   Are you -- are you -- I'm asking
8  about entitlements to digital assets.
9          Is that your definition of
10 account balance?
11     A.   No, I believe I've answered
12 that, and it's reflected in my
13 declaration.  Let me reference that.
14     Q.   So then answer my question.
15         Are --
16         MR. GLUECKSTEIN:  Can you just
17     not interrupt the witness, please,
18     when he's answering the question.
19         MR. PROULX:  The question was
20     it.
21         MR. GLUECKSTEIN:  You can ask
22     another one when he's finished.
23 BY MR. PROULX:
24     Q.   The question was, did any
25 customers have entitlements to digital

1
2  assets in June of 2022?
3      A.   And my answer was many customers
4  had account balances in June of 2022.
5          MR. PROULX:  Move to strike the
6      answer as nonresponsive.
7  BY MR. PROULX:
8      Q.   You've mentioned that
9  customer -- I think you testified that
10 Three Arrows digital asset entitlements
11 were not stored in Three Arrows accounts;
12 is that correct?
13     A.   I testified that digital assets
14 were not stored in customer accounts
15 because that's not possible.
16     Q.   And where were Three Arrows'
17 entitlements to digital assets stored --
18         MR. PROULX:  Excuse me.  Strike
19     that.
20     Q.   Where are the digital assets
21 underlying Three Arrows' entitlements to
22 those digital assets stored?
23         MR. GLUECKSTEIN:  Object to the
24     form; lack of function.
25     A.   So, all digital assets related

1
2  to exchange activities were stored in
3  commingled wallets with other assets of
4  the FTX Group and other assets of the
5  exchange, other digital assets of the
6  exchange.
7      Q.   Are they -- I just want to make
8  sure I'm using the right terminology here.
9  You mentioned commingled wallets.
10         What's a wallet?
11     A.   I'm sorry, I -- I -- that's
12 technically incorrect.  That's a phrase
13 that's commonly used as something that
14 stores cryptocurrency.  Technically
15 wallets only store the private keys used
16 to access addresses on the blockchain
17 which store cryptocurrency.
18         The correct way to describe that
19 would have been, and is, commingled
20 addresses.
21     Q.   And in these commingled
22 addresses, did FTX pool digital assets
23 underlying other customers' beyond Three
24 Arrows' asset entitlements?
25     A.   When I say commingled addresses,

1
2  I'm referencing the fact that many
3  customers deposited cryptocurrency into
4  addresses in the possession of the FTX
5  Group.  Those deposits were then
6  commingled with other deposits of
7  cryptocurrency from other customers.
8      Q.   Did FTX include in those
9  commingled addresses any assets other than
10 those deposited by customers on the FTX
11 exchange such as assets that FTX acquired
12 in its own name?
13     A.   It's the position of the estate
14 that all assets in the possession of the
15 FTX Group are -- are property of the
16 estate.  So it would be difficult for me
17 to -- to delineate between the two.  But
18 in general, cryptocurrency was commingled.
19     Q.   I'm asking a different question.
20         Factually, were there any assets
21 in those commingled addresses other than
22 those that customers deposited into the
23 FTX exchange?
24     A.   As I've just said, I -- it's not
25 possible for me to delineate between --

MAGNA
LEGAL SERVICES

1
2  between different assets that were in the
3  possession of the estate because they were
4  all commingled.
5      Q.   I'm not asking for any
6  delineation. I'm just asking a question
7  about the existence of any assets that FTX
8  may have included in those commingled
9  addresses other than those that entered
10 the exchange by virtue of customer
11 deposits.
12     The answer is "I don't know"?
13     A.   The answer is I -- I believe
14 they were.
15     Q.   You believe what were?
16     A.   I believe that cryptocurrency
17 other than customer deposits, exclusively
18 from customer deposits were commingled
19 with customer deposits.
20     Q.   And that understanding is based
21 on what?
22     A.   That understanding is based on
23 my general knowledge having worked for FTX
24 for the last nearly three years and
25 discussions with my team.

1
2      Q.   In FTX's view, did customers
3  deposited -- depositing assets into the
4  exchange or acquiring assets on the
5  exchange, did they understand that those
6  assets were being placed in those
7  commingled addresses you just testified
8  to?
9      A.   I am not --
10     MR. GLUECKSTEIN: Object to the
11 form.
12     A.   I am not one of those customers,
13 and I don't personally know or have spoken
14 to any FTX customers, so I could not
15 purport to know what they understood or
16 not.
17     Q.   I'm not asking about your
18 personal views. I'm asking about FTX's
19 views.
20     Does FTX have a position on
21 whether it understood that customers
22 depositing cryptocurrency into the
23 exchange would result in that
24 cryptocurrency being placed in those
25 commingled -- commingled addresses you've

1
2  been discussing?
3      MR. GLUECKSTEIN: Object to the
4  form.
5      A.   So, as a -- as a practical
6  matter, all what are referred to as on
7  chain movements of cryptocurrency are
8  visible by the public on the blockchain.
9  So when a customer deposited
10 cryptocurrency into an address to
11 effectuate a deposit on to the exchange,
12 they had the ability to see that movement
13 of digital assets on the relevant
14 blockchain. They could use a tool like
15 Etherscan, for example.
16     They then had the ability to
17 monitor that wallet on chain, or that
18 address, I'm sorry, on chain and would be
19 able to see any subsequent transfers or
20 amounts of cryptocurrency in those
21 addresses prior to their deposit. So it's
22 the FTX Trust's position that customers
23 had the ability to understand their
24 cryptocurrency was being commingled with
25 other cryptocurrency.

1
2      MR. PROULX: All right. Let's
3  take a break for lunch here.
4      THE WITNESS: Okay. Thank you.
5      THE VIDEOGRAPHER: 12:56 p.m.
6  Off the record.
7      (Luncheon recess taken.)
8      - - -
9      A F T E R N O O N   S E S S I O N
10     - - -
11     THE VIDEOGRAPHER: 1:44 p.m.
12 Back on the record.
13 BY MR. PROULX:
14     Q.   Before the lunch break, Mr.
15 Coverick, we were talking about account
16 balances. I see that you define it here
17 in paragraph 7 of your declaration.
18     How did FTX define account
19 balance for its customers pre-petition?
20     A.   In a certain document?
21     Q.   Are there any documents in which
22 FTX defined what a customer's account
23 balance was to that customer pre-petition?
24     A.   There may be. I -- I would need
25 to look at the specific document, and I'm

MAGNA ❯
LEGAL SERVICES

1
2  not qualified to interpret any legal
3  conclusions on it.  But it may have been
4  referenced.  I -- I would have to see a
5  document to know.
6      Q.    Sitting here in this room,
7  you're not aware of any specific documents
8  where that was defined for customers
9  pre-petition?
10     A.    I think it's very likely that --
11 that those words are used in the terms of
12 service, but I can't be sure because I
13 don't have it memorized.  I believe it was
14 also something that was referenced on
15 certain help pages, but I would need,
16 again, to have a more specific document to
17 look at to see how it was defined.
18     Q.    You testified before the break
19 that, quote, it's the position of the
20 estate that all assets in the possession
21 of the FTX Group are property of the
22 estate.
23         Is that testimony correct?
24     A.    Yes.
25     Q.    What is FTX's position with

1
2  respect to whether customer entitlements
3  were its property pre-petition?
4          MR. GLUECKSTEIN:  Object to the
5  form and calls for a legal conclusion.
6          Don't reveal any information
7  that's based on your discussions with
8  counsel.  If you have an
9  understanding, you otherwise can
10 answer.
11     A.    So, customer entitlements are a
12 liability, not an asset of the exchange.
13 So I would not consider them to be assets.
14     Q.    What is FTX's position on
15 whether digital assets deposited by its
16 customers pre-petition were the property
17 of FTX Group pre-petition?
18         MR. GLUECKSTEIN:  That calls
19 for -- objection, it calls for a legal
20 conclusion.
21     A.    I'm not a lawyer, so I can't
22 speak to the legal nuances of property
23 rights.
24         My only knowledge regarding
25 property rights is the confirmation order

1
2  stating that all assets are property of
3  the estate.
4      Q.    Outside the context of the
5  confirmation order, does FTX have a
6  factual position on whether assets in
7  possession of the pre-petition debtors by
8  virtue of customer deposits were its --
9  its property pre-petition?
10         MR. GLUECKSTEIN:  Same
11 objection.
12     A.    Again I'm familiar with the
13 Bankruptcy Court ruling with regard to
14 customer property, and I'm not aware of
15 any evidence or any facts that would
16 suggest the circumstances prior to the
17 petition date are different from those on
18 the petition date.
19     Q.    Are you aware of whether any
20 such evidence or facts was presented to
21 the Bankruptcy Court in connection with
22 the ruling you referenced?
23         MR. GLUECKSTEIN:  Object to the
24 form.
25     A.    I think, again, not a legal

1
2  conclusion, but it's my businessperson's
3  understanding that all relevant facts and
4  circumstances regarding this topic were
5  disclosed to the Court.
6      Q.    Were you involved in the --
7  those disclosures to the Court?
8      A.    I don't directly make
9  disclosures to the Court other than
10 submitting declarations from time to time.
11         I'm generally involved with many
12 aspects of the estate's business, so I was
13 generally aware of those disclosures.
14     Q.    And what facts and circumstances
15 were presented to the Bankruptcy Court
16 with respect to the pre-petition ownership
17 of digital assets?
18     A.    I think there were many facts
19 and circumstances given.  It was not
20 something that I focused on in my
21 declaration.  I don't have those all
22 committed to memory, but I believe they're
23 documented in other declarations,
24 including the Mosley declaration and Lord
25 Neuberger's declaration in support of plan

Page 150

1
2    confirmation.
3        Q.    Are you aware of what the
4    confirmation order you referenced says
5    with respect to property ownership?
6            MR. GLUECKSTEIN:  Objection;
7        calls for a legal conclusion.
8        A.    I don't have the entire
9    confirmation order committed to memory,
10    but I am aware that it says something to
11    the effect of all assets being property of
12    the estate.
13        Q.    All estates being property of
14    the estate at what point in time?
15        A.    The confirmation order is
16    effective as of the date it's entered, is
17    my understanding.
18        Q.    So are you -- are you testifying
19    that the confirmation order spoke to the
20    ownership of such assets on the date of
21    the confirmation order and going forward?
22        A.    I'm just --
23            MR. GLUECKSTEIN:  Objection; it
24        calls for a legal conclusion.
25            You can answer only if you have

Page 151

1
2        an understanding outside of a legal
3        conclusion and discussions with
4        counsel.
5        A.    I'm testifying that if I am able
6    to accurately answer questions about the
7    confirmation order, I would need to see
8    the relevant part of the confirmation
9    order you're asking me a question about.
10    I honestly do not have it all committed to
11    memory.
12        Q.    I'm just asking for your
13    understanding given that you referenced
14    it.  I'm not asking, just to be clear for
15    the record, about any communications you
16    had with counsel with respect to the
17    confirmation order.
18            MR. GLUECKSTEIN:  Object to the
19        form.
20        A.    My understanding is that
21    property ownership is a legal question.
22            My general understanding of the
23    confirmation order is what I said, which
24    is that assets are property of the asset.
25        Q.    At what point in time?

Page 152

1
2            MR. GLUECKSTEIN:  Object to the
3        form.
4        A.    Again I would need to see the
5    confirmation order to quote any specific
6    dates in question.
7        Q.    Does FTX have a view on whether
8    digital -- the digital assets underlying
9    3AC's asset entitlements can be traced or
10    not?
11        A.    Yes.
12        Q.    And what is that position?
13        A.    That it's impossible to trace
14    any digital assets deposited on to the
15    exchange.
16        Q.    Any at all or any by Three
17    Arrows?
18        A.    Specifically if you are asking
19    about Three Arrows, it's the estate's
20    position that it's impossible to trace any
21    cryptocurrency deposits made on to the
22    exchange.
23            It's also impossible as a
24    general matter to trace cryptocurrency
25    deposits back to a customer account.

Page 153

1
2        Q.    Are there any customer accounts
3    for which FTX has been able to trace back
4    to that depositing customer?
5        A.    Not that I'm aware of.
6        Q.    What, if any, steps has FTX
7    taken to attempt to conduct such tracing?
8        A.    There were exhaustive steps
9    taken do -- to determine the ability to
10    trace -- or lack of ability to trace
11    customer deposits.  This included a series
12    of -- or -- or a number of different
13    advisors, including Alvarez and Marsal, my
14    firm, Cignia Consulting which is another
15    cybersecurity firm that is employed by the
16    estate, as well as a number of vendors
17    that were engaged by the estate to assist
18    in those efforts with the appropriate
19    technology.  Those vendors include
20    Chainalysis and TRM Labs.
21        Q.    And I think you described the
22    entities involved in that exercise, but I
23    don't know that I heard what was done to
24    attempt that exercise.
25            Can you elaborate on that?

MAGNA
LEGAL SERVICES

1
2      A.   Sure.
3           I can speak mostly for what my
4   team did because that's what I'm most
5   closely involved with and supervise.  FTX
6   has a license with TRM Labs to use their
7   proprietary tracing software that the A&M
8   team as an advisor to the estate is able
9   to use for purposes of tracing
10  cryptocurrency.
11          Many customers had unique
12  deposit addresses that they would deposit
13  cryptocurrency into when they were
14  attempting to make a deposit on to the
15  exchange.  The general process by which my
16  team and other advisors followed when
17  attempting to trace the cryptocurrency was
18  to look at, first, the exchange ledger to
19  see what recorded deposits were made on
20  the ledger and then compare those deposits
21  to the known addresses associated with the
22  relevant accounts being examined.
23          The software allows you, or
24  allows anyone with a license to it, to
25  view the contents of an address on the

1
2   blockchain as of any date.  So my team
3   used the software to look at different
4   points in time at a particular address to
5   confirm our general understanding that
6   cryptocurrency was swept into commingled
7   wall.  It's based on our broader review of
8   the documents -- of -- of different
9   documentation that the pre-petition
10  management team had, as well as
11  conversations with the pre-petition
12  management team about the practices of the
13  exchange, which were that once a deposit
14  was made into a posit -- into a deposit
15  address, it was almost immediately, either
16  between 30 seconds to an hour, from the
17  time of deposit swept into a commingled
18  wallet.  My team looked at the deposit
19  addresses to confirm that practice was
20  true and verified that for a large number
21  of customer accounts and further attempted
22  to trace subsequent transactions from the
23  commingled addresses where the deposits
24  were swept to and identified that in many
25  instances hundreds, if not thousands, of

1
2   transactions occurred prior to that date.
3   But most importantly, as I believe is
4   referenced in the Mosley declaration,
5   while the hundreds, if not thousands, of
6   subsequent transactions would make
7   traceability even more difficult, once the
8   deposits were swept into a commingled
9   account and commingled with other
10  cryptocurrency, that was the point at
11  which they became impossible to trace
12  because other than NFTs, non-fungible
13  tokens, cryptocurrency like bitcoin or
14  Ethereum is fungible and one token cannot
15  be distinguished from another.  So when
16  one customer deposit -- when -- an example
17  where customer A and customer B both
18  deposit into the same address or deposit
19  into separate addresses and those
20  addresses are then swept into a single
21  address, it's impossible to tell which
22  bitcoin, for example, came from which
23  customer.
24     Q.   So, is -- is the fungibility of
25  the crypto assets the reason that FTX

1
2   asserts that tracing is impossible?
3          MR. GLUECKSTEIN:  Objection; it
4      calls for a legal conclusion.
5      A.   It's one aspect of the analysis
6   that was done to reach that conclusion.
7      Q.   What are the other aspects?
8      A.   The aspects that I just named,
9   which are that the cryptocurrency was
10  commingled which does relate to the
11  fungibility of the assets being
12  commingled, as well as the number of
13  transactions that occurred amongst
14  different wallets after the point of
15  commingling.
16     Q.   So I'm putting aside the
17  fungibility issue for -- for the moment.
18          The number of transactions, is
19  that -- does that literally preclude any
20  calculation as to the tracing of the
21  assets if they were, say, fungible?
22         MR. GLUECKSTEIN:  Object to the
23     form.
24     A.   I can't speculate to a
25  hypothetical because cryptocurrency, like

1
2  bitcoin and Ethereum, is fungible.  So I
3  can't speculate to a -- a nonrealistic
4  scenario where it suddenly is fungible.
5  I'm just basing what I'm saying off of the
6  exercise that was done.
7      Q.   Is tracing feasible for -- not
8  for specific assets, but from a -- a
9  customer deposit into a more general sweep
10  wallet or pool of assets?
11      MR. GLUECKSTEIN:  Object to the
12  form.
13      A.   Again, that's a headlight
14  scenario.
15      As a general practice, and again
16  I don't have the facts and circumstances
17  of every single of the millions of
18  customer accounts that traded on the
19  exchange at any point in time memorized,
20  but as a general matter, most customers
21  deposited into a single deposit address
22  and those deposits were then swept into
23  commingled wallets.
24      Q.   How many commingled wallets are
25  we talking about here?

1
2      A.   I don't have the exact number
3  memorized.
4      Q.   I'm not going to hold you to a
5  specific number, but do you have a -- a
6  general order of magnitude in mind?
7      A.   Given I'm testifying under oath,
8  I don't want to speculate to a number that
9  I don't have memorized, but I know it
10  was -- it was many.
11      Q.   Is many more or less than a
12  thousand?
13      MR. GLUECKSTEIN:  Object to the
14  form.
15      A.   Again, I don't -- I don't want
16  to guess when I'm testifying under oath.
17      Q.   I'm definitely not asking you to
18  guess.
19      Do you have reason to believe
20  that it is not above a thousand?
21      MR. GLUECKSTEIN:  Objection;
22  asked and answered.
23      A.   I -- I don't have the exact
24  number memorized.  It's possible that it's
25  above a thousand; it's possible that it's

1
2  below a thousand.  I characterize it as
3  many.
4      Q.   When did -- as to what period of
5  time was this tracing exercise performed?
6      A.   It was performed -- in general
7  over the pendency of the Chapter 11 case,
8  there was an attempt to trace many
9  customer deposits.  I'm also generally
10  aware, although I don't have the specific
11  creditors memorized, that other creditors
12  did assert arguments relating to
13  traceability, and so our team performed
14  the necessary analysis to evaluate --
15  evaluate those arguments.
16      So I would say those tracing
17  efforts happened throughout the pendency
18  of the case and continue when issues arise
19  relating to traceability.
20      Q.   And maybe the question was a
21  poor one.
22      The attempt to trace customer
23  deposits into specific sweep wallets,
24  understanding that it was conducted during
25  the case, was that -- did it have a

1
2  look-back period to at any pre-petition
3  point, or did the period of relevance, was
4  it only after the petition that that
5  tracing exercise was performed?
6      A.   We --
7      MR. GLUECKSTEIN:  Object to the
8  form.
9      A.   We have a large team at Alvarez
10  and Marsal focused exclusively on tracing
11  related to a number of different requests,
12  not only from creditors, but also from
13  regulatory bodies.  I -- I can't speak to
14  all different periods that tracing
15  analysis was performed, but it was many
16  different periods, I know that much.
17      Q.   Any tracing performed in June of
18  2022?
19      A.   Yes.
20      Q.   Tracing performed specifically
21  with respect to Three Arrows' claims in
22  this litigation?
23      A.   Yes.
24      Q.   What, if any, conclusions were
25  reached as to that, as to the Three Arrows

MAGNA
LEGAL SERVICES

1
2  specific assets?
3      MR. GLUECKSTEIN:  Objection and
4  I caution -- object to the form and
5  caution the witness not to reveal
6  anything that reflects work product
7  related to litigation or discussions
8  with counsel.
9      You can otherwise answer.
10     A.   I believe I state the conclusion
11  in my declaration, my original declaration
12  filed on June 20th of 2025 which are that,
13  and I'm quoting paragraph 98 of my
14  declaration:  Based on my review of the
15  activity in 3AC accounts set forth below,
16  it would be impossible to trace any of
17  3AC's entitlements to any digital assets
18  associated with the 3AC accounts as of the
19  end of the day on June 12th, 2022, to any
20  digital assets held by FTX Group on June
21  12th of 2022 or to any digital assets
22  currently held by the FTX Recovery Trust.
23     Q.   And in that paragraph you invoke
24  the Mosley declaration confirmation; is
25  that correct?

1
2      A.   I am stating that the
3  conclusions articulated in his declaration
4  are still applicable to the 3AC accounts.
5      Q.   And what measures, if any, were
6  taken to actually apply the conclusions to
7  the 3AC accounts?
8      MR. GLUECKSTEIN:  Object to the
9  form.
10     A.   The same steps that I just
11  outlined with regard to how my team traces
12  cryptocurrency to confirm, most
13  importantly, that all of the known deposit
14  addresses for the 3AC accounts were empty
15  on June 12th of 2022.
16     Q.   So then why does the -- in
17  paragraph 100 you speak to tracing with
18  respect to bitcoin.
19     Do you see that?
20     A.   Paragraph 20?
21     Q.   I'm sorry, 100.
22     A.   100.
23     I'm sorry, could you repeat the
24  question?
25     Q.   Sure.

1
2      In paragraph 100 do you speak to
3  your positions on tracing with respect to
4  bitcoin?
5      A.   I do.
6      Q.   Okay.
7      You see that you say, given the
8  substantial amount of activity in the 3AC
9  accounts with respect to BTC during this
10  time period, you represent it would be
11  impossible to trace.
12     Do you see that?
13     A.   I do.
14     Q.   Why then if the -- why then is
15  the substantial amount of activity
16  relevant to your position on tracing?
17     A.   Because it further complicates
18  the issue at hand.  There -- there's two
19  primary issues.  One is the initial point
20  of commingling, which is the most
21  important point when it comes to
22  traceability.  The second are the
23  subsequent transactions that occurred.  If
24  you're attempting to trace something that
25  happened at point zero, let's say, and you

1
2  want to trace that to where that asset is
3  now, it would require you to follow every
4  transaction that potentially related to
5  the assets deposited at point zero.  The
6  fact that there are hundreds, if not
7  thousands, of subsequent transactions from
8  the wallets involved in the commingling of
9  deposited crypto on to the exchange
10  further complicates and, in fact, renders
11  impossible, the ability to trace any
12  cryptocurrency deposited on to the
13  exchange.
14     Q.   I want to make sure I'm
15  understanding you correctly.
16     Understanding your position that
17  there are -- that the number of subsequent
18  transactions complicates that exercise,
19  are you -- are you -- is it your position,
20  is it FTX's position that the number also
21  renders it impossible?
22     A.   I say in my declaration that
23  given the substantial amount of activity
24  in the accounts, I'm paraphrasing, it is
25  impossible to trace 3AC's entitlement to

1
2    the bitcoin.
3        I also then say in the
4    subsequent paragraph, which is not
5    separate, but part of the analysis, that
6    the deposit addresses were empty on -- I'm
7    paraphrasing, were empty on June 12th.
8    Q.    I know you say that.  That's
9    FTX's position?
10   A.    Yes.
11   Q.    If FTX had not commingled
12   customer deposits into commingled pools,
13   would your position in the paragraphs
14   we've been looking at be the same?
15       MR. GLUECKSTEIN:  Objection; it
16       calls for a legal conclusion.
17       Caution the witness not reveal
18       discussions with counsel, work product
19       in anticipation of litigation.
20   A.    I can't speculate to a
21   hypothetical like that because it would
22   require knowing every fact and
23   circumstance of a different environment
24   that did not exist in the period in
25   question.

1
2    Q.    If the deposits Three Arrows --
3    if the digital assets Three Arrows
4    deposited stayed in Three Arrows' specific
5    addresses on the FTX exchange, would those
6    digital assets be traceable to Three
7    Arrows, in your view?
8        MR. GLUECKSTEIN:  Objection;
9        calls for a legal conclusion.
10   A.    Again, I can't speculate to a
11   hypothetical scenario of an environment
12   that did not exist because I would need to
13   know every fact and circumstance about
14   that environment, and I -- I could not
15   form that conclusion without that being a
16   actual event that I could analyze.
17   Q.    Well, I mean, isn't that what
18   happened in the actual world that you are
19   analyzing?  Weren't there Three Arrows
20   specific deposit addresses on the FTX
21   exchange prior to sweeping into commingled
22   addresses?
23       MR. GLUECKSTEIN:  Object to the
24       form; misstates the record.
25   A.    There was cryptocurrency

1
2    deposited into addresses that were then --
3    that was then swept into commingled
4    addresses, yes.  That's the environment
5    that I can speak to.
6    Q.    And was those first addresses
7    you mentioned, what were those prior to
8    the commingled addresses?
9    A.    Are you asking what the actual
10   address numbers were?  I -- I don't know.
11   Q.    No, I'm not asking for --
12   A.    I don't have --
13   Q.    Sorry.
14       I didn't ask you for a number.
15   I'm just asking for what you mean by that.
16       You said there were -- there was
17   cryptocurrency deposited into addresses
18   that were then swept into commingled
19   addresses.
20       The first type of address you
21   mentioned, what was that?
22       MR. GLUECKSTEIN:  Object to the
23       form.
24   A.    That's what I reference as the
25   deposit address in my declaration.

1
2    Q.    And what's a deposit address?
3    A.    Again, I would point to my
4    declaration.  There's a footnote on that
5    definition which quotes the Mosley
6    declaration that when an asset was
7    deposited with one of the FTX exchanges by
8    a customer, that asset moved from an
9    external address or account into an
10   address or account owned and controlled by
11   an end -- end -- entity within FTX Group
12   which is defined as a deposit address.
13   Q.    That deposit address was
14   specific to the specific depositing
15   customer?
16   A.    Again I can't speak to every
17   single customer account on the exchange,
18   there's millions.  For 3AC, as I analyze
19   in my declaration, those deposit addresses
20   were specific to 3AC.
21   Q.    What's a futures contract?
22       MR. GLUECKSTEIN:  Objection;
23       calls for a legal conclusion.
24       You can answer if you have an
25       understanding.

Page 170

1
2      A.   A futures contract is a
3  derivative instrument.
4      Q.   Did the FTX -- FTX exchange make
5  futures contracts available to any
6  customers?
7      A.   I don't know if they were
8  available to all customers, but they were
9  available to some customers.
10     Q.   What types of futures products
11 or contracts were made available to some
12 customers?
13     A.   The most popular, by far, was a
14 product called a perpetual future.  There
15 were also more, what I would refer to as
16 traditional futures which are futures that
17 have expiration dates.  Those were traded
18 as well, but much less commonly than
19 perpetual futures on the FTX exchange.
20     Q.   Is that quarterly futures
21 contract an example of a traditional
22 futures contract?
23     A.   That is one of the contracts
24 I'm -- I'm casually referring to as a
25 traditional futures contract.  That is a

Page 171

1
2  product that was traded on the exchange,
3  to my knowledge.
4      Q.   Why did the FTX exchange make
5  these sort of futures contracts available
6  to customers?
7          MR. GLUECKSTEIN:  Object to the
8      form.
9      A.   I cannot speak to the intent of
10 pre-petition management because I was not
11 there.
12     Q.   You haven't seen any documents
13 that shed light on why these contracts
14 were made available by the FTX exchange?
15     A.   Again, I can't speak to
16 someone's intent that I haven't spoken
17 with about that subject.
18         I have a general understanding
19 of why they were so popular on the
20 exchange, but I cannot speak to the
21 management team's intent of why they
22 offered that product.
23     Q.   Why were they so popular on the
24 exchange?
25     A.   It's my -- it's my common

Page 172

1
2  knowledge, general knowledge based on my
3  nearly three years of experience working
4  for FTX and communicating with customers
5  that one of the reasons they were so
6  popular was because of the large amount of
7  leverage that they could provide a -- a
8  customer.  With leverage comes the
9  potential for increased reward at a much
10 higher risk.
11     Q.   Did they, futures contracts that
12 is, offer more leverage than spot margin
13 trading to those customers?
14     A.   In a way they could.
15     Q.   Tell me more about that.
16     A.   So, there was ways to develop
17 leverage in spot positions in a customer's
18 account.  I -- I walked through this in my
19 declaration.  Happy to elaborate.
20         Perpetual futures, unlike spot
21 positions, offered customers the ability
22 to gain exposure to a larger notional
23 value related to an underlying reference
24 cryptocurrency, and that's an important
25 distinction because futures contracts,

Page 173

1
2  certainly perpetual futures contracts,
3  didn't -- were not explicitly tied to, for
4  example, bitcoin if it was a bitcoin perp.
5  They -- they operated somewhat
6  independently of the reference asset.
7          The way that perpetual futures
8  worked was that you could, subject to
9  margin requirements, open a notional
10 position without having to buy that
11 position or pay for it, and that position
12 was predicated on a reference price which
13 was distinct from the price of the -- of
14 the reference cryptocurrency.  So in --
15 I'm going to use the example of bitcoin
16 just because I think it's the easiest.
17 So, the -- the reference price for a
18 bitcoin perpetual future was not
19 necessarily the same as the prevailing
20 price for bitcoin on the exchange at that
21 time.  It was -- it was set by the market.
22 It was a product of supply and demand for
23 that -- for that future position.
24     Q.   Can I ask, were there funding
25 payments designed to have the two

Page 174

1
2  approximate one another, in theory?
3      A.   That's exactly correct.  So, the
4  market will, based on supply and demand,
5  dictate what the reference price is for
6  that future contract at any 30-second
7  interval.  The way that perpetual futures
8  are intended to mimic movements in the
9  price of the reference cryptocurrency is
10  through that funding payment concept.  To
11  the extent that the price begins to
12  diverge, the reference price of the future
13  contract begins to diverge from the
14  prevailing price of the referenced
15  cryptocurrency, a funding payment would be
16  charged either to the long side; in other
17  words, people that had taken positions
18  that would yield gains if the reference
19  price increased over time.  So it would
20  charge one side depending on if the price
21  was higher or lower, or the other side of
22  those contracts on the flip side.
23      Q.   And I just want to make sure I'm
24  understanding the reasons that a customer
25  might choose a futures product as opposed

Page 175

1
2  to a -- the underlying digital asset in a
3  spot margin trading concept.  So let me
4  take this step-by-step.
5      First, there's a fee to enter
6  into a futures contract; is that correct?
7      A.   There are trading fees, to my
8  knowledge -- on any transaction that's
9  conducted on the exchange, there is some
10  relatively small trading fee that's --
11  that's incurred.  That's how the exchange
12  generated revenue.
13      Q.   Any sort of deposit that the
14  customer entering into a futures contract
15  needs to make, even if temporary, to
16  acquire that position?
17      A.   Not necessarily.  There are
18  margin requirements to maintain a
19  sufficient amount of margin trading
20  account value, effectively, to keep a
21  position open, and the intent of that is
22  to prevent -- due to how quickly those --
23  those contracts can generate gains or
24  losses in a customer's account, those
25  margin requirements are designed to

Page 176

1
2  prevent the account from ever going
3  negative.
4      Q.   There were also margin
5  acquire -- requirements, were there not,
6  for spot margin trading, the FTX's margin
7  program?
8      A.   There were.
9      Q.   Were those requirements
10  materially different from one another in
11  the futures contract versus the spot
12  margin context?
13      A.   They were different in the sense
14  that there were different factors applied
15  on one hand for futures to a notional
16  value which is different from the asset
17  value.  Also futures did not -- did not
18  comprise any component of the -- any
19  component of the margin trading account
20  value which is, again, often referred to
21  as collateral, because they're not assets
22  that you don't -- when you close the
23  position, you don't get the notional value
24  back.  Any gains and losses from that
25  contract are credited to the account or

Page 177

1
2  debited from the account every 30 seconds.
3  So they're -- it's a similar process and
4  it goes into the same calculation just as
5  every component of the account balance
6  goes into that calculation, but they are
7  treated differently because they're very
8  different types of components --
9      Q.   Why --
10      A.   -- on a customer's account.
11      Q.   Help me understand why they were
12  so popular relative to the spot margin
13  positions that a customer could
14  alternatively acquire with respect to the
15  underlying digital assets.
16      A.   In -- in general, they allowed
17  customers to gain a higher level of
18  leverage than spot trading would.  Spot
19  trading would -- requires either the --
20  the -- having sufficient value to purchase
21  or trade for assets on the exchange or
22  borrow from the borrowing program to
23  acquire increased assets.  That's one way
24  you can develop leverage in the spot
25  product.

1
2      Futures allow you to open a
3  higher exposure in terms of notional value
4  closely tied to the same market as -- as
5  the spot market.
6      Q.   So does that mean that
7  futures -- futures contracts or products
8  had greater upside to customers who
9  acquired them than merely holding the
10 underlying digital assets?
11     MR. GLUECKSTEIN:  Object to the
12 form.
13     A.   It -- it depends on the -- the
14 notional value and the number of contracts
15 that are opened, but it -- with -- with
16 greater risk and the risk of quicker
17 losses comes greater potential for gains.
18     Q.   Other than the greater upside or
19 greater downside in holding futures
20 positions, how economically do they differ
21 from holding the underlying digital asset?
22     A.   Well, the most important example
23 is that you don't need to purchase
24 anything to gain the exposure to the
25 notional value.  If you want exposure to

1
2  one bitcoin and bitcoin is worth $50,000,
3  you would need $50,000 to buy that bitcoin
4  on the exchange.
5      If instead you wanted -- you
6  wanted that same exposure but did not want
7  to have to utilize $50,000 worth of other
8  assets -- asset entitlements that comprise
9  the account balance, you could simply open
10 up a futures position, for example one --
11 one contract in BTC, and have a similar
12 level of exposure and then depending on
13 the applicable margin requirements could
14 incorporate leverage into that calculation
15 too. So it was a -- it was a -- the
16 primary difference is you don't need to
17 purchase anything to open a futures
18 contract.
19     Q.   When open -- opening a futures
20 contract, does any -- you mentioned that
21 there were margin maintenance requirements
22 for them; is that correct?
23     A.   There's --
24     Q.   Futures?
25     A.   -- margin maintenance

1
2  requirement on the entire -- excuse me.
3  On the entire account. The components of
4  that margin maintenance requirement
5  involve looking at both open positions
6  like futures, as well as comparing that to
7  any levered positions, or said dimple
8  positions that required borrowing.
9      (Coverick Exhibit 13, Complete
10     Futures Specs April 11, 2022, Bates
11     FTX_3AC_000045026-067, was marked for
12     identification, as of this date.)
13 BY MR. PROULX:
14     Q.   So, you've been handed what's
15 been marked as Exhibit Number 13.  This is
16 a document titled "Complete Futures Specs"
17 dated April 11th, 2022, produced by FTX in
18 this litigation.
19     Are you familiar with this
20 document?
21     A.   I believe I've seen it.  I'm not
22 intimately familiar with all of it, but
23 I -- I do believe I've seen this
24 document --
25     Q.   Seen --

1
2      A.   -- at some point.
3      Q.   I'm sorry, I didn't mean to step
4  over you.
5      Seen it in connection with the
6  preparation of your declaration in this
7  matter?
8      A.   That's most likely because I
9  generally have not spent time browsing the
10 archives of -- of help pages, but I --
11 again, I don't recall the specific details
12 of this specific document.
13     Q.   Without revealing the substance
14 of any communications with counsel, did
15 you assist in any way with locating
16 materials that may have been posted to the
17 FTX exchange website in April of 2022 or
18 any point pre-petition?
19     A.   I did not personally assist with
20 production requests.  My team did assist
21 counsel in -- from time to time with
22 production requests, but my understanding
23 is they were predominantly done using
24 searches of the -- what's called our
25 Relativity database which is the

Page 182

1
2  repository for documents that have been
3  collected and archived throughout the
4  pendency of the case.
5       Q.    And do you know specifically how
6  documents relating -- or documents
7  reflecting to --
8       MR. PROULX:  Strike that.
9       Q.    Documents reflecting potential
10 FTX webpages were located by FTX in this
11 litigation?
12      A.    I understand that generally
13 there were search terms negotiated with
14 3AC that were applied to searches, and the
15 relevant documents that were found were
16 produced.
17      I also understand that if a
18 specific document was requested, there
19 were searches for that specific document,
20 and that specific document, to the extent
21 rel -- relevant was produced.  I don't
22 know specific which of those steps
23 produced -- resulted in, you know,
24 locating this specific document.
25      Q.    Well, I'll represent this

Page 183

1
2  document doesn't have any mention of or
3  anything to do with 3AC by name.
4       A.    Okay.
5       Q.    Do you know who authored this
6  document?
7       A.    I do not.
8       Q.    Do you know how long it was up
9  on the FTX webpage after April 11th, 2022,
10 assuming it was posted on that date?
11      A.    I do not.
12      Q.    Do you know if this was
13 available to customers?
14      A.    Again, I do not know for certain
15 every document that was available to
16 customers and when.
17      If this was produced to 3AC
18 based on a search of the Relativity
19 database, I think that it's likely it was
20 from the website.  It looks like it was
21 from the website, but I can't be certain.
22 I didn't do that search myself.
23      Q.    Are you -- are there any FTX
24 webpages that you're, on behalf of FTX,
25 able to verify were, in fact, posted on

Page 184

1
2  the dates stated in these webpages?
3       MR. GLUECKSTEIN:  Object to the
4  form.
5       A.    Again, I -- I can verify that
6  they were found using the process that I
7  described and that, to the best of my
8  knowledge, they are what they purport to
9  be.  I have no evidence to suggest
10 otherwise or reason to suggest otherwise,
11 but I did not personally verify every
12 production request or -- or document
13 produced to 3AC.
14      Q.    What does this document purport
15 to be?
16      A.    It's -- I believe it's titled
17 "complete futures specs."
18      Q.    Do you understand this document
19 to reflect FTX's policies with respect to
20 the operation of futures contracts on the
21 exchange as of April 2022?
22      MR. GLUECKSTEIN:  Object to the
23 form.
24      A.    My only understanding of this
25 document is that it seems to contain

Page 185

1
2  information relating to futures on the FTX
3  exchange.
4       Q.    You referred a couple times to
5  the notional value of futures contracts.
6       Do you recall that testimony?
7       A.    I -- I recall using that word,
8  yes.
9       Q.    And you'll see that on page 2 of
10 this document under -- there's some
11 terminology under Accounts, first defined
12 term as position -- notional defined as
13 position size times MP.
14      Do you see that?
15      A.    I do.
16      Q.    Is MP market price?
17      A.    I would have to read through
18 this document.  I don't know if it's
19 defined somewhere.  I did not author this
20 document.
21      Q.    But FTX did or did not?
22      A.    It's my understanding that
23 FTX -- someone on the pre-petition
24 employee group would have produced this
25 document.

MAGNA
LEGAL SERVICES

1
2    Q.   Why is the notional value of
3  futures contractual?
4       MR. GLUECKSTEIN:  Objection to
5  form.
6    A.   Relevant to what?
7    Q.   Well, it's a defined term, yes?
8    A.   Position notional is a defined
9  term; is that the question?
10    Q.   The notional value of a futures
11  contract, this comes up in your
12  declaration too.
13    A.   I'd have to look at my
14  declaration to see if it's a defined term
15  or not.
16       MR. PROULX:  I strike that.
17  BY MR. PROULX:
18    Q.   I don't mean defined with
19  quotation marks.  I mean a term that you
20  use in your declaration as well?
21    A.   Yes, sir.  Yes.
22    Q.   Thank you.  Sorry for that lack
23  of clarity.
24    A.   No problem.
25    Q.   In what context is the notional

1
2  value of a futures contract relevant in
3  FTX's view?
4    A.   In a couple of different ways.
5  One, the notional value of a position is a
6  factor that goes into calculating the gain
7  or loss on that contract every 30-second
8  period, which is then settled into the
9  user's USD balance.
10       The second context that I can
11  recall in the moment is that it is a
12  factor in calculating the maintenance
13  margin requirement of an account.
14    Q.   Any other contexts in which it's
15  relevant?
16    A.   The -- not that I can recall in
17  the moment.
18    Q.   So let's talk about that first
19  context, calculating the gain or loss on
20  that contract every 30-second period.
21       How is -- how does the notional
22  value of a futures contract play into
23  that?
24    A.   The notional value, which would
25  be the -- of an entire position in a -- in

1
2  a perpetual future, would be the number of
3  contracts times the reference price.  For
4  simple math, let's say that price is one
5  at T equals zero, and at T plus 30 seconds
6  that price equals two.
7       The difference in the reference
8  price, which could then be multiplied by
9  the number of positions to reach a total
10  notional value for that position, if
11  someone was on the long side of that
12  contract, would represent a one dollar
13  gain in that 30-second period.  That one
14  dollar would be credited to the user's USD
15  balance and the reference price would then
16  reset to the current reference price at
17  that plus 30 seconds and then be -- and so
18  on and so forth every 30 seconds.
19    Q.   You're not -- let me make sure I
20  understand your -- your testimony.
21       You're not -- you're not
22  asserting that the gain or loss within the
23  30-second period is the entire notional
24  value of the futures contract, are you?
25    A.   No.  I'm saying the gain/loss

1
2  can be calculated by taking the difference
3  in the notional value of the position
4  between one period and the next.
5    Q.   Okay.
6       And notional value of the
7  position is defined as the size of that
8  position times the reference price of that
9  position?
10    A.   My understanding is it would be
11  the number of contracts times the
12  reference price.
13    Q.   How are -- in situations where a
14  given customer has both a buy-side futures
15  positions and sell-side futures positions,
16  how is the size of that position
17  determined in the aggregate?
18    A.   It would just be the opposite of
19  what I just explained for the sell-side
20  positions.  If the reference price went
21  up, it would generate a loss; if it went
22  down, it would generate a gain.
23    Q.   And to assess overall gains or
24  losses, do you -- do you, in FTX's view,
25  net out the buy -- number of buy-side

1
2    positions versus sell-side positions, or
3    do you keep them separate?
4         Help me understand that.
5         MR. GLUECKSTEIN:  Object to the
6    form.
7    A.    At the end of the day,
8    everything is netted out and aggregated to
9    reach the total account balance.  So a
10   dollar gain would increase -- on one
11   contract would increase the account
12   balance by a dollar, all else equal, and a
13   dollar loss would offset that dollar gain
14   in the account balance.
15   Q.    In which component of the
16   account balance do -- do gains or losses
17   from futures contract affect, in FTX's
18   view?
19   A.    The gains and losses were
20   credited to the user's USD balance.
21   Q.    Could a customer stand to
22   recover at some period in time the full
23   notional value of its futures contract?
24   A.    At any -- no.  At any point in
25   time, you could not recover the full

1
2    notional value because it was not an asset
3    position.
4    Q.    I'm not asking about asset
5    positions.  I'm asking about the amount
6    from -- that a customer stood to receive
7    in value from holding a perpetual futures
8    contract, could that have equaled the
9    notional value of that futures contract?
10        MR. GLUECKSTEIN:  Object to the
11   form.
12   A.    No.  The only impact on an
13   account balance related to futures
14   contracts are the gains or losses off of
15   those positions calculated every 30
16   seconds and credited to the account every
17   30 seconds.
18        A customer cannot buy -- cannot
19   buy a future.  They enter into a future
20   contract or open a future contract
21   position.  At no point in time are they
22   entitled to receive the entire notional
23   value of the account balance, or of the --
24   I'm sorry, of the notional value.
25   Q.    So why, on page 1 of this

1
2    document we have in front of us there's a
3    section called expiration, in the middle
4    of that section it says:  For instance,
5    say that you deposited ten thousand of
6    collateral and used it to buy 10 BC
7    quarterly futures.
8         Is that wrong?  Can you not buy
9    quarterly futures?
10        MR. GLUECKSTEIN:  Object to the
11   form.
12   A.    I don't know who wrote this
13   document or what the intent was.  All I
14   know, in -- and the FTX Trust's position
15   is that you cannot buy futures.  You open
16   futures contracts.  To the extent there's
17   confusing language in a pre-petition
18   document, I can't speak to that because I
19   don't know who the author was or what the
20   intent was.
21   Q.    So then if FTX isn't relying on
22   any of these explainer documents; is that
23   correct?
24        MR. GLUECKSTEIN:  Object to the
25   form; misstates the testimony; assumes

1
2    facts not in evidence.
3    A.    I did not say that.
4    Q.    Is FTX relying on this
5    particular document to form its position
6    with respect to futures contracts?
7         MR. GLUECKSTEIN:  Object to the
8    form; calls for a legal conclusion.
9    A.    FTX is relying on the analysis
10   performed in -- with respect to futures
11   contracts and their impact on the account
12   balance, FTX is relying on the analysis in
13   my declaration which was predicated on a
14   review of the code base of the exchange
15   and how the change operated at the time it
16   was functional.
17        FTX did not do analysis
18   reflected in the claim objection or my
19   declaration that's entirely reliant on any
20   document in its -- in its isolation.
21   Q.    Is that true of your
22   supplemental declaration as well?
23        MR. GLUECKSTEIN:  Object to the
24   form.
25   A.    It is -- again, my supplemental

MAGNA
LEGAL SERVICES

Page 194

1
2  declaration, as I described it earlier, is
3  a process by which one can calculate the
4  same figures included in my original
5  declaration filed on June 20th by using
6  the extracts into Microsoft Excel or other
7  formats that were produced to the joint
8  liquidators to reach the same numbers that
9  were included in my declaration. That
10 process was based on a review of the code
11 base operating the exchange, as well as an
12 understanding of how to reconcile extracts
13 from the exchange ledger with that
14 analysis done using Python script.
15     Q.   So if the reference price for a
16 perpetual futures contract double --
17 double with -- doubled within the
18 30-second period, what does a customer
19 receive in that -- in that situation?
20     A.   They would receive a -- well, if
21 they were on the long side of the
22 position, they would receive the value of
23 the change in reference price, whatever
24 that value is.
25     Q.   And --

Page 195

1
2     A.   But at no point would they be
3  entitled to the new notional value of
4  the -- like, in your example that it
5  doubles --
6     Q.   No, no, no.
7     A.   -- they're not entitled to the
8  new notional value. It's simply been
9  changed.
10     Q.   I'm talking about the notional
11 value of the futures contract when a
12 customer enters into a futures contract.
13         We agreed, did we not, that a
14 customer can enter into a futures
15 contract?
16     A.   I don't know what we agreed to,
17 but I --
18     Q.   I'm asking did we?
19     A.   I don't know what your position
20 is, so I don't know what we agreed to.
21     Q.   A customer can't buy a futures
22 contract in FTX's view.
23         What can they do with respect to
24 a futures contract?
25     A.   They can enter into a futures

Page 196

1
2  contract, which is what I also would
3  describe as open a futures contract.
4     Q.   Okay. So I'll use enter into or
5  open.
6     A.   Sure.
7     Q.   Is there a notional value of
8  that futures contract at the point of
9  entry or open of that futures contract?
10     A.   There is a notional value with
11 respect to two things: the calculation of
12 the future gains or losses that will be
13 calculated off of that futures contract,
14 as well as its application to the
15 maintenance margin requirement.
16     Q.   Yeah, and I'm asking about the
17 former. So there's a notional value
18 that's frozen in time at the point at
19 which a customer enters into an open
20 futures contract; is that right?
21     A.   Well, the notional value can
22 change if -- if the number of contracts
23 change. They can open additional
24 contracts or close some of the contracts
25 and the notional value will fluctuate by

Page 197

1
2  any change in the number of contracts.
3     Q.   Let's just take a BTC perpetual
4  futures contract; assume the customer's on
5  long side of it.
6     A.   Okay.
7     Q.   Assume they keep it open.
8  They're a point zero, I think that was
9  your terminology.
10     A.   Sure.
11     Q.   Is there a notional value of
12 that futures contract?
13     A.   For purposes of calculating
14 future gains and losses and application to
15 the maintenance margin requirement, there
16 is a notional value of that futures
17 contract, but at no point in time does
18 that notional value comprise any aspect of
19 the account balance.
20     Q.   And if a customer holds from
21 point time zero to time X and they're on
22 the long side of a perpetual futures
23 contract, do they stand, potentially, to
24 recover the notional value of the futures
25 contract to time zero?

Page 198

1
2      A.   They potentially -- excuse me.
3   They potentially stand to gain unlimited
4   amounts depending on how high the
5   reference price goes while they hold that
6   contract.
7          (Coverick Exhibit 14, Updated
8      Analysis - Three Arrows Capital
9      September 4, 2024, Bates
10     FTX_3AC_000013874-911, was marked for
11     identification, as of this date.)
12  BY MR. PROULX:
13     Q.   I'm handing you what's been
14  marked as Exhibit Number 14.
15     A.   Okay.
16     Q.   Are you familiar with this
17  document?
18     A.   Yes, I'm generally familiar with
19  it.
20     Q.   What is it?
21     A.   This document was internal work
22  product of a subset of the Alvarez and
23  Marsal team that was used -- my
24  understanding, was that it was used in
25  connection with evaluating 3AC's claim in

Page 199

1
2   the earlier days of -- of the dispute.
3          My understanding it was a
4   internal work product.  I -- I did not
5   review it, but I understand it was
6   produced coming out of Mr. Gordon's
7   deposition.
8      Q.   Did you help prepare this
9   document in any way?
10     A.   I did not.
11     Q.   When you refer to the early days
12  of this litigation, what do you mean?
13     A.   I'm -- I'm speaking generally.
14  It was -- I understand it was drafted
15  based on the -- on the cover page of the
16  document, September 4th, which is over a
17  year ago.  So I would refer to this as a
18  later day compared to an earlier day being
19  a year ago.
20     Q.   Go to page 21, please, using the
21  numbers on the lower right-hand corner.
22     A.   Okay.
23     Q.   Feel free to take look at the
24  pages before or after for context, but
25  this is talking about 3AC exchange account

Page 200

1
2   balance changes, at least according to the
3   title.
4          Do you see that?
5      A.   Yes.
6      Q.   And specifically on -- in the
7   June 12th through June 14th period?
8      A.   Yes.
9      Q.   Looking specifically at page 21
10  which I believe relates, according to A&M
11  at the time, to the June 13 period,
12  there's a dash, the second one down:
13  Futures:  Sold 18.7K BTC-PERP and 3.4K
14  ETH-PERP, reducing EOD USD borrow balance
15  by 437.2 million and 4.1 million,
16  respectively.
17         You see all that?
18     A.   I do see it.
19     Q.   What is -- what did A&M mean
20  when it talks -- referred to selling a BTC
21  perp contract?
22     A.   Yeah, so I think this is a -- a
23  common misunderstanding that I reference
24  in my declaration, a common
25  misunderstanding of -- that's clearly

Page 201

1
2   reflected in the joint liquidators'
3   amended proof of claim.
4          Mr. Gordon led the team involved
5   with the compiling of the debtors'
6   statements and schedules for the
7   bankruptcy, including the scheduling of
8   customer claims.  At the time of
9   scheduling of customer claims, pricing of
10  cryptocurrency or other positions as it
11  relates to the valuation of a customer's
12  claim had not yet been determined.
13         At the request of the Unsecured
14  Creditors Committee at the time, we took a
15  different approach to scheduling customer
16  claims than what would have been reflected
17  in the exchange ledger at the time the
18  exchange was operational.  This request
19  was related to the potential that perhaps
20  the last 30-second period prior to the
21  position time the gains/losses on
22  perpetual futures may or may not have been
23  added to the U.S. dollar balance, and so
24  to account for that, the UCC requested
25  that the debtors break out the quantity of

MAGNA
LEGAL SERVICES

1
2    futures contracts in the schedules
3    alongside the quantity of other aspects of
4    the account, including those that make up
5    the account balance, and then an
6    offsetting adjustment was made to each
7    user's USD balance to avoid double
8    counting once that pricing was determined.
9         So in other words, to the extent
10   that there was a missing 30-second gain or
11   loss that was not reflected in the ledger
12   as of the petition time, the price applied
13   to the notional futures, or the number of
14   futures contracts that were scheduled
15   could be set to be slightly different than
16   the offsetting adjustment that was made to
17   the U.S. dollar balance to make that
18   adjustment.  That did not end up being the
19   case.  It was determined that -- that all
20   30-second periods were incorporated in the
21   ledger as of the petition time, and that's
22   why in the estimation order, the pricing
23   for the scheduled future contracts was set
24   to be equal to the offsetting adjustment
25   made to each user's USD balance.

1
2         This is something very bespoke
3    that's inconsistent with how the shaping
4    operated, but was done for the purposes of
5    the case at the time based on people not
6    have -- creditors and parties in interest
7    not having full transparency into what
8    pricing would eventually be applied.
9         Mr. Gordon's team that completed
10   this presentation was most familiar when
11   analyzing accounts with that methodology,
12   which again is inconsistent with how the
13   exchange operated at any time it was
14   functional, and in evaluating any claim,
15   it did not matter because the change --
16   the account balance was unaffected by it.
17   You had two different sides to the ledger.
18   When they were viewing total account
19   balances, it did not make an impact.
20        So this presentation is focused
21   on the statements and -- what I call the
22   statements and schedules methodology which
23   is a very bespoke methodology that was
24   used exclusively for purposes of -- of
25   scheduling customer claims.

1
2        Q.   So, let's take that
3    step-by-step.
4        A.   Sure.
5        Q.   First of all, you -- you refer
6    to this as a bespoke methodology and
7    inconsistent with how the -- the exchange
8    operated.
9         What do you mean by that?  How
10   did the exchange operate if not that way?
11       A.   The exchange did not include any
12   notional value for futures contracts in
13   the account balance, and that was known at
14   the time.  It was also disclosed to the
15   creditor base on a what we call an FAQ
16   page that was posted to -- to the Kroll
17   website, I believe, explaining this
18   difference and the -- the reason for this
19   methodology.
20        Again, if someone opened a
21   futures contract for whatever value, they
22   could not turn around and close that
23   contract and then somehow receive the --
24   the notional value that was not purchased
25   or sold.  It was simply an opening of a

1
2    position and a gain or loss was calculated
3    on that position.
4         For the reasons that I just
5    stated, the statements and schedules took
6    a different methodology based on the
7    issued at hand in the case at the time,
8    namely not having pricing for components
9    of an account balance, and used that
10   methodology in consultation with the
11   unsecured creditors committee for
12   scheduling purposes only.  The exchange
13   did not calculate account balances this
14   way.
15       Q.   When you're referring to
16   pricing, are you referring to using the
17   reference price of futures contracts in
18   this matter?
19       A.   I'm sorry, thank you for
20   clarifying.
21        I'm referring to pricing of
22   anything that could affect a customer's
23   account balance.  So, most -- most
24   predominantly that included the pricing of
25   any cryptocurrency position in an account

1
2  as of the petition time.  That was
3  something that was under dispute and there
4  was a motion by the debtors and an
5  eventual estimation order entered by the
6  Court to specify a pricing table for all
7  assets.  The reason there was an
8  adjustment made related to futures was
9  with regard to this question at the time
10 that has since been answered of are we
11 sure that the last 30-second period of
12 gain/loss on perpetuals is included in the
13 USD balance.
14      Q.   And what was the answer to that?
15      A.   The eventual answer is yes, it
16 was.  And so therefore, there was no
17 need -- the entire purpose of splitting
18 them out was to list out the quantity of
19 open future positions just as we list out
20 the quantity of every cryptocurrency
21 position that was in the account.  The
22 decision was to list out the quantity of
23 future contracts, and then at the time,
24 there was an assumed reference price
25 applied to those positions to calculate an

1
2  estimated notional value that was backed
3  out or would reduce the user's USD
4  balance.  The purpose of doing it that way
5  was if it was determined that there was a
6  30-second gain or loss period missing from
7  the USD balance as of the petition time,
8  the estimation order would have been able
9  to set a slightly different reference
10 price when putting prices on those future
11 contracts versus what was adjusted out of
12 the USD balance.
13      Q.   That adjustment to the pricing
14 of the estimated -- that the claims
15 estimation process used, what was that an
16 adjustment relative to?  The reference
17 price of the futures contracts on the
18 petition date?
19           MR. GLUECKSTEIN:  Objection to
20      the -- object to the form.
21 BY MR. PROULX:
22      Q.   You talk about an adjustment
23 several times.  I don't know what you're
24 adjusting.
25           What are you adjusting?

1
2           MR. GLUECKSTEIN:  Object to the
3      form.
4      A.   We adjusted the USD balance of
5  each account in the schedules by an amount
6  equal to the number of open future
7  positions, you know, depending on what
8  side of the future position they were,
9  or -- multiplied by an assumed reference
10 price at the time of scheduling.
11           And again, if I can give an
12 example, any 30-second period to calculate
13 the gain or loss on a futures position you
14 would take -- again we're going to -- I'm
15 using zero T plus 30, you would take the
16 notional value of the futures positions,
17 the quantity times the reference price,
18 minus -- at T plus 30, minus that same
19 position quantity times reference price,
20 and that -- that subtraction, that T plus
21 30 minus T plus -- minus to zero would
22 equal the gain or loss for that 30-second
23 period.
24           The intent of breaking futures
25 out in this bespoke manner in the

1
2  schedules allowed us to set a reference
3  price or a -- a dollar amount to be -- to
4  decrease a user's USD balance, and it
5  didn't matter if the reference price that
6  we chose was right or wrong because we
7  knew once an estimation order was entered,
8  we would be able to set that reference
9  price applied to the -- the scheduled
10 quantity of futures contracts such that it
11 could adjust for any missing 30-second
12 gain or loss on the customer accounts.
13      Q.   Why would there be -- only be a
14 downward adjustment to the --
15      A.   It could be up or down depending
16 on the -- the individual user's position
17 in that futures -- in their futures
18 contracts.
19      Q.   So then coming full circle,
20 does -- does A&M's report here in this
21 document we're looking at represent a
22 common misunderstanding as to how futures
23 worked?
24           MR. GLUECKSTEIN:  Object to the
25      form.

Page 210

1
2      A.   No.  This report reflects the
3   statements and schedules methodology that
4   was used.
5          The common misunderstanding is,
6   I'm saying, this -- the -- the common
7   reference in 3AC's claim to futures being
8   assets.
9      Q.   I don't see where that's talking
10  about assets.  I just see by -- by
11  selling.  If you turn to the next page,
12  for example, on page 22 you see a
13  reference to not only buying, but selling
14  futures contracts.
15         Same misunderstanding there?
16     A.   I -- I think that the word
17  "buying" and "selling" is often -- is
18  often used casually to represent buy --
19  buying a futures contract would represent
20  opening up a long futures contract, and
21  selling a futures contract would represent
22  opening up a short futures contract.
23         Sometimes it could be casually
24  referred to selling a future if you
25  sold -- if you closed the position.

Page 211

1
2      Q.   So, I want to make sure then --
3   then you're clear.
4          Buying and selling does not
5   correlate with entering/exiting a futures
6   position, but merely holding a positive
7   versus holding a negative perpetuals
8   position?
9          MR. GLUECKSTEIN:  Object to the
10     form.
11     A.   I am saying that these terms are
12  often used interchangeably when -- when
13  people discuss futures.
14         As a technical matter, when you
15  open a long futures contract, that means
16  there is another counterparty that's
17  taking the short side of that contract.
18     Q.   Can you -- can you buy a short
19  perpetuals position, or not?
20     A.   You can open a short perpetuals
21  contract.
22     Q.   And having opened a short
23  perpetual contract, is that the same thing
24  as used in this presentation by your
25  colleagues as selling --

Page 212

1
2          MR. GLUECKSTEIN:  Object to the
3      form.
4      Q.   -- that position?
5      A.   Can you repeat the question?
6      Q.   Yeah, I want to make sure I
7   understand.
8          When you're -- when you're here
9   sitting here today using the term "buy and
10  sell futures positions," I want to make
11  sure I understand what you mean, what FTX
12  means.
13         MR. GLUECKSTEIN:  Object to the
14     form; misstates the testimony.
15     A.   Are you referencing the second
16  bullet on page 21 where it says "Sold
17  18.7K BTC-PERP" and so forth?
18     Q.   Why don't we go back to the
19  document we were just looking at --
20     A.   Okay.
21     Q.   -- from FTX, the webpage
22  "Complete Futures Specs."  This was
23  previously shown to you as Exhibit 13.
24     A.   Okay.
25     Q.   What does FTX mean?

Page 213

1
2      A.   As I testified earlier --
3      Q.   -- by buy or sell a futures
4   contract?
5          MR. GLUECKSTEIN:  Object to the
6      form; misstates prior testimony again.
7      A.   As I testified earlier, I can't
8   speak to the intent or the meaning of what
9   someone wrote that I have not spoken with
10  or did not know.
11     Q.   What does it mean to trade a
12  futures contract?
13     A.   I think in the traditional
14  sense, trading a futures contract
15  references the opening or closing of a
16  futures contract.
17     Q.   Is that the terminology that FTX
18  uses in this litigation by "trading"?
19     A.   I am not familiar with the
20  general global application of the term
21  "trading" in this litigation.  If there's
22  a specific document that has that word, I
23  can certainly elaborate.
24     Q.   Yeah, sure.  So take a look at
25  your own declaration --

**MAGNA**
LEGAL SERVICES

1
2        MR. GLUECKSTEIN:  Counsel, can
3   you stop cutting the witness off
4   before he's finished answering his
5   question?  When he's finished, you can
6   ask the next question.
7        MR. PROULX:  I don't see any
8   cutoff whatsoever.
9        MR. GLUECKSTEIN:  He's still
10  talking and you cut him off for about
11  the fifth time today.  So I'm going to
12  ask you yet again to stop doing that.
13  BY MR. PROULX:
14      Q.   Were you finished with your
15  answer?
16      A.   I am now.
17      Q.   Okay.
18        Anything else you wanted to add
19  to the last answer, or not?
20      A.   No.
21      Q.   Okay.  Thank you.
22        Paragraph 73 of your declaration
23  you refer to 3AC's future trades.
24        What do you mean by "3AC's
25  future trades"?

1
2      A.   I'm sorry, I have the wrong
3   declaration open.
4        Sorry, just give me a second,
5   please.
6      Q.   Yeah, of course.
7      A.   I'm sorry, can you repeat the
8   paragraph reference?
9      Q.   Of course.  I'm on paragraph 73
10  of your declaration, original declaration.
11      A.   Thank you.
12        And your question was what do I
13  mean by "futures trades"?
14      Q.   Yes.
15      A.   I mean the opening and closing
16  of futures positions.
17      Q.   How many futures contracts,
18  roughly speaking, did Three Arrows have
19  open as of June 12th, 2022?
20      A.   I don't have that exact number
21  memorized.  I would have to -- I would
22  have to -- I would to have consult with my
23  team.  I don't -- I don't know if it's
24  explicitly referenced anywhere in my
25  declaration, but I don't -- I don't have

1
2   it memorized one way or another.
3        (Coverick Exhibit 15, FTX Terms
4        of Service May 13, 2022, Bates
5        FTX_3AC_000013695-756, was marked for
6        identification, as of this date.)
7   BY MR. PROULX:
8      Q.   So, this document is titled "FTX
9   Terms of Service" date May 13th, 2022.
10        Is this one of the documents
11  that you reviewed in preparation for your
12  deposition?
13      A.   I did.
14      Q.   I'd like to jump to page 35,
15  using the pagination on the lower
16  right-hand corner of this document.  It's
17  titled "Schedule 5 Service Schedule."
18      A.   Okay.
19      Q.   And the specified service is
20  stated as "Futures Market."
21      A.   Okay.
22      Q.   Is this a -- before we get into
23  this schedule, is this a document that FTX
24  drafted?
25      A.   My understanding is this

1
2   document was drafted by the pre-petition
3   management team of FTX -- of the FTX
4   Group.  I don't know specifically who
5   drafted it.
6      Q.   But it's an FTX document, not
7   drafted by a third party?
8      A.   Again, I don't know if there was
9   counsel or who may have assisted with it
10  or who drafted it, but I do believe it --
11  I know it's the FTX Terms of Service that
12  FTX produced.
13      Q.   Did this document govern use of
14  and transactions on the FTX exchange as of
15  June 2022?
16      A.   That's my --
17        MR. GLUECKSTEIN:  Objection;
18  calls for a legal conclusion.
19        You can answer it if you --
20  answer if you have an understanding.
21      A.   My businessperson's
22  understanding is that this was one of the
23  governing documents at the exchange.
24      Q.   I'm not asking you for your
25  businessperson perspective.  I'm asking

Page 218

1
2    you as FTX, do you have a view?
3         MR. GLUECKSTEIN:  Objection;
4    calls for a legal conclusion.
5    BY MR. PROULX:
6         Q.    As to whether this document
7    governs use of the FTX exchange as of June
8    of 2022?
9         A.    Again, that is my general
10   understanding.
11        Q.    So the specified service in this
12   schedule that we were looking at,
13   Schedule 5, there is a discussion first of
14   quarterly futures contracts and then
15   perpetual futures contracts.
16             Do you see that?
17        A.    Yes.
18        Q.    So focusing on the second of the
19   two it states:  Perpetual futures
20   contracts represent obligations to buy or
21   sell a digital asset at a specific price
22   at any time while the contract remains
23   open.
24             Do you see that?
25        A.    I do.

Page 219

1
2         Q.    What does FTX mean here by buy
3    or sell a digital asset?
4         A.    I'm not a lawyer --
5             MR. GLUECKSTEIN:  Objection;
6    calls for a legal conclusion.
7         A.    I'm not a lawyer and was not
8    involved in the drafting of this.  I'm not
9    qualified to interpret the meaning of
10   certain clauses or how they may relate to
11   other sections of the terms of service.
12        Q.    In your capacity not as a
13   nonlawyer, but as FTX's representative, do
14   you have the same answer?
15        A.    I did not, nor was anyone
16   currently at FTX, involved in drafting
17   these terms of service, and so any
18   interpretation of them would need to be
19   done by counsel.
20        Q.    Is it your position that the FTX
21   Recovery Trust and the post-petition
22   debtors have no view on the interpretation
23   of -- no factual view on the
24   interpretation of what it means to buy or
25   sell a digital asset within the meaning of

Page 220

1
2    this schedule?
3             MR. GLUECKSTEIN:  Objection;
4    calls for a legal conclusion.
5         A.    No, that's not what I'm saying.
6             I'm saying that I am not a
7    lawyer and I am not qualified to interpret
8    the terms of service.  That would require
9    legal counsel for the estate.
10        Q.    And I want to be clear I'm not
11   asking you these questions in your
12   capacity as a nonlawyer or as your
13   capacity as an individual, but as in your
14   capacity as the FTX Recovery Trust itself.
15             MR. GLUECKSTEIN:  Counsel, a
16   30(b)(6) does not have to testify
17   about legal positions.  He has told
18   you and answered this question three
19   times now.
20             MR. PROULX:  Counsel, you're
21   welcome to impose any objections you
22   like.  I want to be sure about the
23   framing of the question as asked.
24             MR. GLUECKSTEIN:  Object to the
25   question, form of the question; calls

Page 221

1
2    for a legal conclusion.
3         A.    I'm sorry, I don't want to keep
4    repeating myself, but my answer stands
5    that I'm not a lawyer and I'm not
6    qualified to make legal conclusions off of
7    a document like this, and nor was anyone
8    that's currently involved in the
9    management of the FTX Recovery Trust.
10   None of those individuals are involved in
11   the drafting of these contracts.  That
12   would require a legal conclusion that I'm
13   not qualified to provide.
14        Q.    How if at all did you determine
15   whether Three Arrows was long or short on
16   perpetual futures contracts?
17        A.    I'm sorry, could you repeat that
18   question?
19        Q.    Sure.
20             Do you have a view, does the FTX
21   Recovery Trust have a view as to whether
22   as of June 2022, specifically June 12th,
23   2022, FTX had long versus short positions
24   on BTC perpetual futures contracts?
25        A.    In general, I understand that

**MAGNA**
LEGAL SERVICES

Page 222

1
2  prior to the deterioration of the account
3  following June 12th, they predominantly
4  held long positions in BTC futures.
5      Q.   And what is this understanding
6  based on?
7      A.   A review of the general ledger
8  of the exchange.
9      Q.   How is a long position denoted
10  on the general ledger of the exchange as
11  opposed to a short position?
12      A.   I would need to look at the
13  exact table, which I believe is called the
14  fills table that has been extracted from
15  the database and produced to the -- the
16  joint liquidators, to confirm that, and I
17  would need to verify with my team that I'm
18  accurately stating all of the different
19  aspects of a long position in a trade.
20      Q.   Can futures contracts such as
21  perpetual futures contracts be tokenized?
22      A.   I do not know hypothetically
23  what could be done to tokenize something.
24  Again, the futures contracts opts exchange
25  only traded on the exchange ledger, they

Page 223

1
2  were not things that were minted on the
3  blockchain.  Whether or not that's
4  possible, I -- I can't speak to.
5      Q.   Do you know whether futures --
6  perpetuals contracts on the exchange were
7  in fact tokenized in some cases?
8      A.   Perpetuals contracts on the FTX
9  exchange were ledger entries on the FTX
10  ledger only.
11      Q.   In your declaration you refer to
12  futures positions as being -- as being
13  contracts.
14          Is that a fair characterization?
15      A.   That is how they're described,
16  yes.
17      Q.   Is that how FTX describes them?
18      A.   Can you point me to where --
19      Q.   Sure.  I'm not trying to hide
20  the ball from you here.  I think it's
21  pervasive.
22          So for example, take a look at
23  paragraph 30 --
24      A.   Okay.
25      Q.   -- of your original declaration.

Page 224

1
2      A.   Yes.
3      Q.   You refer to a couple times a
4  perpetual futures contract.  So for
5  example the bottom of page 10 in your
6  declaration.
7      A.   Yes.  It's my understanding
8  that's generally what they were referred
9  to as.
10      Q.   Are those -- when you say
11  contract, what does that mean in this
12  context?
13      A.   I -- in general, I'm not
14  qualified to offer the legal definition of
15  a contract, but what it means as a -- as a
16  common understanding or a businessperson's
17  understanding of how the exchange operated
18  was that a future -- perpetual future was,
19  in essence, a contract of differences.  So
20  in other words, if you had the long side
21  of a contract the future, there was
22  another customer that was sitting on the
23  short side of that contract and you paid
24  one another based on the differences in
25  the reference price during that -- during

Page 225

1
2  every 30-second period until you closed
3  the contract with a -- which is
4  effectively writing that contract to
5  someone else to take over your side of the
6  position.
7      Q.   So effectively a transfer of
8  that contract?
9      A.   It's someone stepping into the
10  other side economically.
11      Q.   And does that mean that there
12  were -- for example, you have a long BTC
13  perpetual.  Does that mean there was a
14  counterparty to that contract on the short
15  side of that perpetual?
16      A.   Yes.
17      Q.   How is that --
18      A.   They're another customer.
19      Q.   Sorry.
20          How is that other customer or
21  counterparty identified or selected to be
22  the counterparty to that contract?
23      A.   In general, there was a matching
24  engine in the code base of the exchange
25  for futures contracts that identified

Page 226

1
2    someone being willing to open the long
3    side and someone being able to open --
4    being willing to open the short side and
5    it would -- the matching engine algorithm
6    of the exchange would connect those two
7    counterparties together.
8        Q.    They -- they didn't proactively
9    find each other, but they used the FTX
10    exchange for that matching?
11        A.    That's correct.
12        Q.    The contract -- the -- are these
13    contracts governed by any sort of written
14    terms?
15        A.    I am not aware of the existence
16    of any separate legal agreements or
17    documentation regarding futures contracts.
18        Q.    Separate from what?  Are you
19    saying that there is some document that
20    speaks to these?
21        A.    Other than the economic
22    transaction that they were entering into
23    on the exchange.
24        Q.    So fair to say they couldn't be
25    negotiated, these futures contracts?

Page 227

1
2        A.    I wouldn't say that.
3        Q.    Could they be negotiated?
4        A.    Well, in effect, the reference
5    price of a future contract is the product
6    of the market's negotiation of that price.
7    There are people willing to open the
8    contract at certain prices, people
9    willing -- on the long side, people
10    willing to take the sell-side at different
11    prices.  So the reference price on the
12    exchange at any point in time reflects the
13    market -- the market's aggregate
14    negotiation of that price.
15        Q.    An individual customer who
16    entered -- who enters into a futures
17    contract, they can't set the reference
18    price; that's governed by the market?
19        A.    They can decide whether or not
20    they want to open the contract at the
21    prevailing price.
22        Q.    Do they have any other agency,
23    or does it stop there?
24        MR. GLUECKSTEIN:  Object to the
25    form.

Page 228

1
2        A.    As with -- as with any aspect
3    of -- of futures contracts, they can
4    decide whether they want to or do not want
5    to enter into the contract, but there are
6    this -- to answer your question more
7    specifically, I don't believe there's any
8    other specific terms other than the
9    quantity of contracts that they open that
10    they can specify.
11        Q.    When a customer enters into a
12    futures contract, do they know who their
13    counterparty is?  Is that disclosed to
14    them by FTX or otherwise in some way?
15        A.    No.  When the exchange was
16    functional, I am not aware of any
17    disclosure of who the counterparty to any
18    trade was, or any transaction that
19    occurred on the exchange, whether it be
20    opening futures contracts or buying or
21    selling cryptocurrency positions.
22        Q.    In paragraph 29 of your
23    declaration and otherwise in your
24    deposition today, you -- you indicate that
25    these contracts result in a credit or

Page 229

1
2    debit -- debit to the USD balance every 30
3    seconds.
4        Do you see that?
5        A.    I do.
6        Q.    What's the basis for asserting
7    that that crediting or debiting happens
8    every 30 seconds?
9        A.    A review of my team's review of
10    the exchange code base to confirm that is
11    how the account balance was updated.
12        Q.    And is that code base reflected
13    in any of the ten spreadsheets that you
14    describe in your original declaration as
15    underlying your analysis therein?
16        A.    No.  As I think I explained
17    earlier, but I -- I can clarify, the --
18    the documents I reference in my
19    declaration that were produced to 3AC are
20    extracts from the exchange database into
21    Excel or other readable formats.  I
22    believe one of them may have been produced
23    in a -- in a database format, but I'm not
24    certain.
25        The code used to operate the

**MAGNA** ▶
LEGAL SERVICES

1
2 exchange is what populated the exchange
3 ledger and also what was used to run the
4 FTX exchange website.  They're related,
5 but they're two different things.  One is
6 used to create the other.
7     Q.   So the 30 seconds -- the
8 assertion that all this is happening every
9 30 seconds, is this coming from underlying
10 code?
11     A.   That's correct.  It's coming
12 from underlying code, as well as
13 communications that my team has had with
14 FTX employees throughout the pendency of
15 the case, in addition to communications
16 with creditors throughout the pendency of
17 the case.  It's -- it's commonly
18 understood that that is how futures
19 operated.
20     Q.   Was that communicated to
21 customers pre-petition?
22     A.   I don't --
23         MR. GLUECKSTEIN:  Object to the
24     form.
25     A.   I don't recall everything that

1
2 was -- I wasn't there, first of all, so
3 I -- I don't know what was communicated to
4 customers at every point in time.
5         I -- I do believe, based on my
6 general understanding, that it was
7 commonly understood by customers to be the
8 way perpetual futures worked.
9     Q.   Is there a particular document
10 that you can have in mind that tells
11 customers that fact?
12     A.   I do -- I -- I can't specify the
13 title of it or the Bates number, but I do
14 believe that there were help pages on the
15 website that referenced the 30 seconds
16 settlement.  That -- that's not what I'm
17 basing my statement on.  I -- I verified
18 that through my team's review of the code
19 base of the exchange, but I -- I do
20 believe it was commonly understood and --
21 and common knowledge amongst the customer
22 base.
23     Q.   And that -- that -- I want to
24 make sure the record is clean.  Feel free
25 to correct me if I'm wrong, but that 30

1
2 seconds interval, is that reflected in any
3 of the spreadsheets or financial data that
4 FTX produced to Three Arrows Capital in
5 this litigation?
6         MR. GLUECKSTEIN:  Object to the
7     form.
8     A.   The 30-second interval you're
9 asking about is not reflected explicitly
10 in those spreadsheets because that's not
11 the way the exchange ledger stored data.
12 And -- and I think I referenced this
13 earlier, there are volume constraints for
14 any database of what can be stored.  So
15 for example, to store pricing at every
16 second or even every 30 seconds for every
17 asset or cryptocurrency position or
18 contract that was traded on the exchange
19 would be an incredible volume of data.
20 And so the -- the ledger did not store the
21 price at every single point in time, which
22 is something I reference in my declaration
23 as being an assumption in our analysis.
24 The same result following the calculation
25 steps laid out in my supplemental

1
2 declaration can be derived by taking the
3 change in open positions and a reference
4 price at the point of exit or at the
5 point -- if you're evaluating, like, a --
6 a balance at a certain point in time and
7 want to understand the cumulative gains or
8 losses on future contracts, that can be
9 calculated from the data provided using
10 the steps, but because intermittent
11 pricing at every 30-second intervals was
12 not stored on the exchange ledger, there's
13 nothing explicit in that --
14     Q.   Is there anything implicit --
15 I'm sorry, I didn't mean to interrupt you.
16 Did you --
17     A.   I finished, thank you.
18     Q.   I thought you were done.
19         Is there anything implicit in
20 what's been produced to Three Arrows that
21 would corroborate the 30-seconds interval
22 based on the code as you describe it?
23     A.   Again, I can't recall every
24 document.  I believe -- I cannot be
25 certain, but I believe that that may be

Page 234

1
2  referenced in help pages that have been
3  produced.  If it's not, then it would be
4  my testimony.
5      MR. PROULX:  Well, we have
6  not -- been unable to, despite
7  diligent efforts to corroborate that
8  30-second interval based on any sort
9  of transactional data that A&M has
10 produced to us or FTX has produced to
11 us that A&M has relied on, and we do
12 request production of document --
13 document that corroborate that
14 position.
15     MR. GLUECKSTEIN:  You don't need
16 to respond to that.
17     Your position is noted.  We
18 disagree with it and the witness
19 testified to this issue.  So we'll
20 write it down with the rest of your
21 requests that are going to be
22 rejected.
23     MR. PROULX:  Are you rejecting
24 them now, or are you saying they're
25 going to be rejected?  I don't know if

Page 235

1
2      I see a difference, Brian.
3      MR. GLUECKSTEIN:  We'll take it
4  under advisement.
5  BY MR. PROULX:
6      Q.   Is it FTX's position that
7  futures contracts had no value to those
8  who had opened them?
9      A.   I wouldn't characterize future
10 positions as having no value because they
11 can generate gains or losses every 30
12 seconds, but at any point in time, they
13 have no intrinsic value due to how
14 frequently those gains and losses are
15 settled.
16     Q.   Could a customer's futures
17 positions or contracts be liquidated or
18 seized by FTX?
19     A.   You -- lic -- a customer's
20 futures positions could be liquidated in
21 the sense that they could be closed by
22 FTX.
23     Again, there's nothing to --
24 there's nothing to sell.  It's simply
25 finding a counterparty to step in to

Page 236

1
2  the -- the side of the contract that the
3  liquidating account would have been in.
4      Q.   Is that something that FTX, in
5  fact, did?
6      A.   Yes --
7      MR. GLUECKSTEIN:  Object to the
8  form.
9      A.   FTX did close future positions
10 on customer accounts that were being
11 liquidated, yes, frequently.
12     Q.   What are the general
13 circumstances in which that may have
14 occurred?
15     MR. GLUECKSTEIN:  Object to the
16 form.
17     A.   The circumstances where that
18 occurs is one of the fundamental aspects
19 of the exchange which is that accounts
20 were not permitted to have negative
21 balances.  Due to the volatility of gains
22 and losses that could be generated from a
23 perpetual future position, the maintenance
24 margin requirement came into play and was
25 reflected in the code base as being the --

Page 237

1
2  the determination of whether an account
3  had sufficient collateral to maintain a --
4  a futures position or other levered
5  positions.  To the extent an account did
6  not have -- did not sufficiently satisfy
7  the maintenance margin requirements, that
8  account would begin to be automatically
9  liquidated as -- as structured in the code
10 base of the exchange.  If that account had
11 open future contracts, that liquidation
12 would involve the closing of future
13 contracts.
14     Q.   When FTX closed a futures
15 contracts in the manner you've just
16 described, would they ever assume the
17 position of the customer that had the
18 contract closed on them, or would they
19 always find some other customer in the
20 market to assume that position?
21     A.   The exchange itself, FTX, did
22 not step into the other side of the
23 contracts.  It, again, used first the
24 matching engine, so depending on the
25 liquidity of the contract, for example,

**MAGNA** ›
LEGAL SERVICES

Page 238

1
2  BTC perps, perpetual futures related to
3  bitcoin, were -- were very commonly
4  entered into and -- and closed, or, for a
5  simple term, traded much so if someone's
6  account was liquidated for a BTC perp
7  contract, it's likely, depending on the
8  point in time, but that's a more liquid,
9  if you will, market, and so there are more
10 willing counterparties for that product to
11 step into the other side.
12       For less frequently traded
13 futures and other coins, there may be less
14 market participants amongst the customer
15 base willing to step into the other side,
16 and there were a type of market maker on
17 the exchange that are often referred to as
18 backstop liquidity providers that opted
19 into a program where they agreed to step
20 into those positions if there wasn't an
21 ample market to otherwise take them.
22     Q.  What, if anything, did the FTX
23 exchange, I think you referred to it as
24 the user interface in your declaration,
25 present to customers regarding any

Page 239

1
2  realized or unrealized losses or gains on
3  their futures contracts and for what
4  duration?
5       I know that was a lot.  I'm
6  happy to take that step-by-step if
7  helpful.  If you understand the question,
8  please answer.
9           MR. GLUECKSTEIN:  Object to the
10      form.
11     A.  Can you repeat the question?  I
12 do not understand it.
13     Q.  I'll take this step-by-step.
14       Was a customer shown unrealized
15 gains for futures contracts in its user
16 interface on the FTX exchange?
17     A.  The realized gains were
18 reflected in their USD balance.  They
19 settled every 30 seconds, and so they
20 would see their realized gains every 30
21 seconds appear in their USD balance.
22     Q.  I was actually asking about the
23 unrealized gains.
24       What, if anything, are
25 customers -- were customers pre-petition

Page 240

1
2  shown about those?
3     A.  I cannot recall specifically
4  what information, if there was any
5  intermittent within the 30 seconds
6  displayed on the website.  I can't recall
7  that.
8     Q.  Are customers, understanding
9  your position that the realized gains are,
10 in some way, factored into the U.S. dollar
11 balance, are the total realized gains
12 arising from a particular futures
13 contracts or type of futures contracts
14 separately presented to the customer?
15     A.  Again, I cannot recall
16 everything that was presented to the
17 customer.  The website changed frequently.
18 So I can't speak to all of the information
19 they may have been able to see.  But they
20 could certainly see the change in their
21 USD balance at a certain point in time.
22     Q.  Let me ask you this.
23       How -- how, if at all, could a
24 customer tell whether its futures
25 positions were paying off or not for it?

Page 241

1
2     A.  They would see an increase in
3  their USD balance if they were profitable
4  positions.
5     Q.  But don't -- doesn't other
6  things affect the USD balance such as the
7  need to borrow for margin -- regular
8  margin trading, nonfutures margin trading?
9     A.  Sure, there are other --
10    Q.  Receipt of interest payments.
11 Just let me finish my question.  Receipt
12 of interest payments for participation in
13 a lender program, for example?
14          MR. GLUECKSTEIN:  Object to the
15     form.
16    A.  Yes, there are other factors
17 that impact the USD balance.
18    Q.  When, if ever, were Three
19 Arrows' futures positions on the exchange
20 closed?
21    A.  I believe they were closed --
22 well, I -- I believe -- I don't have the
23 entire transaction history committed to
24 memory, but I believe 3AC opened and
25 closed perpetual futures in the ordinary

Page 242

1
2 course on a fairly regular basis
3 throughout the history of their account.
4      I do understand that positions
5 were closed after June 12th.
6      Q.   And you used the passive voice
7 there, were closed.
8      Is it your position that Three
9 Arrows closed those contracts after June
10 12th?
11      A.   Sorry, I just want to reference
12 one place in my declaration just to be
13 certain my testimony's accurate.
14      Q.   Perfectly fine.
15      A.   Yes, that -- that is correct
16 that -- said differently, the only
17 transactions that I'm aware of that 3AC
18 did not conduct within their account
19 relate to approximately $82 million of
20 value -- account balance neutral
21 transactions to close positions in spot
22 Ethereum FTT, GBTC and ETHE, to use the
23 abbreviations, as well as for $81 million
24 and another million dollars of additional
25 spot liquidations that were performed on

Page 243

1
2 June 14th.  Every other transaction in the
3 history of 3AC's account, based on all
4 evidence I'm aware of or all knowledge I
5 have, was performed by 3AC.
6      Q.   And just so I'm clear, which
7 paragraph are you looking at or
8 referencing in your declaration at this
9 moment?
10      A.   I'm sorry.  I'm referencing
11 paragraph 77.
12      Q.   What entitlements, if any, did a
13 customer who realized gains pursuant to a
14 futures contract have?
15      A.   I'm -- I'm sorry, can you repeat
16 your question?
17      Q.   Sure.
18      What entitlements, if any, for a
19 customer who realized gains on a futures
20 contract, what, if any, what entitlements
21 did that customer have?
22      A.   The gain would result in an
23 increase to the USD balance within their
24 account.
25      Q.   So a customer would have an

Page 244

1
2 entitlement to USD corresponding --
3      A.   The customer --
4      Q.   -- to the gain on that position?
5      A.   The customer, in the -- in my
6 view and the estate's position, had a
7 singular entitlement that was the account
8 balance.  The USD would have been a
9 component of that account balance.
10      Q.   Account balance, just to make
11 sure I -- I'm understanding your prior
12 testimony, that's -- that's always
13 reflected in U.S. dollars; is that -- that
14 is correct?
15      A.   That's correct, that is how it
16 was presented on the exchange.
17      Q.   So is it FTX's position that at
18 all times over the history of the entire
19 exchange pre-petition and post-petition,
20 customers never had entitlements to
21 underlying digital assets?
22      MR. GLUECKSTEIN:  Object to the
23 form.
24      A.   I believe I already testified to
25 this earlier.

Page 245

1
2      It's the position of the estate
3 that FTX customers had an account balance,
4 and represented in U.S. dollars that was
5 their entitlement against the exchange.
6      I also testified that customers
7 had the ability to withdraw other assets
8 from the exchange sub -- subject to the
9 various circumstances and requirements
10 that we discussed earlier.
11      Q.   And you -- are you drawing a
12 distinction, is FTX drawing a distinction
13 between an ability to withdraw a digital
14 asset from an entitlement to that digital
15 asset?
16      A.   I am not drawing any
17 distinction.  I am just stating the facts
18 as I understand them.
19      I understand customers had the
20 ability to withdraw certain assets subject
21 to the facts and circumstances of that
22 case and the various requirements, and I
23 also understand that an account balance
24 rep -- represented in U.S. dollars the
25 singular entitlement a customer had

**MAGNA** ▶
LEGAL SERVICES

Page 246

1
2  against the exchange at any point in time.
3     Q.   I'm not -- I'm still not
4  understanding the testimony.
5        Is there a distinction -- so if
6  there's no distinction between an ability
7  to withdraw assets and an entitlement to
8  those assets, then is a customer
9  pre-petition entitled to withdraw those
10 assets from the exchange?
11       MR. GLUECKSTEIN:  Object to the
12 form.
13    A.   I -- I think the distinction
14 you're asking me to make requires a legal
15 conclusion that I'm not qualified to make.
16    Q.   FTX doesn't have a nonlegal
17 position on whether a customer was -- who
18 had the ability to withdraw an asset
19 pre-petition was entitled to that asset?
20       MR. GLUECKSTEIN:  Object to the
21 form.
22    A.   Again, any legal conclusion of
23 the estate would require advice of
24 counsel, and I'm not qualified to provide
25 that opinion.

Page 247

1
2     Q.   So no factual position on that
3  question?
4     A.   Again, my factual position is
5  that at any point in time, a customer's
6  entitlement against the exchange is their
7  account balance is expressed in U.S.
8  dollars.  I also have stated the fact that
9  customers had the ability to withdraw
10 different forms of assets from the
11 exchange at different points in time.
12    Q.   Different forms of assets in
13 non-USD assets?
14    A.   Correct.  Sometimes
15 cryptocurrencies, U.S. dollars.
16       MR. PROULX:  Okay.
17       Let's take a break there.  Ten
18 minutes.
19       MR. GLUECKSTEIN:  3:31 p.m.
20       Off the record.
21       (Recess taken.)
22       THE VIDEOGRAPHER:  3:51 p.m.
23       Back on the record.
24 BY MR. PROULX:
25    Q.   Mr. Coverick, did Three Arrows

Page 248

1
2  have any accounts with Alameda?
3     A.   I am not aware of a -- an
4  account such as an exchange account with
5  Alameda.
6     Q.   So, we previously gave you an
7  A&M presentation from September 2024.  It
8  was marked as Exhibit 14.
9     A.   Yes, I have it here.
10    Q.   Thank you.
11       And just a quick question about
12 page 10 in that document.
13    A.   The page numbers are cut off.
14       Okay, yeah.
15    Q.   You'll see there's a timeline in
16 the middle column it says 2020 first box
17 there February 2020 Three Arrows, 3AC
18 creates its Alameda and FTX.com exchange
19 accounts.
20       Do you see that?
21    A.   Yes.
22    Q.   Do you know what that's
23 referring to?
24    A.   I believe that's referring to
25 the what's referred to as the OTC portal,

Page 249

1
2  which stands for over the counter portal
3  where certain FTX exchange customers could
4  trade directly with Alameda, predominantly
5  institutional traders could make trades
6  directly with Alameda.
7        I -- I do not believe this means
8  an account in the sense of an exchange
9  account.  They did not deposit assets.
10 Alameda did not operate an exchange.  We
11 were a trader on the exchange.
12    Q.   What -- what, if anything, was
13 Three Arrows transacting with Alameda on
14 its OTC portal?
15    A.   I don't have the entire
16 transaction history committed to memory,
17 but I understand that 3AC had the ability
18 to conduct trades through the OTC portal,
19 and I believe they did do that.  I don't
20 have a summary of those trades prepared or
21 committed to memory.
22    Q.   Do you know if Alameda was the
23 counterparty or a participant in any of
24 those trades?
25    A.   If they were trading through the

**MAGNA**
LEGAL SERVICES

Page 250

1
2    OTC portal, Alameda would have been the
3    counterparty to those trades.
4        Q.    We also previously discussed
5    Exhibit 15.  This is the May 2022 Terms of
6    Service.
7        A.    Okay.
8        Q.    Just let me know when you have
9    that in front of you.
10        A.    I do.
11        Q.    Do you know when this document
12    went into effect, if ever?
13        A.    My understanding is this version
14    of the terms of service went into effect
15    on May 13th, 2022, which is the date
16    listed at the top of page 1.
17        Q.    Who drafted this document?
18        A.    As I answered before, I -- I am
19    not aware of specifically who drafted the
20    document.
21        Q.    Are you aware generally of who
22    drafted the document?
23        A.    I do not know the identity of
24    the person or persons involved in drafting
25    the document.

Page 251

1
2        Q.    Do you know when the document
3    was drafted?
4        A.    I believe it was finalized on
5    May 13th because that's the date, that's
6    the information the Trust has, to my
7    knowledge, with regard to its creation.
8    I'm -- I'm not aware of the period of time
9    it took to draft the terms of service.
10        Q.    Do you know if internal or
11    external FTX counsel was involved in the
12    drafting, putting aside the specific
13    identities of that counsel?
14        A.    I do not know what counsel
15    specifically was involved in drafting or
16    advising on the Terms of Service at the
17    time.
18        Q.    Has FTX made any attempt to
19    discover any of that information?
20            MR. GLUECKSTEIN:  Object to the
21    form.
22        A.    I am not aware of FTX having
23    knowledge of the individual person that
24    drafted or the law firms involved in
25    drafting of the Terms of Service, but I am

Page 252

1
2    also not claiming that I know all of the
3    60 million documents that were collected
4    as part of the debtors' investigation
5    efforts.
6        Q.    Understanding you lack knowledge
7    of it, my question was a little bit
8    different.
9            My question was has FTX made any
10    attempt to identify who drafted this
11    document and when?
12        A.    Once again, I am not aware of
13    all of the documents and information that
14    the debtors collected.  Given -- I am
15    aware of it generally happening and I
16    understand the general nature of the
17    information that was collected.
18            The FTX debtors during the
19    pendency of the case and the FTX Recovery
20    Trust continues to make exhaustive efforts
21    to determine as much knowledge as they
22    possibly can based on the activities of
23    pre -- pre-petition management and
24    documents that they can collect.  I think
25    that effort has been exhaustive, and I'm

Page 253

1
2    not aware of any specific information
3    regarding the author of the Terms of
4    Service.
5        Q.    And do you know whether any of
6    those efforts you described were put
7    toward, in fact, identifying any documents
8    reflecting the drafting of the Terms of
9    Service?
10        A.    I think those efforts were
11    intended to uncover anything and
12    everything that could be discovered about
13    the pre-petition company.
14        Q.    Is that based on any personal
15    knowledge or information that has been
16    conveyed to you by counsel, the content of
17    which I'm not inquiring about?
18        A.    It's based on my general
19    knowledge of discussions with the entire
20    advisor team of -- of FTX, as well as
21    discussions with John Ray who was the CEO
22    and CRO of the FTX debtors and the current
23    plan administrator of the FTX Recovery
24    Trust.  It's my general understanding that
25    every measure that could reasonably be

**MAGNA**
LEGAL SERVICES

1
2  taken was taken to discover relevant
3  information about the operations of FTX
4  pre-petition.
5      Q.   And that includes the drafting
6  history of the Terms of Service from May
7  of 22?
8      A.   It include --
9          MR. GLUECKSTEIN:  Object to the
10     form.
11     A.   It includes everything that was
12  reasonably attainable.
13     Q.   What did Mr. Ray tell you about
14  the efforts that were taken with respect
15  to this -- this subject?
16          MR. GLUECKSTEIN:  Object to the
17     form; misstates the testimony.
18     A.   I do not recall the contents of
19  any specific conversation with Mr. Ray
20  about document collection other than I
21  know he directed the advisor team to
22  uncover and store any documentation that
23  was able to be attained.
24     Q.   Has FTX produced any documents
25  reflecting the tran -- the drafting or

1
2  preparation of the Terms of Service to any
3  other parties in its bank -- in this
4  bankruptcy?
5      A.   I am not aware of any Terms of
6  Service that have been produced other than
7  the ones I reference in my declaration.
8      Q.   Does FTX have reason to believe
9  that drafts of the Terms of Service from
10  May of 2022 do not exist?
11          MR. GLUECKSTEIN:  Object to the
12     form.
13     A.   I, once again, do not know by
14  memory all of the 60 million documents
15  that were collected.  So I can't answer
16  that question under oath with any willful
17  of certainty.
18     Q.   I just want to be incredibly
19  clear I'm not asking you any questions
20  about 60 million documents whatsoever.
21  I'm asking about a specific category of
22  document which is the drafting and
23  preparation of the May 2022 Terms of
24  Service.
25          MR. GLUECKSTEIN:  Objection;

1
2  misstates the testimony.
3      A.   Again, I do not have committed
4  to memory every document that was
5  collected.  So to the extent there are or
6  are not drafts of Terms of Service that
7  were collected, I cannot recall their
8  existence or lack thereof as I sit here
9  today.
10     Q.   Are you -- is FTX aware of any
11  iterations of a Terms of Service that came
12  after this document we have in front of
13  us?
14     A.   I'm sorry, I just want to
15  reference my declaration just --
16          MR. GLUECKSTEIN:  Object to the
17     form.
18     A.   (Witness reads document.)
19     I do not believe so, no.
20     Q.   We talked earlier about Schedule
21  5 to the Terms of Service that was on page
22  35.  I'm going to flip a little bit
23  earlier to schedule 2.  This is on page
24  31.
25     A.   Okay.

1
2      Q.   This is titled service schedule
3  and the specified service is spot market.
4      Do you see all that?
5      A.   I do.
6      Q.   What's the spot market?
7      A.   Again, I cannot interpret a
8  legal document, but my general
9  understanding when spot markets are
10  referenced is in -- is with regard to spot
11  positions in cryptocurrency.
12     Q.   Under the third box on that
13  schedule it references a service provider,
14  it states specifically:  This specified
15  service forms part of the services and is
16  provided by FTX Digital Markets Ltd. an
17  international business company
18  incorporated in the Bahamas.
19     Do you see that?
20     A.   I do.
21     Q.   What was or is FTX Digital
22  Markets?
23     A.   FTX Digital Markets is a legal
24  entity incorporated in the Bahamas.
25     Q.   What is the relationship, if

Page 258

1
2  any, between the FTX debtors and FTX
3  Digital Markets?
4      MR. GLUECKSTEIN:  Objection;
5  calls for a legal conclusion.
6      You can answer if you have an
7  understanding.
8  A.   My understanding of FTX Digital
9  Markets is that it was an entity
10 established by the pre-petition management
11 team in the Bahamas.  The nature of FTX
12 Trading Limited's relationship with --
13 with FTX Digital Markets is product to a
14 settlement with the joint liquidators of
15 that entity.
16 Q.   To FTX's knowledge, is FTX
17 Digital Markets a subsidiary pre-petition
18 to FTX Trading Limited?
19     MR. GLUECKSTEIN:  Objection;
20 calls for a legal conclusion.
21 A.   Again, the nature of the
22 relationship between FTX Trading Limited
23 and FTX Digital Markets is something that
24 was subject to dispute under the -- during
25 the pendency of the Chapter 11

Page 259

1
2  proceedings, and a settlement agreement
3  was reached with the joint liquidators to
4  settle those disputes.
5  Q.   Are you testifying that dispute
6  related to the corporate relationship
7  between those two parties?
8      MR. GLUECKSTEIN:  Objection;
9  calls for a legal conclusion.
10 A.   My general is understanding is
11 the global settlement with the joint
12 liquidators -- joint official liquidators
13 of FTX Digital Markets governed all
14 disputes related to the relationship
15 between the two entities and the exchange.
16 Q.   Is there a dispute, to FTX's
17 knowledge, about whether one of these two
18 entities was a subsidiary of the other?
19     MR. GLUECKSTEIN:  Object to the
20 question -- object to the form of the
21 question.  It calls for a legal
22 conclusion.
23 A.   My understanding of the dispute
24 is that it was highly legal in nature and
25 was settled through the global settlement

Page 260

1
2  agreement with FTX Digital Markets.
3  Q.   Who, if anyone, controlled FTX
4  Digital Markets pre-petition?
5  A.   Again, to the extent that that's
6  a legal question, I'm able to answer it,
7  but I understand that the pre-petition
8  management team, including Sam
9  Bankman-Fried and others, controlled all
10 of the related entities in the FTX Group.
11 Q.   Who else is on the pre-petition
12 management team according to FTX?
13 A.   I don't know --
14     MR. GLUECKSTEIN:  Object to the
15 form.
16 A.   I don't know how management team
17 is being defined.  Other names that I'm
18 aware of that were employed by FTX include
19 Gary Wang and Nishad Singh, I believe his
20 name was.  I -- I believe all of this is
21 ref -- referenced in the disclosure
22 statement related to the confirmed plan.
23 It lists the employees that FTX considers
24 to be the management team of FTX.
25 Q.   And did, according to the

Page 261

1
2  disclosure statement, did FTX also
3  consider these individuals to be owners of
4  the pre-petition debtors?
5  A.   I do not recall what the
6  disclosure statement specifically says
7  about ownership of any legal entity.
8  It -- it's been a while since I've
9  reviewed the disclosure statement.
10 Q.   Sitting here today, does FTX
11 have a view of who the pre-petition owners
12 of the debtors were?
13     MR. GLUECKSTEIN:  Objection;
14 calls for a legal conclusion.
15 A.   I believe that all disputes
16 regarding ownership of the entities at any
17 point in time are settled by virtue of the
18 Chapter 11 plan.  I believe that's the
19 debtors' position.
20 Q.   Do you know why FTX Digital
21 Markets served as the service provider
22 pursuant to the schedules we are looking
23 at?
24 A.   I understand that the definition
25 of "service provider" is a legal term that

1
2    was involved in the dispute referenced
3    with the joint official liquidators of FTX
4    Digital Markets and was settled via the
5    global settlement disagreement with the
6    joint liquidators.
7        Q.   What services did the service
8    provider, in fact, provide pre-petition?
9        MR. GLUECKSTEIN:  Object to the
10    form.
11        A.   Again, I understand that to be
12    an aspect of the dispute which was settled
13    with the joint official liquidators of the
14    Bahamas.
15        Q.   You don't know what, FTX doesn't
16    know what FTX Digital Markets did at all?
17        A.   There was a dispute with the
18    joint official liquidators of FTX Digital
19    Markets specifically with regard to
20    whether or not customer relationships
21    migrated from FTX Trading Limited to FTX
22    Digital Markets.  That was something the
23    FTX debtors and the joint official
24    liquidators of the Bahamas disagreed
25    about.  That dispute was not litigated to

1
2    a conclusion, but was instead settled via
3    the global settlement disagreement.
4        Q.   In fact, did FTX Digital Markets
5    operate the FTX.com exchange?
6        A.   That is also something that is
7    subject to that dispute which was settled
8    via the global settlement disagreement.
9        Q.   What position does FTX take on
10    that?
11        MR. GLUECKSTEIN:  Object to the
12    form; calls for a legal conclusion.
13        A.   Again I'm not a lawyer, but my
14    understanding is that FTX's position is
15    that that matter has been settled with the
16    joint official liquidators via the global
17    settlement agreement.
18        Q.   Any documents you're aware of
19    other than this Terms of Service that
20    describe the mandate or role or
21    responsibilities of FTX Digital Markets
22    with respect to the FTX.com exchange?
23        A.   Not that I can recall at this
24    point other than the document I reference
25    which is the global settlement agreement I

1
2    know also discusses those issues.
3        Q.   Did customers who use the
4    FTX.com exchange pre-petition interface in
5    any way with FTX Digital Markets?
6        A.   That very question was a element
7    of the dispute with the joint official
8    liquidators and was settled via the global
9    settlement agreement.
10        Q.   What position did FTX take in
11    that dispute?
12        MR. GLUECKSTEIN:  Objection.
13    Don't reveal anything that reveals
14    legal strategy with respect to any
15    litigation, including with the joint
16    liquidators.
17        If you have a -- any other
18    source of an answer, you can provide
19    it.
20        A.   Again, FTX's position is these
21    issues were settled via the global
22    settlement agreement.
23        Q.   Do you have a -- does FTX have a
24    position on whether customers pre-petition
25    interfaced with FTX.com Digital Markets?

1
2        MR. GLUECKSTEIN:  Object to the
3    form of the question.
4        A.   I'm sorry, maybe I'm
5    misunderstanding this question because I
6    think you just answered -- asked the same
7    question again.  That's an issue that was
8    settled via the global settlement
9    agreement and that's the position of the
10    estate.
11        Q.   Prior to the global settlement
12    agreement that you keep referencing, what
13    was FTX's position on that topic?
14        MR. GLUECKSTEIN:  Object to form
15    of the question.  Caution you not to
16    reveal legal strategy or positions
17    learned from counsel.
18        If you have any other answer,
19    you can provide it.
20        A.   Again, that was a topic that I'm
21    generally aware was involved in the
22    dispute with FTX Digital Markets and was
23    settled via the global settlement
24    agreement.
25        Q.   Why did FTX Trading Limited need

MAGNA
LEGAL SERVICES

Page 266

```
1
2    a service provider regardless of who that
3    was?
4         MR. GLUECKSTEIN:  Object to the
5    form.
6    A.    The FTX Recovery Trust does not
7    have a position on the need or lack
8    thereof of any service provider.
9    Q.    Why didn't FTX Trading Limited
10   dot -- excuse me.  Why didn't FTX Trading
11   Limited itself provide the services
12   identified in these schedules?
13        MR. GLUECKSTEIN:  Object to the
14   form; misstates the record.
15   A.    I was not there, so I can't
16   speak to the reasoning of the pre-petition
17   management team and why they did the
18   things they did.
19   Q.    Just so the record is clear,
20   have you personally spoken with any
21   members of the pre-petition management
22   team during the life of this bankruptcy?
23   A.    I have been on -- on group phone
24   calls primarily through online -- online
25   video conferencing platforms, like Zoom or
```

Page 267

```
1
2    Google Meet, and some of those group
3    conversations included members of the
4    pre-petition management team.  I have
5    never spoken with a member of the
6    pre-petition management team individually.
7    And all of those conversations happened in
8    the early weeks after the bankruptcy
9    filing.
10   Q.    What subjects were discussed on
11   those video conferencing meetings you
12   referenced?
13   A.    The general subject of those
14   conversations was securing assets of the
15   estate.
16   Q.    By the estate, are you referring
17   to the debtors' estates or to FTX Digital
18   Markets' estates or something else?
19        MR. GLUECKSTEIN:  Object to the
20   form.
21   A.    I am referring to securing all
22   assets that the debtors believe are
23   property of the estate.
24   Q.    And how, if at all, did the
25   pre-petition management members assist or
```

Page 268

```
1
2    not assist with that inquiry?
3    A.    Those conversations were a very
4    long time ago, so I don't recall the
5    specific things that were said.
6         In general, they provided
7    information that they were willing to
8    provide and that information was used to
9    the best of the estate's ability to
10   perform the objective of securing assets
11   of the estate.
12   Q.    Have you personally corresponded
13   with the legal counsel to the pre-petition
14   management members, assuming that counsel
15   is different from FTX's counsel?
16        MR. GLUECKSTEIN:  Object to the
17   form.
18   A.    I'm sorry, can you repeat the
19   question?  Counsel to whom?
20   Q.    Sure.  I'm asking now not about
21   any communications you may have been privy
22   to with pre-petition management team, but
23   now their counsel.
24   A.    Counsel to?
25   Q.    To the pre-petition management
```

Page 269

```
1
2    team.
3    A.    Not -- not pre-petition counsel
4    for the company, but for the management
5    team --
6    Q.    Yes.
7    A.    -- members specifically?
8    Q.    Yes.
9    A.    No, I do not believe so.
10   Q.    Thank you for that
11   clarification.
12        Flip to page 10 of the Terms of
13   Service.
14   A.    Okay.
15   Q.    There's Section 8.2 called
16   digital assets.
17        Do you see that?
18   A.    Yes, sir.
19   Q.    What's a digital asset as used
20   within this Terms of Service?
21        MR. GLUECKSTEIN:  Objection;
22   calls for a legal conclusion.
23   A.    I would need to look and see
24   where it's defined.  It appears to be a
25   defined term, given that it's capitalized.
```

1
2    But again, I'm not a lawyer and I'm not
3    qualified to interpret legal documents
4    such as the Terms of Service.
5        Q.   Yeah, I'm not trying to hide the
6    ball.  We can try to find that definition
7    together really quickly here.
8        So, I believe it's on page 28.
9        A.   Okay.
10       Q.   I believe it's defined there.
11   Please let me know if you see that.
12       A.   I see it.
13       Q.   Feel free to go ahead and read
14   that.
15       My -- my question is is this how
16   FTX's interpreting "digital assets" within
17   the meaning of this litigation as well?
18       A.   It -- it -- that would call for
19   a legal conclusion that I'm not able to
20   provide, but FTX does take the position
21   that this is the definition as written
22   here in the Terms of Service as of May
23   13th, 2022.
24       Q.   You used the term "digital
25   assets" frequently in your declaration.

1
2    I'm certainly happy to point to some
3    examples.
4        I'm wondering if factually as
5    you use it there is any different than
6    this definition that you just read here.
7        A.   Again, the first time I believe
8    I refer to digital assets, and -- and I
9    define a term in my declaration digital
10   asset balance which is defined as the
11   aggregate sub-balance of all digital
12   assets.
13       Q.   Yeah, so --
14       A.   I'm --
15       Q.   Go ahead.
16       A.   The preceding sentence is -- is
17   an important one.  I am saying for
18   purposes of analysis, which it does not
19   say, but it means in a manner consistent
20   with this dispute and how it's being
21   argued, I am breaking up components of the
22   account balance into two sub-balances,
23   again solely for purposes of analysis.
24   One sub-balance would be the USD balance
25   which would comprise the culmination of

1
2    all USD transactions in the accounts's
3    history up to that point in time in
4    question.  The remaining components of the
5    account would represent the digital asset
6    account balance and within the context of
7    3AC's account, I understand that to be the
8    spot cryptocurrency positions that are
9    listed in the declaration.  I don't have
10   them all memorized, but bitcoin, Ethereum,
11   et cetera.
12       Q.   I just want to be clear, Mr.
13   Coverick.  I'm not asking about your
14   definition of digital asset balance or USD
15   balance.  I'm just asking about your use
16   of lower-case digital asset, lower-case D,
17   lower-case A, as you use it your
18   declaration.
19       Is that any different than what
20   you just read here on page 28 of the Terms
21   of Service?
22       A.   I'm -- I'm sorry, I thought I
23   answered that question.  When I refer to
24   digital assets in my declaration, I'm
25   referring to the digital assets other than

1
2    the USD balance that are included as
3    subcomponents of 3AC's account balance.
4        I am not relying on any
5    definition in the Terms of Service for
6    digital assets as I reference them in my
7    declaration.
8        Q.   Are you aware, with that caveat
9    about what you're excluding from the
10   definition of lower-case D lower-case A
11   digital assets in your declaration, are
12   you aware of any differences between that
13   conception and what you're reading here on
14   the page?
15       MR. GLUECKSTEIN:  Object to the
16   form.
17       A.   I have not done an analysis of
18   the definition in the Terms of Service
19   compared to how I'm using it in the
20   context of this declaration.
21       Q.   In -- in preparing your
22   declaration, did you intend to track this
23   definition on page 28 of the Terms of
24   Service?
25       MR. GLUECKSTEIN:  Object to the

MAGNA ▶
LEGAL SERVICES

Page 274

1
2      form; asked and answered.
3          A.    I did not rely on any
4   definitions in the Terms of Service for
5   words that I used relating to my analysis
6   of 3AC's account.
7          Q.    8.2.6 in the middle of that on
8   page 10, backing up a bit states that all
9   digital assets are held in your account on
10  the following basis.  Title to your -- A,
11  title to your digital assets shall at all
12  times remain with you and shall not
13  transfer to FTX trading.
14          Do you see that?
15         A.    I do.
16         Q.    Why did FTX write that?
17             MR. GLUECKSTEIN:  Object to the
18      form.
19         A.    Again, I was not involved with
20  FTX on May 13th of 2022, or at any point
21  prior.  I did not speak with anyone that
22  was involved in the drafting of these
23  terms.
24             Further, I'm not a lawyer, and
25  this is a highly legal document.  I'm not

Page 275

1
2   qualified to provide conclusions or
3   opinions on the language or the intent
4   thereof.
5          Q.    Is it FTX's position that this
6   language has any meaning?
7             MR. GLUECKSTEIN:  Object to the
8      form calls for a legal conclusion.
9             Caution you not to reveal any
10      discussions with counsel about legal
11      issues or strategy.
12         A.    Again, it is the FTX Recovery
13  Trust's position that all assets in
14  possession of the FTX Recovery Trust are
15  property of the estate pursuant to the
16  confirmation order.
17         Q.    And prior to FTX's bankruptcy
18  petition, does FT -- did FTX take a
19  different interpretation of this
20  provision?
21         A.    Again, given I'm not a lawyer,
22  the only position that I am aware of is
23  that all assets are property of the estate
24  as specified in the confirmation order.
25         Q.    8.2.6 B states:  None of the

Page 276

1
2   digital assets in your account are
3   property of or shall be -- or shall -- or
4   may be loaned to FTX Trading.  FTX Trading
5   does not represent or treat digital assets
6   in user's accounts as belonging to FTX
7   Trading.
8             Do you see that?
9          A.    I do.
10         Q.    What is FTX's current position
11  on the meaning of this clause B?
12             MR. GLUECKSTEIN:  Object to the
13      form of the question; calls for a
14      legal conclusion.  And I caution you
15      not to reveal any discussions with
16      counsel, advice of counsel, or legal
17      strategy.
18         A.    Again, as relates to the prior
19  question on point A, as well as point B or
20  any other point in this document, I'm not
21  a lawyer, and I'm not qualified to provide
22  legal opinions.
23             It is the FTX Recovery Trust's
24  position that the confirmation order
25  settles any disputes over customer

Page 277

1
2   property or estate property matters.
3          Q.    Prior to the bankruptcy
4   petition, what position, if any, did FTX
5   take on meaning of this provision?
6             MR. GLUECKSTEIN:  Object to the
7      form; calls for a legal conclusion.
8          A.    I was not involved with FTX
9   prior to the bankruptcy filing and have
10  not spoken with any -- any member of the
11  pre-petition management team regarding
12  their position on anything.
13         Q.    What, if any, efforts did FTX in
14  preparation for this deposition take to
15  assess the pre-petition interpretation by
16  FTX of these provisions?
17         A.    In preparation for this
18  deposition, I did not do anything to
19  examine the intent of the pre-petition
20  management team regarding any matter.
21         Q.    Under what factual circumstances
22  would FTX take the position that digital
23  assets in user's accounts do not belong to
24  FTX Trading?
25             MR. GLUECKSTEIN:  Object to the

MAGNA
LEGAL SERVICES

1
2    form; calls for a legal conclusion.
3        A.    That's a hypothetical scenario
4    that I am not qualified to evaluate
5    because I am not a lawyer and it's a
6    highly legal question.
7        Q.    What, if anything, would
8    constitute a breach by FTX of 8.2.6 A
9    pre-petition?
10            MR. GLUECKSTEIN:  Objection;
11        calls for a legal conclusion.
12        A.    Once again, I'm not a lawyer and
13    I am not qualified to opine on what would
14    constitute a breach of a contract or any
15    other legal agreement.
16        Q.    What, if any, actions by FTX
17    pre-petition would breach 8.2.6 B?
18            MR. GLUECKSTEIN:  Objection;
19        calls for a legal conclusion.
20        A.    Again, my answer remains the
21    same for the entirety of this document.
22    I'm not qualified to opine on breaches of
23    legal documents.
24        Q.    I want to make -- I've made
25    clear before this is going to be a

1
2    standing clarification.  I'm not asking
3    any of these questions to you in your
4    capacity as a nonlawyer.  I'm asking all
5    these questions to you in your capacity as
6    the FTX Recovery Trust.
7            Does that change your answer?
8        A.    My --
9            MR. GLUECKSTEIN:  FTX does not
10        have to give you legal advice in a
11        30(b)(6) deposition.  So we object to
12        the question, calling for legal
13        advice.
14            If you have an answer to the
15        question, Mr. Coverick, outside of
16        that, you can provide it.
17        A.    Once again, FTX has a
18    confirmation order from a federal
19    bankruptcy court resolving these issues.
20        Q.    When, if ever, did title to
21    customers's digital assets transfer to FTX
22    Trading?
23            MR. GLUECKSTEIN:  Objection;
24        calls for a legal conclusion.
25        A.    Once again, these issues were

1
2    settled by the confirmation order.
3        Q.    When, if ever, did, looking at
4    8.2.6 B, digital assets in customer
5    accounts become the property of or belong
6    to FTX Trading?
7            MR. GLUECKSTEIN:  Objection;
8        calls for a legal conclusion.
9        A.    Once again, my understanding is
10    that is all settled by the confirmation
11    order.
12        Q.    The positions taken by the
13    confirmation order, or the result taken by
14    the confirmation order, was that ever
15    communicated to FTX customers
16    pre-petition?
17            MR. GLUECKSTEIN:  Objection to
18        the form of the question.
19        A.    The confirmation order was
20    entered after the bankruptcy filing which
21    defines pre- versus post-petition.
22        Q.    Did FTX Trading ever inform its
23    customers pre-petition that:  Title to
24    your digital assets shall not at all times
25    remain with you and shall transfer to FTX

1
2    Trading?
3            MR. GLUECKSTEIN:  Object to the
4        form.
5        A.    I am not aware of all
6    communications FTX may have had with its
7    customers prior to the petition date.
8        Q.    Did FTX Trading ever inform its
9    customers prior to the petition date that
10    it is untrue in its view that none of the
11    digital assets in your account are the
12    property of or shall or may be loaned to
13    FTX Trading?
14            MR. GLUECKSTEIN:  Object to the
15        form.
16        A.    I am not aware of communications
17    the pre-petition management team had with
18    its customers in their entirety.
19        Q.    Did -- did FTX ever represent to
20    its customers pre-petition that in its
21    view, FTX Trading does represent or treat
22    digital assets in users's accounts as
23    belong -- belonging to FTX Trading?
24        A.    Can you --
25            MR. GLUECKSTEIN:  Object to the

Page 282

1
2     form.
3        A.    Can you repeat the question,
4     please?
5        Q.    Did FTX ever represent to its
6     customers pre-petition that it is untrue,
7     looking at 8.2.6 B, that FTX Trading does
8     not represent or treat digital assets in
9     users' accounts as belonging to FTX
10    Trading?
11          MR. GLUECKSTEIN:  Object to the
12    form.
13       A.    I am not aware of all
14    conversations or communications the
15    pre-petition management team had with its
16    customers.
17       Q.    Are you aware of any
18    communications whatsoever pre-petition FTX
19    made with its customers regarding 8.2.6?
20       A.    I do not recall any specific
21    communications regarding 8.2.6.
22       Q.    Are you aware -- is FTX aware of
23    any communications regarding that FTX
24    Trading made to its pre-petition customers
25    regarding the ownership of digital assets

Page 283

1
2     other than what appears in 8.2.6 here?
3        A.    Again, I cannot recall or am not
4     aware of all communications the management
5     team had with their customers.
6        Q.    Are you aware of any
7     communications whatsoever that are
8     consistent or inconsistent with 8.2.6 that
9     FTX Trading had with its customers
10    pre-petition?
11          MR. GLUECKSTEIN:  Object to the
12    form of the question.
13       A.    My awareness of communications
14    does not mean they did or did not happen,
15    but I am not aware, do not personally
16    recall any specific communications
17    regarding 8.2.6.
18       Q.    Is FTX aware of or recall any
19    specific communications regarding the
20    topics of -- subject to 8.2.6?
21          MR. GLUECKSTEIN:  Object to the
22    form.
23       A.    Again, I do not have every
24    document that was collected memorized.
25          I am not aware of any specific

Page 284

1
2     communications that I can recall regarding
3     8.2.6.
4        Q.    Are you aware of any
5     communications from FTX Trading to its
6     customers pre-petition that states or
7     suggests that customers did not have a
8     beneficial ownership interest in the
9     digital assets allocated to their accounts
10    on the exchange?
11       A.    Once again, I am not aware of
12    all communications the pre-petition
13    management team had or did not have with
14    its customers.
15       Q.    And are you aware of any of them
16    regarding that topic?
17       A.    I do not recall any specific
18    communications regarding that topic, but
19    that does not mean they do or do not
20    exist.
21       Q.    What efforts, if any, did FTX
22    take to determine whether they exist or
23    not?
24       A.    As I testified before, FTX took
25    exhaustive efforts to uncover any

Page 285

1
2     information that was able to be obtained.
3          (Coverick Exhibit 16, Exhibit 16
4     email from FTX OTC Portal 3/20/2020,
5     Bates 3AC-FTX-00534514, was marked for
6     identification, as of this date.)
7          (Coverick Exhibit 17, email from
8     FTX OTC Portal 6/2/2020, Bates
9     3AC-FTX-00536147, was marked for
10    identification, as of this date.)
11    BY MR. PROULX:
12       Q.    You've been handed what's been
13    marked as Exhibit Numbers 16 and 17.
14    These are two trade confirmations from FTX
15    OTC portal with an FTX.com email address
16    in 2020 produced by prior in this
17    litigation.
18          Feel free to take a moment and
19    let me know when you've reviewed these.
20          MR. GLUECKSTEIN:  I'm sorry,
21    counsel.  Which has been marked as
22    what exhibit?
23          MR. PROULX:  Yeah, that's a fair
24    question.
25          So, the one dated March 20th,

1
2    2020 is marked as Exhibit 16.  The one
3    dated January -- excuse me.  June 2nd,
4    2020 is marked as Exhibit 17.
5        THE WITNESS:  I'm sorry, am I --
6    are you waiting for me?
7        MR. PROULX:  I'm just -- let me
8    know when you've had a moment to
9    review them.
10        THE WITNESS:  I -- I -- I --
11    I've viewed them.
12    BY MR. PROULX:
13    Q.    Have you seen documents like
14    this before?
15    A.    This appears to be an email.
16    I've seen emails before.
17    Q.    That's a cute answer.
18        I'm asking about trade
19    confirmations.
20        Have you seen FTX issue trade
21    confirmations to its customers?
22    A.    I do not recall all of the
23    emails that I've seen.
24    Q.    Are you aware --
25    A.    I cannot -- I cannot

1
2    specifically recall a specific trade
3    confirmation.
4    Q.    Are you aware of whether, in
5    fact, FTX sent trade confirmations to its
6    customers on the exchange?
7    A.    I am aware that there are
8    different levels of communication to FTX
9    customers.  I am not specifically -- I do
10    not specifically recall every
11    communication or have memorized every
12    communication the debtors are in
13    possession of or the FTX Recovery Trust is
14    in possession of.  But I am aware that
15    there were circumstances in which trade
16    confirmations were sent via email.
17    Q.    And those circumstances, are
18    they consistent with the type of documents
19    you're seeing here?
20    A.    Again, I don't have them
21    memorized.  So I can't verify consistency
22    or inconsistency with other emails.
23    Q.    Each of the documents is from
24    FTX OTT portal beginnings:  Hello Three
25    Arrows Capital limited.  Taking Exhibit 16

1
2    first.
3        You sold -- actually, taking 17
4    first, excuse me.  You bought (FTX sold 5)
5    BTC at a certain price in U.S. dollars
6    with a total cash of USD.
7        Do you see all that?
8    A.    I do.
9    Q.    What does it mean for a customer
10    to buy BTC from FTX?
11    A.    In context of this email, or in
12    general?
13    Q.    In context of a trade
14    confirmation.
15    A.    In general, my -- my
16    understanding of the term "buying BTC"
17    means that within the context of a
18    customer's account, they purchased a
19    entitlement to bitcoin for U.S. dollar
20    consideration within their account.
21    Q.    This doesn't say that you
22    purchased an entitlement that FTX owned,
23    does it?
24    A.    No, but you asked me for my
25    understanding, I thought.  I'm sorry if I

1
2    misunderstood the question.
3    Q.    Your answer was buying BTC means
4    that within the context of a customer's
5    account they purchased a entitlement to
6    bitcoin for U.S. dollar consideration
7    within their account.
8        Is that fair?
9    A.    That sounds like what I said.
10    Q.    What's the difference between
11    purchasing an entitlement to bitcoin
12    versus purchasing the bitcoin itself?
13    A.    To the extent that question is
14    related to title to an asset or whose
15    property an asset is, once again, I've --
16    I've said repeatedly that the estate's
17    position is that the confirmation order
18    settles those matters.
19        Typically, if I buy something, I
20    would expect to be in possession of it.
21    When -- when I say it's within the context
22    of their account, I mean that they did not
23    receive a bitcoin at an address that they
24    controlled, they being 3AC.  They acquired
25    a digital asset entitlement or an

MAGNA
LEGAL SERVICES

Page 290

1
2  entitlement to bitcoin as recorded on the
3  exchange general ledger.
4      Q.   Now to the U.S. dollar value of
5  a bitcoin, correct?
6      A.   The U.S. dollar value of a
7  bitcoin would be a component of their
8  total account balance, which as I've
9  stated previously is the estate's position
10  represents the entirety of a customer's
11  entitlement against the exchange.
12      Q.   Did an asset exist described in
13  this confirmation we're looking at here in
14  Exhibit 17?
15          MR. GLUECKSTEIN:  Object to the
16      form.
17      A.   Are you asking me if this
18  specific bitcoin existed?
19      Q.   Yeah.  The 5 bitcoin referenced
20  in this Exhibit 17, did that in fact exist
21  in the real world?
22          MR. GLUECKSTEIN:  Object to the
23      form.
24      A.   So, that's the thing about the
25  exchange is transactions such as these

Page 291

1
2  occurred on the exchange ledger.  The
3  movement or location of digital assets had
4  no relation other than deposits and
5  withdrawals to the exchange ledger.  So
6  when one customer entered into a sell
7  trade and the other side of that trade was
8  a buy trade for a customer, there was no
9  underlying movement or underlying bitcoin
10  that was identified for that transaction.
11      Q.   I'm not -- I'm not sure if that
12  was responsive to my question.
13          Understanding FTX's position
14  that there was no movement of that asset,
15  that that asset nevertheless exists, the 5
16  bitcoin described here?
17      A.   That speaks to the traceability
18  conversation that we had earlier to
19  confirm whether something exists would
20  require you to be able to trace it.  And
21  sop my answer to your question is that
22  there were no underlying movements of
23  assets corresponding trades within
24  exchange accounts, and so it is impossible
25  to trace the existence of a particular

Page 292

1
2  bitcoin for that reason.
3      Q.   I'm not -- Mr. Coverick, I'm not
4  asking about tracing here at all.  I'm not
5  trying to engage in a metaphysical
6  conversation with you.  I'm just asking if
7  the thing exists in the real world?
8          MR. GLUECKSTEIN:  Objection;
9      argumentative.
10  BY MR. PROULX:
11      Q.   Does a bitcoin exist at a
12  particular address, regardless much
13  whether that address moved or not in a
14  confirmation order like this?
15          MR. GLUECKSTEIN:  Objection;
16      argumentative.
17      A.   Cryptocurrency is a digital
18  asset.  So the existence of a digital
19  asset requires tracing of that digital
20  asset on the blockchain.
21          What I'm saying is that trades
22  on the exchange were conducted on the
23  ledger of the exchange as it existed
24  within Amazon Web Services server.  It did
25  not relate to, or there was no underlying

Page 293

1
2  identification or movement of a particular
3  bitcoin when a customer entered into a
4  trade like this.
5      Q.   Somewhere at an address
6  potentially controlled by FTX were there
7  five bitcoins that existed to make this
8  transaction result in an actual
9  entitlement?
10          MR. GLUECKSTEIN:  Object to the
11      form.
12      A.   Again, the -- the transaction
13  itself only existed or occurred on the --
14  on the ledger of the exchange.  That can
15  occur whether there are or not bitcoin in
16  the possession of FTX Trading limited.
17  It's simply an entry on to a ledger in a
18  database.
19      Q.   Would FTX have conducted that
20  ledger entry that you're describing if it
21  had zero bitcoin at any addresses that it
22  controlled?
23      A.   I can't speculate as to what FTX
24  would have or would not have done in
25  hypothetical circumstances.

**MAGNA**
LEGAL SERVICES

Page 294

1
2      Q.   Is that a possibility what I
3  just described?
4      A.   Is it a possibility that FTX
5  would allow a trade to be entered on to
6  the exchange ledger if FTX did not possess
7  any bitcoin?  Is that the question?
8      Q.   Yes.
9      A.   It is completely possible that a
10  transaction could be entered on to the
11  ledger regardless of whether FTX was in
12  possession of -- of a certain
13  cryptocurrency because all that is
14  required for that transaction to occur is
15  someone making that entry on a ledger.
16  I'm just speaking mechanically, all that
17  needs to be done is for that entry to be
18  made on the ledger by virtue of the
19  customer conducting the trade.
20      Q.   Have you located any examples
21  where FTX effected a ledger transaction
22  for which it lacked a sufficient number of
23  the digital asset being transacted in
24  its -- in its addresses to support that
25  transaction?

Page 295

1
2      A.   Are you asking across the entire
3  exchange?  Or the -- I'm sorry, are you
4  asking of all of the bitcoin, for example,
5  that FTX was in possession of?
6      Q.   Let's start broad and see where
7  we go with that.
8          MR. GLUECKSTEIN:  Object to the
9      form.
10      A.   FTX, as in the FTX Recovery
11  Trust and the pre-effective FTX debtors,
12  are aware that as of the petition date and
13  all analyzed periods prior to the petition
14  date, that there was a shortfall of
15  cryptocurrency in the possession of FTX
16  when compared to customer entitlements to
17  those same positions.
18      Q.   Did FTX warn customers of that
19  scenario that you've just described
20  pre-petition when the customers entered
21  into trade confirmations like this?
22      A.   Not that I'm aware --
23          MR. GLUECKSTEIN:  Object to the
24      form.
25      A.   Not that I'm aware of.

Page 296

1
2      Q.   8.2.6 C says:  You control the
3  digital assets held in your account at any
4  time subject to outages, downtime, and
5  other applicable policies including the
6  terms.  You may withdraw your digital
7  assets by sending them to a different
8  block train -- blockchain address
9  controlled by you or a third party.
10          Do you see that?
11      A.   I do.
12      Q.   It's factually the case, is it
13  not, that customers could withdraw their
14  digital assets from the exchange in this
15  manner?
16          MR. GLUECKSTEIN:  Object to the
17      form.
18      A.   I would not characterize it that
19  way.
20      Q.   How do you characterize it then?
21      A.   You asked if they could withdraw
22  their digital assets.  As I testified
23  earlier, they could withdraw certain
24  cryptocurrencies from the exchange subject
25  to them being available in their account

Page 297

1
2  balance and satisfying the applicable
3  margin requirements and any other
4  requirement that may have existed.
5          It -- as I also testified
6  earlier, customers had the ability to see
7  on the blockchain that any cryptocurrency
8  they deposited was swept into commingled
9  addresses.
10      Q.   Subject to the caveats you've
11  just described regarding potential
12  limitations on asset withdrawal, customers
13  in fact withdrew assets from the exchange
14  pre-petition.  Is that true?
15      A.   I'm sorry, I didn't --
16      Q.   Subject to the limitations
17  you've testified to in the real world,
18  customers in fact withdraw assets from the
19  exchange pre-petition?
20      A.   Customers did withdraw
21  cryptocurrency from the exchange
22  pre-petition, yes.
23      Q.   Pursuant to this section 8.2.6
24  C?
25          MR. GLUECKSTEIN:  Object to the

Page 298

1
2    form calls for a legal conclusion.
3        A.   I cannot opine on whether it's
4    pursuant to anything.  I can just state
5    the fact that customers did withdraw
6    cryptocurrency from the exchange
7    pre-petition.
8        Q.   Did FTX -- provided that the
9    restrictions or limitations you described
10   were satisfied, did FTX ever say no, you
11   can't do that?
12           MR. GLUECKSTEIN:  Object to the
13   form.
14       A.   I'm sorry, can you clarify the
15   question?
16       Q.   Did FTX ever refuse to honor a
17   withdrawal request provided that the
18   applicable limitations on withdrawal
19   you've testified to were satisfied?
20       A.   There were circumstances where
21   FTX did not allow customers to withdraw
22   assets.
23       Q.   And are those circumstances
24   different than the restrictions or
25   limitations you testified to earlier, or

Page 299

1
2    is that a different type where they made a
3    bespoke degrees to whatever reason refuse
4    that withdrawal?
5        A.   As a -- as a technical matter,
6    there were -- I am aware that on certain
7    accounts, FTX turned off the ability to
8    withdraw assets of any kind from the
9    account and that -- the reasoning for that
10   is typically because of the limitations
11   that I cited, specifically the maintenance
12   margin requirement or any other
13   requirement that was applied to the
14   account.  But separately from that, I am
15   also aware that shortly before the
16   bankruptcy filing, FTX turned off the
17   ability for all -- nearly all customers to
18   withdraw assets from the exchange.
19       Q.   And was that in connection with
20   anticipation of the bankruptcy proceeding,
21   or for some other reason?
22       A.   I do not know because I did not
23   speak with anyone that made that decision.
24       Q.   Who in FTX's view, looking at
25   8.2.6 C, controlled the digital assets

Page 300

1
2    held in your account?
3           MR. GLUECKSTEIN:  Objection;
4    calls for a legal conclusion.
5        A.   As a technical matter, FTX
6    controlled all digital assets deposited on
7    to the exchange because FTX possessed the
8    private keys to the addresses where the
9    cryptocurrency was held.
10       Q.   And when you say FTX possessed
11   those private keys, are you referring to a
12   specific entity, a specific person, or
13   something else?
14       A.   I'm referring to the FTX group
15   of entities.
16       Q.   Is there some entity at the top
17   of that structure that ultimately
18   controlled the rest of them?
19           MR. GLUECKSTEIN:  Objection;
20   calls for a legal conclusion.
21       A.   I do not recall what entity had
22   the -- was account -- was specifically the
23   counterparty to the contract with Amazon
24   Web Services which is where the private
25   keys were stored.

Page 301

1
2        My testimony is that to access
3    or move cryptocurrency from an address,
4    you need to have the private key as a
5    technical matter, and I understand that
6    FTX was in possession of those private
7    keys as stored on Amazon Web Services.
8        Q.   Did FTX pre-petition tell its
9    customers that it interprets control
10   within the meaning of 8.2.6 to mean
11   possession of the private keys?
12           MR. GLUECKSTEIN:  Object to the
13   form of the question; calls for a
14   legal conclusion.
15       A.   I believe it's commonly
16   understood by knowledgeable participants
17   in the cryptocurrency space or traders of
18   cryptocurrency that you need a private key
19   to move cryptocurrency from one address to
20   another.
21       Q.   Is FTX equating moving
22   cryptocurrency from one address to another
23   as the same as control of that
24   cryptocurrency?
25           MR. GLUECKSTEIN:  Objection;

**MAGNA** ◗
LEGAL SERVICES

1
2       calls for a legal conclusion.
3       A.   Again I'm not a lawyer, so I
4    can't interpret the definition or legal
5    meaning of "control."  But from a
6    practical perspective, you control
7    something if you can move it, and you
8    cannot move cryptocurrency from one
9    address to another without the private
10   key.
11      Q.   Who controlled the debiting or
12   crediting of profits and losses from
13   futures contracts?
14      A.   I don't understand the question
15   in the context of con -- the word
16   "control."  I can explain my understanding
17   of how those gains and losses were
18   recorded.
19           Is that the question?
20      Q.   That is not the question.
21      A.   Okay.
22      Q.   I'll move on if you don't
23   understand the question.
24           Take a look at on the next page
25   or two Section 9.1 of the Terms of

1
2    Service.
3       A.   Yes, sir.
4       Q.   This is in relation to unclaimed
5    or abandoned property as defined in that
6    section.
7            What is FTX's interpretation of
8    that provision, 9.1?
9            MR. GLUECKSTEIN:  Objection;
10     calls for a legal conclusion.
11      A.   Again, FTX's position is that
12   all -- all topics or disputes related to
13   the ownership of any property were settled
14   via the confirmation order.
15      Q.   Prior to settlement of -- of
16   these issues through the confirmation
17   order, in FTX's view, did FTX have a
18   position on that --
19           MR. GLUECKSTEIN:  Objection to
20     the form of the question.
21      Q.   -- pre-petition?
22           MR. GLUECKSTEIN:  And calls for
23     a legal conclusion.
24      A.   It is not knowable of me to know
25   what FTX pre-petition management had

1
2    positions on or not.
3       Q.   Knowable by FTX itself?
4            MR. GLUECKSTEIN:  Object to the
5      form.
6       A.   Not that I'm aware of.
7       Q.   Section 10 of this agreement, or
8    I should say document, the Terms of
9    Service we're still on, is titled "Debit
10   Account Balance."
11           What's a debit account balance
12   within the meaning of this document?
13           MR. GLUECKSTEIN:  Objection;
14     calls for a legal conclusion.
15      A.   Again, I do not know the
16   definitions or how they traced other
17   meanings within the context of this
18   document.
19      Q.   Same answer for FTX?
20      A.   Again --
21           MR. GLUECKSTEIN:  Object to the
22     form of the question.
23      A.   -- FTX's position on account
24   balance is that it represents the singular
25   entitlement any customer has against the

1
2    exchange.
3       Q.   Well, this says debit account
4    balance.
5            Is it FTX's position that the
6    debit account balance represents a single
7    entitlement that a customer has to the
8    exchange?
9       A.   Again, I cannot interpret this
10   document.
11           However, this language from a
12   businessperson's perspective appears to be
13   referring to an account balance that's in
14   a negative position.  I believe it's
15   referencing the same account balance that
16   I am stating the FTX Recovery Trust has a
17   position on, which is that is the singular
18   entitlement of a customer against the
19   exchange.
20      Q.   Same answer for debit balance as
21   used in 10.1?
22           MR. GLUECKSTEIN:  Object to the
23     form.
24      A.   I -- I'm sorry, that's what I
25   was referencing in that answer.

Page 306

1
2      Q.   Yeah, I was -- just to be clear,
3  I was referencing the title of that
4  section debit account balance.
5      A.   Okay.
6          It appears to me, and I have not
7  memorized the Terms of Service, so I'm
8  reading this live, it appears to me this
9  language is in reference to a negative
10 balance a customer could potentially have,
11 a negative account balance.
12     Q.   So, you've opined on, from a
13 quote/unquote, businessperson perspective
14 on what debit balance means in Section 10.
15         Moving back to Section 8.2.6,
16 page 10, from a businessperson
17 perspective, what does "title to your
18 digital asset shall at all times remain
19 with you and shall not transfer to FTX
20 Trading" mean?
21         MR. GLUECKSTEIN:  Objection;
22     calls for a legal conclusion.
23     A.   Again, I've already answered
24 this question.  I do not have the ability
25 to provide a legal conclusion.

Page 307

1
2      Q.   Are you providing a -- moving
3  back to Section 10 now, debit account
4  balance.
5          Are you providing a legal
6  conclusion there -- sorry, was your prior
7  answer a legal conclusion?
8      A.   No, sir, it was not.  It was my
9  understanding of the word "debit balance"
10 as was asked of me.
11     Q.   What's FTX's interpretation of
12 Section 10.3, and specifically 10.3.1:  If
13 after a demand is made by FTX Trading you
14 have not made payment of the outstanding
15 debit balance by the time stated in the
16 demand, then you authorize us to sell any
17 digital assets or redeem any fiat currency
18 or e-money in your account to recover the
19 outstanding debit -- debt balances --
20         MR. PROULX:  Strike that.
21     Q.   Debit balances.
22         MR. GLUECKSTEIN:  Objection to
23     the form, and objection; calling for a
24     legal conclusion.
25     A.   Again, I'm not a lawyer, and I

Page 308

1
2  can't interpret the meaning of this
3  clause.
4      Q.   Same answer for FTX?
5          MR. GLUECKSTEIN:  Same
6      objection.
7      A.   Can you state the question?
8      Q.   How does FTX pre-petition
9  interpretation what I just read into the
10 record, Section 10.3.1?
11         MR. GLUECKSTEIN:  Object to the
12     form of the question, and calls for a
13     legal conclusion.
14     A.   The FTX Recovery Trust position
15 is that the confirmation governs all these
16 issues.
17     Q.   And how, if at all, does the
18 confirmation order speaking -- speak to
19 debit balances?
20     A.   The -- the confirmation order
21 addresses the resolution of all claims
22 against the estate.
23     Q.   Does the confirmation order
24 speak to the resolution of, going back to
25 section 9.1, unclaimed or abandoned

Page 309

1
2  property?
3      A.   I don't specifically know of
4  references to unclaimed or abandoned
5  property.  I do know those phrases are
6  used in the plan administrative agreement
7  which is authorized by the confirmation
8  order.  I don't believe it's with regard
9  to the way it's being used here, but I --
10 as I understand a debit balance to mean a
11 negative account balance, the confirmation
12 order authorizes the plan administrator to
13 pursue asset recoveries.
14     Q.   And I just want to be clear,
15 when you say you understand debit balance
16 to mean that, you're talking about in
17 your -- from a litigation perspective now
18 as opposed to in the confines of the Terms
19 of Service?
20     A.   I am saying that from an
21 analytical perspective, I have -- I have
22 testified that the account balance is
23 comprised of a series of debits and
24 credits.  Credits generally increase the
25 account balance; debits generally decrease

MAGNA
LEGAL SERVICES

Page 310

1
2    the account balance.
3        So from an accounting
4    perspective and a financial analysis
5    perspective, I understand the general use
6    of a debit balance to mean a negative
7    balance.
8        I am not opining or offering any
9    testimony as to the legal interpretation
10   of -- of this document.
11   Q.   You testified earlier that the
12   FTX exchange did not allow customers to
13   incur negative USD --
14       MR. PROULX:  Strike that.
15   Q.   To incur negative total account
16   balances; is that correct?
17   A.   I said they did not permit, and
18   it was a policy that accounts should not
19   go negative.
20   Q.   Is this that policy, or is that
21   policy somewhere else?
22   A.   The policy that I'm referencing
23   is embedded in the code base of the
24   exchange and predicated on the maintenance
25   margin formula that prohibited customers

Page 311

1
2    from going below a level that could result
3    in their account going negative.
4        As I testified earlier, accounts
5    that fell below the maintenance margin
6    fraction ran the risk of being liquidated
7    by the exchange to close out their
8    supporter to certain positions.  There are
9    certain circumstances I am aware of where
10   that liquidation process could not happen
11   quick enough to react to rapidly changing
12   markets, and in those limited circumstances,
13   there were accounts that despite the
14   policy that accounts cannot go negative
15   could in fact go negative.
16       So I am -- I am delineating
17   between the practices of the exchange that
18   your account is not permitted to go
19   negative versus the reality that sometimes
20   it happened despite efforts to prevent it.
21           - - -
22       E V E N I N G   S E S S I O N
23           - - -
24   Q.   Flip to page 26, Section 38.6:
25   No Partnership or Agency.

Page 312

1
2        I'm not going to read that into
3    the record, but please read it to yourself
4    and tell me what FTX's pre-petition
5    position on the meaning of this provision
6    is.
7        MR. GLUECKSTEIN:  Object to form
8    of the question; calls for a legal
9    conclusion.
10   A.   The FTX Recovery Trust does not
11   know the pre-petition management team's
12   position on this clause.
13   Q.   Flip back to earlier in this
14   document, section 2.1.3 on page 2.
15       What is the pre -- what is
16   pre-petition FTX's interpretation of this
17   provision?  Feel free to read it yourself.
18   Take all the time you need.
19   A.   I'm sorry, can you repeat the
20   section?
21   Q.   Of course.  2.1.3 on page 2.
22   A.   It -- it's --
23       MR. GLUECKSTEIN:  Object to the
24   form, and object; calls for a legal
25   conclusion.

Page 313

1
2    A.   It's the same answer.  The FTX
3    Recovery Trust does not know the
4    pre-petition management team's position.
5    Q.   Same question with respect to
6    Section 2.2.2 on the next page, page 3.
7    Take a moment to read that.
8    A.   2.2. -- sorry, can you repeat
9    the section reference?
10   Q.   Of course.  2.2.2.
11   A.   Okay.
12   Q.   Beginning:  Understanding
13   digital assets requires advanced technical
14   knowledge.
15       MR. GLUECKSTEIN:  Object to the
16   form of the question.  Object; calling
17   for a legal conclusion.
18   A.   Again, to the best of my
19   knowledge, the FTX Recovery Trust cannot
20   know the intent of the pre-petition
21   management team.
22   Q.   Same question for 2.4.1, same
23   page about two-thirds of the way down.
24       MR. GLUECKSTEIN:  Object to form
25   of the question.

MAGNA
LEGAL SERVICES

1
2    BY MR. PROULX:
3        Q.    Under the heading "Margin
4    Trading."
5            MR. GLUECKSTEIN:  Object; calls
6        for a legal conclusion.
7        A.    Again, to the best of my
8    knowledge, the FTX Recovery Trust cannot
9    know the intent of the pre-petition
10   management team.
11       Q.    Flip to page 9 and at the very
12   bottom of that page there's a Section
13   8.1.3.
14           Same question, what is FTX's
15   pre-petition interpretation of that
16   provision.
17           MR. GLUECKSTEIN:  Object to the
18       form of the question.  Object; calls
19       for a legal conclusion.
20       A.    Again, the FTX Recovery Trust,
21   to the best of my knowledge, cannot know
22   the intent of the pre-petition management
23   team.
24       Q.    And so the record is clean, when
25   you testify that the FTX Recovery Trust

1
2    cannot know the intent of the preman --
3    pre-petition management team, the
4    implication of that is that FTX does not
5    know the pre-petition interpretation of
6    that provision?
7            MR. GLUECKSTEIN:  Object to the
8        form.
9        A.    I -- I -- that is a legal
10   question that I cannot answer with regard
11   to interpretation of a legal document at a
12   prior point in time.
13       Q.    Not -- I'm not asking you to
14   interpret anything.  I'm -- I'm saying I'm
15   interpreting your response to be that
16   factually, FTX cannot take a
17   interpretation of these provisions if it
18   does not know the intent of the
19   pre-petition management team.
20       A.    I do not --
21           MR. GLUECKSTEIN:  Object to the
22       form.
23       A.    I do not know what's required to
24   make a legal interpretation.  I don't -- I
25   am just saying that the FTX Recovery Trust

1
2    cannot know the intent of the pre-petition
3    management team involved in drafting these
4    documents.
5        Q.    And to be clear for the record,
6    I've been asking about the factual
7    interpretation of any informations we've
8    just gone over today.
9            Does that change your response
10   to any of the questions?
11           MR. GLUECKSTEIN:  Object to the
12       form.
13       A.    As a general matter, I -- I do
14   not believe the FTX Recovery Trust can
15   know the intents of the pre-petition
16   management team when drafting these
17   documents.
18       Q.    Same answer?
19           MR. GLUECKSTEIN:  Object to the
20       form.
21       A.    I don't understand the question.
22       Q.    Same -- you just gave the same
23   answer as you did before.  Is that a fair
24   characterization?
25           MR. GLUECKSTEIN:  Object to the

1
2    form.
3        A.    I -- I think so.
4        Q.    Turning back to 8.2.6 on page
5    10.
6        A.    Yes, sir.
7        Q.    Did FTX ever pre-petition warn
8    any customers that they did not own the
9    assets allocated to their accounts?
10           MR. GLUECKSTEIN:  Objection to
11       the form; asked and answered.
12       A.    I believe I answered this
13   previously, but I'm not aware of all
14   communications that the pre-petition
15   management team had with their customers.
16       Q.    And from a businessperson
17   perspective first, why did FTX tell
18   customers in 8.2.6 A and B that customers
19   owned these digital assets?
20           MR. GLUECKSTEIN:  Objection;
21       calls for a legal conclusion.
22       A.    Again, a businessperson could
23   not know the intent of the pre-petition
24   management team when drafting these
25   documents.

MAGNA▸
LEGAL SERVICES

1
2      Q.   You're not aware of any
3  documents that reveals the intent of the
4  pre-petition management team from FTX's
5  position currently?
6      A.   I am aware of a lot of documents
7  existing.  I can't purport to know what
8  they all contain.
9          It's possible that there are
10 documents that discuss this provision in
11 the Terms of Service.  It's possible
12 they're not.  I do not have all documents
13 that have been collected --
14     Q.   And sitting here today --
15     A.   -- committed to memory.
16     Q.   -- you can't recall a single one
17 that speaks to what FTX did or did not
18 represent pre-petition to its customers
19 with respect to ownership of assets?
20     A.   A single document in existence
21 anywhere?  Is that the question?
22     Q.   Yes.
23     A.   I cannot identify a specific
24 document or recall a specific document.
25         I do understand that generally

1
2  the -- this topic may have come up in the
3  criminal trial of Sam Bankman-Fried, but I
4  do not -- I cannot confirm that, but that
5  is one area that I am aware that there
6  could be documents that discuss this
7  because I know that most things were
8  discussed fairly exhaustively in that
9  trial.
10     Q.   That document wasn't
11 pre-petition, correct?
12     A.   I'm not identifying a document.
13 I'm saying there -- that is one place a
14 document could be that I do not recall
15 because I do not have all of those papers
16 committed to memory.
17     Q.   And just so the record is
18 abundantly clear, you're not, sitting here
19 today, you are unable to identify a single
20 document where FTX pre-petition warned its
21 customers they did not own the assets in
22 their -- were allocated to their FTX
23 accounts; is that correct?
24     A.   I cannot recall a document where
25 the pre-petition team warned customers of

1
2  anything.
3      Q.   And FTX more generally?
4      A.   I'm sorry.
5          MR. GLUECKSTEIN:  Object to the
6  form.
7  BY MR. PROULX:
8      Q.   You referenced the pre-petition
9  management team and warning customers.
10 I'm asking about FTX more generally.
11 Maybe there was some person other than on
12 the pre-petition management team that's --
13 that gave such a statement I've been
14 asking about.
15         You're not aware of any of those
16 documents, are you?
17     A.   I cannot --
18         MR. GLUECKSTEIN:  Object to the
19 form.
20     A.   I cannot recall a document where
21 someone warned a customer pre-petition of
22 the commingling or other aspects of the
23 storage of digital assets.
24     Q.   In paragraph 46 of your
25 declaration you state that the -- excuse

1
2  me, that Three Arrows agreed to the Terms
3  of Service when it opened the 3AC
4  accounts.
5          What is the factual basis for
6  that statement?
7      A.   My team examined -- I'm sorry,
8  let me just flip -- what paragraph is that
9  again?
10     Q.   Take your time.  Paragraph 46.
11     A.   Thank you.
12         My team examined the code base
13 underlying the exchange and the website
14 and confirmed that when a customer opened
15 an account, it required that customer to
16 check a box acknowledging they agreed to
17 the terms of service.  That's the basis of
18 my understanding of that statement.
19     Q.   Any specific checkbox
20 documentation or memorialization with
21 respect to 3AC in particular?
22         MR. GLUECKSTEIN:  Object to the
23 form.
24     A.   My understanding is there is a
25 record that 3AC opened their account and

Page 322

1
2  that a review of the code base of the
3  exchange at the time of share account
4  opening revealed that there was a checkbox
5  that required acknowledgement of the terms
6  of service.
7     Q.   So, you've been handed an
8  exhibit, it's been premarked as Exhibit
9  Number 6.  The document is titled "FTX
10  Digital Markets Limited Safeguarding of
11  Assets and Digital Token Management
12  Policy."  It's been produced by FTX -- the
13  FTX debtors in this litigation.
14        Are you familiar with this
15  document?
16     A.   I do not believe this document
17  is something I reviewed in prep --
18  preparation for my deposition.  I may have
19  seen it before, but I'm not intimately
20  familiar with it.
21     Q.   In what context may your -- may
22  you have seen it before?
23     A.   Just in the course of my broader
24  responsibilities with -- with FTX.  This
25  looks familiar, but I -- I'm not

Page 323

1
2  intimately familiar with it.
3     Q.   Is this an internal FTX policy
4  document?
5     A.   It appears to be an internal
6  document of FTX Digital Markets Limited.
7     Q.   On the next page, page 2, it
8  refers to a document history of August
9  2021 version 1.  Looking a bit below it --
10  there's section titled:  Review and
11  approvals.  Name Ryan Salem888.  Data
12  processed August 16th, 2021.
13        Do you see those things?
14     A.   I do.
15     Q.   Do you have any knowledge of
16  whether Mr. Salem authorized this document
17  or not, approved this document or not?
18     A.   I do not have firsthand
19  knowledge of his approval, but I do see
20  that it says he approved it.
21     Q.   On behalf of FTX, do you -- does
22  FTX doubt that he approved it?
23        MR. GLUECKSTEIN:  Object to the
24     form, I'm not aware of any evidence
25     one way or the other.

Page 324

1
2     Q.   Is FTX aware of any evidence
3  that this document was or policy was
4  terminated or became inoperative at a
5  certain point of time after August of
6  2021?
7        MR. GLUECKSTEIN:  Object to the
8     form.
9     A.   I am not aware of all documents
10  that may have been drafted before or after
11  this.
12     Q.   That's a "no"?
13        MR. GLUECKSTEIN:  Object to the
14     form.
15     A.   I am saying I am not aware of
16  documents that may have been drafted after
17  August of 2021 with respect to the topics
18  covered in -- in this document.
19     Q.   I'm not asking that.  I'm just
20  asking if you're any -- if you've seen any
21  documents that would suggest that this
22  document became inactive at a certain
23  point or in -- in -- noneffective at a
24  certain point.
25        Is the answer "no"?

Page 325

1
2     A.   I'm sorry, I thought I answered
3  that.
4        I'm not aware of any documents
5  that came -- came after this, but that
6  doesn't mean that they may -- that they
7  could not exist.  I'm just not aware.
8     Q.   So, there are some objectives
9  stated in this document on page 4.
10     A.   Okay.
11     Q.   Feel free to read those.
12  There's -- there are four bullet points in
13  there.
14        My question is what is the
15  purpose of this document, in FTX's view?
16        MR. GLUECKSTEIN:  Object to the
17     form of the question.
18     A.   Given this is a document that
19  was drafted prior to the petition date, I
20  cannot know what the intent -- what the
21  intended purpose of this is other than the
22  words on the page regarding the objective.
23     Q.   Is it FTX's position that FTX
24  did not have the objectives in terms of
25  the words written on this page?

1
2      MR. GLUECKSTEIN:  Object to the
3   form.
4      A.   It's the FTX Recovery Trust's
5   position that this is a document that was
6   uncovered as part of the exhaustive search
7   for pre-petition documentation.
8      Q.   Throwing away this document for
9   the moment, did FTX have a policy to
10   commit to the safeguarding of the assets
11   belonging to -- to exchange customers?
12      MR. GLUECKSTEIN:  Object to the
13   form.
14      A.   I understand that there are
15   documents created by the pre-petition
16   management team that speak to the
17   safeguarding of customer assets.  I'm also
18   aware of what actually happened that was
19   inconsistent with -- with what was
20   outlined in many documents.
21      Q.   And other than this document,
22   what are some others that you're aware of
23   that speak to the safeguarding of customer
24   assets?
25      A.   Again, I can't recall every

1
2   specific document, but an example is I'm
3   aware of tweets made by members of the
4   pre-petition management team that spoke to
5   how digital assets were custodied that
6   were inconsistent with what was actually
7   happening at the time.
8      Q.   Pre-petition, were those
9   documents or tweets ever corrected by the
10   pre -- pre-petition management team or
11   FTX?
12      A.   The -- the nature of the way
13   digital assets were -- were stored was
14   corrected by the FTX Recovery Trust, or at
15   the time the FTX Chapter 11 debtors in a
16   series of court pleadings, including the
17   first-day declaration, the -- the
18   disclosure statement, and other documents
19   based on the knowledge the FTX Recovery
20   Trust -- or, I'm sorry, the FTX debtors
21   gained throughout the pendency of the
22   case.
23      Q.   My question was just
24   pre-petition.  So --
25      A.   I'm sorry.

1
2      Q.   -- put all that to the side.
3      No, not a problem.
4      Put all that to the side for a
5   moment.  Pre-petition, did FTX or any of
6   its personnel issue any sort of corrective
7   statements to the policies that you've
8   just referenced were communicated to the
9   public?
10      MR. GLUECKSTEIN:  Object to the
11   form.
12      A.   Prior to the filing of the
13   bankruptcy petition, I do not believe so.
14      I know there were a lot of
15   tweets and communications in the days
16   following the bankruptcy filing by the
17   pre-petition management team, but I
18   wouldn't view those as an accurate
19   depiction of what was actually happening.
20      Q.   Setting aside the -- the real
21   world practices of FTX pre-petition and
22   its pre-management team, what was FTX's
23   policy look -- with respect to digital
24   tokens under its custody?
25      MR. GLUECKSTEIN:  Object to the

1
2   form.
3      A.   I have to answer that in two
4   parts.
5      There were documents such as
6   these that said one thing, and then there
7   was what actually happened, and I know you
8   said to exclude that, but from a policy
9   perspective, I view the operative policy
10   as what was embedded into the code base of
11   the exchange and how underlying movements
12   of digital assets occurred.  It was a
13   consistent practice of the pre-petition
14   management team to comingle cryptocurrency
15   of customers and that of other
16   cryptocurrency, and it was also a
17   consistent practice that there were
18   shortfalls of cryptocurrency that
19   otherwise should have been on the exchange
20   versus what was actually there.
21      Q.   So, I'm confused -- thank you
22   for that answer.  I'm very confused by it
23   because you had, I thought, suggested that
24   there were two categories.  There were the
25   policies and then what actually happened

**MAGNA**
LEGAL SERVICES

2  in the real world.
3      It seems to me that what the
4  code reflected is the latter, what
5  happened in the real world.
6      Are you suggesting that the code
7  was embedded in any sort of official
8  policy by FTX?
9      MR. GLUECKSTEIN:  Objection;
10  misstates the testimony.
11  A.    What I am saying is that what
12  was in the code was written by the people
13  operating the exchange, and it did what it
14  was written to do.
15      I am acknowledging that there
16  are documents that the pre-petition FTX
17  organization produced that are
18  inconsistent with that practice, and so I
19  am just delineating the fact that there
20  was explicit computer code designed to and
21  consistently conducting those practices
22  which were inconsistent with the words on
23  the page of many of the documents
24  regarding the same topics.
25  Q.    Of the two, of the two

2  categories, the words on the page of the
3  documents and the code, which were made
4  known to FTX customers pre-petition?
5  A.    Well, anything that was
6  communicated to FTX customers would have
7  been made known to -- to those customers.
8  Again, I -- I can't recall and don't know
9  everything that was communicated.  But as
10  I also testified, customers had the
11  ability to examine the blockchain and see
12  that assets were being commingled.
13  Q.    Top of page 5 there's a
14  reference to FDM, which I'll represent is
15  defined earlier as FTX Digital Markets.
16  It says:  FDM is a company incorporated
17  and registered in the Bahamas, as is
18  therefore bound to comply with certain
19  rules, regulations concerning customer
20  data.
21      Do you see that?
22  A.    Yes, sir.
23  Q.    Do you know what rules and
24  regulations those were?
25  A.    I am not an expert on Bahamas

2  law or a lawyer that can interpret law in
3  the Bahamas.
4      I am generally aware of -- of
5  one what I believe would be referred to as
6  a regulation called the Dare Act that I
7  know the FTX Digital Markets specifically
8  filed an application for.  So I would
9  assume that is one of those rules or
10  regulations, but I -- I cannot be certain
11  because I'm not a lawyer qualified to
12  interpret governing rules and regulations.
13  Q.    And the -- whereas you testified
14  to the regulation called the Dare Act in
15  the application submitted thereto is a
16  document you reviewed in preparation for
17  this deposition?
18  A.    Not that I reviewed in
19  preparation for the deposition, but I have
20  reviewed the document previously in
21  connection with other matters for the
22  case.
23  Q.    In connection with ownership
24  issues?
25  A.    Specifically in connection with

2  the dispute with the joint official
3  liquidators of -- of the Bahamas -- of FTX
4  Digital Markets prior to the global --
5  global settlement agreement being reached.
6  Q.    With respect to ownership or
7  custody disputes?
8      MR. GLUECKSTEIN:  Object to the
9  form.
10  A.    My review of this document was
11  in connection with all disputes as part of
12  an investigation effort my team and I did
13  into the nature of all of those disputes
14  with the joint official liquidators of the
15  Bahamas.
16  Q.    And which -- which disputes are
17  those?
18  A.    There are many, and I would
19  reference the global settlement agreement
20  as the -- the source of that information.
21      In general, as I testified to
22  earlier, the -- the general nature of the
23  dispute with FTX Digital Markets was with
24  regard to which legal en -- entity owned
25  the customer relationships and operated

MAGNA
LEGAL SERVICES

Page 334

1
2     the exchange.
3           MR. PROULX: Counsel, this
4     document is squarely responsive to
5     discovery requests we promulgated
6     previously on the FTX Recovery Trust.
7           Given the testimony we heard
8     here today, we request its prompt
9     production.
10          MR. GLUECKSTEIN: We disagree
11    with your characterization, but we
12    take the request under advisement.
13          MR. PROULX: We request
14    production prior to Mr. Coverick's
15    deposition tomorrow or otherwise
16    before the third day of the
17    deposition.
18          MR. GLUECKSTEIN: We'll take
19    that under advisement.
20    BY MR. PROULX:
21    Q.   Did the policies here apply to
22    the FTX debtors pre-petition? And I'm --
23    to be clear, I'm talking about the first
24    category, the policies as portrayed to the
25    public, not the real world practices by

Page 335

1
2     FTX.
3     A.   Can you clarify --
4           MR. GLUECKSTEIN: Object to the
5     form.
6     A.   Can you clarify what you mean by
7     apply?
8     Q.   Sure.
9           Did FTX -- if the FTX debtors
10    pre-petition see themselves as governed by
11    the policies here?
12          MR. GLUECKSTEIN: Objection;
13    calls for a legal conclusion.
14    A.   I cannot speak to what the
15    pre-petition management team viewed
16    themselves as being governed by or not.
17    That would require me to have been there,
18    spoken with them.
19    Q.   Does FTX have any reason to
20    dispute whether this document applied to
21    it?
22          MR. GLUECKSTEIN: Object to the
23    form.
24    BY MR. PROULX:
25    Q.   Pre-petition?

Page 336

1
2     A.   Again, I don't understand the
3     question as it relates to the word
4     "apply."
5           I don't believe the FTX Recovery
6     Trust has a position as to what the intent
7     of the pre-petition management team or the
8     understanding of the pre-petition
9     management team was or was not.
10    Q.   Middle of page 4 under Scope:
11    This policy is subject to any local or
12    jurisdictional legal or regulatory
13    requirements applies to. I'm omitting
14    some of the next line. But it then says:
15    Any person having access to FDM or
16    customer assets.
17          Did the FTX debtors pre-petition
18    see themselves as having access to
19    customer assets?
20          MR. GLUECKSTEIN: Object to the
21    form.
22    A.   I cannot speak to what the
23    pre-petition management team saw
24    themselves as having access to or not.
25    That would require me to know their

Page 337

1
2     intent.
3     Q.   Sitting here today, did FTX in
4     fact have access to customer assets
5     pre-petition?
6           MR. GLUECKSTEIN: Objection to
7     the form.
8     A.   The phrasing of that question
9     suggests that -- it requires me to weigh
10    in on the ownership of assets because you
11    asked me were they in possession of
12    customer assets. As I've clarified and
13    testified previously, the position of the
14    FTX Recovery Trust is that all assets in
15    its possession are property of the estate.
16          MR. PROULX: Let's take a short
17    break here. Let's first get -- off
18    the record, please.
19          THE VIDEOGRAPHER: 5:27 p.m.
20    Off the record.
21    (Recess taken.)
22          THE VIDEOGRAPHER: 5:46 p.m.
23    Back on the record.
24    BY MR. PROULX:
25    Q.   Mr. Coverick, at a number of

1
2 points today, we talked in passing about
3 the margin program that the FTX exchange
4 had.
5         When I refer to margin program,
6 do you know what I'm referring to?
7     A.   I -- I can summarize how I would
8 refer to it and you can -- can you tell me
9 if I'm correct?
10     Q.   Sure.  Again I'm just trying to
11 streamline things here.
12         I see that you define it on page
13 13 of your declaration.  I'm happy to use
14 that same definition for purposes of our
15 discussion moving forward today and
16 tomorrow.
17     A.   Yes, sir, that sounds good to
18 me.
19     Q.   Okay.
20         When was the margin program --
21 let me take a step back.
22         What is the margin program,
23 generally speaking?
24     A.   The margin program was a
25 component of the exchange which allowed

1
2 customers to borrow value from other
3 customers to build positions in their
4 account that they would otherwise not have
5 sufficient value to build absent the
6 borrowing.
7     Q.   When did FTX implement that
8 program?
9     A.   I don't recall the specific date
10 that FTX implemented that program.
11     Q.   What was the purpose of the
12 program from FTX's perspective?
13     A.   I can't speak to what FTX's
14 perspective was at the time, but I can
15 speak to what it was designed to do.
16     Q.   Is that different than your -- I
17 know you gave a general description of the
18 program.
19         Was it designed to do something
20 other than what you just testified to?
21     A.   To my knowledge, no.  It was
22 designed -- just to repeat, or rephrase,
23 it was designed to allow customers to
24 borrow from our customers, to conduct
25 trading activities subject to certain

1
2 requirements.
3     Q.   What benefits, if any, did the
4 existence of the margin program provide
5 FTX?
6     A.   Any benefit to FTX would be the
7 same benefit that any of the products it
8 offered provided the company, which would
9 be making the exchange an attractive place
10 for cryptocurrency traders to conduct
11 trading activities and therefore increase
12 revenue by virtue of having more
13 participants on the exchange.
14     Q.   I -- I saw in paragraph 14 of
15 your declaration that you refer to the
16 margin program as a, quote, competitive
17 peer-to-peer market.
18         Is that correct?
19     A.   Yes.
20     Q.   Did other -- who were FTX --
21 FTX's competitors within the
22 cryptocurrency exchange market?
23     A.   That's not what I was
24 referring -- I was not referring to
25 external competitors when I -- when I

1
2 drafted or -- and -- and was involved in
3 the drafting of my declaration.
4         When I wrote the word
5 "competitive" I intended to mean that the
6 market for lending was set on a
7 competitive basis, meaning that users
8 could make offers at certain rates at
9 which they were willing to lend.  So it
10 was a competitive market from the
11 perspective of the customers participating
12 in the program.  That -- that's -- that's
13 what I meant when I said "competitive."
14     Q.   Understood that, and I
15 appreciate that -- that clarification in
16 terms of your meaning here.
17         Let me ask my question again
18 though, which is that did FTX have
19 competitors in the market for
20 cryptocurrency exchanges?
21     A.   Yes.
22     Q.   Who were some of those?
23     A.   One of those would be Binance.
24     Q.   Did those competitors, to your
25 knowledge and FTX's knowledge, offer their

Page 342

1
2  customers a -- some kind of margin trading
3  program?
4      A.   I'm aware of the existence of
5  other peer-to-peer lending programs on
6  other exchanges, but I do not know the
7  specifics of those programs.
8      Q.   Why did FTX implement the margin
9  program again?  I -- I'm not sure if I
10  understood the testimony.
11      A.   I -- I cannot -- my testimony
12  was I cannot speak to why they offered the
13  program.
14          I can speak to what the program
15  did, what the function of the program was.
16      Q.   Let's talk about the function of
17  the program.
18          Were there ways for a customer
19  to borrow from, on the FTX exchange, to
20  borrow from other customers outside of the
21  peer-to-peer margin program?
22      A.   To borrow from other customers
23  outside of the peer-to-peer program, I am
24  not aware of any formal program that would
25  allow customers to do so.

Page 343

1
2      Customers could transfer amounts
3  to other customers.  So as a technical
4  matter, it's possible that there were
5  customers that could have other agreements
6  outside the confines of the exchange, but
7  I'm not aware of any circumstances like
8  that.
9      Q.   The only FTX official program
10  for peer-to-peer lending and borrowing was
11  its margin program?
12      A.   Correct.
13      Q.   All right.
14          Let's turn to -- this program,
15  the margin program, governed by any sort
16  of documents or written terms?
17      A.   My understanding, although I
18  cannot interpret the document because I'm
19  not a lawyer, my understanding is the
20  Terms of Service governed the -- the use
21  of the exchange.
22      Q.   And specifically the margin
23  program on the exchange?
24      A.   That's my understanding.  But
25  again, I'm not a lawyer, so I can't speak

Page 344

1
2  to the legal aspect of that.
3      Q.   What sections of the Terms of
4  Service?  This is previously marked as
5  Exhibit 15, you want to pull that up.
6      A.   I can pull it up.  I can locate
7  a section that speaks to the borrowing
8  program, but again because I'm not a
9  lawyer, where a trace definitions or
10  understand the -- the -- you know, any
11  secondary relationships other sections
12  that the Terms of Service might have.  But
13  if you know where it is for efficiency --
14      Q.   No, I just want to make sure I
15  understand your -- your position on -- on
16  the Terms of Service as applied to the
17  margin program.
18          MR. PROULX:  Let's give you a
19  new document here.
20          (Coverick Exhibit 18, Spot
21      Margin Trading Explainer April 4,
22      2022, Bates FTX 3AC 000045694-712, was
23      marked for identification, as of this
24      date.)
25  BY MR. PROULX:

Page 345

1
2      Q.   This is marked as Exhibit 18.
3  It's a document produced by FTX titled
4  "Spot Margin Trading Explainer"
5  purportedly dated April 4th, 2022.
6          Are you familiar with this
7  document?
8      A.   Yes.
9      Q.   Are you familiar in connection
10  with your deposition preparation or
11  otherwise?
12      A.   I am familiar with it in
13  preparation of my deposition.
14      Q.   Is it FTX's position that this
15  document is a -- that this document
16  governed the terms of FTX's margin program
17  pre-petition?
18      A.   Again I'm not a lawyer, so I
19  can't speak to legally what governs an
20  aspect of the exchange other than my
21  general understanding that the terms of
22  service are the -- are the document that
23  govern use of the exchange at the time the
24  exchange was operating.
25          The estate's --

Page 346

1
2    Q.   What --
3    A.   I'm sorry.
4    Q.   Please finish your answer.
5    A.   The estate's position is this
6    was a webpage on -- on the FTX website
7    that we often refer to as a help page
8    which provided additional information to
9    customers.
10   Q.   Was it meant to supplement the
11   Terms of Service in some way, in FTX's
12   view?
13   A.   I am not aware of what it was
14   meant to do other than the fact that it
15   existed and it contained information
16   relating to, in this case the spot margin
17   program.  There were many help pages that
18   provided information about different
19   facets of the exchange.
20   Q.   Are these types of documents
21   that you're describing purely
22   informational for customers, or do they
23   govern customers' relationships with the
24   FTX exchange?
25   MR. GLUECKSTEIN:  Objection; it

Page 347

1
2    calls for a legal conclusion.
3    A.   I can't provide a legal opinion
4    on what governs the use of the exchange.
5    Again, with the exception that it's my
6    general understanding the Terms of Service
7    are the procedure governing document of
8    the use of the exchange at the time the
9    exchange was operating.
10   It's my understanding that this
11   was a help page that provided information
12   and the FTX Recovery Trust is not taking a
13   position that it did or did not supplement
14   the Terms of Service.
15   Q.   And is it also not taking a
16   position on whether it did or did not
17   govern the terms of the margin program
18   pre-petition?
19   MR. GLUECKSTEIN:  Objection;
20   calls for a legal conclusion.
21   A.   Again, I'm not a lawyer.
22   My understanding is that help
23   pages were not governing documents of the
24   exchange.
25   Q.   Who authored this document?

Page 348

1
2    A.   I do not know.
3    Q.   Do you know whether this
4    document was, in fact, on the FTX webpage
5    as of April 4th, 2022?
6    A.   I know that's what it says.  I
7    have no reason not to believe that date is
8    accurate, but I cannot confirm that
9    specific date.
10   Q.   Same answer for FTX, it can't
11   confirm that specific date?
12   A.   I am not aware if FTX is able to
13   perform certain analysis or investigation
14   to see at what specific time this was live
15   on the website.  I -- I do not know what
16   our ability is in that regard.  It doesn't
17   mean that we can't do it; I just don't
18   know that technical question.
19   Q.   Has FTX undertaken any
20   investigation as to whether this document
21   was live on the website as of June of
22   2022?
23   A.   My understanding is that FTX has
24   exhausted every measure available to it to
25   uncover information, including the

Page 349

1
2    contents of the website.
3    The FTX Recovery Trust does not
4    have any information, that I'm aware of,
5    that would suggest otherwise.
6    Q.   Does FTX have any information as
7    to whether or not it complied or adhered
8    to the policies set forth in this document
9    pre-petition?
10   MR. GLUECKSTEIN:  Object to the
11   form; mischaracterizes the document.
12   A.   I would not characterize the
13   document as a policy.  I would
14   characterize it how I did in my previous
15   answer, which was that it's a help page
16   that contains information for customers.
17   Q.   Does FTX have any information as
18   to whether or not it complied or adhered
19   to this help page that contains
20   information for customers?
21   MR. GLUECKSTEIN:  Object to the
22   form.
23   A.   I have not analyzed and
24   reconciled every word in this document
25   with the code base of the exchange.  To --

Page 350

1
2 to answer that question accurately would
3 require me to do so with my team.
4      Having said that, I am not aware
5 of any material inconsistency between what
6 I see in this document and how the code
7 base of the exchange was structured, as I
8 understand it, but that does not mean
9 there may not be some minutia in the
10 document that's inconsistent.  I just
11 haven't performed that analysis.
12   Q.   I'm -- I'm happy to make a
13 representation that there are not a
14 significant number of these help -- to use
15 your language, help pages that contain
16 information for customers that have been
17 produced in this litigation.
18      My question is for any of these
19 help pages containing information for
20 customers, has FTX undertaken the analysis
21 to determine whether they are consistent
22 with the code base of the exchange?
23      MR. GLUECKSTEIN:  Object to the
24 form of the question.
25   A.   My declaration does not speak to

Page 351

1
2 consistency of help pages with the
3 underlying code base of the exchange.
4      To my knowledge, I would have to
5 re-read it, but I do not believe the
6 recovery trust's objection to 3AC's claim
7 speaks to the consistency of help pages
8 with the underlying code base of the
9 exchange.
10      I am aware on certain help pages
11 that there are immaterial and unmeaningful
12 differences in the way some formulas are
13 described versus how certain formulas for
14 the maintenance margin fraction were coded
15 in the exchange database, but it would not
16 change the output of those calculations.
17 They're descriptive differences.  But my
18 team and I have not undertaken an
19 exhaustive analysis to reconcile every
20 aspect of the help pages with the
21 underlying code base of the exchange.
22   Q.   On page 2 of this document,
23 there are some formulas toward the bottom
24 under the overall section titled "How Does
25 Margin Work For Borrowing?"  There's a 1

Page 352

1
2 and a 2:  If token quantity is positive
3 versus if token quantity is negative.
4      Do you see those?
5   A.   I do.
6   Q.   Are these formulas intending to
7 calculate the margin trading account
8 value, as you used that term in your
9 original declaration?
10   A.   I'm sorry, can you repeat the
11 exact formula you're referencing?
12   Q.   Yeah, just I'm referencing the
13 formula that appears at the bottom of page
14 2 of this document, Exhibit 18.  There's a
15 number 1 and a number 2.
16      And I'm asking if this is meant
17 to get at the margin trading account
18 value, as you used that term in your
19 declaration.
20   A.   (Witness reads document.)
21      I believe that is the formula --
22 that's -- that's a formula consistent with
23 the formula used to calculate margin
24 trading account value.
25   Q.   Going up to the top of that --

Page 353

1
2 or, to the beginning of that section which
3 since begins in the middle of the page
4 again.  Again we're under the section how
5 does margin work for borrowing.  It says:
6 Your spot margin positions are
7 cross-margined with your futures position.
8 There's no separate spot margin
9 requirement you have to monitor.
10      Do you see that sentence?
11   A.   Yes, sir.
12   Q.   What does it mean for spot
13 margin positions to be cross-margined with
14 futures positions?
15   A.   What it means is that -- well, I
16 don't know the intent of language of the
17 author, but in general, as I testified to
18 earlier, the margin -- the maintenance
19 margin level included both a requirement
20 for leveraged positions as well as for the
21 notional value of future positions as the
22 notional value of future positions
23 represented some level of exposure to
24 underlying price movements in that
25 contract, and so both were aspects of the

MAGNA ▶
LEGAL SERVICES

Page 354

```
1
2    required collateral level or -- or margin
3    trading account value that was needed to
4    stay in compliance.
5        Q.   When you say that the notional
6    value of future positions represented some
7    level of exposure to the underlying price
8    movements, what do you mean by that?
9        A.   What I mean is, for example, if
10   you had millions of dollars of notional
11   value exposure.  By -- by opening future
12   contracts, you had a high level of
13   exposure to movements in the reference
14   price for that future contract.
15   Therefore, the USD balance in your account
16   could change rapidly, and that is the
17   reason future -- notional value of future
18   positions are taken into account when
19   calculating the required maintenance
20   margin.
21       Q.   Turn to page 4 of this document.
22   There's a section titled "Lending" at the
23   bottom of that page.
24       A.   Page 4.
25            I'm sorry, are the pages
```

Page 355

```
1
2    numbered?
3        Q.   They're not.
4        A.   Okay.
5        Q.   I'm happy to give you the Bates
6    number.  Sometimes it can be unwieldy, but
7    it ends in 45697.
8        A.   Yes, sir.
9        Q.   Okay.
10            Do you see the section titled
11   "Lending" toward the bottom?
12       A.   Yes.
13       Q.   At the end of that first
14   paragraph there's sentence:  Lenders bear
15   no counterparty risk.  FTX guarantees
16   interest payments for however long your
17   funds are -- I think the final part of the
18   page is cut off -- borrowed even if the
19   brother gets liquidated.
20            Do you see that?
21       A.   I do.
22       Q.   What did FTX mean by this?
23       A.   I --
24            MR. GLUECKSTEIN:  Object to the
25       form.
```

Page 356

```
1
2        A.   I cannot know what FTX or the
3    author of this document meant by that, but
4    I do know it's inconsistent with the Terms
5    of Service and how the exchange operated.
6        Q.   What provision of the Terms of
7    Service are you referring to in that
8    statement?
9        A.   I -- I don't have the sections
10   memorized.  So I would be happy to flip
11   through and find the section on -- on
12   borrowing, but my understanding is that
13   the Terms of Service specify that the
14   lenders bear the risk of loss and does not
15   say that FTX guarantees the loss, or
16   protection from loss.
17       Q.   Do flip back to the Terms of
18   Service.  It is Exhibit 15.
19       A.   Yes, sir.
20       Q.   I'm going to hazard a guess that
21   you may have in mind Section 2.4.1, which
22   is on page 3 of that document.
23            You -- you can read it and let
24   me know if that's what you had in mind in
25   your last statement.
```

Page 357

```
1
2        A.   Yes, sir, this is exactly the
3    provision I had in mind.
4            Again, I cannot interpret this
5    document.  I just know that it's
6    inconsistent language with what was in the
7    help page.  More importantly, I know that
8    it's inconsistent with how the code base
9    of the exchange operated.
10       Q.   Well, let's talk about the --
11   the first comparison.  Section 2.4.1 talks
12   about a risk of, quote:  Loss of an unpaid
13   principal.
14            Do you see that?
15       A.   Yes.
16       Q.   Then flipping back to the
17   Exhibit 18 which we were just in, you
18   might want to keep that to the side of
19   you.
20       A.   Yes, sir.
21       Q.   That talks about FTX
22   guaranteeing interest payments.  I don't
23   think it says principal there.
24            How are they inconsistent?
25       A.   My understanding of this
```

MAGNA ▶
LEGAL SERVICES

Page 358

1
2  document is that it specifies there is
3  high risk of participating in the margin
4  program.
5        Again, I can't interpret this
6  document and give a legal opinion on its
7  meaning, but my understanding is that
8  interest payments nor principal were
9  guaranteed by FTX by virtue of how the
10  exchange actually operated and how the
11  code base was structured.
12     Q.   And that was the second
13  category, the second comparison.  I was
14  just with that question referring to the
15  first two -- these two documents, and I
16  was wondering if you have any factual
17  position on how they differ.
18        MR. GLUECKSTEIN:  Objection;
19  asked and answered.
20     A.   My factual difference is one is
21  a help page on a website; one is a terms
22  of service.  One re -- one, the help page
23  requires an understanding of the intent of
24  the author; the other requires a legal
25  opinion that I'm not able to give.

Page 359

1
2     Q.   Is FTX aware of instances where
3  customers participating in the lending
4  program who lend assets did, in fact, lose
5  their unpaid principal pre-petition?
6     A.   Well, as -- as a -- as a global
7  statement, all customers of FTX lost
8  access to their account balance in its
9  entirety just prior to the petition date.
10     Q.   Let's move before that.
11        Are you aware of any instances
12  in which lending customers pursuant to the
13  margin program lost an unpaid principal?
14     A.   It depends how you define
15  "lost."
16     Q.   How does FTX define it?
17     A.   I don't.
18        MR. GLUECKSTEIN:  Object to the
19  form.
20  BY MR. PROULX:
21     Q.   I'm using the -- the words that
22  appear on the -- on FTX's own document
23  here, and FTX doesn't have a position on
24  those words?
25     A.   I am not -- I don't see

Page 360

1
2  something where the word "lost" is
3  defined.  That was the way you phrased the
4  question, and I'm just saying that "lost"
5  could have different meanings.
6     Q.   Is FTX aware of any instances
7  pre-petition and pre-account freezing,
8  whatever you've just referenced, where
9  lending customers did not receive the
10  interest payments that were owed to them
11  pursuant to the margin program?
12     A.   I am not aware of instances,
13  although I do not have the transaction
14  history of every account memorized, but I
15  am not aware of instances where accounts
16  were not credited for interest payments
17  associated with the lending -- with the
18  margin program.
19     Q.   With respect to 3AC
20  specifically, are there any documents,
21  other than the Terms of Service, that
22  govern its participation in the margin
23  program?
24     A.   There are related documents that
25  I understand govern aspects of their

Page 361

1
2  account that tie in to the margin program.
3     Q.   What are those related documents
4  you have in mind?
5     A.   Those would be the line of
6  credit agreements that impacted the
7  collateral value at any point in time of
8  3AC's account.
9     Q.   So FTX -- is FTX's position that
10  there were no guarantees of either
11  principal or interest owed to lending
12  customers in the margin program by FTX?
13     A.   FTX is aware of statements made
14  regarding program -- a program that
15  effectively backstopped aspects of the
16  margin program.  I'm referring to
17  what's -- what's often referred to as an
18  insurance fund.  But FTX is not aware of
19  any explicit guarantees that losses could
20  not be incurred as a result of the margin
21  program.
22     Q.   Is FTX aware of any internal
23  policy documents that were not provided to
24  customers with respect to the terms of
25  operation of the margin program?

**MAGNA** ▸
LEGAL SERVICES

Page 362

1
2      A.   Can you repeat the question?
3      Q.   Yeah.
4           Are there any other documents,
5   internal documents, FTX is aware of that
6   speak to the terms of the -- of the margin
7   program?
8      A.   I cannot recall any specific
9   internal documents.  There -- there may be
10  internal emails, but I -- I don't have all
11  those committed to memory.
12     Q.   You're not sure?
13     A.   It's possible there are internal
14  documents.  I just cannot recall them as I
15  do not have all the documents committed to
16  memory.
17     Q.   What FTX customers, if any, were
18  permitted to participate in the margin
19  program pre-petition?
20          MR. GLUECKSTEIN:  Object to the
21  form.
22     A.   In general, customers could opt
23  in to the margin program subject to their
24  account being in compliance with all other
25  requirements of the exchange.

Page 363

1
2      Q.   Customer didn't need to have a
3   minimum account balance or anything like
4   this to participate in the margin program?
5      A.   I cannot recall if there are
6   specific minimum balance requirements or
7   not.
8      Q.   Did the margin program involve
9   lending of digital assets?
10     A.   Customers could lend both U.S.
11  dollars and digital asset balances within
12  their account balance.  That's my
13  understanding, yes.
14     Q.   What do you mean digital assets
15  within their account balance?
16     A.   So for example, if an account
17  balance included some bitcoin and some
18  U.S. dollar balance, a customer could
19  choose to lend either the U.S. dollars or
20  the bitcoin.  I'm not sure that every
21  digital asset entitlement that could be a
22  part of an account balance could be lent,
23  but I know that there were digital assets
24  that could be lent.
25     Q.   So an account balance was, at

Page 364

1
2   least for purposes of lending, composed of
3   both digital assets and U.S. dollar
4   balances?
5      A.   That's my understanding,
6   correct.
7      Q.   A customer wasn't only lending
8   it out -- who was participating in the
9   margin program wasn't only lending out
10  U.S. dollars; they were also lending out
11  digital assets?
12          MR. GLUECKSTEIN:  Object to the
13  form; misstates the testimony.
14     A.   As I said, a cust -- customers
15  had the ability to lend digital assets,
16  and they also had the ability to lend fiat
17  balances within their account balance.
18     Q.   Did they need an entitlement to
19  those two types of assets to lend them out
20  pursuant to the lending program?
21          MR. GLUECKSTEIN:  Object to the
22  form.
23     A.   Those components of the account
24  balance had to be in the account balance
25  for the customer to be able to lend them

Page 365

1
2   on the exchange.  In other words, I -- I
3   cannot think of a scenario where a
4   customer could lend something that it did
5   not have in its account balance.
6      Q.   So a customer had digital assets
7   in its account balance but not in its
8   account.  Is that FTX's position?
9      A.   No.  As I said previously, the
10  position of the FTX Recovery Trust is that
11  an account balance is comprised of all
12  debits and credits related to trading
13  activities, deposits, withdrawals, and any
14  other relatives which sum together
15  represent its aggregate account balance
16  which is the singular entitlement against
17  the exchange.
18          As I also testified, it is not
19  possible for cryptocurrency to be in an
20  account because an account is solely
21  comprised of ledger entries of debits and
22  credits.
23     Q.   Is a customer lending, pursuant
24  to the margin program, lending out the
25  credits and debits in its account or the

**MAGNA** LEGAL SERVICES

1
2 digital assets associated with its
3 account?
4     A.   Like all other activities on the
5 exchange other than deposits and
6 withdrawals, activity on the exchange did
7 not result in the movement of digital
8 assets.  So when a customer,
9 quote/unquote, lent to another customer,
10 what effectuated that transaction was an
11 entry on the ledger of the exchange.  It
12 did not result in the movement of fiat
13 currency or cryptocurrency on the
14 blockchain.
15     Q.   So the relationship between the,
16 quote/unquote, lending customer and the
17 underlying asset that is being lent out is
18 what?
19     A.   I'm sorry, can you --
20         MR. GLUECKSTEIN:  Object to the
21     form.
22 BY MR. PROULX:
23     Q.   Does the lending customer own
24 the digital assets that are being lent out
25 pursuant to the margin program?

1
2     A.   As I've testified previously,
3 the FTX Recovery Trust's position is that
4 the FTX Recovery Trust and prior to the
5 effective date the FTX debtors own the
6 assets of the exchange.
7     Q.   So does that mean lending
8 customers were lending out FTX's assets to
9 borrowing customers?
10         MR. GLUECKSTEIN:  Object to the
11     form.
12     A.   It means that lending customers
13 entered into an on-ledger transaction to
14 change the composition of both their
15 account balance and the account balance --
16 the composition of the account balance of
17 the party it was lending to within the
18 context of the exchange.  As I just
19 testified, there were no movement of you
20 think underlying assets when ledger
21 entries were made on the exchange with the
22 exception of when can you see deposited
23 cryptocurrency onto the exchange and when
24 customers withdrew cryptocurrency or fiat
25 from the exchange.

1
2     Q.   So lending -- lending -- does
3 that mean that lending customers weren't
4 actually lending any digital assets at
5 all; they were lending ledger credit or
6 debit?
7     A.   I -- I believe that calls for a
8 legal conclusion that I'm not qualified to
9 make.
10         My understanding and what I have
11 verified is that when a customer
12 transacted on the exchange, with the
13 exception of deposits and withdrawals, it
14 simply resulted in the entry of debits an
15 credits on the exchange and there was a
16 movement of underlying assets.
17     Q.   Let me ask it -- thank you for
18 that.  Let me ask it this way just to make
19 sure I'm understanding correctly.
20         When a lending customer wants to
21 lend one bitcoin to a borrowing customer
22 pursuant to the margin program and that
23 bitcoin is on the exchange, does the
24 lending customer first obtain title to
25 that bitcoin from FTX before lending it to

1
2 the borrowing customer?
3         MR. GLUECKSTEIN:  Objection;
4     calls for a legal conclusion.
5     A.   Again, I'm not qualified to
6 opine on circumstances under which title
7 may or may not transfer to a specific
8 asset.
9         The lending and borrowing
10 relationships on the exchange are a
11 product of changing compositions of
12 aggregate entitlements against the
13 exchange.
14     Q.   Are lending customers then
15 lending out their entitlements to
16 borrowing customers?
17         MR. GLUECKSTEIN:  Objection;
18     calls for a legal conclusion.
19     A.   When a customer lends to another
20 customer, and -- and to be clear,
21 customers did not lend directly to one
22 another in a one-to-one sense.  As I go
23 through in my declaration, it -- there was
24 a pool system where total borrow demand
25 and total lend supply was matched using a

**MAGNA** ▶
LEGAL SERVICES

Page 370

1
2  certain algorithm, meaning one pool went
3  to another pool.  There were debits and
4  credits made to the associated accounts.
5  On the borrow side, there would be an
6  appropriate debit and credit to the
7  positions being borrowed, and the flip
8  side would happen to the customers
9  lending.  Those transactions occurred and
10 were recorded on the exchange ledger.
11     Q.   Did the digital assets stay at
12 the exact same address the entire time
13 during the lending and borrowing and
14 repayment process?
15     A.   Digital assets were moving
16 constantly amongst addresses, but the
17 entry of a transaction such as a lending
18 transaction or any other trade on the
19 exchange did not result in the movement of
20 an underlying asset unless that
21 transaction was a deposit on to the
22 exchange or withdrawal from the exchange.
23     Q.   Thank you for that
24 clarification.
25         When a borrowing customer

Page 371

1
2  borrowed a, quote/unquote, asset from a
3  lending customer, could that borrowing
4  customer withdraw that asset from the
5  exchange?
6     A.   It depends.
7     Q.   What is an example where it
8  could?  What is an example where it
9  couldn't?
10    A.   A customer could withdraw assets
11 from the exchange to the extent it
12 satisfied the margin requirements and had
13 a positive balance of that subcomponent of
14 their account balance.  So for example,
15 you could not withdraw U.S. dollars if
16 your U.S. dollar balance was negative, nor
17 could you withdraw bitcoin if your bitcoin
18 balance was negative absent entering into
19 other transactions to convert those
20 subcomponents of the account balance.
21        So an example of when someone
22 could withdraw is if they borrowed a
23 bitcoin position in their account or
24 borrowed a U.S. dollar position in their
25 account, maintained a positive position

Page 372

1
2  with respect to that ticker and satisfied
3  the margin requirements of the account,
4  they could withdraw assets from the
5  exchange if they satisfied those
6  requirements.
7     Q.   So, in the second scenario where
8  a customer obtains one, to use a very
9  simple example I think we've been using
10 together over the course of today, when a
11 customer borrows one bitcoin pursuant to
12 the margin program and has otherwise
13 satisfied all applicable margin or
14 collateral requirements to withdraw that
15 asset, it could in fact withdraw that
16 asset?
17    A.   To be clear, and if I -- if I
18 said this, I misspoke, that asset does
19 not -- is not identifiable because it's
20 simply a ledger transaction on the
21 exchange.
22        My testimony is that if an
23 account had a positive bitcoin balance
24 within its account balance at a point in
25 time and met the maintenance margin

Page 373

1
2  requirements, it could withdraw bitcoin
3  from the exchange to the extent it
4  maintained above that level.
5     Q.   And just to use the super
6  simplified example, subject to all those
7  caveats you just mentioned, if a borrowing
8  customer received one bitcoin pursuant to
9  the margin program, could it review --
10 could it withdraw a bitcoin from the
11 exchange?
12    A.   Subject to all of those other
13 requirements.  It's tough to do a
14 hypothetical that simple because the
15 account balance would likely have other
16 aspects and other subcomponents to it, but
17 subject to meeting the maintenance margin
18 requirements, having a positive account
19 balance, and having a positive balance
20 within their account balance to that
21 ticker, my understanding is they could
22 withdraw an asset with that ticker.
23    Q.   So then the lending customers
24 weren't lending out specific assets to the
25 borrowing customer, right?

MAGNA
LEGAL SERVICES

1
2      A.    Again there was no movement of
3  underlying assets, and assets cannot be
4  traced to a specific customer account once
5  they're deposited on to the exchange
6  and -- and because there's no underlying
7  movement of assets, you can't trace all of
8  the trades that occur on the exchange to
9  other assets, but assets could be
10  withdrawn from the exchange subject to the
11  applicable requirements.
12      Q.    What happens if a lending
13  customer lends a bitcoin and prior to
14  repayment of that bitcoin ceases
15  participation in the margin program?
16      A.    I'm just trying to understand
17  your question.  If a lender lends a
18  bitcoin and prior to the repayment of that
19  bitcoin they want to opt out of lending?
20  Is that -- is that what you're asking?
21      Q.    Yes.
22      A.    So, the way the -- the margin
23  program worked with regard to borrowing
24  and lending was that at the beginning of
25  every hour, there was a calculation the

1
2  exchange performed automatically to
3  aggregate what was referred to as the
4  borrow demand, so all customers requesting
5  to borrow assets by whatever tickers they
6  were requesting to borrow.  That's what I
7  referred to as the aggregate borrow
8  demand.
9          There was also a calculation of
10  customers willing to lend those assets by
11  ticker and at what rate they were willing
12  to lend.
13          There was an algorithm that then
14  matched and -- and sorted the lending
15  offers by interest rate lowest to highest,
16  sort of if you can envision a spreadsheet
17  of --
18      Q.    Yeah, I think you summarized
19  this in your declaration; is that right?
20      A.    I do, but it's relevant to the
21  question you asked if --
22      Q.    Please feel free to answer.
23      A.    -- if you don't mind.
24      Q.    Yeah, of course.
25      A.    That -- that process sorts the

1
2  lending offers by interest rate, adds up
3  the dollar amount or the value of those
4  offers to -- to get to the same number as
5  the borrow demand.  Whatever the highest
6  interest rate is is applied to all loans.
7  So the lenders receive that highest
8  interest rate within that calculation, the
9  borrowers pay that rate, and that
10  calculation is done every time.
11          So, if a customer decided that
12  they wanted to opt out after lending, they
13  could do so, and each hour as that
14  calculation was performed, there would be
15  a different customer willing to
16  participate in the pool to effectively top
17  off the pool to lend to those pool of
18  borrowers.  But again, there's no
19  one-to-one relationship between borrowers
20  and lenders, so it's not as if a borrower
21  still had a bitcoin from a specific
22  customer.  It was a pool-to-pool
23  relationship.
24      Q.    And how -- how would the FTX
25  exchange ensure that a different customer

1
2  performs that top-off you referenced
3  dollar-for-dollar if -- if a lending
4  customer opts out or pulls out or
5  terminates its participation in the margin
6  program?
7          MR. GLUECKSTEIN:  Object to the
8      form and misstates the testimony.
9      A.    I can't possibly know the amount
10  of lending offers versus borrow offers at
11  every point in time the exchange operated,
12  but it's my general understanding that
13  there were always ample offers to satisfy
14  the borrow demand.  The -- the question
15  was one of rate.  At a certain rate, there
16  were borrowers willing to lend -- or there
17  were lenders willing to lend, and that
18  calculation would be done every hour.
19      Q.    A lender shall a lending
20  customer in the margin program who lends
21  out a certain amount of bitcoin subject to
22  compliance with any applicable collateral
23  or margin requirements, can it withdraw
24  from the exchange that same quantity of
25  bitcoin?

MAGNA ▶
LEGAL SERVICES

1
2      A.   It depends what their aggregate
3  balance of bitcoin is.  They -- a customer
4  does not have to lend all of their
5  entitlements to a given ticker.
6      Q.   I'm not referring to all of
7  their entitlements.  I'm referring to some
8  number of bitcoin just to use a very
9  simple example.
10     A.   Well, a simple example, and you
11 can tell me if this answers your question,
12 if a user lent all of their bitcoin, for
13 example, they would not have bitcoin
14 available to withdraw from the exchange
15 while that bitcoin is being lent into the
16 margin program.
17     Q.   Even though they are
18 participating in the margin program?  I
19 thought the margin program allows
20 borrowing subject to a deduction of the
21 U.S. dollar balance?
22     A.   I'm sorry, can you repeat the
23 question?
24         MR. GLUECKSTEIN:  Object to the
25     form.

1
2  BY MR. PROULX:
3      Q.   Sure.
4          In your hypothetical, the
5  lending customer lends all of its bitcoin
6  out pursuant to the margin program.
7      A.   Okay.
8      Q.   Do you agree so far?
9      A.   Well, I'm following the example.
10     Q.   So, that's the -- that's the --
11 the premise.  And the question then
12 becomes can that lending customer withdraw
13 from the exchange the same amount of
14 bitcoin?
15     A.   I answered that question, and
16 that was part of my original answer with
17 regard to when customers can withdraw
18 assets from the exchange.  One of the most
19 basic requirements is that they had to
20 have a positive balance in that
21 entitlement such that if someone went lent all
22 of their balance in that entitlement, they
23 would not have that asset available to
24 withdraw from the exchange while they were
25 participating in the lending program.

1
2      Q.   Well, let's -- I want to make
3  sure I understand this.
4          So, a customer lends out all of
5  its bitcoin pursuant to the margin
6  program, has no more bitcoin allocated to
7  its account at that moment in time
8  pursuant to the ledger, but has well more
9  than enough positive U.S. dollar fiat
10 currency balance to borrow that same
11 amount of bitcoin pursuant to the lending
12 program.
13         Can it withdraw that amount of
14 bitcoin in that scenario?
15     A.   It -- if it subsequently
16 borrowed bitcoin after lending bitcoin, I
17 would have to confer with my team how
18 mechanically that would work on the
19 exchange because that doesn't make
20 immediate sense to me why someone would
21 both borrow and lend bitcoin.  I would
22 think they would do one or the other.  But
23 to the extent that that happened and there
24 was a positive bitcoin balance within the
25 customer account balance, they could

1
2  withdraw bitcoin subject to the other
3  margin requirements.
4          But my earlier point was that if
5  they do not have a positive balance in
6  that entitlement at that point in time,
7  they cannot withdraw an asset from the
8  exchange.  That's related to that.
9      Q.   So this --
10     A.   Entitlement components of their
11 account balance.
12     Q.   In this context, the margin
13 trading and lending and borrowing process,
14 the specific collateral matters?  In other
15 words, how, if at all, does the overall
16 singular account balance affect whether or
17 not a customer can lend or withdraw
18 bitcoin?
19         Is your -- your testimony and
20 FTX's testimony that there has to be some
21 amount of bitcoin specifically to
22 participate in that program?
23         MR. GLUECKSTEIN:  Object to the
24     form of the question.
25     A.   I -- I -- I'm sorry.  I cannot

Page 382

1
2  follow that question.  Can you repeat
3  that?
4      Q.    Why are you -- why are there
5  limitations on a customer's ability to
6  lend or withdraw or borrow or withdraw
7  bitcoin so long as the customer maintains
8  a sufficient overall net account balance?
9      A.    Because there are margin
10  requirements that relate to all levered
11  positions or oper -- open futures
12  positions within the account, and if they
13  don't meet those requirements, they are
14  not -- the exchange would not let a
15  customer conduct a withdrawal that would
16  cause them to go below the maintenance
17  margin requirement and therefore be
18  liquidated.  It prevented customers from
19  doing that.
20      Q.    My scenario assumes compliance
21  with any applicable margin or collateral
22  requirements.
23          MR. GLUECKSTEIN:  Object to the
24  form of the question.
25      A.    Then, I'm sorry, I don't know

Page 383

1
2  the question.
3      Q.    We'll come back to it.
4          When a customer who lents --
5  lends digital assets pursuant to the
6  margin program receives its principal
7  back, how is that mechanical -- how does
8  that mechanically happen?  What happens on
9  the FTX exchange at that moment?
10      A.    The ledger entry, in the
11  simplest example, just to stick with U.S.
12  dollars, would be a customer that lent
13  cryptocurrency -- or, I'm sorry.  U.S.
14  dollars when they lent the money or when
15  they -- when they lent that value, it
16  removed the -- there was a difference
17  between the customer's total balance and
18  their available balance, and so the -- the
19  exchange both tracked how much U.S.
20  dollars the customer had in their account
21  balance as well as what was available
22  within that balance.  The available
23  balance if something was being lent in its
24  entirety would be zero, and once they
25  opted out of the program or were no longer

Page 384

1
2  matched based on the interest rate they
3  were offering, the available balance would
4  increase back to the full amount of their
5  USD balance under the assumption that
6  that's what they lent originally.
7      Q.    But this is all -- this is all
8  happening on the ledger and only on the
9  ledger; is that correct?
10      A.    Yes, sir.  The -- the borrowing
11  and lending transactions that are part of
12  the -- the margin program, as we define
13  it, were recorded on the ledger.
14      Q.    You talked about an algorithm, I
15  believe, in your declaration.  This is in
16  paragraph 15, to connect pools of
17  borrowers and lenders.
18          Do you recall that?
19      A.    Yes, sir.
20      Q.    What do you mean by an
21  algorithm?
22      A.    When I use the word "algorithm"
23  I am talking about the -- the code used to
24  connect the pools of borrowers and lenders
25  and -- and the math associated with that

Page 385

1
2  connection.
3      Q.    And is this -- this reviewer of
4  this code, is this something that your
5  team at Alvarez and Marsal assisted you to
6  understand?
7      A.    That's correct.
8      Q.    Anyone at FTX or the FTX
9  Recovery Trust assist with that
10  understanding of the code as well?
11      A.    I understand my team has spoken
12  with FTX employees.  As I testified to, I
13  believe, this morning, I have not spoken
14  with any FTX employees about the code base
15  of the exchange directly, but I understand
16  that part of my team's process to review
17  the code included speaking with FTX
18  employees.
19      Q.    And I'm specifically referring
20  here to this algorithm of connecting pools
21  of borrowers and lenders.
22          Is that -- is that true of -- of
23  connecting with FTX employees on that
24  particular subject as well?
25      A.    Yes, as part of the code base of

**MAGNA**
LEGAL SERVICES

Page 386

1
2 the exchange, that same answer is true.
3    Q.    Is each pool, as you use that
4 term, of borrowers and lenders
5 asset-specific?
6    A.    Each pool included the demand
7 and supply by ticker by interest rate.
8 Together those were added up, and when I
9 refer to them in my declaration, they
10 were -- they were aggregated together, but
11 the calculation is done on a
12 ticker-specific level.
13    Q.    When you say ticker, is that
14 something different from asset in FTX's
15 view?
16    A.    It's a way of describing asset
17 entitlements or borrower -- borrows.  It's
18 a way of describing any position in the
19 account in the exchange ledger.
20        Ticker was a field that
21 specified which asset was being traded at
22 any -- for any transaction.  So for
23 example, bitcoin would have a ticker
24 versus Ethereum would be a different
25 ticker versus U.S. dollars.  Every

Page 387

1
2 different type of asset and product even
3 that was offered on the exchange had a
4 different ticker.
5    Q.    Any types of products that could
6 be lent out under the margin program other
7 than a digital asset or a fiat currency
8 asset?
9    A.    I cannot recall a non-fiat or
10 cryptocurrency ticker being able to be
11 lent.  I do not -- I don't believe so.
12    Q.    You say in paragraph 16 of your
13 declaration that, quote, there is no
14 one-to-one borrower/lender relationship
15 for any specific margin loan.
16        What do you mean by one-to-one
17 borrower/lender relationship?
18    A.    I just mean that one customer
19 does not lend to another directly.  As I
20 testified to, and as included in my
21 declaration, the program calculated
22 amounts of pools, one on the borrow side,
23 one on the lending side, and matched those
24 pools together.  So the lenders
25 represented a pool that lent to the pool

Page 388

1
2 of borrowers, but it was not as if you and
3 I were customers on the exchange and you
4 say, I'm lending to you.  It was a pool to
5 pool lending relationship.
6    Q.    Let me -- let me ask it this
7 way.
8        Let's say there are ten
9 customers in the lending pool and ten
10 customers in the borrowing pool for a
11 particular ticker or asset.  Could it be
12 the case that five of the lenders are
13 lending to four of the borrowers, or is it
14 always the case that ten of the lenders
15 are lending to ten of the borrowers, or
16 something else?
17        MR. GLUECKSTEIN:  Object to the
18     form.
19    A.    The entirety of the borrow pool
20 borrowed from the entirety of the lending
21 pool.  So in that matching process that I
22 described, also described as an algorithm
23 that sorts the lending offers, calculates
24 the highest interest rate once the borrow
25 demand is filled includes whatever number

Page 389

1
2 of lenders in your example, ten, if
3 there's ten lenders demanding to borrow,
4 all ten of the lenders -- and -- and it
5 doesn't -- to be clear, it doesn't have to
6 be the same number because it matches
7 dollar amounts, but all participating
8 lenders in the lender pool lend to all
9 borrowers in the borrower pool.
10    Q.    When you say it doesn't have to
11 be the same number, what are we talking
12 about, the same number of what?
13    A.    The same number of customers.
14 So for example, some customers could be
15 willing to lend large amounts.  Some
16 customers could be willing to lend small
17 amounts.  It's the -- it's the value or
18 the U.S. dollar value of the lending
19 offers that's matched with the U.S. dollar
20 value of the borrow demand.
21    Q.    If -- are there cases where the
22 lending pool for any particular lend --
23 excuse me.
24        Are there any cases where the
25 borrowing pool or any particular borrower

Page 390

1
2  in it is receiving a fractional amount of
3  a particular asset from the lending pool?
4        MR. GLUECKSTEIN:  Object to the
5  form.
6        A.   I believe it's possible to
7  specify a borrow request that is not in a
8  full unit.  For example, I -- I believe
9  you could borrow to the decimal place an
10  amount of bitcoin that didn't have to be
11  only the entire bitcoin.  Same for U.S.
12  dollars.  I'm not certain, but I believe
13  if you wanted to borrow pennies on top of
14  the dollar amount you could do so.  I'm --
15  I'm not certain of that so.
16        Q.   Can a customer deposit a
17  fractional amount of bitcoin onto the
18  exchange?
19        A.   I believe so.
20        Q.   Withdraw a fractional amount
21  of -- of a bitcoin?
22        A.   I believe so.
23        Q.   When a customer withdraws a
24  fractional amount of bitcoin, assuming
25  they were able to do so, does the bitcoin

Page 391

1
2  then become their asset once it's off the
3  exchange completely?
4        MR. GLUECKSTEIN:  Object to the
5  form; calls for a legal conclusion.
6        A.   Again, I can't speak to property
7  rights because I'm not a lawyer.
8        If a customer has cryptocurrency
9  in a wallet to which they have the private
10  key, they have the ability to move that
11  cryptocurrency.
12        Q.   Can a customer have, or FTX for
13  that matter, have a private key to a
14  fractional amount of a bitcoin?
15        A.   I -- I am not certain, but my
16  understanding is that bitcoin wallets
17  could contain fractional amounts of
18  bitcoin, but I'm not -- I'm not certain of
19  that.
20        I'm sorry, I should have said
21  bitcoin addresses.
22        Q.   What pools of -- of assets or
23  tickers did Three Arrows borrow from in
24  the June 12th through June 14 period?
25        A.   I would need to review what I

Page 392

1
2  believe is, you know, the documents
3  produced to Three Arrows Capital to
4  confirm, but I believe they predominantly
5  borrowed U.S. dollars.
6        Q.   And in -- in that time period,
7  is that predominantly borrowed U.S.
8  dollars during that time period itself or
9  had outstanding borrowings in U.S. dollars
10  from earlier time periods?
11        MR. GLUECKSTEIN:  Object to the
12  form.
13        A.   I'm -- I'm sorry, I want to make
14  sure I get the answer right.  Can you
15  rephrase the question?
16        Q.   Of course, yeah.
17        As of June 12th -- between June
18  12th and June 13th, to FTX's knowledge,
19  did Three Arrows Capital engage in any
20  borrowing pursuant to the margin program?
21        A.   So, one way that we have not
22  discussed today that you can incur a
23  negative USD balance on the exchange
24  outside of acquiring spot asset positions
25  by borrowing is that losses on perpetual

Page 393

1
2  future contracts that are realized in the
3  U.S. dollar balance can cause the U.S.
4  dollar to go further negative, thus
5  necessitating borrowing from the -- the
6  lending pool.  That happened.  3AC had a
7  negative dollar balance as of June 12th
8  and then subsequently incurred perpetual
9  future related losses during those two
10  days.
11        Q.   And when a customer borrowed in
12  connection with the futures contract on
13  the exchange, when they borrowed under the
14  margin program, they were borrowing U.S.
15  dollars only?
16        A.   Gains and losses from perpetual
17  futures were realized in the U.S. dollar
18  balance of the account.  And so if a
19  perpetual future loss resulted in any
20  customer's account going negative, that
21  would require -- their USD balance going
22  negative, that would require them to pull
23  from the margin program.
24        MR. PROULX:  Let's take a very
25  short break here.  We don't have much

Page 394

1
2    more.  I recognize we're probably
3    almost at our runtime.
4         MR. GLUECKSTEIN:  We are over
5    time.
6         MR. PROULX:  We are overtime?
7         THE VIDEOGRAPHER:  6:53 p.m.
8         Off the record.
9         (Recess taken.)
10        THE VIDEOGRAPHER:  7:03 p.m.
11        Back on the record.
12   BY MR. PROULX:
13   Q.    Mr. Coverick, is FTX aware of
14   any instances in which a lending customer
15   under the margin program was not repaid
16   the print it lent under that program?
17   A.    Again, there wasn't a repayment
18   of assets in a physical sense because
19   these were on-ledger transactions that did
20   not result in the underlying movement of
21   any cryptocurrency or fiat currency.
22        While I don't have the facts and
23   circumstances of every customer account
24   committed to memory, I am not aware of an
25   instance where a -- loss was debited to

Page 395

1
2    a lending customer's account balance, but
3    that does not mean that it could not
4    happen.
5    Q.    You mentioned earlier, if I
6    recall your testimonial, that once digital
7    assets were swept into the pool of
8    addresses that FTX controlled that there
9    was, from that point in time forward,
10   thousands of further transactions
11   involving those same assets.
12        Did I understand your testimony
13   correctly?
14        MR. GLUECKSTEIN:  Object to the
15   form.
16   A.    I don't think that's exactly
17   what I said.  I said depending on the
18   specific address, anywhere from hundreds
19   to thousands of subsequent movements from
20   addresses occurred.
21   Q.    And under what circumstances
22   would hundreds to thousands of subsequent
23   movements of addresses occur?
24   A.    Once the cryptocurrency was
25   moved from deposit addresses into

Page 396

1
2    commingled addresses, it was viewed and
3    there were -- there were programs,
4    computer programs, that would identify the
5    location of cryptocurrency when a
6    withdrawal request was made, and that
7    differed for different cryptocurrencies.
8    For example, bitcoin withdrawals utilized
9    a software program called bitcoin core, I
10   believe.  I believe the exact name is
11   referenced in the Mosley declaration.  But
12   that logic would dictate the movement of
13   bitcoin associated with withdrawal
14   requests.
15        Similarly, an aspect of the
16   bitcoin blockchain is that any time a
17   component or some of the bitcoin at an
18   address is moved, but not all of it, a
19   change address for the change or the
20   residual is automatically created and
21   the -- the change or residual that was not
22   moved is transferred to that new change
23   address, and that occurred very
24   frequently.  So the combination of the
25   prevailing logic that identified the

Page 397

1
2    location of cryptocurrency when withdrawal
3    requests from made, as well as aspects of
4    the blockchain like the change addresses
5    resulted in hundreds, if not thousands, of
6    movements from addresses.
7    Q.    The change addresses, did -- did
8    the underlying cryptocurrency assets move
9    outside of addresses held the private keys
10   to in connection with those changes?
11        MR. GLUECKSTEIN:  Object to the
12   form.
13   A.    Can you repeat the question,
14   please?
15   Q.    Sure.
16        The -- the change address events
17   that you've just referred to, did that
18   result in any assets that FTX had the
19   private keys to leaving FTX's possession?
20        MR. GLUECKSTEIN:  Object to the
21   form.
22   A.    Well, FTX has private keys to
23   the addresses, not the underlying
24   cryptocurrency.  The private key is
25   effectively like the password to access

Page 398

1
2  the address and move coins in or out of
3  that address.
4        When change addresses were
5  created, FTX maintained the private keys
6  to those change addresses.
7    Q.   You mentioned -- prior to the
8  discussion of those change addresses, you
9  mentioned a possible change of address
10  when a withdrawal request was -- was made.
11        Are there other circumstances in
12  which, putting aside the withdrawal
13  request, in which addresses or underlying
14  assets moved within FTX's control?
15        MR. GLUECKSTEIN:  Object to the
16    form.
17    A.   I'm sorry, can you repeat the
18  question?
19        MR. PROULX:  Let me strike the
20    question.
21        Let me ask you a different
22    question.
23  BY MR. PROULX:
24    Q.   The lending program was -- when
25  a customer elected to lend out its assets

Page 399

1
2  or certain types thereof or -- or its
3  ledger entries with respect thereto, was
4  that loan made immediately upon that
5  election?
6    A.   Again, the loan was -- lending
7  on the exchange was not done on a
8  one-to-one relationship, or funded by --
9  with -- with any fiat -- like physical
10  fiat currency or any actual
11  cryptocurrency.  They were on ledger
12  transactions as I've been testifying to.
13        The calculation for who was
14  participating in the pool which is how the
15  margin program worked, matching a pool of
16  lenders to a pool of borrowers, calculated
17  who -- the exchange code calculated who
18  was participating in that pool at any
19  given time and who -- on the lending side
20  versus the borrowing side, and that's how
21  interest was calculated, and that happened
22  on an hourly basis.
23    Q.   What duration of time was -- was
24  interest charged on?
25    A.   As long as a customer was

Page 400

1
2  borrowing from the program.
3    Q.   Is there some maximum or minimum
4  amount of time through which the program
5  required repayments of the change to the
6  ledger entry that occurred when a lending
7  customer loaned out its assets or its
8  credits or debits with respect thereto?
9    A.   I -- can you repeat the
10  question?
11    Q.   Is there some upper limit on the
12  amount of time a given asset as reflected
13  in a ledger entry could be loaned out for?
14    A.   I -- I am not aware of a maximum
15  lending duration for customers that
16  participated in the margin program with --
17  like solely with respect to time, I'm not
18  aware of an upper limit of how long they
19  can less than or borrow for other than the
20  other applicable requirements, like
21  specifically the margin requirements.
22        MR. PROULX:  All right.  Thank
23    you, Mr. Coverick.  Let's stop there
24    for today.
25        THE WITNESS:  Okay.

Page 401

1
2        MR. PROULX:  I look forward to
3  seeing you again bright and early.
4    We're off the record.
5        MR. GLUECKSTEIN:  No, we're not
6  off the record.  We are not off the
7  record.
8        So, we are now past seven hours
9  of testimony today.
10        So I don't know, what time are
11  we starting tomorrow?
12        MR. PROULX:  Well, I don't know
13  that that's true.  Let's get the
14  runtime.  But let's assume we're at
15  seven hours.
16        MR. GLUECKSTEIN:  We are well
17  past seven hours.  We can get the
18  official time.
19        THE VIDEOGRAPHER:  It's about
20  7:10.
21        MR. GLUECKSTEIN:  Okay.  So we
22  are past seven hours, and so from
23  FTX's perspective, the 30(b)(6)
24  portion of this deposition is
25  concluded.  Under Rule 30(d) 1, there

MAGNA
LEGAL SERVICES

Page 402

1
2   is seven hours of 30(b)(6) testimony
3   of a witness.
4       At the outset of this deposition
5   today, counsel represented that he was
6   going to be asking every question, All
7   of my questions to Mr. Coverick in a
8   representative capacity.  If he's
9   intending to ask a question to him in
10  an individual capacity, he will
11  preface that.
12      I did not hear any such
13  questions prefaced.  If I'm wrong
14  about that, I'm happy to discuss what
15  questions or how much of the limited
16  testimony that we might have missed is
17  in that capacity.  Otherwise Mr.
18  Coverick will be here tomorrow to
19  finish the deposition with respect to
20  any questions you have of him in that
21  capacity.
22      MR. PROULX:  Brian, we made
23  abundantly clear to the FTX Recovery
24  Trust that we were taking Mr.
25  Coverick's testimony concurrently

Page 403

1
2   throughout the two days in both a
3   representative and individual
4   capacity.  We made that clear to you
5   several times.  At no point did you
6   object to that sequencing.
7       Your position here is a
8   litigation tactic and is sandbagging
9   behavior that I think is unbecoming,
10  and I think if we need to go to the
11  court to resolve this, we certainly
12  will.
13      Mr. Coverick will be here in a
14  representative capacity tomorrow.  He
15  will be taking his position
16  concurrently.
17      Throughout the day today, he
18  frequently answered questions in terms
19  of his personal knowledge caveating
20  that he's not a lawyer, answering in
21  the capacity of "I" throughout.  If we
22  need to do a control-F for that we
23  will, and we will tell you how many
24  instances of that occurred throughout
25  the course of the day today.

Page 404

1
2       Your position is rejected, and
3   we reserve all rights with respect
4   thereto.
5       MR. GLUECKSTEIN:  You can
6   reserve all rights.
7       Your statement at 10:18 this
8   morning, not a single question today
9   was asked of Mr. Coverick in his
10  personal capacity.
11      We never at any time agreed to
12  extend the seven-hour limit for a
13  corporate representative deposition.
14  We agreed to allow you to ask
15  questions concurrently.  You have
16  proceeded with the deposition in the
17  manner that you chose.
18      MR. PROULX:  By your logic,
19  Brian, you know, we've -- because we
20  were taking the deposition
21  concurrently, we were also asking
22  those same questions in his individual
23  capacity.  Your position is arbitrary.
24      He will be here tomorrow in a
25  representative capacity.  The absolute

Page 405

1
2   mirror image of that argument could be
3   applied.
4       MR. GLUECKSTEIN:  We have made
5   our position known.
6       He will be here, and the record
7   stands as it stands.
8       THE VIDEOGRAPHER:  7:14 p.m.
9       Off the record.
10      (Deposition adjourned at
11  approximately 7:14 p.m. EDT)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

MAGNA
LEGAL SERVICES

Page 406

```
1
2        INSTRUCTIONS TO WITNESS
3
4        Please read your deposition over
5   carefully and make any necessary
6   corrections.  You should state the
7   reason in the appropriate space on the
8   errata sheet for any corrections that
9   are made.
10       After doing so, please sign the
11  errata sheet and date it.  It will be
12  attached to your deposition.
13       It is imperative that you return
14  the original errata sheet to the
15  deposing attorney within thirty (30)
16  days of receipt of the deposition
17  transcript by you.  If you fail to do
18  so, the deposition transcript may be
19  deemed to be accurate and may be used
20  in court.
21
22
23
24
25
```

Page 407

```
1
2          A C K N O W L E D G M E N T
3
4    STATE OF          )
5                      :ss
6    COUNTY OF         )
7
8        I, STEVEN P. COVERICK, hereby
9    certify that I have read the transcript of
10   my testimony taken under oath in my
11   deposition of September 24, 2025; that the
12   transcript is a true and complete record
13   of my testimony, and that the answers on
14   the record as given by me are true and
15   correct.
16
17
18   _____
         STEVEN P. COVERICK
19
20   Signed and subscribed to before me this
21   _____ day of _____, 20__.
22
23   _____
24   Notary Public, State of
25
```

Page 408

```
1
2              E R R A T A
3    PAGE/LINE/   CHANGE  /  REASON
4    ____ / ____ / ____ / _____
5    ____ / ____ / ____ / _____
6    ____ / ____ / ____ / _____
7    ____ / ____ / ____ / _____
8    ____ / ____ / ____ / _____
9    ____ / ____ / ____ / _____
10   ____ / ____ / ____ / _____
11   ____ / ____ / ____ / _____
12   ____ / ____ / ____ / _____
13   ____ / ____ / ____ / _____
14   ____ / ____ / ____ / _____
15   ____ / ____ / ____ / _____
16   ____ / ____ / ____ / _____
17   ____ / ____ / ____ / _____
18   ____ / ____ / ____ / _____
19   ____ / ____ / ____ / _____
20   ____ / ____ / ____ / _____
21   ____ / ____ / ____ / _____
22   ____ / ____ / ____ / _____
23   ____ / ____ / ____ / _____
24   ____ / ____ / ____ / _____
25   ____ / ____ / ____ / _____
```

Page 409

```
1
2          C E R T I F I C A T E
3        I, MARIE FOLEY, Registered Merit
4    Reporter, Certified Realtime Reporter, and
5    Notary Public for the State of New York,
6    do hereby certify that prior to the
7    commencement of the examination, STEVEN P.
8    COVERICK, was duly remotely sworn by me to
9    testify to the truth, the whole truth and
10   nothing but the truth.
11       I DO FURTHER CERTIFY that the foregoing
12   is a verbatim transcript of the testimony
13   as taken stenographically by me at the time,
14   place and on the date hereinbefore set forth,
15   to the best of my ability.
16       I DO FURTHER CERTIFY that I am neither
17   a relative nor employee nor attorney nor
18   counsel of any of the parties to this action,
19   and that I am neither a relative nor employee
20   of such attorney or counsel, and that I am
21   not financially interested in the action.
22   _____
     COURT REPORTER
23   Registered Merit Reporter
     Certified Realtime Reporter
24   Notary Public
     Dated: September 30, 2025
25
```

**A**

**abandoned**
303:5 308:25 309:4

**abbreviations**
242:23

**ability**
40:23 76:6 77:12
91:20 96:12 103:15
103:17 144:12,16
144:23 153:9,10
165:11 172:21
245:7,13,20 246:6
246:18 247:9
249:17 268:9 297:6
299:7,17 306:24
331:11 348:16
364:15,16 382:5
391:10 409:15

**able**
66:25 73:23 76:25
106:24 107:11
144:19 151:5 153:3
154:8 183:25 207:8
209:8 226:3 240:19
254:23 260:6
270:19 285:2
291:20 348:12
358:25 364:25
387:10 390:25

**above**
1:18 159:20,25 373:4

**absent**
101:18 107:7 113:13
339:5 371:18

**absolute**
404:25

**absolutely**
66:16

**abundantly**
102:19 319:18
402:23

**access**
140:16 301:2 336:15
336:18,24 337:4
359:8 397:25

**accommodate**
13:12

**accordance**
88:13

**according**
87:11 117:4 120:7
200:2,10 260:12,25

**accounting**
31:2 98:18,19 310:3

**accounts**
46:18 96:8,23,25
97:7,16 116:21
117:4 137:8,11,17
137:19 139:11,14
153:2 154:22
155:21 158:18
162:15,18 163:4,7
163:14 164:9
165:24 185:11
203:11 209:12
236:10,19 248:2,19
276:6 277:23 280:5
281:22 282:9 284:9
291:24 299:7
310:18 311:4,13,14
317:9 319:23 321:4
360:15 370:4

**accounts's**
272:2

**account's**
121:10

**accuracy**
68:23,25 75:20

**accurate**
35:3 69:4,4 78:17
102:22 242:13
328:18 348:8
406:19

**accurately**
13:22 74:11,13 151:6
222:18 350:2

**achieve**
53:25

**acknowledgement**
322:5

**acknowledging**

321:16 330:15

**acquire**
175:16 176:5 177:14
177:23

**acquired**
141:11 178:9 289:24

**acquiring**
143:4 392:24

**across**
295:2

**Act**
332:6,14

**action**
409:18,21

**actions**
41:6 278:16

**activities**
28:3 41:6 65:13
140:2 252:22
339:25 340:11
365:13 366:4

**activity**
162:15 164:8,15
165:23 366:6

**actual**
75:23 117:25 167:16
167:18 168:9 293:8
399:10

**actually**
71:22 163:6 239:22
288:3 326:18 327:6
328:19 329:7,20,25
358:10 368:4

**Adam**
2:19 10:3

**add**
214:18

**added**
201:23 386:8

**addition**
125:7 230:15

**additional**
59:13 70:10 71:19
79:14,21,24,25
80:10,11 104:16
196:23 242:24

346:8

**address**
144:10,18 154:25
155:4,15 156:18,21
158:21 168:10,20
168:25 169:2,9,10
169:12,13 285:15
289:23 292:12,13
293:5 296:8 301:3
301:19,22 302:9
370:12 395:18
396:18,19,23
397:16 398:2,3,9

**addresses**
97:2,7,16 140:16,20
140:22,25 141:4,9
141:21 142:9 143:7
143:25 144:21
154:12,21 155:19
155:23 156:19,20
163:14 166:6 167:5
167:20,22 168:2,4,6
168:8,17,19 169:19
293:21 294:24
297:9 300:8 308:21
370:16 391:21
395:8,20,23,25
396:2 397:4,6,7,9
397:23 398:4,6,8,13

**adds**
376:2

**adhered**
349:7,18

**adjourned**
405:10

**adjudicating**
27:18

**adjudication**
49:22

**adjust**
209:11

**adjusted**
207:11 208:4

**adjusting**
207:24,25

**adjustment**



38:15 202:6,16,18
202:24 206:8
207:13,16,22
209:14
**administrative**
309:6
**administrator**
27:2,7,12 51:18,22
53:2,5 57:8 253:23
309:12
**advance**
16:15
**advanced**
313:13
**advice**
53:3 246:23 276:16
279:10,13
**advise**
51:22
**advisement**
58:10 235:4 334:12
334:19
**advising**
251:16
**advisor**
15:4 30:19 154:8
253:20 254:21
**advisors**
57:15 80:17 153:13
154:16
**affect**
190:17 205:22 241:6
381:16
**affiliates**
5:15 14:17 50:20
61:13
**affirm**
10:19
**after**
32:17 79:15 85:25
101:9,11 102:11,14
114:13 157:14
161:4 183:9 199:24
242:5,9 256:12
267:8 280:20
307:13 324:5,10,16

325:5 376:12
380:16 406:10
**AFTERNOON**
4:10
**against**
88:6 245:5 246:2
247:6 290:11
304:25 305:18
308:22 365:16
369:12
**agency**
227:22 311:25
**aggregate**
84:14,17 88:24 90:3
105:18 111:23
189:17 227:13
271:11 365:15
369:12 375:3,7
378:2
**aggregated**
96:9 106:3 112:11
190:8 386:10
**aggregation**
110:3
**ago**
70:13,16 115:17
199:17,19 268:4
**agree**
379:8
**agreed**
195:13,16,20 238:19
321:2,16 404:11,14
**agreeing**
58:11
**agreement**
259:2 260:2 263:17
263:25 264:9,22
265:9,12,24 278:15
304:7 309:6 333:5
333:19
**agreements**
83:4,7,8 226:16
343:5 361:6
**ahead**
72:13 270:13 271:15
**al**

1:5 9:9
**Alameda**
248:2,5,18 249:4,6
249:10,13,22 250:2
**algorithm**
226:5 370:2 375:13
384:14,21,22
385:20 388:22
**aligned**
12:11
**allocated**
137:8 284:9 317:9
319:22 380:6
**allow**
178:2 294:5 298:21
310:12 339:23
342:25 404:14
**allowed**
27:22,25 49:22 62:23
62:24 106:15
108:20 110:7
177:16 209:2
338:25
**allows**
154:23,24 378:19
**alluded**
60:15
**all-inclusive**
39:7
**almost**
119:3 155:15 394:3
**alone**
115:4
**alongside**
202:3
**already**
244:24 306:23
**also**
3:2,8 14:21,24 15:15
17:19 18:16 19:7
21:3,8 22:9 30:10
34:23 50:11 51:16
52:21 53:16 60:23
66:9 67:25 80:15
89:11 91:11 93:17
96:11 103:3 114:12

123:25 128:8
131:15 146:14
152:23 160:9
161:12 165:20
166:3 170:15 176:4
176:17 182:17
196:2 204:14 230:3
245:6,23 247:8
250:4 252:2 261:2
263:6 264:2 297:5
299:15 326:17
329:16 331:10
347:15 364:10,16
365:18 375:9
388:22 404:21
**alternatively**
177:14
**although**
68:25 105:13 108:15
160:10 343:17
360:13
**Alvarez**
3:3,4 10:12 22:4,10
23:7,13 24:12 42:8
43:19 44:12 59:9,10
153:13 161:9
198:22 385:5
**always**
37:25 38:7 112:6
113:19 115:11
237:19 244:12
377:13 388:14
**am**
11:13 15:17,18 16:14
17:19 21:11 25:2
31:4 45:23 72:9
75:22 76:16,25
83:14 105:11
116:10 118:24
126:22 129:3,23
135:8,20 143:9,12
150:10 151:5 163:2
211:11 213:19
214:16 220:6,7
226:15 228:16
245:16,17 248:3



252:12,14 255:5
267:21 271:17,21
273:4 275:22 278:4
278:5,13 281:5,16
282:13 283:3,15,25
284:11 286:5 287:7
287:9,14 299:6,14
305:16 309:20
310:8 311:9,16,16
315:25 318:6 319:5
324:9,15,15 330:11
330:15,19 331:25
332:4 342:23
345:12 346:13
348:12 350:4
351:10 359:25
360:12,15 384:23
391:15 394:24
400:14 409:16,19
409:20
**Amazon**
33:23 84:24 85:8
98:8 292:24 300:23
301:7
**amended**
5:12,20 6:10,16
20:22 34:18 61:10
65:22 69:12 128:14
128:22 201:3
**amendments**
68:21,24
**Americas**
1:16 2:20 9:13
**among**
51:10
**amongst**
157:13 231:21
238:14 370:16
**amount**
35:12 82:4,24 107:20
111:12 112:4
126:20 134:12
164:8,15 165:23
172:6 175:19 191:5
208:5 209:3 376:3
377:9,21 379:13

380:11,13 381:21
384:4 390:2,10,14
390:17,20,24
391:14 400:4,12
**amounts**
144:20 198:4 343:2
387:22 389:7,15,17
391:17
**ample**
238:21 377:13
**analysis**
7:6 29:10 34:22
36:16 37:13,19,23
38:22,23 39:19
42:17 49:10 67:13
68:5 72:21 78:5,24
85:19 105:23,24
106:5,9 112:12
123:19 157:5
160:14 161:15
166:5 193:9,12,17
194:14 198:8
229:15 232:23
271:18,23 273:17
274:5 310:4 348:13
350:11,20 351:19
**analyst**
53:15
**analytical**
309:21
**analyze**
41:19 167:16 169:18
**analyzed**
295:13 349:23
**analyzing**
167:19 203:11
**and/or**
17:12
**annual**
58:25
**another**
36:10,15 92:21 93:25
97:12 106:24
136:20 137:6
138:22 153:14
156:15 174:2

176:10 211:16
216:2 224:22,24
225:18 242:24
301:20,22 302:9
366:9 369:19,22
370:3 387:19
**answer**
8:4 12:13 13:3,4 18:8
31:18 33:13 35:8
36:4 39:6 40:6,22
45:21 62:10 71:23
95:23 112:3,23
113:20 118:17
120:2 121:22
138:14 139:3,6
142:12,13 147:10
150:25 151:6 162:9
169:24 206:14,15
214:15,19 217:19
217:20 219:14
221:4 228:6 239:8
255:15 258:6 260:6
264:18 265:18
278:20 279:7,14
286:17 289:3
291:21 304:19
305:20,25 307:7
308:4 313:2 315:10
316:18,23 324:25
329:3,22 346:4
348:10 349:15
350:2 375:22
379:16 386:2
392:14
**answered**
90:22 138:11 159:22
206:10 220:18
250:18 265:6
272:23 274:2
306:23 317:11,12
325:2 358:19
379:15 403:18
**answering**
138:18 214:4 403:20
**answers**
378:11 407:13

**anticipation**
166:19 299:20
**anybody**
21:25
**anymore**
68:9
**anyone**
41:5,5,12,12 42:5,7,9
43:18 56:14 67:9,15
67:16,20 68:10
112:4 154:24
219:15 221:7 260:3
274:21 299:23
385:8
**anything**
20:18 30:6 33:14
48:11 51:23 69:18
75:25 162:6 178:24
179:17 183:3
205:22 214:18
233:14,19 238:22
239:24 249:12
253:11 264:13
277:12,18 278:7
298:4 315:14 320:2
331:5 363:3
**anywhere**
127:8 215:24 318:21
395:18
**apart**
33:7
**apologize**
62:25
**apparent**
64:13
**appear**
67:2 239:21 359:22
**appearances**
2:2 4:6 9:21
**appearing**
18:12
**appears**
66:6,9,11 70:25
269:24 283:2
286:15 305:12
306:6,8 323:5



352:13
**applicable**
52:22 58:18 84:21
87:20 88:10 104:14
137:15 163:4
179:13 296:5 297:2
298:18 372:13
374:11 377:22
382:21 400:20
**application**
196:14 197:14
213:20 332:8,15
**applied**
84:21 134:3 137:16
176:14 182:14
202:12 203:8
206:25 209:9
299:13 335:20
344:16 376:6 405:3
**applies**
336:13
**apply**
59:5 95:23 163:6
334:21 335:7 336:4
**appreciate**
50:4 68:14 129:12
341:15
**approach**
201:15
**appropriate**
27:21 153:18 370:6
406:7
**appropriately**
32:2
**approval**
323:19
**approvals**
323:11
**approved**
323:17,20,22
**approximate**
174:2
**approximately**
36:24 37:24 242:19
405:11
**April**

6:21 7:24 180:10,17
181:17 183:9
184:21 344:21
345:5 348:5
**arbitrary**
404:23
**arbitration**
55:13
**archived**
182:3
**archives**
181:10
**area**
319:5
**argued**
271:21
**argument**
405:2
**argumentative**
79:8 292:9,16
**arguments**
160:12,15
**arise**
160:18
**arising**
240:12
**around**
52:23 74:16 95:21
204:22
**arrangement**
58:12
**arrive**
73:4
**Arrows**
2:14 5:23 6:12,18 7:7
9:24 10:6 15:16,16
15:18 30:20 31:9,13
33:18 38:12 44:14
56:4 65:24 69:13
73:17 82:12 116:20
117:2,7 128:15,23
137:7,21,24 139:10
139:11,16,21
140:24 152:17,19
161:21,25 167:2,3,4
167:7,19 198:8

215:18 221:15
232:4 233:20
241:19 242:9
247:25 248:17
249:13 287:25
321:2 391:23 392:3
392:19
**articulated**
37:9 163:3
**aside**
48:13 59:11 157:16
251:12 328:20
398:12
**ask**
10:17 12:13,20 13:10
13:15 20:11 30:14
92:5 138:21 168:14
173:24 214:6,12
240:22 341:17
368:17,18 388:6
398:21 402:9
404:14
**asked**
22:7 41:21 159:22
220:23 265:6 274:2
288:24 296:21
307:10 317:11
337:11 358:19
375:21 404:9
**asking**
13:18 20:9 25:22
43:6 45:11,13 51:25
52:2 72:15 90:16,17
117:14 118:14,15
121:15,16 131:17
132:17 138:7
141:19 142:5,6
143:17,18 151:9,12
151:14 152:18
159:17 168:9,11,15
191:4,5 195:18
196:16 217:24,25
220:11 232:9
239:22 246:14
255:19,21 268:20
272:13,15 279:2,4

286:18 290:17
292:4,6 295:2,4
315:13 316:6
320:10,14 324:19
324:20 352:16
374:20 402:6
404:21
**aspect**
73:19 104:11 157:5
197:18 228:2
262:12 344:2
345:20 351:20
396:15
**aspects**
42:17 103:13 149:12
157:7,8 202:3
222:19 236:18
320:22 353:25
360:25 361:15
373:16 397:3
**assert**
160:12
**asserted**
34:17 105:25
**asserting**
188:22 229:6
**assertion**
230:8
**asserts**
157:2
**assess**
189:23 277:15
**asset-specific**
386:5
**assign**
32:2
**assigned**
58:15
**assist**
153:17 181:15,19,20
267:25 268:2 385:9
**assisted**
67:9,13 68:3 217:9
385:5
**assisting**
49:6



**assists**
50:15
**associated**
44:5 84:15 154:21
  162:18 360:17
  366:2 370:4 384:25
  396:13
**Association**
53:19
**assume**
13:17 14:25 197:4,7
  237:16,20 332:9
  401:14
**assumed**
206:24 208:9
**assumes**
192:25 382:20
**assuming**
183:10 268:14
  390:24
**assumption**
232:23 384:5
**Atherton**
21:7
**attached**
21:2,4 66:10 406:12
**attachments**
129:9
**attainable**
254:12
**attained**
254:23
**attempt**
41:11 74:8 153:7,24
  160:8,22 251:18
  252:10
**attempted**
42:8 44:13 155:21
**attempting**
154:14,17 164:24
**attorney**
406:15 409:17,20
**attractive**
340:9
**audibly**
12:13

**August**
323:8,12 324:5,17
**author**
185:19 192:19 253:3
  353:17 356:3
  358:24
**authored**
183:5 347:25
**authorize**
307:16
**authorized**
309:7 323:16
**authorizes**
309:12
**automatically**
237:8 375:2 396:20
**availability**
94:10,11
**available**
31:24 71:20 79:13,23
  89:15 91:15 94:23
  95:6,12,17,18,22
  96:2,15 106:15
  107:10 115:2 170:5
  170:8,9,11 171:5,14
  183:13,15 296:25
  348:24 378:14
  379:23 383:18,21
  383:22 384:3
**Avenue**
1:16 2:20 9:13
**avoid**
202:7
**awareness**
283:13
**away**
326:8
**AWS**
72:24 97:25 98:11
**A&M**
23:12,12 30:19 31:2
  31:14 37:19 43:14
  50:18 51:20 53:7,10
  56:10,14,16,23
  57:25 58:15 59:6
  67:10,15,16,21 68:9

78:23 81:13,22
  154:7 200:10,19
  234:9,11 248:7
**A&M's**
23:22 24:13 54:9
  56:6 209:20
**a.m**
1:17 9:3,11 11:10,11
  81:5,8

————————————
**B**
————————————

**B**
5:3 6:3 7:3 156:17
  275:25 276:11,19
  278:17 280:4 282:7
  317:18
**back**
69:23 80:12 81:9
  83:19 110:14
  131:11,13 145:12
  152:25 153:3
  176:24 212:18
  247:23 306:15
  307:3 308:24
  312:13 317:4
  337:23 338:21
  356:17 357:16
  383:3,7 384:4
  394:11
**backed**
207:2
**backing**
274:8
**backstop**
238:18
**backstopped**
361:15
**Bad**
67:18
**Bahamas**
257:18,24 258:11
  262:14,24 331:17
  331:25 332:3 333:3
  333:15
**balances**
98:20 109:19 110:3

111:14,20 121:18
  138:6 139:4 145:16
  203:19 205:13
  236:21 307:19,21
  308:19 310:16
  363:11 364:4,17
**ball**
223:20 270:6
**bank**
94:20 96:25 97:6,16
  255:3
**Bankman-Fried**
260:9 319:3
**bankruptcy**
1:2 11:20 14:19
  30:16 47:24 60:20
  60:22 86:2,3 87:11
  87:15,16,19 148:13
  148:21 149:15
  201:7 255:4 266:22
  267:8 275:17 277:3
  277:9 279:19
  280:20 299:16,20
  328:13,16
**base**
44:2 72:6 76:22
  122:5 131:4 193:14
  194:11 204:15
  225:24 229:10,12
  231:19,22 236:25
  237:10 238:15
  310:23 321:12
  322:2 329:10
  349:25 350:7,22
  351:3,8,21 357:8
  358:11 385:14,25
**based**
34:21 39:16 117:14
  136:9 142:20,22
  147:7 155:7 162:14
  172:2 174:4 183:18
  194:10 199:15
  203:5 205:6 222:6
  224:24 231:5
  233:22 234:8 243:3
  252:22 253:14,18



327:19 384:2
**basic**
379:19
**basing**
158:5 231:17
**basis**
56:24 59:2 112:15
229:6 242:2 274:10
321:5,17 341:7
399:22
**Bates**
6:23 7:9,13,17,21,25
180:10 198:9 216:4
231:13 285:5,8
344:22 355:5
**BBI**
15:21
**BC**
192:6
**bear**
355:14 356:14
**became**
156:11 324:4,22
**because**
30:14 72:9 73:24
76:21 113:21 119:8
121:6 130:23 134:3
139:15 142:3
146:12 154:4
156:12 157:25
164:17 166:21
167:12 171:10
172:6,25 173:16
176:21 177:7 181:8
191:2 192:18
203:15 209:6
232:10 233:10
235:10 251:5 265:5
278:5 294:13
299:10,22 300:7
319:7,15 329:23
332:11 337:10
343:18 344:8
365:20 372:19
373:14 374:6
380:19 382:9 389:6

391:7 394:18
404:19
**become**
68:21 82:8 108:22
280:5 391:2
**becomes**
379:12
**been**
11:3,16 12:7 16:3,4
16:19 17:2 18:15,16
18:18,21 19:19,20
21:10 24:24 34:2,5
34:9 36:25 37:25
45:13 51:6 53:6
57:21 61:16,17,17
66:3,25 67:14 70:3
72:16 73:21 79:17
87:9 104:23 105:14
118:25 128:19,20
129:6 136:16
140:19 144:2 146:3
153:3 166:14
180:14,15 181:16
182:2 195:8 198:13
201:12,16,22
206:10 207:8
222:14 229:22
233:20 234:2,6
236:3 240:19 244:8
250:2 252:25
253:15 255:6 261:8
263:15 266:23
268:21 285:12,12
285:21 316:6
318:13 320:13
322:7,8,12 324:10
324:16 329:19
331:7 335:17
350:16 372:9
399:12
**before**
11:16 12:8 19:24
27:21 37:8 48:22
81:11 95:2 97:21
127:15 145:14
146:18 199:24

214:4 216:22
250:18 278:25
284:24 286:14,16
299:15 316:23
322:19,22 324:10
334:16 359:10
368:25 407:20
**began**
29:20 54:19
**begin**
237:8
**beginning**
80:4 313:12 353:2
374:24
**beginnings**
287:24
**begins**
9:6 174:11,13 353:3
**behalf**
2:4,14 10:9 14:7
27:17 35:24 58:22
183:24 323:21
**behavior**
403:9
**being**
9:12 12:2 24:15,21
26:16 29:14 34:17
35:10 41:21 44:17
50:14 65:4 75:7
76:2 77:6 78:19
85:4 105:25 116:18
119:19 122:8,25
130:2,12 136:20
143:6,24 144:24
150:11,13 154:22
157:11 167:15
199:18 202:18
210:7 223:12,12
226:2,3,4 232:23
236:10,25 260:17
271:20 289:24
294:23 296:25
309:9 311:6 331:12
333:5 335:16
362:24 366:17,24
370:7 378:15

383:23 386:21
387:10
**believe**
12:4 17:8 21:9,13,17
23:6 26:25 28:11
41:18,21 42:25
43:23 44:6 48:8
50:20 51:3 67:22
68:17 70:15 73:23
125:4 135:11
138:11 142:13,15
142:16 146:13
149:22 156:3
159:19 162:10
180:21,23 184:16
200:10 204:17
217:10 222:13
228:7 229:22 231:5
231:14,20 233:24
233:25 241:21,22
241:24 244:24
248:24 249:7,19
251:4 255:8 256:19
260:19,20 261:15
261:18 267:22
269:9 270:8,10
271:7 301:15
305:14 309:8
316:14 317:12
322:16 328:13
332:5 336:5 348:7
351:5 352:21 368:7
384:15 385:13
387:11 390:6,8,12
390:19,22 392:2,4
396:10,10
**Beller**
3:10 21:5
**belong**
277:23 280:5 281:23
**belonging**
276:6 281:23 282:9
326:11
**below**
160:2 162:15 311:2,5
323:9 382:16



**beneficial**
284:8
**benefit**
340:6,7
**benefits**
62:15 340:3
**Benjamin**
3:10
**bespoke**
203:2,23 204:6
208:25 299:3
**best**
12:19 40:6,23 43:9
43:11 69:6 184:7
268:9 313:18 314:7
314:21 409:15
**bet**
118:12
**better**
74:2,3 76:25 77:12
78:8
**between**
22:15 23:4 38:22
47:12 73:11,25
101:17 117:18
133:8 141:17,25
142:2 155:16 189:4
245:13 246:6 258:2
258:22 259:7,15
273:12 289:10
311:17 350:5
366:15 376:19
383:17 392:17
**beyond**
106:6 140:23
**bill**
58:17
**Binance**
341:23
**birthday**
68:17,20
**bit**
47:8 252:7 256:22
274:8 323:9
**bitcoins**
293:7

**bitcoin's**
113:7
**block**
296:8
**blockchain**
93:4 140:16 144:8,14
155:2 223:3 292:20
296:8 297:7 331:11
366:14 396:16
397:4
**bodies**
161:13
**bore**
108:18
**borrow**
177:22 200:14 241:7
339:2,24 342:19,20
342:22 369:24
370:5 375:4,5,6,7
376:5 377:10,14
380:10,21 382:6
387:22 388:19,24
389:3,20 390:7,9,13
391:23 400:19
**borrowed**
355:18 370:7 371:2
371:22,24 380:16
388:20 392:5,7
393:11,13
**borrower**
376:20 386:17 389:9
389:25
**borrowers**
108:14 376:9,18,19
377:16 384:17,24
385:21 386:4 388:2
388:13,15 389:9
399:16
**borrower/lender**
387:14,17
**borrowing**
108:4,5 125:5 177:22
180:8 339:6 343:10
344:7 351:25 353:5
356:12 367:9
368:21 369:2,9,16

370:13,25 371:3
373:7,25 374:23
378:20 381:13
384:10 388:10
389:25 392:20,25
393:5,14 399:20
400:2
**borrowings**
392:9
**borrows**
108:19 372:11
386:17
**both**
12:22 14:13 15:6,7
86:21 156:17 180:5
189:14 353:19,25
363:10 364:3
367:14 380:21
383:19 403:2
**bottom**
224:5 314:12 351:23
352:13 354:23
355:11
**bought**
120:19 288:4
**bound**
331:18
**box**
248:16 257:12
321:16
**boxes**
137:17
**Brantley**
3:3 24:2,7
**breach**
278:8,14,17
**breaches**
278:22
**break**
13:9 59:18 81:3,11
137:3 145:3,14
146:18 201:25
247:17 337:17
393:25
**breaking**
208:24 271:21

**Brian**
2:6 10:7 59:9 235:2
402:22 404:19
**bright**
401:3
**broad**
2:8 295:6
**broader**
31:2 155:7 322:23
**brother**
355:19
**brought**
110:14
**browsing**
181:9
**BTC**
164:9 179:11 197:3
200:20 221:24
222:4 225:12 238:2
238:6 288:5,10,16
289:3
**BTC-PERP**
200:13 212:17
**build**
109:6 339:3,5
**built**
94:13 96:8
**bullet**
212:16 325:12
**burdensome**
64:15,23
**business**
26:15 49:19 51:24
56:23 57:9,11
149:12 257:17
**businessperson**
108:17 217:25
306:13,16 317:16
317:22
**businessperson's**
47:19 149:2 217:21
224:16 305:12
**button**
124:2
**buy**
112:25 173:10 179:3



189:25 191:18,19
192:6,8,15 195:21
210:18 211:18
212:9 213:3 218:20
219:2,24 288:10
289:19 291:8
**buying**
113:17 210:13,17,19
211:4 228:20
288:16 289:3
**buy-side**
189:14,25

---

### C

**C**
296:2 297:24 299:25
407:2 409:2,2
**calculate**
72:4 75:15 121:8
194:3 205:13
206:25 208:12
352:7,23
**calculated**
71:12 120:13 130:16
189:2 191:15
196:13 205:2 233:9
387:21 399:16,17
399:21
**calculates**
388:23
**calculating**
187:6,12,19 197:13
354:19
**calculation**
74:5 157:20 177:4,6
179:14 196:11
232:24 374:25
375:9 376:8,10,14
377:18 386:11
399:13
**calculations**
77:6,21 121:14
130:20,23,24 131:2
351:16
**call**
112:11 203:21

204:15 270:18
**called**
105:16 118:5 131:14
134:18 170:14
181:24 192:3
222:13 269:15
332:6,14 396:9
**calling**
279:12 307:23
313:16
**calls**
22:25 47:14 50:3
62:9 108:11 116:22
147:5,18,19 150:7
150:24 157:4
166:16 167:9
169:23 193:8
217:18 218:4 219:6
220:4,25 258:5,20
259:9,21 261:14
263:12 266:24
269:22 275:8
276:13 277:7 278:2
278:11,19 279:24
280:8 298:2 300:4
300:20 301:13
302:2 303:10,22
304:14 306:22
308:12 312:8,24
314:5,18 317:21
335:13 347:2,20
368:7 369:4,18
391:5
**came**
156:22 236:24
256:11 325:5,5
**cancelled**
37:3,15
**cannot**
39:6,20 40:7 46:20
52:16 55:14,15,19
109:17 156:14
171:9,20 191:18,18
192:15 233:24
240:3,15 256:7
257:7 283:3 286:25

286:25 298:3 302:8
305:9 311:14
313:19 314:8,21
315:2,10,16 316:2
318:23 319:4,24
320:17,20 325:20
332:10 335:14
336:22 342:11,12
343:18 348:8 356:2
357:4 362:8,14
363:5 365:3 374:3
381:7,25 387:9
**can't**
13:21 39:11 47:16
63:25 68:6 108:12
108:16 132:3
135:19 136:19
146:12 147:21
157:24 158:3
161:13 166:20
167:10 169:16
171:15 183:21
192:18 195:21
213:7 223:4 227:17
231:12 233:23
240:6,18 255:15
266:15 287:21
293:23 298:11
302:4 308:2 318:7
318:16 326:25
331:8 339:13
343:25 345:19
347:3 348:10,17
358:5 374:7 377:9
391:6
**capability**
40:7
**capacity**
12:3,5 14:4,6,7 17:22
18:4,12 20:5,10,12
44:5 219:12 220:12
220:13,14 279:4,5
402:8,10,17,21
403:4,14,21 404:10
404:23,25
**Capital**

2:14 5:23 6:12,19 7:7
9:24 10:6 15:17,19
65:24 69:13 117:8
128:16,23 198:8
232:4 287:25 392:3
392:19
**capitalized**
269:25
**careful**
45:10
**carefully**
406:5
**case**
1:8 16:7 32:6,10
34:25 50:13 57:2
60:3 64:13 76:19
81:13 94:4 99:6
136:17 160:7,18,25
182:4 202:19 203:5
205:7 230:15,17
245:22 252:19
296:12 327:22
332:22 346:16
388:12,14
**cases**
223:7 389:21,24
**cash**
116:18 288:6
**casually**
170:24 210:18,23
**categories**
39:8,12 49:19 92:13
329:24 331:2
**category**
39:10 92:13,21 105:5
255:21 334:24
358:13
**cause**
109:11 382:16 393:3
**caution**
45:18 162:4,5 166:17
265:15 275:9
276:14
**caveat**
130:22 273:8
**caveating**



403:19
**caveats**
297:10 373:7
**ceases**
374:14
**celebrities**
83:6
**CEO**
27:4 253:21
**certain**
12:6 21:11 34:23
36:12,18 39:15 43:3
60:23 63:15 68:6
83:5 86:12 89:13
91:23 92:22 115:25
116:2,5 120:16
123:9 135:9 145:20
146:15 183:14,21
219:10 227:8
229:24 233:6,25
240:21 242:13
245:20 249:3 288:5
294:12 296:23
299:6 311:8,9 324:5
324:22,24 331:18
332:10 339:25
341:8 348:13
351:10,13 370:2
377:15,21 390:12
390:15 391:15,18
399:2
**certainly**
136:21 173:2 213:23
240:20 271:2
403:11
**certainty**
255:17
**CERTIFICATE**
4:14
**certified**
53:17 409:4,23
**certify**
407:9 409:6,11,16
**cetera**
107:9 272:11
**CFA**

53:16
**chain**
144:7,17,18
**Chainalysis**
153:20
**change**
73:11 75:16 100:15
100:18 101:7,13,22
102:3,23 112:6
113:16,22 114:5,9
114:13,23 115:4,7
115:14 119:13
120:23,25 121:18
193:15 194:23
196:22,23 197:2
203:15 233:3
240:20 279:7 316:9
351:16 354:16
367:14 396:19,19
396:21,22 397:4,7
397:16 398:4,6,8,9
400:5 408:3
**changed**
48:20 58:21 114:16
195:9 240:17
**changes**
52:24 87:19,23
119:22 200:2
397:10
**changing**
311:11 369:11
**Chapter**
1:7 5:12 47:22 50:13
61:11 160:7 258:25
261:18 327:15
**characterization**
223:14 316:24
334:11
**characterize**
30:18 31:22 34:21
41:9,16 160:2 235:9
296:18,20 349:12
349:14
**charge**
174:20
**charged**

58:25 174:16 399:24
**chartered**
53:15
**Chase**
3:3 24:2
**check**
72:18 136:25 321:16
**checkbox**
321:19 322:4
**choose**
174:25 363:19
**chose**
209:6 404:17
**Christopher**
3:9
**Cignia**
153:14
**circle**
209:19
**circumstance**
166:23 167:13
**circumstances**
95:21 107:25 108:3
108:24 110:24
111:3 148:16 149:4
149:14,19 158:16
236:13,17 245:9,21
277:21 287:15,17
293:25 298:20,23
311:9,12 343:7
369:6 394:23
395:21 398:11
**cite**
134:6
**cited**
299:11
**cites**
129:21
**Civil**
16:10
**claim**
5:21 6:10 20:22,22
20:24 21:5 24:17
26:17,18 29:10,12
30:3 34:17,18,23
35:17 37:20 39:19

44:17,18 49:23
57:13,17,22 60:10
62:22,23,24 65:23
66:8 69:12 70:8
82:7 83:2,3,15
105:25 106:10
128:22 129:4,8
193:18 198:25
201:3,12 203:14
210:7 351:6
**Claimed**
6:16 128:14
**claiming**
252:2
**claims**
27:19,20,22,25 49:21
61:2 62:17 63:15,16
72:22 82:6,8,22,24
83:7,10,13 87:7
88:13 161:21 201:8
201:9,16 203:25
207:14 308:21
**clarification**
13:15 15:11 66:14
67:8 269:11 279:2
341:15 370:24
**clarified**
337:12
**clarify**
40:13 71:23 73:5
112:16 229:17
298:14 335:3,6
**clarifying**
205:20
**clarity**
186:23
**classification**
61:2
**clause**
276:11 308:3 312:12
**clauses**
219:10
**clean**
20:8 126:5 129:13
231:24 314:24
**clear**



18:11 29:23 33:12
37:18 46:6 54:12
67:23 75:14 83:22
100:14 102:19
103:2 106:4 132:16
151:14 211:3
220:10 243:6
255:19 266:19
272:12 278:25
306:2 309:14 316:5
319:18 334:23
369:20 372:17
389:5 402:23 403:4
**clearly**
125:20 200:25
**client**
10:4 12:22 52:7,23
52:25
**clients**
12:22 14:18 51:11
52:4
**close**
124:3 176:22 196:24
204:22 236:9
242:21 311:7
**closed**
119:11 210:25 225:2
235:21 237:14,18
238:4 241:20,21,25
242:5,7,9
**closely**
57:10,13 154:5 178:4
**closing**
213:15 215:15
237:12
**code**
44:2 60:22 72:6,11
76:18,21,22 77:7
87:12 120:14 122:5
131:4 193:14
194:10 225:24
229:10,12,25
230:10,12 231:18
233:22 236:25
237:9 310:23
321:12 322:2

329:10 330:4,6,12
330:20 331:3
349:25 350:6,22
351:3,8,21 357:8
358:11 384:23
385:4,10,14,17,25
399:17
**coded**
351:14
**cofounders**
59:10
**coin**
94:18 115:16,19
**coins**
105:9 116:2,6 238:13
398:2
**collateral**
132:14,21 133:6,9,10
133:18 134:12,23
135:4,5,10,13,18,23
136:5,13,20 176:21
192:6 237:3 354:2
361:7 372:14
377:22 381:14
382:21
**colleagues**
10:2 211:25
**collect**
252:24
**collected**
136:16 182:3 252:3
252:14,17 255:15
256:5,7 283:24
318:13
**collection**
254:20
**column**
248:16
**combination**
396:24
**come**
96:25 97:15 319:2
383:3
**comes**
18:7 91:9 164:21
172:8 178:17

186:11
**comfortable**
74:12 75:19
**coming**
69:23 199:6 209:19
230:9,11
**comingle**
329:14
**commencement**
409:7
**commencing**
1:17
**comment**
118:22 119:2
**commingled**
140:3,9,19,21,25
141:6,9,18,21 142:4
142:8,18 143:7,25
143:25 144:24
155:6,17,23 156:8,9
157:10,12 158:23
158:24 166:11,12
167:21 168:3,8,18
297:8 331:12 396:2
**commingling**
17:12 28:23 29:2
157:15 164:20
165:8 320:22
**commit**
74:8 326:10
**committed**
34:8 36:9 60:9 78:6
93:10 111:4 125:9
133:15 149:22
150:9 151:10
241:23 249:16,21
256:3 318:15
319:16 362:11,15
394:24
**committee**
201:14 205:11
**common**
171:25 200:23,24
209:22 210:5,6
224:16 231:21
**commonly**

140:13 170:18
230:17 231:7,20
238:3 301:15
**communicate**
56:25
**communicated**
45:4 230:20 231:3
280:15 328:8 331:6
331:9
**communicating**
172:4
**communication**
25:23 287:8,11,12
**communications**
33:25 44:25 45:12,20
46:4,7 151:15
181:14 230:13,15
268:21 281:6,16
282:14,18,21,23
283:4,7,13,16,19
284:2,5,12,18
317:14 328:15
**company**
253:13 257:17 269:4
331:16 340:8
**compare**
67:2 154:20
**compared**
134:12 199:18
273:19 295:16
**comparing**
180:6
**comparison**
357:11 358:13
**compensation**
58:7,12,14,20 59:5,8
59:13
**competently**
78:10
**competitive**
340:16 341:5,7,10,13
**competitors**
340:21,25 341:19,24
**compiling**
201:5
**complete**



6:21 180:9,16
184:17 212:22
407:12
**completed**
51:6 203:9
**completely**
123:17 125:19 294:9
391:3
**complex**
64:15,22 65:3,9,11
77:21 78:5
**compliance**
133:4 354:4 362:24
377:22 382:20
**complicates**
164:17 165:10,18
**complied**
349:7,18
**comply**
331:18
**component**
131:18 133:11
176:18,19 177:5
190:15 244:9 290:7
338:25 396:17
**components**
177:8 180:3 205:8
271:21 272:4
364:23 381:10
**composed**
364:2
**composition**
95:24 101:6 122:20
367:14,16
**compositions**
369:11
**comprise**
100:5 176:18 179:8
197:18 271:25
**comprised**
100:2,23 103:11
309:23 365:11,21
**compromise**
62:17 63:15 64:10
**computer**
72:9 76:17 330:20

396:4
**computers**
99:5
**con**
302:15
**concept**
174:10 175:3
**conception**
273:13
**conceptually**
133:18
**concerning**
331:19
**concluded**
401:25
**conclusion**
47:15 50:3 62:9
108:11 109:21
116:23 117:17
147:5,20 149:2
150:7,24 151:3
157:4,6 162:10
166:16 167:9,15
169:23 193:8
217:18 218:4 219:6
220:4 221:2,12
246:15,22 258:5,20
259:9,22 261:14
263:2,12 269:22
270:19 275:8
276:14 277:7 278:2
278:11,19 279:24
280:8 298:2 300:4
300:20 301:14
302:2 303:10,23
304:14 306:22,25
307:6,7,24 308:13
312:9,25 313:17
314:6,19 317:21
335:13 347:2,20
368:8 369:4,18
391:5
**conclusions**
63:25 74:24 146:3
161:24 163:3,6
221:6 275:2

**concurrently**
402:25 403:16
404:15,21
**conduct**
106:23 153:7 242:18
249:18 339:24
340:10 382:15
**conducted**
1:15 22:25 37:22
85:2 99:18 112:25
119:5 160:24 175:9
292:22 293:19
**conducting**
294:19 330:21
**confer**
380:17
**conferencing**
266:25 267:11
**confines**
128:4 309:18 343:6
**confirm**
155:5,19 163:12
222:16 229:10
291:19 319:4 348:8
348:11 392:4
**confirmation**
5:11 49:13 60:11,15
60:19,24 61:10,21
147:25 148:5 150:2
150:4,9,15,19,21
151:7,8,17,23 152:5
162:24 275:16,24
276:24 279:18
280:2,10,13,14,19
287:3 288:14
289:17 290:13
292:14 303:14,16
308:15,18,20,23
309:7,11
**confirmations**
285:14 286:19,21
287:5,16 295:21
**confirmed**
47:24 64:3 87:12
88:14 260:22
321:14

**confused**
74:18 329:21,22
**confusing**
192:17
**conjunction**
112:13,19,22
**connect**
226:6 384:16,24
**connecting**
385:20,23
**connection**
16:6 21:25 24:24
25:8 26:4,12 28:6
28:17 29:6,12,21
30:3,15 31:8,25
32:23 33:10 34:11
38:17 40:25 43:20
44:14,16,22 45:5,14
55:2 59:3,25 60:11
71:6 76:9 125:23
126:13 148:21
181:5 198:25
299:19 332:21,23
332:25 333:11
345:9 385:2 393:12
397:10
**connects**
97:11
**consider**
34:13 82:11 147:13
261:3
**consideration**
62:14 118:10 288:20
289:6
**considerations**
107:8
**considering**
106:6
**considers**
260:23
**consistency**
287:21 351:2,7
**consistent**
72:5 73:2 75:18 76:3
77:7 121:11 129:7
130:20 131:3



287:18 329:13,17
350:21 352:22
**consistently**
330:21
**constantly**
370:16
**constitute**
278:8,14
**constraints**
76:5 79:2 232:13
**consult**
24:9 40:24 215:22
**consultation**
22:4 205:10
**consulted**
23:7,10
**Consulting**
153:14
**contact**
44:13
**contacted**
44:13 47:4
**contain**
184:25 318:8 350:15
391:17
**contained**
346:15
**containing**
350:19
**contains**
349:16,19
**contemporaneous**
42:2
**content**
25:23 253:16
**contents**
127:17 154:25
254:18 349:2
**context**
86:21 105:25 109:16
110:12,23 134:24
134:25 135:2,15,21
135:21 136:3,14
148:4 176:12
186:25 187:10,19
199:24 224:12

272:6 273:20
288:11,13,17 289:4
289:21 302:15
304:17 322:21
367:18 381:12
**contexts**
187:14
**continue**
38:8 160:18
**continued**
77:13
**continues**
252:20
**Continuing**
86:6
**continuously**
31:23
**contracts**
118:8 122:3,7,24
123:8,10,21,23,25
125:14 170:5,11,23
171:5,13 172:11,25
173:2 174:22
175:23 178:7,14
184:20 185:5 188:3
189:11 191:14
192:16 193:6,11
196:22,24,24 197:2
202:2,14,23 204:12
205:17 206:23
207:11,17 209:10
209:18 210:14
215:17 218:14,15
218:20 221:11,16
221:24 222:20,21
222:24 223:6,8,13
225:25 226:13,17
226:25 228:3,9,20
228:25 233:8 235:7
235:17 237:11,13
237:15,23 239:3,15
240:13,13 242:9
302:13 354:12
393:2
**contractual**
62:20 186:3

**contrast**
47:9
**control**
296:2 301:9,23 302:5
302:6,16 398:14
**controlled**
169:10 260:3,9
289:24 293:6,22
296:9 299:25 300:6
300:18 302:11
395:8
**control-F**
403:22
**controversies**
62:18
**conversation**
254:19 291:18 292:6
**conversations**
22:5 43:5 155:11
267:3,7,14 268:3
282:14
**convert**
94:17 371:19
**conveyed**
253:16
**core**
68:11,13 396:9
**corner**
199:21 216:16
**corporate**
17:2,15,23 18:12
98:19 259:6 404:13
**correct**
15:5,9 30:5,16,17
31:10 56:3 65:16,18
66:16 81:18,19 86:5
89:9,24 91:9,23
98:11,12 100:9
104:18 106:11
122:14 139:12
140:18 146:23
162:25 174:3 175:6
179:22 192:23
226:11 230:11
231:25 242:15
244:14,15 247:14

290:5 310:16
319:11,23 338:9
340:18 343:12
364:6 384:9 385:7
407:15
**corrected**
327:9,14
**corrections**
406:6,8
**corrective**
328:6
**correctly**
91:19 165:15 368:19
395:13
**correlate**
211:5
**corresponded**
268:12
**correspondence**
115:12
**corresponding**
244:2 291:23
**corroborate**
233:21 234:7,13
**costless**
118:8,21 119:7
**couldn't**
226:24 371:9
**counsel**
9:20 13:2,24 17:6
18:18,21,23 22:6,11
25:17,24 45:2,2,12
45:14,20,23 46:5
47:3,3 58:4 59:20
79:13,23 80:8,11
125:15,25 126:16
137:2 147:8 151:4
151:16 162:8
166:18 181:14,21
214:2 217:9 219:19
220:9,15,20 246:24
251:11,13,14
253:16 265:17
268:13,14,15,19,23
268:24 269:3
275:10 276:16,16



285:21 334:3 402:5
409:18,20
**count**
70:23
**counter**
249:2
**counterparties**
226:7 238:10
**counterparty**
211:16 225:14,21,22
228:13,17 235:25
249:23 250:3
300:23 355:15
**counting**
202:8
**COUNTY**
407:6
**couple**
35:21 124:2 185:4
187:4 224:3
**course**
15:7 22:16 23:2
35:21 66:17 69:17
77:22 125:21 215:6
215:9 242:2 312:21
313:10 322:23
372:10 375:24
392:16 403:25
**court**
1:2 9:17 10:14 12:21
47:24 49:8 63:5
88:16 148:13,21
149:5,7,9,15 206:6
279:19 327:16
403:11 406:20
409:22
**cover**
129:11 199:15
**covered**
324:18
**Coverick**
1:15 4:8 5:6,7,9,10
5:17,18 6:6,7,14,21
7:6,11,15,19,23 9:8
11:2,9 18:11,16,22
19:3,4,19,22 20:17

61:8,9 65:19,20
69:8,10 81:11
125:16 126:7
128:12 145:15
180:9 198:7 216:3
247:25 272:13
279:15 285:3,7
292:3 337:25
344:20 394:13
400:23 402:7,18
403:13 404:9 407:8
407:18 409:8
**Coverick's**
334:14 402:25
**co-lead**
54:8
**co-leads**
24:13
**create**
230:6
**created**
85:18 326:15 396:20
398:5
**creates**
248:18
**creation**
48:2,21 251:7
**credit**
109:9,11 110:11,21
133:2 228:25 361:6
368:5 370:6
**credited**
91:21 119:19 176:25
188:14 190:20
191:16 360:16
**crediting**
119:22 229:7 302:12
**creditor**
81:25 82:5,17 83:12
204:15
**creditors**
49:7 160:11,11
161:12 201:14
203:6 205:11
230:16
**credits**

84:19 87:2 88:8 90:9
90:11 137:14
309:24,24 365:12
365:22,25 368:15
370:4 400:8
**criminal**
319:3
**CRO**
27:4 253:22
**Cromwell**
2:5 3:10,11 10:8 14:2
14:11 22:12
**cross-margined**
353:7,13
**CRR**
1:22
**Crumpler**
3:5 25:8
**crypto**
23:23 97:7 156:25
165:9
**cryptocurrencies**
86:17 89:14 92:3
115:20 247:15
296:24 396:7
**cryptocurrency**
53:21,23 54:3,5,10
54:23 55:2,5,9 87:3
91:15 94:2 97:2,16
120:25 121:4
137:20 140:14,17
141:3,7,18 142:16
143:22,24 144:7,10
144:20,24,25
152:21,24 154:10
154:13,17 155:6
156:10,13 157:9,25
163:12 165:12
167:25 168:17
172:24 173:14
174:9,15 201:10
205:25 206:20
228:21 232:17
257:11 272:8
292:17 294:13
295:15 297:7,21

298:6 300:9 301:3
301:17,18,19,22,24
302:8 329:14,16,18
340:10,22 341:20
365:19 366:13
367:23,24 383:13
387:10 391:8,11
394:21 395:24
396:5 397:2,8,24
399:11
**culmination**
271:25
**cumulative**
88:7 233:7
**currencies**
86:15 105:2,10 106:6
116:14
**currency**
86:13 87:4 93:25
105:19 106:14
115:22,24 137:20
307:17 366:13
380:10 387:7
394:21 399:10
**current**
26:25 38:5 40:24
42:20 44:11,19
45:24 52:5 53:9
57:19 75:7 91:7
188:16 253:22
276:10
**currently**
15:3,20 26:8,24 31:3
47:12 48:17 50:13
52:8 57:19 121:7
162:22 219:16
221:8 318:5
**curriculum**
53:24
**cust**
364:14
**custodied**
327:5
**custody**
328:24 333:7
**customers's**



279:21
**customer's**
87:5 88:6 89:3 112:5
114:9,13 115:4
130:10 145:22
172:17 175:24
177:10 197:4
201:11 205:22
235:16,19 247:5
288:18 289:4
290:10 382:5
383:17 393:20
395:2
**cut**
214:10 248:13
355:18
**cute**
286:17
**cutoff**
214:8
**cutting**
214:3
**cybersecurity**
153:15

**D**

**D**
2:6 272:16 273:10
407:2
**Dallas**
11:12
**Darby**
2:7 10:11
**Dare**
332:6,14
**dash**
200:12
**data**
33:23 38:12 71:19
72:16,19 73:9 77:9
85:17,21 232:3,11
232:19 233:9 234:9
323:11 331:20
**database**
33:24 72:5,20,23
76:24 77:9 84:24

121:8 130:25
181:25 183:19
222:15 229:20,23
232:14 293:18
351:15
**date**
1:18 19:6 32:18,19
38:5,10 39:18 47:21
50:21,24 61:14
65:25 69:15 79:21
79:25 80:11 82:10
85:22 87:8,11,22
88:9,10,12 89:8
95:2 117:5 128:17
148:17,18 150:16
150:20 155:2 156:2
180:12 183:10
198:11 207:18
216:6,9 250:15
251:5 281:7,9 285:6
285:10 295:12,14
325:19 339:9
344:24 348:7,9,11
359:9 367:5 406:11
409:14
**dated**
180:17 285:25 286:3
345:5 409:24
**dates**
152:6 170:17 184:2
**day**
57:4 69:24 162:19
190:7 199:18,18
334:16 403:17,25
407:21
**days**
23:3 35:21 66:18
70:13,16 79:16
199:2,11 328:15
393:10 403:2
406:16
**day-to-day**
56:24
**de**
101:19
**debit**

229:2,2 304:9,11
305:3,6,20 306:4,14
307:3,9,15,19,21
308:19 309:10,15
310:6 368:6 370:6
**debited**
177:2 394:25
**debiting**
229:7 302:11
**debits**
84:19 87:2 88:8 90:9
90:11 137:13
309:23,25 365:12
365:21,25 368:14
370:3 400:8
**debt**
108:9,13 307:19
**debtor**
5:15 14:17 50:9
61:12 110:7
**debtors**
1:6 47:10,13,20,21
47:23 48:5,7,11,15
49:25 50:10,12 51:7
51:10,15 52:20
58:23 85:12 148:7
201:5,25 206:4
219:22 252:4,14,18
253:22 258:2 261:4
261:12,19 262:23
267:17,22 287:12
295:11 322:13
327:15,20 334:22
335:9 336:17 367:5
**dec**
68:15 129:24
**decide**
227:19 228:4
**decided**
376:11
**decimal**
390:9
**decision**
206:22 299:23
**deck**
80:7

**declarations**
21:2,3 28:5,19 30:15
33:6 41:7 55:15,25
59:24 60:3,7 149:10
149:23
**decrease**
209:4 309:25
**deduction**
378:20
**deemed**
406:19
**deems**
39:23
**defaults**
108:19
**defend**
108:23
**define**
84:6,11 96:6 100:19
105:16 112:7
115:11 135:11
145:16,18 271:9
338:12 359:14,16
384:12
**defined**
62:12 87:7 90:3 96:9
108:14 130:6
131:15 145:22
146:8,17 169:12
185:11,12,19 186:7
186:8,14,18 189:7
260:17 269:24,25
270:10 271:10
303:5 331:15 360:3
**defines**
280:21
**defining**
106:8 136:12
**definitely**
159:17
**definition**
15:23 87:25 108:13
117:14 138:9 169:5
224:14 261:24
270:6,21 271:6
272:14 273:5,10,18



273:23 302:4
338:14
**definitions**
274:4 304:16 344:9
**degrees**
299:3
**DELAWARE**
1:3
**delineate**
141:17,25
**delineating**
311:16 330:19
**delineation**
142:6
**demand**
173:22 174:4 307:13
307:16 369:24
375:4,8 376:5
377:14 386:6
388:25 389:20
**demanding**
389:3
**denominated**
132:9
**denomination**
132:11
**denominator**
93:23
**denoted**
222:9
**dep**
41:2
**depend**
87:19 108:24
**depending**
23:17 174:20 179:12
198:4 208:7 209:15
237:24 238:7
395:17
**depends**
87:17 93:20,21 94:12
95:23 114:15
178:13 359:14
371:6 378:2
**depiction**
328:19

**deposed**
11:16 12:2,7 20:4
24:16,21,24 25:8
26:16 29:11,14 31:8
**deposing**
406:15
**deposit**
94:19 113:25 114:4,8
114:13,17 144:11
144:21 154:12,12
154:14 155:13,14
155:17,18 156:16
156:18,18 158:9,21
163:13 166:6
167:20 168:25
169:2,12,13,19
175:13 249:9
370:21 390:16
395:25
**deposited**
114:20 116:15 141:3
141:10,22 143:3
144:9 147:15
152:14 158:21
165:5,9,12 167:4
168:2,17 169:7
192:5 297:8 300:6
367:22 374:5
**depositing**
114:22 143:3,22
153:4 169:14
**deposition**
1:14 5:6 8:2 9:7,12
11:25 13:25 14:15
16:6,8,9,16,24
17:21 18:19 19:4,21
20:19 21:23 22:18
23:20 25:4,6,12,14
25:17 26:4,13 28:6
29:6,22 30:8 32:23
32:24 33:7,11,20
34:11,12 35:11
38:17 41:2,22 42:10
42:24 67:12 76:6,8
77:23 79:10 80:4,8
125:12 129:16

199:7 216:12
228:24 277:14,18
279:11 322:18
332:17,19 334:15
334:17 345:10,13
401:24 402:4,19
404:13,16,20
405:10 406:4,12,16
406:18 407:11
**depositions**
11:23
**deposits**
17:13 36:12,14,18,22
37:15,17,25 38:3
90:12 97:14 141:5,6
142:11,17,18,19
148:8 152:21,25
153:11 154:19,20
155:23 156:8
158:22 160:9,23
166:12 167:2 291:4
365:13 366:5
368:13
**derivative**
170:3
**derived**
72:2 137:13 233:2
**describe**
140:18 196:3 229:14
233:22 263:20
**described**
57:6 59:12 74:24
116:14 130:20
153:21 184:7 194:2
223:15 237:16
253:6 290:12
291:16 294:3
295:19 297:11
298:9 351:13
388:22,22
**describes**
223:17
**describing**
118:18 134:20
293:20 346:21
386:16,18

**description**
5:5 6:5 7:5 339:17
**descriptive**
351:17
**designated**
16:20 18:17,22 56:16
**designation**
53:15
**designations**
53:13,20,25
**designed**
173:25 175:25
330:20 339:15,19
339:22,23
**designee**
17:15,23 18:5
**despite**
234:6 311:13,20
**detail**
36:19
**details**
25:19 26:19,21 29:17
35:20 74:4 77:20
181:11
**deterioration**
222:2
**determination**
21:18,21,25 22:3
237:2
**determinations**
64:2
**determine**
153:9 221:14 252:21
284:22 350:21
**determined**
32:7 37:23 189:17
201:12 202:8,19
207:5
**determines**
123:2
**determining**
133:4
**develop**
41:19 74:3,9 76:19
109:22 172:16
177:24



**developed**
39:17
**dictate**
174:5 396:12
**didn't**
41:4 68:8 93:11
　112:3 168:14 173:3
　181:3 183:22 209:5
　226:8 233:15 266:9
　266:10 297:15
　363:2 390:10
**differ**
63:10 178:20 358:17
**differed**
396:7
**difference**
73:6,10 87:24 117:17
　119:15 179:16
　188:7 189:2 204:18
　235:2 289:10
　358:20 383:16
**differences**
38:22 101:16 224:19
　224:24 273:12
　351:12,17
**different**
35:15,16 49:3 71:14
　74:22 91:12 98:4
　99:6 104:7 107:24
　122:22 123:6
　127:16 132:22
　133:2 135:7,8,25
　141:19 142:2
　148:17 153:12
　155:3,8 157:14
　161:11,14,16
　166:23 176:10,13
　176:14,16 177:8
　187:4 201:15
　202:15 203:17
　205:6 207:9 222:18
　227:10 230:5
　247:10,11,12 252:8
　268:15 271:5
　272:19 275:19
　287:8 296:7 298:24

299:2 339:16
　346:18 360:5
　376:15,25 386:14
　386:24 387:2,4
　396:7 398:21
**differently**
110:6 177:7 242:16
**difficult**
141:16 156:7
**diligent**
234:7
**dimple**
180:7
**directed**
254:21
**DIRECTION**
8:4
**directly**
68:8 72:2,4,23 78:25
　89:13 149:8 249:4,6
　369:21 385:15
　387:19
**director**
53:11 56:18
**dis**
130:8
**disagree**
234:18 334:10
**disagreed**
262:24
**disagreement**
262:5 263:3,8
**disclose**
73:24
**disclosed**
73:22 74:13 76:2
　149:5 204:14
　228:13
**disclosure**
63:19 69:2 77:14
　79:3 228:17 260:21
　261:2,6,9 327:18
**disclosures**
70:11 149:7,9,13
**discover**
251:19 254:2

**discovered**
253:12
**discovery**
334:5
**discuss**
41:7 211:13 318:10
　319:6 402:14
**discussed**
35:10 36:11 65:4
　79:18 80:6,9 131:6
　136:21 245:10
　250:4 267:10 319:8
　392:22
**discusses**
264:2
**discussing**
81:12 136:12 144:2
**discussion**
83:10 218:13 338:15
　398:8
**discussions**
45:19,24 79:19
　142:25 147:7 151:3
　162:7 166:18
　253:19,21 275:10
　276:15
**displayed**
120:15 124:25 125:2
　125:4,5 130:8 240:6
**dispute**
44:20,23 57:13,17,22
　65:10 82:13 83:15
　199:2 206:3 258:24
　259:5,16,23 262:2
　262:12,17,25 263:7
　264:7,11 265:22
　271:20 333:2,23
　335:20
**disputed**
82:6,7
**disputes**
27:19 63:21 64:4,10
　64:18 82:9,17 259:4
　259:14 261:15
　276:25 303:12
　333:7,11,13,16

**dissolution**
51:5,19
**dissolutions**
50:17
**distinct**
173:13
**distinction**
18:25 172:25 245:12
　245:12,17 246:5,6
　246:13
**distinguished**
156:15
**distribution**
62:23 63:17
**distributions**
27:24 49:22 62:14
**DISTRICT**
1:3
**diverge**
174:12,13
**diverged**
35:23
**documentation**
155:9 226:17 254:22
　321:20 326:7
**documented**
74:11,13 75:17 78:18
　149:23
**documents**
8:9 20:21 21:10,12
　21:18 22:9 33:15,17
　34:7,9 48:7,16
　69:18 73:3 135:25
　136:10,10,16
　145:21 146:7 155:8
　171:12 182:2,6,6,9
　182:15 192:22
　216:10 217:23
　229:18 252:3,13,24
　253:7 254:24
　255:14,20 263:18
　270:3 278:23
　286:13 287:18,23
　316:4,17 317:25
　318:3,6,10,12 319:6
　320:16 324:9,16,21



325:4 326:15,20
327:9,18 329:5
330:16,23 331:3
343:16 346:20
347:23 358:15
360:20,24 361:3,23
362:4,5,9,14,15
392:2
**does**
26:23 54:2 56:13
57:5 59:4 63:9
66:21 67:2,4 71:4
71:13,18 72:21 73:8
73:8 80:23 103:18
106:20 111:6
116:19 121:8 130:4
133:6 136:21
143:20 148:5 152:7
157:10,19 163:16
178:6 179:20
184:14 187:21
194:18 197:17
209:20,20 211:4
212:25 213:11
219:2 220:16
221:20 224:11
225:11,13 227:23
255:8 261:10 263:9
264:23 266:6
270:20 271:18
275:18 276:5 279:7
279:9 281:21 282:7
283:14 284:19
288:9,23 292:11
306:17 308:8,17,23
312:10 313:3 315:4
315:18 316:9
323:21 335:19
349:3,6,17 350:8,25
351:24 353:5,12
356:14 359:16
366:23 367:7 368:2
368:23 372:18
378:4 381:15 383:7
387:19 390:25
395:3

**doesn't**
81:19 102:23 131:25
136:23 183:2 241:5
246:16 262:15
288:21 325:6
348:16 359:23
380:19 389:5,5,10
**doing**
77:8 105:23 207:4
214:12 382:19
406:10
**dollar**
89:19 93:18 94:7
104:21 105:17
107:10,12,19,25
109:3 110:10,22,25
111:7,13 112:5,12
112:19 113:5,12,23
114:5,14,17 115:15
116:4,5,7 117:8,18
119:20,23 120:8
121:17 126:20
188:12,14 190:10
190:12,13,13
201:23 202:17
209:3 240:10
288:19 289:6 290:4
290:6 363:18 364:3
371:16,24 376:3
378:21 380:9 389:7
389:18,19 390:14
393:3,4,7,17
**dollars**
86:16 89:4,7,20 90:6
90:21 91:8,17 93:24
94:17,21 101:11
102:17 103:17,19
103:24 104:13,13
104:20,24 105:8
107:7,11 109:23
115:2,7 116:13
130:9 132:10
242:24 244:13
245:4,24 247:8,15
288:5 354:10
363:11,19 364:10

371:15 383:12,14
383:20 386:25
390:12 392:5,8,9
393:15
**dollar-for-dollar**
377:3
**done**
55:14,21 72:22 75:24
77:7 153:23 157:6
158:6 181:23
194:14 203:4
219:19 222:23
233:18 273:17
293:24 294:17
376:10 377:18
386:11 399:7
**dot**
64:19 266:10
**dot-com**
64:19
**double**
194:16,17 202:7
**doubled**
194:17
**doubles**
195:5
**doubt**
323:22
**down**
50:14,16 189:22
200:12 209:15
234:20 313:23
**downside**
178:19
**downtime**
296:4
**downward**
209:14
**draft**
251:9
**drafted**
199:14 216:24 217:2
217:5,7,10 250:17
250:19,22 251:3,24
252:10 324:10,16
325:19 341:2

**drafting**
219:8,16 221:11
250:24 251:12,15
251:25 253:8 254:5
254:25 255:22
274:22 316:3,16
317:24 341:3
**drafts**
255:9 256:6
**drawing**
245:11,12,16
**due**
175:22 235:13
236:21
**duly**
11:3 409:8
**duplicate**
85:16
**duplication**
85:23
**duration**
239:4 399:23 400:15
**during**
14:14 16:24 65:4
101:20 160:24
164:9 224:25,25
252:18 258:24
266:22 370:13
392:8 393:9

**E**

**E**
5:3 6:3 7:3 145:9,9
311:22,22,22 407:2
407:2 408:2 409:2,2
**each**
14:17 39:20 57:5
58:19 95:12 96:2
202:6,25 208:5
226:9 287:23
376:13 386:3,6
**earlier**
33:12 47:8 49:9
67:24 122:9 131:6
194:2 199:2,18
213:2,7 229:17



232:13 244:25
245:10 256:20,23
291:18 296:23
297:6 298:25
310:11 311:4
312:13 331:15
333:22 353:18
381:4 392:10 395:5
**early**
37:12 39:18 199:11
267:8 401:3
**early-stage**
34:22
**easier**
69:25
**easiest**
173:16
**economic**
226:21
**economically**
178:20 225:10
**Edgar**
24:9
**EDT**
1:18 9:3 405:11
**effect**
63:16 150:11 227:4
250:12,14
**effected**
294:21
**effective**
32:11,17,19 47:20,25
50:21,24 150:16
367:5
**effectively**
118:12 175:20 225:4
225:7 361:15
376:16 397:25
**effectiveness**
27:3 49:4,5,13
**effectuate**
144:11
**effectuated**
366:10
**efficiency**
344:13

**effort**
252:25 333:12
**efforts**
153:18 160:17 234:7
252:5,20 253:6,10
254:14 277:13
284:21,25 311:20
**either**
30:6,9 43:18 53:20
86:12 94:5 96:25
97:15 155:15
174:16 177:19
361:10 363:19
**elaborate**
153:25 172:19
213:23
**elected**
398:25
**election**
399:5
**electronically**
116:17
**element**
264:6
**else**
21:19 22:2 29:3
43:18 56:14 103:12
121:22 190:12
214:18 225:5
260:11 267:18
300:13 310:21
388:16
**email**
2:11,23 7:15,19
285:4,7,15 286:15
287:16 288:11
**emails**
286:16,23 287:22
362:10
**embedded**
310:23 329:10 330:7
**employed**
26:9 42:4,15 44:4
53:6 71:6,15 153:15
260:18
**employee**

42:19,21 43:13,15,24
44:7,20,21 46:12,15
58:15 99:9 136:6
185:24 409:17,19
**employees**
23:16,19 24:3 40:25
42:14,18 43:3,8,17
44:12 45:5,17,25
46:2 47:2 67:25
230:14 260:23
385:12,14,18,23
**employee's**
99:4
**employing**
76:12
**employment**
46:19
**empty**
163:14 166:6,7
**en**
333:24
**end**
162:19 169:11,11
190:7 202:18
355:13
**ends**
355:7
**engage**
292:5 392:19
**engaged**
153:17
**engagement**
14:10 15:7 23:11
24:14 48:25 49:2,15
50:18,18,22,25
51:20,21 52:5,18
54:4,9,14,15,17,19
55:3,6,18 56:6,10
56:18,20 57:24 58:8
58:17,22 125:22
**engine**
225:24 226:5 237:24
**enough**
311:11 380:9
**ensure**
74:10 85:20 376:25

**ensuring**
27:20
**enter**
118:8,21 175:5
191:19 195:14,25
196:4 228:5
**entered**
38:4 50:22 142:9
150:16 206:5 209:7
227:16 238:4
280:20 291:6 293:3
294:5,10 295:20
367:13
**entering**
120:8 121:18 175:14
226:22 371:18
**entering/exiting**
211:5
**enters**
195:12 196:19
227:16 228:11
**entire**
66:22 81:22 91:25
93:7 109:17 125:9
127:5 129:5 133:15
150:8 180:2,3
187:25 188:23
191:22 206:17
241:23 244:18
249:15 253:19
295:2 370:12
390:11
**entirely**
73:2 102:22 193:19
**entirety**
46:20 67:3 278:21
281:18 290:10
359:9 383:24
388:19,20
**entities**
15:8 50:12 51:19
153:22 259:15,18
260:10 261:16
300:15
**entitle**
93:17


MAGNA ▶
LEGAL SERVICES

**entitled**
96:18 191:22 195:3,7
246:9,19
**entitlement**
86:9,18,25 87:14,16
87:20,25 88:6,21
89:2,3,5,18 90:20
90:20 91:2,5 92:8
92:16 93:14,17 94:4
95:5,11 96:3,17
97:4 98:15 101:8
102:8,9,12,16 103:4
103:9 104:21 132:7
134:10 137:22
165:25 244:2,7
245:5,14,25 246:7
247:6 288:19,22
289:5,11,25 290:2
290:11 293:9
304:25 305:7,18
363:21 364:18
365:16 379:21,22
381:6,10
**entitlements**
84:15 86:7,11,16
88:17,21,23 90:4,18
91:20 93:2 96:7
97:6,18,22 99:20,22
100:2 104:24 105:3
105:13 106:19
109:19,25 117:19
117:24 126:21
131:6,15,18 138:3,8
138:25 139:10,17
139:21 140:24
147:2,11 152:9
162:17 179:8
243:12,18,20
244:20 295:16
369:12,15 378:5,7
386:17
**entity**
15:19 50:17 169:11
257:24 258:9,15
261:7 300:12,16,21
333:24

**entries**
223:9 365:21 367:21
399:3
**entry**
119:23 196:9 293:17
293:20 294:15,17
366:11 368:14
370:17 383:10
400:6,13
**environment**
85:9,10,15,16,17
166:23 167:11,14
168:4
**envision**
375:16
**EOD**
200:14
**equal**
190:12 202:24 208:6
208:22
**equaled**
191:8
**equals**
188:5,6
**equating**
301:21
**errata**
4:13 406:8,11,14
**especially**
34:17
**ESQUIRE**
2:6,7,16,17,18,19
**essence**
224:19
**established**
258:10
**estate**
23:18 26:15 27:14,15
29:16 31:4,25 32:5
56:23 57:9 64:5
141:13,16 142:3
146:20,22 148:3
150:12,14 153:16
153:17 154:8 220:9
245:2 246:23
265:10 267:15,16

267:23 268:11
275:15,23 277:2
308:22 337:15
**estates**
150:13 267:17,18
**estate's**
149:12 152:19 244:6
268:9 289:16 290:9
345:25 346:5
**estimate**
23:3
**estimated**
207:2,14
**estimating**
88:16
**estimation**
202:22 206:5 207:8
207:15 209:7
**et**
1:5 9:9 107:9 272:11
**ETHE**
242:22
**Ethereum**
156:14 158:2 242:22
272:10 386:24
**Etherscan**
144:15
**ETH-PERP**
200:14
**evaluate**
31:23 35:17 160:14
160:15 278:4
**evaluating**
198:25 203:14 233:5
**even**
93:25 156:7 175:15
232:16 355:18
378:17 387:2
**EVENING**
4:11
**event**
167:16
**events**
397:16
**eventual**
49:12 206:5,15

**eventually**
203:8
**ever**
20:11 54:22 55:8,11
57:20 97:5,6 176:2
237:16 241:18
250:12 279:20
280:3,14,22 281:8
281:19 282:5
298:10,16 317:7
327:9
**every**
42:19 56:8,10 57:13
58:15 77:20 81:20
85:2 101:20 102:21
104:3,10 111:4
119:15 120:17,19
120:22,25 121:3,3,9
123:3 124:24
131:20 158:17
165:3 166:22
167:13 169:16
177:2,5 183:15
184:11 187:7,20
188:18 191:15,16
206:20 225:2 229:2
229:8 230:8 231:4
232:15,16,16,21
233:11,23 235:11
239:19,20 243:2
253:25 256:4
283:23 287:10,11
326:25 348:24
349:24 351:19
360:14 363:20
374:25 376:10
377:11,18 386:25
394:23 402:6
**everything**
40:8 41:20 65:12
66:20 74:8 109:15
118:23 190:8
230:25 240:16
253:12 254:11
331:9
**evidence**



148:15,20 184:9
193:2 243:4 323:24
324:2
**evolution**
49:12
**evolved**
32:10 34:19 77:25
78:4
**exact**
32:16 44:10 79:18
85:17 99:11 122:19
130:22 159:2,23
215:20 222:13
352:11 370:12
396:10
**exactly**
88:22 123:11 174:3
357:2 395:16
**examination**
4:8 11:7 409:7
**examine**
277:19 331:11
**examined**
11:5 154:22 321:7,12
**example**
35:5 36:10 39:4
57:14 82:22,25 83:5
84:4 90:25 91:2,13
93:15 94:19 100:16
100:22 102:18
103:3,20 104:5,17
106:15 109:7,8
110:9 113:6,24
114:2,19 120:18,23
127:9 131:22
132:25 135:8
136:20 144:15
156:16,22 170:21
173:4,15 178:22
179:10 195:4
208:12 210:12
223:22 224:5
225:12 232:15
237:25 241:13
295:4 327:2 354:9
363:16 371:7,8,14

371:21 372:9 373:6
378:9,10,13 379:9
383:11 386:23
389:2,14 390:8
396:8
**examples**
35:19,22 93:7 100:21
102:5 110:13
112:24 124:8
136:12 271:3
294:20
**exams**
53:24
**Excel**
77:2,8,10 78:20,24
194:6 229:21
**exception**
88:15 347:5 367:22
368:13
**excerpted**
66:15
**exchanges**
169:7 341:20 342:6
**exclude**
329:8
**excluded**
37:16
**excluding**
118:24 273:9
**exclusion**
36:13
**exclusively**
142:17 161:10
203:24
**excuse**
16:4,8 20:13 61:16
79:5 129:25 139:18
180:2 198:2 266:10
286:3 288:4 320:25
389:23
**exercise**
153:22,24 158:6
160:5 161:5 165:18
**exhausted**
348:24
**exhaustive**

153:8 252:20,25
284:25 326:6
351:19
**exhaustively**
319:8
**exhibit**
5:7,10,18 6:7,15,22
7:7,12,15,16,20,24
16:4,5 19:3,20 61:8
61:18 65:19 66:4
69:8 71:2 128:12,20
180:9,15 198:7,14
212:23 216:3 248:8
250:5 285:3,3,7,13
285:22 286:2,4
287:25 290:14,20
322:8,8 344:5,20
345:2 352:14
356:18 357:17
**exhibits**
4:7,16 21:2,6 66:9,15
66:21
**exist**
74:16,21 75:6 136:23
166:24 167:12
255:10 284:20,22
290:12,20 292:11
325:7
**existed**
34:4 85:21 92:24
290:18 292:23
293:7,13 297:4
346:15
**existence**
142:7 226:15 256:8
291:25 292:18
318:20 340:4 342:4
**existing**
24:17 318:7
**exists**
121:7 291:15,19
292:7
**exit**
233:4
**exited**
118:9 119:12

**expect**
289:20
**expensive**
65:5
**experience**
54:5,7,11 172:3
**expert**
55:8,11,17,18,20,21
56:2 331:25
**expiration**
170:17 192:3
**explain**
71:5 302:16
**explained**
189:19 229:16
**explainer**
7:24 192:22 344:21
345:4
**explaining**
204:17
**explicit**
25:18 233:13 330:20
361:19
**explicitly**
173:3 215:24 232:9
**exposure**
172:22 178:3,24,25
179:6,12 353:23
354:7,11,13
**express**
93:23,24
**expressed**
89:4 90:6 93:22
130:9 247:7
**expressly**
17:18 123:18
**extend**
404:12
**extended**
109:9
**extent**
89:15 109:20 112:3
116:22 117:9
174:11 182:20
192:16 202:9 237:5
256:5 260:5 289:13



371:11 373:3
380:23
**external**
169:9 251:11 340:25
**extract**
76:23 94:8,14,23
95:10,19 103:24
**extracted**
77:9 222:14
**extraction**
95:6
**extracts**
33:22 72:20 98:24
130:25 194:6,12
229:20
**e-money**
116:9,12,21 117:3,11
117:13,18 307:18

———————

**F**

**F**
2:16 145:9 409:2
**facets**
346:19
**fact**
24:15,21 29:14 34:18
36:25 45:3 58:24
79:22 117:24 130:7
141:2 165:6,10
166:22 167:13
183:25 223:7
231:11 236:5 247:8
253:7 262:8 263:4
287:5 290:20
297:13,18 298:5
311:15 330:19
337:4 346:14 348:4
359:4 372:15
**factor**
187:6,12
**factored**
240:10
**factors**
94:12 134:4 176:14
241:16
**facts**

78:11 95:20 108:24
111:2 148:15,20
149:3,14,18 158:16
193:2 245:17,21
394:22
**factual**
148:6 219:23 247:2,4
277:21 316:6 321:5
358:16,20
**factually**
69:4 117:2 141:20
271:4 296:12
315:16
**fail**
406:17
**failure**
19:13
**fair**
68:11 223:14 226:24
285:23 289:8
316:23
**fairly**
242:2 319:8
**faith**
62:16
**familiar**
16:12 52:21 61:5
76:17 81:20 82:2
83:14 99:11 116:8
128:25 129:3
130:15 136:2,3
148:12 180:19,22
198:16,18 203:10
213:19 322:14,20
322:25 323:2 345:6
345:9,12
**FAQ**
204:15
**far**
121:2 170:13 379:8
**FDM**
331:14,16 336:15
**feasible**
158:7
**February**
248:17

**federal**
16:10 279:18
**fee**
175:5,10
**feel**
15:12 131:12 199:23
231:24 270:13
285:18 312:17
325:11 375:22
**fees**
101:19 102:20
113:14 118:25
119:4 175:7
**fell**
311:5
**few**
12:10 100:20 115:17
137:12
**fiat**
86:13 87:4 94:20
105:2,12,18 106:6
106:14 115:22,24
116:13 137:20
307:17 364:16
366:12 367:24
380:9 387:7 394:21
399:9,10
**field**
37:3,13 105:11
386:20
**fifth**
214:11
**figure**
130:3,5
**figures**
71:12,25 72:17 194:4
**filed**
5:21 6:10,17 20:23
22:19 30:11 37:20
51:2 58:22 65:23
67:6 69:12 70:9
74:17 75:6,7 83:7
83:23 128:14,22
129:4 162:12 194:5
332:8
**filing**

73:24 86:2,3 267:9
277:9 280:20
299:16 328:12,16
**filled**
388:25
**fills**
222:14
**final**
64:14 355:17
**finalized**
251:4
**finally**
27:23
**financial**
15:4 53:15 232:3
310:4
**financially**
409:21
**find**
226:9 237:19 270:6
356:11
**finding**
235:25
**fine**
242:14
**finish**
13:10 241:11 346:4
402:19
**finished**
138:22 214:4,5,14
233:17
**firm**
153:14,15
**firms**
251:24
**first**
11:3 12:17 101:23
102:6 104:17
154:18 168:6,20
175:5 185:11
187:18 204:5
218:13 231:2
237:23 248:16
271:7 288:2,4
317:17 334:23
337:17 355:13



357:11 358:15
368:24
**firsthand**
41:5,12,17,24 323:18
**first-day**
49:9 327:17
**five**
22:15 70:16,25 293:7
388:12
**flip**
131:13 174:22
256:22 269:12
311:24 312:13
314:11 321:8
356:10,17 370:7
**flipping**
357:16
**fluctuate**
112:13,22 196:25
**fluctuating**
112:19
**focus**
12:9
**focused**
29:15 31:3,5 32:4,9
32:12 49:17 60:18
149:20 161:10
203:20
**focusing**
218:18
**Foley**
1:21 9:18 409:3
**follow**
165:3 382:2
**followed**
154:16
**following**
50:23 87:16 103:15
222:3 232:24
274:10 328:16
379:9
**follows**
11:6
**footnote**
169:4
**foregoing**

409:11
**forever**
108:21
**formal**
342:24
**format**
76:25 229:23
**formats**
194:7 229:21
**formed**
78:20
**former**
40:25 42:20 44:11,19
45:4,16,24 196:17
**formerly**
34:4
**forms**
91:12 247:10,12
257:15
**formula**
133:15 310:25
352:11,13,21,22,23
**formulas**
77:8 351:12,13,23
352:6
**forth**
162:15 188:18
212:17 349:8
409:14
**forward**
150:21 338:15 395:9
401:2
**found**
182:15 184:6
**four**
325:12 388:13
**fraction**
311:6 351:14
**fractional**
390:2,17,20,24
391:14,17
**framing**
220:23
**frankly**
68:2
**free**

15:12 131:13 199:23
231:24 270:13
285:18 312:17
325:11 375:22
**freezing**
360:7
**frequently**
235:14 236:11
238:12 240:17
270:25 396:24
403:18
**front**
35:7 36:6 39:5 129:6
192:2 250:9 256:12
**frozen**
88:13 196:18
**FT**
275:18
**FTS**
63:23 81:13
**FTT**
242:22
**FTX's**
17:12 20:23 21:4
44:17 65:12 84:11
89:7 133:8 135:13
143:2,18 146:25
147:14 165:20
166:9 176:6 184:19
187:3 189:24
190:17 195:22
219:13 235:6
244:17 258:16
259:16 263:14
264:20 265:13
268:15 270:16
275:5,17 276:10
291:13 299:24
303:7,11,17 304:23
305:5 307:11 312:4
312:16 314:14
318:4 325:15,23
328:22 339:12,13
340:21 341:25
345:14,16 346:11
359:22 361:9 365:8

367:8 381:20
386:14 392:18
397:19 398:14
401:23
**FTX.com**
90:7 127:23 130:8
248:18 263:5,22
264:4,25 285:15
**FTX_3AC_000013...**
7:13 216:5
**FTX_3AC_000013...**
7:9 198:10
**FTX_3AC_000045...**
6:23 180:11
**full**
43:24 190:22,25
203:7 209:19 384:4
390:8
**fully**
13:22 69:3 78:12
**function**
139:24 342:15,16
**functional**
193:16 203:14
228:16
**functionality**
98:5
**fund**
361:18
**fundamental**
236:18
**funded**
399:8
**funding**
173:24 174:10,15
**funds**
355:17
**fungibility**
156:24 157:11,17
**fungible**
156:14 157:21 158:2
158:4
**further**
37:22 39:18 155:21
164:17 165:10
274:24 393:4



395:10 409:11,16
**future**
101:24 117:22
118:12 119:9,16
122:3 123:21,25
124:3 170:14
173:18,23 174:6,12
188:2 191:19,19,20
196:12 197:14
202:23 206:19,23
207:10 208:6,8
210:24 214:23,25
224:18,18,21 227:5
233:8 235:9 236:9
236:23 237:11,12
353:21,22 354:6,11
354:14,17,17 393:2
393:9,19

### G

**G**
2:7 311:22 407:2
**gain**
92:16 119:19 123:2
172:22 177:17
178:24 187:6,19
188:13,22 189:22
190:10,13 198:3
202:10 205:2 207:6
208:13,22 209:12
243:22 244:4
**gained**
327:21
**gains**
174:18 175:23
176:24 178:17
189:23 190:16,19
191:14 196:12
197:14 233:7
235:11,14 236:21
239:2,15,17,20,23
240:9,11 243:13,19
302:17 393:16
**gains/losses**
201:21
**gain/loss**

188:25 206:12
**Gary**
260:19
**Gaurav**
3:4 23:25
**gave**
34:13 86:25 248:6
316:22 320:13
339:17
**GBTC**
242:22
**general**
26:15 27:10 28:18,21
35:18 36:15 38:20
46:16 47:18 54:16
56:5 60:16,18 63:13
65:6 76:5 81:12,21
114:22 127:23
130:5 133:14,17
141:18 142:23
151:22 152:24
154:15 155:5 158:9
158:15,20 159:6
160:6 171:18 172:2
177:16 213:20
218:9 221:25 222:7
222:10 224:13
225:23 231:6
236:12 252:16
253:18,24 257:8
259:10 267:13
268:6 288:12,15
290:3 310:5 316:13
333:21,22 339:17
345:21 347:6
353:17 362:22
377:12
**generally**
24:16 39:11,13 55:12
57:14 60:4 83:11
86:10 112:18
121:20,25 126:22
133:19 134:15,22
149:11,13 160:9
181:9 182:12
198:18 199:13

224:8 250:21
252:15 265:21
309:24,25 318:25
320:3,10 332:4
338:23
**generate**
134:11 175:23
189:21,22 235:11
**generated**
119:6 175:12 236:22
**get**
29:16 75:19 78:20
80:12 176:23
216:22 337:17
352:17 376:4
392:14 401:13,17
**gets**
355:19
**give**
10:20 100:20 117:17
208:11 215:4
279:10 344:18
355:5 358:6,25
**given**
32:5 34:17 36:25
63:18 100:24
120:24 149:19
151:13 159:7 164:7
165:23 189:14
252:14 269:25
275:21 325:18
334:7 378:5 399:19
400:12 407:14
**global**
61:25 62:5,12 63:3
63:10,13 118:22
119:2 213:20
259:11,25 262:5
263:3,8,16,25 264:8
264:21 265:8,11,23
333:4,5,19 359:6
**gluecksteinb@sull...**
2:11
**go**
12:8,8 25:19 35:20
72:13 113:11,12

199:20 212:18
270:13 271:15
295:7 310:19
311:14,15,18
369:22 382:16
393:4 403:10
**goes**
177:4,6 187:6 198:5
**going**
13:17 14:13,24 15:10
15:13 20:9 49:8
136:24 137:5
150:21 159:4
173:15 176:2
208:14 214:11
234:21,25 256:22
278:25 308:24
311:2,3 312:2
352:25 356:20
393:20,21 402:6
**Goldberg**
2:19 10:3
**gone**
316:8
**good**
11:9,14 59:19,20
62:16 120:22 137:4
338:17
**Google**
267:2
**Gordon**
29:5,8 30:22,24 31:7
31:13 32:6 35:4
38:16,24 201:4
**Gordon's**
32:12,22 33:2,4,9
34:10,19,20 35:24
39:16,23 199:6
203:9
**got**
63:5
**govern**
217:13 345:23
346:23 347:17
360:22,25
**governed**



226:13 227:18
259:13 335:10,16
343:15,20 345:16
**governing**
52:22 217:23 332:12
347:7,23
**governs**
218:7 308:15 345:19
347:4
**great**
14:23
**greater**
178:8,16,17,18,19
**group**
27:5 28:25 97:17
140:4 141:5,15
146:21 147:17
162:20 169:11
185:24 217:4
260:10 266:23
267:2 300:14
**guaranteed**
358:9
**guaranteeing**
357:22
**guarantees**
355:15 356:15
361:10,19
**guess**
159:16,18 356:20
**guessing**
69:23

---

**H**

**H**
5:3 6:3 7:3
**hadn't**
76:10
**hand**
10:17 164:18 176:15
205:7
**handed**
16:4 19:19 61:17
66:3 70:3 128:19
180:14 285:12
322:7

**handing**
198:13
**handling**
65:14
**happen**
120:22 283:14
311:10 370:8 383:8
395:4
**happened**
77:17 120:18 160:17
164:25 167:18
267:7 311:20
326:18 329:7,25
330:5 380:23 393:6
399:21
**happening**
230:8 252:15 327:7
328:19 384:8
**happens**
229:7 374:12 383:8
**happy**
13:11 35:8 136:24
172:19 239:6 271:2
338:13 350:12
355:5 356:10
402:14
**Harris**
3:9
**Harrison**
24:4
**has**
18:16,18,21 19:9
24:24 31:24 32:10
32:11 34:18 36:16
37:6 42:13,20 43:5
45:23 51:6,8 57:21
58:15,20 67:14,15
79:13,17,23 93:22
109:16 129:8
135:14 153:3,6
154:6 189:14
206:10 213:22
220:17 222:14
230:13 234:9,10,11
251:6,18 252:9,25
253:15 254:24

263:15 275:6
279:17 285:21
304:25 305:7,16
336:6 348:19,23
350:20 372:12
380:6,8 381:20
385:11 391:8
397:22
**haven't**
46:22 57:24 66:25
136:22 171:12,16
350:11
**having**
11:3 48:20 94:9
96:14 109:24
111:14 142:23
173:10 177:20
203:7 205:8 211:22
235:10 251:22
336:15,18,24
340:12 350:4
373:18,19
**hazard**
356:20
**he**
24:4,21 26:16,18,19
27:3 29:9,11,14
31:3,21 32:8 34:13
40:5 44:6 46:16
51:23 57:5,10,16,18
57:21 125:20,20
220:17 254:21
323:20,22 402:5,10
403:14,17 404:24
405:6
**head**
23:22
**heading**
314:3
**headlight**
158:13
**headline**
130:3,5
**hear**
402:12
**heard**

80:3 153:23 334:7
**held**
22:9 33:24 96:22
122:23 123:7
162:20,22 222:4
274:9 296:3 300:2,9
397:9
**Hello**
287:24
**help**
34:3 38:16 75:19
132:20 135:9
146:15 177:11
181:10 190:4 199:8
231:14 234:2 346:7
346:17 347:11,22
349:15,19 350:14
350:15,19 351:2,7
351:10,20 357:7
358:21,22
**helped**
23:20 67:12
**helpful**
239:7
**helping**
42:23,24
**here**
11:15 15:14 24:7,25
26:4 28:6 35:21
59:14 65:10 79:16
81:16 90:18 128:5
129:14 134:17
140:8 145:3,16
146:6 158:25
209:20 212:8,9
219:2 223:20 248:9
256:8 261:10 270:7
270:22 271:6
272:20 273:13
283:2 287:19
290:13 291:16
292:4 309:9 318:14
319:18 334:8,21
335:11 337:3,17
338:11 341:16
344:19 359:23



385:20 393:25
402:18 403:7,13
404:24 405:6
**hereby**
407:8 409:6
**herein**
11:2
**hereinbefore**
409:14
**he's**
24:16,18 26:16 56:19
57:12,14 138:18,22
214:4,5,9 402:8
403:20
**hide**
223:19 270:5
**high**
198:4 354:12 358:3
**higher**
172:10 174:21
177:17 178:3
**highest**
375:15 376:5,7
388:24
**highlights**
12:10
**highly**
259:24 274:25 278:6
**him**
24:20 26:12 29:13,19
42:25 51:23 214:10
402:9,20
**his**
18:12 35:2,6,11
38:17 39:14 40:17
43:23,23 44:8,10
46:14,21 51:23
57:15 78:3 125:19
125:21 126:2 163:3
214:4 260:19
323:19 403:15,19
404:9,22
**history**
34:16 111:3 121:10
241:23 242:3 243:3
244:18 249:16

254:6 272:3 323:8
360:14
**hold**
22:20 53:14 159:4
198:5
**holder**
62:22
**holders**
27:25 49:23
**holding**
178:9,19,21 191:7
211:6,7
**holds**
27:15 197:20
**honestly**
151:10
**honor**
298:16
**hope**
11:14
**hospitable**
13:8
**hosted**
98:7
**hour**
79:14,22,24 80:10
155:16 374:25
376:13 377:18
**hourly**
58:15 59:11 399:22
**hours**
22:22 23:5 58:16,18
79:5 401:8,15,17,22
402:2
**housekeeping**
16:2
**however**
305:11 355:16
**hundreds**
155:25 156:5 165:6
395:18,22 397:5
**hypothetical**
114:21 157:25
166:21 167:11
278:3 293:25
373:14 379:4

**hypothetically**
113:7 222:22

---
## I

**identifiable**
372:19
**identification**
19:5 61:14 65:25
69:14 128:17
180:12 198:11
216:6 285:6,10
293:2 344:23
**identified**
155:24 225:21,25
266:12 291:10
396:25
**identify**
252:10 318:23
319:19 396:4
**identifying**
253:7 319:12
**identities**
43:7 251:13
**identity**
250:23
**image**
123:16 405:2
**images**
98:25 124:9,11,14
125:16
**immaterial**
351:11
**immediate**
380:20
**immediately**
101:10 114:12
119:19 155:15
399:4
**impact**
129:6 191:12 193:11
203:19 241:17
**impacted**
361:6
**imperative**
406:13
**implement**

339:7 342:8
**implementation**
49:17
**implemented**
339:10
**implication**
315:4
**implications**
19:12
**implicit**
233:14,19
**implying**
41:18
**important**
164:21 172:24
178:22 271:17
**importantly**
156:3 163:13 357:7
**impose**
220:21
**impossible**
152:13,20,23 156:11
156:21 157:2
162:16 164:11
165:11,21,25
291:24
**improved**
77:21
**inaccuracies**
40:17
**inaccurate**
34:14 39:24
**inactive**
324:22
**include**
14:21,24 20:21 33:22
48:6 54:2 65:9,11
66:9,21 67:5 89:18
90:11,20 95:5,12
141:8 153:19
204:11 254:8
260:18
**included**
35:13 37:4,25 38:7,9
49:6 55:18 63:19
72:15 75:21 90:23



91:20 95:5 105:14
116:4,6 127:14
128:7 132:5 142:8
153:11 194:4,9
205:24 206:12
267:3 273:2 353:19
363:17 385:17
386:6 387:20
**includes**
23:21,24 27:13 49:21
55:24 71:25 254:5
254:11 388:25
**including**
21:5 23:25 24:4
27:15 33:13,14
55:16 60:20 65:14
91:13 100:7 134:6
149:24 153:13
201:7 202:4 260:8
264:15 296:5
327:16 348:25
**inclusion**
35:11 36:12
**inconsistency**
287:22 350:5
**inconsistent**
203:3,12 204:7 283:8
326:19 327:6
330:18,22 350:10
356:4 357:6,8,24
**incorporate**
179:14
**incorporated**
202:20 257:18,24
331:16
**incorrect**
140:12
**increase**
106:13 190:10,11
241:2 243:23
309:24 340:11
384:4
**increased**
172:9 174:19 177:23
**incredible**
232:19

**incredibly**
255:18
**incur**
109:2 111:13 310:13
310:15 392:22
**incurred**
101:20 102:20,21
119:4 175:11
361:20 393:8
**incurring**
110:10
**independent**
76:20 77:11,16
**independently**
173:6
**INDEX**
4:4,7 8:2
**indicate**
228:24
**individual**
12:2,5 20:5,12 43:12
209:16 220:13
227:15 251:23
402:10 403:3
404:22
**individually**
267:6
**individuals**
46:8 68:4 221:10
261:3
**inform**
45:2 280:22 281:8
**informal**
56:15
**informally**
30:25
**information**
45:15 71:11 76:24
120:15 128:2 147:6
185:2 240:4,18
251:6,19 252:13,17
253:2,15 254:3
268:7,8 285:2
333:20 346:8,15,18
347:11 348:25
349:4,6,16,17,20

350:16,19
**informational**
346:22
**informations**
316:7
**informed**
45:14 47:3
**Inherently**
118:6
**initial**
164:19
**initiate**
96:24
**inoperative**
324:4
**inquiring**
46:3 253:17
**inquiry**
268:2
**instance**
102:6 192:4 394:25
**instances**
35:22 116:2 129:22
136:4 155:25 359:2
359:11 360:6,12,15
394:14 403:24
**instead**
11:11 179:5 263:2
**Institute**
53:16
**institutional**
249:5
**instruct**
13:3
**instructed**
17:2
**instruction**
62:19
**INSTRUCTIONS**
406:2
**instrument**
170:3
**insurance**
361:18
**intend**
273:22

**intended**
115:21 174:8 253:11
325:21 341:5
**intending**
20:11 352:6 402:9
**intent**
171:9,16,21 175:21
192:13,20 208:24
213:8 275:3 277:19
313:20 314:9,22
315:2,18 316:2
317:23 318:3
325:20 336:6 337:2
353:16 358:23
**intents**
316:15
**interact**
68:2,8
**interchangeably**
135:6,24 211:12
**interest**
203:6 241:10,12
284:8 355:16
357:22 358:8
360:10,16 361:11
375:15 376:2,6,8
384:2 386:7 388:24
399:21,24
**interested**
409:21
**interests**
61:2 62:17
**interface**
117:25 124:25 127:2
127:20,22 128:4,9
238:24 239:16
264:4
**interfaced**
67:23 264:25
**intermittent**
233:10 240:5
**internal**
56:15 198:21 199:4
251:10 323:3,5
361:22 362:5,9,10
362:13



**international**
257:17
**interposed**
18:15
**interpret**
108:16 146:2 219:9
    220:7 257:7 270:3
    302:4 305:9 308:2
    315:14 332:2,12
    343:18 357:4 358:5
**interpretation**
219:18,22,24 275:19
    277:15 303:7
    307:11 308:9 310:9
    312:16 314:15
    315:5,11,17,24
    316:7
**interpretations**
135:17,20
**interpreting**
270:16 315:15
**interprets**
301:9
**interrupt**
138:17 233:15
**interval**
174:7 232:2,8 233:21
    234:8
**intervals**
233:11
**intimate**
77:19
**intimately**
24:18 48:9 57:21
    81:20 82:2,8,12
    83:14 180:22
    322:19 323:2
**into**
35:20 50:22 76:24
    77:10 118:8,21
    119:20,23 120:8
    121:18 141:3,22
    143:3,22 144:10
    154:13 155:6,14,14
    155:17 156:8,18,19
    156:20 158:9,21,22

160:23 166:12
167:21 168:2,3,17
168:18 169:9 175:6
175:14 177:4,6
179:14 187:6,8,22
191:19 194:6
195:12,14,25 196:4
196:19 203:7
216:22 225:9
226:22 227:16
228:5,11 229:20
236:24 237:22
238:4,11,15,19,20
240:10 250:12,14
271:22 291:6 293:3
295:21 297:8 308:9
312:2 329:10
333:13 354:18
367:13 371:18
378:15 395:7,25
**intrinsic**
101:15 235:13
**inversely**
112:6
**investigation**
252:4 333:12 348:13
    348:20
**invoke**
162:23
**involve**
49:9 180:5 237:12
    363:8
**involved**
24:18,22 26:19,20
    29:9,17 41:25 43:25
    43:25 48:10 49:20
    56:11 57:10,13,16
    57:22 60:10 67:16
    67:20 77:24 82:9,12
    83:11 149:6,11
    153:22 154:5 165:8
    201:4 219:8,16
    221:8,10 250:24
    251:11,15,24 262:2
    265:21 274:19,22
    277:8 316:3 341:2

**involvement**
46:17 82:23 83:9
    124:16
**involving**
83:12 395:11
**isn't**
167:17 192:21
**isolation**
115:6 193:20
**issue**
29:18 37:7 157:17
    164:18 234:19
    265:7 286:20 328:6
**issued**
205:7
**issues**
30:20 54:23 55:2,9
    64:14 65:3,9,11
    160:18 164:19
    264:2,21 275:11
    279:19,25 303:16
    308:16 332:24
**items**
39:21,23
**iterations**
256:11
**its**
5:14 14:17 50:19
    61:12 75:6 112:6
    116:21 117:3,3
    134:13 137:8
    141:12 145:19
    147:3,15 148:8,9
    190:23 193:5,20,20
    196:14 239:15
    240:24 248:18
    249:14 251:7 255:3
    280:22 281:6,8,10
    281:18,20,20 282:5
    282:15,19,24 283:9
    284:5,14 286:21
    287:5 294:24,24
    301:8 318:18
    319:20 328:6,22,24
    334:8 337:15
    343:11 358:6 359:8

360:22 365:5,7,7,15
365:25 366:2
372:24 377:5 379:5
380:5,7 383:6,23
398:25 399:2 400:7
400:7
**itself**
66:12,19 89:19 94:6
    103:4 114:4 220:14
    237:21 266:11
    289:12 293:13
    304:3 392:8
**I'd**
20:12 58:3 186:13
    216:14
**I'll**
12:9,19 18:8 57:23
    64:12,12 182:25
    196:4 239:13
    302:22 331:14
**I've**
46:24 54:24 55:14
    82:3,22 83:9 138:11
    141:24 180:21,23
    261:8 278:24
    286:11,16,23
    289:15,16 290:8
    306:23 316:6
    320:13 337:12
    367:2 399:12

———————— **J** ————————
**January**
32:20 47:25 286:3
**John**
26:11,14 56:25
    253:21
**joined**
10:2,10
**joint**
5:12,22 6:11,17 9:23
    10:5 15:20,20 61:11
    65:23 69:12 80:16
    128:15,23 194:7
    201:2 222:16
    258:14 259:3,11,12



262:3,6,13,18,23
263:16 264:7,15
333:2,14
**JTD**
1:9
**judgment**
64:15
**jump**
25:21 216:14
**June**
30:2 41:8 42:3,5
68:18 73:22,25
74:16,23 76:4 79:4
83:23 116:20 117:6
117:7 137:9,22,25
138:4,6 139:2,4
161:17 162:12,19
162:20 163:15
166:7 194:5 200:7,7
200:11 215:19
217:15 218:7
221:22,22 222:3
242:5,9 243:2 286:3
348:21 391:24,24
392:17,17,18 393:7
**junior**
24:3
**jurisdictional**
336:12

———————
**K**
———————
**K**
407:2
**keep**
12:21 20:8 69:19
83:17 118:23
136:24 137:5
175:20 190:3 197:7
221:3 265:12
357:18
**key**
301:4,18 302:10
391:10,13 397:24
**keys**
140:15 300:8,11,25
301:7,11 397:9,19

397:22 398:5
**kind**
92:6 299:8 342:2
**knew**
209:7
**knowable**
303:24 304:3
**knowing**
166:22
**knowledge**
26:9 27:6 32:8 39:16
39:18 41:6,13,17,24
42:9 43:10,11 44:9
50:7 51:2 69:6 74:3
74:4 77:20 122:2,3
142:23 147:24
171:3 172:2,2 175:8
184:8 231:21 243:4
251:7,23 252:6,21
253:15,19 258:16
259:17 313:14,19
314:8,21 323:15,19
327:19 339:21
341:25,25 351:4
392:18 403:19
**knowledgeable**
82:18 301:16
**known**
154:21 163:13
204:13 331:4,7
405:5
**Kroll**
204:16
**Kumanan**
23:21

———————
**L**
———————
**L**
407:2
**Labs**
153:20 154:6
**lack**
119:21 120:7 139:24
153:10 186:22
252:6 256:8 266:7
**lacked**

294:22
**laid**
72:24 121:12 232:25
**language**
84:12 192:17 275:3,6
305:11 306:9
350:15 353:16
357:6
**large**
81:24 82:21 155:20
161:9 172:6 389:15
**larger**
172:22
**last**
54:8,13 55:5 71:23
126:7,10 142:24
201:20 206:11
214:19 356:25
**lasted**
22:23
**later**
105:16 199:18
**Latham**
1:15 2:15 3:9 9:15,25
**latter**
330:4
**law**
251:24 332:2,2
**laws**
52:22
**lawyer**
47:16 48:9 52:16
63:24 108:12,16
135:18 147:21
219:4,7 220:7 221:5
263:13 270:2
274:24 275:21
276:21 278:5,12
302:3 307:25 332:2
332:11 343:19,25
344:9 345:18
347:21 391:7
403:20
**LayerZero**
11:19
**lead**

30:19,24 32:13,14
56:7,17,17
**learn**
54:25
**learned**
55:4 265:17
**least**
101:23 200:2 364:2
**leaving**
31:23 397:19
**led**
201:4
**ledger**
33:24 37:2,5,15 38:2
38:4 43:4 84:21,22
84:23 85:7 88:9
90:10 91:4 92:25
93:3 97:23,24 98:9
98:21,25 99:7,10,12
99:15,16 100:4,8,12
101:4 102:3 105:2,8
105:12 106:3 107:6
117:4,20,22 118:16
120:17 121:7,21
137:15 154:18,20
194:13 201:17
202:11,21 203:17
222:7,10,25 223:9
223:10 230:3
232:11,20 233:12
290:3 291:2,5
292:23 293:14,17
293:20 294:6,11,15
294:18,21 365:21
366:11 367:20
368:5 370:10
372:20 380:8
383:10 384:8,9,13
386:19 399:3,11
400:6,13
**left**
31:21
**legally**
345:19
**lend**
104:6,9,12,18 341:9



359:4 363:10,19
364:15,16,19,25
365:4 368:21
369:21,25 375:10
375:12 376:17
377:16,17 378:4
380:21 381:17
382:6 387:19 389:8
389:15,16,22
398:25
**lender**
241:13 374:17
377:19 389:8
**lenders**
108:18 355:14
356:14 376:7,20
377:17 384:17,24
385:21 386:4
387:24 388:12,14
389:2,3,4,8 399:16
**lending**
108:7 125:6 341:6
342:5 343:10
354:22 355:11
359:3,12 360:9,17
361:11 363:9 364:2
364:7,9,10,20
365:23,24 366:16
366:23 367:7,8,12
367:17 368:2,2,3,4
368:5,20,24,25
369:9,14,15 370:9
370:13,17 371:3
373:23,24 374:12
374:19,24 375:14
376:2,12 377:3,10
377:19 379:5,12,25
380:11,16 381:13
384:11 387:23
388:4,5,9,13,15,20
388:23 389:18,22
390:3 393:6 394:14
395:2 398:24 399:6
399:19 400:6,15
**lends**
369:19 374:13,17

377:20 379:5 380:4
383:5
**lent**
363:22,24 366:9,17
366:24 378:12,15
379:21 383:12,14
383:15,23 384:6
387:6,11,25 394:16
**lents**
383:4
**less**
57:4 134:15 159:11
170:18 238:12,13
400:19
**let**
13:9 15:12 18:8
67:18 92:5 138:13
175:3 188:19
240:22 241:11
250:8 270:11
285:19 286:7 321:8
338:21 341:17
356:23 368:17,18
382:14 388:6,6
398:19,21
**letter**
14:10 37:14 50:19,22
50:25 51:20,21 52:5
56:20 57:24 58:22
84:20
**let's**
15:25 62:5 81:3
88:18 100:25 113:6
126:4 137:6 145:2
164:25 187:18
188:4 197:3 204:2
247:17 295:6
337:16,17 342:16
343:14 344:18
357:10 359:10
380:2 388:8 393:24
400:23 401:13,14
**level**
38:20 39:10 46:17
65:7 83:9 177:17
179:12 311:2

353:19,23 354:2,7
354:12 373:4
386:12
**levels**
287:8
**leverage**
172:7,8,12,17 177:18
177:24 179:14
**leveraged**
353:20
**levered**
180:7 237:4 382:10
**liabilities**
48:4 50:7 51:15
**liability**
147:12
**lic**
235:19
**license**
154:6,24
**licenses**
53:12
**life**
69:25 266:22
**light**
171:13
**like**
33:15 61:20 69:18
86:15 92:23 94:2
97:9 107:8 123:17
132:2 137:2 144:14
156:13 157:25
166:21 180:6
183:20 195:4
216:14 220:22
221:7 233:5 266:25
286:13 289:9
292:14 293:4
295:21 343:7 363:3
366:4 397:4,25
399:9 400:17,20
**likely**
66:16 146:10 181:8
183:19 238:7
373:15
**limit**

400:11,18 404:12
**limitations**
95:3 297:12,16 298:9
298:18,25 299:10
382:5
**limited**
9:9,25 14:17 15:17
15:19 50:19 258:18
258:22 262:21
265:25 266:9,11
287:25 293:16
311:12 322:10
323:6 402:15
**Limited's**
258:12
**line**
8:5,10,16,21 13:11
109:11 110:11,21
132:25 336:14
361:5
**lines**
109:9
**liquid**
134:15 238:8
**liquidated**
235:17,20 236:11
237:9 238:6 311:6
355:19 382:18
**liquidating**
236:3
**liquidation**
237:11 311:10
**liquidations**
242:25
**liquidators**
5:22 6:11,18 9:24
10:6 15:20 65:23
69:13 80:16 128:15
128:23 194:8 201:2
222:16 258:14
259:3,12,12 262:3,6
262:13,18,24
263:16 264:8,16
333:3,14
**liquidity**
134:7 237:25 238:18



list
91:25 93:8 123:10
124:4 206:18,19,22
listed
17:11,20 118:2,4
122:21 123:5,21,22
123:24 250:16
272:9
listen
25:3,11
listing
123:7
lists
260:23
literally
157:19
litigated
262:25
litigation
24:25 25:9 27:17
30:20 31:9,13 32:24
33:6 38:18,23 43:20
44:15 45:6 47:6
52:11 55:12 56:2,5
59:4 60:2 64:14
65:2,6 81:17,21
82:5,13 83:12
125:12,24 126:14
136:11 161:22
162:7 166:19
180:18 182:11
199:12 213:18,21
232:5 264:15
270:17 285:17
309:17 322:13
350:17 403:8
litigations
81:25
little
36:19 47:8 69:25
112:21 252:7
256:22
Liu
3:11
live
306:8 348:14,21

LLP
2:5,15
loan
387:15 399:4,6
loaned
276:4 281:12 400:7
400:13
loans
376:6
local
336:11
locate
344:6
located
11:12 182:10 294:20
locating
181:15 182:24
location
291:3 396:5 397:2
locked
92:14,19
logged
124:22
logic
396:12,25 404:18
long
22:22 53:6 70:17,19
71:2 174:16 183:8
188:11 194:21
197:5,22 210:20
211:15 221:15,23
222:4,9,19 224:20
225:12 226:2 227:9
268:4 355:16 382:7
399:25 400:18
longer
67:21 383:25
look
84:3 145:25 146:17
154:18 155:3
186:13 199:23
213:24 222:12
223:22 269:23
302:24 328:23
401:2
looked

69:22 123:17 155:18
looking
131:11 166:14 180:5
200:9 209:21
212:19 218:12
243:7 261:22 280:3
282:7 290:13
299:24 323:9
looks
61:20 129:7 183:20
322:25
look-back
161:2
Lord
21:8 149:24
lose
359:4
loss
119:19 123:2 187:7
187:19 188:22
189:21 190:13
202:11 205:2 207:6
208:13,22 209:12
356:14,15,16
357:12 393:19
394:25
losses
175:24 176:24
178:17 189:24
190:16,19 191:14
196:12 197:14
233:8 235:11,14
236:22 239:2
302:12,17 361:19
392:25 393:9,16
lost
359:7,13,15 360:2,4
lot
55:4 239:5 318:6
328:14
lower
133:19 134:11
174:21 199:21
216:15
lower-case
272:16,16,17 273:10

273:10
lowest
375:15
Ltd
1:5 2:4 5:14 61:12
128:24 257:16
lunch
137:3 145:3,14
Luncheon
145:7
Lylian
24:4

M

M
407:2
made
18:18,21,23,24 21:19
21:19,21 22:3 57:14
62:24 68:22 79:13
79:23 84:20 90:13
152:21 154:19
155:14 170:11
171:14 202:6,16,25
206:8 251:18 252:9
278:24 282:19,24
294:18 299:2,23
307:13,14 327:3
331:3,7 361:13
367:21 370:4 396:6
397:3 398:10 399:4
402:22 403:4 405:4
406:9
Magna
1:19 9:17,18
magnitude
159:6
maintain
43:4 175:18 237:3
maintained
98:11 371:25 373:4
398:5
maintains
382:7
maintenance
132:18 135:22



179:21,25 180:4
187:12 196:15
197:15 236:23
237:7 299:11
310:24 311:5
351:14 353:18
354:19 372:25
373:17 382:16
**major**
49:18
**make**
12:10 21:24 58:3
63:5 69:24 91:18
100:13 126:4
129:12 140:7 149:8
154:14 156:6
165:14 170:4 171:4
174:23 175:15
188:19 202:4,17
203:19 211:2 212:6
212:10 221:6
231:24 244:10
246:14,15 249:5
252:20 278:24
293:7 315:24 341:8
344:14 350:12
368:9,18 380:2,19
392:13 406:5
**maker**
238:16
**makes**
38:15
**making**
27:23 117:12 294:15
340:9
**manage**
56:22
**management**
53:18 155:10,12
171:10,21 217:3
221:9 252:23
258:10 260:8,12,16
260:24 266:17,21
267:4,6,25 268:14
268:22,25 269:4
277:11,20 281:17

282:15 283:4
284:13 303:25
312:11 313:4,21
314:10,22 315:3,19
316:3,16 317:15,24
318:4 320:9,12
322:11 326:16
327:4,10 328:17
329:14 335:15
336:7,9,23
**managing**
53:11 56:18
**mandate**
27:9 48:19 57:7
263:20
**manifests**
89:6
**manner**
72:5 130:19 208:25
237:15 271:19
296:15 404:17
**manners**
94:15 95:10 96:14
**many**
22:13,24 33:21 49:16
50:11 70:13 138:5
139:3 141:2 149:11
149:18 154:11
155:24 158:24
159:10,11 160:3,8
161:15 215:17
326:20 330:23
333:18 346:17
403:23
**March**
36:23 285:25
**margins**
133:5
**Marie**
1:21 9:18 409:3
**marked**
8:20 16:3,5 19:5,20
61:13,16,17 65:24
66:3 69:14 70:4
128:16,20 180:11
180:15 198:10,14

216:5 248:8 285:5,9
285:13,21 286:2,4
344:4,23 345:2
**market**
134:13 173:21 174:4
178:4,5 185:16
216:20 227:13,18
237:20 238:9,14,16
238:21 257:3,6
340:17,22 341:6,10
341:19
**markets**
120:25 257:9,16,22
257:23 258:3,9,13
258:17,23 259:13
260:2,4 261:21
262:4,16,19,22
263:4,21 264:5,25
265:22 267:18
311:12 322:10
323:6 331:15 332:7
333:4,23
**market's**
227:6,13
**marks**
186:19
**Marsal**
3:3,4 10:12 22:5,11
23:8,13 24:12 42:8
43:19 44:12 59:9,10
153:13 161:10
198:23 385:5
**master**
98:21 99:15 105:2
117:4 118:16
121:21
**matched**
369:25 375:14 384:2
387:23 389:19
**matches**
389:6
**matching**
225:23 226:5,10
237:24 388:21
399:15
**material**

82:3 87:24 131:25
350:5
**materially**
131:3 176:10
**materials**
181:16
**math**
121:11,12 188:4
384:25
**matter**
9:8 23:19 27:10
28:17 44:17 56:15
63:13 65:3 85:14
114:22 144:6
152:24 158:20
181:7 203:15
205:18 209:5
211:14 263:15
277:20 299:5 300:5
301:5 316:13 343:4
391:13
**matters**
29:15 31:5 32:4,12
54:6 57:15 277:2
289:18 332:21
381:14
**maximum**
400:3,14
**may**
7:12 13:2 25:24
39:22 55:18 62:22
68:8 90:13,14 93:24
110:21 118:25
142:8 145:24 146:3
181:16 201:22,22
216:4,9 217:9
219:10 229:22
233:25 236:13
238:13 240:19
250:5,15 251:5
254:6 255:10,23
268:21 270:22
274:20 276:4 281:6
281:12 296:6 297:4
319:2 322:18,21,21
324:10,16 325:6



350:9 356:21 362:9
369:7,7 406:18,19
**maybe**
105:15 160:20 265:4
320:11
**McGregor**
24:4
**MD**
56:17
**me**
10:10 13:9 15:12
16:4,8 20:13 22:7
23:14,20 29:8 35:7
36:6 39:5 42:23,24
56:12 61:16 67:12
67:19 74:9 75:19
77:5,22 78:9 79:5
92:5 129:7,25
138:13 139:18
141:16,25 151:9
172:15 175:3
177:11 180:2
188:19 190:4 198:2
215:4 223:18
231:25 240:22
241:11 246:14
250:8 266:10
270:11 285:19
286:3,6,7 288:4,24
290:17 303:24
306:6,8 307:10
312:4 321:2,8 330:3
335:17 336:25
337:9,11 338:8,18
338:21 341:17
350:3 356:24
368:17,18 378:11
380:20 388:6,6
389:23 398:19,21
407:14,20 409:8,13
**mean**
36:20 41:24 64:22
65:2 74:20 81:19
93:11 112:21 130:4
136:22 167:17
168:15 178:6 181:3

186:18,19 199:12
200:19 204:9
212:11,25 213:11
214:24 215:13,15
219:2 224:11
225:11,13 233:15
283:14 284:19
288:9 289:22
301:10 306:20
309:10,16 310:6
325:6 335:6 341:5
348:17 350:8
353:12 354:8,9
355:22 363:14
367:7 368:3 384:20
387:16,18 395:3
**meaning**
64:19 135:14 213:8
219:9,25 270:17
275:6 276:11 277:5
301:10 302:5
304:12 308:2 312:5
341:7,16 358:7
370:2
**meanings**
304:17 360:5
**means**
56:19 211:15 212:12
219:24 224:15
249:7 271:19
288:17 289:3
306:14 353:15
367:12
**meant**
114:7 341:13 346:10
346:14 352:16
356:3
**measure**
253:25 348:24
**measurements**
125:13
**measures**
163:5
**mechanical**
383:7
**mechanically**

294:16 380:18 383:8
**meet**
267:2 382:13
**meeting**
373:17
**meetings**
22:10,13,23,24
267:11
**member**
267:5 277:10
**members**
23:24 43:2 266:21
267:3,25 268:14
269:7 327:3
**memorialization**
321:20
**memorization**
77:19
**memorized**
17:7 60:13 92:2,12
104:4 122:20
123:17 131:22
136:18 146:13
158:19 159:3,9,24
160:11 215:21
216:2 272:10
283:24 287:11,21
306:7 356:10
360:14
**memory**
34:8 36:9 39:9 40:7
60:9 68:3 74:8 78:7
93:10 111:5 125:9
133:16 149:22
150:9 151:11
241:24 249:16,21
255:14 256:4
318:15 319:16
362:11,16 394:24
**mention**
183:2
**mentioned**
31:7 43:12 80:3
97:21 106:12 139:8
140:9 168:7,21
179:20 373:7 395:5

398:7,9
**merely**
178:9 211:6
**Merit**
409:3,23
**met**
27:21 372:25
**metaphysical**
292:5
**method**
95:6
**methodological**
38:21
**methodologies**
34:24 71:6,15
**methodology**
35:15,23 73:2 74:24
76:12 203:11,22,23
204:6,19 205:6,10
210:3
**Microsoft**
77:2,10 78:20 194:6
**middle**
192:3 248:16 274:7
336:10 353:3
**might**
16:23 100:17 114:16
174:25 344:12
357:18 402:16
**migrated**
262:21
**Miles**
24:5
**million**
36:24 37:24,24
136:15 200:15,15
242:19,23,24 252:3
255:14,20
**millions**
158:17 169:18
354:10
**mimic**
115:21 174:8
**mind**
159:6 231:10 356:21
356:24 357:3 361:4



375:23
**minimis**
101:19
**minimum**
127:13 129:10 363:3
 363:6 400:3
**minted**
93:3 223:2
**minus**
208:18,18,21,21
**minute**
100:24
**minutes**
137:6 247:18
**minutia**
350:9
**mirror**
85:16 405:2
**misappropriation**
28:24 29:2
**mischaracterizes**
349:11
**mischaracterizing**
126:2
**missed**
402:16
**missing**
202:10 207:6 209:11
**misspoke**
114:6 372:18
**misstates**
36:2 39:2 40:2 75:3
 78:3 88:4 89:22
 125:19 167:24
 192:25 212:14
 213:6 254:17 256:2
 266:14 330:10
 364:13 377:8
**misstating**
129:14
**misunderstanding**
200:23,25 209:22
 210:5,15 265:5
**misunderstood**
289:2
**misuse**

17:13
**mm-hms**
12:14
**Molina**
26:3,7,8 43:21,22,23
 43:24 44:4,23 46:9
**moment**
38:3 80:22 83:19
 88:19 136:19
 157:17 187:11,17
 243:9 285:18 286:8
 313:7 326:9 328:5
 380:7 383:9
**moments**
115:17
**monetization**
49:21
**monetized**
27:24
**monetizing**
27:14
**money**
383:14
**monies**
83:3
**monitor**
144:17 353:9
**month**
32:16 54:20
**months**
79:6 126:11
**more**
24:3,3 35:3,9 36:19
 39:3 55:12 57:12
 60:3 67:6 75:24
 77:8 78:7 111:19
 112:21 134:15,22
 134:22 146:16
 156:7 158:9 159:11
 170:15 172:12,15
 228:6 238:8,9 320:3
 320:10 340:12
 357:7 380:6,8 394:2
**morning**
11:9,11 385:13 404:8
**Mosley**

17:11,18 18:24 24:10
 24:11,15,23 56:16
 56:22 149:24 156:4
 162:24 169:5
 396:11
**Mosley's**
28:12
**most**
32:7 82:18 154:4
 156:3 158:20
 163:12 164:20
 170:13 178:22
 181:8 203:10
 205:23,23 319:7
 379:18
**mostly**
154:3
**motion**
206:4
**mouthful**
45:10
**move**
19:13 115:11 139:5
 301:3,19 302:7,8,22
 359:10 391:10
 397:8 398:2
**moved**
19:9 169:8 292:13
 395:25 396:18,22
 398:14
**movement**
113:4 120:7 144:12
 291:3,9,14 293:2
 366:7,12 367:19
 368:16 370:19
 374:2,7 394:20
 396:12
**movements**
144:7 174:8 291:22
 329:11 353:24
 354:8,13 395:19,23
 397:6
**moving**
301:21 306:15 307:2
 338:15 370:15
**MP**

185:13,16
**much**
78:6 121:15 161:16
 170:18 172:9 238:5
 252:21 292:12
 383:19 393:25
 402:15
**multiple**
22:9 23:3 57:3 95:19
**multiplied**
188:8 208:9
**must**
111:19
**myself**
32:3 72:11 78:23
 183:22 221:4

**N**

**N**
145:9,9,9 311:22,22
 311:22 407:2,2
**Nacif**
2:18 10:4
**name**
43:24 68:3 141:12
 183:3 260:20
 323:11 396:10
**named**
157:8
**namely**
205:8
**names**
260:17
**naming**
20:4
**nature**
34:16 47:17 48:25
 252:16 258:11,21
 259:24 327:12
 333:13,22
**nearly**
55:5 142:24 172:3
 299:17
**necessarily**
113:21 134:24
 173:19 175:17



**necessary**
49:11 160:14 406:5
**necessitating**
393:5
**need**
13:9 15:11 39:3,5
59:17 68:21 80:9
95:22 107:9 121:11
145:24 146:15
151:7 152:4 167:12
178:23 179:3,16
206:17 219:18
222:12,17 234:15
241:7 265:25 266:7
269:23 301:4,18
312:18 363:2
364:18 391:25
403:10,22
**needed**
99:7 107:4 118:24
354:3
**needs**
13:12 23:17 31:25
51:23 175:15
294:17
**negative**
35:13 107:13,17,20
107:20 108:2,21
109:3,6,12,13,18,23
110:5,10,13,22,24
111:7,13,17,19,22
117:8 176:3 211:7
236:20 305:14
306:9,11 309:11
310:6,13,15,19
311:3,14,15,19
352:3 371:16,18
392:23 393:4,7,20
393:22
**negotiated**
63:14 182:13 226:25
227:3
**negotiating**
49:6
**negotiation**
49:7 65:4 82:23

227:6,14
**neither**
409:16,19
**net**
112:4 189:25 382:8
**netted**
190:8
**Neuberger's**
21:8 149:25
**neutral**
242:20
**never**
26:6 44:18 46:24
57:21 93:3 111:11
244:20 267:5
404:11
**nevertheless**
291:15
**new**
1:16,17 2:9,9,21,21
9:13,14 11:5 50:22
50:25 57:24 70:3
195:3,8 344:19
396:22 409:5
**next**
64:11,17 82:18 189:4
210:11 214:6
302:24 313:6 323:7
336:14
**NFT**
132:2
**NFTs**
156:12
**Nils**
26:3,6,8 43:24 44:23
46:9
**Nishad**
260:19
**no**
1:8 5:5 6:5 7:5 11:24
12:14,14 13:23
30:24 43:14 55:10
59:2,15 67:21 68:24
71:17 73:14 75:4
77:16 82:3 101:22
103:12 117:11,15

118:9 126:15
132:15 138:11
168:11 184:9
186:24 188:25
190:24 191:12,21
195:2,6,6,6 197:17
206:16 210:2
214:20 219:22,23
220:5 228:15
229:16 235:7,10,13
246:6 247:2 256:19
269:9 288:24 291:4
291:8,14,22 292:25
298:10 307:8
311:25 324:12,25
328:3 339:21
344:14 348:7 353:8
355:15 361:10
365:9 367:19 374:2
374:6 376:18 380:6
383:25 387:13
401:5 403:5
**nodding**
12:14
**none**
8:6,17,22 221:10
275:25 281:10
**noneffective**
324:23
**nonfutures**
241:8
**nonlawyer**
219:13 220:12 279:4
**nonlegal**
246:16
**nonrealistic**
158:3
**nonresponsive**
139:6
**non-fiat**
387:9
**non-fungible**
156:12
**non-USD**
247:13
**nor**

42:5 219:15 221:7
358:8 371:16
409:17,17,17,19
**Notary**
11:4 407:24 409:5,24
**note**
19:8
**noted**
19:16 37:2,15 234:17
**nothing**
10:21 103:12 233:13
235:23,24 409:10
**Notice**
5:6 16:7,8 17:21 19:3
19:21 22:18
**noticed**
37:13
**notional**
35:12 124:4 172:22
173:9 176:15,23
178:3,14,25 185:5
185:12 186:2,8,10
186:25 187:5,21,24
188:10,23 189:3,6
190:23 191:2,9,22
191:24 195:3,8,10
196:7,10,17,21,25
197:11,16,18,24
202:13 204:12,24
207:2 208:16
353:21,22 354:5,10
354:17
**November**
50:20 54:19 86:4
**now**
9:5 18:7 32:10 39:23
43:6 49:17 78:12
86:20 87:10 137:3
165:3 214:16
220:19 234:24
268:20,23 290:4
307:3 309:17 401:8
**nuance**
50:5 51:13 52:2,17
**nuances**
147:22



**number**
9:7 20:20 22:21
  55:15 61:18 66:4
  67:25 106:23 123:8
  128:20 129:22
  153:12,16 155:20
  157:12,18 159:2,5,8
  159:24 161:11
  165:17,20 168:14
  178:14 180:15
  188:2,9 189:11,25
  196:22 197:2
  198:14 202:13
  208:6 215:20
  231:13 294:22
  322:9 337:25
  350:14 352:15,15
  355:6 376:4 378:8
  388:25 389:6,11,12
  389:13
**numbered**
355:2
**numbers**
72:4,9,15 73:4 75:15
  75:20,20 78:21
  168:10 194:8
  199:21 248:13
  285:13

---

**O**

**O**
145:9,9,9 311:22
  407:2
**oath**
159:7,16 255:16
  407:10
**objection**
5:20 6:9,14 17:5
  20:23 21:4 24:17
  25:22 26:18,22 30:3
  44:18 50:2 62:8
  65:22 66:8 69:11
  70:8 75:2 103:6
  128:12,21 129:3,8,9
  129:21,25 130:7
  135:11 147:19

148:11 150:6,23
  157:3 159:21 162:3
  166:15 167:8
  169:22 186:4
  193:18 207:19
  217:17 218:3 219:5
  220:3 255:25 258:4
  258:19 259:8
  261:13 264:12
  269:21 278:10,18
  279:23 280:7,17
  292:8,15 300:3,19
  301:25 303:9,19
  304:13 306:21
  307:22,23 308:6
  317:10,20 330:9
  335:12 337:6
  346:25 347:19
  351:6 358:18 369:3
  369:17
**objections**
17:7 18:14 19:16
  60:10,24 220:21
**objective**
268:10 325:22
**objectives**
325:8,24
**obligations**
218:20
**obtain**
368:24
**obtained**
285:2
**obtains**
372:8
**obviously**
15:12 36:8 67:4
**occur**
85:24 293:15 294:14
  374:8 395:23
**occurred**
42:3 87:21 156:2
  157:13 164:23
  228:19 236:14
  291:2 293:13
  329:12 370:9

395:20 396:23
  400:6 403:24
**occurring**
25:18 101:8,10
**occurs**
236:18
**off**
68:3 72:4,19,23,23
  77:9 81:6 145:6
  158:5 191:14
  196:13 214:3,10
  221:6 240:25
  247:20 248:13
  299:7,16 337:17,20
  355:18 376:17
  391:2 394:8 401:4,6
  401:6 405:9
**offer**
172:12 224:14
  341:25
**offered**
131:21 171:22
  172:21 340:8
  342:12 387:3
**offering**
310:8 384:3
**offers**
341:8 375:15 376:2,4
  377:10,10,13
  388:23 389:19
**official**
259:12 262:3,13,18
  262:23 263:16
  264:7 330:7 333:2
  333:14 343:9
  401:18
**offline**
80:8,12
**offset**
111:19 190:13
**offsetting**
202:6,16,24
**often**
24:12 30:25 56:9,24
  86:13 105:6 119:16
  176:20 210:17,18

211:12 238:17
  346:7 361:17
**Oftentimes**
57:3
**okay**
11:18 12:17 18:2
  20:2,7 21:15 23:12
  26:2 30:14 55:7,23
  59:22 68:14 80:14
  82:15 83:20 84:2,5
  134:21 145:4 164:6
  183:4 189:5 196:4
  197:6 198:15
  199:22 212:20,24
  214:17,21 216:18
  216:21 223:24
  247:16 248:14
  250:7 256:25
  269:14 270:9
  302:21 306:5
  313:11 325:10
  338:19 355:4,9
  379:7 400:25
  401:21
**old**
14:14
**omitting**
336:13
**once**
40:4,21 52:12,15
  74:12 106:18,22
  116:14 155:13
  156:7 202:8 209:7
  252:12 255:13
  278:12 279:17,25
  280:9 284:11
  289:15 374:4
  383:24 388:24
  391:2 395:6,24
**ones**
21:14 255:7
**one-to-one**
112:15 113:4,20
  115:12 369:22
  376:19 387:14,16
  399:8



online
266:24,24
only
20:12 22:8 44:21
52:7 78:6 79:10
89:5 92:24 114:23
135:14 140:15
147:24 150:25
161:4,12 184:24
191:12 205:12
209:13 210:13
222:25 223:10
242:16 275:22
293:13 343:9 364:7
364:9 384:8 390:11
393:15
onto
367:23 390:17
on-ledger
367:13 394:19
open
123:22 173:9 175:21
178:2 179:9,17,19
180:5 191:20
192:15 196:3,5,9,19
196:23 197:7
206:19 208:6
211:15,20 215:3,19
218:23 226:2,3,4
227:7,20 228:9
233:3 237:11
382:11
opened
101:18 118:4 119:8
178:15 204:20
211:22 235:8
241:24 321:3,14,25
opening
179:19 204:25
210:20,22 213:15
215:15 228:20
322:4 354:11
oper
382:11
operate
204:10 229:25

249:10 263:5
operated
35:18 37:5 72:7 87:6
122:2 135:3 173:5
193:15 203:4,13
204:8 224:17
230:19 333:25
356:5 357:9 358:10
377:11
operates
97:10
operating
56:21 67:3 89:11
90:5 94:25 107:4
109:25 194:11
330:13 345:24
347:9
operation
184:20 361:25
operational
201:18
operations
254:3
operative
329:9
opine
108:13 135:19
278:13,22 298:3
369:6
opined
306:12
opining
310:8
opinion
246:25 347:3 358:6
358:25
opinions
275:3 276:22
opposed
116:17 174:25
222:11 309:18
opposite
189:18
opt
362:22 374:19
376:12

opted
238:18 383:25
opts
222:24 377:4
order
19:10,14 88:16
147:25 148:5 150:4
150:9,15,19,21
151:7,9,17,23 152:5
159:6 202:22 206:5
207:8 209:7 275:16
275:24 276:24
279:18 280:2,11,13
280:14,19 289:17
292:14 303:14,17
308:18,20,23 309:8
309:12
ordinary
241:25
organization
330:17
original
4:16 20:21 29:10
71:7,16,21 73:11
74:6,17,25 76:3,10
77:13,17 83:18,21
85:15,21 89:25
129:21 162:11
194:4 215:10
223:25 229:14
352:9 379:16
406:14
originally
384:6
OTC
7:16,19 248:25
249:14,18 250:2
285:4,8,15
others
57:12 60:12 260:9
326:22
otherwise
13:11 34:12 37:3
72:22 132:6 134:13
147:9 162:9 184:10
184:10 228:14,23

238:21 329:19
334:15 339:4
345:11 349:5
372:12 402:17
OTT
287:24
our
12:22 19:16 23:24
24:19 26:17 31:24
34:15 35:21 36:16
37:13,18 38:5 42:17
48:25 49:5,15 52:5
52:17,25 54:19
58:12,25 66:18
136:25 155:5,7
160:13 181:24
232:23 338:14
339:24 348:16
394:3 405:5
ourselves
24:13
out
18:7 40:10,14,16
72:24 104:18
108:22 121:12
122:21 123:5,7,10
124:4 189:25 190:8
199:6 201:25
206:18,18,19,22
207:3,11 208:25
232:25 311:7 364:8
364:9,10,19 365:24
366:17,24 367:8
369:15 373:24
374:19 376:12
377:4,4,21 379:6
380:4 383:25 387:6
398:2,25 400:7,13
outages
296:4
outcome
79:19
outlined
133:16 163:11
326:20
output



77:6 351:16
**outset**
402:4
**outside**
45:21 110:11,23
134:23 136:2,13
148:4 151:2 279:15
342:20,23 343:6
392:24 397:9
**outstanding**
307:14,19 392:9
**over**
12:8,20 15:6 22:16
22:25 23:15 35:20
54:7 63:16 66:17
77:25 93:12 98:6
124:15 125:21
136:15 160:7
174:19 181:4
199:16 225:5
244:18 249:2
276:25 316:8
372:10 394:4 406:4
**overall**
189:23 351:24
381:15 382:8
**oversee**
57:5
**overseeing**
81:22
**oversees**
27:12 28:2 57:9
**overtime**
394:6
**owe**
108:6 111:23 112:3
**owed**
107:21 109:14,20
360:10 361:11
**own**
38:17 74:3,4 84:10
141:12 213:25
317:8 319:21
359:22 366:23
367:5
**owned**

97:7 169:10 288:22
317:19 333:24
**owners**
261:3,11
**ownership**
63:22 64:4 65:10,17
149:16 150:5,20
151:21 261:7,16
282:25 284:8
303:13 318:19
332:23 333:6
337:10

---
**P**

**P**
1:15 4:8 5:7,9,17 6:7
11:2 19:4,21 61:9
65:20 69:9 407:8,18
409:7
**page**
4:5,12 5:5 6:5 7:5 8:5
8:10,16,21 17:9
61:24 64:12 70:23
105:15 112:8 127:5
127:14 128:7
129:11 130:10
185:9 191:25
199:15,20 200:9
204:16 210:11,12
212:16 216:14
224:5 248:12,13
250:16 256:21,23
269:12 270:8
272:20 273:14,23
274:8 302:24
306:16 311:24
312:14,21 313:6,6
313:23 314:11,12
317:4 323:7,7 325:9
325:22,25 330:23
331:2,13 336:10
338:12 346:7
347:11 349:15,19
351:22 352:13
353:3 354:21,23,24
355:18 356:22

357:7 358:21,22
**pages**
34:3 70:25 71:2,3
132:20 135:9
146:15 181:10
199:24 231:14
234:2 346:17
347:23 350:15,19
351:2,7,10,20
354:25
**PAGE/LINE**
408:3
**pagination**
216:15
**paid**
101:21 118:10,25
224:23
**papers**
319:15
**paragraph**
64:11 84:3,7 86:8
105:15 112:8
127:19 129:24
131:12,16 145:17
162:13,23 163:17
163:20 164:2 166:4
214:22 215:8,9
223:23 228:22
243:7,11 320:24
321:8,10 340:14
355:14 384:16
387:12
**paragraphs**
61:23 166:13
**paraphrasing**
17:11 81:16 165:24
166:7
**part**
23:8 24:10 32:24
42:9,15 63:13 64:9
64:9 72:8,14 90:8
128:8 131:18
132:21 133:11
151:8 166:5 252:4
257:15 326:6
333:11 355:17

363:22 379:16
384:11 385:16,25
**participant**
249:23
**participants**
238:14 301:16
340:13
**participate**
362:18 363:4 376:16
381:22
**participated**
108:5,7 400:16
**participating**
108:3 111:25 341:11
358:3 359:3 364:8
378:18 379:25
389:7 399:14,18
**participation**
109:4 241:12 360:22
374:15 377:5
**particular**
25:25 37:7 57:17
119:24 134:7 155:4
193:5 231:9 240:12
291:25 292:12
293:2 321:21
385:24 388:11
389:22,25 390:3
**parties**
9:20 203:6 255:3
259:7 409:18
**partner**
24:11
**Partnership**
311:25
**parts**
329:4
**party**
217:7 296:9 367:17
**passed**
12:17
**passing**
338:2
**passive**
242:6
**password**



397:25
**past**
401:8,17,22
**Pause**
72:12
**pay**
173:11 376:9
**paying**
240:25
**payment**
174:10,15 307:14
**payments**
173:25 241:10,12
355:16 357:22
358:8 360:10,16
**peer-to-peer**
340:17 342:5,21,23
343:10
**pegged**
116:3
**pendency**
76:18 99:5 124:15
160:7,17 182:4
230:14,16 252:19
258:25 327:21
**pending**
13:10
**pennies**
390:13
**people**
67:24 93:24 174:17
203:5 211:13 227:7
227:8,9 330:12
**Perfectly**
242:14
**perform**
78:22,24 121:11
268:10 348:13
**performed**
130:24 160:5,6,13
161:5,15,17,20
193:10 242:25
243:5 350:11 375:2
376:14
**performing**
67:13 85:19

**performs**
377:2
**perhaps**
12:10 15:16 201:19
**period**
22:17 41:8 87:17
94:25 101:24 123:3
160:4 161:2,3
164:10 166:24
187:8,20 188:13,23
189:4 190:22
194:18 200:7,11
201:20 206:11
207:6 208:12,23
225:2 251:8 391:24
392:6,8
**periods**
161:14,16 202:20
295:13 392:10
**permit**
310:17
**permitted**
111:17,21 236:20
311:18 362:18
**perp**
173:4 200:21 238:6
**perpetual**
170:14,19 172:20
173:2,7,18 174:7
188:2 191:7 194:16
197:3,22 201:22
211:23 218:15,19
221:16,24 222:21
224:4,18 225:13,15
231:8 236:23 238:2
241:25 392:25
393:8,16,19
**perpetuals**
206:12 211:7,19,20
223:6,8
**perps**
238:2
**person**
58:19 68:7 250:24
251:23 300:12
320:11 336:15

**personal**
14:3,6,7 143:18
253:14 403:19
404:10
**personally**
14:9 46:23 124:8,12
124:14 125:10
130:12 143:13
181:19 184:11
266:20 268:12
283:15
**personnel**
328:6
**persons**
250:24
**perspective**
56:21 137:4 217:25
302:6 305:12
306:13,17 309:17
309:21 310:4,5
317:17 329:9
339:12,14 341:11
401:23
**pervasive**
223:21
**petition**
38:4,10 85:22 87:8
87:11,22 88:12 89:8
95:2 148:17,18
161:4 202:12,21
206:2 207:7,18
275:18 277:4 281:7
281:9 295:12,13
325:19 328:13
359:9
**phone**
2:10,22 22:25 266:23
**phrase**
140:12
**phrased**
360:3
**phrases**
309:5
**phrasing**
337:8
**physical**

394:18 399:9
**place**
23:2 132:19 242:12
319:13 340:9 390:9
409:14
**placed**
143:6,24
**places**
135:8
**plain**
14:14
**plan**
5:13 27:2,7,12 32:11
47:23,25 48:2 49:3
49:5,7,12,14,18
51:17,22 53:2,4
57:8 60:11,14,20,24
61:3,11,22 62:15,16
64:3,9 65:5 87:7,12
88:14 149:25
253:23 260:22
261:18 309:6,12
**platforms**
266:25
**play**
187:22 236:24
**pleadings**
49:10 327:16
**please**
10:14,18 40:13 58:4
138:17 199:20
215:5 239:8 270:11
282:4 312:3 337:18
346:4 375:22
397:14 406:4,10
**plus**
188:5,17 208:15,18
208:20,21
**point**
13:9 15:12 18:7
23:16 31:20 46:23
48:22 75:11 99:13
101:2 102:24
108:21 110:8 111:8
120:13 121:9
136:22 150:14



151:25 156:10
157:14 158:19
161:3 164:19,21,25
165:5 169:3 181:2
181:18 190:24
191:21 195:2 196:8
196:18 197:8,17,21
223:18 227:12
231:4 232:21 233:4
233:5,6 235:12
238:8 240:21 246:2
247:5 261:17
263:24 271:2 272:3
274:20 276:19,19
276:20 315:12
324:5,23,24 361:7
372:24 377:11
381:4,6 395:9 403:5
**points**
37:16 43:3 155:4
247:11 325:12
338:2
**policies**
184:19 296:5 328:7
329:25 334:21,24
335:11 349:8
**policy**
110:2 136:10 310:18
310:20,21,22
311:14 322:12
323:3 324:3 326:9
328:23 329:8,9
330:8 336:11
349:13 361:23
**pool**
108:8 140:22 158:10
369:24 370:2,3
376:16,17,17 386:3
386:6 387:25,25
388:4,5,9,10,19,21
389:8,9,22,25 390:3
393:6 395:7 399:14
399:15,16,18
**pools**
166:12 384:16,24
385:20 387:22,24

391:22
**pool-to-pool**
376:22
**poor**
160:21
**popular**
170:13 171:19,23
172:6 177:12
**populate**
120:14
**populated**
230:2
**portal**
7:16,19 248:25 249:2
249:14,18 250:2
285:4,8,15 287:24
**portion**
401:24
**portrayed**
334:24
**posit**
155:14
**positions**
86:12 87:4 96:7
117:22 118:3,5
122:12,16,22 123:6
123:20 124:5,19
125:6,8 128:7 134:4
164:3 172:17,21
174:17 177:13
178:20 180:5,7,8
188:9 189:15,15,20
190:2,2 191:5,15
201:10 206:19,25
208:7,16 212:10
215:16 220:17
221:23 222:4
223:12 228:21
233:3 235:10,17,20
236:9 237:5 238:20
240:25 241:4,19
242:4,21 257:11
265:16 272:8
280:12 295:17
304:2 311:8 339:3
353:6,13,14,20,21

353:22 354:6,18
370:7 382:11,12
392:24
**position's**
19:16
**positive**
94:5 108:22 109:18
109:24 111:14
115:4 211:6 352:2
371:13,25 372:23
373:18,19 379:20
380:9,24 381:5
**possess**
294:6
**possessed**
97:8 300:7,10
**possession**
33:16 47:21 48:16
97:2,13,17 141:4,14
142:3 146:20 148:7
275:14 287:13,14
289:20 293:16
294:12 295:5,15
301:6,11 337:11,15
397:19
**possibility**
294:2,4
**possible**
55:17 79:21 104:8
109:10 111:5
139:15 141:25
159:24,25 223:4
294:9 318:9,11
343:4 362:13
365:19 390:6 398:9
**possibly**
252:22 377:9
**posted**
181:16 183:10,25
204:16
**post-petition**
37:19 47:13 48:15
49:25 51:7,10 58:23
86:21 88:2 219:21
244:19 280:21
**potential**

104:4,12 172:9
178:17 182:9
201:19 297:11
**potentially**
41:22 103:24 132:2
165:4 197:23 198:2
198:3 293:6 306:10
**practical**
144:5 302:6
**practice**
23:23 155:19 158:15
329:13,17 330:18
**practices**
155:12 311:17
328:21 330:21
334:25
**pre**
252:23 280:21
312:15 327:10
**preceding**
105:21 271:16
**preclude**
157:19
**precluded**
76:2 79:3
**predicated**
34:23 35:15 173:12
193:13 310:24
**predominantly**
27:13 181:23 205:24
222:3 249:4 392:4,7
**preempt**
25:22
**preface**
20:13,14 402:11
**prefaced**
402:13
**preference**
20:13 83:13,15
**preliminary**
34:22
**preman**
315:2
**premarked**
322:8
**premise**



379:11
**prep**
29:21 322:17
**preparation**
24:10,22 26:20 29:7
  30:7 32:25 33:5,8
  33:19 41:10 42:10
  45:15 67:17 79:9
  125:11 129:15
  181:6 216:11 255:2
  255:23 277:14,17
  322:18 332:16,19
  345:10,13
**prepare**
20:18 22:8 23:20
  38:16 42:23,24
  67:12 76:6,7,7
  199:8
**prepared**
17:14,19,22 18:3,8
  74:6 249:20
**preparing**
21:22,23 29:20,22,24
  33:10 49:9 67:10
  68:4 71:20 77:22
  273:21
**presence**
40:17
**present**
3:2,8 9:21 24:8 46:18
  99:9 238:25
**presentation**
123:4 124:7 203:10
  203:20 211:24
  248:7
**presented**
122:8,17 124:21
  126:19 127:10
  130:17 132:10
  148:20 149:15
  240:14,16 244:16
**preservation**
85:20,24
**preserved**
85:15
**prevailing**

173:19 174:14
  227:21 396:25
**prevent**
175:22 176:2 311:20
**prevented**
382:18
**previous**
349:14
**previously**
16:5 31:8 78:9
  106:20 212:23
  248:6 250:4 290:9
  317:13 332:20
  334:6 337:13 344:4
  365:9 367:2
**pre-account**
360:7
**pre-effective**
50:9 295:11
**pre-management**
328:22
**pre-plan**
27:3
**price**
119:15,17 121:3
  122:24,25 123:24
  132:2 173:12,13,17
  173:20 174:5,9,11
  174:12,14,19,20
  185:16 188:3,4,6,8
  188:15,16 189:8,12
  189:20 194:15,23
  198:5 202:12
  205:17 206:24
  207:10,17 208:10
  208:17,19 209:3,5,9
  218:21 224:25
  227:5,6,11,14,18,21
  232:21 233:4 288:5
  353:24 354:7,14
**prices**
88:15 207:10 227:8
  227:11
**pricing**
84:21 87:20,24 88:10
  118:12 120:23,24

137:16 201:9 202:8
  202:22 203:8 205:8
  205:16,21,24 206:6
  207:13 232:15
  233:11
**primarily**
23:21 266:24
**primary**
33:22 164:19 179:16
**principal**
357:13,23 358:8
  359:5,13 361:11
  383:6
**print**
394:16
**prior**
16:6 18:19 47:20
  49:3,5 54:4 55:17
  59:24 73:24 75:7
  77:17 80:7,21 87:15
  87:18,22 94:25
  101:7 102:7 103:2
  103:14 144:21
  148:16 156:2
  167:21 168:7
  201:20 213:6 222:2
  244:11 265:11
  274:21 275:17
  276:18 277:3,9
  281:7,9 285:16
  295:13 303:15
  307:6 315:12
  325:19 328:12
  333:4 334:14 359:9
  367:4 374:13,18
  398:7 409:6
**prioritized**
63:16
**priority**
62:2 63:10,12,17,20
  64:6,8
**private**
140:15 300:8,11,24
  301:4,6,11,18 302:9
  391:9,13 397:9,19
  397:22,24 398:5

**privy**
268:21
**proactively**
226:8
**probably**
54:20 394:2
**problem**
186:24 328:3
**procedure**
16:11 347:7
**proceed**
12:11
**proceeded**
404:16
**proceeding**
11:20 14:19 55:13
  299:20
**proceedings**
15:21 259:2
**process**
23:8 41:19 42:16
  50:14,15 51:5 72:8
  72:14 73:7,9 74:7
  75:15 154:15 177:3
  184:6 194:3,10
  207:15 311:10
  370:14 375:25
  381:13 385:16
  388:21
**processed**
323:12
**processes**
49:8
**produce**
58:4,11 125:15
**produced**
21:10,12 33:14,18
  34:2,5,9 36:16
  38:12,14 67:14 68:5
  72:16 73:3,16
  136:10 180:17
  182:16,21,23
  183:17 184:13
  185:24 194:7 199:6
  217:12 222:15
  229:19,22 232:4



233:20 234:3,10,10
254:24 255:6
285:16 322:12
330:17 345:3
350:17 392:3
**product**
93:8 131:21 162:6
166:18 170:14
171:2,22 173:22
174:25 177:25
198:22 199:4 227:5
238:10 258:13
369:11 387:2
**production**
8:9 21:13 181:20,22
184:12 234:12
334:9,14
**products**
92:22 170:10 178:7
340:7 387:5
**professional**
53:12,18 54:10
**profitable**
241:3
**profits**
302:12
**program**
108:4,6,8 109:4
110:12,23 112:2
176:7 177:22
238:19 241:13
338:3,5,20,22,24
339:8,10,12,18
340:4,16 341:12
342:3,9,13,14,15,17
342:21,23,24 343:9
343:11,14,15,23
344:8,17 345:16
346:17 347:17
358:4 359:4,13
360:11,18,23 361:2
361:12,14,14,16,21
361:25 362:7,19,23
363:4,8 364:9,20
365:24 366:25
368:22 372:12

373:9 374:15,23
377:6,20 378:16,18
378:19 379:6,25
380:6,12 381:22
383:6,25 384:12
387:6,21 392:20
393:14,23 394:15
394:16 396:9
398:24 399:15
400:2,4,16
**programmer**
72:10 76:17
**programming**
72:3 73:15
**programs**
342:5,7 396:3,4
**prohibited**
310:25
**projected**
63:18
**prompt**
334:8
**promulgated**
334:5
**proof**
5:21 6:10,16 20:22
20:22,24 65:22
69:12 128:14,22
201:3
**property**
141:15 146:21 147:3
147:16,22,25 148:2
148:9,14 150:5,11
150:13 151:21,24
267:23 275:15,23
276:3 277:2,2 280:5
281:12 289:15
303:5,13 309:2,5
337:15 391:6
**proprietary**
154:7
**protection**
356:16
**protective**
19:10,14
**Proulx**

2:16 4:9 9:23,25 11:8
18:20 19:7,18 31:17
36:3 57:23 58:6
59:17,20,22,23
61:15 66:2 67:18
69:16 81:3,10 89:23
110:19 126:4,6,16
126:18 128:11,18
138:19,23 139:5,7
139:18 145:2,13
180:13 182:8
186:16,17 198:12
207:21 214:7,13
216:7 218:5 220:20
234:5,23 235:5
247:16,24 285:11
285:23 286:7,12
292:10 307:20
310:14 314:2 320:7
334:3,13,20 335:24
337:16,24 344:18
344:25 359:20
366:22 379:2
393:24 394:6,12
398:19,23 400:22
401:2,12 402:22
404:18
**prove**
77:5
**provide**
35:5 36:19 45:22
53:3 116:24 172:7
221:13 246:24
262:8 264:18
265:19 266:11
268:8 270:20 275:2
276:21 279:16
306:25 340:4 347:3
**provided**
17:5 62:15 72:19
131:2 233:9 257:16
268:6 298:8,17
340:8 346:8,18
347:11 361:23
**provider**
257:13 261:21,25

262:8 266:2,8
**providers**
238:18
**provides**
71:10
**providing**
49:10 307:2,5
**provision**
275:20 277:5 303:8
312:5,17 314:16
315:6 318:10 356:6
357:3
**provisions**
62:16 277:16 315:17
**public**
11:4 144:8 328:9
334:25 407:24
409:5,24
**publicly**
51:2 58:21
**published**
54:22
**pull**
344:5,6 393:22
**pulls**
377:4
**purchase**
177:20 178:23
179:17
**purchased**
204:24 288:18,22
289:5
**purchasing**
289:11,12
**purely**
346:21
**purport**
46:20 71:5 143:15
184:8,14 318:7
**purported**
119:21
**purportedly**
345:5
**purpose**
35:16 206:17 207:4
325:15,21 339:11



**purposes**
34:25 68:22,24 76:12
85:18 97:25 105:22
105:24 106:5,9
112:10,12 154:9
197:13 203:4,24
205:12 271:18,23
338:14 364:2
**pursuant**
16:8,10 58:8 62:15
243:13 261:22
275:15 297:23
298:4 359:12
360:11 364:20
365:23 366:25
368:22 372:11
373:8 379:6 380:5,8
380:11 383:5
392:20
**pursue**
309:13
**pursuing**
27:16
**put**
129:6 137:18 253:6
328:2,4
**putting**
48:13 157:16 207:10
251:12 398:12
**Python**
72:3,10 73:15 76:11
76:18,21 77:7
120:14 194:14
**p.m**
145:5,11 247:19,22
337:19,22 394:7,10
405:8,11

—————————
**Q**
**qualified**
109:21 116:23
117:16 146:2 219:9
220:7 221:6,13
224:14 246:15,24
270:3 275:2 276:21
278:4,13,22 332:11

368:8 369:5
**quantity**
122:23 123:23
201:25 202:3
206:18,20,22
208:17,19 209:10
228:9 352:2,3
377:24
**quarterly**
170:20 192:7,9
218:14
**queries**
72:2
**questioned**
16:23
**questioning**
13:11
**questions**
8:20 13:5,16 20:9
35:9 151:6 220:11
255:19 279:3,5
316:10 402:7,13,15
402:20 403:18
404:15,22
**quick**
248:11 311:11
**QuickBooks**
98:14,17
**quicker**
178:16
**quickly**
175:22 270:7
**quite**
21:12 100:20
**quotation**
186:19
**quote**
84:7 123:5 127:20
130:2 146:19 152:5
340:16 357:12
387:13
**quotes**
169:5
**quote/unquote**
128:3 306:13 366:9
366:16 371:2

**quoting**
162:13

—————————
**R**
**R**
145:9 408:2,2 409:2
**raise**
10:17
**Ramanathan**
23:22
**ran**
311:6
**rapidly**
311:11 354:16
**rate**
58:16,18 59:11
375:11,15 376:2,6,8
376:9 377:15,15
384:2 386:7 388:24
**rates**
58:25 341:8
**rates-times-hours**
58:14
**raw**
72:23
**Ray**
26:11,14,23 28:2,11
56:25 57:9 253:21
254:13,19
**Ray's**
26:25 28:4,15,16
**re**
1:5 358:22
**reach**
157:6 188:9 190:9
194:8
**reached**
161:25 259:3 333:5
**react**
311:11
**reaction**
81:2
**read**
64:12 185:17 270:13
271:6 272:20 308:9
312:2,3,17 313:7

325:11 356:23
406:4 407:9
**readable**
229:21
**reading**
63:2,7 273:13 306:8
**reads**
256:18 352:20
**real**
290:21 292:7 297:17
328:20 330:2,5
334:25
**reality**
311:19
**realized**
239:2,17,20 240:9,11
243:13,19 393:2,17
**really**
63:17 270:7
**Realtime**
409:4,23
**reason**
13:21 85:19 119:14
156:25 159:19
184:10 204:18
206:7 255:8 292:2
299:3,21 335:19
348:7 354:17 406:7
408:3
**reasonably**
253:25 254:12
**reasoning**
266:16 299:9
**reasons**
172:5 174:24 205:4
**recalculate**
72:17
**recall**
28:16 32:16 33:19
39:8,11,13,20 47:7
55:14,15,19 122:10
123:25 124:6,20,24
126:9,12 132:3
136:11,19 181:11
185:6,7 187:11,16
230:25 233:23



240:3,6,15 254:18
256:7 261:5 263:23
268:4 282:20 283:3
283:16,18 284:2,17
286:22 287:2,10
300:21 318:16,24
319:14,24 320:20
326:25 331:8 339:9
362:8,14 363:5
384:18 387:9 395:6
**receipt**
241:10,11 406:16
**receive**
94:19 96:19 104:12
191:6,22 194:19,20
194:22 204:23
289:23 360:9 376:7
**received**
45:16 90:15 97:6
102:17 118:10
373:8
**receives**
383:6
**receiving**
59:13 390:2
**recently**
30:11 38:14 67:6
75:24
**recess**
81:7 145:7 247:21
337:21 394:9
**recognize**
129:10 394:2
**recognized**
53:17
**reconcile**
194:12 351:19
**reconciled**
349:24
**record**
9:6 12:22 18:11,20
19:8 20:8 58:3 63:6
66:22 80:15 81:6,9
84:25 126:5 129:13
145:6,12 151:15
167:24 231:24

247:20,23 266:14
266:19 308:10
312:3 314:24 316:5
319:17 321:25
337:18,20,23 394:8
394:11 401:4,6,7
405:6,9 407:12,14
**recorded**
88:8 90:10 97:22
101:3 102:2 107:6
116:17 120:20
137:14 154:19
290:2 302:18
370:10 384:13
**record's**
29:23 102:25
**recover**
190:22,25 197:24
307:18
**recoveries**
63:18 309:13
**recovery**
5:19 6:8,15 10:9
14:22,24 16:9 17:23
18:5,14 19:9 27:3,7
30:12 47:9,12 48:3
48:5,12,17,21 49:16
49:20 50:10,23
51:21 52:6,18 53:2
53:4 58:2 65:21
66:7 69:11 70:7
79:11 128:13,21
129:4 162:22
219:21 220:14
221:9,21 252:19
253:23 266:6
275:12,14 276:23
279:6 287:13
295:10 305:16
308:14 312:10
313:3,19 314:8,20
314:25 315:25
316:14 326:4
327:14,19 334:6
336:5 337:14
347:12 349:3 351:6

365:10 367:3,4
385:9 402:23
**redeem**
307:17
**reduce**
207:3
**reducing**
200:14
**ref**
260:21
**refer**
24:12,19 30:25 53:14
54:13 56:9,17 58:13
86:7,12 88:20,23
94:11 114:7 127:20
127:21 170:15
199:11,17 204:5
214:23 223:11
224:3 271:8 272:23
338:5,8 340:15
346:7 386:9
**reference**
64:18 65:10 84:12
86:24 92:12 119:17
122:24,25 123:24
138:13 168:24
172:23 173:6,12,14
173:17 174:5,9,12
174:18 188:3,7,15
188:16 189:8,12,20
194:15,23 198:5
200:23 205:17
206:24 207:9,16
208:9,17,19 209:2,5
209:8 210:7,13
215:8 224:25 227:4
227:11,17 229:18
232:22 233:3
242:11 255:7
256:15 263:24
273:6 306:9 313:9
331:14 333:19
354:13
**referenced**
28:12,19 42:23 43:8
57:25 61:21 67:11

67:24 70:11 73:16
95:4 122:7 125:10
135:24 146:4,14
148:22 150:4
151:13 156:4
174:14 215:24
231:15 232:12
234:2 257:10
260:21 262:2
267:12 290:19
320:8 328:8 360:8
377:2 396:11
**references**
54:2 86:10 213:15
257:13 309:4
**referencing**
87:18 90:25 119:25
121:21,25 141:2
212:15 243:8,10
265:12 305:15,25
306:3 310:22
352:11,12
**referred**
28:11 51:6 73:10
92:14,23 105:6,7
112:18 115:20
119:17 131:14
135:9 144:6 176:20
185:4 200:20
210:24 224:8
238:17,23 248:25
332:5 361:17 375:3
375:7 397:17
**referring**
14:14,15,16 15:10,18
23:13 29:25 30:6,10
37:18 50:16 54:14
54:16 83:22 88:24
99:19 114:7 117:10
127:22 128:9
170:24 205:15,16
205:21 248:23,24
267:16,21 272:25
300:11,14 305:13
338:6 340:24,24
356:7 358:14



361:16 378:6,7
385:19
**refers**
129:25 132:20,21
323:8
**refined**
36:17 37:7 38:11
**reflect**
71:14 88:7 101:8,11
119:18 184:19
**reflected**
38:11 117:19 119:24
124:18 126:25
127:4,5 131:7
138:12 193:18
201:2,16 202:11
229:12 232:2,9
236:25 239:18
244:13 330:4
400:12
**reflecting**
125:12 182:7,9 253:8
254:25
**reflects**
120:6 162:6 210:2
227:12
**refuse**
298:16 299:3
**regard**
32:13,15 106:10
148:13 163:11
206:9 251:7 257:10
262:19 309:8
315:10 333:24
348:16 374:23
379:17
**regarding**
44:20 49:11 57:2
147:24 149:4
226:17 238:25
253:3 261:16
277:11,20 282:19
282:21,23,25
283:17,19 284:2,16
284:18 297:11
325:22 330:24

361:14
**regardless**
266:2 292:12 294:11
**registered**
331:17 409:3,23
**regular**
241:7 242:2
**regularly**
26:14
**regulation**
332:6,14
**regulations**
331:19,24 332:10,12
**regulatory**
161:13 336:12
**rejected**
234:22,25 404:2
**rejecting**
234:23
**rel**
182:21
**relate**
28:22 157:10 219:10
242:19 292:25
382:10
**related**
21:4 26:21 30:6 49:8
49:10 51:23 53:23
54:2 56:9,23 58:17
60:23 64:4 65:12
71:11 83:4 84:19
86:11,16 87:3 90:2
90:11 96:22 97:13
139:25 161:11
162:7 165:4 172:23
191:13 201:19
206:8 230:4 238:2
259:6,14 260:10,22
289:14 303:12
360:24 361:3
365:12 381:8 393:9
**relates**
17:20 52:19 63:14
200:10 201:11
276:18 336:3
**relating**

31:6 62:18,20 76:21
160:12,19 182:6
185:2 274:5 346:16
**relation**
37:20 291:4 303:4
**relationship**
47:11,18 51:13 52:17
52:23 133:7 257:25
258:12,22 259:6,14
366:15 376:19,23
387:14,17 388:5
399:8
**relationships**
262:20 333:25
344:11 346:23
369:10
**relative**
48:22 58:21 85:11,11
177:12 207:16
409:17,19
**relatively**
101:19 175:10
**relatives**
365:14
**Relativity**
181:25 183:18
**relevance**
21:20 161:3
**relevant**
21:9,14,17 32:7
42:17 85:6 87:3
115:24 144:13
149:3 151:8 154:22
164:16 182:15,21
186:6 187:2,15
254:2 375:20
**reliant**
193:19
**relied**
234:11
**relies**
123:19
**rely**
17:18 71:19 78:25
274:3
**relying**

192:21 193:4,9,12
273:4
**remain**
101:5 274:12 280:25
306:18
**remaining**
95:24 272:4
**remains**
218:22 278:20
**remember**
40:8 47:5
**remembering**
78:7
**remotely**
3:8 409:8
**removed**
383:16
**renders**
165:10,21
**Reorganization**
5:13 61:11
**rep**
245:24
**repaid**
110:25 111:12
394:15
**repay**
111:7
**repayment**
370:14 374:14,18
394:17
**repayments**
400:5
**repeat**
45:7 95:7 110:15
116:25 120:3 131:9
163:23 212:5 215:7
221:17 239:11
243:15 268:18
282:3 312:19 313:8
339:22 352:10
362:2 378:22 382:2
397:13 398:17
400:9
**repeatedly**
289:16



**repeating**
118:23 221:4
**rephrase**
339:22 392:15
**report**
28:15 55:17,19,21
209:20 210:2
**reporter**
9:18 10:14 12:21
63:5 409:4,4,22,23
409:23
**REPORTER'S**
4:14
**reports**
28:11 29:8 55:22
56:2
**repository**
182:2
**represent**
9:22 33:22 49:24
57:23 80:15 84:18
91:6 130:7 164:10
182:25 188:12
209:21 210:18,19
210:21 218:20
272:5 276:5 281:19
281:21 282:5,8
318:18 331:14
365:15
**representation**
98:13 117:13 350:13
**representative**
12:3 16:20 17:3
20:10 219:13 402:8
403:3,14 404:13,25
**representatives**
10:5,11
**represented**
13:24 15:6 245:4,24
353:23 354:6
387:25 402:5
**representing**
15:2,21
**represents**
72:19 86:14 89:3
110:4 118:11

290:10 304:24
305:6
**request**
8:9 9:14 58:3 125:15
125:25 126:17
184:12 201:13,18
234:12 298:17
334:8,12,13 390:7
396:6 398:10,13
**requested**
182:18 201:24
**requesting**
375:4,6
**requests**
161:11 181:20,22
234:21 334:5
396:14 397:3
**require**
104:10 165:3 166:22
220:8 221:12
246:23 291:20
335:17 336:25
350:3 393:21,22
**required**
13:4 53:25 133:4
180:8 294:14
315:23 321:15
322:5 354:2,19
400:5
**requirement**
132:18,22 135:22
180:2,4 187:13
196:15 197:15
236:24 297:4
299:12,13 353:9,19
382:17
**requirements**
27:21 60:19,21
104:15 107:9
132:24 133:2 173:9
175:18,25 176:5,9
179:13,21 237:7
245:9,22 297:3
336:13 340:2
362:25 363:6
371:12 372:3,6,14

373:2,13,18 374:11
377:23 379:19
381:3 382:10,13,22
400:20,21
**requires**
104:17 177:19
246:14 292:19
313:13 337:9
358:23,24
**reserve**
19:11 82:7 404:3,6
**reset**
188:16
**residual**
396:20,21
**resolution**
308:21,24
**resolve**
63:21 79:6 403:11
**resolving**
27:19 279:19
**resources**
31:24 32:2,4
**respect**
17:3 18:17 19:10
26:24 30:19 41:8
47:6 51:7 52:10
60:14 62:22 63:22
64:18 73:9 79:14,25
81:13 110:20
125:14 127:2,24
132:17 147:2
149:16 150:5
151:16 161:21
163:18 164:3,9
177:14 184:19
193:6,10 195:23
196:11 254:14
263:22 264:14
313:5 318:19
321:21 324:17
328:23 333:6
360:19 361:24
372:2 399:3 400:8
400:17 402:19
404:3

**respectively**
200:16
**respond**
234:16
**response**
315:15 316:9
**responses**
18:13
**responsibilities**
27:8,11 48:20 263:21
322:24
**responsible**
51:18 81:22
**responsive**
291:12 334:4
**rest**
234:20 300:18
**restrictions**
298:9,24
**restructuring**
23:25 54:6
**result**
100:15,17 113:4
119:18 143:23
228:25 232:24
243:22 280:13
293:8 311:2 361:20
366:7,12 370:19
394:20 397:18
**resulted**
48:2 110:22 182:23
368:14 393:19
397:5
**retain**
87:15
**return**
406:13
**reveal**
45:19 147:6 162:5
166:17 264:13
265:16 275:9
276:15
**revealed**
322:4
**revealing**
44:24 181:13



**reveals**
264:13 318:3
**revenue**
119:6 175:12 340:12
**review**
25:4,5,12 28:4 32:22
33:2,4,9 36:25 58:5
122:5 136:9 155:7
162:14 193:14
194:10 199:5 222:7
229:9,9 231:18
286:9 322:2 323:10
333:10 373:9
385:16 391:25
**reviewed**
16:15 20:20 21:3,9
21:11,14,16 28:10
28:14 76:10 78:19
125:17,21 126:8
129:5,15 216:11
261:9 285:19
322:17 332:16,18
332:20
**reviewer**
385:3
**reviewing**
33:19 34:10 39:14
80:17 125:11
**reward**
172:9
**re-read**
351:5
**right**
10:17 81:14 86:6
140:8 145:2 196:20
209:6 343:13
373:25 375:19
392:14 400:22
**rights**
19:12 62:21 106:19
147:23,25 391:7
404:3,6
**right-hand**
199:21 216:16
**risk**
108:18 172:10

178:16,16 311:6
355:15 356:14
357:12 358:3
**riskier**
134:9
**risks**
134:8
**risky**
134:16
**RMR**
1:22
**road**
12:9
**Robert**
29:5
**role**
26:23 27:11 46:14,21
48:19 78:23 79:10
81:12 263:20
**roles**
49:6
**roll**
56:13 81:17
**rolls**
56:11
**room**
67:3 146:6
**roughly**
215:18
**rule**
16:10 109:25 401:25
**rules**
12:9 331:19,23 332:9
332:12
**ruling**
40:10,14,16 148:13
148:22
**run**
66:25 230:3
**runtime**
394:3 401:14
**Russell**
3:5 25:7
**Ryan**
323:11

**S**

**S**
3:10 5:3 6:3 7:3
145:9,9,9 311:22,22
311:22
**safeguarding**
322:10 326:10,17,23
**said**
23:6 33:13 39:16
40:5 74:19 80:21
81:16 95:9 103:8
110:5 111:11,12,24
141:24 151:23
168:16 180:7
242:16 268:5 289:9
289:16 310:17
329:6,8 341:13
350:4 364:14 365:9
372:18 391:20
395:17,17
**sake**
66:14
**sakes**
12:23
**sale**
102:11,14 103:2
**Salem**
323:16
**Salem888**
323:11
**Sam**
10:11 260:8 319:3
**same**
12:21 67:11 68:12,13
72:17 73:4 74:7
78:21 85:10,17 86:7
88:14 127:5,14,18
131:16 132:13
148:10 156:18
163:10 166:14
173:19 177:4 178:4
179:6 194:4,8
208:18 210:15
211:23 219:14
232:24 265:6

278:21 295:17
301:23 304:19
305:15,20 308:4,5
313:2,5,22,22
314:14 316:18,22
316:22 330:24
338:14 340:7
348:10 370:12
376:4 377:24
379:13 380:10
386:2 389:6,11,12
389:13 390:11
395:11 404:22
**Sammy**
3:15 9:16
**SAMUEL**
2:7
**sandbagging**
403:8
**satisfied**
298:10,19 371:12
372:2,5,13
**satisfy**
237:6 377:13
**satisfying**
297:2
**saw**
127:2,17 336:23
340:14
**say**
21:16 23:4,12 36:18
50:15 54:17 68:6,11
78:4 87:18 100:25
102:22 103:8 113:6
118:23 123:4
130:11 135:16
140:25 157:21
160:16 164:7,25
165:22 166:3,8
188:4 192:5 193:3
224:10 226:24
227:2 271:19
288:21 289:21
298:10 300:10
304:8 309:15 354:5
356:15 386:13



387:12 388:4,8
389:10
**saying**
74:21 75:4,5,22 80:5
83:21 106:2 117:16
135:20 158:5
188:25 210:6
211:11 220:5,6
226:19 234:24
271:17 292:21
309:20 315:14,25
319:13 324:15
330:11 360:4
**says**
68:17 105:22 150:4
150:10 192:4
212:16 248:16
261:6 296:2 305:3
323:20 331:16
336:14 348:6 353:5
357:23
**scenario**
109:14 111:6 158:4
158:14 167:11
278:3 295:19 365:3
372:7 380:14
382:20
**schedule**
80:9 216:17,17,23
218:12,13 220:2
256:20,23 257:2,13
**scheduled**
202:14,23 209:9
**schedules**
201:6 202:2 203:22
205:5 208:5 209:2
210:3 261:22
266:12
**scheduling**
79:17 201:7,9,15
203:25 205:12
208:10
**Scope**
336:10
**script**
72:3 73:16 76:11

194:14
**search**
182:13 183:18,22
326:6
**searches**
181:24 182:14,19
**second**
5:11 27:18 61:10
121:2,3 164:22
187:10 200:12
212:15 215:4
218:18 232:16
358:12,13 372:7
**secondary**
344:11
**seconds**
101:23 119:15
155:16 177:2 188:5
188:17,18 191:16
191:17 229:3,8
230:7,9 231:15
232:2,16 235:12
239:19,21 240:5
**section**
60:21 192:3,4 269:15
297:23 302:25
303:6 304:7 306:4
306:14,15 307:3,12
308:10,25 311:24
312:14,20 313:6,9
314:12 323:10
344:7 351:24 353:2
353:4 354:22
355:10 356:11,21
357:11
**sections**
219:11 344:3,11
356:9
**securing**
267:14,21 268:10
**see**
17:10 39:5 48:19
51:9 62:3 64:20
84:8 99:3 105:20
144:12,19 145:16
146:4,17 151:7

152:4 154:19
163:19 164:7,12
185:9,14 186:14
200:4,17,18 210:9
210:10,12 214:7
218:16,24 229:4
235:2 239:20
240:19,20 241:2
248:15,20 257:4,19
269:17,23 270:11
270:12 274:14
276:8 288:7 295:6
296:10 297:6
323:13,19 331:11
331:21 335:10
336:18 338:12
348:14 350:6 352:4
353:10 355:10,20
357:14 359:25
367:22
**seeing**
136:11 287:19 401:3
**seems**
184:25 330:3
**seen**
19:23 57:24 98:21,24
98:25 124:7,9,11,14
130:12 136:22
171:12 180:21,23
180:25 181:5
286:13,16,20,23
322:19,22 324:20
**seized**
235:18
**selected**
225:21
**sell**
103:18 106:14 113:2
212:10 213:3
218:21 219:3,25
235:24 291:6
307:16
**selling**
102:7,17 103:25
113:17 200:20
210:11,13,17,21,24

211:4,25 228:21
**sell-side**
189:15,19 190:2
227:10
**sending**
296:7
**sense**
22:22 176:13 213:14
235:21 249:8
369:22 380:20
394:18
**sent**
90:15 287:5,16
**sentence**
64:17 105:21 271:16
353:10 355:14
**separate**
33:6 115:23 118:4
156:19 166:5 190:3
226:16,18 353:8
**separately**
117:23 240:14
299:14
**September**
1:11 7:8 9:10 70:9,15
73:25 198:9 199:16
248:7 407:11
409:24
**sequencing**
403:6
**series**
33:25 34:3 134:3
153:11 309:23
327:16
**serve**
55:8,11
**served**
85:5 261:21
**server**
84:25 98:7,10 292:24
**service**
7:11 97:25 99:8
108:15,17 146:12
216:4,9,17,19
217:11 218:11
219:11,17 220:8



250:6,14 251:9,16
251:25 253:4,9
254:6 255:2,6,9,24
256:6,11,21 257:2,3
257:13,15 261:21
261:25 262:7
263:19 266:2,8
269:13,20 270:4,22
272:21 273:5,18,24
274:4 303:2 304:9
306:7 309:19
318:11 321:3,17
322:6 343:20 344:4
344:12,16 345:22
346:11 347:6,14
356:5,7,13,18
358:22 360:21
**services**
1:19 9:17,19 33:23
53:3 84:25 85:8
98:8 257:15 262:7
266:11 292:24
300:24 301:7
**SESSION**
4:10,11
**set**
59:8 162:15 173:21
202:15,23 207:9
209:2,8 227:17
341:6 349:8 409:14
**sets**
15:7
**Setting**
328:20
**settle**
64:10 259:4
**settled**
64:3 187:8 235:15
239:19 259:25
261:17 262:4,12
263:2,7,15 264:8,21
265:8,23 280:2,10
303:13
**settlement**
61:25 62:2,6,12,13
63:3,10,11,12,14

64:7,8 101:24
231:16 258:14
259:2,11,25 262:5
263:3,8,17,25 264:9
264:22 265:8,11,23
303:15 333:5,19
**settlements**
63:21
**settles**
276:25 289:18
**seven**
401:8,15,17,22 402:2
**seven-hour**
404:12
**several**
23:24 207:23 403:5
**shall**
274:11,12 276:3,3
280:24,25 281:12
306:18,19 377:19
**shaping**
203:3
**share**
322:3
**shed**
171:13
**sheet**
406:8,11,14
**short**
23:13 94:25 210:22
211:17,18,20,22
221:15,23 222:11
224:23 225:14
226:4 337:16
393:25
**shortfall**
295:14
**shortfalls**
329:18
**shortly**
85:25 299:15
**should**
304:8 310:18 329:19
391:20 406:6
**shown**
212:23 239:14 240:2

**shows**
121:17
**shy**
54:21
**side**
69:20 83:18 174:16
174:20,21,22
188:11 194:21
197:5,22 208:8
211:17 224:20,23
225:5,10,15 226:3,4
227:9 236:2 237:22
238:11,15 291:7
328:2,4 357:18
370:5,8 387:22,23
399:19,20
**sides**
203:17
**Sienna**
3:11
**sign**
406:10
**SIGNATURE**
4:12
**signed**
56:20 407:20
**significant**
350:14
**signs**
56:19
**similar**
49:16 177:3 179:11
**Similarly**
101:14 118:9 119:11
396:15
**simple**
100:22 127:9 188:4
238:5 372:9 373:14
378:9,10
**simpler**
121:15
**simplest**
383:11
**simplified**
373:6
**simply**

45:13 118:11 123:7
179:9 195:8 204:25
235:24 293:17
368:14 372:20
**since**
22:18 29:20 34:19
39:18 53:8 68:15,19
206:10 261:8 353:3
**Singh**
260:19
**single**
156:20 158:17,21
169:17 232:21
305:6 318:16,20
319:19 404:8
**singular**
110:4 244:7 245:25
304:24 305:17
365:16 381:16
**sir**
12:25 13:7 15:24
16:17 19:25 25:2,10
30:13 31:11 32:21
55:10 59:15 63:8
70:12 71:17 73:14
81:15 84:9 129:17
186:21 269:18
303:3 307:8 317:6
331:22 338:17
353:11 355:8
356:19 357:2,20
384:10,19
**sit**
256:8
**sitting**
146:6 212:9 224:22
261:10 318:14
319:18 337:3
**situation**
194:19
**situations**
189:13
**six**
126:10
**size**
66:14 185:13 189:7



189:16
**slightly**
54:18 202:15 207:9
**small**
23:19 175:10 389:16
**software**
99:8,12 154:7,23
155:3 396:9
**sold**
27:16 101:2 106:18
106:21 113:10
120:19 200:13
204:25 210:25
212:16 288:3,4
**solely**
53:23 271:23 365:20
400:17
**some**
15:25 17:5 24:2,3
33:17,21 34:6 35:20
36:11 44:5 45:24
46:17 53:23 57:12
60:9,10 65:7 68:7
82:22 83:9 92:12
97:20 108:21 111:8
122:8 131:7 132:20
136:22 170:9,11
175:9 181:2 185:10
190:22 196:24
223:7 226:19
228:14 237:19
240:10 267:2 271:2
299:21 300:16
320:11 325:8
326:22 336:14
341:22 342:2
346:11 350:9
351:12,23 353:23
354:6 363:17,17
378:7 381:20
389:14,15 396:17
400:3,11
**somehow**
204:23
**someone**
21:19 29:3 91:3

137:18 185:23
188:11 204:20
213:9 225:5,9 226:2
226:3 294:15
320:21 371:21
379:21 380:20
**someone's**
171:16 238:5
**something**
36:10 40:5 84:6
86:18 89:6 96:19
105:16,23 121:22
123:18 131:14,23
131:25 132:4
134:18 137:18
140:13 146:14
149:20 150:10
164:24 203:2 206:3
222:23 232:22
236:4 258:23
262:22 263:6
267:18 289:19
291:19 300:13
302:7 322:17
339:19 360:2 365:4
383:23 385:4
386:14 388:16
**sometime**
32:17 85:25
**sometimes**
57:4 210:23 247:14
311:19 355:6
**somewhat**
173:5
**somewhere**
22:15 23:4 116:18
185:19 293:5
310:21
**sop**
291:21
**sorry**
22:7 45:7 66:20
70:18 71:22 90:22
93:11 95:7 98:6
110:15 112:16
120:3 140:11

144:18 163:21,23
168:13 181:3
186:22 191:24
205:19 215:2,4,7
221:3,17 225:19
233:15 242:11
243:10,15 256:14
265:4 268:18
272:22 285:20
286:5 288:25 295:3
297:15 298:14
305:24 307:6
312:19 313:8 320:4
321:7 325:2 327:20
327:25 346:3
352:10 354:25
366:19 378:22
381:25 382:25
383:13 391:20
392:13 398:17
**sort**
22:20 55:12 171:5
175:13 226:13
234:8 328:6 330:7
343:15 375:16
**sorted**
375:14
**sorts**
375:25 388:23
**sounds**
289:9 338:17
**source**
33:23 264:18 333:20
**space**
301:17 406:7
**speak**
12:19 16:20 17:14
18:4 26:12,14 28:20
29:5 41:4,11 42:8
47:17 51:12 52:16
60:17,25 63:25
93:12 147:22 154:3
161:13 163:17
164:2 168:5 169:16
171:9,15,20 192:18
213:8 223:4 240:18

266:16 274:21
299:23 308:18,24
326:16,23 335:14
336:22 339:13,15
342:12,14 343:25
345:19 350:25
362:6 391:6
**speaking**
39:11 44:22 66:17
98:6 127:18 199:13
215:18 294:16
308:18 338:23
385:17
**speaks**
226:20 291:17
318:17 344:7 351:7
**specific**
22:21 35:9 38:6 39:4
39:22 40:5,22 53:21
54:14 59:8 74:5
79:21 82:4 95:21
102:18 112:21
145:25 146:7,16
152:5 158:8 159:5
160:10,23 162:2
167:4,20 169:14,14
169:20 181:11,12
182:18,19,20,22,24
213:22 218:21
228:8 251:12 253:2
254:19 255:21
268:5 282:20
283:16,19,25
284:17 287:2
290:18 300:12,12
318:23,24 321:19
327:2 339:9 348:9
348:11,14 362:8
363:6 369:7 373:24
374:4 376:21
381:14 387:15
395:18
**specifically**
18:6 36:23 39:20
43:7 53:22 59:4,7
64:7 105:5 118:6



125:23 132:4
152:18 161:20
182:5 200:6,9 217:4
221:22 228:7 240:3
250:19 251:15
257:14 261:6
262:19 269:7 287:2
287:9,10 299:11
300:22 307:12
309:3 332:7,25
343:22 360:20
381:21 385:19
400:21
**specifics**
36:7 342:7
**specified**
88:16 216:19 218:11
257:3,14 275:24
386:21
**specifies**
358:2
**specify**
108:18 206:6 228:10
231:12 356:13
390:7
**specs**
6:21 180:10,16
184:17 212:22
**speculate**
36:7 157:24 158:3
159:8 166:20
167:10 293:23
**speed**
63:18
**spent**
78:7 82:3 181:9
**splitting**
206:17
**spoke**
22:8 25:16 29:13
42:25 43:19 67:23
150:19 327:4
**spoken**
24:14,20 26:3,6
29:19 42:14,20 43:2
44:19 46:22,24

143:13 171:16
213:9 266:20 267:5
277:10 335:18
385:11,13
**sponsorship**
82:21 83:2,4,6,8
**spot**
7:23 172:12,17,20
175:3 176:6,11
177:12,18,18,24
178:5 242:21,25
257:3,6,9,10 272:8
344:20 345:4
346:16 353:6,8,12
392:24
**spreadsheet**
375:16
**spreadsheets**
77:3 229:13 232:3,10
**squarely**
334:4
**ss**
407:5
**stable**
94:18 105:9 115:16
115:19 116:2,6
**stage**
49:2
**stages**
37:12 49:9
**stand**
19:17 190:21 197:23
198:3
**standing**
279:2
**stands**
126:17 221:4 249:2
405:7,7
**start**
15:25 38:21 62:5
295:6
**starting**
11:10 401:11
**state**
9:21 11:4 32:5 78:16
162:10 298:4 308:7

320:25 406:6 407:4
407:24 409:5
**stated**
184:2 205:5 216:20
247:8 290:9 307:15
325:9
**statement**
63:19 231:17 260:22
261:2,6,9 320:13
321:6,18 327:18
356:8,25 359:7
404:7
**statements**
201:6 203:21,22
205:5 210:3 328:7
361:13
**states**
1:2 218:19 257:14
274:8 275:25 284:6
**stating**
74:23 148:2 163:2
222:18 245:17
305:16
**status**
57:15
**stay**
108:21 354:4 370:11
**stayed**
167:4
**Stenographer**
10:16,24 62:19
**stenographically**
409:13
**step**
77:20 181:3 235:25
237:22 238:11,15
238:19 338:21
**stepping**
225:9
**steps**
72:24 74:5,11,12,14
74:20,22 75:16,18
75:23 76:2 78:8,13
78:17,19,19,22
153:6,8 163:10
182:22 232:25

233:10
**step-by-step**
175:4 204:3 239:6,13
**Steven**
1:15 4:8 5:7,9,17 6:7
9:7 11:2 19:4,21
61:9 65:20 69:9
407:8,18 409:7
**stick**
383:11
**still**
30:22 44:4,6 49:24
51:9 80:17 82:6,6
85:4,8 163:4 214:9
246:3 304:9 376:21
**STIPULATIONS**
8:15
**stocks**
92:24
**stood**
191:6
**stop**
126:2 214:3,12
227:23 400:23
**storage**
320:23
**store**
121:3,8 137:19
140:15,17 232:15
232:20 254:22
**stored**
72:24 84:24 85:4,5,8
98:7,10 116:18
120:22 137:10,14
139:11,14,17,22
140:2 232:11,14
233:12 300:25
301:7 327:13
**stores**
140:14
**straightforward**
52:3
**strategy**
264:14 265:16
275:11 276:17
**streamline**



338:11

**Street**
2:8

**strike**
67:19 128:11 139:5
139:18 182:8
186:16 307:20
310:14 398:19

**structure**
58:8,14,20 59:5,12
300:17

**structured**
122:4 237:9 350:7
358:11

**sub**
245:8

**subcomponent**
127:6,12 371:13

**subcomponents**
273:3 371:20 373:16

**subject**
18:13 61:6 87:23
94:9 95:3 96:14
104:14 171:17
173:8 245:8,20
254:15 258:24
263:7 267:13
283:20 296:4,24
297:10,16 336:11
339:25 362:23
373:6,12,17 374:10
377:21 378:20
381:2 385:24

**subjects**
60:16 267:10

**submitted**
30:2,15 55:25 59:25
60:2 68:16 69:5
70:14 332:15

**submitting**
68:15,19 77:17
149:10

**subordination**
62:21

**subscribed**
407:20

**subsequent**
144:19 155:22 156:6
164:23 165:7,17
166:4 395:19,22

**subsequently**
380:15 393:8

**subset**
23:19 198:22

**subsidiary**
258:17 259:18

**substance**
44:25 46:4,7 181:13

**substantial**
164:8,15 165:23

**subtraction**
208:20

**sub-balance**
106:13 107:21
124:18 128:2
271:11,24

**sub-balances**
112:11 115:10
271:22

**such**
42:9 62:24 64:14
77:2 100:10 107:16
113:24 132:2
141:11 148:20
150:20 153:7
209:10 222:20
241:6 248:4 270:4
290:25 320:13
329:5 370:17
379:21 402:12
409:20

**suddenly**
158:4

**sufficient**
175:19 177:20 237:3
294:22 339:5 382:8

**sufficiently**
237:6

**suggest**
69:19 148:16 184:9
184:10 324:21
349:5

**suggested**
83:17 329:23

**suggesting**
330:6

**suggests**
284:7 337:9

**Sullivan**
2:5 3:10,11 10:8 14:2
14:10 22:11

**sum**
365:14

**summarize**
40:8 338:7

**summarized**
25:14 375:18

**summarizing**
35:8

**summary**
249:20

**summation**
84:18

**summed**
105:12

**super**
373:5

**supervise**
154:5

**supervised**
78:18

**supplement**
346:10 347:13

**supplemental**
6:6 20:25 30:10 67:5
68:25 69:2,9 70:6
70:20 71:4,11,13,18
72:25 73:12,20 75:9
77:14 79:15 80:2,18
121:12 130:21
133:17 193:22,25
232:25

**supply**
173:22 174:4 369:25
386:7

**support**
5:10,18 6:8 8:2 61:9
61:21 65:21 66:7

68:7 69:10 70:7
149:25 294:24

**supporter**
311:8

**suppose**
131:22

**sure**
12:10 14:13 36:21
40:15 43:6 45:9
50:4 51:12 60:12
63:5 69:21 80:12
91:19 93:6,20
100:20 118:17
120:5 126:5 129:8
129:13 131:10
140:8 146:12 154:2
163:25 165:14
174:23 188:19
196:6 197:10 204:4
206:11 211:2 212:6
212:11 213:24
220:22 221:19
223:19 231:24
241:9 243:17
244:11 268:20
291:11 335:8
338:10 342:9
344:14 362:12
363:20 368:19
379:3 380:3 392:14
397:15

**surprise**
80:23

**surrounding**
27:20

**swear**
10:14,19

**sweep**
158:9 160:23

**sweeping**
167:21

**swept**
155:6,17,24 156:8,20
158:22 168:3,18
297:8 395:7

**sworn**



11:3 409:8
**system**
98:18 369:24

---

**T**

T
5:3 6:3 7:3 145:9
188:5,5 208:15,18
208:20,21 407:2
408:2 409:2,2
**tab**
118:4,5 122:12,16
123:20 124:8,12,15
124:18,24 125:2,3,5
125:8,11,16 126:8
127:25 128:7
**table**
206:6 222:13,14
**tabs**
124:21 125:7 127:16
**Tackett**
46:9,10,12,23,25
**Tackett's**
46:19
**tactic**
403:8
**take**
32:14 58:9 65:5
80:11 81:3 116:19
145:3 175:4 197:3
199:23 204:2
208:14,15 213:24
223:22 225:5
227:10 235:3
238:21 239:6,13
247:17 263:9
264:10 270:20
275:18 277:5,14,22
284:22 285:18
302:24 312:18
313:7 315:16
321:10 334:12,18
337:16 338:21
393:24
**taken**
9:12 32:13 74:22

78:9 81:7 109:16
145:7 153:7,9 163:6
174:17 247:21
254:2,2,14 280:12
280:13 337:21
354:18 394:9
407:10 409:13
**taking**
189:2 211:17 233:2
287:25 288:3
347:12,15 402:24
403:15 404:20
**talk**
17:19 29:24 61:24
88:18 187:18
207:22 342:16
357:10
**talked**
47:8 115:16 128:10
136:4,8 256:20
338:2 384:14
**talking**
15:15 22:14,17
104:23 145:15
158:25 195:10
199:25 210:9
214:10 309:16
334:23 384:23
389:11
**talks**
200:20 357:11,21
**Taousse**
2:18 10:4
**team's**
37:19 122:4 171:21
229:9 231:18
312:11 313:4
385:16
**technical**
85:14 211:14 299:5
300:5 301:5 313:13
343:3 348:18
**technically**
52:19 55:16 140:12
140:14
**technology**

153:19
**tell**
156:21 172:15
240:24 254:13
301:8 312:4 317:17
338:8 378:11
403:23
**tells**
231:10
**temporary**
175:15
**ten**
22:15 192:5 229:13
247:17 388:8,9,14
388:15 389:2,3,4
**Teneo**
3:5
**term**
87:14 96:18 97:19
112:7 116:8 122:13
130:6 131:6 135:14
135:18 185:12
186:7,9,14,19 212:9
213:20 238:5
261:25 269:25
270:24 271:9
288:16 352:8,18
386:4
**terminated**
324:4
**terminates**
377:5
**terminology**
140:8 185:11 197:9
213:17
**terms**
7:11 15:18 22:21
66:18 70:23 82:16
108:15,16 146:11
178:3 182:13
211:11 216:3,9
217:11 219:11,17
220:8 226:14 228:8
250:5,14 251:9,16
251:25 253:3,8
254:6 255:2,5,9,23

256:6,11,21 263:19
269:12,20 270:4,22
272:20 273:5,18,23
274:4,23 296:6
302:25 304:8 306:7
309:18 318:11
321:2,17 322:5
325:24 341:16
343:16,20 344:3,12
344:16 345:16,21
346:11 347:6,14,17
356:4,6,13,17
358:21 360:21
361:24 362:6
403:18
**test**
12:18
**testified**
11:5 35:14 38:23
76:16 90:9 107:2
115:13 123:15
125:20 130:18
137:12 139:9,13
143:7 146:18 213:2
213:7 234:19
244:24 245:6
284:24 296:22
297:5,17 298:19,25
309:22 310:11
311:4 331:10
332:13 333:21
337:13 339:20
353:17 365:18
367:2,19 385:12
387:20
**testify**
13:21 41:22 78:10
220:16 314:25
409:9
**testifying**
14:6 59:14 96:11
124:13 127:15
128:6 134:17 135:4
150:18 151:5 159:7
159:16 259:5
399:12



**testimonial**
395:6
**testimony**
10:20 28:5 34:13,19
34:20 35:2 36:2
39:2,24 40:2 49:11
75:3 78:3 79:14,22
79:24 80:10 86:24
88:4 89:22 100:14
122:10 125:19
126:3 127:24
129:14 146:23
185:6 188:20
192:25 212:14
213:6 234:4 244:12
246:4 254:17 256:2
301:2 310:9 330:10
334:7 342:10,11
364:13 372:22
377:8 381:19,20
395:12 401:9 402:2
402:16,25 407:10
407:13 409:12
**testimony's**
242:13
**than**
35:3,16 49:3 54:7
56:4 57:12 58:24
66:21 71:15 90:21
109:3 111:19
113:17 121:16
134:2 141:9,21
142:9,17 149:9
156:12 159:11
170:18 172:12
177:18 178:9,18
201:16 202:15
226:21 228:8
254:20 255:6
263:19,24 271:5
272:19,25 283:2
291:4 298:24
320:11 325:21
326:21 339:16,20
345:20 346:14
360:21 366:5 380:9

387:7 400:19,19
**thank**
10:24 11:10 23:14
24:6 59:16 63:4
66:13 67:7,7 70:2
129:18 145:4
186:22 205:19
214:21 215:11
233:17 248:10
269:10 321:11
329:21 368:17
370:23 400:22
**them**
14:19 15:11 33:21
53:14 55:16 56:9
60:8,9,13 93:17
95:13 99:3 115:11
117:23 127:17
136:17 147:13
178:9 179:22 190:3
206:18 219:18
223:17 228:14
229:22 234:24
235:8 237:18
238:21 245:18
272:10 273:6
284:15 286:9,11
287:20 296:7,25
300:18 335:18
360:10 362:14
364:19,25 382:16
386:9 393:22
**themselves**
80:17 92:18 335:10
335:16 336:18,24
**then**
12:8 14:7 24:2 27:23
50:21 91:18 112:2
127:25 132:22
138:14 141:5
144:16 154:20
156:20 158:22
163:16 164:14,14
166:3 168:2,3,18
179:12 187:8 188:8
188:15,17 192:21

202:5 204:23
206:23 209:19
211:2,3 218:14
234:3 246:8 296:20
307:16 329:6,25
336:14 357:16
369:14 373:23
375:13 379:11
382:25 391:2 393:8
**theory**
174:2
**therefore**
93:4 111:18 206:16
331:18 340:11
354:15 382:17
**therein**
229:15
**thereof**
65:17 256:8 266:8
275:4 399:2
**thereto**
332:15 399:3 400:8
404:4
**there's**
17:8 18:25 33:25
34:3 65:7 94:22
164:18 169:4,18
175:5 179:23
185:10 192:2,16
196:17 200:12
213:21 228:7
233:12 235:23,24
246:6 248:15
269:15 314:12
323:10 325:12
331:13 351:25
352:14 353:8
354:22 355:14
374:6 376:18 389:3
**these**
14:18 16:22 19:11
70:10 74:14 78:17
78:19 92:15,25,25
108:14 140:21
171:5,13 184:2
192:22 211:11

219:17 220:11
221:11 226:12,20
226:25 228:25
259:17 261:3
264:20 266:12
274:22 277:16
279:3,5,19,25
285:14,19 290:25
303:16 308:15
315:17 316:3,16
317:19,24 329:6
346:20 350:14,18
352:6 358:15
394:19
**they're**
56:2 74:15 87:10
106:15 118:9,10
135:6 149:22
176:21 177:3,7
195:7 197:8,21
223:15 225:18
230:4,5 234:24
318:12 351:17
355:3 374:5
**thing**
88:14 122:25 127:18
132:14 211:23
290:24 292:7 329:6
**things**
27:13 34:25 39:15
41:21 76:20 120:16
120:21 134:5
196:11 223:2 230:5
241:6 266:18 268:5
319:7 323:13
338:11
**think**
22:7 51:5 54:18
89:25 98:12 102:24
111:24 112:23
113:19 114:6,21
132:4,20 135:16
136:15 137:12
139:9 146:10
148:25 149:18
153:21 173:16



183:19 197:8
200:22 210:16
213:13 223:20
229:16 232:12
238:23 246:13
252:24 253:10
265:6 317:3 355:17
357:23 365:3
367:20 372:9
375:18 380:22
395:16 403:9,10
**third**
217:7 257:12 296:9
334:16
**thirty**
406:15
**though**
341:18 378:17
**thought**
233:18 272:22
288:25 325:2
329:23 378:19
**thousand**
159:12,20,25 160:2
192:5
**thousands**
92:2 155:25 156:5
165:7 395:10,19,22
397:5
**three**
2:14 5:22 6:12,18 7:6
9:24 10:6 15:16,16
15:18 27:13 30:20
31:9,13 33:18 38:12
44:14 49:18 54:8,13
54:17,18,21 55:5
56:4 65:24 69:13
73:16 79:5,5 82:12
116:20 117:2,7
128:15,23 137:7,21
137:24 139:10,11
139:16,21 140:23
142:24 152:16,19
161:21,25 167:2,3,4
167:6,19 172:3
198:8 215:18

220:18 221:15
232:4 233:20
241:18 242:8
247:25 248:17
249:13 287:24
321:2 391:23 392:3
392:19
**three-year**
125:22
**through**
22:19 25:19 38:4,10
41:18 49:8 50:21
74:7 77:13 78:9
81:18 88:9 92:16
99:2 172:18 174:10
185:17 200:7
231:18 249:18,25
259:25 266:24
303:16 356:11
369:23 391:24
400:4
**throughout**
23:2 69:24 76:18
77:22 99:5 160:17
182:3 230:14,16
242:3 327:21 403:2
403:17,21,24
**Throwing**
326:8
**thus**
393:4
**ticker**
105:7 372:2 373:21
373:22 375:11
378:5 386:7,13,20
386:23,25 387:4,10
388:11
**tickers**
105:6 115:24 123:21
375:5 391:23
**ticker-specific**
386:12
**tie**
361:2
**tied**
173:3 178:4

**timeline**
248:15
**times**
37:5 57:4 58:18 99:6
137:12 185:4,13
188:3 189:8,11
207:23 208:17,19
220:19 224:3
244:18 274:12
280:24 306:18
403:5
**title**
27:2 44:8,10 53:9
200:3 231:13
274:10,11 279:20
280:23 289:14
306:3,17 368:24
369:6
**titled**
16:7 19:21 180:16
184:16 216:8,17
257:2 304:9 322:9
323:10 345:3
351:24 354:22
355:10
**today**
9:10 10:10,22 12:12
13:8,22 14:15 15:14
16:21 17:16 18:4
20:8,19 24:7,25
26:5 28:7 35:3 52:4
59:14 63:17 70:15
83:16 87:6 137:12
212:9 214:11
228:24 256:9
261:10 316:8
318:14 319:19
334:8 337:3 338:2
338:15 372:10
392:22 400:24
401:9 402:5 403:17
403:25 404:8
**together**
56:22 66:18 79:16
96:9 226:7 270:7
365:14 372:10

386:8,10 387:24
**token**
156:14 322:11 352:2
352:3
**tokenize**
222:23
**tokenized**
92:24 222:21 223:7
**tokens**
92:14,15 156:13
328:24
**told**
220:17
**tomorrow**
334:15 338:16
401:11 402:18
403:14 404:24
**Tony**
59:9
**too**
121:2 179:15 186:12
**took**
23:2 75:18 79:5
201:14 205:5 251:9
284:24
**tool**
144:14
**top**
130:10,11,13 250:16
300:16 331:13
352:25 376:16
390:13
**topic**
35:10 36:15 149:4
265:13,20 284:16
284:18 319:2
**topics**
16:19,23,25 17:5,8
17:10,15,20 18:3,17
18:23,25 19:11
28:18 54:2 283:20
303:12 324:17
330:24
**top-off**
377:2
**TOS**



64:19
**total**
22:21 71:3 188:9
190:9 203:18
240:11 288:6 290:8
310:15 369:24,25
383:17
**totalled**
36:24
**totally**
74:18
**tough**
373:13
**toward**
253:7 351:23 355:11
**trace**
152:13,20,24 153:3
153:10,10 154:17
155:22 156:11
160:8,22 162:16
164:11,24 165:2,11
165:25 291:20,25
344:9 374:7
**traceability**
156:7 160:13,19
164:22 291:17
**traceable**
167:6
**traced**
152:9 304:16 374:4
**traces**
163:11
**tracing**
153:7 154:7,9 157:2
157:20 158:7 160:5
160:16 161:5,10,14
161:17,20 163:17
164:3,16 292:4,19
**track**
58:16 98:20 105:4,5
117:22 273:22
**tracked**
97:20,23 99:15,22
105:2,8 115:23
117:23 118:16
120:17 383:19

**tracking**
98:2,10,16
**tracks**
100:4,8,12
**trade**
92:17,18 106:24
120:18 177:21
213:11 222:19
228:18 249:4
285:14 286:18,20
287:2,5,15 288:13
291:7,7,8 293:4
294:5,19 295:21
370:18
**traded**
92:3,6,11,22 93:2
121:4 131:22
158:18 170:17
171:2 222:25
232:18 238:5,12
386:21
**trader**
249:11
**traders**
249:5 301:17 340:10
**trades**
90:12 119:4 120:20
214:23,25 215:13
249:5,18,20,24
250:3 291:23
292:21 374:8
**trading**
1:5 2:4 5:14 7:23 9:8
14:16 50:19 61:12
101:19 102:20
113:13 134:18,25
135:5,12,15,23
136:13 172:13
175:3,7,10,19 176:6
176:19 177:18,19
213:14,18,21 241:8
241:8 249:25
258:12,18,22
262:21 265:25
266:9,10 274:13
276:4,4,7 277:24

279:22 280:6,22
281:2,8,13,21,23
282:7,10,24 283:9
284:5 293:16
306:20 307:13
314:4 339:25
340:11 342:2
344:21 345:4 352:7
352:17,24 354:3
365:12 381:13
**traditional**
50:16 77:8 86:14,15
94:20 115:21
170:16,21,25
213:13
**traditionally**
96:12 115:19
**train**
296:8
**tran**
254:25
**transacted**
294:23 368:12
**transacting**
249:13
**transaction**
85:2 100:17 101:3,7
101:10,20 102:15
103:14,16 104:4,17
111:3 113:2,2,25
115:3 118:24 119:4
165:4 175:8 226:22
228:18 241:23
243:2 249:16
291:10 293:8,12
294:10,14,21,25
360:13 366:10
367:13 370:17,18
370:21 372:20
386:22
**transactional**
234:9
**transactions**
38:6 42:2 87:21 90:8
92:17 99:14,17,20
100:3,5,7,9,11,13

100:14 102:2
103:23 106:23
113:16,22 115:14
155:22 156:2,6
157:13,18 164:23
165:7,18 217:14
242:17,21 272:2
290:25 370:9
371:19 384:11
394:19 395:10
399:12
**transaction's**
102:21
**transcript**
4:4,16 25:4,5,12,20
32:23 33:3,5,10
34:11 35:7 36:6,8
39:5,14 40:9 406:17
406:18 407:9,12
409:12
**transcripts**
33:15
**transfer**
48:3,10,11,14 92:17
225:7 274:13
279:21 280:25
306:19 343:2 369:7
**transferred**
50:8 51:16 396:22
**transfers**
90:14 144:19
**transparency**
203:7
**treat**
276:5 281:21 282:8
**treated**
177:7
**Tresser**
24:5
**trial**
319:3,9
**trip**
11:14
**TRM**
153:20 154:6
**true**



87:5 88:15 155:20
193:21 297:14
385:22 386:2
401:13 407:12,14
**trust**
6:15 10:9 14:22,25
16:9 17:24 18:5,14
19:9 27:3,8,11,17
30:12 47:9,13 48:3
48:5,12,17,21 49:16
49:20 50:10,23
51:16,17,22 52:6,18
53:2,4 58:2 79:11
128:13,21 129:4
162:22 219:21
220:14 221:9,21
251:6 252:20
253:24 266:6
275:14 279:6
287:13 295:11
305:16 308:14
312:10 313:3,19
314:8,20,25 315:25
316:14 327:14,20
334:6 336:6 337:14
347:12 349:3
365:10 367:4 385:9
402:24
**trust's**
5:19 6:9 65:21 66:8
69:11 70:8 144:22
192:14 275:13
276:23 326:4 351:6
367:3
**truth**
10:20,21,22 409:9,9
409:10
**truthfully**
13:22
**try**
270:6
**trying**
41:23 45:10 114:21
133:7 223:19 270:5
292:5 338:10
374:16

**turn**
12:20 17:9 83:19
204:22 210:11
343:14 354:21
**turnaround**
53:17,18
**turned**
299:7,16
**Turning**
317:4
**tweets**
327:3,9 328:15
**two**
28:10,19 36:22 38:6
39:8 46:8 53:13
54:21 59:24 66:18
79:16 101:17
105:16 115:10
135:7 141:17
164:18 173:25
188:6 196:11
203:17 218:19
226:6 230:5 259:7
259:15,17 271:22
285:14 302:25
329:3,24 330:25,25
358:15,15 364:19
393:9 403:2
**two-thirds**
313:23
**type**
99:21 101:25 168:20
238:16 240:13
287:18 299:2 387:2
**types**
99:14 101:25 113:15
113:22 115:14
170:10 177:8
346:20 364:19
387:5 399:2
**typically**
72:22 289:19 299:10

──────── U ────────

**UCC**
201:24

**ultimately**
300:17
**unable**
234:6 319:19
**unaffected**
203:16
**unbecoming**
403:9
**uncertain**
64:16,23
**uncertainty**
65:8
**unchanged**
101:5
**unclaimed**
303:4 308:25 309:4
**unclear**
41:23
**uncover**
253:11 254:22
284:25 348:25
**uncovered**
326:6
**under**
36:25 47:21 54:18
58:10 61:3 159:7,16
185:10,11 206:3
235:4 255:16
257:12 258:24
277:21 314:3
328:24 334:12,19
336:10 351:24
353:4 369:6 384:5
387:6 393:13
394:15,16 395:21
401:25 407:10
**underlie**
133:6
**underlying**
73:8 139:21 140:23
152:8 172:23 175:2
177:15 178:10,21
229:15 230:9,12
244:21 291:9,9,22
292:25 321:13
329:11 351:3,8,21

353:24 354:7
366:17 367:20
368:16 370:20
374:3,6 394:20
397:8,23 398:13
**understand**
13:6,16,18 14:18
15:22 16:22 17:4
20:3,15 34:2 36:11
38:14 42:16 46:20
74:2 77:2,12 78:12
78:17 79:17 80:19
80:20 102:24
122:21 133:7 143:5
144:23 177:11
182:12,17 184:18
188:20 190:4 199:5
199:14 212:7,11
221:25 233:7 239:7
239:12 242:4
245:18,19,23
249:17 252:16
260:7 261:24
262:11 272:7 301:5
302:14,23 309:10
309:15 310:5
316:21 318:25
326:14 336:2
344:10,15 350:8
360:25 374:16
380:3 385:6,11,15
395:12
**understanding**
14:5 16:18 17:24
26:10 28:22 34:15
34:20 37:6 38:5
46:11 47:19 51:14
51:17 62:11 63:2
64:2 65:7 77:24
78:8 91:19 104:10
107:18 108:17
115:25 116:12
119:3 142:20,22
147:9 149:3 150:17
151:2,13,20,22
155:5 160:24



165:15,16 169:25
171:18 174:24
181:22 184:24
185:22 189:10
194:12 198:24
199:3 216:25
217:20,22 218:10
222:5 224:7,16,17
231:6 240:8 244:11
246:4 250:13 252:6
253:24 257:9 258:7
258:8 259:10,23
263:14 280:9
288:16,25 291:13
302:16 307:9
313:12 321:18,24
336:8 343:17,19,24
345:21 347:6,10,22
348:23 356:12
357:25 358:7,23
363:13 364:5
368:10,19 373:21
377:12 385:10
391:16

**understood**
12:15,24 13:13,19
14:20 25:16 83:24
83:25 143:15,21
230:18 231:7,20
301:16 341:14
342:10

**undertaken**
348:19 350:20
351:18

**unique**
154:11

**unit**
390:8

**UNITED**
1:2

**unless**
13:2 370:20

**unlike**
172:20

**unlimited**
198:3

**unmeaningful**
351:11

**unpaid**
357:12 359:5,13

**unrealized**
239:2,14,23

**unsecured**
201:13 205:11

**until**
101:23 225:2

**untrue**
281:10 282:6

**unwieldy**
355:6

**up**
11:15 18:7 56:11,13
80:11 81:18 105:12
179:10 183:8
186:11 189:21
202:4,18 209:15
210:20,22 271:21
272:3 274:8 319:2
344:5,6 352:25
376:2 386:8

**update**
58:25

**updated**
7:6 198:7 229:11

**upon**
48:20 119:23 120:8
121:18 399:4

**upper**
400:11,18

**upside**
178:8,18

**upwards**
23:16

**us**
14:13 58:5 64:19
192:2 209:2 234:10
234:11 256:13
307:16

**USD**
35:13 105:17 106:7,7
109:6,12,13,18
111:18 113:16

126:23 187:9
188:14 190:20
200:14 202:7,25
206:13 207:3,7,12
208:4 209:4 229:2
239:18,21 240:21
241:3,6,17 243:23
244:2,8 271:24
272:2,14 273:2
288:6 310:13
354:15 384:5
392:23 393:21

**use**
72:16 90:18 91:2
93:15 102:5 127:9
144:14 154:6,9
173:15 186:20
196:4 217:13 218:7
242:22 264:3 271:5
272:15,17 310:5
338:13 343:20
345:23 347:4,8
350:14 372:8 373:5
378:8 384:22 386:3

**used**
34:24 35:16 72:18
75:15 76:11,12
84:13,25 85:11
97:25 98:14,18,19
122:13 130:23
133:3 135:6,7
140:13,15 146:11
155:3 192:6 198:23
198:24 203:24
205:9 207:15 210:4
210:18 211:12,24
226:9 229:25 230:3
230:6 237:23 242:6
268:8 269:19
270:24 274:5
305:21 309:6,9
352:8,18,23 384:23
406:19

**user**
127:20,21 128:3,9
238:24 239:15

378:12

**users**
282:9 341:7

**users's**
281:22

**user's**
119:20 120:15 187:9
188:14 190:20
202:7,25 207:3
209:4,16 276:6
277:23

**uses**
213:18

**using**
15:13,17 72:3 73:3
87:14 88:15 96:18
97:19 99:9 120:13
140:8 181:23 184:6
185:7 194:5,14
199:20 205:16
208:15 212:9
216:15 233:9
273:19 359:21
369:25 372:9

**utilize**
179:7

**utilized**
396:8

**utilizing**
109:11

——— **V** ———

**V**
311:22

**validate**
72:14

**valuation**
201:11

**valued**
87:7,9,10 101:9

**varies**
57:3

**variety**
91:12 94:15,22 95:10
95:12 96:14

**various**



81:17 134:5 245:9
245:22
**vendors**
153:16,19
**verbatim**
63:7 64:13 409:12
**verification**
42:16 76:20 77:11,16
**verified**
155:20 231:17
368:11
**verify**
41:19 72:8 183:25
184:5,11 222:17
287:21
**Verni**
3:15 9:16
**version**
250:13 323:9
**versus**
88:2 134:14 176:11
190:2 207:11 211:7
221:23 280:21
289:12 311:19
329:20 351:13
352:3 377:10
386:24,25 399:20
**very**
75:14 100:22 125:20
146:10 177:7 203:2
203:23 238:3 264:6
268:3 314:11
329:22 372:8 378:8
393:24 396:23
**via**
99:15,15 262:4 263:2
263:8,16 264:8,21
265:8,23 287:16
303:14
**video**
266:25 267:11
**videographer**
3:14 9:5,16 10:13
81:5,8 145:5,11
247:22 337:19,22
394:7,10 401:19

405:8
**videotape**
9:6
**Videotaped**
1:14
**view**
35:3 36:17 79:3 89:7
89:7 93:21 99:7
126:23 133:8
134:23 135:13
143:2 152:7 154:25
167:7 187:3 189:24
190:18 195:22
218:2 219:22,23
221:20,21 244:6
261:11 281:10,21
299:24 303:17
325:15 328:18
329:9 346:12
386:15
**viewed**
99:13 134:15 286:11
335:15 396:2
**viewing**
203:18
**views**
143:18,19
**virtue**
110:11 142:10 148:8
261:17 294:18
340:12 358:9
**visible**
144:8
**voice**
242:6
**volatility**
236:21
**volume**
232:13,19
**voluminous**
21:13 121:2

——————————
**W**
——————————
**W**
407:2
**waiting**

286:6
**Walia**
3:4 24:2,7 42:22
43:12,13,14,18
**walked**
172:18
**wall**
155:7
**wallet**
140:10 144:17
155:18 158:10
391:9
**wallets**
140:3,9,15 157:14
158:23,24 160:23
165:8 391:16
**Wang**
260:19
**want**
13:8 18:10 19:8
25:21 36:6 63:4
69:24 73:5 93:21
112:20 140:7 159:8
159:15 165:2,14
174:23 178:25
179:6 211:2 212:6
212:10 220:10,22
221:3 227:20 228:4
228:4 231:23 233:7
242:11 255:18
256:14 272:12
278:24 309:14
344:5,14 357:18
374:19 380:2
392:13
**wanted**
93:15 106:25 136:25
179:5,6 214:18
376:12 390:13
**wants**
368:20
**warn**
295:18 317:7
**warned**
319:20,25 320:21
**warning**

320:9
**wasn't**
73:21 136:6 231:2
238:20 319:10
364:7,9 394:17
**Watkins**
1:16 2:15 3:9 9:15
10:2
**way**
25:15 41:10,17 58:21
63:21 76:22 92:5
97:20 98:14 106:12
106:17 107:21
116:13 122:8 131:7
140:18 172:14
173:7 174:7 177:23
181:15 199:9
204:10 205:14
207:4 216:2 228:14
231:8 232:11
240:10 264:5
296:19 309:9
313:23 323:25
327:12 346:11
351:12 360:3
368:18 374:22
386:16,18 388:7
392:21
**ways**
49:17 94:22 95:19
96:2 103:22 109:2,5
119:6 172:16 187:4
342:18
**Web**
33:23 84:24 85:8
98:8 292:24 300:24
301:7
**webpage**
183:9 212:21 346:6
348:4
**webpages**
182:10 183:24 184:2
**website**
34:4 90:6 99:2 118:2
120:16 122:20
123:16 124:10



181:17 183:20,21
204:17 230:4
231:15 240:6,17
321:13 346:6
348:15,21 349:2
358:21
**weeks**
267:8
**weigh**
109:22 337:9
**welcome**
69:17 220:21
**well**
10:4 11:14 14:8 15:2
20:24 21:7 22:5,11
27:16 41:20 59:5
86:16 90:13 102:14
104:3 105:8 114:3
126:4 132:16 135:2
153:16 155:10
157:12 167:17
170:18 178:22
180:6 182:25 186:7
186:20 193:22
194:11,20 196:14
196:21 227:4
230:12 234:5
241:22 242:23
253:20 270:17
276:19 305:3 331:5
353:15,20 357:10
359:6 378:10 379:9
380:2,8 383:21
385:10,24 397:3,22
401:12,16
**went**
41:18 47:25 74:6
189:20,21 250:12
250:14 370:2
**weren't**
41:25 111:25 167:19
368:3 373:24
**we'll**
15:15 35:19 58:9
66:16 69:23 83:18
234:19 235:3

334:18 383:3
**we're**
12:11 24:25 58:10
208:14 209:21
290:13 304:9 353:4
394:2 401:4,5,14
**we've**
37:22 104:23 166:14
316:7 372:9 404:19
**whatever**
87:9 88:10 90:24
194:23 204:21
299:3 360:8 375:5
376:5 388:25
**whatsoever**
52:2 214:8 255:20
282:18 283:7
**what's**
19:20 61:17 62:7
66:3 83:2 84:17,22
86:9 100:16 109:7
115:18,18 116:11
119:16 128:19
134:22 140:10
169:2,21 180:14
181:24 198:13
229:6 233:20
248:25 257:6
269:19 285:12
289:10 304:11
307:11 315:23
361:17,17
**where**
35:22 39:23 88:12
103:20 110:13,24
120:19 126:25
127:8,19 139:16,20
146:8 155:23
156:17 158:4 165:2
189:13 210:9
212:16 223:18
236:17 238:19
249:3 269:24
294:21 295:6
298:20 299:2 300:8
300:24 311:9

319:20,24 320:20
344:9,13 359:2
360:2,8,15 365:3
369:24 371:7,8
372:7 389:21,24
394:25
**whereas**
31:4 332:13
**whether**
45:3 48:14 104:5
137:2 143:21 147:2
147:15 148:6,19
152:7 218:6 221:15
221:21 223:3,5
227:19 228:4,19
237:2 240:24
246:17 253:5
259:17 262:20
264:24 284:22
287:4 291:19
292:13 293:15
294:11 298:3
323:16 335:20
347:16 348:3,20
349:7,18 350:21
381:16
**while**
49:16 87:5 89:10
94:24 107:3 130:6
156:5 198:5 218:22
261:8 378:15
379:24 394:22
**who**
14:25 23:9,9,22 42:9
42:22 43:9,17,22
46:10 52:4 56:19
59:9 94:4 96:16,18
110:20 111:6
124:22 178:8 183:5
192:12,19 217:4,9
217:10 227:15,16
228:12,17 235:8
243:13,19 246:17
250:17,19,21
252:10 253:21
260:3,11 261:11

264:3 266:2 299:24
302:11 340:20
341:22 347:25
359:4 364:8 377:20
383:4 399:13,17,17
399:19
**whole**
10:21 409:9
**whom**
9:22 15:19 268:19
**whose**
289:14
**why**
163:16 164:14,14
171:4,13,19,21,23
177:9,11 186:2
191:25 202:22
209:13 212:18
261:20 265:25
266:9,10,17 274:16
317:17 342:8,12
380:20 382:4,4
**will**
9:20 10:13,20 12:11
40:6,22 80:11,12
118:23 137:18
174:4 196:12,25
238:9 402:10,18
403:12,13,15,23,23
404:24 405:6
406:11
**willful**
255:16
**willing**
226:2,4 227:7,9,10
238:10,15 268:7
341:9 375:10,11
376:15 377:16,17
389:15,16
**withdraw**
89:11,13 91:11,14,17
91:21 92:19 93:16
94:16,18 96:13
103:15,17,19
104:13,19 106:25
107:3,7,11 245:7,13



245:20 246:7,9,18
247:9 296:6,13,21
296:23 297:18,20
298:5,21 299:8,18
371:4,10,15,17,22
372:4,14,15 373:2
373:10,22 377:23
378:14 379:12,17
379:24 380:13
381:2,7,17 382:6,6
390:20
**withdrawal**
91:16 96:24,24
297:12 298:17,18
299:4 370:22
382:15 396:6,13
397:2 398:10,12
**withdrawals**
90:12 291:5 365:13
366:6 368:13 396:8
**withdrawing**
103:5 114:25 115:6
**withdrawn**
92:8 93:5 95:18
374:10
**withdraws**
390:23
**withdrew**
97:14 297:13 367:24
**within**
31:2 56:6 57:7 74:4
105:24 106:7
109:15 126:10
128:3,4 134:10
169:11 188:22
194:17 219:25
240:5 242:18
243:23 269:20
270:16 272:6
288:17,20 289:4,7
289:21 291:23
292:24 301:10
304:12,17 340:21
363:11,15 364:17
367:17 372:24
373:20 376:8

380:24 382:12
383:22 398:14
406:15
**without**
44:24 46:3 103:24
109:18,23 111:14
118:18 167:15
173:10 181:13
302:9
**witness**
8:4 10:10,15,23 11:2
45:19 55:8,11 59:19
136:25 138:17
145:4 162:5 166:17
214:3 234:18
256:18 286:5,10
352:20 400:25
402:3 406:2
**wondering**
271:4 358:16
**won't**
12:8 22:20
**word**
90:18 185:7 210:16
213:22 302:15
307:9 336:3 341:4
349:24 360:2
384:22
**words**
72:18 84:10,11 88:25
116:16 134:9 135:7
146:11 174:17
202:9 224:20 274:5
325:22,25 330:22
331:2 359:21,24
365:2 381:15
**work**
28:5 49:19 56:22
59:3 162:6 166:18
198:21 199:4
351:25 353:5
380:18
**worked**
58:16 74:2,9 142:23
173:8 209:23 231:8
374:23 399:15

**working**
23:18,23 172:3
**works**
23:14 75:10
**workstream**
24:19 56:8,10 81:21
**workstreams**
31:4 56:5 57:6 81:17
**world**
167:18 290:21 292:7
297:17 328:21
330:2,5 334:25
**worth**
100:25 113:7,9 179:2
179:7
**wouldn't**
31:22 132:5 227:2
235:9 328:18
**wound**
50:14,16
**write**
234:20 274:16
**writing**
75:23 225:4
**written**
66:12 74:15 226:13
270:21 325:25
330:12,14 343:16
**wrong**
192:8 209:6 215:2
231:25 402:13
**wrote**
192:12 213:9 341:4
**www.MagnaLS.com**
1:20

--- X ---

**X**
5:3 6:3 7:3 197:21

--- Y ---

**yeah**
45:9 59:21 70:24
196:16 200:22
212:6 213:24 215:6
248:14 270:5

271:13 285:23
290:19 306:2
352:12 362:3
375:18,24 392:16
**year**
199:17,19
**years**
54:8,13,18,19,21
55:6 142:24 172:3
**yes**
10:23 11:21 12:16,25
13:7,14,20 15:24
16:17 17:25 19:25
20:16 24:8 25:2,10
26:10 30:13 31:11
31:19 32:21 35:6
38:13 43:16 48:23
54:16 59:6 60:5
61:7 63:8 67:11
69:7 70:12 71:24
81:15 84:9 97:21
98:13,25 104:19
106:9 107:14,18
114:11 124:10
129:17,23 130:19
132:12 146:24
152:11 161:19,23
166:10 168:4 185:8
186:7,21,21 198:18
200:5,8 206:15
215:14 218:17
223:16 224:2,7
225:16 236:6,11
241:16 242:15
248:9,21 269:6,8,18
294:8 297:22 303:3
317:6 318:22
331:22 338:17
340:19 341:21
345:8 353:11 355:8
355:12 356:19
357:2,15,20 363:13
374:21 384:10,19
385:25
**yesterday**
22:19



**yet**
40:2 201:12 214:12
**yield**
174:18
**York**
1:17,17 2:9,9,21,21
9:14,14 11:5 409:5
**yourself**
30:18 82:11 312:3,17
**you'd**
137:2
**you'll**
17:10 185:9 248:15
**you're**
11:12 14:25 17:2
40:10,16 41:18
54:13 59:12 61:5
66:15 69:17 87:14
87:17 90:24,24
96:17 106:5,7
117:10 119:25
127:18 132:17
146:7 151:9 164:24
183:24 188:19,21
188:21 205:15
207:23 211:3 212:8
212:8 220:20 232:8
233:5 246:14
263:18 273:9,13
287:19 293:20
309:16 318:2
319:18 320:15
324:20 326:22
346:21 352:11
362:12 374:20
**you've**
15:6 16:3,3,19,25
19:19 37:9 45:13
57:6 61:16,17 66:3
70:3 95:4 128:19
130:12 139:8
143:25 180:14
237:15 285:12,19
286:8 295:19
297:10,17 298:19
306:12 322:7

324:20 328:7 360:8
397:17

---

**Z**

**Zachary**
2:16 9:25
**zachary.proulx@l...**
2:23
**Zane**
46:9,10
**zero**
108:22 110:14
113:11,13 164:25
165:5 188:5 197:8
197:21,25 208:15
208:21 293:21
383:24
**Zhao**
2:17 10:3
**Zijun**
2:17 10:3
**Zoom**
22:25 266:25

---

**$**

**$24**
36:24 37:24
**$50,000**
100:25 101:9,12
113:7,9,11,13 179:2
179:3,7
**$81**
242:23
**$82**
242:19

---

**0**

**000045694-712**
7:25 344:22

---

**1**

**1**
9:7 16:5 191:25
250:16 323:9
351:25 352:15
401:25

**1:44**
145:11
**10**
5:18 11:10 23:4
65:19 66:4 192:6
224:5 248:12
269:12 274:8 304:7
306:14,16 307:3
317:5
**10.1**
305:21
**10.3**
307:12
**10.3.1**
307:12 308:10
**10:00**
1:17
**10:09**
9:3,11
**10:18**
404:7
**100**
163:17,21,22 164:2
**10004-2498**
2:9
**10020**
2:21
**11**
1:7 4:9 5:12 6:7,22
47:22 50:13 61:11
61:24 69:8 70:4
160:7 180:10
258:25 261:18
327:15
**11th**
50:20 180:17 183:9
**11:27**
81:5
**11:44**
81:8
**1129**
60:21
**12**
6:15 128:12,20
**12th**
116:20 117:6,7

162:19,21 163:15
166:7 200:7 215:19
221:22 222:3 242:5
242:10 391:24
392:17,18 393:7
**12:56**
145:5
**125**
2:8
**1271**
1:16 2:20 9:13
**128**
6:14
**13**
6:22 7:12 180:9,15
200:11 212:23
216:4 338:13
**13th**
216:9 250:15 251:5
270:23 274:20
392:18
**14**
7:7 198:7,14 248:8
340:14 391:24
**14th**
200:7 243:2
**145**
4:10
**15**
7:12 71:2 137:6
216:3 250:5 344:5
356:18 384:16
**150**
23:15
**16**
7:15,16 285:3,3,13
286:2 287:25
387:12
**16th**
323:12
**17**
7:20 285:7,13 286:4
288:3 290:14,20
**18**
7:24 344:20 345:2
352:14 357:17



**18.7K**
200:13 212:17
**180**
6:21
**19**
5:6
**19th**
70:9 73:25
**198**
7:6

**2**

**2**
4:6 185:9 256:23
312:14,21 323:7
351:22 352:2,14,15
**2nd**
286:3
**2.1.3**
312:14,21
**2.2**
313:8
**2.2.2**
313:6,10
**2.4.1**
313:22 356:21
357:11
**20**
23:4 71:3 163:20
407:21
**20th**
30:2 68:18 73:22,25
74:16,23 76:4 79:4
83:23 162:12 194:5
285:25
**200**
23:16
**2016**
53:8
**2020**
248:16,17 285:16
286:2,4
**2021**
323:9,12 324:6,17
**2022**
6:22 7:12,24 36:23

41:8 42:3,5 54:20
86:4 117:6,7 137:9
137:23,25 138:4,6
139:2,4 161:18
162:19,21 163:15
180:10,17 181:17
183:9 184:21
215:19 216:4,9
217:15 218:8
221:22,23 250:5,15
255:10,23 270:23
274:20 344:22
345:5 348:5,22
**2024**
7:8 198:9 248:7
**2025**
1:11 9:10 32:20
47:25 70:9 162:12
407:11 409:24
**21**
61:23 199:20 200:9
212:16
**212.558.1635**
2:10
**212.906.1200**
2:22
**216**
7:11
**22**
210:12 254:7
**22-11068**
1:9
**23**
61:23
**24**
1:11 37:23 64:11
407:11
**24th**
9:10 70:16
**26**
311:24
**28**
270:8 272:20 273:23
**285**
7:15,19
**29**

228:22

**3**

**3**
4:6 8:11,12 17:10
18:17 313:6 356:22
**3AC**
7:25 15:16,23 20:23
21:10,12 24:16,17
26:17 29:20 31:6
32:13,15 33:14
37:21 44:17 72:16
73:4 106:2,10 129:5
131:2 162:15,18
163:4,7,14 164:8
169:18,20 182:14
183:3,17 184:13
199:25 229:19
241:24 242:17
243:5 248:17
249:17 289:24
321:3,21,25 344:22
360:19 393:6
**3AC's**
20:21 21:5 29:10
33:16 34:15 36:13
36:14 37:25 38:8,9
66:8 70:8 132:25
152:9 162:17
165:25 198:25
210:7 214:23,24
243:3 272:7 273:3
274:6 351:6 361:8
**3AC-FTX-00534514**
7:17 285:5
**3AC-FTX-00536147**
7:21 285:9
**3.4K**
200:13
**3/20/2020**
7:16 285:4
**3:31**
247:19
**3:51**
247:22
**30**

101:23 119:15
155:16 177:2 188:5
188:17,18 191:15
191:17 208:15,18
208:21 223:23
229:2,8 230:7,9
231:15,25 232:16
235:11 239:19,20
240:5 406:15
409:24
**30(b)(6)**
16:11 220:16 279:11
401:23 402:2
**30(d)**
401:25
**30-second**
123:3 174:6 187:7,20
188:13,23 194:18
201:20 202:10,20
206:11 207:6
208:12,22 209:11
225:2 232:8 233:11
234:8
**30-seconds**
233:21
**31**
256:24
**311**
4:11
**334**
8:12
**344**
7:23
**35**
216:14 256:22
**38.6**
311:24

**4**

**4**
7:8,24 17:10 18:18
198:9 325:9 336:10
344:21 354:21,24
**4th**
199:16 345:5 348:5
**4.1**



200:15
**407**
4:12
**408**
4:13
**409**
4:14
**437.2**
200:15
**45697**
355:7
**46**
320:24 321:10
**49**
17:8

---
**5**
---
**5**
4:7 216:17 218:13
  256:21 288:4
  290:19 291:15
  331:13
**5:27**
337:19
**5:46**
337:22
**50,000**
114:25
**58**
8:11

---
**6**
---
**6**
17:9 129:24 322:9
**6/2/2020**
7:20 285:8
**6:53**
394:7
**60**
136:15 252:3 255:14
  255:20
**61**
5:9
**65**
5:17
**69**

6:6

---
**7**
---
**7**
4:7 84:3 86:8 131:12
  145:17
**7:03**
394:10
**7:10**
401:20
**7:14**
405:8,11
**73**
214:22 215:9
**77**
243:11

---
**8**
---
**8**
5:7 19:3,20 127:19
**8.1.3**
314:13
**8.2**
269:15
**8.2.6**
274:7 275:25 278:8
  278:17 280:4 282:7
  282:19,21 283:2,8
  283:17,20 284:3
  296:2 297:23
  299:25 301:10
  306:15 317:4,18
**866-624-6221**
1:19

---
**9**
---
**9**
5:10 11:11 61:8,18
  105:15 112:8
  314:11
**9.1**
302:25 303:8 308:25
**98**
162:13



# **EXHIBIT 23**

Page 1

1      IN THE UNITED STATES BANKRUPTCY COURT

           FOR THE DISTRICT OF DELAWARE

2

3    IN RE:                        )

                                   ) No. 22-11068 (KBO)

4     FTX TRADING LTD., et al.,      )

                                   )

5                  Debtors.       )

6

7           The videotaped deposition of

8                   MATTHEW LISLE

9    taken before JO ANN LOSOYA, CSR, RPR, CRR, at 330

10   North Wabash, Chicago, Illinois commencing at

11   9:00 on December 4, 2025.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 2

1  PRESENT:
2
   SULLIVAN & CROMWELL LLP
3  CHRISTOPHER DUNNE
   125 Broad St.,
4  New York, NY 10004
   Dunnec@sullcrom.com
5
   and
6
   NAM LUU
7  1700 New York Ave NW
   Suite 700
8  Washington, DC 20006
   (202) 956-7500
9  Luun@sullcrom.com
10     Appeared on behalf of FTX Recovery
       Trust.
11
12
   LATHAM & WATKINS, LLP
13 TIFFANY IKEDA AUSTIN
   355 South Grand Ave
14 Suite 100,
   Los Angeles, California 90071
15 Tiffany.ikeda@lw.com
16 and
17 KARLA MARDUENO
   330 N Wabash Ave
18 Ste 2800
   Chicago, Illinois 60611
19 (312) 876-7700
   Karla.mardueno@lw.com
20
       Appeared on behalf of Joint Liquidators
21     of 3AC.
22
   VIDEOGRAPHER:  Kevin Duncan
23
   STENOGRAPHICALLY REPORTED BY:
24 JO ANN LOSOYA, CSR, RPR, CRR
   LICENSE #:  084-002437
25

Page 3

1           EXAMINATION
2
3  Witness                    Page  Line
4  MATTHEW LISLE
5   By Mr. Dunne              5    10
6   By Ms. Austin             267   9
7
8           ***************
9         INDEX OF EXHIBITS
10 EXHIBIT      DESCRIPTION        PAGE
11 Exhibit 1    Declaration of Matthew W.   25
12     Lisle
13 Exhibit 2    Supplement Declaration of   25
14     Matthew Lisle
15 Exhibit 3    Trial Transcript       45
16 Exhibit 4    Declaration of Stephen     94
17     Atherton
18 Exhibit 5    FTX Terms of Service     172
19 Exhibit 6    Deposition of Sam       201
20     Bankman-Fried
21
22
23
24
25

Page 4

1       THE VIDEOGRAPHER:  Good morning.  We
2  are going on the video record at 9:10 a.m. on
3  December 4, 2025.
4       Here begins the video-recorded
5  deposition of Mr. Matthew W. Lisle taken In Re:
6  FTX Trading Limited, et al., filed with the U.S.
7  District Court for the District of Delaware,
8  bearing Case No. 22-11068 (KBO).
9       Today's deposition is being held
10 at 330 North Wabash, Chicago, Illinois.
11      My name is Kevin Duncan and I am a
12 legal videographer representing Veritext Legal
13 Solutions.  The court reporter today is Ms. JoAnn
14 Losoya.
15      Counsel, will you please identify
16 yourselves and affiliations, starting with the
17 noticing party.
18      MR. DUNNE:  Christopher Dunne and Nam
19 Luu from Sullivan & Cromwell from the FTX
20 recovery trust.
21      MS. AUSTIN:  Tiffany Ikeda Austin and
22 Karla Mardueno for the Joint Liquidators of Three
23 Arrows Capital and the witness.
24      THE VIDEOGRAPHER:  Thank you, Counsel.
25      Will the court reporter please

Page 5

1  administer the oath.
2       (Witness sworn at 9:11 a.m.)
3       THE VIDEOGRAPHER:  You may proceed.
4  WHEREUPON:
5           MATTHEW W. LISLE,
6  called as a witness herein, having been first
7  duly sworn, was examined and testified as
8  follows:
9         E X A M I N A T I O N
10 BY MR. DUNNE:
11   Q.  Good morning, Mr. Lisle.
12   A.  Good morning.
13   Q.  We meet earlier but I'm Chris Dunne.
14 I represent FTX.
15      Before we get started, I'll just
16 note a couple of things.
17      We're obviously in a deposition
18 here.  We have a court reporter taking everything
19 down.  Let's try not to talk over each other.
20 You let me finish my questions; I'll let you
21 finish your answers.
22      If I ever ask a question you don't
23 understand, please ask for clarification.
24 Otherwise, I'll likely move on thinking you have
25 understood me.

2 (Pages 2 - 5)

Page 6

1    Is that okay?
2    A.  Yep.
3    Q.  You may hear objections from time to
4  time during today's deposition.  I would ask that
5  unless instructed not to answer, that you answer
6  my question.
7        If you ever need a break, just let
8  us know.  I'll probably plan to take breaks every
9  hour or so, absent your request for one.
10    A.  Okay.
11    Q.  Is there anything that might prevent
12  you from providing complete and accurate
13  testimony today?
14    A.  Nothing.
15    Q.  No medications or substances that
16  impair your memory or cognition in any way?
17    A.  No.
18    Q.  Have you ever been deposed before?
19    A.  I have.
20    Q.  How many times?
21    A.  Two times.
22    Q.  Two times.
23        What cases were those in?
24    A.  There were two cases of a regulatory
25  nature and -- I apologize.  I have been deposed

Page 7

1  three times --
2    Q.  Three times.
3    A.  -- by regulators.
4        And in two cases I was deposed by
5  the Commodity Futures Trading Commission in my
6  role as CCO at a couple of different places.  And
7  if you need specifics, or should I just move on?
8    Q.  You could complete your answer and
9  I'll ask a follow-up if I need it.
10        Were those -- you mentioned two by
11  the CFTC.
12    A.  Right.
13    Q.  There was one more.
14    A.  One more of a regulatory nature, by
15  the Toronto Stock Exchange.
16    Q.  Got it.
17        So were those -- were those
18  interviews or were they formal depositions like
19  in a litigation?
20    A.  They were regulatory investigations,
21  and pursuant to those, they took on the record
22  testimony for OTRs.
23    Q.  There was a court reporter taking
24  everything down?
25    A.  Yes.

Page 8

1    Q.  But it was -- it was a regulatory
2  proceeding at that stage like an investigative
3  proceeding?
4    A.  It was.
5    Q.  We didn't have people objecting.  It
6  was a little bit of a different setting,
7  otherwise pretty similar to this?
8    A.  Yeah.  I mean, I had counsel in all
9  three cases.
10    Q.  Yep.  Got it.
11        And can you describe the general
12  nature of the inquiries that were going on in
13  each of those matters?
14    A.  Sure.
15        The first one was concerning what
16  we call Exchange for physical trades and the
17  records that are required to be kept for those
18  trades.
19        The second case was with respect
20  to -- again, it was a recordkeeping case with
21  respect to post-trade allocations, meaning trades
22  are done in a bunched order and then allocated
23  after execution into different accounts.
24        And then the third was with
25  respect to market surveillance capacity or

Page 9

1  function in our brokerage.
2    Q.  Were these enforcement proceedings?
3    A.  Yes.
4    Q.  Okay.  Starting with the first one,
5  can you please remind me, forgive me if you just
6  said this, which entity you were affiliated with
7  at the time of the first deposition?
8    A.  The first one I was affiliated with
9  ABN AMRO Clearing Chicago.
10    Q.  What year was that?
11    A.  I was there between 2013 and 2018 so I
12  would guess 2016 or 2017.
13    Q.  And remind me of your position at ABN
14  at the time.
15    A.  Chief compliance officer of the
16  futures division.  They are a broker-dealer FCM
17  combined.
18    Q.  And why were you as a chief compliance
19  officer interviewed in that matter?
20    A.  I was representing the firm, which --
21  who was being investigated by the Commodity
22  Futures Trading Commission for irregularities or
23  possible irregularities with respect to our
24  customers' trading, not our own.  We did not
25  proprietarily trade.

3 (Pages 6 - 9)

Page 10

1    There is a requirement to keep
2 certain sets of records with respect to trades
3 that are called EFPs.  EFPs are trades that occur
4 off Exchange and there are -- most trading in the
5 futures markets is required to be on Exchange.
6    There are exceptions to certain
7 types of trades that can be executed off Exchange
8 and essentially negotiated bilaterally, and those
9 are called Exchange for physicals, meaning that
10 they're allowed -- you're allowed to Exchange a
11 futures position if simultaneously you are
12 transacting or transferring title to a physical
13 inventory.
14    Q.    Physical.  Yeah.
15    A.    Hence, Exchange for physicals.
16    We had to keep records or ensure
17 that our customers kept records with respect to
18 bill of ladings and all of the things that would
19 evidence the physical transaction itself, so that
20 there wasn't any fraud or anything like that.
21    And so the investigation was into
22 whether or not ABN at the time was correctly or
23 adequately supervising its customers with respect
24 to that.
25    I should add that it did not

Page 11

1 result in any sort of an enforcement action.
2    Q.    Thank you for that.
3    Were you -- were you being
4 interviewed as a fact witness or as a corporate
5 representative pursuant to a -- you know, a more
6 formalized inquiry?
7    A.    I was -- if I recall correctly, I was
8 being interviewed in my capacity as the chief
9 compliance officer and a chief representative of
10 the company.  I was the only person that was
11 interviewed from ABN.  I spoke on behalf of the
12 compliance function which was being investigated
13 from the standpoint of, you know, our adequacy of
14 supervision.
15    Q.    Got it.
16    The inquiry was with respect to
17 ABN's compliance with these customer-tracking
18 regulations?
19    A.    Yes.
20    Q.    All right.  You as the chief
21 compliance officer of the futures division were
22 the person responsible for that function?
23    A.    That's correct.
24    Q.    Got it.
25    You mentioned there was no action

Page 12

1 taken against ABN in connection with that matter?
2    A.    That's correct.
3    Q.    Thank you.
4    The second -- that was your first
5 deposition/interview on the record.
6    A.    Yeah.
7    Q.    How about the second one?
8    A.    So the second one was with respect --
9 and it was also an investigation that was
10 commenced by the Commodity Futures Trading
11 Commission, and that was the enforcement staff.
12 And the specific issue there was whether or
13 not --
14    Q.    Let me interrupt you for one second.
15 Apologies.
16    Were you at ABN at the time of
17 that?
18    A.    No, this is my current job Wedbush
19 Securities.
20    Q.    Got it.
21    What year was that?
22    A.    2024.
23    Q.    Okay.  So please describe the nature
24 of that inquiry.
25    A.    Sure.

Page 13

1    So, this inquiry was with respect
2 to our supervision over post-trade allocations.
3 So, again, similar to EFPs, there are certain
4 position transfers that are permitted to be done
5 outside of an Exchange execution, on the books
6 and records.
7    So, it regarded bunch trades.
8 Typically an investment manager who has
9 discretionary authority over, let's say, fund
10 accounts or customer accounts, multiple, will be
11 executing the similar strategy across multiple
12 different entity accounts.  They will and they're
13 permitted to execute all those trades in one,
14 what they call, a suspense account.  And then
15 they're executed.  And then after we clear them,
16 then they're allowed to instruct us as to where
17 those subaccounts, let's call it, are -- you
18 know, the ultimate destination accounts for those
19 trades.
20    Q.    Yep.  Okay.
21    A.    The concern around there is whether
22 they're properly supervised.  In some occasions,
23 there have been issues with respect to investment
24 managers who have engaged in what they call
25 cherry-picking or giving the best fills to their

4 (Pages 10 - 13)

Page 14

1  particular favored customers or accounts.
2    Q.  Got it.
3    A.  And so the inquiry was around whether
4  or not we were adequately supervising and so they
5  wanted to dig into what our procedures were
6  around that.
7    Q.  Is that matter still ongoing?
8    A.  It is not.
9    Q.  What was the ultimate disposition of
10  that matter?
11    A.  You know, regulators never send a
12  letter saying "We're done with you." But we
13  have -- nothing was followed up. Since then we
14  haven't heard. So, I'm assuming that it's been
15  dropped.
16    Q.  They do sometimes send declination
17  letters, but I agree with you that often they do
18  not send such letters.
19         When was the last time you heard
20  from them on this matter?
21    A.  Just after that testimony or
22  on-the-record testimony.
23    Q.  You said it was 2024, approximately?
24    A.  I'm going to say it was the end of
25  summer, August, September.

Page 15

1    Q.  Did that matter concern any of your
2  personal work?
3    A.  No. It was just within my
4  responsibility as somebody who was overseeing the
5  compliance of the firm.
6    Q.  Got it.
7         And, finally, the third
8  interview/deposition I think you mentioned was
9  the Toronto Stock Exchange?
10    A.  Yes.
11    Q.  When was that?
12    A.  That was in the same time frame,
13  roughly. I'm going to say October of last year,
14  2024.
15    Q.  What was the context of that inquiry?
16    A.  The context was FCMs, future
17  commission merchants, are required to have a --
18  they have to supervise their customers' accounts
19  with respect to their actual trading behavior.
20  We are required to ensure that our customers are
21  trading in a compliant fashion.
22         We have a system set up to
23  supervise that. We have a fairly sophisticated
24  system that filters all client executions and
25  order activity into a software database that we

Page 16

1  can then -- you know, we filter it through what
2  we call alerts and alert parameters. And if
3  there are suspicious trading patterns, we get
4  alerted to it and we are required to ensure that,
5  you know, that was actually appropriate trading
6  or not. And we have to do an investigation and
7  close that investigation to our satisfaction.
8         The TSX who runs what they call
9  the Montreal Exchange, which is a futures
10  Exchange out of Quebec that they bought at some
11  period of time, we are a member -- a clearing
12  member there, and one of our clients was -- they
13  suspected that our client was engaging in what
14  they call spoofing, market manipulation, abusive
15  behavior with their order activity. And so there
16  was an investigation that was commenced. Not
17  because we were actually engaging in any
18  anything, you know, non-compliant, but because in
19  their opinion or the allegations is that the --
20  our supervision, our market surveillance system
21  failed to catch that activity.
22         It was our contention that we did
23  catch the activity, we did surveil it, and we
24  closed it out as a -- in our opinion, a permitted
25  form of trading. And that -- that particular

Page 17

1  matter is still pending.
2    Q.  Okay. So that -- that matter is still
3  open?
4    A.  It is. It is.
5    Q.  And that's -- that's pending with --
6  before the enforcement staff of that Exchange?
7    A.  Hm-hmm. Yes.
8    Q.  That's another thing I should mention.
9  We have to make sure we don't nod or use the
10  usual hm-hmms that occur in conversation because
11  they're hard for the court reporter to take down.
12    A.  Understood.
13    Q.  Were you involved personally in the
14  monitoring of the trades at issue?
15    A.  I was not.
16    Q.  You were in that case interviewed
17  similar to the others by virtue of the fact that
18  you oversee the function that does it?
19    A.  That's correct.
20    Q.  Has there been any preliminary or
21  final determination made by the Toronto Stock
22  Exchange as to whether Wedbush behaved
23  appropriately in that matter?
24    A.  Yeah. It's still pending. And it's
25  in process, I guess. So --

5 (Pages 14 - 17)

Page 18

1    Q.   In other words, they haven't formally
2  charged you yet, for example?
3    A.   No.
4    Q.   But the investigation --
5    A.   Pardon me.  I'll take that back.
6        They have formally charged us.  We
7  have reached that part of the proceeding.
8    Q.   Got it.
9        And is that then the current
10 posture of that being an administrative
11 proceeding before the Exchange?
12   A.   Yes.  Civil -- civil matter.
13   Q.   Do you have a sense as to what the
14 scale of the potential fines or penalties are in
15 that matter?
16   A.   I do but it's confidential and I'm not
17 sure I can share it right here.
18        Is that --
19       MS. AUSTIN:  Is it privileged, are you
20 saying?  Maybe we should go off.
21       THE WITNESS:  Well, it's a
22 confidential, you know, matter.  There are rules
23 around what I can say and they have -- this
24 particular investigative body has made it very
25 clear, they don't want us sharing information.  I

Page 19

1  realize this is confidential as well.
2  BY MR. DUNNE:
3    Q.   If it's helpful, we can take -- you
4  guys can take this up at a break.  We can come
5  back to it if you're concerned there is some
6  legal protection that might be violated --
7    A.   Fair enough.
8        MS. AUSTIN:  Thank you.
9  BY MR. DUNNE:
10   Q.   -- with respect to number.
11       I may have asked this but was
12 your -- were you personally involved in the
13 monitoring of any of the trades at issue?
14   A.   No.
15   Q.   Were any of those trades that were at
16 issue escalated to you during the relevant
17 period?
18   A.   The relevant period preceded my
19 employment there.
20   Q.   Understood.  Okay.
21       So, again -- so -- so you were
22 deposed simply by virtue of being the person in
23 charge of the relevant department at the time?
24   A.   Yeah.
25   Q.   At the time of the investigation that

Page 20

1  is?
2    A.   That's correct.
3    Q.   Okay.  Thank you for that background.
4        And those are the only three times
5  you have ever been deposed, I take it?
6    A.   Correct.
7    Q.   Have you ever testified in court
8  before?
9    A.   I have not.
10   Q.   And you work in a space where there
11 are a lot of bodies that are not quite courts and
12 not -- but still are official bodies.
13       Have you ever testified at any
14 administrative or similar proceeding?
15   A.   No, I have not.
16   Q.   Okay.  Fair to say that the three
17 times you have mentioned are the only times other
18 than today that you would regard as testifying
19 under oath?
20   A.   Yes.
21   Q.   Okay.  Have you ever served as an
22 expert witness before, sir?
23   A.   No.
24   Q.   How are you liking it so far?
25   A.   I suppose it's okay.

Page 21

1    Q.   You didn't need to answer that but
2  thank you.
3    A.   Okay.
4    Q.   So to be clear, the declaration that
5  you submitted here was the first expert
6  report-type document you have ever prepared?
7    A.   Actually I'm going to take that back.
8  I was an expert in a previous case that was
9  settled.  And it was in the -- another case in
10 3AC.  I apologize.  It slipped my mind.
11   Q.   No problem.
12       Which case was that?
13   A.   I would have to refer to the records
14 in terms of, you know, exactly the case.
15       Do you -- I don't know.  I can't
16 recall.
17   Q.   Tell me what you do remember about the
18 nature of the case.
19   A.   The nature of the case was with
20 respect to a particular set of lending
21 transactions that Three Arrows Capital had
22 engaged in prior to its bankruptcy.  And as far
23 as I recall, I was asked to engage as an expert
24 with respect to cryptocurrency lending and with
25 particular focus on collateralized lending in

Page 22

1 that space, meaning, perhaps, lending U.S.
2 dollars against cryptocurrency that the borrower
3 may have and the terms and conditions around that
4 and then also certainly the terms and conditions
5 with respect to whether or not there's a default
6 and what an ordinary lender would do in that
7 course.
8     Q.   Got it.
9          And so that is in connection with
10 the Three Arrows Capital bankruptcy matter?
11     A.   It is, but I don't believe it is with
12 respect to the FTX matter.  It was another case
13 that 3AC had in bankruptcy.
14     Q.   It relates to 3AC's own bankruptcy?
15     A.   Yes.
16     Q.   Or liquidation proceeding in the BVI?
17     A.   Yes.
18     Q.   And were you retained by Latham &
19 Watkins in that matter?
20     A.   I was.
21     Q.   When was that -- when did that
22 retention occur?
23     A.   I'm going to say 2024.
24     Q.   Am I correct that you prepared a
25 report or a declaration which was provided to the

Page 23

1 adversary but the matter settled before your
2 deposition was taken?
3     A.   That's correct.
4     Q.   Any other matters?
5     A.   No.
6     Q.   Please tell me, sir, at a high level
7 what you did to prepare for today's deposition.
8     A.   What do you mean by "at a high level"?
9     Q.   What I'm saying is I'm not asking you,
10 for example, if you met with Ms. Austin to tell
11 me what she told you exactly.  But generally,
12 what did you do?
13     A.   Well, you know, in my report,
14 essentially, I reviewed -- just to be specific.
15     Q.   Just to be clear, I'm not asking you
16 about the preparation of your report yet, I will
17 do that, but I was just asking about what you did
18 to prepare for our deposition today.
19     A.   For our deposition.  I essentially
20 reviewed my report.  And I reviewed my report
21 with the aid of Latham & Watkins.
22     Q.   Which Latham lawyers did you meet
23 with?
24     A.   Ms. Austin, and Karla, and Nacif
25 Taousse, and John Niemeyer, as well as some

Page 24

1 representatives from Teneo, Jacob Versteegh and
2 Jamie Cally.
3     Q.   How many times did you meet?
4     A.   Let's see.  Four.
5     Q.   Approximately how many hours in total
6 across those four meetings?
7     A.   I'm going to say we spent about eight
8 to nine hours.
9     Q.   Did you meet with anyone other than
10 the Teneo and Latham personnel you mentioned?
11     A.   No.
12     Q.   Did you discuss the substance of your
13 anticipated testimony today with anyone other
14 than with the Latham and Teneo personnel you
15 mentioned?
16     A.   Oh, no, no.
17     Q.   In connection with your preparation,
18 did you review any documents that you hadn't
19 previously seen in connection with this matter?
20     A.   Yes.  I reviewed a substantial amount
21 of documents that I had never seen before.
22     Q.   What were those?
23     A.   I have them listed in the back of my
24 report.
25     Q.   I'm sorry.  I'm talking about in

Page 25

1 connection with your preparation.
2     A.   Oh, my preparation.  Oh.  Nothing
3 outside of what's listed in my report.
4     Q.   Thank you.  That's what I was -- I was
5 wondering.
6          I'm asking in connection with your
7 preparation, did you consider any documents that
8 are not already identified in your report?
9     A.   Right.  Yeah.
10     Q.   But the answer to that is no, you did
11 not?
12     A.   Right, exactly.
13     Q.   Okay.  So, thank you for that.
14          Mr. Lisle, you should have in
15 front of you our first two exhibits.  They are on
16 your right there.  Exactly.
17          (Deposition Exhibit 1 was
18          marked for identification.)
19          (Deposition Exhibit 2 was
20          marked for identification.)
21 BY MR. DUNNE:
22     Q.   They're what have been marked as Lisle
23 Exhibits 1 and 2.  They are your declaration and
24 first supplemental declaration in this matter.
25          Are those the documents you have

7 (Pages 22 - 25)

Page 26

1 in front of you, sir?
2     A.   I do -- yes, they are.
3     Q.   With respect to Exhibit 1, the
4 original declaration, this is the first
5 declaration you provided in this matter, correct?
6     A.   Yes.
7     Q.   And then Exhibit 2, that's your first
8 supplemental declaration.
9          Am I right about that?
10    A.   That's correct.
11    Q.   Why is the second one a supplemental
12 declaration?
13    A.   You know, I would have to review the
14 report.  I can't recall, but if I -- if I do
15 recall, there were some late pieces of
16 information with respect to a deposition that was
17 taken right prior to the deadline for the report
18 submission.  So if I recall the sequence of
19 events, my first declaration was made prior to
20 understanding and knowing that -- that testimony.
21    Q.   Okay.  Do you recall making any
22 changes to your report in response to that
23 testimony?
24    A.   I do.  Where necessary, where I
25 thought would have supported my opinion, I took

Page 27

1 some of that testimony.
2     Q.   Okay.  We're going to -- well, let me
3 back up.
4          Are there any other changes that
5 were made from the first to the second
6 declaration that you recall?
7     A.   Yeah.  Obviously I'm not really
8 recalling all that well because I'm seeing that
9 the deposition that I was thinking of, the Sam
10 Bankman-Fried deposition, was in the original
11 declaration.  So, I must have been reviewing
12 another report and that report had come in fairly
13 recently.
14    Q.   Let me -- let me see if I can help
15 facilitate this a little bit.
16          There were certain additions made
17 in your supplemental declaration that I recall
18 that related to just the provision of information
19 such as your materials considered and other
20 things that were not set forth in your original
21 declaration.
22    A.   Yeah.
23    Q.   Do you have any recollection of that?
24    A.   No.
25    Q.   Okay.  Does your supplemental

Page 28

1 declaration contain a complete statement of all
2 the opinions you intend to provide in this
3 matter?
4     A.   Supplemental, yes.  This is the one
5 I'm going to rely on.
6     Q.   Got it.  All right.  That is where I
7 was going.
8          There is nothing in the first
9 report of substance that you intend to testify on
10 that is not also set forth in the supplemental
11 report, correct?
12    A.   That's correct.
13    Q.   Okay.  So I thought that -- I thought
14 that was the case.
15          And with that in mind, we're going
16 to refer today to your supplemental declaration.
17 I'll probably call that "your report" or "your
18 declaration" throughout the day as we look at it,
19 but I'm not intending to refer to the original
20 report based on what you are telling me here.
21 You can sort of put the first one aside.  We will
22 work off of the supplemental declaration.
23    A.   Understood.
24    Q.   Does that make sense?
25    A.   Hm-hmm.  Yes.

Page 29

1     Q.   Are there any documents or materials
2 that you relied on to form the opinions in your
3 report that are not cited in the declaration?
4     A.   No.
5     Q.   When was the last time you reviewed
6 your supplemental declaration?
7     A.   Just prior to this.
8     Q.   Are there any opinions that you formed
9 but did not include in the declaration?
10    A.   No.
11    Q.   Is there anything in the declaration
12 that you would like to amend or correct or
13 clarify?
14    A.   No.
15    Q.   And are there any analyses or
16 calculations or reviews that you performed but
17 did not detail in the declaration?
18    A.   Sorry.  I'm not following you.  Can
19 you restate?
20    Q.   Sure.
21    A.   Rephrase.
22    Q.   Is there -- I'm just trying to get at
23 whether there was any work that you did but then
24 decided not to include in this declaration?
25    A.   Oh, okay.  So, briefly I considered

8 (Pages 26 - 29)

Page 30

1  adding a part to the -- I believe it's the third
2  part of this where I analyzed the value of the
3  futures positions and the perp positions. And
4  after doing that analysis and drafting it,
5  decided that it did not add very much to my
6  opinion and so I decided to excise it and leave
7  it out.
8      Q.   Why did you believe it didn't add much
9  to your opinion?
10     A.   Well, I thought -- in that particular
11  part of my opinion, my point is that a user, a
12  participant on the FTX Exchange had an
13  entitlement to all the assets which were being
14  traded on the Exchange. This would include
15  Bitcoin, Ethereum, and all the other coins, and
16  my opinion was focused primarily on whether or
17  not the user or participant expected to have an
18  entitlement to those assets.
19         Obviously, one of the types of
20  positions that Three Arrows had were futures and
21  perps. Looked at that part of the portfolio,
22  and, you know, based upon the fact that there
23  were fairly substantive entitlements to the spot
24  assets, I decided to just frame my opinion with
25  respect to the entitlements to those particular

Page 31

1  digital assets and leave the futures -- the
2  treatment of the futures out.
3      Q.   Did this opinion include some
4  calculation or computation of value in dollars or
5  other number?
6      A.   It involved the payout structure of
7  those particular investments, and the focus was
8  to conclude that there was value in those
9  positions that belonged to the holder, you know,
10  in line with my overall opinion that they had an
11  entitlement to those assets.
12     Q.   So I take it there was not as part of
13  that work some computation done of exactly what
14  the value was?
15     A.   Right. There was not.
16     Q.   Okay. It sounds like that work
17  consisted of some narrative relating to whether
18  there was value in the futures positions?
19     A.   Correct. And to connect it to my
20  overall argument that there was an entitlement to
21  those assets.
22     Q.   What was the conclusion that you
23  reached but did not include?
24     A.   That it was an entitlement that they
25  had to a specific type of asset class, that would

Page 32

1  have been equivalent, I guess, to the other spot
2  positions that they -- a customer could have. It
3  is just a different asset class.
4      Q.   And so, again, why did you choose not
5  to include that?
6      A.   I just didn't feel like it was
7  necessary. It was something that, you know,
8  didn't really align with -- with the opinion
9  itself overall, and I didn't think it was
10  necessary.
11     Q.   Why do you say it didn't align with
12  the opinion itself overall?
13     A.   Well, let me rephrase.
14         It just wasn't necessarily
15  additive so much so I just left it out.
16     Q.   Did that opinion in any way conflict
17  with any of the other opinions set forth in this
18  report?
19     A.   No.
20     Q.   Have you conducted any additional
21  reviews or analyses or calculations for this
22  matter since completing your declaration?
23     A.   No.
24     Q.   Have any of your opinions changed
25  since completing your declaration?

Page 33

1      A.   No.
2      Q.   So I take it you have not formed any
3  additional opinions in this matter that aren't
4  set forth in your declaration?
5      A.   Correct. I have not.
6      Q.   Your report starting at Page 37, I
7  believe, includes an index of documents
8  considered and index of websites referenced.
9  Together do those indices constitute a complete
10  and accurate list of all materials that you
11  considered in drafting your declaration?
12     A.   Yes.
13     Q.   You're not aware of anything that
14  needs to be added?
15     A.   No.
16     Q.   Okay. There's a fair number of
17  materials listed there. Did you review all those
18  materials personally?
19     A.   Yes, I did.
20     Q.   Did you review each of them in their
21  entirety?
22     A.   No.
23     Q.   Which ones did you not review in their
24  entirety?
25     A.   The pleadings that are cited, I did

Page 34

1  not review in their entirety.  The depositions in
2  most respects I did not review in their entirety.
3  That's pretty much it.  The reason for that was
4  their length and also my lawyers provided me with
5  certain set of facts and pointed out where there
6  was some support for those facts.
7      Q.  Okay.  So that brings me to a related
8  question.
9          Did you have any support personnel
10  working for you in connection with this?
11      A.  No.
12      Q.  So how did you identify the documents
13  to include in or to consider in preparing your
14  declaration?
15      A.  Well, I was provided with all of the
16  relevant filings and evidence in this case by
17  Latham, my attorneys.  Latham attorneys.  And
18  then, where necessary, I also did my own
19  research, and not research, but -- well, I
20  guess, research that I then inserted into my
21  opinion as a foundation for it.
22      Q.  Okay.  So you mentioned your own
23  research and materials provided by Latham
24  attorneys.
25      A.  Yes.

Page 35

1      Q.  Are those -- those two methods are the
2  way that you got all of the documents and sources
3  cited in this declaration?
4      A.  Correct.
5      Q.  Which Latham lawyers did you work with
6  in preparing your declaration?
7      A.  Ms. Austin, Mr. Taousse, and
8  Mr. Niemeyer.
9      Q.  And so did -- anyone else?
10      A.  Not to my recollection.
11      Q.  So the materials from the -- leaving
12  aside the research that you may have done -- let
13  me back up.
14          The research that did you,
15  personally, was that research done on the
16  internet?
17      A.  Yes.
18      Q.  Okay.  Did you have personal access,
19  direct personal access to the materials produced
20  in this litigation?
21      MS. AUSTIN:  Object to form.
22  BY THE WITNESS:
23      A.  I guess I'm going to need you to
24  rephrase that question.  I don't understand.
25      Q.  Sure.

Page 36

1          You're undoubtedly aware that a
2  lot of paper has been exchanged between the
3  parties in the litigation, right?
4      A.  Yes.
5      Q.  Do you understand that those materials
6  that have been produced by the parties in this
7  litigation are stored in various online review
8  repositories?
9      A.  I'm not aware of, you know, wherever
10  everything is stored but -- so I can't answer
11  that.
12      Q.  All right.  I'll ask it this way then:
13  The documents that were produced in the
14  litigation, either the Bates-stamped materials
15  that were produced by each of the parties or the
16  deposition transcripts, did you have access to
17  those personally yourself or did you just request
18  them from Latham and Latham provided them to you?
19      A.  Latham provided me with a set of
20  information that they determined was relevant to
21  my opinion.  In the course of my research, I may
22  have occasionally asked for something beyond what
23  I was provided on my own volition but, you know,
24  from the standpoint of me, like, dictating what
25  information that I needed, I wouldn't have had

Page 37

1  any basis to do that because I didn't understand
2  or know exactly what all the documents said.
3      Q.  So you relied on the Latham lawyers to
4  provide you with the documents that they deemed
5  relevant to forming your opinions?
6      A.  That's correct.
7      Q.  Okay.  And then you did some
8  additional work that consisted of internet
9  research; is that right?
10      A.  That's correct.
11      Q.  Other than that internet research, did
12  you do any additional work to find authorities or
13  sources?
14      A.  No.
15      Q.  Did you talk to any former employees
16  of 3AC?
17      A.  I did not.
18      Q.  And I take you know that by "3AC," I
19  mean Three Arrows Capital, the claimant here?
20      A.  I do.
21      Q.  Did you ask to speak to any former
22  employees of Three-Arrows Capital?
23      A.  I did not.
24      Q.  Would you agree that talking to former
25  employees of Three Arrows Capital would have been

10 (Pages 34 - 37)

Page 38

1 helpful or informative for your declaration?
2        MS. AUSTIN:  Object to form.
3        You can answer.
4 BY THE WITNESS:
5    A.  Helpful -- I guess, my -- my opinion
6 is -- is fairly broad.  There's four parts to it.
7 And I'm not sure, other than if you want me to
8 sit here and think it all through from the aspect
9 of each one of my opinions whether, you know,
10 knowing or understanding what Three Arrows
11 traders were thinking at the time, I think it
12 would be, you know, whether or not it was
13 relevant to bits and pieces of my opinion.
14        So that said, I will say that had
15 I been able to talk to them, maybe.  But my role
16 here is as an expert.  My role here is to comment
17 on what I see before me, regardless of who did
18 what.  You know, I was given a set of facts, I
19 was given a set of materials to draw my own
20 conclusions from.  And, you know, at this point,
21 I can't really tell you exactly whether or not it
22 would have changed my opinion.
23    Q.  Okay.  So -- but sitting here right
24 now, you can't think of any way in which speaking
25 to employees of Three Arrows Capital would have

Page 39

1 been informative with respect to any of the
2 opinions you offer?
3    A.  That's correct.
4    Q.  And going back to your selection of
5 materials, you have no way of knowing, I take it,
6 whether the documents that Latham provided are
7 the entirety of relevant documents on a
8 particular topic, do you?
9    A.  No way of knowing that.
10    Q.  Leaving aside from employees or former
11 employees of Three Arrows Capital, did you speak
12 with anyone else who provided information that
13 you considered in connection with the
14 declaration?
15    A.  I'm sorry.  Could you repeat that?
16    Q.  Sure.
17        So we have already talked about
18 the former employees of Three Arrows Capital.
19 Did you speak to anyone else to gather factual
20 information for the purposes of preparing your
21 opinions?
22    A.  No.  I did not.
23    Q.  Mr. Lisle, throughout your declaration
24 you rely on the deposition or trial testimony of
25 several individuals, do you not?

Page 40

1    A.  I do.
2    Q.  And those include Sam Bankman-Fried,
3 Nishad Singh, and Gary Wang, right?
4    A.  Sam Bankman-Fried, Gary Wang, and
5 Nishad Singh, correct.
6    Q.  In relying on their testimony, you
7 necessarily assumed that the testimony that they
8 gave was true and accurate, correct?
9    A.  Correct.
10    Q.  Am I right then that the accuracy of
11 your opinion depends on the accuracy of the
12 witnesses' testimony?
13        MS. AUSTIN:  Object to form.
14 BY THE WITNESS:
15    A.  Yeah, could you rephrase that?
16    Q.  Sure.
17        You said that you reviewed the
18 testimony of Mr. Bankman-Fried, Mr. Singh, and
19 Mr. Wang?
20    A.  Correct.
21    Q.  You assumed in reviewing it that it
22 was necessarily true and accurate, right?
23    A.  I don't think that my analysis
24 entirely depended upon the accuracy of their
25 testimony.  I'm certainly quite aware of the

Page 41

1 subsidiary things, you know, the criminal
2 prosecutions and so forth.
3        The testimony that I reviewed, to
4 the extent that I felt like it was given in
5 objective -- in an objective manner, without
6 trying to obfuscate or anything like that, I
7 relied upon it.
8    Q.  Okay.  But just to put it differently,
9 you wouldn't have relied and cited -- relied upon
10 and cited the particular pieces of the deposition
11 testimony that you did if you didn't believe that
12 the portions you were citing were true and
13 accurate, right?
14    A.  Well, I'm hesitating only because the
15 parts of my opinion where I cite statements made
16 by those particular individuals were only, in
17 part, support for what I was saying.  So I will
18 agree to that to the extent I was citing it to
19 support my opinion.
20    Q.  Understood.
21        To the extent that you have
22 additional support, you were also relying on
23 additional cited support for certain
24 propositions.  That's what you're saying?
25    A.  Yes.

11 (Pages 38 - 41)

Page 42

1    Q.   If you cited testimony, you cited it
2  because you believed it to be accurate, truthful,
3  and relevant to the proposition for which you
4  were citing it?
5    A.   Yes, to the extent that I felt like it
6  was relevant and objective, I relied on it.
7    Q.   Okay.  And in order to do that, you
8  necessarily had to make your own judgments about
9  the objectivity and truthfulness and reliability
10  of the testimony you were citing?
11    A.   That's correct.
12    Q.   And, again, you did not review the
13  entire deposition transcripts of those
14  individuals, correct?
15    A.   No.
16    Q.   So you relied on the portions that
17  Latham & Watkins directed you to?
18    A.   Yeah, either that or doing, you know,
19  a simple word search for the types of terms that
20  I knew would have indicated the parts of the
21  testimony that, you know, were relevant to what I
22  was looking for.
23    Q.   Would you agree at that time if the
24  witness testimony that you were citing for a
25  particular proposition was untrue or inaccurate,

Page 43

1  then the opinion that you based on that testimony
2  would likewise be untrue or inaccurate?
3    A.   You know, I kind of lost my train of
4  thought there.  Could you rephrase that?
5    Q.   Sure.
6         We talked about how you, in
7  choosing to rely on certain statements by the
8  witnesses, necessarily made a judgment about the
9  objectivity and accuracy of the pieces of
10  testimony on which you were relying.  Would you
11  agree that if you got that wrong and the
12  witnesses were not testifying truthfully or the
13  information was not correctly presented, that
14  that would have an impact on the opinions you
15  rendered based on that testimony?
16    A.   I don't agree with that.  For the
17  simple reason that if I was just to take out or
18  eliminate the testimony of those people, my
19  opinion, I believe, would still stand.
20    Q.   So there's no part of your declaration
21  or the opinions set forth in it that you believe
22  depends on the testimony that you cited?
23    A.   That's correct.
24    Q.   You believe that the testimony that
25  you cited was purely additive in some way?

Page 44

1         MS. AUSTIN:  Object to form.
2  BY THE WITNESS:
3    A.   To the extent that it verified my
4  opinion, then I cited that testimony.  Yeah.
5    Q.   There are many footnotes in here, and
6  we'll take a look at some of them where the
7  testimony of one of those witnesses is the only
8  authority that you have cited for a particular
9  proposition.  In those instances, do you believe
10  that if that testimony were not true or objective
11  or accurate that your opinions would be affected?
12         MS. AUSTIN:  Object to form.
13  BY THE WITNESS:
14    A.   You know, can we take a look at one of
15  those examples?
16    Q.   We will do it in context but I would
17  like your answer to the question as a general
18  matter.
19         MS. AUSTIN:  Same objection.
20  BY THE WITNESS:
21    A.   If I'm relying strictly on the
22  testimony of a particular witness, then that's
23  all the foundation that I have for that
24  particular part of the opinion.
25         MR. DUNNE:  Okay.  Let's get Tab 4.

Page 45

1         (Deposition Exhibit 3 was
2          marked for identification.)
3  BY MR. DUNNE:
4    Q.   Mr. Lisle, I'll get to this exhibit in
5  a moment.  First let me ask, do you consider
6  Mr. Bankman-Fried to be a credible witness?
7    A.   The testimony that I reviewed, which
8  was relevant to my opinion, I believe to have
9  been credibly given.  One of the main reasons I
10  do is because it was after he was sentenced and
11  in prison, and I didn't feel like he had any
12  incentive to hide anything and he appeared in his
13  testimony to be fairly forthright.
14    Q.   Okay.  You are referring in this
15  instance to Mr. Bankman-Fried's deposition
16  testimony?
17    A.   The deposition testimony that I cited
18  in my opinion.
19    Q.   Correct.
20         You made your own credibility
21  assessment with respect to Mr. Bankman-Fried's
22  deposition testimony?
23    A.   I did.  Yes.
24    Q.   And you made that assessment based on
25  the portions that Latham & Watkins identified as

Page 46

1 relevant to what you should review?
2    A.   Yes.
3    Q.   You're aware that Mr. Bankman-Fried
4 testified in his own criminal trial as well as in
5 a deposition in this case, right?
6    A.   I presume so, and from what I have
7 read, yes.
8    Q.   You also cited in various places
9 Mr. Bankman-Fried's testimony from his criminal
10 trial, didn't you?
11    A.   I did.
12    Q.   You, I take it, also made a
13 credibility determination with respect to the
14 truthfulness and accuracy of that testimony?
15    A.   Yes.  I did.
16    Q.   Of course, the factors that you
17 mentioned with respect to his deposition
18 testimony being credible would not apply with
19 respect to his trial testimony, right?
20    A.   Could you rephrase that question?
21    Q.   Sure.
22         You said that the testimony of
23 Mr. Bankman-Fried that you reviewed was relevant
24 to your opinion and that you believed it to have
25 been credibly given.  One of the main reasons for

Page 47

1 that is that by that time he was already
2 sentenced to prison and you didn't feel like he
3 had any incentive to hide anything and that he
4 appeared in his testimony to be fairly
5 forthright.
6         Do you remember that?
7    A.   I do.
8    Q.   Okay.  That doesn't apply in any way
9 to his criminal trial testimony, correct?
10    A.   I'm not sure what you mean because the
11 way I think of his criminal trial and his
12 testimony in the trial is a much more complex
13 answer to that question.  I do feel as if there
14 may have been times that he was not telling the
15 full truth, trying to protect his own skin in the
16 matter, but at other times, especially when it
17 benefitted him, he certainly was credible.
18    Q.   You say he certainly was credible
19 based on your review of the selected portion of
20 his trial testimony that Latham directed you to?
21    A.   That's correct.
22    Q.   Okay.  But the other indicia of
23 credibility that you believe were present with
24 respect to his deposition testimony, those were
25 not present with respect to his trial testimony?

Page 48

1         MS. AUSTIN:  Object to form.
2 BY THE WITNESS:
3    A.   That was kind of a complex question
4 there.  Can you break it down?
5    Q.   One reason you said you believed that
6 Mr. Bankman-Fried's deposition testimony was
7 credible is he had already been sentenced to
8 prison, right?
9    A.   Correct.
10    Q.   When he was on trial and facing a
11 prison sentence, he necessarily had not yet been
12 sentenced to prison?
13    A.   That's correct.
14    Q.   That particular indicator would not
15 apply at all to his trial testimony?
16    A.   You say "at all."  And that implies
17 that I can't depend on any of his testimony.  And
18 like I said before, the testimony given by a
19 criminal defendant has multiple facets.  It
20 depends on the context of the questions that were
21 given, and his complex set of analysis that would
22 be required to -- to judge the relative
23 credibility of those statements.
24    Q.   I think your answer suggested that my
25 question did something that it did not do.  I

Page 49

1 was -- I was simply saying that one thing you
2 identified about his deposition testimony as
3 making it credible in your view was that by the
4 time Mr. Bankman-Fried testified at his
5 deposition, he had already been sentenced to
6 trial.
7         I have that right, don't -- had
8 already been sentenced to jail time.  I have that
9 right, do I not?
10    A.   Yes.  That's what I said.
11    Q.   Clearly when he was on trial in the
12 Southern District of New York before Judge
13 Kaplan, he had not yet been sentenced; right?
14         We agree on that?
15    A.   Yes.
16    Q.   While he was on trial, his main
17 concern as a criminal defendant was that he would
18 be found guilty and sentenced to prison.
19         Would you agree?
20         MS. AUSTIN:  Object to form.
21 BY THE WITNESS:
22    A.   Yeah, could you rephrase?
23    Q.   When Mr. Bankman-Fried was on trial in
24 the Southern District of New York, he was facing
25 jail time?

13 (Pages 46 - 49)

Page 50

1    A.   Correct.
2    Q.   And, in fact, he was ultimately
3    convicted and sentenced to jail?
4    A.   Correct.
5    Q.   And you have noted that a criminal
6    defendant on trial and testifying has many
7    different things to consider in making that
8    testimony, right?
9    A.   Yes.  Many different things to
10   consider with respect to each particular
11   question.
12   Q.   But the indicator -- you believe -- I
13   mean, back up a little bit.
14        You believe the fact that
15   Mr. Bankman-Fried had already been sentenced to
16   prison by the time of his deposition, you believe
17   that fact is an indicator that he had less
18   incentive to lie?
19   A.   Yes.
20   Q.   Okay.  All I'm asking is that
21   indicator was not present at all while he was on
22   trial in the criminal case?
23   A.   You keep saying "at all."  And I don't
24   agree with that conclusion.  To me, what I'm
25   hearing is the entire set of testimony is not

Page 51

1    credible because he was facing a serious prison
2    sentence.  What I'm trying to say, is that it is
3    way more complex than that, and depending upon
4    the context of each question, maybe there was an
5    even incentive for him to be absolutely credible.
6    Q.   I understand.  I understand what
7    you're saying.  I'm saying something slightly
8    different but I just want to make sure I
9    understand.
10        It sounds like you made a very
11   nuanced determination of the credibility of
12   Mr. Bankman-Fried's testimony at all times?
13   A.   You keep using the term "at all
14   times."  And I don't see his testimony as, like,
15   an overall general characterization at all times
16   of anything.  What I am saying is that within the
17   context of a particular question and a particular
18   answer that was given, I believe there was, as
19   you used the term, nuances within that which
20   could be understood in an objective fashion, yes.
21   Q.   With respect to each question and
22   answer, you yourself, Matthew Lisle, made a
23   determination that Mr. Bankman-Fried or any other
24   witness was testifying credibly?
25   A.   In that particular context of a

Page 52

1    particular area that I cited, yes.
2    Q.   And if you were citing
3    Mr. Bankman-Fried's trial testimony, one -- a
4    factor that you did not take into account was
5    that he had already been sentenced because that
6    wouldn't make any sense, right?
7    A.   Could you rephrase the question?
8    Q.   Yeah.
9         When you're looking at a -- when
10   you're trying to determine whether to cite an
11   answer that Mr. Bankman-Fried had given at his
12   criminal trial --
13   A.   Yes.
14   Q.   -- you had to determine whether you
15   believed that statement to be credible, right?
16   A.   That was one of the things that I had
17   to do, correct.
18   Q.   Yes.
19        And in making that credibility
20   assessment, with respect to trial testimony, you
21   did not factor into your analysis that
22   Mr. Bankman-Fried had already been sentenced
23   because that wouldn't make any sense, right?
24   A.   That wasn't the case.
25   Q.   Exactly.  That's what I'm getting at.

Page 53

1    A.   Yeah.
2    Q.   So that piece of the credibility
3    assessment does not apply to Q and A that
4    occurred during his trial testimony?
5    A.   Again, you are characterizing it as
6    everything that he says isn't credible because
7    he's facing this criminal sentence, and what I'm
8    trying to say is that especially in areas where
9    it would benefit him from being truthful, there
10   was a complexity and nuance that needs to be
11   determined within this -- within a set of answers
12   or testimony.
13        MR. DUNNE:  Move to strike as
14   nonresponsive.
15   BY MR. DUNNE:
16   Q.   That was not my question.  My question
17   was with respect to any Q and A or take a
18   particular Q and A in isolation, if that question
19   and answer is asked and given during the criminal
20   trial, then necessarily, the fact that
21   Mr. Bankman-Fried had already been sentenced
22   would not be a relevant piece of information to
23   look at in assessing the credibility of that
24   particular question and answer because he had not
25   yet been sentenced?

14 (Pages 50 - 53)

Page 54

1  A.  Mr. Bankman-Fried, when he gave his
2  testimony at trial, had not been sentenced.  I
3  agree with that.
4  Q.  Yeah.
5  A.  Could you restate the rest of the
6  question?
7  Q.  Sure.
8       So because he had not been
9  sentenced, his -- his sentencing, his ultimate
10  sentencing, could not be given any weight in
11  assessing whether he was credible, I guess except
12  insofar --
13  A.  Now I understand what you're saying.
14  Q.  -- it might play a totally different
15  role in his credibility?
16  A.  Correct.  Correct.  When you analyze
17  the credibility of his testimony in the criminal
18  trial, you cannot factor in the fact that, as I
19  stated with respect to his deposition, that he
20  had already gotten through that and passed it and
21  perhaps that led to, you know, maybe a more
22  forthright attitude.
23  Q.  Thank you.  Yes, that's what I was
24  getting at.
25       Please take me through all the

Page 55

1  things that you considered in assessing the
2  credibility of Sam Bankman-Fried when he was
3  testifying at trial.
4  A.  Wow.  That's a loaded question, and
5  without context of a particular thing that I
6  cite, which right now I can't recall, I can't
7  really give of you a full and accurate, and I'm
8  not comfortable giving you an answer on that.
9  Q.  You gave, with respect to his
10  deposition testimony, some of the factors that
11  you considered.  I'm not asking you for an
12  exhaustive list.  I would like to hear generally
13  about your thought process when assessing the
14  credibility of the Sam Bankman-Fried with respect
15  to the testimony he gave in his criminal trial.
16  A.  Can you rephrase that?
17  Q.  Sure.
18       What were some of the things that
19  you considered in assessing the credibility of
20  Sam Bankman-Fried's trial testimony?
21  A.  I was looking for objectivity in the
22  context of basic information as to what was going
23  on on the ground.  To the extent that a
24  particular piece of testimony was reflective of,
25  you know, ordinary type of operations within FTX,

Page 56

1  I felt comfortable relying on that part of the
2  testimony.
3       Other things that would have
4  factored in would have been just essentially my
5  experience, my experience in the cryptocurrency
6  industry, my knowledge of how trading worked, and
7  feeling as if that aligned with what I knew and
8  understood in the industry itself.
9  Q.  I take it with respect to both
10  Mr. Bankman-Fried's deposition testimony and his
11  trial testimony, you had available to you only
12  the excerpts of the written transcripts that
13  Latham & Watkins provided you, correct?
14  A.  That's correct.
15  Q.  Okay.  You did not, for example, view
16  the benefit of seeing Mr. Bankman-Fried's
17  testimony live?
18  A.  That's correct.
19  Q.  You did not watch any videos of his
20  testimony?
21  A.  That is correct.
22  Q.  Okay.  I take it you're, of course,
23  aware that the district court presiding over
24  Mr. Bankman-Fried's trial did have the
25  opportunity to observe his testimony live

Page 57

1  in-person?
2  A.  Of course.
3  Q.  And are you aware that in imposing
4  sentence on Mr. Bankman-Fried, the court found
5  that Mr. Bankman-Fried's gave perjured trial
6  testimony?
7  A.  I'm actually not aware of the basis of
8  the sentencing in any regard.  I have not
9  reviewed anything with respect to that.
10  Q.  You have not reviewed the transcript,
11  for example, that you have in front of you of
12  Mr. Bankman-Fried's sentencing?
13  A.  I have reviewed only the part of it
14  that I cite.
15  Q.  And remind me, do you recall citing
16  the sentencing portion of Mr. Bankman-Fried's
17  trial?
18  A.  I would have to review what I cited.
19  I can't remember.
20  Q.  Understood.
21       But you don't, off the top of your
22  head, remember reviewing the sentencing hearing
23  of Mr. Bankman-Fried's?
24  A.  I don't.  No.
25  Q.  You agree, I take it, that it is the

15 (Pages 54 - 57)

Page 58

1  role of the court in any proceeding to determine
2  the credibility of witnesses?
3        MS. AUSTIN:  Object to form.
4  BY THE WITNESS:
5     A.   With respect to the determination of
6  the credibility of a witness, I believe that
7  that's within the purview of the court and its
8  decisionmaking.
9     Q.   Okay.  Let me direct you, please, to
10  Page 11, Lines 4 through 9 of Mr. Bankman-Fried's
11  sentencing hearing.
12    A.   Page 11?
13    Q.   Yes, sir.
14    A.   4 through 9, okay.
15    Q.   There you see it stars with the court,
16  right?
17    A.   Correct.
18    Q.   And I'll represent to you that that is
19  Judge Kaplan from the District Court in the
20  Southern District of New York speaking.
21        And the court stated "I also think
22  it appropriate to be clear that I have limited my
23  findings with respect to obstruction to what I
24  thought necessary and prudent to justify the
25  two-point adjustment.  This does not necessarily

Page 59

1  exhaust my view as to occasions when the
2  defendant obstructed justice by perjury and
3  otherwise in relation to this case."
4        Do you see that?
5     A.   I do.
6     Q.   Let me direct you to Page 57, Line 16.
7        This is still the court speaking.
8  I'm just going to read through Page 58, Line 2.
9  The court says, "I did not think it a fruitful
10  use of time to spell out every time I thought
11  Mr. Bankman-Fried testified willfully and
12  knowingly falsely at trial.  There are more than
13  the ones I articulated, but that suffices.  And
14  when he wasn't outright lying, he was often
15  evasive, hairsplitting, dodging questions, and
16  trying to get the prosecutor to reword questions
17  in ways that he could answer in ways he thought
18  less harmful than a truthful answer to the
19  question that was posed would have been.  I have
20  been doing this to close for 30 years.  I have
21  never seen a performance quite like that."
22        Do you see that?
23    A.   Yep.  Yes.
24    Q.   Have you read that before?
25    A.   I have not.

Page 60

1     Q.   Does seeing that give you any pause in
2  accepting the accuracy of Mr. Bankman-Fried's
3  testimony as the basis for any of your opinions?
4        MS. AUSTIN:  Object to form.
5  BY THE WITNESS:
6     A.   Can you define "give me pause."
7     Q.   Does it concern you in any way in
8  light of what you have just seen that you relied
9  on Mr. Bankman-Fried's testimony as truthful and
10  accurate for some of your opinions?
11        MS. AUSTIN:  Same objection.
12        You can answer.
13  BY THE WITNESS:
14    A.   I'm not necessarily going to agree
15  with that but I will say that the overall
16  credibility of a witness like Mr. Sam
17  Bankman-Fried was certainly a part of my
18  analysis.
19        Knowledge of generally -- I didn't
20  review any of the trial transcript, or follow the
21  trial all that closely, but just general
22  knowledge of what happened at FTX and so forth, I
23  was very aware of the circumstances around the
24  collapse of the business and so forth.  I was
25  very aware of his participation and his central

Page 61

1  role in that.
2        That said, I felt comfortable when
3  I needed to, to use the testimony that was
4  pointed out to me by my attorneys as helpful to
5  my opinion which essentially I don't feel
6  depended at all on the testimony of Sam
7  Bankman-Fried.  You know, I believe that, you
8  know, I have had enough facts at hand to make my
9  overall impressions and conclusions, that had
10  very little to do with whether or not Sam
11  Bankman-Fried was credible.
12    Q.   You would agree, I take it, that Judge
13  Kaplan was much better positioned to assess the
14  credibility of Sam Bankman-Fried than you were?
15        MS. AUSTIN:  Object to form.
16  BY THE WITNESS:
17    A.   Would I agree -- the judge was at the
18  trial.  His job was to assess his guilt or
19  innocence.  He assessed all things relevant to
20  him and, in that respect, had much more of an
21  intimate knowledge of the facts and circumstances
22  than I did.
23    Q.   Sorry.  The answer to my question
24  would then be yes, I take it?
25    A.   Yes.

16 (Pages 58 - 61)

Page 62

1    Q.   Thank you.  You can set that one
2  aside.
3          I want to understand the drafting
4  process a little bit for your two declarations.
5  Who held the pen on the first draft of the
6  initial declaration?
7          MS. AUSTIN:  Object to form.
8  BY THE WITNESS:
9    A.   Every draft that was produced was my
10  own writing.  Those drafts were then reviewed by
11  counsel and then discussed at length.
12    Q.   Did you draft the initial draft
13  yourself in the first instance?
14    A.   Yes.
15    Q.   And is the same true of the
16  supplemental declaration?
17    A.   Correct.
18          Getting close to needing a break.
19    Q.   I just noticed how long we've been on
20  the record.  I'm happy to take a break right now.
21          THE VIDEOGRAPHER:  We are going off
22  record at 10:23 a.m.
23          (Break in the proceedings
24          taken at 10:23 a.m.)
25          THE VIDEOGRAPHER:  We are back on

Page 63

1  record at 10:39 a.m.
2          You may proceed.
3  BY MR. DUNNE:
4    Q.   Mr. Lisle, did you do anything to
5  assess whether the testimony and documents that
6  Latham & Watkins provided you were all the
7  relevant materials on a particular subject?
8    A.   I depended upon them to provide me
9  with materials, materials that were relevant.
10  Whether I knew -- I never did any separate
11  research or asked any questions as to whether
12  this was everything.
13    Q.   You relied entirely on Latham &
14  Watkins to provide you all the relevant materials
15  on a particular subject?
16    A.   Yes.
17    Q.   I want to ask you about your
18  educational background a little bit, sir.
19          You graduated from Colgate in 1986
20  with a BA in English literature, right?
21    A.   That's correct.
22    Q.   And then from Loyola law school; is
23  that right?
24    A.   Yeah.
25    Q.   When was that?

Page 64

1    A.   1992.
2    Q.   1992.
3          And you were admitted to the bar
4  of the State of Illinois that year, right?
5    A.   Correct.
6    Q.   You're still, I take it, a member of
7  the Illinois bar in good standing?
8    A.   I am, yes.
9    Q.   Are you admitted to the bar in any
10  other jurisdictions?
11    A.   I am not.
12    Q.   You don't hold any degrees in finance,
13  correct?
14    A.   Correct.
15    Q.   Or accounting?
16    A.   That's correct.
17    Q.   No formal training as a statistician,
18  right?
19    A.   No.
20    Q.   No other data science training?
21    A.   No.
22    Q.   You are not a software engineer
23  either, right?
24    A.   I am not.
25    Q.   No training in computer programming?

Page 65

1    A.   No.
2    Q.   If we take a look at your declaration,
3  and your supplemental declaration is what we will
4  be using.
5          I believe you mentioned that you
6  worked as an editor for the Commodity Futures Law
7  Reporter between 1996 and 1998; is that right?
8    A.   That is correct.
9    Q.   What did you do between graduating
10  from law school and working at the Commodity
11  Futures Law Reporter?
12    A.   I graduated law school in '92, got my
13  license, and went into practice as a sole
14  practitioner.  I, actually because I had no real
15  experience, latched on with a sole practitioner
16  and trained under her.  That was primarily in
17  litigation-type work which would have included
18  family law matters, as well as criminal defense.
19          I did that for about a year and a
20  half, and then spent some time looking for a job
21  and got a job in legal publishing with Lawyers
22  Cooperative Publishing to begin with here in
23  Chicago, and I edited some general legal
24  supplementary types of publications and then took
25  a job after that with CCH in 1996.

17 (Pages 62 - 65)

1    Q.    Got it.
2          Very different direction from the
3    solo practitioner's practice.
4    A.    That's correct.  Yeah.  I decided that
5    courtroom work was not for me.  So, God bless
6    you.
7    Q.    And in 1998 you became a staff
8    attorney at the CFTC?
9    A.    Hm-hmm.
10   Q.    And you worked there for a couple of
11   years, right?
12   A.    Correct.
13   Q.    What did do you in that role?
14   A.    I was a staff attorney for what they
15   called the division of trading and markets, which
16   specifically was charged with writing and
17   publishing no-action letters as well as other
18   types of guidance to the industry that the
19   commission would publish from time to time.
20   Q.    Got it.
21         After the CFTC you were at the --
22   you were at the National Grain & Feed
23   Association?
24   A.    I was.
25   Q.    You were general counsel there?

1    A.    Correct.
2    Q.    What did you do in that position?
3    A.    I was general counsel which meant that
4    I was specifically focused or primarily
5    responsible for any pending litigation.  My role
6    also included secretary which under their rules
7    was the administrator of an arbitration system
8    that it ran on behalf of its members to arbitrate
9    disputes over grain contracts.
10         My job responsibilities also
11   extended to being staff liaison to various member
12   committees which would have included the risk
13   committee, risk management committee, which was
14   focused on CFTC-type matters, as well as I
15   believe I was on the transportation committee.
16   And then I ran several -- oversaw several sets of
17   the trade rules that the associated published
18   which governed all transactions in the industry.
19   So, for example, barge freight types of
20   transactions and feed transactions and grain
21   transactions and then there were arbitration
22   committees as well.
23   Q.    After that you -- you went to Eurex?
24   A.    I did.
25   Q.    You were chief compliance officer

1    there?
2    A.    I was.
3    Q.    Briefly what did that work entail?
4    A.    Eurex U.S. was a brand-new start-up
5    Exchange, futures Exchange.  It was founded and
6    funded by Eurex Deutschland, which is the German
7    futures Exchange, as an attempt to compete with
8    the U.S. exchanges here at the time.
9          My role was governed by Part 23 of
10   the CFTC regulations which governs derivatives
11   contract markets or DCMs.  They are required to
12   have an SRO, self-regulatory organization role,
13   so self-regulate themselves and I was the chief
14   of that function.
15   Q.    Okay.  In all these roles we have
16   discussed, so far, I take it you were not
17   yourself responsible for trading derivatives or
18   securities or cryptocurrencies, correct?
19   A.    In all of these was jobs I was not.
20   Q.    And in 2009 you left Eurex?
21   A.    They closed.
22   Q.    They closed?
23   A.    Yes.
24   Q.    Their attempts to compete were
25   unsuccessful?

1    A.    That's correct.  And if you look at
2    the time, that's when the -- all the markets
3    collapsed in 2008 at the end of the year there.
4    Q.    I remember well.
5          After that you were a consultant
6    for a year or so?
7    A.    That's right.
8    Q.    What, generally, type of consulting
9    did you do?
10   A.    Well, I hung out a shingle and was
11   looking for work within my own expertise, which
12   was regulatory -- futures regulatory work.  It
13   eventually led me to doing consulting work for
14   NYSE Liffe and then that led into a full-time
15   job.
16   Q.    Got it.  All right.
17         So you beat me to it.  So you were
18   at NYSE Liffe for three years or so?
19   A.    That's correct.
20   Q.    What did you do there?
21   A.    I was deputy general counsel.  I
22   worked directly underneath the general counsel
23   but I also was chief regulatory officer as well
24   and did primarily the same function, which was
25   run the SRO side of that business, which meant

18 (Pages 66 - 69)

1  enforcing our rules, various types of
2  investigations.  We had committees that we had
3  to -- that we had to administer for various SRO
4  roles which were embedded in new regulations from
5  Dodd-Frank, from the Dodd-Frank Act.
6      Q.   In 2013 you became chief compliance
7  officer at ABN AMRO that we talked about earlier,
8  right?
9      A.   Yes.
10      Q.   And likewise, in none of these roles
11  we just discussed were you a professional trader
12  of securities or derivatives or cryptocurrencies
13  or other products?
14      A.   Correct.  That was not my role.
15      Q.   Right.
16          After ABN AMRO, you were then
17  general counsel for DrawBridge Lending LLC?
18      A.   That's correct.
19      Q.   What did DrawBridge do?
20      A.   DrawBridge was a start-up in the
21  cryptocurrency environment.  Me and my cofounders
22  started a very small operation which was focused
23  on developing what turned out to be somewhat --
24  not -- not exotic but somewhat sophisticated
25  lending structures that involved cryptocurrency

1  as collateral, and adapted to the regulatory
2  environment that was -- well, actually still in
3  place.
4      Q.   And then DrawBridge was acquired by
5  Galaxy?
6      A.   It was in 2020.
7      Q.   And that's when you took on a role of
8  director, legal and chief compliance officer?
9      A.   Yes.
10      Q.   And you were there until late 2022?
11      A.   Yes.
12      Q.   When did you leave Galaxy?
13      A.   In December of -- December 1st, I
14  believe, 2022.
15      Q.   On Page 2 of your declaration, in
16  Paragraph 6, you mention that you were CCO of
17  Galaxy's commodity pool operator?
18      A.   That's correct.
19      Q.   What did your role there entail?
20      A.   So a commodity pool operator is a
21  specific registration category under the CFTC
22  regulatory framework.  Commodity pool operator
23  is -- has its corollary in the securities space
24  as an investment manager.  So we were licensed to
25  start and manage and administer and trade, you

1  know, funds on behalf of customers.  I was the
2  CCO and, therefore, responsible for, you know,
3  compliance, anything with respect to compliance.
4      Q.   Got it.
5          And so, you, I think, anticipated
6  one of my questions but your role -- in your role
7  as chief compliance officer, your role did not
8  itself include managing assets or trading
9  securities, cryptocurrencies, or commodities?
10      A.   No, I did not particularly trade those
11  but I was very aware of those operations and what
12  was going on.  It was a very small shop.
13      Q.   You mentioned in your declaration that
14  you were a cofounder of the Global Digital
15  Asset & Cryptocurrency Association?
16      A.   That's right.
17      Q.   What is that organization?
18      A.   So it's an organization that I believe
19  is now defunct, but it was started by a number of
20  us here in Chicago as an attempt to try and bring
21  some best practices and SRO-type oversight into
22  the crypto space which was in many respects
23  unregulated or it was unclear, uncertain what the
24  laws were.
25      Q.   What did you do in that role?

1      A.   Essentially one of the founders
2  developed the governance framework for the
3  organization itself, ran the board, ran the board
4  meetings.  We sought to develop committees,
5  various committees.  I also headed up the conduct
6  and discipline committee where we had a code of
7  conduct that we developed.
8          And then also we got somewhat
9  involved in lobbying activities with respect to
10  trying to drive legislation in Capitol Hill that
11  would have, in our eyes, benefitted the industry.
12      Q.   Your report mentions that you provided
13  written recommendations to congressional
14  committees with respect to draft legislation and
15  other things?
16      A.   That's correct.
17      Q.   That's what you were -- referred to by
18  the "Capitol Hill" --
19      A.   Yes.
20      Q.   -- work?
21      A.   Yes.
22      Q.   Did any of those recommendations ever
23  get adopted in whole or in part?
24      A.   No, they have not.  There has been no
25  legislation to date that has gotten through

Page 74

1  Congress yet.
2      Q.   Is there any published materials or
3  guidance by the GDCA that is still available to
4  your knowledge?
5      A.   The last time I looked, it is -- they
6  still have a website that's up.  But like I said,
7  I don't know if it's still running.  And since I
8  left the space in '22, I have not had any contact
9  with them.
10     Q.   When we looked, we, I think, found the
11 website to be inaccessible, but can you tell us
12 little bit about any, you know, papers or pieces
13 you remember publishing?
14     A.   Two.  One would be this code of
15 conduct I mentioned.  A code of conduct that if
16 you were to look at it, would have been heavily
17 based on what they call the FX Global Code of
18 Conduct.  Reason being is that the FX industry is
19 fairly similar in mechanics, in operation to
20 cryptocurrency trading.
21          And then the other thing you would
22 have seen would have been a white paper that
23 would have been the topic would have been
24 anti-money laundering best practices.
25     Q.   As part of your work at GDCA, did you

Page 75

1  ever issue any statements or reports or analyses
2  related to FTX?
3      A.   No.
4      Q.   How about to Three Arrows?
5      A.   No.
6      Q.   What about BlockFi?
7      A.   No.
8      Q.   Genesis?
9      A.   No.
10     Q.   Celsius?
11     A.   No.
12     Q.   Terra and Luna?
13     A.   No.
14     Q.   Voyager?
15     A.   No.
16     Q.   In Paragraph 8 of your declaration,
17 you state that you are an expert in derivatives
18 law and regulation including with respect to the
19 cryptocurrency industry?
20     A.   Correct.
21     Q.   I take it you are not an expert
22 yourself in cryptocurrency trading, correct?
23     A.   Well, part of the basis of my -- my
24 opinion in general is, you know, from my
25 experience is in-house counsel and in-house

Page 76

1  compliance kind of work in smaller operations.
2  You're embedded within the business.  You have to
3  completely understand the business.  For example,
4  CCO of the CPL, I had to write the PPM for the --
5  for the investment vehicle, and those kinds of
6  things.  So I -- you know, when you say was I an
7  expert, I wasn't doing actual trading but I was
8  highly aware of the trading operations and what
9  they were doing.
10     Q.   I understand that you played a control
11 role in businesses that did do cryptocurrency
12 trading, but I take it you have never
13 professionally traded cryptocurrencies yourself?
14     A.   That's correct.
15     Q.   You have never managed a
16 cryptocurrency trading portfolio yourself?
17     A.   That's correct.
18     Q.   I take it you have never been
19 responsible for operation of a margin lending
20 program with respect to cryptocurrencies; is that
21 correct?
22     A.   As part of the cryptocurrency lending
23 operation of DrawBridge and Galaxy, I was
24 intimately involved in the transactions, but I
25 was never -- had overall responsibility for those

Page 77

1  portfolios.
2      Q.   What do you mean "intimately involved
3  in the transactions"?
4      A.   These were institutionally --
5  institution-type loans involving institutional
6  participants.  They had to be what we called
7  eligible contract participants, or ECPs, because
8  they, in many respects, involved OTC swaps with
9  respect to the structures of these various
10 lending arrangements.
11          And so I guess what I'm getting at
12 is I was heavily involved in negotiations which
13 would have involved myself in my role and the
14 business head of supervising and then my
15 counterparts and our counterparts at the
16 borrower.  So I was intimately involved, and then
17 once that loan was -- was executed, paperwork
18 signed, and so forth, I would have been consulted
19 and would have had a -- you know, a -- somewhat
20 of a role in -- in helping supervise those
21 portfolios.
22     Q.   How many such transactions were you
23 involved in?
24     A.   I'm really not able to answer that.
25 Over a four-year period of time, four-year-plus,

20 (Pages 74 - 77)

Page 78

1  you know, dozens.
2      Q.   I take it you have never been
3  responsible for making a decision to liquidate
4  collateral to close out an open margin lending
5  position?
6      A.   I don't recall if I ever was.  No
7  recollection of it.
8      Q.   I think you mentioned that you had
9  prepared one other expert report in the past and
10  that was in a different 3AC matter?
11      A.   That's correct.
12      Q.   Were -- to your knowledge, was your
13  competency as an expert challenged in that
14  matter?
15      A.   It never was.  I was never deposed.
16      Q.   That matter settled before you were
17  deposed?
18      A.   Correct.
19      Q.   So am I correct that no court has ever
20  accepted your testimony as an expert in any
21  field?
22      A.   That's correct.
23      Q.   You hold a couple of FINRA licenses;
24  is that right?
25      A.   I do.

Page 79

1      Q.   Which ones were those?
2      A.   I am a Series 7 which also required me
3  to pass a preliminary exam which, for the life of
4  me, I can't remember the acronym, so I -- but I'm
5  also a Series 3 which is actually under the
6  National Futures Association.  The test is
7  administered by FINRA but Series 3 is a futures
8  AP, associated person.
9      Q.   Right.  What does the -- we'll take
10  them both, what does Series 3 qualify you to do?
11      A.   Series 3 would qualify me as what they
12  call an associated person, which would permit me
13  to engage in solicitations for Commodity Futures
14  transactions with potential customers or
15  customers and also trade futures and options.
16      Q.   And I take it you hold that license
17  but you've never actually had to use that
18  license?
19      A.   That's correct.
20      Q.   And -- and forgive me if you said
21  this, but you got that license in 2012 or '13, I
22  think; is that right?
23      A.   That's correct, yeah.
24      Q.   Your Series 7 license, you received
25  more recently?

Page 80

1      A.   Hm-hmm.
2      Q.   When was that?
3      A.   I'm going to say 2024.
4      Q.   What does a Series 7 license authorize
5  you to do?
6      A.   It authorizes you to be an associated
7  person for a broker-dealer, employed by a
8  broker-dealer, and allows you to do primarily the
9  same kind of work, solicitation for securities
10  transactions as well as trading.
11      Q.   I take it you have never made use of
12  those qualifications?
13      A.   Not with respect to actually
14  soliciting customers, no.
15      Q.   Or trading securities?
16      A.   Or trading securities.
17      Q.   I want to talk about your engagement
18  in this matter in a little more detail.
19          On Paragraph 10 of your report,
20  you do describe that a little bit.  Could you
21  sort of tell us in your own words what you
22  were -- what you were asked to opine on in this
23  matter?
24      A.   Well, I was asked to opine on four
25  separate topics.

Page 81

1          The first one would be whether the
2  transactions that occurred between June 12 and
3  June 14 in 2022 were made in the ordinary course
4  of business of a hedge funds trading in digital
5  assets.
6          The second question or the second
7  set of questions was whether FTX incurred or
8  would have incurred financial exposure in the
9  event of defaults by borrowers under its margin
10  program.  Whether FTX benefitted from the near
11  elimination of 3AC's negative USD balance under
12  such program, via the sale or liquidation of
13  assets associated with 3AC's accounts, and
14  whether FTX benefitted from operating its margin
15  program.
16          The third issue I was asked to
17  opine on is whether customers on an Exchange like
18  FTX would have expected to have distinct
19  interests in digital assets or fiat currency in
20  or associated with their accounts and not merely
21  a singular interest in the net monetary value of
22  the combined positive balances and negative
23  balances associated with their accounts.
24          And then, finally, I was asked to
25  opine on whether the loans made to 3AC by its

21 (Pages 78 - 81)

Page 82

1 various lending counterparties would have been
2 called by a reasonable lender, upon that lender
3 becoming aware of 3AC's true financial condition
4 prior to and during the period spanning June 12
5 through June 14 of 2022.
6     Q.   You were reading there from
7 Paragraph 10 of your report, right?
8     A.   That's correct.
9     Q.   In Paragraph 10A, your report states
10 that you were opining on the question of whether
11 the transactions involving assets in or
12 associated with 3AC's accounts between June 12,
13 2022, and June 14, 2022, would have likely been
14 made in the ordinary course of business.  What
15 did you mean by "likely"?
16     A.   I was asked to opine on whether, you
17 know, the expectation -- what the expectation of
18 an ordinary hedge fund would be doing under the
19 circumstances between the dates of June 12 and
20 June 14 of 2022.
21     Q.   So what standard did you use for
22 likely?  What threshold did you use?
23     A.   I would have based that upon the facts
24 that I was given as well as applied my experience
25 in the industry itself.

Page 83

1     Q.   I understand that that would be how
2 you would come to purportedly make the
3 determination, but I'm just trying to understand
4 how likely would it have to be for you to
5 determine that it was likely as you have said
6 here?
7     A.   How likely it would have been likely?
8 Sorry.
9          MS. AUSTIN:  Object to form.
10 BY MR. DUNNE:
11     Q.   So -- so your -- there's some
12 uncertainty expressed through the use of the word
13 "likely," correct?
14     A.   It's a qualification of what I'm
15 saying, yes.
16     Q.   I'm trying to understand what that
17 qualification means.
18     A.   So as I said, you know, I was
19 essentially focused on what I believed, based
20 upon my experience, an ordinary hedge fund would
21 have done in those circumstances in that time
22 frame.
23     Q.   So are you saying it was more likely
24 than not or are you using some other standard?
25     A.   Essentially I'm just getting at the

Page 84

1 fact that it was the ordinary course of business
2 of a hedge fund in my determination, yes.
3     Q.   But is there a particular threshold of
4 likeliness that you were assessing with respect
5 to here?
6          MS. AUSTIN:  Object to form.
7 BY THE WITNESS:
8     A.   I am going to say that it's my
9 conclusion that the events that occurred was not
10 in the ordinary course of what I would think an
11 ordinary hedge fund would have done.
12     Q.   And does your use of the word "likely"
13 here reflect that you have some level of
14 confidence that your conclusion is correct?
15     A.   I have confidence that my conclusion
16 is correct, yes.
17     Q.   What level of confidence out of a
18 hundred percent being absolute certainty and zero
19 percent being absolutely unequivocally not the
20 case, where would your assessment fall here?
21     A.   Pretty high.  I'm not going to put a
22 percentage on it but, again, my opinion was only
23 with respect to what I thought an ordinary hedge
24 fund would have done in terms of trying to manage
25 the portfolio during that period of time.

Page 85

1     Q.   Do you know who Lord David Neuberger
2 is?
3     A.   No, I don't.
4     Q.   He is one of the experts, I'll
5 represent to you, that has been retained by FTX.
6 I take it you did not read his declaration in
7 this matter?
8     A.   I don't recall.
9     Q.   Okay.  Then I take it you're not
10 attempting to respond to the statements in Lord
11 Neuberger's declaration having not read it?
12     A.   That was not in mind when I made
13 the --
14     Q.   Okay.  I take it you do know who
15 Stephen Atherton is?
16     A.   He was one of the experts also
17 retained, yes.
18     Q.   And -- but I take it you were not
19 attempting to respond to Mr. Atherton's
20 declaration, are you not?
21     A.   No, I am not.
22     Q.   You're not a British Virgin Islands
23 lawyer?
24     A.   I am not.
25     Q.   And not a UK lawyer?

22 (Pages 82 - 85)

Page 86

1    A.   No.
2    Q.   Which is what Lord Neuberger is?
3    A.   Okay.
4    Q.   Do you know who Stephen Houseman is?
5    A.   I don't.
6    Q.   He's also one of FTX's experts, but I
7  take it you did not read and are not responding
8  to his declaration?
9    A.   Correct.
10    Q.   You mentioned that you'd worked with
11  Latham & Watkins on another 3AC matter.
12  Obviously you're also working with them on this
13  matter. Are there any other matters on which you
14  are currently working with Latham?
15    A.   No.
16    Q.   And despite your consulting and
17  serving as a purported expert here in this
18  matter, you are still employed by Wedbush?
19    A.   Correct.
20    Q.   If a Wedbush employee is considering
21  an expert engagement, are they free to accept any
22  engagement without internal consultation?
23    A.   They are not, no.
24         MS. AUSTIN:  Object to form.
25

Page 87

1  BY MR. DUNNE:
2    Q.   What is involved in that internal
3  clearing process for serving as an expert?
4    A.   So as an FC and broker-dealer and
5  company policy, it's required that you get
6  permission and declare that you have an outside
7  business activity or an OBA is how they term it.
8    Q.   Is there a -- so that -- so, sorry,
9  backing up.
10         So you're required to disclose
11  that you have an outside business activity?
12    A.   Correct, yes, disclose.
13    Q.   Does Wedbush impose any restrictions
14  on what that outside business activity may be?
15    A.   They certainly have to understand what
16  it is, and so, in my disclosure, I inform them
17  what I am doing. I also inform them that, you
18  know, there is a scope of the engagement, and had
19  to let them know the reason for it, which is I
20  had a great deal of expertise in this area.
21    Q.   Does Wedbush have any say or ability
22  to evaluate the say in or ability to evaluate the
23  opinions that you are offering here?
24    A.   No.
25    Q.   Does Wedbush even know what they are?

Page 88

1    A.   They do not.
2    Q.   It sounds like Wedbush simply needs to
3  know that you are serving as an expert witness in
4  this case but nothing about the substance of your
5  opinions?
6    A.   So the responsibility of Wedbush in
7  supervising its employees with respect to
8  disclosure of OBAs is that they need to
9  understand if you have a conflict of interest by
10  accepting payment for what you do outside of your
11  business responsibilities. They need to know
12  that to make sure that there aren't any industry
13  conflicts of interest that I -- you know, would
14  prevent me from doing, you know, my job
15  responsibilities and/or even, you know, could, in
16  fact, be something that they need to be aware of
17  if it's non-compliant with regulations.
18         But outside of that, they do not
19  have an interest in what I am saying here today.
20    Q.   Okay. I take it you haven't discussed
21  or described to Wedbush the substance of your
22  opinions here?
23    A.   That's correct.
24    Q.   Do I understand correctly you're paid
25  by the hour for your work here?

Page 89

1    A.   Yes.
2    Q.   And that's at your hourly rate of $900
3  an hour?
4    A.   That's correct.
5    Q.   How did you determine that rate?
6    A.   I was asked by Latham what my rate
7  was. I determined it from my understanding of
8  what going rates are for experts in this
9  particular environment, I guess.
10    Q.   How did you come to that
11  determination?
12    A.   How did I come to that? I don't
13  recall exactly. But it was probably some
14  combination of maybe asking other consultants who
15  have done this kind of work, but I don't recall
16  precisely.
17    Q.   Beyond your hourly rate, are you
18  receiving any direct or indirect additional
19  compensation or benefits in connection with your
20  work on this matter?
21    A.   I am not.
22    Q.   Does your compensation depend in any
23  way on the outcome of this litigation?
24    A.   No.
25    Q.   Does it depend on whether the court

23 (Pages 86 - 89)

Page 90

1 accepts your opinions in any way?
2    A.   No.
3    Q.   Have your outstanding bills been paid?
4    A.   No.
5    Q.   They have not?
6    A.   No.
7    Q.   How much is outstanding?
8    A.   I'm going to say north of $70,000
9 right now.
10    Q.   Does Wedbush have any entitlement to
11 any fees that you earn in this matter?
12    A.   No.
13    Q.   Does anyone for that matter have any
14 entitlement to them other than yourself?
15    A.   No, just me.
16    Q.   Just you.
17         Just to recap some things about
18 your work history.  You have never worked as a
19 professional trader of cryptocurrencies, correct?
20    A.   Correct.
21    Q.   And you have never been employed as a
22 professional economist or an econometrician?
23    A.   That's correct.
24    Q.   You are not qualified and have never
25 been qualified to practice law in the United

Page 91

1 Kingdom, correct?
2    A.   Correct.
3    Q.   You don't claim to be an expert in
4 English law or application of English law?
5    A.   That's correct.
6    Q.   You're not qualified to practice law
7 in the BVI?
8    A.   Correct.
9    Q.   And you -- and you have never been
10 qualified in the BVI, correct?
11    A.   Correct.
12    Q.   You are not now and have never been
13 qualified to practice Antigua law, correct?
14    A.   Correct.
15    Q.   You are -- you've never been a
16 professional statistician?
17    A.   Correct.
18    Q.   You are not claiming to be an expert
19 in statistics?
20    A.   Right.  Correct.
21    Q.   And you have no training as a software
22 engineer and are not claiming to be a
23 professional or expert in software engineering or
24 coding?
25    A.   Correct.

Page 92

1    Q.   To prepare your declaration, you did
2 not conduct any statistical analysis, right?
3    A.   Correct.
4    Q.   You did not review any portions of the
5 FTX code base?
6    A.   Correct.
7    Q.   You did not analyze any historical
8 trading data of Three Arrows Capital, right?
9    A.   Correct.
10    Q.   And you did not analyze any historical
11 trading data of any other cryptocurrency trading
12 firms, correct?
13    A.   No.  I mean, yes, correct, I have not
14 reviewed any other trading activity of any other
15 firm.
16    Q.   You were not providing a legal opinion
17 on English law?
18    A.   That's correct.
19    Q.   Or BVI law?
20    A.   That's correct.
21    Q.   Or Antigua law?
22    A.   Correct.
23         MR. DUNNE:  Do you want to take
24 another break?
25         MS. AUSTIN:  I think we have only been

Page 93

1 going 40 minutes or so.
2         MR. DUNNE:  We can keep going then.
3         THE WITNESS:  I'm good.
4 BY MR. DUNNE:
5    Q.   Mr. Lisle, you spend a significant
6 portion of your declaration discussing whether
7 the June 12 through June 14, 2022, trading
8 activities of 3AC were conducted in the ordinary
9 course of 3AC's business; is that right?
10    A.   That's correct.  Yes.
11    Q.   That's from approximately Page 4 to
12 Page 13 of your declaration?  Part IV-A?
13    A.   Yes.  Through Paragraph 25, from
14 Paragraph 11 through Paragraph 25.
15    Q.   Thank you.
16         You do not define ordinary course
17 of business anywhere in your report, do you?
18    A.   I do not.
19    Q.   Why is that?
20    A.   It is what I would think of as a term
21 which would -- is meant to articulate that I am
22 bringing my general experience and knowledge to
23 my opinion as to what a typical hedge fund would
24 do.
25    Q.   So that -- that is -- well, could

24 (Pages 90 - 93)

Page 94

1  you -- could you state for us, I guess, now what
2  your definition of ordinary course is?
3      A.  I thought I just did.
4      Q.  That's what you just did?
5      A.  Yes.
6      Q.  Just making sure.
7          It's in your view what a typical
8  hedge fund would do?
9      A.  Yes.
10     Q.  Does it take into account the
11 circumstances of the particular market in which
12 the hedge fund is trading?
13     A.  It does, yes.
14         (Deposition Exhibit 4 was
15         marked for identification.)
16 BY MR. DUNNE:
17     Q.  Mr. Lisle, you have just been handed a
18 document that has been marked as Exhibit 4.  It
19 is the declaration of Stephen Atherton in support
20 of the FTX Recovery Trust's objection to the
21 amended proof of claim filed by the Joint
22 Liquidators of 3AC.  It is dated on Page 41,
23 June 20, 2025.
24         Is that the document you have in
25 front of you, sir?

Page 95

1      A.  I do.  Yes.
2      Q.  This is Mr. Atherton's declaration
3  which you have read, correct?
4      A.  I believe I'm familiar with it, yes.
5      Q.  You say you're familiar with it.  Did
6  you read it in its entirety?
7      A.  It was the beginning of my engagement,
8  and I don't have specific recollection of whether
9  or not I went through the entire thing, but my
10 general feeling is that I read the relevant
11 parts.
12     Q.  You have no views, I take it, on
13 anything Mr. Atherton says with respect to BVI
14 law?
15     A.  Correct, yes, I don't.
16     Q.  I want to direct you, please, sir, to
17 Page 23 in Paragraph 54.
18     A.  Okay.
19     Q.  This paragraph is the first in a
20 section entitled "The ordinary course of business
21 defense."
22         Do you see that?
23     A.  Yes.
24     Q.  Do you remember if you read this
25 section of Mr. Atherton's report?

Page 96

1      A.  I actually don't recall.  But, you
2  know, maybe I should read it right now.
3      Q.  Sure.  Why don't you read -- why don't
4  you read through Paragraph 58.
5      A.  Okay.
6      Q.  And thank you for that.
7          We talked a moment ago about your
8  definition of the ordinary course which you said
9  was what a typical hedge fund would do.
10     A.  That's correct.
11     Q.  You didn't identify any statute or
12 regulation or legal precedent or other authority
13 as the basis for that definition, right?
14     A.  That's correct.  It was just my
15 experience and knowledge.
16     Q.  Okay.  I understand that you were
17 bringing your experience and knowledge to bear
18 but you don't have any authority for the
19 proposition that that is the right standard of
20 ordinary course to be examining, correct?
21     A.  That's correct.
22     Q.  You just applied your own definition
23 of ordinary course and brought your experience to
24 bear on it?
25     A.  That's correct.

Page 97

1      Q.  All right.  Let me direct you to
2  Paragraph 55, please, of Mr. Atherton's report on
3  Page 24 at the top.
4          Mr. Atherton writes here, "In
5  assessing the relevant circumstances and whether
6  they are such as give rise to this defense,
7  meaning the ordinary course defense, in my
8  opinion, a BVI court would typically examine the
9  actual transaction in its factual setting, an
10 examination that is undertaken objectively by
11 reference to the standard of what constituted the
12 ordinary course of business, and would include
13 consideration of the past practices of the
14 particular company in its dealing with the
15 particular other party."
16         Do you see that?
17     A.  Yes.
18     Q.  You have no basis to dispute that
19 sentence of his report, right?
20     A.  None.
21     Q.  Okay.  And I take it in evaluating --
22 in making your determination of what constitutes
23 ordinary course, you did not examine the past
24 practices of 3AC in its dealings with FTX; is
25 that correct?

25 (Pages 94 - 97)

Page 98

1    A.    Well, not entirely because I was aware
2  generally being in the industry of what type of
3  business 3AC was engaged in.  Also, in my
4  research, I did look for articles that would have
5  talked in general about the -- you know, the
6  price movements in the industry and leading up to
7  the relevant period.
8            Did I look at particular
9  transactions or details about the portfolio?  I
10 did not.  But I -- I was generally aware of
11 the -- what was going on in the industry at the
12 time.
13    Q.    Understood that you were aware of what
14 was going on in the industry but you did not look
15 at 3AC's past trading practices?
16    A.    Not with any specificity, no.
17    Q.    You did not look at its post-trading
18 practices in particular on the FTX Exchange?
19    A.    No, I did not.
20    Q.    Okay.  Mr. Atherton continues, "The
21 court will also have regard to the fact that
22 there may be circumstances where a transaction
23 exceptional to a particular trader will
24 nonetheless be in the ordinary course of
25 business.  In each case, the particular

Page 99

1  circumstances will require to be addressed."
2            I take it you have no basis to
3  dispute Mr. Atherton's statement there that I
4  just read?
5    A.    No basis.
6    Q.    All right.  In Paragraph 56
7  Mr. Atherton writes, "A BVI court would consider
8  3AC's business being that of a cryptocurrency
9  hedge fund."
10           You have no basis to dispute that
11 one I take it?
12    A.    Correct.
13    Q.    You agree that 3AC was a
14 cryptocurrency hedge fund?
15    A.    Correct.
16    Q.    He goes on in that same paragraph,
17 "Insofar as the purported transactions impugned
18 by the Joint Liquidators can be seen as being in
19 and of themselves part of a continuous course of
20 trading by 3AC on the Exchange or that other
21 potentially relevant transactions such as the
22 marking of deposits of digital assets or fiat
23 currency by 3AC into its account with FTX and the
24 making of withdrawals from its account with FTX
25 were occurring with regularity from the date on

Page 100

1  which 3AC opened its accounts, until on or around
2  14 June 2022, such that it might be said that 3AC
3  was operating a running account, the BVI court
4  would, in my opinion, likely be compelled to
5  conclude that there can have been no preference
6  of FTX because any potentially challengeable
7  transactions were entered into by 3AC as part of
8  the ordinary course of dealing between 3AC and
9  FTX/the Exchange and therefore in the ordinary
10 course of 3AC's business."
11           You have no basis to disagree with
12 that statement, do you?
13    A.    No, I do.
14    Q.    What is the basis for your
15 disagreement?
16    A.    Because I conclude in my opinion that
17 the transactions that occurred especially in the
18 relevant period June 12 through June 14 of 2022
19 were actually not made in the ordinary course of
20 business of a typical hedge fund.
21    Q.    I understand that that is your
22 conclusion.  But as pertains to the application
23 of BVI law, and the standard of ordinary course
24 under BVI law, you have no basis to dispute
25 Mr. Atherton's conclusion, do you?

Page 101

1            MS. AUSTIN:  Object to form.
2  BY THE WITNESS:
3    A.    Could you restate the question?
4    Q.    Sure.
5            As pertains to the application of
6  the ordinary course standard under BVI law, you
7  have, being -- not being a BVI lawyer, no basis
8  to dispute Mr. Atherton's contention in this
9  paragraph?
10           MS. AUSTIN:  Same objection.
11 BY THE WITNESS:
12    A.    So, yeah, if I could ask you to break
13 that up into smaller pieces.
14    Q.    Okay.  We have established that you
15 are not a BVI lawyer.
16    A.    Correct.
17    Q.    And we have established that
18 Mr. Atherton is a BVI lawyer.
19    A.    Correct.
20    Q.    And Mr. Atherton is giving an opinion
21 in this paragraph on what the BVI court would
22 likely be compelled to conclude.  It's there on
23 the top of Page 25.
24    A.    Right.
25    Q.    I understand that you have views on

26 (Pages 98 - 101)

Page 102

1  ordinary course using your definition.  But as
2  far as what a BVI court would likely to conclude,
3  applying the BVI legal standard, you have no
4  view, correct?
5        MS. AUSTIN:  Object to form.
6           You can answer.
7  BY THE WITNESS:
8     A.   So if I understand the question,
9  essentially what you're asking is whether or not
10  a BVI court would conclude that there was no
11  preference because these were all in the ordinary
12  course.  And obviously I disagree with that.
13        Also, I'll cite to the fact that,
14  like mine, he uses the term "likely."  And so I
15  would just -- don't want to go all the way to
16  saying that, you know, he is the be-all-end-all
17  authority and that is what the BVI court is
18  actually going to decide, but in respect of
19  his -- his experience and his authority in terms
20  of BVI law, you know, I can't question that.  No.
21     Q.   Okay.  So understanding that you have
22  developed views on ordinary course trading under
23  your standard, under the standard that a BVI
24  court would employ, you agree that Mr. Atherton
25  is better positioned than you are to opine?

Page 103

1        MS. AUSTIN:  Object to form.
2  BY THE WITNESS:
3     A.   To the extent that you are asking that
4  he is an expert in BVI law especially with
5  respect to ordinary course as it's technically
6  defined in BVI law, I cannot question his
7  opinion.
8     Q.   Okay.  And, in fact, if you were --
9  you have served as a general counsel in
10  various -- at various times in the past, correct?
11     A.   That's right.
12     Q.   Did you ever have occasion when
13  serving as a general counsel to consult foreign
14  lawyers?
15     A.   I have.  Yes.
16     Q.   From what jurisdictions?
17     A.   Let's see.  Mostly European
18  jurisdictions where companies I have worked for
19  are doing business and need advice.  Canada as
20  well, and the Far East.  Major financial money
21  centers, yeah.
22     Q.   Ever for any Caribbean jurisdictions?
23     A.   Yes, actually.
24     Q.   How about the BVI?
25     A.   Yes.

Page 104

1     Q.   Who did you consult in that instance?
2     A.   I don't recall.
3     Q.   It wasn't Mr. Atherton, was it?
4     A.   No.
5     Q.   But in those instances you have
6  described, sounds like there were a number of
7  them, you consulted lawyers with expertise in the
8  relevant jurisdictions because you yourself
9  didn't have that expertise, correct?
10     A.   That's correct.
11     Q.   And when you did that, you, I take it,
12  deferred to the advice of those foreign lawyers
13  on the application of facts to foreign legal
14  principles, did you not?
15     A.   To the extent that I felt like they
16  understood the facts at hand, I would accept
17  their advice.
18     Q.   Do you have reason to believe that
19  Mr. Atherton does not understand the facts at
20  hand?
21     A.   I do.
22     Q.   Is the reason you think he doesn't
23  understand the facts at hand because he disagrees
24  with your conclusion?
25     A.   No.  I think he makes a conclusion

Page 105

1  based upon a presumption that an account like 3AC
2  during that time period would ordinarily just
3  liquidate, and my opinion is essentially that you
4  would see or you would like to see or you would
5  expect to see some effort to try and extricate
6  yourself from a position that was clearly in
7  distress.
8     Q.   We'll come to that.
9        But you have no idea whether BVI
10  court would like to see the same things that you
11  would like to see when evaluating ordinary
12  course, correct?
13        MS. AUSTIN:  Object to form.
14  BY THE WITNESS:
15     A.   I can't comment on the procedures in a
16  BVI court and whether or not -- or what types of
17  facts they would like to see.  But in my own,
18  just general reasonable opinion, it would seem to
19  me they would want to know all reasonable facts.
20     Q.   All right.  So just to be sure that we
21  are clear, you don't know one way or the other
22  what a BVI court would examine when evaluating
23  the ordinary course defense, correct?
24        MS. AUSTIN:  Object to form.
25

27 (Pages 102 - 105)

Page 106

1  BY THE WITNESS:
2      A.   With 100 percent certainty I do not
3  know, but I can tell you that in my general
4  experience as a lawyer and my experience in doing
5  business in foreign jurisdictions, I would think
6  that a court of law would be generally interested
7  in all relevant facts.
8      Q.   But you are not qualified to opine on
9  what a BVI court would evaluate in assessing the
10  ordinary course defense?
11     A.   I am not a BVI lawyer.  I'm not
12  licensed to practice in that jurisdictions so, I
13  wouldn't be an authority.
14     Q.   Not -- not simply not being an
15  authority, you would not be qualified to offer
16  such an opinion?
17     A.   You know, absent a qualification of
18  what qualified means, you know -- I'm actually
19  not sure what you mean by qualification /could
20  you define that?
21     Q.   Do you believe that you -- well, I'll
22  break it down a little bit actually.  I'll back
23  up.
24          You never read any BVI insolvency
25  statutes, corrects?

Page 107

1      A.   Correct.
2      Q.   You never read a case evaluating the
3  BVI insolvency statutes under BVI law?
4      A.   Correct.
5      Q.   You never appeared in a BVI court?
6      A.   Correct.
7      Q.   You have never held yourself out as
8  practicing BVI law?
9      A.   That's correct.
10     Q.   Okay.  You have never yourself
11  litigated the question of whether the ordinary
12  course defense applies as a matter of BVI
13  insolvency law?
14     A.   That's correct.  I mean, I'm willing
15  to concede that I'm not an expert in BVI law.
16     Q.   And -- and that concession extends to
17  what a BVI court would consider in evaluating the
18  ordinary course defense, I take it?
19     A.   I actually don't agree with that, and
20  the reason I don't agree is because I'm looking
21  at an opinion from an expert as to what a court
22  likely would conclude, but I can't reach a
23  conclusion as to what they are going to conclude
24  because I'm going to assume based upon this case
25  that these are matters that are contested and

Page 108

1  facts are contested.
2          So, that's -- I mean, I understand
3  and I concede that Mr. Atherton is purportedly an
4  expert, but I -- I don't agree that a BVI court
5  would, in fact, hold eventually when it makes a
6  decision that this was not done -- or, I mean,
7  was done in the ordinary course.  So I believe
8  that it wasn't in the ordinary course.
9      Q.   But you came to that determination as
10  we have discussed already using your standard for
11  ordinary course, correct?
12     A.   Correct.
13     Q.   And you -- you formulated that
14  standard without regard to BVI law, correct?
15     A.   That's correct.
16     Q.   Okay.  And so, insofar as the facts
17  that -- that you have cited and the evaluations
18  you have done interface with BVI law, you have no
19  ability to offer an opinion on what a BVI court
20  might do?
21     A.   So I don't agree with that because I
22  am an expert retained in a matter that's in front
23  of a BVI court, and my presumption is that my
24  testimony would be relevant and relevant to the
25  court's decision.  I don't think that the court

Page 109

1  is going to capitulate just to Mr. Atherton.  I
2  think they're going to consider that opinion and
3  perhaps give it more weight, or not, than my own,
4  but at this point, I, you know, fairly -- my
5  contention is that this was not in the ordinary
6  course.
7      Q.   Why do you presume that your testimony
8  would be relevant to the court's decision here,
9  as a matter BVI law?
10     A.   I don't.  I don't know that.
11     Q.   You said that.  I just quoted your
12  answer back to you.
13     A.   I don't know for certain that my
14  testimony would be accepted in BVI court.  I
15  don't understand to an extent of an expert as to
16  what a BVI court would do in terms of qualifying
17  me.
18     Q.   I take it you certainly don't expect
19  that a U.S. court would qualify you as an expert
20  on BVI law?
21     A.   On the law, no, I am not an expert on
22  BVI law.
23     Q.   And you -- you practice law in the
24  United States in some fields that are fairly
25  complicated, don't you?

28 (Pages 106 - 109)

Page 110

1    A.   I do.  Yes.
2    Q.   And so I take it you know through your
3  own experience as a lawyer that there can be
4  quite a bit of nuance and history with respect to
5  particular legal provisions in your case that
6  comes up in complex regulations all the time,
7  doesn't it?
8    A.   I -- yes.  I agree.
9    Q.   And so with respect to the nuances of
10  particular provisions of BVI law, you agree that
11  Mr. Atherton is better positioned than you to
12  opine?
13    A.   On the law, yes.
14    Q.   And on the application of that law to
15  the facts, he is likewise better positioned to
16  opine?
17       MS. AUSTIN:  Object to form.
18  BY THE WITNESS:
19    A.   Again, I'll just concede that he is an
20  expert on the law.  But I do not believe that he
21  is taking into account all of the facts at hand
22  in making his opinion.
23    Q.   Let's leave aside what he does.  Let's
24  talk about his qualifications with respect to the
25  nuances of the ordinary course defense under BVI

Page 111

1  law, and simply to explain how that evaluation
2  works as a matter of BVI law, you agree that
3  Mr. Atherton is better positioned than you?
4       MS. AUSTIN:  Object to form.
5  BY THE WITNESS:
6    A.   That's a pretty lengthy question.  Can
7  you break it down for me?
8    Q.   I'm sure I can.  I'll try to restate
9  it.
10       With respect to -- well, you agree
11  that the ordinary course defense that is at issue
12  here is a question of BVI law?
13    A.   That seems like a very general
14  statement and I'm not a legal expert in BVI law.
15    Q.   Do you have an understanding as to
16  whether the ordinary course defense at issue in
17  this case is -- arises under BVI or other law?
18    A.   This case is governed by BVI law in my
19  understanding.  And part of that law is what
20  ordinary course means in a legal-technical sense.
21  And I think I have -- you know, I think I have
22  agreed with that.  I think where I disagree is
23  his application of that law to the facts at hand.
24    Q.   But with respect to explaining the
25  legal basis for the ordinary course defense, and

Page 112

1  what constitutes the ordinary course defense
2  under BVI law, you agree, I think, that
3  Mr. Atherton is better positioned than you to
4  opine?
5    A.   With respect to the law, yes.
6    Q.   Okay.  And what about with respect to
7  the factors that a BVI court would consider in
8  evaluating this legal defense?
9    A.   I would not be an expert in what
10  factors are relevant under BVI law.
11    Q.   Okay.  For that reason, when you
12  offered opinions on whether 3AC trading was in
13  the ordinary course, you were doing that as a
14  matter of your own standard which we discussed,
15  not the BVI legal standard?
16    A.   That's correct.
17    Q.   In Paragraph 57, of his report,
18  Mr. Atherton states, "An active trader in
19  cryptocurrency, such as 3AC, would in the
20  ordinary course of its business deposit assets
21  and funds with cryptocurrency exchanges and
22  proceed to trade on those exchanges using those
23  assets/funds."
24       Do you see that?
25    A.   Yes.

Page 113

1    Q.   Do you agree with that statement?
2    A.   I do.
3    Q.   He goes on, "3AC would necessarily
4  have had to deposit assets and fiat currency in
5  order to transact on a cryptocurrency exchange as
6  was the case with the Exchange," referring to the
7  FTX Exchange.
8       Do you see that?
9    A.   Yeah.
10    Q.   You agree with that statement I take
11  it as well?
12    A.   It's kind of general, and the reason
13  why I say that is I take it from the meaning of
14  that sentence that every time you trade, you have
15  to deposit assets or foreign currency.  And I
16  would say that perhaps initially you do, but as
17  long as you have sufficient assets on an
18  exchange, you can trade as much as you want.
19    Q.   Understood.
20       But as a general matter, you
21  believe that to be a generally correct statement?
22    A.   Well, again, I will say that -- I
23  mean, part of the activity that a trader, typical
24  hedge fund would engage in, includes depositing
25  assets and foreign currency to fund their

29 (Pages 110 - 113)

Page 114

1 account, yes.
2    Q.   You said "foreign."  You mean fiat
3 currency?
4    A.   Sorry, fiat.
5    Q.   He goes on, "Trades by 3AC on the
6 Exchange and the deposits of assets within the
7 vulnerability period would, in my opinion,
8 constitute transactions in the ordinary course of
9 3AC's business."
10       Do you see that?
11    A.   I do.
12    Q.   Now, understanding that you have a
13 definition of ordinary course that you are -- you
14 have been applying, you have no basis to dispute
15 Mr. Atherton's statement as a matter of BVI law
16 and application of facts to law, correct?
17       MS. AUSTIN:  Object to form.
18 BY THE WITNESS:
19    A.   Well, first off, I'm looking at
20 vulnerability period and wondering if that has a
21 particular meaning that I should understand here.
22 Vulnerability period, is that June 12 through the
23 14?
24    Q.   You don't know what that terms means
25 at all, do you?

Page 115

1    A.   No.
2    Q.   You have no idea whether that's an
3 important thing to be assessing when looking at
4 whether one traded in the ordinary course as a
5 matter of BVI law?
6       MS. AUSTIN:  Object to form.
7 BY THE WITNESS:
8    A.   My question was simply with respect to
9 the definition of that, taking it from your
10 response that it could be beyond that period of
11 time, and leading up to that period of time.  I
12 don't know for certain.
13       But reading this sentence and your
14 question with respect to the accuracy of this
15 statement, trades by 3AC on the Exchange
16 constitute transactions in the ordinary course of
17 3AC's business is correct.  And the deposit of
18 assets are also transactions that would be
19 typical and ordinary in the course of a hedge
20 fund's business.
21    Q.   And, again, understanding that you
22 have your definition of ordinary course, when it
23 comes to the BVI law definition of ordinary
24 course, you have no basis to dispute
25 Mr. Atherton's conclusion as stated in this

Page 116

1 sentence?
2       MS. AUSTIN:  Object to form.
3 BY THE WITNESS:
4    A.   I have no basis -- actually, I agree
5 with it.  It's a perfectly logical statement of
6 general activities of a hedge fund on an
7 Exchange.
8    Q.   In Paragraph 58 Mr. Atherton states,
9 "I do not view the fact that during the relevant
10 period, 3AC's trading on the Exchange led to
11 losses as being in and of itself any indication
12 that such trading activity was outside the
13 ambit," it says "if" but I think he means "of
14 what would be considered to be the ordinary
15 course of 3AC's business, particularly given the
16 potential for losses when trading in any market
17 and all the more so in what might be considered
18 to be a high risk and volatile market."
19       Do you see that?
20    A.   I do.
21    Q.   Do you agree that ordinary course
22 trades can lead to losses?
23    A.   Yes.
24    Q.   And as a matter of BVI law, you have
25 no basis to dispute the sentence that I just

Page 117

1 read, correct?
2    A.   It's a long sentence.  There's a lot
3 of parts.  Can we take it apart?
4    Q.   Why don't you tell me what as a --
5 within the rubric of BVI law you disagree with in
6 that sentence, if anything.
7    A.   I'm not an expert in BVI law so I
8 can't -- under the standard of BVI law, I can't
9 necessarily question the law itself, but as I go
10 through this, I want to make sure that what it's
11 saying is from a factual standpoint, actually
12 accurate.
13       So it says, "During the relevant
14 period, on the Exchange, the fact that it led to
15 losses in and of itself, any indication that such
16 trading activity was outside the ambit of
17 ordinary course, particularly given the potential
18 losses."  If I read that correctly, he's saying
19 that losses in and of themselves are what you
20 expect from time to time for a typical hedge fund
21 and, to the extent that that's what he's saying,
22 then I agree with that with respect to BVI law.
23    Q.   And you agree that cryptocurrency
24 markets are more risky and volatile than, for
25 example, traditional equities markets?

30 (Pages 114 - 117)

Page 118

1    A.   That's correct.
2    Q.   And are more risky and volatile than
3  most markets, in fact?
4    A.   That's correct.
5    Q.   In the next sentence, he writes, "This
6  view is supported by my understanding that 3AC
7  was an experienced cryptocurrency hedge fund,
8  which would have been familiar with the risks
9  associated with trading digital assets."
10       Do you see that?
11    A.   Yes.
12    Q.   You have no reason to doubt that 3AC
13  was an experienced cryptocurrency hedge fund
14  which would have been familiar with the risks
15  associated with trading in digital assets, right?
16    A.   That's correct, I have no basis.
17       MS. AUSTIN:  Mr. Dunne, we've been
18  going about an hour and 15 minutes.
19       MR. DUNNE:  This is a perfect stopping
20  point.
21       THE VIDEOGRAPHER:  We are going off
22  record at 11:55 a.m.
23       (Break in the proceedings
24       taken at 11:55 a.m.)
25       THE VIDEOGRAPHER:  Good afternoon.  We

Page 119

1  are back on record at 12:50 p.m.
2       You may proceed.
3  BY MR. DUNNE:
4    Q.   Welcome back, Mr. Lisle.  In
5  Paragraph 14 of your declaration, it's on Page 5,
6  you state that "As a large institutional trader,
7  the hedge fund often seeks to add leverage to its
8  trading among other types of leverage.  Leverage
9  can be in the form of trading margin and loans.
10  I understand that this was consistent with 3AC's
11  business model."
12       You agree, I take it, therefore,
13  that 3AC was an active cryptocurrency hedge fund
14  that did engage in margin trading, right?
15    A.   I agree.  Yeah.
16    Q.   You're aware that 3AC conducted more
17  than 52,000 trades during that June 12 through
18  June 14 period?
19    A.   I am, yes.
20    Q.   You didn't conduct any empirical
21  studies to analyze 3AC's trading during that
22  June 12 through 14 period, correct?
23    A.   No, I did not.  I was provided that
24  information.
25    Q.   What do you mean by "that

Page 120

1  information"?
2    A.   That the -- as I say in my opinion, I
3  had been instructed by counsel that 3AC FTX
4  accounts engaged in total of 52,484 spot orders,
5  the overwhelming majority of which 52,483 were
6  sales of spot digital assets associated with the
7  accounts.
8    Q.   Got it.
9       Where were you reading from there
10  for the record?
11    A.   That would be in Paragraph 11 of my
12  opinion.
13    Q.   I'm correct that you did not conduct
14  any analysis of 3AC's historical trading
15  activities before June 12, 2022?
16    A.   Nothing -- I did not analyze their
17  specific trading before -- before that period of
18  time.
19    Q.   So you have no sense as to whether
20  52,000 trades over two days was a high or low or
21  typical number for 3AC; is that right?
22    A.   I have no basis to opine on that, no.
23    Q.   And so you also, I take it, then, did
24  not analyze how often 3AC liquidated or reduced
25  its large positions rapidly in response to

Page 121

1  losses, right?
2    A.   That's correct.
3    Q.   You have no idea whether it's 3AC's
4  normal strategy to sell down large positions in a
5  stressed market where prices were declining,
6  correct?
7    A.   Can you restate that question, please?
8    Q.   Yeah.
9       You don't know whether it was
10  3AC's normal strategy just to sell down large
11  positions when those positions' prices were
12  declining, correct?
13    A.   I didn't analyze any previous activity
14  and, therefore, I'm not aware of what they had
15  done in the past.
16    Q.   Are you aware that 3AC used an
17  application programming interface, or API, to
18  conduct trading during the normal course of its
19  business on the FTX Exchange?
20    A.   I'm not intimately aware of that, no.
21    Q.   Do you know what I'm referring to
22  generally?
23    A.   Yes.
24    Q.   What does it mean to use API to trade
25  on an exchange?

31 (Pages 118 - 121)

Page 122

1    A.   An API is essentially a, from what I
2  understand -- of course, I'm not a technology
3  expert.  But my understanding is it is a way for
4  an entity to connect into the Exchange in order
5  to conduct what you would call high-frequency
6  trading.
7    Q.   Right.
8         So, in other words, 3AC was not
9  using the normal FTX web interface to conduct
10 those 52,000 trades is your understanding?
11   A.   I never made a conclusion in my
12 opinion as to how they executed trades, but if
13 that's what you're telling me that was the case,
14 then I'll -- then that is a fact that I'm not
15 aware of.
16   Q.   Okay.  But, I guess to come at it a
17 little bit differently, you don't believe that
18 there was a human trader at 3AC clicking the
19 trade button on the FTX web interface 52,000
20 times over the course of a couple days, right?
21   A.   No, that would be very out of the
22 ordinary, let's put it that way.
23   Q.   I agree with you.
24        It's your understanding that 3AC
25 was trading pursuant to sort of algorithmic

Page 123

1  protocol that it had developed?
2    A.   I'm not aware of how they were
3  trading, you know, with respect to the
4  methodology.  I'm not.  I'm not aware of those
5  facts.
6    Q.   That would be most likely given the
7  number of trades that they were conducting,
8  right, in your experience?
9    A.   Well, in my experience an operation
10 that is conducting, say, 20,000 trades a day, you
11 know, generally that's a lot of trades per day,
12 if, in fact, they're doing that.  If that's the
13 case, then I would say that it's probably -- it's
14 likely that's it's an algorithm that is driving
15 that.
16   Q.   You don't know one way or the other --
17 you don't know anything about what 3AC's
18 algorithms were, right?
19   A.   No.
20   Q.   You never -- you never seen any
21 information about them?
22   A.   I haven't, no.
23   Q.   I take it then you have -- you don't
24 know one way or the other whether the trades that
25 3AC executed on the FTX Exchange during the

Page 124

1  period June 12 through 14, 2022, were conducted
2  using algorithmic programs that were developed
3  months earlier?
4    A.   Yeah.  I wouldn't have no knowledge
5  about that.
6    Q.   For all you know, 3AC created its
7  trading algorithms in 2012 or whenever it
8  operated and just let them run, correct?
9         MS. AUSTIN:  Object to form.
10 BY THE WITNESS:
11   A.   I mean, I just don't know how they
12 were executing transactions.
13   Q.   You have no -- you have -- you don't
14 know one way or the other whether 3AC had
15 algorithms in place for extended periods of times
16 that caused all of the trades during June 12
17 through 14?
18   A.   Yeah, I have no idea.
19   Q.   Okay.  Let me direct you, please, to
20 Paragraph 23 of your report.
21        In Paragraph 23 you listed -- I
22 should say 23, and then 23, Subparts 1, 2, and 3,
23 you listed some options of -- for what you deemed
24 to be more sophisticated trading strategies than
25 what 3AC did in June 2022, right?

Page 125

1    A.   So, in the Paragraph 23, I do say "A
2  professional trader faced with markets that are
3  moving quickly against its positions but seeking
4  to continue its normal trading operations would
5  have adopted more sophisticated strategies."
6    Q.   You've never been a professional
7  trader though, right?
8    A.   Can you define that?  And the reason
9  I'm asking is you have asked me that question up
10 until now based upon experiences where I did not
11 trade.  But I should let you know that between
12 college and law school, I actually was a trader,
13 and engaged in commodity trading.  So, I mean,
14 accurately, I had an earlier experience as a
15 trader.
16        I would also qualify and say, as I
17 have said before, that I am intimately familiar
18 with trading operations having worked at firms
19 that did actual trading.  And I have been
20 involved in trading my entire -- pretty much my
21 entire professional life.
22   Q.   So let's back up.
23        So the trading experience that
24 you're describing between college and law school,
25 when was that?  What years, please?

32 (Pages 122 - 125)

Page 126

1    A.    That would have been -- let's see.  I
2  graduated in '86, so starting in 1986 through
3  about the end of 1987, I worked for a company
4  called Frutzi which was an Italian grain company
5  a la like Cargill or ADM, and they were a grain
6  merchandiser.  They had elevators located along
7  the Illinois and the Mississippi River.  I was a
8  grain elevator manager in one of their elevators
9  in Florence, Illinois, and my job was to trade
10  cash grain, what they called cash grain, meaning,
11  buy from producers and dump it onto barges and
12  sell it to, you know, various buyers downstream,
13  down river, and part of that was trading actual,
14  what they call, spot commodities but also -- I
15  also traded and hedged those purchases and sales
16  using futures contracts.
17    Q.    Okay.  So other than during 1986 and
18  1987 when you traded certain grain futures, and I
19  guess other grain-related products including
20  perhaps grain, you have no experience as a
21  professional trader yourself?
22    A.    I have no experience as a professional
23  cryptocurrency trader.  I have no experience as a
24  trader aside from what I just talked about.
25    Q.    Okay.  What is your basis for stating

Page 127

1  that the strategies set forth in Paragraph 23 and
2  its subparts are more sophisticated?
3    A.    More sophisticated would be -- the
4  meaning behind that is that the -- the assets
5  traded, the markets that you trade in are more
6  sophisticated, they are populated by more
7  sophisticated counterparties, and, you know, they
8  would necessarily involve a higher knowledge of
9  how these markets worked than simply taking a
10  long or short position in a particular asset
11  class.
12    Q.    In Paragraph 23.1, you discuss taking
13  short positions and other correlated assets,
14  right?
15    A.    Yes.
16    Q.    Have you ever personally put on a
17  short position in a correlated asset to hedge a
18  long position?
19    A.    I did in my earlier job, hedging
20  future -- hedging with futures, hedging spot
21  transactions in commodities with futures.  You're
22  essentially -- say if you're buying cash grain
23  for future delivery, you book that in a contract,
24  for a date in the future, and then you would take
25  a corresponding short position in the futures

Page 128

1  market in order to hedge, and by the time that
2  you actually take delivery of that actual grain,
3  then you would lift that hedge by offsetting it
4  and buying it back.
5    Q.    That was in the -- in the
6  grain-related trading position you had in 1986
7  and '87?
8    A.    Yes.
9    Q.    You have not personally put on such a
10  position since then?
11    A.    No.
12    Q.    And have never done so in the context
13  of cryptocurrency trading, correct?
14    A.    No, I have not.
15    Q.    You refer in Paragraph 23.1 to another
16  widely traded cryptocurrency token Cardano ADA.
17  You say "A sale of Cardano could have generated a
18  6 percent profit."
19         Do you see that?
20    A.    Yes.
21    Q.    What are you -- what is your -- how
22  did you choose Cardano and what are you trying to
23  explain there?
24    A.    I chose Cardano because in my
25  experience it is one of the more liquid coins,

Page 129

1  meaning it is one of the more widely traded coins
2  and, therefore, would have offered a liquid --
3  one of the more liquid markets in order to
4  perhaps take a short position to offset their
5  long portfolio.  And what I mean by correlated is
6  that the market in Cardano necessarily would move
7  not in lockstep with Bitcoin or Ethereum but
8  generally in the same direction.
9    Q.    Would taking short positions in assets
10  like ADA require 3AC to have cash available to
11  trade?
12    A.    Yes, it would.
13    Q.    Do you have an understanding as to
14  whether 3AC had cash available to trade in its
15  FTX.com Exchange account?
16    A.    I do not.
17    Q.    Do you have any understanding as to
18  whether 3AC had cash available to trade in any
19  other accounts?
20    A.    Could you restate that?
21    Q.    Sure.
22         Do you have any understanding
23  during the period June 12 through 14, 2022, as to
24  what 3AC's available cash was?
25    A.    I do not.

33 (Pages 126 - 129)

Page 130

1    Q.   Do you know whether 3AC owned any ADA
2  during the period June 12 through 14, 2022?
3    A.   At some point -- I'm not sure if I
4  have this in my opinion.  Can you give me a
5  second?
6    Q.   Yes.
7    A.   My understanding of 3AC's holdings
8  during that time period is that the majority, the
9  great majority of its holdings were in Bitcoin,
10  Ethereum, GBDC, and BTC and as well FTT which is
11  the FTX token.  I am unaware if their portfolio
12  included ADA.
13    Q.   Do you know whether 3AC has ever used
14  the trading strategy at any time during its
15  existence that you described of taking
16  correlated -- why I don't ask it again.
17         I take it you have no idea whether
18  3AC at any point during its history took short
19  positions in ADA to hedge any of its long
20  positions?
21    A.   I do not know if they did that, no.
22    Q.   Likewise, you do not know whether 3AC
23  at any point during its history took short
24  positions in correlated assets to hedge its
25  exposure to Bitcoin, Ether, FTT, or the other

Page 131

1  assets it held during the period June 12 through
2  14, 2022?
3    A.   I'm sorry.  I'm going to ask you to
4  repeat the question.
5    Q.   Sure.
6         Likewise, you do not know whether
7  3AC at any point during its history took short
8  positions in correlated assets to hedge its
9  exposure to Bitcoin or Ether or FTT, correct?
10    A.   It's my understanding that 3AC's
11  portfolio at the time June 12 through June 14,
12  was comprised almost entirely of Bitcoin,
13  Ethereum, GBTC, and ETHE.  To the extent they had
14  those asset classes and knowing from my research
15  that they -- 3AC had acquired over time holdings
16  in GBTC as well as ETHE, I'm not entirely sure
17  but I'm assuming at some point or another, they
18  were either using those types of investments as
19  collateral in order to do other strategies and/or
20  actually arbitraging between them.  I could see
21  that they would be doing that at certain periods,
22  but I can't point to specific evidence that that
23  would show that.
24    Q.   So I want to follow up on a couple of
25  things.

Page 132

1         First, you said that you were
2  assuming they were doing certain things, but
3  because you have never examined their historical
4  trading practices, you have no idea, correct?
5    A.   No, I didn't say no idea.  I just said
6  that it is -- well, I meant that it was likely
7  that they were as professional traders doing --
8  engaging in several different types of strategies
9  that are common for hedge funds to engage in
10  which would have included looking for
11  opportunities to profit from what I would call
12  arbitrage positions which would necessitate
13  taking a long versus a short position and
14  correlated assets, and I'm making that
15  presumption based upon my knowledge of the
16  portfolio which, to me, signifies the fact that
17  there would have been opportunities for them to,
18  at periods of time, profit from that kind of
19  activity.
20    Q.   I understand that you said -- you
21  didn't say that you had no idea.  I said that you
22  had no idea, and I want to ask my question again.
23         You made some assumptions about
24  what trading 3AC likely had historically engaged
25  in, but because you never actually looked at

Page 133

1  their historical trading, you don't know what
2  they actually did?
3         MS. AUSTIN:  Objection, asked and
4  answered.
5  BY THE WITNESS:
6    A.   So I'll just restate what I said in
7  that based upon my experience and my
8  understanding of 3AC as a professionally traded
9  hedge fund, it was my assumption that at periods
10  of time they would engage in fairly common
11  practices of professional trading operations.
12    Q.   You assumed that but because you
13  didn't look at what they historically did, you
14  actually have no idea what they did?
15         MS. AUSTIN:  Same objection.
16  BY THE WITNESS:
17    A.   No idea, I wouldn't characterize it as
18  that.  I would say that I had a great deal of
19  experience and have based my opinion on that
20  experience and essentially assuming that they had
21  done so based upon a likelihood which is based
22  upon my experience.
23    Q.   But, again, you made an assumption.
24  It's quite possible they didn't do any of that,
25  right?

34 (Pages 130 - 133)

Page 134

1     A.   I have not reviewed their specific
2  trading activity previously, and because of that,
3  I cannot with 100 percent certainty say that they
4  would have -- that they did engage in that kind
5  of strategy.
6     Q.   Indeed far from 100 percent certainty,
7  you, in fact, have no basis other than your own
8  assumption to suggest that they did?
9     A.   Can you give me a second, let me look
10  through my opinion?
11     Q.   Please.
12     A.   Could you restate that?
13     Q.   In fact, far from 100 percent
14  certainty, you actually have no basis other than
15  your own assumption to suggest that 3AC engaged
16  in the types of correlated short trades that you
17  are describing?
18     A.   My assumption is based upon the
19  knowledge of their portfolio and the extensive --
20  or the scope of it in digital assets.  My
21  experience tells me that anybody that has any
22  professional experience in these markets would
23  have looked for opportunities to exploit their
24  investments in order to profit at least in the
25  short terms.

Page 135

1     Q.   But you never spoke with anyone from
2  3AC?
3     A.   Never spoke with anybody at 3AC.
4     Q.   You never actually looked at their
5  trading data yourself for any period?
6     A.   That's correct.
7     Q.   So I understand you're expressing your
8  belief that a sophisticated trader would have
9  undertaken these strategies.  But aside from your
10  own belief in 3AC's sophistication, you have no
11  basis to suggest that they ever did?
12     A.   I have no basis to conclude with
13  100 percent certainty, like I said before, that
14  they actually did.  I do have a great deal of
15  basis to presume that over that period of time,
16  over the period of time that they were in
17  existence that they did and they did it
18  frequently.
19     Q.   But that basis is not -- let me start
20  again.
21          The great deal of basis that you
22  just referred to, comes purely from your own
23  assumptions about what a sophisticated market
24  participant would do, not from any verifiable
25  facts about what 3AC did?

Page 136

1     A.   Can you break that up, please.
2     Q.   You said you had a great deal of basis
3  to presume that 3AC did the kinds of short trades
4  we were talking about, correct?
5     A.   I have a great deal of basis from my
6  experience given my knowledge of their portfolio,
7  yes.
8     Q.   What knowledge of their portfolio are
9  you referring to?
10     A.   The portfolio holdings that they had
11  during the period of time June 12 through
12  June 14. ████████████████████████████
████████████████████████████████
████████████████████████████
████████████████████████████████
19     Q.   All right.  Why don't you lay out for
20  us, please, what you know about the assets that
21  3AC had during the period June 12 through 14,
22  2022?
23     A.   Okay.  So, in Paragraph 21, I am told
24  that those sales that we referred to were in the
25  following assets:  Bitcoin, Ethereum, GBTC, ETHE,

Page 137

1  and units of FTT.  Also -- let's see.
2          Yes, so that's the extent of my
3  opinion with respect to my understanding of the
4  assets in their account during that period of
5  time.
6     Q.   All right.  So to recap, Paragraph 21
7  sets forth the entirety of your understanding as
8  to what 3AC had in its FTX accounts or any of its
9  accounts, I guess for that matter, during the
10  period June 12 through 14, 2022?
11     A.   I believe I reviewed a document that
12  listed out all of the assets but I did not
13  include all the assets here.  So I'm aware that
14  there were other assets and I don't recall if
15  those were actually defined but they were of
16  minimal value and so when I say the majority of
17  positions were in those assets, that -- that was
18  my understanding.
19     Q.   And this understanding comes from what
20  Latham & Watkins told you?
21     A.   Yes, correct.
22     Q.   You didn't actually examine any of
23  3AC's books and records?
24     A.   Correct.
25     Q.   So you are opining that in light of

35 (Pages 134 - 137)

1 the fact that 3AC had the assets set forth here
2 in Paragraph 21, so a lot of Bitcoin, ETH, GBTC,
3 ETHE, and FTT, it is your view that 3AC at some
4 point was hedging those positions using
5 correlated shorts?
6    A.   No, that's not what I'm saying.
7    Q.   Okay.
8    A.   I'm told that all of those
9 positions -- almost all, were sold.  Those were
10 at the start of that period of time long
11 positions, and my reading of this is that all but
12 one were sell orders so they were essentially
13 selling a long position and got down to almost
14 what we would call flat.
15    Q.   And then I'll ask you -- well, you --
16 during this period, you believe that 3AC did not
17 have correlated short positions put on?
18    A.   Well, first and foremost, I do
19 understand that they had a great deal of activity
20 in futures and perps during this time as well.  I
21 did not review those positions so I don't have an
22 understanding of whether there were any shorts
23 there.  These positions right here, they are
24 long.  And during that time period, the only
25 thing that was done was to sell them.  That was

1 it.
2    Q.   And you assume that at some point in
3 the past, 3AC had put on short positions to hedge
4 its long positions?
5    A.   Can you say that again?
6    Q.   Yes.
7         You make an assumption that
8 sometime in the past, 3AC had put on short
9 positions to hedge its long positions?
10    A.   I did.  Yes.  I said that.
11    Q.   And that assumption comes not from any
12 review of data or speaking to anyone with
13 personal knowledge, it is purely an assumption
14 based what you believe a sophisticated market
15 participant would do?
16    A.   Yes.  Because a sophisticated market
17 participant looks not only for opportunities to
18 profit being long with the market that's going
19 up, that's very a simplistic strategy.  A
20 sophisticated investor would engage in strategies
21 that could make money when markets are going
22 down.
23         And I also will add that it's very
24 likely that 3AC, who I know was trading at a lot
25 of other exchanges, may have been maintaining

1 their long positions on FTX and had short
2 positions elsewhere, which would be indicia of
3 what I expect would be a fair amount of arbitrage
4 that they were doing on a high frequency basis.
5    Q.   But you have no idea what positions
6 they had on away from FTX, right?
7    A.   I have not been told what positions
8 they had on.
9    Q.   You are just speculating that they
10 might have had short positions on somewhere else?
11    A.   I'm speculating that they had short
12 positions, but based upon my experience it was a
13 very high likelihood that they were arbitraging
14 between their positions on one exchange versus
15 other exchanges because arbitrage is essentially
16 looking for price discrepancies in the same asset
17 class at different venues.
18    Q.   Again, you have no evidence that 3AC
19 actually engaged in such a trading strategy, an
20 arbitrage strategy as you just described?
21    A.   I don't have any specific trading
22 activity data at my disposal.
23    Q.   Or even anecdotal evidence relating to
24 3AC specifically?
25    A.   I don't know what you mean by

1 anecdotal.
2         I would think anecdotal would
3 include my experience, and therefore, my
4 experience including just generally what was
5 going on and I would lump in 3AC with all the
6 other professional hedge fund operations and my
7 presumption is that they were all engaging in
8 some form of arbitrage.
9    Q.   There's nothing that would have
10 prevented you from actually looking at 3AC's
11 books and records during this period is there?
12    A.   3AC's books and records?  Let me take
13 a minute.
14    Q.   Sure.
15    A.   Okay.  Could you restate the question?
16    Q.   Yeah.  There is nothing that would
17 have prevented you from getting access to 3AC's
18 books and records for this period; is that right?
19    A.   By nothing "preventing me" I was I
20 believe free to ask for anything that I felt like
21 would be relevant to my analysis.  Whether that
22 would be something that could be actually
23 obtained, I don't know.
24    Q.   Do you have an understanding as to
25 whether you could have checked and found out

36 (Pages 138 - 141)

Page 142

1  whether 3AC engaged in the type of hedging
2  strategy that you discuss here?
3      A.  I was asked only to opine on in this
4  particular section whether in my experience
5  looking at the activity, which is all shorting at
6  those particular days, whether that was activity
7  in the ordinary course.  That's all I was asked
8  to do, and therefore, it was not relevant that I
9  actually ask for, you know, what kind of trading
10  patterns they engaged in before.
11          So no, I never -- never really was
12  a strong inclination for me to ask for it.
13      Q.  You don't believe that reviewing 3AC's
14  actual trading activity for any period would have
15  been useful for informing your opinion about
16  whether these trades were done in the ordinary
17  course; is that right?
18      A.  Can you repeat that?
19      Q.  I take it that you do not believe that
20  reviewing 3AC's actual trading activity for any
21  period would have informed your opinion as to
22  whether the trades on June 12 through 14 were
23  conducted in the ordinary course?
24      A.  All I was asked to do was comment on
25  those transactions that I was told occurred on

Page 143

1  FTX in 3AC's accounts between the dates
2  12-14th of June 2022.  That's all I was asked to
3  do.
4          All I was asked to do was analyze
5  whether more than 50,000 sell trades without any
6  other transactions occurring were in the ordinary
7  course.  That's all I was asked to do.
8      Q.  Move to strike as nonresponsive.  I'll
9  ask my question again.
10          I take it that you do not believe
11  that reviewing 3AC's actual trading data for any
12  period would have informed your opinion as to
13  whether the trades on June 12 through 14 whether
14  were conducted in the ordinary course?
15      A.  It's an extremely broad question, and
16  I don't know if there's any way to answer that in
17  any way that would be meaningful.  So I'd ask you
18  to kind of make that more specific because you're
19  saying any and all and those kinds of things.
20  And I'm really trying to be, you know, honest in
21  my answers, but I'm really having trouble and I'm
22  struggling with the question.  So I'd ask you to
23  restate it.
24      Q.  Well, we know that you didn't look at
25  any historical trading activity of 3AC's, right?

Page 144

1      A.  I was told, as I said, that they
2  executed more than 50,000 sell transactions
3  between those dates.  Outside of that, I don't
4  have specific knowledge of any of their trading
5  activity.
6      Q.  And if you -- if you thought that
7  historical trading activity might inform your
8  opinion in this case, I take it you would have
9  wanted to look at that, right?
10      A.  I would have had to look at it if I
11  thought it would be relevant to my narrow opinion
12  about what happened in those two days.
13      Q.  Okay.  So I take it, therefore, that
14  you do not believe that 3AC's historical trading
15  activity was relevant at all to your assessment
16  of whether its trades were in the ordinary course
17  during the period June 12 through 14, 2022?
18      A.  As I say in my opinion, more than
19  52,000 transactions were made, all sells, has no
20  bearing on what happened before.  The only thing
21  that I see is that it was all a fire sale of
22  assets on the Exchange.  Complete.  That's it.
23  And I would have expected other types of
24  transactions to be occurring given the fact that
25  a professional trading operation would have tried

Page 145

1  to survive a market distress event and try stay
2  afloat.
3      Q.  Move to strike as nonresponsive.  That
4  was not my question.
5      A.  Okay.
6      Q.  My question was I take it that you,
7  therefore, do not believe that 3AC's historical
8  trading activity was relevant at all to your
9  assessment of whether its trades during the
10  period June 12 through 14, 2022 were conducted
11  ordinary course?
12      A.  No, I did answer that question.  And
13  the answer -- I stay on the answer.
14          And so I mean, if you want to ask
15  me a different question, I'm happy to try and
16  answer it.  But at the end of the day, all I was
17  asked to do was opine on what happened between
18  the 12th and the 14th, and I'm also said that
19  whatever happened before is irrelevant in my
20  analysis because all I'm looking at is whether or
21  not those transactions during that period of time
22  were done in the ordinary course.
23      Q.  Okay.  So there, I think you may have
24  answered.
25          You said at the end of your answer

Page 146

1  there was what was done before the period
2  June 12th through 14th was irrelevant to you,
3  right? I just want to make sure that's clear.
4      A.  I think that's misstating what I'm
5  saying. What I am saying is all I did is look at
6  the fact that over 50,000 transactions were done
7  and they were all sells and whether or not that
8  was in the ordinary course, that is the only
9  thing that I did in terms of my opinion.
10        Could I take a break?
11        MS. AUSTIN: Yeah, sorry, it's your
12 question.
13        THE WITNESS: Oh, you're not done.
14        MR. DUNNE: Can we finish up this bit
15 here, then we can take a break.
16 BY MR. DUNNE:
17     Q.  I'm just going to read what you said
18 in response to my earlier question. You said, "I
19 have also said that whatever happened before is
20 irrelevant in my analysis because all I'm looking
21 at is whether or not those transactions, meaning
22 the ones done between June 12th and June 14th,
23 were done in the ordinary course."
24        That's what you said. You stand
25 by that statement?

Page 147

1      A.  Anything that happened before that
2  period of time or even after would have been not
3  relevant to my analysis.
4      Q.  No matter what it showed, it wouldn't
5  have been relevant?
6      A.  No matter what it showed.
7        MR. DUNNE: We can take a break.
8        MS. AUSTIN: Thank you.
9        THE VIDEOGRAPHER: We are going off
10 record at 1:36 p.m.
11        (Break in the proceedings
12        taken at 1:36 p.m.)
13        THE VIDEOGRAPHER: We are back on
14 record at 1:53 p.m.
15        You may proceed.
16 BY MR. DUNNE:
17     Q.  Mr. Lisle, we just established before
18 the break that in your view, 3AC's historical
19 trading activity was irrelevant to your ordinary
20 course analysis.
21        I want to also talk about 3AC's
22 contemporaneous trading activity on other
23 exchanges. Do you believe that that also was
24 irrelevant in your analysis of whether 3AC's
25 trades on the FTX Exchange during the period

Page 148

1  June 12th through 14th, 2022, were done in the
2  ordinary course?
3      A.  I just was not asked to opine on that.
4  So I am unfamiliar with any trading they did at
5  other exchanges.
6      Q.  Do you think that that information,
7  though, any trading they did on other exchanges
8  might be relevant to assessing whether their
9  trades done on the FTX Exchange were conducted in
10 the ordinary course?
11     A.  Well, my opinion is based upon a
12 particular set of circumstances, which was the
13 trading on FTX. My presumptions and my
14 determinations are based upon my presumptions
15 that I took from those set of facts. I am, you
16 know -- I'm satisfied that with what I was asked
17 to do I have rendered an opinion. Would that
18 opinion change? I don't think so.
19     Q.  No matter what 3AC was doing on other
20 exchanges, that wouldn't affect your opinion that
21 3AC's trades done on the FTX Exchange during the
22 period June 12th through 14th, 2022 were done in
23 the ordinary course?
24        MS. AUSTIN: Objection, asked and
25 answered.

Page 149

1  BY THE WITNESS:
2      A.  I will just refer to my answer which
3  is all I was asked to do is to opine on the
4  trading that occurred on FTX during that period
5  of time.
6      Q.  And I understand that that's what you
7  were opining on. I'm asking whether information
8  about trades that 3AC did during that same period
9  on other exchanges could possibly impact your
10 opinion?
11        MS. AUSTIN: Same objection.
12 BY THE WITNESS:
13     A.  I'll respond by I was not asked to do
14 it, and therefore, I didn't take a look at what
15 else they were doing at other exchanges. I was
16 only asked to focus on the trading that occurred
17 on FTX.
18     Q.  Do you believe, though, that trades
19 they did somewhere else could be relevant to your
20 assessment?
21        MS. AUSTIN: Same objection.
22 BY THE WITNESS:
23     A.  I'm sorry, I don't understand what you
24 mean by what specific trades done on what
25 specific exchanges.

38 (Pages 146 - 149)

1    Q.   I don't know.  I mean, it sounds like
2  you don't either, but my question is:  Are there
3  any trades that 3AC could have possibly done on
4  other exchanges that might have influenced your
5  opinion on
6  that might have influenced your opinion on
7  whether the trades done on FTX were conducted in
8  the ordinary course?
8       MS. AUSTIN:  Same objection.
9  BY THE WITNESS:
10     A.   And I guess I just feel like your
11  question is very vague and non-specific to me.
12  So if you want to put your question in more
13  specific types of trading that it could or could
14  not have done, then maybe I can answer that
15  question, but right now, all I could do is repeat
16  what I have said, which is I am sticking with,
17  you know, my opinion I was only asked to opine on
18  the events that occurred during those period of
19  time on FTX.
20     Q.   Okay.  Well, I'll propose one specific
21  trade for starters.
22          What if, during this same period,
23  FTX took short positions in the ADA token, which
24  is exactly what you proposed in Paragraph 23.1,
25  but they did it on another exchange -- I'm

1  sorry -- 3AC, not FTX -- would that influence
2  your opinion?
3       MS. AUSTIN:  Object to form.
4  BY THE WITNESS:
5     A.   I'm not sure -- so let me make sure
6  I'm clear on your question.  Are you saying that
7  it actually occurred that they made a short trade
8  on another exchange in ADA?
9     Q.   I'm asking you as a hypothetical, if
10  they had?
11     A.   Oh, as a hypothetical?
12     Q.   Yeah.
13     A.   I'm sorry.  As a hypothetical, if they
14  had made an ADA trade on another exchange, I
15  suppose that that would fit within the theory
16  that I'm making, which is -- or not making, but
17  my presumption is that I would look for
18  sophisticated types of trading activity occurring
19  on FTX, which would signify or evidence an effort
20  to try and extricate itself from a perilous
21  situation.
22     Q.   The trade that I proposed would be one
23  such trade, correct?
24     A.   That is a trade that in my opinion --
25     Q.   It's in 23.1.

1     A.   23.1.  Yes.  So, in my opinion, I make
2  the suggestion that one of the things that they
3  could have done was to trade and short Cardano
4  during that period of time, during a market that
5  was going down, which would have been a
6  profitable trade.
7     Q.   That would have been an indicator that
8  their trades on FTX were in the ordinary course
9  if they had done that in your view?
10     A.   I mean, again, I'll go back to the
11  fact that I was asked to opine on the trading
12  that was done on FTX irregardless of what else
13  was going on in another exchange, and so, you
14  know, again, I'm not familiar with what they were
15  doing on other exchanges and I'm going to make a
16  conclusion based upon what I don't know.
17     Q.   Well, you did make a conclusion based
18  on what you don't know, didn't you, because you
19  conclude that their trades weren't in the
20  ordinary course based solely on the trades that
21  were on FTX with no knowledge whatsoever of
22  trades they were doing away from FTX.
23     A.   I didn't or I don't or I'm unaware of
24  the trades that were done by 3AC on other
25  exchanges.  And so, again, my opinion is based

1  upon what happened actually and what I'm told
2  happen on FTX during that period of time.
3     Q.   And you made no effort to understand
4  whether 3AC was pursuing some of these more
5  sophisticated strategies, that's your term
6  sophisticated strategies, just doing it away from
7  FTX?
8     A.   I'm unaware of any activity that
9  they -- that took place in their accounts on
10  other exchanges.  I'm unaware.
11     Q.   You never asked for that information?
12     A.   I did not ask.
13     Q.   And that's because you didn't believe
14  that information was relevant?
15     A.   I didn't ask because I wasn't asked to
16  analyze any activity outside of what happened on
17  FTX.
18     Q.   I take it you believe that the
19  analysis that you provided of 3AC's trading
20  activity on FTX was based on some kind of sound
21  methodology, right?
22     A.   I took as evidence or, you know, I was
23  given the set of facts -- I was given a set of
24  facts and I took them as what actually occurred.
25     Q.   To be clear, again, you never even

39 (Pages 150 - 153)

Page 154

1  asked for information about what trades 3AC did
2  away from FTX?
3      A.  I did not ask Latham for any
4  information about any trading they did away from
5  FTX.
6      Q.  I am asking you now, do you believe
7  that such information could be relevant to your
8  assessment of whether the trades done on FTX were
9  ordinary course trades?
10      MS. AUSTIN:  Objection, asked and
11  answered.
12  BY THE WITNESS:
13      A.  I guess I will just stand on my
14  previous answer, which is I have been asked to
15  analyze the activity that occurred that I was
16  told occurred on FTX and it was outside of
17  anything else that took place away from FTX.
18      Q.  I know that that's what you were asked
19  to do, and I'm asking whether you think that was
20  the right question.  Do you think that that's the
21  right analysis?  That the analysis should be
22  looking solely at the trades done on the FTX
23  Exchange without regard to any trades done
24  anywhere else?
25      A.  I was asked to do a certain task.  I

Page 155

1  did the task.  I made a determination that
2  whatever was done on FTX was done -- was not done
3  in the ordinary course.  And I'm not sure where
4  you are going with this line of questioning, but
5  all I can do is do what I was asked to do, which
6  is provide an opinion on that.
7      Q.  And we talked about your definition of
8  ordinary course.  You had your own definition of
9  ordinary course that you used?
10      A.  My own.  I had my own articulation in
11  my words as to what ordinary course is, but I do
12  not believe that it's a unique definition.  The
13  definition is I believe understood as what I
14  would think would be in the ordinary course.
15  Yeah.
16      Q.  And in your view to assess that
17  question, all you need to do is look at the
18  trades done on one exchange during this three-day
19  period, correct?
20      MS. AUSTIN:  Objection, asked and
21  answered.
22  BY THE WITNESS:
23      A.  This is what I was asked to do,
24  whether the transactions involving assets in or
25  associated with 3AC's accounts on the exchange

Page 156

1  between June 12th and June 14th would have likely
2  been made in the ordinary course of business of a
3  hedge fund trading in digital assets.  That is
4  all I was asked to do.
5      Q.  I know that's what you were asked to
6  do, but you believe that you can answer that
7  question by looking solely at the trades done on
8  FTX during that period of time and that the
9  answer to that question does not in any way
10  depend on prior trading activity or trading
11  activity during that period away from FTX,
12  correct?
13      MS. AUSTIN:  Object to form.
14  BY THE WITNESS:
15      A.  I answered the question you asked in
16  the best way that I could, which is that's all I
17  was asked to do.
18      Q.  Move to strike as nonresponsive.
19      I don't think you have answered in
20  the best way that you could.  So I'll ask my
21  question again.
22      Leaving aside the scope of your
23  assignment which you were asked to look at, I'm
24  asking do you think it could have been
25  informative to look at trades that 3AC did away

Page 157

1  from FTX during the relevant period?
2      A.  I'm not sure that's a relevant
3  question in the context of my opinion.  So I'm
4  going to be nonresponsive to your question only
5  because I don't think that it's within the
6  context of what I have done or been asked to do.
7      Q.  You could answer my question yes or
8  no, which would be responsive to my question, and
9  you're assiduously avoiding doing that.  But I
10  will continue asking my question until I get what
11  I believe is a proper answer.
12      So I'll just backup a level and
13  start again.
14      We have established that you
15  looked solely at the trades that were done on the
16  FTX Exchange during the three-day period June
17  12th through 14th, 2022, correct?
18      A.  Correct.
19      Q.  And your assignment was to evaluate
20  whether those trades were done in the ordinary
21  course and in your professional expert opinion,
22  correct?
23      A.  Correct.
24      Q.  In order to form that professional
25  expert opinion, you did not deem it appropriate

40 (Pages 154 - 157)

Page 158

1 to look at any other trades conducted anywhere
2 else, correct?
3    A.   No.  I did not ask for any trades that
4 were done, but not because I didn't think it
5 was -- I didn't because I didn't think it was
6 necessary in order to render my opinion.
7    Q.   Did you think it was relevant to your
8 opinion in any way?
9    A.   At the end of the day -- give me a
10 second to read through here.
11        So my opinion isn't solely based
12 on the trading outcome, meaning just the sales.
13 My opinion is also based upon or, you know, other
14 factors like the overall market direction at the
15 time, and my opinion is also directed at the
16 portfolio in question, meaning the portfolio of
17 3AC on the Exchange itself.
18        My opinion is based upon
19 understanding that there was leverage involved.
20        My opinion is also most or mainly
21 based on what I think a sophisticated trading
22 operation would be concerned with respect to its
23 positions on each exchange that it had, and the
24 way I understood my task was to just view what
25 they were doing on FTX with respect to their

Page 159

1 particular situation, given the distress in those
2 accounts and in that portfolio on that exchange,
3 it was my judgment that even in that exchange,
4 there should be activity that was looking to
5 offset its overwhelming long position on the
6 Exchange.
7        And, therefore, when you asked me
8 if what they're doing on other exchanges is
9 relevant, I would say in the context of my
10 opinion, it's not all that relevant because for
11 the most part I can get to my conclusion by just
12 viewing what happened on the FTX Exchange, and I
13 didn't necessarily need information from what
14 they were doing on other exchanges to get to that
15 conclusion.
16    Q.   Okay.  I'm hearing from that long
17 narrative answer, which I move to strike as
18 nonresponsive, that you -- whatever -- whatever
19 the trading that was occurring on other exchanges
20 doesn't matter, it wouldn't change your opinion
21 no matter what it was?
22    A.   You keep using these very broad vague
23 terms, and I will ask you to be a little more
24 specific with your question.
25    Q.   In this case, sir, the very broad

Page 160

1 nature of my question is designed to allow you to
2 explain any way in which trading on another
3 exchange could be relevant.  So you can pick any
4 way and just mention it and that will be fine.
5        My question is:  Based on your
6 last answer and the circular series of questions
7 we've been going through here, I take it that
8 there is no trading of any kind that could have
9 occurred on other exchanges during this period
10 that would lead you to believe that the trades
11 that 3AC conducted on FTX were done in the
12 ordinary course?
13        MS. AUSTIN:  Object to form.
14 BY THE WITNESS:
15    A.   So the way I understand your question
16 is, and I'm starting to gain more of an
17 appreciation for it, but I want you to understand
18 where I'm coming from, which is I was -- what I
19 was asked to do, which you have acknowledged, and
20 the way I'm looking at this, from my last answer,
21 you're calling circular, but I don't think it
22 was, is this:  You have a portfolio -- what did I
23 say it was?  Or I was told the portfolio included
24 basically five assets, BTC, ETH, GBTC, ETHE, and
25 FTT, and it was all long.  The corresponding

Page 161

1 short position at another exchange would do very
2 little, if anything, to alleviate its distress on
3 the FTX Exchange.
4    Q.   Really?
5    A.   Yeah.
6    Q.   Even if --
7    A.   What would a -- I mean, essentially
8 FTX is margining and basing its asset
9 calculations on strictly the trading that's
10 occurring on FTX in the 3AC accounts, and so
11 they're not going to account for or take into
12 account positions on other exchanges.
13    Q.   You can't rule that out on another
14 exchange 3AC had a completely offsetting short
15 position for all the longs it had on FTX, you
16 have no idea?
17    A.   And I have said, I don't know what
18 they did on other exchanges.
19    Q.   All right.  Let's look at
20 Paragraph 23.2.  Here you propose another
21 strategy.  "Another strategy would be to sell
22 options, which would generate income from the
23 premium received from the purchaser."  And you
24 give an example, right?
25    A.   Right.

41 (Pages 158 - 161)

Page 162

1    Q.   And again, you have no idea whether
2  3AC ever pursued that strategy throughout its
3  entire life at any exchange?
4    A.   Correct.  I just was told what
5  occurred in that time period 12th through the
6  14th.
7    Q.   Understood.  And similarly you have no
8  idea whether 3AC was pursuing that very strategy
9  on another exchange during the period June 12th
10  through 14th, 2022?
11    A.   I would have no basis to conclude
12  that, no.
13    Q.   And nonetheless, none of that factors
14  into your analysis, your opinion stands despite
15  not having that information?
16    A.   My opinion stands based upon the
17  information that I was given.
18    Q.   Paragraph 23.3, you propose another
19  strategy.  You say "a safer option strategy would
20  involve the collaring, excuse me, of the existing
21  crypto assets in the portfolio.  A collar is the
22  sale of out-of-the-money call option and the
23  purchase of an out-of-the-money put option, it
24  effectively sets a price floor for the asset at
25  the put option strike price and sets a price

Page 163

1  ceiling at the call option strike price," and
2  then you go on to describe how that strategy is
3  protective, right?
4    A.   Correct.
5    Q.   Once again, you have no idea whether
6  3AC ever did that at any point throughout the
7  existence of that firm?
8    A.   I do not know what they -- what kind
9  of activity that they engaged in prior to this
10  time period.
11    Q.   You have no idea whether they engaged
12  in that activity during this time period
13  somewhere else?
14    A.   I do not know.  I'm not aware of that.
15    Q.   That lack of knowledge does not impact
16  your opinions in any way?
17    A.   It does not.
18    Q.   I note nowhere in this section of your
19  report do you provide any evidence of any other
20  cryptocurrency hedge funds undertaking these
21  strategies during the relevant period, correct?
22    A.   Correct.
23    Q.   You did no analysis to determine the
24  economic viability of those trades during this
25  period?

Page 164

1    A.   When you say "these trades."
2    Q.   The proposed strategies set forth in
3  Paragraph 23, 1, 2 and 3 of your report?
4    A.   If you could rephrase your question.
5    Q.   Sure.
6       You did no analysis to examine the
7  economic viability of those trades during the
8  relevant period?
9    A.   And by viability?
10    Q.   The availability of such trades at
11  terms that would be reasonable.
12    A.   I mean, I made an example here in
13  23.2, where it could have been done, but I didn't
14  have access to particular market data to do a
15  precise analysis.
16    Q.   You couldn't -- you could not say with
17  any certainty in what volume such trades could be
18  put on, for example?
19    A.   I wouldn't have certainty on that, no.
20    Q.   Or what the pricing terms would be?
21    A.   I would not know that either.
22    Q.   Is it not also the case, Mr. Lisle,
23  that one way to reduce exposure to the declining
24  price of Bitcoin or the price of Bitcoin in a
25  declining market is to sell Bitcoin for U.S.

Page 165

1  dollars, right?
2    A.   Yes, that's correct.
3    Q.   You outlined some strategies that
4  involved trades correlated with Bitcoin and
5  designed to hedge exposure to it, right?
6    A.   I do, yes.
7    Q.   But selling Bitcoin for dollars is
8  100 percent correlated with hedging your exposure
9  to Bitcoin, right?
10    A.   Just to be technical, a hedge isn't
11  selling, offsetting a particular position.  It's
12  actually trying to protect a position, but
13  selling Bitcoin is a way to alleviate exposure to
14  a declining price.
15    Q.   Your correction is correct.  Thank you
16  for that.  But you agree that selling Bitcoin for
17  dollars means you are no longer at risk to that
18  amount of Bitcoin that you just sold?
19    A.   That's right.
20    Q.   That is, in fact, the simplest way to
21  reduce one's exposure to Bitcoin?
22    A.   I feel like I'm being Mr. Technical.
23  But "simplest," I don't know.  I'm not going to
24  spend time here trying to figure that out.  But
25  yes, it is a simple way to reduce exposure,

Page 166

1    correct.
2        Q.    In Paragraph 24 of your report, sir,
3    you say "the mass sale of 3AC's FTX accounts'
4    assets that occurred during the June 12th through
5    14th time frame, there's no hallmarks of an
6    attempt by 3AC to remain solvent and live to
7    fight another day."
8        A.    Right.
9        Q.    "I am not aware of a record of any
10   trades that sought to short correlated positions
11   or to deploy an options strategy.  While there
12   was no guarantee such strategies would ultimately
13   meet that objective, a professional investor
14   would have at least made some effort to mitigate
15   its losses.  Rather, the activity in 3AC's FTX
16   accounts during that period bore all of the signs
17   of the intent to shut down as soon as this was
18   not business as usual."
19           I read that correctly?
20       A.    Yes.
21       Q.    Again, you have no idea whether 3AC
22   attempted to mitigate these losses through
23   trading strategies somewhere else?
24       A.    Correct.
25       Q.    You used the term "hallmarks."  What

Page 167

1    are some of the hallmarks of an attempt to remain
2    solvent and live to fight another day?
3        A.    So I suggested in subparagraphs 23.1
4    through 23.3 some types of strategies that could
5    be deployed that would have been a hallmark, but
6    I haven't seen anything aside from the 50,000
7    plus sales transactions that would let me believe
8    that anything else was going on besides a fire
9    sale.
10       Q.    Okay.  So that's -- those are the
11   things we just discussed essentially are the
12   hallmarks?
13       A.    They're examples of hallmarks.
14       Q.    Examples of hallmarks, okay.
15           And you have no idea what any
16   other crypto hedge fund with similar exposures to
17   those of 3AC was doing during the period June
18   12th through 14th, 2022, correct?
19       A.    I have no specific knowledge of what
20   any other hedge fund was doing at the time.
21       Q.    You have no basis, therefore, to say
22   that 3AC's response of selling assets in a
23   declining market was abnormal relative to its
24   peers, correct?
25       A.    Disagree, and the reason I disagree is

Page 168

1    because it defies imagination that out of dozens
2    hedge funds there wouldn't be a fair amount that
3    would be actually trying to do something beyond
4    just selling out its positions and alleviating
5    its long exposure.
6        Q.    Well, two things.  One, because you
7    didn't look at what 3AC did anywhere but in its
8    FTX accounts, you don't know whether 3AC was, in
9    fact, trying to do something beyond just selling
10   out its positions, correct?
11       A.    Can you restate that question?
12       Q.    Sure.  Because you only looked at one
13   set of accounts those on FTX --
14       A.    Yeah.
15       Q.    -- you have no idea whether 3AC was,
16   in fact, pursuing other strategies away from FTX?
17       A.    Right.  I have answered that before.
18       Q.    You have.
19           And two, you also have no idea
20   what trades of any kind any other hedge fund was
21   pursuing at this time because you don't have
22   access to their trading records?
23       A.    That is correct, and that's what I
24   said before.
25       Q.    Yeah.

Page 169

1            So these opinions that you're
2    offering are based purely on your purported
3    expertise and not based on any economic data or
4    trading information?
5        A.    My expertise, not purported, but aside
6    from that, no, I have no knowledge of specific
7    trading activity that 3AC was doing outside of
8    FTX during that period of time, and I don't have
9    knowledge of what particular specific other hedge
10   funds are doing.
11       Q.    Let's move on to another topic.  I
12   want to focus on part IV-B of your report now.
13       A.    What page?
14       Q.    It starts on Page 13.
15           MS. AUSTIN:  If now is okay, if you're
16   changing topics, why don't we take a short five
17   or ten-minute break.
18           MR. DUNNE:  I think we have only been
19   going a half an hour since the last break.  So
20   I'd just prefer to keep moving so I can make my
21   flight.
22           MS. AUSTIN:  Matt, are you okay or do
23   you need to take a break?
24           THE WITNESS:  I'm good.
25           MS. AUSTIN:  Okay.

43 (Pages 166 - 169)

Page 170

1    THE WITNESS:  What time is your
2  flight?
3    MR. DUNNE:  9:00 p.m. or so.  I hope
4  to make it.
5  BY MR. DUNNE:
6    Q.   All right.  Next you discuss in this
7  section the issue of financial exposure under the
8  margin program, right?
9    A.   That is correct.
10    Q.   You purport to opine that FTX was
11  financially exposed to borrower default liability
12  under its margin program.
13    A.   That's right.
14    Q.   It's your understanding that the
15  May 22 FTX terms of service govern the
16  relationship between FTX and 3AC?
17    A.   The May 22 --
18    Q.   Terms of service?
19    A.   -- TOS?
20    Q.   Yeah.
21    A.   I believe, yes.  Hold on.  Let me just
22  make sure that that's right.
23    Your question was with respect to
24  the overall relationship or were you getting at
25  the margin program as well?

Page 171

1    Q.   I was getting at both, both aspects,
2  any aspects of the relationship.
3    A.   Okay.  I mean, I believe that was the
4  last update to the terms of service that was
5  relevant to this case.
6    Q.   Okay.  You believe that's the
7  governing set of terms?
8    A.   Correct.
9    Q.   Is it your understanding that those
10  terms are governed by the laws of the United
11  Kingdom?
12    A.   I can't recall.  I'd have to look at
13  them.
14    Q.   I'll represent to you it was a UK law
15  document.  You don't have any basis to suggest it
16  was something else, right?
17    A.   No.
18    Q.   You're not a UK lawyer as we discussed
19  earlier?
20    A.   Right.
21    Q.   Nor are you an Antigua or Barbuda or
22  BVI lawyer?
23    A.   Correct.
24    Q.   Do you agree that the financial
25  exposure, if any, that FTX had is a product of

Page 172

1  whatever the legal relationship between the
2  parties was?
3    MS. AUSTIN:  Object to form.
4  BY THE WITNESS:
5    A.   Yeah, product of -- I'm not sure what
6  you mean.  Could you restate?
7    Q.   Well, what impact, if any, do you
8  believe that the terms of service had on whether
9  FTX was exposed to losses under the margin
10  lending program vis-a-vis 3AC?
11    A.   The terms of service would have been
12  the -- would have been available to all
13  participants.  They were, as far as I understand,
14  determined by and published by the Exchange
15  itself, and would have purportedly governed the
16  relationship between the participant and the
17  Exchange.
18    Q.   Your index of documents considered
19  includes the terms of service.  Did you read
20  those in full?
21    A.   I did.
22    Q.   Let's take a look at them.
23    (Deposition Exhibit 5 was
24    marked for identification.)
25

Page 173

1  BY MR. DUNNE:
2    Q.   Mr. Lisle, you have been handed a
3  document that has been marked as Exhibit 5, it
4  bears Bates numbers FTX_3AC_0000013695 through
5  13756.  It is the FTX May 2022 Terms of Service.
6  Is that the document you have in front of you?
7    A.   Yes, it is.
8    Q.   You reviewed the document?
9    A.   I did.  It has been a while.
10    Q.   You read it in full you said?
11    A.   I did.
12    Q.   Okay.  I'd like to direct you to the
13  Section 2.4.1 on Page 13697 -- 13697.
14    A.   1369 -- okay.
15    Q.   I'll try to use the Bates numbers.
16    A.   All right.  Got it.  Just so I
17  understand, you are doing that for the record?
18    Q.   Exactly.
19    A.   Okay.
20    Q.   Did you read Section 2.4.1 previously?
21    A.   Yes.
22    Q.   This section states "margin trading is
23  high risk.  As a borrower, you may sustain a
24  total loss of digital assets, fiat currency, and
25  e-money as defined in Section 8.3.2 below,

44 (Pages 170 - 173)

Page 174

1 collectively assets, in your account, or owe
2 assets beyond what you have deposited in your
3 account. When you lend assets to other users,
4 you risk the loss of an unpaid principal if the
5 borrower defaults on a loan and liquidation of
6 the borrower's account fails to raise sufficient
7 assets to cover the borrower's debt."
8        Do you see that?
9 A.  I do.
10 Q.  Do you agree this states that users of
11 the Exchange bear the risk of loss for margin
12 loans, correct?
13 A.  Users.  In what capacity?
14 Q.  Those who participate as lenders in
15 the margin lending program?
16 A.  So lenders on the platform.
17 Q.  Correct.
18 A.  Okay.  And your question is with
19 respect to their risk?
20 Q.  Yes.
21 A.  Okay.  By the terms here, I would say
22 that, you know, essentially a lender is being
23 informed that it risks loss if their loans are
24 not paid.
25 Q.  It doesn't say that FTX bears that

Page 175

1 risk?
2 A.  Nowhere there does it say that FTX
3 bears that risk.
4 Q.  Okay.  Do you have a view on the legal
5 effect of that section?
6 A.  I was not asked to opine on it from a
7 legal perspective.
8 Q.  But it's your view that FTX, in fact,
9 bore the risk of loss on margin loans, is it not?
10 A.  It is the -- that's what I have stated
11 in my opinion.
12 Q.  And that what effect, if any, does
13 Section 2.4.1 have on your view?
14 A.  The way I read Section 2.4.1 is that
15 anybody that lent on the platform, when they lend
16 their assets, took the risk of losing those, but
17 my opinion is essentially based on the fact that
18 nobody ever lost money by lending their assets on
19 the Exchange.
20        In fact, any time there was a
21 default, the evidence pointed me to the fact that
22 it was actually covered by either a -- what do
23 they call it -- a liquidity program, borrower
24 liquidity program or insurance fund.
25 Q.  And the evidence that you're referring

Page 176

1 to is testimony of witnesses in the case; is that
2 right?
3 A.  Yes.
4 Q.  And that was testimony that Latham &
5 Watkins selected and directed you to?
6 A.  That is correct.
7 Q.  And you summarized that testimony in
8 your report at various places?
9 A.  I do.
10 Q.  Okay.  And you did not take into
11 account the terms of services and whatever their
12 legal impact might be?
13 A.  My opinion does not state Rule 2.4.1,
14 or not rule, provision.
15 Q.  Reading provision 2.4.1 has no impact
16 on your opinions in your view?
17 A.  Well, no, it does.  I mean, there's
18 certainly discussion of what they called a
19 clawback program, and I believe the clawback
20 program was essentially justified by the
21 provision 2.4.1 in the contract or the terms of
22 service.
23 Q.  Let me direct to you Paragraph 16.4 on
24 page that ends in Bates number 711.  It is
25 numbered Page 17.

Page 177

1 A.  I see it.
2 Q.  This section says "When you lend
3 assets to other users, you risk the loss of an
4 unpaid principal if the borrower defaults on a
5 loan and liquidation of the borrower's account
6 fails to raise sufficient assets to cover the
7 borrower's debt.  Although we take precautions to
8 prevent borrowing users from defaulting on loans,
9 the high volatility and substantial risk of
10 illiquidity in markets means we cannot make any
11 guarantees to any users using the service against
12 default."
13        Do you see that?
14 A.  I'm sorry.  I actually -- did you read
15 the whole provision?  I must have --
16      MS. AUSTIN:  Where are you?
17      MR. DUNNE:  Is that 16.3?  I referred
18 to 16.4 and I was reading 16.3.
19      THE WITNESS:  Okay.  Is that where you
20 want to direct me to?
21 BY MR. DUNNE:
22 Q.  Yeah.
23 A.  So let me take a moment here.
24 Q.  Take a look.
25        I think I read it correctly when

45 (Pages 174 - 177)

1 you correct for the number of this section.
2     A.   Okay.  I read it.
3     Q.   Had you read this section previously?
4     A.   I have.  Yes.
5     Q.   And do you discuss this section in
6 your report anywhere?
7     A.   I don't.
8     Q.   What impact do you believe that this
9 section has on whether FTX was financially
10 exposed to borrower default risk on the margin
11 program?
12     A.   The only thing that I see is that they
13 take precautions to prevent barring users from
14 defaulting on loans, but they don't guarantee.  I
15 take that to mean that the deployment of the BLP
16 and/or the insurance fund are those precautions.
17     Q.   Right.  And this section also tells
18 users of the Exchange that participating in these
19 programs could lead those users to lose money,
20 right?
21     A.   There's the risk of loss.
22     Q.   That's clearly set forth in there?
23     A.   It is.
24     Q.   Doesn't that mean that users bore the
25 risk of loss in connection with the margin loans

1 on the FTX platform?
2     A.   The way I understood it if you chose
3 to lend your assets, those assets would be put
4 into a pool for borrowers to borrow from, and
5 there was under this term no ultimate guarantee,
6 but I'm also told that there never was a loss
7 from providing a loan where a borrower defaulted
8 and that was because the BLP or the insurance
9 fund was deployed in order to protect against,
10 you know, reputational damage from the impact of
11 a loan being defaulted on and impacting a lender.
12     Q.   You would agree, wouldn't you, that
13 the question of the financial exposure turns on
14 the legal rights and obligations that parties
15 have, doesn't it?
16         MS. AUSTIN:  Object to form.
17 BY THE WITNESS:
18     A.   I have not been asked to opine on
19 legal, you know, what the legal rights and
20 obligations are.  If you could rephrase, I'm
21 happy to try and answer it.
22     Q.   I understand you are not opining on
23 what the legal rights and obligations are, but
24 you do agree, don't you, that the financial
25 exposures that a user has vis-a-vis FTX and vice

1 versa stem from the contractual relationship
2 between them?
3         MS. AUSTIN:  Same objection.
4 BY THE WITNESS:
5     A.   So these terms of service purport to
6 govern the relationship between the user and the
7 Exchange.
8     Q.   Yeah.
9     A.   And to the extent that that they have
10 any legal impact, then I suppose, yes, they
11 govern.
12     Q.   And so how do you divorce the question
13 of financial exposure from that of the legal
14 rights and obligations of the parties in this
15 context?
16     A.   I don't think that I'm contesting nor
17 I don't think I have been unclear about my
18 opinion that a user or a lender would not have
19 technical risk under the terms of service.
20         My opinion is focused on the types
21 of programs put into place as a quote/unquote
22 precaution against lender -- I mean, borrowers
23 defaulting and exposing a user to those potential
24 loss.
25     Q.   All right.  So you're not interpreting

1 the terms of service in any way in connection
2 with forming this opinion?
3     A.   No.  When I talk about a, for example,
4 the clawback program, I think that's a specific
5 acknowledgement that the terms of service as set
6 forth here were certainly potentially a risk to
7 the lender, but what I am told is that there were
8 no actual losses by lenders from a clawback
9 provision, primarily I believe based upon
10 testimony that the clawback provision was not
11 even coded into the Exchange itself.
12     Q.   And so your -- the basis for your
13 assessment that FTX was financially exposed here,
14 is it entirely from the testimony of the
15 witnesses whose depositions are cited in this
16 section?
17     A.   Not just depositions.  I believe there
18 was Congressional testimony as well, and there
19 was also I believe an explainer on the BLP as
20 well as margin loan program I believe also talked
21 about this.
22     Q.   Okay.  But, put differently, it's not
23 coming from your industry expertise, it's coming
24 from your review of documents produced in this
25 litigation, deposition transcripts, and there's

46 (Pages 178 - 181)

Page 182

1  that instance of Congressional testimony; is that
2  right?
3      A.   That's right.
4      Q.   This isn't a broad industry program.
5  You're talking in this section of your report
6  about a specific FTX program?
7      A.   That's correct.
8      Q.   And you cite some of the transcripts
9  that you relied on and the documents and the
10  footnotes in the 50s and 60s, footnotes 50, 51
11  through 60s; am I right about that?
12      A.   So 51 would be explainer of, the next
13  one is due diligence, business -- yeah, and there
14  was some SBF deposition -- deposition cited where
15  SBF is talking about the BLP, direct testimony in
16  57 of SBF about the insurance fund.  So, yes,
17  it's based upon those footnotes.
18      Q.   And your report identifies that
19  relevant testimony and summarizes it for the
20  court here, is that what it's doing?
21      A.   Summarizes it.  I suppose I am basing
22  my opinion, you know, in part on testimony in
23  those cases, yeah.
24      Q.   In fact, take an example, let's look
25  at Paragraph 36.

Page 183

1      A.   Okay.
2      Q.   You say in Paragraph 36 "if the
3  BLP --" that's backstop liquidity provider,
4  right?
5      A.   Yes.
6      Q.   "-- was insufficient, then any loss
7  would be absorbed by FTX in the form of the
8  insurance or backstop fund, a commitment of at
9  least several hundred million dollars by FTX to
10  absorb the first risks of loss."  And you have
11  got footnotes 53 and 54 there, correct?
12      A.   Yes.
13      Q.   You cite in those footnotes
14  extensively to Sam Bankman-Fried's deposition and
15  to some documents, correct?
16      A.   That's correct.
17      Q.   Okay.  And that paragraph is your
18  summary of what Sam is saying about the backstop
19  liquidity provider program?
20      A.   Yes.  Yes.
21      Q.   Again, that's not something that you
22  could have gained through your industry expertise
23  because this is something very specific to FTX
24  that you're saying Sam administered?
25      A.   Well, certainly, and I think it -- I

Page 184

1  don't know if Sam administered -- Sam, I'm not
2  sure was FTX -- all of FTX.  But FTX certainly
3  administered these programs.  I can't recall if,
4  you know, I actually came into contact with the
5  BLP or insurance fund.  I don't think I did.
6          But regardless, this was the
7  information that was given to me and it included,
8  you know, sources beyond testimony in cases.
9          So, you know, I took all of that
10  and put it together to, you know, formulate that
11  part of my opinion.
12      Q.   But there's no -- there's no
13  methodological framework involved in analyzing
14  these witness's testimony, right?  You're
15  summarizing the parts that you think are
16  relevant?
17      MS. AUSTIN:  Object to form.
18  BY THE WITNESS:
19      A.   Summarizing, well, I mean, I would put
20  it the other way.  My opinion is based upon
21  evidence and some of that evidence comes from
22  those depositions.
23      Q.   In Paragraph 36 and 37, you're
24  summarizing the depositions and documents that
25  purport to serve as the basis for your opinion?

Page 185

1      A.   That's correct.
2      Q.   These are, again, sections of the
3  depositions that were identified for you by
4  Latham & Watkins, right?
5      A.   Latham provided me with depositions
6  and in most -- in many cases pointed me to
7  relevant portions of that testimony.
8      Q.   There's no reason to believe that
9  Latham & Watkins couldn't be perfectly capable of
10  the summarizing these documents in the same way
11  you have, correct?
12      MS. AUSTIN:  Object to form.
13  BY THE WITNESS:
14      A.   I'm not sure I can answer that because
15  I'm not sure I need -- I don't know what they
16  could or could not do and they didn't in this
17  case.
18      Q.   Was there any industry expertise
19  you're bringing to bear in summarizing Sam's
20  testimony, for example, on these particular
21  subjects?
22      A.   Industry expertise is not particularly
23  relevant here because essentially I'm focusing on
24  testimony as well as documentation from FTX
25  rather than trying to summarize any of my

47 (Pages 182 - 185)

Page 186

1  experience.
2      Q.   But you didn't -- you didn't select
3  the documents or testimony to summarize here,
4  Latham did that for you?
5      A.   Latham provided a -- the documentation
6  in full, explainers and so forth, which I
7  reviewed on my own, but with respect to
8  depositions and things like that that were
9  lengthy documents, they pointed me to relevant
10  portions.
11     Q.   You just recited the relevant portions
12  in your report?
13         MS. AUSTIN:  Object to form.
14  BY THE WITNESS:
15     A.   I took -- I reviewed the testimony and
16  took the portions which I thought were relevant.
17     Q.   Do you have any reason to believe that
18  the court in this case is incapable of reviewing
19  the testimony and determining what portions it
20  believes to be important?
21     A.   Which court?  I'm sorry.
22     Q.   The bankruptcy court.
23     A.   The court we're in front of?
24     Q.   Yeah.
25     A.   And I'm sorry, your question?

Page 187

1      Q.   Sure.
2      A.   I wasn't following.
3      Q.   My question was do you have any reason
4  to believe that the court in this case is
5  incapable of reviewing the testimony of the
6  witnesses and determining what it believes to be
7  important?
8      A.   I believe that all relevant evidence
9  is within the purview of the court.
10         MS. AUSTIN:  Mr. Dunne, we've been
11  going about an hour, if it's a good time, if we
12  can take a break.
13         MR. DUNNE:  We can take a break.
14         THE VIDEOGRAPHER:  We are going off
15  record at 2:52 p.m.
16         (Break in the proceedings
17         taken at 2:52 p.m.)
18         THE VIDEOGRAPHER:  We are back on
19  record at 3:08 p.m.
20         You may proceed.
21  BY MR. DUNNE:
22     Q.   Mr. Lisle, I'd like to just try to
23  understand what the sort of counterfactual would
24  be for this section of your report.
25         So what would have supported in

Page 188

1  your view the contrary conclusion, i.e., that FTX
2  was not financially exposed to borrower default
3  risk under the margin program?
4      A.   I'm sorry.  You are asking me to
5  provide a contra?
6      Q.   Like a hypothetical that would lead
7  you to the opposite conclusion so I can help
8  understand how you drew this conclusion.
9         MS. AUSTIN:  Object to form.
10  BY THE WITNESS:
11     A.   I'm not -- I don't understand that
12  question.  I mean, can you -- first of all, I
13  made my opinion.  I'm not going to, like, deviate
14  from that opinion, and so if you are asking me to
15  come up with a set of facts to try and contradict
16  myself, it -- I'm not going to do that.
17     Q.   That's not quite what I was actually
18  trying to do.
19         What I was trying to do is
20  understand, like, what different set of facts,
21  i.e., facts you did not see would have caused you
22  to come to a different opinion.
23         So for example, would you have
24  come to a different opinion if these witnesses
25  whose testimony you summarized had said, like,

Page 189

1  the exact opposite, that FTX never backstopped
2  any sort of losses on any of these programs but
3  rather always socialized them?
4         MS. AUSTIN:  Object to form.
5  BY THE WITNESS:
6      A.   That's a -- it's a strange question,
7  and to the extent that I understand it --
8  actually, I really don't understand where we're
9  going with this.
10         Like I said before, I feel like I
11  made an opinion based upon facts that were given
12  to me.  Those facts establish that these
13  particular mechanisms were in place, and that
14  they functioned and they functioned well enough
15  that a clawback was not even necessary.  In fact,
16  that was never even part of the code as far as I
17  understand.
18         So when you're saying, you know,
19  can you come up with any particular argument or I
20  mean, set of facts that would contradict what
21  you're saying, that doesn't make any sense to me.
22     Q.   Okay.  But -- let me ask a different
23  question then.  That's fine.
24         I think -- we have talked about
25  the terms of service a little bit, and am I

Page 190

1  correct that your opinion does not consider any
2  legal obligations created by the terms of service
3  under UK law?
4      A.   Well, I'm not an expert in UK law, and
5  I did not opine on the legal effect of the terms
6  of service.
7          My opinion does focus not
8  necessarily on the legalistic or the legalisms.
9  It focuses on what actually happened, and what
10 actually happened was that there was a program in
11 place that purported to be something, but in
12 reality, was not.
13         And so when I say that, what I
14 mean is even if the lenders had technical risk,
15 it bore out that FTX never actually permitted
16 lenders to get exposed to losses.  In fact, it
17 was not in their interest to do so.
18         They actually made testimony in
19 Congress to say that they had established
20 protections around customer funds, things like
21 that.
22         Industry was aware of this
23 insurance fund.  Industry was aware of the
24 backing of the Exchange itself, and to have a
25 default that would have occurred from a lender

Page 191

1  not being paid back, they would have suffered a
2  great deal of reputational damage.  That was my
3  opinion.
4      Q.   All of that comes from reviewing the
5  documents and the testimony that you have cited
6  here?
7      A.   All of it is based upon the evidence
8  that I have, yeah, footnoted.
9      Q.   It is based on what the witnesses and
10 the documents said?
11     A.   Yes and my reading of those, yes.
12     Q.   And you -- you know, you mentioned in
13 response to several of my questions that Latham
14 provided you with the relevant documents and
15 directed you to portions of relevant testimony,
16 right?
17     A.   Latham provided me with documents, and
18 in certain cases where they were lengthy,
19 directed me to the relevant portions of those
20 documents.
21     Q.   Did you ever ask Latham to provide you
22 with documents, if any, that were inconsistent
23 with the opinions you were offering?
24     A.   I never asked them to provide me with
25 documents that were inconsistent with what they

Page 192

1  had offered.
2      Q.   So you don't know if such documents
3  exist, you only have based your opinions on the
4  documents that were provided to you?
5      A.   My opinions are based upon my
6  experience as well as my reading of the evidence
7  at hand.
8      Q.   Okay.  Let me direct you to
9  Paragraph 31 of your report on Page 15.
10     A.   Page 15?
11     Q.   Yes, sir.
12     A.   Okay.  31.  Got it.
13     Q.   There's a section -- a subsection
14 heading here entitled Borrowers Obligations Under
15 The Margin Program Were to FTX Only?
16     A.   That's correct.
17     Q.   I want to be, again, very clear that
18 you are not addressing in this section what the
19 legal obligations of the borrowers are under the
20 relevant terms of service and other operative
21 documents?
22     A.   I am not focused on the legal terms of
23 the document.  I am more focused on what I was
24 told actually was the case.
25     Q.   Okay.  You were focused on the facts?

Page 193

1      A.   Yes.
2      Q.   But you do agree that ultimately, the
3  obligations and liabilities discussed herein are
4  the product of a legal framework?
5          MS. AUSTIN:  Object to form.
6  BY THE WITNESS:
7      A.   Yeah.  I don't necessarily agree for
8  the -- when you're actually doing trading and
9  participating on an exchange and acting as a
10 hedge fund, I don't think you're at every moment
11 taking into account the various provisions of
12 legal documents.
13         I think you tend to rely on
14 experience, rely on, you know, the operation of
15 the Exchange as you see it.  You rely on a great
16 deal of just experience with the Exchange.
17         So to the extent that an Exchange
18 and a legal document are part and parcel, I'm not
19 sure that that lives up to the billing only
20 because, you know, this is not necessarily an
21 exchange built on technology is a product of a
22 set of rules.
23     Q.   I'm not quite sure I understood that,
24 but my question is the rights and obligations
25 that 3AC and FTX had with respect to each other,

49 (Pages 190 - 193)

Page 194

1  they're governed by the terms of service, right?
2      MS. AUSTIN:  Object to form.
3  BY THE WITNESS:
4      A.   They are -- I mean, I wasn't
5  necessarily asked to opine, again, on the legal,
6  you know, the legal relationship and obligations
7  of the parties.  What I was asked to opine upon
8  was from the standpoint of experience from the
9  standpoint of what I was told was a set of facts.
10      It looks as if FTX actually was on
11  the hook and was exposed to the extent that it
12  maintained let's call it a set of backstops or
13  precautions against lender default -- I mean
14  borrower default risk.
15      Q.   What I'm trying to really make sure
16  we're clear on is this "on the hook piece."  It
17  sounds like you are not saying that, as a legal
18  matter, FTX had any particular obligation, but
19  rather, that you're saying that as a practical
20  matter, from your review of the factual record,
21  they did certain things; is that fair?
22      A.   I am not opining on the legal
23  obligations with respect to the parties and the
24  governance.
25      What I am opining on is a set of

Page 195

1  circumstances and facts that dictate my opinion
2  in that and I have already explained that opinion
3  so I won't --
4      Q.   Okay.
5      A.   -- belabor.
6      Q.   What I'm stuck on is really on the use
7  of the term obligation.  Again we talked about
8  this section heading borrower's obligations under
9  the margin program?
10      A.   Hm-hmm.
11      Q.   Is it -- are you saying that
12  obligation is not really the right word there,
13  that you would -- you would rephrase that to say
14  something more like "as a practical matter, FTX
15  did something with respect to the losses on the
16  margin program" or something like that?
17      A.   I would disagree.  I say obligation in
18  the sense of a general sense, not legally, but a
19  general sense of my intention there is to say
20  that borrowers were obligated to pay FTX back
21  based a set of factors, which would have included
22  the fact that FTX was administering the program,
23  based upon the fact that it doesn't seem like the
24  pool of assets to borrow from was actually
25  technically connected to the pool that was

Page 196

1  allowed to be borrowed from.  It's based upon,
2  you know, other types of factors that I point to
3  here, leading to my sort of broad term borrower's
4  obligations under the margin program were to FTX
5  only.
6      Q.   But what that's really getting at is
7  as a practical matter, the facts, as you believe
8  them to exist, showed that's where the money did
9  go?
10      A.   The money went -- what money?  I'm
11  sorry.
12      Q.   Payment on a margin loan or something
13  equivalent.  Again, I'm struggling with the use
14  of the term obligations, which to me sounds like
15  a legal term.  It sounds like what you were
16  describing is more of the factual flow of funds
17  in practice?
18      A.   I don't think that given the set of
19  circumstances that I see, that a borrower had any
20  obligation to a particular lender.  There was no
21  agreement between the borrower and the lender.
22  The obligations appeared to be between the
23  borrower and FTX.
24      Q.   All right.  And that's -- I'm sorry.
25  Were you finished with your answer?

Page 197

1      A.   And then in practice, that's exactly
2  what happened.
3      Q.   All right.  And that comes from your,
4  again, summary of the deposition testimony and
5  the documents you cited?
6      A.   My reading based upon my observation
7  and experience of the information that I cited,
8  yes.
9      Q.   How was your experience playing into
10  the -- your observation of what the witnesses and
11  documents said here?
12      A.   Well, my experience is with respect to
13  trading and lending, and in this particular
14  instance, we are talking about the lending for
15  the purpose of trading.  So I think my experience
16  is highly relevant in terms of pointing out that
17  there was a set of circumstances that dictate
18  that there was a particular obligation which
19  seemed to me to be between the borrower and the
20  Exchange and the lender and the Exchange, and I
21  didn't see that there was an actual connection
22  direct between the borrowers and the lenders.
23      And so I set out in my opinion
24  that there are actually reasons to believe that
25  there would not have been any way for a

50 (Pages 194 - 197)

Page 198

1 particular loan and a default on that loan to be
2 actually assessed to any particular lender or
3 lenders, and as a result, it seems as if it was
4 all kind of fabricated.
5     Q.   You said there wouldn't have been any
6 way for a particular loan in default to be
7 actually assessed to any particular lender,
8 that's what you said?
9     A.   There -- I -- to be clear, what I
10 said -- I think what I said is given a particular
11 loan and a borrower say borrowing 10 Bitcoin,
12 that Bitcoin most probably -- the provenance of
13 that Bitcoin, the origin of that Bitcoin was in a
14 particular pool handled by FTX, and there would
15 not, had there been a default, a way to trace the
16 lent assets to particular lenders, and as a
17 result, it appeared to me as if really, in
18 reality, there wasn't a bilateral peer-to-peer
19 going on, but there was actually a program that
20 was being administered by FTX itself.
21     Q.   Okay. That's helpful. I think I
22 understand that. But in that hypothetical that
23 you pose with the 10 Bitcoin, the losses on any
24 loan associated with that 10 Bitcoin certainly
25 could have been socialized across all lenders of

Page 199

1 Bitcoin, right?
2     A.   I believe the clawback provision that
3 was discussed in my opinion essentially, you
4 know, that was a potential consequence.
5     Q.   Okay. I'm correct that you did not
6 look at the FTX code base governing the margin
7 program, right?
8     A.   I did not, no.
9     Q.   At Footnote 41, you cite some
10 deposition testimony of Sam Bankman-Fried for the
11 proposition set forth in the first sentence of
12 Paragraph 31, which is that the obligation to
13 repay borrowing liabilities under the margin
14 program was to FTX, not to any specific lending
15 customer, repayments were made to FTX and not
16 credited to any particular lending customer, and
17 they did not decrease any specific lending
18 customer's loan, right? You cite Sam's testimony
19 for that?
20     A.   I cite to his testimony, yes.
21     Q.   That was his deposition testimony in
22 this matter? That's your understanding?
23     A.   The citation is to his testimony.
24 Yes.
25     Q.   These are the portions to which 3AC's

Page 200

1 counsel directed you?
2     A.   3AC directed me to the specific parts
3 of his deposition which would have included this.
4     Q.   Earlier today we talked about your
5 assessment of the credibility of Sam
6 Bankman-Fried's testimony, and I take it you
7 believe that the testimony that you cited here
8 was, in fact, credible?
9     A.   From the standpoint of the
10 deposition --
11     Q.   Yeah.
12     A.   -- post sentencing?
13     Q.   Right.
14     A.   Yes, that's what I said.
15     Q.   You mentioned and we had a back and
16 forth about one of the reasons that you believed
17 his testimony to be credible was that by the time
18 of his deposition at least, he had already been
19 sentenced and was behind bars?
20     A.   Yes.
21     Q.   I take it you sort of thought he
22 didn't have much to lose anymore basically by
23 telling the truth?
24         MS. AUSTIN: Object to form.
25

Page 201

1 BY THE WITNESS:
2     A.   I think what I said was something
3 along the lines of he had no incentive to lie or
4 to be unclear or to obfuscate, I believe I used
5 that term.
6     Q.   That is what you said, I think,
7 something like that. Are you aware that
8 Mr. Bankman-Fried had a criminal appeal argument
9 pending at that time?
10     A.   I am not.
11     Q.   Does the fact that he had an appeal
12 pending at the time of his deposition, which has
13 still not been resolved, in any way change your
14 views in whether -- with respect to whether he
15 had any incentive to testify untruthfully?
16     A.   I'm really not -- I don't know what is
17 being appealed, and I don't know any of the
18 circumstances around that. So I wouldn't be able
19 to comment on whether I would change my opinion
20 or not.
21     Q.   Okay. Let's take a look at his
22 deposition testimony.
23         (Deposition Exhibit 6 was
24         marked for identification.)
25

Page 202

1  BY MR. DUNNE:
2      Q.   Mr. Lisle, you have been handed a
3  document that has been marked as Exhibit 6 to
4  your deposition.  It is the transcript of the
5  deposition of Sam Bankman-Fried in this matter
6  taken on October 16, 2025.
7          Is that what you have in front of
8  you, sir?
9      A.   That is.
10     Q.   Again, you read portions of this to
11 which you were directed but you didn't read the
12 whole thing previously?
13     A.   I have not read the whole thing.
14     Q.   Let me direct you, please, sir, to --
15 it is near the end -- pages 242 through the end
16 of the deposition.  Feel free to take a look at
17 it.  My first question will be if you have read
18 this portion before?
19         MS. AUSTIN:  Mr. Lisle, take your
20 time.
21         THE WITNESS:  Okay.
22 BY MR. DUNNE:
23     Q.   Had you read this section before?
24     A.   I have not.
25     Q.   You saw in there, I take it, there

Page 203

1  were references to John Ray is one of Sam
2  Bankman-Fried's enemies and Sullivan & Cromwell
3  as the, quote, original sin?
4      A.   Yes.
5      Q.   You saw that.
6          And with respect to Mr. Ray being
7  an enemy of Sam Bankman-Fried, Mr. Bankman-Fried
8  was asked the following, this is on Page 243: "I
9  take it that you refer to him," meaning John Ray,
10 "as an enemy because he cooperated with the
11 government in prosecuting you, correct?"
12         Mr. Bankman-Fried responded:  "I
13 call him an enemy because he lied repeatedly and
14 viciously about me while destroying billions of
15 dollars of value for FTX and its numerous
16 stakeholders while also cooperating improperly
17 and in bad faith with the government to prosecute
18 me for things I'm innocent of."
19         Do you see that?
20     A.   Yes.
21     Q.   In light of any of this, do you
22 believe that Sam -- Sam's credibility with
23 respect to his testimony on matters impacting 3AC
24 is at the very least somewhat suspect?
25     A.   I am failing to see the connection

Page 204

1  between his animosity toward John Ray and, you
2  know, the facts at hand here with respect to, you
3  know, the lending program at FTX.
4          So I don't necessarily think that
5  that has any bearing on, you know, the transcript
6  and what I took to be his views about, you know,
7  generally with the program and how it worked.
8      Q.   So the answer is no, you don't believe
9  that his credibility is affected by what you have
10 seen here?
11     A.   His credibility on the particular
12 testimony that I'm citing here in my report.
13     Q.   You agree, I take it, that
14 Mr. Bankman-Fried likely does not think very
15 highly of the FTX debtors and the Recovery Trust
16 and Sullivan & Cromwell, right?
17         MS. AUSTIN:  Object to form.
18 BY THE WITNESS:
19     A.   Yeah.  Could you rephrase that?
20     Q.   Sure.  You don't dispute, do you, that
21 Mr. Bankman-Fried has strong views about FTX, the
22 current FTX, not the business he ran, but the FTX
23 debtors and Sullivan & Cromwell, right?
24     A.   From this testimony, he is admitting
25 to the fact that he has animosity to John Ray.

Page 205

1  I'm not sure we're at the point of S&C, but if
2  we're just focusing here on 243 at the top, yeah,
3  I mean, I think that it's fair to say that you
4  call him -- you know, he's clear.  He says that
5  he's an enemy because he lied repeatedly and
6  viciously about me while destroying billions of
7  dollars of value for FTX.
8      Q.   But in light of that, you are still
9  confident that the portions that you relied on at
10 least are credible?
11     A.   Yes, for the purpose of my opinion.
12     Q.   Do you have a view as to whether
13 Mr. Bankman-Fried was prosecuted for things he
14 was innocent of?
15     A.   That's a really, really broad
16 question.  And there are many -- I think that
17 his -- the crimes for which he was prosecuted
18 were broad.  I don't have a full grasp or
19 understanding of all of those crimes.  I don't
20 have a full grasp of all of the facts that were
21 relevant to those crimes.
22         So, you know, for me to answer
23 that question, I'm not sure I could.
24     Q.   Okay.  You don't have a view one way
25 or the other as you sit here today as to whether

Page 206

1  Sam Bankman-Fried was innocent?
2      A.   I don't have a view.  I don't.
3      Q.   You cited in Footnote 41 of your
4  declaration to Page 111 of his deposition
5  testimony; is that right?
6      A.   Yes.
7      Q.   On that Page 111 when
8  Mr. Bankman-Fried was asked about payments under
9  the margin program, he's asked "If I'm a
10 customer, and I want to borrow U.S. dollars, the
11 code base does not identify a particular customer
12 lender that provided dollars to me, right?"
13         And he said, "Not to my knowledge,
14 although I didn't write the code base so I'm not
15 sure exactly."
16     Right?
17     A.   Yes, that's accurate as to what he
18 said.
19     Q.   Why did you not cite that portion of
20 the testimony in Footnote 41?
21     A.   Well, for one, he's not an expert.
22 He's saying that he didn't write the code.
23     No. 2, I believe in my opinion I
24 do cite to I believe it was Mr. Wang's testimony
25 with respect to -- was it Mr. Wang?  I'm sorry.

Page 207

1  Let me look in my opinion.  Hold on.
2         So in Paragraph 32 of my opinion,
3  I cite to the deposition testimony of Nils
4  Molina, who purportedly was a developer that
5  developed the code base.  And I believe that when
6  he's talking about the code base, that he didn't
7  have familiarity with the code base, so that
8  would not have been something I would need in my
9  opinion.
10     Q.   But in Footnote 41, where you said the
11 obligation to repay borrowing liabilities under
12 the margin program was to FTX, not to any
13 specific lending customer, repayments were made
14 to FTX and not credited to any particular lending
15 customer and they did not decrease any specific
16 lending customer's loan, all you cited for that
17 sentence was Mr. Bankman-Fried's testimony from
18 pages 111 and 112 of his deposition, right?
19     A.   Well, I'm citing there as certainly as
20 support and it's good support, but in reality, I
21 think the terms of service, all the documents we
22 have been talking about, how the actual Exchange
23 and lending program worked, I think it's easy to
24 deduce that a specific lending customer would be
25 expecting repayments to be made from FTX itself

Page 208

1  and that's exactly how it was administered.
2      Q.   Okay.  But focusing on that footnote
3  and that citation, you cited Mr. Bankman-Fried
4  for that one and you omitted from the quoted
5  language the part where he says "but I'm not sure
6  exactly because I didn't write the code"?
7      A.   I did not put in the part about he
8  says "although I didn't write the code base."  I
9  did not put that in.
10     Q.   And you were just referring, I think,
11 to Paragraph 32 and Mr. Molina's testimony?
12     A.   That's correct.
13     Q.   And this paragraph goes on for a bit
14 and it contains several footnotes, all of which
15 are to Mr. Molina's deposition testimony?
16     A.   That's what it purports, yes.
17     Q.   Again, you are not a programmer
18 yourself and didn't look at the code, right?
19     A.   That's correct.
20     Q.   So, in this paragraph, you are simply
21 reciting and summarizing what Mr. Molina said at
22 his deposition about how the code functioned?
23         MS. AUSTIN:  Object to form.
24 BY THE WITNESS:
25     A.   Let me take a second.

Page 209

1      Q.   Sure.
2      A.   Okay.  I'm sorry.  Restate your
3  question.
4      Q.   Yes, I will.
5         In this paragraph, you are simply
6  reciting and summarizing what Mr. Molina said at
7  his deposition about how the code functioned?
8         MS. AUSTIN:  Same objection.
9  BY THE WITNESS:
10     A.   Well, I'm certainly assessing his
11 testimony.  I am, as I said, not an expert in
12 code myself.  So I wouldn't have been able to
13 come to that conclusion, but I am taking his
14 testimony and using it, but I also make points
15 that it doesn't appear that his code contained
16 restrictions and that it would necessarily have
17 checked before allowing a loan to actually go
18 through.
19     Q.   But the authority for the -- well, let
20 me back up.
21         You wrote that the code does not
22 appear to contain any restrictions that would
23 require the system to check for available
24 lenders, that is the sentence you were just
25 referring to, right?

53 (Pages 206 - 209)

Page 210

1    A.   That's right.
2    Q.   The authority for that sentence is
3  Mr. Molina's deposition testimony?
4    A.   That's right.
5    Q.   It's not like you looked at the code
6  and saw it did not contain any restriction?
7    A.   Yes, I said that.  Right.
8    Q.   You're summarizing what Mr. Molina
9  said about the code?
10       MS. AUSTIN:  Object to form.
11 BY THE WITNESS:
12   A.   I'm summarizing -- I suppose
13 summarizing isn't necessarily what I was doing.
14 I mean, I was processing it, I was assessing it,
15 I was, you know, doing what I needed to do in
16 order to arrive at conclusions, but I'm not
17 necessarily reciting and parroting exactly what
18 he was saying.
19   Q.   You had no way to assess what he was
20 saying about the code, right?  I mean, you didn't
21 look at the code one way or the other?
22   A.   I am not a software expert and I did
23 not look at the code.
24   Q.   So what you did here is you read and
25 summarized portions of his testimony about how

Page 211

1  the code functioned?
2        MS. AUSTIN:  Object to form, asked and
3  answered.
4  BY THE WITNESS:
5    A.   So what I am trying to say or I have
6  been saying I think is that Mr. Molina was the
7  expert.  He actually designed and built the code.
8  I read his testimony, I assessed it, and I made
9  it part of my argument, but I'm not necessarily,
10 you know, simply just taking his -- his
11 testimony, putting it in here, and necessarily,
12 you know -- I don't think it's relevant that, you
13 know, I need to have expertise because that's not
14 necessarily what my opinion is based upon.
15   Q.   Right.  But when you say you assessed
16 it, you mean you assessed its credibility, right,
17 is that what you mean in this context?
18   A.   I assessed its credibility, but I also
19 assessed it for its impact on my general
20 conclusion that because of the way that the
21 Exchange was actually built sort of aligned with
22 my general theory that or my conclusion that, in
23 reality, the obligations were to the Exchange.
24   Q.   But there's a bit of a circularity
25 that is giving me a problem, which is the basis

Page 212

1  for that conclusion that the obligations were to
2  the Exchange is simply Mr. Molina's testimony,
3  right?
4    A.   I think Mr. Molina's testimony and
5  what I cited here is part of a greater opinion
6  that the actual program, as it worked, didn't
7  necessarily purport or didn't necessarily align
8  with how it was purported to be, and as a result,
9  it wasn't a peer-to-peer lending program so to
10 speak.  It was actually a lending program that
11 FTX administered, and that it happened to be
12 administered through code was sort of secondary
13 to my conclusion that it was still a function
14 carried out by the Exchange, and that my
15 conclusion also arrived at -- I also arrived at
16 the conclusion that, in reality, the Exchange was
17 actually liable for obligations to lenders.
18   Q.   Again, when you say liable, you are
19 not talking about legal liability, right, because
20 that would be under a UK law contract you weren't
21 interpreting?
22   A.   That's correct.
23   Q.   And so I want to understand your
24 methodology that you employed here, it was to
25 read and summarize in your report the documents

Page 213

1  and portions of testimony to which you were
2  directed for these propositions; is that right?
3        MS. AUSTIN:  Object to form, misstates
4  prior testimony.
5  BY THE WITNESS:
6    A.   Yeah.  Could you restate the question,
7  please?
8    Q.   Sure.  Let me ask it just as an
9  open-ended question.
10       Apart from reading and summarizing
11 the documents and testimony in this section, what
12 methodology did you employ in forming your
13 opinions in this section of your report?
14       MS. AUSTIN:  Object to form and
15 misstates prior testimony.
16 BY THE WITNESS:
17   A.   Well, I mean, to restate what I have
18 said before, the coding was simply technological
19 methodology of the program, and my opinions
20 aren't to the, you know, the efficacy of that
21 code, the efficiency of the code, or what have
22 you.
23       My opinions are to how the actual
24 program worked, and the way it worked gave all
25 indicia of the fact that all obligations were

54 (Pages 210 - 213)

Page 214

1  actually to FTX, that a user would not or a
2  borrower would not ever suspect that it had a
3  particular obligation to a particular lender, but
4  that it was paying fees, interest, all that, to
5  FTX.
6            My opinion also contains the basis
7  or the foundation that a program of this nature
8  would align with the objectives of the Exchange
9  business, which also would benefit from providing
10 leverage to traders that could then trade more.
11 So there was ultimate benefit to FTX for running
12 it.
13           So I don't think that basing my
14 opinion on, you know, some technological
15 expression or explanation of what the coding was
16 intended to do was necessarily a big part of my
17 opinion here.  It was certainly just
18 acknowledging and looking to the actual mechanism
19 by which lending was actually carried out.
20    Q.   Your opinion in this section does not
21 come from anything other than FTX witness's
22 testimony and FTX documents, right?
23    A.   No.  I am saying that based upon my
24 experience and also the knowledge of the
25 particular workings of the Exchange, that it

Page 215

1  appears to me that this did not actually align
2  with how this program was advertised.  In fact,
3  as I said before, and my opinion speaks for
4  itself, that the program was in all aspects
5  carried out by FTX and benefitted them.
6     Q.   Do you believe that any objective
7  observer could read these documents and testimony
8  and come to that conclusion?
9          MS. AUSTIN:  Object to form.
10 BY THE WITNESS:
11    A.   Any objective person could just read
12 and just off the street come to these same
13 conclusions?  No, I don't think anybody could
14 come off the street and read this stuff and make
15 any heads or tails out of this.  I think that it
16 requires a set of, you know, skills and
17 experience that I have accumulated over time, and
18 that has led me to the opinions as I have stated
19 and I stated my opinion.
20    Q.   You believe that there is some unique
21 industry experience that gives you the ability to
22 interpret and draw conclusions from these
23 documents?
24    A.   Yes.
25    Q.   And that's something the lawyers in

Page 216

1  the case don't have, for example?
2     A.   That's correct.
3     Q.   And what is that exactly?
4     A.   The fact that you need to have an
5  understanding of how trading works, how
6  collateralization works.  You need to have an
7  understanding of the need to borrow, why you
8  borrow.  You need to have an understanding of
9  strategies, the entire context for which this
10 program was developed for.
11           If you don't have that, you could
12 read this but it -- you wouldn't be able to put
13 everything together into an opinion that I think
14 has solid foundation to show that FTX was
15 actually running this program and benefitting
16 from it.
17    Q.   Are there any industry sources or
18 publications or other non-FTX materials that you
19 cited as authority for your opinions in this
20 section?
21    A.   My opinion cites the authorities that
22 it needs to have in order to make my reasoned
23 conclusion.
24    Q.   Which here is the FTX documents and
25 testimony in you view?

Page 217

1     A.   FTX documents, testimony, and again my
2  own experience.
3     Q.   Okay.
4          MS. AUSTIN:  We've been going about
5  50 minutes.  Is now a good time to take a break?
6          MR. DUNNE:  Let me see.  It could be.
7  Yeah, now is a good time to take a break.
8          THE VIDEOGRAPHER:  We are going off
9  record at 3:56 p.m.
10         (Break in the proceedings
11          taken at 3:56 p.m.)
12         THE VIDEOGRAPHER:  We are back on
13 record at 4:14 p.m.
14         You may proceed.
15 BY MR. DUNNE:
16    Q.   Mr. Lisle, let me direct you, please,
17 to Paragraph 49 of your report, on Page 24.
18    A.   Got it.
19    Q.   And in that paragraph, you state
20 "because FTX would have ultimately absorbed any
21 losses resulting from 3AC's default on its margin
22 program and LOC borrowings, FTX directly
23 benefitted from the elimination via the sale of
24 assets associated with 3AC's FTX accounts between
25 June 12th and June 14th, 2022, of 3AC's negative

55 (Pages 214 - 217)

Page 218

1  USD balance under the margin program, and had
2  benefitted to the same extent of such negative
3  USD balance."
4      Q.  Do you see that?
5      A.  I do.
6      Q.  What are the losses resulting from
7  3AC's default on its margin program and LOC
8  borrowings?
9      A.  Well, as articulated here, the losses
10  that I would be referring to would be potential
11  losses if 3AC defaulted, and that actually what
12  happened during that time period is there were,
13  you know, all these sale transactions as well as
14  an FTX-directed liquidation that, at the end,
15  left 3AC with a small positive balance and
16  purportedly or apparently paid back all of its --
17  all of its borrowings by the end of that period
18  of time.
19      Q.  Are you -- well, you understand that
20  3AC was never in default on its margin program
21  and line of credit borrowings, right?
22      A.  I was told that they were -- let me
23  look here.  Give me a second.
24      Q.  Sure.
25      A.  End of the day, and I'm having

Page 219

1  difficulty remembering where something is that
2  I'm looking for. ████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████         And that I
7  believe somewhere, which I'm having trouble
8  finding, they were actually underwater, and I'm
9  having trouble finding that.
10      Q.  If it's helpful, I don't believe you
11  said that with respect to their FTX accounts.
12      A.  I did not, but my point was going to
13  be -- I'm sorry.  It took me a while.
14      Q.  No problem.
15      A.  My point was going to be that I was --
16  I did not have knowledge as to whether or not
17  they were actually in default on their loan book,
18  but I do know that they were overleveraged and
19  overall in great distress.
20      Q.  Understood.  I'm trying to -- what I
21  want to know is how would you calculate, like,
22  the loss stemming from any 3AC default in light
23  of the fact that there was no default?
24      A.  Well, if there was no default, they
25  certainly were in incredible peril, and anybody

Page 220

1  could see that they would be, and that a
2  particular lender operating reasonably would have
3  been impelled to actually seek liquidation and,
4  in fact, most loan agreements could do so if they
5  felt as if there was an MAE event or something
6  along those lines.
7      Q.  Understood.  I'm getting at something
8  slightly different.  Let me ask you a different
9  question.
10      Are you aware that at the end of
11  the day on June 12, 2022, 3AC had a positive
12  account balance on FTX of approximately
13  $284 million?
14      A.  I was told that, but let me see where
15  I have that, if you could direct me.
16      Q.  I don't know that that's in your
17  report.  I'll represent it to you to be true.
18      A.  Okay.  It's not in my report, but I
19  did review a piece of evidence that set out what
20  their holdings were starting June 12, I have seen
21  that.
22      Q.  You don't have a basis to dispute at
23  this time that they were net positive 284 million
24  on that date?
25      A.  I cannot dispute that, no.

Page 221

1      Q.  Okay.  And I think you just alluded to
2  this, at the end of the day on June 14, there was
3  still a positive net account balance of
4  approximately 2 million or a little bit under
5  that, right?
6      A.  That's what I understand, yes.
7      Q.  And the reduction in size was in part
8  as a result of 3AC's own trades, is your
9  understanding, which reduced their net position?
10      A.  I don't know who did those trades.  I
11  was -- I was told actually that it's not
12  necessarily understood as to who directed the
13  trading and who caused the trading.  So I was
14  basing my opinion on that particular fact is that
15  we don't know who did it.
16      Q.  But there were a couple of reasons why
17  the account balance shrank though, there was the
18  52,000 some odd trades and there was the FTX
19  liquidation of some piece, right?
20      A.  Yes.  Yes.
21      Q.  And if those things hadn't happened,
22  there's -- the FTX liquidation, by the way, just
23  to be clear, what I was referring to was the
24  manual liquidation during that period of 84 --
25  $81 million.  That's your understanding, right?

56 (Pages 218 - 221)

Page 222

1    A.   Yeah.
2    Q.   If the 52,000 trades and the manual
3  liquidation had not happened, I take it it's your
4  understanding that FTX's -- and prices kept
5  dropping, FTX's various protocols would have
6  kicked in, right?
7    A.   Well, from what I understand from
8  their protocols and their margin lending
9  explainer, I believe there was an algorithm that
10  at a particular point where a borrower's
11  collateralization sank under a certain level,
12  there would be an automatic liquidation.
13    Q.   Yes.  So, your understanding is that
14  at some point if prices kept falling, that
15  automated liquidation algorithm would have kicked
16  in?
17    A.   I am not aware that in this case
18  that's what happened.  I am aware of how the
19  algorithm was designed to work.  I read about it.
20  And it's -- in a falling price environment, where
21  you have got a static loan amount, you know,
22  collateralization could be at risk, yeah.
23    Q.   You're also aware that FTX had the
24  backstop liquidity provider program which you
25  discuss in your report, right?

Page 223

1    A.   Yes.
2    Q.   That's another -- that's another
3  method for protecting FTX or users writ large
4  rather from losses in the event of a liquidation?
5    A.   Lenders, yes.
6    Q.   Lenders.
7    A.   It would protect lenders from default
8  losses.
9    Q.   And then also when you discussed this
10  as well, there's the -- there was the guarantee
11  fund that was associated with and served to
12  protect this process in a programmatic way,
13  correct?
14    A.   The guarantee fund was not
15  programmatic in that it was coded or anything as
16  far as I know, but it was a fund that was
17  accessible in order to, you know, replenish
18  losses that a BLP provider or a participant would
19  have suffered or could have suffered.
20    Q.   You have no basis to suggest that
21  those three processes wouldn't have kicked in had
22  3AC or had the 52,000 trades not occurred, right?
23    A.   I'm sorry.  I wasn't following the
24  question.
25    Q.   No problem.  I'll ask it again.

Page 224

1         We have discussed these -- the
2  auto liquidation algorithm that FTX had, the
3  backstop liquidity provider program, and the
4  guarantee fund.
5    A.   That's right.
6    Q.   It's your understanding, I take it,
7  that if the 52,000 trades and the manual
8  liquidation had not occurred and prices kept
9  falling, Bitcoin prices kept falling, then those
10  three processes would have been employed to
11  minimize or attempt to minimize losses with
12  respect to 3AC's borrowing, right?
13    A.   Well, I'm not aware that that actually
14  kicked in here.  I didn't do any analysis with
15  respect to, you know, the precise amount of
16  losses and the types of collateral that 3AC had
17  nor did I do any analysis as to whether or not
18  under their particular methodology there would
19  have been actually that occurred.  So I can't
20  tell you whether or not that occurred.
21    Q.   Okay.  So that's kind of what I'm
22  getting at.  What I am trying to understand is
23  whether you have done any analysis to evaluate
24  what would have happened if the 52,000 trades had
25  not occurred and the manual liquidation had not

Page 225

1  occurred?
2    A.   That's a multi-part question.  Could
3  you break it up?
4    Q.   Well, you, in Paragraph 49, state that
5  any losses resulting from 3AC's default on the
6  margin program would have been borne by FTX,
7  right?  That's your opinion?
8    A.   49?  Let me look.  Hold on a second.
9         Right.  So if there was a loss
10  stemming from a default, then FTX, in my opinion,
11  would have absorbed that loss.
12    Q.   But you can't say whether there would
13  have been such a loss?
14    A.   That actually I don't think is
15  relevant because at a particular point, a
16  lender -- any lender or reasonable lender would
17  act and act in a way that you could avoid a loss,
18  a loss isn't necessarily -- well, you're trying
19  to act to prevent any losses, and so the way I
20  read this is, you know, good for FTX, they got
21  out and they weren't -- they didn't suffer any
22  losses to 3AC's detriment, and -- but my point
23  isn't necessarily 3AC's impact but more along the
24  lines of because of this particular event, it
25  goes to proving that FTX benefitted from the near

Page 226

1  elimination of its negative USD balance.
2      Q.  Leave aside your views on the
3  relevance of my question for a moment.
4          What I would like to know is
5  whether you did any work to assess what losses,
6  if any, FTX would have suffered if the 52,000
7  trades and manual liquidation had not occurred?
8      A.  I was not asked to do that, nor do I
9  think it's relevant to my opinion, which is more
10  focused on the program itself and how it worked.
11     Q.  Do you believe that there is any way
12  that one even could calculate what those
13  hypothetical losses would be?
14     A.  Jeez, that wouldn't be my specialty.
15  But certainly, I imagine there's a -- some type
16  of an expert that would be able to, using the
17  theoretical price movements and so forth, but at
18  the end of the day, my opinion stands in terms of
19  the focus on how the actual program worked and I
20  wasn't particularly focused on the impact to the
21  portfolio.
22     Q.  All right.  Just to be clear, you're
23  saying maybe someone could do some analysis to
24  figure out what the losses would have been if the
25  52,000 trades and manual liquidation had not

Page 227

1  occurred but you didn't do such an analysis,
2  right?
3      A.  Well, I didn't because it wasn't
4  relevant to what I was asked to do, which is to
5  opine on the FTX program and how it -- that
6  particular asset sale benefitted them.
7      Q.  But the way in which you say it
8  benefitted FTX is that the sales that we're
9  talking about prevented FTX from absorbing losses
10  as a result of 3AC's default?
11     A.  To the extent that it deployed a
12  particular mechanism, it deployed it to its
13  benefit so that it avoided a loss.  That's my
14  opinion.
15     Q.  Who's the "it" in your sentence?
16     A.  FTX avoided a loss.
17     Q.  Okay.  Are you assuming that the
18  52,000 trades were executed by FTX then?
19     A.  No.
20     Q.  Okay.
21     A.  I don't know.
22     Q.  You don't know?
23     A.  Right.
24     Q.  And you're saying that if those trades
25  had not -- well, if those trades had not

Page 228

1  occurred, then the auto liquidation process at
2  FTX would have kicked in, if asset prices kept
3  falling, right?
4          Let me ask differently.  Do you
5  have any view as to whether the auto liquidation
6  program would have kicked in?
7      A.  I think the auto liquidation program
8  was certainly deployed and purportedly, there was
9  a methodology behind it, but I have said before
10  that I'm unaware that it actually was deployed in
11  this particular case with 3AC, and from what I
12  gather, these transactions, whether they were
13  initiated by 3AC or if they were, you know, done
14  by FTX, it's irrelevant.  At the end of the day,
15  there was -- just everything was directed at
16  selling and offsetting its positive asset
17  positions and getting down flat and then zero.
18  As I say, a fire sale.
19     Q.  Why do you say it's irrelevant who did
20  the trades, be it FTX or 3AC?
21     A.  It's irrelevant because, first of all,
22  I have been told we can't even figure it out from
23  the evidence, and secondly, it's irrelevant
24  because the mere fact that it occurred, that's
25  all that's relevant.

Page 229

1      Q.  That's your assessment as a matter of
2  whatever the claims are in this case?
3      A.  At the end of the day, whoever
4  initiated the liquidation doesn't matter because
5  my point is more in the end, FTX benefitted from
6  that liquidation.  Therefore, it's not relevant
7  as to who did it.  I'm just saying FTX happened
8  to benefit from it.
9      Q.  What is FTX's -- what is the benefit
10  that FTX derived from those trades?
11     A.  FTX benefitted by avoiding a loss on
12  loans that it provided to its lender.  It also
13  benefits because a default by particular borrower
14  or borrowers, especially a large default, would
15  have on -- if it didn't stand behind it, it would
16  have a detrimental effect on its reputation.
17         I'm also saying that the benefit
18  extended to the fact that it could attest
19  publicly that it never allowed a default and,
20  therefore, it shows that it's a reputable
21  exchange that has substantial enough assets to
22  protect customer assets.
23     Q.  Are you assuming that if the 52,000
24  trades and the manual liquidation had not
25  occurred, that 3AC -- FTX would have simply lost

58 (Pages 226 - 229)

1 the entirety of the negative USD balance on 3AC's
2 account?
3     A.   Can you restate that?  I'm sorry.
4     Q.   I'd like to know --
5     A.   Can I -- one thing.  I'm getting
6 tangled up in something here.
7     Q.   I sympathize.
8          I'd like to know what you believe
9 the amount of losses that FTX would have
10 sustained had the 52,000 trades and manual
11 liquidation not occurred is?
12     A.   It's not what I was asked to opine on.
13 The facts are at hand.  I'm asked to opine on the
14 fact that because of what happened, FTX
15 benefitted.  That's essentially my conclusion
16 here.
17     Q.   Did you assume that FTX would have
18 sustained some losses had the 52,000 trades and
19 manual liquidation not occurred?
20     A.   I am not assuming anything with
21 respect to -- except for that 82 million -- how
22 the other trades happened.  But I am saying that
23 FTX would have been hurt if there were losses
24 because its insurance fund would have had to kick
25 in and the insurance fund was their own assets.

1     Q.   Why do you say the insurance fund
2 would have had to kick in?
3     A.   Because that was the first backstop
4 after the BLP, and the BLP was deployed, and I
5 guess I'm assuming that if the BLP providers
6 weren't able to liquidate those assets in a
7 profitable way, the insurance fund would have
8 backed it up.
9     Q.   You're assuming a couple of things, I
10 think, right?  One is that the BLP providers
11 wouldn't have been able to liquidate the assets
12 in a profitable way, right?
13     A.   I said if.  I said if.
14     Q.   Again, in order, in this scenario, for
15 FTX to sustain any losses under your version of
16 the facts, that would have to occur, right?  The
17 BLP provider would have been unable to liquidate
18 the assets in a profitable way?
19     A.   That's the way that particular
20 mechanism was designed.
21     Q.   Right.  And even before we get to
22 that, for FTX to sustain any losses, its auto
23 liquidation protocols also would have had to have
24 failed to liquidate these positions in a way that
25 prevented losses from occurring?

1     A.   I'm not sure that's correct.  I
2 believe that in this particular event, regardless
3 of what kicked in or what didn't, at the end, as
4 I say in my opinion, which I'm not, like,
5 broadening, you know, FTX benefitted because it
6 did not have to pay out anything, because it's --
7 you know, the liquidation occurred and there was
8 a positive balance afterward.
9     Q.   Move to strike as nonresponsive.
10          What I'm asking is in the event
11 that the 52,000 trades and 81 million manual
12 liquidation had not occurred, asset prices and
13 asset prices kept falling --
14     A.   Yeah.
15     Q.   -- FTX would have had a few mechanisms
16 to prevent itself from sustaining losses, right?
17     A.   Well, you keep raising facts that
18 actually did not occur, and I was given facts and
19 I make an opinion based upon those facts and, you
20 know, I'm not really sure where this is going.
21 You know, I -- I am at this point just, you know,
22 essentially going to repeat that my opinion says
23 what it says, that FTX benefitted from this
24 liquidation.
25     Q.   Move to strike as nonresponsive.

1          I'd like you to focus on my
2 question, please.
3     A.   Okay.  Can you break it up?
4     Q.   I will.
5          I'd like you to assume for
6 purposes of these -- this -- these questions
7 we're doing now that there were no 52,000 trades
8 or 82 or $81 million manual liquidation and we
9 are still in a scenario where asset prices are
10 falling, market conditions are just as they were.
11          In that scenario, FTX had an
12 automated liquidation program designed to
13 automatically liquidate customer positions before
14 any losses were sustained to the margin lending
15 program, correct?
16     A.   That is what was stated in the
17 liquidation explainer, yes.
18     Q.   You have no reason to believe that
19 that did not exist, correct?
20     A.   I am not aware of any reason why
21 didn't exist.
22     Q.   Now, focusing on that program, the
23 automated liquidation protocol, it is possible
24 that as prices kept falling, the automated
25 liquidation protocol could have successfully

59 (Pages 230 - 233)

Page 234

1  liquidated 3AC's positions before the lending
2  program took any losses, correct?
3     A.   Well, if we're assuming that FTX's
4  positions were in the realm of over a billion
5  dollars, it probably would, in a falling
6  marketplace, liquidity would be disappearing, and
7  it would be extremely difficult, if not
8  impossible, for liquidation to occur without --
9  even with an automated feature without
10  substantial losses.
11     Q.   You have done no analysis, though, to
12  assess how hard it would be for an automated
13  liquidation program to sell out of these
14  positions before losses occurred though, correct?
15     A.   In my experience when markets are
16  falling and they're volatile, people that would
17  necessarily buy step away because they don't know
18  where the prices are going to fall.
19          And what I mean by liquidity
20  drying up is your buyers, people that will stand
21  on the other side of the transaction, aren't
22  there, which is what causes prices to fall even
23  more.
24          And as they fall, you know, less
25  and less people are there to take on transactions

Page 235

1  and to take the risk, and so it's highly probable
2  that in this particular set of circumstances,
3  given the size of the portfolio, in my
4  experience, and that's experience that includes
5  being at exchanges and so forth, this would have
6  been a very difficult portfolio to liquidate in
7  an automated methodology.
8     Q.   Well, I'll have several questions for
9  you based on that answer, but I will repeat my
10  first question, which is:  You have done no
11  analysis to assess how hard it would be for an
12  automated liquidation program to sell out
13  these -- out of these positions before losses
14  occurred?
15     A.   I don't have any analysis in my
16  opinion, but based upon my experience, that is
17  the case.
18     Q.   And -- but and, in fact, in reality --
19  because we were talking about a hypothetical, but
20  in reality, someone was able to do 52,000 trades
21  that sold out of these positions before losses
22  occurred, correct?
23     A.   Over a two-day period of time.
24     Q.   Correct.
25     A.   Yes.

Page 236

1     Q.   That did happen?
2     A.   It's a lengthy period of time.
3     Q.   You have no basis to assert that the
4  automated liquidation protocol couldn't have
5  affected sales just as well as the 52,000 trades
6  did, correct?
7     A.   I'm sorry.  Restate that.
8     Q.   Sure.  You have no reason -- you have
9  no basis to assert that the automated liquidation
10  protocol could not have done exactly what the
11  52,000 trades did; correct?
12          In other words, for all you know,
13  the automated liquidation protocol could have
14  sold off 3AC's assets in exactly the same manner
15  as the 52,000 trades did, thereby preventing any
16  losses to FTX?
17     A.   All I'm saying here is that FTX
18  benefitted from the liquidation of those
19  positions.  That's all I'm saying.
20          My expertise is around the fact
21  that I have analyzed the way the program worked,
22  and in the end, it benefitted FTX.
23     Q.   Move to strike as nonresponsive.
24          I'd like you to answer my
25  question.  You have again --

Page 237

1     A.   Hold on.  I am not clear what your
2  question is so if you could please explain it in
3  way that I could understand, I would appreciate
4  it.
5     Q.   I will do so.
6          Again, you have done no analysis
7  to determine whether the automated liquidation
8  protocol could not have sold out of these
9  positions in a way that prevented a single dollar
10  of loss to the margin lending program?
11     MS. AUSTIN:  Objection, asked and
12  answered.
13  BY THE WITNESS:
14     A.   I'm sorry.  Rephrase.  I lost
15  concentration on your question.  So if you could
16  just rephrase it or restate it.
17     Q.   You have done no analysis to determine
18  whether the automated liquidation protocol would
19  have been unable to sell out of these positions
20  in a way that prevented a single dollar of loss
21  to the margin lending program?
22     MS. AUSTIN:  Same objection.
23  BY THE WITNESS:
24     A.   Again, I'll go back to my answer,
25  which is the relevant part of my opinion doesn't

Page 238

1  necessarily need to accommodate or consider how
2  that mechanism worked.  I was asked to opine as
3  to whether or not the liquidations benefitted
4  FTX, and at the end of the day, it did.
5      Q.   I'd like you to answer my question
6  though.  That wasn't nonresponsive to my question
7  at all.  Move to strike as nonresponsive.
8           My question was whether you have
9  done an analysis, not what you think is relevant,
10  but whether you have done an analysis that would
11  show or would shed light on whether the automated
12  liquidation protocol could have sold out of these
13  positions in a way that prevented any losses from
14  the margin lending program?
15      MS. AUSTIN:  Same objection.
16  BY THE WITNESS:
17      A.   And my response is that that
18  particular set of circumstances, hypothetical,
19  isn't relevant to my opinion.  I don't need to
20  get to how that mechanism worked nor did I need
21  to analyze it in order to arrive at my opinion.
22      Q.   Okay.  But you didn't analyze it?
23      A.   I didn't need to.
24      Q.   And for that reason, you did not?
25      A.   I did not need to, and I didn't

Page 239

1  because of that.
2      Q.   And likewise you performed no analysis
3  that would enable you to say that the automated
4  liquidation program couldn't have liquidated
5  3AC's positions just as well as the 52,000 trades
6  did?
7      MS. AUSTIN:  Objection, asked and
8  answered.
9  BY THE WITNESS:
10      A.   Well, first, I'm not even sure anybody
11  can do that.
12           And secondly, I'll go back to what
13  I said before about just generally in my
14  experience, any market in distress, liquidity
15  dries up.  This is historically backed up, and in
16  this particular set of circumstances, it would be
17  very difficult, whether it is an algorithm or
18  just a manual trader, to get out of these
19  positions without suffering losses.
20      Q.   But in fact, someone was able to do
21  that, right?
22      A.   They were able to eliminate all the
23  losses on FTX.
24      Q.   Despite all of what you said about
25  liquidity in the market and the challenges of

Page 240

1  this declining market, someone, you don't know
2  who, was able to execute 52,000 trades that
3  effectively liquidated this position with no
4  losses?
5      A.   That's right.  And I said before that
6  was over a two-day period of time, and my
7  particular example or my explanation about a
8  falling market and lack of liquidity, that
9  doesn't necessarily mean that over that long a
10  period of time, liquidity -- liquidity is
11  something that disappears and then reappears
12  based upon, you know, over a period of time.
13           And in this particular set of
14  circumstances, it appears that there was
15  sufficient liquidity in order to liquidate at a
16  small frequency over a period of two days that
17  was able to get to a point where they liquidated
18  the entire portfolio.
19      Q.   With no losses?
20      A.   Apparently with no losses.
21      Q.   You have no way of knowing whether the
22  FTX automatic liquidation protocol could not have
23  achieved the same result?
24      A.   I didn't say that.  I said it wasn't
25  relevant to my conclusion.

Page 241

1      Q.   Okay.  I understand you don't think it
2  was relevant, but I will again ask.  You have no
3  way of knowing whether the FTX auto liquidation
4  protocol could not have also liquidated these
5  positions over two days and achieve the same
6  result as the 52,000 trades, correct?
7      A.   And I would say -- I would repeat my
8  question, it wasn't relevant.  That's -- this has
9  been asked and answered multiple times now.
10      Q.   I'm asking it differently and I didn't
11  ask about your thoughts on the relevance of my
12  question.  I would like you to answer my question
13  as I have asked it, and I will ask it again, and
14  I will move to strike your nonresponsive answers
15  as nonresponsive.
16           You have no way of knowing whether
17  the FTX auto liquidation protocol would have been
18  unable to sell out of these positions over two
19  days and achieve the same result as the 52,000
20  trades, correct?
21           I know you don't think it is
22  relevant, but I would like you to answer my
23  question.
24      A.   Yeah, but I have already answered it,
25  and what I answered that one, I said, first of

61 (Pages 238 - 241)

Page 242

1 all, it would probably be impossible for anybody
2 to come up with that analysis, based upon my
3 experience.
4         Secondly, if I were asked to do
5 that, based upon my experience in trading and
6 lending, that I could probably analyze it in an
7 objective manner, but I was not asked to do that.
8 That's my answer.
9     Q.   As a consequence of not being asked to
10 do it, you have no way of knowing whether what I
11 said is correct because you didn't look at it?
12         MS. AUSTIN:  Object to form.
13 BY THE WITNESS:
14    A.   But I just told you that my
15 experience, had I had to look at it, would
16 probably have informed my opinion and I would be
17 able to answer that.  That's what I said.
18    Q.   That's not what I asked.  I didn't ask
19 you whether you would have been able to if you
20 had looked at it.  I asked you to confirm that
21 you didn't look at it.
22    A.   Well, it's not in my opinion, but it
23 wasn't relevant to it.
24    Q.   It's not in your opinion because you
25 did not look at it?

Page 243

1    A.   It's not in my opinion because it
2 wasn't relevant.
3    Q.   Okay.  Again you're focusing on the
4 relevance, and why don't you let the lawyers
5 decide what is and is not relevant and the court.
6 I would like you to answer my question.
7         And my question is about whether
8 you as a purported expert in this case did an
9 analysis, and all you seem to be comfortable
10 telling me is whether that analysis was relevant
11 in your view.  I'm asking you to please tell me
12 whether you did it or not.
13         MS. AUSTIN:  Object to form, asked and
14 answered.
15 BY THE WITNESS:
16    A.   I answered it already like 15 times at
17 this point.
18    Q.   What is the answer, sir?
19         MS. AUSTIN:  Same objection.
20 BY THE WITNESS:
21    A.   At this point, I'll just rephrase.
22 It's not relevant to my opinion.  If I was asked,
23 my experience would be able to inform my opinion,
24 and that opinion would have been based upon my
25 experience, and my experience would have been

Page 244

1 able to draw some conclusions in an expert
2 fashion that would arrive at a conclusion that
3 would probably question whether or not a
4 particular protocol, methodology, or whatever
5 would have been successful to liquidate this
6 entire portfolio without getting a loss.
7    Q.   All right.  Move to strike that as
8 extremely nonresponsive.
9         But I guess I'll then ask -- I
10 understand you're not going to answer my
11 question.  That's fine.  We will see how you
12 answer the questions if you show up in court.
13         However, you express extreme
14 skepticism, it's fair to say, that anyone could
15 have sold out of these positions without
16 incurring some kind of loss, fair to say?
17         MS. AUSTIN:  Object to form.
18 BY THE WITNESS:
19    A.   I didn't say that.
20    Q.   You didn't.  Let me read what you did
21 say.  Okay.
22         You said "if I was asked my
23 experience would be able to inform my opinion and
24 that opinion would have been based on my
25 experience and my experience would have been able

Page 245

1 to draw to some conclusions -- conclusiveness and
2 expert fashion that would arrive at a conclusion
3 that would probably question whether or not a
4 particular protocol or methodology or whatever
5 would have been successful to liquidate this
6 entire portfolio without getting at a loss."
7         So you don't believe a protocol
8 could have liquidated this portfolio without
9 getting a loss, right?
10         MS. AUSTIN:  Objection, form.
11 BY THE WITNESS:
12    A.   No.
13    Q.   No?
14    A.   No.  There's two things operative here
15 the way I see it.  A, what happened, which is
16 more than 50,000 transactions occurred, which
17 flattened the account and apparently left it with
18 no debit.
19         And what you're misconstruing my
20 words is my opinion is that, A, nobody in an
21 objective fashion could actually answer your
22 question yes or no, but based upon my experience,
23 it would be very difficult to, but you could make
24 some presumptions on liquidity in a marketplace
25 in distress; however, I've also talked about the

Page 246

1  fact that these transactions occurred in a
2  two-day period of time, which is -- can be a
3  lifetime in market distress situations.
4      And so it's presumable, and
5  actually it happened, that it can liquidate
6  without a loss, but at the same time, you can
7  actually, in terms of your question, with respect
8  to the liquidation facility, there isn't a known
9  method to man that would be able to, you know,
10  guarantee and avoid a loss.  So I can't render an
11  opinion, but I don't think anybody can.
12      MS. AUSTIN:  Mr. Dunne, could we take
13  a break?
14      MR. DUNNE:  When I'm done with this
15  line of questioning.
16      MS. AUSTIN:  How much longer do you
17  have?
18      MR. DUNNE:  It just depends on the
19  answers.
20      When was the last time we took a
21  break?  It's not been that long.
22      MS. AUSTIN:  We took a break
23  42 minutes ago.
24      MR. DUNNE:  We can keep going.
25      MS. AUSTIN:  I'm going to ask for a

Page 247

1  break soon.
2      THE WITNESS:  I'm going to ask for a
3  break, too.
4      MR. DUNNE:  Let me finish my line of
5  questioning.
6      MS. AUSTIN:  If the witness needs a
7  break --
8      MR. DUNNE:  No, no, the witness has
9  been taking very frequent breaks.  We can finish
10  this line of questions.
11      MS. AUSTIN:  If the witness needs a
12  break, then the witness needs a break.
13      THE WITNESS:  No, I haven't.  I think
14  I have been very -- very good about staying here
15  so --
16      MR. DUNNE:  I'm not agreeing to a
17  break at the moment.  If you want to take your
18  mic off and walk away, you go ahead and do that,
19  but I'm not finished with this line of
20  questioning, and I just have a couple of more
21  questions.
22      MS. AUSTIN:  So if the witness needs a
23  break, then we are taking a break, and we will be
24  leaving the room.  We're not ending the
25  deposition.  We will come back.  It has been

Page 248

1  44 -- however many minutes on the record.  We
2  don't need to be arguing with the witness at this
3  point.  I think we need to take a break.
4      MR. DUNNE:  I don't agree with that.
5  BY MR. DUNNE:
6      Q.  Are you going to sit here and answer
7  my questions or are you going to walk away?
8      A.  I am trying to be polite.
9      Q.  I like to be polite too.
10      A.  It doesn't sound like you are.
11      Q.  Let's try it this way.  Here is a
12  simple question.  Do you have any basis --
13      MS. AUSTIN:  Hold on.  Hold on.  Let's
14  take a break.
15      Mr. Lisle, let's go ahead and step
16  out.  We can go off the record.  If you don't
17  want to go off the record, we don't have to.
18      MR. DUNNE:  We'll go off the record so
19  as to preserve time and convenience.
20      THE VIDEOGRAPHER:  We are going off
21  record at 4:57 p.m.
22      (Break in the proceedings
23      taken at 4:57 p.m.)
24      THE VIDEOGRAPHER:  We are back on
25  record at 5:09 p.m.

Page 249

1      You may proceed.
2  BY MR. DUNNE:
3      Q.  Mr. Lisle, you recognize that someone
4  was able to trade out of 3AC's positions over two
5  days and do so without sustaining any losses
6  despite the extreme market dislocations that were
7  occurring, correct?
8      MS. AUSTIN:  Object to form.
9  BY THE WITNESS:
10      A.  So losses, I guess, obviously, 3AC
11  lost almost the entire portfolio.  But when you
12  say loss, if you're saying to the Exchange or to
13  lenders, they were able to do so without
14  incurring a loss.
15      Q.  That's correct.  And you're right
16  about that clarification.  Thank you.
17      And I think we previously
18  discussed that you do not know how the automated
19  liquidation program functioned in practice,
20  right?
21      A.  I certainly never took it out for a
22  test drive or anything like that.
23      Q.  You didn't look at the code to see how
24  it worked on the Exchange?
25      A.  I am not a coding or a technology

Page 250

1 expert.
2    Q.   And so, therefore, you have no basis
3 to say one way or the other whether the automated
4 liquidation protocol could have, over the course
5 of two days, traded out of 3AC's positions?
6    A.   Actually, that's not what I said.  I
7 said based upon my experience, I'm skeptical that
8 you can design a tool that would actually be able
9 to do it in certain distressed market situations.
10    Q.   Okay.  But you acknowledge that
11 someone somehow was able to do it, using 52,000
12 trades over the course of two days?
13    A.   If you mean 52,000 plus trades were
14 executed and there was no loss to FTX or anybody
15 else, they were able to do it over two days, yes.
16    Q.   And we previously discussed that 3AC
17 was likely, in your view, trading
18 algorithmically, correct?
19    A.   Likely trading algorithmically, let me
20 think.  You represented, if I recall, that there
21 was an API configuration between 3AC and FTX.
22    Q.   That's right.
23    A.   I think we were talking way back in
24 terms of the frequency of the trading, it looked
25 as if it was, yes.

Page 251

1    Q.   That's right.  Okay.
2        So -- and you agree that it's not
3 likely that a human being executed those 52,000
4 trades over that two-day period?
5    A.   That's a lot of trading over a two-day
6 period of time, yes.
7    Q.   So there was some algorithm that ran
8 that executed these trades and managed to
9 liquidate 3AC's positions without causing the
10 margin lending program to incur losses?
11    A.   There was, as I have said, a -- some
12 sort of an algorithmic trading program that was
13 executing trades, but in my experience, in most
14 situations, investors that use those kinds of
15 strategies have several safeguards around them in
16 terms of, you know, manual intervention, when
17 necessary, or perhaps some of their strategies
18 involve more long-term kind of investments in
19 bulk and maybe an OTC transaction here or there.
20        And my point being that there are
21 a number of ways for 3AC to have executed.  So I
22 can't from my, you know, look -- from what I
23 understand, it was just a number of transactions.
24 I can't comment on how all of those transactions
25 were done.

Page 252

1    Q.   Understood.  But again, one way or
2 another, the transactions were done, there was
3 likely an algorithmic component to them, right?
4        MS. AUSTIN:  Objection, asked and
5 answered.
6 BY THE WITNESS:
7    A.   Based upon what I understand.
8    Q.   And they were effective in liquidating
9 3AC's position in a way that did not cause the
10 margin lending program any losses, correct?
11    A.   Yes.
12    Q.   And you sitting here today have no
13 knowledge as to how the FTX auto liquidation
14 program would have behaved differently from the
15 52,000 trades that were executed, right?
16    A.   Asked and answered I believe, but I
17 will restate.
18        My experience tells me that it
19 would be impossible for an algorithm to be
20 designed to, in all circumstances, end up
21 liquidating trades so that it would avoid losses.
22 And that's because those protocols,
23 methodologies, what have you, are always
24 dependent upon market conditions, and you can't
25 always guarantee that somebody is on the other

Page 253

1 side taking those positions.
2    Q.   Okay.  You never designed an auto
3 liquidation protocol though?
4    A.   I have never designed one.
5    Q.   And you have never managed a trading
6 book that was subject to one?
7    A.   Managed?  No, I have not managed a
8 trade book.
9    Q.   Does Wedbush today employ any auto
10 liquidation protocols?
11    A.   Wedbush does not have any automated
12 liquidation protocols.
13    Q.   All right.  In part IV-C of your
14 declaration, sir, which is on pages 27 to 32, you
15 opine that customers on the FTX Exchange would
16 have expected to have an interest in individual
17 assets associated with their accounts, not merely
18 an interest in the net balance of their account,
19 right?
20    A.   That's correct.
21    Q.   And you say in Paragraph 56 on
22 Page 27, that "a customer reading the May 2022
23 terms of service and other FTX materials would
24 expect they were acquiring assets and incurring
25 liabilities as such materials explicitly stated

64 (Pages 250 - 253)

Page 254

1 that users retained ownership of the digital
2 assets they deposited, for example, FTX's
3 May 2022 terms of service provided that title to
4 your digital assets shall at all times remain
5 with you and shall not transfer to FTX Trading
6 and further clarified that none of the digital
7 assets in your account are the property of or
8 shall or may be loaned to FTX trading."
9       Did I read that correctly?
10    A.   Yes.
11    Q.   And you agree again that the terms of
12 service are an English law document, correct?
13    A.   The terms of service I have been told
14 are governed by UK law.
15    Q.   UK law.  You are not opining as a
16 matter of UK law here?
17       MS. AUSTIN:  Objection, asked and
18 answered.
19 BY THE WITNESS:
20    A.   I am not.
21    Q.   And you have not spoken with anyone
22 involved in drafting the terms of service, right?
23    A.   No.
24    Q.   You have not spoken with any customers
25 of FTX about their understanding of the terms of

Page 255

1 service?
2    A.   Well, to the extent that I worked at a
3 customer of FTX, I can say that there was
4 probably a general understanding of what those
5 terms were.
6    Q.   Which customer are you referring to?
7    A.   Galaxy.
8    Q.   Did you speak with anyone at Galaxy
9 about their understanding of the FTX terms of
10 service?
11    A.   I spoke from time to time with the
12 trading team.  We had a trading team that was
13 algorithmic trading as well as arbitraging and
14 amongst various exchanges and one of their
15 accounts was at FTX, and in my discussions with
16 them with respect to whatever issue I would be
17 talking to them, I gained an understanding of
18 their activities and so forth.
19    Q.   Did you ever discuss with them the
20 terms of service though?
21    A.   Specifically the terms of service, no.
22    Q.   Okay.  So you were offering with
23 respect to the terms of service simply your views
24 on them reading them as an American lawyer?
25    A.   Correct.

Page 256

1    Q.   You didn't compare them to those of
2 other exchanges, right?
3    A.   I have not compared them to other
4 exchanges.
5    Q.   Okay.  In Paragraph 58 of your report,
6 sir, you wrote "Similarly, an internal policy
7 document of FTX digital markets, FDM, which was
8 the service provider under the May 2022 terms of
9 service and for these asset programs expressly
10 states that FDM was holding customer assets in
11 trust, FDM was a wholly-owned subsidiary of FTX,
12 and the main regulated and licensed entity for
13 the FTX International platform operating
14 principally in the Bahamas.  FDM's role was to
15 provide exchange services between digital assets
16 and fiat currency as well as between different
17 digital assets to non-U.S. customers of FTX.com
18 like 3AC."
19       Did I read that correctly?
20    A.   Yes, you have.
21    Q.   What is that document you were citing
22 there?
23    A.   Footnote 95 was referring to the terms
24 of service and Footnote 96 is referring to FDM's
25 safeguarding of assets and digital token

Page 257

1 management policy.
2    Q.   I was asking sort of a more generic
3 question about that policy.  Do you believe that
4 to be an internal policy document, is that what
5 you understand it to be?
6    A.   It was a published document, and a
7 user would have been able to access that
8 document.
9    Q.   Do you have any understanding as to
10 whether that document modified or defined any
11 legal obligations between the FTX Exchange and
12 its customers?
13    A.   I'd have to reacquaint myself with the
14 document.  It's not something that I can recall.
15    Q.   Are you sure that that document was
16 published externally?
17    A.   I actually don't know.
18    Q.   Sitting here today, you have no view
19 as to whether that document created any actual
20 legal rights or obligations?
21    A.   To the extent that it was known to a
22 user, then the connotation, especially to me,
23 would have been that assets were held under trust
24 which connotes under a general understanding of
25 any law that there would be some sort of

65 (Pages 254 - 257)

Page 258

1  custodianship and fiduciary duty around those
2  assets.
3      Q.    But you don't know what law applied
4  even to that document, do you?
5      A.    Without looking at it, I wouldn't
6  know.
7      Q.    Okay.
8      A.    I would assume that it would be law
9  that would be, let's see, where the actual entity
10  was, that would be my assumption, which was in
11  the Bahamas.
12      Q.    You have -- you're not asserting a
13  legal opinion that any trust actually was created
14  as a matter of applicable law, are you?
15      A.    I'm not aware that a trust was
16  actually created.
17      Q.    Let me direct you, please, to
18  Paragraph 59 of your report.
19          In this paragraph you state that
20  "the operation of the FTX Exchange further
21  confirms that both FTX and customers -- viewed
22  customers as having an entitlement to each
23  separate underlying asset allocated to their
24  account, not simply to the net balance of the
25  account. After combining the positive and

Page 259

1  negative value of the distinct assets in that
2  account, several factors lead to this conclusion"
3  and then you have some subparts, right?
4      A.    Correct.
5      Q.    So I just want to make sure I
6  understand some basic things here.
7          You don't dispute that an account
8  balance that was the aggregate of all asset
9  entitlements associated with a customer's account
10  was available when logged into the FTX Exchange,
11  they saw a total net USD value number, right?
12      A.    I agree with that. Yes. That was my
13  understanding.
14      Q.    Yeah. Your understanding is that that
15  total net USD value was the net dollarized value
16  of all of the positions in the account?
17      A.    At any one particular moment.
18      Q.    At any one particular moment?
19      A.    Yes.
20      Q.    In fact, many platforms, I mean, even
21  basic things like Fidelity stock trading
22  platform, will give of you a total balance of
23  your account in some form or another, right?
24      A.    Yes.
25      Q.    Yeah. And you agree, I take it, that

Page 260

1  the total net USD value of the account is not
2  affected when one converts one asset to another.
3  So if in a moment I sell Bitcoin for cash, that
4  doesn't affect my total net USD value?
5      A.    In that moment, but then the next
6  moment prices will move, and then it will be
7  impacted.
8      Q.    Meaning that if Bitcoin goes up and I
9  still had the Bitcoin, I would have different net
10  USD value if I had sold it, right?
11      A.    Right.
12      Q.    But the sale of Bitcoin for cash
13  increases the USD balance of the account by the
14  amount of the cash gained, right?
15      A.    I'm sorry. Could you restate?
16      Q.    No problem.
17          If I sell Bitcoin -- we'll use
18  round numbers. And if I sell Bitcoin, and the
19  market price is 100,000, if I sell it for cash
20  and I receive 100,000 U.S. dollars, my total net
21  USD balance is not changed?
22      A.    So if by total net USD balance, you
23  mean this aggregate --
24      Q.    Yes.
25      A.    -- USD balance which would include all

Page 261

1  the, let's say, 2 or 3 or 4 assets that you have
2  on the Exchange, no, it would not change --
3      Q.    Thank you. Yes.
4      A.    -- at that particular moment.
5      Q.    Understood.
6          And you understand that a customer
7  could have -- would also have balance --
8  sub-balances of particular tokens on the
9  Exchange, and by tokens, I mean any assets
10  including fiat currencies?
11      A.    So let's just make sure we're clear.
12      Q.    Yep.
13      A.    So there is an aggregate USD
14  balance --
15      Q.    Yep.
16      A.    -- and that I would also be able to
17  see for each particular asset, security, what
18  have you, just like Fidelity, that there would be
19  a sub-balance associated with that. I agree.
20      Q.    Yep.
21          And with respect to some of those
22  sub-balances, it was possible due to FTX's margin
23  lending program to have negative sub-balances of
24  particular assets and positive sub-balances of
25  others, correct?

66 (Pages 258 - 261)

Page 262

1    A.   So let's -- the way I understood how
2  it worked on a margin basis is that there would
3  be a collateral requirement in some form, whether
4  it was dollars or a particular coin, in exchange
5  for something else, it could be another coin, it
6  could be another dollar.  And those loans would
7  not be necessarily given out if they would incur
8  a net debit immediately, but over time, some of
9  those positions, based upon, you know, their loan
10  portfolio could go negative, yes.
11    Q.   Right.  Thank you.  So your
12  understanding is that it was possible under
13  certain circumstances to have a negative
14  sub-balance in your account in a particular asset
15  and also positive sub-balances in others?
16    A.   Yeah.  And I'll go on to say that, you
17  know, if you have a short position, short
18  positions necessarily could be negative as well.
19    Q.   Right.  And you understand, I take it,
20  that as a general matter the Exchange did not
21  allow a customer to have a negative overall total
22  net balance, right?
23    A.   That's my understanding, yes.
24    Q.   Okay.  And I take it you also
25  understand that as a general matter, a customer

Page 263

1  could not simply withdraw all his positive
2  sub-account balances and just leave the negative
3  sub-balances behind in the account, right?
4    A.   The way an exchange operates is that
5  it has an agreement with the user that it can use
6  the Exchange as long as it can pay its way, and
7  if there was a request to withdraw and there was
8  a debit, that debit would have to be satisfied
9  before you're allowed to withdraw.  That would be
10  a basic tenet of exchanges -- exchanges
11  anywhere.
12    Q.   As a consequence of that, what I was
13  saying about the positive and negative balances
14  is correct, right?  You couldn't just withdraw
15  all the positives and leave the negatives behind,
16  creating a net negative balance with no positive
17  assets at all?
18    A.   Until you satisfy the negative
19  balance, until you paid it back --
20    Q.   Yes.
21    A.   -- or satisfied it.
22    Q.   Got it.  Thank you.
23        Let me direct you, sir, to Part
24  IV-D of your report, which starts on Page 32.
25        In this section, you opine that

Page 264

1  the loans made by 3AC's lenders would have been
2  called by a reasonable lender upon becoming aware
3  of 3AC's true financial condition, right?
4    A.   Correct.
5    Q.   And am I correct that -- sorry.  In
6  this section, you cite as authorities certain
7  lending agreements that 3AC had and the expert
8  report of Gregory Scheig?
9    A.   That's right.
10    Q.   You have no citations to articles or
11  academic sources or studies in here?
12    A.   Academic studies, no, I don't.
13    Q.   And you conducted no analysis of 3AC's
14  positions with any of the loan agreement
15  counterparties, correct?
16    A.   I have not been made aware of any
17  particular amounts of loans or, you know, what
18  the terms were.
19    Q.   Let me direct you, please, sir, to
20  Paragraph 68.  You wrote there "Upon determining
21  that a borrower is insolvent or in significant
22  distress or had materially misrepresented its
23  financial condition as 3AC had, a lender will
24  consider its options by assessing some
25  combination of the following general factors:  1,

Page 265

1  loan size; 2, amount of loan, collateral; 3,
2  borrower credit risk; 4, macroeconomic factors,
3  5, legal risk and 6, any other relevant
4  circumstances.  This assessment should be as
5  objective as possible and driven by the lender's
6  risk and legal teams and not the business."
7        Do you see that?
8    A.   Yes.
9    Q.   You didn't provide any citation to
10  that paragraph.  What is the basis for that
11  statement?
12    A.   My experience as a person that was
13  advising and participating in lending
14  collateralized -- crypto collateralized lending
15  business.
16    Q.   Where did you do that?
17    A.   At DrawBridge Lending and Galaxy.
18    Q.   As part of any of that work, did you
19  perform borrower credit risk analyses?
20    A.   I did not.
21    Q.   Did you analyze the adequacy of loan
22  collateral?
23    A.   There wasn't much to analyze.  It was
24  simply a valuation of that loan collateral per a
25  pricing source.

67 (Pages 262 - 265)

Page 266

1    Q.   Okay.  And I take it in your role,
2  your role did not involve monitoring that
3  valuation?
4    A.   It did not involve monitoring.
5    Q.   With respect to macroeconomics
6  circumstances, No. 4, your experience does not
7  include doing any analysis of the macroeconomic
8  circumstances, correct?
9    A.   Well, we were a team, and the team
10  would have been helping each other out.  We all
11  monitor news sources.  We're aware -- we need to
12  be aware of what's going on.  And so what I meant
13  by macroeconomic circumstances would be
14  circumstances of a nature that would impact a
15  loan portfolio, things like interest rate changes
16  or news of war or anything like that.
17      MR. DUNNE:  Okay.  If we take a break
18  here, I will check my notes and be able to finish
19  up.
20      THE VIDEOGRAPHER:  We are going off
21  record at 5:36 p.m.
22      (Break in the proceedings
23       taken at 5:36 p.m.)
24      THE VIDEOGRAPHER:  We are back on
25  record at 5:46 p.m.

Page 267

1      You may proceed.
2      MR. DUNNE:  Thank you, Mr. Lisle.  I
3  have no further questions.
4      MS. AUSTIN:  I have a couple of
5  follow-up questions to some of the things that
6  Mr. Dunne had talked with you about earlier
7  today.
8        E X A M I N A T I O N
9  BY MS. AUSTIN:
10    Q.   Could you put Exhibit 4 in front of
11  you which is the Atherton declaration and turn to
12  Paragraph 57 please, the last sentence.
13    A.   Yes.
14    Q.   Do you recall your discussion with
15  Mr. Dunne earlier about this particular sentence
16  in Paragraph 57?
17    A.   I do.
18    Q.   That sentence is "trades by 3AC on the
19  Exchange and the deposit of assets within the
20  vulnerability period would, in my opinion,
21  constitute transaction in the ordinary course of
22  3AC's business."
23      Do you see that?
24    A.   I do.
25    Q.   And I believe you agreed with that

Page 268

1  statement earlier.  Could you explain what you
2  meant by that?
3    A.   So I was looking at that particular
4  sentence I would say in a vacuum and thinking of
5  it in terms of just a statement that any trading
6  and any depositing or withdrawing would have been
7  what a hedge fund would do.
8      What I don't want to be
9  misconstrued is that I'm agreeing that what
10  happened between June 12th and 14th of 2022 was
11  in the ordinary course.
12      In fact, I disagree, if that is
13  how Mr. Atherton is concluding, I would disagree
14  with that.  In my opinion, it was not in the
15  ordinary course.
16    Q.   And based on your review of
17  Mr. Atherton's report, does it appear to you that
18  Mr. Atherton considered any evidence in this case
19  in rendering his opinion on ordinary course?
20      MR. DUNNE:  Objection to form.
21  BY THE WITNESS:
22    A.   I cannot find any particular cite to
23  evidence -- in fact, the evidence that I reviewed
24  was, as I have said in my opinion, the fact that
25  more than 50,000 trades were made and they were

Page 269

1  all essentially sells and liquidating of the
2  accounts without anything else occurring.
3    Q.   Does the evidence that you reviewed
4  inform your view of whether you agree with
5  Mr. Atherton's application of the facts to the
6  law?
7    A.   Yeah, I --
8      MR. DUNNE:  Objection to form.
9  BY THE WITNESS:
10    A.   -- I don't see any analysis of facts
11  or factual conclusion.  All I see is a legal
12  opinion that it doesn't seem to be based on the
13  facts that I reviewed, the facts being more than
14  50,000 transactions and all of them liquidating.
15      MS. AUSTIN:  I have no further
16  questions.
17      MR. DUNNE:  None from me.
18      MS. AUSTIN:  We can go off the record.
19      THE VIDEOGRAPHER:  We are going off
20  record at 5:49 p.m. and concludes today's
21  testimony.  Master media will be retained by
22  Veritext Legal Solutions.
23      (Off the record at 5:49 p.m.)
24
25

68 (Pages 266 - 269)

Page 270

```
1              REPORTER CERTIFICATE
2
3        I, JO ANN LOSOYA, a Certified
4   Shorthand Reporter within and for the State of
5   Illinois, do hereby certify:
6           That previous to the
7   commencement of the examination of the witness,
8   the witness was duly sworn to testify the whole
9   truth concerning the matters herein; That the
10  foregoing deposition transcript was reported
11  stenographically by me, and the foregoing
12  constitutes a true record of the testimony given
13  and the proceedings had; That the said deposition
14  was taken before me at the time and place
15  specified; That I am not a relative or employee
16  or attorney or counsel, nor a relative or
17  employee of such attorney or counsel for any of
18  the parties hereto, nor interested directly or
19  indirectly in the outcome of this action.
20          IN WITNESS WHEREOF, I do hereunto set
21  my hand this day, December 7, 2025.
22
23
24          JO ANN LOSOYA, CSR, RPR, CRR
            C.S.R. 84-002437
25
```

Page 271

```
1   TIFFANY IKEDA AUSTIN, ESQ.
2   Tiffany.ikeda@lw.com
3         December 8, 2025
4   RE: IN RE: FTX TRADING LTD., et al.
5     12/4/2025, Matthew Lisle (#7771732)
6     The above-referenced transcript is available for
7   review.
8     Within the applicable timeframe, the witness should
9   read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-ny@veritext.com.
16    Return completed errata within 30 days from
17  receipt of testimony.
18    If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22        Yours,
23        Veritext Legal Solutions
24
25
```

Page 272

```
1   IN RE: FTX TRADING LTD., et al.
2   12/4/2025 - Matthew Lisle (#7771732)
3          E R R A T A  S H E E T
4   PAGE_____ LINE_____ CHANGE_____
5   _____
6   REASON_____
7   PAGE_____ LINE_____ CHANGE_____
8   _____
9   REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____   _____
24  Matthew Lisle              Date
25
```

Page 273

```
1   IN RE: FTX TRADING LTD., et al.
2   12/4/2025 - Matthew Lisle (#7771732)
3         ACKNOWLEDGEMENT OF DEPONENT
4      I, Matthew Lisle, do hereby declare that I
5   have read the foregoing transcript, I have made any
6   corrections, additions, or changes I deemed necessary as
7   noted above to be appended hereto, and that the same is
8   a true, correct and complete transcript of the testimony
9   given by me.
10
11  _____   _____
12  Matthew Lisle              Date
13  *If notary is required
14          SUBSCRIBED AND SWORN TO BEFORE ME THIS
15          _____ DAY OF _____, 20___.
16
17
18          _____
19          NOTARY PUBLIC
20
21
22
23
24
25
```

69 (Pages 270 - 273)

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 24

CONFIDENTIAL

Page 1

1   IN THE UNITED STATES BANKRUPTCY COURT
    FOR THE DISTRICT OF DELAWARE
2   Chapter 11
    Case No. 22-11068 (KBO)
3   b(Jointly Administered)
    ----------------------------------------x
4   In re:
5   FTX TRADING LTD., et al.,
6                   Debtors.
    ----------------------------------------x
7
                        November 25, 2025
8                       9:02 a.m.
9
                -CONFIDENTIAL-
10
11      VIDEOTAPED ZOOM DEPOSITION of
12   ELIZABETH GLOSTER, a Expert Witness in
13   the above-entitled action, located at
14   Sullivan & Cromwell, 125 Broad Street,
15   New York, New York, taken before Dawn
16   Matera, a Certified Shorthand Reporter
17   and Notary Public of the State of New
18   York.
19
20
21                  *     *     *
22
23
24
25

CONFIDENTIAL

Page 2

1  APPEARANCES:
2
   SULLIVAN & CROMWELL LLP
3  Attorneys for the FTX Recovery Trust
      125 Broad Street
4  New York, New York 10004
      Telephone: (212) 558-4000
5
   BY:  BRIAN D. GLUECKSTEIN, ESQ.
6      gluecksteinb@sullcrom.com
7  BY:  ISAAC S. FOOTE, esq.
      ifoote@sllcrom.com
8
   BY:  SAMUEL G. DARBY, ESQ. (Remote)
9      sdarby@sullcrom.com
10
   LATHAM & WATKINS, LLP
11  Attorneys for Joint Liquidators of 3AC
      1271 Avenue of the Americas
12  New York, New York 10020
13  BY:  CHRISTOPHER HARRIS, ESQ.
      chris.harris@lw.com
14
   BY:  ZIJUN ZHAO, ESQ.
15      zijun.zhao@lw.com
16  BY:  ADAM GOLDBERG (Remote)
      adam.goldberg@lw.com
17
   BY:  TIM ROBINSON, ESQ. (Remote)
18      tim.robinson lw.com
19  BY:  ZACHARY PROULX, ESQ. (Remote)
      zachary.proulx@lw.com
20
   BY:  NACIF TAOUSSE (Remote)
21      nacif.taousse@lw.com
22  BY:  JESSICA WALKER, ESQ. (Remote)
      jessica.walker@lw.com
23
24
25

Page 3

1  APPEARANCES (Continued):
2
3  Also Present:
4  Joe Raguso, Videographer
5  Shamus Hogan, law Clerk (Remote)
6  Karen Petch (Remote)
7  Romauld Johnson, Ogier (Remote)
8  Nicholas Brooks, Ogier (Remote)
9
10
11
12            *    *    *
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1      THE VIDEOGRAPHER:  Good morning.    09:01:55
2  We are going on the record at 9:02      09:02:15
3  a.m. EST on Tuesday, November 25th,      09:02:17
4  2025.  Audio and video recording will    09:02:23
5  continue to take place unless all        09:02:28
6  parties agree to go off the record.      09:02:30
7      This is media unit one of the        09:02:33
8  video recorded deposition of Elizabeth   09:02:37
9  Gloster taken by counsel here in the     09:02:40
10  matter of in Re:  FTX trading LTD, et    09:02:43
11  al., in the United States Bankruptcy     09:02:48
12  Court for the District of Delaware,      09:02:50
13  Chapter 11, case number 22-11068 KBO.    09:02:53
14  This deposition is being held at         09:03:01
15  Sullivan & Cromwell.                     09:03:03
16      My name is Joe Raguso with           09:03:05
17  Veritext.  I am the videographer.  The   09:03:07
18  court reporter is Dawn Matera, also      09:03:09
19  with Veritext.                           09:03:11
20      I am not authorized to               09:03:13
21  administer an oath.  I am not related    09:03:14
22  to any party in this action nor am I     09:03:16
23  financially interested in the outcome.   09:03:18
24      Counsels' appearances in the         09:03:20
25  deposition room will be noted on the     09:03:21

Page 5

1  stenographic record and the court        09:03:24
2  reporter will now swear in the           09:03:26
3  witness.                                 09:03:27
4  E L I Z A B E T H  G L O S T E R, the
5  Witness herein, having first been duly
6  sworn by the Notary Public, was examined
7  and testified as follows:
8      THE WITNESS:  Could I make           09:03:38
9  something clear before we start          09:03:39
10  please, which is about the audio and     09:03:40
11  video recording.  Can I have your        09:03:42
12  confirmation, I have already been told   09:03:46
13  this by Latham, that the recording and   09:03:47
14  the video will only be used for the      09:03:52
15  purposes of this deposition and the      09:03:54
16  Court hearing and not be, for            09:03:56
17  example, be made available on YouTube    09:03:59
18  or anything of that sort?                09:04:01
19      MR. GLUECKSTEIN:  Yes, good          09:04:04
20  morning, Ms. Gloster.  Your counsel      09:04:04
21  has the ability to designate this        09:04:06
22  transcript under a Court Order as        09:04:08
23  confidential, which I assume will be     09:04:11
24  done, in which case the limitations      09:04:14
25  that you are requesting will be          09:04:18

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

1 afforded. We would not be using it 09:04:20
2 outside of those uses for any reason 09:04:23
3 anyway. 09:04:25
4    THE WITNESS: Thank you very 09:04:26
5 much for that confirmation. That is 09:04:26
6 what I have been told already, but I 09:04:28
7 am grateful to have it from you. 09:04:29
8    MR. HARRIS: Just to put a pin 09:04:32
9 on that, we will designate this as 09:04:33
10 confidential. 09:04:35
11 EXAMINATION bY MR. GLUECKSTEIN: 09:04:40
12    Q.   Good morning Ms. Gloster. My 09:04:40
13 name is Brian Glueckstein. I am with 09:04:41
14 Sullivan & Cromwell and we represent the 09:04:43
15 FTX Recovery Trust in this matter. 09:04:46
16    A.   Good morning to you, too. I am 09:04:49
17 not Ms. Gloster. My title is Dame 09:04:50
18 Elizabeth Gloster. Please don't feel you 09:04:53
19 have to call me Dame, but please don't 09:04:55
20 call me Miss or Ms., because I am not. 09:04:58
21 You can call me Elizabeth, you can call 09:05:01
22 me Dame Elizabeth, either of those two is 09:05:04
23 fine. 09:05:07
24    Q.   Understood. Dame Elizabeth. 09:05:07
25 Have you been deposed before? 09:05:09

Page 7

1    A.   Yes, I have. 09:05:11
2    Q.   How many times have you been 09:05:12
3 deposed? 09:05:14
4    A.   I have been deposed once. If 09:05:14
5 you mean by that U.S. proceedings 09:05:16
6 deposition. 09:05:17
7    Q.   You were deposed once in a U.S. 09:05:19
8 proceeding deposition? 09:05:24
9    A.   Yes. 09:05:25
10    Q.   When was that? 09:05:26
11    A.   Earlier this year, in August or 09:05:26
12 September, I believe. 09:05:34
13    Q.   And what matter was that 09:05:38
14 involved with? 09:05:39
15    A.   I don't know whether I am at 09:05:40
16 liberty to tell you that. It was a court 09:05:41
17 proceedings. 09:05:45
18    Q.   It was a court proceeding 09:05:47
19 pending, was it in federal court in the 09:05:49
20 United States? 09:05:51
21    A.   Forgive me, I don't know 09:05:56
22 whether it was a federal court. I think 09:05:57
23 it was a court in Arizona. Have I got 09:05:59
24 that right? No. It's not Arizona. It's 09:06:04
25 somewhere else, I think. 09:06:06

Page 8

1    Q.   Did you testify at a trial or 09:06:13
2 in a court proceeding in that particular 09:06:14
3 matter? 09:06:16
4    A.   No, it hasn't come to trial 09:06:16
5 yet. It was just a deposition. 09:06:19
6    Q.   Have you testified in a U.S. 09:06:20
7 court proceeding in any other matter? 09:06:23
8    A.   If you mean by testified, 09:06:24
9 providing an expert opinion or report or 09:06:27
10 declaration in relation to U.S. law, yes, 09:06:31
11 I have. 09:06:34
12    Q.   My question is, first, with 09:06:37
13 respect, have you testified before a 09:06:39
14 judge in court in a United States 09:06:40
15 proceeding? 09:06:44
16    A.   Thank you for that 09:06:45
17 clarification. No, I have not. 09:06:46
18    Q.   And outside of the deposition 09:06:49
19 that you recently gave, have you been 09:06:52
20 deposed under oath and given testimony in 09:06:53
21 any other United States proceeding? 09:06:55
22    A.   Not in United States 09:06:57
23 proceedings, no. 09:07:00
24    Q.   Have you provided expert 09:07:13
25 reports in other court proceedings? 09:07:28

Page 9

1    A.   When you say other, what do you 09:07:32
2 mean by that? 09:07:35
3    Q.   Any court proceeding before a 09:07:36
4 tribunal? 09:07:40
5    A.   I am not understanding your 09:07:41
6 question. Court proceedings don't take 09:07:42
7 place before a tribunal. Are you talking 09:07:44
8 about other court proceedings? 09:07:47
9    Q.   Have you provided an expert 09:07:48
10 report before any -- with respect to any 09:07:50
11 court proceeding? 09:07:53
12    A.   Yes, I have. 09:07:54
13    Q.   How many expert reports have 09:07:57
14 you -- do you recall submitting? 09:07:59
15    A.   I don't remember how many. 09:08:01
16    Q.   Have you submitted any expert 09:08:05
17 reports in court proceedings in the 09:08:07
18 United States? 09:08:09
19    A.   Yes, I have. 09:08:10
20    Q.   How many expert reports have 09:08:12
21 you submitted in court proceedings in the 09:08:13
22 United States? 09:08:16
23    A.   I don't know the precise 09:08:16
24 number. I would expect about four or 09:08:17
25 five. 09:08:20

3 (Pages 6 - 9)

CONFIDENTIAL

1    Q.   Do you recall with respect to          09:08:29
2  those four or five expert reports that        09:08:31
3  you've submitted in the United States          09:08:34
4  proceedings, the subject matters on which     09:08:36
5  you provided expert opinions?                  09:08:41
6    A.   I can't recall all together,            09:08:43
7  but probably relating to disclosure and       09:08:58
8  procedural matters in the United Kingdom       09:09:04
9  or in relation to insolvency matters in        09:09:09
10  the United Kingdom.  You will appreciate      09:09:14
11  that I have provided such opinions not         09:09:17
12  only since I retired as a judge, but also     09:09:22
13  back in the day when I was a QC.  So it's     09:09:26
14  a long time, over a long period of time       09:09:30
15  over which to remember.                        09:09:34
16    Q.   With respect to those four or          09:09:40
17  five expert opinions, other than              09:09:41
18  disclosure on procedural matters and          09:09:47
19  insolvency, do you recall any other           09:09:50
20  subjects in which you gave expert             09:09:52
21  opinions?                                      09:09:54
22    A.   No, my focus would have been on        09:09:54
23  insolvency issues such as trust issues in     09:10:11
24  relation to claims of creditors in            09:10:16
25  relation to contractual issues in             09:10:20

1  connection with trading terms and             09:10:25
2  conditions.                                    09:10:30
3    Q.   Do you recall any proceedings           09:10:36
4  in the United States with any specificity     09:10:39
5  in which you gave an expert opinion with      09:10:41
6  respect to trust issues?                       09:10:44
7    A.   No, I don't.                            09:10:46
8    Q.   You don't recall what cases            09:10:47
9  those would have been?                         09:10:50
10    A.   No.                                    09:10:50
11    Q.   Have any of your expert reports       09:10:51
12  submitted in cases in the United States      09:11:00
13  involved matters including digital            09:11:03
14  assets?                                        09:11:09
15    A.   No, apart from this one.              09:11:09
16    Q.   Have you provided expert             09:11:12
17  opinions in any case in the United States    09:11:14
18  with respect to proprietary interests in     09:11:19
19  intangible assets?                            09:11:24
20    A.   I may have done back in the           09:11:25
21  past in relation to shares or securities.     09:11:31
22    Q.   Do you recall any details            09:11:49
23  around what those opinions were that         09:11:52
24  you're recalling involving shares or         09:11:56
25  securities?                                    09:12:01

1    A.   I am trying to remember.  I            09:12:01
2  know when I was at the bar I had to write     09:12:02
3  an opinion for the purposes of some           09:12:07
4  American proceedings as to whether            09:12:11
5  claimants had trust interests or creditor     09:12:16
6  interests, but because it's such a long       09:12:27
7  time ago, I mean it's over 20, probably       09:12:30
8  over 25 years, over 20 years ago, I can't     09:12:34
9  remember whether that particular opinion      09:12:39
10  related to advice that I was giving the      09:12:42
11  liquidator or whether it was actually        09:12:46
12  used for the purposes of proceedings.  It    09:12:47
13  certainly was never deployed in              09:12:51
14  proceedings in the sense that I was          09:12:52
15  cross-examined on it.                          09:12:55
16    Q.   Have you provided any expert         09:12:56
17  reports in United States proceedings of a    09:13:17
18  405 that you recall providing that           09:13:19
19  involved opinions on English trust law?      09:13:26
20    A.   I don't understand proceeding        09:13:28
21  of a 405.                                      09:13:31
22    Q.   Dame Elizabeth, this is a rough     09:13:38
23  transcript.  Let me repeat the question.     09:13:41
24       Have any of your expert reports        09:13:48
25  that you've submitted in cases in the        09:13:53

1  United States involved opinions on trust      09:13:55
2  law?                                           09:13:58
3    A.   The one that I am trying to            09:13:58
4  recall from when I was a QC did involve       09:14:01
5  my opinion on trust law.  What can't          09:14:11
6  recall is whether it was advice that I        09:14:14
7  gave to the liquidator or whether it was     09:14:17
8  an expert opinion which he, the              09:14:20
9  liquidator, deployed in the context of       09:14:24
10  trust, of proceedings in the U.S.            09:14:26
11    Q.   Have any of your expert              09:14:29
12  opinions submitted in the United States      09:14:39
13  proceedings provided an opinion with         09:14:43
14  respect to bailment of intangible assets?    09:14:46
15    A.   Not that I can recall.               09:14:51
16    Q.   Do you recall, of your expert       09:14:52
17  opinions that you submitted, how many of     09:14:54
18  those were provided to the Court, if any,    09:14:59
19  in litigation?                               09:15:06
20    A.   I wouldn't know whether they         09:15:06
21  were, in fact, provided to the Court.  I     09:15:10
22  would have made them in the proceedings      09:15:14
23  and would have, did make them under oath.    09:15:18
24  Whether in fact they were deployed or        09:15:23
25  used in the proceedings or just shown to     09:15:26

CONFIDENTIAL

Page 14

1 the other side, I couldn't tell you.        09:15:29
2    Q.   Are you aware of any of your        09:15:32
3 expert opinions that you've provided in        09:15:37
4 the United States cases ever being        09:15:40
5 excluded by any United States Court?        09:15:43
6    A.   I am not so aware.        09:15:46
7    Q.   Are you aware of any of your        09:15:47
8 expert opinions provided in any case        09:15:54
9 having been excluded by the Court?        09:15:59
10    A.   When you say excluded, do you        09:16:01
11 mean not allowed into evidence?        09:16:07
12    Q.   Yes.        09:16:12
13    A.   No, I am not so aware.        09:16:12
14    Q.   Dame Elizabeth, you're        09:16:14
15 currently a judge on the Abu Dhabi Global        09:16:45
16 Market Court; is that right?        09:16:49
17    A.   Yes, I am.        09:16:49
18    Q.   You're also serving in the        09:16:51
19 Court of Appeal in Bermuda; is that        09:16:55
20 right?        09:16:57
21    A.   Yes, I am a justice of the        09:16:57
22 Court of Appeal in Bermuda.  I am not        09:17:02
23 obviously currently there.  It's a part-        09:17:06
24 time appointment.  So I am not serving at        09:17:08
25 this precise moment, but when I go there,        09:17:12

Page 15

1 I serve as a Court of Appeal justice,        09:17:14
2 yes.        09:17:17
3    Q.   Am I correct that you currently        09:17:17
4 have private practice as an arbitrator?        09:17:24
5    A.   Yes, I currently practice as an        09:17:26
6 international arbitrator and commercial        09:17:31
7 arbitrator.        09:17:35
8    Q.   Has any of your -- how long        09:17:35
9 have you been serving as an international        09:17:41
10 arbitrator?        09:17:45
11    A.   Since I retired from the Court        09:17:45
12 of Appeal of England and Wales in 2018.        09:17:47
13    Q.   Has any of your matters where        09:17:59
14 you've served as an arbitrator included        09:18:02
15 matters involving cryptocurrency or other        09:18:06
16 digital assets?        09:18:10
17    A.   I'm hesitating because I think        09:18:10
18 that some, one or two of the disputes,        09:18:25
19 included situations where some or more of        09:18:30
20 the underlying assets were crypto assets,        09:18:36
21 yes.        09:18:40
22    Q.   In the first of those matters        09:18:40
23 that you remember, when you say the        09:18:49
24 underlying assets were crypto assets,        09:18:52
25 what were the dispute that was involved        09:18:53

Page 16

1 in the --        09:18:58
2    A.   The issues were contractual        09:18:58
3 issues as to whether transactions had        09:19:00
4 closed or not.  So contractual issues.        09:19:05
5    Q.   Contractual issues involving        09:19:16
6 digital assets in both of those        09:19:27
7 arbitrations or were there other issues        09:19:29
8 in the second one?        09:19:31
9    A.   There would be other issues.        09:19:31
10    Q.   What were the issues involving        09:19:37
11 the second matter in which you arbitrated        09:19:38
12 involving digital assets?        09:19:41
13    A.   I can't remember whether there        09:19:43
14 were one or two.  All I am saying is that        09:19:44
15 in some of the contractual arbitrations        09:19:47
16 that I've done, underlying assets may        09:19:51
17 have included crypto assets.        09:19:54
18    Q.   Any of the matters where you        09:20:09
19 have served as a judge involved disputes        09:20:10
20 of digital assets?        09:20:16
21    A.   It depends on how you define        09:20:17
22 digital assets.  I suspect that they may        09:20:29
23 have done, although if I can put it this        09:20:40
24 way, the nature of the asset was not        09:20:44
25 relevant to the dispute.        09:20:49

Page 17

1    Q.   Have any of the cases in which        09:21:04
2 you have either arbitrated or decided as        09:21:05
3 a judge required you to determine a        09:21:08
4 party's rights in any digital assets?        09:21:16
5    A.   Do you include derivative -- I        09:21:19
6 am asking you a question -- do you        09:21:26
7 include derivative contracts and        09:21:28
8 synthetic contracts traded on an exchange        09:21:30
9 in the category of digital assets or not?        09:21:34
10 If you do, I have done lots of those        09:21:38
11 cases where a title may have been        09:21:40
12 involved.  If you're talking about        09:21:43
13 cryptocurrency, no.        09:21:46
14    Q.   Thank you very much for that        09:21:47
15 clarification.  Dame Elizabeth, one of        09:21:48
16 your arbitral awards was recently set        09:22:12
17 aside by the English Commercial Court, is        09:22:14
18 that correct?        09:22:17
19    A.   Correct.        09:22:17
20    Q.   And that occurred because        09:22:18
21 concerns that were expressed as an        09:22:19
22 apparent bias as a member of that        09:22:22
23 tribunal; is that correct?        09:22:24
24    A.   Correct.  That was the judge's        09:22:26
25 conclusion.        09:22:28

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

1     Q.   And the conclusion there was          09:22:28
2 that you didn't specifically or didn't         09:22:30
3 sufficiently disclose your relationships       09:22:32
4 to one of the law firms involved in that       09:22:34
5 arbitration, correct?                          09:22:37
6     A.   Correct.  I was late in               09:22:37
7 disclosing a particular transaction.           09:22:38
8 Sorry, a particular appointment.               09:22:42
9     Q.   You're here today, Dame               09:22:44
10 Elizabeth, offering opinions as an expert     09:23:14
11 witness for Three Arrows Capital,             09:23:18
12 correct?                                      09:23:19
13     A.   Well, I wouldn't put it as an        09:23:19
14 expert witness for Three Arrows Capital.      09:23:23
15 As I understand my role, although I have      09:23:26
16 been retained as an expert for Three          09:23:29
17 Arrows Capital, my duty is as an              09:23:32
18 independent expert to the Court.              09:23:34
19     Q.   And you were retained for this       09:23:37
20 assignment by the joint liquidators of        09:23:40
21 Three Arrows Capital, correct?                09:23:43
22     A.   Those are the ultimate people        09:23:44
23 who I believe are retaining me, but it's      09:23:51
24 Latham who have retained me directly.         09:23:55
25     Q.   So your retention in this            09:24:01

Page 19

1 matter is by Latham & Watkins as counsel       09:24:03
2 to the joint liquidators; is that             09:24:07
3 correct?                                      09:24:08
4     A.   They are counsel to the joint        09:24:08
5 liquidators.  The ultimate quote client,      09:24:13
6 if you put it that way, are the joint         09:24:17
7 liquidators whom I assume are meeting my      09:24:19
8 fees.  But the retention or the               09:24:25
9 appointment was made through Latham as        09:24:27
10 counsel to the joint liquidators.            09:24:29
11     Q.   And when do you recall were you     09:24:31
12 appointed to this assignment by Latham?      09:24:35
13     A.   I think it was in June of this      09:24:39
14 year, 2025.                                  09:24:43
15     Q.   Had you been in contact with        09:24:49
16 anybody from Latham with respect to an       09:24:51
17 assignment involving Three Arrows Capital    09:24:55
18 prior to June of 2025?                       09:24:58
19     A.   No.                                 09:25:01
20          THE WITNESS:  May I grab another    09:25:12
21 coffee?  Is that all right?                  09:25:13
22          MR. HARRIS:  Don't forget your      09:25:17
23 microphone is attached.                      09:25:18
24     Q.   How were you approached and by      09:25:35
25 whom with respect to this assignment?        09:25:40

Page 20

1     A.   My clerk was approached by           09:25:41
2 someone at Latham.  I assume, but I don't     09:26:00
3 know, the London office.                      09:26:08
4     Q.   Have you previously been             09:26:09
5 retained in any assignment by Latham &        09:26:14
6 Watkins?                                      09:26:20
7     A.   Prior to this assignment as          09:26:20
8 expert, I was appointed as party-            09:26:25
9 appointed arbitrator by a party whose        09:26:31
10 legal representative was Latham &            09:26:36
11 Watkins.  That was a little over five        09:26:43
12 years ago.                                   09:26:49
13     Q.   Other than that one assignment      09:26:56
14 where you served as an arbitrator, any       09:27:01
15 other professional engagements of yours      09:27:02
16 involving Latham & Watkins?                  09:27:09
17     A.   Are you talking about prior to      09:27:09
18 my appointment as expert in this court       09:27:10
19 case?                                        09:27:16
20     Q.   Yes, prior to your being           09:27:16
21 retained in June of 2025 by Latham in        09:27:18
22 this matter.                                 09:27:21
23     A.   Not that I recall.  Whether 20      09:27:22
24 years ago when I was still at the bar I      09:27:30
25 was retained by Latham, I cannot recall.     09:27:34

Page 21

1 I don't believe I was.                        09:27:39
2     Q.   Have you ever been retained for      09:27:52
3 an assignment by Teneo?                       09:27:54
4     A.   Yes, I have advised Teneo in         09:28:01
5 relation to in relation to insolvency        09:28:07
6 matters.                                      09:28:17
7     Q.   Do you recall how many times         09:28:17
8 you advised Teneo with regard to             09:28:23
9 insolvency matters?                          09:28:25
10     A.   I don't remember.                   09:28:26
11     Q.   Are you currently advising         09:28:28
12 Teneo in any insolvency matters outside     09:28:31
13 of the Three Arrows engagement?              09:28:34
14     A.   Two answers to that question.       09:28:35
15 Not that I am aware.  I am not -- and the    09:28:41
16 second question is when you say outside      09:28:46
17 the Three Arrows engagement, I am not       09:28:49
18 advising Teneo in connection with the       09:28:51
19 Three Arrows engagement.                     09:28:54
20     Q.   You are aware that the joint        09:28:56
21 liquidators of Three Arrows Capital are      09:28:58
22 employed by Teneo, correct?                  09:29:01
23     A.   I don't know whether they are       09:29:01
24 employed.  I know that they have an          09:29:06
25 involvement.  I don't know whether the       09:29:08

CONFIDENTIAL

Page 22

1  liquidators are partners or employed.        09:29:14
2  That's the pedantic point I am making.        09:29:17
3      Q.   Do you recall how many            09:29:20
4  engagements you've had where you advised        09:29:22
5  Teneo?                            09:29:27
6      A.   Two possibly.  I can't recall.        09:29:27
7  It could be three.                    09:29:37
8      Q.   Are any of those two to three        09:29:41
9  engagements still active matters?            09:29:43
10      A.   Not that I am aware.            09:29:46
11          MR. GLUECKSTEIN:  Let's mark as        09:30:50
12  Exhibit 1, as the first exhibit, the        09:30:50
13  Declaration of the Right Honorable        09:30:52
14  Dame Elizabeth Gloster, DBE in support        09:30:55
15  of the Amended Proof of Claim filed by        09:31:05
16  the joint liquidators of Three Arrows        09:31:07
17  Capital.                        09:31:09
18          (Gloster Exhibit 1, Declaration        09:30:52
19  of the Dame Elizabeth Gloster, DBE,        09:30:54
20  was so marked for identification, as        09:30:55
21  of this date.)                    09:31:35
22      Q.   Dame Elizabeth, do you            09:31:36
23  recognize what's been marked as Exhibit        09:31:37
24  1?                            09:31:39
25      A.   Yes.                    09:31:40

Page 23

1      Q.   Is this a copy of the expert        09:31:44
2  report that you've submitted in support        09:31:46
3  of the proof of claim filed by the joint        09:31:51
4  liquidators of Three Arrows Capital in        09:31:53
5  this litigation?                    09:31:55
6      A.   Looks like it, but obviously I        09:31:55
7  haven't checked every page.            09:31:57
8      Q.   Does this report contain a        09:32:08
9  complete statement of the opinions that        09:32:10
10  you are providing in this matter?            09:32:11
11      A.   No, it is not complete.  I have        09:32:13
12  other points I can make and in the light        09:32:17
13  of further materials and Lord Neuberger's        09:32:25
14  rebuttal reports and depositions, I could        09:32:29
15  make and would make.  So when you say is        09:32:36
16  that a complete statement of my opinions,        09:32:40
17  no, it is not.                    09:32:42
18      Q.   I am asking whether there are        09:32:43
19  any other opinions outside of Exhibit 1        09:32:44
20  that you are offering to the Court in        09:32:46
21  this matter?                    09:32:51
22          MR. HARRIS:  Objection.  Asked        09:32:52
23  and answered.                    09:32:52
24      Q.   You can answer the question.        09:32:58
25      A.   When you say other opinions, I        09:32:59

Page 24

1  understand that there is not a procedural        09:33:07
2  direction for me to provide a rebuttal        09:33:12
3  report either to the rebuttal report of        09:33:14
4  Lord Neuberger or his deposition.  If        09:33:17
5  there was such a procedure, I would do        09:33:23
6  so.  But at the present time I have not        09:33:26
7  got a further declaration.            09:33:29
8          So when you say are you        09:33:39
9  offering the Court in this matter, yes, I        09:33:40
10  would make additional points if I was        09:33:43
11  called to give evidence in proceedings in        09:33:46
12  Delaware, if I was permitted to do so by        09:33:51
13  the judge.                        09:33:56
14      Q.   Well, I would like to            09:33:56
15  understand what other opinions you would        09:33:58
16  give to the judge in this matter outside        09:34:00
17  of what is reflected in Exhibit 1?        09:34:04
18      A.   There are other points that I        09:34:05
19  could make as part of my analysis in        09:34:08
20  Exhibit 1.  If you characterize those as        09:34:11
21  other opinions, then that is what I would        09:34:20
22  be offering.                    09:34:24
23      Q.   Can you please explain to me        09:34:27
24  what those additional points are that you        09:34:28
25  would be offering to the Court outside of        09:34:36

Page 25

1  what is reflected in Exhibit 1?            09:34:37
2      A.   Certainly.  First of all, since        09:34:39
3  the financial statements of FTX Trading        09:34:45
4  Limited, I am instructed that since my        09:34:52
5  report, the financial statements of FTX        09:34:54
6  Trading Limited were recently produced by        09:35:00
7  FTX on the 7th of November.  That is        09:35:02
8  after I submitted my declaration.  The        09:35:06
9  information in those financials, which I        09:35:12
10  have been provided with and which I have        09:35:14
11  not seen at the date of my report,        09:35:17
12  supports my analysis, namely that the        09:35:21
13  relationship between FTX and 3AC is a        09:35:28
14  trust relationship, namely one where        09:35:31
15  Three Arrows has an equitable proprietary        09:35:35
16  interest in a commingled fund of digital        09:35:38
17  assets where FTX is the trustee.        09:35:42
18          I am also instructed that, and        09:35:46
19  I am instructed to assume that nowhere in        09:35:53
20  the financial statements or the balance        09:35:58
21  sheet is there any entry or narrative        09:35:59
22  that reflects any customer crypto assets.        09:36:04
23          I am further instructed that        09:36:09
24  Latham's accounting expert Stout has made        09:36:11
25  certain conclusions in relation to U.S.        09:36:16

CONFIDENTIAL

Page 26

1 GAAP. I am instructed, and I quote,  09:36:19
2 "That under U.S. Generally Accepted  09:36:25
3 Accounting Principles," in other words,  09:36:29
4 GAAP, "Digital asset custodians such as  09:36:30
5 FTX omission of consumer digital assets  09:36:34
6 from its own balance sheet would indicate  09:36:39
7 the accountant's and auditor's conclusion  09:36:42
8 that the custodial firm" -- i.e. FTX --  09:36:46
9 "did not control such assets. If the  09:36:50
10 custodian here FTX held the assets purely  09:36:55
11 in a custodial capacity and had no such  09:36:58
12 economic rights (if the customer bore all  09:37:02
13 market risk and reward and the customer  09:37:07
14 had no right to sell, pledge or use the  09:37:10
15 crypto for its own benefit) recognition  09:37:13
16 of the assets was not required on the  09:37:17
17 custodian's balance sheet and auditor's  09:37:19
18 unqualified opinion on those financial  09:37:23
19 statements with no such customer asset  09:37:25
20 included on FTX balance sheet would  09:37:29
21 support that they reached the conclusion  09:37:33
22 that FTX did not control customer assets  09:37:37
23 which would thus be considered assets of  09:37:40
24 the customer."  09:37:43
25     That is a reference I am  09:37:45

Page 27

1 instructed to the declaration of G.  09:37:46
2 Scheig at 14-15.  09:37:52
3     I am now going onto another  09:37:57
4 point --  09:37:58
5     Q. I am going to stop you there.  09:37:59
6 Are you reading from a document? I want  09:38:00
7 the record to be clear.  09:38:02
8     A. These are my notes which I  09:38:03
9 drafted which summarize the additional  09:38:04
10 information which I've seen and my views  09:38:08
11 in relation to it. And also summarizes  09:38:11
12 the additional points in relation to  09:38:15
13 further information that I've received,  09:38:19
14 and also in response to new points or  09:38:22
15 different points that Lord Neuberger  09:38:26
16 made.  09:38:29
17     MR. GLUECKSTEIN: Counsel, I am  09:38:32
18 going to obviously ask for a copy of  09:38:34
19 whatever the notes are that Dame  09:38:37
20 Elizabeth is reading from at this  09:38:38
21 deposition and I am going to request  09:38:40
22 that she answer questions without  09:38:42
23 reading from documents that have not  09:38:43
24 been produced in this litigation.  09:38:45
25     MR. HARRIS: Here is a copy. I  09:38:48

Page 28

1 think it's pretty typical that an  09:38:49
2 expert can rely on their notes. So  09:38:52
3 she has them in front of her. You do  09:38:53
4 as well.  09:38:55
5     A. I propose to rely on my notes.  09:38:55
6 I see no reason why I shouldn't.  09:38:58
7     Q. We will -- we will take that  09:39:02
8 matter up with the Court as necessary.  09:39:07
9     MR. GLUECKSTEIN: Why don't we  09:39:19
10 mark as Exhibit 2 -- do you have  09:39:19
11 another copy, Counsel?  09:39:21
12     MR. HARRIS: Yes.  09:39:23
13     (Gloster Exhibit 2, Notes, was  09:39:
14 so marked for identification, as of  09:39:
15 this date.)  09:39:58
16     Q. Dame Elizabeth, is what's been  09:40:04
17 marked as Exhibit 2 a copy of notes that  09:40:06
18 you were just reading from with respect  09:40:08
19 to your prior answer?  09:40:10
20     A. Correct.  09:40:10
21     Q. With respect to these notes  09:40:19
22 that have been marked as Exhibit 2, did  09:40:20
23 you draft these yourself?  09:40:22
24     A. Yes, I did. If you mean did I  09:40:23
25 type them, no, I didn't. But I drafted  09:40:31

Page 29

1 them.  09:40:32
2     Q. Who else was involved in the --  09:40:33
3 if anyone, in the drafting of the notes  09:40:34
4 that have been marked as Exhibit 2?  09:40:37
5     A. The Latham's team.  09:40:38
6     Q. So is it your testimony that  09:41:01
7 what has been marked as Exhibit 2 contain  09:41:02
8 the additional opinions that you would  09:41:05
9 offer to the Court if given such an  09:41:07
10 opportunity in further support of your  09:41:09
11 declaration?  09:41:12
12     A. Correct. They are not the  09:41:13
13 exclusive extent of the further opinions  09:41:25
14 that I would offer to the Court in  09:41:27
15 support of my opinion. There are other  09:41:35
16 additional points that if I was appearing  09:41:37
17 in Court and were being cross-examined, I  09:41:40
18 could make, for example, on the cases.  09:41:43
19     Q. Okay. Outside of your  09:41:52
20 declaration that was marked as Exhibit 1  09:41:54
21 and your opinion and your supplemental  09:41:56
22 opinions that have been marked as Exhibit  09:41:59
23 2, what other opinions would you offer to  09:42:01
24 the Court if provided an opportunity in  09:42:05
25 support of this matter?  09:42:07

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

1    A.   I would provide more detailed      09:42:09
2  analysis of certain of the cases.         09:42:13
3    Q.   And what do you have in mind a      09:42:21
4  more detailed analysis of certain of the  09:42:23
5  cases?                                     09:42:25
6    A.   I would distinguish certain of      09:42:25
7  them and I would use certain of them to    09:42:26
8  support my analysis to a further extent    09:42:28
9  than in my report.                         09:42:34
10      Having said that, most of them       09:42:35
11  are already mentioned in my report, but I  09:42:37
12  could give a more detailed analysis in     09:42:39
13  cross-examination of the particular        09:42:42
14  cases.                                     09:42:46
15    Q.   As you sit here today, what        09:42:46
16  additional analysis are you intending to   09:42:51
17  provide in support of your reports other   09:42:55
18  than what we have discussed?               09:42:59
19    A.   I would go into greater detail     09:43:01
20  in relation to certain of the cases that   09:43:03
21  are cited in my report to point out        09:43:05
22  particular paragraphs in those cases       09:43:08
23  which support my analysis, and             09:43:12
24  distinguish on the facts or on the law     09:43:14
25  certain of the other cases.                09:43:18

Page 31

1      I mean, it's an interesting          09:43:23
2  subject. I could, if I was                 09:43:26
3  cross-examined by you, I am sure we could   09:43:31
4  have an interesting debate on paragraphs    09:43:34
5  in the particular cases to demonstrate      09:43:36
6  how they support my analysis. How Lord      09:43:40
7  Neuberger, in my view, may be wrong to      09:43:43
8  rely on them. So that's an academic         09:43:46
9  debate that we could have together.         09:43:49
10    Q.   Outside of answers on              09:43:51
11  cross-examination, is there any further    09:43:56
12  opinions with respect to any particular    09:43:58
13  cases that you intend to offer             09:44:00
14  affirmatively in support of your           09:44:03
15  opinions?                                  09:44:04
16      MR. HARRIS: Object to the form.       09:44:05
17    A.   They are not further opinions.     09:44:06
18  They're points that I would make on the    09:44:15
19  cases to support my analysis and           09:44:18
20  undermine the analysis made by Lord        09:44:23
21  Neuberger.                                 09:44:26
22    Q.   I am asking sitting here today     09:44:31
23  what points would you make on any          09:44:32
24  particular case to support your analysis   09:44:34
25  and undermine the analysis made by Lord    09:44:37

Page 32

1  Neuberger?                             09:44:39
2    A.   Do you want me to go through     09:44:40
3  each of the cases?                      09:44:44
4    Q.   I would like to know what you    09:44:46
5  intend to testify with respect to any   09:44:47
6  particular case that you have in mind    09:44:49
7  that is not reflected in your opinions.  09:44:52
8      MR. HARRIS: Object to the form.     09:44:54
9    A.   They are all reflected in my     09:44:55
10  opinions.                              09:44:57
11    Q.   The question is what points of   09:45:01
12  analysis you intend to offer beyond those  09:45:04
13  reflected in your written declaration and  09:45:07
14  what has now been marked as Exhibit 2?     09:45:08
15    A.   They would rebut Lord             09:45:10
16  Neuberger's heavy reliance, for example,   09:45:20
17  on Piroozzadeh, to demonstrate that that   09:45:24
18  is an interlocutory case. That the         09:45:28
19  factual circumstances in that case were    09:45:37
20  very different I would also take you        09:45:39
21  through, for example, a case which I rely   09:45:46
22  on in my declaration, Ruscoe and Crypto,   09:45:50
23  Ruscoe and Crypto, which I have here to     09:46:02
24  demonstrate that the analysis of the       09:46:11
25  facts and the legal position in that case  09:46:13

Page 33

1  is very similar to the present case and   09:46:19
2  supports my analysis.                      09:46:22
3    Q.   Dame Elizabeth, I am not asking    09:46:27
4  you to take out any documents.             09:46:29
5    A.   Okay, fine. You asked me what      09:46:31
6  I would be doing.                          09:46:33
7    Q.   I am asking you, as you're         09:46:34
8  sitting here today testifying, what your   09:46:37
9  recollection is of what you mean when you  09:46:39
10  said you were going to make these          09:46:41
11  additional points. I am asking for your   09:46:43
12  testimony.                                09:46:45
13      MR. HARRIS: Just to be clear,        09:46:46
14    you asked her what she would testify    09:46:46
15    about cases. She's trying to answer     09:46:48
16    your question by looking at the cases.  09:46:50
17    But if you don't want her to do that,   09:46:52
18    she won't do that.                      09:46:55
19      MR. GLUECKSTEIN: We can -- I          09:46:56
20    don't want you to do that right now.    09:46:57
21    A.   Okay. Then if you ask me which     09:46:58
22  cases, I can give you a list. I can't      09:47:01
23  give you a list by memory. I am not an     09:47:02
24  academic. But I can tell you the cases     09:47:08
25  in which, if I was being cross-examined    09:47:12

CONFIDENTIAL

Page 34

1 by counsel, I would say let's look at        09:47:16
2 this case, let's analyze that case, it        09:47:19
3 supports my analysis, it undermines Lord       09:47:23
4 Neuberger's. I can give you the names of       09:47:26
5 those cases. I can say in general terms        09:47:29
6 what I get out of them. But you either        09:47:31
7 ask me for the list or you don't.        09:47:33
8        They are all in my -- with one        09:47:35
9 or two exceptions, which are in my        09:47:37
10 additional note -- they are all in my        09:47:39
11 report anyway.        09:47:41
12    Q.    Are there any cases that you        09:47:43
13 have in mind that you would be relying on       09:47:45
14 to support your positions that are not        09:47:49
15 cited in your declaration?        09:47:51
16    A.    Okay. Let me just remind        09:47:52
17 myself of that. In relation to the trust       09:47:54
18 issue I would give you more views, more       09:48:10
19 extensive on Hunter and Moss and Ruscoe       09:48:26
20 and Cryptopia.        09:48:30
21        I would also draw your        09:48:32
22 attention, and I think this may be in my       09:48:35
23 additional document, to the excellent       09:48:43
24 analysis by Briggs J, as he then was. He       09:48:45
25 is now a Supreme Court Justice. In        09:48:52

Page 35

1 Lomas, Pearson, Lomas against Lehman        09:49:00
2 Brothers; which contains really the best       09:49:04
3 analysis of what is required to        09:49:11
4 demonstrate that a customer has an        09:49:15
5 equitable proprietary interest as a        09:49:17
6 tenant in common in a commingled fund.       09:49:20
7 And he sets out at that case at        09:49:24
8 paragraphs 225 to 232 of Pearson, Lomas       09:49:28
9 v. Lehman Brothers, really what you need       09:49:38
10 to find to reach that conclusion. So        09:49:40
11 that's in relation to the trust issue.       09:49:50
12        I would also, in relation to        09:49:52
13 some contractual issues on the particular       09:49:54
14 terms here, refer you to an additional        09:50:01
15 provision in Snell's Equity, which is the       09:50:08
16 standard textbook and most used by        09:50:23
17 practitioners in relation to a number of       09:50:25
18 points. I think I've, I know I referred       09:50:28
19 to Snell's Equity in my original        09:50:30
20 declaration, paragraphs, various        09:50:35
21 paragraphs.        09:50:39
22        But a particular additional        09:50:43
23 point which I would make in response to       09:50:44
24 Lord Neuberger's apparent reliance on        09:50:49
25 clause 213 of the terms, is the point        09:50:52

Page 36

1 that where there is a bare trust, as I        09:50:58
2 say here, a trustee may sometimes hold        09:51:03
3 property for a beneficiary without having       09:51:08
4 any equitable powers of management over       09:51:11
5 it and, and this is important for clause       09:51:14
6 213, without owing any fiduciary duties       09:51:18
7 to the beneficiary in respect of it.        09:51:22
8        That particular passage of        09:51:25
9 Snell was not included in my original        09:51:26
10 report because I hadn't found it. But it       09:51:32
11 ties in with my own views of the case.        09:51:35
12    Q.    Is there any other cases or        09:51:38
13 authorities that are not cited in your        09:51:46
14 report besides the ones that you just        09:51:48
15 mentioned that you would be relying on        09:51:51
16 for your positions?        09:51:53
17    A.    I did, I believe, refer to an        09:51:55
18 important case on bailment called Mercer       09:51:59
19 against Craven Storage [1994] CLC 328. A       09:52:08
20 House of Lords case. But I don't think        09:52:18
21 that I, in my analysis of bailment,        09:52:20
22 sufficiently appreciated the importance       09:52:23
23 of that authority, which if I were        09:52:26
24 cross-examined in a court I would wish to       09:52:29
25 bring to the Court's attention.        09:52:32

Page 37

1        That is an important case        09:52:34
2 because it demonstrates that where        09:52:37
3 persons contribute their fungible goods       09:52:41
4 on a bailment and those goods are mixed       09:52:43
5 irretrievably with identical fungible        09:52:47
6 goods, and where the mixed bulk was then       09:52:50
7 drawn upon and then replenished with        09:52:55
8 records sharing how those receipts and        09:52:56
9 withdrawals were made, the customers can       09:52:59
10 be entitled to an interest in the bulk in       09:53:01
11 proportion to their contributions as        09:53:05
12 bailors.        09:53:08
13        That was a grain case where        09:53:10
14 farmers mixed their grain with a storage       09:53:13
15 society. And the analysis was that there       09:53:20
16 was proprietary interest by the farmers       09:53:22
17 who contributed their grain,        09:53:28
18 notwithstanding that the grain had been       09:53:31
19 intermingled and sold and replenished.        09:53:34
20        I would also -- if you're        09:53:41
21 asking me for additional cases, I would       09:53:43
22 also, in connection with a red herring        09:53:49
23 upon which Lord Neuberger relied, namely       09:53:55
24 the rule against surplusage, wish to draw       09:53:59
25 your attention -- I'm sorry, not your,        09:54:04

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

1  the Court's attention to the decision of    09:54:07
2  the Court of Appeal of England and Wales    09:54:11
3  in a Welsh Water v. Corus U.K. Limited    09:54:15
4  case, [2007] EWCA Civ 285 at 13, where    09:54:21
5  Lord Justice Moore-Bick made the    09:54:28
6  important point, and you got it there    09:54:31
7  quoted in my additional notes, the    09:54:34
8  important point for my purposes is that    09:54:35
9  it's unusual for parties to include in    09:54:38
10 the operative part of a formal agreement    09:54:41
11 a whole clause which is not intended to    09:54:46
12 have contractual effect of any kind.  And    09:54:47
13 one starts therefore with the presumption    09:54:53
14 that it was intended to have some effect    09:54:55
15 on the parties' rights and obligations.    09:54:57
16      In other words, that case    09:55:00
17 demonstrates that surplusage in the form    09:55:01
18 of unnecessary verbiage is one thing.    09:55:09
19 But one doesn't expect to find as here,    09:55:11
20 clause 2.8.6, in the operative part of a    09:55:14
21 formal agreement words which are    09:55:17
22 intended, as Lord Neuberger seems to    09:55:19
23 suggest, to have no meaning.    09:55:22
24    Q.   Thank you.  Are there any other    09:55:33
25 cases or authorities that are not cited    09:55:34

Page 39

1  in your written declaration that you are    09:55:37
2  relying on or intend to offer to the    09:55:38
3  Court in support of your positions?    09:55:40
4    A.   I believe I did not refer in my    09:56:02
5  declaration to a case on construction of    09:56:04
6  contracts, two cases for present    09:56:16
7  purposes -- I'm sorry, three cases for    09:56:18
8  present purposes, which I do not believe    09:56:21
9  I referred to.  You see them on page 8 of    09:56:25
10 my additional notes.    09:56:34
11      The first case is re Sigma    09:56:37
12 which is the decision of House of Lords,    09:56:40
13 I believe.  It may be the Supreme Court,    09:56:43
14 but I think it's the House of Lords, as    09:56:44
15 to commercial -- I'm sorry, the task of    09:56:52
16 construction in commercial contracts.    09:56:55
17 And the important point to note from    09:56:58
18 there, although I set out the full    09:57:00
19 analysis at paragraph A of page 8, is    09:57:04
20 that the task of construction is for the    09:57:07
21 Court to interpret, provisions of a    09:57:13
22 contract, as part of the instrument in    09:57:16
23 light of the commercial intentions of the    09:57:20
24 parties.  Those intentions are to be    09:57:20
25 inferred from the face of the instrument    09:57:24

Page 40

1  and from the debtor's business.  Detailed    09:57:26
2  semantical analysis must give way to a    09:57:29
3  business common sense.  The Court will    09:57:32
4  avoid an overliteral interpretation of    09:57:34
5  one provision which has the affect of    09:57:37
6  distorting or frustrating the whole    09:57:38
7  commercial purpose of the instrument.    09:57:43
8  That's a quote from Sigma.  And again,    09:57:44
9  that is important in one's approach or    09:57:47
10 the English Court's approach to the    09:57:52
11 construction.    09:57:54
12      The next additional case which    09:57:55
13 I think, I think the passage from    09:57:58
14 Lewison, Sir Ken Lewison's book on    09:58:05
15 interpretation of the contracts, might be    09:58:08
16 referred to in one of Lord Neuberger's    09:58:10
17 reports, although I don't -- I can't    09:58:12
18 remember for sure, which was approved    09:58:14
19 judiciously, this is an additional case    09:58:19
20 AIG Europe SA against John Wood Group,    09:58:22
21 2021 EWHC 256.  And again, this is in    09:58:26
22 rebuttal to one of Lord Neuberger's    09:58:34
23 points, is that the principles or canons    09:58:38
24 of construction are no more than pointers    09:58:40
25 to ascertaining the meaning of a written    09:58:43

Page 41

1  contract.  They are not to be slavishly    09:58:46
2  applied.  And where they point in    09:58:48
3  different directions, the Court may    09:58:50
4  select those which will produce a    09:58:52
5  reasonable and just result.    09:58:54
6      And then the third additional    09:58:58
7  case is that the Courts will endeavor to    09:58:59
8  give to every clause in the parties'    09:59:02
9  agreement and not to reject a clause    09:59:06
10 unless it is manifestly inconsistent with    09:59:07
11 or repugnant to the balance of the    09:59:11
12 agreement.    09:59:13
13      In fact, I think that RWE    09:59:13
14 Npower Renewables, Lord Moore-Bick, is    09:59:19
15 not a new case.  I believe that was in my    09:59:20
16 original, my original report.    09:59:25
17      So those were the additional    09:59:30
18 authorities which, in the light of    09:59:32
19 comments made by Lord Neuberger, I would    09:59:37
20 wish to bring to the Court's attention if    09:59:38
21 I had an opportunity to do so.    09:59:43
22    Q.   I want to go back to your    09:59:44
23 original report which has been marked as    09:59:58
24 Exhibit 1.    09:59:59
25    A.   Okay.    10:00:00

11 (Pages 38 - 41)

CONFIDENTIAL

1    Q.   Just with respect to your          10:00:04
2  report, did you prepare the initial draft     10:00:07
3  of the report?                    10:00:11
4    A.   What do you mean by prepare?        10:00:12
5  If you mean type, no.              10:00:15
6    Q.   I mean did you write this         10:00:19
7  report, what's been marked as Exhibit 1?     10:00:24
8    A.   I am responsible for the         10:00:28
9  report. I did not type it. I          10:00:29
10 articulated my views in relation to each    10:00:30
11 topic and as a result of my articulation    10:00:34
12 and expression of my views, an original     10:00:39
13 draft was produced. I did not type it.      10:00:43
14 It reflects my views.               10:00:47
15   Q.   Do you know who produced the       10:00:48
16 initial draft?                   10:00:50
17   A.   Yes, I do.                 10:00:51
18   Q.   Who did?                  10:00:52
19   A.   Ms. Karen Petch, who is a         10:00:52
20 barrister not in my chambers, who was       10:00:58
21 instructed to assist me with the         10:01:01
22 preparation of the report and research.     10:01:04
23   Q.   Can you walk me through the       10:01:13
24 process from the initial draft of the       10:01:14
25 report that you reviewed to the final      10:01:16

1  report that was submitted in this matter?    10:01:18
2    A.   Yes, we can.                10:01:19
3    Q.   And can you just explain to me     10:01:20
4  how you got from that initial draft to      10:01:22
5  the final version, what the process was?     10:01:23
6    A.   Okay. There were a number of      10:01:26
7  drafts. What happened was that in the       10:01:27
8  first instance I was provided by Latham     10:01:35
9  London with some -- sorry, when I say       10:01:41
10 Latham London, it may be Latham London      10:01:48
11 and Latham New York -- with a few         10:01:50
12 documents. I was asked on a telephone       10:01:53
13 conference on what my views on certain      10:02:03
14 issues were. And in particular in         10:02:05
15 relation to the issue about the interest     10:02:07
16 which Three Arrows had in the digital       10:02:19
17 assets under the terms, the standard       10:02:27
18 terms, FTX terms of service dated May      10:02:37
19 13th, 2022.                     10:02:40
20       And I was asked what my view      10:02:43
21 was as to whether on the basis of those     10:02:48
22 terms my view was that FTX -- I'm sorry,    10:02:50
23 that Three Arrows had an equitable        10:03:00
24 proprietary interest or merely a personal    10:03:07
25 contractual interest in the digital        10:03:09

1  assets.                   10:03:10
2        I expressed my views and, as a     10:03:12
3  result, a draft was produced by Ms. Petch    10:03:17
4  which we then discussed, again, in a       10:03:27
5  conference with her and Latham's team. I    10:03:35
6  expressed my views. I said that there      10:03:39
7  should be amendments in the drafting. I     10:03:43
8  expressed views about how my opinion       10:03:53
9  should be more accurately reflected. And    10:03:57
10 as a result the drafting process         10:03:59
11 continued.                    10:04:07
12       On occasions I would myself      10:04:14
13 type additional amendments or additional    10:04:17
14 paragraphs changing the wording, because    10:04:20
15 I am quite specific about how I use my      10:04:24
16 language, how I write. I would change      10:04:28
17 the analysis. Sometimes just dictating      10:04:34
18 in a conference, at other times amending    10:04:38
19 on the draft myself. But it was an        10:04:42
20 iterative process.               10:04:47
21   Q.   Your opinions rely on and        10:04:57
22 assume certain factual matters, correct?    10:05:01
23   A.   Yes. I was instructed to        10:05:03
24 assume certain factual matters.          10:05:09
25   Q.   And you're not testifying,       10:05:10

1  offering testimony to the Court with       10:05:18
2  respect to the validity of any of those     10:05:19
3  assumed facts, correct?              10:05:25
4    A.   I am not sure what you mean by     10:05:27
5  validity.                    10:05:29
6    Q.   You're not offering testimony     10:05:30
7  with respect to the factual accuracy of     10:05:31
8  any of those assumptions?             10:05:34
9    A.   Correct, I am not offering       10:05:36
10 testimony in relation to the factual      10:05:39
11 accuracy of any such matters.           10:05:40
12   Q.   Did you do anything in your       10:05:43
13 work to verify the factual assumptions      10:05:49
14 that underlie your opinions?            10:05:51
15   A.   No, that was not my role.        10:05:52
16   Q.   Dame Elizabeth, if you can look    10:05:53
17 at page 3 of your report. It's Exhibit      10:06:16
18 1. Starting there in Section 2 there are    10:06:19
19 questions for consideration and it lists    10:06:26
20 seven questions going onto the next page,    10:06:28
21 do you see that?                 10:06:30
22   A.   Correct.                  10:06:31
23   Q.   Did you personally formulate      10:06:35
24 those seven questions?              10:06:36
25       MR. HARRIS:  Object to the form.  10:06:46

12 (Pages 42 - 45)

CONFIDENTIAL

1     A.   No, I was asked to answer those    10:06:50
2  questions.  But when you say formulate, I    10:06:57
3  am not quite sure what you mean.    10:07:06
4     Q.   Let me back up.  So your    10:07:11
5  testimony was that you were asked to    10:07:12
6  answer these seven questions, correct?    10:07:13
7     A.   Correct.    10:07:15
8     Q.   So were these seven questions    10:07:17
9  provided to you by Latham?    10:07:22
10     A.   Yes, they were.    10:07:23
11     Q.   Am I correct that you received    10:07:37
12  those questions, analyzed and answered    10:07:41
13  those questions as provided by Latham,    10:07:45
14  correct?    10:07:46
15     A.   Yes.    10:07:46
16     Q.   Were there any other questions    10:08:02
17  that were posed to you in connection with    10:08:03
18  this assignment that you declined to    10:08:05
19  answer?    10:08:07
20     A.   There two questions there, were    10:08:07
21  any other questions posed to me -- sorry,    10:08:12
22  let me back up.    10:08:15
23        Is that one question or two    10:08:16
24  questions?    10:08:17
25     Q.   Were there questions that you    10:08:19

1  were asked to answer beyond the seven    10:08:20
2  reflected in your declaration that you    10:08:23
3  declined to answer?    10:08:26
4     A.   None that I declined to answer,    10:08:27
5  no.    10:08:29
6     Q.   Are there other questions that    10:08:29
7  you did answer that are not reflected in    10:08:42
8  your final report?    10:08:44
9     A.   I don't think so.    10:08:46
10     Q.   Did you perform any analysis as    10:09:12
11  to whether English law is the appropriate    10:09:17
12  law to be applied by a U.S. Court with    10:09:19
13  respect to each of the seven questions    10:09:23
14  that you answered?    10:09:25
15     A.   No, I didn't.  I was asked to    10:09:25
16  answer by reference to English law.    10:09:32
17     Q.   So your opinions assume that    10:09:41
18  English law would apply to each of these    10:09:42
19  questions, correct?    10:09:44
20     A.   Correct.    10:09:44
21     Q.   Am I correct that your    10:10:08
22  declaration reflects opinions about how    10:10:09
23  you believe an English Court would    10:10:13
24  interpret the May 2022 FTX terms of    10:10:16
25  service in relation to these questions,    10:10:19

1  correct?    10:10:22
2     A.   Yes.    10:10:22
3     Q.   And when I refer to the May    10:10:32
4  2022 FTX terms of service, do you know    10:10:33
5  what I am referring to?    10:10:36
6     A.   Yes, I do.    10:10:37
7     Q.   If I refer to those today as    10:10:41
8  the dotcom terms, would you understand    10:10:44
9  what I am talking about?    10:10:47
10     A.   That's fine by me, yes.    10:10:47
11        Can I just make sure that we're    10:10:50
12  talking about the same thing?    10:10:53
13     Q.   I will show it to you in a    10:10:54
14  moment when we get to talking about it,    10:10:55
15  yes.    10:10:57
16        You're not offering any expert    10:11:02
17  opinions to the Court in this matter with    10:11:04
18  respect to BVI law issues, correct?    10:11:08
19     A.   No, I am not.    10:11:10
20     Q.   And you're not offering any    10:11:12
21  opinions to the Court with respect to    10:11:13
22  this matter on Antigua law questions,    10:11:14
23  correct?    10:11:18
24     A.   No, I am not.    10:11:18
25     Q.   You testified a few moments ago    10:11:26

1  that you made certain factual assumptions    10:11:29
2  in connection with your analysis in your    10:11:33
3  report, correct?    10:11:36
4     A.   No.  I testified that I'd been    10:11:36
5  instructed to assume certain -- to make    10:11:40
6  certain assumptions.    10:11:45
7     Q.   Are there any factual    10:11:48
8  assumptions that you rely on that are not    10:11:50
9  disclosed in your report?    10:11:52
10     A.   I don't think so, no.    10:11:53
11     Q.   The factual assumptions to    10:12:28
12  which you were instructed are material to    10:12:29
13  your analysis, correct?    10:12:32
14     A.   They are the basis upon which I    10:12:33
15  made my analysis.    10:12:41
16     Q.   If any of the factual    10:12:45
17  instructions, the factual assumptions on    10:12:46
18  which you were instructed were changed,    10:12:52
19  you would need to reconsider your    10:12:53
20  opinions, correct?    10:12:56
21        MR. HARRIS:  Object to the form.    10:12:57
22     A.   No, it would depend on what the    10:12:58
23  changes were to those factual    10:13:04
24  assumptions.    10:13:08
25     Q.   Certainly there could be    10:13:09

CONFIDENTIAL

Page 50

1 factual assumptions if they were changed    10:13:13
2 that would cause you to reconsider your    10:13:16
3 opinion, correct?    10:13:18
4    A.   It would depend.  If they were    10:13:19
5 material, I might well have to reconsider    10:13:26
6 my opinion.    10:13:28
7    Q.   So if he would can look at    10:13:39
8 Section 4 of your report, it starts on    10:13:41
9 page 8.  Section 4 is entitled "Factual    10:13:43
10 Background and Key Documents," do you see    10:13:55
11 that?    10:13:57
12    A.   Yeah, I see that.    10:13:57
13    Q.   Did you do any analysis to    10:13:58
14 consider whether any of your opinions    10:14:05
15 would change if any of the factual    10:14:09
16 background set out in Section 4 of your    10:14:12
17 report changed?    10:14:14
18    A.   Analysis of what?    10:14:15
19    Q.   Did you consider whether any of    10:14:22
20 your opinions would change if the factual    10:14:27
21 background laid out in Exhibit 4 was    10:14:31
22 changed?    10:14:34
23    A.   No, that would have been a    10:14:35
24 hypothetical exercise.    10:14:36
25    Q.   Fair to say your opinions are    10:14:46

Page 51

1 based on the factual background as set    10:14:48
2 out and assumed in your declaration,    10:14:54
3 correct?    10:14:59
4    A.   Yes, with the addition that the    10:15:00
5 additional factual matters upon which I    10:15:06
6 have now been instructed also are matters    10:15:10
7 upon which my analysis and opinion is    10:15:18
8 based, and in that context, I refer to    10:15:20
9 two facts which you have already seen in    10:15:25
10 my notes at Exhibit 2, namely the    10:15:31
11 additional information contained in the    10:15:35
12 financial statements of FTX and the    10:15:39
13 safeguarding principles which I now    10:15:43
14 understand or am instructed to assume    10:15:48
15 were available to traders or users on the    10:15:55
16 exchange and which expressly stated that    10:15:59
17 all third-party providers are aware that    10:16:06
18 customer assets are held in trust and    10:16:10
19 that all third-party providers will be    10:16:12
20 aware that customer assets do not    10:16:16
21 represent assets of FDM.    10:16:19
22    Q.   And you're referring to what is    10:16:26
23 on page 2 of your notes marked as Exhibit    10:16:28
24 2, Section A; is that correct?    10:16:31
25    A.   Correct, A through E.  Those    10:16:34

Page 52

1 are the additional -- well, there are    10:16:37
2 certain additional facts in there that    10:16:40
3 are additional facts upon which I base my    10:16:43
4 analysis.  When I say facts, I assume    10:16:49
5 them; I don't know whether they are true    10:16:50
6 or not.    10:16:53
7    Q.   It's fair to say that the    10:17:18
8 safeguarding principles document, as you    10:17:19
9 refer to it, is a factual assumption that    10:17:21
10 is material to your analysis, correct?    10:17:23
11    A.   Yes, it is not outcome    10:17:25
12 determinative, but it is of assistance to    10:17:36
13 my analysis.    10:17:40
14    Q.   You use the term, Dame    10:18:21
15 Elizabeth, you use the term "factual    10:18:23
16 matrix" throughout your report.  Can you    10:18:25
17 please explain, so the record in this    10:18:27
18 case is clear, what you refer to by the    10:18:31
19 term "factual matrix"?    10:18:33
20    A.   Yes, there is a quote in one of    10:18:35
21 the authorities which will articulate it    10:18:37
22 better than I can sitting here without    10:18:38
23 reference to my notes.  But basically,    10:18:41
24 it's the factual matters surrounding the    10:18:46
25 making of the contract, which are known    10:18:49

Page 53

1 to the parties to the contract or of    10:18:54
2 which a reasonable person in their    10:18:56
3 position would be aware.    10:19:00
4    Q.   If you can turn to paragraph 35    10:19:23
5 of your declaration, which is on page 13,    10:19:25
6 please.  It you see that, Dame Elizabeth?    10:19:28
7    A.   Yes, I do.    10:19:44
8    Q.   Paragraph 35 appears to    10:19:45
9 summarize, as you say, "To me 3AC has    10:19:46
10 alleged three different breaches in the    10:19:50
11 APOC, which is defined as the Amended    10:19:52
12 Proof of Claim."    10:19:56
13      Do you see that?    10:19:57
14    A.   These are what I've been    10:19:58
15 instructed.    10:20:04
16    Q.   Okay.  And so did you draft the    10:20:04
17 factual background section starting at    10:20:10
18 paragraph 18 of your declaration and    10:20:11
19 continuing through paragraph 37?    10:20:15
20    A.   Did I draft it?  Yes, I did.    10:20:20
21 It was drafted on my instruction.  I was    10:20:22
22 told a number of facts, obviously.  And    10:20:25
23 these were the facts that I was asked to    10:20:28
24 assume, but I did draft it, yes.    10:20:29
25    Q.   So the summary of the breaches    10:20:34

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

1  that is described in paragraph 35, is          10:20:41
2  that your language interpreting the           10:20:43
3  allegations?                                  10:20:44
4      A.   I would have been told that          10:20:45
5  these were the allegations that were          10:21:00
6  being made in the breach of contract          10:21:01
7  claim.                                        10:21:04
8          I had the APOC in front of me,        10:21:05
9  but if this is an incorrect summary, do I     10:21:09
10 take responsibility for it?  I don't          10:21:17
11 know, it depends.  I was instructed that      10:21:20
12 these allegations were being made.  I         10:21:22
13 looked to see whether they were being         10:21:29
14 made and I believe that is the                10:21:31
15 allegations that were being made at the       10:21:41
16 time I did -- sorry, at the time of the       10:21:44
17 APOC.                                         10:21:46
18     Q.   Paragraph 37 on page 15.             10:21:47
19     A.   Yes.                                 10:22:07
20     Q.   You write there, "I am further       10:22:08
21 instructed to assume that both FTX and        10:22:10
22 3AC knew the facts above prior to 3AC         10:22:11
23 entering into the Terms."                     10:22:15
24         Do you see that?                      10:22:17
25     A.   Yes.                                 10:22:18

Page 55

1      Q.   And when you say "The facts          10:22:19
2  above," you're referring to what is the       10:22:21
3  other paragraphs starting at paragraph 18     10:22:23
4  in Section 4 of your declaration,             10:22:26
5  correct?                                      10:22:29
6      A.   Well, it's obviously not             10:22:29
7  referring to the APOC, is it, because         10:22:31
8  that postdates the entry into the             10:22:34
9  contract.                                     10:22:38
10         So the facts I am referring to        10:22:46
11 are 36, but not -- you're right to pick       10:22:49
12 me up on what are the facts I am              10:23:03
13 referring to.  The paragraphs in 36.          10:23:07
14 They would also include 22.  The others       10:23:12
15 postdated, I think the entry into the         10:23:40
16 terms by 3AC.                                 10:23:48
17     Q.   I am just trying to understand,      10:24:06
18 Dame Elizabeth, whether any of the other      10:24:07
19 paragraphs, for example, 24, 25, 28 --        10:24:09
20     A.   Well, no, because they postdate      10:24:13
21 the entry into the terms, don't they?  24     10:24:14
22 postdates.  25 postdates.  26 postdates.      10:24:17
23 27 postdates.  28 postdates.  29 through      10:24:21
24 to 35 all postdated.  So I think 37 is        10:24:31
25 referring specifically to paragraph 36.       10:24:41

Page 56

1      Q.   I think you testified also 22,       10:24:50
2  correct?                                      10:24:53
3      A.   22, yes.                             10:24:53
4      Q.   With respect to paragraph 36         10:25:05
5  that's referenced to being known to FTX       10:25:07
6  and 3AC prior to 3AC entering into the        10:25:09
7  terms, were you provided any documents to     10:25:11
8  support the facts set forth in paragraph      10:25:21
9  36?                                           10:25:26
10     A.   I was instructed to assume           10:25:27
11 those facts.  It may be that some of the      10:25:31
12 documents with which I was provided which     10:25:37
13 I refer to in my declaration might            10:25:43
14 support the facts set forth in paragraph      10:25:52
15 36.  I do not recall.                         10:25:53
16     Q.   For purposes of your report,         10:26:01
17 you were instructed on those facts as set     10:26:02
18 forth in paragraph 36 and you accepted        10:26:08
19 them as true for purposes of your             10:26:09
20 analysis, correct?                            10:26:10
21     A.   Well, I was instructed to            10:26:11
22 assume they were correct.  I don't think      10:26:17
23 it was relevant whether I accepted them       10:26:19
24 or not.  That was the basis -- it was on      10:26:22
25 the basis of those assumptions that I         10:26:25

Page 57

1  gave my report.                              10:26:26
2      Q.   And the assumptions on the           10:26:31
3  basis which you gave your report with         10:26:32
4  respect to the matters set forth in           10:26:35
5  paragraph 36 are the facts as written in      10:26:36
6  that paragraph, correct?                      10:26:41
7      A.   Yes.                                 10:26:45
8      Q.   In paragraph 37, where you           10:26:46
9  said -- where you assume that 3AC knew        10:26:59
10 the facts above, are you assuming that        10:27:04
11 both FTX and 3AC had actual knowledge or      10:27:09
12 constructive knowledge of these facts?        10:27:14
13         MR. HARRIS:  Object to the form.      10:27:18
14     A.   I wasn't asked to assume other       10:27:19
15 than that they knew.  I was not invited       10:27:30
16 to debate the difference between actual       10:27:33
17 and constructive knowledge.                   10:27:37
18     Q.   Well, when you use the term          10:27:41
19 "knew" in paragraph 37, how are you           10:27:43
20 defining it then?                             10:27:45
21     A.   Well, "knew" could comprise          10:27:46
22 both.  I am not expressing a view either      10:27:53
23 way as to actual or constructive.             10:27:56
24     Q.   Does it make any difference to       10:28:03
25 any part of your analysis whether the         10:28:05

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

1  knowledge was only constructive rather    10:28:06
2  than actual?                              10:28:08
3    A.   Under English law there is          10:28:16
4  quite a debate as to what constructive    10:28:17
5  knowledge means.  Don't let's get there.  10:28:19
6      But for the purposes of my             10:28:23
7  analysis, I don't think it does make any  10:28:24
8  difference, whatever constructive         10:28:27
9  knowledge means.                          10:28:29
10   Q.   If it were merely possible that     10:28:30
11 3AC knew the facts in paragraph 36, but   10:28:43
12 did not actually know them, would that    10:28:46
13 impact your analysis?                     10:28:49
14     MR. HARRIS:  Object to the form.       10:28:50
15   A.   I don't think so, no.  That's       10:28:51
16 an evidential question for the judge, I   10:29:06
17 think.                                    10:29:09
18   Q.   If 3AC did not have knowledge       10:29:09
19 of the facts set forth in paragraph 36,   10:29:18
20 would that affect your opinion?           10:29:21
21   A.   I don't think so, no.               10:29:23
22   Q.   Can you explain why not?            10:29:37
23   A.   Because one's got to -- a Court     10:29:38
24 will approach the issue as to whether a   10:29:44
25 trader has an equitable proprietary       10:29:49

Page 59

1  interest by reference to the terms in      10:29:52
2  particular and to the surrounding          10:30:00
3  circumstances, irrespective of whether     10:30:05
4  the 3AC knew prior to entering into the    10:30:11
5  contract that the exchange operated as it  10:30:17
6  did or as I have been asked to assume it   10:30:22
7  did.                                       10:30:25
8      The analysis carried out by the        10:30:32
9  Court has got to be based upon the terms   10:30:34
10 and what happened in practice so far as    10:30:42
11 the debtor, which I mean FTX, did to       10:30:47
12 operate its business and to implement or   10:30:55
13 operate the trust if there is one.  So     10:31:02
14 the Court will look at the manner in       10:31:07
15 which trading was conducted as well as     10:31:15
16 the terms to establish whether a trust     10:31:23
17 came into existence.  It will do so         10:31:27
18 irrespective of whether a particular       10:31:32
19 point was known by 3AC before it entered   10:31:34
20 into the terms.                            10:31:39
21     MR. GLUECKSTEIN:  We can take a         10:32:03
22 break.                                     10:32:04
23     THE VIDEOGRAPHER:  Off the             10:32:12
24 record at 10:30 a.m.                       10:32:19
25   (Off the record.)                        10:54:40

Page 60

1      THE VIDEOGRAPHER:  Back on the         10:54:42
2  record.  The time is 10:54 a.m.           10:54:44
3  BY MR. GLUECKSTEIN:                        10:54:46
4    Q.   Dame Elizabeth, before the          10:54:46
5  break we were talking about the factual   10:54:57
6  assumptions in your report and in that    10:54:58
7  regard if you can turn to paragraph 27 of 10:55:01
8  your report on page 12.  Do you see that? 10:55:04
9    A.   I have it.                          10:55:15
10   Q.   The last sentence of paragraph      10:55:15
11 27 you write, "I am, however, instructed   10:55:17
12 to assume for the purpose of my analysis  10:55:20
13 that 3AC carried out, or was responsible  10:55:22
14 for, the transactions other than the FTX  10:55:24
15 Liquidations."                            10:55:29
16     Do you see that?                       10:55:30
17   A.   Yes.                                10:55:31
18   Q.   And then in paragraph 35 on the     10:55:31
19 next page when you're discussing the      10:55:35
20 breaches of the APOC --                    10:55:38
21   A.   No, these are the breaches that     10:55:42
22 are alleged in the APOC.                   10:55:45
23   Q.   These are the breaches that are     10:55:46
24 alleged.  I am just trying to understand, 10:55:48
25 for purposes of your analysis, does your  10:55:53

Page 61

1  analysis take into account the            10:55:55
2  allegations that differ from paragraph 27 10:55:57
3  that there were violations of certain     10:56:00
4  requirements prior to the 13th of June    10:56:08
5  2022?                                     10:56:10
6      MR. HARRIS:  Object to the form.       10:56:12
7    A.   Could you explain what you mean     10:56:13
8  by the differences?                       10:56:22
9    Q.   So in paragraph 35 (b) of your      10:56:24
10 declaration you're describing --          10:56:28
11   A.   Am I allowed to mark this          10:56:30
12 exhibit or not, with my pen, just to      10:56:32
13 emphasize what you're referring me to?    10:56:36
14   Q.   Well --                            10:56:38
15   A.   I will do it on my own copy,        10:56:40
16 then.                                     10:56:42
17   Q.   -- I think for the record we        10:56:42
18 should have it unmarked.                   10:56:49
19   A.   You can check this one.  It's       10:56:50
20 the same.  Okay.  35.                      10:56:52
21   Q.   I am trying to understand in 35     10:56:53
22 (b), I'm sorry, I referenced (ii) by      10:56:55
23 mistake.  It says "(i) assumes FTX        10:56:59
24 carried out or allowed actions that       10:57:02
25 resulted in the sale, transfer or         10:57:03

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

CONFIDENTIAL

Page 62

1  liquidation of some or all of the 3AC    10:57:05
2  assets specifically on 13 June 2022."    10:57:09
3       Do you see that?    10:57:11
4    A.  Yes.    10:57:13
5    Q.  So I am just trying to    10:57:13
6  understand whether you took that fact    10:57:14
7  into account, that allegation as part of    10:57:19
8  your analysis since it differs from the    10:57:20
9  assumption in paragraph 27 that we just    10:57:26
10 referenced?    10:57:28
11   A.  The difference is the date, is    10:57:28
12 it?    10:57:30
13   Q.  Yes.  Whether or not you're    10:57:31
14 assuming for your analysis that FTX    10:57:35
15 carried out transfers on 13th of June or    10:57:40
16 only on the 14th of June?    10:57:43
17   A.  I didn't take into account that    10:57:47
18 difference if it is indeed one.    10:57:50
19   Q.  So is your statement in    10:57:58
20 paragraph 27, the assumption that is    10:57:59
21 reflected there, is that how you    10:58:03
22 proceeded on your analysis?    10:58:05
23   A.  Well, I based on the date of    10:58:07
24 the 14th of June.  Although there is an    10:58:20
25 ambiguity, if you look at the assumption    10:58:23

Page 63

1  in paragraph 25, because it says between    10:58:30
2  13th of June '22 and 14th of June, the    10:58:32
3  3AC digital assets were substantially    10:58:35
4  also liquidated, et cetera, which doesn't    10:58:40
5  refer specifically as paragraph 27 does    10:58:41
6  to FTX being responsible on the 14th of    10:58:47
7  June.  So it's not clear in 25.    10:58:50
8       But it appears to be clear from    10:58:56
9  the assumption I am asked to make at    10:58:58
10 paragraph 27 that I am asked to assume    10:59:00
11 that it was on the 14th of June.  The    10:59:07
12 allegation in 35 (b), as you pointed out    10:59:12
13 to me, refers to the 13th of June.    10:59:15
14 Whether or not that is a material    10:59:22
15 distinction of fact, I do not know.    10:59:22
16      If I spotted the difference, it    10:59:25
17 didn't affect or take -- or make a    10:59:30
18 difference to my analysis.  And I don't    10:59:34
19 know whether I spotted the difference or    10:59:41
20 not.  I can't remember.    10:59:43
21   Q.  In paragraph 23 (b), on page    10:59:46
22 11, on the last sentence there, you    10:59:57
23 write, "In the Chapter 11 proceedings    10:59:59
24 (defined below) FTX has taken the    11:00:02
25 position that other users of the    11:00:04

Page 64

1  exchange" --    11:00:05
2    A.  I am on the wrong paragraph,    11:00:06
3  forgive me.    11:00:07
4    Q.  23 (b)?    11:00:08
5    A.  Yes.    11:00:10
6    Q.  The last paragraph there states    11:00:10
7  in part, "FTX has taken the position that    11:00:11
8  other users of the exchange and    11:00:14
9  participants in its margin lending    11:00:17
10 program loaned 3AC such borrowed assets.    11:00:19
11 FTX maintains that it did not guarantee    11:00:23
12 such loans."    11:00:25
13      Do you see that?    11:00:26
14   A.  Yes.    11:00:27
15   Q.  Are you, in your opinion,    11:00:32
16 disputing that position?    11:00:34
17      MR. HARRIS:  Object to the form.    11:00:44
18   A.  I am not disputing anything as    11:00:45
19 a matter of fact.  I am based on the    11:00:47
20 assumptions that I have been asked to    11:00:55
21 make.    11:00:57
22      And if you're referring to the    11:00:57
23 first sentence there or the second    11:01:01
24 sentence, neither -- sorry, what is the    11:01:08
25 question that you're asking me?  Are you    11:01:16

Page 65

1  disputing?  No, I am not disputing    11:01:18
2  anything as a matter of fact.  I can't.    11:01:20
3  I am just reciting what is being alleged    11:01:22
4  by both sides.    11:01:24
5    Q.  Okay.  If the assets borrowed    11:01:25
6  on the exchange by 3AC credited to its    11:01:35
7  account came from other users, does that    11:01:39
8  affect your analysis?    11:01:44
9    A.  No.    11:01:46
10   Q.  You don't believe there is any    11:01:49
11 difference in your analysis as to whether    11:01:52
12 the obligations on the exchange of 3AC    11:01:54
13 were to FTX or to other users?    11:02:01
14   A.  There is someplace in my report    11:02:03
15 which I would need to find where I do    11:02:11
16 refer to the fact that it looks as though    11:02:14
17 the loans came from other users rather    11:02:33
18 than FTX.  But I can't remember without    11:02:35
19 going through my report the context or    11:02:40
20 the paragraph or which issue I was    11:02:42
21 addressing in relation to that point, so    11:02:45
22 you would have to take me to it.    11:02:55
23      I know I pick up on the point    11:02:56
24 about who was making the lending at some    11:02:58
25 stage, I think in the context of setoff.    11:03:00

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

1  But I would have to go back and remind          11:03:04
2  myself of the particular point where I          11:03:06
3  refer to who was making the loan.               11:03:12
4      Q.   In paragraph 24 (b) of your            11:03:13
5  report, the top of page 12, do you see          11:03:36
6  that paragraph?                                 11:03:38
7      A.   Yes.                11:03:38
8      Q.   You write that "3AC separately         11:03:40
9  had a substantial negative USD balance on       11:03:43
10 the -- in fiat currency on the exchange,"       11:03:46
11 and it goes on from there.  Do you see          11:03:50
12 that?                    11:03:52
13     A.   Yes.                11:03:52
14     Q.   What do you mean when you write        11:03:56
15 separately, use the word "separately" in        11:04:00
16 that sentence?              11:04:02
17     A.   Okay.  Separately from the             11:04:15
18 assets to which I refer to at A.                11:04:16
19     Q.   And are you offering an                11:04:32
20 opinion as a legal matter with respect to       11:04:34
21 whether the negative USD balance is             11:04:38
22 separate from the assets?        11:04:40
23     A.   Yes, that is a matter which I          11:04:41
24 address in question 3, articulated at           11:04:45
25 page 6 and answered variously in my             11:04:58

Page 67

1  declaration.  And when I say answered          11:05:03
2  variously, I mean answered at various          11:05:13
3  paragraphs.                11:05:15
4      Q.   So in your view, your answer to       11:05:19
5  question 3 as reflected in your                11:05:24
6  declaration addresses, at least in part,       11:05:26
7  the issue of separateness of assets and        11:05:30
8  negative USD balance as reflected in           11:05:34
9  paragraph 24?              11:05:36
10     A.   Yes, I think so.        11:05:37
11     Q.   Are you aware that on the             11:05:55
12 exchange a customer could have had a           11:05:57
13 positive USD balance?            11:05:59
14     A.   Yes, I have been instructed to        11:06:00
15 assume that.              11:06:09
16     Q.   You have been instructed to          11:06:10
17 assume that -- you have been instructed        11:06:12
18 to assume what with respect to U.S.            11:06:16
19 dollar balance?              11:06:19
20     A.   I mean, I assume -- it's             11:06:19
21 implied in what I say, if you're going to       11:06:23
22 have a negative USD balance, you can have       11:06:25
23 a positive USD balance.          11:06:28
24     Q.   Are you aware that a customer         11:06:30
25 could have a negative balance of a             11:06:32

Page 68

1  particular given digital asset on the          11:06:34
2  exchange?                11:06:36
3      A.   Yes.                11:06:36
4      Q.   Are you aware that when a             11:06:43
5  customer logged onto the exchange they          11:06:45
6  did see a single dollarized account            11:06:47
7  balance which aggregated negative and          11:06:50
8  positive positions in digital assets and       11:06:52
9  fiat currency?              11:06:54
10         MR. HARRIS:  Object to the form.  11:06:55
11     A.   That's a factual matter in           11:07:04
12 relation to which I have not been             11:07:06
13 instructed.                11:07:10
14     Q.   So that's not a fact on which         11:07:10
15 you have been instructed as it relates to       11:07:14
16 your consideration of question 3 in your       11:07:16
17 report?                11:07:17
18     A.   Not unless it's in the               11:07:19
19 assumptions and I don't believe it is.         11:07:23
20     Q.   Are you aware that as a factual       11:07:25
21 matter the FTX exchange considered a           11:07:38
22 customer's positive and negative             11:07:40
23 positions in assessing their margin           11:07:43
24 maintenance requirements under Section         11:07:45
25 16.2 of the dotcom terms?        11:07:47

Page 69

1      A.   Not as a factual matter, no.         11:07:51
2      Q.   Is that a fact that forms any         11:07:57
3  part of your assumptions?        11:08:01
4          MR. HARRIS:  Object to the form.  11:08:07
5      A.   If you look at 16.2, the terms       11:08:08
6  are there set out.            11:08:25
7      Q.   I'm sorry, you're looking at         11:08:26
8  the dotcom terms now?            11:08:28
9      A.   Yes.                11:08:29
10     Q.   I would just like to mark that       11:08:31
11 as an exhibit then, so we have it in the       11:08:33
12 record.  We haven't done that yet.           11:08:35
13     A.   I am looking at the dotcom           11:08:37
14 terms.                11:08:38
15         (Gloster Exhibit 3, Document         11:08:38
16     Bates stamped FTX_3AC_000013695, was
17     so marked for identification, as of
18     this date.)                11:09:00
19     A.   The answer to your question is       11:09:08
20 no.                    11:09:09
21     Q.   Would the issue of what, as a       11:09:15
22 factual matter, customers saw when they       11:09:21
23 logged into their account be part of the       11:09:23
24 factual matrix relevant to your analysis?     11:09:25
25     A.   No, it wouldn't.          11:09:28

18 (Pages 66 - 69)

CONFIDENTIAL

1    Q.    And why is that?                11:09:29
2    A.    Because it doesn't relate to      11:09:34
3  the issue and in any event, I can't       11:09:43
4  comment on facts which I don't know        11:09:45
5  about.                                  11:09:48
6    Q.    When you say it doesn't relate   11:09:58
7  to the issue, what issue are you talking   11:10:00
8  about?                                  11:10:01
9    A.    Well, the issue is whether the   11:10:02
10 assets are separate, that is to say the    11:10:04
11 assets were separate from the             11:10:09
12 liabilities, and as a matter of English    11:10:13
13 law, the fact that I own a car is an       11:10:16
14 asset.  The fact that I have a liability   11:10:28
15 in respect to the loan to purchase that    11:10:32
16 car does not mean that you can regard the  11:10:36
17 two matters as one outstanding balance.    11:10:45
18 In fact, in other words, disregard the     11:10:48
19 character of the asset and net it off in   11:10:52
20 value terms as against the amount of the   11:10:56
21 liability.  They are separate animals, to  11:11:00
22 use a figurative term.                  11:11:06
23   Q.    The nature of those obligations  11:11:10
24 are a function of the underlying facts,    11:11:12
25 correct?                                11:11:14

1    A.    I don't understand what you're    11:11:15
2  saying.                                 11:11:20
3    Q.    You're making an assumption       11:11:21
4  with respect to assets and liabilities,   11:11:24
5  but you have to understand the underlying  11:11:28
6  facts in order to characterize them as    11:11:29
7  such, correct?                          11:11:33
8    A.    The fact that the -- sorry, I     11:11:33
9  still don't understand the question.       11:11:43
10 What assumption are you asking me to       11:11:43
11 make?  I have to understand the            11:11:45
12 underlying facts, yes.                  11:11:49
13   Q.    You have to understand the        11:11:55
14 underlying facts in order to apply the     11:11:56
15 legal principle that you just             11:11:58
16 articulated, correct?                   11:12:00
17   A.    Correct.                         11:12:00
18   Q.    And you just testified that       11:12:01
19 you're not -- you can't testify with       11:12:02
20 respect to any facts on which you're not   11:12:05
21 aware, correct?                         11:12:07
22   A.    Correct.                         11:12:08
23   Q.    And so the only facts that are    11:12:09
24 included in your analysis are the facts    11:12:14
25 to which you were instructed that are      11:12:17

1  reflected in your report, correct?         11:12:19
2    A.    Correct.                         11:12:21
3    Q.    So there could be other facts     11:12:24
4  relevant to the factual matrix that       11:12:26
5  you're unaware of, but are not included    11:12:28
6  in your analysis, correct?               11:12:31
7    A.    Correct.                         11:12:31
8    Q.    Paragraph 24 (b) that we are      11:12:53
9  looking at, that we were just looking at,  11:12:56
10 sorry, back in your report, on page 12     11:12:58
11 the second sentence references 3AC's       11:13:07
12 negative U.S. dollar balance reflected,    11:13:09
13 among other things, over $600 million in   11:13:12
14 fiat currency.  Do you see that?          11:13:15
15   A.    Yes.                             11:13:17
16   Q.    Do you have any factual           11:13:17
17 understanding of how 3AC accumulated the   11:13:20
18 600 million negative U.S. dollar balance?  11:13:22
19   A.    No, other than what is set out    11:13:25
20 in the assumptions.                     11:13:32
21   Q.    So then you're not aware that     11:13:33
22 3AC's negative U.S. dollar grew every      11:13:46
23 time it bought a digital asset without     11:13:49
24 sufficient U.S. dollars in its account?    11:13:51
25       MR. HARRIS:  Object to the form.    11:13:55

1    A.    Well, that's a factual matter.    11:13:55
2    Q.    I am asking whether you're        11:14:03
3  aware of that factual matter.            11:14:04
4    A.    No, I'm not.                      11:14:06
5    Q.    Paragraph 27 of your report, we   11:14:08
6  looked at these briefly earlier.  Are you  11:14:20
7  there?                                  11:14:29
8    A.    Yes, I am there.                  11:14:29
9    Q.    The other part, in another part   11:14:30
10 of that paragraph you write that "FTX was  11:14:34
11 directly responsible for the sale,         11:14:46
12 liquidation or transfer of some $82        11:14:48
13 million worth of 3AC digital assets and    11:14:50
14 it applied the proceeds in reduction of    11:14:53
15 3AC's negative U.S. dollar balance by      11:14:55
16 approximately $82 million," which is what  11:14:58
17 you define as the FTX liquidations.  Do    11:15:00
18 you see that?                           11:15:02
19   A.    Yes.                             11:15:03
20   Q.    Are you aware as a factual        11:15:03
21 matter that the code of the FTX exchange   11:15:11
22 automatically reduced to negative U.S.     11:15:14
23 dollar balance whenever a digital asset    11:15:16
24 was sold?                               11:15:18
25   A.    I am not aware.                   11:15:19

CONFIDENTIAL

1  Q.  Is it your opinion that at any   11:15:20
2  time when a transaction occurred on the   11:15:37
3  FTX exchange between two customers, that   11:15:38
4  FTX "Applied the proceeds" of such   11:15:40
5  transaction to a customer's account?   11:15:43
6     MR. HARRIS:  Object to the form.   11:15:48
7  A.  I am not sure I understand what   11:15:49
8  you're asking me to express an opinion   11:16:09
9  on.   11:16:11
10  Q.  I am trying to just understand   11:16:14
11  the facts that you are relying on in your   11:16:16
12  opinions.   11:16:19
13     My question was simply whether   11:16:20
14  it is your understanding then that when   11:16:23
15  an exchange occurred between two   11:16:28
16  customers, that FTX applied the proceeds,   11:16:30
17  those are your words, to their account?   11:16:33
18     MR. HARRIS:  Object to the form.   11:16:37
19  A.  Well, I am not dealing with a   11:16:38
20  sale here between two customers or an   11:16:46
21  exchange.  What I'm dealing with here in   11:16:50
22  27, and it's an assumption, is FTX   11:16:59
23  applying the proceeds of the sale   11:17:02
24  liquidation or transfer of $82 million   11:17:09
25  worth of digital assets in reduction of   11:17:15

1  3AC's negative U.S. dollar balance.  I am   11:17:17
2  not dealing with an exchange between two   11:17:21
3  customers where FTX applied the proceeds   11:17:29
4  whichever way to their account.   11:17:32
5  Q.  So outside the single   11:17:43
6  transaction that is referenced in   11:17:44
7  paragraph 27, you don't have a view one   11:17:45
8  way or the other with respect to the FTX   11:17:47
9  exchange operation in this regard?   11:17:49
10     MR. HARRIS:  Object to the form.   11:17:52
11  A.  I don't have a view as to how   11:17:53
12  this exchange operated in relation to   11:17:57
13  exchanges.   11:18:02
14     It's certainly the case that   11:18:03
15  where an exchange effects a transaction   11:18:05
16  between two participants on the exchange,   11:18:08
17  an exchange may, depending on the   11:18:11
18  mechanics of the particular exchange,   11:18:13
19  apply the proceeds of a sale between two   11:18:16
20  customers to one or the other's account.   11:18:19
21  That's how an exchange operates, some   11:18:22
22  exchanges operate.   11:18:32
23  Q.  With respect to the FTX.com   11:18:33
24  exchange, you don't have a view other   11:18:35
25  than exactly --   11:18:37

1  A.  I don't have a view on the   11:18:38
2  facts other than the assumptions I have   11:18:40
3  been asked to make.   11:18:41
4  Q.  In paragraph 28 you state that   11:18:42
5  "I am also instructed that at the time of   11:18:55
6  the FTX liquidations, FTX had made no   11:18:57
7  demand for repayment of any amount owing   11:18:59
8  by 3AC on the exchange but had merely   11:19:02
9  asked for additional collateral to be   11:19:04
10  posted."   11:19:06
11     Do you see that?   11:19:07
12  A.  Yes.   11:19:08
13  Q.  Were you provided any   11:19:11
14  supporting information for the statements   11:19:13
15  in paragraph 28 that form part of the   11:19:16
16  factual basis of your opinion?   11:19:21
17  A.  I don't believe so, no.   11:19:22
18  Q.  Do you recall reviewing any   11:19:24
19  documents with respect to requests for   11:19:27
20  collateral to be posted, for example?   11:19:30
21  A.  I don't understand what you   11:19:31
22  mean by reviewing.  If you mean look at,   11:19:36
23  I don't recall having looked at any such   11:19:40
24  documents.   11:19:45
25  Q.  Paragraph 36, continuing on in   11:19:45

1  your factual background section, you   11:20:07
2  write, "I am instructed to assume the   11:20:16
3  following facts about how the exchange   11:20:19
4  was likely to have operated."   11:20:21
5     Do you see that?   11:20:23
6  A.  Correct.   11:20:24
7  Q.  Why is this set of facts   11:20:25
8  qualified by "likely to have operated"?   11:20:31
9  A.  Because those instructing me   11:20:35
10  won't necessarily, I assume, have known   11:20:43
11  or have had full transparency of the   11:20:49
12  facts relating to the operation of the   11:20:52
13  exchange given the evidential stage at   11:20:54
14  which the proceedings are at.   11:21:00
15  Q.  Okay.  And we established   11:21:05
16  earlier that part of your factual   11:21:07
17  assumption is that 3AC knew the facts in   11:21:09
18  paragraph 36 prior to 3AC entering into   11:21:14
19  the dotcom terms, correct?   11:21:18
20     MR. HARRIS:  Objection.   11:21:21
21  Misstates the testimony.   11:21:22
22  A.  I would have to look back at   11:21:26
23  precisely what I said.   11:21:28
24  Q.  Do you recall, Dame Elizabeth,   11:21:32
25  we were discussing earlier paragraph 37   11:21:33

CONFIDENTIAL

Page 78

1 and your statement that 3AC knew the       11:21:38
2 facts above prior to 3AC entering into       11:21:41
3 the terms; do you recall that?       11:21:43
4    A.   That is one of the assumptions       11:21:44
5 I'm asked to make, yes.       11:21:51
6    Q.   And so paragraph 36 you       11:21:53
7 testified that the statements in       11:21:56
8 paragraph 36 were factual assumptions       11:21:57
9 that you assumed to be known to 3AC,       11:22:03
10 correct?       11:22:06
11    A.   I don't understand the question   11:22:06
12 you're asking me.  Yes, the fact of       11:22:14
13 likely to have operated is because those   11:22:17
14 instructed me, because of the evidential   11:22:21
15 state, don't have full transparency.  I   11:22:25
16 am instructed to assume that 3AC, as       11:22:27
17 indeed anybody's likely transactions on   11:22:33
18 the exchange, would likely to have some   11:22:39
19 idea of how it worked.       11:22:41
20    Q.   With respect to your analysis,   11:22:42
21 you assumed that the facts set forth in   11:22:47
22 paragraph 36 were both how the exchange   11:22:50
23 operated and that FTX and 3AC knew of   11:23:01
24 those facts, correct?       11:23:05
25    A.   In paragraph 6 I am instructed   11:23:06

Page 79

1 to assume that this is likely, that it's   11:23:19
2 likely that the exchange operated as set   11:23:23
3 out.       11:23:25
4        Paragraph 37, I am instructed       11:23:29
5 to assume that both parties knew it was   11:23:31
6 likely to have operated in that way.       11:23:36
7    Q.   In paragraph 36 (d) you write,   11:23:59
8 in part, in the last sentence, "The       11:24:08
9 account recorded the digital assets       11:24:12
10 deposited but did not record any unique   11:24:14
11 identifying number" --       11:24:16
12    A.   I'm sorry, I was looking at       11:24:17
13 (g).  Let me go to (d).       11:24:20
14    Q.   (d), bottom of page 14?       11:24:21
15    A.   (d).       11:24:24
16    Q.   The last sentence there, if you   11:24:24
17 could read that.       11:24:26
18       (Witness reviews document.)       11:24:27
19    A.   I've read that.       11:24:35
20    Q.   And did you understand that the   11:24:36
21 account did not record any unique       11:24:46
22 identifying number of any specific assets   11:24:47
23 because the digital assets were fungible?   11:24:52
24    A.   I did not -- I was not asked to   11:24:54
25 assume that the reason why the assets       11:25:07

Page 80

1 deposited did not record any unique       11:25:11
2 identifying number was because the       11:25:14
3 digital assets were fungible.       11:25:19
4    Q.   You simply just took that fact   11:25:25
5 as part of your factual, factual       11:25:26
6 assumptions that no unique identifying   11:25:29
7 number was recorded, correct?       11:25:32
8    A.   I was asked to assume       11:25:39
9 something.  I wasn't given a reason as to   11:25:40
10 why there weren't any unique identifying   11:25:47
11 numbers.       11:25:49
12    Q.   Paragraph 36 (e), in the next   11:25:56
13 subsection, you write in the last section   11:25:58
14 of that paragraph, "Those hot wallets   11:26:05
15 (for which FTX retained the private key)   11:26:13
16 held, on an unsegregated, collective   11:26:17
17 basis, the crypto-token entitlements of   11:26:21
18 multiple customers."       11:26:25
19       Do you see that?       11:26:25
20    A.   Yes.       11:26:25
21    Q.   Are you aware that the accounts   11:26:26
22 utilized by FTX also included assets of   11:26:27
23 FTX and other members of the FTX group,   11:26:29
24 not simply other customers?       11:26:33
25       MR. HARRIS:  Object to the form.   11:26:34

Page 81

1    A.   That's a factual matter and I   11:26:49
2 don't know what you mean by the accounts   11:26:50
3 utilized by FTX.       11:26:53
4    Q.   Are you aware that the hot   11:26:54
5 wallets that you reference in paragraph   11:26:59
6 36 (e) contain FTX assets in addition to   11:27:03
7 customer assets?       11:27:07
8    A.   No, I am not so aware.       11:27:08
9    Q.   Are you aware of whether -- are   11:27:32
10 you aware whether or not there were       11:27:34
11 assets of other members of the FTX group   11:27:36
12 that were held in those hot wallets?       11:27:40
13    A.   I am not so aware.       11:27:41
14    Q.   If you could turn, Dame       11:28:04
15 Elizabeth, to paragraph 106 of your       11:28:05
16 report, continuing on your factual       11:28:09
17 assumptions, on page 41.  The second   11:28:13
18 sentence of that paragraph you write, "I   11:28:24
19 have been instructed that FTX did not   11:28:25
20 purport to exercise its right under       11:28:27
21 clause 38.7.2."       11:28:29
22       Do you see that?       11:28:31
23    A.   Yes.       11:28:32
24    Q.   Did you do anything or did you   11:28:36
25 review any documents to verify that       11:28:38

CONFIDENTIAL

Page 82

1  instruction?                          11:28:40
2      A.  I didn't do anything or review     11:28:48
3  any documents to verify that instruction    11:28:49
4  in relation to a factual matter.         11:28:54
5      Q.  If, in fact, FTX had exercised    11:29:09
6  its right under clause 38.7.2, that would    11:29:12
7  cause you to reconsider your analysis on    11:29:16
8  that point, correct?                 11:29:19
9          MR. HARRIS:  Object to the form.   11:29:21
10     A.  Well, it might or might not.      11:29:22
11  It would depend whether it had exercised    11:29:29
12  its right and if so on what basis.       11:29:32
13     Q.  Certainly you would need to do    11:29:42
14  some further analysis to evaluate that     11:29:43
15  change in your factual assumptions,       11:29:45
16  correct?                          11:29:49
17         MR. HARRIS:  Object to the form.   11:29:50
18     A.  I would look at clause 38.7,      11:29:51
19  which is the set-off provision.  38.7.2    11:30:02
20  is the particular relevant clause and I    11:30:10
21  would have to consider on the basis of    11:30:22
22  facts which were presented to me and the    11:30:31
23  entirety of the facts whether the -- a    11:30:34
24  right had arisen.                   11:30:39
25         But what I am looking at here     11:30:41

Page 83

1  is the position or is the issue as to     11:30:46
2  whether or not the provisions of the term    11:30:50
3  support a contention that the extent of    11:31:00
4  3AC's rights, if any, over the 3AC assets    11:31:03
5  is limited to a single net figure arrived    11:31:08
6  at by deducting from the value of the 3AC    11:31:10
7  assets the amount of any liabilities owed    11:31:13
8  by 3AC.  I am not looking, and wasn't     11:31:17
9  asked to address the issue of whether a    11:31:22
10  right of set-off had arisen at all.      11:31:26
11         So in relation to the question     11:31:29
12  3, even if FTX -- sorry, even if FTX had    11:31:34
13  purported to exercise its rights, that, I    11:31:44
14  don't believe, would have made a        11:31:49
15  difference to my bottom line on the      11:31:50
16  particular question 3.              11:31:52
17     Q.  In paragraph 145 of your        11:31:53
18  report, it's on page 53, paragraph 145    11:32:52
19  (c) --                            11:32:54
20     A.  (c) did you say?              11:33:18
21     Q.  (c).  You write there, "In this    11:33:19
22  context I am instructed to assume that    11:33:21
23  the commingling of the 3AC assets was not    11:33:23
24  negligent, but rather a deliberate act on    11:33:26
25  the part of FTX."                   11:33:29

Page 84

1          Do you see that?              11:33:31
2      A.  Yes.                       11:33:32
3      Q.  The question of whether         11:33:45
4  something was negligent or deliberate     11:33:45
5  involves a mix question of law and fact,    11:33:51
6  correct?                          11:33:55
7      A.  Correct, by reference to the     11:33:55
8  standard by which one judges negligence    11:34:07
9  or deliberate acts.                 11:34:09
10     Q.  Okay.  So are you providing as    11:34:10
11  part of your opinion testimony regarding    11:34:12
12  FTX's intent with respect to its        11:34:18
13  commingling?                       11:34:20
14     A.  No, that would be a factual     11:34:20
15  question.                         11:34:22
16     Q.  So you're simply assuming for    11:34:25
17  purposes of your analysis that the mixed    11:34:28
18  legal and factual question of whether    11:34:35
19  something is -- whether the action was    11:34:37
20  negligent versus deliberate, and you're    11:34:40
21  interpreting or assuming it was a       11:34:44
22  deliberate act, correct?             11:34:46
23         MR. HARRIS:  Object to the form.   11:34:47
24     A.  Well, what I am assuming there    11:34:49
25  is that FTX knew what it was doing.  It    11:34:55

Page 85

1  deliberately did it knowing its          11:35:00
2  obligation to keep safe 3AC's equitable    11:35:02
3  proprietary interest in its assets.      11:35:06
4      Q.  You're specifically opining     11:35:11
5  that they were not negligent?          11:35:12
6      A.  I am not specifically opining    11:35:14
7  as a matter of fact whether they were not    11:35:16
8  negligent.  I am being instructed to     11:35:22
9  assume that it was intentional and not    11:35:24
10  negligent.                        11:35:27
11         There were a lot of double       11:35:37
12  negatives in that, as a result of your    11:35:38
13  question, but I think the extent was     11:35:40
14  clear.                           11:35:45
15     Q.  You continue on in that        11:35:45
16  sentence to say, "FTX and -- "On the part    11:35:46
17  of FTX and one, it did knowing its       11:35:50
18  obligation to keep safe 3AC's equitable    11:35:55
19  proprietary interest in its assets."     11:35:57
20         Do you see that?              11:35:59
21     A.  Yes.                       11:36:00
22     Q.  Have you been provided any      11:36:04
23  documents reflecting FTX's awareness that    11:36:07
24  it held digital assets as a trustee?     11:36:14
25     A.  Yes.                       11:36:16

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

1    Q.    And what documents are those?    11:36:24
2    A.    The terms, the dotcom terms,    11:36:26
3  which if FTX had read them, would, in my    11:36:29
4  opinion, have made it clear that it had    11:36:31
5  an obligation to keep safe 3AC's    11:36:35
6  equitable proprietary interest.    11:36:38
7        Second, the safeguarding    11:36:42
8  principles.    11:36:46
9        And third, the financials which    11:36:49
10  I've seen which reflect the analysis that    11:36:53
11  the customer's assets were not included    11:37:06
12  in the balance sheet of the FTX as its    11:37:11
13  own assets.    11:37:20
14        Further, I have read the    11:37:26
15  evidence given prior to the liquidation    11:37:36
16  of FTX of one of its founders or    11:37:38
17  directors.  I am not sure of his    11:37:41
18  statement -- of his -- he's the cofounder    11:37:43
19  and CEO of FTX.  That is the testimony of    11:37:48
20  Sam Bankman-Fried.  And if you look, that    11:37:53
21  is exhibited to my declaration.  And if    11:37:59
22  you look at that, at pages 31 through 34,    11:38:05
23  that supports the view that FTX may have    11:38:31
24  had knowledge of the fact that these    11:38:43
25  assets, digital assets remained customer    11:38:51

Page 87

1  assets owned by customers and that FTX    11:38:54
2  knew that it had an obligation to    11:39:03
3  segregate customer assets from its own    11:39:07
4  assets.  In other words, that it knew    11:39:11
5  that it had an obligation to preserve the    11:39:17
6  customer's equitable proprietary    11:39:23
7  interests in digital assets as part of an    11:39:26
8  interest in a collective fund.    11:39:32
9        I cannot express and do not    11:39:38
10  express any views on those factual    11:39:40
11  matters, but the question I believe you    11:39:41
12  asked me, although I can't see it because    11:39:43
13  it's gone off the rolling page, is    11:39:45
14  whether there was any evidence to support    11:39:48
15  the fact that it knew it had an    11:39:51
16  obligation.  That is the evidence upon    11:39:54
17  which I do not comment as a factual    11:39:56
18  matter, but evidence which might be    11:39:59
19  relied upon as a judge in support of    11:40:01
20  knowledge.    11:40:06
21    Q.    With respect to -- putting    11:40:08
22  aside the dotcom terms -- with respect to    11:40:11
23  the other items that you reference, the    11:40:20
24  FTX Digital Markets document, the    11:40:22
25  financials and Mr. Bankman-Fried's    11:40:25

Page 88

1  testimony, are you relying on those    11:40:29
2  factual assertions as part of your    11:40:39
3  opinions?    11:40:43
4    A.    Can you take me back to the    11:40:44
5  paragraph, please, that we were looking    11:40:45
6  at, because I lost it.    11:40:46
7    Q.    We were looking at paragraph    11:40:48
8  145 (c).  But I am now asking you more    11:40:52
9  generally whether you are relying on the    11:40:56
10  purported evidence that you just walked    11:41:02
11  through, other than the dotcom terms, as    11:41:04
12  part of your conclusions in your    11:41:11
13  opinions?    11:41:13
14    A.    No, as you can see from    11:41:14
15  paragraph (c), I am reciting an    11:41:21
16  assumption that I have been asked to    11:41:28
17  make, which includes the passable clause    11:41:33
18  knowing its obligation to keep safe 3AC's    11:41:39
19  equitable proprietary interest in its    11:41:43
20  assets.  That is an assumption I am asked    11:41:44
21  to make.  I do not express any view on    11:41:47
22  the accuracy of that assumption, but I    11:41:51
23  answered your question as to whether I    11:41:55
24  knew of any matters upon which that    11:41:57
25  assumption could be based, and it was in    11:42:01

Page 89

1  that respect that I answered your    11:42:04
2  question.    11:42:05
3    Q.    Thank you for that    11:42:08
4  clarification.    11:42:09
5        Paragraph 145 (d), just below    11:42:28
6  what we were just looking at, you further    11:42:31
7  state, "Likewise, I am instructed to    11:42:32
8  assume the FTX liquidations were a    11:42:38
9  willful act that took place at a time    11:42:40
10  when it appeared to FTX that it would    11:42:44
11  have been in FTX's best interest to    11:42:49
12  minimize its exposure to 3AC."    11:42:51
13        Do you see that?    11:42:55
14    A.    Yes.    11:42:56
15    Q.    And again, whether something    11:42:56
16  was, somebody acted willfully is a mixed    11:43:02
17  question of law and fact, correct?    11:43:05
18    A.    Correct.    11:43:17
19    Q.    You're not offering any view as    11:43:18
20  to whether FTX acted willfully; you're    11:43:20
21  simply making the assumption that it did,    11:43:22
22  correct?    11:43:24
23    A.    I am instructed to make the    11:43:24
24  assumption.    11:43:26
25    Q.    You're not providing any    11:43:31

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

1 opinions with respect to FTX's intent    11:43:32
2 with respect to the FTX liquidations,    11:43:36
3 correct?    11:43:38
4    A.   No, as I told you previously, I    11:43:39
5 am not here to make or give any views or    11:43:43
6 opinions in relation to factual matters.    11:43:48
7    Q.   And was this factual    11:43:55
8 instruction, paragraph 145 (d), provided    11:43:56
9 to you by Latham?    11:44:00
10    A.   Yes.    11:44:01
11    Q.   There is a portion of that    11:44:08
12 sentence where you say, "When it appeared    11:44:22
13 to FTX that it would have been in FTX's    11:44:23
14 best interest to minimize its exposure to    11:44:25
15 3AC," is that based on anything other    11:44:27
16 than the words that's written there?    11:44:38
17    MR. HARRIS:  Object to the form.    11:44:40
18    A.   It's based on what I was    11:44:41
19 instructed to assume.    11:44:53
20    Q.   So you are discounting any    11:44:54
21 possibility that FTX was acting to    11:45:17
22 protect other margin program participants    11:45:25
23 and not FTX, correct?    11:45:27
24    MR. HARRIS:  Object to the form.    11:45:29
25    A.   I am not discounting or taking    11:45:30

Page 91

1 into account. I am simply expressing my    11:45:37
2 opinion on the basis of the assumption.    11:45:39
3    Q.   And that assumption was limited    11:45:47
4 that FTX -- it was FTX's best interests    11:45:49
5 that were being carried out in the FTX    11:45:55
6 liquidations, correct?    11:46:01
7    MR. HARRIS:  Object to the form.    11:46:01
8    A.   I don't know whether it was    11:46:02
9 limited or not. It states what it    11:46:04
10 states, namely that it's a time when it    11:46:08
11 appeared to FTX that it would have been    11:46:13
12 in FTX's best interest to minimize its    11:46:14
13 exposure to 3AC.    11:46:16
14    Q.   And you don't know one way or    11:46:48
15 the other then whether, if the FTX    11:46:50
16 liquidations had not occurred, whether    11:46:53
17 the 3AC accounts would have been in a    11:46:55
18 better or worse position on June 27th,    11:46:57
19 2022?    11:47:00
20    A.   I have no knowledge. That is a    11:47:01
21 factual matter.    11:47:26
22    Q.   Can you summarize what you    11:47:37
23 believe the relationship is that the    11:47:38
24 dotcom terms created between customers of    11:47:43
25 the exchange and FTX as the digital    11:47:45

Page 92

1 assets?    11:47:50
2    MR. HARRIS:  Object to the form.    11:47:50
3    A.   I don't believe anything. I am    11:47:51
4 expressing my opinion as to what the    11:47:59
5 legal characterization was in relation to    11:48:07
6 the holding or ownership of the assets.    11:48:12
7 I have summarized my views in my    11:48:20
8 declaration already.    11:48:29
9    As you know, my opinion is that    11:48:31
10 the relationship is one as between bare    11:48:32
11 trustee and beneficiary and, as a result,    11:48:39
12 3AC has an equitable proprietary interest    11:48:53
13 in a commingled fund of digital assets in    11:48:58
14 relation to which FTX is the trustee and    11:49:05
15 3AC and other co-users of the exchange    11:49:12
16 are beneficiaries.    11:49:17
17    Q.   Your opinion discusses only in    11:49:22
18 the alternative what you describe as a    11:49:25
19 quasi-bailment theory, correct?    11:49:28
20    A.   Correct.    11:49:29
21    Q.   What is your opinion as to the    11:49:44
22 relationship that you believe the dotcom    11:49:47
23 terms created between the customers of    11:49:51
24 the FTX exchange and FTX as to fiat    11:49:54
25 currency?    11:49:56

Page 93

1    A.   In relation to fiat currency, I    11:49:56
2 express my view that in relation to fiat    11:50:04
3 currency, the relationship is one of    11:50:14
4 debtor and creditor and not one of trust    11:50:18
5 or of bailment.    11:50:21
6    Q.   So is it then your opinion,    11:50:33
7 when a customer purchases digital assets    11:50:36
8 on the FTX exchange with fiat currency,    11:50:38
9 they obtained an equitable interest in    11:50:41
10 the digital assets that were purchased?    11:50:43
11    A.   Yes.    11:50:45
12    Q.   And when customers -- go ahead.    11:50:47
13    A.   You continue.    11:50:50
14    Q.   I just want to make sure you're    11:50:52
15 finished with your answer. I didn't mean    11:50:54
16 to cut you off.    11:50:56
17    A.   Yes.    11:50:57
18    Q.   And when customers sold digital    11:50:58
19 assets for fiat currency on the FTX    11:51:01
20 exchange, did they lose their equitable    11:51:05
21 interest in those digital assets?    11:51:09
22    A.   Yes. It's like stocks and    11:51:10
23 shares. If you sell your share and you    11:51:12
24 get cash back and the cash goes into your    11:51:14
25 account like your bank account, in    11:51:19

24 (Pages 90 - 93)

CONFIDENTIAL

1 relation to fiat currency, you don't        11:51:21
2 under the dotcom terms have any             11:51:30
3 proprietary interest or bailment.  It       11:51:32
4 can't be bailment because it's not a         11:51:34
5 tangible asset in the case of fiat          11:51:37
6 currency.  And it's not something that      11:51:47
7 you can possess.  And it's not trust        11:51:49
8 because the dotcom terms don't suggest      11:51:53
9 that there is any trust over fiat           11:51:56
10 currency, as funds standing to the credit  11:51:58
11 of an account.                             11:52:02
12      You can have an equitable             11:52:10
13 proprietary interest in funds standing to  11:52:13
14 the credit of a custodian's account in     11:52:13
15 other circumstances, but not in these      11:52:14
16 circumstances, because 826 does not apply  11:52:17
17 to fiat currency.                          11:52:21
18   Q.   So if a customer willingly sold     11:52:23
19 digital assets, then they willingly gave   11:53:07
20 up their proprietary interest in that      11:53:09
21 asset, correct?                            11:53:11
22      MR. HARRIS:  Object to the form.      11:53:12
23   A.   I don't know what you're            11:53:13
24 intending to imply by the use of the       11:53:16
25 adverb "willingly" there.  I am not sure   11:53:20

1 what it's adding to your question.          11:53:23
2   Q.   Can you answer my question?          11:53:30
3   A.   I will delete from your              11:53:31
4 question the adverb "willingly" and I       11:53:34
5 will say if a customer -- I will answer     11:53:36
6 the question, if a customer sold digital    11:53:40
7 asset then they gave up their proprietary   11:53:42
8 interest in that asset, correct.  Yes,      11:53:46
9 correct, if I sell my motor car for cash,   11:53:50
10 I give up my proprietary interest in the   11:53:53
11 asset which is the car and obtain cash     11:53:56
12 which I put into my bank account, which    11:54:00
13 normally I do not have a proprietary       11:54:02
14 interest in.                               11:54:05
15      I simply have a personal claim,       11:54:06
16 a debtor/creditor claim, as against my     11:54:11
17 bank.                                      11:54:14
18   Q.   It's your opinion that an           11:54:19
19 English Court's task here would be to      11:54:25
20 ascertain the objective meaning of the     11:54:28
21 language the parties have chosen to        11:54:29
22 express in their agreement, correct?       11:54:32
23   A.   Against the factual matrix,         11:54:34
24 yes.                                       11:54:39
25   Q.   And in doing so, the parties        11:54:39

1 objective intentions are not relevant,      11:54:42
2 correct?                                    11:54:44
3   A.   I don't know what you mean by        11:54:44
4 objective intentions.  Subjective          11:54:50
5 intentions are not relevant.               11:54:52
6      What the Court attempts to do          11:54:55
7 is to ascertain the objective meaning of   11:54:58
8 the words used in order to construe the    11:55:00
9 document.                                  11:55:05
10   Q.   You would agree that where          11:55:11
11 parties have used unambiguous language,    11:55:13
12 the Court should apply that unambiguous    11:55:16
13 language?                                  11:55:18
14      MR. HARRIS:  Object to the form.      11:55:23
15   A.   It depends on the circumstances     11:55:24
16 and which clause you're looking at.        11:55:34
17      Usually, as I set out in the          11:55:38
18 principles of construction, which I agree  11:55:41
19 with Lord Neuberger's articulation of      11:55:44
20 them, that is correct.  But Courts don't   11:55:47
21 take a literal reading of the words.       11:55:57
22 They don't divorce them from their         11:56:01
23 context.  They will consider the contract  11:56:04
24 as a whole and depending on the nature,    11:56:07
25 formality and quality of the drafting,     11:56:13

1 give more or less weight to elements of     11:56:15
2 the wider context in reaching a view as     11:56:17
3 to that objective meaning.                 11:56:20
4      In other words, plain words           11:56:24
5 aren't construed in a vacuum.  So, yes,    11:56:26
6 your black letter articulation is correct  11:56:39
7 so far as it goes, but it requires         11:56:44
8 placing in the context of the particular   11:56:50
9 document and it all depends on the         11:56:53
10 wording of the contract as a whole.        11:57:03
11   Q.   Would you agree the trend in        11:57:26
12 English Courts is to place significant     11:57:28
13 weight on the ordinary meaning of words    11:57:31
14 which the parties elected to use?          11:57:33
15   A.   I agree that the English Courts     11:57:35
16 place significant weight on the ordinary   11:57:44
17 meanings of words which the parties        11:57:46
18 elected to use.  I am not prepared to say  11:57:48
19 that that reflects a trend.                11:57:51
20   Q.   It's your opinion, as you state     11:58:19
21 in paragraph 43 (b) of your opinion on     11:58:22
22 page 18?                                   11:58:25
23   A.   That's a cite from Wood and         11:58:38
24 Capita, which is a pretty good             11:58:39
25 articulation of these principles of        11:58:41

CONFIDENTIAL

Page 98

1 construction.                                11:58:43
2     Q.   I'm sorry, what's a cite to         11:58:56
3 Wood v. Capita?                              11:58:59
4     A.   Well, if you look at, foot          11:59:01
5 14 -- sorry, if you look at A, that's a      11:59:11
6 cite from Wood and Capita.                   11:59:14
7          B is a -- sorry, is a cite from     11:59:19
8 Lord Hamblen in Burnett against              11:59:23
9 International Insurance.                      11:59:26
10         And 15 is a reference to Wood       11:59:27
11 and Capita.  And Wood and Capita is -- is   11:59:32
12 a very good articulation of these           11:59:36
13 principles of construction.                 11:59:38
14    Q.   Looking at 43 (b), within that      11:59:46
15 you state that "The Court will ask what a   11:59:48
16 reasonable person with all the background   11:59:51
17 knowledge that would reasonably have been   11:59:53
18 available to the parties when they          11:59:56
19 entered into the contract would have        11:59:58
20 understood the language of the contract     11:59:59
21 to mean." That's your articulation,         12:00:01
22 correct?                                    12:00:05
23    A.   No, it's not.  I think it's         12:00:05
24 what's in Burnett.  I can't remember        12:00:07
25 precisely so what extent I summarized or    12:00:10

Page 99

1 paraphrased what Lord Hamblen said in       12:00:17
2 Burnett.  I would have to check on the      12:00:19
3 case to see what I have written on that.    12:00:20
4     Q.   You agree with what you wrote      12:00:22
5 in Section 43 (b)?                          12:00:23
6     A.   Yes, I do.                         12:00:24
7     Q.   And you understand that the       12:00:35
8 dotcom terms were entered into as of May   12:00:36
9 13th, 2022?                                 12:00:38
10    A.   I am instructed to assume that,   12:00:39
11 because that's the date they got on them.  12:00:44
12 I mean whether that was in fact the case,  12:00:47
13 I don't know.                              12:00:49
14    Q.   For purposes of your analysis,    12:00:49
15 you assumed that the dotcom terms were     12:00:51
16 effective as of May 13th, 2022?           12:00:53
17    A.   Correct.                          12:00:55
18    Q.   So under English law, from that   12:01:01
19 date, May 13th, 2022 forward, the meaning  12:01:04
20 of those terms as to FTX and 3AC were      12:01:11
21 fixed, correct?                            12:01:14
22    A.   Yes.                              12:01:14
23    Q.   Would you agree that the dotcom   12:01:27
24 terms were a form contract?               12:01:30
25         MR. HARRIS:  Object to the form.  12:01:32

Page 100

1     A.   I don't know what you mean by      12:01:33
2 the word "Form" in that context.  This      12:01:38
3 may be a language issue.                    12:01:41
4     Q.   You're not familiar with the      12:01:42
5 term under English law of a "form           12:01:47
6 contract"?                                  12:01:50
7     A.   If you mean standard terms, is     12:01:51
8 that what you're referring to?              12:01:52
9     Q.   What's your understanding of       12:01:54
10 what standard term contract would be?      12:01:55
11    A.   It's where a party such as an      12:01:57
12 exchange or a supplier uses its standard   12:02:02
13 terms for all market users or purchasers.  12:02:07
14    Q.   Do you consider the dotcom        12:02:20
15 terms to be a standard form contract?      12:02:21
16    A.   Yes, I do.  Although it's fair     12:02:33
17 to say I am not sure I know the factual    12:02:34
18 basis for that assumption I have made.     12:02:37
19 I think I have been asked to               12:02:40
20 assume that, that they were market terms   12:02:41
21 and weren't off-the-shelf terms as         12:02:46
22 between Three Arrows and FTX exclusively.  12:02:50
23    Q.   Is there any significance in      12:03:06
24 English law in contracting of a standard  12:03:08
25 term contract?                            12:03:13

Page 101

1     A.   There might or might not be.      12:03:14
2 It depends what issue you're addressing.   12:03:20
3     Q.   There are certain circumstances  12:03:23
4 where the fact that a contract is a        12:03:29
5 standard terms contract would matter,      12:03:30
6 correct?                                   12:03:34
7     A.   Well, it could, for example, in  12:03:34
8 a consumer contract where the Courts in    12:03:41
9 the context of consumer legislation might  12:03:48
10 be more concerned to construe the         12:03:50
11 standard form contract against the party  12:04:04
12 who proffered the terms.                  12:04:11
13    Q.   Would you agree that where a     12:04:31
14 standard terms contract is at issue, the  12:04:32
15 factual matrix is less relevant?          12:04:38
16        MR. HARRIS:  Object to the form.  12:04:44
17    A.   I think that's too broad a       12:04:45
18 proposition.  The factual matrix may be   12:04:53
19 different where you've got a market       12:04:58
20 situation such as this situation and the  12:05:00
21 Court may well approach it differently.   12:05:30
22        MR. GLUECKSTEIN:  We are at       12:06:04
23 Exhibit 4.                               12:06:05
24        (Gloster Exhibit 4, Document re   12:06:23
25 Sigma Finance Corp., was so marked for   12:06:23

26 (Pages 98 - 101)

CONFIDENTIAL

1    identification, as of this date.)    12:06:06
2    Q.    Dame Elizabeth, you have been    12:06:13
3    handed what's been marked as Exhibit 4,    12:06:15
4    which is U.K. Supreme Court case Sigma    12:06:19
5    Finance Corp.
6        Are you familiar with that    12:06:25
7    case?    12:06:25
8    A.    Yes.    12:06:26
9    Q.    If we can look at paragraph    12:06:31
10    starting at 35 on page 56.    12:06:33
11    A.    35.  Yes.    12:07:04
12    Q.    If we look, I'm sorry,    12:07:17
13    paragraph 37 of Lord Collins' opinion    12:07:19
14    there and are you aware that in this case    12:07:23
15    the Court was considering a standard    12:07:26
16    terms contract?    12:07:31
17    A.    Yes.    12:07:36
18    Q.    And in paragraph 37 Lord    12:07:36
19    Collins says, "Consequently this is not    12:07:38
20    the type of case where the background or    12:07:42
21    matrix of fact is or ought to be    12:07:44
22    relevant, except in the most generalized    12:07:47
23    way."    12:07:49
24        Do you see that?    12:07:50
25    A.    Correct.    12:07:51

1    Q.    Do you agree with his    12:07:51
2    characterization of the application of    12:07:53
3    factual matrix when considering the    12:07:56
4    standard terms contract?    12:07:58
5    A.    I agree with what Lord Collins    12:08:01
6    says in paragraph 37.    12:08:03
7    Q.    Thank you.    12:08:04
8    A.    What is important is the    12:08:08
9    statement "The instrument must be    12:08:12
10    interpreted as a whole in the light of    12:08:14
11    the commercial intention which may be    12:08:17
12    inferred from the instrument and from the    12:08:20
13    nature of the debtor's business."    12:08:24
14        I agree and that is why in    12:08:27
15    construing this contract it is important    12:08:31
16    to look at the nature of the debtor's    12:08:34
17    business, and in particular where one is    12:08:37
18    considering the question of whether or    12:08:42
19    not a trust has been established, to look    12:08:43
20    at the nature of the debtor's business.    12:08:46
21        Lord Collins goes on, "Detailed    12:08:51
22    semantic analysis must give way to    12:08:54
23    business common sense."    12:08:57
24        Again, it all depends, but I    12:08:59
25    100 percent agree with Lord Collins's    12:09:04

1    approach.    12:09:06
2        Indeed, I think it was one of    12:09:14
3    the points that I referred to in the    12:09:16
4    additional points that I gave you in my    12:09:19
5    note today, if you look at page 8 at type    12:09:21
6    A -- sorry, paragraph A.  That's quite    12:09:41
7    the bit you have just taken me to, which    12:09:49
8    I think is important in addressing the    12:09:51
9    construction of a market agreement like    12:09:54
10    this.    12:10:00
11    Q.    You would agree that the dotcom    12:10:00
12    terms must have the same meaning for all    12:10:05
13    customers, correct?    12:10:07
14    A.    Correct.  I agree.    12:10:08
15        (Gloster Exhibit 5, Order of the    12:11:05
16    United States Bankruptcy Court, was so    12:11:05
17    marked for identification, as of this
18    date.)    12:11:01
19    Q.    Dame Elizabeth, you have been    12:11:01
20    handed what's been marked as Exhibit 5,    12:11:02
21    which is an Order of the United States    12:11:04
22    Bankruptcy Court in the FTX matter.    12:11:06
23        Did you review this document as    12:11:11
24    part of the materials you reviewed in    12:11:13
25    connection with your --    12:11:15

1    A.    What's the date of this    12:11:17
2    document?    12:11:17
3    Q.    This document is dated October    12:11:18
4    8th, 2024.    12:11:22
5    A.    I need to check.  I don't    12:11:23
6    recall seeing it, but I need to check    12:11:31
7    whether it's in my documents that I refer    12:11:34
8    to.  The question is did I review the    12:11:39
9    document.  Please may I ascertain to    12:11:49
10    begin with whether it's one of the    12:11:49
11    documents that I've seen, which would be    12:11:54
12    listed, I think, in the schedule.    12:12:04
13        I don't believe that it's    12:12:25
14    included in my background documents, but    12:12:31
15    this isn't a memory test, so you can tell    12:12:38
16    me whether it's included.    12:12:40
17    Q.    I am asking, Dame Elizabeth, in    12:12:42
18    part because as I read it there is some    12:12:45
19    inconsistency.  In Annex 3, I don't see    12:12:47
20    it listed in your background documents.    12:12:51
21    A.    The first document, I don't    12:12:53
22    believe I've seen this before.  But I do    12:12:55
23    need, it could be included in Volume A of    12:12:59
24    the stuff that I was sent.    12:13:02
25    Q.    Part of why I am asking, Dame    12:13:05

27 (Pages 102 - 105)

CONFIDENTIAL

Page 106

1  Elizabeth, is there is a reference to        12:13:09
2  this document in your report on page 10        12:13:10
3  noting the fact that the objection that        12:13:23
4  FTX had filed --        12:13:25
5       A.   Sorry, show me where on page 10        12:13:26
6  I refer to it?        12:13:28
7       Q.   Page 10 in vi, the top of the        12:13:29
8  page, it's referenced as a document that        12:13:33
9  was included in the objection of FTX.  So        12:13:36
10 I am just trying to ascertain whether you        12:13:38
11 ever reviewed this document before?        12:13:40
12      A.   The findings of fact, there you        12:13:48
13 are.        12:13:50
14      Q.   Yes.        12:13:50
15      A.   So it is in documents that I've        12:14:04
16 seen.  I did not review this document, if        12:14:06
17 you mean take it into consideration as        12:14:12
18 part of the facts I was asked to assume.        12:14:14
19      Q.   Thank you.        12:14:23
20      A.   I may have read or skim read        12:14:24
21 bits of it.        12:14:26
22      Q.   Do you have any understanding        12:14:30
23 of whether the United States Bankruptcy        12:14:31
24 Court has already interpreted the dotcom        12:14:35
25 terms on the issues that you are opining        12:14:37

Page 107

1  on?        12:14:39
2       A.   No.        12:14:42
3       Q.   You don't know that one way or        12:14:42
4  the other?        12:14:49
5       A.   No.        12:14:49
6       Q.   And just for completeness then,        12:14:58
7  you have never before reviewed paragraph        12:15:00
8  20 of this document, which appears on        12:15:02
9  page 12?        12:15:04
10      A.   Okay.  So this is the actual        12:15:05
11 finding by the U.S. Bankruptcy Court, is        12:15:14
12 it, at paragraph 20?  Can I just read        12:15:21
13 this, please?        12:15:23
14      Q.   Of course.        12:15:24
15           (Witness reviews document.)        12:15:34
16      A.   I've read paragraph 20.  I have        12:16:10
17 not read the entirety of the document.        12:16:12
18      Q.   You understand in paragraph 20,        12:16:13
19 "The Court finds the factual record        12:16:15
20 establishes that all digital assets and        12:16:18
21 cash held by the FTX exchanges on or        12:16:20
22 after the petition date are property of        12:16:22
23 the debtor's estates" and goes on from        12:16:24
24 there.        12:16:27
25           Do you see that?        12:16:27

Page 108

1           MR. HARRIS:  Object to the form.        12:16:28
2       A.   I read what I read in the        12:16:29
3  entirety of paragraph 20.  I cannot        12:16:32
4  comment as to what that conclusion means        12:16:36
5  as to its scope or as to its effect.        12:16:43
6           From reading this, obviously I        12:16:49
7  am not an American lawyer, what the Court        12:16:50
8  is finding here is that the record        12:16:52
9  establishes that all digital assets and        12:16:56
10 cash are property of the debtor's estate        12:17:00
11 within the meaning of Section 541 of the        12:17:02
12 Bankruptcy Code.  So stopping there, I        12:17:07
13 don't know what the scope is of Section        12:17:09
14 541 of the Bankruptcy Code and what that        12:17:14
15 means.        12:17:16
16           I don't know what it means when        12:17:18
17 it says "and can be distributed pursuant        12:17:19
18 to the plan" because I don't know as a        12:17:23
19 matter of U.S. law what the plan is or        12:17:25
20 what assets could be distributed within        12:17:32
21 the meaning of Section 541 for the        12:17:35
22 purposes of the plan.        12:17:37
23           Further, I don't know what, as        12:17:45
24 a matter of law, is meant by "Any        12:17:47
25 exchange assets" which is the definition        12:17:49

Page 109

1  "Are not the property of the debtor's        12:17:54
2  estates.  The Court has jurisdiction to        12:17:56
3  direct their equitable jurisdiction in        12:17:58
4  accordance with the terms."        12:18:02
5           So put shortly, what the scope        12:18:04
6  of this particular decision is, to what        12:18:10
7  extent it was based on English law, to        12:18:12
8  what extent it found that the digital        12:18:16
9  assets belonging to Three Arrows were        12:18:18
10 assets of the debtor, I simply cannot        12:18:29
11 comment.        12:18:32
12      Q.   You would agree that your        12:18:33
13 opinion with respect to the        12:18:39
14 interpretation of the dotcom terms would        12:18:41
15 apply to all customers subject to those        12:18:43
16 terms at all times, correct?        12:18:48
17           MR. HARRIS:  Object to the form.        12:18:52
18      A.   Correct.  Well, the relevance        12:18:53
19 of this paragraph 20 -- let me start        12:19:02
20 again.        12:19:06
21           This paragraph 20, whatever it        12:19:07
22 concludes and on whatever basis, and        12:19:10
23 after whatever argument in relation to        12:19:13
24 English law, doesn't affect my decision        12:19:16
25 as a matter of English law on the basis        12:19:22

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

1 of the assumptions which I've made.    12:19:25
2    Q.   Understood. Understood. But I    12:19:32
3 just want to make sure I am clear on your    12:19:35
4 last question. That your opinions that    12:19:36
5 are expressed in your declaration would    12:19:39
6 apply to any customers subject to these    12:19:41
7 terms at any point in time, correct?    12:19:44
8        MR. HARRIS: Object to the form.    12:19:47
9    A.   That is too wide a statement.    12:19:48
10 It could be -- I agree with the basic    12:19:58
11 proposition that one has got to construe    12:20:00
12 what appear to be standard terms that one    12:20:04
13 has here, i.e., the dotcom terms, the    12:20:06
14 same in relation to all customers trading    12:20:12
15 on the exchange on those terms.    12:20:18
16      However, there could have been,    12:20:22
17 and I cannot do anything other than    12:20:25
18 speculate about factual matters,    12:20:27
19 different situations pertaining in    12:20:30
20 relation to different traders. There    12:20:33
21 could have been specific agreements.    12:20:38
22      So as a matter of English law,    12:20:43
23 I would agree with you that an English    12:20:45
24 Court would construe, without more, these    12:20:49
25 terms as applying to customers trading on    12:20:54

Page 111

1 FTX Exchange on a similar basis to Three    12:21:00
2 Arrows.    12:21:06
3    Q.   And your interpretation and an    12:21:10
4 English Court's interpretation of these    12:21:12
5 terms would be the same across the    12:21:14
6 entirety of the time that these terms    12:21:19
7 were in effect, correct?    12:21:22
8        MR. HARRIS: Object to the form.    12:21:23
9    A.   I disagree with that. If    12:21:26
10 you're putting it to me that it would be    12:21:28
11 the same all along the period of time, if    12:21:30
12 you're looking at the time the contract    12:21:38
13 was entered into, yes, it applies to    12:21:41
14 people trading at that date.    12:21:48
15      If you're asking me to agree    12:21:52
16 that for all time the position would be    12:21:55
17 the same, I think you're asking me to    12:21:59
18 speculate about perhaps dates when the    12:22:02
19 contract was entered into when the    12:22:08
20 objective factual matrix circumscribed as    12:22:10
21 it was might have been more limited. So    12:22:14
22 I am not prepared to agree, I think to    12:22:17
23 this, to your proposition that it's over    12:22:20
24 all times for all time.    12:22:24
25    Q.   The factual matrix is    12:22:28

Page 112

1 established as of the time the contract    12:22:29
2 is entered into, correct?    12:22:30
3    A.   By the particular party. So    12:22:32
4 for example, if FTX -- if Three Arrows    12:22:36
5 entered into it in 2022 at a time when    12:22:40
6 the market users of the exchange were    12:22:50
7 being told that there was segregation of    12:22:55
8 assets in accordance with trust terms,    12:22:57
9 that might be a different situation from,    12:23:00
10 say, three years earlier or three years    12:23:05
11 later when the market was being told we    12:23:07
12 don't operate trust terms anymore.    12:23:10
13    Q.   You agree -- your testimony    12:23:15
14 earlier today was that the dotcom    12:23:17
15 terms --    12:23:20
16    A.   I think we're not in    12:23:25
17 disagreement actually here.    12:23:26
18    Q.   I didn't think we were but now    12:23:28
19 I am not sure.    12:23:29
20    A.   I don't think we are. I don't    12:23:30
21 think we are. I agree with you that if    12:23:32
22 we are looking at a market contract, it's    12:23:34
23 got to be the same for all users of the    12:23:37
24 market who are trading on similar or    12:23:40
25 identical terms. I am not prepared to go    12:23:42

Page 113

1 any wider than that in a kind of    12:23:45
2 unlimited factual scenario that you're    12:23:49
3 putting to me.    12:23:51
4    Q.   But the terms have to be the    12:23:52
5 same for all users while those terms are    12:23:54
6 in effect regardless of when they open    12:23:57
7 their account, correct?    12:23:59
8    A.   Correct.    12:24:00
9        MR. HARRIS: Just remind the    12:24:01
10 witness to just pause for the court    12:24:02
11 reporter's benefit, because you're    12:24:04
12 talking over each other.    12:24:05
13        THE WITNESS: Sorry, sorry.    12:24:07
14    A.   No, I don't necessarily agree    12:24:11
15 with that. It could be different,    12:24:14
16 because the terms or the factual matrix    12:24:20
17 may have changed at different times.    12:24:24
18    Q.   In that circumstance, are you    12:24:33
19 positing there is a scenario where    12:24:35
20 different customers have the standard    12:24:39
21 terms applied to them differently?    12:24:42
22    A.   No, I am not positing any    12:24:45
23 factual scenarios.    12:24:47
24    Q.   Well, if you're suggesting that    12:24:54
25 there is a different factual matrix, is    12:24:55

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1 the result of that statement that the 12:24:57
2 standard terms would be applied 12:25:01
3 differently to different customers? 12:25:03
4    A.   All I am saying is that as a 12:25:04
5 matter of English law, there is a 12:25:07
6 theoretical possibility that even within 12:25:09
7 the limited circumference of factual 12:25:14
8 matrix or objective factual matrix in 12:25:19
9 relation to standard term contracts, it 12:25:26
10 is possible that, for example, contracts 12:25:28
11 entered into in relation to those terms 12:25:32
12 at a later date might have to be 12:25:34
13 construed in relation to a different 12:25:37
14 factual matrix, and likewise contracts 12:25:41
15 entered into in relation to those terms 12:25:48
16 at an earlier date might have to be 12:25:50
17 looked as by reference to a different 12:25:52
18 factual matrix. 12:25:56
19        That is supported by Lord 12:25:57
20 Collins in Sigma where one has to look 12:25:59
21 at, if and to the extent that it is 12:26:04
22 relevant, the debtor's business. 12:26:07
23    Q.   You can agree with me or would 12:26:12
24 agree with me that at a minimum, all 12:26:13
25 customers that entered into the dotcom 12:26:17

Page 115

1 terms as of May 11th, 2022 would be 12:26:20
2 subject to the same terms and same 12:26:26
3 interpretation of those terms, correct? 12:26:28
4    A.   I agree that would be likely 12:26:35
5 but one cannot rule out from a factual 12:26:37
6 scenario that it could possibly be 12:26:39
7 different in relation to a different 12:26:42
8 customer because of specific arrangements 12:26:48
9 which it had with FTX. 12:26:51
10        But you're asking me to 12:26:53
11 speculate hypothetically and factually 12:26:55
12 and I don't think that's very useful. 12:26:58
13    Q.   In that scenario would it 12:27:01
14 change the meaning of the terms of, of 12:27:04
15 the dotcom terms or their application to 12:27:08
16 the factual scenario? 12:27:10
17    A.   Probably their application. 12:27:11
18    Q.   So your opinions with respect 12:27:13
19 to the meaning of the dotcom terms would 12:27:18
20 not change in that scenario? 12:27:21
21    A.   Correct.  But what I am saying 12:27:23
22 is, and I think Lord Neuberger and I 12:27:25
23 agree on this, is that you start off with 12:27:27
24 the terms, but in circumstances where 12:27:33
25 you're looking at the creation of a trust 12:27:36

Page 116

1 or an equitable proprietary interest, one 12:27:38
2 does have to look at, in working out what 12:27:42
3 those terms mean, how the business 12:27:44
4 operates and that's clear also from 12:27:48
5 Briggs J in Pierce and Low Mass. 12:27:53
6        MR. HARRIS:  If you're at a good 12:28:16
7 point, I think we have gone for about 12:28:17
8 an hour-and-a-half. 12:28:19
9    Q.   Is it your opinion that facts 12:28:40
10 known to only one of the parties to the 12:28:46
11 contract could be included in the factual 12:28:49
12 matrix? 12:28:55
13    A.   Yes, I think it is, in 12:28:58
14 circumstances that they might be regarded 12:28:59
15 as facts that are or would be assumed to 12:29:06
16 be reasonably known to participants in 12:29:20
17 that market, even though they were, in 12:29:24
18 fact, only known by the debtor company. 12:29:29
19        MR. GLUECKSTEIN:  Why don't we 12:29:45
20 go off the record then and take a 12:29:46
21 lunch break. 12:29:48
22        THE VIDEOGRAPHER:  Off the 12:29:49
23 record.  The time is 12:29 p.m. 12:29:49
24        (Whereupon, at 12:29 p.m., a 13:06:01
25 luncheon recess was taken.)

Page 117

1        AFTERNOON SESSION 13:06:01
2        1:06 p.m.
3 E L I Z A B E T H   G L O S T E R,
4 the Witness herein, was examined and
5 testified as follows:
6        THE VIDEOGRAPHER:  Back on the 13:06:05
7 record.  The time is 1:06 p.m. 13:06:05
8 EXAMINATION  (Cont'd) BY MR. GLUECKSTEIN: 13:06:07
9    Q.   Dame Elizabeth, you agree that 13:06:07
10 you note in your report "That the parties 13:06:22
11 must be taken to know the general law," 13:06:27
12 you agree with that, correct? Sorry, I 13:06:29
13 am looking at paragraph 47 on page 20 of 13:06:33
14 your declaration. 13:06:37
15    A.   Yeah. 13:06:38
16    Q.   And you have a quote there, 13:06:46
17 that the parties must be taken to know 13:06:47
18 the general law; do you see that? 13:06:49
19    A.   Yeah.  That's Triple Point 13:06:50
20 Technology. 13:06:55
21    Q.   Can you explain what you 13:06:55
22 understand the general law to mean in 13:06:57
23 this context? 13:06:58
24        MR. HARRIS:  Object to the form. 13:07:04
25    A.   I think it's obvious.  The 13:07:05

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

1 general law. If you want an example, if          13:07:09
2 I say to you you keep your property in an         13:07:21
3 asset you're lending me or putting on my          13:07:24
4 exchange, the general law might say,              13:07:26
5 well, you should know when you tell               13:07:33
6 somebody they are keeping their property,         13:07:37
7 that's what you mean.                             13:07:38
8     Q.    Would you agree that only clear         13:07:42
9 and well-known legal principles can be            13:07:44
10 said to be part of the general law?              13:07:46
11    A.    It depends on the context.              13:07:47
12    Q.    Clearly there are legal                 13:07:51
13 principles that would fall outside of the         13:07:55
14 general law, correct?                            13:07:57
15    A.    I would agree with that.                13:07:58
16    Q.    And for purposes of                     13:08:14
17 interpreting a contract, the principles          13:08:15
18 that make up the general law would be            13:08:17
19 those that must have been established            13:08:18
20 when the contract was entered into,              13:08:20
21 correct?                                         13:08:21
22    A.    I am not sure I understand the          13:08:21
23 question.                                        13:08:36
24    Q.    Let me try it this way. If the          13:08:36
25 law has developed since May of 2022 when         13:08:39

Page 119

1 this, the dotcom terms became effective,          13:08:41
2 those developments would not be                   13:08:46
3 considered general principles -- sorry,           13:08:48
4 part of the general law known to the             13:08:51
5 parties, correct?                                13:08:52
6       MR. HARRIS: Object to the form.            13:08:59
7    A.    It depends what you mean by the          13:09:00
8 law has developed. As a matter of                13:09:04
9 English law, the law in one sense doesn't         13:09:12
10 develop. When a Court finds that this is         13:09:18
11 the law, it's stating what the law is and        13:09:28
12 usually, but not always, has always been.        13:09:34
13 In the present case, what we are looking         13:09:37
14 at is well-established principles                13:09:39
15 relating to the creation of an equitable         13:09:45
16 proprietary interest under a bare trust          13:09:54
17 in a commingled fund. That was a                 13:09:57
18 principle that was well established and          13:10:03
19 recognized for many years.                       13:10:10
20       Likewise, in relation to                   13:10:11
21 bailment, although it could be properly          13:10:14
22 said that there is a development or might        13:10:16
23 be a development in relation to the             13:10:19
24 recognition of the concept of bailment as        13:10:24
25 applying to intangible assets,                   13:10:26

Page 120

1 nonetheless, the concept of the retention        13:10:31
2 of a proprietary interest by bailors in a         13:10:35
3 commingled mixed fund has been well              13:10:42
4 recognized for many years going well back         13:10:46
5 before the decision in Mercer to which I         13:10:50
6 refer.                                           13:10:53
7    Q.    Just to round out your example,         13:10:59
8 is it your opinion that if there were to          13:11:20
9 be further developments recognizing              13:11:25
10 bailment as applying to intangible assets        13:11:30
11 that would be found to be part of the           13:11:35
12 general law at the time this contract was        13:11:37
13 entered into?                                    13:11:38
14       MR. HARRIS: Object to the form.           13:11:41
15    A.    Again, one has to be careful           13:11:42
16 what one means by development of the law.        13:11:59
17 My point is that the law is always there,        13:12:03
18 has always been there, for present              13:12:08
19 purposes, in relation to bailment               13:12:11
20 commingled assets, bailors in relation to        13:12:14
21 a fungible fund.                                 13:12:21
22       That principle of law has                  13:12:24
23 always been there and that principle is a        13:12:25
24 well-known principle that, relating to          13:12:36
25 the retention of proprietary interest of         13:12:38

Page 121

1 bailors in a commingled fund that was            13:12:40
2 certainly as of 2022. The fact that the          13:12:42
3 law is being applied in a different way          13:12:47
4 is irrelevant to the proposition to which        13:12:50
5 I refer.                                         13:12:53
6    Q.    When you say that the principle         13:12:54
7 of law in your bailment example has              13:13:13
8 always been there and well known, it was         13:13:18
9 well known to whom?                              13:13:24
10    A.    People operating under                  13:13:25
11 principles of English law know about the         13:13:33
12 concept of bailment. When I say                  13:13:39
13 operating under, people who contract            13:13:43
14 subject to a contract that is governed by        13:13:52
15 English law objectively should be taken          13:13:56
16 to know about the principle of bailment,         13:14:01
17 which is to use an American phrase, home         13:14:08
18 book law. But again, none of this -- my          13:14:14
19 analysis is not dependent upon the              13:14:20
20 paragraph of my opinion to which you have        13:14:23
21 just taken me.                                   13:14:31
22    Q.    Do you believe that the concept        13:14:31
23 of quasi-bailment, as used in your              13:14:35
24 opinion, is a well-known legal principle?        13:14:38
25    A.    Again, I am expressing my view.        13:14:42

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

1 I am not expressing my belief.  But the        13:14:47
2 reference to quasi-bailment is not a term       13:14:57
3 of mine.  It's a term that was used in          13:15:01
4 the Law Commission Report and in some of        13:15:05
5 the textbook writing as a shorthand term        13:15:11
6 of applying concepts of bailment which          13:15:16
7 usually relate to tangible property to          13:15:21
8 intangible property such as digital             13:15:26
9 assets.                                         13:15:30
10      To answer your question, again,           13:15:33
11 what one is looking at is the application       13:15:36
12 of a well-known principle to a different        13:15:39
13 type of asset.  The well-known principle        13:15:45
14 is the concept of bailment.                     13:15:52
15      Q.   The Law Commission's final           13:15:56
16 report on digital assets was released in        13:15:58
17 2023, correct?                                  13:16:00
18      A.   Yes, they had a previous             13:16:01
19 consultation report.                            13:16:09
20      Q.   The recommendations set forth        13:16:12
21 in the June 2023 final report were not          13:16:14
22 known to the parties at the time they           13:16:17
23 entered into this agreement, correct?           13:16:18
24      MR. HARRIS:  Object to the form.          13:16:20
25      A.   Well, that's a factual               13:16:21

Page 123

1 question.  But also it's an absurd              13:16:32
2 question.  Because, obviously, something        13:16:34
3 that's in 2023 is not known to a party          13:16:36
4 entering into a contract in 2022.  But          13:16:39
5 that says nothing about the concepts of         13:16:45
6 bailment.                                       13:16:51
7      Q.   Would you agree that legal           13:16:52
8 questions related to cryptocurrencies           13:17:07
9 often still remain issues of first              13:17:10
10 impression under English law?                   13:17:12
11      A.   I don't know what you mean by        13:17:14
12 first impression.                               13:17:19
13      Q.   Issues that have not yet been        13:17:20
14 decided by the Courts in England.               13:17:21
15      A.   So your question is would you        13:17:23
16 agree that legal questions relating to          13:17:30
17 crypto assets have yet to be decided            13:17:36
18 under English law; is that your question?       13:17:39
19      Q.   Yes.                                  13:17:44
20      A.   What questions relating to           13:17:45
21 crypto assets are you referring to?             13:17:47
22      Q.   Generally.                            13:17:49
23      A.   Yes, I am sure there are still       13:17:55
24 lots of questions which have to be              13:17:57
25 decided as a matter of English law in           13:18:02

Page 124

1 relation to crypto assets.                      13:18:05
2      Q.   Paragraph 60 of your report, 60      13:18:07
3 (b) on page 24, you cite there the Hunter       13:19:04
4 v Moss case.                                     13:19:09
5      A.   Yeah.                                  13:19:09
6      Q.   And you acknowledge there that       13:19:09
7 there are, that the decision has been           13:19:11
8 interpreted two different ways, correct?        13:19:14
9      A.   Yes.                                   13:19:15
10      Q.   And so if there is a legal           13:19:29
11 principle such as is discussed in that          13:19:32
12 case, where there is not consensus, it is       13:19:36
13 your view that nonetheless the legal            13:19:42
14 principle could be part of the general          13:19:43
15 law?                                            13:19:45
16      MR. HARRIS:  Object to the form.          13:19:48
17      A.   I don't think paragraph (b)          13:19:49
18 says there is no consensus.  What I am          13:20:01
19 referring to there is the fact that you         13:20:05
20 can use Hunter and Moss as authority for        13:20:07
21 two propositions.  I don't think they are       13:20:09
22 mutually exclusive either.                       13:20:24
23      Q.   Right.  And not being mutually       13:20:30
24 exclusive it's your view that general law       13:20:34
25 would encompass multiple interpretations        13:20:37

Page 125

1 of the same legal principle?                    13:20:39
2      MR. HARRIS:  Object to the form.          13:20:50
3      A.   Hunter and Moss stands for two       13:20:53
4 propositions, it is a well-established          13:21:15
5 decision and yes, it is part of the             13:21:18
6 general law of England and Wales.               13:21:28
7      Q.   Can you provide an example of        13:21:40
8 something with respect to intangible            13:21:42
9 assets that you would consider to be            13:21:45
10 outside the scope of the general law?           13:21:48
11      A.   I think I would have to think        13:21:48
12 about that.                                      13:21:57
13      Q.   You state in paragraph 57 of        13:21:57
14 your declaration on page 23 that there          13:22:45
15 are three requirements for a trust, in          13:22:47
16 order for a trust to be met; do you see         13:22:56
17 that?                                           13:23:01
18      A.   Yes.                                  13:23:01
19      Q.   And those are the certainty of       13:23:02
20 objects, subject matter of intention,           13:23:03
21 correct?                                        13:23:05
22      A.   Correct.                              13:23:06
23      Q.   The contract must be clear that     13:23:17
24 a trust is intended for the Court to            13:23:18
25 interpret it as creating a trust,               13:23:20

CONFIDENTIAL

1  correct?                              13:23:22
2     A.   Well, I quoted in paragraph 59    13:23:25
3  to be a "Clear substantive intention,      13:23:29
4  based on an objective assessment by the    13:23:31
5  relevant party or parties for the holding  13:23:34
6  intermediary to hold its title to          13:23:36
7  specific crypto token entitlement on       13:23:39
8  trusts for one or more beneficiaries" and  13:23:43
9  that is a quote from the Law Commission    13:23:46
10  final report and also a quote from Lewin  13:23:48
11  on Trusts, and whether something is a     13:23:57
12  clear intention is context specific.      13:23:59
13     Q.   And those statements set out in   13:24:10
14  paragraph 59 as you just read, that is    13:24:11
15  your view, as well, correct?              13:24:13
16     A.   Yes.                   13:24:14
17     Q.   There is no rule in English law   13:24:24
18  where a contract is ambiguous, that the   13:24:26
19  Court should default to finding a trust   13:24:29
20  was created, correct?                     13:24:31
21     A.   No, there is no default          13:24:32
22  provision.  It depends on the wording and    13:24:40
23  the circumstances.                        13:24:49
24     Q.   Would you agree that before a     13:24:54
25  trust is created, that the equitable      13:24:56

1  title in an asset does not exist separate    13:25:00
2  from the legal title?                     13:25:03
3     A.   It depends.  It could do,         13:25:04
4  depending on the facts.                   13:25:08
5     Q.   And what's a circumstance where   13:25:09
6  it could exist separately in that         13:25:12
7  circumstance?                             13:25:14
8     A.   Well, A holds Black Acre on       13:25:14
9  trust for B.  Let's not use real          13:25:17
10  property.  Let's use personal property.   13:25:20
11       A holds some shares on trust        13:25:22
12  for B.  B, in fact, is a custodian and    13:25:27
13  only, therefore, has an equitable         13:25:31
14  proprietary interest in the securities.   13:25:34
15  B then creates a trust over its equitable    13:25:37
16  proprietary interest in favor of C.  That    13:25:45
17  reflects a common custodian intermediary    13:25:51
18  situation.  So I don't agree that before    13:25:59
19  a trust is created the equitable title    13:26:11
20  doesn't exist separate from the legal     13:26:14
21  title.  It depends what the trust is a    13:26:16
22  trust over.                 13:26:21
23     Q.   Would you understand a           13:26:21
24  reference to the transfer of title in an    13:26:36
25  asset from A to B without more to refer   13:26:38

1  to legal title?                 13:26:42
2     A.   Not necessarily.  That depends    13:26:43
3  on the circumstances.                     13:26:45
4     Q.   Can you explain what you mean     13:26:48
5  by it depends on the circumstances?       13:26:51
6     A.   Well, it depends what the words   13:26:52
7  of the clause say.  If I say even though    13:26:54
8  I am transferring legal title, even       13:26:59
9  though I am transferring title to you, I   13:27:02
10  am going to retain property in my asset,  13:27:07
11  the fact that neither of us have referred    13:27:16
12  to legal title or equitable title doesn't    13:27:18
13  mean that the Court can't construe the    13:27:21
14  fact that I am -- sorry, let me do the    13:27:26
15  example again.                 13:27:30
16       If I say I am transferring          13:27:31
17  title to you without reference to legal   13:27:34
18  or equitable, but I am going to retain    13:27:38
19  ownership of my asset, the fact that      13:27:41
20  neither of us has mentioned legal or      13:27:46
21  equitable title doesn't or may not in the    13:27:48
22  particular context, mean that no trust    13:27:51
23  has been created.                 13:27:55
24     Q.   In your example, you were        13:28:00
25  pointing, though, you're assuming and     13:28:02

1  pointing to other words that would be     13:28:04
2  present in the agreement to provide those    13:28:06
3  other concepts, correct?                  13:28:08
4     A.   No, I am not.  8.2.6 is a         13:28:10
5  classic example of this.  It doesn't      13:28:12
6  refer to legal or equitable title.  What    13:28:18
7  it says clearly is in circumstances where    13:28:21
8  given the way in which the exchange       13:28:25
9  operates assets are going to be           13:28:27
10  transferred to FTX, nonetheless title is    13:28:30
11  going to remain with the customer and FTX    13:28:35
12  is not going to own the digital assets.   13:28:43
13  That, to my mind, is, as I already        13:28:51
14  expressed in my declaration, is easily    13:28:51
15  interpreted as the retention of an        13:28:52
16  equitable proprietary interest           13:28:58
17  notwithstanding that legal title and      13:29:03
18  control to the digital asset is being     13:29:04
19  transferred to FTX.                 13:29:06
20     Q.   Do you agree that it is          13:29:17
21  possible in the abstract for a            13:29:26
22  declaration of trust under a contract to    13:29:28
23  fail?                 13:29:31
24     MR. HARRIS:  Object to the form.    13:29:49
25  Go ahead.                 13:29:50

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

1   A.   I think you have to be more          13:29:51
2  specific as to what you mean by fail.        13:29:52
3   Q.   That a declaration of trust          13:30:01
4  does not result in a trust being formed?      13:30:03
5   A.   Yes, I agree, it is possible in       13:30:08
6  the abstract for a trust not to come into     13:30:11
7  existence brackets, which may be           13:30:16
8  different than a trust failing, if the        13:30:20
9  words of the contract do not satisfy the      13:30:25
10  requirements of certainty of intention,       13:30:30
11  certainty of subject matter, and          13:30:34
12  certainty of object.                13:30:36
13   Q.   What's the distinction you're         13:30:42
14  making between not coming into existence    13:30:43
15  and failing?                    13:30:45
16   A.   The distinction I am making is       13:31:01
17  that a trust may fail even though it is       13:31:03
18  in existence.  What we are looking at        13:31:09
19  here is whether a trust ever comes into      13:31:16
20  existence.  Lord Neuberger's thesis,        13:31:19
21  analysis is that the trust doesn't come      13:31:23
22  into existence.  My thesis or view,        13:31:25
23  analysis is that it does.             13:31:29
24   Q.   And what's your understanding       13:31:41
25  then of what it means then when a trust     13:31:42

Page 131

1  fails after it comes into existence?        13:31:45
2   A.   It could fail because, for         13:31:46
3  example, the trust was one for illegal      13:32:03
4  purposes.  It could fail because although   13:32:13
5  the wording of a trust was satisfied or     13:32:19
6  the requirements for the establishment of   13:32:22
7  a trust were satisfied, the reality of     13:32:24
8  the operation of the trust meant that      13:32:39
9  although it was there it failed.         13:32:44
10      In the context of a charitable      13:32:47
11  trust, a trust can fail where the objects   13:32:54
12  of the trust are no longer in existence,    13:33:00
13  in which case the trust fails but its      13:33:16
14  subject matter is applied, Cy-pres.       13:33:23
15  That's an example of a trust failing.  If   13:33:27
16  I thought about it, I would come up or     13:33:29
17  could come up with some other examples.    13:33:30
18   Q.   In paragraph 56(e) of your         13:33:44
19  declaration you describe -- I am sorry,     13:33:49
20  on page 23, you describe Section 8.2.6 of   13:33:56
21  the dotcom terms has creating a bare       13:34:02
22  custodial trust.  Do you see that?        13:34:05
23   A.   I am sorry, what para am I in?      13:34:07
24   Q.   56(e).                   13:34:09
25   A.   E?                     13:34:10

Page 132

1   Q.   Yes, on page 23, in the middle       13:34:11
2  of the page.  And you refer to the trust    13:34:13
3  as a bare custodial trust; do you see      13:34:20
4  that?                        13:34:22
5   A.   Yes.                    13:34:22
6   Q.   Can you just explain what that      13:34:23
7  means, a bare custodial trust?          13:34:24
8   A.   Yes.  A bare trust is a           13:34:27
9  situation where A holds property for B, a   13:34:31
10  classic example being where a custodian    13:34:36
11  trustee holds securities on trust for a    13:34:39
12  customer where the bare trustee has no     13:34:44
13  obligations other than to deliver the      13:34:49
14  shares or securities in accordance with    13:35:01
15  the directions of the beneficiary and to   13:35:07
16  ensure the -- let me start again.  And to  13:35:24
17  deliver, let us assume securities        13:35:44
18  back to the beneficial owner on his       13:35:51
19  instruction.                    13:35:54
20   Q.   And it's your view that the        13:36:14
21  trust that was created by 8.2.6 was this   13:36:16
22  type of a bare custodial trust, correct?   13:36:22
23   A.   Yes, the example I gave of a       13:36:24
24  bare trust a moment ago.  In the present   13:36:34
25  case, the obligation of the custodian is   13:36:39

Page 133

1  to keep or to preserve that interest, not   13:36:52
2  to destroy it, in the sense of complying   13:36:58
3  with the instructions of the beneficial    13:37:00
4  owner, the market trader, and to return    13:37:02
5  the asset at the direction of the trader,   13:37:06
6  the user, in accordance with the terms of  13:37:16
7  the contract.                   13:37:19
8      Similar obligations are imposed      13:37:36
9  in custodian trustees in other          13:37:41
10  market-type situations.  The classic      13:37:43
11  example being where a custodian, maybe a  13:37:46
12  number of custodians, hold as           13:37:55
13  intermediaries securities, whether in      13:38:02
14  companies or in funds, for the ultimate    13:38:07
15  beneficiary or user.               13:38:17
16      Indeed, if I may comment, Lord      13:38:19
17  Neuberger, in his deposition, accepted, I  13:38:21
18  believe, I know by reference to reading    13:38:25
19  his transcript, that FTX was indeed an     13:38:30
20  intermediary.                   13:38:37
21   Q.   Other than reading             13:38:49
22  Mr. Neuberger's transcript, have you seen  13:38:56
23  any evidence that FTX was an            13:38:58
24  intermediary?                   13:38:59
25   A.   On the facts I have been asked     13:39:00

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

1 to assume and on the wording of the          13:39:06
2 dotcom terms, in relation to the holding      13:39:18
3 of the digital assets, my analysis is          13:39:27
4 that FTX was a custodian, and in that          13:39:35
5 sense, an intermediary in the sense that       13:39:37
6 it held the users assets to enable the         13:39:40
7 user trade on the exchange, and in that        13:39:46
8 sense, in relation to the holding of           13:39:52
9 digital assets, was an intermediary.  It       13:39:55
10 intermediated between, as is common in        13:40:07
11 exchanges, it intermediated between the       13:40:10
12 user and other members of the exchange        13:40:17
13 with whom the particular user, in this        13:40:21
14 case, 3AC traded.                             13:40:26
15     Q.   The dotcom terms with respect       13:40:38
16 to digital assets does not identify FTX       13:40:40
17 as a custodian, do they?                      13:40:43
18     A.   No, it doesn't.                      13:40:44
19     Q.   In paragraph 48(a) of your          13:40:57
20 declaration, on page 20, you write in         13:40:59
21 Subsection A that you agree that it is        13:41:19
22 possible under English law for operators      13:41:21
23 of an exchange to declare a trust over        13:41:23
24 its network addresses that hold digital      13:41:25
25 assets in favor of customers; do you see     13:41:28

Page 135

1 that?                                         13:41:30
2     A.   Yes, that's me agreeing with        13:41:30
3 Lord Neuberger.                               13:41:36
4     Q.   Your agreement there, when you      13:41:36
5 say it's possible, you would agree that       13:41:41
6 the fact that it is possible is               13:41:45
7 predicting what an English Court could do     13:41:48
8 or would do when faced with a novel           13:41:52
9 situation, correct?                           13:41:54
10     A.   No, I think you're confusing       13:42:02
11 the question.  What we are saying is that    13:42:04
12 on the basis of trust law as it stands at    13:42:09
13 the moment, it is possible under English     13:42:12
14 law for the operators of an exchange to      13:42:14
15 declare a trust over its network assets      13:42:17
16 that holds digital assets.  That is not      13:42:20
17 the case of predicting what an English       13:42:27
18 Court would do or could do or would do       13:42:30
19 when faced with a novel situation.           13:42:32
20        It is simply an agreement with       13:42:34
21 his statement that on clear trust law as     13:42:36
22 it stands at the moment, and also certain    13:42:40
23 English decisions, in relation to digital    13:42:44
24 assets, that as a matter of law, it is       13:42:50
25 possible for the operators of an exchange    13:42:52

Page 136

1 to declare a trust over its network          13:42:56
2 addresses that hold digital assets in         13:42:59
3 favor of customers who as beneficiaries       13:43:02
4 share as tenants in common in a pool of       13:43:08
5 digital assets.  That is neither             13:43:10
6 predicting or exploring novel                 13:43:12
7 applications.  It is stating the law as       13:43:18
8 it exists at the moment.                      13:43:24
9     Q.   You can't cite to any English       13:43:25
10 Court that has applied a trust in the       13:43:27
11 circumstances you describe in Section       13:43:30
12 48(a), correct?                             13:43:32
13     A.   What I can point to is English     13:43:33
14 cases where it has been accepted that        13:43:39
15 digital assets are indeed property or        13:43:48
16 interest in digital assets are indeed        13:43:54
17 property to which trusts can apply and       13:43:57
18 that trusts can, of the type of which I      13:44:14
19 have described in this paragraph 48, can,    13:44:17
20 as a matter of analysis, arise what there    13:44:26
21 hasn't been as a matter of English law,      13:44:34
22 contrast the position in New Zealand, is     13:44:37
23 a case whereby the acceptance by the         13:44:39
24 English Court of points A and B, they        13:44:45
25 have actually concluded on the terms of      13:44:47

Page 137

1 the particular case before them that such    13:44:49
2 is the position.                             13:44:55
3        So there are a number of cases,       13:45:01
4 just to recap, where the Courts have         13:45:04
5 accepted that as a matter of English law,    13:45:10
6 digital assets are indeed property that      13:45:13
7 can be made subject to trusts or the         13:45:21
8 creation of equitable proprietary            13:45:23
9 interests in a commingled fund.              13:45:26
10        What hasn't happened yet, as         13:45:34
11 far as I know, is a situation where the      13:45:35
12 Courts on a substantive hearing had had      13:45:41
13 to deal with the issue as to whether on      13:45:44
14 particular terms the -- let me rephrase.     13:45:54
15        What there has been has been         13:46:03
16 cases where the Courts have accepted that    13:46:06
17 these principles apply.  But what there      13:46:13
18 hasn't been is a case which has actually     13:46:15
19 applied those principles in order to         13:46:20
20 conclude that a trust exists.               13:46:22
21     Q.   I appreciate that color.  The      13:46:29
22 answer to my question then is, no, you       13:46:31
23 are not aware of any English Court that      13:46:33
24 has declared a trust of the operator of      13:46:37
25 an exchange holding digital assets in        13:46:42

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

1  favor of customers, correct?          13:46:44
2    A.  I think that's right.  Correct.     13:46:46
3  But I would need to check with the cases     13:46:51
4  which I pulled out in relation to recent     13:47:01
5  cases on digital assets, which I would      13:47:06
6  really need to go through and analyze      13:47:13
7  with you, which I know you don't want to     13:47:15
8  do.                    13:47:17
9    Q.  Thank you.  In paragraph 61 of     13:47:22
10  your report --              13:47:35
11    A.  Hang on just a minute.  I want    13:48:04
12  to qualify that last answer slightly in     13:48:45
13  reference to the decision in Wang and      13:48:48
14  Darby, which is an English law case where    13:48:52
15  Steven Houseman QC was sitting as a      13:48:56
16  Deputy High Court Judge.  And in       13:49:01
17  paragraph 55 of that judgment, he stated    13:49:03
18  that, "as noted above it is common ground    13:49:14
19  that fungible and nonidentifiable digital    13:49:18
20  assets, such as Tezos," that was the      13:49:21
21  digital asset in that case, "constitute     13:49:25
22  property that is capable of being bought    13:49:28
23  and sold, as well as held on trust as a     13:49:30
24  matter of English law."  This reflects     13:49:33
25  the position at first instance in this     13:49:36

Page 139

1  jurisdiction, see AA v Persons Unknown     13:49:39
2  and Ion Science Limited v Persons       13:49:43
3  Unknown.  In both of these cases the      13:49:47
4  Commercial Court granted interim        13:49:48
5  proprietary injunctions against the      13:49:52
6  defendants in respect to cryptocurrencies    13:49:54
7  that have been fraudulently extracted or    13:49:57
8  misappropriated from the claimant or the    13:50:01
9  traceable proceeds of such assets.  The    13:50:03
10  relevant hearings in both places took     13:50:06
11  place on an uncontested basis.  The      13:50:09
12  defendant not appearing or being        13:50:12
13  represented in the matter as the case     13:50:13
14  title suggests.              13:50:16
15       So that is a case where, albeit    13:50:17
16  on an interlocutory basis, two English     13:50:22
17  Courts applying those principles granted    13:50:26
18  proprietary injunctions against the      13:50:32
19  defendants in respect to           13:50:34
20  cryptocurrencies.  Wang and Darby, as I    13:50:39
21  am sure you know, was a case where the     13:50:41
22  English Court held that on the particular    13:50:45
23  terms of that case, there was no        13:50:48
24  proprietary claim based on the existence    13:50:55
25  of a trust.                13:51:00

Page 140

1      That case was very different     13:51:01
2  from the present case, because basically    13:51:03
3  it was a swap transaction in          13:51:06
4  circumstances where the judge found that    13:51:11
5  there had been or that the nature of the    13:51:13
6  transaction was, in fact, a sale or is a    13:51:16
7  sale of digital for bitcoin and there was    13:51:21
8  no retention of title such as to give     13:51:29
9  rise to a trust.  But that somewhat      13:51:32
10  qualifies my answer, my previous answer.    13:51:35
11    Q.  Again, I appreciate that color,    13:51:44
12  but it doesn't change the fact that no     13:51:45
13  English Court has imposed a trust over     13:51:47
14  digital assets in favor of customers,     13:51:51
15  correct?                  13:51:53
16    A.  Well, as I tried to explain by     13:51:53
17  my previous answer, the English Courts in    13:51:55
18  the two interlocutory cases didn't impose    13:51:58
19  a trust, but found that a trust existed    13:52:03
20  in favor of customers in relation to      13:52:09
21  digital assets and, therefore, granted a    13:52:12
22  proprietary injunction to preserve those    13:52:16
23  assets.                  13:52:18
24      It's not a question in any      13:52:20
25  event of an English Court imposing a     13:52:22

Page 141

1  trust.  On the basis of my analysis, what    13:52:24
2  the English Court would do here is to     13:52:30
3  find that a trust exists.  The English     13:52:33
4  Court doesn't impose a trust.  That      13:52:35
5  suggests some sort of remedy.  That's not    13:52:37
6  what I am talking about here in any      13:52:40
7  event.                   13:52:44
8    Q.  The citations you refer to      13:52:47
9  about granting an interlocutory        13:52:48
10  proprietary injunction was not a        13:52:54
11  determination that a trust existed over    13:52:56
12  those assets, correct?            13:52:58
13    A.  I agree with that.  I hope I     13:52:59
14  made that clear.  What I am saying,      13:53:01
15  however, is that it would not have been    13:53:03
16  appropriate, even in an uncontested      13:53:09
17  matter, for a judge to have granted a     13:53:12
18  proprietary injunction unless he was      13:53:15
19  satisfied or bid on an interlocutory      13:53:21
20  basis that indeed a trust existed in      13:53:28
21  favor of beneficiaries.           13:53:30
22    Q.  Paragraph 61 of your report,     13:54:14
23  page 25.  You state that "I see no      13:54:34
24  difficulty in principle with the        13:54:39
25  proposition that clause 8.2.6 creates a    13:54:40

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

1  trust. And that the subject matter and          13:54:45
2  objects of the trust are readily capable        13:54:47
3  of being ascertained by reference to the        13:54:49
4  ledger kept by FTX in respect of assets         13:54:55
5  transferred in and out of the FTX wallets       13:54:58
6  in accordance with the instructions of          13:55:05
7  its customers."                                 13:55:07
8       Do you see that?                           13:55:09
9  A.   Yes.                                        13:55:09
10 Q.   And that's your view on that               13:55:10
11 issue that you're presenting to the             13:55:12
12 Court, correct?                                 13:55:14
13 A.   That's my view.                            13:55:14
14 Q.   Are you aware that FTX had far             13:55:21
15 less digital assets in its commingled hot       13:55:24
16 wallets than customers had entitlements         13:55:27
17 on the ledger of the exchange?                  13:55:31
18      MR. HARRIS:  Object to the form.           13:55:34
19 Assumes facts not in evidence.                  13:55:34
20      MR. GLUECKSTEIN:  I am asking              13:55:36
21 whether she's aware of it.                      13:55:36
22 A.   I have no idea whether that is             13:55:40
23 or is not the case. Sorry, I have no            13:55:44
24 idea whether that was or was not the            13:55:49
25 case.                                           13:55:51

Page 143

1  Q.   Would a deficit in the assets             13:55:59
2  held by the FTX Exchange impact your            13:56:01
3  analysis with respect to the creation of        13:56:04
4  a trust and your views in paragraph 61?         13:56:09
5  A.   No, it would not.                          13:56:13
6  Q.   And why is that?                           13:56:14
7  A.   Because whether or not a trust            13:56:15
8  was created is not dependent on whether         13:56:19
9  the trust was breached by the custodian         13:56:25
10 of the exchange. Not maintaining, as it         13:56:28
11 should have done, if that was the case,         13:56:35
12 sufficient digital assets to meet the           13:56:40
13 entitlement of the equitable proprietary        13:56:43
14 users, claimants to the fund. The fact          13:56:49
15 that in breach of its obligations -- and        13:56:54
16 I do not know whether this was the case         13:56:57
17 or not, as I just mentioned -- but the          13:57:00
18 fact that FTX may be in breach of its           13:57:02
19 trust obligations, used for its own             13:57:07
20 purposes, inconsistently with the terms         13:57:10
21 of the trust, digital assets or may, in         13:57:13
22 breach of its obligations, to hold the          13:57:17
23 digital assets to the order of the users,       13:57:22
24 had misapplied those assets, is                 13:57:26
25 irrelevant to the question as to whether        13:57:29

Page 144

1  or not a trust was, a trust came into          13:57:31
2  existence in the first place. And the           13:57:36
3  fact that there was a shortfall is              13:57:39
4  irrelevant to that fact. And, indeed,           13:57:41
5  many of the cases with which I have been        13:57:45
6  involved and in which the Courts have           13:57:49
7  been involved in relation to Ponzi              13:57:51
8  schemes, securities funds which have            13:57:55
9  become insolvent, that is often and             13:58:02
10 indeed almost inevitably the case. And          13:58:05
11 the beneficiary's interest have to abate        13:58:12
12 accordingly. That does not mean and is          13:58:15
13 wholly irrelevant to the fact as to             13:58:18
14 whether -- sorry, and is wholly                 13:58:21
15 irrelevant to the issue as to whether a         13:58:23
16 trust or an equitable proprietary               13:58:26
17 interest is being created in the first          13:58:28
18 place.                                          13:58:30
19 Q.   You provide an example in                  13:58:35
20 paragraph 89 of your declaration?               13:58:37
21 A.   Sorry?                                      13:58:40
22 Q.   You provide an example in                  13:58:41
23 paragraph 89 of your declaration on page        13:58:42
24 37. It's your view that if a trust was          13:58:44
25 created and 3AC had 100 bitcoin                 13:59:01

Page 145

1  associated with the account on the             13:59:06
2  exchange, which FTX held in an                  13:59:07
3  unsegregated pool of 1000 bitcoin, then         13:59:09
4  3AC would own 10 percent of the equitable       13:59:12
5  interest in that pool, correct?                 13:59:15
6  A.   That's my analysis. But that's            13:59:16
7  the arithmetic that hopefully derives           13:59:18
8  from the analysis.                              13:59:22
9  Q.   And you would acknowledge that             13:59:23
10 the FTX Exchange transaction record was         13:59:24
11 far more complicated than your example,         13:59:28
12 correct?                                        13:59:30
13 A.   I would assume so. But I do                13:59:30
14 not have knowledge of the facts                 13:59:39
15 surrounding the FTX Exchange transaction        13:59:44
16 record. I have not looked at it.                13:59:49
17 Q.   Are you aware that assets were            13:59:51
18 borrowed and lent out of that pool in the       13:59:57
19 margin program that was offered by FTX?         14:00:02
20 A.   I am aware from the terms that            14:00:04
21 assets could be borrowed and lent. I           14:00:14
22 have no knowledge of the factual, of the        14:00:19
23 facts in relation to how that worked in         14:00:26
24 relation to the margin program. The             14:00:30
25 margin program is referred to in clause         14:00:34

CONFIDENTIAL

Page 146

1 16 of the dotcom terms. And also in the 14:00:41
2 service schedule at Schedule 3, spot 14:00:51
3 margin trading. And I believe, but I 14:00:57
4 can't find the place, but no doubt you 14:01:07
5 can take me there, that lending is 14:01:11
6 referred to somewhere in the dotcom 14:01:13
7 terms. But I know nothing about the 14:01:15
8 facts. 14:01:16
9     Q.    Fair to say then you have not 14:01:21
10 considered the factual complexity of the 14:01:23
11 FTX Exchange in your analysis of the 14:01:25
12 factual matrix? 14:01:27
13    A.    I appreciate from the 14:01:27
14 assumptions that I have been asked to 14:01:35
15 assume that the accounting may have been 14:01:37
16 complex -- I have taken that into account 14:01:40
17 in coming to the conclusion which I have 14:01:49
18 based on the factual matrix that this was 14:01:54
19 a very active exchange dealing with lots 14:01:57
20 of trades, and necessarily there may be 14:02:05
21 accounting complexities giving rise to 14:02:06
22 that. That does not affect my 14:02:09
23 conclusion. I appreciate, in other 14:02:11
24 words, that it's not as simple as looking 14:02:18
25 at the position as though it was 10 bit 14:02:20

Page 147

1 coins and a thousand bit coins, or 14:02:26
2 whatever it was in the example that I 14:02:28
3 gave. 14:02:30
4    Q.    Your opinion that a trust was 14:02:47
5 created by the dotcom terms is based 14:02:48
6 solely on Section 8.2.6 of those terms, 14:02:55
7 correct? 14:02:58
8        MR. HARRIS: Object to the form. 14:03:06
9    A.    No, it's not. It's based on a 14:03:07
10 construction of the contract as a whole. 14:03:45
11 The realities of trading on an exchange 14:03:54
12 whereas one of the cases, one of the 14:03:58
13 English cases says, and I can't remember 14:04:01
14 which one, which is where the master of 14:04:04
15 the exchange, the operator of the 14:04:15
16 exchange, has, acquires assets from users 14:04:16
17 of the exchange and holds them for 14:04:23
18 trading use. 14:04:28
19        It is not difficult for the 14:04:32
20 Court or not surprising for the Court to 14:04:34
21 come to the conclusion that assets such 14:04:41
22 as securities or here digital assets, are 14:04:45
23 held in a pool on trust by the operator 14:04:51
24 of the exchange for users. My opinion is 14:04:59
25 also based on the factual circumstances. 14:05:03

Page 148

1 That is to say the debtor's business, to 14:05:10
2 quote Sigma, which is part of the factual 14:05:14
3 matrix, namely the way in which it 14:05:16
4 operated its business in apparently 14:05:28
5 saying to the world, by providing access 14:05:40
6 to its security -- I am sorry, its 14:05:43
7 safeguarding principles, that made it 14:05:46
8 clear that the user's assets were to be 14:05:54
9 held on trust. 14:05:59
10        And in addition, the way in 14:06:07
11 which the financial statements apparently 14:06:08
12 show that the debtors business was 14:06:12
13 operating consistent with my analysis 14:06:18
14 that users assets were not shown as part 14:06:23
15 of the assets of FTX, the corporate full 14:06:36
16 stop. The fact that it may have been the 14:06:45
17 case, I do not know, that there was 14:06:51
18 commingling of certain assets that were 14:07:00
19 owned by FTX or FTX affiliates with users 14:07:04
20 assets does not undermine my analysis. 14:07:10
21    Q.    So I want to follow-up on a few 14:07:19
22 of those points that you just made. The 14:07:21
23 -- my original question, though, was are 14:07:29
24 there any other provisions in the dotcom 14:07:33
25 terms that you're relying on to support 14:07:38

Page 149

1 the creation of a trust other than 14:07:40
2 Section 8.2.6? 14:07:42
3    A.    Yes, if you give me a moment, I 14:07:52
4 will look through. If you start on the 14:08:01
5 first page, "FTX relationship under the 14:08:07
6 terms is as a trading platform provider 14:08:20
7 only. FTX does not act as principal or 14:08:23
8 counterparty with respect to trades 14:08:27
9 entered into on the platform." 14:08:30
10        So this is not, as I understand 14:08:34
11 it, a situation where FTX is buying, as 14:08:37
12 counterparty, to the user. If one was 14:08:43
13 looking at a situation, as one was in 14:08:48
14 Wang and Darby, the swap transaction, 14:08:51
15 which is correctly characterized as an 14:08:54
16 exchange or a sale, that is inconsistent 14:08:58
17 as the judge found in that case, with the 14:09:02
18 concept of a trust. 14:09:04
19        Here, the nature of the trading 14:09:06
20 relationship as described on the first 14:09:08
21 page is consistent with my proprietary 14:09:11
22 analysis. Likewise, if you go to 2.1, 14:09:16
23 the allocation of risk in relation to 14:09:31
24 assets and trade, sorry, and trading is 14:09:36
25 consistent with the concept of the asset. 14:09:45

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

1  We are not talking about money here.  We   14:09:50
2  are talking about an asset being owned by   14:09:51
3  equals having an equitable proprietary   14:09:59
4  interest in the user of the exchange.  So   14:10:03
5  the allocation of risk is consistent, in   14:10:05
6  my view, with the retention of a   14:10:11
7  proprietary interest by the user of the   14:10:20
8  exchange in the digital assets.   14:10:23
9       If you look at clause 2.2.3, I   14:10:30
10  rely on the fact that, again, 2.2.3 makes   14:10:37
11  it clear that you are taking the risk of   14:10:45
12  losing asset access to your digital   14:10:51
13  assets, if assets go off the platform.   14:10:54
14  Again, that is consistent with my   14:10:59
15  analysis of retention of proprietary   14:11:00
16  interest, equitable interest in the   14:11:05
17  underlying -- sorry, in the digital   14:11:07
18  assets.   14:11:09
19       Similarly allocation of risk   14:11:23
20  related to blacklist addresses in Section   14:11:27
21  2.6.  Another provision upon which I rely   14:11:32
22  is the fact in relation to the accretions   14:11:34
23  to the digital assets, those belong to   14:12:02
24  the user.  One gets that from clause 17,   14:12:12
25  and is supported by the statement in the   14:12:45

Page 151

1  financials that accretions from   14:12:47
2  distributions, if they are supported will   14:12:54
3  incur to the benefit of users.  Likewise,   14:12:57
4  many of the other provisions of the   14:13:10
5  contract, and that's why it's important   14:13:13
6  to look at the thing as a whole.  And I   14:13:14
7  am not giving you, I am not referring to   14:13:16
8  every single clause here, is that if you   14:13:22
9  look at, for example, staking, 15.1, when   14:13:25
10  you hold digital assets on the platform,   14:13:36
11  you may be given the option to state   14:13:40
12  these assets via staking services.   14:13:42
13  Again, the reference to your holding   14:13:45
14  digital assets on the platform.  The   14:13:53
15  margin trading provision at 16.2.  Again,   14:13:59
16  are consistent with the retention of   14:14:03
17  ownership in assets.   14:14:04
18       I won't read it all out.  But   14:14:09
19  it is looking at the assets in your   14:14:10
20  account.  Obviously, you're a borrower in   14:14:12
21  relation to margin trading.  But it's   14:14:15
22  looking, again, at assets.  There are   14:14:18
23  frequent references to your assets   14:14:25
24  throughout the document.   14:14:32
25       Look at 2.4.1, you may sustain   14:14:42

Page 152

1  a total loss of digital assets when you   14:14:47
2  lend, this is where we find the reference   14:14:55
3  to lending, when you lend assets to other   14:14:57
4  users, again, consistent with your --   14:15:00
5  sorry, with Three Arrows or other users   14:15:04
6  doing the actual lending.  The exchange   14:15:10
7  isn't doing the lending.   14:15:12
8    Q.   It's your view then that these   14:15:19
9  --   14:15:21
10   A.   You want me to, I haven't   14:15:21
11  finished, but I am happy to stop, because   14:15:23
12  it's quite tedious, but I can go on if   14:15:25
13  you'd like.   14:15:28
14    Q.   If you want to complete your   14:15:28
15  answer, you can if you're not finished?   14:15:31
16   A.   Well, I go on through the   14:15:37
17  document, shall I?   14:15:39
18    Q.   I think we can move on.   14:15:56
19   A.   Okay.   14:15:58
20    Q.   Is it fair that the sections   14:15:58
21  that you're citing to, in your view, are   14:16:02
22  consistent with your reading that a trust   14:16:06
23  was created in Section 8.2.6?   14:16:10
24       MR. HARRIS:  Object to the form.   14:16:15
25   A.   You say is it fair.  That's   14:16:16

Page 153

1  what I don't understand.   14:16:22
2    Q.   Do you agree that -- am I   14:16:23
3  correct that it's your view that the   14:16:26
4  sections you just walked through, and   14:16:28
5  potentially others in the dotcom terms,   14:16:30
6  are consistent with your view that a   14:16:34
7  trust is created through Section 8.2.6?   14:16:39
8   A.   They are consistent, but they   14:16:46
9  go further than that, in my view, because   14:16:48
10  they demonstrate that title is retained   14:16:53
11  or intended to be retained in the digital   14:16:56
12  asset.   14:16:59
13    Q.   None of those references that   14:17:13
14  you just walked through, reference the   14:17:15
15  retention of an equitable interest in the   14:17:16
16  digital assets, correct?   14:17:20
17   A.   That is not necessary for the   14:17:21
18  creation of a trust, to use the word   14:17:22
19  trust or equitable interest.  What   14:17:27
20  matters is how the Court construes the   14:17:29
21  relevant wording and where the wording,   14:17:34
22  as here, refers to title, ownership and   14:17:38
23  property, consistently throughout the   14:17:42
24  document.  It is then for the Court, in   14:17:45
25  accordance with the principles   14:17:52

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

1  articulated by Briggs J in Pearson, Lomas    14:17:54
2  against Lehman to work out what is the        14:17:58
3  correct analysis of the legal                 14:18:03
4  relationship between FTX, as holder of        14:18:08
5  the assets, controller of the assets, on      14:18:12
6  the one hand and the user, Three Arrows,      14:18:16
7  on the other.                                  14:18:19
8         So it is irrelevant -- well,           14:18:24
9  it's not irrelevant, obviously.  But it       14:18:26
10 doesn't matter that there is no specific      14:18:29
11 reference to equitable interest creation      14:18:33
12 of a trust.  What matters is on the           14:18:37
13 construction of the arrangements and the      14:18:39
14 provisions of the dotcom terms, whether       14:18:42
15 the Court should, as I think it should,       14:18:49
16 analyze the relationship in relation to       14:18:51
17 the ownership of assets, as one of trust;     14:18:54
18 i.e., one where the digital assets are        14:19:02
19 swept into a commingled pool in relation      14:19:05
20 to which FTX, as operator of the              14:19:08
21 exchange, holds those digital assets in a     14:19:16
22 pool for users for tenants-in-common with     14:19:22
23 equitable proprietary interest.               14:19:25
24    Q.   Notwithstanding your view as to       14:19:28
25 its importance, my question was there is      14:19:30

Page 155

1  no reference to equitable interest being      14:19:34
2  retained in digital assets in any of the      14:19:36
3  provisions that you just referenced,          14:19:39
4  correct?                                       14:19:40
5         MR. HARRIS:  Object to the form.       14:19:41
6     A.   I agree that the words               14:19:42
7  "equitable interest" do not appear.  I        14:19:46
8  disagree with you in the sense that what      14:19:49
9  references there are to property              14:19:54
10 ownership and title, as a matter of           14:19:57
11 English law, would be construed as a          14:20:00
12 reference to equitable interest.              14:20:02
13    Q.   And the word "trust" does not         14:20:06
14 appear anywhere in Section 8.2.6,             14:20:09
15 correct?                                       14:20:12
16    A.   I agree with that.  That makes        14:20:12
17 no difference.  No, sorry, let me finish.     14:20:14
18 It is not necessary for the word "trust"      14:20:16
19 to appear.  What is necessary is whether      14:20:21
20 on a proper analysis, the requirements        14:20:26
21 for the establishment of a trust or the       14:20:32
22 creation of a relationship between            14:20:33
23 trustee and the owner of a proprietary        14:20:37
24 interest, equitable proprietary interest      14:20:42
25 have been satisfied.                           14:20:45

Page 156

1     Q.   The word "trust" is not used         14:20:45
2  anywhere in Section 8.2.6, correct?           14:20:48
3     A.   Yes, I already agreed to that.       14:20:51
4     Q.   Section 9 of the dotcom terms        14:20:53
5  does use the word "trust" to describe the     14:20:56
6  trust arrangement between a customer and      14:20:58
7  FTX in the case of abandoned assets,          14:21:00
8  correct?                                       14:21:04
9     A.   I agree.                             14:21:04
10    Q.   You in your earlier answer           14:21:05
11 explained that a part of your support         14:21:29
12 beyond Section 8.2.6 for the creation of      14:21:40
13 a trust were the factual circumstances of     14:21:42
14 the FTX business, correct?                    14:21:49
15    A.   What I was saying or I thought        14:22:00
16 I was saying was that the Court would         14:22:02
17 look in accordance with the decision in       14:22:06
18 Sigma, and many other cases, at the          14:22:08
19 factual matrix which would include the        14:22:15
20 operation of the business, the debtor's       14:22:24
21 business, as an aid to construction of        14:22:25
22 the relevant contract.  Here the dotcom       14:22:34
23 terms.                                         14:22:41
24    Q.   And for purposes of your             14:22:42
25 analysis, the factual circumstances that      14:22:43

Page 157

1  you assumed were those set out in             14:22:50
2  paragraph 36 of your declaration,             14:22:52
3  correct, that we discussed earlier?           14:22:55
4     A.   No, the factual matrix goes          14:22:56
5  wider than the circumstances set out in       14:23:03
6  36.  They would include the manner in         14:23:09
7  which FTX operated its business as seen,      14:23:21
8  or as can be gleaned from its financial       14:23:33
9  statements at the relevant time.  The         14:23:35
10 factual matrix would also include or          14:23:34
11 might include depending on the finders of     14:23:52
12 fact, but as a matter of English law in       14:23:54
13 my view would include the brochures or        14:23:59
14 principles, such as the safeguarding          14:24:05
15 principles, that were, if they were made      14:24:08
16 accessible or available to users before       14:24:15
17 they entered into the dotcom terms.  That     14:24:18
18 would be in my view a legitimate part of      14:24:26
19 the factual matrix for a Court to take        14:24:28
20 into account in deciding whether 8.2.6,       14:24:30
21 and the other provisions of the               14:24:37
22 agreement, of the dotcom terms, indeed,       14:24:39
23 created the relationship in relation to       14:24:44
24 the holding of assets to which I have         14:24:51
25 referred.                                      14:24:53

40 (Pages 154 - 157)

CONFIDENTIAL

Page 158

1    Q.   I am trying to understand the        14:24:58
2 factual matrix that you applied in coming     14:24:59
3 up with your opinions.  We discussed this     14:25:01
4 morning paragraph 36 as to how the          14:25:03
5 exchange was likely to have operated.         14:25:07
6 And now you've just supplemented that        14:25:09
7 with the financial statements and the         14:25:11
8 safeguarding principles, if they were        14:25:13
9 made accessible to 3AC, correct?            14:25:16
10    A.   No, not correct.  When I gave        14:25:19
11 you or you were provided with my notes of    14:25:28
12 additional matters, which you wished me      14:25:30
13 to tell you whether I had any additional     14:25:34
14 matters upon which I wanted to give my      14:25:36
15 opinions, in light of further information    14:25:38
16 which I have received since giving my       14:25:43
17 declaration and in the light of further      14:25:46
18 consideration, because as you know, I        14:25:51
19 have the safeguarding principles when I     14:25:52
20 first wrote my declaration I conclude, or    14:25:54
21 my analysis is that you can indeed look     14:26:02
22 at how the debtor operated its business     14:26:05
23 beyond the assumptions that I've made in    14:26:09
24 36.  You can look at the financial          14:26:12
25 statements as part of that operation and    14:26:15

Page 159

1 an English Court would do that, and can      14:26:18
2 also look at brochures or principles that    14:26:21
3 may have been accessible to the market.      14:26:28
4    You put to me if they were made          14:26:33
5 accessible to 3AC.  No, not necessarily.     14:26:34
6 If one is looking at a market contract      14:26:38
7 like this, one would look at what was       14:26:40
8 available to the market generally.          14:26:42
9    Q.   The financial statements that        14:26:58
10 you're referring to are the financial       14:27:00
11 statements referenced on page 1,           14:27:05
12 paragraph A of your notes that have been    14:27:08
13 marked as Exhibit 2?                       14:27:10
14    A.   Correct.  I haven't seen those      14:27:11
15 at the time I gave my declaration.          14:27:13
16    Q.   Have you reviewed those            14:27:18
17 statements yourself since they were made     14:27:19
18 available to 3AC?                          14:27:21
19    A.   Yes, I have.  When I say            14:27:24
20 review, obviously I am not an accountant.    14:27:25
21 I am not a U.S. auditor.  But I'm quite      14:27:27
22 familiar with accounts in a lot of the       14:27:32
23 cases that I've done in the U.K.,           14:27:38
24 probably mainly as a QC, for example,       14:27:42
25 multi-guaranty and a bailor clause, some     14:27:46

Page 160

1 of the Maxwell cases, that is what the       14:27:53
2 Court looks at to identify whether a        14:27:58
3 creditor has got a proprietary claim or     14:28:03
4 simply a personal claim.                    14:28:06
5    But I have looked at the               14:28:12
6 financials and I am happy to go through     14:28:13
7 them with you, but based not only on what    14:28:15
8 I am instructed is the expert evidence,     14:28:25
9 but also reading the, certain of the        14:28:27
10 statements in the financials, obviously     14:28:32
11 not as a judge of fact nor as an expert     14:28:37
12 on facts.  But just as an English lawyer    14:28:39
13 saying what an English Court would take     14:28:43
14 into account.  I can tell you that they     14:28:46
15 support my analysis of a trust            14:28:51
16 relationship.                             14:28:57
17    Q.   Would an English Court conduct      14:28:57
18 -- would an English Court verify the        14:29:04
19 veracity of the financial statements       14:29:10
20 before they took them into account?        14:29:12
21    MR. HARRIS:  Object to the form.        14:29:15
22    A.   It depends on what you mean by     14:29:16
23 verify.  If the -- and there are lots of    14:29:21
24 situations here.  If the debtor company,    14:29:36
25 the insolvent debtor company in the FTX    14:29:41

Page 161

1 position has produced over the years         14:29:45
2 audited financial statements that           14:29:47
3 demonstrate that it does not hold in its     14:29:49
4 own -- as its own assets, customers        14:29:55
5 assets, users assets, but regards those     14:30:03
6 not on its balance sheet but assets that    14:30:10
7 it holds separately in the custodian        14:30:12
8 trustee capacity for users as             14:30:15
9 beneficiaries, an English Court will say     14:30:18
10 that is how it is presented, that is how    14:30:24
11 the Court's trustee has presented its       14:30:27
12 position to the world, that the Court can    14:30:36
13 rely on.  And a Court would say it's not,    14:30:37
14 the custodian, the market operator,        14:30:45
15 cannot now turnaround and say, well,       14:30:50
16 actually, the audited financials were all    14:30:56
17 a pack of lies.  We regarded all of these    14:30:59
18 assets as our own, despite the terms and    14:31:05
19 the brochure switch we put out there, we    14:31:09
20 own these assets.                          14:31:14
21    So, yes, even if they were             14:31:15
22 lies, or however you want to, or false      14:31:18
23 financials, as a matter of factual matrix    14:31:21
24 and looking at the context in which the     14:31:28
25 terms should be interpreted to ascertain    14:31:39

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1 whether, in fact, a trust has been        14:31:41
2 created or not the Court will have regard    14:31:44
3 to, will or may have regard to such        14:31:50
4 financial statements.              14:31:53
5        MR. HARRIS:  Whenever you're at    14:31:56
6 a good time, we are about an hour and    14:31:57
7 an and-a-half.                  14:32:02
8        MR. GLUECKSTEIN:  A few minutes.    14:32:02
9    Q.   Is it your testimony that the    14:32:03
10 English Court would consider the        14:32:04
11 financial statements as part of the      14:32:06
12 factual matrix, even if the trustee, in    14:32:07
13 your example, is disclaiming them as      14:32:12
14 false?                      14:32:15
15    A.   It would depend on the        14:32:15
16 circumstances, okay?  Let me give you an    14:32:20
17 example.  I had a case where -- which way    14:32:22
18 around was it -- it was a case where the    14:32:27
19 issue was whether premiums paid into a    14:32:37
20 broker's account with a company -- it was    14:32:45
21 an extended warranty case.  The extended    14:32:52
22 warranty company that was issuing it went    14:32:55
23 bust, went insolvent.  And the issue was    14:32:58
24 whether the premiums which had been paid    14:33:01
25 by people buying these extended        14:33:12

Page 163

1 warranties were held on trust or not.      14:33:14
2 The Court held they weren't held on      14:33:21
3 trust.  And the Court looked at -- it was    14:33:25
4 a slightly different position -- the      14:33:34
5 Court looked at the financials which      14:33:36
6 showed the audited financials which      14:33:43
7 showed that these premiums weren't held    14:33:45
8 on trust for brokers, they showed them as    14:33:49
9 assets of the company; okay?          14:33:58
10        Even though in one sense they      14:34:01
11 were false, because the perpetrators of    14:34:02
12 these extended warranty schemes, the      14:34:06
13 directors of the company -- sorry, the    14:34:08
14 perpetrators, the vendors of these      14:34:11
15 extended warranties, had gone around      14:34:15
16 telling brokers that the premiums were    14:34:17
17 held on trust.                  14:34:21
18        So the financials were false in    14:34:22
19 one sense because the director had been    14:34:24
20 falsely telling brokers that all of the    14:34:33
21 payments made were held on trust, either    14:34:35
22 for the payors or for the brokers.  But,    14:34:38
23 in fact, the financial statements showed    14:34:41
24 that the assets were not held on trust.    14:34:45
25        Sorry, that's a rather        14:34:50

Page 164

1 complicated argument.  The fact pattern    14:34:51
2 isn't exactly the same.  So you asked me    14:34:54
3 the question will an English Court look    14:34:55
4 at the accounts if they are legitimately    14:34:58
5 part of the factual matrix.  Yes, they    14:35:00
6 will.                      14:35:03
7    Q.   Were you provided any factual    14:35:06
8 information with the financial statements    14:35:09
9 regarding the FTX recovery trust position    14:35:10
10 with respect to those financial        14:35:14
11 statements?                  14:35:15
12    A.   No.  All I was provided with --    14:35:16
13 I was provided with FTX Trading Limited    14:35:30
14 consolidated financial statements as of    14:35:32
15 31 December '21 and '20 for the years      14:35:35
16 ending December 31, 2021 and 2020.  I was    14:35:41
17 not provided with any supporting        14:35:45
18 material.                    14:35:47
19    Q.   Are you aware that the FTX      14:35:47
20 recovery trust has sued those auditors?    14:35:48
21    A.   No.                  14:35:51
22        MR. HARRIS:  Is this a good      14:36:02
23 time?                      14:36:03
24        MR. GLUECKSTEIN:  Yeah, we can    14:36:03
25 take a break.                  14:36:04

Page 165

1        THE VIDEOGRAPHER:  Off the      14:36:05
2 record.  The time is 2:36 p.m.        14:36:06
3        (Off the record.)          14:51:04
4        THE VIDEOGRAPHER:  Back on the    14:51:04
5 record.  The time is 2:51 p.m.        14:51:27
6 BY MR. GLUECKSTEIN:              14:51:30
7    Q.   Dame Elizabeth, we were talking    14:51:30
8 before the break about your, some of the    14:51:37
9 points you had made with respect to your    14:51:42
10 views that further support that a trust    14:51:44
11 was created by this contract.          14:51:48
12        One of the things you had      14:51:52
13 articulated was the realities of trading    14:51:54
14 on an exchange.  I wanted to know if you    14:51:58
15 can expand on what you mean by that.      14:52:02
16    A.   When you have an exchange, and    14:52:04
17 it can depend on the different type of    14:52:17
18 exchange, whether we are dealing with a    14:52:19
19 metal exchange or a securities exchange,    14:52:24
20 pork bellies exchange, gold exchange      14:52:37
21 trading, digital assets trading.  If      14:52:42
22 there is going to be physical delivery of    14:52:48
23 assets into the exchange for the purposes    14:52:50
24 of the user trading on the exchange, then    14:52:55
25 arrangements need to be made for the      14:53:04

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

1  holding of those assets.  Obviously, when    14:53:10
2  I say physical delivery, that's talking      14:53:15
3  in relation to tangible property, but        14:53:19
4  likewise in relation to intangible           14:53:25
5  property, if they are going to be -- the     14:53:27
6  exchange is going to hold assets in order    14:53:31
7  to facilitate the trading of those assets    14:53:34
8  on the exchange between users of the         14:53:39
9  exchange, then arrangements need to be       14:53:42
10 made in relation to the legal                14:53:45
11 relationship between the parties as to       14:53:53
12 property in the goods or in the assets,      14:54:06
13 the risks relating to ownership.  And        14:54:09
14 also one has to look at how sales            14:54:15
15 exchange's trades are affected.              14:54:21
16      And all of those can or may or          14:54:26
17 may not be indicators as to whether the      14:54:28
18 custodian, let's just assume of              14:54:39
19 securities, that are being traded on an      14:54:42
20 exchange or just sitting there in a fund,    14:54:45
21 are held beneficially by the operator of     14:54:49
22 the exchange, beneficially by the            14:54:55
23 operator of the particular fund of           14:54:58
24 securities or on trust.            14:55:01
25      So that's what I am saying,             14:55:07

Page 167

1  when one looks at, did I use the             14:55:09
2  expression the realities of the exchange.    14:55:13
3  I don't think I meant anything more than     14:55:16
4  that.                      14:55:18
5      Q.   For purposes of your analysis       14:55:18
6  in this case, did you rely on any facts      14:55:19
7  with respect to the realities of trading     14:55:25
8  on an exchange beyond what's set forth in    14:55:27
9  your declaration?            14:55:31
10     A.   Beyond what one can glean from      14:55:32
11 -- sorry, the answer to THAT question is,    14:55:37
12 no, beyond what one can glean from the       14:55:39
13 FTX.com terms and also the financial         14:55:43
14 statements in the security document.         14:55:49
15      (Gloster Exhibit 6, Document            14:56:23
16 entitled "FTX Digital Markets Limited,       14:56:23
17 Safeguarding of Digital Assets and           14:56:27
18 Digital Token Management Policy", was        14:56:30
19 so marked for identification, as of          14:56:07
20 this date.)                    14:56:07
21     Q.   Dame Elizabeth, you have been       14:56:19
22 handed what's been marked as Exhibit 6,      14:56:20
23 which is a document entitled "FTX Digital    14:56:22
24 Markets Limited, Safeguarding of Digital     14:56:25
25 Assets and Digital Token Management          14:56:29

Page 168

1  Policy."                     14:56:30
2      Do you see that?                14:56:31
3      A.   Yes, I do.                  14:56:31
4      Q.   Is this the document that you      14:56:33
5  referenced earlier and in your notes as      14:56:35
6  what you refer to as the safeguarding        14:56:38
7  principles?                    14:56:40
8      A.   Let me just check that they are    14:56:40
9  the same, that they've got the same Bates    14:56:45
10 numbers.  Let me just check.  Yeah.          14:56:47
11     Q.   You reviewed this document         14:57:09
12 yourself as part of your work on this        14:57:12
13 matter?                      14:57:13
14     A.   I looked at it the first time      14:57:14
15 around when I did my declaration.  And I     14:57:17
16 looked at it again when I came to prepare    14:57:21
17 for this deposition and when I was told,     14:57:25
18 I can't remember when I was told, that       14:57:27
19 these may have been generally more           14:57:30
20 available or accessible to people on the     14:57:31
21 exchange.                    14:57:34
22      And when I looked at them, I           14:57:36
23 can't remember if it was two weeks ago,      14:57:41
24 three weeks ago, four weeks ago, it          14:57:42
25 struck me that there was, that they          14:57:47

Page 169

1  provided additional support for my           14:57:51
2  analysis.  And then I was told that          14:57:57
3  they'd been made, that a deposition of       14:57:59
4  one of the witnesses in this case or one     14:58:07
5  of the deposed persons in this case          14:58:09
6  stated that they had been, or that they      14:58:13
7  had been made accessible or were             14:58:20
8  accessible to traders at the time.           14:58:22
9      So that's why in my additional          14:58:25
10 notes they came into greater prominence,     14:58:33
11 and why when you asked me have I got         14:58:35
12 anything else to add, I said yes I wanted    14:58:37
13 to refer to these.            14:58:41
14     Q.   Am I correct that you were         14:58:42
15 instructed to assume that this policy had    14:58:44
16 been made available to customers?            14:58:51
17     A.   Let me just check, hold on, on     14:58:53
18 what I was instructed.  It's page 2 of my    14:59:00
19 notes.  And what I was instructed is that    14:59:08
20 during a deposition a former FTX             14:59:18
21 personnel, Zane Tackett testified that       14:59:21
22 FTX customers were provided access to the    14:59:23
23 safeguarding principles document upon        14:59:26
24 request.  That's Tackett deposition          14:59:28
25 transcript at 214, lines 18 to 21.           14:59:34

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

1    Q.    Are you offering a view as a          14:59:41
2  factual matter as to whether, in fact,        14:59:44
3  customers did have access to this             14:59:46
4  document?                                     14:59:48
5    A.    No, as I told you previously, I       14:59:48
6  am not offering views as to factual           14:59:51
7  matters as to whether, in fact, customers     14:59:55
8  did have access to this document.             14:59:57
9    Q.    You testified earlier that for        15:00:01
10  purposes of the factual matrix, this         15:00:03
11  document would be included, if it had        15:00:06
12  been made accessible, to customers,          15:00:09
13  correct?                                     15:00:11
14      MR. HARRIS:  Object to the form.         15:00:11
15    A.    I don't think I said that, but       15:00:12
16  if I did, I should correct it, because in    15:00:21
17  accordance with the decision of the House    15:00:27
18  of Lords in Sigma, the paragraph to which    15:00:29
19  I took you previously, it is relevant in     15:00:36
20  order to ascertain whether a trust           15:00:41
21  relationship has been created                15:00:43
22  particularly in the context of an            15:00:51
23  insolvent fundholder or insolvent            15:00:52
24  operator of an exchange to look at how       15:00:57
25  the debtor, in this case FTX, actually       15:01:06

Page 171

1  operated its business.  And that is the      15:01:07
2  legitimate aid or may be the legitimate      15:01:12
3  aid to construction so irrespective of       15:01:14
4  whether the safeguarding principles had      15:01:27
5  been made accessible to customers, my        15:01:28
6  view is that because -- and this may         15:01:32
7  depend on the factual evidence -- it was     15:01:34
8  or appears to be an internal management      15:01:45
9  policy of the company.  It would,            15:01:52
10  nonetheless, be available as legitimate     15:01:55
11  factual matrix material.                    15:02:02
12    Q.    Would it affect your analysis       15:02:07
13  if the internal policy reflected            15:02:09
14  something inconsistent with how the         15:02:15
15  debtor actually operated the exchange?      15:02:21
16    A.    It might do.  It depends.           15:02:26
17    Q.    For purposes of your analysis       15:02:27
18  in this case, pursuant to the instruction   15:02:33
19  you received, you assumed that this         15:02:38
20  document was made available to customers,   15:02:40
21  correct?                                    15:02:43
22    A.    I make that assumption, but I       15:02:43
23  emphasize -- as I already said in the       15:02:51
24  answer that I have given you -- that my     15:02:53
25  view and conclusion and opinion is not      15:02:55

Page 172

1  dependent on the factor of availability.      15:02:59
2  I also am of the opinion that even if it      15:03:03
3  was merely an internal policy of the          15:03:09
4  company, that, too, and in those              15:03:12
5  circumstances, would enable the Court to      15:03:20
6  use the document, the policy as               15:03:24
7  legitimate factual matrix material as an      15:03:31
8  aid to determining the issue as to            15:03:38
9  whether a trust, in fact, came into           15:03:43
10  existence.                                   15:03:47
11    Q.    If we can turn back to your          15:03:57
12  report, Dame Elizabeth, paragraph 55 on      15:04:00
13  page 21.                                     15:04:02
14    A.    Sorry, I am being slow.  Thank       15:04:27
15  you.                                         15:04:31
16    Q.    In paragraph 55 you acknowledge      15:04:32
17  that read in a vacuum the words              15:04:38
18  "ownership title" could mean either          15:04:44
19  indeed they would probably most naturally    15:04:49
20  be read as a reference to legal and          15:04:54
21  equitable title, correct.                    15:04:56
22      And then you go onto talk about          15:04:57
23  why the factual matrix is relevant, but      15:05:00
24  you agree that the natural read of title     15:05:03
25  would be legal and equitable title,          15:05:06

Page 173

1  correct?                                      15:05:09
2      MR. HARRIS:  Object to the form.          15:05:15
3    A.    I am sorry, you're reading from       15:05:15
4  paragraph 55?                                 15:05:18
5    Q.    55, middle of the paragraph.          15:05:18
6  You agree, you stand by, as you wrote         15:05:20
7  here, that the natural reading of the         15:05:21
8  word "Title" would be a reference to a        15:05:24
9  legal and equitable title, correct?          15:05:27
10      MR. HARRIS:  Objection.                  15:05:28
11    A.    It could mean either, but what       15:05:30
12  I say is what I say.  I say "Read in a       15:05:34
13  vacuum the words can mean either.  Indeed    15:05:38
14  they would probably most naturally be        15:05:40
15  read as a reference to a legal and           15:05:42
16  equitable title.                             15:05:44
17    Q.    Okay.  And notwithstanding that      15:05:52
18  natural reading, in paragraph 56 you set     15:05:58
19  forth a five-step reasoning as to why the    15:06:06
20  trust can be read otherwise, correct?        15:06:16
21    A.    Well, no, what I am doing in         15:06:19
22  paragraph 56 is considering the words in     15:06:21
23  the context of the whole agreement and       15:06:24
24  looking at the, what meaning or the          15:06:36
25  analysis that is to be given to -- title     15:06:40

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

1  at all times remaining with you.          15:06:47
2  Property and control -- I am looking at    15:06:51
3  it in context.  And indeed it depends      15:07:04
4  what time you're looking at it, because    15:07:06
5  it could be argued -- and perhaps this     15:07:11
6  depends on the technicalities -- it could  15:07:13
7  be argued that legal title to the digital  15:07:15
8  assets at the inception of the, putting    15:07:18
9  the assets on the exchange, remained with  15:07:23
10 the customer, because as I understand it,  15:07:30
11 and I may be wrong, because this is a      15:07:34
12 factual matter, the time that the digital  15:07:37
13 asset was actually lodged, it could be     15:07:39
14 said that at that moment, because it was   15:07:42
15 in a private wallet to which the customer  15:07:43
16 -- sorry, the customer, the user had the   15:07:46
17 key, it indeed had legal title at that     15:07:49
18 stage.                                     15:07:54
19      Now, that would be, as I              15:07:55
20 understand it, only in circumstances       15:07:57
21 where the user had the digital assets,     15:07:58
22 initially, and then lodged them on the     15:08:04
23 exchange.  So it puts the digital assets   15:08:09
24 into a private wallet before they are      15:08:13
25 swept into the collective wallet, if I     15:08:15

Page 175

1  can call it that.  So title could mean at  15:08:19
2  the inception of the relationship, legal   15:08:23
3  title.  But in context, that is to say     15:08:25
4  where we know that assets are purchased    15:08:30
5  by users from the exchange in              15:08:34
6  circumstances where they never go into a   15:08:37
7  private wallet of the customer, then one   15:08:41
8  is looking at it at that stage and that    15:08:44
9  is, in my opinion, consistent with         15:08:46
10 equitable proprietary title or an          15:08:48
11 equitable interest in the property.        15:08:53
12     Q.  In Section 56 (b) --               15:08:54
13     A.  Are you looking at my opinion?     15:09:06
14     Q.  Yes, we are still on 56.           15:09:07
15     A.  66?                                15:09:09
16     Q.  Paragraph 56, still.  The same     15:09:10
17 paragraph.  56(b).  And you note there is  15:09:12
18 certain context as you call it relevant    15:09:37
19 to the factual matrix, correct?            15:09:41
20     A.  Yeah.  This is the operation of    15:09:43
21 the exchange.                              15:09:45
22     Q.  "(I)" you're saying that "3AC's    15:09:54
23 act of depositing digital assets with FTX  15:09:59
24 for use on the exchange involved a         15:10:01
25 transfer of control from 3AC to FTX,"      15:10:03

Page 176

1  correct, that's a factual assumption       15:10:06
2  you're making?                             15:10:08
3      A.  Yes, that may be a little bit      15:10:09
4  compressed -- because as I just explained  15:10:15
5  it to you, and as I thought I understood,  15:10:17
6  to begin with, and this may be wrong       15:10:22
7  factually, but I think what I am getting   15:10:24
8  at here, but it's slightly compressed --   15:10:27
9  is that originally the -- when the assets  15:10:30
10 are originally deposited, 3AC retains its  15:10:35
11 private keys in the private wallet.  But   15:10:39
12 once they are deposited for trading on     15:10:45
13 the exchange, they are swept, I don't      15:10:46
14 know what the right nomenclature is, it's  15:10:49
15 FTX private keys that are needed to deal   15:10:54
16 with the assets.                           15:10:57
17     Q.  The second assumption you make     15:11:03
18 there is that 3AC's digital assets would   15:11:05
19 ultimately be pooled with the digital      15:11:08
20 assets of other customers and held in      15:11:10
21 unsegregated hot wallets.                  15:11:13
22     A.  That's the assumption I am         15:11:18
23 making.                                    15:11:20
24     Q.  And that assumption as you         15:11:21
25 applied it to your analysis includes an    15:11:22

Page 177

1  assumption that customers knew about the   15:11:25
2  commingling of assets in those hot         15:11:30
3  wallets, correct?                          15:11:32
4      A.  No, not at this paragraph B.  I    15:11:33
5  am not making that assumption.  My         15:11:41
6  analysis, as I think I said previously,    15:11:50
7  is not dependent on the knowledge of       15:11:52
8  users.  This is, in fact, what happened    15:11:54
9  -- let us assume that this is in fact      15:11:58
10 what happens.  My analysis is not          15:12:00
11 dependent on whether 3AC knew that they    15:12:01
12 were being swept into unsegregated hot     15:12:07
13 wallets.                                   15:12:10
14     Q.  Your analysis does make that       15:12:11
15 assumption, though, as we discussed        15:12:13
16 earlier in paragraphs 36 and 37 of your    15:12:15
17 report, correct?                           15:12:19
18     A.  Yes, but as I am telling you,      15:12:19
19 my analysis and my conclusion is not       15:12:22
20 dependent on whether 3AC did or did not    15:12:30
21 know these specific facts in which I am    15:12:32
22 instructed to assume.                      15:12:34
23     Q.  I didn't ask whether it was        15:12:35
24 dependent.  I asked whether your analysis  15:12:36
25 applied the facts in such a manner?        15:12:39

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

1    A.   I don't understand the last      15:12:42
2  sentence of your new question.          15:12:46
3    Q.   My question was simply whether   15:12:48
4  what you did for purposes of your       15:12:50
5  analysis assumed that the fact of       15:12:51
6  commingling was known to the customers?  15:12:55
7    A.   No, it doesn't. I've already     15:12:57
8  answered that. At paragraph (b) there is  15:12:59
9  no assumption by me. The knowledge is a   15:13:03
10  requisite factor in my reaching my      15:13:07
11  conclusion.                            15:13:10
12    Q.   Dame Elizabeth, didn't we       15:13:12
13  discuss this morning, let's turn back to  15:13:13
14  paragraph 37 of your declaration?      15:13:15
15    A.   Correct. But what I am telling   15:13:17
16  you, and I told you about three or four   15:13:18
17  times now, is that my conclusion and   15:13:21
18  analysis is not dependent upon Three   15:13:23
19  Arrows or indeed any other user knowing  15:13:30
20  all the details of the operation of FTX's  15:13:34
21  operation of the exchange.             15:13:41
22    Q.   Does your analysis require a     15:13:43
23  user to have any reasonable understanding  15:13:46
24  of any, any operational facts of how the  15:13:48
25  exchange works?                        15:13:55

Page 179

1       MR. HARRIS: Object to the form.   15:13:56
2    A.   I don't know what you mean by    15:13:57
3  any reasonable understanding.          15:14:05
4    Q.   Is your analysis affected in     15:14:08
5  any way if a user had zero understanding  15:14:12
6  of how the FTX Exchange operated?      15:14:15
7    A.   No. In other words, it's not a   15:14:17
8  necessary factor or critical factor of my  15:14:28
9  analysis. I reach the same conclusion   15:14:36
10  even if a user had zero understanding of  15:14:38
11  how the FTX Exchange operated.         15:14:41
12    Q.   And it's your testimony that     15:14:44
13  the factual matrix would be unchanged if  15:14:45
14  a user had no knowledge of how the FTX  15:14:49
15  Exchange operated?                     15:14:54
16       MR. HARRIS: Object to the form.   15:14:55
17    A.   Well, obviously, it's a         15:14:57
18  different fact, but it doesn't mean that  15:15:09
19  the conclusion is any different, because  15:15:13
20  what matters, "See Lord Collins in     15:15:18
21  Sigma," is how, in this context, the   15:15:21
22  debtor conducted its operations. Because  15:15:24
23  establishing whether or not a trust    15:15:28
24  exists is not simply a question of     15:15:29
25  looking at the wording, but also in    15:15:33

Page 180

1  looking at the operation of the business  15:15:38
2  that puts the wording in context.      15:15:48
3    Q.   In paragraph 56 (d) on page 23   15:15:49
4  of your report you state that the words  15:16:05
5  of the clause referencing 8.2.6 are    15:16:19
6  capable of carrying that meaning,      15:16:22
7  referring to equitable ownership; do you  15:16:26
8  see that?                              15:16:29
9    A.   Yeah.                           15:16:29
10    Q.   What do you mean by the word     15:16:31
11  "capable of carrying that meaning" in   15:16:52
12  this context?                          15:16:53
13    A.   What I say. I mean something    15:16:54
14  is capable of doing something if it can  15:17:03
15  do something. I think the words can    15:17:05
16  carry that meaning. It's not a distorted  15:17:07
17  meaning or an artificial meaning. The   15:17:13
18  natural meaning of the words of that   15:17:15
19  clause are capable to convey that      15:17:17
20  concept.                               15:17:19
21    Q.   Paragraph 62 of your report, we  15:17:19
22  discussed some of the clauses referenced  15:18:31
23  there in your earlier answer, earlier   15:18:33
24  answers today, but you note in paragraph  15:18:34
25  62 references to clauses 2.1.3, 9.2 and  15:18:37

Page 181

1  38.6 of the terms as having the greatest  15:18:47
2  potential to point against your        15:18:51
3  conclusion, correct?                   15:18:52
4    A.   Well, these are the points that   15:18:54
5  Lord Neuberger relies on, so obviously I  15:18:57
6  got to deal with them. Obviously, I have  15:19:00
7  got to deal with them.                 15:19:13
8    Q.   You agree that the language in   15:19:20
9  Section 2.1.3 disclaiming the fiduciary  15:19:22
10  relationship could be read as contrary to  15:19:27
11  the existence of a trust?              15:19:32
12       MR. HARRIS: Object to the form.   15:19:36
13    A.   Well, no, what I said in my     15:19:37
14  opinion is what 2.1.3 is looking at is   15:20:02
15  what FTX is not in relation to trades,   15:20:05
16  decisions or activities affected by you  15:20:09
17  using the service. So it's not advising  15:20:13
18  you, not intermediating with other     15:20:16
19  people, although it seems to me that it's  15:20:22
20  a nonsense really. Obviously, it's an   15:20:25
21  intermediary in some sense related to   15:20:30
22  trades. But the critical point is that   15:20:32
23  it has, the disclaimer of a fiduciary   15:20:34
24  relationship is only in relation to    15:20:36
25  trading or other decisions. It is not --  15:20:40

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

1  and this is what I say in section 63,        15:20:45
2  paragraph 63 of my report -- it says        15:20:49
3  nothing at all about the relationship        15:20:51
4  between the parties in relation to the        15:20:52
5  holding or ownership of digital assets on        15:20:55
6  the exchange that are associated with        15:20:57
7  3AC's account. It simply isn't looking        15:21:01
8  at ownership or the holding structure        15:21:04
9  between the custodian FTX of the digital        15:21:13
10 assets and users of the exchange. And no        15:21:18
11 English Court would derive -- deprive        15:21:24
12 8.2.6 of meaning simply because of this        15:21:31
13 disclaimer of a fiduciary relationship or        15:21:36
14 obligation in relation to trading or        15:21:39
15 decisions or activities.        15:21:42
16   Q.   Decisions and activities are        15:21:49
17 broad terms, aren't they?        15:21:51
18   A.   Yes, but they don't include --        15:21:52
19 decisions or activities affected by you        15:21:58
20 is not at, in my opinion, to refer to the        15:22:01
21 holding of assets or the ownership of        15:22:10
22 assets which are contributed to the        15:22:12
23 exchange. It's simply not directed to        15:22:16
24 that. And in circumstances where under a        15:22:20
25 contract of this sort one has a        15:22:25

Page 183

1  custodian, whether of securities or        15:22:28
2  whatever, it's not unusual for there to        15:22:31
3  be a disclaimer in relation to trades, et        15:22:36
4  cetera by the bare trustee as far as        15:22:41
5  ownership is concerned of fiduciary        15:22:43
6  obligations. And indeed, the additional        15:22:45
7  passage in Snell, to which I referred to        15:22:47
8  earlier this morning in my additional        15:22:49
9  comments, which I wanted to add, at page        15:22:53
10 3(b) I refer to the fact that Snell's        15:23:05
11 equity at paragraph 21-14 states that a        15:23:06
12 trustee may sometimes hold property for a        15:23:10
13 beneficiary without having any equitable        15:23:11
14 powers of management over it and without        15:23:15
15 owing any fiduciary duties to the        15:23:17
16 beneficiary in respect of it.        15:23:19
17        So I stand by my conclusion        15:23:21
18 that in context, particularly under the        15:23:26
19 Shapo No Advice and No Reliance, 2.1.3 is        15:23:30
20 not directed at, does not affect the        15:23:39
21 relationship between FTX and Three Arrows        15:23:41
22 that arises as a result of and under the        15:23:47
23 provisions of 2.8.6 as construed in the        15:23:50
24 context of the whole of the agreement.        15:23:55
25   Q.   Section 2.1.3 ends by saying        15:23:57

Page 184

1  the "affected by you" language you        15:24:02
2  reference?        15:24:04
3    A.   I am sorry?        15:24:05
4    Q.   The "affected by you" words        15:24:06
5  that you reference, that sentence        15:24:08
6  continues onto say "using the services";        15:24:10
7  do you see that?        15:24:12
8    A.   Yeah.        15:24:13
9    Q.   And services is a defined term        15:24:16
10 under the dotcom terms, correct?        15:24:18
11   A.   Yes.        15:24:21
12   Q.   And the defined terms services        15:24:22
13 includes the holding of digital assets on        15:24:26
14 the exchange, correct?        15:24:28
15   A.   Yes. But still in context.        15:24:29
16 That is referring to the user buying,        15:24:33
17 selling, exchanging and holding. So I        15:24:36
18 take your point. Again, you refer me to        15:24:43
19 the word "hold." But I still don't, in        15:24:45
20 my view, that is not in connection with        15:24:47
21 trades, decisions or activities affected        15:24:53
22 by you using the services. And it is not        15:24:57
23 on any basis something that goes to        15:25:02
24 undermine the creation of a trust        15:25:04
25 relationship and the designation of FTX        15:25:09

Page 185

1  as trustee in circumstances where it, as        15:25:16
2  a custodian, is necessarily holding these        15:25:23
3  assets. It must be holding them on some        15:25:25
4  terms. And if you look at A, for        15:25:29
5  example, that is looking at the user        15:25:33
6  holding assets in the context of its        15:25:38
7  trading activities. It is not looking --        15:25:40
8  I am repeating myself, I know, and I        15:25:45
9  apologize for being tedious -- it is not        15:25:48
10 directed at the proprietary relationship        15:25:50
11 which has to be stated somewhere as to        15:25:57
12 how ownership of the underlying assets is        15:26:00
13 to be held or divided as a matter of        15:26:02
14 English law between custodian -- between        15:26:07
15 FTX and the user.        15:26:11
16   Q.   Nowhere in the terms of service        15:26:17
17 definition of services is, or elsewhere,        15:26:18
18 is FTX referred to as a custodian?        15:26:21
19   A.   Correct. The reality is that        15:26:23
20 if you have an exchange to which assets        15:26:30
21 are contributed, whether you call them an        15:26:33
22 intermediary or whether you call them a        15:26:40
23 custodian, it doesn't matter for my        15:26:42
24 purposes. My analysis is not dependent        15:26:44
25 on the characterization of FTX as the        15:26:47

47 (Pages 182 - 185)

CONFIDENTIAL

Page 186

1 custodian. My analysis is dependent upon      15:26:50
2 the reality of a situation where A          15:27:00
3 receives B's assets and there has to be     15:27:03
4 some description as to the basis on which    15:27:09
5 A is holding those assets when the          15:27:11
6 expressed terms of the contract provide     15:27:14
7 that B's ownership in and entitled to the   15:27:18
8 assets remain B's at all time. You can't    15:27:22
9 just disregard those clauses. An English    15:27:25
10 Court would give them, as an operative      15:27:28
11 clause of the contract, some meaning.       15:27:39
12    Q.  FTX would not be a custodian if      15:27:45
13 FTX, in fact, owned those assets?           15:27:47
14    A.  Correct.                             15:27:48
15    Q.  Correct?                             15:27:49
16    A.  Correct. Well, it depends on         15:27:50
17 how you define custodian. I mean we are     15:27:58
18 slightly dicing with terms here. I am       15:28:00
19 sure that in some circumstances, maybe in   15:28:03
20 regulatory situations, someone might be     15:28:09
21 defined as a custodian albeit that they     15:28:13
22 had full legal and beneficial ownership     15:28:16
23 in the asset. But we needn't go there.      15:28:19
24 I agree with your proposition.              15:28:22
25    Q.  Paragraph 66 of your                 15:28:24

Page 187

1 declaration on page 28, in that            15:28:26
2 paragraph, you are addressing Section       15:28:33
3 38.6 of the dotcom terms, correct?          15:28:37
4    A.  Correct.                             15:28:40
5    Q.  And in that paragraph you say,       15:28:52
6 in the middle of the paragraph "This is     15:28:54
7 essentially a boiler plate provision that   15:28:56
8 appears in the back end of the terms."      15:28:58
9    Do you see that?                         15:29:01
10    A.  Yeah.                               15:29:04
11    Q.  In your view, what is the           15:29:04
12 significance of a provision being boiler    15:29:07
13 plate in English law?                       15:29:10
14    A.  Well, it's a standard provision     15:29:12
15 that one sees at the back of agreements     15:29:16
16 like this. And indeed at the back of a     15:29:19
17 lot of commercial agreements that is put   15:29:21
18 in.                                        15:29:29
19    And the question is what weight          15:29:29
20 do you give -- what weight, if any, does   15:29:31
21 an English Court give to the words for      15:29:37
22 any purpose whatsoever. My analysis is     15:29:40
23 not relying on my characterization of      15:29:45
24 this as a boiler plate provision.          15:29:46
25    Q.  There is no rule of                 15:30:03

Page 188

1 interpretation under English law that      15:30:03
2 would allow a Court to ignore the affect    15:30:05
3 of a term because it's described as         15:30:08
4 boiler plate, correct?                      15:30:10
5    A.  Correct. It's a question of         15:30:11
6 what weight you give to each particular     15:30:18
7 clause and in particular to important       15:30:19
8 operative clauses, such as 8.2.6 and an    15:30:22
9 English Court would have to ask oneself,    15:30:29
10 as indeed you're asking me, does a no      15:30:32
11 partnership or no agency clause, which      15:30:37
12 says nothing is to -- intended to          15:30:45
13 constitute a fiduciary relationship or     15:30:49
14 other cooperative entity between the       15:30:51
15 parties for any purpose whatsoever, does   15:30:54
16 that render obsolete the clear operative   15:30:57
17 provisions in relation to a critical       15:31:04
18 aspect of the relationship; namely, who    15:31:06
19 owns the digital assets that have been     15:31:09
20 lodged on the exchange. And you simply     15:31:11
21 cannot read and an English Court would     15:31:14
22 not read clause 38.6 as saying that this   15:31:17
23 means that the relationship as to owning   15:31:27
24 the asset set out in 8.2.6 is             15:31:31
25 meaningless.                               15:31:35

Page 189

1    The other point I make in              15:31:36
2 relation to 38.6 is that it starts with     15:31:36
3 the expression "Except as expressly         15:31:43
4 provided in the terms."                     15:31:44
5    Now, I know that's the intro             15:31:51
6 simply to the second sentence there, but    15:31:52
7 clearly what 38.6 is doing is saying, in    15:31:55
8 my view, except as expressly provided in    15:32:04
9 the terms.                                 15:32:06
10    Q.  As you're acknowledging, the        15:32:11
11 first sentence that we are discussing       15:32:13
12 regarding a lack of fiduciary              15:32:15
13 relationship does not have that proviso,   15:32:17
14 correct?                                   15:32:20
15    A.  I agree with that, that I don't     15:32:21
16 think that makes any difference as a       15:32:22
17 matter of commercial construction of this  15:32:28
18 agreement.                                 15:32:31
19    What the first sentence or              15:32:37
20 first clause is looking at is basically    15:32:39
21 you can't -- you, the user, can't point    15:32:40
22 to these dotcom terms as saying we are in  15:32:43
23 a partnership relationship, we are in a    15:32:51
24 joint venture, we've got trust            15:32:53
25 obligations towards each other in         15:32:54

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

1 relation to trading on the exchange. We    15:32:57
2 are not in this together. The    15:33:06
3 obligations and rights are separate.    15:33:07
4 That's all that's doing. And you can't    15:33:09
5 have this particular tail wagging the dog    15:33:10
6 of the operative clause of the agreement    15:33:19
7 which defines the ownership relationship.    15:33:23
8    Q.   Section 8.2.6 (c) of the terms,    15:33:25
9 does have that type of proviso, correct,    15:33:32
10 limiting its applicability subject to    15:33:38
11 other applicable policies including the    15:33:43
12 terms?    15:33:45
13    MR. HARRIS:  Object to the form.    15:33:45
14    A.   I don't think it is the same    15:33:57
15 proviso.    15:33:58
16    Q.   You don't believe that Section    15:33:59
17 8.2.6 (c) is qualified by other    15:34:06
18 applicable policies including the terms?    15:34:12
19    A.   Well, yes, it is, but that is    15:34:13
20 what that is saying, the second sentence    15:34:24
21 there, is that anytime, subject to, there    15:34:25
22 is other things, you may withdraw your    15:34:29
23 digital assets. I don't see the point    15:34:31
24 you're putting to me, I am afraid.    15:34:35
25    Q.   Section 8.2.6 (c) is qualified    15:34:38

Page 191

1 by the other limitations that are imposed    15:34:42
2 on the customer including other    15:34:45
3 provisions of the terms, correct?    15:34:46
4    A.   This is only dealing with    15:34:54
5 withdrawing your digital assets. The    15:34:54
6 fact that we got 38.6 can't mean and    15:34:56
7 isn't intended to mean that it's    15:35:05
8 meaningless when you say you may withdraw    15:35:08
9 your digital assets when the clause says    15:35:10
10 you may withdraw your digital assets.    15:35:13
11 Otherwise, there is no function -- that    15:35:18
12 sentence is not providing any function.    15:35:22
13 You can't read it as saying, well,    15:35:26
14 actually, you don't have any digital    15:35:28
15 assets, because they are not yours, and    15:35:29
16 therefore, the clause is meaningless.    15:35:31
17 That would be a nonsense.    15:35:33
18    Q.   I understand that's your    15:35:37
19 opinion.    15:35:39
20    A.   Is that a question?    15:35:42
21    Q.   No.  Your terminology of it    15:35:43
22 being nonsense is your opinion, correct?    15:35:46
23    A.   Yes.  No, the affect -- what I    15:35:48
24 am saying is if the affect of the    15:35:57
25 parenthetical including the terms, which    15:35:59

Page 192

1 is what you appear to be suggesting to    15:36:02
2 me, is that you've got to look at 38.6    15:36:04
3 and say, well, actually, you got to    15:36:08
4 construe 8.2.6 (c) as actually stating,    15:36:11
5 well, you haven't got any digital assets    15:36:15
6 because look at 8.2.6. And the English    15:36:18
7 Court would regard that as wholly    15:36:22
8 uncommercial and in my terms, because    15:36:24
9 it's coming to the, well, not quite to    15:36:27
10 the end of a long day, nonsense.    15:36:28
11    Q.   You acknowledge that a    15:36:58
12 quasi-bailment relationship has never    15:37:01
13 been recognized by an English Court,    15:37:03
14 correct?    15:37:04
15    MR. HARRIS:  Object to the form.    15:37:07
16    A.   If you're pointing me to a    15:37:08
17 particular paragraph of my opinion,    15:37:12
18 please take me there.    15:37:13
19    Q.   I am asking you whether you    15:37:15
20 acknowledge that a quasi-bailment    15:37:16
21 relationship has never been recognized by    15:37:18
22 English Court?    15:37:21
23    MR. HARRIS:  Object to the form.    15:37:21
24    A.   A bailment relationship has.    15:37:22
25 What has not been recognized in this    15:37:30

Page 193

1 context, as is explained well by the Law    15:37:35
2 Commission's final report is that a    15:37:41
3 bailment relationship in relation to    15:37:45
4 digital assets has not been recognized in    15:37:48
5 the cases but certainly as the Law    15:37:53
6 Commission Report recognizes, is an    15:37:58
7 analysis that is open to an English    15:38:04
8 lawyer to conclude. The use of the word    15:38:09
9 quasi-bailment may be confusing. The    15:38:13
10 point is the bailment requires    15:38:24
11 possession. And what is open to debate    15:38:33
12 is whether you could have possession of    15:38:38
13 an intangible asset in circumstances    15:38:40
14 where you have control of it in the way    15:38:46
15 that you do in relation to digital assets    15:38:49
16 such as cryptocurrency.    15:38:55
17    And once it's recognized that    15:38:57
18 digital assets are property, as has been    15:39:05
19 recognized by the English Courts and is    15:39:10
20 actually about to be stated in the    15:39:14
21 statute, it's a bill to the Parliament at    15:39:16
22 the present time to that effect, it's not    15:39:20
23 a huge leap of faith to say that actually    15:39:25
24 looking at control that a person could    15:39:29
25 have over a digital asset, there is no    15:39:33

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

1  reason why one couldn't have an analysis    15:39:37
2  such as bailment applying to the    15:39:43
3  relationship between the exchange and the    15:39:52
4  -- the exchange as bailee and the trader    15:39:54
5  as bailor.  If the English Courts    15:39:58
6  conclude that control of a digital asset    15:40:06
7  is similar to possession, and that's    15:40:09
8  where the quasi comes in.  But the Law    15:40:18
9  Commission Report explains this in a more    15:40:22
10  articulate way than I do.    15:40:24
11      Q.    As of today, English Courts    15:40:28
12  have not recognized a bailment over    15:40:46
13  intangible property such as digital    15:40:51
14  assets, correct?    15:40:52
15      A.    There is not a case to my    15:40:53
16  knowledge where that has happened.  But    15:40:54
17  it is clearly envisaged by the Law    15:41:00
18  Commission Report that in the question,    15:41:03
19  that in dealing with funds of this sort    15:41:06
20  and with assets of this sort, that that    15:41:10
21  is a feasible and legally-based analysis,    15:41:15
22  if one draws the analogy between control    15:41:24
23  of a digital asset and possession.  And    15:41:30
24  it's interesting, the idea of applying    15:41:42
25  principles of bailment as established for    15:41:44

Page 195

1  many years in the authorities, to    15:41:50
2  control/possession of a digital asset is    15:41:55
3  an interesting one.    15:42:02
4      Q.    For the U.S. Bankruptcy Court    15:42:02
5  in this case to recognize a bailment over    15:42:06
6  digital assets, it would need to expand    15:42:11
7  beyond what any English Court has found    15:42:20
8  to date, correct?    15:42:25
9      A.    No.  What it would need to say    15:42:26
10  -- sorry, let me backtrack.  First of    15:42:32
11  all, as you know from my report, my    15:42:34
12  primary analysis is one of trust.  This    15:42:35
13  is an alternative analysis when one is    15:42:39
14  looking at a different way of giving    15:42:44
15  effect to the ownership provisions, which    15:42:52
16  I say appear in clause 8.2.6.  How do you    15:42:55
17  give effect to what I say is the clear    15:43:06
18  intent of this deed, that ownership    15:43:08
19  should be retained by the user on the    15:43:10
20  exchange.    15:43:17
21      Now, in the retention of title    15:43:18
22  clauses, which we did a lot of back in    15:43:22
23  the day, when one is looking to work out    15:43:27
24  whether there has been a retention of a    15:43:33
25  proprietary interest, one of the ways of    15:43:36

Page 196

1  achieving that is the application of the    15:43:42
2  concept of bailment, and the Mercer Grain    15:43:48
3  case is a classic example of that.  So    15:43:53
4  what an American Court needed to    15:44:01
5  find, I accept, is that under English    15:44:04
6  law, by analogy with the bailment cases,    15:44:11
7  yes, indeed, this is a possible    15:44:18
8  alternative analysis and I know nothing    15:44:22
9  about the U.S. law of bailment and again    15:44:27
10  we're not debating which is the proper    15:44:34
11  law to apply to the resolution of this    15:44:36
12  dispute, but it is certainly possible in    15:44:38
13  my view that the English law courts will    15:44:43
14  develop, by analogy with existing -- with    15:44:50
15  the existing rules of bailment, this    15:44:54
16  approach.  And that is supported by the    15:44:57
17  Law Commission's final report and    15:45:02
18  academic writings.    15:45:06
19      Q.    If the U.S. Bankruptcy Court    15:45:12
20  adopted your view and recognized a    15:45:17
21  bailment over the intangible digital    15:45:23
22  assets at issue in this case, it would be    15:45:27
23  recognizing a bailment that no English    15:45:32
24  Court has done to date, correct?    15:45:36
25      MR. HARRIS:  Object to the form.    15:45:41

Page 197

1      A.    It depends.  There might be an    15:45:42
2  English Court case by the time the U.S.    15:45:44
3  Bankruptcy Court comes to take its view.    15:45:47
4  And I would say that the principles of    15:45:51
5  bailment are well established.  The fact    15:46:04
6  that they have not yet been applied to    15:46:08
7  determine the ownership structure in a    15:46:13
8  digital assets case is neither here nor    15:46:16
9  there.    15:46:24
10      It wouldn't be a great step for    15:46:24
11  mankind for the U.S. Court -- sorry, I am    15:46:27
12  using that analogy in a rather stupid    15:46:36
13  fashion -- it wouldn't be a huge leap for    15:46:39
14  a U.S. Court to make this analysis.  Of    15:46:41
15  course, I can't say what a U.S. Court    15:46:50
16  would or would not do.  All I can say is    15:46:51
17  what an English Court would do.    15:46:53
18      And so far as an English Court    15:46:56
19  is concerned, if the facts were right, I    15:46:58
20  do not consider that this would be a huge    15:47:05
21  jump or a huge leap juris prudentially    15:47:07
22  for an English Court to reach that    15:47:15
23  conclusion.  You only have to look at the    15:47:18
24  Law Commission Report and the textbook by    15:47:24
25  Louise Gullifer, to which I refer, to see    15:47:30

50 (Pages 194 - 197)

CONFIDENTIAL

Page 198

1 that.                                              15:47:37
2    Q.   If the U.S. Bankruptcy Court        15:47:41
3 was issuing a decision today recognizing    15:47:43
4 a bailment of digital assets, it would be    15:47:51
5 the first Court decision doing so under      15:47:51
6 English law, correct?                        15:47:56
7    A.   No, I don't think that's right.      15:47:57
8 I think -- well, with one exception.  My     15:48:00
9 recollection is that the Tasmanian Court     15:48:09
10 applying Tasmanian law, all right, it's     15:48:15
11 Australian law, but it's very similar in    15:48:17
12 terms of bailment, I believe to English    15:48:20
13 law concepts, has reached that              15:48:25
14 conclusion.  But I would need to check.     15:48:28
15 I know I refer to it in my report.  It is   15:48:29
16 the first instance Tasmanian Court.  So     15:48:37
17 in a common rule jurisdiction, I don't      15:48:43
18 think it would be the first case to reach   15:48:48
19 that conclusion.  Let me see if I can       15:48:50
20 find it.                                    15:48:52
21    Q.   The Bankruptcy Court would be       15:48:57
22 reaching that conclusion ahead of any       15:48:59
23 English Court, correct?                     15:49:01
24    A.   Yes.  Correct, but it's            15:49:02
25 irrelevant.  It's either right or wrong.    15:49:13

Page 199

1 The fact that the U.S. Court on the basis    15:49:30
2 of English law testimony would reach that   15:49:32
3 conclusion, doesn't seem to me to be        15:49:33
4 relevant to whether the conclusion is a     15:49:39
5 correct one or not.  I think the case I     15:49:40
6 was referring to is called Poulton          15:49:47
7 against Conrad.                             15:49:50
8         That was a case I refer to          15:49:58
9 paragraph 40 of my declaration, where the   15:49:59
10 Tasmanian Court concluded that digital     15:50:08
11 assets are capable of possession while     15:50:10
12 it's describing a conclusion that there    15:50:11
13 could be no claim in conversion for        15:50:13
14 wrongful interference which shows          15:50:16
15 inaction because it could not be           15:50:18
16 possessed as being foreign to              15:50:19
17 contemporary common sense and the reality  15:50:21
18 of the digital world.  And supporting the  15:50:23
19 view that the categorization of personal   15:50:25
20 things either shows it's in possession or  15:50:27
21 inaction no longer reflects to today's     15:50:30
22 commerce and intercourse.  So a common     15:50:33
23 law Court has reached this conclusion.     15:50:39
24    Q.   Paragraph 85, if you can turn       15:50:44
25 back to your declaration, paragraph 85 on  15:50:46

Page 200

1 page 36.                                     15:50:48
2    A.   Paragraph 85?                        15:51:13
3    Q.   Paragraph 85.                        15:51:14
4    A.   What are we on at the moment         15:51:15
5 here?  Bailment, yeah.                      15:51:17
6    Q.   You say at the bottom of that        15:51:23
7 page 36, heading to the next page "In my    15:51:24
8 view if English law were to develop the     15:51:29
9 concept of quasi-bailment and the purpose   15:51:31
10 of that development were to accommodate     15:51:33
11 digital asset exchange structures, then    15:51:36
12 an English Court would likely accept that  15:51:40
13 the superior control based interest of a   15:51:43
14 customer was sufficient to justify the     15:51:45
15 existence of a quasi-bailment; do you see  15:51:47
16 that?                                       15:51:51
17    A.   Yes, I read that.                    15:51:51
18    Q.   Is the statement there that the     15:51:54
19 purpose of that development were to         15:52:10
20 accommodate digital asset exchange         15:52:11
21 structures, material to your analysis?     15:52:14
22    A.   No.                                 15:52:21
23    Q.   What does that mean?                 15:52:21
24    A.   I think it's doing no more than     15:52:22
25 saying that if an English Court were to    15:52:34

Page 201

1 develop the concept of quasi-bailment in    15:52:45
2 the context of digital asset exchange       15:52:48
3 structures -- I mean, I am actually doing   15:52:51
4 very little more than what I just read      15:52:59
5 out to you in relation to the Tasmanian     15:53:00
6 case.                                       15:53:03
7         You've got to look at the           15:53:04
8 reality of the modern world when you are    15:53:05
9 looking at concepts of possession and       15:53:07
10 ownership.  And if an English Court is      15:53:09
11 looking at bailment in the context of the  15:53:15
12 modern world of this digital asset         15:53:20
13 exchange structures, then it would likely  15:53:23
14 accept.  But it's not -- those words are    15:53:25
15 not acting, adding or limiting my          15:53:28
16 analysis.                                   15:53:31
17    Q.   If an English Court were to         15:53:33
18 recognize bailment for intangible assets,  15:53:36
19 nobody knows whether that would be done    15:53:46
20 to accommodate digital asset exchange      15:53:50
21 structures, correct?                       15:53:53
22    A.   No, I agree.  But what one is       15:53:54
23 looking at here is there a need to         15:54:05
24 develop the concepts of bailment to cater  15:54:09
25 for the type of control possession that    15:54:17

51 (Pages 198 - 201)

CONFIDENTIAL

Page 202

1 one has of a digital asset on a digital          15:54:19
2 exchange.  And what one is looking to is        15:54:22
3 an English Court that is extremely              15:54:36
4 sensitive to the notion that English law        15:54:38
5 should reflect, as it has always done,          15:54:43
6 developments in modern trading and              15:54:49
7 commerce and that is why the Law                15:54:51
8 Commission has looked at this in such           15:54:57
9 detail.  It is why the Master of the            15:54:58
10 Rolls legal task force has looked at the       15:55:02
11 question of digital assets because the         15:55:05
12 English Courts are always extremely keen       15:55:08
13 to make sure that they are in the              15:55:10
14 forefront of developing English               15:55:12
15 commercial law to match trading               15:55:18
16 activities in the real world.                 15:55:20
17     So although you're quite right,           15:55:27
18 one cannot say what an English Court           15:55:28
19 would do, what one could judge is the         15:55:30
20 mood music.  And the mood music is what       15:55:33
21 the Law Commission Report has come out        15:55:35
22 with and what the task force has come out     15:55:40
23 with it, and that is all pointing in the      15:55:42
24 direction of making sure that                 15:55:48
25 English/legal concepts -- I am not using      15:55:54

Page 203

1 that in contradistinction to the word         15:55:56
2 "equitable," but that legal concepts of       15:55:58
3 English law indeed reflect the real           15:56:03
4 problems that arise in relation -- issues     15:56:07
5 that arise in relation to the holding and     15:56:13
6 sale and other disposition of digital        15:56:16
7 assets.                                       15:56:18
8     Q.   In your view what is the             15:56:25
9 significance of control of a bailment         15:56:27
10 relationship?                                15:56:30
11     A.   Sorry, what is the significance     15:56:34
12 to control?                                  15:56:36
13     Q.   Of control in a bailment            15:56:38
14 relationship?                                15:56:39
15     A.   Well, control is analogous to       15:56:42
16 possession.  It's not always the same.       15:56:50
17 But in a classic bailment, when the          15:56:52
18 thing, the coat or the car or whatever is    15:57:04
19 bailed, what can be decisive or              15:57:06
20 determinative of whether the bailor has      15:57:15
21 possession before he bails the object or     15:57:19
22 the bailee has control or possession once    15:57:21
23 the object has been bailed.  Control is a    15:57:26
24 feature that determines whether or not       15:57:34
25 the relevant degree of possession is         15:57:36

Page 204

1 present.  And one has to look at control,     15:57:39
2 not just in relation to the bailee, but       15:57:44
3 also to the type of control exercised by      15:57:46
4 the bailor.                                   15:57:52
5     In the classic example of the             15:57:55
6 coat being bailed to the cloakroom            15:57:58
7 attendant.  The control exercised by the      15:58:00
8 bailor with the superior title right is       15:58:03
9 done by his rights under the cloakroom        15:58:08
10 ticket.  But the actual control of the       15:58:11
11 coat, in the sense of possession of the      15:58:13
12 coat, is with the cloakroom attendant.       15:58:16
13     Q.   You rely on Section 8.2.6 (c)       15:58:37
14 for your position that customers had         15:58:41
15 superior control to FTX over the digital     15:58:43
16 assets, correct?                             15:58:46
17     MR. HARRIS:  Object to the form.         15:58:47
18     A.   Can you point me to the             15:58:48
19 paragraph in my opinion that you're          15:59:00
20 looking at, because I am not sure I          15:59:01
21 understand your question.                    15:59:02
22     Q.   I am asking, I am just asking       15:59:03
23 you whether it is a fact that 8.2.6 (c)      15:59:05
24 is the basis for your position that          15:59:11
25 customers had superior control of the        15:59:15

Page 205

1 assets to FTX?                               15:59:17
2     MR. HARRIS:  Object to the form.         15:59:19
3     A.   Are we in the context of            15:59:20
4 bailment still?                              15:59:38
5     Q.   Yes, we are.                        15:59:39
6     A.   No, it's not just 8.2.6.  It's      15:59:41
7 the entirety of the terms, which clearly     15:59:45
8 provide the user with an entitlement to      15:59:55
9 call for its assets, that is the superior    16:00:03
10 control which the bailor on this            16:00:10
11 hypothesis would have.  But it's not just   16:00:20
12 8.2.6.  It's the way in which it operates   16:00:23
13 the, as I took you to earlier, the way in   16:00:28
14 which the exchange works shows that the     16:00:39
15 customer, the user is entitled to call      16:00:48
16 for its digital assets or bid that,         16:00:55
17 because it was fungible, it wouldn't        16:00:59
18 necessarily be getting back when it calls   16:01:02
19 for them the same assets which it           16:01:04
20 deposited.                                  16:01:07
21     MR. GLUECKSTEIN:  Why don't we          16:01:37
22 get a short break, I want to get a          16:01:38
23 sense of where we are on time.              16:01:40
24     THE VIDEOGRAPHER:  Off the              16:01:41
25 record, the time is 4:01 p.m.               16:01:42

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

1    (Off the record.)          16:13:24
2    THE VIDEOGRAPHER: Back on the    16:25:17
3  record. The time is 4:25 p.m.       16:25:17
4  BY MR. GLUECKSTEIN:           16:26:00
5    Q.  Dame Elizabeth, I want to talk   16:26:00
6  about question 3, which we went through   16:26:13
7  the questions this morning, but I want to   16:26:16
8  talk specifically about question 3 which   16:26:19
9  you set out on page 3 of your report.   16:26:20
10   A.  Yeah.              16:26:33
11   Q.  This question was provided to    16:26:33
12  you in this form by Latham for your    16:26:37
13  analysis, correct?            16:26:42
14   A.  Just a second, please. It was   16:26:46
15  certainly provided to me by Latham.    16:26:57
16  Whether the question was always in those   16:27:09
17  terms, I don't know. But it was provided   16:27:15
18  to me by Latham for my analysis.     16:27:23
19   Q.  Did you revise the question    16:27:25
20  yourself in any way?          16:27:29
21   A.  Not that I recall.         16:27:30
22   Q.  Okay. Is it your understanding   16:27:31
23  that what's set forth in question 3 is   16:27:44
24  the FTX Recovery Trust's position in this   16:27:48
25  case?                  16:27:50

Page 207

1    MR. HARRIS: Object to the form.   16:27:59
2    A.  I am not sure I know what is    16:27:59
3  FTX Recovery Trust's position. I     16:28:06
4  couldn't articulate it with certainty.   16:28:16
5    Q.  So you were just given a     16:28:19
6  question and you answered that question,   16:28:20
7  correct?               16:28:22
8    A.  I was given a question and I   16:28:26
9  answered it. I am just checking to see   16:28:28
10  whether I say in a later passage of my   16:28:30
11  opinion where I deal with the issue,    16:28:35
12  whether I refer to the fact that I have   16:28:38
13  been told that that is FTX Recovery's   16:28:42
14  position. I was given the question and I   16:28:46
15  answered the question, yes.        16:29:00
16   Q.  How did you conclude that this   16:29:05
17  question is answered only by reference to   16:29:06
18  the dotcom terms?            16:29:10
19   A.  Because of the formulation of   16:29:17
20  the question, which is do the provisions   16:29:18
21  of the terms support a contention. I did   16:29:29
22  not -- going back to your question, I did   16:29:31
23  not conclude, which is your premise, that   16:29:35
24  this question is answered only by     16:29:38
25  reference to the dotcom terms. So your   16:29:41

Page 208

1  question, if and to the extent that it   16:29:48
2  suggests that I concluded that it was    16:29:52
3  answered only by reference to the dotcom   16:29:57
4  terms, is based on a wrong premise.    16:30:00
5    Q.  You did not consider any other   16:30:23
6  information outside of the dotcom terms   16:30:29
7  with respect to question 3, correct?    16:30:31
8    A.  No.              16:30:33
9    Q.  And I think we covered this    16:30:46
10  generally earlier, but just so the record   16:30:57
11  is clear, you're not offering an opinion   16:31:00
12  as to whether English law applies to    16:31:02
13  answering the question of 3AC's rights as   16:31:07
14  set out in question 3?          16:31:15
15   A.  That is not the same question   16:31:17
16  as you asked me previously. Insofar as   16:31:21
17  one is looking at the rights as they are   16:31:26
18  acquired under the dotcom terms, then my   16:31:35
19  answer is, yes, you look at English law.   16:31:41
20  If, as a matter of correct law for the   16:31:51
21  resolution of a dispute about what the   16:31:53
22  position was under the dotcom terms and   16:31:56
23  the events which happened, that one is   16:31:59
24  entitled to look at the facts. Then I am   16:32:05
25  not expressing any view as to what is the   16:32:12

Page 209

1  correct law that applies to answering the   16:32:20
2  question. If I am just looking at the   16:32:22
3  terms, yes, English law. If one has to   16:32:30
4  look at more facts in order to answer the   16:32:32
5  question in the events which happened,   16:32:39
6  the extent of 3AC's rights are limited to   16:32:46
7  a single net figure, then I am not     16:32:52
8  expressing any view as to the appropriate   16:32:55
9  law to apply to the resolution of that   16:33:00
10  question.               16:33:02
11   Q.  Does question 3 only become    16:33:06
12  relevant where 3AC has liabilities owed   16:33:11
13  to FTX?               16:33:14
14    MR. HARRIS: Object to the form.   16:33:15
15   A.  I don't think so. And I don't   16:33:17
16  think I understand the question.     16:33:32
17   Q.  If 3AC does not owe any      16:33:33
18  liabilities to FTX, is your analysis in   16:33:36
19  question 3 relevant?          16:33:43
20    MR. HARRIS: Object to the form.   16:33:44
21   A.  Well, I don't know the factual   16:33:46
22  situation -- I don't know the factual   16:34:02
23  situation. I have been asked to assume,   16:34:04
24  as we've already looked at matters and   16:34:08
25  facts in relation to 3AC liabilities.   16:34:11

53 (Pages 206 - 209)

CONFIDENTIAL

Page 210

1  Because you are asking me to look at the      16:34:21
2  facts by reference to your question, I      16:34:23
3  cannot tell you whether my analysis would      16:34:25
4  be relevant or not.      16:34:34
5      Q.   And similarly, you do not offer      16:34:35
6  an opinion as to whether your analysis      16:34:36
7  would be relevant if 3AC's liabilities      16:34:38
8  were owed to other customers rather than      16:34:42
9  FTX, correct?      16:34:44
10      MR. HARRIS:  Object to the form.      16:34:45
11      A.   What do you mean by similarly?      16:34:47
12      Q.   You do not offer -- are you      16:34:51
13  offering an opinion as to -- strike that.      16:34:54
14      Is your analysis with respect      16:34:57
15  to question 3 relevant if 3AC's      16:35:05
16  liabilities were owed to other customers      16:35:08
17  rather than FTX?      16:35:11
18      MR. HARRIS:  Objection to form.      16:35:11
19      A.   I am not in a position      16:35:12
20  factually to answer your question whether      16:35:15
21  or not my answer to question 3 would be      16:35:26
22  relevant or would not be relevant, if      16:35:29
23  3(a)'s liabilities were owed to other      16:35:31
24  customers rather than to FTX.  I just      16:35:34
25  don't know.      16:35:42

Page 211

1      Q.   Pursuant to the dotcom terms,      16:35:55
2  the only way that a customer would accrue      16:35:58
3  liabilities is through the margin      16:36:00
4  program, correct?      16:36:02
5      A.   I am not in a position on the      16:36:02
6  basis of the facts which I have been      16:36:09
7  asked to assume, to answer that question.      16:36:11
8      Q.   Can you turn to paragraph 102      16:36:26
9  of your report, on page 40.      16:36:29
10      A.   Yes.      16:36:57
11      Q.   You state in part in section, I      16:36:57
12  am sorry, in paragraph 102 "For example,      16:36:59
13  clause 8.2.6 (c) permits a user to      16:37:03
14  withdraw its digital assets from its      16:37:08
15  account at any time."      16:37:10
16      Do you see that?      16:37:11
17      A.   Yes, I see it.      16:37:12
18      Q.   Do you read Section 8.2.6 (c)      16:37:17
19  as giving customers an unconditional      16:37:20
20  right to withdraw assets?      16:37:22
21      A.   No, I do not.      16:37:24
22      Q.   Can you explain your      16:37:39
23  understanding of the limitations on the      16:37:46
24  statement that a user may withdraw its      16:37:50
25  digital assets from its account at any      16:37:52

Page 212

1  time?      16:37:54
2      A.   Reading from (c) the      16:37:54
3  limitations are subject to outage,      16:37:57
4  downtime and other applicable policies      16:37:58
5  including the terms, so those are      16:38:01
6  limitations or provisos to Three Arrows's      16:38:04
7  right to withdraw digital assets by      16:38:11
8  sending them to a different blockchain      16:38:15
9  address controlled by you or a      16:38:17
10  third-party.  So it's looking at that and      16:38:21
11  sort of dealing with digital assets, no      16:38:22
12  other.      16:38:24
13      Q.   Okay.  So a user -- pursuant to      16:38:24
14  the dotcom terms, a user is actually not      16:38:30
15  able to withdraw its digital assets at      16:38:35
16  any time, correct?      16:38:38
17      MR. HARRIS:  Object to the form.      16:38:39
18      A.   I don't agree with that, and I      16:38:40
19  am not sure what question you're asking.      16:38:50
20      Q.   Your report, in section,      16:38:51
21  paragraph 102 states that "The dotcom      16:38:55
22  terms permitted a user to withdraw its      16:38:59
23  digital assets from its account at any      16:39:02
24  time," correct?      16:39:04
25      A.   Correct.  But it is subject to      16:39:05

Page 213

1  the -- sorry, let me start again.  That      16:39:09
2  is precisely what (c) says at any time,      16:39:15
3  but it is, as I've already accepted,      16:39:21
4  subject to outages, downtime and other      16:39:24
5  applicable policies including the terms.      16:39:27
6  But the words "at any time" are there,      16:39:33
7  subject to the provisos -- sorry, subject      16:39:35
8  to the limitations.      16:39:40
9      Q.   So you would agree then that if      16:39:41
10  there is another provision of the dotcom      16:39:43
11  terms that limit a customer's ability to      16:39:45
12  withdraw its assets, that that conditions      16:39:49
13  Section 8.2.6 (c), correct?      16:39:52
14      A.   If there is such a term, yes.      16:39:55
15  If it does indeed limit the ability to      16:40:02
16  withdraw assets, then that, subject to      16:40:05
17  looking at the particular provision,      16:40:11
18  would appear to be included within the      16:40:13
19  contemplation of the parenthetical.      16:40:16
20      Q.   And if there was another      16:40:20
21  separate contract between FTX and a      16:40:21
22  customer that limited the ability of the      16:40:24
23  customer to withdraw assets, that would      16:40:29
24  also fit within the proviso of 8.2.6 (c),      16:40:30
25  correct?      16:40:35

54 (Pages 210 - 213)

CONFIDENTIAL

Page 214

1    MR. HARRIS:  Object to the form.    16:40:35
2    A.   You're asking me to speculate    16:40:36
3 about another contract about which -- to    16:40:41
4 which you don't refer.  Looking at (c)    16:40:45
5 just on the basis of the limitations in    16:40:50
6 that clause, it is limited to outages,    16:40:52
7 downtime and other applicable policies,    16:40:57
8 including the terms.  Whether a different    16:41:01
9 contract comes within the definition or    16:41:05
10 comes within the wording "Other    16:41:09
11 applicable policies including the terms"    16:41:12
12 is a factual matter upon which I am not    16:41:14
13 able to opine.    16:41:17
14    Q.   Section 16.2 of the dotcom    16:41:18
15 terms, which is on page 16, if you would    16:42:22
16 look at that, please.    16:42:28
17    A.   I have it.    16:42:41
18    Q.   Section 16.2 deals with the    16:42:42
19 requirements for margin trading on the    16:42:45
20 exchange, correct?    16:42:47
21    A.   It's a warning about the risk,    16:42:48
22 and it also obliges the user as set out    16:42:57
23 there to do various things and gives    16:43:03
24 rights to FTX to do things.    16:43:12
25    Q.   Would you agree that the rights    16:43:17

Page 215

1 given to FTX in Section 16.2 would fall    16:43:19
2 within the proviso limiting withdrawals    16:43:22
3 that we just referenced in Section 8.2.6    16:43:26
4 (c)?    16:43:30
5    MR. HARRIS:  Object to the form.    16:43:30
6    A.   It would depend or might depend    16:43:31
7 on the factual situation as to whether    16:43:57
8 one is looking at a withdrawal of digital    16:44:07
9 assets by sending them to a different    16:44:09
10 blockchain address controlled by you or a    16:44:12
11 third-party.  It might.  But I am not in    16:44:14
12 the position to answer that without    16:44:17
13 looking at the facts.    16:44:21
14    Q.   Are there any limitations that    16:44:22
15 you identify in Section 16.2 that would    16:44:52
16 have limited 3AC's ability to withdraw    16:44:56
17 assets, if they were in compliance with    16:44:58
18 the maintenance margin requirements?    16:45:01
19    A.   What are the limitations that I    16:45:13
20 identify in Section 16.2?  What    16:45:15
21 paragraph?  I refer to 16.2.  Where are    16:45:24
22 you, are you looking at paragraph 105?    16:45:26
23 Are you looking at paragraph 105?    16:45:32
24    Q.   I am not.  I am asking your    16:45:35
25 understanding of Section 16.2 which is a    16:45:38

Page 216

1 paragraph that you reference in your    16:45:40
2 analysis of question 3.    16:45:41
3    MR. HARRIS:  Can you repeat the    16:45:43
4 question, I lost it?    16:45:44
5    MR. GLUECKSTEIN:  Sure.    16:45:45
6    Q.   Are there any limitations that    16:45:46
7 you identify in Section 16.2 that would    16:45:49
8 have limited 3AC's ability to withdraw    16:45:52
9 assets if it was in compliance with the    16:45:55
10 maintenance margin requirements?    16:45:57
11    A.   I am not understanding.  Are    16:45:59
12 you saying I haven't identified some    16:46:02
13 limitations or are you asking me to look    16:46:06
14 at 16.2 and say are there any    16:46:09
15 limitations?    16:46:12
16    Q.   I am asking you whether you see    16:46:13
17 any such limitations in Section 16.2?    16:46:14
18    A.   Now as I sit here?    16:46:18
19    Q.   Yes.    16:46:19
20    A.   I identify a limitation that    16:46:20
21 if, as a matter of fact, FTX's rights    16:46:56
22 under 16.2 have arisen, such that they    16:47:05
23 are entitled to seize and/or liquidate    16:47:08
24 any of the user's positions and assets,    16:47:12
25 if that right has arisen, that might, as    16:47:19

Page 217

1 a matter of fact, depending on timing,    16:47:23
2 have limited and entitlement to withdraw    16:47:25
3 digital assets because they might already    16:47:31
4 have been liquidated or seized.    16:47:37
5    Q.   You see that one of the rights    16:47:41
6 that's afforded to FTX in Section 16.2 is    16:47:47
7 that FTX determines in its sole    16:47:50
8 discretion that the user's account    16:47:55
9 "appears to be in danger of defaulting on    16:47:57
10 a loan," correct?    16:48:00
11    A.   Yes.    16:48:01
12    Q.   And that determination is    16:48:12
13 within -- that right to make that    16:48:14
14 determination is in the sole discretion    16:48:15
15 of FTX, correct?    16:48:18
16    A.   Correct.  As a matter of    16:48:20
17 English law, it would have to be    16:48:22
18 exercised properly and for proper    16:48:24
19 purposes, identified for proper purposes.    16:48:27
20    But leaving that on one side,    16:48:33
21 the fact that they have determined that    16:48:35
22 the account appears to be in danger of    16:48:41
23 defaulting on a loan but had only made    16:48:42
24 that determination but had not yet seized    16:48:50
25 or liquidated any of the possessions,    16:48:54

55 (Pages 214 - 217)

CONFIDENTIAL

Page 218

1 would not prevent in my view the 16:49:03
2 construction of Clause 16.2, the ability 16:49:05
3 of and entitlement of Three Arrows to 16:49:08
4 withdraw its assets under Clause 8.2.6. 16:49:20
5 It should say "would not prevent in my 16:49:36
6 view on the construction of Clause 16.2. 16:49:38
7    Q.   Your view is that clause 10 of 16:50:32
8 the dotcom terms applies where the 16:50:34
9 customer has a debit balance on its 16:50:45
10 account, correct? 16:50:47
11      MR. HARRIS:  Objection to the 16:50:48
12    form. 16:50:49
13    A.   Are you pointing me to where I 16:50:49
14 state Clause 10 in my opinion?  If you 16:51:03
15 are, please direct me there and take me 16:51:05
16 there. 16:51:08
17    Q.   You do identify Clause 10 in 16:51:08
18 paragraph 103 of your opinion. 16:51:12
19    A.   So your question is? 16:51:25
20    Q.   I am going to ask a better 16:51:26
21 question.  You see where we are in 16:51:33
22 section, paragraph 103? 16:51:34
23    A.   Yes, I am at 103. 16:51:36
24    Q.   Okay.  Is it your position that 16:51:38
25 Section 10 is implicated where there is a 16:51:46

Page 219

1 negative U.S. dollar balance in a 16:51:50
2 customer's account? 16:51:53
3      MR. HARRIS:  Object to the form. 16:51:55
4    A.   It depends what you mean by 16:51:56
5 negative U.S. dollar balance in a 16:52:06
6 customer's account.  Because of my answer 16:52:08
7 to question 3, I am looking at a debit 16:52:13
8 balance in relation to its liabilities. 16:52:23
9 So it depends how you define negative 16:52:40
10 U.S. dollar balance.  If you're looking 16:52:42
11 at what you say is the correct approach; 16:52:44
12 namely, setting off value of assets at 16:52:47
13 any one time as against amount of 16:53:00
14 liabilities, then I wouldn't agree with 16:53:00
15 you.  If you're looking at the negative 16:53:02
16 U.S. dollar balance, the debit balance on 16:53:05
17 the liability side of this notional 16:53:11
18 balance sheet, then I think I agree with 16:53:14
19 you. 16:53:30
20    Q.   Section 10.3.3 refers to one of 16:54:08
21 the remedies that FTX had exercised, 16:54:17
22 which includes sending the account to a 16:54:19
23 collection agency.  Do you see that? 16:54:26
24    A.   Yes. 16:54:28
25    Q.   Isn't it a commercially 16:54:37

Page 220

1 commonsensical reasoning of that 16:54:51
2 provision to be that in order for a 16:54:53
3 collection agency to be involved, you 16:54:57
4 would have to have an overall negative 16:54:59
5 balance not simply a single liability? 16:55:02
6      MR. HARRIS:  Object to the form. 16:55:06
7    A.   You are asking me to speculate 16:55:10
8 about a factual matter.  I don't think 16:55:11
9 this is a construction or interpretation 16:55:14
10 of a contract matter. 16:55:19
11    Q.   You don't think my question 16:55:24
12 involves a contract interpretation 16:55:25
13 question, that's your answer? 16:55:27
14    A.   No, I do not. 16:55:28
15    Q.   So as a result then, because 16:55:29
16 you deem it a factual question, you're 16:55:33
17 not in a position to answer it, correct? 16:55:35
18    A.   You're asking me to speculate 16:55:37
19 about whether a commercial provision 16:55:39
20 relating to costs for a collection 16:55:47
21 agency, whether that informs the 16:55:51
22 interpretation as to what debit balance 16:55:57
23 means.  I don't see the logic of your 16:55:59
24 question.  And I don't think that, in my 16:56:08
25 view, it doesn't inform the question as 16:56:10

Page 221

1 to whether debit balance is referring to 16:56:16
2 overall debit balance or otherwise 16:56:19
3 irrespective of my criticism of the 16:56:25
4 factual point.  I am not being clear.  I 16:56:27
5 used a double negative again, I think. 16:56:40
6      My answer as a question of 16:56:45
7 construction is that the provision at 16:56:47
8 10.3.3 in relation to a standard 16:56:49
9 provision about being liable for the 16:56:56
10 costs in relation to instructing a 16:56:57
11 collection agency, et cetera, has any 16:57:00
12 bearing as a matter of construction in 16:57:08
13 relation to the issue as to whether a 16:57:09
14 debit balance is simply the balance on 16:57:12
15 one -- on the liability side or whether 16:57:16
16 it includes the overall balance, sorry, 16:57:21
17 whether it's a reference to the overall 16:57:24
18 balance. 16:57:26
19    Q.   In your answers to questions 5 16:57:39
20 and 6, are you offering an opinion as to 16:57:42
21 whether Three Arrows Capital has valid 16:57:56
22 claims against FTX? 16:57:59
23      MR. HARRIS:  Object to the form. 16:58:02
24    A.   I am finding 5 and 6, just a 16:58:03
25 second.  No, I am not offering an opinion 16:58:24

56 (Pages 218 - 221)

CONFIDENTIAL

Page 222

1 as to whether Three Arrows Capital has    16:59:10
2 valid claims against FTX, if by the use    16:59:12
3 of the word "valid" you mean claims that    16:59:17
4 are going to succeed.  All I am    16:59:22
5 expressing a view about is whether on the    16:59:29
6 basis of certain hypotheses which I    16:59:30
7 articulate, as a matter of English law,    16:59:35
8 would such conduct by FTX give rise to a    16:59:44
9 claim on various grounds.    16:59:49
10    I cannot possibly advise on the    16:59:52
11 merits of whether Three Arrows Capital    16:59:55
12 has a claim against FTX, because that    16:59:57
13 will depend on the factual situation and    17:00:01
14 not just on the terms of the contract.    17:00:08
15 That's question 5.    17:00:11
16    Question 6, again, the answer    17:00:13
17 is the same.  Question 6(a) is answered    17:00:32
18 by me on the basis of the hypothesis that    17:01:00
19 my answer to question 5 is yes.  Whether    17:01:03
20 under English law what remedies would be    17:01:09
21 available to Three Arrows for such a    17:01:12
22 breach?  Again, that is not advising on    17:01:17
23 the merits of a claim, if that is what    17:01:18
24 you mean by a valid claim.  And the same    17:01:22
25 answer, I believe, goes for 6(b), if I    17:01:26

Page 223

1 can find it.  Just a second while I find    17:01:39
2 6(b).  No, I am not advising on the    17:01:51
3 merits of a claim, whether 3AC's    17:02:14
4 liquidators would succeed on such a claim.    17:02:17
5 All I am advising, again, is on various    17:02:23
6 hypotheses which I have stated there,    17:02:25
7 whether such a claim would give rise to    17:02:35
8 the claim I there describe.    17:02:39
9    And that is my view as a matter    17:02:43
10 of English law.  I am not expressing any    17:02:46
11 view as to the merits of the claim,    17:02:50
12 because as I said that would be dependent    17:02:52
13 on the facts.    17:02:54
14    Q.   One of claims that you    17:02:55
15 considered in connection with question 5    17:03:00
16 was a breach of contract claim, correct?    17:03:03
17    A.   Correct.    17:03:06
18    Q.   And one of, in the breach of    17:03:20
19 contract that you discuss in paragraph    17:03:32
20 126 --    17:03:33
21    A.   Sorry, that is question 6, not    17:03:36
22 question 5.  Question 5 I deal with in    17:03:43
23 paragraph 117 and at paragraph 118.  So    17:03:50
24 you need to tell me which question I am    17:03:57
25 dealing with for the purposes of your    17:03:59

Page 224

1 question.    17:04:02
2    Q.   With respect to the breach of    17:04:02
3 contract analysis that you set forth in    17:04:03
4 paragraph 126 of your report.    17:04:07
5    A.   Okay.  I think that is dealing    17:04:09
6 with question 6(a) as to what remedies    17:04:19
7 would be available for such a breach.    17:04:21
8    Q.   The analysis I am looking at is    17:04:23
9 in paragraph 126, where you state "If    17:04:27
10 instead FTX conducted commingling in a    17:04:31
11 way that destroyed the proprietary    17:04:33
12 interest, it breached both its    17:04:35
13 obligations under its contract and its    17:04:36
14 duties as trustee."    17:04:40
15    Do you see that?    17:04:41
16    A.   Yes.  One's got to be clear    17:04:43
17 about the hypotheses here, because they    17:04:51
18 can be, one needs to keep them in mind,    17:04:53
19 because as I say here, that looking at    17:04:58
20 pure commingling with the digital assets    17:05:09
21 of other users my analysis does not    17:05:11
22 predicate that is a breach of    17:05:18
23 contract.  But if contrary to my analysis    17:05:19
24 FTX conducted commingling in a way that    17:05:31
25 destroyed that proprietary interest, it    17:05:34

Page 225

1 breached both its obligations under its    17:05:38
2 contract and its duties as trustee.  And    17:05:41
3 so the assumption in this section; i.e.,    17:05:46
4 question 6(a), is that there was a breach    17:05:50
5 of its obligations because it didn't    17:05:54
6 preserve the equitable interest and    17:06:00
7 therefore the assets were lost, and    17:06:05
8 therefore because of a breach of    17:06:09
9 contract, which is a condition to this    17:06:11
10 analysis, the proprietary interest was    17:06:15
11 lost.    17:06:20
12    Q.   And in that factual scenario    17:06:25
13 that you're discussing in paragraph 126,    17:06:37
14 if there was a breach of the contract,    17:06:37
15 the date of the breach would have been    17:06:38
16 the date of the improper commingling,    17:06:40
17 correct?    17:06:44
18    A.   Yes, I think you're probably    17:06:44
19 right.  It might depend on the facts.    17:06:56
20    Q.   So the date?    17:07:09
21    A.   Sorry, usually for a breach of    17:07:10
22 contract, one looks at the date of the    17:07:11
23 breach, but whether that was the initial    17:07:13
24 commingling, which on my analysis was    17:07:22
25 okay, or some subsequent dealing with the    17:07:26

CONFIDENTIAL

Page 226

1 account, would inform the date. But            17:07:28
2 we're looking here at the hypotheses down       17:07:34
3 the line as to whether, as to                   17:07:39
4 circumstances where contrary to my view         17:07:45
5 the initial commingling was not, did not        17:07:48
6 preserve the proprietary beneficial             17:07:53
7 interest of the user. I mean a number of        17:07:56
8 scenarios are packed up in this                 17:08:20
9 paragraph, I think, and the assumption in       17:08:23
10 the last sentence is important.                 17:08:30
11    Q.   You would degree that as a             17:08:41
12 matter of English law that the English         17:08:43
13 Court would look at the date of the            17:08:46
14 breach, here the date that the assets          17:08:47
15 were commingled, to determine when the         17:08:51
16 breach of contract claim arose, correct?       17:08:53
17    A.   That depends, as I said in my          17:08:56
18 previous answer, as to whether one is          17:08:59
19 looking at the initial commingling of          17:09:04
20 sweeping the assets into the hot wallets       17:09:08
21 or whether one is looking at a subsequent      17:09:17
22 breach of FTX's in dealing with the            17:09:25
23 assets where the equitable proprietary         17:09:28
24 interest is lost. It depends on whether        17:09:33
25 my analysis, as to what is the date,           17:09:35

Page 227

1 depends on whether my analysis is              17:09:39
2 accepted, that simply commingling, per         17:09:44
3 se, is not a breach of contract. If I am       17:09:48
4 wrong on that, then the initial                17:09:51
5 commingling was wrong. If I am right on        17:09:52
6 that, then one's looking at the date of        17:09:55
7 breach of the subsequent dealing with          17:09:59
8 assets, whether commingling with FTX's         17:10:02
9 own assets or applying the assets to the       17:10:06
10 credit of FTX itself or some other             17:10:11
11 commingling that destroys the equitable        17:10:17
12 proprietary interest of Three Arrows.          17:10:21
13    Q.   Your opinion doesn't deal             17:10:29
14 substantively with questions of causation     17:10:31
15 in connection with the breach of              17:10:34
16 contract, correct?                            17:10:36
17    MR. HARRIS:  Object to the form.           17:10:36
18    A.   Questions of causation, as a          17:10:38
19 matter of English law are relevant to         17:10:46
20 whether the breach causes the loss. I         17:10:54
21 had not addressed in my opinion a             17:11:02
22 question of causation as to whether the       17:11:11
23 loss was caused, because that could           17:11:18
24 involve factual matters. What I said, as      17:11:20
25 you see, that I had assumed, I am looking      17:11:29

Page 228

1 at 126, that I had assumed that by             17:11:30
2 consequence of such breach 3AC lost its        17:11:33
3 equitable proprietary interest in the 3AC      17:11:38
4 assets. And that the 3AC assets came to        17:11:42
5 form part of FTX's assets beneficially,        17:11:46
6 and therefore part of the Chapter 11           17:11:50
7 bankruptcy estate. That is an assumption       17:11:52
8 that I have made that in consequence of        17:11:54
9 the breach, the equitable proprietary          17:11:56
10 interest was made.                             17:11:58
11    Q.   You would agree that an English       17:12:13
12 Court would consider issues of causation      17:12:14
13 before determining whether and in what        17:12:16
14 measure a claimant was entitled to            17:12:19
15 damages, correct?                             17:12:20
16    A.   That is a procedural question         17:12:21
17 about an English Court would do.              17:12:36
18 Normally that is so, but in many cases a      17:12:43
19 judge case-managing a case would say          17:12:49
20 there is no point issuing, considering        17:12:53
21 issues of causation. What should be           17:12:57
22 determined first, as a prior issue, and       17:13:01
23 maybe as a preliminary issue is the           17:13:05
24 quantum of damages to which a claimant is     17:13:09
25 entitled because if, for example, there       17:13:14

Page 229

1 was an issue as to whether a contractual       17:13:16
2 cap on the quantum of damages applied,         17:13:18
3 with the result that if that contractual       17:13:24
4 cap did apply, the claimant had no claim,      17:13:27
5 then before deciding complex questions of      17:13:31
6 causation, the Court might well decide         17:13:36
7 that it would determine whether and in         17:13:41
8 what measure a claimant was entitled to        17:13:45
9 damages.                                       17:13:49
10    So, no, the answer to your              17:13:50
11 procedural question is that it is not         17:13:53
12 necessarily the case that the Court           17:13:57
13 determines causation prior to issues         17:14:00
14 relating to quantum or damage or             17:14:06
15 entitlement to damage.                        17:14:11
16    Q.   A claimant could not actually        17:14:14
17 recover damages from another party           17:14:15
18 without causation issues being addressed,     17:14:17
19 correct?                                      17:14:20
20    MR. HARRIS:  Objection to the             17:14:21
21 form.                                         17:14:22
22    A.   I don't agree with that.             17:14:22
23    Q.   You believe there is a scenario      17:14:29
24 where the Court would allow a claimant to     17:14:34
25 recover from another party without            17:14:38

58 (Pages 226 - 229)

CONFIDENTIAL

Page 230

1  determining that causation, that the          17:14:40
2  liable party was the cause of the             17:14:48
3  damages?                                      17:14:53
4      A.   It depends how you define            17:15:00
5  damages in the contractual situation.  A      17:15:04
6  refusal to pay the price, for example,        17:15:06
7  gives rise in a contract for sale.  Gives     17:15:10
8  rise to possibly two claims by a              17:15:16
9  claimant.  A claim for the price and          17:15:19
10  alternatively for damages for refusal to     17:15:26
11  pay the price.  In such circumstances        17:15:29
12  where the price has not been paid, a         17:15:35
13  Court may well say here is your, here is     17:15:37
14  a judgment for damages for failure to pay    17:15:40
15  the price.  I mean, I agree with you, I      17:15:44
16  am not sure where this is going.  All I      17:15:47
17  am saying is it depends.  But, of course,    17:15:50
18  normally a judge isn't going to award        17:15:58
19  damages unless it's satisfied that the       17:16:02
20  breaches caused the loss.                    17:16:06
21      Q.   What are the contractual            17:16:11
22  damages that you say are caused by the       17:16:12
23  commingling that's the subject of the        17:16:15
24  discussion in paragraph 126 of your          17:16:23
25  report?                                      17:16:25

Page 231

1      A.   Well, on the hypothesis that         17:16:25
2  there was a breach of contract and that       17:16:36
3  FTX failed to satisfy its promise to          17:16:41
4  maintain the proprietary interest, as a       17:16:43
5  result of which 3AC lost its equitable        17:16:51
6  proprietary interest in the 3AC assets,       17:16:54
7  if that's the result, then the loss of        17:16:57
8  that proprietary interest would be            17:17:04
9  recoverable as damages to the extent that     17:17:09
10  the loss of the proprietary interest was     17:17:11
11  greater than the claim which 3AC would       17:17:16
12  have as an unsecured creditor in the         17:17:25
13  liquidation.                                 17:17:27
14      Q.   In paragraph 128 of your report     17:17:39
15  you discuss your view that 3AC could         17:17:43
16  bring an unjust enrichment claim; do you     17:17:47
17  see that?                                    17:17:49
18      A.   Yes, I see that.                    17:17:49
19      Q.   Am I correct that you're not        17:17:50
20  offering any analysis of the elements of     17:18:01
21  an unjust enrichment claim as part of        17:18:04
22  your report?                                 17:18:07
23      A.   No.  I refer, I think, to           17:18:15
24  Burrows which is the standard textbook on    17:18:18
25  unjust enrichment and restitutional          17:18:21

Page 232

1  remedies but you are right to say I have      17:18:24
2  not set out in extenso the requirements       17:18:31
3  that are necessary to establish a claim       17:18:41
4  in unjust enrichment.                         17:18:42
5      Q.   In paragraph 129 of your             17:18:59
6  report, you discuss a claim of                17:19:01
7  conversion, correct?                          17:19:07
8      A.   Yes.                                 17:19:17
9      Q.   And a tort of conversion             17:19:20
10  doesn't presently extend to intangible       17:19:21
11  assets, correct?                             17:19:24
12      A.   Correct.  So we are looking at      17:19:24
13  applying the analysis that was found to      17:19:27
14  exist -- I am sorry, the analysis adopted    17:19:32
15  by, I think it was the full Court of         17:19:35
16  Tasmania -- it wasn't the first instance     17:19:41
17  Court it was some appellate court in         17:19:43
18  Tasmania in relation to bailment of          17:19:41
19  digital assets.  And it said conversion      17:19:53
20  could run in those circumstances.  So        17:19:55
21  that's what I am addressing there.  On       17:20:01
22  the hypothesis, again I am not dealing       17:20:07
23  with the fact that is by appropriating       17:20:10
24  the assets to itselves FTX committed         17:20:12
25  conversion or an analogous tort.             17:20:16

Page 233

1      Then I say that is based on the           17:20:19
2  bailment analogy, which we refer to as        17:20:25
3  quasi-bailment.                               17:20:28
4      Q.   In paragraph 134 in your report      17:20:48
5  you discuss certain remedies, correct?        17:20:50
6      A.   Yeah.                                17:21:02
7      Q.   And it's your view, as stated        17:21:03
8  in paragraph 134, that the remedy of          17:21:06
9  equitable compensation and account of         17:21:11
10  profits are proprietary remedies which       17:21:29
11  would take priority over unsecured           17:21:29
12  creditors; is that correct?                  17:21:34
13      A.   If I am right in my analysis        17:21:34
14  there was an equitable proprietary           17:21:36
15  interest, and if I am right on the facts     17:21:38
16  that I have assumed, that I am being told    17:21:41
17  to assume, that the liquidations were not    17:21:47
18  permitted by the terms.                      17:21:49
19      And again, that's necessarily            17:21:50
20  dependent on what factually based on the     17:21:53
21  circumstances on the ground that FTX was     17:21:58
22  entitled to do in relation to               17:22:02
23  liquidation, and I can't speak about         17:22:05
24  that, because I don't know and have not      17:22:06
25  been asked to inquire into the facts, and    17:22:13

59 (Pages 230 - 233)

CONFIDENTIAL

Page 234

1 that's a factual issue, and I am talking    17:22:15
2 about the law.    17:22:17
3      All I am saying is that if    17:22:18
4 there had been a breach of trust because    17:22:20
5 the proprietary interests were destroyed    17:22:25
6 wrongly by FTX, by the liquidations -- so    17:22:32
7 there are a lot of assumptions there. If    17:22:34
8 that's right then, 1, 3, 4, is that it's    17:22:36
9 entitled to be put back into the position    17:22:44
10 it would be prior to the breach of trust,    17:22:48
11 either through equitable compensation or    17:22:51
12 an account of profits or by the payment    17:22:54
13 of damages for breach of contract.    17:23:02
14      And that is where one gets into    17:23:04
15 how does one quantify that equitable    17:23:06
16 claim for compensation. Does one do it    17:23:09
17 by reference to the value of the loss    17:23:11
18 preference claim? If indeed the    17:23:14
19 preference claim has been lost. And that    17:23:16
20 really leads into question 6(b).    17:23:25
21      (Gloster Exhibit 7, Sinclair
22      Investment case with the Court of    17:23:59
23      Appeals, was so marked for
24      identification, as of this date.)    17:23:45
25   Q.   I want to look at this quickly    17:23:51

Page 235

1 Dame Elizabeth. This has been marked as    17:23:53
2 Exhibit 7. It's the Sinclair Investments    17:23:54
3 case with the Court of Appeals; are you    17:23:59
4 familiar with this position?    17:24:00
5   A.   I haven't read it. I have come    17:24:02
6 across it before. I can't remember what    17:24:04
7 context. I am not sure without reading    17:24:06
8 it properly I am able to give my    17:24:13
9 off-the-cuff answers to any questions,    17:24:19
10 but I will do my best.    17:24:21
11      I haven't considered it for the    17:24:27
12 purposes of writing my report. I have    17:24:29
13 certainly come across it before. I can't    17:24:34
14 remember what it's an authority for.    17:24:39
15   Q.   I just wanted to look quickly    17:24:46
16 at paragraph 46 of this Court of Appeals    17:24:48
17 decision, which is on page 472.    17:24:50
18   A.   Yes, let me just read this.    17:25:08
19   Q.   Sure.    17:25:09
20      (Witness reviews document.)    17:25:10
21   A.   Yes, I read paragraph 46.    17:25:50
22   Q.   And my question is just whether    17:25:51
23 you agree with the Court of Appeals here    17:25:52
24 that the right to equitable compensation    17:25:55
25 is, in fact, a personal claim that would    17:26:01

Page 236

1 be para passu with other unsecured    17:26:03
2 creditors?    17:26:08
3   A.   I see the point you're making.    17:26:08
4 I need to go back and consider the    17:26:14
5 terms -- sorry, I need to go back and    17:26:15
6 consider precisely what is meant by    17:26:18
7 compensation for breach of trust and    17:26:22
8 equitable compensation.    17:26:26
9      I would not accept that without    17:26:34
10 more research than just from paragraph    17:26:39
11 46, but what one is looking at when one    17:26:43
12 makes a claim for breach of trust, only    17:26:47
13 gives rise to a personal claim in a    17:26:48
14 liquidation. So I need to think about it    17:26:52
15 further. And, again, whether there has    17:26:57
16 been -- this is quite an old case, so I    17:27:01
17 would need to go back and think about it.    17:27:06
18 But if one is looking -- if you look at    17:27:12
19 45, as this suggested reformulation    17:27:14
20 implies the traditional way in which a    17:27:20
21 non-proprietary claim is assessed in    17:27:22
22 equity is through the medium of an    17:27:25
23 equitable account which, in turn, leads    17:27:27
24 to equitable compensation. So this is    17:27:29
25 not a non-proprietary claim. What I am    17:27:35

Page 237

1 referring to in my opinion is a claim    17:27:38
2 that one has been deprived of one's    17:27:43
3 proprietary asset.    17:27:47
4      So I am not looking at a    17:27:55
5 non-proprietary claim. I am looking at a    17:27:57
6 proprietary claim here. So I think, at    17:27:59
7 the moment, without thinking about it    17:28:01
8 more, I don't change my view on the basis    17:28:03
9 of a very swift read of two or three    17:28:09
10 paragraphs.    17:28:13
11   Q.   If we could look just quickly,    17:28:13
12 Dame Elizabeth, back to your opinion.    17:28:20
13   A.   Yes.    17:28:22
14   Q.   You can put that aside.    17:28:22
15 Paragraph 135, which is on page 50.    17:28:24
16   A.   Yeah.    17:28:35
17   Q.   And you agree that your    17:28:36
18 analysis states that the starting point    17:28:44
19 is dependent on two conclusions, that the    17:28:48
20 terms give rise to a trust and that FTX    17:28:50
21 has breached the terms of the trust,    17:28:54
22 correct?    17:28:56
23      MR. HARRIS: Object to the form.    17:28:56
24   A.   Well, it may be dependent on    17:28:59
25 more conclusions, but what I am stating    17:29:40

60 (Pages 234 - 237)

CONFIDENTIAL

Page 238

1 here is if there hadn't been a breach of 17:29:47
2 trust, Three Arrows would have had an 17:29:50
3 equitable proprietary interest in the 17:29:54
4 digital assets. 17:29:56
5      Now, that says nothing about 17:30:02
6 whether FTX had an entitlement to 17:30:04
7 liquidate those assets or anything of 17:30:09
8 that sort. 17:30:11
9      What one, I am assuming here 17:30:12
10 is, there would have been an equitable 17:30:16
11 proprietary interest in the digital 17:30:18
12 assets. And in the factual 17:30:20
13 circumstances, FTX was not entitled to 17:30:23
14 deal with them. 17:30:26
15      Now, I am asking to assume 17:30:30
16 then, that the deprivation of a 17:30:32
17 proprietary interest would be found to 17:30:34
18 prevent the joint liquidators from 17:30:36
19 prevailing in an unfair preference claim 17:30:41
20 against FTX. That's an assumption I am 17:30:43
21 asked to make. 17:30:48
22   Q.   And your conclusion is that the 17:30:57
23 equitable compensation that you view 17:30:59
24 available would include the value of the 17:31:01
25 preference claim, correct? 17:31:07

Page 239

1   A.   Correct. The reason I say that 17:31:10
2 is that the preference claim I am 17:31:14
3 instructed, but I am not opining as to 17:31:27
4 whether that is correct or not, is 17:31:30
5 governed by BVI law, as the law of the 17:31:32
6 liquidation. Whether I have been 17:31:36
7 instructed, it's what I assumed. 17:31:46
8      Whether or not -- I am not in 17:31:49
9 the position to express the view that a 17:31:54
10 deprivation of a proprietary interest 17:32:02
11 would prevent the joint liquidators from 17:32:04
12 prevailing in an unfair preference claim. 17:32:06
13 I don't understand that. I don't 17:32:12
14 understand why it's being asserted. And 17:32:13
15 I understand it's being asserted by the 17:32:18
16 FTX liquidators, that you have to have a 17:32:22
17 proprietary interest in order to support 17:32:24
18 a preference claim. 17:32:27
19      Now, I don't understand that. 17:32:29
20 That is what I am told, that that is what 17:32:32
21 is being asserted by the unfair 17:32:44
22 preference claim by the FTX liquidators. 17:32:46
23   Q.   You haven't cited any authority 17:32:50
24 in your opinion for the proposition that 17:32:52
25 equitable compensation would include the 17:32:55

Page 240

1 value of a preference claim, correct? 17:32:57
2   A.   Correct, I haven't. 17:33:00
3   Q.   And you're not aware of any 17:33:01
4 such authority, correct? 17:33:03
5   A.   I've looked, but to date have 17:33:04
6 not found one. But it seems to me 17:33:09
7 logically consistent with my analysis. 17:33:11
8 The starting premise of this, which is 17:33:21
9 what I find difficult to cope with, 17:33:23
10 because I don't think it would be the 17:33:25
11 same under English law, is the notion 17:33:26
12 that the deprivation of a proprietary 17:33:29
13 interest prevents a preference claim from 17:33:31
14 arising. 17:33:33
15      I mean, as a matter of English 17:33:34
16 law, you don't need to have a proprietary 17:33:36
17 interest in order to bring a preference 17:33:39
18 claim. It's irrelevant. But anyway, I 17:33:40
19 am not asked to opine in any way on the 17:33:44
20 BVI law of preference claims. Still less 17:33:49
21 on the proposition that, the arguments 17:33:54
22 that the FTX joint liquidators are 17:33:56
23 putting forward in relation to preference 17:33:59
24 claims. 17:34:01
25      All I am saying here is that as 17:34:02

Page 241

1 a matter of logic, if that was the 17:34:04
2 position, then the direct loss. What has 17:34:07
3 FTX lost by being deprived of its assets 17:34:17
4 on this hypothetical scenario, premise 17:34:23
5 scenario, it's lost its ability -- sorry, 17:34:28
6 what has Three Arrows lost by being 17:34:31
7 deprived of its fraudulent preference 17:34:38
8 claim is the value of that claim. 17:34:40
9   Q.   I just want to look at one last 17:34:46
10 topic very quickly, if I could. If we 17:34:48
11 could just turn back to the terms, dotcom 17:34:50
12 terms, Dame Elizabeth, and look at 17:34:53
13 Section 30.2. I understand that Section 17:34:55
14 30, in its entirety, is a limitation of 17:35:22
15 liability, correct? 17:35:27
16      MR. HARRIS: Objection. 17:35:29
17 Misstates the record. 17:35:30
18   A.   Well, it says what it says. 17:35:51
19 Whether that is exclusively defined as a 17:35:53
20 limitation of liability or a limitation 17:35:56
21 in the right to recover damages, may be 17:36:00
22 open to debate. 17:36:02
23   Q.   Exclusion clauses such as 17:36:03
24 Section 30.2 of the terms are generally 17:36:09
25 permitted under English law, correct? 17:36:11

61 (Pages 238 - 241)

CONFIDENTIAL

Page 242

1    A.   Correct.  I have dealt with        17:36:13
2  this in my opinion, and I want to refresh   17:36:15
3  my memory as to precisely what I said.       17:36:23
4    Q.   I think you're looking at           17:36:55
5  paragraph 145?                    17:36:57
6    A.   Yes, thank you.  The point I am     17:36:58
7  making here I added to in my notes which     17:37:35
8  I produced this morning in response to       17:37:47
9  Lord Neuberger's views on Clause 32 in      17:37:57
10  his rebuttal report, where he has         17:38:03
11  developed his arguments.              17:38:05
12       And in rebuttal to those new        17:38:08
13  views expressed, I have additionally       17:38:16
14  expressed the views or would like to        17:38:18
15  express the views set out at page 4 of my   17:38:21
16  note.  The first point is that you are      17:38:31
17  right to say that generally English law     17:38:42
18  permits the exclusion clause, but they      17:38:51
19  are limited in or may be limited in their   17:38:57
20  operation or application, depending on      17:39:03
21  the construction of the clauses.  And       17:39:08
22  also what English law says cannot be        17:39:11
23  excluded.  And in my additional note, you   17:39:19
24  see that I express views that Clause 30.2   17:39:32
25  does not preclude direct loss.  I mean my   17:39:35

Page 243

1  overriding point is that Clause 30.2 is     17:39:44
2  not addressing the relationship between     17:39:50
3  FTX and its customer, or its user in        17:39:55
4  relation to the holding or ownership of     17:40:00
5  digital assets.  It is looking at          17:40:03
6  liability or restricting liability for      17:40:07
7  damages arising from the use of the         17:40:12
8  services on the platform.              17:40:13
9       Or to put it very shortly, if        17:40:18
10  FTX -- sorry, if Three Arrows has a         17:40:19
11  proprietary interest, owes in equity its    17:40:24
12  assets, the exclusion clause in 30.2        17:40:30
13  would not be construed by an English        17:40:32
14  Court as depriving Three Arrows as any      17:40:34
15  remedy for misappropriation of Three        17:40:42
16  Arrows' ownership rights to its assets.     17:40:48
17       In other words, FTX can't just       17:40:57
18  snatch all the assets and rely on 30.2 on   17:41:01
19  the assumed scenario that FTX had no        17:41:04
20  contractual entitlement under the terms     17:41:09
21  to liquidate its assets.               17:41:12
22       MR. HARRIS:  Brian, I think we       17:41:14
23  are at seven hours, but if you have         17:41:16
24  more questions on this --              17:41:18
25       MR. GLUECKSTEIN:  I just have        17:41:19

Page 244

1  one last follow-up question and then        17:41:20
2  we can be done.  We can definitely be        17:41:21
3  done.                        17:41:24
4    Q.   Just you would agree with me        17:41:25
5  that the language of Section 30.2 itself    17:41:27
6  does not have any sort of carve-out for     17:41:32
7  Section 8.2.6, correct?              17:41:35
8       MR. HARRIS:  Object to the form.     17:41:39
9    A.   On my construction, it doesn't      17:41:41
10  need to because it's not applying to the    17:41:46
11  relationship of ownership.  It's not        17:41:51
12  applying to ownership at all.  But I do     17:41:53
13  agree with you that there is no expressed   17:41:58
14  reference to Clause 8.2.6 in 30.2.         17:41:59
15       MR. GLUECKSTEIN:  Okay.  We can     17:42:07
16  leave it there.                  17:42:08
17       MR. HARRIS:  Thank you.            17:42:09
18       THE VIDEOGRAPHER:  Going off the    17:42:09
19  record at 5:42 p.m. EST.  This           17:42:11
20  concludes today's proceeding.            17:42:13
21       (Whereupon, at 5:42 p.m., the
22  deposition was concluded.)
23
24
25

Page 245

1       ACKNOWLEDGMENT OF DEPONENT
2
3
4
5       I have read the foregoing
6  transcript of my deposition and except
7  for any corrections or changes noted on
8  the errata sheet, I hereby subscribe to
9  the transcript as an accurate record of
10  the statements made by me.
11
12
13       _____
14       ELIZABETH GLOSTER
15
16
17
18  SUBSCRIBED AND SWORN before
19  and to me this _____ day
20  of _____, 2025.
21
22       _____
23       NOTARY PUBLIC
24  My Commission Expires:
25

62 (Pages 242 - 245)

CONFIDENTIAL

Page 246

1              I N D E X
2
3    WITNESS          EXAMINATION BY      PAGE
4    ELIZABETH GLOSTER    Mr. Glueckstein     6
5
6
7              E X H I B I T S
8
9    GLOSTER      DESCRIPTION           PAGE
10   Exhibit 1   Declaration of the Dame Elizabeth    22
11        Gloster, DBE
12   Exhibit 2   Notes           28
13   Exhibit 3   Document Bates stamped     69
14        FTX_3AC_000013695
15   Exhibit 4   Document re Sigma Finance Corp.    101
16   Exhibit 5   Order of the United States     104
17        Bankruptcy Court
18   Exhibit 6   Document entitled "FTX Digital    167
19        Markets Limited, Safeguarding of
20        Digital Assets and Digital Token
21        Management Policy"
22   Exhibit 7   Sinclair InvestMENT case with the    234
23        Court of Appeals
24
25

Page 247

1              CERTIFICATION
2
3     I, DAWN MATERA, a Notary Public for
4    and within the State of New York, do
5    hereby certify:
6      That the witness whose testimony as
7    herein set forth, was duly sworn by me;
8    and that the within transcript is a true
9    record of the testimony given by said
10   witness.
11     I further certify that I am not
12   related to any of the parties to this
13   action by blood or marriage, and that I
14   am in no way interested in the outcome of
15   this matter.
16     IN WITNESS WHEREOF, I have hereunto
17   set my hand this 26th day of November,
18   2025.
19
20
21        DAWN MATERA
22
23        *   *   *
24
25

Page 248

1        ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS
2
   In Re: FTX TRADING LTD., et al.
3  DATE OF DEPOSITION: November 25, 2025
   WITNESS: ELIZABETH GLOSTER
4
   PAGE/LINE(S)/  CHANGE     REASON
5
6
7
8
9
10
11
12
13
14
15
16
17
18        ELIZABETH GLOSTER
19
   SUBSCRIBED AND SWORN TO
20 BEFORE ME THIS_____DAY
   OF _____, 2025.
21
22  NOTARY PUBLIC
23 MY COMMISSION EXPIRES_____
24
25

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

CONFIDENTIAL

**[& - 22-11068]**                                                                    Page 1

| **&** | **106**  81:15 | **15**  54:18 98:10 | **20**  12:7,8 20:23 |
|---|---|---|---|
| **&**  1:14 2:2,10 | **10:30**  59:24 | **15.1**  151:9 | 107:8,12,16,18 |
| 4:15 6:14 19:1 | **10:54**  60:2 | **16**  146:1 | 108:3 109:19 |
| 20:5,10,16 | **11**  1:2 4:13 | 214:15 | 109:21 117:13 |
| **0** | 63:22,23 228:6 | **16.2**  68:25 69:5 | 134:20 164:15 |
| **000013695** | **117**  223:23 | 214:14,18 | **2007**  38:4 |
| 69:16 246:14 | **118**  223:23 | 215:1,15,20,25 | **2018**  15:12 |
| **1** | **11th**  115:1 | 216:7,14,17,22 | **2020**  164:16 |
| **1**  22:12,18,24 | **12**  60:8 66:5 | 217:6 218:2 | **2021**  40:21 |
| 23:19 24:17,20 | 72:10 107:9 | **16.2.**  151:15 | 164:16 |
| 25:1 29:20 | **125**  1:14 2:3 | 215:21 218:6 | **2022**  43:19 |
| 41:24 42:7 | **126**  223:20 | **167**  246:18 | 47:24 48:4 |
| 45:18 159:11 | 224:4,9 225:13 | **17**  150:24 | 61:5 62:2 |
| 234:8 246:10 | 228:1 230:24 | **18**  53:18 55:3 | 91:19 99:9,16 |
| **10**  106:2,5,7 | **1271**  2:11 | 97:22 169:25 | 99:19 112:5 |
| 145:4 146:25 | **128**  231:14 | **1994**  36:19 | 115:1 118:25 |
| 218:7,14,17,25 | **129**  232:5 | **1:06**  117:2,7 | 121:2 123:4 |
| **10.3.3**  219:20 | **12:29**  116:23 | **2** | **2023**  122:17,21 |
| 221:8 | 116:24 | **2**  28:10,13,17 | 123:3 |
| **100**  103:25 | **13**  38:4 53:5 | 28:22 29:4,7 | **2024**  105:4 |
| 144:25 | 62:2 | 29:23 32:14 | **2025**  1:7 4:4 |
| **1000**  145:3 | **134**  233:4,8 | 45:18 51:10,23 | 19:14,18 20:21 |
| **10004**  2:4 | **135**  237:15 | 51:24 159:13 | 245:20 247:18 |
| **10020**  2:12 | **13th**  43:19 61:4 | 169:18 246:12 | 248:3,20 |
| **101**  246:15 | 62:15 63:2,13 | **2.1**  149:22 | **21**  164:15 |
| **102**  211:8,12 | 99:9,16,19 | **2.1.3**  180:25 | 169:25 172:13 |
| 212:21 | **14**  79:14 98:5 | 181:9,14 | **21-14**  183:11 |
| **103**  218:18,22 | **14-15**  27:2 | 183:19,25 | **212**  2:4 |
| 218:23 | **145**  83:17,18 | **2.2.3**  150:9,10 | **213**  35:25 36:6 |
| **104**  246:16 | 88:8 89:5 90:8 | **2.4.1**  151:25 | **214**  169:25 |
| **105**  215:22,23 | 242:5 | **2.6.**  150:21 | **22**  55:14 56:1,3 |
| | **14th**  62:16,24 | **2.8.6**  38:20 | 63:2 246:10 |
| | 63:2,6,11 | 183:23 | **22-11068**  1:2 |
| | | | 4:13 |

CONFIDENTIAL

**[225 - 4:01]** Page 2

| | | | |
|---|---|---|---|
| **225** 35:8 | 69:15 83:12,16 | 200:1,7 | 177:11,20 |
| **23** 63:21 64:4 | 105:19 146:2 | **37** 53:19 54:18 | 209:12,17,25 |
| 125:14 131:20 | 183:10 206:6,8 | 55:24 57:8,19 | 228:2,3,4 |
| 132:1 180:3 | 206:9,23 208:7 | 77:25 79:4 | 231:5,6,11,15 |
| **232** 35:8 | 208:14 209:11 | 102:13,18 | 246:14 |
| **234** 246:22 | 209:19 210:15 | 103:6 144:24 | **3ac's** 72:11,22 |
| **24** 55:19,21 | 210:21,23 | 177:16 178:14 | 73:15 75:1 |
| 66:4 67:9 72:8 | 216:2 219:7 | **38.6** 181:1 | 83:4 85:2,18 |
| 124:3 | 234:8 246:13 | 187:3 188:22 | 86:5 88:18 |
| **25** 1:7 12:8 | **30** 241:14 | 189:2,7 191:6 | 175:22 176:18 |
| 55:19,22 63:1 | **30.2** 241:24 | 192:2 | 182:7 208:13 |
| 63:7 141:23 | 242:24 243:1 | **38.7** 82:18 | 209:6 210:7,15 |
| 248:3 | 243:12,18 | **38.7.2** 82:6,19 | 215:16 216:8 |
| **256** 40:21 | 244:5 | **38.7.2.** 81:21 | 223:3 |
| **25th** 4:3 | **30.2.** 241:13 | **3ac** 2:11 25:13 | **4** |
| **26** 55:22 | 244:14 | 53:9 54:22,22 | |
| **26th** 247:17 | **31** 86:22 | 55:16 56:6,6 | **4** 50:8,9,16,21 |
| **27** 55:23 60:7 | 164:15,16 | 57:9,11 58:11 | 55:4 101:23,24 |
| 60:11 61:2 | **32** 242:9 | 58:18 59:4,19 | 102:3 234:8 |
| 62:9,20 63:5 | **328** 36:19 | 60:13 62:1 | 242:15 246:15 |
| 63:10 73:5 | **34** 86:22 | 63:3 64:10 | **40** 199:9 211:9 |
| 74:22 75:7 | **35** 53:4,8 54:1 | 65:6,12 66:8 | **405** 12:18,21 |
| **27th** 91:18 | 55:24 60:18 | 69:16 72:17 | **41** 81:17 |
| **28** 55:19,23 | 61:9,20,21 | 73:13 76:8 | **43** 97:21 98:14 |
| 76:4,15 187:1 | 63:12 102:10 | 77:17,18 78:1 | 99:5 |
| 246:12 | 102:11 | 78:2,9,16,23 | **45** 236:19 |
| **285** 38:4 | **36** 55:11,13,25 | 83:4,6,8,23 | **46** 235:16,21 |
| **29** 55:23 | 56:4,9,15,18 | 89:12 90:15 | 236:11 |
| **2:36** 165:2 | 57:5 58:11,19 | 91:13,17 92:12 | **47** 117:13 |
| **2:51** 165:5 | 76:25 77:18 | 92:15 99:20 | **472** 235:17 |
| **3** | 78:6,8,22 79:7 | 134:14 144:25 | **48** 134:19 |
| | 80:12 81:6 | 145:4 158:9 | 136:12,19 |
| **3** 45:17 66:24 | 157:2,6 158:4 | 159:5,18 | **4:01** 205:25 |
| 67:5 68:16 | 158:24 177:16 | 175:25 176:10 | |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **4:25**  206:3 | **60**  124:2,2 | 205:12 218:4 | **abu**  14:15 |
| **5** | **600**  72:13,18 | **82**  73:12,16 | **academic**  31:8 |
| **5**  104:15,20 | **61**  138:9 | 74:24 | 33:24 196:18 |
| 221:19,24 | 141:22 143:4 | **826**  94:16 | **accept**  196:5 |
| 222:15,19 | **62**  180:21,25 | **85**  199:24,25 | 200:12 201:14 |
| 223:15,22,22 | **63**  182:1,2 | 200:2,3 | 236:9 |
| 246:16 | **66**  175:15 | **89**  144:20,23 | **acceptance** |
| **50**  237:15 | 186:25 | **8th**  105:4 | 136:23 |
| **53**  83:18 | **69**  246:13 | **9** | **accepted**  26:2 |
| **541**  108:11,14 | **7** | **9**  156:4 | 56:18,23 |
| 108:21 | **7**  234:21 235:2 | **9.2**  180:25 | 133:17 136:14 |
| **55**  138:17 | 246:22 | **9:02**  1:8 4:2 | 137:5,16 213:3 |
| 172:12,16 | **7th**  25:7 | **a** | 227:2 |
| 173:4,5 | **8** | **a.m.**  1:8 4:3 | **access**  148:5 |
| **558-4000**  2:4 | **8**  39:9,19 50:9 | 59:24 60:2 | 150:12 169:22 |
| **56**  102:10 | 104:5 | **aa**  139:1 | 170:3,8 |
| 131:18,24 | **8.2.6**  129:4 | **abandoned** | **accessible** |
| 173:18,22 | 131:20 132:21 | 156:7 | 157:16 158:9 |
| 175:12,14,16 | 141:25 147:6 | **abate**  144:11 | 159:3,5 168:20 |
| 175:17 180:3 | 149:2 152:23 | **ability**  5:21 | 169:7,8 170:12 |
| **57**  125:13 | 153:7 155:14 | 213:11,15,22 | 171:5 |
| **5777**  247:20 | 156:2,12 | 215:16 216:8 | **accommodate** |
| **59**  126:2,14 | 157:20 180:5 | 218:2 241:5 | 200:10,20 |
| **5:42**  244:19,21 | 182:12 188:8 | **able**  212:15 | 201:20 |
| **6** | 188:24 190:8 | 214:13 235:8 | **accordance** |
| **6**  66:25 78:25 | 190:17,25 | **above**  1:13 | 109:4 112:8 |
| 167:15,22 | 192:4 204:13 | 54:22 55:2 | 132:14 133:6 |
| 221:20,24 | 204:23 211:13 | 57:10 78:2 | 142:6 153:25 |
| 222:16,17,25 | 211:18 213:13 | 138:18 | 156:17 170:17 |
| 223:2,21 224:6 | 213:24 215:3 | **abstract**  129:21 | **account**  61:1 |
| 225:4 234:20 | 244:7,14 | 130:6 | 62:7,17 65:7 |
| 246:4,18 | **8.2.6.**  192:6 | **absurd**  123:1 | 68:6 69:23 |
| | 195:16 205:6 | | 72:24 74:5,17 |
| | | | 75:4,20 79:9 |

CONFIDENTIAL

**[account - advising]**

79:21 91:1
93:25,25 94:11
94:14 95:12
113:7 145:1
146:16 151:20
157:20 160:14
160:20 162:20
182:7 211:15
211:25 212:23
217:8,22
218:10 219:2,6
219:22 226:1
233:9 234:12
236:23
**accountant**
159:20
**accountant's**
26:7
**accounting**
25:24 26:3
146:15,21
**accounts** 80:21
81:2 91:17
159:22 164:4
**accretions**
150:22 151:1
**accrue** 211:2
**accumulated**
72:17
**accuracy** 45:7
45:11 88:22
**accurate** 245:9
**accurately** 44:9

**achieving**
196:1
**acknowledge**
124:6 145:9
172:16 192:11
192:20
**acknowledging**
189:10
**acknowledg...**
245:1
**acquired**
208:18
**acquires**
147:16
**acre** 127:8
**act** 83:24 84:22
89:9 149:7
175:23
**acted** 89:16,20
**acting** 90:21
201:15
**action** 1:13
4:22 84:19
247:13
**actions** 61:24
**active** 22:9
146:19
**activities**
181:16 182:15
182:16,19
184:21 185:7
202:16
**acts** 84:9

**actual** 57:11,16
57:23 58:2
107:10 152:6
204:10
**actually** 12:11
58:12 112:17
136:25 137:18
161:16 170:25
171:15 174:13
191:14 192:3,4
193:20,23
201:3 212:14
229:16
**adam** 2:16
**adam.goldberg**
2:16
**add** 169:12
183:9
**added** 242:7
**adding** 95:1
201:15
**addition** 51:4
81:6 148:10
**additional**
24:10,24 27:9
27:12 29:8,16
30:16 33:11
34:10,23 35:14
35:22 37:21
38:7 39:10
40:12,19 41:6
41:17 44:13,13
51:5,11 52:1,2
52:3 76:9

104:4 158:12
158:13 169:1,9
183:6,8 242:23
**additionally**
242:13
**address** 66:24
83:9 212:9
215:10
**addressed**
227:21 229:18
**addresses** 67:6
134:24 136:2
150:20
**addressing**
65:21 101:2
104:8 187:2
232:21 243:2
**administer**
4:21
**administered**
1:3
**adopted** 196:20
232:14
**adverb** 94:25
95:4
**advice** 12:10
13:6 183:19
**advise** 222:10
**advised** 21:4,8
22:4
**advising** 21:11
21:18 181:17
222:22 223:2,5

CONFIDENTIAL

**[affect - analysis]**                                    Page 5

**affect**  40:5
58:20 63:17
65:8 109:24
146:22 171:12
183:20 188:2
191:23,24
**affected**  166:15
179:4 181:16
182:19 184:1,4
184:21
**affiliates**
148:19
**affirmatively**
31:14
**afforded**  6:1
217:6
**afraid**  190:24
**afternoon**
117:1
**agency**  188:11
219:23 220:3
220:21 221:11
**aggregated**
68:7
**ago**  12:7,8
20:12,24 48:25
132:24 168:23
168:24,24
**agree**  4:6 96:10
96:18 97:11,15
99:4,23 101:13
103:1,5,14,25
104:11,14
109:12 110:10

110:23 111:15
111:22 112:13
112:21 113:14
114:23,24
115:4,23 117:9
117:12 118:8
118:15 123:7
123:16 126:24
127:18 129:20
130:5 134:21
135:5 141:13
153:2 155:6,16
156:9 172:24
173:6 181:8
186:24 189:15
201:22 212:18
213:9 214:25
219:14,18
228:11 229:22
230:15 235:23
237:17 244:4
244:13
**agreed**  156:3
**agreeing**  135:2
**agreement**
38:10,21 41:9
41:12 95:22
104:9 122:23
129:2 135:4,20
157:22 173:23
183:24 189:18
190:6
**agreements**
110:21 187:15

187:17
**ahead**  93:12
129:25 198:22
**aid**  156:21
171:2,3 172:8
**aig**  40:20
**al**  1:5 4:11
248:2
**albeit**  139:15
186:21
**allegation**  62:7
63:12
**allegations**
54:3,5,12,15
61:2
**alleged**  53:10
60:22,24 65:3
**allocation**
149:23 150:5
150:19
**allow**  188:2
229:24
**allowed**  14:11
61:11,24
**alternative**
92:18 195:13
196:8
**alternatively**
230:10
**ambiguity**
62:25
**ambiguous**
126:18

**amended**  22:15
53:11
**amending**
44:18
**amendments**
44:7,13
**american**  12:4
108:7 121:17
196:4
**americas**  2:11
**amount**  70:20
76:7 83:7
219:13
**analogous**
203:15 232:25
**analogy**  194:22
196:6,14
197:12 233:2
**analysis**  24:19
25:12 30:2,4,8
30:12,16,23
31:6,19,20,24
31:25 32:12,24
33:2 34:3,24
35:3 36:21
37:15 39:19
40:2 44:17
47:10 49:2,13
49:15 50:13,18
51:7 52:4,10
52:13 56:20
57:25 58:7,13
59:8 60:12,25
61:1 62:8,14

| | | | |
|---|---|---|---|
| 62:22 63:18 | 232:14 233:13 | **answering** | **appearances** |
| 65:8,11 69:24 | 237:18 240:7 | 208:13 209:1 | 2:1 3:1 4:24 |
| 71:24 72:6 | **analyze** 34:2 | **answers** 21:14 | **appeared** 89:10 |
| 78:20 82:7,14 | 138:6 154:16 | 31:10 180:24 | 90:12 91:11 |
| 84:17 86:10 | **analyzed** 46:12 | 221:19 235:9 | **appearing** |
| 99:14 103:22 | **animals** 70:21 | **antigua** 48:22 | 29:16 139:12 |
| 121:19 130:21 | **annex** 105:19 | **anybody** 19:16 | **appears** 53:8 |
| 130:23 134:3 | **answer** 23:24 | **anybody's** | 63:8 107:8 |
| 136:20 141:1 | 27:22 28:19 | 78:17 | 171:8 187:8 |
| 143:3 145:6,8 | 33:15 46:1,6 | **anymore** | 217:9,22 |
| 146:11 148:13 | 46:19 47:1,3,4 | 112:12 | **appellate** |
| 148:20 149:22 | 47:7,16 67:4 | **anytime** 190:21 | 232:17 |
| 150:15 154:3 | 69:19 93:15 | **anyway** 6:3 | **applicability** |
| 155:20 156:25 | 95:2,5 122:10 | 34:11 240:18 | 190:10 |
| 158:21 160:15 | 137:22 138:12 | **apart** 11:15 | **applicable** |
| 167:5 169:2 | 140:10,10,17 | **apoc** 53:11 | 190:11,18 |
| 171:12,17 | 152:15 156:10 | 54:8,17 55:7 | 212:4 213:5 |
| 173:25 176:25 | 167:11 171:24 | 60:20,22 | 214:7,11 |
| 177:6,10,14,19 | 180:23 208:19 | **apologize** 185:9 | **application** |
| 177:24 178:5 | 209:4 210:20 | **apparent** 17:22 | 103:2 115:15 |
| 178:18,22 | 210:21 211:7 | 35:24 | 115:17 122:11 |
| 179:4,9 185:24 | 215:12 219:6 | **apparently** | 196:1 242:20 |
| 186:1 187:22 | 220:13,17 | 148:4,11 | **applications** |
| 193:7 194:1,21 | 221:6 222:16 | **appeal** 14:19 | 136:7 |
| 195:12,13 | 222:19,25 | 14:22 15:1,12 | **applied** 41:2 |
| 196:8 197:14 | 226:18 229:10 | 38:2 | 47:12 73:14 |
| 200:21 201:16 | **answered** | **appeals** 234:23 | 74:4,16 75:3 |
| 206:13,18 | 23:23 46:12 | 235:3,16,23 | 113:21 114:2 |
| 209:18 210:3,6 | 47:14 66:25 | 246:23 | 121:3 131:14 |
| 210:14 216:2 | 67:1,2 88:23 | **appear** 110:12 | 136:10 137:19 |
| 224:3,8,21,23 | 89:1 178:8 | 155:7,14,19 | 158:2 176:25 |
| 225:10,24 | 207:6,9,15,17 | 192:1 195:16 | 177:25 197:6 |
| 226:25 227:1 | 207:24 208:3 | 213:18 | 229:2 |
| 231:20 232:13 | 222:17 | | |

CONFIDENTIAL

applies   111:13 208:12 209:1 218:8

apply   47:18 71:14 75:19 94:16 96:12 109:15 110:6 136:17 137:17 196:11 209:9 229:4

applying   74:23 110:25 119:25 120:10 122:6 139:17 194:2 194:24 198:10 227:9 232:13 244:10,12

appointed 19:12 20:8,9

appointment 14:24 18:8 19:9 20:18

appreciate 10:10 137:21 140:11 146:13 146:23

appreciated 36:22

approach   40:9 40:10 58:24 101:21 104:1 196:16 219:11

approached 19:24 20:1

appropriate 47:11 141:16 209:8

appropriating 232:23

approved 40:18

approximately 73:16

arbitral   17:16

arbitrated 16:11 17:2

arbitration 18:5

arbitrations 16:7,15

arbitrator   15:4 15:6,7,10,14 20:9,14

argued   174:5,7

argument 109:23 164:1

arguments 240:21 242:11

arisen   82:24 83:10 216:22 216:25

arises   183:22

arising   240:14 243:7

arithmetic 145:7

arizona   7:23,24

arose   226:16

arrangement 156:6

arrangements 115:8 154:13 165:25 166:9

arrived   83:5

arrows   18:11 18:14,17,21 19:17 21:13,17 21:19,21 22:16 23:4 25:15 43:16,23 100:22 109:9 111:2 112:4 152:5 154:6 178:19 183:21 218:3 221:21 222:1,11,21 227:12 238:2 241:6 243:10 243:14,16

arrows's   212:6

articulate 52:21 194:10 207:4 222:7

articulated 42:10 66:24 71:16 154:1 165:13

articulation 42:11 96:19 97:6,25 98:12 98:21

artificial 180:17

ascertain   95:20 96:7 105:9 106:10 161:25 170:20

ascertained 142:3

ascertaining 40:25

aside   17:17 87:22 237:14

asked   23:22 33:5,14 43:12 43:20 46:1,5 47:1,15 53:23 57:14 59:6 63:9,10 64:20 76:3,9 78:5 79:24 80:8 83:9 87:12 88:16,20 100:19 106:18 133:25 146:14 164:2 169:11 177:24 208:16 209:23 211:7 233:25 238:21 240:19

asking   17:6 23:18 31:22 33:3,7,11 37:21 64:25 71:10 73:2

| | | | |
|---|---|---|---|
| 74:8 78:12 | 200:11,20 | 125:9 129:9,12 | 184:13 185:3,6 |
| 88:8 105:17,25 | 201:2,12,20 | 134:3,6,9,16,25 | 185:12,20 |
| 111:15,17 | 202:1 237:3 | 135:15,16,24 | 186:3,5,8,13 |
| 115:10 142:20 | **assets** 11:14,19 | 136:2,5,15,16 | 188:19 190:23 |
| 188:10 192:19 | 13:14 15:16,20 | 137:6,25 138:5 | 191:5,9,10,15 |
| 204:22,22 | 15:20,24,24 | 138:20 139:9 | 192:5 193:4,15 |
| 210:1 212:19 | 16:6,12,16,17 | 140:14,21,23 | 193:18 194:14 |
| 214:2 215:24 | 16:20,22 17:4 | 141:12 142:4 | 194:20 195:6 |
| 216:13,16 | 17:9 25:17,22 | 142:15 143:1 | 196:22 197:8 |
| 220:7,18 | 26:5,9,10,16,22 | 143:12,21,23 | 198:4 199:11 |
| 238:15 | 26:23 43:17 | 143:24 145:17 | 201:18 202:11 |
| **aspect** 188:18 | 44:1 51:18,20 | 145:21 147:16 | 203:7 204:16 |
| **asserted** 239:14 | 51:21 62:2 | 147:21,22 | 205:1,9,16,19 |
| 239:15,21 | 63:3 64:10 | 148:8,14,15,18 | 211:14,20,25 |
| **assertions** 88:2 | 65:5 66:18,22 | 148:20 149:24 | 212:7,11,15,23 |
| **assessed** 236:21 | 67:7 68:8 | 150:8,13,13,18 | 213:12,16,23 |
| **assessing** 68:23 | 70:10,11 71:4 | 150:23 151:10 | 215:9,17 216:9 |
| **assessment** | 73:13 74:25 | 151:12,14,17 | 216:24 217:3 |
| 126:4 | 79:9,22,23,25 | 151:19,22,23 | 218:4 219:12 |
| **asset** 16:24 | 80:3,22 81:6,7 | 152:1,3 153:16 | 224:20 225:7 |
| 26:4,19 68:1 | 81:11 83:4,7 | 154:5,5,17,18 | 226:14,20,23 |
| 70:14,19 72:23 | 83:23 85:3,19 | 154:21 155:2 | 227:8,9,9 |
| 73:23 94:5,21 | 85:24 86:11,13 | 156:7 157:24 | 228:4,4,5 |
| 95:7,8,11 | 86:25,25 87:1 | 161:4,5,5,6,18 | 231:6 232:11 |
| 118:3 122:13 | 87:3,4,7 88:20 | 161:20 163:9 | 232:19,24 |
| 127:1,25 | 92:1,6,13 93:7 | 163:24 165:21 | 238:4,7,12 |
| 128:10,19 | 93:10,19,21 | 165:23 166:1,6 | 241:3 243:5,12 |
| 129:18 133:5 | 94:19 107:20 | 166:7,12 | 243:16,18,21 |
| 138:21 149:25 | 108:9,20,25 | 167:17,25 | 246:20 |
| 150:2,12 | 109:9,10 112:8 | 174:8,9,21,23 | **assignment** |
| 153:12 174:13 | 119:25 120:10 | 175:4,23 176:9 | 18:20 19:12,17 |
| 186:23 188:24 | 120:20 122:9 | 176:16,18,20 | 19:25 20:5,7 |
| 193:13,25 | 122:16 123:17 | 177:2 182:5,10 | 20:13 21:3 |
| 194:6,23 195:2 | 123:21 124:1 | 182:21,22 | 46:18 |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **assist** 42:21 | **assumes** 61:23 | **attendant** | 159:18 168:20 |
| **assistance** | 142:19 | 204:7,12 | 169:16 171:10 |
| 52:12 | **assuming** 57:10 | **attention** 34:22 | 171:20 222:21 |
| **associated** | 62:14 84:16,21 | 36:25 37:25 | 224:7 238:24 |
| 145:1 182:6 | 84:24 128:25 | 38:1 41:20 | **avenue** 2:11 |
| **assume** 5:23 | 238:9 | **attorneys** 2:3 | **avoid** 40:4 |
| 19:7 20:2 | **assumption** | 2:11 | **award** 230:18 |
| 25:19 44:22,24 | 52:9 62:9,20 | **audio** 4:4 5:10 | **awards** 17:16 |
| 47:17 49:5 | 62:25 63:9 | **audited** 161:2 | **aware** 14:2,6,7 |
| 51:14 52:4 | 71:3,10 74:22 | 161:16 163:6 | 14:13 21:15,20 |
| 53:24 54:21 | 77:17 88:16,20 | **auditor** 159:21 | 22:10 51:17,20 |
| 56:10,22 57:9 | 88:22,25 89:21 | **auditor's** 26:7 | 53:3 67:11,24 |
| 57:14 59:6 | 89:24 91:2,3 | 26:17 | 68:4,20 71:21 |
| 60:12 63:10 | 100:18 171:22 | **auditors** | 72:21 73:3,20 |
| 67:15,17,18,20 | 176:1,17,22,24 | 164:20 | 73:25 80:21 |
| 77:2,10 78:16 | 177:1,5,15 | **august** 7:11 | 81:4,8,9,10,13 |
| 79:1,5,25 80:8 | 178:9 225:3 | **australian** | 102:14 137:23 |
| 83:22 85:9 | 226:9 228:7 | 198:11 | 142:14,21 |
| 89:8 90:19 | 238:20 | **authorities** | 145:17,20 |
| 99:10 100:20 | **assumptions** | 36:13 38:25 | 164:19 240:3 |
| 106:18 132:17 | 45:8,13 49:1,6 | 41:18 52:21 | **awareness** |
| 134:1 145:13 | 49:8,11,17,24 | 195:1 | 85:23 |
| 146:15 166:18 | 50:1 56:25 | **authority** 36:23 | **b** |
| 169:15 177:9 | 57:2 60:6 | 124:20 235:14 | **b** 1:3 5:4 61:9 |
| 177:22 209:23 | 64:20 68:19 | 239:23 240:4 | 61:22 63:12,21 |
| 211:7 233:17 | 69:3 72:20 | **authorized** | 64:4 66:4 72:8 |
| 238:15 | 76:2 78:4,8 | 4:20 | 97:21 98:7,14 |
| **assumed** 45:3 | 80:6 81:17 | **automatically** | 99:5 117:3 |
| 51:2 78:9,21 | 82:15 110:1 | 73:22 | 124:3,17 127:9 |
| 99:15 116:15 | 146:14 158:23 | **availability** | 127:12,12,15 |
| 157:1 171:19 | 234:7 | 172:1 | 127:25 132:9 |
| 178:5 227:25 | **attached** 19:23 | **available** 5:17 | 136:24 175:12 |
| 228:1 233:16 | **attempts** 96:6 | 51:15 98:18 | 175:17 177:4 |
| 239:7 243:19 | | 157:16 159:8 | |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 178:8 183:10 | 94:3,4 119:21 | 220:22 221:1,2 | **basis**  43:21 |
| 222:25 223:2 | 119:24 120:10 | 221:14,14,16 | 49:14 56:24,25 |
| 234:20 246:7 | 120:19 121:7 | 221:18 | 57:3 76:16 |
| **b's**  186:3,7,8 | 121:12,16,23 | **bank**  93:25 | 80:17 82:12,21 |
| **back**  10:13 | 122:2,6,14 | 95:12,17 | 91:2 100:18 |
| 11:20 41:22 | 123:6 192:12 | **bankman** | 109:22,25 |
| 46:4,22 60:1 | 192:20,24 | 86:20 87:25 | 111:1 135:12 |
| 66:1 72:10 | 193:3,9,10 | **bankruptcy**  1:1 | 139:11,16 |
| 77:22 88:4 | 194:2,12,25 | 4:11 104:16,22 | 141:1,20 |
| 93:24 117:6 | 195:5 196:2,6 | 106:23 107:11 | 184:23 186:4 |
| 120:4 132:18 | 196:9,15,21,23 | 108:12,14 | 199:1 204:24 |
| 165:4 172:11 | 197:5 198:4,12 | 195:4 196:19 | 211:6 214:5 |
| 178:13 187:8 | 200:5,9,15 | 197:3 198:2,21 | 222:6,18 237:8 |
| 187:15,16 | 201:1,11,18,24 | 228:7 246:17 | **bates**  69:16 |
| 195:22 199:25 | 203:9,13,17 | **bar**  12:2 20:24 | 168:9 246:13 |
| 205:18 206:2 | 205:4 232:18 | **bare**  36:1 92:10 | **bearing**  221:12 |
| 207:22 234:9 | 233:2,3 | 119:16 131:21 | **belief**  122:1 |
| 236:4,5,17 | **bailor**  159:25 | 132:3,7,8,12,22 | **believe**  7:12 |
| 237:12 241:11 | 194:5 203:20 | 132:24 183:4 | 18:23 21:1 |
| **background** | 204:4,8 205:10 | **barrister**  42:20 | 36:17 39:4,8 |
| 50:10,16,21 | **bailors**  37:12 | **base**  52:3 | 39:13 41:15 |
| 51:1 53:17 | 120:2,20 121:1 | **based**  51:1,8 | 47:23 54:14 |
| 77:1 98:16 | **bails**  203:21 | 59:9 62:23 | 65:10 68:19 |
| 102:20 105:14 | **balance**  25:20 | 64:19 88:25 | 76:17 83:14 |
| 105:20 | 26:6,17,20 | 90:15,18 109:7 | 87:11 91:23 |
| **backtrack** | 41:11 66:9,21 | 126:4 139:24 | 92:3,22 105:13 |
| 195:10 | 67:8,13,19,22 | 146:18 147:5,9 | 105:22 121:22 |
| **bailed**  203:19 | 67:23,25 68:7 | 147:25 160:7 | 133:18 146:3 |
| 203:23 204:6 | 70:17 72:12,18 | 194:21 200:13 | 190:16 198:12 |
| **bailee**  194:4 | 73:15,23 75:1 | 208:4 233:1,20 | 222:25 229:23 |
| 203:22 204:2 | 86:12 161:6 | **basic**  110:10 | **bellies**  165:20 |
| **bailment**  13:14 | 218:9 219:1,5 | **basically**  52:23 | **belong**  150:23 |
| 36:18,21 37:4 | 219:8,10,16,16 | 140:2 189:20 | **belonging** |
| 92:19 93:5 | 219:18 220:5 | | 109:9 |

CONFIDENTIAL

**[beneficial - call]** Page 11

**beneficial**
132:18 133:3
186:22 226:6
**beneficially**
166:21,22
228:5
**beneficiaries**
92:16 126:8
136:3 141:21
161:9
**beneficiary**
36:3,7 92:11
132:15 133:15
183:13,16
**beneficiary's**
144:11
**benefit** 26:15
113:11 151:3
**bermuda** 14:19
14:22
**best** 35:2 89:11
90:14 91:4,12
235:10
**better** 52:22
91:18 218:20
**beyond** 32:12
47:1 156:12
158:23 167:8
167:10,12
195:7
**bias** 17:22
**bick** 38:5 41:14
**bid** 141:19
205:16

**bill** 193:21
**bit** 104:7
146:25 147:1
176:3
**bitcoin** 140:7
144:25 145:3
**bits** 106:21
**black** 97:6
127:8
**blacklist**
150:20
**blockchain**
212:8 215:10
**blood** 247:13
**boiler** 187:7,12
187:24 188:4
**book** 40:14
121:18
**bore** 26:12
**borrowed**
64:10 65:5
145:18,21
**borrower**
151:20
**bottom** 79:14
83:15 200:6
**bought** 72:23
138:22
**brackets** 130:7
**breach** 54:6
143:15,18,22
222:22 223:16
223:18 224:2,7
224:22 225:4,8

225:14,15,21
225:23 226:14
226:16,22
227:3,7,15,20
228:2,9 231:2
234:4,10,13
236:7,12 238:1
**breached** 143:9
224:12 225:1
237:21
**breaches** 53:10
53:25 60:20,21
60:23 230:20
**break** 59:22
60:5 116:21
164:25 165:8
205:22
**brian** 2:5 6:13
243:22
**briefly** 73:6
**briggs** 34:24
116:5 154:1
**bring** 36:25
41:20 231:16
240:17
**broad** 1:14 2:3
101:17 182:17
**brochure**
161:19
**brochures**
157:13 159:2
**broker's**
162:20

**brokers** 163:8
163:16,20,22
**brooks** 3:8
**brothers** 35:2,9
**bulk** 37:6,10
**burnett** 98:8,24
99:2
**burrows**
231:24
**business** 40:1,3
59:12 103:13
103:17,20,23
114:22 116:3
148:1,4,12
156:14,20,21
157:7 158:22
171:1 180:1
**bust** 162:23
**buying** 149:11
162:25 184:16
**bvi** 48:18 239:5
240:20

**c**

**c** 83:19,20,21
88:8,15 127:16
190:8,17,25
192:4 204:13
204:23 211:13
211:18 212:2
213:2,13,24
214:4 215:4
**call** 6:19,20,21
6:21 175:1,18

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 185:21,22 205:9,15 | 31:24 32:6,18 32:19,21,25 | **cases** 11:8,12 12:25 14:4 | **causes** 227:20 **ceo** 86:19 |
| **called** 24:11 36:18 199:6 | 33:1 34:2,2 35:7 36:11,18 | 17:1,11 29:18 30:2,5,14,20,22 | **certain** 25:25 30:2,4,6,7,20 |
| **calls** 205:18 | 36:20 37:1,13 | 30:25 31:5,13 | 30:25 43:13 |
| **canons** 40:23 | 38:4,16 39:5 | 31:19 32:3 | 44:22,24 49:1 |
| **cap** 229:2,4 | 39:11 40:12,19 | 33:15,16,22,24 | 49:5,6 52:2 |
| **capable** 138:22 | 41:7,15 52:18 | 34:5,12 36:12 | 61:3 101:3 |
| 142:2 180:6,11 | 75:14 94:5 | 37:21 38:25 | 135:22 148:18 |
| 180:14,19 | 99:3,12 102:4 | 39:6,7 136:14 | 160:9 175:18 |
| 199:11 | 102:7,14,20 | 137:3,16 138:3 | 222:6 233:5 |
| **capacity** 26:11 | 119:13 124:4 | 138:5 139:3 | **certainly** 12:13 |
| 161:8 | 124:12 131:13 | 140:18 144:5 | 25:2 49:25 |
| **capita** 97:24 | 132:25 134:14 | 147:12,13 | 75:14 82:13 |
| 98:3,6,11,11 | 135:17 136:23 | 156:18 159:23 | 121:2 193:5 |
| **capital** 18:11 | 137:1,18 | 160:1 193:5 | 196:12 206:15 |
| 18:14,17,21 | 138:14,21 | 196:6 228:18 | 235:13 |
| 19:17 21:21 | 139:13,15,21 | **cash** 93:24,24 | **certainty** |
| 22:17 23:4 | 139:23 140:1,2 | 95:9,11 107:21 | 125:19 130:10 |
| 221:21 222:1 | 142:23,25 | 108:10 | 130:11,12 |
| 222:11 | 143:11,16 | **categorization** | 207:4 |
| **car** 70:13,16 | 144:10 148:17 | 199:19 | **certification** |
| 95:9,11 203:18 | 149:17 156:7 | **category** 17:9 | 247:1 |
| **careful** 120:15 | 162:17,18,21 | **cater** 201:24 | **certified** 1:16 |
| **carried** 59:8 | 167:6 169:4,5 | **causation** | **certify** 247:5,11 |
| 60:13 61:24 | 170:25 171:18 | 227:14,18,22 | **cetera** 63:4 |
| 62:15 91:5 | 194:15 195:5 | 228:12,21 | 183:4 221:11 |
| **carry** 180:16 | 196:3,22 197:2 | 229:6,13,18 | **chambers** |
| **carrying** 180:6 | 197:8 198:18 | 230:1 | 42:20 |
| 180:11 | 199:5,8 201:6 | **cause** 50:2 82:7 | **change** 44:16 |
| **carve** 244:6 | 206:25 228:19 | 230:2 | 50:15,20 82:15 |
| **case** 1:2 4:13 | 228:19 229:12 | **caused** 227:23 | 115:14,20 |
| 5:24 11:17 | 234:22 235:3 | 230:20,22 | 140:12 237:8 |
| 14:8 20:19 | 236:16 246:22 | | 248:4 |

| | | | |
|---|---|---|---|
| **changed** 49:18 | **circumscribed** | 222:12,23,24 | 82:6,18,20 |
| 50:1,17,22 | 111:20 | 223:3,4,7,8,11 | 88:17 96:16 |
| 113:17 | **circumstance** | 223:16 226:16 | 128:7 141:25 |
| **changes** 49:23 | 113:18 127:5,7 | 229:4 230:9 | 145:25 150:9 |
| 245:7 | **circumstances** | 231:11,16,21 | 150:24 151:8 |
| **changing** 44:14 | 32:19 59:3 | 232:3,6 234:16 | 159:25 180:5 |
| **chapter** 1:2 | 94:15,16 96:15 | 234:18,19 | 180:19 186:11 |
| 4:13 63:23 | 101:3 115:24 | 235:25 236:12 | 188:7,11,22 |
| 228:6 | 116:14 126:23 | 236:13,21,25 | 189:20 190:6 |
| **character** | 128:3,5 129:7 | 237:1,5,6 | 191:9,16 |
| 70:19 | 136:11 140:4 | 238:19,25 | 195:16 211:13 |
| **characterizati...** | 147:25 156:13 | 239:2,12,18,22 | 214:6 218:2,4 |
| 92:5 103:2 | 156:25 157:5 | 240:1,13,18 | 218:6,7,14,17 |
| 185:25 187:23 | 162:16 172:5 | 241:8,8 | 242:9,18,24 |
| **characterize** | 174:20 175:6 | **claimant** 139:8 | 243:1,12 |
| 24:20 71:6 | 182:24 185:1 | 228:14,24 | 244:14 |
| **characterized** | 186:19 193:13 | 229:4,8,16,24 | **clauses** 180:22 |
| 149:15 | 226:4 230:11 | 230:9 | 180:25 186:9 |
| **charitable** | 232:20 233:21 | **claimants** 12:5 | 188:8 195:22 |
| 131:10 | 238:13 | 143:14 | 241:23 242:21 |
| **check** 61:19 | **citations** 141:8 | **claims** 10:24 | **clc** 36:19 |
| 99:2 105:5,6 | **cite** 97:23 98:2 | 221:22 222:2,3 | **clear** 5:9 27:7 |
| 138:3 168:8,10 | 98:6,7 124:3 | 223:14 230:8 | 33:13 52:18 |
| 169:17 198:14 | 136:9 | 240:20,24 | 63:7,8 85:14 |
| **checked** 23:7 | **cited** 30:21 | **clarification** | 86:4 110:3 |
| **checking** 207:9 | 34:15 36:13 | 8:17 17:15 | 116:4 118:8 |
| **chosen** 95:21 | 38:25 239:23 | 89:4 | 125:23 126:3 |
| **chris.harris** | **citing** 152:21 | **classic** 129:5 | 126:12 135:21 |
| 2:13 | **civ** 38:4 | 132:10 133:10 | 141:14 148:8 |
| **christopher** | **claim** 22:15 | 196:3 203:17 | 150:11 188:16 |
| 2:13 | 23:3 53:12 | 204:5 | 195:17 208:11 |
| **circumference** | 54:7 95:15,16 | **clause** 35:25 | 221:4 224:16 |
| 114:7 | 139:24 160:3,4 | 36:5 38:11,20 | **clearly** 118:12 |
| | 199:13 222:9 | 41:8,9 81:21 | 129:7 189:7 |

194:17 205:7
**clerk** 3:5 20:1
**client** 19:5
**cloakroom**
204:6,9,12
**closed** 16:4
**coat** 203:18
204:6,11,12
**code** 73:21
108:12,14
**coffee** 19:21
**cofounder**
86:18
**coins** 147:1,1
**collateral** 76:9
76:20
**collection**
219:23 220:3
220:20 221:11
**collective** 80:16
87:8 174:25
**collins** 102:13
102:19 103:5
103:21 114:20
179:20
**collins's** 103:25
**color** 137:21
140:11
**come** 8:4 130:6
130:21 131:16
131:17 147:21
202:21,22
235:5,13

**comes** 130:19
131:1 194:8
197:3 214:9,10
**coming** 130:14
146:17 158:2
192:9
**comment** 70:4
87:17 108:4
109:11 133:16
**comments**
41:19 183:9
**commerce**
199:22 202:7
**commercial**
15:6 17:17
39:15,16,23
40:7 103:11
139:4 187:17
189:17 202:15
220:19
**commercially**
219:25
**commingled**
25:16 35:6
92:13 119:17
120:3,20 121:1
137:9 142:15
154:19 226:15
**commingling**
83:23 84:13
148:18 177:2
178:6 224:10
224:20,24
225:16,24

226:5,19 227:2
227:5,8,11
230:23
**commission**
122:4 126:9
193:6 194:9,18
197:24 202:8
202:21 245:24
248:23
**commission's**
122:15 193:2
196:17
**committed**
232:24
**common** 35:6
40:3 103:23
127:17 134:10
136:4 138:18
154:22 198:17
199:17,22
**commonsens...**
220:1
**companies**
133:14
**company**
116:18 160:24
160:25 162:20
162:22 163:9
163:13 171:9
172:4
**compensation**
233:9 234:11
234:16 235:24
236:7,8,24

238:23 239:25
**complete** 23:9
23:11,16
152:14
**completeness**
107:6
**complex**
146:16 229:5
**complexities**
146:21
**complexity**
146:10
**compliance**
215:17 216:9
**complicated**
145:11 164:1
**complying**
133:2
**compressed**
176:4,8
**comprise** 57:21
**concept** 119:24
120:1 121:12
121:22 122:14
149:18,25
180:20 196:2
200:9 201:1
**concepts** 122:6
123:5 129:3
198:13 201:9
201:24 202:25
203:2
**concerned**
101:10 183:5

197:19
concerns   17:21
conclude
   137:20 158:20
   193:8 194:6
   207:16,23
concluded
   136:25 199:10
   208:2 244:22
concludes
   109:22 244:20
conclusion
   17:25 18:1
   26:7,21 35:10
   108:4 146:17
   146:23 147:21
   171:25 177:19
   178:11,17
   179:9,19 181:3
   183:17 197:23
   198:14,19,22
   199:3,4,12,23
   238:22
conclusions
   25:25 88:12
   237:19,25
condition   225:9
conditions   11:2
   213:12
conduct   160:17
   222:8
conducted
   59:15 179:22
   224:10,24

conference
   43:13 44:5,18
confidential
   1:9 5:23 6:10
confirmation
   5:12 6:5
confusing
   135:10 193:9
connection
   11:1 21:18
   37:22 46:17
   49:2 104:25
   184:20 223:15
   227:15
conrad   199:7
consensus
   124:12,18
consequence
   228:2,8
consequently
   102:19
consider   50:14
   50:19 82:21
   96:23 100:14
   125:9 162:10
   197:20 208:5
   228:12 236:4,6
consideration
   45:19 68:16
   106:17 158:18
considered
   26:23 68:21
   119:3 146:10
   223:15 235:11

considering
   102:15 103:3
   103:18 173:22
   228:20
consistent
   148:13 149:21
   149:25 150:5
   150:14 151:16
   152:4,22 153:6
   153:8 175:9
   240:7
consistently
   153:23
consolidated
   164:14
constitute
   138:21 188:13
construction
   39:5,16,20
   40:11,24 96:18
   98:1,13 104:9
   147:10 154:13
   156:21 171:3
   189:17 218:2,6
   220:9 221:7,12
   242:21 244:9
constructive
   57:12,17,23
   58:1,4,8
construe   96:8
   101:10 110:11
   110:24 128:13
   192:4

construed   97:5
   114:13 155:11
   183:23 243:13
construes
   153:20
construing
   103:15
consultation
   122:19
consumer   26:5
   101:8,9
cont'd   117:8
contact   19:15
contain   23:8
   29:7 81:6
contained
   51:11
contains   35:2
contemplation
   213:19
contemporary
   199:17
contention   83:3
   207:21
context   13:9
   51:8 65:19,25
   83:22 96:23
   97:2,8 100:2
   101:9 117:23
   118:11 126:12
   128:22 131:10
   161:24 170:22
   173:23 174:3
   175:3,18

CONFIDENTIAL

179:21 180:2
180:12 183:18
183:24 184:15
185:6 193:1
201:2,11 205:3
235:7
**continue**   4:5
85:15 93:13
**continued**   3:1
44:11
**continues**
184:6
**continuing**
53:19 76:25
81:16
**contract**   39:22
41:1 52:25
53:1 54:6 55:9
59:5 96:23
97:10 98:19,20
99:24 100:6,10
100:15,25
101:4,5,8,11,14
102:16 103:4
103:15 111:12
111:19 112:1
112:22 116:11
118:17,20
120:12 121:13
121:14 123:4
125:23 126:18
129:22 130:9
133:7 147:10
151:5 156:22

159:6 165:11
182:25 186:6
186:11 213:21
214:3,9 220:10
220:12 222:14
223:16,19
224:3,13,23
225:2,9,14,22
226:16 227:3
227:16 230:7
231:2 234:13
**contracting**
100:24
**contracts**   17:7
17:8 39:6,16
40:15 114:9,10
114:14
**contractual**
10:25 16:2,4,5
16:15 35:13
38:12 43:25
229:1,3 230:5
230:21 243:20
**contradistinct...**
203:1
**contrary**
181:10 224:23
226:4
**contrast**   136:22
**contribute**   37:3
**contributed**
37:17 182:22
185:21

**contributions**
37:11
**control**   26:9,22
129:18 174:2
175:25 193:14
193:24 194:6
194:22 195:2
200:13 201:25
203:9,12,13,15
203:22,23
204:1,3,7,10,15
204:25 205:10
**controlled**
212:9 215:10
**controller**
154:5
**conversion**
199:13 232:7,9
232:19,25
**convey**   180:19
**cooperative**
188:14
**cope**   240:9
**copy**   23:1
27:18,25 28:11
28:17 61:15
**corp**   101:25
102:5 246:15
**corporate**
148:15
**correct**   15:3
17:18,19,23,24
18:5,6,12,21
19:3 21:22

28:20 29:12
44:22 45:3,9
45:22 46:6,7
46:11,14 47:19
47:20,21 48:1
48:18,23 49:3
49:13,20 50:3
51:3,24,25
52:10 55:5
56:2,20,22
57:6 70:25
71:7,16,17,21
71:22 72:1,2,6
72:7 77:6,19
78:10,24 80:7
82:8,16 84:6,7
84:22 89:17,18
89:22 90:3,23
91:6 92:19,20
94:21 95:8,9
95:22 96:2,20
97:6 98:22
99:17,21 101:6
102:25 104:13
104:14 109:16
109:18 110:7
111:7 112:2
113:7,8 115:3
115:21 117:12
118:14,21
119:5 122:17
122:23 124:8
125:21,22
126:1,15,20

CONFIDENTIAL

**[correct - courts]**                                    Page 17

| | | | |
|---|---|---|---|
| 129:3 132:22 | 218:10 219:11 | 9:17,21 13:18 | 161:9,12,13 |
| 135:9 136:12 | 220:17 223:16 | 13:21 14:5,9 | 162:2,10 163:2 |
| 138:1,2 140:15 | 223:17 225:17 | 14:16,19,22 | 163:3,5 164:3 |
| 141:12 142:12 | 226:16 227:16 | 15:1,11 17:17 | 172:5 182:11 |
| 145:5,12 147:7 | 228:15 229:19 | 18:18 20:18 | 186:10 187:21 |
| 153:3,16 154:3 | 231:19 232:7 | 23:20 24:9,25 | 188:2,9,21 |
| 155:4,15 156:2 | 232:11,12 | 28:8 29:9,14 | 192:7,13,22 |
| 156:8,14 157:3 | 233:5,12 | 29:17,24 34:25 | 195:4,7 196:4 |
| 158:9,10 | 237:22 238:25 | 36:24 38:2 | 196:19,24 |
| 159:14 169:14 | 239:1,4 240:1 | 39:3,13,21 | 197:2,3,11,14 |
| 170:13,16 | 240:2,4 241:15 | 40:3 41:3 45:1 | 197:15,17,18 |
| 171:21 172:21 | 241:25 242:1 | 47:12,23 48:17 | 197:22 198:2,5 |
| 173:1,9,20 | 244:7 | 48:21 58:23 | 198:9,16,21,23 |
| 175:19 176:1 | **corrections** | 59:9,14 96:6 | 199:1,10,23 |
| 177:3,17 | 245:7 | 96:12 98:15 | 200:12,25 |
| 178:15 181:3 | **correctly** | 101:21 102:4 | 201:10,17 |
| 184:10,14 | 149:15 | 102:15 104:16 | 202:3,18 |
| 185:19 186:14 | **corus** 38:3 | 104:22 106:24 | 226:13 228:12 |
| 186:15,16 | **costs** 220:20 | 107:11,19 | 228:17 229:6 |
| 187:3,4 188:4 | 221:10 | 108:7 109:2 | 229:12,24 |
| 188:5 189:14 | **counsel** 4:9 | 110:24 113:10 | 230:13 232:15 |
| 190:9 191:3,22 | 5:20 19:1,4,10 | 119:10 125:24 | 232:17,17 |
| 192:14 194:14 | 27:17 28:11 | 126:19 128:13 | 234:22 235:3 |
| 195:8 196:24 | 34:1 | 135:7,18 | 235:16,23 |
| 198:6,23,24 | **counsels** 4:24 | 136:10,24 | 243:14 246:17 |
| 199:5 201:21 | **counterparty** | 137:23 138:16 | 246:23 |
| 204:16 206:13 | 149:8,12 | 139:4,22 | **court's** 36:25 |
| 207:7 208:7,20 | **course** 107:14 | 140:13,25 | 38:1 40:10 |
| 209:1 210:9 | 197:15 230:17 | 141:2,4 142:12 | 41:20 95:19 |
| 211:4 212:16 | **court** 1:1 4:12 | 147:20,20 | 111:4 161:11 |
| 212:24,25 | 4:18 5:1,16,22 | 153:20,24 | **courts** 41:7 |
| 213:13,25 | 7:16,18,19,22 | 154:15 156:16 | 96:20 97:12,15 |
| 214:20 217:10 | 7:23 8:2,7,14 | 157:19 159:1 | 101:8 123:14 |
| 217:15,16 | 8:25 9:3,6,8,11 | 160:2,13,17,18 | 137:4,12,16 |

CONFIDENTIAL

**[courts - damages]**                                        Page 18

| | | | |
|---|---|---|---|
| 139:17 140:17 | **critical** 179:8 | **custodian** | 213:11 219:2,6 |
| 144:6 193:19 | 181:22 188:17 | 26:10 127:12 | **customers** 37:9 |
| 194:5,11 | **criticism** 221:3 | 127:17 132:10 | 69:22 74:3,16 |
| 196:13 202:12 | **cromwell** 1:14 | 132:25 133:9 | 74:20 75:3,20 |
| **covered** 208:9 | 2:2 4:15 6:14 | 133:11 134:4 | 80:18,24 87:1 |
| **craven** 36:19 | **cross** 12:15 | 134:17 143:9 | 91:24 92:23 |
| **created** 91:24 | 29:17 30:13 | 161:7,14 | 93:12,18 |
| 92:23 126:20 | 31:3,11 33:25 | 166:18 182:9 | 104:13 109:15 |
| 126:25 127:19 | 36:24 | 183:1 185:2,14 | 110:6,14,25 |
| 128:23 132:21 | **crypto** 15:20,24 | 185:18,23 | 113:20 114:3 |
| 143:8 144:17 | 16:17 25:22 | 186:1,12,17,21 | 114:25 134:25 |
| 144:25 147:5 | 26:15 32:22,23 | **custodian's** | 136:3 138:1 |
| 152:23 153:7 | 80:17 123:17 | 26:17 94:14 | 140:14,20 |
| 157:23 162:2 | 123:21 124:1 | **custodians** 26:4 | 142:7,16 161:4 |
| 165:11 170:21 | 126:7 | 133:12 | 169:16,22 |
| **creates** 127:15 | **cryptocurren...** | **customer** 25:22 | 170:3,7,12 |
| 141:25 | 123:8 139:6,20 | 26:12,13,19,22 | 171:5,20 |
| **creating** 125:25 | **cryptocurrency** | 26:24 35:4 | 176:20 177:1 |
| 131:21 | 15:15 17:13 | 51:18,20 67:12 | 178:6 204:14 |
| **creation** 115:25 | 193:16 | 67:24 68:5 | 204:25 210:8 |
| 119:15 137:8 | **cryptopia** | 81:7 86:25 | 210:16,24 |
| 143:3 149:1 | 34:20 | 87:3 93:7 | 211:19 |
| 153:18 154:11 | **cuff** 235:9 | 94:18 95:5,6 | **cut** 93:16 |
| 155:22 156:12 | **currency** 66:10 | 115:8 129:11 | **cy** 131:14 |
| 184:24 | 68:9 72:14 | 132:12 156:6 | **d** |
| **credit** 94:10,14 | 92:25 93:1,3,8 | 174:10,15,16 | |
| 227:10 | 93:19 94:1,6 | 175:7 191:2 | **d** 2:5 79:7,13 |
| **credited** 65:6 | 94:10,17 | 200:14 205:15 | 79:14,15 89:5 |
| **creditor** 12:5 | **currently** 14:15 | 211:2 213:22 | 90:8 180:3 |
| 93:4 95:16 | 14:23 15:3,5 | 213:23 218:9 | 246:1 |
| 160:3 231:12 | 21:11 | 243:3 | **damage** 229:14 |
| **creditors** 10:24 | **custodial** 26:8 | **customer's** | 229:15 |
| 233:12 236:2 | 26:11 131:22 | 68:22 74:5 | **damages** |
| | 132:3,7,22 | 86:11 87:6 | 228:15,24 |

**[damages - deed]**                                                    Page 19

| | | | |
|---|---|---|---|
| 229:2,9,17 | 167:20 195:8 | **debating** | 181:25 182:15 |
| 230:3,5,10,14 | 196:24 225:15 | 196:10 | 182:16,19 |
| 230:19,22 | 225:16,20,22 | **debit** 218:9 | 184:21 |
| 231:9 234:13 | 226:1,13,14,25 | 219:7,16 | **decisive** 203:19 |
| 241:21 243:7 | 227:6 234:24 | 220:22 221:1,2 | **declaration** |
| **dame** 6:17,19 | 240:5 248:3 | 221:14 | 8:10 22:13,18 |
| 6:22,24 12:22 | **dated** 43:18 | **debtor** 59:11 | 24:7 25:8 27:1 |
| 14:14 17:15 | 105:3 | 93:4 95:16 | 29:11,20 32:13 |
| 18:9 22:14,19 | **dates** 111:18 | 109:10 116:18 | 32:22 34:15 |
| 22:22 27:19 | **dawn** 1:15 4:18 | 158:22 160:24 | 35:20 39:1,5 |
| 28:16 33:3 | 247:3,21 | 160:25 170:25 | 47:2,22 51:2 |
| 45:16 52:14 | **day** 10:13 | 171:15 179:22 | 53:5,18 55:4 |
| 53:6 55:18 | 192:10 195:23 | **debtor's** 40:1 | 56:13 61:10 |
| 60:4 77:24 | 245:19 247:17 | 103:13,16,20 | 67:1,6 86:21 |
| 81:14 102:2 | 248:20 | 107:23 108:10 | 92:8 110:5 |
| 104:19 105:17 | **dbe** 22:14,19 | 109:1 114:22 | 117:14 125:14 |
| 105:25 117:9 | 246:11 | 148:1 156:20 | 129:14,22 |
| 165:7 167:21 | **deal** 137:13 | **debtors** 1:6 | 130:3 131:19 |
| 172:12 178:12 | 176:15 181:6,7 | 148:12 | 134:20 144:20 |
| 206:5 235:1 | 207:11 223:22 | **december** | 144:23 157:2 |
| 237:12 241:12 | 227:13 238:14 | 164:15,16 | 158:17,20 |
| 246:10 | **dealing** 74:19 | **decide** 229:6 | 159:15 167:9 |
| **danger** 217:9 | 74:21 75:2 | **decided** 17:2 | 168:15 178:14 |
| 217:22 | 146:19 165:18 | 123:14,17,25 | 187:1 199:9,25 |
| **darby** 2:8 | 191:4 194:19 | **deciding** | 246:10 |
| 138:14 139:20 | 212:11 223:25 | 157:20 229:5 | **declare** 134:23 |
| 149:14 | 224:5 225:25 | **decision** 38:1 | 135:15 136:1 |
| **date** 22:21 | 226:22 227:7 | 39:12 109:6,24 | **declared** |
| 25:11 28:15 | 232:22 | 120:5 124:7 | 137:24 |
| 62:11,23 69:18 | **deals** 214:18 | 125:5 138:13 | **declined** 46:18 |
| 99:11,19 102:1 | **dealt** 242:1 | 156:17 170:17 | 47:3,4 |
| 104:18 105:1 | **debate** 31:4,9 | 198:3,5 235:17 | **deducting** 83:6 |
| 107:22 111:14 | 57:16 58:4 | **decisions** | **deed** 195:18 |
| 114:12,16 | 193:11 241:22 | 135:23 181:16 | |

**deem** 220:16
**default** 126:19
  126:21
**defaulting**
  217:9,23
**defendant**
  139:12
**defendants**
  139:6,19
**deficit** 143:1
**define** 16:21
  73:17 186:17
  219:9 230:4
**defined** 53:11
  63:24 184:9,12
  186:21 241:19
**defines** 190:7
**defining** 57:20
**definitely** 244:2
**definition**
  108:25 185:17
  214:9
**degree** 203:25
  226:11
**delaware** 1:1
  4:12 24:12
**delete** 95:3
**deliberate**
  83:24 84:4,9
  84:20,22
**deliberately**
  85:1
**deliver** 132:13
  132:17

**delivery** 165:22
  166:2
**demand** 76:7
**demonstrate**
  31:5 32:17,24
  35:4 153:10
  161:3
**demonstrates**
  37:2 38:17
**depend** 49:22
  50:4 82:11
  162:15 165:17
  171:7 215:6,6
  222:13 225:19
**dependent**
  121:19 143:8
  172:1 177:7,11
  177:20,24
  178:18 185:24
  186:1 223:12
  233:20 237:19
  237:24
**depending**
  75:17 96:24
  127:4 157:11
  217:1 242:20
**depends** 16:21
  54:11 96:15
  97:9 101:2
  103:24 118:11
  119:7 126:22
  127:3,21 128:2
  128:5,6 160:22
  171:16 174:3,6

186:16 197:1
  219:4,9 226:17
  226:24 227:1
  230:4,17
**deployed** 12:13
  13:9,24
**deponent** 245:1
**deposed** 6:25
  7:3,4,7 8:20
  169:5
**deposited**
  79:10 80:1
  176:10,12
  205:20
**depositing**
  175:23
**deposition** 1:11
  4:8,14,25 5:15
  7:6,8 8:5,18
  24:4 27:21
  133:17 168:17
  169:3,20,24
  244:22 245:6
  248:3
**depositions**
  23:14
**deprivation**
  238:16 239:10
  240:12
**deprive** 182:11
**deprived** 237:2
  241:3,7
**depriving**
  243:14

**deputy** 138:16
**derivative** 17:5
  17:7
**derive** 182:11
**derives** 145:7
**describe** 92:18
  131:19,20
  136:11 156:5
  223:8
**described** 54:1
  136:19 149:20
  188:3
**describing**
  61:10 199:12
**description**
  186:4 246:9
**designate** 5:21
  6:9
**designation**
  184:25
**despite** 161:18
**destroy** 133:2
**destroyed**
  224:11,25
  234:5
**destroys**
  227:11
**detail** 30:19
  202:9
**detailed** 30:1,4
  30:12 40:1
  103:21
**details** 11:22
  178:20

| | | | |
|---|---|---|---|
| **determination** 141:11 217:12 217:14,24 | **dictating** 44:17 **differ** 61:2 **difference** | 16:20,22 17:4 17:9 25:16 26:4,5 43:16 | 176:19 182:5,9 184:13 188:19 190:23 191:5,9 |
| **determinative** 52:12 203:20 | 57:16,24 58:8 62:11,18 63:16 | 43:25 63:3 68:1,8 72:23 | 191:10,14 192:5 193:4,15 |
| **determine** 17:3 197:7 226:15 229:7 | 63:18,19 65:11 83:15 155:17 189:16 | 73:13,23 74:25 79:9,23 80:3 85:24 86:25 | 193:18,25 194:6,13,23 195:2,6 196:21 |
| **determined** 217:21 228:22 | **differences** 61:8 | 87:7,24 91:25 92:13 93:7,10 | 197:8 198:4 199:10,18 |
| **determines** 203:24 217:7 229:13 | **different** 27:15 32:20 41:3 53:10 101:19 | 93:18,21 94:19 95:6 107:20 108:9 109:8 | 200:11,20 201:2,12,20 202:1,1,11 |
| **determining** 172:8 228:13 230:1 | 110:19,20 112:9 113:15 113:17,20,25 | 122:8,16 129:12,18 134:3,9,16,24 | 203:6 204:15 205:16 211:14 211:25 212:7 |
| **develop** 119:10 196:14 200:8 201:1,24 | 114:3,13,17 115:7,7 121:3 122:12 124:8 | 135:16,23 136:2,5,15,16 137:6,25 138:5 | 212:11,15,23 215:8 217:3 224:20 232:19 |
| **developed** 118:25 119:8 242:11 | 130:8 140:1 163:4 165:17 179:18,19 | 138:19,21 140:7,14,21 142:15 143:12 | 238:4,11 243:5 246:18,20,20 **direct** 109:3 |
| **developing** 202:14 | 195:14 212:8 214:8 215:9 | 143:21,23 147:22 150:8 | 218:15 241:2 242:25 |
| **development** 119:22,23 120:16 200:10 200:19 | **differently** 101:21 113:21 114:3 | 150:12,17,23 151:10,14 152:1 153:11 | **directed** 182:23 183:20 185:10 **direction** 24:2 |
| **developments** 119:2 120:9 202:6 | **differs** 62:8 **difficult** 147:19 240:9 | 153:16 154:18 154:21 155:2 165:21 167:16 | 133:5 202:24 **directions** 41:3 132:15 |
| **dhabi** 14:15 **dicing** 186:18 | **difficulty** 141:24 **digital** 11:13 15:16 16:6,12 | 167:17,18,23 167:24,25 174:7,12,21,23 175:23 176:18 | **directly** 18:24 73:11 **director** 163:19 |

CONFIDENTIAL

**[directors - draft]**                                          Page 22

| | | | |
|---|---|---|---|
| **directors** 86:17 163:13 | **disposition** 203:6 | 106:8,11,16 107:8,15,17 | 77:19 86:2 87:22 88:11 |
| **disagree** 111:9 155:8 | **dispute** 15:25 16:25 196:12 | 151:24 152:17 153:24 167:14 | 91:24 92:22 94:2,8 99:8,15 |
| **disagreement** 112:17 | 208:21 | 167:15,23 168:4,11 | 99:23 100:14 104:11 106:24 |
| **disclaimer** 181:23 182:13 183:3 | **disputes** 15:18 16:19 | 169:23 170:4,8 170:11 171:20 | 109:14 110:13 112:14 114:25 |
| **disclaiming** 162:13 181:9 | **disputing** 64:16 64:18 65:1,1 | 172:6 235:20 246:13,15,18 | 115:15,19 119:1 131:21 |
| **disclose** 18:3 | **disregard** 70:18 186:9 | **documents** 27:23 33:4 | 134:2,15 146:1 146:6 147:5 |
| **disclosed** 49:9 | **distinction** 63:15 130:13 | 43:12 50:10 | 148:24 153:5 |
| **disclosing** 18:7 | 130:16 | 56:7,12 76:19 | 154:14 156:4 |
| **disclosure** 10:7 10:18 | **distinguish** 30:6,24 | 76:24 81:25 82:3 85:23 | 156:22 157:17 157:22 184:10 |
| **discounting** 90:20,25 | **distorted** 180:16 | 86:1 105:7,11 105:14,20 | 187:3 189:22 207:18,25 |
| **discretion** 217:8,14 | **distorting** 40:6 | 106:15 | 208:3,6,18,22 |
| **discuss** 178:13 223:19 231:15 | **distributed** 108:17,20 | **dog** 190:5 **doing** 33:6 | 211:1 212:14 212:21 213:10 |
| 232:6 233:5 | **distributions** 151:2 | 84:25 95:25 152:6,7 173:21 | 214:14 218:8 241:11 |
| **discussed** 30:18 44:4 124:11 | **district** 1:1 4:12 | 180:14 189:7 190:4 198:5 | **double** 85:11 221:5 |
| 157:3 158:3 177:15 180:22 | **divided** 185:13 **divorce** 96:22 | 200:24 201:3 **dollar** 67:19 | **doubt** 146:4 **downtime** |
| **discusses** 92:17 | **document** 27:6 34:23 52:8 | 72:12,18,22 73:15,23 75:1 | 212:4 213:4 214:7 |
| **discussing** 60:19 77:25 189:11 225:13 | 69:15 79:18 87:24 96:9 | 219:1,5,10,16 **dollarized** 68:6 | **draft** 28:23 42:2,13,16,24 |
| **discussion** 230:24 | 97:9 101:24 104:23 105:2,3 105:9,21 106:2 | **dollars** 72:24 **dollar's** 67:19 **dotcom** 48:8 68:25 69:8,13 | 43:4 44:3,19 53:16,20,24 |

**drafted** 27:9
28:25 53:21
**drafting** 29:3
44:7,10 96:25
**drafts** 43:7
**draw** 34:21
37:24
**drawn** 37:7
**draws** 194:22
**duly** 5:5 247:7
**duties** 36:6
183:15 224:14
225:2
**duty** 18:17

**e**

**e** 5:4,4,4 51:25
80:12 81:6
117:3,3,3
131:18,24,25
246:1,7
**earlier** 7:11
73:6 77:16,25
112:10,14
114:16 156:10
157:3 168:5
170:9 177:16
180:23,23
183:8 205:13
208:10
**easily** 129:14
**economic** 26:12
**effect** 38:12,14
108:5 111:7

113:6 193:22
195:15,17
**effective** 99:16
119:1
**effects** 75:15
**either** 6:22 17:2
24:3 34:6
57:22 124:22
163:21 172:18
173:11,13
198:25 199:20
234:11
**elected** 97:14
97:18
**elements** 97:1
231:20
**elizabeth** 1:12
4:8 6:18,21,22
6:24 12:22
14:14 17:15
18:10 22:14,19
22:22 27:20
28:16 33:3
45:16 52:15
53:6 55:18
60:4 77:24
81:15 102:2
104:19 105:17
106:1 117:9
165:7 167:21
172:12 178:12
206:5 235:1
237:12 241:12
245:14 246:4

246:10 248:3
248:18
**emphasize**
61:13 171:23
**employed**
21:22,24 22:1
**enable** 134:6
172:5
**encompass**
124:25
**endeavor** 41:7
**ends** 183:25
**engagement**
21:13,17,19
**engagements**
20:15 22:4,9
**england** 15:12
38:2 123:14
125:6
**english** 12:19
17:17 40:10
47:11,16,18,23
58:3 70:12
95:19 97:12,15
99:18 100:5,24
109:7,24,25
110:22,23
111:4 114:5
119:9 121:11
121:15 123:10
123:18,25
126:17 134:22
135:7,13,17,23
136:9,13,21,24

137:5,23
138:14,24
139:16,22
140:13,17,25
141:2,3 147:13
155:11 157:12
159:1 160:12
160:13,17,18
161:9 162:10
164:3 182:11
185:14 186:9
187:13,21
188:1,9,21
192:6,13,22
193:7,19 194:5
194:11 195:7
196:5,13,23
197:2,17,18,22
198:6,12,23
199:2 200:8,12
200:25 201:10
201:17 202:3,4
202:12,14,18
202:25 203:3
208:12,19
209:3 217:17
222:7,20
223:10 226:12
226:12 227:19
228:11,17
240:11,15
241:25 242:17
242:22 243:13

| | | | |
|---|---|---|---|
| **enrichment** 231:16,21,25 232:4 | **entitlements** 80:17 142:16 | 235:24 236:8 236:23,24 | 248:2 |
| **ensure** 132:16 | **entity** 188:14 | 238:3,10,23 | **europe** 40:20 |
| **entered** 59:19 | **entry** 25:21 | 239:25 | **evaluate** 82:14 |
| 98:19 99:8 | 55:8,15,21 | **equity** 35:15,19 | **event** 70:3 |
| 111:13,19 | **envisaged** | 183:11 236:22 | 140:25 141:7 |
| 112:2,5 114:11 | 194:17 | 243:11 | **events** 208:23 |
| 114:15,25 | **equals** 150:3 | **errata** 245:8 | 209:5 |
| 118:20 120:13 | **equitable** 25:15 | 248:1 | **evidence** 14:11 |
| 122:23 149:9 | 35:5 36:4 | **esq** 2:5,7,8,13 | 24:11 86:15 |
| 157:17 | 43:23 58:25 | 2:14,17,19,22 | 87:14,16,18 |
| **entering** 54:23 | 85:2,18 86:6 | **essentially** | 88:10 133:23 |
| 56:6 59:4 | 87:6 88:19 | 187:7 | 142:19 160:8 |
| 77:18 78:2 | 92:12 93:9,20 | **est** 4:3 244:19 | 171:7 |
| 123:4 | 94:12 109:3 | **establish** 59:16 | **evidential** |
| **entirety** 82:23 | 116:1 119:15 | 232:3 | 58:16 77:13 |
| 107:17 108:3 | 126:25 127:13 | **established** | 78:14 |
| 111:6 205:7 | 127:15,19 | 77:15 103:19 | **ewca** 38:4 |
| 241:14 | 128:12,18,21 | 112:1 118:19 | **ewhc** 40:21 |
| **entitled** 1:13 | 129:6,16 137:8 | 119:14,18 | **exactly** 75:25 |
| 37:10 50:9 | 143:13 144:16 | 125:4 194:25 | 164:2 |
| 167:16,23 | 145:4 150:3,16 | 197:5 | **examination** |
| 186:7 205:15 | 153:15,19 | **establishes** | 6:11 30:13 |
| 208:24 216:23 | 154:11,23 | 107:20 108:9 | 31:11 117:8 |
| 228:14,25 | 155:1,7,12,24 | **establishing** | 246:3 |
| 229:8 233:22 | 172:21,25 | 179:23 | **examined** 5:6 |
| 234:9 238:13 | 173:9,16 | **establishment** | 12:15 29:17 |
| 246:18 | 175:10,11 | 131:6 155:21 | 31:3 33:25 |
| **entitlement** | 180:7 183:13 | **estate** 108:10 | 36:24 117:4 |
| 126:7 143:13 | 203:2 225:6 | 228:7 | **example** 5:17 |
| 205:8 217:2 | 226:23 227:11 | **estates** 107:23 | 29:18 32:16,21 |
| 218:3 229:15 | 228:3,9 231:5 | 109:2 | 55:19 76:20 |
| 238:6 243:20 | 233:9,14 | **et** 1:5 4:10 63:4 | 101:7 112:4 |
| | 234:11,15 | 183:3 221:11 | 114:10 118:1 |
| | | | 120:7 121:7 |

125:7 128:15
128:24 129:5
131:3,15
132:10,23
133:11 144:19
144:22 145:11
147:2 151:9
159:24 162:13
162:17 185:5
196:3 204:5
211:12 228:25
230:6
**examples**
131:17
**excellent**  34:23
**except**  102:22
189:3,8 245:6
**exception**
198:8
**exceptions**  34:9
**exchange**  17:8
51:16 59:5
64:1,8 65:6,12
66:10 67:12
68:2,5,21
73:21 74:3,15
74:21 75:2,9
75:12,15,16,17
75:18,21,24
76:8 77:3,13
78:18,22 79:2
91:25 92:15,24
93:8,20 100:12
108:25 110:15

111:1 112:6
118:4 129:8
134:7,12,23
135:14,25
137:25 142:17
143:2,10 145:2
145:10,15
146:11,19
147:11,15,16
147:17,24
149:16 150:4,8
152:6 154:21
158:5 165:14
165:16,18,19
165:19,20,20
165:23,24
166:6,8,9,20,22
167:2,8 168:21
170:24 171:15
174:9,23 175:5
175:21,24
176:13 178:21
178:25 179:6
179:11,15
182:6,10,23
184:14 185:20
188:20 190:1
194:3,4 195:20
200:11,20
201:2,13,20
202:2 205:14
214:20
**exchange's**
166:15

**exchanges**
75:13,22
107:21 134:11
**exchanging**
184:17
**excluded**  14:5,9
14:10 242:23
**exclusion**
241:23 242:18
243:12
**exclusive**  29:13
124:22,24
**exclusively**
100:22 241:19
**exercise**  50:24
81:20 83:13
**exercised**  82:5
82:11 204:3,7
217:18 219:21
**exhibit**  22:12
22:12,18,23
23:19 24:17,20
25:1 28:10,13
28:17,22 29:4
29:7,20,22
32:14 41:24
42:7 45:17
50:21 51:10,23
61:12 69:11,15
101:23,24
102:3 104:15
104:20 159:13
167:15,22
234:21 235:2

246:10,12,13
246:15,16,18
246:22
**exhibited**  86:21
**exist**  127:1,6,20
232:14
**existed**  140:19
141:11,20
**existence**  59:17
130:7,14,18,20
130:22 131:1
131:12 139:24
144:2 172:10
181:11 200:15
**existing**  196:14
196:15
**exists**  136:8
137:20 141:3
179:24
**expand**  165:15
195:6
**expect**  9:24
38:19
**expert**  1:12 8:9
8:24 9:9,13,16
9:20 10:2,5,17
10:20 11:5,11
11:16 12:16,24
13:8,11,16
14:3,8 18:10
18:14,16,18
20:8,18 23:1
25:24 28:2
48:16 160:8,11

CONFIDENTIAL

**expires** 245:24
248:23
**explain** 24:23
43:3 52:17
58:22 61:7
117:21 128:4
132:6 140:16
211:22
**explained**
156:11 176:4
193:1
**explains** 194:9
**exploring**
136:6
**exposure** 89:12
90:14 91:13
**express** 74:8
87:9,10 88:21
93:2 95:22
239:9 242:15
242:24
**expressed**
17:21 44:2,6,8
110:5 129:14
186:6 242:13
242:14 244:13
**expressing**
57:22 91:1
92:4 121:25
122:1 208:25
209:8 222:5
223:10
**expression**
42:12 167:2

189:3
**expressly** 51:16
189:3,8
**extend** 232:10
**extended**
162:21,21,25
163:12,15
**extensive** 34:19
**extenso** 232:2
**extent** 29:13
30:8 83:3
85:13 98:25
109:7,8 114:21
208:1 209:6
231:9
**extracted** 139:7
**extremely**
202:3,12

**f**

**face** 39:25
**faced** 135:8,19
**facilitate** 166:7
**fact** 13:21,24
41:13 62:6
63:15 64:19
65:2,16 68:14
69:2 70:13,14
70:18 71:8
78:12 80:4
82:5 84:5 85:7
86:24 87:15
89:17 99:12
101:4 102:21

106:3,12
116:18 121:2
124:19 127:12
128:11,14,19
135:6 140:6,12
143:14,18
144:3,4,13
148:16 150:10
150:22 157:12
160:11 162:1
163:23 164:1
170:2,7 172:9
177:8,9 178:5
179:18 183:10
186:13 191:6
197:5 199:1
204:23 207:12
216:21 217:1
217:21 232:23
235:25
**factor** 172:1
178:10 179:8,8
**facts** 30:24
32:25 45:3
51:9 52:2,3,4
53:22,23 54:22
55:1,10,12
56:8,11,14,17
57:5,10,12
58:11,19 70:4
70:24 71:6,12
71:14,20,23,24
72:3 74:11
76:2 77:3,7,12

77:17 78:2,21
78:24 82:22,23
106:18 116:9
116:15 127:4
133:25 142:19
145:14,23
146:8 160:12
167:6 177:21
177:25 178:24
197:19 208:24
209:4,25 210:2
211:6 215:13
223:13 225:19
233:15,25
**factual** 32:19
44:22,24 45:7
45:10,13 49:1
49:7,11,16,17
49:23 50:1,9
50:15,20 51:1
51:5 52:9,15
52:19,24 53:17
60:5 68:11,20
69:1,22,24
72:4,16 73:1,3
73:20 76:16
77:1,16 78:8
80:5,5 81:1,16
82:4,15 84:14
84:18 87:10,17
88:2 90:6,7
91:21 95:23
100:17 101:15
101:18 103:3

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 107:19 110:18 | fails 131:1,13 | 93:1,2,8,19 | 163:5,6,18 |
| 111:20,25 | failure 230:14 | 94:1,5,9,17 | find 35:10 |
| 113:2,16,23,25 | fair 50:25 52:7 | fiduciary 36:6 | 38:19 65:15 |
| 114:7,8,14,18 | 100:16 146:9 | 181:9,23 | 141:3 146:4 |
| 115:5,16 | 152:20,25 | 182:13 183:5 | 152:2 196:5 |
| 116:11 122:25 | faith 193:23 | 183:15 188:13 | 198:20 223:1,1 |
| 145:22 146:10 | fall 118:13 | 189:12 | 240:9 |
| 146:12,18 | 215:1 | figurative | finders 157:11 |
| 147:25 148:2 | false 161:22 | 70:22 | finding 107:11 |
| 156:13,19,25 | 162:14 163:11 | figure 83:5 | 108:8 126:19 |
| 157:4,10,19 | 163:18 | 209:7 | 221:24 |
| 158:2 161:23 | falsely 163:20 | filed 22:15 23:3 | findings 106:12 |
| 162:12 164:5,7 | familiar 100:4 | 106:4 | finds 107:19 |
| 170:2,6,10 | 102:6 159:22 | final 42:25 43:5 | 119:10 |
| 171:7,11 172:7 | 235:4 | 47:8 122:15,21 | fine 6:23 33:5 |
| 172:23 174:12 | far 59:10 97:7 | 126:10 193:2 | 48:10 |
| 175:19 176:1 | 137:11 142:14 | 196:17 | finish 155:17 |
| 179:13 209:21 | 145:11 183:4 | finance 101:25 | finished 93:15 |
| 209:22 214:12 | 197:18 | 102:5 246:15 | 152:11,15 |
| 215:7 220:8,16 | farmers 37:14 | financial 25:3,5 | firm 26:8 |
| 221:4 222:13 | 37:16 | 25:20 26:18 | firms 18:4 |
| 225:12 227:24 | fashion 197:13 | 51:12 148:11 | first 5:5 8:12 |
| 234:1 238:12 | favor 127:16 | 157:8 158:7,24 | 15:22 22:12 |
| factually | 134:25 136:3 | 159:9,10 | 25:2 39:11 |
| 115:11 176:7 | 138:1 140:14 | 160:19 161:2 | 43:8 64:23 |
| 210:20 233:20 | 140:20 141:21 | 162:4,11 | 105:21 123:9 |
| fail 129:23 | fdm 51:21 | 163:23 164:8 | 123:12 138:25 |
| 130:2,17 131:2 | feasible 194:21 | 164:10,14 | 144:2,17 149:5 |
| 131:4,11 | feature 203:24 | 167:13 | 149:20 158:20 |
| failed 131:9 | federal 7:19,22 | financially 4:23 | 168:14 189:11 |
| 231:3 | feel 6:18 | financials 25:9 | 189:19,20 |
| failing 130:8,15 | fees 19:8 | 86:9 87:25 | 195:10 198:5 |
| 131:15 | fiat 66:10 68:9 | 151:1 160:6,10 | 198:16,18 |
| | 72:14 92:24 | 161:16,23 | 228:22 232:16 |

242:16
**fit** 213:24
**five** 9:25 10:2
  10:17 20:11
  173:19
**fixed** 99:21
**focus** 10:22
**follow** 148:21
  244:1
**following** 77:3
**follows** 5:7
  117:5
**foot** 98:4
**foote** 2:7
**force** 202:10,22
**forefront**
  202:14
**foregoing**
  245:5
**foreign** 199:16
**forget** 19:22
**forgive** 7:21
  64:3
**form** 31:16
  32:8 38:17
  45:25 49:21
  57:13 58:14
  61:6 64:17
  68:10 69:4
  72:25 74:6,18
  75:10 76:15
  80:25 82:9,17
  84:23 90:17,24
  91:7 92:2

94:22 96:14
99:24,25 100:2
100:5,15
101:11,16
108:1 109:17
110:8 111:8
117:24 119:6
120:14 122:24
124:16 125:2
129:24 142:18
147:8 152:24
155:5 160:21
170:14 173:2
179:1,16
181:12 190:13
192:15,23
196:25 204:17
205:2 206:12
207:1 209:14
209:20 210:10
210:18 212:17
214:1 215:5
218:12 219:3
220:6 221:23
227:17 228:5
229:21 237:23
244:8
**formal** 38:10
  38:21
**formality** 96:25
**formed** 130:4
**former** 169:20
**forms** 69:2

**formulate**
  45:23 46:2
**formulation**
  207:19
**forth** 56:8,14
  56:18 57:4
  58:19 78:21
  122:20 167:8
  173:19 206:23
  224:3 247:7
**forward** 99:19
  240:23
**found** 36:10
  109:8 120:11
  140:4,19
  149:17 195:7
  232:13 238:17
  240:6
**founders** 86:16
**four** 9:24 10:2
  10:16 168:24
  178:16
**fraudulent**
  241:7
**fraudulently**
  139:7
**frequent**
  151:23
**fried** 86:20
**fried's** 87:25
**front** 28:3 54:8
**frustrating**
  40:6

**ftx** 1:5 2:3 4:10
  6:15 25:3,5,7
  25:13,17 26:5
  26:8,10,20,22
  43:18,22 47:24
  48:4 51:12
  54:21 56:5
  57:11 59:11
  60:14 61:23
  62:14 63:6,24
  64:7,11 65:13
  65:18 68:21
  69:16 73:10,17
  73:21 74:3,4
  74:16,22 75:3
  75:8 76:6,6
  78:23 80:15,22
  80:23,23 81:3
  81:6,11,19
  82:5 83:12,12
  83:25 84:25
  85:16,17 86:3
  86:12,16,19,23
  87:1,24 89:8
  89:10,20 90:2
  90:13,21,23
  91:4,5,11,15,25
  92:14,24,24
  93:8,19 99:20
  100:22 104:22
  106:4,9 107:21
  111:1 112:4
  115:9 129:10
  129:11,19

| | | | |
|---|---|---|---|
| 133:19,23 | 237:20 238:6 | 205:17 | 34:4,18 40:2 |
| 134:4,16 142:4 | 238:13,20 | **further** 23:13 | 41:8 90:5 |
| 142:5,14 143:2 | 239:16,22 | 24:7 25:23 | 95:10 97:1 |
| 143:18 145:2 | 240:22 241:3 | 27:13 29:10,13 | 103:22 140:8 |
| 145:10,15,19 | 243:3,10,17,19 | 30:8 31:11,17 | 149:3 158:14 |
| 146:11 148:15 | 246:14,18 | 54:20 82:14 | 162:16 186:10 |
| 148:19,19 | 248:2 | 86:14 89:6 | 187:20,21 |
| 149:5,7,11 | **ftx's** 84:12 | 108:23 120:9 | 188:6 195:17 |
| 154:4,20 156:7 | 85:23 89:11 | 153:9 158:15 | 222:8 223:7 |
| 156:14 157:7 | 90:1,13 91:4 | 158:17 165:10 | 235:8 237:20 |
| 160:25 164:9 | 91:12 178:20 | 236:15 247:11 | **given** 8:20 29:9 |
| 164:13,19 | 216:21 226:22 | **g** | 68:1 77:13 |
| 167:16,23 | 227:8 228:5 | **g** 2:8 5:4 27:1 | 80:9 86:15 |
| 169:20,22 | **ftx.com** 75:23 | 79:13 117:3 | 129:8 151:11 |
| 170:25 175:23 | 167:13 | **gaap** 26:1,4 | 171:24 173:25 |
| 175:25 176:15 | **full** 39:18 77:11 | **general** 34:5 | 207:5,8,14 |
| 179:6,11,14 | 78:15 148:15 | 117:11,18,22 | 215:1 247:9 |
| 181:15 182:9 | 186:22 232:15 | 118:1,4,10,14 | **gives** 214:23 |
| 183:21 184:25 | **function** 70:24 | 118:18 119:3,4 | 230:7,7 236:13 |
| 185:15,18,25 | 191:11,12 | 120:12 124:14 | **giving** 12:10 |
| 186:12,13 | **fund** 25:16 | 124:24 125:6 | 146:21 151:7 |
| 204:15 205:1 | 35:6 87:8 | 125:10 | 158:16 195:14 |
| 206:24 207:3 | 92:13 119:17 | **generalized** | 211:19 |
| 207:13 209:13 | 120:3,21 121:1 | 102:22 | **glean** 167:10 |
| 209:18 210:9 | 137:9 143:14 | **generally** 26:2 | 167:12 |
| 210:17,24 | 166:20,23 | 88:9 123:22 | **gleaned** 157:8 |
| 213:21 214:24 | **fundholder** | 159:8 168:19 | **global** 14:15 |
| 215:1 217:6,7 | 170:23 | 208:10 241:24 | **gloster** 1:12 4:9 |
| 217:15 219:21 | **funds** 94:10,13 | 242:17 | 5:20 6:12,17 |
| 221:22 222:2,8 | 133:14 144:8 | **getting** 176:7 | 6:18 22:14,18 |
| 222:12 224:10 | 194:19 | 205:18 | 22:19 28:13 |
| 224:24 227:10 | **fungible** 37:3,5 | **give** 24:11,16 | 69:15 101:24 |
| 231:3 232:24 | 79:23 80:3 | 30:12 33:22,23 | 104:15 167:15 |
| 233:21 234:6 | 120:21 138:19 | | 234:21 245:14 |

246:4,9,11
248:3,18
**glueckstein** 2:5
5:19 6:11,13
22:11 27:17
28:9 33:19
59:21 60:3
101:22 116:19
117:8 142:20
162:8 164:24
165:6 205:21
206:4 216:5
243:25 244:15
246:4
**gluecksteinb**
2:6
**go** 4:6 14:25
30:19 32:2
41:22 66:1
79:13 93:12
112:25 116:20
129:25 138:6
149:22 150:13
152:12,16
153:9 160:6
172:22 175:6
186:23 236:4,5
236:17
**goes** 66:11
93:24 97:7
103:21 107:23
157:4 184:23
222:25

**going** 4:2 27:3
27:5,18,21
33:10 45:20
65:19 67:21
120:4 128:10
128:18 129:9
129:11,12
165:22 166:5,6
207:22 218:20
222:4 230:16
230:18 244:18
**gold** 165:20
**goldberg** 2:16
**good** 4:1 5:19
6:12,16 97:24
98:12 116:6
162:6 164:22
**goods** 37:3,4,6
166:12
**governed**
121:14 239:5
**grab** 19:20
**grain** 37:13,14
37:17,18 196:2
**granted** 139:4
139:17 140:21
141:17
**granting** 141:9
**grateful** 6:7
**great** 197:10
**greater** 30:19
169:10 231:11
**greatest** 181:1

**grew** 72:22
**ground** 138:18
233:21
**grounds** 222:9
**group** 40:20
80:23 81:11
**guarantee**
64:11
**guaranty**
159:25
**gullifer** 197:25

**h**

**h** 5:4 117:3
246:7
**half** 116:8
162:7
**hamblen** 98:8
99:1
**hand** 154:6
247:17
**handed** 102:3
104:20 167:22
**hang** 138:11
**happened** 43:7
59:10 137:10
177:8 194:16
208:23 209:5
**happens**
177:10
**happy** 152:11
160:6
**harris** 2:13 6:8
19:22 23:22

27:25 28:12
31:16 32:8
33:13 45:25
49:21 57:13
58:14 61:6
64:17 68:10
69:4 72:25
74:6,18 75:10
77:20 80:25
82:9,17 84:23
90:17,24 91:7
92:2 94:22
96:14 99:25
101:16 108:1
109:17 110:8
111:8 113:9
116:6 117:24
119:6 120:14
122:24 124:16
125:2 129:24
142:18 147:8
152:24 155:5
160:21 162:5
164:22 170:14
173:2,10 179:1
179:16 181:12
190:13 192:15
192:23 196:25
204:17 205:2
207:1 209:14
209:20 210:10
210:18 212:17
214:1 215:5
216:3 218:11

219:3 220:6
221:23 227:17
229:20 237:23
241:16 243:22
244:8,17
**heading** 200:7
**hearing** 5:16
137:12
**hearings**
139:10
**heavy** 32:16
**held** 4:14 26:10
51:18 80:16
81:12 85:24
107:21 134:6
138:23 139:22
143:2 145:2
147:23 148:9
163:1,2,2,7,17
163:21,24
166:21 176:20
185:13
**hereunto**
247:16
**herring** 37:22
**hesitating**
15:17
**high** 138:16
**hogan** 3:5
**hold** 36:2 126:6
133:12 134:24
136:2 143:22
151:10 161:3
166:6 169:17

183:12 184:19
**holder** 154:4
**holding** 92:6
126:5 134:2,8
137:25 151:13
157:24 166:1
182:5,8,21
184:13,17
185:2,3,6
186:5 203:5
243:4
**holds** 127:8,11
132:9,11
135:16 147:17
154:21 161:7
**home** 121:17
**honorable**
22:13
**hope** 141:13
**hopefully** 145:7
**hot** 80:14 81:4
81:12 142:15
176:21 177:2
177:12 226:20
**hour** 116:8
162:6
**hours** 243:23
**house** 36:20
39:12,14
170:17
**houseman**
138:15
**huge** 193:23
197:13,20,21

**hunter** 34:19
124:3,20 125:3
**hypotheses**
222:6 223:6
224:17 226:2
**hypothesis**
205:11 222:18
231:1 232:22
**hypothetical**
50:24 241:4
**hypothetically**
115:11

**i**

**i.e.** 26:8 110:13
154:18 225:3
**idea** 78:19
142:22,24
194:24
**identical** 37:5
112:25
**identification**
22:20 28:14
69:17 102:1
104:17 167:19
234:24
**identified**
216:12 217:19
**identify** 134:16
160:2 215:15
215:20 216:7
216:20 218:17
**identifying**
79:11,22 80:2

80:6,10
**ifoote** 2:7
**ignore** 188:2
**ii** 61:22
**illegal** 131:3
**impact** 58:13
143:2
**implement**
59:12
**implicated**
218:25
**implied** 67:21
**implies** 236:20
**imply** 94:24
**importance**
36:22 154:25
**important** 36:5
36:18 37:1
38:6,8 39:17
40:9 103:8,15
104:8 151:5
188:7 226:10
**impose** 140:18
141:4
**imposed** 133:8
140:13 191:1
**imposing**
140:25
**impression**
123:10,12
**improper**
225:16
**inaction** 199:15
199:21

| | | | |
|---|---|---|---|
| **inception** 174:8 175:2 | **indicate** 26:6 **indicators** 166:17 | **instance** 43:8 138:25 198:16 232:16 | **insurance** 98:9 **intangible** 11:19 13:14 |
| **include** 17:5,7 38:9 55:14 156:19 157:6 157:10,11,13 182:18 238:24 239:25 | **inevitably** 144:10 **inferred** 39:25 103:12 **inform** 220:25 226:1 | **instructed** 25:4 25:18,19,23 26:1 27:1 42:21 44:23 49:5,12,18 51:6,14 53:15 | 119:25 120:10 122:8 125:8 166:4 193:13 194:13 196:21 201:18 232:10 |
| **included** 15:14 15:19 16:17 26:20 36:9 71:24 72:5 80:22 86:11 105:14,16,23 106:9 116:11 170:11 213:18 | **information** 25:9 27:10,13 51:11 76:14 158:15 164:8 208:6 **informs** 220:21 **initial** 42:2,16 42:24 43:4 | 54:11,21 56:10 56:17,21 60:11 67:14,16,17 68:13,15 71:25 76:5 77:2 78:14,16,25 79:4 81:19 83:22 85:8 | **intend** 31:13 32:5,12 39:2 **intended** 38:11 38:14,22 125:24 153:11 188:12 191:7 **intending** 30:16 94:24 |
| **includes** 88:17 176:25 184:13 219:22 221:16 | 225:23 226:5 226:19 227:4 **initially** 174:22 | 89:7,23 90:19 99:10 160:8 169:15,18,19 | **intent** 84:12 90:1 195:18 **intention** |
| **including** 11:13 190:11,18 191:2,25 212:5 213:5 214:8,11 | **injunction** 140:22 141:10 141:18 **injunctions** | 177:22 239:3,7 **instructing** 77:9 221:10 **instruction** | 103:11 125:20 126:3,12 130:10 **intentional** 85:9 |
| **inconsistency** 105:19 **inconsistent** 41:10 149:16 171:14 | 139:5,18 **inquire** 233:25 **insofar** 208:16 **insolvency** 10:9 | 53:21 82:1,3 90:8 132:19 171:18 **instructions** 49:17 133:3 | **intentions** 39:23,24 96:1 96:4,5 **intercourse** 199:22 |
| **inconsistently** 143:20 **incorrect** 54:9 **incur** 151:3 **independent** 18:18 | 10:19,23 21:5 21:9,12 **insolvent** 144:9 160:25 162:23 170:23,23 | 142:6 **instrument** 39:22,25 40:7 103:9,12 | **interest** 25:16 35:5 37:10,16 43:15,24,25 59:1 85:3,19 86:6 87:8 |

CONFIDENTIAL

88:19 89:11
90:14 91:12
92:12 93:9,21
94:3,13,20
95:8,10,14
116:1 119:16
120:2,25
127:14,16
129:16 133:1
136:16 144:11
144:17 145:5
150:4,7,16,16
153:15,19
154:11,23
155:1,7,12,24
155:24 175:11
195:25 200:13
224:12,25
225:6,10 226:7
226:24 227:12
228:3,10 231:4
231:6,8,10
233:15 238:3
238:11,17
239:10,17
240:13,17
243:11
**interested**  4:23
247:14
**interesting**
31:1,4 194:24
195:3
**interests**  11:18
12:5,6 87:7

91:4 137:9
234:5
**interference**
199:14
**interim**  139:4
**interlocutory**
32:18 139:16
140:18 141:9
141:19
**intermediaries**
133:13
**intermediary**
126:6 127:17
133:20,24
134:5,9 181:21
185:22
**intermediated**
134:10,11
**intermediating**
181:18
**intermingled**
37:19
**internal**  171:8
171:13 172:3
**international**
15:6,9 98:9
**interpret**  39:21
47:24 125:25
**interpretation**
40:4,15 109:14
111:3,4 115:3
188:1 220:9,12
220:22

**interpretations**
124:25
**interpreted**
103:10 106:24
124:8 129:15
161:25
**interpreting**
54:2 84:21
118:17
**intro**  189:5
**investment**
234:22 246:22
**investments**
235:2
**invited**  57:15
**involve**  13:4
227:24
**involved**  7:14
11:13 12:19
13:1 15:25
16:19 17:12
18:4 29:2
144:6,7 175:24
220:3
**involvement**
21:25
**involves**  84:5
220:12
**involving**  11:24
15:15 16:5,10
16:12 19:17
20:16
**ion**  139:2

**irrelevant**
121:4 143:25
144:4,13,15
154:8,9 198:25
240:18
**irrespective**
59:3,18 171:3
221:3
**irretrievably**
37:5
**isaac**  2:7
**issue**  34:18
35:11 43:15
58:24 65:20
67:7 69:21
70:3,7,7,9 83:1
83:9 100:3
101:2,14
137:13 142:11
144:15 162:19
162:23 172:8
196:22 207:11
221:13 228:22
228:23 229:1
234:1
**issues**  10:23,23
10:25 11:6
16:2,3,4,5,7,9
16:10 35:13
43:14 48:18
106:25 123:9
123:13 203:4
228:12,21
229:13,18

CONFIDENTIAL

**issuing** 162:22 198:3 228:20
**items** 87:23
**iterative** 44:20
**itselves** 232:24

**j**

**j** 34:24 116:5 154:1
**jessica** 2:22
**jessica.walker** 2:22
**joe** 3:4 4:16
**john** 40:20
**johnson** 3:7
**joint** 2:11 18:20 19:2,4,6 19:10 21:20 22:16 23:3 189:24 238:18 239:11 240:22
**jointly** 1:3
**judge** 8:14 10:12 14:15 16:19 17:3 24:13,16 58:16 87:19 138:16 140:4 141:17 149:17 160:11 202:19 228:19 230:18
**judge's** 17:24
**judges** 84:8

**judgment** 138:17 230:14
**judiciously** 40:19
**jump** 197:21
**june** 19:13,18 20:21 61:4 62:2,15,16,24 63:2,2,7,11,13 91:18 122:21
**juris** 197:21
**jurisdiction** 109:2,3 139:1 198:17
**justice** 14:21 15:1 34:25 38:5
**justify** 200:14

**k**

**karen** 3:6 42:19
**kbo** 1:2 4:13
**keen** 202:12
**keep** 85:2,18 86:5 88:18 118:2 133:1 224:18
**keeping** 118:6
**ken** 40:14
**kept** 142:4
**key** 50:10 80:15 174:17
**keys** 176:11,15

**kind** 38:12 113:1
**kingdom** 10:8 10:10
**knew** 54:22 57:9,15,19,21 58:11 59:4 77:17 78:1,23 79:5 84:25 87:2,4,15 88:24 177:1,11
**know** 7:15,21 9:23 12:2 13:20 20:3 21:23,24,25 32:4 35:18 42:15 48:4 52:5 54:11 58:12 63:15,19 65:23 70:4 81:2 91:8,14 92:9 94:23 96:3 99:13 100:1,17 107:3 108:13,16,18 108:23 117:11 117:17 118:5 121:11,16 123:11 133:18 137:11 138:7 139:21 143:16 146:7 148:17 158:18 165:14 175:4 176:14

177:21 179:2 185:8 189:5 195:11 196:8 198:15 206:17 207:2 209:21 209:22 210:25 233:24
**knowing** 85:1 85:17 88:18 178:19
**knowledge** 57:11,12,17 58:1,5,9,18 86:24 87:20 91:20 98:17 145:14,22 177:7 178:9 179:14 194:16
**known** 52:25 56:5 59:19 77:10 78:9 116:10,16,18 118:9 119:4 120:24 121:8,9 121:24 122:12 122:13,22 123:3 178:6
**knows** 201:19

**l**

**l** 5:4,4 117:3,3
**lack** 189:12
**laid** 50:21

CONFIDENTIAL

**language**  44:16 54:2 95:21 96:11,13 98:20 100:3 181:8 184:1 244:5
**late**  18:6
**latham**  2:10 5:13 18:24 19:1,9,12,16 20:2,5,10,16,21 20:25 43:8,10 43:10,11 46:9 46:13 90:9 206:12,15,18
**latham's**  25:24 29:5 44:5
**law**  3:5 8:10 12:19 13:2,5 18:4 30:24 47:11,12,16,18 48:18,22 58:3 70:13 84:5 89:17 99:18 100:5,24 108:19,24 109:7,24,25 110:22 114:5 117:11,18,22 118:1,4,10,14 118:18,25 119:4,8,9,9,11 119:11 120:12 120:16,17,22 121:3,7,11,15

121:18 122:4 122:15 123:10 123:18,25 124:15,24 125:6,10 126:9 126:17 134:22 135:12,14,21 135:24 136:7 136:21 137:5 138:14,24 155:11 157:12 185:14 187:13 188:1 193:1,5 194:8,17 196:6 196:9,11,13,17 197:24 198:6 198:10,11,13 199:2,23 200:8 202:4,7,15,21 203:3 208:12 208:19,20 209:1,3,9 217:17 222:7 222:20 223:10 226:12 227:19 234:2 239:5,5 240:11,16,20 241:25 242:17 242:22
**lawyer**  108:7 160:12 193:8
**leads**  234:20 236:23

**leap**  193:23 197:13,21
**leave**  244:16
**leaving**  217:20
**ledger**  142:4,17
**legal**  20:10 32:25 66:20 71:15 84:18 92:5 118:9,12 121:24 123:7 123:16 124:10 124:13 125:1 127:2,20 128:1 128:8,12,17,20 129:6,17 154:3 166:10 172:20 172:25 173:9 173:15 174:7 174:17 175:2 186:22 202:10 202:25 203:2 248:1
**legally**  194:21
**legislation**  101:9
**legitimate**  157:18 171:2,2 171:10 172:7
**legitimately**  164:4
**lehman**  35:1,9 154:2
**lend**  152:2,3

**lending**  64:9 65:24 118:3 146:5 152:3,6 152:7
**lent**  145:18,21
**letter**  97:6
**lewin**  126:10
**lewison**  40:14
**lewison's**  40:14
**liabilities**  70:12 71:4 83:7 209:12,18,25 210:7,16,23 211:3 219:8,14
**liability**  70:14 70:21 219:17 220:5 221:15 241:15,20 243:6,6
**liable**  221:9 230:2
**liberty**  7:16
**lies**  161:17,22
**light**  23:12 39:23 41:18 103:10 158:15 158:17
**likely**  77:4,8 78:13,17,18 79:1,2,6 115:4 158:5 200:12 201:13
**likewise**  89:7 114:14 119:20

149:22 151:3
166:4
**limit** 213:11,15
**limitation**
216:20 241:14
241:20,20
**limitations**
5:24 191:1
211:23 212:3,6
213:8 214:5
215:14,19
216:6,13,15,17
**limited** 25:4,6
38:3 83:5 91:3
91:9 111:21
114:7 139:2
164:13 167:16
167:24 209:6
213:22 214:6
215:16 216:8
217:2 242:19
242:19 246:19
**limiting** 190:10
201:15 215:2
**line** 83:15
226:3 248:4
**lines** 169:25
**liquidate**
216:23 238:7
243:21
**liquidated** 63:4
217:4,25
**liquidation**
62:1 73:12

74:24 86:15
231:13 233:23
236:14 239:6
**liquidations**
60:15 73:17
76:6 89:8 90:2
91:6,16 233:17
234:6
**liquidator**
12:11 13:7,9
**liquidators**
2:11 18:20
19:2,5,7,10
21:21 22:1,16
23:4 223:4
238:18 239:11
239:16,22
240:22
**list** 33:22,23
34:7
**listed** 105:12
105:20
**lists** 45:19
**literal** 96:21
**litigation** 13:19
23:5 27:24
**little** 20:11
176:3 201:4
**llp** 2:2,10
**loan** 66:3 70:15
217:10,23
**loaned** 64:10
**loans** 64:12
65:17

**located** 1:13
**lodged** 174:13
174:22 188:20
**logged** 68:5
69:23
**logic** 220:23
241:1
**logically** 240:7
**lomas** 35:1,1,8
154:1
**london** 20:3
43:9,10,10
**long** 10:14,14
12:6 15:8
192:10
**longer** 131:12
199:21
**look** 34:1 45:16
50:7 59:14
62:25 69:5
76:22 77:22
82:18 86:20,22
98:4,5 102:9
102:12 103:16
103:19 104:5
114:20 116:2
149:4 150:9
151:6,9,25
156:17 158:21
158:24 159:2,7
164:3 166:14
170:24 185:4
192:2,6 197:23
201:7 204:1

208:19,24
209:4 210:1
214:16 216:13
226:13 234:25
235:15 236:18
237:11 241:9
241:12
**looked** 54:13
73:6 76:23
114:17 145:16
160:5 163:3,5
168:14,16,22
202:8,10
209:24 240:5
**looking** 33:16
69:7,13 72:9,9
79:12 82:25
83:8 88:5,7
89:6 96:16
98:14 111:12
112:22 115:25
117:13 119:13
122:11 130:18
146:24 149:13
151:19,22
159:6 161:24
173:24 174:2,4
175:8,13
179:25 180:1
181:14 182:7
185:5,7 189:20
193:24 195:14
195:23 201:9
201:11,23

CONFIDENTIAL

202:2 204:20
208:17 209:2
212:10 213:17
214:4 215:8,13
215:22,23
219:7,10,15
224:8,19 226:2
226:19,21
227:6,25
232:12 236:11
236:18 237:4,5
242:4 243:5
**looks** 23:6
65:16 160:2
167:1 225:22
**lord** 23:13 24:4
27:15 31:6,20
31:25 32:15
34:3 35:24
37:23 38:5,22
40:16,22 41:14
41:19 96:19
98:8 99:1
102:13,18
103:5,21,25
114:19 115:22
130:20 133:16
135:3 179:20
181:5 242:9
**lords** 36:20
39:12,14
170:18
**lose** 93:20

**losing** 150:12
**loss** 152:1
227:20,23
230:20 231:7
231:10 234:17
241:2 242:25
**lost** 88:6 216:4
225:7,11
226:24 228:2
231:5 234:19
241:3,5,6
**lot** 85:11
159:22 187:17
195:22 234:7
**lots** 17:10
123:24 146:19
160:23
**louise** 197:25
**low** 116:5
**lunch** 116:21
**luncheon**
116:25
**lw.com** 2:13,15
2:16,18,19,21
2:22

**m**

**made** 5:17
13:22 19:9
25:24 27:16
31:20,25 37:9
38:5 41:19
49:1,15 54:6
54:12,14,15

76:6 83:14
86:4 100:18
110:1 137:7
141:14 148:7
148:22 157:15
158:9,23 159:4
159:17 163:21
165:9,25
166:10 169:3,7
169:16 170:12
171:5,20
217:23 228:8
228:10 245:10
**maintain** 231:4
**maintaining**
143:10
**maintains**
64:11
**maintenance**
68:24 215:18
216:10
**make** 5:8 13:23
23:12,15,15
24:10,19 29:18
31:18,23 33:10
35:23 48:11
49:5 57:24
58:7 63:9,17
64:21 71:11
76:3 78:5
88:17,21 89:23
90:5 93:14
110:3 118:18
171:22 176:17

177:14 189:1
197:14 202:13
217:13 238:21
**makes** 150:10
155:16 189:16
236:12
**making** 22:2
52:25 65:24
66:3 71:3
89:21 130:14
130:16 176:2
176:23 177:5
202:24 236:3
242:7
**management**
36:4 167:18,25
171:8 183:14
246:21
**managing**
228:19
**manifestly**
41:10
**mankind**
197:11
**manner** 59:14
157:6 177:25
**margin** 64:9
68:23 90:22
145:19,24,25
146:3 151:15
151:21 211:3
214:19 215:18
216:10

CONFIDENTIAL

**mark** 22:11
28:10 61:11
69:10
**marked** 22:20
22:23 28:14,17
28:22 29:4,7
29:20,22 32:14
41:23 42:7
51:23 69:17
101:25 102:3
104:17,20
159:13 167:19
167:22 234:23
235:1
**market** 14:16
26:13 100:13
100:20 101:19
104:9 112:6,11
112:22,24
116:17 133:4
133:10 159:3,6
159:8 161:14
**markets** 87:24
167:16,24
246:19
**marriage**
247:13
**mass** 116:5
**master** 147:14
202:9
**match** 202:15
**matera** 1:16
4:18 247:3,21

**material** 49:12
50:5 52:10
63:14 164:18
171:11 172:7
200:21
**materials** 23:13
104:24
**matrix** 52:16
52:19 69:24
72:4 95:23
101:15,18
102:21 103:3
111:20,25
113:16,25
114:8,8,14,18
116:12 146:12
146:18 148:3
156:19 157:4
157:10,19
158:2 161:23
162:12 164:5
170:10 171:11
172:7,23
175:19 179:13
**matter** 4:10
6:15 7:13 8:3,7
16:11 19:1
20:22 23:10,21
24:9,16 28:8
29:25 43:1
48:17,22 64:19
65:2 66:20,23
68:11,21 69:1
69:22 70:12

73:1,3,21 81:1
82:4 85:7
87:18 91:21
101:5 104:22
108:19,24
109:25 110:22
114:5 119:8
123:25 125:20
130:11 131:14
135:24 136:20
136:21 137:5
138:24 139:13
141:17 142:1
154:10 155:10
157:12 161:23
168:13 170:2
174:12 185:13
185:23 189:17
208:20 214:12
216:21 217:1
217:16 220:8
220:10 221:12
222:7 223:9
226:12 227:19
240:15 241:1
247:15
**matters** 10:4,8
10:9,18 11:13
15:13,15,22
16:18 21:6,9
21:12 22:9
44:22,24 45:11
51:5,6 52:24
57:4 70:17

87:11 88:24
90:6 110:18
153:20 154:12
158:12,14
170:7 179:20
209:24 227:24
**maxwell** 160:1
**mean** 7:5 8:8
9:2 12:7 14:11
28:24 31:1
33:9 42:4,5,6
45:4 46:3
59:11 61:7
66:14 67:2,20
70:16 76:22,22
81:2 93:15
96:3 98:21
99:12 100:1,7
106:17 116:3
117:22 118:7
119:7 123:11
128:4,13,22
130:2 144:12
160:22 165:15
172:18 173:11
173:13 175:1
179:2,18
180:10,13
186:17 191:6,7
200:23 201:3
210:11 219:4
222:3,24 226:7
230:15 240:15
242:25

meaning 38:23
40:25 95:20
96:7 97:3,13
99:19 104:12
108:11,21
115:14,19
173:24 180:6
180:11,16,17
180:17,18
182:12 186:11
meaningless
188:25 191:8
191:16
meanings
97:17
means 58:5,9
108:4,15,16
120:16 130:25
132:7 188:23
220:23
meant 108:24
131:8 167:3
236:6
measure
228:14 229:8
mechanics
75:18
media 4:7
medium 236:22
meet 143:12
meeting 19:7
member 17:22
members 80:23
81:11 134:12

memory 33:23
105:15 242:3
mentioned
30:11 36:15
128:20 143:17
mercer 36:18
120:5 196:2
merely 43:24
58:10 76:8
172:3
merits 222:11
222:23 223:3
223:11
met 125:16
metal 165:19
microphone
19:23
middle 132:1
173:5 187:6
million 72:13
72:18 73:13,16
74:24
mind 30:3 32:6
34:13 129:13
224:18
mine 122:3
minimize 89:12
90:14 91:12
minimum
114:24
minute 138:11
minutes 162:8
misapplied
143:24

misappropria...
139:8
misappropria...
243:15
misstates 77:21
241:17
mistake 61:23
mix 84:5
mixed 37:4,6
37:14 84:17
89:16 120:3
modern 201:8
201:12 202:6
moment 14:25
48:14 132:24
135:13,22
136:8 149:3
174:14 200:4
237:7
moments 48:25
money 150:1
mood 202:20
202:20
moore 38:5
41:14
morning 4:1
5:20 6:12,16
158:4 178:13
183:8 206:7
242:8
moss 34:19
124:4,20 125:3
motor 95:9

move 152:18
multi 159:25
multiple 80:18
124:25
music 202:20
202:20
mutually
124:22,23

n

n 246:1
nacif 2:20
nacif.taousse
2:21
name 4:16 6:13
names 34:4
narrative 25:21
natural 172:24
173:7,18
180:18
naturally
172:19 173:14
nature 16:24
70:23 96:24
103:13,16,20
140:5 149:19
necessarily
77:10 113:14
128:2 146:20
159:5 185:2
205:18 229:12
233:19
necessary 28:8
153:17 155:18

CONFIDENTIAL

155:19 179:8
232:3
**need** 35:9 49:19
65:15 82:13
105:5,6,23
138:3,6 165:25
166:9 195:6,9
196:4 198:14
201:23 223:24
236:4,5,14,17
240:16 244:10
**needed** 176:15
**needn't** 186:23
**needs** 224:18
**negative** 66:9
66:21 67:8,22
67:25 68:7,22
72:12,18,22
73:15,22 75:1
219:1,5,9,15
220:4 221:5
**negatives** 85:12
**negligence** 84:8
**negligent** 83:24
84:4,20 85:5,8
85:10
**neither** 64:24
128:11,20
136:5 197:8
**net** 70:19 83:5
209:7
**network**
134:24 135:15
136:1

**neuberger** 24:4
27:15 31:7,21
32:1 37:23
38:22 41:19
115:22 133:17
135:3 181:5
**neuberger's**
23:13 32:16
34:4 35:24
40:16,22 96:19
130:20 133:22
242:9
**never** 12:13
107:7 175:6
192:12,21
**new** 1:15,15,17
2:4,4,12,12
27:14 41:15
43:11 136:22
178:2 242:12
247:4
**nicholas** 3:8
**nomenclature**
176:14
**non** 236:21,25
237:5
**nonidentifiable**
138:19
**nonsense**
181:20 191:17
191:22 192:10
**normally** 95:13
228:18 230:18

**notary** 1:17 5:6
245:23 247:3
248:22
**note** 34:10
39:17 104:5
117:10 175:17
180:24 242:16
242:23
**noted** 4:25
138:18 245:7
**notes** 27:8,19
28:2,5,13,17,21
29:3 38:7
39:10 51:10,23
52:23 158:11
159:12 168:5
169:10,19
242:7 246:12
**noting** 106:3
**notion** 202:4
240:11
**notional** 219:17
**notwithstandi...**
37:18 129:17
154:24 173:17
**novel** 135:8,19
136:6
**november** 1:7
4:3 25:7
247:17 248:3
**npower** 41:14
**number** 4:13
9:24 35:17
43:6 53:22

79:11,22 80:2
80:7 133:12
137:3 226:7
**numbers** 80:11
168:10

**o**

**o** 5:4 117:3
**oath** 4:21 8:20
13:23
**object** 31:16
32:8 45:25
49:21 57:13
58:14 61:6
64:17 68:10
69:4 72:25
74:6,18 75:10
80:25 82:9,17
84:23 90:17,24
91:7 92:2
94:22 96:14
99:25 101:16
108:1 109:17
110:8 111:8
117:24 119:6
120:14 122:24
124:16 125:2
129:24 130:12
142:18 147:8
152:24 155:5
160:21 170:14
173:2 179:1,16
181:12 190:13
192:15,23

| | | | |
|---|---|---|---|
| 196:25 203:21 | 225:1,5 | **ogier** 3:7,8 | 171:1,15 179:6 |
| 203:23 204:17 | **obliges** 214:22 | **okay** 29:19 | 179:11,15 |
| 205:2 207:1 | **obsolete** 188:16 | 33:5,21 34:16 | **operates** 75:21 |
| 209:14,20 | **obtain** 95:11 | 41:25 43:6 | 116:4 129:9 |
| 210:10 212:17 | **obtained** 93:9 | 53:16 61:20 | 205:12 |
| 214:1 215:5 | **obvious** 117:25 | 65:5 66:17 | **operating** |
| 219:3 220:6 | **obviously** | 77:15 84:10 | 121:10,13 |
| 221:23 227:17 | 14:23 23:6 | 107:10 152:19 | 148:13 |
| 237:23 244:8 | 27:18 53:22 | 162:16 163:9 | **operation** 75:9 |
| **objection** 23:22 | 55:6 108:6 | 173:17 206:22 | 77:12 131:8 |
| 77:20 106:3,9 | 123:2 151:20 | 212:13 218:24 | 156:20 158:25 |
| 173:10 210:18 | 154:9 159:20 | 224:5 225:25 | 175:20 178:20 |
| 218:11 229:20 | 160:10 166:1 | 244:15 | 178:21 180:1 |
| 241:16 | 179:17 181:5,6 | **old** 236:16 | 242:20 |
| **objective** 95:20 | 181:20 | **omission** 26:5 | **operational** |
| 96:1,4,7 97:3 | **occasions** 44:12 | **once** 7:4,7 | 178:24 |
| 111:20 114:8 | **occurred** 17:20 | 176:12 193:17 | **operations** |
| 126:4 | 74:2,15 91:16 | 203:22 | 179:22 |
| **objectively** | **october** 105:3 | **one's** 40:9 | **operative** 38:10 |
| 121:15 | **offer** 29:9,14 | 58:23 224:16 | 38:20 186:10 |
| **objects** 125:20 | 29:23 31:13 | 227:6 237:2 | 188:8,16 190:6 |
| 131:11 142:2 | 32:12 39:2 | **ones** 36:14 | **operator** |
| **obligation** 85:2 | 210:5,12 | **oneself** 188:9 | 137:24 147:15 |
| 85:18 86:5 | **offered** 145:19 | **open** 113:6 | 147:23 154:20 |
| 87:2,5,16 | **offering** 18:10 | 193:7,11 | 161:14 166:21 |
| 88:18 132:25 | 23:20 24:9,22 | 241:22 | 166:23 170:24 |
| 182:14 | 24:25 45:1,6,9 | **operate** 59:12 | **operators** |
| **obligations** | 48:16,20 66:19 | 59:13 75:22 | 134:22 135:14 |
| 38:15 65:12 | 89:19 170:1,6 | 112:12 | 135:25 |
| 70:23 132:13 | 208:11 210:13 | **operated** 59:5 | **opine** 214:13 |
| 133:8 143:15 | 221:20,25 | 75:12 77:4,8 | 240:19 |
| 143:19,22 | 231:20 | 78:13,23 79:2 | **opining** 85:4,6 |
| 183:6 189:25 | **office** 20:3 | 79:6 148:4 | 106:25 239:3 |
| 190:3 224:13 | | 157:7 158:5,22 | |

CONFIDENTIAL

**[opinion - page]**                                             Page 42

**opinion** 8:9
11:5 12:3,9
13:5,8,13
26:18 29:15,21
44:8 50:3,6
51:7 58:20
64:15 66:20
74:1,8 76:16
84:11 86:4
91:2 92:4,9,17
92:21 93:6
95:18 97:20,21
102:13 109:13
116:9 120:8
121:20,24
147:4,24
171:25 172:2
175:9,13
181:14 182:20
191:19,22
192:17 204:19
207:11 208:11
210:6,13
218:14,18
221:20,25
227:13,21
237:1,12
239:24 242:2
**opinions** 10:5
10:11,17,21
11:17,23 12:19
13:1,12,17
14:3,8 18:10
23:9,16,19,25

24:15,21 29:8
29:13,22,23
31:12,15,17
32:7,10 44:21
45:14 47:17,22
48:17,21 49:20
50:14,20,25
74:12 88:3,13
90:1,6 110:4
115:18 158:3
158:15
**opportunity**
29:10,24 41:21
**option** 151:11
**order** 5:22 71:6
71:14 96:8
104:15,21
125:16 137:19
143:23 166:6
170:20 209:4
220:2 239:17
240:17 246:16
**ordinary** 97:13
97:16
**original** 35:19
36:9 41:16,16
41:23 42:12
148:23
**originally**
176:9,10
**ought** 102:21
**outage** 212:3
**outages** 213:4
214:6

**outcome** 4:23
52:11 247:14
**outside** 6:2
8:18 21:12,16
23:19 24:16,25
29:19 31:10
75:5 118:13
125:10 208:6
**outstanding**
70:17
**overall** 220:4
221:2,16,17
**overliteral** 40:4
**overriding**
243:1
**owe** 209:17
**owed** 83:7
209:12 210:8
210:16,23
**owes** 243:11
**owing** 36:6
76:7 183:15
**own** 26:6,15
36:11 61:15
70:13 86:13
87:3 129:12
143:19 145:4
161:4,4,18,20
227:9
**owned** 87:1
148:19 150:2
186:13
**owner** 132:18
133:4 155:23

**ownership** 92:6
128:19 151:17
153:22 154:17
155:10 166:13
172:18 180:7
182:5,8,21
183:5 185:12
186:7,22 190:7
195:15,18
197:7 201:10
243:4,16
244:11,12
**owning** 188:23
**owns** 188:19

**p**

**p.m.** 116:23,24
117:2,7 165:2
165:5 205:25
206:3 244:19
244:21
**pack** 161:17
**packed** 226:8
**page** 23:7 39:9
39:19 45:17,20
50:9 51:23
53:5 54:18
60:8,19 63:21
66:5,25 72:10
79:14 81:17
83:18 87:13
97:22 102:10
104:5 106:2,5
106:7,8 107:9

CONFIDENTIAL

**[page - parties]** Page 43

| | | | |
|---|---|---|---|
| 117:13 124:3 | 79:4,7 80:12 | 218:22 223:19 | 148:2,14 |
| 125:14 131:20 | 80:14 81:5,15 | 223:23,23 | 156:11 157:18 |
| 132:1,2 134:20 | 81:18 83:17,18 | 224:4,9 225:13 | 158:25 162:11 |
| 141:23 144:23 | 88:5,7,15 89:5 | 226:9 230:24 | 164:5 168:12 |
| 149:5,21 | 90:8 97:21 | 231:14 232:5 | 211:11 228:5,6 |
| 159:11 169:18 | 102:9,13,18 | 233:4,8 235:16 | 231:21 |
| 172:13 180:3 | 103:6 104:6 | 235:21 236:10 | **participants** |
| 183:9 187:1 | 107:7,12,16,18 | 237:15 242:5 | 64:9 75:16 |
| 200:1,7,7 | 108:3 109:19 | **paragraphs** | 90:22 116:16 |
| 206:9 211:9 | 109:21 117:13 | 30:22 31:4 | **particular**  8:2 |
| 214:15 235:17 | 121:20 124:2 | 35:8,20,21 | 12:9 18:7,8 |
| 237:15 242:15 | 124:17 125:13 | 44:14 55:3,13 | 30:13,22 31:5 |
| 246:3,9 248:4 | 126:2,14 | 55:19 67:3 | 31:12,24 32:6 |
| **pages**  86:22 | 131:18 134:19 | 177:16 237:10 | 35:13,22 36:8 |
| **paid**  162:19,24 | 136:19 138:9 | **paraphrased** | 43:14 59:2,18 |
| 230:12 | 138:17 141:22 | 99:1 | 66:2 68:1 |
| **para**  131:23 | 143:4 144:20 | **parenthetical** | 75:18 82:20 |
| 236:1 | 144:23 157:2 | 191:25 213:19 | 83:16 97:8 |
| **paragraph** | 158:4 159:12 | **parliament** | 103:17 109:6 |
| 39:19 53:4,8 | 170:18 172:12 | 193:21 | 112:3 128:22 |
| 53:18,19 54:1 | 172:16 173:4,5 | **part**  14:23 | 134:13 137:1 |
| 54:18 55:3,25 | 173:18,22 | 38:10,20 39:22 | 137:14 139:22 |
| 56:4,8,14,18 | 175:16,17 | 57:25 62:7 | 166:23 188:6,7 |
| 57:5,6,8,19 | 177:4 178:8,14 | 64:7 67:6 69:3 | 190:5 192:17 |
| 58:11,19 60:7 | 180:3,21,24 | 69:23 73:9,9 | 213:17 |
| 60:10,18 61:2 | 182:2 183:11 | 76:15 77:16 | **particularly** |
| 61:9 62:9,20 | 186:25 187:2,5 | 79:8 80:5 | 170:22 183:18 |
| 63:1,5,10,21 | 187:6 192:17 | 83:25 84:11 | **parties**  4:6 38:9 |
| 64:2,6 65:20 | 199:9,24,25 | 85:16 87:7 | 38:15 39:24 |
| 66:4,6 67:9 | 200:2,3 204:19 | 88:2,12 104:24 | 41:8 53:1 79:5 |
| 72:8 73:5,10 | 211:8,12 | 105:18,25 | 95:21,25 96:11 |
| 75:7 76:4,15 | 212:21 215:21 | 106:18 118:10 | 97:14,17 98:18 |
| 76:25 77:18,25 | 215:22,23 | 119:4 120:11 | 116:10 117:10 |
| 78:6,8,22,25 | 216:1 218:18 | 124:14 125:5 | 117:17 119:5 |

CONFIDENTIAL

**[parties - policies]**                                    Page 44

122:22 126:5
166:11 182:4
188:15 247:12
**partners** 22:1
**partnership**
188:11 189:23
**party** 4:22 20:8
20:9 51:17,19
100:11 101:11
112:3 123:3
126:5 212:10
215:11 229:17
229:25 230:2
**party's** 17:4
**passable** 88:17
**passage** 36:8
40:13 183:7
207:10
**passu** 236:1
**past** 11:21
**pattern** 164:1
**pause** 113:10
**pay** 230:6,11
230:14
**payment**
234:12
**payments**
163:21
**payors** 163:22
**pearson** 35:1,8
154:1
**pedantic** 22:2
**pen** 61:12

**pending** 7:19
**people** 18:22
111:14 121:10
121:13 162:25
168:20 181:19
**percent** 103:25
145:4
**perform** 47:10
**period** 10:14
111:11
**permits** 211:13
242:18
**permitted**
24:12 212:22
233:18 241:25
**perpetrators**
163:11,14
**person** 53:2
98:16 193:24
**personal** 43:24
95:15 127:10
160:4 199:19
235:25 236:13
**personally**
45:23
**personnel**
169:21
**persons** 37:3
139:1,2 169:5
**pertaining**
110:19
**petch** 3:6 42:19
44:3

**petition** 107:22
**phrase** 121:17
**physical** 165:22
166:2
**pick** 55:11
65:23
**pierce** 116:5
**pin** 6:8
**piroozzadeh**
32:17
**place** 4:5 9:7
89:9 97:12,16
139:11 144:2
144:18 146:4
**places** 139:10
**placing** 97:8
**plain** 97:4
**plan** 108:18,19
108:22
**plate** 187:7,13
187:24 188:4
**platform** 149:6
149:9 150:13
151:10,14
243:8
**please** 5:10
6:18,19 24:23
52:17 53:6
88:5 105:9
107:13 192:18
206:14 214:16
218:15
**pledge** 26:14

**point** 22:2 27:4
30:21 35:23,25
38:6,8 39:17
41:2 59:19
65:21,23 66:2
82:8 110:7
116:7 117:19
120:17 136:13
181:2,22
184:18 189:1
189:21 190:23
193:10 204:18
221:4 228:20
236:3 237:18
242:6,16 243:1
**pointed** 63:12
**pointers** 40:24
**pointing**
128:25 129:1
192:16 202:23
218:13
**points** 23:12
24:10,18,24
27:12,14,15
29:16 31:18,23
32:11 33:11
35:18 40:23
104:3,4 136:24
148:22 165:9
181:4
**policies** 190:11
190:18 212:4
213:5 214:7,11

CONFIDENTIAL

**policy** 167:18 168:1 169:15 171:9,13 172:3 172:6 246:21
**ponzi** 144:7
**pool** 136:4 145:3,5,18 147:23 154:19 154:22
**pooled** 176:19
**pork** 165:20
**portion** 90:11
**posed** 46:17,21
**positing** 113:19 113:22
**position** 32:25 53:3 63:25 64:7,16 83:1 91:18 111:16 136:22 137:2 138:25 146:25 161:1,12 163:4 164:9 204:14 204:24 206:24 207:3,14 208:22 210:19 211:5 215:12 218:24 220:17 234:9 235:4 239:9 241:2
**positions** 34:14 36:16 39:3 68:8,23 216:24

**positive** 67:13 67:23 68:8,22
**possess** 94:7
**possessed** 199:16
**possession** 193:11,12 194:7,23 195:2 199:11,20 201:9,25 203:16,21,22 203:25 204:11
**possessions** 217:25
**possibility** 90:21 114:6
**possible** 58:10 114:10 129:21 130:5 134:22 135:5,6,13,25 196:7,12
**possibly** 22:6 115:6 222:10 230:8
**postdate** 55:20
**postdated** 55:15,24
**postdates** 55:8 55:22,22,22,23 55:23
**posted** 76:10 76:20
**potential** 181:2

**potentially** 153:5
**poulton** 199:6
**powers** 36:4 183:14
**practice** 15:4,5 59:10
**practitioners** 35:17
**precise** 9:23 14:25
**precisely** 77:23 98:25 213:2 236:6 242:3
**preclude** 242:25
**predicate** 224:22
**predicting** 135:7,17 136:6
**preference** 234:18,19 238:19,25 239:2,12,18,22 240:1,13,17,20 240:23 241:7
**preliminary** 228:23
**premise** 207:23 208:4 240:8 241:4
**premiums** 162:19,24 163:7,16

**preparation** 42:22
**prepare** 42:2,4 168:16
**prepared** 97:18 111:22 112:25
**pres** 131:14
**present** 3:3 24:6 33:1 39:6 39:8 119:13 120:18 129:2 132:24 140:2 193:22 204:1
**presented** 82:22 161:10 161:11
**presenting** 142:11
**presently** 232:10
**preserve** 87:5 133:1 140:22 225:6 226:6
**presumption** 38:13
**pretty** 28:1 97:24
**prevailing** 238:19 239:12
**prevent** 218:1,5 238:18 239:11
**prevents** 240:13

CONFIDENTIAL

**[previous - proprietary]**                                    Page 46

**previous**
  122:18 140:10
  140:17 226:18
**previously**  20:4
  90:4 170:5,19
  177:6 208:16
**price**  230:6,9
  230:11,12,15
**primary**
  195:12
**principal**  149:7
**principle**  71:15
  119:18 120:22
  120:23,24
  121:6,16,24
  122:12,13
  124:11,14
  125:1 141:24
**principles**  26:3
  40:23 51:13
  52:8 86:8
  96:18 97:25
  98:13 118:9,13
  118:17 119:3
  119:14 121:11
  137:17,19
  139:17 148:7
  153:25 157:14
  157:15 158:8
  158:19 159:2
  168:7 169:23
  171:4 194:25
  197:4

**prior**  19:18
  20:7,17,20
  28:19 54:22
  56:6 59:4 61:4
  77:18 78:2
  86:15 228:22
  229:13 234:10
**priority**  233:11
**private**  15:4
  80:15 174:15
  174:24 175:7
  176:11,11,15
**probably**  10:7
  12:7 115:17
  159:24 172:19
  173:14 225:18
**problems**  203:4
**procedural**
  10:8,18 24:1
  228:16 229:11
**procedure**  24:5
**proceeded**
  62:22
**proceeding**  7:8
  7:18 8:2,7,15
  8:21 9:3,11
  12:20 244:20
**proceedings**
  7:5,17 8:23,25
  9:6,8,17,21
  10:4 11:3 12:4
  12:12,14,17
  13:10,13,22,25
  24:11 63:23

77:14
**proceeds**  73:14
  74:4,16,23
  75:3,19 139:9
**process**  42:24
  43:5 44:10,20
**produce**  41:4
**produced**  25:6
  27:24 42:13,15
  44:3 161:1
  242:8
**professional**
  20:15
**proffered**
  101:12
**profits**  233:10
  234:12
**program**  64:10
  90:22 145:19
  145:24,25
  211:4
**prominence**
  169:10
**promise**  231:3
**proof**  22:15
  23:3 53:12
**proper**  155:20
  196:10 217:18
  217:19
**properly**
  119:21 217:18
  235:8
**property**  36:3
  107:22 108:10

109:1 118:2,6
  122:7,8 127:10
  127:10 128:10
  132:9 136:15
  136:17 137:6
  138:22 153:23
  155:9 166:3,5
  166:12 174:2
  175:11 183:12
  193:18 194:13
**proportion**
  37:11
**propose**  28:5
**proposition**
  101:18 110:11
  111:23 121:4
  141:25 186:24
  239:24 240:21
**propositions**
  124:21 125:4
**proprietary**
  11:18 25:15
  35:5 37:16
  43:24 58:25
  85:3,19 86:6
  87:6 88:19
  92:12 94:3,13
  94:20 95:7,10
  95:13 116:1
  119:16 120:2
  120:25 127:14
  127:16 129:16
  137:8 139:5,18
  139:24 140:22

141:10,18
143:13 144:16
149:21 150:3,7
150:15 154:23
155:23,24
160:3 175:10
185:10 195:25
224:11,25
225:10 226:6
226:23 227:12
228:3,9 231:4
231:6,8,10
233:10,14
234:5 236:21
236:25 237:3,5
237:6 238:3,11
238:17 239:10
239:17 240:12
240:16 243:11
**protect** 90:22
**proulx** 2:19
**provide** 24:2
30:1,17 125:7
129:2 144:19
144:22 186:6
205:8
**provided** 8:24
9:9 10:5,11
11:16 12:16
13:13,18,21
14:3,8 25:10
29:24 43:8
46:9,13 56:7
56:12 76:13

85:22 90:8
158:11 164:7
164:12,13,17
169:1,22 189:4
189:8 206:11
206:15,17
**provider** 149:6
**providers**
51:17,19
**providing** 8:9
12:18 23:10
84:10 89:25
148:5 191:12
**provision** 35:15
40:5 82:19
126:22 150:21
151:15 187:7
187:12,14,24
213:10,17
220:2,19 221:7
221:9
**provisions**
39:21 83:2
148:24 151:4
154:14 155:3
157:21 183:23
188:17 191:3
195:15 207:20
**proviso** 189:13
190:9,15
213:24 215:2
**provisos** 212:6
213:7

**prudentially**
197:21
**public** 1:17 5:6
245:23 247:3
248:22
**pulled** 138:4
**purchase** 70:15
**purchased**
93:10 175:4
**purchasers**
100:13
**purchases** 93:7
**pure** 224:20
**purely** 26:10
**purport** 81:20
**purported**
83:13 88:10
**purpose** 40:7
60:12 187:22
188:15 200:9
200:19
**purposes** 5:15
12:3,12 38:8
39:7,8 56:16
56:19 58:6
60:25 84:17
99:14 108:22
118:16 120:19
131:4 143:20
156:24 165:23
167:5 170:10
171:17 178:4
185:24 217:19
217:19 223:25

235:12
**pursuant**
108:17 171:18
211:1 212:13
**put** 6:8 16:23
18:13 19:6
95:12 109:5
159:4 161:19
187:17 234:9
237:14 243:9
**puts** 174:23
180:2
**putting** 87:21
111:10 113:3
118:3 174:8
190:24 240:23

**q**

**qc** 10:13 13:4
138:15 159:24
**qualified** 77:8
190:17,25
**qualifies**
140:10
**qualify** 138:12
**quality** 96:25
**quantify**
234:15
**quantum**
228:24 229:2
229:14
**quasi** 92:19
121:23 122:2
192:12,20

193:9 194:8
200:9,15 201:1
233:3
**question** 8:12
9:6 12:23 17:6
21:14,16 23:24
32:11 33:16
46:23 58:16
64:25 66:24
67:5 68:16
69:19 71:9
74:13 78:11
83:11,16 84:3
84:5,15,18
85:13 87:11
88:23 89:2,17
95:1,2,4,6
103:18 105:8
110:4 118:23
122:10 123:1,2
123:15,18
135:11 137:22
140:24 143:25
148:23 154:25
164:3 167:11
178:2,3 179:24
187:19 188:5
191:20 194:18
202:11 204:21
206:6,8,11,16
206:19,23
207:6,6,8,14,15
207:17,20,22
207:24 208:1,7

208:13,14,15
209:2,5,10,11
209:16,19
210:2,15,20,21
211:7 212:19
216:2,4 218:19
218:21 219:7
220:11,13,16
220:24,25
221:6 222:15
222:16,17,19
223:15,21,22
223:22,24
224:1,6 225:4
227:22 228:16
229:11 234:20
235:22 244:1
**questions** 27:22
45:19,20,24
46:2,6,8,12,13
46:16,20,21,24
46:25 47:6,13
47:19,25 48:22
123:8,16,20,24
206:7 221:19
227:14,18
229:5 235:9
243:24
**quickly** 234:25
235:15 237:11
241:10
**quite** 44:15
46:3 58:4
104:6 152:12

159:21 192:9
202:17 236:16
**quote** 19:5 26:1
40:8 52:20
117:16 126:9
126:10 148:2
**quoted** 38:7
126:2

---

### r

**r** 5:4 117:3
**raguso** 3:4 4:16
**rather** 58:1
65:17 83:24
163:25 197:12
210:8,17,24
**reach** 35:10
179:9 197:22
198:18 199:2
**reached** 26:21
198:13 199:23
**reaching** 97:2
178:10 198:22
**read** 79:17,19
86:3,14 105:18
106:20,20
107:12,16,17
108:2,2 126:14
151:18 172:17
172:20,24
173:12,15,20
181:10 188:21
188:22 191:13
200:17 201:4

211:18 235:5
235:18,21
237:9 245:5
**readily** 142:2
**reading** 27:6,20
27:23 28:18
96:21 108:6
133:18,21
152:22 160:9
173:3,7,18
212:2 235:7
**real** 127:9
202:16 203:3
**realities** 147:11
165:13 167:2,7
**reality** 131:7
185:19 186:2
199:17 201:8
**really** 35:2,9
138:6 181:20
234:20
**reason** 6:2 28:6
79:25 80:9
194:1 239:1
248:4
**reasonable**
41:5 53:2
98:16 178:23
179:3
**reasonably**
98:17 116:16
**reasoning**
173:19 220:1

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **rebut** 32:15 | 193:4,17,19 | **recoverable** | 138:13 142:3 |
| **rebuttal** 23:14 | 194:12 196:20 | 231:9 | 151:13 152:2 |
| 24:2,3 40:22 | **recognizes** | **recovery** 2:3 | 153:14 154:11 |
| 242:10,12 | 193:6 | 6:15 164:9,20 | 155:1,12 |
| **recall** 9:14 10:1 | **recognizing** | 206:24 207:3 | 172:20 173:8 |
| 10:6,19 11:3,8 | 120:9 196:23 | **recovery's** | 173:15 184:2,5 |
| 11:22 12:18 | 198:3 | 207:13 | 207:17,25 |
| 13:4,6,15,16 | **recollection** | **red** 37:22 | 208:3 210:2 |
| 19:11 20:23,25 | 33:9 198:9 | **reduced** 73:22 | 216:1 221:17 |
| 21:7 22:3,6 | **recommendat...** | **reduction** | 234:17 244:14 |
| 56:15 76:18,23 | 122:20 | 73:14 74:25 | **referenced** 56:5 |
| 77:24 78:3 | **reconsider** | **refer** 35:14 | 61:22 62:10 |
| 105:6 206:21 | 49:19 50:2,5 | 36:17 39:4 | 75:6 106:8 |
| **recalling** 11:24 | 82:7 | 48:3,7 51:8 | 155:3 159:11 |
| **recap** 137:4 | **record** 4:2,6 | 52:9,18 56:13 | 168:5 180:22 |
| **receipts** 37:8 | 5:1 27:7 52:17 | 63:5 65:16 | 215:3 |
| **received** 27:13 | 59:24,25 60:2 | 66:3,18 105:7 | **references** |
| 46:11 158:16 | 61:17 69:12 | 106:6 120:6 | 72:11 151:23 |
| 171:19 | 79:10,21 80:1 | 121:5 127:25 | 153:13 155:9 |
| **receives** 186:3 | 107:19 108:8 | 129:6 132:2 | 180:25 |
| **recent** 138:4 | 116:20,23 | 141:8 168:6 | **referencing** |
| **recently** 8:19 | 117:7 145:10 | 169:13 182:20 | 180:5 |
| 17:16 25:6 | 145:16 165:2,3 | 183:10 184:18 | **referred** 35:18 |
| **recess** 116:25 | 165:5 205:25 | 197:25 198:15 | 39:9 40:16 |
| **reciting** 65:3 | 206:1,3 208:10 | 199:8 207:12 | 104:3 128:11 |
| 88:15 | 241:17 244:19 | 214:4 215:21 | 145:25 146:6 |
| **recognition** | 245:9 247:9 | 231:23 233:2 | 157:25 183:7 |
| 26:15 119:24 | **recorded** 4:8 | **reference** 26:25 | 185:18 |
| **recognize** | 79:9 80:7 | 47:16 52:23 | **referring** 48:5 |
| 22:23 195:5 | **recording** 4:4 | 59:1 81:5 84:7 | 51:22 55:2,7 |
| 201:18 | 5:11,13 | 87:23 98:10 | 55:10,13,25 |
| **recognized** | **records** 37:8 | 106:1 114:17 | 61:13 64:22 |
| 119:19 120:4 | **recover** 229:17 | 122:2 127:24 | 100:8 123:21 |
| 192:13,21,25 | 229:25 241:21 | 128:17 133:18 | 124:19 151:7 |

CONFIDENTIAL

**[referring - relying]**  Page 50

159:10 180:7
184:16 199:6
221:1 237:1
**refers**  63:13
153:22 219:20
**reflect**  86:10
202:5 203:3
**reflected**  24:17
25:1 32:7,9,13
44:9 47:2,7
62:21 67:5,8
72:1,12 171:13
**reflecting**
85:23
**reflects**  25:22
42:14 47:22
97:19 127:17
138:24 199:21
**reformulation**
236:19
**refresh**  242:2
**refusal**  230:6
230:10
**regard**  21:8
60:7 70:16
75:9 162:2,3
192:7
**regarded**
116:14 161:17
**regarding**
84:11 164:9
189:12
**regardless**
113:6

**regards**  161:5
**regulatory**
186:20
**reject**  41:9
**relate**  70:2,6
122:7
**related**  4:21
12:10 123:8
150:20 181:21
247:12
**relates**  68:15
**relating**  10:7
77:12 119:15
120:24 123:16
123:20 166:13
220:20 229:14
**relation**  8:10
10:9,24,25
11:21 21:5,5
25:25 27:11,12
30:20 34:17
35:11,12,17
42:10 43:15
45:10 47:25
65:21 68:12
75:12 82:4
83:11 90:6
92:5,14 93:1,2
94:1 109:23
110:14,20
114:9,11,13,15
115:7 119:20
119:23 120:19
120:20 124:1

134:2,8 135:23
138:4 140:20
144:7 145:23
145:24 149:23
150:22 151:21
154:16,19
157:23 166:3,4
166:10 181:15
181:24 182:4
182:14 183:3
188:17 189:2
190:1 193:3,15
201:5 203:4,5
204:2 209:25
219:8 221:8,10
221:13 232:18
233:22 240:23
243:4
**relationship**
25:13,14 91:23
92:10,22 93:3
149:5,20 154:4
154:16 155:22
157:23 160:16
166:11 170:21
175:2 181:10
181:24 182:3
182:13 183:21
184:25 185:10
188:13,18,23
189:13,23
190:7 192:12
192:21,24
193:3 194:3

203:10,14
243:2 244:11
**relationships**
18:3
**released**  122:16
**relevance**
109:18
**relevant**  16:25
56:23 69:24
72:4 82:20
96:1,5 101:15
102:22 114:22
126:5 139:10
153:21 156:22
157:9 170:19
172:23 175:18
199:4 203:25
209:12,19
210:4,7,15,22
210:22 227:19
**reliance**  32:16
35:24 183:19
**relied**  37:23
87:19
**relies**  181:5
**rely**  28:2,5 31:8
32:21 44:21
49:8 150:10,21
161:13 167:6
204:13 243:18
**relying**  34:13
36:15 39:2
74:11 88:1,9
148:25 187:23

CONFIDENTIAL

**remain** 123:9
129:11 186:8
**remained** 86:25
174:9
**remaining**
174:1
**remedies**
219:21 222:20
224:6 232:1
233:5,10
**remedy** 141:5
233:8 243:15
**remember** 9:15
10:15 12:1,9
15:23 16:13
21:10 40:18
63:20 65:18
98:24 147:13
168:18,23
235:6,14
**remind** 34:16
66:1 113:9
**remote** 2:8,16
2:17,19,20,22
3:5,6,7,8
**render** 188:16
**renewables**
41:14
**repayment**
76:7
**repeat** 12:23
216:3
**repeating**
185:8

**rephrase**
137:14
**replenished**
37:7,19
**report** 8:9 9:10
23:2,8 24:3,3
25:5,11 30:9
30:11,21 34:11
36:10,14 41:16
41:23 42:2,3,7
42:9,22,25
43:1 45:17
47:8 49:3,9
50:8,17 52:16
56:16 57:1,3
60:6,8 65:14
65:19 66:5
68:17 72:1,10
73:5 81:16
83:18 106:2
117:10 122:4
122:16,19,21
124:2 126:10
138:10 141:22
172:12 177:17
180:4,21 182:2
193:2,6 194:9
194:18 195:11
196:17 197:24
198:15 202:21
206:9 211:9
212:20 224:4
230:25 231:14
231:22 232:6

233:4 235:12
242:10
**reporter** 1:16
4:18 5:2
**reporter's**
113:11
**reports** 8:25
9:13,17,20
10:2 11:11
12:17,24 23:14
30:17 40:17
**represent** 6:14
51:21
**representative**
20:10
**represented**
139:13
**repugnant**
41:11
**request** 27:21
169:24
**requesting** 5:25
**requests** 76:19
**require** 178:22
**required** 17:3
26:16 35:3
**requirements**
61:4 68:24
125:15 130:10
131:6 155:20
214:19 215:18
216:10 232:2
**requires** 97:7
193:10

**requisite**
178:10
**research** 42:22
236:10
**resolution**
196:11 208:21
209:9
**respect** 8:13
9:10 10:1,16
11:6,18 13:14
19:16,25 28:18
28:21 31:12
32:5 36:7 42:1
45:2,7 47:13
48:18,21 56:4
57:4 66:20
67:18 70:15
71:4,20 75:8
75:23 76:19
78:20 84:12
87:21,22 89:1
90:1,2 109:13
115:18 125:8
134:15 139:6
139:19 142:4
143:3 149:8
164:10 165:9
167:7 183:16
208:7 210:14
224:2
**response** 27:14
35:23 242:8
**responsibility**
54:10

CONFIDENTIAL

| | | | s |
|---|---|---|---|
| **responsible** 42:8 60:13 63:6 73:11 | **review** 81:25 82:2 104:23 105:8 106:16 159:20 | 204:9 208:13 208:17 209:6 214:24,25 216:21 217:5 243:16 | **s** 2:7 5:4 117:3 210:23 246:7 248:4 |

**responsible**
42:8 60:13
63:6 73:11
**restitutional**
231:25
**restricting**
243:6
**result** 41:5
42:11 44:3,10
85:12 92:11
114:1 130:4
183:22 220:15
229:3 231:5,7
**resulted** 61:25
**retain** 128:10
128:18
**retained** 18:16
18:19,24 20:5
20:21,25 21:2
80:15 153:10
153:11 155:2
195:19
**retaining** 18:23
**retains** 176:10
**retention** 18:25
19:8 120:1,25
129:15 140:8
150:6,15
151:16 153:15
195:21,24
**retired** 10:12
15:11
**return** 133:4

**review** 81:25
82:2 104:23
105:8 106:16
159:20
**reviewed** 42:25
104:24 106:11
107:7 159:16
168:11
**reviewing**
76:18,22
**reviews** 79:18
107:15 235:20
**revise** 206:19
**reward** 26:13
**right** 7:24
14:16,20 19:21
22:13 26:14
33:20 55:11
81:20 82:6,12
82:24 83:10
124:23 138:2
176:14 197:19
198:7,10,25
202:17 204:8
211:20 212:7
216:25 217:13
225:19 227:5
232:1 233:13
233:15 234:8
235:24 241:21
242:17
**rights** 17:4
26:12 38:15
83:4,13 190:3

204:9 208:13
208:17 209:6
214:24,25
216:21 217:5
243:16
**rise** 140:9
146:21 222:8
223:7 230:7,8
236:13 237:20
**risk** 26:13
149:23 150:5
150:11,19
214:21
**risks** 166:13
**robinson** 2:17
**role** 18:15
45:15
**rolling** 87:13
**rolls** 202:10
**romauld** 3:7
**room** 4:25
**rough** 12:22
**round** 120:7
**rule** 37:24
115:5 126:17
187:25 198:17
**rules** 196:15
**run** 232:20
**ruscoe** 32:22,23
34:19
**rwe** 41:13

### s

**s** 2:7 5:4 117:3
210:23 246:7
248:4
**sa** 40:20
**safe** 85:2,18
86:5 88:18
**safeguarding**
51:13 52:8
86:7 148:7
157:14 158:8
158:19 167:17
167:24 168:6
169:23 171:4
246:19
**sale** 61:25
73:11 74:20,23
75:19 140:6,7
149:16 203:6
230:7
**sales** 166:14
**sam** 86:20
**samuel** 2:8
**satisfied** 131:5
131:7 141:19
155:25 230:19
**satisfy** 130:9
231:3
**saw** 69:22
**saying** 16:14
71:2 114:4
115:21 135:11
141:14 148:5

CONFIDENTIAL

**[saying - sense]**                                    Page 53

| | | | |
|---|---|---|---|
| 156:15,16 | **sdarby** 2:9 | **sections** 152:20 | 211:17 216:16 |
| 160:13 166:25 | **se** 227:3 | 153:4 | 217:5 218:21 |
| 175:22 183:25 | **second** 16:8,11 | **securities** 11:21 | 219:23 220:23 |
| 188:22 189:7 | 21:16 64:23 | 11:25 127:14 | 224:15 227:25 |
| 189:22 190:20 | 72:11 81:17 | 132:11,14,17 | 231:17,18 |
| 191:13,24 | 86:7 176:17 | 133:13 144:8 | 236:3 242:24 |
| 200:25 216:12 | 189:6 190:20 | 147:22 165:19 | **seeing** 105:6 |
| 230:17 234:3 | 206:14 221:25 | 166:19,24 | **seem** 199:3 |
| 240:25 | 223:1 | 183:1 | **seems** 38:22 |
| **says** 61:23 63:1 | **section** 45:18 | **security** 148:6 | 181:19 240:6 |
| 102:19 103:6 | 50:8,9,16 | 167:14 | **seen** 25:11 |
| 108:17 123:5 | 51:24 53:17 | **see** 28:6 39:9 | 27:10 51:9 |
| 124:18 129:7 | 55:4 68:24 | 45:21 50:10,12 | 86:10 105:11 |
| 147:13 182:2 | 77:1 80:13 | 53:6,13 54:13 | 105:22 106:16 |
| 188:12 191:9 | 99:5 108:11,13 | 54:24 60:8,16 | 133:22 157:7 |
| 213:2 238:5 | 108:21 131:20 | 62:3 64:13 | 159:14 |
| 241:18,18 | 136:11 147:6 | 66:5,11 68:6 | **sees** 187:15 |
| 242:22 | 149:2 150:20 | 72:14 73:18 | **segregate** 87:3 |
| **scenario** 113:2 | 152:23 153:7 | 76:11 77:5 | **segregation** |
| 113:19 115:6 | 155:14 156:2,4 | 80:19 81:22 | 112:7 |
| 115:13,16,20 | 156:12 175:12 | 84:1 85:20 | **seize** 216:23 |
| 225:12 229:23 | 181:9 182:1 | 87:12 88:14 | **seized** 217:4,24 |
| 241:4,5 243:19 | 183:25 187:2 | 89:13 99:3 | **select** 41:4 |
| **scenarios** | 190:8,16,25 | 102:24 105:19 | **sell** 26:14 93:23 |
| 113:23 226:8 | 204:13 211:11 | 107:25 117:18 | 95:9 |
| **schedule** | 211:18 212:20 | 125:16 131:22 | **selling** 184:17 |
| 105:12 146:2,2 | 213:13 214:14 | 132:3 134:25 | **semantic** |
| **scheig** 27:2 | 214:18 215:1,3 | 139:1 141:23 | 103:22 |
| **schemes** 144:8 | 215:15,20,25 | 142:8 168:2 | **semantical** |
| 163:12 | 216:7,17 217:6 | 179:20 180:8 | 40:2 |
| **science** 139:2 | 218:22,25 | 184:7 187:9 | **sending** 212:8 |
| **scope** 108:5,13 | 219:20 225:3 | 190:23 197:25 | 215:9 219:22 |
| 109:5 125:10 | 241:13,13,24 | 198:19 200:15 | **sense** 12:14 |
| | 244:5,7 | 207:9 211:16 | 40:3 103:23 |

119:9 133:2
134:5,5,8
155:8 163:10
163:19 181:21
199:17 204:11
205:23
**sensitive**  202:4
**sent**  105:24
**sentence**  60:10
63:22 64:23,24
66:16 72:11
79:8,16 81:18
85:16 90:12
178:2 184:5
189:6,11,19
190:20 191:12
226:10
**separate**  66:22
70:10,11,21
127:1,20 190:3
213:21
**separately**  66:8
66:15,15,17
127:6 161:7
**separateness**
67:7
**september**  7:12
**serve**  15:1
**served**  15:14
16:19 20:14
**service**  43:18
47:25 48:4
146:2 181:17
185:16

**services**  151:12
184:6,9,12,22
185:17 243:8
**serving**  14:18
14:24 15:9
**session**  117:1
**set**  17:16 39:18
50:16 51:1
56:8,14,17
57:4 58:19
69:6 72:19
77:7 78:21
79:2 82:19
83:10 96:17
122:20 126:13
157:1,5 167:8
173:18 188:24
206:9,23
208:14 214:22
224:3 232:2
242:15 247:7
247:17
**setoff**  65:25
**sets**  35:7
**setting**  219:12
**seven**  45:20,24
46:6,8 47:1,13
243:23
**shamus**  3:5
**shapo**  183:19
**share**  93:23
136:4
**shares**  11:21,24
93:23 127:11

132:14
**sharing**  37:8
**sheet**  25:21
26:6,17,20
86:12 161:6
219:18 245:8
248:1
**shelf**  100:21
**short**  205:22
**shortfall**  144:3
**shorthand**  1:16
122:5
**shortly**  109:5
243:9
**show**  48:13
106:5 148:12
**showed**  163:6,7
163:8,23
**shown**  13:25
148:14
**shows**  199:14
199:20 205:14
**side**  14:1
217:20 219:17
221:15
**sides**  65:4
**sigma**  39:11
40:8 101:25
102:4 114:20
148:2 156:18
170:18 179:21
246:15
**signature**
247:20

**significance**
100:23 187:12
203:9,11
**significant**
97:12,16
**similar**  33:1
111:1 112:24
133:8 194:7
198:11
**similarly**
150:19 210:5
210:11
**simple**  146:24
**simply**  74:13
80:4,24 84:16
89:21 91:1
95:15 109:10
135:20 160:4
178:3 179:24
182:7,12,23
188:20 189:6
220:5 221:14
227:2
**sinclair**  234:21
235:2 246:22
**single**  68:6 75:5
83:5 151:8
209:7 220:5
**sir**  40:14
**sit**  30:15
216:18
**sitting**  31:22
33:8 52:22
138:15 166:20

situation
  101:20,20
  112:9 127:18
  132:9 135:9,19
  137:11 149:11
  149:13 186:2
  209:22,23
  215:7 222:13
  230:5
situations
  15:19 110:19
  133:10 160:24
  186:20
skim  106:20
slavishly  41:1
slightly  138:12
  163:4 176:8
  186:18
sllcrom.com
  2:7
slow  172:14
snatch  243:18
snell  36:9 183:7
snell's  35:15,19
  183:10
society  37:15
sold  37:19
  73:24 93:18
  94:18 95:6
  138:23
sole  217:7,14
solely  147:6
solutions  248:1

somebody
  89:16 118:6
someplace
  65:14
somewhat
  140:9
sorry  18:8
  37:25 39:7,15
  43:9,22 46:21
  54:16 61:22
  64:24 69:7
  71:8 72:10
  79:12 83:12
  98:2,5,7
  102:12 104:6
  106:5 113:13
  113:13 117:12
  119:3 128:14
  131:19,23
  142:23 144:14
  144:21 148:6
  149:24 150:17
  152:5 155:17
  163:13,25
  167:11 172:14
  173:3 174:16
  184:3 195:10
  197:11 203:11
  211:12 213:1,7
  221:16 223:21
  225:21 232:14
  236:5 241:5
  243:10

sort  5:18 141:5
  182:25 194:19
  194:20 212:11
  238:8 244:6
speak  233:23
specific  44:15
  79:22 110:21
  115:8 126:7,12
  130:2 154:10
  177:21
specifically
  18:2 55:25
  62:2 63:5 85:4
  85:6 206:8
specificity  11:4
speculate
  110:18 111:18
  115:11 214:2
  220:7,18
spot  146:2
spotted  63:16
  63:19
stage  65:25
  77:13 174:18
  175:8
staking  151:9
  151:12
stamped  69:16
  246:13
stand  173:6
  183:17
standard  35:16
  43:17 84:8
  100:7,10,12,15

100:24 101:5
  101:11,14
  102:15 103:4
  110:12 113:20
  114:2,9 187:14
  221:8 231:24
standing  94:10
  94:13
stands  125:3
  135:12,22
start  5:9
  109:19 115:23
  132:16 149:4
  213:1
starting  45:18
  53:17 55:3
  102:10 237:18
  240:8
starts  38:13
  50:8 189:2
state  1:17 76:4
  78:15 89:7
  97:20 98:15
  125:13 141:23
  151:11 180:4
  211:11 218:14
  224:9 247:4
stated  51:16
  138:17 169:6
  185:11 193:20
  223:6 233:7
statement  23:9
  23:16 62:19
  78:1 86:18

CONFIDENTIAL

**[statement - support]**                                                                        Page 56

103:9 110:9
114:1 135:21
150:25 200:18
211:24
**statements**
25:3,5,20
26:19 51:12
76:14 78:7
126:13 148:11
157:9 158:7,25
159:9,11,17
160:10,19
161:2 162:4,11
163:23 164:8
164:11,14
167:14 245:10
**states**   1:1 4:11
7:20 8:14,21
8:22 9:18,22
10:3 11:4,12
11:17 12:17
13:1,12 14:4,5
64:6 91:9,10
104:16,21
106:23 183:11
212:21 237:18
246:16
**stating**   119:11
136:7 192:4
237:25
**statute**   193:21
**stenographic**
5:1

**step**   173:19
197:10
**steven**   138:15
**stocks**   93:22
**stop**   27:5
148:16 152:11
**stopping**
108:12
**storage**   36:19
37:14
**stout**   25:24
**street**   1:14 2:3
**strike**   210:13
**struck**   168:25
**structure**   182:8
197:7
**structures**
200:11,21
201:3,13,21
**stuff**   105:24
**stupid**   197:12
**subject**   10:4
31:2 109:15
110:6 115:2
121:14 125:20
130:11 131:14
137:7 142:1
190:10,21
212:3,25 213:4
213:7,7,16
230:23
**subjective**   96:4
**subjects**   10:20

**submitted**   9:16
9:21 10:3
11:12 12:25
13:12,17 23:2
25:8 43:1
**submitting**
9:14
**subscribe**
245:8
**subscribed**
245:18 248:19
**subsection**
80:13 134:21
**subsequent**
225:25 226:21
227:7
**substantial**
66:9
**substantially**
63:3
**substantive**
126:3 137:12
**substantively**
227:14
**succeed**   222:4
223:4
**sued**   164:20
**sufficient**   72:24
143:12 200:14
**sufficiently**
18:3 36:22
**suggest**   38:23
94:8

**suggested**
236:19
**suggesting**
113:24 192:1
**suggests**   139:14
141:5 208:2
**sullcrom.com**
2:6,9
**sullivan**   1:14
2:2 4:15 6:14
**summarize**
27:9 53:9
91:22
**summarized**
92:7 98:25
**summarizes**
27:11
**summary**   53:25
54:9
**superior**
200:13 204:8
204:15,25
205:9
**supplemental**
29:21
**supplemented**
158:6
**supplier**   100:12
**support**   22:14
23:2 24:19
26:21 29:10,15
29:25 30:8,17
30:23 31:6,14
31:19,24 34:14

CONFIDENTIAL

**[support - terms]** Page 57

39:3 56:8,14
83:3 87:14,19
148:25 156:11
160:15 165:10
169:1 207:21
239:17
**supported**
114:19 150:25
151:2 196:16
**supporting**
76:14 164:17
199:18
**supports** 25:12
33:2 34:3
86:23
**supreme** 34:25
39:13 102:4
**sure** 31:3 40:18
45:4 46:3
48:11 74:7
86:17 93:14
94:25 100:17
110:3 112:19
118:22 123:23
139:21 186:19
202:13,24
204:20 207:2
212:19 216:5
230:16 235:7
235:19
**surplusage**
37:24 38:17
**surprising**
147:20

**surrounding**
52:24 59:2
145:15
**suspect** 16:22
**sustain** 151:25
**swap** 140:3
149:14
**swear** 5:2
**sweeping**
226:20
**swept** 154:19
174:25 176:13
177:12
**swift** 237:9
**switch** 161:19
**sworn** 5:6
245:18 247:7
248:19
**synthetic** 17:8

**t**

**t** 5:4,4 117:3,3
246:7
**tackett** 169:21
169:24
**tail** 190:5
**take** 4:5 9:6
28:7 32:20
33:4 54:10
59:21 61:1
62:17 63:17
65:22 88:4
96:21 106:17
116:20 146:5

157:19 160:13
164:25 184:18
192:18 197:3
218:15 233:11
**taken** 1:15 4:9
63:24 64:7
104:7 116:25
117:11,17
121:15,21
146:16
**talk** 172:22
206:5,8
**talking** 9:7
17:12 20:17
48:9,12,14
60:5 70:7
113:12 141:6
150:1,2 165:7
166:2 234:1
**tangible** 94:5
122:7 166:3
**taousse** 2:20
**task** 39:15,20
95:19 202:10
202:22
**tasmania**
232:16,18
**tasmanian**
198:9,10,16
199:10 201:5
**team** 29:5 44:5
**technicalities**
174:6

**technology**
117:20
**tedious** 152:12
185:9
**telephone** 2:4
43:12
**tell** 7:16 14:1
33:24 105:15
118:5 158:13
160:14 210:3
223:24
**telling** 163:16
163:20 177:18
178:15
**tenant** 35:6
**tenants** 136:4
154:22
**teneo** 21:3,4,8
21:12,18,22
22:5
**term** 52:14,15
52:19 57:18
70:22 83:2
100:5,10,25
114:9 122:2,3
122:5 184:9
188:3 213:14
**terminology**
191:21
**terms** 11:1 34:5
35:14,25 43:17
43:18,18,22
47:24 48:4,8
54:23 55:16,21

CONFIDENTIAL

56:7 59:1,9,16
59:20 68:25
69:5,8,14
70:20 77:19
78:3 86:2,2
87:22 88:11
91:24 92:23
94:2,8 99:8,15
99:20,24 100:7
100:13,15,20
100:21 101:5
101:12,14
102:16 103:4
104:12 106:25
109:4,14,16
110:7,12,13,15
110:25 111:5,6
112:8,12,15,25
113:4,5,16,21
114:2,11,15
115:1,2,3,14,15
115:19,24
116:3 119:1
131:21 133:6
134:2,15
136:25 137:14
139:23 143:20
145:20 146:1,7
147:5,6 148:25
149:6 153:5
154:14 156:4
156:23 157:17
157:22 161:18
161:25 167:13

181:1 182:17
184:10,12
185:4,16 186:6
186:18 187:3,8
189:4,9,22
190:8,12,18
191:3,25 192:8
198:12 205:7
206:17 207:18
207:21,25
208:4,6,18,22
209:3 211:1
212:5,14,22
213:5,11 214:8
214:11,15
218:8 222:14
233:18 236:5
237:20,21
241:11,12,24
243:20
**test** 105:15
**testified** 5:7 8:6
8:8,13 48:25
49:4 56:1
71:18 78:7
117:5 169:21
170:9
**testify** 8:1 32:5
33:14 71:19
**testifying** 33:8
44:25
**testimony** 8:20
29:6 33:12
45:1,6,10 46:5

77:21 84:11
86:19 88:1
112:13 162:9
179:12 199:2
247:6,9
**textbook** 35:16
122:5 197:24
231:24
**tezos** 138:20
**thank** 6:4 8:16
17:14 38:24
89:3 103:7
106:19 138:9
172:14 242:6
244:17
**theoretical**
114:6
**theory** 92:19
**thesis** 130:20
130:22
**thing** 38:18
48:12 151:6
203:18
**things** 72:13
165:12 190:22
199:20 214:23
214:24
**think** 7:22,25
15:17 19:13
28:1 34:22
35:18 36:20
39:14 40:13,13
41:13 47:9
49:10 55:15,24

56:1,22 58:7
58:15,17,21
61:17 65:25
67:10 85:13
98:23 100:19
101:17 104:2,8
105:12 111:17
111:22 112:16
112:18,20,21
115:12,22
116:7,13
117:25 124:17
124:21 125:11
125:11 130:1
135:10 138:2
152:18 154:15
167:3 170:15
176:7 177:6
180:15 189:16
190:14 198:7,8
198:18 199:5
200:24 208:9
209:15,16
219:18 220:8
220:11,24
221:5 224:5
225:18 226:9
231:23 232:15
236:14,17
237:6 240:10
242:4 243:22
**thinking** 237:7
**third** 41:6
51:17,19 86:9

CONFIDENTIAL

212:10 215:11
**thought**   131:16
  156:15 176:5
**thousand**   147:1
**three**   18:11,14
  18:16,21 19:17
  21:13,17,19,21
  22:7,8,16 23:4
  25:15 39:7
  43:16,23 53:10
  100:22 109:9
  111:1 112:4,10
  112:10 125:15
  152:5 154:6
  168:24 178:16
  178:18 183:21
  212:6 218:3
  221:21 222:1
  222:11,21
  227:12 237:9
  238:2 241:6
  243:10,14,15
**ticket**   204:10
**ties**   36:11
**tim**   2:17
**tim.robinson**
  2:18
**time**   10:14,24
  12:7 14:24
  24:6 54:16,16
  60:2 72:23
  74:2 76:5 89:9
  91:10 110:7
  111:6,11,12,16

111:24 112:1,5
116:23 117:7
120:12 122:22
157:9 159:15
162:6 164:23
165:2,5 168:14
169:8 174:4,12
186:8 193:22
197:2 205:23
205:25 206:3
211:15 212:1
212:16,24
213:2,6 219:13
**times**   7:2 21:7
  44:18 109:16
  111:24 113:17
  174:1 178:17
**timing**   217:1
**title**   6:17 17:11
  126:6 127:1,2
  127:19,21,24
  128:1,8,9,12,12
  128:17,21
  129:6,10,17
  139:14 140:8
  153:10,22
  155:10 172:18
  172:21,24,25
  173:8,9,16,25
  174:7,17 175:1
  175:3,10
  195:21 204:8
**today**   18:9
  30:15 31:22

33:8 48:7
  104:5 112:14
  180:24 194:11
  198:3
**today's**   199:21
  244:20
**together**   10:6
  31:9 190:2
**token**   80:17
  126:7 167:18
  167:25 246:20
**told**   5:12 6:6
  53:22 54:4
  90:4 112:7,11
  168:17,18
  169:2 170:5
  178:16 207:13
  233:16 239:20
**took**   62:6 80:4
  89:9 139:10
  160:20 170:19
  205:13
**top**   66:5 106:7
**topic**   42:11
  241:10
**tort**   232:9,25
**total**   152:1
**towards**   189:25
**traceable**   139:9
**trade**   134:7
  149:24
**traded**   17:8
  134:14 166:19

**trader**   58:25
  133:4,5 194:4
**traders**   51:15
  110:20 169:8
**trades**   146:20
  149:8 166:15
  181:15,22
  183:3 184:21
**trading**   1:5
  4:10 11:1 25:3
  25:6 59:15
  110:14,25
  111:14 112:24
  146:3 147:11
  147:18 149:6
  149:19,24
  151:15,21
  164:13 165:13
  165:21,21,24
  166:7 167:7
  176:12 181:25
  182:14 185:7
  190:1 202:6,15
  214:19 248:2
**traditional**
  236:20
**transaction**
  18:7 74:2,5
  75:6,15 140:3
  140:6 145:10
  145:15 149:14
**transactions**
  16:3 60:14
  78:17

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **transcript** 5:22 | 125:25 126:19 | 172:9 173:20 | **turnaround** |
| 12:23 133:19 | 126:25 127:9 | 179:23 181:11 | 161:15 |
| 133:22 169:25 | 127:11,15,19 | 184:24 189:24 | **two** 6:22 15:18 |
| 245:6,9 247:8 | 127:21,22 | 195:12 234:4 | 16:14 21:14 |
| **transfer** 61:25 | 128:22 129:22 | 234:10 236:7 | 22:6,8 34:9 |
| 73:12 74:24 | 130:3,4,6,8,17 | 236:12 237:20 | 39:6 46:20,23 |
| 127:24 175:25 | 130:19,21,25 | 237:21 238:2 | 51:9 70:17 |
| **transferred** | 131:3,5,7,8,11 | **trust's** 206:24 | 74:3,15,20 |
| 129:10,19 | 131:11,12,13 | 207:3 | 75:2,16,19 |
| 142:5 | 131:15,22 | **trustee** 25:17 | 124:8,21 125:3 |
| **transferring** | 132:2,3,7,8,11 | 36:2 85:24 | 139:16 140:18 |
| 128:8,9,16 | 132:21,22,24 | 92:11,14 | 168:23 230:8 |
| **transfers** 62:15 | 134:23 135:12 | 132:11,12 | 237:9,19 |
| **transparency** | 135:15,21 | 155:23 161:8 | **type** 28:25 42:5 |
| 77:11 78:15 | 136:1,10 | 161:11 162:12 | 42:9,13 44:13 |
| **trend** 97:11,19 | 137:20,24 | 183:4,12 185:1 | 102:20 104:5 |
| **trial** 8:1,4 | 138:23 139:25 | 224:14 225:2 | 122:13 132:22 |
| **tribunal** 9:4,7 | 140:9,13,19,19 | **trustees** 133:9 | 133:10 136:18 |
| 17:23 | 141:1,3,4,11,20 | **trusts** 126:8,11 | 165:17 190:9 |
| **tried** 140:16 | 142:1,2 143:4 | 136:17,18 | 201:25 204:3 |
| **triple** 117:19 | 143:7,9,19,21 | 137:7 | **typical** 28:1 |
| **true** 52:5 56:19 | 144:1,1,16,24 | **try** 118:24 | |
| 247:8 | 147:4,23 148:9 | **trying** 12:1 | **u** |
| **trust** 2:3 6:15 | 149:1,18 | 13:3 33:15 | **u.k.** 38:3 102:4 |
| 10:23 11:6 | 152:22 153:7 | 55:17 60:24 | 159:23 |
| 12:5,19 13:1,5 | 153:18,19 | 61:21 62:5 | **u.s.** 7:5,7 8:6,10 |
| 13:10 25:14 | 154:12,17 | 74:10 106:10 | 13:10 25:25 |
| 34:17 35:11 | 155:13,18,21 | 158:1 | 26:2 47:12 |
| 36:1 51:18 | 156:1,5,6,13 | **tuesday** 4:3 | 67:18 72:12,18 |
| 59:13,16 93:4 | 160:15 162:1 | **turn** 53:4 60:7 | 72:22,24 73:15 |
| 94:7,9 103:19 | 163:1,3,8,17,21 | 81:14 172:11 | 73:22 75:1 |
| 112:8,12 | 163:24 164:9 | 178:13 199:24 | 107:11 108:19 |
| 115:25 119:16 | 164:20 165:10 | 211:8 236:23 | 159:21 195:4 |
| 125:15,16,24 | 166:24 170:20 | 241:11 | 196:9,19 197:2 |

CONFIDENTIAL

197:11,14,15
198:2 199:1
219:1,5,10,16
**ultimate**  18:22
19:5 133:14
**ultimately**
176:19
**unambiguous**
96:11,12
**unaware**  72:5
**unchanged**
179:13
**uncommercial**
192:8
**unconditional**
211:19
**uncontested**
139:11 141:16
**under**  5:22
8:20 13:23
26:2 43:17
58:3 68:24
81:20 82:6
94:2 99:18
100:5 119:16
121:10,13
123:10,18
129:22 134:22
135:13 149:5
182:24 183:18
183:22 184:10
188:1 196:5
198:5 204:9
208:18,22

216:22 218:4
222:20 224:13
225:1 240:11
241:25 243:20
**underlie**  45:14
**underlying**
15:20,24 16:16
70:24 71:5,12
71:14 150:17
185:12
**undermine**
31:20,25
148:20 184:24
**undermines**
34:3
**understand**
12:20 18:15
24:1,15 48:8
51:14 55:17
60:24 61:21
62:6 71:1,5,9
71:11,13 74:7
74:10 76:21
78:11 79:20
99:7 107:18
117:22 118:22
127:23 149:10
153:1 158:1
174:10,20
178:1 191:18
204:21 209:16
239:13,14,15
239:19 241:13

**understanding**
9:5 72:17
74:14 100:9
106:22 130:24
178:23 179:3,5
179:10 206:22
211:23 215:25
216:11
**understood**
6:24 98:20
110:2,2 176:5
**unfair**  238:19
239:12,21
**unique**  79:10
79:21 80:1,6
80:10
**unit**  4:7
**united**  1:1 4:11
7:20 8:14,21
8:22 9:18,22
10:3,8,10 11:4
11:12,17 12:17
13:1,12 14:4,5
104:16,21
106:23 246:16
**unjust**  231:16
231:21,25
232:4
**unknown**  139:1
139:3
**unlimited**
113:2
**unmarked**
61:18

**unnecessary**
38:18
**unqualified**
26:18
**unsecured**
231:12 233:11
236:1
**unsegregated**
80:16 145:3
176:21 177:12
**unusual**  38:9
183:2
**usd**  66:9,21
67:8,13,22,23
**use**  26:14 30:7
44:15 52:14,15
57:18 66:15
70:22 94:24
97:14,18
121:17 124:20
127:9,10
147:18 153:18
156:5 167:1
172:6 175:24
193:8 222:2
243:7
**used**  5:14 12:12
13:25 35:16
96:8,11 121:23
122:3 143:19
156:1 221:5
**useful**  115:12
**user**  133:6,15
134:7,12,13

**[user - wallets]**                                                    Page 62

149:12 150:4,7
150:24 154:6
165:24 174:16
174:21 178:19
178:23 179:5
179:10,14
184:16 185:5
185:15 189:21
195:19 205:8
205:15 211:13
211:24 212:13
212:14,22
214:22 226:7
243:3
**user's** 148:8
216:24 217:8
**users** 51:15
63:25 64:8
65:7,13,17
92:15 100:13
112:6,23 113:5
134:6 143:14
143:23 147:16
147:24 148:14
148:19 151:3
152:4,5 154:22
157:16 161:5,8
166:8 175:5
177:8 182:10
224:21
**uses** 6:2 100:12
**using** 6:1
181:17 184:6
184:22 197:12

202:25
**usually** 96:17
119:12 122:7
225:21
**utilized** 80:22
81:3

**v**

**v** 35:9 38:3
98:3 124:4
139:1,2
**vacuum** 97:5
172:17 173:13
**valid** 221:21
222:2,3,24
**validity** 45:2,5
**value** 70:20
83:6 219:12
234:17 238:24
240:1 241:8
**various** 35:20
67:2 214:23
222:9 223:5
**variously** 66:25
67:2
**vendors** 163:14
**venture** 189:24
**veracity** 160:19
**verbiage** 38:18
**verify** 45:13
81:25 82:3
160:18,23
**veritext** 4:17,19
248:1

**version** 43:5
**versus** 84:20
**vi** 106:7
**video** 4:4,8
5:11,14
**videographer**
3:4 4:1,17
59:23 60:1
116:22 117:6
165:1,4 205:24
206:2 244:18
**videotaped**
1:11
**view** 31:7 43:20
43:22 57:22
67:4 75:7,11
75:24 76:1
86:23 88:21
89:19 93:2
97:2 121:25
124:13,24
126:15 130:22
132:20 142:10
142:13 144:24
150:6 152:8,21
153:3,6,9
154:24 157:13
157:18 170:1
171:6,25
184:20 187:11
189:8 196:13
196:20 197:3
199:19 200:8
203:8 208:25

209:8 218:1,6
218:7 220:25
222:5 223:9,11
226:4 231:15
233:7 237:8
238:23 239:9
**views** 27:10
34:18 36:11
42:10,12,14
43:13 44:2,6,8
87:10 90:5
92:7 143:4
165:10 170:6
242:9,13,14,15
242:24
**violations** 61:3
**volume** 105:23

**w**

**wagging** 190:5
**wales** 15:12
38:2 125:6
**walk** 42:23
**walked** 88:10
153:4,14
**walker** 2:22
**wallet** 174:15
174:24,25
175:7 176:11
**wallets** 80:14
81:5,12 142:5
142:16 176:21
177:3,13
226:20

CONFIDENTIAL

**wang** 138:13
139:20 149:14
**want** 27:6 32:2
33:17,20 41:22
93:14 110:3
118:1 138:7,11
148:21 152:10
152:14 161:22
205:22 206:5,7
234:25 241:9
242:2
**wanted** 158:14
165:14 169:12
183:9 235:15
**warning**
214:21
**warranties**
163:1,15
**warranty**
162:21,22
163:12
**water** 38:3
**watkins** 2:10
19:1 20:6,11
20:16
**way** 16:24 19:6
40:2 57:23
75:4,8 79:6
91:14 102:23
103:22 107:3
118:24 121:3
129:8 148:3,10
162:17 179:5
193:14 194:10

195:14 205:12
205:13 206:20
211:2 224:11
224:24 236:20
240:19 247:14
**ways** 124:8
195:25
**we've** 189:24
209:24
**weeks** 168:23
168:24,24
**weight** 97:1,13
97:16 187:19
187:20 188:6
**welsh** 38:3
**went** 162:22,23
206:6
**whatsoever**
187:22 188:15
**whereof** 247:16
**whichever** 75:4
**wholly** 144:13
144:14 192:7
**wide** 110:9
**wider** 97:2
113:1 157:5
**willful** 89:9
**willfully** 89:16
89:20
**willingly** 94:18
94:19,25 95:4
**wish** 36:24
37:24 41:20

**wished** 158:12
**withdraw**
190:22 191:8
191:10 211:14
211:20,24
212:7,15,22
213:12,16,23
215:16 216:8
217:2 218:4
**withdrawal**
215:8
**withdrawals**
37:9 215:2
**withdrawing**
191:5
**witness** 1:12
5:3,5,8 6:4
18:11,14 19:20
79:18 107:15
113:10,13
117:4 235:20
246:3 247:6,10
247:16 248:3
**witnesses** 169:4
**wood** 40:20
97:23 98:3,6
98:10,11
**word** 66:15
100:2 153:18
155:13,18
156:1,5 173:8
180:10 184:19
193:8 203:1
222:3

**wording** 44:14
97:10 126:22
131:5 134:1
153:21,21
179:25 180:2
214:10
**words** 26:3
38:16,21 70:18
74:17 87:4
90:16 96:8,21
97:4,4,13,17
128:6 129:1
130:9 146:24
155:6 172:17
173:13,22
179:7 180:4,15
180:18 184:4
187:21 201:14
213:6 243:17
**work** 45:13
154:2 168:12
195:23
**worked** 78:19
145:23
**working** 116:2
**works** 178:25
205:14
**world** 148:5
161:12 199:18
201:8,12
202:16
**worse** 91:18
**worth** 73:13
74:25

CONFIDENTIAL

**[write - zoom]**                                    Page 64

| | |
|---|---|
| **write**   12:2 42:6 | 237:16 |
| 44:16 54:20 | **year**   7:11 19:14 |
| 60:11 63:23 | **years**   12:8,8 |
| 66:8,14 73:10 | 20:12,24 |
| 77:2 79:7 | 112:10,10 |
| 80:13 81:18 | 119:19 120:4 |
| 83:21 134:20 | 161:1 164:15 |
| **writing**   122:5 | 195:1 |
| 235:12 | **york**   1:15,15,18 |
| **writings**   196:18 | 2:4,4,12,12 |
| **written**   32:13 | 43:11 247:4 |
| 39:1 40:25 | **youtube**   5:17 |
| 57:5 90:16 | **z** |
| 99:3 | |
| **wrong**   31:7 | **z**   5:4 117:3 |
| 64:2 174:11 | **zachary**   2:19 |
| 176:6 198:25 | **zachary.proulx** |
| 208:4 227:4,5 | 2:19 |
| **wrongful** | **zane**   169:21 |
| 199:14 | **zealand**   136:22 |
| **wrongly**   234:6 | **zero**   179:5,10 |
| **wrote**   99:4 | **zhao**   2:14 |
| 158:20 173:6 | **zijun**   2:14 |
| **x** | **zijun.zhao**   2:15 |
| | **zoom**   1:11 |
| **x**   1:3,6 246:1,7 | |
| **y** | |
| **yeah**   50:12 | |
| 117:15,19 | |
| 124:5 164:24 | |
| 168:10 175:20 | |
| 180:9 184:8 | |
| 187:10 200:5 | |
| 206:10 233:6 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 25

<pre>
 1                  UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE
 2

 3   IN RE:                         .  Chapter 11
                                    .  Case No. 22-11068 (JTD)
 4   FTX TRADING LTD., et al.,      .
                                    .  (Jointly Administered)
 5                                  .
                                    .  Courtroom No. 5
 6                                  .  824 North Market Street
              Debtors.             .  Wilmington, Delaware 19801
 7                                  .
                                    .  Tuesday, June 25, 2024
 8   . . . . . . . . . . . . . . .  10:00 a.m.

 9                     TRANSCRIPT OF HEARING
               BEFORE THE HONORABLE JOHN T. DORSEY
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Adam Landis, Esquire
                               LANDIS RATH & COBB LLP
13                             919 Market Street
                               Suite 1800
14                             Wilmington, Delaware 19801

15                             Brian Glueckstein, Esquire
                               Andrew Dietderich, Esquire
16                             Alexa Kranzley, Esquire
                               SULLIVAN & CROMWELL LLP
17                             125 Broad Street
                               New York, New York 10004

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:          Jermaine Cooper, ECRO

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
</pre>

```
 1  APPEARANCES (CONTINUED):

 2  For the Moskowitz Law
    Firm and Boies
 3  Schiller Flexner:          Jason Rosell, Esquire
                               PACHULSKI STANG ZIEHL & JONES LLP
 4                             One Sansome Street
                               Suite 3430
 5                             San Francisco, California 94101

 6  For Sunil Kavuri,
    Ahmed Abd El-Razek,
 7  Pat Rabbitte:              David Adler, Esquire
                               MCCARTER & ENGLISH LLP
 8                             Worldwide Plaza
                               825 Eighth Avenue
 9                             31st Floor
                               New York, New York 10019
10
    For the Ad Hoc
11  Committee:                 Matthew Harvey, Esquire
                               MORRIS, NICHOLS, ARSHT
12                               & TUNNELL LLP
                               1201 North Market Street, 16th Floor
13                             P.O. Box 1347
                               Wilmington, Delaware 19899
14
    For the Celsius
15  Litigation
    Administrator:             Seth Lieberman, Esquire
16                             PRYOR CASHMAN LLP
                               7 Times Square
17                             40th Floor
                               New York, New York 10036
18
    For Steadview Capital
19  Management:                Dylan Marker, Esquire
                               PROSKAUER ROSE LLP
20                             Eleven Times Square
                               Eighth Avenue & 41st Street
21                             New York, New York 10036

22  For LayerZero:             Stephen McNeill, Esquire
                               POTTER ANDERSON & CORROON LLP
23                             Hercules Plaza
                               1313 North Market Street, 6th Floor
24                             P.O. Box 951
                               Wilmington, Delaware 19801
25
```

1   <u>APPEARANCES (CONTINUED)</u>:

2   For the Committee of
    Unsecured Creditors:        Kenneth Pasquale, Esquire
3                               PAUL HASTINGS LLP
                                200 Park Avenue
4                               New York, New York 10166

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2     MOTIONS:                                              PAGE

3     Agenda
      Item 4: Motion of Debtors for Entry of an Order          6
4              (I) Approving the Adequacy of the
               Disclosure Statement; (II) Approving
5              Solicitation Packages; (III) Approving
               the Forms and Ballots; (IV) Establishing
6              Voting, Solicitation and Tabulation
               Procedures; and (V) Establishing Notice
7              and Objection Procedures for the
               Confirmation of the Plan [D.I. 4863;
8              Filed December 16, 2023]

9              Court's Ruling:                                81

10    Agenda
      Item 5: Motion of Debtors for Entry of an Order         81
11             Authorizing and Approving (I) the
               Repayment of Intercompany Payables by
12             FTX Japan and (II) the Release of the
               Claims Related to the Intercompany
13             Payables [D.I. 15654; Filed May 23, 2024]

14             Court's Ruling:                                84

15
      DECLARATIONS:                                        PAGE
16
      1)   Steven Coverick - Docket 15654                    83
17
      2)   Steven Coverick - Docket 17173                    83
18

19

20

21

22

23

24

25

1          (Proceedings commence at 10:03 a.m.)

2          (Call to order of the Court)

3               THE COURT:  Good morning, everyone.  Thank you.

4    Please be seated.

5               Mr. Landis.

6               MR. LANDIS:  Good morning, Your Honor.  May I

7    please the Court, Adam Landis from Landis Rath & Cobb on

8    behalf of FTX Trading Ltd., and its affiliated debtors.

9               Your Honor, we are here today with five matters on

10   the agenda.  We are going to just walk right through them if

11   it pleases the Court.

12               With respect to the first two matters, one and

13   two, those have been adjourned by agreement of the parties.

14   This is the Celsius Litigation Administrator's motion for

15   relief from the automatic stay to assert claims in the New

16   York Celsius proceeding.  The debtors, the JOL's and the

17   Celsius Litigation Administrator painstakingly negotiated a

18   tolling and scheduling agreement with respect to this matter

19   that we would expect to file under certification of counsel

20   hopefully later today after a couple of nits of picked on the

21   document itself.

22               We need to toll the statute of limitations by

23   agreement for the Celsius Litigation Administrator's

24   potential claims.  We have agreed to that in order to adjourn

25   the hearing to the July 17th hearing.  So, we expect to

1 submit that and schedule our -- the agreement also will have

2 scheduling provisions for our responses and for that matter,

3 the lift stay matter, going forward.  I think that covers

4 that.

5          With respect to matter number three we are

6 resolved. So, we need not dwell on that.  That will take us

7 into the disclosure statement matters.  Before we get to that

8 Mr. Dietderich would like to address the Court.

9          THE COURT:  Thank you.

10          Mr. Dietderich.

11          MR. DIETDERICH:  Good morning, Your Honor.  For

12 the record Andrew Dietderich, Sullivan & Cromwell.

13          Your Honor, our disclosure statement and

14 solicitation procedures presentation today will have three of

15 us talking.  I would like to give a little bit of background

16 of some general points about how we got here and where we are

17 going.  Mr. Glueckstein will address the objections that we

18 received and then Ms. Kranzley is prepared to walk the Court

19 through the solicitation procedures and detailed comments on

20 all of that.

21          THE COURT:  Okay.

22          MR. DIETDERICH:  So, Your Honor --

23          THE COURT:  I'm intimidated by the very large

24 binder you have sitting on your desk.

25          (Laughter)

1          MR. DIETDERICH:  The disclosure statement, at

2     least in the handheld version, is a document that, obviously,

3     has been a huge team effort by many, many people not just for

4     the debtors but for all of our supporting stakeholders. It

5     goes through unusual detail in explaining the background of

6     the decisions that underly the plan and that this process has

7     stakeholder input and collaboration that we followed from the

8     beginning of the case.  This includes not only plan

9     formation, but really consultation with all of our creditor

10    constituencies on every major decision we have taken in the

11    case.  And that more than anything else, I think, has allowed

12    us to be in this position where we're contemplating a largely

13    consensual process going forward with our key stakeholders.

14          There are a few elements of the plan and the

15    disclosure statement, Your Honor, that I think merit pointing

16    out to the Court this morning.  The first is substantive

17    consolidation. The plan consolidates the estates of most of

18    the debtors.  Now in the Third Circuit substantive

19    consolidation is an extraordinary remedy.  We are told we

20    should only do it when we really need to but I think the

21    debtors and all of the stakeholders are convinced that this

22    is the paranematic case where we do really need to

23    substantively consolidate the estates.

24          We estimate it would cost hundreds of millions of

25    dollars to disentangle FTX and create individual standalone

1  estates.  Even doing that will result in something arbitrary

2  and ultimately unsatisfactory.  We also believe that we

3  passed, I think, the ultimate test in case law substantive

4  consolidation in that everybody is better off because we're

5  doing it.  That remains a critical component of our plan.

6          Now, that relates to a corporate governance point.

7  We arranged our affairs at the beginning of the case with a

8  possibility of substantive consolidation.  Your Honor may

9  remember, but it bears pointing out, our unusual governance

10 structure for these estates.  We have separate independent

11 directors on the board of each of the top companies of each

12 of the four silos that we had at the beginning, but all of

13 the independent directors generally have met as a joint board

14 overseeing operations from the beginning.  We have had 56

15 meetings with the joint board of directors since the filing

16 of the case.

17         Each of the directors has therefore been involved

18 in supervision of the entire FTX business, not only the part

19 that relates to the entity for which they are nominally

20 responsible but for all the asset dispositions across the

21 capital structure.  That allows us, because decisions have

22 generally been made fully informed and unanimously by the

23 joint board, for everyone to be comfortable that everything

24 we have done has been at the interest of all the entities

25 regardless of which entity might, at the end of the day, have

1  a particular interest in, say, the sale proceeds.

2           I think that has built a very strong record as we

3  come into Court now focusing on a substantive consolidation

4  plan that everyone is comfortable with that, at least, from

5  the board of directors and from a governance perspective.  We

6  also have benefited, of course, from the fact that we have

7  had a single committee, a single committee representing all

8  of the creditors across all of the FTX debtors and been able

9  to consult with them and run things on a unified basis as

10 well.

11          The most important fact about the plan, of course,

12 is that its largely consensual. Mr. Glueckstein will address

13 the few objections that we have so far that we're

14 contemplating but the pertinent fact today is the

15 extraordinary absence of objections from any of the major

16 stakeholders with whom we have engaged.  That includes not

17 just the committee, it includes the ad hoc committee of non-

18 US customers representing about $4 billion of customer

19 claims; it includes all of the original adversary proceedings

20 of customer property that were filed against us, not the

21 newer one but the original actions; it includes all of the

22 Chapter 11 debtors that we had collisions with, debtor on

23 debtor collisions with, raising very difficult issues; it

24 includes BlockFi, one of our largest single creditor; it

25 includes all of the government constituencies with the

1  exception of some disclosure objections from a couple states

2  that we have resolved today, we hope consensually.

3       To do that we kind of -- that was a strategic

4  focus.  We recognize that on our fact patter plan litigation

5  would be very difficult and very, very expensive.  So, from

6  the beginning we thought about how do we build a plan process

7  that has as much consensus and buy-in as possible. To do that

8  we include in the plan several really important settlements.

9       The first, of course, is our settlement with the

10  joint official liquidators of FTX DM.  The settlement creates

11  a single economic unit so that creditors can receive an

12  economically equivalent distribution regardless of whether

13  they put in a claim under the US proceeding and the Bahamas

14  proceeding, but yet also includes precautions that allow us,

15  as the debtor, and the joint official liquidators, as

16  fiduciary, to make sure that any payments and distributions

17  are being made in a way that is consistent with, you know,

18  both sets of laws.  They have been a remarkable partner in

19  that effort.

20       I would have to say that we had a lot of concerns

21  about how to operationalize that and there still is work to

22  be done. It's not novel ground.  Nobody has quite done it

23  this way before, but the relationship is a strong working

24  relationship and everybody is pulling in the same direction.

25       The plan, of course, includes a settlement of one

1  of the central issues we have in our case which is the

2  balance of relative entitlements between customers and non-

3  customers.  We built consensus among the key customer

4  communities and the key non-customer communities on the

5  balance of that -- kind of the balance that we struck in the

6  plan.

7          Now the debtors expect this consensus approach to

8  continue.  We are not done making decisions.  We have agreed

9  with our major creditor groups on continuity of governance

10 going forward. The current board, the joint board will be

11 augmented by two representatives of the joint official

12 liquidators and one creditor appointee.  Creditor

13 constituencies will have additional input through our

14 creditor advisory committee.  All of this is explained in the

15 recent changes for the disclosure statement that we filed on

16 the docket recently.

17         Of course, the plan still needs to resolve the

18 customer property issue.  We have known that from the

19 beginning of the case.  It needs to do so because that issue

20 is relevant to so many people, millions of people. It needs

21 to do so in a uniform way that resolves all of the various

22 customer property litigation claims that we face.  We

23 continue to be committed to do that collectively in a plan

24 process.

25         Now here there is also a very strong consensus

1  view. Its not unanimous yet, but a very strong consensus view

2  certainly among everybody around the table as we were forming

3  the plan on what to do.  The answer is that customers are,

4  indeed, special. Something happened that requires a special

5  remedy for customers and that remedy is the customer priority

6  settlement that is described in the disclosure statement.

7  The settlement creates a priority intercompany claim from the

8  exchanges against the general pool for the benefit of not an

9  individual customer versus other customers, but the benefit

10  of all the customers in an exchange versus the general pool.

11          Under our current economic forecasts, we are

12  expecting to pay creditors in full in terms of petition time

13  value.  That priority settlement may not effect the amount of

14  the returns on the simple basis that everybody is going to be

15  paid, but it's still an important component of the plan

16  because it creates a downside priority in favor of customers

17  and it may speed the pace of distributions.  In other words,

18  it may be possible that that priority would conclude that we

19  can pay customers a little bit earlier than other creditors

20  to the extent we need to set up less reserves because of the

21  way the priority works.

22          The other key assumption, or one of the other key

23  assumptions behind the plan, and a very obvious one, the

24  elephant in the room, is the subordination of government

25  creditors.  This is a critically important provision of the

1   plan, indeed. FTX is not solvent.  We are not a solvent

2   estate, far from it.  We are a long, long way away from

3   solvency and no change in the market that we could ever

4   anticipate would create a solvent FTX.  We owe government

5   stakeholders billions and billions of dollars.

6           Now, we have for over a year been in discussions

7   with those government stakeholders on why they should

8   subordinate voluntarily to non-governmental creditors.  And

9   there is several bases for this under law.  Each of the

10   various government agencies, including around the world, have

11   principles and circumstances of criminal fraud that suggest

12   that the government authority should consider subordinating

13   to victims.  Unfortunately, for us none of those laws would

14   necessarily define a victim who are compatible in the same

15   way.

16           One of the central pieces we have been working on

17   for a very long time is the idea that really all creditors

18   are, to some extent, victims here and all creditors can be

19   treated as victims by the government constituencies.  That

20   allows us to coordinate the bankruptcy distribution scheme

21   with the distribution schemes for remission and restitution

22   and disgorgement under various systems of criminal law.

23   There is also a tax -- you know, informing the tax settlement

24   that Your Honor approved is also a concept under tax law of

25   some voluntary guidance to the IRS to consider subordination

1  to the victims of criminal fraud.

2         So, we have taken all of that and we have made a

3  proposal, first confidentially and now quite publicly, to all

4  of the governments involved to voluntarily subordinate to the

5  consensus rate of interest, which I will talk about in just a

6  moment, and also potentially to the extent there are

7  recoveries that exceed that 9 percent.  Although we have some

8  commitment if the IRS settlement is approved by the IRS, a

9  very, very important settlement.

10        We have, I think, an understanding, now approved

11 by the Bahamian Court, with the joint official liquidators

12 that it works under Bahamian law; we do not yet have the

13 agreement of the CFTC, the Department of Justice Southern

14 District of New York in the criminal proceeding, or any of

15 the states; however, I am pleased to state that those

16 conversations are very advanced and they are to a point where

17 I think the entire debtor team and all the consulting

18 professionals are confident that we are ready to launch.  And

19 we hope to be dotting the I's and crossing the T's of those

20 settlements, you know, relatively quickly.

21        Now let me talk a little bit about value.  You

22 know, the best headline we could possibly have is that 98

23 percent of our creditors are expected to receive 119 percent

24 of the petition time claims within 60 days of the effective

25 date.  That is the convenience class.  We have defined the

1  convenience class broadly to include, you know, at a recovery

2  level that does include 98 percent of the people. That is

3  important because its going to take a while to make

4  distributions here given the sheer number of claims that we

5  have and the need to do a claims reconciliation process.  We

6  think that is a fair convenience class treatment. We think

7  it's a sensible convenience class treatment and, you know, we

8  have, again the support of all of our stakeholders on those

9  convenience class levels.

10         With respect to our cash position, we do continue

11  to move our assets into cash.  As described in the disclosure

12  statement, very important to remember in our case that unlike

13  the other cryptocurrency cases our assets generally did not

14  consist of digital assets segregated in an exchange that had

15  any relationship with claims against the exchange.  The

16  segregated asset pools for the exchanges were very

17  significantly defeated, less the one percent of the bitcoin

18  that was supposed to be at the exchange was at the exchange.

19         So, our project has been a different project then

20  those other cryptocurrency cases.  Our assets that we needed

21  to monetize are a mind-blowingly diverse collection of

22  assets, of scattered assets, venture assets, coin positions,

23  digital assets of all shapes and flavors, of course

24  litigation assets, etc.  So, our job has been to monetize

25  this pool of assets.  And when we look at this pool of assets

1   the board of directors have been very focused on one central

2   observation which is these were purchased with

3   misappropriated money.  No one made a decision to invest in

4   these assets.  They made a decision to either lend money to

5   Alameda or they made a decision to invest in FTX.com or FTX

6   US.  So, everybody was an involuntary investor in this crazy

7   pool of assets.

8           Our job has been to turn them into cash.  We have

9   not done so -- we have so deliberately and we have done so

10  consistently and we have done so with really a nice runway

11  established by the bankruptcy.  We have been able to average

12  out a position and do it gradually and deliberately over

13  time.

14          When we filed the initial disclosure statement on

15  May 22nd our cash position was $9.9 billion.  Today its

16  approximately $11.4 billion.  That is Fiat cash in banks.  We

17  anticipate, as we say in the disclosure statement, being a

18  $12.6 billion in cash on the effective date assuming an

19  October 31st effective date.  Now crypto prices are

20  unpredictable, those numbers may change, but I can confirm

21  today, Your Honor, that we do continue to believe the DS

22  recovery projections, as of the date I stand here, are

23  reasonable projections.

24          I'd like to talk just very briefly about the

25  consensus rate.  This is really a lynchpin to the plan.  It

1  simultaneously resolves a number of the pending disputes we

2  have with stakeholders. It's important, in the first

3  instance, in the understanding we have with the customer

4  representatives and constituencies who continue to be

5  settling the customer property allegation or constructive

6  trust allegations in particular in connection with the plan.

7  So, we see the consensus rate is not justified by the -- in

8  the normal way of bankruptcy is a question of we're a solvent

9  debtor and we want to make an equity distribution.

10         We are not making an equity distribution.  We are

11  an insolvent debtor.  We see the consensus rate driven by

12  this network of settlements.  One with the customer property

13  advocates.  One with the IRS, this was an important component

14  of the IRS discussions, its been tabled in the discussions

15  with the CFTC and the SDNY and the other government

16  stakeholders as a fair level of ultimate recovery. It has

17  something to do with the balance of interest between

18  customers and non-customers because we have had the customers

19  agree that we can make this 9 percent consensus rate

20  available to non-customer creditors as well.

21         Now if somebody has a lower contract rate we

22  adjusted, but generally the 9 percent is available to all of

23  the creditors, again, on the basis assumption which we have

24  had to advocate for consistently in the case, but we believe

25  its true, that all creditors are, to some extent, a victim of

1  fraud.

2           You will note, Your Honor, that the consensus rate

3  also is -- would be the prejudgment rate on the date we filed

4  the petition for a constructive trust or a turnover action as

5  well.  Now we have more money than 9 percent potentially and

6  this is important for everybody to understand is that we are

7  not standing here guaranteeing anyone that there will be

8  recoveries greater then, you know, par 9 percent but our plan

9  does need to contemplate the possibility of incremental

10  recoveries.

11           What happens to these incremental recoveries is

12  not for us to decide unilaterally. Its mostly to be decided

13  by the government stakeholders who are allowing the

14  incremental recoveries to creditors by foregoing their own

15  distributions in the case.  There is a question buried here

16  which is what do you do with the extra money, who gets it.

17  We have wrestled with that question with all of our

18  constituencies, had many, many discussions about the right

19  approach and I think the consensus certainly of everyone who

20  has been most involved with the debtor in wrestling with

21  these discussions.

22           The consensus is that a pro rata approach

23  continues to be the fairest approach, that all creditors were

24  involuntary creditors to FTX, that ultimately claims are

25  traded in dollars since the petition time and that if we have

1   any excess recoveries or upside recoveries, we should be

2   sharing that with all customers equally.  Now, of course, not

3   everybody agrees on that.  Some people might have a position

4   that they want more of that then the creditor sitting next to

5   them, but I think the view of the debtors, the view of the

6   government stakeholders, again, their decision but, you know,

7   the growing consensus is reflected in the plan that this

8   money should be available to all creditors.

9           Now there is a little nuance there, because of the

10  nature of the government regulatory claims the -- although I

11  want to say a trade creditor, and we have very little trade,

12  Your Honor, but a general unsecured creditor would receive

13  interest at the consensus rate.  The general unsecured

14  creditor would not have access to the supplemental remission

15  fund that we proposed to the CFTC.  That would be available

16  only to customers and lenders that effectively have

17  cryptocurrency contracts.

18          Now ultimately, Your Honor, the plan is a complex

19  settlement and it includes all these settlements of all of

20  these potential disputes that would need to be resolved by

21  litigation.  So, we see it as a complex settlement and

22  although it is remarkably consensual already, we do -- we are

23  soliciting a vote and one of the purposes of the vote is to

24  get feedback from the creditors who have not been involved in

25  that settlement.  So, we are soliciting broadly, right,

1  despite the almost payment in full nature of the plan.

2          We will continue to press forward with that

3  approach.  The plan is structured, however, Your Honor, to be

4  fair and equitable to each class independently.  We are

5  proceeding with the absolute priority rule and so are options

6  at confirmation depending on the voting results are flexible.

7          I want to speak last about two points and these

8  are the two conditions to the plan.  So, there is two

9  settlements, two key settlements, that Your Honor has already

10 approved: the IRS settlement and the Bahamian settlement.

11 That was necessary because those settlements are really

12 existential.  Our plan does not work without the IRS

13 settlement and our plan does not work without the Bahama

14 settlement. So, we frontloaded that and had the Court approve

15 those settlements and the other parties approve those

16 settlements as well. So, they are done.

17         Now they're contingent upon the confirmation of

18 our plan. So, if our plan isn't confirmed we lose those

19 settlements and simultaneously if there was some problem with

20 the settlements, and we don't anticipate any problem, we

21 wouldn't be able to confirm the plan.  So, those are embedded

22 in the plan as essential conditions.

23         The ongoing discussions with the other governments

24 stakeholders, because the pace of some of those is uncertain,

25 are not embedded as specific settlements that are conditions

1  to the effectiveness of the plan.  The CFTC proposal may not

2  be accepted by the (indiscernible) in its current form, that

3  may change.  You know, the eligibility for the supplemental

4  enrichment fund may be tweaked, right, or they could have

5  different views on the calculation of something.  Again, we

6  don't expect material changes, but those are not inked.

7          Similarly, we do not yet have state buy-in among

8  the states to join the CODC in subordination. Its possible

9  that some states don't agree.  Again, we don't expect that to

10 have a material effect on recoveries, buts its possible. Then

11 finally the forfeiture proceeds with the SDNY.  We do not yet

12 have an agreement with the SDNY that they will give us all

13 the money.  We have asked for it.  We believe we have a

14 strong case for it. In fact, we believe that the amount of

15 those forfeiture proceeds has something to do with the

16 assistance the debtors have provided to the government, but

17 that isn't inked as well and so it's possible that there's

18 modifications to that, understanding that we don't get all

19 the proceeds that a portion is held back, etc.

20          Again, we don't expect that to have a material

21 effect on recovery, but I think it's important for everybody

22 to understand the exact nature of those unlike the other two

23 settlements are not conditions to the effectiveness of the

24 plan and the plan has, you know, kind of a pot plan element

25 to it, right, we will do as well as we can in those

1  circumstances and we think we're very competent with our

2  disclosure about where its trending but the results may be

3  slightly different just like we might sell an asset for a

4  little bit less or a little bit more than we had modeled or

5  very importantly, in our case, the claims pool may change

6  such that it has an influence on recoveries.

7         Again, as I stand here today, Your Honor, probably

8  the most important financial statement is just what I said

9  before which is that based on everything we know, and all the

10 moving pieces, and all the work that has been done, we think

11 the projections in the disclosure statement about recoveries,

12 the bottom line recoveries to customers, are fair and

13 reasonable, you know, as of the moment I stand here.

14         So, that is what I had, Your Honor.  Now I am

15 happy to answer general questions, but absent those I thought

16 I would turn over the podium to Mr. Glueckstein and he can

17 talk a little bit about the objections and our path forward.

18         THE COURT:  I don't have any comments or

19 questions.  Thank you very much.

20         Does anyone else -- let me just ask, because I

21 gave you the opportunity to speak generally, does anybody

22 else wish to make any general comments before we get to the

23 disclosure statement hearing?

24     (No verbal response)

25         THE COURT:  Having heard nothing, Mr. Glueckstein,

1   you're up.

2            MR. GLUECKSTEIN:  Thank you, Your Honor.  Good

3   morning again.  Brian Glueckstein for the debtors.

4            Your Honor, the broad support for the plan and the

5   disclosure statement that Mr. Dietderich highlighted are

6   illustrated today by the lack of objections filed in response

7   to relief that is before the Court this morning.  We received

8   only a grand total of 14 objections and other responses to

9   our motion seeking approval of the disclosure statement and

10  solicitation procedures.

11           The debtors have worked with the objectors to

12  resolve the disclosure statement objections where possible

13  and have now resolved most of them with the objectors and all

14  other parties rights reserved with respect to plan

15  confirmation and any confirmation objections.  We currently

16  have only all or a portion of four objections remaining this

17  morning, Your Honor.  The objections filed by the MDL co-lead

18  counsel and by McCarter & English on behalf of Mr. Kavuri and

19  three other purported creditors, as well as, I understand,

20  the non-disclosure portions of objections from LayerZero and

21  Maps Vault.  That is all that is live before Your Honor this

22  morning.  We did address these and the other objections that

23  are now resolved in the debtors reply that was filed at

24  Docket No. 18083.

25           Your Honor, the debtors submit that the disclosure

1   statement contains more than adequate information as provided

2   in compliance with Section 1125(a)(1) based on the facts and

3   circumstances of this case.  Mr. Dietderich walked through a

4   number of elements that are highlighted in the disclosure

5   statement in his remarks.  I will address, Your Honor, some

6   threshold issues relating to each of the remaining objections

7   and then request to reserve some rebuttal until after any

8   objectors are heard by Your Honor this morning.

9            Your Honor, the first of our two objections that

10  remain pending in full is the objection that was filed by the

11  MDL co-lead counsel.  Your Honor, with respect to the MDL co-

12  lead counsel, as a threshold matter, the debtors submit that

13  MDL counsel lacks standing to object to the debtors

14  disclosure statement and plan of reorganization.  The debtors

15  have elsewhere documented, in filings with this Court, MDL

16  counsel's efforts to divert up to $1.2 billion in assets

17  forfeited by the Department of Justice to the MDL for

18  purposes of pocketing up to $400 million for themselves in

19  fees while depriving the estate and their creditors of those

20  funds.

21           Those fatally flawed efforts aside, MDL counsel

22  needs to establish standing to object to the debtors plan and

23  disclosure statement if they want to be heard in these

24  proceedings before Your Honor today and in the future.  We

25  submit they cannot do so.  The Third Circuit has made clear

1   that Section 1109(b) permits anyone with a legally protected

2   interest that could be effected by the bankruptcy proceeding

3   to be heard.  The Supreme Court's recent decision in Truck

4   Insurance confirms the debtors view.  There the Supreme Court

5   confirmed that even interpreting Section 1109(b) broadly, the

6   statute still requires a party to be "directly and adversely

7   effected by the bankruptcy proceedings."  The MDL are not

8   effected at all.

9         Of course, a party must still satisfy both the

10  constitutional and prudential limitations of standing.  In

11  this context, standing requires that a party actually have an

12  interest in these Chapter 11 proceedings.  MDL counsel, in

13  their capacity as such, have no personal stake in these

14  proceedings.  They are not creditors with claims and their

15  own objection makes clear that the putative class claims

16  being asserted in the MDL proceeding do not include any

17  claims against the debtors, nor, Your Honor, do they

18  represent a certified class of FTX customers as they

19  misleadingly suggest.  That would be impossible because there

20  is no certified class in the MDL.

21        They have not sought class status from this Court

22  pursuant to Bankruptcy Rule 7023 as would be required to

23  object on behalf of a putative class as this Court made clear

24  recently in Mallinckrodt.  Furthermore, MDL counsel do not

25  identify any creditors whom they represent with respect to

1 creditor claims in these Chapter 11 cases.  If they did, any

2 such representation would need to be disclosed pursuant to

3 Bankruptcy Rule 2019 before they are heard. They have not

4 done so.  Such disclosure and such representation would put

5 their status as impartial putative class counsel at risk.

6          MDL counsel here are further removed from any

7 interest in the debtors plan then those parties in recent

8 decisions, we cite in our papers, where creditors were

9 determined to lack standing including in the Genesis Global

10 case where out of the money equity holders were deemed to

11 lack standing to object to the plan because it had no direct

12 interest in the distributions being made under the plan.

13          The MDL objection itself raises a litany of issues

14 that do not implicate any rights or interest of MDL counsel

15 or any of the named MDL class plaintiffs in that capacity.

16 Courts have repeatedly held that an objecting party can only

17 challenge the parts of the plan that directly implicate their

18 own rights and interests.  Nothing in our plan prevents MDL

19 counsel from pursuing direct causes of action held by their

20 named plaintiffs in the MDL and to recover on any such claims

21 for their putative class there.  Of course, individual

22 creditors are free to decide whether to support or oppose the

23 plan the debtors are proposing as creditors in these Chapter

24 11 cases.  The MDL counsel cannot subsite their views for

25 those of creditors on a classified basis.

1           Now, Your Honor, with respect to the objection

2    itself that they filed the debtors did, nonetheless,

3    carefully review the arguments presented in that objection

4    and combined with the changes that have already been made to

5    the disclosure statement that was filed with the Court over

6    the weekend we do not believe there is any additional

7    disclosure required to address them in order to satisfy

8    Section 1125.

9           Although not required, the debtors did add a

10   description of the MDL proceedings in Section (g)(10) of the

11   disclosure statement.  The MDL objection also takes issue

12   with disclosure about the anti-double dip provision in

13   Section 7.12 of the plan.  There is no uncertainty or

14   ambiguity with respect to this provision which is

15   supplemented by the plain language disclosure on page 8 of

16   the disclosure statement.  The discretion to request

17   information in that provision is consistent with standard tax

18   and OFAC certifications required prior to making

19   distributions under a plan similar to Section 7.14 of this

20   plan and others confirmed by this and other Courts in the

21   district.

22          All creditors -- MDL counsel has also argued in

23   their objection, substantively, that the anti-double dip

24   provision, which is a focus of their objection, violates

25   Section 1123(a)(4) because it somehow unfairly discriminates

1  amongst customers.  We discussed this in our papers, but this

2  is untrue.  The case law is clear that differing recoveries

3  are not the same as disparate treatment for claims under a

4  plan.  All creditors are provided the same treatment as other

5  creditors in each class.  Any of those creditors can object

6  to the plan on the basis of the substance of that provision

7  and its impact, if they see fit, in connection with

8  confirmation.  That is not an issue for the disclosure

9  statement.

10        The MDL objection also argues there should be more

11  disclosure as to the implications of the customer property

12  issues while ignoring the four sections in the disclosure

13  statement dedicated to the customer property issues and this

14  proposed settlement that was entered into for the benefit of

15  stakeholders.  The other various issues raised in this

16  objection are plan objections to be addressed later, if

17  necessary, Your Honor.

18        The other objection that we have --

19        THE COURT:  Let's deal with --

20        MR. GLUECKSTEIN:  You want to do them one at a

21  time?

22        THE COURT:  Yeah, let's do one at a time.

23        MR. GLUECKSTEIN:  That's fine, Your Honor.

24        THE COURT:  Let's do the MDL plaintiffs' counsel

25  first.

1          MR. ROSELL:  Good morning, Your Honor.  Jason

2    Rosell, Pachulski Stang Ziehl & Jones, on behalf of the

3    Moskowitz Law Firm and Boies Schiller Flexner LLP in their

4    capacity as plaintiffs co-lead counsel in the FTX MDL which

5    is pending in the United States District Court for the

6    Southern District of Florida.  Joining me today in the

7    courtroom, Your Honor, is Adam Moskowitz of the Moskowitz Law

8    Firm.  We also have Marc Ayala at Boies Schiller, and Mr.

9    Robert Leaf who is also on the MDL leadership.

10          THE COURT:  Okay. Let's deal with the fundamental

11   question here.

12          MR. ROSELL:  Yes, Your Honor.

13          THE COURT:  How do you have standing?  These are -

14   - you represent a law firm. Your entry of appearance is for a

15   law firm, not on behalf of the individual plaintiffs in the

16   MDL action, correct?

17          MR. ROSELL:  That is correct, Your Honor. I think

18   it goes to the question what is -- who are we, what is the

19   MDL.  The MDL is a multi-district litigation. It is, for the

20   record, captioned *In Re FTX Cryptocurrency Exchange Collapse*

21   *Litigation*.  It consists of approximately 50 consolidated

22   class action securities actions and individual actions

23   globally.  We have together in excess of 100 individual

24   defendants and as a result of that and as a result of the

25   Moskowitz Law Firm and Boies Schiller being appointed the

1  plaintiffs co-lead counsel by the District Court in the

2  Southern District of Florida, they represent and speak for

3  those clients.  They are those clients.  Those 100

4  individuals are their clients.

5          THE COURT:  They're not the clients. They

6  represents the clients.  They don't have a claim against this

7  estate, correct?

8          MR. ROSELL:  We have not asserted a claim against

9  the estate -- well, but --

10          THE COURT:  And they are not here -- and you are

11  not here telling me that you represent any of those

12  individual claimants in the MDL action.

13          MR. ROSELL:  That's correct, Your Honor, but the

14  question is really are they a party in interest to be heard

15  today with respect to the disclosure statement.  That is all

16  this is.  We are not here objecting to, like in Mallinckrodt,

17  plan confirmation.  We are here on a disclosure statement

18  hearing asking and advocating for clarity in the disclosure

19  statement for the many.  At the end of the day our class

20  consists of all FTX customers which no one here in this room

21  is speaking for any longer.

22          THE COURT:  How is it any different that this is a

23  disclosure statement as opposed to confirmation.  You still

24  have to have standing.

25          MR. ROSELL:  Well, the question is whether or not,

1  under <u>Truck Insurance</u>, we are a party in interest and the

2  Supreme Court has recently said that courts should interpret

3  that very broadly.  The question is whether or not the

4  hearing or the disclosure statement potentially affects us.

5  Now, we can play games --

6            THE COURT:  Potentially affects the law firm

7  because they're the only party in front of me right now is

8  the law firm.  It doesn't affect the law firm.

9            MR. ROSELL:  And that's fine, Your Honor, because

10  the debtors have conceded and acknowledged that there is $400

11  million at stake for the law firms and the debtors plan --

12            THE COURT:  But that is not money coming from this

13  estate.

14            MR. ROSELL:  I think that is exactly what they are

15  arguing, right.  They are arguing that, and they have

16  submitted the forfeiture proceedings, competing forfeiture

17  proceedings in the criminal court before Judge Kaplan, saying

18  that the forfeiture property is property of the estate.  We

19  have done the same thing and said, no, its property of the

20  customers and should go directly to the customers.  Their

21  plan creates a remission fund that's going to be funded by

22  those proceeds.  Those proceeds would otherwise go through

23  the MDL and be part of the fees that counsel would

24  potentially calculate.

25            I hear laughter over here about, well, you know,

1  they're going to make a big deal that it's a money grab

2  somehow. It's a little bit like the pot calling the kettle

3  black, isn't it.  I mean we have got $400 million at stake

4  potentially.  They like to throw that around; oh, counsel,

5  this is just a money grab. Nothing has been set in stone.

6          We have to go through process all these cases, the

7  class actions, then at the very end of the day submit a

8  request for fees. The District Court Judge, Judge Moore, will

9  decide what our fees are.  This is coming from someone --

10 from a group that --

11         THE COURT:  That's outside the bankruptcy.  That

12 is not -- that has nothing to do with the bankruptcy.

13         MR. ROSELL:  But that bankruptcy plan specifically

14 addresses and seeks to have those funds put into the

15 bankruptcy and distributed.  That --

16         THE COURT:  Well, that is a separate fight.  You

17 have a fight over whether or not the funds being held in the

18 Southern District of New York are going to be transferred to

19 the MDL action or are going to be transferred to the debtors.

20 Either way, they're going to go to the creditors except for

21 the attorneys fees.  They go to either party.  But I am still

22 struggling with how that has any impact on this estate.  How

23 that creates an interest in the estate on behalf of the MDL

24 plaintiffs' counsel.  Their attorney's fees -- they wouldn't

25 have individual standing to argue about the disclosure

1  statement.

2       MR. ROSELL:  If counsel was no longer counsel for

3  the estate and they were a creditor.

4       THE COURT:  Then they would be owed money by the

5  estate.  You are not owed money by the estate.

6       MR. ROSELL:  Well, the question is not whether we

7  have an interest. The question that the Supreme Court has

8  espoused is does what is before the Court potentially

9  concern, potential concern or effect, the party who is

10  asserting standing.

11       THE COURT:  Well then you have got to tell me who

12  the party is that has the standing, it's not the law firm.

13  So, if it's the individual claimants in the MDL action then

14  you have got two problems with that.  One, you haven't

15  disclosed it under 2019, which is required, and, two, you

16  only have a putative class.  You don't have an actual class

17  that has been certified by the Court yet.

18       MR. ROSELL:  Your Honor, if the Court wants to

19  interpret our objection as an objection based on the named

20  plaintiffs, then that is certainly fine as well.  This --

21       THE COURT:  I don't. I'm just telling you that if

22  that's position you are taking you have a problem.

23       MR. ROSELL:  Well, Rule 2019 there is an exception

24  there.  The Rule 2019(b)(2) --

25       THE COURT:  For class actions, correct, but there

 1  is no class action yet.  You only have a putative class

 2  action that hasn't been approved.

 3          MR. ROSELL:  Well, there are fiduciary duties

 4  though and I believe in, I think it was Mallinckrodt, Your

 5  Honor I don't think got into the fiduciary duties owed.

 6  Under Florida law the MDL counsel owe a fiduciary duty to a

 7  pre-certified putative class.  The only reason why its not

 8  certified right now is because the debtors are attempting to

 9  block the certification.  There is -- there are several

10  pending settlement motions with Judge Moore right now that

11  once they go out and get noticed its going to certify the

12  preliminary certified class on those issues. Its just a

13  matter of timing.

14          THE COURT:  But the timing is what matters.  It's

15  not certified yet.

16          MR. ROSELL:  Your Honor, we had the Supreme Court

17  decision in Truck espousing that it should be read broadly.

18  That if it potentially affects the concerns of a party, they

19  should have a right to be heard under 1109(b) of the

20  Bankruptcy Code. If the fees of MDL counsel aren't sufficient

21  and the fact that the plan provides an anti-dip provision

22  that essentially coerces the creditors voting into giving up

23  the MDL because, otherwise, the debtors are going to withhold

24  their distributions sending that 60 days window -- you know,

25  the 60 day promised window for recovery out the window, how

1  do we not have standing to be heard today to be able to

2  advocate for the millions of customers that have no one else

3  left with the.

4          They have cut deals with the ad hoc group.  Well,

5  the ad hoc group, yes, in the very beginning had about $800

6  million of retail. The ad hoc group now holds $4 billion made

7  of claims traders.  Claims traders have been buying claims

8  throughout the bankruptcy on the eve of the disclosure

9  statement being revised with new receivers.  There is nobody

10 left.  The committee is conflicted.  They're hardly heard of

11 in this case.

12         THE COURT:  Well, that is a serious allegation,

13 sir, very serious allegation and you better have some

14 evidence to back it up.

15         MR. ROSELL:  Sorry, Your Honor, I'm talking with

16 respect, of course, to just the FTX customers who is speaking

17 on behalf of just the FTX customers right now.  We are asking

18 for the opportunity today, Your Honor, to be heard and to

19 advocate for them and to protect their rights in the MDL.  We

20 have tried to stay clear of this bankruptcy court, Your

21 Honor.  We have been focused on the MDL, but the debtors have

22 appeared in the MDL. The debtors have even initiated

23 adversary proceedings in this Court asking to stay against

24 the named plaintiffs who we represent.  We should have an

25 opportunity to be heard, Your Honor.

1          THE COURT:  All right.  Well, I -- my view is you

2    do not have standing. This is a law firm that is appearing

3    before me, its not the underlying individual claimants.  Your

4    papers even say you don't have any claims against the estate.

5    You are claiming against third parties. You are trying to

6    recover against these third parties.  You named them in your

7    motion paper who you are going after. That is not part of

8    this estate.  Those are separate issues.

9          Now there may be some tension between whether or

10   not those causes of action are property of the estate or

11   property of the individuals, that issue is not before me on

12   this disclosure statement.  So, if you are going to appear

13   here on behalf of creditors you have to have a creditor.  You

14   don't have a creditor.  You have a law firm who is not a

15   creditor of this estate and, therefore, they do not have

16   standing to press any objections on the disclosure statement.

17          MR. ROSELL:  Thank you, Your Honor.

18          THE COURT:  Thank you.

19          Whenever you are ready, Mr. Glueckstein.

20          MR. GLUECKSTEIN:  Thank you very much, Your Honor.

21          Our other remaining disclosure objection that was

22   filed is the objection that was filed on behalf of Mr. Kavuri

23   and three other creditors by McCarter & English.  As detailed

24   in our reply this group of creditors, led by Mr. Kavuri, have

25   been acting in concert and representing that they are

1  speaking on behalf of numerous other creditors through social

2  media and through an unsanctioned website, FTXVote.com, that

3  has been improperly soliciting no votes on the plan prior to

4  approval of any disclosure statement by this Court.

5        The Kavuri voting website solicits votes against

6  the plan with a lockup mechanism in which creditors purport

7  to provide the Kavuri parties a voting proxy.  These

8  purported 1,700 no votes are being locked up without these

9  small claimants having the information necessary to evaluate

10 the plan and what they are actually going to receive pursuant

11 to it or whether the current plan is better or worse than any

12 perceived alternative.

13        The solicitation of votes prior to approval of the

14 disclosure statement is plainly impermissible under Section

15 1125(b) of the Bankruptcy Code. The debtors reserve all

16 rights and remedies, including to enjoin and vacate this

17 activity, and to designate the votes of all participants in

18 this activity.

19        After we demanded compliance with Bankruptcy Rule

20 2019, McCarter & English finally filed a Rule 2019 disclosure

21 late yesterday afternoon.  That disclosure is illuminate and

22 confirms what the debtors suspected. The Kavuri group

23 actually represents none of the purported customers they

24 misleadingly claim to represent online.  In fact, the Rule

25 2019 disclosure reveals that the Kavuri group has now shrunk

1  to there members down from before who actually filed the

2  objection.

3        The misinformed activity of these three purported

4  creditors is unfortunate but needs to be accurately put into

5  context.  This is three customers trying to allocate more

6  value to themselves at the expense of every other stakeholder

7  of these debtors, nothing more. If these three customers want

8  to object to the customer property settlement and assert

9  property rights or object to the plan on any other legitimate

10 basis, their rights are preserved to do so at the appropriate

11 time. As to their actual disclosure issues raised in the

12 objection, the debtors do not believe there are any further

13 changes that need to be made in response to the Kavuri

14 parties objection, but I reserve the right to respond to any

15 actual disclosure issues that are raised today by counsel.

16        With that, I will turn it over to counsel for Mr.

17 Kavuri.

18        THE COURT:  All right.

19        MR. ADLER:  Good morning, Your Honor.  David Adler

20 from McCarter & English on behalf of Sunil Kavuri, Ahmed Abd

21 El-Razek, and Pat Rabbitte.

22        We did file a 2019 statement yesterday and I want

23 to make it perfectly clear to the Court that from McCarter &

24 English's perspective at the present moment we only represent

25 three creditors.  I did put in the 2019 statement that we had

1   been contacted, we received a list of 1,700 people, we have

2   not been retained yet.  I want to lay that out first thing.

3   We represent three creditors, three direct creditors.  Those

4   were the creditors who filed the adversary proceeding and

5   that is who we are here for today.  We are not here on behalf

6   of anyone else.

7           THE COURT:  Has Mr. Kavuri been soliciting proxies

8   for the --

9           MR. ADLER:  Not to my knowledge, Your Honor, but I

10  have to say that I do not know exactly what he is doing

11  exactly and I take issue with what Mr. Glueckstein said about

12  a lockup because I have heard nothing about that.

13          THE COURT:  Well, what are the 1,700 additional

14  potential customers.

15          MR. ADLER:  My understanding, Your Honor, is that

16  there is a group of original FTX customers, people who have

17  not sold their claims, and Mr. Kavuri has sought to try and

18  get them into a group so that these issues that are

19  particular to the original holders can be brought in some

20  coordinated fashion before this Court.

21          THE COURT:  Well, he has been soliciting, maybe

22  not proxies, customers.

23          MR. ADLER: I don't know if he's been soliciting. I

24  don't know the answer to that, Your Honor.  I don't know

25  exactly what he has done. I know that I have received a list.

1  I don't know how I got that list, but we do not represent

2  them today. I do represent the three other individuals and I

3  am here to make the disclosure statement objection on their

4  behalf.

5          THE COURT:  Okay.

6          MR. ADLER: I do believe that, first off, Your

7  Honor, the disclosure statement is woefully inadequate in

8  describing what the basis for these releases and exculpation

9  provisions are.  Everyone in the world is getting a release

10 under this plan.  There is no disclosure about why these

11 releases are necessary.  There is no disclosure of what

12 potential value that those releases have and it is -- I

13 understand, Your Honor, that a lot of plan objections --

14 well, a lot of objections to disclosure statements that go to

15 the merits of the plan are deferred, but I think we're in a

16 particularly unique period here and I say that, you know,

17 expecting to have come down here today having seen the Purdue

18 decision and I don't know what Purdue is going to say about

19 these types of releases, if anything.

20         I do think that there is a serious questions here

21 about on a plan related issue sending a ballot out to someone

22 and, you know, requiring them to respond in order to opt-out.

23 The way that I read the cases, Your Honor, is that mere

24 silence does not equate to an acceptance when there is no

25 duty to respond.

1          THE COURT:  I have ruled otherwise.

2          MR. ADLER:  Say again.

3          THE COURT:  I have ruled otherwise in

4  Mallinckrodt.

5          MR. ADLER:  You are, obviously, not the first,

6  Your Honor, but I think in this case there are particularly

7  larger circumstances because we're all over the world. I

8  don't know anything about how this information is being

9  conveyed in Thailand, in China, and every other place in the

10  world about how -- you know, what the consequences are for

11  not returning a form.  To me it seems to be non-consensual

12  when there is no duty to speak, but I will leave it at that

13  because I believe that, well, perhaps the Supreme Court will

14  address that issue this week, Monday, whenever they release

15  Purdue.

16          THE COURT:  Well, it will definitely be out before

17  the confirmation hearing.  So, and this is really a

18  confirmation hearing issue.

19          MR. ADLER:  That is true, Your Honor. I would -- I

20  mean, if they say something that is clear that this type of

21  duty to respond is not permissible it would be an awful waste

22  of money and time to sort have gone through the disclosure

23  statement. I think maybe --

24          THE COURT:  You might not get that in this case

25  though because I think Purdue is non-consensual third-party

1  releases, not consensual.

2          MR. ADLER:  Correct.  That is absolutely correct.

3  And the question before the Supreme Court is whether non-

4  consensual releases are permissible and I'm not sure that

5  they are going to go into what is consent versus non-consent.

6  We are all sitting here waiting to see what they say about

7  that issue, but you are correct, Your Honor, they may just

8  say non-consensual releases are impermissible and then it's

9  for us to figure out whether these releases are non-

10  consensual or not.

11          I do believe though that it may be wise to not

12  commence the solicitation process. I'm not even sure it could

13  begin prior to the issuance of that decision because we just

14  don't know what they are going to say. I don't think that is

15  going to impact anything because its going to be out, I'm

16  guessing, in the next five to seven days. That was one point

17  that we raised and I understand, Your Honor, that it's a plan

18  objection, but I do see it as a disclosure statement issue

19  here to the extent that any information is coming at us that

20  could potentially suggest that this type of release is not

21  permissible.

22          I do think there should be disclosure and why

23  exculpated parties need releases as well.  I mean, I am used

24  to see exculpation provisions. I am not used to seeing

25  exculpation provisions and then the exculpated party is also

1  getting a release.  I don't know why that is required here

2  and I think it's something that requires more disclosure.

3         Separately, Your Honor, I do think -- we did raise

4  a number of straight disclosure issues about certain items

5  that had to be addressed in the disclosure statement, I think

6  particularly the IRS settlement. I think that the debtors

7  addressed that.  We did raise that there should be more

8  disclosure on tax related issues.

9         In the crypto cases that I've been involved with

10  there's generally a strong desire that the customers receive

11  the crypto back in kind because if they don't get it back in

12  kind it's a disposition event or people believe that it may

13  be a disposition event under US tax law.  So, you know, when

14  we're looking at issues here this sort of goes to best

15  interest. If there were a trustee who was prepared to

16  distribute in kind versus a debtor that is not willing to

17  distribute in kind that might make a big difference in this

18  case to some people who may have a huge tax bill if they're

19  getting cash rather than in kind.

20         THE COURT:  I think Mr. Dietderich explained that

21  situation that the debtors could do that in this case because

22  the exchanges didn't have the crypto, it was gone.

23         MR. ADLER:  Correct, Your Honor. I mean they are

24  sitting with cash but there are other crypto cases out there,

25  I believe BlockFi may be one, where they're sitting with cash

1  too and on the way out the door its going through a third

2  party and being converted into crypto at the prevailing rate

3  so that the distribution the customer receives is actually

4  crypto in kind rather then cash.

5       So, in other words, if you had 10 bitcoin on the

6  platform, and you're getting a recovery, let's say, $80,000

7  or whatever, on the way out the door it may pass through

8  Coinbase or PayPal or some other third party so that the

9  customer actually receives bitcoin back rather then cash.  I

10 don't really understand what the logical issues are why that

11 can't be done here, but it would save people who have

12 potential tax bills enormous sums of money, okay, to get

13 distribution in kind rather then in cash.

14      THE COURT:  Well, again, that sounds like a

15 confirmation issue.

16      MR. ADLER:  I'll throw another one on, Your Honor,

17 1141(d)(3).  This debtor is liquidating.  1141(d)(3) says the

18 liquidating debtor is not entitled to a discharge.

19      Here, the debtor is getting a discharge and in

20 addition to the discharge, everyone else is getting a release

21 and exculpated, but, you know, it all flows from that, you

22 know, if the debtor is not entitled to a discharge, why is

23 everyone else getting releases and exculpation provisions?  I

24 know that's a confirmation issue, Your Honor, but I thought

25 I'd highlight it.

1          I do think that there should be further

2  disclosure.  I listened to the debtors' counsel about the

3  customer property issue.  I don't think they really go

4  through in much detail, and I certainly don't see anything in

5  there that talking about the terms and conditions of what the

6  agreements were between the customers and FTX regarding the

7  property at the time it was deposited.  I know the debtors

8  probably don't want to say that, but, you know, for purposes

9  of disclosure, it probably should be said that various

10 parties take the position that the property that the debtor

11 is holding on to is customer property.  You know, they can

12 disagree with it if they want or they can say whatever they

13 want about it, but I do think there should be some statement

14 in there that explicitly references the terms and conditions

15 of the agreement between the customers and FTX.

16          We had some other related issues, with respect to

17 the timing on the solicitation.  I think that we have to

18 object.  The creditors have to object to any plan supplement

19 one week prior to the voting deadline.

20          Your Honor, it's been my experience that a lot of

21 these plan supplements come trickling in and I would suggest

22 that the language be revised that the creditors are given at

23 least one week to object to any plan supplement that gets

24 filed.  That's more of a solicitation issue, but I did want

25 to highlight that for the Court.

1          I think we raised some issues about the

2    liquidation analysis being inconsistent and what we said was

3    in Appendix C, it's unclear why there are more assets

4    available in a Chapter 7 than in a Chapter 11.  I don't know,

5    frankly, if that issue has been addressed or not in the

6    latest iteration that was filed, but we did flag that for the

7    Court.

8          We also thought there should be more disclosure on

9    the pending adversary proceedings that have been filed in the

10   court, specifically, the Kavuri action, the MDL action, as

11   well, and any other litigation or any other adversary

12   proceeding that's been filed since the case was commenced.

13         With those -- and I do want to point out a couple

14   other things.  We did file a joinder to the MDL objection

15   this morning.  So we join in those objections and I think

16   from my perspective as a bankruptcy lawyer -- and I'm not

17   involved at all in the MDL proceeding -- you know, we think

18   that the customers, obviously, should have, you know, a

19   choice of or not be precluded from recovery in the MDL

20   proceeding if they're, you know, if they're participating in

21   this matter.  I do recognize, Your Honor, that that's a

22   confirmation issue, as well, so I'm going to leave it at that

23   for the time being, but I just want to note it for the

24   record.

25         I think that's pretty much it, Your Honor, in

1   terms of what I wanted to -- I think, obviously, any

2   supplemental reports adduced by the examiner should be --

3   there should be a mechanism for disclosure of that to the

4   creditor base.  I don't know when, exactly, that report is

5   coming out, but --

6                THE COURT:  It's already out, right?

7                MR. ADLER:  The supplemental?

8                THE COURT:  Oh the supplemental one?  I didn't

9   hear you say supplemental.

10               MR. ADLER:  Okay.  I was talking about the

11   supplemental report and how that gets transmitted, if it

12   comes out during the solicitation process and, you know, it

13   could be, I guess, another mass solicitation.  I imagine that

14   the solicitation is going to be a fortune, to put it mildly,

15   and I don't know if it makes better economies of scales -- I

16   don't know what the timetable is for that, if there is a

17   timetable, but, obviously, to the extent it comes out during

18   the solicitation, it should be conveyed to all creditors.

19               THE COURT:  Well, it would be put on the docket,

20   for sure.

21               MR. ADLER:  I do just want to finish with the

22   point about taxes, because I do think that this is a big

23   issue for a lot of original customers.  There are situations

24   that I've seen -- not in this case, but in other cases --

25   where creditors were offered cash and that cash would be

1  basically a disposition of the original crypto position.  And

2  some examples that I've seen result in the creditor not only

3  having to give up all the distribution to the tax

4  authorities, but to pay even more than the distribution,

5  depending on how it gets configured.

6          So I do think that in terms of looking out for the

7  customers' best interests, that the distribution in kind

8  seems to me to be something that's easily solved.  You know,

9  I doesn't even have to be through FTX; it could from a

10  third party going on when it's going out the door.  But, you

11  know, creditors have been waiting nearly two years and it's -

12  - I think it should be relatively easy to solve this problem

13  and I think it would generate more support among creditors if

14  they're getting a distribution.  And instead of having to pay

15  a capital gains tax on it, they're able to look to the loss,

16  you know, of their property when it resided at FTX, which

17  does remind me that there should be more disclosure in the

18  disclosure statement about customers, whether the customer --

19  whether it is the debtors' position that the customers, the

20  distribution could be characterized as a theft loss or

21  another type of loss.  There's no discussion in the

22  disclosure statement about that.

23          Now, I realize that that is often times an

24  individual tax decision, but in this case, you know, the

25  debtor surely formed an opinion about whether this amounts to

1   a theft loss or not.

2           THE COURT:  Well, can the debtors make that

3   decision on behalf of an individual?

4           MR. ADLER:  They don't have to make it on behalf

5   of all of them.  They can say, "It's our view."

6           THE COURT:  I don't know how much weight that

7   would carry, but, all right.

8           MR. ADLER:  All right.  Your Honor --

9           THE COURT:  Thank you.

10          MR. ADLER:  -- thank you.

11          MR. GLUECKSTEIN:  Your Honor, Brian Glueckstein,

12  again, for the record.  Just very briefly on a couple of

13  these points.  I'm not going to go through the laundry list

14  of points, most of which Mr. Adler acknowledged are

15  confirmation issues.  But just on a couple of points so the

16  record is clear, Your Honor asked a question with respect to

17  Mr. Kavuri's activity online with respect to solicitation and

18  lockup.  Mr. Adler claims not to have knowledge of it.

19          But we did submit, in connection with our reply

20  papers, information about the website, including under a

21  declaration from Ms. Kranzley, an excerpt of the cover

22  homepage of the website on which Mr. Adler's firm is listed

23  as counsel.  And it walks through what is happening here,

24  with respect to the solicitation of votes.

25          So the debtors will address this issue.  We'll

1  make a motion, Your Honor, to deal with this -- obviously,

2  it's not before Your Honor today -- but the suggestion that

3  somehow these three creditors are acting independently of

4  what's happening and what Mr. Kavuri is doing online is -- we

5  do not believe is credible.

6          The -- to be clear, on his question and the

7  argument about releases, there is nothing in the releases

8  that are proposed in this plan, which, of course, is a plan

9  confirmation issue, it is a classic plan confirmation

10 issue -- it comes up in almost every case -- there's nothing

11 about these releases that is a nonconsensual release that is

12 going to turn on the decision that is pending before the

13 Supreme Court in Purdue.

14         The releases are limited to activities with

15 respect to these cases.  We're not giving prepetition conduct

16 releases for prepetition conduct of the debtors or seeking

17 them.  And we did, importantly, make a change in the round of

18 comments that were -- and changes that were filed with the

19 Court most recently after consultation with our stakeholders

20 and the United States Trustee's Office to make clear that the

21 non-voting classes are opt-in releases only.  So there is no

22 nonconsensual release component to the releases that are

23 proposed, so I don't want that to be misconstrued coming out

24 of the hearing today.

25         We've addressed, and Mr. Dietderich has addressed,

1  we've addressed at length, the issues around inability from

2  day one of these cases, to provide in-kind distributions of

3  digital assets to customers.  That issue has been discussed.

4  The entirety of the case has revolved around the idea and the

5  reality is that the debtors here need to monetize -- recover,

6  monetize assets and make distributions to creditors in non-

7  digital asset currency.

8            THE COURT:  Should there be a disclosure about the

9  tax issue?

10           MR. GLUECKSTEIN:  On the tax issue, Your Honor, so

11 let me address that.  On the tax issue, there's been

12 significant revisions, as Your Honor will see in the redline

13 to the tax disclosure in Section 8 of the disclosure

14 statement.  That disclosure was vetted extensively with the

15 Official Committee, with the Ad Hoc Committee, with our tax

16 advisors to expand, significantly, the disclosures around

17 tax.

18           I would submit, Your Honor, this idea that the

19 debtor should take a position, which it sounds like,

20 effectively, give tax advice into the disclosure statement on

21 some type of worldwide basis, we don't think would be

22 appropriate.  But we do think the expanded tax disclosure

23 addresses a number of the points and we think is more than

24 sufficient for purposes of the disclosure statement on the

25 (indiscernible).

1        Similarly, on the issues of customer property,

2    again, there's extensive disclosure.  Mr. Kavuri's adversary

3    proceeding is disclosed in the disclosure statement.  The

4    idea that there are arguments that have been asserted and are

5    being asserted is not new and the settlement of the customer

6    property issues with those whom -- with whom we are proposing

7    to settle and those being put forth to voting creditors to

8    the plan is extensively discussed in the disclosure

9    statement.

10        With respect to the plan supplement, Your Honor,

11    this is important, and we agree that there needs to be

12    sufficient time for creditors, prior to the voting deadline,

13    to review the information that's in the plan supplement and

14    we have revised the materials to make clear that we will be

15    filing that plan supplement two weeks prior to the objection

16    deadline.  So I think Mr. Adler was asking the creditors

17    should have a week to review.  They're actually going to have

18    two, at a minimum, to review information in the plan

19    supplement.

20        And, finally, Your Honor, with respect to the

21    examiner report, we added disclosure in the most recent round

22    of changes, with respect to the examiner's report that was

23    filed and the disclosure statement makes clear that there is

24    the potential for a supplemental report to be issued.  As

25    Your Honor knows, that report will be on the docket of the

1   Court.  We do not think there would be a need to serve out

2   that report to creditors in the way that was just suggested.

3          But, certainly, the creditors, in reviewing the

4   disclosure statement, will be made aware of the fact, not

5   only of the examiner's report and his findings, but the

6   possibility of a supplemental report to be issued in the

7   future.  And we don't believe there's anything in that

8   report, Your Honor, that would -- the scope of that report

9   that's been requested by Mr. Cleary that would do anything to

10  change the plan or the issues before the Court or before the

11  creditors on a voting basis.

12         THE COURT:  While I'm thinking of it, this is off

13  the objections, where does that stand?  Has the U.S. Trustee

14  -- is the U.S. Trustee here?

15         MR. GLUECKSTEIN:  Right there, Your Honor.

16         THE COURT:  Have you -- what are we doing with the

17  proposed supplemental investigation by the examiner?

18         MR. GLUECKSTEIN:  So, Your Honor, I'm happy to

19  address it, but I'll let Ms. Richenderfer.

20         MS. RICHENDERFER:  Your Honor, just to be clear,

21  the United States Trustee is in agreement with the request

22  and so you're not going to be hearing from us individually

23  about it and I believe it's listed for an upcoming here.

24         THE COURT:  Okay.  I just want to make sure it's

25  on somebody's radar that it's going to be on --

1          MS. RICHENDERFER:  Oh, yes, Your Honor.  It's

2    moving forward.  It was filed by counsel for the examiner

3    himself.  We have already reviewed it.  I believe other

4    parties that are sitting here in front of you, parties in

5    interest, have also reviewed it and I don't believe that I've

6    seen any objections to it yet.

7          THE COURT:  Okay.

8          MR. GLUECKSTEIN:  And, Your Honor, that's correct.

9    The examiner did file a motion to authorize the scope and the

10   budget and timing of that supplemental piece.  The objection

11   deadline on that was actually, I believe, was yesterday, and

12   so our understanding is that a CNO is going to be submitted

13   later today to Your Honor for the Court's review.

14         THE COURT:  Okay.

15         MR. GLUECKSTEIN:  But the debtor also had no

16   objection to what was requested.

17         THE COURT:  All right.  And as long as we're

18   talking about plan supplements, I will apologize to all the

19   parties about the time it has taken me to get to the opinion

20   on the estimation of certain cryptocurrencies that were

21   presented to the Court back in March, I think it was.  But I

22   will be issuing an opinion on that this week, so that will

23   come out this week.  There was a lot of stuff there to go

24   through.

25         (Laughter)

1          MR. GLUECKSTEIN:  Thank you, Your Honor.

2          I do believe that does takes us, and is very

3   helpful, Your Honor.  We have two other objections, with

4   respect to --

5          THE COURT:  Well, I can probably rule on this.

6   Let me see if there's any response.  Mr. Adler, did you

7   want --

8          MR. GLUECKSTEIN:  Oh, I'm sorry.

9          THE COURT:  -- did you want a chance to respond?

10         MR. ADLER:  David Adler from McCarter & English.

11         Your Honor, just with respect to the comments

12  about the solicitation, I'll say it again.  I don't know

13  anything about it, okay.  I literally don't know anything

14  about it.  But it will be dealt with and I forgot to note

15  that we have been asked by the people that we do represent to

16  file a motion to certify a class within the bankruptcy and I

17  expect that we will do so in some short period of time.

18         THE COURT:  Certify a class in what?

19         MR. ADLER:  Of original customers in this case.

20         THE COURT:  Certify it for what purpose?  There's

21  no adversary proceeding.

22         MR. ADLER:  For confirmation purposes.

23         THE COURT:  You've got to have an adversary to

24  certify a class.

25         MR. ADLER:  Well, we have a pending adversary.

1          THE COURT:  Okay.

2          MR. ADLER:  That's number one.

3          Number two, I did forget to mention that we noted

4   that there should be more disclosure on Binance in terms of

5   causes of action.  With that, Your Honor, I don't have

6   anything else further, unless you had some questions for me?

7          THE COURT:  Mr. Glueckstein, what about the

8   Binance disclosure?

9          MR. GLUECKSTEIN:  Your Honor, Binance is one of

10  many potential targets of litigation in this case.  We don't

11  believe we have disclosure obligation, nor would it be

12  prudent to disclose, you know, all potential causes of action

13  that the debtor might be investigating or pursuing.

14          We have an extensive discussion and disclosure

15  statement with respect to the litigation claims that are

16  pending and, of course, as we note there, and as we made

17  clear on the record, the debtor continues to investigate

18  other claims.  We don't believe there's any specific

19  disclosure with respect to Binance that is necessary, but

20  what, you know, what's discussed, with respect to litigation

21  claims, generally.

22          THE COURT:  Okay.  Thank you.

23          On these objections, I'll overrule the objections

24  and, obviously, Mr. Adler, your rights are reserved to raise

25  any or all of these issues at the final confirmation.  I

1  think almost all of these were confirmation-type issues.  The

2  ones that weren't, it seems the debtor has addressed those

3  and updated the disclosure statement to address those

4  concerns.  So I will overrule the objection.

5       MR. GLUECKSTEIN:  All right.  Thank you, Your

6  Honor.

7       I believe, and I'm sure folks in the courtroom

8  will correct me if I'm wrong, but my understanding is that's

9  the scope of the disclosure objections that we have that were

10 still outstanding that the Court has now addressed.  There

11 are portions, at least coming into this hearing, of two other

12 objections that we understood parties were intending to

13 pursue before Your Honor.  The first of which, I think Your

14 Honor just addressed by informing the parties to expect in

15 the near term, a decision on the further estimation

16 proceeding on the MAPS and OXY tokens.  There was an

17 objection that is unresolved from Maps Vault, who is one such

18 party.  We worked with counsel to resolve their disclosure

19 objections.

20      There is a dispute between the parties as to how

21 their claim will be treated for voting purposes in the event

22 that the Court had not ruled by the voting deadline.  I think

23 that issue, based on Your Honor's announcement a few moments

24 ago is moot, but I will turn it over to Mr. O'Donnell to see

25 if he still has issues he would like to address.

1          THE COURT:  All right.  Thank you.

2          Mr. O'Donnell?

3          MR. O'DONNELL:  Your Honor, Dennis O'Donnell of

4    DLA Piper, on behalf of MAPS and OXY Vault, here, with

5    respect to the limited objection we raised, which may well

6    have been fully resolved by your indication that a decision

7    will be issued this week.

8          Our concern, as Mr. Glueckstein said, was not with

9    we understand that whatever your decision says will control

10   our voting amount for purposes of, you know, voting on the

11   plan.  The concern was what if we didn't have a decision.  I

12   think if that decision, in fact, issues this week, the

13   problem is resolved and the rest of our objection can go away

14   with a reservation of rights.  Clearly, if there are some

15   complications we can't foresee at this point, we would retain

16   the right to come before the Court presumably on a 3018.

17         You know I have some issues with whether it would

18   apply.  There is no pending objection, but to the extent we

19   needed to come back to the Court in some shape or form after

20   that decision issued as to voting rights, we can do it then.

21   But I think given what you've told us, for the moment, we can

22   stand-down.

23         THE COURT:  Okay.  Thank you.

24

25         MR. GLUECKSTEIN:  Thank you, Your Honor.

1        And the debtors would just reserve rights on that

2   issue.  It sounds like we're not going to need to address it.

3        The last pending objection, as we understand it,

4   that's still pending this morning is the objection that was

5   filed by the LayerZero parties.  And with respect to the

6   LayerZero, the debtors have agreed to make certain changes to

7   the disclosure statement and corresponding changes to the

8   plan to provide some further clarifying language that, one,

9   claims arising under Section 502(h) of the Bankruptcy Code

10  are not being discharged on the effective date and, two, that

11  the disputed claims reserve, which is contemplated in the

12  plan, will, in fact, be established.

13       Specifically, in addition to the changes that

14  were, certain of these changes were reflected in the redlines

15  that were filed with the Court over the weekend, we will be

16  adding the "avoidance of doubt" language that appears in the

17  disclosure statement into plan Sections 4.4 and 10.2 and

18  tweaking the language of Section 8.5 of the plan itself,

19  consistent with the disclosure to provide some further

20  clarification.  With those changes, our understanding is that

21  LayerZero's disclosure statement objections are resolved.

22  We, nonetheless, understand them to be pursuing some form of

23  a patently unconfirmable objection this morning and I'll turn

24  it over to them.

25       THE COURT:  Okay.  Just the -- I did receive a

1  redline this morning.  These changes are not included in that

2  redline?

3           MR. GLUECKSTEIN:  No, we will update these changes

4  and if there was anything that came out of the hearing today,

5  and file one further redline after the hearing today.

6           THE COURT:  Okay.  Thank you.

7           MR. MCNEILL:  Good morning, Your Honor.  Steve

8  McNeill from Potter Anderson & Corroon, here on behalf of the

9  LayerZero Group.  I wanted to introduce Your Honor to Dylan

10  Marker from Proskauer Rose, my co-counsel, who will be

11  addressing this matter.  He is admitted *pro hac*.

12           THE COURT:  Okay.  Thank you.

13           MS. MARKER:  Your Honor, may I please the Court?

14  Dylan Marker of Proskauer Rose, on behalf of LayerZero Labs

15  Ltd., Ari Litan, and Skip & Goose LLC, whom I will refer to

16  as the "LayerZero Group."

17           Before I begin, I want to acknowledge that we were

18  able to resolve our disclosure-related objections

19  consensually with the debtors with the representations that

20  the debtors just made on the record; however, the disclosure

21  statement should not be approved today because the Court is

22  being asked to approve a disclosure statement for a plan that

23  is drafted as patently unconfirmable.

24           As the Third Circuit found in, In re American

25  Capital Equipment LLC, at 688 F.3d 145:

1         "If it is obvious that a plan described in the

2    disclosure statement is patently unconfirmable, the

3    Bankruptcy Court can address the issue of plan confirmation

4    and deny approval of the disclosure statement."

5         The plan cannot be confirmed under Sections

6    1129(a)(1) and (a)(3), which requires that the plans comply

7    with the applicable provisions of the Bankruptcy Code and be

8    proposed in good faith.  The requirements of Sections

9    1129(a)(1) and (a)(3) cannot be satisfied here because the

10   plan violates Section 1123(a)(4) of the Bankruptcy Code and

11   is not being proposed in good faith.

12        The plan violates Section 1123(a)(4) by treating

13   the LayerZero Group's claims in Classes 5(a) and 5(b) worse

14   than almost every other creditor in Classes 5(a) and 5(b),

15   without any member of the LayerZero Group's consent.  Equal

16   treatment is one of the bedrock, equitable principles that

17   Section 1123(a)(4) protects.

18        If you'll indulge me, Your Honor, we think it

19   would be helpful to provide some background on the claims in

20   the adversary proceeding and how those claims are being

21   treated to make clear to the Court how this plan harms our

22   clients and other similarly situated creditors.  The

23   LayerZero Group consists of LayerZero Labs, a Web3 startup

24   focused on interoperability solutions between different block

25   chains; Ari Litan, one of LayerZero's former COO; and Skip &

1  Goose LLC, an investment vehicle controlled by Ari Litan.

2         Prepetition, Alameda was an investor in LayerZero

3  and LayerZero was one of Alameda's funded debt creditors.

4  LayerZero also used exchange accounts on FTX.com to store

5  crypto tokens needed for its business.  Ari Litan and Skip &

6  Goose used FTX U.S. Exchange accounts just like all of the

7  debtors' other customers to invest in cryptocurrencies.

8         The debtors have brought an adversary proceeding

9  against the LayerZero Group consisting of causes of action in

10 two different buckets.  The first bucket seeks to undo

11 transactions between LayerZero Labs and Alameda, related to

12 an exchange of $45 million in debt claims that LayerZero held

13 against Alameda for equity, interest, and warrants that

14 Alameda held against LayerZero.

15        The first bucket only has causes of action against

16 LayerZero Labs.  Note that this bucket involves the debtors

17 and the Alameda silo, and the relationship between LayerZero

18 and Alameda.

19        The second bucket seeks to avoid, as preferential

20 transfers, withdrawals from FTX.com and FTX U.S. Exchange

21 accounts by each member of the LayerZero Group that occurred

22 90 days before the petition date.  This second bucket of

23 causes of action are the same customer preference claims the

24 debtors are waiving under Section 5.5 of the plan.  If a

25 customer in Classes 5(a) and 5(b) votes to accept the plan

1  and agrees to the amount of their claim.

2          What the debtors appear to be doing is to

3  designate preference claims in bucket 2 and exclude a

4  preference action solely because of the cause of action

5  against LayerZero Labs in bucket 1.  Even though these are

6  unrelated causes of action there unrelated debtors.  This

7  treatment violates Section 1123(a)(4) of the Bankruptcy Code.

8          Section 1123(a)(4) provides that a plan shall

9  provide the same treatment for each claim or interest of a

10 particular class unless the holder of a particular claim or

11 interest agrees to less favorable treatment of such

12 particular claim or interest.

13         It is uncontroverted that "equal treatment" means

14 that all members of the class must receive equal value and

15 pay the same consideration for their distributions.  The

16 Court in W.R. Grace, 475 B.R. 34, has also noted that equal

17 treatment means that all class members are subject to the

18 same process for claim satisfaction and that all claims in a

19 class must receive equal value through the same pro rata

20 distributions or payment procedures to all claims.

21         Where the debtors have deviated from this

22 requirement is by offering to waive valuable preference

23 causes of action in exchange for a vote to accept the plan

24 for virtually all customers, but a select few.  In looking at

25 this issue, the Court must look at the value the customers

1    are receiving from a preference waiver, which cannot be

2    separated from the distributions that Class 5(a) and 5(b)

3    creditors will receive.  These preference waivers are

4    extremely valuable to Class 5(a) and 5(b) creditors because

5    these are the classes of creditors, who, as the debtors have

6    described in their disclosure statement, attempted to

7    withdraw billions of dollars of assets from their deposit

8    account on the eve of the Chapter 11 filing.

9            While the debtors have not disclosed exactly how

10   much money was withdrawn shortly before the petition date, we

11   understand from public reportings that roughly $6 billion was

12   withdrawn in November 2022.  Either way, the value of these

13   preference waivers are being denied to the LayerZero Group,

14   but billions of dollars of value is being provided to

15   similarly situated creditors in the same class.

16           As an example, Bitcoin is currently trading at

17   approximately $70,000 per Bitcoin, but the debtors are

18   estimating one Bitcoin at approximately $17,000.  Any

19   creditor who withdrew one Bitcoin in the preference period

20   is, thus, receiving approximately $53,000 in value.

21   Creditors that sold their Bitcoin around $17,000 per coin

22   risk potentially losing $53,000 if the debtors were

23   successful in all of their arguments and forced the customer

24   to purchase a new Bitcoin in the open market for the debtors.

25           The debtors attempt to obfuscate the issue by

1  arguing that the preference waiver is separate from treatment

2  on behalf of a customer entitled to a claim.  It is not.  The

3  waiver is being offered in exchange for a vote to accept the

4  plan and only to customers in Classes 5(a) and 5(b).  It is,

5  by definition, being offered on account of a creditor's claim

6  in exchange for a vote to accept the plan; an opportunity

7  that is being denied to the LayerZero Group for treatment of

8  its claims.

9       The debtors say that all holders of dot com

10  customer entitlement claims and U.S. entitlement claims will

11  receive the same kind of treatment, but then also say that

12  some of these holders are deemed to be excluded customer

13  preference actions, which completely cuts against the

14  argument that all holders of dot com customer entitlement

15  claims and U.S. customer entitlement claims are being treated

16  the same.

17       The debtors cite, In re Breitburn Energy, 582 B.R.

18  321, which notes that as long as all creditors had the same

19  opportunity to participate in the rights offering, equal

20  treatment was not violated.

21       Here, the debtors are specifically excluding the

22  LayerZero Group from an opportunity to participate in the

23  preference waiver.  While the LayerZero Group can choose not

24  to participate in the preference waiver, just like creditors

25  can choose not to participate in a rights offering, the

1  opportunity is being denied to them and not similarly

2  situated creditors in their class.

3          We agree with the debtors that 1123(a)(4) requires

4  equal treatment, not equal outcome.  When you *carte blanche*

5  denied opportunity to participate in a settlement because of

6  litigation relating to unrelated claims against three

7  creditors, this is relation to treatment and not outcome.

8  The LayerZero Group is being denied an opportunity to receive

9  value on account of its claims that virtually every other

10  creditor in Classes 5(a) and 5(b) receives.

11          Because the plan provides these valuable

12  preference waivers to almost all creditors except the

13  LayerZero Group, the plan violates equal treatment.  Although

14  the disclosure statement does not say who is entitled to

15  participate in the preference waiver and notes that a plan

16  supplement will detail all of the excluded customer

17  preference actions, the only other active litigation we find

18  where customers are being excluded are preferences against

19  former employees and insiders or customers who allegedly

20  jumped the queue and received manual withdrawals ahead of

21  other customers.

22          The debtors have not brought any similar

23  allegations of wrongdoing against any member of the LayerZero

24  Group.  While 1123(a)(4) is the problematic Code provision

25  that the debtors are violating in their plan, we also want to

1   highlight that the plan also violates Section 502(d).

2   Section 2.1.8(d) of the plan provides that a plan will not be

3   allowed if it is subject to risk of disallowance under

4   Section 502(d), even if a creditor has otherwise filed a

5   valid and timely proof of claim and will, therefore, not

6   receive a distribution.  The claim will be deemed a disputed

7   claim and not receive a distribution under Section 8.8 of the

8   plan.

9           Unfortunately, this flies in the face of

10  applicable Delaware case law.  Judge Walrath, in, In re Lids,

11  260 B.R. 680, held that a debtor could not avail itself to

12  the benefits of Section 502(d) without a judicial

13  determination against a creditor.  Judge Walrath said, and I

14  quote:

15          "To disallow a claim under Section 502(d) requires

16  a judicial determination that the claimant is liable,

17  therefore a debtor wishing to avail itself of the benefits of

18  Section 502(d) must first obtain a judicial determination on

19  the preference complaint."

20          Here, the debtor has merely commenced an adversary

21  proceeding.  That is not enough to determine that a creditor

22  is liable.  The debtors cannot hold up distributions to

23  members of the LayerZero Group or other customers on claims

24  that should have been allowed merely because of an adversary

25  proceeding, where there's not been a judicial determination.

1          Lastly, the disclosure statement should not be

2    approved because the plan was not proposed in good faith in

3    violation of Section 1129(a)(3).  Treatment for Classes 5(a)

4    and 5(b) depends on whether the debtors have unrelated causes

5    of action against the customer.  While not defined, the plan

6    provides a variety of factors of whether a customer is the

7    subject to an excluded preference action.  These include

8    where a customer was an employee, insider, acknowledged of

9    the commingling and misuse of corporate and customer funds or

10   changed its "know-your-customer" information to facilitate

11   withdrawals or received manual information for withdrawals,

12   where said withdrawals were otherwise halted.

13          It also provides, and this is more relevant to the

14   LayerZero Group's claims, where any debtor has a cause of

15   action or a defense against the recipient of the applicable

16   preferential payment or transfer or a subsequent transferee

17   of the applicable customer entitlement claim or any of its

18   affiliates, other than a claim arising under a customer

19   preference action.  While not drafted particularly clearly,

20   this appears to mean that the debtors can exclude any

21   customer from receiving equal treatment on its deposit

22   account claims because of an unrelated cause of action by or

23   against unrelated debtors.

24          This exclusion for unrelated causes of action

25   means that creditors like Mr. Litan and Skip & Goose, who the

1  debtors have only brought causes of action relating to

2  customer preference claims are being excluded from

3  participating in the same distributions as all other

4  similarly situated creditors because of the bucket 1 causes

5  of action against LayerZero, an entity where Mr. Litan only

6  has an equity interest.

7          LayerZero is also being excluded from receiving a

8  distribution on its customer entitlement claims for unrelated

9  causes of action against an unrelated debtor, i.e., causes of

10  action by Alameda against LayerZero.  The only basis for this

11  treatment is leverage in the adversary proceeding and to

12  force a settlement, rather than a legitimate good faith

13  bankruptcy purpose.  If the debtors had a good faith

14  bankruptcy purpose, they would seek to give the LayerZero

15  Group equal treatment with other creditors in Classes 5(a)

16  and 5(b).

17          For all the reasons stated, the disclosure

18  statement should not be approved because the plan is patently

19  unconfirmable and the relief requested by the debtors should

20  denied.

21          Does Your Honor have any questions?

22          THE COURT:  No questions, but there was a lot of

23  facts in there for which I have no evidence.

24          Let me hear from Mr. Glueckstein.

25          MR. GLUECKSTEIN:  Thank you, Your Honor.  Brian

1  Glueckstein for the debtors.

2          I think it is clear LayerZero is unhappy that

3  they've been sued and that the debtor is seeking to recover

4  amounts from them through an avoidance action.  That

5  adversary proceeding is pending.

6          I find the last statement particularly

7  interesting, accusing the debtor of not proposing its plan of

8  reorganization, and it's entirely in good faith because of

9  their inability to participate, and it's not just them --

10  I'll get to that in a moment -- in the offer to resolve

11  preference actions.  Their reaction, apparently, to the

12  litigation that they don't like is to try to stop this plan

13  in its tracks.

14          But, Your Honor, with respect to the merits of

15  this objection, everything that you heard, to the extent it's

16  relevant to the plan process at all -- I'm not going to get

17  into the adversary proceeding; those matters will come before

18  Your Honor at the appropriate time -- the issues, with

19  respect to the operation of the plan provisions is a plan

20  confirmation issue.  There's nothing about the way this plan

21  is drafted that in any way, shape or form, would rise to the

22  level of this plan being -- having (indiscernible).

23          The debtors, in Section 5.5 of the plan, and this

24  is explained in the disclosure statement, are offering to

25  settle and waive certain customer preference actions through

1    the plan balloting process.  The debtors' offer to settle and

2    waive those actions is not being made on account of these

3    customer entitlement claims, so we submit that the cited

4    provision under 1123(a)(4) is not applicable to this offer in

5    any event.

6            The debtors are making this offer to waive and not

7    prosecute customer preference actions against holders of

8    customer entitlement claims who consent to and stipulate to

9    the amount of their claim and vote to accept the plan.  Each

10   creditor's choice to do that, to accept that offer is

11   voluntary.  The debtors, of course, are using the plan voting

12   and balloting process to effectuate the settlement offer,

13   given the number of people at issue, but it is not in

14   exchange for plan treatment or on account of claims against

15   the debtors.

16           The debtor benefits from expediting and reducing

17   the costs of claims administration and reconciliation with

18   respect to ordinary course preference actions, but not every

19   potential defendant is similarly situated and, thus, not

20   every customer is eligible for the waiver of the customer

21   preference actions.  Not every customer is in a position

22   where the debtor can determine to forego those actions on

23   these terms and that is very clear in Section 5.5 of the plan

24   and the related disclosure as to what the debtors are

25   considering with respect to whether that settlement offer is

1  available or not.  The suggestion that this is somehow

2  singling out LayerZero or that substantially all of the

3  creditors are going to get this treatment is simply not based

4  on any facts that are before the Court, and counsel is

5  correct, we are going to be making clear, the list of

6  excluded customer preference actions in connection with the

7  plan supplement.  And the inclusion of that list is one of

8  the reasons why we can move forward with the disclosure of

9  the plan supplement and it includes that, amongst other

10  information, to 14 days prior to the -- to no later than 14

11  days prior to the proposed objection deadline.  So the

12  creditors will be able to see if they are eligible to elect

13  in to the preference settlement.  But there's nothing about

14  that settlement offer that is being done on account of the

15  treatment of the claim that the customer is seeking to

16  recover on against the estate.

17          LayerZero argued and asserted that there were

18  ambiguities about this and we did add language clarifying

19  that, one, any ending preference action, including the action

20  against LayerZero, will be on the list of excluded customer

21  preference actions and that those Defendants are not eligible

22  for a release.  As I mentioned, the debtors will include the

23  list of excluded customer preference actions in the plan

24  supplement, which we filed no later than two weeks before the

25  proposed voting deadline.  And we made clear that for those,

1  where the offer is made and accepted, that the debtors shall

2  waive and not pursue those actions, so that once the offer is

3  made by the debtor and accepted by the creditor, that that

4  shall be the outcome, that it shall be waived, and we've

5  added some clarifying language about that.

6           So we submit, Your Honor, there's nothing about

7  the inclusion of these provisions in the plan that is

8  problematic, but that issue is not before the Court today;

9  that's potentially a confirmation issue.

10          The only question before the Court today is

11 whether the inclusion of this provision, Section 5.5 of the

12 plan, somehow renders the plan patently unconfirmable and we

13 certainly submit that it does not.

14          THE COURT:  Okay.  Thank you.

15          Any response, Mr. Marker?

16          MS. MARKER:  Dylan Marker of Proskauer Rose, on

17 behalf of the LayerZero Group.

18          Your Honor, I think what's important to look at is

19 who is this opportunity being provided to and why is it being

20 given?  Six billion of customer preferences, of potential

21 customer preference claims, the debtors could have asserted

22 in these cases.  That's half of the cash that they say they

23 have -- that they will have for confirmation.  This is a

24 tremendous amount of value that is being provided to customer

25 preferences.

1          You can say it's for a settlement.  You can try

2   and frame it however you want, but the fact is that this is

3   value of the estate that is not being provided to our

4   clients, and for those reasons, we submit that the Court

5   should not approve the disclosure statement because the plan

6   is patently unconfirmable on that issue.

7          THE COURT:  All right.  Well, as I said, you gave

8   me a lot of information, a lot of facts for which I have no

9   evidence, which is why in a disclosure statement hearing,

10  it's difficult to raise issues, especially bad faith.  You've

11  got to have something that gives me something to hang on to,

12  and I have nothing to hang on to.

13         I mean, they've presented their plan.  They're

14  arguing it is proposed in good faith.  You're telling me it's

15  not proposed in good faith.  It's a fact issue.  It's an

16  issue for confirmation.  So I'm going to overrule your

17  disclosure statement objection and you obviously have the

18  right to raise whatever objections you want to when you get

19  to confirmation, but come with evidence.

20         MS. MARKER:  Thank you, Your Honor.

21         THE COURT:  Okay.

22         MR. GLUECKSTEIN:  Okay.  Your Honor, by the

23  debtors' count, that is the scope of the objections that need

24  to be dealt with this morning, but I should probably pause

25  there as to whether anybody else thinks I'm mistaken.

1          THE COURT:  I think there were two -- weren't

2    there two pro se objections to the disclosure statement?

3          MR. GLUECKSTEIN:  I think we -- we certainly

4    disclosed that we had received certain correspondence from

5    the *pro ses*.  I don't think we characterized them as raising

6    disclosure issues, but, you're correct, Your Honor, they're

7    not resolved.

8          THE COURT:  Right.  Well, let me just ask if there

9    is any *pro se* claimant online who wishes to be heard on the

10   disclosure statement?

11       (No verbal response)

12         THE COURT:  Okay.  I've heard nothing.

13         I did see the two pro se claimant filings and I

14   agree with debtors' counsel, they didn't really raise any

15   issues regarding disclosure, so those two objections are

16   overruled, as well.

17         MS. GAMBALE:  Alexis Gambale from Pashman Stein on

18   behalf of the joint liquidators of Three Arrows Capital.

19         I have with me Rebecca Pressley from Latham &

20   Watkins.  She just wants to be heard on the matter.

21         THE COURT:  Okay.

22         MS. PRESSLEY:  Good morning, Your Honor.

23         For the record, Rebecca Pressley of Latham &

24   Watkins on behalf of the joint liquidators of Three Arrows

25   Capital.

1          We just wanted to state for the record, we had

2  filed a limited objection to the disclosure statement and we

3  worked with the debtors to resolve that objection, but we

4  just wanted to note that we have a remaining issue with the

5  plan, which is that the debtors should required to create a

6  reserve in an amount determined with approval of the Court,

7  as opposed to the more discretionary nature of the reserve

8  that's built into the plan.  However, we're going to reserve

9  that argument for the plan confirmation stage, but we just

10 wanted to note that for the record.

11         THE COURT:  Okay.

12         MS. PRESSLEY:  With that, unless you have any

13 questions, nothing further from me.

14         THE COURT:  No questions, thank you.

15         MS. PRESSLEY:  Thank you.

16         MR. HACKMAN:  Good morning, Your Honor.

17         May I please the Court?  Ben Hackman for the U.S.

18 Trustee.

19         Our office filed a limited objection and

20 reservation of rights at Docket Item 17428, and I rise to

21 confirm that that objection is resolved.  There was one issue

22 we had discussed with debtors' counsel yesterday into this

23 morning.  I understand the debtors will add a small, a

24 relatively short provision to Section 3(c) of the disclosure

25 statement addressing the Kroll data breach.

1          The language is acceptable to the U.S. Trustee and

2   so we thank counsel for working with us to resolve our

3   concerns.  I would reserve the U.S. Trustee's rights and

4   objections regarding plan confirmation.

5          Unless Your Honor has any questions, that's all I

6   have.

7          THE COURT:  No questions, thank you.

8          MR. HACKMAN:  Thank you.

9          MR. GLUECKSTEIN:  Your Honor, I can confirm, we

10  did agree with the United States Trustee's Office, as I

11  mentioned earlier, on the language that Mr. Hackman is

12  referring to, and that will appear in the further redline

13  that we submit of the disclosure statement.

14         THE COURT:  All right.  Thank you.

15         MR. LIEBERMAN:  Good morning, Your Honor.

16         THE COURT:  Good morning.

17         MR. LIEBERMAN:  Seth Lieberman of Pryor Cashman,

18  LLP, counsel to the Celsius litigation administrator.

19         I'm here today with my colleague Andrew Richmond,

20  along with our co-counsel from Cole Schotz.  Patrick Reilley

21  of Cole Schotz is here with me, as well.

22         We filed the disclosure statement objection, Your

23  Honor, on June 5th.  That can be found at Docket 16820.  And

24  I'm pleased to report that consistent with the amended

25  agenda, that that disclosure statement objection has, in

1  fact, been resolved.  It's been resolved by the inclusion of

2  additional language in the disclosure statement itself, which

3  can be found at Docket 18537.

4         In particular, Your Honor, the redline at 18538,

5  there's language which begins on page 77 of that document.

6  That is what has helped to resolve our disclosure statement

7  objection.

8         And while I'm happy to report that we worked

9  constructively and in good faith with the debtors'

10 professionals in resolving this disclosure statement

11 objection, like some of the others that just appeared before

12 me, we, too, reserve our rights with respect to confirmation

13 of this plan.  We have raised certain claims and causes of

14 action in the disclosure statement objection, which I

15 understand that the debtors here vehemently object to, as

16 they put it, however, we remain hopeful and optimistic that

17 this can be resolved in advance of confirmation.

18        Nonetheless, Your Honor, I rise to reserve our

19 rights in connection with confirmation.  Thank you.

20        THE COURT:  Okay.  Thank you.

21        Anyone else?

22    (No verbal response)

23        THE COURT:  All right.  Well, that resolves all of

24 the objections to the plan and disclosure statement and I

25 will ask counsel to submit a -- you'll be submitting a

1  revised order.

2           MR. GLUECKSTEIN:  We will and Ms. Kranzley can

3  briefly address the solicitation in the order, and we will,

4  as I said, Your Honor, address with a further revised draft

5  of the plan and disclosure statement, reflecting the

6  incremental changes discussed this morning.

7           MR. PASQUALE:  Your Honor, this seems to be the

8  right time.

9           THE COURT:  All right.

10          MR. PASQUALE:  Ken Pasquale for the Official

11  Committee of Unsecured Creditors from Paul Hastings.

12          Your Honor, there were a couple of things said

13  earlier.  I know Your Honor has already overruled the

14  objections, but I'd be remiss if I didn't stand and address

15  just a couple of those comments.

16          First, our Committee is very proud of the fact

17  that we have not, but for an exception or two, had to be

18  before Your Honor to air our dirty laundry.  Our advocacy has

19  taken place in the negotiations that Mr. Dietderich

20  mentioned.  We have vigorously advocated our positions and,

21  as I said, we are very pleased to be standing here now in

22  support of the plan for confirmation, without having had to

23  come to the Court very often to complain.  We think that's

24  commendable, not subject to criticism.

25          There was also a comment that our committee is

1  conflicted in representing customers.  It's certainly the

2  case that we have a fiduciary duty do all creditors across

3  the various silos, but there's no conflict in how our

4  Committee has operated and I think that's proven, again, by

5  the plan that is now before the Court.

6         There are a number of things in the plan that the

7  Committee was instrumental in negotiating and that includes

8  the post-effective date governance agreement that was just

9  reached, as well as components, such as the consensus

10  interest rate and what is now being called, as it developed

11  from negotiations, the supplemental remission fund concept.

12         What you see in the plan is the subject of

13  successful negotiations.  That doesn't mean that the

14  Committee got everything that it wanted, that the debtors or

15  other stakeholders got everything they initially negotiated.

16  This was true negotiation, as should be, in the bankruptcy

17  setting.

18         So, Your Honor, without burdening the record more,

19  I did just want to stand up and say those couple of things.

20         THE COURT:  Okay.  Thank you, Mr. Pasquale.

21         MR. PASQUALE:  Thank you.

22         MS. KRANZLEY:  Good morning, Your Honor.  Alexa

23  Kranzley from Sullivan & Cromwell.

24         With respect to the solicitation procedures, the

25  related materials and the proposed form of order, I'm pleased

1  to inform the Court that everything is fully consensual.

2  We've worked it through with all the objecting parties, the

3  U.S. Trustee, the UCC, and the Ad Hoc Committee.

4          I would note, Your Honor, that we've had a couple

5  of changes since the version that was filed on Sunday.  This

6  is to add in that the publication notice will be with the New

7  York Times national and international editions and CoinDesk,

8  and then there's a few additional other cleanup changes.

9          Your Honor, I'm happy to walk through any of the

10  solicitation dates, materials, packages, ballots, or answer

11  any questions that you have.

12          THE COURT:  No, I reviewed them.  I appreciate it.

13  Thank you.

14          MS. KRANZLEY:  Thank you very much, Your Honor.

15          Then we ask that that be entered, and we'll

16  submit -- similar to the plan and disclosure statement, we'll

17  submit the revised version, as well, with the appropriate

18  redlines.

19          THE COURT:  Let me just confirm there's no

20  objection?

21      (No verbal response)

22          THE COURT:  Okay.  It's approved.

23          MS. KRANZLEY:  Thank you very much, Your Honor.

24          THE COURT:  Submit a revised form of order.

25          MS. KRANZLEY:  Your Honor, I think that leaves one

1   item on the agenda, Item No. 5 is the debtors motion for

2   authorization for repayment of intercompany payables by

3   debtor FTX Japan and the related release of claims that was

4   filed at Docket 15654.

5           Just to give the Court some brief background and

6   context for this motion, the debtors are looking for

7   authorization for the payment by debtor Japan KK to its

8   debtor parent Japan Holdings KK and other debtor affiliates

9   to satisfy certain pre and post-petition intercompany claims

10  totaling approximately $69.7 million.  The repayment is

11  necessary now as the debtors are exploring a sale of FTX

12  Japan.

13          Last week, on June 20th, the debtors filed a

14  motion at Docket No. 17923 seeking authorization to sell the

15  equity interest of debtor Japan KK.  The repayment of the

16  intercompany payables is a closing condition of that proposed

17  sale and was factored in by the purchaser determining the

18  purchase price that was offered.  After the repayment of

19  these intercompany payables the debtors anticipate that FTX

20  Japan will have cash and cash equivalents of approximately

21  $33.5 million in excess of its liabilities.

22          Your Honor, we received two pro se objections to

23  the motion and we filed a reply at Docket No. 17170.  Both of

24  these pro se claimants are alleging claims against FTX Japan

25  and various other debtors in various amounts, and argue that

1    the debtors motion should be denied until resolution of their

2    respective claims.  Your Honor, the debtors are not seeking

3    to adjudicate their claims in connection with this motion.

4    They are not prejudicing the adjudication of their claims and

5    anticipate having significant cash in excess to satisfy those

6    claims to the extent that they're allowed.

7        Your Honor, there were two declarations submitted

8    by Mr. Steven Coverick from Alvaraz & Marsal in support.  One

9    filed with the motion at Exhibit B to Docket 15654 and a

10    supplemental declaration in support of the reply at Docket

11    No. 17173.  We ask that these declarations be admitted into

12    evidence and Mr. Coverick is in the courtroom today.

13        THE COURT:  Is there any objection?

14      (No verbal response)

15        THE COURT:  They're admitted without objection.

16      (Coverick declarations received into evidence)

17        MS. KRANZLEY:  Your Honor, unless you have

18    questions for me I am happy to hear if either of the

19    objectors are on the line to be heard.

20        THE COURT:  Okay.  Let's see if anyone wants to

21    object to the motion for authorization of intercompany

22    payments regarding FTX Japan.  There were two objections

23    filed, right?

24        MS. KRANZLEY:  That is correct, Your Honor.

25        THE COURT:  Are either of the objectors on the

1  line?

2        (No verbal response)

3            THE COURT:  Okay.  I have heard nothing.  I did

4  review the objections and the response from the debtors. I

5  think the debtors are correct, to the extent there is a

6  ballot objection they can be dealt with separately and

7  there's going to be sufficient funds remaining at FTX Japan

8  to pay those two objectors who have raised the objections.

9  So, there is no prejudice to them in approving it. So, I will

10 approve the order.

11           MS. KRANZLEY:  Thank you very much, Your Honor.  I

12 believe those are the only items we have the agenda for

13 today.

14           THE COURT:  Okay.  Anything else before we

15 adjourn?

16           MR. HARVEY:  Good morning, Your Honor, almost

17 afternoon.  For the record Matthew Harvey from Morris,

18 Nichols, Arsht & Tunnell on behalf of the ad hoc committee of

19 non-US customers of FTX.com.

20           Ms. Kranzley beat me up here before I could

21 address -- stand to address our support of the disclosure

22 statement approval. Our group, which is nearly $5 billion in

23 claims now with approximately 75 percent of our members being

24 original holders, like the creditors committee, has worked

25 behind the scenes in order to get to the result we are today.

1  We think this is an important step in milestone in getting to

2  plan solicitation in getting to the point where we can make

3  distributions to customers as soon as possible. For those

4  reasons, Your Honor, we support approval of the disclosure

5  statement and the start of solicitation.

6              THE COURT:  Thank you.

7              MR. HARVEY:  Thank you, Your Honor.

8              THE COURT:  Anything else?

9         (No verbal response)

10              THE COURT:  Thank you all very much.  We are

11  adjourned.

12         (Proceedings concluded at 11:59 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 CERTIFICATION

2         We certify that the foregoing is a correct

3  transcript from the electronic sound recording of the

4  proceedings in the above-entitled matter to the best of our

5  knowledge and ability.

6

7  /s/ William J. Garling               June 25, 2024

8  William J. Garling, CET-543

9  Certified Court Transcriptionist

10  For Reliable

11

12  /s/ Tracey J. Williams              June 25, 2024

13  Tracey J. Williams, CET-914

14  Certified Court Transcriptionist

15  For Reliable

# EXHIBIT 26

Court of Appeal

# Wilkinson and others *v* North and another

## [2018] EWCA Civ 161

2017 Nov 7; 2018 Feb 9                              Gloster, David Richards LJJ

*Trusts — Creation — Sole trader's business — Claim that businessman creating trust in claimants'*
*favour over undivided shares in business venture carried out by him as sole trader — Whether*
*sufficient identification of property to be held on trust — Whether intention to create trust*

The claimants brought a claim against the defendants, the sons of the deceased, seeking a
declaration that a residential property that was occupied by the second defendant and his family
was held on trust for them. The claimants alleged that they had invested significant sums of
money in the deceased's business as a sole trader on the basis of agreements with, or declarations
by, him that they would each receive a percentage "equity position" in the business; that by
such agreements and declarations the deceased had created a trust in the claimants' favour over
undivided shares in his business; that under the trust they were each entitled to a percentage
share of damages which the deceased had been awarded by a court in the United States; and
that the mortgage loan used for the property's purchase had been repaid from funds subject to
the trust. The judge granted the claim, finding that the deceased had validly created a trust in
the claimants' favour. The defendants appealed, contending that the judge had erred in finding
that there was certainty as to (i) the property that was subject to the trust and (ii) the deceased's
intention to create the trust.

On the appeal—

*Held*, allowing the appeal, that the creation of a trust of a share in a sole trader's business
caused difficulties which related more to the question of whether the settlor had intended to
create a trust than to the issue of certainty of subject matter; that in the present case the judge had
been right to hold that the property subject to the alleged trust was sufficiently certain; that, in
particular, there was no obstacle to the subject of a trust consisting of (i) assets of a business which
were constantly changing, (ii) a share of an indivisible asset such as real property, intellectual
property rights or book debts, (iii) an undivided share of a holding of securities or of a credit
balance in a bank account; that, further, if A declared himself trustee of a 5% share of his business
for B, it could take effect as an equitable tenancy in common between A and B in the agreed
proportions; that, however, on the facts of the present case, there had been no sufficient intention
on the part of the deceased to create a trust of shares in his business; that the documents relied on
by six of the claimants suggested that their main purpose had been to confer contractual rights
on the claimants, the language used was inapposite to the creation of a trust and no consideration
had been given to the issues that would need to be addressed if a trust were intended; that
there was no reason to suppose that the investments made by the claimants who relied on oral
discussions had been made on different terms; and that, accordingly, no trusts over the business
or the assets of the business had been created (*post*, paras 12, 16–24, 54, 62–65, 66).

*In re Rhagg (decd)* [1938] Ch 828, *In re London Wine Co (Shippers) Ltd* [1986] PCC 121, *Hunter*
*v Moss* [1994] 1 WLR 452, CA and *In re Lehman Bros International (Europe) Ltd* [2011] EWCA Civ
1544, CA considered.

Decision of Judge Pelling QC sitting as a judge of the Chancery Division [2016] EWHC 1242
(Ch) affirmed.

**APPEAL** from Judge Pelling QC sitting as a judge of the Chancery Division

By a claim form the claimants, Geoffrey John Wilkinson, Alan Charles Winch, Bryan
John Richard Wilkins, Alexander Charles Smart, John Thomas Formby, Simon James Weir-
Rhodes, Ian Philip Hornblow and Nicholas Colin Thomas, brought proceedings as purported
beneficiaries of a trust created by John North (now deceased) against Steven John North and
Peter North seeking a declaration that a residential property in Rackheath, Norfolk owned by JS
Property Holdings Inc and occupied by the second defendant and his family was held on trust
for the claimants on the basis that a mortgage loan used for its purchase had been repaid from

1

funds that were subject to the trust. By a decision dated 27 May 2016 Judge Pelling QC sitting as a judge of the Chancery Division [2016] EWHC 1242 (Ch) allowed the claim.

By an appellant's notice dated 8 September 2016 and with permission of the Court of Appeal (Lewison LJ) granted 21 December 2016 the defendants appealed.

The facts are stated in the judgment of David Richards LJ.

*Thomas Munby* (instructed by *Hatch Brenner llp, Norwich*) for the defendants.
*Neil Cadwallader* (instructed by *Richard Slade & Co*) for the claimants.

The court took time for consideration.
9 February 2018. The following judgments were handed down.

## DAVID RICHARDS LJ

*Introduction*

1 The issue on this appeal is whether a trust was validly created by the appellants' father in favour of the first to eighth respondents ("the respondents") over undivided shares in a business venture carried on by him as a sole trader. The issue falls to be decided on the basis of the terms of documents prepared by the appellants' father, John North ("Mr North"), without any legal advice, construed against the relevant background facts as they existed at the dates of the documents.

2 The creation of a trust has significant, and generally irreversible, consequences. The settlor, by creating the trust, ceases to be entitled to the benefit of the property subject to the trust. If, as in the present case, he continues to hold the legal title to the property, he holds it, to the extent of the interest created by the trust, for the benefit of the beneficiaries of the trust and becomes subject to exacting fiduciary duties owed to the beneficiaries in relation to the trust property. The law therefore requires certainty of three crucial elements: the intended beneficiaries, the property to be subject to the trust and the intention of the settlor to create the trust. These elements must be established objectively by reference to the documents, words or conduct relied on as creating the trust. statements as to the settlor's intention made subsequently are irrelevant. There is a parallel with the approach adopted to determine whether a contract has been made.

3 There is, in the present case, no issue about the identity of the beneficiaries, if the other two elements are established. They are the respondents. The points in issue are whether Mr North intended to create a trust and, if so, the property to be subject to the trust. These issues are closely linked.

4 Mr North died in February 2012, over four years before the trial, but so far as the claim to a trust rests on documents, as it very largely does, his evidence would have been irrelevant, as there was no real dispute about the background to the documents.

5 Judge Pelling QC, sitting as a judge of the Chancery Division, held that Mr North had validly created trusts in favour of the respondents, albeit "with some hesitation". Permission to appeal was granted by Lewison LJ.

6 The claim was for a declaration that a residential property in Rackheath, Norfolk which is occupied by Peter North (the second appellant) and his family was held on trust for the claimants (the respondents to this appeal). The claim was made on the basis that a mortgage loan used for its purchase had been repaid from funds that were subject to the trust. Legal title to the property was transferred to, and is still held by, the 9th respondent, a company established by Mr North, If the funds were subject to the trust, the company had notice of that fact through the knowledge of Mr North.

7 Apart from the issue of the alleged trust, and on the assumption that it had been validly created, there were a number of defences and other issues before the judge, all of which he decided against the appellants and none of which are subject to this appeal.

8 The judge helpfully and concisely set out the background facts [2016] EWHC 1242 (Ch):

"5. Mr North designed a spallation drilling device and then a component based on his spallation drilling device that could be applied in the manufacture of vacuum cleaners and washing machines amongst other things. Having entered into a confidentiality agreement with Electrolux Floor Care and Light Appliances AB ('Electrolux'), a corporation that manufactures such products, in breach of that agreement Electrolux adopted Mr North's designs other than by agreement with him. He instructed an attorney in Texas to commence proceedings for damages for breach of

2

contract against Electrolux. Those proceedings were settled before trial by a payment to Mr North, net of the attorney's contingency fee, of US$17,774,135·52 ('the damages').

"6. The claimants allege that they invested significant sums of money with Mr North for the purpose of enabling him to develop and exploit his inventions. The claimants maintain that they all invested on the basis of agreements with, or declarations by, Mr North that they would each receive back their initial investment, a sum equivalent to five times their initial investment and a percentage 'equity position' in 'the venture' that was different for each investor but appears to have depended on mutual agreement and the amount invested.

"7. It is the claimants' case that the damages were fruits of the venture and that following payment of the damages by Electrolux to Mr North they became entitled not merely to the return of their investment and the agreed uplift but a percentage share of the damages calculated by reference to their agreed percentage equity position. Mr North is said to have paid the investors all or most of their respective initial investments and the uplift but not any sum in respect of the investors' respective equity positions. None of the claimants maintain in these proceedings that they are entitled to recover anything other than the sums they maintain they are entitled to in respect of their respective equity positions.

"8. Mr North's failure to pay the investors the sums they maintain they are entitled to in respect of their respective equity positions resulted in proceedings in the Chancery Division by the claimants ('the first claim') in which it was alleged that the damages were held on trust as to the sum of the amounts claimed by each investor by reference to their agreed percentage equity position. Mr North did not co-operate in the conduct of those proceedings but in the end the claimants in the first claim recovered a default judgment against Mr North for £2·138m, which he failed to pay."

9 The basis of the respondents' claims is not identical. The first respondent, Mr Wilkinson, relies on a document dated 25 June 1997 and signed by himself and Mr North ("the Wilkinson Agreement"). The third to seventh respondents rely on letters in substantially similar terms signed by Mr North and sent to them in 1999–2000. The second respondent, Mr Winch, relies on oral discussions between himself and Mr North in November 1997 and May 2004 and the eighth respondent, Mr Thomas, relies on discussions with Mr Wilkinson. As it is not suggested that any of the trusts were created over interests in land, they could be created orally.

10 In order to determine whether Mr North intended to create trusts in favour of the respondents, it is necessary to examine the documents or discussions relied on, in the context of their surrounding circumstances. The question of whether there was sufficient certainty of subject, that is, sufficient identification of the property to be held on trust, is common to all the claims and I will address that first.

*Certainty of subject matter*

11 In *Westdeutsche Landesbank Girozentrale v Islington London Borough Council* [1996] AC 669, 705, Lord Browne-Wilkinson identified four propositions fundamental to the law of trusts. They included, first, that to establish a trust there must be identifiable trust property (leaving aside the special case of constructive trusts, which is not relevant to the present case) and, secondly, that

"(iv) once a trust is established, as from the date of its establishment the beneficiary has, in equity, a proprietary interest in the trust property … enforceable in equity against any subsequent holder of the property (whether the original property or substituted property into which it can be traced) other than a purchaser for value of the legal estate without notice."

At p 709, Lord Browne-Wilkinson said that:

"A trust can only arise where there is defined trust property; it is therefore not consistent with trust principles to say that a person is a trustee of property which cannot be defined."

12 It is worth recording that, so far as the researches of counsel and the court go, there is no decision of any court addressing a trust created by a sole trader of a share of his business. Nor has any discussion of such a trust been found in any textbook or precedents book. As will become apparent, even if such a trust is possible, it raises significant issues which one would expect to be addressed by anyone proposing to create such a trust.

3

© 2018. The Incorporated Council of Law Reporting for England & Wales

13 Although the judge said that the property subject to the trusts that he found to have been created in favour of the respondents other than Mr Wilkinson and Mr Winch was the "the assets of, and goodwill associated with, the business carried on using the trading name Hydratherm", he did not explicitly identify the assets subject to the trusts in favour of Mr Wilkinson and Mr Winch. The Wilkinson Agreement and the first discussion with Mr Winch pre-dated the Hydratherm business by at least two years and 18 months respectively (judgment at para 25), when Mr North had not yet developed the application of his spallation drilling technology to vacuum cleaners and washing machines. However, by a parity of reasoning, it is reasonably apparent that the judge considered that the trust in favour of Mr Wilkinson and Mr Winch covered the assets and goodwill of Mr North's business concerning "spallation drilling and its applications as well as the 'Hot Dry Rock' programme", to quote from the Wilkinson Agreement.

14 I will assume—no one has suggested the contrary—that there were at the date of the Wilkinson Agreement one or more assets falling within that description. It would seem likely that, if nothing else, Mr North had some intellectual property rights in respect of his spallation drilling technology. This is important because the creation of a valid trust requires the existence at that time of some assets to which the trust would apply: see Lord Browne-Wilkinson in the Westdeutsche case at p 705. If, however, there were no business assets at the time of the Agreement, there could not be a present trust, only an agreement to create a trust over future property, which would require consideration to be enforceable. The Wilkinson Agreement did not in my view contain any consideration moving from Mr Wilkinson. At most, it was an agreement to agree and hence lacked legal effect as a contract to create a trust.

15 Mr Munby, appearing for the appellants, submitted that there were three grounds on which the judge was wrong to hold that the property subject to the alleged trust was sufficiently certain.

16 First, there were insurmountable difficulties in identifying the relevant assets. Clearly, they did not include Mr North's personal non-business assets, but, without a separate business structure, it was impossible to draw the line with a sufficient degree of certainty. The example was given of a sum of money earmarked by Mr North for use in the business. Was it an asset of the business in circumstances where Mr North could change his mind and decide not to use it in the business?

17 I do not regard this as an insurmountable problem. The assets of a business will in the case of many assets be obvious. It is true that there may be difficult questions as to whether a particular asset falls for the purposes of a trust to be an asset of the business, but the courts have for many years had to resolve such issues. For example, there are numerous cases in which a testator has left his business, or one of his businesses, to a particular beneficiary, requiring the assets of the business, as opposed to the testator's other assets, to be identified. In In re Rhagg (Deceased) [1938] Ch 828, a testator bequeathed his business as a solicitor and the office furniture, law books and other articles in the office to his managing clerk, leaving the residue to charities. Questions arose as to whether the gift of the business included various assets, including the business premises and loans to clients. Simonds J held that they were included. He said, at p 836:

"There will, no doubt, often be room for controversy what are the assets of the business, whether it be an individual business or a partnership business. But, if an asset can properly be called an asset of the business, I see no reason for its exclusion from the bequest, unless a particular context makes exclusion necessary."

18 For another example, see In re White, Decd, McCann v Hull [1958] Ch 762.

19 Second, Mr Munby submitted that assets of the business were a constantly changing collection of assets about which there would be uncertainty and over which a trust could not therefore be created. However, that constantly changing assets can form the subject of a valid trust is shown by the decision of this court in In re Lehman Bros International (Europe) Ltd [2011] EWCA Civ 1544 at [69]–[77].

20 The submissions dealt with above would apply to a trust of the whole business as much as to a trust of a share of the business, but Mr Munby's third submission is directed specifically at the situation in this case of a trust of an undivided share of a business. He submitted that such a trust could not take effect on account of an insufficient identification of the assets subject to the trust. He referred to the decision of this court in Hunter v Moss [1994] 1 WLR 452, in which a trust of 50 shares out of a holding of 950 shares was held to be valid, notwithstanding that there was no identification of the particular 50 shares. This, submitted Mr Munby, represented a particularly generous application of a strict rule, although I think it fair to say that the decision in the Lehman Bros case referred to above, in which Hunter v Moss was considered, goes further.

4

21 In my judgment, a generalised statement is insufficient and it is necessary to look at each class of asset of the business. In terms of certainty of subject, I do not see a difficulty in a trust of a share of an indivisible asset, such as real property, intellectual property rights or book debts. Having regard to *Hunter v Moss* and the *Lehman Bros* case, there would not be an obstacle to a trust of an undivided share of a holding of securities or of a credit balance on a bank account (see *Hunter v Moss* at first instance: [1993] 1 WLR 934, 941H). However, in the present case, Mr Wilkinson's beneficial interest would attach not to 5% of a credit balance on a particular date but to 5% of such fluctuating credit balance as from time to time existed during the currency of the trust. In my view, such a trust would not lack certainty of subject matter but it raises serious issues, which I address below, as to how such a trust was intended to operate, those issues being relevant to whether Mr North had the necessary intention to create a trust.

22 On one view, any chattels comprised in the assets of the business could not be the subject of the trust without identification of the particular chattels: see *In re London Wine Co (Shippers) Ltd* [1986] PCC 121, *In re Goldcorp Exchange Ltd* [1995] 1 AC 74 and *In re Harvard Securities Ltd* [1998] BCC 567.

23 However, in a case where A declares himself trustee of a 5% share of his business for B, it could take effect as an equitable tenancy in common between A and B in the agreed proportions: see *In re London Wine Co (Shippers) Ltd* at p 137.

24 The creation of a trust of a share in a sole trader's business undoubtedly causes difficulties, which have not been explored in any authority, but, as I see it, they go more to the question of intention than to the issue of certainty of subject matter.

25 I therefore turn to the question whether a sufficient intention on the part of Mr North to create a trust of shares in his business can be found in the documents and discussions on which the respondents rely.

*Mr Wilkinson's claim*

26 The document on which Mr Wilkinson relies is dated 25 June 1997 and headed "Contract of Agreement between John North and Geoffrey Wilkinson including Provisional Terms and Conditions". It is signed by Mr Wilkinson and Mr North under the words "Agreed as written, read and understood".

27 It is necessary to set out the entire text of the document:

"*Preamble*

"The underwritten is to be considered the understanding between the mentioned parties, and constitutes the formal contract between the nominated parties. A contract will be signed by both parties and come into effect for a period of five years (5 yrs) with three (5 yr) options, as from the funding of any given entity that will conduct the business of the company responsible for 'Spallation Drilling' and its applications as well as the 'Hot Dry Rock' programme. The initial terms and conditions will remain in effect for the five year period unless otherwise agreed in writing by both parties. The equity position granted to Geoffrey Wilkinson at the signing of this agreement will remain the property of Geoffrey Wilkinson for perpetuity.

"*Terms and Conditions*

"Equity:

"A five percent (5%), non dilutable, voting equity interest in the holding company, and/or any subsidiary company subsequently formed, heirs and/or successors of John North and Worldrill, will be made available to Geoffrey Wilkinson at the signing of this contract and demonstrated by the issuance of stock certificates. An additional non dilutable, three percent (3%) equity interest in all subsidiary or associated companies registered outside the UK, and/or a three percent (3%) profits interest in any UK company doing business outside the UK will be granted to GJW. The equity position will cover the activities of any company or corporate vehicle, trust, partnership or similar of John North, his heirs or successors. Geoffrey Wilkinson pledges that the above provision does not include any private trust or corporation set up by John North for the sole benefit of any heirs, assignees or successors of John North, [if] he donates or grants equity shares in the business, to same. John North covenants to donate, pledge or grant only that percentage of equity shares or interest to the trust or corporation owned outright by John North at that time.

5

© 2018. The Incorporated Council of Law Reporting for England & Wales

"Compensation:

"An annual salary of (to be agreed) will be paid bi-monthly to Geoffrey Wilkinson as from the signing of, and funding of the first contract. Other increases will be provided for as soon as the cash flow (revenue) allows same to be applied.

"Signed Bonus:

"A cash sum (to be agreed) to be paid at the commencement of the contract.

"Position:

"A full main board directorship, with the position of CEO reporting straight to John North, as well as the board of directors.

"Contract:

"The duration of the contract will be for a period of five years (5 yrs) with three (3) five year options, commencing as from the signing and funding of the first contract with an outside agency.

"Commencement:

"At the first funding of the company by an outside agency."

28 I earlier mentioned that the relevant documents in this case were prepared without legal advice. Although the Wilkinson Agreement uses legal jargon, it does so in a way which shows that the parties had limited understanding of legal matters. To a lawyer, it borders in many places on the incoherent. But, as Mr Cadwallader for the respondents emphasised, there is no formality or particular language required for the creation of a trust. The court must examine the terms of the document to determine whether Mr North intended to create a trust and, if so, whether there is the certainty as regards the trust property required by the law.

29 Although the document is headed "Contract of Agreement", it did not in my view have contractual effect. Critical terms are subject to further agreement (both Mr Wilkinson's annual salary and signing bonus were to be agreed).

30 Whatever the contractual status of the Wilkinson Agreement, Mr Wilkinson's case rests on that part of it providing for the grant of an equity position to him. At the end of the Preamble, it is stated that the equity position is granted to him 'at the signing of this agreement' and will remain his property in perpetuity. There follow two paragraphs against the side heading "Equity". The first paragraph is principally addressed to the issue of shares in one or more companies to Mr Wilkinson and involves no question of a trust. Mr Wilkinson's case for a trust of 5% (or 8%) of the business carried on by Mr North as a sole trader rests essentially on the last sentence of the first paragraph: "The equity position will cover the activities of any company or corporate vehicle, trust, partnership or similar of John North, his heirs or successors".

31 The judge said, at para 21, that "on its face, the Wilkinson Agreement was an agreement under which Mr Wilkinson would receive shares in a company to be formed … and would be employed as the CEO of that company". He observed that it was not on its face a declaration of trust. He said that it contemplated that at some stage in the future a company or companies would be formed with 5% of the shares being allotted to Mr Wilkinson, with an entitlement to an additional 3% shareholding in any non-UK company or to 3% of the profits made by a UK company carrying on business outside the UK.

32 The judge correctly directed himself that for this document to create a valid trust, the words used by Mr North must show an intention to create a trust and that the trust property should be sufficiently certain. He concluded, with some hesitation, that those requirements were satisfied.

33 The judge set out his reasoning at para 30:

"Whilst I accept that the Wilkinson Agreement has been formulated on the assumption that a company would be formed, and that Mr Wilkinson would have a shareholding in that company, I do not accept that the agreement was not intended to have any effect in the event that a company was not in the end formed. I reach that conclusion because of the final sentence in the sub-paragraph of the agreement entitled 'Equity', which is to the following effect: "The equity position will cover the activities of any company or corporate vehicle, trust, partnership or similar of John North …" Like much else in the agreement, the language used is imprecise. It could have been intended simply as a means by which dilution could be avoided by aggregating all holdings held by Mr North or on his behalf and those connected with him in whatsoever form in the proposed company. However, construing the words used in their commercial context leads me to conclude that it is much more likely that the sentence was included in order to cater for the possibility that as the business referred to in the Preamble developed it

6

was decided in the end by Mr North not to carry it on using a corporate vehicle. That was an obvious risk for an investor investing before the company was formed and is likely to be one that someone in Mr Wilkinson's position would want addressed. This analysis is supported by the use of the phrase 'any given entity that will conduct the business of the company …' in the Preamble and by the fact that the non-dilution issue had been expressly addressed in the opening sentence of the Wilkinson Agreement headed 'Equity'."

**34** At para 31, the judge said that this conclusion was supported by later acknowledgements and admissions against interest made by Mr North, to which I will later refer.

**35** As the judge observed in his judgment at para 21, the Wilkinson Agreement is not on its face a declaration of trust and appears to be either an agreement or conditional agreement entered into in contemplation of events that did not happen. With the qualification that in my view the Agreement was not an enforceable contract because it was too uncertain in its terms, I agree with what the judge said.

**36** While the judge accepted that the Wilkinson Agreement had been formulated on the assumption that a company would be formed and that Mr Wilkinson would have a shareholding in it, he did not accept that the agreement was not intended to have any effect if a company were not formed. For this he relied on the last sentence of the first paragraph under "Equity", quoted above. The judge concluded that this sentence was not aimed simply as a means by which dilution could be avoided but was included to cater for the possibility that Mr North might ultimately decide not to carry on the business using a corporate vehicle. This, the judge considered, was an obvious risk that someone in the position of Mr Wilkinson would want addressed.

**37** From this analysis, which he considered to be supported by the acknowledgements and admissions detailed at paras 27–28, the judge concluded that Mr North manifested an intention to hold the assets of the business on trust for himself and Mr Wilkinson in the agreed shares.

**38** It is the link between this analysis of the purpose of the last sentence of the first paragraph under "Equity" and the conclusion of a trust that is principally challenged on this appeal. The judge does not appear to have considered that his analysis could lead to a conclusion other than a trust, in particular a personal obligation, nor to have considered the difficulties involved in a finding of a trust which in turn suggest that Mr North cannot have intended to create a trust.

**39** In my judgment, this challenge is well founded. I have three principal grounds for this view.

**40** First, the judge was right to identify as the primary purpose of the "Equity" section of the Wilkinson Agreement an agreement to provide Mr Wilkinson with an equity shareholding in the company that would carry on the business. That must inform the meaning to be given to the last sentence of the first paragraph dealing with Equity.

**41** A shareholding would not give Mr Wilkinson any proprietary interest in the assets, gross or net, of the company. A share, as is often said, is a bundle of rights. A shareholding would give him a contractual right to share, subject to the articles of association of the company, in any dividends declared by the company and in any capital distributions, whether made on a liquidation or otherwise. The indirect "interest" of a shareholder is in the net assets and profits of the company. The assets of the company are, of course, first applied in the payment of its liabilities. A shareholding of 5%, or 8%, would give Mr Wilkinson no right or power to control the appointment of directors or their conduct of the business. The shareholding would not itself entitle Mr Wilkinson to any participation in or influence over the management of the business, although the Agreement envisaged that he would be appointed CEO of the company, albeit reporting to Mr North and the board of directors.

**42** This is no template for a direct proprietary interest in the assets and goodwill of the business if carried on by Mr North as a sole trader. Just as a shareholding gives the shareholder contractual, and some statutory, rights against the company, so an agreement by Mr North to pay 5% or 8% of profits taken out of the business and of the proceeds of sale of the business would give Mr Wilkinson the equivalent rights if Mr North carried on the business in his own name. The main purpose of the Agreement therefore suggests that, if anything, contractual rights against Mr North were the intended effect of the critical sentence of the Agreement.

**43** This approach is, in my judgment, strongly supported by the issues that the Wilkinson Agreement does not begin to address if a trust were intended. This constitutes the second ground for my conclusion.

7

**44** First, how were the liabilities of the business to be dealt with? This is not an issue if the business were carried on by a company, as explained above. The judge held that the other respondents had a proprietary interest in the assets of, and goodwill associated with, the business, and presumably thought the same applied to Mr Wilkinson, although that is not spelt out in the judgment. If the judge meant that he was entitled to the agreed percentage of the gross assets, that cannot be right. It is inconceivable that Mr North intended to give a proprietary interest in the assets, while not giving him any recourse as regards the debts of the business for which, as a sole trader, he would of course be personally liable. When, in the hearing of the appeal, Mr Cadwallader appearing for the respondents was asked about this, he submitted that Mr Wilkinson and the other respondents had a proprietary interest in the net assets. But, so stated, that cannot be right. Net assets are an accounting entry; they are the amount of the assets less the liabilities. They cannot form the subject matter of a trust. It would no doubt have been possible for Mr North to have agreed that, in the event of a sale or other realisation of the business, he would hold 5% of the ultimate net proceeds on trust for Mr Wilkinson. But that cannot be spelt out of the Wilkinson Agreement. If it were clear that a trust was intended, the solution that equity might provide would be to charge the assets with payment of the liabilities. The significant point in the present context is that no thought at all had been given to this issue, an obvious issue to business people as well as to lawyers.

**45** Nor had any thought been given to how the business would be managed if a trust were created. If the business were carried on by a company, the business would be managed by the directors, who in the discharge of their responsibilities would be subject to the duties now set out in sections 170 et seq of the Companies Act 2006. These are longstanding duties developed in the context of commercial concerns. They are significantly different from the duties of a trustee. Mr Cadwallader accepted that this was so, but submitted that the problem could be dealt with, if necessary, by application to the court for directions. It is difficult to imagine that any business people would think this a sensible way to proceed. If it was intended that Mr Wilkinson should have a direct proprietary interest in the assets of the business, the parties would have been likely to address the issue of management of the business, both as to rights of participation in management and as to the nature and extent of any restrictions on those responsible for management. The business was highly speculative and would likely involve the incurring of debts and liabilities which would not fit well with the conventional duties of trustees, but again no provision was made in this respect.

**46** No thought was given to the rights, if any, that Mr Wilkinson might have to withdraw his share. Beneficiaries with fixed absolute interests are entitled, subject to practical difficulties of division, to call at any time for the return of their shares. This would not be the case with shares in a company. A shareholder would have no right to require his shares to be purchased by the company or others, in the absence of special provision to that effect, of which there is no hint in the Wilkinson Agreement.

**47** The third ground for my conclusion is the simplest. The language of the Wilkinson Agreement is simply inapposite to create a trust, all the more so in the light of the considerations rehearsed above. The judge appears to have considered that the only way to give any effect to it was by way of a trust. I do not share that view. If effect was to be given to it, it seems to me that much the more obvious way would by way of a personal obligation on the part of Mr North of the type to which I have referred. Further, it is wholly unclear as to the time at which the supposed trust would take effect. The judge thought that it was an obvious risk that North might in the end decide not to carry on the business through a company, but does that mean that the trust was to take effect not immediately but at some indeterminate time in the future? If so, that would be an agreement to create a trust, for which consideration would be required but is not, in my view, contained in the Agreement.

**48** Although an intention to create a trust does not require the use of the word trust or similar language, there must be, as Scarman LJ said in *Paul v Constance* [1977] 1 WLR 527, 531, "a clear declaration of trust and that means there must be clear evidence from what is said or done of an intention to create a trust …" For the reasons given above, I do not consider that any such clear evidence is provided by the Wilkinson Agreement.

**49** Nor do I think that the admissions and acknowledgements on which the judge relied provide support for a trust.

**50** The acknowledgements comprised three lists, prepared in 2001, 2003 and 2006. The first is headed "shareholders list" and shows Mr Wilkinson with a 7% interest. It supported his case that he was entitled to shares in a company applying the spallation technology to washing machines and vacuum cleaners, but it does nothing to support the existence of a trust. The other two lists

8

show "company shares allowed [sic]". They also refer to partnership participation, but no one has suggested that a partnership ever existed.

**51** The admissions arose in the course of proceedings brought by the respondents against Mr North in his lifetime, alleging the same trusts as they advance in the present case. In a consent order made in those proceedings, Mr North admitted the trusts but denied that they extended to the damages recovered from Electrolux. Directions were agreed for the trial of that issue. Mr North subsequently admitted that he held agreed percentages of the damages on trust for Mr Wilkinson, Mr Formby, another respondent to this appeal, and Mr Day, a claimant in these proceedings but not a respondent to this appeal. Judgment on admissions was entered in favour of those parties. In the present case, the judge rejected Mr Day's case based on the same allegation of trust and he has not appealed. Mr North failed to comply with the directions in the consent order and judgment in default was entered against him in favour of the other claimants, who are respondents to this appeal. Mr North applied to withdraw the admissions on which the first judgment was based and to set aside both judgments. The application failed.

**52** In dealing with Mr Wilkinson's claim, the judge did not rely on these admissions as support for his claim that the Wilkinson Agreement had created a trust but for his case that the trust extended to the washing machine and vacuum cleaner business and to the damages.

**53** The judge addressed directly the significance of the admissions in his judgment at para 42 in the context of a dispute about Mr Winch's percentage share, recording that they were not made in proceedings to which the appellants were parties and correctly holding that they were not bound by them. The admissions were "merely part of the evidence that has to be evaluated in order to arrive at a conclusion applying the relevant burden and standard of proof rules". I do not read the judgment as placing reliance on the admissions in support of the conclusion that a trust was created by the Wilkinson Agreement or, in the case of the other respondents, by later documents and discussions. It would not, in my judgment, be permissible to do so. The admissions were subsequent statements as to Mr North's subjective intention at the dates when the trusts were allegedly created. As such they are inadmissible as evidence of an intention to create a trust: see *Lewin on Trusts*, 19th ed (2015), paras 6-004–6-005 and the authorities there cited.

**54** For these reasons, the judge was in my judgment wrong to hold that the Wilkinson Agreement created any trust over the assets of Mr North's business.

*The claims of the fourth to eighth respondents*

**55** The claims of these respondents rest on letters sent to each of them in similar terms in 1999–2000.

**56** The letters were headed "Hydratherm Energy International" and, in some of the letters, "A Division of Worldrill International" appeared immediately below this heading. The address of the "UK Office" was given. As the judge remarked, the heading to each letter suggested it was written by a company.

**57** The text of the letter to Mr Formby, which will serve as an example, read as follows:

> "This is to confirm Geoffrey Wilkinson has deposited on your behalf Four Thousand Pounds Sterling (£4,000·00) with Hydratherm Energy International as an investment into the company for the specific purpose of developing and building the third prototype cyclonic separator and centrifugal vacuum cleaner.
>
> "Hydratherm is pleased to grant an equity position of One Half of One percent (·500%) in the company and or its successors. Additionally, and upon a successful manufacturing rights payment being received by Hydratherm, a direct financial reward will be payable to you of five times (5 times) the investment for a total of twenty thousand pounds (£20,000·00), plus the original investment."
>
> "The company will in the near future go on to build and develop an ultra fast spallation gas jet/multi UHP hydro-jet drilling concept for ultra deep drilling and tunnelling in the oil, gas, water, geothermal, mineral industries and urban infrastructure with the creation of underground chambers for the incineration of general and toxic waste, at 1,100 C subterranean and 5,000°C surface plasma after-burning, of the waste flue gases, micro tunnelling for cable and pipe laying for utilities, and the creation of 'HOT DRY ROCK' super critical geothermal steam for cheaper heavy oil recovery and electrical power generation.
>
> "We have over the last several years in particular, contracted and worked with all of the principal oil companies as well as the universities in the USA and UK. Upon a successful demonstration of the concept we will be immediately considered the worlds

9

leading authority in this field. The patents have been lodged and everything is ready for financing.

"I would further confirm that the previous agreement still stands and that Hydratherm (Worldrill) will repay the principle [sic] and interest on the $30,000 and that the original one half of one percent (1/2%) be increased to one percent (1%).

"I thank you for making this investment and look forward to meeting you soon when I am next in the United States."

**58** The letter plainly reads as referring to an investment in a company. The first paragraph refers to "an investment into the company". The second paragraph states that "Hydratherm is pleased to grant an equity position of One Half of One Percent (·500%) in the company and or it's [sic] successors". The fourth paragraph states that "The company will in the future go on to build and develop …" In the case of Mr Wilkins, this impression was reinforced by the provision to him of documents purporting to be share certificates issued by Hydratherm Energy International in respect of stated numbers of "fully paid up Shares … in the above-named Company, And the subsequent articles of Association of the new Company. Hydratherm Energy International Incorporated. Nassau, NP, Bahamas".

**59** The judge held that the effect of these letters was to create a trust of the relevant percentage shares in the business being carried on by Mr North personally under the name Hydratherm. He said, at para 47:

"In the context in which the word was used in the letters, the reference to 'company' can only have been to Hydratherm. However, as is common ground, the business conducted under that name was never conducted by or transferred to a company and at the date when the letters were written it was nothing more or less than a trading name style or title used by Mr North. I have no means of knowing whether Mr North's reference to Hydratherm as being a company was the result of a lack of knowledge on his part as to what was and was not a company, or whether it was an attempt to deceive. It does not matter for present purposes. In my judgment the effect of what Mr North said was that he declared himself the trustee of the assets of the business conducted by him using the name style or title Hydratherm for otherwise what was set out in the letter could be of no effect."

**60** He rejected the appellants' submission that the letters did no more than promise shares in a company and that, as the company was never formed, the investors had or may have had claims against Mr North for breach of contract or misrepresentation. The judge, at para 48, considered this to be a mistaken analysis:

"The letter does not contain a reference to a company to be formed but only a reference to 'the company'. As I have explained, in context that can only have been a reference to Hydratherm. That was not in fact a company but was the name style or title of an unincorporated business carried on by Mr North. What was being granted therefore was an equity position in that business—that is in its assets and goodwill."

**61** The judge said at para 49 that the effect of what was being promised "could only take effect as a declaration of trust of the assets and goodwill of the business conducted using the Hydratherm name". It did not matter that some or all of the investors thought their position was akin to that of a shareholder in a company "for if there was no company there could be no shares".

**62** I am unable to share the judge's approach. It does not follow from the failure by Mr North to give effect to what he promised in the letters that he created an immediate trust of undivided shares in his business in favour of the investors. There were no words suggesting the creation of a trust, and no consideration given to the issues and difficulties involved in such a trust, to which I have earlier referred. The obvious consequence of the failure is not a trust but, as was submitted by the appellants, a claim for damages against Mr North.

*Mr Thomas*

**63** Mr Thomas made an investment at much the same time as the fourth to eighth respondents but he had no direct dealings with Mr North, dealing instead with Mr Wilkinson. There is no reason to doubt his claim as to the percentage shareholding that he was to receive. At the same time, there is no reason to suppose that his investment was made on terms differing from those set out in the letters. Indeed, in his evidence Mr Thomas stated that he understood

10

that he was investing in a company and that he "would, indirectly, through my shareholding, have an interest in all the assets of the Venture which would, by then, have been transferred to the company".

*Mr Winch*

**64** The evidence of Mr Winch was that he made his investment in November 1997 following an approach from Mr Wilkinson, for which he was granted "1/8 of a percent in the Venture", increased in May 2004 to 1%. Mr North placed no restrictions "on my shares in the Venture". He said, "Although I knew at the outset that the company had not yet been incorporated, I regarded myself as being akin to a shareholder in a company in that I was receiving a share in all the assets of the Venture". Like Mr North, Mr Winch had died before the trial of these proceedings, so that the contents of their discussions could not be explored in cross-examination. In the light of the issues that I have earlier considered, I do not consider that a trust can be spelt out of this evidence, nor is it likely that Mr North intended to go further with Mr Winch than he had agreed with Mr Wilkinson or would later agree with the other respondents.

*Conclusion*

**65** For the reasons given in this judgment, I would therefore allow the appeal as against all the respondents.

**GLOSTER LJ**

**66** I agree with David Richards LJ that, in the circumstances of this case, including the terms of the documents relied upon by the respondents, no trusts over the business or the assets of the business were created. Accordingly, the appeal must be allowed.

*Appeal allowed.*

ALISON SYLVESTER, *Barrister*

© 2018. The Incorporated Council of Law Reporting for England & Wales

# **EXHIBIT 27**



<strong><em>External manifestation of intention</em></strong>

**Underhill and Hayton: Law of Trusts and Trustees**  >  **Division Two Express Trusts**  >  **Chapter 3 Matters essential to the prima facie validity of an express trust**  >  **ARTICLE 10 Language sufficient to create a trust for persons**  >  **Paragraph 1**

## Chapter 3    Matters essential to the prima facie validity of an express trust

## ARTICLE 10    LANGUAGE SUFFICIENT TO CREATE A TRUST FOR PERSONS

**[10.1]**

The following principles govern the creation of a trust for persons:

(1)    No technical expressions are necessary for the creation of an express trust, which may be created without the settlor necessarily being aware of the legal consequences of his action, so long as he externally manifests an intention to create a state of affairs that can only be accomplished if it creates a trust. It is sufficient if the settlor indicates with reasonable certainty:

(a)    an intent to create a trust forthwith, involving the trust property being intended to be kept separate from other property of the trustee and not being at his free disposal;

(b)    the trust property;

(c)    the persons (individual or corporate) intended to be beneficiaries; and

(d)    the purpose of the trust so that the trust is administratively workable and not capricious;

providing always that for there to be a valid, and therefore enforceable, trust the trust must be intended to be directly (or possibly indirectly) for the benefit of persons (individual or corporate) so that some person has locus standi to enforce the trust unless the trust is for charitable purposes, when enforceable by the Attorney-General or the Charity Commission, or for a limited anomalous number of non-charitable purposes relating to the maintenance of animals, tombs and the performance of private religious rituals, although there is scope for the courts to uphold non-charitable purpose trusts if the settlor's trust instrument provides for a person with locus standi to enforce the purpose trust, assuming it to be workable and restricted to a valid perpetuity period.

(2)    Whether an intention to create a trust is sufficiently evinced is in each case a question of objective contextual interpretation. As in interpreting a contract, the court concerned with an alleged trust seeks to find the intention of the party or parties. It does this by identifying the meaning of the relevant words (a) in the light of (i) the natural and ordinary meaning of those words, (ii) the overall purpose of the document, (iii) any other provisions of the document, (iv) the facts known and assumed by the party or parties at the time of execution of the document, and (v) common sense, but (b) ignoring subjective evidence of any party's intentions. There is a well-established rule of construction that where an instrument is capable of two

interpretations, one of which would give effect to the purpose of the person who drew it up, and the other of which would frustrate such purpose, one should prefer the former interpretation to the latter. Whether or not there is an intention to create a trust may crucially depend upon the context.

In particular:

(a)   an apparent power of appointment among such of a class as the donee of the power may select, unaccompanied by a gift over in default of appointment, may raise an inference that a fixed trust was intended in favour of the class in default of appointment if there appears to be a general intention to benefit the objects of the power, alternatively, the apparent power may be treated as in the nature of a discretionary trust for the class members;

(b)   a gift by will to a person, followed by precatory words expressive of the testator's request, recommendation, desire, hope or confidence, that the property will be applied in favour of others, may exceptionally create a trust, if, on considering the will as a whole, it appears that the testator intended the words to be imperative, but the court will not presume the imposition of a trust merely from the presence of particular precatory words;

(c)   a devise or bequest 'upon condition' or 'to the intent' that a benefit may be conferred on a third party, may create a trust for the third party if, on construing the whole will, the court comes to the conclusion that what was intended was a trust, and not merely a charge, or a personal obligation, or a condition entailing forfeiture if breached;

(d)   a contract to create a trust of which specific performance would be ordered is considered to be an executory trust, conferring on parties who could sue for specific performance the same rights and imposing the same liabilities as if the contract had been actually performed.

(3)   On the other hand, persons to whom payments are directed to be made by trustees are not necessarily beneficiaries and cannot enforce such directions if the object of the payments, as gathered from the whole instrument, was not to confer benefits on the payees, but to facilitate the administration of an estate or to relieve the owner of trouble or inconvenience. In many cases the so-called trustee is regarded as an agent.

# Paragraph 1

# External manifestation of intention

**[10.2]**

Equity will not take cognisance of a private unexpressed intention to create a trust. It is unnecessary that the settlor's intention to do so be communicated to the beneficiary at the time the trust is created, but a failure to communicate the intention to create a trust to any beneficiary may raise a strong inference that the settlor did not intend to create one. The important point is that the settlor's intentions to create a trust must be externally manifested somehow, eg by saying something to someone else or writing them down in a form that is discoverable by others later. Otherwise, the intended beneficiary and/or trustee cannot decide whether to accept or disclaim the settlor's bounty and/or the office of trusteeship, nor will third parties who come into contact with the relevant assets be able to tell whether they are subject to a trust or not.

End of Document

# **EXHIBIT 28**

A

## Re Sigma Finance Corp (in admin. rec.)

[2009] UKSC 2
Supreme Court.
Lord Hope, Deputy President, Lord Scott, Lord Walker, Lord Mance and Lord
Collins.
Judgment delivered October 29, 2009.

B

> *Administrative receivership—Structured investment vehicle (SIV)—Security trust deed*
> *(STD)—Loan notes—Priorities in repayment of loan notes—SIV became insolvent—All*
> *creditors secured—Receivers appointed—Receivers of a structured—Loan notes prevented creditors winding up*
> *SIV—STD required trustee to repay short-term liabilities "so far as possible" in 60-day*
> *realisation period—Construction of "so far as possible"—Whether phrase required pay*
> *as you go basis for first in time priority—Whether pari passu distribution excluded—Pay*
> *as you go basis preferred—Appeal.*

C

These were appeals against a decision of the Court of Appeal ([2009] B.C.C. 393)
dismissing an appeal from Sales J. ([2008] EWHC 2997 (Ch)) that the correct
construction of a security trust deed was a "pay as you go" construction and accordingly
the receivers of the assets of a structured investment vehicle company were directed to
use its assets to pay its liabilities as they fell due and were not required by the terms of
the deed to distribute the available assets on a pari passu basis between its secured
creditors.

D

The company, "Sigma", was a structured investment vehicle, whose business involved
acquiring asset-backed securities and other instruments, using funds raised by issuing or
guaranteeing US dollar and Euro medium-term notes. The scheme was thought to be
insolvency proof. Most of Sigma's creditors were secured and all of its assets were
secured in favour of its secured creditors upon the terms of a security trust deed
("STD") made between Sigma and a security trustee and governed by English law.
Under cl.7.6 of the STD the occurrence of an "enforcement event" started a 60-day
realisation period, and triggered an obligation on the trustee to use its reasonable
endeavours to establish by the end of that period a short-term pool (for short-term
liabilities) as well as a number of long-term pools and a residual equity pool. The global
financial crisis affected the value of Sigma's assets in 2008, as well as its ability to issue
notes and raise funds to cover its obligations under previously issued notes and
instruments as they matured. As a result, Sigma began to resort to selling assets, which
involved it in further potential liability to meet margin calls, if and when the value of the
assets sold and agreed to be repurchased at some future date fell below a certain level.

E

F

In September 2008, Sigma received margin calls which it did not honour and its board
resolved that it could no longer continue in business, so that it wrote to the security
trustee that there was no reasonable likelihood of Sigma avoiding an insolvent
liquidation. On October 2, 2008, one of Sigma's liquidity providers gave notice of an
event of default under its facility agreement and in consequence, an actual enforcement
event occurred and the floating charge created under the security trust deed crystallised.
On October 6, 2008, the security trustee appointed receivers under the deed, and
directed them to comply with the deed to establish the pools to pay the liabilities. By the
time of the Court of Appeal judgment Sigma's assets consisted of cash of no more than
US$450 million. Its unpaid secured liabilities were estimated to total around US$6.2
billion. The issue was how the remaining assets were to be distributed.

G

H

The final sentence of cl.7.6 of the STD stated: "During the realisation period the
security trustee shall so far as possible discharge on the due dates therefor any short
term liabilities falling due for payment during such period ...". The secured creditors

**SC**                            **Re Sigma Finance Corp**                            **41**

A    were under the terms of their notes precluded from seeking to wind up Sigma, and the STD defined their contractual rights against Sigma and in respect of its assets. Four interested creditors advanced various possibilities. Party A (whose notes matured on October 23, 2008, during the realisation period) and Party B (whose notes matured on November 14, 2008, i.e. during the realisation period but after Party A's notes) submitted that the assets fell to be distributed preferentially to the creditors in respect of the debts falling due in the realisation period (and possibly immediately before that

B    period) but differed between themselves as to priority; and Party C and Party D, who held respectively short-term and long-term notes maturing after the end of the realisation period, argued that assets fell to be allocated equitably as between short and long-term liabilities, and short-term liabilities fell to be distributed pari passu in relation to each other, and that the long-term liabilities likewise fell to be treated in relation to each other.

C        The judge and Court of Appeal found in favour of Party A, that the final sentence of cl.7.6 was clear in imposing an obligation on the trustee to pay on the due dates the short-term liabilities falling due during the realisation period, out of the available assets, so far as possible. The wording was unlike most other provisions of the deed in imposing a specific obligation to pay as and when liabilities fell due and was not subject to any clear indication that the obligation was conditional on the trustee being of the view that

D    the available assets were sufficient to discharge the corresponding liabilities. If that had been intended a suitable provision could and would have been included, as it had been elsewhere in the deed. The obligation in cl.7.6 was qualified by the words "so far as possible" which could refer to payment on the due date, so as to protect the trustee if payment was possible but not until a day or more late. The argument for pari passu distribution placed on the words "so far as possible" a weight and significance they could not bear. Parties B, C and D appealed.

E        *Held*, allowing C and D's appeal and dismissing B's appeal (Lord Walker dissenting):

        **1. (Per Lord Mance)** The conclusion reached in the courts below attached too much weight to what the courts perceived as the natural meaning of the words of the final sentence of cl.7.6, and too little weight to the context in which that sentence appeared and to the scheme of the STD as a whole. Of great importance, in the ascertainment of the meaning that the deed would convey to a reasonable person with the relevant

F    background knowledge, was an understanding of its overall scheme and a reading of its individual sentences and phrases which placed them in the context of that overall scheme. The courts below elevated a subsidiary provision for the interim discharge of debts "so far as possible" to a level of pre-dominance which it was not designed to have in a context where, if given that pre-dominance, it conflicted with the basic scheme of the deed.

G        **2.** The starting point was that the occurrence of an enforcement event was not necessarily to be equated with insolvency, still less insufficiency of assets to meet all secured liabilities. On the contrary, cll.7.3–7.8 were all drafted on the assumption of a situation in which Sigma had enough assets to cover at least its secured creditors. Only in cl.7.9 did the deed turn to and address the possibility of a shortfall in the principal amount of the assets needed to cover Sigma's liabilities. The provision by cl.7.6 for

H    discharge of short-term liabilities as they fell due thus appeared in a context where the underlying assumption was that all secured liabilities could be covered and no issue of priority could arise. To treat it, in the different context of insolvency, as creating effective priority for such short-term liabilities as may happen to fall due during the realisation period therefore involved the risk of giving to a sentence, buried in a provision like cl.7.6 concerned essentially with a different situation, the effect of changing fundamentally the apparent financial structure of the relationship.

A

**3. In the present situation, the reasonable man's task in understanding the meaning and application of the last sentence of cl.7.6 was greatly facilitated by the existence of a clear basic scheme, from which it was improbable that the parties would have wished to depart. That basic scheme involved the creation of a short and of long-term pools, each with sufficient nominal assets of sufficient rating quality to meet, or meet pro rata, the pool's liabilities as and when they matured. The basic purpose of the realisation period was to give time for the creation of such pools. Realisation period debts were to be part of the short-term pool. Seen in the context in which the third sentence of cl.7.6 appeared, its aim was to put realisation period debts in the same position as other short-term liabilities. They were to be paid so far as possible on their maturity and payment dates. Seen in a context where the trustee concluded that cl.7.9 applied, the approach of the courts below achieved the opposite result to elevate realisation period creditors to a special status, extracted them from the pool to which the deed assigned them, distorted the apparent aim to achieve equity between all creditors by the creation of short and long-term pools, and probably also distorted the relationship between the short and the long-term pools. These considerations showed that the parties to the deed could not have contemplated the approach adopted by the courts below, even in a less extreme situation of insolvency than the present, such as they might have foreseen.**

B

C

**4, On the true construction of cl.7.6, and in the events which happened, the receivers were not obliged to use cash or other realisable or maturing assets of Sigma to pay short-term liabilities falling due for payment during the realisation period either in the order in which they fell due or pari passu with other short-term liabilities due for payment during the realisation period. Instead, such liabilities were to be treated along with all other short-term liabilities in respect of which payments fell to be made under cl.7.11 of the deed out of the short-term pool to be established under cll.7.6–7.10. Interested Parties C and D had argued for such a construction and their appeals would be allowed.**

D

**5. (Per Lord Walker, dissenting) It was necessary to construe the language of cl.7.6 in the landscape of the instrument as a whole. One of the most striking features of the landscape of the deed was that cl.7 did not provide for the immediate winding up of Sigma on the occurrence of a default which amounted to an enforcement event. It was therefore necessary to repress any instinctive feeling that pari passu distribution at the earliest practicable date was the most natural solution. The parties could not have contemplated that Sigma would have insufficient assets to meet its liabilities even to secured creditors, especially not on the scale of the extraordinary loss that actually occurred. These skilled and sophisticated investors expected to make money, not to lose it. The fact that the effect of the deed, in a situation which the parties never contemplated, may appear fortuitous or arbitrary did not therefore carry much weight. It was not for the court to make a new contract for experienced commercial operators advised by expert lawyers. Clause 7.6 was concerned with what was to happen during the 60-day realisation period. In setting up the pools the trustee was to perform what might well be a difficult exercise, but it was essentially an exercise of an administrative nature. The words "so far as possible" in cl.7.6 were wide enough to cover both the possibility that a payment might for practical reasons have to be delayed by a few days, and the much more remote possibility (as it would have appeared to the parties at the time) that there would be a permanent deficiency of assets. The appeals should be dismissed.**

E

F

G

H

The following cases were referred to in the judgment:

*Antaios Compania Naviera SA v Salen Rederierna AB (The Antaios)* [1985] A.C. 191.
*Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38.
*Charter Reinsurance Co Ltd (in liq.) v Fagan* [1997] A.C. 313.

320-2-10

**SC**                      **Re Sigma Finance Corp**                      **43**
                              (Lord Mance)

A    *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 W.L.R.
     896.
     *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] A.C. 749.
     *Miramar Maritime Corporation v Holborn Oil Trading Ltd (The Miramar)* [1984] A.C.
     676.
     *Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWCA Civ 487, [2008] 2
     C.L.C. 864.

B
     Richard Sheldon Q.C. and Felicity Toube (instructed by Dechert LLP) for appellant B.

     Simon Mortimore Q.C. and Daniel Bayfield (instructed by Jones Day LLP) for appellant C.

     Sue Prevezer Q.C. and Edmund King (instructed by Quinn Emanuel Urqhart Oliver &
     Hedges LLP) for appellant D.

C    Mark Howard Q.C. and Jonathan Dawid (instructed by Mayer Brown International LLP)
     for respondent A

     James Potts (instructed by Allen & Overy LLP) for the security trustee.

     Gabriel Moss Q.C. and Barry Isaacs (instructed by Lovells LLP) for the administrative
     receivers.

D                                    JUDGMENT

     **Lord Mance (with whom Lords Hope, Scott and Collins concur): Introduction**

     1. Sigma Finance Corp ("Sigma") and those who invested in it are victims of the current
     financial crisis. Sigma is a structured investment vehicle, whose business involved acquiring
     asset-backed securities and other instruments, using funds raised by issuing or guaranteeing
     US dollar and Euro medium-term notes (MTNs) as well as liquidity from other sources, such
E    as facilities, derivatives, repurchase (or "repo") contracts and capital notes (the last two
     categories representing its unsecured creditors). All of Sigma's assets are secured in favour of
     its secured creditors upon the terms of a security trust deed ("STD"), dated March 27, 2003,
     made between Sigma as issuer and Deutsche Trustee Co Ltd ("Deutsche Trustee") as security
     trustee and governed by English law.

     2. The financial crisis affected the value and liquidity of Sigma's assets, as well as its ability
F    to issue notes and raise funds to cover its obligations under previously issued notes and
     instruments as they matured from time to time. As a result, it began to resort to selling assets,
     either outright or under repo agreements. The latter involved Sigma in further potential
     liability to meet margin calls, if and when the value of the assets sold and agreed to be
     repurchased at some future date fell below a certain level. In September 2008, Sigma received
     margin calls which it did not honour. On September 30, 2008, its board resolved that it could
G    no longer continue in business, and on October 1, 2008, Sigma wrote informing Deutsche
     Trustee as security trustee that it had resolved that there was "no reasonable likelihood of
     Sigma avoiding an insolvent liquidation" and that there had been non-payment of interest due
     on September 30, 2008 constituting a "potential enforcement event" for the purposes of the
     security trust deed. On October 2, 2008, one of Sigma's liquidity providers gave notice of an
     event of default under its facility agreement. In consequence, an actual "enforcement event"
     occurred and the floating charge created under cl.4.1 of the security trust deed crystallised on
H    that date, and the liquidity facility was also cancelled. On October 6, 2008, the security trustee
     appointed receivers under cl.14.1 of the deed, and directed them to comply with cll.7.6–7.9 of
     the deed as if references in those clauses to the security trustee were references to the
     receivers.

     3. Under the security trust deed, the occurrence of an enforcement event started a 60-day
     "realisation period", and triggered an obligation on the trustee to use its reasonable

**44**                          **Re Sigma Finance Corp**                    **[2010] B.C.C.**
                                    (Lord Mance)

endeavours to establish by the end of that period a short-term pool (for short-term liabilities, defined by cl.1 to cover "outstanding payment obligations … which are due and payable or which have scheduled maturity or payment dates falling less than 365 days from the Enforcement Date"), as well as a number of long-term pools (for "any liabilities … which are not Short Term Liabilities") and a residual equity pool. Following realisation of its remaining portfolio in December 2008 after the Court of Appeal had given judgment ([2008] EWCA Civ 1303; [2009] B.C.C. 393) and refused a further stay, Sigma's assets consist of cash of no more than around US$450 million.

4. Sigma's unpaid secured liabilities are estimated to total around US$6.2 billion. They include (a) about US$900,000, representing coupon payments on notes which fell due on September 30 and October 1, 2008, (b) about US$1.350 billion, representing principal and coupon payments on notes which fell due during the realisation period, (c) about US$3.134 billion, representing principal on notes constituting short-term liabilities falling due between November 30 (i.e. after the end of the realisation period) and October 1, 2009, and (d) about US$1.511 billion, representing principal on notes constituting long-term liabilities falling due after October 2, 2009. As is evident, Sigma's remaining assets fall far short of the liabilities included in (a) and (b), or in (b) alone.

5. The issue on these appeals is how Sigma's remaining assets are to be distributed. This is an issue of construction of the security trust deed. Secured creditors are under the terms of their notes precluded from seeking to wind up Sigma, and the security trust deed defines their contractual rights against Sigma and in respect of its assets. Four interested creditors have advanced various possibilities. Interested parties A and B submit that the assets fall to be distributed preferentially to the creditors in respect of the debts identified in (b), or in (a) and (b). Assuming that to be right, they differ between themselves as to priority. Mr Howard Q.C. representing interested party A submits that the assets are to be distributed according to the dates when the relevant debts became due, while Mr Sheldon Q.C. representing interested party B submits that all debts falling due in (or prior to) the realisation period are part of a single pool, within which Sigma's remaining assets fall to be distributed pari passu. Mr Mortimore Q.C. representing interested party C and Miss Prevezer Q.C. representing interested party D maintain, first, that Sigma's remaining assets fall to be allocated equitably as between short and long-term liabilities, and, secondly, that, having been so allocated, its short-term liabilities identified in (a), (b) and (c) fall in effect to be distributed pari passu in relation to each other, and that its long-term liabilities identified in (d) fall to be treated likewise in relation to each other.

6. Sales J. ([2008] EWHC 2997 (Ch)) and, by a majority, the Court of Appeal ([2008] EWCA Civ 1303; [2009] B.C.C. 393) accepted the case advanced by Mr Howard for interested party A. Lord Neuberger dissented, concluding that the case advanced by interested parties C and D was generally correct, but with the refinement that creditors with debts falling due in the realisation period were entitled to be paid within that period such amount as the trustee was confident would ultimately be paid to them out of the short-term pool, with any balance due being paid later from that pool. Against the decision of the majority, these appeals are brought by leave of the House of Lords.

**The security trust deed**

7. The appeals turn ultimately on the meaning given to the final sentence of cl.7.6 of the deed. But this needs to be set in its context. Clause 7 is long and detailed, and provides, inter alia:

"7. ENFORCEMENT

7.1 The Security Trustee shall be entitled to enforce the Security on and from the Enforcement Date only in accordance with this Clause notwithstanding any contrary

320-2-10

**SC**                    **Re Sigma Finance Corp**                    **45**
                              (Lord Mance)

A    instruction or direction from any Beneficiary or any other person. The Security Trustee shall not exercise any of its powers under this Clause until the Enforcement Date.

7.2 Without prejudice to any rule of law which may have a similar effect, the floating charge constituted by Clause 4.1.2 shall on the Enforcement Date automatically be converted with immediate effect into a fixed charge as regards the assets subject to such floating charge and without notice from the Security Trustee to the Issuer.

B    7.3 On the Enforcement Date or as soon thereafter as can practicably be arranged the Security Trustee shall (to the extent that the relevant Liquidity Facility has not been cancelled by the relevant Liquidity Provider) on behalf of, and as attorney for, the Issuer draw Advances under each Liquidity Facility up to the Available Amount and shall specify repayment dates (except in the case of Swing-line Advances) for such Advances falling after the Realisation Period. If the Issuer has Committed Liquidity (as

C    defined in the IMC) and more than one Liquidity Facility, the Security Trustee shall ensure that, as between Liquidity Facilities, any drawings are made *pro rata* to the aggregate available commitments under such Liquidity Facilities. Advances drawn shall be used in order (i) to discharge the Issuer's obligations to pay sums due and owing to Beneficiaries in accordance with the relevant Beneficiaries' Documents and (ii) to effect replaying of any Advance made under a Liquidity Facility. If and to the extent that all or any part of the Advances drawn down are not immediately required by

D    the Security Trustee for the purposes of (i) or (ii) above, the Security Trustee shall deposit the unutilised portion(s) of such Advances on a call basis with any bank or financial institution whose short-term unsecured, unguaranteed and unsubordinated debt is rated A-1 by S&P, P-1 by Moody's and F1 by Fitch or shall invest such portion(s) in certificates of deposit, United States or United Kingdom government securities or commercial paper rated A-1 + by S&P and P-1 by Moody's.

E    7.4 If the Security Trustee applies an Advance (or part thereof) to discharge any of the Issuer's Short Term Liabilities because of the default, late payment or non-performance of any Asset in the Short Term Pool (a 'non-performing asset') any monies subsequently recovered or received in respect of such nonperforming asset shall be applied by the Security Trustee in repayment (or part payment) of such Advance before being applied pursuant to the trust declared in Clause 7.11.2.

F    . . .

7.6 The Security Trustee shall use its reasonable endeavours (and in doing so may rely upon the advice of any investment or other advisers as it shall in its absolute discretion consider appropriate and shall not be responsible for any loss which results from such reliance) to establish by the end of the Realisation Period a Short Term Pool, a number of Long Term Pools (one in relation to each Series of EMTNs each Series of ADMTNs and each Series of USMTNs, and one in relation to each other group of Long Term Liabilities having the same payment and/or maturity dates), and a Residual Equity

G    Pool. In order to establish such Pools, the Security Trustee shall during Realisation Period (but not thereafter) realise, dispose of or otherwise deal with the Assets in such manner as, in its absolute discretion, it deems appropriate. During the Realisation Period the Security Trustee shall so far as possible discharge on the due dates there for any Short Term Liabilities falling due for payment during such period, using cash or

H    other realisable or maturing Assets of the Issuer.

7.7 The Security Trustee shall use its reasonable endeavours (and in doing so may rely upon the advice of any investment or other advisers as it shall in its absolute discretion consider appropriate and shall not be responsible for any loss which results from such reliance) to ensure that at the time the Short Term Pool and each Long Term Pool is established (1) the aggregate principal amount of the Assets allocated to each such Pool

**46**              **Re Sigma Finance Corp**              **[2010] B.C.C.**
                    (Lord Mance)

is equal to the aggregate principal amount of the liabilities to which such Pool has been allocated, (2) the Assets allocated to each such Pool have maturity and payment dates corresponding to the relevant liabilities and (3) payments, recoveries and receipts in respect of the Assets allocated to each such Pool are scheduled to be made or received in the currency in which the relevant liabilities are denominated and (4) the aggregate principal value of Assets rated AA/Aa or lower (or if the Asset has a short-term rating, A - 1 + or lower) issued or guaranteed by any one single body corporate or sovereign or by separate bodies corporate which are members of the same group does not exceed an amount equal to 50% of the Residual Equity Pool Stake attributable to such Short Term Pool or, as the case may be, Long Term Pool and (5) the aggregate principal value of Assets rated A (or if the Asset has a short term rating, A - 1/P - 1) issued or guaranteed by any one single body corporate or sovereign or by separate bodies corporate which are members of the same group does not exceed an amount equal to 50% of the Residual Equity Pool Stake attributable to the Issuer's Short Term Liabilities or, as the case may be, those of its Long Term Liabilities in relation to which a Long Term Pool is established. The Security Trustee shall also use its reasonable endeavours to ensure that the credit quality by rating category and percentage of Assets comprising the Short Term Pool and each Long Term Pool is the same or better than the following:

| Long Term Rating | Short Term Rating | Percentage by Principal Value of Short Term/Long Term Pool |
|---|---|---|
| AAA (S&P)/Aaa | – | Minimum 20% |
| AA (S&P)/Aa | A - 1 + (S&P) | Minimum 50% |
| A | A - 1/P - 1 | Maximum 30% |

7.8 Subject to Clause 7.7, it is a matter for the Security Trustee's absolute discretion which Assets are allocated to which Pool and no liability shall attach to the Security Trustee if its allocation of Assets between Pools proves to be unfavourable or disadvantageous to any person. *Provided that* the Security Trustee uses its reasonable endeavours as provided in Clause 7.7, no liability shall attach to the Security Trustee if the purpose for which such endeavours were to be made fails to be realised and the Security Trustee shall be under no liability to any Beneficiary if the Assets allocated to any Pool are insufficient to meet the liabilities of the Issuer to which such Pool related in full or in a timely manner, notwithstanding that the claim of any other Beneficiary shall have been discharged in full. For the avoidance of doubt, the Security Trustee shall not be obliged to ensure that each Pool complies with the criteria set out in the Second Schedule to the IMC. Subject to the above and to Clause 7.7, the Security Trustee (i) shall have no regard to the credit quality of each Asset when establishing the Short Term and Long Term Pools and when determining which Assets should be allocated to which Pool and (ii) shall not be concerned with the ultimate composition of each of the Short Term Pool and Long Term Pools with regard to the concentration of assets by rating category nor to the spread across the Pools of Assets of any given rating category.

7.9 If the principal amount of the Assets is less than the principal amount of the Issuer's Total Indebtedness, the Security Trustee shall calculate the proportion borne by the deficit to the Issuer's Total Indebtedness and shall reduce the principal amount of the Assets allocable to the Short Term Pool and each Long Term Pool accordingly.

. . .

7.11 Subject to Clause 7.4, all payments, recoveries or receipts in respect of Assets in the Short Term Pool shall be held by the Security Trustee on trust and shall be applied in accordance with the following priority of payments:

**SC**        **Re Sigma Finance Corp**        **47**
(Lord Mance)

A        7.11.1 *first*, to pay the Relevant Proportion of the remuneration payable to the Security Trustee pursuant to this Deed and of any amount due in respect of costs, charges, liabilities and expenses incurred by the Security Trustee or a Receiver appointed by it (and for the purposes of this sub-clause the 'Relevant Proportion' shall be the principal amount of the Issuer's Short Term Liabilities divided by the Issuer's Total Indebtedness, both such amounts to be determined on the last day of the Realisation Period);

B        7.11.2 *second*, to pay when due or as soon thereafter as can practicably be arranged all principal, interest or other amounts in respect of the Issuer's Short Term Liabilities to Beneficiaries (*pro rata* to the respective amounts of the Short Term Liabilities due, owing or incurred to each Beneficiary); and

7.11.3 *third*, in accordance with the provisions of Clause 7.13

C        *Provided that* (in respect of 7.11.2 above):

(a)    if at any time after the Realisation Period the Security Trustee reasonably believes that payments, recoveries and receipts in respect of Assets allocated to the Short Term Pool will be insufficient to meet the Issuer's Short Term Liabilities, the Security Trustee shall calculate the proportion of the Short Term Liabilities which, in its reasonable opinion, can be met and shall pay only that
D         proportion of any amounts due in respect of the Issuer's Short Term Liabilities to any Beneficiary; and

(b)    if at the time a payment is proposed to be made to a Beneficiary pursuant to this Clause such Beneficiary is in default under any of its obligations to make a payment to the Issuer pursuant to any Beneficiaries' Document (the '**defaulted payment**') the amount of the payment which shall be made to such Beneficiary
E         shall be reduced by an amount equal to the amount of the defaulted payment. Any amount so withheld shall be paid to the relevant Beneficiary as and when (and *pro rata* to the extent that) the defaulted payment is duly paid by that Beneficiary.

7.12 Subject to Clause 7.5, all payments, recoveries or receipts in respect of Assets in the Long Term Pool shall be held by the Security Trustee on trust and shall be applied in accordance with the following priority of payments:
F

[There follow provisions largely similar to those of cl.7.11, relating to the Short Term Pool.]"

Clause 17 further provides:

"17 GENERAL SECURITY TRUSTEE PROVISIONS.

G        ...

17.3 The Security Trustee (save as expressly provided otherwise herein) as regards all the trusts, powers, authorities and discretions vested in it by these presents or by operation of law, have absolute and uncontrolled discretion as to the exercise or non-exercise thereof ...

... 
H

17.5 The Security Trustee as between itself and the other Beneficiaries shall have full power to determine all questions and doubts arising in relation to any of the provisions of these presents and every such determination, whether made upon a question actually raised or implied in the acts or proceedings of the Security Trustee, shall be conclusive and shall bind the Security Trustee and the other Beneficiaries.''

**48**         **Re Sigma Finance Corp**         **[2010] B.C.C.**
                    (Lord Mance)

A
8. The scheme of the security trust deed is thus that, upon the occurrence of an enforcement event, there will be a realisation period of up to 60 days, to enable the security trustee to establish the relevant pools using Sigma's assets. "Assets" are defined in cl.1 in the widest possible terms, including, in a final sub-clause, "all other rights, benefits, property, assets and undertaking … whatsoever and wheresoever situate". The short and long-term pools are under cll.7.7 and 7.8 to be structured with a view to matching the principal amount of Sigma's short and long-term liabilities with high quality rated assets in corresponding principal amounts and with corresponding maturity and payment dates. If that is not possible, because the principal amount of Sigma's assets is less than that of its total indebtedness, then, under cl.7.9, the trustee is to calculate the proportionate deficit, and reduce the principal amount of assets allocable to each pool accordingly. Once the pools have been set up, then, under cll.7.11 and 7.12, each pool is to operate separately, but within each pool, if it later appears that the assets allocated to that pool will be insufficient to meet the pool's liabilities, the trustee is to calculate and pay to any creditor only that proportion which can, in its reasonable opinion, be met. Under cl.17.3 and 17.5, the trustee is given the broadest discretion and powers. It is in the context of this scheme that it is necessary to read and understand the provision in the third and last sentence of cl.7.6, that:

> "During the Realisation Period the Security Trustee shall so far as possible discharge on the due dates therefore any Short Term Liabilities falling due for payment during such period, using cash or other realisable or maturing Assets of the Issuer."

**The law**

9. The principles upon which a court should interpret a document such as the present are not in doubt. They have been reviewed and restated by the House of Lords in a series of cases: *Charter Reinsurance Co Ltd (in liq.) v Fagan* [1997] A.C. 313, *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] A.C. 749, *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 W.L.R. 896 and *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38. In *Charter Reinsurance* (above) Lord Mustill underlined the danger of focusing too narrowly on a critical phrase (in that case, a phrase defining the term "net loss" as meaning "the sum actually paid by the reinsured in settlement of claims"), saying ([1997] A.C. 313 at 384G–H) that:

> "This is … an occasion when a first impression and simple answer no longer seem the best, for I recognise that the focus of the argument is too narrow. The words must be set in the landscape of the instrument as a whole. Once this is done the shape of the policy and the purpose of the terms … become quite clear"

Adopting that approach, the House concluded that the words "actually paid" were in context intended not to introduce a pre-condition of prepayment by the insurer to the original insured, but to ensure that the reinsurers' liability was measured precisely by reference to any settlement of liability as between the insurer and insured. Later (at 387D) Lord Mustill said that the principle that the liability of a reinsurer is wholly unaffected by whether the insurer has in fact satisfied the claim under the inward insurance is one which:

> "can undoubtedly be changed by express provision, but clear words would be required; and it would to my mind be strange if a term changing so fundamentally the financial structure of the relationship were to be buried in a provision such as clause 2, concerned essentially with the measure of indemnity, rather than being given a prominent position on its own."

10. In *Investors Compensation Scheme* ([1998] 1 W.L.R. 896) at 912G–913F, Lord Hoffmann summarised the development of the principles of contractual interpretation in this well-known passage:

320-2-10

**SC**                    **Re Sigma Finance Corp**                    **49**
                              (Lord Mance)

A    "The result has been, subject to one important exception, to assimilate the way in
     which such documents are interpreted by judges to the common sense principles by
     which any serious utterance would be interpreted in ordinary life. Almost all the old
     intellectual baggage of 'legal' interpretation has been discarded. The principles may be
     summarised as follows:

     (1)   Interpretation is the ascertainment of the meaning which the document would
B          convey to a reasonable person having all the background knowledge which
           would reasonably have been available to the parties in the situation in which
           they were at the time of the contract.

     (2)   The background was famously referred to by Lord Wilberforce as the 'matrix of
           fact', but this phrase is, if anything, an understated description of what the
           background may include. Subject to the requirement that it should have been
C          reasonably available to the parties and to the exception to be mentioned next, it
           includes absolutely anything which would have affected the way in which the
           language of the document would have been understood by a reasonable man.

     (3)   The law excludes from the admissible background the previous negotiations of
           the parties and their declarations of subjective intent. They are admissible only in
           an action for rectification. The law makes this distinction for reasons of practical
D          policy and, in this respect only, legal interpretation differs from the way we
           would interpret utterances in ordinary life. The boundaries of this exception are
           in some respects unclear. But this is not the occasion on which to explore them.

     (4)   The meaning which a document (or any other utterance) would convey to a
           reasonable man is not the same thing as the meaning of its words. The meaning
           of words is a matter of dictionaries and grammars; the meaning of the document
           is what the parties using those words against the relevant background would
E          reasonably have been understood to mean. The background may not merely
           enable the reasonable man to choose between the possible meanings of words
           which are ambiguous but even (as occasionally happens in ordinary life) to
           conclude that the parties must, for whatever reason, have used the wrong words
           or syntax. (see *Mannai Investments Co Ltd v Eagle Star Life Assurance Co Ltd*
           [1997] AC 749).

F    (5)   The 'rule' that words should be given their 'natural and ordinary meaning'
           reflects the common sense proposition that we do not easily accept that people
           have made linguistic mistakes, particularly in formal documents. On the other
           hand, if one would nevertheless conclude from the background that something
           must have gone wrong with the language, the law does not require judges to
           attribute to the parties an intention which they plainly could not have had. Lord
G          Diplock made this point more vigorously when he said in *Antaios Compania
           Neviera S.A. v Salen Rederierna A.B.* [1985] A.C. 191, 201:

           '. . . if detailed semantic and syntactical analysis of words in a commercial
           contract is going to lead to a conclusion that flouts business common sense, it
           must be made to yield to business common sense.' "

     In the present case the focus is on the general nature of the business involved—apparent from
H    the document itself—and upon the scheme and wording of the security trust deed read as a
     whole. As in *Miramar Maritime Corp v Holborn Oil Trading Ltd (The Miramar)* [1984] A.C.
     676 (per Lord Diplock at 682A–F), so here the document is one which would be expected to
     have a consistent meaning as between all parties to whom it applied. I therefore also agree
     with Lord Collins' supplementary remarks on the approach to interpretation.

**50**                           **Re Sigma Finance Corp**                    **[2010] B.C.C.**
                                    (Lord Mance)

A

11. I pay tribute to the speed with which the courts below have addressed the issue, and the meticulous attention which they have given it. Ultimately, Sales J. and the majority in the Court of Appeal were persuaded in favour of interested party A's case by the consideration that the last sentence of cl.7.6 had a clear natural meaning, and that there was nothing in its language (particularly in the phrase "so far as possible") to affect the operation of that meaning in the circumstances which arose. The trustee's obligation during the realisation period was to continue to discharge Sigma's debts as and when they fell due, so long and so far as such payment was possible using cash or other realisable or maturing assets; and the reference to such debts being discharged "on the due dates therefor" was inconsistent with party B's argument in favour of pari passu distribution of available assets between creditors whose debts fell due during the realisation period.

B

**Analysis**

C

12. In my opinion, the conclusion reached below attaches too much weight to what the courts perceived as the natural meaning of the words of the third sentence of cl.7.6, and too little weight to the context in which that sentence appears and to the scheme of the security trust deed as a whole. Lord Neuberger was right to observe that the resolution of an issue of interpretation in a case like the present is an iterative process, involving "checking each of the rival meanings against other provisions of the document and investigating its commercial consequences" ([2009] B.C.C. 393 at [98], and also [115] and [131]). Like him, I also think that caution is appropriate about the weight capable of being placed on the consideration that this was a long and carefully drafted document, containing sentences or phrases which it can, with hindsight, be seen could have been made clearer, had the meaning now sought to be attached to them been specifically in mind ([100]–[101]). Even the most skilled drafters sometimes fail to see the wood for the trees, and the present document on any view contains certain infelicities, as those in the majority below acknowledged (Sales J., [37]–[40], Lloyd L.J., [44], [49]–[52] and [53], and Rimer L.J. [90]). Of much greater importance in my view, in the ascertainment of the meaning that the deed would convey to a reasonable person with the relevant background knowledge, is an understanding of its overall scheme and a reading of its individual sentences and phrases which places them in the context of that overall scheme. Ultimately, that is where I differ from the conclusion reached by the courts below. In my opinion, their conclusion elevates a subsidiary provision for the interim discharge of debts "so far as possible" to a level of pre-dominance which it was not designed to have in a context where, if given that pre-dominance, it conflicts with the basic scheme of the deed.

D

E

F

13. The starting point is that the occurrence of an enforcement event is not necessarily to be equated with insolvency, still less insufficiency of assets to meet all secured liabilities. On the contrary, and this is I think a point with a relevance which does not emerge from the judgments below, cll.7.3–7.8 are all drafted on the assumption of a situation in which Sigma has enough assets to cover at least its secured creditors. The detailed provisions in cl.7.3 and 7.4 for drawing down on any relevant liquidity facility can have little or very limited application in any situation where Sigma lacked funds to cover such creditors, since in such a situation any liquidity provider would be expected to cancel any relevant facility (as happened in this case: see [12] above). The provisions of cll.7.7 and 7.8 contemplate that there will be sufficient assets to create matching pools of assets of high rating quality and liabilities. Only in cl.7.9 does the deed turn to and address the possibility of a shortfall in the principal amount of the assets needed to cover Sigma's liabilities.

G

14. The provision by cl.7.6 for discharge of short-term liabilities as they fall due thus appears in a context where the underlying assumption is that all secured liabilities can be covered and no issue of priority can arise. To treat it, in the different context of insolvency, as creating effective priority for such short-term liabilities as may happen to fall due during the realisation period may, therefore, involve a similar risk to that identified by Lord Mustill in

H

320-2-10

**SC**         **Re Sigma Finance Corp**         **51**
(Lord Mance)

A     *Charter Reinsurance* (above)—that of giving to a sentence, buried in a provision like cl.7.6 concerned essentially with a different situation, the effect of changing fundamentally the apparent financial structure of the relationship.

15. A second point is that the short and long-term pools were under cll.7.6, 7.9, 7.11 and 7.12 to be established to meet Sigma's total indebtedness, with the short-term pool covering all its short-term liabilities and the long-term pool covering all its long-term liabilities as B    defined by cl.1. Any suggestion that the final sentence of cl.7.6 was intended to extract, from the short-term liabilities, any which happened to fall due during the realisation period and to constitute them a separate pool or class with effective priority over other short-term liabilities is questionable on its face. Yet, the conclusion accepted in the courts below means that realisation period debts will not (or only in very rare circumstances) form part of the short-term liabilities to be met out of the short-term pool.

C    16. Sigma's assets could normally be expected to consist of cash or other maturing or realisable assets—even if, in the case of some "realisable" assets, their realisation prior to maturity would come at some cost, because of the element of "fire-sale" involved. Accordingly, on the approach taken by the courts below, realisation period debts will either have been paid during the realisation period before any pools are established at all, or their payment will exhaust all the assets with the result that there will never be any pools at all.

D    17. In any case where there is an overall shortfall of assets, the priority given by the courts below to realisation period debts would also skew the relationship of any short and long-term pools which were created. Clause 7.9 requires an overall comparison of total indebtedness and assets, and a pro rata reduction of the amount of assets allocated to each pool. Realisation period debts fall within the definition of short-term liabilities. However, they would on the approach of the courts below have been paid in full. This would further reduce the amount available for payment to other short-term liabilities, which would accordingly receive a lesser E    pro rata payment than long-term creditors. The only alternative, to treat realisation period debts as an entirely separate pool, conflicts with the definition of short-term liabilities in cl.1 and with the express recognition of such debts as short-term liabilities in the third sentence of cl.7.6 itself, and gives the third sentence a significance which seems in context improbable.

18. There are further conceptual difficulties about drawing any clear-cut distinction between realisation period debts and other short-term liabilities. Three subsidiary points arise. First, the F    last sentence of cl.7.6 contemplates on any view that it may not always be possible to pay realisation period debts on their due dates during the realisation period. Some might as a result not even be paid within that period. They would then fall within the general body of short-term liabilities where they would have no especial priority. That raises the question why realisation period debts should be given priority according to the happenstance that their payment was possible within the realisation period.

G    19. The second subsidiary point is that pools were to be established "by the end of the Realisation Period". The processes of making realisations and establishing matching assets envisaged by cll.7.6 and 7.7 and of calculating whether any and if so what deficit adjustment was necessary under cl.7.9 were bound to take time and to be potentially complex. In a fully solvent situation, there would be little problem about continuing to discharge realisation period debts as they fell due. But, in an insolvent situation, with the risk that further indebtedness might arise during that period from margin calls or the acceleration of other H    debts and a shortage of assets overall, the trustee would, on the approach accepted by the courts below, face conflicting pressures which it would be difficult to reconcile: on the one hand, the short-term duty to meet realisation period debts as they arose, if necessary by firesales; on the other the long-term duty to ensure balanced and equitable pools for the benefit of short and long-term creditors.

**52**          **Re Sigma Finance Corp**          **[2010] B.C.C.**
                        (Lord Mance)

20. The third subsidiary point is that the language of cl.7.6 indicates on its face that pools A
might be established *before* the end of the realisation period, as Rimer L.J. accepted ([89]),
though Sales J., as I read his judgment, did not ([28]). It is true that cll.7.11.1, 7.11.3(a) and
7.12.1 all operate by reference to the last day of the realisation period, in a way which might
be said to assume that the pools will not have been established until then. This may well be no
more than a drafting infelicity, since it would seem strange, if it were not open, as cl.7.6
suggests it is, to the trustee to establish the pools on a day prior to the 60th day after the
enforcement event. Assuming this to be so, then, in a situation where cl.7.9 came into B
operation, the setting up of the pools would be expected to exhaust Sigma's assets. Yet, on the
approach of the courts below, cl.7.6 would, read literally, require the trustee to continue to
discharge realisation period debts in full, after the setting up of the pools, in circumstances
where Sigma's assets were now held on the express trusts established by cll.7.11 and 7.12.
The only alternative would be to treat the obligation under cl.7.6 as coming to an end, despite
its terms, before the end of the realisation period. However, this third subsidiary point is a
small one. C

21. A third main point is the fortuitous effect of the interpretation placed on cl.7.6 by the
courts below. Depending upon when an enforcement event occurred, those whose debts
happened to fall due during the ensuing realisation period would gain priority. Creditors might
be able to procure priority for themselves by making a margin call or giving notice advancing
the payment date of their debts. Sales J. treated this as representing a normal assumption of
risk, under which every lender to Sigma "took a chance ... that it might be in the D
advantageous position in which Party A now finds itself" ([26]). Rimer L.J. was also
influenced by the fact that the deed was a "commercial bargain", intended to operate in
insolvent and solvent situations, although he thought it improbable that the parties had
foreseen "the possibility of the extraordinary, probably unprecedented, market events" that
had actually unfolded ([92]). Accepting what Rimer L.J. says, it remains in my view
improbable that commercial parties would contemplate that, after so important an occurrence E
as an enforcement event, priority would be conferred even to a modest extent and in the short-
term on a particular group of creditors on the basis of the chance of their indebtedness falling
due, or being capable of being made to fall due, during the realisation period.

22. The basic aim of cl.7.6 is to provide for the establishment of the pools and the
realisation of assets, in such manner as the trustee may in its absolute discretion deem
appropriate, for that purpose. The pools are under cll.7.7 to 7.9 to contain assets matching, or F
corresponding pro rata with, the payment and maturity dates of Sigma's short and long-term
liabilities. The third sentence of cl.7.6 has in this context the flavour of an ancillary provision
designed to achieve a similar interim position during the realisation period. To my mind, it is
unlikely that the trustee's obligation under the third sentence was intended to override the
absolute discretion given to it under the second sentence. This may be part of the explanation
for the use of the phrase "so far as possible". Whether that is so or not, the third sentence
appears in a context and form which makes it, to my mind, an improbable vehicle for a duty to G
pay realisation period debts, regardless of any conclusion by the trustee that cl.7.9 applies or
will apply and that such payment will accordingly diminish the assets capable of allocation to
the short-term pool (or to the short and long-term pools).

23. The fourth point is that, if the final sentence of cl.7.6 is intended to operate even in
circumstances where this would give realisation period creditors priority over other short and
long-term creditors, it fails notably to address the position of creditors whose unpaid debts fell H
due for payment prior to the realisation period, i.e. in this case the US$900,000 of debts
representing coupon payments on notes which fell due on September 30 and October 1, 2008
([4] above). Sales J. thought that there was "no difficulty" about reading the words "falling
due" as embracing debts already due, once it was borne in mind that a debt remains due on
each day until it is satisfied ([36]). Lloyd L.J. ([51]) and Rimer L.J. ([90]) thought that no

320-2-10

**SC**                    **Re Sigma Finance Corp**                    **53**
                              (Lord Mance)

A    specific thought can have been given to such liabilities when cl.7 was drafted (although they fall within the definition of short-term liabilities and so naturally within cl.7.11.2). Both thought that it would not be a "major qualification" to read the final sentence of cl.7.6 as if it referred to short-term liabilities "*already due or* falling due" ([52] and [90]). Elsewhere, Lloyd L.J. laid some weight upon the deed being "a commercial document prepared by skilled and specialist lawyers for use in relation to sophisticated financial transactions" ([67]), and Rimer L.J. upon it being "a 45-page document reflecting the considered input of

B    (probably) a team of commercial lawyers" (para. 86). But it contains, as their judgments also accept ([51]–[52] and [90]) infelicities, which indicate, at the lowest, the importance of keeping an eye on and making sense of the overall picture.

24. I add that, on the view I take of the third sentence of cl.7.6, it is not surprising that it makes no reference to unpaid pre-enforcement debts; the sentence appears, as I have said, in a context where the assumption is one of solvency, in which context one would not expect any

C    unpaid pre-enforcement debts. However, when the sentence is transposed and applied to a situation of insolvency, pre-enforcement debts are more easily and naturally catered for as part of the general body of short-term liabilities, on the construction advanced by parties C and D, with or without Lord Neuberger's refinement, for reasons pointed out by Lord Neuberger ([107]).

25. A fifth point relates to the provisions for payment of the fees and expenses of the

D    security trustee and any receiver. Under cll.7.11.1 and 7.12.1, these are, as one would expect, express prior charges on the relevant pool assets. In a solvent situation, there would be no problem about payment of such fees and expenses out of Sigma's assets during the realisation period before any pools or pool assets were established. But, if the final sentence of cl.7.6 applies to require payment out in insolvent situations, although discharge in full of the realisation period debts might (as here) exhaust the whole of the available assets, there is nothing in cl.7.6 to give the security trustee or receiver any priority or protection. Sales J.

E    ([37]–[40]), with whom Lloyd L.J. agreed on the point ([53]), regarded this as no more than infelicity of drafting. Sales J. suggested that, in practice, the receiver could be covered if the trustee fixed his remuneration and directed that it be paid out of the assets under cl.14.3.4 and if the receiver, with the trustee's permission, then, in order to cover his fees and expenses, borrowed money on the security of Sigma's assets in priority to any secured creditor, as expressly permitted by cl.14.3.6. As to the trustee, he thought the position "slightly less

F    clear", but that the trustee could cover itself in one or two ways. First, it could appoint a receiver to act on its behalf, in which case the receiver's fees and expenses would be recoverable as above. Secondly, cl.13.2 allowed the trustee, out of the profits and income of the assets and moneys received by it in the exercise of any of its powers, to "pay and discharge all expenses and outgoings incurred in and about the exercise of any such powers", and the word "expenses" could be read as including "remuneration". These ingenious solutions do not overcome the basic problem, that, if the last sentence of cl.7.6 was ever

G    envisaged as creating a continuing "pay as you go" regime, which would give effective priority to realisation period creditors, even though nothing would then remain for other creditors, it is remarkable that no special provision was made for the trustee's or receiver's fees and expenses. However remote the risk of non-payment, such priority would normally be standard form. The inference is that the trustee's and receiver's prior right under cll.7.11.1 and 7.12.1 was thought to be all that could ever be required, and that it was never contemplated

H    that payments could or would be made under cl.7.6 in circumstances which could conceivably affect their entitlement to such fees and expenses. That argues for considerable caution before concluding that it must nevertheless be interpreted and so taken to have been intended to have that effect.

26. Most if not all of the above points were identified by both Sales J. and by the majority in the Court of Appeal and are summarised clearly and cogently, for example by Lloyd L.J. ([57]

**54**          **Re Sigma Finance Corp**          **[2010] B.C.C.**
              (Lord Mance)

and [58]) and Rimer L.J. ([80]). At the end of the day, other considerations persuaded them that the last sentence of cl.7.6 must be regarded as applying so as to require payment in full of realisation period debts as they fell due, regardless of the effect on the creation of the pools in general or on other short term creditors in particular.

27. In support of this approach, Mr Howard and Mr Sheldon submit that an important key to understanding the last sentence of cl.7.6 is to see it as no more than the agreed continuation for a short period of the "pay as you go" regime prevailing prior to the occurrence of the enforcement event. While realisations were being made, they submit, it would have been thought convenient to continue this regime and to be unlikely to have much if any effect on non-Realisation Period creditors. However, that in my opinion fails to give proper weight to the major significance attaching under the scheme of the deed to an enforcement event. It may be (although the House understood it to be contentious) that Sigma was free to continue with a "pay as you go" system after it had become clear that this could affect later creditors, by realising assets and entering into repo agreements for the purpose. But the purpose of cl.7 is evidently to draw a line at a certain point. The crystallisation of powers and of the floating charge under cll.7.1 and 7.2 and the definitions in cl.1 of short and long-term liabilities and of the pools to be established under cll.7.6–7.9 strongly support a conclusion that that point was the enforcement date.

28. The argument remains, nevertheless, that the third sentence of cl.7.6 is an unequivocal short-term provision, and that nothing in its language or in the deed as a whole limits, or entitles the court to limit, its application in a situation like the present. The majority in the Court of Appeal in rejecting the arguments advanced for parties C and D attached importance to the fact that the sentence used the words "so far as", rather than "if". Further, in rejecting Lord Neuberger's refinement of the argument, they noted the absence of any definition of the state of mind which the trustee would have to have or of what it would have to do, as well as the absence of any definition of the scope of the trustee's discretion, or judgment, if it was in whatever was the relevant state of mind as regards the prospects for payment in full, or only on account, of Sigma's various secured liabilities ([62]–[72], per Lloyd L.J.). I think that a similar objection could however be made in relation to cl.7.9. Its operation must involve a substantial and time-consuming process of evaluation and judgment during the realisation period. Whether and how it applies must be potentially complex matters for the trustee's judgment, having regard to the provisions of cl.7.7 regarding maturity and rating quality.

29. Ultimately, in Lloyd L.J.'s view, the position was that "the sentence is on the face of it, clear and unequivocal as to the trustee's obligation to discharge the short-term liabilities falling due during the realisation period" ([63]), in a commercial document prepared by skilled and specialist lawyers, "the clear and natural meaning of the words should prevail" ([67]) and, especially bearing in mind the "elaborate and careful" provisos to cll.7.11 and 7.12 whereby an obligation to pay pro rata was introduced, "the argument for pari passu distribution involves placing on the words "so far as possible" a weight and significance that they cannot bear" ([69]). Rimer L.J. adopted similar reasoning, considering that, if the approaches advanced by parties C and D or adopted by Lord Neuberger had been intended, that could and would have been said ([86]–[88]).

30. Both Lloyd and Rimer L.JJ. recognised that the parties would, when subscribing to notes on the terms of the deed, not have had in contemplation the extraordinary market events which have occurred, or what, they recognised, might be regarded on their approach as leading to an "unfair result" ([69] and [92]). But they noted ([30]–[31], [85] and [92]) that the deed foresaw that an enforcement event might result from insolvency as from solvency. In those circumstances, and in the absence of any appropriate limitation, they saw the last sentence of cl.7.6 as equally applicable in both situations. At one point in his judgment ([59]), Lloyd L.J. also said that "The sentence does not say "if possible", but "so far as possible"; the latter phrase seems clearly to indicate that partial payment may be possible". However, if

320-2-10

**SC**                  **Re Sigma Finance Corp**                  **55**
(Lord Mance)

A    he was here suggesting that the sentence was expressly addressing a situation of insolvency in which realisation period debts would exhaust all Sigma's assets, the suggestion is in conflict with what was said elsewhere about the improbability of the parties foreseeing any such situation, and with the probable reality.

31. I return to my starting point. The last sentence of cl.7.6 appears in and was drafted in contemplation of the situation where no question of insolvency arose. It is not until cl.7.9 that any such possibility is addressed. In practice, no doubt, an enforcement event would be more

B    likely than not to result from some financial difficulty on Sigma's part. But that is not the situation which cll.7.6–7.8 are drafted to address. The last sentence of cl.7.6 has therefore now to be interpreted in a quite different context to that in which it appears and for which it was designed. This is not an unusual phenomenon, as Sales J. and the majority in the Court of Appeal recognised, when they found it necessary to expand or to qualify or read words into certain of the deed's provisions in the light of the "infelicities" of drafting which on their

C    approach emerged.

32. In the present situation, the reasonable man's task in understanding the meaning and application of the last sentence of cl.7.6 is in my opinion greatly facilitated by the existence of a clear basic scheme, from which it is improbable that the parties would have wished to depart. That basic scheme involved the creation of a short and of long-term pools, each with sufficient nominal assets of sufficient rating quality to meet, or meet pro rata, the pool's

D    liabilities as and when they matured. The basic purpose of the realisation period was to give time for the creation of such pools. Realisation period debts were to be part of the short-term pool. Seen in the context in which the third sentence of cl.7.6 appears, its aim was to put realisation period debts in the same position as other short-term liabilities. They were to be paid so far as possible on their maturity and payment dates. Seen in a context where the trustee concludes that cl.7.9 applies, the approach of the courts below achieves the opposite result. It elevates realisation period creditors to a special status, extracts them from the pool to which

E    the deed assigns them, distorts the apparent aim to achieve equity between all creditors by the creation of short and long-term pools, and probably also distorts the relationship between the short and the long-term pools. These considerations are sufficient to persuade me, as they persuaded Lord Neuberger, that the parties to the deed cannot have contemplated the approach adopted by the courts below, even in a less extreme situation of insolvency than the present, such as they might have foreseen.

F    33. The phrase "so far as possible" was used in a context where what were in mind were no doubt relatively minor discrepancies (during the realisation period when the trustee's main concern would be the creation of appropriate pools) between available cash or other realisable or maturing assets and liabilities, which could delay or prevent payment of all or some realisation period debts. That alone would explain why the word "if" was not used instead of "so far as". But, when the sentence is transposed and applied to a situation in which cl.7.9

G    applies, those words are apposite to enable the trustee to determine that no further payments can appropriately be made, having regard to the overall aim of achieving equitable pools and an equitable allocation of assets between the two (or more) main pools. I would, in this context and so far as necessary, be prepared to read the words "so far as" as equating with "if". I find it difficult in any event to attach as much weight as the Court of Appeal did to the difference. But it seems to me, as it did to Lord Neuberger, that it would also be open to the trustee to make on account payments during the realisation period in respect of realisation

H    period debts as they fell due. The calculation made or being made under cl.7.9 would indicate what proportion of such debts could safely be paid. The trustee's extensive and absolute discretions and powers under cll.17.3 and 17.5 would avoid any argument. It is however unnecessary on the facts to reach any concluded decision on the correctness of Lord Neuberger's refinement to the case advanced by parties C and D. It is not, in my opinion, critical to the outcome of these appeals whether or not that refinement be accepted.

**British Company Cases**

**56**                     **Re Sigma Finance Corp**                     **[2010] B.C.C.**
                             (Lord Walker)

**Conclusion**

34. I would therefore allow the appeals of interested parties C and D and dismiss the appeal of interested party B, set aside the decisions of the courts below and declare that, on the true construction of cl.7.6 of the security trust deed, and in the events that have happened, the receivers were not obliged to use cash or other realisable or maturing assets of Sigma to pay short-term liabilities falling due for payment during the realisation period after October 6, 2008, either in the order in which they fell due or pari passu with other short-term liabilities due for payment during the realisation period. I would further declare that such liabilities are to be treated along with all other short-term liabilities in respect of which payments fall to be made under cl.7.11 out of the short-term pool to be established under cll.7.6–7.10.

**Lord Collins (with whom Lords Hope and Mance concur):**

35. I agree with Lord Mance that the appeals of interested parties C and D should be allowed for the reasons he gives, and I add only a few remarks of my own on the approach to interpretation. In complex documents of the kind in issue there are bound to be ambiguities, infelicities and inconsistencies. An over-literal interpretation of one provision without regard to the whole may distort or frustrate the commercial purpose. This is one of those too frequent cases where a document has been subjected to the type of textual analysis more appropriate to the interpretation of tax legislation which has been the subject of detailed scrutiny at all committee stages than to an instrument securing commercial obligations: *cf. Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWCA Civ 487, [2008] 2 C.L.C. 864, at [2].

36. Sigma financed its investments over a 13-year period by debt securities issued or guaranteed by it. It entered into liquidity facilities intended to hedge against market liquidity risks. It entered into financial instruments intended to hedge against currency and interest rate risk. Others provided liquidity facilities, or entered into financial hedging instruments. The security trust deed secures a variety of creditors, who hold different instruments, issued at different times, and in different circumstances.

37. Consequently this is not the type of case where the background or matrix of fact is or ought to be relevant, except in the most generalised way. I do not consider, therefore, that there is much assistance to be derived from the principles of interpretation re-stated by Lord Hoffmann in the familiar passage in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 W.L.R. 896, 912–913. Where a security document secures a number of creditors who have advanced funds over a long period it would be quite wrong to take account of circumstances which are not known to all of them. In this type of case it is the wording of the instrument which is paramount. The instrument must be interpreted as a whole in the light of the commercial intention which may be inferred from the face of the instrument and from the nature of the debtor's business. Detailed semantic analysis must give way to business common sense: *Antaios Compania Naviera SA v Salen Rederierna AB (The Antaios)* [1985] A.C. 191, 201.

38. Once cl.7.6 of the security trust deed is seen in context, the conclusion that the receivers were not obliged to give priority to the first maturing short-term liabilities is consistent with the wording of the clause in the context of the trust deed as a whole and with the commercial purpose of the instrument.

**Lord Walker (dissenting):**

39. These appeals will determine how the enormous loss incurred by Sigma Finance Corp is to be borne as between the anonymous investment banks, hedge funds and other entities which are its secured creditors. Lord Mance refers to them as victims of the current financial

320-2-10

**SC**                    **Re Sigma Finance Corp**                    **57**
                              (Lord Walker)

A     crisis. An alternative view would be that they are among the authors of the crisis. But that is not an issue for the court.

40. Although I was one of those who gave permission for a further appeal (as it then was, to the Appellate Committee of the House of Lords) I find, on closer consideration, that the case involves no issue of general public importance. There is no doubt as to the principles of construction to be applied. They are clearly summarised (under the heading "The law") in B    Lord Mance's judgment. The only issue is as to the interpretation of the security trust deed in the light of those principles. Sales J. and the majority of the Court of Appeal (Lloyd and Rimer L.JJ.) took one view but Lord Neuberger (sitting in the Court of Appeal) took a different view.

41. In respectful dissent from the majority of this court I prefer the view taken by the judge and the majority of the Court of Appeal. Since no issue of principle is involved it would be C     quite inappropriate to give any lengthy explanation of my reasons. I will limit myself to three fairly general points.

42. First, I completely agree that it is necessary to construe the language of cl.7.6 of the deed "in the landscape of the instrument as a whole" (in the words of Lord Mustill in *Charter Reinsurance Co Ltd (in liq.) v Fagan* [1997] A.C. 313, 384H). One of the most striking features of the landscape of the deed, to my mind, is that cl.7 does not provide for the immediate winding up of Sigma on the occurrence of a default which amounts to an D     enforcement event. On the contrary, secured creditors are prohibited from taking steps to wind up the company. It is therefore necessary to repress any instinctive feeling (and it is, I acknowledge, a strong instinctive feeling) that pari passu distribution at the earliest practicable date is the most natural (one might almost say the only rational) solution.

43. Instead, the assets were to be retained and marshalled (in accordance with the detailed provisions of cll.7.6–7.10) in order to match the company's short-term and long-term E     liabilities, as defined, all of which were to be paid (under cl.7.11 or 7.12) as they fell due. The procedure envisaged was comparable to that of a funded occupational pension scheme which is closed to new entrants but not wound up. In such a case the trustees would adjust the way in which the fund was invested in order to match its predictable short-term, medium-term and long-term liabilities. Scheme members would still have to wait for the payment of their respective pensions to fall due, and as each became entitled to a pension he or she would (in F     the typical case) then be entitled to preference, as against those whose pensions had not fallen due, if and when there was eventually a winding-up.

44. Secondly, the need to exclude any instinctive feeling about insolvent winding up is reinforced by the fact, to which Lord Mance rightly attaches importance, that the parties cannot have contemplated that Sigma would have insufficient assets to meet its liabilities even to secured creditors—especially not on the scale of the extraordinary loss that has actually G     occurred. These skilled and sophisticated investors expected to make money, not to lose it. The fact that the effect of the deed, in a situation which the parties never contemplated, may appear fortuitous or arbitrary does not therefore carry much weight. It is not for the court to make a new contract for experienced commercial operators advised by expert lawyers.

45. Thirdly, cl.7.6 (the crucial provision which has to be fitted into the landscape of the deed as a whole) is concerned with what is to happen during the 60-day realisation period. In setting up the pools the trustee was to perform what might well be a difficult exercise, but it H     was essentially an exercise of an administrative nature. The references to the trustee's "absolute discretion" are to my mind explained by the trustee's wish to protect itself from possible criticism, rather than to any power for the trustee to prefer one secured creditor to another. The direction for payment of liabilities falling due for payment during the realisation period was no doubt expected to be more or less ancillary (as Lord Mance puts it) but it has, in the wholly unexpected events which have occurred, assumed unexpected importance.

**58**            **Re Sigma Finance Corp**         **[2010] B.C.C.**
(Lord Walker)

A

Reference was made to the direction applying "so far as possible" (rather than "if and so far as possible") and to the fact that those words are not immediately adjacent to the words "on the due dates therefore". I would not attach any importance to those details of language. The words are wide enough to cover both the possibility that a payment might for practical reasons have to be delayed by a few days, and the much more remote possibility (as it would have appeared to the parties at the time) that there would be a permanent deficiency of assets.

46. I would therefore dismiss these appeals.

B

(*Appeals allowed*)

C

D

E

F

G

H

# **EXHIBIT 29**



**Hilary Term**
**[2017] UKSC 24**
*On appeal from: [2015] EWCA Civ 839*

# JUDGMENT

# Wood (Respondent) *v* Capita Insurance Services Limited (Appellant)

**before**

**Lord Neuberger, President**
**Lord Mance**
**Lord Clarke**
**Lord Sumption**
**Lord Hodge**

## JUDGMENT GIVEN ON

## 29 March 2017

**Heard on 7 February 2017**

*Appellant*
Edward Cumming

(Instructed by Enyo Law
LLP)

*Respondent*
Andrew Twigger QC

(Instructed by Birketts
LLP)

**LORD HODGE: (with whom Lord Neuberger, Lord Mance, Lord Clarke and Lord Sumption agree)**

1.      This appeal raises a question of contractual interpretation. It concerns an indemnity clause in an agreement dated 13 April 2010 ("the SPA") for the sale and purchase of the entire issued share capital of a company, Sureterm Direct Limited ("the Company"), which carries on business as a specialist insurance broker, primarily offering motor insurance for classic cars.

2.      The sellers of the Company were the respondent, Mr Andrew Wood ("Mr Wood"), who owned 94% of its share capital, and Mr Christopher Kightley and Mr Howard Collinge, who owned 1% and 5% of its share capital respectively. Each was a director of the Company and Mr Wood was its managing director. The purchaser was Capita Insurance Services Ltd ("Capita"). Mr Wood remained as managing director of the Company until the end of 2010. He brought proceedings against Capita arising out of the termination of his employment and Capita brought a counterclaim against him under the indemnity provision in the SPA, which is the subject matter of this appeal. Mr Kightley and Mr Collinge were, but are no longer, parties to the proceedings.

3.      It is not necessary to set out in any detail the circumstances in which Capita came to make its claim under the indemnity. It suffices to summarise Capita's claim as follows.

4.      In about August 2008 the Company began to sell motor insurance through online aggregator sites such as Confused.com. The sales were not completed online: potential customers obtained a quotation from the Company on the aggregator site and the Company then contacted the potential customer directly with a view to confirming their risk details before selling them the appropriate insurance policy.

5.      Shortly after Capita's purchase of the Company's share capital, employees of the Company raised concerns about the Company's sales processes, which had resulted in some customers paying substantially more than they had been quoted online. The employees alleged that the Company had presented customers with higher quotations without informing them why the quotations had increased. The Company had thus increased its own arrangement fees when neither the underwriting premium nor the risk profile had changed significantly. The Company responded to the allegations by carrying out a review of its sales between January 2009 and January 2011. This review revealed that in many cases the Company's telephone operators had misled customers into believing that an underwriter had

required a higher premium or that their risk profile was worse than it was or had pressurised the customer to make sure that a sale was made.

6.     Capita and the Company were obliged to inform the Financial Services Authority ("FSA") of the findings and did so on 16 December 2011. The FSA informed them that the customers had been treated unfairly and had suffered detriment and that there would have to be redress. After the FSA had conducted a risk assessment visit to the Company in November 2012, Capita and the Company agreed with the FSA to conduct a remediation scheme to pay compensation to customers who were identified as potentially affected by the Company's mis-selling. Capita alleges that it, the Company and Capita's other subsidiaries have suffered loss as a result of the mis-selling or suspected mis-selling of insurance products in the period before the completion of the sale under the SPA. Capita's claim is for £2,432.883.10, comprising an estimate of the compensation at £1.35m, interest of about £400,000 and the costs of the remediation scheme.

7.     It is appropriate to record that some of Capita's allegations are disputed, including the extent of the mis-selling and any detriment to customers. Other than, perhaps, the facts narrated in para 4 above (which do not appear to be disputed), they are not facts by reference to which the SPA is to be construed. But the circumstances in which Capita and the Company were required to set up the remediation scheme are of some importance because Mr Wood contends that they fall outside the scope of the indemnity clause which is the subject matter of this action. In particular, the requirement to compensate was not the result of a claim by one or more of the Company's customers or a complaint by those customers to the FSA or another public authority. It resulted, as I have said, from information about the internal review which Capita and the Company gave the FSA and the requirement by the FSA that compensation should be paid to the customers.

*Contractual interpretation*

8.     In his written case counsel for Capita argued that the Court of Appeal had fallen into error because it had been influenced by a submission by Mr Wood's counsel that the decision of this court in *Arnold v Britton* [2015] AC 1619 had "rowed back" from the guidance on contractual interpretation which this court gave in *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900. This, he submitted, had caused the Court of Appeal to place too much emphasis on the words of the SPA and to give insufficient weight to the factual matrix. He did not have the opportunity to develop this argument as the court stated that it did not accept the proposition that *Arnold* had altered the guidance given in *Rainy Sky*. The court invited him to present his case without having to refer to the well-known authorities on contractual interpretation, with which it was and is familiar.

9.     It is not appropriate in this case to reformulate the guidance given in *Rainy Sky* and *Arnold*; the legal profession has sufficient judicial statements of this nature. But it may assist if I explain briefly why I do not accept the proposition that *Arnold* involved a recalibration of the approach summarised in *Rainy Sky*.

10.     The court's task is to ascertain the objective meaning of the language which the parties have chosen to express their agreement. It has long been accepted that this is not a literalist exercise focused solely on a parsing of the wording of the particular clause but that the court must consider the contract as a whole and, depending on the nature, formality and quality of drafting of the contract, give more or less weight to elements of the wider context in reaching its view as to that objective meaning. In *Prenn v Simmonds* [1971] 1 WLR 1381 (1383H-1385D) and in *Reardon Smith Line Ltd v Yngvar Hansen-Tangen* [1976] 1 WLR 989 (997), Lord Wilberforce affirmed the potential relevance to the task of interpreting the parties' contract of the factual background known to the parties at or before the date of the contract, excluding evidence of the prior negotiations. When in his celebrated judgment in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896 Lord Hoffmann (pp 912-913) reformulated the principles of contractual interpretation, some saw his second principle, which allowed consideration of the whole relevant factual background available to the parties at the time of the contract, as signalling a break with the past. But Lord Bingham in an extra-judicial writing, *A new thing under the sun? The interpretation of contracts and the ICS decision* Edin LR Vol 12, 374-390, persuasively demonstrated that the idea of the court putting itself in the shoes of the contracting parties had a long pedigree.

11.     Lord Clarke elegantly summarised the approach to construction in *Rainy Sky* at para 21f. In *Arnold* all of the judgments confirmed the approach in *Rainy Sky* (Lord Neuberger paras 13-14; Lord Hodge para 76; and Lord Carnwath para 108). Interpretation is, as Lord Clarke stated in *Rainy Sky* (para 21), a unitary exercise; where there are rival meanings, the court can give weight to the implications of rival constructions by reaching a view as to which construction is more consistent with business common sense. But, in striking a balance between the indications given by the language and the implications of the competing constructions the court must consider the quality of drafting of the clause (*Rainy Sky* para 26, citing Mance LJ in *Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd (No 2)* [2001] 2 All ER (Comm) 299 paras 13 and 16); and it must also be alive to the possibility that one side may have agreed to something which with hindsight did not serve his interest: *Arnold* (paras 20 and 77). Similarly, the court must not lose sight of the possibility that a provision may be a negotiated compromise or that the negotiators were not able to agree more precise terms.

12.     This unitary exercise involves an iterative process by which each suggested interpretation is checked against the provisions of the contract and its commercial

consequences are investigated: *Arnold* para 77 citing *In re Sigma Finance Corpn* [2010] 1 All ER 571, para 10 per Lord Mance. To my mind once one has read the language in dispute and the relevant parts of the contract that provide its context, it does not matter whether the more detailed analysis commences with the factual background and the implications of rival constructions or a close examination of the relevant language in the contract, so long as the court balances the indications given by each.

13.    Textualism and contextualism are not conflicting paradigms in a battle for exclusive occupation of the field of contractual interpretation. Rather, the lawyer and the judge, when interpreting any contract, can use them as tools to ascertain the objective meaning of the language which the parties have chosen to express their agreement. The extent to which each tool will assist the court in its task will vary according to the circumstances of the particular agreement or agreements. Some agreements may be successfully interpreted principally by textual analysis, for example because of their sophistication and complexity and because they have been negotiated and prepared with the assistance of skilled professionals. The correct interpretation of other contracts may be achieved by a greater emphasis on the factual matrix, for example because of their informality, brevity or the absence of skilled professional assistance. But negotiators of complex formal contracts may often not achieve a logical and coherent text because of, for example, the conflicting aims of the parties, failures of communication, differing drafting practices, or deadlines which require the parties to compromise in order to reach agreement. There may often therefore be provisions in a detailed professionally drawn contract which lack clarity and the lawyer or judge in interpreting such provisions may be particularly helped by considering the factual matrix and the purpose of similar provisions in contracts of the same type. The iterative process, of which Lord Mance spoke in *Sigma Finance Corpn* (above), assists the lawyer or judge to ascertain the objective meaning of disputed provisions.

14.    On the approach to contractual interpretation, *Rainy Sky* and *Arnold* were saying the same thing.

15.    The recent history of the common law of contractual interpretation is one of continuity rather than change. One of the attractions of English law as a legal system of choice in commercial matters is its stability and continuity, particularly in contractual interpretation.

*The Sale and Purchase Agreement*

16.    The SPA is a detailed and professionally drafted contract. It provided for the sale and purchase of the Company's share capital (clause 3) for the consideration of

£7,681,661 payable on completion (clause 4), and it also provided for deferred consideration (Schedule 8). Clause 1 contained the following definitions which are relevant to the construction of the disputed indemnity:

> "**Authority** means any local, national, multinational, governmental or non-governmental authority, statutory undertaking, agency or public or regulatory body (whether present or future) which has jurisdiction over the Business or any decision, consent or licence which is required to carry out the Business and Authorities shall be construed accordingly.

> **Company** means Sureterm Direct Ltd …

> **Completion Date** means the date of this Agreement.

> **Employees** has the meaning given to it at paragraph 6 of Schedule 4 [which refers to a list of all of the employees employed by the Company].

> **FSA** means the Financial Services Authority and any body which supersedes it.

> **Regulatory Authority** means any body by which any part of the Business is or was regulated pursuant to any Applicable Financial Services Laws (including, but not limited to, the FSA, the Personal Investments Authority Ltd, the General Insurance Standards Council, the Insurance Brokers Registration Council and including the Financial Services Ombudsman and any voluntary regulatory body with whose rules the Company has agreed to comply).

> **Relevant Person** means an Employee or a former employee of the Company and any dependant of an Employee or a former employee of the Company.

> **Shares** means all of the issued shares in the capital of the Company.

> **Warranties** means the Tax Warranties and the warranties set
> out in Schedule 4."

17.    Clause 7 dealt with warranties and indemnities. Each of the sellers severally
warranted to the buyer on a proportionate basis in terms of the Warranties (clause
7.1); the Warranties were qualified by matters which had been fairly disclosed in the
disclosure letter (clause 7.2); and where a Warranty was qualified by an expression
such as "so far as the Sellers are aware" that referred to the actual knowledge of the
sellers, who confirmed that they had made due and careful enquiry of the Company's
compliance manager, IT Director and HR Director (clause 7.3).

18.    The indemnity clause whose interpretation is in dispute is clause 7.11. It
provided:

> "The Sellers undertake to pay to the Buyer an amount equal to
> the amount which would be required to indemnify the Buyer
> and each member of the Buyer's Group against all actions,
> proceedings, losses, claims, damages, costs, charges, expenses
> and liabilities suffered or incurred, and all fines, compensation
> or remedial action or payments imposed on or required to be
> made by the Company following and arising out of claims or
> complaints registered with the FSA, the Financial Services
> Ombudsman or any other Authority against the Company, the
> Sellers or any Relevant Person and which relate to the period
> prior to the Completion Date pertaining to any mis-selling or
> suspected mis-selling of any insurance or insurance related
> product or service."

19.    This clause must be seen in its contractual context. Schedule 4 contained 30
pages of detailed warranties. In Part 12 of that Schedule, which concerned litigation,
disputes and investigations, the sellers warranted that they were not aware of
circumstances which were likely to give rise to any investigation or enquiry by any
Authority (para 12.4) and that no breach of contract, tort, statutory duty or law had
been committed for which the Company was or might be liable (para 12.5). Part 14
which was concerned with compliance and regulatory matters included the
following para:

> "14.1
>
> (a)    The Company conducts, and has conducted the Business
> in accordance with the requirements of all Competition laws

and Applicable Financial Services Laws applicable to the business and has not been and is not being investigated for any alleged non-compliance or infringement of such Competition Laws and Applicable Financial Services Laws. …

(c)    The Company has no reason to believe that any action will be taken against it in relation to any of its current or past activities based on any alleged non-compliance or infringement of any Competition Laws and Applicable Financial Services Laws."

20.    Part 14 also contained detailed warranties that the Company had complied with its regulatory obligations and that correspondence between the Company and all Regulatory Authorities had been disclosed, that the Company, its officers and employees had not been subject to any regulatory sanction and that no such sanction was likely or pending; and that the Company had not been subject to a regulatory investigation and, so far as the Sellers were aware, there were no circumstances which could give rise to a visit by any Regulatory Authority.

21.    Clause 8 of the SPA provided for limitations on the sellers' liability in Schedule 5, which in para 1 provided that the aggregate maximum liability of all claims under the SPA (with one exception) would not exceed the purchase price and that the liability of each seller would not exceed his proportionate liability (ie 94%, 5% and 1%). That limitation applied to claims under clause 7.11 as well as under the warranties. But paragraph 3 of Schedule 5 imposed time limits on the warranties by providing:

"3.1    Save in respect of a Warranty Claim or a claim under the Tax Covenant notified in writing to the Sellers prior to such a date, the Sellers will cease to be liable:

(a)    for any claim under the tax warranties or under the Tax Covenant on the seventh anniversary of Completion; and

(b)    for any other Warranty Claim on the second anniversary of Completion."

Thus in contrast to the indemnity under clause 7.11, the warranties relating to, among other things, regulatory compliance, had a lifespan of only two years.

22.     In a judgment dated 14 October 2014 ([2014] EWHC 3240 (Comm)) Popplewell J decided the preliminary issue of the interpretation of the indemnity clause and held, in effect, that it required Mr Wood to indemnify Capita even if there had been no claim or complaint by a customer. The Court of Appeal (Patten LJ, Gloster LJ and Christopher Clarke LJ) in a judgment written by Christopher Clarke LJ ([2015] EWCA Civ 839) disagreed. In its order dated 30 July 2015 the Court of Appeal declared that Mr Wood's liability under the indemnity in clause 7.11 of the SPA:

> "cannot arise unless the matter in respect of which indemnity is sought follows and arises out of either (i) a claim made against the Company, a Seller or a Relevant Person or (ii) a complaint registered with the FSA, the Financial Services Ombudsman or any other Authority against the Company, a Seller or a Relevant Person and, in either case, the claim or complaint (a) relates to the period prior to the Completion Date and (b) pertains to any mis-selling or suspected mis-selling of any insurance or insurance related product."

23.     Capita appeals against that order, arguing that the contractual indemnity is not confined to loss arising out of a claim or complaint.

24.     In this case both Popplewell J and the Court of Appeal have considered and weighed both the language of the disputed clause 7.11 and the commercial considerations. They have both started by examining the language but have reached opposing conclusions. This disagreement is not caused by any failure to apply the correct principles but is, in my view, the result of an opaque provision which, as counsel for each party acknowledged, could have been drafted more clearly.

25.     I have concluded that the Court of Appeal has come to the correct view as to the meaning of this difficult clause. I set out below my reasons, which are essentially the same as those which Christopher Clarke LJ presented.

*Discussion*

26.     Clause 7.11 has not been drafted with precision and its meaning is avoidably opaque. My preliminary view of the meaning of the clause on a first reading was consistent with the view which the Court of Appeal favoured, namely that the indemnity covered loss and damage which (a) followed and arose out of claims or complaints against the Company, the Sellers or any Relevant Person, (b) related to the period before completion and (c) pertained to the mis-selling or suspected mis-

selling of insurance products or services. But it is necessary to place the clause in the context of the contract as a whole, to examine the clause in more detail and to consider whether the wider relevant factual matrix gives guidance as to its meaning in order to consider the implications of the rival interpretations.

27.    The contractual context is significant in this case. The indemnity in clause 7.11 is an addition to the detailed warranties in Schedule 4. The mis-selling which clause 7.11 addresses is also covered by the warranty in paragraph 14.1 of Schedule 4 (para 18 and para 19 above). But liability for the Schedule 4 warranties is time-limited by Schedule 5. In particular paragraph 3.1(b) of that Schedule (para 20 above) required the Company to claim within two years of the completion of the sale and purchase. The scope of the clause 7.11 indemnity, breach of which gives rise to a liability which is unlimited in time, falls to be assessed in the context of those time-limited warranties.

28.    All of the parties to the SPA were commercially sophisticated and had experience of the insurance broking industry. Capita was not involved in the management of the Company before the share purchase. The Sellers were the directors and the only shareholders of the Company. They were the people who knew or ought to have known how the Company had operated its business; Capita would in all probability not have that knowledge. The parties to the SPA would have known this. That lack of knowledge explains why Capita required the disclosures in the disclosure letter and the detailed warranties in Schedule 4; but it does not assist the court to determine the scope of the indemnity clause. The court is not aware of the negotiations which led to the SPA; they are not relevant to the task of interpreting that agreement: *Chartbrook Ltd v Persimmon Homes Ltd* [2009] AC 1101. Business common sense suggests that Capita had an interest in obtaining as broad an indemnity against the adverse consequences of mis-selling as it could obtain. But the sellers had given warranties of compliance with regulatory requirements, which covered such mis-selling, subject to the agreed limits of quantum and time. The sellers were exposed to a potential liability under those warranties for the two years after the Completion Date, during which Capita could learn of the Company's sales practices. One may readily infer that they had an interest in minimising their further exposure to liability after that time had elapsed. Business common sense is useful to ascertain the purpose of a provision and how it might operate in practice. But in the tug o' war of commercial negotiation, business common sense can rarely assist the court in ascertaining on which side of the line the centre line marking on the tug o' war rope lay, when the negotiations ended. I therefore turn to examining the clause in more detail before returning to the commercial context.

29.    In order to illustrate the competing contentions of the parties Popplewell J helpfully divided clause 7.11 into its constituent parts. I set that presentation out below with the addition in (B) of the sub-headings (i) and (ii) to assist my exegesis.

30.     Clause 7.11 thus divided provides:

> "The Sellers undertake to pay to the Buyer an amount equal to the amount which would be required to indemnify the Buyer and each member of the Buyer's Group against
>
> (1)     all actions, proceedings, losses, claims, damages, costs, charges, expenses and liabilities suffered or incurred, and
>
> (2)     all fines, compensation or remedial action or payments imposed on or required to be made by the Company
>
>> (A)     following and arising out of claims or complaints registered with the FSA, the Financial Services Ombudsman or any other authority against the Company, the Sellers or any Relevant Person
>>
>> (B)     (i) and which relate to the period prior to the Completion Date (ii) pertaining to any mis-selling or suspected mis-selling of any insurance or insurance related product or service."

31.     Counsel for Capita submitted that the clause should be read by treating (2) and (A) as a composite phrase so that the Sellers were bound to indemnify against both (1) and (2+A), each of which was subject to the two conditions in (B). This meant that it was only the fines etc in (2) which had to follow on or arise out of claims or complaints made to the FSA or other Authority against the Company etc as provided in (A). Thus, it was submitted, the indemnity covered all liabilities in (1) provided only that (i) they related to the period prior to the completion date and (ii) pertained to any mis-selling or suspected mis-selling of insurance products etc.

32.     Counsel for Mr Wood submitted that the clause was properly construed by treating both (1) and (2) as being subject to three conditions, namely (A), B(i) and (B)(ii). He submitted that (A) should be read as if there was a comma after "claims", so that it provided as a condition for the triggering of the indemnity under (1) or (2) that there must be either claims by customers, or complaints made to the regulatory authorities, in each case against the Company, the Sellers or any Relevant Person. Thus, on his approach, either a claim by a customer against the Company, the Sellers or an employee or former employee of the Company, or a complaint to a regulatory authority against the Company, the Sellers or an employee or former employee of the Company would trigger the indemnity if the two conditions in (B) were met.

33.     Both counsel accepted that, because of the breadth of the terms used in (1), the types of loss and damage in (1) covered all of the types of loss and damage in (2). Thus it was suggested that (2) must have been included only for the avoidance of doubt. This means that on Mr Wood's approach (2) was otiose while on Capita's approach the composite (2+A) was otiose. I find the latter proposition remarkable and unlikely for two reasons.

34.     First, and to my mind most significantly, (A) would serve no purpose by restricting the source of loss and damage if (A) governed only (2) and therefore (1) was unrestricted. (A) would not restrict the scope of the indemnity in any way. On Mr Wood's construction the words in (A) have a purpose as they limit the scope of both (1) and the otiose (2).

35.     Secondly, if one airbrushes out (2+A) as otiose, the clause does not specify against whom the actions, proceedings and claims in (1) are directed. The clause would read:

> "The Sellers undertake to pay to the Buyer an amount equal to the amount which would be required to indemnify the Buyer and each member of the Buyer's Group against
>
> all actions, proceedings, losses, claims, damages, costs, charges, expenses and liabilities suffered or incurred, and which relate to the period prior to the Completion Date pertaining to any mis-selling or suspected mis-selling of any insurance or insurance related product or service."

The identity of the persons against whom the relevant claims etc could be made so as to trigger the sellers' indemnity would, on Capita's approach, be left to implication. There must be a limit on who such persons could be as it would be absurd for Capita to have a claim against the Sellers for indemnity resulting from any mis-selling on its part before the Completion Date. But, even assuming that the target was mis-selling by or on behalf of the Company, it is far from obvious that the delimited class of persons would be "the Company, the Sellers or any Relevant Person".

36.     Capita made three further points against Mr Wood's interpretation. First, there is an element of tautology as the "claims" in (1) are said in (A) to follow and arise out of "claims". But as Christopher Clarke LJ observed, tautology in commercial contracts is not unknown and the verbal exuberance (or torrential drafting) of (1) makes tautology difficult to avoid.

37.     Secondly, Capita pointed out that there is a comma after "incurred" at the end of (1) and no comma after "Company" at the end of (2). This could support the separation of (1) from (2) and the conjunction of (2) and (A). Similarly, Mr Wood's interpretation would involve inserting in (A) a comma after "claims" and also after "any other Authority" so as to limit both the claims and the regulatory complaints to those against "the Company, the Sellers or any Relevant Person". Again in agreement with Christopher Clarke LJ I do not think that the use of commas in this clause is a strong pointer in favour of Capita's interpretation, both because there are no set rules for the use of commas and in any event the draftsman's use of commas in this clause is erratic.

38.     Thirdly, the draftsman used an adjectival participle at the start of (A) ("following and arising out of") and "changed tone" by using a relative pronoun ("and which") at the start of (B). But the use of the adjectival participle does not tie (A) exclusively into (2) because in (B) the adjectival participle ("pertaining to") unquestionably applies to both (1) and (2). These detailed points of style and syntax are of little assistance in construing an admittedly opaque clause.

39.     I return to the commercial context and the practical consequences of the rival interpretations. On Mr Wood's interpretation it requires a customer or customers to make a claim, or complaint to the regulatory authorities, against the Company, the sellers or a Relevant Person in order to trigger the indemnity. Thus if a whistle-blower alerted the regulatory authorities of suspected or actual mis-selling, or if (as in fact occurred) management, complying with their regulatory obligations, reported such mis-selling to the FSA, which ordered the payment of compensation, the indemnity would not be triggered. Yet in each case, the mis-selling before the date of completion causes the Company loss.

40.     The general purpose of clause 7.11, to indemnify Capita and its group against losses occasioned by mis-selling is clear. Had clause 7.11 stood on its own, the requirement of a claim or complaint by a customer and the exclusion of loss caused by regulatory action which was otherwise prompted might have appeared anomalous. But clause 7.11 is in addition to the wide-ranging warranties in Part 14 of Schedule 4 (paras 18 and 19 above) which probably covered the circumstances which eventuated. Capita had two years after completing the purchase to examine the sales practices of the Company's employees and so uncover any regulatory breaches in order to make a claim under the Schedule 4 indemnities. Prima facie that was not an unreasonable time scale. Indeed, Capita was able to send its findings to the FSA within 20 months of the Completion Date. It is not contrary to business common sense for the parties to agree wide-ranging warranties, which are subject to a time limit, and in addition to agree a further indemnity, which is not subject to any such limit but is triggered only in limited circumstances.

41.     From Capita's standpoint the SPA may have become a poor bargain, as it appears that it did not notify the sellers of a warranty claim within two years of Completion. But it is not the function of the court to improve their bargain.

42.     In this case, the circumstances which trigger that indemnity are to be found principally in a careful examination of the language which the parties have used.

*Conclusion*

43.     I would therefore dismiss the appeal.

# **EXHIBIT 30**



**Trinity Term**
**[2015] UKSC 36**
*On appeal from: [2013] EWCA Civ 902*

# JUDGMENT

# Arnold (Respondent) *v* Britton and others (Appellants)

**before**

**Lord Neuberger, President**
**Lord Sumption**
**Lord Carnwath**
**Lord Hughes**
**Lord Hodge**

## JUDGMENT GIVEN ON

## 10 June 2015

**Heard on 26 January 2015**

*Appellants*
Timothy Morshead QC
Rawdon Crozier
(Instructed by Fursdon
Knapper Solicitors)

*Respondent*
Michael Daiches

(Instructed by Morgan la
Roche Solicitors)

**LORD NEUBERGER: (with whom Lord Sumption and Lord Hughes agree)**

1.     This appeal concerns the interpretation of service charge contribution provisions in the leases of a number of chalets in a caravan park in South Wales.

*The facts*

2.     The facts may be summarised as follows (although they are more fully set out by Lord Carnwath in paras 81 to 103).

3.     Oxwich Leisure Park is on the Gower Peninsular, and contains 91 chalets, each of which is let on very similar terms. The five leases which we have seen were granted between 1978 and 1991, either for a premium (of less than £20,000) or in return for the lessee constructing the chalet. Each of the 91 chalets was let on a lease which was for a term of 99 years from 25 December 1974 and reserved a rent of £10 per annum increasing by £5 for each subsequent period of 21 years. Para (2) of the recital of each lease contains the statement that the chalets on the Leisure Park were intended to be subject to leases "upon terms similar in all respects to the present demise".

4.     Clause 3 of each lease contains various covenants by the lessee, and it is introduced by the words:

> "The lessee hereby covenants with the lessor and with and for the benefit of the owners and lessees from time to time during the currency of the term hereby granted of the other plots on the estate so far as the obligations hereinafter mentioned are capable of benefitting them …"

The covenants that follow concern use, repair, alienation and the like. Crucially for present purposes, clause 3(2) is a covenant to pay an annual service charge. Each lease also contains covenants by the lessor. One such covenant is to provide services to the Park, such as maintaining roads, paths, fences, a recreation ground and drains, mowing lawns, and removing refuse. The lessor also covenants in clause 4(8) that leases of other chalets "shall contain covenants on the part of the lessees thereof to observe the like obligations as are contained herein or obligations as similar thereto as the circumstances permit".

5.      Twenty-five of the chalets are said by the respondent, the current owner of the Leisure Park and the landlord under the leases, to be subject to leases containing a service charge provision in clause 3(2), which requires the lessee to pay for the first year of the term a fixed sum of £90 per annum, and for each ensuing year a fixed sum representing a 10% increase on the previous year – ie an initial annual service charge of £90, which increases at a compound rate of 10% in each succeeding year. The issue on this appeal is whether the respondent's interpretation of clause 3(2) in those 25 leases is correct.

6.      Of the 25 leases in question, 21 were granted between 1977 and 1991. Prior to the grant of most of those 21 leases, the other 70 chalets had been the subject of leases granted from the early 1970s. In each of those 70 leases, clause 3(2) was a covenant by the lessee:

> "To pay to the Lessor without any deduction in addition to the said rent a proportionate part of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal and the provision of services hereinafter set out the yearly sum of Ninety Pounds and value added tax (if any) for the first three years of the term hereby granted increasing thereafter by Ten Pounds per Hundred for every subsequent three year period or part thereof."

The effect of this clause, at least on the face of it, is that the initial service charge of £90 per annum was to be increased on a compound basis by 10% every three years, which is roughly equivalent to a compound rate of 3% per annum.

7.      The 21 leases referred to in para 6 have two slightly different versions of clause 3(2), but the clause can be set out in the following form (with the words shown in bold included in 14 of the 21 leases, but not in the other seven):

> "To pay to the Lessor without any deductions in addition to the said rent **as** a proportionate part of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal **and renewal of the facilities of the Estate** and the provision of services hereinafter set out the yearly sum of Ninety Pounds and Value Added tax (if any) for the first Year of the term hereby granted increasing thereafter by Ten Pounds per hundred for every subsequent year **or part** thereof."

8.      To complicate matters a little further, the service charge clause in four of these 21 leases (being three of the seven which did not include the words in bold in the preceding quotation), had the word "for" before "the yearly sum of Ninety

Pounds". These four leases also included a proviso to the effect that, so long as "the term hereby created is vested in the [original lessees] or the survivor of them", clause 3(2) would be treated as being in the form set out in para 6 above. This proviso has ceased to have effect as these four leases are no longer vested in the original lessees.

9.      Finally, the service charge clause in four of the 70 leases referred to in para 6 above were varied pursuant to deeds of variation executed between October 1998 and August 2002 so as to be identical to that set out in para 7 above, including the words in bold.

*The issues between the parties*

10.      As already explained, the respondent, the current landlord, contends that the service charge provisions in clause 3(2) of the 25 leases referred to in paras 6 to 9 above have the effect of providing for a fixed annual charge of £90 for the first year of the term, increasing each subsequent year by 10% on a compound basis. The appellants, the current tenants under 24 of the 25 leases, primarily contend that the respondent's construction results in such an increasingly absurdly high annual service charge in the later years of each of the 25 leases that it cannot be right. They argue that, properly read, each service charge clause in the 25 leases requires the lessee to pay a fair proportion of the lessor's costs of providing the services, subject to a maximum, which is £90 in the first year of the term, and increases every year by 10% on a compound basis. In other words, the appellants argue that, in effect, the words "up to" should be read into the clause set out in para 7 above, between the words "the provision of services hereinafter set out" and "the yearly sum of Ninety Pounds". The appellants also have an alternative contention, based on the provisions of recital (2), the opening words of clause 3 and the provisions of clause 4(8) of their leases, namely that the lessor cannot recover more by way of service charge than could be recovered under each of the first 70 leases.

*The evidence*

11.      Apart from the documents themselves and the published Retail Price Index (RPI) for each of the years 1970-2010, there is no evidence as to the surrounding circumstances in which the 21 leases were executed, other than the fact that the four leases referred to in para 8 above were granted to individuals connected with the lessor. Following a request from the court, we were also told that three of the four deeds of variation referred to in para 9 above were entered into with the lessor's daughter as lessee.

12.    I do not find it surprising that we have not been provided with any further evidence. So far as the wording of clause 3(2) is concerned, there may have been letters or notes of discussions in connection with the original drafting and granting (and, in the four cases referred to in para 9 above, the amending) of the leases. But, even if such notes or letters had survived, I very much doubt that they would have thrown any light on what was intended to be the effect of the drafting of the various forms of clause 3(2). Even if they had done, they would probably have been inadmissible as I strongly suspect that they would merely have shown what one party thought, or was advised, that the clause meant. If such documents had shown what both parties to the lease in question intended, they would probably only have been admissible if there had been a claim for rectification.

13.    As to the possibility of other material, I am unconvinced that, even if it existed, evidence of the original level of services, the original cost of the services or any investigations made on behalf of a potential lessee in relation to the original services and their cost would have assisted on the issue of what clause 3(2) of any of the 25 leases meant. The provisions for increase at the end of clause 3(2) of each lease were plainly included to allow for inflation, and the only evidence which appears to me to be potentially relevant would be contemporary assessments of the actual and anticipated annual rate of inflation, and, as already mentioned, we have the RPI for each of the years in question.

*Interpretation of contractual provisions*

14.    Over the past 45 years, the House of Lords and Supreme Court have discussed the correct approach to be adopted to the interpretation, or construction, of contracts in a number of cases starting with *Prenn v Simmonds* [1971] 1 WLR 1381 and culminating in *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50; [2011] 1 WLR 2900.

15.    When interpreting a written contract, the court is concerned to identify the intention of the parties by reference to "what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean", to quote Lord Hoffmann in *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] 1 AC 1101, para 14. And it does so by focussing on the meaning of the relevant words, in this case clause 3(2) of each of the 25 leases, in their documentary, factual and commercial context. That meaning has to be assessed in the light of (i) the natural and ordinary meaning of the clause, (ii) any other relevant provisions of the lease, (iii) the overall purpose of the clause and the lease, (iv) the facts and circumstances known or assumed by the parties at the time that the document was executed, and (v) commercial common sense, but (vi) disregarding subjective evidence of any party's intentions. In this connection, see *Prenn* at pp 1384-1386 and *Reardon Smith*

*Line Ltd v Yngvar Hansen-Tangen (trading as HE Hansen-Tangen)* [1976] 1 WLR 989, 995-997 per Lord Wilberforce, *Bank of Credit and Commerce International SA (in liquidation) v Ali* [2002] 1 AC 251, para 8, per Lord Bingham, and the survey of more recent authorities in *Rainy Sky*, per Lord Clarke at paras 21-30.

16.    For present purposes, I think it is important to emphasise seven factors.

17.    First, the reliance placed in some cases on commercial common sense and surrounding circumstances (eg in *Chartbrook*, paras 16-26) should not be invoked to undervalue the importance of the language of the provision which is to be construed. The exercise of interpreting a provision involves identifying what the parties meant through the eyes of a reasonable reader, and, save perhaps in a very unusual case, that meaning is most obviously to be gleaned from the language of the provision. Unlike commercial common sense and the surrounding circumstances, the parties have control over the language they use in a contract. And, again save perhaps in a very unusual case, the parties must have been specifically focussing on the issue covered by the provision when agreeing the wording of that provision.

18.    Secondly, when it comes to considering the centrally relevant words to be interpreted, I accept that the less clear they are, or, to put it another way, the worse their drafting, the more ready the court can properly be to depart from their natural meaning. That is simply the obverse of the sensible proposition that the clearer the natural meaning the more difficult it is to justify departing from it. However, that does not justify the court embarking on an exercise of searching for, let alone constructing, drafting infelicities in order to facilitate a departure from the natural meaning. If there is a specific error in the drafting, it may often have no relevance to the issue of interpretation which the court has to resolve.

19.    The third point I should mention is that commercial common sense is not to be invoked retrospectively. The mere fact that a contractual arrangement, if interpreted according to its natural language, has worked out badly, or even disastrously, for one of the parties is not a reason for departing from the natural language. Commercial common sense is only relevant to the extent of how matters would or could have been perceived by the parties, or by reasonable people in the position of the parties, as at the date that the contract was made. Judicial observations such as those of Lord Reid in *Wickman Machine Tools Sales Ltd v L Schuler AG* [1974] AC 235, 251 and Lord Diplock in *Antaios Cia Naviera SA v Salen Rederierna AB (The Antaios)* [1985] AC 191, 201, quoted by Lord Carnwath at para 110, have to be read and applied bearing that important point in mind.

20.    Fourthly, while commercial common sense is a very important factor to take into account when interpreting a contract, a court should be very slow to reject the

natural meaning of a provision as correct simply because it appears to be a very imprudent term for one of the parties to have agreed, even ignoring the benefit of wisdom of hindsight. The purpose of interpretation is to identify what the parties have agreed, not what the court thinks that they should have agreed. Experience shows that it is by no means unknown for people to enter into arrangements which are ill-advised, even ignoring the benefit of wisdom of hindsight, and it is not the function of a court when interpreting an agreement to relieve a party from the consequences of his imprudence or poor advice. Accordingly, when interpreting a contract a judge should avoid re-writing it in an attempt to assist an unwise party or to penalise an astute party.

21.     The fifth point concerns the facts known to the parties. When interpreting a contractual provision, one can only take into account facts or circumstances which existed at the time that the contract was made, and which were known or reasonably available to both parties. Given that a contract is a bilateral, or synallagmatic, arrangement involving both parties, it cannot be right, when interpreting a contractual provision, to take into account a fact or circumstance known only to one of the parties.

22.     Sixthly, in some cases, an event subsequently occurs which was plainly not intended or contemplated by the parties, judging from the language of their contract. In such a case, if it is clear what the parties would have intended, the court will give effect to that intention. An example of such a case is *Aberdeen City Council v Stewart Milne Group Ltd* [2011] UKSC 56, 2012 SCLR 114, where the court concluded that "any … approach" other than that which was adopted "would defeat the parties' clear objectives", but the conclusion was based on what the parties "had in mind when they entered into" the contract (see paras 17 and 22).

23.     Seventhly, reference was made in argument to service charge clauses being construed "restrictively". I am unconvinced by the notion that service charge clauses are to be subject to any special rule of interpretation. Even if (which it is unnecessary to decide) a landlord may have simpler remedies than a tenant to enforce service charge provisions, that is not relevant to the issue of how one interprets the contractual machinery for assessing the tenant's contribution. The origin of the adverb was in a judgment of Rix LJ in *McHale v Earl Cadogan* [2010] EWCA Civ 14, [2010] 1 EGLR 51, para 17. What he was saying, quite correctly, was that the court should not "bring within the general words of a service charge clause anything which does not clearly belong there". However, that does not help resolve the sort of issue of interpretation raised in this case.

*Discussion: interpretation of clause 3(2)*

24.    When one turns to clause 3(2) of each of the 91 leases of the chalets in Oxwich Park, the natural meaning of the words used, at least until one considers the commercial consequences, seems clear. The first half of the clause (up to and including the words "hereinafter set out") stipulates that the lessee is to pay an annual charge to reimburse the lessor for the costs of providing the services which he covenants to provide, and the second half of the clause identifies how that service charge is to be calculated.

25.    The fact that the second half of the clause results in the service charge being a fixed sum, rather than a sum dependent on the costs to the lessor of providing the contractual services is readily explicable. As stated in Wonnacott's *The History of the Law of Landlord and Tenant in England and Wales* (2012), p 106, clauses which provide for charges which vary with the costs of providing services have resulted, at least since around 1960, in "more trouble between landlord and tenant than anything else". Further, legislation which started to come into force in 1972 has rendered it progressively more difficult for an "amateur landlord" (to use Wonnacott's expression) to recover a disputed service charge calculated on such a basis. The fact that the second half of the clause goes on to provide for a fixed increase in the annual sum is also readily explicable: the parties assumed that the cost of providing the services in sterling terms would increase, or, to put the same point another way, they assumed that the value of money would fall.

26.    Davis LJ concisely explained the thinking behind the clause in the course of his judgment in the Court of Appeal, [2013] EWCA Civ 902, para 52:

> "Lack of correspondence between outlay and receipt is the almost inevitable consequence of such a clause if the parties have elected for a fixed charge formula. It has a similarity with a liquidated damages clause: it represents the parties' estimate at the outset for the future with neither guarantee nor even expectation of entire coincidence with the eventual outcome. But the advantage is certainty. The parties know from the outset where they stand. Moreover, it is a surrounding circumstance legitimately to be taken into account here that the leases were made at a time of inflation – in some years, very significant inflation – which the parties, objectively and commercially speaking, could be expected to want to confront. They chose to do so by this particular formula of increase."

27.    In those seven leases where the word "as" is not included, I suppose that it might be said that this is not clear unless words such as "quantified in the sum of"

were included in order to link the two halves of the clause, but that is, to my mind, a really pedantic argument. Although perfectionist drafting might suggest the inclusion of such words, it seems to me that the absence of such words cannot fairly be invoked to suggest ambiguity or a lack of clarity. The reasonable reader of the clause would see the first half of the clause as descriptive of the purpose of clause 3(2), namely to provide for an annual service charge, and the second half as a quantification of that service charge.

28.     It is true that the first part of the clause refers to a lessee paying a "proportionate part" of the cost of the services, and that, unless inflation increases significantly in the next 50 years, it looks likely that the service charge payable under each of the 25 leases may exceed the cost of providing services to the whole of the Leisure Park. However, if, as I believe is clear, the purpose of the second part of the clause is to quantify the sum payable by way of service charge, then the fact that, in the future, its quantum may substantially exceed the parties' expectations at the time of the grant of the lease is not a reason for giving the clause a different meaning. As already explained, the mere fact that a court may be pretty confident that the subsequent effect or consequences of a particular interpretation was not intended by the parties does not justify rejecting that interpretation.

29.     However, given the way things have turned out, it is tempting to latch onto the absence of words such as "quantified in the sum of", and to see the two halves of clause 3(2) as mutually inconsistent in their effect. This would be on the ground that the first half of the clause requires the lessee to pay a "proportionate part" of the cost to the lessor of providing services, whereas the latter half requires the lessee to pay a sum which could exceed the whole of that cost. On that basis, it might be said that the court can reject or modify one half to give effect to the real intention of the parties – see eg *Walker v Giles* (1848) 6 CB 662. However, as explained in para 24 and 25 above, this argument would, in my view, involve the court inventing a lack of clarity in the clause as an excuse for departing from its natural meaning, in the light of subsequent developments.

30.     Were it not for the percentage increases of 10% per annum specified in the 25 service charge clauses which are being considered on this appeal, coupled with the subsequent history of inflation in the United Kingdom, that would be the end of it. Thus, it seems to me that the original 70 leases (referred to in para 6 above), with a clause 3(2), which provided for increases of about 3% per annum (at a time when inflation was running at a significantly higher rate), should plainly be interpreted in the way in which the respondent contends. However, the consequences of the annual sum of £90 being increased annually by 10% on a compound basis are plainly unattractive, indeed alarming, to a lessee holding a chalet under one of the 25 leases. If one assumes a lease granted in 1980, the service charge would be over £2,500 this year, 2015, and over £550,000 by 2072. This appears to be an alarming outcome for the lessees, at least judging by how things look in 2015, because annual inflation in

the last 15 years has hardly ever been above 4%, indeed has been under 3% for ten of those years, and has notoriously been falling recently almost to the point of turning negative, whereas the service charge over that period has increased, and will continue to increase, by 10% per annum.

31.     The appellants argue that these figures illustrate the extreme unlikelihood of the parties to the 21 leases (or to the four subsequent deeds of variation), and in particular the lessees, having intended to agree that the original £90 service charge would be automatically increased by 10% annually on a compound basis. Accordingly, they contend, the latter half of clause 3(2) should be interpreted as imposing a maximum on the annual service charge recoverable by the lessor. In other words, the effect of the clause is said to be that the lessor is entitled to an appropriate percentage of the annual cost of providing the contracted services, subject to a maximum – which was initially £90, but which increases by 10% compound annually.

32.     Despite the unattractive consequences, particularly for a lessee holding a chalet under one of the 25 leases, I am unconvinced by this argument. It involves departing from the natural meaning of clause 3(2) in each of those leases, and it involves inserting words which are not there.

33.     Further, the appellants' argument involves attributing to the parties to the 25 leases an intention that there should be a varying service charge and that the lessor (or some other unspecified person) should assess the total costs of the services and determine the appropriate proportion of the cost of the contractual services to allocate to each chalet. Although I accept that it has an element of circularity, it appears to me that the average reader of clause 3(2) would have thought that those are exercises which the clause seems to have been designed to avoid.

34.     Although there are one or two very small errors in the drafting, I do not consider that anything has gone significantly wrong with the wording of clause 3(2) of any of the 25 leases. As already explained, I would reject the notion that, on a natural reading, the two parts of the clause do not relate to each other, or appear to say different things, even in the seven cases where the word "as" is not included: as the Court of Appeal said, the first half imposes a liability for an annual service charge and the second half explains how it is to be assessed. I do not think that the reference to part of a year in the closing words of the clause (para 7 above refers), or the inclusion of an unnecessary "for" (para 8 above refers), in some of the 25 leases can possibly justify departing from the natural meaning of clause 3(2). At best the reference to part of a year is meaningless. However, given that the 99 year term of each lease ran from Christmas 1974, all of them would have ended part way through a year, as they would also have been very likely to do if surrendered or forfeited. Furthermore, the fact that some clauses refer not merely to "repair

maintenance and renewal", but also to "renewal of facilities on the Estate" seems to me to be irrelevant to the issue on this appeal.

35.    Quite apart from the fact that the effect of clause 3(2) appears clear in each lease as a matter of language, I am far from convinced by the commercially-based argument that it is inconceivable that a lessee would have agreed a service charge provision which had the effect for which the respondents contend, at least in the 1970s and much of the 1980s. Although I would have expected most solicitors to have advised against it, and imprudent though it undoubtedly has turned out to be (at least so far), a lessee could have taken the view that a fixed rate of increase of 10% per annum on a fixed initial service charge, at a time when annual inflation had been running at a higher rate for a number of years (well over 10% per annum between 1974 and 1981, indeed over 15% per annum for six of those eight years; although it was less than 10% per annum after 1981), was attractive or at least acceptable.

36.    If inflation is running at, say 10% per annum, it is, of course, very risky for both the payer and the payee, under a contract which is to last around 90 years, to agree that a fixed annual sum would increase automatically by 10% a year. They are taking a gamble on inflation, but at least it is a bilateral gamble: if inflation is higher than 10% per annum, the lessee benefits; if it is lower, the lessor benefits. On the interpretation offered by the appellants, it is a one way gamble: the lessee cannot lose because, at worst, he will pay the cost of the services, but, if inflation runs at more than 10% per annum, the lessor loses out.

37.    The fact that a court may regard it "unreasonable to suppose that any economist will be able to predict with accuracy the nature and extent of changes in the purchasing power of money" over many decades (to quote Gibbs J in *Pennant Hills Restaurants Pty Ltd v Barrell Insurances Pty Ltd* [1981] HCA 3, (1981) 145 CLR 625, 639) is nothing to the point. People enter into all sorts of contracts on the basis of hopes, expectations and assessments which no professional expert would consider prudent, let alone feel able to "predict with accuracy". I have little doubt that many fortunes have been both made and lost (and sometimes both) by someone entering into such a contract.

38.    In terms of commercial justification, the analysis in paras 34 and 35 above becomes more difficult to invoke the further one moves on from 1981, the last year when inflation was above 10% per annum, although in 1990 it almost hit that figure. Accordingly, while I think the analysis comfortably applies to the 21 leases referred to in paras 6 to 8 above, which were granted between 1977 and 1990, it is unconvincing in relation to the four leases whose service charge provisions were amended around 2000, as mentioned in para 9 above.

39.     It seems rather extraordinary that a lessee under a lease which provided for an increase in a fixed service charge at the rate of 10% over three years should have agreed to vary the lease so that the increase was to be at the rate of 10% per annum, at a time when inflation was running at around 3% per annum. However, I do not accept that this justifies reaching a different result in relation to any of the four leases which were varied in 2000. Three of them are relatively easily explicable, as the lessee who agreed the variation was closely connected with the lessor. The fact that they were subsequently assigned is, I accept, remarkable, but that later fact cannot affect the interpretation of the deeds. As to the fourth deed, it was, on any view, an improvident variation to have agreed, but, as already explained, that is not enough to justify the court rewriting the contract under the guise of interpreting it. Further, given that, at least in my view, there could be no ground for suggesting that the original clause 3(2) in the three leases (providing as it did for an annual increase of around 3%) had any effect other than that for which the respondent contends, it is particularly difficult to suggest that the substituted clause, which changed the annual increase to 10%, but was otherwise identically worded (save that it included the word "as" and was therefore even clearer), should have a different effect.

40.     I note in this connection that, at a time when inflation was running at well over 10% per annum from 1974 to 1980 (possibly excepting 1984), the lessor was granting leases which provided, in effect, for increases in the £90 at the rate of about 3% per annum (para 6 above refers). Of course, that cannot be taken into account when interpreting any of the 25 leases, but it shows the lessor was prepared to take what appears to have been an unwise decision which was not entirely dissimilar from the unwise decision which, in my view, the lessees under the 25 leases took.

41.     I do not think that this is a case where the approach adopted by this court in *Aberdeen City Council* can assist the appellants. Unlike that case, this is not a case where one of the parties has done something which was not contemplated by the contract. It is clear that the 10% per annum increase in clause 3(2) was included to allow for a factor which was out of the control of either party, namely inflation. In my judgment, there is no principle of interpretation which entitles a court to re-write a contractual provision simply because the factor which the parties catered for does not seem to be developing in the way in which the parties may well have expected.

42.     It also appears to me that there is a degree of inconsistency in the appellants' case. That case is, of course, ultimately based on the unlikelihood of a lessor and lessee of a single chalet agreeing that an initial annual service charge of £90 should be increased at a rate which could well lead to the annual charge being an absurdly high figure – possibly more than the cost of providing the services for the whole Leisure Park. But it is also rather unlikely (albeit less unlikely, I accept) that they will have agreed a ceiling on the annual service charge which would become so absurdly high that it would be meaningless. In other words, it can be said with some

force that the appellants' solution to the problem which they identify does not actually address the problem: it merely changes its commercial consequences.

43.    I should add that, subject to the point dealt with in the next section of this judgment, I am unconvinced that any assistance can be gained from the differences between the various forms of clause 3(2). It seems to me positively unlikely that the lessees under the later 21 leases would have been aware of the terms of clause 3(2) of the earlier 70 leases. But, even if they had been so aware, it seems to me that it would assist the respondent's case, not that of the appellants. That is because, given that it appears clear that the second half of clause 3(2) in the earlier 70 leases operated to quantify the service charge, then it seems to me (as explained in the last sentence of para 39 above) that it is very unlikely that the parties can have intended the almost identically worded second half of clause 3(2) in the later 21 leases to have a very different effect from that in the earlier 70 leases.

44.    In his judgment at para 116, Lord Carnwath rightly points out that, even after he assigns the lease, the original lessee is bound for the duration (at least if it was granted before 1996). However, I do not see what that adds in this case: on any view, these leases involve long term commitments on both sides. I agree with his view in para 117 that a prospective lessee of a flat in a block or the like (as here) will normally be likely to have less negotiating freedom as to the terms than in relation to a "free standing" property. But so will the lessor, and either is free to walk away if he regards the terms as unsatisfactory.

45.    I am also unconvinced that the remedies available (whether in common law or under statute) to the parties in the event of a breach in connection with services or service charge, as discussed in Lord Carnwath's para 121-123, assists on the issue we have to decide. We are concerned with what a service charge clause means, not how it is being operated.

46.    Finally on this first point, Lord Carnwath makes some remarks about service charge provisions in his para 119. There will, I suspect, be many cases where his observations are very much in point: indeed, they may well be normally in point. However, the lessor has no duty to be "fair" when negotiating the terms of a lease (any more than the lessee does), although it may well be in his interest to be (or at least to appear to be) fair. But, whosoever interpretation is correct, clause 3(2) was self-evidently not a "normal" service charge clause: on the respondent's case, the landlord might get more or less than the costs of providing the services; on the appellants' case, the landlord might get less than the costs of providing the services.

*Discussion: the effect of clause 4(8) and the terms of the other leases*

47.    The appellants, at the invitation of the court, argued that clause 4(8), which as explained in para 4 above required leases of chalets to be granted subject to identical or similar obligations, substantially mitigated the effect of clause 3(2) of their leases. They contended that clause 4(8), when read together with the opening words of clause 3 and para (2) of the recital to each lease, referred to in paras 3 and 4 above, enable them to limit the service charge which the landlord could otherwise recover under clause 3(2).

48.    The appellants' argument in this connection proceeds in two steps. First, as a result of clause 4(8), the opening words of clause 3, and para (2) of the recital in each of their leases, a term was implied into their leases to the effect that clause 3(2) was in the same terms as clause 3(2) of the leases of chalets which had already been granted – ie the 70 leases referred to in para 6 above. Secondly, in those circumstances the lessor is now precluded from recovering more by way of service charge than would be recoverable under the terms of the service charge provisions in the 70 leases – ie £90 plus 10% compounded every three years. While this argument has obvious attraction, I would reject it.

49.    The purpose of clause 4(8), the opening words of clause 3, and recital (2) was, I would accept, to create what is sometimes referred to as a "building scheme", but, at least in the present context is more accurately described as a letting scheme. Such a scheme, which is recognised and given effect to by equity, has to be apparent from the terms of the relevant leases (or, very unusually, from a side agreement entered into by each lessee with the lessor). A letting scheme involves properties within a given area being let on identical or similar terms, normally by the same lessor, with the intention that the terms are to be enforceable not only by the lessor against any lessee, but as between the various lessees – even by an earlier lessee of one property against a later lessee of another property. There is plainly a strong case for saying the combination of para (2) of the recital, the opening words of clause 3 and the provisions of clause 4(8) establishes that there is such a scheme in relation to the chalets in the Leisure Park. Accordingly, I am prepared to assume that there was envisaged that there would be a degree of reciprocity and mutual enforceability between the lessees of chalets when it came to the covenants they entered into.

50.    However, in my view, the appellants' reliance on the scheme in order to limit the service charges recoverable under clause 3(2) of their leases faces a number of problems.

51.    First, it seems to me to be unclear whether a provision such as clause 3(2) could be or was subject to the scheme. There is room for argument whether a letting

scheme can only extend, like freehold schemes, to restrictive covenants, or whether it can also extend to positive covenants (on the basis that positive covenants between lessor and lessee are enforceable as between their respective successors, whereas only restrictive covenants are enforceable as against successors of covenantors in relation to freeholds). Even if a leasehold scheme can extend to positive covenants, it is also questionable whether a lessee's covenant to pay a service charge, or any other sum of money to the lessor, can be within the ambit of a scheme.

52.     Secondly, in so far as they are dealing with the provisions of leases of other chalets, clause 4(8), and (arguably) the opening words of clause 3 and recital (2) appear to refer to future lettings, not to past lettings. It is quite a bold step to imply a term as to what has happened in the past from an express provision which is limited to the future. Having said that, there is considerable practical force in the contention that the scheme contemplated by the three provisions could only work if leases of all the chalets, past, present and future, were on the same terms.

53.     Thirdly, even if the appellants' argument based on an implied term was otherwise correct, there would still be considerable force in the contention that it would not exonerate the appellants from complying with their obligations under clause 3(2). It seems clear that, where there is a letting scheme, a tenant can enjoin the landlord from letting a property within the scheme area on terms which are inconsistent with the scheme. However, as far as I am aware, there is no case where the landlord has been held liable to a tenant in damages (or otherwise) for having let a property within the scheme area on such terms, prior to the grant of the tenant's lease.

54.     Fourthly, even if these arguments are all rejected, the closing words of clause 4(8) clearly permit a degree of variation between the terms of the leases of different chalets. If the second part of clause 3(2) is intended to reflect the level of projected inflation, then the parties may well have regarded it as almost inevitable that any annual or triennial adjustment would vary from time to time. On that basis, there may be no breach of any implied term anyway.

55.     However, it is unnecessary to address the four points identified in paras 51-54 above, because, in my judgment, there is a fatal flaw in the appellants' argument based on an implied term. In effect, the appellants' case is that the implied term in each of the 21 leases is that the lessor was not asking anything of the lessee which had not been, or would not be, required of lessees of other chalets, whether their leases were in the past or the future. However, it seems to me that, assuming everything else in the appellants' favour, that would not be the correct term to imply. As I see it, if there is an implied term along the lines argued for, it is that the already existing 70 leases of chalets contain a clause 3(2) identical with that in the

appellant's leases – ie that the 70 existing leases have service charges which increase at the compound rate of 10% per annum as in the 21 leases.

56.     In so far as it relates to the 70 existing leases, the implied term suggested by the appellants is inconsistent with both (a) an express term of the appellants' leases, namely clause 3(2) itself, and (b) what is implied in relation to future leases. As to point (a), the appellants' suggested implied term means that clause 3(2) involves a 10% increase every three years, whereas there is an express term to the effect that the 10% increase is every year; and it is a fundamental principle that one cannot imply a term which is inconsistent with an express term. As to point (b), any reader of an appellant's lease who was asked what future leases of chalets would contain by way of a service charge provision would answer that it would be the same as that in the instant lease – ie £90 pa subject to an increase of 10% per annum compounded; and the implied term applicable to future leases should be the same as that applicable to past leases.

57.     If the appellants are right in their contention that there is an implied term, the term which I would favour (as set out at the end of para 55 above) runs into neither of these difficulties. It amounts to saying that, as clause 3(2) of an appellant's lease means that the service charge is to be £90 pa increasing by 10% pa compounded, there is a term implied into the lease that that is what the existing leases provide and it is what future leases will provide.

58.     If, as the appellants contend, there is an implied term, but that is its correct characterisation, it is difficult to see how it can help them. An appellant can say that the fact that the 70 existing leases contain a different clause 3(2) means that there is a breach of the implied term, but it is hard to see what damage or other injury has been suffered if the respondent now insists on enforcing clause 3(2) of their leases against the appellants. If an appellant could show that the value of his lease was reduced because the lessor had not granted the first 70 leases with the same clause 3(2) as was in the appellant's lease, the consequent reduction in the value of that lease could well be the appropriate measure of damages. But I cannot at the moment see on what basis the breach can assist an appellant in resisting the full financial consequences of the clause 3(2) he entered into.

59.     I should add that, if, contrary to my view expressed in para 43 above, the lessees under the later 21 leases would have been aware of the terms of clause 3(2) of the earlier 70 leases (as Lord Carnwath suggests), it would negative any reliance which the lessees under the 21 leases could place on clause 4(8), as just discussed. This is because the later lessees would have known of, and accepted, the departure from the original clause 3(2).

*Conclusion*

60.     Accordingly, in agreement with the reasons given by Lord Hodge in this court, Davis LJ in the Court of Appeal and Morgan J in the High Court, I would dismiss this appeal, and I do not consider that the appellants are assisted by the additional argument raised in this court. I should, however, make five final points.

61.     First, the Court of Appeal suggested that the only way the lessees under the 25 leases could escape from their problems would be by surrendering or suffering forfeiture. In case this is misinterpreted, it is right to point out that surrender is consensual between lessee and lessor, and forfeiture involves unilateral action by a lessor, and so neither course can be forced on the lessor.

62.     Secondly, I have considerable sympathy with Lord Carnwath's conclusion that the appeal should be allowed (not least because it is a much more satisfactory outcome in common sense terms, particularly viewed as at today), and I acknowledge that his reasons are as powerful as his conclusion allows. However, for the reasons I have given, I cannot agree with him.

63.     Thirdly, the fact that four leases were granted to associates of the lessor with the proviso described in para 8 above, and that three of the deeds of variation described in para 9 above were entered into with a lessee who was a close relation of the lessor, is worthy of comment. It suggests that the lessor or her advisers may have appreciated the potential disadvantages of the clause now contained in the 25 leases. However, I do not see how it can assist the lessees on the issue in these proceedings, namely the interpretation of the clause in the 25 leases.

64.     Fourthly, as Lord Carnwath records in para 155 below, it appears that the respondent realistically recognises the unsatisfactory situation in which the lessees under the 25 leases find themselves, and is prepared to agree appropriate amendments to their leases. I hope that a fair and just amendment can be agreed.

65.     Finally, as Lord Carnwath also points out in paras 90-93 below, there are various statutory provisions which protect tenants against unreasonable service charges, but none of them apply here. The present case suggests that there may be a strong case for extending such provisions to cases such as the present, even though they involve a fixed sum payable by way of service charge. But that is a policy issue for Parliament, and there may be arguments either way.

**LORD HODGE: (agrees with Lord Neuberger)**

66.    I agree that the appeal must be dismissed for the reasons which Lord Neuberger sets out. But it is a highly unsatisfactory outcome for the chalet tenants who are affected by the annual escalator of the service charge. It is not clear whether there are many long leases containing fixed service charges with escalators which are beyond the reach of statutory regulation. If there are, there may be a case for Parliament to consider extending the provisions that protect tenants against unreasonable service charges.

67.    Mr Morshead QC for the appellants submitted in his written case that what was important was "(a) that the risk [of inflation falling and remaining substantially below 10%] would have been obvious to the officious, reasonable bystander who must be imagined interrogating the actual parties and (b) that no reasonable person in the position of the parties, looking at the leases in their entirety and in context, would understand them to have intended that the tenants should assume that risk". He envisaged that in a hypothetical dialogue the officious bystander would warn the parties of the risks of their proposed contract and they would make it clear that that was not their intention.

68.    In the course of the debate we were referred directly or by reference to several cases concerning the remediation of a mistake by construction or the implication of a term. In my view they do not give the support that Mr Morshead needs.

69.    In *Homburg Houtimport BV v Agrosin Private Ltd (The Starsin)* [2004] 1 AC 715 the mistaken omission of words in a clause was apparent because the bill of lading had been modelled on a standard clause. The person who had transposed the standard clause into the bill of lading had omitted a phrase in the standard clause in which the same word had appeared at the end of two consecutive phrases. The mistake was clear and it was apparent what correction was called for (paras 22 and 23 per Lord Bingham).

70.    In *Chartbrook Ltd v Persimmon Homes Ltd* [2009] 1 AC 1101 a definition, which contained a grammatical ambiguity, made no commercial sense if interpreted in accordance with the ordinary rules of syntax. The background to the deal and the internal context of the contract showed that there was a linguistic mistake in the definition, which the court was able to remove by means of construction. In his speech Lord Hoffmann (at p 1114) referred with approval to the judgment of Carnwath LJ in *KPMG LLP v Network Rail Infrastructure Ltd* [2007] Bus LR 1336. In that case, which concerned a rent review clause in a lease, it was clear from the terms of the clause that its wording did not make sense. The court was assisted by an earlier agreement which set out the then intended clause containing a parenthesis,

of which only part had remained in the final lease. It was not clear whether the parties had mistakenly deleted words from the parenthesis, which they had intended to include, or had failed to delete the parenthesis in its entirety. But that uncertainty as to the nature of the mistake, unusually, did not matter as the outcome was the same on either basis.

71.     In *Aberdeen City Council v Stewart Milne Group Ltd* [2011] UKSC 56, 2012 SCLR 114 the internal context of the contract provided the answer. The sale contract provided for the payment to the vendor of a further sum on disposal of the land by the purchaser. Two of the methods of disposal required the parties to ascertain the market value of the property on disposal in calculating the additional payment and the other used the "gross sales proceeds" in calculating that payment. The purchaser sold the site at an under-value to an associated company, a circumstance which on the face of the contract the parties had not contemplated. The courts at each level interpreted the provision, which used the gross sales proceeds in the calculation, as requiring a market valuation where there was a sale which was not at arm's length. They inferred the intention of the parties at the time of the agreement from the contract as a whole and in particular from the fact that the other two methods of disposal required such a valuation. While this line of reasoning was criticised by Professor Martin Hogg ((2011) Edin LR 406) on the ground that it protected a party from its commercial fecklessness, it seems to me to be the correct approach in that case as the internal context of the contract pointed towards the commercially sensible interpretation.

72.     The context, whether internal to the contract or otherwise, provides little assistance in this case. Beyond the words of the relevant clauses, there is the context of the other provisions of each of the 25 individual leases which are at issue. They are long leases, having a term of 99 years. The court in interpreting the leases can and should take into account the great difficulty in predicting economic circumstances in the distant future and ask itself whether the parties really intended to do so.

73.     The court also can and should take into account the economic circumstances which prevailed at the time each lease was entered into. It is clear from the table which Lord Carnwath has set out in para 100 of his judgment that between 1974 and 1988 the use of a 10% annual escalator achieved a result which was not far off the diminution of the value of money in the difficult economic circumstances that then prevailed. The future was and is unknown.

74.     Little else is known and I do not think that it is appropriate to speculate about the extent to which lessees would have known the terms of earlier leases. In my view there is much to be said for the practice, which Lord Drummond Young and other judges have encouraged in Scotland, of requiring parties to give notice in their

written pleadings both of the nature of the surrounding circumstances on which they rely and of their assertions as to the effect of those facts on the construction of the disputed words: *MRS Distribution Ltd v DS Smith (UK) Ltd* 2004 SLT 631, para 14. Such notice of relevant facts, which are either admitted or proved at trial, would avoid disputes on appeal such as whether the affected lessees were aware of the earlier leases.

75.    While there are infelicities in the language of the relevant clauses in some of the leases and no clear explanation of minor changes in drafting, I am not persuaded that the meaning of the language is open to question when full weight is given to the very limited factual matrix with which the courts have been presented in this case. We are invited to construe that which reads on a first consideration as a fixed service charge with an escalator to deal with future inflation, as a variable service charge which is subject to a cap to which the escalator applies. I find that very difficult. In my view there is nothing in the relevant context to support the construction of the clause as creating a cap, other than the view, which events have fully justified, that it was unwise of the lessees to agree to a fixed service charge with an escalator based on an assumption that the value of money would diminish by 10% per year.

76.    This conclusion is not a matter of reaching a clear view on the natural meaning of the words and then seeing if there are circumstances which displace that meaning. I accept Lord Clarke's formulation of the unitary process of construction, in *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900, para 21:

> "[T]he exercise of construction is essentially one unitary exercise in which the court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant. In doing so the court must have regard to all the relevant surrounding circumstances. If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other."

77.    This unitary exercise involves an iterative process by which each of the rival meanings is checked against the provisions of the contract and its commercial consequences are investigated (*Re Sigma Finance Corp* ([2009] UKSC 2) [2010] 1 All ER 571, para 12 per Lord Mance). But there must be a basis in the words used and the factual matrix for identifying a rival meaning. The role of the construct, the reasonable person, is to ascertain objectively, and with the benefit of the relevant background knowledge, the meaning of the words which the parties used. The construct is not there to re-write the parties' agreement because it was unwise to

gamble on future economic circumstances in a long term contract or because subsequent events have shown that the natural meaning of the words has produced a bad bargain for one side. The question for the court is not whether a reasonable and properly informed tenant would enter into such an undertaking. That would involve the possibility of re-writing the parties' bargain in the name of commercial good sense. In my view, Mr Morshead's formulation (para 67 above), on which his case depends, asks the court to re-write the parties' leases on this illegitimate basis.

78.     Nor is this a case in which the courts can identify and remedy a mistake by construction. Even if, contrary to my view, one concluded that there was a clear mistake in the parties' use of language, it is not clear what correction ought to be made. The court must be satisfied as to both the mistake and the nature of the correction: *Pink Floyd Music Ltd v EMI Records Ltd* [2010] EWCA Civ 1429, para 21 per Lord Neuberger MR. This is not an unusual case, such as *KPMG* (above) in which a mistake was obvious on the face of the contract and the precise nature of the correction had no effect on the outcome.

79.     My conclusion that the court does not have power to remedy these long term contracts so as to preserve the essential nature of the service charge in changed economic circumstances does not mean that the lessees' predicament is acceptable. If the parties cannot agree an amendment of the leases on a fair basis, the lessees will have to seek parliamentary intervention.

**LORD CARNWATH: (dissenting)**

*Preliminary comments*

80.     The contractual provisions in this case pose unusual interpretative challenges, which may call for unusual solutions. The leases with which we are concerned are of 25 chalets within Oxwich Leisure Park, in South Wales. It is an estate of 91 such chalets first developed in 1974. It is in an attractive holiday location close to Oxwich Beach on the Gower Peninsular. The challenges arise from a combination of factors. The intention, stated in the preamble to each lease, was that they should be "upon terms similar in all respects …". Yet we are faced with five forms of service charge provision, agreed over a period of some 20 years, the variations in which at first sight defy rational analysis. As interpreted by the Court of Appeal, they would lead over the course of the leases to supposedly "proportionate" service charges becoming wholly disproportionate to the costs of the relevant services, to extreme and arbitrary differences between the treatment of different groups of leases within the estate, and to the prospect in the foreseeable future of potentially catastrophic financial consequences for the lessees directly concerned.

81.    It does not help that, remarkably, the case has come to us with minimal evidence to explain the circumstances, or "factual matrix", in which these variations were agreed at different times, or even simply to add some context or colour to the bare legal and statistical analysis. That applies even to the most recent, and most surprising, of the transactions, effected as recently as 2000, and to which Mrs Arnold the present respondent was herself a party. Nor have we been told anything about how the clauses have been operated in practice at any time: for example how the estate has been managed and what costs incurred by the lessor, what service charge payments have been demanded of the various categories of lessee, and what has happened to any surplus.

82.    It is to be borne in mind also that in the early 1970s (when this clause was first devised) variable service charge provisions were a relatively "new and modern" addition to the law, prompted in part by rapidly increasing prices (see Mark Wonnacott, *The History of the Law of Landlord and Tenant in England and Wales* (2012) p 105; *Hyams v Titan Properties Ltd* (1972) 24 P & CR 359). Since then, it is said in the same history (*ibid* p 106), service charges have caused "more trouble between landlord and tenant than anything else", but they have in turn been regulated by statute to such an extent as to make it "all but impossible for an amateur landlord to recover (a service charge) in the event of a dispute". Whether or not that extreme view is justifiable, the need for special measures to safeguard the interests of lessees has been acknowledged by the legislature, which has thus for the most part relieved the courts of responsibility for developing a common law response to the problems.

83.    As I shall explain, these leases are a rare example of a category of residential lease which has slipped through the statutory net. That is of no direct relevance to the legal issues before us, save that it may help to explain why no ready solutions are to be found in the authorities. Furthermore, in so far as policy has a part to play in the development of the common law, it may be legitimate to seek guidance in the approaches adopted by the legislature in analogous contexts (see *Johnson v Unisys Ltd* [2003] 1 AC 518 para 37, per Lord Hoffmann).

*The leases*

84.    The first lease was granted on 26 October 1974. Of the others most were granted during the 1970s, and are not directly involved in the present dispute. The 25 with which we are concerned were granted (or varied) in the period from 1980 to 2000. Whenever granted, all the leases (with one immaterial exception) were expressed as being for terms of 99 years starting from 25 December 1974, and for a yearly rent of £10, increasing by £5 for every subsequent period of 21 years. Each lease began with a preamble which described the "lessor" as the owner of the land edged pink on the attached lay-out plan ("the estate") and stated:

"(2) It is intended to erect chalets on the estate and to grant leases upon terms similar in all respects to the present demise."

The lessees' covenants (clause 3) limited the use to that of a "holiday residence of a single family" from March to October (clause 3(12)).

85.     It seems from the examples before us that the earliest leases were granted in return for lessees' covenants to construct chalets in accordance with plans approved by the lessors (eg chalet 40 - lease dated 9 August 1977, clause 3(3)). Later chalets, presumably after erection of chalets by the lessor or others, were granted without such a covenant but for a premium (eg £13,000 for chalet 76 - lease dated 22 September 1980; £16,500 for chalet 96 –lease dated 1 July 1985). Otherwise no issue arises on the lessee's covenants other than clause 3(2) relating to service charges, to which I will come.

86.     The lessors in turn covenanted to provide various common services. They included constructing and maintaining the roads and footways (unless or until becoming maintainable at public expense), mowing lawns, maintaining a recreation ground, keeping fences and drains in good repair, issuing regulations, and arranging refuse collection and a regular patrol to discourage vandalism during the unoccupied period (clause 4). By clause 4(viii) the lessors covenanted:

"(viii) That the Leases granted by the Lessors of all other plots on or comprised in the estate shall contain covenants on the part of the Lessees thereof to observe the like obligations as are contained herein or obligations as similar thereto as the circumstances permit."

87.     Five leases have been selected for the purpose of showing the different versions of clause 3(2) relevant to the dispute. The principal difference is between the original leases, granted between 1974 and 1980, in which an initial service charge figure of £90 is increased by 10% every three years ("the triennial formula"), and later leases in which it is increased by 10% every year ("the annual formula"). The five versions were applied as follows (the selected lease in each case is indicated in brackets):

i)      *Version 1* (Chalet 40, dated 9 August 1977) - This was the "original version", applied to 70 leases granted mainly during the 1970s. The first was granted on 26 October 1974. The rest followed at a steady rate over the next six years at an average of just over 12 per year, until 1980 when seven were granted in this form, the last on 9 July 1980. Four of these leases (granted

between August 1977 and July 1980) were varied in 2000 to incorporate the annual formula (see version 5 below).

ii)     *Version 2* (Chalet 76, dated 22 September 1980) - This version applied to 14 leases granted between August 1980 and February 1983, the first being dated 11 August 1980.

iii)     *Version 3* (Chalet 96 dated 1 July 1985) - This applied to three leases granted between July 1985 and January 1988.

iv)     *Version 4* (Chalet 29 dated 22 March 1991) - This applied to four leases granted between December 1988 and March 1991.

v)     *Version 5* (Deed of variation dated 20 August 2000) - This applied to four leases previously subject to version 1.

The lessors for the first three selected leases in this list were Mr A and Mr B Lewis; for version 4, Mrs J Short; and for version 5, Mrs Arnold, the present respondent. In the result the triennial formula now applies to 66 leases on the estate, the annual formula to 25.

88.     I now set out the five clauses, emphasising the parts which are material to the dispute:

i)     *Version 1 – triennial (1974-1980)*

"To pay to the Lessors without any deductions in addition to the said rent *a proportionate part* of the expenses and outgoings incurred by the Lessors in the repair maintenance renewal and the provision of services hereinafter set out the yearly sum of Ninety Pounds and value added tax (if any) *for the first three years* of the term hereby granted increasing thereafter *by Ten Pounds per Hundred for every subsequent Three year period or part thereof.*"

ii)     *Version 2 – annual (1980-1983)*

"To pay to the Lessors without any deductions in addition to the said rent *as a proportionate part* of the expenses and outgoings incurred by the Lessors in the repair maintenance and renewal *of the facilities of the Estate and the provisions* of services hereinafter set out the yearly sum of Ninety pounds and Value Added tax (if any) *for the first year of the term* hereby granted increasing thereafter *by ten pounds per hundred for every subsequent year or part thereof*."

Apart from the change from the triennial to the annual 10% rate, other differences are the lengthening of the expression "… renewal and the provision of services" to "renewal of the facilities of the Estate and the provisions (*sic*) of services", and the inclusion of "as" before "a proportionate part".

iii)    *Version 3 – annual (1985-1988)*

"To pay to the Lessor without any deductions in addition to the said rent *a proportionate part* of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal and the provision of services hereinafter set out the yearly sum of Ninety Pounds and Value Added tax (if any) *for the first Year of the term hereby granted increasing thereafter by Ten Pounds per hundred for every subsequent year thereof*."

Changes from version 2 are: reversion to the expression "renewal and the provision of services", the omission of "as" before "a proportionate part", and the omission at the end of "or part (thereof)".

iv)    *Version 4 – annual subject to triennial proviso (1988-1991)*

"To pay to the Lessor without any deductions in addition to the said rent *a proportionate part* of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal and the provision of services hereinafter set out *for* the yearly sum of Ninety Pounds and value Added tax [if any] *for the first year of the term hereby granted increasing thereafter by Ten Pounds per Hundred for every subsequent year thereof*."

This version was subject to a proviso:

"Provided always and it is hereby expressly agreed that *whilst the term hereby created is vested in the said William Richard Short and the said Janice Short or the survivor of them* then maintenance shall be calculated as follows:-

To pay to the Lessor without any deduction in addition to the said rent *a proportionate part* of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal and the provision of services hereinafter set out the yearly sum of Ninety Pounds and value added tax (if any) *for the first three years of the term hereby granted increasing thereafter by Ten Pounds per Hundred for every subsequent three year period or part thereof.*"

The main clause is identical to version 3 save for the insertion of "for" before "the yearly sum". The proviso had the effect of substituting temporarily the triennial formula as in version 1, but that has ceased to be operative following the disposal of the lease by the Shorts.

v)    *Version 5 – varied from triennial to annual (2000)*

In four of the original 1970s version 1 leases (triennial), a Deed of Variation dated 20th August 2000, at the same time as revising the extent of land demised, substituted with effect from the beginning of the lease a new clause 3(2) in the form of version 2 (annual formula).

89.    Although we have been invited to consider all five versions, the most important for the purposes of interpretation are the first (October 1974) and the second (August 1980), and the circumstances surrounding them. The first is not directly in issue but set the drafting pattern, and provided the background to what followed. The second saw the first incorporation of the controversial annual formula. The later versions are of more limited relevance, save in so far as they throw some light on how the clauses were interpreted in practice, or help to illustrate the relative merits of the rival interpretations.

*The statutory provisions*

90.    By sections 18-19 of the Landlord and Tenant Act 1985, a "service charge" (as defined) payable by a tenant of a "dwelling", is limited to an amount which reflects the costs "reasonably incurred" in the provision of services. The controls originally applied only to "flats" but were extended by amendment in 1987 to

include "dwellings" as defined (Landlord and Tenant Act 1987 section 60). It is not in dispute, in these proceedings at least, that the chalets are "dwellings" for this purpose. The issue is whether the charges are "service charges" as defined by section 18(1):

> "'service charge' means an amount payable by the tenant of a dwelling as part of or in addition to the rent –
>
>> (a) which is payable, directly or indirectly, for services, repairs, maintenance, improvements or insurance or the landlord's costs of management, and
>>
>> (b) the whole or part of which varies or may vary according to the relevant costs."

91.    The lessees submit that properly interpreted the clause imposes an obligation to pay a "proportionate part" of the costs incurred, subject only to an upper limit or cap determined by reference to the formula in the second part of the clause. On this footing it is an amount which "varies or may vary according to the relevant costs" (section 18(1)(b)). The respondent submits that charge is outside the statutory definition because the annual amount is fixed by that formula, without any reference to the costs actually incurred by the lessor. If the lessees are right, the amount of the charge is limited to the amounts reasonably incurred. If the lessor is right, there is no statutory limit or other control.

92.    Other safeguards for lessees were introduced by the 1987 Act, but none covers the present situation. Thus it introduced a new right for any party to a long lease (not only the lessee) of a "flat" to apply to the court (now the first-tier tribunal) for an order varying a lease on the grounds that it "fails to make satisfactory provision" in respect of various matters, one being the computation of service charges, but this did not apply to other forms of dwelling such as in this case. There is a more general provision, for application by "a majority of parties" for variation of a number of leases under a single lessor (section 75), but again it applies only to flats. On the other hand, section 40, which allows similar applications for variation of insurance provisions, applies to "dwellings" in general. It is difficult to detect any legislative purposes for these distinctions. The present case illustrates the potentially unfortunate consequences for parties to those rare forms of residential lease which for no apparent reason fall outside any of the protections given by the legislative scheme.

93.    For completeness, I note also that no issue arises in the present proceedings as to the possible application of other more general protections relating to unfair contractual terms. Sections 2 to 4 of the Unfair Contract Terms Act 1977 do not in any event apply to contracts relating to the creation or transfer of interests in land (Schedule 1, paragraph 1(b)). No such limitation appears in the Unfair Terms in Consumer Contracts Regulations 1999 (SI 1999/2083), which give effect in this country to EC Directive 93/13/EEC of 5 April 1993 on unfair terms in consumer contracts. The Directive was first transposed in 1994 Regulations (SI 1994/3159) which were later replaced by the 1999 Regulations. The 1994 Regulations came into effect on 1 July 1995, and therefore would not it seems apply to contracts concluded before that date (regulation 1; Chitty on Contracts para 37-087). Accordingly, it could be relevant if at all only to version 5 (2000).

*The proceedings*

94.    We know very little about the background to the present dispute. It first reached the courts in September 2011 in the form of an application by the appellant lessees to the county court for pre-action disclosure. The application was said to be in anticipation of a representative application to resolve an ambiguity in the service charge clause, which "appears to result in a variable service charge but on the other hand create a fixed service charge". It also spoke of the lessees' concerns that the sums collected by way of service charge were exceeding the amount of "legitimate" expenditure by "such a substantial amount as to produce a credit balance that should be held in a service charge trust account"; and also that the lessor had disposed of the former clubhouse for the park to provide accommodation for her daughter. They sought disclosure of information about the sums collected as service charge and the amounts expended since 2005.

95.    An order for disclosure was made on 20 September 2011, but was quickly met by an application by the lessor for declaratory relief relating to the interpretation of the service charge clause, following which the disclosure order was stayed pending the determination of these proceedings. The application sought in particular a declaration that on the true interpretation of the service charge clause, the sum payable was not a "service charge" within the meaning of section 18 of the Landlord and Tenant Act 1985. In the county court, HHJ Jarman QC determined the issue in favour of the lessees. But his decision was reversed on appeal to Morgan J, whose judgment was upheld by the Court of Appeal (Richards, Davis and Lloyd Jones LJJ). The lessees appeal to this court with permission granted by the court itself.

96.    The issue between the parties has throughout been very narrow: that is, whether the figure of £90 as inflated is to be read as a fixed amount, or as an upper limit or cap. That in turn depends on whether it is permissible and appropriate to

read in such words as "limited to" (Judge Jarman's words) or "up to" before the reference to "ninety pounds". As Mr Morshead submits in his printed case:

> "There is no need to undertake an elaborate drafting exercise. The necessary effect can be achieved by implying the words 'up to' before the words 'Ninety pounds'; and, in versions 2 and 5, deleting the word 'as'."

97.    Giving the single judgment in the Court of Appeal, Davis LJ rejected that approach, holding in substantial agreement with Morgan J that the addition of these words -

> "… would involve subverting the proper process of construction of the language actually used and would in truth involve the court rewriting the bargain the parties have made." (para 45)

He rejected the argument that this interpretation would consign the first part of the clause to "mere surplusage". Its function was to identify "the character of the payment to be made". The words "a proportionate part" were apt for a situation where "other lessees also are contributing to the overall service charge, which is in consequence to be apportioned between them". Although he accepted that the word "incurred" was "the language of actual outlay", it was "entirely explicable when one appreciates that this part of the sub-clause identifies the character of the payment being made" (paras 48-49). He also pointed to other difficulties in Mr Morshead's interpretation, in particular the problems of calculating a "proportionate" amount, and the lack of any protection for the lessor if the inflation regularly exceeded 10% (para 53).

*Inflation calculations*

98.    The judge was shown without objection two sets of tables, one showing the annual Retail Price Index (RPI) from 1948 to 2012, taken from figures published by the Office of National Statistics ("the inflation table"); the other, the effect of the increases of service charge compounded over the period of the leases in accordance with respectively the annual and the triennial formula ("the compounding table"). As I understand it, the information in these tables is accepted as forming part of the factual matrix against which it is appropriate to judge the parties' contractual intentions at the relevant dates. There are some minor but apparently immaterial differences between the hard-copy and electronic versions of the compounding table; I have used the latter.

99.     It is helpful to focus on the rates which would have been in immediate contemplation of the parties at dates when each of the five versions was first agreed: that is, 26 October 1974 (the date of the first lease on the estate incorporating version 1, rather than the 1977 lease which was used as an example at the hearing); 11 August 1980 (the first version 2 lease); 1 July 1985 (version 3); 1 December 1988 (the first version 4 lease); 20 August 2000 (version 5). The table below includes also the rate in contemplation at the date of the county court hearing (June 2012), and in the last year of the lease (2072). The figures in the compounding table are given for 25 December 1974, the commencement of the lease period, and for the same date in each subsequent year. For illustrative purposes I have taken the rate for the year commencing after each of the identified dates (ie 25 December next following each such date), which would have been the rate applicable to the first complete year under each new lease.

100.    The resulting figures (rounded) for annual service charges at each such years:

|      | Triennial | Annual    | [Actual inflation] |
|------|-----------|-----------|--------------------|
| 1974 | £90       | £90       | £90                |
| 1980 | £109      | £159      | £219               |
| 1985 | £132      | £257      | £310               |
| 1988 | £145      | £342      | £350               |
| 2000 | £212      | £1,073    | £557               |
| 2012 | £311      | £3,366    | £794               |
| 2072 | £1,900    | £1,025,004 | N/A               |

[The last column shows for purposes of comparison the equivalent figures implied by actual inflation, arrived at by increasing the initial £90 by the recorded price increases over the period from 1974 to each of the selected years. Though not in evidence before us, those figures have been taken from the "inflation calculator" on the Bank of England's website, and are used for illustration only.]

101.    The rate of price increase during the 1970s can also be contrasted with the pattern in the previous and subsequent decades. Average annual inflation in the 1950s and 1960s was of the order of 3.5-4%. (It had averaged 2.5% in the 50 years from 1900 to 1950.) It then rose sharply to 6.4% in 1970 and 9.3% in 1973, followed by a much steeper rise to 16% in 1974 and an annual peak of 24.2% in 1975. It dropped to 8.3% in 1978 before rising again to 16% in 1980. The annual rate fell to 12% in 1981, and then to around 5-6% in the period 1983-85 (immediately before version 3), 4-5% in 1986-1988 (before version 4), and 3% in 2000 (version 5). It has remained at, or below, that low level ever since.

102.    The compounding table enables comparisons to be drawn between the contributions made respectively by the 66 "triennial" and the 25 "annual" leases over different periods, if the lessor is correct. For example, on the 1988 figures, the triennial leases would have contributed a total of £8,712 (66 x £132), slightly more than the total contribution of the annual leases (£8,550 = 25 x £342). On the basis of the figures in the third column, the combined total (£17,262) was still much lower than the figure required to keep pace with actual inflation since 1974 (91 x £350 = £31,850). The figures at or about the time of the hearing show a very different picture. On the 2012 figures the triennial leases would have been contributing a total of £18,612 (66 x £282) compared to £84,150 (25 x £3,366) contributed by the annual leases. The total amount (£102,762) was now substantially more than that required to keep pace with inflation (91 x £794 = £72,254). (These figures differ slightly from those in the submitted tables due to rounding.)

103.    The table also shows the amounts that, on the lessor's interpretation, would be payable under each formula over the whole period from 24 December 2013 to the end of the term (2072). The total amount payable during that period under each "annual" lease would be £11,238,016, compared to £53,386 payable for the same period under each "triennial" lease.

*Inflation and the factual matrix*

104.    There is no difficulty in principle in taking account of the calculations in the compounding table, which require no outside information, and could have been carried out by the parties (or a reasonable observer) at any of the relevant dates. On the Court of Appeal's interpretation, the figures show increases which appear extraordinary in themselves, in the light of modern conditions of low inflation. No less importantly, they result in dramatically increasing, and ultimately grotesque, differences between the amounts payable by the two different groups of lessees on the same estate. This consequence could and should have been anticipated at the time, certainly by the lessors who were parties to both groups of leases and responsible for maintaining reasonable equivalence between them.

105.    The use to be made of the historic inflation figures raises rather different questions. By agreeing to their use, the parties impliedly ask us to assume that the figures up to and including those for each of the relevant years (or the then most recently published figures) would been have been known to the parties at the time, and therefore must be taken as part of the relevant factual matrix. This is no doubt a reasonable working assumption to indicate the general trend as known to the public.

106.    It is however highly artificial  to be asked to take account of the bare statistics, without reference to the political and economic circumstances which surrounded

them, so far as they were common knowledge at the time. We are not required to assume total ignorance of current events, in the parties or their reasonable observers. It would not have been difficult to obtain information about contemporary perceptions of the direction of inflation, whether from official reports of the time, or from reports in the South Wales press. Even without such evidence, we are entitled in my view to assume knowledge of some of the key events: for example, of the dramatic rise in oil prices at the end of 1973 and again in 1979, each followed by a sharp increase in inflation in the following year; and also of the election in 1979 of a new Conservative government committed to controlling inflation. We are not required to assume that predictions about future inflation were made in a vacuum.

107.    We are also entitled, as part of the factual matrix, to take account of the nature and circumstances of the estate, as they would have been perceived by potential purchasers. It was planned as a holiday estate close to a popular beach. Potential buyers were likely to come from people already familiar with the area from previous visits with their families. It is fair to assume also that they would have regarded the acquisition of a holiday chalet, not simply as source of pleasure, but also as a long term investment for them and their families. They would have been keen to avoid undue financial burden or risk. It would be strange if they had not taken the opportunity to talk to existing residents about their own experiences of the estate and its management, and of the associated costs. This will become relevant when considering what knowledge of previous terms should be attributed to the first version 2 lessees.

*Approach to interpretation*

108.    In an unusual case such as this, little direct help is to be gained from authorities on other contracts in other contexts. As Tolstoy said of unhappy families, every ill-drafted contract is ill-drafted "in its own way". However, the authorities provide guidance as to the interpretative tools available for the task. The general principles are now authoritatively drawn together in an important passage in the judgment of Lord Clarke JSC in *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900, paras 14-30. As that passage shows, there is often a tension between, on the one hand, the principle that the parties' common intentions should be derived from the words they used, and on the other the need if possible to avoid a nonsensical result.

109.    The former is evident, as Lord Clarke emphasised, in the rule that "where the parties have used unambiguous language, the court must apply it" (para 23). However, in view of the importance attached by others to the so-called "natural meaning" of clause 3(2), it is important to note that Lord Clarke (paras 20-23) specifically rejected Patten LJ's proposition that -

> "… unless the most natural meaning of the words produces a result so extreme as to suggest that it was unintended, the court must give effect to that meaning."

In Lord Clarke's view it was only if the words used by the parties were "unambiguous" that the court had no choice in the matter.

110.    He illustrated the other side of the coin by quotations from Lord Reid in *Wickman Machine Tools Sales Ltd v L Schuler AG* [1974] AC 235, 251:

> "The fact that a particular construction leads to a very unreasonable result must be a relevant consideration. The more unreasonable the result, the more unlikely it is that the parties can have intended it, and if they do intend it the more necessary it is that they shall make that intention abundantly clear."

> and Lord Diplock in *Antaios Cia Naviera SA v Salen Rederierna AB (The Antaios)* [1985] AC 191, 201:

> "If detailed and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business common sense it must yield to business common sense."

As a rider to the last quotation, Lord Clarke cited the cautionary words of Hoffmann LJ (*Co-operative Wholesale Society Ltd v National Westminster Bank plc* [1995] 1 EGLR 97, 99):

> "This robust declaration does not, however, mean that one can rewrite the language which the parties have used in order to make the contract conform to business common sense. But language is a very flexible instrument and, if it is capable of more than one construction, one chooses that which seems most likely to give effect to the commercial purpose of the agreement."

111.    I agree with Mr Morshead (questioning in this respect the approach of Davis LJ, para 35) that it may be unnecessary and unhelpful to draw sharp distinctions between problems of ambiguity and of mistake, or between the different techniques available to resolve them. In *Chartbrook Ltd v Persimmon Homes Ltd* [2009] 1 AC 1101, para 23, Lord Hoffmann cited with approval a passage of my own (in *KPMG LLP v Network Rail Infrastructure Ltd* [2007] Bus LR 1336, para 50) where I

discussed the role of what is sometimes called "interpretation by construction". I criticised the tendency to deal separately with "correction of mistakes" and "construing the paragraph 'as it stands'", as though they were distinct exercises, rather than as "aspects of the single task of interpreting the agreement in its context, in order to get as close as possible to the meaning which the parties intended". Lord Hoffmann added:

> "What is clear from these cases is that there is not, so to speak, a limit to the amount of red ink or verbal rearrangement or correction which the court is allowed. All that is required is that it should be clear that something has gone wrong with the language and that it should be clear what a reasonable person would have understood the parties to have meant." (para 25)

112. Another permissible route to the same end is by the implication of terms "necessary to give business efficacy to the contract". I refer again to Lord Hoffmann's words, this time in *Attorney General of Belize v Belize Telecom Ltd* [2009] UKPC 10, [2009] 1 WLR 1988, para 22, explaining the "two important points" underlined by that formulation:

> "The first, conveyed by the use of the word 'business', is that in considering what the instrument would have meant to a reasonable person who had knowledge of the relevant background, one assumes the notional reader will take into account the practical consequences of deciding that it means one thing or the other. In the case of an instrument such as a commercial contract, he will consider whether a different construction would frustrate the apparent business purpose of the parties. … The second, conveyed by the use of the word 'necessary', is that it is not enough for a court to consider that the implied term expresses what it would have been reasonable for the parties to agree to. It must be satisfied that it is what the contract actually means."

113. *Aberdeen City Council v Stewart Milne Group Ltd* [2011] UKSC 56 is a useful recent illustration in this court of how these various principles may be deployed, to enable the court to achieve a commercially sensible result in the face of apparently intractable language. A contract for the sale of development land gave the council the right to an uplift (described as "the profit share") in certain defined circumstances, one being the sale of the property by the purchaser. The issue was the calculation of the profit share, which the contract defined as a specified percentage of the "estimated profit" (defined by reference to "open market value") or "the gross sale proceeds". The issue was how the definition should be applied in the case of a sale by the purchaser to an associated party at an undervalue. The court

held in agreement with the lower courts that, in that event, notwithstanding the apparently unqualified reference to gross sale proceeds, the calculation should be based on open market value.

114.    In a concurring judgment, with which all the members of the court agreed, Lord Clarke referred to his own judgment in *Rainy Sky* as indicating the "ultimate aim", that is:

> "… to determine what the parties meant by the language used, which involves ascertaining what a reasonable person would have understood the parties to have meant; the relevant reasonable person being one who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract." (para 28)

As he pointed out, "on the face of it" the reference in the contract to the gross sale proceeds was a reference to the "actual sale proceeds" received by the appellants. It was not easy to conclude "as a matter of language" that the parties meant, not the actual sale proceeds, but the amount the appellants would have received on an arm's length sale at market value of the property; nor was it easy to conclude that the parties "must have intended" the language to have that meaning. He referred to the comment of Baroness Hale in the course of the argument that:

> "… unlike *Rainy Sky*, this is not a case in where there are two alternative available constructions of the language used. It is rather a case in which, notwithstanding the language used, the parties must have intended that, in the event of an on sale, the appellants would pay the respondents the appropriate share of the proceeds of sale on the assumption that the on sale was at a market price."

He thought the problem should be solved by implying a term to the effect that, in the event of a sale which was not at arm's length in the open market, an open market valuation should be used. As he explained:

> "If the officious bystander had been asked whether such a term should be implied, he or she would have said "of course". Put another way, such a term is necessary to make the contract work or to give it business efficacy."

He preferred the use of an implied term to "a process of interpretation", although "the result is of course the same". (paras 30-33)

115.   As Mr Morshead observes, the result in *Aberdeen City* could probably have been explained equally as a case of correction by interpretation. In any event, this example provides support for his proposition that, where an ordinary reading of the contractual words produces commercial nonsense, the court will do its utmost to find a way to substitute a more likely alternative, using whichever interpretative technique is most appropriate to the particular task.

*Residential leases*

116.   Long residential leases are an exceptional species of contract, and as such may pose their own interpretative problems. In no other context is a private individual expected to enter into a financial commitment extending for the rest of his or her life, and probably beyond. The original lessee may have been unaware that (at least under contracts before the Landlord and Tenant (Covenants) Act 1995) he was taking on a personal legal commitment which could continue even after he had disposed of any interest in the property itself (*Norwich Union Life Insurance Society v Low Profile Fashions Ltd* (1991) 64 P & CR 187). So far as it relates only to ground rent, the commitment is unlikely to be burdensome, and it may be readily accepted as a necessary incident of a valuable property interest. Service charges are a different matter, since the amounts may be substantial, and, apart from statute, the lessee is likely to have no direct control over the lessor's expenditure.

117.   Where the lease is for one of a number of units in a managed building or estate, provision has to be made for expenditure by the lessor on common services and maintenance, and for the cost to be shared between the lessees. Substantial equivalence of rights and obligations under such leases is normally important for all parties, both for the good management of the building or estate, and for harmony among those living within it. Equivalence can only be achieved by the lessor, who alone is party to them all. After the first lease has been negotiated and granted, later incoming lessees will usually have little choice in practice but to accept the covenants in the form dictated by the lessor. Their reasonable expectation will be that all have been granted in like terms, both in terms of covenants and in terms of sharing financial responsibility for services, with a view to ensuring fair distribution of the overall cost. Often that expectation and the lessor's responsibility for achieving it, will be expressed in the terms of the lease (as here, in the preamble and clause 4(viii)).

118.   Mr Daiches submits, correctly in my view, that the effect of such words is to create "a letting scheme, or local law, of negative obligations mutually enforceable in equity between all occupiers of the properties on the estate". He cites authorities such as *In re Dolphin's Conveyance* [1970] Ch 654, which related to an estate of freehold properties. Examples of the same principle as applied to leasehold developments are given in the textbooks (see *Megarry & Wade Law of Real*

*Property* 8th ed (2012), para 32-079). As I understand his argument, he asks us to infer that a clause such as 4(viii) has to "look to the future not the past", and that accordingly it is not to be construed as containing any implied representation as to previous leases. I cannot agree. In my view, the existence of such a scheme reinforces the view that each lessee has a legitimate interest in the form and content of all leases within the development, whenever granted. Even if, as in clause 4(viii), the lessor's responsibility is expressed as an obligation in respect of future leases, it should in its context (including the preamble) be read also as containing an implied representation that leases previously granted are also in substantially the same form.

119.    Provision for services is normally dealt with by reciprocal covenants, positive in form: by the lessor to arrange and pay for the carrying out of the necessary services, and by the lessees to pay their respective shares of the costs so incurred. There is no common format for such service charge covenants, and they can and do vary greatly between different buildings or estates. Unlike negative covenants, it seems that they are not mutually enforceable as such, but the expectation is that they will have been drafted to ensure that the lessees' financial obligations are shared fairly between them all. Again this is in the interests of good management and harmony within the development for both lessor and lessees. Differences may be necessary to cater for differences in size of the individual units or other features, but otherwise they will normally be in a standard form in all the leases.

120.    In the courts below there was some discussion of the "restrictive" approach said to be appropriate to service charge provisions (*McHale v Earl Cadogan* [2010] 1 EGLR 51, para 17 per Rix LJ). I agree, if by this it is meant that the court should lean towards an interpretation which limits such clauses to their intended purpose of securing fair distribution between the lessees of the reasonable cost of shared services.

121.    Support for this approach is to be found also in the disparity in practice between the potential remedies available to each party for breach by the other. A lessor who fails to maintain services at the level thought appropriate by the lessees is in principle open to enforcement action in court. But the practical effect of such action for the lessees is uncertain in the absence of a precise definition of what he is required to provide. If there has been a complete breakdown of services, they may be able to obtain injunctive relief or appointment of their own manager. In less extreme circumstances the form of remedy or the extent of any damages may be difficult to define.

122.    By contrast, the lessor's remedies for breach of the service charge clause are all too clear. In the Court of Appeal, Davis LJ was apparently content to assume that the charges might "*in extremis*, force some of these lessees into surrender or forfeiture" (para 57). However, if by this he intended to imply that either escape-

route would be available to the lessees other than by agreement with the lessors, he would have been wrong. Apart from any special provision, the lessee's obligation, once the service charge has been determined, will have crystallised into a contractual obligation to pay a fixed amount. That is in principle enforceable by a simple action through the courts, and ultimately by forfeiture and bankruptcy. The legislature intervened long ago to provide some statutory relief against forfeiture (Law of Property Act 1925, section 146). But that provides no protection against enforcement of the personal liability to pay the contractual amount.

123.    As already explained, the scope for abuse has been recognised by the legislature in the special provision made for controlling "variable" charges as defined in the 1987 Act. Fixed service charges do not normally give rise to the same risk of abuse. The lessee is given the certainty of a fixed financial commitment, and the lessor has the advantage of simplified administration. Provision is needed to deal with price inflation. But if this is fixed by reference to an independent formula, such as an official inflation index, there is no significant risk to either party. The approach adopted in this case seems highly unusual, if not unique. Even where the legislature has not intervened, the courts have a responsibility in my view to ensure that such clauses are interpreted as far as possible not only to give effect to their intended purpose, but also to guard against unfair and unintended burdens being placed on the lessees.

*Interpretation of clause 3(2)*

124.    Against that general background, I come to consider the construction of clause 3(2) in its various versions. At first sight, the main principles seem reasonably clear:

    i)      The intention was that all the leases should be on terms as "similar … as the circumstances permit", and that it was the lessors' responsibility to achieve such equivalence (necessarily, since only they would be party to all of them) (preamble (2); clause 4(8))

    ii)     The commercial purpose of clause 3(2) was to enable the lessor to recover from the lessees the costs incurred by him in maintaining the estate on their behalf, the payment by each lessee being intended to represent a "proportionate" part of the expenses so incurred.

    iii)    Although there was a general description of the services which the lessor was contractually obliged to provide, the extent of those services was not precisely defined by the lessors' covenants (clause 4),

which left to them a large measure of discretion as to the amounts to be spent in practice.

In themselves, these features are typical and uncontroversial. It is at the next stage, in giving effect to those principles, that the clause becomes problematic.

125.   It is clear to my mind that something has gone wrong with the drafting, at least in the original wording, as it appeared in the 1974 version, and (apart from the change of inflation formula) was repeated in 1985 and 1988. The clause imposes an obligation to pay, but contains two different descriptions of the payable amount: by reference, first, to a "proportionate part of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal and the provision of services …", and secondly, to a "yearly sum" determined by reference to a fixed formula. There are two linguistic problems. First, there is no grammatical connection to show the relationship between the two descriptions. Secondly, they are mutually inconsistent. A figure can be determined as a proportionate part of some other variable amount, or it can be a yearly sum, fixed by a predetermined formula; but it cannot be both. There is an inherent ambiguity which needs to be resolved.

126.   In the Court of Appeal Davis LJ thought that the first part of the clause was designed simply to identify "the character of the payment to be made" (para 48). I find that unconvincing. If the intention was to indicate no more than the purpose of the payment, one would have expected some such general words as "by way of contribution to the services", not a detailed and specific formula. Conversely, if the character of the contributions was to be that of payments determined by reference to a fixed formula and nothing else, the description in the first part was neither accurate nor useful. Proportionality had no part to play in such a fixed calculation, nor any relation to reality after 1980 if the court's interpretation is correct. Nor is it easy to explain the purpose of the specific reference to "expenses and outgoings incurred" by the lessor on a defined range of services, unless it was intended to play some material part in the calculation.

127.   At this point it is convenient to note the minor differences of wording in some later versions. A change such as the omission of the words "or part …" in version 3 can readily be dismissed as a copying error. Others give more room for argument. It would be tempting to read more significance into the word "as", which appears for the first time in the important 1980 version 2. Grammatically, it may be said (with Davis LJ – para 54), the insertion of the word "as" implies that the operative text is in the second part of the clause, the first part being merely descriptive. There are two difficulties with that explanation. First, for the reasons I have given, neither the reference to proportionality nor the detail of the formula in the first part is compatible with that limited sense. Secondly, there are linguistic indications the other way. The word "as" did not survive into any of the later versions, except the

2000 deed of variation (version 5), which seems to have been copied directly from version 2. Version 2 itself also saw the introduction of a new reference to expenditure on "the renewal of the facilities of the estate", which is hard to explain if the detail of the first part had no practical significance. Version 4 added to the mystery by adopting a different connecting word "for", this time in front of the second description ("*for* the yearly sum of ninety pounds"). That is even more difficult to interpret, but if anything it seems to imply that it was the first part of the clause which was the primary description. In the end I conclude that no persuasive guidance, one way or the other, is to be derived from these minor changes.

128.    There are only two realistic possibilities for the second part of the clause, which are those respectively adopted by Judge Jarman, on the one hand, and Morgan J and the Court of Appeal, on the other. Either it is a fixed amount which in effect supplants any test of proportionality under the first part; or it is no more than an upper limit to the assessment of a proportionate amount. I reject the theoretical alternative that it was designed as a lower limit for the benefit of the lessors. That interpretation would have made no sense at all in relation to version 1, agreed at a time when the possibility of inflation falling *below* 3% would have occurred to no-one as a risk requiring special provision, particularly for the lessor who unlike the lessees was in control the level of his own expenditure. There is thus no doubt that this part of the clause was originally designed for the benefit of the lessees, and I see no reason to think that its purpose had radically changed by the time of version 2.

129.    Davis LJ was concerned as to the practicalities of determining the "proportionate" amount of the qualifying expenditure. Morgan J (para 51) described it as "workable but not ideal". I do not see any great difficulty. The relevant items are precisely defined. The lessor has simply to demonstrate (to the lessees and if necessary to the court) that the expenditure has been properly incurred on those items, and that it has been divided "proportionately" between the lessees.

130.    I note that in *Hyams v Titan Properties* (see para 82 above), which was decided two years before the first of these leases, the court had to fix the terms of a new business lease under the Landlord and Tenant Act 1954 taking account of rapid price inflation. Buckley LJ recorded that "the modern practice generally accepted … was to make service charges payable on a proportional basis". In that case (where there were nine units) the court approved a clause "requiring the tenant to pay one-ninth of the cost of providing the services under the covenant in addition to the rent payable under the lease". There was no suggestion that this formulation was defective in the absence of specific machinery to settle the figure. The first half of clause 3(2) follows the same model, allowing for the fact that the precise number of units was probably not known at the outset, so that it was not possible to put in a specific fraction. The use of the same figure of £90 in all the leases (whatever its precise purpose) would have been a strong indication that equal shares were intended.

131.   I turn therefore to consider the two alternatives as applied to each of the five versions in its own context. In the words of the authorities, we must inquire "what a reasonable person would have understood the parties to have meant", that person being one who had "all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract", and who would have also taken into account "the practical consequences of deciding that it means one thing or the other". Where necessary the reasonable observer can be invited notionally to take on the more active role of "officious bystander", in order to interrogate the parties as to their common intentions.

*The five versions in context*

*Version 1 (October 1974 - July 1980)*

132.   It is impossible to do more than guess at the common intentions of the parties to the first lease in relation to this part of clause 3(2). It is hard at first sight to see any rational basis for selecting a rate of 10% every three years, at a time when annual inflation was running at around twice that rate. At little over 3% per year, it was a little low even by reference to the inflation of the two previous decades, although it was in line with the historic long term average.

133.   In such inflationary conditions, there is no difficulty in understanding why it was acceptable to the lessees. It is the lessor's thinking which needs explaining. We know nothing of the first lessors (the Lewises). They may perhaps have been builders, themselves involved in the development of the estate, and so more able to absorb the initial costs of maintenance in their other expenditure. If so, to make the estate attractive to purchasers, they may have gambled on being able to bear the price increases during the early years, in the expectation of inflation falling to more reasonable levels in the near future. (Comparable optimism seems to have been reflected in their view of ground rent, which was to be increased by only 50% every 21 years.)

134.   In any event, their apparent generosity would be more explicable if, as may have been the case, the figure of £90 was based not simply on an estimate of current costs, but gave a reasonable margin for anticipated inflation in the short term. That possibility is borne out to some extent by the fact that the triennial formula survived, apparently without question, for six years of high inflation. If so, it is certainly possible that, even during that period, it was treated as a cap, the contributions being based on a share of actual expenditure from year to year. (Unlike Morgan J - para 32 - I see no basis, in the absence of evidence, for any positive inference that service charges were paid, then or later, "in accordance with the lessor's interpretation".)

135.   Since version 1 is not in issue, it is unnecessary to decide between the alternative interpretations at this stage. Version 1 does however provide the necessary background to the contentious versions which came later. It makes clear that the inclusion of a specific figure for inflation was designed originally for the benefit of the lessees not the lessor. It may also enable one to discount any intention on the part of the Lewises at least to take unfair advantage of their lessees.

*Version 2 (August 1980 – February 1983)*

136.   As I have said, the fact that it took the Lewises six years to react to the apparent disparity between the triennial formula and actual inflation suggests that, one way or another, they were able to maintain expenditure within the initial figure for some time. The change of heart may well have been triggered by the renewed jump in inflation in 1979, which reached its peak in summer 1980, although it is notable that the last version 1 lease was granted as late as July 1980. If the Court of Appeal is right, there was then in August 1980 a dramatic change in their thinking, from the exaggerated optimism which had prevailed over the last six years, to such abject pessimism about the future of the economy that they thought it reasonable to assume continuing 10% inflation for the remaining 93 years of the leases, and to expect their purchasers to share that assumption.

137.   If that is the correct interpretation, they would have been contemplating an impossibility, even for economists. In *Pennant Hills Restaurants Pty Ltd v Barrell Insurances Pty Ltd* [1981] HCA 3, (1981) 145 CLR 625, 639 Gibbs J spoke of the reasons for making no allowance for inflation in awards for future loss:

> "It is unreasonable to suppose that any economist will be able to predict with accuracy the nature and extent of changes in the purchasing power of money during a period extending for several decades ahead. Whether inflation increases or is brought under control depends upon political and economic events and decisions at home and abroad as to whose occurrence it is not possible to do more than conjecture. Predictions as to the economic future in 30 years time may perhaps be made by a soothsayer but expert evidence cannot rationally be given on such a subject." (cited with approval by Lord Hope in *Helmot v Simon* [2012] UKPC 5, para 45)

If that is unreasonable for an economist, how much less likely is it as an explanation of the thinking of the lessors or lessees of these modest holiday chalets in August 1980?

138.    The improbability becomes even more striking when one compares the figures for the new and old groups of lessees. It is true that, even as a cap, the annual formula would result in the new lessees paying more initially than the existing lessees (£159 in 1980, compared to £109 under version 1). But over the period of the lease the differences become grotesque. On the Court of Appeal's interpretation the parties were accepting, as a mathematical certainty, that by the end of the lease period each lessee's service charges would have totalled over £11m, more than 200 times the amounts payable by the existing lessees. Put the other way, if the assumed prediction were correct, the lessees of more than two-thirds of the chalets on the estate would by then have contributed 200 times less than the figure necessary for the lessors' expenditure to keep pace with inflation. Even from the lessors' point of view, that scenario implied commercial disaster.

139.    Whatever the lessors' state of mind, it beggars belief that the new lessees would have been content to proceed on that basis. It is particularly improbable for a person of ordinary means investing perhaps limited savings in a holiday home. It is simply inconceivable that such a potential purchaser would have been willing to accept a prediction of continuing inflation at that level for over 90 years, and to take that as a basis for undertaking a contractual obligation lasting for the rest of his life and beyond without any escape route.

140.    There has been some discussion before us as to whether the lessees would have known of the comparable clauses in the previous leases. Mr Daiches asks us (and through us the reasonable observer) to proceed on the basis that the new lessees in 1980 would have been unaware of the triennial formula used in the previous leases, and says that is the basis on which the case has been approached hitherto. I am unwilling to make that assumption, which I regard as wholly unrealistic. It is not on any view an assumption that can be made in respect of versions 4 and 5, where the change was apparent on the face of the documents (see below).

141.    Even without direct information in the documents, a potential purchaser in 1980 could be expected to have wanted to satisfy himself about the existing arrangements within the estate, and would have had a legitimate interest in doing so. Absent bad faith, it is hard to see any reason why the lessor would have wished or felt able to hide information about the previous leases. In any event, it could readily have been discovered by talking to other lessees within the estate. In Lord Clarke's words, it would have been "background knowledge … reasonably … available to the parties" in the circumstances of the contract. I would accordingly approach the interpretation of version 2 on the assumption that both parties (like their reasonable observer) would have been aware of the proposed change from the triennial formula, and that they are to be taken as having accepted the change for what they regarded as good reasons.

142.   On the basis that it was intended as a cap, the lessees' thinking is understandable. They would have needed persuasion to take the leases on less generous terms than their predecessors. On the other hand, they would have understood that any assumptions made in 1974 about the prospects of an early fall in inflation had been falsified by events. They would have understood also that the lessor would find it difficult to support reasonable expenditure on services without some adjustment. We do not of course know what if anything may have been said about increasing future contributions from the existing lessees to ensure fair distribution. But from their own point of view, with current inflation at or around 20%, substitution of a limit of ten per cent might have been seen by them as an acceptable compromise for the immediate future, while allowing for a return to more normal levels in the medium term. That may not be a complete explanation, but it is at least plausible, unlike the alternative.

143.   As in the *Aberdeen Council* case, we can imagine the responses of lessor and lessee to questioning by the officious bystander as to the purpose of the clause. Did they really intend to enter into a contract which had the extraordinary long term implications outlined in the previous paragraphs? I find it hard to conceive of any other response than "of course not; it is a cap not a fixed amount". The alternative would have seemed absurd and unreasonable to both, as much to the lessor as to the lessees.

144.   The Court of Appeal thought they were applying the "natural meaning" of the clause, and that it was not the task of the court to relieve the lessees of a "bad bargain" entered into in different circumstances, albeit possibly without having done their arithmetic. For the reasons I have given, I am not convinced that the "natural meaning" is that adopted by the Court of Appeal, at least once one discounts the inclusion of the word "as" in version 2, or that, even if it is, it relieves the court of the obligation to seek a sensible result. On the other side of the coin, I agree with Mr Morshead that "bad bargain" is a gross understatement of the implications of their interpretation, which as he says were from the outset "not only stark but disastrous". Nor do I see any reason to assume that these contracting parties, treated (in Lord Hoffmann's words) as alive to the "practical consequences" of the alternative interpretations, should have been ignorant of the ordinary principles governing compound interest.

   *Version 3 (1985)*

145.   By this time inflation had fallen significantly to around 5-6%. Pessimistic thoughts about the future direction of inflation for the foreseeable future would have largely dissipated. If it was difficult in 1980, it would surely be impossible now, for the reasonable observer to imagine the parties committing themselves, even in the

medium term, to a fixed inflation figure of almost double the current rate. As a cap, it would hardly have attracted attention.

*Version 4 (1988)*

146.    By this time annual inflation had fallen to less than 5%. The annual formula produced a figure more than double that implied by the triennial formula, but one closely comparable to that resulting from actual inflation since 1974 (£342 compared to £350, in the table at para 100 above). If the then lessor, Mrs Short, was still charging her pre-1980 lessees by reference to the lower triennial rate, it raises a question of how she was covering her own expenditure on services, in circumstances where two-thirds of the leases were contributing at only half the rate implied by inflation since 1974. That may suggest either that she was able in practice to keep expenditure to a level significantly below that implied by inflation, or possibly that in order to maintain services at a reasonable level some of the pre-1980 lessees had been persuaded to pay more than their strict obligation.

147.    The only novel feature of this version is that it was subject to a proviso in effect substituting the triennial formula during the tenure of the named lessees. It appears to have escaped notice in the courts below that the example used for this version was in a lease between the lessor, Mrs J Short, and herself and a Mr W R Short (her husband) as joint lessees. Since the hearing it has been confirmed that she had the same interest in the other three "proviso" leases granted between 1988 and 1991. They were clearly not arms-length transactions.

148.    We know nothing about Mrs Short, or her thinking. It is difficult to understand how this special personal protection could have been reconciled with her obligation to the other post-1980 leases (under clause 4(viii)) to ensure that the covenants in these leases were as "similar … as the circumstances permit". It is even more difficult, at least on the Court of Appeal's interpretation, to understand how she would have explained the change to her future assignees, who were to lose that protection. The contrast between the two versions could not have been drawn more clearly to their attention. On the basis that the revised percentage figure was no more than a cap, they may plausibly have been content to accept an obligation to keep pace with inflation, in line with other post 1980-lessees. The alternative assumes that, at time when inflation rates were less than 5% and apparently falling, they knowingly accepted a continuing obligation to pay service charges increasing at twice that rate for the rest of the term. On any view that is absurd.

*Version 5 (2000)*

149.   By this time inflation had fallen to about 3%. The clause 3(2) figure was by now more than five times greater under the annual formula than under the triennial formula. As Mr Daiches accepts, the parties to these transactions were fully aware of the differences between the two versions. In those circumstances, whatever the changes in the extent of their holdings, there is on the face of it no rational explanation for four lessees agreeing not only to the loss of the protection of version 1, but to the substitution of a permanent obligation to pay service charges increasing at a rate three times the then current rate of inflation.

150.   Since these variations were agreed only 15 years ago, and since by this time the respondent, Mrs Arnold, was herself directly involved, it might have been thought that she at least would be able to throw some light on these extraordinary transactions. After the hearing, the parties were put on notice of the court's concern on this point, and invited to comment. It has emerged that three out of the four variations were agreed between Mrs Arnold and her daughter, Mrs Fraser (signed under a power of attorney by Mrs Arnold's son). The fourth was a Mrs Pace, of whom no information has been provided, save that she is apparently still the owner of the chalet, and she is named as one of the defendants in these proceedings.

151.   If there was in Mrs Arnold's thinking a rational explanation for these particular variations, she has not taken the opportunity to disclose it. Instead of such direct evidence, Mr Daiches remarkably asks us to imagine a series of "inferences" drawn by the parties (including his client and her daughter) and the reasonable observer. They would have inferred, he says, that version 1 lessees were paying less than the rates required by inflation and that there were in consequence "historic shortfalls" in the lessor's service charge income; and that the multiplier was to be increased, not only to take account of actual inflation since 1974, and to reflect the fact that it might once again rise to levels above that implied by the triennial formula, but also to compensate the lessor both for past shortfalls, and for the risk that he or she might not be able to persuade other lessees to agree to similar increases in the future.

152.   With respect to Mr Daiches I have to say that, even in this extraordinary case, I find these submissions quite astonishing. Given that his client and her daughter were the principal parties to these transactions, why on earth should the court be expected to draw "inferences" as to what was in their minds? Why should we speculate as to the extent of any "historic shortfalls", when she presumably has access to the actual accounts, and has resisted the lessees' requests for disclosure? What evidence is there that by 2000 anyone was seriously concerned about an imminent risk of return to double-digit inflation? Finally, what possible reason would these lessees have had for wishing to "compensate" the lessor for the past or

future financial consequences of imperfections in leases for which they were not responsible?

153.   With regard to the only independent party, Mrs Pace, Mr Daiches asks us to note that her variation was agreed shortly after the sale of the lease to her by the respondent herself. It should not be difficult, he says, to "infer that the purchase price paid by her to the respondent reflected her agreement to increase the multiplier". Although she is apparently one of the appellants represented by Mr Morshead, he has not volunteered any specific explanation on her behalf. He merely points to the difficulty of imagining any price reduction or other inducement sufficient to compensate her for "the devastating implications" of the multiplier if it operates as Mrs Arnold contends.

154.   In the absence of further evidence from either side, it is impossible to draw any clear conclusions about the purpose of these curious transactions. It is enough to observe that, viewed objectively, they are at least consistent with an interpretation which limits the lessees' future exposure to actual inflation, within a defined limit. On the lessors' interpretation, as with version 4, they make no sense at all.

*Conclusion*

155.   The true explanation for these wretchedly conceived clauses may be lost in history, but the problems for the parties are all too present and deeply regrettable. No doubt in recognition of such considerations, Mr Daiches, on behalf of Mrs Arnold, indicated that his client "fully understands the appellants' predicament and is sympathetic to it", and that if the appeal fails there would have to be a re-negotiation of the leases "for pragmatic if not for legal reasons". She wished it to be stated openly that –

> "… she is willing for the appellants' leases to be renegotiated on terms that would, among other things, involve the leases being varied by substituting an adjustment linked to the Consumer Price Inflation index instead of the current fixed adjustment of 10% per annum."

156.   Although on its face this indication seems helpful and realistic, it is not clear what it would mean in practical terms. It rightly acknowledges that the problems may well be incapable of truly satisfactory resolution by conventional legal analysis. The main obstacle may be that hinted at in Mr Daiches' post-hearing submission. That is the need to find some way of making good the shortfall resulting from the unrealistically low contributions required from more than two-thirds of the lessees under the pre-1980 leases. Even if the lessees' interpretation prevails, it will still

leave an unhappy imbalance between these lessees, and the version 1 lessees, who will be left paying substantially less than their proportionate share.

157.    Whatever the strict legal position, the other lessees may perhaps be persuaded that they have a common interest in the good management of the estate, and at least a moral obligation to contribute their fair share of its costs. A long-running dispute of this kind can hardly be conducive to the atmosphere appropriate to a holiday location, even for those not directly involved. It is to be hoped that some way can be found of bringing them into the discussions. On any view, the case seems to cry out for expert mediation, if it has not been attempted before, preferably not confined to the present parties. If thought appropriate, one possibility might be an application by consent to the President of the First-Tier Tribunal (Property Chamber – Residential Property) to appoint as mediator a senior judge of that tribunal, with the benefit of that tribunal's experience of dealing with service charge issues under statute. However, that must be a matter for the parties not this court.

158.    It is necessary therefore to return to the essential question: what in the view of a reasonable observer did clause 3(2) mean? It will be apparent from my detailed analysis that I regard the consequences of the lessor's interpretation as so commercially improbable that only the clearest words would justify the court in adopting it. I agree with HH Judge Jarman QC that the limited addition proposed by the lessees does not do such violence to the contractual language as to justify a result which is commercial nonsense.

159.    For these reasons, in respectful disagreement with the majority, I would have allowed the appeal and restored the order of HH Judge Jarman QC.

# **EXHIBIT 31**



**Trinity Term**
**[2021] UKSC 29**
*On appeal from: [2019] EWCA Civ 230*

# JUDGMENT

# Triple Point Technology, Inc (Respondent) *v* PTT Public Company Ltd (Appellant)

**before**

**Lord Hodge, Deputy President**
**Lady Arden**
**Lord Sales**
**Lord Leggatt**
**Lord Burrows**

## JUDGMENT GIVEN ON

### 16 July 2021

**Heard on 12 November 2020**

| *Appellant* | *Respondent* |
|---|---|
| James Howells QC | Paul Darling QC |
| Nicholas Maciolek | Andrew Stafford QC |
| | Nathaniel Barber |
| (Instructed by Watson | (Instructed by Kobre & |
| Farley & Williams LLP) | Kim (UK) LLP (London)) |

**LADY ARDEN: (with whom Lord Leggatt and Lord Burrows agree)**

**Outline of the software contract in issue, the issues on this appeal and my determination of them**

1.     This is an appeal concerning a software contract which provides for the implementation and provision of a software-based business system. The appeal raises general issues about a provision for liquidated damages and specific issues about the limitation of remedies under this contract.

2.     The software contract ("the CTRM Contract"), dated 8 February 2013, was made between the appellant, PTT Public Company Ltd ("PTT") and Triple Point Technology, Inc ("Triple Point") for the design, installation (by data transmission), maintenance and licencing of software to assist PTT to carry on its business in commodity trading. Triple Point had to customise its proprietary software for commodity trading and risk management to the needs of PTT, and it was remunerated by reference to "milestones" set by the contract at which specified work had been done and steps completed. Triple Point also agreed to enter into maintenance, upgrade, replacement, online support and staff training obligations. It further agreed to enter into a perpetual licence. The terms of the Perpetual License Agreement ("PLA"), which formed part of the CTRM Contract, which was based on Triple Point's standard form licence agreement and contained various warranties as to the quality of the software, were annexed to the main part of the CTRM Contract ("the Main Part"). There were provisions for checking that the software provided conformed to specification, ie achieved the agreed "functionality" or the purposes and range of functions that it was designed to perform: it is obvious that this was an important part of the CTRM Contract and that software defects could cause enormous financial and other harm to PTT.

3.     The CTRM Contract was not, therefore, simply a standard-form contract but was tailored to the requirements of this particular project. The governing law was English law. The provisions of the Main Part provided that, in the event of inconsistency between the PLA or other annexed parts, and the Main Part, the terms of the Main Part were to prevail (article 29).

4.     The parties agreed substantial limitations on the remedies available in the event of delay and so on. Liquidated damages were available for delay (article 5.3 of the Main Part). There was a non-financial remedy for certain other breaches of contract in that in specified circumstances Triple Point had an opportunity to cure

the defect. If it failed to do so, damages were payable but were limited to the fees paid for the relevant work (article 12.3 of the Main Part).

5.      The principal issue ("the availability of liquidated damages issue") on this appeal is whether PTT is entitled under the CTRM Contract to liquidated damages for delay in respect of work which had not been completed before the contract was terminated. The second and third issues arise from article 12.3 of the Main Part which imposes a limit or "cap" on the amount of damages which PTT could claim for Triple Point's breach of contract. Thus the second issue ("the cap carve-out for negligence issue") is whether an exception from the cap in article 12.3 for negligence removes from the cap losses caused by Triple Point's negligent breach of contract or only losses for the commission of some independent tort. The third issue ("capping of liquidated damages issue") is whether liquidated damages fell within the cap on Triple Point's liability imposed by article 12.3.

6.      In my judgment, for the reasons explained in this judgment, the Court of Appeal fell into error on Issue 1 in its approach to the liquidated damages clause, which failed to take account in the process of interpretation of the legal incidents and function of such clauses, and on Issue 2 in relation to the interpretation of the cap carve-out for negligence. However, on Issue 3, I conclude that the Court of Appeal was right to hold that (subject to the cap carve-out for negligence) liquidated damages fall within the cap.

**The facts in greater detail**

7.      By the CTRM Contract, PTT, a Thai company, contracted with Triple Point for the provision of a software system which would facilitate its trading in certain commodities and manage their purchase, including their delivery and so on. Triple Point had standard terms, but it agreed to supplement these by customised terms, which were to have priority over its standard terms.

8.      The CTRM Contract was negotiated over a period of some six to seven months in 2012 and 2013 and the functional specifications for the software system to be supplied by Triple Point were ultimately recorded in the Terms of Reference and clarifications incorporated as annexes to the CTRM Contract. At the time the parties entered into the CTRM Contract, they had agreed the Contract Price for the Phase 1 Services, including business consultancy, design, configuration and implementation services, software licenses and year one software maintenance services, to be $6,920,000. The CTRM Contract was subsequently varied by the addition of two further order forms, with which this appeal is not directly concerned.

**Relevant terms of the CTRM Contract (the software contract)**

9.      We are told that the CTRM Contract followed a structure used for software contracts which involve the implementation and provision of software-based business systems. There was no supply of hardware involved and no physical construction work. What Triple Point agreed to do was to design, implement, support and maintain an IT system which was to be built based upon configurable packages of Triple Point proprietary software marketed for use in businesses focussed upon trading in petrochemicals and other commodities markets.

10.     In article 1.2 of the Main Part, "Services" were defined in wide terms to include almost anything done by Triple Point under the CTRM Contract:

> "all activities rendered by CONTRACTOR to PTT in connection with the Project."

11.     Article 5 of the Main Part provided for Triple Point to perform the Services in accordance with the Project Plan (which set out the timetable for performance) and to pay damages for delay:

> "ARTICLE 5.  SCHEDULE OF SERVICES
>
> 1.      The Services to be performed by the CONTRACTOR shall be in conformance with the Schedule for the Services ('Project Plan') as proposed by the CONTRACTOR and accepted by PTT.
>
> 2.      The CONTRACTOR shall use its best effort and professional abilities to complete Phase 1 of the Project within 460 calendar days after the Effective Date. If however such date is not attainable due to a delay out of the control of the CONTRACTOR, the CONTRACTOR shall continue to perform the Services for the time necessary to complete the project. This extension will require written approval from PTT. (Para numbers added)
>
> 3.      If CONTRACTOR fails to deliver work within the time specified and the delay has not been introduced by PTT, CONTRACTOR shall be liable to pay the penalty at the rate of 0.1% (zero point one percent) of undelivered work per day of

delay from the due date for delivery up to the date PTT accepts such work, provided, however, that if undelivered work has to be used in combination with or as an essential component for the work already accepted by PTT, the penalty shall be calculated in full on the cost of the combination." (Para numbers added)

12.    Article 12 of the Main Part provided for Triple Point to use reasonable care and skill, and limits on its liability (by way of a "cap") and restrictions on PTT's remedies:

"ARTICLE 12.  LIABILITY AND RESPONSIBILITY

12.1    CONTRACTOR shall exercise all reasonable skill, care and diligence and efficiency in the performance of the Services under the Contract and carry out all his responsibilities in accordance with recognized international professional standards. [...]

12.3    CONTRACTOR shall be liable to PTT for any damage suffered by PTT as a consequence of CONTRACTOR's breach of contract, including software defects or inability to perform 'Fully Complies' or 'Partially Complies' functionalities as illustrated in Section 24 of Part III Project and Services. The total liability of CONTRACTOR to PTT under the Contract shall be limited to the Contract Price <u>received by CONTRACTOR with respect to the services or deliverables involved under this Contract. Except for the specific remedies expressly identified as such in this Contract, PTT's exclusive remedy for any claim arising out of this Contract will be for CONTRACTOR, upon written notice, to use best endeavor to cure the breach at its expense, or failing that, to return the fees paid to CONTRACTOR for the Services or Deliverables related to the breach.</u> This limitation of liability shall not apply to CONTRACTOR's liability resulting from fraud, negligence, gross negligence or wilful misconduct of CONTRACTOR or any of its officers, employees or agents."

13.    Article 13 of the Main Part provided:

"ARTICLE 13.  INDEMNITY

13.1   Each party shall indemnify, protect, defend and hold harmless the other party, its affiliates and their respective directors, officers, agents and employees from and against all losses, damages, liabilities and claims, including legal expenses, arising out of or relating to the performance or obligation of CONTRACTOR under this Contract, provided that such losses, damages, liabilities and claims shall occur as a consequence of the errors, omissions, negligence or wilful misconduct of the indemnifying party, its personnel or agents on the CONTRACTOR's part."

14.    Article 18 of the Main Part provided:

"18.1   Payment shall be made by milestone as indicated in the below table. The CONTRACTOR shall submit invoice to PTT (1 original and 2 copies) along with sign off document of each milestone in section 23, DELIVERABLES of *Part III Project and Services.*"

| | Milestone | Percentage of Payment of Total Contract Value |
|---|---|---|
| Phase 1 | Project Preparation and Review Business Process | 15% |
| Phase 2 | Business Blueprint | |
| Phase 3 | Implementation and Configuration | 30% |
| Phase 4 | Functional/Technical Test | |
| Phase 5 | Core Team Training | 45% |
| Phase 6 | UAT/End User Training | |
| Phase 7 | Final Preparation | |
| Phase 8 | Go-Live and Post Implementation Support | 10% |
| Phase 9 | First Month End Closing | |
| | Total | 100% |

15.    Articles 28 and 29 of the Main Part provided:

"ARTICLE 28.  MODIFICATION TO CONTRACT

This Contract consists of the Contract document and the Exhibits thereto.

Exhibit 1    Letter of Intent Number 4110000917 and Terms of Reference (TOR) For Commodity Trading & Risk Management (CTRM) System, Rev June 13, 2012

Exhibit 2    Technical Document (Clarification)

Exhibit 3    Triple Point Software Product Perpetual License Agreement, Software Maintenance Services and Order Form 2012 (dated January 31, 2013)

Exhibit 4    Performance Security

The Contract constitutes the entire agreement between PTT and CONTRACTOR and shall not be altered, amended or modified except in writing which shall bear the authorized signatures of both parties.

ARTICLE 29.  ORDER OF PRECEDENCE

In the event of a conflict in the provisions of this Contract, the following shall prevail in the order set forth below:

29.1    This Contract

29.2    Exhibit 1 and 2

29.3    Exhibit 3

> CONTRACTOR shall immediately refer to PTT for clarification of any such inconsistency."

16.    Articles 23 and 24 of the Terms of Reference (part of Exhibit 1 to the CTRM Contract) made provision for "deliverables" and "functionalities". Deliverables, which were itemised in article 23, were essentially the documentation to be delivered by Triple Point at the end of each specified step in the development and installation of the CTRM system verifying that that particular step had been completed. Functionalities were dealt with in article 24. PTT had in its invitation for bids specified a number of functionalities which it needed, and it stipulated that bidders should in their bids state whether the functionality of their system complied wholly or partly with its requirements. By article 24 of the Terms of Reference, the parties in effect incorporated into their agreement the 567 functionalities of the system identified in the bidding process which PTT wanted. Article 24 left the agreed level of compliance with the required functionalities blank but it appears that PTT agreed to the level of functionalities which Triple Point had specified in its bid. Triple Point's bid contained over 600 functionalities. At all events, it is clear from article 12.3 that the parties had agreed on some functionalities.

17.    The relevant provisions of the PLA forming part of the CTRM Contract were as follows:

> (a)    Clause 7 of the PLA was headed: "Warranties, Liabilities and Indemnification". Paragraph 7.1 of the PLA provided:

>> "Triple Point represents and warrants to Licensee that the Maintenance Services and Consulting Services, if applicable, will be provided with its best efforts and professional abilities. Triple Point represents and warrants to Licensee that Licensee's use of the Licensed Software as contemplated by this Agreement does not infringe any US patent, trademark, trade secret, copyright or similar right of any third party. If the Licensed Software is held, or believed by Triple Point, to so infringe or misappropriate, Triple Point shall have the option, at its expense, to (x) modify the Licensed Software to be non-infringing or (y) obtain for Licensee a license to continue using the Licensed Software, and if (x) or (y) are commercially impractical, then Triple Point may terminate the Software License and refund the Software License Fee paid by Licensee, pro rated over a five year term from the Effective Date."

> (b)    Paragraph 7.2 provided:

"If any third party claim of intellectual property infringement is brought against Licensee arising from Licensee's use of the Licensed Software licensed under this Agreement in accordance with the terms hereof, Triple Point will indemnify, defend and hold harmless at its own expense, Licensee from and against any and all costs, damages, expenses, liability, suits, claims and proceedings (including reasonable attorneys' and professional fees) incurred by Licensee as a result of any such suit or action. Licensee shall provide Triple Point with as soon as possible written notice of the suit or action for which indemnity is claimed giving Triple Point sole control of the defence thereof and any related settlement negotiations; and providing all assistance, information and authority reasonably required to defend or settle the suit or action."

(c)    Paragraph 7.3 provided:

"Triple Point represents and warrants that the Licensed Software will substantially conform to the documentation in all material respects and Triple Point's sole obligation hereunder shall be to repair any defect in the Licensed Software or replace the Licensed Software that causes it to fail to so conform provided that written notice of such defect is received by Triple Point during the Maintenance Term. Except with respect to the warranty set forth in this section, the Licensed Software, Documentation, Maintenance and Consulting Services are provided 'as is' and without warranty of any kind, express or implied, including any implied warranties of merchantability or fitness for a particular purpose. Triple Point does not warrant that the Licensed Software will be free of defects, will operate uninterrupted or error free or will satisfy the operational requirements of Licensee."

(d)    Paragraph 7.4 provided:

"Without limiting the foregoing, Licensee agrees that the aggregate liability of Triple Point for damages from any cause of action whatsoever, regardless of the form of action, shall not exceed the fees paid to Triple Point under the CTRM Contract and except such damages caused by fraud, gross negligence and wilful misconduct."

(e)      Paragraph 7.5 provided:

"In no event shall either party be liable for lost profits or indirect, incidental, consequential, special or punitive damages of any nature whatsoever."

(f)      Paragraph 10.9 of the PLA provides that that Agreement and the CTRM Contract should constitute the entire agreement and understanding between the parties. The proviso in paragraph 10.9 stated:

"Provided, however, that Triple Point agrees that this Agreement shall not supersede and shall be an Annex to the CTRM Contract. In addition, Triple Point agrees that if there is any conflict between the CTRM Contract and this Agreement, the CTRM Contract shall prevail and be enforceable."

## Performance of the Contract

18.    The completion of the Phase 1 business blueprints was significantly delayed. Work did not commence on the preparation of the Phase 2 scope of works at all. In December 2013 and March 2014, the parties met in Singapore to seek to resolve disagreements as to the functional scope of the Project and as to significant aspects of the functionality. At a meeting on 19 March 2014 the parties agreed that PTT would accept the work performed in respect of Project milestones 1 and 2 of Phase 1 (the first payment Milestone) subject to recording certain areas as to be completed. The parties thereafter also agreed a Revised Phase 1 Project Plan. On 31 March 2014 Triple Point agreed that if the payment was made in respect of the first payment Milestone in the sum of US$1,038,000 by 28 April 2014 it would not suspend its works on the Project. In May 2014 Triple Point demanded payment in respect of other invoices it had previously submitted. PTT refused to make those payments on the grounds that they were not payable under the terms of the CTRM Contract. From May 2014 Triple Point refused to continue performance of the CTRM Contract without payment of the additional sums it had demanded. Triple Point did not complete the works in respect of any other part of Phase 1 or any part of Phase 2 prior to termination. On 23 March 2015, PTT gave notice stating it was terminating the CTRM Contract under articles 15.1 and 15.7 of the Main Part.

## These proceedings from commencement to date

19.    Triple Point commenced proceedings in the Technology and Construction Court in London on 12 February 2015. Triple Point claimed in respect of alleged

failures to make payments for software licence fees. In its Defence and Counterclaim dated 21 May 2015, PTT denied all of Triple Point's claims and counterclaimed damages for breach of contract on termination of the parties' contract in respect of its wasted costs in respect of hardware purchased prior to termination, liquidated damages under the terms of the contract up to the date of termination and, as termination loss, the costs of procuring a replacement system plus interest pursuant to statute. In its Reply and Defence to Counterclaim dated 9 July 2015, Triple Point denied that it was liable as alleged. It also relied on the cap in article 12.3 of the Main Part as limiting the damages claimed by PTT. Triple Point contended that any sums found to be due to PTT should be set off against the Performance Security, being the security for payment required to be provided by Triple Point under the terms of the CTRM Contract.

20.   In due course the matter came on for trial before Jefford J between 28 November to 14 December 2016 and on 31 January 2017. She gave judgment on 23 August 2017. She found that the delay in performance of the CTRM Contract was caused by Triple Point's breach of article 12.1 of the Main Part to exercise reasonable skill, care and diligence in the performance of its services, through negligently: failing carefully to plan, programme and manage the Project or delays in the Project; failing to provide sufficient numbers of suitably qualified staff; failing to conduct adequate business analysis and production of business blueprints required under the terms of the CTRM Contract; and, failing to follow internationally recognised and applied methodologies for the design, development and implementation of software.

21.   The judge dismissed Triple Point's claims and decided that PTT was, prima facie, entitled to damages for breach of contract by Triple Point and on termination of the CTRM Contract and/or repudiation of that contract in the sums of: US$3,459,278.40 in respect of liquidated damages for delays prior to termination; US$630,000 damages in respect of wasted costs of hardware purchases prior to termination; and, US$10,574,756.78 in respect of termination loss for the costs of procuring a replacement system from a new contractor.

22.   The judge held that Triple Point's liability for damages in respect of wasted costs and termination loss was capped at US$1,038,000 by article 12.3 of the Main Part, being the amount paid by PTT under the contract prior to termination. The judge rejected arguments, including arguments as to the quantum of liquidated damages, from which Triple Point did not appeal. The judge decided that PTT's entitlement to liquidated damages was not subject to the cap.

23.   Triple Point appealed to the Court of Appeal and PTT cross appealed. The Court of Appeal (Lewison and Floyd LLJ and Sir Rupert Jackson) held that PTT was entitled only to liquidated damages in respect of works that had been completed

by reference to the agreed stages contained in article 18 of the Main Part and the Project Plan and that the appellant's entitlement to receive liquidated damages under article 5 of the Main Part was, together with all entitlements to general damages on termination, subject to the cap in article 12.3 of the Main Part. The Court of Appeal held that the exception to the limitation on liability for breach of contract in article 12.3 for "negligence" did not apply to cases where Triple Point was liable for breach of the contractual obligation to exercise reasonable skill and care and only applied to cases of "freestanding torts or deliberate wrongdoing", and that in those circumstances it did not apply (para 119 of the Court of Appeal's judgment [2019] 1 WLR 3549).

### Issue 1:  Are liquidated damages payable under article 5.3 of the Main Part where Triple Point never completes the work and PTT never accepts it?

24.     The issue here is whether PTT is entitled (subject to any operation of the cap) to liquidated damages for work which Triple Point never completed, and which was therefore never accepted by PTT. This point was raised only orally in the Court of Appeal with Triple Point submitting that it was not liable to pay any liquidated damages for delay under article 5.3 because the work in question was never completed or accepted by PTT. So we have no skeleton arguments for this point in the Court of Appeal and we cannot tell precisely how it was put. However, it is clear that initially Triple Point did not propose to argue the point by reference to an analysis of the authorities which were ultimately cited by the Court of Appeal in its judgment.

25.     However, it appears from the judgment of Sir Rupert Jackson, with whom Lewison and Floyd LJJ agreed, that the Court of Appeal regarded the point as raising questions of principle although the application of the principle would be affected by the terms of the contract in question. In the course of his judgment, Sir Rupert Jackson examined or referred to some ten authorities. He considered that the first case, *British Glanzstoff Manufacturing Co Ltd v General Accident, Fire and Life Assurance Corpn Ltd* [1913] AC 143, established a point of principle though the principle in question was never to my mind clearly articulated. This case loomed large in the reasoning of the Court of Appeal although its significance had not previously been appreciated. The essential facts are very simple.

26.     Glanzstoff employed Brown to build a new factory. The contractual completion date was 31 January 1910 (which it was agreed should be extended to February 1910), but Brown ceased work before that date. On 16 September 1909, Glanzstoff engaged Henshaw to complete the contract and he completed the works on 28 March 1910. The issue was whether Glanzstoff could claim liquidated damages for delay from Brown under clause 24 of the contract between Brown and Glanzstoff for the period from February 1910 to 28 March 1910. Brown had

provided a guarantee to secure the performance of his contractual obligations and Glanzstoff hoped to recover the liquidated damages under the guarantee. Clause 24 provided:

> "If the contractor fail to complete the works by the date named in clause 23 … and the architect shall certify in writing that the works could reasonably have been completed by the said date, … the contractor shall pay or allow to the employer the sum of £250 sterling per week for the first four weeks, and £500 per week for all subsequent weeks as liquidated and ascertained damages for every week beyond the said date or extended time, as the case may be, during which the works shall remain unfinished …"

27.    The Outer House and Inner House of the Court of Session dismissed Glanzstoff's claim as did the House of Lords. As Sir Rupert Jackson explains, the judgment of the House of Lords is more fully reported in the Reports of the Sessions Cases: 1913 SC (HL) 1. Viscount Haldane LC gave the leading judgment. He characterised clause 26 as "an enclave in the contract by itself providing for a special remedy": p 2. He held that that clause did not apply for two reasons:

> "In my opinion it does not apply, and I think it does not apply for two reasons: first of all, that it is altogether inapt to the provisions made by clause 26, which contain a complete code of themselves; and secondly, *because upon its construction I read it as meaning that if the contractors have actually completed the works, but have been late in completing the works, then, and in that case only, the clause applies.* Under the circumstances in which this appeal comes before us the contractors have not completed the works; on the contrary, they have been ousted from the works by the employers under their powers given them by clause 26. I am therefore of the same opinion as the learned Judges in the Court of Session, who were unanimous in holding that clause 24 has no application to the present case …" (p 3, Emphasis added)

28.    Sir Rupert Jackson focused on the passage which I have italicised in the preceding paragraph. He examined some ten other cases on the operation of liquidated damages clauses. The conclusions of this examination are set out in para 106 of his judgment which placed the cases which had been examined into three categories:

"106.  Let me now stand back from the authorities and review where we have got to. In cases where the contractor fails to complete and a second contractor steps in, three different approaches have emerged to clauses providing liquidated damages for delay:

> (i)  The clause does not apply: the *Glanzstoff* case [1913] AC 143; the *Chanthall* case 1976 SC 73; the *Gibbs* case 35 Con LR 86.

> (ii)  The clause only applies up to termination of the first contract: the *Greenore* case [2006] EWHC 3119 (TCC); the *Shaw* case [2010] EWHC 1839 (TCC); the *LW Infrastructure* case [2012] BLR 13; the *Bluewater* case 155 Con LR 85.

> (iii)  The clause continues to apply until the second contractor achieves completion: the *Hall* case [2010] EWHC 586 (TCC); the *Crestdream* case (2013) HCCT 32/2013; the *GPP* case [2018] EWHC 2866 (Comm)."

29.  Sir Rupert Jackson rejected the argument that the principle in *Glanzstoff* could be confined to cases where the contract was terminated before the contractual completion date (para 108). As to category (ii), he held:

> "110. The textbooks generally treat category (ii) as the orthodox analysis, but that approach is not free from difficulty. If a construction contract is abandoned or terminated, the employer is in new territory for which the liquidated damages clause may not have made provision. Although accrued rights must be protected, it may sometimes be artificial and inconsistent with the parties' agreement to categorise the employer's losses as £x per week up to a specified date and then general damages thereafter. It may be more logical and more consonant with the parties' bargain to assess the employer's total losses flowing from the abandonment or termination, applying the ordinary rules for assessing damages for breach of contract. In my view, the question whether the liquidated damages clause (a) ceases to apply or (b) continues to apply up to termination/abandonment, or even conceivably beyond that date, must depend upon the wording of the clause itself. There is no invariable rule that liquidated damages must

be used as a formula for compensating the employer for part of its loss."

30.    Sir Rupert Jackson saw much force in the reasoning of the House of Lords and took the view that the wording of the liquidated damages clause could be so close to the wording in *Glanzstoff* that the House of Lords decision is binding. I find this observation difficult to follow as the clauses in question in *Glanzstoff* were not said to be some market-accepted wording or clauses from some standard form recognised in the industry where the interpretations of the courts in reported cases may in practice be treated as binding in later cases involving the same wording. With those exceptions, in general the decision of one case as to the meaning and effect of a clause cannot be binding as to the meaning and effect of even a similar clause in another case.

31.    Sir Rupert Jackson went on to hold that if the liquidated damages clause did not make specific provision for a particular circumstance, the employer was in new territory for which the liquidated damages clause may have made no provision. It was possible that the parties intended the situation after the contractor ceased to act to be dealt with as general damages. The question whether the liquidated damages clause should apply would have to depend on the wording of the clause. In this case, however, the Court of Appeal considered that the words "up to the date PTT accepts such work" meant that article 5.3 had no application in a situation where the contractor never completed the works, and, by definition, the employer never accepted them. As Sir Rupert Jackson put it:

> "112.  Let me now turn to article 5.3 in the present case. This clause, like clause 24 in the *Glanzstoff* case, seems to be focused specifically on delay between the contractual completion date and the date when Triple Point actually achieves completion. The phrase in article 5.3 'up to the date PTT accepts such work' means 'up to the date when PTT accepts completed work from Triple Point'. In my view article 5.3 in this case, like clause 24 in the *Glanzstoff* case, has no application in a situation where the contractor never hands over completed work to the employer."

32.    Mr James Howells QC, for PTT, contends that Sir Rupert Jackson erred in law in this passage. By contrast, Mr Darling QC and Mr Stafford QC, for Triple Point, seek to uphold the decision of the Court of Appeal. They argue that, although the judgment of Sir Rupert Jackson included an analysis of a number of previous decisions on liquidated damages, this analysis had little bearing on the decision reached by the Court of Appeal. The decision identified several different outcomes from previous cases and then identified the outcome based on the wording in the

CTRM Contract. Moreover, on their submission, the decision made business sense. On Triple Point's case, there is logical force, and high authority, in support of the Court of Appeal's approach in the cases cited by Sir Rupert Jackson and see also per Coulson LJ in *Construction Law: Recent Highlights and Greatest Hits*, October 2019, The Society of Construction Law Paper No 220, p 4.

33.     In my judgment, the passages that I have quoted from Sir Rupert Jackson's judgment are equivocal as to whether the point is being treated as one of interpretation or as one of principle. The approach seems to have been a mixture of the two. The point may have ultimately been presented to the Court of Appeal as one of principle rather than one of interpretation of article 5.3. If the question was one of interpretation, para 106 must refer to three possible outcomes rather than categories.

34.     The more important question is: what was the conclusion which the Court of Appeal drew from Sir Rupert Jackson's analysis of the authorities? The Court of Appeal were alive to the fact that they were departing from the generally understood position as to the meaning of liquidated damages clauses (see para 110, set out above). In my judgment, the Court of Appeal concluded that *Glanzstoff* showed that there were circumstances in which a liquidated damages clause would not necessarily apply even if the contractor had been guilty of delay and had not completed the work on time. It followed in the Court of Appeal's view that it should not be assumed that the liquidated damages clause had any operation beyond the precise event for which it expressly provided: the only event for which article 5.3 provided was that in which the employer accepted the delayed work. The event described in the liquidated damages clause was to be determined from the words used. PTT did not, therefore, in the judgment of the Court of Appeal, have an entitlement to liquidated damages in the present case where the contractor did not complete the work.

35.     The difficulty about this approach is that it is inconsistent with commercial reality and the accepted function of liquidated damages. Parties agree a liquidated damages clause so as to provide a remedy that is predictable and certain for a particular event (here, as often, that event is a delay in completion). The employer does not then have to quantify its loss, which may be difficult and time-consuming for it to do. Parties must be taken to know the general law, namely that the accrual of liquidated damages comes to an end on termination of the contract (see *Photo Production Ltd v Securicor Transport Ltd* [1980] AC 827, 844 and 849). After that event, the parties' contract is at an end and the parties must seek damages for breach of contract under the general law. That is well-understood: see per Recorder Michael Harvey QC in *Gibbs v Tomlinson* (1992) 35 Con LR 86, p 116. Parties do not have to provide specifically for the effect of the termination of their contract. They can take that consequence as read. I do not, therefore, agree with Sir Rupert Jackson when he holds in the second sentence of para 110 of his judgment that "If a

construction contract is abandoned or terminated, the employer is in new territory for which the liquidated damages clause may not have made provision." The territory is well-trodden, and the liquidated damages clause does not need to provide for it.

36.     Of course, the parties may out of prudence provide for liquidated damages to terminate on completion and acceptance of the works so as to remove any question of their being payable thereafter. But if they do, it is in my judgment unrealistic to interpret the clause as meaning that if that event does not occur the contractor is free from all liability for liquidated damages, and that the employer's accrued right to liquidated damages simply disappears. It is much more probable that they will have intended the provision for liquidated damages to cease on completion and acceptance of the works to stand in addition to and not in substitution for the right to liquidated damages down to termination.

37.     Reading the clause in that way meets commercial common sense and prevents the unlikely elimination of accrued rights. The Court of Appeal was aware of the importance of accrued rights because after the sentence last quoted the judgment of Sir Rupert Jackson begins: "Although accrued rights must be protected, ...". However the rest of that sentence and the next sentence go on to hold that it may be that the parties intended that general damages should take the place of liquidated damages: "… it may sometimes be artificial and inconsistent with the parties' agreement to categorise the employer's losses as £x per week up to a specified date and then general damages thereafter. It may be more logical and more consonant with the parties' bargain to assess the employer's total losses flowing from the abandonment or termination, applying the ordinary rules for assessing damages for breach of contract." If that were so, it is hard to believe that the parties would have gone to the trouble of providing for liquidated damages in the first place. Moreover, under this approach, accrued rights are not protected. They are lost.

38.     The Court of Appeal did not ask whether there was any commercial reason for holding that the parties intended that the liquidated damages clause should provide for damages only in the one case, which is where delay occurs, but Triple Point subsequently produces work which PTT is content to accept as complying with the contract. Why should the parties want liquidated damages in that event but not in any other event where the work had not been delivered on schedule? If their purpose was to achieve a certain and quick resolution of the employer's claim for loss for the potential benefit of both parties, in the event of delay, then it would not be achieved by limiting article 5.3 to the situation where the work is ultimately done and accepted. Put another way, it must follow on the Court of Appeal's approach that some positive wording is needed if the employer is to be protected against other causes of delay. In my judgment, additional wording is not needed. It would be sufficient to interpret the words "up to the date PTT accepts such work" as meaning "up to the date (if any) PTT accepts such work".

39.    The detailed analysis of the later authorities by the Court of Appeal therefore proceeded from the wrong hypothesis and nothing would in my judgment be gained by this Court analysing those authorities again. They all turn on their particular circumstances.

40.    Mr Howells impressed on us that a liquidated damages clause gave rise to an accrued right to liquidated damages on the part of the employer and that the courts have held that this right should not be taken away without clear words. I have dealt with accruals above: the parties are unlikely to intend that the right to liquidated damages once it had accrued is simply extinguished.

41.    Mr Darling submits that the issue in this case is not whether the right to liquidated damages was extinguished but whether any such right existed in the first place. But a sufficient answer to Mr Darling's point is that there is nothing to suggest that the aim of the parties in this case was that the entitlement to liquidated damages should be limited to the situation where Triple Point was late in completing its work, but depends on whether it finished the work and PTT accepted it. By contrast it was perfectly natural that the parties should seek to put an end date on the accrual of liquidated damages to prevent a party who had accepted the performance of work from continuing to demand liquidated damages.

42.    Nor do I consider that the little-known case of *Glanzstoff* should have led the Court of Appeal to their radical re-interpretation of the case law on liquidated damages clauses. In my judgment, *Glanzstoff* is a decision on the interpretation of a particular contract. The decision is, as one would expect, that the liquidated damages clause in Brown's contract could not be relied on to make him liable for the delay in completion due to the employment of a substitute contractor. An alternative explanation for the decision is that the contract with Brown had terminated before the contractual completion date so that in accordance with general principle the only remedy for loss after the date of termination was for (unliquidated) damages for breach of contract, but I agree with Sir Rupert Jackson that this is not the basis of the decision (although in my judgment it is also clear that (as stated in the Appeal Cases report) all the House of Lords did was to affirm the decision of the Inner House: 1912 SC 591). When the court is required to interpret a similar clause today, it will have to decide the issue in the same way as any other question of interpretation and not by treating *Glanzstoff* as having created some special rule applying to liquidated damages clauses.

43.    Although the Court of Appeal treated the *Glanzstoff* case as a case of significance, it is not. The first edition of *The Law of Contract: A Treatise on the Principles of Contract in the Law of Scotland*, W M Gloag, (1914), p 798, a leading work, treated the *Glanzstoff* case as one on the meaning of the particular clause,

rather than as establishing any point of principle. In my judgment, it turns on its particular facts and establishes no new proposition of law whatever.

44.    Sir Rupert Jackson included *Chanthall Investments Ltd v F G Minter Ltd* 1976 SC 73 with *Glanzstoff* in the first of the three categories of clause which he sets out at para 106 of his judgment. *Glanzstoff* had indeed been cited in that case. The material point in this decision of the Inner House of the Court of Session was that the Inner House applied *Glanzstoff* in support of its acceptance of the contractor's contention that, although he was late in performing the work he had agreed to undertake under the contract, he was not liable under the liquidated damages clause, clause 22, for delays caused by others. Clause 22 provided as follows:

> "22.    If the Contractor fails to complete the Works by the Date for Completion …, then the Contractor shall pay or allow to the Employer a sum calculated at the rate stated in the said appendix as Liquidated and Ascertained Damages for the period during which the Works shall so remain or have remained incomplete, and the Employer may deduct such sum from any monies due or to become due to the Contractor under this Contract."

45.    Lord Justice-Clerk Wheatley, with whom the other members of the Inner House of the Court of Session agreed, treated *Glanzstoff* as a case where it was held that references to completion in the relevant clause were to completion under and in conformity with the same contract. Lord Wheatley considered that this was the view taken by Viscount Haldane LC in *Glanzstoff* when he held that the liquidated damages clause in that case applied where the original contractor had completed the works but had been late in doing so. Viscount Haldane was not dealing with the situation where there had been a delay in completion, but where the delay had been caused by other factors. Again the approach is one of interpreting the liquidated damages clause in very different circumstances from those in the present case.

46.    Recorder Michael Harvey QC approached the *Glanzstoff* case in a similar way in *Gibbs v Tomlinson* (above, para 35). This is the other case to which Sir Rupert Jackson referred in his first category, along with *Glanzstoff*.

47.    *Glanzstoff* is rarely discussed in leading works on the law of contract in England and Wales. It is an illustration of how a liquidated damages clause can be interpreted. Lewison on *The Interpretation of Contracts*, 7th ed (2020), para 17.50 helpfully sums up the overall position on the categorisation of cases made in para 106 of the judgment of Sir Rupert Jackson as follows:

> "Ultimately the question turns on the wording of the particular clause. One question that will arise is whether the purpose of the clause is limited to liquidating damages for delay in completion, or whether it also liquidates damage for failure to complete at all."

48.    In the instant case, article 5.3 of the Main Part on its true construction provided for liquidated damages if Triple Point did not discharge its obligations within the time fixed by the contract irrespective of whether PTT accepted any works which were completed late. The function of the words on which the Court of Appeal relied was to provide an end date for liquidated damages on acceptance of the works by PTT to ensure that in that event there was no further claim for liquidated damages in respect of the relevant delay. But it did not follow that there were to be no liquidated damages if there was no such acceptance. To reach that conclusion would be to render the liquidated damages clause of little value in a commercial contract. To use an idiomatic phrase, the interpretation accepted by the Court of Appeal in effect threw out the baby with the bathwater.

49.    I conclude with my views on some interesting but in the end not very convincing auxiliary arguments made in this Court. I do not see much force in the argument advanced by Triple Point that this Court's interpretation would hand all control to the employer if there were delay in completing the works since only PTT had the ability to terminate the CTRM Contract under article 15. That would have been obvious to Triple Point when the CTRM Contract was made: it was part of their bargain. Mr Darling also submits that there are circumstances in which an employer may prefer general damages to those available under a liquidated damages clause, but he did not point to any specific matter in this regard. Mr Darling further argues that there was no contractual mechanism for recovering overpaid liquidated damages. This was so whichever interpretation was adopted. Mr Darling's point may be said to be an argument for preferring a restrictive interpretation of the liquidated damages clause. However, the absence of this mechanism would also seem to indicate that the parties never thought about the issue, which means that they cannot have attached much significance to it.

**Issue 2:  Are damages for Triple Point's negligent breach of the CTRM Contract within the liability-limitation exception in the final sentence of article 12.3?**

50.    On this appeal, the parties provided the Court at its request with a full copy of the CTRM Contract (507 pages) rather than simply the extracts of some 74 pages originally included in the electronic bundle. No doubt the decision to provide only a limited number of pages was done for reasons of economy but speaking for myself, I found it helpful to see the entire contract. I do not know whether this was an

advantage which the Court of Appeal also had. Contrary to the conclusions of the judge and the Court of Appeal, I take the view that the liquidated damages are within the cap carve-out in the fourth sentence of article 12.3 if they result from breaches by Triple Point of its contractual obligation of skill and care so that liability for them is uncapped. My reasons are contained in the paragraphs immediately following.

*(1)    Structure of article 12.3*

51.    Article 12.3 consists of four sentences. The first constitutes a statement that Triple Point is liable to PTT for any damage in consequence of any breach of contract, including software defects or inability to meet the functionality criteria. The second sentence is the cap, namely the global limit for all breaches of contract, fixed at the contract price received by Triple Point. The third sentence deals with the form of remedies. Apart from specific remedies PTT's exclusive remedy was for the contractor to use his best endeavours to cure the defect and failing that to return the attributable part of the fees paid. The fourth and final sentence contained a carve-out from the limitation of liability, and I call it the "cap carve-out". It provided that the contractor's liability resulting from the fraud, negligence, gross negligence or wilful misconduct of the contractor was not limited. I will set out article 12.3 again, this time numbering each of the sentences for convenience:

> "ARTICLE    12.3
>
> 1.    CONTRACTOR shall be liable to PTT for any damage suffered by PTT as a consequence of CONTRACTOR's *breach of contract*, including software defects or inability to perform 'Fully Complies' or 'Partially Complies' functionalities as illustrated in Section 24 of Part III Project and Services.
>
> 2.    The total liability of CONTRACTOR to PTT *under the Contract* shall be limited to the Contract Price received by CONTRACTOR with respect to the services or deliverables involved under this Contract.
>
> 3.    Except for the specific remedies expressly identified as such in this Contract, PTT's exclusive remedy for *any claim arising out of this Contract* will be for CONTRACTOR, upon receipt of written notice, to use best endeavor to cure the breach at its expense, or failing that, to return the fees paid to

CONTRACTOR for the Services or Deliverables related to the breach.

4.    *This limitation of liability* shall not apply to CONTRACTOR's liability resulting from fraud, negligence, gross negligence or wilful misconduct of CONTRACTOR or any of its officers, employees or agents." (Numbering and italics added)

### *(2)    The concept of "negligence" denoted by article 12.3*

52.    The first point to make is that the word "negligence" has an accepted meaning in English law, which was the governing law of the CTRM Contract. It covers both the separate tort of failing to use due care and also breach of a contractual provision to exercise skill and care. Unless, therefore, some strained meaning can be given to the word "negligence" in the context of the final sentence of article 12.3 the effect of that clause is that liability for negligence does not exclude the breach of a contractual duty of care. As I shall explain in the next paragraph, the courts below took the view that the contractual duty of care was not included in the reference to negligence in the final sentence of article 12.3.

### *(3)    The CTRM Contract is not just for services to be provided carefully: it is also for defect-free software and deliverables and functionality compliance*

53.    The judge considered that there would be little point in imposing a cap on liability for breach of the contractual duty of skill and care in a contract which was wholly or substantially for services, which had to be provided with skill and care, only to remove the cap in the final sentence. The Court of Appeal agreed. The argument that impressed the courts below was therefore that, since the centrepiece of the contract was services, there was little point in having a cap and then carving out, by the cap carve-out, the bulk if not the entirety of the claims. Put another way, if the cap carve-out included breaches of the contractual duty of care, the cap was emasculated. Therefore, it is said, the word "negligence" could not mean "negligence" in the ordinary sense of that word. It had to exclude breaches of a contractual duty of care and be limited to breaches of a duty of care which arose entirely independently of those breaches, ie independent torts.

54.    The difficulty with that argument, however, as Mr Howells points out, was that the contract was not solely about the provision of services. It included important obligations on Triple Point's part for the provision of defect-free software and the "Deliverables". It was clear from the opening sentence of article 12.3 that there were

certain matters which Triple Point agreed to do or provide as an absolute covenant, not merely one of skill and care. Those matters also included the agreed level of functionality. Thus, in the first sentence of article 12.3, there was an obligation to provide software which met the specifications as to functionality. An example is the ability to create trade templates. PTT had specified in the invitation to bid that the system must have this functionality and that bidders had to state the level of compliance of their systems. Accordingly in its bid, Triple Point stated that its system had the desired functionality and fully complied with the bid specification. It added a note explaining that the CTRM system allowed users to create trade templates with frequently used trade data. As Mr Howells pointed out, apart from software defects and functionality compliance (article 12.3), the CTRM Contract and the documents annexed to it or incorporated into it contain the following further obligations which were obligations of result on the part of Triple Point and not obligations of skill and care:

(a)    Warranties as to use of intellectual property/non-infringement of third-party intellectual property rights, and conformity to documentation (PLA paragraphs 7.1 and 7.3).

(b)    Obligations as to time for completion (article 5).

(c)    Obligations as to use and protection of confidential information (article 6).

(d)    Obligations as to appointment, replacement and control of personnel (article 10).

(e)    Obligations as to sub-contracting or assignment of rights to payment (article 10.8).

(f)    Obligations as to remuneration and prohibition on gratuities and commission (article 17).

(g)    Obligations as to maintenance of records of expenses and audit (article 18.9).

(h)    Obligations to pay all taxes and duties (article 19).

(i)      Obligation to ensure any sub-contract is assignable and assigned to PTT on termination (articles 15.4.2 and 20).

(j)      Obligations arising in respect of the Software Warranty (article 22, Perpetual License Agreement paragraph 7).

(k)      Obligations as to title (article 25).

(l)      Obligations of the respondent and its staff to abide by the rules and regulations of the Kingdom of Thailand (article 27.4).

55.    As I see it the CTRM Contract drew a distinction between those Services in respect of which Triple Point owed a contractual duty of care, and those matters which it would be a breach of contract not to provide (ie a distinction between contractual obligations of reasonable care and skill and strict contractual obligations). Defect-free software and deliverables fell into the second category as did functionality compliance. This distinction can be seen in the opening sentence of article 12.3 of the Main Part, and in addition, in the case of the deliverables, in article 23 of Part III Project & Services, which specifies by a table with columns the Milestones by reference to which Triple Point is to submit Deliverables to PTT. Two of those columns are for "Milestone and Activity" and "Deliverables" respectively. For example, the former includes an item of which the activity is stated to be "Prepare functional specification that describes the solution requirements, the architecture, and the detailed design for all the features" and the Deliverable as "Functional Specification" (item 3.2). Satisfaction of the specification for the new system and functional criteria would obviously be matters of considerable importance in a contract of this kind. The first sentence of article 12.3 makes it clear that there was a strict (or an absolute) obligation to supply software which was not defective and which met the agreed level of functionality.

### *(4)      It is incoherent and inappropriate to interpret the cap carve-out by reference to unrealistic examples of independent torts*

56.    What the Court of Appeal and the judge held is that the word "negligence" must mean some independent tort and excludes breach of a contractual duty of skill and care. But no-one has yet thought of a realistic example of such a tort. Unless there is an obvious example of an independent tort, it is unlikely in my judgment that the parties considered that the word "negligence" should apply, and on Triple Point's case apply only, to an independent tort. As I have explained, the Services were to be provided by data transmission. There would be no question of attending at the premises of PTT or of injury being done to wiring or hardware or to members

of PTT's staff through the actions of Triple Point. Neither the example given by Sir Rupert Jackson in his judgment in the Court of Appeal nor that given by Mr Stafford on the hearing of this appeal was apt for that reason. The example given by Sir Rupert Jackson was that of damage to the wiring at PTT's premises causing personal injury to staff members of PTT (Judgment, para 119). In argument, Mr Stafford gave the example of the extracontractual service of repairing a computer done voluntarily at the request of a staff member at PTT's premises. These are simply not realistic examples, and no-one has been able to think of a better one.

57.    Moreover, and more importantly, these are examples of acts that were outside article 12.3 altogether. Article 12.3 only dealt with liability under the CTRM Contract: see the words italicised in article 12.3 as set out in para 51 above. That was the limitation on damages. The limitation placed on damages was on damages under the CTRM Contract. So, any exclusion from that limitation also had to be damages under the Contract and that would exclude an independent tort. At one point in his argument, Mr Stafford was compelled to accept that the provision in the final sentence of article 12.3 was simply there for the avoidance of doubt (Transcript, p 86).

58.    Furthermore, article 13 provides a further indication against the limitation of the cap carve-out to independent torts. It was surmised by Triple Point that in their negotiations the parties to the CTRM Contract would have started with the position as set out in clause 7 of the PLA. The provenance of this document is a standard form contract which Triple Point requires persons who wish to buy its software to sign, and it contains a cap carve-out which does not use the word "negligence". Insofar as the suggestion is that that word must have been put into article 12.3 without any intention to produce a different result, there is absolutely no evidence to support that suggestion and it would only be admissible evidence if it was the objective of both parties. In my judgment, quite the contrary is plain without the need for any evidence. The word "negligence" clearly appears in article 12.3. In addition, it also appears in article 13 which provides an obligation of indemnity for loss caused by the actions of either party. The fact that the word was introduced not just once but twice in the main part of the CTRM Contract is inconsistent with any suggestion that its appearance in article 12.3 was of no import or a mistake. In the light of article 13, the inherent probability is that it was introduced deliberately.

59.    This point also receives a measure of support from the fact that article 29 provides that in the event of any conflict the provisions in the Main Part should prevail over any provision in the PLA and from the further fact that article 29 at least in one respect enhances the protection given to PTT over that provided to users under the PLA. If the article 29 provision had not been there, PTT would have been subject to the other provisions of paragraph 7 of the PLA which exclude all liability for breach of warranty. As the provisions of article 12.3 take priority, PTT has the possibility of obtaining damages of any kind up to the amount of the price received

by Triple Point. This demonstrates an intention to enhance PTT's position as regards the damages remedy in the Main Part from that which it enjoyed under the PLA.

60.    Article 29 only operates where there is a conflict. Consequential loss of profits is a matter which would be of concern to commercial parties to a software contract. While the point has not been argued, there must be an argument that this is not within article 12.3 in any event because of the provisions of clause 7.5 of the PLA.

61.    Another argument advanced by Mr Stafford was that the objective of the parties was to have a meaningful cap. But this argument works both ways. The exclusion of negligence from the cap also made it a meaningful cap because otherwise article 12.3 arguably provided a wholly inadequate damages remedy to PTT.

62.    Mr Howells argues that the term "negligence" was an inappropriate one in any event because the contracts were not being performed within the English jurisdiction. This, he submits, is another argument for saying that the parties were unlikely to have intended that the cap carve-out should refer to an independent tort and that has some force. It should however be borne in mind, as the contract is governed by English law, that the court would endeavour to apply the English concept of negligence to whatever wrong was claimed to have occurred under any foreign law.

63.    In my judgment, the Court of Appeal went down the wrong route in concluding that the word "negligence" in the cap carve-out referred to an independent tort. The matters referred to in the final sentence are all characteristics of conduct: fraud, wilful misconduct, gross negligence and negligence. These can apply to breaches of the CTRM Contract. Considering the sentence as a whole it is clear that it includes an act which is a breach of contract and which possesses one of those characteristics. Thus, if there is a breach of contract to exercise skill and care by reason of Triple Point's negligence, that will not be subject to the cap in article 12.3. It is simply the provision of Deliverables and other obligations of result under the CTRM Contract which fall within the cap. As I have explained, in a software contract, where the provision of software may result in damages of a considerable amount without any fault on the part of the designer and installer of the software, it is understandable that claims for damages for breach of the requirement that software be defect-free should in those circumstances be subject to the cap.

*(5)    The exclusion of warranties in the PLA was deliberately not followed in article 12.3*

64.    As an alternative, it is said that the formula for excluding matters from the limitation of liability was taken from the PLA and the word "negligence" was merely added in, and so it was suggested that it is unlikely to add very much more. But that is to misunderstand the nature of the PLA. As I have explained, the provenance of this document was a standard form agreement for licensing the software for which Triple Point had copyright protection. It was therefore an agreement with persons who might contract for nothing more than the licensing of that copyrighted software (just as a person might download open-source software on the internet for free).

65.    The notion that article 12.3 of the Main Part should be interpreted in line with paragraph 7.4 of the PLA has no traction when the very different provenance of those two provisions is considered. When the PLA was made a part of the CTRM Contract, which was for the provision of the design and installation of software including the copyrighted material, the formula used in article 12.3 cannot simply be assimilated to that in paragraph 7.4 of the PLA. It is likely to have been independently negotiated in a format appropriate for the CTRM Contract. There is no basis for the suggestion that the same terms as to liability should be included in a customised contract as were included in a standard form contract. In a customised contract the customer has the ability to negotiate a better deal than a person who is simply offered a standard form contract. Moreover, the principal concern of a person taking a licence from Triple Point would be the warranties as to merchantability and quality of the software (and so on) being licenced. In that context, negligence as an independent tort is not a relevant consideration.

66.    Mr Howells made a point about the creation of perverse incentives. He submits that the cap was framed around the contract price received by Triple Point. This framing had the effect of incentivising Triple Point to delay the performance of its obligations and the more liquidated damages PTT became entitled to the less the amount available to pay damages for other breaches. That, submits Mr Howells, might have been a reason why PTT would have been concerned to exclude negligence from the limitation of liability.

67.    I would not give weight to that submission as there is no evidence about the aims of both parties in framing the cap carve-out as they did. It is clear that Triple Point wanted to have a limitation of liability and one can well understand that the design and installation of software can give rise to claims by the client for compensation for loss and damage: for example, the new software may be said to be incompatible with other software of the client. This could no doubt happen without any lack of skill and care, but it may be entirely different if a defect occurs through

lack of skill and care. Be that as it may, there was no evidence about the parties' aim in agreeing to the cap carve-out.

*Conclusion on Issue 2*

68.    In my judgment the cap carve-out in the final sentence of article 12.3 for all the reasons given above should be given its natural and ordinary meaning of removing from the cap all damages for negligence on Triple Point's part, including damages for negligent breach of contract. That means that in my judgment the judge and the Court of Appeal were wrong to treat damages for breach of the contractual duty of skill and care as subject to the cap in article 12.3 of the Main Part of the CTRM Contract.

**Issue 3:  The capping of liquidated damages issue - Are liquidated damages subject to the cap in article 12.3?**

69.    The issue here is helpfully explained in the following passage from the judgment of Sir Rupert Jackson, who also sets out the Court of Appeal's answer to it, which differed from that of the judge (judgment, paras 272 to 275):

> "123.  The final question is whether liquidated damages for delay fall outside the article 12.3 cap as the judge has held. On this issue Mr Howells supports the judge's reasoning and Mr Stafford attacks it.
>
> 124.  Mr Stafford submits that sentence 3 is a separate provision from sentence 2. He bases this argument on the reference to 'the services or deliverables related to the breach' at the end of sentence 3. He submits that sentence 3 is making provision for specific breaches of contract, each of which will have a lower damages cap than the total liability cap imposed by sentence 2. Therefore, says Mr Stafford, the exception in sentence 3 for 'specific remedies expressly identified as such in this contract' has no application to the general cap imposed by sentence 2.
>
> 125.  Mr Howells rejects that analysis. He points out that under article 18 the contract price was payable by reference to milestones, not by reference to services or deliverables. He submits that sentences 2 and 3 must be read together. Sentence 3 amplifies sentence 2 and provides further details. Therefore,

the exception in sentence 3 applies also to the cap imposed by sentence 2.

126.   Both counsel accept that there are difficulties with the second and third sentences of article 12.3, whichever interpretation is correct. I have come to the conclusion that the appellant's construction is preferable. Sentence 3 is dealing with specific remedies for individual breaches. Each breach is subject to its own individual mini-cap. I agree that precise calculation of an individual mini-cap will not be easy because of the way in which the contract price is structured, but it will be possible to make a reasonable assessment. For obvious reasons, sentence 3 cannot apply to delays. Unlike defects, delays cannot usually be 'cured' by the contractor. Furthermore, delays cannot be valued in the same way as defects. So there is a formula elsewhere, namely in clause 5.3, for valuing delays. Accordingly sentence 3 of article 12.3 contains a specific exclusion for delay breaches. Sentence 2 is talking about something different from sentence 3, namely the cap on the contactor's total liability for all breaches.

127.   In my view, the way in which the contract works is this:

(i)   Article 5.3 provides a formula for quantifying damages for delay.

(ii)   Sentence 3 of article 12.3 deals with breaches of contract not involving delay. Hence sentence 3 necessarily includes the words 'Except for the specific remedies expressly identified as such in this contract'. It is common ground that this phrase refers to liquidated damages under article 5.3. Sentence 3 of article 12.3 imposes a cap on the recoverable damages for each individual breach of contract.

(iii)   Sentence 2 of article 12.3 imposes an overall cap on the contractor's *total* liability. That cap on total liability means what it says. It encompasses damages for defects, damages for delay and damages for any other breaches …"

70.     Mr Howells seeks to persuade the Court that the judge was right and that liquidated damages are outside the cap. In particular, he submits that the liquidated damages for delay cannot be correlated with any portion of the Contract Price as required by the second sentence.

71.     In my judgment, the reasoning of the Court of Appeal is correct. I agree with the Court of Appeal that a reasonable assessment can be made of the relevant part of the price. I do not accept that the exception for special remedies in the third sentence extends to the second sentence dealing with the global cap. On my interpretation, the second and third sentences of article 12.3 serve separate functions and are in logical order. First there is a limitation on liability and, second, there is a limitation on the form of remedy. The limitation on the form of remedy contains an exception for special remedies under the contract, of which the liquidated damages clause would be one. But that does not mean to say that the same exception should be written into the limitation on liability. Accordingly, I would reject PTT's appeal on this point.

**Conclusion on the three issues on this appeal**

72.     I would allow this appeal in part. For the reasons given above, I conclude on Issue 1 (the availability of liquidated damages issue), that the Court of Appeal fell into error in being guided by the decision of the House of Lords in *Glanzstoff* because of the similarity in wording. This decision was not binding on them in that respect. I would accordingly allow the appeal on Issue 1. On Issue 2 (the scope of negligence issue), I would also allow the appeal. The exclusion from the cap should be given its ordinary meaning and not a strained meaning. A strained meaning is not justified in fact by the argument that the exclusion of damages for negligent breach of contract from the cap would then emasculate the cap. The important obligations about meeting the specifications for functionality and other absolute obligations in the CTRM Contract meant that liability for negligent breach of contract was not the core obligation of Triple Point under the CTRM Contract. Had the position been otherwise, that would have supported reading the reference to negligence in the cap carve-out as limited to the independent tort of negligence. On Issue 3 (the capping of liquidated damages), I would dismiss the appeal. The Court of Appeal were right to say that the cap embraced liquidated damages so that they counted towards the maximum damages recoverable under the cap.

**LORD LEGGATT: (with whom Lord Burrows agrees)**

73.     I agree with Lady Arden that the appeal should be allowed for the reasons she gives but wish to add reasons of my own for reaching this conclusion.

**Liquidated damages**

74.    A liquidated damages clause is a clause in a contract which stipulates what amount of money will be payable as damages for loss caused by a breach of the contract irrespective of what loss may actually be suffered if a breach of the relevant kind (typically, delay in performance of the contract) occurs. Liquidated damages clauses are a standard feature of major construction and engineering contracts and commonly provide for damages to be payable at a specified rate for each week or day of delay in the completion of work by the contractor after the contractual completion date has passed. Such a clause serves two useful purposes. First, establishing what financial loss delay has caused the employer would often be an intractable task capable of giving rise to costly disputes. Fixing in advance the damages payable for such delay avoids such difficulty and cost. Second, such a clause limits the contractor's exposure to liability of an otherwise unknown and open-ended kind, while at the same time giving the employer certainty about the amount that it will be entitled to recover as compensation. Each party is therefore better able to manage the risk of delay in the completion of the project.

*The approach of the Court of Appeal*

75.    In his judgment in the Court of Appeal (with which Lewison and Floyd LJJ agreed), Sir Rupert Jackson reviewed a series of cases in which courts have decided whether liquidated damages were payable in circumstances where the contract was terminated before the work had been completed: see [2019] EWCA Civ 230; [2019] 1 WLR 3549, paras 76-111. He divided the cases (at para 106) into three groups, according to whether the court concluded that:

> (a)    the clause in question did not apply to any period of delay in completion of the work;

> (b)    the clause applied to any period of delay up to the date of termination of the contract; or

> (c)    the clause continued to apply even after the termination of the contract until the work was completed by another contractor.

76.    Sir Rupert Jackson concluded that the category into which a particular clause falls must depend upon the wording of the clause itself (para 110). That must clearly be correct. He also expressed views, however, about the inherent likelihood that parties to a construction contract (or, as in this case, software engineering contract) would intend a liquidated damages clause to operate in one or another of the three

possible ways he had identified. He said he had doubts about the cases in category (iii) as, if those cases were correct, the result would be that the employer and the second contractor could control the period for which liquidated damages will run (para 108). As regards category (i), Sir Rupert Jackson said that he saw much force in the reasoning of the House of Lords in the Scottish case of *British Glanzstoff Manufacturing Co Ltd v General Accident, Fire and Life Assurance Corpn Ltd* [1913] AC 143; 1913 SC (HL) 1 (para 109). He also said that the "*Glanzstoff* principle" cannot be confined to cases where - as happened in *Glanzstoff* itself - the contract was terminated before the due date for completion of the work (para 107). He drew an analogy with the clause in *Glanzstoff* when he came to interpret the liquidated damages clause at issue in the present case (para 112).

77.      I agree with Lady Arden that *Glanzstoff* is not authority for any legal principle (in either Scottish or English law). As Viscount Haldane LC said in giving the principal speech in that case: "What we have to determine is a matter of pure construction." What the House of Lords decided, affirming the decision of the Court of Session, was that, on the correct interpretation of the contract in question, the liquidated damages clause did not apply to delay in completing the works which occurred after the employer had exercised its contractual right to take possession of the works and engage another contractor to complete them. The damages recoverable in that situation were governed by another clause in the contract which, in the words of Viscount Haldane, "constitutes an enclave in the contract by itself providing for a special remedy": see 1913 SC (HL) 1 at p 2. As already mentioned, on the facts of *Glanzstoff*, the contract had been terminated before the date for completion of the work had arrived. No liquidated damages were therefore payable for the simple reason that no default by the contractor which gave rise to a liability to pay liquidated damages ever occurred. It is true that Viscount Haldane said of the liquidated damages clause in *Glanzstoff* (at p 3) that:

> "upon its construction I read it as meaning that if the contractors have actually completed the works, but have been late in completing the works, then, <u>and in that case only</u>, the clause applies." (Emphasis added)

However, the House of Lords was not contemplating a situation in which the contractors, having failed to complete the works by the due date, were then ousted from the contract by the employer before they had completed the works. No reason was given for supposing that, in such a situation, the contractors would not have been liable to pay liquidated damages for the delay which had already occurred before the contract was terminated, and I cannot think that Viscount Haldane (whose speech was given ex tempore at the conclusion of the appellant's argument) had such a situation in mind. In any event, in the absence of any reasoning to support such a conclusion, no weight should in my view be attached to his remark.

78.     Sir Rupert Jackson acknowledged that a conclusion that a liquidated damages clause applies up to the termination of the contract - his category (ii) - is generally treated as the "orthodox analysis" but he suggested that this approach "is not free from difficulty" (para 110). That is because:

> "If a construction contract is abandoned or terminated, the employer is in new territory for which the liquidated damages clause may not have made provision. Although accrued rights must be protected, it may sometimes be artificial and inconsistent with the parties' agreement to categorise the employer's losses as £x per week up to a specified date and then general damages thereafter. It may be more logical and more consonant with the parties' bargain to assess the employer's total losses flowing from the abandonment or termination, applying the ordinary rules for assessing damages for breach of contract."

79.     I confess to having difficulty with this reasoning. I agree that, if a construction contract is abandoned or terminated, the employer is <u>thereafter</u> in new territory for which the liquidated damages clause may not have made provision. However, as Sir Rupert Jackson acknowledged in saying that "accrued rights must be protected", the effect in law of termination of a contract on the parties' rights and obligations is prospective only. In other words, subject to contrary agreement, the parties are discharged from their obligations under the contract which would otherwise arise after termination but not those which have arisen before: see eg Burrows, *A Restatement of the English Law of Contract*, 2nd ed (2020), section 19(4). In principle, therefore, where at the time of termination delay for which liquidated damages are payable has already occurred, there is no reason - in law or in justice - why termination of the contract should deprive the employer of its right to recover such damages, unless the contract clearly provides for this. The fact that, if the employer were deprived of that right, only one assessment of damages for delay would be required instead of two does not seem to me a good reason. Moreover, the last sentence of the passage quoted above appears to overlook the fact that losses caused by breaches occurring before the contract is abandoned or terminated are not part of the employer's total losses flowing from the abandonment or termination. There is therefore nothing illogical in quantifying the damages for them separately. Whether it is inconsistent with the parties' agreement to do so begs the question of what they have agreed.

80.     In addition to the ordinary effect of termination on the parties' rights and obligations, I agree with Lady Arden that there are cogent commercial reasons why parties who include a liquidated damages clause in their contract would be unlikely to intend the employer's right to receive such damages for delay by the contractor to be conditional upon the contractor actually completing the work. In the first place,

if the parties wish to obtain the benefits of a liquidated damages clause mentioned at the start of this judgment, I can see no reason why, in the event that the contract is terminated before the work is completed, they would wish to forgo those benefits of certainty, simplicity and efficiency in quantifying the damages in relation to delay which has already occurred. Indeed, making the right to liquidated damages for delay by the contractor conditional upon the contractor completing the work would itself introduce considerable uncertainty at the time of contracting about what sum would be recoverable if delay occurs and would thus deprive the parties of the advantage of being able to know their financial exposure from this risk in advance.

81.    Secondly and still more importantly, a clause which had this effect would give a contractor who badly overruns the time specified for completion an incentive not to complete the work in order to avoid paying liquidated damages for the delay which its breach of contract has caused. It makes no sense to create such an incentive. As Lord Skerrington said in *Cameron-Head v Cameron & Co* 1919 SC 627, p 636 - a case in which it was argued, relying on *Glanzstoff*, that a sum payable per day by purchasers of timber "until [the work of clearing the timber] was done" could not be recovered unless and until the work had been completed:

> "It was suggested that the purchasers had it in their power to reduce this stipulation to a mere nullity, because they had only to be bold enough to throw up the contract and say that they would not fulfil it in order to relieve themselves of it. … The purpose which the parties had in view would be defeated, if the penalty could not be exacted immediately but was to be payable only if and when the purchasers thought fit to complete their contract."

See also Davie M and Dowers N, "The Court of Appeal's Look North for a Solution Goes South: Liquidated Damages and Termination in *Triple Point Technology v PTT*", (2019) 23(3) Edin LR 395, 400. While this point assumes that the right to be paid liquidated damages is beneficial to the employer, if the parties have agreed a low rate which favours the contractor, the same point applies in reverse.

82.    I recognise that judges whose experience of entering into contracts of the kind under consideration is entirely vicarious need to be cautious in expressing views that a particular type of arrangement would not make commercial sense, especially if the arrangement is in fact commonly adopted. I therefore thought it would be a useful cross-check to ask counsel for Triple Point if, after the hearing, they could give an example of a standard form of contract which provides that liquidated damages for delay will be payable only if the contractor actually completes the work. The example they produced was the 2017 FIDIC Conditions of Contract for Plant & Design Build (the Yellow Book). However, clause 15.4(c) of these conditions

provides that, where the contract is terminated for the contractor's default, liquidated damages are payable for every day that has elapsed between the due date for completion of the works and the date of termination; see also Inns D & Touhey K, "Liquidated damages for delay after termination: until completion do us part?" (2019) 35(4) Const LJ 221 at 232. In other words, this is an example of the "orthodox" approach. The fact that no standard clause could be found which falls into Sir Rupert Jackson's category (i) reinforces my view that such a clause is not one which parties to a commercial contract would think it sensible to choose.

83.   What of a clause in category (iii) which continues to apply even after the termination of the contract until the work is completed by another contractor? In *Hall v Van der Heiden* [2010] EWHC 586 (TCC), para 76, Coulson J rejected the suggestion that the defendant's liability to pay liquidated damages came to an end when his employment under the contract was terminated. Coulson J said:

> "Any such term would reward the defendant for his own default. Take the example of a contractor who has wholly failed to comply with the contract, is in considerable delay, and is facing a notice of termination. The defendant's case would mean that such a contractor was only liable to pay liquidated damages for delay before the decision was taken to terminate, thereby penalising the employer for trying to get the works completed by another contractor, and rewarding the contractor for sitting on his hands and failing to carry out the works in accordance with the programme."

84.   As Sir Rupert Jackson pointed out, this decision has been criticised: [2019] EWCA Civ 230; [2019] 1 WLR 3549, para 100, citing as an example *Hudson's Building and Engineering Contracts*, 13th ed (2015), p 733, fn 156 (now 14th ed (2020), para 6-023, fn 161). One criticism that has been made is that the reasoning reveals a misapprehension that, in the absence of a claim under the liquidated damages clause, the claimant would have had had no claim for damages for delay: see McKendrick E, "Liquidated Damages, Delay and the Termination of Contracts", (2019) 8 JBL 577 at 587. However, I see no reason to think that Coulson J made such an elementary error. I am sure that what he had in mind was the difficulty of proving and quantifying loss caused by delay and the fact that a right to damages at the agreed rate of £700 per week in *Hall* was - as is often the position - patently far more advantageous to the employer than a claim for damages at common law (under which the only damages recoverable in *Hall* would have been a much smaller sum in storage costs). As I understand it, the point that Coulson J was making was that cutting off liquidated damages at the date of termination rewards the contractor for the fact that its default has led to the contract being terminated before the work has been completed by relieving it of further liability to pay damages at the agreed rate.

85.    While this is a relevant consideration, a clause under which liquidated damages cease to run at the date of termination cannot be said to reward the contractor for its default to an extent comparable to a clause which makes recovery of any liquidated damages for delay, including past delay, conditional upon whether the contractor chooses to complete the work. Any such factor also has to be set against the point made by Sir Rupert Jackson that, after the contract has been terminated, the time taken to complete the work is entirely outside the control of the original contractor. As Professor McKendrick has observed, it is possible that the risk which this poses for the contractor could be mitigated by making clear in the clause itself that the liability to pay liquidated damages will only arise post-termination if the employer and any replacement contractor complete the works in a timely, efficient and cost-effective manner: see 8 JBL 577, 593. But without some protection of this kind, it seems unlikely that a contractor would put itself at the mercy of the employer by agreeing that liquidated damages should continue to run after the termination of the contract.

86.    I conclude that it is ordinarily to be expected that, unless the clause clearly provides otherwise, a liquidated damages clause will apply to any period of delay in completing the work up to, but not beyond, the date of termination of the contract.

### The liquidated damages clause in this case

87.    The relevant clause of the CTRM Contract is the third paragraph of article 5 (referred to for convenience as "article 5.3"), which states:

> "If CONTRACTOR fails to deliver work within the time specified and the delay has not been introduced by PTT, CONTRACTOR shall be liable to pay the penalty at the rate of 0.1% (zero point one percent) of undelivered work per day of delay <u>from the due date for delivery up to the date PTT accepts such work</u> …" (Emphasis added)

It is common ground on this appeal that, although the sum payable is referred to as "the penalty", the clause is not a penalty clause but a clause providing for the payment of liquidated damages.

88.    Much money potentially turns on the meaning of this clause. The relevant facts are that Triple Point completed Stages 1 and 2 of Phase 1 of the project 149 days late but did not complete any of the further seven Stages of Phase 1 nor any of the nine Stages of Phase 2 by the due dates or at all before the CTRM Contract was terminated. If (as the judge held and PTT contends) liquidated damages are payable

for the delay up to the date of termination in delivering all the uncompleted work (a total period of 3,220 days), the sum recoverable is US$3,459,278.40. If on the other hand (as the Court of Appeal held and Triple Point contends) liquidated damages are payable only for the delay of 149 days in completing the work which Triple Point actually did complete, then the liquidated damages which Triple Point is liable to pay are only US$154,662.

89.    The meaning and effect of article 5.3 is in my view reasonably straightforward. Where the two conditions specified in the opening words are met - that is, (1) the Contractor fails to deliver work within the time specified, and (2) the delay has not been introduced by PTT, then liquidated damages are payable for each day of delay from the due date for delivery of any item of work up to the date when PTT accepts the work.

90.    It could not reasonably have been intended that, if PTT unjustifiably refuses to accept completed work, liquidated damages should continue to accrue until PTT chooses to accept the work, and it is not suggested that the clause has that effect. It seems to me that, on the wording of the clause, the way in which such a consequence is avoided is that any delay in accepting work after it has been completed would be delay "introduced by PTT". Hence Triple Point would not be liable to pay the specified sum in respect of any such period.

91.    PTT has not sought to argue that article 5.3 continued to apply after the contract was terminated. (Nor in fact did PTT claim any unliquidated damages in relation to the further time taken for another contractor to complete the work after that date.) In light of the considerations discussed above, the term "delay" would in my view reasonably be understood to refer to delay by the Contractor - that is to say, any period of time when the Contractor is under an obligation to deliver work with which it has failed to comply. Accordingly, if the Contractor ceases to be under an obligation to deliver work because the Contractor is discharged from that obligation by the termination of the contract, no further liability to pay the sum payable for each day of delay in the performance of that obligation will arise. However, termination of the contract will not affect the liability of Triple Point to pay liquidated damages for each day of delay in the performance of its obligation to deliver work under the contract which had already occurred before the contract was terminated.

92.    The interpretation of article 5.3 contended for by Triple Point and accepted by the Court of Appeal is that, if Triple Point never completes the work because for example, as happened in this case, PTT terminates the contract lawfully because of Triple Point's repudiatory breach, then there never is a date when PTT accepts the work and in these circumstances the liability to pay liquidated damages has no application. This interpretation seems to me to have the double disadvantage of

being inconsistent with both the language and the commercial purpose of the clause. It is inconsistent with the language because the clause specifies the conditions which must be met in order for liability to pay liquidated damages to arise, and acceptance of the work by PTT is not one of them. The clause does not say that the Contractor shall be liable to pay the agreed sum for each day of delay provided that PTT accepts the work, or anything of that kind. It simply makes the Contractor liable to pay that sum for each day of delay up to the date PTT accepts the work. This carries no implication that the Contractor will not have a liability to pay liquidated damages for delay unless such a date arrives. To the contrary, the clause clearly signifies that, provided the two stated conditions are met, the liability to pay the agreed sum for each day of delay will run from the due date of delivery and will go on running until the work is accepted. That is the effect of the clause, no more and no less. If the contract is terminated, the liability to pay liquidated damages stops running, not because the end date specified in the clause has been reached, but because Triple Point ceases to be under an obligation to deliver work with which it is failing to comply.

93.    The interpretation for which Triple Point contends is also inconsistent with the purpose of the clause for the reasons given at paras 80-81 above. In short, the purpose of agreeing in advance on a sum payable as liquidated damages for each day of delay caused by the contractor would be defeated if the stipulated sum was payable only if and when the contractor chose to complete the contract.

94.    It was submitted by Mr Paul Darling QC, who argued this issue for Triple Point, that it may not be possible before work has been completed to determine what, if any, part of a period of delay in completing the work has been caused by PTT and is therefore not delay for which Triple Point is liable to pay liquidated damages. The suggestion was that reasonable parties would be unlikely in these circumstances to intend that liquidated damages should be payable unless and until a defined stage of the work has been completed. I am not persuaded by this argument. I accept that, if the contract is terminated after the due date for completion of work but before the relevant work has been completed, it may be impossible to know with any certainty when, if the contract had not been terminated, the work would have been completed and what part, if any, of the overall period of delay would have been caused by the employer. But that is not the relevant question. The relevant question is what part of the delay which has occurred between the due date for completion and the date of termination has in fact been caused by the employer. That does not depend on what would have happened thereafter. In any case, to the extent that there may be difficulties in proving to what extent delay has been caused by the employer, those difficulties would equally exist if the quantum of damages was at large and are not a reason to infer that, where a period of delay not caused by the employer has been established, the parties would not want the damages to be quantified on the basis of an agreed daily rate and would instead want them to be unliquidated.

95.    Accordingly, I would reject Triple Point's contention that it is not liable under article 5.3 to pay liquidated damages for the periods of delay which occurred between the due dates for delivery of work and the termination of the contract (none of which on the judge's findings were introduced by PTT). It follows that - subject to the issues about the correct interpretation of article 12.3 of the CTRM Contract to which I am about to turn - PTT is entitled to recover liquidated damages under article 5.3 in the amount of US$3,459,278.40 assessed by the judge.

**The meaning of article 12.3**

96.    Article 12.3 (with the four sentences separated and numbered for convenience) provides as follows:

> "1.    CONTRACTOR shall be liable to PTT for any damage suffered by PTT as a consequence of CONTRACTOR's breach of contract, including software defects or inability to perform 'Fully Complies' or 'Partially Complies' functionalities as illustrated in Section 24 of Part III Project and Services.

> 2.    The total liability of CONTRACTOR to PTT under the Contract shall be limited to the Contract Price received by CONTRACTOR with respect to the services or deliverables involved under this Contract.

> 3.    Except for the specific remedies expressly identified as such in this Contract, PTT's exclusive remedy for any claim arising out of this Contract will be for CONTRACTOR, upon receipt of written notice, to use best endeavor to cure the breach at its expense, or failing that, to return the fees paid to CONTRACTOR for the Services or Deliverables related to the breach.

> 4.    This limitation of liability shall not apply to CONTRACTOR's liability resulting from fraud, negligence, gross negligence or wilful misconduct of CONTRACTOR or any of its officers, employees or agents."

97.    The first point to make about this clause is that, as is clear from the first sentence onwards, the clause is concerned only with the liability of the Contractor for any damage suffered by PTT as a consequence of the Contractor's breach of contract. It does not apply to any extra-contractual liability which the Contractor

might incur under the law of tort. Although the words "arising out of this Contract" in sentence 3 might in some contexts (such as an arbitration clause) be construed more widely to include other claims arising out of the parties' relationship, it is apparent from the later part of sentence 3 that it is concerned only with remedies for breach of contract. Like the rest of the clause, therefore, sentence 3 is dealing only with liability under the law of contract and not with liability in tort.

### The relationship of sentences 2 and 3

98.    It is common ground that sentences 2 and 3 of article 12.3 need to be read together in that they together constitute the "limitation of liability" referred to in sentence 4. PTT seeks to take this interrelationship a stage further, however, by arguing that the exception for "the specific remedies expressly identified as such in this Contract" at the start of sentence 3 also qualifies sentence 2. I agree with Lady Arden that this argument can be disposed of shortly, as there is simply no justification for rewriting the contract in such a way. The exception for specific remedies is needed in order to preserve, in particular, the remedy of liquidated damages for delay in the delivery of work provided by article 5.3. The remedy of returning the fees paid to the Contractor is not apposite to such a breach, as it is only once work has been delivered that fees are payable for it. By contrast, it makes perfectly good sense for the parties, if they choose to do so, to agree separately to impose a cap on the Contractor's total liability under the contract which includes any liability to pay liquidated damages. It is clear from the wording of the clause that this is indeed what the parties have done - subject to the exception in sentence 4.

### The meaning of "negligence" in sentence 4

99.    The principal dispute in relation to article 12.3 is whether the word "negligence" in sentence 4 refers to breach of a contractual duty of care (as PTT contends) or to breach of a duty of care in tort which does not give rise to a concurrent liability for breach of contract (as the judge and the Court of Appeal held).

100.    The starting point must be that, as the judge observed, any breach of an obligation to exercise reasonable care and skill would, in common legal language, be called "negligence", whether the source of the obligation is a term of the contract or the law of tort: see [2017] EWHC 2178 (TCC), para 258. On a straightforward reading of article 12.3, therefore, liability resulting from breach of a contractual duty of care falls within the exception for "liability resulting from … negligence" established by sentence 4. Hence such liability is not subject to the limitation on the liability of Triple Point to PTT.

101.    A further, compelling reason for giving the word "negligence" in article 12.3 its straightforward and ordinary legal meaning is that, as already noted, article 12.3 only deals with liability for breach of the CTRM Contract and does not deal with liability in tort at all. It therefore makes no sense to interpret the word "negligence" in sentence 4 as referring to a basis of liability which is not part of the subject matter of the clause. The cap imposed in sentence 2 applies to the total liability of the Contractor under the CTRM Contract. It does not apply to any other liability which the Contractor might have independently of the CTRM Contract under the law of tort. The same applies to sentence 3 which, as already noted, deals with remedies for breaches of the CTRM Contract. Hence the only limitation of liability resulting from the Contractor's negligence which sentence 4 can disapply is liability resulting from breach of a contractual duty of care. Liability in tort does not enter the equation.

102.    That is also consistent with the rest of sentence 4. The terms "gross negligence" and "wilful misconduct" are not, at least in common law systems, separate torts. It seems clear that those terms must be intended to describe, or at the very least to include, conduct which amounts to a breach of the contract. The same is true of "fraud". Although that term could be used to refer to claims in tort such as claims in the tort of deceit, it is apt also to refer to fraud which would entitle the innocent party to rescind the contract or fraud in the performance of the contract. It is anomalous to treat the term "negligence" as excluding negligent conduct which amounts to a breach of the contract when there is no similar restriction on the scope of the other terms in the list.

103.    By contrast, the interpretation of the word "negligence" for which Triple Point contends is inconsistent not merely with the ordinary legal meaning of the word but with any meaning which the word can reasonably bear. I would certainly accept that the word "negligence" could in some contexts mean the tort of negligence - though, as stated, this is not a reasonable interpretation of the word in the context of a clause which does not apply to liability in tort at all. That is not, however, the meaning of the word for which Triple Point contends. If "negligence" in article 12.3 meant the tort of negligence, this might not be good enough for Triple Point and could produce illogical results. The reason is that, at any rate in English law, someone who provides services to another person generally owes that person a duty of care in tort whether or not the relationship between them is contractual and even if such a duty of care is also owed under the contract: see *Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145; *Robinson v PE Jones (Contractors) Ltd* [2011] EWCA Civ 9; [2012] QB 44. In the present case a claim in tort would not have been governed by English law. Pursuant to article 4(1) of Regulation (EC) 864/2007 (Rome II), the applicable law would be that of the country where the damage occurred, which was probably Thailand where PTT carries on its business. However, if the applicable law were similar in this respect to English law, negligence in the performance of the "Services" (defined in article 1.2 of the CTRM Contract to mean "all activities rendered by [Triple Point] to PTT in connection with the Project")

would give rise to a concurrent liability in tort as well as under the contract. If the intention were to cap Triple Point's liability to PTT resulting from negligence in the performance of the contract, it would potentially defeat that intention to create an exception from the cap for liability for negligence in tort which arises concurrently with liability for breach of a contractual duty of care.

104.    To avoid that result, Triple Point contends that the term "negligence" in sentence 4 of article 12.3 does not include want of care which gives rise to liability in tort if it also gives rise to liability for breach of the contract. I take the Court of Appeal to have accepted this contention in holding that "negligence" in sentence 4 of article 12.3 means "the freestanding tort of negligence": see [2019] EWCA Civ 230; [2019] 1 WLR 3549, para 119. The word "freestanding" was presumably intended to signify that the term "negligence" is confined to a negligent act or omission which is a breach of a duty of care owed in tort but is not also a breach of a duty of care arising under the contract.

105.    The problem with this approach, however, is that it seeks to build into the word "negligence" a convoluted meaning which the word cannot reasonably bear. No reasonable person would understand the word "negligence" to mean negligence which is neither a breach of a contractual duty of care nor of a concurrent duty of care in tort. Still less is that a possible meaning when, as discussed above, the context in which the word is used is a clause dealing only with liability for breach of the contract and not with liability in tort at all - let alone with liability in tort which arises altogether outside the scope of the contract.

### Clear words needed to restrict valuable rights

106.    Even if the interpretation for which Triple Point contends were considered to be a possible meaning of the word, a further reason for giving the word "negligence" its straightforward and ordinary legal meaning is that clear words are necessary before the court will hold that a contract has taken away valuable rights or remedies which one of the parties to it would have had at common law (or pursuant to statute).

107.    The approach of the courts to the interpretation of exclusion clauses (including clauses limiting liability) in commercial contracts has changed markedly in the last 50 years. Two forces have been at work. One has been the impact of the Unfair Contract Terms Act 1977, which provided a direct means of controlling unreasonable exclusion clauses and removed the need for courts to resort to artificial rules of interpretation to get around them: see Lord Denning's swansong in *George Mitchell (Chesterhall) Ltd v Finney Lock Seeds Ltd* [1983] QB 284, 296-301; and *Bank of Credit and Commerce International SA v Ali* [2001] UKHL 8; [2002] 1 AC 251, paras 57-60 (Lord Hoffmann). This change of attitude was heralded by the

decision of the House of Lords in *Photo Production Ltd v Securicor Transport Ltd* [1980] AC 827. The second force has been the development of the modern approach in English law to contractual interpretation, with its emphasis on context and objective meaning and deprecation of special "rules" of interpretation - encapsulated by Lord Hoffmann's announcement in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896 at 912 that "almost all the old intellectual baggage of 'legal' interpretation has been discarded".

108.    The modern view is accordingly to recognise that commercial parties are free to make their own bargains and allocate risks as they think fit, and that the task of the court is to interpret the words used fairly applying the ordinary methods of contractual interpretation. It also remains necessary, however, to recognise that a vital part of the setting in which parties contract is a framework of rights and obligations established by the common law (and often now codified in statute). These comprise duties imposed by the law of tort and also norms of commerce which have come to be recognised as ordinary incidents of particular types of contract or relationship and which often take the form of terms implied in the contract by law. Although its strength will vary according to the circumstances of the case, the court in construing the contract starts from the assumption that in the absence of clear words the parties did not intend the contract to derogate from these normal rights and obligations.

109.    The first and still perhaps the leading statement of this principle is that in *Modern Engineering (Bristol) Ltd v Gilbert-Ash (Northern) Ltd* [1974] AC 689 ("*Gilbert-Ash*"). The question was whether the parties to a building contract had agreed to exclude the contractor's common law and statutory right to set off claims for breach of warranty against the price. The right allegedly excluded was thus one which would diminish the value of the claim otherwise maintainable against the contractor. Lord Diplock said (at 717H):

> "It is, of course, open to parties to a contract for sale of goods or for work and labour or for both to exclude by express agreement a remedy for its breach which would otherwise arise by operation of law … But in construing such a contract one starts with the presumption that neither party intends to abandon any remedies for its breach arising by operation of law, and clear express words must be used in order to rebut this presumption."

In *Photo Production* [1980] AC 827, 850-851, Lord Diplock returned to this principle and explained its rationale more fully:

"Since the presumption is that the parties by entering into the contract intended to accept the implied obligations exclusion clauses are to be construed strictly and the degree of strictness appropriate to be applied to their construction may properly depend upon the extent to which they involve departure from the implied obligations. <u>Since the obligations implied by law in a commercial contract are those which, by judicial consensus over the years or by Parliament in passing a statute, have been regarded as obligations which a reasonable businessman would realise that he was accepting when he entered into a contract of a particular kind</u>, the court's view of the reasonableness of any departure from the implied obligations which would be involved in construing the express words of an exclusion clause in one sense that they are capable of bearing rather than another, is a relevant consideration in deciding what meaning the words were intended by the parties to bear. But this does not entitle the court to reject the exclusion clause, however unreasonable the court itself may think it is, if the words are clear and fairly susceptible of one meaning only." (Emphasis added)

110.    Many further authoritative statements of this principle are quoted in Lewison, *The Interpretation of Contracts*, 7th ed (2020), chapter 12, section 20: see eg *Trafalgar House Construction (Regions) Ltd v General Surety & Guarantee Co Ltd* [1996] AC 199, 208C (Lord Jauncey of Tullichettle); *Stocznia Gdanska SA v Latvian Shipping Co* [1998] 1 WLR 574, 585 (Lord Goff of Chieveley); *HIH Casualty & General Insurance Ltd v Chase Manhattan Bank* [2003] UKHL 6; [2003] 1 All ER (Comm) 349, para 11 (Lord Bingham of Cornhill); *Bahamas Oil Refining Co International Ltd v Owners of the Cape Bari Tankschiffahrts GMBH & Co KG* [2016] UKPC 20; [2017] 1 All ER (Comm) 189, para 31 (Lord Clarke). Notable statements of the principle are also contained in several judgments of Moore-Bick LJ in the Court of Appeal. In *Stocznia Gdynia SA v Gearbulk Holdings Ltd* [2009] EWCA Civ 75; [2010] QB 27, para 23, he said:

"The court is unlikely to be satisfied that a party to a contract has abandoned valuable rights arising by operation of law unless the terms of the contract make it sufficiently clear that that was intended. The more valuable the right, the clearer the language will need to be."

See also *Whitecap Leisure Ltd v John H Rundle Ltd* [2008] EWCA Civ 429; [2008] 2 Lloyd's Rep 216, para 20; and *Seadrill Management Services Ltd v OAO Gazprom* [2010] EWCA Civ 691; [2011] 1 All ER (Comm) 1077, paras 27-29. In *Seadrill* at para 29, Moore-Bick LJ described the principle as "essentially one of common

sense; parties do not normally give up valuable rights without making it clear that they intend to do so".

111.   To the extent that the process has not been completed already, old and outmoded formulas such as the three-limb test in *Canada Steamship Lines Ltd v The King* [1952] AC 192, 208, and the "contra proferentem" rule are steadily losing their last vestiges of independent authority and being subsumed within the wider *Gilbert-Ash* principle. As Andrew Burrows QC, sitting as a Deputy High Court Judge, said in *Federal Republic of Nigeria v JP Morgan Chase Bank NA* [2019] EWHC 347 (Comm); [2019] 1 CLC 207, para 34(iii):

> "Applying the modern approach, the force of what was the *contra proferentem* rule is embraced by recognising that a party is unlikely to have agreed to give up a valuable right that it would otherwise have had without clear words. And as Moore-Bick LJ put it in the *Stocznia* case, at para 23, 'The more valuable the right, the clearer the language will need to be'. So, for example, clear words will generally be needed before a court will conclude that the agreement excludes a party's liability for its own negligence."

See also Peel E, "Whither Contract Proferentem?" in Burrows and Peel (eds), *Contract Terms* (2007), chapter 4; and Foxton D, "The Status of the Special Rules of Construction of Exemption Clauses in Commercial Contracts" (2021) JBL 205.

112.   In *Seadrill* and in *JP Morgan Chase Bank* the obligation allegedly excluded by a clause in the contract was in each case an aspect of the obligation implied by law - originally at common law and now by section 13 of the Supply of Goods and Services Act 1982 - in a contract to supply services that the supplier will carry out the service with reasonable care and skill. In each case, applying the *Gilbert-Ash* principle, it was held that clear wording would be needed to exclude this obligation and that there was no such clear wording. Affirming the decision of the deputy judge in *Federal Republic of Nigeria v JP Morgan Chase Bank NA* [2019] EWCA Civ 1641; [2019] 2 CLC 559, para 40, Rose LJ (with whom Baker LJ and Sir Bernard Rix agreed) said that the duty to exercise reasonable care and skill in the services provided (in that case by a bank to its customer) can "properly be described as one of the incidents which the law ordinarily attaches to the relationship" and is "a duty which is inherent in that relationship". Those descriptions well express the doctrine that many types of contract are regarded as having certain ordinary incidents, derived from the nature of the relationship they create, which inform the interpretation of the contract and which clear words are required to displace.

113.    In the present case it was likewise an obligation implied by law in the CTRM Contract, in so far as it involved the supply of services, that Triple Point should carry out those services with reasonable care and skill. The parties have not sought to exclude that obligation from arising. Indeed, they have positively reinforced it by article 12.1. The extent of the departure from the ordinary remedy of damages for loss resulting from breach of that obligation which applying the liability cap would involve is illustrated by the potential financial impact of such a conclusion in the present case. On the judge's findings, negligence of Triple Point in the performance of the Services gave rise prima facie to a liability to pay damages to PTT in a sum of US$14,664,035.18. This amount comprises the cost of procuring an alternative system quantified at US$10,574,756.78, wasted costs of US$630,000 and the liquidated damages for delay of US$3,459,278.40 referred to at para 95 above. If, however, the limitation of liability contained in article 12.3 applies to negligence in the performance of the Services, the total liability of Triple Point is limited to the sum of US$1,038,000. Hence declining to interpret the term "negligence" in sentence 4 as bearing its ordinary legal meaning would involve a substantial departure from the obligations implied by law in a contract of the present kind.

*Triple Point's argument*

114.    The argument which persuaded the Court of Appeal that the word "negligence" in sentence 4 of article 12.3 should not be given its straightforward meaning of a failure to exercise reasonable care and skill in the performance of the Services was that, on that basis, sentence 4 "would take away almost the entire protection afforded by the cap" and "deprive the … cap of any practical effect": see [2019] EWCA Civ 230; [2019] 1 WLR 3549, paras 117 and 121.

115.    In my view, there are at least four flaws in this argument. First, as already indicated, the alternative meaning for which Triple Point contends - that the word "negligence" in sentence 4 of article 12.3 refers to negligence altogether outside the scope of the contract - is, in my view, not merely contrary to the ordinary legal meaning of the word "negligence" but is not a meaning which the term can reasonably bear.

116.    Second, as Lady Arden has shown, the argument in any case exaggerates the effect of giving the term "negligence" its ordinary legal meaning. As well as agreeing to supply services, Triple Point also agreed to provide what are referred to in article 12.3 as "Deliverables" consisting in software which complied with contractual specifications. This aspect of the contract imported obligations which were strict and not just duties of care. While it is true, therefore, that giving the term "negligence" in sentence 4 its ordinary legal meaning creates a significant exception to the limitation of liability in article 12.3, it is going too far to say that it takes away "almost the entire protection" afforded by the cap or that it deprives the cap "of any

practical effect". The clause still has the practical effect of limiting the liability of Triple Point for breach of any of the numerous obligations of result referred to by Lady Arden at para 54 of her judgment.

117.   Third, Triple Point's argument would have more to commend it if, conversely, restricting the "negligence" referred to in sentence 4 to negligence outside the scope of the contract left the term with some meaningful content. However, as Lady Arden has also shown, it empties the term of any meaningful content. Several attempts have been made to come up with an example of a liability in tort outside the scope of the contract that reasonable parties could credibly have been seeking to preserve. None of the examples suggested seems to me to describe a scenario which might realistically have been a source of concern that would explain the decision to exclude liability for "negligence" from the cap. Moreover, even if any of the examples suggested is considered realistic, the exception would anyway have no content or practical effect as the cap does not apply to liability other than liability under the contract.

118.   Like Lady Arden, I do not consider that Triple Point gets any assistance from comparing sentence 4 of article 12.3 with clause 7.4 of Triple Point's standard Licence Agreement, which formed part of the CTRM Contract. Clause 7.4 of the Licence Agreement limits "the aggregate liability of Triple Point for damages from any cause of action whatsoever" to the fees paid to Triple Point under the agreement, except for "such damages caused by fraud, gross negligence and wilful misconduct." Far from assisting Triple Point, the fact that the exception in this standard term does not refer to "negligence" serves to show that the term "negligence" has been deliberately added in article 12.3 which is a bespoke clause (and is the relevant clause in this case because it is contained in the main contract which covered the implementation of the software system which Triple Point agreed to supply). It is not to be supposed that reasonable parties would have gone to the trouble of altering the wording of a standard clause in a way that was utterly pointless.

119.   Of more help to Triple Point, in my view, is the argument that the addition of "negligence" in article 12.3, if the term is given its ordinary legal meaning, makes the expression "gross negligence" redundant. I agree that it does have this result and that it would have been neater and better drafting simply to have deleted the word "gross". But arguments of this sort based on verbal surplusage in a commercial contract do not count for much. As Staughton LJ said in *Total Transport Corpn v Arcadia Petroleum Ltd* [1998] 1 Lloyd's Rep 351, 357:

> "It is well-established that the presumption against surplusage is of little value in the interpretation of commercial contracts."

Many authorities confirming that proposition are collected in Lewison, *The Interpretation of Contracts*, 7th ed (2020), chapter 7, section 3.

120.    Fourth, the argument advanced by Triple Point, even if it otherwise had merit, fails to take account of the principle discussed above that clear words are needed to exclude or limit an obligation implied by law as an ordinary incident of a contract.

121.    I therefore consider that no adequate reason has been shown for construing the contractor's "liability resulting from … negligence" which is expressly excepted from the cap on liability by sentence 4 of article 12.3 to mean liability resulting from negligence outside the contract which would in any case not be subject to the cap. On the contrary, the only reasonable meaning of these words is that the cap does not apply to liability resulting from negligence in the performance of the Services under the contract. It follows that the cap does not apply to the damages claimed by PTT in this case.

**Conclusion**

122.    For these reasons in addition to those given by Lady Arden, I agree that the appeal should be allowed, with the result that PTT is entitled to recover the damages assessed by the judge in the total sum of US$14,664,035.18 without any limitation of liability.

**LORD SALES: (part dissenting) (with whom Lord Hodge agrees)**

123.    I agree with the judgment of Lady Arden on the first and third issues in the appeal. I also agree with Lord Leggatt's reasoning on the first issue. I gratefully adopt Lady Arden's account of the facts and will use her terminology in this judgment.

124.    The second issue relates to the interpretation of the word "negligence" in the fourth sentence of article 12.3 of the Main Part of the CTRM Contract between PTT and Triple Point. On that issue I have come to a different conclusion.

125.    I agree with the judge (paras 261-262) and Sir Rupert Jackson and the other members of the Court of Appeal (paras 117-121) that the word "negligence", as used in that sentence, does not refer to negligence in the performance of Triple Point's obligations under the CTRM Contract. I think it is telling that four experienced judges have all come to this view with little hesitation. Sir Rupert Jackson, who has

great experience in dealing with contracts of this type, thought that the judge's conclusion was obviously correct.

126.   The CTRM Contract was pulled together from a number of sources. Aspects of it are not well drafted. In particular, the fourth sentence of article 12.3 is not well expressed, whatever interpretation one gives to the word "negligence". This is a one-off provision and the question of law to which it gives rise has no wider significance than this case.

127.   In my opinion, to understand article 12 four features of the CTRM Contract are of particular importance. First, the provisions of the Main Part are expressed to prevail where there is any conflict with other documentation pertaining to and forming part of the CTRM Contract: article 29 of the Main Part and clause 10.9 of the PLA. The Main Part is the primary source of the parties' rights and obligations. Secondly, the term "Services" is defined in article 1.2 of the Main Part in very wide terms: "all activities rendered by CONTRACTOR [ie Triple Point] to PTT in connection with the Project". As Lady Arden points out, this includes almost anything done by Triple Point under the CTRM Contract. Thirdly, article 12 appears in the section of the Main Part entitled "Performance Security and Liability", comprising articles 11 to 13. It is this section which defines the basic obligations of the parties in a manner which governs all aspects of the CTRM Contract. Fourthly, it is common ground that the CTRM Contract and the services provided under it were produced by customising Triple Point's standard software products and contractual terms: hence the use of the PLA, in modified form, as part of the CTRM Contract.

128.   In the "Performance Security and Liability" section of the Main Part, article 11 imposes an obligation on Triple Point to furnish a performance security as a guarantee for the proper fulfilment of its obligations. Article 12 is headed "Liability and Responsibility" and deals with the obligations of Triple Point which are fundamental to performance of the CTRM Contract. Article 13 is headed "Indemnity" and sets out the obligation of each party (but with particular reference to Triple Point) to hold the other harmless in respect of liabilities the other may incur as a result of steps taken in implementation of the CTRM Contract.

129.   Article 12 provides:

> "12.1  CONTRACTOR shall exercise all reasonable skill, care and diligence and efficiency in the performance of the Services under the Contract and carry out all his responsibilities in accordance with recognized international professional standards. The CONTRACTOR, his employees and sub-

contractors, while in Thailand and/or other countries where the Services are being carried out, shall respect the law and customs of the respective countries. The CONTRACTOR shall replace employees and sub-contractors who commit serious violation of the laws of such countries with others of equal competence satisfactory to PTT at the expense of the CONTRACTOR.

12.2   CONTRACTOR's personnel, representatives, successors and permitted assignees shall not have the benefit, whether directly or indirectly, of any royalty on or of any gratuity of commission in respect of any patented or protected articles or process used on or for the purpose of the Contract unless it is mutually agreed in writing that CONTRACTOR shall have such benefit.

12.3   CONTRACTOR shall be liable to PTT for any damage suffered by PTT as a consequence of CONTRACTOR's breach of contract, including software defects or inability to perform 'Fully Complies' or 'Partially Complies' functionalities as illustrated in section 24 of Part III Project and Services. The total liability of CONTRACTOR to PTT under the Contract shall be limited to the Contract Price received by CONTRACTOR with respect to the services or deliverables involved under this Contract. Except for the specific remedies expressly identified as such in this Contract, PTT's exclusive remedy for any claim arising out of this Contract will be for CONTRACTOR, upon receipt of written notice, to use best endeavor to cure the breach at its expense, or failing that, to return the fees paid to CONTRACTOR for the Services or Deliverables related to the breach. This limitation of liability shall not apply to CONTRACTOR's liability resulting from fraud, negligence, gross negligence or wilful misconduct of CONTRACTOR or any of its officers, employees or agents."

130.   The core obligation of Triple Point under the CTRM Contract is to exercise reasonable skill and care: article 12.1. The limitation of liability provisions set out in the second and third sentences of article 12.3, which form part of the same article, have to be read in that context. In my view, on a fair and straightforward reading of those sentences, they are intended to create a limitation of liability for Triple Point in respect of any breach of that core obligation, including to the extent that it may be reflected in a co-extensive duty of care in tort as contemplated in *Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145. The fourth sentence of article 12.3 naturally falls to be interpreted with that in mind.

131.    Mr Howells QC for PTT makes a textual point which, taken out of context, would have force. He emphasises that the limitation of liability in both the second and third sentences of article 12.3 refers to the liability of Triple Point "under" or "arising out of" the CTRM Contract; therefore, he says, the fourth sentence should be taken to be referring to (and only to) liability of Triple Point for breach of the CTRM Contract and any co-extensive *Henderson v Merrett* duty of care, and not other forms of liability it may incur. It would be unnecessary to refer to other forms of liability, since the limitation of liability in the second and third sentences of article 12.3 does not apply to them. Alternatively, the fourth sentence should be taken to include reference to breaches of the CTRM Contract with particular qualities as set out there, even if it also includes reference to other forms of legal liability as well, making it clear for the avoidance of doubt as regards those other forms of liability that the limitation of liability in the provision does not apply to them. On either basis, Mr Howells submits, the fourth sentence of article 12.3 should be interpreted to mean that breaches of the CTRM Contract which have the quality of "negligence" do not fall within the scope of the limitation of liability in that article.

132.    The immediate objection to this which the judge and the Court of Appeal regarded as insuperable is that this interpretation would have the practical effect of undoing what the parties obviously intended the limitation of liability provision should achieve, namely to limit Triple Point's liability for breach of its core obligation under the Contract to exercise reasonable skill and care in carrying out its tasks. By virtue of the definition of "Services" in article 1.2 of the Main Part and the priority given to the Main Part by virtue of article 29 of the Main Part and clause 10.9 of the PLA (in the modified form in which it is incorporated in the CTRM Contract), that is the standard of obligation which governs practically all of what Triple Point is required to do under the CTRM Contract. Breach of such an obligation may be described as "negligence", as a matter of ordinary legal parlance. Mr Howells does not suggest otherwise. Therefore, on the interpretation proposed by PTT, article 12.3 would grant a limitation of liability for Triple Point in respect of any simple failure by it (which did not have any added element of fraud, gross negligence or wilful misconduct) to comply with its core obligation under the CTRM Contract, while taking that away in the following sentence. If the word "negligence" in the fourth sentence is construed as applying to breaches by Triple Point of its obligation to exercise reasonable skill and care in carrying out its tasks, it would effectively nullify the limitation of liability in the second and third sentences. That limitation of liability would then only apply in relation to non-negligent breaches of any strict obligations in the CTRM Contract, but there are very few and, with the exception of the warranties as to the use of intellectual property rights in the PLA (clauses 7.1 and 7.3), are ancillary or peripheral to the main performance obligations under the Contract. Although Lady Arden regards the obligations of Triple Point regarding provision of defect-free software and "Deliverables" under the CTRM Contract as strict (para 54), I do not think that is right. They are part of the "Services" (as defined) under the CTRM Contract and

accordingly, by virtue of article 12.1, are the subject of a performance obligation of reasonable skill and care.

133.    In my view, it makes no sense to interpret article 12.3 as giving with one hand and taking away with the other in this way. To the extent that the fourth sentence might be regarded as being in conflict with the second and third sentences, an interpretation should be adopted which gives effect to what was clearly the main purpose of article 12.3, which was to confer on Triple Point the protection of a limitation of liability in respect of ordinary breaches of its core performance obligation. That purpose is promoted, rather than defeated, by the interpretation given to the fourth sentence by the courts below.

134.    That interpretation is reinforced by the wider contractual context and by three textual features of the fourth sentence.

135.    The services to be provided by Triple Point under the CTRM Contract involved combining and modifying existing software products which it already offered to customer licensees. Those were to be the building blocks for the system it agreed to supply to PTT. The contractual starting point for the drafters of the CTRM Contract was to take Triple Point's standard terms in relation to its existing products and then to incorporate them in the CTRM Contract, subject to certain adaptations.

136.    Clause 7.4 of Triple Point's standard terms, as modified in the PLA for the purpose of being appended to and incorporated in the CTRM Contract, provided as follows:

> "… Licensee agrees that the aggregate liability of Triple Point for damages from any cause of action whatsoever, regardless of the form of action, shall not exceed the fees paid to Triple Point under the CTRM Contract and except such damages caused by fraud, gross negligence and wilful misconduct."

Thus, the starting point for the drafters was a limitation of liability provision which applied in relation to all forms of liability, whether under contract, in tort or otherwise, subject to disapplication in the case of damages caused by fraud, gross negligence or wilful misconduct (whether arising under contract or in tort or otherwise).

137.    The drafters recognised that provisions in Triple Point's standard terms might conflict with what was written in the bespoke terms set out in the Main Part of the

CTRM Contract. So, in clause 10.9 of the PLA as appended to and incorporated in the CTRM Contract, they included the following statement:

> "… Triple Point agrees that this agreement shall not supersede and shall be an annex to the CTRM Contract. In addition, Triple Point agrees that if there is any conflict between the CTRM Contract and this agreement, the CTRM Contract shall prevail and be enforceable."

In this way, the drafters demonstrated their concern to manage any potential dissonance between article 12.3 of the Main Part and clause 7.4 of the PLA standard terms. The inference is that the fourth sentence of article 12.3 was derived from the exception proviso in clause 7.4 and was intended to be interpreted in line with that proviso, so far as possible. Where conflict could not be avoided, the terms of the Main Part would prevail.

138.  The standard term clause 7.4 of the PLA was concerned with all forms of liability, so the terms "fraud", "gross negligence" and "wilful misconduct" were intended to apply to breaches of contract and tort. There is every reason to infer that the same is true where the parties used the same terms in article 12.3 of the Main Part, having regard to the drafting history and since that would minimise the scope for conflict between the provisions. If the list in the fourth sentence of article 12.3 referred only to breaches of contract, arguments could arise whether that involved a conflict with clause 7.4 having the effect that it was displaced; but the intention was that the scope for such arguments to arise should be kept to a minimum. Further, since the drafters were concerned to manage possible conflicting impressions which might be created by the different contractual documents, it is a reasonable inference that they intended the fourth sentence of article 12.3 to fulfil to some degree the function of avoiding doubt.

139.  Therefore, when the drafters wrote "this limitation shall not apply [etc]" in the fourth sentence of article 12.3 they intended the list as a whole to cover liability arising both in contract and in tort, and to say that the limitation cap on liability did not apply to fraud, gross negligence or wilful misconduct within either of those categories of liability, as was the case with clause 7.4. I use English law categories for ease of exposition and because they are the most obvious frame of reference for the drafters of the CTRM Contract as a contract governed by English law; but the terms in the list are applicable in relation to all and any type of non-contractual liability which might arise, including under the law of the various jurisdictions which might be implicated in the provision of the services under the CTRM Contract, such as Thailand, Singapore and the United Arab Emirates. Against this background, the suggestion that the restriction on the limitation of liability in article

12.3 is limited to liability under the CTRM Contract (the first alternative in para 131 above) is not persuasive.

140.   Three textual features of the fourth sentence of article 12.3 also support this view. First, since the list of cases of exception set out in that provision has been expanded to include "negligence" alongside "gross negligence", the provision would be incoherent and nonsensical if it applied only to breaches of contract. The "gross negligence" category would be redundant. Therefore, the drafters must have intended that there should be scope for these terms to apply distinctly in relation to different types of liability. The only way for the fourth sentence of article 12.3 to be given an interpretation which avoids such redundancy is by reading the list as a whole as applicable to both liability in contract and liability in tort, while at the same time treating the specific term "negligence" as limited to liability in tort in order to reflect the purpose of the second and third sentences of article 12.3 as explained above. This has the result that "negligence" can be read as referring to liability in tort alone, and since "gross negligence" covers both forms of liability it is not a redundant term since it applies to breaches of contract involving gross, but not ordinary, negligence.

141.   Secondly, in the context set out above, it is significant that, by contrast with the second and third sentences of article 12.3, the fourth sentence is expressed in general terms and not by reference to liability "under the Contract".

142.   The commercial sense of the restriction in the context of clause 7.4 of the PLA is readily understood. The limitation of liability was to cover Triple Point in respect of its ordinary conduct in seeking to meet its contractual obligations, where it was found not to have met the contractual standard of reasonable skill and care. But it would not apply if Triple Point did something out of the ordinary and involving a degree of culpability which was not to be expected as an ordinary incident of commercial relations under the contract, ie amounting to fraud, gross negligence or wilful misconduct.

143.   In my view, that same objective was intended to be carried into the fourth sentence of article 12.3. So what was the point of adding "negligence" to the list of forms of conduct to which the limitation of liability was not to apply? For the reasons I have given, the list as a whole is intended to refer to liability in contract and liability in tort. However, in the case of "negligence", to avoid incompatibility with the fundamental object of the second and third sentences of article 12.3 and to avoid incoherence and textual redundancy in the fourth sentence, that specific term can only sensibly refer to liability in tort. It therefore must be taken to refer to the freestanding tort of negligence which, like the other terms in the list, is something apart from an ordinary incident of commercial relations under the contract. I agree with Sir Rupert Jackson's explanation at para 119:

"… The word 'negligence' must be read in context. The phrase 'fraud, negligence, gross negligence, or wilful misconduct' is describing unusual or extreme conduct, such that Triple Point should forfeit the protection of the cap. It is talking about breaches of contract which are also freestanding torts or deliberate wrongdoing. In my view, 'negligence' in this context means the freestanding tort of negligence. For example, if Triple Point's engineers carelessly left electrical wiring exposed which caused personal injury, that would be both a breach of contract and the freestanding tort of negligence. If the engineers did so deliberately, that would be both a breach of contract and wilful misconduct. In those two examples Triple Point would be liable for the full consequences of the engineers' negligent conduct, alternatively their wilful misconduct, without the article 12.3 cap limiting the financial liability."

144.    Mr Howells criticised Sir Rupert's example, pointing out that the services to be rendered under the CTRM Contract did not include supply of hardware. But Sir Rupert's basic point is correct. It is recognised that in cases involving the supply of services under a contract it is possible for the contractors to do something alongside the work they are carrying out under the contract, but outside the terms of the contract, which gives rise to an assumption of responsibility in the tort of negligence and hence to freestanding liability in negligence: see eg *Holt v Payne Skillington* (1995) 77 BLR 51, 72-73 (Hirst LJ) and *Robinson v PE Jones (Contractors) Ltd* [2011] EWCA Civ 9; [2012] QB 44, paras 77-80 (Jackson LJ). I do not think it is difficult to think of situations where this could be the case in relation to work carried out by Triple Point under the CTRM Contract. For example, freestanding liability in negligence could arise if one of Triple Point's agents, while delivering training on the new system to a PTT employee under the CTRM Contract, was given remote access to the employee's computer; the employee asked him to fix an unrelated problem with the computer alongside delivering the training; and he did so, but in a negligent way which caused damage to the computer or to PTT's other operational systems. Given the vulnerability of computer systems to be infected by software content delivered remotely, which was to be the manner in which Triple Point's agents were to be interacting with PTT's systems, there could be many scenarios in which there might be a risk of tortious action by agents of Triple Point. As Sir Rupert appreciated, the important point is that there is a category of case to which the term "negligence" can coherently and sensibly refer which does not do violence to the intended effect of the second and third sentences of article 12.3. If anything, his example, focusing as it did on a problem in the delivery of hardware, understated the size and significance of this category of case.

145.    Therefore, while the list of excepted conduct in the fourth sentence of article 12.3, taken as a whole, refers to liability in contract and liability in tort, the word "negligence" is intended to refer only to freestanding liability in tort. In my view, that is the only coherent interpretation which can be given to the fourth sentence. Certainly, in the context of this poorly drafted provision, I think it can be said to be the interpretation which is the least incoherent and which best reflects the intended effect of article 12.3 as a whole.

146.    Thirdly, in English law, which governs the CTRM Contract, "negligence" is a term which is capable of bearing a narrow, technical meaning as referring to the tort of negligence. The drafters' choice of that word in article 12.3, rather than referring more generally to a failure to exercise "reasonable skill and care" (ie using the language already employed in the same provision in article 12.1), tends to indicate that they deliberately intended to draw a distinction between the two concepts and that the word "negligence" should bear that narrower, technical meaning.

147.    For these reasons, I would have dismissed PTT's appeal in relation to the second issue.

# **EXHIBIT 32**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE


--------------------------------
                               )
In Re FTX TRADING LTD, et al    )
                               )
                 Debtors   )    CHAPTER 11
                               )
Case No. 22-11068 (KBO)         )
                               )
--------------------------------


Deposition of

THE RIGHT HONOURABLE
LORD NEUBERGER OF ABBOTSBURY


taken on behalf of the Joint Liquidators of
Three Arrows Capital Ltd


at the offices of

Latham & Watkins LLP,
99 Bishopsgate,
London EC2M 3XF


on

11 November 2025
beginning at 12.00 pm Greenwich Mean Time.


Reported by Nia Davidson MBIVR
Magna Legal Services



## Page 2

APPEARANCES

Counsel for joint liquidators for Three Arrows
Capital Ltd:

LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020-1300
(212) 906-1200
   BY: CHRISTOPHER R. HARRIS
      christopher.harris@lw.com

- and -

LATHAM & WATKINS LLP
99 Bishopsgate
London EC2M 3XF
   BY: TIM ROBINSON
      tim.robinson@lw.com

Counsel for FTX Recovery Trust:

SULLIVAN & CROMWELL
125 Broad Street
New York, New York 10004
(212) 558-4000
   BY: BRIAN D. GLUECKSTEIN
      ISAAC S. FOOTE
      gluecksteinb@sullcrom.com
      footei@sullcrom.com

Also present:

Jarret Huang, counsel

Karen Petch, counsel

Joseph Viner, videographer

Nia Davidson, court reporter

## Page 3

INDEX

Page

Examination of:
LORD NEUBERGER OF ABBOTSBURY

   BY MR. HARRIS          5 - 307

EXHIBITS

100 First declaration of Lord Neuberger      13

101 Second declaration of Lord Neuberger     42

102 Rebuttal declaration of Lord Neuberger   42

103 Law Commission "Digital assets:          92
    Final report"

104 Hin Liu article "Transferring legal title 103
    to a digital asset" (2023) 5 JIBFL 317.

105 Hin Liu, Louise Gullifer, Henry Chong    105
    article "Client-Intermediary Relations
    in the Crypto-Asset World".

106 Law Commission "Digital Assets:          128
    Consultation paper".

107 Ruscoe v Cryptopia (in liquidation)      135
    [2020] NZHC 728

108 FTX TERMS OF SERVICE                     148

109 Declaration of Dame Elizabeth Gloster DBE 184

## Page 4

1          THE VIDEOGRAPHER:  We are now on the
2    record.  This begins videotape number 1 in the
3    deposition of The Right Honourable Lord Neuberger of
4    Abbotsbury in the matter of FTX Trading Limited, et al,
5    in the United States Bankruptcy Court for the District
6    of Delaware, case number 22-11068.
7          Today's date is November 11, 2025.  The time on
8    the video monitor is 12 pm.
9          This deposition is being taken at Latham &
10   Watkins at 99 Bishopsgate, London, EC2.
11         The videographer today is Joseph Viner on
12   behalf of Magna Legal Services, and the court
13   reporter today is Nia Davidson of Magna Legal
14   Services.
15         Could counsel please identify themselves
16   and state who they represent for the record?
17         MR. HARRIS:  Chris Harris of Latham &
18   Watkins.
19         MR. ROBINSON:  Tim Robinson for Latham &
20   Watkins.
21         MS. PETCH:  Karen Petch, counsel.
22         MR. GLUECKSTEIN:  Brian Glueckstein,
23   Sullivan & Cromwell, on behalf of FTX Recovery Trust and
24   the witness.

## Page 5

1          MR. FOOTE: Isaac Foote, also on behalf of
2    the FTX Recovery Trust and the witness.
3          MR. HUANG:  Jarret Huang, counsel.
4          THE VIDEOGRAPHER:  Will the court
5    reporter please swear in the witness, and we can
6    proceed.
7          LORD NEUBERGER OF ABBOTSBURY,
8          HAVING BEEN DULY SWORN,
9          TESTIFIED AS FOLLOWS:
10   BY MR. HARRIS:
11     Q.   Good morning, Sir, or good afternoon.
12   I am Chris Harris, like I said, and we represent the
13   joint liquidators of Three Arrows Capital.
14     A.   Good morning, or good afternoon.
15     Q.   Have you ever had your deposition taken
16   before?
17     A.   No, I have not.
18     Q.   Let me go over some ground rules then.
19   The most important one is if I ask you a question that
20   you do not understand, please let me know.  It is my job
21   to ask a clear question and I will try and fix it, so
22   just let me know if there is anything that is not clear
23   about it.
24          The second thing is, so we have a clean
25   transcript, it is important that we do not talk over



2 (Pages 2 to 5)

Page 6

1  each other, so I will try and pause after you finish
2  speaking, and please do the same after I finish asking
3  just to help our court reporter.
4       A third one is we can take a break any
5  time you would like, except if there is a question
6  pending I would ask just that you answer the question
7  and then if you need a break we can take a break, and if
8  your counsel feels the need to stop for some other
9  reason, he will let us know as well.
10      Do you understand you are being deposed
11 as an expert witness for FTX?
12      A.    I do.
13      Q.    Okay.  And are you being represented by
14 counsel today?
15      A.    I have got the three people here who have
16 announced who they are.  I have not got my own personal
17 counsel, but I have been working with Mr. Huang, so in
18 that sense I suppose he is my counsel, but he is not
19 here to represent me in any sense.
20      Q.    And what are you being offered as an
21 expert in?
22      A.    I think I am being offered as an expert
23 in English law.
24      Q.    Not English law specific to digital
25 assets; is that right?

Page 7

1       A.    Well, English law in relation to the
2  topics which I have spoken to because I feel I am
3  capable of speaking to those topics bearing in mind my
4  experience and expertise.
5       Q.    Do you view yourself as an expert in
6  digital assets?
7       A.    No.  I have taken an interest in digital
8  assets but I cannot pretend to be an expert on the
9  topic.
10      Q.    Do you consider yourself an expert on the
11 law regarding digital assets?
12      A.    It is a broad question.  Certain aspects
13 of the law regarding digital assets, yes, but I am not
14 sufficiently confident about every aspect of the law on
15 digital assets as to know whether I could speak to that.
16 But I have to say that my experience as a judge has been
17 in all areas of law which I have had to rule on and in
18 that sense any aspect of the law of digital assets which
19 came before me as a judge I would have to rule on.  So
20 to that extent I could say I am an expert, but I would
21 not want to give a blanket assurance on every aspect.
22      Q.    So what are the aspects of the law
23 regarding digital assets that you do view yourself as an
24 expert in?
25      A.    I think in terms of ownership of the

Page 8

1  assets in the broadest sense, equitable and legal
2  ownership and anything relating to that aspect.
3       Q.    Okay, and the reason you view yourself as
4  an expert in that area of the law is because you have
5  had cases about ownership of digital assets?
6       A.    No, I have not had cases involving
7  ownership of digital assets as a judge, but I have had
8  one or two arbitrations involving digital assets and
9  ownership.
10      Q.    Okay.
11      A.    But, as I say, I cannot pretend to great
12 expertise on digital assets themselves.
13      Q.    So while you were a judge, did you have
14 any cases involving digital assets?
15      A.    No.
16      Q.    So let us just back up then.  What
17 experience have you had with digital assets?
18      A.    What experience have I had with digital
19 assets?  Well, I have read about them, been to
20 conferences about them and, in relation to this
21 particular case, I have looked into digital assets and
22 what has been said in cases by the Law Commission and so
23 on.
24      Q.    Okay.  So your experience with digital
25 assets is that you have read about them, you have been

Page 9

1  to conferences and you have done research specific to
2  this case?
3       A.    I have done some reading in relation to
4  this case.  What I have really done, I suppose, for the
5  purposes of this case is to satisfy myself, I hope
6  rightly, that I knew enough about digital assets to
7  explain and deal with the points which I was asked to
8  deal with.
9       Q.    Okay.  Anything else that would be
10 relevant to your experience with digital assets?
11      A.    Well, I suppose I am used to dealing with
12 intellectual property generally because I did a number
13 of cases on intellectual property as a judge and
14 I suppose it is of some relevance possibly that my first
15 degree was as a scientist -- in science.  So I suppose,
16 at the risk of sounding a little arrogant, I am more
17 comfortable with scientific concepts/with mathematical
18 concepts than perhaps most lawyers, but I cannot pretend
19 that it goes any further than that.
20      Q.    Okay.  Have you had any experience with
21 digital assets besides the reading you have done with
22 cases and the Law Commission and articles?
23      A.    I have discussed with my children
24 investing in digital assets, but I do not think I can
25 say any more than that.



1     Q.   Have you in fact invested in digital
2 assets?
3     A.   On the whole ----
4     Q.   I do not need to know the numbers.
5     A.   It is a perfectly fair question as
6 I raised it.  Unfortunately, in view of what happened
7 recently, I have not, no, although at other times
8 I would say fortunately I had not.
9     Q.   You did mention you have had an
10 arbitration or arbitrations involving digital assets?
11     A.   Yes.
12     Q.   What were those about, to the extent you
13 can speak of them?
14     A.   They were basically concerned with a
15 recording of a transaction that went wrong and who was
16 responsible for it.
17     Q.   Okay.  Did those arbitrations involve
18 issues of disputed ownership of the digital assets?
19     A.   Not really.  I suppose you could just
20 about say that it was inferentially a problem, but for
21 the purpose of the sort of problem we are concerned with
22 today I think the fair answer to your question is no.
23     Q.   Okay.  Just to get some more background
24 topics out of the way, what did you do to prepare for
25 your deposition today?

1     A.   What, from the beginning or in the past
2 two or three days?
3     Q.   Just in the past two or three days,
4 specifically to testify today as opposed to your work to
5 prepare your reports, and if it went back further than
6 the last couple of days that is fine as well, but I am
7 just interested in the work to be deposed.
8     A.   I have had a couple of meetings with
9 Sullivan & Cromwell and Mr. Huang.  I suppose they
10 lasted about an hour each.  I have read Dame Elizabeth's
11 opinion.  I re-read my two opinions, or three opinions
12 -- two opinions and a rebuttal.  I looked at some of the
13 cases.  I checked up to see if there were any recent
14 developments and I suppose I have thought a bit about
15 it.
16     Q.   Okay.  Do you recall which cases you
17 looked at?
18     A.   I looked again at Piroozzadeh.  Which
19 other?  I looked again at the Law Commission report;
20 I am trying to remember, but I think I looked at one of
21 the New Zealand cases; I think I looked at a Singapore
22 case; and I checked on the Bailii website, which is
23 a website which contains almost all English cases
24 decided by the High Court, Court of Appeal or Supreme
25 Court, to see if there was any recent learning.

1     Q.   The New Zealand case, is that the Ruscoe
2 case?
3     A.   I think it was, yes.
4     Q.   And do you think that the materials you
5 just cited are the ones that are probably most relevant
6 to this dispute?
7     MR. GLUECKSTEIN:  Object to the form.
8     A.   No, not really.  One or two points I was
9 just curious to check up what was said or how it was
10 said and just wanted to see if there was anything else
11 in the case, but I cannot pretend that I particularly
12 thought any particular case was relevant, no.
13     Looking at cases was more curiosity or
14 refreshing memory rather than because I thought they
15 were important.  I really concentrated more on the
16 principles and on what had been said by Dame Elizabeth
17 and by me.
18 BY MR. HARRIS:
19     Q.   Did you review any documents that you had
20 not reviewed in preparation for your three reports?
21     A.   There is one other document I should
22 mention, which is pretty obvious, but I did look at that
23 again, which is the Dotcom Terms themselves.  Sorry,
24 apart from that I do not think I did look at any other
25 document that I can recall, no.

1     Q.   So did you look at any documents to
2 prepare for your deposition that you had not looked at
3 in preparing your three reports?
4     A.   Not that I can recall, no.
5     Q.   Was there something that you noticed when
6 you reviewed the Bailii website?
7     A.   No.
8     Q.   So based on the work you did to prepare
9 for your deposition today, are there any changes you
10 would like to make to any of the statements or opinions
11 in your prior reports?
12     A.   No, and nothing that struck me that I was
13 uncomfortable with when I went through those reports.
14     Q.   Okay.
15     (Exhibit 100 was marked for identification)
16     Q.   You have been handed what has been marked
17 as exhibit 100.
18     A.   Yes.
19     Q.   Do you recognise this as the first
20 declaration you submitted in this case?
21     A.   Yes, it certainly looks like that.
22     Q.   Can you go to near the back where there
23 is an appendix B?
24     A.   Yes.
25     Q.   Is that your resumé, Sir?

1    A.    Yes.
2    Q.    Is it accurate today?
3    A.    Actually my wife is no longer a governor
4 of the Arts University Bournemouth, so that is out of
5 date.
6    Q.    And I believe we have already gone
7 through whatever prior experience you have with digital
8 assets; is that right, Sir?
9    A.    I think so.
10    Q.    Okay.  Have you served as an expert
11 witness before?
12    A.    Yes.
13    Q.    How many times has that been?
14    A.    I think I have listed them in my appendix
15 B.  Can I just check?
16    Q.    Yes, of course.
17    A.    Yes, I am in the process of doing another
18 one at the moment actually in relation to patent law.
19 I have done the statement, I think, certainly since
20 I did this one.  I think there may be two more.  I do
21 not know if they are attached to my subsequent
22 statement.
23    Q.    I believe ----
24    A.    I am sorry, if you want to come back to
25 this, that is fine with me, but I think I updated this.

1    Q.    Okay.  When I get there ----
2    A.    I ought to remember, but I am sure there
3 is at least one more since the Ericsson case.  I think
4 there may be two.
5    Q.    Did any of your other expert work involve
6 digital assets?
7    A.    No.
8    Q.    Did any of them involve trusts -- the
9 creation of trusts?
10    A.    I do not think any of these did, no.
11    Q.    Were the rates you charged for the other
12 expert engagements the same as you are charging today?
13    A.    I am not sure, but I am pretty sure the
14 earlier ones were a bit lower.  My rates have gone up --
15 but I think they were not that different -- but they
16 were slightly lower.  Quite when they changed, I am not
17 sure.  I am afraid English barristers -- and I was
18 a barrister -- tend to leave their negotiating of fees
19 to their clerks so I am less up to date than I should be
20 on that.
21    Q.    For your current engagements, do you
22 charge the same rate for all of them?
23    A.    Pretty well, yes.  I think I do, yes.
24    Q.    Have any of your expert opinions ever
25 been rejected either in whole or in part by a court?

1    A.    I do not know.  I suspect that in one it
2 was, but I have not actually had any follow-up in any of
3 them.
4    Q.    What is the one that you suspect?
5    A.    I suspect it would not have been in
6 number 4.  I may be wrong, but I would ----
7    Q.    Number 4, for the record, is the Deutsche
8 Bank AG v Sebastian Holdings?
9    A.    Yes.  That is speculation on my part.
10 I do not know.
11    Q.    What is your basis for speculating that
12 your expert opinion was rejected in the Deutsche Bank
13 case?
14    A.    First that I think my view as to piercing
15 the corporate veil in English law was not the same as
16 American law.  Secondly, because I think a judge would
17 almost certainly have taken a pretty strong view on the
18 merits against the party I was expressing a view in
19 favour of.
20    Q.    What do you mean, "the judge would almost
21 certainly have taken a pretty strong view on the
22 merits"?
23    A.    I think he would have taken the view that
24 in that particular case the person on whose behalf I was
25 giving evidence did not have a very attractive case on

1 the facts, and my opposite number who produced an
2 opinion I did not agree with, but I thought there was
3 a real prospect that the judge would go along with that
4 opinion.  I was looking at it, as it were, through those
5 eyes.  As I say, it is pure speculation.
6    Q.    So who was the person on whose behalf you
7 gave an opinion?
8    A.    I cannot actually remember his name, but
9 it was Sebastian Holdings Inc.
10    Q.    And do you know if the court issued
11 a decision in that case?
12    A.    No, I do not.  As I say, it is
13 speculation on my part.
14    Q.    So the attorneys never followed up with
15 you to tell you the results?
16    A.    In none of these cases.
17    Q.    Have any courts ever criticised your
18 methodology or qualifications in other matters in which
19 you submitted an expert report?
20    A.    Not that I am aware of.
21    Q.    Were you consulted by the Post Office in
22 connection with Bates v Post Office Limited?
23    A.    Yes. I was.
24    Q.    What was your role in that?
25    A.    My role was to express a view as to



Page 18

1  whether or not the judge had acted in a way that meant
2  that he should not continue with the case, because he
3  had expressed views at one stage and he should not have
4  and then continued with the case.
5      Q.    What was the opinion that you offered?
6      A.    I thought he should not and the judge and
7  the Court of Appeal took a different view, but they did
8  not say anything about my opinion.
9      Q.    But they did hold that the Post Office's
10 application for a recusal was misconceived and never had
11 any substance, right?
12     A.    They did.
13     Q.    And you provided a statement to the Post
14 Office inquiry, right, after the ----
15     A.    Mm-mh, I did.
16     Q.    I should have said this: we have to
17 answer yes or no.
18     A.    I knew that, I am sorry.  I did, yes.
19          MR. GLUECKSTEIN:  Also for the court
20 reporter's benefit, try to let him finish his question
21 before you answer so that only one person speaks at
22 a time.
23 BY MR. HARRIS:
24     Q.    In your statement you said you remained
25 of the view that the judge should have recused himself

Page 19

1  notwithstanding the Court of Appeal's finding.
2      A.    Yes.  I spent three days looking back on
3  it again because I was anxious to say whether I still
4  took the view that I did, and I did offer them a close
5  analysis of my reasoning if they wanted it but they did
6  not ask for it.
7      Q.    Okay.  Moving up to this engagement, who
8  was your client here?
9      A.    My client -- well, I have been asked to
10 provide my opinion by Sullivan & Cromwell and they are
11 acting for FTX.  I am not absolutely sure which company
12 in FTX, but I know it is the FTX, the liquidators of
13 FTX.
14     Q.    And how did you become engaged?
15     A.    They got in touch with me.  As I say,
16 I am in a set of chambers.  Although I am not
17 a barrister, I am in a set of barristers' chambers and
18 barristers are, as it were, protected by clerks, so
19 people do not get in touch with you directly.  They get
20 in touch with your clerk who then gets in touch with
21 you.  So quite how the contact was made with the clerk,
22 I do not know.
23     Q.    Do you recall when it happened?
24     A.    No, I do not.  I can check up if you
25 would like to know, but I cannot immediately answer that

Page 20

1  question.
2      Q.    Looking at the date of your first report,
3  which is September 2024, how long in advance of that do
4  you think your clerk was first contacted?
5      A.    I would really be guessing, but I would
6  guess possibly five or six months before, but it may be
7  three.  I could quite easily check if you wanted me to
8  on my emails when FTX first appears, but I can do that
9  later.
10     Q.    If you find out and can let me know, that
11 would be ----
12     A.    I will do that.  I will inform Sullivan &
13 Cromwell and they can tell you, or I can tell you
14 direct, however you like, but I can easily find out.
15     Q.    Do you recall what you were asked to do?
16     A.    Do I actually recall the initial
17 instructions?  No.  But I do not recall that they
18 changed that much in the sense that this first report of
19 mine reflects what I think I was asked to do, namely
20 identify who I thought had proprietary interests or the
21 proprietary interest in the digital assets held by FTX.
22     Q.    And was the scope of your analysis
23 limited to the terms of service, or the Dotcom Terms as
24 you call them?
25     A.    Not entirely.  I think, as is recorded

Page 21

1  here, if I remember rightly, I was also told about
2  certain statements that were made after, or possibly
3  before even, the liquidation or bankruptcy occurred, but
4  the statements that were made by Mr. Bankman-Fried, for
5  example.  But it was mostly, you are absolutely right,
6  based on the Dotcom Terms and the facts that I was told
7  and assumed.
8      Q.    Other than the statements by
9  Mr. Bankman-Fried, were there any other statements
10 outside of the terms of service that you were asked to
11 consider?
12     A.    I think -- again, I am going on
13 recollection -- all the other statements I was asked to
14 consider are mentioned in my original report.
15     Q.    Okay.
16     A.    Albeit briefly.
17     Q.    Okay.  You were only asked to analyse the
18 ownership issue under English law; is that right?
19     A.    Yes.  I suppose technically, if I
20 remember rightly, under Antiguan law, but English law
21 and Antiguan law for present purposes are the same.
22     Q.    Why do you say you were asked to analyse
23 ownership under Antiguan law?
24     A.    If I remember rightly, the contract was
25 under Antiguan law.  Perhaps I have misremembered.

MAGNA
LEGAL SERVICES

1   Certainly I approached it on the basis that English law
2   was the relevant law because, whether it was Antiguan or
3   English, for present purposes it would be the same.
4       Q.   So your understanding is the law of
5   ownership of assets is the same under English and
6   Antiguan law?
7       A.   Yes.
8       Q.   What contract is it you are remembering
9   was governed by Antiguan law?
10      A.   I seem to remember -- I may be
11  misremembering now.  I will have to remind myself by
12  reference to the ----
13      Q.   Feel free to look at whatever would be
14  helpful.
15      A.   It is just here.  Maybe I am -- yes, I
16  make the point in paragraph 6 that I sat on cases
17  involving the law of former British colonies, including
18  Antigua and Barbuda, and I had an idea that somehow that
19  came into this, but perhaps I am misremembering, because
20  certainly this is English law.
21      Q.   Okay.
22      A.   As you say, as it is 38.11, it is
23  governed by English law.  Or maybe I am misremembering.
24      Q.   If you think of what it is you are
25  remembering about Antiguan law, just please let me know.

1       A.   No, it may be that I am misremembering,
2   but, as I say, I have not really concentrated on whether
3   it is English or Antiguan because English law is the
4   same as Antiguan law when it comes to -- or rather
5   Antiguan law is the same as English law when it comes to
6   this area, the areas we are covering here.
7       Q.   Okay.  Stepping back, you have issued
8   three reports in this matter, right?
9       A.   That is right.
10      Q.   And probably spanning about a year and a
11  half from when you first began working on this; is that
12  right, Sir?
13      A.   Yes, I would say so.
14      Q.   So is it fair to say you have had
15  sufficient time that you needed to research the issues?
16  Is that right?
17      A.   Yes.
18      Q.   And to find whatever cases or authorities
19  you think would be relevant?
20      A.   I think so, yes.  I mean, one is never
21  totally confident one has found every case because
22  anyone who looks at websites with English cases will
23  realise how many there are, and it must be even more
24  true of the United States law.  So I am not sufficiently
25  arrogant to say I have found every conceivable relevant

1   case.
2       Q.   But you are comfortable you have been
3   able to find what you think is relevant; is that right?
4       A.   I am comfortable.  That is certainly
5   true, yes.
6       Q.   You have also had sufficient time to ask
7   any factual questions that you have; is that right?
8       A.   Yes.  I have made certain factual
9   assumptions that I have been asked to make and I have
10  occasionally asked questions of fact, but I do not think
11  I have asked many.
12      Q.   Can you recall any questions you asked --
13  factual questions?
14      A.   Yes.  I mean, to what sort of dealings
15  are involved in order to -- by customers of FTX, what
16  sort of dealings there were, apart from margin trading,
17  sales, purchasers, exchanges, liquidations and so on.
18      Q.   So you recall asking what sorts of
19  dealings there were with customers aside from margin
20  trading, sales, purchases exchanges and liquidations; is
21  that right?
22      A.   Yes, just to make sure that I understood
23  the sort of transactions that occurred.
24      Q.   And what answer were you given?
25      A.   I was given essentially that those were

1   what happened plus liquidations, assets, and then of
2   course there was the possibility at any rate of FTX
3   itself liquidating positions.
4       Q.   Do you recall being given any documents
5   that answered that question?
6       A.   No.  I do recall that I was not given any
7   documents.
8       Q.   And do you recall asking any other
9   questions besides that one?
10      A.   I cannot say I specifically recall asking
11  any other questions, but I would be surprised if I had
12  not.
13      Q.   And how much time do you think you spent
14  in total among your three reports?
15      A.   That again I could find out because, to
16  be blunt, I have charged for my hours.  But I think one
17  would also have to take into account the fact that I was
18  assisted by others.  So quite a lot of the work was done
19  by, for instance, Mr. Huang and by his predecessor.  But
20  the work I have done, I can certainly tell you the
21  number of hours.
22      Q.   Okay.  Roughly, just focusing on you
23  personally, do you think you have spent more than 100
24  hours on this?
25      A.   I may look an idiot for chancing my arm

1  but I think 100 hours could well be right, that sort of
2  figure, yes.  I would be surprised if it was less than
3  60 and surprised if it was more than 120, but I will
4  have to check.
5      Q.    Have you had a prior professional
6  relationship with Sullivan & Cromwell?
7      A.    If I have, I do not recall it.  I am
8  pretty confident that if I have it would have been in
9  the context of an arbitration as an arbitrator, but I do
10 not think I have had any contact with them.  But I could
11 be wrong.  Again, I can check if you like.
12     Q.    I am assuming you have not had a prior
13 professional relationship with FTX or any of the FTX
14 entities.
15     A.    No, no prior relationship.
16     Q.    And you did not have a prior business
17 relationship with FTX or its entities?
18     A.    No.
19     Q.    Who did the initial drafts of your
20 reports, and if it is different for each report, then
21 feel free to explain that?
22     A.    To the best of my recollection, in each
23 case the first draft was done by Mr. Huang or his
24 predecessor because that is my normal way of practice.
25 I certainly recall it was done for my most recent

1  report.  I find that useful if I have got a good person
2  doing it and worse than useless if I have not.  In each
3  case, not merely because Mr. Huang is here, I found it
4  useful.  But, more seriously, I find that a useful --
5  I discuss it first with them; they do not produce
6  a report, as it were, out of the blue.  I discuss with
7  them what we might say, what we think and how it might
8  be structured.  They then produce a report and I make
9  a habit of trying to rewrite everything, sometimes very
10 slightly, changing it a little, but I do not send out
11 a document that someone else has drafted.  I feel it
12 important that I make enough amendments, sometimes very
13 substantial amendments, restructuring, adding stuff,
14 taking stuff out, raising questions, sending it back,
15 discussing it, sending it back to the person who did the
16 first draft.  The ultimate content, it is fair to say,
17 often may be not that different from the first draft,
18 but the structure and the way it is put and the emphasis
19 may be quite different from the beginning.
20         I am sorry it is a bit woolly, but that
21 is how I would describe it.
22     Q.    And where in that process did Sullivan &
23 Cromwell become involved?
24     A.    It then goes to Sullivan & Cromwell.
25 This is all right for me to say, is it?  In the case of

1  this, the most recent document, because we were under
2  the cosh in terms of time, the draft I think -- the
3  second draft done by Jarret Huang after I had checked
4  his first draft went to Sullivan & Cromwell, although
5  I would have preferred it to wait for me to go through
6  it.  In fact, I was able to go through it rather quicker
7  than I expected, so that went to Sullivan & Cromwell,
8  but the normal approach is that when there is something
9  I am reasonably happy with, not that I regard as the
10 final draft, but something I have tinkered with and
11 played with that I think is something I am reasonably
12 happy with, then that goes to Sullivan & Cromwell and
13 they then have input and it comes back to Jarret Huang
14 and me or to Jarret's predecessors and me and we
15 normally go through the same process: Jarret has a go at
16 redrafting it and taking into account their comments,
17 sends it to me, I then consider it and add my comments
18 and redraft and so on and then it may go back to Jarret
19 or may go to Sullivan & Cromwell again.
20         To some extent, it is an iterative
21 process and depends on the complexity and number of
22 points raised as to how often one goes round the
23 roundabout and how much time one has.
24     Q.    So on the first report, do you recall any
25 comments you provided on the initial or subsequent

1  drafts that Mr. Huang had drafted?
2      A.    It was not Mr. Huang -- I am sorry, I am
3  not very good at names -- it was another junior.  I will
4  get his name for you if you want.  He then went to New
5  Zealand -- sorry, could you ask the question again?
6      Q.    On the first report, do you recall any
7  comments you personally provided on the initial draft
8  you received from your colleague?
9      A.    Oh, yes.
10     Q.    What were ----
11     A.    Sorry, I recall making lots of comments
12 and lots of amendments.  Specific comments and
13 amendments, no, I cannot remember at this stage.  Again,
14 if you wanted me to -- I am sure it is on my machine --
15 I can have a look.  But there will have been a lot of
16 rewriting and a lot of redrafting, not so much because
17 I disagreed, although there will have been some areas
18 I disagree, but more because I wanted to put it in my
19 own words or have a different emphasis or a different
20 order, but sometimes because I took a different view.
21     Q.    How about on your third report, the one
22 Mr. Huang was involved in, what if any specific comments
23 do you recall making?
24     A.    Again, I could easily check but I
25 remember going through it fairly carefully with quite



Page 30

1  a few comments, quite a few changes; he put in some
2  comments for me to answer.  I do not know whether I am
3  -- what I can say about the draft, but I can certainly
4  look at it and answer your question if you want me to
5  but I would have to look at the draft, I am afraid.
6        MR. GLUECKSTEIN:  We are not going to
7  answer questions about the specific versions of drafts
8  that were prepared, at the direction of counsel.
9  BY MR. HARRIS:
10       Q.    Do you think you had more or fewer
11  comments on the third report than you did on your first
12  report?
13       A.    I cannot -- I am sure, because the first
14  report is longer, I probably had more on the first
15  report.  Because the third report is shorter, and also
16  the basic principles I thought were established in the
17  first report, I probably had fewer comments.  On the
18  other hand, because we were reacting to Dame Elizabeth,
19  there may have been more comments.  I just cannot
20  answer.  In terms of pure number, I suspect there were
21  fewer because it is a shorter report.  In terms of "per
22  page", I really do not know.
23       Q.    Okay.  Do you recall each of your three
24  reports lists materials you considered?
25       A.    Yes.

Page 31

1        Q.    Okay, and who identified those?  Were
2  those materials you identified or that were provided to
3  you?
4        MR. GLUECKSTEIN:  Object to the form.
5        A.    I think as far as -- to be honest,
6  I cannot remember, because I will have looked at some
7  case law right at the beginning before I discussed it
8  and looked at the Law Commission report and so on before
9  I discussed it with my junior, if I can call them that,
10  and they will then have done their report which will
11  have looked at more cases.  So the ultimate list of
12  cases will have started with me looking at the cases and
13  talking to them.  They will have then looked at more
14  cases and I might well have added to the cases that they
15  identified.  Again, I cannot recall at this stage what,
16  if any, cases I added, but that is the way it would have
17  worked.
18  BY MR. HARRIS:
19       Q.    Whose idea was it to look at the Law
20  Commission report, for instance?
21       A.    That is going back -- I cannot answer
22  that question.  I just cannot answer that question.
23  I do not know.
24       Q.    Do you think you were aware of the Law
25  Commission report before this engagement?

Page 32

1        A.    Yes, I was.  I certainly was, yes.
2        Q.    How was it you were aware of it?
3        A.    Because I had been interested in digital
4  assets.
5        Q.    It is a well-known report in the legal
6  community; is that right?
7        A.    I think it is well known in the part of
8  the legal community that is interested in digital
9  assets.  I think the majority of the legal community
10  would probably run a mile.  It is quite technical and
11  the majority of lawyers in this country are not
12  naturally interested in that sort of thing.
13       Q.    For English courts that had to address an
14  issue regarding digital assets, is it an authority they
15  would consult?
16       A.    It is something that they would consult,
17  but the cases -- if one is going to be cynical, Law
18  Commission reports which support the view the judge
19  wants to arrive at are enthusiastically cited; Law
20  Commission reports which the judge disagrees with are
21  put rather on one side.
22       Q.    What is your view of the Law Commission
23  report on digital assets?
24       A.    I think it is an impressive document.
25       Q.    If you were a jurist at the time, you

Page 33

1  would consult it and find it persuasive?
2        A.    As a judge I always took Law Commission
3  reports seriously but I did not always agree with them,
4  and sometimes the laws that are brought about by the Law
5  Commission I do not think are very good, but generally
6  speaking they are good.
7        Q.    Do you agree with the analysis in this
8  Law Commission report?
9        MR. GLUECKSTEIN:  Object to the form.
10       A.    I mean, that is a very broad question.
11  I think I would go so far as to say that I regard --
12  because there is so much in it, it is a dangerous thing
13  for me to say, but there is nothing which I think is
14  indefensible in there on a number of aspects on which
15  they say further research needs to be done, a number of
16  aspects on which they express a view, and their view is,
17  in my opinion, always sensible.  Whether it is right or
18  not remains to be seen.
19       One of the big problems is that if the
20  Government legislates, if Parliament legislates along
21  the Law Commission report recommendations, because we
22  are at such an early stage, it may turn out that it is
23  not as clever an idea as it seems.  And there is a lot
24  to be said for letting the courts work it out before the
25  Law Commission reports are adopted, which is an



1   important reason, in my mind, for the courts to consider
2   what the Law Commission is saying.  It is not quite an
3   answer to your question, I am sorry.  I have certainly
4   gone off at a tangent.
5   BY MR. HARRIS:
6       Q.    Focusing just on the questions of the Law
7   Commission report that deal with ownership of digital
8   assets, is there anything in those portions that you
9   think is incorrect?
10          MR. GLUECKSTEIN:  Object to form.
11      A.    I am very uncomfortable answering that
12  question because I cannot pretend to have gone through
13  everything they have said with a view to saying do
14  I agree or not.  I think the general thrust -- I cannot
15  really say more than the general thrust -- of what they
16  say seems to me to be pretty sensible and there is
17  nothing which I vehemently disagree with as far as I can
18  recollect.
19  MR. HARRIS:
20      Q.    So I take there is nothing, sitting here
21  today, about their analysis of ownership of digital
22  assets that strikes you as incorrect?
23          MR. GLUECKSTEIN:  Object to the form.
24      A.    There is nothing that strikes me as
25  obviously incorrect, but there are a number of things

1   which could well be incorrect, and that is the problem.
2   BY MR. HARRIS:
3       Q.    By "could well" you mean depending on how
4   the law develops?
5       A.    Depending on how the law develops and
6   depending on experience.  I mean, the common law
7   develops by experience, as one great American judge
8   said, and that cannot be more true than in a totally new
9   area like digital assets.  So any view one expresses in
10  relation to what would be new law in relation to a new
11  type of asset has to be provisional and tentative, which
12  is why I am sounding provisional and tentative.
13      Q.    Is there anything about the Law
14  Commission's analysis of the current law regarding
15  digital assets that you view to be incorrect?
16          MR. GLUECKSTEIN:  Object to the form.
17      A.    As far as I can recollect, there is
18  nothing that I thought was plainly incorrect.  Again, as
19  I say, I have not been through the Law Commission report
20  marking each sentence with a tick or a cross or
21  a question mark.
22  BY MR. HARRIS:
23      Q.    Okay.  You also cited cases from both
24  English courts and other commonwealth jurisdictions,
25  right?  As an English jurist, are decisions from other

1   commonwealth courts persuasive authority?
2       A.    I think it depends on the court and
3   depends on the reasoning.  As a judge, I was quite keen
4   to tend towards having a common view with Australia,
5   Singapore, New Zealand and Hong Kong courts, but there
6   are a number of occasions where the courts have differed
7   and I think that it will have persuasive value.  But
8   again, at the risk of sounding cynical, an English judge
9   who agrees with, say, an Australian case will cite it
10  enthusiastically in support of the conclusion he or she
11  has reached, whereas if the judge does not agree with
12  the Australian case it will be a footnote in the
13  judgment.
14      Q.    And if I have it right, I think you said
15  you, as a judge, try to be consistent with decisions by
16  Australian, Singapore, Hong Kong and New Zealand courts;
17  is that right?
18      A.    Mm-mh.
19          MR. GLUECKSTEIN:  You need to answer.
20      A.    Yes.  I did in general, but I think in
21  the end you have to decide what is right, and if you
22  think the decision of a particular court is wrong, you
23  say so.
24  MR. HARRIS:
25      Q.    Why do you mention those four particular

1   jurisdictions?
2       A.    Because their common law tends to be
3   generally similar to that in this country.  So you would
4   expect, all things being equal, the law to be similar,
5   but there are a number of areas where we differ.
6       Q.    Do you recall any ways in which the law
7   concerning digital assets for those four countries
8   differs from the law in England?
9       A.    Again, on particulars, I think I would
10  have to look at the particular cases.  I certainly
11  remember, and I am slightly reluctant to answer, but
12  I think there is a New Zealand case one aspect of which
13  I do not agree with, but that may be misremembering.
14      Q.    Do you remember what the New Zealand case
15  was?
16      A.    No.  It is ----
17      Q.    You said New Zealand?
18      A.    I think New Zealand, yes.  I think that
19  is right, but, as I say, that is recollection.  I cannot
20  pretend to have gone through every case and remember
21  every case.
22      Q.    Okay.  What case of the ones you reviewed
23  do you find most factually similar to the FTX Three
24  Arrow situation we are dealing with today?
25          MR. GLUECKSTEIN:  Object to the form.



1    A.    There were three or four English cases on
2  digital assets which I found quite useful, but they did
3  not bear that much on the issue. I think a comment in
4  the Piroozzadeh case did have some -- Trower J. That is
5  one that sticks in my mind, but I cannot pretend that
6  there is anything in particular that I remember.
7  I mean, the trouble is when it comes to some of the
8  issues here, one is concerned with established law
9  applied to a new asset and in other areas one is
10  concerned with making new law to deal with a new asset.
11  And when it comes to established law dealing with a new
12  asset, one is on much firmer ground and one can look
13  more broadly. When one is looking at possible new law
14  on a new asset, it is more difficult.
15    Q.    I just want to make sure my question was
16  clear. I wanted to see what case you felt was most
17  factually similar, so is there one that comes to mind
18  you think is factually similar to our situation?
19        MR. GLUECKSTEIN: Object to the form.
20    A.    I think I cannot be sure as to which of
21  the cases are the most similar. As I say, I have been
22  more concerned with principle, and one of the problems
23  about looking at cases is that we are ultimately
24  concerned with a contract here, whether it created
25  a trust, whether it created a quasi-bailment

1  arrangement, if it exists, and in my experience looking
2  at other cases concerned with different contracts and
3  slightly different facts can be actually misleading. I
4  look at the cases more for principle rather than for
5  individual facts.
6        So, as I say, I cannot really with any
7  confidence, indeed I cannot actually say which cases
8  struck me as being most similar because I have been
9  looking at principles and looking at principles in
10  relation to our contracts and our facts.
11  MR. HARRIS:
12    Q.    So if I understand correctly, you were
13  focused more on deducing the principles than on finding
14  individual facts that might be similar to our situation?
15    A.    Yes, I think that is right. First of
16  all, our contract is a one-off contract which generally
17  has not got sort of standard forms, and even if it does
18  it is not the same, as far as I know, as it was in any
19  other case.
20        Secondly, the facts I am asked to assume,
21  I do not know whether they are going to be the same in
22  the other cases, and differences in fact could be quite
23  important, and differences in contractual terms could
24  obviously be important.
25    Q.    I take it you do not recall another case

1  about whether a customer on a digital asset exchange has
2  an ownership interest in the digital assets held on that
3  exchange?
4    A.    I think the Piroozzadeh case got close to
5  that sort of point, but I need to look at it again. As
6  I say, I have been focusing on principle, not fact, when
7  I looked at other cases.
8    Q.    Are there any other cases beside
9  Piroozzadeh that you recall being similar to the factual
10  situation of whether a customer on a digital asset
11  exchange has an ownership interest in those digital
12  assets?
13    A.    If there are, I do not recollect
14  specifically any other cases, no. As I say, I have been
15  looking at principle, not fact.
16    Q.    In addition to authorities, you also
17  looked at a few documents specific to FTX; is that
18  right?
19    A.    I certainly looked at the Dotcom Terms,
20  yes, and I looked at the other document for my second
21  opinion, I think.
22    Q.    Okay. Who made the decision what
23  FTX-specific documents you would look at?
24    A.    I was free to ask for any more documents.
25  Sullivan & Cromwell did send me some other documents

1  right at the beginning -- sent me quite a suite of
2  documents. Again, I cannot tell you what they are, but
3  I can easily find out. But I quickly came to the
4  conclusion that actually we were concerned with the
5  relationship between customers and FTX, and if there are
6  all sorts of other documents relating to FTX that the
7  customer has not seen, they do not really help in terms
8  of identifying the relationship between the customer and
9  the FTX because the customer has not seen them.
10    Q.    I want to make sure I understand. So you
11  were sent more documents about FTX than are listed in
12  your reports; is that right?
13    A.    I cannot remember what is listed in my
14  report.
15    Q.    If it is helpful, why don't I mark the
16  other two reports also so you can look at all of them.
17    A.    Yes. Yes, those are all the documents,
18  yes. They are listed there, thank you -- 1 to 15.
19  Those are indeed the other documents.
20    Q.    Okay, hold on. Let me make sure I am
21  ----
22    A.    But the great majority of those documents
23  seem to me to cover facts that were not known to the
24  customer, and when you are concerned with that, I did
25  not read them very carefully. One or two of these



1 documents set out some factual matters which I mention,
2 but those are the totality of the documents I was
3 provided with.  But to pretend I read all of them with
4 the same care for the purposes of my report as I did the
5 Dotcom Terms would be wrong.
6       (Exhibits 101 and 102
7       were marked for identification)
8   Q.   Just for the record, so you have them all
9 -- I do not want to make you do a guessing game --
10 exhibit 101 is your second declaration and exhibit 102
11 is your third declaration.  Just to back up, you were
12 first describing documents 1 through 15 in your first
13 declaration?
14   A.   Yes.
15   Q.   And to make sure I understand, 1 through
16 15 does include all the documents that Sullivan &
17 Cromwell sent to you?
18   A.   I cannot pretend -- the files are in my
19 office -- to have checked that 1 to 15 is a complete
20 list, but I am pretty confident it is.  Again, I can go
21 back and check in due course, but I believe it is, yes.
22 It looks about the right number of documents, and
23 looking at what they are I think that is right.
24   Q.   Did I understand you correctly that your
25 view was that documents that customers had not seen

1 would not be relevant to this issue?
2   A.   In terms of interpretation of the
3 contract and creation of trust, yes.
4   Q.   What if they reflected the views of FTX
5 when it entered into the contract?
6   A.   The views of FTX when it enters into the
7 contract are irrelevant to the construction of the
8 contract.
9   Q.   So you think the parties' views are
10 irrelevant?
11   A.   Yes ----
12   Q.   I take it you did not select ----
13   A.   ---- unless the parties exchange views as
14 to what they understand, in which case it may be
15 possible to rectify the contract.  But as a matter of
16 English law, what is locked away in the party's mind and
17 unknown to the other party is not relevant when
18 construing a contract.
19   Q.   If a contract is ambiguous, do the
20 parties views become relevant?
21   A.   No.
22   Q.   How do you know that these documents in 1
23 through 15 were not known to the customers?
24   A.   Some of them were created or occurred
25 after the contracts were entered into.

1   Q.   And by "the contracts", you say the
2 contracts were entered into, what contracts?
3   A.   Dotcom contract.
4   Q.   When was that contract entered into?
5   A.   Entered into at various times before the
6 liquidation; and these documents, many of them were
7 created after the company went into bankruptcy.  I mean,
8 they contain facts which are relevant but all the facts
9 I have assumed are clear from my statement, from my
10 declaration.
11   Q.   Do you personally know which of these
12 documents that pre-dated the bankruptcy were available
13 to customers?
14   A.   I would have to go through, but most of
15 them I think plainly post date the bankruptcy.  As
16 I say, they sometimes contained facts prebankruptcy,
17 like statements made by Mr. Bankman-Fried and so on.
18   Q.   If Mr. Bankman-Fried made statements
19 prebankruptcy that were available to customers, that
20 could inform both parties' views of the contract, right,
21 Sir?
22   A.   It is extremely unlikely to be construed
23 by the court for purposes of interpreting the contract.
24 You might be able to raise some sort of estoppel if you
25 could show you reasonably relied on what

1 Mr. Bankman-Fried said, but we have to remember here
2 that we have a standard form contract which I imagine
3 many, many people entered into and the court will
4 proceed on the basis that the contract means the same
5 for all customers.  So what a particular customer knows
6 or does not know is very unlikely to affect the
7 construction.
8   Q.   Let me just unpack a few things you said.
9 I want to focus on statements that were available to all
10 customers.
11   A.   Well, the fact ----
12   Q.   Hold on.
13   A.   I am sorry, I beg your pardon; I thought
14 you had finished.
15   Q.   If FTX made a statement that was
16 available to all customers, could that be relevant to
17 the parties' understanding?
18     MR. GLUECKSTEIN:  Object to the form.
19   A.   First of all, one would have to know
20 whether the statement was made before or after the
21 contract was entered into.
22 BY MR HARRIS:
23   Q.   If FTX made a statement to all customers
24 before the date of the Dotcom Terms, could that be
25 relevant to the parties' understanding?

Page 46

1    A.    It would not be relevant to the
2  interpretation of the contract.
3    Q.    My question is different.
4    A.    It could give rise to an estoppel in
5  theory -- it would be a high hurdle -- and it could give
6  rise to a claim for rectification in theory, but I think
7  both would be extraordinarily ambitious.  But obviously
8  it depends on the statement and how available it was.
9          One of the troubles is a statement being
10 available does not mean that everyone has seen it and it
11 is questionable whether a person who enters into
12 a contract can rely on a statement which he has not
13 seen.
14   Q.    So my question was more limited than
15 that.
16   A.    I am sorry.
17   Q.    I was not asking about the legal
18 implication.  I am just asking if FTX made a statement
19 available to customers before the Dotcom Terms went into
20 effect, could that be relevant to the parties'
21 understanding of the relationship?
22   A.    The trouble is English law is not
23 concerned with the parties' understanding of the
24 relationship.  English law is concerned with what
25 a reasonable person seeing the contract would understand

Page 47

1  and what was known to both parties.  When it comes to
2  a standard form, it becomes a bit more difficult what
3  you take into account as to what is known to both
4  parties because you have got multiple different parties
5  all dealing with FTX.
6    Q.    So English law is concerned with what
7  a reasonable person seeing the contract would understand
8  and what was known to both parties; is that right, Sir?
9    A.    How a reasonable person looking at the
10 words of the contract would understand it to mean
11 knowing what is known to both parties.
12   Q.    And statements that were made by one
13 party and available to the other party would be part of
14 what is known to both parties, right, Sir?
15   A.    It could be known, but in the end, so
16 much depends on -- it is too much of a hypothetical
17 issue at the moment.  It would rather depend on what was
18 said, but normally if I say to somebody X and the
19 contract says Y, that does not mean that Y means X.
20 What it may mean is that the other person is entitled to
21 say "You told me it meant Y.  Therefore I am holding you
22 to Y, but I relied on it".  But that is slightly
23 different.  It does not alter the meaning of the
24 contract.
25   Q.    Now, looking at your three reports

Page 48

1  together, so over the course of the engagement, did you
2  review any testimony from FTX personnel, people who used
3  to work at FTX before the bankruptcy?
4    A.    Unless it is in the 15 documents listed
5  here, no.
6    Q.    I take it you did not review any
7  testimony from Mr. Bankman-Fried from his criminal
8  trial?
9    A.    Other than what I was told he had said
10 and I refer to, I cannot recall being referred to
11 anything he said, no.
12   Q.    You recall being told something about
13 what Mr. Bankman-Fried testified at his criminal trial?
14   A.    Whether it was at his criminal trial or
15 not, I do not know.  I do refer somewhere in my first
16 report to statements made, and those statements are the
17 only statements, as far as I recall, that I was told
18 about.
19   Q.    Okay.  Is there a reason you did not
20 review the testimony of the FTX personnel in the
21 criminal trial?
22   A.    Yes.  I did not think it would be
23 relevant.  I looked at the contract and I have said what
24 facts I assume.
25   Q.    So just let me give you a hypothetical.

Page 49

1    A.    Okay.
2    Q.    Let us say every single person who worked
3  at FTX testified that their understanding was that users
4  owned the digital assets and FTX did not; that would be
5  irrelevant to you?
6    A.    Ultimately, yes.  The question is what
7  the contract says.
8    Q.    Okay.  Likewise, if every customer who
9  was asked said their understanding was they owned their
10 digital assets; that would also be irrelevant to you?
11   A.    Yes.  There is a case called Rose v Pim
12 in 1956 where a seller agreed to sell a certain type of
13 beans to the buyer.  They both thought that the beans
14 were type X.  In fact, they were type Y, but they both
15 thought they were referring to type X, but it was held
16 none the less that they were stuck with type Y because,
17 viewed objectively, that is what they agreed, even
18 though they both thought that they were agreeing
19 something else.  Rose v Pim it is called.
20   Q.    I do not think that is a case that you
21 cited in your reports; is that right?
22   A.    No, because -- as I say, I describe the
23 principles that apply to contract and I make the point
24 that it is an objective test to be judged by what the
25 parties say.



1    Q.   Do you recall a case where both parties
2  agreed that ownership of an asset would belong to one of
3  the parties but the courts found that instead the
4  ownership belonged to a different party?
5        MR. GLUECKSTEIN:  Object to the form.
6    A.   There are certainly cases where parties
7  have thought that they had contracted to sell a property
8  from A to B and the court held the contract was invalid.
9  There are certainly lots of cases where parties think
10 that the property belongs to one person and it belongs
11 to another.  I cannot immediately identify cases where
12 both parties thought one thing and it was another.  Rose
13 v Pim is an example I have thought of, but it is not
14 unusual or surprising for both parties to think the
15 contract means X and for the court to conclude it means
16 Y.
17 BY MR. HARRIS:
18   Q.   I want to ask you about a few different
19 terms you use in your different reports.  The first one
20 "trust".  What is a trust?
21   A.   A trust is an arrangement whereby the
22 legal ownership is held by one person, but the
23 beneficial ownership is owned by someone else or by
24 a group of other people, and the person who owns it
25 legally is obliged to deal with it in a way that is not

1  in his interests but is in the interests of the people
2  on behalf of whom he or she holds the asset.
3    Q.   In that instance, is the asset held by
4  the trustee on behalf of the beneficiary?
5    A.   That is a good, loose way of putting it,
6  yes -- a good, broad way of putting it.
7    Q.   Then what is a bailment?
8    A.   A bailment is where somebody who has
9  possession of property gives it to somebody else to look
10 after and the other person has control over it and has
11 a degree of legal title, but the superior legal title
12 remains with the person who gave it to the bailee,
13 namely the bailor.
14   Q.   Who has the beneficial ownership, the
15 equitable title in that instance?
16   A.   Equitable title does not exist then.  The
17 equitable title only exists when it separates from the
18 legal title.  If I own my house outright, to say I own
19 the equitable interest is a misconception.  It does not
20 exist.  The equitable interest only exists when it is
21 separated from the legal interest.
22   Q.   Does legal title exist before separation?
23   A.   Oh, yes, legal title always exists.
24   Q.   So, in your view, the concept of
25 equitable title does not exist until there is a split

1  between the legal and ownership interests -- legal and
2  equitable interests?
3    A.   Yes, they basically merge -- the
4  equitable ownership.  It is like saying if I own the
5  freehold of my house I do not also own the leasehold
6  interest.  There is not a leasehold interest until it is
7  created, and similarly there is not an equitable
8  interest until it is separated from the legal interest.
9    Q.   In a bailment, the bailee also holds
10 assets on behalf of the bailor; is that right?
11   A.   Yes.  I mean, one of the curiosities of
12 the common law is that you have the two threads of
13 equity and common law running together and it is even
14 more complex because in one sense equity is part of the
15 common law.  But if you use common law in the sense of
16 distinct from equity, bailment is a common law concept,
17 whereas trust is an equitable concept.  Until the 1870s
18 you had the two strands running separately in English
19 law, and from the 1870s onwards they run together and
20 are sometimes slightly uncomfortable bed fellows.
21   Q.   Are the duties of a bailee different from
22 the duties of a trustee?
23   A.   It is an interesting question.  It
24 probably depends on the terms of the bailment and the
25 terms of the trust.

1    Q.   So there is no "one size fits all"
2  definition of the duties of a trustee or a bailee?
3        MR. GLUECKSTEIN:  Object to the form.
4    A.   I think that in terms of trust, there is
5  equity has developed some pretty strict rules about the
6  duties of a trustee and the common law has not developed
7  the same degree of strict law rules in relation to
8  a bailor -- a bailee relationship.
9  BY MR. HARRIS:
10   Q.   So what are the pretty strict rules about
11 the duties of a trustee that you have in mind?
12   A.   That the trustee is obliged to act in the
13 interests of the beneficiary, not at any time in his or
14 her own interests, the duties of good faith and in the
15 equitable sense.  It is well described in a case called
16 Armitage v Nurse, which Dame Elizabeth cites in her
17 proof, by Millet LJ, who was one of the great equity
18 lawyers of his generation.
19   Q.   Just to make sure I have this right,
20 I believe you mentioned two: one was to act in the
21 interests of the beneficiary and not in his own
22 interest; and the second was the duties of good faith?
23   A.   Acting in good faith.  I think that, in
24 practice, equity would probably regard the duty of
25 a trustee to be more strict than the common law would



MAGNA
LEGAL SERVICES

1  regard the duty of a bailor, but normally these
2  arrangements are subject to documentary agreements and
3  they largely govern the relationship. Generalisations
4  are of limited value because in the end one has to look
5  at what the parties have agreed.
6         Q.    So the duties of a trustee or a bailee
7  could be modified by contract?
8         A.    Oh, yes. For instance, trustees strictly
9  cannot be paid out of the trust fund. That would be the
10 trust fund being used for their benefit, but,
11 unsurprisingly, if you have got a valuable trust, there
12 is provision for payment of the trustee out of the
13 trust.
14        Q.    I have seen the term "custodial
15 arrangement" used at times. Is that a form of trust
16 relationship or a form of bailment or something else?
17              MR. GLUECKSTEIN: Object to the form.
18        A.    It could be either. Custody is not
19 a technical term in the same way as trust or bailment.
20 BY MR. HARRIS:
21        Q.    Okay. Is a custodial relationship
22 indicative of a trust?
23        A.    It can be.
24        Q.    How about an agency relationship, could
25 that be indicative of a trust?

1         A.    No. I think that if -- you immediately
2  get into problems as usual with English law because you
3  could argue that an agent has certain, or can have
4  equitable duties. For instance, if an agent takes
5  a bribe, then he effectively holds the bribe on trust
6  for the principal, but a principal agent relationship is
7  a common law relationship that does not of itself have
8  an equitable dimension. But there is not a clean cut in
9  the sense, as I say, an agent can do things that give
10 rise to an equitable right in the principal.
11        Q.    Would an agency relationship be
12 consistent with a bailment?
13        A.    It could be. It could be.
14        Q.    How about if I act as your agent in
15 acquiring assets; would I hold them in trust for you?
16        A.    You would hold them as my agent. The
17 trust concept might come into it, but it would not,
18 normally -- I think there are a few cases where the law
19 has been quite anxious to emphasise that you should not
20 be too ready to introduce equitable relationships or
21 equitable principles into commercial relationships.
22        Q.    Okay.
23        A.    So if it is a straightforward commercial
24 agency relationship, the court is not likely to agree to
25 find an equitable duty. But, as I say, if the agent

1  receives a bribe, then equity does spring into action.
2         Q.    What if my agent who is acquiring assets
3  from me commits to safeguard them; could that create
4  a trust relationship?
5         A.    No.
6               MR. GLUECKSTEIN: Object to form.
7         A.    I think it creates a contractual
8  relationship. He has agreed to safeguard them and
9  I would have thought probably he would be under a duty
10 to safeguard them anyway if he is your agent. But if he
11 agrees to do it, that would merely emphasise that he has
12 got an express contractual duty to do that.
13 BY MR. HARRIS:
14        Q.    A few more background questions. So what
15 did you do to familiarise yourself with FTX's
16 operations, the pre-petition operations?
17        A.    Well, to get a general picture I did read
18 some of the documents which I said I had not read
19 recently. I think there are one or two here, and
20 I cannot remember at this stage which ones, that do
21 describe what happens in the FTX operation that I read.
22 But I cannot tell you here and now which of them I read.
23 I can have a look.
24        Q.    Can you explain your understanding of how
25 the exchange operated?

1               MR. GLUECKSTEIN: Objection to the form.
2         A.    Sorry?
3  BY MR. HARRIS:
4         Q.    What is your understanding of how the
5  exchange operated?
6               MR. GLUECKSTEIN: Object to the form.
7         A.    My understanding is that customers came
8  sometimes with digital assets that they put into their
9  wallet and sometimes without and that they then traded
10 assets in different ways -- margin trading, selling,
11 buying, possibly going short -- and on their account in
12 different assets, in different digital assets, that the
13 digital assets were swept into a pool, I think twice
14 a day, which contained all the assets which were then
15 dealt with by FTX in different ways. And customers'
16 accounts were updated rather like, I suppose, a bank
17 account recording what they had done, or an account with
18 a broker, according to what had been done, what they had
19 bought, what they had sold and simply margin trading --
20 keeping records.
21 BY MR. HARRIS:
22        Q.    What is your understanding of who the
23 customers traded with?
24        A.    As I understood it, they traded sometimes
25 with the FTX and sometimes with each other.

1      Q.    So your understanding is sometimes they
2  traded with FTX?
3      A.    And sometimes with each other, yes.
4      Q.    What is the basis for your understanding
5  that sometimes they traded with FTX?
6      A.    It may be impression or recollection.
7  I cannot put my finger on any precise fact that tells me
8  that is the case.
9      Q.    Did that factual issue matter to any of
10 your opinions?
11         MR. GLUECKSTEIN:  Object to the form.
12     A.    I do not think so, no.
13 BY MR. HARRIS:
14     Q.    What is your understanding about where
15 the digital assets that were held on the exchange came
16 from?
17     A.    Well, my understanding was that they
18 either provided by the customers or they were
19 acquired by FTX.
20     Q.    So your understanding is that some of the
21 assets on the exchange were acquired by FTX?
22     A.    Yes.
23     Q.    What is the basis for that understanding?
24     A.    Again, I cannot tell you what my -- it is
25 an assumption or recollection.

1      Q.    Does it matter to you where the assets
2  came from to your opinion?
3      A.    No, I do not think it does.  I think the
4  basic picture I had was that the assets were kept --
5  were swept into a pool and were then dealt with by
6  customers trading and FTX sometimes adding to the pool
7  and sometimes taking away from the pool.
8      Q.    I think you said your understanding was
9  that twice a day the digital assets were swept into
10 commingled accounts; is that right?
11     A.    That was my understanding.
12     Q.    Do you understand that each commingled
13 account only handled one particular kind of digital
14 asset?
15         MR. GLUECKSTEIN:  Object to the form.
16     A.    I think I must have assumed that was the
17 case because there would have to be a record of
18 individual assets.  So, yes, I think I probably assumed
19 that was the case.
20 BY MR. HARRIS:
21     Q.    Okay.  And is it your understanding that
22 customers were aware that their assets would be swept
23 into a commingled account?
24     A.    I am not sure about that.  Undoubtedly
25 I would have thought they must have become aware.  What

1  they were told, I do not know.  I was not asked to
2  assume anything.  I just -- no, I did not make an
3  assumption about that.
4      Q.    But you would have thought that they must
5  have become aware that their assets were being swept to
6  a commingled account?
7      A.    I would have thought they must become
8  aware pretty quickly, but, again, that is a sort of
9  factual matter which I cannot speak of with any
10 confidence.
11     Q.    I take it that is not a factual question
12 you asked FTX's lawyers?
13     A.    No, no it was not.
14     Q.    Did it matter to your opinion?
15     A.    I think, really -- let me revisit that --
16 we may have discussed it, but it did not really matter
17 to my opinion, no.
18     Q.    What do you recall ----
19     A.    Clearly if the clients knew, if the
20 customers knew, it made it harder for them to object to
21 the fact that it happened or to say they did not know
22 about it, but, beyond that, I do not think it goes much
23 further.
24     Q.    So are any of your opinions affected by
25 the question of whether or not the customers were aware

1  that their digital assets were being swept into
2  commingled accounts?
3      A.    I think the way I would put it is it
4  would not alter my opinion either way; but if they were
5  aware, it would probably strengthen my opinion.
6      Q.    Why would it strengthen your opinion?
7      A.    Because it would mean it was difficult
8  for them to say that they believed they had the asset in
9  their wallet or they had a specific asset, but, as
10 I say, it is not vital to my reasoning, but it would
11 strengthen it.
12     Q.    Did you ever ask FTX's attorneys what
13 evidence there was about whether the customers were
14 aware of the sweeping into commingled accounts?
15     A.    If I did, I do not remember.
16     Q.    Is there anything in the terms of service
17 that indicates whether assets will be swept into
18 a commingled account?
19     A.    Not that I recall.
20     Q.    Is that relevant to you?
21         MR. GLUECKSTEIN:  Object to the form.
22     A.    When construing the contract, clearly the
23 fact that something is not there means it cannot be
24 taken into account.  When construing how the contract
25 works, then you have to look at what happens.

BY MR. HARRIS:

1   Q.   If the terms of service did reveal that
2   digital assets would be swept into a commingled account,
3   would that affect any of your opinions?
4   A.   It would strengthen my opinions.
5   Q.   Why would it strengthen them?
6   A.   Because it would mean that the parties
7   knew at the beginning what happened to the digital
8   assets.
9   Q.   Okay.
10  A.   It is the same really as -- it is
11  a stronger version of knowing what happened after the
12  contract, if you like.
13  Q.   Now, your opinions are affected by the
14  fact of the commingling, right?
15  A.   Yes.
16  Q.   Do I take that to mean that facts outside
17  of the contract can affect whether a trust exists?
18  A.   Oh, yes.
19  Q.   Could statements outside of the contract
20  affect whether a trust exists?
21  A.   It is possible, but unlikely.  I point to
22  one ----
23  Q.   Why do you say that?
24  A.   Because basically when parties have

1   entered into a long and detailed contract drawn up by
2   lawyers, the court is very unlikely to say that their
3   contract has been varied by something that is said,
4   particularly -- and we are coming back to the same point
5   in a way -- when it is a standard form contract.
6   Q.   What if the terms of the contract are
7   unclear?
8   A.   If they are unclear, then it is easier to
9   depart from their meaning or give them a less natural
10  meaning depending on the circumstances.  You do not
11  construe a contract in a vacuum.  You construe it at the
12  date that it is entered into by reference to what the
13  parties knew and by reference to business sense.  If it
14  is clear what it means, that is that.  If it is not
15  clear what it means, then you can look at business
16  common sense.  But even when you look at business common
17  sense, it cannot rewrite the contract.  The words are
18  what the parties have chosen to express their
19  arrangement.
20  Q.   So if the contract is not clear on its
21  face, you could look at business common sense?
22  A.   Yes.  Again, you can always -- you cannot
23  ignore business common sense, but the extent to which
24  you rely on business common sense depends on the
25  circumstances.  Again, I cite the relevant cases:

1   Capita Holdings is perhaps the most recent Supreme Court
2   case, but there is another one called Arnold v Britton.
3   If you have got a detailed contract written by a lawyer
4   and a detailed contract written by a lawyer which is
5   a standard form used by a lot of people, then it is very
6   difficult to depart from the natural meaning of the
7   words.  It is not a totally black and white picture, but
8   as a general proposition the words are what you start
9   with and if they are tolerably clear it is very
10  difficult to persuade a court to move away from them.
11  Q.   What if the parties have entered into two
12  contracts; do you consider them both?
13  A.   If they have entered into two contracts
14  you would have to consider both, yes.
15  Q.   What if the contracts have contradictory
16  terms; what do you do?
17  A.   Your best.
18  Q.   Could you consult the parties'
19  understanding?
20  A.   No, not if you are interpreting the
21  contracts.  I think -- it depends, but the general rule
22  might be that the second contract varies the first.  But
23  it would all depend.  It is not a question I think
24  really would be sensible to answer in vacuo, in
25  a vacuum, but in general if you have entered into

1   a contract with me to do something and then we enter
2   into a subsequent contract and it is inconsistent with
3   the first, the natural implication would be that either
4   there had been a mistake or that we have varied the
5   first contract.
6   Q.   A few more background questions.  You may
7   have answered this already, but your understanding is
8   that FTX held the key to the wallets in which the
9   digital assets were held; is that right?
10  A.   I think so, yes.
11  Q.   And that is true both for the
12  customer-specific accounts and also the commingled
13  accounts; is that right?
14  A.   I am not sure about the customer's
15  accounts, but the commingled accounts, yes.
16  Q.   Okay.  What is your understanding about
17  what holding the key to the commingled accounts as
18  a factual matter lets FTX do with those assets?
19  A.   In practice, what it can do depends on
20  the relationship between the parties.  In practice, what
21  it did, I understand, was to feel itself free to deal
22  with them as it saw fit.
23  Q.   [Short pause to adjust microphone]  If I
24  understand you, you were describing a difference between
25  sort of what legal control FTX might have versus what

**MAGNA**
LEGAL SERVICES

1  kind of factual control it had in the real world; is
2  that right, Sir?
3          MR. GLUECKSTEIN:  Object to the form.
4      A.    Yes.  I mean, you look at the contract to
5  see what their rights are and then I look at what
6  I understand to be the facts when they are relevant to
7  see what the facts are.  For instance, something like
8  control:  what their entitlement to control was might
9  have been X, what their actual control was was Y, and,
10 depending on what the question is that you are
11 considering, one may be relevant and the other may not.
12 BY MR. HARRIS:
13     Q.    So there can be a difference between
14 legal control and factual control; is that right?
15     A.    The right to control and actual control,
16 yes.
17     Q.    And you are aware there were contractual
18 restraints on FTX's ability to deal with the digital
19 assets, right?
20         MR. GLUECKSTEIN:  Object to the form.
21 Calls for legal conclusion.
22     A.    I think the degree of contractual control
23 depends obviously on what they agreed under the
24 contract, yes, and to the extent that the contract
25 prevents them from doing certain things, it prevents

1  them doing certain things.
2  BY MR. HARRIS:
3      Q.    That is my question.  This contract here,
4  you are aware there were restraints under the terms of
5  service on FTX's ability to transact with the digital
6  assets, right?
7      A.    Yes.
8          MR. GLUECKSTEIN:  Object to the form.
9      A.    Yes, it depends on the contractual terms,
10 yes.
11 BY MR. HARRIS:
12     Q.    So what were the contractual restraints
13 on FTX's ability to deal with the digital assets?
14     A.    Well, if ----
15         MR. GLUECKSTEIN:  Object to the form.
16     A.    If there was -- it is quite a general
17 question.  It depends on the answer to the sort of
18 questions which Dame Elizabeth and I have been asked to
19 answer, but if there was no bailment, or quasi-bailment
20 and no trust, then the assets were those of FTX.
21 BY MR. HARRIS:
22     Q.    We may be misunderstanding each other.
23 You are leaping ahead to whether there was a bailment.
24     A.    Yes.
25     Q.    I am not asking that; I am just asking

1  under the terms of the contract.
2      A.    I would have to look at the contract to
3  see what the terms are.  If you are asking
4  me about the contract, I need to look at the terms.
5  I can only deal with the question generally, I am sorry.
6  The short answer would be, which is not a very helpful
7  answer to you, is that any restriction in the contract
8  would be binding on them.  But in order to discuss the
9  restriction, I would need to look at the contract,
10 sorry.
11 BY MR. HARRIS:
12     Q.    I want to just walk through some of the
13 assumptions.  If you need to take a break at any time
14 ----
15     A.    No, I am fine.  The trouble is that
16 I have not been specifically asked about restrictions on
17 FTX beyond the issues that I have been asked to deal
18 with.  That is why I appear to be floundering a bit on
19 your question.
20     Q.    To make sure I understand, part of your
21 engagement was not to determine what contractual
22 restrictions there were on FTX's ability to deal with
23 the digital assets?
24     A.    I was asked to deal with two questions,
25 essentially the question of a trust and the question of

1  quasi-bailment and certain questions that led to, such
2  as following and tracing.  Those were the questions
3  I was asked to deal with.  I have gone a bit wider in my
4  recent declaration to deal with the point -- in my
5  rebuttal, to deal with the further points that Dame
6  Elizabeth has dealt with, but other questions I was not
7  asked to deal with.
8      Q.    So you were not asked to analyse what
9  contractual restrictions there were on FTX's ability to
10 transact with the digital assets; is that right?
11     A.    No, I was not.
12     Q.    Okay.  I want to ask about some of the
13 assumptions that you were provided.  Do you recall any
14 particular assumptions you were given?
15     A.    At this stage, I imagine that if they
16 were relevant they will be in my report, in my
17 declaration.
18     Q.    Your expectation is whatever assumptions
19 you were given would be reflected in your reports?
20     A.    I think so, yes.
21     Q.    Can we look at the first report?
22     A.    Yes, of course.
23     Q.    Exhibit 100.
24     A.    Yes, I have it.
25     Q.    We will start with paragraph 1.

MAGNA
LEGAL SERVICES

1    A.    That sounds good, yes.
2    Q.    So you see you write that FTX "provided
3  its customers...with services which included the holding
4  and trading of digital assets, on standard terms of
5  service, which I have been asked to assume are set out
6  in a document headed 'FTX Terms of Service'"; do you see
7  that?
8    A.    Mm-mh.
9    Q.    What did you mean by "holding" of digital
10 assets there?
11   A.    I meant having them I think in what
12 turned out to be the pool.
13   Q.    And what did you mean by "trading" of
14 digital assets?
15   A.    That they provided customers with the
16 service of trading, so they enabled them to trade.
17   Q.    Okay.  Then you were asked to assume that
18 the terms were set out in the document called "FTX Terms
19 of Service"?
20   A.    That is right.
21   Q.    Did you ask FTX whether there were any
22 other documents that described the terms?
23   A.    Other than the 15 documents we have
24 referred to, I was not provided with any other documents
25 and I did not ask them about any other terms, no.  I was

1  told the Dotcom Terms were the terms.  I was told -- and
2  it is fair to say I was given previous versions of the
3  Dotcom Terms, but I did not really look at them because
4  I had been told these were the relevant ones.
5    Q.    Okay.  The terms of service are not
6  signed, right, Sir?
7    A.    No.
8    Q.    Okay.  They were available on the FTX
9  website to customers to review ?
10   A.    Right.
11   Q.    Are you aware there were other documents
12 also available on the FTX website for customers to
13 review?
14   A.    I cannot say I was aware or unaware.
15 I do not think I knew about that.
16   Q.    Okay.  So you do not believe you were
17 aware there were other documents available on the FTX
18 website for customers to review?
19   A.    Not so far as I recollect, no.  It is
20 conceivable, again, going back in time, that I was and
21 looked at them, but I do not recall doing so.
22   Q.    A few other assumptions I want to ask
23 about, in paragraph 15 of your first declaration?
24   A.    1,5?
25   Q.    Yes.

1    A.    Yes.
2    Q.    You say:
3      "I have been asked to assume that English
4  law will also apply to the proprietary consequences of
5  the Dotcom Terms."  Do you see that?
6    A.    Yes.
7    Q.    What do you mean by "the proprietary
8  consequences"?
9    A.    I mean who actually owns the assets.
10 That was what I was principally concerned with.
11   Q.    So you were asked to assume that English
12 law ----
13   A.    Yes.
14   Q.    ---- would apply to who actually owns the
15 assets?
16   A.    Yes.
17   Q.    Do you know why you were given that
18 assumption?
19   A.    No.  I mean, I assume it was because the
20 contract was subject to English law and it was assumed
21 that English law might apply.  I have remembered why
22 I referred to Antiguan law.  As I recall it, the company
23 was based in Antigua and I thought Antiguan law might be
24 relevant.  I am sorry to go back on your question, and
25 I do apologise.

1      Coming back to question on 15, I was just
2  asked to make that assumption.
3    Q.    So were you asked to assume that the
4  Dotcom Terms would govern who owned the digital assets?
5    A.    Yes.
6    Q.    A few more of these.
7    A.    Obviously that is a question for the US
8  courts and I am not competent to speak on it, but I was
9  asked to make that assumption.
10   Q.    Okay.
11   A.    I suppose if made the wrong assumption,
12 then this document is not of much use.
13   Q.    If you go to paragraph 47.2 ----
14   A.    Thank you, I have it.
15   Q.    Okay.  We see you wrote:
16      "I am instructed that such use of pool
17 addresses and the commingling of Digital Assets did in
18 fact occur on the FTX platform" ----
19   A.    Yes.
20   Q.    ---- "and that related transfers of
21 Digital Assets to and from pooled addresses would have
22 been visible on publicly available blockchains."
23      Do you see that?
24   A.    Mm-mh.
25   Q.    Is it relevant to your opinions that the



MAGNA
LEGAL SERVICES

Page 74

1  transfers to and from pooled addresses would have been
2  visible on publicly available blockchains?
3      A.   I answer that in (a), (b) and (c), as
4  I say, "As to the relevance of such matters", I think on
5  the following page, and that reflects my view.
6      Q.   Just to make sure we have a clean record
7  here, what is your view as to whether it is relevant
8  that it was visible that the transfers to and from
9  pooled assets were visible to users?
10     A.   I am sorry, it was a slightly flip
11 answer.  First of all, if that was a view, if that was
12 something which the public, a customer, would have known
13 about only after he or she started trading, then it is
14 irrelevant for the interpretation of the document -- of
15 the Dotcom Terms.  But if it is something they knew or
16 should reasonably be expected to know, then it could
17 form part of the factual matrix and be taken into
18 account.
19     Q.   So if someone had, for instance, traded
20 with FTX before the Dotcom Terms went into effect and
21 therefore were aware of the sweeping, that is something
22 that could form part of the factual matrix?
23     A.   Yes.  I mean, the problem is that I do
24 not pick up here, to be fair, and I pick up in my recent
25 rebuttal is the problem with asking what individual

Page 75

1  customers knew is that one is dealing with, as you say,
2  standard form on the website, and the idea that it has
3  different meanings for different customers is something
4  the court will not, if they had to, want to find.  So
5  what is known to some individual customers who have
6  dealt before but not to the majority, for example,
7  probably would not be relevant.
8      Q.   Do you know whether the majority of FTX
9  customers were in fact aware of the sweeping into
10 commingled accounts?
11     A.   I have absolutely no idea, I am afraid.
12     Q.   I take it your view is that in order for
13 it to be a relevant part of the factual matrix this
14 would need to be something that the majority of
15 customers were aware of?
16         MR. GLUECKSTEIN:  Object to the form.
17     A.   I think in view of what I have said, if
18 you are construing a standard agreement, then you would
19 look to see what was or should have been generally
20 known, yes.
21 BY MR. HARRIS:
22     Q.   But you did not ask FTX what was
23 generally known to FTX's customers about the sweeping,
24 correct?
25     A.   No, because, apart from anything else,

Page 76

1  I might then have got drawn into what do you mean by
2  generally known and all that sort of detailed fact.
3  I am concerned with the principle.
4      Q.   And you are not expressing for purposes
5  of your opinion what "generally known" would require?
6      A.   No.  I think that can be quite
7  a difficult question, and, to be fair, it is not a point
8  that has been gone into in detail in the cases.  All the
9  cases such as Sigma, which I refer to, say is that you
10 can only look at the most general sort of facts which
11 were available at the relevant time in a standard form
12 contract.  What I am not in a position to say was
13 whether for the sort of people who became customers of
14 FTX it would have been generally known that the
15 commingling occurred.  I just do not know.  That is
16 a question of fact for the US court, not for me.
17     Q.   In this 65.2, what do you mean that
18 a transfer from a pooled address "would have been
19 visible"?  I am sorry, 47.2.
20     A.   That it would have been visible that
21 there were being transfers of digital assets to and from
22 pooled addresses.  The public would have seen it
23 happening -- could have seen that it happened.
24     Q.   Is it relevant to any of your opinions
25 that a transfer from a pooled account was visible?

Page 77

1      A.   It depends where it went, but the overall
2  picture was money flowing, or digital assets, rather,
3  flowing to and from pooled accounts.  That is the
4  picture I was giving.  It is primarily relevant -- if
5  digital assets go into individual addresses, individual
6  customers' addresses or wallets, that would be of some
7  relevance.  If all customers' assets go into or remain
8  in the pool, that is also relevant.
9      Q.   So what is it you think was visible in
10 terms of transfers from a pooled account?
11     A.   What I am told -- and what I have assumed
12 -- is more or less what I have said, that it would have
13 been possible to see that individual accounts, any
14 deposit, any digital asset deposit into an individual
15 wallet was swept into the pool and that could be seen by
16 the public.
17     Q.   I was asking about a different assumption
18 you make here, which is that transfers from a pooled
19 account were visible.  What is it you think was visible
20 in terms of a transfer from a pooled account?
21     A.   That whatever left the pool could be
22 seen, or some of what left the pool could be seen.  As
23 I say, I did not go into great detail here.  All that
24 I was told is that you could see that digital assets
25 went out of the pool and came into the pool, that the


MAGNA
LEGAL SERVICES

1  pool was a fast-moving, quickly varying place -- if it
2  can be called a place -- where digital assets went in
3  and out.
4  Q.   Do you think you could tell whether
5  particular digital assets left the pool?
6  A.   Well, I assumed you could tell whether it
7  was, say, bitcoin or Ethereum or that, but identifying
8  individual assets, I thought not.
9  Q.   All right, let us look at another one of
10 these -- 65.2.
11 A.   Yes.
12 Q.   Okay.  You see there you write:
13      "There would also be an arguable case for
14 saying that the customer would obtain superior legal
15 title to any Digital Assets which were subsequently
16 acquired."
17 A.   Yes.
18 Q.   Then in the next sentence you write:
19      "However, this would depend on whether
20 the customer obtained sufficient 'control' over the
21 Digital Asset for title to pass, and I am instructed, it
22 appears that this did not occur in practice."
23      Do you see that?  So what exactly are you
24 saying you were instructed there?
25 A.   As I understand it, the customer did not

1  get any control, could not physically control the
2  digital asset.
3  Q.   What do you mean by that?
4  A.   That without FTX they could not do
5  anything with it.
6  Q.   Are we talking about a factual control?
7  A.   Yes, we are talking about factual
8  control.  I am sorry, I should have made that clear.
9  Q.   Can we look at your second declaration?
10 A.   Yes, of course.
11 Q.   If you look at paragraph 8.
12 A.   I have it, yes.
13 Q.   In paragraph 8 you write:
14      "I am also instructed that by the end of
15 day on June 12, 2022 there was no ETH, BTC, GBTC, ETHE,
16 FTT or other Digital Assets segregated for 3AC benefit
17 in any deposit address associated with 3AC's customer
18 Account."
19      Do you see that, Sir?  What did you mean
20 by that?
21      MR. GLUECKSTEIN:  Object to the form.
22 A.   I understood that what it says, I think,
23 that if you looked at the position on June 12th, there
24 were not any specific digital assets which were in any
25 way put on one side or put in an account or placed

1  anywhere as a matter of fact for any party.
2  BY MR. HARRIS:
3  Q.   What did you mean by "any deposit
4  addresses associated with 3AC's customer Account."?
5  A.   If there was a wallet in which the
6  digital assets were specifically put which were 3AC's
7  wallet, that is what I was concerned with.  So, as it
8  were, there was no physical placing, if I can put it
9  that way, if you can talk about a physical placing, of
10 any digital asset into a 3AC wallet.
11 Q.   So that would be referring to a wallet
12 that is specifically for and just for 3AC?
13 A.   Yes.
14 Q.   So the FTX account of 3AC would be the
15 wallet that is specifically allocated to 3AC?
16 A.   Well, the account, as I understand it,
17 a bit like a bank account, if you like, which records
18 your position.  The question is what actually happens to
19 the digital assets themselves.  That is what I am
20 discussing in paragraph 10.
21 Q.   Are you aware that FTX's ledger kept
22 track of the number of each kind of digital asset that
23 was associated with 3AC's account, right?
24 A.   So they might have 10,000 of one sort of
25 digital asset and 2,000 of another and that was recorded

1  on their ledger, yes.
2  Q.   If we can look at paragraph 9.
3  A.   Okay, thank you.
4  Q.   You say you were "instructed that any
5  ETH, BTC and FTT that 3AC deposited prior to June 12,
6  2022 had been swept out of deposit addresses associated
7  with 3AC's customer Account."  Do you see that?
8  A.   Yes.
9  Q.   And that again is referring to the
10 3AC-specific wallets?
11 A.   Yes.  As I say, it is talking about
12 addresses associated with their account.  It is not
13 talking about their account itself, which I regard as
14 being a sort of record of their position, their
15 contractual arrangement.
16 Q.   Then it says into "pool addresses under
17 the sole control of FTX Trading".  Do you see that?
18 A.   Yes.
19 Q.   Is the sole control also something you
20 were told to assume?
21 A.   Yes.
22 Q.   And that is referring to the factual
23 control we talked about?
24 A.   Quite right, yes, that is factual
25 control.  I should have -- in a perfect world, I would

Page 82

1  have put in "factual", you are quite right.
2      Q.    And then in paragraph 10, this is
3  discussing GBTC and ETHE; do you see that?
4      A.    Yes.
5      Q.    And here also when you refer to sole
6  control you are talking about factual control?
7      A.    Yes, I am.
8      Q.    Could we look at your third report?
9      A.    Yes.
10      Q.    Paragraph 25 -- when you are there.
11      A.    Thank you, yes.
12      Q.    Do you see, I think it is the fifth line?
13      A.    Yes.
14      Q.    You say:  "While that analysis could be
15  applicable at the moment that the 100 Bitcoin were swept
16  into the pool or 'hot wallet', as I have been instructed
17  of the factual position, the analysis becomes more
18  problematic."
19          Just to make sure I understand, what is
20  it you were instructed in this sentence?
21      A.    I am instructed that, as a result of what
22  I am told -- it is again a fair point that it could be
23  better worded -- "the analysis becomes problematic
24  because, as I am instructed...".  I think it would have
25  been better if the words "as I have been instructed of

Page 83

1  the factual position" were placed after "the analysis
2  becomes problematic immediately thereafter, because, as
3  I have been instructed...".
4          I am sorry about that, it is a perfectly
5  fair point, but I am relying on the thousands of
6  deposits and so on being what I have been instructed.
7      Q.    So you were instructed that there were
8  thousands of deposits and withdrawals every hour in the
9  sweep address?
10      A.    Yes.
11      Q.    Were you instructed that, as a result,
12  FTX was unable to track the quantities of particular
13  digital assets in its wallets?
14      A.    No, I was looking at the facts and then
15  looking at what had been said about it in English cases.
16      Q.    So I take it you do not know whether or
17  not FTX was able to track the quantity of
18  a particular ----
19      A.    No.
20      Q.    ---- digital asset?
21      A.    You are right.
22      Q.    And just for the court reporter's
23  benefit, if you could pause, even though I am sure you
24  understand what I am going to ask, but it is hard for
25  her to record.

Page 84

1          MR. GLUECKSTEIN:  Just let him finish the
2  question, please, before you answer.
3  BY MR. HARRIS:
4      Q.    And then in the next sentence you wrote:
5          "Further, because I have been instructed
6  that the FTX Exchange continuously collected trading
7  fees in the form of Digital Assets like Bitcoin, not
8  only were a customer's assets commingled with other
9  customers' assets, they were commingled with the assets
10  of the FTX Exchange."  Do you see that?
11      A.    Mm-mh, yes.
12      Q.    So what you were instructed was that the
13  FTX Exchange collected trading fees in the form of
14  digital assets; is that right?
15      A.    Yes.
16      Q.    Were you instructed that as a result the
17  exchange could not determine what percentage of
18  a particular digital asset was owned by customers as
19  opposed to itself?
20      A.    No.  I was just taking these facts that I
21  was told and then applying what an English judge had
22  said about a similar situation in the Piroozzadeh case.
23      Q.    So as far as you were instructed, and as
24  far as you know, FTX was always able to determine how
25  many digital assets of a particular kind it had, what

Page 85

1  percentage of those were owned by customers and what
2  percentage of those were owned by itself?
3          MR. GLUECKSTEIN:  Object to the form.
4      A.    If that is the case, then it does dilute
5  what I have said, but I still think the idea of
6  a proprietary interest the nature of which changes
7  a thousand times an hour or more is something which
8  I find rather difficult to swallow.  But it is
9  a perfectly fair point, that if it is possible, then
10  that does weaken the point I am making, yes.
11  BY MR. HARRIS:
12      Q.    You have not been presented with any
13  evidence that FTX was unable to determine the amount of
14  digital assets and the percentage of those assets that
15  were owned by customers as opposed to itself at any
16  point in time, right?
17          MR. GLUECKSTEIN:  Object to the form.
18      A.    What I have been told is what is in
19  paragraph 25.  I have not been told they could and
20  I have not been told they could not.
21          MR. HARRIS:  Okay.  Why don't we take
22  a short break.
23          THE VIDEOGRAPHER:  We are going off the
24  record.  The time is 1.49 pm.
25          (A Short Break)

MAGNA
LEGAL SERVICES

1          THE VIDEOGRAPHER:  We are back on the
2    record.  The time is 2.06 pm.
3    BY MR. HARRIS:
4          Q.    Sir, it would not surprise you that
5    a computer could track thousands of trades per hour,
6    right?
7          A.    Nothing surprises me about computers, so,
8    no.
9          Q.    You would expect that in fact FTX's
10   systems were designed so that they could track all the
11   trades that occurred on their exchange, right?
12         A.    Yes.  I think that is fair, yes.
13         Q.    We talked about whether the views of the
14   parties could be relevant to interpreting a contract; do
15   you remember that?
16         A.    Yes, I do.
17         Q.    When I asked you about "views" I was not
18   very specific on what that might mean, so let me ask
19   a more particular question.
20         A.    Of course.
21         Q.    Could you look at and consider
22   circumstances that the market generally understood when
23   determining the meaning of contractual terms?
24         A.    There is certainly a principle that if an
25   expression or a term is understood in a particular area

1    of the market to have a certain meaning, then the court
2    will, depending on the circumstances, but in principle,
3    be prepared to give it that meaning.  I think it is more
4    difficult in a case where you are dealing with members
5    of the public.
6          Q.    What if there is a factual background
7    that the market generally understood?  Could you
8    consider that as part of the factual matrix in
9    interpreting a contract?
10         MR. GLUECKSTEIN:  Object to the form.
11         A.    In principle, yes.
12   BY MR. HARRIS:
13         Q.    Okay.  I am going to hand you a document
14   that has already been marked in another deposition, and
15   you will see it has a handwritten scrawl at the bottom,
16   exhibit 6, but I believe this is one of the documents
17   that you reviewed.
18         A.    I have to confess I do not recall it, but
19   if you say it is, I am quite prepared to accept that.
20         Q.    Let me make sure I have the right
21   document then.  If you go back to your first declaration
22   and if you look at the appendix A or annex A?
23         A.    Background documents, yes.
24         Q.    And if you look at number 8?
25         A.    Yes, that seems to be that document, you

1    are quite right.
2          Q.    But I take it this document does not look
3    familiar to you?
4          A.    I must admit I will have looked at it
5    before I did my first report, but I do not recall having
6    looked at it since.
7          Q.    Okay.  Do you believe you reviewed it in
8    its entirety at the time?
9          A.    I cannot answer that question with any
10   degree of confidence.  I would certainly have looked at
11   it to the extent I thought it appropriate, but I would
12   be guessing if I were to say any more than that.
13         Q.    Do you know what entity FTX Digital
14   Markets Limited is?
15         A.    No.
16         Q.    Do you think you asked that question?
17         A.    No.
18         Q.    Do you know if FTX Digital Markets
19   provided any services to FTX Trading's customers?
20         A.    If I knew, I do not recall.
21         Q.    Okay.  If you could look at the fifth
22   page of this document?
23         A.    Yes, I have it.
24         Q.    There is a section called "Apportionment
25   of Responsibilities" in a black heading at the top.  Do

1    you have that?
2          A.    Yes, I see that.
3          Q.    And then the section that says, "FDM's
4    Responsibilities"; do you see that?
5          A.    Yes.
6          Q.    It says that FDM is ultimately
7    responsible for the safeguarding of its customers'
8    assets.  Do you see that?
9          A.    Yes.
10         Q.    Then it says that FDM's key roles and
11   responsibilities in relation to safeguarding of assets
12   are outlined below.  Do you see that, Sir?
13         A.    Yes.
14         Q.    And do you see the second bullet is "All
15   third-party providers will be aware that customer assets
16   do not represent assets of FDM"?  Do you see that?
17         A.    Yes.
18         Q.    Is that a fact that you took into account
19   in any of your reports?
20         MR. GLUECKSTEIN:  Object to form.
21         A.    I may have done, but it seems entirely
22   consistent with 8.2.6 I think.
23   BY MR. HARRIS:
24         Q.    So both this bullet and 8.2.6 state that
25   customer assets are not assets of FTX, right, Sir?

**MAGNA** ▸
LEGAL SERVICES

1        A.    As I recall, so I may have, as it were,
2   mentally ticked it, but I cannot say I took it into
3   account.
4        Q.    Okay.  Do you see the third bullet says
5   that all third-party providers are aware that customer
6   assets are held in trust; do you see that, Sir?
7        A.    Yes.
8        Q.    Do you recall seeing that language
9   before?
10       A.    I do not recall that, no.
11       Q.    It is not something you mentioned in any
12  of your reports, right, Sir?
13       A.    No.
14       Q.    It is not something that FTX brought
15  specifically to your attention, right, Sir?
16       A.    Not as far as I recall, no.
17       Q.    Are you aware of what rules and
18  regulations would govern a company like FTX Digital
19  Markets that was incorporated in the Bahamas?
20       A.    No.
21       Q.    Okay.  So I take it you are not giving
22  any opinion on what regulations might govern
23  safeguarding of customer assets under the Bahamas,
24  right?
25       A.    No, I have no idea.

1        Q.    Okay.  If you look at page 7, a section
2   at the top, "Safeguarding and Segregation", do you see
3   that?
4        A.    Yes.
5        Q.    And you see it says that FDM has a
6   responsibility to ensure that customer assets are
7   appropriately safeguarded and segregated from its own
8   funds.  Do you see that, Sir?
9        A.    Yes.
10       Q.    And do you see there are four bullets
11  under that?
12       A.    Yes.
13       Q.    And do you see the last one is that all
14  third-party providers are aware that customer assets are
15  held in trust; do you see that?
16       A.    Yes.
17       Q.    And likewise that statement was not
18  brought to your attention, right, Sir?
19       A.    Not as far as I recollect, no.
20       Q.    Do you agree that statement is at least
21  supportive of the idea that customer assets are held in
22  trust?
23            MR. GLUECKSTEIN:  Object to the form.
24       A.    On the face of it, yes; viewed in
25  isolation, yes.  I am not sure what third-party --

1   I cannot remember what "third-party providers" are.
2   BY MR. HARRIS:
3        Q.    Okay, let me ask you about another
4   document that is listed in your report.  Actually, you
5   mentioned it already, which is the Law Commission
6   report.
7        A.    As I recall it, it certainly is.
8   (Exhibit 103 was marked for identification)
9        A.    Yes.
10       Q.    You have been handed exhibit 103 which is
11  a long document, hundreds of pages, from the Law
12  Commission entitled "Digital Assets: Final report".
13       A.    That is right.
14       Q.    Do you see that, Sir?
15       A.    Yes.
16       Q.    This is a document that you relied on in
17  your reports, right, Sir?
18       A.    Yes.
19       Q.    Okay.  If you turn to the fourth page,
20  and the numbering at the bottom is "i".
21       A.    Yes, I have that.
22       Q.    Okay.  This page lists the members of the
23  Law Commission; is that right?
24       A.    Yes.
25       Q.    Are you familiar with these individuals?

1        A.    I am reasonably familiar with Green LJ,
2   I slightly know Sarah Green and I slightly know Nicholas
3   Paines.
4        Q.    How generally does one become a member of
5   the Law Commission?
6        A.    The Chair of the Law Commission is either
7   a High Court judge who immediately gets promoted to the
8   Court of Appeal or a Court of Appeal judge.  They are
9   selected by a committee, a panel consisting of judges.
10  I was on a panel once.  I think I was the only judge on
11  the panel.  There were various other people on the panel
12  from the law and from the Civil Service.  The other
13  members tend to be from -- there tends to be a family
14  law, a criminal law, a property/Chancery law and one
15  other law expert.  But they tend to have experts in
16  different areas of law.
17       Q.    I take it the people who are selected are
18  generally highly regarded in the legal community?
19       A.    Yes, I think that is fair enough.
20       Q.    And you said you are familiar with Lord
21  Green; is that right?
22       A.    Lord Justice Green, yes.
23       Q.    Is he a well respected jurist?
24       A.    Yes.
25       Q.    Are you familiar with the Law

1    Commission's process?
2         A.    In general terms they tend to produce
3    a paper which consults.  They then consult people and
4    they then produce a final report.
5         Q.    Do you believe it is a well-thought-out
6    process to reach legal conclusions and advice?
7         A.    Yes.
8         Q.    And are their reports generally respected
9    in the English legal community?
10        A.    They are certainly respected.  They are
11   sometimes criticised; they are sometimes acted on.  They
12   are rarely acted on without variation of some sort.  But
13   sometimes they will be acted on without any change;
14   sometimes they are not acted on at all; and sometimes
15   they are acted on with variations.
16        Q.    Do you know if any of the recommendations
17   in the "Digital Assets: Final report" have been acted
18   upon yet?
19        A.    As far as I know, no.  I know there has
20   been a House of Lords Committee looking at it.  As far
21   as I know, they have not been acted on.
22        Q.    Okay.  Let me take a step back then and
23   ask you some questions about the specific opinions you
24   are giving.
25              What are your conclusions regarding

1    ownership of the digital assets on the FTX Exchange?
2         A.    My conclusions are that there is no
3    trust, that there is no quasi-bailment and that the
4    digital assets in the pool are held by FTX, and what the
5    customers have is a claim as creditors of the FTX.
6         Q.    You said they are held by FTX.  Is it
7    your conclusion that the digital assets are owned by
8    FTX?
9         A.    In practice, they held legal ownership.
10        Q.    Do they have equitable ownership?
11        A.    I do not think anyone else has equitable
12   ownership, so they have legal ownership, yes.
13        Q.    I want to make sure I understand.
14   I asked does FTX have equitable ownership?
15        A.    We come back to my point that if the
16   legal and equitable ownership have not been separated,
17   there is not an equitable ownership.  If I own my house, I
18   do not have an equitable ownership in my house;
19   I simply own my house.  But if I declare a trust of my
20   house for my children, then I have the legal ownership
21   and my children have the equitable ownership.  But until
22   facts arise to give rise to an equitable ownership, it
23   does not exist.
24        Q.    And are your conclusions about ownership
25   as of a specific point in time?

1         A.    No.  I think they apply at any time.
2         Q.    So is there any point in time in which
3    you believe a customer did own assets on the FTX
4    Exchange?
5         A.    I think at any time that specific assets
6    are in the client's wallet, then I think the client will
7    have owned those assets.
8         Q.    What do you mean by "the client's
9    wallet"?
10        A.    I mean if they are specifically put.  It
11   all depends on the precise facts, but if identified
12   specific coins, identified specific assets, are
13   segregated in any way with the client's name on it, as
14   it were, then that is different.  But if they are simply
15   in the pool, then, no, I do not think the customer has
16   an interest.
17        Q.    Is it your understanding that digital
18   assets can be -- you can put someone's name on a digital
19   asset?
20        A.    It all depends what you actually do.  It
21   depends on the facts.  But if there are simply
22   a collection of digital assets in a pool without anyone
23   identified as owning any particular ones in any way,
24   then I think that if they are in the pool FTX owns them
25   legally and nobody else has a beneficial interest.  But

1    if they are somehow segregated out of the pool in some
2    way, physically in a separate place, then that would be
3    different.
4         Q.    So is it your understanding that any
5    digital assets were ever segregated for particular
6    customers?
7         A.    I do not know exactly what happened.
8    I know that when -- as I understand it, if a customer
9    came with digital assets and put them, as it were, in an
10   account, they would be swept out of the account in due
11   course into the pool.  But if my understanding is right,
12   and it may be wrong, while they were in the account,
13   then they were the client's.
14        Q.    And by "the account" you mean the wallet
15   that is specifically assigned to a particular customer?
16        A.    If it was in a particular wallet.  If it
17   was simply recorded in their account, like my bank
18   account records me as having money, then, no; but if it
19   is in a separate wallet as a specific bitcoin or a
20   specific Ethereum coin or whatever, then, yes.
21        Q.    Okay.  So when you referred to "put in
22   the customer's account" you meant the wallet that was
23   specifically assigned to a particular customer?
24        A.    Yes.
25        Q.    Are there any conclusions that you



1  reached in your first declaration about ownership that
2  do not apply to the pre-petition period?
3          MR. GLUECKSTEIN:  Object to the form.
4          A.    I do not think so because I do not deal
5  in any way with set-off or anything like that.  I think
6  that whether there is an equitable interest or
7  a quasi-bailee and bailor's interest does not depend on
8  timing, no.
9  BY MR. HARRIS:
10         Q.    Okay.  Can we look back at your first
11 declaration?
12         A.    Yes, of course.
13         Q.    I am going to ask you about paragraph 11.
14         A.    Thank you.  Yes.
15         Q.    In 11.1 you say:
16         "So far as digital assets as defined in
17 the Dotcom Terms...are concerned, and based on the
18 information currently available to me, my view is that
19 customers are likely to be unsecured creditors of FTX
20 Trading."  Do you see that?
21         A.    Yes, I do.
22         Q.    By referring to "unsecured creditors",
23 were you contrasting that with secured creditors?
24         A.    Well, I was -- it sounds a cheap answer,
25 but I was meaning to distinguish it from any other

1  relationship.
2          Q.    What relation -- I am sorry.
3          A.    Beneficiaries, or bailee or bailors.
4          Q.    So you are trying to distinguish an
5  unsecured creditor from being a bailor; is that right?
6          MR. GLUECKSTEIN:  Object to the form.
7          A.    What I have done here is to say they are
8  unsecured creditors and in particular they are not
9  beneficiaries under a trust and they are not
10 quasi-bailors.
11 BY MR. HARRIS:
12         Q.    Okay.  What did you mean by "likely" in
13 11.1?
14         A.    When it comes to the creation of a trust,
15 my views are pretty clear that there is no trust that
16 has been created.  When it comes to bailment,
17 quasi-bailment, we are in a totally new area.  As I said
18 earlier, when we are talking about the creation of
19 a trust of digital assets, we are talking about normal
20 legal principles relating to the creation of a trust,
21 albeit in relation to a new form of asset and therefore
22 I feel that I can talk with some confidence about the
23 creation of a trust because it is established law.
24         When it comes to the second question of
25 quasi-bailment, I am inevitably on less firm ground

1  because we do not even know if quasi-bailment exists.
2  It is a theory which I am inclined to think probably
3  does exist, but until the courts have dealt with it, to
4  say that there is no quasi-bailment or is quasi-bailment
5  is something one can only say in terms of what one
6  thinks is likely because one is looking into a concept
7  that at the moment the existence of which, let alone the
8  parameters of which, are unknown.
9          Q.    So if I understand that explanation, you
10 are inclined to think that quasi-bailment probably
11 exists?
12         A.    I am inclined to think, yes.  As I said,
13 the Law Commission favours it and I think their reasons
14 I agree with.  But it remains to be seen.
15         Q.    Okay.  Can we look at 18.2, which is when
16 you start to discuss the principles of contract
17 interpretation ?
18         A.    Yes.
19         Q.    Okay.  18.2 is still your view of the way
20 to determine the objective intention of the parties,
21 right?
22         A.    Yes.
23         Q.    So do you agree that commercial context
24 and commercial consequences are important for the court
25 to evaluate in order to ascertain the objective

1  intention?
2          A.    Yes, although one has to be careful about
3  how far one can take that, but, yes.  I quote the cases
4  more fully in my rebuttal because there seems to be
5  a difference between me and Dame Elizabeth, perhaps
6  a difference of emphasis.  My summary here is rather
7  shorter.
8          Q.    And you agree that the weight to be given
9  to the ordinary and natural meaning of the words will
10 vary depending on the circumstances, right, Sir?
11         A.    Yes, but it is particularly important
12 when, A, the document is a long, detailed and
13 lawyer-written document and, B, when it is a standard
14 form document.
15         Q.    Okay.  And you agree that the court can
16 otherwise consider evidence as to the factual matrix in
17 which the contract was agreed at the time it was formed,
18 right, Sir?
19         A.    Subject to what I have said, yes.
20         Q.    Okay.  I want to go up to the section on
21 transfer of legal title.
22         A.    Yes, of course.
23         Q.    Which I think starts in paragraph 26.
24         A.    Thank you.  Yes.
25         Q.    So you note that the subject of the

Page 102

1  transfer of legal title to digital assets is not the
2  subject of any judicial authority in England, right?
3      A.    That is the point I was making about why
4  one cannot be confident about how quasi-bailment will
5  work.
6      Q.    Are there cases outside of England that
7  discuss the transfer of legal title to digital assets?
8      A.    I am afraid to say I do not recall now.
9      Q.    Would those cases be persuasive to an
10 English court if they ----
11     A.    They would certainly be looked at by the
12 English courts, yes.
13     Q.    You rely on the Law Commission's final
14 report and an article by Hin Liu; is that right?
15     A.    That is right.
16     Q.    And I take it you found those persuasive
17 and informative to you?
18     A.    What I say about them is in paragraph 28,
19 the Law Commission and Liu's conclusions, analyses
20 "support the following conclusions, which, while they
21 cannot be regarded as clear given the developing state
22 of the law, appear to me to be correct."
23     Q.    Okay.
24     A.    So, yes, as I say, that summarises my
25 understanding, my view.

Page 103

1      Q.    Okay, and your view is that a transfer of
2  legal title to digital assets would require both
3  a change of control and an intention to pass title?
4      A.    That is right.
5      Q.    So if there was a change of control but
6  not an intention to change control -- I am sorry.  If
7  there was a change in control but not an intention to
8  pass legal title, then both requirements would not be
9  met; right?
10     A.    Yes.
11     Q.    And therefore title would not pass;
12 right?
13     A.    That is right.
14     Q.    I want to walk through those two sources
15 then.
16     (Exhibit 104 was marked for identification)
17     Q.    You have been handed exhibit 104, which
18 I believe is the article by Hin Liu that you underline
19 in your report; is that right?
20     A.    Thank you.
21     Q.    And do you know who Hin Liu is?
22     A.    I do not.
23     Q.    Okay.  Is this article that you are
24 referred to one that is commonly relied upon and cited
25 in the profession?

Page 104

1      A.    No.  I think it was found by the junior
2  who was assisting me in this case as I recall, or I may
3  have found it from the Law Commission report, I am not
4  sure which.
5      Q.    But I take it you found it useful for
6  your purposes?
7      A.    Yes.
8      Q.    Just to be clear, did you review articles
9  from any other scholars concerning digital assets?
10     A.    I think anything I reviewed would have
11 been mentioned in my report.
12     Q.    Is it fair to say you followed the
13 reasoning of this report and adopted those two
14 requirements for title to pass; right?
15     A.    I think so, yes.
16     Q.    If you look at paragraph 2.1 of the
17 article, it is a section called 2.1 Ambiguity in the use
18 of 'transfer'"; do you see that?
19     A.    Yes.
20     Q.    And you see the first paragraph starts:
21 "Although this article's focus is on the transfer of
22 title to a digital asset ..."; do you see that, Sir?
23     A.    Mm-mh.
24     Q.    And then do you see the last sentence
25 says: "The final notion of transfer refers to the

Page 105

1  transfer of legal title."  Do you see that?
2      A.    Yes.
3      Q.    And so this article is concerning how to
4  transfer legal title?
5      A.    Yes.
6      Q.    There is not a discussion in here about
7  equitable title?
8      A.    That is quite true.
9      Q.    Okay.  Do you agree with the reasoning in
10 this report that people generally expect or assume that
11 if someone has control over a digital asset he has title
12 to it?
13     A.    It seems to me as a general proposition
14 to have a lot of force, but I am being a bit cautious
15 because generalisation, but, yes, I can see that.
16     Q.    I want to show you another article.
17     (Exhibit 105 was marked for identification)
18     Q.    Do you recall this is another article
19 that you cite in your report?
20     A.    I do remember this in general terms.
21 I do not remember all the details, I have to admit.
22     Q.    You recall this was another useful
23 authority you relied upon?
24     A.    It was certainly one I cited, yes.
25     Q.    If you look at the authors on the first

MAGNA ▶
LEGAL SERVICES

Page 106

1  page ----
2       A.    Yes.
3       Q.    ---- first off the article is entitled:
4  "Client-Intermediary Relations in the Crypto-Asset
5  World"; do you see that?
6       A.    Yes, I do.
7       Q.    And the authors are Hin Liu, who authored
8  the previous article; right?
9       A.    That is right.
10      Q.    Louise Gullifer; do you see that?
11      A.    Yes.
12      Q.    And Henry Chong; do you see that?
13      A.    Yes.
14      Q.    Are you familiar with Louise Gullifer QC?
15      A.    I know her by name and reputation.
16      Q.    What is her reputation?
17      A.    She is meant to be good.
18      Q.    A respected QC or KC?
19      A.    She is largely an academic, yes, but she
20  is none the worse for that.
21      Q.    If you look at the second page, so the
22  end of the first section; do you see there is
23  essentially a decision tree?
24      A.    Yes.
25      Q.    Do you agree with this decision tree?

Page 107

1       A.    I have not thought about it in terms.  It
2  looks to me a perfectly sensible approach, but I,
3  not thought about it specifically, I would not want to
4  go further than that.
5       Q.    Okay.  If you turn to the third page, do
6  you see there is a section discussing the scenario of
7  Outright Title Transfer; do you see that?
8       A.    Yes.
9       Q.    And it says: "The first possible legal
10  relationship between client and intermediary is that of
11  outright title transfer, i.e. where legal title is
12  vested absolutely in the intermediary"; do you see that,
13  Sir?
14      A.    Yes.
15      Q.    And then in the second paragraph, do you
16  see it says: "The effect of an outright title transfer
17  is that the intermediary can freely dispose of the
18  assets held in its custody; ...".
19      A.    Yes.
20      Q.    Do you see that?
21      A.    Yes.
22      Q.    Meaning that contractually, the
23  intermediary could decide to do whatever it wanted with
24  the assets; right?
25      A.    Yes.

Page 108

1       Q.    And do you see in the second sentence the
2  authors write: "This has consequences in terms of
3  insolvency and tax treatment"; do you see that?
4       A.    Yes.
5       Q.    And then I guess the fourth sentence, the
6  authors write: "In relation to tax, it is the
7  intermediary who will be subject to the applicable tax
8  regime, meaning that (for example) capital gains tax
9  would not be levied upon the client, but rather the
10  intermediary"; do you see that?
11      A.    Yes.
12      Q.    Do you know whether the -- and FTX in our
13  scenario is the intermediary; right?
14      A.    Possibly.  I would need to look at this
15  more carefully.  I am prepared to proceed on that
16  assumption, but I would need to look at this paper more
17  carefully to see how they define the intermediary.
18      Q.    Okay.  This is the paper you reviewed for
19  the purposes ----
20      A.    I know, but I have to say I cannot
21  remember what I said about it, but, as I say, it is,
22  I think I cite it for more specific points.
23      Q.    Do you know whether FTX paid capital
24  gains on gains and losses on the digital assets of its
25  customers?

Page 109

1       A.    I have no idea.
2       Q.    Is that something you asked FTX to tell
3  you?
4       A.    No.
5       Q.    Do you see in the next sentence the
6  authors write: "In addition, it would be expected that
7  the asset will show up on the intermediary's balance
8  sheet: the fact that the asset shows up on the
9  intermediary's balance sheet is a strong indicia of
10  intent to transfer title"; do you see that, Sir?
11      A.    I do.
12      Q.    Do you have any reason to disagree with
13  that analysis?
14      A.    Slightly, yes.
15      Q.    What is your reason?
16      A.    Well, it simply shows what the
17  intermediary thought.  It may be some evidence, but
18  I think -- I would not necessarily call it strong
19  indicia of intent.  But I think it is some evidence of
20  intent.
21      Q.    Okay.  Do you know whether customers'
22  assets show up on FTX's balance sheet?
23      A.    No, I do not.
24      Q.    It is not something you asked FTX to let
25  you know the facts of?

MAGNA ▶
LEGAL SERVICES

1      A.    No.
2      Q.    The next section in this article is about
3  the scenario of a trust.  Do you see that, Sir?
4      A.    Yes.
5      Q.    And do you see the end of the first
6  paragraph the authors write for a trust:  "What must be
7  intended is the intermediary will not have free use of
8  the asset."  Do you see that, Sir?
9      A.    Yes.
10     Q.    Do you agree with that statement?
11     A.    Yes, but it is not sufficient to create
12  a trust, but certainly it is a necessary ingredient of
13  a trust.
14     Q.    Okay.  There are a few other things
15  I want to ask about in here.  If you go to page 10 there
16  is another section, section C, "Trust"; do you see that?
17     A.    Yes.
18     Q.    And it discusses the obligations and
19  duties of a trustee; do you see that?
20     A.    Yes.
21     Q.    Okay.  And then in the third paragraph,
22  do you see there a discussion of the case Citibank v
23  MBIA?
24     A.    Yes.
25     Q.    Are you familiar with that case?

1      A.    I do not recall it, I have to say.
2      Q.    Do you see that according to the authors
3  here that case indicates that a party can disclaim
4  fiduciary duties and still be a trustee?
5      A.    Yes.
6      Q.    And you agree with that general
7  principle; right?
8      A.    As we discussed earlier, rules of a trust
9  are such that there are certain principles of a trust
10  which will apply, but those principles, depending on the
11  terms of the actual trust, can be varied or reduced.  It
12  is an unusual trust which satisfies that test certainly
13  but I do not know whether that was all the beneficiaries
14  that were being referred to.
15     Q.    Can you go to page 15?
16     A.    1-5.
17     Q.    Yes.  You see there is a section 5:  "The
18  Redundancy of bailment in the crypto-asset context"?
19     A.    Yes.
20     Q.    And then do you see the authors write:
21  "As we have seen, the incidence of an English law trust
22  can be heavily modified by the parties' agreement.
23  Extensive exclusions of duties, even those that appear
24  to strike at the heart of the 'irreducible core' of
25  trusteeship, remain compatible with the existence of

1  a trust"; do you see that?
2      A.    Yes, I do.
3      Q.    And you agree with that description of
4  the law; right?
5      A.    Yes.  I think the extent to which you can
6  strike at the irreducible core may be open to argument
7  but as a matter of principle, yes.
8      Q.    Okay.  And if you can turn to the last
9  page?
10     A.    Yes.
11     Q.    If you look at the -- I guess we can move
12  on.  Never mind.
13     A.    The last page is?
14     Q.    Page 18, I guess, sorry, if you look at
15  the -- there is a third paragraph?
16     A.    Yes.
17     Q.    That says:  "So far most digital assets
18  intermediaries ..."; do you see that?
19     A.    Yes.
20     Q.    If you look fifth line from the bottom
21  there is a sentence that starts:  "This"; do you see
22  that?
23     A.    Yes, the trust.
24     Q.    It says: "This, along with recent
25  judgements in the Quoine and Cryptopia cases ..." the

1  is the Ruscoe v Cryptopia case:  "... clearly show a
2  trend towards regulators and courts deciding that the
3  proper and natural relationship between digital asset
4  intermediaries and their clients is one of a trust."  Do
5  you see that, Sir?
6      A.    Yes.
7      Q.    Do you have any reason to disagree that
8  that is the trend?
9      A.    No, I do not think it is.  I think that
10  the conclusion of this paper, which I accidently looked
11  at because you talked about the last page puts it well
12  quasi-bailment is uncertain but possible.  The more
13  natural thing is trust, but it all depends on what the
14  parties have agreed.
15     Q.    Okay, and I just want to make sure my
16  question and answer are clear.  Do you have any reason
17  to disagree that the trend is for regulators and courts
18  to decide that the proper and natural relationship
19  between digital asset intermediaries and their clients
20  is one of a trust?
21     A.    I think that may be a very easy
22  conclusion to reach in some cases, but, as I say, it all
23  depends on the individual contract and facts, which is
24  why I am hedging.  It may well be that if there is no
25  contract and somebody simply places a digital asset on

MAGNA
LEGAL SERVICES

Page 114

1  a platform that a trust will be inferred, but once there
2  is a contract we have to look at the contract. The view
3  expressed here could turn out to be right, but, as
4  I say, it is -- in the end it turns on what the parties
5  have agreed.
6      Q.    Okay.
7      A.    And what happens on the ground. So
8  I would not go so far as to disagree with what has been
9  said there let me be fair, but I would not want to go so
10  far as to say that trust is the natural conclusion,
11  although it well could be.
12     Q.    If we can look back at your first report,
13  I think we are up to paragraph 29, and there was
14  a section called "Intermediaries"; do you see that?
15     A.    Yes.
16     Q.    So you use the term "intermediaries"?
17     A.    I do.
18     Q.    And FTX is an intermediary as you use
19  that term?
20     A.    Yes, I just was not sure quite how that
21  term was used in the other paper but, yes, you are
22  right.
23     Q.    And you say: "However", at the end of 29
24  you say: "However, digital assets can also be held by
25  intermediaries, where the intermediary controls the

Page 115

1  network addresses and private keys." Do you see that?
2      A.    Yes.
3      Q.    That is the typical use of that term,
4  which is an intermediary has the digital keys; right?
5      A.    Yes.
6      Q.    And by "control", again you are referring
7  to factual control?
8      A.    Yes.
9      Q.    And then you identified these three
10  possible types of relationship, a trust, a
11  quasi-bailment and outright title transfer; right?
12     A.    Yes.
13     Q.    And those are relationships that were
14  discussed in the client intermediary relations article
15  that we just looked at; right?
16     A.    That is right.
17     Q.    In paragraph 34, you say: "A trust will
18  only be found to exist if there is a sufficiently
19  certain intention to create a trust." Do you see that,
20  Sir?
21     A.    Yes.
22     Q.    Whose intention are you referring to?
23     A.    Well, if somebody executes a document on
24  their own and it is a deed poll, as it were, then it is
25  their intention; if it is a contractual document, then

Page 116

1  the parties to the contract.
2      Q.    So in this instance when you are
3  analysing the terms of service you would be looking at
4  the intention of the parties to it?
5      A.    You would be looking at the words of the
6  contract to derive the intention of the parties to it by
7  reference to what a reasonable person would understand.
8      Q.    You would agree that the intention to
9  create a trust does not have to be derived from
10  a contract; right?
11     A.    No, it does not have to be derived from
12  a contract. You can make a trust -- I could make
13  a trust of my assets tomorrow if I wanted on my own,
14  yes.
15     Q.    It could also be, the intention could
16  also be derived by conduct; right, Sir?
17     A.    Yes, yes, it could. It would be slightly
18  difficult to envisage how it would purely be by conduct.
19  I suppose if I transferred my house to you, then
20  traditionally that would be regarded as you would hold
21  it on trust for me, but whether that is creating a trust
22  by action or not I am not sure. But it would be rather
23  unusual. I would find it difficult to think of
24  circumstances where a trust arises purely by acts and
25  nothing to do with what anyone says. But it would be

Page 117

1  possible, I agree.
2      Q.    Are you aware of any cases that address
3  the issue of whether a trust over digital assets had
4  been created by conduct of the intermediary?
5      A.    Not that I can think of, but it would be
6  possible.
7      Q.    What kind of conduct might create a trust
8  over digital assets?
9      A.    I find this quite difficult to think of,
10  not least because I just cannot imagine somebody
11  depositing, digital assets or dealing in digital assets
12  with an intermediary without having some sort of words.
13  If you give me a scenario, I will tell you whether you
14  can create a trust but I find it quite difficult to
15  think of a trust, but I accept it may be possible.
16     Q.    In 35.1 you agree that creation of
17  a trust does not require the use of the word "trust" or
18  similar language; right?
19     A.    Absolutely, yes.
20     Q.    And do you agree that the parties do not
21  need to explicitly realise that the arrangements gave
22  rise to a trust?
23     A.    Yes, I do.
24     Q.    And you agree that in assessing whether
25  a trust has been created a court will consider the true



Page 118

1  effect of the arrangement?
2       A.    Yes, I think the test is exactly like
3  a contract.
4       Q.    Okay.
5       A.    Except it is slightly more technical than
6  you asking whether it creates a trust, but you ask
7  whether looking at the document in all the circumstances
8  was there an intention to create a trust?
9       Q.    You would agree that a statement that the
10  customer assets are held on trust could be meaningful to
11  a court?
12       A.    Yes.
13       Q.    In 38.2 you discuss whether there is an
14  intent to establish a trust over beneficiaries of a bulk
15  of unascertained property; do you see that issue, Sir?
16       A.    Yes.
17       Q.    And you cited two cases on that issue.
18       A.    Yes.
19       Q.    That is London Wine and Goldcorp cases;
20  right?
21       A.    Yes.
22       Q.    Neither of those involved digital assets;
23  right?
24       A.    That is right.
25       Q.    And neither of them involved an exchange

Page 119

1  intermediary; right, Sir?
2       A.    No.
3       Q.    And do you recall that in London Wine
4  part of the reason for the court's decision was that the
5  mass itself could not be ascertained?
6       A.    I think that sounds right.  I do not
7  specifically remember.
8       Q.    And then in Goldcorp, do you recall that
9  likewise part of the reasoning of the court was that
10  there was no existing bulk and therefore nothing from
11  which a title could be carved out?
12       A.    I do not remember that, no.
13       Q.    Do you recall that both Goldcorp and
14  London Wine were cases under the Sale of Goods Act?
15       A.    That I did not recall, no.
16       Q.    If that is the case you would agree that
17  the Sale of Goods Act does not apply to FTX's holding of
18  assets?
19       A.    I agree with that.
20       Q.    So that if in fact those two cases were
21  under the Sale of Goods Act that might limit their
22  applicability to our situation here?
23       A.    All I rely on in those cases is that
24  those two cases recognised what the law was as described
25  in the previous sentence.

Page 120

1       Q.    If part of the reason that they came to
2  their conclusions was that it turned on the Sale of
3  Goods Act, would you agree it makes those cases somewhat
4  less relevant here?
5       A.    Oh, yes.
6       Q.    Do you recall those cases turned on
7  whether the contract was a sale ex bulk?
8       A.    I do not.  All I recall is what is in
9  that sentence.
10       Q.    What is a sale ex bulk?
11       A.    A sale out of a bulk of goods, you have
12  a bulk of goods and you are selling some of them, or
13  part of them.
14       Q.    And what is the difference between
15  generic goods and goods sold ex bulk?
16       A.    I do not recall.
17       Q.    Okay.  Do you recall those cases were
18  about the sale of goods; right?
19       A.    Yes.  As I say, I am only relying on
20  those cases as being examples of recognition of the
21  possibility of what is said in the previous sentence.
22       Q.    So you agree, as you say in 38.2 that:
23  "A trust can be established in favour of one or more
24  beneficiaries over a bulk of unascertained property
25  ..."?

Page 121

1       A.    Yes.
2       Q.    Okay.  And that is particularly true for
3  intangible goods; right?
4       A.    It is particularly true for goods which
5  are, as it were, not specifically identified
6  individually, if that is the circumstance, yes.
7       Q.    And digital assets are not specifically
8  identified individually; right?
9       A.    That is right.
10       Q.    In paragraph 38.5 you cite Hunter v Moss;
11  do you see that?
12       A.    Yes.
13       Q.    Do you recall that the Law Commission
14  final report also discussed Hunter v Moss?
15       A.    I had forgotten that.
16       Q.    Why don't we pull that up and take a look
17  if you still have that.  If you can go to section 7.50?
18       A.    If you can give me a page.
19       Q.    Sorry, yes, it is page 159.
20       A.    I am sorry, I am looking at it the wrong
21  way round.
22       Q.    It is very big.
23       A.    I have it, thank you so much.
24       Q.    Okay.  So you see that the Law Commission
25  final report discusses how there are two ways to

MAGNA ▶
LEGAL SERVICES

Page 122

1  interpret Hunter v Moss; do you see that?
2      A.   Yes.
3      Q.   And one is the intangible asset exception
4  approach and the other is the equitable co-ownership
5  approach; do you see that?
6      A.   Yes.
7      Q.   And then do you see in 7.53?
8      A.   Yes.
9      Q.   Do you see the Law Commission
10  provisionally said: "In our consultation ..." report:
11  "... we provisionally concluded that the best way to
12  characterise the interests of beneficiaries of
13  crypto-tokens or crypto-token entitlements held by a
14  custodial holding intermediary on a consolidated
15  unallocated basis for the benefit of multiple users is
16  as rights of co-ownership in an equitable tenancy in
17  common." Do you see that, Sir?
18      A.   Yes.
19      Q.   And you see that the report indicates
20  that: "Consultees agreed"; do you see that?
21      A.   Yes.
22      Q.   And just for the benefit of our US judge,
23  what does "consultees" refer to?
24      A.   They put it out for consultation and
25  anyone interested, whether an academic practising lawyer

Page 123

1  or financier or person with interests in digital assets,
2  can reply.  It is an open consultation.
3      Q.   Okay.  And then you see the Law
4  Commission report then continues:  "The analysis has
5  received support from academic commentators and has been
6  endorsed by the courts in England and Wales." Do you see
7  that, Sir?
8      A.   I do.
9      Q.   And then the commission concludes:  "We
10  adopt it as our preferred view"; do you see that?
11      A.   Yes.
12      Q.   Okay.  You do not disagree with their
13  view here, do you?
14      A.   No.  I think it is probably right, yes.
15      Q.   And then there is a box in the report
16  that says:  "Conclusion 4"; do you see that on page 160.
17      A.   Sorry.  Yes.  So basically this is saying
18  that held on trust and the trust can be equitable
19  co-owners, equitable tenants in common of the mass of
20  coins, mass of digital assets.
21      Q.   Okay.  We can put that aside for now but
22  I am sure we will come back to it.  I want to keep
23  walking through your report.
24       In paragraph 39 of your report -- first
25  report -- in 39.1 it is still your position that:  "It

Page 124

1  would be possible for a person (or an exchange) to
2  declare a trust over all of its network addresses in
3  favour of a beneficiary in relation to a specific
4  proportion of the total holdings." Right, Sir?
5      A.   That is right.
6      Q.   And then in 39.3 it is still your opinion
7  that a court might hold that there was a trust overall
8  the pool addresses in respect of which all customers
9  were beneficiaries as tenants in common as long as it is
10  clear that such a trust relationship was intended?
11      A.   If the agreement made it clear a trust
12  relationship was intended and that there would be
13  sweeping and pooling, then, yes.
14      Q.   Do any of the authorities you cite say it
15  is necessary for the parties to explicitly state that
16  the trust is over a pool of assets?
17      A.   I do not know that they do, but they do
18  make it clear that a trust relationship is needed.
19  I cannot tell you whether they make it clear about the
20  pool.
21      Q.   If we can look back at the Law Commission
22  final report -- I did warn you we would be going back
23  and forth ----
24      A.   You did.
25      Q.   Are you familiar with what the Law

Page 125

1  Commission said about the impact of commingled wallets
2  on certainty of intention?
3      A.   I cannot pretend to remember at all
4  clearly, no.
5      Q.   If you can go to page 158.
6      A.   Thank you.  Yes.
7      Q.   Do you see in paragraph 7.48 ----
8      A.   I have it.
9      Q.   The Law Commission said:  "In our view,
10  certainty of subject-matter can be satisfied
11  irrespective of whether assets are segregated or held in
12  commingled, unallocated holdings such as in omnibus
13  accounts." Do you see that, Sir?
14      A.   Yes.
15      Q.   Do you have any reason to disagree with
16  the Law Commission's view?
17      A.   No.  I quite accept that it can be
18  satisfied irrespective of that, yes.
19      Q.   And the Law Commission continues:  "We do
20  not continue that statutory intervention or other  law
21  reform is necessary to clarify that point." Do you see
22  that, Sir?
23      A.   Yes, I do see that.
24      Q.   So they are indicating that is the
25  current state of English law.

**MAGNA**
LEGAL SERVICES

1      A.    As I say, when it comes to trusts I think
2  the state of English law is fairly clear and I do not
3  disagree with that.
4      Q.    So this is indicating that even if the
5  assets are in a commingled omnibus wallet certainty of
6  subject-matter is still satisfied; right?
7      A.    Yes.  I mean, sorry to sound like
8  a scratched record but this is assuming, A, there is
9  a trust relationship and, B, everything inevitably
10 depends on the terms of the contract.
11     Q.    Okay.
12     A.    But, subject to that, yes, I do agree.
13     Q.    If you look at paragraph 7.45?
14     A.    Yes, I have it, thank you.
15     Q.    You see there is a section, it is in
16 a section called:  "Certainty of intention"; do you see
17 that?
18     A.    Yes.
19     Q.    Okay.  And the Law Commission says:
20 "Whether there is a requisite certainty of intention to
21 create a trust must be ascertained for the
22 user-intermediary agreement or relationship."  Do you
23 see that?
24     A.    Yes.
25     Q.    Okay.  And the Law Commission says: "We

1  consider it likely that the courts will take
2  a purpose-based and commercially responsive approach to
3  identifying and giving effect to an intention to
4  establish trusts by crypto-token holding
5  intermediaries." Do you see that, Sir?
6      A.    Yes.
7      Q.    You agree with that statement; right?
8      A.    Well, giving effect to an intention means
9  looking at what the parties intended and that involves
10 looking at the contract.
11     Q.    But you agree that it is likely the
12 courts will take a purpose-based and commercially
13 responsive approach to identifying giving effect to that
14 intention; right, Sir?
15     A.    I would prefer to say they would adopt
16 the same approach as they adopt in the case of any other
17 contract.
18     Q.    Well, in most contracts, do courts take
19 up purpose-based and commercially responsive approach?
20     A.    Yes, but unless one adds, "having regard
21 to the overriding importance of the words used", one
22 could go wrong.
23     Q.    Okay.  And do you see at the end of
24 paragraph 7.45 there is a footnote 730; do you see that,
25 Sir?

1      A.    Yes, I do.
2      Q.    There the commission is adopting the
3  discussion of indicative case law from the consultation
4  paper; do you see that, Sir?
5      A.    Yes.
6      Q.    Did you review the consultation paper?
7      A.    I think I did look at it, yes.  As far as
8  I recollect I looked at it.
9      Q.    It is listed on your list.
10     A.    I thought I looked at it.  Thank you.
11     Q.    Okay.
12     A.    I cannot pretend to remember what is in
13 those six paragraphs, or maybe it is seven.
14     Q.    I understand.
15     A.    But I imagine they go through the cases
16 on interpretation of contracts, but I may be wrong.
17     Q.    Why don't we take a look at those
18 paragraphs then.
19     A.    Okay.
20     (Exhibit 106 was marked for identification)
21     Q.    Why don't we go through this one slowly
22 because the pages will be a mess.  So take your time.
23     A.    As you like.
24     Q.    My questions are going to be about
25 Chapter 16, custody of crypto-tokens which starts on

1  page 327?
2      A.    I have it, thank you.  I am afraid I have
3  taken off the rubber band, taking rather a risk.  Yes.
4      Q.    Okay.  So the reason I pulled this out
5  was the final report referred back to the interpretation
6  of case law in the ----
7      A.    I understand.
8      Q.    In this report, so that was at
9  paragraph 16.57 onwards they are referring to I believe?
10     A.    Page 342, yes.
11     Q.    And you see starting in paragraph 16.58
12 there is an extensive discussion of the Ruscoe v
13 Cryptopia case; do you see that?
14     A.    Yes.
15     Q.    That is a decision by the New Zealand
16 High Court; right?
17     A.    Yes.
18     Q.    That is one of the courts you indicated
19 you attempt to be consistent with when you were a judge?
20     A.    Yes.
21     Q.    And do you see at the end of -- in
22 paragraph 16.58 before the numbered paragraphs, the Law
23 Commission described the Ruscoe v Cryptopia's
24 conclusions as: "The court was satisfied that the
25 necessary certainty of intention was established by

Page 130

1  a combination of ..." and then it lists four factors;
2  do you see that, Sir?
3      A.   Yes.
4      Q.   And the first was: "The structure and
5  content of the internal database maintained by Cryptopia
6  to track client account balances."  Do you see that,
7  Sir?
8      A.   I do.
9      Q.   And the second was:  "The content of
10 Cryptopia's internal financial accounts and its Goods
11 and Services Tax returns."  Do you see that, Sir?
12     A.   Yes.
13     Q.   And then the third was: "Cryptopia's
14 conduct in establishing the crypto-token exchange
15 'without allocating to account holders public and
16 private keys for the [crypto-tokens] it ... [held] for
17 them'."  Do you see that?
18     A.   Yes.
19     Q.   The fourth is:  "The fact that Cryptopia
20 did not intend to, and in fact never did, use the
21 crypto-tokens held on behalf of and in support of the
22 customer's trading balances to engage in trading for its
23 own principal benefit." Do you see that, Sir?
24     A.   I do.
25     Q.   Do you disagree with the Law Commission's

Page 131

1  interpretation of the holding of Ruscoe v Cryptopia
2  described here?
3      A.   I think I referred earlier to the fact
4  I thought there was a New Zealand case that I did not
5  entirely agree with rather early on in this meeting and
6  I think I am not sure that I agree with that decision.
7  I do not know that it matters in this case, but I am
8  doubtful.  It is a High Court decision, which is
9  a first-instance decision and I have my doubts about it,
10 but I certainly note that it is there and it is
11 a respected court and it is a decision, yes.
12     Q.   My question was a little different.
13     A.   I am sorry.
14     Q.   My question is, do you disagree with the
15 Law Commission's interpretation of the holding of Ruscoe
16 v Cryptopia?
17     A.   I would have to look at Ruscoe but
18 I would be surprised if the Law Commission had got it
19 wrong.
20     Q.   Your expectation would be they are
21 accurately describing the holding?
22     A.   Yes.
23     Q.   But I take it you do not recall if this
24 was the New Zealand decision you disagreed with?
25     A.   I think it was.  I had my doubts about

Page 132

1  it, yes.  I do not know that it matters for this case
2  but I am not convinced it is right.
3      Q.   Do you recall what it is you thought was
4  incorrect if that was the case?
5      A.   I think I thought that there was
6  insufficient to justify the conclusion they reached but
7  I cannot pretend to have given it detailed attention,
8  because in the end one is looking for principles and,
9  for the reasons I have tried to give, I take a pretty
10 firm view that there cannot be a trust here.
11         So if there cannot be a trust one does
12 not get to this stage of saying could it be a trust over
13 the pool where all the customers have the rights of
14 tenants in common.  Ruscoe v Cryptopia did not really
15 bear on the question, the main question as I saw it
16 under this head, which was whether there was a trust or
17 not.
18     Q.   So your view is that Ruscoe v Cryptopia
19 did not address the issue of whether there was an
20 intention to create a trust?
21     A.   That is not really what I am saying.
22 What I am saying is -- I am sorry if I appear not to be
23 answering -- I formed the strong view, which I adhere
24 to, that because of certain provisions in the Dotcom
25 Terms there was no intention to create a trust.

Page 133

1  Therefore, the trust issue was a non-starter.
2          Ruscoe v Cryptopia is relevant if there
3  is a trust.  So I did not give a great deal of careful
4  attention to Ruscoe v Cryptopia, but even if that was
5  not the case, it is a decision of one judge in New
6  Zealand and I cannot, without disrespect to that judge,
7  I do not find it awfully persuasive, but I cannot
8  pretend that I have thought about it in detail.
9      Q.   You would agree that the Law Commission
10 seemed to find it persuasive; right, Sir?
11         MR. GLUECKSTEIN:  Object to the form.
12     A.   I am not sure.  They say that it provides
13 some indication of the operational structures.  They
14 certainly do not disagree with it and you could say as
15 a very pallid implied approval but they certainly do not
16 disagree with it and they cite it.  So I think it is
17 fair to say it does not -- that you could argue that
18 they are agreeing with it but I would not go that far.
19 BY MR. HARRIS:
20     Q.   Are there certain facts about the FTX
21 situation that you view as different than the facts in
22 Ruscoe v Cryptopia?
23     A.   Again, without looking at Ruscoe v
24 Cryptopia it would be wrong for me to express a view but
25 I very much doubt in Ruscoe v Cryptopia that the

MAGNA ▸
LEGAL SERVICES

1  contract the customers had had provisions expressly
2  saying there was no intention to have a fiduciary duty,
3  but I may be wrong.  I will have to check.
4      Q.   Is that the critical provision you have
5  in mind that would distinguish Ruscoe versus the FTX
6  situation?
7      A.   If you are trying to argue for an
8  equitable interest over the whole -- that all customers
9  have an equitable interest over the pool, that is
10  a trust.  And if there is something in the agreement
11  saying that there is no intention to create a trust,
12  that is a route, in my view, you cannot take.
13      Q.   You would agree nothing in the terms of
14  service says there is no intention to create a trust;
15  right.  Those words do not appear, do they?
16      A.   We can go through the provisions of the
17  trust.  I have identified and Dame Elizabeth has been
18  through the provisions which arguably are inconsistent
19  with a trust and in my view they are very strong.
20      Q.   Let me just be more particular.  There is
21  nothing in the terms of service that says the parties do
22  not intend to create a trust; right, Sir?
23          MR. GLUECKSTEIN:  Object to the form.
24      A.   I think they are words which amount to
25  that.

1  BY MR. HARRIS:
2      Q.   That is not my question.  Do the words:
3  "The parties do not intend to create a trust" appear
4  anywhere in the terms of service?
5      A.   As far as I recollect, no, but words to
6  that effect, in my view, certainly do.
7      Q.   If we can go back to the Law Commission
8  report, let me give you time to put that back together.
9      A.   I will put it back so hopefully I will be
10  able to look at it again if we want to.
11      Q.   Okay.
12      A.   Which page would you like me to go to?
13      Q.   It is section 7.55 -- actually we covered
14  that we are moving along quickly.  Let me instead show
15  you the Ruscoe v Cryptopia case.
16          (Exhibit 107 was marked for identification)
17      Q.   We have exhibit 107 which is the Ruscoe v
18  Cryptopia case and I -- actually if it is helpful, in
19  your report you cited this case so I want to make sure
20  you see that.  It is on page 23, footnote 77?
21      A.   Yes.
22      Q.   So do you see -- this is in a footnote to
23  paragraph 39.3 about a trust relationship could be
24  created over a pooling of digital assets; do you see
25  that, Sir?

1      A.   Yes.  And I see what is said, that each
2  -- what is said in the particular contract, which is
3  different from ours, yes, I see.
4      Q.   So the reasons why you distinguish Ruscoe
5  from the FTX situation is that in Ruscoe it was made
6  clear to customers that all digital assets might be:
7  "... pooled in our internal accounts with other users'
8  Coins at any time."  That is one of the reasons; right,
9  Sir?
10      A.   And that: "Each user's entry ... is held
11  by us on trust ...".
12      Q.   And then you indicate: "No such language
13  is evident in the Dotcom Terms?"
14      A.   Yes.  I am ashamed to say this is what
15  I had forgotten, yes, thank you.
16      Q.   So those are, the two reasons that you
17  viewed Ruscoe as different, is one that it was made
18  clear to customers that digital assets might be held in
19  pooled accounts and, second, is that the contract said
20  that each user's entry into the general ledger of
21  ownership is held on trust?
22          MR. GLUECKSTEIN:  Object to the form.
23      A.   I think it was the combination.  I would
24  not say (1) and (2).  I would say it was a combination
25  of those.

1  BY MR. HARRIS:
2      Q.   I see, okay.  Just if we can go back to
3  the case itself, then.
4      A.   Yes, of course.
5      Q.   Would you agree that Ruscoe is a widely
6  cited case on the issue of ownership of digital assets?
7          MR. GLUECKSTEIN:  Object to the form.
8      A.   It is certainly referred to quite often.
9  There is a Singapore case I think Quoine too that is
10  quite often referred to.  I think they show slightly
11  different approaches but, yes, you are quite right, it
12  is referred to from time to time, yes.
13  BY MR. HARRIS:
14      Q.   If you look at paragraph [143]?
15      A.   Yes, I have it, thank you.
16      Q.   You see it says: "As a cryptocurrency
17  exchange, Cryptopia maintained its own database of the
18  accountholders and digital assets that it controlled, as
19  I have noted, called the SQL database."  Do you see
20  that?
21      A.   I do.
22      Q.   And it says: "The liquidators as I
23  understand it are still in the process of reconciling
24  this database."  Do you see that, Sir?
25      A.   Yes.

Page 138

1     Q.   It is fair to say despite the fact the
2 database was still being reconciled the Ruscoe court
3 found there to be sufficient certainty to find a trust
4 existed; right, Sir?
5     A.   Yes. That would appear to be right.
6 I am not sure what was argued but, yes.
7     Q.   Okay. If you can look at paragraph
8 [144], the next paragraph, do you see in the second part
9 of that sentence it notes: "... Cryptopia was itself
10 one of the beneficiaries of some trusts ..."?
11     A.   Yes.
12     Q.   Do you take that to mean that Cryptopia
13 owned some of the assets?
14     A.   Yes. Again I cannot pretend to be an
15 expert on the facts but that itself looks likely, yes.
16     Q.   And the Ruscoe court found there to be
17 a trust despite the fact that the exchange, Cryptopia
18 owned some of the assets in commingled wallets; right,
19 Sir?
20     A.   It would seem to be the case.
21     Q.   If you look at paragraph [149].
22     A.   Yes, thank you.
23     Q.   Do you see it indicates that the
24 liquidators may have some difficulties finding out the
25 true identities of some of the account holders?

Page 139

1     A.   Yes.
2     Q.   And making contact with them. But do you
3 see that Ruscoe court concludes that despite that, that
4 does not invalidate the trust for those whose precise
5 identities can be shown; do you see that, Sir?
6     A.   Yes, I do.
7     Q.   And the court observes: "Evidential
8 uncertainty does not defeat a trust"; do you see that,
9 Sir?
10     A.   Yes, Baden's Deed Trusts, yes.
11     Q.   And you agree with that description of
12 the law; right?
13     A.   Yes. I think the slight difficulty is
14 that if you know in advance from the facts at the time
15 the alleged trust is created that there will be obvious
16 difficulties, it is slightly different from saying they
17 are difficulties which transpire down the line.
18 Difficulties that transpire down the line should not
19 prevent the problem.
20     Q.   If you look at the next page, there is
21 a section called certainty of intention; do you see
22 that?
23     A.   Yes.
24     Q.   And this is a section that describes
25 whether there was sufficient certainty of intention to

Page 140

1 create a trust; right, Sir?
2     A.   Yes.
3     Q.   And if you look at paragraph [153].
4     A.   Yes.
5     Q.   Do you see the Ruscoe court said: "On
6 this, I am satisfied that Cryptopia manifested its
7 intent through its conduct in creating the exchange
8 without allocating to accountholders public and private
9 keys for the digital assets it commenced to hold for
10 them." Do you see that, Sir?
11     A.   Yes.
12     Q.   So the Ruscoe court determined that by
13 creating an exchange without allocating to account
14 holders the keys for the digital assets, the Cryptopia
15 exchange manifested its intent for a trust; right, Sir?
16     A.   Yes.
17     Q.   And you would agree that FTX also created
18 an exchange without allocating to account holders the
19 keys for the digital assets; right, Sir?
20     A.   In the end, that is not a question for
21 me, but I have no reason to doubt it if you say that is
22 the position.
23     Q.   That is what you were told to assume;
24 right, Sir?
25     A.   Yes, exactly.

Page 141

1     Q.   If you look at paragraph [157] do you see
2 the judge writes: "For completeness, I note also a
3 number of factors here which support the conclusions I
4 have reached ..."; do you see that, Sir?
5     A.   Mm-mh.
6     Q.   And sub-paragraph (a) indicates that an
7 express trust can be evidenced: "... orally or as
8 result of conduct ..."; do you see that?
9     A.   Yes.
10     Q.   You agree with that as a statement of the
11 law; right, Sir?
12     A.   Yes.
13     Q.   Paragraph [157](c), the court writes:
14 "It is not a significant indicator against a trust that
15 the fungible property of one party is mixed with the
16 fungible property of another in a single pool ..."; do
17 you see that, Sir?
18     A.   Yes. I do not agree with that. That is
19 inconsistent with what Briggs J said, I think, in the
20 LBIE case which Dame Elizabeth cites. I think, with all
21 due respect to the judge, it is wrong.
22     Q.   Okay.
23     A.   I am not saying it would be decisive, but
24 it is a significant indicator in English law.
25     Q.   In [157](c) you see the court also

MAGNA ▶
LEGAL SERVICES

Page 142

1   indicates that it is not a significant indicator against
2   a trust that: "... the content of that pool and the
3   identity of the beneficiaries is constantly changing."
4   Do you see that, Sir?
5       A.   Three years after this decision, Trower J
6   in an English case Piroozzadeh said precisely the
7   opposite.
8       Q.   We will get there.
9       A.   I am just saying why I disagree.  You
10  have put it to me so I am answering.
11      Q.   But you see that is what this court held
12  that the content ----
13      A.   Yes.
14      Q.   The fact that the content of that pool
15  and the identity of the beneficiaries is constantly
16  changing is not a significant indicator against a trust;
17  right, Sir?
18      A.   I see what he says, yes.
19      Q.   So we will get to the Piroozzadeh case in
20  a minute.  If you look at paragraph [160].  If you look
21  at paragraphs [159] and [160] and [161] you see there is
22  a discussion of the Goldcorp case?
23      A.   Yes.  That picks up your Sale of Goods
24  point.
25      Q.   And in [161] you see the court indicates

Page 143

1   Goldcorp is primarily simply a Sale of Goods Act; do you
2   see that, Sir?
3       A.   I had not relied on Goldcorp for
4   supporting my view.  Indeed, I cite it to support the
5   view that can be a trust over the pool in principle.
6       Q.   Okay.  If you look at paragraph [172] you
7   see this is in a section that is called:  "Additional
8   matters" that starts on the prior page; do you see that?
9       A.   Yes.
10      Q.   And do you see then on [172] do you see
11  the court describes other material that supported its
12  view; do you see that, Sir?
13      A.   Yes.
14      Q.   And so one of the sources that the court
15  looked at was Cryptopia's web-based instruction pages;
16  do you see that, Sir?
17      A.   Mm-mh.
18      Q.   And the court also looked at Cryptopia
19  live customer interfaces; do you see that, Sir?
20      A.   Mm-mh, yes.
21      Q.   Do you see the court noted as meaningful
22  that those two sources:  "... implied that
23  accountholders would be depositing, buying, selling and
24  owning their own cryptocurrency"; do you see that?
25      A.   Yes.

Page 144

1       Q.   The court also noted as meaningful that:
2   "... there is reference in the documentation to 'your
3   coin balances' ..."; do you see that, Sir?
4       A.   Yes.
5       Q.   Do you see in the middle of the paragraph
6   there is a sentence that starts:  "Those instructions":
7   "Those instructions might possibly" ----
8       A.   Yes.
9       Q.   And the court here writes:  "Those
10  instructions might possibly have misled accountholders
11  into thinking that they directly held the cryptocurrency
12  in question rather than perhaps being only beneficial
13  owners." Do you see that?
14      A.   Mm-mh, yes I do.
15      Q.   Then the court writes:  "But what is
16  clear to me is that those instruction pages certainly do
17  not suggest that accountholders were to have nothing
18  more than a mere contract under which they would be
19  unsecured creditors of Cryptopia with Cryptopia having
20  the power to dispose of the cryptocurrency without an
21  accountholder's consent." Do you see that, Sir?
22      A.   Yes.
23      Q.   So this would suggest that statements of
24  ownership do not disclaim being a beneficial owner;
25  right, Sir?

Page 145

1       MR. GLUECKSTEIN:  Object to the form.
2       A.   I think -- I have not seen the whole
3   document and I notice this is, sort of, additional
4   matters.  It does not seem to be part of his basic
5   reasoning.  As I say, as I have said in my report,
6   I think in the absence of clear indications to the
7   contrary, if you will refer to "your asset" it means
8   that you own it.  If you refer to "title to the asset",
9   even more clearly that you own it unless there is some
10  factor such as "equitable before title".
11      Q.   You would agree the Ruscoe judge
12  indicated the statements of ownership do not disclaim
13  being a beneficial owner; right, Sir?
14      A.   Of course they do not, but the anterior
15  question is whether they indicate legal ownership.  If
16  they indicate legal ownership then you do not get to
17  beneficial ownership, but if you accept there is not
18  legal ownership then they could mean beneficial
19  ownership.
20      Q.   You would agree the Ruscoe court found
21  that despite statements about the customer owning the
22  cryptocurrency and there being your balances in your
23  assets, that the customers there had beneficial but not
24  legal ownership; right, Sir?
25      A.   I see what he says but I have not seen

1  the whole contract. I am slightly uncomfortable about
2  expressing a view.
3      Q.   Okay.
4      A.   But I do think the crucial point is that
5  it referred to the existence of a trust in the document,
6  which we do not.
7      Q.   Let us look at that. If you turn to
8  paragraph [179] ----
9      A.   I am sorry, of?
10     Q.   I am sorry, still of Ruscoe.
11     A.   Yes, [179], I am there, yes, thank you.
12     Q.   Let me know when you are there.
13     A.   I am there.
14     Q.   Do you see the court begins to discuss
15  the amended terms and conditions updated from August 7,
16  2018; do you see that?
17     A.   Mm-mh.
18     Q.   Okay. And do you see that contains the
19  language you are referring to that: "Each user's entry
20  in the general ledger of ownership of coins is held by
21  us, on trust ..."; do you see that, Sir?
22     A.   Yes.
23     Q.   That is the reference to trust you
24  referred to in the footnote in your report; right, Sir?
25     A.   Mm-mh. Yes, I do. I think I may be

1  wrong, but I think what he is saying is that trust is
2  important, it just is a nonsensical trust to interpret
3  it the way that is being done according to Ms. Cooper,
4  but I may be wrong.
5      Q.   Let us look at paragraph [181]. Do you
6  see the judge writes: "On these aspects, I disagree
7  with Mr Barker's interpretation here. I have confirmed
8  above that I am satisfied no variation of trust was
9  involved in the amended terms. Those terms merely
10  confirmed what were the existing trusts in operation."
11  Do you see that, Sir?
12     A.   Yes.
13     Q.   And then if you go to paragraph [183], do
14  you see the judge writes: "It must follow, therefore,
15  that at no point in time were there separate sets of
16  trust assets on the one hand, for accountholders under
17  the historic terms and, on the other, for accountholders
18  who had accepted the amended terms." Do you see that,
19  Sir?
20     A.   Yes.
21     Q.   So the court in Ruscoe concluded there
22  was a trust before this amendment existed; right?
23     A.   Yes. That seems to be the case. I think
24  you are right about that, yes.
25     Q.   So the court in Ruscoe found a trust

1  despite there not being a contract at that point in time
2  saying that the ownership was held on trust; right, Sir?
3      A.   That would seem to be the case, yes.
4      Q.   Are you aware that the Law Commission
5  also noted in interpreting Ruscoe that the court found
6  was created before the trust language was put in
7  a contract?
8      A.   I have not checked, but I will take it,
9  if you say that is the position I am prepared to accept
10  it.
11     Q.   Okay. Let me ask you about another of
12  the requirements which is certainty of object.
13     A.   Okay.
14     Q.   I believe you have agreed that there is
15  not a lack of uncertainty about object; right?
16     A.   I think I said that in paragraph 42, yes.
17     Q.   Why do we not take a brief break. We
18  have been going about an hour and a half.
19          THE VIDEOGRAPHER: We are going off the
20  record. The time is 3.36 pm.
21          (A Short Break)
22          THE VIDEOGRAPHER: We are back to
23  the record. The time is 3.53 pm.
24          (Exhibit 108 was marked for identification)
25     Q.   You have been handed what we have marked

1  as exhibit 108, which is the terms of service?
2      A.   Yes.
3      Q.   I am handing it to you because I am going
4  to ask you what section 8.2.6 means. You might have it
5  memorised but I thought it could not hurt to take
6  a look.
7      A.   At my age I do not rely on my memory more
8  than I have to, but thank you.
9      Q.   When you are ready, Sir, my question is
10  what do you take 8.2.6 to mean?
11          MR. GLUECKSTEIN: Object to the form.
12     A.   Well, what it means is that it is saying
13  that you legally own your digital assets and FTX trading
14  does not.
15  BY MR. HARRIS:
16     Q.   Anything else?
17     A.   Well, the implications can be quite
18  significant, but that is the basic message. I am
19  slightly uncomfortable about re-phrasing a provision,
20  but I think the important point is that title to your
21  digital assets means legal title on the face of it and
22  none of the digital assets are the property of FTX
23  Trading means that FTX Trading do not own them.
24     Q.   So is it your view that it means that the
25  customer owns the assets at all points in time?

Page 150

1    A.    That is what it would seem to mean, yes.
2    Q.    Okay.  Now, do you recall that in your
3    rebuttal report you instead say that it means that legal
4    title to Three Arrows Digital Assets rest with 3AC at
5    least at the point that they are deposited; do you see
6    that, do you remember that, Sir?
7    A.    I do.  There is a difference between what
8    the parties have agreed and the legal effect of what has
9    happened.
10    Q.    I understand and I am not asking about
11    the legal effect of what has happened.  I am trying to
12    understand what you think 8.2.6 means.  So do you think
13    it means for all times the customer owns the assets or
14    it only means that at the time they are deposited into
15    the customer's specific account, the customer owns the
16    assets?
17        MR. GLUECKSTEIN:  Object to the form.
18    A.    Why I am struggling with this slightly is
19    that in the end who owns property is a matter for the
20    court not a matter for the parties to agree.  I can say
21    I own your house.  We can almost, A and B can agree that
22    C owns your house, but it does not mean he owns your
23    house.  So it means, what does it mean or what do the
24    parties think it means?  What it clearly is intended to
25    mean is that legal title to the digital asset is

Page 151

1    intended to rest with the customer.  And it is intended
2    that FTX has no interest in the digital assets owned by
3    the customer.
4    Q.    So legal and title is intended to rest
5    with the digital customer at all times?
6    A.    That, I think, is the natural meaning of
7    the clause, yes.
8    Q.    So the natural reading of the clause is
9    that legal title is intended to vest with the customer
10    at all times; right?
11    A.    Yes.
12    Q.    Can we look at your rebuttal report?
13    A.    Yes.
14    Q.    So if you look at page -- if you go to
15    page 11 in paragraph 21.a.iii.
16    A.    Yes.
17    Q.    You say that the natural meaning of 8.2.6
18    is: "... that legal title to 3AC's Digital Assets rests
19    with 3AC, at least at the point that they are deposited,
20    and then it leaves it to the courts to work out the
21    consequences of the dealings with those assets
22    thereafter." Do you see that, Sir?
23    A.    I do.
24    Q.    Is that still your view today?
25    A.    I think that, yes, in effect I am dealing

Page 152

1    with Dame Elizabeth's point there and what I am saying
2    is that this is saying how they intend legal title to be
3    dealt with, but, as I say, legal title is not purely
4    a question of what the parties intend.
5    Q.    I am just focusing on the -- You can put
6    Dame Elizabeth's report aside and I just want to know
7    your interpretation of what the parties intended under
8    8.2.6.  Is it your interpretation that the parties
9    intended to clarify ownership at the time they were
10    deposited and then the parties intended to leave it to
11    the courts thereafter?
12    A.    Yes.
13    Q.    Okay.  What do you mean by 3AC's Digital
14    Assets?
15    A.    I mean that the digital assets which are
16    recorded in their accounts.
17    Q.    What do you mean "recorded in their
18    accounts"?
19    A.    Well, they will have an account which
20    would presumably record what digital assets they have
21    bought or sold and what they hold at the moment.
22    Q.    You mean, the ledger system that FTX
23    created and updated?
24    A.    Yes.  I mean the assets have to be
25    deposited.  If they are not deposited then they have not

Page 153

1    been -- they have not got them.  But this is their
2    intention.
3    Q.    In this paragraph we have been looking
4    at, which is 21.a.iii you say that 8.2.6 naturally means
5    that legal title to 3AC's Digital Assets, why do you say
6    "legal title" as opposed to ----
7    A.    Because when you talk about title you
8    mean legal title normally.  If you want to say equitable
9    title or anything like that you qualify it.
10    Q.    You chose to qualify it, wrote the word
11    legal title here; right, Sir?
12    A.    That is because the natural meaning of,
13    "I have got title to this property" would be naturally
14    understood to mean, "I have got legal title".  I agree
15    I am qualifying it but I am saying the natural meaning
16    is legal title.
17    Q.    You would agree that 8.2.6 does not say
18    legal title; right?
19    A.    I will agree that certainly.
20    Q.    It could have been written, just used
21    that phrase instead; right, Sir?
22    A.    It could have been written that way, yes.
23    Q.    You indicate that the natural reading of
24    8.2.6 only addresses legal title at the point they are
25    deposited; right?



1      A.   I think again one has to distinguish
2  between what the parties may have thought and what the
3  effect is.
4      Q.   I am trying to figure out what you
5  believe the parties thought.  So you think the parties
6  only intended to address ownership at the time that
7  assets were deposited; is that right, Sir?
8      A.   No.  I think it means that legal title is
9  intended to be with the customer.
10     Q.   At all points in time.
11     A.   But the question is what is the effect of
12  what has happened?
13     Q.   Okay, I am not asking about the effect.
14  I am asking about the intent.  When people put words on
15  a page, right, so they had an intent when they did so;
16  right, Sir?
17     A.   Yes.
18     Q.   So I want to know what you think the
19  intent of this section was.  So do you think the intent
20  when the parties put these words on the page was only to
21  address ownership at the time of deposit?
22     A.   I am dealing -- it is right to say that
23  21.a.ii is dealing with a specific point made by
24  Dame Elizabeth Gloster when she talks about it being
25  surplusage because it would not mean anything.

1      Q.   What do you think the meaning of 8.2.6
2  is?
3      A.   I think it means that legal title to the
4  digital assets is intended to be with the customer.
5      Q.   So is only intended to be with the
6  customer at the time of deposit?
7      A.   No.  I do not think -- that is not what
8  the natural meaning of this clause is.
9      Q.   Let me make sure the natural meaning of
10  8.2.6 is not that legal title to the digital assets is
11  intended to be with the customer solely at the time of
12  deposit; correct?
13         MR. GLUECKSTEIN:  Object to the form.
14     A.   What I have said is that 8.2.6 (A) and
15  (B) indicate that legal title is to be, according to the
16  parties, with the customer and the FTX is not intended
17  to have any meaning.  What Dame Elizabeth has said, as
18  I recall, in 8.2.6, I do not have it in front of me, is
19  that because the assets are all swept into the pool, if
20  I am right, 8.2.6 has no real meaning.  All I am saying
21  is that it does have a meaning at the moment any assets
22  are deposited in the customer's wallet.
23     Q.   Is the natural meaning of 8.2.6 solely
24  that legal title is intended to be with the customer at
25  the time of deposit?

1          MR. GLUECKSTEIN:  Object to the form.
2      A.   As I say, I think it means that legal
3  title is to be with the customer.
4  BY MR. HARRIS:
5      Q.   At all times; right, Sir?
6      A.   Yes.
7      Q.   So the natural meaning is not that legal
8  intent, title is intended to be with the customer at the
9  time of deposit; right, Sir?
10         MR. GLUECKSTEIN:  Object to the form.
11     A.   It is to be at the time of deposit but
12  thereafter the expectation and intention is it remains
13  with the customer.
14  BY MR. HARRIS:
15     Q.   Okay.  There is no natural interpretation
16  of this clause that solely addresses legal title at the
17  time of deposit; right, Sir?
18         MR. GLUECKSTEIN:  Object to the form.
19     A.   I think that if you can take into account
20  the pooling and its consequences, you could argue that
21  it meant it only takes effect at that time, but I think
22  it is a bit of a stretch bearing in mind the natural
23  meaning.
24  BY MR. HARRIS:
25     Q.   Tell me one more time, what is the

1  natural meaning?
2      A.   I think I have told you more than once.
3  I think it means title to the digital assets rests with
4  the customer.
5      Q.   At all points in time?
6      A.   Yes, provided the digital assets are in
7  the account.
8      Q.   What do you mean provided the digital
9  assets are in the account?
10     A.   I am reading from the clause:  "As the
11  owner of Digital Assets in your Account ...".
12     Q.   So what do you view "your Account" to
13  mean?
14     A.   I think it means digital assets recorded
15  in the account.
16     Q.   What does "your Account" mean, Sir?
17     A.   The account means the overall account of
18  the client.  It is defined, I think, at the very
19  beginning of this agreement.
20     Q.   So it is not just the customer-specific
21  wallet you are talking about; right?
22     A.   No.
23     Q.   So the natural meaning of this clause is
24  that at all points in time, no matter where and in what
25  wallet the assets are held that the customer owns the

1   digital assets; right, Sir?

2         MR. GLUECKSTEIN:  Object to the form.

3     A.   Yes.

4  BY MR. HARRIS:

5     Q.   You would agree that 8.2.6, the natural

6  meaning of it does not say that we are leaving it to the

7  court to determine the consequences of dealing with the

8  assets; right?

9     A.   No, I do not think you need to say that

10  in a law-abiding country.

11     Q.   Well, Sir, if the parties just wanted to

12  leave everything to the court they would not need to say

13  anything; right?

14     A.   No, all I am saying is parties can agree

15  what they like but certain agreements and the effect of

16  the agreement are subject to the law and whatever the

17  parties have agreed is taken into account by the courts

18  and the courts try to give effect to it.  But it is

19  a question of law who has title; not a question of what

20  the parties agree.

21     Q.   Is there something in 8.2.6 where the

22  parties say, "We are going to leave it to the court to

23  work out the consequences of the dealings with the

24  asset"?

25     A.   I ----

1         MR. GLUECKSTEIN:  Object to the form.

2  Misstates testimony.

3     A.   There is not anything to that effect and

4  it would be remarkable if there was.

5  BY MR. HARRIS:

6     Q.   There is nothing in 8.2.6 that says that

7  after deposit the form of ownership changes; right?

8     A.   No.

9     Q.   There is nothing in 8.2.6 that says the

10  ownership changes depending on where the digital assets

11  are held; right?

12     A.   Right.

13     Q.   Okay.  In fact, there is language in

14  8.2.6 that indicates that the form of ownership at all

15  times stays with the owner; right, Sir?

16     A.   Well, I think we are agreed on that.

17     Q.   Okay.  For instance, 8.2.6(A) says:

18  "Title to your Digital Assets shall at all times remain

19  with you ..."; right?

20     A.   Yes.  We seem to be in vehement

21  agreement.

22     Q.   What does the term "held" in 8.2.6 mean?

23     A.   "... held in your Account."  Well, it

24  could either mean "held in your account" in the sense as

25  "recorded to your credit in your account" or it could

1  mean "in your wallet".  I have interpreted it as meaning

2  "as held in your account" in the sense of "recorded in

3  your account".

4     Q.   So you interpret "held in your account"

5  to mean "credited to your account" as opposed to "held

6  in the customer-specific wallet"; right?

7     A.   I think so.  If you look at the

8  definition of account, that tends to support it.

9     Q.   If you look at 8.2.6(C), do you see it

10  says at the end that a user can send digital assets:

11  "... to a different blockchain address controlled by you

12  or a third party."

13     A.   Yes.

14     Q.   And that suggests that customers were

15  aware that the blockchain address that FTX were using

16  were not controlled by the user; right, Sir?

17     A.   I am not sure I agree with that, no.

18     Q.   Do you have any reason to think customers

19  thought the blockchain addresses that FTX was using

20  were controlled by the user?

21     A.   Not that I can immediately think of, no.

22     Q.   Would you agree that this language in

23  8.2.6(C) tends to suggest that customers were aware that

24  the blockchain addresses FTX used were controlled by

25  FTX?

1     A.   No.  All it refers to is a different

2  blockchain address controlled by you or a third party.

3  It does not mean they are casting any suggestions as to

4  how FTX's blockchain address or the customer's

5  blockchain address with FTX is controlled.

6     Q.   You see that 8.2.6 is in a section 8.2

7  Digital Assets; do you see that?

8     A.   Yes, I do.

9     Q.   And 8.2.1 is about depositing of digital

10  assets; right, Sir?

11     A.   Yes.

12     Q.   And 8.2.2 is about purchasing digital

13  assets; right?

14     A.   Yes.

15     Q.   And 8.3.5 talks about delivering digital

16  assets to your account; right, Sir?

17     A.   Yes.

18     Q.   Okay.  I am sorry, just to go back,

19  nothing in 8.2.6 says it is limited to either deposited

20  or purchased digital assets; right?

21     A.   No.

22     Q.   In fact, it refers to all digital assets;

23  right, Sir?

24     A.   Yes.

25     Q.   Up to 8.3.5, sorry, under a section

MAGNA
LEGAL SERVICES

1  called "Fiat currency"?
2      A.   Yes.
3      Q.   And 8.3.5 talks about delivering digital
4  assets to your account; do you see that, Sir?
5      A.   Yes.
6      Q.   And 8.2.6 would cover digital assets that
7  were delivered to your account; right, Sir?
8      A.   Yes.
9      Q.   Can I ask you this, Sir.  If the parties
10 intended for 3AC to retain title, legal title, then on
11 what legal basis could FTX commingle the assets?
12     A.   I think one has to look at the facts.
13 They may have intended it but legal title does not pass.
14 It depends when talking about equity or whether talking
15 about trust or quasi-bailment, but as I see it if they
16 are digital assets in the pool and a customer acquires
17 them and they are credited to his account, there may be
18 an intention that he has title transferred to him under
19 8.2.6.  If he is not given control over the specific
20 assets title does not pass and that is a matter of law.
21          As you put to me earlier, in order to
22 transfer title it would seem (a) there has to be an
23 intention to transfer title, that seems to be achieved
24 in 8.2.6, but there also has to be a transfer of
25 control.  As I understand the facts that was not

1  achieved.  I think that is where Dame Elizabeth and
2  I disagree, but that is the essential point.
3      Q.   So I believe you said you do not think
4  equitable title exists until equitable and legal title
5  are broken?
6      A.   Yes.
7      Q.   Okay.  So the intent was for -- in 8.2.6
8  was for the customer to retain both equitable and legal
9  title; right, Sir?
10     A.   The way I would prefer to put it is to
11 retain legal title because equitable title does not come
12 into the picture.
13     Q.   Okay.  They intended for the user -- for
14 the customer to be the owner in all aspects; right, Sir?
15     A.   Yes, that is right.
16     Q.   They did not intend any title to pass to
17 FTX; right, Sir?
18     A.   That is right, yes.
19     Q.   Are you aware of scenarios where parties
20 do not intend to pass title but title is none the less
21 passed?
22          MR. GLUECKSTEIN:  Object to the form.
23     A.   There must be plenty of cases where
24 parties have agreed things where they do not realise
25 that they have agreed them.  I cannot put my finger on

1  a particular case.
2  BY MR. HARRIS:
3      Q.   You would agree for digital assets under
4  the criteria you have laid out there has to be an intent
5  to transfer title; right, Sir?
6      A.   Yes.
7      Q.   So if a customer deposits an asset on the
8  exchange you agree they did not intend to transfer title
9  to FTX; right, Sir?
10     A.   If they transfer it on to the exchange,
11 I agree.
12     Q.   Okay.  So there is no scenario in which
13 an asset was deposited into the exchange would
14 become -- FTX would acquire title to it; right?
15          MR. GLUECKSTEIN:  Object to the form.
16     A.   No, but I mean if FTX were to sell it or
17 it were to disappear, then it would go and there would
18 be nothing to get title to.  But I think an asset which
19 the customer has and puts on to the, goes into the pool
20 is one thing, but an asset that -- a digital asset that
21 remains in the pool is another.
22 BY MR. HARRIS:
23     Q.   Well, let us just walk through a
24 scenario.  Customer A deposits a hundred bitcoins into
25 the exchange.  At that point, according to the terms of

1  service, the customer has title; right?
2      A.   (Nodded)
3      Q.   That title, that asset is then swept into
4  the commingled account.  Are you with me so far?
5      A.   Yes.
6      Q.   But the parties did not intend for title
7  to pass to FTX; right?  Correct, Sir?
8      A.   Mm-mh.
9      Q.   So at that point the customer still has
10 title to that asset under your interpretation even
11 though it is in the commingled account; right, Sir?
12     A.   Arguably.  That is where you get into
13 problems about following and tracing assets.  If it is
14 a legal title.
15     Q.   I am just making sure here.  You agree
16 the parties did not intend to pass legal title; right,
17 Sir?
18     A.   I agree.
19     Q.   So therefore title did not pass; right,
20 Sir?
21     A.   If it was originally the property of the
22 customer, then -- and the customer had it and passed it
23 into the -- and it landed up in the pool, then I agree
24 8.2.6 means there was not an intention to pass title.
25 But then you get into vexed questions about following

MAGNA
LEGAL SERVICES

1   and tracing assets, which -- but subject to that, yes.
2       Q.    But just to make sure we are in agreement
3   here. In this scenario where a customer deposited an
4   asset into the exchange and then it was swept into the
5   commingled account, the customer retains legal title;
6   correct, Sir?
7       A.    Not necessarily, no. I think that there
8   is an intention that he does. I freely accept. But you
9   get into problems about following and tracing in law.
10  Then you have to get into a question of whether the
11  client has equitable or legal title.
12      Q.    To make sure I understand. So this is
13  a scenario we just described where the parties did not
14  intend title to transfer; right, Sir? But your position
15  right here today is that despite lacking one of the two
16  requirements to pass legal title, that now you think
17  legal title did pass?
18      A.    It is not a question -- that is
19  a question of where parties -- that is dealing with
20  a situation of contract where parties agree to pass
21  title. What I am dealing with is a slightly little
22  different issue which is when my property gets
23  commingled with somebody else's and it remains "my
24  property", can I still claim it as being my property?
25  That is the question. And you get into difficulties

1   about -- you then have to decide if it is "my property
2   in equity" or "my property in law". Strangely enough,
3   on our system that we have, it is, you are better off if
4   it is your property in equity than if it is your
5   property in law.
6       Q.    Sir, if we are in this situation where
7   the customer has deposited bitcoin and they have legal
8   title and it is swept into a commingled account where
9   the party's intention was not to transfer title, there
10  was never an intention for FTX to become, to get the
11  legal title; right?
12          MR. GLUECKSTEIN: Object to the form.
13  BY MR. HARRIS:
14      Q.    And the commingling would not grant FTX
15  ownership; right?
16      A.    The trouble is a commingling is
17  commingling with other assets.
18      Q.    Other user's assets?
19      A.    Maybe others user's assets and FTX's
20  assets but identifying whose is whose is quite difficult
21  and you then get into my discussion in my first evidence
22  -- my first statement as to following the legal estate
23  or are you following a legal estate or an equitable
24  estate.
25      Q.    So the commingling would not generate --

1   create legal title in FTX, would it?
2       A.    I think if it is in FTX's name and under
3   FTX's control, in practice it would, not because of the
4   rule about transferring title contractually which is
5   what we are talking about when it comes to change of
6   intention to pass title and intention to change of
7   control. We are talking about commingling of assets and
8   that becomes problematic whether you can follow the
9   asset into -- like with bank and your money. If the
10  money in your account goes into the bank's assets ----
11      Q.    That is a different situation, Sir.
12      A.    Bitcoins and digital assets are fungible.
13  This is the problem about quasi-bailment for example.
14      Q.    Have you ever seen a bank account
15  agreement where it says title to the cash remains with
16  the customer?
17      A.    No, but if it did, you would still -- and
18  the cash went into the general bank's account, you could
19  not follow the cash through. It would be mingled with
20  the bank's cash. That is why there is no point in doing
21  it.
22      Q.    Explain to me again, how did title
23  transfer to FTX when the parties never intended it to ?
24      A.    It commingled with assets which were
25  partly FTX's, which were under FTX's control, which FTX

1   in practice dealt with as if it were its own. And in
2   those circumstances, the argument is, and it seems to me
3   to be the case, that you cannot follow the asset.
4   Anyway, in due course the asset will have been
5   dissipated.
6       Q.    So is it your testimony today that if you
7   cannot trace an asset then legal ownership goes to the
8   intermediary?
9       A.    Yes.
10      Q.    Is that your testimony?
11      A.    In practice.
12      Q.    Is there a case that says that?
13      A.    I think if you cannot trace it and the
14  person who owns it cannot have it, then it must be in
15  the person who is in possession of it. The person in
16  possession of it, we recognise in English law prima
17  facie that the person in possession is the owner.
18      Q.    Is there anywhere in your report where
19  you said that if you cannot trace an asset then legal
20  ownership goes to the intermediary?
21      A.    I would ----
22      Q.    In your reports.
23      A.    I would have to look at my first
24  declaration but I deal with following. I am not sure
25  I quite put it in those terms.



Page 170

1      Q.    The terms you said is that ownership does
2  not transfer unless there is both an intention ----
3      A.    That is when it transfers -- sorry,
4  I interrupted.  I beg your pardon.
5      Q.    No, no, go ahead.  I did not mean to cut
6  you off.
7      A.    That is when I said that that was dealing
8  with transfer by agreement, but we are dealing with
9  a slightly different point is when the asset is
10  commingled with other assets.  I deal with that in
11  Part 7.  In terms of following and tracing of my
12  statement of my evidence.
13      Q.    Let us look at that.  You are saying
14  somewhere in your original report, Part 7, you dealt
15  with this principle where you announce that FTX can
16  acquire ownership interest if property is not traceable;
17  is that right?
18      A.    I think it depends whether it is an
19  equitable interest or a legal interest.
20      Q.    Show me where it is you are pointing to
21  for this?
22      A.    I deal with it in Part 7 generally.
23      Q.    Okay, show me where.
24      A.    I deal with it I suppose in summary terms
25  in paragraph 76 onwards.

Page 171

1      Q.    Where in 76 onwards do you state the
2  principle that FTX acquires title by, "if the assets
3  cannot be traced"?
4      A.    I say that the customer cannot trace it
5  and therefore I think it must follow that FTX is the
6  owner because FTX is in control of it.
7      Q.    Is there anywhere where the second part
8  of that sentence is stated?
9      A.    No, but I think it follows as a necessary
10  conclusion because somebody has to own the asset.
11      Q.    Is it possible that the customers own
12  them as tenants in common?
13      A.    I think that that is a possibility, but
14  you then have to go back to the contract and work out
15  how that actually works.
16      Q.    Do you agree the parties intended that
17  the customers would own their assets?
18      A.    The customers, there is no evidence that
19  they intended there to be -- that they intended any sort
20  of tenancy in common of the pool.
21      Q.    I did not get there yet.  Do you agree
22  the parties intended that the customers would own their
23  assets?
24      A.    We have agreed on that, yes.
25      Q.    Okay.  So if I understand your position

Page 172

1  now about why FTX own the asset it is because of the
2  inability to trace them; is that right?
3      A.    No.  As I understand it, most of the
4  transactions which a customer entered into did not
5  involve transfer of any assets into their wallet.
6      Q.    Sir, do you know where the assets on the
7  exchange came from?
8      A.    Well, some of the assets will have come
9  from the customers, but none the less those assets have
10  long -- if a customer brings assets into the pool they
11  come from the customer and that is what we are talking
12  about.
13      Q.    Would it surprise you to learn that
14  almost all of the assets in the FTX Exchange were
15  deposited by customers?
16          MR. GLUECKSTEIN:  Object to the form,
17  lacks foundation.
18      A.    The trouble is that those assets have
19  long since gone.  The customer has dealt with other
20  assets, bought other assets that he has not had control
21  of.  They have remained in the control of FTX.
22      Q.    But at no point, you would agree, Sir,
23  that any of those customers who deposited assets
24  intended FTX to have ownership of them?
25      A.    No, but the trouble is that the

Page 173

1  subsequent assets never got to the customer.
2      Q.    So the only reason that any of the assets
3  the customers deposited would be owned by FTX is because
4  of this principle you have just described regarding
5  inability to trace them; right?
6      A.    Well, I want to go back on this.  As
7  I understand it, there are two sorts of asset which
8  would be recorded in the customer's account.  One is
9  assets which the customer brought and then goes into the
10  pool.  The other is assets which the customer acquires
11  by dealing and so on, which do not go into his control.
12  And those, it seems to me, it is quite difficult to
13  argue that he ever had title to them.
14      Q.    But do you understand, Sir, that those
15  assets that one customer acquired by dealing were
16  acquired from another customer; do you understand that,
17  Sir?
18      A.    That may well be the case, but it still
19  does not alter the fact that they are not -- they do not
20  get to the customer's control.
21      Q.    But talking about the first customer, the
22  one who deposited the asset, they never intended to
23  transfer title; right?
24      A.    No, well, in relation to those assets
25  that you get into following and tracing, but not in

1  relation to subsequent trades.
2      Q.    Imagine a scenario where all the assets
3  on the exchange were deposited by customers and then
4  traded among those customers.  Are you following that
5  scenario, Sir?
6      A.    Yes.
7      Q.    So the only way in which FTX might own
8  those assets were through this principle that you
9  described today of inability to trace those assets;
10  right?
11      A.    No, because those assets do not
12  necessarily remain the customer's.  If I own 20 bitcoin
13  and I put it in to the pool, then I see your point.  But
14  then if you acquire it from the pool and you never get
15  control of it, then I have lost it because I have got
16  rid of it and you have acquired it but you have never
17  got control of it, therefore you have never got it and
18  FTX have got it.
19      Q.    Why would not the first customer have
20  kept ownership?
21      A.    Because it has been passed on.  He has
22  sold it.  How could he claim he owns it if he has sold
23  it and got some Ethereum or some other coin.
24      Q.    If I understand right, your view is that
25  by commingling the assets FTX acquired title to them?

1      A.    It is more that once there is an asset
2  which is in the client's account which the client never
3  controlled, the client can never have acquired it --
4  title to it, that is the point.
5      Q.    Okay.  Let us talk about a few of the
6  other sections that you refer to.  One section you refer
7  to is section 2.2.3.  Let me know when you are there.
8      A.    Yes.  2.1.3, thank you.
9      Q.    What is the relevance of 2.1.3 to the
10  issue of whether Three Arrows has an ownership interest
11  in the digital assets?
12      A.    It is relevant to the question of whether
13  there is a trust relationship because it says:  "FTX ...
14  has no fiduciary relationship or obligation to you in
15  connection with any trades or other decisions or
16  activities affected by you using the Services." And that
17  seems to me to be flatly inconsistent with the idea that
18  FTX is a trustee because a trustee is a fiduciary
19  relationship.
20      Q.    You agree, however, that the parties can
21  modify the duties of a trustee through contract; right?
22      A.    They can, but if you modify the duties of
23  a trustee to saying there is no fiduciary relationship,
24  then you are saying there is no trusteeship.
25      Q.    Okay.  Is there a case that you are

1  familiar with that says if a contract has a provision
2  stating there is no fiduciary relationship that it means
3  that there is no trust?
4      A.    No.  It seems to me blindingly obvious to
5  be the case, to be quite honest with you.
6      Q.    You see this provision about fiduciary
7  relationship is limited to trades or other decisions or
8  activities affected by you; do you see that, Sir?
9      A.    "... in connection with any trades or
10  other decisions or activities affected by you using the
11  Services."  We have to look at the definition of
12  services.  As I say in my rebuttal, "in connection with"
13  is wide and "the Services" is a wide decision.
14      Q.    Would you agree that the section 2.1
15  generally seems to be about trading; right, Sir?
16      A.    No.  It comes under "Risk Disclosures"
17  and "No advice and no reliance".
18      Q.    Okay.
19      A.    I do not think there is anything that
20  links it specifically to trading.
21      Q.    You would at least agree 2.1.3 is limited
22  to decisions or activities affected by you; right, Sir?
23      A.    In connection with decisions or: "...
24  trades or other decisions or activities effected by you
25  ...", yes, "... using the Services."  Yes.

1      Q.    Sir, you would agree that the decision to
2  move a digital asset from a segregated wallet to
3  a commingled wallet was a decision made by FTX; right,
4  Sir?
5      A.    Yes.
6      Q.    And likewise the movement itself was an
7  activity by FTX, not the customer; right, Sir?
8      A.    Yes.
9      Q.    So you would agree that both the decision
10  to move the asset and the movement of the asset were not
11  decisions or activities done by the customer; right,
12  Sir?
13         MR. GLUECKSTEIN:  Object to the form.
14      A.    I agree, but we are concerned with the
15  meaning of the expression:  "... in connection with any
16  trades or other decisions or activities effected by you
17  using the Services."  One has to look at that as
18  a composite provision and it looks intended pretty
19  clearly to be pretty wide.  "In connection with" is
20  recognised as being a wide terms and "the Services" are
21  given a wide definition on the first page.
22  BY MR. HARRIS:
23      Q.    I see.  Do you view the term:  "...
24  effected by you ..." to be meaningless?
25      A.    No.  It is: "... in connection with any

| Page 178 |
| --- |

1  trades or other decisions or activities effected by you
2  ...", but it is not limited, it does not say obligation,
3  "arising in relation to any trades"; it is "in
4  connection with".
5      Q.    Could it be that 2.1.3 is trying to
6  ensure that FTX has no liability for the decisions made
7  by a customer?
8      A.    No, because it talks about trades and
9  activities as well as decisions.
10     Q.    Could it be that 2.1.3 is trying to
11 ensure that FTX has no liability for the decisions and
12 actions made by a customer?
13     A.    It talks about activities.  Again, I come
14 back to the fact it is in connection with.  If it was
15 purely limited to the trades and decisions and
16 activities of the customer, that would be one thing.
17 But it is no obligation in connection with.  Again, you
18 have got to look at the definition of the services.
19     Q.    So would you -- are you saying that 2.1.3
20 covers all actions by FTX itself even if they are not
21 decisions or activities by the customer?
22     A.    No, they have got to be in connection
23 with.
24     Q.    Is there any action by FTX that would not
25 be in connection with an action of a customer?

| Page 179 |
| --- |

1      A.    Yes, I am sure there would be, like
2  paying tax.
3      Q.    Do you think customers were aware that
4  FTX would be moving the digital assets into commingled
5  accounts?
6      A.    I do not know.  Dame Elizabeth has made
7  certain assumptions.  I cannot comment.  I do not know.
8      Q.    Okay.  Let us look at 2.2.2, that is the
9  second section you refer to; right?
10     A.    It is really the last part of 2.2
11 I think.
12     Q.    Okay.  You are referring to the last
13 sentence: "We provide no warranty as to the suitability
14 of the Digital Assets traded under the Terms and assume
15 no fiduciary duty to you in connection with such use of
16 the Services."  Do you see that?
17     A.    Yes.
18     Q.    You agree it does not say in connection
19 with use of the services; it says: "... in connection
20 with such use of the Services."
21     A.    I agree "such" makes it slightly more
22 opaque.
23     Q.    And "such" refers presumably to the
24 preceding text, right, which is the digital assets
25 traded under the terms; right, Sir?

| Page 180 |
| --- |

1      A.    Yes, the trouble is it is: "... in
2  connection with such use of the Services."  Services
3  includes any other services offered through the FTX
4  website.  I would have thought that part of the trading
5  is how the trading is recorded and so on.
6      Q.    You would agree that the preceding part
7  of 2.2.2 is talking about trading, not holding; right,
8  Sir.
9      A.    Yes.  It does refer to trading; you are
10 quite right, yes.  But in a sense it emphasises the
11 width of 2.1.3, which is clearly wider.
12     Q.    Let us look at 2.10?
13     A.    This is a much less powerful point, in my
14 view.
15     Q.    2.10 is less powerful?
16     A.    Yes, it is merely an indication.  I do
17 not pretend it has the force of the previous two
18 clauses.
19     Q.    Okay.
20     A.    It is an indication.  It is a "straw in
21 the wind" expression some judges use.
22     Q.    Is it your view that trusts held -- that
23 assets held in a trust are never at risk in a trustee's
24 insolvency?
25     A.    My understanding is they are not eligible

| Page 181 |
| --- |

1  for public or private deposit insurance protection.  If
2  that is wrong, then my point on 2.10 is wrong.  It is
3  that simple.  As I say, I do not want to make too much
4  of it.  It is, if I am right in what I understand to be
5  the case, then it is an indication that there is no
6  trust, but on its own it is a much less powerful point.
7      Q.    I just want to make sure I understand.
8  You said: "If that is wrong, then my point on 2.10 is
9  wrong" and I just was not sure what you were saying, if
10 what is wrong?
11     A.    If I am wrong in my understanding.  My
12 understanding is that if the money is held on trust,
13 then eligibility for public or private deposit insurance
14 protection is not available.  If I am wrong about that,
15 then my reliance on 2.10 goes.  That is all I am saying.
16     Q.    I see.
17     A.    As I say, 2.10 is something of
18 a thrown-in point.  It is not central to my reasoning.
19     Q.    You are familiar with section 9.2 that
20 talks about a trust?
21     A.    Yes.
22     Q.    For unclaimed assets; right?
23     A.    Yes, I am.
24     Q.    Could not deposit insurance have been
25 useful in that instance?

1       A.    I do not know enough to answer that
2  question about deposit insurance.
3       Q.    Okay.  So I take it you just do not know
4  whether deposit insurance is available for digital
5  assets or fiat currency; right?
6       A.    I believe it is available, but it is not
7  available if there is a trust, that is my point.  So it
8  is a limited point.
9       Q.    Is that under English law or the law
10 where FTX is incorporated?
11      A.    I will have to check, but my recollection
12 is it is what I was told.
13      Q.    Told by whom?
14      A.    By Sullivan & Cromwell.
15      Q.    So you were told that under some law that
16 deposit insurance was not available to assets held under
17 trust?
18      A.    It was not available to the
19 beneficiaries.
20      Q.    But you do not know what law that was?
21      A.    No.
22      Q.    And you did not check whether that was
23 true yourself?
24      A.    No, I was told to assume it is my
25 recollection.  As I say, I am perfectly comfortable with

1  my view, even if I am wrong about the assumption I am
2  making on 2.10.
3       Q.    If we look at paragraph 45.3 this is
4  where you discuss section 2.10?
5       A.    Yes.
6       Q.    There is no discussion in here about some
7  law saying you cannot have deposit insurance for assets
8  held on trust; right?
9       A.    No.
10      Q.    That is right, it does not mention that;
11 right, Sir?
12      A.    No, it does not.
13      Q.    Instead, the reason you put in your
14 report is that ----
15      A.    Yes, it suggests ----
16      Q.    That there is no risk of loss if there
17 are assets held on trust; right.
18      A.    Mm-mh.
19      Q.    So my question to you, Sir, is, is it not
20 possible for there to be a risk of loss in a bankruptcy
21 even over -- even if an asset is held on trust?
22      A.    Yes, there is, it is a fair point, yes.
23      Q.    Can we just look at your rebuttal report
24 for a second.
25      A.    Yes.

1       Q.    If you go to paragraph 22.i.
2       A.    Yes.
3       Q.    This is where you talk about the risk of
4  loss; do you see that, Sir?
5       A.    Yes.
6       Q.    At the end of this paragraph you see:
7  "... this line of argument is not addressed by
8  Dame Elizabeth at all."  Do you see that, Sir?
9       A.    Yes.
10      Q.    Does the copy of the rebuttal report you
11 have in front of you have Dame Elizabeth's report
12 attached to it?
13      A.    No, it does not.
14      Q.    Why don't we mark that then?
15      (Exhibit 109 was marked for identification)
16      A.    Yes.
17      Q.    If you look at pages 29 and 30 there is
18 a paragraph in her report 69(c)?
19      A.    Yes.
20      Q.    Do you see she discusses clause 2.10?
21      A.    Yes.
22      Q.    And in the second sentence she says:  "In
23 some jurisdictions, public government deposit insurance
24 schemes are available to protect customer bank deposits
25 in case of bank failure."  Do you see that, Sir?

1       A.    Yes.
2       Q.    You have no knowledge whether this is
3  true or not for FTX; right, Sir?
4       A.    No, that is perfectly fair.
5       Q.    And then at the top of the next page in
6  the third line she says:  "The fact that an asset cannot
7  be insured does not mean that it cannot be held on trust
8  or that, if the trustee damages it, loses it,
9  misappropriates to itself or otherwise misappropriates
10 it that the beneficiary would have no remedies against
11 the trustee for breach of trust, conversion, account of
12 profits or damages."  Do you see that, Sir?
13      A.    Yes.
14      Q.    So do you think it is accurate to say
15 that this issue is not addressed by Dame Elizabeth at
16 all?
17      A.    No, I do not think it is at all.  I am
18 sorry, I was wrong.  But I think that -- yes, I have to
19 say that that is unfair.  She does address it.
20      Q.    Just going back to 8.2.6 as it is helpful
21 to look at that.
22      A.    8.2.6?
23      Q.    Yes.  I think one of the points you make
24 in your report is that nowhere in the terms of service
25 does it say that assets will be held on behalf of or for

Page 186

1  the customer; is that right?
2      A.  Yes.
3      Q.  And why would those terms be meaningful
4  to you in determining whether a trust exists?
5      A.  They deal with title here, both saying it
6  is with FTX and saying that no property -- that the
7  digital assets are not the property of FTX.  So they are
8  saying the digital assets are the property of the
9  customer and none of the digital assets are the property
10  of FTX.  On my reading that is perfectly clear, they are
11  just saying FTX does not own the digital assets.  The
12  customer does.  If it means that the customer has the
13  equitable interest, which is not the natural reading of
14  (A), then it also does not seem to work with (B) because
15  (B) would be inconsistent with that because FTX would be
16  the owner because it would be the property of FTX as
17  legal owner.  So if it was going to have some sort of
18  equitable arrangement it is quite remarkable that it is
19  not covered there.
20      Q.  So if 8.2.6 had said: "All Digital
21  Assets are held in your account on your behalf on the
22  following basis ...", would that support that there was
23  a trust?
24      A.  It could do.  Again you get into
25  difficulty because of (B) which says FTX does not own

Page 187

1  them.
2      Q.  Well, the fact that they are held on
3  behalf of a user would be consistent with FTX not owning
4  them; right?
5      A.  No, because then FTX would be the legal
6  owner.  As I say, having a different hypotheses as what
7  these clauses might say what one conclusion would be if
8  they said something different, is always a little
9  difficult because what other -- if you amend (A) do you
10  amend (B) and so on.  But all I am able to do is to say
11  how, what it means to me as presently drafted.
12      Q.  Okay.  Another section that you focus on
13  is section 9.2.  Do you have that?
14      A.  Yes.
15      Q.  And 9.2 that provides there is a trust
16  for unclaimed or abandoned property; is that right, Sir?
17      A.  Yes, that is right.
18      Q.  So this indicates that when property
19  becomes unclaimed or abandoned then FTX Trading or an
20  affiliate of FTX Trading will serve as the trustee for
21  that property; is that right?
22      A.  That is right.
23      Q.  In your view this is an example of the
24  parties using clear terms to create a trust beneficiary
25  relationship; right, Sir?

Page 188

1      A.  Yes, it is.
2      Q.  Sections 9.1 and 9.2 both deal with the
3  scenario unclaimed or abandoned property; right, Sir?
4      A.  Yes.
5      Q.  And section 9.1 says what happens if the
6  local laws require FTX to turn the property over to
7  authorities; right?
8      A.  Yes.
9      Q.  And section 9.2 deals with the situation
10  of what happens if FTX is not required to turn the
11  property over; right, Sir.
12      A.  Yes.
13      Q.  If the property was previously owned by
14  FTX, how could it then be held on trust for the customer
15  just because it is unclaimed?
16      A.  I think -- well, that is what they have
17  agreed.  They have agreed that if it is unclaimed and
18  abandoned, then there is a trust.
19      Q.  So is it your -- it is your view that
20  a user's failure to use the services or respond to
21  requests therefore creates a property interest of the
22  user in the digital property?
23          MR. GLUECKSTEIN:  Object to the form.
24      A.  That is how it works.
25  BY MR. HARRIS:

Page 189

1      Q.  Why would the parties agree that leaving
2  a property unclaimed and failing to respond to requests
3  gives that customer more rights than if they had claimed
4  the property?
5      A.  I suppose that some -- it is a matter of
6  speculation on my part but it may be felt that some
7  customers may die and their heirs may be unaware of what
8  assets they have.  Some may be trading from countries
9  where they are in difficulties in declaring their rights
10  and doing things legally.  In those circumstances they
11  have the protection of knowing, or their estates have
12  the protection of knowing that there will be a trust.
13  This is pure speculation on my part -- I do not know --
14  but the provision of 9.2 is very clear.  It undoubtedly
15  creates a trust in these circumstances and the main
16  point is, A, why is there a need to create a trust if
17  there already is a trust and, B, this shows that the
18  parties know full well how to create a trust if they
19  want to.  Why they have done it, I agree, it is slightly
20  odd, but they have done it.  And it is odd whoever is
21  right about interpreting the contract.
22      Q.  So you agree it would be odd to give
23  non-responsive customers more rights than responsive
24  customers; right, Sir?
25          MR. GLUECKSTEIN:  Object to the form.

MAGNA ▶
LEGAL SERVICES

1       A.   I do not necessarily agree that, no.
2   I think that you might find a non-responsive customer is
3   non-responsive because he is dead or she is dead or
4   because they have got put in prison or been dealt with
5   in some repressive country.  I just do not know.  But
6   they might like to know they have got the comfort of the
7   property or their survivors have the property then held
8   on trust.  This is speculation on my part, but the truth
9   is whoever is right about this contract, this is what
10  9.2 says.
11  BY MR. HARRIS:
12      Q.   Okay.  Well, so you view 9.2 as clearly
13  creating a trust for unclaimed or abandoned property;
14  right, Sir?
15      A.   Yes, it does.
16      Q.   And you believe it is odd that they give
17  equitable ownership interests to users who do not
18  respond to FTX's attempts to contact them; right?
19          MR. GLUECKSTEIN:  Object to the form.
20      A.   It could be said to be even odder to give
21  it to people who already have an equitable interest.
22  BY MR. HARRIS:
23      Q.   Is it possible that these sections are
24  saying that FTX may have to deliver the property to
25  a relevant jurisdiction but otherwise it will be held on

1   trust?
2           MR. GLUECKSTEIN:  Object to the form.
3       A.   I am not sure.  All it seems to be saying
4   is what it says.  And 9.1 suggests that there is not
5   a trust until you get to 9.2.
6   BY MR. HARRIS:
7       Q.   Does anything in 9.1 or 2 say there was
8   not a pre-existing trust?
9       A.   If there was then it was a bit odd that
10  when you get to 9.2 they create one.
11      Q.   Is it possible that these sections were
12  clarifying that if it is transferred to another FTX
13  entity that FTX entity will still hold it on trust?
14      A.   Yes, except for the fact that FTX Trading
15  is specifically covered as a party as FTX or the
16  affiliate as applicable.
17      Q.   Is it possible it is clarifying that even
18  if a user fails to respond or abandons property that FTX
19  will still hold it on trust?
20      A.   Well, it is very odd that it does that,
21  if it does, because it spells it out as trustee, whereas
22  before it said nothing about trustee and has expressly
23  disclaimed a fiduciary relationship.
24      Q.   Is it possible that the parties wanted to
25  make clear that no ownership interests were lost as a

1   result of failing to respond or abandoning property?
2       A.   It is possible that that is what they
3   wanted, but they had a very odd way of expressing it if
4   that is what they did because that is not what one
5   gathers from 9.2.  9.2, read naturally, suggests that
6   there is not a trustee beneficiary relationship but if
7   the circumstances in 9.2 arise, they will be created.
8       Q.   Okay, but you would agree it is possible
9   that this section 9.2 is clarifying that users do not
10  lose an ownership interest just by having not responding
11  or abandoning property; right, Sir?
12          MR. GLUECKSTEIN:  Object to the form.
13      A.   All I can do is to say how I interpret
14  this, and I interpret it as clearly indicating that
15  a trust is created in certain circumstances as spelt out
16  in 9.2 and that suggests strongly that a trust prior to
17  that did not exist.
18  BY MR. HARRIS:
19      Q.   But another ----
20      A.   And it shows that the parties were able
21  to make it very clear when they intended to create
22  a trust.
23      Q.   You would agree that another possible
24  interpretation is that 9.2 is clarifying that ownership
25  interest is not destroyed by the fact that property is

1   unclaimed or abandoned; right, Sir?
2       A.   I am playing with words slightly.  Of
3   course it can be argued, one has heard, and as
4   a barrister I argued, weak points, so it could be
5   argued, but I have to say I think it is a very weak
6   argument.
7       Q.   You would agree that 9.2 grants certain
8   powers that would not otherwise be available to
9   a trustee; right?
10      A.   Yes, but of course that does not really
11  deal with the point.  It does grant those rights; yes.
12      Q.   So is it possible the purpose of 9.2 was
13  to expand the rights that FTX otherwise had?
14      A.   Well, I do not think so because it talks
15  about maybe transferred to FTX and if FTX were the legal
16  owner and there was a trust, they would not need to be
17  transferred.
18      Q.   Well, I am sorry, I think you just said
19  if FTX was the legal owner then the property would not
20  need to be transferred to FTX?
21      A.   Yes, yes.  The theory, if we are dealing
22  with the question of, "Is there a trust?"  The trust is
23  FTX as a legal owner and the customer is the equitable
24  owner.
25      Q.   But your view is that FTX was the legal

1  owner; right?
2      A.    Sorry?
3      Q.    Your view is FTX was the legal owner?
4      A.    No, what I am saying is if FTX was the
5  legal owner then there was no need to transfer to FTX.
6      Q.    But your view is that FTX was the legal
7  owner; right, Sir?
8      A.    It is, but -- yes, it was, but I have
9  explained why that does not work.  The difference
10  between us is not what was intended -- well, subject to
11  the point about equity, the difference between us is not
12  what 8.2(B) means, 8.2(A) and 8.2(B) means, subject to
13  the question of equity whether there is a trust; it is
14  whether it was effective to transfer an interest.  But
15  if we are agreed that 8.2(A) means that the customer
16  owns -- that 8.2(A) and (B), if you are right, if
17  Dame Elizabeth is right, if it means that the trustee --
18  that FTX is a trustee for the customer, then there would
19  be no need under 9.2 to transfer to the trustee, to FTX
20  as trustee.  That is the point.
21      Q.    Do you see where it talks about
22  transferring is not property, it is your account; do you
23  see that, Sir?
24      A.    Yes.
25      Q.    And that is a different defined term than

1  property; right, Sir?
2      A.    It must be the assets of the account.
3      Q.    Really, well let us look at the
4  definition of it.
5      A.    Transferring an account.
6      Q.    Go to the first page.  Let me know when
7  you are there, Sir.
8      A.    Yes, I have the first page.
9      Q.    Do you see in the second full paragraph
10  it says: "By registering for a Platform account
11  ('Account') ...".  Do you see that?
12      A.    Yes.
13      Q.    So the definition is of account is
14  a Platform account; right?
15      A.    Yes.
16      Q.    It is not the same thing as the property;
17  right?
18      A.    In practice it is the assets in the
19  account, that is what you have got.
20      Q.    Your view is the account is the same
21  thing as the assets allocated to the account?
22      A.    Well, I think that when they talk about
23  agreeing that your account may be transferred, but I see
24  your point, what I have just said may not be a good
25  point.  I see that.

1      Q.    Okay.  Just to walk through some other
2  provisions that you cite to you also cite to
3  section 38.6?
4      A.    Yes.
5      Q.    That section title is:  "No partnership
6  or agency"; do you see that?
7      A.    Yes.
8      Q.    What again is the relevance of this
9  section in your view to the issue of whether 3AC has an
10  ownership interest in the digital assets?
11      A.    "Nothing in the Terms or in any matter or
12  any arrangement contemplated by it is intended to
13  constitute a ... fiduciary relationship ... between the
14  parties for any purpose whatsoever."
15      Q.    So this is the same point of the
16  disclaimer of a fiduciary relationship; is that right,
17  Sir?
18      A.    Yes.
19      Q.    What is your understanding of what the
20  words:  "... other co-operative entity ..." mean?
21      A.    I think it is not an expression I am
22  familiar with.  I think it means any other joint
23  ownership if there is any other sort of joint
24  venture-type arrangement that is not covered by the
25  preceding words involving the two parties together in

1  some way.
2      Q.    Do you consider that a trust would be
3  viewed as a co-operative entity?
4      A.    In a sense, yes.
5      Q.    Is a trustee holding property an entity
6  under English law?
7      A.    I think the trust is an entity and -- as
8  I say, co-operative is not a word I am familiar with in
9  this context but it seems to me, particularly in
10  relation to this transaction, if the FTX was a trustee
11  for a customer to call it a co-operative, to call that
12  trust a co-operative entity would not be a particularly
13  inaccurate description, but it is not an expression
14  I know, but it would certainly be a fiduciary
15  relationship if FTX was a trustee for the customer.
16      Q.    Okay.  Can we look at your rebuttal
17  report.  I just want to cross-reference what you said
18  there about this section.  It is page 16 but section
19  22.o.  Let me know when you are there.
20      A.    Yes.
21      Q.    So in 22.o you indicate you agree there
22  is an inconsistency between your interpretation of 38.6
23  and section 9.2; right, Sir?
24      A.    There is an inconsistency in the sense
25  that there is a creation of a trust undoubtedly in 9.2

MAGNA
LEGAL SERVICES

Page 198

1  and 38.6 says nothing is meant to create a trust, yes.
2      Q.   It does not say there is nothing meant to
3  create a trust.  It says there are no fiduciary duties;
4  right?
5      A.   No, there is no fiduciary relationship
6  and a trust relationship is the archetypal fiduciary
7  relationship.
8      Q.   So the inconsistency, if I understand
9  right, is that 9.2 explicitly creates a trust and 38.6
10 disclaims any fiduciary relationship?
11     A.   Yes.
12     Q.   And you reconcile that issue by referring
13 to the well-known rule that one gives effect to the
14 particular; is that right?
15     A.   Yes.  If you have a general provision, it
16 yields to a particular provision.  But that does not
17 mean to say you cross it out.
18     Q.   So the rule you are referring to is that
19 if you have a general provision it yields to the
20 particular provision?
21     A.   Yes.  You cannot use 38.6 to negative
22 9.2.
23     Q.   And you view 38.6 as a general provision?
24     A.   Relatively general; yes, I do.
25     Q.   Would you agree section 8.2.6 is more

Page 199

1  particular to the issue of ownership than 38.6?
2      A.   Yes.
3      Q.   And would you agree therefore 38.6 should
4  yield to 8.2.6 on the issue of ownership?
5      A.   I think it would be remarkable if there
6  was no intention generally to create a fiduciary
7  relationship if one ended up with a conclusion that all
8  digital assets held by FTX in customers' accounts were
9  subject to a fiduciary relationship.  I do not find it
10 remotely surprising to find that in one very exceptional
11 case, 9.2, they do have a fiduciary relationship,
12 although generally they exclude it.
13     Q.   That was certainly more than I asked.
14 I was just asking would you agree that 38.6 should yield
15 to 8.2.6 on the issue of ownership of digital assets?
16         MR. GLUECKSTEIN:  Object to form; asked
17 and answered.
18     A.   No.  I do not see an inconsistency.  So
19 I do not think it should, no.  But, as I say, it would
20 be odd if it did because it would mean that the
21 reference to fiduciary relationship in 38.6 had no point
22 because 8.2.6 would govern all assets held by customers.
23 BY MR. HARRIS:
24     Q.   Okay.  In 22.n, the prior paragraph, you
25 say ignoring the effect of a term flies in the face of

Page 200

1  Dame Elizabeth's rejection of surplusage; do you see
2  that?
3      A.   Yes, yes, I do.
4      Q.   You would agree that 38.6 can have many
5  meanings other than determining ownership; right, Sir?
6      A.   38.6 is certainly a general provision,
7  yes.  It can have -- it is quite wide in what it covers,
8  yes.
9      Q.   Can we go back to your original report,
10 keep marching through a few sections in it.  I think we
11 are up to paragraph 46 now.  So in 46 you write: "It
12 appears to me to be clear that whatever defects there
13 may be said to suffer from, the Dotcom Terms are drafted
14 with some care with the benefit of legal assistance."
15 Do you see that?
16     A.   Mm-mh, yes.
17     Q.   What were you referring to when you
18 talked about defects they may be said to suffer from?
19     A.   I have no particular defects in mind.  It
20 did not seem to me a particularly good bit of drafting
21 but I did not really go through it marking it for
22 drafting.  All I was really saying is whether you think
23 it was a good document or not it was clearly drafted
24 with some care and by lawyers, that is all the point
25 I am making.  I am sorry if I did not express myself

Page 201

1  more clearly.
2      Q.   What do you mean it was not
3  a particularly good bit of drafting?
4      A.   I just thought it was rather long and not
5  always as clear as it might be in certain places, but
6  I did not have in mind any particular criticism of it.
7  The important point is that whatever defects they may be
8  said to suffer from, just in case people are saying,
9  they are not very well drafted.  All I am saying is they
10 were drafted with care and with the benefit of legal
11 assistance.
12     Q.   What is your basis for saying they were
13 drafted with care and the benefit of legal assistance?
14     A.   I think lawyers -- experienced lawyers
15 are pretty used to looking at documents and seeing
16 whether they were drafted with care and legal
17 assistance.  As the English cases show, the courts have
18 to decide whether a contract has been drafted with care
19 and legal assistance because that will influence the
20 court's view of how to construe it.  You do not normally
21 have evidence about how a document was drafted.  You
22 draw conclusions from reading it.  That is what all
23 judges will do when faced with a contract.
24     Q.   Did you review any documents or testimony
25 that would cause you to believe this was drafted with

MAGNA >
LEGAL SERVICES

Page 202

1  care and with the benefit of legal assistance?
2      A.   No.  As I say, it is a matter one,
3  certainly in this country judges are very used to doing
4  and looking at documents.  There are certain documents
5  that are obviously homemade and one is more ready to
6  interpret them generously as was made clear by the
7  Supreme Court in the Capita case.  There are other
8  documents that clearly a lot of effort and legal work
9  has gone into them and one construes them more strictly.
10     Q.   Do you know ----
11     A.   And I have never known -- well, that
12 would be wrong.  I cannot think of a case where that
13 issue was determined by the parties giving evidence as
14 to how the contract was drafted.
15     Q.   Do you know who drafted the terms of
16 service?
17     A.   No.
18     Q.   Did you ask?
19     A.   No.
20     Q.   Is it relevant to you what the drafts
21 people intended?
22     A.   No.  That is inadmissible in English law.
23     Q.   What if the contract has terms that are
24 ambiguous.
25     A.   One does one's best with the terms.

Page 203

1      Q.   So if there is a term that is ambiguous
2  you would not try and determine what the parties to the
3  contract said they meant by that?
4      A.   The only way you can look at what the
5  parties say they meant when it comes to interpreting
6  a written contract is if there is a claim for
7  rectification, i.e. to correct the contract.  Otherwise
8  what the parties intended is not relevant.
9      Q.   At 47 you write that: "... even if
10 a trust were intended, I do not consider it possible to
11 construe the Dotcom Terms as creating a trust which
12 extended over all of FTX Trading's network addresses for
13 a particular type of Digital Asset ...".  Do you see
14 that?
15     A.   Yes.
16     Q.   Okay.  And you list in 47.1 one reason,
17 which is that: "... the Dotcom Terms refer to 'your
18 Digital Assets' ...".  Do you see that?
19     A.   I do.
20     Q.   And you indicate: "That is inconsistent
21 with a customer having a proportionate share in the
22 assets in the pool addresses."  Do you see that?
23     A.   Yes.
24     Q.   Are you aware of any case that supports
25 your interpretation of that?

Page 204

1      A.   I cannot immediately think of one, no,
2  but, it is a matter of language.
3      Q.   Okay.  In 47.2 you said: "I am
4  instructed that such use of pool addresses and the
5  commingling ...".  Actually, I am sorry, we already
6  talked about that.  I do not need to go over that again.
7           In 47.2(b) you say: "If a customer could
8  reasonably have been expected to know, prior to
9  contracting with FTX Trading, that pooled addresses
10 would be used and Digital Assets would or could be
11 commingled, that could form part of the factual matrix
12 against which the Dotcom Terms are to be construed."  Do
13 you see that, Sir?
14     A.   Yes, I do.
15     Q.   You still agree with that; right?
16     A.   Yes.  Again, I think that I would
17 slightly reword it to deal with the point that this is
18 a standard form and if a particular customer could be
19 reasonably expected to know, that is not good enough.
20 You have to look at, would you expect customers
21 generally to know.
22     Q.   Okay.
23     A.   But subject to that, yes.
24     Q.   Then at 47.2(c), you indicate basically
25 even if customers were aware that would not be enough to

Page 205

1  change your view as to the intention of the parties?
2      A.   Yes.
3      Q.   And that is because of the other terms of
4  service clauses that you mentioned?
5      A.   It is really the wording of the contract,
6  yes.  One comes back to the point in Arnold v Britton
7  and Capita, that where you have got a detailed contract
8  such as this you apply the words of the contract because
9  that is what the parties agreed.
10     Q.   So to make sure I understand, your view
11 is even if the customers knew that the assets would be
12 commingled, your view is they still must have intended
13 title not to pass to FTX?
14     A.   No, it is not what they intended.  As
15 I say, it is a question of whether title did pass.  And
16 we come back to the discussion we had about a client
17 dealing -- a customer dealing with assets and never
18 getting control of them.  It is not a question of what
19 they agreed.  They agreed what they intended and what
20 happened is slightly different, or can be very
21 different.
22     Q.   If the customers knew that the assets
23 would be commingled ----
24     A.   Mm-hm.
25     Q.   ---- and understood that for digital

MAGNA
LEGAL SERVICES

Page 206

1 assets legal title generally follows factual control, is
2 it possible that in 8.2.6 the customer is therefore
3 intended to say that equitable title would stay with the
4 customers?
5     A.    I just do not think you can get the words
6 out of 8.2.6. I see the logic of trying to do that, but
7 you cannot rewrite the contract simply because it
8 produces a better result, a more sensible result. The
9 cases -- there have been a number of cases recently
10 which are littered with judges saying -- not "littered"
11 -- but there have been a number of cases where judges
12 have said, "If the parties had thought about this, they
13 would not have provided this" or "If the parties had
14 appreciated the situation, they would have written
15 something different." But you have the language and
16 I am afraid you have got to follow the language.
17     Q.    The rewriting that would need to occur
18 would be changing the term "title" to "equitable title";
19 right Sir?
20     A.    No, it would go further than that.
21     Q.    What else would need to be done?
22     A.    You would need to say FTX has property in
23 it because it is the legal owner. You would need to
24 alter 8.2(A) and -- do I mean 8.2 or 8.6? But you need
25 to alter (A) and (B).

Page 207

1     Q.    I see. So we need to change all the
2 references to "title" and "ownership" to "beneficial
3 title" and "beneficial ownership"; right, Sir?
4     A.    You would need to say -- It would be very
5 odd because it nowhere defines who has legal title. It
6 defines -- you read title in 8.2.6(A) as being
7 beneficial title.
8     Q.    Mm-hm.
9     A.    And then you would have to read 8.2.6(B)
10 as being a reference to equitable property.
11     Q.    Mm-hm.
12     A.    And you would have to use belonging in
13 equity at the end of 8.2.6(B) and then would you have to
14 say it is a bit strange that it does not tell us who is
15 the legal owner.
16     Q.    Okay.
17     A.    It becomes a rather -- a very strange
18 provision. It is just not what it says.
19     Q.    The scenario I had asked you to consider
20 was one where the users understood that title would pass
21 -- that legal title would pass to FTX because FTX would
22 have control of the keys. So in that scenario, you
23 would agree it might make sense for all these references
24 to be to beneficial ownership and title; right, Sir?
25     A.    Two points: one is assuming that the

Page 208

1 parties knew the facts about pooling does not mean they
2 understood the legal consequences of control passing and
3 so on, namely that the law of quasi-bailment might
4 develop in the way in which Dame Elizabeth and/or
5 I suggest. So that is a big leap. We cannot assume the
6 parties would have understood the law, I do not think.
7 And even if we can, I just think you are stretching the
8 words beyond what -- the meaning they naturally bear.
9 And even though I see why it might be said to be
10 a commercially sensible result, you cannot get there on
11 the words and under English law the fact that you get
12 a commercially sensible result by changing the contract
13 does not entitle you to change the contract.
14     Q.    Let me just walk through a couple of
15 things you just said. So the law as it currently exists
16 is that legal title follows who has control of the keys;
17 right?
18     A.    Yes.
19     Q.    Okay. So the law does not have to
20 develop for legal title to follow ownership of the keys;
21 right, Sir?
22     A.    It is a question of whether people know
23 about legal title and what "control of the keys" means.
24     Q.    I just want to break this up. It is not
25 that the law has to develop for legal ownership to

Page 209

1 follow the keys; right, Sir?
2     A.    I see your point. I am sorry, are we
3 dealing with 8.2.6(B), what that means or are we dealing
4 with following assets? I am sorry, I am not quite clear
5 what we are dealing with.
6     Q.    First, I am trying to understand the
7 legal framework in England. The current legal framework
8 is that legal title to digital assets follows control of
9 the keys; right, Sir?
10     A.    That would seem to be the law, yes.
11     Q.    Okay. So if we have a world where users
12 of FTX generally understood that legal title would
13 follow ownership -- control of the keys, in that world
14 there would not be a need to express, explicitly mention
15 legal title; correct, Sir?
16     A.    If that is the case, yes, but I am far
17 from persuaded that the average customer had the
18 faintest idea about legal title and the keys and what it
19 meant.
20     Q.    This is a standard contract; correct,
21 Sir?
22     A.    It is a standard contract.
23     Q.    Would you agree the people who drafted
24 this presumably understood that legal title would follow
25 the keys?



Page 210

1       A.   I do not know.  I cannot make any
2   assumptions as to what the people who drafted it knew.
3       Q.   You think this is a sophisticated counsel
4   who drafted this; right, Sir?
5       A.   I just do not know.
6       Q.   Probably counsel who is familiar with the
7   law of digital assets would have drafted this; right,
8   Sir?
9       A.   Quite possibly, but I just do not know.
10  FTX seems to have been run in an unusual way, so I just
11  do not know how this contract came to be drafted.
12      Q.   Do you not think it is likely that the
13  counsel who drafted this understood that, under existing
14  English law legal, title would follow who has control of
15  the keys?
16          MR. GLUECKSTEIN:  Object to the form.
17      A.   I really do not know.  I mean, we have
18  the Law Commission report which sets out the law as they
19  think it should be and how the law will develop nobody
20  quite knows.
21  BY MR. HARRIS:
22      Q.   We are not talking about developing the
23  law, we are talking about the existing English law.  Do
24  you not think that counsel who drafted this likely
25  understood that under existing English law legal title

Page 211

1   would follow who has control of the keys?
2          MR. GLUECKSTEIN:  Object to the form.
3       A.   I just do not know.  He may or she may or
4   they may not.  I just do not know.  As I say, in the end
5   the drafter is -- People sometimes in contracts talk
6   about the intention of the drafter but it is actually
7   the intention of the parties.  So I would say that
8   actually what the drafter knew or did not know in the
9   end does not matter.
10  BY MR. HARRIS:
11      Q.   So it does not matter if the drafter
12  already knew that legal title was passing to FTX because
13  of the keys?
14      A.   If the draftsman knew that, then it might
15  be quite sensible for him to record it.  If the
16  draftsman did not know that, it might be sensible for
17  him to record it.
18      Q.   If the draftsman knew that legal title
19  was passing to FTX because of the keys, there would not
20  be a need to repeat undisputed English law; correct,
21  Sir?
22          MR. GLUECKSTEIN:  Object to the form.
23      A.   There would not be a need but it might be
24  quite sensible.
25  BY MR. HARRIS:

Page 212

1       Q.   Okay.  Sir, in your view, the customers
2   only had contractual entitlements to the digital assets
3   ----
4       A.   In the end, yes.
5       Q.   ---- on the exchange; right?  So what
6   were their contractual entitlements?
7       A.   Their contractual entitlements were
8   rather like -- well, all the rights under this contract
9   that we could go through.  But in terms of their assets,
10  it was a right to be paid their assets and if they could
11  not recover their assets it was to be paid damages.
12      Q.   Okay, so they had a contractual right to
13  withdraw the purchased assets; right?
14      A.   They had a contractual right to the
15  assets ----
16      Q.   Okay.
17      A.   ---- to ask for the assets back.
18      Q.   And they also had the contractual right
19  to prevent FTX from doing certain things with the
20  Digital Assets; right?
21      A.   Yes, if FTX did something which was -- or
22  threatened to do something which was a breach of their
23  contractual rights, they could have stopped it, yes ----
24      Q.   Okay.
25      A.   ---- or they could have applied to the

Page 213

1   court to stop it, yes.
2       Q.   So could FTX lend out the digital assets
3   without the customer's permission?
4          MR. GLUECKSTEIN:  Objection to form.
5       A.   I have not really looked into that.
6   BY MR. HARRIS:
7       Q.   Could FTX invest the digital assets
8   without the customer's permission?
9          MR. GLUECKSTEIN:  Objection to form.
10      A.   I have not looked into that.
11  BY MR. HARRIS:
12      Q.   Could FTX trade the customer's digital
13  assets without the customer's permission?
14      A.   I have not looked at that.
15          MR. GLUECKSTEIN:  Objection to form.
16  BY MR. HARRIS:
17      Q.   You would agree customer's contractual
18  rights were not limited to just being paid their account
19  balance; right?
20      A.   Well, I am sorry to be unhelpful, but I
21  have been asked to deal with two questions really, or
22  the questions that have been raised in my evidence and
23  I have not been asked to deal with those questions.  So
24  I am not really in a position to answer, I am sorry.
25      Q.   Okay.  So you do not have a -- you are

Page 214

1 not giving opinion whether the customer's contractual
2 rights were limited to just being paid their account
3 balance; right, Sir?
4       A.   I am not giving evidence of what they
5 were or were not just limited to, yes.
6       Q.   Do you see in 8.2.6(B) ----
7       A.   Yes.
8       Q.   ---- it says: "None of the Digital
9 Assets in your Account are the property of, or shall or
10 may be loaned to, FTX Trading ...".
11      A.   Yes.
12      Q.   So that prevents FTX Trading from loaning
13 those assets to itself; right?
14            MR. GLUECKSTEIN:  Object to the form.
15      A.   That is what it does.
16 BY MR. HARRIS:
17      Q.   So that is at least one contractual right
18 that the customers had to the digital assets?
19      A.   Yes, I suppose the only question which
20 I cannot say I have fully considered is, if I am right
21 about the digital assets in the account not being their
22 property because they have not got control, whether (B)
23 would still apply.  Because it is a bit of a nonsense if
24 they are not theirs and they are FTX's to talk about
25 them being "loaned".  So I cannot say I thought that

Page 215

1 through, but -- So my answer is slightly in the air I am
2 afraid, but it seems to me that if I am right -- and
3 I know you say I am not -- but if I am right and the
4 assets are FTX's, then the idea of them being loaned to
5 FTX is an obvious problem.
6       Q.   I think you are saying that the
7 provisions saying that they may not be loaned to FTX is
8 inconsistent with the view that FTX is the owner; is
9 that right?
10      A.   I think it may be.  As I say, I am
11 thinking on my -- I was going to say on my feet but on
12 my backside because I have not quite thought through
13 that particular provision in the circumstances that we
14 are discussing.
15            THE COURT REPORTER:  If it is okay, could
16 we break here?
17            MR. HARRIS:  Sure.  You need a break.
18 Why do we not break now?
19            THE VIDEOGRAPHER:  We are going off the
20 record.  The time is 5.21 pm.
21            (A Short Break)
22            THE VIDEOGRAPHER:  We are back on the
23 record.  The time is 5.22 pm.
24 BY MR. HARRIS:
25      Q.   Okay, can we look at your first report,

Page 216

1 paragraph 48 within a section called "Prior statements"?
2       A.   Yes.  Thank you.
3       Q.   So in paragraph 48 you indicate that:
4 "... prior statements and prior declarations of trust
5 can in principle form part of the factual matrix against
6 which any subsequent contract is to be interpreted."  Do
7 you see that?
8       A.   Mm-mh.
9       Q.   Okay.  Then in 50, you discuss statements
10 made by Mr. Bankman-Fried to the US Senate.  Do you see
11 that, Sir?
12      A.   Yes, I do.
13      Q.   Okay.  And then you say:  "It seems ...
14 implausible that general statements made in that context
15 were intended to constitute declarations of trust by FTX
16 Trading (as opposed to representations as to what it had
17 in fact been doing, or statements as to its
18 understanding as to what it had been, or (possibly) was,
19 obliged to do." Do you see that?
20      A.   Yes, I do.
21      Q.   Okay.  I am just trying to make sure
22 I understand what those statements mean.  What do you
23 mean by representations as to what FTX in fact had been
24 doing?
25      A.   Well, what I mean is that what he was

Page 217

1 saying was -- We need to get the statements up I think
2 but you may not want to, may not help -- is that
3 I thought he was saying what FTX had been doing,
4 statements as to what he thought it was obliged to do or
5 statements as to what it had been obliged to do.  But
6 they were not statements assuring people what it was to
7 do.  In other words, he was saying, "We do X" or "We are
8 obliged to do X" or "We were -- I thought we were
9 obliged to do X" or "I thought we are obliged to do X".
10 But he is not saying, "I hereby take on a liability,
11 which I have not had before, to do X."  That is the
12 point I am making.  Can I rephrase that?  I rather
13 bumbled it.
14      Q.   Yes, sure.
15      A.   He is saying, "We have done X" or "We
16 have said X".  And my view is that when
17 Mr. Bankman-Fried said "X" what he was saying was
18 either, "That is actually what has happened" or he was
19 saying, "My understanding is that is what we have
20 to do" or he was saying, "That is my understanding of
21 what we currently have to do."  What he was not saying,
22 in my view, or should be not be taken as saying, was,
23 "Even if we had not had to do this now, I am now taking
24 on this responsibility".  Because if he was saying what
25 he understood to be the case, it is not relevant for

MAGNA ►
LEGAL SERVICES

Page 218

1  contractual construction.  It is only if what he was
2  saying created a new right, and it seems to me very
3  unlikely that he was creating a new right.  If he was
4  simply giving his understanding it is irrelevant.
5      Q.    I had better make sure I understand that.
6  You are saying his statement about what FTX's existing
7  obligations are would be irrelevant but if he were to
8  say that, "We will be taking on an obligation" that
9  would be relevant?
10     A.    If he was to say, "I hereby declare that
11  all the assets held in the pool are held on trust
12  beneficially for all the customers", then if he had
13  authority and that was a valid declaration of trust
14  although orally by one person in the court, then it
15  would operate as a declaration.  If he said, "I believe
16  we are holding this on trust" then that is merely his
17  belief and is not evidence of anything other than what
18  he believes.
19     Q.    So if I understand that right, under
20  English law statements of a party's current obligations
21  are irrelevant?
22     A.    I would not go that far.  But if you are
23  interpreting a contract and somebody says, one of the
24  parties to the contract says, "I have always thought it
25  means X and that is what I thought when I entered into

Page 219

1  the contract and that is what I still think", that is
2  strictly inadmissible in court as evidence when you are
3  construing the contract.
4      Q.    What if it is an admission against
5  interest?
6      A.    It does not really alter the fact.  The
7  fact that you thought it was a liability does not alter
8  anything.  Where it gets more ticklish is if both
9  parties say, "That is what we thought we were agreeing
10  and we discussed it".  Then you might be able to vary
11  the contract by rectification.  But you cannot construe,
12  interpret the contract by reference to what the parties
13  thought they were doing.
14     Q.    What if it is a standard contract?
15     A.    It is even more difficult then because
16  you are looking, you know a number of parties who
17  entered into the contract may think it means X, a number
18  may think it means Y and particularly if they are
19  altogether in the pool, as it were, it is a pretty odd
20  situation if the contract means different things for
21  different people.
22     Q.    Okay.  Let us go to a section on
23  quasi-bailment and we will break as soon as the food is
24  here.
25          You see starting on paragraph 40 -- 52

Page 220

1  there is a section:  "Availability of quasi-bailment as
2  a means to hold digital assets"; do you see?
3      A.    Mm-mh.
4      Q.    In paragraph 52 do you see:  "A bailment
5  is a legal relationship in which a person with superior
6  legal title to the property (the 'bailor') does not have
7  possession of the property, but rather the property is
8  possessed by another (the 'bailee')."  Do you see that?
9      A.    Mm-mh, yes.
10     Q.    And then you say:  "The bailee has a
11  legal proprietary interest in the property based on
12  possession, but this is inferior to the bailor's legal
13  proprietary interest."  Do you see that?
14     A.    Yes.
15     Q.    And in a 55 you say that quasi-bailment,
16  "... seems to be a logical extension of the conclusion
17  that digital assets are property."  Do you see that?
18     A.    Yes.
19     Q.    What do you mean by it £seems to be
20  a logical extension"?
21     A.    Well, I mean that the concept of bailment
22  with variations is one which you could perfectly easily,
23  without any difficulties that I can see, apply to
24  digital assets.  But, as I record, that is one view, it
25  seems to be the prevailing view but at the moment we do

Page 221

1  not know that it is the correct view.  And when I say
2  what I say there what I am really saying is that it does
3  seem quite a logical step.  There is no reason why it
4  should not be taken, but that does not mean it is the
5  right reason, or a right decision.
6      Q.    I understand you think it is likely that
7  the courts will follow that step but not assured?
8      A.    At the moment I think it is likely but
9  I certainly do not think it is sure.
10     Q.    Okay.  And then in paragraph 57 you
11  indicate:  "... the requirements ... are not yet
12  settled" but in your opinion there would be two
13  requirements and then you list them under (a) and (b);
14  is that right?
15     A.    Yes.
16     Q.    Okay.  The first requirement is:  "the
17  parties intended to create a legal relationship whereby
18  the bailee would obtain control of the [legal] assets
19  but the bailor would have superior legal title ...".  Do
20  you see that?
21     A.    Yes.
22     Q.    Okay.  What do you mean by "control of
23  the digital assets"?
24     A.    Well, I would have thought it is a matter
25  of fact but in the end if you have got the key, you have



Page 222

1  got control.
2      Q.    Okay.  So by "control of digital assets"
3  you mean having the key over the wallet?
4      A.    I think that would normally be the case,
5  yes.
6      Q.    Okay.  And then you say: "... but the
7  bailor would have superior legal title ..."?
8      A.    Yes.
9      Q.    And that is related to the second
10  requirement:  "the bailor in fact had superior legal
11  title"; right?
12      A.    Yes.
13      Q.    So what is a scenario in which the bailee
14  has the key but the bailor has superior legal title?
15      A.    It depends on the facts but you have to
16  show both facts arising.  If I have the asset and I give
17  it to somebody else to look after and they have control
18  but it is understood that I still retain ownership, then
19  that would -- and I do in fact retain ownership, then
20  that is effective as a baileeship.
21      Q.    Okay.  I want to focus specifically on
22  the situation of digital assets ----
23      A.    Okay.
24      Q.    ---- which is the situation where
25  a quasi-bailment you indicate is likely to be created.

Page 223

1  So in that situation of digital Assets, can you describe
2  to me what the factual scenario would be where the
3  bailee has the key to the wallet but the bailor has
4  superior legal title?
5      A.    Well, it depends on the facts.  But the
6  bailor has to have -- in order to have superior title
7  the bailor has to have acquired superior title in some
8  way.  He has to have it in the first place and that is
9  a question of fact, whether he has got it.  If he has
10  got it, then quasi-bailment may work if the bailee has
11  the key.  But it depends on the facts really.  It is
12  a little difficult to start, sort of, saying what is
13  required.  I do not think I can really say much more
14  than what is in 57 and what follows.
15      Q.    I am trying to understand the factual
16  scenario where your requirements for a quasi-bailment
17  for a digital asset could be satisfied.  So can you tell
18  me again what is a factual scenario where those
19  requirements could be satisfied?
20      A.    If I have a digital asset which I bring
21  to a pool and put it in the pool while intending to keep
22  title then, subject to me being able to keep title, then
23  there would be a baileeship.  If, for instance, it went
24  into a segregated -- to take a simple case -- if my
25  digital assets went into a segregated wallet which was

Page 224

1  controlled by FTX and there was an agreement that
2  I retained title before I gave it to FTX, that would be
3  a baileeship, quasi-baileeship.
4      Q.    Okay.
5      A.    They would have the asset but they had
6  agreed I kept title and it was segregated and
7  identified.
8      Q.    Okay.  In 60.2 you say: "... if a
9  customer has legal title to a digital asset and
10  transfers that digital asset to an exchange, superior
11  legal title will not pass if there is no intention to
12  pass title."  Do you see that?
13      A.    Yes.
14      Q.    Why do you refer to "legal title" there
15  instead of just "title"?
16      A.    Because we are discussing -- I before
17  discussed legal and equitable title, so it is sensible
18  to make it clear that I am referring to "legal title" so
19  there is no doubt.
20      Q.    So there could be times where referring
21  to just title could be unclear?
22      A.    Look, it would be silly for me to deny
23  that if you talk about "legal title" it is clearer that
24  you are referring to legal title than if you simply
25  refer to "title".  So to that extent I quite accept that

Page 225

1  legal title more clearly means legal title than title.
2      Q.    Okay.  So what degree of control is
3  needed for the ----
4      A.    I think that is a matter of fact and, as
5  I say, I say with some -- I did not say with some
6  hesitation but I probably should have said with some
7  hesitation, the control of the key.  If you have got the
8  key you have got the control.  But that seems to me to
9  be at least arguable and I am prepared to proceed on the
10  basis that it is right.  But I -- Factual control is
11  ultimately a question of fact and I am not here to -- it
12  would not be appropriate for me to express my view on
13  a fact confidently.
14      Q.    What degree of control is needed for the
15  customer in order for the customer to have a superior
16  legal title?
17      A.    The customer has had to have had control
18  but if he passes the control over to the person, the
19  bailee, then he does not immediately need control.  He
20  can ask for it back.
21      Q.    In 60.5 you indicate: "What degree of
22  control is required on the part of the customer in order
23  to obtain legal title is uncertain."  Do you see that?
24      A.    Yes.
25      Q.    And then you refer to the Law

Page 226

1    Commission's analysis; right?
2        A.    Yes.
3        Q.    Okay.  Do you know if the Law Commission
4    formed a view as to what degree of control on the part
5    of the customer is required?
6        A.    My recollection, and I am afraid it is no
7    better than what is in 60.5, is that they thought it
8    should be needed -- a body of experts to consider.
9        Q.    Okay.
10       A.    Particularly as there is quite a strong
11   difference of opinion between the academics.
12       Q.    Okay.
13       A.    As I say, I express a view which is
14   somewhat tentative in light of that in 60.5.
15       Q.    So if I understand correctly, in your
16   view FTX had sufficient legal title for there to be
17   a bailment but the Three Arrows did not have sufficient
18   legal title for there to be a bailment.  Is that right?
19       A.    I think if the assets were always in the
20   pool FTX never -- the Three Arrows never had legal
21   title, yes.
22       Q.    I had asked you two things, I want to
23   make sure they are both correct.  In your view FTX had
24   had sufficient legal title for there to be a bailment
25   but Three Arrows did not have sufficient legal title for

Page 227

1    there to be a bailment.  Is that right?
2        A.    Three Arrows did not have sufficient
3    legal title.  FTX having sufficiently legal title is an
4    interesting way of putting it.  If FTX did not have --
5    if Three Arrows did not have sufficient legal title then
6    FTX did.
7        Q.    Okay.  So in your view FTX had legal
8    title but Three Arrows did not have sufficient legal
9    title for there to be a bailment.  Is that right?
10       A.    I would not put it that way.  I would
11   just say FTX -- that Three Arrows did not have any title
12   so that is the end quasi-bailment.
13       Q.    But you do agree FTX did have legal
14   title; right, Sir?
15       A.    They certainly had possession and in the
16   absence of anyone else having title, yes.
17       Q.    So is your view that FTX had legal title?
18       A.    Yes, think it is.
19            MR. HARRIS:  Why do we not take a break?
20   I'm sure it will be here soon.  I think our Court
21   Reporter needs a break.
22            THE COURT REPORTER:  Thank you.
23            THE VIDEOGRAPHER:  We are going off the
24   record.  The time is 5.38 pm.
25            (A Short break)

Page 228

1            THE VIDEOGRAPHER:  We are back on the
2    record.  The time is 6.20 pm.
3    BY MR. HARRIS:
4        Q.    Just to make sure I understood one piece
5    of your prior testimony ----
6        A.    Of course.
7        Q.    ---- I believe you indicated that if a
8    customer deposited assets on the exchange and then they
9    were swept into the commingled account the customer
10   would therefore lose title to those assets; is that
11   right?
12       A.    Yes.  I think -- it depends what you say
13   the client had to begin with.  If he had legal title
14   I think it would be difficult because of the rule of
15   following.  If he had only equitable title then he could
16   be okay.  Because the rules for following and tracing
17   are different for reasons that many people think are
18   absurd but, none the less, they are different for legal
19   and equitable interests, I am afraid.
20       Q.    So if the customer only had equitable
21   title then the customer might be able to retain that
22   equitable title?
23       A.    Yes.
24       Q.    Okay.  Am I right that your view that
25   Three Arrows does not have a tenancy in common is

Page 229

1    dependent on that sweeping having happened; right?
2        A.    I think we have to go back a little.  It
3    does not have a tenancy in common in equity because we
4    do not -- because there is no trust and therefore you
5    cannot get to a tenancy in common that way.  As for
6    quasi-bailment, the difficulty is that (a) the client
7    has no -- the customer has no title to the asset once
8    the original asset has been replaced and he has never
9    had control of it.  And anyway there is a problem that
10   all he has the right to is the asset, not to an interest
11   in an unspecified group of assets which seems to me to
12   give rise to problems for various reasons.
13       Q.    Would you agree that if Three Arrows's
14   assets were always held in a segregated wallet then
15   Three Arrows might have an ownership interest ----
16       A.    Yes.
17       Q.    Okay.  So Three Arrows failure to have an
18   ownership interest depends on the facts of how the
19   assets were actually held; right?
20       A.    Yes.  Yes, think that is right.
21       Q.    Okay.  So it is not -- your opinion is
22   not based solely on the terms of the terms of service
23   but include the actual facts of what occurred?
24       A.    Assumptions as to facts, that is a fair
25   point.

MAGNA ▶
LEGAL SERVICES

Page 230

1      Q.   Okay.  Given that, why would it not be
2  appropriate to also look at the other facts as they
3  occurred such as whether FTX held the assets on its
4  balance sheet?
5      A.   Well, it could be relevant, but it seems
6  to me that if the assets were all held in a pool where
7  they were not in any way identified as being the
8  property of or having interests from various parties, it
9  is hard to see where, if my analysis is right, it is
10  hard to see what is in FTX's accounts would help.
11  I mean if my accounts record something inaccurate or
12  record something that is not in accordance with the
13  legal analysis, it does not alter the legal analysis
14  normally both between me and other parties.
15      Q.   It would reflect -- it could reflect what
16  FTX viewed was the proper legal analysis, though; right?
17      A.   It could reflect but then you are back to
18  the problem that what FTX thought was the proper and
19  legal analysis does not really affect what the proper
20  legal analysis is.
21      Q.   Okay.  Do you have the terms of service
22  there?
23      A.   I am sorry, yes, I do, here they are.
24      Q.   I want to look again at clause 9, 9.2.
25      A.   Yes.

Page 231

1      Q.   Clause 9.2 is talking about the user's
2  "Unclaimed or Abandoned Property"; right?
3      A.   Yes.
4      Q.   9.2 assumes that the user has some
5  property interest, or some interest in the property;
6  correct, Sir?
7      A.   Yes.  Let me just check.  "Holding assets
8  in your Account", that is what it is talking about is,
9  is it not?  It brings one back to the first line of 9.1.
10  And the account may be, as you pointed out quite
11  rightly, correcting me, "... your Account may be
12  transferred to FTX Trading ...".  And then the trustee
13  holds the unclaimed or abandoned property on your
14  behalf, yes.
15      Q.   So if the customer had no interest at all
16  in the unclaimed or abandoned property you would not
17  need to have 9.2; right?
18      A.   Well, you would because he has not got an
19  interest whereas this way he does get an interest.
20      Q.   So 9.2 is necessary in order to create an
21  interest for the user is what you are saying?
22      A.   Well, if you want to create a beneficial
23  interest, if I am right in my view that there was no
24  beneficial interest up to this point, then if you want
25  to create a beneficial interest you need 9.2.

Page 232

1      Q.   Okay.  If the customer never had any
2  interest -- never even had a contractual interest in the
3  property, then you would agree you would not need
4  a clause giving permission to transfer that property;
5  correct?
6      A.   Well, it is interestingly worded.  It
7  applies, 9.1:  "If FTX is holding Assets in your Account
8  ...".  So it looks as if it is treating FTX here as
9  holding the assets in your account.  It could be said
10  that -- it is pretty obvious what it means.  It refers
11  to whatever assets are recorded as being in the relevant
12  person's account and what FTX Trading has to do is to
13  create a trust of that.
14      Q.   Okay.
15      A.   I would not like to say, because I do not
16  know enough about the minutiae of the facts, how they
17  would do it, but they may have to segregate assets that
18  reflect the assets in the account picking up the point
19  in Briggs J's judgment in LBIE, in L-B-I-E, that
20  segregation is a very good indication and a very good
21  hallmark of trusteeship.  So that is what I imagine
22  would happen, but I am thinking aloud as it were, but
23  that is how I think it would work.
24      Q.   All right.  Let me return a little more
25  to the topic of quasi-bailment, then.

Page 233

1      A.   Yes, of course.
2      Q.   Do will recall the Law Commission
3  endorsed the idea that a quasi-bailment for digital
4  property was a likely development?
5      A.   Yes, I think there are two question
6  marks.  One is, is it going to happen and Dame Elizabeth
7  and I think it probably will and the Law Commission is
8  recommending it.  And the second is precisely what are
9  its demarcations and characteristics and that is where
10  it gets more uncertain.
11      Q.   And if I understand correctly, on the
12  area that you and Dame Elizabeth disagree on is the
13  level of a customer's control that is needed for
14  a quasi-bailment?
15      A.   I think that is certainly something we
16  disagree on, yes.
17      Q.   Can we look at the Law Commission report
18  again then.
19      A.   Yes, of course.
20      Q.   I think the paragraphs that discuss this
21  are basically starting at 7.11 onwards.
22      A.   Seven point?
23      Q.   111 sorry, page 175.
24      A.   I have it, thank you.
25      Q.   If you look at 7.113 ----



Page 234

1    A.   I think, sorry, just to go back on the
2 previous answer, where we disagree is both on the point
3 you mentioned and on the effect of the contractual
4 arrangement between the parties.
5    Q.   Okay.
6    A.   I think that is another point where -- a
7 reason I disagree with her.  I am sorry to interrupt.
8    Q.   You see in 7.113 the Law Commission says:
9 "We do not consider that the recognition of a limited
10 control-based legal proprietary interest would
11 necessarily be precluded where crypto-tokens are
12 commingled or mixed so that specific entitlements can no
13 longer be identified."  Do you see that?
14    A.   Mm-mh.
15    Q.   And you see, "Conclusion 5" and 7.115
16 ----
17    A.   Yes.
18    Q.   ---- likewise indicates you could have,
19 they expect there could be: "... a control-based
20 proprietary interest in held crypto-token entitlements
21 that is subject to a superior legal title retained by
22 users".  Do you see that, Sir?
23    A.   Yes, I do.
24    Q.   So the Law Commission is recognising that
25 there could be a quasi-bailment where the intermediary

Page 235

1 holds the keys but the customer has some level of
2 control that gives it a superior legal title; is that
3 right, Sir?
4    A.   Yes.  What they are covering is that is
5 a possibility, but, (a) they have not dealt with, as far
6 as I can see, and we read this recently, the question of
7 whether the customer has to have a superior legal title
8 as is normally needed for bailment, and what effect the
9 terms of the contract have.
10    Q.   Right.  Well you would agree, Sir, that
11 the kind of control that the customer would need to have
12 under the Law Commission's analysis is not factual
13 control, it is not control of the keys; right?
14    A.   I think that is what the Law Commission
15 is laying down as a possibility, yes.
16    Q.   Okay.  And so that would leave the other
17 type of control that -- the remaining type of control
18 would be legal control; right?
19    A.   I think that is what they are getting at,
20 yes.
21    Q.   Okay.  So the scenario they are
22 envisioning is that a quasi-bailment would be created by
23 the intermediary having the factual control through the
24 keys and the customer having some sort of legal control
25 based on the contract; is that right, Sir?

Page 236

1    A.   It could be that.  I slightly -- I do not
2 want to say it definitely is, but that is a possibility.
3 But they are raising that as a possibility and it could
4 well be that what you say is right.
5    Q.   And you see there is nothing in the Law
6 Commission's analysis that requires that the customer
7 previously had legal title?
8    A.   No, interestingly.  And whether that
9 would be an appropriate principle to adopt in relation
10 to quasi-bailment seems to me to be highly questionable.
11    Q.   Okay.
12    A.   We are trying to develop -- This is where
13 we really get into the realms of speculation:  how far
14 will the law develop the idea of quasi-bailment to make
15 it even easier to get a bailment for cryptocurrency and
16 so on.  I think that is a very open question, but I am
17 dubious whether the fundamental principles of bailment
18 would be relaxed to that extent, but they do not
19 actually deal with that point.
20    Q.   Okay.  All right.  A few more questions
21 on your original declaration.
22    A.   Yes, of course.
23    Q.   If we could go to paragraph 81.
24    A.   Yes.
25    Q.   So this is a section on "Fiat currency,

Page 237

1 E-Money".
2    A.   Yes.
3    Q.   And at the end of 81 you say: "... the
4 parties cannot realistically have intended that
5 impossibility" of retaining legal title to the fiat
6 currency.  Do you see that, Sir?
7    A.   Yes.
8    Q.   And so you are saying here the parties
9 cannot intend an impossibility?
10    A.   Yes.
11    Q.   Okay.
12    A.   As I understand it, this is familiar
13 debtor, creditor, this is a familiar banking-type
14 operation effectively.
15    Q.   So the parties cannot have intended
16 something that any market participant would know is an
17 impossibility; right?
18    A.   In connection with a bank account, yes,
19 because this is familiar territory now.
20    Q.   Then if you go to section 83.3 of your
21 report ----
22    A.   Yes.
23    Q.   ---- you say: "... 8.3 ... stands in
24 stark contrast with section 8.2 ...".  Do you see that?
25    A.   Yes.

MAGNA ▶
LEGAL SERVICES

1    Q.    What do you mean by "stark contrast"?
2    A.    Let me have a look at 8.3 and 8.2.
3  Oh, yes, I think I explain it in the next sentence:
4  "While the section 8.2 addresses the issues of 'title'
5  and 'ownership' of Digital Assets, there is no
6  equivalent provision in relation to fiat currency."
7  That is the stark contrast I have in mind.
8    Q.    Why is that stark contrast relevant to
9  the ownership of fiat currency and E-Money?
10    A.    Because it seems to me that the parties
11  have gone out of their way to spell out exactly how
12  title to the digital assets is intended to work in 8.2
13  and they have not done that in 8.3.
14    Q.    Okay.  In 83.5, do you see: "The
15  remainder of section 8.3 ... uses ambiguous language."
16  Do you see that?
17    A.    Yes.
18    Q.    And then you see: "There are references
19  ... to fiat currency or E-Money being 'held' in an
20  account."  Do you see that?
21    A.    Yes.
22    Q.    Why does "held" create some ambiguity as
23  to ownership?
24    A.    Give me a second, if you would.  (Pause)
25  I think I am just saying that referring to it held in

1  the account does not really add much to the reference to
2  E-Money.
3    Q.    Well, you called it "ambiguous language".
4  Why do you say the phrase "held" creates an ambiguity?
5    A.    I do not know that I am saying that held
6  -- I must admit, I have not studied this part, I am
7  sorry, I should have done, of my evidence.
8    Q.    Is it because the phrase "held" at least
9  could imply held on behalf of someone?
10    A.    No, I do not think so.  I just think it
11  talks about E-Money "held' in your account", for
12  instance in 8.3.4 (sic), E-Money credited to your
13  account in 8.3.5 (sic), E-Money from your account.
14  I think I am making rather a weak point that it just
15  uses different expressions that it is not very clear but
16  I am not really sure to be honest with you what point
17  I am making in 8.3 -- 83.5.
18    Q.    Okay.  In 95, it is in a section about
19  "Earlier Terms" ----
20    A.    Yes.
21    Q.    ---- you note in 95: "... the Earlier
22  Terms ... say nothing expressly" about ownership; right?
23    A.    Yes.
24    Q.    So do you have views as to why the change
25  was made expressly to discuss ownership?

1    A.    I think that where two parties have
2  a contract and they agree a new form of contract, it is
3  permissible to look at the old form to help construe the
4  new form.  I am dubious whether that is really
5  permissible in relation to a contract which you are
6  making with the world.  My own view would be that where
7  you are holding out a contract to the world which is
8  what FTX are doing, you do not look at things that
9  somebody coming to FTX would not know about, which is
10  the previous terms, which are now dead.  Some people
11  would know about them and others would not.  But I think
12  you probably cannot look at the old terms to construe
13  the new terms.  If you can, I am not really sure where
14  it takes you anyway.
15    Q.    My question was different.  It was do you
16  have any understanding why the change was made to
17  expressly discuss ownership?
18    A.    I am sorry, I beg your pardon.  No, but,
19  again, with all due respect, the reason why one party
20  makes an amendment to a contract which is then agreed to
21  by another party, again brings one back to the point
22  that the intentions of one party or understanding of one
23  party to a contract simply is irrelevant as a matter of
24  English law when you are interpreting the contract.
25    Q.    All right, let us look at your second

1  declaration.  This will be quicker.
2    A.    Thank you.
3    Q.    I want to ask you about the section that
4  begins on paragraph 12, the: "Application to Perpetual
5  Futures Contracts".
6    A.    Yes.
7    Q.    You opine in this section that the
8  parties did not intend to create a trust?
9    A.    Yes.
10    Q.    If you look at paragraph 15 you indicate
11  that in your view the Perpetual Futures Contracts are
12  contractual rights; right?
13    A.    Yes.
14    Q.    And you are not giving an opinion as to
15  whether 3AC owns those contractual rights; correct?
16    A.    No, I think I am just saying that as a
17  matter of law I do not think quasi-bailment can apply to
18  contractual rights.
19    Q.    Okay.  Starting on page 7 there is
20  a section on:  "The October 2021 LSA, March 2022 LOC and
21  Margin Agreement".  Do you see that?
22    A.    Yes, I do.
23    Q.    And in paragraph 21 you acknowledge that
24  background knowledge can include previous contracts
25  between the parties; right?

MAGNA
LEGAL SERVICES

1    A.    Yes.

2    Q.    But in paragraph 22 you express your view

3 that: "... the March 2022 LOC and the Margin Agreement

4 are not admissible background to the interpretation of

5 the Dotcom Terms.  Do you see that?

6    A.    Yes.

7    Q.    And that is because the Dotcom Terms are

8 open to any user; is that right?

9    A.    Yes.  I really explain that and it is the

10 point I made a short time ago, yes.

11    Q.    Okay.  Is it possible that the Dotcom

12 Terms could have different impacts on different

13 customers depending on other contractual arrangements

14 between them?

15    A.    It is obviously possible.  I mean, if,

16 for instance, somebody wanted to open an account with

17 FTX and said, "I am not prepared to abide by clause

18 8.2.6" and FTX said, "Fine", then that would be

19 a binding contract.  But in general the court's

20 attitude, and it is a pragmatic view, is that if this is

21 a contract which they are offering to the world, then

22 they and the world will assume that surrounding

23 circumstances known to some parties but not others will

24 not be taken into account.  But it is a pragmatic

25 somewhat, I cannot pretend absolutely dogmatic view but

1 it will apply undoubtedly to a contract such as this.

2    Q.    Do you know whether the Margin Agreement

3 was also offered to the world?

4    A.    No, I do not.

5    Q.    Okay.  If the Margin Agreement was

6 offered to the world, would you expect that that

7 agreement could also be considered background to the

8 interpretation of the Dotcom Terms?

9        MR. GLUECKSTEIN:  Object to the form.

10    A.    I think it depends on the facts.  The

11 fact that somebody offers -- that an organisation offers

12 two contracts on the market if you could show, for

13 instance, at one extreme that punters are in two sorts,

14 one of whom is barely interested in one sort of contract

15 and one in another, then you would probably say each is

16 irrelevant to the other.  If you would say the market

17 generally consists of people who would look at two types

18 of contract and might enter into both or one and would

19 compare them, then you could take them into account.

20 I think it would depend on the facts.

21 BY MR. HARRIS:

22    Q.    So if the Margin Agreement was a type of

23 contract where people could enter that simultaneously

24 with the terms of service then you could consider the

25 Margin Agreement as part of the admissible background;

1 right?

2    A.    Yes.  I mean I have to say that when

3 I was sailing in slightly uncharted waters, the general

4 proposition is that where it is a standard form you do

5 not look at surrounding circumstances except to a very

6 limited extent.  We are now looking at a rather

7 particular case.  I think my own view would be that if

8 generally most people in the market would look at both

9 contracts and consider which one to enter into, then you

10 could use one to construe the other.

11    Q.    Okay.

12    A.    But I think the court would be pretty

13 unimpressed with giving much weight to that argument

14 because they are both detailed contracts and the parties

15 do not have in mind the detailed provisions of one when

16 looking at the other.

17    Q.    If most users actually entered into both

18 contracts, both the Margin Agreement and the terms of

19 service, would a court try and interpret them in a way

20 that was consistent?

21    A.    I think the more you could show that the

22 two contracts were going to be entered into by

23 everybody, I mean it is not good enough to say there

24 would be a few people who would do both or even, I do

25 not know, 30% of customers who would do both, you would

1 need a lot more than that.  But if you could show that

2 you would have both, you would have the beginnings of an

3 argument.  But in order to see whether the argument was

4 one that could run you would have to look at the

5 particular point that was being made.

6        But I certainly accept that if the court

7 accepted or if it was found that the two agreements

8 were, as it were, generally looked at together by

9 potential customers, then you would definitely get to

10 first base in terms of being able to use one to construe

11 the other.  But I still think, in general, it would be

12 quite a long shot.

13    Q.    Would it be relevant if the terms of

14 service actually contemplated the parties entering into

15 a Margin Agreement?

16    A.    Yes.  That would potentially help.  But

17 it is quite fact-sensitive and even if you get to -- and

18 you may get to, this is a question of fact -- to the

19 point where one can be compared with the other, I think

20 it is quite a long shot to say, "This agreement means X

21 but now I have looked at another agreement it means Y";

22 but it is possible.

23    Q.    Okay.  It is possible a court would try

24 and interpret the contracts in a way where they are

25 consistent rather than contradictory; right?

MAGNA
LEGAL SERVICES

Page 246

1      A.    The problem always is this.  If the two
2  contracts provide -- express differently, one side says,
3  "They should be construed in a way that is mutually
4  consistent", the other side says, "The parties have used
5  different language in the two contracts so they should
6  obviously be construed differently", and the court says,
7  "Both arguments are valid so I am going to do my best on
8  each contract without looking at the other one."  That
9  is the problem.
10     Q.    All right.  A couple more questions on
11 this.  On paragraph 25 you have a footnote, Footnote 9,
12 which is about the October 2021 LSA.
13     A.    Yes.  Sorry, yes, I see, I was looking at
14 the wrong page, I do beg your pardon.
15     Q.    You see that in that, in: "... the
16 October 2021 LSA 3AC represented and warranted that it
17 was the sole legal and equitable owner of the
18 Collateral."  Do you see that, Sir?
19     A.    Yes.
20     Q.    Okay.  So this is an incident where both
21 terms were used simultaneously; right?
22     A.    Yes.
23     Q.    But you, kind of, discount that language
24 because you say it is relatively formulaic; right?
25     A.    Yes.

Page 247

1      Q.    Why does it being formulaic make you
2  discount it?
3      A.    It is the sort of thing which -- I do not
4  discount it.  I think that it is "relatively formulaic"
5  means that one treats it with a certain amount of care
6  and does not give it the weight that you might give
7  something which was not formulaic.  But I am not
8  dismissing it.  That is why I add what I add, because if
9  I just thought it was formulaic and that was the end of
10 it, I would not have felt it necessary to say anything
11 else.
12     Q.    So if I understand correctly, because it
13 is relatively formulaic you give it less weight; is that
14 right?
15     A.    I think that is fair.
16     Q.    Okay.  I know you have reviewed Dame
17 Elizabeth's report; right.  Did you review all the
18 materials and authorities that were cited by her in her
19 report?
20     A.    I am not sure that I looked at all of
21 them.
22     Q.    Okay.
23     A.    There was a certain amount of pressure of
24 time.
25     Q.    Did you ---- Sorry.

Page 248

1      A.    I was content with what I did but it
2  would be wrong I think to say I looked at everything.
3      Q.    Did you read all the authorities that
4  were cited in your reports?
5      A.    In this passage of time I cannot say
6  I definitely did but I certainly looked at them all.
7  Whether I read -- I doubt I read all the way through
8  them.
9      Q.    Okay.
10     A.    Well, I will have read all the way
11 through quite few of them but I doubt I will have read
12 every word in every report.
13     Q.    Did you review any of the expert reports
14 submitted by any of the other experts in this case other
15 than Dame Elizabeth?
16     A.    No.
17     Q.    Okay.  Why don't we look at your rebuttal
18 report, the third report.
19     A.    Of course.
20     Q.    I am going to look at paragraph 13.
21     A.    Yes.
22     Q.    Okay.  You write: "Dame Elizabeth's
23 conclusion is that the effect of section 8.2.6 is to
24 vest legal title over 3AC's Digital Assets in FTX" and
25 then you have a parenthetical "(or assumes that legal

Page 249

1  title is vested in FTX) ...".  So I am wondering what
2  are you trying to distinguish here between vesting legal
3  title versus assuming legal title is vested?
4      A.    The question is, depending on the precise
5  facts, either legal title was not -- that would not be
6  vested in FTX unless 8.2.6 did it, but it does not do it
7  expressly.  So I am saying alternatively it assumes it
8  because there is nothing in 8.2.6 which deals with legal
9  title according to the theory supported by Dame
10 Elizabeth.
11     Q.    So I am not sure, when you say "assumes",
12 are you saying the clause assumes it or Dame Elizabeth
13 assumes it?
14     A.    No.  The effect of 8.2.6 is to vest or
15 assumes that legal title is vested.  So I say -- if you
16 read 8.2.6, if you read it my way, it says legal title
17 is vested in the customer.  If you read it in Dame
18 Elizabeth's way it says that equitable title is vested
19 in the customer.
20     Q.    I see.
21     A.    And it is silent on legal title.  Now
22 either it vests legal title impliedly or it assumes that
23 legal title is vested in FTX.
24     Q.    I see.  Now I understand.  You are saying
25 your view is that 8.2.6 vests legal title and Dame

Page 250

1  Elizabeth's view is that it assumes that legal title is
2  vested?
3       A.    No.  She either says it vests legal title
4  or she says it assumes legal title is vested.
5       Q.    I see, okay.  If Three Arrows did have
6  legal title to the digital assets, what exactly did it
7  have legal title to given that it did not have the
8  private keys?
9       A.    When it put the assets in the wallets,
10 which it did not have private keys to, it had legal
11 title at that point.  And if it was not intending to
12 pass legal -- if it was intending to keep legal title
13 then for the moment it kept legal title.  But if quasi-
14 baileeship works, query, which I think it probably does
15 and so does Dame Elizabeth, but it remains to be seen,
16 then a quasi-baileeship arose.
17      Q.    Just to make sure I understood, for
18 digital assets the Three Arrows purchased on the
19 exchange?
20      A.    They are purchased on the exchange then
21 if they do not go into the wallet they do not get legal
22 title because although there is an intention for them to
23 get legal title (see 8.2.6(a)) they never get control.
24      Q.    So for assets purchased on the exchange
25 it was not possible for Three Arrows to get legal title?

Page 251

1       A.    Unless it was put in their wallets in
2  some way.
3       Q.    Okay.
4       A.    But they just did not have control, yes.
5       Q.    So for assets that were -- that Three
6  Arrows purchased on the exchange where the assets
7  replaced into the commingled wallet it was not possible
8  for Three Arrows to get legal title?
9       A.    On the facts as I understand them, yes.
10      Q.    Okay.  Now as a factual matter in terms
11 of factual control, you agree that FTX had the practical
12 ability to sell customers' assets at any time given its
13 control of the keys?
14      A.    I understand that is the case, yes.
15      Q.    Okay.  So in that context why is it your
16 view that the parties intended to agree that 3AC held
17 legal title to the digital assets?
18      A.    Sorry, where are you reading from?
19      Q.    Well, I am just -- I think you have said
20 it is your view that the parties intended that 3AC have
21 legal title to the digital assets; right?
22      A.    Because if it is a quasi-baileeship, they
23 did not give up the legal title.  Title did pass to FTX
24 but it was -- while it was a baileeship it was an
25 inferior title.

Page 252

1       Q.    But you agree that 8.2.6 covered assets
2  that were purchased on the exchange also; right?
3       A.    I agree with intended to.
4       Q.    So how could the parties have intended
5  for assets that 3AC purchased on the exchange that 3AC
6  would hold legal title to them?
7       A.    Well, it is what they thought would
8  happen, but it was not the law.
9       Q.    Okay.  They just misunderstood the law?
10      A.    Yes.  It is not the first and will not be
11 by any means be the first time it happens that parties
12 enter into contracts which ----
13      Q.    Okay.
14      A.    ---- assume the law is different from
15 what it is and it is particularly unsurprising in this
16 new area where, you know, with quasi-bailment to some
17 extent it can be said we cannot be sure what the law is.
18      Q.    Going on to 14(e) ----
19      A.    Yes, of course.
20      Q.    ---- you are discussing whether it was
21 intended for the parties -- the parties intended to
22 split the title?
23      A.    Yes.
24      Q.    And you say that: "The notion that legal
25 title is vested in FTX while equitable title vested in

Page 253

1  3AC ... is flatly contrary to the ... [parties'
2  intention] as revealed in a number of [terms] ...";
3  right, Sir?
4       A.    Yes, that is right, we discussed that
5  earlier.
6       Q.    And you mention 2.1.3; 2.2.2; 38.6; 2.10;
7  8.2.6 and 9.2, do you see that?
8       A.    Yes, I do.
9       Q.    Other than 8.2.6, none of them actually
10 mentions title; right?
11      A.    No, that is true.
12      Q.    Okay.  None of them say you cannot split
13 title; correct?
14      A.    Absolutely; except they say there is no
15 intention to create a fiduciary relationship which
16 involves a split of title.
17      Q.    Okay.  Would you agree that a fiduciary
18 relationship is an effect, not the cause, of a trustee
19 relationship?
20      A.    In many circumstances, yes.  If you
21 create a trust you create a fiduciary relationship.
22      Q.    Okay.
23      A.    That would be the normal situation, that
24 a fiduciary relationship arises from a trust or from
25 certain other relationships, yes.

MAGNA ▶
LEGAL SERVICES

Page 254

1    Q.    Okay.  If you look at 14(f)?
2    A.    I have it.
3    Q.    You cite the case LBIE ----
4    A.    Yes.
5    Q.    ---- as holding that the absence of an
6  obligation to keep the property separate, if a trustee
7  -- "... keep the property separate from [a trustee's]
8  own property is a powerful indicator of the ... absence
9  of a ... trustee and beneficiary [relationship] ...".
10    A.    Yes.
11    Q.    LBIE is not in the context of digital
12  assets; right?
13    A.    No, it is not.  It is a general
14  proposition.
15    Q.    Okay.  What if the party was required to
16  avoid taking steps that would interfere with ownership?
17  Would that be a helpful factor?
18    A.    In terms of what was the intention, it
19  could be.  Again, one would have to look at the
20  particular clause in its context.
21    Q.    Okay.
22    A.    It could be uncomfortable -- I would be
23  uncomfortable about asking a question about a sort of
24  generic clause.
25    Q.    Are you aware of any cases about whether

Page 255

1  a trust was created over digital assets at an exchange
2  that involved the factual situation where the exchange
3  held some of its own assets in the commingled digital
4  wallets?
5    A.    I think we looked at Ruscoe where that
6  happened, did it not?
7    Q.    In Ruscoe the court found a trust was
8  established despite that?
9    A.    It did.
10    Q.    Okay.
11    A.    Ruscoe, I looked it up during the break.
12  It has been cited in two English cases, not with any
13  great approval.
14    Q.    Did those cases criticise Ruscoe?
15    A.    I think they were pretty neutral about it
16  but it is fair to say it was cited; just picking your
17  point up earlier about whether it was cited.
18    Q.    At 14(h) ----
19    A.    Yes.
20    Q.    ---- you indicate, you refer to, "the
21  natural meaning of section 8.2.6"?
22    A.    I do.
23    Q.    And just to be clear again, what is that
24  natural meaning?
25    A.    The natural meaning is that the digital

Page 256

1  assets are intended to be the property of the customer
2  and that FTX is intended to have no interest in those
3  assets.
4    Q.    Okay, and that is true at all periods of
5  time; right?
6    A.    That is what would seem to be the
7  intention, yes.
8    Q.    Okay.  At 14(i) ----
9    A.    Yes.
10    Q.    ---- you said there is not:  "... the
11  requisite certainty of subject matter ... [because] it
12  would be extraordinarily difficult, if not impossible,
13  task for any customer to [identify] the actual Digital
14  Assets"?
15    A.    Yes.
16    Q.    Why would a customer need to identify the
17  actual digital assets as opposed to the percentage of
18  digital assets in a wallet?
19        MR. GLUECKSTEIN:  Object to the form.
20    A.    I think again this is possibly a factual
21  question but if the client says, "I have got 100
22  bitcoins, my account shows 100 bitcoins and there are
23  20,000 bitcoins in the pool"; before you can work out
24  what the client has got I would have thought would you
25  have to look at what other customers have got and then

Page 257

1  would you have to work out a proportion.
2  BY MR. HARRIS:
3    Q.    And if the exchange's systems are
4  sufficient to identify those percentages, then you could
5  establish sufficient certainty over the pool of digital
6  assets; right, Sir?
7    A.    I think it (a) depends whether it is
8  possible and (b) depends how difficult it is.  I notice
9  that in one case here it was said that it was near
10  impossible.  In another case it was said it might be
11  possible.  In Ruscoe they were taking a long time
12  sorting it out.  To my mind all that is a bit uncertain.
13    Q.    Okay.
14    A.    And then you have got the other point
15  that given what FTX were able to do, there might be
16  nothing in the pool.  They may take an intense --
17  bearing in mind the sort of risks that I understand the
18  FTX were taking, they might have, sort of, gone short of
19  bitcoin or got rid of all the bitcoin in which case
20  there would have been nothing left for anyone to have an
21  interest in.
22    Q.    You do not know factually what FTX was
23  able to determine; right?
24    A.    No, you are absolutely right, I do not.
25    Q.    In paragraph 17 you see you offer an

Page 258

1  analogy; right?
2      A.    Yes.
3      Q.    And you say if you offered to sell title
4  to your house but the purchaser only became the
5  equitable owner, they "would be unlikely to be
6  satisfied"; do you see that?
7      A.    Yes.
8      Q.    Why is this analogy relevant?
9      A.    Because this talks about who has title
10  and who is the owner.
11      Q.    Okay.
12      A.    And what I am saying is that, it, may be
13  a slightly childish analogy -- but I am simply saying
14  that to an ordinary person, if I say, "You can have
15  title to my house and you will become the owner", they
16  would be slightly disappointed or worse if they
17  discovered they merely had the equitable interest.
18      Q.    And Three Arrows is the purchaser in this
19  analogy?
20      A.    Well, it really turns on title to your
21  digital assets shall remain with you as the owner of the
22  digital assets in your account.  So this is Three
23  Arrows.  And I have just taken the words from that
24  particular provision.
25      Q.    Okay.  So in your analogy, would the

Page 259

1  purchaser be satisfied if they obtained neither legal
2  nor equitable title?
3      A.    No.  But, as I say, when I have come to
4  that conclusion it is not based on what the contract
5  says.  It is based on what the legal consequences of
6  what has happened are.
7      Q.    You thought it was relevant to tell the
8  court here whether the party would be satisfied with the
9  results; right?
10      A.    But that is when I was concerned with
11  interpreting the contract.
12      Q.    So when you are interpreting the contract
13  you do want to consider whether the parties would be
14  satisfied with that interpretation; right?
15          MR. GLUECKSTEIN:  Objection to form.
16      A.    No.  I want to explain why I think the
17  natural meaning of a word is what I have said it is.
18  BY MR. HARRIS:
19      Q.    Well, here you thought it was relevant to
20  tell the court what interpretation would satisfy the
21  parties' expectations; right?
22      A.    It was an illustration as to the natural
23  meaning of title and owner.
24      Q.    Well, you talked about whether the
25  purchaser would be satisfied; right?

Page 260

1      A.    Yes, because the purchaser would not be
2  satisfied because title and owner would convey to the
3  purchaser that he or she was going to be the owner of
4  the freehold title to the house.
5      Q.    Do you think the purchaser would be more
6  satisfied to at least have equitable title as opposed to
7  having no title at all?
8      A.    I do, but that is a matter of contractual
9  construction, not a question of the consequence of what
10  has happened.
11      Q.    Okay.  Would not a better analogy here be
12  that the purchaser of a house has transferred the keys
13  to the house to another party but intended to leave the
14  rights regarding that house with Three Arrows, with the
15  purchaser?
16          MR. GLUECKSTEIN:  Objection to form.
17      A.    Perhaps it is my fault for going to an
18  analogy at all, I must admit, but if I give the keys of
19  my house to somebody, I think they would merely assume
20  that I was letting them spend the night or something.
21  I think analogies are dangerous.  But, to be fair to
22  you, I started the analogy game.
23  BY MR. HARRIS:
24      Q.    Okay.  You would think if someone were to
25  transfer the keys of their house to another party and

Page 261

1  gave that other party the ability to transact and sell
2  that house they would be doing so under a trust
3  arrangement?
4          MR. GLUECKSTEIN:  Object to the form.
5      A.    I think that if that was to happen, they
6  probably would be the agent of the person for the
7  purpose of selling the house.  I do not think it would
8  create a trust.
9  BY MR. HARRIS:
10      Q.    Okay.
11      A.    But it so much depends on the precise
12  circumstances.  I do not think -- as I say, I plead
13  guilty to the analogy line of argument which may not be
14  helpful.
15      Q.    At paragraph 19 you discuss the LBIE case
16  again?
17      A.    Yes, I do.
18      Q.    And you focus on the terms "custodian"
19  and "custody" in the agreement; right?
20      A.    Well, I really concentrate on the whole
21  provision in that case rather than any singular
22  particular word.  I just make the point that "custodian"
23  and "custody" were words which weighed with Briggs J,
24  which were not quoted by Dame Elizabeth.
25      Q.    Okay, but I assume you thought this was

MAGNA ▶
LEGAL SERVICES

Page 262

1   meaningful or you would not have put it in here; right?
2        A.   I just wanted to say, to be frank, that
3   I thought that it was a partial quotation she was
4   relying on and I was simply anxious to emphasise that
5   the quotation, relevant quotation, was more than she put
6   in.  That was all.
7        Q.   Okay.  Well the court in LBIE did not say
8   that the terms "custodian" and "custody" were more
9   important than the phrase "belonging to the
10  counterparty"; right?
11       A.   I did not say they did.
12       Q.   Okay.  In fact it described all of that
13  language as the clearest language; right?
14       A.   That was my point, that you want to look
15  at the whole language.
16       Q.   Did you think the terms "custodian" and
17  "custody" would be supportive of a trust arrangement?
18       A.   I think that particularly bearing in mind
19  the contract as a whole, or the words as a whole, Briggs
20  J unsurprisingly was completely right.
21       Q.   Okay.  Do you recall that in LBIE the
22  agreement there allowed the mixing of the trustee and
23  beneficiaries' assets so long as the books and records
24  made the amounts separately identifiable?
25       A.   I had forgotten that but I note that.

Page 263

1        Q.   Okay.
2        A.   But, as I say, in that case there was
3   belonging beneficially and I have quoted what Briggs J
4   said about that a bit earlier.
5        Q.   Okay.  In 21(b) you are discussing the
6   factual matrix; right?
7        A.   Yes.
8        Q.   And you indicate that the factual matrix
9   in 21(b)(iii) would "be inconsistent with a trustee-
10  beneficiary relationship".  Do you see that, Sir?
11       A.   Sorry, could you repeat that, I am
12  terribly sorry.
13       Q.   In 21(b) and (iii) ----
14       A.   I see, that is referring back, I think,
15  to Briggs J.  I think it is -- Let me just check
16  paragraph 14.  Yes, that is Briggs J in LBIE, that is
17  all.
18       Q.   So you are referring back to the fact
19  that ----
20       A.   They were not segregated.
21       Q.   I see.
22       A.   Sorry, if that was not clear.  It should
23  be.
24       Q.   And this goes back to the issue of what
25  if anything LBIE was saying about the trustee having the

Page 264

1   ability to commingle assets or not; yes?
2        A.   If the factual matrix is relevant then
3   the point I am making is the commingling was
4   inconsistent with the existence of the trust.
5        Q.   Do you recall that the Law Commission
6   formed the view that commingling of the intermediary's
7   assets with the user's does not prevent the
8   establishment of a trust?
9        A.   I cannot remember exactly how they put it
10  but I do not think Briggs J said it prevented it.
11  I think he said what it was indicative of.
12       Q.   Okay.
13       A.   And I do not say that it is a slam dunk
14  but I do say that it is a relevant factor.
15       Q.   Okay.  In 21(c) "Impossibility" at (i)
16  you say: "The argument that it is 'impossible' for 3AC
17  to hold the legal title ... is difficult to reconcile
18  with 3AC's case on quasi-bailment ...".
19       A.   Yes.
20       Q.   Quasi-bailment is a doctrine that you and
21  Dame Elizabeth think is likely to be developed in
22  future; right?
23       A.   Right.
24       Q.   But you agree that under current English
25  law it is not possible for 3AC to hold the legal title

Page 265

1   to the digital assets associated with the 3AC accounts;
2   right?
3        A.   I would be very technical and say if the
4   courts decide that quasi-bailment is valid, then under
5   our common law system it is deemed always to be valid.
6   So one could argue that it remains the law.  But it is
7   a fair point that at this point with quasi-bailment
8   being uncertain, yes.  But I do not think I can say more
9   than that really.
10       Q.   Okay.  Until the doctrine of
11  quasi-bailment is implemented, it would not be possible
12  for 3AC to hold the legal title to the digital assets?
13       MR. GLUECKSTEIN:  Object to the form.
14       A.   Yes, I cannot quite agree with that.  If
15  the doctrine of quasi-bailment is rejected, then it
16  would not be possible.  If it is accepted, then it would
17  be possible.
18  BY MR. HARRIS:
19       Q.   Okay.
20       A.   I am sorry, I hope I am not playing with
21  words, but that is how I put it.
22       Q.   I understand.  Paragraph 24 discusses
23  certainty as subject-matter.
24       A.   Yes.
25       Q.   And you discuss the Pearson opinion.

Page 266

1          A.    Yes.
2          Q.    Why did you rely on Pearson here?
3          A.    It is Dame Elizabeth I think who relied
4    on Pearson.
5          Q.    Did you find it an informative case on
6    this issue?
7          A.    Well, anything Briggs J says is worth
8    considering.
9          Q.    In 25 you indicate that you: "...
10   consider that the requirements ... in Pearson are not
11   satisfied"?
12         A.    Yes.
13         Q.    Right.  Do you recall that in Pearson
14   there was no contractual certainty as to how losses
15   would be shared?
16         A.    I think that is right.
17         Q.    But despite that, the court still found
18   the subject sufficiently certain; right?
19         A.    Yes.  It is illustrative of the point
20   that it all depends on the facts.
21         Q.    Okay.  And in Pearson the court held that
22   law does not lightly allow contracting parties' purposes
23   and intentions to be defeated by supposed uncertainty.
24   Does that sound right to you, Sir?
25         A.    Yes.

Page 267

1          Q.    And the court also said that in all such
2    cases the law fills the consequential gap by implication
3    and by importation of generally accepted principles.
4    Does that sound right to you, Sir?
5          A.    I do not think "in all such cases".
6    I think it tries to do that and sometimes cannot but if
7    it can it will.
8          Q.    Okay.  Do you recall that we looked at
9    one of the research papers where you see the client
10   intermediary relations in the crypto asset world?
11         A.    Yes, I remember.
12         Q.    Do you recall that those authors noted
13   that in Pearson even the right to use the asset would
14   not negate the existence of a trust?
15         A.    Yes.  One has to look at all the
16   circumstances.  In some circumstances it would, but
17   I quite accept, if you say, "I hereby intend to create
18   a trust" and then have three provisions that are
19   completely inconsistent with normal trust law, you have
20   still created a trust.
21         Q.    Do you recall Pearson held that even if
22   an intermediary could take the asset, as long as it had
23   replaced them then that would just be a right to swap
24   which is still consistent with a trust?
25               MR. GLUECKSTEIN:  Object to the form.

Page 268

1          A.    I think one has to look at all the facts.
2    The fact that you can deal with the asset as you like is
3    an indication against there being a trust, but if you
4    spell out there is a trust then the court will try and
5    give effect to that.
6    BY MR. HARRIS:
7          Q.    Do you say a right to swap is not
8    inconsistent with a trust under Pearson?
9          A.    I think that a right to deal with assets
10   as you want is not inconsistent with a trust if the
11   trust permits you to do that.  But unless the trust
12   specifically permits you to do that it is completely
13   antithetical to a trust.  So I think that, yes, a trust
14   can be set up which permits the trustee to do almost
15   anything and it is still a trust provided the parties
16   agree it is a trust.  A point might come where the
17   rights of the trustee are so inconsistent with the
18   concept of a trust that the court will say, "Well, you
19   might call it a trust but I am sorry it is not one."
20   But I am afraid that the problem is it is hard to answer
21   a question like that without specific examples.  But if
22   everything points in favour of a trust except the fact
23   that the trustee can replace assets at will, if that is
24   inconsistent with a trust, then there is a trust.
25         Q.    Okay.  So in the abstract at least the

Page 269

1    parties could set up a trust which permits the trustee
2    to do almost anything as long as the parties agreed that
3    there is a trust?
4          A.    I think "almost anything" may be a bit
5    high but you can have a trust which permits the trustee
6    and indeed the beneficiary to do things which a normal
7    trust lawyer would regard as very inconsistent with
8    a trust.  But, as I say, the point comes where it is so
9    inconsistent the court would say, "This cannot be
10   a trust."
11         Q.    Okay.  At the beginning of 25 you say:
12   "While I hesitate to step into the facts ..."; do you
13   see that?
14         A.    Yes.
15         Q.    What do you mean by "the facts" here?
16         A.    What the precise facts are in terms of
17   the sweep addresses and the point you raised about
18   whether it was possible or nigh on impossible to work
19   out what proportion of a particular pool, a particular
20   customer had.  Those are the sorts of facts which you
21   very fairly put to me.  I do not know.
22         Q.    Okay.  At the end of 25 you refer to the
23   Piroozzadeh case ----
24         A.    Yes.
25         Q.    ---- and you say: "In those

MAGNA ▶
LEGAL SERVICES

Page 270

1  circumstances, it must be an 'essentially futile and
2  close to impossible and possibly impossible exercise' to
3  identify 3AC's proportionate share of the Bitcoin ...".
4  Do you see that?
5      A.    Yes.
6      Q.    Okay.  By "in those circumstances" are
7  you referring to the facts that you were told to assume
8  in the prior sentences?
9      A.    Effectively, yes.  You made the fair
10 point to me that I do not know precisely what FTX can
11 and cannot do about their assets and they told -- and
12 they have not told me what they can and cannot do.
13     Q.    So you do not know whether factually it
14 is futile and impossible to identify 3AC's proportionate
15 share; correct?
16         MR. GLUECKSTEIN:  Object to the form.
17     A.    That is fair.  It strikes me from reading
18 that case and reading Ruscoe that it is clearly quite
19 difficult in, futile, close to impossible, possibly
20 impossible in one case and in another it was clearly
21 difficult to do because in Ruscoe the judge referred to
22 that in the passage you took me to.
23     Q.    Do you recall in the Piroozzadeh case
24 that was an interlocutory case?
25     A.    That is a fair point.

Page 271

1      Q.    So it was not a final decision; correct?
2      A.    No.  Correct.
3      Q.    And it was about an asset that had been
4  stolen from the claimant; right?
5      A.    That is true.
6      Q.    And the claimant itself was not a user of
7  the exchange; right?
8      A.    No.
9      Q.    So the case was not before whether a user
10 of the exchange was in a trust relationship with the
11 exchange; right?
12     A.    That is perfectly fair, but the truth is
13 that what the judge was looking at -- and it is
14 perfectly fair it is an interlocutory decision -- what
15 the judge was looking at was whether it could be done,
16 not whether somebody was entitled to do it or anything
17 like that and I think it was the same sort of exercise.
18     Q.    Well, the court in Piroozzadeh ----
19     A.    I am glad you are having the same
20 problem.
21     Q.    I am having a lot of problem ----
22     A.    It was Trower J's case.
23     Q.    What the court in Piroozzadeh was looking
24 at was whether the digital assets could be traced;
25 right?

Page 272

1      A.    Yes.
2      Q.    The court was not trying to determine
3  whether a percentage of digital assets could be
4  determined; right?
5      A.    That is true but it was the same sort of
6  exercise of masses of different front actions going on
7  over a relatively short period, but it was.  When I say
8  it was the same exercise, you are right, it was
9  a slightly different one.
10     Q.    Okay.  Do you believe that an
11 interlocutory decision such as Piroozzadeh would be
12 strong authority on the issues that it discusses?
13     A.    It is not as good authority as a final
14 decision.
15     Q.    And do you recall that the issue in this
16 case was about whether the plaintiff had properly
17 presented potential defences in an ex parte hearing?
18     A.    You are right, that was an issue, yes.
19     Q.    And in particular the defence that was
20 not properly raised was that a bona fide purchaser will
21 destroy the customer's beneficial property interest;
22 right?
23     A.    Yes.
24     Q.    And that issue is not at play in our
25 case; right ?

Page 273

1      A.    Well, I suppose only to the extent that
2  if somebody purchases the bitcoins that belong to one
3  customer, they are a bona fide purchaser for value.  So
4  to that extent it does apply.
5      Q.    Okay, but that is not the analysis that
6  either you or Dame Elizabeth was going through to
7  determine ownership here; right?
8      A.    No, but if you do go down particular
9  specific assets, the bona fide purchaser for value is
10 the answer.
11     Q.    Okay.  Looking back at your report in
12 paragraph 36.
13     A.    Of my first report?
14     Q.    Sorry, we are in your rebuttal report.
15     A.    36, yes.
16     Q.    So in 36(a) you mention the issue that
17 3AC's digital assets -- "... the value of the
18 unsegregated sweep addresses containing 3AC's Digital
19 Assets may at any time have decreased to zero ...".  Do
20 you see that?
21     A.    Yes.
22     Q.    Do you have some reason to believe that
23 is factually true?
24     A.    No, I have to say that is purely, as
25 I understand it, a possibility.

Page 274

1    Q.   Okay.
2    A.   It is perfectly fair to say it does not
3 go further than that.
4    Q.   What is the relevance of that
5 hypothetical possibility?
6    A.   If one is considering the realistic
7 practicalities, which cases such as Piroozzadeh and
8 indeed Ruscoe suggest, then it seems to me this is
9 something that could be taken into account.
10    Q.   The fact that the denominator might go to
11 zero does not prevent you from knowing the numerator;
12 right?
13    A.   No, but you get nothing.  And the fact
14 that they bring back fresh assets they cannot possibly
15 be the customers who had put in assets before it went to
16 zero because their asset, whatever interest they could
17 conceivably have, has gone.  That is my point.
18    Q.   It would not be possible to trace those
19 assets any more?
20    A.   No, even with the most optimistic
21 tracing, when the asset disappears, you cannot trace it
22 into a new asset, no.
23    Q.   Okay.  So if there is a hundred bitcoins
24 in a fund and a person, a particular customer, held ten
25 bitcoins in day one and the market value dropped to

Page 275

1 zero, they would still -- they could still have 10% of
2 that account; right?
3    A.   It is not the market value dropping to
4 zero, I am sorry I did not make it clear; it is the
5 bitcoins being swept out ----
6    Q.   I see.
7    A.   ---- because FTX decides to -- the
8 bitcoins are about to go, much less -- is going to do
9 much less well than some other digital asset so they
10 just get rid of all their bitcoins and get the other
11 digital asset.  That is what I am thinking about.
12    Q.   Okay.  Do you know whether FTX
13 contractually had the right to do that?
14    A.   I do not, but I know they did a great
15 number of things which, like that, as I understand it,
16 they treated the digital assets in the pool as they
17 wanted.  And again, this is all a little difficult, but
18 if we are assuming, as Dame Elizabeth assumes in places,
19 that you assume the parties know the facts, then the
20 fact that FTX treat it as their own is relevant.
21 I accept this point becomes less relevant if you do not
22 look at the actual facts.
23    Q.   What are the actual facts that you are
24 thinking of in terms of FTX treating the digital assets
25 as its own?

Page 276

1    A.   Well, as I understand it, and I have to
2 say this is what I understand to be the case, they
3 removed and brought in digital assets into the pool as
4 they wanted really.
5    Q.   What is your evidence of that?
6    A.   Well, that is my understanding.  I am not
7 here to give evidence, my understanding.
8    Q.   Has someone told you that?
9    A.   Yes.
10    Q.   Who told you that?
11    A.   That I cannot remember.  It would have
12 been probably -- maybe I misunderstood it, but that was
13 my understanding from Sullivan & Cromwell that bitcoin
14 -- that the digital assets came in and went out.  But if
15 I misunderstood, I am sorry.
16    Q.   Is that fact relevant to any of your
17 opinions?
18    A.   I think the only relevance it has got is
19 in 36(a), that they could have reduced it to nothing.
20 But I suppose it still could be ----
21    Q.   If the contract prevented them from doing
22 that?
23    A.   Then we come back to Dame Elizabeth's
24 point, where do we take into account what actually
25 happened and what the parties knew was happening?  If we

Page 277

1 do not then as I said a minute ago that point 36(a) is
2 much weaker.  But if we do take into account the factual
3 circumstances known to the parties and, as you fairly
4 say, if my understanding is right, then it is relevant.
5 But otherwise not.
6    Q.   So if the agreement prevented legally
7 this scenario from occurring that you describe in 36(a),
8 then you would agree that would not be a reason to not
9 have a quasi-bailment; right?
10    MR. GLUECKSTEIN:  Object to the form.
11    A.   It becomes weaker.  It depends.  If there
12 is a possibility for any reason of the pool of digital
13 assets for any reason going to nil, and that is
14 something the parties anticipate could happen either
15 because -- for any reason, then that is a ground for
16 doubting in practical terms the quasi-bailment
17 apportionment of interest in the pool.
18 BY MR. HARRIS:
19    Q.   Well just to make sure, discussing the
20 terms here, right, the whole quasi-bailment scenario
21 where you have indicated it is likely to be developed is
22 one where the intermediary has the digital keys; right?
23    A.   Yes.
24    Q.   So in every such situation it is
25 theoretically possible that the intermediary could get

MAGNA
LEGAL SERVICES

Page 278

1    rid of the assets and transfer them entirely away;
2    right?
3        A.    I agree, but if we are looking at what
4    happened on the ground, I understand that FTX were
5    fairly loose in the way they dealt with the assets.
6        Q.    Are you saying the customers were aware
7    of that?
8        A.    I do not know.
9        Q.    Okay.
10       A.    That is one of the troubles:  to what
11   extent does one assume those facts?  I would prefer not
12   to make any assumptions about what the clients knew,
13   just to look at the contract.
14       Q.    Okay.
15       A.    But Dame Elizabeth, understandably, and
16   I do not agree with her in certain respects, has gone
17   into the facts and it is fair to say that 36(a) assumes
18   less force if it is something that FTX was not allowed
19   to do.  It assumes no force if FTX could not do it.  But
20   it assumes real force if it is something that could
21   lawfully happen.
22       Q.    Okay.  You also went into the facts.
23   Your analysis relies on the fact that the digital assets
24   are transferred into a commingled account right; Sir?
25       A.    That is true.

Page 279

1        Q.    At 36(b) you mentioned "floodgate
2    concerns".  What did you mean by that?
3        A.    Where would one end up with control?
4    Control has been a fundamental aspect of bailment.  If
5    you have got what amounts effectively to a fungible
6    asset like bitcoin or other digital assets, where would
7    it stop?  Why would it not apply to money, for example?
8    And yet bailment has never applied to money.  And
9    I think this raises a really interesting issue about
10   quasi-bailment.  It is called quasi-bailment because
11   bailment cannot apply to digital assets because they are
12   not physical assets.  They are in some respects like
13   money.
14            The difficult question is when you start
15   to apply something like quasi-bailment or when you
16   invent quasi-bailment and try and apply it to digital
17   assets, quite how does it apply and if you apply it in
18   a certain way is it going to lead to a floodgates
19   argument or an inconsistency.
20       Q.    By "floodgates" you mean applying it to
21   assets that are not digital assets?
22       A.    Yes.
23       Q.    Okay.  Could that be addressed by courts
24   only applying it to digital assets?
25       A.    Well it could be addressed by

Page 280

1    legislation.  But I think the courts might find it quite
2    difficult to say, "We only apply this to digital
3    assets."  The courts are going to have to do some
4    invention, but the advantage of the trust solution is
5    that it does not require any invention and development
6    of the law.  The trouble with quasi-bailment is that it
7    does and in many ways that is better done by Parliament
8    that can take an overall view with legislation than
9    listen to all interested parties and have debates rather
10   than by the courts developing the law on a case-by-case
11   basis.
12       Q.    Despite this floodgate concern it is
13   still your view that the courts are likely to develop
14   a doctrine of quasi-bailment for digital assets; right,
15   Sir?
16       A.    I think either the courts or Parliament
17   will, yes.  I mean, ideally, as I say, it would be
18   Parliament.  The courts will have to do their best and,
19   as I say, I do not want to give the impression that the
20   courts will not develop quasi-bailment.  But, like Dame
21   Elizabeth I think, we have to wait and see and then --
22   I am repeating myself now.  We have to wait and see what
23   its precise parameters are.
24            MR. HARRIS:  Okay.  Why don't we take
25   a break and then we will try to finish off this

Page 281

1    document?
2            THE VIDEOGRAPHER:  We are going off the
3    record.  The time is 7.31.
4            (A short break)
5            THE VIDEOGRAPHER:  We are back on the
6    record.  The time is 7.43 pm.
7    BY MR. HARRIS:
8        Q.    We discussed previously that under the
9    terms of service Three Arrows had certain contractual
10   rights related to the digital assets such as the right
11   to have the Digital asset returned to it; right?
12       A.    Yes, I think that is right, yes.
13       Q.    And do you recall that Three Arrows also
14   had the right to -- that FTX could not loan the digital
15   asset to itself.  Do you recall that also?
16       A.    I certainly remember there is a provision
17   saying they cannot loan it, yes, to FTX, yes.
18       Q.    So you are not giving an opinion that
19   Three Arrows' only contractual right under the terms of
20   service was to be paid its net account balance; right?
21            MR. GLUECKSTEIN:  Object to the form.
22       A.    I have not considered the extent of its
23   rights as such.  I have just considered the issues that
24   I have been asked to consider.
25   BY MR. HARRIS:

1    Q.    Just to be clear you are not giving an
2  opinion that Three Arrows' only contractual right under
3  terms of service was to be paid its net account balance;
4  right?
5         MR. GLUECKSTEIN:  Object to form.
6    A.    I am not saying that is not their only
7  right and I am not saying it is.  I simply am dealing
8  with their rights to the extent I have been asked to
9  deal with them.
10 BY MR. HARRIS:
11   Q.    Okay.  Can we look at your rebuttal
12 report.
13   A.    Of course.
14   Q.    Let us start with paragraph 41.
15   A.    I am sorry, I am looking at the wrong
16 one.  I beg your pardon, yes.  I think I have got there,
17 yes.
18   Q.    Okay.  And this is under a heading
19 "Single Asset Theory".  Do you see that?
20   A.    Yes.
21   Q.    And you say:  "Before addressing the
22 support Dame Elizabeth finds in the Dotcom Terms to
23 answering Question 3 in the affirmative, it is necessary
24 to address the assumptions inherent in the phrasing of
25 Question 3."  Do you see that?

1    A.    Yes, I do.
2    Q.    Do you disagree with any of these
3  assumptions?
4    A.    I cannot judge (a) because I think that
5  is for the New York court to decide, I beg your pardon,
6  for the Delaware court, the Bankruptcy Court to decide.
7  I make a comment on (b).  So far as (c) is
8  concerned ----
9    Q.    Just to pause you on (b) are you
10 disagreeing with that or are you just providing
11 a commentary?
12   A.    No, I think that it assumes it and
13 I think that the liability is probably correct but
14 I just note the point that I make there.
15         So far as (c) is concerned ----
16   Q.    Sorry, just before -- I keep interrupting
17 you, I am sorry.
18   A.    No, no, please.
19   Q.    I just want to make sure I understand the
20 issue.  It is probably correct that liabilities were
21 owed by 3AC to FTX?  Is that what you said?
22   A.    I do not know as a fact that liabilities
23 are owed by 3AC to FTX.  It is assumed that that is the
24 case.  I have not been told either way.
25   Q.    Okay.  And you are not giving an opinion

1  either way?
2    A.    No, no.  I cannot.
3    Q.    I am sorry.  41(c) you were about to
4  continue?
5    A.    To be fair to you I did not answer the
6  question properly so thank you very much.
7    Q.    Okay.
8    A.    41(c); yes.
9    Q.    Are you giving any opinion about whether
10 41(c) is right or not?
11   A.    No, I am not.  I am simply making the
12 point that the question does not identify.
13   Q.    41(d) are you giving an opinion?
14   A.    I am not giving an opinion about that
15 other than the fact that there is a factual -- there may
16 be a factual issue.
17   Q.    Okay.
18   A.    And (e) I am not giving an opinion on
19 that, there may be a legal issue about that.
20   Q.    Okay.
21   A.    So these are just assumptions I am
22 noting.  I am not expressing a view on any of them.
23   Q.    Okay.  In 43 you then discuss principally
24 section 16.2; right?
25   A.    Yes.

1    Q.    And you say:  "... any analysis of the
2  applicability of 'single asset theory' ... should begin
3  with the primary means through which, under the relevant
4  contractual terms, a customer may incur a negative
5  balance ...".
6    A.    Yes.
7    Q.    And you say:  "... in the case of the
8  Dotcom Terms, the margin program discussed in section 16
9  in schedule 3."
10   A.    Yes.
11   Q.    Okay.  What is your basis for saying that
12 the primary way a customer may incur a negative balance
13 is through the margin programme?
14   A.    That would seem to be the contractual
15 terms.  It may be that I was told that.  I cannot, to be
16 honest, remember being told that.
17   Q.    Okay.
18   A.    But I think I may have assumed that.
19   Q.    In 43(b) you say in the middle of it:
20 "As a result, in order to incur a negative balance, a
21 customer consents to the so-called 'single asset theory'
22 by way of the Dotcom Terms which in this context refer
23 to the value of all the customer's 'Assets' in their
24 'Account' ...".  What do you mean by they consent to the
25 "single asset theory"?

Page 286

1    A.    I think what I mean is that in practice
2  it seems to me that the effect of section 16.2 is to
3  look at the assets in the account as a whole and see if
4  it falls below -- they fall below the margin maintenance
5  requirements.  That involves looking at all the assets
6  because they are all in one account.
7    Q.    In 16.2 the customer consented to FTX
8  selling its assets if the customer falls below the
9  margin requirement; right?
10    A.    Yes.
11    Q.    So that means there are assets of the
12  customer to sell; right?
13    A.    Yes.  Well, if there are no assets they
14  cannot sell them.
15    Q.    Okay.
16    A.    So within the account there may be
17  a deficit on one lot of digital assets and a credit on
18  another.
19    Q.    In 43(c) you agree that a customer is
20  entitled to trade its asset if the customer does not
21  have a negative balance; right?
22    A.    Yes.
23    Q.    And by "negative balance" you mean a net
24  account balance?
25    A.    That is exactly right.

Page 287

1    Q.    Okay.  But if they fall into a negative
2  balance they no longer have the right to trade their
3  assets; correct?
4    A.    Well, they have the obligation under
5  16.2.
6    Q.    Okay.  Now the fact that they may lose
7  certain rights if they go into a negative balance, that
8  does not mean that until then they never had those
9  rights; correct?
10    A.    Yes.  I mean, the single asset theory
11  only becomes relevant once they have a negative balance.
12    Q.    Okay.  Let us look at 16.2.
13    A.    Yes, of course.  Page 16.
14    Q.    So 16.2 says: "Margin trading is HIGH
15  RISK."
16    A.    Yes.
17    Q.    And then it says: "As a borrower, you
18  may sustain a total loss of Assets or owe Assets beyond
19  what you have deposited to your Account."  Do you see
20  that?
21    A.    Yes.
22    Q.    So as we discussed this, 16.2 assumes
23  that there are in fact assets that the customer has
24  deposited to the account; right, Sir?
25    A.    Yes, it is looking at a single account

Page 288

1  and saying you may have a loss on one part and assets on
2  the other.
3    Q.    Okay.  And do you see in -- maybe it is
4  the fourth sentence that starts, "If the value of the
5  assets".  Do you see that sentence: "If the value of
6  the Assets in your Account falls below the margin
7  maintenance requirement ...".
8    A.    Yes, I have that.
9    Q.    Okay.  And then it says: "... we may
10  seize and/or liquidate any or all of your positions and
11  Assets on any balance in your Account in order to reduce
12  your leverage or settle your debts to other Users ...";
13  do you see that?
14    A.    Yes.
15    Q.    So this contemplates that one customer
16  could have a debt to another user; right?
17    A.    Well, it is to reduce your leverage or
18  settle your debt to other users.
19    Q.    Okay.
20    A.    So there are two alternatives there,
21  I think.
22    Q.    One of the alternatives it contemplates
23  is that a user has a debt to other users?
24    A.    That is one of the things it assumes,
25  yes.

Page 289

1    Q.    Okay.  So 16.2 suggests that customers
2  both have assets and can also have debts; right?
3    A.    Yes.
4    Q.    If instead of that the only contractual
5  arrangement between a user and the FTX was the
6  requirement for one party or the other to pay the net
7  account value, there would be no need for 16.2; right?
8    A.    Well, what they are saying is they have
9  the right to walk in effectively and effect a stop loss
10  by selling assets if the borrower sustains a loss or his
11  assets are below deposit.
12    Q.    If the customer actually had no
13  contractual rights to any assets, there would be no need
14  for FTX to sell the assets; right?
15    A.    There would be no assets to sell, agreed.
16    Q.    Okay.  If you look at 16.3 it talks about
17  when a user can lend assets to other users; right?
18    A.    Yes.
19    Q.    So that is the user being the lender in
20  the margin programme?
21    A.    That is right.
22    Q.    Okay.  And that suggests that the
23  customer does have assets to lend; right?
24    A.    Yes.
25    Q.    Okay.  So if instead all the customer had

**MAGNA**
LEGAL SERVICES

1  was a net account value, they would not have assets that
2  they could lend; right?
3      A.   No, but they could direct assets to be
4  lent to somebody effectively, yes.
5      Q.   Well, if they did not have any assets and
6  all they had was their net account value, they could not
7  lend assets out; correct?
8      A.   It would depend on the facts, but if they
9  had 20 bitcoin they could lend 20 bitcoin.
10     Q.   Okay.  But if they did not have 20
11 bitcoin and all they had was a $4 entitlement of the net
12 asset value to make FTX pay at $4, they could not lend
13 out 20 bitcoin; right?
14     A.   No, but if they had 20 bitcoin in their
15 account then they could lend 20 bitcoin.
16     Q.   Okay.
17     A.   But if they had a pure margin then there
18 would be nothing to lend, I suppose.
19     Q.   Looking back at your report again in 45,
20 your paragraph 45, at the end of 45, before (a) you say:
21 "I disagree with Dame Elizabeth's construction of the
22 phrase 'debit balance' for the following reasons."  Do
23 you see that?
24     A.   I do.
25     Q.   What do you think the term "debit

1  balance" means?
2      A.   I think it means a debit balance on the
3  account as a whole.
4      Q.   Okay.  You would agree section 10 is
5  about amounts that the user owes to FTX; is that right,
6  Sir?
7      A.   I think it does, yes.
8      Q.   And section 16.2 is amounts that the user
9  owes to other users; right?
10     A.   It is the amount they owe to other users
11 or leverage, deficit.
12     Q.   Okay.  So what are the liabilities that
13 the customer owes to FTX under section 10?
14     A.   Under section 10, if there is a debit
15 balance, the customer has to pay the fees set out in the
16 schedule, the total debit balance, and whatever else is
17 provided for in the terms.  If they do not, then it is
18 open to FTX to suspend the ability under -- to use the
19 services under 10.2 and so on.
20     Q.   What does it mean in your view to recover
21 the debit balance?
22     A.   It means to do its best to recover what
23 it can get.
24     Q.   I think that was a circular answer.  What
25 does it mean to recover the debit balance?

1      A.   It means to recover as much as -- If
2  there is a debit, it means it can recover to reduce or
3  extinguish the debit balance.
4      Q.   Okay.  So recovering the debit balance
5  means to reduce or extinguish the debit balance?
6      A.   Yes.  I mean, I see Dame Elizabeth's
7  point that if it is in debit overall and you sell the
8  assets, you are not going to be able to reduce the debit
9  to nothing if it leaves the account because by
10 definition it is in debit.  I see that point.  But
11 I think that that gives a totally artificial meaning to
12 it if at any time your account has a debit balance.
13 I think it is looking at the account and seeing if it
14 has a debit balance.  And "recover", I accept it may not
15 be its primary meaning, but basically it is to get back
16 what we can.
17     Q.   So if assets are sold for fair value,
18 then the net account balance would not change; right?
19     A.   Then the net position would not change
20 but would you have stopped the loss.
21     Q.   You would not have reduced the debit
22 balance; right?
23     A.   You probably would not have reduced the
24 debit balance, no.
25     Q.   Okay.  At paragraph 46, there is

1  a discussion about section 38.7.2.
2      A.   Yes.
3      Q.   And then that section is about
4  a contractual right of set-off?
5      A.   That is right, yes.
6      Q.   Okay.  Now if a customer does not have
7  any digital assets or liabilities there would be no need
8  to set them off; right?
9      A.   I agree.
10     Q.   And you are not giving an opinion whether
11 or not the customer had assets and liabilities; right?
12     A.   You are quite right.
13     Q.   Okay.  So you are not giving an opinion
14 whether the single asset theory is correct or not;
15 right?
16     A.   I find the single asset theory, I have
17 always found it quite difficult to understand.  I am --
18 perhaps it is my fault, I am somebody who tends to work
19 out what the parties' rights are by reference to what
20 they have agreed rather than to some theory.  But it
21 seems to me that FTX's rights under the two clauses
22 which we have been considering, section 16 and section
23 10, mean that if the client -- if the customer gets into
24 a negative situation, then there is effectively a right
25 of set-off in which case I think that is inconsistent

Page 294

1  with the single asset theory.  But I accept that if the
2  client is not in debit then the single asset theory does
3  not apply.  But I would rather just analyse what the
4  parties' rights are under clause 16 or section 16 and
5  section 10 rather than getting into an argument about
6  what the single asset theory means.
7      Q.    Okay.  I just want to make sure I have
8  your testimony correctly.  I think you said you find the
9  single asset theory difficult to understand.  Is that
10  right?
11      A.    I just find it slightly difficult because
12  to some extent it may mean different things to different
13  people.  What I prefer do is to decide what the parties
14  rights are.
15      Q.    Okay.
16      A.    And I think the single asset theory may
17  not apply in this case while the client is in credit but
18  I think it may apply when the client is in debit because
19  of clauses 16 and 10.
20      Q.    Okay.  So if I understand right, you
21  think it probably does not apply when the client has
22  a positive net asset value; is that right?
23          MR. GLUECKSTEIN:  Object to the form.
24      A.    I think that is right, yes.
25  BY MR. HARRIS:

Page 295

1      Q.    And when the client has a negative asset
2  value, then you believe that essentially FTX has the
3  right to offset the debit, the liabilities ----
4      A.    Exactly.
5      Q.    ---- and assets?
6      A.    Yes.
7          MR. GLUECKSTEIN:  Object to the form.
8      A.    So in a sense I am saying that the single
9  asset theory, if I understand it correctly, does not
10  apply while the client is in credit but it does apply
11  when he is in debit overall.
12  BY MR. HARRIS:
13      Q.    So up until the trigger of going into
14  a debit overall balance, you read the terms of service
15  to mean that the customer can have assets and
16  liabilities?
17          MR. GLUECKSTEIN:  Object to the form;
18  misstates testimony.
19      A.    I think so.
20  BY MR. HARRIS:
21      Q.    The last topic I want to go through is
22  the -- well, I do not believe a lawyer -- do not believe
23  a lawyer who ever says that!
24      A.    I know the feeling!
25      Q.    I have more topics than that.  I am going

Page 296

1  to go to what you call, "The Remaining Questions" which
2  starts on paragraph 48.
3      A.    Okay.
4      Q.    In paragraph 49 you say: "... dismissal
5  of Dame Elizabeth's primary case would, in many senses,
6  be determinative of these remaining [issues] ...".  Do
7  you see that?
8      A.    Yes.
9      Q.    Which issues would it be determinative
10  of?
11      A.    Well, I put a note in that Question 7 is
12  an example.  What I am really saying is that her -- if
13  she is wrong in there being an equitable interest then
14  at least Question 7 goes.  I am not absolutely sure
15  which other questions go.  I think it may well be that
16  the exclusion clause is not relevant because at least
17  that goes in part ----
18      Q.    Okay.
19      A.    ---- because it refers to equity and if
20  there is no trust then equity does not matter.
21      Q.    Does your report contain all of the
22  meaningful disagreements you have with Dame Elizabeth on
23  the remaining issues?
24      A.    Yes, I think it does, yes.
25      Q.    Okay.

Page 297

1      A.    I have tried to limit it to what
2  I disagree with.  There may be one or two little things
3  that do not matter which I do not agree with but
4  I concentrated on things, on disagreements that I think
5  matter.
6      Q.    Okay.  On Question 4, am I right that the
7  only issue you address is the construction of section
8  16.2 and section 10?
9      A.    I think you are right, yes.
10      Q.    Okay.  You say that you interpret 16.2 to
11  mean that FTX can sell assets to reduce leverage?
12      A.    Yes.
13      Q.    Not simply to settle the customer's debts
14  to other users?
15      A.    That is right.
16      Q.    So what implication, if any, does that
17  clarification you make have on whether the terms
18  authorises FTX to appropriate customer assets?
19      A.    Sorry, where are we looking?
20      Q.    Well, Question 4 says: "If FTX had
21  carried out or permitted action(s) that resulted in the
22  sale, transfer, or liquidation of some or all of the 3AC
23  Assets between 12 June and June 14, 2022, would the
24  terms have authorised such action(s)?"
25          I am just wondering what is the relevance

MAGNA ▶
LEGAL SERVICES

Page 298

1  of the fact that you give the opinion that section 16.2
2  allows FTX to sell assets to reduce leverage?
3      A.    Well, "In danger of defaulting on a loan
4  we may seize and/or liquidate any of our positions and
5  assets on any balance in your account in order to reduce
6  your leverage."  That is the provision I had in mind.
7      Q.    So you are saying if the assets were sold
8  to reduce leverage then it not be in violation of the
9  terms of service?
10      A.    Absolutely, yes.
11      Q.    Okay.  You do not say that you disagree
12  with Dame Elizabeth that there is no general
13  authorisation for FTX to sell a user's assets; right?
14      A.    I think the three provisions of relevance
15  are the ones I identified at clause 10, clause 16 and
16  clause 37.6, or whatever it was.
17      Q.    Okay, other than the authorisations if
18  any in those ----
19      A.    38.  Sorry, can I just correct what
20  I said?
21      Q.    Yes.
22      A.    I do beg your pardon, 38.7.2 was what
23  I meant, sorry to interrupt.
24      Q.    No.  So to the extent there is an
25  authorisation of FTX to sell a customer's assets it

Page 299

1  would be what is described in those three provisions?
2      A.    Yes.
3      Q.    There is no free-standing authorisation
4  for FTX to sell customer assets other than as you just
5  described in those three provisions?
6      A.    Those are the three provisions I rely on
7  and there are not -- if there are others I have not
8  found them so, yes, those are the three.
9      Q.    Okay.  Do you disagree with Dame
10  Elizabeth's opinion that her contractual analysis does
11  not depend on whether 8.2.6 created a trust over the 3AC
12  digital assets?
13      A.    In relation to that point?  Yes, I think
14  I do, yes.  In relation to Question 4, yes.
15      Q.    You do disagree?
16      A.    No, I do not disagree.  Sorry.
17      Q.    Sorry.
18      A.    My fault, my fault.
19      Q.    Do you agree with her opinion that if FTX
20  appropriated the digital assets without authorisation
21  that would amount to a breach of clause 8.2.6?
22      A.    I have not fully considered that.  That
23  depends.  I am not sure it would.
24      Q.    Are you giving an opinion one way or
25  another?

Page 300

1      A.    I am not giving an opinion one way or the
2  other because I have not thought about it.
3      Q.    Okay.  Are you giving an opinion whether,
4  assuming Dame Elizabeth is correct that a trust has been
5  created, then are you giving an opinion that if that is
6  the case that FTX's actions in appropriating assets
7  would be a breach of trust?
8      A.    I have not checked all the terms of the
9  contract to see whether that is so.
10      Q.    So you are not giving an opinion one way
11  or another?
12      A.    I am not giving an opinion on it.
13      Q.    Okay.  Let us go on to Question 5 then,
14  which is: "To the extent that FTX's conduct deprived
15  3AC of, or removed, 3AC's ownership rights (if any) ...
16  would such conduct ... give rise, as against FTX, a
17  breach of contract claim, a claim in restitution, a
18  claim in conversion, a breach of trust claim, and/or a
19  breach of fiduciary duty claim?"
20          You are not giving an opinion regarding
21  her Question number 5; right?
22      A.    I do not think so.  I mean, I think it is
23  section 30.2 but I am not sure that comes into -- I am
24  afraid I have not identified which questions I am
25  dealing with, which is not very clever of me.  I have

Page 301

1  just identified which points I am making, (a) (b) and
2  (c).  I am not sure whether Question 5 deals with the
3  exclusion cause in section 30.
4      Q.    Okay.  Other than what impact 30.2 has,
5  you do not recall any other opinion you are giving
6  regarding Question 5?
7      A.    I think that is a fair question.
8      Q.    Okay.
9      A.    There is the Attorney General v Blake
10  point, that is the only other one.
11      Q.    Right.  In terms of sections 30.1 and
12  30.2, you say 30.1 will not exclude loss or damage
13  resulting from actual fraud; right?
14      A.    Absolutely.
15      Q.    What does "actual fraud" mean?
16      A.    It means fraud.
17      Q.    Okay.
18      A.    Fraud:  sometimes people talk about
19  equitable fraud which I do not think is covered by fraud
20  here.  It is arguable.  I have not considered that.  But
21  certainly actual fraud is certainly covered.
22      Q.    Could a court find the misappropriation
23  of customer assets constituted actual fraud?
24      A.    That would depend on facts, but it could
25  do.

Page 302

1    Q.   Okay.
2    A.   It would have to find effectively
3  dishonesty.
4    Q.   Would you agree you cannot have
5  a provision to allow one party to misappropriate the
6  property of another party?
7    A.   No.  I think in general you cannot have
8  -- basically you cannot have a provision which excludes
9  liability for anything that involves ultimately
10  dishonesty or personal injury or death.  But I think
11  misappropriation is too wide and innocent
12  misappropriation -- I mean, trusts which we have
13  discussed regularly have provisions which exclude
14  liability for a trustee who misappropriated assets in
15  good faith.
16    Q.   Okay.
17    A.   But anything involving dishonest
18  misappropriation I would agree with you.
19    Q.   So you would agree this provision does
20  not relieve the trustee from liability for
21  misappropriating property that does not belong to the
22  trustee; right?
23    A.   I think it does not exclude it from being
24  liable for dishonest misappropriation.
25    Q.   What do you mean by "dishonest"?

Page 303

1    A.   Well, that is a question which judges
2  have struggled with in this country from time to time.
3  I am not entirely happy, I am not prepared really to
4  define it.  On the whole, most judges know it when they
5  see it.  I think taking money you know is not yours and
6  with a view to not returning it could easily be
7  dishonest.  But it depends so much on the particular
8  facts of the case and the mind of the person doing the
9  misappropriation.
10    Q.   Okay.  You also give an interpretation of
11  section 30.2; right?
12    A.   That is right.
13    Q.   You would agree 30.2 only limits the kind
14  of damages that can be incurred; right?
15    A.   It says it cannot be liable and then it
16  sets out various areas.  It is hard to think of
17  a broader provision, contract, tort, equity, statute or
18  any other cause, arising out of or in connection with
19  your use or inability to use the services.
20    Q.   But do you see at the end of that it then
21  says "4" and then it has a colon and then a list of
22  damages you cannot be liable for?
23    A.   Yes.
24    Q.   So it is not saying you cannot be liable.
25  It is just saying you cannot have those particular kinds

Page 304

1  of damages; right, Sir?
2    A.   That is a fair point.  If you have -- if
3  you can find damage which is not within 30.2.1, then
4  I accept it is not excluded by 30.2.  That is a fair
5  point.
6    Q.   And you are not giving an opinion as to
7  what kinds of damages would or would not be excluded by
8  30.2.1 or 30.2.2; right?
9    A.   That is right.  I think the problem is
10  that unless one has the facts relating to the alleged
11  damage, one cannot really say whether it falls within
12  30.2.1 or 2 or does not fall within it.
13    Q.   Okay.  It would not exclude, for
14  instance, direct damage from a breach of contract;
15  right?
16    A.   I think -- calling it "direct" does not
17  necessarily help.  If it is loss of goodwill or loss of
18  revenue or loss of profit, that could be direct, but
19  that seems to be excluded.
20    Q.   Okay.  You are not saying that this
21  contract provision excludes all breach of contract
22  claims; right?
23    A.   I could not possibly say that, but what
24  I can say is if you had a particular claim for breach of
25  contract you would have to see whether it falls within

Page 305

1  30.2.1 or 30.2.2.  And if your point, as I understand
2  it, is if it would not fall within that, then I accept
3  it would not be excluded.
4    Q.   Okay.  Do you see, if this is helpful, if
5  you go back to paragraph 48 of your rebuttal report?
6    A.   Sorry, yes.
7    Q.   You see Question 6 has an (a) and a (b)?
8    A.   Yes.
9    Q.   And you do not address or provide an
10  opinion regarding Question 6(b); right?
11    A.   You are right.
12    Q.   And then Question 7, the only commentary
13  you make on it is what we discussed in Footnote 9;
14  right?
15    A.   That is right.
16    Q.   Let me make sure I understand that,
17  though.  You agree that a party can have contractual
18  rights that it owns; correct?
19    A.   Yes.
20    Q.   Okay.  It does not require -- and you do
21  not disagree that Three Arrows in fact owned the
22  contractual rights associated with the futures contracts
23  that it entered into; right?
24    A.   Yes.  It is unusual language to say "own
25  contractual rights", but we normally talk about having

MAGNA
LEGAL SERVICES

1  contractual rights but that is a rather pernickety
2  point.
3        Q.    Okay.  Just a few more points, sorry.
4  These are on the proper standards for contractual
5  interpretation.  Do you recall that you have indicated
6  that clear words are necessary in order to create
7  property rights?
8        A.    In general, yes.
9        Q.    Okay.  I assume that standard applies to
10  FTX as well as to Three Arrows; right?
11       A.    Yes.  If you want to say your rights
12  arise under a contract, you have to point to the
13  contract and be able to show that the contractual right
14  arises in that way, yes.
15       Q.    So for FTX to have property rights there
16  must be clear words granting FTX property rights?
17       A.    If they are said to arise under contract,
18  yes.
19       Q.    Okay.  But I take it your view is that
20  FTX's property rights in the digital assets did not
21  arise under contract but rather by operation of the
22  sweeping of the digital assets?
23       A.    Effectively, yes.  They had control and
24  possession of the assets.
25       Q.    Okay.  You also discussed the rule

1  against surplusage; right?
2        A.    Yes.
3        Q.    Do you know if Dame Elizabeth said she
4  was relying on that rule?
5        A.    In practice she was because she was --
6  I do not have her statement in front of me, but in
7  practice she was because she was saying something was
8  unnecessary if it was saying the same thing.
9        Q.    Is there a difference between relying on
10  the rule of surplusage versus indicating that
11  a contractual provision needs to have meaning?
12       A.    They are different things.  Surplusage is
13  saying you have got two provisions in the contract which
14  appear to mean the same thing.  So you say one of them
15  must mean something different because you cannot have
16  two provisions saying the same thing; whereas giving
17  a provision meaning is saying, "You have one provision
18  and I cannot work out what it means, but if I can give
19  it a meaning I will."  But ----
20       Q.    So the rule against surplusage does not
21  apply when there is only one provision in the contract
22  addressing a particular topic?
23       A.    That is perfectly true.
24       Q.    Okay.
25             MR. GLUECKSTEIN:  Can you tell us where

1  we are in time, please?
2             THE VIDEOGRAPHER:  We have done 6.52.
3             MR. HARRIS:  I am going to stop now.
4             MR. GLUECKSTEIN:  All right.  Let us go
5  off the record.
6             THE VIDEOGRAPHER:  We are going off the
7  record.  The time is 8.19 pm.
8             (The deposition was concluded)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    ERRATA
2         11TH NOVEMBER 2025 - DEPOSITION OF
3       THE RT. HON. LORD NEUBERGER OF ABBOTSBURY
4
5  PAGE/LINE      FROM           TO
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

1
2               CERTIFICATE OF WITNESS
3
4
5          I, THE RT. HON. LORD NEUBERGER OF
6    ABBOTSBURY, have read the foregoing deposition and
7    hereby affix my signature that the same is true
8    and correct, except as noted above.
9
10
11
12
13
14   ..........................
15   THE RT. HON. LORD NEUBERGER OF ABBOTSBURY.
16
17
18
19   ..........................
20   DATE
21
22
23
24
25

1
2               CERTIFICATE OF REPORTER
3
4    I, Nia Davidson, a reporter certified by the British
5    Institute of Verbatim Reporters, hereby certify to the
6    following:
7          That the witness, The Rt. Hon. Lord Neuberger of
8    Abbotsbury, was duly sworn by me and that the transcript
9    of the oral deposition is a true and accurate record of
10   the testimony given by the witness, transcribed to the
11   best of my skill and ability.
12         I further certify that I am neither counsel for,
13   related to, nor employed by any of the parties or
14   attorneys in the action in which this proceeding was
15   taken and further that I am not financially or otherwise
16   interested in the outcome of the action.
17
21   ....................
22   Nia Davidson
23
24   Date:   13 November 2025
25

MAGNA
LEGAL SERVICES

**A**

**abandoned**
187:16,19 188:3,18
190:13 193:1 231:2
231:13,16

**abandoning**
192:1,11

**abandons**
191:18

**Abbotsbury**
1:13 3:3 4:5 5:7
309:3 310:6,15
311:8

**abide**
242:17

**ability**
66:18 67:5,13 68:22
69:9 251:12 261:1
264:1 291:18
311:11

**able**
24:3 28:6 44:24
83:17 84:24 135:10
187:10 192:20
219:10 223:22
228:21 245:10
257:15,23 292:8
306:13

**above**
147:8 310:8

**absence**
145:6 227:16 254:5,8

**absolutely**
19:11 21:5 75:11
107:12 117:19
242:25 253:14
257:24 296:14
298:10 301:14

**abstract**
268:25

**absurd**
228:18

**academic**
106:19 122:25 123:5

**academics**

226:11

**accept**
87:19 117:15 125:17
145:17 148:9 166:8
224:25 245:6
267:17 275:21
292:14 294:1 304:4
305:2

**accepted**
147:18 245:7 265:16
267:3

**accidently**
113:10

**accordance**
230:12

**according**
57:18 111:2 147:3
155:15 164:25
249:9

**accountholder's**
144:21

**accountholders**
137:18 140:8 143:23
144:10,17 147:16
147:17

**accounts**
57:16 59:10 61:2,14
65:12,13,15,15,17
75:10 77:3,13
125:13 130:10
136:7,19 152:16,18
179:5 199:8 230:10
230:11 265:1

**accurate**
14:2 185:14 311:9

**accurately**
131:21

**achieved**
162:23 163:1

**acknowledge**
241:23

**acquire**
164:14 170:16
174:14

**acquired**

58:19,21 78:16
173:15,16 174:16
174:25 175:3 223:7

**acquires**
162:16 171:2 173:10

**acquiring**
55:15 56:2

**act**
53:12,20 55:14
119:14,17,21 120:3
143:1

**acted**
18:1 94:11,12,13,14
94:15,17,21

**acting**
19:11 53:23

**action**
56:1 116:22 178:24
178:25 311:14,16

**actions**
178:12,20 272:6
300:6

**action(s)**
297:21,24

**activities**
175:16 176:8,10,22
176:24 177:11,16
178:1,9,13,16,21

**activity**
177:7

**acts**
116:24

**actual**
66:9,15 111:11
229:23 256:13,17
275:22,23 301:13
301:15,21,23

**actually**
14:3,18 16:2 17:8
20:16 39:3,7 41:4
72:9,14 80:18 92:4
96:20 135:13,18
171:15 204:5 211:6
211:8 217:18
229:19 236:19

244:17 245:14
253:9 276:24
289:12

**add**
28:17 239:1 247:8,8

**added**
31:14,16

**adding**
27:13 59:6

**addition**
40:16 109:6

**additional**
143:7 145:3

**address**
32:13 76:18 79:17
83:9 117:2 132:19
154:6,21 160:11,15
161:2,4,5 185:19
282:24 297:7 305:9

**addressed**
184:7 185:15 279:23
279:25

**addresses**
73:17,21 74:1 76:22
77:5,6 80:4 81:6,12
81:16 115:1 124:2,8
153:24 156:16
160:19,24 203:12
203:22 204:4,9
238:4 269:17
273:18

**addressing**
282:21 307:22

**adds**
127:20

**adhere**
132:23

**adjust**
65:23

**admissible**
242:4 243:25

**admission**
219:4

**admit**
88:4 105:21 239:6



260:18
**adopt**
123:10 127:15,16
236:9
**adopted**
33:25 104:13
**adopting**
128:2
**advance**
20:3 139:14
**advantage**
280:4
**advice**
94:6 176:17
**affect**
45:6 62:4,18,21
230:19
**affected**
60:24 62:14 175:16
176:8,10,22
**affiliate**
187:20 191:16
**affirmative**
282:23
**affix**
310:7
**afraid**
15:17 30:5 75:11
102:8 129:2 206:16
215:2 226:6 228:19
268:20 300:24
**after**
6:1,2 18:14 21:2 28:3
43:25 44:7 45:20
51:10 62:12 74:13
83:1 142:5 159:7
222:17
**afternoon**
5:11,14
**AG**
16:8
**again**
11:18,19 12:23 19:3
21:12 25:15 26:11
28:19 29:5,13,24

31:15 35:18 36:8
37:9 40:5 41:2
42:20 58:24 60:8
63:22,25 71:20 81:9
82:22 115:6 133:23
135:10 138:14
154:1 168:22
178:13,17 186:24
196:8 204:6,16
223:18 230:24
233:18 240:19,21
254:19 255:23
256:20 261:16
275:17 290:19
**against**
16:18 141:14 142:1
142:16 185:10
204:12 216:5 219:4
268:3 300:16 307:1
307:20
**age**
149:7
**agency**
54:24 55:11,24 196:6
**agent**
55:3,4,6,9,14,16,25
56:2,10 261:6
**ago**
242:10 277:1
**agreed**
49:12,17 50:2 54:5
56:8 66:23 101:17
113:14 114:5
122:20 148:14
150:8 158:17
159:16 163:24,25
171:24 188:17,17
194:15 205:9,19,19
224:6 240:20 269:2
289:15 293:20
**agreeing**
49:18 133:18 195:23
219:9
**agreement**
75:18 111:22 124:11

126:22 134:10
157:19 158:16
159:21 166:2
168:15 170:8 224:1
241:21 242:3 243:2
243:5,7,22,25
244:18 245:15,20
245:21 261:19
262:22 277:6
**agreements**
54:2 158:15 245:7
**agrees**
36:9 56:11
**ahead**
67:23 170:5
**air**
215:1
**al**
1:6 4:5
**albeit**
21:16 99:21
**alleged**
139:15 304:10
**allocated**
80:15 195:21
**allocating**
130:15 140:8,13,18
**allow**
266:22 302:5
**allowed**
262:22 278:18
**allows**
298:2
**almost**
11:23 16:17,20
150:21 172:14
268:14 269:2,4
**alone**
100:7
**along**
17:3 33:20 112:24
135:14
**aloud**
232:22
**already**

14:6 65:7 87:14 92:5
189:17 190:21
204:5 211:12
**also**
2:20 5:1 18:19 21:1
24:6 25:17 30:15
35:23 40:16 41:16
49:10 52:5,9 65:12
71:12 72:4 77:8
78:13 79:14 81:19
82:5 114:24 116:15
116:16 121:14
140:17 141:2,25
143:18 144:1 148:5
162:24 186:14
196:2 212:18 230:2
243:3,7 252:2 267:1
278:22 281:13,15
289:2 303:10
306:25
**alter**
47:23 61:4 173:19
206:24,25 219:6,7
230:13
**alternatively**
249:7
**alternatives**
288:20,22
**although**
10:7 19:16 28:4
29:17 101:2 104:21
114:11 199:12
218:14 250:22
**altogether**
219:19
**always**
33:2,3,17 51:23
63:22 84:24 187:8
201:5 218:24
226:19 229:14
246:1 265:5 293:17
**ambiguity**
104:17 238:22 239:4
**ambiguous**
43:19 202:24 203:1



238:15 239:3
**ambitious**
46:7
**amend**
187:9,10
**amended**
146:15 147:9,18
**amendment**
147:22 240:20
**amendments**
27:12,13 29:12,13
**American**
16:16 35:7
**Americas**
2:5
**among**
25:14 174:4
**amount**
85:13 134:24 247:5
247:23 291:10
299:21
**amounts**
262:24 279:5 291:5,8
**analogies**
260:21
**analogy**
258:1,8,13,19,25
260:11,18,22
261:13
**analyse**
21:17,22 69:8 294:3
**analyses**
102:19
**analysing**
116:3
**analysis**
19:5 20:22 33:7
34:21 35:14 82:14
82:17,23 83:1
109:13 123:4 226:1
230:9,13,16,19
230:20 235:12
236:6 273:5 278:23
285:1 299:10
**and/or**

208:4 288:10 298:4
300:18
**annex**
87:22
**announce**
170:15
**announced**
6:16
**another**
14:17 29:3 39:25
50:11,12 64:2 78:9
80:25 87:14 92:3
105:16,18,22
110:16 141:16
148:11 164:21
173:16 187:12
191:12 192:19,23
220:8 234:6 240:21
243:15 245:21
257:10 260:13,25
270:20 286:18
288:16 299:25
300:11 302:6
**answer**
6:6 10:22 18:17,21
19:25 24:24 30:2,4
30:7,20 31:21,22
34:3 36:19 37:11
64:24 67:17,19 68:6
68:7 74:3,11 84:2
88:9 98:24 113:16
182:1 213:24 215:1
234:2 268:20
273:10 284:5
291:24
**answered**
25:5 65:7 199:17
**answering**
34:11 132:23 142:10
282:23
**anterior**
145:14
**anticipate**
277:14
**Antigua**

22:18 72:23
**Antiguan**
21:20,21,23,25 22:2
22:6,9,25 23:3,4,5
72:22,23
**antithetical**
268:13
**anxious**
19:3 55:19 262:4
**anyone**
23:22 95:11 96:22
116:25 122:25
227:16 257:20
**anything**
5:22 8:2 9:9 12:10
18:8 34:8 35:13
38:6 48:11 60:2
61:16 75:25 79:5
98:5 104:10 149:16
153:9 154:25
158:13 159:3
176:19 191:7
218:17 219:8
247:10 263:25
266:7 268:15 269:2
269:4 271:16 302:9
302:17
**anyway**
56:10 169:4 229:9
240:14
**anywhere**
80:1 135:4 169:18
171:7
**apart**
12:24 24:16 75:25
**apologise**
72:25
**Appeal**
11:24 18:7 93:8,8
**Appeal's**
19:1
**appear**
68:18 102:22 111:23
132:22 134:15
135:3 138:5 307:14

**appears**
20:8 78:22 200:12
**appendix**
13:23 14:14 87:22
**applicability**
119:22 285:2
**applicable**
82:15 108:7 191:16
**application**
18:10 241:4
**applied**
38:9 212:25 279:8
**applies**
232:7 306:9
**apply**
49:23 72:4,14,21
96:1 98:2 111:10
119:17 205:8
214:23 220:23
241:17 243:1 273:4
279:7,11,15,16,17
279:17 280:2 294:3
294:17,18,21
295:10,10 307:21
**applying**
84:21 279:20,24
**apportionment**
88:24 277:17
**appreciated**
206:14
**approach**
28:8 107:2 122:4,5
127:2,13,16,19
**approached**
22:1
**approaches**
137:11
**appropriate**
88:11 225:12 230:2
236:9 297:18
**appropriated**
299:20
**appropriately**
91:7
**appropriating**



300:6
**approval**
133:15 255:13
**arbitration**
10:10 26:9
**arbitrations**
8:8 10:10,17
**arbitrator**
26:9
**archetypal**
198:6
**area**
8:4 23:6 35:9 86:25
99:17 233:12
252:16
**areas**
7:17 23:6 29:17 37:5
38:9 93:16 303:16
**arguable**
78:13 225:9 301:20
**arguably**
134:18 165:12
**argue**
55:3 133:17 134:7
156:20 173:13
265:6
**argued**
138:6 193:3,4,5
**argument**
112:6 169:2 184:7
193:6 244:13 245:3
245:3 261:13
264:16 279:19
294:5
**arguments**
246:7
**arise**
95:22 192:7 306:12
306:17,21
**arises**
116:24 253:24
306:14
**arising**
178:3 222:16 303:18
**arm**

25:25
**Armitage**
53:16
**Arnold**
64:2 205:6
**arose**
250:16
**arrangement**
39:1 50:21 54:15
63:19 81:15 118:1
186:18 196:12,24
234:4 261:3 262:17
289:5
**arrangements**
54:2 117:21 242:13
**arrive**
32:19
**arrogant**
9:16 23:25
**Arrow**
37:24
**Arrows**
1:15 2:3 5:13 150:4
175:10 226:17,20
226:25 227:2,5,8,11
228:25 229:15,17
250:5,18,25 251:6,8
258:18,23 260:14
281:9,13,19 282:2
305:21 306:10
**Arrows's**
229:13
**article**
3:14,17 102:14
103:18,23 104:17
105:3,16,18 106:3,8
110:2 115:14
**articles**
9:22 104:8
**article's**
104:21
**artificial**
292:11
**Arts**
14:4

**ascertain**
100:25
**ascertained**
119:5 126:21
**ashamed**
136:14
**aside**
24:19 123:21 152:6
**ask**
5:19,21 6:6 19:6 24:6
29:5 40:24 50:18
61:12 69:12 70:21
70:25 71:22 75:22
83:24 86:18 92:3
94:23 98:13 110:15
118:6 148:11 149:4
162:9 202:18
212:17 225:20
241:3
**asked**
9:7 19:9 20:15,19
21:10,13,17,22 24:9
24:10,11,12 39:20
49:9 60:1,12 67:18
68:16,17,24 69:3,7
69:8 70:5,17 72:3
72:11 73:2,3,9
86:17 88:16 95:14
109:2,24 199:13,16
207:19 213:21,23
226:22 281:24
282:8
**asking**
6:2 24:18 25:8,10
46:17,18 67:25,25
68:3 74:25 77:17
118:6 150:10
154:13,14 199:14
254:23
**aspect**
7:14,18,21 8:2 37:12
279:4
**aspects**
7:12,22 33:14,16
147:6 163:14

**assessing**
117:24
**assigned**
97:15,23
**assistance**
200:14 201:11,13,17
201:19 202:1
**assisted**
25:18
**assisting**
104:2
**associated**
79:17 80:4,23 81:6
81:12 265:1 305:22
**assume**
39:20 48:24 60:2
70:5,17 72:3,11,19
73:3 81:20 105:10
140:23 179:14
182:24 208:5
242:22 252:14
260:19 261:25
270:7 275:19
278:11 306:9
**assumed**
21:7 44:9 59:16,18
72:20 77:11 78:6
283:23 285:18
**assumes**
231:4 248:25 249:7
249:11,12,13,15,22
250:1,4 275:18
278:17,19,20
283:12 287:22
288:24
**assuming**
26:12 126:8 207:25
249:3 275:18 300:4
**assumption**
58:25 60:3 72:18
73:2,9,11 77:17
108:16 183:1
**assumptions**
24:9 68:13 69:13,14
69:18 71:22 179:7



210:2 229:24
278:12 282:24
283:3 284:21
**assurance**
7:21
**assured**
221:7
**assuring**
217:6
**attached**
14:21 184:12
**attempt**
129:19
**attempts**
190:18
**attention**
90:15 91:18 132:7
133:4
**attitude**
242:20
**Attorney**
301:9
**attorneys**
17:14 61:12 311:14
**attractive**
16:25
**August**
146:15
**Australia**
36:4
**Australian**
36:9,12,16
**authored**
106:7
**authorisation**
298:13,25 299:3,20
**authorisations**
298:17
**authorised**
297:24
**authorises**
297:18
**authorities**
23:18 40:16 124:14
188:7 247:18 248:3

**authority**
32:14 36:1 102:2
105:23 218:13
272:12,13
**authors**
105:25 106:7 108:2,6
109:6 110:6 111:2
111:20 267:12
**Availability**
220:1
**available**
44:12,19 45:9,16
46:8,10,19 47:13
71:8,12,17 73:22
74:2 76:11 98:18
181:14 182:4,6,7,16
182:18 184:24
193:8
**Avenue**
2:5
**average**
209:17
**avoid**
254:16
**aware**
17:20 31:24 32:2
59:22,25 60:5,8,25
61:5,14 66:17 67:4
71:11,14,17 74:21
75:9,15 80:21 89:15
90:5,17 91:14 117:2
148:4 160:15,23
163:19 179:3
203:24 204:25
254:25 278:6
**away**
43:16 59:7 64:10
278:1
**awfully**
133:7

———————
B
———————
**b**
3:7 13:23 14:15 50:8
74:3 101:13 126:9

150:21 155:15
186:14,15,25
187:10 189:17
194:16 206:25
214:22 221:13
257:8 283:7,9 301:1
305:7
**back**
8:16 11:5 13:22
14:24 19:2 23:7
27:14,15 28:13,18
31:21 42:11,21 63:4
71:20 72:24 73:1
86:1 87:21 94:22
95:15 98:10 114:12
123:22 124:21,22
129:5 135:7,8,9
137:2 148:22
161:18 171:14
173:6 178:14
185:20 200:9 205:6
205:16 212:17
215:22 225:20
228:1 229:2 230:17
231:9 234:1 240:21
263:14,18,24
273:11 274:14
276:23 281:5
290:19 292:15
305:5
**background**
10:23 56:14 65:6
87:6,23 241:24
242:4 243:7,25
**backside**
215:12
**Baden's**
139:10
**Bahamas**
90:19,23
**bailee**
51:12 52:9,21 53:2,8
54:6 99:3 220:8,10
221:18 222:13
223:3,10 225:19

**baileeship**
222:20 223:23 224:3
250:14 251:24
**Bailii**
11:22 13:6
**bailment**
51:7,8 52:9,16,24
54:16,19 55:12
67:19,23 99:16
111:18 220:4,21
226:17,18,24 227:1
227:9 235:8 236:15
236:17 279:4,8,11
**bailor**
51:13 52:10 53:8
54:1 99:5 220:6
221:19 222:7,10,14
223:3,6,7
**bailors**
99:3
**bailor's**
98:7 220:12
**balance**
109:7,9,22 213:19
214:3 230:4 281:20
282:3 285:5,12,20
286:21,23,24 287:2
287:7,11 288:11
290:22 291:1,2,15
291:16,21,25 292:3
292:4,5,12,14,18,22
292:24 295:14
298:5
**balances**
130:6,22 144:3
145:22
**band**
129:3
**bank**
16:8,12 57:16 80:17
97:17 168:9,14
184:24,25 237:18
**banking-type**
237:13
**Bankman-Fried**



21:4,9 44:17,18
45:1 48:7,13 216:10
217:17
**bankruptcy**
1:1 4:6 21:3 44:7,12
44:15 48:3 183:20
283:6
**bank's**
168:10,18,20
**Barbuda**
22:18
**barely**
243:14
**Barker's**
147:7
**barrister**
15:18 19:17 193:4
**barristers**
15:17 19:17,18
**base**
245:10
**based**
13:8 21:6 72:23
98:17 220:11
229:22 235:25
259:4,5
**basic**
30:16 59:4 145:4
149:18
**basically**
10:14 52:3 62:25
123:17 204:24
233:21 292:15
302:8
**basis**
16:11 22:1 45:4 58:4
58:23 122:15
162:11 186:22
201:12 225:10
280:11 285:11
**Bates**
17:22
**beans**
49:13,13
**bear**

38:3 132:15 208:8
**bearing**
7:3 156:22 257:17
262:18
**became**
76:13 258:4
**become**
19:14 27:23 43:20
59:25 60:5,7 93:4
164:14 167:10
258:15
**becomes**
47:2 82:17,23 83:2
168:8 187:19
207:17 275:21
277:11 287:11
**bed**
52:20
**before**
5:16 7:19 14:11
18:21 20:6 21:3
31:7,8,25 33:24
44:5 45:20,24 46:19
48:3 51:22 74:20
75:6 84:2 88:5 90:9
129:22 145:10
147:22 148:6
191:22 217:11
224:2,16 256:23
271:9 274:15
282:21 283:16
290:20
**beg**
45:13 170:4 240:18
246:14 282:16
283:5 298:22
**began**
23:11
**begin**
228:13 285:2
**beginning**
1:21 11:1 27:19 31:7
41:1 62:8 157:19
269:11
**beginnings**

245:2
**begins**
4:3 146:14 241:4
**behalf**
1:14 4:13,24 5:1
16:24 17:6 51:2,4
52:10 130:21
185:25 186:21
187:3 231:14 239:9
**being**
4:10 6:10,13,20,22
25:4 37:4 39:8 40:9
46:9 48:10,12 54:10
60:5 61:1 76:21
81:14 83:6 99:5
105:14 111:14
120:20 138:2
144:12,24 145:13
145:22 147:3 148:1
154:24 166:24
177:20 207:6,10
213:18 214:2,21,25
215:4 223:22 230:7
232:11 238:19
245:5,10 247:1
265:8 268:3 275:5
285:16 289:19
296:13 302:23
**belief**
218:17
**believe**
14:6,23 42:21 53:20
71:16 87:16 88:7
94:5 96:3 103:18
129:9 148:14 154:5
163:3 182:6 190:16
201:25 218:15
228:7 272:10
273:22 295:2,22,22
**believed**
61:8
**believes**
218:18
**belong**
50:2 273:2 302:21

**belonged**
50:4
**belonging**
207:12 262:9 263:3
**belongs**
50:10,10
**below**
89:12 286:4,4,8
288:6 289:11
**beneficial**
50:23 51:14 96:25
144:12,24 145:13
145:17,18,23 207:2
207:3,7,24 231:22
231:24,25 272:21
**beneficially**
218:12 263:3
**beneficiaries**
99:3,9 111:13 118:14
120:24 122:12
124:9 138:10 142:3
142:15 182:19
262:23
**beneficiary**
51:4 53:13,21 124:3
185:10 187:24
192:6 254:9 263:10
269:6
**benefit**
18:20 54:10 79:16
83:23 122:15,22
130:23 200:14
201:10,13 202:1
**beside**
40:8
**besides**
9:21 25:9
**best**
26:22 64:17 122:11
202:25 246:7
280:18 291:22
311:11
**better**
82:23,25 167:3 206:8
218:5 226:7 260:11



280:7
**between**
41:5,8 52:1 65:20,24
66:13 101:5 107:10
113:3,19 120:14
150:7 154:2 194:10
194:11 196:13
197:22 226:11
230:14 234:4
241:25 242:14
249:2 289:5 297:23
307:9
**beyond**
60:22 68:17 208:8
287:18
**big**
33:19 121:22 208:5
**binding**
68:8 242:19
**Bishopsgate**
1:18 2:11 4:11
**bit**
11:14 15:14 27:20
47:2 68:18 69:3
80:17 105:14
156:22 191:9
200:20 201:3
207:14 214:23
257:12 263:4 269:4
**bitcoin**
78:7 82:15 84:7
97:19 167:7 174:12
257:19,19 270:3
276:13 279:6 290:9
290:9,11,13,14,15
**bitcoins**
164:24 168:12
256:22,22,23 273:2
274:23,25 275:5,8
275:10
**black**
64:7 88:25
**Blake**
301:9
**blanket**

7:21
**blindingly**
176:4
**blockchain**
160:11,15,19,24
161:2,4,5
**blockchains**
73:22 74:2
**blue**
27:6
**blunt**
25:16
**body**
226:8
**bona**
272:20 273:3,9
**books**
262:23
**borrower**
287:17 289:10
**both**
35:23 44:20 46:7
47:1,3,8,11,14
49:13,14,18 50:1,12
50:14 64:12,14
65:11 89:24 103:2,8
119:13 163:8 170:2
177:9 186:5 188:2
219:8 222:16
226:23 230:14
234:2 243:18 244:8
244:14,17,18,24,25
245:2 246:7,20
289:2
**bottom**
87:15 92:20 112:20
**bought**
57:19 152:21 172:20
**Bournemouth**
14:4
**box**
123:15
**breach**
185:11 212:22
299:21 300:7,17,18

300:19 304:14,21
304:24
**break**
6:4,7,7 68:13 85:22
85:25 148:17,21
208:24 215:16,17
215:18,21 219:23
227:19,21,25
255:11 280:25
281:4
**Brian**
2:17 4:23
**bribe**
55:5,5 56:1
**brief**
148:17
**briefly**
21:16
**Briggs**
141:19 232:19
261:23 262:19
263:3,15,16 264:10
266:7
**bring**
223:20 274:14
**brings**
172:10 231:9 240:21
**British**
22:17 311:4
**Britton**
64:2 205:6
**broad**
2:15 7:12 33:10 51:6
**broader**
303:17
**broadest**
8:1
**broadly**
38:13
**broken**
163:5
**broker**
57:18
**brought**
33:4 90:14 91:18

173:9 276:3
**BTC**
79:15 81:5
**bulk**
118:14 119:10 120:7
120:10,11,12,15,24
**bullet**
89:14,24 90:4
**bullets**
91:10
**bumbled**
217:13
**business**
26:16 63:13,15,16,21
63:23,24
**buyer**
49:13
**buying**
57:11 143:23

_____
**C**

**c**
2:1 74:3 110:16
141:13,25 150:22
283:7,15 301:2
**call**
20:24 31:9 109:18
197:11,11 268:19
296:1
**called**
49:11,19 53:15 64:2
70:18 78:2 88:24
104:17 114:14
126:16 137:19
139:21 143:7 162:1
216:1 239:3 279:10
**calling**
304:16
**Calls**
66:21
**came**
7:19 22:19 41:3 57:7
58:15 59:2 77:25
97:9 120:1 172:7
210:11 276:14



MAGNA
LEGAL SERVICES

capable
7:3
Capita
64:1 202:7 205:7
capital
1:15 2:3 5:13 108:8
108:23
care
42:4 200:14,24
201:10,13,16,18
202:1 247:5
careful
101:2 133:3
carefully
29:25 41:25 108:15
108:17
carried
297:21
carved
119:11
cases
8:5,6,14,22 9:13,22
11:13,16,21,23
12:13 17:16 22:16
23:18,22 31:11,12
31:12,14,14,16
32:17 35:23 37:10
38:1,21,23 39:2,4,7
39:22 40:7,8,14
50:6,9,11 55:18
63:25 76:8,9 83:15
101:3 102:6,9
112:25 113:22
117:2 118:17,19
119:14,20,23,24
120:3,6,17,20
128:15 163:23
201:17 206:9,9,11
254:25 255:12,14
267:2,5 274:7
case-by-case
280:10
cash
168:15,18,19,20
casting

161:3
cause
201:25 253:18 301:3
303:18
cautious
105:14
central
181:18
certain
7:12 21:2 24:8 49:12
55:3 66:25 67:1
69:1 87:1 111:9
115:19 132:24
133:20 158:15
179:7 192:15 193:7
201:5 202:4 212:19
247:5,23 253:25
266:18 278:16
279:18 281:9 287:7
certainly
13:21 14:19 16:17,21
22:1,20 24:4 25:20
26:25 30:3 32:1
34:3 37:10 40:19
50:6,9 86:24 88:10
92:7 94:10 102:11
105:24 110:12
111:12 131:10
133:14,15 135:6
137:8 144:16
153:19 197:14
199:13 200:6 202:3
221:9 227:15
233:15 245:6 248:6
281:16 301:21,21
certainty
125:2,10 126:5,16,20
129:25 138:3
139:21,25 148:12
256:11 257:5
265:23 266:14
CERTIFICATE
310:2 311:2
certified
311:4

certify
311:5,12
Chair
93:6
chambers
19:16,17
chancing
25:25
change
94:13 103:3,5,6,7
168:5,6 205:1 207:1
208:13 239:24
240:16 292:18,19
changed
15:16 20:18
changes
13:9 30:1 85:6 159:7
159:10
changing
27:10 142:3,16
206:18 208:12
Chapter
1:7 128:25
characterise
122:12
characteristics
233:9
charge
15:22
charged
15:11 25:16
charging
15:12
cheap
98:24
check
12:9 14:15 19:24
20:7 26:4,11 29:24
42:21 134:3 182:11
182:22 231:7
263:15
checked
11:13,22 28:3 42:19
148:8 300:8
childish

258:13
children
9:23 95:20,21
Chong
3:16 106:12
chose
153:10
chosen
63:18
Chris
4:18 5:12
CHRISTOPHER
2:7
christopher.harris...
2:7
circular
291:24
circumstance
121:6
circumstances
63:10,25 86:22 87:2
101:10 116:24
118:7 169:2 189:10
189:15 192:7,15
215:13 242:23
244:5 253:20
261:12 267:16,16
270:1,6 277:3
cite
36:9 63:25 105:19
108:22 121:10
124:14 133:16
143:4 196:2,2 254:3
cited
12:5 32:19 35:23
49:21 103:24
105:24 118:17
135:19 137:6
247:18 248:4
255:12,16,17
cites
53:16 141:20
Citibank
110:22
Civil



93:12
**claim**
46:6 95:5 166:24
174:22 203:6
300:17,17,18,18,19
304:24
**claimant**
271:4,6
**claimed**
189:3
**claims**
304:22
**clarification**
297:17
**clarify**
125:21 152:9
**clarifying**
191:12,17 192:9,24
**clause**
151:7,8 155:8 156:16
157:10,23 184:20
230:24 231:1 232:4
242:17 249:12
254:20,24 294:4
296:16 298:15,15
298:16 299:21
**clauses**
180:18 187:7 205:4
293:21 294:19
**clean**
5:24 55:8 74:6
**clear**
5:21,22 38:16 44:9
63:14,15,20 64:9
79:8 99:15 102:21
104:8 113:16
124:10,11,18,19
126:2 136:6,18
144:16 145:6
186:10 187:24
189:14 191:25
192:21 200:12
201:5 202:6 209:4
224:18 239:15
255:23 263:22

275:4 282:1 306:6
306:16
**clearer**
224:23
**clearest**
262:13
**clearly**
60:19 61:22 113:1
125:4 145:9 150:24
177:19 180:11
190:12 192:14
200:23 201:1 202:8
225:1 270:18,20
**clerk**
19:20,21 20:4
**clerks**
15:19 19:18
**clever**
33:23 300:25
**client**
19:8,9 96:6 107:10
108:9 115:14 130:6
157:18 166:11
175:2,3 205:16
228:13 229:6
256:21,24 267:9
293:23 294:2,17,18
294:21 295:1,10
**clients**
60:19 113:4,19
278:12
**client's**
96:6,8,13 97:13
175:2
**Client-Intermediary**
3:17 106:4
**close**
19:4 40:4 270:2,19
**coin**
97:20 144:3 174:23
**coins**
96:12 123:20 136:8
146:20
**Collateral**
246:18

**colleague**
29:8
**collected**
84:6,13
**collection**
96:22
**colon**
303:21
**colonies**
22:17
**combination**
130:1 136:23,24
**come**
14:24 55:17 95:15
123:22 163:11
172:8,11 178:13
205:16 259:3
268:16 276:23
**comes**
23:4,5 28:13 38:7,11
38:17 47:1 99:14,16
99:24 126:1 168:5
176:16 203:5 205:6
269:8 300:23
**comfort**
190:6
**comfortable**
9:17 24:2,4 182:25
**coming**
63:4 73:1 240:9
**commenced**
140:9
**comment**
38:3 179:7 283:7
**commentary**
283:11 305:12
**commentators**
123:5
**comments**
28:16,17,25 29:7,11
29:12,22 30:1,2,11
30:17,19
**commercial**
55:21,23 100:23,24
**commercially**

127:2,12,19 208:10
208:12
**commingle**
162:11 264:1
**commingled**
59:10,12,23 60:6
61:2,14,18 62:3
65:12,15,17 75:10
84:8,9 125:1,12
126:5 138:18 165:4
165:11 166:5,23
167:8 168:24
170:10 177:3 179:4
204:11 205:12,23
228:9 234:12 251:7
255:3 278:24
**commingling**
62:15 73:17 76:15
167:14,16,17,25
168:7 174:25 204:5
264:3,6
**commission**
3:12,19 8:22 9:22
11:19 31:8,20,25
32:18,20,22 33:2,5
33:8,21,25 34:2,7
35:19 92:5,12,23
93:5,6 100:13
102:19 104:3
121:13,24 122:9
123:4,9 124:21
125:1,9,19 126:19
126:25 128:2
129:23 131:18
133:9 135:7 148:4
210:18 226:3 233:2
233:7,17 234:8,24
235:14 264:5
**Commission's**
35:14 94:1 102:13
125:16 130:25
131:15 226:1
235:12 236:6
**commits**
56:3



committee
93:9 94:20
common
35:6 36:4 37:2 52:12
    52:13,15,15,16 53:6
    53:25 55:7 63:16,16
    63:21,23,24 122:17
    123:19 124:9
    132:14 171:12,20
    228:25 229:3,5
    265:5
commonly
103:24
commonwealth
35:24 36:1
community
32:6,8,9 93:18 94:9
company
19:11 44:7 72:22
    90:18
compare
243:19
compared
245:19
compatible
111:25
competent
73:8
complete
42:19
completely
262:20 267:19
    268:12
completeness
141:2
complex
52:14
complexity
28:21
composite
177:18
computer
86:5
computers
86:7

conceivable
23:25 71:20
conceivably
274:17
concentrate
261:20
concentrated
12:15 23:2 297:4
concept
51:24 52:16,17 55:17
    100:6 220:21
    268:18
concepts
9:18
concepts/with
9:17
concern
280:12
concerned
10:14,21 38:8,10,22
    38:24 39:2 41:4,24
    46:23,24 47:6 72:10
    76:3 80:7 98:17
    177:14 259:10
    283:8,15
concerning
37:7 104:9 105:3
concerns
279:2
conclude
50:15
concluded
122:11 147:21 308:8
concludes
123:9 139:3
conclusion
36:10 41:4 66:21
    95:7 113:10,22
    114:10 123:16
    132:6 171:10 187:7
    199:7 220:16
    234:15 248:23
    259:4
conclusions
94:6,25 95:2,24

97:25 102:19,20
    120:2 129:24 141:3
    201:22
conditions
146:15
conduct
116:16,18 117:4,7
    130:14 140:7 141:8
    300:14,16
conferences
8:20 9:1
confess
87:18
confidence
39:7 60:10 88:10
    99:22
confident
7:14 23:21 26:8
    42:20 102:4
confidently
225:13
confirmed
147:7,10
connection
17:22 175:15 176:9
    176:12,23 177:15
    177:19,25 178:4,14
    178:17,22,25
    179:15,18,19 180:2
    237:18 303:18
consent
144:21 285:24
consented
286:7
consents
285:21
consequence
260:9
consequences
72:4,8 100:24 108:2
    151:21 156:20
    158:7,23 208:2
    259:5
consequential
267:2

consider
7:10 21:11,14 28:17
    34:1 64:12,14 86:21
    87:8 101:16 117:25
    127:1 197:2 203:10
    207:19 226:8 234:9
    243:24 244:9
    259:13 266:10
    281:24
considered
30:24 214:20 243:7
    281:22,23 299:22
    301:20
considering
66:11 266:8 274:6
    293:22
consistent
36:15 55:12 89:22
    129:19 187:3
    244:20 245:25
    246:4 267:24
consisting
93:9
consists
243:17
consolidated
122:14
constantly
142:3,15
constitute
196:13 216:15
constituted
301:23
construction
43:7 45:7 218:1
    260:9 290:21 297:7
construe
63:11,11 201:20
    203:11 219:11
    240:3,12 244:10
    245:10
construed
44:22 204:12 246:3,6
construes
202:9


MAGNA ▶
LEGAL SERVICES

**construing**
43:18 61:22,24 75:18
219:3
**consult**
32:15,16 33:1 64:18
94:3
**consultation**
3:19 122:10,24 123:2
128:3,6
**consulted**
17:21
**consultees**
122:20,23
**consults**
94:3
**contact**
19:21 26:10 139:2
190:18
**contacted**
20:4
**contain**
44:8 296:21
**contained**
44:16 57:14
**containing**
273:18
**contains**
11:23 146:18
**contemplated**
196:12 245:14
**contemplates**
288:15,22
**content**
27:16 130:5,9 142:2
142:12,14 248:1
**context**
26:9 100:23 111:18
197:9 216:14
251:15 254:11,20
285:22
**continue**
18:2 125:20 284:4
**continued**
18:4
**continues**

123:4 125:19
**continuously**
84:6
**contracted**
50:7
**contracting**
204:9 266:22
**contracts**
39:2,10 43:25 44:1,2
44:2 64:12,13,15,21
127:18 128:16
211:5 241:5,11,24
243:12 244:9,14,18
244:22 245:24
246:2,5 252:12
305:22
**contractual**
39:23 56:7,12 66:17
66:22 67:9,12 68:21
69:9 81:15 86:23
115:25 212:2,6,7,12
212:14,18,23
213:17 214:1,17
218:1 232:2 234:3
241:12,15,18
242:13 260:8
266:14 281:9,19
282:2 285:4,14
289:4,13 293:4
299:10 305:17,22
305:25 306:1,4,13
307:11
**contractually**
107:22 168:4 275:13
**contradictory**
64:15 245:25
**contrary**
145:7 253:1
**contrast**
237:24 238:1,7,8
**contrasting**
98:23
**control**
51:10 65:25 66:1,8,8
66:9,14,14,15,15,22

78:20 79:1,1,6,8
81:17,19,23,25 82:6
82:6 103:3,5,6,7
105:11 115:6,7
162:19,25 168:3,7
168:25 171:6
172:20,21 173:11
173:20 174:15,17
205:18 206:1
207:22 208:2,16,23
209:8,13 210:14
211:1 214:22
221:18,22 222:1,2
222:17 225:2,7,8,10
225:14,17,18,19,22
226:4 229:9 233:13
235:2,11,13,13,17
235:17,18,23,24
250:23 251:4,11,13
279:3,4 306:23
**controlled**
137:18 160:11,16,20
160:24 161:2,5
175:3 224:1
**controls**
114:25
**control-based**
234:10,19
**conversion**
185:11 300:18
**convey**
260:2
**convinced**
132:2
**Cooper**
147:3
**copy**
184:10
**core**
111:24 112:6
**corporate**
16:15
**correct**
75:24 102:22 155:12
165:7 166:6 203:7

209:15,20 211:20
221:1 226:23 231:6
232:5 241:15
253:13 270:15
271:1,2 283:13,20
287:3,9 290:7
293:14 298:19
300:4 305:18 310:8
**correcting**
231:11
**correctly**
39:12 42:24 226:15
233:11 247:12
294:8 295:9
**cosh**
28:2
**counsel**
2:3,13,21,22 4:16,22
5:3 6:8,14,17,18
30:8 210:3,6,13,24
311:12
**counterparty**
262:10
**countries**
37:7 189:8
**country**
32:11 37:3 158:10
190:5 202:3 303:2
**couple**
11:6,8 208:14 246:10
**course**
14:16 25:2 42:21
48:1 69:22 79:10
86:20 97:11 98:12
101:22 137:4
145:14 169:4 193:3
193:10 228:6 233:1
233:19 236:22
248:19 252:19
282:13 287:13
**court**
1:1 2:24 4:6,13 5:4
6:3 11:24,24,25
15:25 17:10 18:7,19
19:1 36:2,22 44:23



45:3 50:8,15 55:24
63:2 64:1,10 75:4
76:16 83:22 87:1
93:7,8,8 100:24
101:15 102:10
117:25 118:11
119:9 124:7 129:16
129:24 131:8,11
138:2,16 139:3,7
140:5,12 141:13,25
142:11,25 143:11
143:14,18,21 144:1
144:9,15 145:20
146:14 147:21,25
148:5 150:20 158:7
158:12,22 202:7
213:1 215:15
218:14 219:2
227:20,22 244:12
244:19 245:6,23
246:6 255:7 259:8
259:20 262:7
266:17,21 267:1
268:4,18 269:9
271:18,23 272:2
283:5,6,6 301:22
**courts**
17:17 32:13 33:24
34:1 35:24 36:1,5,6
36:16 50:3 73:8
100:3 102:12 113:2
113:17 123:6 127:1
127:12,18 129:18
151:20 152:11
158:17,18 201:17
221:7 265:4 279:23
280:1,3,10,13,16,18
280:20
**court's**
119:4 201:20 242:19
**cover**
41:23 162:6
**covered**
135:13 186:19
191:15 196:24

252:1 301:19,21
**covering**
23:6 235:4
**covers**
178:20 200:7
**co-operative**
196:20 197:3,8,11,12
**co-owners**
123:19
**co-ownership**
122:4,16
**create**
56:3 110:11 115:19
116:9 117:7,14
118:8 126:21
132:20,25 134:11
134:14,22 135:3
140:1 168:1 187:24
189:16,18 191:10
192:21 198:1,3
199:6 221:17
231:20,22,25
232:13 238:22
241:8 253:15,21,21
261:8 267:17 306:6
**created**
38:24,25 43:24 44:7
52:7 99:16 117:4,25
135:24 139:15
140:17 148:6
152:23 192:7,15
218:2 222:25
235:22 255:1
267:20 299:11
300:5
**creates**
56:7 118:6 188:21
189:15 198:9 239:4
**creating**
116:21 140:7,13
190:13 203:11
218:3
**creation**
15:9 43:3 99:14,18
99:20,23 117:16

197:25
**credit**
159:25 286:17
294:17 295:10
**credited**
160:5 162:17 239:12
**creditor**
99:5 237:13
**creditors**
95:5 98:19,22,23
99:8 144:19
**criminal**
48:7,13,14,21 93:14
**criteria**
164:4
**critical**
134:4
**criticise**
255:14
**criticised**
17:17 94:11
**criticism**
201:6
**Cromwell**
2:15 4:24 11:9 19:10
20:13 26:6 27:23,24
28:4,7,12,19 40:25
42:17 182:14
276:13
**cross**
35:20 198:17
**cross-reference**
197:17
**crucial**
146:4
**crypto**
267:10
**cryptocurrency**
137:16 143:24
144:11,20 145:22
236:15
**Cryptopia**
3:21 112:25 113:1
129:13 130:5,19
131:1,16 132:14,18

133:2,4,22,24,25
135:15,18 137:17
138:9,12,17 140:6
140:14 143:18
144:19,19
**Cryptopia's**
129:23 130:10,13
143:15
**crypto-asset**
3:17 106:4 111:18
**crypto-token**
122:13 127:4 130:14
234:20
**crypto-tokens**
122:13 128:25
130:16,21 234:11
**curiosities**
52:11
**curiosity**
12:13
**curious**
12:9
**currency**
162:1 182:5 236:25
237:6 238:6,9,19
**current**
15:21 35:14 125:25
209:7 218:20
264:24
**currently**
98:18 208:15 217:21
**custodial**
54:14,21 122:14
**custodian**
261:18,22 262:8,16
**custody**
54:18 107:18 128:25
261:19,23 262:8,17
**customers**
24:15,19 41:5 42:25
43:23 44:13,19 45:5
45:10,16,23 46:19
57:7,15,23 58:18
59:6,22 60:20,25
61:13 70:3,15 71:9



71:12,18 75:1,3,5,9
75:15,23 76:13 77:6
77:7 84:9,18 85:1
85:15 88:19 89:7
95:5 97:6 98:19
108:25 109:21
124:8 132:13 134:1
134:8 136:6,18
145:23 160:14,18
160:23 171:11,17
171:18,22 172:9,15
172:23 173:3 174:3
174:4 179:3 189:7
189:23,24 199:8,22
204:20,25 205:11
205:22 206:4 212:1
214:18 218:12
242:13 244:25
245:9 251:12
256:25 274:15
278:6 289:1
**customer's**
65:14 84:8 97:22
130:22 150:15
155:22 161:4 173:8
173:20 174:12
213:3,8,12,13,17
214:1 233:13
272:21 285:23
297:13 298:25
**customer-specific**
65:12 157:20 160:6
**cut**
55:8 170:5
**cynical**
32:17 36:8

---

**D**

**D**
2:17 3:1
**damage**
301:12 304:3,11,14
**damages**
185:8,12 212:11
303:14,22 304:1,7

**Dame**
3:24 11:10 12:16
30:18 53:16 67:18
69:5 101:5 134:17
141:20 152:1,6
154:24 155:17
163:1 179:6 184:8
184:11 185:15
194:17 200:1 208:4
233:6,12 247:16
248:15,22 249:9,12
249:17,25 250:15
261:24 264:21
266:3 273:6 275:18
276:23 278:15
280:20 282:22
290:21 292:6 296:5
296:22 298:12
299:9 300:4 307:3
**danger**
298:3
**dangerous**
33:12 260:21
**database**
130:5 137:17,19,24
138:2
**date**
4:8 14:5 15:19 20:2
44:15 45:24 63:12
310:20 311:24
**Davidson**
1:23 2:24 4:14 311:4
311:22
**day**
57:14 59:9 79:15
274:25
**days**
11:2,3,6 19:2
**DBE**
3:24
**dead**
190:3,3 240:10
**deal**
9:7,8 34:7 38:10
50:25 65:21 66:18

67:13 68:5,17,22,24
69:3,4,5,7 98:4
133:3 169:24
170:10,22,24 186:5
188:2 193:11
204:17 213:21,23
236:19 268:2,9
282:9
**dealing**
9:11 37:24 38:11
47:5 75:1 87:4
117:11 151:25
154:22,23 158:7
166:19,21 170:7,8
173:11,15 193:21
205:17,17 209:3,3,5
282:7 300:25
**dealings**
24:14,16,19 151:21
158:23
**deals**
188:9 249:8 301:2
**dealt**
57:15 59:5 69:6 75:6
100:3 152:3 169:1
170:14 172:19
190:4 235:5 278:5
**death**
302:10
**debates**
280:9
**debit**
290:22,25 291:2,14
291:16,21,25 292:2
292:3,4,5,7,8,10,12
292:14,21,24 294:2
294:18 295:3,11,14
**debt**
288:16,18,23
**debtor**
237:13
**Debtors**
1:7
**debts**
288:12 289:2 297:13

**decide**
36:21 107:23 113:18
167:1 201:18 265:4
283:5,6 294:13
**decided**
11:24
**decides**
275:7
**deciding**
113:2
**decision**
17:11 36:22 40:22
106:23,25 119:4
129:15 131:6,8,9,11
131:24 133:5 142:5
176:13 177:1,3,9
221:5 271:1,14
272:11,14
**decisions**
35:25 36:15 175:15
176:7,10,22,23,24
177:11,16 178:1,6,9
178:11,15,21
**decisive**
141:23
**declaration**
3:8,9,11,24 13:20
42:10,11,13 44:10
69:4,17 71:23 79:9
87:21 98:1,11
169:24 218:13,15
236:21 241:1
**declarations**
216:4,15
**declare**
95:19 124:2 218:10
**declaring**
189:9
**decreased**
273:19
**deducing**
39:13
**deed**
115:24 139:10
**deemed**



265:5
**defaulting**
298:3
**defeat**
139:8
**defeated**
266:23
**defects**
200:12,18,19 201:7
**defence**
272:19
**defences**
272:17
**deficit**
286:17 291:11
**define**
108:17 303:4
**defined**
98:16 157:18 194:25
**defines**
207:5,6
**definitely**
236:2 245:9 248:6
**definition**
53:2 160:8 176:11
   177:21 178:18
   195:4,13 292:10
**degree**
9:15 51:11 53:7
   66:22 88:10 225:2
   225:14,21 226:4
**Delaware**
1:2 4:7 283:6
**deliver**
190:24
**delivered**
162:7
**delivering**
161:15 162:3
**demarcations**
233:9
**denominator**
274:10
**deny**
224:22

**depart**
63:9 64:6
**depend**
47:11 64:23 78:19
   98:7 243:20 290:8
   299:11 301:24
**dependent**
229:1
**depending**
35:3,5,6 63:10 66:10
   87:2 101:10 111:10
   159:10 242:13
   249:4
**depends**
28:21 36:2,3 46:8
   47:16 52:24 63:24
   64:21 65:19 66:23
   67:9,17 77:1 96:11
   96:20,21 113:13,23
   126:10 162:14
   170:18 222:15
   223:5,11 228:12
   229:18 243:10
   257:7,8 261:11
   266:20 277:11
   299:23 303:7
**deposed**
6:10 11:7
**deposit**
77:14,14 79:17 80:3
   81:6 154:21 155:6
   155:12,25 156:9,11
   156:17 159:7 181:1
   181:13,24 182:2,4
   182:16 183:7
   184:23 289:11
**deposited**
81:5 150:5,14 151:19
   152:10,25,25
   153:25 154:7
   155:22 161:19
   164:13 166:3 167:7
   172:15,23 173:3,22
   174:3 228:8 287:19
   287:24

**depositing**
117:11 143:23 161:9
**deposition**
1:11 4:4,10 5:15
   10:25 13:2,9 87:14
   308:8 309:2 310:6
   311:9
**deposits**
83:6,8 164:7,24
   184:24
**deprived**
300:14
**derive**
116:6
**derived**
116:9,11,16
**describe**
27:21 49:22 56:21
   223:1 277:7
**described**
53:15 70:22 119:24
   129:23 131:2
   166:13 173:4 174:9
   262:12 299:1,5
**describes**
139:24 143:11
**describing**
42:12 65:24 131:21
**description**
112:3 139:11 197:13
**designed**
86:10
**despite**
138:1,17 139:3
   145:21 148:1
   166:15 255:8
   266:17 280:12
**destroy**
272:21
**destroyed**
192:25
**detail**
76:8 77:23 133:8
**detailed**
63:1 64:3,4 76:2

**depositing**
101:12 132:7 205:7
   244:14,15
**details**
105:21
**determinative**
296:6,9
**determine**
68:21 84:17,24 85:13
   100:20 158:7 203:2
   257:23 272:2 273:7
**determined**
140:12 202:13 272:4
**determining**
86:23 186:4 200:5
**Deutsche**
16:7,12
**develop**
208:4,20,25 210:19
   236:12,14 280:13
   280:20
**developed**
53:5,6 264:21 277:21
**developing**
102:21 210:22
   280:10
**development**
233:4 280:5
**developments**
11:14
**develops**
35:4,5,7
**die**
189:7
**differ**
37:5
**differed**
36:6
**difference**
65:24 66:13 101:5,6
   120:14 150:7 194:9
   194:11 226:11
   307:9
**differences**
39:22,23
**different**



MAGNA
LEGAL SERVICES

15:15 18:7 26:20
27:17,19 29:19,19
29:20 39:2,3 46:3
47:4,23 50:4,18,19
52:21 57:10,12,12
57:15 75:3,3 77:17
93:16 96:14 97:3
131:12 133:21
136:3,17 137:11
139:16 160:11
161:1 166:22
168:11 170:9 187:6
187:8 194:25
205:20,21 206:15
219:20,21 228:17
228:18 239:15
240:15 242:12,12
246:5 252:14 272:6
272:9 294:12,12
307:12,15
**differently**
246:2,6
**differs**
37:8
**difficult**
38:14 47:2 61:7 64:6
64:10 76:7 85:8
87:4 116:18,23
117:9,14 167:20
173:12 187:9
219:15 223:12
228:14 256:12
257:8 264:17
270:19,21 275:17
279:14 280:2
293:17 294:9,11
**difficulties**
138:24 139:16,17,18
166:25 189:9
220:23
**difficulty**
139:13 186:25 229:6
**dilute**
85:4
**dimension**

55:8
**direct**
20:14 290:3 304:14
304:16,18
**direction**
30:8
**directly**
19:19 144:11
**disagree**
29:18 34:17 109:12
113:7,17 114:8
123:12 125:15
126:3 130:25
131:14 133:14,16
142:9 147:6 163:2
233:12,16 234:2,7
283:2 290:21 297:2
298:11 299:9,15,16
305:21
**disagreed**
29:17 131:24
**disagreeing**
283:10
**disagreements**
296:22 297:4
**disagrees**
32:20
**disappear**
164:17
**disappears**
274:21
**disappointed**
258:16
**disclaim**
111:3 144:24 145:12
**disclaimed**
191:23
**disclaimer**
196:16
**disclaims**
198:10
**Disclosures**
176:16
**discount**
246:23 247:2,4

**discovered**
258:17
**discuss**
27:5,6 68:8 100:16
102:7 118:13
146:14 183:4 216:9
233:20 239:25
240:17 261:15
265:25 284:23
**discussed**
9:23 31:7,9 60:16
111:8 115:14
121:14 219:10
224:17 253:4 281:8
285:8 287:22
302:13 305:13
306:25
**discusses**
110:18 121:25
184:20 265:22
272:12
**discussing**
27:15 80:20 82:3
107:6 215:14
224:16 252:20
263:5 277:19
**discussion**
105:6 110:22 128:3
129:12 142:22
167:21 183:6
205:16 293:1
**dishonest**
302:17,24,25 303:7
**dishonesty**
302:3,10
**dismissal**
296:4
**dismissing**
247:8
**dispose**
107:17 144:20
**dispute**
12:6
**disputed**
10:18

**disrespect**
133:6
**dissipated**
169:5
**distinct**
52:16
**distinguish**
98:25 99:4 134:5
136:4 154:1 249:2
**District**
1:2 4:6
**doctrine**
264:20 265:10,15
280:14
**document**
12:21,25 27:11 28:1
32:24 40:20 70:6,18
73:12 74:14 87:13
87:21,25 88:2,22
92:4,11,16 101:12
101:13,14 115:23
115:25 118:7 145:3
146:5 200:23
201:21 281:1
**documentary**
54:2
**documentation**
144:2
**documents**
12:19 13:1 25:4,7
40:17,23,24,25 41:2
41:6,11,17,19,22
42:1,2,12,16,22,25
43:22 44:6,12 48:4
56:18 70:22,23,24
71:11,17 87:16,23
201:15,24 202:4,4,8
**dogmatic**
242:25
**doing**
14:17 27:2 66:25
67:1 71:21 168:20
189:10 202:3
212:19 216:17,24
217:3 219:13 240:8



MAGNA
LEGAL SERVICES

261:2 276:21 303:8
**done**
9:1,3,4,21 14:19
25:18,20 26:23,25
28:3 31:10 33:15
57:17,18 89:21 99:7
147:3 177:11
189:19,20 206:21
217:15 238:13
239:7 271:15 280:7
308:2
**don't**
41:15 85:21 121:16
128:17,21 184:14
248:17 280:24
**Dotcom**
12:23 20:23 21:6
40:19 42:5 44:3
45:24 46:19 71:1,3
72:5 73:4 74:15,20
98:17 132:24
136:13 200:13
203:11,17 204:12
242:5,7,11 243:8
282:22 285:8,22
**doubt**
133:25 140:21
224:19 248:7,11
**doubtful**
131:8
**doubting**
277:16
**doubts**
131:9,25
**down**
139:17,18 235:15
273:6
**draft**
26:23 27:16,17 28:2
28:3,4,10 29:7 30:3
30:5
**drafted**
27:11 29:1 187:11
200:13,23 201:9,10
201:13,16,18,21,25

202:14,15 209:23
210:2,4,7,11,13,24
**drafter**
211:5,6,8,11
**drafting**
200:20,22 201:3
**drafts**
26:19 29:1 30:7
202:20
**draftsman**
211:14,16,18
**draw**
201:22
**drawn**
63:1 76:1
**dropped**
274:25
**dropping**
275:3
**dubious**
236:17 240:4
**due**
42:21 97:10 141:21
169:4 240:19
**duly**
5:8 311:8
**dunk**
264:13
**during**
255:11
**duties**
52:21,22 53:2,6,11
53:14,22 54:6 55:4
110:19 111:4,23
175:21,22 198:3
**duty**
53:24 54:1 55:25
56:9,12 134:2
179:15 300:19

———————————
**E**
———————————
**e**
2:1,1 3:1,7 284:18
**each**
6:1 11:10 26:20,22

27:2 30:23 35:20
57:25 58:3 59:12
67:22 80:22 136:1
136:10,20 146:19
243:15 246:8
**earlier**
15:14 99:18 111:8
131:3 162:21
239:19,21 253:5
255:17 263:4
**early**
33:22 131:5
**easier**
63:8 236:15
**easily**
20:7,14 29:24 41:3
220:22 303:6
**easy**
113:21
**EC2**
4:11
**EC2M**
1:18 2:11
**effect**
46:20 74:20 107:16
118:1 127:3,8,13
135:6 150:8,11
151:25 154:3,11,13
156:21 158:15,18
159:3 198:13
199:25 234:3 235:8
248:23 249:14
253:18 268:5 286:2
289:9
**effected**
176:24 177:16,24
178:1
**effective**
194:14 222:20
**effectively**
55:5 237:14 270:9
279:5 289:9 290:4
293:24 302:2
306:23
**effort**

202:8
**either**
15:25 54:18 58:18
61:4 65:3 93:6
159:24 161:19
217:18 249:5,22
250:3 273:6 277:14
280:16 283:24
284:1
**eligibility**
181:13
**eligible**
180:25
**Elizabeth**
3:24 12:16 30:18
53:16 67:18 69:6
101:5 134:17
141:20 154:24
155:17 163:1 179:6
184:8 185:15
194:17 208:4 233:6
233:12 248:15
249:10,12 250:15
261:24 264:21
266:3 273:6 275:18
278:15 280:21
282:22 296:22
298:12 300:4 307:3
**Elizabeth's**
11:10 152:1,6 184:11
200:1 247:17
248:22 249:18
250:1 276:23
290:21 292:6 296:5
299:10
**else**
9:9 12:10 27:11
49:19 50:23 51:9
54:16 75:25 95:11
96:25 149:16
206:21 222:17
227:16 247:11
291:16
**else's**
166:23



**emails**
20:8
**emphasis**
27:18 29:19 101:6
**emphasise**
55:19 56:11 262:4
**emphasises**
180:10
**employed**
311:13
**enabled**
70:16
**end**
36:21 47:15 54:4
79:14 106:22 110:5
114:4,23 127:23
129:21 132:8
140:20 150:19
160:10 184:6
207:13 211:4,9
212:4 221:25
227:12 237:3 247:9
269:22 279:3
290:20 303:20
**ended**
199:7
**endorsed**
123:6 233:3
**engage**
130:22
**engaged**
19:14
**engagement**
19:7 31:25 48:1
68:21
**engagements**
15:12,21
**England**
37:8 102:2,6 123:6
209:7
**English**
6:23,24 7:1 11:23
15:17 16:15 21:18
21:20 22:1,3,5,20
22:23 23:3,3,5,22

32:13 35:24,25 36:8
38:1 43:16 46:22,24
47:6 52:18 55:2
72:3,11,20,21 83:15
84:21 94:9 102:10
102:12 111:21
125:25 126:2
141:24 142:6
169:16 182:9 197:6
201:17 202:22
208:11 210:14,23
210:25 211:20
218:20 240:24
255:12 264:24
**enough**
9:6 27:12 93:19
167:2 182:1 204:19
204:25 232:16
244:23
**ensure**
91:6 178:6,11
**enter**
65:1 243:18,23 244:9
252:12
**entered**
43:5,25 44:2,4,5 45:3
45:21 63:1,12 64:11
64:13,25 172:4
218:25 219:17
244:17,22 305:23
**entering**
245:14
**enters**
43:6 46:11
**enthusiastically**
32:19 36:10
**entirely**
20:25 89:21 131:5
278:1 303:3
**entirety**
88:8
**entities**
26:14,17
**entitle**
208:13

**entitled**
47:20 92:12 106:3
271:16 286:20
**entitlement**
66:8 290:11
**entitlements**
122:13 212:2,6,7
234:12,20
**entity**
88:13 191:13,13
196:20 197:3,5,7,12
**entry**
136:10,20 146:19
**envisage**
116:18
**envisioning**
235:22
**equal**
37:4
**equitable**
8:1 51:15,16,17,19
51:20,25 52:2,4,7
52:17 53:15 55:4,8
55:10,20,21,25
95:10,11,14,16,17
95:18,21,22 98:6
105:7 122:4,16
123:18,19 134:8,9
145:10 153:8 163:4
163:4,8,11 166:11
167:23 170:19
186:13,18 190:17
190:21 193:23
206:3,18 207:10
224:17 228:15,19
228:20,22 246:17
249:18 252:25
258:5,17 259:2
260:6 296:13
301:19
**equity**
52:13,14,16 53:5,17
53:24 56:1 162:14
167:2,4 194:11,13
207:13 229:3

296:19,20 303:17
**equivalent**
238:6
**Ericsson**
15:3
**ERRATA**
309:1
**essential**
163:2
**essentially**
24:25 68:25 106:23
270:1 295:2
**establish**
118:14 127:4 257:5
**established**
30:16 38:8,11 99:23
120:23 129:25
255:8
**establishing**
130:14
**establishment**
264:8
**estate**
167:22,23,24
**estates**
189:11
**estoppel**
44:24 46:4
**et**
1:6 4:5
**ETH**
79:15 81:5
**ETHE**
79:15 82:3
**Ethereum**
78:7 97:20 174:23
**evaluate**
100:25
**even**
21:3 23:23 39:17
49:17 52:13 63:16
83:23 100:1 111:23
126:4 133:4 145:9
165:10 178:20
183:1,21,21 190:20



MAGNA
LEGAL SERVICES

191:17 203:9
204:25 205:11
208:7,9 217:23
219:15 232:2
236:15 244:24
245:17 267:13,21
274:20
**ever**
5:15 15:24 17:17
61:12 97:5 168:14
173:13 295:23
**every**
7:14,21 23:21,25
37:20,21 49:2,8
83:8 248:12,12
277:24
**everybody**
244:23
**everyone**
46:10
**everything**
27:9 34:13 126:9
158:12 248:2
268:22
**evidence**
16:25 61:13 85:13
101:16 109:17,19
167:21 170:12
171:18 201:21
202:13 213:22
214:4 218:17 219:2
239:7 276:5,7
**evidenced**
141:7
**evident**
136:13
**Evidential**
139:7
**ex**
120:7,10,15 272:17
**exactly**
78:23 97:7 118:2
140:25 238:11
250:6 264:9 286:25
295:4

**Examination**
3:3
**example**
21:5 50:13 75:6
108:8 168:13
187:23 279:7
296:12
**examples**
120:20 268:21
**except**
6:5 118:5 191:14
244:5 253:14
268:22 310:8
**exception**
122:3
**exceptional**
199:10
**exchange**
40:1,3,11 43:13
56:25 57:5 58:15,21
84:6,10,13,17 86:11
95:1 96:4 118:25
124:1 130:14
137:17 138:17
140:7,13,15,18
164:8,10,13,25
166:4 172:7,14
174:3 212:5 224:10
228:8 250:19,20,24
251:6 252:2,5 255:1
255:2 271:7,10,11
**exchanges**
24:17,20
**exchange's**
257:3
**exclude**
199:12 301:12
302:13,23 304:13
**excluded**
304:4,7,19 305:3
**excludes**
302:8 304:21
**exclusion**
296:16 301:3
**exclusions**

111:23
**executes**
115:23
**exercise**
270:2 271:17 272:6,8
**exhibit**
13:15,17 42:10,10
69:23 87:16 92:8,10
103:16,17 105:17
128:20 135:16,17
148:24 149:1
184:15
**Exhibits**
42:6
**exist**
51:16,20,22,25 95:23
100:3 115:18
192:17
**existed**
138:4 147:22
**existence**
100:7 111:25 146:5
264:4 267:14
**existing**
119:10 147:10
210:13,23,25 218:6
**exists**
39:1 51:17,20,23
62:18,21 100:1,11
163:4 186:4 208:15
**expand**
193:13
**expect**
37:4 86:9 105:10
204:20 234:19
243:6
**expectation**
69:18 131:20 156:12
**expectations**
259:21
**expected**
28:7 74:16 109:6
204:8,19
**experience**
7:4,16 8:17,18,24

9:10,20 14:7 35:6,7
39:1
**experienced**
201:14
**expert**
6:11,21,22 7:5,8,10
7:20,24 8:4 14:10
15:5,12,24 16:12
17:19 93:15 138:15
248:13
**expertise**
7:4 8:12
**experts**
93:15 226:8 248:14
**explain**
9:7 26:21 56:24
168:22 238:3 242:9
259:16
**explained**
194:9
**explanation**
100:9
**explicitly**
117:21 124:15 198:9
209:14
**express**
17:25 33:16 56:12
63:18 133:24 141:7
200:25 209:14
225:12 226:13
242:2 246:2
**expressed**
18:3 114:3
**expresses**
35:9
**expressing**
16:18 76:4 146:2
192:3 284:22
**expression**
86:25 177:15 180:21
196:21 197:13
**expressions**
239:15
**expressly**
134:1 191:22 239:22



239:25 240:17
249:7
**extended**
203:12
**extension**
220:16,20
**extensive**
111:23 129:12
**extent**
7:20 10:12 28:20
63:23 66:24 88:11
112:5 224:25
236:18 244:6
252:17 273:1,4
278:11 281:22
282:8 294:12
298:24 300:14
**extinguish**
292:3,5
**extraordinarily**
46:7 256:12
**extreme**
243:13
**extremely**
44:22
**eyes**
17:5
**E-Money**
237:1 238:9,19 239:2
239:11,12,13

_____

**F**

**face**
63:21 91:24 149:21
199:25
**faced**
201:23
**facie**
169:17
**fact**
10:1 24:10 25:17
28:6 39:22 40:6,15
45:11 49:14 58:7
60:21 61:23 62:15
73:18 75:9 76:2,16

80:1 86:9 89:18
109:8 119:20
130:19,20 131:3
138:1,17 142:14
159:13 161:22
173:19 178:14
185:6 187:2 191:14
192:25 208:11
216:17,23 219:6,7
221:25 222:10,19
223:9 225:4,11,13
243:11 245:18
262:12 263:18
268:2,22 274:10,13
275:20 276:16
278:23 283:22
284:15 287:6,23
298:1 305:21
**factor**
145:10 254:17
264:14
**factors**
130:1 141:3
**facts**
17:1 21:6 39:3,5,10
39:14,20 41:23 44:8
44:8,16 48:24 62:17
66:6,7 76:10 83:14
84:20 95:22 96:11
96:21 109:25
113:23 133:20,21
138:15 139:14
162:12,25 208:1
222:15,16 223:5,11
229:18,23,24 230:2
232:16 243:10,20
249:5 251:9 266:20
268:1 269:12,15,16
269:20 270:7
275:19,22,23
278:11,17,22 290:8
301:24 303:8
304:10
**factual**
24:7,8,13 40:9 42:1

58:9 60:9,11 65:18
66:1,14 74:17,22
75:13 79:6,7 81:22
81:24 82:1,6,17
83:1 87:6,8 101:16
115:7 204:11 206:1
216:5 223:2,15,18
225:10 235:12,23
251:10,11 255:2
256:20 263:6,8
264:2 277:2 284:15
284:16
**factually**
37:23 38:17,18
257:22 270:13
273:23
**fact-sensitive**
245:17
**failing**
189:2 192:1
**fails**
191:18
**failure**
184:25 188:20
229:17
**faintest**
209:18
**fair**
10:5,22 23:14 27:16
71:2 74:24 76:7
82:22 83:5 85:9
86:12 93:19 104:12
114:9 133:17 138:1
183:22 185:4
229:24 247:15
255:16 260:21
265:7 270:9,17,25
271:12,14 274:2
278:17 284:5
292:17 301:7 304:2
304:4
**fairly**
29:25 126:2 269:21
277:3 278:5
**faith**

53:14,22,23 302:15
**fall**
286:4 287:1 304:12
305:2
**falls**
286:4,8 288:6 304:11
304:25
**familiar**
88:3 92:25 93:1,20
93:25 106:14
110:25 124:25
176:1 181:19
196:22 197:8 210:6
237:12,13,19
**familiarise**
56:15
**family**
93:13
**far**
31:5 33:11 34:17
35:17 39:18 48:17
71:19 84:23,24
90:16 91:19 94:19
94:20 98:16 101:3
112:17 114:8,10
128:7 133:18 135:5
165:4 209:16
218:22 235:5
236:13 283:7,15
**fast-moving**
78:1
**fault**
260:17 293:18
299:18,18
**favour**
16:19 120:23 124:3
268:22
**favours**
100:13
**FDM**
89:6,16 91:5
**FDM's**
89:3,10
**feel**
7:2 22:13 26:21



27:11 65:21 99:22
**feeling**
295:24
**feels**
6:8
**fees**
15:18 84:7,13 291:15
**feet**
215:11
**fellows**
52:20
**felt**
38:16 189:6 247:10
**few**
30:1,1 40:17 45:8
50:18 55:18 56:14
65:6 71:22 73:6
110:14 175:5
200:10 236:20
244:24 248:11
306:3
**fewer**
30:10,17,21
**fiat**
162:1 182:5 236:25
237:5 238:6,9,19
**fide**
272:20 273:3,9
**fiduciary**
111:4 134:2 175:14
175:18,23 176:2,6
179:15 191:23
196:13,16 197:14
198:3,5,6,10 199:6
199:9,11,21 253:15
253:17,21,24
300:19
**fifth**
82:12 88:21 112:20
**figure**
26:2 154:4
**files**
42:18
**fills**
267:2

**final**
3:13 28:10 92:12
94:4,17 102:13
104:25 121:14,25
124:22 129:5 271:1
272:13
**financial**
130:10
**financially**
311:15
**financier**
123:1
**find**
20:10,14 23:18 24:3
25:15 27:1,4 33:1
37:23 41:3 55:25
75:4 85:8 116:23
117:9,14 133:7,10
138:3 190:2 199:9
199:10 266:5 280:1
293:16 294:8,11
301:22 302:2 304:3
**finding**
19:1 39:13 138:24
**finds**
282:22
**fine**
11:6 14:25 68:15
242:18
**finger**
58:7 163:25
**finish**
6:1,2 18:20 84:1
280:25
**finished**
45:14
**firm**
99:25 132:10
**firmer**
38:12
**first**
3:8 9:14 13:19 16:14
20:2,4,8,18 23:11
26:23 27:5,16,17
28:4,24 29:6 30:11

30:13,14,17 39:15
42:12,12 45:19
48:15 50:19 64:22
65:3,5 69:21 71:23
74:11 87:21 88:5
98:1,10 104:20
105:25 106:3,22
107:9 110:5 114:12
123:24 130:4
167:21,22 169:23
173:21 174:19
177:21 195:6,8
209:6 215:25
221:16 223:8 231:9
245:10 252:10,11
273:13
**first-instance**
131:9
**fit**
65:22
**fits**
53:1
**five**
20:6
**fix**
5:21
**flatly**
175:17 253:1
**flies**
199:25
**flip**
74:10
**floodgate**
279:1 280:12
**floodgates**
279:18,20
**floundering**
68:18
**flowing**
77:2,3
**focus**
45:9 104:21 187:12
222:21 261:18
**focused**
39:13

**focusing**
25:22 34:6 40:6
152:5
**follow**
147:14 168:8,19
169:3 171:5 206:16
208:20 209:1,13,24
210:14 211:1 221:7
**followed**
17:14 104:12
**following**
69:2 74:5 102:20
165:13,25 166:9
167:22,23 169:24
170:11 173:25
174:4 186:22 209:4
228:15,16 290:22
311:6
**follows**
5:9 171:9 206:1
208:16 209:8
223:14
**follow-up**
16:2
**food**
219:23
**Foote**
2:17 5:1,1
**footei@sullcrom.c...**
2:18
**footnote**
36:12 127:24 135:20
135:22 146:24
246:11,11 305:13
**force**
105:14 180:17
278:18,19,20
**foregoing**
310:6
**forgotten**
121:15 136:15
262:25
**form**
12:7 31:4 33:9 34:10
34:23 35:16 37:25



38:19 45:2,18 47:2
50:5 53:3 54:15,16
54:17 56:6 57:1,6
58:11 59:15 61:21
63:5 64:5 66:3,20
67:8,15 74:17,22
75:2,16 76:11 79:21
84:7,13 85:3,17
87:10 89:20 91:23
98:3 99:6,21 101:14
133:11 134:23
136:22 137:7 145:1
149:11 150:17
155:13 156:1,10,18
158:2 159:1,7,14
163:22 164:15
167:12 172:16
177:13 188:23
189:25 190:19
191:2 192:12
199:16 204:11,18
210:16 211:2,22
213:4,9,15 214:14
216:5 240:2,3,4
243:9 244:4 256:19
259:15 260:16
261:4 265:13
267:25 270:16
277:10 281:21
282:5 294:23 295:7
295:17
**formed**
101:17 132:23 226:4
264:6
**former**
22:17
**forms**
39:17
**formulaic**
246:24 247:1,4,7,9
247:13
**forth**
124:23
**fortunately**
10:8

**found**
23:21,25 27:3 38:2
50:3 102:16 104:1,3
104:5 115:18 138:3
138:16 145:20
147:25 148:5 245:7
255:7 266:17
293:17 299:8
**foundation**
172:17
**four**
36:25 37:7 38:1
91:10 130:1
**fourth**
92:19 108:5 130:19
288:4
**framework**
209:7,7
**frank**
262:2
**fraud**
301:13,15,16,18,19
301:19,21,23
**free**
22:13 26:21 40:24
65:21 110:7
**freehold**
52:5 260:4
**freely**
107:17 166:8
**free-standing**
299:3
**fresh**
274:14
**from**
11:1 12:24 23:11
24:16,19 27:17,19
29:8 35:23,25 37:8
44:9,9 48:2,7,7 50:8
51:17,21 52:8,16,19
52:21 56:3 58:16
59:2,7 63:9 64:6,10
66:25 73:21 74:1,8
75:25 76:18,21,25
77:3,10,18,20 91:7

92:11 93:12,12,13
98:25 99:5 104:3,9
112:20 116:9,11
119:10 123:5 128:3
136:3,5 137:12
139:14,16 146:15
157:10 172:7,9,11
173:16 174:14
177:2 189:8 192:5
200:13,18 201:8,22
209:17 212:19
214:12 230:8
239:13 251:18
252:14 253:24,24
254:7 258:23
270:17 271:4
274:11 276:13,21
277:7 301:13
302:20,23 303:2
304:14 309:5
**front**
155:18 184:11 272:6
307:6
**FTT**
79:16 81:5
**FTX's**
56:15 60:12 61:12
66:18 67:5,13 68:22
69:9 75:23 80:21
86:9 109:22 119:17
161:4 167:19 168:2
168:3,25,25 190:18
214:24 215:4 218:6
230:10 293:21
300:6,14 306:20
**FTX-specific**
40:23
**full**
189:18 195:9
**fully**
101:4 214:20 299:22
**fund**
54:9,10 274:24
**fundamental**
236:17 279:4

**funds**
91:8
**fungible**
141:15,16 168:12
279:5
**further**
9:19 11:5 33:15
60:23 69:5 84:5
107:4 206:20 274:3
311:12,15
**futile**
270:1,14,19
**future**
264:22
**futures**
241:5,11 305:22

————————

**G**

**gains**
108:8,24,24
**game**
42:9 260:22
**gap**
267:2
**gathers**
192:5
**gave**
17:7 51:12 117:21
224:2 261:1
**GBTC**
79:15 82:3
**general**
34:14,15 36:20 56:17
64:8,21,25 67:16
76:10 94:2 105:13
105:20 111:6
136:20 146:20
168:18 198:15,19
198:23,24 200:6
216:14 242:19
244:3 245:11
254:13 298:12
301:9 302:7 306:8
**generalisation**
105:15



**Generalisations**
54:3
**generally**
9:12 33:5 37:3 39:16
  68:5 75:19,23 76:2
  76:5,14 86:22 87:7
  93:4,18 94:8 105:10
  170:22 176:15
  199:6,12 204:21
  206:1 209:12
  243:17 244:8 245:8
  267:3
**generate**
167:25
**generation**
53:18
**generic**
120:15 254:24
**generously**
202:6
**get**
10:23 15:1 19:19,19
  29:4 55:2 56:17
  79:1 132:12 142:8
  142:19 145:16
  164:18 165:12,25
  166:9,10,25 167:10
  167:21 171:21
  173:20,25 174:14
  186:24 191:5,10
  206:5 208:10,11
  217:1 229:5 231:19
  236:13,15 245:9,17
  245:18 250:21,23
  250:23,25 251:8
  274:13 275:10,10
  277:25 291:23
  292:15
**gets**
19:20 93:7 166:22
  219:8 233:10
  293:23
**getting**
205:18 235:19 294:5
**give**

7:21 46:4,5 48:25
  55:9 63:9 87:3
  95:22 117:13
  121:18 132:9 133:3
  135:8 158:18
  189:22 190:16,20
  222:16 229:12
  238:24 247:6,6,13
  251:23 260:18
  268:5 276:7 280:19
  298:1 300:16
  303:10 307:18
**given**
24:24,25 25:4,6
  69:14,19 71:2 72:17
  101:8 102:21 132:7
  162:19 177:21
  230:1 250:7 251:12
  257:15 311:10
**gives**
51:9 189:3 198:13
  235:2 292:11
**giving**
16:25 77:4 90:21
  94:24 127:3,8,13
  202:13 214:1,4
  218:4 232:4 241:14
  244:13 281:18
  282:1 283:25 284:9
  284:13,14,18
  293:10,13 299:24
  300:1,3,5,10,12,20
  301:5 304:6 307:16
**glad**
271:19
**Gloster**
3:24 154:24
**Glueckstein**
2:17 4:23,23 12:7
  18:19 30:6 31:4
  33:9 34:10,23 35:16
  36:19 37:25 38:19
  45:18 50:5 53:3
  54:17 56:6 57:1,6
  58:11 59:15 61:21

66:3,20 67:8,15
  75:16 79:21 84:1
  85:3,17 87:10 89:20
  91:23 98:3 99:6
  133:11 134:23
  136:22 137:7 145:1
  149:11 150:17
  155:13 156:1,10,18
  158:2 159:1 163:22
  164:15 167:12
  172:16 177:13
  188:23 189:25
  190:19 191:2
  192:12 199:16
  210:16 211:2,22
  213:4,9,15 214:14
  243:9 256:19
  259:15 260:16
  261:4 265:13
  267:25 270:16
  277:10 281:21
  282:5 294:23 295:7
  295:17 307:25
  308:4
**gluecksteinb@sull...**
2:18
**go**
5:18 13:22 17:3 28:5
  28:6,15,15,18,19
  33:11 42:20 44:14
  72:24 73:13 77:5,7
  77:23 87:21 101:20
  107:4 110:15
  111:15 114:8,9
  121:17 125:5
  127:22 128:15,21
  133:18 134:16
  135:7,12 137:2
  147:13 151:14
  161:18 164:17
  170:5 171:14 173:6
  173:11 184:1 195:6
  200:9,21 204:6
  206:20 212:9
  218:22 219:22

229:2 234:1 236:23
  237:20 250:21
  273:8 274:3,10
  275:8 287:7 295:21
  296:1,15 300:13
  305:5 308:4
**goes**
9:19 27:24 28:12,22
  60:22 164:19
  168:10 169:7,20
  173:9 181:15
  263:24 296:14,17
**going**
21:12 29:25 30:6
  31:21 32:17 39:21
  57:11 71:20 83:24
  85:23 87:13 98:13
  124:22 128:24
  148:18,19 149:3
  158:22 185:20
  186:17 215:11,19
  227:23 233:6
  244:22 246:7
  248:20 252:18
  260:3,17 272:6
  273:6 275:8 277:13
  279:18 280:3 281:2
  292:8 295:13,25
  308:3,6
**Goldcorp**
118:19 119:8,13
  142:22 143:1,3
**gone**
14:6 15:14 34:4,12
  37:20 69:3 76:8
  172:19 202:9
  238:11 257:18
  274:17 278:16
**good**
5:11,11,14,14 27:1
  29:3 33:5,6 51:5,6
  53:14,22,23 70:1
  106:17 195:24
  200:20,23 201:3
  204:19 232:20,20



244:23 272:13
302:15
**goods**
119:14,17,21 120:3
120:11,12,15,15,18
121:3,4 130:10
142:23 143:1
**goodwill**
304:17
**got**
6:15,16 19:15 27:1
39:17 40:4 47:4
54:11 56:12 64:3
76:1 131:18 153:1
153:13,14 173:1
174:15,17,17,18,23
178:18,22 190:4,6
195:19 205:7
206:16 214:22
221:25 222:1 223:9
223:10 225:7,8
231:18 256:21,24
256:25 257:14,19
276:18 279:5
282:16 307:13
**govern**
54:3 73:4 90:18,22
199:22
**governed**
22:9,23
**government**
33:20 184:23
**governor**
14:3
**grant**
167:14 193:11
**granting**
306:16
**grants**
193:7
**great**
8:11 35:7 41:22
53:17 77:23 133:3
255:13 275:14
**Green**

93:1,2,21,22
**Greenwich**
1:21
**ground**
5:18 38:12 99:25
114:7 277:15 278:4
**group**
50:24 229:11
**guess**
20:6 108:5 112:11,14
**guessing**
20:5 42:9 88:12
**guilty**
261:13
**Gullifer**
3:16 106:10,14

---

**H**

**H**
3:7
**habit**
27:9
**half**
23:11 148:18
**hallmark**
232:21
**hand**
30:18 87:13 147:16
**handed**
13:16 92:10 103:17
148:25
**handing**
149:3
**handled**
59:13
**handwritten**
87:15
**happen**
232:22 233:6 252:8
261:5 277:14
278:21
**happened**
10:6 19:23 25:1
60:21 62:8,12 76:23
97:7 150:9,11

154:12 205:20
217:18 229:1 255:6
259:6 260:10
276:25 278:4
**happening**
76:23 276:25
**happens**
56:21 61:25 80:18
114:7 188:5,10
252:11
**happy**
28:9,12 303:3
**hard**
83:24 230:9,10
268:20 303:16
**harder**
60:20
**Harris**
2:7 3:4 4:18,18 5:10
5:12 12:18 18:23
30:9 31:18 34:5,19
35:2,22 36:24 39:11
45:22 50:17 53:9
54:20 56:13 57:3,21
58:13 59:20 62:1
66:12 67:2,11,21
68:11 75:21 80:2
84:3 85:11,21 86:3
87:12 89:23 92:2
98:9 99:11 133:19
135:1 137:1,13
149:15 156:4,14,24
158:4 159:5 164:2
164:22 167:13
177:22 188:25
190:11,22 191:6
192:18 199:23
210:21 211:10,25
213:6,11,16 214:16
215:17,24 227:19
228:3 243:21 257:2
259:18 260:23
261:9 265:18 268:6
277:18 280:24
281:7,25 282:10

294:25 295:12,20
308:3
**having**
5:8 36:4 70:11 88:5
97:18 107:2 117:12
127:20 144:19
187:6 192:10
203:21 222:3 227:3
227:16 229:1 230:8
235:23,24 260:7
263:25 271:19,21
305:25
**he**
6:9,18,18 16:23 18:2
18:2,3,6 29:4 30:1
36:10 46:12 48:9,11
51:2 55:5 56:8,9,10
56:10,11 74:13
93:23 105:11
142:18 145:25
147:1 150:22
162:18,19 166:8
172:20 173:13
174:21,22,22,22
190:3 211:3 216:25
217:3,4,7,10,15,17
217:18,20,21,24,25
218:1,3,3,7,10,12
218:15,18 223:8,9,9
225:18,19,19
228:13,15,15 229:8
229:10 231:18,19
260:3 264:11
295:11
**head**
132:16
**headed**
70:6
**heading**
88:25 282:18
**heard**
193:3
**hearing**
272:17
**heart**



111:24
**heavily**
111:22
**hedging**
113:24
**heirs**
189:7
**held**
20:21 40:2 49:15
50:8,22 51:3 58:15
65:8,9 90:6 91:15
91:21 95:4,6,9
107:18 114:24
118:10 122:13
123:18 125:11
130:16,21 136:10
136:18,21 142:11
144:11 146:20
148:2 157:25
159:11,22,23,24
160:2,4,5 180:22,23
181:12 182:16
183:8,17,21 185:7
185:25 186:21
187:2 188:14 190:7
190:25 199:8,22
218:11,11 229:14
229:19 230:3,6
234:20 238:19,22
238:25 239:4,5,8,9
239:11 251:16
255:3 266:21
267:21 274:24
**help**
6:3 41:7 217:2
230:10 240:3
245:16 304:17
**helpful**
22:14 41:15 68:6
135:18 185:20
254:17 261:14
305:4
**Henry**
3:16 106:12
**her**

53:14,16 83:25
106:15,16 184:18
234:7 247:18,18
278:16 296:12
299:10,19 300:21
307:6
**here**
6:15,19 19:8 21:1
22:15 23:6 27:3
34:20 38:8,24 45:1
48:5 56:19,22 67:3
74:7,24 77:18,23
82:5 99:7 101:6
105:6 110:15 111:3
114:3 119:22 120:4
123:13 131:2
132:10 141:3 144:9
147:7 153:11
165:15 166:3,15
183:6 186:5 215:16
219:24 225:11
227:20 230:23
232:8 237:8 249:2
257:9 259:8,19
260:11 262:1 266:2
269:15 273:7 276:7
277:20 301:20
**hereby**
217:10 218:10
267:17 310:7 311:5
**hesitate**
269:12
**hesitation**
225:6,7
**high**
11:24 46:5 93:7
129:16 131:8 269:5
287:14
**highly**
93:18 236:10
**him**
18:20 84:1 162:18
211:15,17
**himself**
18:25

**Hin**
3:14,16 102:14
103:18,21 106:7
**his**
17:8 18:20 25:19
26:23 28:4 29:4
48:7,13,14 51:1
53:13,18,21 145:4
162:17 173:11
218:4,6,16 289:10
**historic**
147:17
**hold**
18:9 41:20 45:12
55:15,16 116:20
124:7 140:9 152:21
191:13,19 220:2
252:6 264:17,25
265:12
**holders**
130:15 138:25
140:14,18
**holding**
47:21 65:17 70:3,9
119:17 122:14
127:4 131:1,15,21
180:7 197:5 218:16
231:7 232:7,9 240:7
254:5
**holdings**
16:8 17:9 64:1 124:4
125:12
**holds**
51:2 52:9 55:5
231:13 235:1
**homemade**
202:5
**Hon**
309:3 310:5,15 311:7
**honest**
31:5 176:5 239:16
285:16
**Hong**
36:5,16
**Honourable**

1:12 4:4
**hope**
9:5 265:20
**hopefully**
135:9
**hot**
82:16
**hour**
11:10 83:8 85:7 86:5
148:18
**hours**
25:16,21,24 26:1
**house**
51:18 52:5 94:20
95:17,18,19,20
116:19 150:21,22
150:23 258:4,15
260:4,12,13,14,19
260:25 261:2,7
**how**
12:9 14:13 19:14,21
20:3 23:23 25:13
27:7,21 28:22,23
29:21 32:2 35:3,5
43:22 46:8 47:9
54:24 55:14 56:24
57:4 61:24 84:24
93:4 101:3 102:4
105:3 108:17
114:20 116:18
121:25 152:2 161:4
168:22 171:15
174:22 180:5
187:11 188:14,24
189:18 192:13
201:20,21 202:14
210:11,19 229:18
232:16,23 236:13
238:11 252:4 257:8
264:9 265:21
266:14 279:17
**however**
20:14 78:19 114:23
114:24 175:20
**Huang**



2:21 5:3,3 6:17 11:9
  25:19 26:23 27:3
  28:3,13 29:1,2,22
**hundred**
164:24 274:23
**hundreds**
92:11
**Hunter**
121:10,14 122:1
**hurdle**
46:5
**hurt**
149:5
**hypotheses**
187:6
**hypothetical**
47:16 48:25 274:5

**I**

**idea**
22:18 31:19 33:23
  75:2,11 85:5 90:25
  91:21 109:1 175:17
  209:18 215:4 233:3
  236:14
**ideally**
280:17
**identifiable**
262:24
**identification**
13:15 42:7 92:8
  103:16 105:17
  128:20 135:16
  148:24 184:15
**identified**
31:1,2,15 96:11,12
  96:23 115:9 121:5,8
  134:17 224:7 230:7
  234:13 298:15
  300:24 301:1
**identify**
4:16 20:20 50:11
  256:13,16 257:4
  270:3,14 284:12
**identifying**

41:8 78:7 127:3,13
  167:20
**identities**
138:25 139:5
**identity**
142:3,15
**idiot**
25:25
**ignore**
63:23
**ignoring**
199:25
**iii**
263:13
**illustration**
259:22
**illustrative**
266:19
**imagine**
45:2 69:15 117:10
  128:15 174:2
  232:21
**immediately**
19:25 50:11 55:1
  83:2 93:7 160:21
  204:1 225:19
**impact**
125:1 301:4
**impacts**
242:12
**implausible**
216:14
**implemented**
265:11
**implication**
46:18 65:3 267:2
  297:16
**implications**
149:17
**implied**
133:15 143:22
**impliedly**
249:22
**imply**
239:9

**importance**
127:21
**important**
5:19,25 12:15 27:12
  34:1 39:23,24
  100:24 101:11
  147:2 149:20 201:7
  262:9
**importation**
267:3
**impossibility**
237:5,9,17 264:15
**impossible**
256:12 257:10
  264:16 269:18
  270:2,2,14,19,20
**impression**
58:6 280:19
**impressive**
32:24
**inability**
172:2 173:5 174:9
  303:19
**inaccurate**
197:13 230:11
**inadmissible**
202:22 219:2
**Inc**
17:9
**incidence**
111:21
**incident**
246:20
**inclined**
100:2,10,12
**include**
42:16 229:23 241:24
**included**
70:3
**includes**
180:3
**including**
22:17
**inconsistency**
197:22,24 198:8

199:18 279:19
**inconsistent**
65:2 134:18 141:19
  175:17 186:15
  203:20 215:8 263:9
  264:4 267:19 268:8
  268:10,17,24 269:7
  269:9 293:25
**incorporated**
90:19 182:10
**incorrect**
34:9,22,25 35:1,15
  35:18 132:4
**incur**
285:4,12,20
**incurred**
303:14
**indeed**
39:7 41:19 143:4
  269:6 274:8
**indefensible**
33:14
**indicate**
136:12 145:15,16
  153:23 155:15
  197:21 203:20
  204:24 216:3
  221:11 222:25
  225:21 241:10
  255:20 263:8 266:9
**indicated**
129:18 145:12 228:7
  277:21 306:5
**indicates**
61:17 111:3 122:19
  138:23 141:6 142:1
  142:25 159:14
  187:18 234:18
**indicating**
125:24 126:4 192:14
  307:10
**indication**
133:13 180:16,20
  181:5 232:20 268:3
**indications**



145:6
**indicative**
54:22,25 128:3
264:11
**indicator**
141:14,24 142:1,16
254:8
**indicia**
109:9,19
**individual**
39:5,14 59:18 74:25
75:5 77:5,5,13,14
78:8 113:23
**individually**
121:6,8
**individuals**
92:25
**inevitably**
99:25 126:9
**inferentially**
10:20
**inferior**
220:12 251:25
**inferred**
114:1
**influence**
201:19
**inform**
20:12 44:20
**information**
98:18
**informative**
102:17 266:5
**ingredient**
110:12
**inherent**
282:24
**initial**
20:16 26:19 28:25
29:7
**injury**
302:10
**innocent**
302:11
**input**

28:13
**inquiry**
18:14
**insolvency**
108:3 180:24
**instance**
25:19 31:20 51:3,15
54:8 55:4 66:7
74:19 116:2 159:17
181:25 223:23
239:12 242:16
243:13 304:14
**instead**
50:3 135:14 150:3
153:21 183:13
224:15 289:4,25
**Institute**
311:5
**instructed**
73:16 78:21,24 79:14
81:4 82:16,20,21,24
82:25 83:3,6,7,11
84:5,12,16,23 204:4
**instruction**
143:15 144:16
**instructions**
20:17 144:6,7,10
**insufficient**
132:6
**insurance**
181:1,13,24 182:2,4
182:16 183:7
184:23
**insured**
185:7
**intangible**
121:3 122:3
**intellectual**
9:12,13
**intend**
130:20 134:22 135:3
152:2,4 163:16,20
164:8 165:6,16
166:14 237:9 241:8
267:17

**intended**
110:7 124:10,12
127:9 150:24 151:1
151:1,4,9 152:7,9
152:10 154:6,9
155:4,5,11,16,24
156:8 162:10,13
163:13 168:23
171:16,19,19,22
172:24 173:22
177:18 192:21
194:10 196:12
202:21 203:8,10
205:12,14,19 206:3
216:15 221:17
237:4,15 238:12
251:16,20 252:3,4
252:21,21 256:1,2
260:13
**intending**
223:21 250:11,12
**intense**
257:16
**intent**
109:10,19,20 118:14
140:7,15 154:14,15
154:19,19 156:8
163:7 164:4
**intention**
100:20 101:1 103:3,6
103:7 115:19,22,25
116:4,6,8,15 118:8
125:2 126:16,20
127:3,8,14 129:25
132:20,25 134:2,11
134:14 139:21,25
153:2 156:12
162:18,23 165:24
166:8 167:9,10
168:6,6 170:2 199:6
205:1 211:6,7
224:11 250:22
253:2,15 254:18
256:7
**intentions**

240:22 266:23
**interest**
7:7 20:21 40:2,11
51:19,20,21 52:6,6
52:8,8 53:22 85:6
96:16,25 98:6,7
134:8,9 151:2
170:16,19,19
175:10 186:13
188:21 190:21
192:10,25 194:14
196:10 219:5
220:11,13 229:10
229:15,18 231:5,5
231:15,19,19,21,23
231:24,25 232:2,2
234:10,20 256:2
257:21 258:17
272:21 274:16
277:17 296:13
**interested**
11:7 32:3,8,12
122:25 243:14
280:9 311:16
**interesting**
52:23 227:4 279:9
**interestingly**
232:6 236:8
**interests**
20:20 51:1,1 52:1,2
53:13,14,21 122:12
123:1 190:17
191:25 228:19
230:8
**interfaces**
143:19
**interfere**
254:16
**interlocutory**
270:24 271:14
272:11
**intermediaries**
112:18 113:4,19
114:14,16,25 127:5
**intermediary**



107:10,12,17,23
108:7,10,13,17
109:17 110:7
114:18,25 115:4,14
117:4,12 119:1
122:14 169:8,20
234:25 235:23
267:10,22 277:22
277:25
**intermediary's**
109:7,9 264:6
**internal**
130:5,10 136:7
**interpret**
122:1 147:2 160:4
192:13,14 202:6
219:12 244:19
245:24 297:10
**interpretation**
43:2 46:2 74:14
100:17 128:16
129:5 131:1,15
147:7 152:7,8
156:15 165:10
192:24 197:22
203:25 242:4 243:8
259:14,20 303:10
306:5
**interpreted**
160:1 216:6
**interpreting**
44:23 64:20 86:14
87:9 148:5 189:21
203:5 218:23
240:24 259:11,12
**interrupt**
234:7 298:23
**interrupted**
170:4
**interrupting**
283:16
**intervention**
125:20
**introduce**
55:20

**invalid**
50:8
**invalidate**
139:4
**invent**
279:16
**invention**
280:4,5
**invest**
213:7
**invested**
10:1
**investing**
9:24
**involve**
10:1 15:5,8 172:5
**involved**
24:15 27:23 29:22
118:22,25 147:9
255:2
**involves**
127:9 253:16 286:5
302:9
**involving**
8:6,8,14 10:10 22:17
196:25 302:17
**irreducible**
111:24 112:6
**irrelevant**
43:7,10 49:5,10
74:14 218:4,7,21
240:23 243:16
**irrespective**
125:11,18
**Isaac**
2:17 5:1
**isolation**
91:25
**issue**
21:18 32:14 38:3
43:1 47:17 58:9
117:3 118:15,17
132:19 133:1 137:6
166:22 175:10
185:15 196:9

198:12 199:1,4,15
202:13 263:24
266:6 272:15,18,24
273:16 279:9
283:20 284:16,19
297:7
**issued**
17:10 23:7
**issues**
10:18 23:15 38:8
68:17 238:4 272:12
281:23 296:6,9,23
**iterative**
28:20
**its**
26:17 63:20 70:3
83:13 88:8 89:7
91:7 107:18 108:24
124:2 130:10,22
137:17 140:6,7,15
143:11 156:20
169:1 181:6 216:17
230:3 233:9 251:12
254:20 255:3
275:25 280:23
281:20,22 282:3
286:8,20 291:22
292:15
**itself**
25:3 55:7 65:21
81:13 84:19 85:2,15
119:5 137:3 138:9
138:15 177:6
178:20 185:9
214:13 271:6
281:15
**I'm**
227:20
**i.e**
107:11 203:7

──────────────
**J**
──────────────
**J**
38:4 141:19 142:5
261:23 262:20

263:3,15,16 264:10
266:7
**Jarret**
2:21 5:3 28:3,13,15
28:18
**Jarret's**
28:14
**JIBFL**
3:15
**job**
5:20
**joint**
1:14 2:3 5:13 196:22
196:23
**Joseph**
2:23 4:12
**judge**
7:16,19 8:7,13 9:13
16:16,20 17:3 18:1
18:6,25 32:18,20
33:2 35:7 36:3,8,11
36:15 84:21 93:7,8
93:10 122:22
129:19 133:5,6
141:2,21 145:11
147:6,14 270:21
271:13,15 283:4
**judged**
49:24
**judgements**
112:25
**judges**
93:9 180:21 201:23
202:3 206:10,11
303:1,4
**judgment**
36:13 232:19
**judicial**
102:2
**June**
79:15,23 81:5 297:23
297:23
**junior**
29:3 31:9 104:1
**jurisdiction**



190:25
**jurisdictions**
35:24 37:1 184:23
**jurist**
32:25 35:25 93:23
**Justice**
93:22
**justify**
132:6
**J's**
232:19 271:22

_____
**K**

**Karen**
2:22 4:22
**KBO**
1:8
**KC**
106:18
**keen**
36:3
**keep**
123:22 200:10
   223:21,22 250:12
   254:6,7 283:16
**keeping**
57:20
**kept**
59:4 80:21 174:20
   224:6 250:13
**key**
65:8,17 89:10 221:25
   222:3,14 223:3,11
   225:7,8
**keys**
115:1,4 130:16 140:9
   140:14,19 207:22
   208:16,20,23 209:1
   209:9,13,18,25
   210:15 211:1,13,19
   235:1,13,24 250:8
   250:10 251:13
   260:12,18,25
   277:22
**kind**

59:13 66:1 80:22
   84:25 117:7 235:11
   246:23 303:13
**kinds**
303:25 304:7
**knew**
9:6 18:18 60:19,20
   62:8 63:13 71:15
   74:15 75:1 88:20
   205:11,22 208:1
   210:2 211:8,12,14
   211:18 276:25
   278:12
**knowing**
47:11 62:12 189:11
   189:12 274:11
**knowledge**
185:2 241:24
**known**
32:7 41:23 43:23
   47:1,3,8,11,14,15
   74:12 75:5,20,23
   76:2,5,14 202:11
   242:23 277:3
**knows**
45:5 210:20
**Kong**
36:5,16

_____
**L**

**lack**
148:15
**lacking**
166:15
**lacks**
172:17
**laid**
164:4
**landed**
165:23
**language**
90:8 117:18 136:12
   146:19 148:6
   159:13 160:22
   204:2 206:15,16

238:15 239:3 246:5
   246:23 262:13,13
   262:15 305:24
**largely**
54:3 106:19
**last**
11:6 91:13 104:24
   112:8,13 113:11
   179:10,12 295:21
**lasted**
11:10
**later**
20:9
**Latham**
1:17 2:5,10 4:10,18
   4:20
**lawfully**
278:21
**laws**
33:4 188:6
**lawyer**
64:3,4 122:25 269:7
   295:22,23
**lawyers**
9:18 32:11 53:18
   60:12 63:2 200:24
   201:14,14
**lawyer-written**
101:13
**law-abiding**
158:10
**laying**
235:15
**LBIE**
141:20 232:19 254:3
   254:11 261:15
   262:7,21 263:16,25
**lead**
279:18
**leap**
208:5
**leaping**
67:23
**learn**
172:13

**learning**
11:25
**leasehold**
52:5,6
**least**
15:3 91:20 117:10
   150:5 151:19
   176:21 214:17
   225:9 239:8 260:6
   268:25 296:14,16
**leave**
15:18 152:10 158:12
   158:22 235:16
   260:13
**leaves**
151:20 292:9
**leaving**
158:6 189:1
**led**
69:1
**ledger**
80:21 81:1 136:20
   146:20 152:22
**left**
77:21,22 78:5 257:20
**legally**
50:25 96:25 149:13
   189:10 277:6
**legislates**
33:20,20
**legislation**
280:1,8
**lend**
213:2 289:17,23
   290:2,7,9,12,15,18
**lender**
289:19
**lent**
290:4
**less**
15:19 26:2 49:16
   63:9 77:12 99:25
   120:4 163:20 172:9
   180:13,15 181:6
   228:18 247:13



**MAGNA**
LEGAL SERVICES

275:8,9,21 278:18
**let**
5:18,20,22 6:9 8:16
18:20 20:10 22:25
41:20 45:8 48:25
49:2 60:15 78:9
84:1 86:18 87:20
92:3 94:22 100:7
109:24 114:9
134:20 135:8,14
146:7,12 147:5
148:11 155:9
164:23 170:13
175:5,7 179:8
180:12 195:3,6
197:19 208:14
219:22 231:7
232:24 238:2
240:25 263:15
282:14 287:12
300:13 305:16
308:4
**lets**
65:18
**letting**
33:24 260:20
**level**
233:13 235:1
**leverage**
288:12,17 291:11
297:11 298:2,6,8
**levied**
108:9
**liabilities**
283:20,22 291:12
293:7,11 295:3,16
**liability**
178:6,11 217:10
219:7 283:13 302:9
302:14,20
**liable**
302:24 303:15,22,24
**light**
226:14
**lightly**

266:22
**like**
5:12 6:5 13:10,21
19:25 20:14 26:11
35:9 44:17 52:4
57:16 62:13 66:7
80:17,17 84:7 90:18
97:17 98:5 118:2
126:7 128:23
135:12 153:9
158:15 168:9 179:1
190:6 212:8 232:15
268:2,21 271:17
275:15 279:6,12,15
280:20
**likely**
55:24 98:19 99:12
100:6 127:1,11
138:15 210:12,24
221:6,8 222:25
233:4 264:21
277:21 280:13
**likewise**
49:8 91:17 119:9
177:6 234:18
**limit**
119:21 297:1
**limited**
4:5 17:22 20:23
46:14 54:4 88:14
161:19 176:7,21
178:2,15 182:8
213:18 214:2,5
234:9 244:6
**limits**
303:13
**line**
82:12 112:20 139:17
139:18 184:7 185:6
231:9 261:13
**links**
176:20
**liquidate**
288:10 298:4
**liquidating**

25:3
**liquidation**
3:21 21:3 44:6
297:22
**liquidations**
24:17,20 25:1
**liquidators**
1:14 2:3 5:13 19:12
137:22 138:24
**list**
31:11 42:20 128:9
203:16 221:13
303:21
**listed**
14:14 41:11,13,18
48:4 92:4 128:9
**listen**
280:9
**lists**
30:24 92:22 130:1
**littered**
206:10,10
**little**
9:16 27:10 131:12
166:21 187:8
223:12 229:2
232:24 275:17
297:2
**Liu**
3:14,16 102:14
103:18,21 106:7
**Liu's**
102:19
**live**
143:19
**LJ**
53:17 93:1
**LLP**
1:17 2:5,10
**loan**
281:14,17 298:3
**loaned**
214:10,25 215:4,7
**loaning**
214:12

**LOC**
241:20 242:3
**local**
188:6
**locked**
43:16
**logic**
206:6
**logical**
220:16,20 221:3
**London**
1:18 2:11 4:11
118:19 119:3,14
**long**
20:3 63:1 92:11
101:12 124:9
172:10,19 201:4
245:12,20 257:11
262:23 267:22
269:2
**longer**
14:3 30:14 234:13
287:2
**looked**
8:21 11:12,17,18,19
11:20,21 13:2 31:6
31:8,11,13 40:7,17
40:19,20 48:23
71:21 79:23 88:4,6
88:10 102:11
113:10 115:15
128:8,10 143:15,18
213:5,10,14 245:8
245:21 247:20
248:2,6 255:5,11
267:8
**looking**
12:13 17:4 19:2 20:2
31:12 38:13,23 39:1
39:9,9 40:15 42:23
47:9,25 83:14,15
94:20 100:6 116:3,5
118:7 121:20 127:9
127:10 132:8
133:23 153:3



201:15 202:4
219:16 244:6,16
246:8,13 271:13,15
271:23 273:11
278:3 282:15 286:5
287:25 290:19
292:13 297:19
**looks**
13:21 23:22 42:22
107:2 138:15
177:18 232:8
**loose**
51:5 278:5
**Lord**
1:13 3:3,8,9,11 4:4
5:7 93:20,22 309:3
310:5,15 311:7
**Lords**
94:20
**lose**
192:10 228:10 287:6
**loses**
185:8
**loss**
183:16,20 184:4
287:18 288:1 289:9
289:10 292:20
301:12 304:17,17
304:18
**losses**
108:24 266:14
**lost**
174:15 191:25
**lot**
25:18 29:15,16 33:23
64:5 105:14 202:8
245:1 271:21
286:17
**lots**
29:11,12 50:9
**Louise**
3:16 106:10,14
**lower**
15:14,16
**LSA**

241:20 246:12,16
**Ltd**
1:6,15 2:3
**L-B-I-E**
232:19

---

## M

**machine**
29:14
**made**
19:21 21:2,4 24:8
40:22 44:17,18
45:15,20,23 46:18
47:12 48:16 60:20
73:11 79:8 124:11
136:5,17 154:23
177:3 178:6,12
179:6 202:6 216:10
216:14 239:25
240:16 242:10
245:5 262:24 270:9
**Magna**
1:24 4:13,14
**main**
132:15 189:15
**maintained**
130:5 137:17
**maintenance**
286:4 288:7
**majority**
32:9,11 41:22 75:6,8
75:14
**make**
13:10 22:16 24:9,22
27:8,12 38:15 41:10
41:20 42:9,15 49:23
53:19 60:2 68:20
73:2,9 74:6 77:18
82:19 87:20 95:13
113:15 116:12,12
124:18,19 135:19
155:9 166:2,12
181:3,7 185:23
191:25 192:21
205:10 207:23

210:1 216:21 218:5
224:18 226:23
228:4 236:14 247:1
250:17 261:22
275:4 277:19
278:12 283:7,14,19
290:12 294:7
297:17 305:13,16
**makes**
120:3 179:21 240:20
**making**
29:11,23 38:10 85:10
102:3 139:2 165:15
183:2 200:25
217:12 239:14,17
240:6 264:3 284:11
301:1
**manifested**
140:6,15
**many**
14:13 23:23 24:11
44:6 45:3,3 84:25
200:4 228:17
253:20 280:7 296:5
**March**
241:20 242:3
**marching**
200:10
**margin**
24:16,19 57:10,19
241:21 242:3 243:2
243:5,22,25 244:18
245:15 285:8,13
286:4,9 287:14
288:6 289:20
290:17
**mark**
35:21 41:15 184:14
**marked**
13:15,16 42:7 87:14
92:8 103:16 105:17
128:20 135:16
148:24,25 184:15
**market**
86:22 87:1,7 237:16

243:12,16 244:8
274:25 275:3
**Markets**
88:14,18 90:19
**marking**
35:20 200:21
**marks**
233:6
**mass**
119:5 123:19,20
**masses**
272:6
**material**
143:11
**materials**
12:4 30:24 31:2
247:18
**mathematical**
9:17
**matrix**
74:17,22 75:13 87:8
101:16 204:11
216:5 263:6,8 264:2
**matter**
4:5 23:8 43:15 58:9
59:1 60:9,14,16
65:18 80:1 112:7
150:19,20 157:24
162:20 189:5
196:11 202:2 204:2
211:9,11 221:24
225:4 240:23
241:17 251:10
256:11 260:8
296:20 297:3,5
**matters**
17:18 42:1 74:4
131:7 132:1 143:8
145:4
**may**
14:20 15:4 16:6 20:6
22:10 23:1 25:25
27:17,19 28:18,19
30:19 33:22 37:13
43:14 47:20 58:6



60:16 65:6 66:11,11
67:22 89:21 90:1
97:12 104:2 109:17
112:6 113:21,24
117:15 128:16
134:3 138:24
146:25 147:4 154:2
162:13,17 173:18
189:6,7,7,8 190:24
195:23,24 200:13
200:18 201:7 211:3
211:3,4 214:10
215:7,10 217:2,2
219:17,18 223:10
231:10,11 232:17
245:18 257:16
258:12 261:13
269:4 273:19
284:15,19 285:4,12
285:15,18 286:16
287:6,18 288:1,9
292:14 294:12,16
294:18 296:15
297:2 298:4

**maybe**
22:15,23 128:13
167:19 193:15
276:12 288:3

**MBIA**
110:23

**MBIVR**
1:23

**meaning**
47:23 63:9,10 64:6
86:23 87:1,3 98:25
101:9 107:22 108:8
151:6,17 153:12,15
155:1,8,9,17,20,21
155:23 156:7,23
157:1,23 158:6
160:1 177:15 208:8
255:21,24,25
259:17,23 292:11
292:15 307:11,17
307:19

**meaningful**
118:10 143:21 144:1
186:3 262:1 296:22

**meaningless**
177:24

**meanings**
75:3 200:5

**means**
45:4 47:19 50:15,15
61:23 63:14,15
127:8 145:7 149:4
149:12,21,23,24
150:3,12,13,14,23
150:24 153:4 154:8
155:3 156:2 157:3
157:14,17 165:24
176:2 186:12
187:11 194:12,12
194:15,17 196:22
208:23 209:3
218:25 219:17,18
219:20 220:2 225:1
232:10 245:20,21
247:5 252:11 285:3
286:11 291:1,2,22
292:1,2,5 294:6
301:16 307:18

**meant**
18:1 47:21 70:11
97:22 106:17
156:21 198:1,2
203:3,5 209:19
298:23

**meeting**
131:5

**meetings**
11:8

**member**
93:4

**members**
87:4 92:22 93:13

**memorised**
149:5

**memory**
12:14 149:7

**mentally**
90:2

**mention**
10:9 12:22 36:25
42:1 183:10 209:14
253:6 273:16

**mentioned**
21:14 53:20 90:11
92:5 104:11 205:4
234:3 279:1

**mentions**
253:10

**mere**
144:18

**merely**
27:3 56:11 147:9
180:16 218:16
258:17 260:19

**merge**
52:3

**merits**
16:18,22

**mess**
128:22

**message**
149:18

**met**
103:9

**methodology**
17:18

**microphone**
65:23

**middle**
144:5 285:19

**might**
27:7,7 31:14 39:14
44:24 55:17 64:22
65:25 66:8 72:21,23
76:1 80:24 86:18
90:22 117:7 119:21
124:7 136:6,18
144:7,10 149:4
174:7 187:7 190:2,6
201:5 207:23 208:3
208:9 211:14,16,23

219:10 228:21
229:15 243:18
247:6 257:10,15,18
268:16,19 274:10
280:1

**mile**
32:10

**Millet**
53:17

**mind**
7:3 34:1 38:5,17
43:16 53:11 112:12
134:5 156:22
200:19 201:6 238:7
244:15 257:12,17
262:18 298:6 303:8

**mine**
20:19

**mingled**
168:19

**minute**
142:20 277:1

**minutiae**
232:16

**misappropriate**
302:5

**misappropriated**
302:14

**misappropriates**
185:9,9

**misappropriating**
302:21

**misappropriation**
301:22 302:11,12,18
302:24 303:9

**misconceived**
18:10

**misconception**
51:19

**misleading**
39:3

**misled**
144:10

**misremembered**
21:25



MAGNA
LEGAL SERVICES

**misremembering**
22:11,19,23 23:1
  37:13
**misstates**
159:2 295:18
**mistake**
65:4
**misunderstanding**
67:22
**misunderstood**
252:9 276:12,15
**mixed**
141:15 234:12
**mixing**
262:22
**Mm-hm**
205:24 207:8,11
**Mm-mh**
18:15 36:18 70:8
  73:24 84:11 104:23
  141:5 143:17,20
  144:14 146:17,25
  165:8 183:18
  200:16 216:8 220:3
  220:9 234:14
**modified**
54:7 111:22
**modify**
175:21,22
**moment**
14:18 47:17 82:15
  100:7 152:21
  155:21 220:25
  221:8 250:13
**money**
77:2 97:18 168:9,10
  181:12 279:7,8,13
  303:5
**monitor**
4:9
**months**
20:6
**more**
9:16,25 10:23 12:13
  12:15 14:20 15:3

23:23 25:23 26:3
27:4 29:18 30:10,14
30:19 31:11,13
34:15 35:8 38:13,14
38:22 39:4,13 40:24
41:11 46:14 47:2
52:14 53:25 56:14
65:6 73:6 77:12
82:17 85:7 86:19
87:3 88:12 101:4
108:15,16,22
113:12 118:5
120:23 134:20
144:18 145:9 149:7
156:25 157:2 175:1
179:21 189:3,23
198:25 199:13
201:1 202:5,9 206:8
219:8,15 223:13
225:1 232:24
233:10 236:20
244:21 245:1
246:10 260:5 262:5
262:8 265:8 274:19
295:25 306:3
**morning**
5:11,14
**Moss**
121:10,14 122:1
**most**
5:19 9:18 12:5 26:25
  28:1 37:23 38:16,21
  39:8 44:14 64:1
  76:10 112:17
  127:18 172:3 244:8
  244:17 274:20
  303:4
**mostly**
21:5
**move**
64:10 112:11 177:2
  177:10
**movement**
177:6,10
**moving**

19:7 135:14 179:4
**Ms**
4:22 147:3
**much**
20:18 25:13 28:23
  29:16 33:12 38:3,12
  47:16,16 60:22
  73:12 121:23
  133:25 180:13
  181:3,6 223:13
  239:1 244:13
  261:11 275:8,9
  277:2 284:6 292:1
  303:7
**multiple**
47:4 122:15
**must**
23:23 59:16,25 60:4
  60:7 88:4 110:6
  126:21 147:14
  163:23 169:14
  171:5 195:2 205:12
  239:6 260:18 270:1
  306:16 307:15
**mutually**
246:3
**myself**
9:5 22:11 200:25
  280:22

_____
        **N**
_____
**N**
2:1 3:1
**name**
17:8 29:4 96:13,18
  106:15 168:2
**namely**
20:19 51:13 208:3
**names**
29:3
**natural**
63:9 64:6 65:3 101:9
  113:3,13,18 114:10
  151:6,8,17 153:12
  153:15,23 155:8,9

155:23 156:7,15,22
157:1,23 158:5
186:13 255:21,24
255:25 259:17,22
**naturally**
32:12 153:4,13 192:5
  208:8
**nature**
85:6
**near**
13:22 257:9
**necessarily**
109:18 166:7 174:12
  190:1 234:11
  304:17
**necessary**
110:12 124:15
  125:21 129:25
  171:9 231:20
  247:10 282:23
  306:6
**need**
6:7,8 10:4 36:19 40:5
  68:4,9,13 75:14
  108:14,16 117:21
  158:9,12 189:16
  193:16,20 194:5,19
  204:6 206:17,21,22
  206:23,24 207:1,4
  209:14 211:20,23
  215:17 217:1
  225:19 231:17,25
  232:3 235:11 245:1
  256:16 289:7,13
  293:7
**needed**
23:15 124:18 225:3
  225:14 226:8
  233:13 235:8
**needs**
33:15 227:21 307:11
**negate**
267:14
**negative**
198:21 285:4,12,20



286:21,23 287:1,7
287:11 293:24
295:1
**negotiating**
15:18
**neither**
118:22,25 259:1
311:12
**net**
281:20 282:3 286:23
289:6 290:1,6,11
292:18,19 294:22
**network**
115:1 124:2 203:12
**Neuberger**
1:13 3:3,8,9,11 4:4
5:7 309:3 310:5,15
311:7
**neutral**
255:15
**never**
17:14 18:10 23:20
112:12 130:20
167:10 168:23
173:1,22 174:14,16
174:17 175:2,3
180:23 202:11
205:17 226:20,20
229:8 232:1,2
250:23 279:8 287:8
**new**
2:6,6,16,16 11:21
12:1 29:4 35:8,10
35:10 36:5,16 37:12
37:14,17,18 38:9,10
38:10,11,13,14
99:17,21 129:15
131:4,24 133:5
218:2,3 240:2,4,13
252:16 274:22
283:5
**next**
78:18 84:4 109:5
110:2 138:8 139:20
185:5 238:3

**Nia**
1:23 2:24 4:14 311:4
311:22
**Nicholas**
93:2
**nigh**
269:18
**night**
260:20
**nil**
277:13
**nobody**
96:25 210:19
**Nodded**
165:2
**none**
17:16 49:16 106:20
149:22 163:20
172:9 186:9 214:8
228:18 253:9,12
**nonsense**
214:23
**nonsensical**
147:2
**non-responsive**
189:23 190:2,3
**non-starter**
133:1
**nor**
259:2 311:13
**normal**
26:24 28:8 99:19
253:23 267:19
269:6
**normally**
28:15 47:18 54:1
55:18 153:8 201:20
222:4 230:14 235:8
305:25
**note**
101:25 131:10 141:2
239:21 262:25
283:14 296:11
**noted**
137:19 143:21 144:1

148:5 267:12 310:8
**notes**
138:9
**nothing**
13:12 33:13 34:17,20
34:24 35:18 86:7
116:25 119:10
134:13,21 144:17
159:6,9 161:19
164:18 191:22
196:11 198:1,2
236:5 239:22 249:8
257:16,20 274:13
276:19 290:18
292:9
**notice**
145:3 257:8
**noticed**
13:5
**noting**
284:22
**notion**
104:25 252:24
**notwithstanding**
19:1
**November**
1:20 4:8 309:2
311:24
**now**
4:2 22:11 47:25
56:22 62:14 102:8
123:21 150:2
166:16 172:1
200:11 215:18
217:23,23 237:19
240:10 244:6
245:21 249:21,24
251:10 280:22
287:6 293:6 308:3
**nowhere**
185:24 207:5
**number**
4:3,7 9:12 16:6,7
17:1 25:21 28:21
30:20 33:14,15

34:25 36:6 37:5
42:22 80:22 87:24
141:3 206:9,11
219:16,17 253:2
275:15 300:21
**numbered**
129:22
**numbering**
92:20
**numbers**
10:4
**numerator**
274:11
**Nurse**
53:16
**NZHC**
3:21

---

**O**

---

**object**
12:7 31:4 33:9 34:10
34:23 35:16 37:25
38:19 45:18 50:5
53:3 54:17 56:6
57:6 58:11 59:15
60:20 61:21 66:3,20
67:8,15 75:16 79:21
85:3,17 87:10 89:20
91:23 98:3 99:6
133:11 134:23
136:22 137:7 145:1
148:12,15 149:11
150:17 155:13
156:1,10,18 158:2
159:1 163:22
164:15 167:12
172:16 177:13
188:23 189:25
190:19 191:2
192:12 199:16
210:16 211:2,22
214:14 243:9
256:19 261:4
265:13 267:25
270:16 277:10



281:21 282:5
294:23 295:7,17
**Objection**
57:1 213:4,9,15
259:15 260:16
**objective**
49:24 100:20,25
**objectively**
49:17
**obligation**
175:14 178:2,17
218:8 254:6 287:4
**obligations**
110:18 218:7,20
**obliged**
50:25 53:12 216:19
217:4,5,8,9,9
**observes**
139:7
**obtain**
78:14 221:18 225:23
**obtained**
78:20 259:1
**obvious**
12:22 139:15 176:4
215:5 232:10
**obviously**
34:25 39:24 46:7
66:23 73:7 202:5
242:15 246:6
**occasionally**
24:10
**occasions**
36:6
**occur**
73:18 78:22 206:17
**occurred**
21:3 24:23 43:24
76:15 86:11 229:23
230:3
**occurring**
277:7
**October**
241:20 246:12,16
**odd**

189:20,20,22 190:16
191:9,20 192:3
199:20 207:5
219:19
**odder**
190:20
**off**
34:4 85:23 106:3
129:3 148:19 167:3
170:6 215:19
227:23 280:25
281:2 293:8 308:5,6
**offer**
19:4 257:25
**offered**
6:20,22 18:5 180:3
243:3,6 258:3
**offering**
242:21
**offers**
243:11,11
**office**
17:21,22 18:14 42:19
**offices**
1:16
**Office's**
18:9
**offset**
295:3
**often**
27:17 28:22 137:8,10
**Oh**
29:9 51:23 54:8
62:19 120:5 238:3
**old**
240:3,12
**omnibus**
125:12 126:5
**once**
93:10 114:1 157:2
175:1 229:7 287:11
**ones**
12:5 15:14 37:22
56:20 71:4 96:23
298:15

**one's**
202:25
**one-off**
39:16
**only**
18:21 21:17 48:17
51:17,20 59:13 68:5
74:13 76:10 84:8
93:10 100:5 115:18
120:19 144:12
150:14 153:24
154:6,20 155:5
156:21 173:2 174:7
203:4 212:2 214:19
218:1 228:15,20
258:4 273:1 276:18
279:24 280:2
281:19 282:2,6
287:11 289:4 297:7
301:10 303:13
305:12 307:21
**onwards**
52:19 129:9 170:25
171:1 233:21
**opaque**
179:22
**open**
112:6 123:2 236:16
242:8,16 291:18
**operate**
218:15
**operated**
56:25 57:5
**operation**
56:21 147:10 237:14
306:21
**operational**
133:13
**operations**
56:16,16
**opine**
241:7
**opinion**
11:11 16:12 17:2,4,7
18:5,8 19:10 33:17

40:21 59:2 60:14,17
61:4,5,6 76:5 90:22
124:6 214:1 221:12
226:11 229:21
241:14 265:25
281:18 282:2
283:25 284:9,13,14
284:18 293:10,13
298:1 299:10,19,24
300:1,3,5,10,12,20
301:5 304:6 305:10
**opinions**
11:11,11,12 13:10
15:24 58:10 60:24
62:4,5,14 73:25
76:24 94:23 276:17
**opposed**
11:4 84:19 85:15
153:6 160:5 216:16
256:17 260:6
**opposite**
17:1 142:7
**optimistic**
274:20
**oral**
311:9
**orally**
141:7 218:14
**order**
24:15 29:20 68:8
75:12 100:25
162:21 223:6
225:15,22 231:20
245:3 285:20
288:11 298:5 306:6
**ordinary**
101:9 258:14
**organisation**
243:11
**original**
21:14 170:14 200:9
229:8 236:21
**originally**
165:21
**others**



25:18 167:19
240:11 242:23
299:7
**otherwise**
101:16 185:9 190:25
193:8,13 203:7
277:5 311:15
**ought**
15:2
**our**
6:3 38:18 39:10,10
39:14,16 108:12
119:22 122:10,22
123:10 125:9 136:7
167:3 227:20 265:5
272:24 298:4
**ours**
136:3
**out**
10:24 14:4 20:10,14
25:15 27:6,10,14
33:22,24 41:3 42:1
54:9,12 70:5,12,18
77:25 78:3 81:6
97:1,10 114:3
119:11 120:11
122:24 129:4
138:24 151:20
154:4 158:23 164:4
171:14 191:21
192:15 198:17
206:6 210:18 213:2
231:10 238:11,11
240:7 256:23 257:1
257:12 268:4
269:19 275:5
276:14 290:7,13
291:15 293:19
297:21 303:16,18
307:18
**outcome**
311:16
**outlined**
89:12
**outright**

51:18 107:7,11,16
115:11
**outside**
21:10 62:17,20 102:6
**over**
5:18,25 48:1 51:10
78:20 105:11 117:3
117:8 118:14
120:24 124:2,16
132:12 134:8,9
135:24 143:5
162:19 183:21
188:6,11 203:12
204:6 222:3 225:18
248:24 255:1 257:5
272:7 299:11
**overall**
77:1 124:7 157:17
280:8 292:7 295:11
295:14
**overriding**
127:21
**owe**
287:18 291:10
**owed**
283:21,23
**owes**
291:5,9,13
**own**
6:16 29:19 51:18,18
52:4,5 53:14,21
91:7 95:17,19 96:3
115:24 116:13
130:23 137:17
143:24 145:8,9
149:13,23 150:21
169:1 171:10,11,17
171:22 172:1 174:7
174:12 181:6
186:11,25 240:6
244:7 254:8 255:3
275:20,25 305:24
**owned**
49:4,9 50:23 73:4
84:18 85:1,2,15

95:7 96:7 138:13,18
151:2 173:3 188:13
305:21
**owner**
144:24 145:13
157:11 159:15
163:14 169:17
171:6 186:16,17
187:6 193:16,19,23
193:24 194:1,3,5,7
206:23 207:15
215:8 246:17 258:5
258:10,15,21
259:23 260:2,3
**owners**
144:13
**ownership**
7:25 8:2,5,7,9 10:18
21:18,23 22:5 34:7
34:21 40:2,11 50:2
50:4,22,23 51:4
52:1,4 95:1,9,10,12
95:12,14,16,17,18
95:20,21,22,24 98:1
136:21 137:6
144:24 145:12,15
145:16,17,18,19,24
146:20 148:2 152:9
154:6,21 159:7,10
159:14 167:15
169:7,20 170:1,16
172:24 174:20
175:10 190:17
191:25 192:10,24
196:10,23 199:1,4
199:15 200:5 207:2
207:3,24 208:20,25
209:13 222:18,19
229:15,18 238:5,9
238:23 239:22,25
240:17 254:16
273:7 300:15
**owning**
96:23 143:24 145:21
187:3

**owns**
50:24 72:9,14 96:24
149:25 150:13,15
150:19,22,22
157:25 169:14
174:22 194:16
241:15 305:18

---

**P**

**P**
2:1,1
**page**
3:1 30:22 74:5 88:22
91:1 92:19,22 106:1
106:21 107:5
110:15 111:15
112:9,13,14 113:11
121:18,19 123:16
125:5 129:1,10
135:12,20 139:20
143:8 151:14,15
154:15,20 177:21
185:5 195:6,8
197:18 233:23
241:19 246:14
287:13
**pages**
92:11 128:22 143:15
144:16 184:17
**PAGE/LINE**
309:5
**paid**
54:9 108:23 212:10
212:11 213:18
214:2 281:20 282:3
**Paines**
93:3
**pallid**
133:15
**panel**
93:9,10,11,11
**paper**
3:19 94:3 108:16,18
113:10 114:21
128:4,6



267:9
**paragraph**
22:16 69:25 71:23
73:13 79:11,13
80:20 81:2 82:2,10
85:19 98:13 101:23
102:18 104:16,20
107:15 110:6,21
112:15 114:13
115:17 121:10
123:24 125:7
126:13 127:24
129:9,11,22 135:23
137:14 138:7,8,21
140:3 141:1,13
142:20 143:6 144:5
146:8 147:5,13
148:16 151:15
153:3 170:25 183:3
184:1,6,18 195:9
199:24 200:11
216:1,3 219:25
220:4 221:10
236:23 241:4,10,23
242:2 246:11
248:20 257:25
261:15 263:16
265:22 273:12
282:14 290:20
292:25 296:2,4
305:5
**paragraphs**
128:13,18 129:22
142:21 233:20
**parameters**
100:8 280:23
**pardon**
45:13 170:4 240:18
246:14 282:16
283:5 298:22
**parenthetical**
248:25
**Parliament**
33:20 280:7,16,18
**part**

15:25 16:9 17:13
32:7 47:13 52:14
68:20 74:17,22
75:13 87:8 119:4,9
120:1,13 138:8
145:4 170:11,14,22
171:7 179:10 180:4
180:6 189:6,13
190:8 204:11 216:5
225:22 226:4 239:6
243:25 288:1
296:17
**parte**
272:17
**partial**
262:3
**participant**
237:16
**particular**
8:21 12:12 16:24
36:22,25 37:10 38:6
45:5 59:13 69:14
78:5 83:12,18 84:18
84:25 86:19,25
96:23 97:5,15,16,23
99:8 134:20 136:2
164:1 198:14,16,20
199:1 200:19 201:6
203:13 204:18
215:13 244:7 245:5
254:20 258:24
261:22 269:19,19
272:19 273:8
274:24 303:7,25
304:24 307:22
**particularly**
12:11 63:4 101:11
121:2,4 197:9,12
200:20 201:3
219:18 226:10
252:15 262:18
**particulars**
37:9
**partly**
168:25

**partnership**
196:5
**party**
16:18 43:17 47:13,13
50:4 80:1 111:3
141:15 160:12
161:2 191:15
240:19,21,22,23
254:15 259:8
260:13,25 261:1
289:6 302:5,6
305:17
**party's**
43:16 167:9 218:20
**pass**
78:21 103:3,8,11
104:14 162:13,20
163:16,20 165:7,16
165:19,24 166:16
166:17,20 168:6
205:13,15 207:20
207:21 224:11,12
250:12 251:23
**passage**
248:5 270:22
**passed**
163:21 165:22
174:21
**passes**
225:18
**passing**
208:2 211:12,19
**past**
11:1,3
**patent**
14:18
**pause**
6:1 65:23 83:23
238:24 283:9
**pay**
289:6 290:12 291:15
**paying**
179:2
**payment**
54:12

**Pearson**
265:25 266:2,4,10,13
266:21 267:13,21
268:8
**pending**
6:6
**people**
6:15 19:19 45:3 48:2
50:24 51:1 64:5
76:13 93:11,17 94:3
105:10 154:14
190:21 201:8
202:21 208:22
209:23 210:2 211:5
217:6 219:21
228:17 240:10
243:17,23 244:8,24
294:13 301:18
**per**
30:21 86:5
**percentage**
84:17 85:1,2,14
256:17 272:3
**percentages**
257:4
**perfect**
81:25
**perfectly**
10:5 83:4 85:9 107:2
182:25 185:4
186:10 220:22
271:12,14 274:2
307:23
**perhaps**
9:18 21:25 22:19
64:1 101:5 144:12
260:17 293:18
**period**
98:2 272:7
**periods**
256:4
**permissible**
240:3,5
**permission**
213:3,8,13 232:4



**permits**
268:11,12,14 269:1,5
**permitted**
297:21
**pernickety**
306:1
**Perpetual**
241:4,11
**person**
16:24 17:6 18:21
27:1,15 46:11,25
47:7,9,20 49:2
50:10,22,24 51:10
51:12 116:7 123:1
124:1 169:14,15,15
169:17 218:14
220:5 225:18
258:14 261:6
274:24 303:8
**personal**
6:16 302:10
**personally**
25:23 29:7 44:11
**personnel**
48:2,20
**person's**
232:12
**persuade**
64:10
**persuaded**
209:17
**persuasive**
33:1 36:1,7 102:9,16
133:7,10
**Petch**
2:22 4:22,22
**phrase**
153:21 239:4,8 262:9
290:22
**phrasing**
282:24
**physical**
80:8,9 279:12
**physically**
79:1 97:2

**pick**
74:24,24
**picking**
232:18 255:16
**picks**
142:23
**picture**
56:17 59:4 64:7 77:2
77:4 163:12
**piece**
228:4
**piercing**
16:14
**Pim**
49:11,19 50:13
**Piroozzadeh**
11:18 38:4 40:4,9
84:22 142:6,19
269:23 270:23
271:18,23 272:11
274:7
**place**
78:1,2 97:2 223:8
**placed**
79:25 83:1
**places**
113:25 201:5 275:18
**placing**
80:8,9
**plainly**
35:18 44:15
**plaintiff**
272:16
**platform**
73:18 114:1 195:10
195:14
**play**
272:24
**played**
28:11
**playing**
193:2 265:20
**plead**
261:12
**please**

4:16 5:5,20 6:2 22:25
84:2 283:18 308:1
**plenty**
163:23
**plus**
25:1
**pm**
1:21 4:9 85:24 86:2
148:20,23 215:20
215:23 227:24
228:2 281:6 308:7
**point**
22:16 40:5 49:23
62:22 63:4 69:4
76:7 82:22 83:5
85:9,10,16 95:15,25
96:2 102:3 125:21
142:24 146:4
147:15 148:1
149:20 150:5
151:19 152:1
153:24 154:23
163:2 164:25 165:9
168:20 170:9
172:22 174:13
175:4 180:13 181:2
181:6,8,18 182:7,8
183:22 189:16
193:11 194:11,20
195:24,25 196:15
199:21 200:24
201:7 204:17 205:6
209:2 217:12
229:25 231:24
232:18 233:22
234:2,6 236:19
239:14,16 240:21
242:10 245:5,19
250:11 255:17
257:14 261:22
262:14 264:3 265:7
265:7 266:19
268:16 269:8,17
270:10,25 274:17
275:21 276:24

277:1 283:14
284:12 292:7,10
299:13 301:10
304:2,5 305:1 306:2
306:12
**pointed**
231:10
**pointing**
170:20
**points**
9:7 12:8 28:22 69:5
108:22 149:25
154:10 157:5,24
185:23 193:4
207:25 268:22
301:1 306:3
**poll**
115:24
**pool**
57:13 59:5,6,7 70:12
73:16 77:8,15,21,22
77:25,25 78:1,5
81:16 82:16 95:4
96:15,22,24 97:1,11
124:8,16,20 132:13
134:9 141:16 142:2
142:14 143:5
155:19 162:16
164:19,21 165:23
171:20 172:10
173:10 174:13,14
203:22 204:4
218:11 219:19
223:21,21 226:20
230:6 256:23 257:5
257:16 269:19
275:16 276:3
277:12,17
**pooled**
73:21 74:1,9 76:18
76:22,25 77:3,10,18
77:20 136:7,19
204:9
**pooling**
124:13 135:24



156:20 208:1
**portions**
34:8
**position**
76:12 79:23 80:18
    81:14 82:17 83:1
    123:25 140:22
    148:9 166:14
    171:25 213:24
    292:19
**positions**
25:3 288:10 298:4
**positive**
294:22
**possessed**
220:8
**possession**
51:9 169:15,16,17
    220:7,12 227:15
    306:24
**possibility**
25:2 120:21 171:13
    235:5,15 236:2,3
    273:25 274:5
    277:12
**possible**
38:13 43:15 62:22
    77:13 85:9 107:9
    113:12 115:10
    117:1,6,15 124:1
    171:11 183:20
    190:23 191:11,17
    191:24 192:2,8,23
    193:12 203:10
    206:2 242:11,15
    245:22,23 250:25
    251:7 257:8,11
    264:25 265:11,16
    265:17 269:18
    274:18 277:25
**possibly**
9:14 20:6 21:2 57:11
    108:14 144:7,10
    210:9 216:18
    256:20 270:2,19

274:14 304:23
**post**
17:21,22 18:9,13
    44:15
**potential**
245:9 272:17
**potentially**
245:16
**power**
144:20
**powerful**
180:13,15 181:6
    254:8
**powers**
193:8
**practical**
251:11 277:16
**practicalities**
274:7
**practice**
26:24 53:24 65:19,20
    78:22 95:9 168:3
    169:1,11 195:18
    286:1 307:5,7
**practising**
122:25
**pragmatic**
242:20,24
**prebankruptcy**
44:16,19
**preceding**
179:24 180:6 196:25
**precise**
58:7 96:11 139:4
    249:4 261:11
    269:16 280:23
**precisely**
142:6 233:8 270:10
**precluded**
234:11
**predecessor**
25:19 26:24
**predecessors**
28:14
**prefer**

127:15 163:10
    278:11 294:13
**preferred**
28:5 123:10
**preparation**
12:20
**prepare**
10:24 11:5 13:2,8
**prepared**
30:8 87:3,19 108:15
    148:9 225:9 242:17
    303:3
**preparing**
13:3
**present**
2:20 21:21 22:3
**presented**
85:12 272:17
**presently**
187:11
**pressure**
247:23
**presumably**
152:20 179:23
    209:24
**pretend**
7:8 8:11 9:18 12:11
    34:12 37:20 38:5
    42:3,18 125:3
    128:12 132:7 133:8
    138:14 180:17
    242:25
**pretty**
12:22 15:13,23 16:17
    16:21 26:8 34:16
    42:20 53:5,10 60:8
    99:15 132:9 177:18
    177:19 201:15
    219:19 232:10
    244:12 255:15
**prevailing**
220:25
**prevent**
139:19 212:19 264:7
    274:11

**prevented**
264:10 276:21 277:6
**prevents**
66:25,25 214:12
**previous**
71:2 106:8 119:25
    120:21 180:17
    234:2 240:10
    241:24
**previously**
188:13 236:7 281:8
**pre-dated**
44:12
**pre-existing**
191:8
**pre-petition**
56:16 98:2
**prima**
169:16
**primarily**
77:4 143:1
**primary**
285:3,12 292:15
    296:5
**principal**
55:6,6,10 130:23
**principally**
72:10 284:23
**principle**
38:22 39:4 40:6,15
    76:3 86:24 87:2,11
    111:7 112:7 143:5
    170:15 171:2 173:4
    174:8 216:5 236:9
**principles**
12:16 30:16 39:9,9
    39:13 49:23 55:21
    99:20 100:16 111:9
    111:10 132:8
    236:17 267:3
**prior**
13:11 14:7 26:5,12
    26:15,16 81:5 143:8
    192:16 199:24
    204:8 216:1,4,4



228:5 270:8
**prison**
190:4
**private**
115:1 130:16 140:8
181:1,13 250:8,10
**probably**
12:5 23:10 30:14,17
32:10 52:24 53:24
56:9 59:18 61:5
75:7 100:2,10
123:14 210:6 225:6
233:7 240:12
243:15 250:14
261:6 276:12
283:13,20 292:23
294:21
**problem**
10:20,21 35:1 74:23
74:25 139:19
168:13 215:5 229:9
230:18 246:1,9
268:20 271:20,21
304:9
**problematic**
82:18,23 83:2 168:8
**problems**
33:19 38:22 55:2
165:13 166:9
229:12
**proceed**
5:6 45:4 108:15
225:9
**proceeding**
311:14
**process**
14:17 27:22 28:15,21
94:1,6 137:23
**produce**
27:5,8 94:2,4
**produced**
17:1
**produces**
206:8
**profession**

103:25
**professional**
26:5,13
**profit**
304:18
**profits**
185:12
**program**
285:8
**programme**
285:13 289:20
**promoted**
93:7
**proof**
53:17
**proper**
113:3,18 230:16,18
230:19 306:4
**properly**
272:16,20 284:6
**property**
9:12,13 50:7,10 51:9
118:15 120:24
141:15,16 149:22
150:19 153:13
165:21 166:22,24
166:24 167:1,2,4,5
170:16 186:6,7,8,9
186:16 187:16,18
187:21 188:3,6,11
188:13,21,22 189:2
189:4 190:7,7,13,24
191:18 192:1,11,25
193:19 194:22
195:1,16 197:5
206:22 207:10
214:9,22 220:6,7,7
220:11,17 230:8
231:2,5,5,13,16
232:3,4 233:4 254:6
254:7,8 256:1
272:21 302:6,21
306:7,15,16,20
**property/Chancery**
93:14

**proportion**
124:4 257:1 269:19
**proportionate**
203:21 270:3,14
**proposition**
64:8 105:13 244:4
254:14
**proprietary**
20:20,21 72:4,7 85:6
220:11,13 234:10
234:20
**prospect**
17:3
**protect**
184:24
**protected**
19:18
**protection**
181:1,14 189:11,12
**provide**
19:10 179:13 246:2
305:9
**provided**
18:13 28:25 29:7
31:2 42:3 58:18
69:13 70:2,15,24
88:19 157:6,8
206:13 268:15
291:17
**providers**
89:15 90:5 91:14
92:1
**provides**
133:12 187:15
**providing**
283:10
**provision**
54:12 134:4 149:19
176:1,6 177:18
189:14 198:15,16
198:19,20,23 200:6
207:18 215:13
238:6 258:24
261:21 281:16
298:6 302:5,8,19

303:17 304:21
307:11,17,17,21
**provisional**
35:11,12
**provisionally**
122:10,11
**provisions**
132:24 134:1,16,18
196:2 215:7 244:15
267:18 298:14
299:1,5,6 302:13
307:13,16
**public**
74:12 76:22 77:16
87:5 130:15 140:8
181:1,13 184:23
**publicly**
73:22 74:2
**pull**
121:16
**pulled**
129:4
**punters**
243:13
**purchased**
161:20 212:13
250:18,20,24 251:6
252:2,5
**purchaser**
258:4,18 259:1,25
260:1,3,5,12,15
272:20 273:3,9
**purchasers**
24:17
**purchases**
24:20 273:2
**purchasing**
161:12
**pure**
17:5 30:20 189:13
290:17
**purely**
116:18,24 152:3
178:15 273:24
**purpose**



10:21 193:12
196:14 261:7
**purposes**
9:5 21:21 22:3 42:4
44:23 76:4 104:6
108:19 266:22
**purpose-based**
127:2,12,19
**put**
27:18 29:18 30:1
32:21 57:8 58:7
61:3 79:25,25 80:6
80:8 82:1 96:10,18
97:9,21 122:24
123:21 135:8,9
142:10 148:6 152:5
154:14,20 162:21
163:10,25 169:25
174:13 183:13
190:4 223:21
227:10 250:9 251:1
262:1,5 264:9
265:21 269:21
274:15 296:11
**puts**
113:11 164:19
**putting**
51:5,6 227:4

**Q**

**QC**
106:14,18
**qualifications**
17:18
**qualify**
153:9,10
**qualifying**
153:15
**quantities**
83:12
**quantity**
83:17
**quasi**
250:13
**quasi-bailee**

98:7
**quasi-baileeship**
224:3 250:16 251:22
**quasi-bailment**
38:25 67:19 69:1
95:3 99:17,25 100:1
100:4,4,10 102:4
113:12 115:11
162:15 168:13
208:3 219:23 220:1
220:15 222:25
223:10,16 227:12
229:6 232:25 233:3
233:14 234:25
235:22 236:10,14
241:17 252:16
264:18,20 265:4,7
265:11,15 277:9,16
277:20 279:10,10
279:15,16 280:6,14
280:20
**quasi-bailors**
99:10
**query**
250:14
**questionable**
46:11 236:10
**questions**
24:7,10,12,13 25:9
25:11 27:14 30:7
34:6 56:14 65:6
67:18 68:24 69:1,2
69:6 94:23 128:24
165:25 213:21,22
213:23 236:20
246:10 296:1,15
300:24
**quicker**
28:6 241:1
**quickly**
41:3 60:8 78:1
135:14
**quite**
15:16 19:21 20:7
25:18 27:19 29:25

30:1 32:10 34:2
36:3 38:2 39:22
41:1 55:19 67:16
76:6 81:24 82:1
87:19 88:1 105:8
114:20 117:9,14
125:17 137:8,10,11
149:17 167:20
169:25 173:12
176:5 180:10
186:18 200:7 209:4
210:9,20 211:15,24
215:12 221:3
224:25 226:10
231:10 245:12,17
245:20 248:11
265:14 267:17
270:18 279:17
280:1 293:12,17
**Quoine**
112:25 137:9
**quotation**
262:3,5,5
**quote**
101:3
**quoted**
261:24 263:3

**R**

**R**
2:1,7
**raise**
44:24
**raised**
10:6 28:22 213:22
269:17 272:20
**raises**
279:9
**raising**
27:14 236:3
**rarely**
94:12
**rate**
15:22 25:2
**rates**

15:11,14
**rather**
12:14 23:4 28:6
32:21 39:4 47:17
57:16 77:2 85:8
101:6 108:9 116:22
129:3 131:5 144:12
201:4 207:17 212:8
217:12 220:7
239:14 244:6
245:25 261:21
280:9 293:20 294:3
294:5 306:1,21
**Re**
1:6
**reach**
94:6 113:22
**reached**
36:11 98:1 132:6
141:4
**reacting**
30:18
**read**
8:19,25 11:10 41:25
42:3 56:17,18,21,22
192:5 207:6,9 235:6
248:3,7,7,10,11
249:16,16,17
295:14 310:6
**reading**
9:3,21 151:8 153:23
157:10 186:10,13
201:22 251:18
270:17,18
**ready**
55:20 149:9 202:5
**real**
17:3 66:1 155:20
278:20
**realise**
23:23 117:21 163:24
**realistic**
274:6
**realistically**
237:4



**really**
9:4 10:19 12:8,15
20:5 23:2 30:22
34:15 39:6 41:7
60:15,16 62:11
64:24 71:3 132:14
132:21 179:10
193:10 195:3
200:21,22 205:5
210:17 213:5,21,24
219:6 221:2 223:11
223:13 230:19
236:13 239:1,16
240:4,13 242:9
258:20 261:20
265:9 276:4 279:9
296:12 303:3
304:11
**realms**
236:13
**reason**
6:9 8:3 34:1 48:19
109:12,15 113:7,16
119:4 120:1 125:15
129:4 140:21
160:18 173:2
183:13 203:16
221:3,5 234:7
240:19 273:22
277:8,12,13,15
**reasonable**
46:25 47:7,9 116:7
**reasonably**
28:9,11 44:25 74:16
93:1 204:8,19
**reasoning**
19:5 36:3 61:10
104:13 105:9 119:9
145:5 181:18
**reasons**
100:13 132:9 136:4,8
136:16 228:17
229:12 290:22
**rebuttal**
3:11 11:12 69:5

74:25 101:4 150:3
151:12 176:12
183:23 184:10
197:16 248:17
273:14 282:11
305:5
**recall**
11:16 12:25 13:4
19:23 20:15,16,17
24:12,18 25:4,6,8
25:10 26:7,25 28:24
29:6,11,23 30:23
31:15 37:6 39:25
40:9 48:10,12,17
50:1 60:18 61:19
69:13 71:21 72:22
87:18 88:5,20 90:1
90:8,10,16 92:7
102:8 104:2 105:18
105:22 111:1 119:3
119:8,13,15 120:6,8
120:16,17 121:13
131:23 132:3 150:2
155:18 233:2
262:21 264:5
266:13 267:8,12,21
270:23 272:15
281:13,15 301:5
306:5
**received**
29:8 123:5
**receives**
56:1
**recent**
11:13,25 26:25 28:1
64:1 69:4 74:24
112:24
**recently**
10:7 56:19 206:9
235:6
**recognise**
13:19 169:16
**recognised**
119:24 177:20
**recognising**

234:24
**recognition**
120:20 234:9
**recollect**
34:18 35:17 40:13
71:19 91:19 128:8
135:5
**recollection**
21:13 26:22 37:19
58:6,25 182:11,25
226:6
**recommendations**
33:21 94:16
**recommending**
233:8
**reconcile**
198:12 264:17
**reconciled**
138:2
**reconciling**
137:23
**record**
4:3,17 16:7 42:8
59:17 74:6 81:14
83:25 85:24 86:2
126:8 148:20,23
152:20 211:15,17
215:20,23 220:24
227:24 228:2
230:11,12 281:3,6
308:5,7 311:9
**recorded**
20:25 80:25 97:17
152:16,17 157:14
159:25 160:2 173:8
180:5 232:11
**recording**
10:15 57:17
**records**
57:20 80:17 97:18
262:23
**recover**
212:11 291:20,22,25
292:1,2,14
**recovering**

292:4
**Recovery**
2:13 4:24 5:2
**rectification**
46:6 203:7 219:11
**rectify**
43:15
**recusal**
18:10
**recused**
18:25
**redraft**
28:18
**redrafting**
28:16 29:16
**reduce**
288:11,17 292:2,5,8
297:11 298:2,5,8
**reduced**
111:11 276:19
292:21,23
**Redundancy**
111:18
**refer**
48:10,15 76:9 82:5
122:23 145:7,8
175:6,6 179:9 180:9
203:17 224:14,25
225:25 255:20
269:22 285:22
**reference**
22:12 63:12,13 116:7
144:2 146:23
199:21 207:10
219:12 239:1
293:19
**references**
207:2,23 238:18
**referred**
48:10 70:24 72:22
97:21 103:24
111:14 129:5 131:3
137:8,10,12 146:5
146:24 270:21
**referring**



49:15 80:11 81:9,22
98:22 115:6,22
129:9 146:19
179:12 198:12,18
200:17 224:18,20
224:24 238:25
263:14,18 270:7
**refers**
104:25 161:1,22
179:23 232:10
296:19
**reflect**
230:15,15,17 232:18
**reflected**
43:4 69:19
**reflects**
20:19 74:5
**reform**
125:21
**refreshing**
12:14
**regard**
28:9 33:11 53:24
54:1 81:13 127:20
269:7
**regarded**
93:18 102:21 116:20
**regarding**
7:11,13,23 32:14
35:14 94:25 173:4
260:14 300:20
301:6 305:10
**regime**
108:8
**registering**
195:10
**regularly**
302:13
**regulations**
90:18,22
**regulators**
113:2,17
**rejected**
15:25 16:12 265:15
**rejection**

200:1
**related**
73:20 222:9 281:10
311:13
**relating**
8:2 41:6 99:20
304:10
**relation**
7:1 8:20 9:3 14:18
35:10,10 39:10 53:7
89:11 99:2,21 108:6
124:3 173:24 174:1
178:3 197:10 236:9
238:6 240:5 299:13
299:14
**relations**
3:17 106:4 115:14
267:10
**relationship**
26:6,13,15,17 41:5,8
46:21,24 53:8 54:3
54:16,21,24 55:6,7
55:11,24 56:4,8
65:20 99:1 107:10
113:3,18 115:10
124:10,12,18 126:9
126:22 135:23
175:13,14,19,23
176:2,7 187:25
191:23 192:6
196:13,16 197:15
198:5,6,7,10 199:7
199:9,11,21 220:5
221:17 253:15,18
253:19,21,24 254:9
263:10 271:10
**relationships**
55:20,21 115:13
253:25
**relatively**
198:24 246:24 247:4
247:13 272:7
**relaxed**
236:18
**relevance**

9:14 74:4 77:7 175:9
196:8 274:4 276:18
297:25 298:14
**relevant**
9:10 12:5,12 22:2
23:19,25 24:3 43:1
43:17,20 44:8 45:16
45:25 46:1,20 48:23
61:20 63:25 66:6,11
69:16 71:4 72:24
73:25 74:7 75:7,13
76:11,24 77:4,8
86:14 120:4 133:2
175:12 190:25
202:20 203:8
217:25 218:9 230:5
232:11 238:8
245:13 258:8 259:7
259:19 262:5 264:2
264:14 275:20,21
276:16 277:4 285:3
287:11 296:16
**reliance**
176:17 181:15
**relied**
44:25 47:22 92:16
103:24 105:23
143:3 266:3
**relies**
278:23
**relieve**
302:20
**reluctant**
37:11
**rely**
46:12 63:24 102:13
119:23 149:7 266:2
299:6
**relying**
83:5 120:19 262:4
307:4,9
**remain**
77:7 111:25 159:18
174:12 258:21
**remainder**

238:15
**remained**
18:24 172:21
**remaining**
235:17 296:1,6,23
**remains**
33:18 51:12 100:14
156:12 164:21
166:23 168:15
250:15 265:6
**remarkable**
159:4 186:18 199:5
**remedies**
185:10
**remember**
11:20 15:2 17:8 21:1
21:20,24 22:10
29:13,25 31:6 37:11
37:14,20 38:6 41:13
45:1 56:20 61:15
86:15 92:1 105:20
105:21 108:21
119:7,12 125:3
128:12 150:6 264:9
267:11 276:11
281:16 285:16
**remembered**
72:21
**remembering**
22:8,25
**remind**
22:11
**remotely**
199:10
**removed**
276:3 300:15
**repeat**
211:20 263:11
**repeating**
280:22
**rephrase**
217:12
**replace**
268:23
**replaced**



229:8 251:7 267:23
**reply**
123:2
**report**
3:13 11:19 17:19
  20:2,18 21:14 26:20
  27:1,6,8 28:24 29:6
  29:21 30:11,12,14
  30:15,15,17,21 31:8
  31:10,20,25 32:5,23
  33:8,21 34:7 35:19
  41:14 42:4 48:16
  69:16,21 82:8 88:5
  92:4,6,12 94:4,17
  102:14 103:19
  104:3,11,13 105:10
  105:19 114:12
  121:14,25 122:10
  122:19 123:4,15,23
  123:24,25 124:22
  129:5,8 135:8,19
  145:5 146:24 150:3
  151:12 152:6
  169:18 170:14
  183:14,23 184:10
  184:11,18 185:24
  197:17 200:9
  210:18 215:25
  233:17 237:21
  247:17,19 248:12
  248:18,18 273:11
  273:13,14 282:12
  290:19 296:21
  305:5
**Reported**
1:23
**reporter**
2:24 4:14 5:5 6:3
  215:15 227:21,22
  311:2,4
**Reporters**
311:5
**reporter's**
18:20 83:22
**reports**

11:5 12:20 13:3,11
  13:13 23:8 25:14
  26:20 30:24 32:18
  32:20 33:3,25 41:12
  41:16 47:25 49:21
  50:19 69:19 89:19
  90:12 92:17 94:8
  169:22 248:4,13
**represent**
4:17 5:12 6:19 89:16
**representations**
216:16,23
**represented**
6:13 246:16
**repressive**
190:5
**reputation**
106:15,16
**requests**
188:21 189:2
**require**
76:5 103:2 117:17
  188:6 280:5 305:20
**required**
188:10 223:13
  225:22 226:5
  254:15
**requirement**
221:16 222:10 286:9
  288:7 289:6
**requirements**
103:8 104:14 148:12
  166:16 221:11,13
  223:16,19 266:10
  286:5
**requires**
236:6
**requisite**
126:20 256:11
**research**
9:1 23:15 33:15
  267:9
**respect**
124:8 141:21 240:19
**respected**

93:23 94:8,10 106:18
  131:11
**respects**
278:16 279:12
**respond**
188:20 189:2 190:18
  191:18 192:1
**responding**
192:10
**responsibilities**
88:25 89:4,11
**responsibility**
91:6 217:24
**responsible**
10:16 89:7
**responsive**
127:2,13,19 189:23
**rest**
150:4 151:1,4
**restitution**
300:17
**restraints**
66:18 67:4,12
**restriction**
68:7,9
**restrictions**
68:16,22 69:9
**restructuring**
27:13
**rests**
151:18 157:3
**result**
82:21 83:11 84:16
  141:8 192:1 206:8,8
  208:10,12 285:20
**resulted**
297:21
**resulting**
301:13
**results**
17:15 259:9
**resumé**
13:25
**retain**
162:10 163:8,11

222:18,19 228:21
**retained**
224:2 234:21
**retaining**
237:5
**retains**
166:5
**return**
232:24
**returned**
281:11
**returning**
303:6
**returns**
130:11
**reveal**
62:2
**revealed**
253:2
**revenue**
304:18
**review**
12:19 48:2,6,20 71:9
  71:13,18 104:8
  128:6 201:24
  247:17 248:13
**reviewed**
12:20 13:6 37:22
  87:17 88:7 104:10
  108:18 247:16
**revisit**
60:15
**reword**
204:17
**rewrite**
27:9 63:17 206:7
**rewriting**
29:16 206:17
**re-phrasing**
149:19
**re-read**
11:11
**rid**
174:16 257:19
  275:10 278:1



**rightly**
9:6 21:1,20,24
    231:11
**rights**
66:5 122:16 132:13
    189:3,9,23 193:11
    193:13 212:8,23
    213:18 214:2
    241:12,15,18
    260:14 268:17
    281:10,23 282:8
    287:7,9 289:13
    293:19,21 294:4,14
    300:15 305:18,22
    305:25 306:1,7,11
    306:15,16,20
**rise**
46:4,6 55:10 95:22
    117:22 229:12
    300:16
**risk**
9:16 36:8 129:3
    176:16 180:23
    183:16,20 184:3
    287:15
**risks**
257:17
**Robinson**
2:12 4:20,20
**role**
17:24,25
**roles**
89:10
**Rose**
49:11,19 50:12
**Roughly**
25:22
**round**
28:22 121:21
**roundabout**
28:23
**route**
134:12
**Rt**
309:3 310:5,15 311:7

**rubber**
129:3
**rule**
7:17,19 64:21 168:4
    198:13,18 228:14
    306:25 307:4,10,20
**rules**
5:18 53:5,7,10 90:17
    111:8 228:16
**run**
32:10 52:19 210:10
    245:4
**running**
52:13,18
**Ruscoe**
3:21 12:1 113:1
    129:12,23 131:1,15
    131:17 132:14,18
    133:2,4,22,23,25
    134:5 135:15,17
    136:4,5,17 137:5
    138:2,16 139:3
    140:5,12 145:11,20
    146:10 147:21,25
    148:5 255:5,7,11,14
    257:11 270:18,21
    274:8

---
**S**

**S**
2:1,17 3:7
**safeguard**
56:3,8,10
**safeguarded**
91:7
**safeguarding**
89:7,11 90:23 91:2
**said**
5:12 8:22 12:9,10,16
    18:16,24 33:24
    34:13 35:8 36:14
    37:17 45:1,8 47:18
    48:9,11,23 49:9
    56:18 59:8 63:3
    75:17 77:12 83:15

84:22 85:5 93:20
    95:6 99:17 100:12
    101:19 108:21
    114:9 120:21
    122:10 125:1,9
    136:1,2,19 140:5
    141:19 142:6 145:5
    148:16 155:14,17
    163:3 169:19 170:1
    170:7 181:8 186:20
    187:8 190:20
    191:22 193:18
    195:24 197:17
    200:13,18 201:8
    203:3 204:3 206:12
    208:9,15 217:16,17
    218:15 225:6 232:9
    242:17,18 251:19
    252:17 256:10
    257:9,10 259:17
    263:4 264:10,11
    267:1 277:1 283:21
    294:8 298:20
    306:17 307:3
**sailing**
244:3
**sale**
119:14,17,21 120:2,7
    120:10,11,18
    142:23 143:1
    297:22
**sales**
24:17,20
**same**
6:2 15:12,22 16:15
    21:21 22:3,5 23:4,5
    28:15 39:18,21 42:4
    45:4 53:7 54:19
    62:11 63:4 127:16
    195:16,20 196:15
    271:17,19 272:5,8
    307:8,14,16 310:7
**Sarah**
93:2
**sat**

22:16
**satisfied**
125:10,18 126:6
    129:24 140:6 147:8
    223:17,19 258:6
    259:1,8,14,25 260:2
    260:6 266:11
**satisfies**
111:12
**satisfy**
9:5 259:20
**saw**
65:22 132:15
**saying**
34:2,13 52:4 78:14
    78:24 123:17
    132:12,21,22 134:2
    134:11 139:16
    141:23 142:9 147:1
    148:2 149:12 152:1
    152:2 153:15
    155:20 158:14
    170:13 175:23,24
    178:19 181:9,15
    183:7 186:5,6,8,11
    190:24 191:3 194:4
    200:22 201:8,9,12
    206:10 215:6,7
    217:1,3,7,10,15,17
    217:19,20,21,22,24
    218:2,6 221:2
    223:12 231:21
    237:8 238:25 239:5
    241:16 249:7,12,24
    258:12,13 263:25
    278:6 281:17 282:6
    282:7 285:11 288:1
    289:8 295:8 296:12
    298:7 303:24,25
    304:20 307:7,8,13
    307:16,17
**says**
47:19 49:7 79:22
    81:16 89:3,6,10
    90:4 91:5 104:25



MAGNA
LEGAL SERVICES

107:9,16 112:17,24
116:25 123:16
126:19,25 134:14
134:21 137:16,22
142:18 145:25
159:6,9,17 160:10
161:19 168:15
169:12 175:13
176:1 179:19
184:22 185:6
186:25 188:5
190:10 191:4
195:10 198:1,3
207:18 214:8
218:23,24 234:8
246:2,4,6 249:16,18
250:3,4 256:21
259:5 266:7 287:14
287:17 288:9
295:23 297:20
303:15,21
**scenario**
107:6 108:13 110:3
117:13 164:12,24
166:3,13 174:2,5
188:3 207:19,22
222:13 223:2,16,18
235:21 277:7,20
**scenarios**
163:19
**schedule**
285:9 291:16
**schemes**
184:24
**scholars**
104:9
**science**
9:15
**scientific**
9:17
**scientist**
9:15
**scope**
20:22
**scratched**

126:8
**scrawl**
87:15
**Sebastian**
16:8 17:9
**second**
3:9 5:24 28:3 40:20
42:10 53:22 64:22
79:9 89:14 99:24
106:21 107:15
108:1 130:9 136:19
138:8 171:7 179:9
183:24 184:22
195:9 222:9 233:8
238:24 240:25
**Secondly**
16:16 39:20
**section**
88:24 89:3 91:1
101:20 104:17
106:22 107:6 110:2
110:16,16 111:17
114:14 121:17
126:15,16 135:13
139:21,24 143:7
149:4 154:19 161:6
161:25 175:6,7
176:14 179:9
181:19 183:4
187:12,13 188:5,9
192:9 196:3,5,9
197:18,18,23
198:25 216:1
219:22 220:1
236:25 237:20,24
238:4,15 239:18
241:3,7,20 248:23
255:21 284:24
285:8 286:2 291:4,8
291:13,14 293:1,3
293:22,22 294:4,5
297:7,8 298:1
300:23 301:3
303:11
**sections**

175:6 188:2 190:23
191:11 200:10
301:11
**secured**
98:23
**seeing**
46:25 47:7 90:8
201:15 292:13
**seem**
22:10 41:23 138:20
145:4 148:3 150:1
159:20 162:22
186:14 200:20
209:10 221:3 256:6
285:14
**seemed**
133:10
**seems**
33:23 34:16 87:25
89:21 101:4 105:13
147:23 162:23
169:2 173:12
175:17 176:4,15
191:3 197:9 210:10
215:2 216:13 218:2
220:16,19,25 225:8
229:11 230:5
236:10 238:10
274:8 286:2 293:21
304:19
**seen**
33:18 41:7,9 42:25
46:10,13 54:14
76:22,23 77:15,22
77:22 100:14
111:21 145:2,25
168:14 250:15
**segregate**
232:17
**segregated**
79:16 91:7 96:13
97:1,5 125:11 177:2
223:24,25 224:6
229:14 263:20
**segregation**

91:2 232:20
**seize**
288:10 298:4
**select**
43:12
**selected**
93:9,17
**sell**
49:12 50:7 164:16
251:12 258:3 261:1
286:12,14 289:14
289:15 292:7
297:11 298:2,13,25
299:4
**seller**
49:12
**selling**
57:10 120:12 143:23
261:7 286:8 289:10
**Senate**
216:10
**send**
27:10 40:25 160:10
**sending**
27:14,15
**sends**
28:17
**sense**
6:18,19 7:18 8:1
20:18 52:14,15
53:15 55:9 63:13,16
63:17,21,23,24
159:24 160:2
180:10 197:4,24
207:23 295:8
**senses**
296:5
**sensible**
33:17 34:16 64:24
107:2 206:8 208:10
208:12 211:15,16
211:24 224:17
**sent**
41:1,11 42:17
**sentence**



35:20 78:18 82:20
84:4 104:24 108:1,5
109:5 112:21
119:25 120:9,21
138:9 144:6 171:8
179:13 184:22
238:3 288:4,5
**sentences**
270:8
**separate**
97:2,19 147:15 254:6
254:7
**separated**
51:21 52:8 95:16
**separately**
52:18 262:24
**separates**
51:17
**separation**
51:22
**September**
20:3
**seriously**
27:4 33:3
**serve**
187:20
**served**
14:10
**service**
3:23 20:23 21:10
61:16 62:2 67:5
70:5,6,16,19 71:5
93:12 116:3 134:14
134:21 135:4 149:1
165:1 185:24
202:16 205:4
229:22 230:21
243:24 244:19
245:14 281:9,20
282:3 295:14 298:9
**services**
1:24 4:13,15 70:3
88:19 130:11
175:16 176:11,12
176:13,25 177:17

177:20 178:18
179:16,19,20 180:2
180:2,3 188:20
291:19 303:19
**set**
19:16,17 42:1 70:5
70:18 268:14 269:1
291:15 293:8
**sets**
147:15 210:18
303:16
**settle**
288:12,18 297:13
**settled**
221:12
**set-off**
98:5 293:4,25
**seven**
128:13 233:22
**shall**
159:18 214:9 258:21
**share**
203:21 270:3,15
**shared**
266:15
**she**
36:10 51:2 74:13
106:17,19,19
154:24 184:20,22
185:6,19 190:3
211:3 250:3,4 260:3
262:3,5 296:13
307:3,5,5,7,7
**sheet**
109:8,9,22 230:4
**short**
57:11 65:23 68:6
85:22,25 148:21
215:21 227:25
242:10 257:18
272:7 281:4
**shorter**
30:15,21 101:7
**shot**
245:12,20

**should**
12:21 15:19 18:2,3,6
18:16,25 55:19
74:16 75:19 79:8
81:25 139:18 199:3
199:14,19 210:19
217:22 221:4 225:6
226:8 239:7 246:3,5
263:22 285:2
**show**
44:25 105:16 109:7
109:22 113:1
135:14 137:10
170:20,23 201:17
222:16 243:12
244:21 245:1
306:13
**shown**
139:5
**shows**
109:8,16 189:17
192:20 256:22
**sic**
239:12,13
**side**
32:21 79:25 246:2,4
**Sigma**
76:9
**signature**
310:7
**signed**
71:6
**significant**
141:14,24 142:1,16
149:18
**silent**
249:21
**silly**
224:22
**similar**
37:3,4,23 38:17,18
38:21 39:8,14 40:9
84:22 117:18
**similarly**
52:7

**simple**
181:3 223:24
**simply**
57:19 95:19 96:14,21
97:17 109:16
113:25 143:1 206:7
218:4 224:24
240:23 258:13
262:4 282:7 284:11
297:13
**simultaneously**
243:23 246:21
**since**
14:19 15:3 88:6
172:19
**Singapore**
11:21 36:5,16 137:9
**single**
49:2 141:16 282:19
285:2,21,25 287:10
287:25 293:14,16
294:1,2,6,9,16
295:8
**singular**
261:21
**sitting**
34:20
**situation**
37:24 38:18 39:14
40:10 84:22 119:22
133:21 134:6 136:5
166:20 167:6
168:11 188:9
206:14 219:20
222:22,24 223:1
253:23 255:2
277:24 293:24
**six**
20:6 128:13
**size**
53:1
**skill**
311:11
**slam**
264:13



**slight**
139:13
**slightly**
15:16 27:10 37:11
39:3 47:22 52:20
74:10 93:2,2 109:14
116:17 118:5
137:10 139:16
146:1 149:19
150:18 166:21
170:9 179:21
189:19 193:2
204:17 205:20
215:1 236:1 244:3
258:13,16 272:9
294:11
**slowly**
128:21
**sold**
57:19 120:15 152:21
174:22,22 292:17
298:7
**sole**
81:17,19 82:5 246:17
**solely**
155:11,23 156:16
229:22
**solution**
280:4
**some**
5:18 6:8 9:3,14 10:23
11:12 28:20 29:17
30:1 31:6 38:4,7
40:25 42:1 43:24
44:24 53:5 56:18
58:20 68:12 69:12
75:5 77:6,22 94:12
94:23 97:1 99:22
109:17,19 113:22
117:12 120:12
133:13 138:10,13
138:18,24,25 145:9
172:8 174:23,23
180:21 182:15
183:6 184:23

186:17 189:5,6,8
190:5 196:1 197:1
200:14,24 223:7
225:5,5,6 231:4,5
235:1,24 238:22
240:10 242:23
251:2 252:16 255:3
267:16 273:22
275:9 279:2 280:3
293:20 294:12
297:22
**somebody**
47:18 51:8,9 113:25
115:23 117:10
166:23 171:10
218:23 222:17
240:9 242:16
243:11 260:19
271:16 273:2 290:4
293:18
**somehow**
22:18 97:1
**someone**
27:11 50:23 74:19
105:11 239:9
260:24 276:8
**someone's**
96:18
**something**
13:5 28:8,10,11
32:16 48:12 49:19
54:16 61:23 63:3
65:1 66:7 74:12,15
74:21 75:3,14 81:19
85:7 90:11,14 100:5
109:2,24 134:10
158:21 181:17
187:8 206:15
212:21,22 230:11
230:12 233:15
237:16 247:7
260:20 274:9
277:14 278:18,20
279:15 307:7,15
**sometimes**

27:9,12 29:20 33:4
44:16 52:20 57:8,9
57:24,25 58:1,3,5
59:6,7 94:11,11,13
94:14,14 211:5
267:6 301:18
**somewhat**
120:3 226:14 242:25
**somewhere**
48:15 170:14
**soon**
219:23 227:20
**sophisticated**
210:3
**sorry**
12:23 14:24 18:18
27:20 29:2,5,11
34:3 45:13 46:16
57:2 68:3,5,10
72:24 74:10 76:19
79:8 83:4 99:2
103:6 112:14
121:19,20 123:17
126:7 131:13
132:22 146:9,10
161:18,25 170:3
185:18 193:18
194:2 200:25 204:5
209:2,4 213:20,24
230:23 233:23
234:1,7 239:7
240:18 246:13
247:25 251:18
263:11,12,22
265:20 268:19
273:14 275:4
276:15 282:15
283:16,17 284:3
297:19 298:19,23
299:16,17 305:6
306:3
**sort**
10:21 24:14,16,23
26:1 32:12 39:17
40:5 44:24 60:8

65:25 67:17 76:2,10
76:13 80:24 81:14
94:12 117:12 145:3
171:19 186:17
196:23 223:12
235:24 243:14
247:3 254:23
257:17,18 271:17
272:5
**sorting**
257:12
**sorts**
24:18 41:6 173:7
243:13 269:20
**sound**
126:7 266:24 267:4
**sounding**
9:16 35:12 36:8
**sounds**
70:1 98:24 119:6
**sources**
103:14 143:14,22
**so-called**
285:21
**spanning**
23:10
**speak**
7:15 10:13 60:9 73:8
**speaking**
6:2 7:3 33:6
**speaks**
18:21
**specific**
6:24 9:1 29:12,22
30:7 40:17 61:9
79:24 86:18 94:23
95:25 96:5,12,12
97:19,20 108:22
124:3 150:15
154:23 162:19
234:12 268:21
273:9
**specifically**
11:4 25:10 40:14
68:16 80:6,12,15



90:15 96:10 97:15
97:23 107:3 119:7
121:5,7 176:20
191:15 222:21
268:12
**speculating**
16:11
**speculation**
16:9 17:5,13 189:6
189:13 190:8
236:13
**spell**
238:11 268:4
**spells**
191:21
**spelt**
192:15
**spend**
260:20
**spent**
19:2 25:13,23
**split**
51:25 252:22 253:12
253:16
**spoken**
7:2
**spring**
56:1
**SQL**
137:19
**stage**
18:3 29:13 31:15
33:22 56:20 69:15
132:12
**standard**
39:17 45:2 47:2 63:5
64:5 70:4 75:2,18
76:11 101:13
204:18 209:20,22
219:14 244:4 306:9
**standards**
306:4
**stands**
237:23
**stark**

237:24 238:1,7,8
**start**
64:8 69:25 100:16
223:12 279:14
282:14
**started**
31:12 74:13 260:22
**starting**
129:11 219:25
233:21 241:19
**starts**
101:23 104:20
112:21 128:25
143:8 144:6 288:4
296:2
**state**
4:17 89:24 102:21
124:15 125:25
126:2 171:1
**stated**
171:8
**statement**
14:19,22 18:13,24
44:9 45:15,20,23
46:8,9,12,18 91:17
91:20 110:10 118:9
127:7 141:10
167:22 170:12
218:6 307:6
**statements**
13:10 21:2,4,8,9,13
44:17,18 45:9 47:12
48:16,16,17 62:20
144:23 145:12,21
216:1,4,9,14,17,22
217:1,4,5,6 218:20
**States**
1:1 4:6 23:24
**stating**
176:2
**statute**
303:17
**statutory**
125:20
**stay**

206:3
**stays**
159:15
**step**
94:22 221:3,7 269:12
**Stepping**
23:7
**steps**
254:16
**sticks**
38:5
**still**
19:3 85:5 100:19
111:4 121:17
123:25 124:6 126:6
137:23 138:2
146:10 151:24
165:9 166:24
168:17 173:18
191:13,19 204:15
205:12 214:23
219:1 222:18
245:11 266:17
267:20,24 268:15
275:1,1 276:20
280:13
**stolen**
271:4
**stop**
6:8 213:1 279:7
289:9 308:3
**stopped**
212:23 292:20
**straightforward**
55:23
**strands**
52:18
**strange**
207:14,17
**Strangely**
167:2
**straw**
180:20
**Street**
2:15

**strengthen**
61:5,6,11 62:5,6
**stretch**
156:22
**stretching**
208:7
**strict**
53:5,7,10,25
**strictly**
54:8 202:9 219:2
**strike**
111:24 112:6
**strikes**
34:22,24 270:17
**strong**
16:17,21 109:9,18
132:23 134:19
226:10 272:12
**stronger**
62:12
**strongly**
192:16
**struck**
13:12 39:8
**structure**
27:18 130:4
**structured**
27:8
**structures**
133:13
**struggled**
303:2
**struggling**
150:18
**stuck**
49:16
**studied**
239:6
**stuff**
27:13,14
**subject**
54:2 72:20 101:19,25
102:2 108:7 126:12
158:16 166:1
194:10,12 199:9


MAGNA ▶
LEGAL SERVICES

204:23 223:22
234:21 256:11
266:18
**subject-matter**
125:10 126:6 265:23
**submitted**
13:20 17:19 248:14
**subsequent**
14:21 28:25 65:2
173:1 174:1 216:6
**subsequently**
78:15
**substance**
18:11
**substantial**
27:13
**sub-paragraph**
141:6
**such**
33:22 69:1 73:16
74:4 76:9 111:9
124:10 125:12
136:12 145:10
179:15,20,21,23
180:2 204:4 205:8
230:3 243:1 267:1,5
272:11 274:7
277:24 281:10,23
297:24 300:16
**suffer**
200:13,18 201:8
**sufficient**
23:15 24:6 78:20
110:11 138:3
139:25 226:16,17
226:24,25 227:2,5,8
257:4,5
**sufficiently**
7:14 23:24 115:18
227:3 266:18
**suggest**
144:17,23 160:23
208:5 274:8
**suggestions**
161:3

**suggests**
160:14 183:15 191:4
192:5,16 289:1,22
**suitability**
179:13
**suite**
41:1
**Sullivan**
2:15 4:24 11:9 19:10
20:12 26:6 27:22,24
28:4,7,12,19 40:25
42:16 182:14
276:13
**summarises**
102:24
**summary**
101:6 170:24
**superior**
51:11 78:14 220:5
221:19 222:7,10,14
223:4,6,7 224:10
225:15 234:21
235:2,7
**support**
32:18 36:10 102:20
123:5 130:21 141:3
143:4 160:8 186:22
282:22
**supported**
143:11 249:9
**supporting**
143:4
**supportive**
91:21 262:17
**supports**
203:24
**suppose**
6:18 9:4,11,14,15
10:19 11:9,14 21:19
57:16 73:11 116:19
170:24 189:5
214:19 273:1
276:20 290:18
**supposed**
266:23

**Supreme**
11:24 64:1 202:7
**sure**
15:2,13,13,17 19:11
24:22 29:14 30:13
38:15,20 41:10,20
42:15 53:19 59:24
65:14 68:20 74:6
82:19 83:23 87:20
91:25 95:13 104:4
113:15 114:20
116:22 123:22
131:6 133:12
135:19 138:6 155:9
160:17 165:15
166:2,12 169:24
179:1 181:7,9 191:3
205:10 215:17
216:21 217:14
218:5 221:9 226:23
227:20 228:4
239:16 240:13
247:20 249:11
250:17 252:17
277:19 283:19
294:7 296:14
299:23 300:23
301:2 305:16
**surplusage**
154:25 200:1 307:1
307:10,12,20
**surprise**
86:4 172:13
**surprised**
25:11 26:2,3 131:18
**surprises**
86:7
**surprising**
50:14 199:10
**surrounding**
242:22 244:5
**survivors**
190:7
**suspect**
16:1,4,5 30:20

**suspend**
291:18
**sustain**
287:18
**sustains**
289:10
**swallow**
85:8
**swap**
267:23 268:7
**swear**
5:5
**sweep**
83:9 269:17 273:18
**sweeping**
61:14 74:21 75:9,23
124:13 229:1
306:22
**swept**
57:13 59:5,9,22 60:5
61:1,17 62:3 77:15
81:6 82:15 97:10
155:19 165:3 166:4
167:8 228:9 275:5
**sworn**
5:8 311:8
**system**
152:22 167:3 265:5
**systems**
86:10 257:3

---

**T**

**T**
3:7
**take**
6:4,7 25:17 34:20
39:25 43:12 47:3
48:6 60:11 62:17
68:13 75:12 83:16
85:21 88:2 90:21
93:17 94:22 101:3
102:16 104:5
121:16 127:1,12,18
128:17,22 131:23
132:9 134:12



138:12 148:8,17
149:5,10 156:19
182:3 217:10
223:24 227:19
243:19 257:16
267:22 276:24
277:2 280:8,24
306:19
**taken**
1:14 4:10 5:15 7:7
16:17,21,23 61:24
74:17 129:3 158:17
217:22 221:4
242:24 258:23
274:9 311:15
**takes**
55:4 156:21 240:14
**taking**
27:14 28:16 59:7
84:20 129:3 217:23
218:8 254:16
257:11,18 303:5
**talk**
5:25 80:9 99:22
153:7 175:5 184:3
195:22 211:5
214:24 224:23
301:18 305:25
**talked**
81:23 86:13 113:11
200:18 204:6
259:24
**talking**
31:13 79:6,7 81:11
81:13 82:6 99:18,19
157:21 162:14,14
168:5,7 172:11
173:21 180:7
210:22,23 231:1,8
**talks**
154:24 161:15 162:3
178:8,13 181:20
193:14 194:21
239:11 258:9
289:16

**tangent**
34:4
**task**
256:13
**tax**
108:3,6,7,8 130:11
179:2
**technical**
32:10 54:19 118:5
265:3
**technically**
21:19
**tell**
17:15 20:13,13 25:20
41:2 56:22 58:24
78:4,6 109:2 117:13
124:19 156:25
207:14 223:17
259:7,20 307:25
**tells**
58:7
**ten**
274:24
**tenancy**
122:16 171:20
228:25 229:3,5
**tenants**
123:19 124:9 132:14
171:12
**tend**
15:18 36:4 93:13,15
94:2
**tends**
37:2 93:13 160:8,23
293:18
**tentative**
35:11,12 226:14
**term**
54:14,19 86:25
114:16,19,21 115:3
159:22 177:23
194:25 199:25
203:1 206:18
290:25
**terribly**

263:12
**territory**
237:19
**test**
49:24 111:12 118:2
**testified**
5:9 48:13 49:3
**testify**
11:4
**testimony**
48:2,7,20 159:2
169:6,10 201:24
228:5 294:8 295:18
311:10
**text**
179:24
**than**
9:18,19,25 11:5
12:14 15:19 21:8
25:23 26:2,3 27:2
28:7 30:11 34:15
35:8 39:4,13 41:11
46:14 48:9 53:25
70:23 88:12 107:4
118:5 133:21
144:12,18 149:8
157:2 167:4 189:3
189:23 194:25
199:1,13 200:5
206:20 218:17
223:14 224:24
225:1 226:7 245:1
245:25 248:15
253:9 261:21 262:5
262:9 265:9 274:3
275:9 280:8,10
284:15 293:20
294:5 295:25
298:17 299:4 301:4
**thank**
41:18 73:14 81:3
82:11 98:14 101:24
103:20 121:23
125:6 126:14
128:10 129:2

136:15 137:15
138:22 146:11
149:8 175:8 216:2
227:22 233:24
241:2 284:6
**their**
15:18,19 28:16 31:10
33:16 34:21 37:2
49:3,9,9 54:10 57:8
57:11 59:22 60:5
61:1,9 63:2,9,18
66:5,8,9 81:1,12,13
81:14,14 86:11 94:8
97:17 100:13 113:4
113:19 115:24,25
119:21 120:2
123:12 143:24
152:16,17 153:1
171:17,22 172:5
189:7,9,11 190:7
212:6,7,9,10,11,22
213:18 214:2,21
238:11 251:1
260:25 270:11
274:16 275:10,20
280:18 282:6,8
285:23 287:2 290:6
290:14
**theirs**
214:24
**them**
8:19,20,25 10:13
14:14 15:8,22 16:3
19:4 20:24 26:10
27:5,7 31:9,13 33:3
41:9,16,25 42:3,8
43:24 44:6,15 55:15
55:16 56:3,8,10,22
60:20 61:8 62:6
63:9 64:10,12 65:22
66:25 67:1 68:8
70:11,16,25 71:3,21
96:24 97:9 102:18
118:25 120:12,13
130:17 139:2



140:10 149:23
153:1 162:17
163:25 171:12
172:2,24 173:5,13
174:25 187:1,4
190:18 202:6,9,9
205:18 214:25
215:4 221:13
240:11 242:14
243:19,19 244:19
247:21 248:6,8,11
250:22 251:9 252:6
253:9,12 260:20
267:23 276:21
278:1 282:9 284:22
286:14 293:8 299:8
307:14

**themselves**
4:16 8:12 12:23
80:19

**theoretically**
277:25

**theory**
46:5,6 100:2 193:21
249:9 282:19 285:2
285:21,25 287:10
293:14,16,20 294:1
294:2,6,9,16 295:9

**thereafter**
83:2 151:22 152:11
156:12

**therefore**
47:21 74:21 99:21
103:11 119:10
133:1 147:14
165:19 171:5
174:17 188:21
199:3 206:2 228:10
229:4

**these**
15:10 17:16 41:25
43:22 44:6,11 54:1
71:4 73:6 78:10
84:20 92:25 115:9
147:6 154:20 187:7

189:15 190:23
191:11 207:23
283:2 284:21 296:6
306:4

**thing**
5:24 32:12 33:12
50:12 113:13
164:20 178:16
195:16,21 247:3
307:8,14,16

**things**
34:25 37:4 45:8 55:9
66:25 67:1 110:14
163:24 189:10
208:15 212:19
219:20 226:22
240:8 269:6 275:15
288:24 294:12
297:2,4 307:12

**thinking**
144:11 215:11
232:22 275:11,24

**thinks**
100:6

**third**
6:4 29:21 30:11,15
42:11 82:8 90:4
107:5 110:21
112:15 130:13
160:12 161:2 185:6
248:18

**third-party**
89:15 90:5 91:14,25
92:1

**those**
7:3 10:12,17 13:13
17:4 24:25 31:1,2
34:8 36:25 37:7
40:11 41:17,19,22
42:2 48:16 65:18
67:20 69:2 85:1,2
85:14 96:7 102:9,16
103:14 104:13
111:10,23 115:13
118:22 119:20,23

119:24 120:3,6,17
120:20 128:13,17
134:15 136:16,25
139:4 143:22 144:6
144:7,9,16 147:9
151:21 169:2,25
172:9,18,23 173:12
173:14,24 174:4,8,9
174:11 186:3
189:10 193:11
213:23 214:13
216:22 223:18
228:10 241:15
255:14 256:2 257:4
267:12 269:20,25
270:6 274:18
278:11 287:8
298:18 299:1,5,6,8
303:25

**though**
49:18 83:23 165:11
208:9 230:16
305:17

**thought**
11:14 12:12,14 17:2
18:6 20:20 30:16
35:18 45:13 49:13
49:15,18 50:7,12,13
56:9 59:25 60:4,7
72:23 78:8 88:11
107:1,3 109:17
128:10 131:4 132:3
132:5 133:8 149:5
154:2,5 160:19
180:4 201:4 206:12
214:25 215:12
217:3,4,8,9 218:24
218:25 219:7,9,13
221:24 226:7
230:18 247:9 252:7
256:24 259:7,19
261:25 262:3 300:2

**thousand**
85:7

**thousands**

83:5,8 86:5

**threads**
52:12

**threatened**
212:22

**three**
1:15 2:3 5:13 6:15
11:2,3,11 12:20
13:3 19:2 20:7 23:8
25:14 30:23 37:23
38:1 47:25 115:9
142:5 150:4 175:10
226:17,20,25 227:2
227:5,8,11 228:25
229:13,15,17 250:5
250:18,25 251:5,8
258:18,22 260:14
267:18 281:9,13,19
282:2 298:14 299:1
299:5,6,8 305:21
306:10

**through**
13:13 14:7 17:4 28:5
28:6,15 29:25 34:12
35:19 37:20 42:12
42:15 43:23 44:14
68:12 103:14
123:23 128:15,21
134:16,18 140:7
164:23 168:19
174:8 175:21 180:3
196:1 200:10,21
208:14 212:9 215:1
215:12 235:23
248:7,11 273:6
285:3,13 295:21

**thrown-in**
181:18

**thrust**
34:14,15

**tick**
35:20

**ticked**
90:2

**ticklish**



219:8
**Tim**
2:12 4:20
**time**
1:21 4:8 6:5 18:22
    23:15 24:6 25:13
    28:2,23 32:25 53:13
    68:13 71:20 76:11
    85:16,24 86:2 88:8
    95:25 96:1,2,5
    101:17 128:22
    135:8 136:8 137:12
    137:12 139:14
    147:15 148:1,20,23
    149:25 150:14
    152:9 154:6,10,21
    155:6,11,25 156:9
    156:11,17,21,25
    157:5,24 215:20,23
    227:24 228:2
    242:10 247:24
    248:5 251:12
    252:11 256:5
    257:11 273:19
    281:3,6 292:12
    303:2,2 308:1,7
**times**
10:7 14:13 44:5
    54:15 85:7 150:13
    151:5,10 156:5
    159:15,18 224:20
**timing**
98:8
**tim.robinson@lw.c...**
2:12
**tinkered**
28:10
**today**
4:12,14 6:14 10:22
    10:25 11:4 13:9
    14:2 15:12 34:21
    37:24 151:24
    166:15 169:6 174:9
**Today's**
4:8

**together**
48:1 52:13,19 135:8
    196:25 245:8
**told**
21:1,6 47:21 48:9,12
    48:17 60:1 71:1,1,4
    77:11,24 81:20
    82:22 84:21 85:18
    85:19,20 140:23
    157:2 182:12,13,15
    182:24 270:7,11,12
    276:8,10 283:24
    285:15,16
**tolerably**
64:9
**tomorrow**
116:13
**too**
47:16 55:20 137:9
    181:3 302:11
**took**
18:7 19:4 29:20 33:2
    89:18 90:2 270:22
**top**
88:25 91:2 185:5
**topic**
7:9 232:25 295:21
    307:22
**topics**
7:2,3 10:24 295:25
**tort**
303:17
**total**
25:14 124:4 287:18
    291:16
**totality**
42:2
**totally**
23:21 35:8 64:7
    99:17 292:11
**touch**
19:15,19,20,20
**towards**
36:4 113:2
**trace**

**169:7,13,19 171:4**
    172:2 173:5 174:9
    274:18,21
**traceable**
170:16
**traced**
171:3 271:24
**tracing**
69:2 165:13 166:1,9
    170:11 173:25
    228:16 274:21
**track**
80:22 83:12,17 86:5
    86:10 130:6
**trade**
70:16 213:12 286:20
    287:2
**traded**
57:9,23,24 58:2,5
    74:19 174:4 179:14
    179:25
**trades**
86:5,11 174:1 175:15
    176:7,9,24 177:16
    178:1,3,8,15
**trading**
1:6 4:5 24:16,20
    57:10,19 59:6 70:4
    70:13,16 74:13
    81:17 84:6,13 98:20
    130:22,22 149:13
    149:23,23 176:15
    176:20 180:4,5,7,9
    187:19,20 189:8
    191:14 204:9
    214:10,12 216:16
    231:12 232:12
    287:14
**Trading's**
88:19 203:12
**traditionally**
116:20
**transact**
67:5 69:10 261:1
**transaction**

10:15 197:10
**transactions**
24:23 172:4
**transcribed**
311:10
**transcript**
5:25 311:8
**transfer**
76:18,25 77:20
    101:21 102:1,7
    103:1 104:18,21,25
    105:1,4 107:7,11,16
    109:10 115:11
    162:22,23,24 164:5
    164:8,10 166:14
    167:9 168:23 170:2
    170:8 172:5 173:23
    194:5,14,19 232:4
    260:25 278:1
    297:22
**transferred**
116:19 162:18
    191:12 193:15,17
    193:20 195:23
    231:12 260:12
    278:24
**transferring**
3:14 168:4 194:22
    195:5
**transfers**
73:20 74:1,8 76:21
    77:10,18 170:3
    224:10
**transpire**
139:17,18
**treat**
275:20
**treated**
275:16
**treating**
232:8 275:24
**treatment**
108:3
**treats**
247:5



tree
106:23,25
trend
113:2,8,17
trial
48:8,13,14,21
tried
132:9 297:1
tries
267:6
trigger
295:13
trouble
38:7 46:22 68:15
167:16 172:18,25
180:1 280:6
troubles
46:9 278:10
Trower
38:4 142:5 271:22
true
23:24 24:5 35:8
65:11 105:8 117:25
121:2,4 138:25
182:23 185:3
253:11 256:4 271:5
272:5 273:23
278:25 307:23
310:7 311:9
trustee
51:4 52:22 53:2,6,11
53:12,25 54:6,12
110:19 111:4
175:18,18,21,23
185:8,11 187:20
191:21,22 192:6
193:9,9 194:17,18,19
194:20 197:5,10,15
231:12 253:18
254:6,9 262:22
263:9,25 268:14,17
268:23 269:1,5
302:14,20,22
trustees
54:8

trusteeship
111:25 175:24
232:21
trustee's
180:23 254:7
trusts
15:8,9 126:1 127:4
138:10 139:10
147:10 180:22
302:12
truth
190:8 271:12
try
5:21 6:1 18:20 36:15
158:18 203:2
244:19 245:23
268:4 279:16
280:25
trying
11:20 27:9 99:4
134:7 150:11 154:4
178:5,10 206:6
209:6 216:21
223:15 236:12
249:2 272:2
turn
33:22 92:19 107:5
112:8 114:3 146:7
188:6,10
turned
70:12 120:2,6
turns
114:4 258:20
twice
57:13 59:9
two
8:8 11:2,3,11,12 12:8
14:20 15:4 41:16,25
52:12,18 53:20
56:19 64:11,13
68:24 103:14
104:13 118:17
119:20,24 121:25
136:16 143:22
166:15 173:7

180:17 196:25
207:25 213:21
221:12 226:22
233:5 240:1 243:12
243:13,17 244:22
245:7 246:1,5
255:12 288:20
293:21 297:2
307:13,16
type
35:11 49:12,14,14,15
49:16 203:13
235:17,17 243:22
types
115:10 243:17
typical
115:3

_____

U

ultimate
27:16 31:11
ultimately
38:23 49:6 89:6
225:11 302:9
unable
83:12 85:13
unallocated
122:15 125:12
unascertained
118:15 120:24
unaware
71:14 189:7
uncertain
113:12 225:23
233:10 257:12
265:8
uncertainty
139:8 148:15 266:23
uncharted
244:3
unclaimed
181:22 187:16,19
188:3,15,17 189:2
190:13 193:1 231:2
231:13,16

unclear
63:7,8 224:21
uncomfortable
13:13 34:11 52:20
146:1 149:19
254:22,23
under
21:18,20,23,25 22:5
28:1 56:9 66:23
67:4 68:1 81:16
90:23 91:11 99:9
119:14,21 132:16
144:18 147:16
152:7 161:25
162:18 164:3
165:10 168:2,25
176:16 179:14,25
182:9,15,16 194:19
197:6 208:11
210:13,25 212:8
218:19 221:13
235:12 261:2
264:24 265:4 268:8
281:8,19 282:2,18
285:3 287:4 291:13
291:14,18,19
293:21 294:4
306:12,17,21
underline
103:18
understand
5:20 6:10 39:12
41:10 42:15,24
43:14 46:25 47:7,10
59:12 65:21,24 66:6
68:20 78:25 80:16
82:19 83:24 95:13
97:8 100:9 116:7
128:14 129:7
137:23 150:10,12
162:25 166:12
171:25 172:3 173:7
173:14,16 174:24
181:4,7 198:8
205:10 209:6


MAGNA
LEGAL SERVICES

216:22 218:5,19
221:6 223:15
226:15 233:11
237:12 247:12
249:24 251:9,14
257:17 265:22
273:25 275:15
276:1,2 278:4
283:19 293:17
294:9,20 295:9
305:1,16
**understandably**
278:15
**understanding**
22:4 45:17,25 46:21
46:23 49:3,9 56:24
57:4,7,22 58:1,4,14
58:17,20,23 59:8,11
59:21 64:19 65:7,16
96:17 97:4,11
102:25 180:25
181:11,12 196:19
216:18 217:19,20
218:4 240:16,22
276:6,7,13 277:4
**understood**
24:22 57:24 79:22
86:22,25 87:7
153:14 205:25
207:20 208:2,6
209:12,24 210:13
210:25 217:25
222:18 228:4
250:17
**undisputed**
211:20
**undoubtedly**
59:24 189:14 197:25
243:1
**unfair**
185:19
**Unfortunately**
10:6
**unhelpful**
213:20

**unimpressed**
244:13
**United**
1:1 4:6 23:24
**University**
14:4
**unknown**
43:17 100:8
**unless**
43:13 48:4 127:20
145:9 170:2 249:6
251:1 268:11
304:10
**unlikely**
44:22 45:6 62:22
63:2 218:3 258:5
**unnecessary**
307:8
**unpack**
45:8
**unsecured**
98:19,22 99:5,8
144:19
**unsegregated**
273:18
**unspecified**
229:11
**unsurprising**
252:15
**unsurprisingly**
54:11 262:20
**until**
51:25 52:6,8,17
95:21 100:3 163:4
191:5 265:10 287:8
295:13
**unusual**
50:14 111:12 116:23
210:10 305:24
**up**
8:16 11:13 12:9
15:14,19 17:14 19:7
19:24 42:11 63:1
74:24,24 101:20
109:7,8,22 114:13

121:16 127:19
142:23 161:25
165:23 199:7
200:11 208:24
217:1 231:24
232:18 251:23
255:11,17 268:14
269:1 279:3 295:13
**updated**
14:25 57:16 146:15
152:23
**upon**
94:18 103:24 105:23
108:9
**us**
6:9 8:16 49:2 73:7
76:16 78:9 122:22
136:11 146:7,21
147:5 164:23
170:13 175:5 179:8
180:12 194:10,11
195:3 207:14
216:10 219:22
240:25 282:14
287:12 300:13
307:25 308:4
**use**
50:19 52:15 73:12,16
104:17 110:7
114:16,18 115:3
117:17 130:20
179:15,19,20 180:2
180:21 188:20
198:21 204:4
207:12 244:10
245:10 267:13
291:18 303:19,19
**used**
9:11 48:2 54:10,15
64:5 114:21 127:21
153:20 160:24
201:15 202:3
204:10 246:4,21
**useful**
27:1,4,4 38:2 104:5

105:22 181:25
**useless**
27:2
**user's**
146:19
**user**
160:10,16,20 163:13
187:3 188:22
191:18 231:4,21
242:8 271:6,9
288:16,23 289:5,17
289:19 291:5,8
**users**
49:3 74:9 122:15
136:7 190:17 192:9
207:20 209:11
234:22 244:17
288:12,18,23
289:17 291:9,10
297:14
**user's**
136:10,20 167:18,19
188:20 231:1 264:7
298:13
**user-intermediary**
126:22
**uses**
238:15 239:15
**using**
160:15,19 175:16
176:10,25 177:17
187:24
**usual**
55:2

---
**V**
---
**v**
3:21 16:8 17:22
49:11,19 50:13
53:16 64:2 110:22
113:1 121:10,14
122:1 129:12,23
131:1,16 132:14,18
133:2,4,22,23,25
135:15,17 205:6



301:9
**vacuo**
64:24
**vacuum**
63:11 64:25
**valid**
218:13 246:7 265:4,5
**valuable**
54:11
**value**
36:7 54:4 273:3,9,17
274:25 275:3
285:23 288:4,5
289:7 290:1,6,12
292:17 294:22
295:2
**variation**
94:12 147:8
**variations**
94:15 220:22
**varied**
63:3 65:4 111:11
**varies**
64:22
**various**
44:5 93:11 229:12
230:8 303:16
**vary**
101:10 219:10
**varying**
78:1
**vehement**
159:20
**vehemently**
34:17
**veil**
16:15
**venture-type**
196:24
**Verbatim**
311:5
**version**
62:12
**versions**
30:7 71:2

**versus**
65:25 134:5 249:3
307:10
**very**
16:25 27:9,12 29:3
33:5,10 34:11 41:25
45:6 63:2 64:5,9
68:6 86:18 113:21
121:22 133:15,25
134:19 157:18
189:14 191:20
192:3,21 193:5
199:10 201:9 202:3
205:20 207:4,17
218:2 232:20,20
236:16 239:15
244:5 265:3 269:7
269:21 284:6
300:25
**vest**
151:9 248:24 249:14
**vested**
107:12 249:1,3,6,15
249:17,18,23 250:2
250:4 252:25,25
**vesting**
249:2
**vests**
249:22,25 250:3
**vexed**
165:25
**video**
4:9
**videographer**
2:23 4:2,12 5:4 85:23
86:1 148:19,22
215:19,22 227:23
228:1 281:2,5 308:2
308:6
**videotape**
4:3
**viewed**
49:17 91:24 136:17
197:3 230:16
**views**

18:3 43:4,6,9,13,20
44:20 86:13,17
99:15 239:24
**Viner**
2:23 4:12
**violation**
298:8
**visible**
73:22 74:2,8,9 76:19
76:20,25 77:9,19,19
**vital**
61:10

---

### W

**wait**
28:5 280:21,22
**Wales**
123:6
**walk**
68:12 103:14 164:23
196:1 208:14 289:9
**walking**
123:23
**wallet**
57:9 61:9 77:15 80:5
80:7,10,11,15 82:16
96:6,9 97:14,16,19
97:22 126:5 155:22
157:21,25 160:1,6
172:5 177:2,3 222:3
223:3,25 229:14
250:21 251:7
256:18
**wallets**
65:8 77:6 81:10
83:13 125:1 138:18
250:9 251:1 255:4
**want**
7:21 14:24 29:4 30:4
38:15 41:10 42:9
45:9 50:18 68:12
69:12 71:22 75:4
95:13 101:20
103:14 105:16
107:3 110:15

113:15 114:9
123:22 135:10,19
152:6 153:8 154:18
173:6 181:3,7
189:19 197:17
208:24 217:2
222:21 226:22
230:24 231:22,24
236:2 241:3 259:13
259:16 262:14
268:10 280:19
283:19 294:7
295:21 306:11
**wanted**
12:10 19:5 20:7
29:14,18 38:16
107:23 116:13
158:11 191:24
192:3 242:16 262:2
275:17 276:4
**wants**
32:19
**warn**
124:22
**warranted**
246:16
**warranty**
179:13
**waters**
244:3
**Watkins**
1:17 2:5,10 4:11,19
4:21
**way**
10:24 18:1 26:24
27:18 31:16 50:25
51:5,6 54:19 61:3,4
63:5 79:25 80:9
96:13,23 97:2 98:5
100:19 121:21
122:11 147:3
153:22 163:10
174:7 192:3 197:1
203:4 208:4 210:10
223:8 227:4,10



229:5 230:7 231:19
238:11 244:19
245:24 246:3 248:7
248:10 249:16,18
251:2 278:5 279:18
283:24 284:1
285:12,22 299:24
300:1,10 306:14

**ways**
37:6 57:10,15 121:25
280:7

**weak**
193:4,5 239:14

**weaken**
85:10

**weaker**
277:2,11

**website**
11:22,23 13:6 71:9
71:12,18 75:2 180:4

**websites**
23:22

**web-based**
143:15

**weighed**
261:23

**weight**
101:8 244:13 247:6
247:13

**well**
6:9 7:1 8:19 9:11
11:6 15:23 19:9
26:1 31:14 32:7
35:1,3 45:11 53:15
56:17 58:17 67:14
78:6 80:16 93:23
98:24 109:16
113:11,24 114:11
115:23 127:8,18
149:12,17 152:19
158:11 159:16,23
164:23 172:8 173:6
173:18,24 178:9
187:2 188:16
189:18 190:12

191:20 193:14,18
194:10 195:3,22
201:9 202:11 212:8
213:20 216:25
220:21 221:24
223:5 230:5 231:18
231:22 232:6
235:10 236:4 239:3
248:10 251:19
252:7 258:20
259:19,24 261:20
262:7 266:7 268:18
271:18 273:1 275:9
276:1,6 277:19
279:25 286:13
287:4 288:17 289:8
290:5 295:22
296:11,15 297:20
298:3 303:1 306:10

**well-known**
32:5 198:13

**well-thought-out**
94:5

**went**
10:15 11:5 13:13
28:4,7 29:4 44:7
46:19 74:20 77:1,25
78:2 168:18 223:23
223:25 274:15
276:14 278:22

**whatever**
14:7 22:13 23:18
69:18 77:21 97:20
107:23 158:16
200:12 201:7
232:11 274:16
291:16 298:16

**whatsoever**
196:14

**when**
13:5,13 15:1,16
19:23 20:8 23:4,5
23:11 28:8 38:7,11
38:13 40:6 41:24
43:5,6,17 44:4 47:1

51:17,20 61:22,24
62:25 63:5,16 66:6
82:5,10 86:17,22
97:8,21 99:14,16,18
99:24 100:15
101:12,13 116:2
126:1 129:19
146:12 149:9 153:7
154:14,15,20,24
162:14 166:22
168:5,23 170:3,7,9
175:7 187:18
191:10 192:21
195:6,22 197:19
200:17 201:23
203:5 217:16
218:25 219:2 221:1
240:24 244:2,15
249:11 250:9 259:3
259:10,12 272:7
274:21 279:14,15
289:17 294:18,21
295:1,11 303:4
307:21

**where**
13:22 27:22 36:6
37:5 49:12 50:1,6,9
50:11 51:8 55:18
58:14 59:1 77:1
78:2 87:4 107:11
114:25 116:24
132:13 157:24
158:21 159:10
163:1,19,23,24
165:12 166:3,13,19
166:20 167:6,8
168:15 169:18
170:15,20,23 171:1
171:7 172:6 174:2
182:10 183:4 184:3
189:9 194:21
202:12 205:7
206:11 207:20
209:11 219:8
222:24 223:2,16,18

224:20 230:6,9
233:9 234:2,6,11,25
236:12 240:1,6,13
243:23 244:4
245:19,24 246:20
251:6,18 252:16
255:2,5 267:9
268:16 269:8
276:24 277:21,22
279:3,6 297:19
307:25

**whereas**
36:11 52:17 191:21
231:19 307:16

**whereby**
50:21 221:17

**while**
8:13 82:14 97:12
102:20 223:21
238:4 251:24
252:25 269:12
294:17 295:10

**white**
64:7

**who**
4:17 6:15,16 10:15
17:1,6 19:7,20
20:20 23:22 26:19
27:15 31:1 36:9
40:22 46:11 48:2
49:2,8 50:24 51:8
51:12,14 53:17 56:2
57:22 72:9,14 73:4
75:5 76:13 93:7,17
103:21 104:2 106:7
108:7 147:18
150:19 158:19
169:14,15 172:23
173:22 190:17,21
202:15 207:5,14
208:16 209:23
210:2,4,6,13,14,24
211:1 219:16
243:17 244:24,25
258:9,10 266:3



274:15 276:10
293:18 295:23
302:14
**whoever**
189:20 190:9
**whole**
10:3 15:25 134:8
145:2 146:1 261:20
262:15,19,19
277:20 286:3 291:3
303:4
**whom**
51:2 182:13 243:14
**whose**
16:24 17:6 31:19
115:22 139:4
167:20,20
**why**
21:22 35:12 36:25
41:15 61:6 62:6,24
68:18 72:17,21
85:21 102:3 113:24
121:16 128:17,21
136:4 142:9 148:17
150:18 153:5
168:20 172:1
174:19 184:14
186:3 189:1,16,19
194:9 208:9 215:18
221:3 224:14
227:19 230:1 238:8
238:22 239:4,24
240:16,19 247:1,8
248:17 251:15
256:16 258:8
259:16 266:2 279:7
280:24
**wide**
176:13,13 177:19,20
177:21 200:7
302:11
**widely**
137:5
**wider**
69:3 180:11

**width**
180:11
**wife**
14:3
**will**
5:4,21 6:1,9 20:12,12
22:11 23:22 26:3
29:3,15,17 31:6,10
31:10,12,13 36:7,9
36:12 45:3 61:17
69:16,25 72:4 75:4
87:2,15 88:4 89:15
94:13 96:6 101:9
102:4 108:7 109:7
110:7 111:10 114:1
115:17 117:13,25
123:22 127:1,12
128:22 134:3 135:9
135:9 139:15 142:8
142:19 145:7 148:8
152:19 153:19
169:4 172:8 182:11
185:25 187:20
189:12 190:25
191:13,19 192:7
201:19,23 210:19
218:8 219:23 221:7
224:11 227:20
233:2,7 236:14
241:1 242:22,23
243:1 248:10,11
252:10 258:15
267:7 268:4,18,23
272:20 280:17,18
280:20,25 301:12
307:19
**wind**
180:21
**Wine**
118:19 119:3,14
**withdraw**
212:13
**withdrawals**
83:8
**within**

216:1 286:16 304:3
304:11,12,25 305:2
**without**
57:9 79:4 94:12,13
96:22 117:12
130:15 133:6,23
140:8,13,18 144:20
213:3,8,13 220:23
246:8 268:21
299:20
**witness**
4:25 5:2,5 6:11 14:11
310:2 311:7,10
**wondering**
249:1 297:25
**woolly**
27:20
**word**
117:17 153:10 197:8
248:12 259:17
261:22
**worded**
82:23 232:6
**wording**
205:5
**words**
29:19 47:10 63:17
64:7,8 82:25 101:9
116:5 117:12
127:21 134:15,24
135:2,5 154:14,20
193:2 196:20,25
205:8 206:5 208:8
208:11 217:7
258:23 261:23
262:19 265:21
306:6,16
**work**
11:4,7 13:8 15:5
25:18,20 33:24 48:3
102:5 151:20
158:23 171:14
186:14 194:9 202:8
223:10 232:23
238:12 256:23

257:1 269:18
293:18 307:18
**worked**
31:17 49:2
**working**
6:17 23:11
**works**
61:25 171:15 188:24
250:14
**world**
3:17 66:1 81:25
106:5 209:11,13
240:6,7 242:21,22
243:3,6 267:10
**worse**
27:2 106:20 258:16
**worth**
266:7
**write**
70:2 78:12,18 79:13
108:2,6 109:6 110:6
111:20 200:11
203:9 248:22
**writes**
141:2,13 144:9,15
147:6,14
**written**
64:3,4 153:20,22
203:6 206:14
**wrong**
10:15 16:6 26:11
36:22 42:5 73:11
97:12 121:20
127:22 128:16
131:19 133:24
134:3 141:21 147:1
147:4 181:2,2,8,9
181:10,11,14 183:1
185:18 202:12
246:14 248:2
282:15 296:13
**wrote**
73:15 84:4 153:10

---

**X**

---



**X**
3:1,7 47:18,19 49:14
  49:15 50:15 66:9
  217:7,8,9,9,11,15
  217:16,17 218:25
  219:17 245:20

___

**Y**

**Y**
47:19,19,21,22 49:14
  49:16 50:16 66:9
  219:18 245:21
**year**
23:10
**years**
142:5
**yet**
94:18 171:21 221:11
  279:8
**yield**
199:4,14
**yields**
198:16,19
**York**
2:6,6,16,16 283:5
**yours**
303:5
**yourself**
7:5,10,23 8:3 56:15
  182:23

___

**Z**

**Zealand**
11:21 12:1 29:5 36:5
  36:16 37:12,14,17
  37:18 129:15 131:4
  131:24 133:6
**zero**
273:19 274:11,16
  275:1,4

___

**$**

**$4**
290:11,12

___

**1**

**1**
4:3 41:18 42:12,15
  42:19 43:22 69:25
  136:24
**1,5**
71:24
**1-5**
111:16
**1.49**
85:24
**10**
80:20 82:2 110:15
  291:4,13,14 293:23
  294:5,19 297:8
  298:15
**10%**
275:1
**10,000**
80:24
**10.2**
291:19
**100**
3:8 13:15,17 25:23
  26:1 69:23 82:15
  256:21,22
**10004**
2:16
**10020-1300**
2:6
**101**
3:9 42:6,10
**102**
3:11 42:6,10
**103**
3:12,14 92:8,10
**104**
3:14 103:16,17
**105**
3:16,16 105:17
**106**
3:19 128:20
**107**
3:21 135:16,17
**108**
3:23 148:24 149:1

**109**
3:24 184:15
**11**
1:7,20 4:8 98:13
  151:15
**11TH**
309:2
**11.1**
98:15 99:13
**111**
233:23
**12**
4:9 79:15 81:5 241:4
  297:23
**12th**
79:23
**12.00**
1:21
**120**
26:3
**125**
2:15
**1271**
2:5
**128**
3:19
**13**
3:8 248:20 311:24
**135**
3:21
**14**
263:16 297:23
**14(e)**
252:18
**14(f)**
254:1
**14(h)**
255:18
**14(i)**
256:8
**143**
137:14
**144**
138:8
**148**

3:23
**149**
138:21
**15**
41:18 42:12,16,19
  43:23 48:4 70:23
  71:23 73:1 111:15
  241:10
**153**
140:3
**157**
141:1,13,25
**158**
125:5
**159**
121:19 142:21
**16**
128:25 197:18 285:8
  287:13 293:22
  294:4,4,19 298:15
**16.2**
284:24 286:2,7 287:5
  287:12,14,22 289:1
  289:7 291:8 297:8
  297:10 298:1
**16.3**
289:16
**16.57**
129:9
**16.58**
129:11,22
**160**
123:16 142:20,21
**161**
142:21,25
**17**
257:25
**172**
143:6,10
**175**
233:23
**179**
146:8,11
**18**
112:14



**18.2**
100:15,19
**181**
147:5
**183**
147:13
**184**
3:24
**1870s**
52:17,19
**19**
261:15
**1956**
49:12

**2**

**2**
136:24 191:7 304:12
**2,000**
80:25
**2.06**
86:2
**2.1**
104:16,17 176:14
**2.1.3**
175:8,9 176:21 178:5
    178:10,19 180:11
    253:6
**2.10**
180:12,15 181:2,8,15
    181:17 183:2,4
    184:20 253:6
**2.2**
179:10
**2.2.2**
179:8 180:7 253:6
**2.2.3**
175:7
**20**
174:12 290:9,9,10,13
    290:14,15
**20,000**
256:23
**2018**
146:16

**2020**
3:21
**2021**
241:20 246:12,16
**2022**
79:15 81:6 241:20
    242:3 297:23
**2023**
3:15
**2024**
20:3
**2025**
1:20 4:8 309:2
    311:24
**21**
241:23
**21(b)**
263:5,13
**21(b)(iii)**
263:9
**21(c)**
264:15
**21.a.ii**
154:23
**21.a.iii**
151:15 153:4
**212**
2:6,16
**22**
242:2
**22-11068**
1:8 4:7
**22.i**
184:1
**22.n**
199:24
**22.o**
197:19,21
**23**
135:20
**24**
265:22
**25**
82:10 85:19 246:11
    266:9 269:11,22

**26**
101:23
**28**
102:18
**29**
114:13,23 184:17

**3**

**3**
282:23,25 285:9
**3AC**
79:16 80:10,12,14,15
    81:5 150:4 151:19
    162:10 196:9
    241:15 246:16
    251:16,20 252:5,5
    253:1 264:16,25
    265:1,12 283:21,23
    297:22 299:11
    300:15
**3AC's**
79:17 80:4,6,23 81:7
    151:18 152:13
    153:5 248:24
    264:18 270:3,14
    273:17,18 300:15
**3AC-specific**
81:10
**3XF**
1:18 2:11
**3.36**
148:20
**3.53**
148:23
**30**
184:17 301:3
**30%**
244:25
**30.1**
301:11,12
**30.2**
300:23 301:4,12
    303:11,13 304:4
**30.2.1**
304:3,8,12 305:1

**30.2.2**
304:8 305:1
**307**
3:4
**317**
3:15
**327**
129:1
**34**
115:17
**342**
129:10
**35.1**
117:16
**36**
273:12,15
**36(a)**
273:16 276:19 277:1
    277:7 278:17
**36(b)**
279:1
**37.6**
298:16
**38**
298:19
**38.11**
22:22
**38.2**
118:13 120:22
**38.5**
121:10
**38.6**
196:3 197:22 198:1,9
    198:21,23 199:1,3
    199:14,21 200:4,6
    253:6
**38.7.2**
293:1 298:22
**39**
123:24
**39.1**
123:25
**39.3**
124:6 135:23



**4**

**4**
16:6,7 123:16 297:6
 297:20 299:14
 303:21
**40**
219:25
**41**
282:14
**41(c)**
284:3,8,10
**41(d)**
284:13
**42**
3:9,11 148:16
**43**
284:23
**43(b)**
285:19
**43(c)**
286:19
**45**
290:19,20,20
**45.3**
183:3
**46**
200:11,11 292:25
**47**
203:9
**47.1**
203:16
**47.2**
73:13 76:19 204:3
**47.2(b)**
204:7
**47.2(c)**
204:24
**48**
216:1,3 296:2 305:5
**49**
296:4

**5**

**5**
3:4,15 111:17 234:15

300:13,21 301:2,6
**5.21**
215:20
**5.22**
215:23
**5.38**
227:24
**50**
216:9
**52**
219:25 220:4
**55**
220:15
**558-4000**
2:16
**57**
221:10 223:14

**6**

**6**
22:16 87:16 305:7
**6(b)**
305:10
**6.20**
228:2
**6.52**
308:2
**60**
26:3
**60.2**
224:8
**60.5**
225:21 226:7,14
**65.2**
76:17 78:10
**69(c)**
184:18

**7**

**7**
91:1 146:15 170:11
 170:14,22 241:19
 296:11,14 305:12
**7.11**
233:21

**7.113**
233:25 234:8
**7.115**
234:15
**7.31**
281:3
**7.43**
281:6
**7.45**
126:13 127:24
**7.48**
125:7
**7.50**
121:17
**7.53**
122:7
**7.55**
135:13
**728**
3:21
**730**
127:24
**76**
170:25 171:1
**77**
135:20

**8**

**8**
79:11,13 87:24
**8.19**
308:7
**8.2**
161:6 206:24 237:24
 238:2,4,12
**8.2(A)**
194:12,15,16 206:24
**8.2(B)**
194:12,12
**8.2.1**
161:9
**8.2.2**
161:12
**8.2.6**
89:22,24 149:4,10

150:12 151:17
 152:8 153:4,17,24
 155:1,10,14,18,20
 155:23 158:5,21
 159:6,9,14,22 161:6
 161:19 162:6,19,24
 163:7 165:24
 185:20,22 186:20
 198:25 199:4,15,22
 206:2,6 242:18
 248:23 249:6,8,14
 249:16,25 252:1
 253:7,9 255:21
 299:11,21
**8.2.6(A)**
159:17 207:6
**8.2.6(a))**
250:23
**8.2.6(B)**
207:9,13 209:3 214:6
**8.2.6(C)**
160:9,23
**8.3**
237:23 238:2,13,15
 239:17
**8.3.4**
239:12
**8.3.5**
161:15,25 162:3
 239:13
**8.6**
206:24
**81**
236:23 237:3
**83.3**
237:20
**83.5**
238:14 239:17

**9**

**9**
81:2 230:24 246:11
 305:13
**9.1**
188:2,5 191:4,7



231:9 232:7
**9.2**
181:19 187:13,15
188:2,9 189:14
190:10,12 191:5,10
192:5,5,7,9,16,24
193:7,12 194:19
197:23,25 198:9,22
199:11 230:24
231:1,4,17,20,25
253:7
**906-1200**
2:6
**92**
3:12
**95**
239:18,21
**99**
1:18 2:11 4:11



# EXHIBIT 33



<u>Neutral Citation Number: [2022] EWHC 2954 (Comm)</u>

<u>Case No: CL-2022-000517</u>

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS & PROPERTY COURTS OF**
**ENGLAND AND WALES**
**COMMERCIAL COURT (KBD)**

<u>Royal Courts of Justice</u>
<u>Strand, London, WC2A 2LL</u>

<u>Date: 29/11/2022</u>

**Before** :

<u>**THE HON MR JUSTICE BUTCHER**</u>

- - - - - - - - - - - - - - - - - - - -

**Between :**

**LMN**                                                          <u>Claimant</u>

**- and –**

**(1) BITFLYER HOLDINGS INC.**
**(a company registered in Japan)**
**(2) BINANCE HOLDINGS LIMITED**
**(a company registered in the Cayman Islands)**
**(3) PAYWARD INC**
**(a company incorporated in the USA)**
**(4) LUNO PTE LTD**
**(a company registered in Singapore)**
**(5) COINBASE INC**
**(a company incorporated in the USA)**
**(6) HUOBI GLOBAL LIMITED**
**(a company incorporated in the Republic of**
**Seychelles)**
**(7) LUNO (Pty) LTD**
**(a company incorporated in South Africa)**
**(8) PERSONS UNKNOWN (BINANCE)**
**(being the individuals or companies or other entities**
**who are identified in the Binance.com platform's**
**terms and conditions as Binance Operators but not**
**the Second Defendant)**
**(9) PERSONS UNKNOWN (BITFLYER)**

**(being the companies or other entities who own
and/or operate the 'Bitflyer' cryptocurrency
exchange and who have been informed about these
proceedings and/or this order but not the First
Defendant)
(10) PERSONS UNKNOWN (KRAKEN)
(being the companies or other entities who own
and/or operate the 'Kraken' cryptocurrency
exchange and who have been informed about these
proceedings and/or this order but not the Third
Defendant)
(11) PERSONS UNKNOWN (LUNO)
(being the companies or other entities who own
and/or operate the 'Luno' cryptocurrency exchange
and who have been informed about these proceedings
and/or this order but not the Fourth or Seventh
Defendants)
(12) PERSONS UNKNOWN (HUOBI)
(being the companies or other entities who own
and/or operate the 'Huobi' cryptocurrency exchange
and who have been informed about these proceedings
and/or this order but do not include the Sixth
Defendant)**　　　　　　　　　　　　　**Defendants**

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Josephine Davies and Sam Goodman** (instructed by **Rahman Ravelli**) for the **Claimant
Nik Yeo** (instructed by **DLA Piper UK LLP**) for the **5th Defendant** at the hearing on 11
November 2022

Hearing dates: 28 October, 11 November 2022

- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

.............................

Approved Judgment

**Mr Justice Butcher :**

1.    The present claim is made for information orders by LMN, which is a cryptocurrency exchange ('C') against six other cryptocurrency exchanges.  I will refer to each of the Defendants as D1, D2 etc, respectively.

2.    This judgment relates to two hearings.  The first, on 28 October 2022, was an *ex parte* application made by C, without notice to any of the Defendants.  I made certain orders, which are described below, and required that notice of the application for the substantive relief claimed should be given to the Defendants.   A further hearing, on notice, occurred on 11 November 2022.  At that hearing, D5 was represented by Mr Yeo and I am grateful to him for his helpful submissions.  A representative of D1 was present at that hearing.  The position of most of the other Defendants had also been made known to the court by that stage.  I made further orders on that occasion.  Again, I will refer to them below.

3.    On each occasion, I indicated that I would provide my reasons for the orders made subsequently.  These are those reasons.

Factual Background

4.    The essential factual background to this case, as alleged by C, is as follows.  C is a company incorporated in England and Wales.  It operates a cryptocurrency exchange.  Its analysis is that in doing so it does not hold the cryptocurrencies on trust.  Rather, it holds cryptocurrency in its own name and, in a manner analogous to conventional banking, owes a personal obligation to pay the relevant amount to each customer.

5.    A percentage of C's cryptocurrency reserves is accessible via the internet through what are called 'Hot Wallets', which is a term explained in the Securities and Exchange Commission's Glossary to the Cryptoeconomy as 'wallet[s] … connected to the internet, enabling [them] to broadcast transactions'.

6.    C's evidence is that some two years ago, hackers obtained access to its systems, and transferred some millions of dollars-worth of cryptocurrency (consisting of Bitcoin, Ripple, Tether, Ethereum, ZCash and Ethereum Classic) from it.  C sought help from a number of UK regulatory and law enforcement agencies, including the FCA, the National Crime Agency and the Metropolitan Police.  It worked closely with officers of the Metropolitan Police's Cyber Crime Unit.  After about 3 months, however, the Cyber Crime Unit said that it could provide no further assistance and suggested that C should consider civil proceedings.

7.    After a further four months, C instructed solicitors to pursue a civil action.   C instructed an expert, Pamela Clegg of CipherTrace, to seek to trace the cryptocurrency which had been transferred by the hackers. Ms Clegg produced a report dated 14 September 2022, and then a supplementary report dated 7 November 2022.  Ms Clegg's reports indicate that she was provided by C with details of the transactions believed to have been carried out by the hackers on the day of the hack.  She then tracked the transactions on the relevant blockchains.  Using proprietary software and public records, Ms Clegg was able to identify addresses under the same control; and through further software-based analysis of transactions was able to identify 'address clusters' that could be inferred to be under common control.

Approved Judgment

8.     On any occasion where the chain of transactions reached an 'exchange address' Ms Clegg could not discover what became of the cryptocurrency thereafter. This is because 'exchange addresses' are addresses owned and operated by the exchange itself. Whilst such addresses tend to be associated with a particular customer, the actual crediting of cryptocurrency to the relevant customer's account takes place 'off-chain' (ie via an internal accounting exercise). Cryptocurrency received into an 'exchange address' will be often merged by the exchange into an 'omnibus wallet' which is used to service multiple customers' requests.

9.     The result of Ms Clegg's exercise was the identification of 26 recipient addresses, which were 'exchange addresses', to which Bitcoin ('BTC') or Bitcoin Cash ('BCH') had been transferred. The distribution of these addresses amongst exchanges operated either by the relevant Defendant or a company in the same group (a point to which I will return) was as follows for BTC: D1, 1 account; D2, 5 accounts; D3, 1 account; D4, 2 accounts; D5, 1 account; and D6, 5 accounts. For BCH the distribution was: D2, 7 accounts; D6, 4 accounts.

10.    C's evidence is that, as all these addresses are 'exchange addresses' it is impossible to trace the cryptocurrency any further without information from the exchanges about the individuals behind the transactions. In the case of exchanges either operated by one of the Defendants or by an associated company, C had reason to believe that each collected know your client ('KYC') and anti-money laundering ('AML') information, and thus might be able to provide relevant information.

11.    As already indicated, C's evidence prepared for the initial hearing, while identifying the exchanges concerned, was not able to identify the exact legal entities which might be responsible for operating them and hold the information and documents which C sought. That evidence suggests that many exchanges use different companies to contract in different jurisdictions and thus the relevant entity might depend on where the natural person associated with a target address was located. Accordingly, in the initial Claim Form what was called the 'topco' for each exchange was identified. These 'topcos' had been identified by C from a number of sources, including websites, Bloomberg, WSJ, and regulatory and legal filings.

The 28 October 2022 Hearing

12.    At the 28 October 2022 hearing, C sought a 'rolled up' hearing of applications for permission to serve the Defendants out of the jurisdiction and to serve by alternative means, and of the substantive application for information orders. I agreed that this hearing should be held in private, in order that publicity should not defeat the object of the proceedings by giving notice to the putative fraudsters of the attempts to identify them. I also agreed to consider the application for permission to serve out and to serve by alternative means. I declined, however, to proceed with the application for the substantive relief without notice being given to the Defendants. To do so appeared to me inappropriate in the present case given: (a) that the alleged fraud was not of very recent occurrence; (b) that the application was not made against the putative fraudsters; and (c) none of the Defendants (nor any associated company) was alleged to have been itself in any way fraudulent.

*The application to serve out of the jurisdiction*

13.     The principal application which was, therefore, considered at the 28 October 2022 hearing was that for permission to serve out.  The Claim Form in relation to which this permission was sought at that stage named six Defendants, to wit Ds 1-4 and 6, and Coinbase Global Inc as D5.  The Claim Form stated in part:

'[C] seeks disclosure of documents and information, and ancillary relief, against [Ds] in the form of the draft order appended to this Claim Form, pursuant to s. 37 of the Senior Courts Act 1981, the *Bankers Trust* jurisdiction, to assist in identifying Persons Unknown and locating the proceeds of [C's] property.

… Part 8 of the Civil Procedure Rules applies to this claim.'

14.     The draft order there referred to sought from each D the following information:

1.1. In respect of any customer account(s) which the [relevant] Target Cryptocurrency were allocated to and/or received on behalf of:

 1.1.1. The name the account(s) is held in;

1.1.2. All 'Know Your Customer' information and documents provided in respect of the account(s);

1.1.3. Any other information and documents held in relation to the account(s) which might or does identify the holder of the account(s), including but not limited to bank account and payment card details, email addresses, residential addresses, phone numbers, bank statements, correspondence and documents provided on account opening or verification.

1.2. To the best of the [the relevant D's] ability:

1.2.1. An explanation as to what has become of the [relevant] Target Cryptocurrency.

1.2.2. Insofar as the [relevant] Target Cryptocurrency has been transferred to any other accounts (Onwards Account(s)), the details of the Onward Accounts set out in paragraph 1.1 above.'

The requirements for an order permitting service out

15.     The first question which accordingly needed to be decided was whether permission should be granted to serve out of the jurisdiction a Claim Form seeking such relief. This required a consideration of three matters, as summarised in <u>Altimo Holdings and Investment Ltd v Kyrgyz Mobil Tel Ltd</u> [2011] UKPC 7 at [71] per Lord Collins, namely:

(1) Was there a serious issue to be tried on the merits?

(2) Was there a good arguable case that the claim fell within one of the 'gateways' in CPR PD 6B §3.1?

(3) Was England and Wales the appropriate forum for the claim to be tried?

The merits of the claim

16.     As to the merits of the claim, C argued that there was at least a serious issue to be tried, and that indeed there was a good arguable case as to its entitlement to the orders sought.  I am satisfied that C does have a good arguable case in this regard on the basis set out in the following paragraphs.

17.     The court has a wide jurisdiction to grant injunctions under s. 37 Senior Courts Act 1981.   Orders requiring the provision of information have been considered justifiable by two strands of authority.   One is that stemming from Norwich Pharmacal Co v Comrs of Customs and Excise [1974] AC 133. The principles applicable to a Norwich Pharmacal order were conveniently summarised in Mitsui & Co v Nexen Petroleum UK Ltd [2005] EWHC 625 (Ch), where Lightman J said (at [18]-[21]):

18. … In its original form, the Norwich Pharmacal jurisdiction allowed a claimant to seek disclosure from an "involved" third party who had information enabling the claimant to identify a wrongdoer so as to be in a position to bring an action against the wrongdoer where otherwise he would not be able to do so. Lord Reid described the principle at page 175 as follows:

"...if through no fault of his own a person gets mixed up in the tortious acts of others so as to facilitate their wrong-doing he may incur no personal liability but he comes under a duty to assist the person who has been wronged by giving him full information and disclosing the identity of the wrongdoers. I do not think that it matters whether he became so mixed up by voluntary action on his part or because it was his duty to do what he did. It may be that if this causes him expense the person seeking the information ought to reimburse him. But justice requires that he should co-operate in righting the wrong if he unwittingly facilitated its perpetration."

The required disclosure may take any appropriate form. Usually it takes the form of production of documents, but it may also include providing affidavits, answering interrogatories or attending court to give oral evidence.

19. In subsequent cases, the courts have extended the application of the basic principle. The jurisdiction is not confined to circumstances where there has been tortious wrongdoing and is now available where there has been contractual wrongdoing: P v T Limited [1997] 1 WLR 1309; Carlton Film Distributors Ltd v VCI Plc [2003] FSR 47 ("Carlton Films"); and is not limited to cases where the identity of the wrongdoer is unknown. Relief can be ordered where the identity of the claimant is known, but where the claimant requires disclosure of crucial information in order to be able to bring its claim or where the claimant requires a missing piece of the jigsaw: see Axa Equity & Law Life Assurance Society Plc v National Westminster Bank (CA) [1998] CLC, 1177 ("Axa Equity"); Aoot Kalmneft v Denton Wilde Sapte [2002] 1 Lloyds Rep 417 ("Aoot"); see also Carlton Films. Further the third party from whom information is sought need not be an innocent third party: he may be a wrongdoer himself: see CHC Software Care v. Hopkins and Wood [1993] FSR 241 and Hollander, Documentary Evidence 8th ed p.78 footnote 11.

20. Norwich Pharmacal relief is a flexible remedy capable of adaptation to new circumstances. Lord Woolf CJ noted in Ashworth Hospital Authority v MGN Ltd [2002] 1 WLR 2033 at 2049F:

"New situations are inevitably going to arise where it will be appropriate for the [Norwich Pharmacal] jurisdiction to be exercised where it has not been exercised previously. The limits which applied to its use in its infancy should not be allowed to stultify its use now that it has become a valuable and mature remedy."

The development of the jurisdiction is illustrated by the disclosure relief ordered by McGonigal J in Aoot where he said:

"[17] In Norwich Pharmacal the information required was the identity of the wrongdoer (the applicant knew what wrong had been done but not who had done it) but I see no reason why the principle is limited to disclosure of the identity of an unknown wrongdoer and does not extend to information showing that he has committed the wrong.

"…The information held by [the respondent] may not conclusively reveal an alternate defendant to [one of the alleged wrongdoers] nor conclusively disclose who received any part of the prepayment moneys, but I am satisfied that there is a sufficient prospect that the information they hold will assist [the applicant] in its search for wrongdoers and the funds paid away …to justify making the orders sought.

….

[20] The potential advantages to [the applicant] of seeing this part of the jigsaw and the potential disadvantages of it being denied a sight of that part outweigh, in my view, any detriment to [the respondent]."

21. The three conditions to be satisfied for the court to exercise the power to order Norwich Pharmacal relief are:

i) a wrong must have been carried out, or arguably carried out, by an ultimate wrongdoer;

ii) there must be the need for an order to enable action to be brought against the ultimate wrongdoer; and

iii) the person against whom the order is sought must: (a) be mixed up in so as to have facilitated the wrongdoing; and (b) be able or likely to be able to provide the information necessary to enable the ultimate wrongdoer to be sued.

18. The second line of authority is that stemming from Bankers Trust Co v Shapira [1980] 1 WLR 1274 ('Bankers Trust'). This may itself be said to be founded on the principle in Norwich Pharmacal (as is suggested in Mackinnon v Donaldson, Lufkin & Jenrette Corp [1986] Ch 482 ('Mackinnon') at 498A/B per Hoffmann J), or to overlap with it (as suggested in Murphy v Murphy [1999] 1 WLR 282 at 290A/B per Neuberger J). The central requirements for an order under this jurisdiction were summarised by Warby J in Kyriakou v Christie Manson & Wood Limited [2017] EWHC 487 (QB), as follows:

'12.  The Bankers Trust jurisdiction arises where there is strong evidence that the claimant's property has been misappropriated. The case decided that where there is such evidence the court will not hesitate to make strong orders to ascertain the

whereabouts of property and to prevent its disposal, and those orders may intrude into what would otherwise be confidential customer information.

13.  The jurisdiction has been considered on a number of occasions since; the main authorities being *Arab Monetary Fund v Hashim (No.5)* [1992] 2 All E.R. 911, *Murphy v Murphy* [1999] 1 WLR 282, both of those being High Court decisions, and *Marc Rich v Krasner* [1999] EWCA Civ 581, a decision of the Court of Appeal.

14.  Five principles have been identified (and I accept can be identified) as emerging from those authorities. First, there must be good grounds for concluding that the money or assets about which information is sought belonged to the claimant; secondly, there must be a real prospect that the information sought will lead to the location or preservation of such assets; and thirdly, the order should, so far as possible, be directed at uncovering the particular assets which are to be traced. Although the specificity required will differ according to the facts of each case, the general principle appears to be that the order should not be wider than is necessary in the circumstances.

15.  A key passage relating to this principle is to be found in the judgment of Morritt LJ in the *Marc Rich* case, where he said, referring to a passage in the judgment of Hoffmann J in *Arab Monetary Fund v Hashim*, the following:

"I do not understand Hoffmann J to be stating that a *Bankers Trust* order must be as specific as a subpoena in all cases …No doubt the degree of specificity required will differ according to the facts of each case and those facts will include the relationship between the person against whom the order is sought and the other persons against whom the claims are made. The court must in this, as in all other exercises of its discretionary powers, seek to achieve a just balance between those who seek such orders and those against whom they are sought. In striking such a balance it is necessary to consider the onerousness of compliance with the order sought without being tied down by rules relating to subpoenas."

Those words are also illustrative of the fourth principle; namely that interests of the claimant in obtaining the order must be balanced against the possible detriment to the respondent in complying with the order, and the detriment to the respondent includes, in a case where this arises, any infringement, or potential infringement, of rights of privacy or confidentiality.

16.  Fifthly (and finally), it is established that the applicant must provide undertakings, first of all to pay the expenses of the Respondent in complying with the order; secondly, to compensate the respondent in damages, should loss be suffered as a result of the order; and thirdly, only to use the documents or information obtained for the purpose of tracing the assets or their proceeds.'

19.  I will take the requirements for an order under the Bankers Trust jurisdiction in turn. As to the first, in the present case, I concluded that there is a good arguable case that whoever holds the cryptocurrency or traceable substitutes therefor does so as a constructive trustee for C.  In this regard:

(1) There is a good arguable case that cryptocurrencies are a form of property.  This is supported by the legal analysis in the Legal Statement of the UK Jurisdiction Task Force ('Legal Statement') paras. 71-84, referred to and adopted by Bryan J in AA v Persons Unknown [2019] EWHC 3556 (Comm) at [56]-[61].

(2) There is a good arguable case that 'when property is obtained by fraud equity imposes a constructive trust on the fraudulent recipient: the property is recoverable

and traceable in equity' (to use the words of Lord Browne-Wilkinson in <u>Westdeutsche Landesbank Girozentale v Islington BC</u> [1996] AC 668 at 716). This principle was applied in relation to intangible property which was neither a thing in possession nor a thing in action in <u>Armstrong GmbH v Winnington Networks Ltd</u> [2012] EWHC 10 (Ch), esp at [127]; and see *Snell's Equity* (24th ed), para. 26-012.

(3) While there are arguments, drawn to my attention by Mr Yeo, that transfer of Bitcoin on the Bitcoin blockchain may create a new asset in the hands of the acquirer (Legal Statement para. 47), nevertheless there is a good arguable case that the transfers can nevertheless be the subject of tracing, on the basis that there is a relevant substitution (see *Lewin on Trusts* 20th ed., 44-063-071, *Civil Fraud: Law, Practice & Procedure* ed. Grant and Mumford, 23-014-015).

20.   The case summarised in the preceding paragraphs has been formulated on the basis that the law of England and Wales is applicable. I concluded that there is a good arguable case that that is so. Specifically there is a good arguable case that:

(1) The claim can be regarded as one involving a non-contractual obligation arising out of a tort/delict for the purposes of Article 4(1) of the Rome II Regulation (Reg (EC) No. 864/2007, as amended).

(2) That the relevant cryptocurrencies were at the time of the hack located and has their *situs* in England and Wales, on the basis that C is resident and carries on its relevant business here. This is supported by the analysis in Dickinson *Cryptocurrencies in Public and Private Law* para. 5.109 and *Dicey Morris & Collins on the Conflict of Laws* (16th ed) para. 23-050; and by the reasoning in <u>Tulip Trading Ltd v Bitcoin Association for BSV</u> [2022] EWHC 667 (Ch) at [147]-[149] per Falk J. I consider that there is a good arguable case that this is so, notwithstanding the fact that C's servers are located in Romania, which may be regarded as an adventitious circumstance.

(3) That accordingly, either the cryptocurrency can be regarded as 'damaged' in England and Wales because it is in England that it was taken from C's control (see *Dicey Morris & Collins* op cit at para. 35-027) or because C as an English company has suffered loss and damage in England.

21.   The second principle in relation to the grant of an order under the <u>Bankers Trust</u> jurisdiction is that there should be a real prospect that the information sought will lead to the location or preservation of the misappropriated cryptocurrencies. I was satisfied that, given the nature of the apparent fraud and of the information sought, which is in particular as to the identity of account holders and the destination of transfers, that this was so.

22.   The third principle in relation to the grant of a <u>Bankers Trust</u> order is that the order should not be wider than is necessary. This is a matter which has been addressed in the context of exactly what information was ordered to be provided: see below.

23.   The fourth principle is that the interests of the claimant in obtaining the order must be balanced against the possible detriment to the respondent(s) in complying with the order. As to this, there was and is a clear benefit to C in obtaining the information sought. I was satisfied that the potential detriment to Ds could be eliminated or at

least very effectively mitigated by C's undertakings as to expenses and damages, the restriction on collateral use, and the provision in the order that Ds are not required to do anything which would contravene local law.

24.   The fifth principle relates to the undertakings to be given by C. Such undertakings were offered in this case.

25.   Accordingly, I considered that there was a good arguable case on the merits of a claim under the <u>Bankers Trust</u> jurisdiction. I should add that, given that there seems no doubt that the Ds were 'mixed up' in the fraud (in the relevant sense, which does not involve any fraud or wrongdoing on their part), I consider that these considerations also show that there was a good arguable case that relief should be granted under the <u>Norwich Pharmacal</u> jurisdiction.

The existence of a 'gateway'

26.   The second jurisdictional issue is whether there is a good arguable case as to the availability of a 'gateway' for service out. I considered that there clearly was, namely the new 'gateway' in PD 6B §3.1(25) which applies where:

'A claim or application is made for disclosure in order to obtain information —

(a) regarding: (i) the true identity of a defendant or a potential defendant; and/or (ii) what has become of the property of a claimant or applicant; and

(b) the claim or application is made for the purpose of proceedings … which, subject to the content of the information received, are intended to be commenced either by service in England and Wales or CPR rule 6.32, 6.33 or 6.36.'

27.   The information sought falls within the terms of (a)(i) and (a)(ii). As to (b), C's stated intention is that, should the information obtained reveal potential cause of action defendants in the jurisdiction, it will commence proceedings against them here. Equally, if the information indicates that they are outside the jurisdiction, C intends to commence proceedings here and to seek to serve such proceedings out of the jurisdiction. I concluded that there is a good arguable case that this would be possible on the basis of the potential applicability of the 'gateways' in PD 6B §3.1(11) and/or (15). There is an argument, based on what was said in <u>Fujifilm Kyowa Kirin Biologics Co Ltd v Abbvie Biotechnology Ltd</u> [2016] EWHC 2204 (Pat) at [97] per Arnold J, that the location of the assets should be their location at the time permission to serve out of the jurisdiction is sought, but I do not consider that what was said in that case, which were *obiter dicta*, means that there would not be a good arguable case as to the availability of service out in such a case as this.

Is England and Wales the proper forum?

28.   The third jurisdictional issue is whether England and Wales is the proper place in which to bring the claim. On the basis of the information presently available (and which was available on 28 October 2022), England does appear to be the proper place for the action to be brought. C is an English company; there are good grounds for considering the *situs* of the cryptocurrency to be in England; relevant documents are

in England; and the law of England and Wales at least arguably governs the proprietary claim.

*The Application for Service by Alternative Means*

29.   The second principal application which needed to be determined on 28 October 2022 was C's application to serve the Defendants by alternative means, pursuant to CPR 6.15, 6.27 and 6.37(5)(b).  There must be 'good reason' for such permission to be granted.  Further, in the case of defendants situated in Hague Service Convention countries, at least where those countries have entered a reservation under Article 10, there need to be exceptional or special circumstances, which I take to mean that there must be a factor which provides a sufficiently good reason for such service notwithstanding the significance to be accorded to the reservation.

30.   I was satisfied that there was a good reason (and to the extent necessary, exceptional circumstances) afforded by the nature of the claim and the need for steps to be taken as soon as possible to seek to identify the relevant defendants and to preserve property.  I recognised that the case could not be properly described as one of 'hot pursuit', given the length of time between the fraud and now, but I did not consider that C was blameworthy in this regard, and the fact that time had elapsed did not mean that it was no longer important for there to be expedition. Steps should be taken before the scent goes colder.  Accordingly I made orders for service by alternative means by email at a number of specified email addresses and in one case additionally by posting a link to the documents on the online contact form on the relevant Defendant's website.  The order provided that the Defendants should be able to apply to set this order aside.

*Further orders*

31.   The order made on 28 October 2022 also ordered that the hearing of C's application on notice to the Defendants should take place on 11 November 2022.  In order that the purpose of the application should not be defeated by publicity, I also made confidentiality orders, which directed Ds, until the hearing, or further order of the court, and except for the purpose of obtaining legal advice, not to inform persons (other than subsidiaries) of the proceedings or the contents of the order.  It also ordered that if the Defendants contacted their subsidiaries about the claim, they should obtain an undertaking from those subsidiaries that they should not inform others about the claim, in a form which was annexed to the order.

The 11 November 2022 Hearing

32.   According to the information which C provided and which was available to the court at the hearing on 11 November 2022, it appeared that each of the Defendants named in the Claim Form for which permission to serve out had been given on 28 October 2022 had received notice of the hearing by the means ordered.  None had applied to set aside that order for service by alternative means. At the hearing itself, D1 attended personally through a representative.  As I have said, D5 was represented by Mr Yeo. I will return to the position of the different Defendants in due course.

33.   C sought that the hearing should be in private.  This was not objected to by those Defendants participating.  I considered, again in order that publicity should not defeat

the object of the application, that it was necessary to hold the hearing in private.  I indicated however, that I would wish to ensure that there should be a public judgment setting out the reasons for what had been determined (anonymised or redacted only to the extent necessary to ensure that the object was not defeated).

34.   The hearing was being conducted and orders were being sought by C at a point at which it was still open to the Defendants to challenge the jurisdiction of the court under CPR Part 11, including by a challenge to the order permitting service out of the jurisdiction.  None of the Defendants had positively stated that it would challenge the court's jurisdiction, but D2, D3 and D5 had expressly reserved their positions in relation to this.  The orders to be made had necessarily to be tailored to preserve the Defendants' right to challenge the jurisdiction, and any participation in the hearing by D1 and D5 and any concessions made by D2 and D3 in relation to the relief sought were without prejudice to such rights.

*The Application for <u>Bankers Trust</u> relief*

35.   As to the merits of the application for <u>Bankers Trust</u> relief, I considered, for reasons I have already given in the context of the application for permission to serve out, that C has a good claim to such relief.

36.   I should, however, address one specific point to which reference was made in correspondence with C's solicitors by the solicitors for D2.  That is that there is an argument to the effect that the making of <u>Bankers Trust</u> orders against foreign defendants constitutes an infringement of the sovereignty of a foreign jurisdiction and should only be made in exceptional circumstances.  It was suggested that such an argument can be made on the basis of what was said in <u>Mackinnon</u> esp at 493-4 per Hoffmann J.

37.   In my judgment the approach indicated in <u>Mackinnon</u> is inapplicable in the present case.  Here, it is not known where the relevant documents are located. While there is clearly a possibility that the documents are in another or other jurisdictions, they may be in this one.  Furthermore, it may well be that the location of the documents (which may be electronic) is of little significance. The court is faced with the novel challenges of fraud in relation to cryptocurrency transactions, and an approach adopted in relation to banks in 1985 does not seem to me to be apposite.  In any event, Hoffmann J himself recognised in <u>Mackinnon</u> that such orders might be made in exceptional circumstances, and that exceptional circumstances had been found where crime and fraud were involved (see at 498 by reference to <u>London and County Securities Ltd v Caplan (Unreported) 26 May 1978</u>).  The present case involves crime and fraud and the pursuit of assets.  Although that pursuit cannot be said to be 'hot', it is nevertheless important that there should be no further avoidable delay.  It would be impractical and contrary to the interests of justice to require a victim of fraud to make speculative applications in different jurisdictions to seek to locate the relevant exchange company and then to seek disclosure, probably in aid of foreign proceedings. That would be productive of increased costs, and delay, and reduce the possibility of effective location of the fruits of fraud.  Concerns about national laws can be catered for by the terms of the order which make clear that no respondent is required to do anything contrary to local laws.

*The position of the Ds*

38.    The position of the various Ds was, as it appeared at the hearing on 11 November 2022, as follows.

D1

39.    D1 appeared at the hearing, and raised the entirely legitimate concern that there should not be identification of an inappropriate defendant.   D1 did not raise substantive objections to the relief sought.

D2

40.    As I have said, D2 had, through its solicitors Herbert Smith Freehills, made reference to Mackinnon.  It had, however, also made it clear that it would not actively oppose the granting of a Bankers Trust order, and would take a neutral position in the present case.  In addition, it raised points about the confidentiality provisions and the terms of the order. And, significantly, it stated that D2 is not the ultimate entity which owns or operates the Binance.com exchange and does not hold the information sought, nor does it have an unfettered legal right to demand that information from any other Binance entities.   Nor was it willing to identify the relevant entity.   It said that, nevertheless, if the court granted the order it would request the information from other 'Binance Operators' (as defined in the terms and conditions on the Binance website).

41.    The difficulty of C not knowing which was the precise legal entity concerned, in circumstances where the exchange 'topco' was not willing or able to say, was addressed by C by seeking to add a 'Persons Unknown' Defendant in respect of the Binance exchange.  Thus, at the hearing on 11 November 2022 I gave permission for the addition of an eighth Defendant, namely 'Persons Unknown (being the individuals or companies or other entities who are identified in the Binance.com platform's terms and conditions as Binance Operators but not [D2])'.

D3

42.    D3 was named because C contended that it is the 'topco' in relation to the Kraken exchange.  D3's response to service of the proceedings was that C was in breach of a contract between C and D3 whereunder C had agreed not to bring an action against Payward entities without complying with its terms and conditions.  It is not necessary to set out that issue in any detail.  D3 maintained that position, but indicated, without submitting to the jurisdiction, that it would comply with an order if made.

D4

43.    Issues were raised in correspondence from D4 as to the whether the correct Defendant had been named.  This led to C seeking permission, which I granted, to add the 7th Defendant.  A concern was also raised as to whether the order required a cross-border transfer of personal information.   It appeared to me that that issue would be sufficiently dealt with by the provision that the order did not require the defendant to do anything prohibited by local law.

D5

44.    Coinbase Inc, through its solicitors DLA Piper UK LLP and counsel, had indicated that it, rather than Coinbase Global Inc, which had originally been named, was the

relevant entity.  I made an order substituting it as D5.

45.     D5 pointed out that the sum allegedly received by a Coinbase user was very small, but it indicated that it was nevertheless prepared to provide information to assist C to identify the alleged fraudster.  D5 made a number of points as to the terms of the order, and in particular as to the width of the information which should be provided.  In substantial measure as a result of these submissions, the information which I ordered should be produced (for all Defendants) was as follows:

> 1. In respect of any customer account(s) which the Target Cryptocurrency was allocated to and/or received on behalf of:

> (a) the name the account(s) is held in;

> (b) All 'Know Your Customer' (**KYC**) information and documents provided in respect of the account(s);

> (c) Any other information and documents held in relation to the account(s) which does (or which the relevant Defendant consider is likely to) identify the holder of the account(s), including email addresses, residential addresses, phone numbers and bank account details, save that any bank account details and/or social security numbers may be partially redacted by the relevant Defendant.

> 2. To the best of the Defendant's ability:

> (a) An explanation as to what has become of the Target Cryptocurrency (for the avoidance of doubt, this should be with reference to the customer account which is not necessarily the same as the recipient address listed in Schedule 1);

> (b) The balance in the customer account referred to under sub-paragraph (a) above: (i) immediately before it was allocated and/or received the Target Cryptocurrency; and (ii) at the time of that Defendant's response pursuant to this order;

> (c) (In respect of the 1st-4th and 6th-8th Defendants only) insofar as transfers have been made from (or on behalf of) that customer account to any other recipient address between [date A] and [date B], if those recipient addresses are associated with customers of the relevant exchange, the name and residential address of each accountholder.

46.     D5 also submitted that the court should not make a Confidentiality Order in the form which had been included in the order of 28 October 2022, and which was included in C's draft order for 11 November 2022.  That form of order required, in outline, that if a defendant needed to contact a subsidiary to respond to the claim, it should seek to obtain a written undertaking from that subsidiary that it would not disclose the existence of the proceedings or order and agree that the undertaking was subject to English jurisdiction.  D5's submission was that it was inappropriate to order a Defendant to obtain an undertaking from a subsidiary (which included an obligation to submit to the jurisdiction of the English court).  I considered that that objection had considerable force.  Accordingly no such provision was included in the order made on

**Approved Judgment**

11 November 2022. The position in relation to subsidiaries who needed to be informed was dealt with by adding the 9th to 12th Defendants, so that any persons who fell within those limited categories would be directly bound by the confidentiality provisions of the order. D5 reserved its position as to whether that was an appropriate way in which the issue was dealt with (since it did not affect D5 in the case).

47.    D5 also submitted that C's undertaking as to collateral use should specifically prohibit use of the information obtained for the purpose of a substantive claim against any of the Defendants without the leave of the court.    Accordingly, the terms of the undertaking which was required from C in this respect was in the following terms:

As to collateral use:

(1) Subject to sub-paragraph (2) below, the Claimant shall only use the information and disclosure provided by the Defendants for the purpose of recovering their (allegedly) misappropriated assets or damages in respect of the misappropriation (which shall include (i) taking further steps in this claim or to obtain further information / documentation from third parties as well (ii) bringing proceedings against any persons who may be liable to the Claimant in relation to the alleged misappropriation of assets).

(2) The Claimant will not use the information or disclosure provided for the purpose of any substantive claim against any of the Defendants without prior permission from the court.

(3) The Claimant shall use reasonable endeavours to keep the disclosure and information provided confidential to the extent that is possible and permitted by the court (including redaction and/or ensuring such disclosure is subject to protective orders to prevent public inspection).

D6

48.    D6 had made no substantive comments (whether by way of objection, reservation of position or otherwise).

*Summary*

49.    In the circumstances I was prepared to make an order requiring the provision of information and documentation.  The dates for compliance were adjusted so that they fell after the date on which any application under Part 11 had to be made.  Insofar as Defendants were added, provisions were included as to permission to serve out, alternative service, and time for challenging the jurisdiction of the court.   C was required to give undertakings covering expenses and loss in usual terms.  It was also required to provide an undertaking as to collateral use in the terms which I have set out above.  End dates for the confidentiality and privacy obligations, subject to further order of the court, were provided for.

# EXHIBIT 34

A

B

HCCW 18/2019
[2023] HKCFI 914

C

**IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE**
COMPANIES (WINDING-UP) PROCEEDINGS NO 18 OF 2019

D

E

F

———————————

G

IN THE MATTER of GATECOIN LIMITED (in liquidation)

H

and

I

IN THE MATTER of the Companies (Winding Up and Miscellaneous Provisions) Ordinance (Cap. 32)

J

K

———————————

L

Before: Hon Linda Chan J in Chambers

M

Date of Hearing: 23 February 2023

Date of Decision: 31 March 2023

N

O

———————————

D E C I S I O N

———————————

P

Q

1.      There is before the court an application made by Ms Chi Lai Man Jocelyn and Ms Li Chung Ngai both of Kroll (HK) Limited, the joint and several liquidators of Gatecoin Limited ("**Liquidators**") under s.200(3) of the Companies (Winding up and Miscellaneous Provisions) Ordinance (Cap. 32) ("**CWUMPO**") for directions on (1) the characterisation of cryptocurrencies

R

S

T

U

V

and fiat currencies [1] (together "**Currencies**") held by Gatecoin Limited ("**Gatecoin**"); and (2) the allocation of the Currencies to the customers.

2.      Having regard to the nature of the application, the complex legal and factual issues raised by the Liquidators some of which have never been determined in Hong Kong, and the number of customers whose interest would be affected by the determination, this Court gave directions on the further conduct of the application on 5 December 2022 (reproduced in the Schedule hereto) so that any stakeholders may file evidence and participate in the application if they want to do so.

3.      At the hearing, the Liquidators are represented by Mr Justin Ho, who is led by Ms Eva Sit SC in the skeleton submissions originally lodged with the court.  Cumberland DRW LLC, a Group A customer (as defined in §24 below), is represented by Mr Eric Chan of Messrs. Simmons & Simmons.

*A.      Overview*

4.      The Liquidators seek directions or determinations on the following questions:

(1)   Question 1: Gatecoin had 3 different sets of terms and conditions ("**T&Cs**") at various times. [2]  The question is whether the Currencies are held on trust for each type of "Group A", "Group B" and "Group C" customers (as defined in §24 below) (collectively "**Customers**").  The Liquidators' position is that the Currencies of Group A and B customers were held on trust,

---

[1]    That is, legal tender issued by governments such as USD, GBP, EURO
[2]    See §24 below

whereas Group C customers only have a contractual claim against Gatecoin for the Currencies.

(2)     Question 2: Whether the Currencies in the accounts of Blue Fire Capital, LLC (a US company) or Blue Fire Capital Europe Coöperatief U.A. (a Dutch company) ("**BlueFire**") form part of Gatecoin's general assets.

(3)     Question 3: Given the Currencies in the Liquidators' hands cannot satisfy all the trust claims of Group A and B customers, how should their claims be met.  The Liquidators' position is:

(a)     Group A and B customers are beneficial tenants-in-common in the pool of a specific type of Currency in proportions to their account balances in the "Exchange Ledger" (as defined in §22(2) below).

(b)     Where there is no shortfall, each Customer should be entitled to his entitlement subject to the Liquidators' costs, fees and expenses ("**Expenses**") being borne by trust assets *pro rata*.

(c)     Where there is shortfall, the "pools" should be shared amongst Group A and B customers *pari passu*, subject to the Expenses being borne by such trust assets *pro rata*, with the remaining claims being treated as unsecured claims.

(4)     Question 4: The mechanics of effecting allocation of trust assets, given the practicalities and expense involved in making allocation *in specie*.  The Liquidators' position is that:

> (a)  If allocation *in specie* is impracticable, the Liquidators be empowered to sell the Currencies and distribute the proceeds after deduction of the Expenses.

> (b)  The share of unidentified and uncontactable Group A and Group B customers' assets be dealt with pursuant to ss.62 and 67 of the Trustee Ordinance (Cap. 29).

5.       Upon determination of Questions 1 and 2, the Liquidators will know whether the Currencies (or any part thereof) are held by Gatecoin on trust for the Customers or any of them.  This, in turn, will determine whether Gatecoin has any assets which can be deployed by the Liquidators to pay the Expenses and make distribution to the unsecured creditors.  If and to the extent that there are assets not held by Gatecoin on trust for the Customers, it may not be necessary for the court to determine Questions 3 and 4.  For these reasons, in this Decision, only Questions 1 and 2 will be determined.

*B.     Background*

*B1.    Gatecoin*

6.       Gatecoin is a Hong Kong company founded and beneficially owned by Mr Aurelien Pierre Georges Menant ("**Mr Menant**").

7.       Gatecoin was wound up by the court on 13 March 2019.  The Liquidators were appointed on 20 March 2019.

8.       From January 2015, Gatecoin operated a cryptocurrency exchange platform at https://gatecoin.com/ ("**Platform**") through which it provided all the services to the customers.  To access and use the Platform, a customer had to open and register an account with Gatecoin and deposit

cryptocurrencies or fiat currencies for trading or withdrawal purposes.  There were more than 45 types of cryptocurrencies trading carried on through the Platform.[3]  In addition, Gatcoin also engaged in trading of cryptocurrencies in its own right including trading with its customers[4].  Other than the Platform, Gatecoin did not operate its business in any other form.

9.        As regards fiat currencies, they were pooled together and kept in the accounts held by Gatecoin at 3 payment service providers (“**PSPs**”)[5] and the total amount recovered by the Liquidators as at 31 October 2022 was HK$11,589,477[6].  In addition, the Liquidators were able to secure over 50 types of cryptocurrencies which had an aggregate value of HK$140,390,667 as at 31 October 2022[7].

10.        The Liquidators have contacted over 102,600 creditors but only 1,132 of them have lodged proofs of debt (“**PODs**”).  This  represents 75% of the amount owed to the creditors as recorded in Gatecoin’s books and records, which stood at HK$249,905,111 (as at 13 March 2019)[8].  Apart from Mr Menant, all the creditors are customers with positive account balances in their accounts at Gatecoin.  Amongst them, 316 (35% by number and 42% by value) preferred allocation *in specie* instead of cash dividend[9].

---

[3]    Chi 2nd §§5, 7.2.
[4]    Report of Ms Jesse Co, the expert engaged by the Liquidators (“**Report**”), §80.
[5]    Namely Nederlandsche Betaal & Wissel Maatschappij N.V., International Business Settlement and BD Multimedia
[6]    Chi 2nd §§60-64.
[7]    Chi 2nd §§20-21; Summary of Currencies secured by the Liquidators.
[8]    Chi 2nd §23.
[9]    Chi 2nd §19.7.

## B2.    *Cryptocurrency and Blockchain*

11.    Before considering the facts of this case, it is necessary to understand the nature of cryptocurrency and blockchain technology which lie at the very heart of Gatecoin's business and operation.

12.    Cryptocurrency is a digital asset based on blockchain technology, which records transaction data in a list of records (a block) with a time stamp, and one block is linked to the next by cryptography.  The blockchain contains all transactions processed, with each transaction cryptographically linked to the previous one.  The data stored can only be changed when all the participants agree.  This ensures that blockchain is not controlled by any single authority, and the data stored in the blockchain is immutable (*Sarra and Gullifer, Crypto-claimants and Bitcoin Bankruptcy Challenges for Recognition and Realisation* (2019) 28 IIR 233, 235-236; *UK Jurisdictional Taskforce, Legal Statement on Cryptoassets and Smart Contracts,* November 2019, §§28-29).

13.    As explained by Ms Jesse Co [10], the expert engaged by the Liquidators, blockchain and cryptocurrency have the following features.

14.    First, a cryptocurrency can only be transferred from one user to another user through a cryptocurrency network, and the transfer must be initiated and approved by the owner of that cryptocurrency:

   (1)    Each user of a cryptocurrency network owns a "wallet".  Each wallet has a unique address and is associated with 2 distinct keys: a "public key" (akin to a bank account) and a "private key" (akin

---

[10]    General Manager of Blockchain Solutions Ltd, a blockchain consultancy service company based in Hong Kong, which provides end-to-end blockchain technology solutions.

to a PIN).  The private key is used to transfer cryptocurrency from a user's wallet to the wallet of another user[11].

    (2)    To effect a transfer, the transferor creates a record of the transfer by modifying the public key of his wallet, and digitally signing it with his private key.  The cryptocurrency then becomes linked to the wallet address of the transferee[12].

15.    Second, the cryptocurrencies received by a user in a particular transaction are *indivisible* and must be fully consumed in a single setting:

    (1)    Thus, if a user received 10 cryptocurrencies in an inbound transaction but only wants to transfer 1 cryptocurrency to another user, he needs to make a composite outbound transaction by transferring 1 cryptocurrency to the transferee and 9 cryptocurrencies back to himself as "change".

    (2)    Conversely, a user may amalgamate the cryptocurrencies received in a few inbound transactions and transfer them out of his wallet[13].

16.    Third, once the cryptocurrencies received from an inbound transaction are transferred out of a user's wallet, that inbound transaction (which remains recorded on the blockchain) ceases to have any value in the wallet and cannot be used as an "input" transaction in another transaction[14].

17.    Fourth, a user cannot select which inbound transaction he would like to use for a transfer/withdrawal, as the system would do the matching and

---

[11]   Report §§12-13
[12]   Report §15
[13]   Report §§17-19
[14]   Report §19

select the inbound transaction (with the specific wallet address and the amount of cryptocurrency held) and use it as "input" for a transfer/withdrawal. The cryptocurrency in that "input" would be fully utilised and transferred to other wallets and shown as "outputs" in that transaction (or the fee charged by the operator/exchange if there was such fee)[15].

18.     Fifth, blockchain is a publicly available ledger containing a record of all transactions made in respect of that cryptocurrency[16]. For example, in respect of Bitcoin, details of all the transactions can be viewed at Wallet.Exlorer.com. A user can trace a cryptocurrency from its creation all the way through to each transaction it has gone through.

19.     Sixth, every transaction recorded in the blockchain is *unique* and can be identified:

    (1)   For each transaction recorded on the blockchain, apart from date and time of the transaction, there is (a) a unique transaction ID; (b) a wallet address of the transferor; (c) a wallet address of the transferee; (d) the amount of cryptocurrency transferred; and (e) a unique identifier of the previous transaction through which the transferor obtained the cryptocurrency in question[17].

    (2)   As each transaction is linked to an "input" (akin to a deposit) or a number of "inputs" and an "output" (akin to a withdrawal), one can trace any specific cryptocurrency from the date it was first

---

[15]   Report §20
[16]   Report §14
[17]   Report §§14-15

created or "mined" to all the transactions through which it was transferred to various wallets[18].

(3) Each record of transfer will be added to the blockchain upon being checked against all other transactions to ensure there is no double spending (*Sarra & Gullifer*, 236).

20.     Seventh, the blockchain does not show the current balance of each wallet.  The balance of cryptocurrency in a given wallet is simply a reference to the difference between (1) the total amount of cryptocurrencies of all inbound transactions (i.e. inputs) and, (2) the total amount of cryptocurrencies of all outbound transactions (i.e. outputs)[19].

## B3.   Operation of Gatecoin

21.     For the purpose of its business, Gatecoin controlled 4 types of wallets, and all the transactions conducted with these wallets were recorded and shown in the blockchain[20]:

(1) External Wallets: Wallets designated to receive cryptocurrencies deposited by the Customers from their private wallets.  Gatecoin had thousands of External Wallets.

(2) Mother Wallets: Each Mother Wallet was used to collect and store a type of cryptocurrency.  Once the cryptocurrency was received through the External Wallet(s), it would be transferred to the Mother Wallet and mixed with all cryptocurrencies kept in that Mother Wallets.  Gatecoin had 18 Mother Wallets.

---

[18]   Report §16
[19]   Report §20
[20]   Report §§28-70

(3) <u>Operational Wallets:</u> Wallets designated to transfer cryptocurrency to the Customers' private wallets in accordance with their transfer/withdrawal instructions, or to receive the balance of cryptocurrencies not consumed in a single setting. Gaincoin had 25,408 Operational Wallets[21].

(4) <u>Multifunction Wallets:</u> Wallets with the functions of Operational Wallet and Mother Wallet[22].

22. As regards the dealings between Gatecoin and its Customers:

(1) A Customer had to register an account with Gatecoin, and would be assigned with a unique customer ID.

(2) The Customer would deposit or transfer/withdraw cryptocurrency through the Platform. All transactions made by the Customers through the Platform would *only* be recorded in Gatecoin's internal exchange ledger ("**Exchange Ledger**"). The Exchange Ledger recorded details of the transactions namely, the date, transaction ID, type of cryptocurrency, amount, transaction type, transferor address (for deposit into Gatecoin) and transferee address (for withdrawal out of Gatecoin).

(3) In turn, Gatecoin would carry out the transactions made/approved by the Customers through either (a) its External Wallet and Mother Wallet (for cryptocurrency deposited by customer), or (b) its Mother Wallet and Operational Wallet/Multi-function Wallet

---

[21]  Report §§28, 31-32
[22]  Report §§59-66

(for cryptocurrency withdrew by customer).    All these transactions would be recorded and shown in the blockchain[23].

(4)    Where Gatecoin executed the trade made by a customer "in house", that is, using the cryptocurrency kept at the Mother Wallet it controlled, the transaction would not involve any movement between different wallets and, therefore, would not be recorded or shown in the blockchain[24].

23.    The *modus operandi* of Gatecoin's business means that:

(1)    Once a customer deposit cryptocurrency at the Platform, it would be transferred from the External Wallet to the Mother Wallet (both controlled by Gatecoin) and mixed with the cryptocurrencies in that Mother Wallet;

(2)    Gatecoin would be able to apply any cryptocurrencies in the Mother Wallet for its purposes including making a transfer in compliance with a withdrawal request made by any customer;

(3)    The customer ceased to have any control over the cryptocurrency from the moment it was deposited with Gatecoin[25]; and

(4)    The information recorded on the Exchange Ledger is not sufficient for the Liquidators to trace through the cryptocurrency deposited with Gatecoin as most of the trades recorded in the Exchange Ledger were executed by Gatecoin "in house" which did not involve any movement between different wallets[26].

---

[23]    Report §§25-26, 30, 70, 77-78
[24]    Report §§77-79
[25]    Report §71
[26]    Report §§76-79

*B4.    Gatecoin's T&Cs*

24.        The Liquidators have identified 3 different sets of T&Cs which were in force at different time periods.  According to Gatecoin's books and records, as at 31 October 2022, the number of Customers and the value of their claims are as follows[27]:

| Set | Effective Date | Customers | No. of Customers | Value of claim |
|---|---|---|---|---|
| "2016 T&C" | 28/1/2015 – 11/2016 | Group A | 10,010[28] | 205,409,870 |
| | | With ETD | 401 | 178,868,991 (valued as at 31/3/2019) |
| "Trust T&C" | 11/2016 – ~3/2018 | Group B | 80,011 | 170,955,596 |
| "2018 T&C" | 6/3/2018 – 13/3/2019 | Group C | 12,697 | 11,992,862 |

25.        The <u>2016 T&C</u> provides, *inter alia,* that:

    (1)    the terms constitute "a binding agreement" (p.1);

    (2)    Gatecoin reserved the right to modify the terms "without prior notice" (p.2); and

    (3)    a User's access to and use of the website constitutes "acceptance of [the 2016 T&Cs]".  There is no provision which has the effect of creating a trust over the Currencies deposited or kept by Group A in their accounts at Gatecoin.

---

[27]  Chi 2nd §§55, 57.2
[28]  This figure includes 401 Group A Customers with ETD claims.

26.          As for the <u>Trust T&C</u>, the Liquidators consider that the following terms taken together have the effect of creating a trust over the Currencies in favour of Group B customers:

(1)    Clause 1.1 states that the use of Gatecoin's platform constitutes agreement to be bound by the Trust T&C.

(2)    Clause 1.2.2 reserves Gatecoin's right to change terms, although Users would "have the right to receive prior notice of any material change" and be "asked to agree".

(3)    Clause 5.1 provides that Gatecoin maintains an Exchange Ledger to track User's ownership of fiat currency and "Digital Assets" reflected in the associated Digital Asset Account.

(4)    Clause 7.3.1 provides that the Digital Assets would be held in "pooled digital wallets" and a User "will have beneficial ownership interest in the Digital Assets".

(5)    Clause 7.3.2 provides that Gatecoin acts as a "custodian" holding the Digital Assets "in trust".

(6)    Clause 7.4.1 provides that Gatecoin is "fiduciary" and will hold the fiat currency reflected in User's Fiat Account.

(7)    Clause 7.4.2 provides that "cash balances held in your Fiat Account will not be treated as general assets".

(8)    Clause 7.5 provides that all tokens would be registered in Gatecoin's name, although it would credit "all rewards,

distributions and other[29] in respect of tokens" not registered in a User's name into his account.

(9)    Further, the phrase "your Digital Assets" can be found in Clauses 3.3.2, 7.3.1, 7.3.2, 10.2.2.7.

27.    Under the 2018 T&C, there is no provision which has the effect of creating a trust over the Currencies in favour of Group C customers:

(1)    Clauses 1.7 and 3.5 provide that Gatecoin is "not" acting in "fiduciary capacity".

(2)    Clause 12.5 provides a User should "not" expect any new or additional Blockchain Assets created by Forks to be credited, and Clause 13.1 provides a User will "not" receive any tokens or Airdrops;

(3)    Clause 10.1.1 provides that "Gatecoin maintains a private exchange ledger to track a … User's ownership of (a) Fiat Currency reflected in the User's Fiat Account and (b) Blockchain Assets reflected in the User's Blockchain Asset Account"; and

(4)    Clause 27.1.2 provides that upon closure of an account, a User is required to provide transfer instructions of where to transfer the fiat and Blockchain Assets in his account, and Clause 27.2.4 states that Gatecoin is authorised to send any remaining Currencies or sell them.

---

[29]    This is a reference to "airdrops", an accretion of crypto included in the blockchain protocol of that crypto which would be triggered as designed.

### B5.    BlueFire

28.        BlueFire was a "market maker" which traded in cryptocurrencies on behalf of Gatecoin, using the funds provided by Gatecoin.    Although BlueFire held the largest amount of Currencies at Gatecoin, it has not asserted any claim over the Currencies.    Nor has it lodged any POD with the Liquidators. According to the information provided by Mr Menant, as corroborated by the Liquidators' investigation, the Currencies held in BlueFire's accounts belonged to Gatecoin[30].

### B6.    ETD Holders[31]

29.        In May 2016, there was a cyberattack on the Platform in which 90% of ETH[32] held by Gatecoin was stolen ("**Hack**").    By email dated 17 August 2016, Gatecoin informed the Customers affected by the Hack that:

(1)    All customers who held ETH could withdraw and trade up to 10% of their balances in ETH, and the remaining 90% would thenceforth be recorded as "ETD" (i.e. Ethereum Debt) in their account balance;

(2)    ETD is simply a record of the debt owed by Gatecoin to the holders of ETD ("**ETD Holders**"), but the ETD Holders would not be able to withdraw them at that time;

(3)    The value of ETD would link to the market price of ETH; and

(4)    The ETD would be "locked until [Gatecoin has] the ETH liquidity to enable full reconciliation of ETD for ETH".

---

[30]    Chi 2nd §§66-73
[31]    Chi 2nd §§19.6; 56.3
[32]    Ethereum, a type of cryptocurrency

*C.    Applicable principles*

30.    The Liquidators apply for directions under s.200(3) of the CWUMPO, having regard to the following facts and matters:

(1)    The existence of 3 different sets of T&Cs, one of which indicates that the Currencies are held on trust;

(2)    If the Currencies are held by Gatecoin on trust, (a) given the diverse nature of cryptocurrencies and their fluctuating value, it may not be practicable or cost effective to distribute them to the Customers *in specie*, and (b) it is necessary to devise a means for dealing with the unclaimed Currencies for those Customers who do not come forth to claim their entitlements;

(3)    Although BlueFire held accounts at Gatecoin, the evidence suggests that the Currencies in BlueFire's accounts may be assets belonging to Gatecoin; and

(4)    The substantial shortfall between the Currencies and the total amount owed to the Customers as recorded in Gatecoin's records.

31.    The principles governing an application under s.200(3) are well settled.  As submitted by Mr Justin Ho, counsel for the Liquidators:

(1)    A liquidator should seek directions from the court if there is any difficulty at any stage during the course of the administration. However, this does not mean that a liquidator can ask the court to approve any decision which appropriateness she is uncertain about.  In particular, the liquidator should not ask the court to approve what is a matter of commercial judgment; it is for the

liquidator to conduct a liquidation exercising her own professional expertise and judgment.

(2)     A direction must require something other than general endorsement of a proposed cause of action. Normally this will require the formulation of a precise issue, commonly legal and of significance.

(3)     The liquidator bears responsibility of making full and fair disclosure of material facts, and the court is not to resolve factual conflicts.

(4)     It is not for the court to develop alternative proposals, but depending on the issue it may be appropriate for the court to suggest changes to the proposed course of action which could render it acceptable (*McPherson and Keay, Law of Company Liquidation*, 5th edn, 2021, §§9-043-9-046; *Re a Company (Liquidators: Cowley and Lui)* [2020] 3 HKLRD 96, §§19-22, applied in *Re Hsin Chong Construction Company Limited* [2021] HKCA 1581, §§15-16).

## D.     Question 1: the Trust Issue

### D1.     Liquidators' view

32.     The view of the Liquidators on Question 1 may be summarised as follows:

(1)     Group A customers who opened their accounts when the 2016 T&C was in force have *no* proprietary claim over the Currencies in their accounts as Gatecoin did not hold the Currencies on trust

for them.  However, as they subsequently agreed to the Trust T&C, a trust was created over the Currencies in favour of Group A (see Section D5.3.1 below);

(2)   Group B customers who opened their accounts when the Trust T&C was in force have a proprietary claim over the Currencies in their accounts given that (a) the Trust T&C has the effect of creating a trust over the Currencies in favour of Group B; and (b) the legal requirements for creating a trust over the Currencies are satisfied (see Section D5.3.2 below);

(3)   The nature of each Group A and B customer's beneficial interest in the cryptocurrencies in his account is by way of co-ownership in a pool of cryptocurrencies of the specific type to which he or she has a credit balance; and

(4)   The cryptocurrencies in the accounts of Group C customer and ETD Holders were not subject to any trust arrangement and they only have contractual claims against Gatecoin [33] (see Section D5.3.3 below).

## D2.    Whether 2018 T&C applies to Group A and B

33.       In my view, the question whether the Currencies are held by Gatecoin on trust for the Customers (be it Group A, B or C) should be determined by construing the terms of the 2018 T&C.  The earlier versions of the T&Cs (i.e. 2016 T&C and Trust T&C) have no application for the reasons explained below.

---

[33]   Chi 2nd §12

34.        According to Mr Menant, the 2018 T&C came into force in March 2018, and superseded the Trust T&C.  From that time onwards, all Customers including Group A and B customers who registered their accounts when the 2016 T&C and Trust T&C were in force, were *required* to click to acknowledge and *accept* the 2018 T&C before they could continue to access and use Gatecoin's website (i.e. the Platform)[34].  His statement is consistent with:

(1)        the Liquidators' investigation; and

(2)        the following terms of the 2018 T&C:

(a)        Clause 1.2.2 and 3.2.2 (which are identical) state that:

"<u>By visiting, accessing or using Gatecoin Platform</u>, you confirm, represent and warrant that:

1.        ….

2.        You have the legal capacity to accept these Terms and to <u>agree to be bound by the Terms</u> in their entirety;" (underlined added)

(b)        Clause 28.2 provides that:

"These Terms (including any other terms and/or documents incorporated herein by reference) <u>constitutes the entire agreement</u> between you and Gatecoin relating to your use of or participation in the Gatecoin Platform and these Terms <u>supersede any and all other agreements</u>, oral or in writing, with respect thereto between you and Gatecoin." (underlined added)

35.        As Gatecoin did not have any physical presence and all the services were provided through the Platform, it is reasonable to infer that Group A and B customers (and each of them) must have accepted the 2018

---

[34]    Chi 2nd §54.1-54.2

T&C as otherwise they would not have been able to access their accounts or carry on any transactions in respect of the Currencies in their accounts.

36.        If and to the extent that Group A and B customers have accepted and agreed to the terms of the 2018 T&C, I do not see why the court should ignore the contractual bargain reached between the parties and allow these customers to rely on the terms of the Trust T&C.

37.        Mr Ho submits that the 2018 T&C does not impact the position of Group A and B customers (that Gatecoin held the Currencies on trust for them) for the following reasons:

(1)    Clause 1.2.2 of the Trust T&C states that *prior* notice of change must be notified, but there is no evidence of notification.  Mr Menant only stated that the Customers would have to click on the 2018 T&C before they could proceed to use the website, not that notification had been given.

(2)    Even if the 2018 T&C purported to supersede the Trust T&C, it is doubtful whether such an amendment was capable of bringing the existing trust arrangement to an end without the consent of the customer (being the beneficiary of such a trust) given that:

(a)    A trustee can only disclaim his office if he has not yet done any act showing his acceptance of it (*Snell's Equity* §27-030).  Having expressly agreed to hold (and having held) the Currencies on behalf of Group A and Group B customers, it was no longer open to Gatecoin to disclaim its obligations as trustee.

(b)    Where a trustee accepts his obligations to act as such, he would only be able to free himself from these obligations by varying the terms of the trust or obtaining a release from his beneficiaries.  However, the variation contemplated by the present facts involves a termination of the trust arrangement without the trustee first making a final allocation to the beneficiaries (its customers).  In other words, it would involve customers transferring their beneficial interest in their Currencies to Gatecoin, in return for a personal obligation by Gatecoin to repay the same.  Unless Gatecoin obtains its customers' fully informed consent to such a course, the transaction would fall foul of the fair dealing rule and would be voidable at the instance of the beneficiary (*Snell's Equity* §7-022).

(3)    Although Clauses 1.7 and 3.5 of the 2018 T&C contain express disclaimer of fiduciary obligations, so long as it is clear that the parties intended a trust relationship, the purported exclusion of fiduciary duties would simply be void insofar as it conflicts with the "irreducible core" of duties that are owed by trustees to fiduciaries (including the obligation to act in good faith) (*Armitage v Nurse* [1998] Ch 241, 253H-254A, per Millett LJ).

(4)    Mr Menant's reliance on Clauses 10.1.1 and 27.2.4 of the 2018 T&C is neither here nor there.  Since the contractual provision governing change in the Trust T&C had not been observed by Gatecoin at all, the 2018 T&C was simply inapplicable to Group A and Group B customers, who continued to be governed by the Trust T&C.

38.        At the heart of Mr Ho's submissions is that Group A and B customers did not receive any prior notice of the changes nor did they ever agree to the termination of the trust arrangement over the Currencies in their accounts.  However, as discussed in §§34-35 above, the evidence before the court shows that Group A and B customers must have accepted and agreed to the 2018 T&C in entirety when they accessed and used the Platform after March 2018.

39.        While one cannot rule out the possibility that there *may* be Group A and B customers who had registered their accounts before the 2018 T&C came into effect and did not access or use the Platform from March 2018 up to the date of the liquidation of Gatecoin (such that they did not accept or agree to the terms of the 2018 T&C) (collectively "**Non-consenting Customers**"), it is not clear whether there is in fact such customer.  When this Court raises the issue with Mr Ho, he says that the Liquidators do not possess any information other than what they have already been provided to the court (and shared with the creditors who have been in contact with the Liquidators).

40.        It seems to me that the claim of the Non-consenting Customers is a matter which can be addressed by the Liquidators giving appropriate notice to Group A and B customers of the Court's view on Question 1, and invite them to notify the Liquidators that if they are Non-consenting Customers and provide evidence in support of their claim within a specified time period.  Upon completion of this process, the Liquidators will be in a position to know whether there are Non-consenting Customers and the amount claimed by them. This, in turn, will determine the extent to which Gatecoin holds the Currencies on trust for the Non-consenting Customers.

### D3.    Whether the Currencies are held on trust

41.        In my judgment, the Currencies are *not* held by Gatecoin on trust for the Customers (except the Non-Consenting Customers), but are held by Gatecoin in its own right for the reasons explained below.

42.        As rightly pointed out by the Liquidators, the 2018 T&C contains *no* express declaration of trust.  To the contrary, the following terms make clear that the Currencies in the accounts of the Customers are *not* held by Gatecoin on trust for the Customers:

(1)    Clauses 1.7 and 3.5 expressly disclaim any fiduciary relationship between Gatecoin and the Customer.  Clause 3.5 states that:

"By using Gatecoin Platform you acknowledge and agree that (a) Gatecoin (and the Gatecoin Group) is <u>not acting</u> as your broker, intermediary, agent or adviser or <u>in any fiduciary capacity</u>" (underlined added)

(2)    Clause 10.1.1 provides that:

"… The account amounts listed in the Exchange Ledger may correspond to funds stored in one or more pooled Blockchain Assets accounts or one or more omnibus fiat accounts …"

(3)    Clauses 12.5 and 13.1 provide that Gatecoin, but the Customers, would be entitled to cryptocurrencies created by Forks[35], or any accretions to the cryptocurrencies as a result of tokens and/or Airdrops[36], which is consistent with Gatecoin being the beneficial owner of the cryptocurrencies[37].

---

[35]    That is, where changes to the underlying code of a cryptocurrency results in the creation of a new currency which exists in parallel with the original cryptocurrency
[36]    Where new units of a cryptocurrency are distributed to the existing holders, usually for free
[37]    Chi 2nd §30

(4)    Clauses 27.1.2, 27.2.4 and 27.3.1 (which deal with account closure and suspension and unclaimed funds) refer to fiat currency and cryptocurrency in the same way[38].

43.    Further, the following objective facts show that the Currencies have always been treated as Gatecoin's assets, rather than assets held on trust for the Customers:

(1)    All the cryptocurrencies deposited by the Customers were not segregated, but were transferred to, and mixed with those cryptocurrencies deposited in, the Mother Wallets.  The same applies to the fiat currencies, which were not segregated but pooled together with other currencies and kept at the accounts maintained by Gatecoin at the PSPs;

(2)    Gatecoin was able to use the cryptocurrencies kept in the Wallets it controlled in the way it saw fit including for the purpose of carrying on trades in its own right.  The same applies to the fiat currencies kept at the PSPs, which Gatecoin was able to use for its purposes;

(3)    There was no requirement for Gatecoin to hold any cryptocurrencies in any of the Wallets it controlled on account of the Customers or that Gatecoin should hold an amount equivalent to the cryptocurrencies recorded in the Exchange Ledger; and

(4)    In Gatecoin's audited financial statements for the years 2016 and 2017, the cryptocurrencies held by Gatecoin were treated as its assets while the "customer deposits" were treated as liabilities.

---

[38]  Chi 2nd §31

44.        Having reached the above conclusion, it is unnecessary to determine whether Gatecoin holds the Currencies on trust for Group A and B customers.  However, as there may be Non-consenting Customers, I will deal with the other issues raised by the Liquidators.

*D4.    Whether cryptocurrency is "property"*

45.        Mr Ho submits that the starting point is s.197 of the CWUMPO, which imposes an obligation on a liquidator to take into custody all "property" upon a winding-up order.  However, the meaning of "property" is not defined in CWUMPO, and s.3 of the Interpretation and General Clauses Ordinance (Cap. 1) defines "property" as "includes (a) money, goods, choses in action and land; and (b) obligations, easements and every description of estate, interest and profit, present or future, vested or contingent, arising out of or incident to property as defined in paragraph (a) of this definition".  The question therefore is whether cryptocurrency falls within the meaning of "property".[39]

46.        The requirements for "property" were stated by Lord Wilberforce in *National Provincial Bank v Ainsworth* [1965] AC 1175, 1247-1248 as follows:

> "Before a right or an interest can be admitted into the category of property, or of a right affecting property, it must be definable, identifiable by third parties, capable in its nature of assumption by third parties, and have some degree of permanence or stability."

---

[39]    By way of background, it should be noted that the Hong Kong Government has very recently issued a policy statement signifying the possibility of the introduction of a statutory definition for digital assets as property: see Financial Services and the Treasury Bureau, "Policy Statement on Development of Virtual Assets in Hong Kong" dated 31 October 2022, §8.  However, this does not affect the present analysis, which is based upon the prevailing common law definitions of "property".

47.       Mr Ho draws to the court's attention the academic debate on whether cryptocurrencies, which are not choses in possession (as they are virtual and cannot be possessed) or choses in action (as they do not embody any right capable of being enforced by action), constitute property (*Legal Statement* §§66-68; *Sarra and Gullifer* 235).

(1)    The debate stems from the traditional view that "property" can only be choses in possession and choses.  In *Colonial Bank v Whinney* (1885) 30 Ch D 261, Fry LJ said "all personal things are either in possession or action.  The law knows no *tertium quid* between the two".

(2)    In the *Legal Statement* however, UKJT[40] considered that *Colonial Bank* is not an authority on the scope on what kinds of things can be property in law.  Rather, it is an authority on the question whether shares are things in action for the purpose of the Bankruptcy Act (§§73-78).  The courts have found no difficulty in treating novel kinds of intangible assets as property, both in particular statutory contexts and in general.  On that basis, while a crypto asset might not be a thing in action on the narrower definition of that term, but that does not mean that it cannot be treated as property (§§82-84).

48.       As far as counsel's research goes, the preponderance of jurisprudence recognises the proprietary nature of cryptocurrencies.

49.       In <u>Hong Kong</u>, the courts have granted interlocutory proprietary injunctions over cryptocurrencies without any party suggesting that

---

[40]   UK Jurisdiction Taskforce

cryptocurrencies are not "property".  See: *Nico Constantijn Antonius Samara v Stive Jean-Paul Dan* [2021] HKCFI 1078[41]; *Yan Yu Ying v Leung Wing Hei* [2021] HKCFI 3160; *Huobi Asia Limited & Anor v Chen Boliang & Anor* [2020] HKCFI 2750.

50.        In <u>England and Wales</u>:

    (1)    In *AA v Persons Unknown* [2019] EWHC 3556 (Comm) [2020] 4 WLR 35 §§55-61, Bryan J considered the question whether Bitcoin is "property" capable of being subject of a proprietary injunction.  The learned Judge adopted the reasons identified in §§71-84 of the *Legal Statement* and held that Bitcoin meets the 4 criteria set out in *Ainsworth* as being definable, identifiable by third parties, capable in their nature of assumption by third parties, and having some degree of permanence (§59).

    (2)    The courts granted proprietary injunctions over cryptocurrencies in *Toma v Murray* [2020] EWHC 2295 (Ch); *Zi Wang v Graham Darby* [2021] EWHC 3054 (Comm) (where *AA* was followed); *Sally Jayne Danisz v Persons Unknown* [2022] EWHC 280 (QB) and *Lavinia Deborah Osbourne v Persons Unknown* [2022] EWHC 1021 (Comm).

51.        In the <u>BVI</u>, in *Joint Liquidators of Torque Group Holdings Ltd (In liq) v Torque Group Holdings Ltd (In liq)* (BVIHC (Com) 0031 of 2021, 2 July 2021), the court considered an urgent application made by the liquidator for sanction to convert or exchange the various types of cryptocurrencies to US

---

[41] This matter had proceeded to trial and final judgment has been given in favour of the plaintiff ([2022] HKCFI 1254).  However the judgment contains no analysis on "property", but only determines the rights of the plaintiff and defendant therein *inter se* and has no impact on the issue before the Court.

dollars owing to their volatility.  On the question whether cryptocurrencies are "asset" within the meaning of s.2(1) of the BVI Insolvency Act, 2003[42] (which is very similar to the definition of "property" under s.3 of our Cap 1), Wallbank J followed the conclusions in the *Legal Statement* and in *AA* and held that crypto assets are assets for the purposes of liquidation (§§23-25).

52.      In <u>Singapore</u>, the courts came to the same conclusion that cryptocurrencies meet all the requirements for property:

(1)      In *B2C2 Ltd v Quoine Pte Ltd* [2019] 4 SLR 17; [2019] SGHC(I) 03, the plaintiff claimed against the defendant (which operated a platform for third parties to trade in cryptocurrencies) for breach of contract and breach of trust.  The defendant did not dispute that cryptocurrencies are a specie of property that is capable of being held on trust.  Simon Thorley IJ considered that the concession was right as cryptocurrencies "do have the fundamental characteristic of intangible property as being an identifiable thing of value", and they meet all the requirements for property discussed in *Ainsworth* (§142).

(2)      On appeal, the Court of Appeal considered the *Legal Statement's* view that (a) cryptocurrencies have all the indicia of property, (b) their novel or distinctive features do not disqualify them from being property, and (c) they could be treated, in principle, as property.  Although the court considered that there may be much to commend the view that cryptocurrencies should be capable of assimilation into the general concepts of property, it did not find

---

[42]    An asset is defined as including "money, goods, things in action, land and every description of property wherever situated and obligations and every description of interest, whether present or future or vested or contingent, arising out of, or incidental to, property" (see §21 of *Torque Group Holdings Ltd*)

it necessary to decide what type of property that is involved in respect of cryptocurrency (*B2C2 Ltd v Quoine Pte Ltd* [2020] 2 SLR 20; [2020] SGCA(I) 02, §§139-144).

(3)    In *CLM v CLN & Ors* [2022] SGHC 46, the court in the context of an *ex parte* application for joinder of parties as defendants and proprietary injunction enjoining such defendants from dealing with the cryptocurrencies stolen from the plaintiff, considered the question whether cryptocurrency is capable of giving rise to proprietary right which could be protected through a proprietary injunction.  Lee J reviewed the cases decided in other common law jurisdictions and concluded cryptocurrencies satisfy the definition of a property right in *Ainsworth* (§§40-46).

53.    In <u>Canada</u>:

(1)    In *Copytrack Pte Ltd v Wall* [2018] BCJ 3325, the plaintiff claimed against the defendant for conversion and wrongful detention of certain ETH transferred to the defendant by mistake. On the plaintiff's application for summary judgment, the court considered that the proper characterization of cryptocurrency and the evidentiary record was not sufficient to permit a summary determination of the issue.   However, regardless of the characterisation of the ETH, it was not in dispute that they were the plaintiff's property and had been sent to the defendant in error, and the defendant had no proprietary claim to them.  The court ordered that the plaintiff was entitled to trace and recover the ETH from whatever hands they were currently held in but refused to

give summary judgment on the other relief such as disgorgement and/or damages.

(2)    In *Shair.Com Global Digital Services Ltd v Arnold* [2018] BCJ 3114, the plaintiff claimed against the defendant (a former officer and employee) for conversion and/or misappropriation of certain digital currencies and information related thereto.    On the plaintiff's *ex parte* application, the court was satisfied that the plaintiff had a claim to a proprietary interest in the laptop computer and in any digital currencies purchased by defendant flowing from the plaintiff's initial amount invested in Bitcoin, and granted a preservation order over such currencies and the wallet information in relation thereto (§§13-15, 24).

54.    In the United States:

(1)    In *United States v 50.44 Bitcoins*, Civil Action No. ELH-15-3692 (D Md 31 May 2016), in the context of an application for default judgment and order of forfeiture over the 50.44 Bitcoins on the ground that they were "property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. s.1960], or any property traceable to such property"[43].    The federal magistrate judge proceeded on the basis that Bitcoins were property which may be subject to forfeiture and concluded that there was reasonable cause for the seizure of the Bitcoins in question.

---

[43]    Section 1960 – Prohibition of unlicensed money transmitting businesses

(2)    In *Lagemann v Spence*, 2020 U.S. Dist. LEXIS 88066 (SDNY 18 May 2020), the court gave summary judgment against the defendant (who did not file any opposition) for *inter alia* conversion of the cryptocurrencies purchased with the plaintiffs' funds.    The case was decided on the bases that (a) cryptocurrencies are "property"; (b) under New York law, "money can be the subject of a conversion action when it can be identified and segregated as a chattel can be", and "intangible rights can form the basis of conversion damages when the converted property is a document into which intangible rights have merged" (p.10, section G).

(3)    Similarly, in *Meta-Tech Consultants, LLC v Niu*, 2021 US Dist LEXIS 209207 (D Nev, 29 October 2021), the court in the context of the plaintiff's application for default judgment, held that the defendant's conversion of the Bitcoins (which had been purchased by the defendant with the plaintiff's fund but failed to return them upon demand) denied the plaintiff the opportunity to sell the Bitcoins at their then high-end value.    Judgment was entered against the defendant for the amount invested by the plaintiff together with loss of profit and fee paid to the defendant.

(4)    In *BDI Capital v Bulbul Investments LLC* 446 F.Supp.3d 1127 (2020), the plaintiff applied for summary judgment for conversion of the Bitcoins wrongfully retained by the defendant.    On the question whether Bitcoins, as a virtual and intangible cryptocurrency, may be the subject of a conversion action, the

court applied the reasoning in *Kleiman v Wright*[44], and held that Bitcoins are sufficiently identifiable to be considered "specific intangible property" and hence are capable of being the subject of a conversion action under Florida law (p.8).

    (5)    Further, for federal tax purposes, the Internal Revenue Services has treated virtual currency as property and general tax principles apply to transactions using virtual currency (IRS Notice 2014-21).

55.    In <u>Australia</u>, in *Australian Federal Police v Bigatton* [2020] NSWSC 245, the court held that there were reasonable grounds to suspect that the defendant had been "dealing with property reasonably suspected of being proceeds of crime contrary to s.400.9 of the Criminal Code" (§59), and granted a freezing order and custody and control orders over the defendant's property including the Bitcoins and ETH in the wallets under its effective control (§§60, 64-66, 79).

56.    The most detailed analysis on the issue is to be found in *Ruscoe v Cryptopia* [2020] NZHC 728, where the <u>New Zealand</u> court was asked to give directions under s.284(1)(a) of the Companies Act 1993[45] relating to the categorisation and distribution of the cryptocurrencies under the control of Cryptopia Ltd, a company which operated a cryptocurrency trading exchange and was placed into liquidation after suffering a serious hack and loss of a substantial amount of cryptocurrencies. The main issues are (1) whether the cryptocurrencies held by the liquidators is a type of "property" within the meaning of s.2 of the Companies Act 1993 and can cryptocurrency form the subject matter of a trust; and (2) whether the cryptocurrencies are held by

---

[44]   No. 18-CV-80176, 2018 WL 6812914, 2018 US Dist. LEXIS 216417 (SD Fla, 27 December 2018)
[45]   Similar to s.200(3) of CWUMPO

Cryptopia on trust for the account holders (§§46-47). In essence, the dispute is one between the accountholders and the creditors of Cryptopia, and the court had the benefit of the submissions from counsel representing the liquidators, the accountholders and the creditors at a hearing which lasted for 4 days.

57.        On the "property" issue, the accountholders contend that cryptocurrency is a form of intangible personal property both at common law and within the definition of s.2 of the Companies Act [46] and, even if cryptocurrency is not personal property in the full sense, it is still capable of forming the subject matter of a trust. On the other hand, the creditors contend that cryptocurrency is not property capable of forming the subject matter of a trust at common law (§§50-51). All parties agreed that cryptocurrency is a form of "assets"[47] for the purpose of the Companies Act (§61). Gendall J considered some of the authorities discussed in §§47-55 above, and concluded that cryptocurrency satisfies the 4 criteria for "property" as explained in *Ainsworth* and is a type of intangible property in that:

(1)    It is underlinedefinable as the public key allocated to a cryptocurrency wallet is readily identifiable, sufficiently distinct and capable of being allocated uniquely to individual accountholder (§§104-108).

(2)    It is identifiable by third parties in that only the holder of a private key is able to access and transfer the cryptocurrency from one wallet to another (§§109-113).

---

[46]    Defined as "… property of every kind whether tangible or intangible, real or personal, corporeal or incorporeal, and includes rights, interests, and claims of every kind in relation to property however they arise". It has been held that the definition is a wide one and includes "money" (§§71-74)

[47]    "Assets" is not defined in the Companies Act but s.129(2) which applies to "major transactions" provides that "assets includes property of any kind, whether tangible or intangible".

(3)    It is <u>capable of assumption by third parties</u> in that it can be and is the subject of active trading markets where (a) the rights of the owner in that property are respected, and (b) it is potentially desirable to third parties such that they want themselves to obtain ownership of it (§§114-116).

(4)    It has <u>some degree of permanence or stability</u> as the entire life history of a cryptocurrency is available in the blockchain (§§117-119).

58.    Further, Gendall J held that:

(1)    cryptocurrency, not being tangibles or choses in action, is no bar to recognition of its proprietary status (§§122-125);

(2)    cryptocurrency is not just information[48], but an item of tradeable value which affords exclusivity to its owner (§§127-128); and

(3)    there are no public policy objections to the court recognising cryptocurrency to have the status of property (§§129-132).

59.    Although the definition of "property" under s.3 of Cap 1 is different from those adopted in the other jurisdictions considered above, I note that like other common law jurisdictions, our definition of "property" is an inclusive one and intended to have a wide meaning.  Further, our courts have consistently applied and followed the principles expounded in *Ainsworth* when determining the question whether a right or interest meets all the requirements for property.  For these reasons, it seems to me that in considering the question

---

[48]    Which is not regarded as property, as "it is normally open to all who have eyes to read and ears to hear" (*Boardman v Phipps* [1967] 2 AC 46, 127)

whether cryptocurrency is "property", it is appropriate to apply and follow the reasonings in the *Legal Statement* and *Ruscoe v Cryptopia*, and their conclusion that cryptocurrency is "property", which is capable of forming the subject matter of a trust.

## D5.   Whether Gatecoin held cryptocurrencies on trust

60.       Mr Ho submits that to create an express trust, there must be the "three certainties" (*Snell's Equity*, 34th ed., §22-012).   The question is to determine not just the express arrangements as to how property is to be held, but whether it is held on trust (*R v Clowes* [1994] 2 All ER 316, 326d).

## D5.1   Certainty of subject matter

61.       As Mr Ho submits, notwithstanding the lack of segregation of the cryptocurrencies[49], there is sufficient certainty of subject matter.   The law distinguishes between shares and intangibles on the one hand, and chattels on the other (*Re Harvard Securities Ltd* [1998] BCC 567,575).   While a trust can only attach to specified and identifiable chattels (*Re Goldcorp* [1995] 1 AC 74), the position is different in respect of intangibles:

(1)     It is possible for a settlor to declare a trust over a part of a bulk of identical and interchangeable assets such as shares or securities (e.g. *Hunter v Moss* [1994] 1 WLR 452, 457H-458C; *Re CA Pacific Finance Ltd* [1999] 2 HKLRD 1, 17B-18F).

(2)     A trust of part of a fungible mass without appropriation of any specific part does not fail for uncertainty of subject matter,

---

[49]    Trust T&Cs cl.5.1 provides "The account amounts listed in the Exchange Ledger may correspond to funds stored in one or more pooled Digital Asset accounts or one of more omnibus fiat accounts"; 2018 T&Cs cl.10.1.1 which is in *pari materia*.

provided that the mass is sufficiently identified and the beneficiary's proportionate share of it is not uncertain (*Re Lehman Brothers Intl (Europe)* [2010] EWHC 2914 (Ch), §225(iii)).   Such a trust works by creating a beneficial co-ownership share in the identified fund, instead of having to identify a particular part of the fund which the beneficiary owns outright (§232).

62.     In the present case, certainty of subject matter can be derived from a claim to a proportionate share of an undivided bulk:

(1)     There is compelling reason to draw an analogy between cryptocurrencies with a trust over shares or securities.   In both cases, the right conferred upon the beneficiary would not depend on the precise identification of the asset owned.   As each unit of cryptocurrency is identical to other unit of that kind, it makes no difference whether a customer holds the same output that originated from his initial input on the blockchain.

(2)     On the basis that there can be a trust over a proportionate share of all cryptocurrencies, the subject matter of the trust vis-à-vis each customer is sufficiently certain, as the account balance represents the proportion of the cryptocurrencies over which such customer has a beneficial interest in the pool.

(3)     Such was the conclusion in *Ruscoe*, where the court held (§§145, 147) that the internal ledger clearly recorded the contributions of each accountholder which provided sufficient certainty of subject matter.   A trust arose whereby the beneficial co-ownership of each

cryptocurrency was shared by all account holders in proportion to the amount of relevant cryptocurrencies they each contributed.

(4) In the present case, there is certainty of subject matter as the amounts of Currencies held by the Customers were recorded in the Exchange Ledger, and they co-own and share each type of cryptocurrency and fiat currency in proportion to the credit balances standing in their accounts.

## D5.2    *Certainty of object*

63.        A trust would be valid so long as there is no conceptual ambiguity or uncertainty in the definition of the class of beneficiaries (*Re Gulbenkian* [1970] AC 508, 524E-G; *Ruscoe,* §149).

64.        Here, there is certainty of object as the beneficiaries of the trust and the extent of their claim can readily be seen from the Exchange Ledger.

## D5.3    *Certainty of intention*

65.        The principles on certainty of intention have been summarised by Briggs J in *Re Lehman Brothers* §225(v)-(x) as follows:

> "(v)    Subject to the issue of certainty, the question whether B has a proprietary interest in the property acquired by A for B's account depends upon their <u>mutual intention, to be ascertained by an objective assessment of the terms of the agreement or relationship between A and B with reference to that property</u>.
>
> (vi)    The words used by the parties such as 'trust', 'custody', 'belonging', 'ownership', 'title', may be persuasive, but they are not conclusive in favour of the recognition of B's proprietary interest in the property, if the terms of the agreement or relationship, viewed objectively, compel a different conclusion.

(vii)  The identification of a relationship in which A is B's agent or broker is not conclusive of a conclusion that A is, in relation to the property, B's trustee, although it may be a pointer towards that conclusion.

(viii)  A relationship which absolves A from one or more of the basic duties of trusteeship towards B is not thereby rendered incapable of being a trustee beneficiary relationship, but may be a pointer towards a conclusion that it is not.

(ix)  Special care is needed in a business or commercial context. Thus:

(a)  The law should not confine the recognition and operation of a trust to circumstances which resemble a traditional family trust, where the fulfilment of the parties' commercial objective calls for the recognition of a proprietary interest in B.

(b)  The law should not unthinkingly impose a trust where purely personal rights between A and B sufficiently achieve their commercial objective.

(x)  There is, at least at the margin, an element of policy. For example, what appears to be A's property should not lightly be made unavailable for distribution to its unsecured creditors in its insolvency, by the recognition of a proprietary interest in favour of B. Conversely, the clients of intermediaries which acquire property from them should be appropriately protected from the intermediary's insolvency."

### D5.3.1  *During the currency of the 2016 T&Cs*

66.  The 2016 T&C is silent on the nature of Gatecoin's holding of the Currencies for Group A customers.

67.  Nevertheless, the Liquidators considered that by reason of the following facts and matters, Gatecoin did intend to hold the Currencies on trust for Group A customers:

(1)  Mr Max Jackowski ("**MJ**"), the person engaged to "update" Gatecoin's terms and conditions, was instructed by Gatecoin's representative on 27 October 2016 that "as Gatecoin, we hold the

property on behalf of the client", and to incorporate express trust language.  On this basis, MJ drafted the Trust T&Cs[50].

(2)    Gatecoin agreed to compensate the affected Customers of the value of ETH stolen as at the time the compensation was paid (as opposed to the time of the Hack)[51].  Such treatment was consistent with Gatecoin holding the ETH in Customers' accounts on trust.

(3)    The pooling of cryptocurrencies in the wallets controlled by Gatecoin does not mean that no trust was intended as the beneficiaries' interest can be ascertained from the Exchange Ledger.

(4)    Although Mr Menant in his reply dated 13 May 2022 claimed that Gatecoin had no intention to create a trust, that has to be read in its context, where Mr Menant continued to say that the earlier versions of T&C had been superseded by the 2018 T&C; and Clauses 10.1.1 and 27.2.4 of the 2018 T&C show that there was no trust intended.  The basis of Mr Menant's statement is his belief that the 2018 T&C would apply to all Customers, which the Liquidators consider to be incorrect.

(5)    In any event, even if the 2016 T&C by itself did not create a trust, once the Trust T&C was adopted, they applied to the Group A customers, rendering the relationship they had with Gatecoin to be one of trust.  In this regard, the 2016 T&C provided that Gatecoin might change the terms at any time without prior notice.

---

[50]    Chi 2nd §45.2
[51]    Chi 2nd §56.3

In any event, Gatecoin had notified the Group A customers by email when the Trust T&C came into effect.

68.        In respect of the Non-Consenting Customers, I agree that for the reasons identified by the Liquidators, Gatecoin holds the Currencies on trust for them.  However, for the reasons stated in <u>Section D2</u> above, I do not agree that the relationship between Group A customers (and B customers for that matter) was governed by the Trust T&C as these customers had accepted and agreed to the 2018 T&C.

*D5.3.2     During the currency of the Trust T&C*

69.        The Liquidators consider that there was a trust relationship between Gatecoin and Group B customers:

   (1)    The express trust language in Clauses 7.3.1-7.3.2 and the recognition that accretion to cryptocurrencies belonged to the Customers in Clause 7.5;

   (2)    The Trust T&C was drafted by MJ on Gatecoin's express instructions that the cryptocurrencies were to be held on trust;

   (3)    The policy consideration concerning unsecured creditors in insolvency (*Re Lehman Brothers* §25(x)) cannot override clear expression of intention to create a trust for Group B customers; and

   (4)    the Liquidators' initial view of no trust[52] is of no relevance, since that view was formed on the basis that the 2018 T&C governed

---

[52]   Chi 2nd §36

the relationship between Gatecoin and all the Customers and without the benefit of the Trust T&C or the contemporaneous evidence of intention referred to above.

70.     In view of the clear language of the Trust T&C discussed in §26 above, if the Trust T&C had not been superseded by the 2018 T&C, I would agree with the Liquidators that it was the mutual intention of Gatecoin and Group B customers (and Group A customers for the reasons stated in §67(5) above), that the Currencies were held by Gatecoin on trust for these customers.

### D5.3.3    *During the currency of 2018 T&Cs*

71.     It is clear that from the terms of the 2018 T&C that there was no intention to create any trust for the Customers:

(1)     In the 2018 T&C, all the trust language in the Trust T&C was removed;

(2)     Clauses 1.7 and 3.5 contained express disclaimers of fiduciary obligation;

(3)     Clauses 12.5 and 13.1 allow Gatecoin to keep accretion to the cryptocurrencies.   This is consistent with and reinforces the position that Gatecoin is the beneficial owner of the cryptocurrencies; and

(4)     Although Clause 10.1.1, still uses the phrase "the Exchange Ledger to track a User's <u>ownership</u> of" the Currencies, this is not sufficient to displace the clear intention stated in the other Clauses discussed above.

### D6.   Whether fiat currencies are held on trust

72.       As stated above, Gatecoin's fiat currencies were also mixed and kept at the PSPs.  Such pooling of fiat was expressly contemplated in the Trust T&C Clause 5.1 and the 2018 T&C Clause 10.1.1.

73.       The above analysis applies with equal force to fiat currencies standing in credit in the Customers' accounts.  It follows that the fiat currencies are not held by Gatecoin on trust for the Customers, be it Group A, B or C customers.

74.       I should add that Mr Chan contends that:

    (1)   As a Group A customer Cumberland agrees with the Liquidators' analysis that Gatecoin holds the Currencies on trust for Group A customers.

    (2)   Cumberland does not agree with the Liquidators' view that the ETD Holders are unsecured creditors to the extent of the value of the ETD in their accounts, apparently on the basis that Gatecoin held the ETH on trust for Group A customers including Cumberland.  To the extent that Gatecoin lost the ETH in the Hack, it acted in "breach of duty and give rise to an action in conversion" and Cumberland is entitled to be compensated for the loss of the ETH.

    (3)   In any event, the information available is not sufficient for the Court to determine the question whether the ETH Holders have a proprietary claim over the ETH recorded in their accounts or that they only have a non-proprietary claim against Gatecoin.

75.    In light of my conclusion that the Currencies are not held by Gatecoin on trust for the Customers, the basis for contending that Cumberland has a proprietary claim over the ETH recorded in its account no longer exists. As to the question whether the ETD Holders have a proprietary claim over the ETH lost in the Hack (that is, the ETD Debt), it will be considered in the next stage, after the parties have the opportunity to consider the Court's determination on Question 1.

E.    Question 2: Blue Fire Issue

76.    As stated in Section B5 above, BlueFire is the largest account holder but has not asserted any claim over the Currencies or filed any POD. The evidence shows that BlueFire did not carry on any trade in its own right but acted on behalf of Gatecoin in that:

   (1)    BlueFire was described as a market maker for Gatecoin;

   (2)    Gatecoin had advanced credit lines to BlueFire for the trades it carried on through the Platform; and

   (3)    Gatecoin's records show that BlueFire did not pay any account fees or charges, unlike the Customers who had to pay fees and charges to Gatecoin in return for the services rendered to them.[53]

77.    As Gatecoin acted as agent of Gatecoin in carrying on all the transactions, the Currencies recorded in its accounts must be regarded as assets of Gatecoin. The conclusion is consistent with and reinforced by the following facts and matters.

---

[53]  Chi 2nd §70

78.      First, according to Mr Menant, there was no written agreement entered into between BlueFire and Gatecoin.  The Liquidators find no evidence of any agreement or documentary record of Gatecoin's arrangements with BlueFire[54].

79.      Second, the evidence available to the Liquidators all show that BlueFire acted as a service provider which: (a) used Gatecoin's funds to buy and sell cryptocurrencies in accordance with Gatecoin's orders at the crypto clearing house and (b) transferred the cryptocurrencies to Gatecoin's Wallets after completion of these transactions (which Gatecoin recorded in the Exchange Ledger under BlueFire name).

   (1)   Mr Menant referred to BlueFire as a market maker.  This is consistent with industry understanding of what this means[55]- a market maker upon receiving an order from a buyer would immediately sell off its position of cryptocurrency from its own inventory and is then compensated with a fee in exchange for providing the market-making service (though it may also profit from the difference in the bid-ask spread from the trades it makes.

   (2)   The description in the Cheng Report is consistent with news report which described BlueFire as a market maker.

80.      Mr Ho submits that the position that Gatecoin (but not BlueFire) has proprietary interest in the Currencies recorded in BlueFire's account is bolstered by the following legal analysis:

---

[54]   Chi 2nd §19.2
[55]   Expert Memorandum of Mr Casper Cheng ("**Cheng Report**") §§ 1-2, 9-14

(1) Since Gatecoin's funds were advanced to BlueFire for the sole purpose of purchasing cryptocurrencies on Gatecoin's behalf[56], a *Quistclose* trust would have arisen whereby BlueFire held the funds Gatecoin advanced on trust for Gatecoin (*Twinsectra Ltd v Yardley* [2002] 2 AC 164, §§68-102).

(2) Further, a *Quistclose* trust may be applied to non-loan situations such as the present (*Twinsectra* §99; *Typhoon 8 Research Ltd v Seapower Resources International Ltd* [2002] 2 HKLRD 660, §§18-19, per Le Pichon JA (as she then was)).

(3) If a *Quistclose* trust is imposed on the fiat used to acquire cryptocurrencies, this adds strength to the conclusion that the cryptocurrencies so acquired belong to Gatecoin.

81.   As there is no dispute that BlueFire was the market maker engaged by Gatecoin and all the transactions were carried on by BlueFire using the funds provided by Gatecoin, it is indisputable that the Currencies recorded in its accounts are assets of Gatecoin.

## F.   Conclusion

82.   For the reasons discussed above, in respect of Question 1, I hold that:

(1) Except the Non-Consenting Customers, the 2018 T&C applied to, and governed the relationship between all the Customers (be it Group A, B or C customers) and Gatecoin (Section D2 above).

---

[56]   Cheng Report §6

(2)    The terms of the 2018 T&C make clear that the cryptocurrencies are not held by Gatecoin on trust for the Customers.  This is consistent with and reinforced by the objective facts that the cryptocurrencies have always been treated as Gatecoin's assets (<u>Section D3</u> above).

(3)    Cryptocurrency is "property" and is capable of being held on trust (<u>Section D4</u> above).

(4)    There was certainty of subject matter and object.  However, the terms of the 2018 T&C show that there was no certainty of intention to create a trust over the cryptocurrencies held by Gatecoin (<u>Section D5</u> above).

(5)    Except the Non-Consenting Customers, the fiat currencies are not held by Gatecoin on trust for the Customers (<u>Section D6</u> above).

83.    As for Question 2, I hold that the Currencies recorded in BlueFire's accounts are assets of Gatecoin (<u>Section E</u> above).

84.    I give liberty to the parties to apply for further directions.


(Linda Chan)
Judge of the Court of First Instance
High Court

Mr Justin Ho, instructed by Clifford Chance, for the Liquidators

Mr Eric Chan, of Simmons & Simmons, for Cumberland DRW LLC

A
B
C
D
E
F
G
H
I
J
K
L
M
N
O
P
Q
R
S
T
U
V

**Schedule**
**(Directions made on 5 December 2022)**

1.   Notice of the Summons, the 2nd Affirmation of Chi Lai Man Jocelyn dated 29 November 2022, the Skeleton dated 30 November 2022, and the draft Order attached to the Skeleton be uploaded to the website maintained by the Liquidators of Gatecoin: https://www.gatecoinliquidation.com/ ("**Website**") from the date of this order;

2.   Any former customer or creditor of Gatecoin wishing to be heard by the Court on the Summons do (a) notify the Liquidators of Gatecoin of their intention; (b) provide to the Liquidators (i) an effective means of communication (email address or physical address) and (ii) the names of their legal representatives (if any), and (c) file and serve affidavit evidence (together with any exhibits) (if any) within 4 weeks of this order;

3.   Within 4 weeks thereafter:

   3.1   The Liquidators shall file any affidavit in reply to the affidavit evidence in §2 above (if so advised);

   3.2   Subject to confirmation of identity, the Liquidators shall compile (a) a list of all persons who have given notice in accordance with §2 above ("**Interested Parties**") and (b) a list of issues raised by the Interested Parties, and lodge such lists with the Court and upload such lists on the Website;

4.   A callover hearing of the Summons be fixed on 23 February 2023 at 10am ("**Callover Hearing**"), at which the Court will consider whether the Summons can be determined summarily, and in the event that the Court so decides the Summons will be determined summarily at the Callover Hearing;

5.   7 days prior to the Callover Hearing, the Interested Parties may (if they so wish) file their skeleton submissions with the Court, and in the event that they choose to file skeleton submissions they must serve a copy on the Liquidators. The skeleton submissions of each Interested Party will be limited to 10 pages (using at least size font 14 with normal page

margins, i.e. 2.54 cm on top, bottom, right and left of page), unless leave of the Court is obtained for a higher page limit; and

6.    3 days prior to the Callover Hearing, the Liquidators do file skeleton submissions in reply (if any) and upload the same to the Website. The Liquidators do upload these directions to the Website within 24 hours from the date of this order.

7.    Costs be in the cause of the Summons.

# EXHIBIT 35

**IN THE COURT OF APPEAL OF THE REPUBLIC OF SINGAPORE**

**[2020] SGCA(I) 02**

Civil Appeal No 81 of 2019

Between

Quoine Pte Ltd

... *Appellant*

And

B2C2 Ltd

... *Respondent*

---

# JUDGMENT

---

[Contract] — [Breach]
[Contract] — [Contractual terms] — [Express terms]
[Contract] — [Contractual terms] — [Implied terms]
[Contract] — [Mistake] — [Mistake of fact]
[Restitution] — [Unjust enrichment]
[Trusts] — [Breach of trust]
[Trusts] — [Express trusts] — [Certainties]

i

**This judgment is subject to final editorial corrections approved by the court and/or redaction pursuant to the publisher's duty in compliance with the law, for publication in LawNet and/or the Singapore Law Reports.**

# Quoine Pte Ltd
## v
# B2C2 Ltd

### [2020] SGCA(I) 02

Court of Appeal — Civil Appeal No 81 of 2019
Sundaresh Menon CJ, Andrew Phang Boon Leong JA, Judith Prakash JA,
Robert Shenton French IJ and Jonathan Mance IJ
14 October 2019

24 February 2020                                            Judgment reserved.

**Sundaresh Menon CJ (delivering the judgment of the majority):**

**Introduction**

1       The world of cryptocurrency trading is not for the faint-hearted. It can involve computer-generated, high frequency transactions in digital quasi-currencies (otherwise known and referred to in this judgment as "cryptocurrencies") which manifest on computer screens or printouts but are not otherwise in a physical form. The transactions which have led to this appeal were conducted by way of algorithms created by the appellant, Quoine Pte Ltd ("Quoine"), and by the respondent, B2C2 Ltd ("B2C2"). Quoine operated a cryptocurrency exchange platform known as QUOINExchange ("the Platform"), and B2C2 traded on the Platform at the material time. Both Quoine and B2C2 were also market-makers on the Platform, which meant that they created liquidity on the Platform by actively placing orders to buy and sell

1

cryptocurrencies, and in so doing, helped to minimise volatility in the market on the Platform. As is typical of algorithmic trading, the buy and sell contracts on the Platform were concluded without any direct human involvement, save that involved in the creation of the algorithmic processes leading to their formation. Algorithmic trading has been described as follows (see Alain Chaboud *et al*, "Rise of the Machines: Algorithmic Trading in the Foreign Exchange Market", *International Finance Discussion Papers*, 29 September 2009 <http://www.federalreserve.gov/pubs/ifdp/2009/980/ifdp980.pdf> at p 1):

> In algorithmic trading … [traders'] computers directly interface with trading platforms, placing orders without immediate human intervention. The computers observe market data and possibly other information at very high frequency, and, based on a built-in algorithm, send back trading instructions, often within milliseconds. …

Sometimes things can go wrong, as they did in the present case.

2        It transpired that Quoine's failure to make certain necessary changes to several critical operating systems on the Platform set off a chain of events that eventually led to the transactions which are at the heart of this appeal. On 19 April 2017, a total of 13 trades ("the Disputed Trades") were concluded between B2C2 and two other users of the Platform, namely Pulsar Trading Capital and Mr Yu Tomita ("Pulsar" and "Mr Tomita" respectively, and "the Counterparties" collectively), where B2C2 sold one type of cryptocurrency, Ethereum ("ETH"), for another type, Bitcoin ("BTC"), at a rate of either 9.99999 BTC or 10 BTC for 1 ETH. The rates at which the Disputed Trades were concluded were approximately 250 times the then going rate in the market of around 0.04 BTC for 1 ETH. The Disputed Trades were automatically settled by the Platform, and 3092.517116 BTC was debited from the Counterparties' accounts and credited into B2C2's account, while 309.2518 ETH was debited from B2C2's account and credited into the Counterparties' accounts. As the

2

Counterparties' accounts did not have a sufficient BTC balance to meet the amount that was debited, this resulted in a negative BTC balance in the Counterparties' accounts. When Quoine became aware of the Disputed Trades the next day, it considered the rates at which the trades were concluded to be highly abnormal and unilaterally proceeded to cancel the trades. The debit and credit transactions involving B2C2's account and the Counterparties' accounts were also reversed.

3        B2C2 subsequently commenced proceedings against Quoine on the basis that its unilateral cancellation of the Disputed Trades and reversal of the settlement transactions were in breach of contract and/or breach of trust. The International Judge who heard the matter ("the Judge") rejected all of Quoine's defences and allowed B2C2's claims for both breach of contract and breach of trust. The Judge did not address the issue of damages given that the trial was bifurcated (see *B2C2 Ltd v Quoine Pte Ltd* [2019] 4 SLR 17 ("Judgment") at [134]).

4        A central plank of Quoine's defence both at trial and on appeal was the contention that the contracts underlying the Disputed Trades ("the Trading Contracts") were void or voidable for unilateral mistake. This requires us to consider how the doctrine of unilateral mistake should operate where the contracts in question were entered into by way of the parties' respective algorithms, as transpired here.

5        So far as the asserted breach of trust is concerned, this raises the complex question of whether the relevant cryptocurrency, BTC, may even be regarded as a species of property capable of attracting trust obligations.

*Quoine Pte Ltd v B2C2 Ltd*                                    [2020] SGCA(I) 02

6        Both these questions were the subject of extensive analysis by Prof Goh
Yihan ("Prof Goh"), whom we appointed as *amicus curiae*. We are deeply
grateful to Prof Goh for the extensive research he conducted and the excellent
assistance he afforded us on both issues. However, the latter question was not
explored in detail in the court below, where the parties appeared to have
proceeded on the common ground that BTC *was* a species of property that *was*
capable of being the subject of a trust. Despite Prof Goh's able assistance, for
reasons which we develop later, we think that the question as to whether BTC
can be the subject of a trust should not be dealt with here but should be kept
open for another day, in a case in which this issue is properly before the court.

7        In our judgment, for the reasons that follow, the Judge was correct to
find that there were no terms in the various contractual documents, whether
express or implied, which entitled Quoine unilaterally to cancel the Disputed
Trades. We also agree with the Judge that there was no operative mistake on the
part of the Counterparties that could be relied upon to vitiate the Trading
Contracts. Additionally, given that the BTC was credited into B2C2's account
pursuant to valid contracts, B2C2 could not be said to have been unjustly
enriched. We therefore dismiss Quoine's appeal with respect to the breach of
contract claim. However, we are satisfied that no trust could have arisen over
the BTC in B2C2's account, even assuming that the BTC could be the subject
of a trust. Therefore, we allow Quoine's appeal with respect to the breach of
trust claim and reverse the decision of the Judge in that regard.

**The factual background**

8        The detailed facts are set out in the Judgment at [14]–[26] and [69]–
[105]. It suffices for us to reproduce the salient facts which are relevant to
understanding the arguments made in this appeal.

4

**Quoine and the Quoter Program**

9      We begin with a brief introduction of Quoine and the program it used for its trades as a market-maker. Quoine is a Singapore incorporated company which operated the Platform at all material times. The Platform allows users to trade cryptocurrencies, like BTC and ETH, for other cryptocurrencies or for fiat currencies. It uses an electronic ledger as an order book for all the orders that are placed by users wishing to buy and sell cryptocurrencies. Real time information on the available buy and sell orders are also displayed on the right panel of what was referred to as the "Trading Dashboard" located on the Platform's website.

10     As mentioned, apart from being the operator of the Platform, Quoine also functions as a market-maker on the Platform. In actively placing buy and sell orders, Quoine adds depth to the order book and ensures that there is a continuous two-sided market on the Platform, thus creating liquidity on the Platform and helping to minimise volatility in the market (see Judgment at [18]). A market-maker also profits from what is known as the "bid-ask" spread, which is the difference between the price at which the market-maker is willing to *buy* or *bid for* a particular currency and the price at which it is willing to *sell* or *ask for* that currency. In the material period, Quoine was the principal market-maker on the Platform. Mr Mario Antonio Gomez Lozada ("Mr Lozada"), Quoine's Chief Technical Officer, estimated that Quoine was responsible for around 98% of the market-making trades on the Platform (Judgment at [73]).

11     Quoine's market-making trades on the Platform are conducted through its "Quoter Program". The Quoter Program retrieves external market prices from other cryptocurrency exchanges and uses this data to determine the orders that Quoine will place on the Platform for market-making purposes.

Importantly, the Quoter Program is proprietary to Quoine and the information generated by it is not available to other users of the Platform (Judgment at [18] and [72]).

### The Counterparties and margin trading

12     We touch on some basic aspects of trading on the Platform as described in Quoine's Trading Rules dated 17 March 2017. There are two types of trading offered on the Platform which are relevant to the present dispute. The first is spot trading, where trades are settled instantly with payment for a trade being effected as soon as the trade is completed. The second is margin trading, which is a variant where trades are entered into using borrowed funds (including borrowed cryptocurrencies). Margin traders may obtain loans directly from Quoine, or from other users of the Platform willing to offer them. For margin traders with loans from Quoine, the assets in their accounts serve as the collateral for the loans, which has a bearing on how the Platform's operating system functions. The Platform is designed to close out a margin trader's open positions when it detects that the margin trader may not be able to repay its loans. In the event that the collateral in the margin trader's account falls below a pre-determined percentage of the loan, a margin call is triggered against the margin trader and the Platform automatically force-closes its margin positions by placing market orders on the Platform to close out its open positions. This is known as a "margin sell-out position".

13     The Platform continually monitors a margin trader's "live profit and loss" in respect of each open position ("live P&L") for the purposes of determining how much collateral the margin trader has available in its account. The live P&L is calculated by multiplying the quantity of borrowed cryptocurrency by the difference between its open price and its theoretical close

6

price. The theoretical close price is calculated by simulating the closing of the margin trader's position against the current price ladder on the Platform's order book. The price ladder refers to the available buy and sell orders with bid and ask prices that are presently on the Platform's order book. Therefore, abnormally priced orders placed on the order book and/or an abnormally thin order book can affect the calculation of the margin trader's live P&L, and cause the Platform to detect that the margin trader is in a margin sell-out position and take steps to force-close the margin trader's positions. In such circumstances, the Platform's operating system will automatically execute the force-closures as market orders to buy or sell the relevant currency at the *best available price on the Platform*. Further, the margin trader is not contacted in advance of the force-closures being executed; nor will it know the precise prices at which the force-closures will be executed (Judgment at [17]).

14      At and around the time of the Disputed Trades, the Counterparties were trading in the ETH/BTC market using ETH borrowed from Quoine (Judgment at [25]).

**B2C2 and the Trading Software**

15      Next, we introduce B2C2 and its trading software. B2C2 is incorporated in England and Wales and amongst its business interests is that of being a market-maker. As with other exchange platforms on which B2C2 conducts market-making, its entire trading process on the Platform is automated using its algorithmic trading software ("the Trading Software") which was designed to function with minimal human intervention (Judgment at [13]). The Trading Software was designed almost exclusively by Mr Maxime Boonen ("Mr Boonen"), a director of B2C2 and its key witness at the trial. It should be noted that the Trading Software's algorithm is *deterministic* (Judgment at [82]),

7

which, as defined by both the Judge and Prof Goh, is one which will always produce precisely the same output given the same input. To put it another way, the Trading Software will do just what it was programmed to do and does not have the capacity to develop its own responses to varying conditions. Hence, faced with any given set of conditions, it will always respond to that in the same way. The fact that the Trading Software's algorithm is deterministic is significant to our analysis below in relation to Quoine's defence of unilateral mistake.

16     As explained in the report of Quoine's expert witness, Mr Vikram Kapoor, the Trading Software's algorithm for placing buy and sell orders on the Platform comprises different "layers" at which different algorithmic trading "strategies" are applied. The first layer contains 12 different algorithmic trading strategies that are programmed to work in sequence, and such a series of trading strategies is known as a "strategy chain". The "PureQuote" strategy, which the Judge discussed at [83]–[84] of the Judgment, is the first strategy in the strategy chain of the First Layer. For the relevant sell (or buy) order B2C2 wishes to place on the Platform, the PureQuote strategy first constructs an order book that is internal to the Trading Software based on the 20 best sell (or buy) orders already placed on the Platform's order book. This information is *received from the Platform*. In constructing the internal order book, the PureQuote strategy will also disregard any sell (or buy) order that has been placed for less than a certain quantity of the cryptocurrency. The PureQuote strategy then processes the information on the internal order book and produces an "output" price. In other words, based on the parameters that have been pre-programmed into the PureQuote strategy, the PureQuote strategy determines the optimal output price given the information it has received from the Platform. This output price that is produced by the PureQuote strategy, however, is not the price that the Trading

8

Software will ultimately quote for the sell (or buy) order it eventually places on the Platform. The output price from the PureQuote strategy merely serves as an input variable for the next trading strategy in the strategy chain, which in turn produces another output price. This process continues through all the trading strategies in the strategy chain, until all the strategy chains in the layers of the Trading Software's algorithm that are running at the material time have been applied. At the end of this process, the final output price produced is that which the Trading Software quotes for the sell (or buy) order it places on the Platform.

17    Where the Platform is functioning properly with a healthy order book, the PureQuote strategy can construct the Trading Software's internal order book by drawing on the 20 best orders from the Platform's order book. However, it was anticipated that there might be situations where the Platform's order book would be either empty or populated by a large number of low volume orders which the PureQuote strategy would disregard, such that the PureQuote strategy would have no or insufficient input from the Platform's order book. This was explained by Mr Boonen as follows:

> … [The output prices from the PureQuote strategy form] the basis of what orders we could later on send into the market, but the prices themselves are, so to speak, the best prices that we would compute on the basis of the order book proposed to us, but then other strategies can worsen those prices for a variety of reasons. So they form a sort of building block … *there must at all time[s] exist such a building block, otherwise the rest of the strategy stack fails.* That's why we use *that method of adding* **virtual prices** *that are not necessarily present in the market*, because in a *completely empty order book*, for instance, the strategy cannot run, as … it doesn't have an anchor from which it could create its output. [emphasis added]

18    As alluded to in that extract from Mr Boonen's evidence, when the PureQuote strategy has no or insufficient input from the Platform's order book, it would not be able to "run" and so to produce an output price. Such a situation

would be undesirable, given that the Trading Software was designed to function continuously with minimal human intervention. Mr Boonen therefore programmed the PureQuote strategy to always add a "virtual price" for the sell (or buy) orders of the Trading Software's internal order book. The "virtual price" is also known as a "deep price". The price is "virtual" in the sense that it is not obtained from the Platform, but is inserted into the Trading Software's internal order book so that the PureQuote strategy always has a price input to work with so as to produce an output price, even if there happened to be no or insufficient input from the Platform's order book. In this way, the Trading Software's algorithm would continue functioning and placing orders on the Platform. After some changes, Mr Boonen settled on programming a deep price of 10 BTC to 1 ETH for the sell orders for ETH. This was done before the events with which we are concerned.

### The terms of use of the Platform

19    We turn to the terms and conditions of the agreement governing the use of the Platform ("the Agreement"), which were set out on Quoine's website. The Agreement recited that it was "effective upon the date of electronic acceptance" and that it was "entered into by and between [Quoine] and the user of [Quoine's Platform]". We highlight some of the relevant provisions of the Agreement.

20    Under the heading "General Terms", the Agreement stated:

> …
>
> This Agreement sets forth the terms and conditions governing the access and use of the Platform. *This Agreement may be changed at any time by the Company. It is the responsibility of the User to keep himself/ herself updated with the current version of the Agreement.* Users and Members waive any claim

10

> regarding this issue. This Agreement may only be amended with the express consent of the Company. …
>
> …
>
> [emphasis added]

The same text, which purported to allow Quoine unilaterally to vary the Agreement, also appeared under the heading "Membership And Users Of The Platform".

21     Similarly, under the heading "Representations and Warranties", the Agreement provided as follows in sub-para (h) (which we will refer to as "the Without Notice Clause"):

> *You agree that the Company reserves the right to change any of the terms, rights, obligations, privileges or institute new charges for access to or continued use of services at any time, with or without providing notice of such change.* You are responsible for reviewing the information and terms of usage as may be posted from time to time. Continued use of the services or non-termination of your membership after changes are posted or emailed constitutes your acceptance or deemed acceptance of the terms as modified. [emphasis added]

We will refer to the clauses excerpted at [20]–[21], which purported to allow Quoine unilaterally to vary the terms of the Agreement without giving notice to the users of the Platform, collectively as "the Unilateral Variation Clauses".

22     Under the heading "Trading & Order Execution", the Agreement provided that:

> Only registered users or Members are allowed to buy, sell and use the services provided by the Platform. The exchange functions of [t]he Platform will fill in orders at the best possible available market price. Note that as markets move continuously, the prices displayed on user interfaces, on our web app or on mobile apps are in no way guaranteed. The Platform, however, has been designed to allow members to fill at best possible prices and in a timely manner. Nevertheless the Company will not be liable under any circumstances for the

11

consequences of any delay in order filling or failure to deliver or perform.

*Furthermore, once an order is filled, you are notified via the Platform and such an action is irreversible.*

…

[emphasis added]

B2C2 relied specifically on the italicised portion, which we will refer to as "the Irreversible Action Clause", to argue that Quoine breached the Agreement by unilaterally cancelling the Disputed Trades.

23     As part of Quoine's defence, it asserted that in addition to the Agreement, the services it provided to the users of the Platform were governed by all other terms and conditions posted on Quoine's website, including those contained within the "'Risks in Virtual Currency Transactions' statement ... which was posted on [Quoine's] website on 22 March 2017" ("the Risk Disclosure Statement").

24     The Risk Disclosure Statement began with an explanatory paragraph:

There are many risks associated with virtual currency transactions. Please read the following to gain a sufficient understanding of the features, mechanisms, and risks in virtual currency transactions. Please execute your transaction with understanding such features, mechanisms and risks without objection and based on your own judgment and responsibility.

25     A class of risks designated "System Risks" was set out as follows in the Risk Disclosure Statement:

**8.  System Risks**

…

Please be aware that in the event that a customer loses any opportunity (e.g., the Company is unable to receive a customer's order and the customer therefore loses the opportunity to place the order, losing profits that he or she

12

> ordinarily would have earned) due to emergency system maintenance or a system failure, the Company will not be able to execute a process to fix the error because it will be unable to identify the order details that the customer intended to place (the original order). *The system may produce an aberrant value for the buy or sell price of the virtual currency calculated by the system. Please be aware that if the Company finds that a transaction took effect based on an aberrant value, the Company may cancel the transaction.* Your understanding is appreciated.

> [emphasis added]

26      Quoine contended at trial, and on appeal, that when the Risk Disclosure Statement was posted on Quoine's website in March 2017, it introduced a new term into the Agreement (referring to the italicised text in the preceding paragraph) which permitted Quoine to cancel a transaction if it had taken place at an "aberrant value". We will refer to this as "the Aberrant Value Clause".

**The events leading to the Disputed Trades**

27      Against that background, we outline the events that led to the Disputed Trades. On 13 April 2017, Quoine changed some login passwords for several critical operating systems on the Platform but, due to an oversight, certain necessary changes to the Quoter Program were not implemented (Judgment at [71]). The effect of this was that the Quoter Program could not access external market data from other cryptocurrency exchanges, which prevented it from generating new ETH/BTC orders on the Platform for market-making purposes (Judgment at [72]). Given that Quoine was the primary market-maker on the Platform at the material time, the fact that it stopped placing new orders resulted in the Platform's order book gradually thinning out.

28      It was not until 19 April 2017 that the pre-existing ETH/BTC orders depleted to the point that Mr Lozada described the Platform's order book as "abnormally thin". This affected the Counterparties' live P&L and caused the

Platform to conclude that they were in margin sell-out positions (see [12]–[13] above). This, in turn, triggered margin calls against them and the Platform automatically force-closed their positions by placing market orders to buy ETH at the *best available price on the Platform*, in order to repay the Counterparties' ETH loans. When the margin call was triggered against Pulsar, the market orders to buy ETH were first matched with the lowest priced sell orders available on the Platform's order book at that time. Working its way through the sell orders, Pulsar, through the Platform's algorithm, bought ETH at prices that were increasingly higher in order to fulfil the margin call (see Judgment at [78]–[79]). It became apparent that the loss of liquidity on the Platform also caused the trading systems of other users of the Platform to place sell orders at increasingly higher prices.

29     As for B2C2, the Platform's thinning order book resulted in the PureQuote strategy of the Trading Software having no or insufficient input from the Platform's order book (see [16]–[17] above). This caused the deep price of 10 BTC to 1 ETH for the sell orders for ETH, which had been programmed into the PureQuote strategy, to take effect in the Trading Software's algorithm such that the Trading Software eventually placed sell orders to sell ETH at prices of 9.99999 BTC and 10 BTC to 1 ETH on the Platform (see [18] above). When B2C2's orders became the lowest priced sell orders available on the Platform's order book, they matched with Pulsar's market orders to buy ETH. The force-closure of Mr Tomita's positions was slightly different, but it was not suggested that anything turned on this (Judgment at [80]). Eventually, a total of 13 trades were concluded between B2C2 and the Counterparties, these being the Disputed Trades which were concluded at approximately 250 times what had been the prevailing market rate of around 0.04 BTC for 1 ETH. The relevant amount of BTC was accordingly debited from the Counterparties' accounts and credited

14

into B2C2's account, while the corresponding amount of ETH was debited from B2C2's account and credited into the Counterparties' accounts (see [2] above).

30    Mr Lozada, upon becoming aware of the Disputed Trades, and with the strenuous encouragement of Pulsar, decided that these should be cancelled and the resulting debit and credit transactions reversed. The Disputed Trades were thus cancelled on 20 April 2017 by Quoine with the corresponding debit and credit transactions reversed.

**The decision below**

31    At the trial, B2C2 argued that Quoine's unilateral cancellation of the Disputed Trades and reversal of the settlement transactions were in breach of contract and/or breach of trust. In response, Quoine raised the following defences to defend its unilateral cancellation of the Disputed Trades: (a) it was contractually entitled to cancel the trades by reason of two terms it sought to imply into the Agreement; (b) it was contractually entitled to cancel the trades by reason of the Aberrant Value Clause in the Risk Disclosure Statement; (c) the Trading Contracts were void on the basis of unilateral mistake at common law, or, in the alternative, voidable on the basis of unilateral mistake in equity; (d) the Trading Contracts were void on the basis of common mistake at common law; and (e) B2C2 would otherwise be unjustly enriched at the expense of the Counterparties. As mentioned, the Judge rejected all of Quoine's defences and allowed B2C2's claims for both breach of contract and breach of trust. We briefly set out the Judge's findings in relation to B2C2's claims and Quoine's defences.

15

### The contractual relationship

32      We first set out the Judge's findings in relation to the contractual relationship between B2C2, Quoine and the Counterparties. This in particular shaped the Judge's analysis of Quoine's defence of unilateral mistake. B2C2 argued that Quoine was a common counterparty to all the trades made between the users of the Platform. On this basis, it was said that the concluded trades took the form of back-to-back contracts between the buyer and Quoine at one end, and the seller and Quoine at the other. Quoine, on the other hand, contended that the trades were concluded directly between the buyer and the seller, and that it only provided the Platform on which the trades would be conducted. The Judge agreed with Quoine and held that the contract in respect of each concluded trade was made directly between the buyer and the seller (see Judgment at [131]), though each of the parties was also contractually bound with Quoine under the Agreement which governed the terms of use of the Platform.

### B2C2's breach of contract and breach of trust claim

33      With respect to B2C2's breach of contract claim, the Judge held that Quoine's unilateral cancellation of the Disputed Trades was a breach of the Agreement, and in particular of the Irreversible Action Clause (see [22] above; Judgment at [136]–[137]).

34      As for B2C2's breach of trust claim, the Judge found that Quoine held the BTC in B2C2's account, which had been credited following the Disputed Trades, on trust for B2C2, and so Quoine was in breach of trust when it reversed the relevant credit transaction (see Judgment at [146]). The Judge found that Quoine held the BTC on trust for B2C2 on the basis that the "three certainties" had been fulfilled, namely, certainty of subject matter, certainty of objects and

16

certainty of intention to create a trust. First, the Judge held that there was certainty of subject matter because cryptocurrency should be treated as property that was capable of being held on trust, on the basis that it satisfied the definition of a property right in *National Provincial Bank v Ainsworth* [1965] 1 AC 1175 ("*Ainsworth*") at 1248, in that it was definable, identifiable by third parties, capable in its nature of assumption by third parties, and had some degree of permanence or stability. In any case, the Judge noted, Quoine did not dispute this (Judgment at [142]). Second, the Judge found that there was certainty of objects, given that the beneficiaries were identifiable from the individual accounts of the users of the Platform (Judgment at [143]). Third, the Judge found that there was certainty of intention, based on the fact that the users' assets were managed separately from Quoine's own assets, thereby indicating that Quoine intended to hold the assets of an individual user on trust for that user (Judgment at [145]).

### Quoine's defences

35      Turning then to Quoine's defences, Quoine first sought to contend that two terms ought to be implied into the Agreement (collectively, "the Proposed Implied Terms"), namely:

> (a)      Quoine may reverse any trades which had been executed at any abnormal rate or price as a result of any technical and/or system failure and/or error affecting the Platform; and

> (b)      Quoine may reverse any trades resulting from orders placed in breach of the terms of the Agreement, including any trade resulting from any orders which amounted to market manipulation and/or abuse and, therefore, entailed an "unauthorised use" of the Platform.

17

36     The Judge found that the Proposed Implied Terms, which would allow Quoine to reverse trades on the Platform under certain circumstances, contradicted the Irreversible Action Clause which was an express term of the Agreement (Judgment at [152]). The Judge also found that in any event, the Proposed Implied Terms were not necessary to give business efficacy to the Agreement. It was instead the Irreversible Action Clause, the express term, that brought certainty to the Platform and led to a clear apportionment of risk (Judgment at [153]–[154]).

37     Second, Quoine argued that the Aberrant Value Clause in the Risk Disclosure Statement (see [25]–[26] above) allowed it unilaterally to cancel the Disputed Trades. The Judge, however, disagreed that this had been incorporated into the Agreement.

38     Third, Quoine argued that it was entitled to cancel the Disputed Trades because the Trading Contracts were void on the basis of unilateral mistake at common law. Quoine submitted that the Counterparties had entered into the Trading Contracts under two mistaken beliefs: (a) that it was necessary to close out their positions in response to the margin calls which the Platform made on them ("the First Mistaken Belief"); and (b) that they were buying ETH for BTC under contracts at prices which accurately represented or did not deviate significantly from the true market value and/or price of ETH relative to BTC on 19 April 2017 ("the Second Mistaken Belief"). Quoine argued in the alternative that the Trading Contracts were voidable on the basis of unilateral mistake in equity. Quoine submitted that by deliberately including the deep prices in the Trading Software, B2C2's conduct was unconscionable and amounted to sharp practice.

39      In considering the issue of unilateral mistake, the Judge held that where it was necessary to assess the state of mind of a party in situations where acts of *deterministic* computer programs were in issue, regard should be had to the state of mind of the programmer of the relevant program at the time it was written – which in the present case would be that of Mr Boonen (Judgment at [211]). The Judge rejected Quoine's contention that the court should instead approach the matter on the basis of considering what the contracting parties were likely to have known and intended if, hypothetically, they had met on the "floor of the exchange" for the purpose of entering into the Disputed Trades on 19 April 2017 (Judgment at [200]). The Judge found this approach wholly artificial given that the contracting parties had chosen to use deterministic algorithms as the means of entering into the Trading Contracts (see Judgment at [204]).

40      The Judge held that the Trading Contracts were not void on the basis of unilateral mistake at *common law*. With regard to the First Mistaken Belief, the Judge found that Mr Tseung Wai Kit ("Mr Tseung"), a co-founder of Pulsar, did genuinely hold such a mistaken belief. But the Judge was of the view that this was not a mistaken belief as to a term of the Trading Contracts (see Judgment at [220] and [222]). As regards the Second Mistaken Belief, not only did the Judge find that Mr Tseung did in fact hold such a mistaken belief, the Judge also held that it was a mistake as to a term of the Trading Contracts (Judgment at [227]–[228]).

41      In considering whether Mr Boonen had actual knowledge of the First Mistaken Belief and the Second Mistaken Belief, contrary to Quoine's assertions, the Judge did not think that there was any malicious motive on Mr Boonen's part in designing the Trading Software and including the deep prices in the manner that he did. Mr Boonen had settled on programming a deep price of 10 BTC to 1 ETH for the sell orders for ETH (see [18] above) after

19

reducing it twice, first from an initial price of "a very high number" of BTC to 1 ETH to 50 BTC to 1 ETH, and then to 10 BTC to 1 ETH, and the Judge accepted that these reductions were done for a variety of legitimate reasons (see Judgment at [96]–[97]). The Judge also accepted that although Mr Boonen knew, at the time he designed the Trading Software, that it would place sell orders at the deep price if the Platform's order book became empty, Mr Boonen did not ever consider that there was a real possibility of the deep price orders being executed (see Judgment at [123]). The Judge found that Mr Boonen's design of the Trading Software and choice of the deep price were chiefly directed to ensuring that the Trading Software remained operational rather than exploiting the existence of illiquidity on the Platform or a thinning order book (see Judgment at [121]). The Judge concluded that while Mr Boonen's programming was opportunistic in the sense that B2C2 should be best placed to make a profit if the unlikely became a reality, it was in no respect sinister (Judgment at [125]).

42     The Judge also accepted Mr Boonen's evidence that he was unaware of the glitches causing illiquidity on the Platform until after the events of 19 April 2017. While Mr Boonen had also made changes to the Trading Software's code on 13 April 2017, the Judge accepted that he had done so independent of and without knowledge of Quoine's failure, on the same day, to take certain necessary steps to secure the continued proper functioning of the Quoter Program (see Judgment at [100]–[102]). There was also no evidence to show that Mr Boonen had turned his mind to the relationship between the margin traders and those who had loaned them money, much less programmed the Trading Software to exploit this relationship by causing its deep prices to consummate force-closures of the positions of margin traders (see Judgment at [124] and [223]). The Judge found that Mr Boonen also did not turn his mind to

the circumstances that might lead to trades being executed at the deep prices (Judgment at [230]). Therefore, the Judge concluded that Mr Boonen did not have actual knowledge of the First Mistaken Belief and the Second Mistaken Belief. He accordingly found that there was no basis for Quoine to rely on unilateral mistake at common law to void the Trading Contracts.

43      The Judge also held that the Trading Contracts were not voidable on the basis of unilateral mistake in *equity*, because he found Mr Boonen had no constructive knowledge of either the First Mistaken Belief or the Second Mistaken Belief (see Judgment at [233]). The Judge further held that there was no impropriety on B2C2's part, and its conduct, even if opportunistic, was not sinister (Judgment at [236]).

44      Fourth, Quoine argued that it was entitled to cancel the Disputed Trades because the Trading Contracts were void on the basis of common mistake at common law. Quoine contended that at the time the Disputed Trades were concluded, both the Counterparties and B2C2 wrongly assumed that (a) the Platform was working correctly and (b) the trades were therefore being transacted under normal market conditions, meaning at prices which accurately reflected or did not deviate significantly from the true market value and/or price of ETH relative to BTC on 19 April 2017. The Judge held that this defence failed because even if Quoine held a mistaken belief as to the prices at which the Disputed Trades were to be concluded, Mr Boonen (and thus B2C2) did not (see Judgment at [237]–[239]).

45      Fifth, Quoine argued that it was necessary to cancel the Disputed Trades in order to prevent B2C2 from being unjustly enriched at the expense of the Counterparties. The Judge acknowledged that as a matter of legal formality, a cause of action in unjust enrichment would only accrue if B2C2 succeeded in

its suit, and it would technically accrue to the Counterparties and not to Quoine. However, since B2C2 had not applied for this defence to be struck out, the Judge decided to treat it as a potential defence (Judgment at [242]–[244]). He found that the fact that the Trading Contracts were valid and enforceable operated as a bar to any action in unjust enrichment (Judgment at [247], [249] and [252]).

46      As for the relief sought by B2C2, the Judge declined to allow B2C2's prayer for specific performance, on the basis that the price of BTC at the time of the Judge's decision was significantly higher than that when the Disputed Trades were concluded, and this would therefore cause substantial hardship to Quoine (Judgment at [256]).

**The issues on appeal**

47      The issues that arise in this appeal and that we will address in this Judgment are the following:

(a)      What were the contractual arrangements between B2C2, Quoine and the Counterparties?

(b)      Was Quoine contractually entitled to cancel the Disputed Trades by reason of any express or implied terms of its contract with B2C2?

(c)      In relation to Quoine's defence of unilateral mistake, did the Judge err in finding that Mr Boonen did not have actual or constructive knowledge of a relevant mistaken belief on the part of the Counterparties in relation to the Disputed Trades?

(d)      Were the Trading Contracts void on the basis of common mistake at common law?

(e)    Was Quoine entitled to cancel the Disputed Trades on the basis that B2C2 would otherwise be unjustly enriched at the expense of the Counterparties?

(f)    Did Quoine hold B2C2's cryptocurrency assets on trust?

**Our decision**

*Issue (a): The contractual relationships*

48    We begin with the question of how the contractual relationships between B2C2, Quoine and the Counterparties should be characterised. As the Judge noted, the resolution of this question is relevant to the subsequent analysis on unilateral mistake, in so far as it is first necessary to identify which contract was affected by any asserted mistake and who the mistaken party was (Judgment at [129]).

49    B2C2 contended that the correct way to understand the contractual relationships was to see the Trading Contracts as part of a "spider's web" of contracts, with Quoine as the central counterparty to both sides of each trade. In this way, the Platform would enable trading to be conducted on an anonymous basis as between the ultimate buyers and sellers. B2C2 argued on this basis that there could be no operative mistake as to the terms of the trading contracts made *between Quoine and B2C2* in relation to the Disputed Trades. Any alleged unilateral mistake would be that of the Counterparties, and so Quoine's defence of unilateral mistake would fail at the threshold. Quoine, on the other hand, argued that the Agreement made it plain that Quoine merely provided a service to the users of the Platform, and that the trading contracts were made directly between the buyers and the sellers.

23

50      We affirm the Judge's analysis of the contractual arrangements between the various parties, in which he accepted Quoine's characterisation of the contractual relationships. In essence, he held that the Trading Contracts were formed directly between B2C2 and the Counterparties (Judgment at [131]). The Trading Contracts constituted one of three categories of contracts the Judge identified, as follows (see Judgment at [126]):

> (a)      The first category was the "Platform contracts", which governed the use of the services provided by the Platform, the parties to which were Quoine and the individual users of the Platform, and the terms of which were found in the Agreement.

> (b)      The second category was the "Margin contracts", which concerned the arrangements based on which the margin traders would have their transactions financed. In the present case, the parties to these were Quoine and the Counterparties.

> (c)      The third category was the "Trading contracts", which were the contracts that came into existence when trades were concluded and governed the relationship between the parties to those trades. For the avoidance of doubt, we refer to this category of contracts as "trading contracts". As for the specific trading contracts that underlay the Disputed Trades, we refer to these as Trading Contracts, as noted at [4] above. The Judge held that B2C2 and the Counterparties were the parties to the Trading Contracts in question in this case.

51      In our judgment, this characterisation of the trading contracts best accords with the terms of the Agreement, which made clear that Quoine was merely providing a *service* to the users of the Platform which would transact with one another in the exchange of cryptocurrencies on the Platform.

52      First, the "General Terms" of the Agreement stated as follows:

> Quoine is a platform that provides services that allow the
> exchange of virtual currencies such as [BTC] for fiat currencies.
> ...
>
> ...
>
> This Agreement sets forth the terms and conditions governing
> the access and use of the Platform. ...
>
> ...

The same was repeated under the heading "Membership And Users Of The
Platform".

53      Second, under the heading "Fees, Funding & Withdrawals", it was stated
that "[a]s compensation for [t]he Platform services … [Quoine] charges a fee
on each transaction initiated by [the users of the Platform]". This lent support
to the contention that Quoine was merely providing a service to the users of the
Platform for which it charged a fee.

54      Third, under the heading "Trading & Order Execution", it was stated
that:

> Only registered users or Members are allowed to buy, sell and
> use the services provided by the Platform. The exchange
> functions of [t]he Platform will fill in orders at the best possible
> available market price. ...
>
> ...

This suggested that Quoine's primary function was to operate the Platform
which would fill orders placed by its users at the best *available* market price.

55      We therefore agree with the Judge that Quoine was only providing the
services available on the Platform and that it was the parties to the trading
contracts that were responsible for whether and on what terms they would place

25

or fill orders. This, however, is not to say that there was no contractual relationship between Quoine and the users of the Platform. First, as we have noted at [50(a)] above, Quoine as the provider of the Platform's services entered into Platform contracts with the users of the Platform. Second, as noted at [50(b)] above, Quoine could be and was party to Margin contracts. Third, given that Quoine also acted as a market-maker on the Platform, there would have been situations where Quoine was the counterparty to a concluded trade, in which case it would have been party to a trading contract with a user of the Platform. However, the trades that we are concerned with in the present case, specifically the Disputed Trades, did not involve that situation.

56      In addition, we do not accept B2C2's other arguments as to why the contractual relationships ought to be seen as a "spider's web" of contracts. B2C2 contended that Quoine must have interposed itself as a "middle-man" in any trade and was obliged to underwrite the risk of a counterparty not being able to fund a trade, given that trading on the Platform was conducted anonymously and the users of the Platform would not have visibility of the creditworthiness of potential counterparties. We do not accept this because the terms of the Agreement seem to us to say the very opposite:

**Trading & Order Execution**

…

[Quoine] and its affiliates *assume no responsibility for any loss or damage incurred by members or users as a result of their use of [t]he Platform* …

…

**Representations and Warranties**

As a Member or User, you agree to the following:

…

26

*Quoine Pte Ltd v B2C2 Ltd*                                    [2020] SGCA(I) 02

> **d.** You agree that use of the service is *at your own risk* and you are solely responsible for interactions … with any other Member or User of the service. [Quoine] … *assume[s] no responsibility whatsoever for harm that may come to you as a result of your interactions with any other Member or User of the service …*
>
> …
>
> [emphasis added]

57    It is evident from these terms that Quoine had expressly sought to disclaim any liability for losses that users of the Platform might suffer arising from their use of the Platform. This would include the credit risk of a counterparty.

58    We also do not accept B2C2's argument that the trading contracts could not have been formed directly between the buyers and sellers on the Platform because all trading was done anonymously. Even if the traders were unaware of who their potential counterparties might be before the conclusion of the trades, once a trade was completed, the identity of the parties to the trade became ascertainable by way of a unique user identification number (Judgment at Annex 3). Further, there is no difficulty in the fact that the traders would not know who their counterparties were until after the trades were concluded, given that they were agreeing in effect to enter into contracts with such other users of the Platform as accepted their bids or asks as the case might be. We will discuss this in greater detail when we examine the formation of contracts by algorithmic trading (at [94]–[96] below).

### Issue (b): Express and implied terms of the Agreement

59    Quoine argued that there were terms in the Agreement, both express and implied, which allowed it to cancel the Disputed Trades. We do not accept these contentions for the following reasons.

27

*The Aberrant Value Clause*

60      Quoine argued on appeal (as it did at trial) that the Aberrant Value Clause in the Risk Disclosure Statement (see [25]–[26] above) entitled it to cancel the Disputed Trades. It also contended that the Unilateral Variation Clauses (see [20]–[21] above) allowed it unilaterally to vary the terms of the Agreement when it uploaded the Risk Disclosure Statement on its website *without* giving notice to the users of the Platform. On the other hand, B2C2 maintained that neither the Risk Disclosure Statement nor the Aberrant Value Clause had been incorporated into the Agreement. B2C2 further submitted that even if the Aberrant Value Clause had been incorporated into the Agreement, it did not assist Quoine because it would only have permitted Quoine to cancel transactions in which the prices of the trades had been incorrectly calculated by Quoine's system due to a "system failure" or "malfunction". "System failure" and "malfunction" were defined terms in the Risk Disclosure Statement, and required there to be a situation where customers could "no longer … place orders over the Internet", or the orders "arrive[d] late or [could not] be placed" (see also [68] below). The Disputed Trades were not such transactions.

61      The Judge found that the Unilateral Variation Clauses, properly construed, did not allow Quoine to change the terms of the Agreement without its drawing this to the attention of the users of the Platform in some way. Quoine thus had to provide notice to the users in order to effect a change to the terms of the Agreement. The Judge also found that merely uploading the Risk Disclosure Statement on Quoine's website without any indication that it was intended to have legal effect did not constitute such notice that changes had been made to the Agreement. This was because the Risk Disclosure Statement purported only to be a summary of risks with no indication that it was intended to have legal effect (see Judgment at [174]–[176]).

28

62      We affirm the Judge's analysis on this point. Although it was not necessary for Quoine to obtain the consent of a user of the Platform before changing the terms of the Agreement, we are satisfied that a user had to have reasonable means of knowing that there had been a modification to the terms and what that modification was before any such change could have legal effect. Armed with such knowledge, the user could then decide whether or not it would continue to use the Platform. In this case, all Quoine did was to upload the Risk Disclosure Statement onto its website without more. This could not on any basis have sufficed to constitute the requisite notice.

63      Further, in determining whether notice of changes to the Agreement had to be given, we also have regard to the Unilateral Variation Clauses, which include the Without Notice Clause (see [21] above). We reproduce the Without Notice Clause here:

> You agree that [Quoine] reserves the right to change any of the terms, rights, obligations, privileges or institute new charges *for access to or continued use of services at any time, with or without providing notice of such change.* You are responsible for reviewing the information and terms of usage as may be posted from time to time. *Continued use of the services or non-termination of your membership after changes are posted or emailed constitutes your acceptance or deemed acceptance of the terms as modified.* [emphasis added]

64      We note that the Without Notice Clause *expressly* stated that Quoine was permitted to effect changes to any of the terms, rights, obligations, privileges or to institute new charges for access to or continued use of services "without providing notice of such change". However, the changes contemplated by this clause were restricted only to changes pertaining to "access to or continued use" of Quoine's services. We assume, without finding, that incorporating the Aberrant Value Clause into the Agreement would be such a change. Even so, we think that it was *implicit* within the Without Notice Clause

29

that a user of the Platform ought to be given the opportunity to consider the change in question, so that it could decide whether to continue using Quoine's services. We say this for three reasons.

65    First, the Without Notice Clause stated that changes to the terms would be "posted or emailed", which suggested that Quoine would take positive steps to bring the changes to the attention of the users of the Platform. Second, the clause stated that continued use of Quoine's services after such changes had been posted or emailed would amount to an affirmation or deemed acceptance of the terms as modified. This part of the clause would not make sense if the users did not have an *awareness* of those modified terms to begin with. Third, the "General Terms" of the Agreement provided that the users of the Platform were responsible for reviewing the changes to the Agreement:

> … This Agreement may be changed at any time by [Quoine]. *It is the responsibility of the User to keep himself/ herself updated with the current version of the Agreement.* Users and Members waive any claim regarding this issue. … [emphasis added]

This contemplated that users would have the *opportunity* to review the changes in the first place, which in turn necessitated them being given notice of these changes.

66    For these reasons, we do not think that the requirement of notice was displaced by the Without Notice Clause. Sufficient notice of the incorporation of the Aberrant Value Clause as a term of the Agreement had to be given to users of the Platform before it could be regarded as having been incorporated into the Agreement. We acknowledge that pursuant to the "General Terms" of the Agreement, the onus was on the users of the Platform to keep themselves updated with the latest version of the Agreement. However, there must at least have been some indication on Quoine's website to inform users about

amendments to the Agreement. We therefore agree with the Judge that simply uploading the Risk Disclosure Statement onto Quoine's website without alerting users to the fact that a new term had been introduced was insufficient to constitute the requisite notice (see Judgment at [176]).

67     Moreover, as the Judge pointed out, the Risk Disclosure Statement appeared to be nothing more than a summary of the various risks that users would expect to face when using the Platform (see [24] above), and there would have been no reason for a user reading it to think that amendments to the terms of the Agreement were embedded within it. We also find no reason to disturb the Judge's finding that there was nothing on Quoine's website, the Agreement, or the Risk Disclosure Statement to alert the user to the need to read these documents together.

68     In any case, even if the Aberrant Value Clause had been incorporated into the Agreement, we do not think that it had the effect that Quoine suggested it did of entitling it to cancel the Disputed Trades. The relevant portion of the Risk Disclosure Statement which contained the Aberrant Value Clause (the italicised text below) stated:

> There is the risk that a system failure may occur due to changes to the external environment, etc., and this may disrupt a customer's ability to execute transactions. A "system failure" is when [Quoine] finds that a malfunction (not including obstructed network lines or problems with a customer's computer, etc.) has clearly arisen in the system required to provide [Quoine's] services, and customers are no longer able to place orders over the Internet ([Quoine's] website, mobile site, or applications) or customers' orders arrive late or cannot be placed.

> Please be aware that in the event that a customer loses any opportunity (e.g., [Quoine] is unable to receive a customer's order and the customer therefore loses the opportunity to place the order, losing profits that he or she ordinarily would have earned) due to emergency system maintenance or a system

31

failure, [Quoine] will not be able to execute a process to fix the error because it will be unable to identify the order details that the customer intended to place (the original order). *The system may produce an aberrant value for the buy or sell price of the virtual currency calculated by the system. Please be aware that if [Quoine] finds that a transaction took effect based on an aberrant value, [Quoine] may cancel the transaction.* Your understanding is appreciated.

[emphasis added]

69      In our judgment, having regard to these portions of the Risk Disclosure Statement, the Aberrant Value Clause was meant to apply in situations where there was a discrepancy between the value input by a user of the Platform and the value generated or calculated by the system "due to emergency system maintenance or a system failure". In short, this would be the case where the value generated by the Platform was not the value intended by the user. We come to this conclusion because of the words "[Quoine] will not be able to execute a process to fix the error because it will be unable to identify the order details that the customer *intended to place*" [emphasis added]. It would be unsurprising in such circumstances that Quoine could cancel the transaction; this was simply never an intended transaction. In the present case, however, the only alleged "malfunction" in the Platform's system was the Quoter Program not being able to access external price data and therefore not being able to generate new orders, which led to a gradual thinning out of the Platform's order book. Apart from that, the market orders placed by the Platform on the Counterparties' behalf were executed exactly as intended, which was to purchase ETH at the best available price on the Platform at the material time. The prices of B2C2's sell orders for ETH, at prices of 9.99999 BTC and 10 BTC to 1 ETH, which orders were matched with the Counterparties' market orders, were similarly not "aberrant" in the sense that they were exactly what B2C2 intended them to be; they were simply the result of the pre-programmed deep price of 10 BTC to 1 ETH in the PureQuote strategy taking effect (see [29]

32

above). The Disputed Trades were concluded based on prices *correctly* quoted by the Trading Software for B2C2, and market orders that were *correctly* placed by the Platform for the Counterparties.

70      Aside from this, if we were to accept Quoine's position, it would seem to lead to the conclusion that the Aberrant Value Clause enabled Quoine to undertake some sort of "reasonableness" check on transactions entered into by others and then to cancel whatever transactions *it* thought was beyond the bounds of reason. We do not think this can possibly be correct.

*The Proposed Implied Terms*

71      We turn then to Quoine's contention that it was entitled to cancel the Disputed Trades on the basis of the Proposed Implied Terms (see [35] above). We agree with the Judge that the terms sought to be implied are incompatible with the Irreversible Action Clause (see [22] above). The Proposed Implied Terms would allow Quoine to reverse trades on the Platform which (a) had been executed at abnormal prices as a result of any error affecting the Platform, or (b) resulted from orders placed in breach of the terms of the Agreement. The Irreversible Action Clause, however, provided that "once an order is filled, [the user is] notified via the Platform and such an action is irreversible".

72      In *Sembcorp Marine Ltd v PPL Holdings Pte Ltd and another and another appeal* [2013] 4 SLR 193 at [94]–[95], we held that a term may only be implied into a contract where the parties did not contemplate the issue at all and so left a gap in their contractual arrangements. If the question is whether the Agreement made provision for whether and when a concluded trade could be reversed, the answer to this was that the Irreversible Action Clause made it clear that once an order had been filled and the parties to the trade had been notified

33

by the Platform, such an action was *irreversible*. In this regard, the Proposed Implied Terms are inherently incompatible with the Irreversible Action Clause given that they purport to allow Quoine to reverse trades which had been executed and had become irreversible.

73     Quoine sought to meet this by contending that the Irreversible Action Clause only applied to the users of the Platform and not to Quoine itself as the owner and operator of the Platform. We disagree. It is clear from the plain words of the Irreversible Action Clause and the adjacent terms that it was meant to apply to all orders that had been filled, regardless of whether it was a user of the Platform or Quoine itself that was seeking to reverse the trades. The Irreversible Action Clause (the italicised text below) was found under the heading "Trading & Order Execution", which provided as follows:

> Only registered users or Members are allowed to buy, sell and use the services provided by the Platform. The exchange functions of [t]he Platform will fill in orders at the best possible available market price. Note that as markets move continuously, the prices displayed on user interfaces, on our web app or on mobile apps are in no way guaranteed. The Platform, however, has been designed to allow members to fill at best possible prices and in a timely manner. Nevertheless [Quoine] will not be liable under any circumstances for the consequences of any delay in order filling or failure to deliver or perform.
>
> *Furthermore, once an order is filled, you are notified via the Platform and such an action is irreversible.*
>
> [Quoine] and its affiliates assume no responsibility for any loss or damage incurred by members or users as a result of their use of [t]he Platform …
>
> [emphasis added]

74     As the Judge noted at [151] of the Judgment, the Agreement governed the contractual relationship between Quoine and all the users of the Platform. Therefore, the terms of the Agreement would presumptively be equally

applicable to Quoine. This view is supported by the sentence immediately preceding the Irreversible Action Clause, which sought to limit *Quoine's* liability for the consequences of any delay in the filling of an order or any failure to deliver or perform. Similarly, the sentence that immediately followed the Irreversible Action Clause limited *Quoine's* liability for any loss incurred by a user as a result of its use of the Platform. These sentences would have been unnecessary if the provisions under the heading "Trading & Order Execution" did not apply to Quoine. Furthermore, the Irreversible Action Clause itself provided that once an order had been filled, and the users of the Platform had been notified through the Platform, "such an action", which in this context could only mean the filling of the order, was irreversible. As the Judge noted at [152] of the Judgment, the word "irreversible" was plainly not qualified in any way and drew no distinction between the users of the Platform and Quoine as the operator of the Platform.

75      Subsequent to the hearing of this appeal, Quoine drew our attention to an article which commented on several aspects of the Judgment: see Kelvin Low & Eliza Mik, "Unpicking a Fin(e)tech Mess: Can Old Doctrines Cope in the 21st Century?", *Oxford Business Law Blog*, 8 November 2019 <https://www.law.ox.ac.uk/business-law-blog/blog/2019/11/unpicking-finetech-mess-can-old-doctrines-cope-21st-century> (accessed 14 November 2019) ("*Low & Mik*"). The authors argued that if Quoine itself was not a counterparty to the Disputed Trades, then it must have been acting as agent for B2C2 and the Counterparties, and the users of the Platform in general, for the purposes of matching trades. On that basis, the authors contended that the Irreversible Action Clause should be construed to mean that only the *instructions* given by the users to Quoine as agent were irreversible, and not the trades themselves. We respectfully disagree.

35

76     First, it appears that the authors' underlying premise was that the relationship between Quoine and the users of the Platform was binary – either Quoine was the central counterparty to all trades on the Platform, or it acted as agent for the users. However, we have held that the trading contracts were formed directly between the parties to the respective trades (see [50(c)] above) and this did not require a finding that Quoine acted as agent for the parties. We consider the function of the Platform to be somewhat similar to that of an Internet messaging application, which allows users of the application to communicate with one another. If a contract is formed between two users on this messaging application, it would be artificial to suggest that the owner or operator of the Platform acted as an agent for these users. There was no suggestion that trading instructions were first passed to Quoine as a third party before they were uploaded on the Platform. Second, and more fundamentally, we consider the authors' interpretation of the Irreversible Action Clause to be contrary to the plain words of the clause. The irreversibility applies to the action of filling an order, as we have held at [74] above.

77     For these reasons, we do not think that it is permissible to imply the terms that Quoine was contending for.

### Issue (c): Unilateral mistake

78     We turn to the central feature of Quoine's defence, and one which the Judge acknowledged was "the most troubling and difficult in this case" (Judgment at [183]). Quoine relied on both unilateral mistake at common law and in equity to argue that the Trading Contracts should be vitiated, and therefore that its cancellation of the Disputed Trades was warranted. There is a threshold question whether Quoine, which was not a party to the Trading Contracts, could invoke the doctrine by way of defence to the claim that it

36

breached *its* contract with B2C2 (meaning, the Irreversible Action Clause in the Agreement). In other words, the question is whether Quoine would necessarily be excused of its breach even if the Trading Contracts were vitiated. We assume, without deciding, that the defence of unilateral mistake was available to Quoine in the indirect way argued. The parties did not dispute this specific point. As noted at [45] above and [132] below, a broadly similar approach was taken by the Judge and by us in the context of the claim in unjust enrichment. Leaving this to the side, the complexity arose because the defence of unilateral mistake was being raised for the first time, as far as we are aware, in the context of algorithmic trading and the formation of contracts by such means. B2C2 and the Counterparties had entered into the Trading Contracts by means of B2C2's and Quoine's deterministic algorithms. B2C2 and the Counterparties therefore did not know until *after* the Trading Contracts had been entered into, whether an offer would be made or accepted, or the terms on which a contract would be concluded. How then could the doctrine of unilateral mistake apply in this situation, where the contracting parties did not know the specific terms on which the Trading Contracts would be entered into? It is therefore necessary to consider the principles behind the doctrine before considering its application to this novel situation.

79      We state at the outset that we approach this issue of unilateral mistake on the footing that as a court applying the common law, our task is to apply the existing law on the doctrine subject to incremental adjustments being made in order to suit the particular context. Algorithmic trading is an area of dynamic change, and it might be more appropriate for legislative intervention in due course, if it were thought that a more fundamental redesign of the applicable legal framework is called for. That is certainly not our view at this time and we

consider that the existing body of law can be meaningfully adapted to deal with the situation at hand.

*Doctrine of unilateral mistake at common law and in equity*

80    We begin by setting out the requirements for unilateral mistake at common law and in equity, and in so doing, we highlight their differences in requirements and consequences. This was the subject of our decision in *Chwee Kin Keong and others v Digilandmall.com Pte Ltd* [2005] 1 SLR(R) 502 ("*Digilandmall.com*"). In essence, one party must have transacted while operating under a mistake as to a *fundamental term* of the contract (see *Digilandmall.com* at [34] and [80]). As we note below, there is a question as to whether this also applies in the context of the doctrine in equity. But beyond this:

> (a)    for unilateral mistake at common law, the non-mistaken party must have had *actual* knowledge of the mistaken party's mistake, and if this is established, the contract will be rendered *void*; but

> (b)    for unilateral mistake in equity, the non-mistaken party must have had at least *constructive* knowledge of the mistaken party's mistake and must have engaged in some *unconscionable* conduct in relation to that mistake, and if this is established, the contract will be *voidable*.

81    We begin with the rationale underlying the doctrine of unilateral mistake at common law. As we alluded to in *Digilandmall.com*, the reason for the doctrine is that "a party who is aware of the error made by the other party cannot claim that there is *consensus ad idem*" (at [31]). It follows that the doctrine is best understood by having regard to the principles governing offer and acceptance. A contract cannot be formed unless the contracting parties agree as

38

*Quoine Pte Ltd v B2C2 Ltd*                                    [2020] SGCA(I) 02

to the *terms* of the contract. Unilateral mistake at common law voids a contract because the contracting parties have not in fact reached an agreement when one party is mistaken as to the terms put forward by the other party, and that other party knows this to be the case. In such circumstances, there is no correspondence between offer and acceptance. To explain this, it is helpful to set out what has been explained in *The Law of Contract in Singapore* (Andrew Phang Boon Leong gen ed) (Academy Publishing, 2012) at para 10.144:

> … By [the theory of "promisee objectivity"], there is no contract where the non-mistaken party knows … that the mistaken party does not intend to contract on the intended terms. There is no departure from an "objective" view of agreement because the law, in looking at the non-mistaken party's knowledge of the mistaken party's intention is not asking what the mistaken party intended. Instead, it is looking at what the non-mistaken party had reason to believe for the purpose of interpreting the communication made by the mistaken party to the non-mistaken party. …

In short, where the non-mistaken party knows that the mistaken party made a mistake in communicating a term, the non-mistaken party cannot treat the mistaken party as having agreed to the term. Absent such knowledge, however, the position is otherwise because it would give rise to intolerable uncertainty in contractual arrangements if a party could be permitted to assert its own subjective view that it had operated under a mistake, even though there appeared objectively to be a concluded contract and the non-mistaken party was fairly operating on that basis.

82     Significantly, for the relevant mistake to void the contract, it must be about a *term* of the contract, and cannot merely be a mistaken assumption about the circumstances under which the contract was or would be concluded. A contract can be concluded as long as the contracting parties agree as to its terms, regardless of their beliefs and assumptions about the contract. This proposition

was alluded to in the decision of *Smith v Hughes* (1871) LR 6 QB 597 ("*Smith v Hughes*").

83      In *Smith v Hughes*, the plaintiff farmer sued the defendant racehorse trainer for breach of a contract for the sale of oats. The plaintiff had given the defendant's manager a sample of the *new* oats that he intended to sell and the defendant agreed to purchase those oats of which he received a sample. The defendant subsequently refused to complete the contract on the ground that the contract had been for the sale and purchase of *old* oats. At the trial, it was disputed whether the plaintiff and the defendant's manager discussed the subject of the oats being old oats. At the end of the trial, the judge put two questions to the jury: (a) whether the word "old" had been used with reference to the oats in the conversation between the plaintiff and the defendant's manager; and (b) whether the plaintiff had believed that the defendant believed that he was contracting for old oats. The judge directed the jury to find for the defendant if either question was answered in the affirmative. The jury found for the defendant but did not give specific answers to the two questions.

84      On appeal, the court held that the judge's direction in respect of the first question was correct. However, it found that the judge's direction in respect of the second question was either wrong or likely to be misunderstood by the jury, and a new trial was therefore necessary. In the words of Hannen J, for the jury to find for the defendant pursuant to the second direction, "the jury should find not merely that the plaintiff believed the defendant to believe that he was buying old oats, but that he believed the defendant to believe that he, the plaintiff, was *contracting* to sell old oats" [emphasis added] (*Smith v Hughes* at 611).

85      The decisions of Cockburn CJ and Blackburn J too illustrate the point that the relevant mistake to void a contract, on the basis of unilateral mistake,

40

had to be about a *term* of the contract, and not merely about the circumstances under which the contract was or would be concluded.

86    Blackburn J put it in these terms at 606–607:

> … on the sale of a specific article, unless there be a warranty making it part of the bargain that it possesses some particular quality, the purchaser must take the article he has bought though it does not possess that quality. … *even if the vendor was aware that the purchaser thought that the article possessed that quality*, and would not have entered into the contract unless he had so thought, still the purchaser is bound, unless the vendor was guilty of some fraud or deceit upon him, and that a mere abstinence from disabusing the purchaser of that impression is not fraud or deceit … [emphasis added]

87    Cockburn CJ identified "the fallacy of confounding what was merely a *motive* operating on the buyer to induce him to buy with one of the essential *conditions* of the contract" [emphasis added] (at 606). If a contracting party made a mistake about the circumstances under which the contract was or would be concluded, *caveat emptor* would apply, and the contract would not be vitiated so long as the parties did reach an agreement on the *terms* of the contract. In emphasising this point, Cockburn CJ also observed that "the passive acquiescence of the seller in the self-deception of the buyer [in thinking that the oats were old oats]" would not entitle the buyer to avoid the contract (*Smith v Hughes* at 602–603).

88    The requirement that the relevant mistake to void a contract on the basis of unilateral mistake must concern a *term* of the contract was also applied more recently in the decision of the English High Court in *Statoil ASA v Louis Dreyfus Energy Services LP (The "Harriette N")* [2008] 2 Lloyd's Rep 685 ("*Statoil*"). In *Statoil*, the relevant question was whether a contract of compromise between the parties was binding on the claimant when its employee had made an error in calculating the amount of demurrage due from the defendant, because the

41

claimant's employee thought that the vessel in question had completed discharging her cargo on 13 October 2006 when in fact she only completed discharging on 24 October 2006. Prior to concluding the contract of compromise, the defendant's employee realised that the claimant's employee made this error but opted to say nothing about it. Aikens J held that it was *not a term* of the contract that the compromise was reached on the premise that the discharge had been completed on 13 October 2006 (at [91]). He accordingly held that there was no operative unilateral mistake as to a term of the contract, which therefore remained binding. Citing *Smith v Hughes* in coming to his decision, Aikens J framed the relevant proposition of law as follows (*Statoil* at [88]):

> … if one party has made a mistake about a fact on which he bases his decision to enter into the contract, but *that fact does not form a term of the contract* itself, then, *even if the other party knows that the first is mistaken as to this fact,* the contract will be binding. … [emphasis added]

89    We turn next to the rationale behind the doctrine of unilateral mistake in equity. We held in *Digilandmall.com* that we have an equitable jurisdiction with regard to unilateral mistake and that this jurisdiction exists to assist us in achieving the ends of justice in appropriate cases (see *Digilandmall.com* at [74] and [77]). To invoke this jurisdiction, it must be shown that the non-mistaken party had constructive knowledge of the mistaken party's mistake and further, that it was *unconscionable for the non-mistaken party to insist on the performance of the contract* because it had engaged in some unconscionable conduct or sharp practice in relation to that mistake (see *Digilandmall.com* at [80] and [83]).

90    There is a question as to whether unilateral mistake in equity can extend beyond a mistake as to a term of the contract, and related to this, whether a

42

mistaken assumption about the circumstances under which the contract was or would be concluded can itself be an operative mistake. The English authorities seem to suggest, on balance, that there is no equitable jurisdiction to vitiate a contract for unilateral mistake and if there were, they appear to doubt whether it extends beyond a mistake as to a term of the contract: see *Chitty on Contracts* (H G Beale gen ed) (Sweet & Maxwell, 33rd Ed, 2018) ("*Chitty*") at para 3-027; Edwin Peel, *The Law of Contract* (Sweet & Maxwell, 14th Ed, 2015) at para 8–058; Jack Beatson, Andrew Burrows & John Cartwright, *Anson's Law of Contract* (Oxford University Press, 29th Ed, 2010) at p 278; see also *Clarion Ltd and Others v National Provident Institution* [2000] WLR 1888 at 1905C–1905H; *Great Peace Shipping Ltd v Tsavliris Salvage (International) Ltd* [2003] QB 679; *Huyton SA v Distribuidora Internacional de Productos Agricolas SA de CV* [2003] 2 Lloyd's Rep 780; *Statoil*. The High Court of Australia in *Taylor v Johnson* (1983) 151 CLR 422 treated relief for unilateral mistake as to a fundamental term as equitable in character; see also N C Seddon & R A Bigwood, *Cheshire and Fifoot Law of Contract* (LexisNexis Butterworths, 11th Australian Ed, 2017) at para 12.44 in which it is said that an equitable principle of mistake has probably displaced any possible common law doctrine of mistake.

91      As for the position in Singapore, although there is a recognised equitable jurisdiction for dealing with unilateral mistake, the question as to whether this extends beyond a mistake as to a term of the contract remains open. In *Digilandmall.com*, the mistake in question was undoubtedly one as to a fundamental term of the contract, namely the price, and there was no detailed discussion about whether any other type of mistake could be relied upon to invoke the defence (see *Digilandmall.com* at [34] and [80]). It is true that in *Digilandmall.com*, the court did go on to observe that "[o]ne suggested way" to

43

differentiate between unilateral mistake at common law and in equity would be to hold that the former was "limited to mistakes with regard to the subject matter of the contract", while the latter "[could] have regard to a wider and perhaps open-ended category of 'fundamental' mistake" (at [75]). This, however, was not explored or developed in detail.

92     The issue of whether unilateral mistake in equity can extend beyond a mistake as to a term of the contract was not fully argued before us. In addition, we are satisfied that it is not necessary for us to determine this question in this case. Even on the Judge's view of the relevant belief (the Second Mistaken Belief) being treated as a mistake for the purposes of the equitable jurisdiction, there are the further requirements of constructive knowledge of the mistake and unconscionability and those simply did not exist in this case.

93     If the doctrine of unilateral mistake is to be understood in terms of the principles governing offer and acceptance, or in other words, the formation of the contract, then, as Prof Goh suggested, the question of how the doctrine should apply to contracts made by computerised trading systems should be answered by first considering the more fundamental issue of *how* such contracts are formed. We therefore turn to consider this.

94     The decision of the English High Court in *R (on the application of Software Solutions Partners Ltd) v Her Majesty's Commissioners for Customs and Excise* [2007] EWHC 971 (Admin) ("*Software Solutions Partners*") is of some assistance. There, the court considered an automated electronic process of contracting involving the software of the applicant, Software Solutions Partners Ltd ("SSP"). Insurance brokers who used SSP's software could enter into insurance contracts on behalf of their customers with insurers who were using the same software. A broker would input the details for the required insurance

44

product into the software, which would calculate quotes available from those insurers based on pre-determined qualification criteria as agreed between the insurers and SSP, and also electronically determine whether the risk was acceptable to the insurers without referring it back to them. Once the customer accepted the price and terms of an insurance cover, the software would process the customer's data automatically and generate the relevant policy contract and the relevant insurer would be bound by it. All the information necessary for contract formation was pre-programmed in the software according to parameters laid down by the insurer. The court concluded in these circumstances that the insurer using the software had, expressly or impliedly, invited the insurance broker to use the software as the medium for contract formation and undertook to be bound by the automatically generated policy contract even if the insurer was temporarily unaware of it (see *Software Solutions Partners* at [65] and [67]). Put another way, the insurer made a binding offer to provide insurance and the broker, on the customer's behalf, could accept it and that would be effective when received by SSP's information system (see *Software Solutions Partners* at [19]).

95     The court in *Software Solutions Partners* analogised that case to *Thornton v Shoe Lane Parking Ltd* [1971] 2 QB 163 where Lord Denning MR discussed the situation of a customer putting money into an automatic machine and being issued with a ticket. There, Lord Denning MR held that the offer was made when the proprietor of the machine held it out as being ready to receive money and the customer accepted the offer by inserting money into the machine (at 169).

96     What is clear in our case is that the Trading Contracts had been entered into pursuant to the parties' respective deterministic algorithms. As was the case in *Software Solutions Partners* for the insurers using SSP's software, the

45

contracting parties and Quoine did not know beforehand that the Trading Contracts would be entered into; and they were also unaware of the specific terms on which the contracts would be concluded. These factors did not prevent the formation of the policy contracts in *Software Solutions Partners*, and, in our judgment, did not here prevent the formation of a contract at the point of time when an offer made by one algorithm was accepted by the other.

97     This was also the view of the Judge and it drove him, in our judgment, inevitably, to adopt a certain analytical model when considering the issue of unilateral mistake. Specifically, he refused to consider the matter by reference to what the position would have been and what the contracting parties were likely to have known, intended and agreed had they had face-to-face negotiations at a hypothetical meeting on the "floor of the exchange" to enter into the Trading Contracts, at the time these were entered into, because this was simply not how they had agreed to form their contracts. Instead, they had decided to form contracts using the relevant deterministic algorithms (see Judgment at [200] and [204]). We agree with this characterisation of the parties' method of contracting and we think it would be wholly artificial to recast the relevant matrix of fact, which was one where the contracting parties did not in fact know beforehand that they were going to enter into the Trading Contracts or their terms, and were content to abide by what the relevant algorithms did at least as long as this was within the ambit of their programmed parameters. We also agree with the Judge that it follows from this that in cases where contracts are made by way of *deterministic* algorithms, any analysis concerning knowledge of a mistake or unconscionably taking advantage of one must be done by reference to the state of mind of the programmers of the algorithms at the time of the programming (see Judgment at [211]).

46

98      As we have noted at [15] above, a deterministic computer program or algorithm is bound by the parameters set by the programmer, and can (and generally will) only do what the programmer has programmed it to do. Given a particular input, it will produce a particular output; on each occasion, the output should and will be the same if the former does not change. Therefore, when it comes to assessing the state of knowledge that is to be attributed to the parties at the time of a contract made by way of deterministic algorithms, the relevant inquiry cannot be directed at the parties themselves, who had no knowledge of or direct personal involvement in the formation of the contract. Rather, working backwards from the output that emanated from the programs, we are driven to assess the relevant state of knowledge by examining that of *the programmers*. This approach is consistent with that which was advocated by Prof Goh.

99      Apart from determining whose knowledge is relevant, it is also important to consider the relevant *time* for assessing that person's knowledge. In our judgment, the relevant time frame within which we should assess the knowledge of a programmer or the person running the algorithm would be from the point of programming up to the point that the relevant contract is formed. As Prof Goh noted, the point of programming is when the programmer's knowledge is the most concretised. The question can first be framed in this way: if the algorithm was programmed to produce a particular output, *why* was this done? But the inquiry cannot end there and must extend past that point of time because there may be situations where a programmer or the person running the algorithm who did not contemplate the relevant mistake at the point of programming came to learn of it subsequently *before* the contract had been formed, and yet allowed the algorithm to continue running, intending thereby to take advantage of the mistake. In such a case, it would be wrong to ignore the

subsequent acquisition of knowledge. This is why it is appropriate to have regard to the state of knowledge up to the time of the contract.

100    Prof Goh cited Nik Yeo & Joseph Farmer, "Mapping the Landscape: Cryptocurrency Disputes under English Law (Part 2)" (2019) 5 JIBFL 290 at p 291. This was a commentary on the Judge's decision in which the authors note as follows:

> An issue to which the case gives rise is an apparent timing mismatch: the traders' mistakes must necessarily have arisen, or at least have been continuing, at the point of the original trades, whereas the last human input into the programming must by practical necessity have occurred *before* those trades. *How then could the state of mind of the programmer when originally programming B2C2's "deep price" methodology ever include knowledge of the relevant mistake?* ... the law might need to recognise that so long as the knowledge or intention of the original programmer was that there ought not to be the sort of mistake which subsequently arose, then it does not matter for the rules of unilateral mistake if the particular instantiation of that mistake post-dates the last act of a human being, so long as the programmer's state of mind could be said still to be extant at the time the mistake is made (in other words, that the code has not changed by then in a way which would be inconsistent with that state of mind). [emphasis added]

101    We also note that *Low & Mik* ([75] *supra*) made some similar points in commenting on the Judge's decision as follows:

> ... Being unaware of the conclusion of a contract, a contracting party utilising automated contracting is *ipso facto* incapable of having any actual knowledge of any mistake on the part of its counterparty at the time of contracting, however egregious the mistake. But this would have the effect of immunising any contracting party employing algorithmic contracting from the doctrine of unilateral mistake entirely, which cannot be correct. ...
>
> ... it is unrealistic to attempt to attribute knowledge of a future mistake to a past programmer a la Nostradamus. ...

102     We have two observations on these extracts. The first relates to the level of knowledge of the mistake while the second relates to the time when the knowledge is assessed. Turning to the first point, it is true that it may be artificial, even unrealistic, to conduct the analysis on the basis of an expectation that the non-mistaken party must have knowledge of the specific and precise details of the mistake that has arisen. Programmers are not expected to be prophets and mistakes can take a wide range of forms. But the law on unilateral mistake is concerned:

> (a)     with a type or class of mistake, that is one concerning the fundamental terms of the contract (at least at common law); and

> (b)     with the mental state of the non-mistaken party – whether it knew (or ought to have known) of the (type of) mistake and was acting to take advantage of it.

103     In our judgment, keeping the focus on these considerations enables us to address the authors' concern that the state of mind of the programmer when originally programming the algorithm could never have included knowledge of the particular manifestation of the relevant mistake. That is not and should not be the inquiry and we do not think it was the inquiry that the Judge pursued. Rather, the relevant inquiry might be framed thus: when programming the algorithm, was the programmer doing so with actual or constructive knowledge of the fact that the relevant offer would only ever be accepted by a party operating under a mistake and was the programmer acting to take advantage of such a mistake? In our judgment, this was the essential methodology applied by the Judge at [229]–[230] of the Judgment, which we set out at [124] below.

49

104     The second point which pertains to timing is resolved by the approach that we have set out at [99] above. If at the point of programming, the programmer contemplated or ought to have contemplated that a mistake might arise on the part of a counterparty to a future contract and designed the algorithm to exploit such a mistake, then it does not matter for the purposes of establishing the requisite knowledge that the relevant mistake had occurred *after* the algorithm had been programmed. Further, as we have noted, the framework we have developed also enables the court to examine and consider the knowledge actually acquired after the point of programming and the actual conduct of the parties up to the time of the contract. However, we emphasise that this is directed at *actual* conduct. This is to be contrasted with the approach that Quoine urged upon us, which we have rejected (see [97] above), which was to analyse the matter by reference to a "hypothetical meeting on the trading floor that notionally took place just before the contract was concluded in the light of the information available at that time". On that approach, the question posed is whether the parties *would have agreed* to the contract with knowledge of the mistake. With respect, this is, as we have mentioned, a wholly artificial analysis that has no relation to the reality of the situation, which is that the trades were conducted by way of algorithmic trading and not by way of an imagined meeting on some trading floor. The consequence of this is that the parties had *committed* to transact with each other in a certain way which entailed that they would not even know whether a contract would be formed, and if it were, on what terms that would be, *and* they chose in these circumstances not to bargain for a right to review, confirm or invalidate any ensuing contract that might emerge out of the arrangements that they had committed to. This simply did not accommodate the court artificially (or "equitably") interposing another last look at the proposed terms immediately prior to the algorithms concluding the contract and, for that matter, still less *after*. Having committed to transact in this way, and in

50

the absence of any basis upon which equity's intervention could be justified up to the time the relevant offer was accepted and the contract formed, we cannot see a principled basis for such intervention premised on a review of the reasonableness of the ensuing contract *after* it had been formed without any mistake as to its terms.

105     We turn to the *type* of knowledge required on the part of the non-mistaken party of the mistaken party's mistake, which, as stated at [80] above, differs depending on whether a party is seeking to invoke the doctrine of unilateral mistake at common law or in equity. The former requires proof that the non-mistaken party had *actual* knowledge of the mistake at the time of the contract, while the latter requires *constructive* knowledge (coupled with an element of unconscionability). The distinguishing line between actual knowledge and constructive knowledge can be difficult to draw, if not in theory then in practice. This is not least because both forms of knowledge require the court to adopt an objective inquiry (see *Digilandmall.com* at [44]; *Wellmix Organics (International) Pte Ltd v Lau Yu Man* [2006] 2 SLR(R) 117 at [66]).

106     The test for establishing actual knowledge is set out in *Digilandmall.com* at [41]–[42] as follows:

> 41      As is so often alluded to in the cases, in the absence of an express admission or incontrovertible evidence, the fact of knowledge would invariably have to be inferred from all the surrounding circumstances, *including the* **experiences and idiosyncrasies** *of the person and what* **a reasonable person** *would have known in a similar situation. If a court, upon weighing all the circumstances, thinks that the non-mistaken party is* **probably aware** *of the error made by the mistaken party, it is entitled to find, as a fact, that the former party has actual knowledge of the error.* Following from that holding, the court should declare the contract so formed as void on the ground of unilateral mistake.
>
> 42      In order to enable the court to come to the conclusion that the non-mistaken party had actual knowledge of the

51

> mistake, *the court would go through a process of reasoning where **it may consider what a reasonable person, placed in the similar situation**, would have known.* In this connection, we would refer to what is called "Nelsonian knowledge", namely, wilful blindness or shutting one's eyes to the obvious. Clearly, if the court finds that the non-mistaken party is guilty of wilful blindness, it will be in line with logic and reason to hold that that party had actual knowledge.
>
> [emphasis added]

107    Actual knowledge is concerned with the *subjective* knowledge of the non-mistaken party. In other words, for actual knowledge to be made out, it must be shown that the non-mistaken party actually knew of the relevant fact. However, the means by which the *subjective* knowledge of the non-mistaken party is ascertained may include considerations of the matter from an objective perspective. This was consistent with the approach that Prof Goh urged upon us at para 137 of his submissions on the mistake issue:

> What is the criterion to be applied in so far as the ascertainment of the presence of knowledge … is concerned? **The answer would appear, by the very nature of the doctrine itself, to hinge upon the subjective knowledge of the party concerned.** However, it is submitted that such "subjective knowledge" must be **objectively ascertained**, and, indeed, the case of *Hartog v Colin & Shields* [[1939] 3 All ER 566] supports this proposition. In that case, the reference to verbal and written negotiations prior to the sale concerned as well as expert evidence as to the prevalent trade practice … tilted the decision in favour of the defendant sellers who, Singleton J decided, had obviously made a mistake which was equally clear to the plaintiff buyer, having regard to the *objective facts* just mentioned. As Singleton J observed:
>
>> "[T]here was an accident. The offer [by the defendant sellers] was wrongly expressed, and the defendants *by their evidence, and by their correspondence*, have satisfied me that the plaintiff could *not reasonably* have supposed that that offer contained the [defendants'] *real* intention."
>
> [emphasis in original in italics; emphasis added in bold; footnotes omitted]

108    In contrast to actual knowledge, constructive knowledge involves *imputing* knowledge to the non-mistaken party. The inquiry is not directed at whether the non-mistaken party *actually* knew of the mistaken party's mistake, but whether a reasonable person in the position of the non-mistaken party would have known of the mistake. If the answer to that is yes, then the non-mistaken party is *deemed* to have constructive knowledge of the mistake, notwithstanding that it could not be proved that it did indeed have that knowledge. Here the inquiry that is adopted by the court is necessarily an objective one.

109    The final requirement to establish unilateral mistake in equity is that the non-mistaken party must also be found to have engaged in some *unconscionable* conduct in relation to the relevant mistake. In *Digilandmall.com*, this was also referred to as "sharp practice" and "impropriety" (see *Digilandmall.com* at [77] and [80]). Much more recently, in *BOM v BOK and another appeal* [2019] 1 SLR 349 ("*BOM*"), we elaborated on what constitutes "unconscionable conduct" although this was not in the context of unilateral mistake in equity. In *BOM*, we were required to consider the circumstances in which a deed of trust might be set aside on the basis of unconscionability, and in that context held that "the narrow doctrine of unconscionability" [original emphasis omitted] applies in Singapore (at [142]):

> … To invoke the doctrine, the plaintiff has to show that he was suffering from an infirmity that the other party exploited in procuring the transaction. Upon the satisfaction of this requirement, the burden is on the defendant to demonstrate that the transaction was fair, just and reasonable. In this regard, while the successful invocation of the doctrine does not require a transaction at an undervalue or the lack of independent advice to the plaintiff, these are factors that the court will invariably consider in assessing whether the transaction was improvident.

In relation to the requirement for the plaintiff to be suffering from an infirmity, this refers to the plaintiff being poor and ignorant or suffering from other forms

53

of infirmities of sufficient gravity, whether physical, mental and/or emotional in nature, as to have acutely affected his ability to "conserve his own interests" (*BOM* at [141]). Admittedly there is a potential tension between requiring, on the one hand, that unconscionability be shown, this necessarily being a subjective inquiry premised on what the non-mistaken party actually knew – see *Digilandmall.com* at [78] – and, on the other, that the non-mistaken party have at least constructive knowledge of the mistake, this being, as we have already noted, an objective inquiry.

110    Aside from this, a narrow conception of unconscionability limits excessive subjectivity in determining what amounts to unconscionable conduct, and instead promotes certainty and predictability for contracting parties (see *BOM* at [176]). Given the circumstances of this case, and for reasons we will shortly develop, we consider that we would not on any footing have been able to find that there was unconscionable conduct on the part of B2C2 or Mr Boonen, and thus it is not necessary for present purposes either to resolve the tension we have alluded to or to decide the question as to whether the same narrow conception of unconscionability should apply in the context of unilateral mistake in equity. We therefore leave this open for the present.

111    Further, it is also relevant when considering unilateral mistake in equity to have regard to the degree of carelessness or negligence on the part of the mistaken party to determine where the equities fall, even if a mistaken party's carelessness would not in and of itself disentitle it from relief (*Digilandmall.com* at [79]).

*Application to the facts of this case*

112    On appeal, Quoine focused on the Second Mistaken Belief as the operative mistake held by the Counterparties, which was that they believed they were buying ETH for BTC under contracts at prices which accurately represented or did not deviate significantly from the true market value and/or price of ETH relative to BTC on 19 April 2017 (see [38] above). Quoine argued that Mr Boonen had actual or at least constructive knowledge of the Second Mistaken Belief, because his main objective in programming the Trading Software to place sell orders for ETH at the deep price of 10 BTC to 1 ETH when the Platform's order book became empty or abnormally thin was to unconscionably profit from potential errors of the other market participants. Against this, B2C2 submitted that there was no mistake as to the prices quoted and accepted for the Disputed Trades, and that Mr Boonen had not engaged in any unconscionable conduct when programming the Trading Software.

113    To recapitulate, B2C2 had through its algorithm placed sell orders for ETH on the Platform at prices of 9.99999 BTC and 10 BTC to 1 ETH. On the other side of the transactions, orders had been placed on behalf of the Counterparties to buy ETH at the best available price on the Platform. These orders had been placed by the Platform's operating system, which had done just as it had been programmed to do in the light of the conditions presented on the Platform. These were the two sides of the trades that were matched and resulted in the Trading Contracts.

114    It is helpful to pause here and examine the position a little more closely. Because the Trading Contracts had been entered into pursuant to deterministic algorithmic programs that had acted exactly as they had been programmed to act, it is not clear what mistake can be said to have affected the formation of the

55

contracts. The mistake, if anything, was in the way the Platform had operated as a result of Quoine's failure to make certain necessary changes to several critical operating systems, which led to a series of steps that force-closed the Counterparties' positions and triggered buy orders for ETH being placed on their behalf. This might conceivably be seen as a mistake as to the premise on which the buy orders were placed, but it can in no way be said to be a mistake as to the terms on which the contracts could or would be formed. If a party A is told a falsehood by B which causes A to accept C's offer to transact at a price A would not otherwise have transacted at, in circumstances where C was neither aware of nor involved in B's falsehood, we are unable to see how that falsehood can be said to be a mistake that vitiates the contract. Here, the problems with the Quoter Program and the subsequent force-closure of the Counterparties' positions are akin to a "falsehood" told by Quoine to the Counterparties. This cannot be a mistake that vitiates the Trading Contracts between B2C2 and the Counterparties.

115    Accordingly, although we find no reason to disagree with the Judge's finding that the Counterparties held the Second Mistaken Belief that they were buying ETH for BTC at prices which did not deviate significantly from the market price on 19 April 2017 (see Judgment at [228]), we respectfully disagree that this mistake was as to a *term* of the Trading Contracts. The Second Mistaken Belief was characterised as a mistake as to the prices at which the Trading Contracts were entered into. In our judgment, this was incorrect. The prices that the Disputed Trades were concluded at were arrived at by operation of the parties' respective algorithms, and it was common ground that these had operated as they were meant to. In fact, the precise mistake in this case was a mistaken *assumption* on the part of the Counterparties as to how the Platform would operate. In other words, their real belief was that the Platform would not

56

fail; and as the Judge found, the premise for the Second Mistaken Belief was that the Platform would either always operate as intended or, alternatively, there would be adequate error identification and protection systems to prevent trading from continuing if the Platform operations deviated from this assumed state of affairs (Judgment at [227]). However, we do not see how this can assist Quoine because the Second Mistaken Belief was not a mistake as to the terms of the Trading Contracts, but instead was a mistaken assumption as to the circumstances under which the Trading Contracts would be concluded. This is not an operative mistake at least in the context of unilateral mistake at common law. In this regard, the position of the Counterparties (with their mistaken assumption) is analogous to the position of the claimant in *Statoil*, where the court found that there was no operative unilateral mistake as to a contract term and the contract of compromise in question thus remained binding (see [88] above). In fact, the claimant in *Statoil* would, on the face of things, seem to have been in a better position than the Counterparties in the present case, because the defendant in *Statoil* was actually aware that the claimant had entered into the contract on a mistaken assumption; in contrast, as we discuss below, Mr Boonen did not have actual or constructive knowledge of the Second Mistaken Belief (see [126] below).

116    In a sense, this might be sufficient to dispose of the case on unilateral mistake (at least at common law). However, since we have left open the issue identified at [92] above, we proceed on the assumption that there was an operative mistake, and examine whether the non-mistaken party, B2C2, had the requisite knowledge of this mistake.

117    In relation to B2C2, the Judge made the following findings:

(a)    There was plainly no mistake on B2C2's part in designing its algorithm to place the sell orders on the Platform at the deep price.

(b)    There was no sinister motive behind Mr Boonen programming the Trading Software with the deep prices. Specifically, at the time the Trading Software was designed, the deep prices had *not* been programmed with either the awareness or the intention to take advantage of a mistaken bid by a counterparty or to enter into a contract on that basis.

118    Quoine did not (and plainly could not) challenge the first finding and although it mounted a challenge of sorts against the second finding, we consider that this challenge was bound to fail. The Judge gave detailed reasons for his findings and there is neither reason nor basis for us to overturn those findings. In this regard, we are cognisant of our position as an appellate court. We did not have the benefit of hearing the parties' evidence at trial or grappling with the minutiae of that evidence as the Judge did, and thus appropriate caution demands that we should be slow to overturn primary findings of fact made by the Judge. In any event, we accept the Judge's findings for the following reasons.

119    First, there were no grounds for concluding that Mr Boonen had ever turned his mind to the relationship between the margin traders and those who loaned them money (Judgment at [124] and [223]). It is difficult to see how Quoine could even begin to mount a challenge against this finding. It was not suggested that the deep prices were programmed with margin trades in mind. If Mr Boonen did not programme the deep prices with awareness or consideration of the terms on which margin trading was done, he could not have programmed the Trading Software with the *knowledge* that in situations of illiquidity on the

Platform when the order book was abnormally thin, margin calls would be triggered and market orders would be placed to purchase ETH at the best available price, thereby creating an opportunity for exploitation.

120    Second, the Judge accepted that the programming of the deep prices was in part to ensure that the PureQuote strategy would always have price inputs so that the Trading Software would function continuously (see [18] above), and in part to ensure that in the unlikely event that a trade were to occur at a deep price, it would adequately protect B2C2 against any adverse consequences of such a trade (see Judgment at [83] and [85]). The Judge acknowledged that Mr Boonen's strategy might not have been wholly defensive, but nevertheless held that the overriding reason for programming the deep prices was to protect B2C2 in the event of the unexpected happening (see Judgment at [119] and [230]).

121    Third, the Judge accepted that when Mr Boonen designed the Trading Software, he knew of the *possibility* that the Platform's order book might become empty and that in that event the deep prices would be inserted into the Trading Software's internal order book. However, the Judge also stated that Mr Boonen had never considered that there was a *real* possibility of orders placed on the Platform at the deep prices being filled. Mr Boonen in fact considered that this was unlikely and the Judge found that he did not turn his mind in any detail to the circumstances in which this might happen (Judgment at [121] and [123]).

122    The first finding at [117(a)] above is fatal to any argument resting on common mistake since it is plain that B2C2 was never acting under a mistake (see [129] below).

59

123    The second finding at [117(b)] above, in our judgment, is fatal to any argument resting on unilateral mistake. This is because it excludes any notion of the Trading Contracts having been concluded in circumstances where B2C2 either actually knew or must be taken to have known that these had been or must have been the result of a mistake having been made by either of the Counterparties. This follows from the analysis of the law that we have set out above. Further, as we have observed at [42] above, the Judge also accepted that Mr Boonen had no knowledge of the glitches causing the illiquidity on the Platform until after the Disputed Trades had been transacted.

124    Following from our analysis of the law at [103] above, the relevant inquiry in this case could be framed thus: when programming the Trading Software with the deep prices, was the programmer doing so with actual or constructive knowledge of the fact that sell orders at those prices would only ever be accepted by a party operating under a mistake and was the programmer acting to take advantage of that mistake? In our judgment, this was the essential methodology applied by the Judge at [229]–[230] of the Judgment and which led him to conclude that Mr Boonen neither had such knowledge nor programmed the Trading Software to take advantage of any such mistake:

> 229    It is next necessary to determine whether Mr Boonen had actual knowledge of the mistaken belief at the time he inserted the deep prices … Can it be said that Mr Boonen knew that "it was never contemplated by [any trader] that any trades would be transacted on the Platform at prices which deviated so substantially from the actual market prices"? This amounts to a belief held by Mr Boonen at that date *that the price was so abnormal that no trader would trade at that price otherwise by way of a mistake.*
>
> 230    … I have concluded on the basis of those findings of fact that Mr Boonen did not insert the deep prices with that belief. He foresaw that a number of factors might arise which would cause the deep prices to be inserted and the overriding reasons for them being inserted was to protect B2C2 in the event of the unexpected happening. He did not exclude the possibility of

> trades at those prices being executed. Whilst he was aware that one possible cause was that it could be the result, wholly or in part, of some error or omission on the part of someone, including himself, he did not turn his mind in any detail to the circumstances that might lead to such trades being executed. He knew that the Platform was an automated system and that therefore no opportunity would arise for any particular trade to be reviewed by the parties in advance. In the circumstances of this case, in order for him to have actual knowledge that other traders believed that in no circumstances would a trade be transacted on the Platform at prices which deviated so substantially from the actual market prices, I consider that it would be necessary for it to be demonstrated that he held that belief himself, which he did not …

> [emphasis added]

125    We have also observed above at [99] that the programmer's knowledge, or indeed the knowledge of anyone running the algorithm, is relevant *past* the point of programming, and up till the Disputed Trades occurred. Examining the state of B2C2's knowledge at this later point in time, however, we consider that Quoine could not establish or adduce any evidence to show that B2C2 and/or Mr Boonen had become aware of the problems with the Quoter Program or the fact that the Platform's order book had gradually thinned out in the period *after* the Trading Software had been programmed and *prior* to the Disputed Trades (which was when the Trading Contracts were entered into). Quoine did seek to rely on the email that was sent by Mr Boonen on 20 April 2017, the morning *after* the Disputed Trades had occurred but in our view, this does not help its case at all. That email simply stated in the subject line "Major Quoine database breakdown, please call us urgently". Quoine argued that Mr Boonen's reaction showed that he knew that there must have been some mistake. However, this, at its highest, showed Mr Boonen's state of mind *after* he became aware of the Disputed Trades, which is not part of the relevant time frame. Further, the email, if anything, supports the Judge's finding that Mr Boonen did not programme the Trading Software with the deep prices with any sinister intent, because his

61

reaction was simply inconsistent with that of a man who had anticipated the possibility of such a mistake occurring and designed his algorithm to exploit it.

126     Taking the evidence above together, it is apparent to us that Mr Boonen did not have actual or constructive knowledge of the Second Mistaken Belief. Mr Boonen would have had to foresee a perfect storm of events that began with the problems with the Quoter Program and ended with the Disputed Trades being concluded at the deep price for him to have had, or be taken to have had, the Second Mistaken Belief. Despite Quoine's considerable efforts to mount a case suggesting even a hint of this, there was simply no evidence to suggest that Mr Boonen had ever contemplated anything of the sort. We therefore reject Quoine's case on this aspect of the appeal.

127     We add for completeness that the second finding of the Judge described at [117(b)] above, that there was no sinister motive behind programming the Trading Software with the deep prices, also excludes any notion of the Trading Contracts having been entered into in circumstances where B2C2 had acted unconscionably. We find no reason to disagree with the Judge's finding that although Mr Boonen's inclusion of the deep prices was an opportunistic business decision, it was not motivated by sinister intent (Judgment at [236]).

128     For all these reasons, we are satisfied that Quoine's defences of unilateral mistake at common law and in equity fail.

### Issue (d): Common mistake

129     Quoine also argued that the Trading Contracts were void for common mistake, since B2C2 and the Counterparties had entered into the Disputed Trades under a shared mistaken assumption that they were transacting at or around the going market rate for ETH. However, B2C2 could not have been

labouring under such an assumption, given that it had placed its sell orders for ETH at prices of 9.99999 BTC and 10 BTC to 1 ETH on the Platform *because* the *intentionally* pre-programmed deep price of 10 BTC to 1 ETH in the PureQuote strategy took effect (see [117(a)] above). Therefore, Quoine's defence of common mistake at common law fails.

### Issue (e): Unjust enrichment

130     We turn to Quoine's argument that it was entitled to cancel the Disputed Trades on the basis that B2C2 would otherwise be unjustly enriched at the expense of the Counterparties and/or Quoine. Quoine's and B2C2's arguments on unjust enrichment hinged on whether we accepted that the Trading Contracts were vitiated for mistake. If the Trading Contracts remained valid and enforceable, that would seem to bar any action in unjust enrichment.

131     In his discussion of the unjust enrichment point below, the Judge applied our decision in *Singapore Swimming Club v Koh Sin Chong Freddie* [2016] 3 SLR 845 at [90], which sets out the three requirements for an action in unjust enrichment to succeed: (a) a benefit has been received or an enrichment has accrued to the defendant; (b) the benefit or enrichment is at the claimant's expense; and (c) the defendant's enrichment is unjust.

132     As a preliminary point, we agree with the Judge's conclusion that if the Disputed Trades were not cancelled, B2C2 would stand to receive a substantial benefit in terms of the considerable value of BTC that had been credited into its account. However, as the Judge noted, this benefit would have been at the expense of the *Counterparties*, which would have had to make up the shortfall between the BTC actually in their accounts and the amount that had been debited from their accounts pursuant to the Disputed Trades. Therefore, the

63

cause of action in unjust enrichment should if at all vest in the Counterparties, and not Quoine. However, B2C2 did not attempt to strike out this aspect of Quoine's defence, and the Judge therefore proceeded with the trial on the basis that it was properly raised as a defence. We therefore proceed on the same basis.

133    As to the first element, there is no doubt that B2C2 was enriched or derived a benefit from having the proceeds of the Disputed Trades credited into its account. Assuming that the Counterparties are able to bring a claim against Quoine for the losses they might suffer as a result of the Disputed Trades if the Trading Contracts remain valid and enforceable, it might then be said that B2C2's enrichment was at least indirectly at the expense of Quoine. On this basis, the first two requirements of unjust enrichment would be made out. We turn then to the last requirement, which is that there must be an unjust factor.

134    The unjust factors that were pleaded by Quoine were first, that the benefit was conferred upon B2C2 pursuant to a mistake, and second, that there was a lack of consent in the formation of the Trading Contracts by which B2C2 was enriched. In truth, these were the same points raised in relation to the case on unilateral mistake, which we have rejected.

135    Further, given our conclusion that the Trading Contracts are not vitiated, B2C2's enrichment would have been pursuant to valid contracts and it is difficult to see how this could be said to be unjust. As stated in *Goff & Jones: The Law of Unjust Enrichment* (Charles Mitchell, Paul Mitchell & Stephen Watterson eds) (Sweet & Maxwell, 9th Ed, 2016) at para 9–94 (see Judgment at [249]):

> Where a benefit is mistakenly conferred by one party on another *under a contract*, a claim in unjust enrichment will commonly fail *even if the mistake would otherwise support such a claim*. … the contract will bar the claim, to the extent *that it entitles the*

64

> *defendant to receive the relevant benefit.* For the claim to succeed, the claimant will need to show that the contract is invalid, being either non-existent, void or voidable. ... [emphasis added]

136    Therefore, we are satisfied that Quoine's defence of unjust enrichment cannot succeed.

### Issue (f): The trust question

137    Finally, we turn to B2C2's contention that Quoine was holding the BTC which was credited into B2C2's account pursuant to the Disputed Trades on trust and that Quoine breached that trust when it reversed that credit transaction. This raises the threshold issue of whether cryptocurrency, specifically BTC, is a species of property that is capable of being held on trust.

138    This point was not disputed by the parties when they were before the Judge and was only raised belatedly by Quoine on appeal. Nevertheless, the Judge briefly considered the question, and concluded that cryptocurrency satisfied all the requirements in the classic definition of a property right set out in the decision of the UK House of Lords in *Ainsworth* at 1248 (see [34] above). However, he left open the question of what the precise nature of the property right was, having been satisfied that cryptocurrency could be treated as property in a generic sense.

139    There have been some other cases in the Commonwealth that have implicitly accepted that cryptocurrency may be regarded as property, although we are not aware of any court that has attempted to identify the precise nature of the property right if any. In *Elena Vorotyntseva v Money-4 limited and others* [2018] EWHC 2596 (Ch), the English High Court issued a proprietary injunction preventing the removal of specific ETH and BTC holdings. In

65

coming to his decision, Birss J observed that there had been no suggestion that cryptocurrencies could not be a form of property.

140     In *Copytrack Pte Ltd v Wall* [2018] BCSC 1709, the Supreme Court of British Columbia ordered that some C$400,000 worth of ETH be traced, which suggests that ETH was recognised as a species of property susceptible to tracing. The action was brought by Copytrack Pte Ltd ("Copytrack"), a company engaged in the business of digital content management and automated copyright enforcement. Copytrack created its own cryptocurrency, Copytrack tokens, and mistakenly transferred a more valuable cryptocurrency, ETH, to the defendant investor instead of Copytrack tokens. The ETH was then transferred by the defendant to third parties. Copytrack sought to trace and recover the ETH. The court characterised the issue of whether the property law doctrines of conversion and wrongful detention could apply to cryptocurrencies as a "critical issue" and the "real issue on this application". While the court did not go so far as to rule on whether cryptocurrencies could, in fact, be subject to specific property law claims, the court held that it would be unreasonable and unjust in the circumstances to deny Copytrack a remedy, and so allowed Copytrack to trace and recover the wrongfully transferred ETH.

141     Academic commentators broadly agree that BTC may be regarded as a property right, although they disagree as to the precise nature of this right. In Jean Bacon *et al*, "Blockchain Demystified: A Technical and Legal Introduction to Distributed and Centralised Ledgers" (2018) 25(1) Rich J L & Tech 1, the authors suggest (at para 182) that holders of digital tokens such as BTC should be regarded as having a property interest at common law, because they hold a bundle of rights that include the right to control the token. This interest is identifiable through entries on the blockchain, can be transferred by entries of the blockchain, and has a high degree of permanence and stability.

66

142     To similar effect is Kelvin FK Low & Ernie GS Teo, "Bitcoins & Other Cryptocurrencies as Property?" (2017) (21) Singapore Management University School of Law Research Paper, where the authors argue that the property right relating to BTC is the right to have one's public BTC address appear as the last entry in the blockchain in relation to a particular BTC. Such a right provides exclusive control to the holder in the form of universal exigibility and can be seen as involving a true property transfer when one transfers BTC from one's public BTC address to another's BTC address.

143     Most recently, the UK Jurisdiction Taskforce ("UKJT") chaired by Sir Geoffrey Vos released its *Legal Statement on Cryptoassets and Smart Contracts* (November 2019), where it considered the question of whether English law would treat a particular cryptoasset as property. The UKJT defined cryptoassets as generally having the following characteristics (at para 31): (a) intangibility; (b) cryptographic authentication; (c) use of a distributed transaction ledger; (d) decentralisation; and (e) rule by consensus. The UKJT stated (at para 85) that cryptoassets have all the indicia of property, and that their novel or distinctive features as aforementioned do not disqualify them from being property. The UKJT also stated that cryptoassets are not disqualified from being property simply because they might not be classifiable either as things in possession or as things in action. The UKJT therefore concluded that cryptoassets could be treated, in principle, as property.

144     There may be much to commend the view that cryptocurrencies should be capable of assimilation into the general concepts of property. There are, however, difficult questions as to the type of property that is involved. It is not necessary for us to come to a final position on this question in the present case. This is because even if BTC were to be regarded as a species of property which is capable of being the subject of a trust, we are satisfied that B2C2's breach of

trust claim would fail because, contrary to what the Judge found, we consider that there was no certainty of intention to create a trust. In this regard, we agree with the observations made by French CJ in the High Court of Australia decision of *Korda v Australian Executor Trustees (SA) Ltd* (2015) 255 CLR 62 ("*Korda*"). French CJ stated that the process of ascertaining whether the necessary intention to create a trust should be imputed is "one of construction of the relevant text or oral dealings in their context" (*Korda* at [11]). He clarified that an intention is not to be imputed and a trust inferred "simply because a court thinks it is an appropriate means of protecting or creating an interest".

145    The Judge held that the "decisive factor" which led him to find that a trust had arisen over the BTC that had been credited into B2C2's account was that B2C2's assets were held separately as assets of an individual user of the Platform rather than as part of Quoine's trading assets. He regarded this as a "clear indication" that Quoine claimed no title to the user's assets and acknowledged that it was holding them to the order of the user who could demand withdrawal at any time (see Judgment at [145]). In our respectful view, the mere fact that Quoine's assets were segregated from its customer's cannot in and of itself lead to the conclusion that there was a trust. In *Vintage Bullion DMCC (in its own capacity and as representative of the customers of MF Global Singapore Pte Ltd (in creditors' voluntary liquidation)) v Chay Fook Yuen (in his capacity as joint and several liquidator of MF Global Singapore Pte Ltd (in creditors' voluntary liquidation)) and others and other appeals* [2016] 4 SLR 1248, we stated as follows at [61]:

> Counsel for Vintage … submitted at the hearing before us that the Company had in effect by its conduct made a declaration of trust over the sum representing the Unrealised Profits by computing the gains and losses in relation to the Unrealised Profits daily, and thereafter setting aside and segregating the funds. In our view, however, the concepts of segregation and trust need to be clearly distinguished. *The mere segregation of*

*Quoine Pte Ltd v B2C2 Ltd*                                        [2020] SGCA(I) 02

> money into separate bank accounts does not equate to the
> creation of a trust and is not sufficient to establish a proprietary
> interest in those funds in anyone other than the account holder
> … Put simply, *segregation is a necessary but not a sufficient
> condition* to give rise to an express trust over the Sums in favour
> of the Customers. What is further required is to establish that
> the Company had *the requisite certainty of intention for the
> funds to be held on trust* … [original emphasis omitted;
> emphasis added in italics]

146    In any event, the manner in which BTC was *actually* stored by Quoine
in the cold storage wallet suggests that there was *in fact*, *no* segregation, which
militates against the inference that it was being held on trust. The manner in
which BTC was set aside for users of the Platform was explained by Mr Lozada
as follows at the trial:

> Q.    … even though the asset in the wallet is not specifically
> identifiable to each customer, Quoine has an internal
> book which identifies the amount of assets that are held
> to the credit of each customer; correct?
>
> A.    Yeah, **the database has each customer account has
> the balance**. It's like – **think of it as a bank**. You have
> your US dollar and how much US dollar you hold in your
> account. That is in … Quoine's database.
>
> Q.    Let's assume there were only 100 ETH in a cold storage
> wallet of Quoine, and you have 100 customers with a
> credit of 1 ETH each. Then, in a sense, you would be
> able to identify that 1 ETH belongs to each customer in
> the cold storage wallet; correct?
>
> A.    We don't normally do that. We base our accounting on
> what we have in the database. As I said before, ***what's
> in the cold storage doesn't necessarily have to
> match what the customer balance has.*** As I
> explained, if we sell a [BTC] to a customer and the
> database gets updated, we will have to go and procure
> it. ***The database will say they own 1 [BTC] or 1 ETH.
> The wallet may have a different amount.***
>
> [emphasis added]

147    Given that the amount that was reflected in the account balance of a user
of the Platform as it appeared on Quoine's database did not necessarily match

the amount in the cold storage wallet, it could not be said that Quoine was holding the amount stated in the user's account balance on trust. From Mr Lozada's explanation, it appears that the only amount which a user was concerned with was what was reflected on Quoine's database. The actual amount in the cold storage wallet did not matter because if there were insufficient assets to meet the account balance reflected in the database, Quoine would simply purchase the required amount from other sources to make up the shortfall. We find this arrangement to be more akin to deposits being made with a bank (as Mr Lozada suggested at the trial). The account balance that was stated in Quoine's database was the amount Quoine owed a user, and it was up to Quoine to take steps to ensure that it could repay that debt as and when the user called on it.

148     Further, cl 9 of the Risk Disclosure Statement seem to us to contradict the suggestion that there was an intention to create a trust. Clause 9 provided that:

> ...
>
> ... [Quoine] does not, however, take client fund safety measures such as depositing [the assets deposited by customers] in an account with a trust bank, etc. regarding these assets, so if [Quoine] goes bankrupt, [Quoine] will not be able to return customer assets, and customers may suffer losses.

Assets held on trust would generally not be subject to the trustee's insolvency creditors.

149     For these reasons, we are satisfied that no express trust arose over the BTC in B2C2's account. We therefore allow Quoine's appeal in this regard. That said, given our decision above that the Trading Contracts are valid and enforceable, B2C2 is nevertheless contractually entitled to the proceeds of the Disputed Trades from Quoine.

70

*Quoine Pte Ltd v B2C2 Ltd*                                    [2020] SGCA(I) 02

**Conclusion**

150     In the circumstances, we dismiss Quoine's appeal on the breach of contract claim, and allow its appeal on the breach of trust claim. Unless the parties are able to come to an agreement on costs, they are to furnish written submissions limited to six pages each, within three weeks of the date of this judgment, as to the appropriate costs orders.

151     Finally, we would like to record our deep gratitude to Prof Goh for his submissions, which were characteristically thorough, meticulously researched and extremely clear and greatly assisted us in coming to our decision.


Sundaresh Menon          Andrew Phang Boon Leong          Judith Prakash
Chief Justice            Judge of Appeal                  Judge of Appeal



Robert Shenton French
International Judge


71

*Quoine Pte Ltd v B2C2 Ltd*                                      [2020] SGCA(I) 02

**Jonathan Mance IJ (dissenting):**

**Introduction**

152     Do conventional legal principles work, or may they need to adapt, when traders hand their affairs to computers operating by algorithm? These questions are raised by this appeal. The computers in issue were "deterministic", meaning that they operated according to pre-determined algorithmic programs, set by humans. This is therefore a case about the legal rules applicable when machines contract in mechanistic fashion by reference to their data input, and by mistake the data input is interrupted and so the outcome becomes fundamentally distorted. The contracts here, made in the middle of the night, were for the supply of BTC by or through Quoine in exchange for the supply of ETH by B2C2 – I adopt throughout the abbreviations used by the majority ("the Majority") in their judgment ("the Majority Judgment"). In the event, the BTC were undervalued or the ETH over-valued by some 250 times, compared to any "normal" price. This occurred because Quoine's computer had, by accident, been cut off from outside world information. But it takes two to contract, and the programming of B2C2's computer to bid or offer at "deep" prices played an important role which will require further examination.

153     B2C2 maintains that, whatever went wrong, a contract so made must stand. For reasons which will appear, I consider that it is correct to approach the case on the basis that it would have been obvious to any human that a wholly untoward breakdown or error had occurred. Since the contracts were made around midnight on 19 April 2017, no human was around to make this observation, but at 6.15am next morning B2C2 did make it, by sending to Quoine the simple message: "Major Quoine database breakdown" and asking

72

Quoine to call B2C2 urgently. The question is whether the contracts were and are, nonetheless, binding.

**The facts**

154    The facts have been set out in the Majority Judgment. In brief outline:

(a)    The Platform operated by Quoine in Singapore provided (i) a facility for trading virtual currencies against each other, together with (ii) a real-time price chart of completed trades for each currency pair executed on the Platform and several other major cryptocurrency exchanges. The real-time prices so displayed were "calculated, consolidated and published" to the trading dashboard through a software program used by the Platform known as the "Quoter Program": Judgment at [14] and Mr Lozada's affidavit at [9(f)].

(b)    Quoine also acted as a market maker on the Platform, using the external price information obtained by its Quoter Program to generate buy and sell orders, thereby generating liquidity and depth, minimising volatility and ensuring a continuous two-sided market on the Platform: Judgment at [18] and [72].

(c)    Quoine extended credit to certain margin traders on the Platform, which monitored such trades and was programmed, in the event of any margin shortfall, to close them out automatically, selling at the best available price the assets in the relevant trader's account serving as collateral: Judgment at [16]–[17].

155    The Platform and the Quoter Program were therefore designed and expected to operate integrally. However, on 13 April 2017 the login passwords

for several critical systems on the Platform were changed for security reasons, and, by oversight, the corresponding necessary changes to the Quoter Program were not implemented. As a result, the Quoter Program ceased to be able to access data from external exchanges and stopped creating new ETH/BTC orders on the Platform. This did not generate an exception message, because the notification flag for such messages had itself been disabled (see the Judgment at [71]–[72]).

156     The volume of trades shown on the Platform gradually diminished, as outstanding orders were filled, with the effect that in the middle of the night of 19 April 2017 the Platform concluded that two margin traders, Pulsar and Mr Tomita, who had borrowed ETH from Quoine in order to speculate in BTC, were in a "margin sell-out position". The Platform therefore triggered calls to force-sell their BTC assets in exchange for ETH at the best available market price. Adding to the chapter of misfortunes, though not centrally relevant to the issues before this Court, the Platform, by design oversight, lacked a facility to check that there were sufficient assets available as security to cover any perceived margin shortfall, and so purportedly sold considerably more BTC than the margin traders had – 3000 BTC were sold in the case of Pulsar, which in fact only had some 13.5 BTC: Judgment at [73]–[74].

157     B2C2 is a trader on the Platform. Its software program operated primarily by examining to the first 20 price levels on both the bid and the offer side, and calculating by a series of steps appropriate order levels. But, against the possibility that the available price levels might be too few or too low in value, the program included "deep prices" on the bid and ask side to prevent the program "erroring out". As at 19 April 2017 these deep prices were 10 BTC/ETH on the ask side and 0.00001 BTC/ETH on the bid side. On the bid side (B2C2 buying ETH in return for BTC) an artificial limit would in practice

74

prevent quotes reaching the Platform, on the ground that the bid quantity was too small. On the ask side (B2C2 buying BTC), the only limit was by reference to a threshold based on a notional exchange rate, regardless of the actual sale value.

158     Bid and ask orders at deep prices were, it appears, regularly sent out into the market on the Platform by B2C2's program, but under normal conditions they were ignored, as they would be entirely out of line with available market prices. In evidence which the Judge accepted (Judgment at [113]), Mr Boonen, the proprietor of B2C2, explained that the purpose of the deep prices was "to cover the risk to B2C2 of uncertain liquidity and market conditions" (Judgment at [112]), so catering for very remote market circumstances. Mr Boonen also stated:

> Now, this check or this feature that we're talking about, that price of 10, it's not the sort of day-to-day measure, right. It is a circuit breaker. It is when something very unusual happens. It's when the unfathomable actually crystallises. I think it's important to add that clarification.

The Judge accepted that Mr Boonen was not thereby referring to the possibility of errors of which the programme might take advantage. He was "affronted at the suggestion" that he had designed the software with this in mind (Judgment at [117]). On the contrary, the Judgment recites that:

> 118     … [H]is primary concern when writing the program was to protect the integrity of the B2C2 trading system so as to minimise the risk of any unwarranted exposure.
>
> …
>
> 121     … [H]e would have appreciated that the deep prices would only be likely to be executed when there was illiquidity in the order book for that was one of the reasons underlying the addition of the deep prices in the software in the first place. His reasoning was however directed to ensuring the B2C2 system remained operational in such circumstances rather than exploiting the existence of illiquidity.

> 122    ... He might have appreciated that one contributing factor to illiquidity could be due to an oversight or error on the part of someone but there are no grounds for concluding that he considered that these would be the only circumstances that would lead to illiquidity. ...

159    What in the event happened was that, in the absence of any other market liquidity, the force-close orders put out by Quoine's Platform, following Pulsar's and Mr Tomita's perceived defaults, were matched with seven of B2C2's deep price bids for BTC at or around 10 BTC/ETH. This "was at a rate approximately 250 times the rate of about 0.04 BTC for 1 ETH which had been the previous going rate" (Judgment at [4]). Next morning, when human eyes spotted what had happened overnight, Quoine purported to reverse the trades. The present case is about whether it had valid grounds to do so.

**Issues**

160    The trial and the appeal have raised a large number of issues, on most of which I am in full agreement with the Majority. In particular, and for the reasons given at [48]–[58] of the Majority Judgment, I agree that the force-out sales which the Platform brought about were between Pulsar and Mr Tomita (the "Counterparties" on whose behalf Quoine was acting) and B2C2. I also consider, if there was any basis for their reversal, that Quoine was acting on behalf of Pulsar and Mr Tomita and was entitled to act on their behalf in taking advantage of it. A security holder is bound to have regard to the interests of a margin trader in executing against margin, and here that clearly required the reversal of the trades, if legally possible.

161    Further, for the reasons given at [60]–[67] of the Majority Judgment, I agree that the contracts brought about by the computers did not incorporate the Aberrant Value Clause, on which Quoine relied. I prefer to reserve my position in relation to the construction and ambit of that clause had it been incorporated,

addressed at [68]–[70] of the Majority Judgment, it being unnecessary to determine this. I also agree, for the reasons provided at [71]–[77] of the Majority Judgment, that it is not possible to identify any relevant implied term, unless (I would add) it were one simply mirroring the principles, as I analyse them below, governing mistake; those principles in my view reflect precisely what honourable and reasonable traders would also regard as axiomatic in the present context, whatever the other contractual terms. Finally, I agree with the Majority's reasons at [129]–[149] for concluding that there was here no common mistake of the nature there identified, and no unjust enrichment or trust.

### Unilateral mistake – *Digilandmall.com*

162     The central issue, in my opinion, addressed at [78]–[128] of the Majority Judgment, is whether the doctrine of unilateral mistake applies in these circumstances to enable the reversal of the trades. The law regarding unilateral mistake has been considered in Singapore in *Digilandmall.com*. The actual decision in *Digilandmall.com* was based on findings of actual knowledge in relation to each appellant: see *Digilandmall.com* at [88] *et seq*. The Court's discussion of the potential role of equity in the context of unilateral mistake was therefore *obiter*, though it is of great assistance in the analysis and merits close attention. The Court was clear that, outside the sphere of common law mistake, there was room for equity to operate. The contrary simple approach (that unilateral mistake only exists at common law) would not, it thought, always lead to a just result.

163     There are two particular respects in which equity may supplement the common law relating to unilateral mistake. One is to give the court jurisdiction in cases of fundamental mistake of a nature not covered by the common law.

The other is to give it jurisdiction in cases where the non-mistaken person lacks whatever is the requisite mental state for common law relief. The Court in *Digilandmall.com* alluded to both these aspects. It focused in the main on the latter aspect, and, as the Majority Judgment notes at [91], did not explore the former aspect in detail. But it came down in favour of a "flexible" doctrine of mistake in equity (further explored at [166] below), in terms which could countenance a wider and perhaps open-ended category of "fundamental" mistake. The Court in *Digilandmall.com* stated at [75] that one possible approach to equity's role would be:

> 75      ... [T]o hold that the former [*ie*, common law mistake] is limited to mistake with regard to the subject matter of the contract (like that in *Bell v Lever Bros*), while the latter [*ie*, mistake in equity] can have regard to a wider and perhaps open-ended category of "fundamental" mistake: see *William Sindall Plc v Cambridgeshire County Council* [1994] 1 WLR 1016, *per* Hoffmann LJ at 1042.

It went on at [76] to note that another possibility would be:

> 76      ... [T]o take a clear simplistic approach, namely, where there is actual knowledge, the contract would be void at common law. But where there is no actual knowledge, the contract ought to be performed. There would then be no room for equity to operate. But we believe that simplicity may not always lead to a just result, especially where innocent third parties are involved.

164     The Court concluded therefore that there is a role for equity. However, it did not endorse the precise distinction suggested at [75] of that case. That is because it saw common law mistake as extending beyond mistake with regard to the "subject matter" of the contract. Denning LJ had, in its view, erred in *Solle v Butcher* [1950] 1 KB 671 at 692 in suggesting (in relation to both common and unilateral mistake) that, following *Bell v Lever Bros* [1932] AC 161, "only mistake relating to identity or subject matter would come within the common law doctrine of common mistake", whereas any other "common

78

mistake, even on a most fundamental matter", such as a mistake "about the terms of an offer, or the identity of the person by whom it was made", would not render a contract void at law. So thought the Court in *Digilandmall.com* at [58], and I respectfully agree.

165     The limitation suggested by Denning MR would restrict common law mistake radically (although he would have counter-balanced this with a correspondingly wider role for equity). However, the English authorities, considered in the Majority Judgment at [83]–[90], indicate that, contrary to what Denning LJ thought in *Solle v Butcher*, mistake under English common law extends to all situations involving a sufficiently fundamental mistake as to the subject matter or a term, though no further. That being the scope of common law mistake under the English law, it is, as the Majority indicates at [90], unresolved to what, if any, extent there is, under English law, a further equitable jurisdiction to relieve against other situations of fundamental mistake. In contrast with English common law, the High Court of Australia has, I note, endorsed the limited role given to common law mistake by Denning LJ, but again counterbalanced this with a recognition of equitable relief in other cases: *Taylor v Johnson* at [9]–[11]. I note in this connection that the High Court spoke of the nature of mistake "in relation to a fundamental term" as capable of leading to the grant of equitable relief where one party was aware that the other was "entering [into] the contract under some serious mistake or misapprehension about either the content or subject matter of that term" (*Taylor v Johnson* at [14]). Further, it granted such equitable relief on the facts when all that could be said was that the non-mistaken party (Mr Taylor) "believed that [Mrs Johnson] was under some serious mistake or misapprehension about either the terms (the price) or the subject matter (its value) of the relevant transaction" (at [15]).

166    The Court in *Digilandmall.com* went on to consider and disagree with Canadian authority which also suggested a composite analysis, whereby mistake in equity would subsume the common law. It went on at [55] to hold that there was a role for both common law and equitable mistake, along lines indicated in *Associated Japanese Bank (International) Ltd v Crédit du Nord SA* [1989] 1 WLR 255, where Steyn J (as he then was) said this:

> No one could fairly suggest that in this difficult area of the law there is only one correct approach or solution. But a narrow doctrine of common law mistake (as enunciated *in Bell v Lever Brothers* [1932] AC 161), supplemented by the more flexible doctrine of mistake in equity (as developed in *Solle v Butcher* [1950] 1 KB 671 and later cases) seems to me to be an entirely sensible and satisfactory state of the law …

Subject to the qualification, which the Court in *Digilandmall.com* had already made at [58], that common law mistake should not be understood as narrowly as Denning LJ had suggested in *Solle v Butcher*, Singapore law therefore recognises both the common law and equity as having relevant roles in cases of unilateral mistake. The recognition of a clear role of equity comes with the advantage that Steyn J pointed out, which the Court in *Digilandmall.com* echoed at [77], namely that "[a] great attribute … of equity[] is its flexibility to achieve the ends of justice".

167    The Court specifically identified in this connection the ability of equity to address situations of constructive notice. By this, it made clear that it was referring to situations falling short of actual knowledge: see *eg*, *Digilandmall.com* at [76], [77], [83] and [88]. Of such situations, the Court said:

> 77    … Constructive notice is a concept of equity and whether constructive notice should lead the court to intervene must necessarily depend on the presence of other factors which could invoke the conscience of the court, such as "sharp practice" or "unconscionable conduct. Negligence *per se*, on the other hand, should not be sufficient to invoke equity. Parties to a contract do not owe a duty of care to each other.

80

One important consideration that may, of course, arise is that the exercise of any equitable jurisdiction can and will always take care to protect legitimate third party interests. Here, however, it was not suggested that any such interests which arose in the very short period before the mistake came to light precluded the avoidance by Quoine of the transactions. (Paragraph 256 of the Judge's first instance judgment mentions – but only as a reason for not ordering specific performance against Quoine – that, "[b]efore the trades were reversed", B2C2's software generated sales of slightly under one-third of the BTC "on nine different exchanges". Since any such sales were not relied on as a bar to avoidance, no consideration was, it seems, given to their terms or prices, though these may of course become material to damages.)

168    The Court in *Digilandmall.com* developed its reference to unconscionability in the following *dicta*:

> 78    However, "unconscionability" cannot be imputed based on what a reasonable person would have known. It must be based on matters the non-mistaken party knows: see *Can-Dive Services v Pacific Coast Energy Corp* (2000) 74 BCLR (3d) 30 ("*Can-Dive*") per Southin JA at [142]. One cannot act unconscionably if one does not know of facts which could render an act so. Thus, we do not think we can accept the views of Shaw J, the lower court judge in *Can-Dive,* that constructive knowledge alone would suffice to invoke equity's conscience. However, as we have indicated earlier, Canadian jurisprudence has moved in that direction.

169    The judgment in *Digilandmall.com*, therefore, indicates that unilateral mistake in equity can exist where there is a combination of factors: (i) constructive notice of a mistake which would, if actual knowledge existed, render the contract void; (ii)(a) behaviour by the non-mistaken party which is unconscionable (b) based on knowledge by the non-mistaken party of the facts involved in the unconscionability. It is also consistent with the further proposition, which I would endorse, that the flexible equitable doctrine is

81

capable of covering situations of unilateral mistake, where the mistake, although not strictly as to subject matter or a term, is sufficiently "fundamental" to justify equitable intervention – subject again, if the analysis in *Digilandmall.com* is followed through, to the presence of factors (ii)(a) and (b).

170     The analysis in *Digilandmall.com* does, however, give rise to two points, which I mention although their resolution is not in my opinion necessary for the determination of this appeal. First, if unconscionable behaviour based on knowledge by the non-mistaken party is understood as behaviour conducing to the mistaken party remaining mistaken, then it is difficult to see how there could ever be constructive notice. As the Court in *Digilandmall.com* recognised at [76], [77], [83] and [88], constructive notice comes into consideration where there is no actual knowledge of the mistake. Second, the primary basis for equitable relief on the ground of unilateral mistake is the mistake of which the non-mistaken party has constructive notice. Where unconscionability operates, it is as an additional element (see *Digilandmall.com* at [77], [80] and [83]) – in effect a control mechanism. Authorities such as, most recently, *BOM* deal with the situation, materially different therefore from the present, where unconscionability is all that is relied on to justify the setting aside in equity of an otherwise valid transaction. The limited view of unconscionability taken in *BOM* (linking it closely with what was called "class 1 undue influence") must be seen in that context. Where the primary basis for relief is a mistake of which the non-mistaken party has constructive notice, no reason appears why unconscionability should not operate on a flexible basis to meet the equity of the particular case.

171     Consistently with the first point, unconscionable behaviour conducing to the mistaken party remaining mistaken is a typical – though not essential – hallmark of unilateral mistake at common law based on *actual* knowledge of a

mistake as to a term which the non-mistaken party "snaps up". Thus, in common law cases such as *Tamplin v James* (1880) 15 Ch D 215, quoted in *Hartog v Colin & Shields* [1939] 3 All ER 566, courts spoke in terms of a party "snapping up the offer", which, as also in *Digilandmall.com*, the non-mistaken party actually realised to be mistaken. (The position is different in Australia, where, for reasons explained at [164] above, the role of equity is much greater and embraces situations of "snapping up" with actual knowledge, like that in *Taylor v Johnson* itself, which would under English and Singapore law fall within common law mistake.) But "snapping up" or unconscionable behaviour conducing to the mistake is not an essential feature of unilateral mistake at common law, because this can occur where there is simply knowing and silent "standing by".

172     There can be marginal situations where a non-mistaken party suspects a mistake by the other party and "proceeds on a course of wilful ignorance designed to inhibit his own actual knowledge of the other's mistake" (in the words of McLachlin CJBC, as she then was, in *First City Capital Ltd v British Colombia Building Corp* (1989) 43 BLR 29 ("*First City Capital*") at [30]). But, just as shutting a blind eye may be equated with actual knowledge or recklessness with intention, such situations are best equated with actual knowledge, rather than treated as cases of constructive notice. That is in my opinion correctly stated by the Court in *Digilandmall.com* at [42], where it referred to 'what is called "Nelsonian knowledge"', namely wilful blindness or shutting one's eyes to the obvious", and went on to state:

> … Clearly, if the court finds that the non-mistaken party is guilty of wilful knowledge, it will be in line with logic and reason to find that that party had actual knowledge.

However such situations may be analysed, it is clear that the Court in *Digilandmall.com* understood the concept of constructive notice to extend to a different, broader range of situations.

173    It follows that if constructive notice is to have the relevant role in relation to unilateral mistake in Singapore law, which the Court in *Digilandmall.com* in my view correctly assigned to it, unconscionability cannot relate to behaviour with knowledge of the mistake conducing to the mistaken party remaining mistaken. Equity's conscience must be capable of being affected by behaviour in seeking to retain the benefit of the mistake, once it is discovered. Taking words which were used by the Court in *Digilandmall.com* itself at [80], the court is then:

> ... [E]ntitled to intervene and grant relief when it is unconscionable for the non-mistaken party to insist that the contract be performed. ...

174    Two passages from prior Canadian authority cited by the Court in *Digilandmall.com* at [49] and [51] need to be read with caution and in context, in so far as they may at first reading appear to link unconscionability and "snapping up" to equitable relief in circumstances of constructive notice. The two passages come from the first instance decision in *First City Capital Ltd* at [34] and the British Colombia Court of Appeal decision in *256593 BC Ltd v 456795 BC Ltd* (1999) 171 DLR (4th) 470 ("*256593 BC Ltd*") at [25]. In the first passage, McLachlin CJBC said that, on a hypothesis of no actual knowledge:

> ... [T]his is most certainly a case where [the defendant] ought to have known that [the owner] had no right to sell the building to it. Nevertheless, [the defendant], in its negotiations with [the owner], pursued a course designed to inhibit discovery of the mistake, moving with uncharacteristic haste to snap at [the owner's] mistaken offer.

84

On its facts, *First City Capital* falls fairly clearly into the category of Nelsonian knowledge: see in particular at [18]–[20] of *First City Capital*, where McLachlin CJBC concluded that BCBC "at very least suspected" a mistake and checked with a superior the authority of the junior with whom it was dealing "without, significantly, asking … about the substance of the transaction, a course which might have disclosed the error".

175    The second passage is attributed in *Digilandmall.com* to Donald JA, giving the judgment of the Court of Appeal in *256593 BC Ltd*. But it was actually a quotation by Donald JA, from (once again) the judgment of McLachlin CJBC in *First City Capital*, about which Donald JA went on to make this reservation:

> [26] Counsel for Ace submits there is no evidence of snapping up the offer in the present case. Assuming that to be so, I do not think that conduct so characterized is necessary for rescission on mistake. I respectfully agree with the reasoning of Shaw J. in *Can-Dive* … where he said at 69-70 that:
>
>> While I agree with what Madam Justice McLachlin said so far as it goes, I do not believe she intended to imply that there must be a conscious taking advantage by one party of the other in all cases. The element of constructive knowledge based upon what a reasonable person "ought to know" is premised upon that person not being conscious of the error. Thus, while the idea of "snapping up" may well apply in cases where one side is aware of the other side's error, I do not think it can be applied literally in the constructive knowledge cases. Rather, in my opinion, constructive knowledge alone will suffice to invoke equity's conscience. [Emphasis added].
>
> [27] Baker J. in *Craig Estate v. Higgins* (1993), 86 B.C.L.R. (2d) 64, put in summary form at 72 a statement of the law with which I respectfully agree:
>
>> The court may grant relief from a contract entered into on the basis of unilateral mistake where the plaintiff has established, and has met the high burden imposed upon it of doing so, that a mistake has been made and that it would be unjust or inequitable for the court to allow the other party to uphold the bargain. One of the grounds

85

> on which a court may find that it would be unfair or inequitable is if the party seeking to enforce it had actual knowledge or constructive knowledge that a mistake had been made prior to acceptance of the offer.
>
> [28] All the elements for rescission on unilateral mistake are present here: (1) a mistake; (3) on a material term; (3) known actually or constructively by the non-mistaken party; and (4) an unconscionable result if the settlement agreement is enforced. It is my opinion that the mistake gives Ace a huge windfall that it had never bargained for and leaves Earl's with an outstanding debt while simultaneously transferring Earl's' interest in the very asset underlying that debt.

176    Other passages in McLachlin CJBC's judgment in *First City Capital* in my opinion actually support the analysis adopted in British Colombia by the Court of Appeal as well as by Shaw J and Baker J. Thus, referring to *McMaster University v Wilchar Construction Ltd* [1971] 3 OR 801, 22 DLR (3d) 9 (HC) at p 18, McLachlin CJBC said:

> [26] In *McMaster*, the Court held that the offeror was to be relieved from a contract involving a mistake known to the offeree because "it would be unconscionable, unfair and unjust *to permit the plaintiff to maintain the contract*" (p. 22). This test was applied by Gould, J. of this Court in *Beverly Motel (1972) Ltd. v. Klyne Properties Ltd.* (1981), 30 B.C.L.R. 282 … :
>
> > Provided there is mistake as to the promise or as to some material term of the contract, if the court finds that there has been honest, even though inadvertent, mistake, it will afford relief *in any case where it considers that it would be unfair, unjust or unconscionable not to correct it* …
>
> [27] … Fraud in this wider sense refers to transactions falling short of deceit *but where the Court is of the opinion that it is unconscientious for a person to avail himself of the advantage obtained* …"
>
> [emphasis added]

177    At [78] of *Digilandmall.com*, quoted at [167] above, the Court cited Southin JA who said at [142] of *Can-Dive Services v Pacific Coast Energy Corp* (2000) 74 BCLR (3d) 30 that "questions of unconscionability are not matters to

be determined on what someone ought to have known, but what he did know". The context was a claim to rectify a sub-contract to give a right to claim extra remuneration for working in difficult soil conditions, in circumstances where it was thought (as it turned out mistakenly) that such a right anyway followed from the back-to-back terms of the head contract. The claim failed on the basis that '[t]he critical "fact" - the true meaning of the head contract - was unknown to both parties to the sub-contract until the learned trial judge handed down his judgment": *Can-Dive* at [143]. Both parties had "agreed to be bound by the head contract, whatever it meant", and the claim amounted to an attempt to rectify the bargain, rather than the sub-contract (*Can-Dive* at [141] and [144]). But what is of current interest is that Southin JA, with whose judgment Ryan JA agreed, gave at [141], as an example of a situation where equitable relief against mistake could be given, a scenario where a mistake occurred in the course of "mechanical" transcription and was only subsequently discovered. She said:

> In the case at bar, if, when the subcontract had been typed up, the typist had omitted to put in the weather clause upon which the parties had struck a bargain, it would, in my opinion, be equitable fraud for the head contractor to say, in effect: "Well, too bad, see the words of the contract." But that is not what happened here. ...

178    The Court at [78] of *Digilandmall.com* also expressed some disagreement with the views of Shaw J at first instance in *Can-Dive*, while going on to recognise that Canadian jurisprudence "has moved in that direction" - quite possibly a reference to the British Colombia Court of Appeal's reasoning in *256593 BC Ltd*. But the problem is not just one of preference, it goes to the heart of any significant doctrine of constructive notice as a basis for equitable relief. It is not however critical, as I see it, to resolve the problem in this case, which is concerned with a different issue: how, if at all, a doctrine based on a need for either actual or constructive notice can operate in circumstances where neither party was or could have been aware of the mistake as and when it

occurred. As will appear, I consider that this conundrum can be resolved in this case by considering what B2C2's actual state of mind would have been, given knowledge of the circumstances of the transactions as and when they occurred. To that extent, the case parallels situations of actual knowledge, rather than constructive notice.

### Conceptual basis of unilateral mistake

179    Before considering further how the law of unilateral mistake may apply in the present case, I should say something about its conceptual basis. The Court at [31] of *Digilandmall.com*, in a phrase quoted in the Majority Judgment at [81], suggested that it is "self-evident" that "a party who is aware of the error made by the other party cannot claim that there is *consensus ad idem*". There is a long-standing academic debate about the foundational principle underpinning the law of contract at common law. Is contract based on objective evaluation of the parties' communications against the background of all the circumstances which were or are to be taken to have been within their knowledge? Or is it based on subjective consensus, modified in almost every case by the consideration that each party will be effectively precluded from relying on any interpretation different from that which they objectively agreed between them (an approach similar to that which I understand the French Civil Code to adopt: see *eg*, *Dallah Real Estate and Tourism Holding Company v The Ministry of Religious Affairs, Government of Pakistan* [2011] 1 AC 763, at [19])? If the former, then unilateral mistake operates as a limited exception to the objective approach, which is how it is explained in *Chitty* at para 3-022; see also *Treitel on The Law of Contract* (Sweet & Maxwell, 14th ed, 2015) at paras 1-002, 2-002 and 8-047; and John Cartwright, *Misrepresentation, Mistake and Non-Disclosure* (Sweet & Maxwell, 3rd ed, 2012) at para 13-02. If the latter, then

88

unilateral mistake is one, limited situation where estoppel cannot and does not operate, because there is no reliance.

180    In *Taylor v Johnson*, the High Court of Australia concluded at [9] that "[w]hile the sounds of conflict have not been completely stilled, the clear trend in decided cases and academic writings has been to leave the objective theory in command of the field". I agree with this, and it corresponds with the terms in which other common law courts have described the principles governing contract: see *eg*, *Reardon Smith Line Ltd v Yngvar Hansen-Tangen* [1976] 1 WLR 989 at 997; *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896 at 912; *Charter Reinsurance Co Ltd v Fagan* [1997] AC 313 at 384; and *Wood v Capita Insurance Services Ltd* [2017] AC 1173 at [10] ("The court's task is to ascertain the objective meaning of the language which the parties have chosen to express their agreement"). On that basis, unilateral mistake is an exception, recognised by the law to further the ends of justice, of a similar character to the principles underlying the law of misrepresentation, undue influence or mistake. The Court in *Digilandmall.com* effectively recognised this at [31] when it said:

> … The law should not go to the aid of a party who knows that the objective appearance does not correspond with reality. It would go against the grain of justice if the law were to deem the mistaken party bound by such a contract.

This analysis also has the further consequential advantage of explaining why and how the law can establish, as the Court recognised that it should in *Digilandmall.com*, different rules for common law mistake in circumstances where a fundamental mistake as to a term is involved (the contract is void), and for equitable mistake (the contract is potentially voidable). The logic of the theory of subjective consensus is that there is no contract at all in any case of

unilateral mistake, whether common law or equitable. The High Court of Australia pointed this out in *Taylor v Johnson* at [8].

181     The value of a differentiated analysis of unilateral mistake, operating both at common law and in equity, is that it enables the court to address in a circumstance-specific way situations where, for one reason or another, parties objectively reach agreement on a contract which, as one party knows or ought to know, differs in some fundamental respect from what the other party thinks it is or means. The mistake may, I add, come to the former party's knowledge quite independently of and outside the contractual discussions. Take for example, a contract made for oats or even for new oats, where the seller, unknown to the buyer, is told by a third party with no authority to act for the buyer (or discovers by reading without permission a piece of paper on the buyer's desk while the buyer is out of the room), that the buyer believes it to be a term of the contract that the oats will be old. The offer and acceptance and the contract made all objectively permit or call for the delivery of new oats, but the seller's knowledge of the buyer's actual misapprehension prevents the seller from insisting on performance. The underlying rationale is not a lack of correspondence between offer and acceptance, but a principle of justice.

**The application or adaption of the above principles**

182     I turn to the application, or adaption, of the above principles in the present circumstances. For the reasons given by the Majority at [114], I agree that the present case cannot readily be analysed as involving an actual mistake as to a term of the transactions as executed. That is because of the very fact that the transactions were effected by computers operating mechanistically according to algorithms, leading inexorably, although blindly, to such transactions. The case does not therefore fit within the principles governing

90

unilateral mistake at common law, and it would not be right to extend these to cover such a situation, since the operation of the algorithms might also have led (though it did not do so here) to relevant third party interests arising before any human discovery of the mistake. What can however be stated with confidence is that the mistake and its outcome in the form of the transactions was in human terms just as fundamental as the sort of mistake at issue in *Digilandmall.com*. The reaction of any human trader viewing the transactions as executed would have been that they were fundamentally misconceived – the result of some fundamental mistake leading to terms for the sale of BTC to which no seller of BTC would, in prevailing market conditions, agree.

183    In these circumstances, the enquiry therefore moves to the more flexible area of unilateral mistake in equity. For that purpose, the Judge's findings, in particular at [227] were and are, to my mind, clear. There was a fundamental mistake, in that Quoine's system operated (and led to the sale of BTC on terms) in a way that was not conceived as possible and would never have been accepted by Quoine or the counterparties in the prevailing circumstances. Further, although B2C2 had no knowledge of the mistake as and when it occurred, the position is that, as soon as it inspected the computer print-outs next morning, it knew at once that there had been such a mistake, and emailed its message to Quoine: "Major Quoine database breakdown", to which I referred at the outset of this judgment and to which I shall return at [203]. The question is whether, where two parties well know that there has been a fundamental mistake as soon as a computerised transaction comes to their attention, where no detriment has occurred and no relevant third party interests intervened, and where the mistake could readily be rectified, the law will enforce the contract regardless. For the reasons I will give, in my opinion, the law should and can in such circumstances hold that the contract is voidable, as Quoine claims.

184    Certainty in contract is of course important, but it is not everything: see *eg*, *Golden Strait Corporation v Nippon Yusen Kubishiki Kaisha* (*The "Golden Victory"*) [2007] 2 AC 353; *Bunge SA v Nidera BV* [2015] 3 All ER 1082. Like all great judges, Lord Mansfield could see the force of both considerations. In *Vallejo v Wheeler* (1774) 1 Cowp 143 at 153 he said that:

> In all mercantile transactions the great object should be certainty: and therefore, it is of more consequence that a rule should be certain, than whether the rule is established one way or the other. Because speculators in trade then know which ground to go upon.

But in another famous decision, *Alderson v Temple* (1768) 4 Burr 2235 at 2239, he showed a different concern:

> … [T]he most desirable object in all judicial determinations, especially in mercantile ones, (which ought to be determined upon natural justice, and not upon the niceties of the law,) is, to do substantial justice. …

There are cases where justice outweighs in the balance the interests of legal certainty. The Court in *Digilandmall.com* recognised this in the present context, endorsing at [81] a statement of Assoc Prof Yeo Tiong Min that '[t]he fear that the use of "elastic" equitable principles will lead to uncertainty and encourage litigation is arguably exaggerated' and adding it 'is not more difficult to determine what is "equitable" than what is "reasonable" at common law'.

185    The critical problem which Quoine faces in this case is that, in conventional cases of unilateral mistake, the relevant knowledge or constructive knowledge either exists or not, as a matter of fact, as and when the contract is made. The focus of the enquiry is then on the actual state of mind and conduct of human beings involved in the making of the contract. That approach is by definition impossible in the different context of a contract made between

92

computers programmed by humans. But the right approach is less obvious. The Judge dealt with the issue as follows:

> 200    Quoine submits that the Court should consider what the parties are likely to have known and intended if, hypothetically, they had met on the "floor of the exchange" for the purpose of reaching an agreement on the trades on 19 April 2017. On this basis, as I understand it, it is contended that mistakes can be identified by comparing theoretically what would have happened in face-to-face negotiations with what actually happened at the computer interface.
>
> ...
>
> 202    B2C2 contends that there must be a mistake as to a term of the contract and that the party placing the order, albeit by a computer, must be the person mistaken. It was not sufficient if there was a mistake as to facts surrounding that term. In this respect therefore B2C2's position was that the assessment of a relevant mistake was no different in the case of computer transactions than in face-to-face transactions.
>
> 203    Further, relying on *Chwee* [*ie, Digilandmall.com*], B2C2 contends that the only relevant knowledge is knowledge at the time of contracting and suggests that it is wrong to assess knowledge or constructive knowledge at the time the deep price mechanism was programmed.
>
> 204    So far as concerns the nature of the mistake, I cannot accept Quoine's hypothetical meeting contention. The question is not what would have happened if the computer element was absent. The parties have chosen to use computers as the means of entering the Trading contracts. They have entered Platform contracts with Quoine so as to be able to enter Trading contracts and, in the case of margin traders, they have entered the Margin trading contracts to regulate their position vis-à-vis the lender, in this case Quoine. All parties were therefore aware that there was to be no human element in the trades and it is wholly artificial to work on the basis of what might have happened if a human element was involved. Equally whilst B2C2's position identifies what the nature of the mistake must be, it does not assist in determining how and when to identify it.
>
> 205    In the circumstances of this case, I have concluded that the relevant mistake must be a mistake by the person on whose behalf the computer placed the order in question as to the terms on which the computer was programmed to form a Trading contract in relation to that order. This mistake will have to be in existence at the date of the contract in question but may have

93

been formed at an earlier date. The existence of a relevant mistake will be a question of fact in each case.

206    Turning to knowledge of the mistake, the law in relation to the way in which ascertainment of knowledge in cases where computers have replaced human actions is to be determined will, no doubt, develop as legal disputes arise as a result of such actions. This will particularly be the case where the computer in question is creating artificial intelligence and could therefore be said to have a mind of its own.

...

210    Where it is relevant to determine what the intention or knowledge was underlying the mode of operation of a particular machine, it is logical to have regard to the knowledge or intention of the operator or controller of the machine. In the case of the kitchen blender, this will be the person who put the ingredients in and caused it to work. His or her knowledge or intention will be contemporaneous with the operation of the machine. But in the case of robots or trading software in computers this will not be the case. The knowledge or intention cannot be that of the person who turns it on, it must be that of the person who was responsible for causing it to work in the way it did, in other words, the programmer. Necessarily this will have been done at a date earlier than the date on which the computer or robot carried out the acts in question. To this extent I reject B2C2's contention that that the only relevant knowledge is knowledge at the time of contracting. I agree with Quoine that regard should be had to the knowledge and intention of the programmer of the program in issue when that program (or the relevant part of it) was written.

211    Accordingly, in my judgment, in circumstances where it is necessary to assess the state of mind of a person in a case where acts of deterministic computer programs are in issue, regard should be had to the state of mind of the programmer of the software of that program at the time the relevant part of the program was written. In the present case that person is Mr Boonen.

186    The Judge then gave effect to this approach, by examining first the state of mind of Pulsar and Mr Tomita operating as margin traders on the market and then that of Mr Boonen when he programmed the B2C2 computer and set it into operation to trade on the market. As to the former, the Judge focused on the state of mind of the margin traders, and, on the basis of the evidence given by

Mr Tseung of Pulsar, accepted that both Pulsar and Mr Tomata held a mistaken belief which was fundamental to the trades. The Judge explained this conclusion as follows:

> 227    Mr Tseung, however, gives evidence that because the trades were carried out at the highly abnormal price, they were clearly invalid and that Pulsar did not consider them to be valid. He went on to state "[i]t was never contemplated by Pulsar that any trades may be transacted on the Platform at prices which deviated so substantially from the actual market prices". Although he gave no reasons for holding this belief, he was not cross-examined on this statement and I therefore accept that this was a genuinely held belief. Indeed, having heard all the evidence, I can well understand that a trader on the Platform who was not a market maker might well have formed such a belief even having read the Agreement and the Risk Disclosure Statement. It is a belief which is founded on the premise that the Platform would either always operate as intended or, alternatively, if for some reason it did not, there would be adequate error identification and protection systems in place to prevent trading continuing in such circumstances.
>
> 228    I therefore accept that the Counterparties held this mistaken belief and that it is a belief which is fundamental to the Trading contracts.

187    The evidence was, in substance, that Pulsar never contemplated that trading could occur at such deviant prices other than as a result of some egregious error. The Judge said he could well understand that a trader on the Platform who was not a market maker might well have formed such a belief. The reservation "who was not a market maker" deserves a word. 98% of the relevant market making on the Platform was done by Quoine, as the Majority Judgment recites at [10], and there is every reason to think that it would and did view the relevant trades in exactly the same way as Mr Tseung of Pulsar, and sought to set them aside on that basis. The Judge's reservation presumably arises because B2C2 did some market making, and at the same time also issued its "deep" bids and offers which it contemplated might be accepted for some reason other than a mistake (though the suggested unfathomable market event had

never in fact arisen). The reservation therefore takes one back to the core of the issue – whether B2C2's accepted intention to cater for wholly unfathomable events (which in fact never occurred) is the answer to the claim of unilateral mistake.

188     A collateral observation which it is convenient to interpose at this point is that it is, to my mind, odd that attention at trial should have been so focused on the margin traders, and not on Quoine. It was Quoine whose computer was programmed to instruct the trades. Moreover, most of the BTC sold did not exist as assets of Pulsar, and there must at least be a question whether Quoine could have had ostensible authority to bind Pulsar by a sale of non-existent assets which Quoine can have had no actual authority to sell on Pulsar's behalf. These points were not explored before us, and I need say no more about them, save to repeat that, if attention had been focused on Quoine's state of mind, rather than that of the margin traders, I feel confident that the Judge would have made the same finding with regard to Quoine that he made with regard to the margin traders.

189     Having found a fundamental mistake on the side of the suppliers of BTC, the Judge turned to consider the other side of the issue, whether the mistake was sufficiently known to B2C2 as the supplier in exchange of ETH. As to this, he said:

> 229     It is next necessary to determine whether Mr Boonen had actual knowledge of the mistaken belief at the time he inserted the deep prices and I thus return to the findings of fact in [118]–[125] above. Can it be said that Mr Boonen knew that "it was never contemplated by [any trader] that any trades would be transacted on the Platform at prices which deviated so substantially from the actual market prices"? This amounts to a belief held by Mr Boonen at that date that the price was so abnormal that no trader would trade at that price otherwise by way of a mistake.

> 230    This is the aspect of this case that I have found to be most troubling but I have concluded on the basis of those findings of fact that Mr Boonen did not insert the deep prices with that belief. He foresaw that a number of factors might arise which would cause the deep prices to be inserted and the overriding reasons for them being inserted was to protect B2C2 in the event of the unexpected happening. He did not exclude the possibility of trades at those prices being executed. Whilst he was aware that one possible cause was that it could be the result, wholly or in part, of some error or omission on the part of someone, including himself, he did not turn his mind in any detail to the circumstances that might lead to such trades being executed. He knew that the Platform was an automated system and that therefore no opportunity would arise for any particular trade to be reviewed by the parties in advance. In the circumstances of this case, in order for him to have actual knowledge that other traders believed that in no circumstances would a trade be transacted on the Platform at prices which deviated so substantially from the actual market prices, I consider that it would be necessary for it to be demonstrated that he held that belief himself, which he did not: see [123] above.

> 231    Accordingly, whilst I accept that the Counterparties held the second mistaken belief relied upon by Quoine, I do not accept that Mr Boonen had actual knowledge of that belief. The defence of unilateral mistake at common law therefore fails."

190    The paragraph numbered [123], to which the Judge referred at the end of [230] read as follows:

> 123    I therefore accept that when Mr Boonen configured the code he knew of the possibility that the order book might become empty and that in that event the deep prices would be placed on the order book but I do not accept that he ever considered that there was a real possibility of the deep price orders being executed. He considered that this was unlikely and I do not believe that he turned his mind in any detail to the circumstances in which this might happen. That was not the motivation for designing the software as he did. He did not consider that the deep prices were irrational. Indeed he gave cogent reasons for the selection of the prices which were directed to protecting the integrity of his system but at a level which he felt would not be so high as to cause a circuit break on the Platform: see [86] above. This last factor is inconsistent with any assertion that Mr Boonen understood that trades would only be matched by the Platform at prices at or near the previously existing prevailing market price: see [230] below.

The Judge went on at [124]:

> 124    The evidence does not support the conclusion that when designing the code Mr Boonen perceived that no trader would ever agree to buy ETH at such a price unless he had made a mistake and included the deep prices with this in mind. …

191    In relation to Mr Boonen the Judge therefore thought that the relevant enquiry was whether he knew or believed when he programmed B2C2's computer, prior to and in June 2016, that *no trade would ever take place at the deep prices* which he had programmed his computer to output to the Platform at apparently random times *other than as a result of some fundamental error*. Since the Judge had held that Mr Boonen had a rational motive for inserting the deep prices (which Mr Boonen had explained as being to cover very unusual or unfathomable market conditions: see the Judgment at [113], quoted at [158] above), he could not be said to know or believe when programming his computer or at any time in advance of the actual transactions that, if a transaction took place at the deep prices, it *must involve a mistake and nothing else*.

192    On such an approach, before any relief could be granted, it would have to be shown (a) that Mr Boonen knew by prophetic foresight that the particular transactions would occur at the deep prices over the night of 13 April 2017 due to some fundamental error (which is obviously impossible) or (b) that each and every transaction which might ever occur at the deep prices he offered would be the result of some mistake, *ie*, that any transaction at his deep prices could *only* arise from some fundamental mistake. The latter approach, which the Judge adopted, therefore looks at the position in the abstract and in advance, without any regard for the actual transactions or the market circumstances surrounding them. This is a different approach to that which applies when considering mistake in the context of a transaction completed by human intervention, when

the first question is the actual state of mind of each party in the light of the surrounding circumstances. If one of them by mistake refers to a price per "pound", rather than per "piece", the other, if aware of the state of the market, will know in that light when a wholly mistaken word has been used. The Judge's approach involves omitting a usually important element in any appraisal of such a situation, namely (here) whether there was anything drastically unusual about the surrounding circumstances or the state of the market to explain on a rational basis why such abnormal prices could occur, or whether the only possible conclusion was that some fundamental error had taken place, giving rise to transactions which the other party could never rationally have contemplated or intended.

193     The key question is, therefore, whether the law of unilateral mistake falls to be applied in a manner which leaves out of consideration circumstances which are normally central to its application, simply because the parties entrusted their dealings to computers which can have no such consciousness. In my opinion, it does not and should not. The law must be adapted to the new world of algorithmic programmes and artificial intelligence, in a way which gives rise to the results that reason and justice would lead one to expect. The introduction of computers no doubt carries risks, but I do not consider that these include the risk of being bound by an algorithmic contract, which anyone learning of would at once see could only be the result of some fundamental error in the normal operation of the computers involved. Computers are outworkers, not overlords to whose operations parties can be taken to have submitted unconditionally in circumstances as out of ordinary as the present. I do not think that the obvious malfunctioning of a computer-based system should be given the dominance that B2C2's case implies.

99

194    In my opinion, it is necessary to revisit the Judge's refusal to take as the relevant test what Mr Boonen or anyone in his position could or would have known or believed, if he or they had known of the circumstances which have actually occurred. That is a test which relates what actually occurred to natural human reactions, given knowledge of what occurred. It matters not whether one assumes such knowledge at the time of the transactions, or prophetically in advance. The answer is the same. If it would at once have been perceived that some fundamental error had occurred, relief should be available. There is no difficulty here about identifying the circumstances to which, given such knowledge, the objective test would and should be applied.

195    For the reasons indicated at [182] and [183] above, any relief should be equitable, rather than at common law. The fact that computers were involved makes this appropriate. B2C2's computer might have on-sold the BTC by algorithm at a normal price to a *bona fide* purchaser for value. Equity could then refuse to set aside the transaction whereby B2C2 acquired the BTC. The fact that Quoine was at fault should not however point decisively away from relief. There was here certainly a series of avoidable errors, which some might suggest should preclude relief. But the question is whether the errors were so egregious as to justify imposing (on whichever of Pulsar and Mr Tomita or Quoine might end up holding the parcel) a loss of perhaps millions of dollars, and benefitting B2C2 to the tune of perhaps millions of dollars by way of what some would call an uncovenanted windfall. In circumstances where B2C2 would and did know at once that some fundamental error had occurred, which error could be rectified without any detriment being suggested to B2C2 or any third party, I have no doubt about the answer. Unilateral mistake commonly involves fault, even if the fault only consists in failure by the mistaken party to appreciate what impression they have, objectively, given to the other party. Where the error is known, the

100

fact that it is or may be attributable to fault cannot axiomatically outweigh the considerations of fair dealing that lead to relief both at common law or, *a fortiori* as here, in equity. The High Court of Australia cited in this connection, with apparent approval, at [13] of *Taylor v Johnson*, the position in the United States that "it matters not that the mistake is, or may be, due to negligence or want of care on the part of the party who is mistaken when the other party has not materially changed his position and third party rights are not in question (*De Paola v. City of New York* (1977) 394 NYS (2d) 525, at pp 527–528)". But it is unnecessary to go that far. There is on any view a balance. In the present case, where any reasonable trader would at once have identified, as B2C2 did identify, a fundamental computer system breakdown as the cause of the transactions, the considerations weighing in favour of reversal of the transactions outweigh in the balance any errors or faults which led to that breakdown.

196    It should also be remembered that fundamental errors of the present nature can and do occur in computerised exchanges without any fault. Suppose in the present case that a mouse had eaten, or a third party using a mechanical digger had cut, a cable linking the Platform to the Quoter Program. Or suppose someone had hacked into Quoine's computer and disconnected the link. The same question, whether relief could be granted, would arise, without there being necessarily any background of fault. The law must be capable of addressing such a situation in a manner which corresponds with what I would regard as the clear justice of the case, as well as with the natural expectations of reasonable traders.

197    It was suggested that all such problems, including the present, could have been dealt with by appropriately framed conditions of business. No doubt that is so. But the same could said in many of the situations in which the

101

common law has developed principles of relief, to achieve just results. The law governing mistake is itself a classic example, as is the law of misrepresentation, duress, undue influence, *etc*. The question is not whether the parties might have regulated such situations generally, or the present situation in particular, by specific agreement, but whether in the circumstances they should be taken to have accepted the risk of their occurrence so as to preclude application of such common law principles, adapted as necessary to the age of algorithms.

198    There is nothing surprising about the law applying a test which asks what an honest and reasonable trader would have understood, given knowledge of the particular circumstances. The law of contract itself is, as I have indicated at [179]–[181], based generally not on what the parties actually thought or knew was the effect of particular words or conduct, but upon what they must reasonably be taken to have understood or known in all the relevant circumstances.

199    A similar objective approach is also found in tort and criminal law. Take the tort of knowing or dishonest assistance. This is committed where a breach of fiduciary duty has been committed by A, and B is said to have assisted it dishonestly. But dishonesty is judged objectively in the light of the circumstances known to the alleged assister. In other words, there are two stages: the first is to ascertain what the alleged assister knew; but, once that is ascertained, the honesty or dishonesty of their conduct falls to be judged by an objective standard of honesty to be expected and applied in the light of such knowledge: see *Barlow Clowes International Ltd & Ors v Eurotrust International Ltd & Ors* [2006] 1 WLR 1476; see also two recent judgments of the Court of Appeal of England and Wales applying this test: *Group Seven Ltd v Notable Services LLP* [2019] EWCA Civ 614 and *Simetra Global Assets Ltd v Ikon Finance Ltd* [2019] EWCA Civ 1413. This objective approach also

102

applies in the criminal law: see *Ivey v Genting Casinos* (UK) Ltd [2018] AC 391, indicating that the decision in *R v Ghosh* [1982] QB 1043 should no longer be followed in so far as it stated that a defendant must be conscious subjectively that his conduct was dishonest.

200    There is nothing surprising, impermissible or unworkable therefore about a test which asks what any reasonable trader would have thought, given knowledge of the particular circumstances. That is the proper approach, in my opinion, in the present situation. Whether the unknown activities of two computers in the middle of the night should bind the parties should be judged by asking whether any reasonable trader, on the relevant exchange, knowing what was happening (or what had happened) could or would have thought, in the otherwise prevailing circumstances, that this was anything other than the consequence of a gross and unintended "major database breakdown" or error with equivalent effect. Since this is how B2C2 actually categorised it, the answer is doubly obvious. Of course, this test involves a hypothetical, as the Judge said at [204]. But it does not work on the basis of speculation as to what "might" have happened if a human element had been involved. On the contrary, it provides relief in equity in the present case because any reasonable person, knowing of the relevant market circumstances, _would_ have known that there was a fundamental mistake. It is the Judge's approach which seems to me, to use his word, "artificial" in assessing whether the contract can stand, not by reference to the circumstances and time when it was made, but on the basis that Mr Boonen would have to be shown to be aware *in advance* that the only circumstances in which a contract could come into existence at his deep prices would be if some fundamental mistake occurred. That prevents any assessment of the validity of computer-made contracts as and when made, and potentially enables traders to make what an honourable and reasonable trader would, I

103

believe, identify as an unjustified windfall – and would expect to forego because it was such.

201    In the present case, there can only be one answer to the question of what any reasonable trader with knowledge of the market circumstances would have thought. There was not and never has been any suggestion that Mr Boonen's very unusual or unfathomable market developments occurred. The only explanation of the transactions, whether hypothesised in advance, observed concurrently or considered early next morning, was and is major error – as B2C2 at once saw.

202    Mr Boonen was very well informed about actual world and market circumstances. The Judge recorded (at [102]):

> … He explained that B2C2 was connected to 15 exchanges at the time, on some of which up to ten pairs were traded. The market for BTC/ETH on the Platform was relatively small …

As to Mr Boonen's state of mind when next morning he observed the overnight trades, the Judge recorded (at [114]):

> … Mr Boonen gave evidence that he was surprised when he first saw that the orders had been filled and that he considered the possibility that there was an error on the Platform or an error in the B2C2 system. Having checked that there were no apparent errors in either system he thought "Wow, there must have been something incredible happened [*sic*] in the market overnight".

Mr Boone's reaction that something incredible must have happened in the market overnight cannot have lasted more than a second, since his connection to fifteen world exchanges would have informed him that no such thing had happened.

104

203     Curiously, but very relevantly on this appeal, the Judge also omitted from the Judgment reference to one key document which above all others gives a key to Mr Boonen's actual state of mind, on learning of the transactions next morning. He sent the email at 6.15am to Quoine's support team requesting that it call B2C2 urgently as he had detected a "Major Quoine database breakdown". That is what the Judge said he could well understand might be the reaction of an ordinary trader on the Platform, and it was evidently what Mr Boonen thought. The present case is one, in my judgment, where any reasonable trader would expect the general law to afford relief, as it does in more conventional cases of mistake.

**Unconscionability**

204     In so far as it is suggested that unconscionability is a pre-requisite to equitable relief, I would repeat what is indicated at [178] above. First, the present situation is one where the primary vitiating factor relied on is mistake, and, second, it is not one where relief is being sought on the basis of constructive notice. The question in the present case is not whether B2C2 had constructive notice, because constructive notice depends, like actual knowledge, on human involvement during the relevant transaction. The present case is one where the law needs to fashion an appropriate principle to cater for a situation where it is clear that there would have been actual knowledge of mistake had the actual transactions been foreseen in advance or had there been human involvement at the time (and where it is also the fact that there was such knowledge as soon as they were discovered). Unconscionability in bringing about the transactions cannot and should not have a role in relation to this novel situation, which is, as I have indicated at [178], closer to one of actual knowledge than of constructive notice. I add that is unnecessary on the facts to consider in this case whether equitable relief would extend to the (probably unlikely) situation in which all

105

that could be affirmed was that the party in B2C2's position, knowing of the transaction against the relevant market background, *should* have realised that it had only come about as a result of some fundamental error. In this case, it can unhesitatingly be affirmed that B2C2 would actually have realised this, and did do so as soon as it knew of the transaction.

205    To the extent that unconscionability may be relevant, it is in my view clearly unconscionable in the present context of unilateral mistake for a trader to retain the benefit of transactions which he would – and did – at once recognise as due to some major error as soon as he came to learn of them. This parallels the analysis taken, in my view appropriately, by the Court of Appeal of British Colombia took in *256593 BC Ltd* at [26]–[28], and is consistent with other statements of principle: see [172]–[175] above. I may also be forgiven for quoting here from a judgment of my own in the area of unjust enrichment – *McDonald v Coys of Kensington* [2004] EWCA Civ 47. In that case, a purchaser insisted on holding onto a valuable registration number plate or mark (with the initials TAC 1) for which he had not contracted and which had remained on the vehicle as transferred to him by a mistake on the part of the vendor. The issue was whether the purchaser had been unjustly enriched. His defence was that he had done nothing wrong and had simply acquired the number plate as part of the car which was now his. Giving the sole reasoned judgment of the Court of Appeal of England and Wales and holding that he had been unjustly enriched, I said this at [37]:

> Looking at the matter generally, I have no doubt that justice requires that a person, who (as a result of some mistake which it becomes evident has been made in the execution of an agreed bargain) has a benefit or the right to a benefit for which he knows that he has not bargained or paid, should reimburse the value of that benefit to the other party if it is readily returnable without substantial difficulty or detriment and he chooses to retain it (or give it away to a third party) rather than to re-transfer it on request. Even if realisable benefit alone is not

generally sufficient, the law should recognise, as a distinct category of enrichment, cases where a benefit is readily returnable. A person who receives another's chattel must either return it or pay damages, commonly measured by reference to its value. The mark is not a chattel, and it was not suggested before us that its return could at any stage (even before the gift to the partner) have been enforced, or that its non-return could sound in damages. (There were allegations below of implied duties to co-operate in the return of the mark, but the judge did not accept them, and there is no appeal in that respect.) However, Mr McDonald's insistence on keeping the mark and the absence of any obvious means of compelling its re-transfer are reasons for analysing this case in terms of unjust enrichment. Mr McDonald knew that he had not bargained or paid for the mark. The mark or its benefit was in practice easily returnable. If Mr McDonald chose to keep it, then I see every reason for treating him as benefited.

206     In my opinion, a parallel analysis applies here. Equity will look at all aspects of a transaction. If it is immediately obvious that a mistaken transfer has occurred, a failure to do the honourable thing and return the benefit can be as unconscionable as the conduct of someone who plays some positive part in bringing the transaction about.

**Conclusion**

207     In these circumstances, and on the basis that the test in law is that which I have suggested it should be, the claim that the transactions were voidable for unilateral mistake should have succeeded. I would have allowed this appeal accordingly.

Jonathan Mance
International Judge

107

Stanley Lai SC, Ong Min-Tse Paul, Lim Jun Rui Ivan and
Marrissa Miralini Karuna (Allen & Gledhill LLP) for the appellant;
Ong Tun Wei Danny, Ng Hui Ping Sheila, Zhuang Wenxiong and
Teo Jason (Rajah & Tann Singapore LLP) for the respondent;
Professor Goh Yihan (Singapore Management University) as
*amicus curiae*.

———————————————

# EXHIBIT 36

SUPREME COURT OF SEYCHELLES

Unreportable
[2025]
CC 18/2025

**Ex Parte**

**YIELD APP LIMITED (IN LIQUIDATION (COMPANY)**    **Applicant**
c/o Cork Gully LLP, 40 Villiers Street, London, WC2N 6NJ
United Kingdom, made by Stephen Cork and Hadley Chilton
as joint and several liquidators of the Applicant, acting as agents
only and without personal liability

**In Re**

**IN THE MATTER OF AN APPLICATION PURSUANT TO**    **Respondent**
**SECTION 295 OF THE INTERNATIONAL BUSINESS**
**COMPANIES ACT 2016 (THE "IBC ACT")**

**AND**

**THE MATTER OF YIELD APP LIMITED (IN LIQUIDATION)**
a company incorporated in Seychelles, IBC Company number: 229095
having its registered office at F2-04, Oceanic House, Providence Estate
 Mahé, Seychelles
(**Company**)

| | |
|---|---|
| **Neutral Citation:** | *In the matter of Yield App Limited (In Liquidation)* (CC 18/2025) (24th October 2025) |
| **Before:** | Burian J |
| **Summary:** | Directives of the Court pursuant to section 295 of the IBC Act |
| **Heard:** | 11th, 17th & 24th July and 28th August 2025 |
| **Delivered:** | 24th October 2025 |

RULING

**BURIAN J**

**INTRODUCTION**

[1]     This application is made pursuant to Section 295 of the International Business
        Companies Act 2016 ("the IBC Act") by Stephen Cork and Hadley Chilton, as joint
        and several liquidators of Yield App Limited ('the company'), who seek direction and
        confirmation from the Court regarding the appropriate and fair treatment of
        commingled crypto assets subject to competing claims from creditors, in accordance
        with Section 289(1)(k) of the IBC Act.

**BACKGROUND FACTS**

[2]     In February 2021, the company launched its platform, hereinafter referred to as the YA
        Platform, described as a managed yield-generating digital asset platform which utilised
        its own proprietary wallet technology. On 2nd October 2023, the company transitioned
        to using Fireblocks, a third-party vendor of crypto wallet technology.

[3]     Upon completion of the account opening documentation and the requisite KYC checks,
        each user of the YA Platform was assigned a unique wallet for specific asset types,
        enabling them to transfer their crypto assets to the platform. A user could then either:

        (i) hold their crypto assets in their user wallet and retain title to those assets; or
        (ii) select an Earn product, in which case the assets were loaned to the company for a
             potential return.

[4]     Contrary to the company's most recently published terms and conditions ('April 2024
        T & Cs'), the liquidators' investigations reveal that, once users transferred crypto assets
        to their wallets, the company would routinely and arbitrarily sweep those assets from
        user wallets into various wallets forming part of the 'Withdrawal Pool'. The YA
        Platform, however, continued to display user balances as though the assets remained
        segregated and held on a custodial basis.

[5]     The April 2024 T & Cs state that a user's wallet balance reflects tokens held by the
        company on a custodial basis, with legal title remaining with the user and that these
        tokens must be held separately from the company's own assets and from other users'
        assets. The April 2024 T & Cs further indicate that this separation may be achieved
        through distinct ledger accounting entries and the company '*shall not have any
        obligation to use different block chain addresses to segregate digital assets owned by*

*you and Digital Assets owned by other users, the company, or any yield with respect to lent Digital Assets'.*

[6]     Instead the 'Withdrawal Pool' effectively functioned as the company's general omnibus account, used both to receive company assets into the business and to pay suppliers. The assets in this pool thus formed a mixed fund, and according to the findings of the liquidators, the complexity of the transactions in and out of the 'Withdrawal Pool' renders it impossible to trace assets back to their original user deposits.

[7]     According to investigations, from inception, the 'Withdrawal Pool' contained:

(i) crypto assets lent by users under earn products,

(ii) crypto assets of custody users swept from their wallets, and

(iii) the company's own crypto assets.

[8]     Notwithstanding that a user may not have selected any "earn" product, the company would routinely and automatically transfer tokens held in the user's designated wallet addresses into the company's 'Withdrawal Pool'. This "sweeping" process consolidated individual user deposits into a single centralized wallet for each asset type, although certain wallets contained multiple token types. As a result, while a user's wallet balance remained unchanged, the corresponding tokens were no longer held in the user's designated wallet address. Similarly, following a withdrawal or redemption, the user's wallet balance would reflect the transaction, but no corresponding on-chain transfer of assets was made back to the user's wallet addresses. The liquidators are not aware of any threshold balance that would trigger an automatic sweep, which resulted in some wallets not being swept.

[9]     On 28th June 2021, through its Product Disclosure Statement ('PDS'), the company represented that encrypted keys would be held in custody by the licensee. This contradicted the representation that users would retain control of their assets until they selected an "earn" product, since the company's control of the keys allowed it to arbitrarily sweep assets without user involvement.

[10]    The PDS further stated that individual client accounts would be segregated from each other, while all portfolio investment account funds would be pooled, and that funds deposited by other users would be separated from client monies and held in custodial wallets. These representations were materially false as in practice, tokens were routinely swept into the company's 'Withdrawal Pool', where they were commingled with both other users' assets and the company's own assets.

[11]    The company moved to a new infrastructure platform named Fireblocks on the 2nd October 2023 and it appears that all user deposit wallets were again swept into a variety of other wallets. These wallets were also used to fund withdrawals across the YA Platform. As a result, once the Fireblocks migration was completed, assets of the same class belonging to different users became fully commingled.

[12]    On 28th June 2024, the company announced the suspension of all activities on its digital wealth platform, as it prepared to enter insolvent liquidation. The company was formally placed into liquidation on 1st July 2024, pursuant to the IBC Act, and the liquidators were appointed on the same day. The purpose of the liquidation is to manage the winding up of the platform's affairs, to maximise asset realisation, to ensure fair treatment of customers and creditors, to comply with legal and regulatory requirements, and to formally dissolve the business.

[13]    In accordance with their statutory duties, the liquidators have taken steps to recover the company's assets. Other than certain claims in litigation, all assets are in the form of crypto assets. The majority of assets recovered including those from third-party managers and from exchanges are being held at two market-leading custodians:

•    Zodia Custody, registered with the Central Bank of Ireland and the UK Financial Conduct Authority (FCA); and
•    Coinbase, also registered with the FCA.

Certain assets held by the company at the date of liquidation are secured in wallets on a Fireblocks account controlled by the liquidators.

[14]    The liquidators have made an interim distribution to creditors whose claims were received by the bar date of 20th December 2024 and have been reviewed, verified, and

admitted. The interim distribution excludes claims where there is material uncertainty, claims that are disputed, and claims not yet capable of adjudication. Full allowance has been made for these excluded claims. Should such claims later be accepted or rejected, future distributions will be adjusted accordingly.

[15]    As of 26th June 2025, the equivalent U.S. dollar value of assets recovered by the liquidators stood at USD 3.5 million. As these assets continue to be held in their native token form, their dollar value is expected to fluctuate over time. Save for a potential recovery from an inter-company receivable, subject to current legal proceedings, no further recoveries are anticipated in respect of the assets held in the custody of the wallets or withdrawal pool.

[16]    According to the company's records, as of the date of liquidation there were 9,125 users with tokens recorded in custody wallets. If the in-house YLD tokens (valued at nil) are excluded, there remain 3,961 user custody wallets to be considered. The crypto assets held within the 'Withdrawal Pool' and the custody wallets which form the subject of this application have been ring-fenced and do not form part of the interim distribution.

[17]    In the present case, the liquidators have received 2,196 custody wallet claims. After excluding duplicate claims, there remain 1,796 competing custody wallet claims to be considered, collectively valued at approximately USD 40 million. It appears, however, that some claims were incorrectly completed. On the basis of the company's records, it is anticipated that the custody wallet claims will ultimately amount to approximately USD 12.8 million, against assets in the aggregate value of only USD 4.8 million.

[18]    The crypto assets held in the custody wallets including those within the 'Withdrawal Pool' have not been converted to USD Coin, but remain in their native token form as at the date of liquidation.

[19]    The liquidators have received queries from four creditors who assert that their assets are being held on trust by the company. This issue has also been raised at the fortnightly meetings with the creditors' committee, which appears to be divided on the point. Some creditors argue that the tokens remaining in the 'Withdrawal Pool' should be distributed exclusively among those users whose assets had been swept into the respective wallets for each asset type. However, this approach fails to take into account the inflow of

company assets into those withdrawal pool wallets in order to provide liquidity and enable user withdrawals and the disparity between claims and balances.

[20]   The liquidators engaged the services of numerous experts throughout this process including Forensic Risk Alliance who have prepared a report dated 2nd June 2025 ('FRA Tracing Report') which identifies that this sweeping activity constitutes a significant portion of the inflows across multiple token types and whilst the extent of sweeping varied across different token types, the practice as a whole was exceptionally prevalent, irrespective of whether a user had selected an 'earn' product or not. The company also did not maintain a separate internal ledger in respect of the balances held within the 'Withdrawal Pool', in order to distinguish between wallet balances of individual users and the company's own assets. Further, the company's' 'Withdrawal Pool' suffered a significant shortfall as it did not maintain in the pool the same quantity of tokens as were represented in user wallets as purportedly held on a 'custodial basis'. The 'Withdrawal Pool' effectively functioned as the company's general omnibus account, with assets flowing in from user deposits as well as being utilized for purposes beyond just facilitating user withdrawals.

[21]   Given the complexity of the matter, the significant value of the assets in question, and the nature of the competing claims advanced by creditors, the liquidators consider it appropriate that the Court provide directions. Such directions are necessary to ensure that the issue is resolved in the best interests of all creditors and claimants.

**POSITION OF LIQUIDATORS**

[22]   The liquidators are in agreement that where an insolvent company holds assets belonging to a third-party, such assets are held on trust or in a custodial structure and do not form part of the company's estate for distribution to the company's creditors; whether that trust is express, implied, constructive or by statute.

[23]   It is thus accepted that for those customers who had a 'custodial account' with the company and whose assets were automatically swept into the 'Withdrawal Pool' but were never selected to 'earn' product, that the wording of the April 2024 T & C's would appear to indicate that a trust was intended to be created. That being said, the company's business model (and therefore the assumed basis on which user's contracted with the

company) was for users to loan crypto assets to the company in exchange for the promise of an increased return. This leads the liquidators to anticipate that there may be only a small subset of users who opted to only hold the asset with the company on a custodial basis and the process of identification of those users itself will be a manual and expensive process. Additionally, there are practical issues which arise with tracing these assets as it will be an exceptionally difficult and manual exercise to isolate the inflows to the 'Withdrawal Pool' that are only attributable to sweeps of user deposits; and then to apply a standard tracing methodology to trace a specific user's assets, and only their assets, into and out of the 'Withdrawal Pool' to work out which users' assets would qualify.

[24]    For those who opted to 'earn' on the platform, it is the liquidators view that at the point of opting to 'earn' the question of an express trust would fall. It is further submitted that the fact pattern does not support the creation of a 'constructive trust' in respect of the assets in question. It is argued that for a constructive trust to arise, it needs to be proven that the user's specific assets were held by the company and that they can be followed or traced. In the present case, it has been determined that identification will prove to be exceptionally challenging and costly. This is because the manner through which the directors operated the 'Withdrawal Pool' has rendered practical enforcement virtually impossible due to extensive commingling of assets, and pursuing such claims would be commercially unviable given the disproportionate costs of asset tracing relative to potential recovery.

[25]    The final category of assets involves the small balances in custody wallets that were never swept into the 'Withdrawal Pool'. The evidence discloses that small balances were retained in certain user custody wallets, amounting in aggregate to approximately USD 371,175/- across 1,398 wallets. Though it is accepted that it is theoretically possible for individual users to assert a proprietary interest in those balances, it has been determined that such claims would necessarily fall to be determined on a case-by-case basis in order to identify whether some of these users had opted to 'earn' product in which case the corresponding tokens though remaining in the customer wallet are in fact the property of the company. The liquidators have expressed the view that the cost of this exercise across 1,298 individual wallets makes it uncommercial considering the costs of verification, including establishing precise balances, conducting due diligence

on user identity, performing anti-money-laundering checks, and implementing a mechanism for return all would significantly outweigh the total value of the assets to be distributed. Additionally, it has been noted that effecting a return of the assets in their native form would be prohibitive, given that the platform is no longer operational and if a return is to be effected their proposal is to convert such assets into USDC and distribute the equivalent value, subject to deduction of the reasonable costs of distribution from each individual wallet, so as not to burden the general body of creditors.

Identifiable Assets in the Withdrawal Pool:

[26]   The liquidators have also considered whether any identifiable assets within the 'Withdrawal Pool' may be traced to specific users. It was suggested that in circumstances where a particular asset type is associated with only a small number of transactions or users, and has been held in a discrete wallet, it might be possible to identify assets capable of supporting proprietary claims. The liquidators accept that such a scenario is conceivable in theory, and any such claim would be assessed individually. However, applying a first-in, first-out tracing principle, they conclude that no proprietary claims would succeed. They therefore propose that any such assets be treated as part of the general estate and made available for distribution to creditors as a whole.

Unidentifiable Assets in the Withdrawal Pool:

[27]   The liquidators have received approximately 1,700 custody claims totalling USD 40 million in respect of residual assets in the 'Withdrawal Pool', which are valued at only USD 4.8 million. Some creditors have argued that fairness requires a *'pari passu'* distribution, under which assets would be shared proportionately among users in accordance with the value of their adjudicated claims. The liquidators reject this approach because of their observation that the assets in question are irretrievably co-mingled: user deposits have been mixed with lent assets under "earn" products, together with company assets. In addition, there are insufficient quantities of certain asset types to meet claims. Where assets have been swept into the 'Withdrawal Pool' and intermingled with company holdings, they have lost their identity. In those circumstances, no proprietary claim can be sustained.

[28]    Lastly, the liquidators emphasise their duty to act in the best interests of creditors as a whole. They accordingly stress the importance of proper accounting and documentation of allocations and distributions, and of fair valuation of the assets made available for distribution. Consideration and reference was made to the cases of *D'Aloia v Persons Unknown A & Ors*[1] and *Re Celsius Network LCC et al*[2] and it was the liquidators position that the decision in Celsius can be distinguished from the present case on the basis that in the case of Celsius there was no dispute between the parties as to whom held the proprietary interest of the custody assets and additionally in Celcius, the company had maintained a ledger which recorded the balances which should be held in custody wallets and would periodically transfer digital assets to or from the custody Wallets to match the aggregate amounts of cryptocurrency balances in custody accounts as reported on Celsius' ledger. Conversely, in the present case, the un-earnt assets were not kept separate from the omnibus funds of the company.

**FINDINGS OF THE FRA TRACING REPORT**

[29]    Annexed to the supplementary affidavit in support is a declaration by Meredith Fitzpatrick, a Director of Cryptocurrency Investigations and Compliance at Forensic Risk Analysis, an international consultancy specializing in forensic investigations, where she has been employed since April 2023.

[30]    The consultancy was retained by the liquidators to provide cryptocurrency forensic accounting services in connection with the insolvency proceedings. Their assignment included:

    (i) Analyzing the YieldApp 'Withdrawal Pool', including its structure, operation, and use;

    (ii) Examining the flow of funds into and out of the 'Withdrawal Pool'.

    (iii)Assessing various forensic accounting methodologies available for such an analysis; and

    (iv)Evaluating whether those methodologies could reasonably be used to trace a specific user's assets within the 'Withdrawal Pool'.

---

[1] [2024] EWHC 2342 (ChD)
[2] (Case Number: 22-10964 (MG)

[31]    The opinions expressed in the analysis and report represent Mrs. Fitzpatrick's professional judgment, based on her education, training, prior professional experience, ongoing work with the joint liquidators, independent research, and expertise in the field.

[32]    She has worked in this field since 2017 and has extensive experience tracing complex cryptocurrency money-laundering typologies using both open-source and commercial blockchain analysis tools, including Chainalysis and TRM Labs. Mrs. Fitzpatrick holds multiple certifications in blockchain analysis, including Chainanalysis Reactor Certification (CRC), among others. She earned a Bachelor of Arts in Mathematics and Statistics from Williams College. She has conducted cryptocurrency-related investigations across multiple industries and jurisdictions and has served as a cryptocurrency tracing expert for a wide range of clients, including a stablecoin protocol, major cryptocurrency exchanges, and individuals and companies involved in cryptocurrency-related disputes. Prior to joining Forensic Risk Analysis ('FRA'), Mrs. Fitzpatrick served for seven years as a Special Agent with the Federal Bureau of Investigation ('FBI'), specializing in computer intrusion and virtual currency investigations. In that capacity, she led investigations involving cryptocurrency-enabled money laundering, state-sponsored use of virtual currency, dark web marketplaces, non-compliant cryptocurrency exchanges, business email compromise schemes, and Russian state-sponsored computer intrusions.

[33]    After reviewing her professional qualifications, I am satisfied that Mrs. Fitzpatrick is an expert in cryptocurrency asset tracing, and investigation and her report and finding will prove fundamental in assisting the Court in reaching a fair as well as practicable determination.

[34]    The report examined the various accounting methodologies available when conducting a flow of funds analysis, namely FIFO (first in, first out), LIFO (Last in, last out), lowest intermediate balance rule, pari-passu and rolling charge. It then proceeded to provide a comprehensive overview of the structure and operation of the Yield App 'Withdrawal Pools' in which it was explained that the purpose of the pools was to consolidate on-chain user deposits into a single, centralized address for each asset/token and to provide a source of liquidity for all Yield App user withdrawal requests. An extract of addresses

from Fireblocks revealed there were a total of twenty-four (24) unique addresses labelled as 'Withdrawal Pool'. Ten (10) of those addresses had no activity and the fourteen (14) remaining addresses can be broken down into eleven (11) 'Withdrawal Pool' wallets (listed in paragraph 46 of the annex N). The 'Withdrawal Pool' addresses are all on-chain addresses and not internal ledger adjustments.

[35]    An in-depth analysis was carried out on each 'Withdrawal Pool' wallet and in summary the findings show that assets were heavily co-mingled. The inflows of funds into the wallets came from a variety of sources, including wallet addresses labelled as belonging to other entities within the Yield App corporate umbrella. In the majority of the wallets the outflows were directed towards staking or other business purposes and were co-mingled with user withdrawal requests. Because both customer withdrawals and other withdrawals were funded by the same pool of assets, it has become exceptionally challenging to isolate and trace specific user funds.

[36]    It was determined in the FRA Tracing Report that all of the withdrawal pool wallets that form the Yield App 'Withdrawal Pool', with the exception of the DOGE, LTC and XTZ withdrawal pool wallets, operate in a dynamic in which customer withdrawals and Yield App business related withdrawals were funded by the same pool of assets. Moreover, the inflows to the 'Withdrawal Pools' included sweeps of user on-chain deposits and transfers from wallet addresses labelled in Fireblocks as belonging to other entities within the Yield App corporate umbrella, and addresses labelled in FireBlocks as being used by Yield App for other purposes such as liquidity management. Additionally, the sources and volumes of the non-customer related inflows and outflows to the 'Withdrawal Pool' varied significantly across the various withdrawal pool wallets. As a result, it becomes exceptionally difficult to first isolate the inflows and outflows to the 'Withdrawal Pool' that are only attributable to sweeps of customer deposits and customer withdrawal requests and then apply a standard tracing methodology to trace a user's specific funds, and only their funds, into and out of the 'Withdrawal Pool'.

[37]    The findings also show that even in the case of the DOGE. LTC and XTZ withdrawal pool wallets, the inflows to those withdrawal pools included sweeps of user on-chain deposits and transfers from wallet addresses labelled in Fireblocks as belonging to other

entities within the Yield App corporate umbrella, and addresses labelled in Fireblocks are being used by Yield App for other business purposes.

[38]    The situation is further complicated by the extremely volatile price fluctuations of cryptocurrency assets and requires special consideration.

[39]    The analyst has been unable to identify documentation describing a standard process followed by Yield App to select specific assets from the 'Withdrawal Pool' when a user initiates a withdrawal request of assets from the platform. Therefore, there is no guarantee that a withdrawal will be funded by a specific, predetermined asset from the pool, only that the user withdrawal request will be sourced by a withdrawal pool wallet.

[40]    To conclude it has been determined that the feasibility of applying one of the traditional tracing methodologies is extraordinarily complicated for a number of reasons, but mainly because of the co-mingled pool of both co-mingled user assets and company assets, which in turn were used for both customer fulfilment and business purposes, such as liquidity management. Therefore, whilst it may be theoretically possible to trace individual user on-chain deposits through the Yield App infrastructure, it would require extensive work to reconcile the on-chain records with the Yield App internal ledger records which show the off-chain movement of assets to and from the relevant withdrawal pool. According to the expert report, it would be at this point that the blockchain analytics can no longer assist with tracing the user's funds as they were co-mingled with other users' deposits and company funds and the Yield App's internal ledger records would be required to trace through these transactions to understand the ultimate destination of a user's funds. It has been determined that this exercises would be both time and cost intensive and would be cost prohibitive when compared to the value of the assets identified.

[41]    Based on the expert's analysis it has been concluded that it would not be reasonable for a user to use a tracing methodology that is commonly used in traditional insolvency settings with Fiat currency to trace their specific assets in the Yield App withdrawal pool, nor would it result in the proper and fair treatment of the other assets in the pool.

## SUBMISSIONS

[42]    The submissions are produced in furtherance to the first affidavit of Stephen Cork dated 3rd March 2025 and the supplementary affidavit dated 4th July 2025 together with the preliminary hearing in respect of these proceedings that took place on 24th July 2025.

[43]    Counsel has provided an executive summary of the background facts of the application already rehearsed in detail in the preceding paragraphs. The issues that require judicial determination are:

- Whether the users claiming wallet balances have proprietary claims to particular assets held by the company, or whether such claims should be treated as unsecured claims in the company's liquidation; and
- How to address the significant deficit in the actual assets held by the company as against the value of the claims.

[44]    It is not in dispute that where an insolvent company holds assets belonging to a third-party, such assets are held on trust or in a custodial structure and do not form part of the company's estate for distribution to the company's creditors; whether that trust is express, implied, constructive or by statute however in order to have a claim against the trust property held by a company, the claimant must be able to prove that they have a proprietary right to the assets in the trust.

[45]    As such, the user must be able to establish that the assets are capable of being property. Once the asset has been established as 'property' then it must be determined as to whether there is a legal or an equitable right to the said property and thirdly that the property is identifiable and/or capable of being traced. It will need to subsequently be decided if the property is made up of mixed funds and which method of tracing the assets would be the fairest and most appropriate method in the circumstances of the case.

[46]    Counsel canvassed the various tracing methods available to the liquidators. The most common being the rule in *Claytons case* whereby payments out of an account are attributed to payments into the account in the order in which the payments were made.

This is known as the "first in, first out. The second method available being the *pari passu* method, whereby the remaining money is divided between recipients in proportion to the amounts which they are owed. Lastly, the final method being that of the *Rolling Charge* method, which combines the *parri passu* method with the lowest intermediate balance principle. The effect is that the position has to be analysed whenever a payment/withdrawal is made out of the fund, and no contributor can be paid more than his rateable share of the lowest intermediate balance while his assets remain in the fund.

[47]   Counsel argues that regardless of the method applied, there remains the issue around the user's ability to trace or follow their assets given the nature of the relationship between users and the company, and the operation of the 'Withdrawal Pool'. Relying on the conclusion of the FRA Tracing Report, it is the submission of Counsel that given the nature of the 'Withdrawal Pool', and assuming that a particular user did otherwise have a prima facie argument for assets being held on a "custodial basis", it becomes exceptionally difficult (and therefore time and cost prohibitive) to apply any sort of tracing methodology to trace a user's specific assets.

[48]   The Court was further addressed on the English law of trusts and its applicability to the present case. It is submitted that the April 2024 T & Cs contemplated a custody arrangement in respect of un-earnt assets and, on their face, the wording would appear to indicate that a trust was intended to be created. However, the company's business model was premised on users loaning crypto assets for returns. Upon selecting 'earn' products, any question of express trust falls away as title transfers to the company.

[49]   Secondly, for those users who never selected an "earn" product (although this is expected to be a fairly limited category), extensive commingling in the 'Withdrawal Pool' renders it impossible to trace specific assets that might otherwise form the subject matter of an express trust.

[50]   The liquidators have identified several theoretical categories of assets that could potentially form part of an express trust. These are assets placed into custodial wallets but never selected for 'earn' products and never swept into the 'Withdrawal Pool', assets automatically swept into the 'Withdrawal Pool' but never selected for 'earn' products, and assets that were selected for 'earn' products but subsequently redeemed, with

corresponding ledger entries but no on-chain transfer back to designated wallet addresses.

[51]    It is argued however that practical enforcement proves virtually impossible. For the first category, whilst approximately USD 371,175 of assets remain in 1,398 individual user wallets, identifying which users never selected 'earn' products would require a manual and costly exercise on a case-by-case basis. For the two remaining categories (b) and (c), the extensive commingling within the 'Withdrawal Pool' makes tracing exceptionally difficult and cost-prohibitive relative to potential recovery.

[52]    Counsel further submits that where express trusts fail, English law recognises that constructive trusts may arise from breach of fiduciary duty or misappropriation. The courts are willing to imply constructive trusts where there has been fraud or breach of fiduciary duty, particularly where a company fails to treat assets in accordance with stated custodial arrangements. Several factors can be considered to support the argument that a constructive trust arose, namely:

   (i) The company's terms and conditions (notably, the 2024 April T & Cs) created a fiduciary relationship through the custodial arrangements, with the company undertaking to act in a particular manner for users' benefit;

   (ii) The company's systematic commingling of user assets with company funds, whilst contractually representing custodial segregation, constitutes a clear breach of a fiduciary duty;

   (iii) The use of user funds for operational expenses including payroll, whilst representing segregation in contractual documentation and the PDS, provides strong evidence of misappropriation.

[53]    However, again the argument put forth is that the extensive commingling within the 'Withdrawal Pool' renders practical enforcement of any constructive trust virtually impossible. Reference was made to English case law developments, particularly *D'Aloia v Persons Unknown Category A & Ors supra*, which case confirmed that equitable tracing requires the ability to follow assets through their transformations. However, the analysis in the FRA Tracing Report demonstrates that multiple inflow sources beyond user deposits, substantial outflows to staking activities and business

operations, and varied transaction patterns across different token types make conventional tracing impractical. While the FRA Tracing Report indicates it may theoretically be possible to trace individual user on-chain deposits through the company's infrastructure, this would require extensive manual reconciliation of on-chain movements with internal ledger records, which would be cost-prohibitive compared to potential recoveries

[54] Finally, under traditional "first in, first out" tracing principles, the liquidators' analysis indicates that company assets often entered the 'Withdrawal Pool' before user deposits, which would defeat user proprietary claims even if a constructive trust were established

[55] It is submitted that a fundamental principle of English trust law established that in order to validly create an express trust, there must be three certainties: (i) certainty of intention to create a trust; (ii) certainty of subject matter of the trust; and (iii) certainty of objects – the beneficiaries (reference was made to the case of *Knight v Knight[3]*).

[56] However, insofar as it relates to the subject matter of any trust said to otherwise arise in favour of a specific user, the company simply did not either:

    (i) ensure the segregation of those assets the subject of a redemption to be held in separate designated wallet addresses such that a particular user's wallet balance corresponds directly with a particular balance in a designated wallet address; or

    (ii) ensure that the 'Withdrawal Pool' had a sufficient balance of each relevant token to correspond with the total of all users' wallet balances to a particular token.

[57] Therefore, the fundamental difficulty facing the Liquidators here is that, with a relatively limited pool of assets in the 'Withdrawal Pool' (with an aggregate equivalent value of only approximately USD 3.3 million) and a very large number of user claims (some 1,796 Users claiming wallet balances), and on the basis of the advice and analysis undertaken by FRA, it would be a manual, lengthy, and expensive (likely to be disproportionately so) process to attempt to identify specific assets which may be said to be the subject to specific redemption for a specific user at a specific point in time.

---

[3] (1840) 3 Beaver 148)

[58]    To conclude therefore the liquidators respectfully seek the Court's directions on how available assets in the 'Withdrawal Pool' should be distributed given: (a) extensive commingling making conventional tracing impractical; (b) significant shortfall (the equivalent of approximately USD 12.1 million) between available assets and claimed Wallet balances; and (c) competing claims from general unsecured creditors totalling USD 201 million. The Liquidators submit that, whilst the factual matrix suggests potential grounds for constructive trust claims based on breach of fiduciary duty for some users, and potentially express trusts for others, the practical realities of extensive commingling, the business model premised on lending rather than custody, and disproportionate costs of asset tracing relative to potential recovery, militate against recognising such claims.

## LEGAL ANALYSIS

[59]    The matter before the Court concerns the distribution of assets following the insolvency of the company. Two distinct categories of property are said to have been held by the company:

    (i)  Cryptocurrency assets to be held on a custodial basis for clients; and
    (ii) Assets which the platform was permitted to invest.

[60]    Contrary to the terms and conditions, the company placed all assets, and even its own proprietary funds into various undifferentiated 'Withdrawal Pools' and there was no proper ledger being maintained to distinguish the sources of the deposits or the ownership of the funds.

[61]    I have considered both affidavits along with all the accompanying exhibits, including but not limited to the FRA Tracing Report prepared by Meredith Fitzpatrick dated 2nd June 2025.

[62]    It is the Courts considered view that the core issues to be determined are:

    • Whether the crypto assets are capable of being property?
    • Do the users have an equitable or legal title to these crypto assets?
    • Can the crypto assets be traced and if so, how?

- Is there a mixed fund and if so whether the unauthorised mixing of custodial and investment assets has destroyed such proprietary interests, converting clients into general unsecured creditors; and

- Lastly, what is the appropriate method of distribution where the mixed fund is insufficient to meet all claims and how to address this significant deficit in the actual assets held by the company as against the value of the claims.

## Is cryptocurrency to be considered 'property'?

[63]   It is now well established in English law that cryptocurrency constitutes a form of property capable of ownership and protection. The question of whether cryptoassets may be recognised as property has been considered by the courts for several years, and the position is no longer novel or uncertain. In *AA v Persons Unknown*[4], Bryan J held that Bitcoin and other cryptocurrencies meet the definition of property as set out in *National Provincial Bank v Ainsworth*[5] namely, that they are definable, identifiable by third parties, capable of assumption by third parties, and have some degree of permanence. The court in that case granted a proprietary injunction over Bitcoin, thereby recognising its proprietary nature.

[64]   Subsequent decisions, including *Ion Science Ltd v Persons Unknown*[6] and *Liam David Robertson v Persons Unknown*[7], have reaffirmed that cryptocurrencies are to be treated as property and that orders such as freezing injunctions and proprietary claims may properly be made in relation to them. This approach is consistent with the findings of the *UK Jurisdiction Taskforce's Legal Statement on Cryptoassets and Smart Contracts (2019)*[8], which concluded that cryptoassets are capable of being property at common law.

[65]   Accordingly, this Court considers that the characterisation of cryptocurrency as property is well established. Both judges and practitioners before the English courts are by now familiar with the fundamental attributes of cryptocurrency as an asset class and with its treatment within the framework of English property law. This Court therefore

---

[4] [2019] EWHC 3556 (Comm)
[5] [1965] AC 1175
[6] (unreported, 21 December 2020, Commercial Court)
[7] Case No: CL-2019-000746
[8] https://technation.io/wp-content/uploads/2019/11/6.6056_JO_Cryptocurrencies_Statement_FINAL_WEB_111119-1.pdf

proceeds on the basis that cryptocurrencies, although intangible, constitute a species of property capable of being owned, transferred, and made the subject of proprietary relief.

[66]    This test was applied by the Judge in the recent case *of D'Aloia v Persons Unknown supra* where the High Court found that crypto assets (in this case Tether) constituted property. Here, the Judge found that with crypto assets being "not merely the data but the combination of the data and the transactional functionalities related to it" gives the expectation needed that crypto asset transactions will be honoured in sufficient form to attract property rights.

[67]    In the Seychelles, under the Virtual Asset Service Providers Act, 2024, a virtual asset is defined as:

*"a digital representation of value that can be digitally traded or transferred and can be used for payment or investment purposes and does not include digital representation of fiat currencies, securities and other financial assets".*

[68]    The courts in Seychelles when dealing with interlocutory applications have treated cryptocurrency as concrete assets capable of seizure and this application can be seen in practice in *Liu v Auxiliary Cayes Fintech Co. Ltd*[9] and *The Government of Seychelles v Bybit Fintech Limited*[10].

[69]    The courts have considered disputes involving cryptocurrency assets in *Filippo v Huobi Global Limited*[11] and *Lui v Huobi Global Limited*[12] which cases show that the Seychelles courts are prepared to deal with claims about crypto assets and ordering the transfer or return of those assets. These decisions indicate that Seychelles courts are accepting the practical reality that crypto assets are treatable as "property or assets" in litigation, particularly in claims of theft, possession, conversion, or restitution capable of being seized, frozen, or returned.

---

[9] (MA 406 of 2023 – SCSC, 2024)
[10] (XP 15 of 2025, SCSC, May 2025)
[11] (CS 92 of 2023) [2024] SCSC 174

[12] *(CS 124 of 2023) [2025] SCSC*

[70]   In the present case and based on the information provided, I can establish that there are three categories of users of the YA platform:

(i)   Custody Wallet Users: users whose assets were retained within their individual custody wallets.

(ii)  Swept but Unidentifiable Assets: users whose assets were swept into the 'Withdrawal Pool' and are now unidentifiable within that commingled fund; and

(iii) Swept but Potentially Identifiable Assets: users whose assets were swept into the 'Withdrawal Pool' but which may remain identifiable within a wallet for a specific asset type, by reason of their rarity and limited transactional history.

**Does there exist an equitable or legal title to these crypto assets?**

Custody Wallet Users

[71]   There remains crypto assets with an aggregate value of USD 371,175, representing un-lent user assets that were not swept into the 'Withdrawal Pool' and which remain in 1,398 individual user wallets. I am satisfied that these custody wallet user assets were capable of being treated as property and it can be argued that a fiduciary relationship existed between the company and the users, and that those users retained equitable title to the assets based on the April 2024 T & C's. Accordingly, these assets should be capable of easily being traced under the common law because they were not transferred into a mixed fund. These users should in theory be able to equitably follow their crypto assets and assert a proprietary claim against the company in respect of their un-lent assets.

[72]   However, the liquidators have identified a potential obstacle as they continue examining how user wallet balances were handled specifically, whether funds were transferred into or out of these wallets. For instance, a user might have deposited an amount too small to be swept into the main pool. Yet, if that user had enrolled in an "earn" product, they could still have indirectly benefited from the collective pool of crypto assets contributed by other users. In cases where assets were mixed to the extent that they can no longer be distinguished or traced back to individual users, it would likely weaken any personal ownership claims. Conversely, if a specific user's wallet shows no movement at all, that user might be able to assert an equitable claim to the

assets held in that wallet. As a result, the liquidators will need to evaluate each claim individually on a case-by-case basis taking into account the unique circumstances of each user's wallet.

Swept but Unidentifiable Assets:

[73]    Where users' assets were swept from their individual wallets into the 'Withdrawal Pool', whether expressly instructed to do so, those assets have now become a part of a mixed fund. From the evidence on record, the 'Withdrawal Pool' was comprised of crypto assets from multiple sources, including both user deposits and company-owned assets and because of this mixing, the assets lost their individual identity. As a result, identification of these assets is now impossible and a such I am satisfied that any proprietary claim by a user is likely to fail in this instance.

[74]    Although a formal fiduciary relationship cannot be established, it may still be arguable that a constructive trust has arisen as a result of the company's apparent misappropriation or misuse of user assets. In equity, a constructive trust can be imposed by the court to prevent unjust enrichment where one party has wrongfully retained property belonging to another.

[75]    The factual background in this case could, therefore, provide limited grounds for certain users to argue that a constructive trust exists particularly where the company's conduct indicates a breach of fiduciary-like duties, such as mishandling or misallocating assets that were meant to be held for users' benefit. However, several practical and legal barriers significantly weaken the likelihood of these claims succeeding. The extensive commingling of assets across user accounts makes it exceedingly difficult to trace individual entitlements. Moreover, the company's business model, which was fundamentally based on lending and earning returns on pooled assets rather than providing custodial services, further undermines the premise of trust-based ownership. Finally, the disproportionate costs and complexity of forensic asset tracing, when weighed against the potential recoverable value, render the pursuit of such claims commercially impractical. In sum, while constructive or express trust arguments may exist in theory, the legal, evidential, and practical realities of this case strongly militate against their recognition in practice.

Swept but Potentially Identifiable Assets:

[76]     The liquidators are still investigating whether, in limited circumstances, a discrete set
         of crypto assets within the 'Withdrawal Pool' can be identified and attributed to
         particular users. This possibility arises where there is only a very small number of users,
         or a very limited number of transactions, in respect of a specific asset type. If, due to
         this exceptionally low transaction volume, the relevant asset type has been held in a
         separate wallet, or is otherwise clearly traceable to identifiable user deposits, then those
         users may be able to trace their assets into the 'Withdrawal Pool'. However, any such
         claims would still need to be assessed individually, on a user-by-user basis. Based on
         their current findings, the liquidators have not yet identified any situation in which this
         methodology could apply.

**Can the crypto assets be traced/followed and if so how?**

[77]     The present issue concerns the treatment of claims where multiple innocent parties have
         contributed to a mixed fund which is now insufficient to satisfy all of their entitlements.
         The question for the Court is how the law should address this common misfortune, in
         particular the principles by which the remaining balance ought to be distributed.

[78]     As rightly pointed out by Counsel in his submissions, the processes of following and
         tracing are different concepts and cannot be used interchangeably. Following entails
         following the same asset as it moves from one person to another and this may be
         possible for those assets that were never swept into the 'Withdrawal Pool' and for those
         that remained identifiable. However, where an asset is exchanged for another or
         becomes co-mingled into a 'Withdrawal Pool' it would need to be traced. In order to
         'trace' property, one must be able to identify what happened to the asset, identify the
         proceeds of the assets and identify the persons who have handled the assets.

[79]     When following assets, the common law does not allow a party to follow a 'chose in
         action' i.e an intangible personal property, examples of which include shares, IP rights,
         rights under contract, as opposed to a 'chose in possession' which is physical property
         such as a car and jewellery. Recent authority has held that crypto assets are capable of
         being a chose in possession as well as a chose which is neither a chose in possession
         nor a chose in action but is still capable of being traced at the common law. Following

the *Law Commission Report, Law Com No 412 "Digital Assets: Final Report" ('Final Report")*, I note that the current position is that crypto assets which are a 'persistent' thing can be traced through the blockchain system. Therefore, I am satisfied that the assets in question can be traced in theory, so long as there exists no practical impediments.

### Is there a mixed fund and if so whether the unauthorised mixing of custodial and investment assets destroyed such proprietary interests, converting clients into general unsecured creditors?

[80] Having reviewed the FRA report I am satisfied that the thorough analysis of the account demonstrates that there exists a mixed fund whereby all assets were held in a 'Withdrawal Pool' co-mingled with company assets.

[81] In the case of *Space Investments v. Canadian Imperial Bank of Commerce[13]*, Lord Templeman considered the position of a bank acting as trustee under settlements that expressly permitted it to open and maintain savings accounts with any bank, including itself. Acting under this authority, the bank deposited trust money with itself and credited the funds to trust deposit accounts. The court held that when a person deposits money with a bank, the depositor transfers both legal and beneficial ownership of the funds to the bank. Consequently, when trust money is deposited in this way, ownership passes to the bank. Upon the bank's insolvency, the beneficiaries of the trust had no priority over other unsecured creditors. Because the mixing of trust funds with the bank's own monies had been expressly authorized and was therefore lawful, the beneficiaries lost any proprietary interest in the money. Their position was reduced to that of ordinary creditors, and tracing was unavailable. The Court determines that this reasoning would apply to investors who had chosen to deposit assets and opted for 'earn' in the Yield App.

[82] By contrast, Lord Templeman further noted that if such mixing of trust funds with the trustee's own monies had occurred without express authorization, it would have been unlawful. In those circumstances, beneficiaries could trace their trust money into the bank's assets and enforce recovery through an equitable charge over all the bank's

---

[13] (1987, 1 WLR 1072

property, though only if such tracing was practically possible. Whilst I take the position that this principle could apply to users who entrusted assets to Yield App under a 'custodian arrangement' without agreeing to their use in yield-generating activities it cannot be denied that by accepting these custodian customers as still having a proprietary interest in the co-mingled funds, it can appear unfair to the general creditors. I would go further to state that it would also erode the basic requirement of certainty and identifiability of assets held in trust and stretch the equitable tracing doctrines beyond their established limits.

[83]    In the case of *Re Goldcorp Exchange Ltd[14]*, customers who had paid for bullion but had not taken delivery sought to trace into the assets of the now insolvent company. Save for one class of customers whose bullion had been segregated, the claim failed because the customers never had any proprietary rights in the bullion, nor in the money paid over, which had never been impressed with any trust. They were simply viewed as unsecured creditors.

[84]    It is the final determination of the FRA Tracing Report that regardless of the method of tracing applied, there remains the issue around the user's ability to trace and follow their assets given the nature of the relationship between the users and the company, and the operation of the 'Withdrawal Pool'. The conclusion being that given the nature of the 'Withdrawal Pool', and assuming that a particular user did have a prima facie argument for assets being held on a 'custodial basis', it becomes exceptionally difficult (and therefore time and costs prohibitive) to apply any sort of tracing methodology to trace a user's specific assets.

[85]    One option put forward for the Court's consideration would be to hold that, by mixing all assets together without distinction, any proprietary interest of clients was lost. The beneficiaries would then rank as unsecured creditors *pari passu* with other creditors in the winding up. The advantage with this course of action is that it is simple for the liquidators to administer, however some may argue unfair to users who deposited funds in custody on the understanding they would not be risked.

---

[14] [1995] 1 A.C. 74

**If proprietary rights are recognised, what is the appropriate method of distribution where the mixed fund is insufficient to meet all claims and how to address this significant deficit in the actual assets held by the company as against the value of the claims**

[86]     Alternatively, the Court may decide that custodial assets were always impressed with a trust, and that the company's breach in mixing them does not destroy that equitable interest. In such a case, clients are entitled to trace into the mixed account. If evidence allows some distinction between custodial cryptocurrency and investment assets, the liquidators could treat the custodial pool as trust property and the investment pool as company property. However, in the absence of accurate ledgers, such segregation may be impracticable.

[87]     Three possible approaches have been advanced in English and Australian authority: (i) the rule in *Clayton's Case*; (ii) the *pari passu* approach; and (iii) the *rolling charge*, sometimes referred to as the 'North American approach'.

The rule in Clayton's Case:

[88]     The first approach derives from the rule in *Clayton's Case*, which applies the principle of "first in, first out". In this scheme, withdrawals from a mixed account are deemed to be made in the order in which deposits were received.

[89]     However, this Court recognises two principal problems to the application of *Clayton's Case* in matters of mixed funds. First, it operates arbitrarily and often unjustly when applied to competing claims of innocent contributors. Secondly, *Clayton's Case* was not a tracing case, and it concerned the appropriation of payments between banker and customer. It was premised on historical assumptions about banking practice which no longer reflect commercial reality. For these reasons, it is observed that the rule in *Clayton's Case* is now rarely applied and, in this context, it may be set aside in favour of more equitable solutions.

The pari passu approach:

[90]     The second considered approach is that of *pari passu* distribution. Under this method, the remaining balance is shared rateably among the contributors in proportion to their respective contributions. Each claimant bears gains and losses equally, reflecting the

fact that each is equally innocent. The *pari passu* approach has the virtues of simplicity, convenience, and economy. It ensures that no claimant's interest is subordinated to another.

[91]  Nevertheless, the Court acknowledges its potential for unfairness. Where later contributions have not been depleted by subsequent withdrawals, the method may require those later contributors to subsidise earlier contributors whose funds have already been diminished. As Lord Atkin observed in *General Medical Council v. Spackman*[15], "convenience and justice are often not on speaking terms" which observation captures the enduring tension between administrative convenience and substantive justice. The present case exemplifies this tension because on the one hand, there is an equitable instinct to recognise that users who deposited assets under what they understood to be a custodial arrangement should, in justice, have those assets restored to them, as they never intended to part with beneficial ownership. On the other hand, the practical realities of extensive commingling, the impossibility of precise tracing, and the collective nature of the insolvency process render such restitution administratively unworkable and potentially unjust to the general body of creditors. In these circumstances, the Court must acknowledge that the pursuit of perfect justice for a few may compromise the orderly and equitable distribution for all. The law, therefore, inclines towards convenience and towards a recognition that in insolvency, collective justice sometimes demands the subordination of individual claims.

The rolling charge approach:

[92]  The third approach, which has gained increasing recognition, is the *rolling charge* method. This was described by Woolf LJ in *Vaughan and others v Barlow Clowes International Ltd and others*[16] as treating the account as a blended "cocktail," such that each withdrawal is deemed to reduce the interests of all contributors in proportion to their respective shares immediately prior to the withdrawal. Like the *pari passu* approach, it allocates losses pro rata. However, the *rolling charge* differs in that it recalculates the claimants' respective entitlements after each transaction. It thereby more accurately reflects the fluctuating composition of the account.

---

[15] [1943] AC 627
[16] [1991] EWCA Civ 11

[93]    The *rolling charge* is further subject to the lowest intermediate balance rule. That rule
        provides that, absent a clear intention to replenish misapplied funds, a beneficiary
        cannot trace through a mixed account for more than the lowest balance that stood to the
        account between the time of contribution and the date of claim. In *Caron v Jahani[17]*,
        the New South Wales Court of Appeal adopted a simplified version of the rolling charge
        approach, recognising it as a fairer and more principled means of resolving disputes of
        this kind. However, in the case of *Barlow Clowes Supra,* though the *rolling charge* was
        determined conceptually fairer it was determined to be impractical due to complexity
        and cost of the case.

[94]    This Court is thus faced with a choice between convenience and fairness. The *Clayton's
        Case* rule is largely obsolete in this context and should not be applied. The *pari passu*
        method, though simple and inexpensive, can operate unjustly where contributions were
        made at different times. The *rolling charge*, though more complex, best accords with
        an equitable principle, and produces a fairer outcome by dynamically adjusting the
        claimants' shares in accordance with the movements of the fund. However, it remains
        costly and complex in large matters which in my opinion renders it entirely unsuitable
        in the present circumstances.

[95]    This Court has also considered the case of *In re Celsius Network LCC et all[18]* which
        involved a company which operated similarly to a traditional bank by holding or
        reinvesting customer deposits. Celsius continually made clear in its Terms of Use as
        well as in its "First Day" Declaration that Celsius accounts are not bank accounts,
        deposit accounts, savings accounts, checking accounts, or any other type of asset
        accounts. Although customers retained title to digital assets held by Celsius through its
        custodial service, all such user assets are comingled, meaning under the Celsius Terms
        of Use, custody users are not entitled to the return of their specific digital assets, but
        rather the return of the same type of digital asset. On the other hand, customers who
        transferred digital assets to Celsius either as collateral or in order to earn rewards also
        transferred "all right and title" to those assets "including ownership rights" and the right
        to "pledge, re-pledge, hypothecate, re-hypothecate, sell, lend, or otherwise transfer or
        use any amount of" such digital assets.

---

[17] (No. 2) [2020] NSWCA 117
[18] (Case Number 22-10964)

[96]     The distinguishing feature in the *Celsius* bankruptcy proceedings was that the company periodically rebalanced its custody wallets to ensure that, in aggregate, they held digital assets equal to or exceeding the total customer balances of each cryptocurrency as recorded in its internal custody ledger. Under the company's Terms of Use, assets placed in the custody program remained the property of the user and did not generate yield. Those terms expressly stipulated that ownership of custody assets would at all times vest in the user, and that Celsius was prohibited from transferring, selling, lending, or otherwise re-hypothecating such assets without the user's express instruction, save where required by a valid court order. It was, moreover, common ground among the parties that the custody assets belonged to the customers rather than the company, irrespective of the manner in which they were stored or transferred. Accordingly, the proprietary character of those assets was not in issue and required no judicial determination. Nor was there evidence before the Court of any practical impediments such as an asset shortfall that might have complicated or rendered inequitable their return. The case thus stands in contrast to situations where assets have been pooled or co-mingled, and where equitable principles necessitate a proportionate approach to the distribution of investor claims.

[97]     What is particularly noteworthy is that the court in the Celsius case acknowledged in a footnote that even if the Terms of Use expressly provided that the digital assets were property of the customers, "customers would still not get back 100% of their coins," because Celsius *"do[es] not have enough coin to give everybody their coin back in kind."* (December 5, 2022 H'rg Tr. 109:21–24). Thus, the Court acknowledged that even a win on the underlying issue by earn account holders would not result in customers being made completely whole.

[98]     The liquidators in the case at hand have considered whether the default tracing method of first-in, first-out ('FIFO') could be applied to the specific asset-type wallets within the 'Withdrawal Pool'. Based on the information currently available, they have found that company assets were deposited into the pool before user deposits and therefore on a strict FIFO analysis, this sequencing would mean that user proprietary claims are defeated, since the earlier company assets would be deemed to have been withdrawn first.

[99]  In my final analysis, I can see two alternate courses of action. This Court can direct that all the assets should be regarded as company property, in which case the US $3.5 million (as of  June 2025 and subject to fluctuations) would be distributed *pari passu* among all unsecured creditors. If this approach is recommended, custodial clients lose the benefit of any trust rights and rank equally with general creditors. This method maximises administrative simplicity but sacrifices fairness to custodial clients. Alternatively, if the Court decides to uphold the existence of a constructive trust, it may recommend that the liquidators view the remaining US $3.5 million as the traceable substitute of custodial assets, notwithstanding the shortfall. The liquidators would then be left to decide how best to divide that fund among the beneficiaries.

[100]  In such circumstances, the rolling charge approach would in my opinion remains the fairest method of allocation. Each users interest is adjusted proportionately at every withdrawal, subject to the lowest intermediate balance rule. Although the percentage recovery will be extremely small, the relative fairness between users is preserved. Where a distinction can be drawn between custodial clients (whose assets were to be safeguarded) and investment clients (who consented to their assets being used for profit-making), fairness would require acknowledging that only the former are entitled to share in the trust fund. The latter must rank as unsecured creditors of the estate, alongside other company creditors. In such a case, the US $3.5 million would be allocated solely among custodial claimants, by way of the rolling charge approach. The remaining creditors, whose assets were invested or whose claims arise in contract, would share *pari passu* in any other company property.

[101]  However, the FRA Tracing Report has made it abundantly clear that it is neither practical nor cost-effective to carry out a tracing exercise in this case. The shortfall affects the practical outcome of distribution because whatever method is chosen, the users will recover only a small fraction of their entitlements and there is a real eventuality that this sum will disappear altogether after the costs of tracing has been deducted from the sums to be distributed.

## CONCLUSION

[102]  In assessing fairness, the Court must balance two competing concerns:

- The protection of proprietary interests of those who entrusted assets to be held in custody.
- The equitable treatment of all innocent users in circumstances where the company's breach has rendered precise allocation impossible.

[103]   To treat all users as unsecured creditors would be convenient but may be viewed as manifestly unjust to custodial clients. To recognise proprietary rights but distribute *pari passu* may be simple but unfair to those custodial clients. Additionally, the *rolling charge method*, though more complex, most closely reflects the equitable principle that each claimant's interest should fluctuate in accordance with the real movements of the mixed account.

[104]   Equity aims for fairness, but not at the expense of futility. The forensic report now before the Court indicates that it would not be cost-effective to apply the rolling charge method of distribution. The expense of reconstructing the account history and recalculating each claimant's proportionate entitlement would exceed the very funds available for distribution. The Court must therefore determine whether the beneficiaries' equitable rights require strict adherence to tracing principles notwithstanding the prohibitive cost, or whether a more pragmatic solution should be adopted in order to achieve a measure of justice within the limits of practicality.

[105]   It is my opinion that equity requires not only fairness but also practicability. The courts have long recognised that remedies which are "expensive, impractical, or contrary to the presumed intentions of the parties" may be displaced in favour of simpler solutions. This reflects Lord Atkin's observation in *General Medical Council v Spackman supra*. As such I am of the view that where the cost of implementing the rolling charge would consume or exceed the available fund, it would be perverse to insist upon it. The beneficiaries would receive nothing, and the remedy would fail in its very object.

[106]   Therefore considering the findings, and in particular the evidence that user assets were co-mingled with company funds within the 'Withdrawal Pool', this Court concludes that the requisite certainty of subject matter necessary to sustain a trust cannot be established. The proprietary character of any individual user's claim has therefore been extinguished, and their entitlements reduced to personal claims against the company. In

consequence, all users whether or not they believed their assets were held under a custodial arrangement must be treated as unsecured creditors within the insolvency.

[107]  While the Court recognises that this outcome may appear harsh to certain users, it represents the only practicable and legally coherent means of achieving collective fairness within the constraints imposed by the extensive commingling of assets.

## ORDERS

[108]  In the circumstances this Court makes the following orders:

i.    The liquidators are accordingly directed to administer the estate in accordance with the general principles of insolvency law, applying a *pari passu* distribution among all unsecured claims, after deducting the reasonable costs and expenses of the liquidation.

ii.   The liquidators shall also ensure transparency by circulating the proposed schedule of admitted claims and allowing a period for objections prior to the final distribution.

Signed, dated and delivered at Ile du Port on 24th October 2025

Burian J

# EXHIBIT 37

Case 22-11068-KBO    Doc 34263-2    Filed 01/05/26    Page 1043 of 1365

Section E. - The Test for the Recognition of Property, UKBC-LAWPERP 466450112...

# Section E. - The Test for the Recognition of Property

**The Law of Personal Property 3rd Ed.**

**Mainwork**

**Chapter 1 - Introduction**

**Section E. - The Test for the Recognition of Property**

## The boundaries of property

**1-068**  As stated above, personal property as the residual category of property law (once interests in land are excised) is the repository or dumping-ground for allegedly new species of property right. We have suggested that the three features of transferability, excludability and exigibility provide useful benchmarks for testing whether new forms of wealth or other assets give rise to property rights. Despite criticisms, the judicial starting-point remains Lord Wilberforce in *National Provincial Bank Ltd v Ainsworth*. In rejecting the purported recognition of a "deserted wife's equity" in the former matrimonial home as a form of a property right, as opposed to a merely personal right, his Lordship famously observed:

> "On any division, then, which is to be made between property rights on the one hand, and personal rights on the other hand, however broad or penumbral the separating band between these two kinds of rights may be, there can be little doubt where the wife's rights fall. *Before a right or an interest can be admitted into the category of property, or of a right affecting property, it must be definable, identifiable by third parties, capable in its nature of assumption by third parties, and have some degree of permanence or stability*. The wife's right has none of these qualities, it is characterised by the reverse of them." [299]

The testing ground for new interests is often, but not always, insolvency. An example from outside the context of insolvency is *Yearworth v North Bristol NHS Trust* concerning bodily products [300] Lord Judge CJ, delivering the judgment of the Court, observed: "A decision whether something is capable of being owned cannot be reached in a vacuum." [301] Similarly *Armstrong DLW GmbH v Winnington Networks Ltd* [302] concerned the nature and existence of a claim to recover purely intangible wealth. [303] In *AA v Persons Unknown* [304] Bryan J held that bitcoins were intangible personal property for the purposes of a proprietary injunction.

© 2025 Thomson Reuters.

Case 22-11068-KBO    Doc 34263-2    Filed 01/05/26    Page 1044 of 1365

Section E. - The Test for the Recognition of Property, UKBC-LAWPERP 466450112...

## Vehicle registration marks

**1-069**  In *Goel v Pick*[305] a vehicle registration mark ("VRM") was only capable of being transferred pursuant to statutory regulations.[306] An individual agreed to transfer his mark for value, but failed to complete the necessary documentation before a trustee in bankruptcy was appointed in respect of his assets. The court held the agreement was not sufficient, and the statutory machinery for a transfer of the mark had simply not operated. An alternative argument was that the mark was a chose in action and that there had been a legal or equitable assignment. Sir Francis Ferris stated that: "A VRM is an item of property only in a very qualified sense… It is only as an incident of the requirement to that every road vehicle shall have a VRM assigned to it that certain marks or numbers have come to be regarded as attractive by reason of their novelty or distinctiveness, and thus to have a value. A glance at the press advertisements shows that some VRMs are traded, or are at least offered for sale, at substantial prices."[307] However the argument that a mark was a chose in action was rejected, although the judge considered the statutory right of retention for a period whilst the mark was not displayed on a vehicle was more akin to a chose in action. The critical point was that the mark was not amenable to legal or equitable assignment, but only by means of the statutory mechanism, which preserved vesting by operation of law, such as on death or bankruptcy.[308] We would submit that a vehicle registration mark is personal property. Some marks are clearly of substantial value, and capable of being comprehended in a freezing and disclosure of assets order, or of vesting in a trustee in bankruptcy. It constitutes an exclusive right, and one which is capable of transfer in accordance with the statutory mechanism.

## Bodies, body parts and bodily products

**1-070**  The common law was clear that neither a living human body nor a corpse was capable of being owned or possessed.[309] In this field there has been significant statutory interventions in the shape of the Human Tissue Act 2004 and the Human Fertilisation and Embryology Act 1990. Nevertheless a recent Court of Appeal case in the field of bodily products and tissue donation suggests a major re-evaluation, and future deployment, of proprietary reasoning in this field.[310]

## Information

**1-071**  Whether information can constitute property has proved controversial.[311] It is clear that certain types of information are capable of being the subject-matter of property rights. Goodwill has been treated as a species of asset.[312] So too, know-how[313] and trade secrets.[314] Different opinions were

© 2025 Thomson Reuters.

Case 22-11068-KBO   Doc 34263-2   Filed 01/05/26   Page 1045 of 1365

Section E. - The Test for the Recognition of Property, UKBC-LAWPERP 466450112...

expressed in the speeches in *Boardman v Phipps* [315] with Lord Hodson, [316] Lord Guest [317] and Viscount Dilhorne (dissenting) [318] favouring a proprietary analysis. Nevertheless the view of Lord Upjohn in his dissenting judgment that information was not property, albeit wrongful transmission of confidential information can be restrained, has come to predominate. [319] So Lord Walker of the majority in *OBG Ltd v Allen* stated: "information, even if it is confidential, cannot properly be regarded as a form of property." [320] So too in *Your Response Ltd v Datateam Business Media Ltd* [321] Floyd LJ stated: "Although information may give rise to intellectual property rights, such as database right and copyright, the law has been reluctant to treat information itself as property." [322] We consider further information, confidences, goodwill and trade secrets in Ch.10.

1-072    It is clear that information held in intangible form is not capable of being possessed, and the tort of conversion is not available where an interest has been interfered with. [323] It has been held that information or documents held in electronic form are not amenable to the jurisdiction to grant delivery up, or interim delivery up of goods under ss.3 and 4 of the Torts (Interference With Goods) Act 1977. [324] Accordingly, in *Churngold Recycling Ltd v The Environment Agency* [325] the Court of Appeal reversed the judge below who had ordered delivery up of both photocopies and electronic scans of documents obtained by the agency in what was alleged to have been an unlawful search.

## Software and databases

1-073    Where software was stored on a physical disk or data-stick the analogy with sale of goods on occasion proved persuasive. However developments in technology whereby software is now almost invariably downloaded in purely digital format means that any debate about whether software corresponds to goods, or is purely intangible, has now been resolved in favour of software as an intangible species of property. [326] Protection of software is provided by intellectual property rules. [327] Chapter 3 of Pt 1 of the Consumer Rights Act 2015 now comprehensively regulates the rights and obligations arising from the supply of digital content by traders to consumers (as distinct from the regime for goods), without entering into the debate as to whether it constitutes property, and if so, whether it is tangible or intangible. A significant decision of the Court of Appeal held that a database was not capable of being subject to a common law lien, because the essence of such a right turned on possession. In *Your Response Ltd v Datateam Business Media Ltd* [328] Moore-Bick LJ opined that a database "if it constitutes property at all, does not constitute property of a kind that is susceptible of possession or of being the subject of the tort of conversion." [329] It was noted that protection was afforded by statutory regulations. [330] Whilst the entry of information may effect physical changes on the storage medium that did not render the information tangible property. [331] The proper remedy lies in the statutory rights protecting database rights. [332]

Case 22-11068-KBO    Doc 34263-2    Filed 01/05/26    Page 1046 of 1365

Section E. - The Test for the Recognition of Property, UKBC-LAWPERP 466450112...

**1-074**  The view that downloaded software does not constitute goods has now received the imprimatur of the Court of Appeal. In *Computer Associates UK Ltd v Software Incubator Ltd* [333] the Court of Appeal ruled that software generally sold as downloads did not constitute goods for the purposes of the Commercial Agents regime [334] either as a matter of EU or UK Law. The distinction between goods and intangible property was well-recognised in the authorities and the textbooks in that field. [335] Gloster LJ made reference to authority in a wide number of contexts and concluded: "This court cannot simply ignore the weight of judicial authority that supports maintaining the tangible/intangible distinction." [336] The court observed that the development of a bespoke regime for the supply of digital content to consumers in Pt 1 of the Consumer Rights Act 2015 demonstrated that these matters involved policy considerations which were a matter for Parliament. [337] On appeal the Supreme Court made a reference to the Court of Justice of the European Union, and Advocate-General Tanchev has produced an opinion which would reverse the result of the Court of Appeal and treat the software as goods for the purpose of the Commercial Agents regime. Subsequently the Court of Justice of the European Union agreed that the autonomous meaning of "goods" in the commercial agency context can include software. [338]

## Digital assets and cryptoassets

**1-075**  Cryptocurrencies, [339] or more broadly cryptoassets, and the distributed ledger technology underpinning them raise important issues of public policy and regulation. [340] They form part of the wider category of digital assets, which also includes digital files, digital records, domain names and in-game digital assets. [341] The nomenclature is not settled, with some commentators preferring "virtual", "digitized" or "electronic" assets. Each of these emergent phenomena pose the question whether such interests will be afforded the status of property as a matter of law, with many supportive of legal recognition. [342] The UK Government has been a notable supporter of the anticipated benefits of the wider economic context of financial technology or "FinTech". [343] In March 2018 the Chancellor of the Exchequer launched a Cryptoassets Taskforce consisting of the Bank of England, Financial Conduct Authority and HM Treasury. The Taskforce published its final report in October 2018, [344] defining cryptoassets as "cryptographically secured digital representation of value or contractual rights that uses some sort of DLT [distributed ledger technology] and can be transferred, stored or traded electronically." Subsequently the UK Government launched a FinTech Delivery Panel, including a LawTech Delivery Panel, which includes the UK Jurisdiction Taskforce (UKJT), consisting of members of the judiciary, the Law Commission for England and Wales and technology and legal professionals, together with the Financial Conduct Authority as a consultant, which published a consultation on cryptoassets, distributed ledger technology and smart contracts in the UK in May 2019. [345]

© 2025 Thomson Reuters.

Case 22-11068-KBO   Doc 34263-2   Filed 01/05/26   Page 1047 of 1365

Section E. - The Test for the Recognition of Property, UKBC-LAWPERP 466450112...

1-076    The UKJT, chaired by Sir Geoffrey Vos, the Chancellor of the High Court, considered whether the English law and English jurisdiction can provide an appropriate legal foundation for these innovations. Sir Geoffrey Vos addressed the question whether cryptoassets can be regarded as property under English law in an extra-judicial lecture. [346] He identified two potential problems: first, whilst intangible assets were recognised in English law, a cryptoasset did not generate a right against another person like a thing in action or a bank account; and secondly, differing species of cryptoasset—the fungible or "account model" and the "unspent transaction output ('UXTO') model"—raised questions as to the ability to possess such assets and the remedies which may be available. The UKJT consulted on whether a cryptoasset is capable of being recognised as property, together with related questions as to whether it is personal property, a thing in action or some other species of personal property? Further whether a cryptoasset can be the subject of a bailment, whether it can be the subject-matter of a security interest, and its position with regard to the Bills of Exchange Act 1882, the Sale of Goods Act 1979, the Insolvency Act 1986, the Companies Act 2006 and the Uncertificated Securities Regulations 2001 (SI 2001/3755). [347] One option under consideration was the adoption of a short Act of Parliament clarifying and settling the proprietary status of cryptoassets. [348]

1-077    As stated above [349] the emergence of cryptoassets re-opened the debate about whether the categories of things in possession and things in action is exhaustive. Following its consultation the UKJT issued what is intended to be a definitive statement that as a matter of English law cryptoassets have all the indicia of property, are intangible in nature, and are not capable of being possessed or bailed. On one view of the statement, notably in *AA v Persons Unknown*, [350] the UKJT appears to accept that such interests are "other intangible property", rather than things in action. [351] However, it has also been suggested that another reading of the UKJT's statement favours a broader view of things in action which would then accommodate cryptoassets, with the view that they are other intangible property merely serving as a fallback position should a narrow view of things in action be adopted by the courts. [352] Most recently the Law Commission has been asked by the Ministry of Justice to review the law on cryptoassets and has published a call for evidence. [353]


## The testing-ground of insolvency

1-078    The insolvency legislation, in s.436 of the Insolvency Act 1986, [354] defines property extremely broadly. Accordingly caution is required when approaching cases determined under this section. [355] A broader definition is difficult to imagine. [356] The word "interest" has received a particularly expansive reading. [357] Property has therefore been held to include the "entitlement" of a bankrupt commercial fisherman (or of a person in whose favour he waives the entitlement) to

© 2025 Thomson Reuters.

Section E. - The Test for the Recognition of Property, UKBC-LAWPERP 466450112...

Case 22-11068-KBO    Doc 34263-2    Filed 01/05/26    Page 1048 of 1365

apply for new licences, when his fishing licences were invalidated on his bankruptcy.[358] Property has also been held to include the holding of a waste management licence [359] and of a milk quota,[360] in the latter case despite the fact that the licence could be transferred only with great difficulty. Indeed, an item may be the subject of proprietary rights though it is not freely transferable at all.[361]

## Test for the recognition of property in statutory exemptions

1-079 In *Re Celtic Extraction Ltd*[362] Morritt LJ suggested a three-stage test for recognising a property right arising from an exemption from a general statutory prohibition upon some form of conduct. First, there must be a statutory framework conferring the entitlement to the exemption to those who satisfy certain criteria, even though the statutory authority may enjoy a degree of discretion. Secondly, the exemption must be transferable. Thirdly, the exemption must be of value.

## Summary

1-080 This test has been applied outside the insolvency context in the recognition of a carbon trading allowance as giving rise to a species of property right.[363] It is submitted that whilst a statutory framework and the economic value are often present in the modern cases, these are not true indicia of property rights. The cases, whether in the insolvency context or outside of it, are generally consistent. As suggested above transferability remains a common sense requirement insisted upon in judicial tests. Furthermore, the ability to exclude others from the thing and the exigibility of the interest against a subsisting asset are also important characteristics of a proprietary entitlement. Lord Wilberforce's other criterion in *Ainsworth* of definability, identifiability by third parties and relative permanence or stability should also be relevant.[364]

---

### Footnotes

299 *National Provincial Bank Ltd v Ainsworth [1965] A.C. 1175 at 1247–1248, HL* (emphasis added). This was the starting point in the recent case of *Armstrong DLW GmbH v Winnington Networks Ltd [2012] EWHC 10 (Ch); [2013] Ch. 156; [2012] Bus. L.R. 1199* at [42] and [50].

300 *Yearworth v North Bristol NHS Trust [2009] EWCA Civ 37; [2010] Q.B. 1* at [25]–[45].

301 *Yearworth v North Bristol NHS Trust [2010] Q.B. 1* at [28].

Case 22-11068-KBO   Doc 34263-2   Filed 01/05/26   Page 1049 of 1365

Section E. - The Test for the Recognition of Property, UKBC-LAWPERP 466450112...

302  *Armstrong DLW GmbH v Winnington Networks Ltd [2012] EWHC 10 (Ch); [2013] Ch 156; [2012] Bus. L.R. 1199*. A lottery ticket has been held to be "property": *Abrahams v Trustee of the Property of Abrahams [1999] B.P.I.R. 637, 649-650, Ch D* (Lindsay J).

303  See Sir Geoffrey Vos, "Cryptoassets as property: how can English law boost the confidence of would-be parties to smart legal contracts?" (Joint Northern Chancery Bar Association and University of Liverpool Lecture, 2 May 2019): https://www.judiciary.uk/announcements/speech-by-sir-geoffrey-vos-chancellor-of-the-high-court-cryptoassets-as-property/.

304  *AA v Persons Unknown [2019] EWHC 3556 (Comm); [2020] 4 W.L.R. 35; [2020] 2 All E.R. (Comm) 704.*

305  *Goel v Pick [2006] EWHC 833 (Ch); [2007] 1 All E.R. 982*. The valuable asset is the statutory right to display a particular mark on a vehicle rather than the physical number plates.

306  Section 26 of the Vehicle Excise and Registration Act 1994, and the Retention of Registration Marks Regulations 1993 (SI 1993/987), as amended, made thereunder, and in particular reg.13.

307  *Goel v Pick [2006] EWHC 833 (Ch)* at [20].

308  Retention of Registration Marks Regulations 1993 (SI 1993/987), reg.13.

309  *Yearworth v North Bristol NHS Trust [2009] EWCA Civ 37; [2010] Q.B. 1* at [30]–[32].

310  *Yearworth v North Bristol NHS Trust [2009] EWCA Civ 37; [2010] Q.B. 1*. For further discussion see Ch.3.

311  Kohler, P. and Palmer, N., "Information as Property" in Palmer, N. and McKendrick, E., Interests in Goods, 2nd edn (1998).

312  *Commissioners of Inland Revenue v Muller & Co's Margarine Ltd [1901] A.C. 217 at 223–24* (Lord Macnaghten). See para.10-002.

313  *Rolls Royce Ltd v Jeffrey [1962] 1 W.L.R. 425* at 430, HL (Lord Radcliffe).

314  *Herbert Morris Ltd v Saxelby [1916] 1 A.C. 688* at 714, HL (Lord Shaw). See paras 10-037 to 10-042.

315  *Boardman v Phipps [1967] 2 A.C. 46*.

316  *Boardman v Phipps [1967] 2 A.C. 46 at 127* ("I dissent from the view that information is of its nature something which is not properly to be described as property.") See also at 109.

317  *Boardman v Phipps [1967] 2 A.C. 46* at 115: "I see no reason why information and knowledge cannot be trust property".

318  *Boardman v Phipps [1967] 2 A.C. 46* at 89–90: "some information and knowledge may properly be regarded as property".

319  *Boardman v Phipps [1967] 2 A.C. 46* at 127–128. See paras 8-005 and 10-044.

320  *OBG Ltd v Allen [2007] UKHL 21; [2008] 1 A.C. 1* at [275].

321  *Your Response Ltd v Datateam Business Media Ltd [2014] EWCA Civ 281; [2015] Q.B. 41*. See also *Capita Plc v Darch [2017] EWHC 1248 (Ch); [2017] I.R.L.R 718* at [67]–[72]

322  *Your Response Ltd v Datateam Business Media Ltd [2014] EWCA Civ 281; [2015] Q.B. 41* at [42]. See also *Dixon v R [2015] NZSC 147* at [23] referring to "the orthodox view that information, even confidential information, is not property" (Arnold J).

323  *OBG Ltd v Allan [2007] UKHL 21; [2008] 1 A.C. 1* at [94]–[107] (Lord Hoffmann), [271] (Lord Walker), and [319] and [321] (Lord Brown).

324  *Thunder Air Ltd v Hilmarsson [2008] EWHC 355 (Ch)* at [29] (Patten J).

Case 22-11068-KBO  Doc 34263-2  Filed 01/05/26  Page 1050 of 1365

Section E. - The Test for the Recognition of Property, UKBC-LAWPERP 466450112...

325  *Churngold Recycling Ltd v The Environment Agency [2014] EWCA Civ 909; [2014] W.L.R. (D) 295.* Contrast the approach of the New York Court of Appeals extending the tort of conversion to electronic records in *Thyroff v Nationwide Mutual Insurance Co 8 NY 3d 283 (NY 2007).*

326  See paras 8-020 to 8-029; *St. Albans City and District Council v International Computers Ltd [1996] 4 All E.R. 481, CA*; *Erris Promotions Ltd Commissioner of Inland Revenue [2004] 1 NZLR 811*; *Gammasonics Institute for Medical Research Pty Ltd v Comrad Medical Systems Pty Ltd [2010] NSWSC 267; (2010) 77 N.S.W.L.R. 479 at 481–89.* See also *Thunder Air Ltd v Hilmarsson [2008] EWHC 355 (Ch)* at [28] (Patten J) where it was common ground that any claim under the Torts (Interference With Goods) Act 1977 was confined to the hard disk of a computer, but not the files stored on it, following *Dunn & Bradstreet v Typesetting Facilities Ltd [1992] FSR 320.* For the argument that software constitutes goods see *Green, S. and Saidov, D., "Software as Goods" [2007] J.B.L. 161.* See also *Moon, K., "The Nature of Computer Programs: Tangible? Goods? Personal Property? Intellectual Property?" (2009) 31(8) EIPR 396.* Contrast the inclusion of "computer software" in the New Zealand Sale of Goods Act 1908 s.2 (as amended by the Sale of Goods Amendment Act 2003 (NZ) s.3).

327  See Ch.9.

328  *Your Response Ltd v Datateam Business Media Ltd [2014] EWCA Civ 281; [2015] Q.B. 41.*

329  *Your Response Ltd v Datateam Business Media Ltd [2014] EWCA Civ 281; [2015] Q.B. 41* at [17].

330  The Copyright and Rights in Databases Regulations 1997 (SI 1997/3032). See further paras 9-045 to 9-049 and 29-012.

331  *Your Response Ltd v Datateam Business Media Ltd [2014] EWCA Civ 281; [2015] Q.B. 41* at [18]–[21]. See paras 8-013 to 8-019. See also *Dixon v R [2015] NZSC 147* at [25] where the Supreme Court of New Zealand concluded that digital files have a "physical presence, albeit one that cannot be detected by means of the unaided senses." See also *South Central Bell Telephone Co v Barthelemy 643 So 2d 1240 (Lou 1994) (Sup Ct of Louisiana)*; Randall QC, J. and Green, S., The Tort of Conversion (2009), 118–119.

332  Copyright and Rights in Databases Regulations 1997 (SI 1997/3032), reg.16. See further paras 9-045 to 9-049 and 29-052.

333  *Computer Associates UK Ltd v Software Incubator Ltd [2018] EWCA Civ 518; [2019] Bus. L.R. 522; [2018] 2 All E.R. (Comm) 398; [2018] 1 Lloyd's Rep. 613.*

334  Commercial Agents (Council Directive) Regulations 1993 (SI 1993/3053) reg.2(1) applies to "sale" of "goods" without defining either term; implementing Council Directive 86/853/ EEC, which also does not define either term.

335  *Computer Associates UK Ltd v Software Incubator Ltd [2018] EWCA Civ 518; [2018] 2 All E.R. (Comm) 398 at [25].* Contrast *Green Deal Marketing Southern Ltd v Economy Energy Trading [2019] EWHC 507 (Ch).*

336  *Computer Associates UK Ltd v Software Incubator Ltd [2018] EWCA Civ 518; [2018] 2 All E.R. (Comm) 398 at [55].*

337  *Computer Associates UK Ltd v Software Incubator Ltd [2018] EWCA Civ 518; [2018] 2 All E.R. (Comm) 398 at [56] and [67].*

Section E. - The Test for the Recognition of Property, UKBC-LAWPERP 466450112...

Case 22-11068-KBO    Doc 34263-2    Filed 01/05/26    Page 1051 of 1365

338   *The Software Incubator Ltd v Computer Associates UK Ltd (Case C–410/19)* (16 September 2021). See para.8-025.

339   See paras 7-027 and 7-028 on cryptocurrencies. See also Fox, D., and Green, S., (eds), Cryptocurrencies in Public and Private Law (2019); Cranston, R. et al, Principles of Banking Law, 3rd edn (2017), pp.369–371; *Low, K. and Teo, E., "Bitcoins and other cryptocurrencies as property?" (2017) 9 Law, Innovation and Technology 235*; Sir Geoffrey Vos, "Cryptoassets as property: how can English law boost the confidence of would-be parties to smart legal contracts?" (Joint Northern Chancery Bar Association and University of Liverpool Lecture, 2 May 2019): https://www.judiciary.uk/announcements/speech-by-sir-geoffrey-vos-chancellor-of-the-high-court-cryptoassets-as-property/.

340   However as noted by Mark Carney, then Governor of the Bank of England: "Just because something is new doesn't mean it should be treated any differently." See Carney, M., "Building the Infrastructure to Realise FinTech's Promise" (International FinTech Conference 2017, Old Billingsgate; 12 April 2017): https://www.bankofengland.co.uk/speech/2017/building-the-infrastructure-to-realise-fintechs-promise.

341   See Ch.8.

342   For a more sceptical account see *Low, K.F.K. and Mik, E., "Pause the Blockchain Legal Revolution" (2020) 69 I.C.L.Q. 135*, and *Low K.F.K., "Confronting Cryptomania: Can Equity Tame the Blockchain?" (2020) 14 J. Eq. 240*.

343   See the *Kalifa Review of UK FinTech* (February 2021): https://www.gov.uk/government/publications/the-kalifa-review-of-uk-fintech. See also Carney, M., "The Promise of FinTech – Something New under the Sun?" (Deutsche Bundesbank G20 conference on "Digitising finance, financial inclusion and financial literacy", Wiesbaden; 25 January 2017): https://www.bankofengland.co.uk/speech/2017/the-promise-of-fintech-something-new-under-the-sun.

344   Joint Bank of England, Financial Conduct Authority and HM Treasury, Cryptoassets Taskforce: final report (October 2018): https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/752070/cryptoassets_taskforce_final_report_final_web.pdf.

345   UK Jurisdiction Taskforce of the LawTech Delivery Panel, *Public consultation—The status of cryptoassets, distributed ledger technology and smart contracts under English private law* (May 2019).

346   Sir Geoffrey Vos, "Cryptoassets as property: how can English law boost the confidence of would-be parties to smart legal contracts?" (Joint Northern Chancery Bar Association and University of Liverpool Lecture, 2 May 2019), especially at [23] and following: https://www.judiciary.uk/announcements/speech-by-sir-geoffrey-vos-chancellor-of-the-high-court-cryptoassets-as-property/.

347   UK Jurisdiction Taskforce of the LawTech Delivery Panel, *Public consultation—The status of cryptoassets, distributed ledger technology and smart contracts under English private law* (May 2019), Annex 1.

348   Sir Geoffrey Vos, "Cryptoassets as property: how can English law boost the confidence of would-be parties to smart legal contracts?" (Joint Northern Chancery Bar Association and University of Liverpool Lecture, 2 May 2019), [47] and [50]–[55].

© 2025 Thomson Reuters.

Case 22-11068-KBO    Doc 34263-2    Filed 01/05/26    Page 1052 of 1365

Section E. - The Test for the Recognition of Property, UKBC-LAWPERP 466450112...

349   See para.1-017.

350   *AA v Persons Unknown [2019] EWHC 3556 (Comm); [2020] 4 W.L.R. 35; [2020] 2 All E.R. (Comm) 704* at [55]–[61] (Bryan J); noted *Low, K.F.K., "Bitcoins as Property: Welcome Clarity?" (2020) 136 L.Q.R. 1*; *Condon, R.R., "Bit-Property" (2020) 79 C.L.J. 224*; and *Lau, J., "That New Chestnut – The Proprietary Status of Bitcoins" [2020] L.M.C.L.Q. 378.* See para.8-049.

351   The LawTech Delivery Panel, *Legal statement on cryptoassets and smart contracts: UK Jurisdiction Taskforce* (November 2019), 15–17, 66–84.

352   See para.1-023.

353   Law Commission, *Digital assets: Call for evidence* (2021).

354   Section 436 of the Insolvency Act 1986 defines "property" as including "money, goods, things in action, land and every description of property wherever situated and also obligations and every description of interest, whether present or future or vested or contingent, arising out of, or incidental to, property."

355   See the warning by Lord Porter in *Nokes v Doncaster Amalgamated Collieries Ltd [1940] A.C. 1014 at 1051* (quoted at para.1-002).

356   *Bristol Airport Plc v Powdrill [1990] B.C.C. 130 at 148*.

357   *Re Rae [1995] B.C.C. 102 at 113*: "The word 'interest' is notoriously one of wide import, the meaning of which varies according to the context in which it is used. Here it is not limited to an interest in property. It extends to an interest 'arising out of, or incidental to, property.'"

358   *Re Rae [1995] B.C.C. 102.*

359   *Re Celtic Extraction Ltd [2001] Ch. 475, CA.*

360   *Swift v Dairywise Farms Ltd [2000] 1 W.L.R. 1177, affirmed [2003] 1 W.L.R. 1606 (Note); [2001] EWCA Civ 145.*

361   *Money Markets International Stock Brokers Ltd v London Stock Exchange [2002] 1 W.L.R. 1150* (seat on a stock exchange).

362   *Re Celtic Extraction Ltd [2001] Ch 475, CA.*

363   *Armstrong DLW GmbH v Winnington Networks Ltd [2012] EWHC 10 (Ch) at [50]; [2013] Ch 156; [2012] Bus. L.R. 1199*, citing *National Provincial Bank Ltd v Ainsworth [1965] A.C. 1175 at 1247–1248, HL.*

364   *National Provincial Bank Ltd v Ainsworth [1965] A.C. 1175* at 1247–1248, HL. See para.1-004.

End of Document          © 2025 SWEET & MAXWELL

# EXHIBIT 38

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
----------------------------------------X
IN RE: FTX TRADING LTD., et al.,

                        Debtors.


                        CHAPTER 11


Case No. 22-11068


----------------------------------------X


                DATE: September 25, 2025

                TIME: 9:00 A.M.


        VIDEOTAPED DEPOSITION of STEVEN

COVERICK, held at Latham & Watkins, 1271

Avenue of the Americas, New York, New York,

before Rivka Trop, a Notary Public of the

State of New York.


                Magna Legal Services
                   866-624-6221
                  www.MagnaLS.com



Page 2

```
 1
 2   A P P E A R A N C E S:
 3   COUNSEL FOR JOINT LIQUIDATORS FOR THREE
 4   ARROWS CAPITAL LTD:
 5   LATHAM & WATKINS, LLP
         Attorneys for the Plaintiff
 6   IN RE: FTX TRADING LTD., ET AL
         1271 Avenue of the Americas
 7     New York, New York 10020
       BY: ZACHARY PROULX, ESQ.
 8       ZIJUN ZHAO, ESQ.
         ADAM GOLDBERG, ESQ.
 9       CHRISTOPHER HARRIS, ESQ.
10
11
12   COUNSEL FOR FTX RECOVERY TRUST AND THE
13   WITNESS:
14   SULLIVAN & CROMWELL
         Attorneys for the Defendant
15     125 Broad Street
       New York, New York 10004
16   BY: BRIAN GLUECKSTEIN, ESQ.
         SAMUEL G. DARBY, ESQ.
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2
 3
     ALSO PRESENT:
 4     GAURAV WALIA, (Alvarez & Marsal)
 5     CHASE BRANTLEY, (Alvarez & Marsal)
 6     Jacob Versteegh (Teneo)
 7     CHRISTOPHER FARMER (Teneo), via Zoom
 8     JEREMY KOVACS,
 9       Videographer
10           *   *   *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2          THE VIDEOGRAPHER:  Good morning.
 3   We are now on the record.  This begins
 4   videotape number 1 in the deposition of
 5   Steven Coverick slash FTX 30(b)(6) day
 6   2 in the matter of Re: FTX Trading
 7   Limited, et al. in the United States
 8   Bankruptcy Court for the District of
 9   Delaware, Case No. 22-11068.
10          Today is Thursday, September 25,
11   2025, and the time is 9:17 a.m.
12   eastern.  This deposition is being
13   taken at Latham & Watkins, 1271 Avenue
14   of the Americas, New York, New York
15   10020, at the request of Latham &
16   Watkins.
17          The videographer is Jeremy Kovacs
18   of Magna Legal Services and the court
19   reporter is Rivka Trop of Magna Legal
20   Services.
21          Will counsel and all parties
22   present state their appearances and
23   whom they represent.
24          MR. PROULX:  For the joint
25   liquidators of Three Arrows Capital,
```

Page 5

```
 1          S. COVERICK
 2   Zachary Proulx of Latham & Watkins,
 3   joined by my colleagues, Zijun Zhao,
 4   Adam Goldberg, Christopher Harris.
 5   From Teneo, Jacob Versteegh.
 6          MR. GLUECKSTEIN:  Good morning,
 7   Brian Glueckstein, Sullivan & Cromwell,
 8   on behalf of the FTX Recovery Trust and
 9   the witness.  Along with me is Sam
10   Darby from Sullivan & Cromwell and
11   Gaurav Walia and Chase Brantley from
12   Alvarez & Marsal.
13          THE VIDEOGRAPHER:  Will the court
14   reporter please swear in the witness
15   and then we may begin.
16   S T E V E N   C O V E R I C K, called as a
17   witness, having been first duly sworn by a
18   Notary Public of the State of New York, was
19   examined and testified as follows:
20   EXAMINATION BY
21   MR. PROULX:
22      Q.  Please state your name for the
23   record.
24      A.  Steven Coverick.
25      Q.  Mr. Coverick, good morning?
```



Page 6

1            S. COVERICK
2      A.  Good morning.
3      Q.  Thank you for speaking with us
4  again today.
5      Are you prepared -- we will be
6  conducting this deposition concurrently in
7  your individual and joint and representative
8  capacities for FTX.
9      Do you remain prepared to speak in
10  those capacities?
11     MR. GLUECKSTEIN:  I would like to
12  interpose an objection.  As I said on
13  the record last night, our position is
14  that Mr. Coverick's 30(b)(6) testimony
15  is complete given the way the time was
16  allotted yesterday.  Nonetheless we are
17  not going instruct him not to answer
18  any questions today.  My position is
19  noted.
20     A.  I will answer your questions to
21  the best of your ability.
22     Q.  And you will answer in your
23  capacity as -- currently in your capacity as
24  the FTX Recovery Trust designee for this
25  deposition?

Page 7

1            S. COVERICK
2      A.  To the best of my ability.
3      Q.  Thank you.
4      MR. PROULX:  And for the record,
5  Brian, we reject your position with
6  respect to the capacity in which
7  Mr. Coverick is testifying here today.
8  The parties previously entered into an
9  agreement whereby both days of
10  Mr. Coverick's deposition would be
11  conducted concurrently.  We have -- it
12  has been documented in numerous emails,
13  we have acted in reliance on it, we
14  reserve all rights.  And if you insist
15  on precluding the witness from
16  testifying in a representative capacity
17  today, we will move to compel an
18  additional day of testimony in that
19  capacity and solely in that capacity.
20     MR. GLUECKSTEIN:  You can feel
21  free to make any motions you want at
22  any time.  Our position is noted.  But
23  for the record, there was never any
24  agreement that Mr. Coverick would
25  provide more than seven hours of

Page 8

1            S. COVERICK
2  testimony in his corporate
3  representative capacity.  You chose to
4  conduct the deposition how you chose to
5  conduct it yesterday.
6      MR. PROULX:  Exhibit 19.
7      (Whereupon, a document was marked
8  Coverick Exhibit 19 for identification
9  as of this date.)
10     MR. PROULX:  Counsel, for the
11  record, we are not intending to ask the
12  witness any questions about it.  We are
13  entering this solely for this
14  deposition record.  And refer to your
15  colleague's agreement to present
16  Mr. Coverick in a concurrent
17  representative and individual
18  capacities on both days.
19     MR. GLUECKSTEIN:  I disagree with
20  your characterization of this document.
21  But if you want it in the record, it
22  could be in the record.
23     MR. PROULX:  You could put that to
24  the side, Mr. Coverick.
25     Q.  Mr. Coverick, yesterday we talked

Page 9

1            S. COVERICK
2  a little bit about futures contracts, do you
3  recall that?
4      A.  Yes.
5      Q.  I think you mentioned that Three
6  Arrows had entered into a number of
7  perpetual futures contracts that were closed
8  in the June 13 through June 14 period; is
9  that correct?
10     A.  Yes, sir.
11     Q.  In your declaration, you want to
12  pull that up, that was previously marked as
13  Exhibit Number 9 -- strike that, 10.
14     If you turn to paragraph 65 of
15  your original declaration, just let me know
16  when you are there, please, sir?
17     A.  I am there.
18     Q.  You wrote that 3AC paid 74 million
19  in USD via settlements under BTC perp
20  contracts on June 13 and 14, 2022.
21     Do you see that?
22     A.  Yes, sir.
23     Q.  What is the date on which you
24  relied in reaching that conclusion?
25     A.  The gains and losses on a



Page 10

1           S. COVERICK
2   perpetual futures contract, as I discussed
3   yesterday, were settled every 30 seconds.
4   But the exchange database did not store
5   30-second incremental balance data.
6           So our team used a calculation
7   consistent with the math that was used on
8   the exchange at the time it was operating to
9   calculate the aggregate gains and losses on
10  open perpetual futures contracts,
11  specifically the -- the table within the
12  database is referred to as the fills table.
13  And they -- my team extracted or analyzed
14  data from that table to calculate the gain
15  and loss on any open futures positions that
16  3AC had in their account.
17      Q.   When you refer to the fills
18  tables, is this reflected in any document
19  produced to Three Arrows that you know?
20      A.   It is.
21      Q.   And is this document 2 that we
22  refer to as colloquially in this matter?
23          MR. GLUECKSTEIN:  Object to the
24  form.
25      Q.   When I say document 2,

Page 11

1           S. COVERICK
2   specifically I am referring to FT -- FTX
3   underscore 3AC underscore 8072?
4       A.   Yes, sir, that's the table that I
5   am referring to.
6       Q.   It is FTX's position that this
7   table reflects, from this table and from
8   only this table the 74 million can be -- can
9   be calculated?
10          MR. GLUECKSTEIN:  Objection to the
11  form.
12      A.   As produced to the joint
13  liquidators, there is -- there are
14  additional assumptions that would need to be
15  made to calculate the exact $74 million
16  figure.  The reason for that is one of the
17  reasons I discussed yesterday, the exchange
18  database did not store pricing at every
19  second.  It -- it simply took at any point
20  in time the current price.  It recorded any
21  -- the price of any transactions to the
22  extent a future contract was opened, the
23  price at which it was opened was recorded.
24  To the extent that future position was
25  closed, the price at which it was closed,

Page 12

1           S. COVERICK
2   and I am referring to the reference price
3   that we discussed yesterday, was recorded.
4   But it did not keep a -- it did not -- the
5   database did not store all of the
6   intermittent prices as they changed on a
7   second by second basis.
8       Q.   So what assumptions did you make
9   that were not reflected in that document?
10      A.   The only assumption that would
11  need to be added is pricing of those future
12  contracts.  The joint liquidators have the
13  price at which those contracts were opened.
14  They would need to calculate the gain/loss
15  using an assumed price for those future --
16  future contracts, given the -- the future
17  position that 3AC had entered into their
18  account was a BTC perp.  Any variance of
19  what BTC perps traded at at any point in
20  time on the FTX exchange or other exchanges
21  would be fairly negligible from my
22  understanding.  And so the joint liquidators
23  could use those prices that are readily
24  available in other public sources to -- to
25  make their own pricing assumptions and get

Page 13

1           S. COVERICK
2   to a similar number.
3       Q.   And in what documents, whether
4   produced or not, are the assumed prices that
5   FTX used reflected?
6       A.   I am not aware of a document that
7   includes assumed prices for futures
8   contracts.
9       Q.   How then did you make the
10  assumptions with respect to those prices if
11  not reflected in document 2?
12      A.   My team generally used the latest
13  trade price for the perp, for that future,
14  the latest notional price.  That is another
15  way the joint liquidators could -- could
16  make a pricing assumption.
17      Q.   Using what underlying data to make
18  or to determine the, quote, latest notional
19  price?
20      A.   You could look at the fills -- the
21  joint liquidators or anyone could look at
22  the fills table and take the most recent
23  reference price that it --
24      Q.   I am asking about FTX.  What did
25  FTX do to determine the latest notional

Page 14

S. COVERICK

1               S. COVERICK
2  price?
3        MR. GLUECKSTEIN:  Objection.  Once
4    again, counsel, please do not cut the
5    witness off in the middle of an answer.
6        MR. PROULX:  The record will
7    reflect I did no such thing.
8    A.  What I was saying was my team
9  looked at the latest price, the latest
10  reference price at which a -- the
11  predominant future in question is bitcoin
12  perpetual futures.  Those traded frequently
13  on the exchange.  And my team used the
14  latest, the latest meaning whatever point in
15  time you are measuring the gain/loss, they
16  used the latest closed reference price
17  position as reflected in the futures table
18  in general.
19        So the joint liquidators could
20  also use that data that is within the fills
21  table to make their own pricing assumptions.
22    Q.  Yes or no, is the latest closed
23  reference price reflected in doc 2?
24    A.  Yes.
25    Q.  As FTX used that information?

Page 15

1               S. COVERICK
2        MR. GLUECKSTEIN:  Objection to the
3    form.
4    A.  Yes, that would be included in the
5  fills table.  To the extent that 3AC closed
6  a future, to the extent that the more recent
7  time was another customer account, I do not
8  believe that data was provided to the joint
9  liquidators on the account of it being data
10  for a different customer account.
11    Q.  Earlier you said that this
12  methodology was generally consistent with
13  math used by the exchange itself.  Is there
14  any ways in which it was not fully
15  consistent?
16    A.  The output of my team's
17  calculations are materially consistent with
18  the code base of the exchange, with the
19  acknowledgment that due to the lack of
20  second by second pricing data in the
21  exchange database, it is not possible to
22  know at any second or point in time what the
23  operative price for certain positions would
24  have been.
25        I -- I describe in my declaration

Page 16

1               S. COVERICK
2  the methodology that was used.  But the
3  check -- I think I also mentioned yesterday
4  that the exchange did not store second by
5  second account balances for every account.
6  And I lay out the methodology for how you
7  can get back to those account balances at
8  any point in time in my supplemental
9  declaration.
10        But the check that my team used
11  was the one balance that was recorded at any
12  point in time in the exchange database was
13  the -- the borrow, the spot margin borrow
14  position, which effectively served as a plug
15  in the account.  As I discussed yesterday,
16  any positive positions would be offset by
17  any borrow balance to reach the total
18  account balance.  And when my team performed
19  that math, again, with the understanding
20  there were assumptions that needed to be
21  made with respect to pricing, that they were
22  able to reconcile to that spot margin
23  position in 3AC's account at any point in
24  time within a margin of error of .1 percent.
25    Q.  Which account or accounts

Page 17

1               S. COVERICK
2  associated with 3AC did -- did FTX reconcile
3  to -- to the spot margin position?
4    A.  In general, there was one main
5  subaccount that participated most materially
6  in the spot margin program.  I believe
7  the -- I believe the account number or the
8  subaccount number ended in 82.  And that was
9  the main account that they used to -- to
10  reconcile versus the spot margin, because
11  that's the account that -- that had the
12  large balance.
13    Q.  When you say they, you mean the
14  FTX Recovery Trust?
15        MR. GLUECKSTEIN:  Objection to the
16  form.
17    A.  I am sorry, can you repeat, I
18  don't immediately recall what I said they in
19  relation to.
20    Q.  Did you -- did the FTX Recovery
21  Trust use only the account number, the 3AC
22  account number ending in 82, for purposes of
23  the reconciliation that you just described?
24    A.  I am not saying we only reconciled
25  the 82 account.  I am saying that was the

MAGNA ▶
LEGAL SERVICES

1            S. COVERICK
2  main reference point that my team at Alvarez
3  & Marsal used in performing the analysis
4  underlying my declaration.
5      Q.  Did you use others or not?
6      A.  Others, other what?
7      Q.  Other account numbers in that
8  reconciliation?
9      A.  My team reconciled every
10 subaccount for 3AC.
11     Q.  Yesterday we talked about
12 something called the maintenance margin
13 requirement.  Are you familiar with that
14 term?
15     A.  Yes, sir.
16     Q.  Is this a term that you speak to
17 in your original declaration?
18     A.  I believe that's how I define it.
19 I just want to confirm that those are the
20 exact words.
21     Q.  You can jump to paragraph 44 to
22 help you out there.
23     A.  Yes.
24     Q.  At a high level, how does FTX
25 define the maintenance margin requirement?

1            S. COVERICK
2      A.  The maintenance margin requirement
3  is a figure that can be expressed in US
4  dollars at which a margin trading account
5  value, which as we discussed yesterday, is
6  often referred to as collateral value, that
7  can also be expressed in US dollars, must
8  remain above.
9      Q.  And when you say remain above, are
10 you specifically taking the position that
11 the margin trading account value needs to be
12 above the maintenance margin level to comply
13 with the maintenance margin requirement?
14     A.  I am saying that the formula the
15 exchange used was that the maintenance
16 margin requirement was the margin trading
17 account value remain at or above the
18 maintenance margin level.
19     Q.  And again, at a general level, the
20 maintenance margin requirement, for what
21 unit was that calculated?  I will explain
22 what I mean by that, was that calculated on
23 a subaccount basis, an asset by asset basis,
24 a subaccount and asset basis or anything
25 else?

1            S. COVERICK
2        MR. GLUECKSTEIN:  Objection to the
3  form of the question.
4      A.  So the -- the calculation of both
5  the margin and trading account value and the
6  maintenance margin level is done on a ticker
7  by ticker basis, because each ticker has
8  different factors that need to be applied to
9  it when determining both numbers that are
10 specified on a ticker by ticker basis.
11       Does that answer your question or
12 am I missing a part?
13     Q.  I think I understand your
14 testimony to be it was at least partially
15 conducted on a ticker by ticker basis.  Was
16 it also conducted on an account by account
17 basis or subaccount by subaccount basis?
18     A.  My understanding was that it was
19 conducted for the entirety of the account.
20     Q.  So one -- one calculation for the
21 entirety of the account?
22     A.  That is my understanding.
23     Q.  Why was it conducted on a ticker
24 by ticker basis within the overall account?
25     A.  Each ticker in each cryptocurrency

1            S. COVERICK
2  position or other position that an account
3  could -- that an account could be comprised
4  of has different levels of risk associated
5  with -- with it.
6        For example, there are certain
7  cryptocurrencies that have historically been
8  more volatile than others.  And so when
9  determining collateral or margin trading
10 account level, those -- those -- it is my
11 understanding, although I cannot be sure of
12 the intent of the pre-petition management
13 team, it is my under -- generally
14 understanding that those factors applied in
15 the formula account for those relative
16 risks.
17     Q.  Do you have an example of a more
18 comparatively risky ticker than another?
19     A.  I do not have the entire table
20 memorized.  I think an example categorically
21 would be that bitcoin is historically less
22 volatile than what are often referred to as
23 mimcoins which have more historical price
24 volatility.
25     Q.  And that -- that -- those

MAGNA
LEGAL SERVICES

```
1              S. COVERICK
2   differential risks you testified today,
3   those aren't accounted for in any way in
4   FTX's view in the overall account balance?
5       A.   Other than the fact that the
6   account balance is predicated on the price
7   of -- of cryptocurrency positions at any
8   point in time which can change based on the
9   risk of that position.  The factors used in
10  the margin trading account value calculation
11  or the maintenance margin level are not
12  explicitly used -- are not used when
13  calculating the aggregate account balance.
14      Q.   Are not used currently or were not
15  used pre-petition?
16      A.   Were not used pre-petition in
17  calculating the account balance.
18      Q.   Could a customer be in compliance
19  with a one --  strike that.
20         Could a customer comply with a
21  maintenance margin requirement with respect
22  to one ticker, but not other?
23      A.   No, the account -- the maintenance
24  margin requirement is performed at an
25  account level as I testified to earlier.
```

```
1              S. COVERICK
2       Q.  Was the formula or definition of
3   maintenance margin requirement ever
4   communicated to FTX customers pre-petition?
5       A.   As we discussed yesterday, I
6   understand there were help pages which --
7   which provided formulas.  I do note that in
8   the code, as I testified to yesterday, there
9   were deminimis or negligible differences in
10  the code versus how the formulas were
11  sometimes described on the help pages.  But
12  in no instance did that lower -- did that
13  lower the requirement.  The requirement on
14  the exchange was actually slightly lower
15  than some of the formulas would suggest.
16      Q.   So as to those differences you
17  just testified to, to assess that they were
18  deminimis or negligible in FTX's view, that
19  means you calculated them in both -- using
20  both formulas?
21      A.   We only calculated -- in my
22  supplemental declaration and in my original
23  declaration, when I state the point at which
24  3AC fell below the maintenance margin
25  requirement, we calculated the maintenance
```

```
1              S. COVERICK
2   margin requirement in a manner consistent
3   with the code base of the exchange, what we
4   saw operating on the exchange at the time.
5       Q.   With some differences?
6       A.   There were no differences with the
7   way that we calculated the figures reflected
8   in my supplemental declaration or the
9   statement of when they -- when 3AC went
10  below the maintenance margin requirement and
11  the underlying code base of the exchange.
12  The differences I am referencing are on
13  certain help pages that were on the FTX
14  website.  But again, I described those as
15  negligible.
16      Q.   And you ran the formula using
17  the -- the information presented on those
18  help pages to use your language to confirm
19  it was deminimis?
20      A.   We did not need to perform the
21  calculation, because we understood that,
22  one, there -- there was something referenced
23  as an MMF weight which was only one, so it
24  didn't change the output of the formula,
25  just mathematically we didn't need to run
```

```
1              S. COVERICK
2   the calculation because multiplying
3   something by one doesn't change the output.
4   And there were other formulas that we
5   realized would also not produce a material
6   impact if applied versus what was operating
7   on the exchange base.  So we only ran the
8   formulas -- my team only ran the formulas
9   consistent with what was in the code base
10  operating on the exchange.
11      Q.   You referenced a moment ago that
12  FTX had calculated or assessed the
13  maintenance margin requirement with respect
14  to Three Arrows accounts as of June 2022; is
15  that correct?
16      A.   Correct.
17      Q.   And what -- what time specifically
18  in June of 2022 was that assessment
19  performed with respect to?
20      A.   I understand that my team
21  performed the assessment at multiple time
22  periods throughout the pendency of June 13
23  and June 14.  The specific times that I
24  reviewed are the ones listed in my
25  supplemental declaration.
```



Page 26

1          S. COVERICK
2      Q.   Let's -- let's first look at the
3   original declaration.  As you know, the
4   joint liquidators were only recently
5   provided with a supplemental declaration and
6   are still reviewing it.
7          Do you draw any assessment with
8   respect to maintenance margin requirement
9   compliance in your original declaration?
10     A.   I do.
11     Q.   Where is that?
12     A.   I begin, I believe it begins on --
13  in paragraph 74.
14     Q.   And what does the conclusion reach
15  with respect to maintenance margin
16  requirements in that paragraph?
17     A.   The margin trading account value
18  for the 3AC accounts fell below the
19  maintenance margin level absent the line of
20  credit at approximately 9:00 a.m. on
21  June 13, 2022.
22     Q.   What does the phrase absent the
23  line of credit mean in that statement?
24     A.   The line of credit is -- in any
25  line of credit on the FTX exchange is

Page 27

1          S. COVERICK
2   something that works in conjunction with the
3   margin trading -- the margin trading account
4   value.  The -- the purpose of the line of
5   credit is to increase an account's margin
6   trading account value effectively providing
7   it additional collateral so that it -- the
8   account has more -- more cushion or head
9   room over the requirement.
10     Q.   Is that functionality of the line
11  of credit you just referenced reflected in
12  paragraph 49 of your original declaration?
13     A.   Yes, sir.
14     Q.   So if a customer had a line of
15  credit that was operational, the margin
16  trading account value should be increased by
17  the -- is it face amount of that line of
18  credit to determine the margin trading
19  account value?
20     A.   For 3AC's account they were
21  utilizing the full amount of the line of
22  credit in the periods referenced in my -- in
23  my declaration.  But it would be the -- the
24  utilized amount of the line of credit.
25     Q.   When you say utilized amount of

Page 28

1          S. COVERICK
2   the line of credit, what do you mean by
3   utilized?
4      A.   So the line of credit effectively
5   functioned in a similar fashion with the --
6   as the peer to peer borrowing program
7   functioned.  And as I state in my
8   declaration it -- it allows -- it allows 3AC
9   or any customer with a line of credit to
10  first draw from the line of credit before
11  borrowing from the margin program.
12         So to the extent an account had a
13  line of credit, but did not have leverage
14  positions or was not needing to borrow, it
15  would not have any amount drawn on the line
16  of credit.  But once -- once there are
17  borrowings on the line of credit, that would
18  increase the margin trading account value by
19  that -- by that value.
20     Q.   So if -- if there was utilization
21  of a line of credit that the extent of that
22  utilization should be added to the margin --
23  margin trading account value to determine
24  the value of that definition; is that
25  correct?

Page 29

1          S. COVERICK
2      MR. GLUECKSTEIN:  Objection to the
3   form.
4      A.   The line of credit if -- to the
5   extent utilized would be added to the margin
6   trading account value for purposes of
7   calculating compliance with the mainten --
8   maintenance margin requirement.
9      Q.   And did FTX include the
10  added -- strike that.
11         Did FTX include the utilized
12  amount of the line of credit by Three Arrows
13  at all times in calculating the margin
14  trading account value?
15     A.   At periods in which it was
16  compliant with the requirements under the
17  line of credit.
18     Q.   At what point in time was it not
19  compliance -- compliant in FTX's view with
20  the requirements under the line of credit?
21     A.   As I state in paragraph 74 of my
22  declaration, the account balance for 3AC
23  accounts dropped below $240 million by
24  2:00 a.m. UTC on June 13, 2022 and
25  thereafter.

MAGNA
LEGAL SERVICES

Page 30

1              S. COVERICK
2        Q.  Is that -- strike -- sorry, go
3    ahead?
4        A.  The requirement on the line of
5    credit was to maintain 200 percent of the
6    amount of the line of credit or simply put,
7    $240 million, which was the threshold that
8    the total account balance had to remain
9    above.
10       Q.  Let me make sure I understand
11   this.
12           So it is FTX's position that even
13   if a customer had an operative line of
14   credit, the moment in time at which its
15   accounts fell below the collateral
16   requirements associated with the line of
17   credit, precludes the inclusion of the
18   utilized amount of the line of credit in the
19   margin trading account value?
20       A.  I am sorry, just to make sure I
21   got that, can you repeat that one time,
22   please.
23       Q.  Sure.  Is it your position that as
24   a -- looking at paragraph 74, is it your
25   position that at 2:01 a.m. UTC, June 13,

Page 31

1              S. COVERICK
2    2022, the utilized amount of the line of
3    credit could no longer be added to the
4    margin trading account value?
5        A.  It is my understanding that FTX no
6    longer was required to extend the line of
7    credit due to the non-compliance of the
8    account.
9        Q.  What did FTX, in fact, do in the
10   real world?
11       A.  In general, I was not there, so I
12   can't be certain of everything that they
13   did.  I am aware that FTX communicated with
14   3AC the -- I don't know what -- what it is
15   called in the 3AC proceeding, but
16   effectively the pre-petition or
17   pre-liquidation management team of 3AC that
18   their account was out of compliance, and
19   asked them to bring their account back into
20   compliance to avoid the line of credit being
21   pulled.  And my understanding is 3AC did not
22   do so, and FTX pulled the line of credit.
23       Q.  And did it pull the line of credit
24   at 2:01 a.m. on June 13, 2022?
25       A.  Mechanically in the exchange

Page 32

1              S. COVERICK
2    ledger, the time of the ledger entry to
3    remove the line of credit was entered was
4    10:29 p.m. on June 14.
5        Q.  Did it -- if it didn't pull the
6    line of credit until 10:21 p.m., June 14, it
7    certainly didn't pull it at 9:00 a.m.
8    June 13, looking at the second sentence of
9    paragraph 74; is that correct?
10       A.  The mechanical entry on the
11   exchange ledger was made at the time I just
12   referenced.
13       Q.  That's a yes?
14           MR. GLUECKSTEIN:  Objection,
15   misstates the answer.
16       A.  I am answering that the mechanical
17   entry for the removal of the line of credit
18   on the exchange ledger was made at
19   10:29 p.m.  That is in my opinion different
20   from when the line of credit no longer
21   applied to the maintenance margin
22   requirement.
23       Q.  You say that's your opinion, is it
24   also FTX's position?
25       A.  Yes.

Page 33

1              S. COVERICK
2        Q.  Is that reflected in any data on
3    the exchange, the line of credit no longer
4    being applied at any point in time earlier
5    than 10:21 p.m., June 14?
6            MR. GLUECKSTEIN:  Objection to the
7        form.
8        A.  That -- as I testified, the
9    mechanical entry on the exchange was made at
10   the time I -- I stated.  I am aware of the
11   requirements on the line of credit from both
12   reviewing the line of credit agreement as
13   well as seeing communications from FTX to
14   3AC.  Those are the -- those are the
15   documents that my team has uncovered.
16       Q.  Have you seen a single document
17   anywhere reflecting the pulling or removal
18   of the line of credit as of 9:00 a.m.,
19   June 13, 2022?
20       A.  Again, I believe that calls for a
21   legal interpretation as to when the line of
22   credit would be in compliance or continued
23   to be extended.  I can only speak to when I
24   know they were out of compliance on the line
25   of credit, as well as when the mechanical



S. COVERICK

1          S. COVERICK
2 entry was made to remove the line of credit.
3    Q.  Does that mean -- and just for the
4 record, when we are talking about times
5 here, can we agree we have both been
6 referring to UTC time period?
7    A.  Yes, sir.
8    Q.  Thank you.
9       Does FTX take the position that
10 any time another customer's line of credit
11 fell below the collateral requirements with
12 respect to that line of credit, that that
13 line of credit was removed as to that
14 customer?
15    A.  My business person's
16 understanding, because again that is a legal
17 question of -- of when certain parties have
18 rights to do certain things, my business
19 person's understanding is that once a line
20 of credit was out of compliance with its
21 collateral requirements, whatever those were
22 defined to be on a line of credit by line of
23 credit basis, FTX no longer had to extend
24 that line of credit.  And not extending the
25 line of credit in some circumstances could

S. COVERICK

1          S. COVERICK
2 cause the account to go below the margin
3 trading account or the maintenance margin
4 requirement.
5    Q.  I hear FTX's position that it no
6 longer had to extend the line of credit, but
7 is there a point in time at which FTX in
8 fact removes a line of credit?
9    A.  I believe that's a legal question.
10 I am not sure if the legal requirement of
11 removal of the line of credit is dictated by
12 when it is entered on the exchange ledger or
13 when it falls out of compliance with a legal
14 agreement.
15    Q.  When did any of the pre-petition
16 management team members state that they
17 removed 3AC's line of credit in the real
18 world?
19      MR. GLUECKSTEIN:  Objection to the
20    form.
21    A.  I do not know everything that the
22 pre-petition management team stated.
23    Q.  Are you aware of any --
24    A.  I wasn't there.
25    Q.  I am sorry, finish your answer,

S. COVERICK

1          S. COVERICK
2 please?
3    A.  I wasn't there, so I can't know
4 what they stated.
5    Q.  Are you aware of any documents
6 reflecting a statement by them of the
7 removal of a line of credit at 3AC's line of
8 credit at any point on June 13?
9    A.  I am aware and I have seen, but do
10 not have committed to memory certain
11 communications that I believe are attached
12 to the Beller declaration.  And I believe
13 those also, those include some, for lack of
14 a better word, they appear to be instant
15 messaging sort of communications as well as
16 some emails, but I don't recall the specific
17 contents.  I would have to -- see it.
18    Q.  In the party's course of dealing
19 after 2:00 a.m. UTC on June 13, did they
20 communicate with one another regarding the
21 amount of collateral available under the
22 line of credit?
23    A.  I am sorry, was that a question?
24    Q.  Yes, have you seen any
25 communications in which after 2:00 a.m. UTC,

S. COVERICK

1          S. COVERICK
2 June 13, 2022, the parties -- when I say the
3 parties I mean 3AC and FTX -- communicated
4 regarding the utilized amount of the line of
5 credit?
6    A.  Again, I don't recall the specific
7 contents of all the communications.  It is
8 my understanding they have been produced to
9 the joint liquidators.  If I had it in front
10 of me, I would be happy to answer questions
11 on my limited understanding of what it might
12 mean.
13    Q.  There is something called the
14 initial margin requirement, are you familiar
15 with that term?
16    A.  Yes, generally.
17    Q.  Is it FTX's position that Three
18 Arrows was out of compliance with the
19 initial margin requirement at any point?
20    A.  It -- it -- it is my understanding
21 the initial margin requirement is the
22 requirement required to open a new position,
23 which differs formulaically, although I
24 don't have the formulas memorized, my
25 understanding is it differs from the

**MAGNA** ▶
LEGAL SERVICES

Page 38

1          S. COVERICK
2  maintenance margin requirement, which is the
3  requirement to maintain positions in the
4  account.
5      Q.  Is it FTX's position that Three
6  Arrows was out of compliance with the
7  initial margin requirement at any point?
8      A.  I would need to consult with my
9  team to do that analysis.  I don't believe I
10 state anything to that effect in my
11 declaration.  But that doesn't mean it is
12 not true, it doesn't mean it is true.
13     Q.  Sitting here today, FTX doesn't
14 have a position on this?
15     A.  I did not say they do not have a
16 position on it.  I said to answer that
17 question accurately would require further
18 analysis.
19     Q.  When did FTX first form the
20 position that Three Arrows' line of credit
21 was, quote, absent?
22     A.  Are you asking when the FTX
23 Recovery Trust in context of this litigation
24 formed that position?
25     Q.  FTX refers to, as we discussed

Page 39

1          S. COVERICK
2  yesterday, pre-petition debtors and
3  post-petition debtors.  When did FTX first
4  form the position that -- that the Three
5  Arrows line of credit became absent?
6      MR. GLUECKSTEIN:  I caution the
7  witness not to reveal any work product
8  or discussions with counsel.  Your
9  answer -- if you can answer with
10 respect to the pre-petition debtor or
11 otherwise, you can answer.
12     A.  Based on the documents my team has
13 reviewed to -- to know the answer to that
14 question, I would need to know the knowledge
15 inside the heads of the pre-petition
16 management team to -- to be able to answer
17 that.
18     Q.  They were on the ground on June 13
19 and 14; is that correct?
20     MR. GLUECKSTEIN:  Objection to the
21 form.
22     A.  Are you -- are you defining "they"
23 as the pre-petition management team?
24     Q.  Yes.
25     A.  It is my understanding that on

Page 40

1          S. COVERICK
2  June 13 wanted June 14 of 2022 the
3  pre-petition management team was operating
4  the company.
5      Q.  And you are not -- you are not
6  able to assess their position on when the
7  line of credit went absent?
8      A.  I am able to verify what I see in
9  documents and what I see on the exchange
10 ledger.  It is not possible for me to know
11 the thinking of the pre-petition management
12 team at the time.
13     Q.  Does FTX take the position that
14 there is a distinction between
15 non-compliance with collateral requirements
16 under a line of credit and termination of
17 the line of credit?
18     MR. GLUECKSTEIN:  Objection to the
19 form, calls for a legal conclusion.
20     A.  I can't provide a legal analysis
21 that I believe might be required to answer
22 that question.  Having said that, as I
23 testified to earlier, it is my understanding
24 that the collateral requirements on a line
25 of credit and the removal of a line of

Page 41

1          S. COVERICK
2  credit are related concepts to one another.
3      MR. PROULX:  Is there a
4  contractual basis -- why don't we pull
5  up the line of credit.
6      (Whereupon, a line of credit
7  document was marked Coverick Exhibit 20
8  for identification as of this date.)
9      Q.  Mr. Coverick, you have been handed
10 what has been marked as Exhibit Number 20.
11 This is a document titled, on the first
12 page, FTX Line of Credit.  On the second
13 page, FTX Institutional Customer Margin and
14 Line of Credit Agreements produced by FTX in
15 this litigation.
16     Are you familiar with this
17 document?
18     I see you reviewing that document,
19 I was asking if you were familiar with that
20 document?
21     A.  I am cross-referencing it with my
22 declaration to confirm.  Yes, I am familiar
23 with this document.
24     Q.  Thank you.  Factually where does
25 this document provide for the termination or



Page 42

```
 1            S. COVERICK
 2  the removal of a line of credit based on
 3  non-compliance with collateral requirements
 4  associated with that line of credit?
 5       MR. GLUECKSTEIN:  Objection, calls
 6    for a legal conclusion.
 7       A.  I am not a lawyer, I am not
 8  qualified to interpret this document with
 9  respect to anyone's rights.  My business
10  person's understanding and the way my team
11  utilized this document to confirm
12  information that it saw in the code base of
13  the exchange was the 200 percent line of
14  credit requirement which was also
15  corroborated by communications that my team
16  reviewed.  And I understand it has been
17  produced to the joint liquidators.
18       Q.  My question wasn't about the
19  200 percent line of credit requirement.  My
20  question was about termination or removal of
21  the line of credit, do you have any factual
22  basis for that position?
23       MR. GLUECKSTEIN:  Objection, calls
24    for a legal conclusion.
25       A.  As I answered, I am not a lawyer
```

Page 43

```
 1            S. COVERICK
 2  and I am not qualified to offer a legal
 3  interpretation of any party's rights as
 4  contained in this document.
 5       Q.  Yet again, since it appears that
 6  the witness is -- is consistently attempting
 7  to answer in an individual capacity, what is
 8  -- is that the same position with respect to
 9  FTX?
10       A.  I cannot provide a legal
11  conclusion on behalf of FTX because I am not
12  a lawyer.
13       Q.  Okay.  Did FTX draft this
14  document?
15       A.  I was not there at the time of the
16  drafting of this document, so I am not sure
17  who was involved in the drafting of it.
18       Q.  Was FTX there at the time of the
19  drafting of this document?
20       A.  I was not there, so I cannot be
21  certain where the employees of FTX were at
22  the time this document was drafted or where
23  it was drafted.
24       Q.  I am not asking about your
25  position.  I am asking yet again about FTX's
```

Page 44

```
 1            S. COVERICK
 2  position, did FTX draft this document?
 3       A.  As I stated, FTX -- no one can be
 4  certain of where members of the management
 5  team were at a given point in time or who
 6  contributed to the drafting of this
 7  document.  I can only testify to the fact
 8  that this document was discovered by the FTX
 9  debtor team.
10       Q.  Does FTX -- does the FTX debtor
11  team have a position on whether this
12  document is enforceable or not?
13       MR. GLUECKSTEIN:  Objection, calls
14    for a legal conclusion.
15       A.  I am not a lawyer and I cannot
16  provide legal analysis on behalf of the
17  recovery trust.
18       Q.  Does FTX have reason to believe
19  factually that someone other than FTX
20  drafted this document?
21       A.  Not that I am aware.
22       Q.  What is FTX's position on the
23  relationship, if any, between the first
24  section of this document, which I provided
25  the title of previously, versus the second
```

Page 45

```
 1            S. COVERICK
 2  section which appears on page 2?
 3       MR. GLUECKSTEIN:  Object to the
 4    form, calls for a legal conclusion.
 5       A.  Once again, I am not a lawyer, I
 6  can't provide legal interpretation of a
 7  legal document.
 8       Q.  And once again, I am not asking
 9  for your interpretation as a non-lawyer, I
10  am asking for FTX's interpretation of this
11  document?
12       A.  And once again, I am not a lawyer,
13  I cannot provide legal interpretations on
14  behalf of the FTX Recovery Trust.
15       Q.  Is there any provision within this
16  agreement that you on behalf of the FTX
17  Recovery Trust are able to form a factual
18  position on?
19       MR. GLUECKSTEIN:  Objection to the
20    form of the question.
21       A.  Once again, as I have testified, I
22  am aware of the line of credit collateral
23  requirement as defined in this document
24  being 200 percent of the line of credit.
25  From a mathematical perspective, that is the
```

1              S. COVERICK
2  assumption my team used when performing the
3  analysis underlying my declaration.  But
4  once again, any other conclusions or legal
5  interpretations of this document can only be
6  provided by counsel.
7      Q.  FTX's position is that the only
8  interpretation of this document that can be
9  given by it is in a legal litigation
10  posture?
11          MR. GLUECKSTEIN:  Objection to the
12  form.
13      A.  FTX's position is that legal
14  interpretations must be conducted by
15  lawyers.
16      Q.  You talked about the 200 percent,
17  I think you used the term collateral
18  requirement, but correct me if that's wrong,
19  how do you define the 200 percent provision
20  in this document?  What words do you want to
21  use to describe that?
22      A.  I believe in my declaration I
23  refer to it as the account balance 3AC was
24  required to maintain as a condition to its
25  continued access to the line of credit.

1              S. COVERICK
2      Q.  Where are you looking specifically
3  in your declaration?
4      A.  Paragraph 53, line 6 of paragraph
5  53, line 5 and 6.  If there is a more
6  succinct way defined in my declaration, I am
7  happy to use that.  But I believe --
8      Q.  I believe, I am happy to make a
9  representation that FTX uses the term in its
10  claim objection LOC or line of credit
11  requirement.  Is it fair to use that term in
12  referring to this provision 5 in the line of
13  credit document?
14      A.  I am happy to use that term when
15  referencing the way I describe it my
16  declaration, yes.
17      Q.  Okay.  What is FTX's
18  interpretation of the line of credit
19  requirement in this provision 5 of the FTX
20  line of credit?
21      A.  That the 3AC account balance was
22  required to maintain an amount equal to
23  200 percent of the amount of the line of
24  credit which is equal to $240 million.  The
25  simple interpretation is 3AC's account

1              S. COVERICK
2  balance had to stay above $240 million to
3  continue accessing the line of credit.
4      Q.  And to get to 240 million, does
5  that mean you are multiplying 120 million by
6  two?
7      A.  That same math gets to
8  $240 million, yes.
9      Q.  And the reason you are using
10  120 million is because that was the face
11  value of the line of credit; is that
12  correct?
13      A.  That was the amount of the line of
14  credit.
15      Q.  Amount, do you -- when you say
16  amount and I say face -- face value, does
17  that mean something different in your view?
18      A.  Again, at the periods I analyzed,
19  the line of credit, the amount, the face
20  value the drawn amount were all synonymous,
21  they were all -- they were all $120 million.
22  The -- how do we define that, the LOC
23  collateral requirement?
24      Q.  LOC requirement or line of credit
25  requirement, that's okay with you?

1              S. COVERICK
2      A.  Yes, sir, the line of credit
3  requirement would have been $240 million.
4      Q.  How do you know it is -- how does
5  FTX know it is 200 percent of the face
6  amount of the line of credit versus the
7  drawn amount of the line of credit?
8      A.  I would need to consult with my
9  team to understand the specific way that was
10  confirmed in the exchange database.  But
11  the -- again, my understanding is that
12  during the period in question that I
13  testified to in my declaration, the full
14  amount of the line of credit was fully
15  drawn.  So those two amounts would be the
16  same.
17      Q.  Was the line of credit fully drawn
18  at all points in time in -- in which it was
19  issued to Three Arrows?
20      A.  I believe there were periods,
21  although I cannot specifically recall them,
22  I don't have them committed to memory, where
23  3AC did not fully draw the line of credit.
24      Q.  And in those periods, would FTX
25  calculate the line of credit requirement by

MAGNA ▶
LEGAL SERVICES

1               S. COVERICK
2   multiplying by two the drawn amounts or the
3   face amount?
4       A.   At those specific time periods I
5   would need to confirm with my team the exact
6   calculation that was used on the exchange at
7   that time.
8       Q.   When was Three Arrows' line of
9   credit face amount fully drawn in FTX's
10  view?
11      MR. GLUECKSTEIN:  Objection to the
12  form.
13      A.   Again, I don't specify that in my
14  declaration.  I would need to consult with
15  my team to do the analysis required to
16  identify the specific point in time.  But I
17  understand based on what I state in my
18  declaration that the -- the time period at
19  which the line of credit was fully utilized
20  was some time in May of 2022.
21      Q.   And it is FTX's position that it
22  remained fully utilized at all points in
23  time after that while the line of credit was
24  in existence?
25      A.   What I have committed to memory

1               S. COVERICK
2   and what I can recall based on the periods I
3   looked at was that in mid May it had fully
4   drawn on the line of credit, 3AC's account
5   had fully drawn on the line of credit.  And
6   by the end of the day on June 12, the line
7   of credit was still fully drawn.  I am not
8   sure if there was some intermittent period
9   at some minute of one of those in between
10  days at which the account balance improved
11  by memory.
12      MR. PROULX:  Mark this as 21.
13      (Whereupon, a line of credit
14  document produced in native format was
15  marked Coverick Exhibit 21 for
16  identification as of this date.)
17      Q.   Mr. Coverick, you have been handed
18  what has been marked as Exhibit 21.  This is
19  a document produced in native format by FTX
20  in this litigation.  And the native version
21  of this is prepared -- is presented on the
22  pages following the production page.  I can
23  represent that this document contains two
24  tabs, one is titled LOC underscore changes,
25  the other is titled LOC underscore interest

1               S. COVERICK
2   underscore charges, which you can tell from
3   the footers of the page.
4       Are you familiar with this
5   document?
6       A.   I am generally familiar with it,
7   although I don't have all of it committed to
8   memory, but I am generally familiar with it.
9       Q.   What does the first tab show, LOC
10  underscore changes?
11      A.   Is that in --
12      MR. GLUECKSTEIN:  Counsel, where
13  are we looking, because the footer in
14  every one of these pages says LOC
15  interest changes?
16      MR. PROULX:  No, it is on page 2,
17  it is a different footer.  It says LOC
18  underscore changes.  So page 2 of the
19  document to answer your question,
20  Mr. Coverick.
21      A.   I am sorry, what was the question?
22      Q.   Sure, the question is what does
23  this data show, LOC underscore changes?
24      A.   It is my understanding that this
25  document shows changes to the amount of the

1               S. COVERICK
2   line of credit.
3       Q.   When, if ever, in the June 12 or
4   June 14 period, 2022 were there such changes
5   made to the line of credit?
6       A.   Just to clarify the question, are
7   you asking when between June 12 and June 14
8   were changes to the line of credit amount
9   made?
10      Q.   You testified a moment ago that it
11  is my understanding that this document shows
12  changes to the amount of the line of credit;
13  is that correct?
14      A.   Yes, sir.
15      Q.   I am asking when in the June 12 or
16  June 14 period 2022 such changes were made,
17  if ever?
18      A.   It would show the amount of the
19  changes on the rows that contain the date
20  June 14.  I believe there is -- I
21  wouldn't -- I can count, but I believe there
22  is several.
23      Q.   What were those changes made on
24  June 14?
25      A.   The effect of those changes was --

S. COVERICK

1
2  were the ledger entries I was referring to
3  when FTX removed 3AC's line of credit.
4     Q.   The removal happened at the point
5  of the ledger entries?
6        MR. GLUECKSTEIN:  Objection to the
7  form, calls for a legal conclusion.
8     A.   As I testified earlier, that is
9  when the entries were made on the ledger.
10    Q.   Did FTX have any other process of
11 removing a line of credit other than the
12 entries on the ledger?
13    A.   From a legal perspective I can't
14 answer that question.  But from a mechanical
15 perspective, the ledger was the only way
16 changes to aspects of a customer's account
17 could be recorded.
18    Q.   What was the amount, if any, of
19 any change to the line of credit on June 14?
20    A.   They removed the $120 million line
21 of credit.
22    Q.   The removal of that line of credit
23 at that point in time did what to the
24 overall face amount of the line of credit?
25    A.   It reduced it to zero.

S. COVERICK

1
2     Q.   Did the line of credit document
3  remain enforceable after the reduction of
4  the line of credit to zero?
5        MR. GLUECKSTEIN:  Objection, calls
6  for a legal conclusion.
7     A.   I am not a lawyer, so I can't
8  speak to the enforceability of a legal
9  document.
10    Q.   Any ledger entries made to the
11 line of credit on June 14 -- strike that, I
12 think I misspoke.
13       Any ledger entries made to the
14 line of credit on June 13, 2022?
15    A.   I do not see any ledger entries on
16 June 13 to the line of credit.
17    Q.   Is FTX aware of any ledger entries
18 that may have existed that aren't reflected
19 in this document?
20    A.   No, sir.
21    Q.   Thank you.
22       Second document or -- strike that.
23       The second tab which begins on
24 page 3 is LOC underscore interest underscore
25 charges, do you see that tab?

S. COVERICK

1
2     A.   Yes, sir.
3     Q.   What does this tab show generally
4  speaking?
5     A.   It is my understanding this --
6  this is the table or an extract from the
7  table within the database that records
8  interest charges on lines of credit.
9     Q.   When you say an extract, are you
10 representing that this data is not complete
11 with respect to Three Arrows?
12       MR. GLUECKSTEIN:  Object to the
13 form, misstates testimony.
14    A.   I am not stating that it is not
15 complete.  As I testified to you yesterday,
16 the exchange database was not stored in
17 Microsoft Excel, it was stored in a Python
18 based database stored on Amazon web
19 services.  To view that data in a format
20 like this it must be extracted from the
21 database into that readable format.
22    Q.   That -- to FTX's knowledge, no raw
23 data was omitted with respect to Three
24 Arrows in creating this document; is that

S. COVERICK

1
2  correct?
3     A.   No data was omitted that was
4  relevant, no.
5     Q.   There is a column in this document
6  called principal, do you see that?
7     A.   I do.
8     Q.   What does that column represent?
9     A.   I would need to consult with my
10 team to understand the implication of this
11 column in the context of the broader
12 account.  It is not a column that I believe
13 I explicitly used in my analysis.
14    Q.   Did you implicitly use the data in
15 this document in any way in your analysis?
16       MR. GLUECKSTEIN:  Objection to the
17 form.
18    A.   The way that my analysis uses this
19 table is in terms of calculating the account
20 balance at any point in time, which requires
21 incorporation of any interest charges to the
22 account.  So it is the size column that is
23 used in that account balance calculation.
24    Q.   So the size column represents what
25 in FTX's view?



S. COVERICK

1
2     A.  The interest charges on the line
3  of credit.
4     Q.  Interest charges on what aspect of
5  the line of credit, the drawn amount?
6     A.  That's my understanding.
7     Q.  Based on what?
8     A.  My understanding is that the
9  interest charges were on the drawn amount of
10 the line of credit, that's just my general
11 understanding.
12    Q.  Yeah, and what -- how does that
13 understanding derive from source code, from
14 the line of credit document that we looked
15 at a moment ago?
16    A.  From conversations with my team.
17    Q.  They didn't provide the basis for
18 that -- that calculation?  And to be clear I
19 am not asking for the substance of
20 communications with your counsel?
21    A.  The basis of my team's conclusions
22 and -- and information they provided me is
23 their understanding of the code base of the
24 exchange.
25    Q.  FTX doesn't have a view on what

S. COVERICK

1
2  the principal column means in this document?
3     A.  I am not saying FTX does not have
4  a view.  I am saying that I do not have
5  memorized the exact implications of the
6  principal column or how it is used
7  mathematically in other aspects of the
8  account.
9     Q.  I am not asking for your personal
10 view, I am not asking you to memorize
11 anything, I am not asking for any
12 application, I am asking for FTX's
13 understanding of the meaning of the term
14 "principal" as it appears only in the
15 heading of this document?
16    A.  My answer is that the FTX Recovery
17 Trust would need me to consult with my team
18 to accurately answer that question.
19    Q.  You didn't prepare to discuss that
20 topic here today?
21    MR. GLUECKSTEIN:  Objection to the
22    form, argumentative.
23    A.  I prepared to discuss the
24 documents that have been produced, with the
25 caveat that it is not possible to know every

S. COVERICK

1
2  single column and every single number of
3  every document that is produced.  These are
4  extremely voluminous.  I prepared to discuss
5  the method my team used to perform the
6  analysis underlying my declaration.
7     Q.  And you relied on this document at
8  least in part in preparing your declaration;
9  is that correct?
10    A.  I relied on this document in part
11 to verify the method in which my team
12 performed the analysis underlying my
13 declaration was accurate.
14    Q.  Is this one of the ten
15 spreadsheets you speak of in your
16 declaration as you having relied on in
17 preparing the declaration?
18    A.  Yes, sir.
19    Q.  Is this in one of the -- is this
20 document identified by name in the
21 deposition topics you have been designated
22 for?
23    A.  I -- I would have to look.  I
24 believe you if you say that it is.
25    Q.  I an happy to make a

S. COVERICK

1
2  representation that it was, for the record,
3  that's in topic number 46?
4     MR. GLUECKSTEIN:  And for the
5     record, this witness is -- is
6     testifying pursuant to our objections
7     which were proposed which address this
8     topic among others.
9     Q.  Let's turn to the bottom of this
10 document, looking at the same tab, there is
11 a dates column titled created at, if you
12 want to flip back to the column --  strike
13 that, to the row headings, I am going to ask
14 about questions at the very bottom of this
15 document?
16    A.  Sorry, the headers don't carry
17 over.
18    Q.  Yes, it is a fair critique, like I
19 said, it was produced to us natively?
20    A.  And you want me to go to the last
21 page?
22    Q.  Yes.
23    A.  Okay.
24    Q.  What, if anything, does this
25 document represent with respect to the

MAGNA
LEGAL SERVICES

Page 62

1          S. COVERICK
2  principal on June 13 and June 14, 2022 under
3  the line of credit?
4          A.   Once again, I would need to
5  consult with my team to answer questions
6  about the principal column given that it is
7  not something I used when calculating the
8  figures and verifying the figures in my
9  declaration.
10         The created at column was used for
11 the context of the analysis my team
12 performed to add up the interest charges to
13 the account to calculate the account balance
14 at any point in time.
15         Q.   Why is there no entry for June 12,
16 2022, including with respect to the size
17 column that you represented you relied on to
18 calculate account balances?
19         A.   I would need to investigate that
20 with my team.  I did not perform that
21 analysis as part of preparing my
22 declaration.
23         Q.   No position by FTX on the omission
24 of that row?
25         MR. GLUECKSTEIN:  Object to the

Page 63

1          S. COVERICK
2  form of the question.
3          A.   The position of FTX is answering
4  that question would require additional
5  analysis that has not yet been performed.
6          Q.   If -- if it is your testimony that
7  the line of credit was fully utilized by
8  Three Arrows in the June 12, 13 period --
9  let me stop there, is that a fair
10 characterization of your testimony?
11         A.   Yes.
12         Q.   Does that imply that this
13 principal column in this document we are
14 looking at cannot be the utilization of the
15 line of credit, at least in the same time
16 periods?
17         A.   It would need to be taken in
18 context with any other aspects of the
19 exchange database.  Again, I would need to
20 consult with my team to understand how the
21 drawn balance is fully calculated.
22         Q.   June 14 at 00030 a.m., the very
23 last row of this document, do you see that?
24         A.   Yes.
25         Q.   Do you see that there is a

Page 64

1          S. COVERICK
2  $13,445 roughly being charged in interest on
3  that date at that time on the line of
4  credit?
5          A.   I see that amount, yes.
6          Q.   Why was that FTX charging interest
7  on -- on a document that in FTX's view was
8  absent or removed by that point?
9          MR. GLUECKSTEIN:  Objection to the
10 form.
11         A.   I would need to consult with my
12 team to -- to understand any comparison to
13 the time stamps in this document to the UC
14 -- UTC times reflected in my declaration, as
15 well as the calculation of interest and the
16 specific point in time at which interest
17 amounts were charged to an account.
18         It is entirely possible that --
19 and often as reflected in debt instruments
20 that I have seen in my experience as a
21 financial adviser, that interest is
22 calculated for one period and subsequently
23 charged once that calculation has occurred.
24         I see the time stamp seems to be
25 30:51, I would need to understand exactly

Page 65

1          S. COVERICK
2  how that translates to UTC time, and also
3  consult with my team to understand the
4  formal process of when interest charges are
5  accounted for on the ledger and for what
6  period those charges related to.
7          Q.   After the period in time in which
8  in FTX's view the line of credit was absent
9  or removed, it would have been improper for
10 FTX to charge any interest on utilization of
11 the line of credit after that point in time;
12 is that correct?
13         MR. GLUECKSTEIN:  Objection, calls
14 for a legal conclusion.
15         A.   Again, absent a legal conclusion
16 that I cannot testify to, it is entirely
17 possible for interest charges to accrue and
18 be charged at a later point in time.
19         Q.   I am referring to the point in
20 time of accrual, it would be improper for
21 Three Arrows to accrue interest on a line of
22 credit that was absent or removed; is that
23 fair?
24         A.   That would require an
25 interpretation of the line of credit

S. COVERICK

1           S. COVERICK
2   agreement and legal rights of both parties,
3   and that would require a lawyer to perform
4   that interpretation.
5       Q.  FTX has no position on that?
6       A.  FTX's position is that that answer
7   can only be provided by an attorney.
8       Q.  What is the -- what is the balance
9   change ID?  This is the final column of this
10  tab we are looking at, feel free to flip
11  back up to page 3 of the document, the same
12  document?
13      A.  The balance change ID is not
14  something -- is not a field that I believe I
15  explicitly use in my analysis.  Let me just
16  confirm that answer is true.
17          I do not believe that that column
18  is included in the calculation steps
19  required to derive the figures in my
20  declaration.  So I would need to consult
21  with my team.
22      Q.  And to be clear, that wasn't my
23  question, my question is does FTX have a
24  view on what this means independent of
25  whether it was used as part of the

1           S. COVERICK
2   calculations as you had previously done?
3       A.  I would need to consult with my
4   team to answer that question.
5       Q.  Flip back to the previous page,
6   the LOC underscore changes tab, just one
7   page up from here?
8       A.  Okay.
9       Q.  Yes, perfect, okay.
10          This notes field, do you see that,
11  notes column?
12      A.  I do.
13      Q.  Is this something that was
14  manually entered by someone at FTX or was it
15  system generated or something else?
16      A.  I do not know specifically how
17  that field was populated at the time.
18      Q.  It was populated at the time,
19  though, and not at a later point in time?
20      A.  I don't have any information to
21  suggest it was created at a later point in
22  time.
23      Q.  The same question for this dest --
24  excuse me, destination not credited column,
25  second from the end, what is FTX's

1           S. COVERICK
2   interpretation of that column?
3       A.  Again, I would need to consult
4   with my team to understand the utility of
5   that column in the context of the exchange
6   functionality.  I did not use this column or
7   rely on it expressly in my analysis.
8       Q.  What -- now jumping back to the
9   next page, the LOC interest charge's
10  document, one page down?
11      A.  Okay.
12      Q.  What, if any, role did the
13  principal amount listed in the third from
14  the final column play in a customer's, and
15  specifically Three Arrows, overall account
16  balance?
17      A.  The manner in which my team
18  calculated account balances is, as I have
19  testified to several times, was to use
20  Python scripts to calculate the figures in
21  my declaration, using -- querying the raw
22  exchange database directly.  I then used
23  these documents to verify, confirm the
24  accuracy.  That was one way I confirmed the
25  accuracy of those figures.  I did not use

1           S. COVERICK
2   the principal column in the process of doing
3   that.
4       Q.  What role, if any, did the drawn
5   amount of Three Arrows line of credit play
6   in its overall account balance?
7       A.  The account balance would be net
8   of the utilized amount of the line of
9   credit.
10      Q.  What do you mean net of?
11      A.  You would subtract the utilized
12  amount of the line of credit.
13      Q.  From what to get to what?
14      A.  You would add up all of the
15  positions in the account, including any
16  borrow positions from the peer to peer
17  program and then subtract the utilized
18  amount of the line of credit.
19      Q.  To get to the overall account
20  balance?
21      A.  To get to the total account
22  balance.
23      Q.  The face value, total face amount
24  of the line of credit, does that factor into
25  the overall account balance or only the

**MAGNA** ▶
LEGAL SERVICES

S. COVERICK

1
2 utilized amount of it?
3          MR. GLUECKSTEIN:  Objection to the
4    form.
5     A.   It is my understanding that it is
6 the utilized amount of the line of credit
7 that would be netted from the account
8 balance.
9     Q.   If you subtract the utilized
10 amount of line of credit from the account
11 balance, does that mean it is part of the
12 U.S. negative dollar amount, why are we
13 subtracting?
14     A.   It was separate from the negative
15 USD balance when the exchange was
16 functioning.  The exchange delineated
17 between the amount drawn from the line of
18 credit, as well as the negative USD balance
19 from the borrow program.
20     Q.   So then does -- does that mean it
21 is FTX's position that the overall account
22 balance is not a net sum of all the asset
23 entitlements, but also for those who have a
24 line of credit includes that?
25          MR. GLUECKSTEIN:  Object to the

S. COVERICK

1
2    form.
3     A.   As I state in my declaration, a
4 function of the line of credit is that it
5 allowed accounts to utilize the line of
6 credit prior to borrowing from the borrowing
7 program, from the margin program.  So it
8 would be treated the same way as the margin
9 program.  It is a borrow on the account that
10 needs to be included when calculating the
11 total customer entitlement which is the
12 total account balance.
13     Q.   But that borrow is not reflected
14 in the negative US dollar balance as you
15 have been using and as FTX has been using
16 that term?
17     A.   It is -- that is for purposes of
18 analysis.  It could be aggregated in a
19 number of different ways.  The line of
20 credit is a negative USD amount on the
21 account balance.
22     Q.   You testified yesterday that
23 customers were shown I believe a balances
24 for each fiat currency including the US
25 dollar balance; is that correct?

S. COVERICK

1
2     A.   I believe that sounds consistent
3 with what I said.
4     Q.   Does -- did Three Arrows US dollar
5 balance, as presented to it by the exchange
6 pre-petition, include a subtraction or an
7 addition of the absolute value of the drawn
8 amount of the line of credit?
9     A.   Well, for one, I don't know what
10 3AC saw on its API, which I understand
11 conducted the vast majority of the trades
12 that 3AC performed.  Like many institutional
13 traders, 3AC used an API to access the
14 exchange.  That was a -- a software that
15 allowed them to interrogate access to the
16 exchange with certain systems of theirs,
17 although I am not familiar specifically with
18 how 3AC's functioned.  So I cannot speak to
19 how the account balances were specifically
20 displayed within 3AC's API.
21          On the website the negative USD
22 balance and the line of credit negative USD
23 balance were displayed separately from one
24 another.
25     Q.   Let's turn to -- back to the line

S. COVERICK

1
2 of credit document which was I believe the
3 previous exhibit, Exhibit 20.
4          Are you there?
5     A.   I have the exhibit, yes.
6     Q.   Take a look again at that section
7 5 on the first page?
8     A.   Okay.
9     Q.   It says, Throughout the lifetime
10 of the line of credit, at least 200 percent
11 of the line of credit (Collateral) must be
12 maintained in the borrower's FTX account.
13          Do you see that?
14     A.   I do.
15     Q.   Collateral is capital C
16 collateral?
17          MR. GLUECKSTEIN:  Objection to the
18    form.
19     Q.   Is that a yes?
20     A.   Yes.
21     Q.   What does that mean in FTX's view?
22     A.   It is my understanding they are
23 referencing the account value, which they
24 refer to as maintained in the borrower's FTX
25 account.

MAGNA
LEGAL SERVICES

1              S. COVERICK
2       Q.   Where is that term defined,
3   collateral to be account value?
4       A.   Again, I can't interpret a legal
5   document.  I am not sure if it is defined in
6   this document.  But that is my understanding
7   of how the requirement was applied on the
8   exchange.
9       Q.   Based on the code, based on
10  discussions with counsel, content of which I
11  am not inquiring into, what?
12      A.   Based on a review of the code and
13  my team's conversations with FTX employees
14  as well as a review of the relevant
15  documents.
16      Q.   Which FTX employees?
17      A.   Again, as I testified to
18  yesterday, I believe the primary FTX
19  employee, or the one that I am aware of my
20  team spoke with regarding the exchange code
21  base is Mr. Nils Molina.
22          MR. PROULX:  M-O-L-I-N-A.
23      Q.   Were there any secondary FTX
24  employees that you spoke to on this
25  particular subject?

1              S. COVERICK
2       A.   As I testified to you yesterday, I
3   have not spoken with any FTX employees.
4       Q.   So FTX's position is that
5   collateral refers to a net account value,
6   not any particular assets?
7       A.   I believe I described it as total
8   account value, which would be the summation
9   of all positions in the account.
10      Q.   The line of credit itself is a
11  position in the account that affects the
12  account balance, so does that mean that --
13  how does that factor into the definition of
14  collateral here?
15      A.   Like any negative USD balance, the
16  line of credit would reduce the total
17  account balance.
18      Q.   Could customers use a net account
19  balance for purposes of collateral in the
20  margin trading program?
21      A.   The margin trading -- the margin
22  trading program I believe as you are
23  referring to it, or the margin program, used
24  the maintenance margin requirement formula
25  to calculate compliance with -- with the

1              S. COVERICK
2   maintenance margin requirement.
3       Q.   And those operated on specific
4   tickers; right?
5       A.   The formula applied on a ticker by
6   ticker basis.
7       Q.   It didn't take some sort of
8   percentage of the overall account balance;
9   is that correct?
10      A.   That is not how the math was
11  performed.  You could calculate a percent of
12  the total account balance, but the math was
13  performed at a ticker by ticker level.
14      Q.   And when the lender was lending
15  out a particular ticker or asset as part of
16  the margin program, there were requirements,
17  were there not, with respect to the amount
18  of that specific asset they needed to lend
19  it out?
20      A.   I am sorry, can you repeat the
21  question.
22      Q.   When a lender was lending out
23  digital assets, a fiat currency under the
24  margin program, are you with me so far?
25      A.   Yes.

1              S. COVERICK
2       Q.   Did FTX impose requirements on
3   that lender with respect to how many of that
4   specific asset, specific currency needed to
5   be in its account prior to lending?
6       A.   It is my understanding that an
7   account -- that an account needed to have an
8   asset balance in it to be able to lend it
9   out.
10      Q.   Of that particular asset?
11      A.   Of that particular asset, yes.
12      Q.   Customers were not lending out a
13  net account value to some other customer?
14      A.   It was done on a ticker by ticker
15  basis.
16      Q.   Here, though, collateral doesn't
17  need to be -- has no bearing on any
18  particular tickers or any particular assets,
19  is that FTX's position?
20          MR. GLUECKSTEIN:  Objection to the
21      form.
22      A.   Again, it is my understanding and
23  FTX's position that the requirement here was
24  that the total account value remain at
25  $240 million or above.



Page 78

1            S. COVERICK
2      Q.  In US dollars or some other --
3      A.  In US dollars.
4      Q.  To comply with that requirement,
5  does that mean that if Three Arrows needed
6  to at all times maintain positive
7  240 million in its US dollar sub balance?
8      A.  No, as I testified to yesterday,
9  total account value is expressed in US
10  dollars, but included quantities of each --
11  summing up the quantities of each ticker in
12  the account times the relevant price of each
13  ticker at any point in time as expressed in
14  USD.  And then those amounts would be added
15  up.  Some of those amounts could be
16  positive, some of those amounts could be
17  negative, and summation of those amounts
18  would equal the total account balance.
19      Q.  If the customer, in this case
20  Three Arrows, had 240 million worth of
21  bitcoin associated with its accounts, no
22  negative liabilities, no negative US dollar
23  balances, would it be in compliance with
24  this line of credit requirement?
25      A.  Can you repeat the question.  It

Page 79

1            S. COVERICK
2  would -- it would be based on the specifics
3  of everything in their account.
4      Q.  Yeah, I was trying to be as
5  specific as possible.  If Three Arrows rows
6  had $241 million worth of bitcoin associated
7  with their accounts, are you with me so far?
8      A.  Yes.
9      Q.  Entitlement to that same amount of
10  bitcoin assets, are you with me so far?
11      A.  Yes.
12      Q.  No negative balances, no negative
13  US dollar balances in its account, are you
14  with me so far?
15      A.  Yes.
16      Q.  Is it in compliance with the line
17  of credit requirement?
18      A.  So when you say no negative
19  balances in the account, are you suggesting
20  that they would not have utilized any of the
21  line of credit?
22      Q.  Let's -- let's take both
23  scenarios.  Let's say they were at zero
24  utilization of the line of credit, are they
25  in compliance with it?

Page 80

1            S. COVERICK
2      A.  Their account value would be over
3  $240 million of USD value, so yes.
4      Q.  So let's say they are utilizing
5  the full 120 million of the line of credit,
6  in that scenario, are they in compliance
7  with the line of credit requirement?
8      A.  The net total account value would
9  be below the line of credit requirement, so
10  no.
11      Q.  So at full utilization of the line
12  of credit requirement, the Three Arrows
13  account balance had to actually be
14  $360 million; is that correct?
15      A.  I would need to consult with my
16  team to perform these hypothetical
17  calculations.  So what I know, as stated in
18  my declaration, is that at the time periods
19  in question they were out of compliance,
20  because their total account value was less
21  than $240 million.
22      Q.  And at those time periods you just
23  referenced, the applicable line of credit
24  requirement and the definition of collateral
25  as used here is equal to $240 million?

Page 81

1            S. COVERICK
2      A.  The requirement is that the
3  account value be above $240 million.
4      Q.  Did FTX have any other bases,
5  factual or legal, for taking the position
6  that collateral refers to some kind of net
7  account balance in this context?
8          MR. GLUECKSTEIN:  Object to the
9      form to the extent it calls for a legal
10      conclusion.
11      A.  Other than to the extent that I
12  have already discussed, that's what I am
13  basing my understanding on.
14          MR. PROULX:  Let's take a short
15      break here.
16          THE WITNESS:  Okay.
17          MR. PROULX:  Off the record,
18      please.
19          THE VIDEOGRAPHER:  We are going
20      off the record.  The time is 10:49 a.m.
21          (Whereupon, a short recess was
22      taken.)
23          THE VIDEOGRAPHER:  We are back on
24      the record.  The time is 11:19 a.m.
25          MR. PROULX:  Thank you.



Page 82

S. COVERICK

1
2    Q.   Mr. Coverick, before the break we
3    were talking about the maintenance margin
4    requirement, do you recall that discussion?
5        A.   Yes, sir.
6        Q.   And we were discussing FTX's
7    calculation and publication of that
8    requirement to the 3AC accounts, do you
9    recall that?
10       A.   Yes, sir.
11       Q.   So as we have made clear on the
12   record, our review of the underlying
13   calculations and analysis in your supplement
14   declaration are ongoing, but I wanted to
15   point you to paragraph 14 of your
16   supplemental declaration?
17       A.   Yes, sir.
18       Q.   Do you have that open in front of
19   you?
20       A.   Yes, I do.
21       Q.   For the record, we will just
22   clarify what exhibit number that is, you in
23   paragraph 14, make certain representations
24   regarding the margin trading account value
25   and maintenance margin level with respect to

Page 83

S. COVERICK

1
2    Three Arrows' accounts; is that correct?
3        A.   Yes, sir.
4        Q.   You do so at three points in time?
5        A.   There are three points in time at
6    which I specify in my supplemental
7    declaration, yes, sir.
8        Q.   The first point in time is
9    June 13, 2022 UTC at 9:00 a.m.?
10       A.   Yes, sir.
11       Q.   And this lists a margin trading
12   account value of 75.4, is that in millions
13   or dollars?  Millions, I see above; is that
14   correct?
15       A.   That's correct.
16       Q.   Does that margin trading account
17   value include the drawn or utilized amount
18   of the line of credit as of that time?
19       A.   So the way that a line of credit
20   would impact the margin trading account
21   value is in -- I would characterize it in
22   comparison to how traditional borrows would
23   work off of the peer to peer program for an
24   account that did not have a line of credit.
25   If the account did not have a line of

Page 84

S. COVERICK

1
2    credit, all of their borrows would come from
3    the margin program.  And that negative USD
4    amount would be netted against all of the
5    other positions in the -- in the rest of the
6    account.
7            The way a line of credit functions
8    is it does not count the negative USD value
9    for the line of credit amount in the margin
10   trading account value.  The time periods
11   referenced are after the line of credit was
12   out of compliance with its collateral
13   requirement.  And so it does not include the
14   add back for the line of credit in these
15   numbers.
16       Q.   If in FTX's view the line of
17   credit requirement had been in compliance
18   with, should the drawn amount in that case
19   of a line of credit have been added to the
20   margin trading account value?
21       A.   I can't speculate to a
22   hypothetical.  My understanding is the line
23   of credit was out of compliance and
24   therefore it was not added back to the
25   margin trading account value.

Page 85

S. COVERICK

1
2    Q.   Did you calculate the margin
3    trading account value for 3AC at any point
4    in time before June 13, 2022?
5        A.   My team did.  These are the ones
6    that I specify in my declaration that I am
7    personally aware of.  But my team analyzed
8    the margin trading account value at prior
9    points.
10       Q.   In that analysis, how did they
11   include -- to what extent did they include
12   the drawn amount of the line of credit in
13   the margin trading account value?
14       A.   In my team's analysis when the
15   line of credit was in compliance with its
16   collateral requirements, the line of credit
17   amount was added to the margin trading
18   account value and was not when the line of
19   credit was out of compliance with the
20   requirement.
21       Q.   Just to clarify the record, the
22   face value of the line of credit was added
23   or the drawn amount was added?
24       A.   For the periods in question, those
25   two amounts are the same.



S. COVERICK

1
2  Q.  Did you or your team calculate the
3  margin trading account value at all points
4  between June 13, 9:00 a.m. and June 15,
5  12:00 a.m.?
6        MR. GLUECKSTEIN:  Objection to the
7  form.
8  A.  My team did not calculate it on a
9  second by second basis.  But I understand
10  that they calculated it and annualized it
11  for various periods throughout those two
12  days.
13  Q.  Does FTX have a position on
14  whether at any point in time outside of
15  these three data points within this window,
16  the margin requirement -- the maintenance
17  margin requirement with respect to Three
18  Arrows was in compliance?
19  A.  I believe I referenced this in my
20  declaration, the original declaration, I
21  just want to reference that.
22        As I state in paragraph 74 in my
23  declaration, the margin trading account
24  value for the 3AC accounts fell below the
25  maintenance margin level absent the line of

S. COVERICK

1
2  credit at approximately June 13 of 2022.
3  Q.  My question -- finish your answer,
4  I didn't know if you were done.
5        My question was of course
6  different, my question was is it FTX's
7  position that it remained below the
8  maintenance margin level absent the line of
9  credit after that point in time?
10  A.  I am sorry for interrupting you, I
11  am not aware of a time period after
12  9:00 a.m. on June 13 that the account was in
13  compliance.  But I did not look at every
14  second by second interpretation of that
15  requirement.  But I am not aware of it ever
16  being in compliance after 9:00 a.m.
17  Q.  If it did come back into
18  compliance after 9:00 a.m. on June 13, 2022,
19  how, if at all, would that affect your --
20  FTX's view as to the compliance with MMR by
21  Three Arrows?
22        MR. GLUECKSTEIN:  Objection to the
23  form.
24  A.  Are we -- I assume by MMR you are
25  speaking of maintenance margin requirement,

S. COVERICK

1
2  I am -- I am fine to use that.
3  Q.  I accept I probably didn't define
4  that acronym earlier, yes, that's what I am
5  referring to?
6  A.  Okay, thank you.
7        I would have to analyze any
8  hypothetical scenario with my team and
9  define what the parameters of that
10  hypothetical scenario would be to provide an
11  accurate answer.
12  Q.  When a maintenance -- when Three
13  Arrows' maintenance margin level --  strike
14  that.
15        When Three Arrows' maintenance
16  margin requirement is complied with
17  hypothetically at some point between June 13
18  and June 14 other than on the three specific
19  time periods you have identified here, is
20  its line of credit reinstated at that point
21  in time?
22  A.  Well, the line of credit
23  collateral agreement is -- I think we
24  defined it earlier as the line of credit
25  requirement, while that is used in

S. COVERICK

1
2  conjunction with the maintenance margin
3  requirement, as I just walked through with
4  its impact to the margin trading account
5  value, that calculation is separate from the
6  margin trading account value, in that the
7  line of credit requirement is simply that
8  the total account value must remain above
9  $240 million, specifically in the periods in
10  question.  The maintenance margin
11  requirement is the detail -- more detailed
12  formula that applies the factors to each
13  ticker position and either does or does not
14  include the line of credit in the margin
15  trading account value.
16  Q.  Yeah, and that's exactly what I
17  meant.  I just asked you if Three Arrows is
18  -- returns to compliance with the
19  maintenance margin requirement at some point
20  in time in the midst of these three dates
21  you have asked here, does the line of credit
22  then again included, in the
23  maintenance --  strike that, in the margin
24  trading account value?
25        MR. GLUECKSTEIN:  Objection to the

**MAGNA**
LEGAL SERVICES

Page 90

S. COVERICK

1        S. COVERICK
2    form.
3        A.   As I explained, the line of credit
4    is extended when the line of credit
5    requirement -- when the account is in
6    compliance with the line of credit
7    requirement.
8        Q.   Understood.  Once Three Arrows
9    returns to compliance with the LOC or line
10   of credit requirement, in the midst of these
11   three dates you have here, at that point in
12   time does the drawn amount of the line of
13   credit get added back into the margin
14   trading account value?
15       A.   That is a hypothetical scenario
16   that would both require additional financial
17   analysis by my team as well as legal
18   analysis of the document.  So I can't
19   provide an answer on that hypothetical
20   scenario.
21       Q.   But it is not FTX's position that
22   the moment there is an asserted
23   non-compliance by Three Arrows with the LOC
24   requirements, the LOC is never again part of
25   the margin trading account value?

Page 91

S. COVERICK

1        S. COVERICK
2        MR. GLUECKSTEIN:  Objection to
3    form, misstates the testimony and asked
4    for a legal conclusion.
5        A.   Again, my answer is that that
6    hypothetical scenario, which did not occur
7    to my knowledge, would require additional
8    financial and legal analysis to answer
9    accurately.
10       Q.   FTX has produced documents in this
11   litigation that refer to something called a
12   liquidation engine or a risk engine, are you
13   familiar with these terms?
14       A.   I am.
15       Q.   What is your general understanding
16   of what the liquidation engine or risk
17   engine is?  And if you see a difference
18   between these terms, please let me know as
19   well?
20       A.   I believe those terms are used to
21   mean the same thing.  They are referenced in
22   different places, but they are -- they are
23   referring to the same thing based on my
24   knowledge.
25       In general, the liquidation engine

Page 92

S. COVERICK

1        S. COVERICK
2    or the risk engine refers to the algorithm
3    by which FTX will commence automatic
4    liquidation transactions once an account is
5    out of compliance with the maintenance
6    margin requirement.
7        Q.   Does that mean the risk engine
8    operates only on the maintenance margin
9    requirements?  Are there any other
10   collateral or similar types of requirements
11   that the liquidation engine operates on?
12       A.   To be clear, I am not speaking of
13   any liquidations that can occur in an
14   account.  But I am speaking to a component
15   of the -- the source code underlying the
16   exchange and operating the exchange that
17   would automatically liquidate an account
18   pursuant to a certain priority and logic
19   that was built into that algorithm.  That
20   happens when an account falls below the
21   maintenance margin requirement.  There is
22   also a further transaction, liquidation
23   transaction that would occur when an account
24   falls below what is called the auto close
25   fraction, I believe.

Page 93

S. COVERICK

1        S. COVERICK
2        Q.   Just to clar -- and we will pull
3    up a document I think, and discuss some of
4    these concepts, but just to clarify, does
5    the first step, liquidation engine, is that
6    triggered in any instances other than
7    non-compliance with the maintenance margin
8    requirement?
9        A.   It is my understanding that that
10   is the trigger, the maintenance margin
11   requirement.
12       Q.   Did in the real world the
13   liquidation engine in fact ever trigger?
14       A.   To my knowledge, and I cannot
15   confirm specifically, because I have not
16   reviewed every single transaction, it is my
17   understanding it happened every day, the
18   exchange was operating.
19       Q.   Pre-petition?
20       A.   Pre-petition.
21       MR. PROULX:  This is Exhibit 22.
22       (Whereupon, a document was marked
23   Coverick Exhibit 22 for identification
24   as of this date.)
25       Q.   Before we dive into this document,



1              S. COVERICK
2    I just wanted to make sure the record is
3    clear as to a point we were just discussing
4    on maintenance margin requirement that we
5    were -- we had just been looking at
6    paragraph 14 of your declaration.  Let's
7    turn back there for a brief moment.  This
8    was the supplemental declaration?
9        A.  Yes, sir.
10       Q.  If the line of credit requirements
11   had been complied with by Three Arrows on
12   the three dates you have set out in that
13   paragraph, would the face value or drawn
14   amount of the line of credit have been added
15   to the margin -- margin trading account
16   value?
17           MR. GLUECKSTEIN:  Objection.
18       Q.  Using the code?
19           MR. GLUECKSTEIN:  Object, calls
20       for a legal conclusion.
21       A.  From a financial perspective, to
22   analyze that hypothetical scenario I would
23   need to understand all of the various
24   aspects of the account that would cause the
25   account to be in compliance with the line of

1              S. COVERICK
2    credit requirement, as many of those
3    components would also be factored into the
4    overall maintenance margin requirement.  So
5    it is not possible for me to answer that
6    hypothetical question.
7        Q.  And even if there is a stipulation
8    that the line of credit requirement was in
9    full compliance, you still -- FTX still has
10   no view of whether or not that should be --
11   that would be added properly to the margin
12   trading account value?
13           MR. GLUECKSTEIN:  Objection,
14       misstates the testimony, calls for a
15       legal conclusion.
16       A.  I would need to know all of the
17   aspects of what resulted in that stipulation
18   to be able to answer that question.
19       Q.  The drawn amount of the line of
20   credit on each of these dates was
21   120 million; is that correct?
22       A.  Mechanically in the exchange
23   database, the drawn amount on the line of
24   credit at 9:00 a.m. on 6/13 and 10:00 p.m.
25   on 6/14 was $120 million.

1              S. COVERICK
2        Q.  If $120 million were added by
3    stipulation to each value in the margin
4    trading account value here, is the margin
5    trading account value above the maintenance
6    margin level?
7        A.  If absent all of the other caveats
8    that I just described, because there would
9    be other factors that must be different in
10   the account for that to be the case for --
11   for 120 million to be added.  But if you
12   simply added, for example, 120 million to
13   75 million, that would get you to, I
14   believe, 195.4 million, which is
15   mathematically higher than 86.8 million,
16   which is the calculated maintenance margin
17   requirement.  But again, there would be
18   other factors in the account that must be
19   different for FTX to have stipulated or for
20   the line of credit to otherwise be in
21   compliance.
22       Q.  If the line of credit were
23   complied with and the line of credit
24   document were in operation on each of these
25   dates, would Three Arrows be in compliance

1              S. COVERICK
2    the maintenance margin requirement.
3            MR. GLUECKSTEIN:  Object to the
4        form.
5        A.  Can you repeat the question,
6    because it sounded like the same question I
7    just answered.  I am sorry if I am
8    misunderstanding.
9        Q.  If -- if the line of credit on
10   each of these three dates was not absent or
11   removed, would Three Arrows margin trading
12   account value be above its maintenance
13   margin level?
14           MR. GLUECKSTEIN:  Objection to the
15       form, asked and answered.
16       A.  Let me try my answer differently,
17   because I believe I just answered that.
18   Mechanically in the exchange database, the
19   removal of the line of credit simply caused
20   FTX -- or I am sorry, the 3AC accounts to
21   resort to borrowing from the peer to peer
22   borrowing program as opposed to borrowing
23   from the line of credit.  That is
24   mechanically what would have happened.
25           Had that removal mechanically

**MAGNA**
LEGAL SERVICES

S. COVERICK

1  happened prior to -- had it -- had the line
2  of credit been removed prior to series of
3  manual liquidations that were performed, it
4  would have triggered the risk engine or auto
5  liquidation engine that we were just
6  discussing immediately, because the account
7  would have immediately in the code been
8  recognized as out of compliance, which as I
9  testified, was the trigger point for that
10 occurring.
11    Q.  So the drawn amount of the line of
12 credit is not then borrowing from the peer
13 to peer margin program?
14    A.  No, as I state in my declaration,
15 a function of the line of credit is to
16 borrow from the line of credit prior to
17 borrowing from the peer to peer borrowing
18 program.
19    Q.  And that's borrowing from FTX as
20 the lender of the line of credit?
21    A.  I believe the borrower/lender
22 relationship from a legal perspective is a
23 legal question that I am not qualified to
24 answer.  Mechanically, though, it was not

S. COVERICK

1  borrowed from the pool of lenders in the
2  peer to peer borrowing program.  That amount
3  was not what the line of credit was -- was
4  in place.
5     Q.  Sure.  Let's turn back to Exhibit
6  20, this is the line of credit document.
7        Who were the parties to this
8  document, if any?
9     A.  It -- I am not a lawyer.  So I am
10 not qualified to interpret who the parties
11 are.  I can read the names on the top of the
12 page, but I don't know how to -- I am not
13 qualified to analyze who the parties may or
14 may not be.  But I can read the names at the
15 top of the page.
16    Q.  Yeah, why don't you do that for
17 the record, read the names at the top of the
18 page and how they are defined, please?
19    A.  The top of the page reads, This
20 line of credit agreement is made as of this
21 30th day of March 2022 defined as the "Line
22 of Credit Agreement" by and among Three
23 Arrows Capital Ltd. of ABM Chambers 2283,
24 Road Town, Tortola, BVI, VG1110, which is

S. COVERICK

1  defined as borrower, and FTX Trading Ltd.
2  which is defined as lender.
3     Q.  Any other parties to this
4  document?
5     A.  Again, I understand parties to a
6  document to constitute a legal term.  I am
7  not aware of any other parties that are
8  referenced in the document.
9     Q.  Any other parties that FTX takes
10 the view are parties to this document beyond
11 those referenced here?
12       MR. GLUECKSTEIN:  Objection, calls
13 for a legal conclusion.
14    A.  I am not aware of any additional
15 parties that are referenced in this
16 document, other than the only other name I
17 see in this document is the name on the
18 signature line.
19    Q.  Are you referring to Kyle Davies?
20    A.  Yes, sir.
21    Q.  And that's Three Arrows Ltd.?
22    A.  Under the Three Arrows Ltd.
23 signature block, yes, sir.
24    Q.  I should have said Three Arrows

S. COVERICK

1  Capital Ltd.
2        Let's turn back to Exhibit 22.
3        Have you seen this document
4  before?
5     A.  I have.
6     Q.  In connection to your deposition
7  preparation?
8     A.  Yes, sir.
9     Q.  And is this another one of those
10 informational or help pages you had spoken
11 about yesterday?
12    A.  Yes, sir, that's my understanding.
13    Q.  And what, if any, position does
14 FTX take on the presence of this document on
15 FTX's website as of April 4, 2022 or at any
16 other point in time?
17    A.  I have no reason to believe that
18 it wasn't posted on the website as of that
19 date it is listed.
20    Q.  But it doesn't -- but FTX doesn't
21 no for sure?
22    A.  I have no reason and no evidence
23 to believe that it was not posted on the
24 website as of that time.

MAGNA
LEGAL SERVICES

1             S. COVERICK
2     Q.   So this document, is this -- does
3  this relate to the liquidation or risk
4  engine we were talking about earlier?
5     A.   Among other things, it appears
6  to -- to reference aspects of the
7  liquidation process, yes.
8     Q.   Are there other processes that
9  it -- that it references?
10    A.   Related processes.  There is a
11 reference in here to the back stop liquidity
12 provider program, which -- and then an
13 insurance fund, which are -- are other
14 aspects of the exchange that function in
15 relation to liquidation scenarios.
16    Q.   This document references a
17 three-step process for liquidations, do you
18 see that?
19    A.   Yes.
20    Q.   And the first step is, We, FTX,
21 first closed down positions with rate
22 limited liquidation orders in the market?
23    A.   I see that.
24    Q.   In the market, what does that
25 mean?

1             S. COVERICK
2     A.   I don't know the intent of the
3  author that wrote this document.
4     Q.   On page 2 of this document, it
5  says, I am reading the second full sentence,
6  The goal of the liquidation engine is to
7  carefully close down positions in the market
8  while minimizing impact keeping markets
9  orderly?
10    A.   I am sorry, what -- where was
11 that?
12    Q.   Sure, the second full sentence, do
13 you want to read that?
14    A.   Of page 2?
15    Q.   Correct.
16    A.   Oh, I see.
17    Q.   Just let me know when you have had
18 a moment to read that.
19    A.   Okay, I have read it.
20    Q.   How did the liquidation engine
21 assist in keeping markets orderly?
22    A.   Well, while those are the words on
23 the page, again, I don't know the intent of
24 the author that wrote them.  My
25 understanding of how the liquidation

1             S. COVERICK
2  algorithm worked is that once a account was
3  out of compliance with the maintenance
4  margin requirement, there was a process by
5  which positions that were available to be
6  sold within the context of the account,
7  liquidated in the account, would be sold to
8  bring the account back in compliance with
9  the maintenance margin requirement.
10    Q.   And FTX was the one doing that
11 selling?
12    A.   The underlying exchange base -- or
13 the underlying code base, sorry, of the
14 exchange, conducted those transactions in
15 the event of an auto liquidation.  Again,
16 these transactions are simply ledger entries
17 on the exchange ledger, and do not result in
18 the movement of any other assets, either
19 fiat or digital assets.
20    Q.   Why did FTX care if an account
21 dropped below its maintenance margin
22 requirement?
23    A.   I cannot speculate as to what the
24 pre-petition management team cared about.
25 As a practical matter, it is my

1             S. COVERICK
2  understanding that the utility on the
3  exchange of the maintenance margin
4  requirement was intended to prevent accounts
5  from going negative and being a debtor
6  position to the exchange.
7     Q.   Is that something that FTX strived
8  to avoid?
9     A.   FTX -- the FTX exchange as it
10 operated pre-petition had measures in place
11 to avoid accounts from going negative.
12    Q.   Why did it care if accounts went
13 negative?
14    A.   I don't know why the pre-petition
15 management team would care about something
16 or not.
17    Q.   What is -- from a business person
18 perspective economically, what reason would
19 FTX have for taking certain measures to
20 prevent accounts from going negative?
21    A.   Again, I can't speculate as to the
22 intent of the pre-petition management team.
23 As a business person, I can speculate that
24 one reason conceivably that the exchange
25 would want to avoid customers incurring

**MAGNA**
LEGAL SERVICES

1          S. COVERICK
2  occurring debt is because they wanted the
3  exchange to be an attractive place for
4  customers to trade.  And if customers were
5  routinely incurring debts on account of
6  levered positions, they would likely not
7  want to continue to trade in the exchange.
8  That's just one potential reason from a
9  business person's understanding.  But I
10 cannot speculate as to all the of the
11 reasons the pre-petition management team
12 might have considered when not wanting
13 accounts to go negative or not -- or putting
14 measures in place rather to prevent accounts
15 from going negative.
16     Q.   And just for the record, the same
17 answer on behalf of the FTX Recovery Trust?
18     A.   That answer is to the best of my
19 knowledge.
20     Q.   When you say debit --  strike
21 that.
22          When you said debts, wanted to
23 avoid customers incurring debts, are you
24 referring to debit balances or negative
25 account balances or something else?

1          S. COVERICK
2     A.   I think it is safe to say those
3  three things are the same.  A negative
4  account balance, as we discussed yesterday,
5  can also be described as a debit account
6  balance, which would also be a debt to the
7  exchange.
8     Q.   Any other reasons why from your
9  business person in FTX's position today the
10 exchange would have wanted to prevent those
11 things?
12          MR. GLUECKSTEIN:  Objection to the
13 form.
14     A.   Again, I can't speculate to all of
15 the reasons that might have been considered,
16 because I wasn't there at the time.
17     Q.   There may have been others?
18     A.   There may or may not have been
19 others.  And the one I referenced is my
20 speculation of a potential consideration.  I
21 certainly cannot testify that that is what
22 management was considering at the time.
23     Q.   Step two of this document, this is
24 on the bottom of the same page we are
25 looking at, refers to the back stop

1          S. COVERICK
2  liquidity provider system kicking in, or I
3  should say will kick in, let me know if you
4  see that?
5     A.   Yes, sir, I do see that.
6     Q.   What is the back stop
7  liquidity provide -- provider system?
8     A.   Sure.  I believe I touched on it a
9  bit yesterday, so apologies if -- if I am
10 being repetitive.  But the back stop
11 liquidity provider program involved a series
12 of market makers on the exchange that
13 specifically wanted to opt in to the back
14 stop liquidity provider program.  Their role
15 on the exchange was to effectively ensure
16 the -- the balance, if you will, of the
17 futures product on the exchange.  And they
18 stepped into certain transactions only with
19 regard to the closing of future contracts
20 during an account's liquidation.  When
21 accounts were liquidated by the liquidation
22 engine or risk engine, the algorithm, if you
23 will, that underlied that process on the
24 exchange, that included both sale
25 transactions of -- of assets in the account

1          S. COVERICK
2  or asset entitlements in the account, asset
3  positions in the account as well as
4  potentially closing open future positions on
5  the account.
6          As I mentioned yesterday, certain
7  future positions, certainly like the ones
8  that 3AC entered into, namely, bitcoin
9  perpetual futures, had a high volume of
10 trading on the exchange.  There were a lot
11 of market participants, and in most, if not
12 all, scenarios, there were typically willing
13 participants or other third-party customers
14 on the other side of -- of a transaction
15 that anyone wanted to perform.
16          So for example, if a long bitcoin
17 perpetual position was being closed as part
18 of a liquidation, it is likely that the
19 matching engine of the exchange would be
20 able to find another customer that wanted to
21 step into that position, so that whoever the
22 other counterparty to the original position
23 was, would not have to be, you know -- would
24 not have to have their contract closed out.
25 So that's what I talk about when I say the

MAGNA
LEGAL SERVICES

S. COVERICK

1          S. COVERICK
2    balance of the future system.
3        Q.   So the -- the closing out and
4    transfer to other counterparties of futures
5    contracts, is this part of the -- of FTX's
6    initial liquidation process or are we always
7    in step two of this process and this is part
8    of the back stop liquidity provider's
9    process?
10        MR. GLUECKSTEIN:  Object to the
11    form.
12        Q.   Let me just take this step by
13    step.  Futures contracts subject to
14    liquidation, are they closed by FTX in step
15    one or the back stop liquidity provider in
16    step two?
17        A.   My understanding is that they can
18    be closed by the liquidation engine in step
19    one, but I hadn't gotten that part of my
20    answer yet.  The back stop liquidity
21    provider program specifically relates to
22    once the account is below the auto close.
23        Q.   But the back stop liquidity
24    provider system only operates on futures
25    contracts?

S. COVERICK

1          S. COVERICK
2        A.   Correct.
3        Q.   How do you know that?
4        A.   My teams underlying review of the
5    code base of the exchange.
6        Q.   Any documents other than the code
7    base?
8        A.   Their review of the code base of
9    the exchange as well as conversations with
10    FTX employees.
11        Q.   Who were the back stop liquidity
12    providers that you have referenced?
13        A.   I don't have the specific
14    counterparties committed to memory.  But in
15    general they were market makers that
16    otherwise traded on the exchange and -- and
17    provided market making activities on the
18    exchange that specifically opted in to being
19    a back stop liquidity provider.
20        Q.   And when a back stop liquidity
21    provider closed a futures position, did it
22    take on that position itself?
23        A.   So that's what I was trying to get
24    to in my earlier answer, if I could pick up
25    where I left off on the bitcoin perpetual

S. COVERICK

1          S. COVERICK
2    futures.
3        Q.   If it is responsive to my current
4    question?
5        A.   It is, I was -- I was trying to
6    get here.
7        Q.   Okay?
8        A.   So the example I gave was for a --
9    a -- a perpetual future position that was
10    actively trading with, there are many
11    willing counterparties to step into the
12    other side of the position.  So if I had a
13    perpetual futures contract and you were the
14    counterparty and I was auto liquidated and
15    that position was closed, it is likely that
16    someone else at this table, using that as an
17    example, would step into the other side
18    and -- and your future -- your perpetual
19    future would continue to run, you would --
20    you would have no counterparty risk in that
21    scenario.
22        In less frequently traded
23    perpetual futures, where there was a less
24    active market, if you will, there were
25    circumstances in which there were not --

S. COVERICK

1          S. COVERICK
2    there was not an adequate demand on the
3    other side of the contract to step into that
4    position at a -- at a price -- a reference
5    price similar to where the future was
6    trading.  There was an algorithm in the code
7    base of the exchange that would then match
8    that -- that liquidation or that transfer of
9    the position of the future that is being
10    closed for the liquidating account to one of
11    the back stop liquidity providers.  The back
12    stop liquidity provider as compensation for
13    participating in that program, would
14    effectively receive a favorable reference
15    price at the open point of -- of that future
16    contract being transferred to them.  And
17    that was effectively their compensation for
18    being willing to just say I will take any
19    other side of -- of these auto close
20    liquidation future positions.
21        Q.   Give us an example or two, if you
22    know, of a futures product for which the
23    supply increased the demand?
24        A.   I -- I wouldn't want to speculate,
25    because I have not analyzed all of the

Page 114

S. COVERICK

1           S. COVERICK
2 trading activity of perpetual futures and
3 done that analysis. I could speculate, but
4 there is a chance it would be wrong. And I
5 am -- I am testifying under oath and would
6 not want to do that.
7     Q. What is the volume of these
8 futures contracts that were subject to the
9 back stop liquidity provider process?
10     A. That would require -- answering
11 that question would require my team to do
12 additional analysis.
13     Q. Do you know who any of the back
14 stop liquidity providers were by specific
15 identification?
16     A. I believe the FTX Recovery Trust
17 has that information. I don't have it
18 committed to memory.
19     Q. Are any FTX affiliates among the
20 back stop liquidity providers to FTX's
21 knowledge?
22     A. I do believe, but would have to
23 confirm with my team that Alameda Research
24 may have been one of the back stop liquidity
25 providers. But I would need to confirm that

Page 115

1           S. COVERICK
2 with my team.
3     Q. When -- when a -- when Alameda
4 served as a back stop liquidity provider, it
5 received some sort of -- some sort of fee
6 for the positions it assumed?
7     A. It is the fee would be embedded in
8 the first 30-second gain or loss that the --
9 that the future incurred after it was
10 transferred to the back stop liquidity
11 provider. So they effectively gave a
12 favorable reference price at the expense of
13 the account being liquidated to the back
14 stop liquidity provider.
15     Q. Why did Alameda Research serve as
16 a back stop liquidity provider?
17     A. I do not know the intent of the
18 pre-petition management team via either FTX
19 nor Alameda, I do know that Alameda was one
20 of the largest reference market makers on
21 the exchange. And many other large market
22 makers on the exchange participated in the
23 back stop liquidity provider program.
24     Q. Step three talks about this
25 insurance fund or at least page 1 talks

Page 116

1           S. COVERICK
2 about this insurance fund, do you see that?
3     A. Yes, sir.
4     Q. What is the insurance fund?
5     A. It -- it works in -- in parallel
6 to the back stop liquidity provider program
7 that we just discussed. So in that same
8 example, when I said that there would be a
9 favorable reference price given to
10 incentivize the back stop liquidity provider
11 to step into that position, there would also
12 be a charge to the liquidating -- the -- the
13 account being liquidated, that would reflect
14 effectively a third of the remaining account
15 value. If you recall, this is only in
16 circumstances where accounts are being auto
17 closed. Again, that because this operates
18 solely in the context of the closing of
19 future positions, that is effectively,
20 again, incurring like a final loss, if you
21 will, on the future contract for the
22 customer being liquidated. That amount that
23 was charged to the account being liquidated
24 theoretically went into what was referred to
25 as an insurance fund. Such that in

Page 117

1           S. COVERICK
2 circumstances where accounts were being
3 liquidated, but there wasn't sufficient
4 account value to both pay that fee to the
5 back stop liquidity provider without the
6 account going negative, the insurance fund
7 would fill that gap.
8     Q. Are there examples of a lack of
9 such liquidity at various points?
10     A. I am aware that there are accounts
11 that did not have sufficient account value
12 when their futures were being liquidated to
13 both close the position and pay the fee to
14 the back stop liquidity provider stepping
15 in.
16     Q. And not sufficient lenders, other
17 customers on the program, to step in either?
18     A. That would be those -- in those
19 circumstances, yes.
20     Q. When the insurance fund stepped
21 in, so who controlled the insurance fund?
22     A. I don't know specifically who was
23 responsible for maintaining the insurance
24 fund. But the technical control of the
25 insurance fund would have been the code base

**MAGNA** ▸
LEGAL SERVICES

Page 118

1              S. COVERICK
2    of the exchange.
3        Q.  That's FTX's exchange we are
4    talking about?
5        A.  Yes, sir.
6        Q.  It is a fund, it is an FTX fund of
7    some kind?
8        A.  It was not a segregated fund like
9    all other things.  This was something that
10   was maintained on the exchange ledger in the
11   sense that the auto close transactions I am
12   discussing were recorded on the exchange
13   ledger.
14       Q.  How much did -- did the insurance
15   fund extend to cover customer account losses
16   pursuant to this process?
17           MR. GLUECKSTEIN:  Objection to the
18   form.
19       A.  Answering that question would
20   require my team to perform additional
21   analysis that I haven't performed.
22       Q.  It was some positive number?
23       A.  Again, that would require my team
24   to perform additional analysis that I
25   haven't performed.

Page 119

1              S. COVERICK
2        Q.  Did the insurance fund also have
3    a -- any sort of favorable pricing that they
4    received, fees that they received, other
5    economic incentives to act in that capacity?
6           MR. GLUECKSTEIN:  Objection to the
7    form.
8        A.  The insurance fund was funded as I
9    described it.  I am not aware of other
10   aspects that would be charged in those
11   liquidation scenarios.
12       Q.  How, if at all, was the insurance
13   fund related to the Alameda Research?
14       A.  Alameda Research was one of the
15   largest market makers on the exchange.  And
16   I believe they also participated as a back
17   stop liquidity provider.  It is -- it is
18   possible, but I do not know, because I
19   haven't analyzed every transaction on the
20   exchange and I haven't performed the
21   specific analysis.  But if Alameda was a
22   back stop liquidity provider in a
23   circumstance where there was not sufficient
24   account value to -- there was not sufficient
25   account value to pay the back stop liquidity

Page 120

1              S. COVERICK
2    provider fee, Alameda -- Alameda
3    theoretically would have been paid that fee
4    by the insurance fund.  But I cannot confirm
5    if there are circumstances where that
6    happened.  That's just theoretically how it
7    would work like any other back stop
8    liquidity provider.
9           MR. PROULX:  Let's give you a new
10      document, please.  This is 23.
11          (Whereupon, a document entitled
12      FTX Advisory Board Meeting for
13      September 19, 2022 was marked Coverick
14      Exhibit 23 for identification as of
15      this date.)
16       Q.  Mr. Coverick, you have been handed
17   what has been marked as Exhibit Number 23 it
18   is a document produced by FTX in this
19   litigation.  It is entitled FTX Advisory
20   Board Meeting for September 19, 2022.
21          Are you familiar with this
22   document?
23       A.  I believe I have seen it.  I have
24   not studies it to a level of detail that
25   would allow me to analyze it.

Page 121

1              S. COVERICK
2        Q.  Have you seen it in connection
3    with your deposition preparation?
4        A.  I believe I have seen it as a
5    document that was produced to 3AC.
6        Q.  If you can turn to page 3 of this
7    document, there are highlights, do you see
8    that?
9        A.  I do.
10       Q.  What is the FTX Advisory Board?
11       A.  I do not know.
12       Q.  Page 3 of this document, you will
13   see a reference to Three Arrows under item
14   number one, do you see that?
15       A.  I do.
16       Q.  Specifically under 1(a) Romanette
17   1, Three Arrows Capital was a large trader
18   on FTX.  The FTX risk and liquidation engine
19   liquidated them to close the account at zero
20   dollar exposure.
21          Do you see that?
22       A.  I do.
23       Q.  Zero dollar exposure to whom?
24       A.  I do not know the intent of the
25   author of this document nor have I verified

Page 122

S. COVERICK

1    S. COVERICK
2    the statements contained within it.
3        Q.  You don't know if in fact the
4    Three Arrows liquidation resulted in zero
5    dollars exposure to FTX?
6        A.  I do not know what the author is
7    intending to say here.  I also know that
8    like other documents I have seen from the
9    pre-petition time period, there are
10   inaccuracies, for example, I do not believe
11   the 3AC account was closed.
12       Q.  How do you define closing an
13   account?
14       A.  I define closing an account by the
15   account being closed and the customer no
16   longer having access to conduct transactions
17   on the exchange.
18       Q.  FTX has no position on whether in
19   the real world setting, aside this document,
20   the liquidation of the Three Arrows account
21   resulted in zero dollar exposure to it?
22       MR. GLUECKSTEIN:  Object to the
23   form.
24       A.  I do not know what is being
25   referenced or how it is being characterized

Page 123

S. COVERICK

1    S. COVERICK
2    or the intent of the author.  And I do note
3    the inaccuracies in the statement as it is
4    written.
5        Q.  Did in fact the FTX risk and
6    liquidation -- liquidation engine operate on
7    Three Arrows accounts at any point?
8        A.  For a relatively small amount of
9    dollars in the -- relatively small in the
10   context of 3AC's account history, it did.
11       Q.  The next item says, In June of
12   2022, the insurance fund made 2.5 million
13   from liquidations.
14       Do you see that?
15       A.  I see.
16       Q.  Do you have any reason to doubt
17   the accuracy of that statement?
18       A.  Given the inaccuracy I just noted
19   and the fact that I testified just a moment
20   ago that my team has not performed any
21   analysis on the insurance fund as of
22   June 2022 or other dates, I have reason to
23   doubt the accuracy of this document.
24       Q.  Any pre-petition documents
25   produced by FTX that you don't have reason

Page 124

S. COVERICK

1    S. COVERICK
2    to doubt the accuracy of?
3        MR. GLUECKSTEIN:  Object to the
4    form.
5        A.  I can only attest to the accuracy
6    of something if I have gone through my
7    process of analyzing it and verifying it
8    with my team.  I have not done that with
9    this document.
10       Q.  Do you know if the insurance fund
11   in fact, made 2.5 million from liquidations
12   from the Three Arrows' liquidation?
13       MR. GLUECKSTEIN:  Object to the
14   form, misstates the document.
15       A.  I do not know that, nor do I
16   believe that the Three Arrow -- the 3AC
17   liquidations resulted in any payments to the
18   insurance fund.
19       Q.  Was the insurance fund involved in
20   any way in the Three Arrows liquidations?
21       A.  I do not recall any information to
22   suggest that it was.  I would need my team
23   to perform additional analysis to ensure I
24   am answering that question accurately, but I
25   am not aware of any information that

Page 125

S. COVERICK

1    S. COVERICK
2    suggests that the insurance fund was
3    involved in the liquidation of 3AC's
4    account.
5        Q.  Let's put futures contracts to the
6    side for a moment and talk about more
7    generally the spot margin trading?
8        A.  Okay.
9        Q.  Were there instances where the
10   supply of assets being lent pursuant to that
11   trading program exceeded the demand for it?
12       MR. GLUECKSTEIN:  Object to the
13   form.
14       A.  Again, I haven't analyzed every
15   transaction on the exchange's history.  But
16   it is possible and perhaps likely that there
17   were always mismatches in supply and demand.
18   That is the very thing that would cause
19   price to move.
20       Q.  Is FTX aware of any instances
21   where a customer who had lent out a
22   particular asset or asset entitlement or
23   ledger entry pursuant to the margin program
24   was not made whole pursuant to that lend?
25       A.  Again, as I testified to you

Page 126

S. COVERICK

1
2  yesterday, I understand make whole or
3  occurrence of a loss to be and require legal
4  interpretation.  I am not aware of entries
5  on the exchange ledger related to loss on
6  lending.  And one of the reasons for that is
7  that, as I testified to you yesterday, there
8  was no one-to-one borrower relationship, it
9  was a pool-to-pool relationship.  But I am
10 not aware of any specific debits or credits
11 to specific customer accounts that were
12 incurred through participation of the
13 lending program.
14     Q.   Okay.  Is another reason for a
15 certain amount of coverage of losses that
16 FTX made whole those customers whether
17 pursuant to the liquidity -- the back stop
18 liquidity program or the insurance fund?
19     A.   I would not characterize it that
20 way.  Again, the back stop liquidity
21 provider and the insurance fund are specific
22 to the closing of future contracts.
23     Q.   So when there was a situation
24 where the supply of a given asset being lent
25 pursuant to the spot margin trading program

Page 127

S. COVERICK

1
2  exceeded the demand, how, if at all, was the
3  repayment allocated among the exchange or
4  its users or FTX?
5     A.   If supply exceeded demand or
6  something else caused the price to move
7  down, the price at which the account or the
8  position was liquidated would -- would
9  presumably just be lower.  It is not a --
10 said differently, the conversation earlier
11 on futures contracts is relevant because
12 there are two counterparties to that futures
13 contract.  And the exchange wanted to ensure
14 that when customers open future positions
15 they were not regularly getting closed due
16 to their counterparty being liquidated.  So
17 the exchange provided a matching service to
18 ensure that there were other counterparties
19 willing to step into those positions.
20     Spot positions operate entirely
21 differently.  There are spot positions that
22 can be sold for a price, it is just a
23 question of what price their -- the selling
24 transaction occurs at.
25     Q.   And when they are sold at a

Page 128

S. COVERICK

1
2  particular price pursuant to the spot margin
3  matching program and the borrower defaults,
4  their account goes negative, how, if at all,
5  is the lending customer made whole?
6     A.   In -- during the existence of the
7  FTX exchange, I am not aware of any specific
8  accounting decisions that were made or the
9  decision on when or if to inevitably incur
10 that loss or push that loss to the customer.
11 It doesn't mean that they didn't have the
12 right to do it, it doesn't mean they weren't
13 going to do it, it just means for the time
14 the exchange was abruptly shut down in
15 November of 2022, I have not seen evidence
16 of that having been done.
17     Q.   When you refer to pushing a loss
18 to the customer, is that the same thing as a
19 clawback?
20     MR. GLUECKSTEIN:  Object to the
21     form.
22     A.   I don't know what context we are
23 using the clawback in.  I understand
24 clawback to often refer to ability to get
25 monies or claw back monies from someone

Page 129

S. COVERICK

1
2  else.  I have seen the word clawback used in
3  the context of FTX communicating to
4  customers in certain documents that if their
5  account balance went negative, they had the
6  right to clawback those amounts.
7     Q.   So let's look at a particular
8  document that I think you have it in front
9  you, it is a couple of exhibits back.
10 Exhibit Number 22, specifically, on the very
11 first page, very first line?
12     A.   Yep.
13     Q.   It says, FTX significantly reduces
14 the likelihood of clawbacks by using the
15 three-tiered liquidation model.
16     We just had been discussing this
17 three-tier liquidation model; is that
18 correct?
19     A.   Yes, sir, sir.
20     Q.   Why does -- how does -- how does
21 this model reduce the likelihood of
22 clawbacks?
23     A.   I don't know the intent of this
24 offer -- author, nor did I use those words
25 in my analysis.  So I cannot speak to what

**MAGNA**
LEGAL SERVICES

S. COVERICK

1  they were referring to in this document.
2
3     Q.   So what policies, if any, did FTX
4  have regarding whether the losses were
5  pushed to customers or not?
6            MR. GLUECKSTEIN:  Object to the
7  form.
8     A.   My understanding is the policies
9  that govern the exchange and the operative
10  document governing the use of the exchange
11  were the terms of service.
12     Q.   Where did those speak to the
13  pushing of losses to customers or not?
14            MR. GLUECKSTEIN:  Objection, calls
15  for a legal conclusion.
16     A.   Again, I am not a lawyer and I am
17  not qualified to interpret that document.
18     Q.   Wasn't it FTX's policy to assume
19  losses, if it could, itself?
20            MR. GLUECKSTEIN:  Object to the
21  form.
22     A.   I am not aware of that policy and
23  any interpretation of a legal document would
24  require the opinion of a lawyer.
25            MR. PROULX:  This will be 24.

S. COVERICK

1
2            (Whereupon, transcript of
3  testimony given by Samuel Bankman-Fried
4  in his criminal proceeding on
5  October 27, 2023 was marked Coverick
6  Exhibit 24 for identification as of
7  this date.)
8     Q.   Let's look at a non-legal document
9  then.  This is the transcript of testimony
10  given by Samuel Bankman-Fried in his
11  criminal proceeding on October 27, 2023.
12            Are you familiar with this
13  testimony?
14     A.   I am not intimately familiar with
15  the testimony.  But it does look very much
16  like a legal document to me.
17     Q.   Did you review this document or
18  obtain a summary of Mr. Bankman-Fried's
19  testimony in connection with your deposition
20  preparation?
21     A.   I viewed this transcript at some
22  point.  To be fully honest, I can't recall
23  if it was specifically in preparation for
24  this deposition.  But I have seen this
25  document, I have read through parts of it.

S. COVERICK

1
2  I am not familiar -- I don't have it
3  memorized or a summary committed to memory.
4     Q.   I certainly would not ask you to
5  memorize this 100 page document plus
6  potentially.
7            Take a look at page 2433 at the
8  top right-hand corner?
9     A.   2433?
10     Q.   Yes, please?
11     A.   I am there.
12     Q.   And I am going to begin towards
13  the bottom of this page, there is a
14  question.
15            Were you familiar with something
16  that FTX called the insurance fund?
17            Mr. Bankman-Fried, yes.
18            Question, What was that?
19            And take a moment to read the next
20  paragraph that follows?
21     A.   Okay.
22     Q.   Any reason to dispute that the
23  insurance fund as referenced here is the
24  same one we have been discussing in this
25  deposition?

S. COVERICK

1
2            MR. GLUECKSTEIN:  Object to the
3  form.
4     A.   I am sorry, I cannot verify the
5  accuracy of anything Mr. Bankman-Fried said
6  during his defense of criminal prosecution.
7     Q.   I am not asking you to verify
8  anything.
9            Is the description of his
10  insurance fund here consistent with your
11  understanding of the insurance fund?
12     A.   I would not characterize my
13  understanding of the insurance fund this
14  way.  I would characterize it the way I
15  described it just prior to receiving this
16  document.  To be extremely clear I have
17  reason to doubt anything that
18  Mr. Bankman-Fried says in this document.
19     Q.   He describes the insurance fund as
20  the amount of money that we were pledging to
21  cover customer account losses, do you see
22  that?
23     A.   I do.
24     Q.   Were there, in fact, customer
25  account losses?

Page 134

```
1              S. COVERICK
2       A.  I have already testified that
3  account losses would require a legal
4  determination of what the exchange's rights
5  were.  I have also testified that I have not
6  seen any ledger entries to formally debit
7  lending customers accounts for any losses.
8  But I would not and will not agree with
9  anything in Mr. Bankman-Fried's testimony.
10      Q.  If there were customer account
11 losses pursuant to the spot margin trading
12 program or futures trading program, did
13 either FTX or its customers cover those
14 losses?
15      A.  I am sorry, can you repeat the
16 question?
17      Q.  If there were losses by --
18 pursuant to the spot margin trading program
19 or futures contracts trading program, is it
20 FTX's position this in all cases either FTX
21 or its customers cover them?
22      MR. GLUECKSTEIN:  Object to the
23   form.
24      A.  I don't understand the question,
25 because losses could mean many different
```

Page 135

```
1              S. COVERICK
2  things.  Losses are incurred on customer
3  accounts, for example, on account of
4  30-second intervals of holding perpetual
5  future contracts on a regular basis.  So I
6  would need you to define loss to better
7  answer the question.
8       Q.  Default of a repayment obligation
9  by a borrowing customer?
10      A.  Default is a legal term that would
11 require counsel to provide an analysis and
12 opinion on.  I understand as a business
13 person default means the inability to repay
14 a loan.  As I have testified to yesterday,
15 there are circumstances under which accounts
16 went negative despite the efforts of the
17 liquidation engine to liquidate those
18 accounts quickly enough to prevent that from
19 happening.  Whether or not that constitutes
20 a final default on the loan is a legal
21 question.
22      For example, it is entirely
23 possible, and I have seen examples of
24 customer account balances that went negative
25 and then subsequently brought their account
```

Page 136

```
1              S. COVERICK
2  balance back to a positive position through
3  depositing.  The exchange abruptly shut down
4  on November of 2022.  So I cannot speculate
5  as to what the exchange may have eventually
6  decided to do or what its legal rights were
7  with regard to the peer to peer borrowing
8  program.
9       Q.  Did FTX analyze whenever -- all
10 cases in which an account became negative,
11 whether it was in fact brought up to zero,
12 did FTX conduct that analysis?
13      A.  I am not aware of my team
14 conducting that analysis.
15      MR. PROULX:  Let's break here for
16   lunch.  Off the record, please.
17      THE VIDEOGRAPHER:  We are going
18   off the record.  The time is 12:23 p.m.
19   you.
20      (Luncheon recess taken.)
21      THE VIDEOGRAPHER:  We are back on
22   the record.  The time is 1:10 p.m.
23      MR. PROULX:  Mr. Coverick, you
24   have been handed what has been marked
25   as Exhibit Number 25.
```

Page 137

```
1              S. COVERICK
2       (Whereupon, responses to the joint
3    liquidators seventh set of
4    interrogatories was marked Coverick
5    Exhibit 25 for identification as of
6    this date.)
7       Q.  These are among other things,
8  responses to the joint liquidators seventh
9  set of interrogatories, are you familiar
10 with this document?
11      A.  I am.
12      Q.  In fact, did you verify the
13 responses to these interrogatories?
14      A.  I believe I did.
15      Q.  Can you turn to page 27 of this
16 document.
17      And specifically, actually on the
18 bottom of page 26, the interrogatory
19 question to FTX reads, Identify all
20 customers including any customers affiliated
21 with FTX who at any time between the
22 inception of FTX's margin program or lending
23 program and FTX's bankruptcy filings had a
24 negative account balance, and the
25 circumstances in which such customers
```

Page 138

1           S. COVERICK
2  acquired a negative account balance at such
3  time.
4           Do you see that?
5       A.  I do.
6       Q.  And FTX provides their response on
7  the next two pages, do you see those?
8       A.  I do.
9       Q.  And FTX did, in fact, conduct an
10  analysis, at least during a certain time
11  period, with respect to customers who
12  obtained a negative account balance; is that
13  right?
14       A.  That's correct.
15       Q.  What was that time period over
16  which or during which that analysis was
17  conducted?
18       A.  For purposes of this response,
19  these calculations were based off of reviews
20  of accounts balances as of June 14, 2022.
21       Q.  Is the underlying data for that
22  the exchange master ledger data we have been
23  discussing?
24       A.  The exchange ledger, yes, sir.
25       Q.  What, if anything, did FTX

Page 139

1           S. COVERICK
2  determine as to the quantity of customers
3  who had negative account balances as some
4  point in time on that date?
5       A.  That as of that date, there were
6  approximately 11,000 customer accounts that
7  had negative balances.  Of those amounts
8  58 percent was less than a dollar of
9  negative balance and 99 percent had a
10  negative account balance of less than
11  $1,000.
12       Q.  On the previous page you refer to
13  that that assessment as a preliminary
14  assessment, that's four lines from the
15  bottom of the previous page, has that
16  analysis or that assessment further evolved
17  in any way since the day of these
18  interrogatories?
19       A.  I am not aware of any additional
20  analysis being performed since the
21  production of this interrogatory.
22       Q.  Of the account, negative account
23  balances that were above a thousand dollars,
24  of which I think mathematically there must
25  be some, what was the -- what were those

Page 140

1           S. COVERICK
2  values as of June 14?
3       A.  I do not recall those specific
4  values.
5       Q.  Do you know the maximum negative
6  balance among the 11,000 you identified in
7  responding to this interrogatory?
8       A.  I do not recall.
9       Q.  Have you a general assessment or
10  approximation of what that maximum balance
11  might have been?
12       A.  I wouldn't want to guess and I do
13  not recall the exact number.  I would need
14  to review what my team did at the time.
15       Q.  So as of -- as of June -- as of
16  June 14, did FTX then continue to track
17  whether these 11,000 negative account
18  balances were ever brought current or
19  brought non-negative?
20       A.  This analysis requires extensive
21  assumptions regarding pricing which is
22  referenced in the response.  As I have
23  stated a number of times, the exchange in
24  the ledger of the exchange did not record
25  minute by minute pricing.  So to analyze an

Page 141

1           S. COVERICK
2  account balance at any particular point in
3  time, an analysis must be done to estimate
4  the pricing for all positions on the
5  exchange as of that time.
6           For positions like bitcoin, that's
7  very easy, it is a readily available price,
8  we could extract it directly from the
9  exchange ledger, and it is going to be
10  consistent with publicly available data on
11  the price of bitcoin at that time.  But
12  there were many coins and many products
13  offered on the FTX exchange, so an analysis
14  to determine the pricing that would comprise
15  all customer account balances on the
16  exchange is very extensive and takes time.
17  We have not continued to do that analysis on
18  a rolling basis.
19       Q.  Yeah, that wasn't my question at
20  all.  The 11,000 that you have already
21  identified here, did you take even one
22  example to see if their accounts were ever
23  brought back to positive, a positive net
24  account balance?
25       A.  I have asked my team during the

MAGNA
LEGAL SERVICES

S. COVERICK

1  preparation for my deposition to confirm
2  whether account balances were brought back
3  to a positive state.  And they confirmed
4  that there were balances that were brought
5  back to a net positive state.  They did not
6  track all 11,000 accounts for the pendency
7  of their relationship with FTX.
8      Q.   At the point in time which they
9  tracked some portion of those 11,000
10 accounts, what -- how many of them had not
11 been brought back to a positive net account
12 balance according to that analysis?
13         MR. GLUECKSTEIN:  Object to the
14 form.
15     A.   Again, I did not say that they
16 tracked all 11,000 accounts.  I asked my
17 teams if there were examples.  And they
18 identified examples of accounts that were
19 brought back to a positive state.  It would
20 be an extremely time intensive and expensive
21 exercise for the estate to continue to
22 monitor those accounts and establish pricing
23 at every point in time from June 14 through
24 the petition date.

S. COVERICK

1      Q.   That wasn't my question at all.
2  My question is did they also provide any
3  examples of account balances among some
4  subset of these 11,000 that had not been
5  brought positive in terms of net account
6  balance at that later point of assessment?
7      A.   I understand now.  I am aware of
8  the existence of accounts that had a
9  negative account balance as of the petition
10 date.  And I believe some of those may have
11 been accounts amongst this 11,000.  It could
12 also have been accounts that became negative
13 at a later point in time.
14     Q.   Understood.  Did -- does FTX have
15 an assessment of how many accounts had a
16 negative net account balance as of the
17 petition date?
18     A.   I believe my team has an
19 understanding of that number.  It would have
20 been reflected in the debtors statements and
21 schedules.  I don't have it committed to
22 memory.
23     Q.   Is it more or less than a thousand
24 customers as of the petition date?

S. COVERICK

1      A.   Given I do not know the number by
2  memory, I -- I cannot estimate what that
3  number is.  But again, I believe that would
4  be reflected in the debtors statements and
5  schedules with the application of pricing
6  via the estimation order.
7      Q.   And just to make sure I am
8  understanding correctly, the number of
9  customers who had a negative account balance
10 as of the petition date, that may have
11 included some customers beyond the 11,000
12 you are speaking to here with respect to
13 June 14; is that correct?
14     A.   It certainly could have.  But I
15 did not do an analysis, nor did my team do
16 an analysis comparing the accounts that were
17 negative on the petition date versus
18 June 14.
19     Q.   Of the number of accounts that had
20 a negative net account balance on June 14,
21 how many -- for how many did FTX -- does FTX
22 view the negative amount as some material
23 number?
24     A.   Again, the output of that analysis

S. COVERICK

1  is reflected in the response to this
2  question.  I do not have a definition for
3  material in context of the entire exchange
4  or the individual customer account.  For
5  example, while a million dollars could be a
6  material number for one customer, it
7  certainly wouldn't be a material number for
8  a much larger account.  For example, like
9  3AC, that would be a relatively smaller
10 portion of their account.  I do not have a
11 maximum amount committed to memory.  So I
12 don't know what the definition of material
13 would be.
14         But in this response, we do
15 describe 99 percent as having an account
16 balance of less than 1,000, which implies
17 that approximately 1 percent had a negative
18 account balance of greater than 1,000.
19     Q.   As of the petition date, what
20 percent of customers had a negative net
21 account balance of greater than a thousand?
22     A.   I do not have that number
23 committed to memory, but it could be derived
24 by viewing the debtors statements and

S. COVERICK

1          S. COVERICK
2  schedules in conjunction with the estimation
3  order.
4    Q.   How as a factual matter did FTX
5  account for those customers' negative net
6  account balance in connection with any
7  creditor claims or customer entitlement
8  claims that they filed?
9    A.   Are you asking how did the FTX
10  Recovery Trust account for customer
11  entitlement claims in our quarterly reports
12  which are the only reports the recovery
13  trust has currently provided to the public?
14    Q.   Let's -- let's start there.  My
15  question is a little bit different.  But
16  since you suggested that, why don't we start
17  there, so how -- in those documents, how are
18  customer entitlements created, entitlements?
19    A.   Sure.  Customer entitlement claims
20  are reflected as a liability on the
21  quarterly report of the FTX Recovery Trust.
22  Like most accounting of liabilities, there
23  are certain assumptions that need to be
24  applied.  Those assumptions that I am
25  specifically referencing include an

1          S. COVERICK
2  assumption on what allowed claims will be as
3  of the petition date or -- or eventually
4  allowed claims will be that those
5  assumptions, for instance, reference the
6  fact that there are certain customer claims
7  that have been filed that are not otherwise
8  agreed to or allowed.  And those assumptions
9  are used to estimate the estate's view of
10  what the aggregate of customer entitlement
11  claims are.
12    And -- and further, as I reflect
13  on the entirety of that report, the FTX
14  Recovery Trust quarterly report bifurcates
15  allowed claims versus disputed claims.
16  Allowed claims are claims in which the
17  debtors agree and have otherwise allowed the
18  customer's claim, that specific liability on
19  the quarterly report reflects that amount.
20    Q.   Okay?
21    A.   The disputed claims are accounted
22  for on disputed claim reserve, which is
23  accounted for at its court ordered value,
24  which includes many of those assumptions,
25  which I believe you have discussed with 3AC

1          S. COVERICK
2  previously.
3    Q.   So I appreciate that
4  qualification.  Why don't we just for the
5  sake of simple explicit talk only about the
6  allowed claims for a moment?
7    A.   Okay.
8    Q.   When the entitlements, or I think
9  you used the term accounting of liabilities,
10  were reported for those allowed claims, were
11  they reported on an aggregate basis an asset
12  specific basis or on some other basis?
13    MR. GLUECKSTEIN:  Object to the
14  form.
15    A.   They are recorded in the
16  aggregate, allowed claims are recorded as
17  one aggregate number on the pay-off sheet.
18    Q.   I am referring to the quarterly
19  statements you mentioned?
20    A.   That's what I am referring to as
21  well.
22    To be clear, that is not how the
23  that number is developed.  I am just saying
24  they are reported as a single number.
25    Q.   One number for one customer?

1          S. COVERICK
2    A.   One number in total for all
3  allowed claims.
4    Q.   So I am not asking that.  Is there
5  any document in which -- that is publicly
6  filed in which FTX reports on liabilities of
7  specific customers who have submitted an
8  allowed customer entitlement claim?
9    A.   The public documents regarding
10  customer claims would include the debtors
11  statements and schedules.  If the customer
12  filed a proof of claim, that would be
13  public.  But the Recovery Trust does not
14  report on the individual status of every
15  customer claim on a public basis.
16    Q.   Any customers who had a loan
17  pursuant to the margin program outstanding
18  as of the petition date?
19    A.   Are there any -- is the question
20  were there any customers that had a borrow
21  position in their account as of the petition
22  date?
23    Q.   No, are there any -- were there
24  lending, I am talking about lending
25  customers under the margin program, do we

```
1              S. COVERICK
2   know who we are talking about here?
3       A.  Lending customers.
4       Q.  So lending customers, let's say
5   they lend out an asset?
6       A.  Okay.
7       Q.  But haven't yet, their ledger
8   hasn't yet reflected repayment of that
9   asset?
10      A.  Okay.
11      Q.  Any examples of that as of the
12  petition date?
13      A.  There are certainly were customers
14  who had lending positions open as of the
15  petition date.
16      Q.  How -- if those customers
17  otherwise have an allowed claim, how is the
18  lending, the open lending or the outstanding
19  lending position accounted for in that
20  claim?
21      A.  I would need to verify it with my
22  team by looking at an example.  I am not
23  familiar exactly with how we schedule that.
24      Q.  Do you know the number, the
25  approximate number of customers with open or
```

```
1              S. COVERICK
2   outstanding lending claims as of the
3   petition date?
4       A.  I do not have that number
5   committed to memory.
6       Q.  Has FTX assessed the number of
7   customers who had margin spot positions
8   whose value was less than their borrows as
9   of the petition date?
10      A.  I do not believe that analysis has
11  been performed.  It doesn't mean that it
12  hasn't been.  I am not aware of every single
13  analysis my team has conducted.  But I -- I
14  can't particularly recall that specific
15  analysis having been done.
16      Q.  Let's turn back to your original
17  declaration for a moment.  And specifically
18  I am going to look at paragraph 24.
19          This is a continuation of an
20  example, I guess beginning on paragraph 18
21  appears to be the start of this example,
22  where a customer has a US dollar balance of
23  60,000 and the BTC price was 50,000, do you
24  see this?
25      A.  Are you pointing me to paragraph
```

```
1              S. COVERICK
2   24 or do you want me to start with 18?
3       Q.  I was -- I am not asking you to
4   read the whole thing.  I know you authored
5   this document.  I am just giving context to
6   what -- what the example is I am referring
7   to.  I am just trying to use your exact
8   example here?
9       A.  Sure, sure.
10      Q.  So the example here is a customer
11  who has got a positive digital asset balance
12  of $500,000 reflecting the value of 10 BTC
13  and a negative US dollar balance of
14  $440,000, this is from paragraph 19?
15      A.  Okay.
16      Q.  And continuing with this example,
17  you talk about the potential losses that
18  this customer faces if the value of bitcoin
19  decline by 10 percent, 10 percent decline of
20  50,000 would be 50,000 -- 10 percent decline
21  of $500,000 would be $50,000 bringing the
22  digital asset balance of that customer to
23  $450,000.
24          Do you see that?
25      A.  I am losing track of the -- yes,
```

```
1              S. COVERICK
2   you are now on paragraph 24 again?
3       Q.  Yes, exactly?
4       A.  I am following I just want to make
5   sure.
6       Q.  Yes, there are a couple of
7   different paragraphs we are drawing from
8   here to get to paragraph 24.
9           That customer still has a negative
10  USD balance of $440,000 in this example; is
11  that correct?
12      A.  That's correct, yes.
13      Q.  How -- how would the value, the
14  components of the account value in FTX's
15  view change if the price of bitcoin
16  decreased by 50 percent instead of
17  10 percent?
18      A.  So you are asking me to reanalyze
19  this example, but with a 50 percent decline?
20      Q.  And I am happy to make some
21  representations, and you could let me know
22  if you disagree.  So if there were a
23  50 percent decline in $500,000 worth of
24  bitcoin, that would bring the price of the
25  entitlement to bitcoin down to $250,000,
```

**MAGNA**
LEGAL SERVICES

```
1              S. COVERICK
2   does that sound fair?
3       A.  Sure.
4       Q.  The customer would still in your
5   view have a negative US dollar balance of
6   $440,000 in that case?
7       A.  Sure.
8       Q.  Leading to a overall account
9   position of 250,000 minus 440,000, which is
10  the same as I think negative 190 million --
11  $190,000, does that sound fair?
12      A.  I am following you, yes.
13      Q.  Okay.  Could that happen?
14      A.  It is very unlikely that that
15  would happen in this example.
16      Q.  Even upon a rapid fluctuation in
17  the price of bitcoin?
18      A.  Given the liquidity of the bitcoin
19  market and how many participants there were
20  in bitcoin, it is very unlikely that would
21  happen for bitcoin.
22          Again, the auto liquidation engine
23  is able to act very quickly, and generally
24  is able to liquidate positions prior to the
25  account balance becoming negative.
```

```
1              S. COVERICK
2           It is theoretically possible that
3   an account balance could go negative in a
4   large amount if it had a large position, but
5   very unlikely.  I do not have memorized the
6   extent to which accounts may have gone
7   negative.  But I -- I do not know of any
8   examples where they went negative to that
9   magnitude on bitcoin liquidations.
10      Q.  What about in other types of
11  assets, I think we discussed, I am not sure
12  if it was today or yesterday, that some
13  digital assets are more risky than others?
14      A.  Correct, we did.
15      Q.  So would you -- so would your
16  opinion of the likelihood of that scenario
17  change if we were discussing a more risky
18  asset?
19      A.  I would need to understand all of
20  the different factors that could come into
21  play.  As the response to the question we
22  just went through noted, the extent of my
23  knowledge on customer negative balances on
24  June 14 were that 99 percent were less than
25  a thousand.  That means approximately
```

```
1              S. COVERICK
2   1 percent were above a thousand.  But I do
3   not have memorized the magnitude of those
4   losses and wouldn't want to speculate as to
5   how quickly that very complex algorithm --
6   algorithm could work or how liquid the
7   market could be.  That would just be pure
8   speculation.
9       Q.  Sure.  Do you have a general sense
10  of whether there were market price
11  fluctuations of note on June 14?
12      A.  I understand that in June of 2022
13  in general there were market price
14  fluctuations as I discuss in my declaration,
15  yes.
16      Q.  That were material in FTX's view
17  to the value of digital assets?
18      A.  I --
19          MR. GLUECKSTEIN:  Object to the
20      form.
21      A.  I don't take a position as far as
22  I can tell with the definition -- as to the
23  definition of material.  But they were
24  larger than other periods of price declines,
25  but smaller than others as well.
```

```
1              S. COVERICK
2           MR. PROULX:  In a moment we will
3       hand you a new exhibit.
4           (Whereupon, a native document was
5       marked Coverick Exhibit 26 for
6       identification as of this date.)
7       Q.  So this has been marked as Exhibit
8   Number 26, it is a document produced by FTX
9   in this litigation.  Again, natively, so you
10  will have to bear with us with the document.
11          The title of the document or the
12  title of the native tab is allow underscore
13  negative, you can see that in the footer of
14  the pages and the Bates numbers reflected on
15  the slip sheet at the beginning.
16  Recognizing the font is a little small here,
17  I am going to ask you a couple of questions
18  about this document.  Feel free to take a
19  moment.
20          The first question is do you know
21  what this is?
22      A.  I have a general understanding of
23  what it is, yes.
24      Q.  What is that general
25  understanding?
```

**MAGNA**
LEGAL SERVICES

Page 158

1              S. COVERICK
2     A.   My general understanding is that
3  this is an extract of information on the
4  exchange database with regard to certain
5  settings for customer accounts as specified
6  in the code.
7     Q.   Certain settings for customer
8  accounts, settings with respect to what?
9     A.   Settings primarily with respect to
10 their ability to have a negative account
11 balance or borrow -- sorry, withdraw when
12 their account balance is negative.
13    Q.   And for the record, are these
14 account balances reflected, are
15 these -- strike that.
16      Are these customer accounts
17 reflected among the 11,000 that you and FTX
18 analyzed in responding to the interrogatory
19 we just discussed a moment ago?
20    A.   I do not believe so, because those
21 accounts did not have the allowed negative
22 setting set equal to true.  Those accounts
23 went negative, based on my understanding of
24 my team's analysis, due to the failure of
25 the liquidation engine to liquidate the

Page 159

1              S. COVERICK
2  positions in the account quickly enough to
3  prevent the account from going negative.
4      My understanding of the allow
5  underscore negative setting in the code is
6  that that setting permitted accounts to go
7  negative without liquidating any positions.
8  And this was a setting based on my
9  understanding which is based on discussions
10 with my team and the understanding they have
11 developed over the course of the last three
12 years working at FTX, that this setting
13 effectively turned off the auto liquidation
14 engine with regard to the maintenance margin
15 requirement.
16    Q.   Thank you.  So before we get to
17 that setting in particular and its
18 implications, I just want to make sure that
19 if FTX's assessment of the -- with respect
20 to the 11,000 accounts, the number that we
21 are above or below a certain negative
22 account balance would not reflect the
23 negative account balances held by the -- any
24 of the customers or accounts on this new
25 document we are discussing, if they were in

Page 160

1              S. COVERICK
2  fact negative at that time?
3     A.   I do not believe that is the case,
4  because I understand that the way my team
5  conducted that analysis was to look at
6  customer accounts.
7     Q.   Yeah?
8     A.   Most of the accounts listed on
9  this page are internal accounts.  I don't
10 want to categorically represent all of them
11 are, but I am fairly certain by scanning the
12 list, they almost all seem to be affiliated
13 accounts or internal accounts that had that
14 setting turned on.
15    Q.   How was this document constructed?
16    MR. GLUECKSTEIN:  Object to the
17 form.
18    A.   My understanding is that it was
19 constructed to include a list of accounts.
20 And to be perfectly accurate, I don't have
21 memorized the exact nature of the steps
22 taken to -- to extract this information from
23 the exchange.  But my basic understanding is
24 that it was a list of accounts that had the
25 allow negative setting equal to true.

Page 161

1              S. COVERICK
2     Q.   And I didn't immediately see a
3  date on this document.  So my question is,
4  when are this -- these settings that we are
5  referring to and -- and are reflected in
6  this document, when are they accurate as of?
7     A.   I do not know the answer to that
8  question.  But I -- I could obtain it from
9  my team.
10    Q.   You do not know if it is the
11 petition date?
12    A.   I don't know for certain if it is
13 the petition date or if it is some prior
14 period.  But I am sure what that whatever it
15 was represented to the joint liquidators to
16 be as of is the data my team pulled it as
17 of.
18    Q.   So there is a column, I am going
19 to estimate here about five or six in,
20 called back stop provider, do you see that?
21    A.   Yes, sir, I do.
22    Q.   I see a true value, scrolling down
23 on the first page, with respect to the user
24 name, info@AlamedaResearch.com?
25    A.   Yes, sir.

MAGNA
LEGAL SERVICES

1                S. COVERICK
2      Q.  What does -- what does that mean?
3      A.  My understanding of that column is
4  it is a setting in the exchange code to
5  specify which accounts were participants in
6  the back stop liquidity provider program.
7  As we discussed earlier, I mentioned market
8  makers had the ability to opt into that
9  program.  My understanding is this is the
10 setting where the exchange recorded that opt
11 in.
12     Q.  And I also see a true value for
13 Alameda Research with respect to the column
14 two over, can withdraw below borrow, do you
15 see that?
16     A.  I do.
17     Q.  What does that mean, if anything
18 different?
19     A.  It is very different.  It is what
20 has been publicly disclosed by the FTX
21 Recovery Trust as the back door that Alameda
22 used to be able to withdraw funds from the
23 exchange.  So unlike other customers who
24 cannot have a negative account balance, but
25 certainly if they did get to a negative

1                S. COVERICK
2  account balance in the limited situations
3  that we have discussed, could not withdraw
4  from the exchange.
5      Alameda researched the info at
6  Alameda Research accounts that we are
7  referencing, to my knowledge is the only
8  account on the entirety of the exchange with
9  this setting to be true, set to true.  This
10 allowed Alameda Research to withdraw funds
11 off of the exchange despite having a
12 negative account balance.
13     Q.  I see a value for borrow in the
14 preceding column that's I am going to
15 reference is approximately $65 billion, do
16 you see that?
17     A.  I do.
18     Q.  Is that tied to the can withdraw
19 below borrow, is it a limitation on those
20 borrowings in any way?
21     A.  While I am not intimately familiar
22 with how the borrow column can be used in
23 the context of other customer accounts,
24 again, the exchange database is very complex
25 with many different settings that relate to

1                S. COVERICK
2  different aspects of the code, my
3  understanding is that this figure for
4  Alameda Research's account effectively
5  functioned as a line of credit of
6  effectively unlimited nature without
7  requirement so that they could borrow and
8  their account would not be subject to the
9  auto liquidation engine.
10     That amount in conjunction with
11 these other settings based on my team's
12 review of the code were a bit duplicative in
13 the code.  There were multiple settings set
14 to ensure that Alameda Research could
15 extract funds from the exchange despite
16 having a negative account balance.
17     Q.  You mentioned Alameda Research had
18 a line of credit, did I hear correctly?
19     A.  I said it functioned similar to a
20 line of credit with respect to that dollar
21 amount.  But again, that setting was also
22 duplicative to some of the other settings
23 specified for that that account, all with
24 the -- all with the consequence of Alameda
25 being able to withdraw assets from the

1                S. COVERICK
2  exchange despite having a negative account
3  balance.
4      Q.  Did -- separate and apart from
5  this, did Alameda, in fact, have a line of
6  credit with FTX?
7      A.  I am not aware of any
8  documentation of a formal line of credit
9  with Alameda Research and FTX.
10     Q.  Whenever this may have been, this
11 document may have been created, what was the
12 maximum negative account balance among the
13 users identified in this document?
14     A.  I -- I do not have that number
15 memorized, but it is safe to assume that it
16 was Alameda Research.
17     Q.  Was that 65 billion?
18     A.  They did not utilize the full
19 65 billion thankfully.
20     Q.  Do you have a sense of the next
21 most negative account after Alameda Research
22 among the customers identified here?
23     A.  I do not have the account balance
24 as of the petition date memorized for these
25 accounts.

MAGNA ▶
LEGAL SERVICES

1              S. COVERICK
2      Q.   You mentioned that -- as I am
3  recalling your testimony, feel free to
4  correct me, that some of the user names
5  here -- user names on this document were of
6  users or customers affiliated with FTX?
7      A.   Affiliated with or what are --
8  what have often been referred to as internal
9  accounts.  So these were effectively
10 operating accounts of the exchange that were
11 used for a variety of purposes.
12     Q.   What is an operating account?
13     A.   In the context of the exchange, I
14 don't know the purpose of all of these
15 accounts.  But some examples of things these
16 accounts were used for included trade --
17 accruing trading fees that were paid to the
18 exchange.  In some -- in some instances I am
19 aware of payroll being facilitated through
20 some of these accounts to FTX employees and
21 other functions of the exchange.
22         But I do not -- I do not have a
23 full accounting for or recollection of what
24 each one of these accounts purpose was.
25     Q.   Were some of these accounts

1              S. COVERICK
2  non-FTX operating accounts?
3      A.   Yes, I spot at least one, which
4  would be Alameda Research.
5      Q.   Okay.  I am going to ask you, I
6  don't know, maybe ten to fifteen from the
7  top, I see this Genesis@projectserum.com,
8  let me know when you have a moment to spot
9  that one?
10     A.   I do.
11     Q.   Was that an FTX affiliated account
12 or user?
13     A.   I am not certain as to the nature
14 of this account.  I do understand Project
15 Serum to be something that insiders of FTX
16 or FTX itself may have been involved with.
17 I am not sure entirely.
18         I -- I do believe that many of
19 the -- many of the operating accounts -- I
20 am trying to find an example.  Many of the
21 operating accounts include FTX.com in the --
22 in the user name.  I am not certain if all
23 of them do.  For example, Extra realized P &
24 L, I believe is an internal account.  So
25 there is inconsistency in the naming of

1              S. COVERICK
2  these accounts.
3      Q.   I see a column called taker fee
4  and maker fee, these are maybe three or four
5  in, do you see those?
6      A.   I do.
7      Q.   What are those -- what do those
8  columns represent?
9      A.   I did not utilize these columns
10 for any purposes in my analysis explicitly.
11 I understand them to have some connection to
12 market making activities, with the
13 understanding that there are numbers
14 specified for accounts that are not market
15 makers on the exchange.  I am not sure of
16 the entire utility of how these fields could
17 be used throughout the entire exchange
18 ledger.
19     Q.   More generally, a customer who was
20 or an account that was allowed to have a
21 negative net account balance as reflected in
22 this chart, did they ever receive or pay
23 some kind of fee for that allowance?
24     A.   I would need to analyze the
25 individual account in question to understand

1              S. COVERICK
2  the activity of that account.
3      Q.   Why would FTX allow -- let's put
4  aside Alameda for a moment.  For other
5  accounts beyond Alameda, why did FTX allow
6  customer accounts to go negative?
7      A.   As a general matter, as I have
8  testified to, FTX did not explicitly allow
9  or permit customer accounts to go negative.
10 There are circumstances under which customer
11 accounts did go negative that we have
12 discussed.  These accounts to my
13 understanding all have some affiliation with
14 FTX and some internal purpose.  They are not
15 external customer accounts to my knowledge.
16 And I don't have a full accounting for of --
17 or -- or documentation on the purpose of
18 each of these accounts.  So I can't speak to
19 why they were required to be able to go
20 negative.
21     Q.   I am not really following your
22 answer that FTX did not explicitly allow or
23 permit customer accounts to go negative.  I
24 mean the title of this document is Allow
25 Negative, is it not?

1          S. COVERICK
2      A.   Again, I am speaking of
3  third-party customer accounts, parties not
4  affiliated with FTX, like 3AC or other
5  third-party customers.  As a general policy,
6  and as I say in my declaration, FTX
7  generally did not permit accounts, the
8  operative word being "permit," to go
9  negative other than -- I know it is in the
10  declaration somewhere, other than certain
11  affiliated accounts or something to that
12  nature.
13      Q.   Do you have a sense of Alameda's
14  negative account balance as of the petition
15  date?
16      A.   I believe that's reflected in --
17  that's reflected in the plan.  I don't want
18  to misquote it, but it is somewhere.  It is
19  in the billions.
20      Q.   Some of that account balance, was
21  that accrued by virtue of borrowing from
22  lending customers in the margin program?
23      A.   I believe that's true, yes.
24      Q.   What happened with those lending
25  customers -- sorry, what happened with the

1          S. COVERICK
2  lending customers' entitlements or ledger
3  entries that had been lent out pursuant to
4  that program, how, if at all, were they
5  repaid?
6      A.   FTX filed for Chapter 11
7  bankruptcy and over the course of a couple
8  of years negotiated a plan pursuant to the
9  bankruptcy code.  And they are currently
10  being repaid by the FTX Recovery Trust.
11      Q.   I am going to turn back to a
12  document that we were discussing a moment
13  earlier, this is the line of credit document
14  at Exhibit 20?
15      A.   Okay.
16      Q.   I just want to understand, start
17  how interest payments work pursuant to this
18  document.  I see in section 4 on page 1, it
19  says, Funds advanced through the line of
20  credit will bear interest at a rate of
21  5 percent per annum payable daily at
22  approximately 30 UTC and calculated only in
23  respect of that portion of the line of
24  credit then being utilized.
25          I may have misread a portion of

1          S. COVERICK
2  that, but I hope that's largely correct?
3      A.   I -- I see that, yes.
4      Q.   Was Three Arrows, in fact, charged
5  interest on this line of credit?
6      A.   That's my understanding, yes.
7      Q.   Who, if anyone, did it pay that
8  interest to?
9      A.   It is my understanding that that
10  interest was paid.  I don't know the exact
11  account, but that interest was paid to an
12  FTX affiliated account on the exchange
13  ledger.
14      Q.   Do you -- do you see on page 2 of
15  this document, there is this term in this --
16  in this new -- new portion of this document
17  under the title FTX institutional customer
18  margin and line of credit agreement?
19      A.   I do.
20      Q.   There is this term indebtedness
21  that is defined formally, do you see that?
22      A.   I do.
23      Q.   What is FTX's view on the meaning
24  of the term indebtedness?
25          MR. GLUECKSTEIN:  Objection, calls

1          S. COVERICK
2  for a legal conclusion.
3      A.   I am not a lawyer, so I can't
4  opine on the meaning of a defined term in a
5  legal document.
6      Q.   We got an answer a lot from you
7  over the course of the last couple of days,
8  Mr. Coverick.  I am not asking you in your
9  individual capacity as a lawyer, I am asking
10  you as a representative of the FTX Recovery
11  Trust, same answer?
12      A.   I am sorry for providing that
13  answer so frequently, but I must provide it
14  because it is true.  I am not a lawyer and I
15  can't provide legal opinions or
16  interpretations.
17      Q.   The same answer as to the
18  interpretation of the interest rate as
19  applied to indebtedness on the next page,
20  looking at the section 5 on page 3?
21          MR. GLUECKSTEIN:  Object to the
22  form, calls for a legal conclusion.
23      A.   Yes, sir, the same answer.  And I
24  will supplement it with I can only verify
25  what my team has analyzed and seen on the

S. COVERICK

1
2  exchange ledger.  And I do understand that
3  interest was charged.
4      Q.  I see a reference later on in this
5  same section we are looking at to -- strike
6  that.
7          Are you aware, is FTX aware of any
8  other customers who had similar lines of
9  credit on the FTX exchange?
10         MR. GLUECKSTEIN:  Object to the
11  form.
12     A.  I am aware of other accounts
13  having lines of credit that functioned in a
14  similar fashion to 3AC's.
15     Q.  Do you have a sense of the face
16  amount or size of any of those other lines
17  of credit?
18     A.  I understand that 3AC's line of
19  credit was amongst if not the largest line
20  of credit extended, again, with the
21  exception of the account settings for
22  Alameda that we just discussed.  I do not
23  have the specifics of every account
24  committed to memory, and I do not have to
25  terms of those lines of credit committed to

S. COVERICK

1
2  memory, because I did not analyze them in
3  connection with my preparation for this
4  deposition.
5          (Whereupon, a short message
6      report, date range 6/29/2022 was marked
7      Coverick Exhibit 27 for identification
8      as of this date.)
9      Q.  So you have been handed,
10  Mr. Coverick, Exhibit 27, this is a -- the
11  title of it is short message report, date
12  range 6/29/2022, a document produced by FTX,
13  it begins with a message from Jim Outen, do
14  you know who that individual is?
15     A.  No, sir, I do not.
16     Q.  Do you know with which FTX entity,
17  if any, he was affiliated?
18     A.  I do not.
19     Q.  Have you seen this document
20  before?
21     A.  I believe I have seen the document
22  before, but I can't recall the specific time
23  that I saw it.  I would need some context.
24  It looks like one of the documents that may
25  have been produced by the debtors to 3AC

S. COVERICK

1
2      Q.  I can make that representation
3  that it was?
4      A.  Okay.
5      Q.  And he writes, Jim, this is a
6  little worrying, some discussion of, quote,
7  LOC, which I assume to mean letter/line of
8  credit.  If we are in some context assessing
9  a collateral ratio based on the letter of
10  credit and not assets deposited at the
11  exchange, that seems to be a significant
12  shift in messaging.
13         Do you see that?
14     A.  Yes, sir, I do.
15     Q.  Do you know what he meant by that?
16     A.  I do not.
17     Q.  Have you seen any documents or
18  policies in which the term "collateral
19  ratio" is used, he uses quotation marks
20  around that term here?
21     A.  Not that I can recall.  It is not
22  a term that I recall using or hearing in
23  discussions with my team.  And I did not
24  rely on anything in this document certainly
25  for purposes of my analysis underlying my

S. COVERICK

1
2  declaration.
3      Q.  He references in the next line,
4  someone by the name of Julie Schoening, or
5  Schoening, do you know who that individual
6  is?
7      A.  No, sir, I do not.
8      Q.  Do you know if she was affiliated
9  in any way with FTX generally speaking?
10     A.  I cannot confirm that.
11     Q.  You can put that document to the
12  side?
13     A.  Okay.
14     Q.  Unless your further review of it
15  has led to recollection as to any of my
16  answers, has it?
17     A.  No, sir.  I was just attempting to
18  continue reading it.
19     Q.  Let's talk about Three Arrows
20  accounts in a little more detail on the FTX
21  exchange.
22         Does FTX have any knowledge of
23  who, if anyone, from Three Arrows was
24  authorized to execute trades on those
25  accounts?

MAGNA
LEGAL SERVICES

S. COVERICK

1     A.  I am not aware of who was
2     authorized from 3AC's perspective to
3     authorize trades.  I do know that to conduct
4     trades on the exchange, 3AC either needed to
5     log into the exchange or access the exchange
6     via the API.
7         Q.  What is the difference between
8     logging into an exchange versus accessing it
9     via the API?
10        A.  Sure, logging into the -- when I
11    say logging into the exchange, I am
12    referencing some-- someone going to FTX.com
13    and typing in a user name and a password to
14    access the account, not dissimilar from how
15    someone would access a bank account online.
16        APIs, based on my general
17    understanding, are something that exchanges
18    in general, but FTX specifically, offer
19    institutional investors the ability to
20    create as a way of better integrating, for
21    lack of a better word, access to the
22    exchange with the systems and any related
23    trading algorithms of -- of the -- of the
24    customer.

S. COVERICK

1     Q.  How many such institutional
2     investors roughly speaking had that
3     functionality via the API?
4         A.  I do not know the exact number or
5     an approximate number.
6         Q.  Did FTX log or track in any way
7     the specific individuals who used the log in
8     avenue for accessing the Three Arrows
9     accounts?
10        A.  It is my understanding that the
11    exchange database, which included the
12    exchange ledger, but the inclusion of this
13    information did not impact anything with the
14    account balance.  But it -- the exchange
15    database did store certain information with
16    respect to how customers were accessing the
17    account.
18        Q.  Including Three Arrows Capital?
19        A.  That's my understanding, that they
20    did that for all customers.
21        Q.  Did FTX impose any two factor or
22    multi-factor authentication or other
23    security protocol around log in to accounts?
24        A.  I am not personally familiar with

S. COVERICK

1     the specific security measures at any -- at
2     any given point in time FTX enforced for
3     logging into the account.
4         Q.  What about for executing trades
5     once within an account?
6         A.  Again, I am not familiar with the
7     specific security measures that the FTX
8     exchange had in place with regard to login
9     and specifically with regard to two-factor
10    authentication.
11        Q.  What controls or access, if any,
12    did FTX or its personnel have over the --
13    over customer accounts in terms of login,
14    API or other access to the accounts?
15        MR. GLUECKSTEIN:  Object to the
16    form.
17        A.  I am not aware of FTX employees
18    having access to log in to accounts,
19    certainly not through APIs, which based on
20    my understanding is an interface created by
21    the customer in accordance with certain
22    limitations to ensure it can link up to the
23    exchange.
24        I have no evidence to suggest that

S. COVERICK

1     any FTX employee had the required password
2     to access any customer's account.
3         MR. PROULX:  Let's go off the
4     record for a moment.
5         THE VIDEOGRAPHER:  We are going
6     off the record.  The time is 2:08 p.m.
7         (Whereupon, an off-the-record
8     discussion was held.)
9         THE VIDEOGRAPHER:  We are back on
10    the record.  The time is 2:10 p.m.
11        (Whereupon, a slip sheet was
12    marked Coverick Exhibit 28 for
13    identification as of this date.)
14        Q.  Mr. Coverick, you have been handed
15    what has been marked as exhibit 28.  This is
16    a slip sheet, don't need to worry about
17    what that means, but it reflects the
18    production by FTX of this document.  The
19    document is being presented to you natively
20    on a laptop.  You have a laptop in front of
21    you, yes?
22        A.  Yes, sir.
23        Q.  And you are seeing an Excel
24    spreadsheet of some sort?

**MAGNA** ▶
LEGAL SERVICES

S. COVERICK

1    A.  I am, yes, sir.
2    Q.  I am happy to make a
3  representation that it is -- actually, you
4  can probably see that there is a tab in this
5  spreadsheet called activity records in the
6  lower portion.
7       Do you see that?
8    A.  Yes, sir, I do.
9    Q.  I will scroll over, if you need me
10 to make this larger or smaller for context,
11 I will rely on you to let me know, okay?
12   A.  Okay.
13   Q.  So I see for example, column user
14 ID, account ID, email, type, created at,
15 device ID, I am skipping some columns for
16 the record, and data.  Under type, I see
17 some references to page load among other
18 notations.
19       The first question for you is, do
20 you know what this document purports to
21 represent?
22   A.  It is my general understanding
23 that this document was produced in response
24 to a request from 3AC to provide information

S. COVERICK

1  relating to logins or website activity.  I
2  am sorry, I can't remember what the specific
3  request was.  It is my general understanding
4  that this document contains information that
5  was stored on the exchange database related
6  to accessing the FTX.com website.
7    Q.  Accessing the FTX.com website by
8  whom?
9    A.  I believe -- I believe and again,
10 I can't recall the specific request, but I
11 believe that the email and then the user ID,
12 which is a I think an internal
13 representation of the user name or the user
14 ID represents the user accessing the account
15 or accessing that aspect of the site.
16   Q.  When you refer to the user ID, the
17 user here, are the users reflected in this
18 document connected in some way with Three
19 Arrows or their FTX accounts?
20   A.  Again, I do not recall the
21 specific parameters on what accounts this
22 was produced for.  For example, I do not
23 personally recognize the Genesis cap as
24 being affiliated with 3AC.  I would -- I

S. COVERICK

1  would need more context.  It appears this
2  may include other names.  But I -- I have
3  not -- I have not verified all of or
4  discussed in detail all of the user names
5  included on this.
6    Q.  I also see a
7  PeterSingapore@gmail.com?
8    A.  I do.
9    Q.  Do you know who or what that is?
10   A.  I do not personally know.  I know
11 it is an email address, but I don't know of
12 whom.
13   Q.  I also see a trading@QCP.Capital,
14 do you see that too?
15   A.  I do.
16   Q.  Do you have any knowledge or
17 personal knowledge of what that is?
18   A.  I do not have any personal
19 knowledge of what that is.
20   Q.  What is a page load in this next
21 column?
22   A.  My general understanding, an
23 again, I did not rely on this for any -- for
24 anything in my declaration explicitly.  But

S. COVERICK

1  my general understanding is that this
2  contains some sort of indication of the type
3  of activity that happened on the account.  I
4  don't know specifically what page load
5  versus new login dialogue dismiss means.  I
6  just understand it had something to do with
7  what part of the website they were accessing
8  or doing, but I -- I can't be sure.  I am
9  not particularly -- I am not relying on any
10 of this for purposes of my core analysis.
11   Q.  I am asking, again, in your
12 capacity as the FTX designee, just to
13 explain informationally what this document
14 shows regardless of whether it ties or does
15 not tie to your analysis individually.
16       Do you know if this document would
17 reflect all page loads in the created at
18 time period?
19   MR. GLUECKSTEIN:  Object to the
20   form.
21   A.  Again, my understanding is that
22 this document contains information relating
23 to login activity on the website.  I do not
24 know the specific meanings or source of each

S. COVERICK

of these columns.

Q.   If you would bear with me for one
moment, it is a large file, so I am in the
process of sorting it.  You can see the
methodology that I am applying as I do so, I
am selecting specifically June 12 to June 14
of 2022 period.  And I see -- you see the
entire sort using that methodology.  I am
only seeing one entry for 3ACLFTX@teneo.com
for the June 12 to June 14 time period, do
you see that?

A.   Yes, sir, I do.

Q.   What did the page load by this
Three Arrows related email on June 14, 2022
represent?

A.   Again, I don't know the specifics
of what page underscore load means.  I
generally understand this to mean that the
3ACLFTX@Teneo.com account, which to be
clear, I believe this reflects the user name
as of the petition dates, so not necessarily
the user name as of the -- as of the -- the
created at date.  Because I think when the
exchange updates a user name, it does so for

S. COVERICK

the entirety of the account, and it is not a
period by period sort of thing.

But I understand this to mean that
June 14, that account accessed or logged in
in some fashion to the FTX.com website.

Q.   What, if anything, does the login
according to FTX on June 14 of this account,
but not on, according to this document,
June 12 or 13, represent in the view of the
FTX Recovery Trust?

MR. GLUECKSTEIN:  Object to the
form.

A.   I am not sure what you mean by the
question.  Can you ask it another way?

Q.   If there was such a login on
June 14 as you described here, does that
mean there was no such login on June 12 or
13, given the absence of rows with the same
email in this document?

A.   I -- I believe that again, this
represents times this user logged in to the
FTX.com website.  As I testified to
previously, 3AC predominantly used their API
to access the site.  I do not believe

S. COVERICK

access -- I am sorry, I misspoke, the API
doesn't access the site, the API can access
the exchange.  The website is different,
that's someone going into a web browser and
typing in FTX.com and logging in.

I understand that this information
only includes explicit logins to the FTX.com
website and does not include the access via
the API.  And I also understand that the
vast majority of 3AC's trades were conducted
via the API.

Q.   What records, if any, of use of or
access to the API does FTX maintain?

A.   I believe there is something.  I
have not personally spent time analyzing it,
but I do believe there is the ability -- or
I know there is the ability to see access
via an API in the exchange database.

MR. PROULX:  Can you just confirm,
Brian, that you are no longer seeing
this document.

MR. GLUECKSTEIN:  Confirmed.

MR. PROULX:  Is that true of you
as well Mr. Coverick?

S. COVERICK

THE WITNESS:  It is.  It is okay
if I move the computer?

MR. PROULX:  Yes.  But you may
need that again.  So don't keep it too
far, in fact, keep it close.

THE WITNESS:  Okay.

Q.   Let me know when you are ready?

A.   I am ready.

Q.   Your original declaration speaks
to a document that I am going to
colloquially call doc 38 or original doc 38.
Specifically it is FTX underscore 3AC
underscore 7038.

Do you know what document I am
talking about?

A.   Yes, sir, I do.

Q.   Okay, I am just going to call this
original doc 38, is that fair?

A.   I understand there to be two
versions of doc 38.  So you are just saying
you are -- you are only speaking about the
original version?

Q.   In the moment you represent that
your counsel produced a separate document

S. COVERICK

1
2  that has the same Bates number, but then
3  underscore amended different Bates number,
4  that I am happy to call amended doc 38, do
5  those two terms work for you?
6      A.  Okay, sure.
7      Q.  Okay.
8          Original doc 38, was this a
9  document created by Alvarez & Marsal?
10     A.  Yes, it was.
11     Q.  When was it created by them?
12     A.  I believe it was created at some
13 point prior to Mr. Gordon's deposition.
14     Q.  Were you involved in the --
15 personally in the creation of this?
16     A.  No, sir, I was not.
17     Q.  Did you rely on original doc 38 in
18 connection with your declaration or
19 declaration in this litigation?
20     A.  No, sir, I did not rely on the
21 original doc 38.
22     Q.  Why not?
23     A.  Original doc 38 was an analysis
24 performed by members of the A & M team based
25 on the preliminary information they had at

S. COVERICK

1
2  the time, and utilized a methodology
3  consistent with the work that team had been
4  doing to date for FTX, which heavily
5  involved working on the debtors' statements
6  and schedules.  This was the methodology
7  that I discussed yesterday.
8          Since the creation of that
9  document, our team has advanced its
10 understanding and analysis of 3AC's claim.
11     Q.  Tell me what you mean by advanced
12 its understanding?
13     A.  Well, for one, the statements and
14 schedules methodology that was originally
15 discussed yesterday was typically not one
16 that came up in the context of customer
17 claims, adjudication or reconciliation.
18 Because every other customer claim that I am
19 aware of in this case has focused on the
20 aggregate account balance.  It was an
21 uncommon circumstance for a creditor to
22 attempt to split up components of their
23 account in arguing for a -- for a different
24 claim amount.
25          The team that put doc 38 together

S. COVERICK

1
2  utilized that statements and schedules
3  methodology, because that was the
4  methodology the team had been using up to
5  that date.  That resulted in the inclusion
6  of the notional future amount in the
7  negative USD balance, also consistent with
8  futures not being assets that would be
9  incorporated into the composition of the
10 account.  There were -- there were no
11 offsetting values for futures included in
12 that account.  There were also a couple of
13 other things that our team's understanding
14 has advanced on since the creation of that
15 document that are reflected in the amended
16 doc 38.
17     Q.  You write in your declaration,
18 this is at paragraph 92, feel free to turn
19 to it, you don't need to, that original doc
20 38 can be considered incomplete work
21 product.
22          Does FTX, in fact, consider it
23 incomplete work product?
24     A.  I believe that sentence needs to
25 be read in its entirety.  It is it can be

S. COVERICK

1
2  considered incomplete work product in the
3  context of the proposition for which the
4  joint liquidators seek to use this document,
5  i.e., isolating particular components of the
6  account balance without accounting for the
7  rest, because it included a negative offset
8  to USD, but not the notional amount of
9  futures that created the need for this
10 offset.
11     Q.  And the ways in which FTX has
12 purportedly advanced its understanding as to
13 this document, were those communicated --
14 when were those first communicated to the
15 joint liquidators?
16     A.  I don't have all communications
17 with the joint liquidators committed to
18 memory nor do I have a log of all those
19 communications in front of me.  But I do
20 understand, as I state in my declaration,
21 that that particular change to doc 38 that
22 was made and the methodology that was behind
23 it, was communicated back in July of 2024.
24     Q.  Is that the -- is that the
25 statement in the final sentence of this

1          S. COVERICK
2  paragraph 92 that you are referencing there?
3       A.  Yes, sir.
4          MR. PROULX:  Let's give you that
5  document.
6          (Whereupon, a document entitled
7  Debtors Responses and Objections to the
8  Foreign Representatives of Three Arrows
9  Capital Ltd. was marked Coverick
10  Exhibit 29 for identification as of
11  this date.)
12          THE WITNESS:  Thank you.
13       Q.  You have been handed Exhibit 29.
14  This is entitled Debtors Responses and
15  Objections to the Foreign Representatives of
16  Three Arrows Capital Ltd. and some various
17  discovery requests.  You could see if you
18  flip to the very end or the second to last
19  page perhaps, it is dated July 26, 2024.
20          Do you see that?
21       A.  I am sorry, which page?
22       Q.  Sure, I was just giving the title
23  on the very first page?
24       A.  Sure.
25       Q.  And then I was on the second to

1          S. COVERICK
2  last page, just looking at the date of this
3  document, July 26, 2024, do you see that?
4       A.  Oh, yes, sir.
5       Q.  Okay.  The same date as the
6  communication to the joint liquidators you
7  refer to in paragraph 92 of your
8  declaration?
9       A.  Yes, sir.
10       Q.  Is this the communication you
11  refer to in that -- in that paragraph?
12       A.  I was not involved in the
13  communication to joint liquidators on
14  July 26 of 2024.  As I mentioned previously,
15  I had not yet been intimately involved in
16  the work stream.  It was communicated to me
17  by my team that that was the date they
18  communicated that it was communicated to 3AC
19  about this -- this methodology or intricacy
20  with the original doc 38.
21       Q.  When you wrote under oath that
22  this was communicated to the joint
23  liquidators on July 26, 2024, were you
24  referencing any particular documents?
25       A.  I believe it was this document.  I

1          S. COVERICK
2  am not aware of referencing anything else.
3       Q.  Where in this document was any of
4  what you just described communicated to the
5  joint liquidators?  Take your time?
6       A.  It was my understanding that that
7  the response to interrogatory number 1
8  addressed informal communications, informal
9  discovery relating to doc 38.
10       Q.  I am sorry, I must not be
11  understanding you, where did the -- the
12  advanced understandings, where are they
13  described in the response to interrogatory
14  number 1?
15          MR. GLUECKSTEIN:  Object to form.
16  It misstates the testimony.
17       A.  I am just reading the page and
18  this is what I read when I made the
19  statement.  And it was expressed to me by my
20  team and others that this information was
21  conveyed in July of 2024, that this
22  response, which I will read, The debtors
23  referred foreign representatives to
24  materials previously produced to the debtors
25  by the debtors to 3AC as part of the

1          S. COVERICK
2  informal information exchange between the
3  parties along with supplemental discussions
4  and explanations provided by the debtors and
5  their financial advisors in connection
6  therewith the informal discovery.
7          It is my understanding that that
8  informal discovery included discussion of
9  the notional futures balance being in the
10  negative USD balance.
11       Q.  Any of that in this document?
12       A.  This document references
13  discussions and informal discovery.  You
14  asked me why I was comfortable to paraphrase
15  writing under oath that this was
16  communicated to the joint liquidators on
17  July of 2026.  And I am answering your
18  question that I reviewed this document,
19  which is the first set of interrogatory
20  responses and objections, and it references
21  communications and discussions that my team
22  expressed to me including the mention of
23  this aspect of doc 38.
24       Q.  Any other documents you are aware
25  of that support the assertion in your

1           S. COVERICK
2    declaration that this was communicated to
3    the joint liquidators on July 26, 2024 as
4    part of the debtors responses and
5    objections?
6        A.   In my declaration I reference this
7    first set of interrogatories which includes
8    an informal discovery process that I was not
9    a part of.  So I relied on my team's
10   information that was provided to me.
11       Q.   You were not involved at all in
12   that process?
13       A.   I was --
14           MR. GLUECKSTEIN:  Object to the
15   form, misstates the testimony.
16       A.   Other than the fact that all
17   members of the A & M team inevitably roll up
18   to me and Mr. Mosley, I was not intimately
19   involved in -- in July of 2024 with the
20   Three Arrows' capital dispute.  And I was
21   not involved at the time in the production
22   of this response to the interrogatories.  I
23   understand that I verified them.  And I also
24   understand that that was based on a
25   review of -- I believe -- I believe this was

1           S. COVERICK
2    included in what I recently verified.  And
3    that was based on a review and I believe it
4    also included that I don't have personal
5    knowledge of everything in the responses.
6        Q.   Were you part of the -- any
7    earlier in time communication or discussions
8    that you just testified to between the joint
9    liquidators and FTX with respect to the
10   informal discovery?
11       A.   I -- as I just stated, I was not
12   involved on an intimate level including
13   discussions with 3AC at that time.
14       Q.   Have you been copied on emails?
15       A.   Not that I am aware of.
16       Q.   Based on original doc
17   28 -- strike that.
18           Based on original document 38 --
19   well, strike that as well.
20           You referenced an advance, an
21   advancing understanding with respect to the
22   notional value of futures contracts in
23   testimony a couple of minutes ago, do you
24   recall that?
25       A.   Yes, sir.

1           S. COVERICK
2        Q.   I believe you may have referenced
3    other advanced understandings.  What -- what
4    other advanced understandings were you
5    referencing there?
6            MR. GLUECKSTEIN:  Objection.  I
7    just caution the witness not to reveal
8    anything that reflects legal strategy
9    discussions with counsel.  But any
10   factual answers you have to counsel's
11   questions, you should provide.
12       A.   I believe there are three other
13   categories of -- of advanced analysis that
14   were -- analysis that was advanced since the
15   creation of the original doc 38.
16           One is a category that we have
17   discussed already and relates to $24 million
18   of deposits that parts of the exchange
19   ledger were denoted as canceled, but were
20   otherwise credited to the account balance.
21   It is my understanding that the original doc
22   38, which for sake of clarity I do not rely
23   on for purposes of my declaration, it is my
24   understanding that that document excluded or
25   did not credit the account for those

1           S. COVERICK
2    $24 million of deposits.  Given the exchange
3    ledger reflected that 24 million of deposits
4    in the account balance at all times, after
5    continued review of the exchange ledger as I
6    have discussed throughout the last two days,
7    that amount was added back to account
8    balance given that it was always in the
9    account balance on the exchange ledger.
10           It was also uncovered that a very
11   diminimus amount measured in the single
12   digit thousands of fees that were charged to
13   the account were not incorporated.  This was
14   due to an advanced understanding of a change
15   in field is how it was described to me, that
16   some of the trading fees were recorded in,
17   in the exchange ledger, but at a very
18   diminimus impact.
19           And then the last category is, it
20   is my understanding that certain locked
21   token pricing that was used in doc 38.
22   Again, I mentioned that pricing is one of
23   the biggest assumptions you have to make
24   when doing these exchange analyses, given
25   they are not stored in the exchange ledger

1              S. COVERICK
2    at every point in time. It is my
3    understanding that a price of zero dollars
4    was originally applied to certain lock
5    tokens. And that was updated to reflect
6    more accurate pricing at the time based on
7    further analysis of those specific lock
8    tickers, which had a result of slightly
9    increasing 3AC's account balance, because it
10   previously did not include a price for those
11   tickers. Those are the changes that I am
12   aware of.
13       Q.   Any other categories, we will talk
14   through them in some detail, but any other
15   categories you are aware of -- FTX is aware
16   of?
17       A.   Not that I can specifically
18   recall. I believe those were the changes
19   that were made between the original version
20   and the amended version.
21       Q.   So let's talk about this
22   24 million of deposits, what is FTX's
23   current position? I am aware of the
24   presentation that A & M previously created,
25   I can easily pull it out if you need it,

1              S. COVERICK
2    that refer to a miscrediting of $24 million
3    to Three Arrows' accounts. What is FTX's
4    current position with respect to that
5    24 million?
6              MR. GLUECKSTEIN: I caution the
7        witness not to reveal legal strategy or
8        discussions with counsel, but you can
9        offer FTX's factual.
10       A.   FTX's position is that the
11   exchange ledger is the source of the
12   information required to understand an
13   account balance, and that an account balance
14   should be calculated off of the exchange
15   ledger. That $24 million deposit was
16   included in the account balance on the
17   exchange ledger. And so we have included it
18   in our analysis of this claim.
19       Q.   So it was excluded in the original
20   doc 38, but included in amended doc 38?
21       A.   Correct.
22       Q.   The sum and substance of that
23   distinction was that in original doc 38,
24   negative US dollar balances were 24 million
25   higher or lower than that reported in

1              S. COVERICK
2    amended doc 38?
3        A.   The -- the exclusion of a
4    $24 million deposit would make the negative
5    account balance higher or more negative.
6    Because a deposit would -- of US dollars
7    would lower the negative amount or -- or in
8    normal terms increase the -- the USD
9    balance.
10       Q.   Make it more or less negative with
11   respect to original doc 38 or amended doc
12   38, I just want to make sure we are being
13   very clear with each other?
14             MR. GLUECKSTEIN: Object to the
15       form.
16       A.   With respect to this issue, the
17   $24 million deposit, the negative USD
18   balance in the original doc 38 is more
19   negative than the negative USD balance in
20   the amended doc 38 solely with respect to
21   this 24 million.
22       Q.   Said otherwise, the absolute value
23   of the negative USD balance in original doc
24   38 is higher than the absolute value of the
25   USD balance in amended doc 38 solely with

1              S. COVERICK
2    respect to this particular issue?
3        A.   That's correct.
4        Q.   What kind of fees were you talking
5    about in that second example?
6        A.   These are trading fees that I have
7    mentioned several times over the last couple
8    of days. They are the fees that FTX charged
9    customers when they made trades.
10             It was -- it was discovered by our
11   team as they continued to analyze the 3AC
12   account, that the field in the database that
13   recorded these fees at one point was
14   changed, in other words, they recorded fees
15   in a certain field of the database and then
16   for whatever reason began recording them in
17   a -- in a different column.
18             The impact of that I understand to
19   be less than $10,000.
20       Q.   And then finally you mentioned
21   some locked tokens, if I recall correctly,
22   as being differently treated with respect to
23   original and amended doc 38?
24       A.   Yes, sir.
25       Q.   What is a locked token?

MAGNA
LEGAL SERVICES

Page 206

```
1              S. COVERICK
2       A.  A locked token in the -- in the
3  traditional sense is a token that cannot be
4  sold.  It is similar to the concept of
5  something vesting, if you will.  Locked
6  tokens are often issued as part of early --
7  issued to early investors in a token
8  project.  But to prevent all of those
9  investors from immediately selling their
10 tokens and potentially decreasing the price
11 of those tokens, token issuers often provide
12 locking schedules whereby customers can't
13 sell those tokens for some period of time.
14      The FTX exchange also incorporated
15 a similar concept, although those -- those
16 were ledger only entries as opposed to
17 traditional locked tokens are actually
18 locked on the block chain.
19      Q.  Amended doc 38, was this prepared
20 by A & M as well?
21      A.  Amended dock 38 was prepared by A
22 & M as well.
23      Q.  When was it prepared by A & M?
24      A.  To my understanding, it was
25 prepared just prior to being produced to the
```

Page 207

```
1              S. COVERICK
2  joint liquidators.  I don't know the exact
3  date.
4       Q.  I am happy to make a
5  representation that it was August 25, 2025,
6  no reason to dispute that to your knowledge?
7       A.  I will take your word for it.
8       Q.  Had it been created at the time of
9  the claim objection filed by FTX on June 20
10 of 2025?
11      A.  The completion of amending doc 38,
12 I don't know exactly when that specific
13 document began being updated.  I understand
14 that it didn't happen instantaneously.  But
15 the creation or completion of doc 38 did not
16 have any bearing on the filing of the claim
17 objection in terms of the underlying
18 analysis.  I believe it is a clarifying
19 point that there were things in the original
20 doc 38 that the understanding of has evolved
21 since.
22      Q.  A clarifying point to the tune of
23 how -- how many -- how much of a difference
24 with respect to the negative US dollar
25 balance across the two documents?
```

Page 208

```
1              S. COVERICK
2       A.  I don't have a full reconciliation
3  committed to memory.  But the notional value
4  of futures was approximately $576 million, I
5  believe.  And then the negative or the
6  deposit in question was $24 million.  I am
7  not sure specifically how the other minor
8  changes impacted the change in USD balance,
9  but those would have been the biggest two
10 drivers.
11      Q.  Did you rely on amended doc 38 in
12 preparation of your original declaration?
13      A.  In preparation of my original
14 declaration I believe I reference the
15 amended doc 38.
16      I am sorry, I need to find the --
17 maybe I am -- maybe I am thinking about my
18 supplemental declaration.  I -- I cannot
19 recall specifically at what point in time
20 the amended doc 38 was completed.
21      Q.  Was it largely completed,
22 substantially completed at the time of your
23 June 20 2020 -- 21st declaration?
24      A.  In substance doc 38 is effectively
25 the output of all of the steps that I lay
```

Page 209

```
1              S. COVERICK
2  out in my supplemental declaration, which as
3  we have discussed, are consistent with how
4  my team derived the figures in my
5  declaration.  From that perspective the core
6  analysis that is reflected in doc 38 had
7  been done and the product of that was my
8  declaration.
9       I do not recall specifically when
10 the amended doc 38 was completed.  I am sure
11 I could -- that that information would be
12 attainable, but I don't have it committed to
13 memory.
14      Q.  Did amended doc 38 rely on any
15 underlying data that original doc 38 did
16 not?
17      A.  I am sorry, can you repeat the
18 question, just so I can try and answer
19 accurately.
20      Q.  Did amended doc 38 rely on any
21 underlying data that original doc 38 did
22 not?
23      A.  To my knowledge only with respect
24 to pricing information that I -- that I
25 mentioned.  I am not -- I can't immediately
```

1            S. COVERICK
2  recall anything else, underlying data wise
3  that would have changed.
4      Q.   Pricing information as to futures
5  contracts or other types of assets or
6  positions?
7      A.   Excuse me, the pricing information
8  when they did the lock tokens that I was
9  just discussing.
10     Q.   Do you know why it took FTX two
11 months to share those clarifications with
12 the joint liquidators?
13         MR. GLUECKSTEIN:  Object to the
14     form.
15     A.   I do not.
16         MR. PROULX:  Let's take a short
17     break.
18         (Whereupon, a short recess was
19     taken.)
20         THE VIDEOGRAPHER:  We are going
21     off the record.  The time is 2:47 p.m.
22         (Whereupon, a short recess was
23     taken.)
24         THE VIDEOGRAPHER:  We are back on
25     the record.  The time is 3:13 p.m.

1            S. COVERICK
2      Q.   Thank you, Mr. Coverick.  In
3  paragraph 66 of your original declaration,
4  you note that Three Arrows withdrew
5  35 million US dollars on June 13, 2022.
6         Am I reading that correctly?
7      A.   Yes, sir.
8      Q.   Also withdrew 2 million worth of
9  FTT?
10     A.   Yes, sir.
11     Q.   4 million worth of BTC?
12     A.   Yes, sir.
13     Q.   How was it able to withdraw those
14 assets from the exchange on that date?
15         MR. GLUECKSTEIN:  Object to the
16     form.
17     A.   A customer can initiate a
18 withdrawal from the exchange by initiating a
19 request to withdraw sufficient to having
20 a -- provided it has a sufficient account
21 balance and otherwise satisfies the
22 maintenance margin requirements.
23     Q.   These were asset entitlements that
24 Three Arrows had as of this time and date?
25     A.   These were assets that 3AC was

1            S. COVERICK
2  able to draw on that date.
3      Q.   Once Three Arrows withdrew these
4  assets on this date, what was FTX's position
5  with respect to the ownership of those
6  assets?
7         MR. GLUECKSTEIN:  Objection to the
8      form, calls for a legal conclusion.
9      A.   Again, I can't provide a legal
10 conclusion on behalf of the FTX Recovery
11 Trust.  My practical understanding is that
12 once 3AC withdrew these assets, they were in
13 possession of those assets.
14     Q.   They being Three Arrows?
15     A.   Once they withdrew them, they
16 would have been in possession of them.
17     Q.   In paragraph 68 of your
18 declaration you reference Three Arrows
19 having made more than 52,000 trades on
20 June 13 and 14 in which they sold digital
21 assets for USD.
22         Did I read that correctly?
23     A.   Yes.
24     Q.   How is that, the number of such
25 trades determined by FTX?

1            S. COVERICK
2      A.   The number of such trades would be
3  derived from the general ledger of the
4  exchange.
5      Q.   When you say general ledger, I --
6      A.   I am --
7      Q.   Let me finish the question, yeah.
8  I know at times we I think referred to just
9  ledger or master ledger, were there any sort
10 of different ledgers?
11     A.   No, sir, that's the financial
12 adviser in me, I often use the term general
13 ledger.  When I have said that, I have been
14 referring to the ledger of the exchange.
15     Q.   I appreciate you keeping the
16 record clean on that.
17         Does FTX know who at Three Arrows
18 it asserts made these 52,000 trades?
19     A.   In terms of a specific person, FTX
20 is not aware of the specific person to the
21 extent it was a specific person that
22 initiated those trades.
23         MR. PROULX:  Let's go off the
24     record for a moment.  I am being
25     informed that there is no audio.  Off

Page 214

S. COVERICK

1 the record, please.
2 THE VIDEOGRAPHER: Off the record.
3 The time is 3:17 p.m.
4 (Whereupon, an off-the-record
5 discussion was held.)
6 THE VIDEOGRAPHER: We are back on
7 the record, the time is 3:15 p.m.
8 Q. Does FTX assert that it was, in
9 fact, a specific person at Three Arrows who
10 conducted these trades as opposed to some
11 sort of automated process implemented by
12 Three Arrows?
13 A. Either are possible. However, if
14 an automated process such as a trading
15 algorithm were involved in conducting those
16 trades, a person at some point would have
17 had to create that algorithm thereby being
18 the person traceable to those trades being
19 conducted if it had to be traced to a
20 person.
21 Q. Does FTX have a view on whether at
22 a -- for the quantity of this number of
23 trades over 52,000, it would have been an
24 individual versus that kind of logarithm?

Page 215

S. COVERICK

1 A. FTX, to the best of my knowledge,
2 does not have information regarding
3 specifics of the Three Arrows Capital API,
4 which would have been the aspect of their
5 access to the exchange that would conduct
6 algorithmic trading. So FTX does not have a
7 view as to how much of the trading was done
8 via automated process versus manual process.
9 Q. Who were the counterparties to the
10 trades referenced in this paragraph 68?
11 A. The counterparties were likely
12 many different customers, certainly for this
13 number of trades. I do not have an
14 accounting for the various counterparties by
15 hand.
16 Q. Do you -- does FTX know the
17 identities of any particular customers who
18 were counterparties to these trades?
19 A. For the 52,000 trades in question,
20 that would require further analysis that my
21 team has not done.
22 Q. Further analysis or any analysis?
23 A. I am sorry, can you clarify the
24 question?

Page 216

S. COVERICK

1 Q. Yes, you referenced further
2 analysis, is that meant to imply that some
3 analysis has been done as to who the
4 counterparties of those trades were by Three
5 Arrows?
6 A. I am not aware of specific
7 counterparty tracing analysis on these
8 52,000 trades. I am not aware if that
9 specific analysis has been done.
10 (Whereupon, a document titled
11 Supporting Analysis for the Three
12 Arrows Capital Discussions was marked
13 Coverick Exhibit 30 for identification
14 as of this date.)
15 Q. Mr. Coverick, you have been handed
16 Exhibit 30?
17 A. Yes, sir.
18 Q. This is titled Supporting Analysis
19 for the Three Arrows Capital Discussions,
20 dated draft October 25, 2023, with Alvarez &
21 Marsal and Sullivan & Cromwell identified on
22 the title page.
23 Do you recognize this document?
24 A. I do.

Page 217

S. COVERICK

1 Q. What is this?
2 A. I would characterize this as a
3 very preliminary presentation as the header
4 of the document reflects, I believe, on
5 almost every page. This was a presentation
6 created by junior members of the A & M team
7 during the verification analysis of the 3AC
8 claim.
9 Q. Does that include Mr. Gordon?
10 A. I do not know if Mr. Gordon
11 specifically participated in the preparation
12 of this document. But it is my
13 understanding that it was referenced in his
14 deposition.
15 Q. Jump to page 12, please.
16 There is a statement here, On
17 June 13, 2022, 3AC sold out of many spot and
18 futures positions totalling over
19 1.08 billion. There were over 1,000
20 accounts on the buy side of Three Arrows'
21 trades, debtor accounts representing 8.0
22 percent of the total trade value.
23 Do you see all that?
24 A. I do.

**MAGNA** ▶
LEGAL SERVICES

Page 218

```
1            S. COVERICK
2      Q.   What debtor accounts does this
3  refer to?
4      A.   I am not familiar, although I have
5  seen this document and reviewed it.  I am
6  not relying on it in any way.  As I
7  described, it was a very preliminary
8  analysis.  And I -- I base my testimony in
9  my declaration and all the preparation for
10  my deposition on our team's latest thinking
11  and understanding of the information
12  relating to 3AC's account, which this does
13  not reflect.
14      Q.   Yeah, I wasn't asking anything
15  about your declaration in preparation for
16  the deposition, I was simply asking if FTX
17  knows or has a position on whether debtors
18  accounts were counterparties to the trades
19  on June 13?
20      A.   Given I have not spent time
21  analyzing this preliminary draft and did not
22  review it at the time, I have not developed
23  any further understanding other than what
24  the words on the page say.  I have not
25  analyzed or supervised the analysis of
```

Page 219

```
1            S. COVERICK
2  debtors accounts involved in 3AC's trades on
3  June 13.
4      Q.   Who has?
5      A.   Who has what?
6      Q.   Done that analysis, there are
7  numbers here 8.0 percent, yes?
8      A.   I understand this was completed by
9  members of Mr. Gordon's team.  Mr. Gordon
10  does report to me, but I was not involved at
11  the time this document was created.
12      Q.   You are aware, are you not, that
13  this document is referenced in the
14  deposition topics you were designated for
15  today?
16      A.   I am.
17      Q.   Is Alameda one of the debtor
18  accounts or debtor affiliated accounts that
19  was a counterparty to any trades prior to
20  the liquidation on June 14?
21      A.   I have not confirmed.  But I
22  believe based on conversations with my team
23  that from time to time Alameda would have
24  been the counterparty to certain trades
25  prior to June 14.
```

Page 220

```
1            S. COVERICK
2      Q.   Certain trades with Three Arrows?
3      A.   Yes, sir.
4      Q.   Do you know the quantity of such
5  trades?
6      A.   I do not.
7      Q.   The value in dollar terms of such
8  trades?
9      A.   I do not.
10      MR. GLUECKSTEIN:  Objection to the
11  form.
12      A.   I do not have the specifics of
13  3AC's trading history with Alameda prior to
14  June 14 committed to memory.
15      Q.   Do you know if Alameda more
16  generally was a lender under the margin
17  program?
18      A.   While I am not aware and have not
19  committed to memory all specifics of Alameda
20  Research's account, I understand that they
21  were a borrower in the margin program.
22      Q.   My question was a little bit
23  different, it was whether they were a lender
24  in the margin program?
25      A.   I understood the question.  I am
```

Page 221

```
1            S. COVERICK
2  saying I understand they were to be a
3  borrower and had a large borrow balance.
4  Whether or not they had certain tickers in
5  which they were lending, I do not have
6  committed to memory.
7      (Whereupon, a slipsheet was marked
8      Coverick Exhibit 31 for identification
9      as of this date.)
10      Q.   Mr. Coverick, you have been handed
11  Exhibit 31, this is what is called a ship
12  sheet.  It reflects a production by FTX of a
13  document in native format.  We are opening
14  up this document on the laptop, do you see
15  it?
16      A.   Yes, sir, I do.
17      MR. PROULX:  Opposing counsel, I
18  just want to make sure you can see it
19  as well?
20      MR. GLUECKSTEIN:  Yes, I can
21  counsel, thank you.
22      Q.   You will see there is a -- there
23  are two tabs in the bottom of this
24  spreadsheet, borrows and lends, do you see
25  those?
```

**MAGNA** ▸
LEGAL SERVICES

Page 222

```
1              S. COVERICK
2       A.  Yes, sir, I do.
3       Q.  Do you know generally speaking
4   what this spreadsheet reflects?
5       A.  Am I viewing the entirety of the
6   spreadsheet or is there other columns to the
7   right?
8       Q.  So I am showing you now the lens
9   to show you there is a separate tab.  Let's
10  start off with the lens tab, you will see
11  main account, can zoom in if you need, user
12  ID, email, user name, ticker ID.  I will
13  stop there, but I believe you can see the
14  rest of the columns?
15      A.  Yes, sir.
16      Q.  What does this document reflect?
17      A.  I believe this document was
18  produced in response to a request to provide
19  information on participating lenders and
20  borrowers, in other words, the pools of --
21  of borrowers and lenders at what appear to
22  be different points in time.
23      Q.  Do you know offhand what those
24  points in times are?
25      A.  I -- I can see the dates on the
```

Page 223

```
1              S. COVERICK
2   funding time column.  I -- I believe that
3   was during the period of June 13 and 14,
4   but -- I understand in general the document
5   to represent the pools of borrowers and
6   lenders during the period in question.
7       Q.  I will read into the record,
8   counsel, let me know if we have any issues
9   with this, that a representation made in an
10  August 15, 2025 set of discovery responses
11  from FTX.  And this is in response
12  specifically to interrogatory number 3.  The
13  statement in question is however, the FTX
14  recovery request will produce to the joint
15  liquidators data sufficient to identify the
16  pool of borrowers and pool of lenders at the
17  beginning of the day on June 12 and June 13,
18  2022 for each digital asset that 3AC
19  borrowed.
20      Any reason to doubt that that
21  representation is consistent with the data
22  reflected in the document in front of you?
23      A.  No, sir.
24      Q.  I am doing a search for Alameda, I
25  am seeing an instance of -- actually, just
```

Page 224

```
1              S. COVERICK
2   so it is clear to everyone, keep the top row
3   in place, I think you had commented on this
4   rightfully so earlier, do you see an email
5   info@alamedaresearch.com in the lending tab
6   of this document?
7       A.  Yes, sir, I do.
8       Q.  I will be happy to scroll over for
9   full context.  You see the ticker ID is
10  Rune, R-U-N-E?
11      A.  Yes, sir.
12      Q.  This particular lend on June 12,
13  2022, do you see that?
14      A.  Yes, sir.
15      Q.  Information about the size of the
16  proceeds of the lend, do you see that?
17      A.  Yes, sir.
18      Q.  What is the size of the lend?
19      A.  It is my understanding that, and I
20  would need to confirm with my team, I
21  believe the size is the quantity of that
22  ticker that was being lent at that point in
23  time.
24      Q.  And just for illustrative
25  purposes, I will continue the search, you
```

Page 225

```
1              S. COVERICK
2   will see Alameda appears on another row of
3   this tab, do you see that there?
4       A.  Yes, sir.
5       Q.  Another one here?
6       A.  I see it.
7          MR. PROULX:  I am going to close
8       the document out.
9          THE WITNESS:  Okay.
10      Q.  Any reason to doubt that Alameda
11  was lender as of at least June 12 through 13
12  pursuant to the margin program?
13      A.  No, as I testified, I -- they
14  could have been a lender, I didn't have it
15  committed to memory, in certain tickers.  My
16  understanding is that overall they were
17  borrowing from the exchange in aggregate.
18  But -- users could borrow one ticker and
19  lend another.
20      Q.  Do you know if any other FTX
21  affiliates or related entities served as
22  lenders in that program?
23      A.  I am not aware of any from memory,
24  but that doesn't mean there were or were
25  not.
```

**MAGNA** ▶
LEGAL SERVICES

1             S. COVERICK
2     Q.  Do you know if any such FTX
3  related or affiliated lenders lent asset
4  entitlements or ledger entries to Three
5  Arrows specifically?
6     A.  Not that I can recall.  But again,
7  I don't have the specific details of every
8  affiliated account memorized, nor have I
9  personally conducted a counterparty tracing
10 analysis.
11    Q.  Has FTX?
12    A.  To the extent that -- again, the
13 borrowing pool and lending pool, as I have
14 stated, are pool to pool relationships.  So
15 the assertion that an account such as
16 Alvarez & Marsal or a party such as Alvarez
17 & Marsal directly lent to 3AC is not one I
18 would -- that's not how I would characterize
19 it.  I would say that Alameda was part of
20 the pool that lent to the borrowing pool in
21 which 3AC was a member.
22    Q.  And that's true of all of the
23 other customers in such lending pools as
24 well?
25    A.  Yes.

1             S. COVERICK
2     Q.  Didn't lend to 3AC directly?
3     A.  It was not a one to one
4  relationship.  It was a pool to pool
5  relationship.
6     Q.  What, if anything -- strike that.
7        Did -- we were talking about
8  the -- the liquidation engine or risk engine
9  earlier, do you recall that discussion?
10    A.  Yes, sir.
11    Q.  And that, correct me if I am
12 wrong, I believe that program or function
13 operated on the maintenance margin
14 requirement that FTX imposed on customer
15 accounts?
16    A.  That's my understanding is that,
17 as I testified, the maintenance margin
18 requirement was the trigger for the auto
19 liquidation process.
20    Q.  And by auto, you mean that process
21 happened automatically upon a maintenance
22 margin requirement non-compliance issue?
23    A.  What I mean, which sounds similar
24 to what you said, is that the code base of
25 the exchange monitored account's compliance

1             S. COVERICK
2  with the maintenance margin requirement.
3  And once they fell below that requirement,
4  the code base of the exchange was structured
5  such that it would initiate an auto
6  liquidation.
7     Q.  And that happened automatically,
8  there wasn't someone in a room at FTX who
9  had to press a button before that auto --
10 automatic liquidation would in fact occur?
11    A.  That's my understanding, yes.
12    Q.  Turn back to your supplemental
13 declaration?
14    A.  Yes, sir.
15    Q.  I appreciate by the way you
16 keeping those in front of you, as I
17 suggested earlier today, I think it made
18 everyone's life a lot easier here.
19        In paragraph 14 of the
20 supplemental declaration, you were talking
21 about this one earlier, you have got a table
22 on the bottom purporting to reflect the
23 components of the maintain -- the
24 maintenance margin requirement for Three
25 Arrows account at specific times on specific

1             S. COVERICK
2  dates.
3        Do you see that again?
4     A.  Yes, sir.
5     Q.  And it is FTX's position that
6  Three Arrows fell out of compliance with its
7  maintenance margin requirement as of
8  9:00 a.m. UTC, June 13, 2022?
9     A.  Yes, sir.  Again, as I testified,
10 mechanically in the exchange, the line of
11 credit had not been removed.  And that is
12 why the account was not auto liquidated.
13 But absent the line of credit, which it was
14 out of compliance with, these would be the
15 deficits to the margin trading account value
16 at each point in time.
17    Q.  So it wasn't automatic for Three
18 Arrows upon its alleged breach of the
19 maintenance margin requirement that required
20 some additional steps to happen?
21    A.  There were additional steps taken
22 with 3AC's account given the size of the
23 account.
24    Q.  Automatic for some, not automatic
25 for others?

**MAGNA** ▶
LEGAL SERVICES

Page 230

S. COVERICK
1          S. COVERICK
2      MR. GLUECKSTEIN:  Object to the
3 form.
4      A.  My understanding of the
5 maintenance margin requirement and how it
6 operates inside of the code is in
7 conjunction with my understanding that the
8 terms of service specify FTX had the right
9 to liquidate any customer account for any
10 reason at any time.
11      Q.  In paragraph 77 of your original
12 declaration now, please?
13      A.  Yes, sir, 77.
14      Q.  77.
15      A.  Yes, sir.
16      Q.  You say that on 10:21 p.m. UTC,
17 FTX performed a series of managed
18 liquidation transactions involving four
19 assets.
20      Do you see that?
21      A.  Yes, sir.
22      Q.  What is a managed liquidation
23 transaction mean?
24      A.  I am referring to the fact that it
25 was -- another word for managed could be

Page 231

1          S. COVERICK
2 manual.  It was a manual liquidation, in
3 other words, it was not performed by the
4 auto liquidation algorithm.  It was
5 performed manually by FTX.
6      Q.  What other circumstances would FTX
7 perform a manual liquidation of a customer
8 account or some portion thereof?
9      A.  I can't speak to the specifics of
10 every account.  I understand that FTX
11 provided different levels of customer
12 service to certain customers than others
13 based on the size of their accounts.  I also
14 understand that 3AC was one of the larger
15 accounts at some points in time on the FTX
16 exchange and one of the more active traders
17 on the FTX exchange.
18      Q.  Understanding you can't speak to
19 the specifics of every single account, is
20 FTX aware of any instances in which a
21 customer's account other than Three Arrows
22 was manually liquidated in whole or in part?
23      A.  That would require further
24 analysis.  I have spent my time focusing on
25 the specifics of 3AC's account.

Page 232

1          S. COVERICK
2      Q.  You say further analysis, has any
3 analysis been done on that question?
4      A.  I am not aware if my team has for
5 other purposes identified circumstances in
6 which manual liquidations are -- were or
7 were not done.  That doesn't mean they were,
8 it doesn't mean they weren't, it just means
9 that I have not been involved in those
10 analyses.
11      Q.  Who at FTX, if anyone, had
12 authority to manually liquidate an account
13 in whole or in part?
14      A.  I did not work at FTX at the time.
15 And as well documented in public filings and
16 the media, it is -- it is unclear, it is
17 frequently unclear how different authorities
18 worked at FTX.  So I cannot purport to know
19 each individual that had authority to
20 liquidate the account.
21      Q.  Did you know anyone who had that
22 authority?
23      A.  I believe authority is likely a
24 question of legal interpretation.  And I --
25 I do not have any other information that

Page 233

1          S. COVERICK
2 would allow me to reach conclusion on that.
3      Q.  Who, in fact, in the real world
4 manually liquidated Three Arrows' accounts
5 on June 14?
6      A.  It is unclear to our team based on
7 our review of the code the individual person
8 who specifically entered the transactions,
9 although we have an understanding of how the
10 transactions were effectuated.
11      Q.  Did three -- did FTX need access
12 to Three Arrows' accounts or API to
13 effectuate those transactions?
14      A.  They did not need access to their
15 user name and password to effectuate those
16 transactions, nor did they need access to
17 their API to effectuate those transactions.
18      Q.  Did they, in fact, obtain such
19 access to effectuate those transactions?
20      A.  Those transactions were not
21 effectuated in either of those manners.
22 They were effectuated directly on the
23 exchange ledger, not dissimilar to how an
24 auto liquidation would occur without
25 someone -- the exchange did not need to log

**MAGNA**
LEGAL SERVICES

S. COVERICK

1 into the customer's account or access its
2 API to conduct an auto liquidation. And
3 similarly FTX had the ability to conduct the
4 liquidations manually without accessing
5 their account through the website or the
6 API.
7    Q.  Pursuant to what asserted rights
8 or contractual provisions did FTX initiate
9 the liquidation at 10:21 p.m.?
10    MR. GLUECKSTEIN:  Objection, calls
11 for a legal conclusion.
12    A.  Again, given I am not a lawyer, I
13 cannot provide the conclusion on rights.  My
14 general business person's understanding is
15 that the terms of service give FTX the right
16 to liquidate accounts at any time for any
17 reason.
18    Q.  Did you ever see any document
19 reflecting the indication of the terms of
20 service or anything else as a basis for
21 liquidating Three Arrows accounts on
22 June 14?
23    A.  Again, my only business
24 understanding which is not to be -- I am not

S. COVERICK

1 stating a legal conclusion, but my general
2 understanding is that the terms of service
3 say FTX can liquidate an account at any time
4 for any reason.
5    Q.  You may not have heard me, my
6 question is very different from that.  It is
7 have you in your review in preparation for
8 this deposition or otherwise seen any
9 document in which at the time someone at FTX
10 or otherwise invoked a particular provision
11 or contract as a basis for liquidating Three
12 Arrows' accounts?
13    MR. GLUECKSTEIN:  Objection, calls
14 for a legal conclusion.
15    A.  Can you clarify what you mean by
16 invoke?
17    Q.  Have you ever seen any document in
18 which anyone from FTX wrote the words
19 referencing any particular document for the
20 basis of liquidating Three Arrows' accounts
21 on June 14?
22    A.  I cannot recall seeing a document
23 where an employee of FTX references a
24 specific section of the terms of service.

S. COVERICK

1 But I can't recall the existence of every
2 document.  That doesn't mean it exists or
3 does not exist.  I just can't recall a
4 document in this moment that says something
5 like that.
6    Q.  In the read world did FTX
7 liquidate Three Arrows' accounts because of
8 a perceived noncompliance with the
9 maintenance margin requirement at 10:21,
10 June 14?
11    MR. GLUECKSTEIN:  Objection, calls
12 for a legal conclusion.
13    A.  I can only answer that question
14 based on the facts I have available to me.
15 I cannot -- I cannot venture to understand
16 the reasoning of people I have not spoken
17 with or worked with directly.
18    From a factual basis I have seen
19 communications that indicate concern over
20 3AC's account by what I understand to be FTX
21 employees.  From a factual basis I
22 understand that the calculation of the
23 maintenance margin requirement showed a
24 deficit in conjunction with the

S. COVERICK

1 noncompliance on the line of credit
2 requirement as we defined it.
3    From the factual standpoint I can
4 see on the exchange ledger that manual
5 liquidation transactions were entered in a
6 value neutral fashion that did not change
7 the account balance, but simply closed out
8 spot positions in exchange for USD
9 positions.
10    Q.  I am still unclear of your
11 position factually.  Does FTX take the view
12 that factually a collateral requirement
13 under the letter of line of credit triggered
14 the need for a manual liquidation,
15 maintenance margin requirement triggered the
16 need for a manual liquidation or something
17 else?
18    MR. GLUECKSTEIN:  Object to the
19 form, calls for a legal conclusion.
20    A.  Again, as I testified, my business
21 person's understanding is that the line of
22 credit requirement as well as the
23 maintenance margin requirement work in
24 conjunction with one another, given a key

MAGNA ▶
LEGAL SERVICES

Page 238

1          S. COVERICK
2  aspect of the maintenance margin requirement
3  is the margin trading account value which is
4  impacted by the line of credit.
5      Q.   The line of credit had been
6  removed at the initiation of the liquidation
7  at 10:21 p.m.; is that correct?
8      A.   I am sorry, can you repeat the
9  question.
10     Q.   Sure, the line of credit, had it
11 been removed by FTX as of 10:21 p.m. on
12 June 14?
13     A.   No.  As I have testified to
14 earlier, mechanically in the exchange, and
15 as is clearly stated in my declaration, the
16 removal of the line of credit on the
17 exchange ledger happened approximately eight
18 minutes after the manual liquidation
19 transactions occurred, followed by
20 approximately 18 minutes later a small auto
21 liquidation occurring.  I view these events
22 as happening contemporaneously.
23     Q.   Let's flip to Exhibit 14, I think
24 we probably looked at this one yesterday.
25          Are you there?

Page 239

1          S. COVERICK
2      A.   I have Exhibit 14, yes, sir.
3      Q.   Thank you very much and we can
4  move to page 28 of this document.
5          Is this an accurate summary of the
6  liquidation conducted by FTX on June 14?
7      A.   Again, in reference to this
8  document, I am not relying on this document
9  for any component of my declaration.  There
10 are things that I would characterize
11 differently in the language.  And further I
12 have not reconciled every line of this with
13 the documents I do rely on for purposes of
14 my declaration, because this is not a
15 document I relied on.
16          I -- I will note the consistency
17 with the general time period that is
18 referenced in this, although I would need my
19 team to do a cross-reference to ensure
20 that -- that there is not a typo in this
21 presentation.
22     Q.   Let's talk directionally, did the
23 liquidation occur --  strike that.
24          Was the liquidation initiated by
25 FTX at 10:21 UTC on June 14?

Page 240

1          S. COVERICK
2      A.   Yes, as I state in my declaration.
3      Q.   Was the LOC reversed approximately
4  eight or nine minutes later?
5      A.   As I state in my declaration, the
6  exchange ledger reflected a removal of the
7  line of credit at 10:29.
8      Q.   Prior to the removal the line of
9  credit, how much had -- in value had FTX
10 liquidated from Three Arrows' accounts?
11     A.   In account value, zero dollars.
12 The -- the transactions were neutral to the
13 account value.  There was approximately
14 81 million of spot assets that were sold or
15 had sell transactions entered on the ledger
16 in exchange for the same amount of US dollar
17 balance on the -- on the ledger.
18     Q.   And those spot assets you refer
19 to, were those in GBTC, THE, FTT and ETH
20 prior to the LOC reversal?
21     A.   Those transactions occurred prior
22 to the entry of the removal of the line of
23 credit on the exchange.
24     Q.   The same -- I am sorry, I don't
25 mean to cut you off?

Page 241

1          S. COVERICK
2      A.   I am finished.
3      Q.   The same assets as reflected in
4  this document on page 28, are you seeing any
5  inaccuracies with respect to the specific
6  spot assets liquidated prior to LOC removal?
7      A.   Sitting here comparing my
8  declaration to this document, I do not see
9  any inconsistency in the tickers.
10     Q.   How much value in digital assets
11 was liquidated following the line of credit
12 reversal or removal?
13     A.   Again, there was no impact to the
14 account value.  The notional value or the --
15 notional value is not the right word, the --
16 the approximate value of the spot assets
17 that were sold, as well as the value of USD
18 that was received, was approximately
19 $1 million.  As I state in my declaration, I
20 am referring to the transaction -- the auto
21 liquidation transactions that occurred after
22 the entry of the removal of the line of
23 credit on the ledger.
24     Q.   Is that the first point at which
25 an auto liquidation was applied to Three

MAGNA
LEGAL SERVICES

Page 242

S. COVERICK

1    S. COVERICK
2    Arrows' accounts?
3         MR. GLUECKSTEIN:  Object to the
4    form.
5         A.   I am -- I have not reviewed or
6    committed to memory the entirety of 3AC's
7    account history, although I understand it is
8    in the documents that underlie my
9    declaration.  But I have not personally
10   examined every point in time.  I am not
11   personally aware of an auto liquidation
12   occurring on the 3AC accounts.  But I would
13   need my team to perform that analysis or
14   speak to my team to confirm that it never
15   happened.  I am not aware of it happening,
16   though.
17        Q.   Prior to 10:29 p.m. UTC we are
18   talking about, June 14?
19        A.   Correct.
20        Q.   What is FTX's position?  Any
21   different than what you just testified to?
22        A.   I suppose FTX's position would be
23   that I am personally not aware of those.
24   But the FTX position would be that whatever
25   the exchange ledger reflects is what

Page 243

1    S. COVERICK
2    happened.
3         Q.   And so how much was liquidated
4    following LOC reversal in an auto
5    liquidation capacity in value, spot margin
6    asset value?
7         MR. GLUECKSTEIN:  Object to the
8    form.
9         A.   I am sorry, is that different than
10   what we just discussed?
11        Q.   You may have, and I am not looking
12   at your declaration, maybe I should, just to
13   -- I am just trying to do the math on the
14   fly here, looking at the same document that
15   we have open between 82 million and change
16   and 81 million and change.
17        Do you have -- does FTX have an
18   opinion as to the amount of the -- of
19   digital assets auto liquidated?
20        A.   Between the time periods
21   referenced in paragraph 77?
22        Q.   No, I am still looking at the same
23   document that we were discussing.  Let's
24   return to your declaration.
25        Okay, well, what does your

Page 244

1    S. COVERICK
2    declaration say?
3         MR. GLUECKSTEIN:  Object to the
4    form.
5         A.   My declaration says an additional
6    1 million in assets were then auto
7    liquidated by FTX starting at 10:47 p.m.
8         And that is part of paragraph 77,
9    which references the 82 million of
10   liquidations that occurred on this -- on
11   this date, which seems consistent with the
12   figures on page 28, of this other document.
13        Q.   Is FTX aware of a method of
14   blocking the triggering of the automatic
15   liquidation process if it were to otherwise
16   be triggered?
17        A.   Yes.  As I testified earlier,
18   there were settings in the account that can
19   be turned on to prevent the auto liquidation
20   engine from being triggered.
21        Q.   Were those settings ever turned on
22   with respect to Three Arrows?
23        A.   Not to my knowledge.
24        Q.   Why -- why was 82 million
25   approximately liquidated in terms of the

Page 245

1    S. COVERICK
2    value of digital assets, why not 70 million
3    or 90 million?
4         A.   Sure.  As I mentioned earlier,
5    the -- the general process that the auto
6    liquidation followed was to attempt to bring
7    an account balance back in compliance with
8    the maintenance margin requirement.  In my
9    supplemental declaration, the table we have
10   referenced a few times where I list the
11   three time periods, you will see that
12   following the auto liquidation, so at the
13   end of day on 6:14 or beginning of day,
14   6:15, 3AC's account remained out of
15   compliance with the margin maintenance
16   requirement.  This is due to the fact that
17   the remaining spot assets in 3AC's account
18   were locked as we discussed earlier and
19   could not be sold at the exchange via the
20   auto liquidation process.
21        Q.   At what point in time were Three
22   Arrows' accounts locked?
23        A.   What do you mean by accounts
24   locked?
25        Q.   That's a fair point.  Reading the

**MAGNA**
LEGAL SERVICES

1          S. COVERICK
2    testimony from you, it says due to the fact
3    that the remaining spot assets in 3AC's
4    accounts were locked.  At what point in time
5    were the remaining spot assets in Three
6    Arrows' accounts locked?
7        A.  I am sorry --
8          MR. GLUECKSTEIN:  Object to the
9      form, misstates the testimony.
10        A.  I am sorry if there was confusion
11    in the -- in the way I described it.  It was
12    not that the remaining assets were locked at
13    that time.  When we were previously
14    discussing the existence of locked tokens,
15    so tokens that are not available for sale,
16    3AC had positions in certain locked tokens,
17    just as I reference one of the changes in
18    the amended doc 38 being pricing for locked
19    tokens, I am referring to the same type of
20    tokens, the auto liquidation tool, nor could
21    any customer sell a locked token.  Locked
22    tokens had an unlocking schedule associated
23    with them.  And that was something that
24    happened over a time period and differed by
25    ticker.  But that was why the auto

1          S. COVERICK
2    liquidation could not bring the account back
3    into compliance, because the remaining spot
4    assets were locked tickers.
5        Q.  Why wasn't the line of credit
6    reversed at 10:21 p.m. at the commencement
7    of the liquidation?
8        A.  I don't know why the steps were
9    taken in the order in which they were,
10    because that would require me to have been
11    there and spoken with the people that were
12    doing it.
13          I understand that the impact of
14    those transactions was all contempor -- or
15    that the occurrence of those steps was all
16    contemporaneous and effectuated the same
17    result.
18        Q.  And what point in time, if ever,
19    did Three Arrows total account balance drop
20    below 240 million for the first time?
21        A.  As I stated in my declaration, it
22    was some time between 1:00 a.m. and
23    2:00 a.m. on June 13 of 2022.
24        Q.  Who, if anyone, at FTX had
25    authority to remove lines of credit?  We

1          S. COVERICK
2    previously talked about authority to
3    liquidate, now I am asking the same question
4    for removing a line of credit?
5        A.  From a legal standpoint, I can't
6    provide testimony on legal authority to do
7    something.  Mechanically the person -- a
8    person able to do that in the account would
9    have had to have access to the underlying
10    code base of the exchange.  That removal was
11    the done using Python script directly into
12    the code base of the exchange.
13        Q.  I think you mentioned that the
14    liquidation consisted of 24 trades, this is
15    paragraph 70 of your declaration.  Why 24
16    trades?
17        A.  I do not know.
18          I do know that it appears based on
19    this other document, to the extent it is
20    consistent with the documents underlying my
21    declaration, is that there were different
22    trades for different tickers.  That could be
23    one reason why there were multiple trades.
24    Each ticker would represent a different
25    trade.

1          S. COVERICK
2        Q.  Why were the specific digital
3    assets manually liquidated prior to the line
4    of credit reversal?
5        A.  I, again, don't know why the
6    pre-petition management did what they did
7    and the order in which they did it.  I
8    cannot know their intent.  I do know
9    practically, as I have testified to, that
10    based on how the exchange operated, had they
11    removed the line of credit first in the
12    ledger, it would have triggered an auto
13    liquidation.
14        Q.  Was the line of credit associated
15    with any particular accounts held by Three
16    Arrows on the FTX exchange?
17        A.  My understanding is that the -- is
18    that the requirement related to the total
19    account balance of all sub accounts.  It was
20    the total account balance of the main
21    account which is the culmination these -- of
22    the various sub accounts.
23          (Whereupon, a set of discovery
24      responses from the FTX Recovery Trust
25      was marked Coverick Exhibit 32 for

S. COVERICK

1   S. COVERICK
2   identification as of this date.)
3       Q.   Mr. Coverick, you have been handed
4   Exhibit Number 32.
5       This is a set of discovery
6   responses from the FTX Recovery Trust,
7   including certain responses to
8   interrogatories issued by the joint
9   liquidators.
10      Are you familiar with this
11  document?
12      A.   Yes, sir, I am.
13      Q.   And in fact, you verified the
14  interrogatories in this document --
15  interrogatory responses I should say?
16      A.   Yes, sir.
17      Q.   On page 39, there is an
18  interrogatory.  I am sorry I misspoke, on
19  page 39, yes, page 39, there is an
20  interrogatory, it is number 5, it is a bit
21  lengthy.  Feel free to read that question
22  and let me know when you have done so?
23      A.   Yes, sir I have read it.
24      Q.   Thank you, sir, I appreciate that.
25  You will see at the very end of FTX's

S. COVERICK

1   S. COVERICK
2   recovery trust response, it says, Liquidated
3   assets were sold to the applicable
4   counterparty at applicable prices.
5       Do you see that part?
6       A.   I do.
7       Q.   So let's take that in turn
8   starting with applicable prices, what does
9   that mean?
10      A.   The prices at which those
11  transactions were transacted at, so the
12  price for each of these tickers in the
13  transaction.
14      Q.   How was that price set for the
15  liquidation transactions?
16      A.   I do not know.
17      Q.   Do you know whether it was at fair
18  market value or not?
19      A.   To understand what fair market
20  value is would require me to be able to
21  analyze the current market for
22  cryptocurrency at the time, and take other
23  factors into account such as the size of the
24  positions being liquidated relative to the
25  liquidity of the market for each ticker.

S. COVERICK

1   S. COVERICK
2   And so -- as well as other -- other
3   considerations a counterparty might have
4   regarding taking size of that nature on top
5   of considerations on the speed in which the
6   transactions were intended to be conducted
7   in or the time period over which the
8   transactions were intended to be conducted
9   over.  So I do not know -- I am not able to
10  conduct an analysis of fair market value
11  without knowing those other factors.
12      Q.   Has FTX endeavored to assess the
13  price of the assets sold out of --
14  liquidated out of Three Arrows' accounts
15  relative to those of sales involving the
16  same digital assets in the same period?
17      A.   To -- I would characterize it
18  differently, there were no assets that were
19  sold out of 3AC's accounts.  Again, the
20  transactions were on ledger transactions
21  that were value neutral, meaning the -- the
22  value of the spot position was equal to the
23  value of the USD position that was received.
24  So the total account balance did not change
25  at the moment of those transactions.

S. COVERICK

1   S. COVERICK
2       Due to the limitations that I --
3   that I just discussed, FTX has not been able
4   to conduct an analysis of the fair market
5   value of the prices those transactions were
6   transacted at.
7       Q.   Who was applicable counterparty
8   for those transactions?
9       A.   It was Alameda Research.
10      Q.   They are among the FTX debtors?
11      A.   Yes, sir, they are.
12      Q.   And does -- in their capacity as
13  the counterparty, does that mean that
14  Alameda received the proceeds of those
15  liquidation transactions?
16      A.   No, again, there were no assets
17  exchanged in the real world as a process of
18  these liquidations.  In other words, there
19  was no underlying movement of GBTC -- GBTC
20  or ETHE, on account of neither of those
21  assets existing anywhere except the exchange
22  ledger.  And there was no underlying
23  movement of FTT or ETH on the block chain
24  related to those transactions.  So Alameda
25  Research did not receive a transfer of

MAGNA
LEGAL SERVICES

Page 254

```
 1           S. COVERICK
 2   cryptocurrency from one address to another.
 3   They were on ledger transactions between
 4   those two customer accounts.
 5       Q.  What, in fact, did Alameda receive
 6   from those liquidation transactions?
 7       A.  The transactions recorded on the
 8   ledger for their account.
 9       Q.  A crediting to their account?
10       A.  A crediting of one asset for a
11   debiting of another asset.
12       Q.  The -- was Alameda the
13   counterparty with respect to both the four
14   pre-LOC removal digital assets and the post
15   LOC removal digital assets?
16       A.  I -- I do not know if Alameda was
17   the counterparty to all of the -- are you
18   referring to the $1 million of auto
19   liquidation transactions that followed the
20   $81 million?
21       Q.  Yes.
22       A.  I did not know if they were
23   counterparty to all.  It is certainly
24   possible they were counterparty to some.  I
25   haven't conducted that complete counterparty
```

Page 255

```
 1           S. COVERICK
 2   analysis.
 3           But consistent with the fact that
 4   Alameda Research was one of the largest
 5   market makers on the exchange, they were
 6   frequently involved in liquidation
 7   transactions of customer accounts.
 8       Q.  Why was Alameda selected or a
 9   participant in these particular liquidation
10   transactions?
11       A.  I do not know.
12       Q.  Did you see any documents
13   referencing that decision point?
14       A.  I cannot recall any documents that
15   referenced that decision point.
16       Q.  You don't know who at FTX proposed
17   that Alameda receive these proceeds?
18           MR. GLUECKSTEIN:  Object to the
19   form, misstates the testimony.
20       A.  Again, Alameda did not receive
21   proceeds on account of these transactions.
22   Having said that, I do not know who made the
23   decision to have Alameda be the counterparty
24   to those transactions.
25           (Whereupon, a native document was
```

Page 256

```
 1           S. COVERICK
 2   marked Coverick Exhibit 33 for
 3   identification as of this date.)
 4       Q.  Mr. Coverick, you have been handed
 5   Exhibit 33, this is another document
 6   produced in native format by FTX in this
 7   litigation.  Thank you, by the way, for your
 8   patience straining your eyesight today.  I
 9   know a few of our charts have been -- have
10   involved very small print?
11       A.  It is part of my job.
12       Q.  There is -- the name of this tab I
13   can represent is liquidation fills, you can
14   see that like with the other documents on
15   the footer of each page, do you see that?
16       A.  Yes, sir, I do.
17       Q.  What does this document show?
18       A.  I believe this document, although
19   it is not something I expressly rely on for
20   purposes of my declaration, includes
21   information about liquidation transactions.
22       Q.  Specifically with respect to Three
23   Arrows' accounts on June 14?
24       A.  I believe so, yes.
25       Q.  I see a notation under fill type,
```

Page 257

```
 1           S. COVERICK
 2   this is roughly the sixth or seventh column
 3   in, that in some cases says OTC and in
 4   others says liquidation, do you know what
 5   that means?
 6       A.  I believe it would be in reference
 7   to -- the OTC generally relates to the
 8   over-the-counter portal with Alameda
 9   Research.
10       Q.  What, if any, information does
11   this document reflect regarding the identity
12   of the counterparty to the liquidation
13   transactions?
14       A.  Again, I did not rely on this for
15   my declaration.  This appears to provide
16   detail on the counterparty to the
17   liquidation transactions.
18       Q.  And what detail does it appear to
19   provide?
20       A.  It -- it appears to provide the
21   time, amount, ticker and the parties on the
22   buy and sell side of the transaction.
23       Q.  Does it corroborate the fact that
24   Alameda was, in fact, the counterparty for
25   each of these transactions?
```

MAGNA
LEGAL SERVICES

Page 258

S. COVERICK

1
2     A.  I would need my team to confirm
3  that for me, but I have no reason --
4     Q.  I see there is a created at column
5  roughly seven or eight in, let me know when
6  you have spotted that one?
7     A.  Just to finish my last answer, I
8  have no reason to dispute that Alameda
9  Research was the counterparty to these
10 liquidation transactions.
11    Q.  Do you see the column created at,
12 maybe seven or eight in roughly?
13    A.  Yes, sir.
14    Q.  And I see created at dates that
15 follow June 13, in fact, extend to, you
16 know, for example June 15, 16, 26, et
17 cetera?
18    A.  Yes, sir.
19    Q.  I see that Alameda appears to be a
20 counterparty to those transactions as well,
21 do you see that?
22    A.  Yes, sir.
23    Q.  What does that show?
24    A.  So this is -- this would be
25 related.  And I am aware of relatively small

Page 259

S. COVERICK

1
2  in dollar amounts, but by the time in
3  question, 3AC's account balance was down to
4  $2 million after July 14.  I am aware that
5  auto liquidations occurred on the account
6  following July 14.  That is related to my
7  testimony earlier about the fact that
8  following the liquidations on June 14, 3AC's
9  account remained out of compliance with the
10 maintenance margin requirement, but could
11 not be further liquidated due to tokens
12 being locked.
13       My understanding of these
14 transactions are that they were the result
15 of those tokens unlocking in accordance with
16 the schedule set for that ticker.  And then
17 upon their unlocking and being available for
18 sale on the exchange, the auto liquidation
19 engine would kick in and liquidate those
20 positions until 3AC's account was back in
21 compliance.
22    Q.  Why did FTX conduct these
23 liquidation transactions?
24    A.  Are you asking about all of the
25 liquidation transactions in the document or

Page 260

S. COVERICK

1
2  just the ones after June 14?
3     Q.  Let's just start with the June 14
4  liquidation transactions, why did FTX
5  conduct those?
6     A.  Again, I can't -- I can't speak to
7  the intent of the management team, because I
8  was not there and I have not spoken with
9  them.  I understand the facts that I stated
10 previously, that 3AC was out of compliance
11 with their line of credit requirement as
12 well as the maintenance margin requirement.
13       I understand there is
14 communications regarding that subject.  I
15 understand and have verified that entries
16 were made on the exchange ledger to perform
17 the manual liquidations for approximately
18 $81 million that we discussed.  I understand
19 on the entry of the removal of the line of
20 credit was made on the ledger of the
21 exchange, I understand that mechanically
22 that that triggered the -- the auto
23 liquidation of an additional million dollars
24 of positions.  And I further understand that
25 after that point on June 14, mechanically

Page 261

S. COVERICK

1
2  3AC's account was still out of compliance,
3  but could not be further liquidated due to
4  its remaining spot positions being locked.
5  And that upon them unlocking in accordance
6  with the locking schedule for each ticker,
7  other auto liquidations were triggered due
8  to the same maintenance margin requirement
9  deficiencies.
10    Q.  Is FTX aware of any communications
11 that it made with Three Arrows prior to the
12 liquidation at 10:21 p.m. with respect to
13 FTX's intent to conduct such a liquidation?
14    A.  I am aware of communications that
15 I believe were -- were through Slack, which
16 is an instant messaging system, as well as
17 some emails regarding the subject.  And I
18 believe those have all been produced to the
19 joint liquidators.
20       (Whereupon, a document was marked
21       Coverick Exhibit 34 for identification
22       as of this date.)
23    Q.  You have been provided,
24 Mr. Coverick with Exhibit Number 34, is this
25 one of the types of communications you just

Page 262

S. COVERICK

1    referenced a moment ago?
2    A.   Yes, sir, it is.
3    Q.   And I will -- this one I actually
4  won't take responsibility for.  This
5  document was produced to us in a very gray
6  format.  But we have conducted -- extracted
7  -- put in the extracted text right after
8  this, so it is clear and easier for everyone
9  to review it, verbatim rendition of an email
10 from Zane Tackett on June 14 to Kyle at
11 Three Arrows Capital.com.
12         Have you seen this document
13 before?
14 A.   Yes, sir, I have.
15       MR. GLUECKSTEIN:  I am not really
16 understanding what counsel said they
17 did here, but this is not the complete
18 document.
19       MR. PROULX:  Counsel, you are more
20 than welcome to go into your production
21 database and confirm whether or not
22 this is the complete document or not.
23       MR. GLUECKSTEIN:  Okay.
24 A.   I would just restate my testimony

Page 263

S. COVERICK

1    to clarify that I believe I have seen this
2  document, but I am not verifying it is the
3  complete document.
4    Q.   And I am not asking that question.
5    A.   Understood.
6    Q.   The production records will speak
7  for themselves?
8    A.   Okay.
9    Q.   Generally speaking, what is FTX's
10 understanding about what Zane Tackett was
11 doing in this communication to Kyle on
12 June 1.  And here it does say 11:53 a.m. a
13 bit different than some of the other time
14 times that we have been looking at, eastern
15 time frame, EDT, a bit different than UTC?
16 A.   Can I take a moment to read the
17 email --
18 Q.   Yes, of course.
19 A.   -- so I can familiarize myself to
20 it.
21 Q.   All the power to you, if you can
22 read that gray version.
23         Yes, sir, thank you for allowing
24 me to read it, and I have read it.  Of

Page 264

S. COVERICK

1    course, if you need to read a document at
2  any point, just let me know.
3         In this document, is Mr. Tackett
4  providing Three Arrows advance notice of
5  FTX's intent to liquidate potentially its
6  accounts?
7    A.   I don't know what Mr. Tackett's
8  intent was.  I don't know what constitutes
9  proper notice from a legal perspective given
10 my lack of qualifications in that area,
11 which I have repeatedly referenced.
12         I do understand from a business
13 person's perspective this would constitute a
14 warning to 3AC of their noncompliance with
15 various requirements and states different
16 things that can happen, including the
17 account potentially being liquidated.
18 That's the extent of my understanding of the
19 document that was discovered.
20 Q.   FTX, in fact, in its claim
21 objection, this was previously introduced as
22 Exhibit 12, refers to FTX's having provided
23 extensive prior notice to Three Arrows
24 before initiating the liquidation.  I would

Page 265

S. COVERICK

1    be happy to point you to that or you can
2  take my representation?
3    A.   Okay, I will take your word for
4  it.
5    Q.   Any reason -- does FTX have any
6  reason to dispute that characterization?
7    A.   I do not have any reason to
8  dispute the characterization that this is a
9  form of notice.  I was just clarifying that
10 I -- I am not a lawyer so I -- I am not
11 speaking to any form of legal notice.
12 Q.   What, if any, actions could Three
13 Arrows, based on this communication and any
14 others you have seen, taken to prevent a
15 liquidation by FTX on June 14?
16 A.   There are -- there are a number of
17 things that -- that could have happened.
18 The ones that come to mind most immediately
19 are they could have deposited additional
20 funds, either fiat or cryptocurrency, into
21 their account out of the exchange, they
22 could have de-levered themselves, in other
23 words, removing open spot ticker exposure.
24 Those things would have the effect of -- in

1          S. COVERICK
2    some combination to potentially bringing
3    them back into compliance.
4        Q.   Did FTX do anything that would
5    have prevented Three Arrows from doing the
6    things you just mentioned?
7          MR. GLUECKSTEIN:  Object to the
8    form.
9        A.   No, sir, not that I am aware of.
10       Q.   Whether or not Three Arrows took
11   the actions you just described was then its
12   decision?
13       A.   Three Arrows Capital had the
14   ability to decide to deposit more assets
15   onto the exchange.  They also had the
16   ability to conduct transactions on their
17   account.
18         MR. PROULX:  I need a short break
19   here.
20         THE VIDEOGRAPHER:  We are going
21   off the record.  The time is 4:26 p.m.
22         (Whereupon, a short recess was
23   taken.)
24         THE VIDEOGRAPHER:  We are back on
25   the record.  The time is 4:43 p.m.

1          S. COVERICK
2        Q.   Mr. Coverick, you wrote in your
3    declaration that 3AC's trading changed in
4    May 18 of 2022, do you recall that?
5        A.   I do recall that.
6        Q.   I am wondering in what ways it
7    changed starting at that point?
8        A.   Let me just locate the specific
9    section.
10         The way I am referring to their
11   trading changing was with regard to it
12   opening large spot margin positions in BTC.
13       Q.   Do you know why it opened large
14   spot margin positions in BTC at that time?
15       A.   I cannot know the intent of 3AC,
16   but the economic consequence of opening
17   large, long spot positions in BTC would be
18   to profit from rises in the price of BTC or
19   incur losses from the decline in price in
20   BTC.
21       Q.   I think you also wrote in your
22   declaration about an uptick in 3AC entering
23   into BTC perp contracts around this time?
24       A.   Yes, sir.
25       Q.   And I think you actually,

1          S. COVERICK
2    somewhere in your declaration talk about the
3    number of BTC perp contracts that 3AC had
4    entered into in perhaps some period in June,
5    do you recall that testimony?
6        A.   Let me locate that.
7          Are you seeing a number of --
8        Q.   I -- I am not.  I just recall,
9    perhaps, testimony.  If I am mistaken,
10   that's fine.  Let me just ask you the simple
11   question is prior to the June 22 period, is
12   FTX aware of 3AC having entered into the
13   same number of BTC perp contracts, whatever
14   the number may have been?
15       A.   FTX is aware of the contents of
16   the ledger of the exchange, which would
17   include the number of perp contracts that
18   3AC entered into.
19       Q.   Sitting here today, you are not
20   aware of whether it had entered into a large
21   number of BTC perp contracts at this point
22   in time relative to earlier periods in time?
23       A.   Sitting here today I don't recall
24   the exact number from memory of BTC perp
25   contracts that 3AC entered into at a

1          S. COVERICK
2    specific point in time.
3          To the -- to the extent I have
4    included in that in my declaration.  I am
5    looking for it.
6        Q.   How -- does FTX have a view on how
7    Three Arrows' transactions on the FTX
8    exchange in June of 2022 differed, if at
9    all, relative to earlier time periods?
10       A.   Again, it is my understanding that
11   there was an increase in spot positions
12   acquired through the margin program as well
13   as an increase in long perpetual futures in
14   BTC during May of 2022.
15       Q.   Does in June of 2022, did the
16   pre-petition FTX debtors have a -- have
17   views on Three Arrows trading on other
18   cryptocurrency exchanges?
19         MR. GLUECKSTEIN:  Object to the
20   form.
21       A.   I am not personally familiar with
22   3AC's trading activity on other
23   cryptocurrency exchanges.
24       Q.   The same question for FTX?
25       A.   I do not recall specific documents

Page 270

```
 1          S. COVERICK
 2  regarding 3AC's trading activity on other
 3  exchanges, but that does not mean they don't
 4  exist.  It just means that I do not recall
 5  them.
 6      Q.  Is FTX aware of any instances
 7  prior to the June, mid June 2022 period
 8  where Three Arrows' USD borrowings on the
 9  exchange were eliminated or came close to
10  being eliminated?
11          MR. GLUECKSTEIN:  Objection to the
12      form.
13      A.  Are you asking if at any point in
14  time 3AC had a positive USD balance?
15      Q.  No, I am asking -- well, let me
16  ask this general question, yeah, since the
17  inception of Three Arrows' participation in
18  the margin program, is FTX aware of any
19  instances where it had a positive US dollar
20  balance?
21      A.  FTX is aware of the contents of
22  the ledger of the exchange.  I do not have
23  committed to memory the entire account
24  history of 3AC's account.
25      Q.  Does FTX have a view -- strike
```

Page 271

```
 1          S. COVERICK
 2  that.
 3          In June of 2022, did FTX have a
 4  view of Three Arrows' financial situation or
 5  financial health?
 6      A.  I cannot know what FTX had a view
 7  of or what information was available or
 8  known by the members of the pre-petition
 9  management team as of June of 2022.
10      Q.  What about at any earlier point in
11  time prior to June of 2022?
12          MR. GLUECKSTEIN:  Object to the
13      form.
14      A.  It is not possible for me to know
15  what pre-petition management knew at any
16  point in time.
17      Q.  Does FTX have a view today as to
18  when, if ever, it viewed Three Arrows as
19  insolvent?
20          MR. GLUECKSTEIN:  Objection, calls
21      for a legal conclusion.
22      A.  I understand insolvency to be a
23  legal analysis, and I have not prepared an
24  insolvency analysis regarding Three Arrows'
25  capital that I can speak to.
```

Page 272

```
 1          S. COVERICK
 2      Q.  The same of FTX, it has prepared
 3  such an analysis?
 4          MR. GLUECKSTEIN:  Objection, and
 5      caution you not to reveal any legal
 6      strategy discussions with counsel or
 7      privileged information in your answer.
 8      A.  FTX is aware of Three Arrows
 9  Capital filing the liquidation proceeding.
10  That's the extent of my personal knowledge.
11      Q.  When did it become aware of
12  FTX -- strike that, of Three Arrows filing
13  such a proceeding?
14      A.  Based on my knowledge, it would
15  have become aware when the filing was made
16  public.
17      Q.  Has FTX filed a claim against the
18  Three Arrows' estate in that BVI proceeding
19  I just -- I believe you just mentioned?
20          MR. GLUECKSTEIN:  Object to the
21      form.
22      A.  I am not aware of a claim filed by
23  the FTX Recovery Trust or the FTX debtors
24  against 3AC in their liquidation
25  proceedings.
```

Page 273

```
 1          S. COVERICK
 2      Q.  Does FTX take the position that it
 3  is a creditor with respect to Three Arrows
 4  in such proceedings?
 5          MR. GLUECKSTEIN:  Objection.  It
 6      calls for a legal conclusion.  I
 7      caution you not to reveal advice of
 8      counsel or litigation strategy.
 9      A.  I do not have personal knowledge
10  of the question.
11      Q.  Does FTX have a factual basis for
12  a creditor claim against Three Arrows in its
13  insolvency proceedings?
14          MR. GLUECKSTEIN:  The same caution
15      not to reveal legal advice from counsel
16      or litigation strategy in your answer.
17      If you have one otherwise on behalf of
18      FTX, you can offer.
19      A.  That would require a legal
20  analysis that I am not qualified to conduct.
21  I would be required to consult with counsel.
22      Q.  Did FTX Trading Ltd. prepare any
23  audited financial statements?
24      A.  It is my understanding that FTX
25  had engagement letters with, I believe from
```

1          S. COVERICK
2  memory, two different auditors.  I cannot
3  recall what the specific scope of each
4  auditor's engagement was.  So I understand
5  there were auditors that were engaged by FTX
6  pre-petition.
7      Q.  And did those auditors assist or
8  have involvement in the preparation of
9  audited financial statements?
10      A.  I do not know the scope of the
11  auditors' engagement or what they did.
12      Q.  Are you aware in such financial
13  statements of how, if at all, FTX Trading
14  Ltd. accounted for or -- or presented its
15  liabilities to customers of the exchange?
16      MR. GLUECKSTEIN:  Object to the
17      form, misstates the record.
18      A.  I am aware only that FTX engaged
19  or had engagement letters or agreements with
20  two auditor firms.  I am not aware of the
21  process or scope of those agreements.
22      Q.  Do you know how, if at all, FTX
23  trading accounted for its liabilities to
24  customers with respect to spot borrowings?
25      MR. GLUECKSTEIN:  Object to the

1          S. COVERICK
2  form.
3      A.  My only understanding of FTX's
4  pre-petition accounting practices are that
5  they were inconsistent with generally
6  accepted accounting principles and
7  international report -- financial reporting
8  standards.
9      Q.  And do you know how, if at all,
10  FTX Trading Ltd. accounted for any futures
11  contracts its exchange customers --
12  customers had entered into in such
13  statements?
14      MR. GLUECKSTEIN:  Object to the
15      form.
16      A.  My only understanding of FTX's
17  pre-petition accounting records were that
18  they were inconsistent with generally
19  accepted accounting principles and
20  international financial reporting standards.
21      Q.  What is that basis, what is that
22  based on, the view that they were
23  inconsistent?
24      A.  I would reference the first day
25  declaration as well as other filings in

1          S. COVERICK
2  general of the FTX estate regarding
3  inadequacies within the pre-petition FTX
4  organization's accounting.
5      (Whereupon, a document was marked
6      Coverick Exhibit 35 for identification
7      as of this date.)
8      Q.  You have been handed Exhibit 35,
9  Mr. Coverick, are you familiar with this
10  document?
11      A.  Yes, I believe this is a document
12  I referenced yesterday.
13      Q.  Did you know that it was produced
14  shortly before your deposition today to the
15  joint liquidators?
16      A.  Receiving it now, it is my
17  understanding it was produced some time
18  between you requesting it yesterday and me
19  seeing it now.
20      Q.  Do you see on page 2 of this
21  document -- well, let me ask you, what is
22  this document?
23      A.  My understanding of this document
24  is that it was discovered in connection with
25  the dispute with the joint official

1          S. COVERICK
2  liquidators in FTX Digital Markets.  My
3  understanding is that it is a type of
4  application in the Bahamas for what I
5  believe is referred to in the document as a
6  digital asset business.
7      Q.  So there is a date in the top it
8  says -- do you know if this document is
9  dated in any way?
10      A.  No, I do not see a date.
11      Q.  Why was FTX Digital Markets
12  Limited submitting this application, for
13  what purpose?
14      A.  I am not aware of the decision
15  making process of the management team of FTX
16  Digital Markets.
17      Q.  Well, this document was --
18  purported to be signed by Ryan Salame and
19  Samuel Bankman-Fried on the next page, am I
20  reading that correctly?
21      A.  I see that.
22      Q.  Were they among the pre-petition
23  management team of FTX Trading Ltd.?
24      A.  That's my understanding.
25      Q.  On the second page, a little bit

S. COVERICK

1
2  above the signatures -- actually in the
3  second box, right-hand column, it says,
4  Please find attached the audited financial
5  statements for FTX Trading Ltd., a
6  significant interest holder, of FTX Digital
7  Markets Ltd., do you see that?
8      A.  Yes, sir, I do see that.
9      Q.  Have you seen before the -- those
10 audited financial statements referenced in
11 that box?
12     A.  I cannot recall -- one, I do not
13 know what audited financial statements they
14 are referring to.  And I cannot recall all
15 of the financial statements I may have seen
16 earlier in the case or whether or not they
17 were formally audited.
18     Q.  It appears to me that -- you see
19 how it says please find attached, you
20 don't-- you don't see this attached, do you?
21     A.  I do not.
22        MR. PROULX:  I couldn't find that
23     in the production either.  As part of
24     the application, counsel, we request
25     the prompt production of that piece of

S. COVERICK

1
2  the document for completeness as well.
3      MR. GLUECKSTEIN:  Counsel, we have
4  produced the document as we have it in
5  our records.  We do not take ownership
6  of the document.  We have produced the
7  document in response to your requests
8  with the attachments you have not given
9  to the witness and produced with it.
10 That's the document we have.
11     MR. PROULX:  I don't understand
12 the position, but I can reiterate a
13 request.
14     MR. GLUECKSTEIN:  Our position is
15 that the document has been produced.
16 Just because it references something in
17 here doesn't mean it is actually
18 attached to the document we have.  We
19 have produced the document as it sits
20 in FTX's records.
21     MR. PROULX:  Please promptly
22 produce another document if it is not
23 attached as represented in this page.
24     MR. GLUECKSTEIN:  We are not going
25 to debate this.  The document has been

S. COVERICK

1
2  produced, there is nothing else to
3  produce, end of story.
4      MR. PROULX:  That could be the end
5  of your story, that is not the end of
6  the joint liquidators' story, the
7  request stands.
8      Q.  So we are going to turn back to
9  Exhibit 25, I probably showed it to you at
10 some point yesterday.
11     A.  I am sorry, I have a lot of
12 documents in front of me, I will try to
13 locate it.
14     Q.  I understand that, please take
15 your time?
16     A.  Okay, found it.
17     Q.  I will dispense with the
18 preliminary of what this is, I am sure we
19 dealt with that yesterday, and there are
20 discovery responses from the FTX Recovery
21 Trust, and you see that there are some
22 requests for admission on pages 28, 29, 30
23 of this document?
24     A.  I do see the request for
25 admission.

S. COVERICK

1
2      Q.  And I am specifically looking at
3  request for admission number 2 to start,
4  Admit that FTX Trading Ltd. individually was
5  solvent on each of June 12, 2022, June 13,
6  June 14, as the debtors use the term solvent
7  in the disclosure statement and in the Ray
8  declaration, do you see that request?
9      A.  I do.
10     Q.  And then FTX Recovery Trust
11 responds subject to and without waiver of
12 its objections, the FTX Recovery Trust
13 denies request for admission number 2, do
14 you see that response?
15     A.  Yes, sir, I do.
16     Q.  What is the factual basis for that
17 denial?
18     MR. GLUECKSTEIN:  Object to the
19 form, calls for a legal conclusion as
20 to solvency.
21     A.  I have nothing further to add to
22 the language on this page.
23     Q.  How does FTX define solvency in
24 responding to this request for admission?
25     MR. GLUECKSTEIN:  Objection, calls

Page 282

S. COVERICK

1     S. COVERICK
2  for a legal conclusion.
3     A.  I have nothing further to add
4  other than the language on the page.
5     Q.  Does FTX have a good faith basis,
6  factual basis for denying this request for
7  admission?
8     A.  Again, I have nothing further to
9  add than the language on the page.
10     Q.  The same questions for request for
11  admission number 3, admit that the dot com
12  silo collectively was solvent on each of the
13  same dates pursuant to the same definitions
14  and the response in sum and substance was
15  the same.
16       Do you see that there?
17     A.  I do.
18     Q.  What is the factual basis for the
19  denial of request for admission number 3?
20       MR. GLUECKSTEIN:  Objection, calls
21     for a legal conclusion.
22     A.  Again, I am not a lawyer.  I see
23  the language on the page and the objections
24  it references, and I have nothing further to
25  add.

Page 283

S. COVERICK

1     S. COVERICK
2     Q.  In preparation for your
3  deposition, did you discuss any factual
4  basis with anyone for the denials of these
5  requests for admission?
6       MR. GLUECKSTEIN:  Object to the
7     form and advise you not to reveal any
8     legal advice or discussions with
9     counsel regarding the issue.
10     A.  I am afraid I don't believe I can
11  answer that question without revealing
12  conversations with counsel.
13     Q.  Okay.  Without revealing the
14  substance of any communications with
15  counsel, did you discuss the responses for
16  these requests for admission in connection
17  with your deposition preparation?
18     A.  I dis -- I discussed the fact that
19  it was included in the 30(b)(6) deposition
20  notice.  I discussed the fact that these
21  were the responses, those are the things
22  that I discussed.
23     Q.  But no factual basis for those
24  responses?
25     A.  I am sorry, can you clarify the

Page 284

S. COVERICK

1     S. COVERICK
2  question.
3     Q.  As I understand your testimony as
4  you discussed the fact of the responses, and
5  I am asking about whether you discussed the
6  factual basis for the responses with
7  counsel?
8     A.  My understanding is that solvency
9  is a technical analysis that requires legal
10  conclusions that I am not qualified to make.
11  But I have nothing further to add than that.
12     Q.  How did customer entitlements to
13  digital assets on the FT -- FTX exchange on
14  the petition date compare to the digital
15  assets in the FTX addresses or wallets on
16  the petition date?
17     A.  I am sorry, I think I understood
18  the question, but can you just repeat it one
19  time, please.
20     Q.  As always, of course.
21       How did customer entitlements to
22  digital assets on the exchange as of the
23  petition date compare the digital assets in
24  FTX's addresses or wallets on that same
25  date?

Page 285

S. COVERICK

1     S. COVERICK
2       MR. GLUECKSTEIN:  Object to the
3     form.
4     A.  In general there was a significant
5  shortfall of assets, including
6  cryptocurrency and fiat currency, in the
7  possession of the FTX Recovery Trust as
8  compared to estimated customer entitlements
9  as of the petition date.
10     Q.  Well, the FTX Recovery Trust
11  didn't exist until January of 2025, no?
12     A.  I am sorry, did I say FTX Recovery
13  Trust?
14     Q.  I am just reading the transcript?
15     A.  If I said FTX Recovery Trust, you
16  are correct, it did not exist, I misspoke.
17  I would be referring to FTX Trading Ltd.
18     Q.  Okay.  What about any -- what
19  about the addresses or wallets held by other
20  FTX debtor entities, how does that
21  comparison shake out in that situation?
22       MR. GLUECKSTEIN:  Object to the
23     form.
24     A.  In general the assets held by the
25  FTX Recovery Trust -- I am -- I am sorry, I

MAGNA
LEGAL SERVICES

S. COVERICK

1
2  did it again.  In general the assets held by
3  the FTX group, the FTX debtors were lower
4  than the aggregate value of claims estimated
5  as of the petition date.
6      Q.  At what other points in time was
7  that analysis conducted with respect to the
8  FTX group?
9      A.  The primary point in time that I
10  can recall was the petition date.  I cannot
11  recall specific analyses of prior shortfall
12  calculations as I sit here today.
13      Q.  Did FTX conduct any such analysis
14  again with respect to the FTX group in, for
15  example, June of 2021 -- strike that, I -- I
16  misspoke just then, I meant June of 2022?
17      A.  Okay, I am aware of analysis that
18  was done to look at entitlements in certain
19  coins as compared to assets in the
20  possession of FTX Trading Ltd. I am not
21  aware of an analysis of the comprehensive
22  holdings of assets in June of 2022 for the
23  entire FTX group.
24      Q.  Are you suggesting that you are
25  aware of such an analysis in June of 2022

S. COVERICK

1
2  specifically with respect to FTX Trading
3  Ltd.?
4      A.  I am aware that my team looked at
5  certain points in time.  And I am also aware
6  one of those points in time was June of 2022
7  with respect to certain coins or certain
8  tickers of customer entitlements as compared
9  to the holdings of FTX Trading Ltd.
10      Q.  What specific tickers, by way of
11  example only, were included in that
12  analysis?
13      A.  I am not aware of all tickers, as
14  I sit here today, that may or may not have
15  been analyzed.  I do know, for example, that
16  bitcoin was one of the tickers that was
17  analyzed and reviewed over different time
18  periods.  And I also understand that
19  ethereum was another coin that -- that my
20  team has looked at in terms of shortfalls at
21  different points in time.
22      Q.  And what did those analyses show
23  with respect to that comparison in June of
24  2022?
25      A.  Based on information my team has

S. COVERICK

1
2  conveyed to me, my understanding is that
3  aggregate customer entitlements in bitcoin
4  exceeded the bitcoin in the possession of
5  FTX Trading Ltd. in June of 2022 -- is that
6  the full question, just bitcoin?
7      Q.  I was asking for an example of a
8  ticker?
9      A.  So for bitcoin there was a
10  shortfall in June of 2022, according to my
11  team's review of the block chain and the --
12  the exchange ledger.
13      Q.  What about any other tickers, did
14  any of the analyses show that with respect
15  to those other tickers FTX Trading held a
16  surplus of such assets relative to the
17  corresponding customer entitlements?
18      A.  I am not aware of any such
19  surplus.  But again, I have not personally
20  reviewed any analysis of all tickers on any
21  such date other than the petition date.
22      Q.  Was ETH or ethereum, I may be
23  mispronouncing that, one of the tickers that
24  were reviewed in the June 2022 period with
25  respect to FTX Trading?

S. COVERICK

1
2      A.  Yes, I believe it was.
3      Q.  What did that analysis show, if
4  anything?
5      A.  My recollection is that that
6  analysis showed where my team's conclusion
7  reviewing the available information was that
8  there were a greater value of the customer
9  entitlements for ethereum than a ethereum in
10  the possession of FTX Trading Ltd.
11      Q.  As part of that analysis, did FTX
12  rely on documents showing the total quantity
13  and amount of customer assets in these
14  digital assets in the June 2022 time period?
15      MR. GLUECKSTEIN:  Object to the
16  form.
17      A.  My team and almost all analyses
18  they perform on the FTX exchange, the source
19  of that -- the source data for that analysis
20  would be the exchange ledger itself.
21      Q.  What other points in time, if any,
22  in April or May of 2022, did FTX conduct
23  these analyses you just referenced?
24      A.  I am not -- I can't recall every
25  specific point in time my team may or may

Page 290

S. COVERICK

1    not have looked at. I am aware of June 2022
2    specifically, because I asked my team if
3    they looked at that period specifically, and
4    they informed me that they did.
5        Q.   And did you ask your team in
6    connection with this litigation
7    specifically?
8        A.   That is part of the discussions I
9    have had with my team in preparation for the
10   deposition.
11       Q.   Are you aware that we requested,
12   the joint liquidators requested documents
13   sufficient to show the total quantity and
14   amount of customer deposits for each digital
15   asset on the FTX exchange on each of
16   June 12, June 13 and June 1, 2022, as well
17   as the total quantity and amount of each
18   digital asset that the pre-petition debtors
19   held, possessed or otherwise controlled
20   categorized by type of asset on those same
21   dates?
22       A.   That sounds familiar.
23       Q.   And FTX conducted that analysis to
24   respond to that inquiry?

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 291

S. COVERICK

1        MR. GLUECKSTEIN:  Object to the
2    form.  Misstates the testimony.
3        A.   That is not what I said.  I had
4    said that my team from time to time has
5    examined the available information to assess
6    whether there were shortfalls for a
7    particular tickers.  The analysis was not
8    done explicitly relating to my deposition.
9    I only stated that I asked my team if they
10   had ever looked at certain tickers in that
11   time period.  And my team communicated to me
12   that they had analyzed data and verified
13   that there were shortfalls in those two
14   tickers that I can specifically remember.
15       Q.   I wasn't asking about your
16   deposition or deposition preparation in any
17   way.  My question was asking about this
18   litigation more generally, so that analysis
19   that I described has been done more
20   generally --
21       MR. GLUECKSTEIN:  Objection.
22       Q.   -- in this litigation or not?
23       MR. GLUECKSTEIN:  Object to the
24   form, misstates testimony.

Page 292

S. COVERICK

1        A.   I am only saying that I am aware
2    my team has looked at shortfalls for
3    different time periods.
4        Q.   And were June 12, 13 and/or 14,
5    2022 among those time periods?
6        A.   I cannot recall the specific
7    dates.  I can only recall that June of 2022
8    was a time period that was looked at.
9        Q.   Are you aware that in response to
10   that request the FTX Recovery Trust says --
11   stated that following a reasonable search it
12   has not identified additional non-privileged
13   documents responsive to this document
14   request?
15       A.   Is that in this packet?
16       Q.   It may not be.  I am making a
17   representation to you?
18       A.   Okay, I will take your word for
19   it.
20       Q.   Thank you.  Are you aware of that
21   response from the FTX Recovery Trust?
22       A.   Based on your representation I am
23   aware of it.
24       Q.   Are you aware of any

Page 293

S. COVERICK

1    non-privileged documents that are -- that
2    are -- that describe the sort of analyses
3    you just described here?
4        A.   As I said, I spoke with my team.
5    I am not aware or cannot recall any specific
6    documents.  Just because my team analyzes
7    something, oftentimes that analysis is
8    something that happens in discussion or
9    contemporaneously with looking at data.  Not
10   every analysis is formally documented.
11       Q.   I think I am going to ask a
12   question about what I hope is the same
13   document, if you turn to the request for
14   admission number 6 on page 30.
15       This asks, Admit that FTX did not
16   and does not have a valid and enforceable
17   security interest in any assets in or
18   allocated to 3AC's accounts between June 12,
19   2022 and June 14, 2022 inclusive.
20       Do you see that request?
21       A.   Yes, sir, I do.
22       Q.   And -- and what was the FTX
23   Recovery Trust response for this request for
24   admission?

MAGNA
LEGAL SERVICES

Page 294

1          S. COVERICK
2      A.   The response is written on the
3  bottom of page 30 and continues to the top
4  of page 31.
5      Q.   Would you indulge me on just
6  reading this one in, hopefully I spared you
7  from reading too much on the record?
8      A.   I would be happy to, I would be
9  happy to.
10          The response to request for
11  admission number 6 reads, The FTX Recovery
12  Trust incorporates by reference the general
13  objections, objections to definitions and
14  objections to instructions as set forth
15  above.  Subject to and without waiver of its
16  objections, the FTX Recovery Trust admits
17  that FTX did not have a security interest in
18  any assets associated with the 3AC accounts
19  between June 12 and June 14, 2022, because
20  FTX owned all assets associated with 3AC
21  accounts prior to the effective date at
22  which point all assets were transferred to
23  the FTX Recovery Trust.
24      Q.   So I don't believe that effective
25  date was defined.  Do you know what that

Page 295

1          S. COVERICK
2  means as used in this response?
3      A.   From my understanding it would be
4  the effective date of the plan, which
5  occurred at the beginning of January of
6  2025.
7      Q.   Does FTX have any other factual
8  bases for denying this request for admission
9  or admitting it?
10          MR. GLUECKSTEIN:  Objection to the
11  extent it calls for a legal conclusion.
12      A.   Again, with any matters related to
13  customer property rights, that's a legal
14  matter.  I am not qualified to offer a legal
15  conclusion.  The factors that I know that
16  are related to the topic include the
17  traceability of assets which I testified to,
18  I believe, yesterday.  My other general
19  knowledge in terms of factual basis would be
20  the confirmation order.
21      Q.   And do you -- do you -- is it your
22  testimony that both of those topics relate
23  to ownership in some way?
24      A.   It is -- it is my testimony that I
25  understand those topics including

Page 296

1          S. COVERICK
2  traceability to be a topic that is discussed
3  when discussing property rights.  I am not a
4  lawyer, so I can't speak to the application
5  of that.  It is my business person's
6  understanding that the confirmation order
7  included -- included orders as it relates to
8  this topic.
9      Q.   If FTX is found not to own the
10  assets associated with 3AC's accounts on
11  these dates, does it have a factual basis
12  for denying this request for admission in
13  that situation?
14          MR. GLUECKSTEIN:  Objection, calls
15      for a legal conclusion.
16      A.   In addition to the fact that I am
17  not a lawyer and I am not qualified to offer
18  a legal opinion, that is a hypothetical
19  scenario that even further renders me unable
20  to answer the question.
21      Q.   Well, sitting here today, other
22  than its position with respect to ownership,
23  does FTX have any factual bases to assert a
24  valid enforceable security interest in these
25  assets?

Page 297

1          S. COVERICK
2          MR. GLUECKSTEIN:  Objection, calls
3      for a legal conclusion.
4      A.   Again, given I am not an attorney,
5  I am not qualified to offer opinions on
6  security interests.
7      Q.   And just so the record is as clear
8  as possible, that's FTX's answer as well?
9      A.   FTX's answer is that a non-lawyer
10  is not qualified to provide opinions on
11  security interests.
12      Q.   A non-lawyer that is designated as
13  its representative?
14          MR. GLUECKSTEIN:  Objection,
15      argumentative.
16      Q.   You can answer?
17      A.   The designation of a 30(b)(6)
18  representative is a legal topic that I am
19  not qualified to provide a response to.
20      Q.   As a factual matter, is -- is FTX
21  aware of any entity serving as a collateral
22  agent of it with respect to the collateral
23  that customers provided via the exchange?
24          MR. GLUECKSTEIN:  Object to the
25      form.

MAGNA
LEGAL SERVICES

Page 298

S. COVERICK

1
2     A.   I cannot recall a document that
3  uses those words.
4     Q.   Any similar words used by a
5  document that you can recall sitting here
6  today?
7     A.   I cannot recall the specific use
8  of the words collateral agent in a certain
9  document.  That does not mean that they
10  don't appear in a document that I have seen.
11  It just means I can't recall it as I sit
12  here today.
13     Q.   I have a couple of questions about
14  a few more documents that were recently
15  produced to us.  Thanks for your patience.
16  Just give me a moment here, I will stay on
17  the record.
18        (Whereupon, a document in native
19     form was marked Coverick Exhibit 36 for
20     identification as of this date.)
21     MR. PROULX:  We are going to pull
22     up another document on the computer,
23     just to preview what is coming.  Thanks
24     for your patience as we do that.
25     Q.   So Mr. Coverick, before you look

Page 299

S. COVERICK

1
2  at the screen, hopefully you have been
3  handed an exhibit, it is number 36, another
4  document produced in native format by FTX in
5  this litigation.
6        Did you get the slip sheet just to
7  make sure you have all the papers on stack
8  on your end?
9     A.   Yes, sir.
10     Q.   Okay, I just want to make sure.
11        Is it showing on your screen now?
12     A.   Yes, sir, it is.
13     Q.   This is a document heading in a
14  bunch of zeroes followed by 8.  I believe it
15  has colloquially referred to as doc 8
16  informally by the parties in this
17  litigation.  The tab title underneath it is
18  request underscore 1051 underscore spot
19  margin borrow.
20        Do you see all that so far?
21     A.   Yes, sir, I do.
22     Q.   And to make it easier for us, do
23  you see there is a main account ID number
24  all the way to the left, information about
25  funding time, size, hourly rate, cost, among

Page 300

S. COVERICK

1
2  other fields.  Is this one of the
3  spreadsheets you relied on for purposes your
4  original or supplemental analysis?
5     A.   It is one of the source documents
6  that includes the source data that I relied
7  upon.
8     Q.   And what generally speaking does
9  this document reflect?
10     A.   This is -- my understanding of
11  this document is that it is the -- we refer
12  to it as the spot margin borrows table.
13     Q.   And I am sorry, I don't know if
14  that was responsive.  I am asking what is
15  the content of the document, I am not asking
16  for the detail, but what generally speaking
17  does it show?
18     A.   It generally shows information
19  regarding the borrowing of an exchange
20  account.
21     Q.   And here is it specifically
22  showing borrowing by Three Arrows' exchange
23  accounts?
24     A.   That is my understanding, yes.
25     Q.   When you say borrowing, is that

Page 301

S. COVERICK

1
2  spot margin borrowing, negative USD
3  borrowing or some other type of borrowing?
4     A.   My understanding is that it is the
5  spot margin borrowing.
6     Q.   And in which field is this spot
7  margin borrowing reflected in this document?
8     A.   I believe the position is located
9  in the size column.
10     Q.   When you say the position, you
11  mean the spot margin borrower position?
12     A.   Correct.
13     Q.   I -- I see there is this field
14  funding time just to the left of that, do
15  you see that as well?
16     A.   Yes, sir, I do.
17     Q.   I am happy to make a
18  representation that we have not changed the
19  data in any way here, this is exactly how it
20  was produced to us in native form.  It seems
21  like there might be a conversion required to
22  get to those actual dates and in a usable
23  form.  I am attempting to do that here, do
24  you see what I have just done there?
25     A.   Yes, sir, I do.

Page 302

S. COVERICK

1
2     Q.   And if we go to row cell K11194,
3  you see that -- let me know if you need me
4  to Zoom in or anything, but this fund time
5  is now identified as June 13, 2022,
6  12:00 a.m., do you see that?
7     A.   Yes, sir, I do.
8     Q.   Moving one column to the right
9  then onto the size, I am happy to convert
10 that to a more user friendly format, but my
11 question is, what, if anything, does this
12 document show about 3AC's spot margin borrow
13 position at that date and time, June 13,
14 2022, at midnight?
15    A.   It shows that at that time 3AC had
16 a spot margin borrow position of
17 $631,287,133 and 10 cents.
18    Q.   And is that across all 3AC
19 accounts or with respect to a specific 3AC
20 account or accounts?
21    A.   That is with respect to the
22 subaccount it was borrowing on.
23    Q.   I believe yesterday you may have
24 referred to a specific account or subaccount
25 as the main or primary account, does this

Page 303

S. COVERICK

1
2  match your recollection as well?
3     A.   Yes, sir.
4     Q.   And is this that account?
5     A.   The main account is the summation
6  of all accounts, all subaccounts as I
7  understand it.  But this subaccount that is
8  referenced here in the account ID is the
9  subaccount I was referencing as the account
10 that had the most activity, the subaccount
11 that had most activity within 3AC's
12 accounts.
13    Q.   Thank you for that.  You could put
14 the computer to the side for the moment?
15    A.   Okay.
16    Q.   Yesterday we talked briefly about
17 A & M's compensation in this matter.  We had
18 requested an engagement letter, do you
19 recall that from your counsel?
20    A.   I recall us having -- I recall you
21 saying that, yes.
22    Q.   And if I recall, A & M has a new
23 engagement letter with the FTX Recovery
24 Trust specifically; is that correct?
25    A.   Following the effective date, A &

Page 304

S. COVERICK

1
2  M entered into an engagement letter with the
3  FTX Recovery Trust, yes.
4     Q.   For the record, we are still
5  waiting on production of that particular
6  engagement letter from your counsel.
7          Do you know if anyone at Alvarez &
8  Marsal's compensation is affected in any way
9  by the outcome of this litigation
10 specifically with Three Arrows?
11    A.   No one's compensation at Alvarez &
12 Marsal is affected by the outcome of this
13 litigation.
14    Q.   In his capacity as plan
15 administrator for the FTX Recovery Trust, do
16 you know how Mr. John Ray is compensated?
17    A.   My understanding in accordance
18 with the plan administration agreement is
19 that Mr. John Ray is compensated on a rates
20 time hours basis as dictated by the board of
21 directors of the FTX Recovery Trust.
22    Q.   Does any of his compensation
23 structure -- is any of his compensation
24 structure impacted by the total amount of
25 allowed or disallowed customer claims in the

Page 305

S. COVERICK

1
2  FTX bankruptcy?
3     A.   No.
4     Q.   Is any component of his
5  compensation structure impacted by the total
6  number of distributions that the FTX
7  Recovery Trust makes to creditors of the
8  estate?
9          MR. GLUECKSTEIN:  Object to the
10 form.
11    A.   Mr. Ray's compensation structure,
12 as I described it, is on an hours times rate
13 basis, which is not tied to the outcome in
14 this litigation nor the amount of the
15 distributions made to creditors or the
16 amount of allowed claims.
17    Q.   Do you have a sense of how much
18 Alvarez & Marsal has in the aggregate
19 received in compensation over the course of
20 the FTX bankruptcy proceeding?
21    A.   I do not recall the specific
22 number.  But I do know it is disclosed in
23 both of the post confirmation quarterly
24 reports that are filed on the Chapter 11
25 docket as well as our final fee application.

MAGNA
LEGAL SERVICES

Page 306

```
1              S. COVERICK
2      Q.  When was the final fee application
3  submitted roughly speaking?
4      A.  I -- I can't be certain of the
5  date, but it would have been some time after
6  the confirmation order was entered.
7          MR. PROULX:  We are going to take
8  our final break here, Jeremy, can we go
9  off the record, please.
10          THE VIDEOGRAPHER:  We are off the
11  record, the time is 5:40 p.m.
12          (Whereupon, a short recess was
13  taken.)
14          THE VIDEOGRAPHER:  We are back on
15  the record.  The time is 6:03 p.m.
16          MR. PROULX:  Mr. Coverick, we
17  appreciate your time over the last
18  couple of days.  You have beared with
19  us with a number of exhibits, some fine
20  print, some technology swaps with --
21  with our laptop in front of you here, I
22  think you handled it all ably, and we
23  appreciate your responses where --
24  where provided.
25          We are reserving the right to and
```

Page 307

```
1              S. COVERICK
2  will be working with your counsel here
3  to schedule an additional hour of
4  testimony at a mutually agreeable time
5  regarding the supplemental declaration,
6  the content of the supplemental
7  declaration that you filed on last
8  Friday.
9      Q.  Do you understand that arrangement
10  will -- will be made, has not yet been made
11  between counsel?
12      A.  I understand.
13          MR. PROULX:  We will work
14  off-line, of course, with -- with
15  counsel here with respect to that
16  scheduling.  We are potentially
17  amenable, just so you know, to do so in
18  a remote capacity to keep your life
19  easier.
20          We are keeping open the portions
21  of this deposition on topics other than
22  your supplemental declaration as well
23  where the testimony provided has not in
24  the joint liquidators' view shown
25  adequate preparation with respect to
```

Page 308

```
1              S. COVERICK
2  those topics.  We reserve all rights as
3  to those issues, otherwise subject to
4  those qualifications, we have concluded
5  your deposition here today.
6          Thank you for your time.
7          MR. GLUECKSTEIN:  So for the
8  record, we will work with counsel on
9  the one hour.  We appreciate you
10  indicating perhaps doing that remotely
11  would be efficient for the parties.
12  But we will talk to you about that at a
13  mutually agreeable time.
14          We disagree that anything will be
15  left open here with respect to the
16  testimony that has been offered or any
17  characterization of Mr. Coverick or
18  FTX's testimony.  But of course all
19  parties rights are reserved.  And with
20  that, I think we will conclude.
21          MR. PROULX:  And we are not yet
22  off the record.  We reiterate our
23  request over the last two days, Brian,
24  Sam and others, with respect to the
25  documents that we believe should have
```

Page 309

```
1              S. COVERICK
2  been produced but have not.
3          MR. GLUECKSTEIN:  We took those
4  under advisement and remain so.
5          THE VIDEOGRAPHER:  This concludes
6  today's deposition of Steven Coverick
7  FTX 30(b)(6) day two witness.  The time
8  is 6:06 p.m.
9          THE COURT REPORTER:  Would you
10  like the rough?
11          MR. GLUECKSTEIN:  Rough, and
12  expedited for Monday.
13          (Whereupon, at  6:06 P.M.,  the
14  Examination of this witness was
15  concluded.)
16
17              °   °   °   °
18
19
20
21
22
23
24
25
```

Page 310

```
 1              S. COVERICK
 2            D E C L A R A T I O N
 3
 4      I hereby certify that having been first
 5  duly sworn to testify to the truth, I gave
 6  the above testimony.
 7
 8      I FURTHER CERTIFY that the foregoing
 9  transcript is a true and correct transcript
10  of the testimony given by me at the time and
11  place specified hereinbefore.
12
13
14
          _____
15          STEVEN COVERICK
16
17
18  Subscribed and sworn to before me
19  this _____ day of _____ 20___ .
20
21
          _____
22          NOTARY PUBLIC
23
24
25
```

Page 311

```
 1              S. COVERICK
 2              I N D E X
 3
 4  EXAMINATION BY              PAGE
 5    MR. PROULX            5
 6
 7            E X H I B I T S
 8
 9  COVERICK EXHIBITS
10
11  EXHIBIT      EXHIBIT
12  LETTER       DESCRIPTION      PAGE
13
14   19        Document          8
15   20        Line of credit document 41
16   21        Line of credit document 51
              produced in native format
17
18   22        Document          93
19   23        Document entitled FTX 120
              Advisory Board Meeting
20            for September 19, 2022
21   24        Transcript of testimony 31
              given by Samuel
22            Bankman-Fried in his
              criminal proceeding on
23            October 27, 2023
24   25        Responses to the joint 137
              liquidators seventh set
25            of interrogatories
```

Page 312

```
 1              S. COVERICK
 2  COVERICK EXHIBITS
 3
 4  EXHIBIT      EXHIBIT
 5  LETTER       DESCRIPTION      PAGE
 6
 7   27        Short message report, 175
              date range 6/29/2022
 8   28        Slip sheet        181
 9   29        Document entitled 194
              Debtors Responses and
10            Objections to the Foreign
              Representatives of Three
11            Arrows Capital Ltd.
12   30        Document titled   216
              Supporting Analysis for
13            the Three Arrows Capital
              Discussions
14
15   31        Slipsheet         221
16   32        Set of discovery  250
              responses from the FTX
17            Recovery Trust
18   33        Native document   256
19   34        Document          261
20   35        Document          276
21   36        Document in native 298
              form
22
23
24
25
```

Page 313

```
 1              S. COVERICK
 2            C E R T I F I C A T E
 3
 4  STATE OF NEW YORK       )
                : SS.:
 5  COUNTY OF QUEENS        )
 6
 7      I, RIVKA TROP, a Notary Public for and
 8  within the State of New York, do hereby
 9  certify:
10      That the witness whose examination is
11  hereinbefore set forth was duly sworn and
12  that such examination is a true record of
13  the testimony given by that witness.
14      I further certify that I am not related
15  to any of the parties to this action by
16  blood or by marriage and that I am in no way
17  interested in the outcome of this matter.
18      IN WITNESS WHEREOF, I have hereunto set
19  my hand this 25th day of September, 2025.
20
21
22
          _____
23          RIVKA TROP
24
25
```

**A**

**ability**
6:21 7:2 128:24
158:10 162:8
178:20 188:17,18
234:4 266:14,16
**able**
16:22 39:16 40:6,8
45:17 77:8 95:18
109:20 154:23,24
162:22 164:25
169:19 211:13
212:2 248:8 251:20
252:9 253:3
**ably**
306:22
**ABM**
99:24
**about**
8:12 9:2 13:24 18:11
34:4 42:18,20 43:24
43:25 46:16 61:14
62:6 82:3 101:12
102:4 104:24
105:15 109:25
115:24 116:2 118:4
125:6 148:5 149:24
150:2 152:17
155:10 157:18
161:19 177:19
180:5 181:17
189:16,22 195:19
202:21 205:5
208:17 218:15
224:15 227:7
228:21 242:18
248:2 256:21 259:7
259:24 263:11
267:22 268:2
271:10 284:5
285:18,19 288:13
291:16,18 293:13
298:13 299:24
302:12 303:16
308:12

**above**
19:8,9,12,17 30:9
48:2 77:25 81:3
83:13 89:8 96:5
97:12 139:23 156:2
159:21 278:2
294:15 310:6
**abruptly**
128:14 136:3
**absence**
187:19
**absent**
26:19,22 38:21 39:5
40:7 64:8 65:8,15
65:22 86:25 87:8
96:7 97:10 229:13
**absolute**
72:7 204:22,24
**accept**
88:3
**accepted**
275:6,19
**access**
46:25 72:13,15
122:16 178:6,15,16
178:22 180:12,15
180:19 181:3
187:25 188:2,3,3,9
188:14,18 215:6
233:11,14,16,19
234:2 248:9
**accessed**
187:5
**accessing**
48:3 178:9 179:9,17
183:7,8,15,16 185:8
234:5
**accordance**
180:22 259:15 261:5
304:17
**according**
142:13 187:8,9
288:10
**accounted**
22:3 65:5 147:21,23

150:19 274:14,23
275:10
**accounting**
128:8 146:22 148:9
166:23 169:16
193:6 215:15 275:4
275:6,17,19 276:4
**account's**
27:5 108:20 227:25
**accrual**
65:20
**accrue**
65:17,21
**accrued**
170:21
**accruing**
166:17
**accuracy**
68:24,25 123:17,23
124:2,5 133:5
**accurate**
60:13 88:11 160:20
161:6 202:6 239:5
**accurately**
38:17 59:18 91:9
124:24 209:19
**acknowledgment**
15:19
**acquired**
138:2 269:12
**acronym**
88:4
**across**
207:25 302:18
**act**
119:5 154:23
**acted**
7:13
**action**
313:15
**actions**
265:13 266:11
**active**
112:24 231:16
**actively**

112:10
**activities**
111:17 168:12
**activity**
114:2 169:2 182:6
183:2 185:4,24
269:22 270:2
303:10,11
**actual**
301:22
**actually**
23:14 80:13 137:17
182:4 206:17
223:25 262:4
267:25 278:2
279:17
**Adam**
2:8 5:4
**add**
62:12 69:14 84:14
281:21 282:3,9,25
284:11
**added**
12:11 28:22 29:5,10
31:3 78:14 84:19,24
85:17,22,23 90:13
94:14 95:11 96:2,11
96:12 201:7
**addition**
72:7 296:16
**additional**
7:18 11:14 27:7 63:4
90:16 91:7 100:15
114:12 118:20,24
124:23 139:19
229:20,21 244:5
260:23 265:20
292:13 307:3
**address**
61:7 184:12 254:2
**addressed**
196:8
**addresses**
284:15,24 285:19
**adequate**



113:2 307:25
**adjudication**
191:17
**administration**
304:18
**administrator**
304:15
**admission**
280:22,25 281:3,13
  281:24 282:7,11,19
  283:5,16 293:15,25
  294:11 295:8
  296:12
**admit**
281:4 282:11 293:16
**admits**
294:16
**admitting**
295:9
**advance**
199:20 264:5
**advanced**
171:19 191:9,11
  192:14 193:12
  196:12 200:3,4,13
  200:14 201:14
**advancing**
199:21
**advice**
273:7,15 283:8
**advise**
283:7
**advisement**
309:4
**adviser**
64:21 213:12
**advisors**
197:5
**Advisory**
120:12,19 121:10
  311:19
**affect**
87:19
**affected**
304:8,12

**affects**
75:11
**affiliated**
137:20 160:12 166:6
  166:7 167:11 170:4
  170:11 172:12
  175:17 177:8
  183:25 219:18
  226:3,8
**affiliates**
114:19 225:21
**affiliation**
169:13
**afraid**
283:10
**after**
36:19,25 50:23 55:3
  65:7,11 84:11 87:9
  87:11,16,18 115:9
  165:21 201:4
  238:18 241:21
  259:4 260:2,25
  262:8 306:5
**again**
6:4 14:4 16:19 19:19
  24:14 33:20 34:16
  37:6 43:5,25 45:5,8
  45:12,21 46:4 48:18
  49:11 50:13 62:4
  63:19 65:15 68:3
  73:6 74:4,17 77:22
  89:22 90:24 91:5
  96:17 100:6 103:23
  104:15 105:21
  107:14 116:17,20
  118:23 125:14,25
  126:20 130:16
  142:16 144:4,25
  153:2 154:22 157:9
  163:24 164:21
  170:2 174:20 180:7
  183:10,21 184:24
  185:12,22 186:17
  187:21 189:5
  201:22 212:9 226:6

226:12 229:3,9
  234:13,24 237:21
  239:7 241:13 249:5
  252:19 253:16
  255:20 257:14
  260:6 269:10 282:8
  282:22 286:2,14
  288:19 295:12
  297:4
**against**
84:4 272:17,24
  273:12
**agent**
297:22 298:8
**aggregate**
10:9 22:13 147:10
  148:11,16,17
  191:20 225:17
  286:4 288:3 305:18
**aggregated**
71:18
**ago**
25:11 53:10 58:15
  123:20 158:19
  199:23 262:2
**agree**
34:5 134:8 147:17
**agreeable**
307:4 308:13
**agreed**
147:8
**agreement**
7:9,24 8:15 33:12
  35:14 45:16 66:2
  88:23 99:21,23
  172:18 304:18
**agreements**
41:14 274:19,21
**ahead**
30:3
**al**
1:3 2:6 4:7
**Alameda**
114:23 115:3,15,19
  115:19 119:13,14

119:21 120:2,2
  162:13,21 163:5,6
  163:10 164:4,14,17
  164:24 165:5,9,16
  165:21 167:4 169:4
  169:5 174:22
  219:17,23 220:13
  220:15,19 223:24
  225:2,10 226:19
  253:9,14,24 254:5
  254:12,16 255:4,8
  255:17,20,23 257:8
  257:24 258:8,19
**Alameda's**
170:13
**algorithm**
92:2,19 104:2 108:22
  113:6 156:5,6
  214:16,18 231:4
**algorithmic**
215:7
**algorithms**
178:24
**all**
4:21 7:14 12:5 29:13
  37:7 48:20,21,21
  49:18 50:22 52:7
  69:14 70:22 75:9
  78:6 84:2,4 86:3
  87:19 94:23 95:16
  96:7 106:10 107:14
  109:12 113:25
  118:9 119:12 127:2
  128:4 134:20 136:9
  137:19 141:4,15,20
  142:7,17 143:2
  149:2 155:19
  160:10,12 164:23
  164:24 166:14
  167:22 169:13
  171:4 179:21 184:4
  184:5 185:18
  193:16,18 198:11
  198:16 201:4 206:8
  208:25 217:24



218:9 220:19
226:22 247:14,15
249:19 254:17,23
259:24 261:18
263:22 269:9
274:13,22 275:9
278:14 287:13
288:20 289:17
294:20,22 299:7,20
299:24 302:18
303:6,6 306:22
308:2,18
**alleged**
229:18
**allocated**
127:3 293:19
**allotted**
6:16
**allow**
120:25 157:12 159:4
160:25 169:3,5,8,22
169:24 233:2
**allowance**
168:23
**allowed**
71:5 72:15 147:2,4,8
147:15,16,17 148:6
148:10,16 149:3,8
150:17 158:21
163:10 168:20
304:25 305:16
**allowing**
263:24
**allows**
28:8,8
**almost**
160:12 217:6 289:17
**along**
5:9 197:3
**already**
81:12 134:2 141:20
200:17
**also**
3:3 14:20 16:3 19:7
20:16 25:5 32:24

36:13 42:14 65:2
70:23 92:22 95:3
107:5,6 116:11
119:2,16 122:7
134:5 143:3,13
162:12 164:21
184:7,14 188:10
192:7,12 198:23
199:4 201:10
206:14 211:8
231:13 266:15
267:21 287:5,18
**although**
21:11 37:23 49:21
52:7 72:17 206:15
218:4 233:9 239:18
242:7 256:18
**Alvarez**
3:4,5 5:12 18:2 190:9
216:21 226:16,16
304:7,11 305:18
**always**
110:6 125:17 201:8
284:20
**Amazon**
56:18
**amenable**
307:17
**amended**
190:3,4 192:15
202:20 203:20
204:2,11,20,25
205:23 206:19,21
208:11,15,20
209:10,14,20
246:18
**amending**
207:11
**Americas**
1:16 2:6 4:14
**among**
61:8 99:23 102:5
114:19 127:3 137:7
140:6 143:4 158:17
165:12,22 182:18

253:10 277:22
292:6 299:25
**amongst**
143:12 174:19
**amount**
27:17,21,24,25 28:15
29:12 30:6,18 31:2
36:21 37:4 47:22,23
48:13,15,16,19,20
49:6,7,14 50:3,9
52:25 53:8,12,18
54:18,24 58:5,9
64:5 68:13 69:5,8
69:12,18,23 70:2,6
70:10,12,17 71:20
72:8 76:17 79:9
83:17 84:4,9,18
85:12,17,23 90:12
94:14 95:19,23
98:12 99:3 116:22
123:8 126:15
133:20 144:23
145:12 147:19
155:4 164:10,21
174:16 191:24
192:6 193:8 201:7
201:11 204:7
240:16 243:18
257:21 289:13
290:15,18 304:24
305:14,16
**amounts**
49:15 50:2 64:17
78:14,15,16,17
85:25 129:6 139:7
259:2
**analyses**
201:24 232:10
286:11 287:22
288:14 289:17,23
293:3
**analyze**
88:7 94:22 99:14
120:25 136:9
140:25 168:24

175:2 205:11
251:21
**analyzed**
10:13 48:18 85:7
113:25 119:19
125:14 158:18
173:25 218:25
287:15,17 291:13
**analyzes**
293:7
**analyzing**
124:7 188:16 218:21
**and/or**
292:5
**annualized**
86:10
**annum**
171:21
**another**
13:14 15:7 21:18
34:10 36:20 41:2
72:24 101:10
109:20 126:14
187:15 225:2,5,19
230:25 237:25
254:2,11 256:5
279:22 287:19
298:22 299:3
**answer**
6:17,20,22 14:5
20:11 32:15 35:25
37:10 38:16 39:9,9
39:11,13,16 40:21
43:7 52:19 54:14
59:16,18 62:5 66:6
66:16 67:4 87:3
88:11 90:19 91:5,8
95:5,18 97:16 98:25
106:17,18 110:20
111:24 135:7 161:7
169:22 173:6,11,13
173:17,23 209:18
236:14 258:7 272:7
273:16 283:11
296:20 297:8,9,16



answered
42:25 97:7,15,17
answering
32:16 63:3 114:10
  118:19 124:24
  197:17
answers
177:16 200:10
anyone
13:21 109:15 172:7
  177:23 232:11,21
  235:19 247:24
  283:4 304:7
anyone's
42:9
anything
19:24 38:10 59:11
  61:24 133:5,8,17
  134:9 138:25
  162:17 176:24
  179:14 184:25
  187:7 196:2 200:8
  210:2 218:14 227:6
  234:21 266:4 289:4
  302:4,11 308:14
anywhere
33:17 253:21
apart
165:4
API
72:10,13,20 178:7,10
  179:4 180:15
  187:24 188:2,3,10
  188:12,14,19 215:4
  233:12,17 234:3,7
APIs
178:17 180:20
apologies
108:9
appear
36:14 222:21 257:18
  298:10
appearances
4:22
appears

43:5 45:2 59:14
  102:5 151:21 184:2
  225:2 248:18
  257:15,20 258:19
  278:18
applicable
80:23 251:3,4,8
  253:7
application
59:12 144:6 277:4,12
  278:24 296:4
  305:25 306:2
applied
20:8 21:14 25:6
  32:21 33:4 74:7
  76:5 146:24 173:19
  202:4 241:25
applies
89:12
applying
186:6
appreciate
148:3 213:15 228:15
  250:24 306:17,23
  308:9
approximate
150:25 179:6 241:16
approximately
26:20 87:2 139:6
  145:18 155:25
  163:15 171:22
  208:4 238:17,20
  240:3,13 241:18
  244:25 260:17
approximation
140:10
April
101:16 289:22
area
264:11
aren't
22:3 55:18
arguing
191:23
argumentative

59:22 297:15
around
176:20 179:24
  267:23
arrangement
307:9
Arrow
124:16
aside
122:19 169:4
ask
8:11 61:13 132:4
  157:17 167:5
  187:15 268:10
  270:16 276:21
  290:6 293:12
asked
31:19 89:17,21 91:3
  97:15 141:25
  142:17 197:14
  290:3 291:10
asking
13:24 38:22 41:19
  43:24,25 45:8,10
  53:7,15 58:19 59:9
  59:10,11,12 133:7
  146:9 149:4 152:3
  153:18 173:8,9
  185:12 218:14,16
  248:3 259:24 263:5
  270:13,15 284:5
  288:7 291:16,18
  300:14,15
asks
293:16
aspect
58:4 183:16 197:23
  215:5 238:2
aspects
54:16 59:7 63:18
  94:24 95:17 102:6
  102:14 119:10
  164:2
assert
214:9 296:23

asserted
90:22 234:8
assertion
197:25 226:15
asserts
213:18
assess
23:17 40:6 252:12
  291:6
assessed
25:12 151:6
assessing
176:8
assessment
25:18,21 26:7 139:13
  139:14,16 140:9
  143:7,16 159:19
asset
19:23,23,24 70:22
  76:15,18 77:4,8,10
  77:11 109:2,2
  125:22,22 126:24
  148:11 150:5,9
  152:11,22 155:18
  211:23 223:18
  226:3 243:6 254:10
  254:11 277:6
  290:16,19,21
assets
75:6 76:23 77:18
  79:10 104:18,19
  108:25 125:10
  155:11,13 156:17
  164:25 176:10
  192:8 210:5 211:14
  211:25 212:4,6,12
  212:13,21 230:19
  240:14,18 241:3,6
  241:10,16 243:19
  244:6 245:2,17
  246:3,5,12 247:4
  249:3 251:3 252:13
  252:16,18 253:16
  253:21 254:14,15
  266:14 284:13,15



284:22,23 285:5,24
286:2,19,22 288:16
289:13,14 293:18
294:18,20,22
295:17 296:10,25
**assist**
103:21 274:7
**associated**
17:2 21:4 30:16 42:4
78:21 79:6 246:22
249:14 294:18,20
296:10
**assume**
87:24 130:18 165:15
176:7
**assumed**
12:15 13:4,7 115:6
**assumption**
12:10 13:16 46:2
147:2
**assumptions**
11:14 12:8,25 13:10
14:21 16:20 140:21
146:23,24 147:5,8
147:24 201:23
**attached**
36:11 278:4,19,20
279:18,23
**attachments**
279:8
**attainable**
209:12
**attempt**
191:22 245:6
**attempting**
43:6 177:17 301:23
**attest**
124:5
**attorney**
66:7 297:4
**Attorneys**
2:5,14
**attractive**
106:3
**audio**

213:25
**audited**
273:23 274:9 278:4
278:10,13,17
**auditor**
274:20
**auditors**
274:2,5,7,11
**auditor's**
274:4
**August**
207:5 223:10
**authentication**
179:23 180:11
**author**
103:3,24 121:25
122:6 123:2 129:24
**authored**
152:4
**authorities**
232:17
**authority**
232:12,19,22,23
247:25 248:2,6
**authorize**
178:4
**authorized**
177:24 178:3
**auto**
92:24 98:5 104:15
110:22 112:14
113:19 116:16
118:11 154:22
159:13 164:9
227:18,20 228:5,9
229:12 231:4
233:24 234:3
238:20 241:20,25
242:11 243:4,19
244:6,19 245:5,12
245:20 246:20,25
249:12 254:18
259:5,18 260:22
261:7
**automated**

214:12,15 215:9
**automatic**
92:3 228:10 229:17
229:24,24 244:14
**automatically**
92:17 227:21 228:7
**available**
12:24 36:21 104:5
141:7,10 236:15
246:15 259:17
271:7 289:7 291:6
**avenue**
1:16 2:6 4:13 179:9
**avoid**
31:20 105:8,11,25
106:23
**aware**
13:6 31:13 33:10
35:23 36:5,9 44:21
45:22 55:17 74:19
85:7 87:11,15 100:8
100:15 117:10
119:9 124:25
125:20 126:4,10
128:7 130:22
136:13 139:19
143:8 151:12 165:7
166:19 174:7,7,12
178:2 180:18
191:19 196:2
197:24 199:15
202:12,15,15,23
213:20 216:7,9
219:12 220:18
225:23 231:20
232:4 242:11,15,23
244:13 258:25
259:4 261:10,14
266:9 268:12,15,20
270:6,18,21 272:8
272:11,15,22
274:12,18,20
277:14 286:17,21
286:25 287:4,5,13
288:18 290:2,12

292:2,10,21,24,25
293:6 297:21
**a.m**
1:12 4:11 26:20
29:24 30:25 31:24
32:7 33:18 36:19,25
63:22 81:20,24 83:9
86:4,5 87:12,16,18
95:24 229:8 247:22
247:23 263:13
302:6

---

**B**

**B**
311:7
**back**
16:7 31:19 61:12
66:11 67:5 68:8
72:25 81:23 84:14
84:24 87:17 90:13
94:7 99:6 101:3
102:11 104:8
107:25 108:6,10,13
110:8,15,20,23
111:11,19,20
113:11,11 114:9,13
114:20,24 115:4,10
115:13,16,23 116:6
116:10 117:5,14
119:16,22,25 120:7
126:17,20 128:25
129:9 136:2,21
141:23 142:3,6,12
142:20 151:16
161:20 162:6,21
171:11 181:10
193:23 201:7
210:24 214:7
228:12 245:7 247:2
259:20 266:3,24
280:8 306:14
**Bahamas**
277:4
**balances**
16:5,7 62:18 68:18



71:23 72:19 78:23
79:12,13,19 106:24
106:25 135:24
138:20 139:3,7,23
140:18 141:15
142:3,5 143:4
155:23 158:14
159:23 203:24
**bank**
178:16
**Bankman-Fried**
131:3,10 132:17
133:5,18 277:19
311:21
**Bankman-Fried's**
131:18 134:9
**bankruptcy**
1:2 4:8 137:23 171:7
171:9 305:2,20
**base**
15:18 24:3,11 25:7,9
42:12 58:23 74:21
104:12,13 111:5,7,8
113:7 117:25 218:8
227:24 228:4
248:10,12
**based**
22:8 39:12 42:2
50:17 51:2 56:18
58:7 74:9,9,12 79:2
91:23 138:19
158:23 159:8,9
164:11 176:9
178:17 180:20
190:24 198:24
199:3,16,18 202:6
219:22 231:13
233:6 236:15
248:18 249:10
265:14 272:14
275:22 287:25
292:23
**bases**
81:4 295:8 296:23
**basic**

160:23
**basing**
81:13
**basis**
12:7 19:23,23,24
20:7,10,15,17,17,24
34:23 41:4 42:22
58:17,21 76:6 77:15
86:9 135:5 141:18
148:11,12,12
149:15 234:21
235:12,21 236:19
236:22 273:11
275:21 281:16
282:5,6,18 283:4,23
284:6 295:19
296:11 304:20
305:13
**Bates**
157:14 190:2,3
**bear**
157:10 171:20 186:3
**beared**
306:18
**bearing**
77:17 207:16
**became**
39:5 136:10 143:13
**because**
17:10 20:7 24:21
25:2 34:16 43:11
48:10 52:13 80:20
93:15 96:8 97:6,17
98:7 106:2 107:16
113:25 116:17
119:18 127:11
134:25 158:20
160:4 173:14 175:2
186:24 191:18
192:3 193:7 202:9
204:6 236:8 239:14
247:3,10 260:7
279:16 290:3 293:7
294:19
**become**

272:11,15
**becoming**
154:25
**before**
1:17 28:10 82:2 85:4
93:25 101:5 159:16
175:20,22 228:9
262:14 264:25
276:14 278:9
298:25 310:18
**began**
205:16 207:13
**begin**
5:15 26:12 132:12
**beginning**
151:20 157:15
223:17 245:13
295:5
**begins**
4:3 26:12 55:23
175:13
**behalf**
5:8 43:11 44:16
45:14,16 106:17
212:10 273:17
**behind**
193:22
**being**
4:12 15:9 31:20 33:4
45:24 64:2 87:16
105:5 108:10
109:17 111:18
113:9,16,18 115:13
116:13,16,22,23
117:2,12 122:15,24
122:25 125:10
126:24 127:16
139:20 164:25
166:19 170:8
171:10,24 181:20
183:25 192:8 197:9
204:12 205:22
206:25 207:13
212:14 213:24
214:18,19 224:22

244:20 246:18
251:24 259:12,17
261:4 264:18
270:10
**Beller**
36:12
**below**
23:24 24:10 26:18
29:23 30:15 34:11
35:2 80:9 86:24
87:7 92:20,24
104:21 110:22
159:21 162:14
163:19 228:3
247:20
**best**
6:21 7:2 106:18
215:2
**better**
36:14 135:6 178:21
178:22
**between**
40:14 44:23 51:9
53:7 70:17 86:4
88:17 91:18 137:21
178:8 197:2 199:8
202:19 243:15,20
247:22 254:3
276:18 293:19
294:19 307:11
**beyond**
100:11 144:12 169:5
**bifurcates**
147:14
**biggest**
201:23 208:9
**billion**
163:15 165:17,19
217:20
**billions**
170:19
**bit**
9:2 108:9 146:15
164:12 220:22
250:20 263:14,16



277:25
**bitcoin**
14:11 21:21 78:21
79:6,10 109:8,16
111:25 141:6,11
152:18 153:15,24
153:25 154:17,18
154:20,21 155:9
287:16 288:3,4,6,9
**block**
100:24 206:18
253:23 288:11
**blocking**
244:14
**blood**
313:16
**board**
120:12,20 121:10
304:20 311:19
**borrow**
16:13,13,17 28:14
69:16 70:19 71:9,13
98:17 149:20
158:11 162:14
163:13,19,22 164:7
221:3 225:18
299:19 302:12,16
**borrowed**
99:2 223:19
**borrower**
100:2 126:8 128:3
220:21 221:3
301:11
**borrowers**
222:20,21 223:5,16
**borrower's**
73:12,24
**borrower/lender**
98:22
**borrowing**
28:6,11 71:6,6 97:21
97:22,22 98:13,18
98:18,20 99:3 135:9
136:7 170:21
225:17 226:13,20

300:19,22,25 301:2
301:3,3,5,7 302:22
**borrowings**
28:17 163:20 270:8
274:24
**borrows**
83:22 84:2 151:8
221:24 300:12
**both**
7:9 8:18 20:4,9 23:19
23:20 33:11 34:5
66:2 79:22 90:16
108:24 117:4,13
254:13 295:22
305:23
**bottom**
61:9,14 107:24
132:13 137:18
139:15 221:23
228:22 294:3
**box**
278:3,11
**Brantley**
3:5 5:11
**breach**
229:18
**break**
81:15 82:2 136:15
210:17 266:18
306:8
**Brian**
2:16 5:7 7:5 188:21
308:23
**brief**
94:7
**briefly**
303:16
**bring**
31:19 104:8 153:24
245:6 247:2
**bringing**
152:21 266:2
**Broad**
2:15
**broader**

57:11
**brought**
135:25 136:11
140:18,19 141:23
142:3,5,12,20 143:6
**browser**
188:5
**BTC**
9:19 12:18,19 151:23
152:12 211:11
267:12,14,17,18,20
267:23 268:3,13,21
268:24 269:14
**built**
92:19
**bunch**
299:14
**business**
34:15,18 42:9 105:17
105:23 106:9 107:9
135:12 234:15,24
237:21 264:13
277:6 296:5
**button**
228:9
**buy**
217:21 257:22
**BVI**
99:25 272:18

——————————
**C**
——————————

**C**
2:2 5:16,16 73:15
310:2 313:2,2
**calculate**
10:9,14 11:15 12:14
49:25 62:13,18
68:20 75:25 76:11
85:2 86:2,8
**calculated**
11:9 19:21,22 23:19
23:21,25 24:7 25:12
63:21 64:22 68:18
86:10 96:16 171:22
203:14

**calculating**
22:13,17 29:7,13
57:19 62:7 71:10
**calculation**
10:6 20:4,20 22:10
24:21 25:2 50:6
57:23 58:18 64:15
64:23 66:18 82:7
89:5 236:23
**calculations**
15:17 67:2 80:17
82:13 138:19
286:12
**call**
189:12,18 190:4
**called**
5:16 18:12 31:15
37:13 57:6 91:11
92:24 132:16
161:20 168:3 182:6
221:11
**calls**
33:20 40:19 42:5,23
44:13 45:4 54:7
55:5 65:13 81:9
94:19 95:14 100:13
130:14 172:25
173:22 212:8
234:11 235:14
236:12 237:20
271:20 273:6
281:19,25 282:20
295:11 296:14
297:2
**came**
191:16 270:9
**can**
7:20 11:8,8 16:7
17:17 18:21 19:3,7
22:8 30:21 33:23
34:5 39:9,11 44:3,7
46:5,8 51:2,22 52:2
53:21 66:7 76:20
78:25 92:13 97:5
99:12,15 105:23



107:5 110:17 121:6
124:5 127:22
134:15 137:15
156:22 157:13
162:14 163:18,22
173:24 176:2,21
177:11 180:23
182:5 186:5 187:15
188:3,20 192:20,25
202:17,25 203:8
209:17,18 211:17
215:24 221:18,20
222:11,13,25 226:6
235:4,16 236:14
237:4 238:8 239:3
244:18 256:13,13
263:17,20,22
264:17 265:2
271:25 273:18
279:12 283:10,25
284:18 286:10
291:15 292:8
297:16 298:5 306:8
**canceled**
200:19
**cannot**
21:11 43:10,20 44:15
45:13 49:21 63:14
65:16 72:18 93:14
104:23 106:10
107:21 120:4
129:25 133:4 136:4
144:3 162:24
177:10 206:3
208:18 232:18
234:14 235:23
236:16,16 249:8
255:14 267:15
271:6 274:2 278:12
278:14 286:10
292:7 293:6 298:2,7
**can't**
31:12 36:3 40:20
45:6 54:13 55:7
74:4 84:21 90:18

105:21 107:14
131:22 151:14
169:18 173:3,15
175:22 183:3,11
185:9 206:12
209:25 212:9 231:9
231:18 236:2,4
248:5 260:6,6
289:24 296:4
298:11 306:4
**cap**
183:24
**capacities**
6:8,10 8:18
**capacity**
6:23,23 7:6,16,19,19
8:3 43:7 119:5
173:9 185:13 243:5
253:12 304:14
307:18
**capital**
2:4 4:25 73:15 99:24
101:2 121:17
179:19 194:9,16
198:20 215:4
216:13,20 266:13
271:25 272:9
312:11,13
**Capital.com**
262:12
**care**
104:20 105:12,15
**cared**
104:24
**carefully**
103:7
**carry**
61:16
**case**
1:7 4:9 78:19 84:18
96:10 154:6 160:3
191:19 278:16
**cases**
134:20 136:10 257:3
**categorically**

21:20 160:10
**categories**
200:13 202:13,15
**categorized**
290:21
**category**
200:16 201:19
**cause**
35:2 94:24 125:18
**caused**
97:19 127:6
**caution**
39:6 200:7 203:6
272:5 273:7,14
**caveat**
59:25
**caveats**
96:7
**cell**
302:2
**cents**
302:17
**certain**
15:23 21:6 24:13
31:12 34:17,18
36:10 43:21 44:4
72:16 82:23 92:18
105:19 108:18
109:6 126:15 129:4
138:10 146:23
147:6 158:4,7
159:21 160:11
161:12 167:13,22
170:10 179:16
180:22 201:20
202:4 205:15
219:24 220:2 221:4
225:15 231:12
246:16 250:7
286:18 287:5,7,7
291:11 298:8 306:4
**certainly**
32:7 107:21 109:7
132:4 144:15 145:8
150:13 162:25

176:24 180:20
215:13 254:23
**certify**
310:4,8 313:9,14
**cetera**
258:17
**chain**
206:18 253:23
288:11
**Chambers**
99:24
**chance**
114:4
**change**
22:8 24:24 25:3
54:19 66:9,13
153:15 155:17
193:21 201:14
208:8 237:7 243:15
243:16 252:24
**changed**
12:6 205:14 210:3
267:3,7 301:18
**changes**
51:24 52:10,15,18,23
52:25 53:4,8,12,16
53:19,23,25 54:16
67:6 202:11,18
208:8 246:17
**changing**
267:11
**Chapter**
1:6 171:6 305:24
**characterization**
8:20 63:10 265:7,9
308:17
**characterize**
83:21 126:19 133:12
133:14 217:3
226:18 239:10
252:17
**characterized**
122:25
**charge**
65:10 116:12



**charged**
64:2,17,23 65:18
    116:23 119:10
    172:4 174:3 201:12
    205:8
**charges**
52:2 55:25 56:8
    57:21 58:2,4,9
    62:12 65:4,6,17
**charge's**
68:9
**charging**
64:6
**chart**
168:22
**charts**
256:9
**Chase**
3:5 5:11
**check**
16:3,10
**chose**
8:3,4
**Christopher**
2:9 3:7 5:4
**circumstance**
119:23 191:21
**circumstances**
34:25 112:25 116:16
    117:2,19 120:5
    135:15 137:25
    169:10 231:6 232:5
**claim**
47:10 147:18,22
    149:8,12,15 150:17
    150:20 191:10,18
    191:24 203:18
    207:9,16 217:9
    264:21 272:17,22
    273:12
**claims**
146:7,8,11,19 147:2
    147:4,6,11,15,15,16
    147:16,21 148:6,10
    148:16 149:3,10

151:2 191:17 286:4
    304:25 305:16
**clar**
93:2
**clarifications**
210:11
**clarify**
53:6 82:22 85:21
    93:4 215:24 235:16
    263:2 283:25
**clarifying**
207:18,22 265:10
**clarity**
200:22
**claw**
128:25
**clawback**
128:19,23,24 129:2,6
**clawbacks**
129:14,22
**clean**
213:16
**clear**
58:18 66:22 82:11
    92:12 94:3 133:16
    148:22 186:21
    204:13 224:2 262:9
    297:7
**clearly**
238:15
**close**
92:24 103:7 110:22
    113:19 117:13
    118:11 121:19
    189:6 225:7 270:9
**closed**
9:7 11:25,25 14:16
    14:22 15:5 102:21
    109:17,24 110:14
    110:18 111:21
    112:15 113:10
    116:17 122:11,15
    127:15 237:8
**closing**
108:19 109:4 110:3

116:18 122:12,14
    126:22
**code**
15:18 23:8,10 24:3
    24:11 25:9 42:12
    58:13,23 74:9,12,20
    92:15 94:18 98:8
    104:13 111:5,6,8
    113:6 117:25 158:6
    159:5 162:4 164:2
    164:12,13 171:9
    227:24 228:4 230:6
    233:7 248:10,12
**coin**
287:19
**coins**
141:12 286:19 287:7
**collateral**
19:6 21:9 27:7 30:15
    34:11,21 36:21
    40:15,24 42:3 45:22
    46:17 48:23 73:11
    73:15,16 74:3 75:5
    75:14,19 77:16
    80:24 81:6 84:12
    85:16 88:23 92:10
    176:9,18 237:13
    297:21,22 298:8
**colleagues**
5:3
**colleague's**
8:15
**collectively**
282:12
**colloquially**
10:22 189:12 299:15
**column**
57:5,8,11,12,22,24
    59:2,6 60:2 61:11
    61:12 62:6,10,17
    63:13 66:9,17 67:11
    67:24 68:2,5,6,14
    69:2 161:18 162:3
    162:13 163:14,22
    168:3 182:14

184:22 205:17
    223:2 257:2 258:4
    258:11 278:3 301:9
    302:8
**columns**
168:8,9 182:16 186:2
    222:6,14
**com**
282:11
**combination**
266:2
**come**
84:2 87:17 155:20
    265:19
**comfortable**
197:14
**coming**
298:23
**commence**
92:3
**commencement**
247:6
**commented**
224:3
**committed**
36:10 49:22 50:25
    52:7 111:14 114:18
    132:3 143:22
    145:12,24 151:5
    174:24,25 193:17
    208:3 209:12
    220:14,19 221:6
    225:15 242:6
    270:23
**communicate**
36:20
**communicated**
23:4 31:13 37:3
    193:13,14,23
    195:16,18,18,22
    196:4 197:16 198:2
    291:12
**communicating**
129:3
**communication**



195:6,10,13 199:7
263:12 265:14
**communications**
33:13 36:11,15,25
37:7 42:15 58:20
193:16,19 196:8
197:21 236:20
260:14 261:10,14
261:25 283:14
**company**
40:4
**comparatively**
21:18
**compare**
284:14,23
**compared**
285:8 286:19 287:8
**comparing**
144:17 241:7
**comparison**
64:12 83:22 285:21
287:23
**compel**
7:17
**compensated**
304:16,19
**compensation**
113:12,17 303:17
304:8,11,22,23
305:5,11,19
**complete**
6:15 56:10,15 254:25
262:18,23 263:4
**completed**
208:20,21,22 209:10
219:8
**completeness**
279:2
**completion**
207:11,15
**complex**
156:5 163:24
**compliance**
22:18 26:9 29:7,19
31:18,20 33:22,24

34:20 35:13 37:18
38:6 75:25 78:23
79:16,25 80:6,19
84:12,17,23 85:15
85:19 86:18 87:13
87:16,18,20 89:18
90:6,9 92:5 94:25
95:9 96:21,25 98:9
104:3,8 227:25
229:6,14 245:7,15
247:3 259:9,21
260:10 261:2 266:3
**compliant**
29:16,19
**complied**
88:16 94:11 96:23
**comply**
19:12 22:20 78:4
**component**
92:14 239:9 305:4
**components**
95:3 153:14 191:22
193:5 228:23
**composition**
192:9
**comprehensive**
286:21
**comprise**
141:14
**comprised**
21:3
**computer**
189:3 298:22 303:14
**conceivably**
105:24
**concept**
206:4,15
**concepts**
41:2 93:4
**concern**
236:20
**conclude**
308:20
**concluded**
308:4 309:15

**concludes**
309:5
**conclusion**
9:24 26:14 40:19
42:6,24 43:11 44:14
45:4 54:7 55:6
65:14,15 81:10 91:4
94:20 95:15 100:14
130:15 173:2,22
212:8,10 233:2
234:12,14 235:2,15
236:13 237:20
271:21 273:6
281:19 282:2,21
289:6 295:11,15
296:15 297:3
**conclusions**
46:4 58:21 284:10
**concurrent**
8:16
**concurrently**
6:6 7:11
**condition**
46:24
**conduct**
8:4,5 122:16 136:12
138:9 178:4 215:6
234:3,4 252:10
253:4 259:22 260:5
261:13 266:16
273:20 286:13
289:22
**conducted**
7:11 20:15,16,19,23
46:14 72:11 104:14
138:17 151:13
160:5 188:11
214:11,20 226:9
239:6 252:6,8
254:25 262:7 286:7
290:24
**conducting**
6:6 136:14 214:16
**confirm**
18:19 24:18 41:22

42:11 50:5 66:16
68:23 93:15 114:23
114:25 120:4 142:2
177:10 188:20
224:20 242:14
258:2 262:22
**confirmation**
295:20 296:6 305:23
306:6
**confirmed**
49:10 68:24 142:4
188:23 219:21
**confusion**
246:10
**conjunction**
27:2 89:2 146:2
164:10 230:7
236:25 237:25
**connected**
183:19
**connection**
101:7 121:2 131:19
146:6 168:11 175:3
190:18 197:5
276:24 283:16
290:7
**consequence**
164:24 267:16
**consider**
192:22
**consideration**
107:20
**considerations**
252:3,5
**considered**
106:12 107:15
192:20 193:2
**considering**
107:22
**consisted**
248:14
**consistency**
239:16
**consistent**
10:7 15:12,15,17



24:2 25:9 72:2
133:10 141:10
191:3 192:7 209:3
223:21 244:11
248:20 255:3
**consistently**
43:6
**constitute**
100:7 264:14
**constitutes**
135:19 264:9
**constructed**
160:15,19
**consult**
38:8 49:8 50:14 57:9
59:17 62:5 63:20
64:11 65:3 66:20
67:3 68:3 80:15
273:21
**contain**
53:19
**contained**
43:4 122:2
**contains**
51:23 183:5 185:3,23
**contempor**
247:14
**contemporaneous**
247:16
**contemporaneously**
238:22 293:10
**content**
74:10 300:15 307:6
**contents**
36:17 37:7 268:15
270:21
**context**
38:23 57:11 62:11
63:18 68:5 81:7
104:6 116:18
123:10 128:22
129:3 145:4 152:5
163:23 166:13
175:23 176:8
182:11 184:2

191:16 193:3 224:9
**continuation**
151:19
**continue**
48:3 106:7 112:19
140:16 142:22
177:18 224:25
**continued**
33:22 46:25 141:17
201:5 205:11
**continues**
294:3
**continuing**
152:16
**contract**
10:2 11:22 109:24
112:13 113:3,16
116:21 127:13
235:12
**contracts**
9:2,7,20 10:10 12:12
12:13,16 13:8
108:19 110:5,13,25
114:8 125:5 126:22
127:11 134:19
135:5 199:22 210:5
267:23 268:3,13,17
268:21,25 275:11
**contractual**
41:4 234:9
**contributed**
44:6
**control**
117:24
**controlled**
117:21 290:20
**controls**
180:12
**conversation**
127:10
**conversations**
58:16 74:13 111:9
219:22 283:12
**conversion**
301:21

**convert**
302:9
**conveyed**
196:21 288:2
**copied**
199:14
**core**
185:11 209:5
**corner**
132:8
**corporate**
8:2
**correct**
9:9 25:15,16 28:25
32:9 39:19 46:18
48:12 53:13 57:2
60:9 65:12 71:25
76:9 80:14 83:2,14
83:15 95:21 103:15
111:2 129:18
138:14 144:14
153:11,12 155:14
166:4 172:2 203:21
205:3 227:11 238:7
242:19 285:16
301:12 303:24
310:9
**correctly**
144:9 164:18 205:21
211:6 212:22
277:20
**corresponding**
288:17
**corroborate**
257:23
**corroborated**
42:15
**cost**
299:25
**could**
8:22,23 12:23 13:15
13:15,20,21 14:19
21:3,3 22:18,20
31:3 34:25 54:17
71:18 75:18 76:11

78:15,16 111:24
114:3 130:19
134:25 141:8
143:12 144:15
145:6,24 153:21
154:13 155:3,20
156:6,7 161:8 163:3
164:7,14 168:16
194:17 209:11
225:14,18 230:25
245:19 246:20
247:2 248:22
259:10 261:3
265:13,18,20,23
280:4 303:13
**couldn't**
278:22
**counsel**
2:3,12 4:21 8:10 14:4
39:8 46:6 52:12
58:20 74:10 135:11
189:25 200:9 203:8
221:17,21 223:8
262:17,20 272:6
273:8,15,21 278:24
279:3 283:9,12,15
284:7 303:19 304:6
307:2,11,15 308:8
**counsel's**
200:10
**count**
53:21 84:8
**counterparties**
110:4 111:14 112:11
127:12,18 215:10
215:12,15,19 216:5
218:18
**counterparty**
109:22 112:14,20
127:16 216:8
219:19,24 226:9
251:4 252:3 253:7
253:13 254:13,17
254:23,24,25
255:23 257:12,16



257:24 258:9,20
**COUNTY**
313:5
**couple**
129:9 153:6 157:17
    171:7 173:7 192:12
    199:23 205:7
    298:13 306:18
**course**
36:18 87:5 159:11
    171:7 173:7 263:19
    264:2 284:20
    305:19 307:14
    308:18
**court**
1:2 4:8,18 5:13
    147:23 309:9
**cover**
118:15 133:21
    134:13,21
**coverage**
126:15
**Coverick's**
6:14 7:10
**create**
178:21 214:18
**created**
61:11 62:10 67:21
    146:18 165:11
    180:21 182:15
    185:18 186:24
    190:9,11,12 193:9
    202:24 207:8 217:7
    219:11 258:4,11,14
**creating**
56:25
**creation**
190:15 191:8 192:14
    200:15 207:15
**credited**
67:24 200:20
**crediting**
254:9,10
**creditor**
146:7 191:21 273:3

273:12
**creditors**
305:7,15
**credits**
126:10
**criminal**
131:4,11 133:6
    311:22
**critique**
61:18
**Cromwell**
2:14 5:7,10 216:22
**cross-reference**
239:19
**cross-referencing**
41:21
**cryptocurrencies**
21:7
**cryptocurrency**
20:25 22:7 251:22
    254:2 265:21
    269:18,23 285:6
**culmination**
249:21
**currency**
71:24 76:23 77:4
    285:6
**current**
11:20 112:3 140:18
    202:23 203:4
    251:21
**currently**
6:23 22:14 146:13
    171:9
**cushion**
27:8
**customer**
15:7,10 22:18,20
    27:14 28:9 30:13
    34:14 41:13 71:11
    77:13 78:19 109:20
    116:22 118:15
    122:15 125:21
    126:11 128:5,10,18
    133:21,24 134:10

135:2,9,24 139:6
141:15 145:5,7
146:7,10,18,19
147:6,10 148:25
149:8,10,11,15
151:22 152:10,18
152:22 153:9 154:4
155:23 158:5,7,16
160:6 163:23
168:19 169:6,9,10
169:15,23 170:3
172:17 178:25
180:14,22 191:16
191:18 211:17
227:14 230:9 231:7
231:11 246:21
254:4 255:7 284:12
284:21 285:8 287:8
288:3,17 289:8,13
290:15 295:13
304:25
**customers**
23:4 71:23 75:18
    77:12 105:25 106:4
    106:4,23 109:13
    117:17 126:16
    127:14 129:4 130:5
    130:13 134:7,13,21
    137:20,20,25
    138:11 139:2
    143:25 144:10,12
    145:21 146:5 149:7
    149:16,20,25 150:3
    150:4,13,16,25
    151:7 159:24
    162:23 165:22
    166:6 170:5,22,25
    171:2 174:8 179:17
    179:21 205:9
    206:12 215:13,18
    226:23 231:12
    274:15,24 275:11
    275:12 297:23
**customer's**
34:10 54:16 68:14

147:18 181:3
231:21 234:2
**cut**
14:4 240:25

---
**D**
---

**D**
310:2 311:2
**daily**
171:21
**Darby**
2:16 5:10
**data**
10:5,14 13:17 14:20
    15:8,9,20 33:2
    52:23 56:10,19,24
    57:3,14 86:15
    138:21,22 141:10
    161:16 182:17
    209:15,21 210:2
    223:15,21 289:19
    291:13 293:10
    300:6 301:19
**database**
10:4,12 11:18 12:5
    15:21 16:12 49:10
    56:7,16,18,21 63:19
    68:22 95:23 97:18
    158:4 163:24
    179:12,16 183:6
    188:19 205:12,15
    262:22
**date**
1:11 8:9 9:23 41:8
    51:16 53:19 64:3
    93:24 101:20
    120:15 131:7 137:6
    139:4,5 142:25
    143:11,18,25
    144:11,18 145:20
    147:3 149:18,22
    150:12,15 151:3,9
    157:6 161:3,11,13
    165:24 170:15
    175:6,8,11 181:14



186:24 191:4 192:5
194:11 195:2,5,17
207:3 211:14,24
212:2,4 216:15
221:9 244:11 250:2
256:3 261:22 276:7
277:7,10 284:14,16
284:23,25 285:9
286:5,10 288:21,21
294:21,25 295:4
298:20 302:13
303:25 306:5 312:7
**dated**
194:19 216:21 277:9
**dates**
61:11 89:20 90:11
94:12 95:20 96:25
97:10 123:22
186:22 222:25
229:2 258:14
282:13 290:22
292:8 296:11
301:22
**Davies**
100:20
**day**
4:5 7:18 51:6 93:17
99:22 139:17
223:17 245:13,13
275:24 309:7
310:19 313:19
**days**
7:9 8:18 51:10 86:12
173:7 201:6 205:8
306:18 308:23
**dealing**
36:18
**dealt**
280:19
**debate**
279:25
**debit**
106:20,24 107:5
134:6
**debiting**

254:11
**debits**
126:10
**debt**
64:19 106:2 107:6
**debtor**
39:10 44:9,10 105:5
217:22 218:2
219:17,18 285:20
**debtors**
1:4 39:2,3 143:21
144:5 145:25
147:17 149:10
175:25 191:5 194:7
194:14 196:22,24
196:25 197:4 198:4
218:17 219:2
253:10 269:16
272:23 281:6 286:3
290:19 312:9
**debts**
106:5,22,23
**decide**
266:14
**decided**
136:6
**decision**
128:9 255:13,15,23
266:12 277:14
**decisions**
128:8
**decline**
152:19,19,20 153:19
153:23 267:19
**declines**
156:24
**decreased**
153:16
**decreasing**
206:10
**default**
135:8,10,13,20
**defaults**
128:3
**Defendant**

2:14
**defense**
133:6
**deficiencies**
261:9
**deficit**
236:25
**deficits**
229:15
**define**
18:18,25 46:19 48:22
88:3,9 122:12,14
135:6 281:23
**defined**
34:22 45:23 47:6
74:2,5 88:24 99:19
99:22 100:2,3
172:21 173:4 237:3
294:25
**defining**
39:22
**definition**
23:2 28:24 75:13
80:24 145:3,13
156:22,23
**definitions**
282:13 294:13
**Delaware**
1:2 4:9
**delineated**
70:16
**demand**
113:2,23 125:11,17
127:2,5
**deminimis**
23:9,18 24:19
**denial**
281:17 282:19
**denials**
283:4
**denies**
281:13
**denoted**
200:19
**denying**

282:6 295:8 296:12
**deposit**
203:15 204:4,6,17
208:6 266:14
**deposited**
176:10 265:20
**depositing**
136:3
**deposition**
1:14 4:4,12 6:6,25
7:10 8:4,14 60:21
101:7 121:3 131:19
131:24 132:25
142:2 175:4 190:13
217:15 218:10,16
219:14 235:9
276:14 283:3,17,19
290:11 291:9,17,17
307:21 308:5 309:6
**deposits**
200:18 201:2,3
202:22 290:15
**derive**
58:13 66:19
**derived**
145:24 209:4 213:3
**describe**
15:25 46:21 47:15
145:16 293:3
**described**
17:23 23:11 24:14
75:7 96:8 107:5
119:9 133:15
187:17 196:4,13
201:15 218:7
246:11 266:11
291:20 293:4
305:12
**describes**
133:19
**description**
133:9 311:12 312:5
**designated**
60:21 219:14 297:12
**designation**



297:17
**designee**
6:24 185:13
**despite**
135:16 163:11
164:15 165:2
**dest**
67:23
**destination**
67:24
**detail**
89:11 120:24 177:20
184:5 202:14
257:16,18 300:16
**detailed**
89:11
**details**
226:7
**determination**
134:4
**determine**
13:18,25 27:18 28:23
139:2 141:14
**determined**
212:25
**determining**
20:9 21:9
**developed**
148:23 159:11
218:22
**device**
182:16
**de-levered**
265:23
**dialogue**
185:6
**dictated**
35:11 304:20
**didn't**
24:24,25 32:5,7
58:17 59:19 76:7
87:4 88:3 128:11
161:2 207:14
225:14 227:2
285:11

**differed**
246:24 269:8
**difference**
91:17 178:8 207:23
**differences**
23:9,16 24:5,6,12
**different**
15:10 20:8 21:4
32:19 48:17 52:17
71:19 87:6 91:22
96:9,19 134:25
146:15 153:7
155:20 162:18,19
163:25 164:2 188:4
190:3 191:23
205:17 213:10
215:13 220:23
222:22 231:11
232:17 235:7
242:21 243:9
248:21,22,24
263:14,16 264:16
274:2 287:17,21
292:4
**differential**
22:2
**differently**
97:16 127:10,21
205:22 239:11
252:18
**differs**
37:23,25
**digit**
201:12
**digital**
76:23 104:19 152:11
152:22 155:13
156:17 212:20
223:18 241:10
243:19 245:2 249:2
252:16 254:14,15
277:2,6,11,16 278:6
284:13,14,22,23
289:14 290:15,19
**diminimus**

201:11,18
**directionally**
239:22
**directly**
68:22 141:8 226:17
227:2 233:22
236:18 248:11
**directors**
304:21
**dis**
283:18
**disagree**
8:19 153:22 308:14
**disallowed**
304:25
**disclosed**
162:20 305:22
**disclosure**
281:7
**discovered**
44:8 205:10 264:20
276:24
**discovery**
194:17 196:9 197:6,8
197:13 198:8
199:10 223:10
249:23 250:5
280:20 312:15
**discuss**
59:19,23 60:4 93:3
156:14 283:3,15
**discussed**
10:2 11:17 12:3
16:15 19:5 23:5
38:25 81:12 107:4
116:7 147:25
155:11 158:19
162:7 163:3 169:12
174:22 184:5 191:7
191:15 200:17
201:6 209:3 243:10
245:18 253:3
260:18 283:18,20
283:22 284:4,5
296:2

**discussing**
82:6 94:3 98:7
118:12 129:16
132:24 138:23
155:17 159:25
171:12 210:9
243:23 246:14
296:3
**discussion**
82:4 176:6 181:9
197:8 214:6 227:9
293:9
**discussions**
39:8 74:10 159:9
176:23 197:3,13,21
199:7,13 200:9
203:8 216:13,20
272:6 283:8 290:9
312:13
**dismiss**
185:6
**dispense**
280:17
**displayed**
72:20,23
**dispute**
132:22 198:20 207:6
258:8 265:7,9
276:25
**disputed**
147:15,21,22
**dissimilar**
178:15 233:23
**distinction**
40:14 203:23
**distributions**
305:6,15
**District**
1:2 4:8
**dive**
93:25
**doc**
14:23 189:12,12,19
189:21 190:4,8,17
190:21,23 191:25



192:16,19 193:21
195:20 196:9
197:23 199:16
200:15,21 201:21
203:20,20,23 204:2
204:11,11,18,20,23
204:25 205:23
206:19 207:11,15
207:20 208:11,15
208:20,24 209:6,10
209:14,15,20,21
246:18 299:15
**dock**
206:21
**docket**
305:23
**documentation**
165:8 169:17
**documented**
7:12 232:15 293:11
**documents**
13:3 33:15 36:5
39:12 40:9 59:24
68:23 74:15 91:10
111:6 122:8 123:24
129:4 146:17 149:9
175:24 176:17
195:24 197:24
207:25 239:13
242:8 248:20
255:12,14 256:14
269:25 280:12
289:12 290:13
292:14 293:2,7
298:14 300:5
308:25
**doesn't**
25:3 38:11,12,13
58:25 77:16 101:21
101:21 128:11,12
151:11 188:3
225:24 232:7,8
236:3 279:17
**doing**
69:2 104:10 185:9

191:4 201:24
223:24 247:12
263:12 266:5
308:10
**dollar**
70:12 71:14,25 72:4
78:7,22 79:13
121:20,23 122:21
139:8 151:22
152:13 154:5
164:20 203:24
207:24 220:7
240:16 259:2
270:19
**dollars**
19:4,7 78:2,3,10
83:13 122:5 123:9
139:23 145:6 202:3
204:6 211:5 240:11
260:23
**done**
20:6 67:2 77:14 87:4
114:3 124:8 128:16
141:3 151:15 209:7
215:8,22 216:4,10
219:6 232:3,7
248:11 250:22
286:18 291:9,20
301:24
**don't**
17:18 31:14 36:16
37:6,24 38:9 41:4
49:22 50:13 52:7
61:16 67:20 72:9
99:13,17 103:2,23
105:14 111:13
114:17 117:22
122:3 123:25
128:22 129:23
132:2 134:24
143:22 145:13
146:16 148:4
156:21 160:9,20
161:12 166:14
167:6 169:16

170:17 172:10
181:17 184:12
185:5 186:17 189:5
192:19 193:16
199:4 207:2,12
208:2 209:12 226:7
240:24 247:8 249:5
255:16 264:8,9
268:23 270:3
278:20,20 279:11
283:10 294:24
298:10 300:13
**door**
162:21
**dot**
282:11
**doubt**
123:16,23 124:2
133:17 223:20
225:10
**down**
68:10 102:21 103:7
127:7 128:14 136:3
153:25 161:22
259:3
**draft**
43:13 44:2 216:21
218:21
**drafted**
43:22,23 44:20
**drafting**
43:16,17,19 44:6
**draw**
26:7 28:10 49:23
212:2
**drawing**
153:7
**drawn**
28:15 48:20 49:7,15
49:17 50:2,9 51:4,5
51:7 58:5,9 63:21
69:4 70:17 72:7
83:17 84:18 85:12
85:23 90:12 94:13
95:19,23 98:12

**drivers**
208:10
**drop**
247:19
**dropped**
29:23 104:21
**due**
15:19 31:7 127:15
158:24 201:14
245:16 246:2 253:2
259:11 261:3,7
**duly**
5:17 310:5 313:11
**duplicative**
164:12,22
**during**
49:12 108:20 128:6
133:6 138:10,16
141:25 217:8 223:3
223:6 269:14

---

**E**

**E**
2:2,2 5:16,16,16
310:2 311:2,7 313:2
313:2
**each**
20:7,25,25 71:24
78:10,11,12 89:12
95:20 96:3,24 97:10
166:24 169:18
185:25 204:13
223:18 229:16
232:19 248:24
251:12,25 256:15
257:25 261:6 274:3
281:5 282:12
290:15,16,18
**earlier**
15:11 22:25 33:4
40:23 54:8 88:4,24
102:4 111:24
127:10 162:7
171:13 199:7 224:4
227:9 228:17,21



238:14 244:17
245:4,18 259:7
268:22 269:9
271:10 278:16
**early**
206:6,7
**easier**
228:18 262:9 299:22
307:19
**easily**
202:25
**eastern**
4:12 263:15
**easy**
141:7
**economic**
119:5 267:16
**economically**
105:18
**EDT**
263:16
**effect**
38:10 53:25 265:25
**effective**
294:21,24 295:4
303:25
**effectively**
16:14 27:6 28:4
31:16 108:15
113:14,17 115:11
116:14,19 159:13
164:4,6 166:9
208:24
**effectuate**
233:13,15,17,19
**effectuated**
233:10,21,22 247:16
**efficient**
308:11
**efforts**
135:16
**eight**
238:17 240:4 258:5
258:12
**either**

89:13 104:18 115:18
117:17 134:13,20
178:5 214:14
233:21 265:21
278:23
**eliminated**
270:9,10
**else**
19:25 67:15 106:25
112:16 127:6 129:2
196:2 210:2 234:21
237:18 280:2
**email**
182:15 183:12
184:12 186:15
187:20 222:12
224:4 262:10
263:18
**emails**
7:12 36:16 199:14
261:17
**embedded**
115:7
**employee**
74:19 181:2 235:24
**employees**
43:21 74:13,16,24
75:3 111:10 166:20
180:18 236:22
**end**
51:6 67:25 194:18
245:13 250:25
280:3,4,5 299:8
**endeavored**
252:12
**ended**
17:8
**ending**
17:22
**enforceability**
55:8
**enforceable**
44:12 55:3 293:17
296:24
**enforced**

180:3
**engaged**
274:5,18
**engagement**
273:25 274:4,11,19
303:18,23 304:2,6
**engine**
91:12,12,16,17,25
92:2,7,11 93:5,13
98:5,6 102:4 103:6
103:20 108:22,22
109:19 110:18
121:18 123:6
135:17 154:22
158:25 159:14
164:9 227:8,8
244:20 259:19
**enough**
135:18 159:2
**ensure**
108:15 124:23
127:13,18 164:14
180:23 239:19
**entered**
7:8 9:6 12:17 32:3
35:12 67:14 109:8
233:8 237:6 240:15
268:4,12,18,20,25
275:12 304:2 306:6
**entering**
8:13 267:22
**entire**
21:19 145:4 168:16
168:17 186:9
270:23 286:23
**entirely**
64:18 65:16 127:20
135:22 167:17
**entirety**
20:19,21 147:13
163:8 187:2 192:25
222:5 242:6
**entities**
225:21 285:20
**entitled**

120:11,19 194:6,14
311:18 312:9
**entitlement**
71:11 79:9 125:22
146:7,11,19 147:10
149:8 153:25
**entitlements**
70:23 109:2 146:18
146:18 148:8 171:2
211:23 226:4
284:12,21 285:8
286:18 287:8 288:3
288:17 289:9
**entity**
175:16 297:21
**entries**
54:2,5,9,12 55:10,13
55:15,17 104:16
126:4 134:6 171:3
206:16 226:4
260:15
**entry**
32:2,10,17 33:9 34:2
62:15 125:23
186:10 240:22
241:22 260:19
**equal**
47:22,24 78:18 80:25
158:22 160:25
252:22
**error**
16:24
**ESQ**
2:7,8,8,9,16,16
**establish**
142:23
**estate**
142:22 272:18 276:2
305:8
**estate's**
147:9
**estimate**
141:3 144:3 147:9
161:19
**estimated**



285:8 286:4
**estimation**
144:7 146:2
**et**
1:3 2:6 4:7 258:16
**ETH**
240:19 253:23
288:22
**ETHE**
253:20
**ethereum**
287:19 288:22 289:9
289:9
**even**
30:12 95:7 141:21
154:16 296:19
**event**
104:15
**events**
238:21
**eventually**
136:5 147:3
**ever**
23:3 53:3,17 87:15
93:13 140:18
141:22 168:22
234:19 235:18
244:21 247:18
271:18 291:11
**every**
10:3 11:18 16:5 18:9
52:14 59:25 60:2,3
87:13 93:16,17
119:19 125:14
142:24 149:14
151:12 174:23
191:18 202:2 217:6
226:7 231:10,19
236:2 239:12
242:10 289:24
293:11
**everyone**
224:2 262:9
**everyone's**
228:18

**everything**
31:12 35:21 79:3
199:5
**evidence**
101:23 128:15
180:25
**evolved**
139:16 207:20
**exact**
11:15 18:20 50:5
59:5 140:13 152:7
160:21 172:10
179:5 207:2 268:24
**exactly**
64:25 89:16 150:23
153:3 207:12
301:19
**examination**
5:20 309:14 311:4
313:10,12
**examined**
5:19 242:10 291:6
**example**
21:6,17,20 96:12
109:16 112:8,17
113:21 116:8
122:10 135:3,22
141:22 145:6,9
150:22 151:20,21
152:6,8,10,16
153:10,19 154:15
167:20,23 182:14
183:23 205:5
258:16 286:15
287:11,15 288:7
**examples**
117:8 135:23 142:18
142:19 143:4
150:11 155:8
166:15
**exceeded**
125:11 127:2,5 288:4
**Excel**
56:17 181:24
**except**

253:21
**exception**
174:21
**exchanged**
253:17
**exchanges**
12:20 178:18 269:18
269:23 270:3
**exchange's**
125:15 134:4
**excluded**
200:24 203:19
**exclusion**
204:3
**excuse**
67:24 210:7
**execute**
177:24
**executing**
180:5
**exercise**
142:22
**exhibit**
8:6,8 9:13 41:7,10
51:15,18 73:3,3,5
82:22 93:21,23 99:6
101:3 120:14,17
129:10 131:6
136:25 137:5 157:3
157:5,7 171:14
175:7,10 181:13,16
194:10,13 216:14
216:17 221:8,11
238:23 239:2
249:25 250:4 256:2
256:5 261:21,24
264:23 276:6,8
280:9 298:19 299:3
311:11,11 312:4,4
**exhibits**
129:9 306:19 311:9
312:2
**exist**
236:4 270:4 285:11
285:16

**existed**
55:18
**existence**
50:24 128:6 143:9
236:2 246:14
**existing**
253:21
**exists**
236:3
**expedited**
309:12
**expense**
115:12
**expensive**
142:21
**experience**
64:20
**explain**
19:21 185:14
**explained**
90:3
**explanations**
197:4
**explicit**
148:5 188:8
**explicitly**
22:12 57:13 66:15
168:10 169:8,22
184:25 291:9
**exposure**
121:20,23 122:5,21
265:24
**expressed**
19:3,7 78:9,13
196:19 197:22
**expressly**
68:7 256:19
**extend**
31:6 34:23 35:6
118:15 258:15
**extended**
33:23 90:4 174:20
**extending**
34:24
**extensive**



140:20 141:16
264:24
**extent**
11:22,24 15:5,6
28:12,21 29:5 81:9
81:11 85:11 155:6
155:22 213:21
226:12 248:19
264:19 269:3
272:10 295:11
**external**
169:15
**Extra**
167:23
**extract**
56:6,9 141:8 158:3
160:22 164:15
**extracted**
10:13 56:20 262:7,8
**extraction**
56:23
**extremely**
60:4 133:16 142:21
**eyesight**
256:8

―――――― F ――――――

**F**
313:2
**face**
27:17 48:10,16,16,19
49:5 50:3,9 54:24
69:23,23 85:22
94:13 174:15
**faces**
152:18
**facilitated**
166:19
**fact**
22:5 31:9 35:8 44:7
93:13 122:3 123:5
123:19 124:11
133:24 136:11
137:12 138:9 147:6
160:2 165:5 172:4

189:6 192:22
198:16 214:10
228:10 230:24
233:3,18 245:16
246:2 250:13 254:5
255:3 257:23,24
258:15 259:7
264:21 283:18,20
284:4 296:16
**factor**
69:24 75:13 179:22
**factored**
95:3
**factors**
20:8 21:14 22:9
89:12 96:9,18
155:20 251:23
252:11 295:15
**facts**
236:15 260:9
**factual**
42:21 45:17 81:5
146:4 200:10 203:9
236:19,22 237:4
273:11 281:16
282:6,18 283:3,23
284:6 295:7,19
296:11,23 297:20
**factually**
41:24 44:19 237:12
237:13
**failure**
158:24
**fair**
47:11 61:18 63:9
65:23 154:2,11
189:19 245:25
251:17,19 252:10
253:4
**fairly**
12:21 160:11
**faith**
282:5
**falls**
35:13 92:20,24

**familiar**
18:13 37:14 41:16,19
41:22 52:4,6,8
72:17 91:13 120:21
131:12,14 132:2,15
137:9 150:23
163:21 179:25
180:7 218:4 250:10
269:21 276:9
290:23
**familiarize**
263:20
**far**
76:24 79:7,10,14
156:21 189:6
299:20
**FARMER**
3:7
**fashion**
28:5 174:14 187:6
237:7
**favorable**
113:14 115:12 116:9
119:3
**fee**
115:5,7 117:4,13
120:2,3 168:3,4,23
305:25 306:2
**feel**
7:20 66:10 157:18
166:3 192:18
250:21
**fees**
119:4 166:17 201:12
201:16 205:4,6,8,13
205:14
**fell**
23:24 26:18 30:15
34:11 86:24 228:3
229:6
**few**
245:10 256:9 298:14
**fiat**
71:24 76:23 104:19
265:21 285:6

**field**
66:14 67:10,17
201:15 205:12,15
301:6,13
**fields**
168:16 300:2
**fifteen**
167:6
**figure**
11:16 19:3 164:3
**figures**
24:7 62:8,8 66:19
68:20,25 209:4
244:12
**file**
186:4
**filed**
146:8 147:7 149:6,12
171:6 207:9 272:17
272:22 305:24
307:7
**filing**
207:16 272:9,12,15
**filings**
137:23 232:15
275:25
**fill**
117:7 256:25
**fills**
10:12,17 13:20,22
14:20 15:5 256:13
**final**
66:9 68:14 116:20
135:20 193:25
305:25 306:2,8
**finally**
205:20
**financial**
64:21 90:16 91:8
94:21 197:5 213:11
271:4,5 273:23
274:9,12 275:7,20
278:4,10,13,15
**find**
109:20 167:20



208:16 278:4,19,22
**fine**
88:2 268:10 306:19
**finish**
35:25 87:3 213:7
258:7
**finished**
241:2
**firms**
274:20
**first**
5:17 26:2 28:10
38:19 39:3 41:11
44:23 52:9 73:7
83:8 93:5 102:20,21
115:8 129:11,11
157:20 161:23
182:20 193:14
194:23 197:19
198:7 241:24
247:20 249:11
275:24 310:4
**five**
161:19
**flip**
61:12 66:10 67:5
194:18 238:23
**fluctuation**
154:16
**fluctuations**
156:11,14
**fly**
243:14
**focused**
191:19
**focusing**
231:24
**follow**
258:15
**followed**
238:19 245:6 254:19
299:14
**following**
51:22 153:4 154:12
169:21 241:11

243:4 245:12 259:6
259:8 292:12
303:25
**follows**
5:19 132:20
**font**
157:16
**footer**
52:13,17 157:13
256:15
**footers**
52:3
**foregoing**
310:8
**foreign**
194:8,15 196:23
312:10
**form**
10:24 11:11 15:3
17:16 20:3 29:3
33:7 35:20 38:19
39:4,21 40:19 45:4
45:17,20 46:12
50:12 54:7 56:13
57:17 59:22 63:2
64:10 70:4 71:2
73:18 77:21 81:9
86:7 87:23 90:2
91:3 97:4,15 107:13
110:11 118:18
119:7 122:23 124:4
124:14 125:13
128:21 130:7,21
133:3 134:23
142:15 148:14
156:20 160:17
173:22 174:11
180:17 185:21
187:13 196:15
198:15 204:15
210:14 211:16
212:8 220:11 230:3
237:20 242:4 243:8
244:4 246:9 255:19
265:10,12 266:8

269:20 270:12
271:13 272:21
274:17 275:2,15
281:19 283:7 285:3
285:23 289:16
291:3,25 297:25
298:19 301:20,23
305:10 312:21
**formal**
65:4 165:8
**formally**
134:6 172:21 278:17
293:11
**format**
51:14,19 56:19,21
221:13 256:6 262:7
299:4 302:10
311:16
**formed**
38:24
**formula**
19:14 21:15 23:2
24:16,24 75:24 76:5
89:12
**formulaically**
37:23
**formulas**
23:7,10,15,20 25:4,8
25:8 37:24
**forth**
294:14 313:11
**found**
280:16 296:9
**four**
139:14 168:4 230:18
254:13
**fraction**
92:25
**frame**
263:16
**free**
7:21 66:10 157:18
166:3 192:18
250:21
**frequently**

14:12 112:22 173:13
232:17 255:6
**Friday**
307:8
**friendly**
302:10
**front**
37:9 82:18 129:8
181:21 193:19
223:22 228:16
280:12 306:21
**FT**
11:2 284:13
**FTT**
211:9 240:19 253:23
**FTX's**
11:6 22:4 23:18
29:19 30:12 32:24
35:5 37:17 38:5
43:25 44:22 45:10
46:7,13 47:17 50:9
50:21 56:22 57:25
59:12 64:7 65:8
66:6 67:25 70:21
73:21 75:4 77:19,23
82:6 84:16 87:6,20
90:21 101:16 107:9
110:5 114:20 118:3
130:18 134:20
137:22,23 153:14
156:16 159:19
172:23 202:22
203:3,9,10 212:4
229:5 242:20,22
250:25 261:13
263:10 264:6,23
275:3,16 279:20
284:24 297:8,9
308:18
**FTX.com**
167:21 178:13 183:7
183:8 187:6,23
188:6,8
**full**
27:21 49:13 80:5,11



95:9 103:5,12
165:18 166:23
169:16 208:2 224:9
288:6
**fully**
15:14 49:14,17,23
50:9,19,22 51:3,5,7
63:7,21 131:22
**function**
71:4 98:16 102:14
227:12
**functionality**
27:10 68:6 179:4
**functioned**
28:5,7 72:18 164:5
164:19 174:13
**functioning**
70:16
**functions**
84:7 166:21
**fund**
102:13 115:25 116:2
116:4,25 117:6,20
117:21,24,25 118:6
118:6,8,15 119:2,8
119:13 120:4
123:12,21 124:10
124:18,19 125:2
126:18,21 132:16
132:23 133:10,11
133:13,19 302:4
**funded**
119:8
**funding**
223:2 299:25 301:14
**funds**
162:22 163:10
164:15 171:19
265:21
**further**
38:17 92:22 139:16
147:12 177:14
202:7 215:21,23
216:2 218:23
231:23 232:2

239:11 259:11
260:24 261:3
281:21 282:3,8,24
284:11 296:19
310:8 313:14
**future**
11:22,24 12:11,15,16
12:16 13:13 14:11
15:6 108:19 109:4,7
110:2 112:9,18,19
113:5,9,15,20 115:9
116:19,21 126:22
127:14 135:5 192:6
**futures**
9:2,7 10:2,10,15 13:7
14:12,17 108:17
109:9 110:4,13,24
111:21 112:2,13,23
113:22 114:2,8
117:12 125:5
127:11,12 134:12
134:19 192:8,11
193:9 197:9 199:22
208:4 210:4 217:19
269:13 275:10

---
### G
**G**
2:16
**gain**
10:14 115:8
**gains**
9:25 10:9
**gain/loss**
12:14 14:15
**gap**
117:7
**Gaurav**
3:4 5:11
**gave**
112:8 115:11 310:5
**GBTC**
240:19 253:19,19
**general**
14:18 17:4 19:19

31:11 58:10 91:15
91:25 111:15 140:9
156:9,13 157:22,24
158:2 169:7 170:5
178:17,19 182:23
183:4 184:23 185:2
213:3,5,12 223:4
234:15 235:2
239:17 245:5
270:16 276:2 285:4
285:24 286:2
294:12 295:18
**generally**
13:12 15:12 21:13
37:16 52:6,8 56:3
125:7 154:23
168:19 170:7 177:9
186:19 220:16
222:3 257:7 263:10
275:5,18 291:19,21
300:8,16,18
**generated**
67:15
**Genesis**
183:24
**Genesis@projectse...**
167:7
**get**
12:25 16:7 48:4
69:13,19,21 90:13
96:13 111:23 112:6
128:24 153:8
159:16 162:25
299:6 301:22
**gets**
48:7
**getting**
127:15
**give**
113:21 120:9 194:4
234:16 298:16
**given**
6:15 12:16 44:5 46:9
62:6 116:9 123:18
126:24 131:3,10

144:2 154:18 180:3
187:19 201:2,8,24
218:20 229:22
234:13 237:25
264:10 279:8 297:4
310:10 311:21
313:13
**giving**
152:5 194:22
**go**
30:2 35:2 61:20
106:13 155:3 159:6
169:6,9,11,19,23
170:8 181:4 213:23
262:21 302:2 306:8
**goal**
103:6
**goes**
128:4
**going**
6:17 61:13 81:19
105:5,11,20 106:15
117:6 128:13
132:12 136:17
141:9 151:18
157:17 159:3
161:18 163:14
167:5 171:11
178:13 181:6 188:5
189:11,18 210:20
225:7 266:20
279:24 280:8
293:12 298:21
306:7
**Goldberg**
2:8 5:4
**gone**
124:6 155:6
**good**
4:2 5:6,25 6:2 282:5
**Gordon**
217:10,11 219:9
**Gordon's**
190:13 219:9
**got**



30:21 152:11 173:6
228:21
**gotten**
110:19
**govern**
130:9
**governing**
130:10
**gray**
262:6 263:23
**greater**
145:19,22 289:8
**ground**
39:18
**group**
286:3,8,14,23
**guess**
140:12 151:20

**H**

**H**
311:7
**hadn't**
110:19
**hand**
157:3 215:16 313:19
**handed**
41:9 51:17 120:16
136:24 175:9
181:15 194:13
216:16 221:10
250:3 256:4 276:8
299:3
**handled**
306:22
**happen**
154:13,15,21 207:14
229:20 264:17
**happened**
54:4 93:17 97:24
98:2 120:6 170:24
170:25 185:4
227:21 228:7
238:17 242:15
243:2 246:24

265:18
**happening**
135:19 238:22
242:15
**happens**
92:20 293:9
**happy**
37:10 47:7,8,14
60:25 153:20 182:3
190:4 207:4 224:8
265:2 294:8,9
301:17 302:9
**Harris**
2:9 5:4
**has**
7:12 20:7 21:4 27:8
33:15 39:12 41:10
42:16 51:18 63:5
64:23 66:5 71:15
77:17 91:10 95:9
114:17 120:17
122:18 123:20
136:24 139:15
143:19 146:13
151:6,10,13,22
152:11 153:9 157:7
162:20 173:25
177:15,16 181:16
190:2 191:9,19
192:14 193:11
207:20 211:20
215:22 216:4,10
218:17 219:4,5
226:11 232:2,4
252:12 253:3 272:2
272:17 279:15,25
287:20,25 291:5,20
292:3,13 299:15
303:22 305:18
307:10,23 308:16
**hasn't**
150:8 151:12
**haven't**
118:21,25 119:19,20
125:14 150:7

254:25
**having**
5:17 40:22 60:16
122:16 128:16
145:16 151:15
163:11 164:16
165:2 174:13
180:19 211:19
212:19 255:22
264:23 268:12
303:20 310:4
**he**
133:19 175:17 176:5
176:15,19 177:3
**head**
27:8
**header**
217:4
**headers**
61:16
**heading**
59:15 299:13
**headings**
61:13
**heads**
39:15
**health**
271:5
**hear**
35:5 164:18
**heard**
235:6
**hearing**
176:22
**heavily**
191:4
**held**
1:15 159:23 181:9
214:6 249:15
285:19,24 286:2
288:15 290:20
**help**
18:22 23:6,11 24:13
24:18 101:11
**here**

7:7 34:5 38:13 59:20
67:7 75:14 77:16,23
80:25 81:15 88:19
89:21 90:11 96:4
100:12 102:11
112:6 122:7 132:23
133:10 136:15
141:21 144:13
150:2 152:8,10
153:8 157:16
161:19 165:22
166:5 176:20
183:18 187:17
217:17 219:7 225:5
228:18 241:7
243:14 262:18
263:13 266:19
268:19,23 279:17
286:12 287:14
293:4 296:21 298:5
298:12,16 300:21
301:19,23 303:8
306:8,21 307:2,15
308:5,15
**hereby**
310:4 313:8
**hereinbefore**
310:11 313:11
**hereunto**
313:18
**high**
18:24 109:9
**higher**
96:15 203:25 204:5
204:24
**highlights**
121:7
**him**
6:17
**his**
8:2 131:4,10 133:6,9
217:14 304:14,22
304:23 305:4
311:21
**historical**



21:23
**historically**
21:7,21
**history**
123:10 125:15
220:13 242:7
270:24
**holder**
278:6
**holding**
135:4
**holdings**
286:22 287:9
**honest**
131:22
**hope**
172:2 293:13
**hopefully**
294:6 299:2
**hour**
307:3 308:9
**hourly**
299:25
**hours**
7:25 304:20 305:12
**how**
8:4 13:9 16:6 18:18
18:24 23:10 46:19
48:22 49:4,4 58:12
59:6 63:20 65:2
67:16 72:18,19 74:7
75:13 76:10 77:3
83:22 85:10 87:19
99:13,19 103:20,25
111:3 118:14
119:12 120:6
122:12,25 127:2
128:4 129:20,20
142:11 143:16
144:22,22 146:4,9
146:17,17 148:22
150:16,17,23
153:13,13 154:19
156:5,6 160:15
163:22 168:16

171:4,17 178:15
179:2,17 201:15
207:23,23,23 208:7
209:3 211:13
212:24 215:8
226:18 230:5
232:17 233:9,23
240:9 241:10 243:3
249:10 251:14
269:6,6 274:13,22
275:9 278:19
281:23 284:12,21
285:20 301:19
304:16 305:17
**however**
214:14 223:13
**hypothetical**
80:16 84:22 88:8,10
90:15,19 91:6 94:22
95:6 296:18
**hypothetically**
88:17

**I**
**ID**
66:9,13 182:15,15,16
183:12,15,17
222:12,12 224:9
299:23 303:8
**identification**
8:8 41:8 51:16 93:23
114:15 120:14
131:6 137:5 157:6
175:7 181:14
194:10 216:14
221:8 250:2 256:3
261:21 276:6
298:20
**identified**
60:20 88:19 140:6
141:21 142:19
165:13,22 216:22
232:5 292:13 302:5
**identify**
50:16 137:19 223:15

**identities**
215:18
**identity**
257:11
**illustrative**
224:24
**immediately**
17:18 98:7,8 161:2
206:9 209:25
265:19
**impact**
25:6 83:20 89:4
103:8 179:14
201:18 205:18
241:13 247:13
**impacted**
208:8 238:4 304:24
305:5
**implemented**
214:12
**implication**
57:10
**implications**
59:5 159:18
**implicitly**
57:14
**implies**
145:17
**imply**
63:12 216:3
**impose**
77:2 179:22
**imposed**
227:14
**improper**
65:9,20
**improved**
51:10
**inability**
135:13
**inaccuracies**
122:10 123:3 241:5
**inaccuracy**
123:18
**inadequacies**

276:3
**incentives**
119:5
**incentivize**
116:10
**inception**
137:22 270:17
**include**
29:9,11 36:13 72:6
83:17 84:13 85:11
85:11 89:14 146:25
149:10 160:19
167:21 184:3 188:9
202:10 217:10
268:17 295:16
**included**
15:4 66:18 71:10
78:10 89:22 108:24
144:12 166:16
179:12 184:6
192:11 193:7 197:8
199:2,4 203:16,17
203:20 269:4
283:19 287:11
296:7,7
**includes**
13:7 70:24 147:24
188:8 198:7 256:20
300:6
**including**
62:16 69:15 71:24
137:20 179:19
197:22 199:12
250:7 264:17 285:5
295:25
**inclusion**
30:17 179:13 192:5
**inclusive**
293:20
**incomplete**
192:20,23 193:2
**inconsistency**
167:25 241:9
**inconsistent**
275:5,18,23



**incorporated**
192:9 201:13 206:14
**incorporates**
294:12
**incorporation**
57:21
**increase**
27:5 28:18 204:8
269:11,13
**increased**
27:16 113:23
**increasing**
202:9
**incremental**
10:5
**incur**
128:9 267:19
**incurred**
115:9 126:12 135:2
**incurring**
105:25 106:5,23
116:20
**indebtedness**
172:20,24 173:19
**independent**
66:24
**indicate**
236:20
**indicating**
308:10
**indication**
185:3 234:20
**individual**
6:7 8:17 43:7 145:5
149:14 168:25
173:9 175:14 177:5
214:25 232:19
233:7
**individually**
185:16 281:4
**individuals**
179:8
**indulge**
294:5
**inevitably**

128:9 198:17
**info**
163:5
**informal**
196:8,8 197:2,6,8,13
198:8 199:10
**informally**
299:16
**information**
14:25 24:17 42:12
58:22 67:20 114:17
124:21,25 158:3
160:22 179:14,16
182:25 183:5
185:23 188:7
190:25 196:20
197:2 198:10
203:12 209:11,24
210:4,7 215:3
218:11 222:19
224:15 232:25
256:21 257:10
271:7 272:7 287:25
289:7 291:6 299:24
300:18
**informational**
101:11
**informationally**
185:14
**informed**
213:25 290:5
**info@alamedarese...**
161:24 224:5
**initial**
37:14,19,21 38:7
110:6
**initiate**
211:17 228:5 234:9
**initiated**
213:22 239:24
**initiating**
211:18 264:25
**initiation**
238:6
**inquiring**

74:11
**inquiry**
290:25
**inside**
39:15 230:6
**insiders**
167:15
**insist**
7:14
**insolvency**
271:22,24 273:13
**insolvent**
271:19
**instance**
23:12 147:5 223:25
**instances**
93:6 125:9,20 166:18
231:20 270:6,19
**instant**
36:14 261:16
**instantaneously**
207:14
**instead**
153:16
**institutional**
41:13 72:12 172:17
178:20 179:2
**instruct**
6:17
**instructions**
294:14
**instruments**
64:19
**insurance**
102:13 115:25 116:2
116:4,25 117:6,20
117:21,23,25
118:14 119:2,8,12
120:4 123:12,21
124:10,18,19 125:2
126:18,21 132:16
132:23 133:10,11
133:13,19
**integrating**
178:21

**intended**
105:4 252:6,8
**intending**
8:11 122:7
**intensive**
142:21
**intent**
21:12 103:2,23
105:22 115:17
121:24 123:2
129:23 249:8 260:7
261:13 264:6,9
267:15
**interest**
51:25 52:15 55:24
56:8 57:21 58:2,4,9
62:12 64:2,6,15,16
64:21 65:4,10,17,21
68:9 171:17,20
172:5,8,10,11
173:18 174:3 278:6
293:18 294:17
296:24
**interested**
313:17
**interests**
297:6,11
**interface**
180:21
**intermittent**
12:6 51:8
**internal**
160:9,13 166:8
167:24 169:14
183:13
**international**
275:7,20
**interpose**
6:12
**interpret**
42:8 74:4 99:11
130:17
**interpretation**
33:21 43:3 45:6,9,10
46:8 47:18,25 65:25


MAGNA
LEGAL SERVICES

66:4 68:2 87:14
126:4 130:23
173:18 232:24
**interpretations**
45:13 46:5,14 173:16
**interrogate**
72:15
**interrogatories**
137:4,9,13 139:18
198:7,22 250:8,14
311:24
**interrogatory**
137:18 139:21 140:7
158:18 196:7,13
197:19 223:12
250:15,18,20
**interrupting**
87:10
**intervals**
135:4
**intimate**
199:12
**intimately**
131:14 163:21
195:15 198:18
**into**
7:8 9:6 12:17 31:19
56:21 69:24 74:11
75:13 87:17 90:13
92:19 93:25 95:3
108:18 109:8,21
112:11,17 113:3
116:11,24 127:19
155:20 162:8 178:6
178:9,11,12 180:4
188:5 192:9 223:7
234:2 247:3 248:11
251:23 262:21
265:21 266:3
267:23 268:4,12,18
268:20,25 275:12
304:2
**intricacy**
195:19
**introduced**

264:22
**investigate**
62:19
**investors**
178:20 179:3 206:7,9
**invoke**
235:17
**invoked**
235:11
**involved**
43:17 108:11 124:19
125:3 167:16
190:14 191:5
195:12,15 198:11
198:19,21 199:12
214:16 219:2,10
232:9 255:6 256:10
**involvement**
274:8
**involving**
230:18 252:15
**isolating**
193:5
**issue**
204:16 205:2 227:22
283:9
**issued**
49:19 206:6,7 250:8
**issuers**
206:11
**issues**
223:8 308:3
**item**
121:13 123:11
**its**
30:14 34:20 46:24
47:9 69:6 72:10
77:5 78:7,21 79:13
84:12 85:15 88:20
89:4 97:12 104:21
127:4 134:13,21
136:6 147:23
159:17 180:13
191:9,12 192:25
193:12 229:6,18

234:2 261:4 264:6
264:21 266:11
273:12 274:14,23
275:11 281:12
294:15 296:22
297:13
**itself**
15:13 75:10 111:22
130:19 167:16
289:20
**i.e**
193:5

---

### J

**Jacob**
3:6 5:5
**January**
285:11 295:5
**Jeremy**
3:8 4:17 306:8
**Jim**
175:13 176:5
**job**
256:11
**John**
304:16,19
**joined**
5:3
**joint**
2:3 4:24 6:7 11:12
12:12,22 13:15,21
14:19 15:8 26:4
37:9 42:17 137:2,8
161:15 193:4,15,17
195:6,13,22 196:5
197:16 198:3 199:8
207:2 210:12
223:14 250:8
261:19 276:15,25
280:6 290:13
307:24 311:23
**Julie**
177:4
**July**
193:23 194:19 195:3

195:14,23 196:21
197:17 198:3,19
259:4,6
**jump**
18:21 217:16
**jumping**
68:8
**junior**
217:7

---

### K

**K**
5:16
**keep**
12:4 189:5,6 224:2
307:18
**keeping**
103:8,21 213:15
228:16 307:20
**key**
237:25
**kick**
108:3 259:19
**kicking**
108:2
**kind**
81:6 118:7 168:23
205:4 214:25
**knew**
271:15
**knowing**
252:11
**knowledge**
39:14 56:22 91:7,24
93:14 106:19
114:21 155:23
163:7 169:15
177:22 184:17,18
184:20 199:5 207:6
209:23 215:2
244:23 272:10,14
273:9 295:19
**known**
271:8
**knows**



218:17
**Kovacs**
3:8 4:17
**Kyle**
100:20 262:11
263:12
**K11194**
302:2

---

**L**

**L**
167:24 310:2
**lack**
15:19 36:13 117:8
178:22 264:11
**language**
24:18 239:11 281:22
282:4,9,23
**laptop**
181:21,21 221:14
306:21
**large**
17:12 115:21 121:17
155:4,4 186:4 221:3
267:12,13,17
268:20
**largely**
172:2 208:21
**larger**
145:9 156:24 182:11
231:14
**largest**
115:20 119:15
174:19 255:4
**last**
6:13 61:20 63:23
159:11 173:7
194:18 195:2 201:6
201:19 205:7 258:7
306:17 307:7
308:23
**later**
65:18 67:19,21 143:7
143:14 174:4
238:20 240:4

**latest**
13:12,14,18,25 14:9
14:9,14,14,16,22
218:10
**Latham**
1:15 2:5 4:13,15 5:2
**lawyer**
42:7,25 43:12 44:15
45:5,12 55:7 66:3
99:10 130:16,24
173:3,9,14 234:13
265:11 282:22
296:4,17
**lawyers**
46:15
**lay**
16:6 208:25
**Leading**
154:8
**least**
20:14 60:8 63:15
73:10 115:25
138:10 167:3
225:11
**led**
177:15
**ledger**
32:2,2,11,18 35:12
40:10 54:2,5,9,12
54:15 55:10,13,15
55:17 65:5 104:16
104:17 118:10,13
125:23 126:5 134:6
138:22,24 140:24
141:9 150:7 168:18
171:2 172:13 174:2
179:13 200:19
201:3,5,9,17,25
203:11,15,17
206:16 213:3,5,9,9
213:13,14 226:4
233:23 237:5
238:17 240:6,15,17
241:23 242:25
249:12 252:20

253:22 254:3,8
260:16,20 268:16
270:22 288:12
289:20
**ledgers**
213:10
**left**
111:25 299:24
301:14 308:15
**legal**
1:21 4:18,19 33:21
34:16 35:9,10,13
40:19,20 42:6,24
43:2,10 44:14,16
45:4,6,7,13 46:4,9
46:13 54:7,13 55:6
55:8 65:14,15 66:2
74:4 81:5,9 90:17
91:4,8 94:20 95:15
98:23,24 100:7,14
126:3 130:15,23
131:16 134:3
135:10,20 136:6
173:2,5,15,22 200:8
203:7 212:8,9
232:24 234:12
235:2,15 236:13
237:20 248:5,6
264:10 265:12
271:21,23 272:5
273:6,15,19 281:19
282:2,21 283:8
284:9 295:11,13,14
296:15,18 297:3,18
**lend**
76:18 77:8 125:24
150:5 224:12,16,18
225:19 227:2
**lender**
76:14,22 77:3 98:21
100:3 220:16,23
225:11,14
**lenders**
99:2 117:16 222:19
222:21 223:6,16

225:22 226:3
**lending**
76:14,22 77:5,12
126:6,13 128:5
134:7 137:22
149:24,24 150:3,4
150:14,18,18,19
151:2 170:22,24
171:2 221:5 224:5
226:13,23
**lends**
221:24
**lengthy**
250:21
**lens**
222:8,10
**lent**
125:10,21 126:24
171:3 224:22 226:3
226:17,20
**less**
21:21 80:20 112:22
112:23 139:8,10
143:24 145:17
151:8 155:24
204:10 205:19
**let**
9:15 30:10 63:9
66:15 91:18 97:16
103:17 108:3
110:12 153:21
167:8 182:12 189:8
213:7 223:8 250:22
258:5 264:3 267:8
268:6,10 270:15
276:21 302:3
**letter**
176:9 237:14 303:18
303:23 304:2,6
311:12 312:5
**letters**
273:25 274:19
**letter/line**
176:7
**let's**



26:2,2 61:9 72:25
79:22,22,23 80:4
81:14 94:6 99:6
101:3 120:9 125:5
129:7 131:8 136:15
146:14,14 150:4
151:16 169:3
177:19 181:4 194:4
202:21 210:16
213:23 222:9
238:23 239:22
243:23 251:7 260:3
**level**
18:24 19:12,18,19
20:6 21:10 22:11,25
26:19 76:13 82:25
86:25 87:8 88:13
96:6 97:13 120:24
199:12
**levels**
21:4 231:11
**leverage**
28:13
**levered**
106:6
**liabilities**
78:22 146:22 148:9
149:6 274:15,23
**liability**
146:20 147:18
**life**
228:18 307:18
**lifetime**
73:9
**like**
6:11 56:20 61:18
72:12 75:15 97:6
109:7 116:20 118:8
120:7 122:8 131:16
141:6 145:9 146:22
170:4 175:24 236:6
256:14 301:21
309:10
**likelihood**
129:14,21 155:16

**likely**
106:6 109:18 112:15
125:16 215:12
232:23
**limitation**
163:19
**limitations**
180:23 253:2
**limited**
4:7 37:11 102:22
163:2 277:12
**lines**
56:8 139:14 174:8,13
174:16,25 247:25
**link**
180:23
**liquid**
156:6
**liquidate**
92:17 135:17 154:24
158:25 230:9
232:12,20 234:17
235:4 236:8 248:3
259:19 264:6
**liquidated**
104:7 108:21 112:14
115:13 116:13,22
116:23 117:3,12
121:19 127:8,16
229:12 231:22
233:4 240:10 241:6
241:11 243:3,19
244:7,25 249:3
251:2,24 252:14
259:11 261:3
264:18
**liquidating**
113:10 116:12 159:7
234:22 235:12,21
**liquidation**
91:12,16,25 92:4,11
92:22 93:5,13 98:6
102:3,7,15,22 103:6
103:20,25 104:15
108:20,21 109:18

110:6,14,18 113:8
113:20 119:11
121:18 122:4,20
123:6,6 124:12
125:3 129:15,17
135:17 154:22
158:25 159:13
164:9 219:20 227:8
227:19 228:6,10
230:18,22 231:2,4,7
233:24 234:3,10
237:6,15,17 238:6
238:18,21 239:6,23
239:24 241:21,25
242:11 243:5
244:15,19 245:6,12
245:20 246:20
247:2,7 248:14
249:13 251:15
253:15 254:6,19
255:6,9 256:13,21
257:4,12,17 258:10
259:18,23,25 260:4
260:23 261:12,13
264:25 265:16
272:9,24
**liquidations**
92:13 98:4 102:17
123:13 124:11,17
124:20 155:9 232:6
234:5 244:10
253:18 259:5,8
260:17 261:7
**liquidators**
2:3 4:25 11:13 12:12
12:22 13:15,21
14:19 15:9 26:4
37:9 42:17 137:3,8
161:15 193:4,15,17
195:6,13,23 196:5
197:16 198:3 199:9
207:2 210:12
223:15 250:9
261:19 276:15
277:2 280:6 290:13

307:24 311:24
**liquidity**
102:11 108:2,7,11,14
110:8,15,20,23
111:11,19,20
113:11,12 114:9,14
114:20,24 115:4,10
115:14,16,23 116:6
116:10 117:5,9,14
119:17,22,25 120:8
126:17,18,20
154:18 162:6
251:25
**list**
160:12,19,24 245:10
**listed**
25:24 68:13 101:20
160:8
**lists**
83:11
**litigation**
38:23 41:15 46:9
51:20 91:11 120:19
157:9 190:19 256:7
273:8,16 290:7
291:19,23 299:5,17
304:9,13 305:14
**little**
9:2 146:15 157:16
176:6 177:20
220:22 277:25
**LLP**
2:5
**load**
182:18 184:21 185:5
186:14,18
**loads**
185:18
**loan**
135:14,20 149:16
**LOC**
47:10 48:22,24 51:24
51:25 52:9,14,17,23
55:24 67:6 68:9
90:9,23,24 176:7



240:3,20 241:6
243:4 254:15
**locate**
267:8 268:6 280:13
**located**
301:8
**lock**
202:4,7 210:8
**locked**
201:20 205:21,25
  206:2,5,17,18
  245:18,22,24 246:4
  246:6,12,14,16,18
  246:21,21 247:4
  259:12 261:4
**locking**
206:12 261:6
**log**
178:6 179:7,8,24
  180:19 193:18
  233:25
**logarithm**
214:25
**logged**
187:5,22
**logging**
178:9,11,12 180:4
  188:6
**logic**
92:18
**login**
180:9,14 185:6,24
  187:7,16,18
**logins**
183:2 188:8
**long**
109:16 267:17
  269:13
**longer**
31:3,6 32:20 33:3
  34:23 35:6 122:16
  188:21
**look**
13:20,21 26:2 60:23
  73:6 87:13 129:7

131:8,15 132:7
151:18 160:5
286:18 298:25
**looked**
14:9 51:3 58:14
238:24 287:4,20
290:2,4 291:11
292:3,9
**looking**
30:24 32:8 47:2
  52:13 61:10 63:14
  66:10 94:5 107:25
  150:22 173:20
  174:5 195:2 243:11
  243:14,22 263:15
  269:5 281:2 293:10
**looks**
175:24
**losing**
152:25
**loss**
10:15 115:8 116:20
  126:3,5 128:10,10
  128:17 135:6
**losses**
9:25 10:9 118:15
  126:15 130:4,13,19
  133:21,25 134:3,7
  134:11,14,17,25
  135:2 152:17 156:4
  267:19
**lot**
109:10 173:6 228:18
  280:11
**lower**
23:12,13,14 127:9
  182:7 203:25 204:7
  286:3
**Ltd**
1:3 2:4,6 99:24 100:2
  100:22,23 101:2
  194:9,16 273:22
  274:14 275:10
  277:23 278:5,7
  281:4 285:17

286:20 287:3,9
288:5 289:10
312:11
**lunch**
136:16
**Luncheon**
136:20

___

## M

**M**
190:24 198:17
  202:24 206:20,22
  206:23 217:7
  303:22 304:2
**made**
11:15 16:21 32:11,18
  33:9 34:2 53:5,9,16
  53:23 54:9 55:10,13
  82:11 99:21 123:12
  124:11 125:24
  126:16 128:5,8
  193:22 196:18
  202:19 205:9
  212:19 213:18
  223:9 228:17
  255:22 260:16,20
  261:11 272:15
  305:15 307:10,10
**Magna**
1:21 4:18,19
**magnitude**
155:9 156:3
**main**
17:4,9 18:2 222:11
  249:20 299:23
  302:25 303:5
**maintain**
30:5 38:3 46:24
  47:22 78:6 188:14
  228:23
**maintained**
73:12,24 118:10
**maintaining**
117:23
**mainten**

29:7
**maintenance**
18:12,25 19:2,12,13
  19:15,18,20 20:6
  22:11,21,23 23:3,24
  23:25 24:10 25:13
  26:8,15,19 29:8
  32:21 35:3 38:2
  75:24 76:2 82:3,25
  86:16,25 87:8,25
  88:12,13,15 89:2,10
  89:19,23 92:5,8,21
  93:7,10 94:4 95:4
  96:5,16 97:2,12
  104:3,9,21 105:3
  159:14 211:22
  227:13,17,21 228:2
  228:24 229:7,19
  230:5 236:10,24
  237:16,24 238:2
  245:8,15 259:10
  260:12 261:8
**majority**
72:11 188:11
**make**
7:21 12:8,25 13:9,16
  13:17 14:21 30:10
  30:20 47:8 60:25
  82:23 94:2 126:2
  144:8 153:4,20
  159:18 176:2 182:3
  182:11 201:23
  204:4,10,12 207:4
  221:18 284:10
  299:7,10,22 301:17
**maker**
168:4
**makers**
108:12 111:15
  115:20,22 119:15
  162:8 168:15 255:5
**makes**
305:7
**making**
111:17 168:12



277:15 292:17
**managed**
230:17,22,25
**management**
21:12 31:17 35:16,22
39:16,23 40:3,11
44:4 104:24 105:15
105:22 106:11
107:22 115:18
249:6 260:7 271:9
271:15 277:15,23
**manner**
24:2 68:17
**manners**
233:21
**manual**
98:4 215:9 231:2,2,7
232:6 237:5,15,17
238:18 260:17
**manually**
67:14 231:5,22
232:12 233:4 234:5
249:3
**many**
72:12 77:3 95:2
112:10 115:21
134:25 141:12,12
142:11 143:16
144:22,22 147:24
154:19 163:25
167:18,19,20 179:2
207:23 215:13
217:18
**March**
99:22
**Mark**
51:12
**marked**
8:7 9:12 41:7,10
51:15,18 93:22
120:13,17 131:5
136:24 137:4 157:5
157:7 175:6 181:13
181:16 194:9
216:13 221:7

249:25 256:2
261:20 276:5
298:19
**market**
102:22,24 103:7
108:12 109:11
111:15,17 112:24
115:20,21 119:15
154:19 156:7,10,13
162:7 168:12,14
251:18,19,21,25
252:10 253:4 255:5
**markets**
103:8,21 277:2,11,16
278:7
**marks**
176:19
**marriage**
313:16
**Marsal**
3:4,5 5:12 18:3 190:9
216:22 226:16,17
304:12 305:18
**Marsal's**
304:8
**master**
138:22 213:9
**match**
113:7 303:2
**matching**
109:19 127:17 128:3
**material**
25:5 144:23 145:4,7
145:8,13 156:16,23
**materially**
15:17 17:5
**materials**
196:24
**math**
10:7 15:13 16:19
48:7 76:10,12
243:13
**mathematical**
45:25
**mathematically**

24:25 59:7 96:15
139:24
**matter**
4:6 10:22 104:25
146:4 169:7 295:14
297:20 303:17
313:17
**matters**
295:12
**maximum**
140:5,10 145:12
165:12
**may**
5:15 50:20 51:3
55:18 99:14,15
107:17,18,18
114:24 136:5
143:11 144:11
155:6 165:10,11
167:16 171:25
175:24 184:3 189:4
200:2 235:6 243:11
267:4 268:14
269:14 278:15
287:14,14 288:22
289:22,25,25
292:17 302:23
**maybe**
167:6 168:4 208:17
208:17 243:12
258:12
**me**
5:9 9:15 30:10 37:10
40:10 46:18 58:22
59:17 61:20 63:9
66:15 67:24 76:24
79:7,10,14 91:18
95:5 97:16 103:17
108:3 110:12
120:25 131:16
151:25 152:2
153:18,21 166:4
167:8 182:10,12
186:3 189:8 191:11
193:19 195:16

196:19 197:14,22
198:10,18 201:15
210:7 213:7,12
219:10 223:8
227:11 233:2 235:6
236:15 247:10
250:22 251:20
258:3,5 263:25
264:3 267:8 268:6
268:10 270:15
271:14 276:18,21
278:18 280:12
288:2 290:5 291:12
294:5 296:19
298:16 302:3,3
310:10,18
**mean**
17:13 19:22 26:23
28:2 34:3 37:3,12
38:11,12 48:5,17
69:10 70:11,20
73:21 75:12 78:5
91:21 92:7 102:25
128:11,12 134:25
151:11 162:2,17
169:24 176:7
186:19 187:4,14,18
191:11 225:24
227:20,23 230:23
232:7,8 235:16
236:3 240:25
245:23 251:9
253:13 270:3
279:17 298:9
301:11
**meaning**
14:14 59:13 172:23
173:4 252:21
**meanings**
185:25
**means**
23:19 59:2 66:24
128:13 135:13
155:25 181:18
185:6 186:18 232:8



257:5 270:4 295:2
298:11
**meant**
89:17 176:15 216:3
286:16
**measured**
201:11
**measures**
105:10,19 106:14
180:2,8
**measuring**
14:15
**mechanical**
32:10,16 33:9,25
54:14
**mechanically**
31:25 95:22 97:18,24
97:25 98:25 229:10
238:14 248:7
260:21,25
**media**
232:16
**Meeting**
120:12,20 311:19
**member**
226:21
**members**
35:16 44:4 190:24
198:17 217:7 219:9
271:8
**memorize**
59:10 132:5
**memorized**
21:20 37:24 59:5
132:3 155:5 156:3
160:21 165:15,24
226:8
**memory**
36:10 49:22 50:25
51:11 52:8 111:14
114:18 132:3
143:23 144:3
145:12,24 151:5
174:24 175:2
193:18 208:3

209:13 220:14,19
221:6 225:15,23
242:6 268:24
270:23 274:2
**mention**
197:22
**mentioned**
9:5 16:3 109:6
148:19 162:7
164:17 166:2
195:14 201:22
205:7,20 209:25
245:4 248:13 266:6
272:19
**message**
175:5,11,13 312:6
**messaging**
36:15 176:12 261:16
**method**
60:5,11 244:13
**methodology**
15:12 16:2,6 186:6,9
191:2,6,14 192:3,4
193:22 195:19
**Microsoft**
56:17
**mid**
51:3 270:7
**middle**
14:5
**midnight**
302:14
**midst**
89:20 90:10
**might**
37:11 40:21 106:12
107:15 140:11
252:3 301:21
**million**
9:18 11:8,15 29:23
30:7 47:24 48:2,4,5
48:8,10,21 49:3
54:20 77:25 78:7,20
79:6 80:3,5,14,21
80:25 81:3 89:9

95:21,25 96:2,11,12
96:13,14,15 123:12
124:11 145:6
154:10 200:17
201:2,3 202:22
203:2,5,15,24 204:4
204:17,21 208:4,6
211:5,8,11 240:14
241:19 243:15,16
244:6,9,24 245:2,3
247:20 254:18,20
259:4 260:18,23
**millions**
83:12,13
**mimcoins**
21:23
**mind**
265:19
**minimizing**
103:8
**minor**
208:7
**minus**
154:9
**minute**
51:9 140:25,25
**minutes**
199:23 238:18,20
240:4
**miscrediting**
203:2
**mismatches**
125:17
**mispronouncing**
288:23
**misquote**
170:18
**misread**
171:25
**missing**
20:12
**misspoke**
55:12 188:2 250:18
285:16 286:16
**misstates**

32:15 56:13 91:3
95:14 124:14
196:16 198:15
246:9 255:19
274:17 291:3,25
**mistaken**
268:9
**misunderstanding**
97:8
**MMF**
24:23
**MMR**
87:20,24
**model**
129:15,17,21
**Molina**
74:21
**moment**
25:11 30:14 53:10
58:15 90:22 94:7
103:18 123:19
125:6 132:19 148:6
151:17 157:2,19
158:19 167:8 169:4
171:12 181:5 186:4
189:24 213:24
236:5 252:25 262:2
263:17 298:16
303:14
**Monday**
309:12
**money**
133:20
**monies**
128:25,25
**monitor**
142:23
**monitored**
227:25
**months**
210:11
**more**
7:25 15:6 21:8,17,23
27:8,8 47:5 89:11
125:6 143:24



155:13,17 168:19
177:20 184:2 202:6
204:5,10,18 212:19
220:15 231:16
262:20 266:14
291:19,20 298:14
302:10
**morning**
4:2 5:6,25 6:2
**Mosley**
198:18
**most**
13:22 17:5 109:11
146:22 160:8
165:21 265:19
303:10,11
**motions**
7:21
**move**
7:17 125:19 127:6
189:3 239:4
**movement**
104:18 253:19,23
**Moving**
302:8
**much**
118:14 131:15 145:9
207:23 215:8 239:3
240:9 241:10 243:3
294:7 305:17
**multiple**
25:21 164:13 248:23
**multiplying**
25:2 48:5 50:2
**multi-factor**
179:23
**must**
19:7 46:14 56:20
73:11 89:8 96:9,18
139:24 141:3
173:13 196:10
**mutually**
307:4 308:13
**myself**
263:20

**M's**
303:17
**M-O-L-I-N-A**
74:22

---

**N**

**N**
2:2 5:16 310:2 311:2
**name**
5:22 60:20 100:17,18
161:24 167:22
177:4 178:14
183:14 186:21,23
186:25 222:12
233:15 256:12
**namely**
109:8
**names**
99:12,15,18 166:4,5
184:3,5
**naming**
167:25
**native**
51:14,19,20 157:4,12
221:13 255:25
256:6 298:18 299:4
301:20 311:16
312:17,20
**natively**
61:19 157:9 181:20
**nature**
160:21 164:6 167:13
170:12 252:4
**necessarily**
186:22
**need**
11:14 12:11,14 20:8
24:20,25 38:8 39:14
49:8 50:5,14 57:9
59:17 62:4,19 63:17
63:19 64:11,25
66:20 67:3 68:3
77:17 80:15 94:23
95:16 114:25
124:22 135:6

140:13 146:23
150:21 155:19
168:24 175:23
181:17 182:10
184:2 189:5 192:19
193:9 202:25
208:16 222:11
224:20 233:11,14
233:16,25 237:15
237:17 239:18
242:13 258:2 264:2
266:18 302:3
**needed**
16:20 76:18 77:4,7
78:5 178:5
**needing**
28:14
**needs**
19:11 71:10 192:24
**negligible**
12:21 23:9,18 24:15
**negotiated**
171:8
**neither**
253:20
**net**
69:7,10 70:22 75:5
75:18 77:13 80:8
81:6 141:23 142:6
142:12 143:6,17
144:21 145:21
146:5 168:21
**netted**
70:7 84:4
**neutral**
237:7 240:12 252:21
**never**
7:23 90:24 242:14
**new**
1:16,16,18 2:7,7,15
2:15 4:14,14 5:18
37:22 120:9 157:3
159:24 172:16,16
185:6 303:22 313:4
313:8

**next**
68:9 123:11 132:19
138:7 165:20
173:19 177:3
184:21 277:19
**night**
6:13
**Nils**
74:21
**nine**
240:4
**no**
1:7 4:9 14:7,22 22:23
23:12 24:6 31:3,5
32:20 33:3 34:23
35:5 44:3 52:16
55:20 56:23 57:3,4
62:15,23 66:5 77:17
78:8,21,22 79:12,12
79:18 80:10 95:10
98:15 101:18,22,23
101:23 112:20
122:15,18 126:8
149:23 175:15
177:7,17 180:25
187:18 188:21
190:16,20 192:10
207:6 213:11,25
223:23 225:13
238:13 241:13
243:22 252:18
253:16,16,19,22
258:3,8 266:9
270:15 277:10
283:23 285:11
304:11 305:3
313:16
**noncompliance**
236:9 237:2 264:15
**Nonetheless**
6:16
**non-compliance**
31:7 40:15 42:3
90:23 93:7 227:22
**non-FTX**



167:2
**non-lawyer**
45:9 297:9,12
**non-legal**
131:8
**non-negative**
140:19
**non-privileged**
292:13 293:2
**nor**
115:19 121:25
124:15 129:24
144:16 193:18
226:8 233:16
246:20 305:14
**normal**
204:8
**Notary**
1:17 5:18 310:22
313:7
**notation**
256:25
**notations**
182:19
**note**
23:7 123:2 156:11
211:4 239:16
**noted**
6:19 7:22 123:18
155:22
**notes**
67:10,11
**nothing**
280:2 281:21 282:3,8
282:24 284:11
**notice**
264:5,10,24 265:10
265:12 283:20
**notional**
13:14,18,25 192:6
193:8 197:9 199:22
208:3 241:14,15
**November**
128:15 136:4
**now**

4:3 68:8 143:8 153:2
222:8 230:12 248:3
276:16,19 299:11
302:5
**number**
4:4 9:6,13 13:2 17:7
17:8,21,22 41:10
60:2 61:3 71:19
82:22 118:22
120:17 121:14
129:10 136:25
140:13,23 143:20
144:2,4,9,20,24
145:7,8,23 148:17
148:23,24,25 149:2
150:24,25 151:4,6
157:8 159:20
165:14 179:5,6
190:2,3 196:7,14
212:24 213:2
214:23 215:14
223:12 250:4,20
261:24 265:17
268:3,7,13,14,17,21
268:24 281:3,13
282:11,19 293:15
294:11 299:3,23
305:6,22 306:19
**numbers**
18:7 20:9 84:15
157:14 168:13
219:7
**numerous**
7:12

_____

**O**

**O**
5:16 310:2
**oath**
114:5 195:21 197:15
**Object**
10:23 45:3 56:12
62:25 70:25 81:8
94:19 97:3 110:10
122:22 124:3,13

125:12 128:20
130:6,20 133:2
134:22 142:14
148:13 156:19
160:16 173:21
174:10 180:16
185:20 187:12
196:15 198:14
204:14 210:13
211:15 230:2
237:19 242:3 243:7
244:3 246:8 255:18
266:7 269:19
271:12 272:20
274:16,25 275:14
281:18 283:6 285:2
285:22 289:15
291:2,24 297:24
305:9
**objection**
6:12 11:10 14:3 15:2
17:15 20:2 29:2
32:14 33:6 35:19
39:20 40:18 42:5,23
44:13 45:19 46:11
47:10 50:11 54:6
55:5 57:16 59:21
64:9 65:13 70:3
73:17 77:20 86:6
87:22 89:25 91:2
94:17 95:13 97:14
100:13 107:12
118:17 119:6
130:14 172:25
200:6 207:9,17
212:7 220:10
234:11 235:14
236:12 264:22
270:11 271:20
272:4 273:5 281:25
282:20 291:22
295:10 296:14
297:2,14
**objections**
61:6 194:7,15 197:20

198:5 281:12
282:23 294:13,13
294:14,16 312:10
**obligation**
135:8
**obtain**
131:18 161:8 233:18
**obtained**
138:12
**occur**
91:6 92:13,23 228:10
233:24 239:23
**occurred**
64:23 238:19 240:21
241:21 244:10
259:5 295:5
**occurrence**
126:3 247:15
**occurring**
98:11 106:2 238:21
242:12
**occurs**
127:24
**October**
131:5,11 216:21
311:22
**off**
14:5 81:17,20 83:23
111:25 136:16,18
138:19 159:13
163:11 181:4,7
203:14 210:21
213:23,25 214:3
222:10 240:25
266:21 306:9,10
308:22
**offer**
43:2 129:24 178:19
203:9 273:18
295:14 296:17
297:5
**offered**
141:13 308:16
**offhand**
222:23



**official**
276:25
**offset**
16:16 193:7,10
**offsetting**
192:11
**off-line**
307:14
**off-the-record**
181:8 214:5
**often**
19:6 21:22 64:19
128:24 166:8 206:6
206:11 213:12
**oftentimes**
293:8
**Oh**
103:16 195:4
**okay**
43:13 47:17 48:25
61:23 67:8,9 68:11
73:8 81:16 88:6
103:19 112:7 125:8
126:14 132:21
147:20 148:7 150:6
150:10 152:15
154:13 167:5
171:15 176:4
177:13 182:12,13
189:2,7,18 190:6,7
195:5 225:9 243:25
262:24 263:9 265:4
280:16 283:13
285:18 286:17
292:19 299:10
303:15
**omission**
62:23
**omitted**
56:24 57:3
**once**
14:3 28:16,16 34:19
45:5,8,12,21 46:4
62:4 64:23 90:8
92:4 104:2 110:22

180:6 212:3,12,15
228:3
**one**
11:16 16:11 17:4
20:20,20 22:19,22
24:22,23 25:3 30:21
36:20 41:2 44:3
51:9,24 52:14 60:14
60:19 64:22 67:6
68:10,24 72:9,23
74:19 101:10
104:10 105:24
106:8 107:19
110:15,19 113:10
114:24 115:19
119:14 121:14
126:6 132:24
141:21 145:7
148:17,25,25 149:2
166:24 167:3,9
175:24 186:3,10
191:13,15 200:16
201:22 205:13
219:17 225:5,18
226:17 227:3,3
228:21 231:14,16
237:25 238:24
246:17 248:23
254:2,10 255:4
258:6 261:25 262:4
273:17 278:12
284:18 287:6,16
288:23 294:6 300:2
300:5 302:8 308:9
**ones**
25:24 85:5 109:7
260:2 265:19
**one's**
304:11
**one-to-one**
126:8
**ongoing**
82:14
**online**
178:16

**only**
11:8 12:10 17:21,24
23:21 24:23 25:7,8
26:4 33:23 44:7
46:5,7 54:15 59:14
66:7 69:25 92:8
100:17 108:18
110:24 116:15
124:5 146:12 148:5
163:7 171:22
173:24 186:10
188:8 189:22
206:16 209:23
234:24 236:14
274:18 275:3,16
287:11 291:10
292:2,8
**onto**
266:15 302:9
**open**
10:10,15 37:22 82:18
109:4 113:15
127:14 150:14,18
150:25 243:15
265:24 307:20
308:15
**opened**
11:22,23 12:13
267:13
**opening**
221:13 267:12,16
**operate**
123:6 127:20
**operated**
76:3 105:10 227:13
249:10
**operates**
92:8,11 110:24
116:17 230:6
**operating**
10:8 24:4 25:6,10
40:3 92:16 93:18
166:10,12 167:2,19
167:21
**operation**

96:24
**operational**
27:15
**operative**
15:23 30:13 130:9
170:8
**opine**
173:4
**opinion**
32:19,23 130:24
135:12 155:16
243:18 296:18
**opinions**
173:15 297:5,10
**opposed**
97:22 206:16 214:11
**Opposing**
221:17
**opt**
108:13 162:8,10
**opted**
111:18
**order**
144:7 146:3 247:9
249:7 295:20 296:6
306:6
**ordered**
147:23
**orderly**
103:9,21
**orders**
102:22 296:7
**organization's**
276:4
**original**
9:15 18:17 23:22
26:3,9 27:12 86:20
109:22 151:16
189:10,12,19,23
190:8,17,21,23
192:19 195:20
199:16,18 200:15
200:21 202:19
203:19,23 204:11
204:18,23 205:23



207:19 208:12,13
209:15,21 211:3
230:11 300:4
**originally**
191:14 202:4
**OTC**
257:3,7
**others**
18:5,6 21:8 61:8
107:17,19 155:13
156:25 196:20
229:25 231:12
257:4 265:15
308:24
**otherwise**
39:11 96:20 111:16
147:7,17 150:17
200:20 204:22
211:21 235:9,11
244:15 273:17
290:20 308:3
**our**
6:13 7:22 10:6 61:6
82:12 146:11 191:9
192:13 203:18
205:10 218:10
233:6,7 256:9 279:5
279:14 305:25
306:8,21 308:22
**out**
16:6 18:22 31:18
33:24 34:20 35:13
37:18 38:6 76:15,19
76:22 77:9,12 80:19
84:12,23 85:19 92:5
94:12 98:9 104:3
109:24 110:3
125:21 150:5 171:3
202:25 209:2
217:18 225:8 229:6
229:14 237:8
245:14 252:13,14
252:19 259:9
260:10 261:2
265:22 285:21

**outcome**
304:9,12 305:13
313:17
**Outen**
175:13
**output**
15:16 24:24 25:3
144:25 208:25
**outside**
86:14
**outstanding**
149:17 150:18 151:2
**over**
27:9 61:17 80:2
138:15 159:11
162:14 171:7 173:7
180:13,14 182:10
205:7 214:24
217:19,20 224:8
236:20 246:24
252:7,9 287:17
305:19 306:17
308:23
**overall**
20:24 22:4 54:24
68:15 69:6,19,25
70:21 76:8 95:4
154:8 225:16
**over-the-counter**
257:8
**own**
12:25 14:21 296:9
**owned**
294:20
**ownership**
212:5 279:5 295:23
296:22

———— P ————

**P**
2:2,2 167:23
**packet**
292:16
**page**
41:12,13 45:2 51:22

52:3,16,18 55:24
61:21 66:11 67:5,7
68:9,10 73:7 99:13
99:16,19,20 103:4
103:14,23 107:24
115:25 121:6,12
129:11 132:5,7,13
137:15,18 139:12
139:15 160:9
161:23 171:18
172:14 173:19,20
182:18 184:21
185:5,18 186:14,18
194:19,21,23 195:2
196:17 216:23
217:6,16 218:24
239:4 241:4 244:12
250:17,19,19
256:15 276:20
277:19,25 279:23
281:22 282:4,9,23
293:15 294:3,4
311:4,12 312:5
**pages**
23:6,11 24:13,18
51:22 52:14 101:11
138:7 157:14
280:22
**paid**
9:18 120:3 166:17
172:10,11
**papers**
299:7
**paragraph**
9:14 18:21 26:13,16
27:12 29:21 30:24
32:9 47:4,4 82:15
82:23 86:22 94:6,13
132:20 151:18,20
151:25 152:14
153:2,8 192:18
194:2 195:7,11
211:3 212:17
215:11 228:19
230:11 243:21

244:8 248:15
**paragraphs**
153:7
**parallel**
116:5
**parameters**
88:9 183:22
**paraphrase**
197:14
**part**
20:12 60:8,10 62:21
66:25 70:11 76:15
90:24 109:17 110:5
110:7,19 185:8
196:25 198:4,9
199:6 206:6 226:19
231:22 232:13
244:8 251:5 256:11
278:23 289:11
290:9
**partially**
20:14
**participant**
255:9
**participants**
109:11,13 154:19
162:5
**participated**
17:5 115:22 119:16
217:12
**participating**
113:13 222:19
**participation**
126:12 270:17
**particular**
74:25 75:6 76:15
77:10,11,18,18
125:22 128:2 129:7
141:2 159:17 193:5
193:21 195:24
205:2 215:18
224:12 235:11,20
249:15 255:9 291:8
304:5
**particularly**



151:14 185:10

**parties**
4:21 7:8 34:17 37:2,3
66:2 99:8,11,14
100:4,6,8,10,11,16
170:3 197:3 257:21
299:16 308:11,19
313:15

**parts**
131:25 200:18

**party**
226:16

**party's**
36:18 43:3

**password**
178:14 181:2 233:15

**patience**
256:8 298:15,24

**pay**
117:4,13 119:25
168:22 172:7

**payable**
171:21

**payments**
124:17 171:17

**payroll**
166:19

**pay-off**
148:17

**peer**
28:6,6 69:16,16
83:23,23 97:21,21
98:13,14,18,18 99:3
99:3 136:7,7

**pendency**
25:22 142:7

**people**
236:17 247:11

**per**
171:21

**perceived**
236:9

**percent**
16:24 30:5 42:13,19
45:24 46:16,19

47:23 49:5 73:10
76:11 139:8,9
145:16,18,21
152:19,19,20
153:16,17,19,23
155:24 156:2
171:21 217:23
219:7

**percentage**
76:8

**perfect**
67:9

**perfectly**
160:20

**perform**
24:20 60:5 62:20
66:3 80:16 109:15
118:20,24 124:23
231:7 242:13
260:16 289:18

**performed**
16:18 22:24 25:19,21
60:12 62:12 63:5
72:12 76:11,13 98:4
118:21,25 119:20
123:20 139:20
151:11 190:24
230:17 231:3,5

**performing**
18:3 46:2

**perhaps**
125:16 194:19 268:4
268:9 308:10

**period**
9:8 34:6 49:12 50:18
51:8 53:4,16 63:8
64:22 65:6,7 87:11
122:9 138:11,15
161:14 185:19
186:8,11 187:3,3
206:13 223:3,6
239:17 246:24
252:7,16 268:4,11
270:7 288:24
289:14 290:4

291:12 292:9

**periods**
25:22 27:22 29:15
48:18 49:20,24 50:4
51:2 63:16 80:18,22
84:10 85:24 86:11
88:19 89:9 156:24
243:20 245:11
268:22 269:9
287:18 292:4,6

**permit**
169:9,23 170:7,8

**permitted**
159:6

**perp**
9:19 12:18 13:13
267:23 268:3,13,17
268:21,24

**perpetual**
9:7 10:2,10 14:12
109:9,17 111:25
112:9,13,18,23
114:2 135:4 269:13

**perps**
12:19

**person**
105:17,23 107:9
135:13 213:19,20
213:21 214:10,17
214:19,21 233:7
248:7,8

**personal**
59:9 184:18,19 199:4
272:10 273:9

**personally**
85:7 179:25 183:24
184:11 188:16
190:15 226:9 242:9
242:11,23 269:21
288:19

**personnel**
180:13

**person's**
34:15,19 42:10 106:9
234:15 237:22

264:14 296:5

**perspective**
45:25 54:13,15 94:21
98:23 105:18 178:3
209:5 264:10,14

**PeterSingapore@g...**
184:8

**petition**
142:25 143:10,18,25
144:11,18 145:20
147:3 149:18,21
150:12,15 151:3,9
161:11,13 165:24
170:14 186:22
284:14,16,23 285:9
286:5,10 288:21

**phrase**
26:22

**pick**
111:24

**piece**
278:25

**place**
99:5 105:10 106:3,14
180:9 224:3 310:11

**places**
91:22

**Plaintiff**
2:5

**plan**
170:17 171:8 295:4
304:14,18

**play**
68:14 69:5 155:21

**please**
5:14,22 9:16 14:4
30:22 36:2 81:18
91:18 99:19 120:10
132:10 136:16
214:2 217:16
230:12 278:4,19
279:21 280:14
284:19 306:9

**pledging**
133:20



133:20

**plug**
16:14

**plus**
132:5

**point**
11:19 12:19 14:14
15:22 16:8,12,23
18:2 22:8 23:23
29:18 33:4 35:7
36:8 37:19 38:7
44:5 50:16 54:4,23
57:20 62:14 64:8,16
65:11,18,19 67:19
67:21 78:13 82:15
83:8 85:3 86:14
87:9 88:17,20 89:19
90:11 94:3 98:10
101:17 113:15
123:7 131:22 139:4
141:2 142:9,24
143:7,14 180:3
190:13 202:2
205:13 207:19,22
208:19 214:17
224:22 229:16
241:24 242:10
245:21,25 246:4
247:18 255:13,15
260:25 264:3 265:2
267:7 268:21 269:2
270:13 271:10,16
280:10 286:9
289:25 294:22

**pointing**
151:25

**points**
49:18 50:22 83:4,5
85:9 86:3,15 117:9
222:22,24 231:15
286:6 287:5,6,21
289:21

**policies**
130:3,8 176:18

**policy**

130:18,22 170:5

**pool**
99:2 223:16,16
226:13,13,14,14,20
226:20 227:4,4

**pools**
222:20 223:5 226:23

**pool-to-pool**
126:9

**populated**
67:17,18

**portal**
257:8

**portion**
142:10 145:11
171:23,25 172:16
182:7 231:8

**portions**
307:20

**position**
6:13,18 7:5,22 11:6
11:24 12:17 14:17
16:14,23 17:3 19:10
21:2,2 22:9 30:12
30:23,25 32:24 34:9
35:5 37:17,22 38:5
38:14,16,20,24 39:4
40:6,13 42:22 43:8
43:25 44:2,11,22
45:18 46:7,13 50:21
62:23 63:3 66:5,6
70:21 75:4,11 77:19
77:23 81:5 86:13
87:7 89:13 90:21
101:14 105:6 107:9
109:17,21,22
111:21,22 112:9,12
112:15 113:4,9
116:11 117:13
122:18 127:8
134:20 136:2
149:21 150:19
154:9 155:4 156:21
202:23 203:4,10
212:4 218:17 229:5

237:12 242:20,22
242:24 252:22,23
273:2 279:12,14
296:22 301:8,10,11
302:13,16

**positions**
10:15 15:23 16:16
22:7 28:14 38:3
69:15,16 75:9 84:5
102:21 103:7 104:5
106:6 109:3,4,7
113:20 115:6
116:19 127:14,19
127:20,21 141:4,6
150:14 151:7
154:24 159:2,7
210:6 217:19 237:9
237:10 246:16
251:24 259:20
260:24 261:4
267:12,14,17
269:11

**positive**
16:16 78:6,16 118:22
136:2 141:23,23
142:4,6,12,20 143:6
152:11 270:14,19

**possessed**
290:20

**possession**
212:13,16 285:7
286:20 288:4
289:10

**possible**
15:21 40:10 59:25
64:18 65:17 79:5
95:5 119:18 125:16
135:23 155:2
214:14 254:24
271:14 297:8

**post**
254:14 305:23

**posted**
101:19,24

**posture**

46:10

**post-petition**
39:3

**potential**
106:8 107:20 152:17

**potentially**
109:4 132:6 206:10
264:6,18 266:2
307:16

**power**
263:22

**practical**
104:25 212:11

**practically**
249:9

**practices**
275:4

**preceding**
163:14

**precludes**
30:17

**precluding**
7:15

**predicated**
22:6

**predominant**
14:11

**predominantly**
187:24

**preliminary**
139:13 190:25 217:4
218:7,21 280:18

**preparation**
101:8 121:3 131:20
131:23 142:2 175:3
208:12,13 217:12
218:9,15 235:8
274:8 283:2,17
290:10 291:17
307:25

**prepare**
59:19 273:22

**prepared**
6:5,9 51:21 59:23
60:4 206:19,21,23



206:25 271:23
272:2
**preparing**
60:8,17 62:21
**presence**
101:15
**present**
3:3 4:22 8:15
**presentation**
202:24 217:4,6
239:21
**presented**
24:17 51:21 72:5
181:20 274:14
**press**
228:9
**presumably**
127:9
**prevent**
105:4,20 106:14
107:10 135:18
159:3 206:8 244:19
265:15
**prevented**
266:5
**preview**
298:23
**previous**
67:5 73:3 139:12,15
**previously**
7:8 9:12 44:25 67:2
148:2 187:24
195:14 196:24
202:10,24 246:13
248:2 260:10
264:22
**pre-liquidation**
31:17
**pre-LOC**
254:14
**pre-petition**
21:12 22:15,16 23:4
31:16 35:15,22 39:2
39:10,15,23 40:3,11
72:6 93:19,20

104:24 105:10,14
105:22 106:11
115:18 122:9
123:24 249:6
269:16 271:8,15
274:6 275:4,17
276:3 277:22
290:19
**price**
11:20,21,23,25 12:2
12:13,15 13:13,14
13:19,23 14:2,9,10
14:16,23 15:23
21:23 22:6 78:12
113:4,5,15 115:12
116:9 125:19 127:6
127:7,22,23 128:2
141:7,11 151:23
153:15,24 154:17
156:10,13,24 202:3
202:10 206:10
251:12,14 252:13
267:18,19
**prices**
12:6,23 13:4,7,10
251:4,8,10 253:5
**pricing**
11:18 12:11,25 13:16
14:21 15:20 16:21
119:3 140:21,25
141:4,14 142:23
144:6 201:21,22
202:6 209:24 210:4
210:7 246:18
**primarily**
158:9
**primary**
74:18 286:9 302:25
**principal**
57:6 59:2,6,14 62:2,6
63:13 68:13 69:2
**principles**
275:6,19
**print**
256:10 306:20

**prior**
71:6 77:5 85:8 98:2,3
98:17 133:15
154:24 161:13
190:13 206:25
219:19,25 220:13
240:8,20,21 241:6
242:17 249:3
261:11 264:24
268:11 270:7
271:11 286:11
294:21
**priority**
92:18
**privileged**
272:7
**probably**
88:3 182:5 238:24
280:9
**proceeding**
31:15 131:4,11 272:9
272:13,18 305:20
311:22
**proceedings**
272:25 273:4,13
**proceeds**
224:16 253:14
255:17,21
**process**
54:10 56:23 65:4
69:2 102:7,17 104:4
108:23 110:6,7,9
114:9 118:16 124:7
186:5 198:8,12
214:12,15 215:9,9
227:19,20 244:15
245:5,20 253:17
274:21 277:15
**processes**
102:8,10
**produce**
25:5 223:14 279:22
280:3
**produced**
10:19 11:12 13:4

37:8 41:14 42:17
51:14,19 59:24 60:3
61:19 91:10 120:18
121:5 123:25 157:8
175:12,25 182:24
183:23 189:25
196:24 206:25
222:18 256:6
261:18 262:6
276:13,17 279:4,6,9
279:15,19 280:2
298:15 299:4
301:20 309:2
311:16
**product**
39:7 108:17 113:22
192:21,23 193:2
209:7
**production**
51:22 139:21 181:19
198:21 221:12
262:21 263:7
278:23,25 304:5
**products**
141:12
**profit**
267:18
**program**
17:6 28:6,11 69:17
70:19 71:7,7,9
75:20,22,23 76:16
76:24 83:23 84:3
97:22 98:14,19 99:3
102:12 108:11,14
110:21 113:13
115:23 116:6
117:17 125:11,23
126:13,18,25 128:3
134:12,12,18,19
136:8 137:22,23
149:17,25 162:6,9
170:22 171:4
220:17,21,24
225:12,22 227:12
269:12 270:18



**project**
167:14 206:8
**prompt**
278:25
**promptly**
279:21
**proof**
149:12
**proper**
264:10
**properly**
95:11
**property**
295:13 296:3
**proposed**
61:7 255:16
**proposition**
193:3
**prosecution**
133:6
**protocol**
179:24
**Proulx**
2:7 4:24 5:2,21 7:4
8:6,10,23 14:6 41:3
51:12 52:16 74:22
81:14,17,25 93:21
120:9 130:25
136:15,23 157:2
181:4 188:20,24
189:4 194:4 210:16
213:23 221:17
225:7 262:20
266:18 278:22
279:11,21 280:4
298:21 306:7,16
307:13 308:21
311:5
**provide**
7:25 40:20 41:25
43:10 44:16 45:6,13
58:17 88:10 90:19
108:7 135:11 143:3
173:13,15 182:25
200:11 206:11

212:9 222:18
234:14 248:6
257:15,19,20
297:10,19
**provided**
15:8 23:7 26:5 44:24
46:6 58:22 66:7
111:17 127:17
146:13 197:4
198:10 211:20
231:11 261:23
264:23 297:23
306:24 307:23
**provider**
102:12 108:2,7,11,14
110:15,21,24
111:19,21 113:12
114:9 115:4,11,14
115:16,23 116:6,10
117:5,14 119:17,22
120:2,8 126:21
161:20 162:6
**providers**
111:12 113:11
114:14,20,25
**provider's**
110:8
**provides**
138:6
**providing**
27:6 173:12 264:5
**provision**
45:15 46:19 47:12,19
235:11
**provisions**
234:9
**public**
1:17 5:18 12:24
146:13 149:9,13,15
232:15 272:16
310:22 313:7
**publication**
82:7
**publicly**
141:10 149:5 162:20

**pull**
9:12 31:23 32:5,7
41:4 93:2 202:25
298:21
**pulled**
31:21,22 161:16
**pulling**
33:17
**pure**
156:7
**purport**
232:18
**purported**
277:18
**purportedly**
193:12
**purporting**
228:22
**purports**
182:21
**purpose**
27:4 166:14,24
169:14,17 277:13
**purposes**
17:22 29:6 71:17
75:19 138:18
166:11 168:10
176:25 185:11
200:23 224:25
232:5 239:13
256:20 300:3
**pursuant**
56:23 61:6 92:18
118:16 125:10,23
125:24 126:17,25
128:2 134:11,18
149:17 171:3,8,17
225:12 234:8
282:13
**push**
128:10
**pushed**
130:5
**pushing**
128:17 130:13

**put**
8:23 30:6 125:5
169:3 177:11
191:25 262:8
303:13
**putting**
106:13
**Python**
56:17 68:20 248:11
**p.m**
32:4,6,19 33:5 95:24
136:18,22 181:7,11
210:21,25 214:4,8
230:16 234:10
238:7,11 242:17
244:7 247:6 261:12
266:21,25 306:11
306:15 309:8,13

**Q**

**qualification**
148:4
**qualifications**
264:11 308:4
**qualified**
42:8 43:2 98:24
99:11,14 130:17
273:20 284:10
295:14 296:17
297:5,10,19
**quantities**
78:10,11
**quantity**
139:2 214:23 220:4
224:21 289:12
290:14,18
**quarterly**
146:11,21 147:14,19
148:18 305:23
**QUEENS**
313:5
**querying**
68:21
**question**
14:11 20:3,11 34:17



35:9 36:23 38:17
39:14 40:22 42:18
42:20 45:20 49:12
52:19,21,22 53:6
54:14 59:18 63:2,4
66:23,23 67:4,23
76:21 78:25 80:19
85:24 87:3,5,6
89:10 95:6,18 97:5
97:6 98:24 112:4
114:11 118:19
124:24 127:23
132:14,18 134:16
134:24 135:7,21
137:19 141:19
143:2,3 145:3
146:15 149:19
155:21 157:20
161:3,8 168:25
182:20 187:15
197:18 208:6
209:18 213:7
215:20,25 220:22
220:25 223:6,13
232:3,24 235:7
236:14 238:9 248:3
250:21 259:3 263:5
268:11 269:24
270:16 273:10
283:11 284:2,18
288:6 291:18
293:13 296:20
302:11
**questions**
6:18,20 8:12 37:10
61:14 62:5 157:17
200:11 282:10
298:13
**quickly**
135:18 154:23 156:5
159:2
**quotation**
176:19
**quote**
13:18 38:21 176:6

### R

**R**
2:2 5:16 310:2 313:2
**ran**
24:16 25:7,8
**range**
175:6,12 312:7
**rapid**
154:16
**rate**
102:21 171:20
173:18 299:25
305:12
**rates**
304:19
**rather**
106:14
**ratio**
176:9,19
**raw**
56:23 68:21
**Ray**
281:7 304:16,19
**Ray's**
305:11
**Re**
1:3 2:6 4:6
**reach**
16:17 26:14 233:2
**reaching**
9:24
**read**
99:12,15,18 103:13
103:18,19 131:25
132:19 152:4
192:25 196:18,22
212:22 223:7 236:7
250:21,23 263:17
263:23,25,25 264:2
**readable**
56:21
**readily**
12:23 141:7
**reading**
103:5 177:18 196:17

211:6 245:25
277:20 285:14
294:6,7
**reads**
99:20 137:19 294:11
**ready**
189:8,9
**real**
31:10 35:17 93:12
122:19 233:3
253:17
**realized**
25:5 167:23
**really**
169:21 262:16
**reanalyze**
153:18
**reason**
11:16 44:18 48:9
101:18,23 105:18
105:24 106:8
123:16,22,25
126:14 132:22
133:17 205:16
207:6 223:20
225:10 230:10
234:18 235:5
248:23 258:3,8
265:6,7,8
**reasonable**
292:12
**reasoning**
236:17
**reasons**
11:17 106:11 107:8
107:15 126:6
**recall**
9:3 17:18 36:16 37:6
49:21 51:2 82:4,9
116:15 124:21
131:22 140:3,8,13
151:14 175:22
176:21,22 183:11
183:21 199:24
202:18 205:21

208:19 209:9 210:2
226:6 227:9 235:23
236:2,4 255:14
267:4,5 268:5,8,23
269:25 270:4 274:3
278:12,14 286:10
286:11 289:24
292:7,8 293:6 298:2
298:5,7,11 303:19
303:20,20,22
305:21
**recalling**
166:3
**receive**
113:14 168:22
253:25 254:5
255:17,20
**received**
115:5 119:4,4 241:18
252:23 253:14
305:19
**receiving**
133:15 276:16
**recent**
13:22 15:6
**recently**
26:4 199:2 298:14
**recess**
81:21 136:20 210:18
210:22 266:22
306:12
**recognize**
183:24 216:24
**recognized**
98:9
**Recognizing**
157:16
**recollection**
166:23 177:15 289:5
303:2
**reconcile**
16:22 17:2,10
**reconciled**
17:24 18:9 239:12
**reconciliation**



17:23 18:8 191:17
208:2
**record**
4:3 5:23 6:13 7:4,23
8:11,14,21,22 14:6
34:4 61:2,5 81:17
81:20,24 82:12,21
85:21 94:2 99:18
106:16 136:16,18
136:22 140:24
158:13 181:5,7,11
182:17 210:21,25
213:16,24 214:2,3,8
223:7 266:21,25
274:17 294:7 297:7
298:17 304:4 306:9
306:11,15 308:8,22
313:12
**recorded**
11:20,23 12:3 16:11
54:17 118:12
148:15,16 162:10
201:16 205:13,14
254:7
**recording**
205:16
**records**
56:7 182:6 188:13
263:7 275:17 279:5
279:20
**recovery**
2:12 5:8 6:24 17:14
17:20 38:23 44:17
45:14,17 59:16
106:17 114:16
146:10,12,21
147:14 149:13
162:21 171:10
173:10 187:11
212:10 223:14
249:24 250:6 251:2
272:23 280:20
281:10,12 285:7,10
285:12,15,25
292:11,22 293:24

294:11,16,23
303:23 304:3,15,21
305:7 312:16
**reduce**
75:16 129:21
**reduced**
54:25
**reduces**
129:13
**reduction**
55:3
**refer**
8:14 10:17,22 46:23
73:24 91:11 128:17
128:24 139:12
183:17 195:7,11
203:2 218:3 240:18
300:11
**reference**
12:2 13:23 14:10,16
14:23 18:2 86:21
102:6,11 113:4,14
115:12,20 116:9
121:13 147:5
163:15 174:4 198:6
208:14 212:18
239:7 246:17 257:6
275:24 294:12
**referenced**
24:22 25:11 27:11,22
32:12 80:23 84:11
86:19 91:21 100:9
100:12,16 107:19
111:12 122:25
132:23 140:22
199:20 200:2
215:11 216:2
217:14 219:13
239:18 243:21
245:10 255:15
262:2 264:12
276:12 278:10
289:23 303:8
**references**
102:9,16 177:3

182:18 197:12,20
235:24 244:9
279:16 282:24
**referencing**
24:12 47:15 73:23
146:25 163:7
178:13 194:2
195:24 196:2 200:5
235:20 255:13
303:9
**referred**
10:12 19:6 21:22
116:24 166:8
196:23 213:8 277:5
299:15 302:24
**referring**
11:2,5 12:2 34:6
47:12 54:2 65:19
75:23 88:5 91:23
100:20 106:24
130:2 148:18,20
152:6 161:5 213:14
230:24 241:20
246:19 254:18
267:10 278:14
285:17
**refers**
38:25 75:5 81:6 92:2
107:25 264:23
**reflect**
14:7 116:13 147:12
159:22 185:18
202:5 218:13
222:16 228:22
257:11 300:9
**reflected**
10:18 12:9 13:5,11
14:17,23 24:7 27:11
33:2 55:18 64:14,19
71:13 143:21 144:5
145:2 146:20 150:8
157:14 158:14,17
161:5 168:21
170:16,17 183:18
192:15 201:3 209:6

223:22 240:6 241:3
301:7
**reflecting**
33:17 36:6 152:12
234:20
**reflects**
11:7 147:19 181:18
186:21 200:8 217:5
221:12 222:4
242:25
**regard**
108:19 136:7 158:4
159:14 180:9,10
267:11
**regarding**
36:20 37:4 74:20
82:24 130:4 140:21
149:9 215:3 252:4
257:11 260:14
261:17 270:12
271:24 276:2 283:9
300:19 307:5
**regardless**
185:15
**regular**
135:5
**regularly**
127:15
**reinstated**
88:20
**reiterate**
279:12 308:22
**reject**
7:5
**relate**
102:3 163:25 295:22
**related**
41:2 65:6 102:10
119:13 126:5
178:23 183:6
186:15 225:21
226:3 249:18
253:24 258:25
259:6 295:12,16
313:14



**relates**
110:21 200:17 257:7
296:7
**relating**
183:2 185:23 196:9
218:12 291:9
**relation**
17:19 102:15
**relationship**
44:23 98:23 126:8,9
142:8 227:4,5
**relationships**
226:14
**relative**
21:15 251:24 252:15
268:22 269:9
288:16
**relatively**
123:8,9 145:10
258:25
**relevant**
57:4 74:14 78:12
127:11
**reliance**
7:13
**relied**
9:24 60:7,10,16
62:17 198:9 239:15
300:3,6
**rely**
68:7 176:24 182:12
184:24 190:17,20
200:22 208:11
209:14,20 239:13
256:19 257:14
289:12
**relying**
185:10 218:6 239:8
**remain**
6:9 19:8,9,17 30:8
55:3 77:24 89:8
309:4
**remained**
50:22 87:7 245:14
259:9

**remaining**
116:14 245:17 246:3
246:5,12 247:3
261:4
**remember**
183:3 291:15
**remote**
307:18
**remotely**
308:10
**removal**
32:17 33:17 35:11
36:7 40:25 42:2,20
54:4,22 97:19,25
238:16 240:6,8,22
241:6,12,22 248:10
254:14,15 260:19
**remove**
32:3 34:2 247:25
**removed**
34:13 35:17 54:3,20
64:8 65:9,22 97:11
98:3 229:11 238:6
238:11 249:11
**removes**
35:8
**removing**
54:11 248:4 265:24
**renders**
296:19
**rendition**
262:10
**repaid**
171:5,10
**repay**
135:13
**repayment**
127:3 135:8 150:8
**repeat**
17:17 30:21 76:20
78:25 97:5 134:15
209:17 238:8
284:18
**repeatedly**
264:12

**repetitive**
108:10
**report**
146:21 147:13,14,19
149:14 175:6,11
219:10 275:7 312:6
**reported**
148:10,11,24 203:25
**reporter**
4:19 5:14 309:9
**reporting**
275:7,20
**reports**
146:11,12 149:6
305:24
**represent**
4:23 51:23 57:8
61:25 160:10 168:8
182:22 186:16
187:10 189:24
223:5 248:24
256:13
**representation**
47:9 61:2 176:2
182:4 183:14 207:5
223:9,21 265:3
292:18,23 301:18
**representations**
82:23 153:21
**representative**
6:7 7:16 8:3,17
173:10 297:13,18
**representatives**
194:8,15 196:23
312:10
**represented**
62:17 161:15 279:23
**representing**
56:10 217:22
**represents**
57:24 183:15 187:22
**request**
4:15 182:25 183:4,11
211:19 222:18
223:14 278:24

**repetitive**
279:13 280:7,24
281:3,8,13,24 282:6
282:10,19 292:11
292:15 293:14,21
293:24 294:10
295:8 296:12
299:18 308:23
**requested**
290:12,13 303:18
**requesting**
276:18
**requests**
194:17 279:7 280:22
283:5,16
**require**
38:17 63:4 65:24
66:3 90:16 91:7
114:10,11 118:20
118:23 126:3
130:24 134:3
135:11 215:21
231:23 247:10
251:20 273:19
**required**
31:6 37:22 40:21
46:24 47:22 50:15
66:19 169:19 181:2
203:12 229:19
273:21 301:21
**requirements**
26:16 29:16,20 30:16
33:11 34:11,21
40:15,24 42:3 76:16
77:2 85:16 90:24
92:9,10 94:10
211:22 264:16
**requires**
57:20 140:20 284:9
**Research**
114:23 115:15
119:13,14 162:13
163:6,10 164:14,17
165:9,16,21 167:4
253:9,25 255:4
257:9 258:9



**researched**
163:5
**Research's**
164:4 220:20
**reserve**
7:14 147:22 308:2
**reserved**
308:19
**reserving**
306:25
**resort**
97:21
**respect**
7:6 13:10 16:21
 22:21 25:13,19 26:8
 26:15 34:12 39:10
 42:9 43:8 56:11,24
 61:25 62:16 76:17
 77:3 82:25 86:17
 138:11 144:13
 158:8,9 159:19
 161:23 162:13
 164:20 171:23
 179:17 199:9,21
 203:4 204:11,16,20
 205:2,22 207:24
 209:23 212:5 241:5
 244:22 254:13
 256:22 261:12
 273:3 274:24 286:7
 286:14 287:2,7,23
 288:14,25 296:22
 297:22 302:19,21
 307:15,25 308:15
 308:24
**respond**
290:25
**responding**
140:7 158:18 281:24
**responds**
281:11
**response**
138:6,18 140:22
 145:2,15 155:21
 182:24 196:7,13,22

198:22 222:18
223:11 251:2 279:7
281:14 282:14
292:10,22 293:24
294:2,10 295:2
297:19
**responses**
137:2,8,13 194:7,14
 197:20 198:4 199:5
 223:10 249:24
 250:6,7,15 280:20
 283:15,21,24 284:4
 284:6 306:23
 311:23 312:9,16
**responsibility**
262:5
**responsible**
117:23
**responsive**
112:3 292:14 300:14
**rest**
84:5 193:7 222:14
**restate**
262:25
**result**
104:17 202:8 247:17
 259:14
**resulted**
95:17 122:4,21
 124:17 192:5
**return**
243:24
**returns**
89:18 90:9
**reveal**
39:7 200:7 203:7
 272:5 273:7,15
 283:7
**revealing**
283:11,13
**reversal**
240:20 241:12 243:4
 249:4
**reversed**
240:3 247:6

**review**
74:12,14 82:12 111:4
 111:8 131:17
 140:14 164:12
 177:14 198:25
 199:3 201:5 218:22
 233:7 235:8 262:10
 288:11
**reviewed**
25:24 39:13 42:16
 93:16 197:18 218:5
 242:5 287:17
 288:20,24
**reviewing**
26:6 33:12 41:18
 289:7
**reviews**
138:19
**right**
76:4 128:12 129:6
 138:13 222:7 230:8
 234:16 241:15
 262:8 302:8 306:25
**rightfully**
224:4
**rights**
7:14 34:18 42:9 43:3
 66:2 134:4 136:6
 234:8,14 295:13
 296:3 308:2,19
**right-hand**
132:8 278:3
**rises**
267:18
**risk**
21:4 22:9 91:12,16
 92:2,7 98:5 102:3
 108:22 112:20
 121:18 123:5 227:8
**risks**
21:16 22:2
**risky**
21:18 155:13,17
**Rivka**
1:17 4:19 313:7,23

**Road**
99:25
**role**
68:12 69:4 108:14
**roll**
198:17
**rolling**
141:18
**Romanette**
121:16
**room**
27:9 228:8
**rough**
309:10,11
**roughly**
64:2 179:3 257:2
 258:5,12 306:3
**routinely**
106:5
**row**
61:13 62:24 63:23
 224:2 225:2 302:2
**rows**
53:19 79:5 187:19
**run**
24:25 112:19
**Rune**
224:10
**Ryan**
277:18
**R-U-N-E**
224:10

---
### S

**safe**
107:2 165:15
**said**
6:12 15:11 17:18
 38:16 40:22 61:19
 72:3 100:25 106:22
 116:8 127:10 133:5
 164:19 204:22
 213:13 227:24
 255:22 262:17
 285:15 291:4,5



293:5
**sake**
148:5 200:22
**Salame**
277:18
**sale**
108:24 246:15
259:18
**sales**
252:15
**Sam**
5:9 308:24
**same**
43:8 48:7 49:16
61:10 63:15 66:11
67:23 71:8 79:9
85:25 91:21,23 97:6
106:16 107:3,24
116:7 128:18
132:24 154:10
173:11,17,23 174:5
187:19 190:2 195:5
240:16,24 241:3
243:14,22 246:19
247:16 248:3
252:16,16 261:8
268:13 269:24
272:2 273:14
282:10,13,13,15
284:24 290:21
293:13
**Samuel**
2:16 131:3,10 277:19
311:21
**satisfies**
211:21
**saw**
24:4 42:12 72:10
175:23
**say**
10:25 17:13 19:9
27:25 32:23 37:2
38:15 48:15,16 56:9
60:24 79:18,23 80:4
106:20 107:2 108:3

109:25 113:18
122:7 142:16 150:4
170:6 178:12 213:5
218:24 226:19
230:16 232:2 235:4
244:2 250:15
263:13 285:12
300:25 301:10
**saying**
14:8 17:24,25 19:14
59:3,4 148:23
189:21 221:2 292:2
303:21
**says**
52:14,17 73:9 103:5
123:11 129:13
133:18 171:19
236:5 244:5 246:2
251:2 257:3,4 277:8
278:3,19 292:11
**scanning**
160:11
**scenario**
80:6 88:8,10 90:15
90:20 91:6 94:22
112:21 155:16
296:19
**scenarios**
79:23 102:15 109:12
119:11
**schedule**
150:23 246:22
259:16 261:6 307:3
**schedules**
143:22 144:6 146:2
149:11 191:6,14
192:2 206:12
**scheduling**
307:16
**Schoening**
177:4,5
**scope**
274:3,10,21
**screen**
299:2,11

**script**
248:11
**scripts**
68:20
**scroll**
182:10 224:8
**scrolling**
161:22
**search**
223:24 224:25
292:12
**second**
11:19 12:7,7 15:20
15:20,22 16:4,5
32:8 41:12 44:25
55:22,23 67:25 86:9
86:9 87:14,14 103:5
103:12 194:18,25
205:5 277:25 278:3
**secondary**
74:23
**seconds**
10:3
**section**
44:24 45:2 73:6
171:18 173:20
174:5 235:25 267:9
**security**
179:24 180:2,8
293:18 294:17
296:24 297:6,11
**seeing**
33:13 181:24 186:10
188:21 223:25
235:23 241:4 268:7
276:19
**seek**
193:4
**seem**
160:12
**seems**
64:24 176:11 244:11
301:20
**seen**
33:16 36:9,24 64:20

101:4 120:23 121:2
121:4 122:8 128:15
129:2 131:24 134:6
135:23 173:25
175:19,21 176:17
218:5 235:9,18
236:19 262:13
263:2 265:15 278:9
278:15 298:10
**segregated**
118:8
**selected**
255:8
**selecting**
186:7
**sell**
206:13 240:15
246:21 257:22
**selling**
104:11 127:23 206:9
**sense**
118:11 156:9 165:20
170:13 174:15
206:3 305:17
**sentence**
32:8 103:5,12 192:24
193:25
**separate**
70:14 89:5 165:4
189:25 222:9
**separately**
72:23
**September**
1:11 4:10 120:13,20
311:19 313:19
**series**
98:3 108:11 230:17
**Serum**
167:15
**serve**
115:15
**served**
16:14 115:4 225:21
**service**
127:17 130:11 230:8



**231:12 234:16,21
235:3,25**
**services**
1:21 4:18,20 56:19
**serving**
297:21
**set**
94:12 137:3,9 158:22
163:9 164:13
197:19 198:7
223:10 249:23
250:5 251:14
259:16 294:14
311:24 312:15
313:11,18
**setting**
122:19 158:22 159:5
159:6,8,12,17
160:14,25 162:4,10
163:9 164:21
**settings**
158:5,7,8,9 161:4
163:25 164:11,13
164:22 174:21
244:18,21
**settled**
10:3
**settlements**
9:19
**seven**
7:25 258:5,12
**seventh**
137:3,8 257:2 311:24
**several**
53:22 68:19 205:7
**shake**
285:21
**share**
210:11
**she**
177:8
**sheet**
148:17 157:15
181:12,17 221:12
299:6 312:8

**shift**
176:12
**ship**
221:11
**short**
81:14,21 175:5,11
210:16,18,22
266:18,22 306:12
312:6
**shortfall**
285:5 286:11 288:10
**shortfalls**
287:20 291:7,14
292:3
**shortly**
276:14
**should**
27:16 28:22 84:18
95:10 100:25 108:3
200:11 203:14
243:12 250:15
308:25
**show**
52:9,23 53:18 56:3
222:9 256:17
258:23 287:22
288:14 289:3
290:14 300:17
302:12
**showed**
236:24 280:9 289:6
**showing**
222:8 289:12 299:11
300:22
**shown**
71:23 307:24
**shows**
52:25 53:11 185:15
300:18 302:15
**shut**
128:14 136:3
**side**
8:24 109:14 112:12
112:17 113:3,19
125:6 177:12

**217:21 257:22**
303:14
**signature**
100:19,24
**signatures**
278:2
**signed**
277:18
**significant**
176:11 278:6 285:4
**significantly**
129:13
**silo**
282:12
**similar**
13:2 28:5 92:10
113:5 164:19 174:8
174:14 206:4,15
227:23 298:4
**similarly**
234:4
**simple**
47:25 148:5 268:10
**simply**
11:19 30:6 89:7
96:12 97:19 104:16
218:16 237:8
**since**
43:5 139:17,20
146:16 191:8
192:14 200:14
207:21 270:16
**single**
33:16 60:2,2 93:16
148:24 151:12
201:11 231:19
**sir**
9:10,16,22 11:4
18:15 27:13 34:7
49:2 53:14 55:20
56:2 60:18 82:5,10
82:17 83:3,7,10
94:9 100:21,24
101:9,13 108:5
116:3 118:5 129:19

**129:19 138:24**
161:21,25 173:23
175:15 176:14
177:7,17 181:23
182:2,9 186:13
189:17 190:16,20
194:3 195:4,9
199:25 205:24
211:7,10,12 213:11
216:18 220:3
221:16 222:2,15
223:23 224:7,11,14
224:17 225:4
227:10 228:14
229:4,9 230:13,15
230:21 239:2
250:12,16,23,24
253:11 256:16
258:13,18,22 262:3
262:15 263:24
266:9 267:24 278:8
281:15 293:22
299:9,12,21 301:16
301:25 302:7 303:3
**sit**
286:12 287:14
298:11
**site**
183:16 187:25 188:3
**sits**
279:19
**sitting**
38:13 241:7 268:19
268:23 296:21
298:5
**situation**
126:23 271:4 285:21
296:13
**situations**
163:2
**six**
161:19
**sixth**
257:2
**size**



57:22,24 62:16
174:16 224:15,18
224:21 229:22
231:13 251:23
252:4 299:25 301:9
302:9

**skipping**
182:16

**Slack**
261:15

**slash**
4:5

**slightly**
23:14 202:8

**slip**
157:15 181:12,17
299:6 312:8

**slipsheet**
221:7 312:14

**small**
123:8,9 157:16
238:20 256:10
258:25

**smaller**
145:10 156:25
182:11

**software**
72:14

**sold**
104:6,7 127:22,25
206:4 212:20
217:18 240:14
241:17 245:19
251:3 252:13,19

**solely**
7:19 8:13 116:18
204:20,25

**solvency**
281:20,23 284:8

**solvent**
281:5,6 282:12

**some**
23:15 24:5 34:25
36:13,16 50:20 51:8
51:9 76:7 77:13

78:2,15,16 81:6
88:17 89:19 93:3
115:5,5 118:7,22
131:21 139:3,25
142:10 143:4,11
144:12,23 148:12
153:20 155:12
161:13 164:22
166:4,15,18,18,20
166:25 168:11,23
169:13,14 170:20
175:23 176:6,8
178:13 181:25
182:16,18 183:19
185:3 187:6 190:12
194:16 201:16
202:14 205:21
206:13 214:11,17
216:3 229:20,24
231:8,15 247:22
254:24 257:3
261:17 263:14
266:2 268:4 276:17
280:10,21 295:23
301:3 306:5,19,20

**someone**
44:19 67:14 112:16
128:25 177:4
178:13,16 188:5
228:8 233:25
235:10

**something**
18:12 24:22 25:3
27:2 37:13 48:17
62:7 66:14 67:13,15
91:11 105:7,15
106:25 118:9 124:6
127:6 132:15
167:15 170:11
178:18 185:7
188:15 206:5 236:5
237:17 246:23
248:7 256:19
279:16 293:8,9

**sometimes**

23:11

**somewhere**
170:10,18 268:2

**sorry**
17:17 30:2,20 35:25
36:23 52:21 61:16
76:20 87:10 97:7,20
103:10 104:13
133:4 134:15
158:11 170:25
173:12 183:3 188:2
194:21 196:10
208:16 209:17
215:24 238:8
240:24 243:9 246:7
246:10 250:18
280:11 283:25
284:17 285:12,25
300:13

**sort**
36:15 76:7 115:5,5
119:3 181:25 185:3
186:9 187:3 213:9
214:12 293:3

**sorting**
186:5

**sound**
154:2,11

**sounded**
97:6

**sounds**
72:2 227:23 290:23

**source**
58:13 92:15 185:25
203:11 289:18,19
300:5,6

**sources**
12:24

**spared**
294:6

**speak**
6:9 18:16 33:23 55:8
60:15 72:18 129:25
130:12 169:18
231:9,18 242:14

260:6 263:7 271:25
296:4

**speaking**
6:3 56:4 87:25 92:12
92:14 144:13 170:2
177:9 179:3 189:22
222:3 263:10
265:12 300:8,16
306:3

**speaks**
189:10

**specific**
25:23 36:16 37:6
49:9 50:4,16 64:16
76:3,18 77:4,4 79:5
88:18 111:13
114:14 119:21
126:10,11,21 128:7
140:3 147:18
148:12 149:7
151:14 175:22
179:8 180:2,8 183:3
183:11,22 185:25
202:7 207:12
213:19,20,21
214:10 216:7,10
226:7 228:25,25
235:25 241:5 249:2
267:8 269:2,25
274:3 286:11
287:10 289:25
292:7 293:6 298:7
302:19,24 305:21

**specifically**
10:11 11:2 19:10
25:17 47:2 49:21
67:16 68:15 72:17
72:19 89:9 93:15
108:13 110:21
111:18 117:22
121:16 129:10
131:23 137:17
146:25 151:17
178:19 180:10
185:5 186:7 189:13



202:17 208:7,19
209:9 217:12
223:12 226:5 233:8
256:22 281:2 287:2
290:3,4,8 291:15
300:21 303:24
304:10
**specifics**
79:2 174:23 186:17
215:4 220:12,19
231:9,19,25
**specified**
20:10 158:5 164:23
168:14 310:11
**specify**
50:13 83:6 85:6
162:5 230:8
**speculate**
84:21 104:23 105:21
105:23 106:10
107:14 113:24
114:3 136:4 156:4
**speculation**
107:20 156:8
**speed**
252:5
**spent**
188:16 218:20
231:24
**split**
191:22
**spoke**
74:20,24 293:5
**spoken**
75:3 101:11 236:17
247:11 260:8
**spot**
16:13,22 17:3,6,10
125:7 126:25
127:20,21 128:2
134:11,18 151:7
167:3,8 217:18
237:9 240:14,18
241:6,16 243:5
245:17 246:3,5

247:3 252:22 261:4
265:24 267:12,14
267:17 269:11
274:24 299:18
300:12 301:2,5,6,11
302:12,16
**spotted**
258:6
**spreadsheet**
181:25 182:6 221:24
222:4,6
**spreadsheets**
60:15 300:3
**SS**
313:4
**stack**
299:7
**stamp**
64:24
**stamps**
64:13
**standards**
275:8,20
**standpoint**
237:4 248:5
**stands**
280:7
**start**
146:14,16 151:21
152:2 171:16
222:10 260:3 281:3
**starting**
244:7 251:8 267:7
**state**
1:18 4:22 5:18,22
23:23 28:7 29:21
35:16 38:10 50:17
71:3 86:22 98:15
142:4,6,20 193:20
240:2,5 241:19
313:4,8
**stated**
33:10 35:22 36:4
44:3 80:17 140:23
199:11 226:14

238:15 247:21
260:9 291:10
292:12
**statement**
24:9 26:23 36:6
123:3,17 193:25
196:19 217:17
223:13 281:7
**statements**
122:2 143:21 144:5
145:25 148:19
149:11 191:5,13
192:2 273:23 274:9
274:13 275:13
278:5,10,13,15
**states**
1:2 4:7 264:16
**stating**
56:14 235:2
**status**
149:14
**stay**
48:2 298:16
**step**
93:5 102:20 107:23
109:21 110:7,12,13
110:14,16,18
112:11,17 113:3
115:24 116:11
117:17 127:19
**stepped**
108:18 117:20
**stepping**
117:14
**steps**
66:18 160:21 208:25
229:20,21 247:8,15
**Steven**
1:14 4:5 5:24 309:6
310:15
**still**
26:6 51:7 95:9,9
153:9 154:4 237:11
243:22 261:2 304:4
**stipulated**

96:19
**stipulation**
95:7,17 96:3
**stop**
63:9 102:11 107:25
108:6,10,14 110:8
110:15,20,23
111:11,19,20
113:11,12 114:9,14
114:20,24 115:4,10
115:14,16,23 116:6
116:10 117:5,14
119:17,22,25 120:7
126:17,20 161:20
162:6 222:13
**store**
10:4 11:18 12:5 16:4
179:16
**stored**
56:16,17,18 183:6
201:25
**story**
280:3,5,6
**straining**
256:8
**strategy**
200:8 203:7 272:6
273:8,16
**stream**
195:16
**Street**
2:15
**strike**
9:13 22:19 29:10
30:2 55:11,22 61:12
88:13 89:23 106:20
158:15 174:5
199:17,19 227:6
239:23 270:25
272:12 286:15
**strived**
105:7
**structure**
304:23,24 305:5,11
**structured**



228:4
**studies**
120:24
**sub**
78:7 249:19,22
**subaccount**
17:5,8 18:10 19:23
    19:24 20:17,17
    302:22,24 303:7,9
    303:10
**subaccounts**
303:6
**subject**
74:25 110:13 114:8
    164:8 260:14
    261:17 281:11
    294:15 308:3
**submitted**
149:7 306:3
**submitting**
277:12
**Subscribed**
310:18
**subsequently**
64:22 135:25
**subset**
143:5
**substance**
58:19 203:22 208:24
    282:14 283:14
**substantially**
208:22
**subtract**
69:11,17 70:9
**subtracting**
70:13
**subtraction**
72:6
**succinct**
47:6
**such**
14:7 53:4,16 116:25
    117:9 137:25 138:2
    179:2 187:16,18
    212:24 213:2

214:15 220:4,7
226:2,15,16,23
228:5 233:18
251:23 261:13
272:3,13 273:4
274:12 275:12
286:13,25 288:16
288:18,21 313:12
**sufficient**
117:3,11,16 119:23
    119:24 211:19,20
    223:15 290:14
**suggest**
23:15 67:21 124:22
    180:25
**suggested**
146:16 228:17
**suggesting**
79:19 286:24
**suggests**
125:2
**Sullivan**
2:14 5:7,10 216:22
**sum**
70:22 203:22 282:14
**summary**
131:18 132:3 239:5
**summation**
75:8 78:17 303:5
**summing**
78:11
**supervised**
218:25
**supplement**
82:13 173:24
**supplemental**
16:8 23:22 24:8
    25:25 26:5 82:16
    83:6 94:8 197:3
    208:18 209:2
    228:12,20 245:9
    300:4 307:5,6,22
**supply**
113:23 125:10,17
    126:24 127:5

**support**
197:25
**Supporting**
216:12,19 312:12
**suppose**
242:22
**sure**
21:11 30:10,20,23
    35:10 43:16 51:8
    52:22 74:5 94:2
    99:6 101:22 103:12
    108:8 144:8 146:19
    152:9,9 153:5 154:3
    154:7 155:11 156:9
    159:18 161:14
    167:17 168:15
    178:11 185:9
    187:14 190:6
    194:22,24 204:12
    208:7 209:10
    221:18 238:10
    245:4 280:18 299:7
    299:10
**surplus**
288:16,19
**swaps**
306:20
**swear**
5:14
**sworn**
5:17 310:5,18 313:11
**synonymous**
48:20
**system**
67:15 108:2,7 110:2
    110:24 261:16
**systems**
72:16 178:23

───── **T** ─────
**T**
5:16 310:2 311:7
    313:2,2
**tab**
52:9 55:23,25 56:3

61:10 66:10 67:6
157:12 182:5 222:9
222:10 224:5 225:3
256:12 299:17
**table**
10:11,12,14 11:4,7,7
    11:8 13:22 14:17,21
    15:5 21:19 56:6,7
    57:19 112:16
    228:21 245:9
    300:12
**tables**
10:18
**tabs**
51:24 221:23
**Tackett**
262:11 263:11 264:4
**Tackett's**
264:8
**take**
13:22 34:9 40:13
    73:6 76:7 79:22
    81:14 101:15
    110:12 111:22
    113:18 132:7,19
    141:21 156:21
    157:18 196:5 207:7
    210:16 237:12
    251:7,22 262:5
    263:17 265:3,4
    273:2 279:5 280:14
    292:19 306:7
**taken**
4:13 63:17 81:22
    136:20 160:22
    210:19,23 229:21
    247:9 265:15
    266:23 306:13
**taker**
168:3
**takes**
100:10 141:16
**taking**
19:10 81:5 105:19
    252:4


MAGNA
LEGAL SERVICES

**talk**
109:25 125:6 148:5
    152:17 177:19
    202:13,21 239:22
    268:2 308:12
**talked**
8:25 18:11 46:16
    248:2 303:16
**talking**
34:4 82:3 102:4
    118:4 149:24 150:2
    189:16 205:4 227:7
    228:20 242:18
**talks**
115:24,25
**teams**
111:4 142:18
**team's**
15:16 58:21 74:13
    85:14 158:24
    164:11 192:13
    198:9 218:10
    288:11 289:6
**technical**
117:24 284:9
**technology**
306:20
**tell**
52:2 156:22 191:11
**ten**
60:14 167:6
**Teneo**
3:6,7 5:5
**term**
18:14,16 37:15 46:17
    47:9,11,14 59:13
    71:16 74:2 100:7
    135:10 148:9
    172:15,20,24 173:4
    176:18,20,22
    213:12 281:6
**termination**
40:16 41:25 42:20
**terms**
57:19 91:13,18,20

130:11 143:6
174:25 180:14
190:5 204:8 207:17
213:19 220:7 230:8
234:16,20 235:3,25
244:25 287:20
295:19
**testified**
5:19 22:2,25 23:8,17
    33:8 40:23 45:21
    49:13 53:10 54:8
    56:15 68:19 71:22
    74:17 75:2 78:8
    98:10 123:19
    125:25 126:7 134:2
    134:5 135:14 169:8
    187:23 199:8
    225:13 227:17
    229:9 237:21
    238:13 242:21
    244:17 249:9
    295:17
**testify**
44:7 65:16 107:21
    310:5
**testifying**
7:7,16 61:6 114:5
**testimony**
6:14 7:18 8:2 20:14
    56:13 63:6,10 91:3
    95:14 131:3,9,13,15
    131:19 134:9 166:3
    196:16 198:15
    199:23 218:8 246:2
    246:9 248:6 255:19
    259:7 262:25 268:5
    268:9 284:3 291:3
    291:25 295:22,24
    307:4,23 308:16,18
    310:6,10 311:20
    313:13
**text**
262:8
**than**
7:25 21:8,18,22 22:5

23:15 33:5 44:19
54:11 80:21 81:11
88:18 93:6 96:15
100:17 111:6 139:8
139:10 143:24
145:17,19,22 151:8
155:13,24 156:24
156:25 170:9,10
198:16 203:25
204:19,24 205:19
212:19 218:23
231:12,21 242:21
243:9 262:21
263:14,16 282:4,9
284:11 286:4
288:21 289:9
296:22 307:17
**thank**
6:3 7:3 34:8 41:24
    55:21 81:25 88:6
    159:16 194:12
    211:2 221:21 239:3
    250:24 256:7
    263:24 292:21
    303:13 308:6
**thankfully**
165:19
**Thanks**
298:15,23
**that's**
11:4 17:11 18:18
    32:13,23 35:9 46:18
    48:25 58:6,10 61:3
    81:12 83:15 88:4
    89:16 98:20 100:22
    101:13 106:8
    109:25 111:23
    118:3 120:6 138:14
    139:14 141:6
    148:20 153:12
    163:14 170:16,17
    170:23 172:2,6
    179:20 188:5 205:3
    213:11 226:18,22
    227:16 228:11

245:25 264:19
268:10 272:10
277:24 279:10
295:13 297:8
**their**
4:22 10:16 12:17,25
    14:21 31:18,19 40:6
    58:23 79:3,7 80:2
    80:20 84:2 108:14
    109:24 111:8
    113:17 117:12
    127:16,23 128:4
    129:4 135:25 138:6
    141:22 142:8
    145:11 149:21
    150:7 151:8 158:10
    158:12 164:8
    183:20 187:24
    191:22 197:5 206:9
    215:5 231:13
    233:14,17 234:6
    249:8 253:12 254:8
    254:9 259:17
    260:11 264:15
    265:22 266:16
    267:10 272:24
**theirs**
72:16
**them**
23:19 31:19 36:6
    49:21,22 72:15
    103:24 113:16
    121:19 134:21
    142:11 160:10
    167:23 168:11
    175:2 190:11
    191:23 202:14
    205:16 212:15,16
    246:23 260:9 261:5
    266:3 270:5
**themselves**
263:8 265:23
**then**
5:15 13:9 68:22
    69:17 70:20 78:14



89:22 98:13 102:12
113:7 131:9 135:25
140:16 171:24
183:12 190:2
194:25 201:19
205:15,20 208:5
244:6 259:16
266:11 281:10
286:16 302:9
**theoretically**
116:24 120:3,6 155:2
**thereafter**
29:25
**thereby**
214:18
**therefore**
84:24
**thereof**
231:8
**therewith**
197:6
**these**
52:14 60:3 68:23
80:16 84:14 85:5
86:15 89:20 90:10
91:13,18 93:4 95:20
96:24 97:10 104:16
113:19 114:7 137:7
137:13 138:19
139:17 140:17
143:5 158:13,15,16
161:4 164:11
165:24 166:9,14,15
166:20,24,25 168:2
168:4,9,16 169:12
169:18 186:2
201:24 205:6,13
211:23,25 212:3,12
213:18 214:11
215:19 216:8
229:14 238:21
249:21 251:12
253:18 255:9,17,21
257:25 258:9
259:13,22 283:4,16

283:20 289:13,23
296:11,24
**thing**
14:7 91:21,23 125:18
128:18 152:4 187:3
**things**
34:18 102:5 107:3,11
118:9 135:2 137:7
166:15 192:13
207:19 239:10
264:17 265:18,25
266:6 283:21
**think**
9:5 16:3 20:13 21:20
46:17 55:12 88:23
93:3 107:2 129:8
139:24 148:8
154:10 155:11
183:13 186:24
213:8 224:3 228:17
238:23 248:13
267:21,25 284:17
293:12 306:22
308:20
**thinking**
40:11 208:17 218:10
**third**
68:13 116:14
**third-party**
109:13 170:3,5
**though**
67:19 77:16 98:25
242:16
**thousand**
139:23 143:24
145:22 155:25
156:2
**thousands**
201:12
**three-step**
102:17
**three-tier**
129:17
**three-tiered**
129:15

**threshold**
30:7
**through**
9:8 89:3 124:6
126:12 131:25
136:2 142:24
155:22 166:19
171:19 180:20
202:14 225:11
234:6 261:15
269:12
**throughout**
25:22 73:9 86:11
168:17 201:6
**Thursday**
4:10
**ticker**
20:6,7,7,10,10,15,15
20:23,24,25 21:18
22:22 76:5,6,13,13
76:15 77:14,14
78:11,13 89:13
222:12 224:9,22
225:18 246:25
248:24 251:25
257:21 259:16
261:6 265:24 288:8
**tickers**
76:4 77:18 202:8,11
221:4 225:15 241:9
247:4 248:22
251:12 287:8,10,13
287:16 288:13,15
288:20,23 291:8,11
291:15
**tie**
185:16
**tied**
163:18 305:13
**ties**
185:15
**times**
25:23 29:13 34:4
64:14 68:19 78:6,12
140:23 187:22

201:4 205:7 213:8
222:24 228:25
245:10 263:15
305:12
**title**
44:25 157:11,12
169:24 172:17
175:11 194:22
216:23 299:17
**titled**
41:11 51:24,25 61:11
216:11,19 312:12
**today**
4:10 6:4,18 7:7,17
22:2 38:13 59:20
107:9 155:12
219:15 228:17
256:8 268:19,23
271:17 276:14
286:12 287:14
296:21 298:6,12
308:5
**today's**
309:6
**together**
191:25
**token**
201:21 205:25 206:2
206:3,7,11 246:21
**tokens**
202:5 205:21 206:6
206:10,11,13,17
210:8 246:14,15,16
246:19,20,22
259:11,15
**too**
184:15 189:5 294:7
**took**
11:19 210:10 266:10
309:3
**tool**
246:20
**top**
99:12,16,18,20 132:8
167:7 224:2 252:4



277:7 294:3

**topic**
59:20 61:3,8 295:16
296:2,8 297:18

**topics**
60:21 219:14 295:22
295:25 307:21
308:2

**Tortola**
99:25

**total**
16:17 30:8 69:21,23
71:11,12 75:7,16
76:12 77:24 78:9,18
80:8,20 89:8 149:2
217:23 247:19
249:18,20 252:24
289:12 290:14,18
304:24 305:5

**totalling**
217:19

**touched**
108:8

**towards**
132:12

**Town**
99:25

**traceability**
295:17 296:2

**traceable**
214:19

**traced**
214:20

**tracing**
216:8 226:9

**track**
140:16 142:7 152:25
179:7

**tracked**
142:10,17

**trade**
13:13 106:4,7 166:16
217:23 248:25

**traded**
12:19 14:12 111:16

112:22

**trader**
121:17

**traders**
72:13 231:16

**trades**
72:11 177:24 178:4,5
180:5 188:11 205:9
212:19,25 213:2,18
213:22 214:11,17
214:19,24 215:11
215:14,19,20 216:5
216:9 217:22
218:18 219:2,19,24
220:2,5,8 248:14,16
248:22,23

**trading**
1:3 2:6 4:6 19:4,11
19:16 20:5 21:9
22:10 26:17 27:3,3
27:6,16,18 28:18,23
29:6,14 30:19 31:4
35:3 75:20,21,22
82:24 83:11,16,20
84:10,20,25 85:3,8
85:13,17 86:3,23
89:4,6,15,24 90:14
90:25 94:15 95:12
96:4,5 97:11 100:2
109:10 112:10
113:6 114:2 125:7
125:11 126:25
134:11,12,18,19
166:17 178:24
201:16 205:6
214:15 215:7,8
220:13 229:15
238:3 267:3,11
269:17,22 270:2
273:22 274:13,23
275:10 277:23
278:5 281:4 285:17
286:20 287:2,9
288:5,15,25 289:10

**trading@QCP.Ca...**

184:14

**traditional**
83:22 206:3,17

**transacted**
251:11 253:6

**transaction**
92:22,23 93:16
109:14 119:19
125:15 127:24
230:23 241:20
251:13 257:22

**transactions**
11:21 92:4 104:14,16
108:18,25 118:11
122:16 230:18
233:8,10,13,16,17
233:19,20 237:6
238:19 240:12,15
240:21 241:21
247:14 251:11,15
252:6,8,20,20,25
253:5,8,15,24 254:3
254:6,7,19 255:7,10
255:21,24 256:21
257:13,17,25
258:10,20 259:14
259:23,25 260:4
266:16 269:7

**transcript**
131:2,9,21 285:14
310:9,9 311:20

**transfer**
110:4 113:8 253:25

**transferred**
113:16 115:10
294:22

**translates**
65:2

**treated**
71:8 205:22

**trigger**
93:10,13 98:10
227:18

**triggered**
93:6 98:5 237:14,16

244:16,20 249:12
260:22 261:7

**triggering**
244:14

**Trop**
1:17 4:19 313:7,23

**true**
38:12,12 66:16
158:22 160:25
161:22 162:12
163:9,9 170:23
173:14 188:24
226:22 310:9
313:12

**trust**
2:12 5:8 6:24 17:14
17:21 38:23 44:17
45:14,17 59:17
106:17 114:16
146:10,13,21
147:14 149:13
162:21 171:10
173:11 187:11
212:11 249:24
250:6 251:2 272:23
280:21 281:10,12
285:7,10,13,15,25
292:11,22 293:24
294:12,16,23
303:24 304:3,15,21
305:7 312:16

**truth**
310:5

**try**
97:16 209:18 280:12

**trying**
79:4 111:23 112:5
152:7 167:20
243:13

**tune**
207:22

**turn**
9:14 61:9 72:25 94:7
99:6 101:3 121:6
137:15 151:16



171:11 192:18
228:12 251:7 280:8
293:14
**turned**
159:13 160:14
244:19,21
**two**
48:6 49:15 50:2
51:23 85:25 86:11
107:23 110:7,16
113:21 127:12
138:7 162:14
179:22 189:20
190:5 201:6 207:25
208:9 210:10
221:23 254:4 274:2
274:20 291:14
308:23 309:7
**two-factor**
180:10
**type**
182:15,17 185:3
246:19 256:25
277:3 290:21 301:3
**types**
92:10 155:10 210:5
261:25
**typically**
109:12 191:15
**typing**
178:14 188:6
**typo**
239:20

———— **U** ————

**UC**
64:13
**unable**
296:19
**unclear**
232:16,17 233:6
237:11
**uncommon**
191:21
**uncovered**

33:15 201:10
**under**
9:19 21:13 29:16,20
36:21 40:16 62:2
76:23 100:23 114:5
121:13,16 135:15
149:25 169:10
172:17 182:17
195:21 197:15
220:16 237:14
256:25 309:4
**underlie**
242:8
**underlied**
108:23
**underlying**
13:17 18:4 24:11
46:3 60:6,12 82:12
92:15 104:12,13
111:4 138:21
176:25 207:17
209:15,21 210:2
248:9,20 253:19,22
**underneath**
299:17
**underscore**
11:3,3 51:24,25 52:2
52:10,18,23 55:24
55:24 67:6 157:12
159:5 186:18
189:13,14 190:3
299:18,18
**understand**
20:13 23:6 25:20
30:10 42:16 49:9
50:17 57:10 63:20
64:12,25 65:3 68:4
72:10 86:9 94:23
100:6 126:2 128:23
134:24 135:12
143:8 155:19
156:12 160:4
167:14 168:11,25
171:16 174:2,18
185:7 186:19 187:4

188:7,10 189:20
193:20 198:23,24
203:12 205:18
207:13 219:8
220:20 221:2 223:4
231:10,14 236:16
236:21,23 242:7
247:13 251:19
260:9,13,15,18,21
260:24 264:13
271:22 274:4
279:11 280:14
284:3 287:18
295:25 303:7 307:9
307:12
**understandings**
196:12 200:3,4
**understood**
24:21 90:8 143:15
220:25 263:6
284:17
**unit**
19:21
**United**
1:2 4:7
**Unless**
177:14
**unlike**
162:23
**unlikely**
154:14,20 155:5
**unlimited**
164:6
**unlocking**
246:22 259:15,17
261:5
**until**
32:6 259:20 285:11
**up**
9:12 41:5 62:12
66:11 67:7 69:14
78:11,15 93:3
111:24 136:11
180:23 191:16,22
192:4 198:17

221:14 298:22
**updated**
202:5 207:13
**updates**
186:25
**upon**
154:16 227:21
229:18 259:17
261:5 300:7
**uptick**
267:22
**us**
6:3 19:3,7 61:19
71:14,24 72:4 78:2
78:3,7,9,22 79:13
113:21 151:22
152:13 154:5
157:10 203:24
204:6 207:24 211:5
240:16 262:6
270:19 298:15
299:22 301:20
303:20 306:19
**usable**
301:22
**USD**
9:19 70:15,18 71:20
72:21,22 75:15
78:14 80:3 84:3,8
153:10 192:7 193:8
197:10 204:8,17,19
204:23,25 208:8
212:21 237:9
241:17 252:23
270:8,14 301:2
**use**
12:23 14:20 17:21
18:5 24:18 46:21
47:7,11,14 57:14
66:15 68:6,19,25
75:18 88:2 129:24
130:10 152:7
188:13 193:4
213:12 281:6 298:7
**used**



10:6,7 13:5,12
14:13,16,25 15:13
16:2,10 17:9 18:3
19:15 22:9,12,14
22:15,16 46:2,17
50:6 57:13,23 59:6
60:5 62:7,10 66:25
68:22 72:13 75:23
80:25 88:25 91:20
129:2 147:9 148:9
162:22 163:22
166:11,16 168:17
176:19 179:8
187:24 201:21
295:2 298:4
**user**
161:23 166:4,5
167:12,22 178:14
182:14 183:12,14
183:14,15,17,18
184:5 186:21,23,25
187:22 222:11,12
233:15 302:10
**users**
127:4 165:13 166:6
183:18 225:18
**uses**
47:9 57:18 176:19
298:3
**using**
12:15 13:17 23:19
24:16 48:9 68:21
71:15,15 94:18
112:16 128:23
129:14 176:22
186:9 192:4 248:11
**UTC**
29:24 30:25 34:6
36:19,25 64:14 65:2
83:9 171:22 229:8
230:16 239:25
242:17 263:16
**utility**
68:4 105:2 168:16
**utilization**

28:20,22 63:14 65:10
79:24 80:11
**utilize**
71:5 165:18 168:9
**utilized**
27:24,25 28:3 29:5
29:11 30:18 31:2
37:4 42:11 50:19,22
63:7 69:8,11,17
70:2,6,9 79:20
83:17 171:24 191:2
192:2
**utilizing**
27:21 80:4
**U.S**
70:12

---

**V**

**V**
5:16,16
**valid**
293:17 296:24
**values**
140:2,4 192:11
**variance**
12:18
**variety**
166:11
**various**
86:11 94:23 117:9
194:16 215:15
249:22 264:16
**vast**
72:11 188:11
**venture**
236:16
**verbatim**
262:10
**verification**
217:8
**verified**
121:25 184:4 198:23
199:2 250:13
260:15 291:13
**verify**

40:8 60:11 68:23
133:4,7 137:12
150:21 173:24
**verifying**
62:8 124:7 263:3
**version**
51:20 189:23 202:19
202:20 263:23
**versions**
189:21
**Versteegh**
3:6 5:5
**versus**
17:10 23:10 25:6
44:25 49:6 144:18
147:15 178:9 185:6
214:25 215:9
**very**
61:14 63:22 125:18
129:10,11 131:15
141:7,16 154:14,20
154:23 155:5 156:5
162:19 163:24
194:18,23 201:10
201:17 204:13
217:4 218:7 235:7
239:3 250:25
256:10 262:6
**vesting**
206:5
**VG1110**
99:25
**via**
3:7 9:19 115:18
144:7 178:7,10
179:4 188:9,12,19
215:9 245:19
297:23
**videographer**
3:9 4:2,17 5:13 81:19
81:23 136:17,21
181:6,10 210:20,24
214:3,7 266:20,24
306:10,14 309:5
**videotape**

4:4
**VIDEOTAPED**
1:14
**view**
22:4 23:18 29:19
48:17 50:10 56:19
57:25 58:25 59:4,10
64:7 65:8 66:24
73:21 84:16 87:20
95:10 100:11
144:23 147:9
153:15 154:5
156:16 172:23
187:10 214:22
215:8 237:12
238:21 269:6
270:25 271:4,6,17
275:22 307:24
**viewed**
131:21 271:18
**viewing**
145:25 222:5
**views**
269:17
**virtue**
170:21
**volatile**
21:8,22
**volatility**
21:24
**volume**
109:9 114:7
**voluminous**
60:4

---

**W**

**waiting**
304:5
**waiver**
281:11 294:15
**Walia**
3:4 5:11
**walked**
89:3
**wallets**



284:15,24 285:19
**want**
7:21 8:21 9:11 18:19
46:20 61:12,20
86:21 103:13
105:25 106:7
113:24 114:6
140:12 152:2 153:4
156:4 159:18
160:10 170:17
171:16 204:12
221:18 299:10
**wanted**
40:2 82:14 94:2
106:2,22 107:10
108:13 109:15,20
127:13
**wanting**
106:12
**warning**
264:15
**wasn't**
35:24 36:3 42:18
66:22 101:19
107:16 117:3
130:18 141:19
143:2 218:14 228:8
229:17 247:5
291:16
**Watkins**
1:15 2:5 4:13,16 5:2
**way**
6:15 13:15 22:3 24:7
42:10 47:6,15 49:9
54:15 57:15,18
68:24 71:8 83:19
84:7 124:20 126:20
133:14,14 139:17
160:4 163:20 177:9
178:21 179:7
183:19 187:15
218:6 228:15
246:11 256:7
267:10 277:9
287:10 291:18

295:23 299:24
301:19 304:8
313:16
**ways**
15:14 71:19 193:11
267:6
**web**
56:18 188:5
**website**
24:14 72:21 101:16
101:19,25 183:2,7,8
185:8,24 187:6,23
188:4,9 234:6
**weight**
24:23
**welcome**
262:21
**well**
33:13,25 36:15 64:15
70:18 72:9 74:14
88:22 90:17 91:19
103:22 109:3 111:9
148:21 156:25
188:25 191:13
199:19,19 206:20
206:22 221:19
226:24 232:15
237:23 241:17
243:25 252:2
258:20 260:12
261:16 269:12
270:15 275:25
276:21 277:17
279:2 285:10
290:17 296:21
297:8 301:15 303:2
305:25 307:22
**went**
24:9 40:7 105:12
116:24 129:5
135:16,24 155:8,22
158:23
**weren't**
128:12 232:8
**whatever**

14:14 34:21 161:14
205:16 242:24
268:13
**whenever**
136:9 165:10
**where**
26:11 41:24 43:21,22
44:4 47:2 49:22
52:12 74:2 103:10
111:25 112:23
113:5 116:16 117:2
119:23 120:5 125:9
125:21 126:24
130:12 151:22
155:8 162:10 196:3
196:11,12 235:24
245:10 270:8,19
289:6 306:23,24
307:23
**whereby**
7:9 206:12
**WHEREOF**
313:18
**Whereupon**
8:7 41:6 51:13 81:21
93:22 120:11 131:2
137:2 157:4 175:5
181:8,12 194:6
210:18,22 214:5
216:11 221:7
249:23 255:25
261:20 266:22
276:5 298:18
306:12 309:13
**whether**
13:3 44:11 66:25
86:14 95:10 122:18
126:16 130:4
135:19 136:11
140:17 142:3
156:10 185:15
214:22 218:17
220:23 221:4
251:17 262:22
266:10 268:20

278:16 284:5 291:7
**while**
50:23 88:25 103:8,22
145:6 163:21
220:18
**who**
43:17 44:5 70:23
99:8,11,14 111:11
114:13 117:21,22
125:21 137:21
138:11 139:3
144:10 149:7,16
150:2,14 151:7
152:11 162:23
168:19 172:7 174:8
175:14 177:5,23
178:2 179:8 184:10
213:17 214:10
215:10,18 216:4
219:4,5 228:8
232:11,21 233:3,8
247:24 253:7
255:16,22
**whoever**
109:21
**whole**
125:24 126:2,16
128:5 152:4 231:22
232:13
**whom**
4:23 121:23 183:9
184:13
**whose**
151:8 313:10
**why**
20:23 41:4 62:15
64:6 70:12 99:17
104:20 105:12,14
107:8 115:15
129:20 146:16
148:4 169:3,5,19
190:22 197:14
210:10 229:12
244:24,24 245:2
246:25 247:5,8



248:15,23 249:2,5
255:8 259:22 260:4
267:13 277:11
**will**
4:21 5:13 6:5,20,22
7:17 14:6 19:21
82:21 92:3 93:2
108:3,16,23 112:24
113:18 116:21
121:12 130:25
134:8 147:2,4 157:2
157:10 171:20
173:24 182:10,12
196:22 202:13
206:5 207:7 221:22
222:10,12 223:7,14
224:8,25 225:2
239:16 245:11
250:25 262:4 263:7
265:4 280:12,17
292:19 298:16
307:2,10,10,13
308:8,12,14,20
**willing**
109:12 112:11
113:18 127:19
**window**
86:15
**wise**
210:2
**withdraw**
158:11 162:14,22
163:3,10,18 164:25
211:13,19
**withdrawal**
211:18
**withdrew**
211:4,8 212:3,12,15
**within**
10:11 14:20 16:24
20:24 45:15 56:7
72:20 86:15 104:6
122:2 180:6 276:3
303:11 313:8
**without**

117:5 159:7 164:6
193:6 233:24 234:5
252:11 281:11
283:11,13 294:15
**witness**
2:13 5:9,14,17 7:15
8:12 14:5 39:7 43:6
61:5 81:16 189:2,7
194:12 200:7 203:7
225:9 279:9 309:7
309:14 313:10,13
313:18
**wondering**
267:6
**won't**
262:5
**word**
36:14 129:2 170:8
178:22 207:7
230:25 241:15
265:4 292:19
**words**
18:20 46:20 103:22
129:24 205:14
218:24 222:20
231:3 235:19
253:18 265:24
298:3,4,8
**work**
39:7 83:23 120:7
156:6 171:17 190:5
191:3 192:20,23
193:2 195:16
232:14 237:24
307:13 308:8
**worked**
104:2 232:18 236:18
**working**
159:12 191:5 307:2
**works**
27:2 116:5
**world**
31:10 35:18 93:12
122:19 233:3 236:7
253:17

**worry**
181:17
**worrying**
176:6
**worth**
78:20 79:6 153:23
211:8,11
**wouldn't**
53:21 113:24 140:12
145:8 156:4
**write**
192:17
**writes**
176:5
**writing**
197:15
**written**
123:4 294:2
**wrong**
46:18 114:4 227:12
**wrote**
9:18 103:3,24 195:21
235:19 267:2,21
**www.MagnaLS.com**
1:22

---

**X**

**X**
1:3,9 311:2,7

---

**Y**

**yeah**
58:12 79:4 89:16
99:17 141:19 160:7
213:7 218:14
270:16
**years**
159:12 171:8
**Yep**
129:12
**yesterday**
6:16 8:5,25 10:3
11:17 12:3 16:3,15
18:11 19:5 23:5,8
39:2 56:15 71:22

74:18 75:2 78:8
101:12 107:4 108:9
109:6 126:2,7
135:14 155:12
191:7,15 238:24
276:12,18 280:10
280:19 295:18
302:23 303:16
**yet**
43:5,25 63:5 110:20
150:7,8 195:15
307:10 308:21
**York**
1:16,16,18 2:7,7,15
2:15 4:14,14 5:18
313:4,8

---

**Z**

**Zachary**
2:7 5:2
**Zane**
262:11 263:11
**zero**
54:25 55:4 79:23
121:19,23 122:4,21
136:11 202:3
240:11
**zeroes**
299:14
**Zhao**
2:8 5:3
**Zijun**
2:8 5:3
**zoom**
3:7 222:11 302:4

---

**$**

**$1**
241:19 254:18
**$1,000**
139:11
**$10,000**
205:19
**$120**
48:21 54:20 95:25



96:2
**$13,445**
64:2
**$190,000**
154:11
**$2**
259:4
**$24**
200:17 201:2 203:2
203:15 204:4,17
208:6
**$240**
29:23 30:7 47:24
48:2,8 49:3 77:25
80:3,21,25 81:3
89:9
**$241**
79:6
**$250,000**
153:25
**$360**
80:14
**$440,000**
152:14 153:10 154:6
**$450,000**
152:23
**$50,000**
152:21
**$500,000**
152:12,21 153:23
**$576**
208:4
**$631,287,133**
302:17
**$65**
163:15
**$74**
11:15
**$81**
254:20 260:18

**0**

**00030**
63:22

**1**

**1**
4:4 16:24 115:25
121:17 145:18
156:2 171:18 196:7
196:14 244:6
263:13 290:17
**1(a)**
121:16
**1,000**
145:17,19 217:20
**1.08**
217:20
**1:00**
247:22
**1:10**
136:22
**10**
9:13 152:12,19,19,20
153:17 302:17
**10:00**
95:24
**10:21**
32:6 33:5 230:16
234:10 236:10
238:7,11 239:25
247:6 261:12
**10:29**
32:4,19 240:7 242:17
**10:47**
244:7
**10:49**
81:20
**100**
132:5
**10004**
2:15
**10020**
2:7 4:15
**1051**
299:18
**11**
1:6 171:6 305:24
**11,000**
139:6 140:6,17

141:20 142:7,10,17
143:5,12 144:12
158:17 159:20
**11:19**
81:24
**11:53**
263:13
**12**
51:6 53:3,7,15 62:15
63:8 186:7,11
187:10,18 217:16
223:17 224:12
225:11 264:23
281:5 290:17 292:5
293:19 294:19
**12:00**
86:5 302:6
**12:23**
136:18
**120**
48:5,10 80:5 95:21
96:11,12 311:18
**125**
2:15
**1271**
1:15 2:6 4:13
**13**
9:8,20 25:22 26:21
29:24 30:25 31:24
32:8 33:19 36:8,19
37:2 39:18 40:2
55:14,16 62:2 63:8
83:9 85:4 86:4 87:2
87:12,18 88:17
187:10,19 211:5
212:20 217:18
218:19 219:3 223:3
223:17 225:11
229:8 247:23
258:15 281:5
290:17 292:5 302:5
302:13
**137**
311:23
**14**

9:8,20 25:23 32:4,6
33:5 39:19 40:2
53:4,7,16,20,24
54:19 55:11 62:2
63:22 82:15,23
88:18 94:6 138:20
140:2,16 142:24
144:14,19,21
155:24 156:11
186:7,11,15 187:5,8
187:17 212:20
219:20,25 220:14
223:3 228:19 233:5
234:23 235:22
236:11 238:12,23
239:2,6,25 242:18
256:23 259:4,6,8
260:2,3,25 262:11
265:16 281:6 292:5
293:20 294:19
**15**
86:4 223:10 258:16
**16**
258:16
**175**
312:6
**18**
151:20 152:2 238:20
267:4
**181**
312:8
**19**
8:6,8 120:13,20
152:14 311:14,19
**190**
154:10
**194**
312:9
**195.4**
96:14

**2**

**2**
4:6 10:21,25 13:11
14:23 45:2 52:16,18



103:4,14 172:14
211:8 276:20 281:3
281:13
**2.5**
123:12 124:11
**2:00**
29:24 36:19,25
247:23
**2:01**
30:25 31:24
**2:08**
181:7
**2:10**
181:11
**2:47**
210:21
**20**
41:7,10 73:3 99:7
171:14 207:9
208:23 310:19
311:15
**200**
30:5 42:13,19 45:24
46:16,19 47:23 49:5
73:10
**2020**
208:23
**2021**
286:15
**2022**
9:20 25:14,18 26:21
29:24 31:2,24 33:19
37:2 40:2 50:20
53:4,16 55:14 62:2
62:16 83:9 85:4
87:2,18 99:22
101:16 120:13,20
123:12,22 128:15
136:4 138:20
156:12 186:8,15
211:5 217:18
223:18 224:13
229:8 247:23 267:4
269:8,14,15 270:7
271:3,9,11 281:5

286:16,22,25 287:6
287:24 288:5,10,24
289:14,22 290:2,17
292:6,8 293:20,20
294:19 302:5,14
311:19
**2023**
131:5,11 216:21
311:22
**2024**
193:23 194:19 195:3
195:14,23 196:21
198:3,19
**2025**
1:11 4:11 207:5,10
223:10 285:11
295:6 313:19
**2026**
197:17
**21**
51:12,15,18 311:16
**21st**
208:23
**216**
312:12
**22**
93:21,23 101:3
129:10 268:11
311:17
**22-11068**
1:7 4:9
**221**
312:14
**2283**
99:24
**23**
120:10,14,17 311:18
**24**
130:25 131:6 151:18
152:2 153:2,8 201:3
202:22 203:5,24
204:21 248:14,15
311:20
**240**
48:4 78:7,20 247:20

**2433**
132:7,9
**25**
1:11 4:10 136:25
137:5 207:5 216:21
280:9 311:23
**25th**
313:19
**250**
312:15
**250,000**
154:9
**256**
312:17
**26**
137:18 157:5,8
194:19 195:3,14,23
198:3 258:16
**261**
312:18
**27**
131:5,11 137:15
175:7,10 311:22
312:6
**276**
312:19
**28**
181:13,16 199:17
239:4 241:4 244:12
280:22 312:8
**29**
194:10,13 280:22
312:9
**298**
312:20

―――――――――――
**3**
―――――――――――

**3**
55:24 66:11 121:6,12
173:20 223:12
282:11,19
**3AC**
9:18 10:16 11:3
12:17 15:5 17:2,21
18:10 23:24 24:9

26:18 28:8 29:22
31:14,15,17,21
33:14 37:3 46:23
47:21 49:23 72:10
72:12,13 82:8 85:3
86:24 97:20 109:8
121:5 122:11
124:16 145:10
147:25 170:4
175:25 178:5
182:25 183:25
187:24 189:13
195:18 196:25
199:13 205:11
211:25 212:12
217:8,18 223:18
226:17,21 227:2
231:14 242:12
246:16 260:10
264:15 267:15,22
268:3,12,18,25
270:14 272:24
294:18,20 302:15
302:18,19
**3ACLFTX@teneo....**
186:10,20
**3AC's**
16:23 27:20 35:17
36:7 47:25 51:4
54:3 72:18,20
123:10 125:3
174:14,18 178:3
188:11 191:10
202:9 218:12 219:2
220:13 229:22
231:25 236:21
242:6 245:14,17
246:3 252:19 259:3
259:8,20 261:2
267:3 269:22 270:2
270:24 293:19
296:10 302:12
303:11
**3:13**
210:25



**3:15**
214:8
**3:17**
214:4
**30**
10:3 171:22 216:14
216:17 280:22
293:15 294:3
312:12
**30th**
99:22
**30(b)(6)**
4:5 6:14 283:19
297:17 309:7
**30-second**
10:5 115:8 135:4
**30:51**
64:25
**31**
221:8,11 294:4
311:20 312:14
**32**
249:25 250:4 312:15
**33**
256:2,5 312:17
**34**
261:21,24 312:18
**35**
211:5 276:6,8 312:19
**36**
298:19 299:3 312:20
**38**
189:12,12,19,21
190:4,8,17,21,23
191:25 192:16,20
193:21 195:20
196:9 197:23
199:18 200:15,22
201:21 203:20,20
203:23 204:2,11,12
204:18,20,24,25
205:23 206:19,21
207:11,15,20
208:11,15,20,24
209:6,10,14,15,20

209:21 246:18
**39**
250:17,19,19

— 4 —

**4**
101:16 171:18
211:11
**4:26**
266:21
**4:43**
266:25
**41**
311:15
**44**
18:21
**440,000**
154:9
**46**
61:3
**49**
27:12

— 5 —

**5**
47:5,12,19 73:7
171:21 173:20
250:20 311:5
**5:40**
306:11
**50**
153:16,19,23
**50,000**
151:23 152:20,20
**51**
311:16
**52,000**
212:19 213:18
214:24 215:20
216:9
**53**
47:4,5
**58**
139:8

— 6 —

**6**
47:4,5 293:15 294:11
**6/13**
95:24
**6/14**
95:25
**6/29/2022**
175:6,12 312:7
**6:03**
306:15
**6:06**
309:8,13
**6:14**
245:13
**6:15**
245:14
**60,000**
151:23
**65**
9:14 165:17,19
**66**
211:3
**68**
212:17 215:11

— 7 —

**70**
245:2 248:15
**7038**
189:14
**74**
9:18 11:8 26:13
29:21 30:24 32:9
86:22
**75**
96:13
**75.4**
83:12
**77**
230:11,13,14 243:21
244:8

— 8 —

**8**
299:14,15 311:14

**8.0**
217:22 219:7
**8072**
11:3
**81**
240:14 243:16
**82**
17:8,22,25 243:15
244:9,24
**86.8**
96:15
**866-624-6221**
1:21

— 9 —

**9**
9:13
**9:00**
1:12 26:20 32:7
33:18 83:9 86:4
87:12,16,18 95:24
229:8
**9:17**
4:11
**90**
245:3
**92**
192:18 194:2 195:7
**93**
311:17
**99**
139:9 145:16 155:24



# EXHIBIT 39



**Hilary Term**
[2021] UKPC 4
**Privy Council Appeal No 0082 of 2019**

# JUDGMENT

# Byers and others (Appellants) *v* Chen Ningning (Respondent) (British Virgin Islands)

## From the Court of Appeal of the Eastern Caribbean Supreme Court (British Virgin Islands)

**before**

**Lord Kerr**
**Lord Briggs**
**Lady Arden**
**Lord Kitchin**
**Lord Leggatt**

## JUDGMENT GIVEN ON

## 22 February 2021

**Heard on 4 June 2020**

*Appellants*
Stephen Smith QC
Ben Griffiths
(Instructed by Holman
Fenwick Willan LLP
(London))

*Respondent*
Victor Joffe QC
Ifan Chan
(Instructed by Harney
Westwood & Riegels LLP
(London))

**LORD KITCHIN:**

1.      This appeal concerns a claim by the joint liquidators of Pioneer Freight Futures Ltd ("PFF") which is based upon the alleged misfeasance of one of PFF's former directors, Miss Chen Ningning ("Miss Chen").

2.      The appeal gives rise to issues concerning the adequacy of the judgment of the trial judge; the relevance of delay by the Court of Appeal in delivering its judgment; the permissibility of challenges on an appeal to the Board of findings of fact made by the trial judge and upheld by the Court of Appeal; the changing nature of the duties of a director once the insolvent administration of a company becomes inevitable; and the scope and nature of the jurisdiction conferred on the court by the Insolvency Act 2003 ("the 2003 Act") where a company has entered into a voidable transaction. The Board will identify the issues more precisely in a moment but first we must explain the background.

*The background*

3.      PFF was incorporated in the British Virgin Islands ("BVI") in 2006 for the purpose of trading in forward freight agreements ("FFAs"). FFAs are contracts for differences that allow shipowners and traders to manage their exposure to the volatility of freight rates. That volatility also provides an opportunity for companies such as PFF to enter into FFAs for speculative purposes. The FFAs entered into by PFF were written on standard terms and referenced to the Baltic Dry Index, an index of freight rates maintained and published by the Baltic Exchange. Until about September 2008, PFF was one of the largest FFA traders in Asia.

4.      The respondent, Miss Chen, is the ultimate beneficial owner of a group of companies known as the Pioneer Group. The principal holding company of the group is another company incorporated in the BVI called Pioneer Iron and Steel Group Company Ltd ("PISG"). PFF is owned by PISG. Upon its incorporation, PFF had three directors, one of whom was Miss Chen. The other two directors resigned in the course of 2007, leaving Miss Chen as PFF's sole director. Miss Chen is based in the People's Republic of China and PFF's main business activities were conducted from offices occupied by PISG in Beijing.

5.      In September 2008 there was a catastrophic collapse in the freight market and in consequence PFF began to experience severe financial difficulties. It ceased trading in

FFAs and concentrated on managing its FFA portfolio with a view to negotiating settlements with its creditors and minimising its losses.

6.     On 15 May 2009 PFF entered into a loan agreement with Zenato Investments Ltd ("Zenato"), a company owned and controlled by Mr Song Dingding ("Mr Song"), a business acquaintance of Miss Chen. Under the terms of this agreement Zenato agreed to lend to PFF up to US$ 13m for a term of two years at an interest rate of 9% per annum. Sums totalling US$ 13m were duly advanced by Zenato to PFF in three tranches in the course of that month.

7.     On 29 October 2009 PFF lost an action that had been brought against it in the High Court in London by an FFA counterparty, Marine Trade SA ("Marine Trade") ([2009] EWHC 2656 (Comm); [2010] 1 Lloyd's Rep 631). It had been conceded by PFF on 23 October 2009, the last day of the trial, that it was commercially insolvent and in the light of that concession the judge, Flaux J (as he then was), held that an event of default had occurred under the terms of their contract and that any liability of Marine Trade to PFF was suspended whilst PFF remained indebted to Marine Trade.

8.     Shortly after the delivery of the Marine Trade judgment and as a result of an improvement in the market, PFF found itself with what the trial judge in these proceedings, Bannister J, described as an "excess margin on deposit" which meant that it could withdraw funds from its deposit account. PFF took that opportunity to repay its indebtedness to Zenato in three tranches on 3, 4 and 27 November 2009. Nevertheless, at the time these payments were made (and indeed at all times from, at the latest, 29 October 2009) PFF was insolvent and an insolvent liquidation or some other protective insolvency process was inevitable.

9.     On 17 December 2009 PFF applied in the BVI for the immediate appointment of joint provisional liquidators on the ground of its insolvency and the need to protect its assets. The application was supported by an affidavit of Mr Eddie Chen (who is not a relative of Miss Chen and is also known as Mr Chen Yang) ("Mr Chen") dated 16 December 2009. He described himself in that affidavit as the "Chief Operating Officer and Director of Risk Management" of PFF but made clear that although his title included the word "Director", he had not in fact been appointed as a board director of PFF.

10.     The court acceded to the application and appointed Mr Mark Byers, Mr Mark McDonald and Mr Andrew Hosking, each of Grant Thornton UK LLP, as joint provisional liquidators ("JPLs"). On 15 February 2010 the JPLs were appointed as PFF's liquidators. Mr Hosking resigned on 24 October 2012. Mr Byers and Mr McDonald remain PFF's liquidators ("the Liquidators").

11.    In the meantime, on 28 January 2010, using the statutory powers conferred on the JPLs, Mr Byers had examined Mr Chen. The meeting at which the examination took place was also attended by Mr Andrew Charters, a director of Grant Thornton, and by Ms Alex Welch, a colleague of Mr Charters. Ms Welch prepared a note ("the note") of the meeting after its conclusion. The note records that Mr Chen told them that the Zenato loan was organised by PISG and that Miss Chen tried to pay back as much of it as possible because "she is reliant on her reputation". The Liquidators have attached particular importance to the contents of this note because the examination took place only shortly after their appointment as provisional liquidators and at a time when they were trying to gather as much information as possible about PFF's affairs. It was only about 12 weeks after instructions had been given for the payments to Zenato to be made.

12.    On 17 May 2010 PISG submitted a claim in PFF's liquidation. That claim was later admitted by the Liquidators in the sum of about US$ 90m. On 17 December 2010 the Liquidators announced their intention to pay to PFF's creditors an interim dividend of US$ 0.06 in the dollar (that is to say, 6%) on admitted debts. This meant that the interim dividend payment in respect of PISG's debt would amount to about US$ 5.4m.

13.    On 2 January 2014 the liquidators of PISG, which was by this stage in liquidation itself, assigned to Miss Chen the right to that interim dividend and, indeed, all other dividends which might become due and payable to PISG in respect of its claim against PFF. Notice of this assignment was given to the Liquidators.

14.    On 7 March 2014 the Liquidators wrote to Miss Chen informing her that they would be withholding payment of the interim dividend to her on the grounds that they might have a cause of action against her. A letter before action followed on 31 March 2014.

15.    On 30 April 2014 Miss Chen made an application in the High Court of Justice of the BVI for an order that the Liquidators pay her, as assignee of PISG, the interim dividend to which she claimed to be entitled.

16.    On 23 May 2014 the Liquidators began these proceedings against Miss Chen in the High Court of Justice of the BVI claiming the sum of US$ 13m together with interest for breach by Miss Chen of her fiduciary duties as a *de jure*, *de facto* or shadow director of PFF, or as someone whose role in the affairs of PFF (including as sole authorised signatory on its bank accounts) justified the imposition of fiduciary duties, for causing and procuring the payments to Zenato in November 2009. They also sought an order against Miss Chen under section 249 of the 2003 Act for restoration of the funds paid to Zenato on the basis that the repayment of the loan constituted an unfair preference and so was a voidable transaction within the meaning of, respectively, sections 245 and 244 of that Act.

*The decision of the trial judge*

17.     The action came on for trial before Bannister J on 3 March 2015 and lasted for four days. He clearly had a poor opinion of the merits of the Liquidators' claims, describing them in his concise judgment, which he delivered on 19 March 2015, as "remarkable" and as giving the impression of having been "cobbled together for the sole purpose of providing the [Liquidators] with grounds for refusing to pay Miss Chen's dividend" (para 14). He recorded as common ground that a director who realises that a company cannot avoid insolvent liquidation and yet uses company money to pay a particular creditor without any proper reason for doing so, misapplies company funds in breach of fiduciary duty. He also found that at all times after the Marine Trade judgment, PFF was unable to pay its debts as they fell due and insolvent liquidation or some other protective insolvency regime was inevitable. However, he then held that:

> (i)      Miss Chen ceased to be a director of PFF at about the beginning of August 2009 and she owed no fiduciary duties to PFF at the time of the Zenato payments in November 2009;

> (ii)     Miss Chen probably knew of and did not object to the Zenato payments but she did not instruct Mr Chen to make them; nor did she cause or procure them to be made in any other way; and

> (iii)    it followed that Miss Chen did not act in breach of fiduciary duty. Further, if Miss Chen was not liable for breach of fiduciary duty, sections 244, 245 and 249 of the 2003 Act were not capable of generating an obligation on their own.

*The decision of the Court of Appeal*

18.     The Liquidators' appeal against Bannister J's judgment and consequential order was heard by the Court of Appeal on 11-12 January 2016. In its judgment, delivered on 12 June 2018, nearly two and a half years later, it dismissed the appeal on all grounds. In broad summary, the court held that:

> (i)      the judge was entitled to find that Miss Chen owed no fiduciary duties to PFF at the time of the payments to Zenato whether as a *de jure*, *de facto* or shadow director or as a result of any role she may have had in the affairs of PFF;

> (ii)     the judge's finding that Miss Chen did not cause or procure the payments to Zenato was one that was open to him on the evidence; and

(iii)    the payments to Zenato constituted an unfair preference within the meaning of section 245 of the 2003 Act, but the court would not exercise its discretion to make an order against Miss Chen because such an order was not required to restore PFF to the position it would have been in had it not made the payments because insolvent liquidation was inevitable in any event. Further, Miss Chen did not receive any benefit from the payments; and the fact that she knew about them but did not object to them was just one of the factors to be considered and by itself did not carry much weight.

*The issues on this appeal*

19.    The Board can now outline the grounds of this further appeal and the rival contentions of the parties. The Liquidators submit that the judge ought to have found that Miss Chen was a *de jure* director of PFF at the time of the payments to Zenato and, indeed, remained a *de jure* director of PFF until its liquidation. They also contend that even if Miss Chen was not a *de jure* director of PFF at the time of these payments, she was a *de facto* or shadow director because she retained responsibility for important aspects of PFF's affairs and, in particular, its bank account and the payments it made. They submit that, irrespective of the precise nature of her directorship, she owed fiduciary duties to PFF and, once it became clear that PFF was insolvent, through PFF to its unsecured creditors. They contend that the Court of Appeal ought to have identified and corrected these failings by the judge and that it fell into error in failing to do so.

20.    The Liquidators also argue that the judge was wrong not to find that Miss Chen acted in breach of these fiduciary duties. She permitted Zenato's loan to be repaid in full when she well knew that PFF was insolvent. The first payment was made a matter of days after the Marine Trade judgment and, within three weeks of the final payment, Miss Chen arranged for PFF to enter provisional liquidation. At the time of the loan repayment, Zenato was only entitled to prove pari passu with PFF's other unsecured creditors in its insolvency and by allowing PFF to repay its loan in full, Miss Chen acted in breach of her duty to the company to have proper regard to the interests of all of those other unsecured creditors. The Liquidators contend that, once again, the Court of Appeal was wrong not to recognise and correct these errors.

21.    The third limb of the Liquidators' case on this appeal is that the judge ought to have found that Miss Chen actually arranged or at least consented to the repayment of the Zenato loan. They maintain that, just as it is inconceivable that Miss Chen would not have known about the plan to repay the Zenato loan prematurely, it is also inconceivable that anybody involved in PFF's affairs would have made the loan repayments without seeking and obtaining her consent. Moreover, they argue, the evidence that Miss Chen was involved in the payments to Zenato and did give her

permission for them to be made was overwhelming and ought to have been accepted. The Court of Appeal wrongly failed so to find.

22.    The fourth and final limb of the Liquidators' case on this appeal concerns their claim under the 2003 Act. They contend that the judge was wrong to reject it as he did on the basis that if Miss Chen was not liable for breach of fiduciary duty then it followed that she was not liable under the provisions of the 2003 Act. They continue that the Court of Appeal was right to find that the repayment of the Zenato loan constituted an unfair preference within the meaning of section 245 and it ought also to have found that it was a voidable transaction within the meaning of section 244, and that section 249 conferred upon it a discretion to make an order against Miss Chen to restore PFF's position to what it would have been had the payments not been made. Further, the Liquidators continue, the Court of Appeal's decision not to make such an order was flawed and should be set aside. They invite the Board to exercise the discretion afresh and, in doing so, to order relief against Miss Chen on this ground too.

23.    The Liquidators recognise that their case before the Board involves challenges to findings of fact made by the judge and upheld by the Court of Appeal. They also acknowledge that there are significant constraints on the ability of the Board to overturn such findings. However, they continue, the central findings which they challenge on this appeal are plainly wrong. The judge ignored relevant evidence and his findings are neither internally consistent nor adequately supported by reasons. These errors were not identified or acted upon by the Court of Appeal and justify the Board interfering in the decisions to which the judge and the Court of Appeal came.

24.    There are two further matters upon which the Liquidators rely. They point, first, to what they describe as the great hostility of the judge to their case, a hostility which, they say, he displayed during the interlocutory stages of the proceedings, at the trial and on handing down his judgment. Moreover, they continue, this is not a case where the judge gave a full and detailed judgment. To the contrary, the judgment is only ten pages long and it was delivered within 14 days. Given the length of the trial (four days) and the complexity of the issues it raised, the concision of the judgment and the speed with which it was delivered reflect a failure by the judge properly to consider and address all the evidence before him and the submissions he heard.

25.    The Liquidators refer, secondly, to the delay of two and a half years by the Court of Appeal in giving its judgment. This, they say, was exceptional and amounts to a real injustice to the parties. Further, when coupled with the errors in the judgment itself, this delay justifies the intervention of the Board.

26.    Miss Chen responds that the Liquidators' case constitutes a wholly inappropriate and unjustified attempt to challenge the findings of fact made by the judge and upheld

by the Court of Appeal. There are, says Miss Chen, several key findings which are fatal to this further appeal: (i) she ceased to be a *de jure* director of PFF around the beginning of August 2009 when she withdrew from involvement in its affairs; (ii) after she ceased to be a *de jure* director of PFF, she did not become a *de facto* or shadow director of the company and did not owe fiduciary duties to it for any other reason; (iii) she did not cause or procure the repayment of the Zenato loan and Mr Chen was a credible witness on this issue. These findings are, Miss Chen continues, unimpeachable and the challenge made to them by the Liquidators was rightly rejected by the Court of Appeal.

27.    As for whether the Court of Appeal was wrong to hold that no order for relief should be made against her under section 249 of the 2003 Act, Miss Chen accepts the Court of Appeal's finding that PFF's repayment of the loan to Zenato constituted an unfair preference within the meaning of section 245 of the 2003 Act. She also accepts that section 249 confers on the court a discretionary power to make orders against third parties. However, she continues, such powers are not unfettered and must be exercised for the restitutionary purpose of restoring the pre-transaction position. The power can only be exercised against a third party who has benefitted from the transaction and so has something to restore. Here there is no finding that she derived any personal benefit from the repayment of the Zenato loan; indeed, there is a finding that she did not.

28.    Miss Chen also rejects the criticisms of the judge's attitude to the claim and the concision of his judgment. These matters were, she says, raised by the Liquidators before the Court of Appeal and rightly dismissed. As for the delay by the Court of Appeal in giving judgment, Miss Chen submits that the critical question is whether there is some error in the Court of Appeal's approach which is attributable to the delay and here there is not.

*The approach to be adopted*

29.    It is well established that, where a trial judge has reached a conclusion on an issue of fact, it will only be on rare occasions that an appellate court will intervene. Lord Reed summarised the position in *Henderson v Foxworth Investments Ltd* [2014] 1 WLR 2600, para 67:

> "in the absence of some other identifiable error, such as (without attempting an exhaustive account) a material error of law, or the making of a critical finding of fact which has no basis in the evidence, or a demonstrable misunderstanding of relevant evidence, or a demonstrable failure to consider relevant evidence, an appellate court will interfere with the findings of fact made by a trial judge only if it is satisfied that his decision cannot reasonably be explained or justified."

30.    Further, as a matter of settled practice, the Board will decline to interfere with concurrent findings of fact of two lower tribunals. This practice will only be departed from in cases of a most unusual nature. In *Central Bank of Ecuador v Conticorp SA* [2015] UKPC 11; [2016] 1 BCLC 26, para 4, the Board made clear that the position remains as stated in *Devi v Roy* [1946] AC 508, pp 508-509, where it said:

> "(4)    That, in order to obviate the practice, there must be some miscarriage of justice or violation of some principle of law or procedure. That miscarriage of justice means such a departure from the rules which permeate all judicial procedure as to make that which happened not in the proper sense of the word judicial procedure at all. That the violation of some principle of law or procedure must be such an erroneous proposition of law that if that proposition be corrected the finding cannot stand; or it may be the neglect of some principle of law or procedure, whose application will have the same effect. The question whether there is evidence on which the courts could arrive at their finding is such a question of law.

> (5)    That the question of admissibility of evidence is a proposition of law, but it must be such as to affect materially the finding. The question of the value of evidence is not a sufficient reason for departure from the practice.

> (6)    That the practice is not a cast-iron one, and the foregoing statement as to reasons which will justify departure is illustrative only, and there may occur cases of such an unusual nature as will constrain the Board to depart from the practice."

31.    The need for caution is yet further heightened where an appellate court is asked to reverse a finding by a trial judge exonerating a party of a lack of probity: see *Conticorp*, para 7.

*Hostility of the judge and speed of delivery and concision of his judgment*

32.    The Board has referred in para 17 above to the judge's observations in his judgment about the merits of this claim from which, the Liquidators say, it is clear that, from the outset, he considered that a director could not be liable for breach of fiduciary duty for causing or permitting an insolvent company to pay an unsecured creditor; and in consequence he did not consider all of the relevant evidence led at trial or all of the material submissions made to him before he reached his overall conclusions.

33.    The Liquidators also rely upon the following matters: first, the judge made hostile remarks about the merits of the claim at a case management conference on 25 November 2014. Secondly, the judge observed during the course of closing submissions that certain authorities relied on by the Liquidators were "highly sanctimonious" and "wholly inequitable"; that certain "general principles about applying trust law to companies" were, though agreed by counsel, "inherently unsound"; and that a number of English authorities upon which the Liquidators relied were "hysterically overreacting". Thirdly, the judge made comments on handing his judgment down to the effect that the claim was "misguided", "wholly misconceived" and had been brought "to spite Miss Chen and for no proper legal reason".

34.    These remarks were, the Liquidators submit, wholly misconceived and are all the more remarkable in light of the fact that the claims were brought by them in their capacity as liquidators and officers of the court, and with the sanction of the creditors' committee. The Liquidators also point out that the judge did not accept Miss Chen's evidence in important respects: he found that she continued to be a *de jure* director of PFF until August 2009, contrary to her evidence that she had resigned as a director on 29 May 2009; and he also found that she knew about the Zenato payments before they were made, and in so doing again rejected her evidence.

35.    These submissions were also made to the Court of Appeal which rejected them, wrongly say the Liquidators. The Court of Appeal held, at para 115:

> "… the appellants' complaint is not made out. Bannister J made remarks at the beginning and in the course of the hearing which indicated his views on the difficulties the appellant may face upon one or more of the points in issue. There is nothing wrong with that, provided that he does not show a closed mind. Bannister J did not show a closed mind neither did he fail to apply his mind to the task before him. It cannot be said that a fair minded and informed observer, having considered the facts would conclude that there was a real possibility that Bannister J had predetermined the case against the appellants. This ground accordingly fails."

36.    It is of course a fundamental principle of civil justice that everyone is entitled to a fair trial before an independent and impartial tribunal. The Board has reviewed with care the judgment of Bannister J and those parts of the transcripts which record the remarks about which complaint is made and reveal the circumstances in which they were uttered. The Board also has in mind that these are proceedings of a commercial nature and that the parties were represented by experienced leading counsel, both before the judge and on appeal. There can be no doubt that the judge's remarks at the case management conference and during the trial were forthright and robust and it would have been better had he expressed himself in a more moderate manner. But they must

be considered in context. Some of them were made in the course of interchanges with counsel in which the judge was seeking to make clear the aspects of the claim which, as a matter of principle, he found difficulty accepting; others were made so that counsel understood his preliminary views on particular issues. The remarks he made when handing down his judgment reflected the decision he had reached. It is also apparent from the transcript that all of these remarks were of a kind with which the counsel before him, both of whom were highly experienced, were well equipped to deal. The Board is satisfied that, having regard to the nature of these proceedings, the parties to them and the skill and experience of those representing them, a fair minded observer, who heard these remarks in the context in which they were made, would not conclude that the judge had set his mind against the Liquidators or had predetermined the case against them. Indeed, the judge's evaluation of Miss Chen's evidence, accepting some parts but rejecting others indicates that he applied a critical mind to the case. The decision of the Court of Appeal on this issue was correct.

37.    In reaching this conclusion the Board has also given careful consideration to the submission that the judgment itself is so concise and that it was produced with such speed that it may be inferred that the judge did not consider all of the relevant evidence before him or the submissions he heard. The Board has no hesitation in rejecting this contention. As a general matter, the expeditious production and delivery of a judgment is to be applauded, not criticised; and concision in a judgment is a quality, not a defect. That is not to say that expedition and concision are a justification for a failure by a judge to address material submissions; for making errors of law or findings of fact which cannot be supported or which are plainly wrong; or for failing adequately to explain the reasons for his or her decision. Of course, they are not. The Board will address the Liquidators' specific criticisms of this kind later in this judgment.

*Delay by the Court of Appeal in delivering judgment*

38.    The Liquidators point to the delay of two and a half years by the Court of Appeal in giving judgment and submit that this too amounts to a miscarriage of justice. They also say that there are errors in the judgment which are probably attributable to this delay and which render it unsafe. They argue that these further factors justify the intervention of the Board.

39.    The Board has been provided with no explanation for the delay of two and a half years by the Court of Appeal in giving judgment in this appeal and we have no doubt that delay was excessive. It is well known that in 2017 the BVI were struck by two category five hurricanes, Hurricane Irma and Hurricane Maria, which caused widespread destruction and disruption and it is possible that the failure to deliver judgment in a timely way was attributable at least in part to these natural disasters. But the Board has been provided with no information which would allow it to determine whether that is so or not.

40.     Excessive delay by a court in giving judgment is a serious matter. As Peter Gibson LJ explained in *Goose v Wilson Sandford and Co* [1998] TLR 85, paras 112-113, in the context of a complaint of undue delay in the delivery of a judgment after a trial, such delay denies justice to the winning party, undermines the loser's confidence in the correctness of the decision and weakens confidence in the judicial process. What is more, in resolving issues of contested fact, the judge has the benefit of having seen and heard the witnesses give their evidence. The passage of time may weaken this advantage.

41.     In this appeal the Board is not concerned with a complaint of excessive delay by a trial judge in the delivery of his judgment. We must address a complaint of excessive delay by the Court of Appeal. We would accept that the outcome of an appeal will not normally depend upon matters such as the evaluation of the honesty of particular witnesses or an assessment of the probative value of the evidence they gave, the reliability of which may be affected by the passing of time. If, as is commonly the case, the appeal is limited to a review of the decision of the lower court, it will usually involve instead an assessment of whether that decision is wrong or whether it is unjust because of some serious procedural or other irregularity. The correctness of decisions by appellate courts may therefore be less sensitive to delay in their delivery. Nonetheless, excessive delay again amounts to a denial of justice to the winning party, undermines the loser's confidence in the correctness of the decision and weakens confidence in the judicial process. What is more, the Board has no doubt that excessive delay by an appellate court in delivering its judgment does increase the risk of it being unreliable and this may justify its careful scrutiny on a further appeal: see, for example, *Al Sadik v Investcorp Bank BSC* [2018] UKPC 15, para 47.

42.     Nevertheless, delay in the delivery of a judgment by a trial judge or by an appellate court, however excessive, does not of itself justify the intervention of an appellate court. In *Cobham v Frett* [2001] 1 WLR 1775, 1784, the Board explained that if excessive delay is to be relied upon as a ground of appeal against a judgment at first instance, a fair case must be shown for believing that the judgment contains errors that are probably or even possibly attributable to that delay. The appellate court must also be satisfied that the judgment is not safe and that to allow it to stand would be unfair to the complainant. We are satisfied that we should adopt the same approach on this second appeal.

43.     As we have foreshadowed, the Liquidators argue that the delay of two and a half years in delivery by the Court of Appeal of its judgment in these proceedings was so excessive as to amount to a miscarriage of justice and to render it generally unreliable. They also say that where, as here, the decision of the appellate court is to the effect that the judge was entitled to reach the conclusion he did, it is permissible to question whether the appellate court has simply taken the line of least resistance because it can no longer recall the intricacies of the arguments presented to it.

44.    These are powerful arguments. On the other hand, we must also take into account that the Court of Appeal had the benefit of extensive written submissions, the Justices took detailed notes during the hearing and a transcript of the hearing was available. Moreover, the judgment of the Court of Appeal is long and detailed and it addresses in a systematic way all of the grounds of appeal. It contains no errors which can be attributed to delay. Weighing all these matters, the Board is not persuaded that the correctness of the judgment of the Court of Appeal can be impugned merely on the ground of excessive delay. Nor is the Board persuaded that the miscarriage of justice inherent in a delay of this duration of itself justifies setting that judgment aside and so depriving Miss Chen of the decision in her favour. However, the Board is satisfied that the delay demands a careful consideration of the merits of the substantive grounds of appeal to see if this is one of those cases in which, on the settled practice of the Board, it is appropriate to intervene. It is to that exercise that the Board now turns.

*Did Miss Chen owe fiduciary duties to PFF in November 2009?*

45.    This is a major issue between the parties and it is convenient to consider it in four parts: (i) the parties' cases and the decisions of Bannister J and the Court of Appeal; (ii) whether Miss Chen resigned as a *de jure* director of PFF on or about 29 May 2009; (iii) whether Miss Chen ceased to be a *de jure* director of PFF at or around the beginning of August 2009; and if necessary (iv) whether Miss Chen owed PFF fiduciary duties after the beginning of August 2009 for any other reason.

(i)      The parties' cases and the decisions below

46.    There has never been any dispute that Miss Chen was the only *de jure* director of PFF at the beginning of May 2009. It was the Liquidators' case at trial that she remained a *de jure* director of PFF until the appointment of the JPLs or at least until November 2009, and was a *de jure* director of the company at the time the payments were made to Zenato. The Liquidators also contended at trial that if Miss Chen resigned as a *de jure* director before the autumn of 2009, she was reappointed in October 2009. A yet further limb of the Liquidators' case was that Miss Chen was at least a *de facto* or shadow director of PFF in November 2009 or that her relationship with PFF was such that she owed it fiduciary duties at that time.

47.    Miss Chen, on the other hand, maintained at trial that she resigned from her position as *de jure* director of PFF on 29 May 2009 and was not at any time reappointed as a director of the company, and did not owe it any fiduciary duties for any other reason. In this connection she relied upon her letter of resignation dated 29 May 2009 and addressed to "the Board of Directors" of PFF in which she said that she: "would like to tender my resignation as a director" of PFF with effect from that day. This was one of a series of three documents bearing that date. The second purported to be a

resolution in writing of "the sole director" of PFF and made pursuant to its articles of association resolving, as of that day, to appoint Mr Gan Shaoqui ("Mr Gan") as a director of PFF and to accept Miss Chen's resignation. The third purported to be a letter from Mr Gan to the Board of Directors of PFF consenting to his appointment as a director of PFF, again, as of that day.

48.    Bannister J addressed this issue in paras 18-27 of his judgment. He began, in para 18, by referring to Miss Chen's letter of resignation. He said that he had no doubt that this letter was not contrived and continued:

> "… I am satisfied that [Miss Chen] originally intended it to have effect as from 29 May 2009. Shortly before that time, she had been held incommunicado for some six weeks by law enforcement agencies of the People's Republic of China in connection, as I understood it, with an investigation, subsequently abandoned, into economic fraud. Although she was, perhaps understandably, sparing with details of this event, I accept her evidence that it traumatized her and that it lay behind her resignation as director, not only of PFF, but also of PML [another Pioneer group company]. The unpleaded allegation that the resignation was backdated is not made out and in any event is irrelevant given the fact that it is common ground that she had effectively resigned as a *de jure* director long before the repayments to Zenato were in contemplation. In any case, she signed a similar resignation letter, with the same timeline, in respect of PML. The [Liquidators] have not suggested that that resignation was similarly backdated nor have they put forward any reason why it might have been." [A footnote is omitted]

49.    Several points emerge from this paragraph. First, the judge found that Miss Chen *originally* intended the letter to have effect as from 29 May 2009. This was an important qualification and the reason for it follows a little later in the judgment, as will become clear in a moment. Secondly, the judge gave a substantive reason for believing that Miss Chen originally had that intention, namely that she had recently been held by the enforcement agencies of the People's Republic of China. That particular finding is not challenged by the Liquidators. Thirdly, the judge believed it to be common ground that Miss Chen resigned as a *de jure* director of PFF long before the payments to Zenato were in contemplation. This was not correct. It is not and has never been common ground that Miss Chen resigned as a *de jure* director of PFF before the repayment of the Zenato loan was in contemplation. A part of the Liquidators' case was and remains that Miss Chen was a *de jure* director of PFF both at the time the payments were contemplated and when they were in fact made.

50.    The judge considered next who, if anyone, succeeded Miss Chen as a director of PFF. This was not an incidental matter. Under section 109(4) of the BVI Companies Act 2004 ("the 2004 Act") and subject to an exception which is irrelevant for the purposes of this appeal, a company is required to have at least one director. If it does not, then, by section 109(6), any person who manages or who directs or supervises the management of the business or affairs of the company is deemed to be a director of the company for the purposes of the Act.

51.    The judge addressed this question at para 19 of his judgment. He found that there was hopeless confusion about who, if anyone, succeeded Miss Chen as PFF's sole *de jure* director. He continued that, for a brief while, it may have been intended that Mr Song should become a director but there was no evidence that he was ever validly appointed. He also observed that there was a "suggestion" that Mr Gan was "latterly a *de jure* director of PFF" and "appears to have signed some documents" on behalf of PFF but found that there was no evidence that he was ever validly appointed, and thought that the issue whether he ever became a director was "immaterial".

52.    The Board has no difficulty understanding why the judge thought there was no satisfactory evidence that Mr Gan was ever appointed as a *de jure* director of PFF. The signature on the document purporting to be the resolution appointing him as a director of PFF is remarkably similar to that on his own letter to PFF consenting to act as such a director, and he could hardly have resolved to appoint himself. However, the Board cannot accept so readily that whether Mr Gan became a director of PFF was immaterial. PFF was required to have at least one director and this was a particularly critical time for the company. If there was no satisfactory evidence that Mr Gan (or anyone else) became a *de jure* director on 29 May 2009, it provides at least some support for the view that Miss Chen did not in fact resign on that day.

53.    Moreover, there was ample evidence before the judge that Miss Chen continued to act as a *de jure* director of PFF after 29 May 2009. She was directly involved with the management and direction of PFF's business and the instruction of Holman Fenwick Willan LLP ("HFW"), the solicitors acting for PFF. In this connection the judge explained at para 20 of his judgment:

> "There is, however, clear evidence that PFF staff continued to behave as if Miss Chen remained as a *de jure* director of PFF until well after 29 May 2009. In particular, in July 2009 they sought her signature to board resolutions of PFF authorizing Mr Chen to execute settlement agreements with FFA creditors. On 14 July 2009 Miss Chen gave advice as to the form of a letter to one of PFF's FFA debtors and HFW copied Miss Chen into draft letters on the point. An email from Mr Chen to HFW dated 20 July 2009, states that Miss Chen had instructed him to call defaults on two of

> PFF's FFA debtors. On 29 July 2009 Miss Fiona Li, the Pioneer Group's Chief Legal Officer, told HFW that she was going to do a note to HFW and Miss Chen to approve the execution of a settlement agreement and of two consent orders."

54.    Miss Chen did not challenge these findings before the Court of Appeal. Nor did she challenge on appeal the further finding made by the judge, at para 25 of his judgment, that she in fact remained a *de jure* director of PFF, capable of signing board resolutions, after 29 May and until the beginning of August 2009.

55.    Since the hearing of this appeal the Board has had the benefit of further submissions in writing from the parties which they have filed in response to directions which we gave on 10 June 2020. In essence, the Board sought and has received further assistance on the status of Miss Chen as a director of PFF and whether and, if so, how her directorship continued after 29 May 2009. It is now clear that Miss Chen does indeed challenge the judge's finding that she continued to be a *de jure* director after 29 May 2009 and this is a matter to which we must return.

56.    The judge turned his attention next to the position after the beginning of August 2009. He found there to be a "distinct and complete gap", so far as disclosed by the documents in evidence, in Miss Chen's involvement in the affairs of PFF in the period from the beginning of August 2009 until November 2009. The Liquidators pointed to the absence on Mr Chen's laptop, which he handed over to the JPLs after PFF had gone into liquidation, of any emails. But Mr Chen explained and the judge accepted that he operated a system whereby all emails self-deleted after a few days, leaving only draft agreements and similar documents. Nor was the judge impressed by the fact that Miss Chen had sole signing rights on PFF's bank accounts. Here the judge accepted what he described as uncontradicted evidence that all PFF's banking transactions were carried out electronically from its offices by its accounts staff and so he thought the point "went nowhere".

57.    The judge was similarly dismissive of the note of Mr Chen's interview in January 2010, observing that it contained only a summary and was "demonstrably inaccurate" in that it did not set out all the questions Mr Chen was asked and to which his statements were supposed to be responsive. Moreover, the judge continued, Mr Chen had never been given an opportunity to review or comment upon the content of the note despite requests by him. So the note was, in the judge's opinion, of no probative value.

58.    The judge did accept, however, that once it became clear that PFF would have to enter into some kind of insolvency process, Miss Chen was kept abreast of discussions. In this regard he held, at para 24, that she expressed her concerns about the process and:

"She expressed her preferences as to process and venue, down to the budget for lawyers' fees. She agreed to underwrite the appointment of Grant Thornton as administrators/liquidators up to a limit of US$ 2m. Despite there being a considerable quantity of traffic with or involving Miss Chen between then and the appointment of the JPL's, none of it concerns the day to day conduct of PFF's business, let alone the Zenato loan or its repayment. It is confined exclusively to the question of insolvent administration of PFF."

59.    The judge's conclusions follow at para 25:

"My conclusions from this material are that, for whatever reason, Miss Chen did in fact remain a *de jure* director of PFF, capable of signing board resolutions, until around the beginning of August 2009. There is no evidence that she was involved in the affairs of PFF at any level or at all between then and the time when it came to put PFF into an insolvency procedure in November/December 2009, and then only in relation to the insolvency process itself. That she was involved in those processes is most naturally explained by the fact that she was PFF's ultimate owner. The evidence is clear that Miss Chen withdrew from any involvement in the affairs of PFF after, at the latest, early August 2009, leaving Mr Chen in charge of its affairs as its sole *de facto* director. There is no material capable of supporting a suggestion that, after she ceased to be a *de jure* director she somehow continued as a director *de facto*."

60.    For like reasons, the judge rejected the Liquidators' alternative case that, after her resignation took effect, Miss Chen acted as a shadow director of PFF. The judge's final conclusion on this issue necessarily followed. He found that Miss Chen owed PFF no fiduciary duties after about the beginning of August 2009.

61.    On appeal, the Court of Appeal dismissed the Liquidators' challenges to these findings, holding, in substance, that they were open to the judge on the evidence before him.

(ii)    *Did Miss Chen resign as a de jure director of PFF on or about 29 May 2009?*

62.    As we have said, Miss Chen maintains in the further submissions that she filed after the hearing that she did indeed resign as a *de jure* director of PFF on 29 May 2009.

In outline, she submits that she has concurrent findings in her favour that her letter containing the notice of her resignation was genuine. As for the date that notice took effect, Miss Chen points to section 115(1) of the 2004 Act which reads:

> "A director of a company may resign his office by giving written notice of his resignation to the company and that resignation has effect from the date the notice is received by the company or from such later date as may be specified in the notice."

63.    This section was implemented in the articles of association of PFF which provided, in article 9.8:

> "A director may resign his office by giving written notice of his intention to the Company and the resignation has effect from the date the notice is received by the Company at the office of its registered agent or from such later date as may be specified in the notice. …"

64.    Miss Chen contends that, as the sole director of PFF, she received the letter on behalf of the company as soon as she had written it. As for article 9.8, Miss Chen recognises there was no evidence of when PFF's registered agent, Tricor Services (BVI) Ltd, received the notice but maintains that, by application of the principle established in *In re Duomatic Ltd* [1969] 2 Ch 365, this is neither here nor there. The sole shareholder of PFF was PISG and Miss Chen was the sole shareholder of PISG. So, Miss Chen continues, under the *Duomatic* principle, any actions taken by her on PISG's behalf were necessarily approved and valid. Further, notwithstanding the terms of article 9.8, PISG, acting by her, was in a position informally to accept delivery of the letter as sufficient notice of her resignation; alternatively, PISG accepted the resignation on behalf of PFF. In so doing, to the effect necessary, PISG, acting through her, informally consented to the necessary alteration of PFF's articles of association.

65.    The history, content and scope of the *Duomatic* principle were recently considered by the Board in some detail in *Ciban Management Corpn v Citco (BVI) Ltd* [2020] UKPC 21; [2020] 3 WLR 705, paras 31 to 47. On this appeal, there is no dispute or issue as to the content of the principle and so, at this stage, we need only recite Buckley J's encapsulation of it in *In re Duomatic* at p 373:

> "where it can be shown that all shareholders who have a right to attend and vote at a general meeting of the company assent to some matter which a general meeting of the company could carry into effect, that assent is as binding as a resolution in general meeting would be."

66.     Nevertheless, the Board has no doubt that application of this principle does not produce the outcome for which Miss Chen contends. The fallacy in the submissions Miss Chen advances is that they assume what they seek to establish, namely that her state of mind remained as it was when she wrote her letter of resignation. But the judge did not make any such finding. To the contrary, he found that Miss Chen *originally* intended it to have effect as from 29 May 2009 but that *in fact* she *remained* a *de jure* director well after that date and until the beginning of August.

67.     The finding that Miss Chen remained a *de jure* director well after the 29 May was a perfectly proper one for the judge to make as a matter of fact and law. Miss Chen may have had second thoughts straight away or changed her mind after a day or two, or perhaps a little longer. At all events, Miss Chen continued to act in relation to the business and affairs of PFF after 29 May 2009 in just the same way as she had before that date and, in making the finding he did, the judge must have been satisfied that, contrary to her evidence and despite her letter of resignation, she decided to continue to be a *de jure* director after all, and that she did so with the consent of PFF.

68.     It has long been established that a director who has given the company proper notice of his or her resignation is not entitled to withdraw that notice, save with the consent of the company: *Glossop v Glossop* [1907] 2 Ch 370. Here, as we have seen, the sole shareholder of PFF was PISG, and Miss Chen was the sole shareholder of PISG. Miss Chen gave evidence at the trial and there is no reason to doubt that she was also a director of PISG. Miss Chen could therefore, upon application of the *Duomatic* principle and on behalf of PISG, as the sole shareholder in PFF, consent to the withdrawal of her notice of resignation, and that consent would be binding on PFF.

69.     The Liquidators also contend that Miss Chen could consent to the withdrawal of her notice of resignation in her capacity as the sole ultimate beneficial owner of PFF. In this regard, the Liquidators have properly drawn the attention of the Board to a number of authorities on the question whether the consent of a beneficial owner will suffice for the purposes of the *Duomatic* principle. It is not necessary to refer to them here, however, because the question has now been considered by the Board in the *Ciban Management* case at para 47:

> "A further possible qualification of the *Duomatic* principle is that, in some cases, doubts have been expressed as to whether the principle applies where it is the beneficial owners, rather than the registered shareholders, who consent. See, eg, *Palmer's Company Law*, looseleaf ed, vol 2, para 7.439. But the correct view is that, at least as here where the ultimate beneficial owner and not the registered shareholder is taking all the decisions in the relevant transactions, the *Duomatic* principle applies as regards the consent of (and authority given by) the ultimate beneficial owner. This is

supported, as a matter of principle, by Mann J's judgment in *Shahar v Tsitsekkos* [2004] EWHC 2659 (Ch), para 67; and by Newey LJ's judgment in *Dickinson v NAL Realisations (Staffordshire) Ltd* [2020] 1 WLR 1122, para 20, in which, while not deciding the point, he stated that he was willing to assume (in the same way as he had done as Newey J in *In re Tulsesense Ltd; Rolfe v Rolfe* [2010] Bus LR D99; [2010] 2 BCLC 525, para 42) that 'the assent of the beneficial owners of a share can meet *Duomatic* requirements'. Certainly the claimant in this case did not seek to argue that, in relation to the *Duomatic* principle, any distinction should be drawn between Mr Byington, as ultimate beneficial owner, and Mr Stollman, his lawyer, who held the bearer shares."

70.    In the circumstances of this case, where the sole shareholder of PFF was PISG, Miss Chen was the sole shareholder of PISG and the relevant decision making was that of Miss Chen, the Board is satisfied that the consent of Miss Chen as the beneficial owner of PFF is sufficient for the *Duomatic* principle to apply.

71.    Further, there is no reason why the *Duomatic* principle should not be applied in the manner the Board has described. There can be no suggestion that it would involve an activity outside the powers of PFF. Nor would it cause loss to PFF's creditors or otherwise impact adversely on its already precarious financial position. It concerns only the appointment and status of Miss Chen as a director. As the Liquidators say and we accept, it would have been open to PISG as the sole shareholder in PFF, acting formally, to have agreed to the withdrawal of Miss Chen's resignation and it could do so informally under the *Duomatic* principle.

72.    The Board therefore concludes that Bannister J was entitled to find that Miss Chen continued to be a *de jure* director of PFF after 29 May 2009. Miss Chen was right not to challenge this finding before the Court of Appeal and we reject her attempt to do so on this further appeal. The next question is whether the judge fell into error in finding that Miss Chen ceased to be a *de jure* director in early August 2009.

    *(iii)    Did Miss Chen cease to be a de jure director of PFF in early August 2009?*

73.    It did not form any part of Miss Chen's case at trial that she decided to or did in fact resign as a *de jure* director of PFF at or around the beginning of August 2009; nor did she or any witness called by her give evidence to this effect. Her case, which the judge rejected, was that she resigned as a *de jure* director of PFF on or about 29 May 2009 and was replaced by Mr Gan. Further, her letter of resignation, dated 29 May 2009,

made clear that she was tendering her resignation as of that day. Miss Chen cannot point to any other document which might be said to constitute a notice by her to PFF of her intention to resign as a *de jure* director of PFF as from any date in early August 2009 or, indeed, at any time other than 29 May 2009.

74.     Similarly, it formed no part of the Liquidators' case at trial that Miss Chen ceased to be a *de jure* director of PFF in early August or at any time before the Zenato loan had been repaid. They too called no evidence which might provide a basis for such a finding. Their case was that Miss Chen remained a *de jure* director of PFF until its liquidation.

75.     How, then, did the judge come to the conclusion that Miss Chen resigned as a *de jure* director in early August 2009? It appears to have been based upon two matters. First, the judge thought it was common ground that Miss Chen resigned as a *de jure* director before the payments to Zenato were in contemplation. This was wrong. It was also a highly material error. It meant that the judge was proceeding under the false impression that the date on which Miss Chen resigned as a *de jure* director did not bear on the question whether she owed PFF fiduciary obligations at the time the payments to Zenato were actually made, it being common ground, so the judge thought, that she was not a *de jure* director at that time.

76.     Secondly, the judge attached considerable importance to what he perceived to be a gap in the disclosure. Here he drew a sharp distinction between the disclosure up to the beginning of August 2009 and the disclosure after that time. He was satisfied that the disclosure up to the beginning of August 2009 showed Miss Chen's involvement in the affairs of PFF. However, he continued, after that time, there was a considerable quantity of email traffic with or involving Miss Chen, but none of it concerned the day to day conduct of PFF's business and it was confined exclusively to the question of the company's insolvent administration. He concluded that Mr Chen was left in charge of the affairs of PFF as its sole *de facto* director.

77.     The Board does not find this reasoning persuasive. A lack of involvement by Miss Chen in the day to day management of PFF's business after the beginning of August 2009 could provide little evidential support for the conclusion that she had resigned as a *de jure* director. Had it been common ground that she resigned as a *de jure* director at some point before the payments to Zenato were made, the position might have been otherwise. But it was not.

78.     What is more, the judge was in any event wrong to characterise the email traffic after the beginning of August 2009 and to dismiss its relevance in the way that he did. Whilst we accept the judge's finding that Miss Chen was not involved in the day to day running of PFF's business, these emails reveal that her instructions were sought both in relation to the forthcoming insolvency proceedings and PFF's ongoing business

concerns. In this connection our attention has been drawn, in particular, to an email from Miss Chen to HFW and Mr Chen dated 10 December 2009 responding to a request for her instructions in relation to the anticipated insolvency proceedings and whether a hearing in ongoing litigation involving PFF and one of its FFA counterparties, referred to as "Klaveness", should be adjourned. All of this email correspondence was consistent with the Liquidators' case that Miss Chen was still a *de jure* director of PFF in the autumn of 2009.

79.     Not only was there no evidence that Miss Chen ceased to be a *de jure* director of PFF at or around the beginning of August 2009, there was at least some evidence that she did not. First, there was the email correspondence to which we have referred, the contents of which were not only consistent with but supportive of the Liquidators' case that Miss Chen remained a director of the company after that time. Once it became apparent that PFF was insolvent, it was the duty of the directors to have regard to the interests of the creditors of the company because the creditors had the primary interest in the assets of the company. The fact that Miss Chen was actively involved in the decisions as to the form and place of the insolvency proceedings is an indication that she was still a director.

80.     Secondly, Mr Perrott, the partner in HFW who was responsible for dealing with the instructions from PFF, gave evidence in an affidavit dated 27 January 2015, in compliance with an order of the High Court of the BVI dated 13 January 2015, that he believed or assumed that all his instructions were fully authorised by Miss Chen, and that he considered that Miss Chen was the key decision maker in relation to PFF. However, it is also right to record that Mr Perrot made it clear that he had no contemporaneous knowledge of the payments to Zenato and so could not comment on whether Miss Chen was involved in the decision to make them.

81.     The judge did not deal with Mr Perrott's evidence at all. The Court of Appeal considered that it was of no assistance in the light of his acceptance that he had no contemporaneous knowledge of the Zenato payments. But as the Liquidators correctly point out, this misses the point. The point is not whether Mr Perrot had direct knowledge of whether Miss Chen specifically authorised the Zenato payments but whether she was a *de jure* director of PFF after the beginning of August 2009 and this is at least some evidence that she was.

82.     Thirdly, Miss Chen accepts that she continued to have sole signing rights on PFF's bank accounts. There is no challenge to the judge's finding that PFF's banking transactions were carried out electronically from its offices by PFF accounts staff. But they could only do so with Miss Chen's authorisation. This too was suggestive that she continued to direct and was responsible for the business affairs of PFF after the beginning of August.

83.    Fourthly, the judge thought that the question whether Mr Gan was ever appointed as a director of PFF was immaterial. The Board cannot agree. This was relevant because it was Miss Chen's case that she was *replaced* as a *de jure* director of PFF by Mr Gan. If she was not, it casts further doubt on her case that she had ceased to be a *de jure* director of PFF by the time the payments were made to Zenato. Moreover, as we have mentioned, BVI companies are required by section 109(4) of the 2004 Act to have at least one director. If Mr Gan was not appointed, it gives further support to the conclusion that Miss Chen did not resign.

84.    Ultimately, in the circumstances of this case, the question whether there was positive evidence that Miss Chen continued to be a *de jure* director after the beginning of August 2009 is not critical, however. The key question is whether there was any evidence that she ceased to be a *de jure* director at about this time. There was no such evidence. Accordingly, the judge erred in law in making the finding that he did. So too, the Court of Appeal erred in failing to identify and correct the judge's error.

85.    The Board has no doubt that this was an error of fundamental importance to the outcome of this appeal. This is therefore one of those rare cases in which, on the established practice of the Board, it is appropriate to intervene.

   *(iv)    Did Miss Chen owe fiduciary duties to PFF after the beginning of August 2009?*

86.    We can now deal with this question very shortly. Miss Chen continued to owe fiduciary duties to PFF after the beginning of August 2009 because she remained a *de jure* director. There is no need to consider whether, had that directorship come to an end, she would have owed fiduciary duties to the company for any other reason.

*Did Miss Chen act in breach of her fiduciary duties?*

87.    The Liquidators alleged in their amended statement of claim that until the appointment of the JPLs, Miss Chen, as the sole authorised signatory on PFF's main trading account, was responsible for "authorising and causing or procuring all payments" made from that account on behalf of PFF in the relevant period, including the payments made to Zenato.

88.    Bannister J rejected this allegation. He considered that Mr Chen gave credible evidence for repaying the Zenato loan when he did, namely that agents of Mr Song were "threatening staff and besieging PFF's offices in search of repayment". He also accepted Mr Chen's denial that Miss Chen had instructed him to repay the Zenato loan. However, he did not accept Miss Chen's evidence that she had no idea about that repayment until

the commencement of these proceedings. He thought it probable that Miss Chen did know of and did not object to the repayment. But he continued at para 29:

> "That, of course, is not the same as causing or procuring the repayment, which is the charge levelled against Miss Chen. There is no evidence at all that she did that."

89.    The Court of Appeal upheld this finding. It considered that the judge was entitled to find that Miss Chen did not instruct Mr Chen to repay the Zenato loan or arrange the repayment; and that the judge was also entitled to find that it had not been established that Miss Chen "specifically caused and or procured the repayments". The Court of Appeal also observed that, in so far as it was contended that Miss Chen acted in breach of her fiduciary duties to PFF by not objecting to the Zenato payments, the judge, in the passage of his judgment cited immediately above, was "making reference to a pleading point, in essence stating that the pleaded case was not supported by the evidence". By this we understand the Court of Appeal to have agreed with the judge that the Liquidators had never alleged that Miss Chen had acted in breach of her fiduciary duties to PFF by failing to object to the Zenato payments.

90.    For reasons to which we will come, we do not accept the judge's characterisation of the Liquidators' pleaded case. But first, we must say something about the duties a director owes to a company in his or her capacity as a director. The general duties owed by a director are well known and are codified in sections 120 to 125 of the 2004 Act. They include the duty to act honestly and in good faith and in what the director considers to be the best interests of the company, and a duty to exercise his or her powers for a proper purpose: see, respectively, sections 120(1) and 121 of the 2004 Act.

91.    The next question is whether, by failing to intervene to prevent the Zenato payments, Miss Chen acted in breach of her fiduciary duties to PFF. As we have said, Miss Chen was a *de jure* director of PFF and she was the sole authorised signatory on the account from which the Zenato payments were made. At all times after the Marine Trade judgment, PFF's insolvent liquidation or some other protective insolvency regime was inevitable and, as the judge found, this was under active discussion between Miss Chen and others on behalf of PFF, on the one hand, and HFW, on the other, "a matter of days" afterwards. It is not necessary for the purposes of this appeal to explore the boundaries of the fiduciary duty owed by a director of an insolvent company for the Board has no doubt that, in the circumstances we have described, when making or authorising payments from PFF's account, Miss Chen had a fiduciary duty to act honestly and in good faith in what she believed to be the best interests of PFF and, through PFF, as an insolvent company, in the best interests of its creditors. Similarly, she had a duty to exercise her powers as a director for proper purposes, that is to say, once PFF became insolvent, for purposes which would further the interests of PFF's

creditors. Further, in light of PFF's insolvency, the normal principle that Miss Chen, as the ultimate owner of PFF, could waive or ratify any such breach of duty was displaced.

92.     Miss Chen could not evade these duties to PFF and, through PFF, to its creditors, simply by delegating to an employee or a *de facto* director her authority to make payments from PFF's account. It has been held in a number of cases, correctly, in the Board's opinion, that a director may not knowingly stand by idly and allow a company's assets to be depleted improperly: see, for example, *Walker v Stones* [2001] QB 902, at 921D-E per Sir Christopher Slade; *Neville v Krikorian* [2006] EWCA Civ 943; [2007] 1 BCLC 1, paras 49-51 per Chadwick LJ; *Lexi Holdings v Luqman* [2007] EWHC 2652 (Ch), paras 201-205 per Briggs J (as he then was). To the contrary, a director who knows that a fellow director is acting in breach of duty or that an employee is misapplying the assets of the company must take reasonable steps to prevent those activities from occurring.

93.     The judge found that Mr Chen was responsible for repaying the Zenato loan and that by this time he was in charge of PFF's affairs as sole *de facto* director. He also found that banking transactions were in practice conducted electronically by PFF's staff without Miss Chen having to sign anything, and that the payments to Zenato were made in this way. However, Miss Chen was, on the judge's findings, aware of these payments. What is more, Miss Chen had a fiduciary duty to PFF to take all reasonable steps to intervene to prevent a payment being made from a trading account of which she was sole signatory for an improper purpose. The repayment of the whole of the Zenato loan was undoubtedly improper. It was made at a time when PFF was insolvent and without any proper reason. Yet Miss Chen took no steps to prevent it. Moreover, given Miss Chen's position in relation to PFF as *de jure* director and sole beneficial owner and given further that she was the sole signatory on the account, there can be no doubt that, had she intervened, the payments would not have been made. She was, as the judge described, "ultimately the boss". In these circumstances the Board is satisfied that her inaction amounted to a breach of her fiduciary duty to PFF.

94.     Was it an answer to this claim that it fell outside the scope of any pleaded issue? The pleaded allegation was that, as the sole authorised signatory on the relevant trading account, Miss Chen authorised, caused or procured all payments made from the account during the relevant period, including the Zenato payments. In the Board's opinion that allegation did encompass the culpable inactivity of Miss Chen that we have described. By delegating to Mr Chen the ability to make payments from the account and by failing to take any action to prevent the improper payments to Zenato, Miss Chen did authorise those payments to Zenato and she relevantly caused them to be made.

*Ought the judge and the Court of Appeal to have found that Miss Chen arranged the repayment of the Zenato loan?*

95.    In these circumstances there is no need to consider whether, as the Liquidators submit, Bannister J also fell into error in failing to find that Miss Chen actually arranged the Zenato payments and whether the Court of Appeal was wrong not to correct this error. It is sufficient to say that the Board has not been persuaded that there is a proper basis for interfering with the concurrent findings of the courts below on this question.

*The claim under the Insolvency Act 2003*

96.    Nor is it necessary for the Board to consider this additional limb of the Liquidators' claim. Both the judge and the Court of Appeal rejected it, but for very different reasons. In the Board's view, our conclusion that Miss Chen is liable to account for breach of fiduciary duty makes any investigation of the question whether the Liquidators have, in addition, a remedy under sections 244 and 245 of the Insolvency Act 2003 simply unnecessary. Miss Chen's liability to account will be a sufficient remedy for the Liquidators, and a parallel remedy under the Act, although discretionary as to its precise extent, could not provide for them anything of greater value than they will obtain from the Board's conclusion that she was in breach of fiduciary duty by failing to prevent the Zenato payments. The Liquidators have not submitted to the contrary, at least before the Board. Nor do we need to address the question whether, as the Liquidators have contended, Miss Chen derived a reputational benefit from the making of the payments.

*Conclusion*

97.    The Board was originally constituted for this appeal as Lord Kerr, Lord Briggs, Lady Arden, Lord Kitchin and Lord Leggatt and was heard by that panel of five. Lord Kitchin had prepared a draft of this judgment, upon the main conclusions of which all five of us were agreed, by the end of October 2020. Lord Kerr had by then retired, at the beginning of October, but had as is usual continued thereafter to participate in the process of perfecting the judgment. Very sadly Lord Kerr died on 1 December after a short illness. It is for that reason that the Board now delivers this judgment as a panel of four rather than the original five.

98.    For the reasons given, the Board will humbly advise Her Majesty that this appeal should be allowed. Miss Chen owed fiduciary duties to PFF at the time of the repayment of the Zenato loan and her failure to intervene to prevent that repayment amounted to a breach of those duties. The Board will invite submissions as to the appropriate form of order in the light of this judgment.

# EXHIBIT 40

Page 1

1    THE UNITED STATES BANKRUPTCY COURT

     FOR THE DISTRICT OF DELAWARE

2    Chapter 11

     Case No. 22-11068 (KBO)

3    (Jointly Administered)

     ----------------------------------------x

4    In re:

5    FTX TRADING LTD., et al.,

6                   Debtors.

     ----------------------------------------x

7

                        December 9, 2025

8                       9:04 a.m.

9

10      VIDEOTAPED ZOOM DEPOSITION of PAUL

11   ANTHONY WEBSTER, a Expert Witness in the

12   above-entitled action, located at

13   Sullivan & Cromwell, taken before Dawn

14   Matera, a Certified Shorthand Reporter

15   and Notary Public of the State of New

16   York.

17

18               *     *     *

19

20

21

22

23

24

25

Page 2

1 APPEARANCES:

2 SULLIVAN & CROMWELL LLP
   Attorneys for the FTX Recovery Trust
3    125 Broad Street
   New York, New York 10004
4    Telephone: (212) 558-4000
5 BY: BENJAMIN BELLER, ESQ.
   bellerb@sullcrom.com
6
   BY: SIENNA LIU, ESQ.
7    lius@sullcrom.com
8 BY: MAYA ARTIS, ESQ.
   artism@sullcrom.com
9
10
   LATHAM & WATKINS, LLP
11 Attorneys for Joint Liquidators of 3AC
   1271 Avenue of the Americas
12   New York, New York 10020
13 BY: CHRISTOPHER HARRIS, ESQ.
   chris.harris@lw.com
14
   BY: JUAN JOSE (JJ) CRESPO, ESQ.
15   jj.crespo@law.com
16 BY: NACIF TAOUSSE, ESQ. (Remote)
   nacif.taousse@lw.com
17
   BY: KARLA MARDUEÑO, ESQ. (Remote)
18   karla.mardueno@lw.com
   330 North Wabash Avenue
19   Suite 2800
   Chicago, IL 60611
20
21
22
23
24
25

Page 3

1 APPEARANCES (Continued):

2

3 Also Present:

4 Amos Efrate, Videographer

5 Christopher Farmer, Teneo (remote)

6 Daniel Burkitt, Ogier (remote)

7 Nicholas Brookes, Ogier (remote)

8 Kerry Anderson, O'Neal Webster (remote)

9

10          *   *   *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1    THE VIDEOGRAPHER:  Good morning
2 everyone.  We are going on the record
3 at 9:04 a.m. EST on December 9th,
4 2025.  Please note that microphones
5 are sensitive and may pick up
6 whispering and private conversations.
7 Please mute your phones at this time.
8 Audio and video recording will
9 continue to take place unless all
10 parties agree to go off the record.
11    This is media unit one of the
12 video-recorded deposition of Paul
13 Anthony Webster in Re:  FTX Trading
14 LTD, et al., filed in the United
15 States Bankruptcy Court for the
16 District of Delaware, Chapter 11, case
17 number 22-11068 KBO.
18    My name is Amos Efrate
19 representing Veritext and I am the
20 videographer.  The court reporter is
21 Dawn Matera from the firm Veritext.
22    I am not authorized to
23 administer an oath.  I am not related
24 to any party in this action nor am I
25 financially interested in the outcome.

Page 5

1    If there are any objections to
2 proceeding, please state them at the
3 time of your appearance.
4    All appearances have been noted
5 in the stenographic record.  Will the
6 court reporter please swear in the
7 witness and then counsel may proceed.
8 P A U L  A N T H O N Y  W E B S T E R,
9 the Witness herein, having first been
10 duly sworn by the Notary Public, was
11 examined and testified as follows:
12 EXAMINATION BY MR. BELLER:
13    Q.   Good morning, Mr. Webster.
14    A.   Good morning.
15    Q.   My name is Benjamin Beller and
16 I am with Sullivan and Cromwell and we
17 represent the FTX Recovery Trust.
18    A.   Yes.
19    Q.   Have you ever been deposed
20 before?
21    A.   No.
22    Q.   Not in a U.S. proceeding or
23 outside the U.S.?
24    A.   I have given oral evidence.  I
25 have been cross-examined in Hong Kong

2 (Pages 2 - 5)

Page 6

1 twice, but I have never given a
2 deposition.
3    Q.   Understood.
4    A.   It's a different procedure.
5    Q.   Understood.  And in the
6 proceeding in which you gave evidence and
7 were cross-examined, when was that?
8    A.   Once in 2009, first time.  And
9 the second time was in 2014.
10    Q.   And were those for two
11 different matters?
12    A.   Two different matters, yes.
13    Q.   And can you briefly tell me
14 what the 2009 matter was?
15    A.   Okay.  I am a BVI lawyer.  I
16 give evidence in that matter as a BVI
17 expert under BVI law relating to the
18 appointment and removal of directors
19 under the International Business
20 Companies Act.
21    Q.   And did that proceeding involve
22 the Latham & Watkins law firm?
23    A.   No, it did not.
24    Q.   Did it involve the Teneo firm?
25    A.   No, it did not.

Page 7

1    Q.   And the 2014 proceeding --
2    A.   Again, in Hong Kong.
3       MR. HARRIS:  I just remind the
4    witness, pause, let the examiner
5    finish his question, pause for a
6    minute and then give your answer.  I
7    can tell you're starting to talk over
8    each other.
9       MR. BELLER:  And we will get
10    through some ground rules soon but we
11    will get through this one first.
12    A.   Can you repeat the question?
13    Q.   Sure.  The 2014 proceeding, can
14 you tell me briefly what was it?
15    A.   It was a Hong Kong proceeding.
16 It involved derivative actions under the
17 law of the BVI.  Specifically it involved
18 whether you can have a, what we call a
19 multiple derivative action in a matter
20 going by BVI law, because the claimant in
21 the case was not the shareholder of the
22 company, which is what you have in a
23 normal derivative action.  The claimant
24 was a shareholder of the shareholder.  So
25 the issue was whether, under BVI law,

Page 8

1 whether by statute or common law, the
2 second shareholder had the right to bring
3 a claim on behalf of the company.
4    Q.   And did that proceeding involve
5 the Latham & Watkins firm?
6    A.   No, it did not.
7    Q.   Did it involve the Teneo firm?
8    A.   No, it did not.
9    Q.   One other question:  Are you
10 aware of a BVI law firm involved in
11 matter?
12    A.   No, I'm not.
13    Q.   So let's get to some ground
14 rules here just on the deposition in this
15 context.
16       As counsel has already
17 previewed, it's important to allow me to
18 finish my questions and I will endeavor
19 to allow you to finish your answers in
20 full, not only so we make it easy on the
21 court reporter, but also so that we have
22 a good, clean record of questions and
23 answers.  Does that make sense?
24    A.   Yes.
25    Q.   Okay.  If I ask a question that

Page 9

1 you don't understand, please tell me and
2 I will do my best to clarify it or to
3 rephrase it.  If you don't, I will assume
4 you understood the question.  Is that
5 understood?
6    A.   Yes.
7    Q.   As I ask questions today,
8 counsel will or may raise objections.
9 Unless you are instructed not to answer
10 the question by counsel you should answer
11 the question and the objections will be
12 for a later time.  Is that understood?
13    A.   Yes, it is.
14    Q.   At any time you need a break,
15 please let me know and we will manage the
16 questions and the sequencing to
17 accommodate that.  The only thing I ask
18 is if there is a question pending, that
19 you complete the answer to that question
20 before we take a break, okay?
21       Do you understand that you're
22 here to answer questions in connection
23 with the dispute between the FTX Recovery
24 Trust and the joint liquidators of Three
25 Arrows Capital?

3 (Pages 6 - 9)

Page 10

1    A.   Yes, I do.
2    Q.   And that you submitted a
3  declaration --
4    A.   Yes, I did.
5    Q.   -- or a report in connection
6  with that dispute?
7    A.   Yes, I did.
8    Q.   And I will just remind you
9  again, please let me finish my questions.
10    A.   Yes.
11    Q.   It's difficult because this is
12  not a conversation but sometimes feels
13  like it.
14    A.   Okay.
15    Q.   Is there anything that might
16  prevent you from testifying completely
17  and accurately today?
18    A.   No, nothing that I am aware of.
19    Q.   Did you bring any notes today?
20    A.   Today?  I have some notes in
21  the breakout room.  None with me here.
22    Q.   And those notes are -- what are
23  those notes?
24    A.   Points that I made when I was
25  doing my research.  Points in a meeting

Page 11

1  with the lawyers I am working with.  Yes.
2    Q.   Any others materials that you
3  brought today?
4    A.   When you say brought, no.
5  Because whatever material I have is in
6  the hotel room.
7    Q.   Understood.  Okay.  What did
8  you do to prepare for today's deposition?
9    A.   To prepare for the deposition
10  today?
11    Q.   Yes.
12    A.   Right.  I reread my
13  declaration.  I read Mr. Hausman's
14  declaration, reread it.  I referred to
15  parts of the, for example, the documents
16  that were filed in the court proceeding,
17  the objection and the points of claim.
18        Can I look at my report to see
19  what documents, if there is anything that
20  I need to mention now, because they are,
21  the documents that I read generally are
22  listed in my opinion?
23    Q.   We'll get to that.  We don't
24  need a perfect memory.  This is not a
25  memory test, at least with respect to

Page 12

1  this question.  And so I don't, it's
2  okay, for now, I think to leave it at
3  that.
4    A.   Okay, fine.
5    Q.   If there are other documents or
6  things that you can remember that you
7  reviewed in preparation specifically for
8  this deposition, please let me know, but
9  otherwise, we will get to the documents.
10    A.   That's what I remember, yes.
11    Q.   And maybe this will involve
12  what you just said, but did you review
13  documents in preparation for today's
14  deposition that you had not previously
15  reviewed?
16        MR. HARRIS:  I got a note that
17  it's hard to hear, Mr. Webster, I
18  don't know if this microphone is on,
19  are you hearing okay?
20        THE VIDEOGRAPHER:  People can
21  just adjust on their own systems.
22        MR. HARRIS:  Just say your
23  question again.
24    Q.   Would you like me --
25    A.   Can you ask the question again,

Page 13

1  yes.
2    Q.   Did you review any documents in
3  preparation for today's deposition that
4  you had not previously reviewed?
5    A.   When you say not previously,
6  what do you mean.
7    Q.   Other than in the context of
8  preparing for this deposition, did you
9  review any documents that had not, you
10  had not looked at otherwise?
11    A.   I can't think of any now.  I
12  know I read some additional cases,
13  documents.  I can't think of any now, no.
14    Q.   So just to be clear, so you're
15  not, you don't -- from your recollection,
16  you don't recall any documents that you
17  reviewed only in the context of preparing
18  for this deposition?
19    A.   There was a document -- there
20  is a document that was filed by Three
21  Arrows fairly recently, which I read
22  parts of.  But I wouldn't say it was in
23  preparation for today.  It's just a
24  document that was filed in the
25  proceedings and I thought it was in order

4 (Pages 10 - 13)

Page 14

1  for me to read that document.
2      Q.   And have you read all of the
3  documents filed in this proceeding
4  relevant to this dispute?
5          MR. HARRIS:  Object to the form.
6      A.   I have read documents that were
7  sent to me and they are listed in my
8  opinion.
9      Q.   So this most recent document
10  that the Three Arrows Capital filed that
11  you reviewed parts of, you said, that was
12  sent to you?
13     A.   Yes, it was.
14     Q.   And who sent it to you?
15     A.   Latham & Watkins.
16     Q.   And have they sent you any
17  other documents that you did not read?
18     A.   No.  I read the -- yes, that's
19  my answer.
20     Q.   In preparation for the
21  deposition, did you meet with counsel?
22     A.   Yes, I did.
23     Q.   And how many times did you meet
24  with them?
25     A.   In person, once.  Virtually

Page 15

1  more than once.  You're saying in
2  preparation for the deposition?
3      Q.   Yes.
4      A.   Maybe about five times in the
5  last say two or three weeks.  And these
6  are virtual meetings of course.
7      Q.   So let's take the virtual
8  meetings first.  How long did those
9  virtual meetings last?
10     A.   The time varied.  Anything from
11  say two to three hours to -- usually
12  three hours, up to three hours.  Maybe
13  less.  But usually up to three hours.
14     Q.   And the in-person meeting, how
15  long did that last?
16     A.   That lasted most of yesterday.
17  We started at minutes to 10 and we ended
18  at, I am not sure exactly what time, but
19  it would have been somewhere between 4
20  and 5 o'clock, I think.
21     Q.   And other than counsel --
22  counsel in those meetings was Latham &
23  Watkins?
24     A.   Yes.
25     Q.   And was there anybody present

Page 16

1  in those meetings, either in person or
2  virtually, other than Latham & Watkins?
3      A.   Yes.  Yes.  I can think of two
4  persons.  There is a local firm involved
5  other than my firm.  A firm of Ogier.
6  They have been working with Latham &
7  Watkins.
8          And I didn't mention that
9  earlier, but, yes, there is another local
10  firm and somebody from that firm is
11  present in the virtual meeting yesterday.
12  As well as Kerry Anderson who I have
13  worked on, in my firm, we have worked
14  together on this matter.  He was also
15  present virtually.
16     Q.   And was anybody present in the
17  virtual meetings that you mentioned other
18  than the Latham & Watkins firm?
19     A.   No.  There were three firms
20  involved, O'Neil Webster, my firm.
21  Ogier, the local BVI firm.  And Latham.
22     Q.   In all of the --
23     A.   In all of the meetings, yeah.
24  I don't think there was ever another
25  lawyer from another firm.

Page 17

1      Q.   And the Ogier firm that you
2  mentioned, you said they were local to
3  what jurisdiction?
4      A.   They have a BVI office.  They
5  have offices elsewhere, but they
6  certainly have a physical BVI presence.
7      Q.   And do you understand them to
8  be counsel to the joint liquidators in
9  this matter?
10     A.   I understand them to be
11  advising the liquidators, yes.
12     Q.   And was the Ogier firm involved
13  in either of the two proceedings that you
14  mentioned having given evidence in?
15     A.   No.
16     Q.   Other than the meetings with
17  counsel that we talked about, did you
18  meet with anybody else in preparation for
19  the deposition?
20     A.   No, I did not.
21     Q.   Did you discuss the preparation
22  of the deposition with anybody other than
23  the three firms that you mentioned?
24     A.   No, I did not.
25     Q.   And when you testified earlier

5 (Pages 14 - 17)

Page 18

1  about documents you prepared -- strike
2  that.
3          When you testified earlier
4  about documents you reviewed in
5  preparation for this deposition, were
6  those documents that you reviewed on your
7  own or with counsel?
8      A.   Both.  I reviewed them on the
9  material that was sent to me initially.
10  I reviewed it on my own.  And then later
11  on before after I prepared my draft, I
12  would have reviewed them with Latham &
13  Watkins.
14      Q.   Did you review any documents on
15  your own that you did not review with
16  Latham & Watkins?
17      A.   Cases, not documents.  No, I
18  did not.
19      Q.   And I should be more clear.
20  When I refer to documents I mean any
21  written material, so that would include
22  written cases, written guidelines?
23          MR. HARRIS:  I am just going to
24  instruct the witness not to reveal any
25  cases that counsel selected for you to

Page 19

1  review, but if there were things that
2  were not chosen by counsel, you can
3  disclose those.
4      A.   Can you repeat the question?
5      Q.   Did you review any documents on
6  your own that you did not review with
7  Latham & Watkins?
8          MR. HARRIS:  I just remind the
9  witness of my instruction.
10      A.   Not in a formal way.  I may
11  have read an article or two or even more
12  than two on just generally the whole
13  crypto works.  So if you mean that level
14  of document, yes, I did review other
15  documents, just to sort of understand,
16  get a better understanding of how digital
17  currencies work.
18      Q.   And those documents you
19  reviewed in preparation for the
20  deposition?
21      A.   Not necessarily, no.  I have
22  been doing that since I got involved in
23  the matter.
24      Q.   Understood.  So let's just go
25  back, because my question was about

Page 20

1  preparation for the deposition, not more
2  generally.  So we will get to documents
3  that you reviewed for your report or
4  otherwise, but right now, I am focused on
5  the deposition preparation.
6          So did you review any documents
7  on your own in preparation for the
8  deposition that you did not review with
9  Latham & Watkins?
10          MR. HARRIS:  And the same
11  instruction.
12      A.   Documents, no.
13      Q.   And by documents, again, I mean
14  any written material, including cases,
15  treatises, guidelines, articles, anything
16  that you reviewed for the deposition on
17  your own that you did not review with
18  Latham & Watkins?
19      A.   I would think that there were
20  cases that I reviewed based on my own
21  research or the research of my partner
22  Kerry.
23      Q.   And what cases were those?
24          MR. HARRIS:  Just the same
25  instruction but you can answer.

Page 21

1          MR. BELLER:  Well, to be clear,
2  the answer was that he reviewed based
3  on his own research or the research of
4  his partner and you had lodged an
5  objection, which we will get to, about
6  cases that were sent or directed by
7  Latham & Watkins.  So it's a different
8  question.
9      A.   Cases -- there was a case from
10  New Zealand that I reviewed.  Ruscoe.
11  English cases that I reviewed.
12          It's difficult to remember now
13  the names of the cases because you read
14  the case, you review it.  If it's not use
15  to you, you move on.
16      Q.   So all of the cases that you
17  reviewed based on your own research or
18  the research of your partner Kerry you
19  determined were not useful to you?
20      A.   They were not useful to me, no.
21      Q.   Sorry, when you say no, do you
22  mean -- what do you mean?
23      A.   That means if I reviewed them
24  and I didn't think they were useful to
25  me, then I went and moved on.

6 (Pages 18 - 21)

Page 22

1    Q.   Right.  So my question is, is
2  that the determination you made, is that
3  the judgment you made about all of the
4  cases that you reviewed from your own
5  research and from the research of your
6  partner Kerry in preparation for this
7  deposition?
8    A.   As best as I can recall, yes.
9    Q.   And when you say of use to you
10 or useful to you, do you mean that they
11 were unhelpful to the positions you've
12 taken in your report?
13   A.   I mean that they were unhelpful
14 to the issues in the case.
15   Q.   And were any of those cases
16 relevant to the issues in the case?
17   A.   Relevant, yes.  Maybe, yes.
18   Q.   Which ones?
19   A.   The New Zealand, case, I think
20 was relevant with how you deal with
21 assets that have been put into a pool and
22 you have nothing but an undivided share
23 in those assets.
24       There is Lehman Brothers, which
25 dealt with securities and liens and

Page 23

1  charges.
2        Is there another case?  There
3  may be others.  I don't want to say no,
4  no others.  But I remember those two.
5    Q.   How did you determine the
6  research parameters for finding the cases
7  that you reviewed in preparation for the
8  deposition?
9    A.   I am not sure I understand what
10 you're asking.
11   Q.   For good reason.
12       You've explained that you
13 conducted some research and that your
14 partner Kerry conducted some research and
15 identified some cases that you then
16 reviewed, right, in preparation for the
17 deposition, correct?
18   A.   That may not have been the
19 sequence in every situation.  It may be
20 that I came up with a case myself because
21 I also did a search.
22   Q.   Right.  And then you determined
23 that none of those cases were useful to
24 the issues in this dispute, right?
25   A.   Yes.

Page 24

1    Q.   But some of them were relevant?
2    A.   Could have been, yeah.
3    Q.   Could have been.  And I am
4  trying to understand how you identified
5  this set of cases that you reviewed, none
6  of which were useful to the issues and
7  some of which were relevant or could have
8  been relevant?
9    A.   So the question is, how did I
10 determine usefulness and relevance on the
11 cases?
12   Q.   We will get there.  But the
13 first question is:  How did you determine
14 this set of cases to review?
15   A.   I am dealing with security
16 documents on the Antiguan law and if I
17 thought a case would assist me on
18 determining whether that particular
19 document would be or would not be a
20 security on Antiguan law, then it
21 becomes, that's one way to determine
22 relevance.
23   Q.   Right.  So I think you're
24 answering the question you had asked,
25 whether I was asking you, which is we're

Page 25

1  not quite there yet.  So let's take it
2  more precisely.
3        You reviewed the Lehman case
4  that you mentioned in preparation for
5  this deposition?
6    A.   Yes.
7    Q.   And you determined that that
8  was not useful to the issues, right?
9    A.   Yes.
10   Q.   But could be relevant?
11   A.   Could be relevant, yes.
12   Q.   How did you find the Lehman
13 case in your effort to find cases to
14 review for this deposition?
15   A.   I was at the time researching
16 the issue of control, how do you
17 determine control of a digital asset.  I
18 did what is equivalent of a word search,
19 I think it was on Google or to have been
20 on Lexus, I am not sure.  And this case
21 came up, Lehman.  I looked at it.  It had
22 what I thought was an excellent
23 definition of control of a digital asset,
24 but it was interpreting a provision of
25 English law; a statutory provision of

7 (Pages 22 - 25)

Page 26

1 English law in England.
2      If it is determining statutory
3 provision, it is not helpful to me,
4 because under our rules how we receive
5 English law, we do not receive statutory
6 law in England. We receive the common
7 law.
8      So the definition, the
9 interpretation of control in Lehman
10 Brothers was not helpful to me at all. I
11 didn't think it was helpful for the case
12 either, because this case in terms of
13 control is dealing with a common law, not
14 English statutory law.
15   Q.   So that word search that you
16 conducted, you did that in preparation
17 for this deposition, right?
18   A.   Actually I did that even before
19 I did the deposition.
20   Q.   When did you conduct this
21 research?
22   A.   I can't say for sure, but I
23 think it was before I did the first
24 opinion, issued the opinion, yes.
25   Q.   So you reviewed the Lehman case

Page 27

1 before you issued your initial report?
2   A.   Yes, I did.
3   Q.   So not in preparation for this
4 deposition?
5   A.   I revisited it, but, yeah, when
6 I reviewed it that time, it was for one
7 issue and it was before I issued the
8 opinion.
9   Q.   How about the New Zealand case,
10 did you review that as well before your
11 initial report?
12   A.   No, that was fairly recent.
13   Q.   Are there any other cases like
14 the New Zealand case that you mentioned,
15 that you have reviewed in preparation for
16 this deposition that you have not
17 previously reviewed, that you can recall?
18   A.   I cannot recall one now, no.
19   Q.   Are there any treatises?
20 treaties that you reviewed in preparation
21 for this deposition that you had not
22 previously reviewed?
23   A.   No. I had previously reviewed
24 treaties and I certainly looked back at
25 one of them for preparation of this

Page 28

1 deposition.
2   Q.   Going to the material you
3 reviewed with counsel for preparation for
4 this deposition, what were those
5 documents?
6      MR. HARRIS:  You're asking what
7 documents counsel selected for him to
8 review. I will instruct him not to
9 answer.
10      MR. BELLER:  Are you taking your
11 counsel's instruction?
12      THE WITNESS:  Yes, I am taking
13 my counsel's instruction.
14      MR. HARRIS:  You can ask him
15 what documents he reviewed in general.
16      MR. BELLER:  That's fine. I
17 just needed him to answer the
18 question.
19   Q.   Did you rely on any documents
20 that were provided by counsel to you in
21 preparation for this deposition?
22   A.   When you say rely on, I was
23 sent several documents and I read them,
24 and I relied on them on a scale of 1 to
25 10 from either zero to 10, because if I

Page 29

1 was sent a document and I didn't think it
2 was really helpful, I wouldn't say I
3 relied on it. But I was sent documents
4 that I thought were helpful, that were
5 relevant and that were material and I
6 relied on them.
7   Q.   So what cases were you sent by
8 counsel that you relied on more than
9 zero?
10   A.   No, no, no. You're asking what
11 case I relied on before. You're now
12 asking me cases sent by counsel?
13   Q.   Let's take a step back. I had
14 asked you what documents you had reviewed
15 with counsel. There was an instruction
16 from your counsel not to answer the
17 question based on privilege. I then
18 asked you whether there were any cases
19 that you relied on in preparation for
20 this deposition sent to you by counsel.
21 And we got into a little bit of a back
22 and forth about your understanding of
23 reliance and the zero to 10 range, right?
24   A.   Mmm-hmm.
25   Q.   So what I am asking is what

8 (Pages 26 - 29)

Page 30

1  cases were sent to you by counsel that
2  you relied on from a binary perspective,
3  meaning more than zero, in preparation
4  for this deposition?
5      MR. HARRIS:  This is just in
6  preparation for the deposition?
7      MR. BELLER:  Yes.
8      MR. HARRIS:  Okay.
9      A.   I cannot think of any cases
10  that were sent to me during that time.
11     Q.   So no cases that counsel sent
12  to you that you are relying on for
13  purposes of this deposition?
14         MR. HARRIS:  That wasn't your
15     question.
16     Q.   My question was:  What cases
17  were sent to you by counsel that you
18  relied on from a binary perspective,
19  meaning more than zero, in preparation
20  for this deposition?
21     A.   And my answer is that I --
22  sorry, were you finished?
23     Q.   Yes.
24     A.   And my answer is that I do not
25  recall being sent any cases by counsel in

Page 31

1  preparation for this deposition.
2      Q.   Or that you were relying on for
3  this deposition?
4          MR. HARRIS:  Object to form.  I
5      don't know what that means.  How can
6      he answer -- you haven't asked him a
7      question so he can tell you whether
8      he's relying on a case for it.
9          MR. BELLER:  Well, that's okay.
10     He can answer a question that isn't
11     exactly that.
12         MR. HARRIS:  Object to form.
13     A.   So what is your question?
14     Q.   Okay.  We were talking about
15  cases that were sent to you by counsel
16  that you relied on for preparation for
17  this deposition and your answer was that
18  there were none?
19     A.   Yes.  That I cannot recall one,
20  yes.
21     Q.   Are there any documents that
22  you reviewed with counsel in your
23  meetings with them that you relied on for
24  preparation of your deposition that you
25  have not identified?

Page 32

1      A.   For this deposition?
2      Q.   Yes.
3      A.   As opposed to the opinion?
4      Q.   Yes.
5      A.   I am trying to remember, but as
6  far as I can recall, there were no
7  additional documents, apart from the one
8  that I mentioned, there were no
9  additional documents sent to me in
10  preparation for the deposition.
11     Q.   Okay.  And did any of your
12  preparation for this deposition cause you
13  to change any aspect of the opinion
14  that's put forward in the report?
15     A.   In my report?
16     Q.   Yes.
17     A.   No.
18     Q.   How did you come to be retained
19  in this dispute?
20     A.   The liquidators of Three
21  Arrows, I have previously worked with
22  them.  And I like to think that they
23  assumed that I am a suitable person for
24  doing this engagement.  And I assume that
25  they recommended me.

Page 33

1      Q.   Who do you understand that they
2  recommended you to?
3      A.   Latham & Watkins.
4      Q.   So are you engaged by Latham &
5  Watkins or by someone else in this
6  matter?
7      A.   My clients are the liquidators
8  of Three Arrows.  The engagement letter
9  is with Latham & Watkins.
10     Q.   And who contacted you to
11  discuss, initially, the engagement?
12     A.   I don't remember specifically,
13  but the person who I remember speaking to
14  from day one, or close to day one, was
15  Daniel Saks, I think that's S-A-K-S,
16  Daniel Saks.
17     Q.   And he's from the Latham &
18  Watkins firm?
19     A.   Latham & Watkins, yes.
20     Q.   And approximately when did you
21  have the initial discussion with
22  Mr. Saks?
23     A.   Late July, maybe early August.
24  But my best guess, and I am just doing
25  this entirely from memory at this stage,

9 (Pages 30 - 33)

Page 34

1 is late July.
2    Q.    And that's late July of 2025?
3    A.    Yes.  Yes.
4    Q.    And you mentioned that you have
5 done work with the joint liquidators
6 before?
7    A.    One of them, yes.
8    Q.    Which one?
9    A.    Crumpler, Russell Crumpler.
10    Q.    And how many times have you
11 worked with Mr. Crumpler before?
12    A.    Once.
13    Q.    And what was that?
14    A.    Liquidation of the bank in
15 Tortola.
16    Q.    I am sorry --
17    A.    Liquidation of the bank in
18 Tortola.  He is the liquidator of the
19 bank and we are advising the liquidators.
20    Q.    And when was that matter?
21    A.    May and continuing.
22    Q.    Began in about May of '25?
23    A.    Began in about May of '25,
24 yeah.
25    Q.    And does that work -- what is

Page 35

1 the name of the bank in liquidation, if
2 you can share it?
3    A.    I can share it because it's a
4 matter of public -- yes, I can share it.
5 It's a matter of public record.  Bank of
6 Asia Limited.
7    Q.    And does that work involve
8 Antiguan law?
9    A.    No, it involves BVI law.
10    Q.    And can you generally describe
11 the work that you personally are doing in
12 that matter?
13    A.    First of all I don't appear in
14 work.  That is work that I don't do.  I
15 am advising the liquidators on their
16 rights and responsibilities in the
17 liquidation of a financial institution.
18        So it varies from, I have given
19 them advice on simple things like --
20 well, it's not a simple matter, I take
21 that back.
22        MR. HARRIS:  You can answer.  I
23    wouldn't reveal the substance of your
24    advice.  It sounds like it's attorney
25    advice, but you can discuss the

Page 36

1    topics.
2    A.    Advising on employment issues.
3 Advising on distribution -- collection
4 matters in the liquidation.  Advising on
5 distribution of the collected assets,
6 having taken care of the liabilities.
7        It still has more work to be
8 done because there are other matters
9 outstanding.  That I would prefer not to
10 give details on.  There is one aspect in
11 particular that is sensitive that is to
12 be done.  So that's the sort of general
13 description of what advice I have given
14 them.
15    Q.    Are there any preference
16 actions in that case?
17    A.    Not yet.
18    Q.    Have you -- is there any work
19 that you've performed in that case
20 relating to the creation and perfection
21 of security interest?
22    A.    No.
23    Q.    Other than this one matter,
24 Bank of Asia in Tortola, have you ever
25 worked with the joint liquidators?

Page 37

1    A.    No, I have never worked with
2 them, no.
3    Q.    And have you ever worked with
4 the Teneo firm, other than in this Bank
5 of Asia matter?
6    A.    I haven't.  The firm has.  And
7 if I may just back up a bit here, I was a
8 judge right up to last year and I
9 rejoined the firm February of this year.
10 So there is work that they did for Teneo
11 before that.  But since I have been in
12 the firm, it has been Bank of Asia.
13    Q.    And in the matters that your
14 firm has been involved in with Teneo, are
15 those are those matters where your firm
16 is serving as a counsel to the joint
17 liquidators?
18    A.    You said matters.  I am
19 speaking about one matter, Bank of Asia.
20    Q.    I understand.  I am asking
21 about the other matters that you
22 mentioned --
23    A.    And I can't speak on the other
24 matters because I am not involved and I
25 am not involved in any other matter in

10 (Pages 34 - 37)

Page 38

1 the firm involving Teneo.
2    Q.    So you never testified as an
3 expert in support of a position that
4 Teneo is taking?
5    A.    No, I haven't.  No.
6    Q.    Have you ever worked with
7 Latham & Watkins before?
8    A.    No.
9    Q.    Have you ever worked with the
10 Ogier firm before?
11    A.    Before I became a judge or
12 since I stepped down from the bench?
13    Q.    Ever.
14    A.    Ever?
15    Q.    Ever.
16    A.    I've worked against them, not
17 with them.
18    Q.    And what is the matter or
19 matters where you worked against them?
20    A.    You're really testing my memory
21 now because you're going back 10, 15
22 years, maybe even longer.  No, not
23 longer, because I think they started
24 about 2010, whatever.  One of them
25 involved derivative actions.  That's what

Page 39

1 it involved, derivative claims.
2    Q.    Anything that you can recall in
3 any of the matters that you have been
4 across from Ogier?
5    A.    I can't recall any now, no.
6 There may be, but we are talking about a
7 long time ago.
8    Q.    And in that matter, was Ogier
9 serving as -- well, what was Ogier's
10 role?
11    A.    I have to start with my role.
12 My role was to represent the company, the
13 majority shareholders of the company,
14 actually, to say that this derivative
15 action was not proper.  Ogier's role was
16 to say it was a proper action as a
17 derivative claim.  Best of my memory,
18 yes.
19    Q.    What was the governing law or
20 jurisdiction?
21    A.    BVI.
22    Q.    BVI?
23    A.    BVI, yes.
24    Q.    Okay.  Thank you.
25       (Webster Exhibit 1, Declaration,

Page 40

1 was so marked for identification, as
2 of this date.)
3    Q.    Okay.  The court reporter has
4 put in front of you what's been marked as
5 Exhibit 1.  Please take your time to
6 review it and when you do please let me
7 know if you recognize this document.
8    A.    It is the declaration that I
9 produced in these proceedings.
10    Q.    If you turn to the very last
11 page, that's your signature?
12    A.    Yes, it is.
13    Q.    And it's dated October 21,
14 2025, right?
15    A.    Yes, it is.
16    Q.    Okay.
17       (Webster Exhibit 2, Supplemental
18    declaration, was so marked for
19    identification, as of this date.)
20    Q.    And now the court reporter has
21 put in front of you what's been marked as
22 Exhibit 2.  And again, please take your
23 time to take a look at it and when you
24 can, let me know if you recognize it.
25    A.    Yes, I recognize it, it is a

Page 41

1 supplemental declaration that I filed,
2 that I made.
3    Q.    And if you turn to the third-
4 to-last page of this package, that's your
5 signature?
6    A.    Yes, it is.
7    Q.    And it's dated October 31,
8 2025?
9    A.    Yes.
10    Q.    So this supplemental report was
11 issued exactly 10 days after the first
12 one, correct?
13    A.    Yes.
14    Q.    What are the differences
15 between the October 21 declaration and
16 this October 31 declaration?
17    A.    For one thing it attaches my
18 resume.  And there is something in here
19 about my fees.  I don't think there are
20 any other differences.  There is no
21 difference to the substance of the first
22 declaration.
23    Q.    And why did you issue what's
24 called the first supplemental
25 declaration?

11 (Pages 38 - 41)

Page 42

1   A.   Because I was advised by
2   counsel that it is usual to include a
3   resume and something about my fees, which
4   was not done in the first declaration.
5   Q.   So what you call the first
6   supplemental declaration, do you agree
7   that's supplanted or replaced the initial
8   declaration for purposes of this matter?
9   A.   Yes, sir, I do.
10   Q.   So if we refer to the first
11   supplemental declaration as the
12   declaration now, will you understand what
13   I am referring to?
14   A.   Yes, I will.
15   Q.   Okay.  And this supplemental
16   declaration now, does it contain all of
17   the opinions that you put forward in your
18   initial declaration?
19   A.   It does, yes.
20   Q.   And does your declaration
21   contain a complete statement of all
22   opinions that you intend to provide in
23   this matter?
24       MR. HARRIS:  Object to the form.
25   A.   Probably not is my answer,

Page 43

1   because if there is an opinion which I
2   have formulated since the declaration,
3   then I would like to think I would be
4   able to say what that opinion is.
5   Q.   So sitting here today, are
6   there any opinions that you have
7   formulated since October 31 that's not
8   included in the declaration?
9   A.   Not that I can recall.  No, I
10   don't think so.
11   Q.   So this declaration contains a
12   complete statement of all opinions you
13   currently intend to provide in this
14   matter?
15       MR. HARRIS:  Object to the form.
16   A.   This statement contains all my
17   opinions up to the 31st of August and
18   October 2025.  If there are any opinions
19   that I have not mentioned, then I would
20   like to think I would be able to refer to
21   those opinions in my deposition or else
22   later on.  But I just can't think of one
23   right now.
24   Q.   I am a little confused.  Today
25   is December 9th.

Page 44

1   A.   9th.
2   Q.   The declaration is dated
3   October 31st, right?
4   A.   Yes.
5   Q.   So it's been a little over a
6   month since your declaration was
7   submitted, right?
8   A.   Month-and-a-half, yeah.
9   Q.   And I asked you earlier are
10   there any opinions that you have
11   formulated since October 31st, so meaning
12   in that month-and-a-half since the
13   declaration was submitted, that was not
14   included in the declaration.  And your
15   answer is "Not that I can recall.  No, I
16   don't think so."
17   A.   That was my answer, yes.
18   Q.   So when I asked you then, as
19   you sit here today, are there any
20   specific opinions that you have formed or
21   intend to put forward in this matter that
22   are not contained in the declaration?
23   A.   And my answer is I am not aware
24   of any.
25   Q.   Are you aware of any

Page 45

1   inaccuracies contained in your
2   declaration?
3   A.   There is one thing I recall,
4   which is not an inaccuracy as such but it
5   could have conveyed a wrong impression.
6   And let me find it, because I need to be
7   specific.
8   Q.   Thank you.  Take your time.
9       (Witness reviews document.)
10   A.   It was a reference to the
11   Companies Act in Antigua.
12       (Witness reviews document.)
13   Q.   I don't mean to disturb you and
14   I don't want to put words in your mouth,
15   but it's possible that it's paragraph 67?
16   A.   Thank you very much, sir.
17   Q.   You're welcome.
18   A.   I don't know why I didn't
19   highlight it in bold, because that is
20   what I would normally do for legislation.
21   Right.
22       That refers to, if you go down
23   to the sixth or seventh line, "While a
24   pledge or lien is perfected by possession
25   without the need for registration,

12 (Pages 42 - 45)

1 charges granted by companies are invalid
2 in many jurisdictions (for example,
3 Antigua and Barbuda, Section 250 of the
4 Companies Act, England and Wales)."
5      By itself that statement is
6 accurate. But I think reading it, you
7 may get the impression that I am saying
8 that in this case there was a requirement
9 to register the charge in Antigua under
10 Section 250 of the Companies Act.
11 Section 250 of the Companies Act does not
12 apply to Three Arrows -- to FTX, I am
13 sorry, to FTX. So I think it creates the
14 wrong impression that I am overstating
15 the position. So it's not a correction.
16 It's pointing out something to you.
17    Q.   Understood. Appreciate that
18 clarification.
19      Are there any other
20 clarifications or corrections that you
21 wish to make to your declaration?
22    A.   I am not aware of any other
23 clarifications or corrections that I
24 would like to make.
25    Q.   We talked about preparation for

1 the deposition. Setting aside the
2 preparation for the deposition, since
3 your October 31 declaration was
4 submitted, have you conducted any
5 additional analysis with respect to the
6 opinions contained in the declaration?
7    A.   I have revisited it. I have
8 looked at the issues. I would have to
9 say yes.
10    Q.   And what was that analysis?
11    A.   For example, I have gone over
12 the issue of how customers invested on
13 the FTX Exchange. And in fact I have
14 received more information as to how that
15 was done, because to me that goes to the
16 issue of control.
17    Q.   Anything else?
18    A.   There may be others, but I
19 can't think of one just now.
20      In fact, when you asked the
21 question first, I couldn't think of any.
22 And then I remembered that one about
23 control and how investments, generally
24 how the exchange operates.
25    MR. HARRIS: Whenever would be a

1 good spot, we are about an hour.
2    MR. BELLER: We are getting
3 really close to a good breaking spot.
4    Q.   So what did that -- what --
5 what information did you receive as to
6 how customers who invested on the FTX
7 Exchange since the October 31 declaration
8 was submitted?
9    A.   You mean envelopes I received
10 since October?
11    Q.   Since October 31, yes.
12    A.   That money you would invest --
13 a customer would invest the money would
14 be into the wallet of the customer or the
15 wallet address of the customer, which I
16 knew before. It was then swept over into
17 the FTX pool account or I think they call
18 it the hot wallet.
19      What I was curious about is,
20 having gone into the hot wallet -- let's
21 say I invest in my exchange. My assets
22 are not in my private wallet, not in the
23 private customer wallet anymore, but now
24 in the FTX hot wallet. How do I deal
25 with those assets? I was curious about

1 that. And I inquired. I made inquiries
2 to see how it happened. And in a
3 nutshell I was told, if you wanted to do
4 a trade, either you would press a button,
5 to put it crudely, or there would be an
6 algorithm which automatically makes a
7 trade. If you wanted to do a withdrawal,
8 you could do a withdrawal.
9      It did not involve getting
10 permission or approval from FTX. And I
11 was very concerned about that issue so I
12 made inquiries and I got answers.
13    Q.   And who were those inquiries
14 made to?
15    A.   Latham & Watkins.
16    Q.   And the answers you were
17 provided with, were those provided to you
18 in written responses from Latham?
19    A.   No, I think it was in meetings.
20    Q.   So those answers were given to
21 you in verbal communications?
22    A.   As far as I can recall, yes.
23    Q.   Were there any documents
24 provided to you in connection with the
25 answers that you got to those questions,

13 (Pages 46 - 49)

Page 50

1 those inquiries?
2     A.    No, I don't think so.  There
3 were two documents that were provided
4 initially, but they are called aids, they
5 are in my opinion.
6         But this was more operational.
7 How -- how did a customer access assets
8 that they had invested on the exchange.
9 That was my concern and that is what I
10 inquired about.  I do not recall getting
11 anything in writing.
12     Q.    And you had not received that
13 information prior to October 31st; is
14 that correct?
15     A.    That is generally correct, yes.
16     Q.    And did the information you
17 receive through these meetings with
18 Latham & Watkins cause you to change any
19 of the opinions that you put forth in
20 your declaration?
21     A.    It caused me to reinforce the
22 opinions that I put forth in my
23 declaration.
24     Q.    And you said you reviewed
25 Mr. Hausman's declaration?

Page 51

1     A.    I thought we were going to take
2 a break.
3     Q.    We are.
4     A.    Okay, I leave that to you.
5     Q.    Did reading Mr. Hausman's
6 declaration cause you to change any
7 opinion in your declaration?
8     A.    Reading his opinions, if
9 anything, caused me to reinforce my
10 opinions.  And I disagreed with some of
11 his opinions.
12         MR. BELLER:  Why don't we take a
13 break.
14         THE VIDEOGRAPHER:  Going off the
15 record at 10:10 a.m. EST.
16         (Off the record.)
17         THE VIDEOGRAPHER:  We are back
18 on the record at 10:25 a.m. EST.
19 BY MR. BELLER:
20     Q.    Okay.  Mr. Webster, what is
21 your understanding of your assignment in
22 this matter?
23     A.    To express an opinion under
24 Antiguan law of the issues raised in the
25 proceedings that are governed by Antiguan

Page 52

1 law.
2     Q.    And what are those --
3     A.    The main thing is --
4     Q.    Mr. Webster, I will remind you
5 again, I know you know where I am
6 going --
7     A.    I apologize, I apologize.
8     Q.    Not at all.  This is totally
9 standard.  I know you know what I am
10 asking, but someone reading it in a few
11 weeks may not.
12         MR. HARRIS:  As your counsel, I
13 am going to say pause two seconds.
14 Maybe yourself do that and then let
15 Mr. Beller continue.
16     Q.    What is your understanding of
17 the Antiguan law issues raised in these
18 proceedings?
19     A.    There is a lending arrangement
20 between FTX and Three Arrows and other
21 customers of FTX.  It involves security.
22         There are two documents that
23 deal with the security.  The Margin
24 Agreement and the line of credit, the one
25 for I think 110 -- 120,000, 120 million,

Page 53

1 sorry.  And my role is to give an opinion
2 on the enforceability of the security in
3 those documents.
4     Q.    And those documents that you
5 mentioned, did you analyze whether they
6 are in fact governed by the laws of
7 Antigua?
8     A.    They state that they are
9 governed by the laws of Antigua.  Did I
10 analyze? I took that at face value.
11     Q.    Okay.  And in connection with
12 your assignment you reviewed certain
13 documents to prepare your declaration,
14 right?
15     A.    Yes.
16     Q.    And if you turn to paragraph 30
17 of your declaration, I will give you a
18 minute to read it.
19         (Witness reviews document.)
20     A.    Yes.
21     Q.    So in paragraph 30 you say that
22 you reviewed portions of the declaration
23 of Robert Stuart Levy KC in support of
24 the joint liquidators Amended Proof of
25 Claim relating specifically to the loan

14 (Pages 50 - 53)

Page 54

1 documents; is that right?
2    A.   Governed by Antiguan law, yes.
3    Q.   What portions of the
4 declaration of Mr. Levy did you review?
5    A.   I could be specific by looking,
6 but in general terms the portion of his
7 declaration dealing with Antiguan law.
8        (Webster Exhibit 3, Declaration
9    of Robert Stuart Levy, was so marked
10    for identification, as of this date.)
11    Q.   The court reporter has put in
12 front of you a document marked as Exhibit
13 3.  Once you had a chance to review it,
14 can you let me know if you recognize it.
15    A.   Yes, it looks like a copy of
16 Mr. Levy's declaration.
17    Q.   Can you tell me in particular
18 which parts of this declaration you
19 reviewed, specifically in connection with
20 the preparation of your declaration?
21    A.   There is a section where he
22 deals with how an English Court -- how an
23 Antiguan Court will deal with English
24 law.  And I would like to find it and not
25 try to do it from memory.  It's going to

Page 55

1 be a little difficult to find it, because
2 I am not thinking of a particular word to
3 zero on.  Maybe the word "Antigua" would
4 help.
5    Q.   So maybe just taking a step
6 back, rather than specific parts of the
7 document, from your recollection, what
8 was the portion -- what was the substance
9 of the portion of the declaration of
10 Mr. Levy that you reviewed in connection
11 with the Antigua law issues?
12    A.   Yes.  From memory, it was where
13 he spoke about the fact that you had
14 documents, security documents governed by
15 Antiguan law and that an Antiguan Court
16 in dealing with, I think he was saying --
17 this is where I want to be specific -- I
18 think he was saying that English law was
19 involved in the interpretation of those
20 documents.  I am not clear on that.
21        What I clearly remember is him
22 saying that in an Antiguan Court, if you
23 need to prove English law, you do not
24 need expert evidence.  Lawyers at the bar
25 table -- he didn't say this, but I am

Page 56

1 saying this now -- lawyers at the bar
2 table can give evidence of what English
3 law is.
4        And I agree with that because
5 understand, I was a judge in the Eastern
6 Caribbean, so I dealt with nine different
7 countries from BVI in the north to
8 Grenada in the south.  They all have the
9 same common law and the same sort of
10 interpretation principles.  And it is a
11 principle of Antiguan law that I am
12 familiar with that if you want to prove
13 English law, you don't have to call an
14 English expert.  You say what it is from
15 the bar table.  That's part of it that I
16 remember.
17    Q.   Okay.  Did you review any other
18 portions of Mr. Levy's declaration in
19 preparation of your declaration?
20    A.   Definitely not for the
21 declaration, because it came out the same
22 day as my declaration.
23        In any event, I haven't
24 reviewed it for other issues than these
25 are matters of BVI law and I am here to

Page 57

1 testify on, to depose, to speak on
2 Antiguan law.  So I left all of that to
3 Mr. Levy.  That's his role.
4    Q.   Okay.  So you have no view on
5 Mr. Levy's testimony or opinions, other
6 than the narrow issue that you identified
7 with respect to expert, expert English
8 law in an Antiguan court?
9    A.   That's correct, yes.
10    Q.   And you're not offering any
11 opinion on BVI law in this matter?
12    A.   No, I am not.
13    Q.   And you didn't rely on any of
14 the opinions that Mr. Levy is putting
15 forward in this matter for your opinions?
16    A.   No, I did not.
17    Q.   And you're not offering any
18 opinion on English law issues in this
19 matter?
20    A.   I am offering opinions on
21 Antiguan law, which includes the common
22 law of England.  So to that extent, I
23 suppose I am saying something about
24 English law, insofar as it applies in
25 Antigua as a part of, in fact, the entire

15 (Pages 54 - 57)

Page 58

1 Eastern Caribbean, as a part of the
2 Eastern Caribbean's common law. We are
3 all common law jurisdictions.
4    Q.    And did your assignment change
5 over the course of your work on this
6 matter at any point?
7    A.    Can you be more specific?
8    Q.    Definitely. You testified
9 earlier that you were approached in or
10 around July/August 2025 time frame about
11 being engaged in this matter, right?
12   A.    Yes, yes, that's correct.
13   Q.    And did you receive an initial
14 assignment or set of instructions for
15 this engagement at or around that time?
16   A.    I did not receive a written
17 instruction setting out the -- I didn't
18 receive a written instruction. I was
19 sent papers. And papers make it fairly
20 obvious what are the issues that I needed
21 to address.
22   Q.    And those papers and the
23 discussions about your assignment
24 occurred in that July/August time frame?
25   A.    I would say more August/

Page 59

1 September.
2    Q.    August/September.
3    A.    I was initially approached end
4 of July. There are formalities to be
5 taken care of. Once the formalities were
6 taken care of, then I started to take
7 real instructions.
8    Q.    And after those initial
9 instructions in that time frame, did you
10 receive any amended or modified
11 instructions about the scope of your
12 assignment?
13       MR. HARRIS: Object to the form.
14   A.    How it worked -- my answer is
15 yes. I produced a first draft of the
16 opinion. I did my work. I produced the
17 first draft. I went over it with my
18 colleague Kerry Anderson. And then it
19 was sent off to Latham & Watkins.
20       In the exchanges that followed,
21 I got additional information; for
22 example, assumptions to be made. Those
23 came not in the form of a letter or a
24 letter of instruction or a document of
25 instruction. It came in amendments to

Page 60

1 the draft.
2    Q.    And so all of those assumptions
3 that you received in the course of the
4 back and forth with Latham are reflected
5 in your declaration that was submitted?
6    A.    I would say all of them that
7 were important to me, yes.
8    Q.    And setting aside the
9 amendment, the assumptions that you were
10 given through the revisions and the
11 exchanges, was there ever a change in
12 your assignment from the initial
13 August/September instructions until
14 submission of your declaration?
15   A.    No.
16   Q.    At any time after the
17 submission of your declaration or the
18 initial declaration, I should say?
19   A.    My instructions never changed.
20   Q.    Okay. And were you ever
21 instructed to express a particular
22 opinion?
23   A.    Yes, I was instructed to
24 express an opinion on the security
25 documents.

Page 61

1    Q.    But were you instructed to
2 express a particular opinion about the
3 security documents?
4    A.    I am not so sure what that
5 means. Does that mean somebody was
6 telling me what my opinion is and I was
7 to express it?
8    Q.    Let's start there.
9    A.    No.
10   Q.    Were there any opinions that
11 you formed from your review and analysis
12 that you were told not to make in your
13 declaration?
14   A.    No.
15   Q.    So there are no opinions that
16 you formed that you did not include in
17 the report, correct?
18       MR. HARRIS: Object to the form.
19   A.    I always had a difficulty with
20 questions like that, because I may have
21 gone one day, I think about this, I have
22 an opinion on this particular issue but
23 it's not really important so I am not
24 going to include it. So to say is there
25 any opinion that I found which is not

16 (Pages 58 - 61)

Page 62

1  included is very difficult for me to
2  answer.
3        The opinions which I have
4  expressed here are the ones which I think
5  are material to what I have been asked to
6  do.
7    Q.   Okay.  Are you receiving any
8  compensation for your work in this matter
9  other than what has been disclosed in
10  your declaration?
11   A.   No.  That's what it is.  I am
12  being compensated on an hourly rate and
13  whatever work I do I get paid that rate.
14   Q.   Who is paying your fees?
15   A.   The liquidators of Three
16  Arrows.
17   Q.   I think you testified earlier
18  that you reviewed the proof of claim
19  submitted in this matter by the joint
20  liquidators.
21   A.   Yes, I did.
22   Q.   And that's the Amended Proof of
23  Claim that was filed in or around
24  February or March of 2025, I believe?
25   A.   I am not sure of the date, but

Page 63

1  I am going to take that from you, yes.
2    Q.   And do you have an
3  understanding of what the joint
4  liquidators' claims -- well, strike that.
5        Have you reviewed -- you also
6  said that you reviewed the recently filed
7  response brief that the joint liquidators
8  filed in response to the FTX Recovery
9  Trust objection to that proof of claim;
10  is that right?
11   A.   Yes, that's correct.
12   Q.   And what is your understanding
13  of the claims of the joint liquidators
14  are pursuing today in connection with
15  this matter?
16      MR. HARRIS:  Object to the form.
17   A.   They are pursuing claims for
18  recoveries of moneys that are assets that
19  they said should not have been realized,
20  taken by FTX.
21   Q.   And do you have any
22  understanding of the particular legal
23  causes of action that the joint
24  liquidators --
25   A.   I --

Page 64

1    Q.   Sorry, sorry, please, I just
2  remind you again, please let me finish my
3  question.
4        Do you have an understanding of
5  the particular legal causes of action the
6  joint liquidators are pursuing today?
7    A.   I have a general understanding
8  of the claims.  I have not gone into them
9  in any detail because that is not my role
10  in this matter.
11   Q.   Okay.  And do you have an
12  understanding of the underlying facts and
13  circumstances on which the joint
14  liquidators' claims and causes of action
15  are based?
16   A.   Only in a brief and general
17  way.  And only insofar as they were
18  helpful for me to understand the issue
19  relating to securities.
20   Q.   And what is your brief and
21  general understanding?
22   A.   That they, Three Arrows,
23  invested in the exchange.  Ran into
24  problems.  FTX stepped in pursuant to, I
25  assume the Margin Agreement or stepped

Page 65

1  in.  Realized assets.  Paid themselves.
2  And FTX -- Three Arrows is now seeking to
3  recover some or all of that money.
4    Q.   I would like to go through some
5  questions on your professional
6  background.
7        What are the jurisdictions that
8  you're admitted to practice in?
9    A.   Antigua, BVI, Anguilla, Turks
10  and Caicos islands, Grenada.
11   Q.   And how long have you been
12  admitted to practice in Antigua?
13   A.   2009.  So that's what, 16
14  years.
15   Q.   So you have maintained
16  admission to practice there since then?
17   A.   It's an admission which
18  maintains itself.  If I were to go into
19  Antigua to argue a case, I would have to
20  get a practicing certificate for that
21  purpose.  But my admission is indefinite.
22   Q.   The practicing certificate, how
23  would you get that to review a case?
24   A.   You apply for it.  Whoever is
25  bringing you in to argue the case in

17 (Pages 62 - 65)

Page 66

1 court would make the necessary
2 arrangements.
3    Q.    And I think you mentioned
4 previously that before you returned to
5 your current firm you were a sitting
6 judge?
7    A.    Yes.
8    Q.    And what was your judicial
9 appointment?
10    A.    What was it?
11    Q.    What was your judicial
12 appointment?  What was the judicial seat
13 that you were sitting in?
14    A.    I was a judge of the Court of
15 Appeal of the Eastern Caribbean Supreme
16 Court.  Is that the answer?  Well, that's
17 my answer.
18    Q.    And did you, in that capacity,
19 did you issue opinions interpreting and
20 applying Antigua law?
21    A.    Yes.  And I must qualify that
22 by saying the rules of interpretation of
23 contracts and statutes run throughout the
24 Eastern Caribbean.
25        So I did cases in Antigua

Page 67

1 dealing with interpretation, in BVI, et
2 cetera.  So in my opinion, they all count
3 towards interpreting documents under
4 Antiguan law, because it's Eastern
5 Caribbean law.
6    Q.    Did you ever issue an opinion
7 as a judge interpreting secure
8 transactions or security interests under
9 Antigua law?
10    A.    I don't recall doing one, no.
11    Q.    Did you ever issue any opinions
12 as a judge interpreting secured
13 transactions or security interests?
14    A.    Secured transactions, yes.  For
15 example, mortgages, charges.  Usually
16 enforcement or attempts by a mortgagee or
17 chargee to sell a security.  That kind of
18 law I have issued opinions on, in that
19 general area.
20    Q.    And approximately how many
21 opinions have you issued on that topic?
22    A.    I think that goes beyond
23 estimating.  I think that would be
24 guessing.  That would be very difficult
25 for me to say, because I may hear an

Page 68

1 appeal, be part of the panel and the
2 panel may issue a decision that I didn't
3 author, I concurred or participated in
4 it.  So that's not my decision, it's a
5 Court's decision.
6        And then there are cases where
7 no written decision, no judgment was
8 issued.  You hear an application relating
9 to securities, it's fairly simple.
10 Nothing is ever simple.  It's not a
11 complicated case and you just give an
12 extemporary decision.
13        So it's very difficult for me
14 to say how many cases I have been
15 involved in that involves securities and
16 enforcement of securities.
17    Q.    And when you say securities and
18 enforcement of securities, you mean
19 security interests and secured
20 transactions?
21    A.    Yes.
22    Q.    Have you ever issued an opinion
23 or concurred an opinion that interpreted
24 or applied the principles that you are
25 opining on in your declaration?

Page 69

1        MR. HARRIS:  Object to the form.
2    A.    I can't recall now.  But
3 insofar as the question relates to
4 enforcing or dealing with transactions
5 that involve security interests, then I
6 have dealt with them but I just can't
7 recall them now.
8        And remember, I am talking
9 about the entire Eastern Caribbean, not
10 just Antigua.
11    Q.    If you turn to paragraph 7 of
12 your declaration.
13    A.    Yes.
14    Q.    So in this paragraph you refer
15 to expert reports on aspects of BVI law
16 that you have submitted?
17    A.    Yes.
18    Q.    Right?
19    A.    Yes.
20    Q.    Have you produced any expert
21 reports on Antigua law?
22    A.    No, not before now.  This is
23 the first one.
24    Q.    And the second sentence of that
25 paragraph you say, "Most of the reports I

18 (Pages 66 - 69)

Page 70

1 have produced are in the area of
2 commercial law, company law and corporate
3 insolvency."
4         Is that right?
5    A.   Yes.
6    Q.   Have you produced any expert
7 reports under any law relating to secured
8 transactions and security interests?
9    A.   I did one in March.
10   Q.   In March of 2025?
11   A.   Yes, this year.
12   Q.   And what case is that?
13   A.   It's probably not mentioned
14 here because I am not even sure the case
15 is finished.  Did I mention it, Celsius
16 and Tether.  And that was on securities,
17 yeah.
18   Q.   And going back to earlier in
19 this paragraph, you refer to expert
20 reports including the United States
21 District Court for the Southern District
22 of New York, three cases.
23   A.   Yes.
24   Q.   Is the Celsius report one of
25 the three?

Page 71

1    A.   Probably it is, yeah,
2 because -- yes, that's why I said three.
3    Q.   Is there a reason you didn't
4 identify the Celsius case as a previously
5 submitted expert report in the
6 declaration?
7    A.   Yes, there is a reason.  I am
8 not sure what are the issues relating to
9 confidentiality.  And even though it is a
10 report for court proceedings, I prefer to
11 err on the side of caution and not call
12 my clients' names or the names of the
13 parties.
14   Q.   Okay.  What were the other two
15 expert reports you submitted in the
16 Southern District of New York Court?
17   A.   One was this year, another one
18 was this year as well, I think in
19 probably April/May, and that was in
20 relation to derivative claims on the BVI
21 law.
22   Q.   And then there was another one?
23   A.   There was another one years
24 ago.  That one I cannot remember the
25 details of.

Page 72

1    Q.   Was it relating to security
2 interests and security transactions?
3    A.   I don't think so, no.
4    Q.   What were the expert report
5 that you submitted in the Celsius case
6 about?
7    A.   There was a contract called a
8 token agreement which involved repayment
9 of moneys, there was a default in payment
10 by Celsius -- yes, Celsius, and Tether
11 attempted to enforce, to enforce the
12 security by selling the secured assets.
13 There is a provision in the contract or
14 the token agreement that says that
15 Celsius was entitled to a 10-hour cure
16 period after the demand for payment was
17 made.
18        There was also another issue
19 relating to whether that had been varied
20 by a variation in the contract.  But the
21 basic question was, having breached the
22 10-hour cure period requirement, was it a
23 valid exercise of the security.  And I
24 was advising Celsius and I said it's a
25 clear breach of the terms of the

Page 73

1 agreement, because in the background
2 there was an amendment, and I think
3 Tether was relying on the amendment to
4 say it varied a term in the contract
5 which said you need 10 hours.
6        I don't know how much detail
7 you need.  But the contract itself had a
8 no-amendment clause.  Which means the
9 terms can't be amended except for the
10 written consent of both parties.
11        So in my opinion the amendment
12 did not kick into this transaction
13 because there was no consensual variation
14 of the term and it was improperly
15 exercised, and that was my opinion.
16   Q.   So your opinion was about the
17 breach of contract question?
18   A.   It's a contract claim, a
19 contract case, yes.
20   Q.   You weren't providing an
21 opinion in that case about the creation
22 of a security interest?
23   A.   No, I was not.
24   Q.   Or a perfection of a security
25 interest?

19 (Pages 70 - 73)

Page 74

1    A.   No.  No, I was not.
2    Q.   Did you provide any opinions in
3 that case with respect to questions of
4 control of digital assets?
5    A.   No, I did not.
6    Q.   Did you provide any opinions in
7 that case with respect to interpreting
8 contract language to determine whether a
9 security interest was formed?
10    A.   Not in the -- to answer your
11 question, no.
12    Q.   Going back to paragraph 7, you
13 then refer to two expert reports that you
14 produced in the High Court of Hong Kong,
15 is that right?
16    A.   Yes.
17    Q.   Are those expert reports in
18 connection with the two cases we
19 discussed earlier?
20    A.   Yes, they are.  It's a
21 reference to those two cases, yes.
22    Q.   And again, neither of those
23 cases related to secure transactions or
24 security interests?
25    A.   No.

Page 75

1    Q.   And then there is a reference
2 to an expert report in the United States
3 District Court for Florida.  What was
4 that case?
5    A.   I am trying to remember.  I
6 don't think it was about securities, but
7 I can't recall now what was involved in
8 that case.
9    Q.   Do you recall the name of the
10 case or the parties to the case?
11    A.   No, I don't.
12    Q.   So no other details?
13    A.   It's a long time ago.  It's
14 before I became a judge.  So predated
15 2015.  I just don't remember.
16    Q.   Then there is a reference to an
17 expert report in the Ontario Supreme
18 Court.  What was that case?
19    A.   Similar.  Those cases go back
20 prior to 2015.  I just don't remember the
21 details.
22    Q.   Okay.  And the same for the ICC
23 case?
24    A.   Yes, same for that one.
25    Q.   But none of those cases related

Page 76

1 to secure transactions or creation or
2 perfection of security interests?
3    A.   I cannot recall any of them
4 dealing with security interests, yeah.
5 Certainly not of the type we are dealing
6 with here.
7    Q.   But of any type?
8    A.   I can't recall.
9    Q.   And in your Celsius opinion,
10 were you opining on questions of
11 cryptocurrency and digital assets?
12    A.   That was a subject matter of
13 the security when I was opining on the
14 terms of a contract.  It was a contract
15 dispute, as far as I was concerned.
16 Underlying asset securities, digital
17 assets.
18    Q.   Do you consider yourself an
19 expert in cryptocurrency or digital
20 assets?
21    A.   The law, yes.  Not the facts.
22 I wouldn't advise on investments in
23 crypto.
24    Q.   And so you view yourself as an
25 expert on the law governing

Page 77

1 cryptocurrency and digital assets?
2    A.   Yes.
3    Q.   And what work have you done on
4 cryptocurrency or digital assets other
5 than the Celsius opinion and this
6 opinion?
7    A.   I also sat on the Commercial
8 Court of the BVI for eight months in
9 2024.  In that period, I sat on, I think
10 three different applications, not cases,
11 applications relating to cryptocurrency.
12       One of them, I think involved
13 some amount of detail about the workings
14 of the system.  The other two I think
15 related to theft of crypto.  So it didn't
16 deal -- that one, two of them did not
17 deal with how crypto works.  It's just
18 how it was stolen from the wallets.
19       So that's -- well, that's my
20 answer.
21    Q.   When you say that one of them
22 involved some amount of detail about the
23 workings of the system --
24    A.   Yeah.
25    Q.   -- what do you mean by that?

20 (Pages 74 - 77)

Page 78

1    A.    The purported owners or those
2  in control of the assets.  And it didn't
3  involve an exchange.  I think this was
4  peer to peer.
5         The purported owners of the
6  crypto assets, they weren't getting
7  along.  And the question is how could,
8  what I think is a majority of them, it
9  was like five, and I think likely of them
10  wanted to deal with the assets one way.
11  The other two -- one of them didn't agree
12  and one was virtually incapacitated.  So
13  they wanted an order from the BVI Court
14  as to how to progress the matter.
15         So I did have to look a bit on
16  how crypto assets work.  But, again, it
17  turned mainly on powers of the person who
18  control the asset, and I think in this
19  case it was a company, there were five
20  people that were behind the company.
21    Q.    And so none of your experience
22  with cryptocurrency involved security
23  interests?
24    A.    Not directly, no.  I would say
25  Celsius did involve some amount of

Page 79

1  security, consideration of security
2  interest in the context of the contract.
3         And maybe a little in the last
4  one I dealt with, the third one I
5  mentioned in the Commercial Court where
6  the owners of the company could not agree
7  how to move forward with the crypto.
8    Q.    And how did that relate to
9  security interest?
10    A.    Because I felt I needed to
11  understand what was underlying asset that
12  they were -- that they were coming to
13  court about.
14    Q.    So were there disputes or
15  questions about a security interest
16  relating to those digital assets?
17    A.    No.
18    Q.    Okay.
19    A.    It's more control of them.  Who
20  had the right to do what, yeah.
21    Q.    And that was a BVI law case,
22  right?
23    A.    BVI law, yes.
24    Q.    Okay.  Did any of those three
25  cases that you mentioned, the

Page 80

1  applications that you mentioned, involve
2  cryptocurrency exchanges?
3    A.    No.
4    Q.    And none of them involved FTX,
5  right?
6    A.    No.  Definitely, no.
7    Q.    And you have never done any
8  work relating to FTX before the report
9  you put in?
10    A.    No, I haven't.  No.
11    Q.    You say in your declaration
12  that "Most of the reports I have produced
13  are in the area of corporate law, company
14  law and corporate insolvency," right?
15    A.    Yes, that's what I say.
16    Q.    What specific areas within
17  corporate law, company law and corporate
18  insolvency, do you consider yourself to
19  be an expert in?
20    A.    Everything to do with
21  shareholders, disputes, entitlements, et
22  cetera, directors, director's power, et
23  cetera.  Insolvencies.  Commercial
24  disputes.
25         But we are the jurisdiction of

Page 81

1  incorporation for these companies.  So we
2  didn't get much into the actual
3  commercial day-to-day disputes of these
4  companies.  It was mainly in relation to
5  internal corporate matters.  Directors,
6  shareholders, insolvency, receivers and
7  the like.
8    Q.    That's it?
9    A.    In a nutshell.  There are
10  several other areas, but I am just giving
11  you the main areas.
12    Q.    So those are the main areas.
13  So what are the not main areas that you
14  consider yourself an expert in within
15  those categories?
16    A.    Interpretation of contracts.
17  Claims, claims for, say, tortious
18  interference, conspiracy, unjust
19  enrichment and others.
20    Q.    Do you consider yourself an
21  expert in secured transactions?
22         MR. HARRIS:  Object to the form.
23    A.    I consider myself an expert to
24  the extent that whenever there is a
25  dispute about these transactions they

21 (Pages 78 - 81)

Page 82

1 come before the Court, and I have dealt
2 with them in the past, and if they come
3 to me now I would deal with them. So
4 that some of them may involve secured
5 transactions.
6    Q.   But secured transactions are
7 not in the categories of either main
8 areas or secondary areas that you
9 consider yourself to be an expert in?
10    A.   I would say secondary areas,
11 because they come to the BVI and to my
12 firm and to my court that I sat on when
13 there was a dispute.
14        And so for example, excuse me,
15 I don't have experience in, for example,
16 advising a client how to invest in crypto
17 or how to use a BVI company to invest in
18 crypto. I am not into that area of
19 securities. The area that I am into is
20 when it is finished, I don't even get
21 into the contracts. That's where
22 Mr. Anderson comes in, Kerry. When there
23 is a dispute, that's when I get involved.
24        So in handling a dispute, I do
25 have to delve into the details of the law

Page 83

1 relating to the transaction that brought
2 about the dispute.
3    Q.   Have you ever testified in a
4 U.S. court?
5    A.   No.
6    Q.   Has your testimony or expert
7 opinion ever been subjected to a motion
8 to exclude or reject?
9    A.   Not that I am aware of, no.
10    Q.   Has your testimony ever been
11 excluded by a Court?
12    A.   Not that I am aware of, no.
13    Q.   Have you ever been involved in
14 any U.S. litigation, other than the ones
15 that we've discussed?
16    A.   As? Involved as?
17    Q.   In any capacity.
18    A.   A litigator? An attorney or as
19 a litigant?
20    Q.   In any capacity in the U.S.
21    A.   In the U.S., apart from
22 advising clients, no.
23    Q.   So you've never testified in
24 any U.S. court in a non-expert or a
25 non-professional capacity?

Page 84

1    A.   I have not.
2    Q.   If we turn to paragraph 10 of
3 your declaration --
4    A.   Yes.
5    Q.   -- you list documents that you
6 reviewed in preparation of the report,
7 right?
8    A.   Yes.
9    Q.   Did you review any other
10 documents in preparation of the report?
11    A.   I think I answered that
12 question already. I did not review any
13 other documents. I may have read reports
14 in the news. I may have watched
15 something on YouTube. But these are the
16 documents that I reviewed and no other
17 documents.
18    Q.   And your report cites to a
19 number of cases that are not listed in
20 this list of documents, right?
21    A.   Sorry, a number -- you mean
22 decided cases -- sorry, there are
23 references in this report to decided
24 cases.
25    Q.   Right.

Page 85

1    A.   What is your question
2 specifically?
3    Q.   That answered the question.
4        Did you review all of the cases
5 that you cited, that you cite in this
6 declaration in preparation for your
7 declaration?
8    A.   Yes.
9    Q.   Were there any cases that are
10 not mentioned in this report that you
11 reviewed in preparation of this
12 declaration?
13    A.   That's a very difficult
14 question to answer, because in research
15 you go through a host of cases -- well,
16 you go through a host of cases and you
17 don't refer to all of them in the report.
18 You refer to those that are material and
19 will assist you, you meaning the client
20 or the Court. So there may be other
21 cases that I refer -- that I refer to and
22 didn't include here.
23    Q.   Are there any cases that you
24 relied on to form your opinions in this
25 declaration that are not identified in

22 (Pages 82 - 85)

Page 86

1  the declaration?
2      A.  No, I am not aware of any such
3  case.
4      Q.  And all of the material cases
5  that you reviewed you identified in this
6  declaration, right?
7      A.  Yes.
8      Q.  Going back to paragraph 10, you
9  didn't review -- strike that.
10         If you can turn back to Exhibit
11  1, apologies, this is your original
12  declaration submitted on October 21st.
13      A.  Yes.
14      Q.  And if you go to paragraph 10
15  in that document, the very last item
16  listed is the declaration of Mr. Levy,
17  right?
18      A.  Yes.
19      Q.  Didn't you testify earlier that
20  you hadn't reviewed Mr. Levy's
21  declaration at all?
22      A.  I said I didn't review it in
23  detail.
24      Q.  I'm sorry, please let me just
25  finish my question.

Page 87

1         Didn't you testify earlier that
2  you hadn't reviewed Mr. Levy's
3  declaration in preparation for your
4  report because it was filed on the same
5  day?
6         MR. HARRIS:  Objection.
7  Misstates the record.
8      A.  I did say that, yes.
9      Q.  So can you clarify for me what
10  you mean in paragraph 10 (f) of your
11  original declaration that you reviewed
12  copies of Mr. Levy's declaration, given
13  that answer?
14      A.  It would have been sent to me
15  before it was filed.
16      Q.  So you did review at least
17  portions of Mr. Levy's declaration prior
18  to it being filed?
19      A.  Yeah, but basically one
20  portion.
21      Q.  And that was just the portion
22  that we talked about earlier?
23      A.  Yes.
24      Q.  Okay.  Did you review any of
25  the other declarations submitted on

Page 88

1  behalf of the joint liquidators in
2  preparation of this original declaration?
3      A.  No.
4      Q.  Did you review any of the
5  declarations submitted on behalf of the
6  joint liquidators in preparation of the
7  supplemental declaration filed 10 days
8  later?
9      A.  No.
10      Q.  Did you review any of the other
11  declarations submitted on behalf of the
12  joint liquidators since the supplemental
13  declaration was submitted?
14      A.  Yes.
15      Q.  Which ones?
16      A.  I reviewed a fair amount of
17  Dame Elizabeth's declaration.  Very
18  briefly did I -- I referred, in a sort of
19  scanning way, to Lord Neuberger's
20  declaration.  I didn't read it.  And I
21  also looked at the person who replied to
22  Robert Levy, Atherton.  I think it's
23  A-T-H-E-R-T-O-N.  In particular, how he
24  dealt with the laws of the BVI relating
25  to perfection of securities.  I looked at

Page 89

1  that.
2      Q.  So you reviewed a fair amount
3  of Dame Elizabeth's declaration and then
4  you referenced Lord Neuberger's and
5  Mr. Atherton's, right?
6      A.  Yes.
7      Q.  Lord Neuberger's declaration
8  was submitted on behalf of the FTX
9  Recovery Trust, right?
10      A.  Yes.
11      Q.  And Mr. Atherton's was also,
12  right?
13      A.  Yes.
14      Q.  Did you review any other
15  declarations submitted on behalf of the
16  joint liquidators?
17      A.  No.
18      Q.  Other than Dame --
19      A.  No.
20      Q.  -- Gloster's?
21      A.  No.
22      Q.  Why did you review Dame
23  Gloster's declaration?
24      A.  Because I was interested in how
25  she came to the conclusion that the

23 (Pages 86 - 89)

Page 90

1 assets in this case were subject to a
2 trust.
3      And I was interested, A, from a
4 professional point of view, because I
5 find it's a very interesting area, and B,
6 to see how it was dealt with in this
7 case.  So I reviewed it mainly for that
8 reason.
9      Q.   So was there any relevance
10 to -- I'm sorry, I referred to her as
11 Dame Gloster but I think you're referring
12 to her as Dame Elizabeth, which I think
13 probably is more correct.
14      A.   I think that's the way she
15 would prefer it.
16      MR. HARRIS:  I will confirm that
17 is correct.
18      Q.   Dame Elizabeth's declaration
19 report, you didn't review it to inform
20 your analysis?
21      A.   No.
22      Q.   And did you review Lord
23 Neuberger's report to inform your
24 analysis?
25      A.   No, I didn't.  I spent very

Page 91

1 little time on his report, with all due
2 respect to him.
3      Q.   And you said you reviewed
4 Mr. Atherton's with respect to BVI
5 security interest, but you're not
6 providing any opinion on BVI law?
7      A.   Right.
8      Q.   Relating to the security
9 interest, right?
10      A.   Right.
11      Q.   Okay.  Is there a reason you
12 didn't review any of the other
13 declarations?
14      A.   Yes, there is a reason.  I
15 didn't think I needed to.  And let's face
16 it, this took up a lot of time.
17      Q.   How much time, how much time
18 did it take?
19      A.   It took me -- in fact I have an
20 exact amount -- I spent 102 hours to get
21 to this point.
22      Q.   When you reviewed Mr. Levy's
23 draft declaration prior to submitting
24 your initial report, did you provide any
25 comments on it?

Page 92

1      A.   I commented that I agreed with
2 what he said about, some thing I
3 mentioned earlier, how an Antiguan Court
4 would deal with English law and the fact
5 that you do not need an expert witness to
6 give evidence of English law in an
7 Antiguan Court.  So to that extent I
8 agreed with him.
9      Q.   You didn't provide any comments
10 on the rest of his report?
11      A.   No, I didn't.
12      Q.   The BVI law issues?
13      A.   No.
14      Q.   Did you read any of the rest of
15 his report on the BVI law issues?
16      A.   I think I may have looked at
17 the early part of it, which told me what
18 the issues are, and then I looked at it
19 and I saw all of these pages dealing with
20 the details of the BVI claims, no, I
21 didn't read those.
22      But I think I may have sort of
23 done a quick read of the section of his
24 report which I thought gave me the flavor
25 of the report.

Page 93

1      Q.   Did you see anything you
2 disagreed with in Mr. Levy's report?
3      A.   No, I didn't.  And based on the
4 level of reading that I did, I was not --
5 I am not in a position to disagree with
6 him.  That's a matter for Mr. Levy.
7      Q.   Who selected the documents
8 listed in paragraph 10 of your report for
9 you to review?
10      A.   Latham & Watkins.  The lawyers
11 instructing me.
12      Q.   And in preparation for the
13 report, you didn't undertake any factual
14 investigation beyond reviewing these
15 documents?
16      A.   No, I didn't.  But I did ask
17 for more facts.
18      Q.   You asked for more facts to
19 prepare this declaration?
20      A.   No, to prepare for the
21 deposition.
22      Q.   So that's the stuff we talked
23 about earlier?
24      A.   Yes, yes, yes.
25      Q.   You didn't ask for anymore

24 (Pages 90 - 93)

1  facts or records or anything similar
2  prior to submitting your declaration
3  beyond what was sent to you?  I'm sorry,
4  let me rephrase that.
5          You didn't ask for anymore
6  facts or records or anything similar
7  prior to submitting your declaration
8  beyond what is listed in paragraph 10 of
9  your report?
10   A.   Yeah, that's correct, yeah.
11   Q.   Are there any documents,
12  sitting here today, that you wish you had
13  been provided with?
14   A.   No, no.
15   Q.   And -- strike that.
16          If you turn to paragraph 16 of
17  your declaration.  This section is titled
18  "Background and Factual Background,"
19  right?
20   A.   Yes.
21   Q.   If you flip through the pages
22  from paragraph 16 to paragraph 32, this
23  sets out the factual background that you
24  assumed for purposes of your report,
25  right?

1   A.   Yes.
2   Q.   Are there any assumptions that
3  you made for purposes of your report that
4  are not included in paragraphs 16 through
5  32?
6   A.   No, I am not aware of any
7  assumption that I did not include.  Let
8  me just check one thing here.
9          (Witness reviews document.)
10   A.   I am checking to see if there
11  is anything here about the sweeping of
12  the assets into the FTX hot wallet,
13  because if that is not here certainly I
14  did proceed on the assumption that the
15  assets had been transferred from the
16  individual customer wallet addresses to
17  the FTX, what I call hot wallet.
18   Q.   So how did you assume that if
19  it wasn't given to you prior to your
20  submission of your declaration as an
21  assumption?
22   A.   Because it would have been told
23  to me.
24   Q.   Didn't you testify earlier that
25  you only learned about the sweeping and

1  the hot wallet arrangement and
2  infrastructure because you asked about it
3  after, I forget whether it was in
4  preparation for the deposition or after
5  the submission of all of the
6  declarations?
7   A.   What I recall saying is that I
8  was curious about how this was done.  The
9  mechanism; not the fact of the sweeping,
10  but how it was done.
11          And that is what I think I --
12  that is what I hope I testified about,
13  because I wanted to know did you have to
14  press a button, did you have to write to
15  the FTX and say I would like to withdraw
16  10 assets.  I was curious.
17   Q.   So what did you assume for
18  purposes of your declaration with respect
19  to these issues that you're talking
20  about?
21          MR. HARRIS:  Object to the form.
22   A.   These issues that I am talking
23  about?
24   Q.   Let me ask a better question.
25          You just testified that you

1  were looking to see whether there was
2  anything about assumptions made for your
3  declaration about the sweeping of the
4  assets into the FTX hot wallet, "because
5  if that is not here, certainly I did
6  proceed on the assumption that the assets
7  had been transferred from the individual
8  customer wallet addresses to the FTX,
9  what I call hot wallet," right?
10   A.   Yes.
11   Q.   So setting aside what is in the
12  report, what did you assume beyond that
13  the assets had been transferred from the
14  individual customer wallet addresses to
15  the FTX hot wallet with respect to
16  questions of sweeping of assets and FTX
17  Exchange wallet architecture?
18   A.   What did I assume in relation
19  to that sweeping exercise?
20   Q.   Yes.
21   A.   I assume it was done.  And the
22  reason why I made further inquiries later
23  on is because I wanted to know -- I
24  wanted to know how it was done, the
25  mechanism.

25 (Pages 94 - 97)

1    Q.   Did you assume anything with
2  respect to the architecture of wallets on
3  the FTX Exchange?
4         MR. HARRIS:  Object to the form.
5    A.   I assumed that FTX, as the
6  person in control of the exchange or who
7  managed the exchange, had the power to
8  transfer the assets across and they did.
9  So if that is an assumption, I made it.
10   Q.   So I am trying to understand a
11 little bit more granularly what you
12 assumed with respect to this topic,
13 because it's, from I can tell, it's not
14 listed in this factual background.
15   A.   Okay.
16   Q.   And so I want to understand the
17 assumptions that you made with respect to
18 this topic.
19   A.   Okay.
20   Q.   And so I understand that you
21 assumed that the assets deposited by a
22 customer onto the FTX Exchange had been
23 transferred from the individual customer
24 wallet addresses to the FTX hot wallets,
25 right?

1    A.   Yes.
2    Q.   Did you make any other
3  assumptions with respect to the way in
4  which a customer might deposit an asset
5  onto the FTX Exchange?
6    A.   No, I assume it was done.  I
7  did not make any assumptions as to how it
8  was done.
9    Q.   Did you make any assumptions
10 about where a customer's deposit of
11 digital assets would go upon deposit onto
12 the FTX Exchange?
13   A.   Clause 3 of the Margin
14 Agreement says it would go into -- it
15 would go in the account, the 3AC account
16 of the customer, the individual -- well,
17 individual is my word -- the agreement
18 said when you deposit your money goes
19 into the individual customer account.  So
20 I didn't need to make an assumptions.
21   Q.   So you assumed that your
22 reading of that term in the document was
23 in, in fact, what happened?
24         MR. HARRIS:  Object to the form.
25   A.   I don't agree with your

1  characterization that I assumed based on
2  what is in the agreement as to what
3  happened.  I just think that is what the
4  agreement says and that is what happened.
5    Q.   Okay.  Did you make any
6  assumptions about what happened to
7  digital assets after it was transferred
8  to the FTX hot wallet?
9    A.   I didn't make an assumptions.
10 I was aware -- I am not sure exactly how
11 I became aware.  I assume it was during
12 the course of these meetings that I had
13 with the lawyers that they were swept
14 over into the FTX hot wallet.
15   Q.   I am asking, for purposes of
16 preparing your report, did you make any
17 assumptions about what happened to
18 digital assets after they were swept into
19 the FTX hot wallets?
20   A.   After they were swept into the
21 hot wallet?
22   Q.   Yes.
23   A.   I did not need to make
24 assumptions.  I had evidence before me
25 that when FTX came to the conclusion that

1  Three Arrows had defaulted, they
2  liquidated the assets that were in the
3  hot wallet or they liquidated assets that
4  were in the hot wallet.
5    Q.   So let's take a step back
6  before we start talking about individual
7  transactions that are involved in this
8  dispute.
9         As a general matter, you made
10 an assumption that when Three Arrows
11 deposited a digital asset onto the FTX
12 Exchange, that it went into an individual
13 customer wallet, right?
14   A.   Yup.
15   Q.   And then you made an assumption
16 that at some point after that those
17 assets were swept into an FTX hot wallet,
18 right?
19   A.   Yes.
20   Q.   As a general matter, did you
21 make any other assumptions about the
22 movement of digital assets after being
23 swept into the FTX hot wallet?
24   A.   And this is before I did my
25 opinion.

26 (Pages 98 - 101)

Page 102

1   Q.   This is -- these are
2  assumptions I am asking about for
3  purposes of your opinion.
4       MR. HARRIS:  I'm sorry, can you
5  just be clear, you mean for purposes
6  of the declaration?
7       MR. BELLER:  Yes, for purposes
8  of the declaration.
9   A.   What you have described is in a
10  general way what I assumed.
11       You've asked me did I make
12  other assumptions?  I would say no, but
13  the assumption that I made is a little
14  more granular than you have put it.
15   Q.   So what is the assumption --
16  how would you put it more granularly than
17  I put it?
18   A.   For example, I heard it didn't
19  take a long time, in fact the assets were
20  very quickly transferred over to the 3AC
21  hot wallet.  Didn't stay in the account
22  for a long time, in the individual
23  accounts for a long time.
24       And there may be other aspects
25  of the assumption, but I think you've

Page 103

1  summed up the general nature of the
2  assumption that I made.
3   Q.   And again, I am just trying to
4  understand the assumptions that you made
5  for purposes of your declaration because
6  they haven't been disclosed.
7   A.   Yeah.
8   Q.   Right?
9   A.   Yeah.
10   Q.   So I am not -- this is not
11  intended to put words in your mouth.  I
12  am just trying to understand the
13  assumptions being made so that we can
14  understand the basis for your opinion --
15   A.   Right.
16   Q.   -- relating to any of the
17  matters that you're opining on in your
18  declaration that rely on or are impacted
19  by assumptions you made about what I call
20  FTX Exchange and wallet architecture and
21  movement of digital assets.  Is that
22  fair?
23   A.   I suppose it is what you have
24  said and I do not disagree with what you
25  have said.

Page 104

1   Q.   Okay.  And so if there are
2  other details of the assumptions that you
3  have made with respect to these matters
4  that we are talking about, please correct
5  me or give the full sense of the
6  assumptions that you have made.
7   A.   Before producing the report or
8  for the purpose of producing the report?
9   Q.   Yes.
10   A.   No, I don't have anything to
11  add.
12   Q.   Okay.  Did you make assumptions
13  about the facts and circumstances
14  relating to the digital assets status in
15  the FTX hot wallets?
16       MR. HARRIS:  Object to the form.
17   A.   Did I make assumptions
18  regarding the status of the digital
19  assets in the hot wallet?  I am not sure
20  how to deal with assumption.
21       When the assets are transferred
22  over into the hot wallet, in my opinion,
23  they have moved from the private wallet,
24  I mean, I think I am repeating myself
25  here, into the hot wallet.  And then it

Page 105

1  becomes mixed up in a pool with thousands
2  of other assets, assets of thousands of
3  other customers, so it becomes a mixed
4  asset.  So I wouldn't call it assumption.
5  It is just what happened.
6   Q.   And did you make any
7  assumptions about access to the digital
8  assets contained in the hot wallets?
9   A.   I didn't have to make an
10  assumption.  It is set out in Clause
11  8.2.6 of the Terms of Service.
12   Q.   So you assume what is set out
13  in Clause 8.2.6 of the Terms of Service
14  is factually what happened?
15       MR. HARRIS:  Object to the form.
16   A.   If I see a document in front of
17  me between two sophisticated parties
18  saying one party can do X and Y and Z, I
19  don't need to make an assumption.  It is
20  there and they did it.
21       I think my concern is your use
22  of the word "assumption."  I would prefer
23  to say inference or conclusion.  But,
24  yes, I did think that the assets were
25  dealt with by the customers according to

27 (Pages 102 - 105)

Page 106

1  8.2.6.
2      Q.   But you didn't do any
3  independent analysis or investigation
4  about whether, in fact, what the
5  parties -- what you understood and
6  interpret the parties to have said in
7  this document in fact happened?
8      A.   If I did an independent
9  investigation of that?
10     Q.   Yeah.
11     A.   No.  No.
12     Q.   And you agree that parties
13 breach contracts all the time, right?
14     A.   Yes, I do.
15     Q.   Okay.  So for purposes of your
16 analysis, you assumed that your
17 interpretation of Section 8.2.6 of the
18 Terms of Service is, in fact, what
19 happened on the FTX Exchange, right?
20         MR. HARRIS:  Object to the form.
21     A.   I am saying that 8.2.6 says
22 what the parties were entitled to do and
23 I have no reason to believe that they
24 acted contrary to that.  So I didn't do
25 an independent investigation, no.  But

Page 107

1  that's what I did.  That's what I assume
2  they did, which is what you're saying.
3      Q.   Thank you.  And you also
4  assumed -- you also made certain
5  assumptions with respect to 3AC's ability
6  to withdraw assets from the FTX Exchange,
7  correct?
8      A.   I looked at the document and I
9  saw that 3AC had the power as a customer,
10 because these terms of reference apply to
11 all the customers, that they had the
12 power to trade, sell, buy, withdraw
13 assets.  That's what the document says.
14 I don't think I needed to make an
15 assumption.  That's what the document
16 says.
17         I also looked at the objection
18 filed by FTX where they state quite
19 clearly that FTX, 3AC withdrew assets
20 from the exchange.  It's not really an
21 assumption.  It's what the contract says
22 and what I saw happening based on the
23 documents.
24     Q.   Well, there is a distinction
25 between whether 3AC withdrew some digital

Page 108

1  assets in connection with its capacity as
2  a customer on the FTX Exchange and its
3  practical process for doing so, right?
4      A.   What was the question?
5          MR. HARRIS:  Object to the form.
6      Q.   There is a distinction between
7  whether 3AC withdrew some digital assets
8  from the FTX Exchange and the actual
9  process by which it did so, right?
10     A.   I don't understand your
11 question.  There is a process set out in
12 the agreement and there is evidence, not
13 just of the process, but the fact that it
14 was actually done.  So I am not
15 understanding the distinction you're
16 asking me to examine.
17     Q.   Okay.  We'll come back to this.
18         You said that since filing your
19 declaration you've reviewed the joint
20 liquidators' response to the recovery
21 trust claim objection?
22     A.   Yes, I did.
23     Q.   And did you identify anything
24 in the joint liquidators' response that's
25 inconsistent with your opinions in the

Page 109

1  declaration?
2          MR. HARRIS:  Object to the form
3  of the question.
4      A.   It's a very long document.  A
5  lot of what is in it does not relate to
6  what I am doing.
7          I am dealing with one discrete
8  part of this dispute, which is the
9  security provided by the two, I call it
10 the two documents.  And what is your
11 question?
12     Q.   Did you identify anything in
13 the joint liquidators' response that's
14 inconsistent with the opinions in the
15 declaration?
16         MR. HARRIS:  Object to the form.
17     A.   I would need to review the
18 report again, because, you know, it's not
19 a document that I read and studied.  I
20 just did a quick read to see what
21 applies, what could apply to my situation
22 and what couldn't.  And, yeah.
23     Q.   Did you identify anything in
24 the joint liquidators' response that's
25 inconsistent with any of the assumptions

28 (Pages 106 - 109)

Page 110

1 that you made in connection with the
2 preparation of your declaration?
3    A.   No.
4    Q.   So let's try it this way.  In
5 paragraph 19 (a), you say "Like other
6 customers on the FTX Exchange, 3AC could
7 deposit, withdraw, buy, sell and transfer
8 digital assets and fiat currency through
9 its accounts," right?
10   A.   Yes.
11   Q.   And what is the basis for that
12 statement?
13   A.   The documents that I read that
14 were filed in the proceedings, the
15 amended claim and the objection and the
16 Terms of Service.
17   Q.   And in 19 (b) you refer to a
18 line of credit or LOC; is that right?
19   A.   Yes.
20   Q.   What is the basis for your
21 statements in 19 (b)?
22   A.   Based on what I read in the
23 documents, other documents about the LOC.
24   Q.   The same documents that you
25 spoke about that formed --

Page 111

1    A.   I think so, yes.
2    Q.   Sorry, just let me finish.
3         -- that formed the basis for 19
4 (a), right?
5    A.   Yes.  Well, the documents
6 listed in that paragraph of my opinion at
7 paragraph 10.
8    Q.   And so you didn't do any
9 investigation or analysis to understand
10 how the LOC functioned beyond the
11 documents that you identified as forming
12 the basis for 19 (b), right?
13   A.   That's correct, yes.  I mean it
14 may have been discussed in meetings,
15 details, but I thought it was fairly well
16 set out in the documents themselves.
17   Q.   Is there anything in paragraphs
18 16 through 32, the basis for which is
19 anything other than the documents listed
20 in paragraph 10 and assumptions provided
21 to you by counsel?
22   A.   No, that would be it.  In terms
23 of what was provided by counsel would be
24 largely in meetings.  If I was told
25 something, they are my clients, they are

Page 112

1 instructing me, they are asking me to
2 make assumptions.  If they ask me to make
3 an assumption, I make it.  It's not as if
4 I say make this assumption.  It's just
5 what came out of the discussion.
6    Q.   What do you mean by "What came
7 out of the discussion"?
8    A.   For example, let me see if I
9 can think of an example, if we are
10 talking about control of the digital
11 assets and the discussion is that the
12 customer had the right to withdraw assets
13 without the approval of FTX, I take that
14 as an assumption, what you call an
15 assumption I take it as my instructions
16 and I work with it.
17   Q.   Right.  What I am trying to
18 understand is the scope of those
19 instructions or assumptions.  I don't
20 feel strongly about the word.  But I want
21 to understand what you were told by
22 counsel that you just accepted to be true
23 versus things that you have independently
24 formed a view on and how that affects
25 this list of factual background and the

Page 113

1 opinions on which it relies.
2         So what you just said is very
3 helpful in helping me understand that you
4 took as an assumption that the customer
5 had the right to withdraw assets without
6 the approval of FTX.
7         MR. HARRIS:  Objection.
8    Misstates the record.
9         MR. BELLER:  It does not
10   misstate the record.  I am reading
11   from the record.
12   A.   I did not say it was an
13 assumption.  I said it is what is in the
14 document.
15   Q.   Let me read back what you just
16 said.  "For example, let me see if I can
17 think of an example.  If we are thinking
18 about control of the digital assets and
19 if the discussion is that the customer
20 had the right to withdraw assets without
21 the approval of FTX, I take that as an
22 assumption, what you call an assumption,
23 I take it as my instructions and I work
24 with it"?
25   A.   Right.  It's my instructions.

29 (Pages 110 - 113)

Page 114

1    Q.   Right.
2    A.   You call it an assumption. I
3  say it's my instructions.
4    Q.   Terrific. So let's use your
5  words so we can cut through this a little
6  bit efficiently.
7    A.   Yeah.
8    Q.   What were the instructions that
9  you were given by counsel in connection
10  with this declaration?
11       MR. HARRIS: Object to the form.
12    A.   If that information is not
13  privileged then I will attempt to answer.
14       MR. HARRIS: I will tell you
15    it's not privileged. You can tell
16    whatever instructions you were given.
17    But I think you need to clarify if
18    you're talking about a factual
19    instruction or you're relying on the
20    documents and agreements. You just
21    need to be clear to Mr. Beller what
22    instructions you were given versus
23    what you are giving your own opinion
24    on.
25       THE WITNESS: Yeah.

Page 115

1       MR. HARRIS: That's what he
2    needs to know.
3    A.   There are documents that I
4  looked at which outline a factual
5  situation. They were elaborated upon in
6  meetings. Did I do a private
7  investigation of those facts? I would
8  say no.
9       I do think -- I am not sure if
10  this qualifies as a private
11  investigation -- but I did do some Google
12  searches on the FTX Exchange, whatever.
13  But I don't -- I didn't rely on that kind
14  of search.
15       The information that I relied
16  on is what was in the documents and what
17  was told to me by those instructing me.
18    Q.   So let's just drill down on the
19  one instruction I have actually been able
20  to understand specifically, which is that
21  3AC was able to withdraw assets without
22  permission or consent from FTX, right?
23    A.   Yes.
24    Q.   And you said that that was an
25  instruction that you were given by

Page 116

1  counsel, right?
2    A.   I said that that was clearly
3  stated in the document and also discussed
4  with counsel.
5    Q.   Where does it clearly state --
6    A.   Can we look at 8.2.6?
7    Q.   I am sure we will.
8    A.   But you're asking me, you're
9  asking me about where the instructions
10  came from and why I came to that --
11    Q.   We'll get there. Let's go
12  back.
13    A.   So my answer is I looked at
14  8.2.6 and to me it clearly gave the
15  customer the right to withdraw and trade,
16  whatever.
17    Q.   So are there any instructions
18  that you were given by counsel, factual
19  instructions, that are not, from your
20  perspective, already in documents that
21  you reviewed and relied on for
22  preparation of your declaration?
23    A.   I can't answer that question
24  because, as far as I was concerned, there
25  was a contractual right to withdraw,

Page 117

1  which was discussed. If facts were given
2  to underlie that factual situation in the
3  contract, maybe there were, I don't
4  remember.
5       What I was focusing on as a
6  lawyer is that I had a document in front
7  of me which clearly said the customer had
8  the right to withdraw, to trade, to
9  whatever. And I had other evidence which
10  supported what is said in 8.2.6.
11    Q.   More generally than this one
12  specific issue about withdrawal, what I
13  am asking is were there factual
14  instructions that you were given by
15  counsel that were not already in
16  documents that you reviewed and relied on
17  for preparation of your declaration?
18       MR. HARRIS: Objection. Asked
19    and answered.
20    A.   During the course of a meeting
21  I could have asked, here is 8.2.6, it
22  says the customers have the right to
23  withdraw assets. Did that actually
24  happen? And the answer may have been
25  yes. That answer is factual.

30 (Pages 114 - 117)

Page 118

1        So if you're asking me did I
2   rely on that, and I am not sure it
3   happened, but there was a general
4   discussion about the right to withdraw,
5   consent, issues like that.
6        So it may be that I was given
7   written instructions -- oral instructions
8   which are not apparent in the document,
9   but I don't think it was necessary to set
10  out all of that when I have clear
11  documents in front of me which achieve
12  the same purpose.
13     Q.   But you just testified that
14  you're not sure whether it happened or
15  not?
16     A.   I am not sure whether it
17  happened, that's correct.
18     Q.   Right.  So you assumed for
19  purposes of your declaration that
20  whatever you saw in the documents and
21  whatever you were interpreting them as,
22  when counsel said yes, that happened or
23  yes, assume that, you did, right?
24        MR. HARRIS:  Hold on, you have
25     to pause a minute.

Page 119

1        Object to the form of the
2     question.
3     A.   No, what I said and what I've
4   said repeatedly is that there was a
5   contract in front of me which gave the
6   right to withdraw, to trade, to do
7   whatever.  There were statements in the
8   FTX documents which said that Three
9   Arrows withdrew assets from what is in
10  effect the hot wallet.
11        I didn't come to a conclusion
12  based on anything, anything that was said
13  to me.  I interpreted the written
14  material in front of me.  It may have
15  been supplemented by what the lawyers
16  said to me.  I can't say no, it wasn't,
17  because we were in discussion.  But I am
18  telling you the primary source of my
19  conclusion is not really an assumption,
20  it is reading the documents and
21  interpreting them.
22     Q.   Did you investigate whether FTX
23  consented to the withdrawals of the $60
24  million of digital assets that you keep
25  referring to?

Page 120

1     A.   No, I did not.
2     Q.   So you have no idea whether it
3   was with FTX's consent, right?
4     A.   If FTX had objected they would
5   have said it in their objection.  They
6   said clearly that Three Arrows withdrew,
7   I think it is $60 million on the 13th or
8   14th of June 2022.  I didn't think I
9   needed to go into consent.
10        So the short answer to your
11  question is no, I did not investigate
12  whether they objected or consented.  They
13  didn't say so.
14     Q.   And you have no idea whether
15  FTX takes the position that FTX, in fact,
16  did have to consent or allow those
17  withdrawals to happen, right?
18     A.   You say I have no idea.  I very
19  much have an idea.  And my idea is that
20  if FTX needed to consent or objected they
21  would have said it already.
22        MR. HARRIS:  I don't want to
23     interrupt you, but we have been going
24     over an hour-and-a-half, so we do need
25     to break.  If you can finish this line

Page 121

1   of questions, and then we do have to
2   break.
3     Q.   And when you say they would
4   have said it already when FTX needed to
5   consent, what do you mean by that?
6     A.   Just what I said.  There is a
7   right set out in the document.  It
8   doesn't say you need consent.  It's a
9   clear right.  There is evidence that that
10  right has been exercised.
11        If FTX's position was that they
12  need consent before exercising that
13  right, FTX would have said it.  I can't
14  make it any clearer than that.
15     Q.   Would have said it where, when?
16     A.   Wherever.
17     Q.   So is it your position that --
18  is it your understanding that FTX does
19  not take the position that its consent or
20  approval was required to allow Three
21  Arrows Capital to make withdrawals off
22  the FTX Exchange?
23     A.   It is my opinion based on the
24  review of the documents and the facts
25  that FTX did not object, and in fact if

31 (Pages 118 - 121)

1 they did object, it would have been in
2 breach of the contract.  There is nothing
3 in the contract that gives them that
4 right.
5      Q.   And what did you do to form the
6 opinion that FTX did not in fact object?
7      A.   I looked at the documents.
8 Sorry?  Are you finished?
9      Q.   Yes.
10      A.   I looked at the documents.  I
11 saw the right to withdraw.  I looked at
12 FTX's documents.  I did not see a protest
13 saying they withdrew when they didn't
14 have the right to.  And that's how I came
15 to my conclusion.
16      MR. BELLER:  Okay.  We can take
17 a break now.
18      THE VIDEOGRAPHER:  Going off the
19 record at 12:04 p.m. EST.
20      (Lunch recess taken.)
21      THE VIDEOGRAPHER:  We are back
22 on the record at 12:42 p.m. EST.
23 BY MR. BELLER:
24      Q.   Good afternoon, Mr. Webster.  I
25 would like to go back to looking at your

1 declaration with you and we'll start with
2 paragraph 13 (a) which is in the summary
3 of conclusions section?
4      A.   Yes.
5      Q.   And in this paragraph you are
6 raising one of two independent reasons
7 why a security interest was not created
8 for the benefit of FTX, right?
9      MR. HARRIS:  Object to the form.
10      A.   Yes.
11      Q.   And this first reason relates
12 to a scenario where FTX owned the
13 relevant assets, right?
14      A.   "The LOC does not purport to
15 and did not provide a security," that
16 sentence?
17      Q.   No, I'm sorry, I think we are
18 looking at something different.
19      A.   Oh.
20      MR. HARRIS:  Can you repeat the
21 question?
22      MR. BELLER:  I will give him a
23 minute to look at the paragraph and
24 then I will.
25      (Witness reviews document.)

1      A.   Yes.
2      Q.   This is a section where you're
3 summarizing your conclusion, right?
4      A.   Yes.
5      Q.   And here you're summarizing
6 what you say is two independent reasons
7 why the Margin Agreement did not create a
8 security interest, right?
9      A.   Yes.
10      Q.   And the first reason you say
11 relates to the ownership of the assets,
12 right?
13      A.   Yes.
14      Q.   And you're saying that if FTX
15 owned the assets, then FTX could not use
16 them as security, right?
17      A.   Yes.
18      Q.   And by that, do you mean that
19 FTX could not have a security interest in
20 assets it owns?
21      A.   Yes, that's what I'm saying.
22      Q.   Is it your understanding that
23 FTX owned all rights, interests and
24 titles to the applicable assets?
25      MR. HARRIS:  Objection.  Outside

1 the scope.
2      A.   I looked at the statement from
3 FTX where they say that they own the
4 assets.  That's the source of what I say
5 here.
6      Q.   Okay.  So you're not putting
7 forward any opinion about whether FTX, in
8 fact, owned the assets entirely, right?
9      A.   No, I am not opining on that,
10 no.
11      Q.   Is it your understanding that
12 the joint liquidators have conceded that
13 FTX owned the assets in their entirety?
14      MR. HARRIS:  Object to the form.
15      A.   That the joint liquidators have
16 conceded that FTX owns the assets in
17 their entirety?  I would have to see that
18 concession.
19      Q.   I am just asking what your
20 understanding is, whether you understand
21 that to be a concession that the joint
22 liquidators have made, whether they have
23 agreed with FTX on that position that FTX
24 has taken?
25      A.   Owned the assets in their

Page 126

1 entirety?
2    Q.  Yeah.
3    A.  I am not aware of that.
4    Q.  Do you understand the contrary,
5 that the joint liquidators are disputing
6 that position taken by FTX?
7    A.  This is going into the whole
8 issue of ownership of the assets which I
9 am not opining on.
10      But as far as I know, the joint
11 liquidators have said that they have,
12 that FTX, I don't know, may have some
13 sort of interest in the assets.  I don't
14 know about ownership completely.  I am
15 just not dealing with ownership.
16    Q.  I understand that you're not
17 putting forward an opinion about
18 ownership and those are legal issues.  I
19 certainly understand that.
20      What I am trying to understand
21 is, you have put at issue as a reason why
22 under Antiguan law FTX does not hold a
23 valid security interest in the relevant
24 assets, that if FTX owns the assets.  And
25 what I am trying to understand is what

Page 127

1 your understanding is about the legal
2 positions taken by the parties in this
3 dispute with respect to that issue, okay?
4 So I will ask it again.
5      What do you understand the
6 joint liquidators' position to be with
7 respect to FTX's position that FTX owns
8 all rights, titles and interest in the
9 relevant assets?
10      MR. HARRIS:  Object to the form.
11    A.  I don't think they agree with
12 that position.
13    Q.  Okay.  So it's your
14 understanding that the joint liquidators
15 take the position that 3AC itself held
16 some interest in the digital assets,
17 right?
18      MR. HARRIS:  Object to the form.
19    A.  I think that that is their
20 position.  But I am not expressing an
21 opinion, yes.
22    Q.  Understood.  And this reason
23 why no security interest was created for
24 the benefit of FTX is premised on 3AC not
25 having any interest in the relevant

Page 128

1 assets, right?
2      MR. HARRIS:  Object to the form
3    of the question.
4    A.  It is premised on FTX saying we
5 own the assets.  That's the premise.
6 Yes, that's the premise.
7    Q.  And if a Court, for example,
8 would decide that FTX held certain
9 interests in the digital assets and 3AC
10 held other interests in the relevant
11 assets, then this reason would fall away,
12 right?
13      MR. HARRIS:  Object to the form.
14    A.  It may need to be considered
15 differently if a Court came to that
16 conclusion.  But I am giving an opinion
17 on what I saw in front of me, which is a
18 bold statement by FTX that we own the
19 assets.
20    Q.  Right.  So for purposes of this
21 paragraph, and the related paragraphs
22 later in your declaration, you didn't
23 consider the position taken by the joint
24 liquidators to the contrary, right?
25    A.  That is probably right, yeah.

Page 129

1    Q.  And you reviewed Mr. Hausman's
2 rebuttal declaration, right?
3    A.  Yes.  I reviewed Mr. Hausman's
4 declaration, yes.  Oh, yes, it was a
5 rebuttal declaration, yes.
6    Q.  And do you understand
7 Mr. Hausman to be putting forward an
8 opinion about ownership of assets.
9      MR. HARRIS:  Object to the form.
10    A.  He took an interesting
11 position.  He said that he was instructed
12 to assume that FTX does not own the
13 assets.
14    Q.  Right.  So he's not putting
15 forward an opinion as whether, in fact,
16 as a legal matter, FTX owns the assets,
17 right?
18    A.  As a legal matter, so he's
19 simply doing it on the basis of an
20 assumption.
21      I have been asked to assume
22 that FTX does not own.  Those are not his
23 exact words, but that's the tenor of his
24 statement.
25    Q.  Just like for purposes of this

33 (Pages 126 - 129)

Page 130

1 opinion, you've been -- you've assumed
2 that FTX does own the digital assets?
3       MR. HARRIS:  Object to the form
4  of the question.
5    A.   But I made a statement because
6 FTX said that they did not own the
7 assets.  It's not an assumption, it's
8 what they said.
9    Q.   And 3AC has said that they own
10 some interests in the assets, right?
11   A.   I think they did, yeah.
12   Q.   And you would agree that under
13 Antiguan law a party can grant a security
14 interest generally speaking in any
15 interest it holds in an asset?
16      MR. HARRIS:  Object to the form.
17   A.   That's a general statement that
18 may be generally true.
19   Q.   And so in which a security
20 interest could be granted could take the
21 form of beneficial ownership?
22      MR. HARRIS:  Object to the form.
23   A.   You're taking me into legal
24 issues.  Can you repeat the question?
25   Q.   Yeah, I am only asking about

Page 131

1 Antiguan-secured transaction security
2 interest law, given that that is what
3 you're being put forward as an expert in,
4 right?
5       So you would agree that,
6 generally speaking, a debtor can grant a
7 security interest in any type of interest
8 it has over an asset?
9       MR. HARRIS:  Object to the form
10 of the question.
11   A.   Yeah, I think my answer to that
12 was that generally speaking that is
13 generally true.
14   Q.   And so you would agree it is
15 not necessary for the debtor to be the
16 absolute owner of the asset given in
17 security, right?
18      MR. HARRIS:  Object to the form
19 of the question.
20   A.   If the debtor is absolute
21 owner, he can -- that's what I said
22 before -- he can give security.
23   Q.   And I am asking you if you
24 agree it is not necessary for the debtor
25 to be the absolute owner of an asset

Page 132

1 given in security?
2       MR. HARRIS:  Object to the form
3  of the question.
4    A.   It is not necessary for the
5 debtor to be the absolute owner of the
6 security in respect of a loan to whom?
7    Q.   Let's just do this a different
8 way.
9       (Webster Exhibit 4, Chapter 2 of
10    a book by Goode and Gullifer, was so
11    marked for identification, as of this
12    date.)
13   Q.   The court reporter has just put
14 in front of you a document marked as
15 Exhibit 4.
16   A.   Yes.
17   Q.   Do you recognize this document?
18   A.   Yes, I do.
19   Q.   What is this document?
20   A.   It's chapter 2 of a book by, a
21 work by Goode and Gullifer.  That's how I
22 have been referring to it, Goode and
23 Gullifer, the authors.
24   Q.   And this is something you cited
25 in your declaration, right?

Page 133

1    A.   Yes, I think I did, yes.
2    Q.   Why did you cite this book in
3 your declaration?
4    A.   Because I was dealing at the
5 time with perfecting the need to perfect
6 security.  And this work had explained
7 why you need to perfect a security to
8 make it enforceable.
9    Q.   So do you believe that this
10 document, this book -- well, strike that.
11      So did you rely on this book or
12 at least the chapter cited in forming the
13 basis of your opinion?
14   A.   I think I did, yes.  I think I
15 did, yes.
16   Q.   Remind you just to let me
17 finish my question.  Okay.  You can put
18 that aside for now.
19      Did you consider for purposes
20 of your declaration a scenario where FTX
21 owned certain interests in the digital
22 assets and Three Arrows Capital held
23 certain interest in the digital assets?
24      MR. HARRIS:  Object to the form.
25   A.   The way I did this declaration

34 (Pages 130 - 133)

Page 134

1 is I looked at the relationship. I
2 looked at issues like perfection and
3 elements necessary to create a charge.
4        Sorry to ask, what is your
5 question again?
6    Q.   No problem. Did you consider a
7 scenario where FTX held certain interests
8 in the relevant digital assets and 3AC
9 held certain other interests in the same
10 digital assets?
11       MR. HARRIS: Object to the form.
12    A.   For the purposes of the
13 opinion, the declaration?
14    Q.   Correct.
15    A.   I don't think I looked at it
16 that way, this sort of individual, this
17 sort of splitting of the ownership.
18       I just dealt with it as assets
19 which FTX is taking for security and what
20 was the result of how they did it.
21    Q.   And when you say what was the
22 result of how they did it, what do you
23 mean by that?
24    A.   For example, their first
25 position is that they owned assets, and I

Page 135

1 said, no, that can't be correct. Well,
2 if they own the asset they can't take it
3 as security over a loan where they are
4 the lenders. So I dismissed that.
5        And then I went on to say if it
6 could otherwise create, could be a valid
7 security. And I went into issues like
8 control, certainty, um, I think I even
9 went into registration -- no,
10 registration is less likely. It's a
11 different issue. So that's my answer.
12    Q.   Okay. Let's turn to paragraph
13 20 of your declaration, please. If you
14 look down to the last sentence of that
15 paragraph, you say, "In construing the
16 LOC and Margin Agreement, I have treated
17 both as separate but related agreements."
18 Sorry, that's the second-to-last
19 sentence. Apologies.
20    A.   Yeah.
21    Q.   And then you refer to the LOC
22 and Margin Agreement together as the
23 "Loan documents," right?
24       So focusing on that second-to-
25 last sentence, you treated the LOC and

Page 136

1 the Margin Agreement as separate but
2 related agreements, right?
3    A.   Yes.
4    Q.   Why did you do that?
5    A.   Because I looked at the
6 documents. They are separate agreements.
7        I mean we can go to the
8 documents if you want to. But they look
9 to me as different agreements dealing
10 with related subject matter, but one is a
11 Margin Agreement and the other is a
12 security agreement. To my way of
13 thinking, they are separate agreements.
14    Q.   Are you providing an opinion
15 about the legal nature of the
16 relationship between these two
17 purportedly separate agreements?
18       MR. HARRIS: Object to the form.
19    A.   I don't think I am providing an
20 opinion. I just say they look like --
21 and I realize Mr. Hausman has a different
22 opinion. He says that it's one
23 agreement. But in my opinion, they look
24 like two agreements. That's what I
25 think.

Page 137

1    Q.   Right. But you're not
2 providing an expert opinion --
3    A.   It's not an expert opinion.
4 It's just --
5        MR. HARRIS: Just remember to
6    pause. Pause a couple of seconds and
7    then let Mr. Beller ask his question.
8    A.   I do apologize.
9    Q.   I know my questions are layups,
10 but we still got to do it.
11       But you're not providing an
12 expert opinion under Antiguan law about
13 whether the LOC and Margin Agreement
14 should be treated as one agreement or two
15 agreements or otherwise, right?
16       MR. HARRIS: Object to the form.
17    A.   No, I am not.
18    Q.   Okay. Does it matter for any
19 of your opinions whether the LOC and
20 Margin Agreement are treated as separate
21 agreements?
22    A.   I don't think so. I don't
23 think that it matters.
24    Q.   So why did you say that you're
25 treating them as separate but related

35 (Pages 134 - 137)

Page 138

1 agreements in your paragraph 20 if it
2 doesn't matter?
3    A.   Because that's how they appear
4 to me.  They look like separate
5 agreements which have been put together
6 and treated as one.  Not by me.
7        Can I say this was close to
8 being a non-issue in my opinion.  You had
9 two agreements put together and I
10 understand whether DocuSign or whatever
11 procedure was used, but in my opinion
12 these were two agreements side by side.
13 And when you -- yes, that's my opinion.
14    Q.   Right.  But you just testified
15 that you're not providing an expert
16 opinion.  So you're giving -- when you
17 say your opinion, you mean your personal
18 non-expert opinion in reviewing these
19 documents, right?
20        MR. HARRIS:  Object to form.
21    A.   I'm a lawyer.  I read the
22 documents and they are two different
23 documents put together.  And I have said
24 I don't think it matters for the purposes
25 of what we are doing in these

Page 139

1 proceedings.
2        MR. HARRIS:  Mr. Beller, if you
3    are going to ask him about the
4    agreement or agreements, maybe you can
5    show it to him?
6        MR. BELLER:  I don't think it's
7    necessary for the line of questioning.
8    I mean we will get to the agreements,
9    the substance of it.  But this is
10   about assumptions he made and why he's
11   viewing them as two separate
12   agreements and whether he's providing
13   an opinion about them.
14       MR. HARRIS:  You may not get all
15   the information about it, then.
16       MR. HARRIS:  That's fine.
17       MR. HARRIS:  It's your choice if
18   you don't want him to be informed when
19   answering your questions.
20       MR. BELLER:  We will show him
21   the document when we need to show him
22   the document.  This line of
23   questioning is simply about the
24   statements he made in paragraph 20.
25   Q.   Do you have an understanding

Page 140

1 whether the joint liquidators have taken
2 a position of whether the LOC and Margin
3 Agreement are two separate agreements?
4    A.   I don't know.  I have not paid
5 any attention, apart from putting on what
6 I said and then reading what Mr. Hausman
7 said, that it is one agreement, because
8 it does not impact the issues that I am
9 dealing with in any significant way, I've
10 moved on.  So I never discussed this with
11 the joint liquidators.
12    Q.   Okay.  Now we can put the
13 document in front of you as Mr. Harris
14 has requested.
15       (Webster Exhibit 5, Document
16       Bates stamped FTX_3AC_000000758, was
17       so marked for identification, as of
18       this date.)
19    Q.   Mr. Webster, the court reporter
20 has put in front of you a document marked
21 as Exhibit 5.  Do you recognize this
22 document?
23    A.   Yes, I do.
24    Q.   And what is this document?
25    A.   It is the line of credit

Page 141

1 agreement and the margin and line and
2 credit agreement, what I have described
3 as the Margin Agreement, the latter part
4 of the document.
5    Q.   In your report, because you
6 assumed that the line of credit and the
7 Margin Agreement are two separate
8 documents, you've talked about whether,
9 first, the line of credit, the LOC
10 provides a security interest, right?
11    A.   Yes.
12    Q.   And you've said that it does
13 not?
14    A.   Yes, I've said that.
15    Q.   Okay.  And then you've said in
16 paragraph 49 that the Margin Agreement
17 purports to be a security document but
18 that nonetheless a valid security
19 interest, the Margin Agreement did not
20 create a valid security interest, right?
21    A.   Yes.
22    Q.   And if you look at paragraph 49
23 of your declaration, 49 (i) talks about
24 the ownership interest that we just
25 discussed and then it has a second

36 (Pages 138 - 141)

Page 142

1 reason, right?
2    A.   Yes.
3    Q.   And that's focusing on Clause 3
4 of the Margin Agreement, the Margin and
5 Line of Credit Agreement that you say
6 purports to grant a security over only
7 assets in all of the FTX accounts of the
8 customer, right?
9    A.   Yes.
10    Q.   And your opinion is that you
11 understand that there are no assets in
12 the individual 3AC wallet?
13    A.   That's what FTX said.  That is
14 my understanding because of what FTX
15 said.
16    Q.   And that therefore this
17 language is granting a security interest
18 in a null set, essentially?
19    A.   Effectively, yes.
20    Q.   And to get there you are
21 employing principles of contract
22 interpretation under Antiguan law, right?
23    A.   Yes.
24    Q.   To interpret the language in
25 Clause 3 and elsewhere in this document,

Page 143

1 right?
2    A.   Yes.
3    Q.   And in your report you refer to
4 all FTX accounts of the customer, right?
5    A.   Where is that?  In 49 (ii)?
6    Q.   That's in paragraph 53.  You
7 purport to quote from Clause 3 first you
8 say, "The language of Clause 3 purports
9 to grant a lien over 'All assets of the
10 FTX accounts of the customer' and as a
11 matter of contract interpretation 'The
12 FTX accounts of the customer' refers to
13 that customer's individual wallet
14 addresses," right?
15    A.   Yes.
16    Q.   And why do you feel that it's
17 reasonable to interpret that language to
18 refer to the customer's individual
19 wallet?
20    A.   Because the clause reads "All
21 assets in all of the FTX accounts of the
22 customer are collateral for the
23 indebtedness."
24        The customer's wallet -- the
25 FTX accounts of the customer refer, in my

Page 144

1 opinion, to the individual wallet of
2 each, wallet or wallets of each
3 individual customer.
4    Q.   And what is that opinion based
5 on?
6    A.   My interpretation of the
7 clause.
8    Q.   But that's a circularity.
9 You're saying your interpretation of the
10 clause relies on an opinion that you're
11 forming conflating the account and the
12 wallet which is based on your reading of
13 the clause?
14        MR. HARRIS:  Object to the form
15    of the question.
16    A.   No, what I am doing is applying
17 a simple rule of construction under
18 Antiguan law, which is that the starting
19 point in interpreting a document is to
20 see what the words say.  And the words
21 here say "All assets in all of the FTX
22 accounts of the customer," which to me
23 interpreted means the individual wallets
24 of each customer.
25    Q.   I understand that and I am

Page 145

1 asking why?  Why does it read to you that
2 a reference to the FTX accounts of the
3 customer means the wallets associated
4 with that account?
5    A.   Because I am looking at the
6 words, and my launch point in terms of
7 interpreting these words is the words
8 themselves.  And the words say "All
9 assets in all of the FTX accounts of the
10 customer."  The customer has only one,
11 one or one type of wallet in the FTX
12 account, which is the individual wallet
13 that the client, the customer gets when
14 he owns an account.
15        So that is my interpretation.
16 You may think it is circular, but that's
17 my interpretation of the clause.
18    Q.   So that interpretation is not
19 based on any Antiguan authority?
20    A.   It is based on several Eastern
21 Caribbean authorities which say that in
22 interpreting a contract you first look at
23 the words used and if the words are
24 clear, then that is what the words mean.
25 So it is based on authorities.

Page 146

1    Q.   Well, I think that's some
2  general authority about contract
3  interpretation.  I was asking whether
4  it's based on any specific authority that
5  says that the word "account" should mean
6  the word "wallet"?
7    A.   No, I haven't seen that, no.
8  I'm sorry, if that's your question, no, I
9  haven't seen that.
10    Q.   So your opinion is that the
11  word "account" here is clear, that it
12  means wallet?
13    A.   That's what it means, that's
14  what I think it means, yes.
15    Q.   And that it's clear?
16    A.   Yes.
17    Q.   And do you have an
18  understanding of what a customer would
19  see when it logged into the FTX interface
20  with respect to its accounts?
21    A.   He would see the status of his
22  account or accounts.
23    Q.   And do you have an
24  understanding of whether that reflected
25  what was in the wallet, the individual

Page 147

1  wallet?
2    A.   Not necessarily.  It could
3  reflect that the assets have been swept
4  out of the individual wallet into the FTX
5  hot wallet and the account would then
6  reflect his or her share in, of the
7  assets in the pool.
8    Q.   So do you believe that a
9  customer reading this language would
10  reasonably believe that the security
11  interest was being granted in what was in
12  the individual wallet rather than in the
13  account that is reflected in the user
14  interface?
15    MR. HARRIS:  Object to the form.
16    A.   Well, that's what the agreement
17  says and yes, I do believe that.
18    Q.   And do you think it's
19  reasonable to believe that FTX would be
20  creating a limited security interest only
21  in what was in the wallet rather than
22  based on the customer's actual account
23  entitlement?
24    MR. HARRIS:  Object to the form.
25    A.   That's what the agreement says.

Page 148

1  We have several rules of interpretation.
2  I have already given you one.
3    Another one is that if the
4  words are clear, even if they would lead
5  to an unreasonable result, the Court is
6  not to rewrite the contract for the
7  parties.  If they made a bad contract,
8  they made a bad contract.  If they make
9  an ambiguous contract, that is a
10  different thing.  But if it is clear what
11  they meant, the Court is not to rewrite
12  the contract.
13    Q.   What would be the unreasonable
14  result?
15    MR. HARRIS:  Object to the form.
16    Q.   What would be the unreasonable
17  result if the contract were interpreted
18  to provide a security agreement in the
19  customer entitlements in its account?
20    MR. HARRIS:  Object to the form.
21    A.   The result -- not necessarily
22  unreasonable -- the result would be there
23  is nothing in the account when it comes
24  to enforcement.  No assets in the account
25  when it comes to enforcement.

Page 149

1    Q.   But there are assets associated
2  with the account, right?
3    MR. HARRIS:  Object to the form.
4    A.   That's not what the agreement
5  says.  It could have said that.  It could
6  have said instead of in all of the FTX
7  accounts, it could have said in all of
8  the accounts associated with -- all
9  assets associated with the FTX accounts.
10  It could have said that.
11    Q.   We will get to that.  I am not
12  asking about what the contract says right
13  now.  I was asking you about the
14  unreasonable result, if the contract were
15  interpreted to provide a security
16  interest in the assets associated with
17  the account, because you had said that
18  that was a rule of construction, right?
19    Your answer, the result, not
20  necessarily unreasonable, the result
21  would be there is nothing in the account
22  when it comes to enforcement.  No assets
23  in the account when it comes to
24  enforcement, right?
25    Do you remember that testimony

Page 150

1 from a moment ago?
2    A.   I remember saying that, yes.
3    Q.   So I am asking that there were
4 assets associated with the account,
5 right?
6        MR. HARRIS:  Object to the form
7 and asked and answered.
8    A.   Sorry, what's the question?
9    Q.   Your view is that it's possible
10 for the parties to have provided for a
11 security interest in the assets
12 associated with 3AC's accounts, right?
13        MR. HARRIS:  Object to the form.
14    A.   I think they could have.  It's
15 a matter of drafting what the parties
16 really intended.
17    Q.   They could have done that?
18    A.   They could have, yes.
19    Q.   And my question is:  Is there
20 an unreasonable result in interpreting
21 this contract to have done that?
22        MR. HARRIS:  Object to the form.
23    A.   I don't want to comment on
24 whether it's unreasonable or not.  I am
25 just looking at the contract and seeing

Page 151

1 what it means.  That's my function.
2    Q.   But you've testified that there
3 is a rule of construction under Antiguan
4 contract interpretation about avoiding
5 unreasonable results, right?
6        MR. HARRIS:  Object to the form.
7    A.   I said that if there are
8 unreasonable results, the Court is not
9 expected to rewrite the terms of the
10 contract.  So if you want to make a bad
11 contract, you make a bad contract.
12 Especially sophisticated businessmen.
13    Q.   How do you determine whether
14 language is clear in a contract?
15    A.   You read it to see -- I am
16 about to give a circular answer -- but
17 you read it to see whether it is
18 reasonable.
19    Q.   So do you believe that it is --
20 so you believe it's reasonable to
21 interpret the reference to FTX accounts
22 of the customer to be individual customer
23 wallets?
24    A.   I believe it is correct to read
25 it that way.

Page 152

1    Q.   Is that different than
2 reasonable?
3    A.   Yes, it is.
4    Q.   Okay.  I am asking about the
5 reasonableness, not the correctness.
6 Because you just testified, I asked you
7 about whether, how do you determine
8 whether something is clear?  And you gave
9 an answer that said whether it's
10 reasonable.  Okay?  So that's what I am
11 focused on, is your answers.
12        MR. HARRIS:  Is there a
13 question?
14        MR. BELLER:  It's coming.
15    Q.   And I asked you whether it's
16 reasonable to interpret this contract
17 language as you have done to mean for the
18 FTX accounts of the customer to mean the
19 individual customer wallets?
20    A.   I do not think it is
21 unreasonable.
22    Q.   Is that different than it being
23 reasonable?
24    A.   No, it's not different.  It's
25 the same thing in substance.

Page 153

1    Q.   Do you think it's reasonable to
2 interpret the reference to the FTX
3 accounts of the customer as -- strike
4 that.
5        Do you think it is reasonable
6 to interpret the language that refers to
7 "all assets in all of the FTX accounts of
8 the customer" as referring to all assets
9 associated with the FTX accounts, all of
10 the FTX accounts of the customer?
11    A.   I think it is correct.
12        MR. HARRIS:  I think there was a
13 transcription error.
14        THE REPORTER:  Can you repeat
15 that?
16        THE WITNESS:  I think it's
17 correct.
18        MR. BELLER:  It is what he said.
19 There is no transcription error.  Let
20 me repeat my question.
21    Q.   Do you think it is reasonable
22 to interpret the language in the Margin
23 Agreement to refer to all assets in all
24 of the FTX accounts of the customer as
25 referring to all assets associated with

Page 154

1 the FTX accounts of the customer?
2     A.   It is reasonable, yes.
3     Q.   Thank you.
4     A.   Because that is what the
5 parties intended.
6     Q.   Thank you.  You discuss
7 different types of security interests
8 under Antiguan law in your declaration,
9 right?
10     A.   Yes.
11     Q.   And that's sort of the first
12 step in an analysis of whether a security
13 interest has been created and then
14 perfected as deciding which type of
15 security interest or which types of
16 security interest it is, right?
17     A.   Yes.
18     Q.   Okay.  Could you walk me
19 through your understanding of the
20 different types of security interests
21 under Antiguan law?
22     A.   Sorry, you are at paragraph?
23     Q.   Let's tie it to the deck and
24 make it a little easier.
25         In paragraph 63 you walk

Page 155

1 through four different types of security
2 interest that can exist under Antiguan
3 law, right?
4     A.   Yes.
5     Q.   Can you generally explain to me
6 how the four different types work and why
7 they are different?
8     A.   A pledge, the first one that I
9 deal with, it's a bailment of personal
10 chattels to the creditor by way of
11 security.  So its consensual.  You give
12 your asset to the pledgee to secure an
13 obligation.  And that really is what a
14 pledge is.  The pledgee can, I think,
15 sell the asset if you default.
16         A lien, and I may need to
17 distinguish two types of liens here.  A
18 contractual lien is simply, I take my car
19 to the garage, the mechanic fixes it and
20 he gives me a bill and I don't pay it.
21 He has a right to hold onto my vehicle
22 until I pay.  He does not have the right
23 to sell my vehicle to recover what is due
24 to him.  There is an equitable lien,
25 which is not mentioned here, where you

Page 156

1 can give the lienee, the person holding
2 the lien the right to dispose of that, to
3 sell the asset in order to recover what
4 was due to him.  So you have a
5 contractual lien and then you have an
6 equitable lien.
7         Continue?
8     Q.   Please.
9     A.   You may have an equitable
10 charge, which is where property is
11 appropriated to discharge a debt, without
12 any conveyance of title to the lender.
13 So I can grant a charge over my property.
14 I don't need to deliver possession to
15 you.  But you have a charge over my
16 property, and you have different kinds of
17 charges.
18         And then there is a mortgage,
19 which I think both Mr. Hausman and I
20 agree that there is no issue of a
21 mortgage in this case, because with a
22 mortgage, the title of the owner of the
23 asset is conveyed to the mortgagee,
24 subject to the right of the mortgagor to
25 recover that asset when he, when he

Page 157

1 fulfills his obligations under the
2 mortgage.  I don't think there is any
3 issue in this matter that title was
4 conveyed to these assets to FTX.  So both
5 Mr. Hausman, and I agree that it's not a
6 mortgage.
7     Q.   Okay.  And what type of
8 security interest do you believe the --
9 sorry, apologies -- do you believe the
10 Margin Agreement purported to create?
11     A.   The right, it purported to
12 create the right to liquidate the assets
13 and satisfy the debt.
14     Q.   And which type of security
15 interest that we just went through does
16 that correlate to?
17     A.   Actually, it doesn't correlate
18 to any of them, because it's not as
19 simple as that.  If, for example, you are
20 doing a lien, you can create the contract
21 by delivering the vehicle to the lien
22 holder.  But in order for it to become a
23 security interest, you have to attach to
24 that lien the right for the lienholder to
25 sell the asset in order to pay the amount

40 (Pages 154 - 157)

Page 158

1 due to him. That is what gives him a
2 security interest in the asset.
3 Otherwise, it's just a contractual right.
4 I have the right to hold onto your
5 vehicle until you pay me, simple.
6    Q.   I asked you what type of
7 security interest do you believe the
8 Margin Agreement purports to create. And
9 you said it created the right, or
10 purported to create the right to
11 liquidate the asset and satisfy the debt?
12    A.   Yeah.
13    Q.   And then you said in order --
14 later you said in order for there to be
15 an security interest, you have to give,
16 attach to that meaning the right for the
17 lienholder to sell the asset in order to
18 pay the amount due?
19    A.   That is what makes it a
20 security interest.
21    Q.   So I am confused about your
22 statement that the right to liquidate the
23 asset and satisfy the debt that you said
24 the Margin Agreement creates, why it
25 doesn't correlate to any of the security

Page 159

1 interests that you have just gone
2 through?
3    A.   It may fit under a lien,
4 because of clause, I think it was Clause
5 4 of the Margin Agreement, which gives
6 the right to, the power of sale. It
7 could.
8    Q.   Where in your declaration does
9 it talk about your opinions with respect
10 to whether the purported security
11 interest granted under the Margin
12 Agreement correlates to any of the types
13 of security interest you go through?
14    A.   I think what my opinion says is
15 they do not create a security interest
16 because even if contractually a security
17 interest arose, it was not perfected.
18    Q.   Right. I understand the
19 perfection point. I am trying to
20 understand if there was something else in
21 your opinion before we get to the
22 perfection point, about what type of
23 security interest is being, is purporting
24 to be created by the Margin Agreement,
25 setting aside the issues that we already

Page 160

1 discussed?
2    A.   It purports to create either a
3 pledge or a lien.
4    Q.   Okay. And what is that based
5 on?
6    A.   What the document says.
7    Q.   What specifically?
8    A.   Clause 3.
9    Q.   Clause 3, okay. What
10 specifically in Clause 3?
11    A.   We've already dealt with the
12 first sentence, "All assets in the FTX
13 accounts."
14       The second sentence "The
15 customer hereby pledges and grants a
16 continuing lien on and a payment and
17 security interest in the security assets
18 as continuing security for the full and
19 punctual payment, performance and
20 discharge of the indebtedness, until the
21 satisfaction of all liabilities and
22 performance of all obligations of
23 customer to FTX under this agreement.
24 FTX shall have all the remedies of a
25 chargee under the laws of Antigua and the

Page 161

1 customer shall not grant any other person
2 a lien against the secured assets in or
3 in any right, title or interest in or to
4 the secured assets without the written
5 consent of FTX."
6    Q.   So that's the language that
7 you're viewing as creating a lien or a
8 pledge?
9    A.   It purports to do that, yes.
10    Q.   Okay. Under what, under what
11 circumstances would it create a pledge
12 versus a lien?
13    A.   If the assets are delivered to
14 the lienholder, the pledgee -- sorry,
15 your question is? I need to be clearer.
16       MR. HARRIS:  Can I just pause.
17    I think people on Zoom can't hear
18    anything. I don't think that is
19    connected to the Zoom.
20    Q.   I think I asked under what
21 circumstances would this language that
22 you just read from paragraph 3 of the
23 Margin Agreement create a pledge versus a
24 lien?
25    A.   If possession of the secured

41 (Pages 158 - 161)

Page 162

1 asset was delivered to the pledgee and
2 then it was perfected.
3    Q.   I am sorry, you will have to
4 explain that a little bit more to me.
5 When will it create a pledge -- let's do
6 that first?
7    A.   Okay.  A pledge happens when
8 you physically deliver your asset to the
9 pledgee as a way of giving security for
10 performing an obligation, be it the
11 payment of money or otherwise.  And the
12 pledgee does have the right to sell the
13 asset if you don't perform your
14 obligation.  That's the nature of a
15 pledge.
16    Q.   And when does this language
17 create a lien?
18    A.   On these facts, it doesn't,
19 because there was never delivery of
20 possession.  You cannot have a pledge
21 without delivery of possession.
22    Q.   Right.  I am asking now about a
23 lien.  So you are talking about a pledge
24 and a pledge happens --
25    A.   I thought you were asking about

Page 163

1 a pledge, I am sorry.
2    Q.   That's okay.  Let's just take
3 it in two different pieces, right.  And
4 again I am more trying to understand as a
5 general matter, before we get into the
6 specifics here, and the facts as you've
7 assumed them, your understanding and your
8 opinion about the difference between a
9 pledge and a lien and how this language
10 might apply to one or both or either.
11       You said a pledge happens when
12 you physically deliver your asset to the
13 pledgee as a way of giving security,
14 right?
15    A.   Yes.
16    Q.   Can you explain to me how a
17 lien happens under this language?
18       MR. HARRIS:  Object to the form.
19    A.   A lien -- the pledge is usually
20 by agreement.  You know, you voluntarily
21 give your asset to the pledgee as
22 security.
23       A lien on the other hand, quite
24 often, comes about by operation of law.
25 So when you give your car to the

Page 164

1 mechanic, you don't give him the right to
2 hold onto it.  But by operation of law,
3 the lien attaches to the car until
4 payment is made and then -- so he's
5 entitled to hold onto it, even though you
6 didn't make any such agreement.  Again,
7 possession, delivery of possession is
8 important.  In fact, essential.
9    Q.   So the delivery of possession
10 is essential for both the pledge and the
11 lien?
12    A.   Yes.
13    Q.   Okay.  So when we were reading
14 this paragraph 3 language, you said, in
15 broad strokes -- and I don't mean to
16 mischaracterize or put words in your
17 mouth -- that this language purports to
18 create either a pledge or a lien, right?
19    A.   Yes.
20    Q.   I am trying to understand your
21 opinions with respect to when or why this
22 language would give rise to a pledge, and
23 when or why this language would give rise
24 to a lien.
25    A.   First of all, that's what the

Page 165

1 parties say in their agreement.  That
2 you're creating a pledge or a lien.
3 Contractually, it's done.  That's the
4 contract.  But it is not perfected.  In
5 both case, both a pledge and a lien, they
6 are not perfected.  So they purport to
7 create a security interest in the form of
8 a pledge or a lien, but I am not saying
9 that they did.
10    Q.   I certainly understand that
11 your opinion is that they did not.  And I
12 certainly understand that there was a
13 second step of perfection that we are
14 going to talk about.  I promise we are
15 going to talk about it.  We are going to
16 get there.  But I need you to stick with
17 me on the questions I am asking --
18    A.   Yes.
19    Q.   -- so we can get to the
20 perfection and anything else that we are
21 going to talk about; okay?
22       And what I am asking is for you
23 to explain to me why your opinion is that
24 this language could give rise to either a
25 lien or a pledge.

42 (Pages 162 - 165)

Page 166

1    A.   I am trying to say something
2    which I haven't said before, but I feel
3    as if I am repeating myself.
4        The document says hereby
5    pledges and grants a continuing lien.
6    That's the language that you use to
7    create a lien or a pledge.
8    Q.   Got it.
9    A.   But the language, of course, is
10   not the end of the day.  You have to
11   deliver.  And then you have to perfect.
12   Q.   Okay.  So your opinion is that
13   because this sentence says "The customer
14   hereby pledges" right --
15   A.   Yes.
16   Q.   -- that can create a pledge?
17   Right?
18   A.   Provided other steps are taken,
19   yes.
20   Q.   Sure.  And then it says "And
21   grants a continuing lien"?
22   A.   Mmm-hmm.
23   Q.   And therefore that constitutes,
24   that could give rise to a lien, provided
25   everything else is satisfied, right?

Page 167

1    A.   Yes.
2    Q.   What is this language about
3    "And security interest" doing here?
4    A.   I have to back up a bit to
5    explain what I understand by this.
6    Q.   Please.
7    A.   We are talking here about a
8    lien.  A lien you have possession being
9    delivered.  Not delivered -- it's
10   delivered, but it's not a consensual
11   situation.  It's by operation of law.
12   Normally that gives rise to a contractual
13   lien.  It is simply your contractual
14   right as a lienholder to sell -- sorry,
15   to hold a security until the amount is
16   paid.  Parties have the power by contract
17   to uplift that arrangement and say to the
18   lienholder you also have the right to
19   sell this asset to get what is due to
20   you.  That is what I think they call an
21   equitable lien.
22       That lien is then part of the
23   security which is being given here.  So
24   it's a lien coupled with a right of sale.
25   And that to me makes it a lien coupled

Page 168

1    with a security interest.  Therefore, the
2    draftsman in drafting this contract,
3    assuming these intricacies, you said the
4    word "assume," I assume these intricacies
5    are known from the draftsman, he makes it
6    clear this is not just a contractual
7    lien, but a lien coupled with a security
8    interest.  He bolts on the words, "Where
9    am I, where am I, where am I," he didn't
10   just stop at lien.
11       He says, "Lien on and security
12   interest in," because this is a lien
13   coupled with a security interest.  And in
14   my opinion, that's the reason why the
15   draftsman added those words "and security
16   interest in."
17       MR. HARRIS:  If you're at a good
18   spot for a break?
19       MR. BELLER:  It's a fine spot,
20   so I can figure out what that means.
21   Okay, a 10-minute break or so?
22       MR. HARRIS:  Sure.
23       THE VIDEOGRAPHER:  We are off
24   the record at 1:46 p.m. EST there.
25       (Off the record.)

Page 169

1        THE VIDEOGRAPHER:  Back on the
2    record at 2:07 p.m., EST.
3    BY MR. BELLER:
4    Q.   Welcome back.  I want to pick
5    up where we left off, where we were
6    trying to talk about the differences
7    between a pledge and a lien.  And we had
8    talked about that language in paragraph 3
9    of the Margin Agreement referring to a
10   security interest.  You were giving an
11   explanation of what that's intended to
12   do, and my question is what is a lien
13   without the right to sale?
14   A.   A contract lien.
15   Q.   And what is that?
16   A.   A right to hold onto the asset
17   in question until the obligation is
18   discharged.  I gave the example of the
19   mechanic and the car.
20   Q.   And in paragraph 63(ii) you
21   refer to a contract lien as a type of
22   security interest, right?
23   A.   It's a kind of security
24   interest -- it's really a contractual
25   right to hold onto the asset until you're

Page 170

1 paid.  A security interest to me is
2 different.  It's a higher level.
3    Q.    What is the basis for that
4 view?
5    A.    It's what I have read in the
6 cases and the authorities and my general
7 knowledge of liens and pledges.
8    Q.    What specifically informs your
9 view that a contract lien is not a
10 security interest?
11    A.    What informs my view is that it
12 is a contractual right which is not a
13 security.  I mean, I can't point to
14 anything specific because this is just a
15 general principle that I have operated on
16 for some time.  A contractual right is
17 not a security.
18    Q.    But in paragraph 63 you say
19 "These securities may be defined as
20 follows," and you list four types and one
21 of them is a contractual lien?
22    A.    Yes.
23    Q.    So I don't understand how you
24 square that with what you're saying right
25 now.

Page 171

1    A.    Well, the word "security" is
2 used in the first line.  But it's not --
3 when it is at the level of just a
4 contractual right, it is not security.
5    Q.    So you're wishing to modify
6 your declaration about this point?
7        MR. HARRIS:  Object to the form.
8    A.    I regard it as a contractual
9 right.  So strictly speaking it doesn't
10 fit within the use of the word
11 "contract," consensual in the first line.
12 So maybe the declaration needs to be
13 modified because it is a contractual
14 right.  Not a security.
15    Q.    Are the other things that you
16 mention in this paragraph security
17 interests?
18    A.    If they are perfected, then
19 they can rise to the level of being a
20 security interest.
21    Q.    But not a contractual lien,
22 that can't --
23    A.    Well, if the contractual lien
24 --
25    Q.    Hold on, let me finish the

Page 172

1 question.
2        If that's perfected on its own,
3 that's not a security interest, right?
4    A.    If it is perfected on its own,
5 then it becomes a security interest.
6    Q.    Do you list here the right of
7 sale as a type of security interest?
8    A.    The right of sale attached to a
9 right, one of these rights, is what can
10 take it to be, make it into a security
11 interest.
12    Q.    Is a right of sale required to
13 make each of these a security interest?
14    A.    Not necessarily.  For example,
15 a pledge.  If you give a pledge which
16 includes the right of sale and you
17 deliver the pledged article, and it is
18 then perfected because possession has
19 been granted, then that's a security
20 interest.
21    Q.    But what if it doesn't have a
22 right of sale?
23    A.    It's not a pledge.
24    Q.    And what about a contractual
25 lien that doesn't have a right of sale?

Page 173

1    A.    It's a contractual right.
2    Q.    And if it's perfected then it's
3 a security interest, right?
4    A.    If it's perfected it becomes a
5 security interest, yes, or it can become
6 a security interest.
7    Q.    Okay.  Do you understand these
8 types of security interests to have
9 different applications when the security
10 is possessory which is a non- possessory
11 security?
12    A.    Sorry, repeat the question.
13    Q.    Do you understand these type of
14 security interests to have different
15 applications when the security is a
16 possessory security versus a
17 non-possessory security?
18        MR. HARRIS:  Object to the form.
19    A.    It can have different
20 applications, yes.
21    Q.    Can you explain to me what your
22 understanding of that is?
23    A.    For example, a charge is a
24 non-possessory security, which is usually
25 accompanied by a power of sale.

44 (Pages 170 - 173)

Page 174

1    Q.   And do you have an
2  understanding of whether the concept of a
3  chose in action versus a chose in
4  possession has an impact on the type of
5  security interest?
6        MR. HARRIS:  Object to the form.
7    A.   It I suppose could have an
8  impact.  A chose in possession,
9  possession is necessary.  A chose in
10  action may not be necessary -- possession
11  may not be necessary.  But you would have
12  to be more specific, because it depends
13  on what kind of chose in action you're
14  talking about.
15    Q.   Do you have an understanding
16  whether a contractual lien security
17  interest can apply to a chose in action?
18    A.   I think it could, yes.
19    Q.   And do you have an
20  understanding of whether a contractual
21  lien security interest can apply to a
22  chose in possession?
23    A.   Yes, if it is perfected, yes.
24    Q.   And do you have an
25  understanding of whether a charge to a

Page 175

1  security interest can apply to a chose in
2  action?
3        MR. HARRIS:  Object to the form.
4    A.   It could be, but I don't know
5  how to give a definitive answer, because
6  questions like that have been very
7  technical.  And unless I have done the
8  work, I just don't want to just answer
9  straight off the hoof like this.
10    Q.   And do you have an
11  understanding of whether a charge to a
12  security interest can apply to a chose in
13  possession?
14        MR. HARRIS:  Object to the form.
15    A.   Basically it's the same answer.
16  I prefer not to deal with that off the
17  hoof like this.
18    Q.   Are you familiar with any legal
19  authority relating to whether a digital
20  action is a chose in action or a chose in
21  possession?
22    A.   If you mean by legal authority
23  a decided case, no.  But I am aware of,
24  for example, the Law Reform Commission
25  saying that it should or it could be

Page 176

1  treated as a security interest.
2    Q.   So do you understand that there
3  is some uncertainty about whether under
4  settled law, whether a digital asset can
5  be subjected to certain kinds of security
6  interest?
7    A.   My understanding is that there
8  is no case which has decided that.  So
9  the law -- if the law -- the law may be
10  settled to say, no, you cannot have a
11  digital asset as security, based on the
12  decided cases.
13    Q.   I am sorry, are you saying that
14  your view is that the law is settled on
15  that question?
16    A.   The law is settled, yes,
17  because there are no decided cases that
18  say that -- as far as I am aware, no
19  decided cases that say that a digital
20  asset can be security.
21    Q.   So the law is settled which
22  way?
23    A.   It cannot be.
24    Q.   Can?
25    A.   It cannot be.

Page 177

1    Q.   Cannot be?
2    A.   Yes, at this stage.
3    Q.   Are you taking the view in your
4  opinion that digital assets cannot be
5  subjected to --
6    A.   I didn't say that in my
7  opinion.  I said the law could develop in
8  the direction of, because that's what the
9  Law Reform Commission says, that it is
10  not security now, but you can have -- the
11  law should move in the direction of
12  allowing digital assets to be used as
13  security.  And I understand Mr. Hausman
14  to agree with that.
15    Q.   I am asking you not so much
16  about what your understanding of what
17  people have said the law should be.
18    A.   Yeah.
19    Q.   I am asking you what your
20  understanding -- what your opinion is
21  about whether, as a matter of Antigua
22  law, you're taking a position that a
23  digital asset can't be perfected -- can't
24  be subject to a perfected security
25  interest?

45 (Pages 174 - 177)

Page 178

1        MR. HARRIS:  Object to the form.
2    A.   I thought I answered that.
3    Because delivery of possession is
4    necessary, and digital assets cannot be
5    delivered in possession, then the law in
6    Antigua now is that a digital asset
7    cannot be secured, is not security.
8    Q.   Where do you say that in your
9    report?  And put a different way, if
10   that's your opinion, why do you go
11   through all of the steps about whether
12   the loan documents intended to create a
13   security interest and whether it was
14   perfected if the answer is just that the
15   law in Antigua is that digital assets
16   can't be subjected to a security
17   interest, why didn't you just say that?
18   A.   Because I think it would be an
19   incomplete opinion, because they are all,
20   there is an indication now that this is a
21   new area which needs to be considered and
22   the law can develop to create, instead of
23   just assets, choses in possession and
24   choses in action, that there can be a
25   third category of assets; namely, digital

Page 179

1    assets, which can form security.  And I
2    didn't think I could turn a blind eye to
3    what is clearly being said, especially by
4    as important a body as the Law Commission
5    of England, because quite often what they
6    say and what they recommend becomes the
7    law.  So I didn't think I could simply
8    bypass it and say, oh, they can't have
9    security in Antigua, because they cannot
10   be possessed.
11   Q.   In fact, you didn't say that in
12   your report?
13   A.   I mean I said it in so few
14   words, because what I did say is in order
15   for it to be security it needs to be
16   perfected.  And perfection is done by
17   taking control.
18   Q.   Right.  That's different -- and
19   you go through a whole analysis and we
20   will talk about that soon, about why your
21   opinion is that FTX did not have the
22   applicable control over the digital
23   assets.  But nowhere in this report do
24   you provide an opinion that as a
25   threshold matter of Antigua law digital

Page 180

1    assets cannot be subjected to a security
2    interest?
3        MR. HARRIS:  Objection.
4    Misstates the record.
5        MR. BELLER:  I am still waiting
6    for an answer about where in this
7    report it says that.  And I would love
8    to be --
9        MR. HARRIS:  Well, if you want
10   the witness to go through every single
11   paragraph, he can do that.
12       MR. BELLER:  I would have
13   thought that the witness would be
14   prepared to talk about his declaration
15   which is not that, frankly, that long.
16   We can look at the summary of
17   conclusions, if you want.  That's a
18   short little section.  There are four
19   conclusions drawn.
20       MR. HARRIS:  But that's not the
21   only pieces.  There is a whole section
22   on requirements for perfecting
23   security.
24   Q.   Mr. Webster, can you point me
25   to anywhere in the summary of conclusions

Page 181

1    that you summarize a conclusion or
2    opinions with respect to the threshold
3    matter of Antigua law that digital assets
4    are not capable of being subjected to
5    security interests?
6    A.   I mean I may have said it in
7    those words, but I have said they don't
8    have a security interest and therefore --
9    in 15(a) in 15 I -- Summary of
10   Conclusions here.
11       So in 15(a) I say that to the
12   extent that FTX has made loans to 3AC
13   through the Margin Lending Program, it
14   did not have a valid perfected security
15   with respect to such lending because the
16   loan documents did not sufficiently
17   identify FTX as the lender for the Margin
18   Lending Program to have a valid security
19   interest.  There must be certainty of
20   identity as to the borrower, et cetera.
21   And then there is privity of contract.
22       So I may not have said it in
23   the way that you have said.  What I have
24   said is they did not constitute security
25   and, therefore, I must move on to the

46 (Pages 178 - 181)

Page 182

1 next step to see if they can constitute
2 security applying the law as it may
3 develop.
4      Q.   Okay.  I am using your words to
5 describe -- asking you where words that
6 you have used in this deposition appear
7 in one form or another, the concept that
8 you have articulated here that as a
9 threshold matter of Antiguan law digital
10 assets are not subject to security
11 interests is not reflected anywhere in
12 this report.  And we can move on from it.
13 But let the record reflect that the
14 witness is unable to point to anything in
15 this report that indicates an opinion
16 reflecting all of that.
17      MR. HARRIS:  If you're going to
18 give a speech, then I am going to give
19 a speech.  There are many places in
20 here that says exactly that.  So your
21 speech is completely incorrect.
22      MR. BELLER:  He's unable to
23 identify anywhere in this report that
24 it does that.
25      MR. HARRIS:  Every time he tries

Page 183

1 to spend time you push him along, and
2 say "We don't need to look at that."
3      MR. BELLER:  That's a complete
4 mischaracterization, and the record
5 will speak for itself.
6      A.   In paragraph 48 it speaks of
7 the LOC does not purport to create a
8 security document.  That is a document
9 creating security.  And it did not create
10 a security interest.
11      Q.   Right.  And where in that
12 sentence, which is a one-sentence
13 paragraph, does it talk at all about how
14 that is based on an opinion of yours that
15 as a threshold matter of Antiguan law,
16 digital assets are incapable of being
17 subjected to a valid security interest.
18 This talks about the LOC as a granting
19 document does not succeed in doing so.
20 This sentence has absolutely nothing to
21 do with -- doesn't even mention Antiguan
22 law.  Doesn't mention any authority.
23 Doesn't mention digital assets.
24      MR. HARRIS:  Is there a
25 question?

Page 184

1      MR. BELLER:  Yeah, there was.
2      MR. HARRIS:  Okay.  Can you
3 please ask it?
4      Q.   Where in that sentence does it
5 talk about an opinion of yours that as a
6 threshold matter of Antiguan law, digital
7 assets are incapable of being subjected
8 to a valid security interest, in
9 paragraph 48, which you just pointed to?
10      A.   Well, it does speak to it, but
11 it speaks with respect to the line of
12 credit agreement.  Not capable of
13 creating a security interest, and it did
14 not create a security interest.
15      It may not have used the words
16 that you're asking me about, but that is
17 what the opinion says and that is the
18 tenor of the opinion, that in order to
19 get security, you have to get perfection
20 and there is no perfection of security in
21 this arrangement.
22      Q.   Okay.  Let's talk about
23 perfection.  So in your report you
24 provide an opinion, and this is
25 summarized in paragraph 14 that there was

Page 185

1 no perfection, as you just put it,
2 perfection of security in this
3 arrangement, right?
4      A.   Mmm-hmm.
5      Q.   And in paragraph 14 you say
6 "Even if the Margin Agreement did create
7 a security, perfection would be necessary
8 to enforce it and FTX did not and cannot
9 perfect the security.  As I explain
10 below, the Margin Agreement purported to
11 allow for a security in the form of a
12 lien or a pledge (as opposed to a charge
13 or mortgage).  In addition to the reason
14 summarized above, which relate to both
15 the grant of security and perfection"
16 which specifically speak to the ownership of
17 the assets issue and the lack of assets
18 issue, which we've discussed, "Under
19 Antiguan law perfection of a lien or
20 pledge requires that the creditor have
21 possession or, when dealing with
22 intangible assets, exclusive control of
23 the secured assets from the moment that
24 the security is created through the
25 duration of the security."

47 (Pages 182 - 185)

Page 186

1      And then you go on to talk
2  about this question of possession and
3  control, right?  Right?
4      A.   Yes.
5      Q.   So your opinion is that the
6  perfection was not accomplished because
7  of the lack of possession or control,
8  right?
9           MR. HARRIS:  Object to the form.
10     A.   It was not accomplished because
11 possession was not possible and control
12 was not established.
13     Q.   And you say, in fact, that
14 intangible assets, which are incapable of
15 possession, can be perfected through
16 control, right?
17     A.   Yes.
18     Q.   Okay.  And you say that "The
19 FTX Terms of Service granted 3AC a right
20 of withdrawal, and FTX has admitted that
21 3AC actually withdrew assets.
22 Accordingly FTX could not enforce any
23 security, to the extent one was granted
24 under the Margin Agreement," right?
25     A.   Yes.

Page 187

1      Q.   So your opinion is that the
2  grant of a right of withdrawal under the
3  FTX Terms of Service means that FTX did
4  not have the requisite control over the
5  digital assets to have a perfected
6  security interest, right?
7           MR. HARRIS:  Object to the form.
8      A.   That's what I am saying, yes --
9      Q.   Yeah.
10     A.   -- there was no exclusive
11 control by FTX.
12     Q.   Right.  And that's the basis
13 for your opinion that there was not
14 proper perfection of a security interest,
15 right?
16     A.   Well, it's a part of the basis
17 of the opinion, yes.
18     Q.   What else is the basis?
19     A.   They didn't have possession.
20 No possession and no perfection of
21 security by establishing control.
22     Q.   Right.  So does the possession
23 -- does it matter for possession --
24 strike that.
25        Does possession matter when

Page 188

1  you're dealing with intangible assets?
2           MR. HARRIS:  Object to the form.
3      A.   Well, it matters that there is
4  no possession.  So you have to look to
5  another criterion to determine whether
6  there has been perfection.
7      Q.   And that is control for
8  intangible assets?
9      A.   That is what the Law Commission
10 has suggested, yes.
11     Q.   I am not asking what the Law
12 Commission suggests.  I am asking what
13 you're saying in your report.
14     A.   But it is based on what the Law
15 Commission says.
16     Q.   That's fine.  That's the basis
17 of your report and your opinions.  I am
18 asking what your opinions are?
19     A.   My opinion is that if there is
20 to be perfection, then the law has to
21 accommodate a situation where control,
22 exclusive control, amounts to perfection.
23     Q.   But you don't say that anywhere
24 in paragraph 14, right?
25     A.   Not in 14, but that's what the

Page 189

1  opinion says.
2      Q.   Well, in paragraph 14, which we
3  will focus on for now, you just say that
4  to perfect an intangible -- over an
5  intangible asset, FTX would have had to
6  have the requisite exclusive control,
7  right?
8      A.   Yes.
9      Q.   Okay.  Do you agree that
10 control for purposes of perfection of a
11 security interest is a question of fact?
12     A.   I think it's a question of
13 mixed fact and law.
14     Q.   How so?
15     A.   For example, let me see, the
16 customer here had a contractual right to
17 create assets or trade assets, to me that
18 is a contractual right as a matter of
19 law.  But mixed up into that, because I
20 find it's always difficult to decide
21 where something will be a matter of law
22 or a matter of fact.  As a matter of
23 fact, the customer could have withdrawn
24 assets, for example.
25     Q.   So you refer to the contractual

48 (Pages 186 - 189)

Page 190

1 rights, I believe, as a starting point
2 for this analysis, right.
3     A.   Where is that?
4     Q.   This is paragraph 85, the first
5 sentence?
6     A.   Right.
7     Q.   So you start with what the loan
8 documents say and then what?
9     A.   I go on to issues like the
10 right to sell.
11     Q.   Sorry, you go to issues like
12 the right to sell?
13     A.   There are indications in the
14 Margin Agreement -- sorry, that's --
15     Q.   I am not asking about what you
16 say in this report yet.
17     A.   Oh, okay.
18     Q.   I am asking you that when you
19 say the starting point for determining
20 the issue of control in this case is the
21 loan documents themselves.  So starting
22 point, that's the first and that suggests
23 that it's not the end, right?
24     A.   Right.
25     Q.   So how do you get from the

Page 191

1 starting point to the end of the
2 analysis?
3     A.   You look at the documents to
4 see, first of all, if there is even that
5 intention to create a security interest.
6     Q.   Does that relate to perfection
7 or does that relate to creation of --
8     A.   A step towards perfection,
9 that's what it relates to.
10     Q.   Okay.
11     A.   If all I am interested in is
12 whether the lien is a lien, forget about
13 perfection now, then I just look at the
14 document for the issue of the nature of
15 the right given.  But if I want to go on
16 to perfection, then I have to go further.
17     Q.   Right.  So I am asking you what
18 do you do to go further with respect to
19 perfection?
20         MR. HARRIS:  Object to the form.
21     A.   I look to see whether the
22 lienholder, in this case FTX, had
23 exclusive control of the assets such that
24 it could go to perfection.  So if the
25 customer had no rights and FTX was in

Page 192

1 exclusive control of the assets, then
2 that's a second step.
3     Q.   And how do you go about
4 determining whether the lienholder had
5 sufficient control to establish
6 perfection?
7     A.   I looked at two things which
8 satisfied me that the lienholder did not
9 have exclusive control.  I looked at the
10 agreement, the Terms of Service.  And I
11 looked at the factual situation as
12 outlined in the FTX objection that, in
13 fact, Three Arrows sold assets, withdrew
14 assets from the hot wallet.
15     Q.   And so your understanding is
16 that FTX's objection stated that Three
17 Arrows could withdraw assets from the hot
18 wallet?
19     A.   It said that Three Arrows did
20 withdraw assets from the exchange.
21     Q.   And what assets do you
22 understand to have been withdrawn by
23 Three Arrows from the hot wallet?
24     A.   The digital assets that were in
25 what I assume is the hot wallet.

Page 193

1     Q.   And what digital assets were
2 those?
3     A.   I can't say --
4     Q.   Were those --
5     A.   -- because they were pooled
6 assets.
7     Q.   So were those the digital
8 assets -- did Three Arrows Capital
9 withdraw specific digital assets?
10         MR. HARRIS:  Object to the form.
11     A.   Did Three Arrows withdraw
12 specific digital assets?  I would not
13 know.  All I know is they withdrew
14 assets.
15     Q.   So based on FTX's own
16 objection, is the entirety of your
17 factual understanding of 3AC's actual
18 withdrawal and the process by which it
19 did so?
20         MR. HARRIS:  Object to the form.
21     A.   Sorry, can you repeat that,
22 please?
23     Q.   Is it that the FTX Recovery
24 Trust claim objection provides the
25 entirety of the factual basis for your

49 (Pages 190 - 193)

1 understanding of 3AC's actual withdrawal
2 of assets off the FTX Exchange?
3        MR. HARRIS:  Object to the form.
4    A.   That certainly is one basis.
5 Are you talking about actual withdrawal
6 as opposed to the right to withdraw?
7    Q.   Correct?
8    A.   I am not sure now if the claim
9 referred to the withdrawal of assets.  So
10 I am not sure about that.  But that
11 certainly is one source.
12    Q.   Okay.  Was there anything else
13 that you reviewed that supported your
14 view that FTX did not have the requisite
15 control to perfect its security interest
16 in the digital assets?
17        MR. HARRIS:  Object to the form.
18    A.   No, because I think the fact
19 that you can withdraw assets from the
20 lienholder is a clear indication that the
21 lienholder does not have exclusive
22 control.
23    Q.   And you note in paragraph 85, I
24 think, two facts that support a view that
25 FTX had some degree of control, you say,

1 right?
2    A.   Yeah.
3    Q.   And you say that, for example,
4 the right to sell or take any action that
5 it deems appropriate to liquidate the
6 assets is in Clause 4 of the Margin
7 Agreement.  And then you also assume that
8 FTX held the private keys to the wallets
9 containing the assets, which also
10 suggests some degree of control, right?
11    A.   Yes.
12    Q.   So when you talk about
13 exclusive control, what do you understand
14 that word "exclusive" to mean?
15    A.   It means that the lienholder
16 has an unrestricted right to make
17 decisions to deal with assets, and that
18 the lienholder can prohibit or stop other
19 persons from dealing with the assets.
20 That makes it exclusive.
21    Q.   And what is that understanding
22 based on?
23    A.   The Law Commission report and
24 the, I call it the Unidroit report.  I am
25 sure I am mispronouncing it, but it's

1 mentioned in my opinion.
2    Q.   So let's look at those
3 documents and maybe you can point me to
4 what part of them informs your opinion.
5 Let's first start with the Unidroit.
6 That's tab 11.
7        (Webster Exhibit 6, Unidroit
8    report, was so marked for
9    identification, as of this date.)
10    Q.   Sir, do you have the document
11 marked as Exhibit 6 in front of you?
12    A.   Yes, I do.
13    Q.   And is this the report that you
14 referred to?
15    A.   Yes.
16    Q.   And I think in your report you
17 cite specifically to 6.1 and 6.2 of this
18 report.  So I want to understand your
19 opinion with respect to why the right to
20 withdraw that 3AC had on the exchange,
21 means FTX did not have the requisite
22 control?
23    A.   Because control of an asset
24 means that you have the right to say what
25 happens with that asset.  And you have

1 the right to tell, to prevent other
2 people from dealing with that asset, so
3 you control it.  So if somebody else has
4 the right to withdraw assets from that
5 pool, from that asset, any portion of it,
6 without even your consent, then that to
7 me destroys the concept of exclusive
8 control.
9    Q.   So did you understand that FTX
10 did not have the ability to block
11 withdrawals by its customers?
12    A.   They had the ability.  I think
13 they did.
14    Q.   And do you understand that the
15 ability to block withdrawals was --
16 strike that.
17        What do you understand to be
18 3ACs or any other customer's recourse if
19 FTX had shut down or blocked withdrawals?
20        MR. HARRIS:  Objection to form.
21    A.   I assume they would have a
22 claim for breach of contract, because
23 there is a contractual arrangement where
24 they have the right to withdraw unless
25 certain events kick in.  For example, if

50 (Pages 194 - 197)

Page 198

1 their margin, if they are below the
2 margin or if they are default in their
3 arrangement in some other way, then FTX
4 can block them. But otherwise, they are
5 free to trade their assets and to
6 withdraw them from the exchange.
7    Q.   Do you understand that FTX only
8 was entitled to block withdrawals under
9 certain specific circumstances?
10    A.   That's my general
11 understanding, yes.
12    Q.   And what is that understanding
13 based on?
14    A.   The, for example, under the,
15 the line of credit and I think also the
16 Margin Agreement lists events of default.
17 And if the customer is in default, then
18 FTX can step in and liquidate the assets.
19 And a part of that procedure would be
20 stopping the customer from trading, as
21 happened in this case.
22    Q.   But there are other documents
23 governing the use of the exchange by a
24 customer, other than the Margin
25 Agreement, right?

Page 199

1    A.   Yeah, I think so.
2    Q.   But you didn't -- you're not
3 offering an opinion about whether those
4 agreements --
5    A.   No, I am not. I am looking at
6 what I am seeing here.
7    Q.   Again, just let me finish my
8 question.
9        You're not offering an opinion
10 of whether those other agreements only
11 allowed FTX to block withdrawals under
12 certain circumstances, right?
13    A.   Yeah.
14    Q.   And is it your opinion that if
15 a party other than the lienholder has any
16 degree of rights or ability to takes
17 action with respect to the asset, then
18 the control test has failed?
19       MR. HARRIS: Object to form.
20    A.   If another person has the
21 ability to do what?
22    Q.   Is it your opinion that the
23 control test requires the lienholder to
24 have all of the rights and ability to
25 take action with respect to the assets?

Page 200

1       MR. HARRIS: Object to the form.
2    A.   It is my opinion that the
3 lienholder has the right to take action
4 in accordance with the terms on which it
5 is holding the lien.
6    Q.   That's not my question. My
7 question is about the control test --
8    A.   Yes.
9    Q.   -- and whether the control test
10 for perfection requires that the
11 lienholder have all of the possible
12 rights and control over the asset in
13 order for the test to be satisfied.
14    A.   It's a question of degree in
15 each case and it has to be exclusive
16 control. So if the lienholder has 90
17 percent of the control, for example, and
18 the customer has 10 percent, maybe that's
19 exclusive. I don't know.
20       All I know is that in this case
21 where the customer has the right to
22 withdraw assets from the exchange, it's a
23 clear indication that that is not
24 exclusive control by the lienholder.
25    Q.   And what is that based on?

Page 201

1    A.   That is based on my
2 understanding of the law and it is also
3 based on the case Your -- I mentioned it
4 in the report, that's the case dealing
5 with -- it's Your Response limited, and I
6 mention it at paragraph 82. So that
7 certainly is a part of the basis of which
8 I use to make that statement.
9    Q.   Is there anything other than
10 the Your Response case that you relied on
11 to form a view that under these
12 circumstances as you assumed them it does
13 not give rise to exclusive control?
14       MR. HARRIS: Object to the form.
15    A.   I think the Law Commission
16 report also deals with exclusive control.
17 So maybe you can ask your question again,
18 because I am not sure if I am answering
19 your question.
20    Q.   I understand that all of these
21 things deal with control. What I am
22 asking is for something that specifically
23 informs your conclusion and supports your
24 conclusion that the right to withdraw, as
25 you have conceptualized it in your

51 (Pages 198 - 201)

Page 202

1 report, on its own, means that FTX did
2 not have the requisite control?
3       MR. HARRIS:  Objection.  Asked
4   and answered.
5    A.   Right to withdraw is a strong
6 indication that the lienholder did not
7 have exclusive control.  In this case the
8 customer also had the right to trade on
9 the exchange.  And I understand that that
10 went on routinely.  So they could trade
11 their assets on the exchange.  They could
12 also withdraw.  They could -- well,
13 selling includes trading.  And when you
14 have that sort of sharing of power
15 between the lienholder and the customer,
16 then it is not exclusive control.  And I
17 think the Your Response case supports
18 that position.  And just the general test
19 in Unidroit and the Law Commission
20 report.
21    Q.   None of those talk about a
22 scenario where a lienholder holds a
23 private key over an asset that nobody
24 else can access, and another party has
25 the ability to request that the

Page 203

1 lienholder release some asset to it from
2 behind that private key and complies with
3 the request, right?
4    A.   If you're asking me if I found
5 a case that says that, no.
6    Q.   And do you have any authority
7 that supports that the pledgor's or
8 lienor's ability to request a withdrawal
9 that needs to be processed and honored by
10 the lienee gives rise to the level of
11 rights that renders control to be
12 sufficient for perfection?
13       MR. HARRIS:  Objection to form.
14    A.   That is not my understanding.
15 My understanding is that the customer
16 could effect transactions on the exchange
17 without getting approval from FTX.
18 Sometimes it's by pressing a button.
19 Sometimes it's just an algorithm kicks
20 in, and the value has dropped to a
21 certain level, and there is an automatic
22 sale.  My understanding is that it did
23 not require the consent or approval or
24 even cooperation of FTX.
25    Q.   So would it change your opinion

Page 204

1 if that were not true?
2       MR. HARRIS:  Object to the form.
3    A.   It's difficult to answer that
4 question, because if something that I
5 rely on turns out to be not true, then it
6 depends on how the facts have shifted,
7 whether it will affect my opinion.
8    Q.   I think you referred to the
9 action taken by 3AC to withdraw was
10 pressing a button, I think you testified
11 to that?
12    A.   That is one way, yeah.
13    Q.   So what is your assumption
14 about what happens when that button is
15 pressed in terms of what happens within
16 the FTX ecosystem?
17    A.   For example, if you press the
18 button to sell, to sell 100 units -- and
19 I am just using my language here -- you
20 press a button to sell 100 units, because
21 you own a thousand units then it just
22 happens.
23    Q.   And does your opinion depend on
24 the ownership that you just mentioned?
25    A.   I am not expressing an opinion

Page 205

1 on ownership.  I am saying that my
2 understanding of the exchange is that
3 customers could deal with their assets
4 without FTX approval or cooperation.  I
5 am not saying FTX can't stop the trade,
6 but the fact is that it happened, it kept
7 on happening.
8    Q.   And what do you mean by their
9 assets?
10    A.   Their share of the pool.  Their
11 right to participate in the assets in the
12 pool.
13    Q.   So your opinion doesn't hinge
14 on the customer's ability to withdraw
15 specific assets?
16    A.   It does.  Oh, specific assets,
17 no, not specific assets, no.
18    Q.   Okay.
19    A.   Just to withdraw assets.
20    Q.   And your opinion remains even
21 though FTX had the ability to block
22 withdrawals whenever it wanted to?
23    A.   Yes.
24    Q.   And your opinion remains even
25 if the customer had no ability or

52 (Pages 202 - 205)

Page 206

1 recourse to actually access any digital
2 assets?
3     A.   If the customer had no recourse
4 or any ability to?
5     Q.   Access digital assets.
6         MR. HARRIS:  Object to form.
7     A.   My understanding is that the
8 customer had the ability to access the
9 digital assets on the exchange.
10     Q.   How did the customer have the
11 ability to access digital assets when FTX
12 controlled the exchange and held the
13 assets behind a private key?
14         MR. HARRIS:  Object to the form.
15     A.   Because each customer, as I
16 understand it, had an undivided share, an
17 entitlement, there were assets on the
18 exchange which included their assets.
19 And the way the exchange operated is the
20 customer could deal with what is in
21 effect its share of the assets on the
22 exchange.
23     Q.   And you don't view FTX creating
24 a user interface that allows the customer
25 to do that, subject to all of the

Page 207

1 documents and terms and conditions as
2 giving consent?
3     A.   No, I don't see that as a way
4 of giving consent, because of how freely
5 the trades were effected.
6     Q.   And what's your basis for that
7 distinction?
8     A.   Because that is my
9 understanding of how the exchange worked.
10     Q.   I am asking as a legal matter.
11     A.   Yeah.
12     Q.   What is your basis to say that
13 because of how freely the trading was
14 happening that, therefore, FTX was not
15 giving consent to the withdrawal and
16 trading by creating the infrastructure
17 that it created for customers to use the
18 exchange?
19         MR. HARRIS:  Object to form.
20     A.   Because the, because of the
21 freedom and ease with which trades could
22 be made.  Nobody had to say to FTX please
23 approve this transfer, this trade, this
24 withdrawal.  It was done without
25 consulting them.  They set up a system

Page 208

1 where their consent was not necessary to
2 effect all of these transactions and
3 there were thousands of them, probably
4 thousands per day.  But there were
5 thousands of transactions.
6     Q.   And I am asking you what legal
7 authority supports your view, as just
8 articulated?
9     A.   Legal authority?  I don't have
10 a legal authority like a case or a
11 learned treatise or anything like that.
12 But we have to apply common sense and how
13 we understand the exchange to have
14 worked.  If consent was needed, then I am
15 sure FTX will file evidence to show that
16 consent was needed.  But that is not my
17 understanding.
18     Q.   So the application of this
19 control test, it's a pretty -- it's not
20 black and white, is it?
21     A.   It certainly is not.  It's a
22 question of, like so many issues in the
23 law, when you apply the fact, you have to
24 see how they come out.  And that's why we
25 have courts.

Page 209

1     Q.   Do you agree that the control
2 test is a proxy for possession with
3 respect to intangible assets?
4     A.   It could develop to become
5 that, yes.  It's not there yet.  And by
6 intangible assets, do you mean intangible
7 assets or digital assets?
8     Q.   Well, I think we covered
9 earlier that your opinion is that, as
10 articulated in the report, is that for
11 intangible assets, the requirement for
12 perfection is control?
13         MR. HARRIS:  Misstates the
14 record.
15     Q.   Right?
16     A.   I would have to check, yeah.
17     Q.   Okay.  I think we went through
18 it in paragraph 14 pretty clearly.  Under
19 Antiguan law perfection of a lien or
20 pledge requires the creditor to have
21 possession or -- sorry, the creditor to
22 have possession or when dealing with
23 intangible assets exclusive control of
24 the secured assets --
25     A.   Right.

53 (Pages 206 - 209)

Page 210

1   Q.   -- right?
2   A.   Yeah, okay.
3   Q.   Okay.  So with respect to
4   intangible assets, do you agree that the
5   control test is meant to be a proxy for
6   the possession test as applied to
7   tangible assets?
8   A.   It becomes the test.  Whether
9   it's a proxy for the control test, I am
10  not so clear on that.  But if it's an
11  intangible asset, then you need to have
12  control.
13  Q.   Doesn't the principle 6 of the
14  Unidroit principles on digital assets and
15  private law talk about how the control
16  test for intangible assets is meant to be
17  a proxy for possession?
18  A.   Can you direct me to where it
19  says that?
20  Q.   Sure.  If you look at 6.2 --
21  A.   Of?
22  Q.   -- this is Exhibit 6, I
23  believe?
24  A.   Unidroit, okay.
25  Q.   The first sentence.

Page 211

1        (Witness reviews document.)
2   A.   So this reflects what I see as
3   the way the law is developing.  It's
4   moving away from the requirement of
5   control to find another criteria,
6   criterion for determining perfection of
7   these intangible and digital assets, so
8   you're moving away from control -- from
9   possession to control.  That is the way
10  the law is moving.  It hasn't reached
11  there, but it's getting there.
12  Q.   This first sentence says "The
13  exclusive ability requirements in
14  principle 6(1)(a) contemplate that
15  'control' assumes a role that is a
16  functional equivalent to that of
17  'possession' of movables," right?
18  A.   Yes.
19  Q.   And would you agree that
20  perfection generally under Antiguan law
21  is required in order to give notice to
22  the world of the potential security
23  interest in the property?
24  A.   This is how the law is
25  developing, because normally if you take

Page 212

1   possession, that's notice to the world
2   because you have it and anybody who tries
3   to deal with that asset will see that you
4   are in possession.
5        The issue of control as it is
6   being used in the language, is being used
7   as a proxy for control -- for possession.
8   So that in terms of the control of the,
9   for example, digital assets, then the
10  control, especially digital assets on an
11  exchange, if you control it, then nobody
12  else can.  So in effect, it's control,
13  it's notice to the world.  So if nobody
14  could withdraw their assets from the FTX
15  Exchange, and FTX had a private key and
16  that's it, then that would be notice to
17  any person who tried to trade any asset
18  on the exchange that FTX has an interest.
19  Q.   Right.  But if anybody went and
20  looked on the blockchain at where the
21  digital assets were being held, it would
22  show that it was being held in FTX
23  wallets?
24       MR. HARRIS:  Object to the form.
25  A.   Well, yes.  Maybe, yeah.  And?

Page 213

1   Q.   Well, not maybe.  If they are
2   being held, if they are being held in FTX
3   wallets, then anybody looking would be
4   able to tell that those assets are being
5   held by FTX?
6        MR. HARRIS:  Object to the form.
7   A.   Yes, but can they trade those
8   assets?  Can they buy those assets, if
9   FTX does not have exclusive control?
10  Q.   If you turn to page 59 of the
11  Unidroit principles on digital assets and
12  private law -- sorry, I started saying
13  Unidroit, but I don't know if it's
14  Unidroit or Unidroit, but whatever.
15       Are you there, page 59,
16  Principle 7?
17  A.   Yes.
18  Q.   Can you explain to me your
19  understanding of Principle 7(1) (a) and
20  (b)?
21       (Witness reviews document.)
22  A.   It seems to suggest that if
23  there is a means of identifying a number
24  or crypto key, an office or an account,
25  even if the means of identification does

Page 214

1 not indicate the name or identity of the
2 person to be identified that may be
3 sufficient to demonstrate the
4 requirements of principle 6(1)(b).
5    Q.  Do you have a view on that?
6      MR. HARRIS:  Object to the form.
7    A.  My view is that in this
8 exercise somebody will have to decide
9 what is sufficient control.  This is one
10 where it seems to indicate where it could
11 be done.  But sufficient control,
12 exclusive control is not a difficult
13 concept in practice.  And in my opinion,
14 and I repeat my opinion, if the customer
15 has the right to deal with assets on the
16 exchange, then that's not exclusive
17 control by FTX.
18    Q.  No matter what conditions are
19 put on that customer's dealing with the
20 assets?
21    A.  Well, if there is a specific
22 contract which does go as far as you are
23 suggesting, maybe that will work.  But
24 that is not my understanding.
25    Q.  I am not following your answer.

Page 215

1 I asked you, no matter what conditions
2 are put on that customer's dealing with
3 the assets.  And you answered "If there
4 is a specific contract which does go as
5 far as you're suggesting, maybe that will
6 work."
7      I don't know what you mean a
8 contract that goes as far as I am
9 suggesting, I am not suggesting anything.
10    A.  For example, if the exchange's
11 Terms of Service says we, the exchange,
12 have the right to exclusive control of
13 all assets, even if you have the right to
14 withdraw.  Then that may be sufficient.
15 And I am not saying that's an opinion or
16 a conclusion on my part.  I am just
17 saying I am looking at this the way I see
18 it on the papers, which is that there was
19 an exchange and the customers have the
20 right to withdraw assets, to deal with
21 the assets without FTX's consent.
22    Q.  Can you turn to page 15 of the
23 Unidroit report.  And if you look at
24 Section 2.8, the last sentence.  This
25 says "However, an individual user does

Page 216

1 have control over a private key which
2 allows the individual user to obtain
3 'control' (as so defined) over a digital
4 assets within the protocol (i.e., over a
5 UTXO (unspent transaction output) in the
6 case of bitcoin)," right?
7    A.  Yes.
8    Q.  And if you go to Section 2.9,
9 the carryover sentence, it's the second
10 sentence of the paragraph, it says "An
11 individual user could not alone control
12 the underlying protocol (the database or
13 blockchain) but could control its own
14 private key and thereby have control (as
15 defined) over the digital assets held
16 through the protocol," right?
17    A.  Yes.
18    Q.  Do you understand this to be
19 suggesting that a party who holds a
20 private key over digital assets obtains
21 control over the digital assets?
22      MR. HARRIS:  Object to the form.
23    A.  The words here may mean that,
24 but as far as I am aware, even though FTX
25 held a private key for the hot wallet, so

Page 217

1 to speak, the users, the customers could
2 access -- it doesn't fit in -- that
3 factual scenario does not fit in with
4 this paragraph, with these two
5 paragraphs.
6    Q.  Right.  And my question is, do
7 you understand this provision that I just
8 read to be suggesting that a party who
9 holds a private key over digital assets
10 obtains control over those digital
11 assets?
12      MR. HARRIS:  Object to form.
13    A.  Can obtain control.  That's my
14 answer.
15      MR. BELLER:  Why don't we take a
16 short break, if that works for
17 everyone?
18      THE VIDEOGRAPHER:  We are going
19 off the record at 3:20 p.m. EST.
20      (Off the record.)
21      THE VIDEOGRAPHER:  Back on the
22 record at 3:38 p.m.
23 BY MR. BELLER:
24    Q.  Mr. Webster, I would like to
25 turn to paragraph 67 of your declaration,

55 (Pages 214 - 217)

Page 218

1 please. The first sentence of this
2 paragraph says "The Margin Agreement does
3 not purport to create a charge," right?
4    A.   Yes.
5    Q.   And you talk a little bit about
6 a charge or an equitable charge in
7 paragraph 63 (iii) of your report. And
8 you say "An equitable charge is created
9 when property is appropriated to the
10 discharge of a debt without any
11 conveyance of title to the lender,"
12 right?
13    A.   Yes.
14    Q.   Can you explain to me a little
15 bit more of what your understanding of a
16 charge is?
17    A.   It's an agreement between the
18 owner of assets and the person to whom
19 that person owes an obligation. It could
20 be a financial obligation. That the
21 assets will be held by the person to whom
22 the chargee, will be held by the chargee
23 as security for the performance of the
24 obligation to the chargee by the chargor.
25 So it's a way of upgrading security.

Page 219

1    Q.   How is it different than a
2 lien?
3    A.   For a lien there has to be
4 possession. And I am talking about the
5 existing law. There has to be
6 possession. With a charge, possession is
7 not necessary, of the asset is not
8 essential.
9    Q.   How do you create a charge?
10    A.   Well, usually by putting up the
11 asset to the chargee, whether in the form
12 of a security, a written agreement. It's
13 unlikely to be verbal. It's usually a
14 written agreement putting up the asset as
15 security for the obligation.
16    Q.   And what do you mean by putting
17 up the asset as security to the chargee?
18    A.   Saying in your security
19 document that the chargee has an interest
20 in the asset as a chargee, a security
21 interest in the asset.
22    Q.   Is it your opinion that it is a
23 requirement of creating a charge to use
24 the word "charge"?
25    A.   I don't think you have to, no.

Page 220

1    Q.   And this probably should have
2 been my first question, but paragraph 63
3 (iii) of your report says that a charge
4 is a type of security interest, right?
5    A.   Yes.
6    Q.   So if a party wants to put up
7 its assets as security to a chargee but
8 doesn't use the word "charge" how would
9 it convey that intent?
10       MR. HARRIS:  Object to the form.
11    A.   The form and the substance of
12 the arrangement would have to be such
13 that it is, in fact, a charge.
14    Q.   Can you explain more
15 specifically what you mean by that?
16    A.   When you strip down the
17 transaction, it is in fact a charge in
18 that the security has been put up. Then
19 it can amount to a charge. It's very
20 difficult if you don't use the word
21 "charge." But I wouldn't say that the
22 failure to use the word "charge" means
23 that it cannot be a charge.
24    Q.   Are a lien and a charge
25 mutually exclusive?

Page 221

1       MR. HARRIS:  Object to the form.
2    A.   Meaning can you -- I mean, is
3 your question that whether a lien can
4 exist side by side with a charge over the
5 same asset?
6    Q.   Let's start with that, yes.
7    A.   I am trying to conceptualize
8 that, because it's two different forms of
9 security. In the lien, the lienholder
10 takes possession. In the charge, he does
11 not necessarily take possession. The
12 lienholder gets -- if it is a charge, if
13 it is a lien that also provides power of
14 sale, then it begins to look like a lien
15 coupled with an interest, a security
16 interest, but it's not quite the same as
17 a charge. And I am not seeing how the
18 two of them can exist side by side.
19    Q.   Can a contract intend to grant
20 both a lien and a charge, depending on
21 subsequent events?
22       MR. HARRIS:  Object to the form.
23    A.   Can you grant a lien and a
24 charge? Well, I would like to break it
25 out in two, because if it depends on

56 (Pages 218 - 221)

Page 222

1 subsequent events, then that creates all
2 kinds of difficulties in my mind. If
3 you're saying can you create a lien and a
4 charge by contract, I am not seeing it.
5 It's something I would have to think
6 about very carefully. But I am not
7 prepared to say right here today that it
8 could happen.
9    Q.   Could a contract grant a lien
10 and a charge -- strike that.
11       Can a contract grant a lien
12 over assets that are delivered to the
13 lienee and a charge over assets that are
14 not?
15       MR. HARRIS: Object to the form.
16    A.   Over assets that are delivered
17 and assets that are not delivered? I
18 mean you're putting together important
19 concepts here. A charge which is
20 delivered is a charge. A lien is a lien.
21 I am just not putting the two things
22 together the way you're suggesting.
23    Q.   Well, you testified earlier
24 that a charge doesn't require delivery or
25 possession, right?

Page 223

1    A.   It does not require -- it's a
2 non-possessory security, yes.
3    Q.   Can a charge -- a valid charge
4 exist over assets that are delivered or
5 in possession of the chargee?
6    A.   I would think so, yes.
7    Q.   So can --
8    A.   It's not a requirement, but if
9 the chargee happens to have the assets,
10 he could take a charge over them, yeah.
11    Q.   Right. So couldn't assets that
12 are delivered to the holder of the
13 security interest be subject to both a
14 valid lien and a valid charge?
15       MR. HARRIS: Object to the form.
16    A.   You are putting to me complex
17 factor situations and asking me for short
18 answers. I am not prepared to give that
19 answer without careful consideration to
20 that question.
21    Q.   I don't think I am asking you
22 for short answers and maybe these are
23 complex situations. But I am not -- I am
24 asking as a general conceptual matter
25 what your understanding is of whether

Page 224

1 assets can be subject to both a lien and
2 a charge, assuming all --
3    A.   Yeah -- sorry.
4    Q.   Assuming perfection and
5 delivery of possession, and all of those
6 requirements of each are met.
7    A.   I have never seen a document or
8 a situation that you're talking about.
9 And I am not prepared to give an answer.
10    Q.   So you testified earlier that
11 the charge, the granting document, does
12 not need to use the word "charge." And
13 it depends on whether the form and
14 substance of the transaction meets the
15 elements of a charge, right?
16    A.   Yeah, that's what I said.
17    Q.   So can you give a little bit
18 more explanation of what the form and
19 substance of a charge is?
20       MR. HARRIS: Object to the form.
21    A.   In very general terms, the
22 owner of property grants the chargee a
23 security interest in the property,
24 usually on condition that if there is a
25 breach of the terms of the charge then

Page 225

1 the chargee will have the right to sell
2 the asset to get what is due to him and
3 pay the balance to the charge or, if
4 there is a balance.
5    Q.   And is the test for a charge
6 based on the granting document, a loan or
7 also on the factual circumstances?
8    A.   It's usually dependent on the
9 document. I wouldn't rule out the
10 possibility that you could look at
11 factual circumstances, but the guiding --
12 the starting point and probably ending
13 point is the terms of the document that
14 the two parties entered into.
15    Q.   Is there a distinction in
16 Antiguan law about the types of assets
17 that can be subjected to a valid charge?
18    A.   There are different types of
19 assets on Antiguan law that can be
20 subject to a valid charge.
21    Q.   What are the types of assets
22 that can be so subject?
23    A.   Real property. Personal
24 property. Maybe even intangibles, but
25 certainly real and personal property.

57 (Pages 222 - 225)

Page 226

1    Q.   Is the type of asset that can
2  be subjected to a valid charge different
3  than the type of asset that can be
4  subjected to a valid lien?
5    A.   It can be different, yes,
6  because a valid charge, for example, over
7  real estate, has specific rules attached
8  to it, so that's one type of asset which
9  has its own rules.  An asset over which a
10 lien can be granted, you can have it over
11 personal assets.  You can grant some kind
12 of a lien over real estate, as well, I
13 suppose, by contract.  But it's not what
14 I am accustomed to seeing.  If it's land,
15 it's a charge.  If it's personal charge,
16 it's a lien or a pledge.
17   Q.   And what about intangibles?
18   A.   For example?
19   Q.   Digital assets.
20   A.   The law of Antigua has not yet
21 said you can grant a security over a
22 digital asset.
23   Q.   And that applies in equal
24 weight to a charge as a lien?
25   A.   Digital assets?

Page 227

1    Q.   Yes.
2    A.   It applies equally, yes,
3  because the law of Antigua has not yet
4  developed to say that you can grant a
5  security interest over a digital asset.
6    Q.   And what about other
7  intangibles?
8    A.   I haven't looked at that.  I
9  know I dealt with digital assets.  And
10 this morning earlier I said that I had
11 not mentioned in my report that -- and I
12 said that you cannot get a security
13 interest over a digital asset.  Well, I
14 checked, and it is in the report.
15   Q.   Okay.  Where?
16   A.   Inside I marked it, but you
17 don't have that copy.  Paragraph 60.
18 Paragraph 73, "Possession simply not for
19 physical assets.  The lender can take
20 actual or constructive delivery of the
21 asset or intangible assets such as shares
22 in a company, the lender can take
23 possession of the share certificates.
24 The secured assets are here consisted of
25 virtual assets, crypto currency, and

Page 228

1  virtual assets are not capable of
2  physical possession and, therefore,
3  applying a traditional approach cannot
4  form the subject of a lien."
5        I may not have said on Antiguan
6  law, but I am delivering an opinion on
7  Antiguan law.  And this is saying virtual
8  assets, digital assets cannot form
9  security.
10   Q.   Applying a traditional
11 approach, right?
12   A.   Yes.
13   Q.   And in that same paragraph
14 you're talking about the traditional
15 approach being possession, right?
16   A.   Yes.
17   Q.   So let's go back to what we
18 were talking about before that digression
19 -- sorry, was there anything else in this
20 report that you identified during the
21 break that you would like to flag in
22 response to the earlier questions?
23   A.   I think 60 is also relevant.
24   Q.   What paragraph?
25   A.   60.  "For the reasons set out

Page 229

1  below, I conclude that FTX did not
2  perfect any security it might have had,
3  given the form of security that Margin
4  Agreement allows, FTX would have needed
5  possession or in the absence of
6  possession, exclusive control over the
7  assets to perfect a security over them,
8  and FTX did not have such possession or
9  control."
10       This is an opinion on Antiguan
11 law, and these are conclusions that I
12 reached or these are opinions that I had.
13   Q.   All right.  That paragraph
14 speaks for itself, so.
15       Let's go back to what we were
16 talking about.  I was asking you about
17 whether Antiguan law deals with, treats
18 the ability to create a charge on
19 intangibles in a different way than a
20 lien on intangibles.  And I think you
21 testified that you haven't looked at
22 that?
23   A.   Yeah.
24   Q.   And then we got off on a
25 tangent.  So maybe you haven't looked at

58 (Pages 226 - 229)

Page 230

1 it, but do you have a view or an
2 understanding of whether as a matter of
3 Antiguan law intangibles, the ability to
4 subject intangibles to a valid charge is
5 different than the ability to subject an
6 intangible to a valid lien?
7    A.   An intangible could include
8 something like a share certificate.  And
9 if you have proof that you own shares in
10 a company, but you don't have the shares
11 themselves, maybe you can use that as
12 security.  But I haven't seen a charge --
13 did you say a charge or a lien?
14    Q.   Well, I've said both.
15    A.   I haven't seen a charge over
16 intangible properties in Antigua.
17    Q.   Okay.  But to answer my
18 question do you have a view of whether
19 Antiguan law treats the creation of a
20 charge over intangibles differently than
21 an ability to create a lien over
22 intangibles?
23        MR. HARRIS:  Objection to form.
24    Go ahead.
25    A.   I think the principles are the

Page 231

1 same.
2    Q.   If you go back to paragraph 67
3 of your declaration, the third sentence
4 says that in speaking about the Margin
5 Agreement, it goes on to state that "FTX
6 shall have"?
7    A.   Sorry, sorry, the third line of
8 the third sentence.
9    Q.   The third sentence, which
10 happens to also be the third line.
11    A.   Yes, sorry.
12    Q.   In speaking about the Margin
13 Agreement, you say "It goes on to state
14 that 'FTX shall have all the remedies of
15 a chargee under the laws of Antigua,'"
16 right?
17    A.   Yes.
18    Q.   And then you say "This
19 additional stipulation would not be
20 necessary if the remainder of Clause 3
21 were intended to create a charge.  And in
22 my opinion an Antiguan court would be
23 likely to find that Clause 3 does not
24 create a charge," right?
25    A.   Yes.

Page 232

1    Q.   Is it your view that because of
2 that language of that sentence, that the
3 remedies of a chargee is not necessary,
4 if the rest of it, if the provision were
5 intended to create a charge, that that
6 language therefore is meaningless?
7    A.   It is meaningless because if it
8 was a charge that's goes without saying,
9 you have the remedies of a chargee.  Here
10 we have a pledge or a lien.  Again, in my
11 interpretation, in my interpretation the
12 words were put in because the drafter
13 knew it was not a charge, but wanted to
14 give the lienholder the remedies of a
15 chargee.
16    Q.   What are the remedies of a
17 chargee?
18    A.   Power to sell, to realize the
19 security and get what is due to them and
20 return the balance.  That's the main
21 power of a charge.  Charges can get very
22 complex, but the main thing is that
23 you're putting up security that can be
24 sold if you default.
25    Q.   What is the difference between

Page 233

1 having a charge and having the remedies
2 of a chargee?
3    A.   If you have a charge, you have
4 the remedies of a chargee -- did you say
5 chargor or a chargee?
6    Q.   A chargee.
7    A.   If you have a charge then as a
8 matter of law you have the remedies of a
9 chargee.  If you have a lien, you do not
10 have the remedies of a chargee, but you
11 may want to give the lienholder that
12 right.  So you put in, I pointed out one
13 thing above, where we spoke about the
14 lien and interest in whatever, in the top
15 of, the second sentence of Clause 3.  And
16 here, again, we see the draftsman putting
17 in language to give the lienholder more
18 than what you would get in a contractual
19 lien.  You're getting an additional
20 right, which is to realize the security.
21    Q.   But what is the difference
22 between having the remedies of a chargee
23 and having a charge itself?
24        MR. HARRIS:  Object to the form.
25    A.   If you have a charge, you have

59 (Pages 230 - 233)

Page 234

1 the remedies of a chargee and you don't
2 need to say it in the charge.
3    Q.   Right.  That's not my question.
4    A.   What is your question?
5    Q.   My question is:  What is the
6 difference, as a functional, practical or
7 legal matter, between being a chargee and
8 having the remedies of a chargee?
9        MR. HARRIS:  Object to the form.
10   A.   A charge may include other
11 rights.  Including just the remedy of
12 sale.  I suppose it depends on the
13 documents.  But I do see a chargee as
14 having powers implied by the law.  They
15 are very powerful powers.  In a lien
16 document the remedies of a chargee, then
17 that may be more limited.  I am not
18 saying I have seen that situation in
19 practice, but I am just giving you my
20 opinion.
21   Q.   When I just asked you what are
22 the remedies of a chargee, you started
23 listing things like the powers of sale?
24   A.   That is one thing, maybe the
25 most important.

Page 235

1    Q.   So you've testified that one of
2 most important remedies of a chargee is a
3 right of sale, right?
4    A.   Yes.
5    Q.   But then you just answered,
6 when I asked you about the difference
7 between the remedies of a chargee and
8 being a chargee, you said a charge may
9 include other rights, including just the
10 remedy of sale, right?
11   A.   Including just the remedy of
12 sale?  That should be including the
13 remedy of sale and other remedies.
14   Q.   Right.  So you've testified now
15 that the remedies of a chargee, the most
16 important is the right of sale?
17   A.   Yeah.
18   Q.   And now a charge, the most
19 important is the right of sale, right?
20   A.   Yes.
21   Q.   Okay.  So would you agree that
22 functionally being a chargee is the same
23 as having the remedies of a chargee?
24       MR. HARRIS:  Object to the form.
25   A.   I don't think it is the same.

Page 236

1 But both situations include a power to
2 sell the assets.
3    Q.   Why are they not the same?
4    A.   A chargee's powers are usually
5 greater.  For example, and again this can
6 be a matter of contract, but you need to
7 insure the property.  You can't offer it
8 to another person as security.  It can
9 have many other rights.  Some of them
10 statutory.  While a lien -- a person -- a
11 lienholder with the remedies of a chargee
12 would not include all of those rights.
13   Q.   Why not?
14   A.   Because you can't read into a
15 lien, for example, a statutory right to
16 keep property insured, a statutory right
17 to pay all the taxes.  I have just never
18 seen it.
19   Q.   Well, you have never seen it.
20 But what is your authority for saying
21 that you can't do that under Antiguan
22 law?
23   A.   Because a lien is a purely
24 contractual document.  If it's not in the
25 lien, it doesn't exist.  While with a

Page 237

1 charge, the rights don't have to be in
2 the document.  Some of the rights are by
3 statute.
4    Q.   But why does that mean that
5 having the remedies of a chargee under a
6 contract doesn't give you the same rights
7 that a contract would give you if it says
8 you are a chargee?
9    A.   Because I think if you're a
10 chargee you have more extensive rights.
11   Q.   And having the remedies of a
12 chargee?
13   A.   Yes, because that is giving you
14 one right.
15   Q.   And why?
16   A.   Because you are dealing with a
17 lien.  That's a purely contractual
18 arrangement.  A charge -- so whatever the
19 document says, you may have it.  But if
20 you're dealing with a charge, there may
21 be other rights, some of which may be
22 implied by law.
23   Q.   But why would you read a
24 contract that gives the remedies of a
25 chargee to the security holder to be

60 (Pages 234 - 237)

Page 238

1 limited in any way?
2    A.   Because if it's -- I am sorry,
3 if it's a charge or a lien?
4    Q.   Well, let's take your example
5 where there is a lien and the lienholder
6 has the remedies of a chargee.
7    A.   Yes.
8    Q.   Your testimony earlier, I
9 think, was that your opinion was that the
10 remedies of a chargee in that situation
11 are necessarily more limited than the
12 rights of a chargee itself.
13    A.   Under a charge.
14    Q.   Under a charge?
15    A.   Yes, that's what I said.
16    Q.   And I am trying to understand
17 what basis you have for that opinion.
18    A.   Because a charge is a more --
19 is a document that has, can have
20 inherently more rights.  For example, you
21 can have statutory rights.  A lienholder
22 with the remedies of a chargee, in my
23 opinion, is limited to whatever the lien
24 document says.
25    Q.   But then why would anybody ever

Page 239

1 talk about the remedies of a chargee?
2    A.   Because I think they wanted to
3 craft onto that arrangement the remedies
4 of a chargee, additional remedies.
5    Q.   Like what?
6    A.   It already says the power of
7 sale down below.  So to me it's a second
8 attempt by the drafter to bolt on this
9 equitable interest in the lien.  They
10 don't want the charge, for whatever
11 reason, because I assume that, again, I
12 assume that these drafters would have
13 known how to create a charge.  They have
14 avoided a charge.  They have created this
15 other instrument which, you know, we can
16 go into that, if you want.  But they've
17 created this document, which is not a
18 charge which requires less formalities
19 and this is one way of them saying, okay,
20 we are going for the lesser legal animal,
21 the lien, we're going to bolt onto it the
22 right, the power to sell the assets.  And
23 we are also going to say you have the
24 rights of a chargee.  Because if it was a
25 chargee, they wouldn't need to say it.

Page 240

1 The powers would be implied by law.
2    Q.   But your reading of that phrase
3 renders it meaningless because you've
4 already testified that your opinion is
5 that regardless of whether that phrase is
6 in the document, they are limited to
7 whatever the lien rights that they are
8 given are --
9        MR. HARRIS:  Objection.
10 Misstates the record.
11    Q.   -- right?
12    A.   And the lien document here in
13 Clause 4 gives them the power of sale,
14 so.
15    Q.   So I would like an answer.
16 That doesn't answer my question.
17    A.   Maybe you should ask the
18 question again.
19    Q.   Wouldn't your reading of the
20 phrase "remedies of a chargee" render it
21 meaningless based on your testimony that
22 regardless of the inclusion of that
23 phrase in the document, the lienholder
24 has whatever rights are otherwise
25 contractually granted in the lien

Page 241

1 granting document?
2        MR. HARRIS:  Object to the form.
3    A.   So the words are probably
4 meaningless, yes.
5    Q.   Okay.
6    A.   Because the power of sale is
7 already there in the contract.
8    Q.   And if the power of sale
9 weren't already there, your testimony is
10 that the language remedies of a chargee
11 wouldn't grant the powers of sale because
12 the lienholder is limited to the
13 contractual rights they are granted in
14 the lien-granting document, right?
15        MR. HARRIS:  Objection.
16 Misstates the record.
17    A.   It would be a very unusual
18 situation that you're talking about.  If
19 it is, if it was a pure lien document
20 without a power of sale, and you put into
21 that document remedies of a chargee, then
22 strike all of those words, they are
23 meaningless.  They cannot convert a lien
24 into a charge.  So I think that would be
25 meaningless.  In this case, the power of

61 (Pages 238 - 241)

Page 242

1 sale is already there. I still think
2 they add nothing to the document.
3    Q.    So either way it's meaningless?
4       MR. HARRIS: Object to the form.
5    A.    I say it adds nothing to the
6 document.
7    Q.    You've mentioned the power of
8 sale as the most important right that a
9 chargee holds under a charge, right?
10   A.    Yes. Yes.
11   Q.    What are some, just a few other
12 of the most important or very important
13 rights in your view that a chargee holds
14 under the charge?
15   A.    Under what kind of a charge,
16 over land, over personal property?
17 Because over land, there are, the law in
18 Antigua implies certain rights into the
19 charge.
20   Q.    Let's talk about a charge over
21 intangibles.
22   A.    I have a difficulty with a
23 charge over intangibles because they have
24 no physical being. They are not
25 physical. I am not seeing a charge over

Page 243

1 an intangibles.
2    Q.    Okay. Let's take a charge over
3 real property --
4    A.    Yes.
5    Q.    -- same question?
6    A.    What additional rights?
7    Q.    What are some of the other
8 really important rights, other than the
9 power of sale?
10   A.    The chargor is always put under
11 certain obligations, by statute. Even if
12 they are not in the document, they are a
13 part of the arrangement to ensure they
14 pay all the taxes, not to use the
15 property as security for another loan.
16 The Registered Land Act in Antigua lists
17 those charges. I would say there are at
18 least 10 of them.
19   Q.    And what about personal
20 property?
21   A.    That's a matter of contract
22 between the parties.
23   Q.    Okay. Let's talk about that.
24 What are some of the most important
25 rights typically associated with a charge

Page 244

1 over personal property?
2    A.    Whatever the parties put in the
3 contract.
4    Q.    And in your expert opinion,
5 what are some of those, similar to the
6 power of sale, that you identified as the
7 most important?
8    A.    It could be the power of sale.
9 You have -- you can have a security
10 document over personal assets that runs
11 pages and is registered in the deeds
12 registry in Antigua for not just
13 completion, but perfection. And it can
14 list, it's a matter of contract between
15 the two parties. They can include in
16 that document whatever they want to
17 include.
18   Q.    I understand that. And you
19 have testified that the most important
20 right typically associated with charges
21 is the right to sell.
22   A.    Yes, I have said that.
23   Q.    So you have said that you have
24 an opinion about the most important
25 right. What is the second most important

Page 245

1 right?
2    A.    I have difficulty answering
3 that question, because it just depends on
4 the circumstances. In one circumstance
5 the second most important right could be
6 that you must ensure the property. In
7 another circumstance it may be that you
8 can't use the property as security for
9 another loan. So I have a difficulty
10 understanding, answering the question in
11 a specific way.
12   Q.    So the right to preclude
13 granting security interest in an asset is
14 consistent with a charge?
15   A.    I would think so, yes.
16   Q.    Any other examples of common
17 rights associated with a charge, other
18 than the ones you've mentioned?
19   A.    Insurance. Paying whatever
20 taxes there are outside on the property,
21 even if it's personal property. Whatever
22 you do to keep your security as valuable
23 as is appropriate in the circumstances.
24   Q.    Okay. Let's go back to
25 paragraph 67 of your report. We are

62 (Pages 242 - 245)

Page 246

1 going to pick up where we left off
2 "Indeed, there is often good reason for a
3 party to seek the remedies of a chargee
4 without seeking to become a chargee.
5 While a pledge or lien is perfected by
6 possession without the need for
7 registration, charges granted by
8 companies are invalid in many
9 jurisdictions (for example, Antigua and
10 Barbuda Section 250 of the Companies Act,
11 England and Wales) if they are not
12 registered. Moreover, the law of
13 incorporation of the chargor; i.e., the
14 customer not FTX, usually determines
15 whether registration is required and the
16 consequence of failing to register which
17 would be logistically very difficult for
18 a company with tens of thousands of
19 customers worldwide," right?
20    A.   Yes.
21    Q.   Why are those reasons for a
22 party to seek the remedies of a chargee
23 instead of seeking to become a chargee?
24    A.   There could be -- implicit in
25 this is that the security holder may not

Page 247

1 want a charge. May just want to have the
2 revenues of a chargee, because this is
3 your classic case of where the security
4 holder will not want a charge, because
5 the validity of that charge, or should I
6 say the perfection of that charge, which
7 is important, is determined by the law of
8 the chargor and FTX had thousands of
9 customers. So it would be, I would
10 think, completely impractical for them to
11 register or perfect, according to the law
12 of the chargors, the security created by
13 a charge against these various customers.
14 So I think that that also shows an
15 excellent reason why the drafters and FTX
16 did not want a charge.
17    Q.   But that is not a reason for
18 someone to not want a charge. That is a
19 reason why someone would not want to go
20 to the effort of perfecting or
21 registering on a case-by-case basis a
22 charge, right?
23        MR. HARRIS: Object to the form.
24    A.   I disagree.
25    Q.   Why do you disagree?

Page 248

1    A.   Because, as I said, this to me
2 is the perfect example of why a person
3 would not want a charge. FTX would then,
4 in order to perfect its security in
5 respect of these thousands of lending
6 arrangements, would need to go to maybe
7 10, 20, 30 countries to have all of these
8 documents, all of these arrangements
9 perfected. It would make perfection of
10 the security virtually, well, very
11 impractical, impractical. And I think
12 that that is one reason why this document
13 is drafted the way it is.
14    Q.   But again, totally unresponsive
15 to my question. That's about perfection,
16 right? And you've already testified, and
17 it's all over your report, that there is
18 at least two steps to this. One is the
19 creation of the security interest.
20    A.   Yeah.
21    Q.   And the other is the perfection
22 of the security interest, right?
23    A.   Right.
24    Q.   Okay. So you're talking about
25 practical impediments to perfection of a

Page 249

1 charge, right?
2    A.   Yes.
3    Q.   It has nothing to do with
4 creating a charge, right?
5        MR. HARRIS: Object to the form.
6    A.   It has everything to do with
7 creating a charge, because businessmen
8 when they sit down to make an agreement,
9 try to make an agreement which makes
10 sense, which is practical, and which
11 suits their needs. Here I assume they
12 were advised that if you do a charge,
13 you're going to have to get all of them
14 perfected by -- because a charge is
15 perfected by a registration. I should
16 say that. It's not perfected by
17 exclusive control. It's perfected by a
18 registration. So they would have to go
19 and register these charges in numerous
20 countries. And failure to do that, not
21 in the BVI, but certainly in Antigua, if
22 you don't register within 21 days, it's
23 void. So they would not want a charge.
24    Q.   Do you have an understanding
25 about the registration requirements in

63 (Pages 246 - 249)

Page 250

1 BVI?
2    A.   I do, yes.
3    Q.   But you're not opining about
4 those, right?
5    A.   I am not opining.
6    Q.   What is your understanding of
7 the registration requirements in BVI?
8        MR. HARRIS: Objection. Outside
9    the scope.
10        MR. BELLER: I am asking his
11    understanding.  He has just put at
12    issue the very question that I posed
13    to him.
14        MR. HARRIS: No.  You posed it
15    to him.  He didn't -- he's not giving
16    an opinion on the BVI requirements.
17        MR. BELLER: He put it in his
18    report about registration requirements
19    in other places of the world.
20    A.   I will answer the question.
21 There are two requirements or two regimes
22 for registering a charge in the BVI for a
23 company like Three Arrows, because we are
24 talking about Three Arrows here.  A, it
25 can do a public registration under the

Page 251

1 International Business Companies Act,
2 which will perfect the security against
3 the world.  It doesn't have to do it.  It
4 uses the word "may."  So they may
5 register.  If they don't register, it
6 does not invalidate the charge.  It
7 simply means it has no priority.
8        The second way of registering
9 the charge in the BVI is what I would
10 call a private registration, in that
11 every company that creates a charge must
12 have a register of charges that are kept
13 at a registered office of the company.
14 It is not in there for the public.  So
15 you must register your charge.  Even
16 though the obligation here is on the
17 chargor to create the charge, they have
18 to do it.  And so you can have that form
19 of registration.  If you have neither one
20 of the two -- and I see nothing in this
21 case to indicate that either system was
22 attempted -- then it means that the
23 charge has not been perfected, if it is a
24 charge.  If it is a charge.
25    Q.   Do you have any reason to

Page 252

1 believe FTX in order to perfect one
2 charge would have to perfect all charges
3 against customers?
4        MR. HARRIS:  Object to the form.
5    A.   If they want to perfect those
6 charges and make them enforceable, then
7 they have to.
8    Q.   So FTX could have registered
9 any number of charges that it wanted to
10 and not have registered the remaining
11 charges?
12    A.   It's up to them.  It's their
13 security.  It's up to them.
14    Q.   Right.  And is it generally
15 your view as a purported expert of
16 secured transactions that a lender or
17 creditor on the whole, all things equal,
18 would rather have more security interests
19 and rights rather than fewer?
20        MR. HARRIS:  Object to the form.
21    A.   As a general statement, yes,
22 they would have prefer to have more
23 security rights than less.
24    Q.   And again, it's possible to
25 have a security interest granted, but not

Page 253

1 perfected, right?
2    A.   Yes.
3    Q.   I would like to talk about the
4 Lehman case that you mentioned earlier.
5        (Webster Exhibit 7, the Lehman
6    case, was so marked for
7    identification, as of this date.)
8    Q.   So you said you reviewed this
9 case previously, right?
10    A.   Yes.
11    Q.   And remind me, did you review
12 this case before submitting your
13 declaration?
14    A.   Before and after.
15    Q.   How recently did you review
16 this case?
17    A.   In preparation for this.
18    Q.   So relatively recently?
19    A.   Relatively recently, yes.
20    Q.   So the court reporter has just
21 put in front of you a document marked as
22 Exhibit 7.  And do you agree that this at
23 least on the face --
24    A.   Before we get into this, can I
25 have a bathroom break?

64 (Pages 250 - 253)

Page 254

1   Q.   Of course.
2        THE VIDEOGRAPHER:  Off the
3   record at 4:30 p.m. EST.
4        (Off the record.)
5        THE VIDEOGRAPHER:  Back on the
6   record at 4:43 p.m., EST.
7   BY MR. BELLER:
8   Q.   Mr. Webster, we are in the
9   homestretch.  I appreciate you working
10  with me on all of these questions and
11  answers.
12       As I mentioned before the
13  break, we are going to look at the Lehman
14  case here that you mentioned.  And is the
15  case in front of you that's been marked
16  as Exhibit 7 the Lehman case that you
17  referred to?
18  A.   Yes, it is.
19  Q.   Okay.  I think earlier you
20  testified that you had reviewed this
21  case, but did not think it was I forget
22  whether the word was relevant or material
23  or instructive, because it was about an
24  English statute.  Not common law, right?
25  A.   That in a sense is what I said,

Page 255

1   yes.
2   Q.   Okay.  Is that true for all of
3   the decisions or only certain of the
4   decisions or rulings?
5        MR. HARRIS:  Object to form.
6   Q.   Let me make that better.
7        Is it your understanding that
8   this opinion includes rulings on multiple
9   issues?
10  A.   Yes, it does.
11  Q.   Okay.  And did your statement
12  that this decision was not relevant to
13  your opinion, because it was about
14  English statute and not common law, does
15  that apply to all of the rulings included
16  in this?
17  A.   No, it doesn't --
18       MR. HARRIS:  I will remind you
19  again to pause after Mr. Beller
20  finishes.  Go ahead.
21       MR. BELLER:  It's my slow New
22  York cadence here that is sucking you
23  in.  I am sorry about that.
24  Q.   Does your statement about the
25  relevance of this decision apply to all

Page 256

1   of the rulings included in this opinion?
2   A.   No.
3   Q.   Okay.  Which ones does it apply
4   to?
5   A.   It applies to the question of
6   control of a digital asset, of an asset.
7   Yeah.
8   Q.   Sorry, were you finished?
9   A.   No, the version of this
10  judgment that I looked at had a headnote
11  with the various things that were
12  decided.  As I said, I was looking for
13  one thing, control.  And the part of the
14  headnote that deals with control, I
15  immediately realized that this is talking
16  about control on the, again, if I had the
17  headnote I could tell you the name of the
18  legislation immediately.
19  Q.   Okay.
20  A.   So this doesn't help me.
21  Q.   And maybe it will help if you
22  turn to paragraph, between 73 and 74,
23  Issue 6.
24  A.   All right.
25  Q.   Does this look like the control

Page 257

1   ruling that you reviewed the headnote for
2   and determined was not going to be
3   relevant or useful?
4   A.   Well, it does refer to the
5   legislation that I was talking about, the
6   financial collateral arrangements, number
7   two regulations, 2003.  Does this have
8   where he made his decision on that
9   because that statute refers to the issue
10  of control.
11  Q.   Okay.  So you didn't read, you
12  only read the headnote for this case, or
13  did you read any of the actual decision?
14  A.   For preparing my opinion I just
15  read the headnote, only the relevant part
16  of the headnote, because I had a lot to
17  do, and if I realize that this case is
18  not helping me on the issue that I want,
19  that I went to it for then I am not going
20  to spend anymore time on it.
21  Q.   Then in preparing for the
22  deposition, did you read anything more
23  than that?
24  A.   Yes, I did.
25  Q.   What did you read in preparing

65 (Pages 254 - 257)

Page 258

1 for the deposition?
2    A.   I read how he deals with a lien
3 and how to classify it.
4    Q.   Okay.  So if you turn to
5 paragraphs, between paragraphs 33 and 34,
6 this is Issue 1, "What is the nature of
7 the security interest created by clause
8 13 of the LBF MCA and describe as a
9 general lien."
10       Does that look like the
11 beginning of the section that you
12 reviewed?
13    A.   Yes.
14    Q.   Do you recall generally the
15 discussion in this Issue 1?
16    A.   In a very general way, yes.
17    Q.   What do you understand the
18 issue to be that's discussed in this
19 case?
20    A.   Whether the security that was
21 created is a charge or a lien.  It uses
22 the word, I think general lien in the
23 security document.  And the issue was
24 whether it created a lien or a charge.
25    Q.   And what do you understand the

Page 259

1 ruling to be?
2    A.   That it created a charge.
3    Q.   And do you understand the
4 reasoning employed by the court in coming
5 to that conclusion?
6    A.   Yes, I think I do.
7    Q.   Can you explain to me your
8 understanding of that?
9    A.   Right.  I think it's Lord
10 Briggs, Justice Briggs as he was then, he
11 looked at the document, he looked at the
12 circumstances, the factual matrix.  And
13 he concluded, if I may jump straight to
14 the conclusion, that what was created
15 here was a charge because the security
16 the parties had agreed to put up, they
17 had agreed on security, and there was an
18 issue as to whether that security is
19 valid.  And if he had treated it as just
20 a lien, it would not have been valid and
21 it would have been -- this is where I
22 missed the headnote, because I used the
23 headnote.
24       He said that it would have been
25 unreasonable, it would have been

Page 260

1 incapable of creating a proper security.
2 And he concluded that it was a charge.
3    Q.   And that was in part because
4 the assets being pledged or the assets
5 that were forming the security were
6 intangibles, right?
7    A.   I think they were, yes, yes.
8    Q.   And so having read this, at
9 least this section of this opinion, in
10 preparation for your deposition, is there
11 anything about your opinion, about your
12 opinions in the declaration, that you
13 would like to modify?
14    A.   No.
15    Q.   Do you believe that now having
16 read this section for the first time,
17 that this opinion is relevant to the
18 opinions that you are offering in this
19 case?
20    A.   It may be relevant, yes.
21    Q.   And how would it be relevant?
22    A.   Because it dealt with a
23 situation on -- there is a factual
24 similarity in that you start it out with
25 a lien.  You ended up with a charge.  And

Page 261

1 Lord Briggs went into consideration of
2 why, and that's why I think it is
3 relevant.
4    Q.   Okay.  So I understand your
5 opinion is that there was no charge
6 created under the Margin Agreement.  But
7 if a charge were created, do you have a
8 view of whether it would be a fixed or
9 floating charge?
10       MR. HARRIS:  Object to the form
11 of the question.
12    A.   I think it would have been
13 neither.
14    Q.   Is there a third option?
15    A.   No, that's my difficulty.  It
16 definitely was not a fixed charge,
17 because the asset here was the
18 fluctuating, the wallet.  And that was
19 changing constantly.  And in my view of a
20 fixed charge, you cannot have a fixed
21 charge over an asset that is constantly
22 fluctuating.
23    Q.   So if the court were to find
24 that this Margin Agreement did create a
25 charge, your view is that it created a

66 (Pages 258 - 261)

Page 262

1 floating charge?
2       MR. HARRIS:  Objection to form.
3    A.    No, that's not what I said.  I
4 said neither.  If you have a charge, a
5 document which parades as a charge and it
6 is not a floating charge, it does not
7 mean that it's a fixed charge.  You have
8 to meet the criteria for being a fixed
9 charge.
10    Q.    Why would FTX not meet the
11 criteria for a floating charge here?
12       MR. HARRIS:  Object to the form.
13    A.    Because the security that was
14 being offered -- a floating charge is
15 normally over the circulating capital of
16 a company.  I do not regard FTX's
17 interest in the pooled assets as a part
18 of its working capital that it used in
19 conducting its business.
20    Q.    But that's not the only way to
21 create a floating charge, right?
22    A.    It is -- the cases suggest that
23 it is the most important criteria.
24    Q.    And a floating charge can only
25 be over the circulating capital of a

Page 263

1 company?
2    A.    The floating charge, yes, over
3 the circulating capital.
4    Q.    So do you have an understanding
5 of what the Antiguan courts used to
6 determine whether a charge is a fixed or
7 floating charge?
8    A.    Well, that is one, whether it
9 is -- well, that is the main criteria
10 whether it is part of the working capital
11 of the work and is used in the company's
12 business and if you put a freeze on that,
13 then the company can't do its business.
14 So that's why its floating.  It only
15 freezes when you crystallize a security.
16       The courts also look at how the
17 asset is dealt with.  So that if the
18 borrower can withdraw assets from the
19 security, it is a clear indication, it is
20 another indication that this can't be a
21 floating security, because -- let me make
22 sure I am saying that right.
23       If the borrower has -- no.  If
24 the lender can restrict borrowing under
25 the security, then that suggests that it

Page 264

1 is not a floating charge.  And this is
2 FTX's position, that they can, they had
3 control of the -- I don't agree, but what
4 Mr. Hausman has said and what FTX is
5 saying is that they had exclusive control
6 of the assets.  And if you have exclusive
7 control of an asset, it just can't be a
8 circulating -- it can't be a fixed, a
9 floating charge, the subject of a
10 floating charge.
11    Q.    Is exclusive control also the
12 test for a fixed charge?
13    A.    Test for what?
14    Q.    For a fixed charge.
15    A.    For what?
16    Q.    You just used the phrase
17 "exclusive control" in the context of
18 discussing whether this is a fixed or a
19 floating charge under the hypothetical I
20 provided to you.
21       I am asking you whether your
22 understanding is that exclusive control
23 is a relevant test in determining whether
24 a charge is a fixed or floating charge?
25       MR. HARRIS:  Object to the form.

Page 265

1    A.    I think it's a relevant test in
2 determining whether it's a floating
3 charge.
4    Q.    And so again, it's this
5 exclusive control question, not some
6 other version of control, right, that's
7 your testimony?
8       MR. HARRIS:  Object to the form.
9    A.    If the lender has control over
10 the assets, so that the borrower cannot
11 deal with the assets in its business as
12 it would like to, then that suggests that
13 it is not a floating charge.
14    Q.    Right.  And what I am asking is
15 when you use the phrase "if the lender
16 has control over the assets," whether
17 your understanding is that that is the
18 same test as we had been talking about
19 earlier today in the context of
20 perfecting a lien?
21    A.    The cases dealing with floating
22 charges don't use the word, the
23 expression "exclusive control."  They say
24 "basically" that if the borrower does not
25 have control of the assets, that he can't

67 (Pages 262 - 265)

Page 266

1 use the assets in his business, what I
2 have described earlier as a circulating
3 capital of the business, then it is not a
4 floating charge.  It's not the same
5 language.
6    Q.   Can there be a charge that's
7 neither a fixed charge or a floating
8 charge?
9    A.   I don't know.  Since I
10 revisited this case on that issue, I
11 really do not have an answer for you as
12 to whether, A, a charge is neither is
13 fixed or floating charge, I don't think
14 it's a charge anymore if it ever was.
15 And secondly where, as in this case,
16 there is no registration to perfect the
17 charge, then it is not a charge which has
18 been perfected, therefore, it has no
19 priority.
20    Q.   Let's go back to your report.
21    A.   Are you finished with Lehman?
22    Q.   I am.
23    A.   I would just like to say if
24 Lehman was being decided today, the
25 decision would have been very different.

Page 267

1 Because in Lehman they were looking at a
2 situation where the assets were -- in
3 Lehman they were looking at the situation
4 where the assets --
5       MR. BELLER:  I am going to
6    strike this answer because I haven't
7    asked a question.  It's completely off
8    the cuff.  And I have limited time to
9    address the rest of my questions?
10       MR. HARRIS:  If you don't want
11    to hear his answer, that's fine.
12       MR. BELLER:  It's just not --
13    it's not responsive to a question.
14       THE WITNESS:  All I am saying
15    is, it would have been decided
16    differently if it was being looked at
17    today.
18       MR. BELLER:  And I am going to
19    move to strike that response.
20    A.   Okay.
21    Q.   Beginning in paragraph 88 of
22 your report through paragraph 100, you
23 put forward opinions, additional opinions
24 about why there is no valid security
25 interest granted to FTX, right?

Page 268

1    A.   Yes.
2    Q.   And looking at paragraph 90
3 through 95, the heading for this section
4 says, "FTX had no security over amounts
5 it or others loaned to 3AC through the
6 Margin Lending Program," right?
7    A.   Yes.
8    Q.   And then you go on to say in
9 paragraph 90, "Regardless of the
10 correctness of FTX's position regarding
11 whether it was a lender under the Margin
12 Lending Program, FTX could not claim a
13 security, any amount or asset that either
14 it or any third-party lenders lent to 3AC
15 under the Margin Lending Program," right?
16    A.   Yes.
17    Q.   And then you say "Under
18 Antiguan law relating to privity of
19 contracts, only a party to a security
20 agreement may acquire a security, and
21 even then only for the amount it has
22 loaned as security because only a lender
23 may acquire a security over its loans,"
24 right?
25    A.   Yes.

Page 269

1    Q.   Can you explain to me what you
2 mean by that?
3    A.   Yeah.  There is a section here
4 where I dealt with security, my
5 understanding of security.  I sort of
6 outline in paragraphs 58 and 59 of the
7 opinion, where I refer to the Powdrill
8 case and the quotation from Sir Nicholas
9 Browne-Wilkinson, where he says "Security
10 is created where a person (the creditor)
11 to whom an obligation is owed by another,
12 (the debtor), by a statute or a contract,
13 in addition to the personal promise of
14 the debtor to discharge the obligation up
15 to its rights exercisable against some
16 property which the debtor has an interest
17 in order to enforce the discharge of the
18 debtor's obligation to the creditor."
19       So that's the basic situation.
20 You have an obligation and the security
21 holder has the security that the
22 agreement says that he has to recover the
23 amount of money that he put up as
24 security.  So that's my sort of basic
25 understanding of a security arrangement,

68 (Pages 266 - 269)

Page 270

1 which is why I say in -- is it 91 that
2 you referred to?
3     Q.    Yes.
4     A.    On the Antiguan law related to
5 the privity of contracts as discussed,
6 because I am not sure if you're taking
7 issue of that, because I made the point
8 earlier that third-party lenders could
9 not claim any rights under the security
10 agreement, because they were not parties
11 to it. And Mr. Hausman agrees with me on
12 that point.
13        So I assume that you're
14 referring to the second part of paragraph
15 91, which says "Only a party to a
16 security document may acquire a security,
17 may acquire a security and even then only
18 for the amount it has loaned as security
19 because only a lender may acquire a
20 security over its loans." Which to me
21 reflects what I said in paragraph 58,
22 yes. That if you lend and you have
23 security for your lending, then you can
24 recover it, but you can go over that.
25     Q.    So this paragraph is only

Page 271

1 attempting to summarize in your own words
2 the language that you just read at
3 paragraph 58, I believe?
4        MR. HARRIS:  Object to the form.
5     A.    58, yeah.
6     Q.    Is that right?
7     A.    Yes, yeah.
8     Q.    So all that you're saying in
9 this paragraph 91 is that that the
10 security secures on obligation?
11        MR. HARRIS:  Object to the form.
12     A.    To the amount that you put in
13 as a lender.
14     Q.    Can a creditor be oversecured?
15     A.    When you say oversecured, if
16 the debt is $100 and the security is
17 $200, is that what you mean by
18 oversecured?
19     Q.    Yes.
20     A.    I would think so, yes.
21     Q.    But they can only recover the
22 amount of their obligation of their
23 claim?
24     A.    Of their lending obligation,
25 yes.

Page 272

1     Q.    Even if their collateral is
2 worth more?
3     A.    That's what I am saying, yes.
4     Q.    Okay.  So how does that
5 principle lead to the conclusion in 92
6 that "FTX, therefore, would not have a
7 security over amounts or assets that the
8 third-party lenders loaned to 3AC"?
9     A.    I think that is a combination
10 of the two factors that are mentioned in
11 91. Firstly, the third-party lenders
12 have no privity, so they can't enforce
13 anything under the security agreement.
14        And secondly, FTX cannot
15 recover the amounts going to them, using
16 the security.
17     Q.    But that's not what this 92
18 says.  This is talking only about FTX's
19 security interest, not the third-party
20 lenders.  You talk about that in the next
21 section.  So setting that aside, you say
22 that "FTX, therefore, would not have
23 security over amounts," okay.  So FTX
24 can't have security interest with respect
25 to obligations owed to the third-party

Page 273

1 lenders; is that what you mean?
2     A.    I think, yeah, that's what I
3 said, yeah.
4     Q.    But then you say "Or assets
5 that the third-party lenders loaned to
6 3AC."
7        Why would FTX not be able to
8 have a security interest over assets held
9 by 3AC that it obtained from loans?
10        MR. HARRIS:  Object to the form.
11     A.    If the third-party lender
12 loaned the assets, because I am assuming
13 this is on the Margin Lending Program,
14 the third-party lender provided assets,
15 those assets belong to the third -- well,
16 they are the security holder.  They are
17 the persons who advanced those assets.
18 So that's why I put assets here, amounts
19 and assets or assets.
20     Q.    But as a legal matter, I am not
21 understanding, why would assets lent by a
22 third-party lender to 3AC, as a facial
23 threshold matter, not be capable of being
24 subjected to a security interest in favor
25 of FTX?

69 (Pages 270 - 273)

Page 274

1          MR. HARRIS:  Object to the form.
2     A.   Because the amounts were
3 advanced by these third-party lenders,
4 and FTX cannot sort of take over their
5 situation.
6     Q.   Are you assuming that the
7 third-party lenders themselves are
8 secured in something?
9     A.   No, I am not assuming that.  I
10 am assuming that, I am assuming what is
11 said in the documents, that they loaned,
12 that they made loans to Three Arrows and
13 other persons on the exchange.
14     Q.   But I am still not
15 understanding.  What, as a matter of
16 Antiguan law, why is it that an asset or
17 cash or any property that is lent to 3AC
18 without more, there is no more
19 explanation here about assumptions that
20 you're making, about the terms of those
21 debts or the terms of the Margin Lending
22 Program or anything about the
23 restrictions on 3AC, as a contractual
24 matter.  I am asking as an Antiguan law
25 matter, why would FTX not be able to

Page 275

1 obtain a security interest in something
2 that had been lent to 3AC by a
3 third-party?
4          MR. HARRIS:  Objection.  Asked
5     and answered.
6     A.   I think I've already answered
7 that question.  Because the amounts and
8 the assets that you are speaking about
9 were advanced by third parties.  They
10 were not advanced by FTX, and therefore,
11 FTX -- are you asking if FTX can recover
12 those amounts?
13     Q.   No, I am asking if FTX, to the
14 extent it has its own -- to the extent
15 3AC owes FTX its own obligation, why FTX
16 cannot be secured in assets that have
17 been delivered to 3AC under loan
18 agreements from third-party lenders?
19          MR. HARRIS:  Object to the form.
20     A.   That's not my understanding of
21 how it works because they may have been
22 on the same exchange, but these assets
23 and monies advanced by the third parties
24 to 3AC.
25     Q.   But why is that inconsistent

Page 276

1 with what I said and you said it's not
2 your understanding of how it works.  What
3 part that I said is not how it works in
4 your understanding or assumptions?
5          MR. HARRIS:  Object to form.
6     A.   I think you're suggesting that
7 FTX has security over these amounts.  And
8 if it has security over these amounts,
9 then it means it can recover them.
10     Q.   I am asking a very simple
11 question, which is if 3AC owed FTX money,
12 and 3AC borrowed from a person, a
13 third-party lender one bitcoin, as a
14 matter of Antiguan law, is it impossible,
15 invalid as a threshold question, for FTX
16 to be secured on that bitcoin?
17          MR. HARRIS:  Object to the form.
18     A.   Well, if there is a document
19 that achieves that purpose, then it may
20 be possible.
21     Q.   Then you go on to say in
22 paragraph 93 "If FTX did provide lending,
23 it could be secured on" -- and I guess
24 maybe I am misunderstanding -- you say
25 "could not have security over the amounts

Page 277

1 it loaned."  Are you referring to the
2 assets that are subject to the security
3 interest or the obligation that is being
4 secured?
5          MR. HARRIS:  Object to the form.
6     A.   Can you repeat the question?  I
7 have to read the paragraph.
8     Q.   When you refer to "Security
9 over the amounts it loaned through the
10 Margin Lending Program," are you talking
11 about the assets subject to the security
12 interest or the obligations that are
13 being secured?
14          MR. HARRIS:  Object to the form.
15     A.   I would have to say to the
16 amounts it loaned through the Margin
17 Lending Program.
18     Q.   I don't know how that's
19 answering my question, that's just the
20 words on the page.  And what I am telling
21 you, I need you to explain what you mean
22 by the words on the page.
23          Are you talking about, when you
24 refer to the amounts it loaned through
25 the Margin Lending Program, and having

70 (Pages 274 - 277)

Page 278

1  security over those amounts, are you
2  talking about having a security interest
3  with respect to the amounts loaned or are
4  you talking about the source of the
5  obligation being secured?
6      MR. HARRIS:  Object to the form.
7  A.   I mean, I am referring in this
8  paragraph to the amounts loaned and not
9  to the form of security.
10  Q.   So if you're not talking about
11  the form of security, then when you talk
12  about the amounts loaned, are you talking
13  about the source of the obligation, which
14  is FTX lent amounts to 3AC under the
15  Margin Lending Program?
16      MR. HARRIS:  Object to the form.
17  A.   I am looking at the sentence
18  that I wrote here and I am trying to
19  explain it to you, which to a certain
20  extent involves simply repeating what is
21  said in the sentence.  To the extent that
22  FTX did provide margin lending, which is
23  not lending under the line of credit,
24  because it could not be identified as the
25  lender, it could not have security.  I

Page 279

1  mean that to me is what I am saying in
2  93.
3  Q.   And what I am trying to
4  understand, and it's still not being
5  answered, is when you refer to security
6  over the amounts it loaned, does the
7  phrase "security over" refer to the thing
8  being subjected to a security interest or
9  to the obligation that is purportedly or
10  may be secured?
11      MR. HARRIS:  Objection.  The
12      question was answered.  The question
13      is difficult to understand.
14      MR. BELLER:  It's a very simple
15      question.
16      MR. HARRIS:  It is definitely
17      not.
18      MR. BELLER:  It really is.
19      MR. HARRIS:  I don't understand
20      it.
21      MR. BELLER:  I think you do.
22      MR. HARRIS:  I promise you I do
23      not.
24  Q.   Do you have an answer to the
25  question?

Page 280

1  A.   My answer is in 93.
2  Q.   Okay.  If FTX was determined to
3  be identifiable as the lender for some
4  amounts to 3AC under the Margin Lending
5  Program, are there any restrictions under
6  Antiguan law about whether it could be,
7  have a security interest?
8      MR. HARRIS:  Object to form.
9  A.   If FTX advanced money under the
10  Margin Lending Program, which is contrary
11  to their case, but let's assume that,
12  then what is the question?
13  Q.   Then would this paragraph 93
14  still apply?
15      MR. HARRIS:  Object to the form.
16  A.   Well, the paragraph deals with
17  the fact that FTX could not be identified
18  as a lender.
19  Q.   I am aware of that.
20  A.   Right.
21  Q.   And I am asking you if it were
22  determined that FTX was identifiable as
23  the lender, would any part of paragraph
24  93 still apply?
25      MR. HARRIS:  Object to the form.

Page 281

1  A.   If FTX was a lender under the
2  Margin Lending Program, then I think
3  there would be an argument -- I am not
4  sure, because I am thinking about this
5  for the first time -- if FTX was a
6  lender, and the moneys that it advanced
7  fell under the indebtedness which is
8  secured by the Margin Agreement, then I
9  suppose FTX, in that hypothetical
10  situation, would be able to claim
11  security in respect to those amounts.
12  Q.   So that's a no?
13      MR. HARRIS:  Objection to the
14      form.
15  A.   You asked me assuming that FTX
16  could be identified as a lender under the
17  program, would my answer to 93 be the
18  same?
19      And I said if, contrary to my
20  understanding, and contrary to FTX's
21  case, FTX was a lender under the margin
22  program, and those lendings fell under
23  the definition of indebtedness, then
24  there could be an argument that FTX had
25  security in respect to those amounts.

71 (Pages 278 - 281)

Page 282

1    Q.   Only in respect of the amounts
2  that it actually loaned or on all, or any
3  potential assets that were subject to the
4  collateral requirements?
5        MR. HARRIS:  Object to the form.
6    A.   FTX had security over the
7  indebtedness as defined in the agreement.
8    Q.   When you say security over the
9  indebtedness, but are you referring to
10  the indebtedness as the obligation or the
11  subject of the security interest?
12    A.   I still don't understand the
13  distinction that you're making.
14    Q.   Let's go back to paragraph 58.
15  You started here, this discussion with
16  paragraph 58, right?  "Security is
17  created where a person (the creditor) to
18  whom an obligation is owed by another
19  (the debtor) by statute or contract in
20  addition to the personal promise of the
21  debtor to discharge the obligation,
22  obtains rights exercisable against some
23  property in which the debtor has an
24  interest in order to enforce the
25  discharge of the debtor's obligation to

Page 283

1  the creditor," right?
2        So this is setting up two
3  distinct concepts.  One is the
4  obligation, right?  And the other is the
5  property in which the debtor has an
6  interest that is subjected to a security
7  interest, right?
8    A.   Okay.
9    Q.   Okay.  So we have obligation
10  and we have collateral securing those
11  obligations, right?
12    A.   Yes.
13    Q.   So when you just answered that
14  FTX could have security over the
15  indebtedness as defined in the agreement,
16  are you talking about the indebtedness as
17  the obligation or as the collateral?
18    A.   As the obligation or the
19  collateral.  I am afraid I am still not
20  clear on the distinction between the
21  obligation and the collateral, because
22  what I am talking about in 58 -- is it
23  58, yeah -- which is basically a
24  debtor/creditor relationship security
25  created and you have a right to pursue

Page 284

1  that security.
2        I am afraid I am not in a
3  position to answer your question.
4    Q.   Mr. Webster, you are being put
5  forward in this case as an expert in
6  secured transactions and security
7  interest, right?
8    A.   Right.
9    Q.   And you can't answer a simple
10  question to explain to me whether you are
11  referring to an obligation or the
12  collateral?
13        MR. HARRIS:  Mr. Beller, clearly
14    your question is confusing.  I do not
15    understand it either.  So badgering
16    the witness is not helping.
17    Q.   You can answer.
18    A.   I've answered.
19    Q.   So you can't answer my question
20  to explain to me whether you are talking,
21  when you refer to security over
22  indebtedness, you are referring to the
23  indebtedness as the underlying obligation
24  or the collateral security?
25    A.   The underlying obligation --

Page 285

1        MR. HARRIS:  Object to form,
2    sorry.
3    A.   -- could only be the obligation
4  to repay.  In fact, if I don't understand
5  your question, I shouldn't answer it.
6    Q.   Do you understand whether FTX
7  could be owed amounts by 3AC other than
8  in connection with the Margin Lending
9  Program?
10    A.   Well, other amounts in respect
11  to the line of credit, that's my answer.
12    Q.   Anything else?
13    A.   Not that I am aware of, no.
14    Q.   If FTX were owed amounts by
15  3AC, separate and apart from the Margin
16  Lending Program, are you giving an
17  opinion about whether those obligations
18  could be secured by assets lent through
19  the Margin Lending Program?
20    A.   If they fell under the
21  definition of indebtedness.
22    Q.   Let's look at the margin and
23  line of credit agreement where you keep
24  talking about the definition of
25  indebtedness, right?

72 (Pages 282 - 285)

1    A.   Yes.
2    Q.   So you're looking at the first
3  recital which says "Whereas customer is a
4  customer of the FTX.com cryptocurrency
5  exchange and FTX desires to afford
6  customer with the access to margin
7  trading and potentially discretionary
8  line of credit facilities, (together the
9  'indebtedness' as set forth herein,"
10 right?
11       So you're saying if the
12 obligations that I was referring to that
13 were owed by 3AC to FTX fell under the
14 indebtedness, then it could be secured by
15 any of the assets that 3AC held?
16   A.   Yes.  Well, it could be secured
17 by any of the assets contemplated by the
18 agreement.
19   Q.   Okay.  If you look at the first
20 page of that document, which is Exhibit
21 5, which you talked about as the FTX line
22 of credit, FTX Trading Limited is
23 identified as the lender, right?
24   A.   Yes.
25   Q.   And so if -- but it's still

1  your opinion, is it your opinion that the
2  line of credit can't be secured?
3       MR. HARRIS:  Object to the form.
4    A.   It is my opinion that the line
5  of credit did not create a security
6  interest.
7    Q.   And why is that?
8    A.   Because it didn't.  It doesn't
9  say so.  It just didn't.
10   Q.   And is that based on the
11 reading of the line of credit and the
12 Margin Agreement as two separate
13 agreements?
14   A.   I would always say that they
15 are two separate agreements that were put
16 together.  That is my assessment of the
17 factual situation here.  They are two
18 agreements.  They may have been put
19 together for some purpose, I don't know.
20 But they have two agreements.
21   Q.   Right.  But do you recall
22 earlier in this deposition I asked you
23 whether it had an impact on your opinion
24 whether they were one or two documents?
25   A.   When you were pointing to

1  something --
2    Q.   Let me finish my question.  And
3  I asked you whether it mattered whether
4  they were one or two documents; do you
5  remember that?
6    A.   You did, yes.
7    Q.   And do you remember that you
8  answered that it doesn't matter?
9    A.   I did say that, yes.
10   Q.   So do you want to change that
11 answer or do you still stand by that?
12   A.   Well, let me hear what you have
13 to say to see if I have to change it.
14   Q.   So do you want to change that
15 answer right now or no?
16   A.   No, I want to hear what you
17 have to say and then I will decide if I
18 want to change my answer.
19   Q.   My question is if these are
20 read as one integrated agreement, does
21 the answer that you previously gave about
22 the line of credit being subjective to
23 security --
24   A.   It's hard to --
25   Q.   Please let me finish my

1  question.  Does that change your answer?
2       MR. HARRIS:  Object to form.
3    A.   It's hard for me to agree to
4  change my answer on the basis of a
5  hypothetical or a premise that I do not
6  agree with.
7    Q.   So do you want to change your
8  answer that you earlier gave that it
9  doesn't matter whether it's read as one
10 or two documents?
11   A.   I would stay with my answer.
12   Q.   So if these are read as a
13 single integrated document, your opinion
14 stays the same?
15   A.   It depends on the question.
16   Q.   The question is what I've
17 asked.  You can't have it both ways.  You
18 have said you read it as two documents
19 and you can't view it as any other way.
20 And then you said your opinion doesn't
21 change, depending on whether it's one or
22 two documents.  So those both can't be
23 true.  So I am asking which one of those
24 are true?
25       MR. HARRIS:  Object to the form.

Page 290

1    A.   Which question, which document?
2  I don't understand the question.  What's
3  the question?
4    Q.   The question is if the line of
5  credit and the Margin Agreement, contrary
6  to your interpretation of it, are not
7  read as two separate documents, but are
8  read as a single agreement whether your
9  answer to the question about whether the
10 line of credit is subject to a valid
11 security interest changes?
12     MR. HARRIS:  Object to the form.
13   A.   Because of my fundamental
14 disagreement with the characterization of
15 these two agreements as one agreement, I
16 am not going to change my answer.
17   Q.   So your testimony is that even
18 if it's one agreement, it still can't be
19 secured?
20   A.   My testimony is that these are
21 two agreements.
22   Q.   Right.  So you're refusing to
23 answer the question about what your view
24 would be --
25   A.   On the basis that I just said.

Page 291

1    Q.   Okay.
2      MR. BELLER:  Let's take a break.
3  I don't know how much time I have
4  left.
5      THE VIDEOGRAPHER:  Going off the
6  record at 5:33 p.m. EST.
7      (Off the record.)
8      THE VIDEOGRAPHER:  We are back
9  on the record at 5:43 p.m. EST.
10 BY MR. BELLER:
11   Q.   Okay.  Mr. Webster, at various
12 times today you've referred to an
13 undivided share in a pool of assets, do
14 you remember mentioning that?
15   A.   Yes.
16   Q.   What do you mean by that?
17     MR. BELLER:  Let's go off the
18 record.
19     (Off the record.)
20     THE VIDEOGRAPHER:  Back on the
21 record at 5:45 p.m. EST.
22 BY MR. BELLER:
23   Q.   Okay, Mr. Webster, would you
24 like me to read back the question I had
25 asked before that break?

Page 292

1    A.   Okay.
2    Q.   Yes?
3    A.   Yes, go ahead.
4    Q.   At various times today you've
5  referred to an undivided share in a pool
6  of assets; do you remember mentioning
7  that?
8    A.   Yes, I did.
9    Q.   And what do you mean by that?
10   A.   It's the assets the customer
11 would deposit, it's the assets into the
12 individual customer accounts.  Those
13 assets were then swept over into the FTX
14 pool account, hot wallet, however you
15 choose to describe it, and that would
16 have been the assets of probably
17 thousands of customers.  So then what is
18 your entitlement in assets that you put
19 into the pool, because there is no
20 commingling with all of these other
21 assets.  What the Law Commission has
22 suggested is that you own an undivided
23 share of the pool.
24   Q.   Are you putting forward an
25 opinion that 3AC had an undivided share

Page 293

1  --
2    A.   I am not putting forward an
3  opinion.
4    Q.   Please, Mr. Webster, we have
5  been doing almost seven hours.  Please
6  let me finish my question.
7      Are you putting forward an
8  opinion that 3AC had an undivided share
9  interest in the commingled pool of assets
10 held by FTX?
11   A.   I am not putting forward an
12 opinion.
13   Q.   Okay.  Do you understand
14 whether anybody is putting forward an
15 opinion about that on behalf of the joint
16 liquidators?
17   A.   I think Dame Elizabeth, yes.
18   Q.   Are your opinions in your
19 report based on the correctness of that
20 position?
21     MR. HARRIS:  Object to the form.
22   A.   I am not opining on the
23 correctness of anybody's position.  I am
24 saying that where the assets got swept
25 over into the pool and it is then owned

74 (Pages 290 - 293)

Page 294

1  by literally thousands of customers, the
2  only right you can have is a right to an
3  undivided share in that pool.  How it
4  works in practice, I don't know.  But
5  that's the only right you can have.
6      Q.   So I didn't ask whether you're
7  opining on the correctness of anybody's
8  position.  I am asking whether you're
9  opining -- whether your opinions in your
10 report are based on the correctness of
11 that position?
12     MR. HARRIS:  Object to the form.
13     A.   It's not based on the
14 correctness of those positions.  It is
15 based on my understanding that you had
16 assets deposited to an account, swept
17 over to another account and then you have
18 a right to something in that account.  So
19 it's just my assessment of where we are.
20     Q.   So it's your opinion that there
21 is no other possible right or entitlement
22 that 3AC could have other than an
23 undivided share of the pooled assets?
24     MR. HARRIS:  Object to the form.
25     A.   I didn't say that, no.

Page 295

1      Q.   So are you putting forward an
2  opinion about the nature of the rights
3  that 3AC had with respect to --
4      A.   No, I am not.
5      Q.   -- to either the digital assets
6  in the pooled account or otherwise?
7      A.   No, I am not.
8      Q.   And do your opinions depend on
9  whether Three Arrows Capital had an
10 undivided share interest in the pooled
11 assets or not?
12     MR. HARRIS:  Object to the form.
13     A.   No, it doesn't.
14     Q.   So if 3AC didn't have an
15 undivided share of the pooled assets, but
16 had some other right, your opinions would
17 be unchanged?
18     A.   I am not expressing an opinion
19 on ownership of the assets.
20     Q.   That I understand.  And my
21 question once again, is different.
22     Do your opinions -- is your
23 opinion -- if Three Arrows Capital did
24 not have an undivided share of the pooled
25 assets, but had some other right or

Page 296

1  interest with respect to digital assets
2  held on the FTX Exchange, are your
3  opinions unchanged?
4      MR. HARRIS:  Object to the form.
5      A.   What is some other form of
6  digital assets?  That to me is vague.
7      Q.   Does it matter?
8      A.   What matters to me is what I
9  said in my opinion.
10     Q.   Does it impact your analysis
11 what the right or interest is that Three
12 Arrows Capital has with respect to the
13 digital assets held by FTX?
14     A.   It may, but I haven't had a
15 chance to analyze exactly how.
16     Q.   Did you assume for purposes of
17 your report the undivided share of pool
18 assets theory was correct?
19     MR. HARRIS:  Object to the form.
20     A.   I made no assumption like that.
21 I am not -- I was not called upon to give
22 an opinion and I did not make an
23 assumption.
24     Q.   Did you make assumption for
25 purposes of your report about the nature

Page 297

1  of Three Arrows Capital's rights or
2  interests with respect to the digital
3  assets held by the FTX Exchange?
4      MR. HARRIS:  Objection.  Asked
5  and answered.
6      A.   So what's the question again?
7      Q.   Did you make an assumption for
8  purposes of your report about the nature
9  of Three Arrows Capital's rights or
10 interests with respect to the digital
11 assets held by the FTX Exchange?
12     MR. HARRIS:  Same objection.
13     A.   I must be getting tired.  I am
14 sorry.  I am going to ask you, forgive
15 me, to repeat the question.
16     Q.   Did you make any assumption
17 about the nature of Three Arrows
18 Capital's rights or interests with
19 respect to digital assets held by the FTX
20 Exchange for purposes of your report?
21     A.   I examined the matter and I
22 thought FTX -- Three Arrows must have
23 some sort of interest in the assets that
24 they put up.
25     Q.   But you didn't conclude

75 (Pages 294 - 297)

Page 298

1 anything beyond that they had some
2 interests in the assets --
3    A.   Yes.
4    Q.   -- right?  So you didn't go
5 beyond to say it had a certain kind of
6 interest, like an undivided share of
7 pooled assets?
8    A.   I did not -- sorry.
9    Q.   You testified that you examined
10 the matter and you thought Three Arrows
11 Capital must have some sort of interest
12 in the assets that they put up.  And I am
13 asking whether you went any further than
14 that.
15    A.   No.  That was sufficient for my
16 analysis.
17    Q.   When did you first consider the
18 undivided share of pooled assets?
19        MR. HARRIS:  Object to the form.
20    A.   After I read -- well, I think I
21 looked at it when I was reading the Law
22 Commission report and then I saw it in
23 Dame Elizabeth's opinion.  So Dame
24 Elizabeth would have come after I have
25 completed the report.  And I would have

Page 299

1 looked at it in the Law Commission report
2 even before I did the opinion.
3    Q.   You didn't discuss the
4 undivided share of pooled assets concept
5 in your report, right?
6    A.   No, I didn't.
7    Q.   And why not?
8    A.   Because I didn't need to.
9    Q.   What do you mean by, didn't
10 need to?
11    A.   My analysis, I carried it out
12 on the basis of what you see in the
13 report.
14        MR. BELLER:  Thank you very much
15 Mr. Webster, I don't have any further
16 questions.
17        MR. HARRIS:  I have a couple
18 very brief ones.
19        THE WITNESS:  And I do
20 apologize, not necessarily for the
21 amount of times that I jumped in.
22 This is an unusual procedure.
23        MR. BELLER:  Not at all.
24 Completely understand.
25        THE WITNESS:  Yes, sorry.

Page 300

1        MR. HARRIS:  Okay.  Just very
2 briefly.
3 EXAMINATION  BY MR. HARRIS:
4    Q.   Okay.  You testified earlier
5 that you reviewed Mr. Hausman's
6 declaration; do you remember that?
7    A.   Yes.
8    Q.   You weren't asked your views of
9 Mr. Hausman's declaration, right?
10    A.   No, I wasn't.
11    Q.   Just to be clear, if you're
12 asked about a particular opinion that
13 Mr. Hausman gives, would you testify as
14 to your views about his opinion?
15    A.   I would, yes.
16    Q.   And then I just wanted to
17 follow up on one issue that you were
18 asked about a couple of different ways
19 and just to make sure we have your clear
20 testimony so you got to bear with me as I
21 scroll way back.  All right.  At one
22 point you were asked.
23        "Question: What would be the
24 unreasonable result if the contract were
25 interpreted to provide a security

Page 301

1 agreement in the customer entitlements in
2 its account?
3        "Answer:  The result -- not
4 necessarily unreasonable -- the result
5 would be there is nothing in the account
6 when it comes to enforcement.  No assets
7 in the account when it comes to
8 enforcement.
9        "Question: But there are
10 assets associated with the account,
11 right?
12        "Answer:  That's not what the
13 agreement says.  It could have said that.
14 It could have said instead of in all of
15 the FTX accounts, it could have said in
16 all of the accounts associated with --
17 all assets associated with the FTX
18 accounts.  It could have said that."
19        Do you remember that?
20    A.   I remember that, yes.
21    Q.   Okay.  And then you were asked:
22        "Question:  Do you think it is
23 reasonable to interpret the language that
24 refers to all assets in all of the FTX
25 accounts of the customer as referring to

76 (Pages 298 - 301)

Page 302

1 all assets associated with the FTX
2 accounts, all of the FTX accounts of the
3 customer?"
4     And your answer was:
5     "Answer: I think it is
6 correct."
7     I just want to make sure I have
8 your clear testimony on that. Do you
9 think the answer you gave the second time
10 is accurate?
11 A.  No, my answer would be what I
12 gave the first time, in the account, not
13 associated with the account.
14     MR. HARRIS:  Okay. Nothing
15 further.
16     MR. BELLER:  Nothing further for
17 me.
18     THE VIDEOGRAPHER:  We are going
19 off the record at 5:58 p.m. EST. And
20 this concludes today's testimony given
21 by Paul Anthony Webster. The total
22 number of media units used was eight,
23 and will be retained by Veritext.
24 Thank you everybody.
25     (Time noted:  5:58 p.m.)

Page 304

1             I N D E X
2
3  WITNESS      EXAMINATION BY          PAGE
4  PAUL WEBSTER      Mr. Beller          5
                Mr. Harris        300
5
6
7           E X H I B I T S
8
9  WEBSTER      DESCRIPTION          PAGE
10 Exhibit 1   Declaration          39
11 Exhibit 2   Supplemental declaration       40
12 Exhibit 3   Declaration of Robert Stuart Levy    54
13 Exhibit 4   Chapter 2 of a book by Goode and   132
14            Gullifer
15 Exhibit 5   Document Bates stamped       140
16            FTX_3AC_000000758
17 Exhibit 6   Unidroit report       196
18 Exhibit 7   the Lehman case       253
19
20
21
22
23
24
25

Page 303

1     ACKNOWLEDGMENT OF DEPONENT
2
3     I have read the foregoing
4 transcript of my deposition and except
5 for any corrections or changes noted on
6 the errata sheet, I hereby subscribe to
7 the transcript as an accurate record of
8 the statements made by me.
9
10
11     _____
12     PAUL WEBSTER
13
14
15 SUBSCRIBED AND SWORN before
16 and to me this _____ day
17 of _____, 2025.
18
19
20     _____
21         NOTARY PUBLIC
22 My Commission Expires:
23
24
25

Page 305

1         CERTIFICATION
2
3
4     I, DAWN MATERA, a Notary Public for
5 and within the State of New York, do
6 hereby certify:
7     That the witness whose testimony as
8 herein set forth, was duly sworn by me;
9 and that the within transcript is a true
10 record of the testimony given by said
11 witness.
12    I further certify that I am not
13 related to any of the parties to this
14 action by blood or marriage, and that I
15 am in no way interested in the outcome of
16 this matter.
17    IN WITNESS WHEREOF, I have hereunto
18 set my hand this 10th day of December,
19 2025.
20
21     Dawn Matera
22     DAWN MATERA
23
24     *   *   *
25

77 (Pages 302 - 305)

Page 306

1     ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS
2
  IN RE:  FTX TRADING LTD, et al
3  DATE OF DEPOSITION:  December 9, 2025
    NAME OF WITNESS:  PAUL WEBSTER
4
    PAGE/LINE(S)/   CHANGE     REASON
5  ____/_____/_____/_____
    ____/_____/_____/_____
6  ____/_____/_____/_____
    ____/_____/_____/_____
7  ____/_____/_____/_____
    ____/_____/_____/_____
8  ____/_____/_____/_____
    ____/_____/_____/_____
9  ____/_____/_____/_____
    ____/_____/_____/_____
10  ____/_____/_____/_____
    ____/_____/_____/_____
11  ____/_____/_____/_____
    ____/_____/_____/_____
12  ____/_____/_____/_____
    ____/_____/_____/_____
13  ____/_____/_____/_____
    ____/_____/_____/_____
14  ____/_____/_____/_____
    ____/_____/_____/_____
15  ____/_____/_____/_____
    ____/_____/_____/_____
16  ____/_____/_____/_____
    ____/_____/_____/_____
17
    _____
18       PAUL WEBSTER
19  SUBSCRIBED AND SWORN TO
    BEFORE ME THIS_____DAY
20  OF _____, 2025.
21  _____
    NOTARY PUBLIC
22
  MY COMMISSION EXPIRES_____
23
24
25

## &

**&**   1:13 2:2,10
6:22 8:5 14:15
15:22 16:2,6
16:18 18:12,16
19:7 20:9,18
21:7 33:3,4,9
33:17,19 38:7
49:15 50:18
59:19 93:10

## 0

**000000758**
140:16 304:16

## 1

**1**   28:24 39:25
40:5 86:11
211:14 213:19
214:4 258:6,15
304:10
**10**   15:17 28:25
28:25 29:23
38:21 41:11
72:15,22 73:5
84:2 86:8,14
87:10 88:7
93:8 94:8
96:16 111:7,20
168:21 200:18
243:18 248:7
**100**   204:18,20
267:22 271:16

**10004**   2:3
**10020**   2:12
**102**   91:20
**10:10**   51:15
**10:25**   51:18
**10th**   305:18
**11**   1:2 4:16
196:6
**110**   52:25
**120**   52:25
**120,000**   52:25
**125**   2:3
**1271**   2:11
**12:04**   122:19
**12:42**   122:22
**13**   123:2 258:8
**132**   304:13
**13th**   120:7
**14**   184:25
185:5 188:24
188:25 189:2
209:18
**140**   304:15
**14th**   120:8
**15**   38:21 181:9
181:9,11
215:22
**16**   65:13 94:16
94:22 95:4
111:18
**19**   110:5,17,21
111:3,12
**196**   304:17

**1:46**   168:24

## 2

**2**   40:17,22
132:9,20
304:11,13
**2.8**   215:24
**2.9**   216:8
**20**   135:13
138:1 139:24
248:7
**200**   271:17
**2003**   257:7
**2009**   6:8,14
65:13
**2010**   38:24
**2014**   6:9 7:1,13
**2015**   75:15,20
**2022**   120:8
**2024**   77:9
**2025**   1:7 4:4
34:2 40:14
41:8 43:18
58:10 62:24
70:10 303:17
305:19 306:3
306:20
**21**   40:13 41:15
249:22
**212**   2:4
**21st**   86:12
**22-11068**   1:2
4:17

**25**   34:22,23
**250**   46:3,10,11
246:10
**253**   304:18
**2800**   2:19
**2:07**   169:2

## 3

**3**   54:8,13 99:13
142:3,25 143:7
143:8 160:8,9
160:10 161:22
164:14 169:8
231:20,23
233:15 304:12
**30**   53:16,21
248:7
**300**   304:4
**31**   41:7,16 43:7
47:3 48:7,11
**31st**   43:17 44:3
44:11 50:13
**32**   94:22 95:5
111:18
**33**   258:5
**330**   2:18
**34**   258:5
**39**   304:10
**3:20**   217:19
**3:38**   217:22
**3ac**   2:11 99:15
102:20 107:9
107:19,25
108:7 110:6

115:21 127:15
127:24 128:9
130:9 134:8
140:16 142:12
181:12 186:19
186:21 196:20
204:9 268:5,14
272:8 273:6,9
273:22 274:17
274:23 275:2
275:15,17,24
276:11,12
278:14 280:4
285:7,15
286:13,15
292:25 293:8
294:22 295:3
295:14 304:16
**3ac's** 107:5
150:12 193:17
194:1
**3acs** 197:18

**4**

**4** 15:19 132:9
132:15 159:5
195:6 240:13
304:13
**40** 304:11
**48** 183:6 184:9
**49** 141:16,22,23
143:5
**4:30** 254:3

**4:43** 254:6

**5**

**5** 15:20 140:15
140:21 286:21
304:4,15
**53** 143:6
**54** 304:12
**558-4000** 2:4
**5777** 305:21
**58** 269:6
270:21 271:3,5
282:14,16
283:22,23
**59** 213:10,15
269:6
**5:33** 291:6
**5:43** 291:9
**5:45** 291:21
**5:58** 302:19,25

**6**

**6** 196:7,11
210:13,22
211:14 214:4
256:23 304:17
**6.1** 196:17
**6.2** 196:17
210:20
**60** 119:23
120:7 227:17
228:23,25
**60611** 2:19
**63** 154:25
169:20 170:18

218:7 220:2
**67** 45:15
217:25 231:2
245:25

**7**

**7** 69:11 74:12
213:16,19
253:5,22
254:16 304:18
**73** 227:18
256:22
**74** 256:22

**8**

**8.2.6** 105:11,13
106:17,21
116:6,14
117:21
**8.2.6.** 106:1
117:10
**82** 201:6
**85** 190:4
194:23
**88** 267:21

**9**

**9** 1:7 306:3
**90** 200:16
268:2,9
**91** 270:1,15
271:9 272:11
**92** 272:5,17
**93** 276:22
279:2 280:1,13

280:24 281:17
**95** 268:3
**9:04** 1:8 4:3
**9th** 4:3 43:25
44:1

**a**

**a.m.** 1:8 4:3
51:15,18
**ability** 107:5
197:10,12,15
199:16,21,24
202:25 203:8
205:14,21,25
206:4,8,11
211:13 229:18
230:3,5,21
**able** 43:4,20
115:19,21
213:4 273:7
274:25 281:10
**above** 1:12
185:14 233:13
**absence** 229:5
**absolute**
131:16,20,25
132:5
**absolutely**
183:20
**accepted**
112:22
**access** 50:7
105:7 202:24
206:1,5,8,11

217:2 286:6
**accommodate**
9:17 188:21
**accompanied**
173:25
**accomplished**
186:6,10
**accordance**
200:4
**account** 48:17
99:15,15,19
102:21 144:11
145:4,12,14
146:5,11,22
147:5,13,22
148:19,23,24
149:2,17,21,23
150:4 213:24
292:14 294:16
294:17,18
295:6 301:2,5
301:7,10
302:12,13
**accounts**
102:23 110:9
142:7 143:4,10
143:12,21,25
144:22 145:2,9
146:20,22
149:7,8,9
150:12 151:21
152:18 153:3,7
153:9,10,24
154:1 160:13

292:12 301:15
301:16,18,25
302:2,2
**accurate** 46:6
302:10 303:7
**accurately**
10:17
**accustomed**
226:14
**achieve** 118:11
**achieves**
276:19
**acknowledg...**
303:1
**acquire** 268:20
268:23 270:16
270:17,19
**act** 6:20 45:11
46:4,10,11
243:16 246:10
251:1
**acted** 106:24
**action** 1:12
4:24 7:19,23
39:15,16 63:23
64:5,14 174:3
174:10,13,17
175:2,20,20
178:24 195:4
199:17,25
200:3 204:9
305:14
**actions** 7:16
36:16 38:25

**actual** 81:2
108:8 147:22
193:17 194:1,5
227:20 257:13
**actually** 26:18
39:14 108:14
115:19 117:23
157:17 186:21
206:1 282:2
**add** 104:11
242:2
**added** 168:15
**addition**
185:13 269:13
282:20
**additional**
13:12 32:7,9
47:5 59:21
231:19 233:19
239:4 243:6
267:23
**address** 48:15
58:21 267:9
**addresses**
95:16 97:8,14
98:24 143:14
**adds** 242:5
**adjust** 12:21
**administer**
4:23
**administered**
1:3
**admission**
65:16,17,21

**admitted** 65:8
65:12 186:20
**advanced**
273:17 274:3
275:9,10,23
280:9 281:6
**advice** 35:19,24
35:25 36:13
**advise** 76:22
**advised** 42:1
249:12
**advising** 17:11
34:19 35:15
36:2,3,4 72:24
82:16 83:22
**affect** 204:7
**affects** 112:24
**afford** 286:5
**afraid** 283:19
284:2
**afternoon**
122:24
**ago** 39:7 71:24
75:13 150:1
**agree** 4:10 42:6
56:4 78:11
79:6 99:25
106:12 127:11
130:12 131:5
131:14,24
156:20 157:5
177:14 189:9
209:1 210:4
211:19 235:21

253:22 264:3
289:3,6
**agreed**  92:1,8
125:23 259:16
259:17
**agreement**
52:24 64:25
72:8,14 73:1
99:14,17 100:2
100:4 108:12
124:7 135:16
135:22 136:1
136:11,12,23
137:13,14,20
139:4 140:3,7
141:1,2,3,7,16
141:19 142:4,5
147:16,25
148:18 149:4
153:23 157:10
158:8,24 159:5
159:12,24
160:23 161:23
163:20 164:6
165:1 169:9
184:12 185:6
185:10 186:24
190:14 192:10
195:7 198:16
198:25 218:2
218:17 219:12
219:14 229:4
231:5,13 249:8
249:9 261:6,24

268:20 269:22
270:10 272:13
281:8 282:7
283:15 285:23
286:18 287:12
288:20 290:5,8
290:15,18
301:1,13
**agreements**
114:20 135:17
136:2,6,9,13,17
136:24 137:15
137:21 138:1,5
138:9,12 139:4
139:8,12 140:3
199:4,10
275:18 287:13
287:15,18,20
290:15,21
**agrees**  270:11
**ahead**  230:24
255:20 292:3
**aids**  50:4
**al**  1:5 4:14
306:2
**algorithm**  49:6
203:19
**allow**  8:17,19
120:16 121:20
185:11
**allowed**  199:11
**allowing**
177:12

**allows**  206:24
216:2 229:4
**ambiguous**
148:9
**amended**  53:24
59:10 62:22
73:9 110:15
**amendment**
60:9 73:2,3,8
73:11
**amendments**
59:25
**americas**  2:11
**amos**  3:4 4:18
**amount**  77:13
77:22 78:25
88:16 89:2
91:20 157:25
158:18 167:15
220:19 268:13
268:21 269:23
270:18 271:12
271:22 299:21
**amounts**
188:22 268:4
272:7,15,23
273:18 274:2
275:7,12 276:7
276:8,25 277:9
277:16,24
278:1,3,8,12,14
279:6 280:4
281:11,25
282:1 285:7,10

285:14
**analysis**  47:5
47:10 61:11
90:20,24 106:3
106:16 111:9
154:12 179:19
190:2 191:2
296:10 298:16
299:11
**analyze**  53:5,10
296:15
**anderson**  3:8
16:12 59:18
82:22
**anguilla**  65:9
**animal**  239:20
**answer**  7:6 9:9
9:10,19,22
14:19 20:25
21:2 28:9,17
29:16 30:21,24
31:6,10,17
35:22 42:25
44:15,17,23
59:14 62:2
66:16,17 74:10
77:20 85:14
87:13 114:13
116:13,23
117:24,25
120:10 131:11
135:11 149:19
151:16 152:9
175:5,8,15

178:14 180:6
204:3 214:25
217:14 223:19
224:9 230:17
240:15,16
250:20 266:11
267:6,11
279:24 280:1
281:17 284:3,9
284:17,19
285:5,11
288:11,15,18
288:21 289:1,4
289:8,11 290:9
290:16,23
301:3,12 302:4
302:5,9,11
**answered**
84:11 85:3
117:19 150:7
178:2 202:4
215:3 235:5
275:5,6 279:5
279:12 283:13
284:18 288:8
297:5
**answering**
24:24 139:19
201:18 245:2
245:10 277:19
**answers** 8:19
8:23 49:12,16
49:20,25
152:11 223:18

223:22 254:11
**anthony** 1:11
4:13 302:21
**antigua** 45:11
46:3,9 53:7,9
55:3,11 57:25
65:9,12,19
66:20,25 67:9
69:10,21
160:25 177:21
178:6,15 179:9
179:25 181:3
226:20 227:3
230:16 231:15
242:18 243:16
244:12 246:9
249:21
**antiguan** 24:16
24:20 35:8
51:24,25 52:17
54:2,7,23
55:15,15,22
56:11 57:2,8
57:21 67:4
92:3,7 126:22
130:13 131:1
137:12 142:22
144:18 145:19
151:3 154:8,21
155:2 182:9
183:15,21
184:6 185:19
209:19 211:20
225:16,19

228:5,7 229:10
229:17 230:3
230:19 231:22
236:21 263:5
268:18 270:4
274:16,24
276:14 280:6
**anybody** 15:25
16:16 17:18,22
212:2,19 213:3
238:25 293:14
**anybody's**
293:23 294:7
**anymore** 48:23
93:25 94:5
257:20 266:14
**apart** 32:7
83:21 140:5
285:15
**apologies** 86:11
135:19 157:9
**apologize** 52:7
52:7 137:8
299:20
**apparent** 118:8
**appeal** 66:15
68:1
**appear** 35:13
138:3 182:6
**appearance** 5:3
**appearances**
2:1 3:1 5:4
**applicable**
124:24 179:22

**application**
68:8 208:18
**applications**
77:10,11 80:1
173:9,15,20
**applied** 68:24
210:6
**applies** 57:24
109:21 226:23
227:2 256:5
**apply** 46:12
65:24 107:10
109:21 163:10
174:17,21
175:1,12
208:12,23
255:15,25
256:3 280:14
280:24
**applying** 66:20
144:16 182:2
228:3,10
**appointment**
6:18 66:9,12
**appreciate**
46:17 254:9
**approach**
228:3,11,15
**approached**
58:9 59:3
**appropriate**
195:5 245:23
**appropriated**
156:11 218:9

approval 49:10
112:13 113:6
113:21 121:20
203:17,23
205:4
approve 207:23
approximately
33:20 67:20
april 71:19
architecture
97:17 98:2
103:20
area 67:19 70:1
80:13 82:18,19
90:5 178:21
areas 80:16
81:10,11,12,13
82:8,8,10
argue 65:19,25
argument
281:3,24
arose 159:17
arrangement
52:19 96:1
167:17 184:21
185:3 197:23
198:3 220:12
237:18 239:3
243:13 269:25
arrangements
66:2 248:6,8
257:6
arrows 9:25
13:21 14:10

32:21 33:8
46:12 52:20
62:16 64:22
65:2 101:1,10
119:9 120:6
121:21 133:22
192:13,17,19
192:23 193:8
193:11 250:23
250:24 274:12
295:9,23
296:12 297:1,9
297:17,22
298:10
article 19:11
172:17
articles 20:15
articulated
182:8 208:8
209:10
artis 2:8
artism 2:8
asia 35:6 36:24
37:5,12,19
aside 47:1 60:8
97:11 133:18
159:25 272:21
asked 24:24
29:14,18 31:6
44:9,18 47:20
62:5 93:18
96:2 102:11
117:18,21
129:21 150:7

152:6,15 158:6
161:20 202:3
215:1 234:21
235:6 267:7
275:4 281:15
287:22 288:3
289:17 291:25
297:4 300:8,12
300:18,22
301:21
asking 23:10
24:25 28:6
29:10,12,25
37:20 52:10
100:15 102:2
108:16 112:1
116:8,9 117:13
118:1 125:19
130:25 131:23
145:1 146:3
149:12,13
150:3 152:4
162:22,25
165:17,22
177:15,19
182:5 184:16
188:11,12,18
190:15,18
191:17 201:22
203:4 207:10
208:6 223:17
223:21,24
229:16 250:10
264:21 265:14

274:24 275:11
275:13 276:10
280:21 289:23
294:8 298:13
aspect 32:13
36:10
aspects 69:15
102:24
assessment
287:16 294:19
asset 25:17,23
76:16 78:18
79:11 99:4
101:11 105:4
130:15 131:8
131:16,25
135:2 155:12
155:15 156:3
156:23,25
157:25 158:2
158:11,17,23
162:1,8,13
163:12,21
167:19 169:16
169:25 176:4
176:11,20
177:23 178:6
189:5 196:23
196:25 197:2,5
199:17 200:12
202:23 203:1
210:11 212:3
212:17 219:7
219:11,14,17

| | | | |
|---|---|---|---|
| 219:20,21 | 126:13,24,24 | 197:4 198:5,18 | 273:12,14,15 |
| 221:5 225:2 | 127:9,16 128:1 | 199:25 200:22 | 273:17,18,19 |
| 226:1,3,8,9,22 | 128:5,9,11,19 | 202:11 205:3,9 | 273:19,21 |
| 227:5,13,21 | 129:8,13,16 | 205:11,15,16 | 275:8,16,22 |
| 245:13 256:6,6 | 130:2,7,10 | 205:17,19 | 277:2,11 282:3 |
| 261:17,21 | 133:22,23 | 206:2,5,9,11,13 | 285:18 286:15 |
| 263:17 264:7 | 134:8,10,18,25 | 206:17,18,21 | 286:17 291:13 |
| 268:13 274:16 | 142:7,11 143:9 | 209:3,6,7,7,11 | 292:6,10,11,13 |
| **assets**   22:21,23 | 143:21 144:21 | 209:23,24 | 292:16,18,21 |
| 36:5 48:21,25 | 145:9 147:3,7 | 210:4,7,14,16 | 293:9,24 |
| 50:7 63:18 | 148:24 149:1,9 | 211:7 212:9,10 | 294:16,23 |
| 65:1 72:12 | 149:16,22 | 212:14,21 | 295:5,11,15,19 |
| 74:4 76:11,17 | 150:4,11 153:7 | 213:4,8,8,11 | 295:25 296:1,6 |
| 76:20 77:1,4 | 153:8,23,25 | 214:15,20 | 296:13,18 |
| 78:2,6,10,16 | 157:4,12 | 215:3,13,20,21 | 297:3,11,19,23 |
| 79:16 90:1 | 160:12,17 | 216:4,15,20,21 | 298:2,7,12,18 |
| 95:12,15 96:16 | 161:2,4,13 | 217:9,11 | 299:4 301:6,10 |
| 97:4,6,13,16 | 177:4,12 178:4 | 218:18,21 | 301:17,24 |
| 98:8,21 99:11 | 178:15,23,25 | 220:7 222:12 | 302:1 |
| 100:7,18 101:2 | 179:1,23 180:1 | 222:13,16,17 | **assignment** |
| 101:3,17,22 | 181:3 182:10 | 223:4,9,11 | 51:21 53:12 |
| 102:19 103:21 | 183:16,23 | 224:1 225:16 | 58:4,14,23 |
| 104:14,19,21 | 184:7 185:17 | 225:19,21 | 59:12 60:12 |
| 105:2,2,8,24 | 185:17,22,23 | 226:11,19,25 | **assist**   24:17 |
| 107:6,13,19 | 186:14,21 | 227:9,19,21,24 | 85:19 |
| 108:1,7 110:8 | 187:5 188:1,8 | 227:25 228:1,8 | **associated** |
| 112:11,12 | 189:17,17,24 | 228:8 229:7 | 145:3 149:1,8 |
| 113:5,18,20 | 191:23 192:1 | 236:2 239:22 | 149:9,16 150:4 |
| 115:21 117:23 | 192:13,14,17 | 244:10 260:4,4 | 150:12 153:9 |
| 119:9,24 | 192:20,21,24 | 262:17 263:18 | 153:25 243:25 |
| 123:13 124:11 | 193:1,6,8,9,12 | 264:6 265:10 | 244:20 245:17 |
| 124:15,20,24 | 193:14 194:2,9 | 265:11,16,25 | 301:10,16,17 |
| 125:4,8,13,16 | 194:16,19 | 266:1 267:2,4 | 302:1,13 |
| 125:25 126:8 | 195:6,9,17,19 | 272:7 273:4,8 | |

**assume** 9:3
32:24 64:25
95:18 96:17
97:12,18,21
98:1 99:6
100:11 105:12
107:1 118:23
129:12,21
168:4,4 192:25
195:7 197:21
239:11,12
249:11 270:13
280:11 296:16
**assumed** 32:23
94:24 98:5,12
98:21 99:21
100:1 102:10
106:16 107:4
118:18 130:1
141:6 163:7
201:12
**assumes** 211:15
**assuming** 168:3
224:2,4 273:12
274:6,9,10,10
281:15
**assumption**
95:7,14,21
97:6 98:9
101:10,15
102:13,15,25
103:2 104:20
105:4,10,19,22
107:15,21

112:3,4,14,15
113:4,13,22,22
114:2 119:19
129:20 130:7
204:13 296:20
296:23,24
297:7,16
**assumptions**
59:22 60:2,9
95:2 97:2
98:17 99:3,7,9
99:20 100:6,9
100:17,24
101:21 102:2
102:12 103:4
103:13,19
104:2,6,12,17
105:7 107:5
109:25 111:20
112:2,19
139:10 274:19
276:4
**atherton** 88:22
**atherton's** 89:5
89:11 91:4
**attach** 157:23
158:16
**attached** 172:8
226:7
**attaches** 41:17
164:3
**attempt** 114:13
239:8

**attempted**
72:11 251:22
**attempting**
271:1
**attempts** 67:16
**attention** 140:5
**attorney** 35:24
83:18
**attorneys** 2:2
2:11
**audio** 4:8
**august** 33:23
43:17 58:10,24
58:25 59:2
60:13
**author** 68:3
**authorities**
145:21,25
170:6
**authority**
145:19 146:2,4
175:19,22
183:22 203:6
208:7,9,10
236:20
**authorized**
4:22
**authors** 132:23
**automatic**
203:21
**automatically**
49:6
**avenue** 2:11,18

**avoided** 239:14
**avoiding** 151:4
**aware** 8:10
10:18 44:23,25
46:22 83:9,12
86:2 95:6
100:10,11
126:3 175:23
176:18 216:24
280:19 285:13

**b**

**b** 5:8 90:5
110:17,21
111:12 213:20
214:4 304:7
**back** 19:25
27:24 29:13,21
35:21 37:7
38:21 51:17
55:6 60:4
70:18 74:12
75:19 86:8,10
101:5 108:17
113:15 116:12
122:21,25
167:4 169:1,4
217:21 228:17
229:15 231:2
245:24 254:5
266:20 282:14
291:8,20,24
300:21

**background**
65:6 73:1
94:18,18,23
98:14 112:25
**bad** 148:7,8
151:10,11
**badgering**
284:15
**bailment** 155:9
**balance** 225:3,4
232:20
**bank** 34:14,17
34:19 35:1,5
36:24 37:4,12
37:19
**bankruptcy** 1:1
4:15
**bar** 55:24 56:1
56:15
**barbuda** 46:3
246:10
**based** 20:20
21:2,17 29:17
64:15 93:3
100:1 107:22
110:22 119:12
121:23 144:4
144:12 145:19
145:20,25
146:4 147:22
160:4 176:11
183:14 188:14
193:15 195:22
198:13 200:25

201:1,3 225:6
240:21 287:10
293:19 294:10
294:13,15
**basic** 72:21
269:19,24
**basically** 87:19
175:15 265:24
283:23
**basis** 103:14
110:11,20
111:3,12,18
129:19 133:13
170:3 187:12
187:16,18
188:16 193:25
194:4 201:7
207:6,12
238:17 247:21
289:4 290:25
299:12
**bates** 140:16
304:15
**bathroom**
253:25
**bear** 300:20
**began** 34:22,23
**beginning**
258:11 267:21
**begins** 221:14
**behalf** 8:3 88:1
88:5,11 89:8
89:15 293:15

**believe** 62:24
106:23 133:9
147:8,10,17,19
151:19,20,24
157:8,9 158:7
190:1 210:23
252:1 260:15
271:3
**beller** 2:5 5:12
5:15 7:9 21:1
28:10,16 30:7
31:9 48:2
51:12,19 52:15
102:7 113:9
114:21 122:16
122:23 123:22
137:7 139:2,6
139:16,20
152:14 153:18
168:19 169:3
180:5,12
182:22 183:3
184:1 217:15
217:23 250:10
250:17 254:7
255:19,21
267:5,12,18
279:14,18,21
284:13 291:2
291:10,17,22
299:14,23
302:16 304:4
**bellerb** 2:5

**belong** 273:15
**bench** 38:12
**beneficial**
130:21
**benefit** 123:8
127:24
**benjamin** 2:5
5:15
**best** 9:2 22:8
33:24 39:17
**better** 19:16
96:24 255:6
**beyond** 67:22
93:14 94:3,8
97:12 111:10
298:1,5
**bill** 155:20
**binary** 30:2,18
**bit** 29:21 37:7
78:15 98:11
114:6 162:4
167:4 218:5,15
224:17
**bitcoin** 216:6
276:13,16
**black** 208:20
**blind** 179:2
**block** 197:10
197:15 198:4,8
199:11 205:21
**blockchain**
212:20 216:13
**blocked** 197:19

**blood** 305:14
**body** 179:4
**bold** 45:19
  128:18
**bolt** 239:8,21
**bolts** 168:8
**book** 132:10,20
  133:2,10,11
  304:13
**borrowed**
  276:12
**borrower**
  181:20 263:18
  263:23 265:10
  265:24
**borrowing**
  263:24
**breach** 72:25
  73:17 106:13
  122:2 197:22
  224:25
**breached** 72:21
**break** 9:14,20
  51:2,13 120:25
  121:2 122:17
  168:18,21
  217:16 221:24
  228:21 253:25
  254:13 291:2
  291:25
**breaking** 48:3
**breakout** 10:21
**brief** 63:7
  64:16,20

299:18
**briefly** 6:13
  7:14 88:18
  300:2
**briggs** 259:10
  259:10 261:1
**bring** 8:2 10:19
**bringing** 65:25
**broad** 2:3
  164:15
**brookes** 3:7
**brothers** 22:24
  26:10
**brought** 11:3,4
  83:1
**browne** 269:9
**burkitt** 3:6
**business** 6:19
  251:1 262:19
  263:12,13
  265:11 266:1,3
**businessmen**
  151:12 249:7
**button** 49:4
  96:14 203:18
  204:10,14,18
  204:20
**buy** 107:12
  110:7 213:8
**bvi** 6:15,16,17
  7:17,20,25
  8:10 16:21
  17:4,6 35:9
  39:21,22,23

56:7,25 57:11
65:9 67:1
69:15 71:20
77:8 78:13
79:21,23 82:11
82:17 88:24
91:4,6 92:12
92:15,20
249:21 250:1,7
250:16,22
251:9
**bypass** 179:8

**c**

**cadence** 255:22
**caicos** 65:10
**call** 7:18 42:5
  48:17 56:13
  71:11 95:17
  97:9 103:19
  105:4 109:9
  112:14 113:22
  114:2 167:20
  195:24 251:10
**called** 41:24
  50:4 72:7
  296:21
**capable** 181:4
  184:12 228:1
  273:23
**capacity** 66:18
  83:17,20,25
  108:1

**capital** 9:25
  14:10 121:21
  133:22 193:8
  262:15,18,25
  263:3,10 266:3
  295:9,23
  296:12 298:11
**capital's** 297:1
  297:9,18
**car** 155:18
  163:25 164:3
  169:19
**care** 36:6 59:5
  59:6
**careful** 223:19
**carefully** 222:6
**caribbean** 56:6
  58:1 66:15,24
  67:5 69:9
  145:21
**caribbean's**
  58:2
**carried** 299:11
**carryover**
  216:9
**case** 1:2 4:16
  7:21 21:9,14
  22:14,16,19
  23:2,20 24:17
  25:3,13,20
  26:11,12,25
  27:9,14 29:11
  31:8 36:16,19
  46:8 65:19,23

65:25 68:11
70:12,14 71:4
72:5 73:19,21
74:3,7 75:4,8
75:10,10,18,23
78:19 79:21
86:3 90:1,7
156:21 165:5
175:23 176:8
190:20 191:22
198:21 200:15
200:20 201:3,4
201:10 202:7
202:17 203:5
208:10 216:6
241:25 247:3
247:21,21
251:21 253:4,6
253:9,12,16
254:14,15,16
254:21 257:12
257:17 258:19
260:19 266:10
266:15 269:8
280:11 281:21
284:5 304:18
**cases** 13:12
18:17,22,25
20:14,20,23
21:6,9,11,13,16
22:4,15 23:6
23:15,23 24:5
24:11,14 25:13
27:13 29:7,12

29:18 30:1,9
30:11,16,25
31:15 66:25
68:6,14 70:22
74:18,21,23
75:19,25 77:10
79:25 84:19,22
84:24 85:4,9
85:15,16,21,23
86:4 170:6
176:12,17,19
262:22 265:21
**cash** 274:17
**categories**
81:15 82:7
**category**
178:25
**cause** 32:12
50:18 51:6
**caused** 50:21
51:9
**causes** 63:23
64:5,14
**caution** 71:11
**celsius** 70:15,24
71:4 72:5,10
72:10,15,24
76:9 77:5
78:25
**certain** 53:12
107:4 128:8
133:21,23
134:7,9 176:5
197:25 198:9

199:12 203:21
242:18 243:11
255:3 278:19
298:5
**certainly** 17:6
27:24 76:5
95:13 97:5
126:19 165:10
165:12 194:4
194:11 201:7
208:21 225:25
249:21
**certainty** 135:8
181:19
**certificate**
65:20,22 230:8
**certificates**
227:23
**certification**
305:1
**certified** 1:14
**certify** 305:6,12
**cetera** 67:2
80:22,23
181:20
**chance** 54:13
296:15
**change** 32:13
50:18 51:6
58:4 60:11
203:25 288:10
288:13,14,18
289:1,4,7,21
290:16 306:4

**changed** 60:19
**changes** 290:11
303:5
**changing**
261:19
**chapter** 1:2
4:16 132:9,20
133:12 304:13
**characterizati...**
100:1 290:14
**charge** 46:9
134:3 156:10
156:13,15
173:23 174:25
175:11 185:12
218:3,6,6,8,16
219:6,9,23,24
220:3,8,13,17
220:19,21,22
220:23,24
221:4,10,12,17
221:20,24
222:4,10,13,19
222:20,24
223:3,3,10,14
224:2,11,12,15
224:19,25
225:3,5,17,20
226:2,6,15,15
226:24 229:18
230:4,12,13,15
230:20 231:21
231:24 232:5,8
232:13,21

233:1,3,7,23,25
234:2,10 235:8
235:18 237:1
237:18,20
238:3,13,14,18
239:10,13,14
239:18 241:24
242:9,14,15,19
242:20,23,25
243:2,25
245:14,17
247:1,4,5,6,13
247:16,18,22
248:3 249:1,4
249:7,12,14,23
250:22 251:6,9
251:11,15,17
251:23,24,24
252:2 258:21
258:24 259:2
259:15 260:2
260:25 261:5,7
261:9,16,20,21
261:25 262:1,4
262:5,6,7,9,11
262:14,21,24
263:2,6,7
264:1,9,10,12
264:14,19,24
264:24 265:3
265:13 266:4,6
266:7,8,12,13
266:14,17,17

**chargee** 67:17
160:25 218:22
218:22,24
219:11,17,19
219:20 220:7
223:5,9 224:22
225:1 231:15
232:3,9,15,17
233:2,4,5,6,9
233:10,22
234:1,7,8,13,16
234:22 235:2,7
235:8,15,22,23
236:11 237:5,8
237:10,12,25
238:6,10,12,22
239:1,4,24,25
240:20 241:10
241:21 242:9
242:13 246:3,4
246:22,23
247:2
**chargee's** 236:4
**charges** 23:1
46:1 67:15
156:17 232:21
243:17 244:20
246:7 249:19
251:12 252:2,6
252:9,11
265:22
**chargor** 218:24
233:5 243:10
246:13 247:8

251:17
**chargors**
247:12
**chattels** 155:10
**check** 95:8
209:16
**checked** 227:14
**checking** 95:10
**chicago** 2:19
**choice** 139:17
**choose** 292:15
**chose** 174:3,3,8
174:9,13,17,22
175:1,12,20,20
**chosen** 19:2
**choses** 178:23
178:24
**chris.harris**
2:13
**christopher**
2:13 3:5
**circular** 145:16
151:16
**circularity**
144:8
**circulating**
262:15,25
263:3 264:8
266:2
**circumstance**
245:4,7
**circumstances**
64:13 104:13
161:11,21

198:9 199:12
201:12 225:7
225:11 245:4
245:23 259:12
**cite** 85:5 133:2
196:17
**cited** 85:5
132:24 133:12
**cites** 84:18
**claim** 8:3 11:17
39:17 53:25
62:18,23 63:9
73:18 108:21
110:15 193:24
194:8 197:22
268:12 270:9
271:23 281:10
**claimant** 7:20
7:23
**claims** 39:1
63:4,13,17
64:8,14 71:20
81:17,17 92:20
**clarification**
46:18
**clarifications**
46:20,23
**clarify** 9:2 87:9
114:17
**classic** 247:3
**classify** 258:3
**clause** 73:8
99:13 105:10
105:13 142:3

142:25 143:7,8
143:20 144:7
144:10,13
145:17 159:4,4
160:8,9,10
195:6 231:20
231:23 233:15
240:13 258:7
**clean** 8:22
**clear** 13:14
  18:19 21:1
  55:20 72:25
  102:5 114:21
  118:10 121:9
  145:24 146:11
  146:15 148:4
  148:10 151:14
  152:8 168:6
  194:20 200:23
  210:10 263:19
  283:20 300:11
  300:19 302:8
**clearer** 121:14
  161:15
**clearly** 55:21
  107:19 116:2,5
  116:14 117:7
  120:6 179:3
  209:18 284:13
**client** 82:16
  85:19 145:13
**clients** 33:7
  71:12 83:22
  111:25

**close** 33:14
  48:3 138:7
**collateral**
  143:22 257:6
  272:1 282:4
  283:10,17,19
  283:21 284:12
  284:24
**colleague** 59:18
**collected** 36:5
**collection** 36:3
**combination**
  272:9
**come** 32:18
  82:1,2,11
  108:17 119:11
  208:24 298:24
**comes** 82:22
  148:23,25
  149:22,23
  163:24 301:6,7
**coming** 79:12
  152:14 259:4
**comment**
  150:23
**commented**
  92:1
**comments**
  91:25 92:9
**commercial**
  70:2 77:7 79:5
  80:23 81:3
**commingled**
  293:9

**commingling**
  292:20
**commission**
  175:24 177:9
  179:4 188:9,12
  188:15 195:23
  201:15 202:19
  292:21 298:22
  299:1 303:22
  306:22
**common** 8:1
  26:6,13 56:9
  57:21 58:2,3
  208:12 245:16
  254:24 255:14
**communicati...**
  49:21
**companies** 6:20
  45:11 46:1,4
  46:10,11 81:1
  81:4 246:8,10
  251:1
**company** 7:22
  8:3 39:12,13
  70:2 78:19,20
  79:6 80:13,17
  82:17 227:22
  230:10 246:18
  250:23 251:11
  251:13 262:16
  263:1,13
**company's**
  263:11

**compensated**
  62:12
**compensation**
  62:8
**complete** 9:19
  42:21 43:12
  183:3
**completed**
  298:25
**completely**
  10:16 126:14
  182:21 247:10
  267:7 299:24
**completion**
  244:13
**complex**
  223:16,23
  232:22
**complicated**
  68:11
**complies** 203:2
**conceded**
  125:12,16
**concept** 174:2
  182:7 197:7
  214:13 299:4
**concepts**
  222:19 283:3
**conceptual**
  223:24
**conceptualize**
  221:7
**conceptualized**
  201:25

**concern** 50:9
105:21
**concerned**
49:11 76:15
116:24
**concession**
125:18,21
**conclude** 229:1
297:25
**concluded**
259:13 260:2
**concludes**
302:20
**conclusion**
89:25 100:25
105:23 119:11
119:19 122:15
124:3 128:16
181:1 201:23
201:24 215:16
259:5,14 272:5
**conclusions**
123:3 180:17
180:19,25
181:10 229:11
**concurred** 68:3
68:23
**condition**
224:24
**conditions**
207:1 214:18
215:1
**conduct** 26:20

**conducted**
23:13,14 26:16
47:4
**conducting**
262:19
**confidentiality**
71:9
**confirm** 90:16
**conflating**
144:11
**confused** 43:24
158:21
**confusing**
284:14
**connected**
161:19
**connection**
9:22 10:5
49:24 53:11
54:19 55:10
63:14 74:18
108:1 110:1
114:9 285:8
**consensual**
73:13 155:11
167:10 171:11
**consent** 73:10
115:22 118:5
120:3,9,16,20
121:5,8,12,19
161:5 197:6
203:23 207:2,4
207:15 208:1
208:14,16

215:21
**consented**
119:23 120:12
**consequence**
246:16
**consider** 76:18
80:18 81:14,20
81:23 82:9
128:23 133:19
134:6 298:17
**consideration**
79:1 223:19
261:1
**considered**
128:14 178:21
**consisted**
227:24
**consistent**
245:14
**conspiracy**
81:18
**constantly**
261:19,21
**constitute**
181:24 182:1
**constitutes**
166:23
**construction**
144:17 149:18
151:3
**constructive**
227:20
**construing**
135:15

**consulting**
207:25
**contacted**
33:10
**contain** 42:16
42:21
**contained**
44:22 45:1
47:6 105:8
**containing**
195:9
**contains** 43:11
43:16
**contemplate**
211:14
**contemplated**
286:17
**context** 8:15
13:7,17 79:2
264:17 265:19
**continue** 4:9
52:15 156:7
**continued** 3:1
**continuing**
34:21 160:16
160:18 166:5
166:21
**contract** 72:7
72:13,20 73:4
73:7,17,18,19
74:8 76:14,14
79:2 107:21
117:3 119:5
122:2,3 142:21

143:11 145:22
146:2 148:6,7
148:8,9,12,17
149:12,14
150:21,25
151:4,10,11,11
151:14 152:16
157:20 165:4
167:16 168:2
169:14,21
170:9 171:11
181:21 197:22
214:22 215:4,8
221:19 222:4,9
222:11 226:13
236:6 237:6,7
237:24 241:7
243:21 244:3
244:14 269:12
282:19 300:24
**contracts** 66:23
81:16 82:21
106:13 268:19
270:5
**contractual**
116:25 155:18
156:5 158:3
167:12,13
168:6 169:24
170:12,16,21
171:4,8,13,21
171:23 172:24
173:1 174:16
174:20 189:16

189:18,25
197:23 233:18
236:24 237:17
241:13 274:23
**contractually**
159:16 165:3
240:25
**contrary**
106:24 126:4
128:24 280:10
281:19,20
290:5
**control** 25:16
25:17,23 26:9
26:13 47:16,23
74:4 78:2,18
79:19 98:6
112:10 113:18
135:8 179:17
179:22 185:22
186:3,7,11,16
187:4,11,21
188:7,21,22
189:6,10
190:20 191:23
192:1,5,9
194:15,22,25
195:10,13
196:22,23
197:3,8 199:18
199:23 200:7,9
200:12,16,17
200:24 201:13
201:16,21

202:2,7,16
203:11 208:19
209:1,12,23
210:5,9,12,15
211:5,8,9,15
212:5,7,8,10,11
212:12 213:9
214:9,11,12,17
215:12 216:1,3
216:11,13,14
216:21 217:10
217:13 229:6,9
249:17 256:6
256:13,14,16
256:25 257:10
264:3,5,7,11,17
264:22 265:5,6
265:9,16,23,25
**controlled**
206:12
**conversation**
10:12
**conversations**
4:6
**convert** 241:23
**convey** 220:9
**conveyance**
156:12 218:11
**conveyed** 45:5
156:23 157:4
**cooperation**
203:24 205:4
**copies** 87:12

**copy** 54:15
227:17
**corporate** 70:2
80:13,14,17,17
81:5
**correct** 23:17
41:12 50:14,15
57:9 58:12
61:17 63:11
90:13,17 94:10
104:4 107:7
111:13 118:17
134:14 135:1
151:24 153:11
153:17 194:7
296:18 302:6
**correction**
46:15
**corrections**
46:20,23 303:5
**correctness**
152:5 268:10
293:19,23
294:7,10,14
**correlate**
157:16,17
158:25
**correlates**
159:12
**counsel** 5:7
8:16 9:8,10
14:21 15:21,22
17:8,17 18:7
18:25 19:2

28:3,7,20 29:8
29:12,15,16,20
30:1,11,17,25
31:15,22 37:16
42:2 52:12
111:21,23
112:22 114:9
116:1,4,18
117:15 118:22
**counsel's** 28:11
28:13
**count** 67:2
**countries** 56:7
248:7 249:20
**couple** 137:6
299:17 300:18
**coupled** 167:24
167:25 168:7
168:13 221:15
**course** 15:6
58:5 60:3
100:12 117:20
166:9 254:1
**court** 1:1 4:15
4:20 5:6 8:21
11:16 40:3,20
54:11,22,23
55:15,22 57:8
66:1,14,16
70:21 71:10,16
74:14 75:3,18
77:8 78:13
79:5,13 82:1
82:12 83:4,11

83:24 85:20
92:3,7 128:7
128:15 132:13
140:19 148:5
148:11 151:8
231:22 253:20
259:4 261:23
**court's** 68:5
**courts** 208:25
263:5,16
**covered** 209:8
**craft** 239:3
**create** 124:7
134:3 135:6
141:20 157:10
157:12,20
158:8,10
159:15 160:2
161:11,23
162:5,17
164:18 165:7
166:7,16
178:12,22
183:7,9 184:14
185:6 189:17
191:5 218:3
219:9 222:3
229:18 230:21
231:21,24
232:5 239:13
251:17 261:24
262:21 287:5
**created** 123:7
127:23 154:13

158:9 159:24
185:24 207:17
218:8 239:14
239:17 247:12
258:7,21,24
259:2,14 261:6
261:7,25
269:10 282:17
283:25
**creates** 46:13
158:24 222:1
251:11
**creating** 147:20
161:7 165:2
183:9 184:13
206:23 207:16
219:23 249:4,7
260:1
**creation** 36:20
73:21 76:1
191:7 230:19
248:19
**credit** 52:24
110:18 140:25
141:2,6,9
142:5 184:12
198:15 278:23
285:11,23
286:8,22 287:2
287:5,11
288:22 290:5
290:10
**creditor** 155:10
185:20 209:20

209:21 252:17
269:10,18
271:14 282:17
283:1,24
**crespo** 2:14
**criteria** 211:5
262:8,11,23
263:9
**criterion** 188:5
211:6
**cromwell** 1:13
2:2 5:16
**cross** 5:25 6:7
**crudely** 49:5
**crumpler** 34:9
34:9,11
**crypto** 19:13
76:23 77:15,17
78:6,16 79:7
82:16,18
213:24 227:25
**cryptocurrency**
76:11,19 77:1
77:4,11 78:22
80:2 286:4
**crystallize**
263:15
**cuff** 267:8
**cure** 72:15,22
**curious** 48:19
48:25 96:8,16
**currencies**
19:17

**currency** 110:8
227:25
**current** 66:5
**currently** 43:13
**customer** 48:13
48:14,15,23
50:7 95:16
97:8,14 98:22
98:23 99:4,16
99:19 101:13
107:9 108:2
112:12 113:4
113:19 116:15
117:7 142:8
143:4,10,12,22
143:25 144:3
144:22,24
145:3,10,10,13
146:18 147:9
148:19 151:22
151:22 152:18
152:19 153:3,8
153:10,24
154:1 160:15
160:23 161:1
166:13 189:16
189:23 191:25
198:17,20,24
200:18,21
202:8,15
203:15 205:25
206:3,8,10,15
206:20,24
214:14 246:14

286:3,4,6
292:10,12
301:1,25 302:3
**customer's**
99:10 143:13
143:18,24
147:22 197:18
205:14 214:19
215:2
**customers**
47:12 48:6
52:21 105:3,25
107:11 110:6
117:22 197:11
205:3 207:17
215:19 217:1
246:19 247:9
247:13 252:3
292:17 294:1
**cut** 114:5

**d**

**d** 304:1
**dame** 88:17
89:3,18,22
90:11,12,18
293:17 298:23
298:23
**daniel** 3:6
33:15,16
**database**
216:12
**date** 40:2,19
54:10 62:25

132:12 140:18
196:9 253:7
306:3
**dated** 40:13
41:7 44:2
**dawn** 1:13 4:21
305:4,22
**day** 33:14,14
56:22 61:21
81:3,3 87:5
166:10 208:4
303:16 305:18
306:19
**days** 41:11 88:7
249:22
**deal** 22:20
48:24 52:23
54:23 77:16,17
78:10 82:3
92:4 104:20
155:9 175:16
195:17 201:21
205:3 206:20
212:3 214:15
215:20 265:11
**dealing** 24:15
26:13 54:7
55:16 67:1
69:4 76:4,5
92:19 109:7
126:15 133:4
136:9 140:9
185:21 188:1
195:19 197:2

201:4 209:22
214:19 215:2
237:16,20
265:21
**deals** 54:22
201:16 229:17
256:14 258:2
280:16
**dealt** 22:25
56:6 69:6 79:4
82:1 88:24
90:6 105:25
134:18 160:11
227:9 260:22
263:17 269:4
**debt** 156:11
157:13 158:11
158:23 218:10
271:16
**debtor** 131:6
131:15,20,24
132:5 269:12
269:14,16
282:19,21,23
283:5,24
**debtor's** 269:18
282:25
**debtors** 1:6
**debts** 274:21
**december** 1:7
4:3 43:25
305:18 306:3
**decide** 128:8
189:20 214:8

288:17
**decided** 84:22
  84:23 175:23
  176:8,12,17,19
  256:12 266:24
  267:15
**deciding**
  154:14
**decision** 68:2,4
  68:5,7,12
  255:12,25
  257:8,13
  266:25
**decisions**
  195:17 255:3,4
**deck** 154:23
**declaration**
  10:3 11:13,14
  39:25 40:8,18
  41:1,15,16,22
  41:25 42:4,6,8
  42:11,12,16,18
  42:20 43:2,8
  43:11 44:2,6
  44:13,14,22
  45:2 46:21
  47:3,6 48:7
  50:20,23,25
  51:6,7 53:13
  53:17,22 54:4
  54:7,8,16,18,20
  55:9 56:18,19
  56:21,22 60:5
  60:14,17,18

61:13 62:10
68:25 69:12
71:6 80:11
84:3 85:6,7,12
85:25 86:1,6
86:12,16,21
87:3,11,12,17
88:2,7,13,17,20
89:3,7,23
90:18 91:23
93:19 94:2,7
94:17 95:20
96:18 97:3
102:6,8 103:5
103:18 108:19
109:1,15 110:2
114:10 116:22
117:17 118:19
123:1 128:22
129:2,4,5
132:25 133:3
133:20,25
134:13 135:13
141:23 154:8
159:8 171:6,12
180:14 217:25
231:3 253:13
260:12 300:6,9
304:10,11,12
**declarations**
  87:25 88:5,11
  89:15 91:13
  96:6

**deeds** 244:11
**deems** 195:5
**default** 72:9
  155:15 198:2
  198:16,17
  232:24
**defaulted** 101:1
**defined** 170:19
  216:3,15 282:7
  283:15
**definitely** 56:20
  58:8 80:6
  261:16 279:16
**definition**
  25:23 26:8
  281:23 285:21
  285:24
**definitive** 175:5
**degree** 194:25
  195:10 199:16
  200:14
**delaware** 1:1
  4:16
**deliver** 156:14
  162:8 163:12
  166:11 172:17
**delivered**
  161:13 162:1
  167:9,9,10
  178:5 222:12
  222:16,17,20
  223:4,12
  275:17

**delivering**
  157:21 228:6
**delivery** 162:19
  162:21 164:7,9
  178:3 222:24
  224:5 227:20
**delve** 82:25
**demand** 72:16
**demonstrate**
  214:3
**depend** 204:23
  295:8
**dependent**
  225:8
**depending**
  221:20 289:21
**depends** 174:12
  204:6 221:25
  224:13 234:12
  245:3 289:15
**deponent** 303:1
**depose** 57:1
**deposed** 5:19
**deposit** 99:4,10
  99:11,18 110:7
  292:11
**deposited**
  98:21 101:11
  294:16
**deposition** 1:10
  4:12 6:2 8:14
  11:8,9 12:8,14
  13:3,8,18
  14:21 15:2

17:19,22 18:5
19:20 20:1,5,8
20:16 22:7
23:8,17 25:5
25:14 26:17,19
27:4,16,21
28:1,4,21
29:20 30:4,6
30:13,20 31:1
31:3,17,24
32:1,10,12
43:21 47:1,2
93:21 96:4
182:6 257:22
258:1 260:10
287:22 303:4
306:3
**derivative** 7:16
7:19,23 38:25
39:1,14,17
71:20
**describe** 35:10
182:5 258:8
292:15
**described**
102:9 141:2
266:2
**description**
36:13 304:9
**desires** 286:5
**destroys** 197:7
**detail** 64:9 73:6
77:13,22 86:23

**details** 36:10
71:25 75:12,21
82:25 92:20
104:2 111:15
**determination**
22:2
**determine** 23:5
24:10,13,21
25:17 74:8
151:13 152:7
188:5 263:6
**determined**
21:19 23:22
25:7 247:7
257:2 280:2,22
**determines**
246:14
**determining**
24:18 26:2
190:19 192:4
211:6 264:23
265:2
**develop** 177:7
178:22 182:3
209:4
**developed**
227:4
**developing**
211:3,25
**difference**
41:21 163:8
232:25 233:21
234:6 235:6

**differences**
41:14,20 169:6
**different** 6:4,11
6:12 21:7 56:6
77:10 123:18
132:7 135:11
136:9,21
138:22 148:10
152:1,22,24
154:7,20 155:1
155:6,7 156:16
163:3 170:2
173:9,14,19
178:9 179:18
219:1 221:8
225:18 226:2,5
229:19 230:5
266:25 295:21
300:18
**differently**
128:15 230:20
267:16
**difficult** 10:11
21:12 55:1
62:1 67:24
68:13 85:13
189:20 204:3
214:12 220:20
246:17 279:13
**difficulties**
222:2
**difficulty** 61:19
242:22 245:2,9
261:15

**digital** 19:16
25:17,23 74:4
76:11,16,19
77:1,4 79:16
99:11 100:7,18
101:11,22
103:21 104:14
104:18 105:7
107:25 108:7
110:8 112:10
113:18 119:24
127:16 128:9
130:2 133:21
133:23 134:8
134:10 175:19
176:4,11,19
177:4,12,23
178:4,6,15,25
179:22,25
181:3 182:9
183:16,23
184:6 187:5
192:24 193:1,7
193:9,12
194:16 206:1,5
206:9,11 209:7
210:14 211:7
212:9,10,21
213:11 216:3
216:15,20,21
217:9,10
226:19,22,25
227:5,9,13
228:8 256:6

295:5 296:1,6
296:13 297:2
297:10,19
**digression**
228:18
**direct**  210:18
**directed**  21:6
**direction**  177:8
177:11
**directly**  78:24
**director's**
80:22
**directors**  6:18
80:22 81:5
**disagree**  93:5
103:24 247:24
247:25
**disagreed**
51:10 93:2
**disagreement**
290:14
**discharge**
156:11 160:20
218:10 269:14
269:17 282:21
282:25
**discharged**
169:18
**disclose**  19:3
**disclosed**  62:9
103:6
**discrete**  109:7
**discretionary**
286:7

**discuss**  17:21
33:11 35:25
154:6 299:3
**discussed**  74:19
83:15 111:14
116:3 117:1
140:10 141:25
160:1 185:18
258:18 270:5
**discussing**
264:18
**discussion**
33:21 112:5,7
112:11 113:19
118:4 119:17
258:15 282:15
**discussions**
58:23
**dismissed**
135:4
**dispose**  156:2
**dispute**  9:23
10:6 14:4
23:24 32:19
76:15 81:25
82:13,23,24
83:2 101:8
109:8 127:3
**disputes**  79:14
80:21,24 81:3
**disputing**  126:5
**distinct**  283:3
**distinction**
107:24 108:6

108:15 207:7
225:15 282:13
283:20
**distinguish**
155:17
**distribution**
36:3,5
**district**  1:1
4:16 70:21,21
71:16 75:3
**disturb**  45:13
**document**
13:19,20,24
14:1,9 19:14
24:19 29:1
40:7 45:9,12
53:19 54:12
55:7 59:24
86:15 95:9
99:22 105:16
106:7 107:8,13
107:15 109:4
109:19 113:14
116:3 117:6
118:8 121:7
123:25 132:14
132:17,19
133:10 139:21
139:22 140:13
140:15,20,22
140:24 141:4
141:17 142:25
144:19 160:6
166:4 183:8,8

183:19 191:14
196:10 211:1
213:21 219:19
224:7,11 225:6
225:9,13
234:16 236:24
237:2,19
238:19,24
239:17 240:6
240:12,23
241:1,14,19,21
242:2,6 243:12
244:10,16
248:12 253:21
258:23 259:11
262:5 270:16
276:18 286:20
289:13 290:1
304:15
**documents**
11:15,19,21
12:5,9,13 13:2
13:9,13,16
14:3,6,17 18:1
18:4,6,14,17,20
19:5,15,18
20:2,6,12,13
24:16 28:5,7
28:15,19,23
29:3,14 31:21
32:7,9 49:23
50:3 52:22
53:3,4,13 54:1
55:14,14,20

60:25 61:3
67:3 84:5,10
84:13,16,17,20
93:7,15 94:11
107:23 109:10
110:13,23,23
110:24 111:5
111:11,16,19
114:20 115:3
115:16 116:20
117:16 118:11
118:20 119:8
119:20 121:24
122:7,10,12
135:23 136:6,8
138:19,22,23
141:8 178:12
181:16 190:8
190:21 191:3
196:3 198:22
207:1 234:13
248:8 274:11
287:24 288:4
289:10,18,22
290:7
**docusign**
138:10
**doing**  10:25
19:22 32:24
33:24 35:11
67:10 108:3
109:6 129:19
138:25 144:16
157:20 167:3

183:19 293:5
**draft**  18:11
59:15,17 60:1
91:23
**drafted**  248:13
**drafter**  232:12
239:8
**drafters**  239:12
247:15
**drafting**  150:15
168:2
**draftsman**
168:2,5,15
233:16
**drawn**  180:19
**drill**  115:18
**dropped**
203:20
**due**  91:1
155:23 156:4
158:1,18
167:19 225:2
232:19
**duly**  5:10 305:8
**duration**
185:25

**e**

**e**  5:8,8 88:23
304:1,7
**earlier**  16:9
17:25 18:3
44:9 58:9
62:17 70:18

74:19 86:19
87:1,22 92:3
93:23 95:24
209:9 222:23
224:10 227:10
228:22 238:8
253:4 254:19
265:19 266:2
270:8 287:22
289:8 300:4
**early**  33:23
92:17
**ease**  207:21
**easier**  154:24
**eastern**  56:5
58:1,2 66:15
66:24 67:4
69:9 145:20
**easy**  8:20
**ecosystem**
204:16
**effect**  119:10
203:16 206:21
208:2 212:12
**effected**  207:5
**effectively**
142:19
**efficiently**
114:6
**effort**  25:13
247:20
**efrate**  3:4 4:18
**eight**  77:8
302:22

**either**  16:1
17:13 26:12
28:25 49:4
82:7 160:2
163:10 164:18
165:24 242:3
251:21 268:13
284:15 295:5
**elaborated**
115:5
**elements**  134:3
224:15
**elizabeth**  90:12
293:17 298:24
**elizabeth's**
88:17 89:3
90:18 298:23
**employed**
259:4
**employing**
142:21
**employment**
36:2
**endeavor**  8:18
**ended**  15:17
260:25
**enforce**  72:11
72:11 185:8
186:22 269:17
272:12 282:24
**enforceability**
53:2
**enforceable**
133:8 252:6

enforcement
  67:16 68:16,18
  148:24,25
  149:22,24
  301:6,8
enforcing  69:4
engaged  33:4
  58:11
engagement
  32:24 33:8,11
  58:15
england  26:1,6
  46:4 57:22
  179:5 246:11
english  21:11
  25:25 26:1,5
  26:14 54:22,23
  55:18,23 56:2
  56:13,14 57:7
  57:18,24 92:4
  92:6 254:24
  255:14
enrichment
  81:19
ensure  243:13
  245:6
entered  225:14
entire  57:25
  69:9
entirely  33:25
  125:8
entirety  125:13
  125:17 126:1
  193:16,25

entitled  1:12
  72:15 106:22
  164:5 198:8
entitlement
  147:23 206:17
  292:18 294:21
entitlements
  80:21 148:19
  301:1
envelopes  48:9
equal  226:23
  252:17
equally  227:2
equitable
  155:24 156:6,9
  167:21 218:6,8
  239:9
equivalent
  25:18 211:16
err  71:11
errata  303:6
  306:1
error  153:13,19
especially
  151:12 179:3
  212:10
esq  2:5,6,8,13
  2:14,16,17
essential  164:8
  164:10 219:8
essentially
  142:18
est  4:3 51:15,18
  122:19,22

168:24 169:2
  217:19 254:3,6
  291:6,9,21
  302:19
establish  192:5
established
  186:12
establishing
  187:21
estate  226:7,12
estimating
  67:23
et  1:5 4:14 67:1
  80:21,22
  181:20 306:2
event  56:23
events  197:25
  198:16 221:21
  222:1
everybody
  302:24
evidence  5:24
  6:6,16 17:14
  55:24 56:2
  92:6 100:24
  108:12 117:9
  121:9 208:15
exact  91:20
  129:23
exactly  15:18
  31:11 41:11
  100:10 182:20
  296:15

examination
  5:12 300:3
  304:3
examine
  108:16
examined  5:11
  5:25 6:7
  297:21 298:9
examiner  7:4
example  11:15
  46:2 47:11
  59:22 67:15
  82:14,15
  102:18 112:8,9
  113:16,17
  128:7 134:24
  157:19 169:18
  172:14 173:23
  175:24 189:15
  189:24 195:3
  197:25 198:14
  200:17 204:17
  212:9 215:10
  226:6,18 236:5
  236:15 238:4
  238:20 246:9
  248:2
examples
  245:16
excellent  25:22
  247:15
except  73:9
  303:4

exchange 47:13
47:24 48:7,21
50:8 64:23
78:3 97:17
98:3,6,7,22
99:5,12 101:12
103:20 106:19
107:6,20 108:2
108:8 110:6
115:12 121:22
192:20 194:2
196:20 198:6
198:23 200:22
202:9,11
203:16 205:2
206:9,12,18,19
206:22 207:9
207:18 208:13
212:11,15,18
214:16 215:11
215:19 274:13
275:22 286:5
296:2 297:3,11
297:20
exchange's
215:10
exchanges
59:20 60:11
80:2
exclude 83:8
excluded 83:11
exclusive
185:22 187:10
188:22 189:6

191:23 192:1,9
194:21 195:13
195:14,20
197:7 200:15
200:19,24
201:13,16
202:7,16
209:23 211:13
213:9 214:12
214:16 215:12
220:25 229:6
249:17 264:5,6
264:11,17,22
265:5,23
excuse 82:14
exercisable
269:15 282:22
exercise 72:23
97:19 214:8
exercised 73:15
121:10
exercising
121:12
exhibit 39:25
40:5,17,22
54:8,12 86:10
132:9,15
140:15,21
196:7,11
210:22 253:5
253:22 254:16
286:20 304:10
304:11,12,13
304:15,17,18

exist 155:2
221:4,18 223:4
236:25
existing 219:5
expected 151:9
experience
78:21 82:15
expert 1:11
6:17 38:3
55:24 56:14
57:7,7 69:15
69:20 70:6,19
71:5,15 72:4
74:13,17 75:2
75:17 76:19,25
80:19 81:14,21
81:23 82:9
83:6,24 92:5
131:3 137:2,3
137:12 138:15
138:18 244:4
252:15 284:5
expires 303:22
306:22
explain 155:5
162:4 163:16
165:23 167:5
173:21 185:9
213:18 218:14
220:14 259:7
269:1 277:21
278:19 284:10
284:20

explained
23:12 133:6
explanation
169:11 224:18
274:19
express 51:23
60:21,24 61:2
61:7
expressed 62:4
expressing
127:20 204:25
295:18
expression
265:23
extemporary
68:12
extensive
237:10
extent 57:22
81:24 92:7
181:12 186:23
275:14,14
278:20,21
eye 179:2

f

f 87:10
face 53:10
91:15 253:23
facial 273:22
facilities 286:8
fact 47:13,20
53:6 55:13
57:25 91:19

92:4 96:9
99:23 102:19
106:4,7,18
108:13 120:15
121:25 122:6
125:8 129:15
164:8 179:11
186:13 189:11
189:13,22,23
192:13 194:18
205:6 208:23
220:13,17
280:17 285:4
**factor** 223:17
**factors** 272:10
**facts** 64:12
76:21 93:17,18
94:1,6 104:13
115:7 117:1
121:24 162:18
163:6 194:24
204:6
**factual** 93:13
94:18,23 98:14
112:25 114:18
115:4 116:18
117:2,13,25
192:11 193:17
193:25 217:3
225:7,11
259:12 260:23
287:17
**factually**
105:14

**failed** 199:18
**failing** 246:16
**failure** 220:22
249:20
**fair** 88:16 89:2
103:22
**fairly** 13:21
27:12 58:19
68:9 111:15
**fall** 128:11
**familiar** 56:12
175:18
**far** 32:6 49:22
76:15 116:24
126:10 176:18
214:22 215:5,8
216:24
**farmer** 3:5
**favor** 273:24
**february** 37:9
62:24
**feel** 112:20
143:16 166:2
**feels** 10:12
**fees** 41:19 42:3
62:14
**fell** 281:7,22
285:20 286:13
**felt** 79:10
**fewer** 252:19
**fiat** 110:8
**figure** 168:20
**file** 208:15

**filed** 4:14 11:16
13:20,24 14:3
14:10 41:1
62:23 63:6,8
87:4,15,18
88:7 107:18
110:14
**filing** 108:18
**financial** 35:17
218:20 257:6
**financially** 4:25
**find** 25:12,13
45:6 54:24
55:1 90:5
189:20 211:5
231:23 261:23
**finding** 23:6
**fine** 12:4 28:16
139:16 168:19
188:16 267:11
**finish** 7:5 8:18
8:19 10:9 64:2
86:25 111:2
120:25 133:17
171:25 199:7
288:2,25 293:6
**finished** 30:22
70:15 82:20
122:8 256:8
266:21
**finishes** 255:20
**firm** 4:21 6:22
6:24 8:5,7,10
16:4,5,5,10,10

16:13,18,20,21
16:25 17:1,12
33:18 37:4,6,9
37:12,14,15
38:1,10 66:5
82:12
**firms** 16:19
17:23
**first** 5:9 6:8
7:11 15:8
24:13 26:23
35:13 41:11,21
41:24 42:4,5
42:10 47:21
59:15,17 69:23
123:11 124:10
134:24 141:9
143:7 145:22
154:11 155:8
160:12 162:6
164:25 171:2
171:11 190:4
190:22 191:4
196:5 210:25
211:12 218:1
220:2 260:16
281:5 286:2,19
298:17 302:12
**firstly** 272:11
**fit** 159:3 171:10
217:2,3
**five** 15:4 78:9
78:19

**fixed** 261:8,16
  261:20,20
  262:7,8 263:6
  264:8,12,14,18
  264:24 266:7
  266:13
**fixes** 155:19
**flag** 228:21
**flavor** 92:24
**flip** 94:21
**floating** 261:9
  262:1,6,11,14
  262:21,24
  263:2,7,14,21
  264:1,9,10,19
  264:24 265:2
  265:13,21
  266:4,7,13
**florida** 75:3
**fluctuating**
  261:18,22
**focus** 189:3
**focused** 20:4
  152:11
**focusing** 117:5
  135:24 142:3
**follow** 300:17
**followed** 59:20
**following**
  214:25
**follows** 5:11
  170:20
**foregoing**
  303:3

**forget** 96:3
  191:12 254:21
**forgive** 297:14
**form** 14:5 31:4
  31:12 42:24
  43:15 59:13,23
  61:18 63:16
  69:1 81:22
  85:24 96:21
  98:4 99:24
  104:16 105:15
  106:20 108:5
  109:2,16
  114:11 119:1
  122:5 123:9
  125:14 127:10
  127:18 128:2
  128:13 129:9
  130:3,16,21,22
  131:9,18 132:2
  133:24 134:11
  136:18 137:16
  138:20 144:14
  147:15,24
  148:15,20
  149:3 150:6,13
  150:22 151:6
  163:18 165:7
  171:7 173:18
  174:6 175:3,14
  178:1 179:1
  182:7 185:11
  186:9 187:7
  188:2 191:20

  193:10,20
  194:3,17
  197:20 199:19
  200:1 201:11
  201:14 203:13
  204:2 206:6,14
  207:19 212:24
  213:6 214:6
  216:22 217:12
  219:11 220:10
  220:11 221:1
  221:22 222:15
  223:15 224:13
  224:18,20
  228:4,8 229:3
  230:23 233:24
  234:9 235:24
  241:2 242:4
  247:23 249:5
  251:18 252:4
  252:20 255:5
  261:10 262:2
  262:12 264:25
  265:8 271:4,11
  273:10 274:1
  275:19 276:5
  276:17 277:5
  277:14 278:6,9
  278:11,16
  280:8,15,25
  281:14 282:5
  285:1 287:3
  289:2,25
  290:12 293:21

  294:12,24
  295:12 296:4,5
  296:19 298:19
**formal** 19:10
**formalities**
  59:4,5 239:18
**formed** 44:20
  61:11,16 74:9
  110:25 111:3
  112:24
**forming** 111:11
  133:12 144:11
  260:5
**forms** 221:8
**formulated**
  43:2,7 44:11
**forth** 29:22
  50:19,22 60:4
  286:9 305:8
**forward** 32:14
  42:17 44:21
  57:15 79:7
  125:7 126:17
  129:7,15 131:3
  267:23 284:5
  292:24 293:2,7
  293:11,14
  295:1
**found** 61:25
  203:4
**four** 155:1,6
  170:20 180:18
**frame** 58:10,24
  59:9

| | | | |
|---|---|---|---|
| **frankly** 180:15 | 115:22 119:8 | 193:23 194:2 | 292:13 293:10 |
| **free** 198:5 | 119:22 120:4 | 194:14,25 | 296:2,13 297:3 |
| **freedom** 207:21 | 120:15,15,20 | 195:8 196:21 | 297:11,19,22 |
| **freely** 207:4,13 | 121:4,13,18,22 | 197:9,19 198:3 | 301:15,17,24 |
| **freeze** 263:12 | 121:25 122:6 | 198:7,18 | 302:1,2 304:16 |
| **freezes** 263:15 | 123:8,12 | 199:11 202:1 | 306:2 |
| **front** 40:4,21 | 124:14,15,19 | 203:17,24 | **ftx's** 120:3 |
| 54:12 105:16 | 124:23 125:3,7 | 204:16 205:4,5 | 121:11 122:12 |
| 117:6 118:11 | 125:13,16,23 | 205:21 206:11 | 127:7 192:16 |
| 119:5,14 | 125:23 126:6 | 206:23 207:14 | 193:15 215:21 |
| 128:17 132:14 | 126:12,22,24 | 207:22 208:15 | 262:16 264:2 |
| 140:13,20 | 127:7,24 128:4 | 212:14,15,18 | 268:10 272:18 |
| 196:11 253:21 | 128:8,18 | 212:22 213:2,5 | 281:20 |
| 254:15 | 129:12,16,22 | 213:9 214:17 | **ftx.com** 286:4 |
| **ftx** 1:5 2:2 4:13 | 130:2,6 133:20 | 216:24 229:1,4 | **fulfills** 157:1 |
| 5:17 9:23 | 134:7,19 | 229:8 231:5,14 | **full** 8:20 104:5 |
| 46:12,13 47:13 | 140:16 142:7 | 246:14 247:8 | 160:18 |
| 48:6,17,24 | 142:13,14 | 247:15 248:3 | **function** 151:1 |
| 49:10 52:20,21 | 143:4,10,12,21 | 252:1,8 262:10 | **functional** |
| 63:8,20 64:24 | 143:25 144:21 | 264:4 267:25 | 211:16 234:6 |
| 65:2 80:4,8 | 145:2,9,11 | 268:4,12 272:6 | **functionally** |
| 89:8 95:12,17 | 146:19 147:4 | 272:14,22,23 | 235:22 |
| 96:15 97:4,8 | 147:19 149:6,9 | 273:7,25 274:4 | **functioned** |
| 97:15,16 98:3 | 151:21 152:18 | 274:25 275:10 | 111:10 |
| 98:5,22,24 | 153:2,7,9,10,24 | 275:11,11,13 | **fundamental** |
| 99:5,12 100:8 | 154:1 157:4 | 275:15,15 | 290:13 |
| 100:14,19,25 | 160:12,23,24 | 276:7,11,15,22 | **further** 97:22 |
| 101:11,17,23 | 161:5 179:21 | 278:14,22 | 191:16,18 |
| 103:20 104:15 | 181:12,17 | 280:2,9,17,22 | 298:13 299:15 |
| 106:19 107:6 | 185:8 186:19 | 281:1,5,9,15,21 | 302:15,16 |
| 107:18,19 | 186:20,22 | 281:24 282:6 | 305:12 |
| 108:2,8 110:6 | 187:3,3,11 | 283:14 285:6 | |
| 112:13 113:6 | 189:5 191:22 | 285:14 286:5 | |
| 113:21 115:12 | 191:25 192:12 | 286:13,21,22 | |

| g | | | |
|---|---|---|---|
| **garage**  155:19 | 156:1 158:15 | 234:19 237:13 | 38:21 51:1,14 |
| **general**  28:15 | 163:21,25 | 250:15 285:16 | 52:6,13 54:25 |
| 36:12 54:6 | 164:1,22,23 | **gloster**  90:11 | 61:24 63:1 |
| 64:7,16,21 | 165:24 166:24 | **gloster's**  89:20 | 70:18 74:12 |
| 67:19 101:9,20 | 172:15 175:5 | 89:23 | 86:8 120:23 |
| 102:10 103:1 | 182:18,18 | **go**  4:10 19:24 | 122:18 126:7 |
| 118:3 130:17 | 201:13 211:21 | 45:22 65:4,18 | 139:3 165:14 |
| 146:2 163:5 | 223:18 224:9 | 75:19 85:15,16 | 165:15,15,21 |
| 170:6,15 | 224:17 232:14 | 86:14 99:11,14 | 182:17,18 |
| 198:10 202:18 | 233:11,17 | 99:15 116:11 | 217:18 239:20 |
| 223:24 224:21 | 237:6,7 296:21 | 120:9 122:25 | 239:21,23 |
| 252:21 258:9 | **given**  5:24 6:1 | 136:7 159:13 | 246:1 249:13 |
| 258:16,22 | 17:14 35:18 | 178:10 179:19 | 254:13 257:2 |
| **generally**  11:21 | 36:13 49:20 | 180:10 186:1 | 257:19 267:5 |
| 19:12 20:2 | 60:10 87:12 | 190:9,11 | 267:18 272:15 |
| 35:10 47:23 | 95:19 114:9,16 | 191:15,16,18 | 290:16 291:5 |
| 50:15 117:11 | 114:22 115:25 | 191:24 192:3 | 297:14 302:18 |
| 130:14,18 | 116:18 117:1 | 214:22 215:4 | **good**  4:1 5:13 |
| 131:6,12,13 | 117:14 118:6 | 216:8 228:17 | 5:14 8:22 |
| 155:5 211:20 | 131:2,16 132:1 | 229:15 230:24 | 23:11 48:1,3 |
| 252:14 258:14 | 148:2 167:23 | 231:2 239:16 | 122:24 168:17 |
| **getting**  48:2 | 191:15 229:3 | 245:24 247:19 | 246:2 |
| 49:9 50:10 | 240:8 302:20 | 248:6 249:18 | **goode**  132:10 |
| 78:6 203:17 | 305:10 | 255:20 266:20 | 132:21,22 |
| 211:11 233:19 | **gives**  122:3 | 268:8 270:24 | 304:13 |
| 297:13 | 155:20 158:1 | 276:21 282:14 | **google**  25:19 |
| **give**  6:16 7:6 | 159:5 167:12 | 291:17 292:3 | 115:11 |
| 36:10 53:1,17 | 203:10 237:24 | 298:4 | **governed**  51:25 |
| 56:2 68:11 | 240:13 300:13 | **goes**  47:15 | 53:6,9 54:2 |
| 92:6 104:5 | **giving**  81:10 | 67:22 99:18 | 55:14 |
| 123:22 131:22 | 114:23 128:16 | 215:8 231:5,13 | **governing** |
| 151:16 155:11 | 138:16 162:9 | 232:8 | 39:19 76:25 |
| | 163:13 169:10 | **going**  4:2 7:20 | 198:23 |
| | 207:2,4,15 | 18:23 28:2 | |

**grant** 130:13 131:6 142:6 143:9 156:13 161:1 185:15 187:2 221:19 221:23 222:9 222:11 226:11 226:21 227:4 241:11

**granted** 46:1 130:20 147:11 159:11 172:19 186:19,23 226:10 240:25 241:13 246:7 252:25 267:25

**granting** 142:17 183:18 224:11 225:6 241:1,14 245:13

**grants** 160:15 166:5,21 224:22

**granular** 102:14

**granularly** 98:11 102:16

**greater** 236:5

**grenada** 56:8 65:10

**ground** 7:10 8:13

**guess** 33:24 276:23

**guessing** 67:24

**guidelines** 18:22 20:15

**guiding** 225:11

**gullifer** 132:10 132:21,23 304:14

**h**

**h** 5:8 88:23 304:7

**half** 44:8,12 120:24

**hand** 163:23 305:18

**handling** 82:24

**happen** 117:24 120:17 222:8

**happened** 49:2 99:23 100:3,4 100:6,17 105:5 105:14 106:7 106:19 118:3 118:14,17,22 198:21 205:6

**happening** 107:22 205:7 207:14

**happens** 162:7 162:24 163:11 163:17 196:25 204:14,15,22

223:9 231:10

**hard** 12:17 288:24 289:3

**harris** 2:13 7:3 12:16,22 14:5 18:23 19:8 20:10,24 28:6 28:14 30:5,8 30:14 31:4,12 35:22 42:24 43:15 47:25 52:12 59:13 61:18 63:16 69:1 81:22 87:6 90:16 96:21 98:4 99:24 102:4 104:16 105:15 106:20 108:5 109:2,16 113:7 114:11,14 115:1 117:18 118:24 120:22 123:9,20 124:25 125:14 127:10,18 128:2,13 129:9 130:3,16,22 131:9,18 132:2 133:24 134:11 136:18 137:5 137:16 138:20 139:2,14,17 140:13 144:14

147:15,24 148:15,20 149:3 150:6,13 150:22 151:6 152:12 153:12 161:16 163:18 168:17,22 171:7 173:18 174:6 175:3,14 178:1 180:3,9 180:20 182:17 182:25 183:24 184:2 186:9 187:7 188:2 191:20 193:10 193:20 194:3 194:17 197:20 199:19 200:1 201:14 202:3 203:13 204:2 206:6,14 207:19 209:13 212:24 213:6 214:6 216:22 217:12 220:10 221:1,22 222:15 223:15 224:20 230:23 233:24 234:9 235:24 240:9 241:2,15 242:4 247:23 249:5 250:8,14 252:4 252:20 255:5

255:18 261:10
262:2,12
264:25 265:8
267:10 271:4
271:11 273:10
274:1 275:4,19
276:5,17 277:5
277:14 278:6
278:16 279:11
279:16,19,22
280:8,15,25
281:13 282:5
284:13 285:1
287:3 289:2,25
290:12 293:21
294:12,24
295:12 296:4
296:19 297:4
297:12 298:19
299:17 300:1,3
302:14 304:4
**hausman** 129:7
136:21 140:6
156:19 157:5
177:13 264:4
270:11 300:13
**hausman's**
11:13 50:25
51:5 129:1,3
300:5,9
**heading** 268:3
**headnote**
256:10,14,17
257:1,12,15,16

259:22,23
**hear** 12:17
67:25 68:8
161:17 267:11
288:12,16
**heard** 102:18
**hearing** 12:19
**held** 127:15
128:8,10
133:22 134:7,9
195:8 206:12
212:21,22
213:2,2,5
216:15,25
218:21,22
273:8 286:15
293:10 296:2
296:13 297:3
297:11,19
**help** 55:4
256:20,21
**helpful** 26:3,10
26:11 29:2,4
64:18 113:3
**helping** 113:3
257:18 284:16
**hereunto**
305:17
**high** 74:14
**higher** 170:2
**highlight** 45:19
**hinge** 205:13
**hmm** 29:24
166:22 185:4

**hold** 118:24
126:22 155:21
158:4 164:2,5
167:15 169:16
169:25 171:25
**holder** 157:22
223:12 237:25
246:25 247:4
269:21 273:16
**holding** 156:1
200:5
**holds** 130:15
202:22 216:19
217:9 242:9,13
**homestretch**
254:9
**hong** 5:25 7:2
7:15 74:14
**honored** 203:9
**hoof** 175:9,17
**hope** 96:12
**host** 85:15,16
**hot** 48:18,20,24
95:12,17 96:1
97:4,9,15
98:24 100:8,14
100:19,21
101:3,4,17,23
102:21 104:15
104:19,22,25
105:8 119:10
147:5 192:14
192:17,23,25
216:25 292:14

**hotel** 11:6
**hour** 48:1
72:15,22
120:24
**hourly** 62:12
**hours** 15:11,12
15:12,13 73:5
91:20 293:5
**hypothetical**
264:19 281:9
289:5

**i**

**i.e.** 216:4
246:13
**icc** 75:22
**idea** 120:2,14
120:18,19,19
**identifiable**
280:3,22
**identification**
40:1,19 54:10
132:11 140:17
196:9 213:25
253:7
**identified**
23:15 24:4
31:25 57:6
85:25 86:5
111:11 214:2
228:20 244:6
278:24 280:17
281:16 286:23

identify 71:4
108:23 109:12
109:23 181:17
182:23
identifying
213:23
identity 181:20
214:1
ii 143:5 169:20
iii 218:7 220:3
il 2:19
immediately
256:15,18
impact 140:8
174:4,8 287:23
296:10
impacted
103:18
impediments
248:25
implicit 246:24
implied 234:14
237:22 240:1
implies 242:18
important 8:17
60:7 61:23
164:8 179:4
222:18 234:25
235:2,16,19
242:8,12,12
243:8,24 244:7
244:19,24,25
245:5 247:7
262:23

impossible
276:14
impractical
247:10 248:11
248:11
impression
45:5 46:7,14
improperly
73:14
inaccuracies
45:1
inaccuracy
45:4
incapable
183:16 184:7
186:14 260:1
incapacitated
78:12
include 18:21
42:2 61:16,24
85:22 95:7
230:7 234:10
235:9 236:1,12
244:15,17
included 43:8
44:14 62:1
95:4 206:18
255:15 256:1
includes 57:21
172:16 202:13
255:8
including 20:14
70:20 234:11
235:9,11,12

inclusion
240:22
incomplete
178:19
inconsistent
108:25 109:14
109:25 275:25
incorporation
81:1 246:13
incorrect
182:21
indebtedness
143:23 160:20
281:7,23 282:7
282:9,10
283:15,16
284:22,23
285:21,25
286:9,14
indefinite
65:21
independent
106:3,8,25
123:6 124:6
independently
112:23
indicate 214:1
214:10 251:21
indicates
182:15
indication
178:20 194:20
200:23 202:6
263:19,20

indications
190:13
individual
95:16 97:7,14
98:23 99:16,17
99:19 101:6,12
102:22 134:16
142:12 143:13
143:18 144:1,3
144:23 145:12
146:25 147:4
147:12 151:22
152:19 215:25
216:2,11
292:12
inference
105:23
inform 90:19
90:23
information
47:14 48:5
50:13,16 59:21
114:12 115:15
139:15
informed
139:18
informs 170:8
170:11 196:4
201:23
infrastructure
96:2 207:16
inherently
238:20

| | | | |
|---|---|---|---|
| **initial** 27:1,11 | 115:19,25 | **intend** 42:22 | 169:22,24 |
| 33:21 42:7,18 | **instructions** | 43:13 44:21 | 170:1,10 |
| 58:13 59:8 | 58:14 59:7,9 | 221:19 | 171:20 172:3,5 |
| 60:12,18 91:24 | 59:11 60:13,19 | **intended** | 172:7,11,13,20 |
| **initially** 18:9 | 112:15,19 | 103:11 150:16 | 173:3,5,6 |
| 33:11 50:4 | 113:23,25 | 154:5 169:11 | 174:5,17,21 |
| 59:3 | 114:3,8,16,22 | 178:12 231:21 | 175:1,12 176:1 |
| **inquired** 49:1 | 116:9,17,19 | 232:5 | 176:6 177:25 |
| 50:10 | 117:14 118:7,7 | **intent** 220:9 | 178:13,17 |
| **inquiries** 49:1 | **instructive** | **intention** 191:5 | 180:2 181:8,19 |
| 49:12,13 50:1 | 254:23 | **interest** 36:21 | 183:10,17 |
| 97:22 | **instrument** | 73:22,25 74:9 | 184:8,13,14 |
| **inside** 227:16 | 239:15 | 79:2,9,15 91:5 | 187:6,14 |
| **insofar** 57:24 | **insurance** | 91:9 123:7 | 189:11 191:5 |
| 64:17 69:3 | 245:19 | 124:8,19 | 194:15 211:23 |
| **insolvencies** | **insure** 236:7 | 126:13,23 | 212:18 219:19 |
| 80:23 | **insured** 236:16 | 127:8,16,23,25 | 219:21 220:4 |
| **insolvency** 70:3 | **intangible** | 130:14,15,20 | 221:15,16 |
| 80:14,18 81:6 | 185:22 186:14 | 131:2,7,7 | 223:13 224:23 |
| **institution** | 188:1,8 189:4 | 133:23 141:10 | 227:5,13 |
| 35:17 | 189:5 209:3,6 | 141:19,20,24 | 233:14 239:9 |
| **instruct** 18:24 | 209:6,11,23 | 142:17 147:11 | 245:13 248:19 |
| 28:8 | 210:4,11,16 | 147:20 149:16 | 248:22 252:25 |
| **instructed** 9:9 | 211:7 227:21 | 150:11 154:13 | 258:7 262:17 |
| 60:21,23 61:1 | 230:6,7,16 | 154:15,16 | 267:25 269:16 |
| 129:11 | **intangibles** | 155:2 157:8,15 | 272:19,24 |
| **instructing** | 225:24 226:17 | 157:23 158:2,7 | 273:8,24 275:1 |
| 93:11 112:1 | 227:7 229:19 | 158:15,20 | 277:3,12 278:2 |
| 115:17 | 229:20 230:3,4 | 159:11,13,15 | 279:8 280:7 |
| **instruction** | 230:20,22 | 159:17,23 | 282:11,24 |
| 19:9 20:11,25 | 242:21,23 | 160:17 161:3 | 283:6,7 284:7 |
| 28:11,13 29:15 | 243:1 260:6 | 165:7 167:3 | 287:6 290:11 |
| 58:17,18 59:24 | **integrated** | 168:1,8,12,13 | 293:9 295:10 |
| 59:25 114:19 | 288:20 289:13 | 168:16 169:10 | 296:1,11 |

297:23 298:6
298:11
**interested**  4:25
89:24 90:3
191:11 305:15
**interesting**
90:5 129:10
**interests**  67:8
67:13 68:19
69:5 70:8 72:2
74:24 76:2,4
78:23 124:23
128:9,10
130:10 133:21
134:7,9 154:7
154:20 159:1
171:17 173:8
173:14 181:5
182:11 252:18
297:2,10,18
298:2
**interface**
146:19 147:14
206:24
**interference**
81:18
**internal**  81:5
**international**
6:19 251:1
**interpret**  106:6
142:24 143:17
151:21 152:16
153:2,6,22
301:23

**interpretation**
26:9 55:19
56:10 66:22
67:1 81:16
106:17 142:22
143:11 144:6,9
145:15,17,18
146:3 148:1
151:4 232:11
232:11 290:6
**interpreted**
68:23 119:13
144:23 148:17
149:15 300:25
**interpreting**
25:24 66:19
67:3,7,12 74:7
118:21 119:21
144:19 145:7
145:22 150:20
**interrupt**
120:23
**intricacies**
168:3,4
**invalid**  46:1
246:8 276:15
**invalidate**
251:6
**invest**  48:12,13
48:21 82:16,17
**invested**  47:12
48:6 50:8
64:23

**investigate**
119:22 120:11
**investigation**
93:14 106:3,9
106:25 111:9
115:7,11
**investments**
47:23 76:22
**involve**  6:21,24
8:4,7 12:11
35:7 49:9 69:5
78:3,25 80:1
82:4
**involved**  7:16
7:17 8:10 16:4
16:20 17:12
19:22 37:14,24
37:25 38:25
39:1 55:19
68:15 72:8
75:7 77:12,22
78:22 80:4
82:23 83:13,16
101:7
**involves**  35:9
52:21 68:15
278:20
**involving**  38:1
**islands**  65:10
**issue**  7:25
25:16 27:7
41:23 47:12,16
49:11 57:6
61:22 64:18

66:19 67:6,11
68:2 72:18
117:12 126:8
126:21 127:3
135:11 138:8
156:20 157:3
185:17,18
190:20 191:14
212:5 250:12
256:23 257:9
257:18 258:6
258:15,18,23
259:18 266:10
270:7 300:17
**issued**  26:24
27:1,7 41:11
67:18,21 68:8
68:22
**issues**  22:14,16
23:24 24:6
25:8 36:2 47:8
51:24 52:17
55:11 56:24
57:18 58:20
71:8 92:12,15
92:18 96:19,22
118:5 126:18
130:24 134:2
135:7 140:8
159:25 190:9
190:11 208:22
255:9
**item**  86:15

| j | jumped 299:21 | kicks 203:19 | l |
|---|---|---|---|
| jj 2:14 | june 120:8 | kind 67:17 | l 5:8 |

**j**

jj 2:14
jj.crespo 2:15
joint 2:11 9:24
17:8 34:5
36:25 37:16
53:24 62:19
63:3,7,13,23
64:6,13 88:1,6
88:12 89:16
108:19,24
109:13,24
125:12,15,21
126:5,10 127:6
127:14 128:23
140:1,11
293:15
jointly 1:3
jose 2:14
juan 2:14
judge 37:8
38:11 56:5
66:6,14 67:7
67:12 75:14
judgment 22:3
68:7 256:10
judicial 66:8,11
66:12
july 33:23 34:1
34:2 58:10,24
59:4
jump 259:13

jumped 299:21
june 120:8
jurisdiction
17:3 39:20
80:25
jurisdictions
46:2 58:3 65:7
246:9
justice 259:10

**k**

k 33:15
karla 2:17
karla.mardue...
2:18
kbo 1:2 4:17
kc 53:23
keep 119:24
236:16 245:22
285:23
kept 205:6
251:12
kerry 3:8 16:12
20:22 21:18
22:6 23:14
59:18 82:22
key 202:23
203:2 206:13
212:15 213:24
216:1,14,20,25
217:9
keys 195:8
kick 73:12
197:25

kicks 203:19
kind 67:17
115:13 169:23
174:13 226:11
242:15 298:5
kinds 156:16
176:5 222:2
knew 48:16
232:13
know 9:15 12:8
12:18 13:12
31:5 40:7,24
45:18 52:5,5,9
52:9 54:14
73:6 96:13
97:23,24
109:18 115:2
126:10,12,14
137:9 140:4
163:20 175:4
193:13,13
200:19,20
213:13 215:7
227:9 239:15
266:9 277:18
287:19 291:3
294:4
knowledge
170:7
known 168:5
239:13
kong 5:25 7:2
7:15 74:14

**l**

l 5:8
lack 185:17
186:7
land 226:14
242:16,17
243:16
language 74:8
142:17,24
143:8,17 147:9
151:14 152:17
153:6,22 161:6
161:21 162:16
163:9,17
164:14,17,22
164:23 165:24
166:6,9 167:2
169:8 204:19
212:6 232:2,6
233:17 241:10
266:5 271:2
301:23
largely 111:24
lasted 15:16
late 33:23 34:1
34:2
latham 2:10
6:22 8:5 14:15
15:22 16:2,6
16:18,21 18:12
18:16 19:7
20:9,18 21:7
33:3,4,9,17,19

38:7 49:15,18
50:18 59:19
60:4 93:10
**launch** 145:6
**law** 6:17,22
7:17,20,25 8:1
8:10 24:16,20
25:25 26:1,5,6
26:7,13,14
35:8,9 39:19
51:24 52:1,17
54:2,7,24
55:11,15,18,23
56:3,9,11,13,25
57:2,8,11,18,21
57:22,24 58:2
58:3 66:20
67:4,5,9,18
69:15,21 70:2
70:2,7 71:21
76:21,25 79:21
79:23 80:13,14
80:17,17 82:25
91:6 92:4,6,12
92:15 126:22
130:13 131:2
137:12 142:22
144:18 154:8
154:21 155:3
163:24 164:2
167:11 175:24
176:4,9,9,9,14
176:16,21
177:7,9,11,17

177:22 178:5
178:15,22
179:4,7,25
181:3 182:2,9
183:15,22
184:6 185:19
188:9,11,14,20
189:13,19,21
195:23 201:2
201:15 202:19
208:23 209:19
210:15 211:3
211:10,20,24
213:12 219:5
225:16,19
226:20 227:3
228:6,7 229:11
229:17 230:3
230:19 233:8
234:14 236:22
237:22 240:1
242:17 246:12
247:7,11
254:24 255:14
268:18 270:4
274:16,24
276:14 280:6
292:21 298:21
299:1
**law.com** 2:15
**laws** 53:6,9
88:24 160:25
231:15

**lawyer** 6:15
16:25 117:6
138:21
**lawyers** 11:1
55:24 56:1
93:10 100:13
119:15
**layups** 137:9
**lbf** 258:8
**lead** 148:4
272:5
**learned** 95:25
208:11
**leave** 12:2 51:4
**left** 57:2 169:5
246:1 291:4
**legal** 63:22
64:5 126:18
127:1 129:16
129:18 130:23
136:15 175:18
175:22 207:10
208:6,9,10
234:7 239:20
273:20 306:1
**legislation**
45:20 256:18
257:5
**lehman** 22:24
25:3,12,21
26:9,25 253:4
253:5 254:13
254:16 266:21
266:24 267:1,3

304:18
**lend** 270:22
**lender** 156:12
181:17 218:11
227:19,22
252:16 263:24
265:9,15
268:11,22
270:19 271:13
273:11,14,22
276:13 278:25
280:3,18,23
281:1,6,16,21
286:23
**lenders** 135:4
268:14 270:8
272:8,11,20
273:1,5 274:3
274:7 275:18
**lending** 52:19
181:13,15,18
248:5 268:6,12
268:15 270:23
271:24 273:13
274:21 276:22
277:10,17,25
278:15,22,23
280:4,10 281:2
285:8,16,19
**lendings**
281:22
**lent** 268:14
273:21 274:17
275:2 278:14

285:18
**lesser** 239:20
**letter** 33:8
59:23,24
**level** 19:13 93:4
170:2 171:3,19
203:10,21
**levy** 53:23 54:4
54:9 55:10
57:3,14 86:16
88:22 93:6
304:12
**levy's** 54:16
56:18 57:5
86:20 87:2,12
87:17 91:22
93:2
**lexus** 25:20
**liabilities** 36:6
160:21
**lien** 45:24
143:9 155:16
155:18,24
156:2,5,6
157:20,21,24
159:3 160:3,16
161:2,7,12,24
162:17,23
163:9,17,19,23
164:3,11,18,24
165:2,5,8,25
166:5,7,21,24
167:8,8,13,21
167:22,24,25

168:7,7,10,11
168:12 169:7
169:12,14,21
170:9,21
171:21,23
172:25 174:16
174:21 185:12
185:19 191:12
191:12 200:5
209:19 219:2,3
220:24 221:3,9
221:13,14,20
221:23 222:3,9
222:11,20,20
223:14 224:1
226:4,10,12,16
226:24 228:4
229:20 230:6
230:13,21
232:10 233:9
233:14,19
234:15 236:10
236:15,23,25
237:17 238:3,5
238:23 239:9
239:21 240:7
240:12,25
241:14,19,23
246:5 258:2,9
258:21,22,24
259:20 260:25
265:20
**lienee** 156:1
203:10 222:13

**lienholder**
157:24 158:17
161:14 167:14
167:18 191:22
192:4,8 194:20
194:21 195:15
195:18 199:15
199:23 200:3
200:11,16,24
202:6,15,22
203:1 221:9,12
232:14 233:11
233:17 236:11
238:5,21
240:23 241:12
**lienor's** 203:8
**liens** 22:25
155:17 170:7
**likely** 78:9
135:10 231:23
**limited** 35:6
147:20 201:5
234:17 238:1
238:11,23
240:6 241:12
267:8 286:22
**line** 45:23
52:24 110:18
120:25 139:7
139:22 140:25
141:1,6,9
142:5 171:2,11
184:11 198:15
231:7,10

278:23 285:11
285:23 286:8
286:21 287:2,4
287:11 288:22
290:4,10 306:4
**liquidate**
157:12 158:11
158:22 195:5
198:18
**liquidated**
101:2,3
**liquidation**
34:14,17 35:1
35:17 36:4
**liquidator**
34:18
**liquidators**
2:11 9:24 17:8
17:11 32:20
33:7 34:5,19
35:15 36:25
37:17 53:24
62:15,20 63:4
63:7,13,24
64:6,14 88:1,6
88:12 89:16
108:20,24
109:13,24
125:12,15,22
126:5,11 127:6
127:14 128:24
140:1,11
293:16

**list** 84:5,20
112:25 170:20
172:6 244:14
**listed** 11:22
14:7 84:19
86:16 93:8
94:8 98:14
111:6,19
**listing** 234:23
**lists** 198:16
243:16
**literally** 294:1
**litigant** 83:19
**litigation** 83:14
**litigator** 83:18
**little** 29:21
43:24 44:5
55:1 79:3 91:1
98:11 102:13
114:5 154:24
162:4 180:18
218:5,14
224:17
**liu** 2:6
**lius** 2:7
**llp** 2:2,10
**loan** 53:25
132:6 135:3,23
178:12 181:16
190:7,21 225:6
243:15 245:9
275:17
**loaned** 268:5
268:22 270:18

272:8 273:5,12
274:11 277:1,9
277:16,24
278:3,8,12
279:6 282:2
**loans** 181:12
268:23 270:20
273:9 274:12
**loc** 110:18,23
111:10 123:14
135:16,21,25
137:13,19
140:2 141:9
183:7,18
**local** 16:4,9,21
17:2
**located** 1:12
**lodged** 21:4
**logged** 146:19
**logistically**
246:17
**long** 15:8,15
39:7 65:11
75:13 102:19
102:22,23
109:4 180:15
**longer** 38:22,23
**look** 11:18
40:23 78:15
116:6 123:23
135:14 136:8
136:20,23
138:4 141:22
145:22 180:16

183:2 188:4
191:3,13,21
196:2 210:20
215:23 221:14
225:10 254:13
256:25 258:10
263:16 285:22
286:19
**looked** 13:10
25:21 27:24
47:8 88:21,25
92:16,18 107:8
107:17 115:4
116:13 122:7
122:10,11
125:2 134:1,2
134:15 136:5
192:7,9,11
212:20 227:8
229:21,25
256:10 259:11
259:11 267:16
298:21 299:1
**looking** 54:5
97:1 122:25
123:18 145:5
150:25 199:5
213:3 215:17
256:12 267:1,3
268:2 278:17
286:2
**looks** 54:15
**lord** 88:19 89:4
89:7 90:22

259:9 261:1
**lot** 91:16 109:5
257:16
**love** 180:7
**lunch** 122:20
**lw.com** 2:13,16
2:18

**m**

**made** 10:24
22:2,3 41:2
49:1,12,14
59:22 72:17
95:3 97:2,22
98:9,17 101:9
101:15 102:13
103:2,4,13,19
104:3,6 107:4
110:1 125:22
130:5 139:10
139:24 148:7,8
164:4 181:12
207:22 257:8
270:7 274:12
296:20 303:8
**main** 52:3
81:11,12,13
82:7 232:20,22
263:9
**maintained**
65:15
**maintains**
65:18

**majority** 39:13
78:8
**make** 8:20,23
46:21,24 58:19
61:12 66:1
99:2,7,9,20
100:5,9,16,23
101:21 102:11
104:12,17
105:6,9,19
107:14 112:2,2
112:3,4 121:14
121:21 133:8
148:8 151:10
151:11 154:24
164:6 172:10
172:13 195:16
201:8 248:9
249:8,9 252:6
255:6 263:21
296:22,24
297:7,16
300:19 302:7
**makes** 49:6
158:19 167:25
168:5 195:20
249:9
**making** 274:20
282:13
**manage** 9:15
**managed** 98:7
**march** 62:24
70:9,10

**mardueño** 2:17
**margin** 52:23
64:25 99:13
124:7 135:16
135:22 136:1
136:11 137:13
137:20 140:2
141:1,3,7,16,19
142:4,4 153:22
157:10 158:8
158:24 159:5
159:11,24
161:23 169:9
181:13,17
185:6,10
186:24 190:14
195:6 198:1,2
198:16,24
218:2 229:3
231:4,12 261:6
261:24 268:6
268:11,15
273:13 274:21
277:10,16,25
278:15,22
280:4,10 281:2
281:8,21 285:8
285:15,19,22
286:6 287:12
290:5
**marked** 40:1,4
40:18,21 54:9
54:12 132:11
132:14 140:17

140:20 196:8
196:11 227:16
253:6,21
254:15
**marriage**
305:14
**matera** 1:14
4:21 305:4,22
**material** 11:5
18:9,21 20:14
28:2 29:5 62:5
85:18 86:4
119:14 254:22
**materials** 11:2
**matrix** 259:12
**matter** 6:14,16
7:19 8:11
16:14 17:9
19:23 33:6
34:20 35:4,5
35:12,20 36:23
37:5,19,25
38:18 39:8
42:8,23 43:14
44:21 51:22
57:11,15,19
58:6,11 62:8
62:19 63:15
64:10 76:12
78:14 93:6
101:9,20
129:16,18
136:10 137:18
138:2 143:11

150:15 157:3
163:5 177:21
179:25 181:3
182:9 183:15
184:6 187:23
187:25 189:18
189:21,22,22
207:10 214:18
215:1 223:24
230:2 233:8
234:7 236:6
243:21 244:14
273:20,23
274:15,24,25
276:14 288:8
289:9 296:7
297:21 298:10
305:16
**mattered** 288:3
**matters** 6:11,12
36:4,8 37:13
37:15,18,21,24
38:19 39:3
56:25 81:5
103:17 104:3
137:23 138:24
188:3 296:8
**maya** 2:8
**mca** 258:8
**mean** 13:6
18:20 19:13
20:13 21:22,22
22:10,13 45:13
48:9 61:5

| | | | |
|---|---|---|---|
| 68:18 77:25 | 146:12,13,14 | **mention** 11:20 | **minutes** 15:17 |
| 84:21 87:10 | 151:1 168:20 | 16:8 70:15 | **mischaracteri...** |
| 102:5 104:24 | 187:3 195:15 | 171:16 183:21 | 183:4 |
| 111:13 112:6 | 196:21,24 | 183:22,23 | **mischaracteri...** |
| 121:5 124:18 | 202:1 213:23 | 201:6 | 164:16 |
| 134:23 136:7 | 213:25 220:22 | **mentioned** | **mispronounc...** |
| 138:17 139:8 | 251:7,22 276:9 | 16:17 17:2,14 | 195:25 |
| 145:24 146:5 | **meant** 148:11 | 17:23 25:4 | **missed** 259:22 |
| 152:17,18 | 210:5,16 | 27:14 32:8 | **misstate** 113:10 |
| 164:15 170:13 | **mechanic** | 34:4 37:22 | **misstates** 87:7 |
| 175:22 179:13 | 155:19 164:1 | 43:19 53:5 | 113:8 180:4 |
| 181:6 195:14 | 169:19 | 66:3 70:13 | 209:13 240:10 |
| 205:8 209:6 | **mechanism** | 79:5,25 80:1 | 241:16 |
| 215:7 216:23 | 96:9 97:25 | 85:10 92:3 | **misunderstan...** |
| 219:16 220:15 | **media** 4:11 | 155:25 196:1 | 276:24 |
| 221:2 222:18 | 302:22 | 201:3 204:24 | **mixed** 105:1,3 |
| 237:4 262:7 | **meet** 14:21,23 | 227:11 242:7 | 189:13,19 |
| 269:2 271:17 | 17:18 262:8,10 | 245:18 253:4 | **mmm** 29:24 |
| 273:1 277:21 | **meeting** 10:25 | 254:12,14 | 166:22 185:4 |
| 278:7 279:1 | 15:14 16:11 | 272:10 | **modified** 59:10 |
| 291:16 292:9 | 117:20 | **mentioning** | 171:13 |
| 299:9 | **meetings** 15:6,8 | 291:14 292:6 | **modify** 171:5 |
| **meaning** 30:3 | 15:9,22 16:1 | **met** 224:6 | 260:13 |
| 30:19 44:11 | 16:17,23 17:16 | **microphone** | **moment** 150:1 |
| 85:19 158:16 | 31:23 49:19 | 12:18 | 185:23 |
| 221:2 | 50:17 100:12 | **microphones** | **money** 48:12 |
| **meaningless** | 111:14,24 | 4:4 | 48:13 65:3 |
| 232:6,7 240:3 | 115:6 | **million** 52:25 | 99:18 162:11 |
| 240:21 241:4 | **meets** 224:14 | 119:24 120:7 | 269:23 276:11 |
| 241:23,25 | **memory** 11:24 | **mind** 222:2 | 280:9 |
| 242:3 | 11:25 33:25 | **minute** 7:6 | **moneys** 63:18 |
| **means** 21:23 | 38:20 39:17 | 53:18 118:25 | 72:9 281:6 |
| 31:5 61:5 73:8 | 54:25 55:12 | 123:23 168:21 | **monies** 275:23 |
| 144:23 145:3 | | | |

**month** 44:6,8
44:12
**months** 77:8
**morning** 4:1
5:13,14 227:10
**mortgage**
156:18,21,22
157:2,6 185:13
**mortgagee**
67:16 156:23
**mortgages**
67:15
**mortgagor**
156:24
**motion** 83:7
**mouth** 45:14
103:11 164:17
**movables**
211:17
**move** 21:15
79:7 177:11
181:25 182:12
267:19
**moved** 21:25
104:23 140:10
**movement**
101:22 103:21
**moving** 211:4,8
211:10
**multiple** 7:19
255:8
**mute** 4:7
**mutually**
220:25

**n**

**n** 5:8,8 88:23
304:1
**nacif** 2:16
**nacif.taousse**
2:16
**name** 4:18 5:15
35:1 75:9
214:1 256:17
306:3
**names** 21:13
71:12,12
**narrow** 57:6
**nature** 103:1
136:15 162:14
191:14 258:6
295:2 296:25
297:8,17
**necessarily**
19:21 147:2
148:21 149:20
172:14 221:11
238:11 299:20
301:4
**necessary** 66:1
118:9 131:15
131:24 132:4
134:3 139:7
174:9,10,11
178:4 185:7
208:1 219:7
231:20 232:3

**need** 9:14 11:20
11:24 45:6,25
55:23,24 73:5
73:7 92:5
99:20 100:23
105:19 109:17
114:17,21
120:24 121:8
121:12 128:14
133:5,7 139:21
155:16 156:14
161:15 165:16
183:2 210:11
224:12 234:2
236:6 239:25
246:6 248:6
277:21 299:8
299:10
**needed** 28:17
58:20 79:10
91:15 107:14
120:9,20 121:4
208:14,16
229:4
**needs** 115:2
171:12 178:21
179:15 203:9
249:11
**neither** 74:22
251:19 261:13
262:4 266:7,12
**neuberger's**
88:19 89:4,7
90:23

**never** 6:1 37:1
38:2 60:19
80:7 83:23
140:10 162:19
224:7 236:17
236:19
**new** 1:15 2:3,3
2:12,12 21:10
22:19 27:9,14
70:22 71:16
178:21 255:21
305:5
**news** 84:14
**nicholas** 3:7
269:8
**nine** 56:6
**non** 83:24,25
138:8,18
173:10,17,24
223:2
**normal** 7:23
**normally** 45:20
167:12 211:25
262:15
**north** 2:18 56:7
**notary** 1:15
5:10 303:21
305:4 306:21
**note** 4:4 12:16
194:23
**noted** 5:4
302:25 303:5
**notes** 10:19,20
10:22,23

notice 211:21
212:1,13,16
null 142:18
number 4:17
84:19,21
213:23 252:9
257:6 302:22
numerous
249:19
nutshell 49:3
81:9

**o**

o 5:8 88:23
o'clock 15:20
o'neal 3:8
o'neil 16:20
oath 4:23
object 14:5
31:4,12 42:24
43:15 59:13
61:18 63:16
69:1 81:22
96:21 98:4
99:24 104:16
105:15 106:20
108:5 109:2,16
114:11 119:1
121:25 122:1,6
123:9 125:14
127:10,18
128:2,13 129:9
130:3,16,22
131:9,18 132:2

133:24 134:11
136:18 137:16
138:20 144:14
147:15,24
148:15,20
149:3 150:6,13
150:22 151:6
163:18 171:7
173:18 174:6
175:3,14 178:1
186:9 187:7
188:2 191:20
193:10,20
194:3,17
199:19 200:1
201:14 204:2
206:6,14
207:19 212:24
213:6 214:6
216:22 217:12
220:10 221:1
221:22 222:15
223:15 224:20
233:24 234:9
235:24 241:2
242:4 247:23
249:5 252:4,20
255:5 261:10
262:12 264:25
265:8 271:4,11
273:10 274:1
275:19 276:5
276:17 277:5
277:14 278:6

278:16 280:8
280:15,25
282:5 285:1
287:3 289:2,25
290:12 293:21
294:12,24
295:12 296:4
296:19 298:19
objected 120:4
120:12,20
objection 11:17
21:5 63:9 87:6
107:17 108:21
110:15 113:7
117:18 120:5
124:25 180:3
192:12,16
193:16,24
197:20 202:3
203:13 230:23
240:9 241:15
250:8 262:2
275:4 279:11
281:13 297:4
297:12
objections 5:1
9:8,11
obligation
155:13 162:10
162:14 169:17
218:19,20,24
219:15 251:16
269:11,14,18
269:20 271:10

271:22,24
275:15 277:3
278:5,13 279:9
282:10,18,21
282:25 283:4,9
283:17,18,21
284:11,23,25
285:3
obligations
157:1 160:22
243:11 272:25
277:12 283:11
285:17 286:12
obtain 216:2
217:13 275:1
obtained 273:9
obtains 216:20
217:10 282:22
obvious 58:20
occurred 58:24
october 40:13
41:7,15,16
43:7,18 44:3
44:11 47:3
48:7,10,11
50:13 86:12
offer 236:7
offered 262:14
offering 57:10
57:17,20 199:3
199:9 260:18
office 17:4
213:24 251:13

| | | | |
|---|---|---|---|
| **offices** 17:5 | 182:4 184:2,22 | **operation** | 138:11,13,16 |
| **ogier** 3:6,7 16:5 | 186:18 189:9 | 163:24 164:2 | 138:17,18 |
| 16:21 17:1,12 | 190:17 191:10 | 167:11 | 139:13 142:10 |
| 38:10 39:4,8 | 194:12 205:18 | **operational** | 144:1,4,10 |
| **ogier's** 39:9,15 | 209:17 210:2,3 | 50:6 | 146:10 159:14 |
| **oh** 123:19 | 210:24 227:15 | **opining** 68:25 | 159:21 163:8 |
| 129:4 179:8 | 230:17 235:21 | 76:10,13 | 165:11,23 |
| 190:17 205:16 | 239:19 241:5 | 103:17 125:9 | 166:12 168:14 |
| **okay** 6:15 8:25 | 243:2,23 | 126:9 250:3,5 | 177:4,7,20 |
| 9:20 10:14 | 245:24 248:24 | 293:22 294:7,9 | 178:10,19 |
| 11:7 12:2,4,19 | 254:19 255:2 | **opinion** 11:22 | 179:21,24 |
| 30:8 31:9,14 | 255:11 256:3 | 14:8 26:24,24 | 182:15 183:14 |
| 32:11 39:24 | 256:19 257:11 | 27:8 32:3,13 | 184:5,17,18,24 |
| 40:3,16 42:15 | 258:4 261:4 | 43:1,4 50:5 | 186:5 187:1,13 |
| 51:4,20 53:11 | 267:20 272:4 | 51:7,23 53:1 | 187:17 188:19 |
| 56:17 57:4 | 272:23 280:2 | 57:11,18 59:16 | 189:1 196:1,4 |
| 60:20 62:7 | 283:8,9 286:19 | 60:22,24 61:2 | 196:19 199:3,9 |
| 64:11 71:14 | 291:1,11,23 | 61:6,22,25 | 199:14,22 |
| 75:22 79:18,24 | 292:1 293:13 | 67:2,6 68:22 | 200:2 203:25 |
| 87:24 91:11 | 300:1,4 301:21 | 68:23 73:11,15 | 204:7,23,25 |
| 98:15,19 100:5 | 302:14 | 73:16,21 76:9 | 205:13,20,24 |
| 104:1,12 | **once** 6:8 14:25 | 77:5,6 83:7 | 209:9 214:13 |
| 106:15 108:17 | 15:1 34:12 | 91:6 101:25 | 214:14 215:15 |
| 122:16 125:6 | 54:13 59:5 | 102:3 103:14 | 219:22 228:6 |
| 127:3,13 | 295:21 | 104:22 111:6 | 229:10 231:22 |
| 133:17 135:12 | **ones** 22:18 62:4 | 114:23 121:23 | 234:20 238:9 |
| 137:18 140:12 | 83:14 88:15 | 122:6 125:7 | 238:17,23 |
| 141:15 152:4 | 245:18 256:3 | 126:17 127:21 | 240:4 244:4,24 |
| 152:10 154:18 | 299:18 | 128:16 129:8 | 250:16 255:8 |
| 157:7 160:4,9 | **ontario** 75:17 | 129:15 130:1 | 255:13 256:1 |
| 161:10 162:7 | **operated** | 133:13 134:13 | 257:14 260:9 |
| 163:2 164:13 | 170:15 206:19 | 136:14,20,22 | 260:11,17 |
| 165:21 166:12 | **operates** 47:24 | 136:23 137:2,3 | 261:5 269:7 |
| 168:21 173:7 | | 137:12 138:8 | 285:17 287:1,1 |

287:4,23
289:13,20
292:25 293:3,8
293:12,15
294:20 295:2
295:18,23
296:9,22
298:23 299:2
300:12,14
**opinions**  42:17
42:22 43:6,12
43:17,18,21
44:10,20 47:6
50:19,22 51:8
51:10,11 57:5
57:14,15,20
61:10,15 62:3
66:19 67:11,18
67:21 74:2,6
85:24 108:25
109:14 113:1
137:19 159:9
164:21 181:2
188:17,18
229:12 260:12
260:18 267:23
267:23 293:18
294:9 295:8,16
295:22 296:3
**opposed**  32:3
185:12 194:6
**option**  261:14
**oral**  5:24 118:7

**order**  13:25
78:13 156:3
157:22,25
158:13,14,17
179:14 184:18
200:13 211:21
248:4 252:1
269:17 282:24
**original**  86:11
87:11 88:2
**outcome**  4:25
305:15
**outline**  115:4
269:6
**outlined**  192:12
**output**  216:5
**outside**  5:23
124:25 245:20
250:8
**outstanding**
36:9
**oversecured**
271:14,15,18
**overstating**
46:14
**owed**  269:11
272:25 276:11
282:18 285:7
285:14 286:13
**owes**  218:19
275:15
**own**  12:21 18:7
18:10,15 19:6
20:7,17,20

21:3,17 22:4
114:23 125:3
128:5,18
129:12,22
130:2,6,9
135:2 172:2,4
193:15 202:1
204:21 216:13
226:9 230:9
271:1 275:14
275:15 292:22
**owned**  123:12
124:15,23
125:8,13,25
133:21 134:25
293:25
**owner**  131:16
131:21,25
132:5 156:22
218:18 224:22
**owners**  78:1,5
79:6
**ownership**
124:11 126:8
126:14,15,18
129:8 130:21
134:17 141:24
185:16 204:24
205:1 295:19
**owns**  124:20
125:16 126:24
127:7 129:16
145:14

**p**

**p**  5:8
**p.m.**  122:19,22
168:24 169:2
217:19,22
254:3,6 291:6
291:9,21
302:19,25
**package**  41:4
**page**  40:11
41:4 213:10,15
215:22 277:20
277:22 286:20
304:3,9 306:4
**pages**  92:19
94:21 244:11
**paid**  62:13 65:1
140:4 167:16
170:1
**panel**  68:1,2
**papers**  58:19
58:19,22
215:18
**parades**  262:5
**paragraph**
45:15 53:16,21
69:11,14,25
70:19 74:12
84:2 86:8,14
87:10 93:8
94:8,16,22,22
110:5 111:6,7
111:20 123:2,5

| | | | |
|---|---|---|---|
| 123:23 128:21 | **part** 56:15 | **partner** 20:21 | 164:4 |
| 135:12,15 | 57:25 58:1 | 21:4,18 22:6 | **peer** 78:4,4 |
| 138:1 139:24 | 68:1 92:17 | 23:14 | **pending** 9:18 |
| 141:16,22 | 109:8 141:3 | **parts** 11:15 | **people** 12:20 |
| 143:6 154:22 | 167:22 187:16 | 13:22 14:11 | 78:20 161:17 |
| 154:25 161:22 | 196:4 198:19 | 54:18 55:6 | 177:17 197:2 |
| 164:14 169:8 | 201:7 215:16 | **party** 4:24 | **percent** 200:17 |
| 169:20 170:18 | 243:13 256:13 | 105:18 130:13 | 200:18 |
| 171:16 180:11 | 257:15 260:3 | 199:15 202:24 | **perfect** 11:24 |
| 183:6,13 184:9 | 262:17 263:10 | 216:19 217:8 | 133:5,7 166:11 |
| 184:25 185:5 | 270:14 276:3 | 220:6 246:3,22 | 185:9 189:4 |
| 188:24 189:2 | 280:23 | 268:14,19 | 194:15 229:2,7 |
| 190:4 194:23 | **participate** | 270:8,15 272:8 | 247:11 248:2,4 |
| 201:6 209:18 | 205:11 | 272:11,19,25 | 251:2 252:1,2 |
| 216:10 217:4 | **participated** | 273:5,11,14,22 | 252:5 266:16 |
| 217:25 218:2,7 | 68:3 | 274:3,7 275:3 | **perfected** 45:24 |
| 220:2 227:17 | **particular** | 275:18 276:13 | 154:14 159:17 |
| 227:18 228:13 | 24:18 36:11 | **past** 82:2 | 162:2 165:4,6 |
| 228:24 229:13 | 54:17 55:2 | **paul** 1:10 4:12 | 171:18 172:2,4 |
| 231:2 245:25 | 60:21 61:2,22 | 302:21 303:12 | 172:18 173:2,4 |
| 256:22 267:21 | 63:22 64:5 | 304:4 306:3,18 | 174:23 177:23 |
| 267:22 268:2,9 | 88:23 300:12 | **pause** 7:4,5 | 177:24 178:14 |
| 270:14,21,25 | **parties** 4:10 | 52:13 118:25 | 179:16 181:14 |
| 271:3,9 276:22 | 71:13 73:10 | 137:6,6 161:16 | 186:15 187:5 |
| 277:7 278:8 | 75:10 105:17 | 255:19 | 246:5 248:9 |
| 280:13,16,23 | 106:5,6,12,22 | **pay** 155:20,22 | 249:14,15,16 |
| 282:14,16 | 127:2 148:7 | 157:25 158:5 | 249:17 251:23 |
| **paragraphs** | 150:10,15 | 158:18 225:3 | 253:1 266:18 |
| 95:4 111:17 | 154:5 165:1 | 236:17 243:14 | **perfecting** |
| 128:21 217:5 | 167:16 225:14 | **paying** 62:14 | 133:5 180:22 |
| 258:5,5 269:6 | 243:22 244:2 | 245:19 | 247:20 265:20 |
| **parameters** | 244:15 259:16 | **payment** 72:9 | **perfection** |
| 23:6 | 270:10 275:9 | 72:16 160:16 | 36:20 73:24 |
| | 275:23 305:13 | 160:19 162:11 | 76:2 88:25 |

134:2 159:19
159:22 165:13
165:20 179:16
184:19,20,23
185:1,2,7,15,19
186:6 187:14
187:20 188:6
188:20,22
189:10 191:6,8
191:13,16,19
191:24 192:6
200:10 203:12
209:12,19
211:6,20 224:4
244:13 247:6
248:9,15,21,25
**perform** 162:13
**performance**
160:19,22
218:23
**performed**
36:19
**performing**
162:10
**period** 72:16,22
77:9
**permission**
49:10 115:22
**person** 14:25
15:14 16:1
32:23 33:13
78:17 88:21
98:6 156:1
161:1 199:20

212:17 214:2
218:18,19,21
236:8,10 248:2
269:10 276:12
282:17
**personal**
138:17 155:9
225:23,25
226:11,15
242:16 243:19
244:1,10
245:21 269:13
282:20
**personally**
35:11
**persons** 16:4
195:19 273:17
274:13
**perspective**
30:2,18 116:20
**phones** 4:7
**phrase** 240:2,5
240:20,23
264:16 265:15
279:7
**physical** 17:6
227:19 228:2
242:24,25
**physically**
162:8 163:12
**pick** 4:5 169:4
246:1
**pieces** 163:3
180:21

**place** 4:9
**places** 182:19
250:19
**please** 4:4,7 5:2
5:6 9:1,15 10:9
12:8 40:5,6,22
64:1,2 86:24
104:4 135:13
156:8 167:6
184:3 193:22
207:22 218:1
288:25 293:4,5
**pledge** 45:24
155:8,14 160:3
161:8,11,23
162:5,7,15,20
162:23,24
163:1,9,11,19
164:10,18,22
165:2,5,8,25
166:7,16 169:7
172:15,15,23
185:12,20
209:20 226:16
232:10 246:5
**pledged** 172:17
260:4
**pledgee** 155:12
155:14 161:14
162:1,9,12
163:13,21
**pledges** 160:15
166:5,14 170:7

**pledgor's** 203:7
**point** 58:6 90:4
91:21 101:16
144:19 145:6
159:19,22
170:13 171:6
180:24 182:14
190:1,19,22
191:1 196:3
225:12,13
270:7,12
300:22
**pointed** 184:9
233:12
**pointing** 46:16
287:25
**points** 10:24,25
11:17
**pool** 22:21
48:17 105:1
147:7 197:5
205:10,12
291:13 292:5
292:14,19,23
293:9,25 294:3
296:17
**pooled** 193:5
262:17 294:23
295:6,10,15,24
298:7,18 299:4
**portion** 54:6
55:8,9 87:20
87:21 197:5

**portions** 53:22
54:3 56:18
87:17
**posed** 250:12
250:14
**position** 38:3
46:15 93:5
120:15 121:11
121:17,19
125:23 126:6
127:6,7,12,15
127:20 128:23
129:11 134:25
140:2 177:22
202:18 264:2
268:10 284:3
293:20,23
294:8,11
**positions** 22:11
127:2 294:14
**possessed**
179:10
**possession**
45:24 156:14
161:25 162:20
162:21 164:7,7
164:9 167:8
172:18 174:4,8
174:9,10,22
175:13,21
178:3,5,23
185:21 186:2,7
186:11,15
187:19,20,22

187:23,25
188:4 209:2,21
209:22 210:6
210:17 211:9
211:17 212:1,4
212:7 219:4,6
219:6 221:10
221:11 222:25
223:5 224:5
227:18,23
228:2,15 229:5
229:6,8 246:6
**possessory**
173:10,10,16
173:17,24
223:2
**possibility**
225:10
**possible** 45:15
150:9 186:11
200:11 252:24
276:20 294:21
**potential**
211:22 282:3
**potentially**
286:7
**powdrill** 269:7
**power** 80:22
98:7 107:9,12
159:6 167:16
173:25 202:14
221:13 232:18
232:21 236:1
239:6,22

240:13 241:6,8
241:20,25
242:7 243:9
244:6,8
**powerful**
234:15
**powers** 78:17
234:14,15,23
236:4 240:1
241:11
**practical** 108:3
234:6 248:25
249:10
**practice** 65:8
65:12,16
214:13 234:19
294:4
**practicing**
65:20,22
**precisely** 25:2
**preclude**
245:12
**predated** 75:14
**prefer** 36:9
71:10 90:15
105:22 175:16
252:22
**preference**
36:15
**premise** 128:5
128:6 289:5
**premised**
127:24 128:4

**preparation**
12:7,13 13:3
13:23 14:20
15:2 17:18,21
18:5 19:19
20:1,5,7 22:6
23:7,16 25:4
26:16 27:3,15
27:20,25 28:3
28:21 29:19
30:3,6,19 31:1
31:16,24 32:10
32:12 46:25
47:2 54:20
56:19 84:6,10
85:6,11 87:3
88:2,6 93:12
96:4 110:2
116:22 117:17
253:17 260:10
**prepare** 11:8,9
53:13 93:19,20
**prepared** 18:1
18:11 180:14
222:7 223:18
224:9
**preparing** 13:8
13:17 100:16
257:14,21,25
**presence** 17:6
**present** 3:3
15:25 16:11,15
16:16

press 49:4
  96:14 204:17
  204:20
pressed 204:15
pressing
  203:18 204:10
pretty 208:19
  209:18
prevent 10:16
  197:1
previewed 8:17
previously
  12:14 13:4,5
  27:17,22,23
  32:21 66:4
  71:4 253:9
  288:21
primary
  119:18
principle 56:11
  170:15 210:13
  211:14 213:16
  213:19 214:4
  272:5
principles
  56:10 68:24
  142:21 210:14
  213:11 230:25
prior 50:13
  75:20 87:17
  91:23 94:2,7
  95:19
priority 251:7
  266:19

private 4:6
  48:22,23
  104:23 115:6
  115:10 195:8
  202:23 203:2
  206:13 210:15
  212:15 213:12
  216:1,14,20,25
  217:9 251:10
privilege 29:17
privileged
  114:13,15
privity 181:21
  268:18 270:5
  272:12
probably 42:25
  70:13 71:1,19
  90:13 128:25
  208:3 220:1
  225:12 241:3
  292:16
problem 134:6
problems 64:24
procedure 6:4
  138:11 198:19
  299:22
proceed 5:7
  95:14 97:6
proceeding 5:2
  5:22 6:6,21 7:1
  7:13,15 8:4
  11:16 14:3
proceedings
  13:25 17:13

40:9 51:25
  52:18 71:10
  110:14 139:1
process 108:3,9
  108:11,13
  193:18
processed
  203:9
produced 40:9
  59:15,16 69:20
  70:1,6 74:14
  80:12
producing
  104:7,8
professional
  65:5 83:25
  90:4
program
  181:13,18
  268:6,12,15
  273:13 274:22
  277:10,17,25
  278:15 280:5
  280:10 281:2
  281:17,22
  285:9,16,19
progress 78:14
prohibit 195:18
promise 165:14
  269:13 279:22
  282:20
proof 53:24
  62:18,22 63:9
  230:9

proper 39:15
  39:16 187:14
  260:1
properties
  230:16
property
  156:10,13,16
  211:23 218:9
  224:22,23
  225:23,24,25
  236:7,16
  242:16 243:3
  243:15,20
  244:1 245:6,8
  245:20,21
  269:16 274:17
  282:23 283:5
protest 122:12
protocol 216:4
  216:12,16
prove 55:23
  56:12
provide 42:22
  43:13 74:2,6
  91:24 92:9
  123:15 148:18
  149:15 179:24
  184:24 276:22
  278:22 300:25
provided 28:20
  49:17,17,24
  50:3 94:13
  109:9 111:20
  111:23 150:10

166:18,24
264:20 273:14
**provides**
141:10 193:24
221:13
**providing**
73:20 91:6
136:14,19
137:2,11
138:15 139:12
**provision** 25:24
25:25 26:3
72:13 217:7
232:4
**proxy** 209:2
210:5,9,17
212:7
**public** 1:15
5:10 35:4,5
250:25 251:14
303:21 305:4
306:21
**punctual**
160:19
**pure** 241:19
**purely** 236:23
237:17
**purport** 123:14
143:7 165:6
183:7 218:3
**purported** 78:1
78:5 157:10,11
158:10 159:10
185:10 252:15

**purportedly**
136:17 279:9
**purporting**
159:23
**purports**
141:17 142:6
143:8 158:8
160:2 161:9
164:17
**purpose** 65:21
104:8 118:12
276:19 287:19
**purposes** 30:13
42:8 94:24
95:3 96:18
100:15 102:3,5
102:7 103:5
106:15 118:19
128:20 129:25
133:19 134:12
138:24 189:10
296:16,25
297:8,20
**pursuant** 64:24
**pursue** 283:25
**pursuing** 63:14
63:17 64:6
**push** 183:1
**put** 22:21 32:14
40:4,21 42:17
44:21 45:14
49:5 50:19,22
54:11 80:9
102:14,16,17

103:11 126:21
131:3 132:13
133:17 138:5,9
138:23 140:12
140:20 164:16
178:9 185:1
214:19 215:2
220:6,18
232:12 233:12
241:20 243:10
244:2 250:11
250:17 253:21
259:16 263:12
267:23 269:23
271:12 273:18
284:4 287:15
287:18 292:18
297:24 298:12
**putting** 57:14
125:6 126:17
129:7,14 140:5
219:10,14,16
222:18,21
223:16 232:23
233:16 292:24
293:2,7,11,14
295:1

| q |
| --- |

**qualifies**
115:10
**qualify** 66:21
**question** 7:5,12
8:9,25 9:4,10

9:11,18,19
12:1,23,25
19:4,25 21:8
22:1 24:9,13
24:24 28:18
29:17 30:15,16
31:7,10,13
47:21 64:3
69:3 72:21
73:17 74:11
78:7 84:12
85:1,3,14
86:25 96:24
108:4,11 109:3
109:11 116:23
119:2 120:11
123:21 128:3
130:4,24
131:10,19
132:3 133:17
134:5 137:7
144:15 146:8
150:8,19
152:13 153:20
161:15 169:12
169:17 172:1
173:12 176:15
183:25 186:2
189:11,12
199:8 200:6,7
200:14 201:17
201:19 204:4
208:22 217:6
220:2 221:3

223:20 230:18
234:3,4,5
240:16,18
243:5 245:3,10
248:15 250:12
250:20 256:5
261:11 265:5
267:7,13 275:7
276:11,15
277:6,19
279:12,12,15
279:25 280:12
284:3,10,14,19
285:5 288:2,19
289:1,15,16
290:1,2,3,4,9
290:23 291:24
293:6 295:21
297:6,15
300:23 301:9
301:22
**questioning**
139:7,23
**questions** 8:18
8:22 9:7,16,22
10:9 49:25
61:20 65:5
74:3 76:10
79:15 97:16
121:1 137:9
139:19 165:17
175:6 228:22
254:10 267:9
299:16

**quick** 92:23
109:20
**quickly** 102:20
**quite** 25:1
107:18 163:23
179:5 221:16
**quotation**
269:8
**quote** 143:7

**r**

**r** 5:8 88:23
**raise** 9:8
**raised** 51:24
52:17
**raising** 123:6
**ran** 64:23
**range** 29:23
**rate** 62:12,13
**rather** 55:6
147:12,21
252:18,19
**reached** 211:10
229:12
**read** 11:13,21
13:12,21 14:1
14:2,6,17,18
19:11 21:13
28:23 53:18
84:13 88:20
92:14,21,23
109:19,20
110:13,22
113:15 138:21

145:1 151:15
151:17,24
161:22 170:5
217:8 236:14
237:23 257:11
257:12,13,15
257:22,25
258:2 260:8,16
271:2 277:7
288:20 289:9
289:12,18
290:7,8 291:24
298:20 303:3
**reading** 46:6
51:5,8 52:10
93:4 99:22
113:10 119:20
140:6 144:12
147:9 164:13
240:2,19
287:11 298:21
**reads** 143:20
**real** 59:7
225:23,25
226:7,12 243:3
**realize** 136:21
232:18 233:20
257:17
**realized** 63:19
65:1 256:15
**really** 29:2
38:20 48:3
61:23 107:20
119:19 150:16

155:13 169:24
243:8 266:11
279:18
**reason** 23:11
71:3,7 90:8
91:11,14 97:22
106:23 123:11
124:10 126:21
127:22 128:11
142:1 168:14
185:13 239:11
246:2 247:15
247:17,19
248:12 251:25
306:4
**reasonable**
143:17 147:19
151:18,20
152:2,10,16,23
153:1,5,21
154:2 301:23
**reasonableness**
152:5
**reasonably**
147:10
**reasoning**
259:4
**reasons** 123:6
124:6 228:25
246:21
**rebuttal** 129:2
129:5
**recall** 13:16
22:8 27:17,18

30:25 31:19
32:6 39:2,5
43:9 44:15
45:3 49:22
50:10 67:10
69:2,7 75:7,9
76:3,8 96:7
258:14 287:21
**receive** 26:4,5,6
48:5 50:17
58:13,16,18
59:10
**received** 47:14
48:9 50:12
60:3
**receivers** 81:6
**receiving** 62:7
**recent** 14:9
27:12
**recently** 13:21
63:6 253:15,18
253:19
**recess** 122:20
**recital** 286:3
**recognize** 40:7
40:24,25 54:14
132:17 140:21
**recollection**
13:15 55:7
**recommend**
179:6
**recommended**
32:25 33:2

**record** 4:2,10
5:5 8:22 35:5
51:15,16,18
87:7 113:8,10
113:11 122:19
122:22 168:24
168:25 169:2
180:4 182:13
183:4 209:14
217:19,20,22
240:10 241:16
254:3,4,6
291:6,7,9,18,19
291:21 302:19
303:7 305:10
**recorded** 4:12
**recording** 4:8
**records** 94:1,6
**recourse**
197:18 206:1,3
**recover** 65:3
155:23 156:3
156:25 269:22
270:24 271:21
272:15 275:11
276:9
**recoveries**
63:18
**recovery** 2:2
5:17 9:23 63:8
89:9 108:20
193:23
**refer** 18:20
42:10 43:20

69:14 70:19
74:13 85:17,18
85:21,21
110:17 135:21
143:3,18,25
153:23 169:21
189:25 257:4
269:7 277:8,24
279:5,7 284:21
**reference** 45:10
74:21 75:1,16
107:10 145:2
151:21 153:2
**referenced** 89:4
**references**
84:23
**referred** 11:14
88:18 90:10
194:9 196:14
204:8 254:17
270:2 291:12
292:5
**referring** 42:13
90:11 119:25
132:22 153:8
153:25 169:9
270:14 277:1
278:7 282:9
284:11,22
286:12 301:25
**refers** 45:22
143:12 153:6
257:9 301:24

**reflect** 147:3,6
182:13
**reflected** 60:4
146:24 147:13
182:11
**reflecting**
182:16
**reflects** 211:2
270:21
**reform** 175:24
177:9
**refusing** 290:22
**regard** 171:8
262:16
**regarding**
104:18 268:10
**regardless**
240:5,22 268:9
**regimes** 250:21
**register** 46:9
246:16 247:11
249:19,22
251:5,5,12,15
**registered**
243:16 244:11
246:12 251:13
252:8,10
**registering**
247:21 250:22
251:8
**registration**
45:25 135:9,10
246:7,15
249:15,18,25

| | | | |
|---|---|---|---|
| 250:7,18,25 | relationship | 133:11 204:5 | 291:14 292:6 |
| 251:10,19 | 134:1 136:16 | relying 30:12 | 300:6 301:19 |
| 266:16 | 283:24 | 31:2,8 73:3 | 301:20 |
| registry 244:12 | relatively | 114:19 | remembered |
| regulations | 253:18,19 | remainder | 47:22 |
| 257:7 | release 203:1 | 231:20 | remind 7:3 |
| reinforce 50:21 | relevance | remaining | 10:8 19:8 52:4 |
| 51:9 | 24:10,22 90:9 | 252:10 | 64:2 133:16 |
| reject 83:8 | 255:25 | remains 205:20 | 253:11 255:18 |
| rejoined 37:9 | relevant 14:4 | 205:24 | remote 2:16,17 |
| relate 79:8 | 22:16,17,20 | remedies | 3:5,6,7,8 |
| 109:5 185:14 | 24:1,7,8 25:10 | 160:24 231:14 | removal 6:18 |
| 191:6,7 | 25:11 29:5 | 232:3,9,14,16 | render 240:20 |
| related 4:23 | 123:13 126:23 | 233:1,4,8,10,22 | renders 203:11 |
| 74:23 75:25 | 127:9,25 | 234:1,8,16,22 | 240:3 |
| 77:15 128:21 | 128:10 134:8 | 235:2,7,13,15 | repay 285:4 |
| 135:17 136:2 | 228:23 254:22 | 235:23 236:11 | repayment |
| 136:10 137:25 | 255:12 257:3 | 237:5,11,24 | 72:8 |
| 270:4 305:13 | 257:15 260:17 | 238:6,10,22 | repeat 7:12 |
| relates 69:3 | 260:20,21 | 239:1,3,4 | 19:4 123:20 |
| 123:11 124:11 | 261:3 264:23 | 240:20 241:10 | 130:24 153:14 |
| 191:9 | 265:1 | 241:21 246:3 | 153:20 173:12 |
| relating 6:17 | reliance 29:23 | 246:22 | 193:21 214:14 |
| 36:20 53:25 | relied 28:24 | remedy 234:11 | 277:6 297:15 |
| 64:19 68:8 | 29:3,6,8,11,19 | 235:10,11,13 | repeatedly |
| 70:7 71:8 72:1 | 30:2,18 31:16 | remember 12:6 | 119:4 |
| 72:19 77:11 | 31:23 85:24 | 12:10 21:12 | repeating |
| 79:16 80:8 | 115:15 116:21 | 23:4 32:5 | 104:24 166:3 |
| 83:1 88:24 | 117:16 201:10 | 33:12,13 55:21 | 278:20 |
| 91:8 103:16 | relies 113:1 | 56:16 69:8 | rephrase 9:3 |
| 104:14 175:19 | 144:10 | 71:24 75:5,15 | 94:4 |
| 268:18 | rely 28:19,22 | 75:20 117:4 | replaced 42:7 |
| relation 71:20 | 57:13 103:18 | 137:5 149:25 | replied 88:21 |
| 81:4 97:18 | 115:13 118:2 | 150:2 288:5,7 | |

**report** 10:5
11:18 20:3
22:12 27:1,11
32:14,15 41:10
61:17 70:24
71:5,10 72:4
75:2,17 80:8
84:6,10,18,23
85:10,17 87:4
90:19,23 91:1
91:24 92:10,15
92:24,25 93:2
93:8,13 94:9
94:24 95:3
97:12 100:16
104:7,8 109:18
141:5 143:3
178:9 179:12
179:23 180:7
182:12,15,23
184:23 188:13
188:17 190:16
195:23,24
196:8,13,16,18
201:4,16 202:1
202:20 209:10
215:23 218:7
220:3 227:11
227:14 228:20
245:25 248:17
250:18 266:20
267:22 293:19
294:10 296:17
296:25 297:8

297:20 298:22
298:25 299:1,5
299:13 304:17
**reporter** 1:14
4:20 5:6 8:21
40:3,20 54:11
132:13 140:19
153:14 253:20
**reports** 69:15
69:21,25 70:7
70:20 71:15
74:13,17 80:12
84:13
**represent** 5:17
39:12
**representing**
4:19
**request** 202:25
203:3,8
**requested**
140:14
**require** 203:23
222:24 223:1
**required**
121:20 172:12
211:21 246:15
**requirement**
46:8 72:22
209:11 211:4
219:23 223:8
**requirements**
180:22 211:13
214:4 224:6
249:25 250:7

250:16,18,21
282:4
**requires**
185:20 199:23
200:10 209:20
239:18
**requisite** 187:4
189:6 194:14
196:21 202:2
**reread** 11:12
11:14
**research** 10:25
20:21,21 21:3
21:3,17,18
22:5,5 23:6,13
23:14 26:21
85:14
**researching**
25:15
**respect** 11:25
47:5 57:7 74:3
74:7 91:2,4
96:18 97:15
98:2,12,17
99:3 104:3
107:5 127:3,7
132:6 146:20
159:9 164:21
181:2,15
184:11 191:18
196:19 199:17
199:25 209:3
210:3 248:5
272:24 278:3

281:11,25
282:1 285:10
295:3 296:1,12
297:2,10,19
**response** 63:7,8
108:20,24
109:13,24
201:5,10
202:17 228:22
267:19
**responses**
49:18
**responsibilities**
35:16
**responsive**
267:13
**rest** 92:10,14
232:4 267:9
**restrict** 263:24
**restrictions**
274:23 280:5
**result** 134:20
134:22 148:5
148:14,17,21
148:22 149:14
149:19,20
150:20 300:24
301:3,4
**results** 151:5,8
**resume** 41:18
42:3
**retained** 32:18
302:23

**return** 232:20
**returned** 66:4
**reveal** 18:24
  35:23
**revenues** 247:2
**review** 12:12
  13:2,9 18:14
  18:15 19:1,5,6
  19:14 20:6,8
  20:17 21:14
  24:14 25:14
  27:10 28:8
  40:6 54:4,13
  56:17 61:11
  65:23 84:9,12
  85:4 86:9,22
  87:16,24 88:4
  88:10 89:14,22
  90:19,22 91:12
  93:9 109:17
  121:24 253:11
  253:15
**reviewed** 12:7
  12:15 13:4,17
  14:11 18:4,6,8
  18:10,12 19:19
  20:3,16,20
  21:2,10,11,17
  21:23 22:4
  23:7,16 24:5
  25:3 26:25
  27:6,15,17,20
  27:22,23 28:3
  28:15 29:14

31:22 50:24
53:12,22 54:19
55:10 56:24
62:18 63:5,6
84:6,16 85:11
86:5,20 87:2
87:11 88:16
89:2 90:7 91:3
91:22 108:19
116:21 117:16
129:1,3 194:13
253:8 254:20
257:1 258:12
300:5
**reviewing**
  93:14 138:18
**reviews** 45:9,12
  53:19 95:9
  123:25 211:1
  213:21
**revisions** 60:10
**revisited** 27:5
  47:7 266:10
**rewrite** 148:6
  148:11 151:9
**right** 8:2 11:12
  20:4 22:1
  23:16,22,24
  24:23 25:8
  26:17 29:23
  37:8 40:14
  43:23 44:3,7
  45:21 53:14
  54:1 58:11

63:10 69:18
70:4 74:15
79:20,22 80:5
80:14 84:7,20
84:25 86:6,17
89:5,9,12 91:7
91:9,10 94:19
94:25 97:9
98:25 101:13
101:18 103:8
103:15 106:13
106:19 108:3,9
110:9,18 111:4
111:12 112:12
112:17 113:5
113:20,25
114:1 115:22
116:1,15,25
117:8,22 118:4
118:18,23
119:6 120:3,17
121:7,9,10,13
122:4,11,14
123:8,13 124:3
124:8,12,16
125:8 127:17
128:1,12,20,24
128:25 129:2
129:14,17
130:10 131:4
131:17 132:25
135:23 136:2
137:1,15
138:14,19

141:10,20
142:1,8,22
143:1,4,14
149:2,12,18,24
150:5,12 151:5
154:9,16 155:3
155:21,22
156:2,24
157:11,12,24
158:3,4,9,10,16
158:22 159:6
159:18 161:3
162:12,22
163:3,14 164:1
164:18 166:14
166:17,25
167:14,18,24
169:13,16,22
169:25 170:12
170:16,24
171:4,9,14
172:3,6,8,9,12
172:16,22,25
173:1,3 179:18
183:11 185:3
186:3,3,8,16,19
186:24 187:2,6
187:12,15,22
188:24 189:7
189:16,18
190:2,6,10,12
190:23,24
191:15,17
194:6 195:1,4

| | | | |
|---|---|---|---|
| 195:10,16 | 262:21 263:22 | **rise** 164:22,23 | **saks** 33:15,16 |
| 196:19,24 | 265:6,14 | 165:24 166:24 | 33:22 |
| 197:1,4,24 | 267:25 268:6 | 167:12 171:19 | **sale** 159:6 |
| 198:25 199:12 | 268:15,24 | 201:13 203:10 | 167:24 169:13 |
| 200:3,21 | 271:6 280:20 | **robert** 53:23 | 172:7,8,12,16 |
| 201:24 202:5,8 | 282:16 283:1,4 | 54:9 88:22 | 172:22,25 |
| 203:3 205:11 | 283:7,11,25 | 304:12 | 173:25 203:22 |
| 209:15,25 | 284:7,8 285:25 | **role** 39:10,11 | 221:14 234:12 |
| 210:1 211:17 | 286:10,23 | 39:12,15 53:1 | 234:23 235:3 |
| 212:19 214:15 | 287:21 288:15 | 57:3 64:9 | 235:10,12,13 |
| 215:12,13,20 | 290:22 294:2,2 | 211:15 | 235:16,19 |
| 216:6,16 217:6 | 294:5,18,21 | **room** 10:21 | 239:7 240:13 |
| 218:3,12 220:4 | 295:16,25 | 11:6 | 241:6,8,11,20 |
| 222:7,25 | 296:11 298:4 | **routinely** | 242:1,8 243:9 |
| 223:11 224:15 | 299:5 300:9,21 | 202:10 | 244:6,8 |
| 225:1 228:11 | 301:11 | **rule** 144:17 | **sat** 77:7,9 82:12 |
| 228:15 229:13 | **rights** 35:16 | 149:18 151:3 | **satisfaction** |
| 231:16,24 | 124:23 127:8 | 225:9 | 160:21 |
| 233:12,20 | 172:9 190:1 | **rules** 7:10 8:14 | **satisfied** 166:25 |
| 234:3 235:3,3 | 191:25 199:16 | 26:4 66:22 | 192:8 200:13 |
| 235:10,14,16 | 199:24 200:12 | 148:1 226:7,9 | **satisfy** 157:13 |
| 235:19,19 | 203:11 234:11 | **ruling** 257:1 | 158:11,23 |
| 236:15,16 | 235:9 236:9,12 | 259:1 | **saw** 92:19 |
| 237:14 239:22 | 237:1,2,6,10,21 | **rulings** 255:4,8 | 107:9,22 |
| 240:11 241:14 | 238:12,20,21 | 255:15 256:1 | 118:20 122:11 |
| 242:8,9 244:20 | 239:24 240:7 | **run** 66:23 | 128:17 298:22 |
| 244:21,25 | 240:24 241:13 | **runs** 244:10 | **saying** 15:1 |
| 245:1,5,12 | 242:13,18 | **ruscoe** 21:10 | 46:7 55:16,18 |
| 246:19 247:22 | 243:6,8,25 | **russell** 34:9 | 55:22 56:1 |
| 248:16,22,23 | 245:17 252:19 | **s** | 57:23 66:22 |
| 249:1,4 250:4 | 252:23 269:15 | **s** 5:8 33:15,15 | 96:7 105:18 |
| 252:14 253:1,9 | 270:9 282:22 | 304:7 306:4 | 106:21 107:2 |
| 254:24 256:24 | 295:2 297:1,9 | | 122:13 124:14 |
| 259:9 260:6 | 297:18 | | 124:21 128:4 |

144:9 150:2
165:8 170:24
175:25 176:13
187:8 188:13
205:1,5 213:12
215:15,17
219:18 222:3
228:7 232:8
234:18 236:20
239:19 263:22
264:5 267:14
271:8 272:3
279:1 286:11
293:24
**says**  72:14
99:14 100:4
106:21 107:13
107:16,21
117:22 136:22
146:5 147:17
147:25 149:5
149:12 159:14
160:6 166:4,13
166:20 168:11
177:9 180:7
182:20 184:17
188:15 189:1
203:5 210:19
211:12 215:11
215:25 216:10
218:2 220:3
231:4 237:7,19
238:24 239:6
268:4 269:9,22

270:15 272:18
286:3 301:13
**scale**  28:24
**scanning**  88:19
**scenario**
123:12 133:20
134:7 202:22
217:3
**scope**  59:11
112:18 125:1
250:9
**scroll**  300:21
**search**  23:21
25:18 26:15
115:14
**searches**
115:12
**seat**  66:12
**second**  6:9 8:2
69:24 135:18
135:24 141:25
160:14 165:13
192:2 216:9
233:15 239:7
244:25 245:5
251:8 270:14
302:9
**secondary**  82:8
82:10
**secondly**
266:15 272:14
**seconds**  52:13
137:6

**section**  46:3,10
46:11 54:21
92:23 94:17
106:17 123:3
124:2 180:18
180:21 215:24
216:8 246:10
258:11 260:9
260:16 268:3
269:3 272:21
**secure**  67:7
74:23 76:1
155:12
**secured**  67:12
67:14 68:19
70:7 72:12
81:21 82:4,6
131:1 161:2,4
161:25 178:7
185:23 209:24
227:24 252:16
274:8 275:16
276:16,23
277:4,13 278:5
279:10 281:8
284:6 285:18
286:14,16
287:2 290:19
**secures**  271:10
**securing**
283:10
**securities**  22:25
64:19 68:9,15
68:16,17,18

70:16 75:6
76:16 82:19
88:25 170:19
**security**  24:15
24:20 36:21
52:21,23 53:2
55:14 60:24
61:3 67:8,13
67:17 68:19
69:5 70:8 72:1
72:2,12,23
73:22,24 74:9
74:24 76:2,4
76:13 78:22
79:1,1,9,15
91:5,8 109:9
123:7,15 124:8
124:16,19
126:23 127:23
130:13,19
131:1,7,17,22
132:1,6 133:6
133:7 134:19
135:3,7 136:12
141:10,17,18
141:20 142:6
142:17 147:10
147:20 148:18
149:15 150:11
154:7,12,15,16
154:20 155:1
155:11 157:8
157:14,23
158:2,7,15,20

| | | | |
|---|---|---|---|
| 158:25 159:10 | 218:23,25 | 275:1 276:7,8 | **seeking** 65:2 |
| 159:13,15,16 | 219:12,15,17 | 276:25 277:2,8 | 246:4,23 |
| 159:23 160:17 | 219:18,20 | 277:11 278:1,2 | **seems** 213:22 |
| 160:17,18 | 220:4,7,18 | 278:9,11,25 | 214:10 |
| 162:9 163:13 | 221:9,15 223:2 | 279:5,7,8 | **seen** 146:7,9 |
| 163:22 165:7 | 223:13 224:23 | 280:7 281:11 | 224:7 230:12 |
| 167:3,15,23 | 226:21 227:5 | 281:25 282:6,8 | 230:15 234:18 |
| 168:1,7,11,13 | 227:12 228:9 | 282:11,16 | 236:18,19 |
| 168:15 169:10 | 229:2,3,7 | 283:6,14,24 | **selected** 18:25 |
| 169:22,23 | 230:12 232:19 | 284:1,6,21,24 | 28:7 93:7 |
| 170:1,10,13,17 | 232:23 233:20 | 287:5 288:23 | **sell** 67:17 |
| 171:1,4,14,16 | 236:8 237:25 | 290:11 300:25 | 107:12 110:7 |
| 171:20 172:3,5 | 243:15 244:9 | **see** 11:18 49:2 | 155:15,23 |
| 172:7,10,13,19 | 245:8,13,22 | 90:6 93:1 | 156:3 157:25 |
| 173:3,5,6,8,9 | 246:25 247:3 | 95:10 97:1 | 158:17 162:12 |
| 173:11,14,15 | 247:12 248:4 | 105:16 109:20 | 167:14,19 |
| 173:16,17,24 | 248:10,19,22 | 112:8 113:16 | 190:10,12 |
| 174:5,16,21 | 251:2 252:13 | 122:12 125:17 | 195:4 204:18 |
| 175:1,12 176:1 | 252:18,23,25 | 144:20 146:19 | 204:18,20 |
| 176:5,11,20 | 258:7,20,23 | 146:21 151:15 | 225:1 232:18 |
| 177:10,13,24 | 259:15,17,18 | 151:17 182:1 | 236:2 239:22 |
| 178:7,13,16 | 260:1,5 262:13 | 189:15 191:4 | 244:21 |
| 179:1,9,15 | 263:15,19,21 | 191:21 207:3 | **selling** 72:12 |
| 180:1,23 181:5 | 263:25 267:24 | 208:24 211:2 | 202:13 |
| 181:8,14,18,24 | 268:4,13,19,20 | 212:3 215:17 | **sense** 8:23 |
| 182:2,10 183:8 | 268:22,23 | 233:16 234:13 | 104:5 208:12 |
| 183:9,10,17 | 269:4,5,9,20,21 | 251:20 288:13 | 249:10 254:25 |
| 184:8,13,14,19 | 269:24,25 | 299:12 | **sensitive** 4:5 |
| 184:20 185:2,7 | 270:9,16,16,17 | **seeing** 150:25 | 36:11 |
| 185:9,11,15,24 | 270:18,20,23 | 199:6 221:17 | **sent** 14:7,12,14 |
| 185:25 186:23 | 271:10,16 | 222:4 226:14 | 14:16 18:9 |
| 187:6,14,21 | 272:7,13,16,19 | 242:25 | 21:6 28:23 |
| 189:11 191:5 | 272:23,24 | **seek** 246:3,22 | 29:1,3,7,12,20 |
| 194:15 211:22 | 273:8,16,24 | | 30:1,10,11,17 |

30:25 31:15
32:9 58:19
59:19 87:14
94:3
**sentence** 69:24
123:16 135:14
135:19,25
160:12,14
166:13 183:12
183:12,20
184:4 190:5
210:25 211:12
215:24 216:9
216:10 218:1
231:3,8,9
232:2 233:15
278:17,21
**separate**
135:17 136:1,6
136:13,17
137:20,25
138:4 139:11
140:3 141:7
285:15 287:12
287:15 290:7
**september** 59:1
59:2 60:13
**sequence** 23:19
**sequencing**
9:16
**service** 105:11
105:13 106:18
110:16 186:19
187:3 192:10

215:11
**serving** 37:16
39:9
**set** 24:5,14
58:14 105:10
105:12 108:11
111:16 118:9
121:7 142:18
207:25 228:25
286:9 305:8,18
**sets** 94:23
**setting** 47:1
58:17 60:8
97:11 159:25
272:21 283:2
**settled** 176:4,10
176:14,16,21
**seven** 293:5
**seventh** 45:23
**several** 28:23
81:10 145:20
148:1
**share** 22:22
35:2,3,4 147:6
205:10 206:16
206:21 227:23
230:8 291:13
292:5,23,25
293:8 294:3,23
295:10,15,24
296:17 298:6
298:18 299:4
**shareholder**
7:21,24,24 8:2

**shareholders**
39:13 80:21
81:6
**shares** 227:21
230:9,10
**sharing** 202:14
**sheet** 303:6
306:1
**shifted** 204:6
**short** 120:10
180:18 217:16
223:17,22
**shorthand** 1:14
**show** 139:5,20
139:21 208:15
212:22
**shows** 247:14
**shut** 197:19
**side** 71:11
138:12,12
221:4,4,18,18
**sienna** 2:6
**signature** 40:11
41:5 305:21
**significant**
140:9
**similar** 75:19
94:1,6 244:5
**similarity**
260:24
**simple** 35:19,20
68:9,10 144:17
157:19 158:5
276:10 279:14

284:9
**simply** 129:19
139:23 155:18
167:13 179:7
227:18 251:7
278:20
**single** 180:10
289:13 290:8
**sir** 42:9 45:16
196:10 269:8
**sit** 44:19 249:8
**sitting** 43:5
66:5,13 94:12
**situation** 23:19
109:21 115:5
117:2 167:11
188:21 192:11
224:8 234:18
238:10 241:18
260:23 267:2,3
269:19 274:5
281:10 287:17
**situations**
223:17,23
236:1
**sixth** 45:23
**slow** 255:21
**sold** 192:13
232:24
**solutions** 306:1
**somebody**
16:10 61:5
197:3 214:8

**soon** 7:10
  179:20
**sophisticated**
  105:17 151:12
**sorry** 21:21
  30:22 34:16
  46:13 53:1
  64:1,1 84:21
  84:22 86:24
  90:10 94:3
  102:4 111:2
  122:8 123:17
  134:4 135:18
  146:8 150:8
  154:22 157:9
  161:14 162:3
  163:1 167:14
  173:12 176:13
  190:11,14
  193:21 209:21
  213:12 224:3
  228:19 231:7,7
  231:11 238:2
  255:23 256:8
  285:2 297:14
  298:8 299:25
**sort** 19:15
  36:12 56:9
  88:18 92:22
  126:13 134:16
  134:17 154:11
  202:14 269:5
  269:24 274:4
  297:23 298:11

**sounds** 35:24
**source** 119:18
  125:4 194:11
  278:4,13
**south** 56:8
**southern** 70:21
  71:16
**speak** 37:23
  57:1 183:5
  184:10 217:1
**speaking** 33:13
  37:19 130:14
  131:6,12 171:9
  231:4,12 275:8
**speaks** 183:6
  184:11 229:14
**specific** 44:20
  45:7 54:5 55:6
  55:17 58:7
  80:16 117:12
  146:4 170:14
  174:12 193:9
  193:12 198:9
  205:15,16,17
  214:21 215:4
  226:7 245:11
**specifically**
  7:17 12:7
  33:12 53:25
  54:19 85:2
  115:20 160:7
  160:10 170:8
  185:16 196:17
  201:22 220:15

**specifics** 163:6
**speech** 182:18
  182:19,21
**spend** 183:1
  257:20
**spent** 90:25
  91:20
**splitting** 134:17
**spoke** 55:13
  110:25 233:13
**spot** 48:1,3
  168:18,19
**square** 170:24
**stage** 33:25
  177:2
**stamped**
  140:16 304:15
**stand** 288:11
**standard** 52:9
**start** 39:11
  61:8 101:6
  123:1 190:7
  196:5 221:6
  260:24
**started** 15:17
  38:23 59:6
  213:12 234:22
  282:15
**starting** 7:7
  144:18 190:1
  190:19,21
  191:1 225:12
**state** 1:15 5:2
  53:8 107:18

  116:5 231:5,13
  305:5
**stated** 116:3
  192:16
**statement**
  42:21 43:12,16
  46:5 110:12
  125:2 128:18
  129:24 130:5
  130:17 158:22
  201:8 252:21
  255:11,24
**statements**
  110:21 119:7
  139:24 303:8
**states** 1:1 4:15
  70:20 75:2
**status** 104:14
  104:18 146:21
**statute** 8:1
  237:3 243:11
  254:24 255:14
  257:9 269:12
  282:19
**statutes** 66:23
**statutory** 25:25
  26:2,5,14
  236:10,15,16
  238:21
**stay** 102:21
  289:11
**stays** 289:14
**stenographic**
  5:5

**step**  29:13 55:5
   101:5 154:12
   165:13 182:1
   191:8 192:2
   198:18
**stepped**  38:12
   64:24,25
**steps**  166:18
   178:11 248:18
**stick**  165:16
**stipulation**
   231:19
**stolen**  77:18
**stop**  168:10
   195:18 205:5
**stopping**
   198:20
**straight**  175:9
   259:13
**street**  2:3
**strictly**  171:9
**strike**  18:1 63:4
   86:9 94:15
   133:10 153:3
   187:24 197:16
   222:10 241:22
   267:6,19
**strip**  220:16
**strokes**  164:15
**strong**  202:5
**strongly**  112:20
**stuart**  53:23
   54:9 304:12

**studied**  109:19
**stuff**  93:22
**subject**  76:12
   90:1 136:10
   156:24 177:24
   182:10 206:25
   223:13 224:1
   225:20,22
   228:4 230:4,5
   264:9 277:2,11
   282:3,11
   290:10
**subjected**  83:7
   176:5 177:5
   178:16 180:1
   181:4 183:17
   184:7 225:17
   226:2,4 273:24
   279:8 283:6
**subjective**
   288:22
**submission**
   60:14,17 95:20
   96:5
**submitted**  10:2
   44:7,13 47:4
   48:8 60:5
   62:19 69:16
   71:5,15 72:5
   86:12 87:25
   88:5,11,13
   89:8,15
**submitting**
   91:23 94:2,7

   253:12
**subscribe**
   303:6
**subscribed**
   303:15 306:19
**subsequent**
   221:21 222:1
**substance**
   35:23 41:21
   55:8 139:9
   152:25 220:11
   224:14,19
**succeed**  183:19
**sucking**  255:22
**sufficient**  192:5
   203:12 214:3,9
   214:11 215:14
   298:15
**sufficiently**
   181:16
**suggest**  213:22
   262:22
**suggested**
   188:10 292:22
**suggesting**
   214:23 215:5,9
   215:9 216:19
   217:8 222:22
   276:6
**suggests**  188:12
   190:22 195:10
   263:25 265:12
**suitable**  32:23

**suite**  2:19
**suits**  249:11
**sullcrom.com**
   2:5,7,8
**sullivan**  1:13
   2:2 5:16
**summarize**
   181:1 271:1
**summarized**
   184:25 185:14
**summarizing**
   124:3,5
**summary**  123:2
   180:16,25
   181:9
**summed**  103:1
**supplanted**
   42:7
**supplemental**
   40:17 41:1,10
   41:24 42:6,11
   42:15 88:7,12
   304:11
**supplemented**
   119:15
**support**  38:3
   53:23 194:24
**supported**
   117:10 194:13
**supports**
   201:23 202:17
   203:7 208:7
**suppose**  57:23
   103:23 174:7

226:13 234:12 281:9

**supreme** 66:15 75:17

**sure** 7:13 15:18 23:9 25:20 26:22 61:4 62:25 70:14 71:8 100:10 104:19 115:9 116:7 118:2,14 118:16 166:20 168:22 194:8 194:10 195:25 201:18 208:15 210:20 263:22 270:6 281:4 300:19 302:7

**swear** 5:6

**sweeping** 95:11 95:25 96:9 97:3,16,19

**swept** 48:16 100:13,18,20 101:17,23 147:3 292:13 293:24 294:16

**sworn** 5:10 303:15 305:8 306:19

**system** 77:14 77:23 207:25 251:21

**systems** 12:21

**t**

**t** 5:8,8 88:23,23 304:7

**tab** 196:6

**table** 55:25 56:2,15

**take** 4:9 9:20 15:7 25:1 29:13 35:20 40:5,22,23 45:8 51:1,12 59:6 63:1 91:18 101:5 102:19 112:13 112:15 113:21 113:23 121:19 122:16 127:15 130:20 135:2 155:18 163:2 172:10 195:4 199:25 200:3 211:25 217:15 221:11 223:10 227:19,22 238:4 243:2 274:4 291:2

**taken** 1:13 22:12 36:6 59:5,6 63:20 122:20 125:24 126:6 127:2 128:23 140:1

166:18 204:9

**takes** 120:15 199:16 221:10

**talk** 7:7 159:9 165:14,15,21 169:6 179:20 180:14 183:13 184:5,22 186:1 195:12 202:21 210:15 218:5 239:1 242:20 243:23 253:3 272:20 278:11

**talked** 17:17 46:25 87:22 93:22 141:8 169:8 286:21

**talking** 31:14 39:6 69:8 96:19,22 101:6 104:4 112:10 114:18 162:23 167:7 174:14 194:5 219:4 224:8 228:14 228:18 229:16 241:18 248:24 250:24 256:15 257:5 265:18 272:18 277:10 277:23 278:2,4 278:10,12 283:16,22 284:20 285:24

**talks** 141:23 183:18

**tangent** 229:25

**tangible** 210:7

**taousse** 2:16

**taxes** 236:17 243:14 245:20

**technical** 175:7

**telephone** 2:4

**tell** 6:13 7:7,14 9:1 31:7 54:17 98:13 114:14 114:15 197:1 213:4 256:17

**telling** 61:6 119:18 277:20

**teneo** 3:5 6:24 8:7 37:4,10,14 38:1,4

**tenor** 129:23 184:18

**tens** 246:18

**term** 73:4,14 99:22

**terms** 26:12 54:6 72:25 73:9 76:14 105:11,13 106:18 107:10 110:16 111:22 145:6 151:9 186:19 187:3 192:10 200:4 204:15 207:1

| | | | |
|---|---|---|---|
| 212:8 215:11 | 241:9 265:7 | 33:15 38:23 | 153:1,5,11,12 |
| 224:21,25 | 290:17,20 | 41:19 43:3,10 | 153:16,21 |
| 225:13 274:20 | 300:20 302:8 | 43:20,22 44:16 | 155:14 156:19 |
| 274:21 | 302:20 305:7 | 46:6,13 47:19 | 157:2 159:4,14 |
| **terrific** 114:4 | 305:10 | 47:21 48:17 | 161:17,18,20 |
| **test** 11:25 | **testing** 38:20 | 49:19 50:2 | 167:20 174:18 |
| 199:18,23 | **tether** 70:16 | 52:25 55:16,18 | 178:18 179:2,7 |
| 200:7,9,13 | 72:10 73:3 | 61:21 62:4,17 | 189:12 194:18 |
| 202:18 208:19 | **thank** 39:24 | 66:3 67:22,23 | 194:24 196:16 |
| 209:2 210:5,6 | 45:8,16 107:3 | 71:18 72:3 | 197:12 198:15 |
| 210:8,9,16 | 154:3,6 299:14 | 73:2 75:6 77:9 | 199:1 201:15 |
| 225:5 264:12 | 302:24 | 77:12,14 78:3 | 202:17 204:8 |
| 264:13,23 | **theft** 77:15 | 78:8,9,18 | 204:10 209:8 |
| 265:1,18 | **theory** 296:18 | 84:11 88:22 | 209:17 219:25 |
| **testified** 5:11 | **thing** 9:17 | 90:11,12,14 | 222:5 223:6,21 |
| 17:25 18:3 | 41:17 45:3 | 91:15 92:16,22 | 228:23 229:20 |
| 38:2 58:8 | 52:3 92:2 95:8 | 96:11 100:3 | 230:25 235:25 |
| 62:17 83:3,23 | 148:10 152:25 | 102:25 104:24 | 237:9 238:9 |
| 96:12,25 | 232:22 233:13 | 105:21,24 | 239:2 241:24 |
| 118:13 138:14 | 234:24 256:13 | 107:14 111:1 | 242:1 245:15 |
| 151:2 152:6 | 279:7 | 112:9 113:17 | 247:10,14 |
| 204:10 222:23 | **things** 12:6 | 114:17 115:9 | 248:11 254:19 |
| 224:10 229:21 | 19:1 35:19 | 118:9 120:7,8 | 254:21 258:22 |
| 235:1,14 240:4 | 112:23 171:15 | 123:17 127:11 | 259:6,9 260:7 |
| 244:19 248:16 | 192:7 201:21 | 127:19 130:11 | 261:2,12 265:1 |
| 254:20 298:9 | 222:21 234:23 | 131:11 133:1 | 266:13 271:20 |
| 300:4 | 252:17 256:11 | 133:14,14 | 272:9 273:2 |
| **testify** 57:1 | **think** 12:2 | 134:15 135:8 | 275:6 276:6 |
| 86:19 87:1 | 13:11,13 15:20 | 136:19,25 | 279:21 281:2 |
| 95:24 300:13 | 16:3,24 20:19 | 137:22,23 | 293:17 298:20 |
| **testifying** 10:16 | 21:24 22:19 | 138:24 139:6 | 301:22 302:5,9 |
| **testimony** 57:5 | 24:23 25:19 | 145:16 146:1 | **thinking** 55:2 |
| 83:6,10 149:25 | 26:11,23 29:1 | 146:14 147:18 | 113:17 136:13 |
| 238:8 240:21 | 30:9 32:22 | 150:14 152:20 | 281:4 |

**third** 41:3 79:4
178:25 231:3,7
231:8,9,10
261:14 268:14
270:8 272:8,11
272:19,25
273:5,11,14,15
273:22 274:3,7
275:3,9,18,23
276:13
**thought** 13:25
24:17 25:22
29:4 51:1
92:24 111:15
162:25 178:2
180:13 297:22
298:10
**thousand**
204:21
**thousands**
105:1,2 208:3
208:4,5 246:18
247:8 248:5
292:17 294:1
**three** 9:24
13:20 14:10
15:5,11,12,12
15:13 16:19
17:23 32:20
33:8 46:12
52:20 62:15
64:22 65:2
70:22,25 71:2
77:10 79:24

101:1,10 119:8
120:6 121:20
133:22 192:13
192:16,19,23
193:8,11
250:23,24
274:12 295:9
295:23 296:11
297:1,9,17,22
298:10
**threshold**
179:25 181:2
182:9 183:15
184:6 273:23
276:15
**tie** 154:23
**time** 4:7 5:3 6:8
6:9 9:12,14
15:10,18 25:15
27:6 30:10
39:7 40:5,23
45:8 58:10,15
58:24 59:9
60:16 75:13
91:1,16,17,17
102:19,22,23
106:13 133:5
170:16 182:25
183:1 257:20
260:16 267:8
281:5 291:3
302:9,12,25
**times** 14:23
15:4 34:10

291:12 292:4
299:21
**tired** 297:13
**title** 156:12,22
157:3 161:3
218:11
**titled** 94:17
**titles** 124:24
127:8
**today** 9:7 10:17
10:19,20 11:3
11:10 13:23
43:5,24 44:19
63:14 64:6
94:12 222:7
265:19 266:24
267:17 291:12
292:4
**today's** 11:8
12:13 13:3
302:20
**together** 16:14
135:22 138:5,9
138:23 222:18
222:22 286:8
287:16,19
**token** 72:8,14
**told** 49:3 61:12
92:17 95:22
111:24 112:21
115:17
**took** 53:10
91:16,19 113:4
129:10

**top** 233:14
**topic** 67:21
98:12,18
**topics** 36:1
**tortious** 81:17
**tortola** 34:15
34:18 36:24
**total** 302:21
**totally** 52:8
248:14
**towards** 67:3
191:8
**trade** 49:4,7
107:12 116:15
117:8 119:6
189:17 198:5
202:8,10 205:5
207:23 212:17
213:7
**trades** 207:5,21
**trading** 1:5
4:13 198:20
202:13 207:13
207:16 286:7
286:22 306:2
**traditional**
228:3,10,14
**transaction**
73:12 83:1
131:1 216:5
220:17 224:14
**transactions**
67:8,13,14
68:20 69:4

70:8 72:2
74:23 76:1
81:21,25 82:5
82:6 101:7
203:16 208:2,5
252:16 284:6
**transcript**
303:4,7 305:9
**transcription**
153:13,19
**transfer** 98:8
110:7 207:23
**transferred**
95:15 97:7,13
98:23 100:7
102:20 104:21
**treated** 135:16
135:25 137:14
137:20 138:6
176:1 259:19
**treaties** 27:20
27:24
**treating** 137:25
**treatise** 208:11
**treatises** 20:15
27:19
**treats** 229:17
230:19
**tried** 212:17
**tries** 182:25
212:2
**true** 112:22
130:18 131:13
204:1,5 255:2

289:23,24
305:9
**trust** 2:2 5:17
9:24 63:9 89:9
90:2 108:21
193:24
**try** 54:25 110:4
249:9
**trying** 24:4
32:5 75:5
98:10 103:3,12
112:17 126:20
126:25 159:19
163:4 164:20
166:1 169:6
221:7 238:16
278:18 279:3
**turks** 65:9
**turn** 40:10 41:3
53:16 69:11
84:2 86:10
94:16 135:12
179:2 213:10
215:22 217:25
256:22 258:4
**turned** 78:17
**turns** 204:5
**twice** 6:1
**two** 6:10,12
15:5,11 16:3
17:13 19:11,12
23:4 50:3
52:13,22 71:14
74:13,18,21

77:14,16 78:11
105:17 109:9
109:10 123:6
124:6 136:16
136:24 137:14
138:9,12,22
139:11 140:3
141:7 155:17
163:3 192:7
194:24 217:4
221:8,18,25
222:21 225:14
244:15 248:18
250:21,21
251:20 257:7
272:10 283:2
287:12,15,17
287:20,24
288:4 289:10
289:18,22
290:7,15,21
**type** 76:5,7
131:7 145:11
154:14 157:7
157:14 158:6
159:22 169:21
172:7 173:13
174:4 220:4
226:1,3,8
**types** 154:7,15
154:20 155:1,6
155:17 159:12
170:20 173:8
225:16,18,21

**typically**
243:25 244:20

**u**

**u** 5:8
**u.s.** 5:22,23
83:4,14,20,21
83:24
**um** 135:8
**unable** 182:14
182:22
**uncertainty**
176:3
**unchanged**
295:17 296:3
**under** 6:17,19
7:16,25 26:4
46:9 51:23
67:3,8 70:7
126:22 130:12
137:12 142:22
144:17 151:3
154:8,21 155:2
157:1 159:3,11
160:23,25
161:10,10,20
163:17 176:3
185:18 186:24
187:2 198:8,14
199:11 201:11
209:18 211:20
231:15 236:21
237:5 238:13
238:14 242:9

242:14,15
243:10 250:25
261:6 263:24
264:19 268:11
268:15,17
270:9 272:13
275:17 278:14
278:23 280:4,5
280:9 281:1,7
281:16,21,22
285:20 286:13
**underlie** 117:2
**underlying**
64:12 76:16
79:11 216:12
284:23,25
**understand** 9:1
9:21 17:7,10
19:15 23:9
24:4 33:1
37:20 42:12
56:5 64:18
79:11 98:10,16
98:20 103:4,12
103:14 108:10
111:9 112:18
112:21 113:3
115:20 125:20
126:4,16,19,20
126:25 127:5
129:6 138:10
142:11 144:25
159:18,20
163:4 164:20

165:10,12
167:5 170:23
173:7,13 176:2
177:13 192:22
195:13 196:18
197:9,14,17
198:7 201:20
202:9 206:16
208:13 216:18
217:7 238:16
244:18 258:17
258:25 259:3
261:4 279:4,13
279:19 282:12
284:15 285:4,6
290:2 293:13
295:20 299:24
**understanding**
19:16 29:22
51:21 52:16
63:3,12,22
64:4,7,12,21
108:15 121:18
124:22 125:11
125:20 127:1
127:14 139:25
142:14 146:18
146:24 154:19
163:7 173:22
174:2,15,20,25
175:11 176:7
177:16,20
192:15 193:17
194:1 195:21

198:11,12
201:2 203:14
203:15,22
205:2 206:7
207:9 208:17
213:19 214:24
218:15 223:25
230:2 245:10
249:24 250:6
250:11 255:7
259:8 263:4
264:22 265:17
269:5,25
273:21 274:15
275:20 276:2,4
281:20 294:15
**understood** 6:3
6:5 9:4,5,12
11:7 19:24
46:17 106:5
127:22
**undertake**
93:13
**undivided**
22:22 206:16
291:13 292:5
292:22,25
293:8 294:3,23
295:10,15,24
296:17 298:6
298:18 299:4
**unhelpful**
22:11,13

**unidroit** 195:24
196:5,7 202:19
210:14,24
213:11,13,14
213:14 215:23
304:17
**unit** 4:11
**united** 1:1 4:14
70:20 75:2
**units** 204:18,20
204:21 302:22
**unjust** 81:18
**unreasonable**
148:5,13,16,22
149:14,20
150:20,24
151:5,8 152:21
259:25 300:24
301:4
**unresponsive**
248:14
**unrestricted**
195:16
**unspent** 216:5
**unusual** 241:17
299:22
**upgrading**
218:25
**uplift** 167:17
**use** 21:14 22:9
82:17 105:21
114:4 124:15
166:6 171:10
198:23 201:8

207:17 219:23
220:8,20,22
224:12 230:11
243:14 245:8
265:15,22
266:1
**used** 138:11
145:23 171:2
177:12 182:6
184:15 212:6,6
259:22 262:18
263:5,11
264:16 302:22
**useful** 21:19,20
21:24 22:10
23:23 24:6
25:8 257:3
**usefulness**
24:10
**user** 147:13
206:24 215:25
216:2,11
**users** 217:1
**uses** 251:4
258:21
**using** 182:4
204:19 272:15
**usual** 42:2
**usually** 15:11
15:13 67:15
163:19 173:24
219:10,13
224:24 225:8
236:4 246:14

**utxo** 216:5

**v**

**vague** 296:6
**valid** 72:23
126:23 135:6
141:18,20
181:14,18
183:17 184:8
223:3,14,14
225:17,20
226:2,4,6
230:4,6 259:19
259:20 267:24
290:10
**validity** 247:5
**valuable**
245:22
**value** 53:10
203:20
**variation** 72:20
73:13
**varied** 15:10
72:19 73:4
**varies** 35:18
**various** 247:13
256:11 291:11
292:4
**vehicle** 155:21
155:23 157:21
158:5
**verbal** 49:21
219:13

**veritext** 4:19,21
302:23 306:1
**version** 256:9
265:6
**versus** 112:23
114:22 161:12
161:23 173:16
174:3
**video** 4:8,12
**videographer**
3:4 4:1,20
12:20 51:14,17
122:18,21
168:23 169:1
217:18,21
254:2,5 291:5
291:8,20
302:18
**videotaped**
1:10
**view** 57:4 76:24
90:4 112:24
150:9 170:4,9
170:11 176:14
177:3 194:14
194:24 201:11
206:23 208:7
214:5,7 230:1
230:18 232:1
242:13 252:15
261:8,19,25
289:19 290:23
**viewing** 139:11
161:7

**views** 300:8,14
**virtual** 15:6,7,9
16:11,17
227:25 228:1,7
**virtually** 14:25
16:2,15 78:12
248:10
**void** 249:23
**voluntarily**
163:20

**w**

**w** 5:8
**wabash** 2:18
**waiting** 180:5
**wales** 46:4
246:11
**walk** 154:18,25
**wallet** 48:14,15
48:18,20,22,23
48:24 95:12,16
95:17 96:1
97:4,8,9,14,15
97:17 98:24
100:8,14,21
101:3,4,13,17
101:23 102:21
103:20 104:19
104:22,23,25
119:10 142:12
143:13,19,24
144:1,2,12
145:11,12
146:6,12,25

147:1,4,5,12,21
192:14,18,23
192:25 216:25
261:18 292:14
**wallets** 77:18
98:2,24 100:19
104:15 105:8
144:2,23 145:3
151:23 152:19
195:8 212:23
213:3
**want** 23:3
45:14 55:17
56:12 98:16
112:20 120:22
136:8 139:18
150:23 151:10
169:4 175:8
180:9,17
191:15 196:18
233:11 239:10
239:16 244:16
247:1,1,4,16,18
247:19 248:3
249:23 252:5
257:18 267:10
288:10,14,16
288:18 289:7
302:7
**wanted** 49:3,7
78:10,13 96:13
97:23,24
205:22 232:13
239:2 252:9

300:16
**wants** 220:6
**watched** 84:14
**watkins** 2:10
6:22 8:5 14:15
15:23 16:2,7
16:18 18:13,16
19:7 20:9,18
21:7 33:3,5,9
33:18,19 38:7
49:15 50:18
59:19 93:10
**way** 19:10
24:21 64:17
78:10 88:19
90:14 99:3
102:10 110:4
132:8 133:25
134:16 136:12
140:9 151:25
155:10 162:9
163:13 176:22
178:9 181:23
198:3 204:12
206:19 207:3
211:3,9 215:17
218:25 222:22
229:19 238:1
239:19 242:3
245:11 248:13
251:8 258:16
262:20 289:19
300:21 305:15

**ways** 289:17
300:18
**we've** 83:15
160:11 185:18
**webster** 1:11
3:8 4:13 5:13
12:17 16:20
39:25 40:17
51:20 52:4
54:8 122:24
132:9 140:15
140:19 180:24
196:7 217:24
253:5 254:8
284:4 291:11
291:23 293:4
299:15 302:21
303:12 304:4,9
306:3,18
**weeks** 15:5
52:11
**weight** 226:24
**welcome** 45:17
169:4
**went** 21:25
59:17 101:12
135:5,7,9
157:15 202:10
209:17 212:19
257:19 261:1
298:13
**whereof** 305:17
**whispering** 4:6

**white** 208:20
**wilkinson**
269:9
**wish** 46:21
94:12
**wishing** 171:5
**withdraw**
96:15 107:6,12
110:7 112:12
113:5,20
115:21 116:15
116:25 117:8
117:23 118:4
119:6 122:11
192:17,20
193:9,11 194:6
194:19 196:20
197:4,24 198:6
200:22 201:24
202:5,12 204:9
205:14,19
212:14 215:14
215:20 263:18
**withdrawal**
49:7,8 117:12
186:20 187:2
193:18 194:1,5
194:9 203:8
207:15,24
**withdrawals**
119:23 120:17
121:21 197:11
197:15,19
198:8 199:11

| | | | |
|---|---|---|---|
| 205:22 | **words** 45:14 | **workings** 77:13 | 76:4 77:24 |
| **withdrawn** | 103:11 114:5 | 77:23 | 79:20 87:19 |
| 189:23 192:22 | 129:23 144:20 | **works** 19:13 | 94:10,10 103:7 |
| **withdrew** | 144:20 145:6,7 | 77:17 217:16 | 103:9 106:10 |
| 107:19,25 | 145:7,8,23,23 | 275:21 276:2,3 | 109:22 114:7 |
| 108:7 119:9 | 145:24 148:4 | 294:4 | 114:25 126:2 |
| 120:6 122:13 | 164:16 168:8 | **world** 211:22 | 128:25 130:11 |
| 186:21 192:13 | 168:15 179:14 | 212:1,13 | 130:25 131:11 |
| 193:13 | 181:7 182:4,5 | 250:19 251:3 | 135:20 158:12 |
| **witness** 1:11 | 184:15 216:23 | **worldwide** | 177:18 184:1 |
| 5:7,9 7:4 18:24 | 232:12 241:3 | 246:19 | 187:9 195:2 |
| 19:9 28:12 | 241:22 271:1 | **worth** 272:2 | 199:1,13 |
| 45:9,12 53:19 | 277:20,22 | **write** 96:14 | 204:12 207:11 |
| 92:5 95:9 | **work** 19:17 | **writing** 50:11 | 209:16 210:2 |
| 114:25 123:25 | 34:5,25 35:7 | **written** 18:21 | 212:25 223:10 |
| 153:16 180:10 | 35:11,14,14 | 18:22,22 20:14 | 224:3,16 |
| 180:13 182:14 | 36:7,18 37:10 | 49:18 58:16,18 | 229:23 235:17 |
| 211:1 213:21 | 58:5 59:16 | 68:7 73:10 | 248:20 256:7 |
| 267:14 284:16 | 62:8,13 77:3 | 118:7 119:13 | 269:3 271:5,7 |
| 299:19,25 | 78:16 80:8 | 161:4 219:12 | 273:2,3 283:23 |
| 304:3 305:7,11 | 112:16 113:23 | 219:14 | **year** 37:8,9 |
| 305:17 306:3 | 132:21 133:6 | **wrong** 45:5 | 70:11 71:17,18 |
| **word** 25:18 | 155:6 175:8 | 46:14 | **years** 38:22 |
| 26:15 55:2,3 | 214:23 215:6 | **wrote** 278:18 | 65:14 71:23 |
| 99:17 105:22 | 263:11 | **x** | **yesterday** |
| 112:20 146:5,6 | **worked** 16:13 | **x** 1:3,6 105:18 | 15:16 16:11 |
| 146:11 168:4 | 16:13 32:21 | 304:1,7 | **york** 1:16 2:3,3 |
| 171:1,10 | 34:11 36:25 | **y** | 2:12,12 70:22 |
| 195:14 219:24 | 37:1,3 38:6,9 | **y** 5:8 105:18 | 71:16 255:22 |
| 220:8,20,22 | 38:16,19 59:14 | **yeah** 16:23 | 305:5 |
| 224:12 251:4 | 207:9 208:14 | 24:2 27:5 | **youtube** 84:15 |
| 254:22 258:22 | **working** 11:1 | 34:24 44:8 | **yup** 101:14 |
| 265:22 | 16:6 254:9 | 70:17 71:1 | |
| | 262:18 263:10 | | |

| z |
|---|
| **z**   105:18 |
| **zealand**   21:10 |
|    22:19 27:9,14 |
| **zero**   28:25 29:9 |
|    29:23 30:3,19 |
|    55:3 |
| **zoom**   1:10 |
|    161:17,19 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.