Confidential

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FTX Trading, Ltd, *et al*., | ) | Case No. 22-11068 (KBO) |
| | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**FIRST SUPPLEMENTAL DECLARATION OF MATTHEW W. LISLE
IN SUPPORT OF THE AMENDED PROOF OF CLAIM
FILED BY THE JOINT LIQUIDATORS OF THREE ARROWS
CAPITAL LTD (IN LIQUIDATION)**

I, **MATTHEW W. LISLE** of WEDBUSH SECURITIES INC. with an address at 141 W Jackson Blvd, Suite 1710A, Chicago, IL 60604 **DO MAKE OATH AND SAY** as follows:

## I.  INTRODUCTION

1.   I am the Chief Compliance Officer of Wedbush Securities, Inc. (Futures Division), a Futures Commission Merchant registered with the National Futures Association (NFA ID# 0086156).  I have been engaged by Mr. Russell Crumpler and Mr. Christopher Farmer in their capacity as joint liquidators of Three Arrows Capital Ltd (in Liquidation) (the "Joint Liquidators" and "3AC" respectively) to act as an expert on cryptocurrency trading, lending and credit, in bankruptcy proceedings in the United States.  I am duly authorised by the Joint Liquidators to make this declaration on their behalf.

2.   Save as otherwise indicated, the facts and matters deposed to in this declaration are derived from my own personal knowledge, my review of materials made available to me, or my opinion based upon my experience and expertise.  Such information is true to the best of my knowledge and belief.  Where facts and matters are not within my own knowledge, the sources of information are stated and the facts and matters are true to the best of my knowledge, information and belief.  Insofar as I am relying on financial or transactional data produced by the FTX Recovery Trust in this proceeding, or factual assertions in declarations,

Confidential

deposition testimony, or other filings submitted by the FTX Recovery Trust, I am assuming the accuracy of the data solely for purposes of this report, but I do not issue any opinion on its accuracy.

3.    Nothing in this declaration is intended to waive privilege and privilege is not being waived.

4.    I make this declaration at the request of the Joint Liquidators in connection with 3AC's Amended Proof of Claim (*i.e.*, Claim No. 100078) asserted in the Chapter 11 proceedings administered under the case caption of *In re FTX Trading, Ltd., et al.*, Case No. 22-11068 (the "Amended POC"), and with the FTX Recovery Trust's objection thereto, which proceedings are pending before the United States Bankruptcy Court for the District of Delaware.

## II.  Qualifications / Expertise in Crypto

5.    I am currently the Chief Compliance Officer of Wedbush Securities, Inc. (Futures Division), which is the largest clearer of U.S. exchange-traded cryptocurrency futures and options. Wedbush is a Futures Commission Merchant registered with the National Futures Association (NFA ID# 0086156).  The Futures Division clears commodity futures and options trades for customers on many futures and options exchanges, including CME Group exchanges, ICE US and ICE EU, Eurex, and Coinbase Derivatives Exchange.

6.    In addition to my cryptocurrency experience at Wedbush, I worked for cryptocurrency lending and trading companies for more than four years.  I previously co-founded Drawbridge Lending, LLC ("Drawbridge") in 2018 and served as its General Counsel.  In November 2020, Drawbridge was sold to Galaxy LLC ("Galaxy").  At Galaxy, I served as Director, Legal as well as CCO of Galaxy's Commodity Pool Operator, Galaxy DBL, LLC. Galaxy and Drawbridge offered loans that were secured by digital assets such as BTC and ETH.  Other related assets, such as GBTC and ETHE, could be used to collateralize loans as well.  We also offered a commodity pool to invest in spot and derivative market digital asset products.  Additionally, we traded in the digital asset markets both proprietarily and on behalf of customers, in both exchange-traded and OTC markets.  Proprietary trading was mostly

**Confidential**

conducted on a high frequency basis on various exchange markets.[1]  OTC trading was done on a principal-to-principal basis pursuant to standard ISDA agreements and included options and non-deliverable forward products.

7.    I was also a co-founder of the Global Digital Asset & Cryptocurrency Association ("GDCA") and served as its first Chairman from 2020-2021.  Until 2022, I also served as chair of the GDCA Conduct and Discipline Committee, which sought to develop industry standards. GDCA provided expert guidance and commentary to legislators, regulators, and its members. This included providing written recommendations to Congressional committees with respect to draft legislation, commenting on relevant government agency requests for comments on rulemakings, and publishing guidance to members on regulatory compliance.

8.    I also have over thirty years of experience as an attorney and compliance officer primarily in the derivatives industry.  I am an expert in derivatives law and regulation, including with respect to the cryptocurrency industry, with relevant experience as follows:

      a.    Chief Compliance Officer – Wedbush Securities – 2023 to present

      b.    Director – Legal & Chief Compliance Officer – Galaxy LLC – 2020-2022

      c.    General Counsel – Drawbridge Lending, LLC – 2018-2020

      d.    Chief Compliance Officer – ABN AMRO Clearing Chicago, LLC – 2013-2018

      e.    Deputy General Counsel – NYSE Liffe Futures Exchange, LLC – 2010-2013

      f.    Consultant – 2009-2010

      g.    Chief Compliance Officer – Eurex US – 2003-2009

      h.    Consultant – 2002-2003

      i.    General Counsel & Secretary – National Grain & Feed Association – 2000-2002

      j.    Staff Attorney – Commodity Futures Trading Commission – 1998-2000

      k.    Editor – Commodity Futures Law Reporter (CCH) – 1996-1998

---

[1]    These platforms would have included all of the major platforms such as FTX, Binance, Deribit, Kraken, Coinbase and major futures exchanges that listed crypto-related futures and options products such as the CME and CBOE Digital (now CBOE Futures).

9.    I hold a JD from Loyola University of Chicago School of Law and have been licensed to practice law in the State of Illinois since 1992.   I am also a 1986 graduate of Colgate University with a B.A. in English Literature.

## III. Scope of Assignment

10.    I have been asked to opine on the following questions:

A.   Whether the transactions involving assets in or associated with 3AC's accounts on the FTX Trading Ltd. ("FTX") exchange ("3AC's FTX Accounts" or the "3AC FTX Accounts") between June 12, 2022 and June 14, 2022 would have likely been made in the ordinary course of business of a hedge fund trading in digital assets.

B.   (i) Whether FTX incurred, or would have incurred, financial exposure in the event of defaults by borrowers under its margin program, (ii) whether FTX benefited from the near-elimination of 3AC's negative USD balance (*i.e.*, borrowed amounts) under such program via the sale or liquidation of assets associated with 3AC's FTX Accounts, and (iii) whether FTX benefited from operating its margin program.

C.   Whether customers on an exchange like FTX would have expected to have distinct interests in digital assets or fiat currency assets in or associated with their accounts, and not merely a singular interest in the net monetary value of the combined positive balances and negative balances associated with their accounts.

D.   Whether the loans made to 3AC by its various lending counterparties would have been called by a reasonable lender upon that lender becoming aware of 3AC's true financial condition prior to and during the period spanning June 12, 2022 through June 14, 2022.

## IV. Expert Opinions

## A.   The June 12-14, 2022 Transactions Were Not Conducted in the Ordinary Course of Business

11.    I have been instructed by counsel that from end of day June 12, 2022 until end of day June 14, 2022,[2] the 3AC FTX Accounts engaged in a total of 52,484 spot orders, the

---

[2]         Unless otherwise stated, all times referenced herein are in UTC.

overwhelming majority of which (52,483) were sales of spot digital assets associated with 3AC's FTX Accounts (as opposed to establishing new positions).  In point of fact, this was a massive sell-off of almost all of 3AC's inventory at FTX.

12.     In my opinion, because these transactions are not consistent with the patterns of trading that would be expected of a hedge fund's ordinary course operations in the crypto industry, these transactions were not done in the ordinary course of 3AC's business, but rather appear to be an extraordinary sell-off in the context of a general market decline.

13.     I understand that 3AC was established as a hedge fund with a focus on trading and investing in cryptocurrency and other digital assets.[3]  Hedge funds are established as investment vehicles that raise capital from investors and are intended to be actively managed by investment advisers.  Cryptocurrency hedge funds like 3AC seek profits from trading in the cryptocurrency markets as well as from making investments in other cryptocurrency-related business ventures.  The overall goal is exposure to the cryptocurrency markets to profit from their volatility.  In effect, a hedge fund seeks to be net long, or own cryptocurrency, as markets go up in value and look for opportunities to be net short when markets fall.

14.     As a large institutional trader, a hedge fund often seeks to add leverage to its trading.  Among other types of leverage, leverage can be in the form of trading margin and loans.  I understand that this was consistent with 3AC's business model.[4]  When successful, leveraged trading can amplify profits.  When a leveraged trading strategy fails, then losses are amplified in proportion to the amount of leverage.[5]

---

[3]      *See Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief* at pages 2 ,4, *In re Three Arrows Capital, Ltd*, No. 22-10920 (Bankr. S.D.N.Y. July 1, 2022) [D.I. 2].

[4]      *Id.* at 4.

[5]      Leverage permits investments to be made using less capital. For example, if an investor invests $100 without leverage, and the asset increases to $110, the investor has made $10 or a 10% gain on capital.  Taking a $1,000 loan for the same investment would lead to a $100 profit (less the cost of loan interest), which would represent a return on capital far exceeding the 10% from an unleveraged investment.  Assuming a 10% down payment on the loan ($100) and $10 in interest and fees, then the return on capital would be ($100 profit - $10 interest) ÷ $100 capital = 90%.  In addition to amplifying profits, leverage frees up an investor's capital, allowing an investor to broaden its investments into other assets.  Leverage can also amplify losses.  If the investment loses 10%, then the investor has lost $100 + cost of the loan, which is more than the original

15. In early November 2021, cryptocurrency markets peaked: BTC's highpoint was over $67,500 and ETH reached over $4,800. But shortly thereafter, markets began to tumble. By late January 2022, BTC and ETH prices had decreased around 50%.[6]

16. Despite the steep losses, markets rebounded fairly quickly, exhibiting upward momentum. By the end of March 2022, BTC prices had increased by 35% and ETH prices by 41%.[7]

17. However, several events converged to destabilize the markets, which had a deleterious impact on 3AC's positions. These events included:

    17.1. **Further erosion in the price of GBTC**. GBTC was an investment trust set up for investors to gain exposure to BTC without investing in BTC directly. I am instructed by counsel that, over time, 3AC had taken a very large long position in GBTC, which, at its peak on October 29, 2021, included $2,809,036,809 in GBTC shares. That would have been initially profitable when one could engage in arbitrage when the price of GBTC was at a premium to BTC.[8] Since GBTC prices were trending higher than BTC, buying GBTC while selling BTC would produce a profit while effectively hedging against the volatility of BTC prices—a way to trade

---

down payment. Considering that this case involved investment losses far exceeding 10%, a leveraged investor could lose many times its original investment.

[6] *See* COINMARKETCAP, https://coinmarketcap.com/.

| Date | BTC | Gain/Loss | ETH | Gain/Loss |
|---|---|---|---|---|
| 8/11/2021 | $67,549 | | $4,810 | |
| 22/1/2022 | $35,047 | -48% | $2,407 | -50% |
| 29/3/2022 | $47,457 | 35% | $3,402 | 41% |

[7] *Id.*

[8] *See Decoding GBTC: A Deep Dive into Fair Market Value, NAV, and the Discount's Demise*, Market Clutch, https://marketclutch.com/decoding-gbtc-a-deep-dive-into-fair-market-value-nav-and-the-discounts-demise/ ("For years, demand to gain Bitcoin exposure through a traditional brokerage account was incredibly high, and GBTC was the only game in town. This led to the shares trading at a massive premium to NAV. An investor buying GBTC was paying more than the value of the Bitcoin it represented. This premium often exceeded 100%."). For instance, on December 21, 2020, GBTC shares peaked to a high of 40.2% premium to the price of BTC. *See* Price Chart "Grayscale Investments BTC Premium," https://www.coinglass.com/Grayscale.

volatile markets rather than taking outright directional bets on prices.[9]  Over time, however, GBTC lost its attractiveness as an investment, with its price reversing to a discount to BTC and which discount continued to widen.[10]  A trader employing this GBTC / BTC arbitrage strategy may have remained optimistic that GBTC's value would recover, either due to normal market forces or if and when GBTC's trustee secured regulatory approval to convert the trust to a more cost-effective ETF structure.[11]  However, market forces did not close the discount, and SEC approval for the ETF was not given until 2024.  By May 9, 2022, the value of 3AC's GBTC holdings eroded to $1,618,772,096, representing a 42.4% loss of value since October 29, 2021, when 3AC's GBTC holdings were (as I am instructed by counsel) at or near their value peak.  This was despite 3AC's holdings of GBTC increasing (as I am instructed by counsel) from 56,328,414 units to 77,453,210 units between October 29, 2021 and May 9, 2022.

17.2.  **The Collapse of Terra LUNA.**  In early 2022, 3AC was heavily invested in the algorithmic stablecoin TerraUSD and the cryptocurrency token LUNA through the Terra blockchain.  TerraUSD was a stablecoin designed to be pegged to the USD.

---

[9]     *See* S. Vishwa, *What is Crypto Arbitrage and How to Start Arbitrage Trading?*, TOKEN METRICS, https://www.tokenmetrics.com/blog/crypto-arbitrage ("The concept of arbitrage trading is based on the idea that the price of an asset can vary in different markets due to various factors such as supply and demand, transaction costs, and currency exchange rates.  The goal of arbitrage trading is to purchase an asset in one market at a lower price and sell it in another market at a higher price, making a profit from the price difference."); *see also* Kent Thune, *Is the GBTC Discount to NAV a Good Arbitrage Opportunity?*, ETF.COM (November 13, 2023), https://www.etf.com/sections/news/gbtc-discount-nav-good-arbitrage-opportunity ("Arbitrage is a trading strategy that aims to profit from the price differences of an asset or security in different markets, attempting to exploit the price differential to generate a 'risk-free' profit.").

[10]    *See GBTC vs. BTC-USD*, PORTFOLIOSLAB, https://portfolioslab.com/tools/stock-comparison/GBTC/BTC-USD.  By March 2, 2021, GBTC shares reverted to a -4.24% discount to the price of BTC.  The discount widened, falling to -15.27% by October 21, 2021, -29.9% by January 21, 2022, and -27% on May 9, 2021. *See* Price Chart "Grayscale Investments BTC Premium," https://www.coinglass.com/Grayscale.

[11]    *See Decoding GBTC: A Deep Dive into Fair Market Value, NAV, and the Discount's Demise*, Market Clutch, https://marketclutch.com/decoding-gbtc-a-deep-dive-into-fair-market-value-nav-and-the-discounts-demise/; *see also* Melissa Horton, *Exchange-Traded Funds (ETFs) vs. Closed-End Funds: What's the Difference?*, INVESTOPEDIA (Jan. 29, 2024), https://www.investopedia.com/ask/answers/052615/what-difference-between-exchange-traded-funds-etfs-and-closed-end-funds.asp.

Confidential

It also benefited from a guarantee fund that was designed to support the value of the coin in case its price declined.  Starting around May 8, 2022, and due to developing negative market consensus, Terra lost its peg to the USD.  Initially, the guarantee fund was used to prop up its value.  But as the market lost faith in its value, overwhelming selling pressure sent the value further downward.  The guarantee fund was exhausted and, with no further support, TerraUSD and LUNA's prices reached less than $0.01 by 12 May 2022 and never recovered.[12]  In addition, since the guarantee fund was made up of approximately $3 billion of BTC, the liquidation of the BTC had the consequent effect of further depressing BTC prices. The Terra collapse resulted in massive losses to 3AC.[13]  Indeed, as of May 4, 2022, 3AC's LUNA holdings were valued at $504,285,073.[14]  That value reached approximately $7,445 by May 12, 2022, representing a nearly 100% loss to 3AC.[15]

17.3. **Widespread market contagion impacted the value of almost all assets in the cryptocurrency and broader digital assets industry**.[16]

17.4. **Steep declines in cryptocurrency prices triggered margin calls from lenders whose loans were purportedly backed by such cryptocurrency and were therefore vulnerable themselves**.[17]  Here, because 3AC's cryptocurrency assets

---

[12]     *See About Terra,* https://coinmarketcap.com/currencies/terra-luna-v2/#About.

[13]     *See* Alexander Osipovich & Elaine Yu, *Crypto Hedge Fund Three Arrows Capital Considers Asset Sales, Bailou*t, WALL ST. J. (June 16, 2022), https://www.wsj.com/finance/currencies/battered-crypto-hedge-fund-three-arrows-capital-considers-asset-sales-bailout-11655469932.

[14]     *See* 3AC-FTX-00501105; 3AC-FTX-00562842.

[15]     *See* 3AC-FTX-00501105; 3AC-FTX-00562842.

[16]     *See* Andrew Chow, *The Real Reasons Behind the Crypto Crash, and What We Can Learn from Terra's Fall*, TIME MAGAZINE (May 17, 2022), https://time.com/6177567/terra-ust-crash-crypto; *see also* David Chau, *'Evil genius' may have caused Terra and LUNA cryptocurrencies to crash in a 'death spiral'*, ABC NEWS (May 12, 2022), https://www.abc.net.au/news/2022-05-13/bitcoin-crypto-terra-ust-luna-stablecoin-evil-genius-plot/101062388.

[17]     *See, e.g.*, Samuel Wan, *Trouble at Celsius Network? Users report difficulties withdrawing funds*, CRYPTOSLATE (June 1, 2022), https://cryptoslate.com/trouble-at-celsius-network-users-report-difficulties-

Confidential

often purportedly served as collateral for loans, the steep decline in price led (as I understand from and am instructed by counsel) numerous lenders to issue margin calls to 3AC for large amounts on various dates in May and June 2022, including Genesis, Equities First, Matrixport, FalconX, Blockchain Access UK Ltd, and numerous others.

18.   In an attempt to rebound from these events, 3AC seems to have gambled by concentrating its investments in BTC, likely hoping the cryptocurrency market would go up.  I have been instructed by counsel that ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████.  For example, 3AC's BTC and GBTC holdings on the FTX exchange, at their respective peaks in terms of value, are listed in the table below:[18]

|      | Max units    | Max units_date | Max USD        | Max USD_date |
|------|--------------|----------------|----------------|--------------|
| GBTC | 2,847,917.00 | 06/09/2022     | 109,015,061.83 | 12/23/2021   |
| BTC  | 27,924.40    | 06/06/2022     | 875,346,146.31 | 06/06/2022   |

19.   But 3AC's gamble did not pay off, as cryptocurrency prices generally and BTC particularly continued to fall sharply.  Between May 31, 2022 and June 12, 2022, BTC lost another 15% of its value and ETH lost 26%.[19]

---

withdrawing-funds/; Robert Stevens, *BlockFi's Rise and Fall: A Timeline*, COINDESK (Nov. 30, 2022), https://www.coindesk.com/learn/blockfis-rise-and-fall-a-timeline.

[18]   *See* FTX_3AC_000000038_amended.

[19]   *See* COINMARKETCAP,  https://coinmarketcap.com/.

Confidential

20. In early June 2022, 3AC was heavily leveraged.[20] In fact, as of June 12, 2022, 3AC had alleged liabilities on the FTX exchange of as much as $1,332,681,172[21] and was cash flow (and balance sheet) insolvent during the period in question (June 12-14, 2022).[22] As stated above, prices did not recover but continued to fall precipitously. Between May 31, 2022 and June 12, 2022, according to FTX, 3AC's spot assets on FTX had lost approximately $224 million in value, and its perpetual futures positions had lost approximately $101 million.[23]

21. Then, I am instructed by counsel that, between June 13-14, 2022, 3AC's FTX Accounts executed a total of 52,484 spot orders (all but one were sell orders). According to FTX, these orders involved the sale of almost all 3AC's digital assets on the FTX exchange, including: 1) 26,585 BTC; 2) 122,874 ETH; 3) 2,847,917 shares of GBTC; 4) 2,500,916 shares of ETHE; and 5) 1,123,117 units of FTT.[24] The records held by the Joint Liquidators do not reflect whether 3AC or FTX triggered these trades. But either way, this marked an extraordinary event that was not in 3AC's ordinary course of business.

22. Given the immense downward pressure across all cryptocurrency markets, and the probability that 3AC was in grave danger and the fact that it was insolvent, the massive asset sales that occurred in 3AC's FTX Accounts would only be understandable in the context of a foreclosure and fire sale of a distressed debtor's assets, whether directed by 3AC or FTX.

---

[20]   *See, e.g.*, 3AC-FTX-00557652 (Master Loan Agreement between Tesseract Group Oy and Three Arrows Capital Ltd., dated 13 August 2020); 3AC-FTX-00559028 (Master Loan Agreement between 3AC and Genesis Global Capital, LLC, dated January 10, 2019); 3AC-FTX-00559049 (Master Loan Agreement between 3AC and Lunex Ventures LP, dated April 1, 2019); 3AC-FTX-00559068 (Digital Asset Lending Agreement between 3AC and Celsius Network Ltd. dated May 25, 2019); *see also* 3AC-FTX-00557685 (Loan Term Sheet dated May 24, 2022 for 450 ETH at 5% APR).

[21]   *See* Amended POC ¶ 27. I understand that, in its claim objection, FTX has alleged that 3AC had USD liabilities of approximately $733 million as of end of day June 12, 2022, with reference to FTX_3AC_000000038_amended.

[22]   *See* Expert Report of Gregory E. Scheig, October 21, 2025.

[23]   *See Declaration of Steven P. Coverick in Support of the FTX Recovery Trust's Objection to the Amended Proof of Claim Filed by Joint Liquidators of Three Arrows Capital, In re FTX Trading, Ltd., et al.*, Case No. 22-11068 [D.I. 20934] ("Coverick Decl.") ¶ 60.

[24]   *See* Coverick Decl. ¶ 71.

**Confidential**

It certainly was not in line with any market strategy to take losses and pivot, change direction, and/or look to capitalize on future market movements.  At the end of June 12, 2022, 3AC's FTX Accounts reflected approximately $1.017 billion[25] in digital assets (without taking into account futures contracts).  By the end of the day on June 14, 2022, almost all of 3AC's positions on the FTX exchange had been closed out and 3AC was left with only $1,721,841.37 in digital assets (again, without taking into account futures contracts which were also largely closed out).[26]  Nearly all of its open futures contracts were also closed.[27]  A course of action leading to such an outcome, such as the sale of virtually all of the assets reflected in 3AC's FTX Accounts, could not conceivably be characterized as 3AC's "business as usual," but rather appeared to reflect a response to severe financial difficulties.

23.    Rather than a full-scale mass sale, a professional trader faced with markets that are moving quickly against its positions but seeking to continue its normal trading operations would have adopted more sophisticated strategies.  This could involve doing one of, or a combination of the following:

23.1.  Taking short positions in other correlated assets.  A correlated asset is one in which the prices tend to move in parallel.  Thus, in a downward market, the short positions would gain in value, offsetting the long portfolio.  For example, between 1:00 A.M and 10:00 P.M. on June 12, 2022, BTC prices decreased 7%.  During the same time period, another widely-traded cryptocurrency token, Cardano (ADA), lost 6% of its value.  A sale of Cardano on June 12, 2022 could have generated a 6% profit.[28]

---

[25]    FTX_3AC_000000038_amended.  Where relevant in this document regarding 3AC's historical asset positions on the FTX exchange, I have been instructed to refer to figures derived from FTX_3AC_000000038_amended instead of FTX_3AC_000000038 (without expressing an opinion on the use of such sources).  I understand that the former document has been provided in discovery by FTX to the Joint Liquidators as an update to the latter.  In citing figures from FTX_3AC_000000038_amended, I do not take a position on this approach.

[26]    FTX_3AC_000000038_amended.

[27]    *See* Coverick Decl. ¶ 86.

[28]    At 1:00 A.M. ADA was priced at $0.5042 and by 10:00 P.M. it was $0.4651.  *See* https://coinmarketcap.com/currencies/cardano/.

Confidential

23.2.  Another strategy would be to sell options which would generate income from the premium received from the purchaser.[29]  For example, with BTC prices decreasing from the $27,000 price level to under $26,000 during the day on June 12, 2022, a call (right to buy) could be sold at a far out of the money strike price (e.g. $30,000 or higher).  Since BTC had been rapidly deteriorating in mid-June 2022, option premiums would have been increasing due to increasing market volatility, which had the probability of producing significant revenue.[30]

23.3.  A safer options strategy would involve the collaring of the existing crypto-assets in the portfolio.  A collar is the sale of an out-of-the-money call option and the purchase of an out-of-the-money put option.  It effectively sets a price floor for the asset at the put option strike price and sets a price ceiling at the call option strike price.  This strategy not only protects the asset against excessive price declines, but if the call strike premium is higher than the put strike premium, the strategy would be cost free and potentially generate income.[31]

24.  The mass sale of 3AC's FTX Accounts' assets that occurred during the June 12-14 timeframe bears no hallmarks of an attempt by 3AC to remain solvent and live to fight another day.  I am not aware of a record of any trades that sought to short correlated positions or to deploy an options strategy.  While there was no guarantee such strategies would ultimately meet that objective, a professional investor would have made at least some effort to mitigate its losses.  Rather, the activity in 3AC's FTX Accounts during that period bore all of the signs of the intent to shut down as soon as possible.  This was not business as usual.

---

[29]    This is known as a naked short options strategy.  Selling options would generate the option premium paid by the purchaser but expose the seller to having to buy or sell the underlying asset at the strike price.  If the put seller does not own the asset, this strategy would be "uncovered."  *See* Gordon Scott, *Naked Options: Risks and Strategies for Calls and Puts*, Investopedia (Sep. 17, 2025), https://www.investopedia.com/terms/n/nakedoption.asp.

[30]    Generally, option premiums tend to move inversely to the prices of the underlying crypto-assets.  Thus, when the price of BTC is moving lower, BTC Option premiums typically move higher due to increased price volatility.

[31]    See Akhilesh Ganti, *The Collar Options Strategy Explained in Simple Terms*, INVESTOPEDIA (May 21, 2025), https://www.investopedia.com/terms/c/collar.asp.

25.    In addition, it is my understanding that late on June 14, 2022, FTX liquidated approximately $82 million of assets associated with 3AC's FTX Accounts in a series of 24 trades.[32]  Since FTX purportedly liquidated these assets as a result of 3AC's purported noncompliance with margin and/or collateral requirements for a line of credit that FTX issued to 3AC, as a matter of course such transactions were, manifestly, not made in the ordinary course of business.  I am unaware of any evidence that FTX previously made a margin or collateral call of 3AC, much less liquidated 3AC's assets as a result.

**B.    FTX Was Financially Exposed to Borrower Default Risk under Its Margin Program, Benefited from the Near-Satisfaction of 3AC's Liability under Such Program as a Result of the Liquidation or Sale of Assets Associated with 3AC's FTX Accounts, and Benefited from its Operation of the Margin Program.**

1.    FTX's Margin Program Generally

26.    FTX offered within its exchange platform a lending program (the "Margin Program") it characterizes as a "peer-to-peer" margin lending program involving purported peer-to-peer loans.  These loans purportedly involved the matching of pools of borrowers with pools of lenders on the FTX platform, such that a borrower could borrow USD or certain cryptocurrency assets as long as there were willing lenders to loan it.  Interest rates were purportedly set by an algorithm based on demand for and supply of loans.  FTX facilitated this program; that is, "lenders" and "borrowers" could not identify and transact with each other bilaterally under this program.[33]

27.    Pure "peer-to-peer" lending, by contrast, involves a private, bilateral loan directly between counterparties with no intermediary.  In general terms, the lender loans its assets directly to the borrower pursuant to an agreement in exchange for consideration that is typically an interest rate and may include other terms like a requirement for the borrower to post collateral.  All of the terms are captured in a written agreement that is privately negotiated between the parties.

---

[32]    *See* Coverick Decl. ¶ 70.

[33]    *See* September 24, 2025 Deposition of Steven Coverick ("Coverick Dep. (Day 1)") at 225:11-226:11, 369:14-370:10, 387:12-388:5.

28. FTX has acknowledged that there was no one-to-one lender-borrower relationship under its Margin Program, unlike a true peer-to-peer lending program, and that it is impossible to identify any specific customer as the source of any specific borrowed assets.[34] Instead, according to FTX, "pools" of lenders loaned certain digital assets to "pools" of borrowers.[35] As presented by FTX, the Margin Program did not facilitate bilateral borrower relationships but was posited as a matching of borrowers with a pool of assets made available by an exchange users.[36] Customers would indicate their intent to lend their assets on the FTX exchange, FTX advertised to customers the availability of loans, and to access a loan, a borrower would indicate their desire to borrow assets on the FTX exchange. FTX would administer the entire process. FTX would then credit the borrower's account in the amount of the loan and debit the account for interest as it was incurred.[37] Thus, under FTX's Margin Program, lending customers did not loan any specific assets to specific borrowing customers.

29. Indeed, according to FTX, no customer (not even the pool of lending customers collectively) actually lent any assets at all. FTX has taken the position that the assets subject to any loan under the Margin Program remained within addresses under FTX's control at all relevant times.[38] According to FTX, a lending "transaction" under its Margin Program resulted only in the debiting and crediting of ledger entries associated with the lender and borrowing customers' FTX accounts, rather than the movement of any assets.[39] Those debits and credits did not associate specific lending customers with specific borrowing customers.[40] FTX has

---

[34]    Debtors' Resp. and Obj. to the Joint Liquidators of Three Arrows Capital, Ltd.'s Fourth Set of Interrog., Resp. to Interrog. No. 2, at 10.

[35]    Coverick Dep. (Day 1) at 369:14-370:10, 376:18-23, 387:12-388:5, 399:6-22.

[36]    FTX Recovery Trust's Resp. and Obj. to the Joint Liquidators of Three Arrows Capital, Ltd.'s Seventh Set of Req. of Produc. of Doc., Sixth Set of Interrog., Resp. to Interrog. No. 3, at 38.

[37]    *See* Coverick Decl. ¶¶ 15-16.

[38]    *See* Coverick Dep. (Day 1) at 370:11-22, 394:17-21.

[39]    *See id.* at 365:23-366:14, 366:23-367:25, 370:11-22.

[40]    *See id.* at 374:12-376:23, 388:6-389:20.

Confidential

also taken the position that customers did not actually have any assets, which would mean they have nothing to lend, as discussed further below.

> 2. <u>FTX Was Financially Exposed to Borrower Default Risk under the Margin Program</u>

30.   FTX was financially exposed to borrower default risk in connection with the Margin Program for at least the following key reasons: (i) borrowers' payment obligations under the Margin Program were solely to FTX, and not to other customers; (ii) the supply of loans under the program was divorced from the actual availability of assets to be loaned or lending customers willing to loan, which implies that FTX itself effectively backstopped the supply of loans under the Margin Program; (iii) FTX could not, and did not, identify any customer as the lender to a particular borrower (including 3AC), and therefore could not allocate losses to any customer lender; and (iv) FTX committed to absorbing losses from defaults in the Margin Program and in reality would have absorbed such losses.  Various elements of FTX's Margin Program demonstrate this conclusion, as explained in detail below.

> *i.   Borrowers' Obligations under the Margin Program Were to FTX Only*

31.   The obligation to repay borrowing liabilities under the Margin Program was to FTX, not to any specific lending customer: repayments were made to FTX, and not credited to any particular lending customer, and they did not decrease any specific lending customer's loan.[41]  And repayment was effectuated via a ledger entry by FTX, not upon the return by a borrowing customer of any asset to that lending customer.[42]

---

[41]     October 16, 2025 Deposition of Sam Bankman-Fried ("SBF") Transcript ("SBF Dep.") at 111:18-112:5 ("Q. So if I borrowed $10 -- U.S. dollars on the margin lending program and I wanted to pay it back, I could transfer $10 onto my FTX account to repay the margin loan? A. In general, yes. Q. That $10 wouldn't then be transferred to the account of a particular customer lender; right? A. Not necessarily. Q. It would not necessarily be transferred to it? A. That's right. I'm not sure how you are defining that."); *Id.* at 114:6-13 ("Q. If I borrowed $100,000 and then I repay it? A. Yep. Q. -- That doesn't -- that doesn't eliminate the loan that a particular user provided; right.  A. It's not identified with a particular user. It decreases the total amount of dollars being borrowed . . .").

[42]     *See* Coverick Dep. (Day 1) 394:13-395:4.

Confidential

ii.  *The Timing of the Grant of a Loan Confirms that the Repayment Obligation Was to FTX*

32.  The FTX exchange's underlying code confirms that a borrowing customer's obligations were to FTX rather than to a customer lender, as that obligation was incurred before any lending customer was committed.  As described by an FTX developer, the FTX code base maintained separate modules for (i) determining whether a borrow would take place, (ii) determining whether a lend would take place, and (iii) matching pools of borrowers and lenders.[43]  The code responsible for allowing a transaction to trigger a borrow would execute almost immediately, while the code that matched pools of lenders and borrowers operated on an hourly basis.[44]  The code does not appear to contain any restrictions that would require the system to check for available lenders before permitting a borrow or trade to be placed.[45]  Instead, the only restrictions governing whether a borrow could occur were that (1) the token to be borrowed had to be designated by FTX as "eligible" for borrowing, and (2) the account initiating the borrow had to be marked by FTX as eligible for borrowing and possess sufficient collateral.[46]  There was no requirement that any customer actually offer to lend that token, yet that token could be lent regardless, implying that FTX backstopped the supply of loaned assets under the Margin Program (and so absorbed the risk if they were insufficient).

iii.  *FTX Ultimately Absorbed Any Losses from Defaults in the Margin Program*

33.  Numerous facts confirm that FTX absorbed, and would have absorbed, any losses from customer defaults in the Margin Program.  First, there was no specific lender for any specific borrower or loan; accordingly, it was not possible for a loss on a default to be allocated to

---

[43]  *See* Deposition of Nils Molina ("Molina Dep.") at 91:3-12.

[44]  *Id.* at 93:7-13.

[45]  *Id.* at 80:16-19.

[46]  *Id.* at 82:12-83:1.

Confidential

specific customer lenders.   Since there were no particular "lenders" for any specific "borrower," [47] FTX had no way to allocate losses to a lender.

34.    Consistent with that, a user who made its assets available for lending under FTX's Margin Program could freely elect to no longer participate in the program, freeing that user's previously lent assets for their withdrawal, despite those assets not having been returned by the applicable borrower.[48]   It therefore follows that, even if the borrower defaults and never actually returns the borrowed asset, any lenders who participated in the pool could subsequently choose to cease their participation and withdraw their assets from the FTX exchange, despite the borrower's default.   Instead, FTX would necessarily absorb that loss (as it could not identify specific lenders to which it could fairly allocate the loss).

35.    Second, the relevant FTX practices make clear that a loss triggered by a borrowing customer's default would not be allocated to a customer lender but rather absorbed by FTX. Indeed, in an apparent attempt to avoid imposing losses on FTX (and other customers), FTX implemented a backstop liquidity program ("BLP") and an insurance fund program (the "Insurance Fund").   Within the FTX exchange ecosystem, Alameda Research (an affiliate of FTX) and, in some cases, other FTX affiliates served as "backstop liquidity providers."[49]   In this capacity, Alameda was tasked with assuming customer positions when those customers' accounts became sufficiently undercollateralized or incurred negative balances, including in the context of leveraged futures trading.[50]   When a customer's margin position was liquidated due to insufficient collateral, and FTX's liquidation engine could not close the position in the open market without causing excessive slippage or loss, the backstop liquidity

---

[47]     FTX Recovery Trust's Resp. and Obj. to the Joint Liquidators of Three Arrows Capital, Ltd.'s Seventh Set of Req. of Produc. of Doc., Sixth Set of Interrog., and Second Set of Req. for Admis., Resp. to Interrog. No. 3 at 38.

[48]     *See* Molina Dep. at 61:23-62:14.

[49]     *See* FTX_3AC_000013853 ("Liquidations" explainer); FTX_3AC_000045167 ("Liquidations" explainer); Coverick Dep. (Day 2) at 102:10-15, 119:14-21.

[50]     *See* Coverick Dep. (Day 2) 119:21-120:4.

Confidential

provider would step in to take over the position and absorb the risk.[51]  If the backstop liquidity provider was then able to close the position profitably, it kept the gains; if not, FTX's Insurance Fund would cover any residual losses if the liquidated account's equity was insufficient or if the backstop liquidity provider could not absorb the full negative balance (further demonstrating the fact that FTX and its affiliates ultimately carried counterparty risk under the Margin Program).[52]

36.    If the BLP was insufficient[53], then any loss would be absorbed by FTX in the form of the "insurance" or "backstop fund," a commitment of at least several hundred million dollars by FTX to absorb the first risk of loss.[54]

37.    The Insurance Fund, based on FTX's representations to its customers, absorbed losses up to the amount of the funding in the Insurance Fund.[55]

---

[51]    *See* FTX_3AC_000013853 at -13854; FTX_3AC_000045167 at -45167; FTX_3AC_000045026 at -45027 ("Complete Futures Specs" explainer, noting a backstop liquidity provider is "an account that promises to take on liquidating accounts' positions").

[52]    *See* FTX_3AC_000045167; FTX_3AC_000043756 (DDQ Business FAQ).

[53]    *See* SBF Dep. at 127:3-8 ("Q. Is there code written to automate this process of transferring to a BLP? A. There is code -- there was code for it, which got modified periodically, which attempted to do so as a default matter; but in large or unique cases, that code was sometimes not sufficient."), 128:4-129:21 (discussing MobileCoin incident where the loss was too large and FTX/Alameda absorbed the losses).  *See also* FTX_3AC_000045026 at -45030 ("If BLP total capacity is insufficient, the remaining size is closed against users with large opposing positions . . ."); FTX_3AC_000045167 at -45168 (same).

[54]    *See* FTX_3AC_000045167; FTX_3AC_000044809 (Backstop Liquidity Program); SBF Dep. at 152:17-153:6 (in response to the situation where a customer "end[ed] up with a negative number of dollars left in the account, an actual loss mark to market", SBF responded that "funds permitting, FTX and/or its backstop liquidity fund would attempt to cover such a loss"), 154:3-13 ("Q. So the goal was never to impose a loss on other users? A. Yes. Unless one had no choice. Q. So, if FTX could, it was going to avoid imposing loss on other users? A. That's right, obviously could -- there are questions of exactly how many dollars FTX would have committed to do so. I think it publicly committed to at least north of a hundred million dollars. In practice, I think it would have been willing to admit to significantly more than that."); Direct Testimony of Can Sun, SBF Criminal Trial Tr. at 1920:9-13 ("Q. You talked about an insurance fund. Based on the defendant's statements, what did you understand was the insurance fund? A. I understand that it was $250 million sitting on the ftx.com exchange and made readily available to cover losses.").

[55]    *See* FTX_3AC_000045167.

Confidential

38.    If that was insufficient, then according to the FTX documents, as a last result, the loss would be "socialized" among FTX users, also called "clawbacks."[56]  "Clawbacks" in this context refer to FTX's process of potentially sharing losses across its customers.[57]  But a clawback would not allocate losses to customer lenders; instead a clawback would allocate losses to investors (long and short) in the particular asset classes of the losing portfolio.[58]  If for instance the defaulting customer had a deficit in its Bitcoin account, the losses would be shared among other Bitcoin account holders on the exchange.  It would not be shared among the customer lenders.[59]  This confirms that the risk of loss was not on the customer lenders.

39.    Moreover, FTX had no intention of effectuating clawbacks on users.  FTX had committed to doing everything possible to avoid clawbacks, and marketed its ability to avoid clawbacks

---

[56]    FTX_3AC_000045167 at -45169 ("Customers only face clawbacks if an account goes bankrupt *and* the backstop liquidity fund is empty." (emphasis original)).

[57]    *See* Direct Testimony of Sam Bankman-Fried, SBF Criminal Trial Tr. at 2433:18-2434:13 ("Q. Were you familiar with something at FTX called the insurance fund? A. Yes.  **Q. What was that?  A. The insurance fund is a word we used to describe the amount of money that we were pledging to cover customer account losses.  This was related to the risk of clawbacks or socialized losses.**  Q. Can you explain how that worked.  A. Yes.  So if there were a customer account that had a margin position, either futures or—— or a spot open, markets moved, its assets declined in value, and it ended up with more liabilities than assets, it ended up with, say, you know, $3,000 of liabilities, $2,000 of assets backing that, it had a net liability of a thousand dollars, would close down the accounts position but it would still have that net liability, and someone had to cover it.  **Either it had to be FTX had to cover it or FTX's customers had to cover it.  That's what socialized losses or clawbacks were.  But before those came, FTX would try and cover it.  The insurance fund, that was the amount of money FTX pledged to use to cover such customer account losses.**" (emphases added)).

[58]    *See* SBF Dep. at 149:25-150:5 ("Q. -- what would it mean to 'close down the positions'? A. Well, it would mean that if they were -- If, for instance, the liquidating users were short bitcoin users and the others were long, it would close down the longs as if they were BLPs.").

[59]    SBF Dep. at 72:10-24 ("Q. So, in 16.2, FTX is warning the margin lender user that they may lose the amount borrowed by the margin? A. Borrower. Q. Borrower? A. That's right. In 16.4, it's referring to multiple types of accounts including accounts that might be subject to liquidation. Q. So 16.4 is a warning to -- not to margin lenders but to -- A. Borrowers or leveraged traders of various sorts -- Q. Okay. A. -- or more broadly to those on a platform with lending, borrowing, and margin trading.").

as a key reason to choose FTX over its competitions.[60]  FTX marketed its Insurance Fund, and its BLP, as protection for customers against the possibility of socialized losses.[61]

40.    In practice, it would seriously damage FTX's business model if it were to implement a nine-figure clawback, given its repeated assurances and its promotion of its business model.  FTX would not only lose what it had marketed as its competitive advantage, but its users would feel misled (rightly or wrongly).  Accordingly, FTX would do everything possible to avoid such a clawback.[62]

---

[60]    SBF Dep. at 155:1-6 ("Q. My understanding, it was important to FTX that it hadn't had to socialize losses; is that right? A. That's right. Q. So you would have done what you could to avoid that if you could? A. I -- in general, yes.").

[61]    FTX Research, *Our Liquidation Engine – how we significantly reduced the likelihood of clawbacks from ever occurring*; FTX Research, *Liquidation Process Flowchart; see also* FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms, attached as Exhibit C to "Digital Assets - Risks, Regulation, and Innovation", Hrg. before the. S. Comm. on Agric., Nutrition and Forestry, 117th Cong. (dated Feb. 9, 2022) at 31-32 (discussing "maintaining adequate resources to return a customer's assets"); Direct Testimony of Can Sun, SBF Criminal Trial Tr. at 1918:4-1919:6 ("Q. And based on what the defendant described, what did you understand to be the procedure for liquidating positions on the FTX exchange? A. So it is a multistep process.  The first step happens is, if your collateral——if the value of your account on the exchange starts to decrease and it hits 3 percent of your position size, that's when FTX's trading engine starts to liquidate you on the market.  If the market moves further adversely to you, it goes further down.  Let's say your collateral, your value of your account drops to 1.5 percent of your total position, notional size, then what happens is, your positions are now moved to what we call backstop liquidity providers, which are basically large market makers on the exchange who signed up to accept these positions.  Now if it goes even further negative and the backstop liquidity program is not able to actually take on these positions, then there's an insurance fund that kicks in, which is basically money that is set aside specifically for the purpose of covering these losses that cannot be satisfied on the platform.  And if that insurance fund gets depleted, runs out, then there would be, you know, socialized losses.  But it has been FTX's consistent position that they have never depleted the insurance fund, we have never clawed back users, and we have no intention of clawing back users as well.  It was one of FTX's main marketing and selling points.") and 1919:7-18 ("Q. And where did you hear the defendant describing FTX's liquidation engine and the selling points of that engine? A. So it comes up in conversations with regulators, our regulators around the world who asks us about our liquidation and margin programs; it comes up in questions from our users who asks about, you know, how our liquidation waterfall works; it's something that a lot of large traders are very much focused on because many other crypto exchanges do not have a good liquidation program, and FTX won a lot of customers because, you know, we marketed it as having a really good program, you have an insurance fund that's never been depleted, we've never done clawbacks.").

[62]    SBF Dep. at 154:3-5 ("Q. Okay.  So the goal was never to impose a loss on other users? A. Yes.  Unless one had no choice.").

41.   Consistent with this, the clawback function was never even implemented in the code base.[63]

42.   As a result, as a practical matter, any losses under the Margin Program would be absorbed by FTX when the Insurance Fund was depleted.  Based on the testimony of FTX's CEO, FTX was willing to absorb up to $1 billion of losses to avoid triggering any clawbacks.[64]

43.   This is confirmed by the history here, in that FTX never had a clawback, and instead repeatedly absorbed losses.[65]  In fact, FTX chose to allocate customer losses to its affiliate Alameda rather than trigger a clawback, including a nine-figure loss associated with MobileCoin.[66]

---

[63]   Nishad Singh, SBF Criminal Trial Tr. at 1387:15-1388:5 ("Q. And what did the code say, if anything, about clawbacks? A. Yeah, I brought this up with Sam and Gary at some point when I discovered it. Clawbacks weren't even implemented. Q. What do you mean 'weren't even implemented'? A. That the code could never cause a clawback.  Q. So what does that mean? A. Even in instances in which a customer account ended up negative and the insurance fund, which is a sort of bailout pool of cash, was empty, the expected option for resolving the negative balance would be a clawback, but there was nothing in the code that would do that. Instead, the account would remain negative and——and Sam and Gary or others would sort of manually handle it however they saw fit.").

[64]   *See* SBF Dep. at 154:14-25 ("Q. Do you have a sense how much it would be willing to [commit]? A. . . . I anticipated at the time that, you know, the number was probably more like a billion.").

[65]   *See* THREE_ARROWS_00322548 at -322549 (FTX Trading Ltd. Balance Sheet as of March 31, 2021) (showing "backstop fund expense" under "Trading Expenses"); THREE_ARROWS_00322563 (FTX Trading, Ltd Trial Balance, as of June 30, 2021) (same); *see also* Direct Testimony of Nishad Singh, SBF Criminal Trial Tr. at 1387:13-14 ("Q. While you were working at FTX did it every do clawbacks? A. No, not that I'm aware of."); SBF Dep. at 150:6-20.

[66]   Direct Testimony of Nishad Singh, SBF Criminal Trial Tr. at 1455:18-1456 ("Q. . . . In 2021 were you aware of any losses——just yes or no——associated with problems in the margins of some? A. Yes.  Q. And how did you come to learn about those losses?  A. Ryan Salame and Sam Bankman-Fried sounded the alarms about somebody exploiting the margin system.  Q. Can you describe what you learned. A. I learned that there were a number of accounts that had deposited a lot of MOB——or M-O-B, MobileCoin——as collateral, and had withdrawn a lot of USD against it using the spot margin system.  They had done so in a way such that the——in a way that the FTX margin system essentially overvalued how much it could get out of the MobileCoin, meaning that these accounts weren't yet liquidated but really should have been much earlier.  **Q. And what, if any, losses resulted from this?  A. I heard from Sam Bankman-Fried——he told me, after it was addressed, that the losses would constitute a fraction of Alameda's revenue that year, around $1 billion.  Q. What, if anything, did the defendant say about what should be done with the loss?  A. He directed the reassigning of the accounts themselves that had on these positions that should have been but were not liquidated to Alameda, meaning that Alameda absorbed the losses associated with those accounts**.  Q. And what, if anything, was the effect of moving those losses to Alameda's account?  A. It meant that because Alameda data is not publicly shared, that these losses would

44. This is also confirmed by FTX's assurances to customer lenders.  In an online explainer document, FTX told customer lenders that they had no exposure to a counterparty's default risk, and that this is because FTX guaranteed the margin loans.[67]  And consistent with this, FTX's CEO confirmed that FTX "was acting as the guaranteeing party for peer-to-peer borrower," and so in economic substance absorbed the losses on margin borrowings.[68]

45. Third, FTX's control over the various aspects of the Margin Program, as well as over enforcement of borrowers' repayment obligations thereunder, confirms that it faced the real risk of loss.  According to FTX, the loaned assets were located in addresses controlled by FTX.[69]  FTX's algorithms also set the interest rate and took on the task of automatically liquidating assets if a borrower fell below applicable maintenance margin requirements.[70]

---

not be publicly shared.") (emphasis added); *see also* Direct Testimony of Gary Wang, SBF Criminal Trial Tr. at 413:4-20 ("Q. Now, in addition to taking money and adding it to the insurance fund, **were there ever times where Alameda just took on losses?  A. Yes**.  Q. Can you describe what happened.  A. There are cases where there is a large market movement.  So when the prices of tokens that trade on FTX change by a large amount, and **this triggers a large amount of liquidations, sometimes in those cases this will cause a very large loss to come from the insurance fund, and in those cases Sam would ask me to go into the database and change the prices that Alameda paid for those liquidation, which would cause Alameda to take the loss instead of the insurance fund.**  In other cases, there would be one big account that needs to be liquidated at a loss, and then Sam would just help me to take that account that needs to be liquidated at a loss and just have Alameda take it on." (emphases added)).

[67] FTX_3AC_000045694 at -45697 ("Lenders bear no counterparty risk: FTX guarantees interest payments for however long your funds are borrowed, even if the borrower gets liquidated."); FTX_3AC_000013862 at -13871 (same).

[68] *See* SBF Dep. at 130:12-20 ("Q. So the line of credit, was that effectively a loan from FTX itself as opposed to the user margin program?  A. What's the difference between those two exactly?  It's an interesting question because ultimately FTX was acting as the guaranteeing party for peer-to-peer borrowers as well. So it was a loan, you know, which ultimately was guaranteed by FTX.").

[69] *See* Coverick Dep. (Day 1) at 370:11-22, 394:17-21.

[70] *See* FTX_3AC_000000758 (March 2022 FTX Line of Credit & FTX Institutional Customer Margin and Line of Credit Agreement); *see also* FTX_3AC_000044454 at -44461 (describing FTX's "backstop liquidity fund"); FTX_3AC_000045026 ("Complete Futures Specs" explainer) (providing details of backstop liquidity); FTX_3AC_000044809 ("Backstop Liquidity Provider Program" explainer) (same); FTX_3AC_000044488 ("Account Margin Management" explainer) (providing details on margin lending at FTX).

**Confidential**

There was no interaction between customer borrowers and lenders.[71]  FTX has taken the position that it maintained broad discretion under the May 2022 TOS and FTX Institutional Line of Credit Agreement to liquidate or sell assets from customer accounts that were unable to satisfy applicable margin requirements.[72]

46.   Indeed, consistent with the fact that FTX's code did not link borrow requests to customer lending availability, FTX has acknowledged that there were likely mismatches between the supply of lenders and requests to borrow, such that it needed to implement its automatic liquidation procedures to attempt to prevent circumstances where lending customers were not made whole after ledger entries for these customers' accounts were debited to reflect the "loaning" of assets under the Margin Program.[73]  FTX was not an impartial bystander in this process, but took active steps to attempt to prevent accounts on the exchange from having insufficient collateral to satisfy margin requirements and or becoming net negative.  As FTX has explained, it sought to prevent customers from incurring non-repayable debt because if customers routinely incurred such debt, the exchange would become unattractive to its customers.[74]

47.   These control activities carry all the hallmarks of a party (such as a guarantor) that is overseeing loans it faces default risk on, and taking quick action if a borrower is overextended or insolvent.  The question is why would FTX go to so much effort if it was not concerned about creditor risk?  The answer is that FTX was practically exposed to borrower non-repayment risk thereunder.[75]

---

[71]   *See* Coverick Dep. (Day 1) at 379:14-380:10.

[72]   *Id.* at 236:12-237:13.

[73]   *See* Coverick Dep. (Day 2) at 125:15-19.

[74]   *See id.* at 104:10-106:19.

[75]   *See* Coverick Dep. (Day 2) at 108:6-110:2, 111:11-19; *see also* FTX_3AC_000045167 ("Liquidations" explainer).

3. FTX Benefited from the Near-Elimination of 3AC's Negative USD Balance (*i.e.*, Borrowed Amounts) under the Margin Program via the Sale of Assets Associated with 3AC's FTX Accounts

48. As a result of the sale or liquidation of nearly all of the digital assets associated with 3AC's FTX Accounts between June 12 and June 14, 2022, borrowings under the Margin Program and the LOC (both of which were reflected in 3AC's negative USD balance) were repaid.

49. Because FTX would have ultimately absorbed any losses resulting from 3AC's default on its Margin Program and LOC borrowings, FTX directly benefited from the elimination (via the sale of assets associated with 3AC's FTX Accounts between June 12 and June 14, 2022) of 3AC's negative USD balance under the Margin Program, and it benefited to the same extent of such negative USD balance.

4. FTX Benefited in Other Ways as Well

50. FTX also benefitted in several other ways. First, FTX benefited substantially from protecting the Margin Program itself.  It derived revenue from the Margin Program (in the form of fees[76]) and promoted its trading platform by increasing its customer base and incentivizing more trading by its customers, thereby increasing its revenue and its business model of avoiding clawbacks (as discussed above in paragraphs 39-40).[77]  And so to the extent that a nine-figure margin trading loss would have deterred customers from participating in the Margin Program, likely resulting in severe reputational damage to FTX and potentially also claims against it (on the basis that FTX did not take adequate steps to protect customers), FTX benefitted from shielding customers from such a loss.

51. Second, FTX benefited through the BLP and Insurance Fund.  The BLP created opportunities for FTX and its affiliates to profit from distressed positions.  When a customer's account was liquidated and the position was assumed by a backstop liquidity provider, that provider could

---

[76]     *See* FTX_3AC_000045983 ("Fees" explainer); FTX_3AC_000044451 ("Trading Fees" explainer).

[77]     *See* Coverick Dep. (Day 1) at 340:3-13 ("Q: What benefits, if any, did the existence of the margin program provide FTX?  A: Any benefit to FTX would be the same benefit that any of the products it offered provided the company, which would be making the exchange an attractive place for cryptocurrency traders to conduct trading activities and therefore increase revenue by virtue of having more participants on the exchange.").

realize gains if the market moved favourably after the takeover.[78]  Since Alameda was often the primary backstop liquidity provider, these profits could flow back to FTX's corporate group, further enriching the exchange and its insiders.[79]  The close integration of the BLP with FTX's risk management framework allowed the exchange to operate with thinner margins and more aggressive product offerings, maximizing fee generation and market share in the competitive crypto derivatives space.  In fact, when an account with a positive net asset value (such as 3AC's) was liquidated, the BLP and the insurance fund took the net asset value and shared it amongst themselves.[80]  So FTX (both directly and through its affiliate Alameda) would have benefitted by liquidating 3AC's account and taking its positive net asset value.

52.  In particular, when a customer's leveraged position fell below the maintenance margin and could not be fully liquidated in the open market, the BLP would activate: designated backstop liquidity providers—often Alameda Research and other FTX affiliates—would step in to assume the distressed position before the account went bankrupt.[81]  At this stage, a portion of the remaining net asset value from the liquidated account was split, with a set percentage (typically one-third) allocated to the Insurance Fund and the remainder going to the backstop liquidity provider as compensation for taking on the risk.[82]  If the backstop liquidity provider

---

[78]     *See* FTX_3AC_000044809 ("Backstop Liquidity Provider Program" explainer); FTX_3AC_000013853 ("Liquidations" explainer); FTX_3AC_000045167 ("Liquidations" explainer).

[79]     *See* Report of Robert J. Cleary, Examiner, *In re FTX Trading, Ltd., et al.*, Case No. 22-11068 [D.I. 15545] at 65 ("With respect to the FTX Group's investors, the evidence proved that Bankman-Fried and certain co-conspirators acting at his direction defrauded them by, among other means, misrepresenting Alameda's privileges on FTX.com and misleading investors about an 'insurance fund' for the FTX Group and about the FTX Group's revenue."); Second Interim Report of John J. Ray III to the Independent Directors: The Commingled and Misuse of Customer Deposits at FTX.com (June 26, 2023), *In re FTX Trading, Ltd., et al.*, Case No. 22-11068 [D.I. 1704-1].

[80]     *See* SBF Dep. at 126:12-127:2; *see also* FTX Research, *FTX Liquidation Process Flowchart* at 2 (showing 1/3 to the insurance fund and 2/3 to the BLP); FTX_3AC_000045167 at -45169 ("If the account isn't yet bankrupt, then the backstop liquidity fund gains 1/3 of the remaining value of the account.").

[81]     *See* FTX_3AC_000013853 at -13854; FTX_3AC_000045167 at -45167; Coverick Dep. (Day 2) at 119:14-21.

[82]     *See* FTX_3AC_000044809 ("Backstop Liquidity Provider Program" explainer).  This help page explains that when an account is handed to backstops at the auto-close trigger, "1/3 of [the account's remaining equity]

was able to close the position profitably, it kept the gains; if not, the Insurance Fund would cover any residual losses if the account's equity was insufficient or if the backstop liquidity provider could not absorb the full negative balance.[83]

53. Accordingly, FTX benefited from its operation of the Insurance Fund and BLP because those programs captured net asset value that could otherwise have gone to the liquidated customer. In FTX's internal accounting, the insurance/backstop fund was considered a form of revenue income for FTX.[84]  In fact, highlights of an FTX advisory board meeting in September 19, 2022 specifically state that FTX's insurance fund "made $2.5 million from liquidations," immediately after discussing the "FTX's risk and liquidation engine liquidated [3AC] to close the account at $0 exposure."[85] Consistent with this, it appears that 3AC's account was liquidated by a backstop liquidity provider taking over the account,[86] which would result in the backstop liquidity provider (which turned out to be Alameda) and FTX seizing 3AC's net account balance.[87]

54. Third, the absorption of losses also benefitted FTX by stabilizing the "crypto ecosystem". As its CEO explained, one benefit of absorbing losses is that it "would help stabilize the

---

would be paid to the backstop liquidity fund."  The example given shows the remaining equity at handoff being split so that roughly one-third goes to the fund.

[83]  *See* FTX_3AC_000043705 at -43707 ("FTX Advisory Board Meeting for Sept 19th 2022").  At the FTX advisory board meeting, FTX highlighted that "in June 2022, the insurance fund made $2.5M from liquidations."

[84]  *See, e.g.*, THREE_ARROWS_00322564 (FTX Profit and Loss, January - June 2021) (showing "Backstop fund revenue" falls under "Income").

[85]  FTX_3AC_000043705 at -43707.

[86]  *See* SBF Dep. at 197:4-18.

[87]  *See* SBF Dep. at 126:12-19; *see also* Coverick Dep. (Day 2) at 253:7-9 ("Q. Who was applicable counterparty for those transactions? A. It was Alameda Research."), 257:10-258:10; FTX Recovery Trust's Resp. and Obj. to the Joint Liquidators of Three Arrows Capital, Ltd.'s Eighth Set of Req. of Produc. of Doc., Seventh Set of Interrog., Third Set of Req. for Admis., Resp. to Doc. Req. 11.

crypto ecosystem," and FTX was a "large enough player that they had an interest in stabilizing the ecosystem".[88]

## C. Customers on the FTX Exchange Would Have Expected to Have an Interest in Individual Assets Associated with Their Accounts, Not Merely an Interest in the Net Balance of Their Account.

55.    FTX was a global cryptocurrency exchange platform where customers could open accounts, deposit fiat or digital assets, and trade a variety of digital asset products.[89]   Once their accounts were established, users could transfer assets into the exchange in two primary ways: by depositing fiat currency (such as USD, EUR, or other supported currencies) or by transferring digital assets—such as Bitcoin, Ethereum, or other cryptocurrencies—from external wallets into their FTX accounts.[90]   This process involved sending cryptocurrency from a personal wallet or another exchange to a unique deposit address generated by FTX for each user.[91]

56.    A customer reading the May 2022 TOS and other FTX materials would expect they were acquiring assets, and incurring liabilities, as such materials explicitly stated that users retained ownership of the digital assets they deposited.   For example, FTX's May 2022 TOS provided that "[t]itle to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading," and further clarified that "[n]one of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading."[92]

---

[88]    *See* SBF Dep. at 207:1-11 ("Q. And why would it be in FTX's interest to offer a bailout to a customer? A. Two reasons.  First of all, this is all potential.  Maybe it wouldn't have; right?  But potential reasons, number one, one could imagine a world in which it could have been a good investment in which, for a relatively low valuation, one could acquire a relatively large fraction of a company that was in financial distress but had a promising future; and, number two, one could imagine a world where doing so would help stabilize the crypto ecosystem.").

[89]    *See generally* FTX_3AC_0000136925 (May 2022 TOS).

[90]    *Id.*

[91]    *See* Coverick Dep. (Day 1) at 154:11-22 ("Many customers had unique deposit addresses that they would deposit cryptocurrency into when they were attempting to make a deposit onto the exchange.").

[92]    FTX_3AC_0000136925 (May 2022 TOS) at -13704, Section 8.2.6.

Confidential

57. In addition to the express contract language, FTX and its founder, Sam Bankman-Fried ("SBF"), made repeated public statements assuring customers that assets deposited on the FTX exchange remained the property of the customers and were not to be used by FTX for its own purposes.  In prepared remarks to Congress, SBF emphasized that a "key investor-protection principle is making sure there is adequate bookkeeping (and related records) to track the customer's assets, combined with appropriate disclosure and reporting," and that FTX's structure was designed to ensure customer assets were kept safe and segregated from company funds.[93]  These statements were intended to reassure customers and the public that FTX operated as a secure custodian, holding assets on behalf of users rather than taking ownership or using them for company activities.  FTX's General Counsel, Can Sun, also testified that he recalled FTX and SBF stated publicly that "all customer assets of FTX were safeguarded, segregated, protected," which are principles documented "on FTX policies website," in SBF's congressional testimony, and "described . . . in various forums with regulators [FTX was] working with around the world."[94]

58. Similarly, an internal policy document of FTX Digital Markets Ltd. ("FDM"), which was the Service Provider under the May 2022 TOS and for these asset programs,[95] expressly states that FDM was holding customer assets in trust.[96]  FDM was a wholly owned subsidiary of FTX and the main regulated and licensed entity for the FTX international platform, operating principally in The Bahamas.  FDM's role was to provide exchange services

---

[93]    *FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms*, attached as Exhibit C to "Digital Assets - Risks, Regulation, and Innovation," Hrg. before the. S. Comm. on Agric., Nutrition and Forestry, 117th Cong. (dated Feb. 9, 2022).

[94]    Direct Testimony of Can Sun, SBF Criminal Trial Tr. at 1901:10-15.

[95]    *See* FTX_3AC_0000136925 (May 2022 TOS) at -13725-34.

[96]    FTX_3AC_000044442 at -44448 (FTX Digital Markets Limited, "Safeguarding of Assets & Digital Token Management Policy") ("All third-party providers are aware that customer assets are held in trust.").

between digital assets and fiat currency, as well as between different digital assets, to non-U.S. customers of FTX.com like 3AC.[97]

59.  The operation of the FTX exchange further confirms that both FTX and customers viewed customers as having an entitlement to each separate underlying asset allocated to their account, not simply to the net balance of the account after combining the positive and negative value of the distinct assets in the account.  Several factors lead to this conclusion:

59.1  FTX tracked the various assets separately.  The FTX master ledger tracked individual asset entitlements, whether positive or negative.[98]  Said differently, FTX did not track just one net account balance but tracked each individual asset type.

59.2  On the FTX exchange interface, customers were presented with balances for each unique ticker symbol, not merely an overall net account balance.[99]  An FTX developer confirmed that an FTX user could see the various balances for different tokens on the exchange interface, and that such "information might impact or be helpful for someone trying to make certain transactions onto [the] FTX Platform."[100]  Therefore, users on the FTX Exchange would also have expected to have an interest in individual assets in their accounts.

59.3  FTX acknowledged that a customer entitlement to a particular asset entitled the customer to that asset, and to withdraw it from the exchange, not merely to the collapsed USD value of that asset after converting all assets in the account to a singular USD entitlement.[101]

---

[97]    *See* FTX_3AC_0000136925 at -13725-34.  May 2022 TOS, Schedules 2-7 identify FDM as the Service Provider for spot market, spot margin trading, OTC/Off-exchange portal (OEP portal), futures market, volatility market (options contracts), volatility market (MOVE volatility contracts).

[98]    *See* Coverick Dep. (Day 1) at 97:18-98:13, 99:14-100:15.

[99]    *See* Molina Dep. at 103:16-104:16; Coverick Dep. (Day 1) at 126:19-127:14, 238:22-241:4.

[100]    Molina Dep. at 122:16-20.

[101]    *See* Coverick Dep. (Day 1) at 86:6-87:12, 88:18-89:16, 91:18-95:2.

59.4 FTX's documents use the terms "purchasing," "buying," and "selling" specific digital assets[102] or futures contracts,[103] not in terms of increases or decreases in a net account balance.  Indeed, FTX would send trade confirmations to customers, including 3AC, which expressly state the customers "sold" or "bought" certain digital assets.[104]

59.5 FTX's alleged "unitary asset" theory is inconsistent with the existence of the Margin Program.  If customers only have a net account balance, they would have no digital assets (or USD) to lend.  But under the Margin Program, customers were "lending" asset entitlements.  In other words, customers were not lending out only a portion of a net account balance but specific asset entitlements.  In addition, FTX paid "lenders" interest, which would make no sense if the lender had nothing to lend but rather just had a net balance figure.

59.6 FTX's margin requirement further confirms that FTX treated customers as having distinct assets and liabilities.  As explained in FTX_3AC_000013862, the margin requirements for any particular asset were given a different haircut depending on the weighted average Maintenance Margin Fraction for the asset.[105]  The amount of the haircut would be driven by the unique price volatility, liquidity, and credit risk factors of each particular asset.[106]  Thus, FTX itself recognized the different

---

[102]    *See, e.g.*, FTX_3AC_0000136925 at -13704 (May 2022 TOS Section 8.2.2); FTX_3AC_000013862 (Spot Margin Trading explainer).

[103]    *See* FTX_3AC_0000136925 at -13729 (May 2022 TOS Schedule 5); FTX_3AC_000045026 (Complete Futures Specs explainer).

[104]    *See, e.g.*, 3AC-FTX-00534514 (March 20, 2020, email from FTX OTC Portal to Kyle Davies re: "Trade Confirmation for Three Arrows Capital Ltd").

[105]    *See* FTX_3AC_000013862 at -13867 ("We look at the weighted average MMF across all of your spot margin and futures positions to determine your account MMF, which would dictate the margin fraction level in which your account would get liquidated.").

[106]    *See* Jake Safane, *Haircut: What It Means in Finance, With Examples*, INVESTOPEDIA (Apr. 15, 2025), https://www.investopedia.com/terms/h/haircut.asp.

Confidential

risk profile of different assets and treated assets in individual customer accounts differently.

59.7    The existence of margin requirements at all shows that FTX viewed customers as having distinct assets and liabilities.  If instead a customer just had a net account balance—which was positive—there was no reason for margin calls, or liquidations, or other protections.  Instead, when an account reached $0, FTX could just close the account.  The fact that instead FTX created extensive processes and protections show it was not an imaginary game.  FTX realizes there were real assets and liabilities with real risks.

59.8    I also understand that, consistent with the above, the CEO of FTX, Mr. Bankman-Fried, confirmed that FTX viewed customers as having entitlements to specific assets and liabilities under the Margin Program, rather than simply an entitlement to their net asset balance.[107]

60.    Further, other features of general cryptocurrency trading are inconsistent with the "unitary asset" theory FTX has suggested.   While there tends to be correlations between cryptocurrencies, each has different characteristics, and those differences will drive unique price movement and lead to differing price volatilities.  This means that over any given timeframe, these different economic factors could lead one cryptocurrency's price to diverge from another's, necessitating different strategies to manage the risk of each particular asset.  Other factors that could differentiate assets are operational and use cases.  For example, while BTC is simply a store of value and unit of exchange, "Solana helps to support the lending, borrowing and trading platforms of decentralized finance, non-fungible token marketplaces

---

[107]    *See* SBF Dep. at 160:17-22 ("Q. Just the overall USD. Is that your understanding of how it worked, that the customer was only entitled to the overall asset balance. A. That was not my understanding, but I'm not sure how you are defining entitlement."), 162:1-9 ("Q. So if someone were to take the position that the way the FTX exchange operated was that a customer has had no assets, margin lenders had no liabilities, and instead the only relationship between FTX and its customers was the net account balance, does that sound accurate to you? A. That is certainly not how I would describe it.")

as well as gaming and Web3 apps."[108]   Accordingly, a trader's behaviour on a crypto exchange is partly tailored based on the unique economic aspects of specific digital assets in their account.

61.   In addition, cryptocurrency traders commonly employ arbitrage as a trading strategy, which consists of buying one asset and selling another correlated asset or the same asset on a different platform where the objective is to buy an asset that the investor believes will increase in value relative to the correlated asset that is sold.   Arbitrage is particularly attractive where the markets traded are highly volatile, like cryptocurrency markets.   Much like the point above, arbitrage is focused on specific digital asset markets, not on one overall account value with a given exchange, and to carry it out would necessitate the tracking the performance of each specific asset, which would be impossible to do based solely on an overall account balance.

62.   Given the above reasons, FTX's "unitary asset" theory is inconsistent with how the exchange operated pre-petition, how traders would have actually behaved on and expected to own on the exchange, and what was conveyed to the users through legal contracts and the exchange user interface.

**D.   The Loans Made by 3AC's Lenders Would Have Been Called by a Reasonable Lender upon Becoming Aware of 3AC's True Financial Condition.**

63.   The primary concern of creditors is typically the risk of borrower default.   A creditor managing a loan portfolio typically has several protections against borrower default risk. These often include the right to call a loan at any time and/or the right to declare the borrower in default under a Material Adverse Event ("MAE") clause.   If a borrower is in financial distress, a responsible lender will act to protect itself against losses by relying on one of these rights or another right entitling the lender to repayment.

64.   3AC was the borrower in respect of large loans made by multiple lenders, such as FTX Trading Limited, Genesis, and BlockChain Access UK Ltd.   3AC's loans were generally

---

[108]   *See* Erik Norland, *Solana vs. Bitcoin vs. Ethereum: How Do They Compare?*, CME GROUP OPEN MARKETS (Mar. 26, 2025), https://www.cmegroup.com/openmarkets/economics/2025/Solana-vs-Bitcoin-vs-Ethereum-How-Do-They-Compare.html.

callable at any time (i.e., open loans)[109] and/or provided that, if there were an MAE event, the loan would terminate or the lender could terminate the loan and demand payment of all principal and interest due.[110]  In my experience, MAE clauses are typically broadly written and intended to permit a lender to exercise reasonable discretion with respect to determining whether a borrower no longer has the wherewithal to repay a loan (and in effect triggering the right to call the loan).  A reasonable lender would view MAE events to include the material detrimental impact of market events on the financial condition of a borrower exposed to such market events.[111]

65.    A rational lender to a borrower near or in insolvency will not rely on speculation on future market price movements when assessing the risk posed by the borrower.  For example, in this case, 3AC's condition never improved, and 3AC ultimately became insolvent, showing the risk to a lender of assuming the market will improve.

66.    I am instructed by counsel that the outstanding loans balances owed by 3AC were in fact substantial,  amounting  to  over  ███████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████    Most lenders would view a borrower with large exposure to a deteriorating market and facing large loan liabilities as grounds for calling their loans, whether on the basis that

---

[109]    3AC-FTX-00559160 at -559161 (Master Loan Agreement between 3AC and Genesis Asia Pacific PTE. LTD. dated January 24, 2020) ("'*Call Option*' means Lender has the option to demand immediate payment of a portion or the entirety of the Loan Balance at any time, subject to this Agreement.").

[110]    *See, e.g.*, 3AC-FTX-00557652 at -557662 (Master Loan Agreement between 3AC and Tesseract Group Oy dated 13 August 2020) ("It is further understood that any of the following event shall constitute an event of default hereunder, and shall be herein referred to as a 'Event of Default' or 'Events of Default' . . . any event or circumstance occurs or exists that is a material adverse effect on the business, operations, prospects, property, assets, liabilities or financial condition of, such party, taken as a whole, or a material adverse effect on the ability of Borrower to perform its obligations under the Loan Documents, including but not limited to the ability to return, transfer, repay, or pay any and all Loaned Assets, Loan Fees, and Late Fees.").

[111]    *See, e.g.*, FTX_3AC_000000075 at -77 (Loan and Security Agreement between 3AC and FTX Trading Limited dated 22 October, 2021) ("**Material Adverse Effect**" means a material adverse effect upon: (i) the business, operations, properties, assets, prospects or condition (financial or otherwise) of Borrower; or (ii) the ability of Borrower to perform the Secured Obligations in accordance with the terms of the Loan Documents, or the ability of Lender to enforce any of its rights or remedies with respect to the Secured Obligations; or (iii) the Collateral or Lender's Liens on the Collateral or the priority of such Liens.")

Confidential

such loans were open loans, or on the basis of an MAE, especially if such deterioration has led to the borrower's severe distress.

67.  A lender is particularly likely to call a loan, especially if it is an "open loan" callable at any time, if it learns of material misrepresentations made by the borrower to such lender.  In this case, I have been instructed that, ████████████████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

68.  Upon determining that a borrower is insolvent or in significant distress, or had materially misrepresented its financial condition as 3AC had, a lender will consider its options by assessing some combination of the following general factors: 1) loan size; 2) amount of loan

████████████████████████████████

Confidential

collateral; 3) borrower credit risk; 4) macroeconomic circumstances; 5) legal risk; and 6) any other relevant circumstances. The assessment should be as objective as possible and driven by the lender's risk and legal teams (and not the business).

69. The facts at hand were as follows:

69.1. 3AC materially misrepresented its true financial condition to its lenders, as discussed above;

69.2. 3AC's total borrowed amounts were in excess of $7.4 billion as of June 12, 2022 (as I am instructed by counsel);

69.3. The borrower was an investment fund with substantial investments in markets that were trending downward. Among other things, shortly before May 9, 2022, the LUNA token market collapsed and it was public knowledge that 3AC was an important investor and supporter of the token;

69.4. The value of BTC had fallen by 35%, GBTC by 39%, and ETHE by 39% since the beginning of 2022, and 3AC had substantial exposure to these assets as I am instructed;

69.5. The lenders themselves all had broad exposure to the marketplace in the form of collateral and were likely also under great stress; and

69.6. The value of the digital asset collateral the lenders held was fast diminishing.

70. Under such circumstances, failure to act quickly could have proven fatal to any chance to recover from 3AC if it were subsequently declared bankrupt.

71. Given these facts, it is my opinion that a responsible lender to 3AC in June 2022 would have, upon learning 3AC's true financial condition, either: 1) immediately called the loan if the loan contained a lender call option and/or 2) exercised its right to terminate the loan on the basis that there had been an MAE.

*I am being compensated for my work on this matter as follows: $900 per hour for my time. This compensation in no way influenced the results of my analysis.*

**Confidential**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.


Dated:    10/31/2025

In:        Chicago, IL

*Matthew Lisle*

Matthew W Lisle

## Index of Documents Considered

3AC-FTX-00501105 (The Luna Foundation Guard - OTC Token Sale Agreement dated January 21, 2022)

3AC-FTX-00534514 (March 20, 2020 email from FTX OTC Portal to Kyle Davies re: "Trade Confirmation for Three Arrows Capital Ltd").

3AC-FTX-00557652 (Master Loan Agreement between Tesseract Group Oy and Three Arrows Capital Ltd., dated August 13, 2020)

3AC-FTX-00557685 (Loan Term Sheet dated 5/24/2022 for 450 ETH at 5% APR)

3AC-FTX-00559028 (Master Loan Agreement between 3AC and Genesis Global Capital, LLC, dated January 10, 2019)

3AC-FTX-00559049 (Master Loan Agreement between 3AC and Lunex Ventures LP, dated April 1, 2019)

3AC-FTX-00559068 (Digital Asset Lending Agreement between 3AC and Celsius Network Ltd. dated May 25, 2019)

3AC-FTX-00559160 (Master Loan Agreement between 3AC and Genesis Asia Pacific PTE. LTD. dated January 24, 2020)

3AC-FTX-00562842 (3AC transaction history)

Amended Proof of Claim [No. 100078]

D.I. 1242 – First Interim Report re Control Failures

Debtors' Resp. and Obj. to the Joint Liquidators of Three Arrows Capital, Ltd.'s Fourth Set of Interrog., Resp. to Interrog. No. 2 (dated Dec. 2, 2024)

Debtors' Resp. and Obj. to the Joint Liquidators of Three Arrows Capital, Ltd.'s Seventh Set of Req. of Produc. of Doc., Sixth Set of Interrog., and Second Set of Req. for Admis., Resp. to Interrog. No. 3 (dated Aug. 15, 2025)

Declaration of Stephen Nicholas Atherton K.C. In Support of the FTX Recovery Trust's Objection to the Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital, *In re FTX Trading Ltd.*, No. 22-11068 [D.I. 30935]

Declaration of Steven P. Coverick in support of the FTX Recovery Trust's Objection to the Amended Proof of Claim filed by Joint Liquidators of Three Arrows Capital, In re FTX Trading, Ltd., et al., Case No. 22-11068 [D.I. 20934]

Declaration of Steven P. Coverick In Support of the FTX Recovery Trust's Objection to the Amended Proof of Claim Filed by Joint Liquidators of Three Arrows Capital, *In re FTX Trading Ltd.*, No. 22-11068 [D.I. 30934]

Deposition of Nils Molina Transcript (Sept. 30, 2025)

Deposition of Sam Bankman-Fried Transcript (Oct. 16, 2025)

Deposition of Steven Coverick Transcript (Sept. 24, 2025)

Deposition of Steven Coverick Transcript (Sept. 25, 2025)

Direct Testimony of Can Sun, Sam Bankman-Fried Criminal Trial Transcript (2023.10.19)

Direct Testimony of Gary Wang, Sam Bankman-Fried Criminal Trial Transcript (2023.10.16)

Direct Testimony of Nishad Singh, Sam Bankman-Fried Criminal Trial Transcript (2023.10.16)

Direct Testimony of Sam Bankman-Fried, Sam Bankman-Fried Criminal Trial Transcript (2023.10.27)

Expert Report of Gregory E. Scheig

First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges, *In re FTX Trading Ltd.*, No. 22-11068 [D.I. 1242-1]

FTX Recovery Trust's Resp. and Obj. to the Joint Liquidators of Three Arrows Capital, Ltd.'s Eighth Set of Req. of Produc. of Doc., Seventh Set of Interrog., Third Set of Req. for Admis., Resp. to Doc. Req. 11

FTX Research, *Liquidation Process Flowchart*

FTX Research, *Our Liquidation Engine – how we significantly reduced the likelihood of clawbacks from ever occurring*

FTX.official Twitter post (Feb. 14, 2021) (stating "The 5.25 million FTT we put in our insurance fund in 2019 now makes the fund worth over 100 million USD")

FTX_3AC_000000038_amended

FTX_3AC_000000075 (Loan and Security Agreement between 3AC and FTX Trading Limited dated 22 October, 2021)

FTX_3AC_000000758 (March 2022 FTX Line of Credit & FTX Institutional Customer Margin and Line of Credit Agreement)

FTX_3AC_000013689 ("Line of Credit on FTX" explainer)

FTX_3AC_0000136925 (May 2022 Terms of Service)

FTX_3AC_000013844 ("Collateral Management" explainer)

FTX_3AC_000013853 ("Liquidations" explainer)

FTX_3AC_000013862 (Spot Margin Trading explainer)

FTX_3AC_000013912 (Collateral Requirements Illustrative)

FTX_3AC_000043705 ("FTX Advisory Board Meeting for Sept 19th 2022")

FTX_3AC_000043705 ("FTX Advisory Board Meeting" dated Sept. 19, 2022)

FTX_3AC_000043756 ("DDQ Business FAQ-fund raise")

FTX_3AC_000043756 (DDQ Business FAQ - fund raise - Comprehensive FAQ)

FTX_3AC_000044442 (FTX Digital Markets Limited, "Safeguarding of Assets & Digital Token Management Policy")

FTX_3AC_000044451 ("Trading Fees" explainer)

FTX_3AC_000044454 ("Complete Futures Specs")

FTX_3AC_000044464 ("Negative Balances on FTX" explainer)

FTX_3AC_000044486 ("Backstop Liquidity Provider Program" explainer)

FTX_3AC_000044488 ("Account Margin Management" explainer)

FTX_3AC_000044809 ("Backstop Liquidity Provider Program" explainer)

FTX_3AC_000045026 ("Complete Futures Specs" explainer, dated April 11, 2022)

FTX_3AC_000045167 ("Liquidations" explainer, dated April 4, 2022)

FTX_3AC_000045694 ("Spot Margin Trading" explainer)

FTX_3AC_000045983 ("Fees" explainer)

FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms, attached as Exhibit C to "Digital Assets - Risks, Regulation, and Innovation", Hearing before the. S. Comm. on Agric., Nutrition and Forestry, 117th Cong. (dated Feb. 9, 2022)

Objection of the FTX Recovery Trust to the Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd., *In re FTX Trading Ltd.*, No. 22-11068 [D.I. 30932]

Report of Robert J. Cleary, Examiner, In re FTX Trading, Ltd., et al., Case No. 22-11068 [D.I. 15545]

Second Declaration of The Ret. Hon. Lord Neuberger of Abbotsbury, *In re FTX Trading Ltd.*, No. 22-11068 [D.I. 30933]

Second Interim Report of John J. Ray III to the Independent Directors: The Commingled and Misuse of Customer Deposits at FTX.com (June 26, 2023), [D.I. 1704-1]

THREE_ARROWS_00322548 at -322549 (FTX Trading Ltd. Balance Sheet as of March 31, 2021) (showing "backstop fund expense" under "Trading Expenses");

THREE_ARROWS_00322562 (FTX group chat "private-ftx-accounting", dated Nov. 2, 2021)

THREE_ARROWS_00322563 (FTX Trading, Ltd Trial Balance, as of June 30, 2021)

THREE_ARROWS_00322564 (FTX Profit and Loss, January - June 2021)

THREE_ARROWS_00322564 (FTX Trading Ltd. (Profit and Loss, January – June 2021)

THREE_ARROWS_00322605 ("private-ftx-accounting" chat, dated Feb. 4, 2022)

THREE_ARROWS_00322607 (excel spreadsheet named "V1 Management Accounts - FTX Trading (2.4.22) (Internal Review)")

Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief at page 4, *In re Three Arrows Capital, Ltd*, No. 22-10920 [ECF No. 2] (Bankr. S.D.N.Y. July 1, 2022)

## Index of Websites Referenced

About Terra – Screen captures from Terra's website, https://coinmarketcap.com/currencies/terra-luna-v2/#About.

Akhilesh Ganti, "The Collar Options Strategy Explained in Simple Terms" INVESTOPEDIA (May 21, 2025), https://www.investopedia.com/terms/c/collar.asp

Alexander Osipovich & Elaine Yu, "Crypto Hedge Fund Three Arrows Capital Considers Asset Sales, Bailout," WALL ST. J. (June 16, 2022), https://www.wsj.com/finance/currencies/battered-crypto-hedge-fund-three-arrows-capital-considers-asset-sales-bailout-11655469932

Andrew Chow, "The Real Reasons Behind the Crypto Crash, and What We Can Learn from Terra's Fall" dated May 17, 2022, https://time.com/6177567/terra-ust-crash-crypto

COINMARKETCAP, https://coinmarketcap.com

COINMARKETCAP, https://coinmarketcap.com/currencies/cardano/

David Chau, "'Evil genius' may have caused Terra and LUNA cryptocurrencies to crash in a 'death spiral," dated May 12, 2022, ABC NEWS, https://www.abc.net.au/news/2022-05-13/bitcoin-crypto-terra-ust-luna-stablecoin-evil-genius-plot/101062388

Decoding GBTC: A Deep Dive into Fair Market Value, NAV, and the Discount's Demise, Market Clutch, https://marketclutch.com/decoding-gbtc-a-deep-dive-into-fair-market-value-nav-and-the-discounts-demise/

Erik Norland, "Solana vs. Bitcoin vs. Ethereum: How Do They Compare?" dated March 26, 2025, https://www.cmegroup.com/openmarkets/economics/2025/Solana-vs-Bitcoin-vs-Ethereum-How-Do-They-Compare.html

GBTC vs. BTC-USD (dated October 21, 2025), PORTFOLIOSLAB, https://portfolioslab.com/tools/stock-comparison/GBTC/BTC-USD

Gordon Scott, "Understanding Naked Options: Risks and Strategies for Calls and Puts" dated September 17, 2025, Investopedia, https://www.investopedia.com/terms/n/nakedoption.asp

Jake Safane, "Haircut: What It Means in Finance, With Examples" dated April 15, 2025, https://www.investopedia.com/terms/h/haircut.asp

Kent Thune, "Is the GBTC Discount to NAV a Good Arbitrage Opportunity?" dated November 13, 2023, ETF.com, https://www.etf.com/sections/news/gbtc-discount-nav-good-arbitrage-opportunity

Melissa Horton, "Exchange-Traded Funds (ETFs) vs. Closed-End Funds: What's the Difference?" dated January 29, 2024, https://www.investopedia.com/ask/answers/052615/what-difference-between-exchange-traded-funds-etfs-and-closed-end-funds.asp.

Price Chart "Grayscale Investments BTC Premium," https://www.coinglass.com/Grayscale.

Robert Stevens, "BlockFi's Rise and Fall: A Timeline" dated November 30, 2022, COINDESK, https://www.coindesk.com/learn/blockfis-rise-and-fall-a-timeline

S. Vishwa, "What is Crypto Arbitrage and How to Start Arbitrage Trading?" dated TOKEN METRICS, https://www.tokenmetrics.com/blog/crypto-arbitrage

Samuel Wan, "Trouble at Celsius Network? Users report difficulties withdrawing funds" dated June 21, 2022 (updated), https://cryptoslate.com/trouble-at-celsius-network-users-report-difficulties-withdrawing-funds/