# **<u>Exhibit 1</u>**

## FTX TERMS OF SERVICE

Date: May 13, 2022

The following terms and conditions of service, together with any other documents expressly incorporated herein, (collectively, the **"Terms"**) constitute an agreement between you (**"you"**, **"your"** or **"User"**) and FTX Trading Ltd, a company incorporated and registered in Antigua and Barbuda (company number 17180) (**"FTX Trading"**, **"we"**, **"our"** or **"us"**), or a Service Provider in respect of a Specified Service, and apply to your use of:

(A)     the Exchange and any Specified Service that may be offered to you by a Service Provider (collectively, the **"Platform"**), as a User to buy, sell, exchange, hold, stake, lend, borrow, send, receive or otherwise transact in (together, **"transact in"**) or list Digital Assets;

(B)     the FTX Application Programming Interface (**"API"**); and

(C)     any other services offered through the FTX website (ftx.com) (the **"Site"**) or any Mobile Application,

(together, the **"Services"**).

By registering for a Platform account (**"Account"**) or using the Services, you agree that you have read, understand and accept the Terms, including our Privacy Policy, Security Policy and Fee Schedule, and you acknowledge and agree that you will be bound by and comply with the Terms. Do not proceed with registering for an Account, or using the Services, if you do not understand and accept the Terms in their entirety.

Section 21 (*Right to change, suspend or discontinue Services*) and Section 22 (*Updates to Terms*) set out the terms on which we may, from time to time, change, suspend, or discontinue any aspect of the Services and amend any part of the Terms.

Our Services are not offered to Restricted Persons (as defined in Section 3.3.1(A) below) or persons who have their registered office or place of residence in the United States of America or any Restricted Territory (as defined in Section 3.3.1(A) below).

FTX Trading's relationship with you under the Terms is as a trading platform provider only. FTX Trading does not act as principal or counterparty with respect to trades entered into on the Platform. Notwithstanding the foregoing:

(A)     FTX Trading may act as a counterparty for limited trades made for the purpose of liquidating fees collected on User trades; and

(B)     Affiliates of FTX Trading may execute trades on the Platform provided, however, that such Affiliates shall not be afforded any priority in trade execution.

Save in certain limited circumstances set out in Section 38.13 (*Exception to arbitration*), Section 38.12 (*Arbitration*) requires all Disputes to be resolved by way of legally binding arbitration on an individual basis only and not as a claimant or class member in a purported class or representative action. There is no judge or jury in arbitration and court review of an arbitration award is limited.

The laws of some jurisdictions may limit or not permit certain provisions of the Terms, such as arbitration, indemnification, the exclusion of certain warranties or the limitation of certain liabilities. In such a case, such provisions will apply only to the maximum extent permitted by the laws of such jurisdictions.

In the Terms, unless the context otherwise requires, the definitions and rules of interpretation set out in Schedule 1 shall apply.

1.      **STRUCTURE OF TERMS**

1.1     The Terms comprise:

        1.1.1     the general terms and conditions set out above, in Sections 1 (*Structure of Terms*) to 38 (*General*), and in Schedule 1 (*Definitions and Interpretation*), which



EXHIBIT ___15___
WIT: Coverick
DATE: 9·24·25
Marie Foley, RMR, CRR

1

apply generally to you, your registration and use of an Account, and your use of the Services (**"General Terms"**);

1.1.2 the policies, schedules and other documents of FTX Trading and its Affiliates incorporated by reference into the Terms, including our Privacy Policy, Security Policy and Fee Schedule (**"FTX Policies"**); and

1.1.3 the terms and conditions set out in each Service Schedule, which shall also apply to the Specified Service referred to therein.

1.2 To the extent there is any conflict or inconsistency between the modules of the Terms, such conflict or inconsistency shall be resolved in the following order of precedence, unless a term or condition set out in a document of lower precedence is expressly identified as taking precedence over a document of higher precedence: General Terms, Service Schedules, Fee Schedule, Privacy Policy, Security Policy and other FTX Policies.

1.3 **IMPORTANT:** You acknowledge and agree that any Specified Service referred to in a Service Schedule shall be provided to you by the Service Provider specified in that Service Schedule. In such case, the Specified Service shall be provided to you on and subject to the Terms, with references in these General Terms to "FTX Trading" (or "we", "our" or "us") being read as references to the Service Provider specified in the Service Schedule, unless the context provides otherwise, and under no circumstances shall any other person, including any Affiliate of the Service Provider, be liable to you for the performance of any of the Service Provider's obligations under the Terms.

2. **RISK DISCLOSURES**

Before beginning to use the Services, you should ensure you have read and understand (and you represent and warrant that you have read and understand) the following risk disclosures and the risk disclosures set out in the Service Schedules. You should note that this is not an exhaustive list of all of the risks associated with Digital Assets and the Services.

2.1 **No advice and no reliance**

2.1.1 FTX Trading does not advise on the merits of any particular transaction, trading risks, or tax consequences, and FTX Trading does not provide any other financial, investment, taxation or legal advice in connection with the Services. To the extent that we or our representatives provide market commentary, or any other information, the act of doing so is incidental to your relationship with us and such information should not be construed as investment or financial advice. Any decision by you to use the Services and transact in Digital Assets is your own independent decision. You represent that you are not relying on any communication (written or oral) by us as investment advice or as a recommendation to use the Services and transact in Digital Assets. FTX Trading will not be liable for any loss suffered by you or any third party.

2.1.2 You accept the risk of trading Digital Assets. In entering into any transaction on the Platform, you represent that you have been, are, and will be solely responsible for making your own independent appraisal and investigations into the risks of such transaction and the underlying Digital Asset. You represent that you have sufficient knowledge, market sophistication, professional advice and experience to make your own evaluation of the merits and risks of any transaction entered into on the Platform or any underlying Digital Asset.

2.1.3 FTX Trading is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using the Services.

2.2 **Digital Asset transfers and volatility**

2.2.1 Trading in Digital Assets can be extremely risky and volatile. Digital Assets may have unique features that make them more or less likely to fluctuate in value.

2

FTX_3AC_000013696

Factors beyond FTX Trading's control, such as regulatory activity or unexplainable price volatility, may affect market liquidity for a particular Digital Asset. Blockchain networks may go offline as a result of bugs, Forks (as defined in Section 17 below), or other unforeseeable reasons. As a general matter, you should not engage in active trading on the Platform if you have limited trading experience or low risk tolerance. Speculating on the value of Digital Assets is high risk and you should never trade more than you can afford to lose.

2.2.2    Understanding Digital Assets requires advanced technical knowledge. Digital Assets are often described in exceedingly technical language that requires a comprehensive understanding of applied cryptography and computer code in order to appreciate the inherent risks. The listing of a Digital Asset on the Platform does not indicate FTX Trading's approval or disapproval of the underlying technology of any Digital Asset and should not be used as a substitute for your own understanding of the risks specific to each Digital Asset. We provide no warranty as to the suitability of the Digital Assets traded under the Terms and assume no fiduciary duty to you in connection with such use of the Services.

2.2.3    You accept all consequences of sending Digital Assets to an address off the Platform. Digital Asset transactions may not be reversible. Once you send Digital Assets to an address, you accept the risk that you may lose access to your Digital Assets indefinitely. For example, an address may have been entered incorrectly and the true owner of the address may never be discovered, or an address may belong to a person that will not return your Digital Assets or may return your Digital Assets but first require action on your part, such as verification of your identity or compensation.

2.3    **Supply and value of Digital Assets**

2.3.1    The value of Digital Assets may be derived from the continued willingness of market participants to exchange Digital Assets for fiat currency and other Digital Assets, which may result in the permanent and total loss of value of a particular Digital Asset should the market for that Digital Asset disappear.

2.3.2    You acknowledge and agree that Digital Assets and/or Services (in whole or in part) available in one jurisdiction may not be available for trading, use or access, as applicable, in another.

2.4    **Margin trading**

2.4.1    Margin trading is HIGH RISK. As a borrower, you may sustain a total loss of Digital Assets, fiat currency and E-Money (as defined in Section 8.3.2 below (collectively, **"Assets"**) in your Account, or owe Assets beyond what you have deposited in your Account. When you lend Assets to other Users, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt.

2.5    **Complex products**

2.5.1    Trading of complex products, including but not limited to Futures Contracts, Options Contracts, and MOVE Volatility Contracts (each as defined in the Service Schedules) (collectively, **"Complex Products"**), may not be suitable for all Users. Complex Product trading is designed to be utilised only by sophisticated Users, such as active traders employing dynamic strategies. You should use extreme caution when trading Complex Products and only trade them if you understand how they work, including but not limited to the risks associated with margin trading, the use of leverage, the risk of shorting, and the effect of compounding and market volatility risks on leveraged products.

2.5.2    Complex Product trading entails significant risk, and you may feel the effects of losses immediately. Complex Product trading requires initial posting of collateral to meet initial margin requirements. If movements in the markets for a Complex

3

Product or the underlying Digital Asset decrease the value of your position in such Complex Product, you may be required to have or make additional collateral available as margin to ensure that maintenance margin requirements are met. If your Account is under the minimum margin requirements, your position may be liquidated at a loss, and you may lose all of your Assets in your Account. If there are any additional deficits in your Account, you will also be liable for all such deficits.

2.5.3 USERS WHO DO NOT UNDERSTAND LEVERAGE OR MARGIN TRADING, OR DO NOT INTEND TO ACTIVELY MANAGE THEIR PORTFOLIO, SHOULD NOT ENGAGE IN COMPLEX PRODUCT TRADING.

2.5.4 FTX TRADING AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR USE OF ANY COMPLEX PRODUCT TRADING SERVICES OFFERED ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH COMPLEX PRODUCT TRADING.

## 2.6 Blacklisted addresses and forfeited Assets

2.6.1 FTX Trading reserves the right to "blacklist" certain addresses and freeze associated Assets (temporarily or permanently) that it determines, in its sole discretion, are associated with illegal activity or activity that otherwise violates the Terms (**"Blacklisted Addresses"**). In the event that you send Assets to a Blacklisted Address or receive Assets from a Blacklisted Address, FTX Trading may freeze such Assets and take steps to terminate your Account.

2.6.2 In certain circumstances, FTX Trading may deem it necessary to report such suspected illegal activity to applicable law enforcement agencies and other Regulatory Authorities, and you may forfeit any rights associated with your Assets, including the ability to redeem or exchange your Digital Assets for other Digital Assets or fiat currency. FTX Trading may also freeze Assets held in your Account in the event that we receive a related order or request from a legal or Regulatory Authority.

## 2.7 Software protocols and operational challenges

2.7.1 The software protocols that underlie Digital Assets are typically open source projects or are otherwise operated by third parties, which means that: (i) the operations, functionalities, development and control of such Digital Assets and their underlying networks are outside of FTX Trading's control; and (ii) such software protocols are subject to sudden and dramatic changes that might have a significant impact on the availability, usability or value of a given Digital Asset.

2.7.2 You are aware of and accept the risk of operational challenges that may impact the Services. The Platform may experience sophisticated cyber-attacks, unexpected surges in activity or other operational or technical difficulties that may cause interruptions to the Services. You understand that the Services may experience operational issues that lead to delays. You agree to accept the risk of transaction failure resulting from unanticipated or heightened technical difficulties, including those resulting from sophisticated attacks. You agree not to hold FTX Trading liable for any related losses.

2.7.3 You understand that the technology underlying Digital Assets is subject to change at any time, and such changes may affect your Digital Assets stored on the Platform. You are fully responsible for monitoring such technological changes and understanding their consequences for your Digital Assets.

2.7.4 Users conduct all trading on their own account and FTX Trading does not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks associated with Digital Assets use generally or your use of our Services.

4

2.7.5   Digital Assets depend on the availability and reliability of power, connectivity, and hardware. Interruption or failure of any of these things may disrupt the networks on which the Digital Assets rely or your ability to access or transact in Digital Assets.

## 2.8   Compliance

You are responsible for complying with all Applicable Laws. You agree that FTX Trading is not responsible for determining whether or which laws and regulations may apply to your transactions, including but not limited to tax laws and regulations. You are solely responsible for reporting and paying any taxes arising from your use of the Services.

## 2.9   Legislative and regulatory changes

Legislative and regulatory changes or actions at the domestic or international level may adversely affect the use, transfer, ability to transact in, and value of Digital Assets, or your access to, and our ability to provide, the Services. You acknowledge and accept the risks that such changes may bring and that FTX Trading is not liable for any adverse impact that that you may suffer as a result.

## 2.10   No deposit protection

Neither Digital Assets nor any fiat currency or E-Money held in your Account is eligible for any public or private deposit insurance protection.

## 2.11   Digital Asset Distributions not supported

Certain Digital Assets are built on protocols that support Digital Asset Distributions (as defined in Section 17.4 below), including, but not limited to, Forks (as defined in Section 17.1 below), Staking Rewards (as defined in Section 17.4 below) and Airdrops (as defined in Section 17.4 below). FTX Trading is not obligated to support any such Digital Asset Distributions for Users. If you hold these Digital Assets in your Account, you thereby forfeit the ability to claim any Digital Asset Distributions from FTX Trading. If you hold Digital Assets with proof-of-stake or delegated proof-of-stake consensus algorithms, FTX Trading may in its sole discretion stake these Digital Assets without any obligation to distribute Staking Rewards to you. Staking may subject your Digital Assets to additional risks and FTX Trading is not liable for losses you may incur related to staking.

## 2.12   Reliance on third parties

Your use of the Services and the value of certain Digital Assets may rely on the acts of third parties or the fulfilment of related obligations by third parties. FTX Trading is not responsible for the acts or omissions of such third parties.

## 3.   APPLICABLE LAWS AND REGULATIONS

## 3.1   Compliance with Applicable Laws

3.1.1   You agree and understand that by opening an Account and using the Services in any capacity, you shall act in compliance with all Applicable Laws. Failure to do so may result in the suspension of your ability to use the Services or the closure of your Account.

3.1.2   Without limitation to the above, your access to and use of your Account and the Services, and the receipt of any fee discounts and rebates, is subject to your continued compliance with all Applicable Laws, including the rules and directions of any applicable Regulatory Authority and, without limitation, all applicable tax, anti-money laundering (**"AML"**) and counter-terrorist financing (**"CTF"**) laws and regulations.

5

3.2 **AML and CTF procedures**

Our AML and CTF procedures are guided by all applicable rules and regulations regarding AML and CTF. These standards are designed to prevent the use of the Platform for money laundering or terrorist financing activities. We take compliance very seriously and it is our policy to take the necessary steps that we believe appropriate to prohibit fraudulent transactions, report suspicious activities, and actively engage in the prevention of money laundering and terrorist financing, any related acts that facilitate money laundering, terrorist financing or any other financial crimes.

3.3 **Export controls**

3.3.1 The Services are subject to all applicable export control restrictions and, by using the Services, you represent that your actions are not in violation of such export control restrictions. Without limiting the foregoing, you may not use the Services if:

(A) you are in a prohibited jurisdiction as set forth at Location Restrictions (**"Restricted Territories"**);

(B) you are a member of any sanctions list or equivalent maintained by the United States government, the United Kingdom government, the European Union, the Singapore government, or The Bahamas government (**"Restricted Persons"**);

(C) you intend to transact with any Restricted Territories or Restricted Persons;

(D) you are located, incorporated or otherwise established in, or a citizen or resident of a jurisdiction where it would be illegal under Applicable Law for you (by reason of your nationality, domicile, citizenship, residence or otherwise) to access or use the Services; or

(E) the publication or availability of the Services in the jurisdiction in which you are based is prohibited or contrary to local law or regulation or could subject FTX Trading to any local registration or licensing requirements.

3.3.2 We may, in our sole discretion, implement controls to restrict access to and use of the Services in any of the Restricted Territories or in any of the circumstances referred to in Section 3.3.1 above. If we determine that you are accessing or using the Services from any Restricted Territory, or any of the circumstances referred to in Section 3.3.1 above apply, we may suspend your ability to use the Services or close your Account at our discretion.

4. **ELIGIBILITY**

4.1 In order to be eligible to open an Account or use the Services (and to enter into the Terms), you must meet (and you represent and warrant that you do meet), the following eligibility criteria:

4.1.1 If you are an individual, you must be at least 18 years of age, have the capacity to accept the Terms, and not have been previously suspended or removed from access to the Services or any other service or product offered by FTX Trading or any of its Affiliates, and are otherwise eligible to use the Services under Applicable Law.

4.1.2 If you are registering to use the Services on behalf of a legal entity, then:

(A) you must be duly authorised by such legal entity to act on its behalf for the purpose of entering into the Terms;

(B) the legal entity must be duly organised and validly existing under the laws of the jurisdiction of its organisation; and

(C) the legal entity must not have been (and each of its Affiliates must not have been) previously suspended or removed from access to the

6

FTX_3AC_000013700

Services or any other service or product offered by FTX Trading or any of its Affiliates and must be otherwise eligible to use the Services under Applicable Law.

4.1.3   You have not: violated; been fined, debarred, sanctioned, the subject of economic sanctions-related restrictions, or otherwise penalised under; received any oral or written notice from any government concerning actual or possible violation by you under; or received any other report that you are the subject or target of sanctions, restrictions, penalties, or enforcement action or investigation under, any Applicable Law (including but not limited to AML, CTF, anti-corruption, or economic sanctions laws).

4.1.4   You do not have your registered office or place of residence in the United States of America or any Restricted Territory.

4.1.5   You are not a Restricted Person nor are you a resident of a Restricted Territory; and

4.1.6   You will not be using the Services for any illegal activity including, but not limited to, those Restricted Activities listed in Section 13 below.

4.2   If we determine that you do not fulfil any of the above criteria, then we may suspend your ability to use the Services or close your Account at our discretion.

5.   **REGISTRATION PROCESS; IDENTITY VERIFICATION**

5.1   When registering your Account, you must provide complete, accurate, up-to-date and not misleading information for all required elements on the registration page, including your full legal name. You also agree to provide us, when registering an Account and on an ongoing basis, with any additional information we request for the purposes of identity verification and the detection of money laundering, terrorist financing, fraud, or any other financial crime, including without limitation a copy of your government issued photo ID or evidence of residency such as a lease or utility bill. You permit us to keep a record of such information and authorise us to make any enquiries, directly or through third parties that we consider necessary to verify your identity or protect you and/or us against fraud or other financial crime, and to take any action we reasonably deem necessary based on the results of such inquiries. When we carry out these enquiries, you acknowledge and agree that your personal information may be disclosed to credit reference and fraud prevention or financial crime agencies and that these agencies may respond to our inquiries in full.

5.2   In certain circumstances, we may require you to submit additional information about yourself, your business, your source of wealth, or your transactions, provide records, and complete other verification steps (such process, **"Enhanced Due Diligence"**).

5.3   You represent and warrant that any and all information provided to us in connection with registering your Account, using the Services, pursuant to the Terms or otherwise is complete, accurate, up-to-date and not misleading in any respect. If any such information changes, it is your obligation to update such information as soon as possible and provide such updates to us.

5.4   Your access to the Services and the limits that apply to your use of the Services may be altered as a result of information collected about you on an ongoing basis.

5.5   If any (or we suspect that any) of the information that you have provided to us is not complete, accurate, up-to-date or misleading in any respect, or you fail to provide updates to any information that you have provided to us to ensure that it is complete, accurate, up-to-date and not misleading in any respect on a timely basis, we may suspend your ability to use the Services or close your Account at our discretion.

5.6   We reserve the right to maintain your Account registration information after you close your Account for business and regulatory compliance purposes, subject to Applicable Laws.

7

6.     **YOUR ACCOUNT; SECURITY OF USER INFORMATION**

6.1    You may access your Account (and the Services) directly via the Site, via a Mobile Application or by such other mode of access (including but not limited to through the APIs) as FTX Trading may prescribe from time to time, using the account names, User IDs, passwords, and other security features (**"User Credentials and Security Passwords"**) made available to you by FTX Trading for the purposes of enabling you to access your Account (and the Services). You are responsible for maintaining the confidentiality and security of any and all User Credentials and Security Passwords, which includes the enabling of all relevant security features. You are responsible for keeping your email address up to date in your Account profile.

6.2    You are only permitted to access your Account using your own User Credentials and Security Passwords. You must ensure that your Account is not used by any other third party and you must not share your User Credentials and Security Passwords with any third party. You are solely responsible for all activity on your Account.

6.3    You agree to notify FTX Trading immediately if you become aware of any breach of security, loss, theft or unauthorised use of your User Credentials and Security Passwords, or unauthorised use of the Services via your Account, or any other breach of security regarding the Services. FTX Trading will not be liable for any loss or damage arising from your failure to protect your Account or your User information. It is important that you regularly check your Account balance and your transaction history to ensure any unauthorised transactions or incorrect transactions are identified and notified to us at the earliest possible opportunity.

6.4    FTX Trading reserves the right to suspend your ability to use the Services or close your Account if we suspect that the person logged into your Account is not you or we become aware of or suspect that there has been any breach of security, loss, theft or unauthorised use of your User Credentials and Security Passwords.

6.5    In order to access your Account (and the Services) you must have the necessary equipment (such as a computer or smartphone) and access to the Internet. You are solely responsible for your own hardware used to access the Services and are solely liable for the integrity and proper storage of any data associated with the Services that is stored on your own hardware. You are responsible for taking appropriate action to protect your hardware and data from viruses and malicious software, and any inappropriate material. Except as provided by Applicable Law, you are solely responsible for backing up and maintaining duplicate copies of any information you store or transfer through our Services. Neither FTX Trading nor any other Indemnified Party shall be liable to you: (i) in the event that your hardware fails, is damaged or destroyed or any records or data stored on your hardware are corrupted or lost for any reason; (ii) for any damage or interruptions caused by any computer viruses, spyware, or other malware that may affect your computer or other equipment, or any phishing, spoofing, or other attack; or (iii) for your use of the Internet to connect to the Services or any technical problems, system failures, malfunctions, communication line failures, high internet traffic or demand, related issues, security breaches or any similar technical problems or defects experienced.

7.     **ORDER BOOK AND CONVERT**

7.1    FTX Trading operates Order Books on which Orders may be placed by Users to be matched with the Orders of other Users. The Order types that FTX Trading may offer from time to time in its sole discretion include but are not limited to "market" ,"limit", "stop-loss limit", "stop-loss market", "trailing stop" and "take profit limit" orders. FTX Trading may issue trading rules from time to time that apply to Orders placed on the Order Book, in addition to these General Terms.

7.2    The Convert function on the Platform also allows you to submit instructions (**"Convert Instructions"**) to exchange (buy or sell) one spot Asset for another. Each Convert transaction is subject to the applicable Exchange Rate quoted for the given transaction and the applicable time limts for such quote. The **"Exchange Rate"** means the price of a given Digital Asset as quoted on your "Wallet" page on the Site or any Mobile Application. The

8

Exchange Rate is stated either as a "Buy Price" or as a "Sell Price", which is the price at which you may buy or sell the Asset, respectively.

7.3    The Exchange Rate quoted will depend on market conditions, and you are under no obligation to execute a Convert transaction at any Exchange Rate quoted to you. You acknowledge that the Buy Price Exchange Rate may not be the same as the Sell Price Exchange Rate at any given time, and that there may be a 'spread' to the quoted Exchange Rate. You agree to accept the Exchange Rate when you authorise a Convert transaction.

7.4    We do not guarantee the availability of any Exchange Rate and we do not guarantee that you will be able to buy and/or sell your Assets using Convert or on the Order Book at any particular price or time.

7.5    You are solely responsible for accurately entering any Order or Convert Instruction, including but not limited to all the necessary information in order to enable us to carry out any Order or Convert Instruction. FTX Trading is not obliged to verify the accuracy or completeness of any such information, Order or Convert Instruction.

7.6    You agree that any Order or Convert Instruction received or undertaken through your Account shall be deemed to be final and conclusive, and that FTX Trading may act upon such Order or Convert Instruction. We shall not be under any obligation to verify the identity or authority of any person giving any Order or Convert Instruction or the authenticity of such Order or Convert Instruction.

7.7    Your Orders and Convert Instructions shall be irrevocable and unconditional and shall be binding on you, and such Orders and Convert Instructions may be acted or relied upon by us irrespective of any other circumstances. As such, once you give any Order or Convert Instruction, you have no right to rescind or withdraw such Order or Convert Instruction without our written consent.

7.8    Each of your Orders and Convert Instructions shall not be considered to be received by FTX Trading unless and until it has been received by FTX Trading's server. FTX Trading's records of all Orders and Convert Instruction shall be conclusive and binding on you for all purposes.

7.9    Under no circumstances shall any of the Indemnified Parties be responsible or liable to you for any Losses suffered or incurred by you or any other person arising from any of the Indemnified Parties relying or acting upon any Order or Convert Instruction which is given or purported to be given by you, regardless of the circumstances prevailing at the time of such Order or Convert Instruction.

7.10    You hereby authorise FTX Trading to credit or debit (or provide settlement information to third parties for the purposes of the third party crediting or debiting) your Assets from your Account in accordance with your Orders and Convert Instructions. We reserve the right not to effect any transaction if you have insufficient Assets in your Account.

8.    **ACCOUNT FUNDING**

8.1    **Funding - General**

8.1.1    In order to fund your Account and begin transacting in Digital Assets using the Platform, you must first procure Digital Assets (or deposit Digital Assets that you already own into your Account) and/or load fiat currency into your Account.

8.1.2    You should be aware that FTX Trading: (i) may not support the loading into and/or storing of fiat currency in your Account in all jurisdictions; and (ii) does not support the use of all fiat currencies. A partial list of fiat currencies supported by FTX Trading can be found here. This list may be amended from time to time by FTX Trading at its sole discretion.

8.1.3    Any available Assets held in your Account is available to be locked and used as collateral for margin trading, or to fund trades, in relation to any Services or part thereof offered through the Platform by FTX Trading or its Affiliates.

9

8.2     **Digital Assets**

8.2.1   The Platform supports deposits and withdrawals of certain Digital Assets, including certain U.S. Dollar-pegged stablecoins (each a **"USD Stablecoin"**). You may deposit Digital Assets that you already own into your Account by generating an address within your Account and sending your Digital Assets to such address, after which they should appear in your Account balance (USD Stablecoins will appear in your "USD Stablecoins (USD)" balance).

8.2.2   You may purchase Digital Assets in exchange for certain supported fiat currencies (depending on your location) by linking a valid payment method to your Account. In such circumstances, you authorise us to debit the relevant amount of fiat currency using your selected payment method(s) to complete your purchase.

8.2.3   The Platform enables you to exchange one Digital Asset for another Digital Asset, send Digital Assets to and receive Digital Assets from other Users of the Services, or third parties outside of the Platform (where permitted by FTX Trading in its sole discretion).

8.2.4   You may sell Digital Assets in exchange for certain supported fiat currencies (depending on your location). In such circumstances, you authorise us to debit your Account and to send instructions to credit your selected payment method(s) in settlement of sell transactions.

8.2.5   FTX Trading makes no representations or warranties regarding the amount of time, transaction fees or other requirements that may be required to complete the transfer of your Digital Assets to or from a third party wallet or other source and for said Digital Assets to become available in your Account.

8.2.6   All Digital Assets are held in your Account on the following basis:

(A)     Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

(B)     None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

(C)     You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

8.2.7   FTX Trading is under no obligation to issue any replacement Digital Asset in the event that any Digital Asset, password or private key is lost, stolen, malfunctioning, destroyed or otherwise inaccessible.

8.2.8   It is your responsibility to ensure that you send all Digital Assets, to the correct address provided for that particular Digital Asset, including with respect to any Digital Assets that you send to the Platform. If you send a Digital Asset to an address that does not correspond to that exact Digital Asset (such as an address not associated with your Account or the specific Digital Asset sent), such Digital Asset may be lost forever. By sending any Digital Assets to the Platform, you attest that you will only send a supported Digital Asset to the Platform wallet address provided to you. For example, if you select an Ethereum Platform wallet address to receive funds, you attest that you are initiating an inbound transfer of Ethereum alone, and not any other forms of Digital Assets. You agree that FTX Trading incurs no obligation whatsoever with regards to sending unsupported Digital Assets to an address provided to you on the Platform. Similarly, if you

10

send a Digital Asset from your Account to an external address that does not correspond to that exact Digital Asset, such Digital Asset may be lost forever.

8.2.9    You assume all liability for any Losses incurred as a result of sending Digital Assets to an incorrect address (such as typos, errors, copy-paste attacks, or an address not associated with your Account, or an address not associated with the specific Digital Asset). You are solely liable for verifying the accuracy of any external wallet address, and the identity of the recipient. All outbound transfers of Digital Assets cannot be reversed once they are broadcast to the underlying blockchain network. FTX Trading does not control any blockchain network and cannot guarantee that any transfer will be confirmed or transferred successfully by the network. FTX Trading is not responsible for any losses or for taking any actions to attempt to recover any lost, stolen, misdirected or irrecoverable Digital Assets. If the Digital Assets are recoverable, we may in our sole discretion attempt to recover them, but such recovery efforts are in no way guaranteed. Please be aware that if you attempt to deposit ETH to your Account by sending it via a smart contract, your ETH may not be automatically credited, and may take time to recover, and may not be recovered at all.

8.2.10    When you elect to transfer Digital Assets from your Account to a third party wallet address or other location, it is always possible that the party administering the new location may reject your transfer or that the transfer may fail due to technical or other issues affecting the Platform. You agree that you shall not hold FTX Trading liable for any damages arising from a rejected or failed transfer.

8.2.11    You hereby represent and warrant to us that any Digital Assets used by you in connection with the Services (including any Digital Assets used to fund your Account) are either owned by you or that you are validly authorised to carry out transactions using such Digital Assets, and that all transactions initiated with your Account are for your own Account and not on behalf of any other person.

8.2.12    It is your responsibility entirely to provide us with correct details of any withdrawal address. We accept no liability resulting in you or any third party not receiving Digital Assets withdrawn by you due to you providing incorrect, erroneous, incompatible or out-of-date details.

8.3    **Fiat currency**

8.3.1    Where specified on the Site or in a Service Schedule, and depending on your location, the Platform may support various fiat currencies for deposit, withdrawal, and/or trading, using wire transfers, credit cards, or other appropriate methods.

8.3.2    Once we receive fiat currency that you load into your Account, we may issue you with an equivalent amount of electronic money (**"E-Money"**), denominated in the relevant fiat currency, which represents the fiat currency that you have loaded. This amount will be displayed in your Account.

8.3.3    E-MONEY IS NOT LEGAL TENDER. FTX TRADING IS NOT A DEPOSITORY INSTITUTION AND YOUR E-MONEY IS NOT A DEPOSIT OR INVESTMENT ACCOUNT. YOUR E-MONEY ACCOUNT IS NOT INSURED BY ANY PUBLIC OR PRIVATE DEPOSIT INSURANCE AGENCY.

8.3.4    E-Money held in your Account will not earn any interest. Your Account may hold E-Money denominated in different currencies and we will show the E-Money balance for each currency that you hold.

8.3.5    You may purchase Digital Assets by using E-Money credited to your Account (depending on your location). To carry out a Digital Asset purchase using E-Money, you must follow the relevant instructions on the Site. You authorise us to debit E-Money from your Account to complete your purchase. Although we will attempt to deliver Digital Assets to you as promptly as possible, E-Money may be debited from your Account before Digital Assets are delivered to your Account.

CONFIDENTIAL

8.3.6    You may sell Digital Assets in exchange for certain fiat currencies (depending on your location). To carry out a Digital Asset sale, you must follow the relevant instructions on the Site. You authorise us to debit Digital Assets from your Account and send instructions to credit your Account with the relevant amount of fiat currency. Once we receive the fiat currency, we will issue you with an equivalent amount of E-Money denominated in the relevant fiat currency.

8.3.7    You may redeem all or part of any E-Money held in your Account at any time subject to outages, downtime, and other applicable policies (including the Terms), by selecting the relevant option in the Site and following the instructions. Unless agreed otherwise, funds will be transferred to the bank account you have registered with us. You hereby represent and warrant that this bank account is your own, and that you have full control over it. It is your responsibility entirely to provide us with correct details of your withdrawal account. We accept no liability resulting in you not receiving any amounts withdrawn by you due to you providing incorrect or out-of-date details.

8.3.8    If the Terms are terminated, we may redeem any E-Money remaining in your Account and attempt to transfer the equivalent amount of fiat currency to the bank account you have registered with us. Prior to redeeming E-Money from your Account, we may conduct checks for the purposes of preventing fraud, money laundering, terrorist financing and other financial crimes, and as required by Applicable Law. This may mean you are prevented or delayed from withdrawing E-Money until those checks are completed to our reasonable satisfaction in order to comply with our regulatory requirements.

## 9.    UNCLAIMED OR ABANDONED PROPERTY

9.1    If FTX Trading is holding Assets in your Account (**"Unclaimed or Abandoned Property"**), and we are unable to contact you and have no record of your use of the Services for a prolonged period of time or your Account has been closed, Applicable Laws may require us to report such Unclaimed or Abandoned Property as unclaimed property to the applicable jurisdiction. If this occurs, FTX Trading will try to locate you using the details shown in our records in relation to your Account, but if FTX Trading is unable to locate you, we may be required to deliver any such Unclaimed or Abandoned Property to the applicable jurisdiction as unclaimed property. FTX Trading reserves the right to deduct a dormancy fee or other administrative charges from such Unclaimed or Abandoned Property, as permitted by Applicable Laws.

9.2    If FTX Trading is holding Unclaimed or Abandoned Property, and we are unable to contact you and have no record of your use of the Services for a prolonged period of time or your Account has been closed, and Applicable Laws do not require us to report such Unclaimed or Abandoned Property as unclaimed property to the applicable jurisdiction, then you acknowledge and agree that your Account may be transferred to FTX Trading, or an Affiliate of FTX Trading, as Trustee of the Unclaimed or Abandoned Property. FTX Trading or the Affiliate of FTX Trading (as applicable), as Trustee, will hold the Unclaimed or Abandoned Property on your behalf and shall, on demand, repay to you the Unclaimed or Abandoned Property subject to your payment of any dormancy fee or other administrative charges that the Trustee may deduct from the Unclaimed or Abandoned Property. If no such demand is made by you, the Trustee may pay the Unclaimed or Abandoned Property into court in the applicable jurisdiction in accordance with Applicable Laws.

9.3    If we receive legal documentation confirming your death or other information leading us to believe you have died, we will freeze your Account and during this time, no transactions may be completed until: your designated fiduciary has opened a new Account, as further described below, and the entirety of your Account has been transferred to such new account, or (ii) we have received proof in a form satisfactory to us that you have not died. If we have reason to believe you may have died but we do not have proof of your death in a form satisfactory to us, you authorise us to make enquiries, whether directly or through third parties, that we consider necessary to ascertain whether you have died. Upon receipt by us of proof satisfactory to us that you have died, the fiduciary you have designated in a

12

valid will or similar testamentary document will be required to open a new Account. If you have not designated a fiduciary, then we reserve the right to treat as your fiduciary any person entitled to inherit your Account, as determined by us upon receipt and review of the documentation we, in our sole and absolute discretion, deem necessary or appropriate, including (but not limited to) a will, a living trust or other similar documentation, or (ii) require an order designating a fiduciary from a court having competent jurisdiction over your estate. In the event we determine, in our sole and absolute discretion, that there is uncertainty regarding the validity of the fiduciary designation, we reserve the right to require an order resolving such issue from a court of competent jurisdiction before taking any action relating to your Account. Pursuant to the above, the opening of a new Account by a designated fiduciary is mandatory following the death of an Account owner, and you hereby agree that your fiduciary will be required to open a new Account in order to gain access to the contents of your Account.

10.      **DEBIT ACCOUNT BALANCE**

10.1     If at any time your Account has a debit balance, you agree to pay us: (i) the applicable fees set out in the Fee Schedule; (ii) the total debit balance; and (iii) such other amounts specified in the Terms.

10.2     If you fail to pay such amounts, we may suspend your ability to use the Services or close your Account. We also reserve the right to debit your Account accordingly and/or to withhold amounts from fiat currency and Digital Assets that you may transfer to your Account.

10.3     If, after a demand is made by FTX Trading, you have not made payment of the outstanding debit balance by the time stated in the demand, then:

         10.3.1   you authorise us to sell any Digital Assets or redeem any fiat currency or E-Money in your Account to recover the outstanding debit balance;

         10.3.2   you agree to indemnify us and each other Indemnified Party against all Losses that we suffer or incur as a result of your not paying the outstanding debit balance; and

         10.3.3   you will be liable for all costs which we incur in relation to instructing a collection agency, law firm or other third party to assist with and advise on the collection of such outstanding debit balance (where applicable).

11.      **THIRD PARTY PERMISSIONS TO CONNECT TO OR ACCESS YOUR ACCOUNT**

         If you grant express permission to a third party to connect to your Account, either through the third party's product or through the Platform, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under the Terms. Further, you acknowledge and agree that you will not hold FTX Trading responsible for, and will indemnify FTX Trading from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant.

12.      **ACCOUNT SUSPENSION AND CLOSURE; SERVICE SUSPENSION AND TERMINATION**

12.1     FTX Trading may, in its sole and absolute discretion and at any time, without liability to you or any third party:

         12.1.1   refuse to let you open an Account, suspend your Account, or terminate your Account;

         12.1.2   decline to process any instruction or Order submitted by you; and/or

         12.1.3   limit, suspend or terminate your use of one or more, or part of, the Services.

12.2     Such actions will not relieve you from your obligations pursuant to the Terms.

12.3     Such actions may be taken as a result of a number of factors, including without limitation:

13

12.3.1    as a result of account inactivity, your failure to respond to customer support requests, our failure or inability to positively identify you;

12.3.2    as a result of a court order or your violation of Applicable Laws or the Terms; or

12.3.3    where we believe that a transaction is suspicious or may involve fraud, money laundering, terrorist financing or other misconduct.

12.4    If you do not agree with any actions taken by us under Section 12.1, then your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any actions taken by us under Section 12.1.

12.5    Without limitation to the foregoing, we may temporarily suspend access to your Account in the event that a technical problem causes a system outage or Account errors until the problem is resolved.

12.6    Where required by Applicable Laws, we will notify you promptly if we have suspended processing your Orders or Convert Instructions and, if possible, provide our reasons for doing so and anything you can do to correct or remedy the matters giving rise to such suspension.

12.7    You may close your Account or terminate your access to and use of the Services at any time upon request to FTX Trading, in accordance with the Terms. In order to close your Account or terminate your access to and use of the Services, you should contact us for assistance. You may not close an Account if we determine, in our sole discretion, that such closure is being performed in an effort to evade a legal or regulatory investigation or to avoid paying any amounts otherwise due to FTX Trading or its Affiliates.

12.8    We encourage you to withdraw any remaining balance of Assets prior to issuing a request to close your Account. We reserve the right to restrict or refuse to permit withdrawals from your Account if:

12.8.1    your Account has otherwise been suspended or closed by us in accordance with the Terms;

12.8.2    to do so would be prohibited by Applicable Laws or court order, or we have determined that the Assets in your Account were obtained fraudulently; or

12.8.3    you have not completed the required identity verification procedure. You can check whether or not your identity has been verified by reviewing your verification status under the "Settings" section of your Account.

12.9    Upon closure or suspension of your Account, you authorise FTX Trading to cancel or suspend pending transactions.

12.10    Notwithstanding that you or FTX Trading closes or deactivates your Account or terminates or suspends your access to and use of any Services, or the termination or expiry of the Terms, you shall remain liable for all activity conducted with or in connection with your Account while it was open, and for all amounts due in connection with such activity.

13.    **RESTRICTED ACTIVITIES**

In connection with your use of the Services, you agree that you will not:

13.1.1    violate or assist any party in violating any Applicable Laws or any rule of any self-regulatory or similar organisation of which you are or are required to be a member through your use of the Services;

13.1.2    provide false, inaccurate, incomplete, out-of-date or misleading information;

13.1.3    infringe upon FTX Trading's or any third party's copyrights, patents, trademarks, or other intellectual property rights;

13.1.4    engage in any illegal activity, including without limitation illegal gambling, money laundering, fraud, blackmail, extortion, ransoming data, the financing of terrorism, other violent activities or any prohibited market practices;

14

CONFIDENTIAL

FTX_3AC_000013708

13.1.5    distribute unsolicited or unauthorised advertising or promotional material, written media releases, public announcements and public disclosures, junk mail, spam or chain letters;

13.1.6    use a web crawler or similar technique to access our Services or to extract data;

13.1.7    reverse engineer or disassemble any aspect of the Site, the API, or the Services in an effort to access any source code, underlying ideas and concepts and algorithms;

13.1.8    perform any unauthorised vulnerability, penetration or similar testing on the API or Services;

13.1.9    take any action that imposes an unreasonable or disproportionately large load on our infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data or information;

13.1.10    transmit or upload any material to the Site that contains viruses, Trojan horses, worms, or any other harmful or deleterious programs;

13.1.11    otherwise attempt to gain unauthorised access to or use of the Site, the API, other FTX Accounts, computer systems, or networks connected to the Site, through password mining or any other means;

13.1.12    transfer any rights granted to you under the Terms;

13.1.13    engage in any activity which, in our reasonable opinion, amounts to or may amount to market abuse including without limitation the carrying out of fictitious transactions or wash trades, front running or engaging in disorderly market conduct;

13.1.14    engage in any behaviour which is unlawful, violates the Terms, or is otherwise deemed unacceptable by FTX Trading in its sole discretion; or

13.1.15    assist, facilitate or encourage any third party in undertaking any activity otherwise prohibited by the Terms.

## 14.    ELECTRONIC TRADING TERMS

14.1    FTX Trading may, in its sole discretion, choose to discontinue support for a currently listed or supported Digital Asset at any time, including without limitation where there are changes in the characteristics of such Digital Asset.

14.2    A transaction on the Platform may fail for several reasons including, without limitation, as a result of a change in prices, insufficient margin, or unanticipated technical difficulties. FTX Trading makes no representation or warranty that any transaction will be executed properly. Under no circumstances are we liable for any loss or injury suffered by a failure of a transaction to complete properly or in a timely manner. Further, we are in no way responsible for notifying you of a transaction failure, although you are able to see any such failures via your Account. You have full responsibility for determining and inquiring into the failure of any transaction which you initiate.

14.3    In the event that you receive any data, information, or software through our Services other than that which you are entitled to receive pursuant to the Terms, you will immediately notify us and will not use, in any way whatsoever, such data, information or software. If you request a withdrawal of Digital Assets and we cannot comply with it without closing some part of your open positions, we will not comply with the request until you have closed sufficient positions to allow you to make the withdrawal.

14.4    We may refuse to execute a trade or impose trade amount limits or restrictions at any time, in our sole discretion without notice. Specifically, we reserve the right to refuse to process, and the right to cancel or reverse, any transaction, as well as to revoke access to a User's deposit address on the Platform, where we suspect the transaction involves money laundering, terrorist financing, fraud, or any other type of crime or if we suspect the transaction relates to a prohibited use as stated in the Terms. FTX Trading reserves the

15

right to halt deposit activity at our sole discretion. A User may not change, withdraw, or cancel its authorisation to make a transaction, except with respect to partially filled Orders.

14.5    FTX Trading may correct, reverse, or cancel any trade impacted by an error in processing a User's transaction or otherwise. The User's remedy in the event of an error will be limited to seeking to cancel an Order or Convert Instruction or obtaining a refund of any amounts charged to the User. FTX Trading cannot guarantee such cancellations or refunds will always be possible.

14.6    Orders placed on the Order Book may be partially filled or may be filled by one or more Orders placed on the Order Book by other Users, depending on the trading activity on the Order Book at the time an Order is placed.

14.7    The Digital Assets available for purchase through the Platform may be subject to high or low transaction volume, liquidity, and volatility at any time for potentially extended periods. You acknowledge that while FTX Trading uses commercially reasonable methods to provide Exchange Rate information to you through the Platform, the Exchange Rate information we provide may differ from prevailing exchange rates made available by third parties. Similarly, the actual market rate at the time of your trade may be different from the indicated Exchange Rate. You agree that you assume all risks and potential losses associated with price fluctuations or differences in any actual versus indicated Exchange Rates.

15.    **STAKING**

15.1    When you hold Digital Assets on the Platform you may be given the option to "stake" these assets via staking services provided by FTX Trading or its Affiliates. You are not required to stake any Digital Assets and you can opt out of any staking services (subject to applicable early withdrawal limits or penalties as specified on the staking page for such Digital Asset). If you stake your Digital Assets, FTX Trading or its Affiliate will facilitate the staking of such Digital Assets on your behalf. You agree and acknowledge that you have no right to any staking rewards whatsoever. FTX TRADING DOES NOT GUARANTEE THAT YOU WILL RECEIVE ANY STAKING REWARDS OVER TIME, INCLUDING THE DISPLAYED STAKING REWARDS RATES.

15.2    The tax treatment of staking Digital Assets is uncertain, and it is your responsibility to determine what taxes, if any, arise from the transactions. You are solely responsible for reporting and paying any applicable taxes arising from staking services and all related transactions, and acknowledge that FTX Trading does not provide investment, legal, or tax advice to you in connection with such election to participate. You should conduct your own due diligence and consult your advisors before making any investment decision including whether to participate in staking and related transactions.

16.    **MARGIN TRADING**

16.1    This Section 16 applies only to the extent you are permitted to engage in margin trading on the Platform. Margin trading is prohibited in certain jurisdictions, and you may not be able to engage in margin trading on the Platform. We reserve the right to amend and/or remove margin trading functionality at any time.

16.2    Margin trading is HIGH RISK. As a borrower, you may sustain a total loss of Assets or owe Assets beyond what you have deposited to your Account. The high volatility and substantial risk of illiquidity in markets means that you may not always be able to liquidate your position. You agree to maintain a sufficient amount of Assets at all times to meet our margin requirements, as such requirements may be modified from time to time. If the value of the Assets in your Account falls below the margin maintenance requirement or we determine, in our sole discretion, that your Account appears to be in danger of defaulting on a loan, we may seize and/or liquidate any or all of your positions and Assets on any balance in your Account in order to reduce your leverage or settle your debt to other Users, in which case, you may sustain a total loss of all Assets in your Account. Our liquidation mechanism is described at https://help.ftx.com/hc/en-us/articles/360027668712-Liquidations. If, after your positions and Assets are liquidated, your Account still contains

16

insufficient Assets to settle your debts to other Users, you will be responsible for any additional Assets owed. Intentionally defaulting on a loan may result in our reporting your activities to authorities and/or in legal prosecution.

16.3   When you lend Assets to other Users, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt. Although we take precautions to prevent borrowing Users from defaulting on loans, the high volatility and substantial risk of illiquidity in markets means that we cannot make any guarantees to any Users using the Services against default.

16.4   Under certain market conditions, it may become difficult or impossible to liquidate a position. This can occur, for example, if there is insufficient liquidity in the market or due to technical issues on the Platform. Placing contingent Orders, such as "stop-loss" or "stop-limit" Orders, will not necessarily limit your losses to the intended amounts, since market conditions may make it impossible to execute such Orders. In such an event, our backstop liquidity provider program may come into play, but there is no assurance or guarantee that any such program activities will be sufficient or effective in liquidating your position. As a result, you may lose all of your Assets or incur a negative balance in your Account. In addition, even if you have not suffered any liquidations or losses, your Account balance may be subject to clawback due to losses suffered by other Users.

16.5   The use of leverage can work against you as well as for you and can lead to large losses as well as gains. Users conduct all trading, margin trading, lending, and/or borrowing on their own account and we do not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks associated with margin trading on the Platform.

## 17.   FORKS AND DISTRIBUTIONS

17.1   As a result of the decentralised and open source nature of Digital Assets it is possible that sudden, unexpected, controversial or other changes (**"Forks"**) can be made to any Digital Asset that may change the usability, functions, compatibility, value or even name of a given Digital Asset. Such Forks may result in multiple versions of a Digital Asset and could lead to the dominance of one or more such versions of a Digital Asset (each a **"Dominant Digital Asset"**) and the partial or total abandonment or loss of value of any other versions of such Digital Asset (each a **"Non-Dominant Digital Asset"**).

17.2   FTX Trading is under no obligation to support a Fork of a Digital Asset that you hold in your Account, whether or not any resulting version of such forked Digital Asset is a Dominant Digital Asset or Non-Dominant Digital Asset or holds value at or following such Fork. Forks of Digital Assets can be frequent, contentious and unpredictable, and therefore cannot be consistently supported on the Platform. When trading or holding Digital Assets using your Account, you should operate under the assumption that the Platform will never support any Fork of such Digital Asset.

17.3   If FTX Trading elects, in its sole discretion, to support a Fork of a Digital Asset, it may choose to do so by making a public announcement through its Site or otherwise notifying customers and shall bear no liability for any real or potential losses that may result based on the decision to support such Fork or the timing of implementation of support. If FTX Trading, in its sole discretion, does not elect to support a Fork of a given Digital Asset, including the determination to support, continue to support, or cease to support any Dominant Digital Asset or Non-Dominant Digital Asset, FTX Trading assumes no responsibility or liability whatsoever for any losses or other issues that might arise from an unsupported Fork of a Digital Asset.

17.4   The Platform does not generally offer support for the distribution of Digital Assets based on a triggering fact or event, such as the possession of another Digital Asset (each an **"Airdrop"**), the provision of rewards or other similar payment for participation in a Digital Asset's protocol (**"Staking Rewards"**), or any other distributions or dividends that Users might otherwise be entitled to claim based on their use or possession of a Digital Asset outside of the Platform (collectively, **"Digital Asset Distributions"**). FTX Trading may, in

17

its sole discretion, elect to support any Digital Asset Distribution, but is under no obligation to do so and shall bear no liability to Users for failing to do so, or for initiating and subsequently terminating such support.

17.5    In the event of a Fork of a Digital Asset, we may be forced to suspend all activities relating to such Digital Asset (including trades, deposits, and withdrawals) on the Platform for an extended period of time, until FTX Trading has determined in its sole discretion that such functionality can be restored (**"Downtime"**). This Downtime may occur at the time that a Fork of a given Digital Asset occurs, potentially with little to no warning. During such Downtime, you understand that you may not be able to trade, deposit, or withdraw the Digital Asset subject to such Fork. FTX Trading does not bear any liability for losses incurred during any Downtime due to the inability to trade or otherwise transfer Digital Assets.

## 18.    ATTACKS ON BLOCKCHAIN NETWORKS

18.1    FTX Trading cannot prevent or mitigate attacks on blockchain networks and has no obligation to engage in activity in relation to such attacks. In the event of an attack, FTX Trading reserves the right to take (or to not take) actions, including, but not limited to, immediately halting trading, deposits and withdrawals for a Digital Asset if we believe that the Digital Asset's network is compromised or under attack. If such an attack caused the Digital Asset to greatly decrease in value, we may discontinue trading in such Digital Asset entirely.

18.2    Resolutions concerning deposits, withdrawals and User balances for a Digital Asset that has had its network attacked will be determined on a case-by-case basis by FTX Trading in its sole discretion. FTX Trading makes no representation and does not warrant the safety of the Services and you assume all liability for any lost value or stolen property.

## 19.    SITE; THIRD PARTY CONTENT

19.1    FTX Trading strives to provide accurate and reliable information and content on the Site, but such information may not always be correct, complete, or up to date. You should always carry out your own independent appraisal and investigations in relation to such information and not rely on it in any way.

19.2    The Site may also contain links to third party websites, applications, events or other materials (**"Third Party Content"**). Such information is provided for your convenience and links or references to Third Party Content do not constitute an endorsement by FTX Trading of any products or services. FTX Trading makes no representation as to the quality, suitability, functionality or legality of Third Party Content, or to any goods and services available from third party websites, and FTX Trading shall have no liability for any losses incurred as a result of actions taken in reliance on the information contained on the Site or in any Third Party Content.

19.3    We have no control over, or liability for, the delivery, quality, safety, legality or any other aspect of any goods or services that you may purchase from a third party (including other Users of the Platform). We are not responsible for ensuring that a third party buyer or seller you transact with will complete the transaction or is authorised to do so. If you experience a problem with any goods or services purchased from, or sold to, a third party purchased using Digital Assets in connection with the Services, you must resolve the dispute directly with that third party.

## 20.    AVAILABILITY

20.1    We do not represent that you will be able to access your Account or the Services 100% of the time. Your Account and the Services are made available to you without warranty of any kind, either express or implied. There are no guarantees that access will not be interrupted, or that there will be no delays, failures, errors, omissions or loss of transmitted information. This could result in the inability to trade on the Platform for a period of time and may also lead to time delays. We may, from time to time, suspend access to your Account and the Services, for both scheduled and emergency maintenance.

18

20.2    You acknowledge and agree that neither FTX Trading nor any other Indemnified Party shall have any liability to you or any third party for the correctness, quality, accuracy, security, completeness, reliability, performance, timeliness, pricing or continued availability of the Services or for delays or omissions of the Services, or for the failure of any connection or communication service to provide or maintain your access to the Services, or for any interruption in or disruption of your access or any erroneous communications between FTX Trading (or any other Indemnified Party) and you, regardless of cause.

20.3    FTX Trading may determine not to make the Services, in whole or in part, available in every market, either in its sole discretion or due to legal or regulatory requirements. In addition, FTX Trading may determine not to make the Services, in whole or in part, available to you, depending on your location. If you travel to a Restricted Territory, our Services may not be available and your access to our Services may be blocked. You acknowledge that this may impact your ability to trade on the Platform and/or monitor any existing Orders or open positions or otherwise use the Services. You must not attempt in any way to circumvent any such restriction, including by use of any virtual private network to modify your internet protocol address.

21.    **RIGHT TO CHANGE, SUSPEND OR DISCONTINUE SERVICES**

21.1    We reserve the right to change, suspend, or discontinue any aspect of the Services at any time and in any jurisdiction, including hours of operation or availability of any feature, without notice and without liability. We may advise you of any such changes, suspensions or discontinuations via your Account or the other contact details that you have provided to us but shall have no obligation to do so.

21.2    If you do not agree with any change, suspension, or discontinuance of any aspect of the Services, then your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any such changes, suspensions, discontinuations or decisions.

22.    **UPDATES TO THE TERMS**

22.1    We reserve the right to amend any part of the Terms, at any time, by posting the revised version of the Terms on the Site, with an updated revision date. The changes will become effective, and shall be deemed accepted by you, the first time you use the Services after the initial posting of the revised Terms and shall apply on a going-forward basis with respect to transactions initiated after the posting date. You acknowledge that it is your responsibility to check the Terms periodically for changes.

22.2    If you do not agree with any amendments to the Terms, your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any amendment of the Terms.

23.    **FEES**

23.1    In consideration for the use of the Services, you agree to pay to FTX Trading the appropriate fees, as set forth in our Fee Schedule displayed on the Site (**"Fee Schedule"**), which FTX Trading may revise or update in its sole discretion from time to time. If you do not agree with any amendments to the Fee Schedule, your sole and exclusive remedy is to terminate your use of the Services and close your Account.

23.2    On request, FTX Trading may make available an alternative fee schedule (**"Alternative Fee Schedule"**) to Users who satisfy certain criteria (such as in relation to trading volume), which are determined by FTX Trading in its sole discretion from time to time.

23.3    You authorise FTX Trading to deduct any applicable fees from your Account at the time you make a given transaction. Changes to the Fee Schedule or Alternative Fee Schedule are effective as of the date set forth in any revision and will apply prospectively from that date forward.

CONFIDENTIAL

24. **TAXES**

24.1 You will be able to see a record of your transactions via your Account which you may wish to use for the purposes of making any required tax filings or payments. It is your responsibility to determine what, if any, taxes apply to your activities on the Platform, and to collect, report, and remit the correct tax to the appropriate tax authority.

24.2 FTX Trading is not responsible for determining whether taxes apply to your transaction, or for collecting, reporting, or remitting any taxes arising from any transaction.

25. **RIGHT TO USE SERVICES; API USE; THIRD PARTY APPLICATIONS**

25.1 **License**

25.1.1 FTX Trading grants you a limited, non-exclusive, non-sublicensable, and non-transferable license, subject to the Terms, to access and use the Services solely for approved purposes as determined by FTX Trading. Any other use of the Services is expressly prohibited. FTX Trading and its licensors reserve all rights in the Services, and you agree that the Terms do not grant you any rights in, or licenses to, the Services except for the limited license set forth above.

25.1.2 Except as expressly authorised by FTX Trading, you agree not to modify, reverse engineer, copy, frame, scrape, rent, lease, loan, sell, distribute, or create derivative works based on the Services, in whole or in part. If you violate any portion of the Terms, your permission to access and use the Services may be terminated pursuant to the Terms.

25.1.3 "FTX.com," "FTX" and all logos related to the Services are either trademarks, or registered marks of FTX Trading or its licensors. You may not copy, imitate, or use them without FTX Trading's prior written consent. All right, title, and interest in and to the Site and any Mobile Application, any content thereon, the Services, and any and all technology or content created or derived from any of the foregoing is the exclusive property of FTX Trading and its licensors.

25.2 **API use**

25.2.1 Subject to your compliance with the Terms and any other agreement which may be in place between you and FTX Trading relating to your use of the API, FTX Trading grants you a limited, revocable, non-exclusive, non-transferable, non-sublicensable license, to use the API solely for the purposes of trading on the Platform. You agree to not use the API or data provided through the API for any other purpose. You agree your access and use of the API shall be entirely at your own risk, and that FTX Trading will not be responsible for any liabilities that you incur as a result of the use of the API or actions you take based on the API.

25.2.2 FTX Trading may, at its sole discretion, set limits on the number of API calls that you can make, for example, to maintain market stability and integrity. You acknowledge and agree that if you exceed these limits, FTX Trading may moderate your activity or cease offering you access to the API (or any other API offered by FTX Trading), each in its sole discretion.

25.2.3 FTX Trading may immediately suspend or terminate your access to the API without notice if we believe you are in violation of the Terms or any other agreement which may be in place between you and FTX Trading related to your use of the API.

25.3 **Third Party Applications**

25.3.1 We offer our Services to users both directly and via third party websites, platforms, applications and other access portals (collectively, "**Third Party Portals**"). If you are accessing these Terms via a Third Party Portal, you agree (a) to comply with all applicable terms of service of such Third Party Portal, (b) that you are solely responsible for payment of any and all costs and fees

20

associated with such Third Party Portals, and (c) we do not owe you any duty of care with respect to such Third Party Portals, nor do we accept any responsibility for them.

25.3.2    If you grant express permission to a third party to connect to your Account, either through the third party's product or through the Services, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under these Terms.

25.3.3    You acknowledge and agree that you will not hold us responsible for, and will indemnify us from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant. You expressly agree that your use of any Third Party Portal is at your own risk and we will not be liable to you for any inaccuracies, errors, omissions, delays, damages, claims, liabilities or losses, arising out of or in connection with your use of Third Party Portals.

25.3.4    In the event that access to the Services via any Third Party Portal is suspended, terminated or cancelled for any reason, you agree that you shall remain bound by these Terms and our Privacy Policy as a user of the Services.

26.    **PRIVACY POLICY**

We are committed to protecting your personal information and to helping you understand exactly how your personal information is being used. You should carefully read our Privacy Policy, which provides details on how your personal information is collected, stored, protected, and used.

27.    **CONFIDENTIALITY**

27.1    You shall treat as strictly confidential and not use or disclose any information or documents which you receive (or have received) from us, whether before, during or after the term of the Terms, and whether communicated orally, in writing, in electronic form or otherwise, relating to our business, financial situation, products and services (including the Services), expectations, processes and methods, customers or employees, in each case which is designated as being "confidential" or which by its very nature should obviously be treated as secret and confidential (together **"Confidential Information"**).

27.2    You may use the Confidential Information solely to the extent necessary to receive the benefit of the Services in accordance with the Terms.

27.3    The obligation to maintain confidentiality under this Section 27 shall not apply to any Confidential Information to the extent that such information is:

27.3.1    in the public domain through no breach of the Terms;

27.3.2    known to you at the time of disclosure without restrictions on use, or independently developed by you, and in each case, there is appropriate documentation to demonstrate either condition; or

27.3.3    required to be disclosed to a Regulatory Authority or by Applicable Laws.

27.4    If you are required under Applicable Laws or by any Regulatory Authority to disclose Confidential Information in the circumstances set out in Section 27.3.3 you shall give us such notice as is practical in the circumstances of such disclosure and shall provide all cooperation reasonably requested by us in relation to mitigating the effects of, or avoiding the requirements for, any such disclosure.

27.5    Any Confidential Information shall remain the property of FTX Trading and may be copied or reproduced only with our prior written consent.

27.6    Upon request, you shall return or destroy all materials containing our Confidential Information and, where such materials have been destroyed, confirm such destruction in writing. You shall be under no obligation to return or destroy such materials if and to the extent you are required to retain such materials under Applicable Laws, provided that you

21

FTX_3AC_000013715

shall notify us in writing of such requirement, giving details of the materials which have not been destroyed or returned, and this Section 27 shall continue to apply to such materials.

27.7 The parties agree and acknowledge that a breach of this Section 27 constitutes a matter of urgency for the purposes of section 12A(4) of Singapore's International Arbitration Act (Chapter 143A) both before, and after, the formation of the arbitral tribunal.

27.8 The availability of relief from an emergency arbitrator or the expedited formation of an arbitral tribunal under SIAC Rules (as defined in Section 38.12.1 below) shall not prejudice any party's right to apply to a state court or other judicial authority for any interim or conservatory measures before the formation of the arbitral tribunal and it shall not be treated as an alternative to or substitute for the exercise of such right. Where a party applies for relief from a state court or other judicial authority, the parties agree that failure to make an application for expedited appointment of the arbitral tribunal and/or for the appointment of an emergency arbitrator under the SIAC Rules shall not indicate, or be deemed to indicate, a lack of urgency. The parties also agree that any refusal by the President of the Court of Arbitration of SIAC to appoint an emergency arbitrator or allow the expedited formation of the arbitral tribunal shall not be determinative of the question of urgency.

27.9 The parties agree that an application to a state court or other judicial authority for interim or conservatory measures after the formation of the arbitral tribunal in respect of this Section 27 shall be considered "exceptional circumstances" under Rule 30.3 of the SIAC Rules. The parties also agree that an application may be made for interim relief on a non-urgent basis under section 12A(5) of Singapore's International Arbitration Act and agree that this Section 27.9 constitutes agreement in writing for the purposes of section 12A(5) of Singapore's International Arbitration Act.

## 28. COOKIES

By accessing the Site, you agree to use cookies in agreement with FTX Trading's Privacy Policy. The Site uses cookies to enable us to retrieve User details for each visit, and to enable the functionality of certain areas of the Site to make it easier for Users visiting the Site to access and use the Services.

## 29. INDEMNIFICATION; RELEASE

29.1 You shall and agree to defend, indemnify and hold harmless FTX Trading, its Affiliates and service providers and, in each case, their Personnel (collectively, **"Indemnified Parties"** and each an **"indemnified Party"**) from and against any and all claims and liabilities, costs, expenses, damages and losses (including any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal and other reasonable professional costs and expenses) **("Losses"** or **"Loss"**) which any Indemnified Party may suffer or incur, arising directly or indirectly out of or in connection with: (i) your use of your Account and/or the Services; (ii) your breach or anticipatory breach of the Terms; or (iii) your violation or anticipatory violation of any Applicable Laws.

29.2 You will cooperate as fully required by the Indemnified Parties in the defence of any such claims and Losses. The Indemnified Parties retain the exclusive right to assume the exclusive defence and control of any claims and Losses. You will not settle any claims and Losses without FTX Trading's prior written consent.

29.3 You hereby agree to release each of the Indemnified Parties from any and all claims and demands (and waive any rights you may have against any of the Indemnified Parties in relation to any Losses you may suffer or incur), arising directly or indirectly out of or in connection with any dispute that you have with any other User or other third party in connection with the Services (including any Digital Asset transactions) or the subject matter of the Terms.

## 30. LIMITATION OF LIABILITY; NO WARRANTY

30.1 NOTHING IN THE TERMS SHALL LIMIT OR EXCLUDE A PARTY'S LIABILITY:

22

30.1.1  FOR DEATH OR PERSONAL INJURY CAUSED BY ITS NEGLIGENCE;

30.1.2  FOR FRAUD OR FRAUDULENT MISREPRESENTATION; OR

30.1.3  TO THE EXTENT SUCH LIABILITY CANNOT BE EXCLUDED BY APPLICABLE LAWS.

30.2  SUBJECT TO SECTION 30.1, NEITHER FTX TRADING NOR ANY OF THE OTHER INDEMNIFIED PARTIES SHALL BE LIABLE TO YOU IN CONTRACT, TORT (INCLUDING NEGLIGENCE), EQUITY, STATUTE OR ANY OTHER CAUSE ARISING OUT OF OR IN CONNECTION WITH THE TERMS (OR ARISING OUT OF OR IN CONNECTION WITH: YOUR USE OR INABILITY TO USE THE SERVICES; THE COST OF PROCURING SUBSTITUTE GOODS AND SERVICES IN CIRCUMSTANCES WHERE YOU DO NOT OR ARE UNABLE TO USE THE SERVICES; ANY GOODS, DATA, INFORMATION, OR SERVICES PURCHASED OR OBTAINED OR MESSAGES RECEIVED OR TRANSACTIONS ENTERED INTO THROUGH OR FROM THE SERVICES; UNAUTHORISED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS OR DATA; OR ANY OTHER MATTER RELATING TO THE SERVICES) FOR:

30.2.1  INCIDENTAL, PUNITIVE, EXEMPLARY OR OTHER SPECIAL LOSS OR DAMAGE; OR LOSS OF PROFIT, LOSS OF REVENUE, LOSS OF GOODWILL, LOSS OF USE, LOSS OF BUSINESS OR CONTRACT, LOST OPPORTUNITIES, INCREASED COSTS OR EXPENSES (OR WASTED EXPENDITURE INCLUDING PRE-CONTRACT EXPENDITURE), LOSS OF SAVINGS, ANY LIABILITY VOLUNTARILY ASSUMED BY YOU, OR LOSS OF OR DAMAGE TO DATA, IN EACH CASE REGARDLESS OF WHETHER SUCH LOSS OR DAMAGE WAS DIRECT OR INDIRECT, FORESEEABLE OR UNFORESEEABLE, OR WHETHER FTX TRADING OR ANY OF THE OTHER INDEMNIFIED PARTIES HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE; OR

30.2.2  INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE.

30.3  YOU ACKNOWLEDGE AND AGREE THAT FTX TRADING AND ITS AFFILIATES MAY RELY ON ONE OR MORE THIRD PARTY INTERMEDIARIES FOR THE PURPOSES OF PROVIDING THE SERVICES. THE THIRD PARTY INTERMEDIARIES ARE INDEPENDENT THIRD PARTIES AND ARE NOT FTX TRADING'S AGENTS OR SUBCONTRACTORS. SUBJECT TO SECTION 30.1, FTX TRADING SHALL NOT BE LIABLE FOR THE ACTS OR OMISSIONS OF ANY THIRD PARTY INTERMEDIARY, OR ANY LOSSES ARISING FROM THE FAULT OF ANY THIRD PARTY INTERMEDIARY, SUCH AS A FAILURE BY A THIRD PARTY INTERMEDIARY TO COMPLY WITH APPLICABLE LAWS OR ANY REASONABLE INSTRUCTIONS PROVIDED BY FTX TRADING.

30.4  YOU ACKNOWLEDGE AND AGREE THAT THE SERVICES ARE PROVIDED ON AN "AS IS" BASIS, WITHOUT ANY WARRANTY OR REPRESENTATION OF ANY KIND AND, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF FTX TRADING AND THE OTHER INDEMNIFIED PARTIES EXPRESSLY DISCLAIM ANY WARRANTIES OR CONDITIONS, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, WITH RESPECT TO THE SERVICES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. NEITHER FTX TRADING NOR ANY OTHER INDEMNIFIED PARTY MAKES ANY WARRANTY THAT:

30.4.1  THE SERVICES WILL MEET YOUR REQUIREMENTS;

30.4.2  THE SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE; OR

30.4.3  THE QUALITY OF ANY PRODUCTS, SERVICES, INFORMATION, OR OTHER MATERIAL PURCHASED OR OBTAINED BY YOU WILL MEET YOUR EXPECTATIONS.

CONFIDENTIAL

30.5    SUBJECT TO SECTION 30.1, NEITHER FTX TRADING NOR ANY OF THE OTHER INDEMNIFIED PARTIES WILL BE RESPONSIBLE OR LIABLE TO YOU FOR ANY LOSS AND TAKE NO RESPONSIBILITY FOR, AND WILL NOT BE LIABLE TO YOU FOR, ANY USE OF THE SERVICES, INCLUDING BUT NOT LIMITED TO ANY LOSSES, DAMAGES OR CLAIMS ARISING FROM: USER ERROR SUCH AS FORGOTTEN PASSWORDS, INCORRECTLY CONSTRUCTED TRANSACTIONS, OR MISTYPED WALLET ADDRESSES; SERVER FAILURE OR DATA LOSS; CRYPTOCURRENCY WALLETS OR CORRUPT FILES; UNAUTHORISED ACCESS TO SERVICES; OR ANY THIRD PARTY ACTIVITIES, INCLUDING WITHOUT LIMITATION THE USE OF VIRUSES, PHISHING, BRUTEFORCING OR OTHER MEANS OF ATTACK AGAINST YOUR COMPUTER OR ANY BLOCKCHAIN NETWORK UNDERLYING THE SERVICES.

31.    **COUNTRY-SPECIFIC ADDENDA**

If you are a resident of Australia, Japan, or South Africa, additional terms and conditions will apply to your use of the Services as set forth in the Schedules attached hereto.

32.    **COMMUNICATIONS IN ENGLISH**

The Terms are provided to you and concluded in English. We will communicate with you in English for all matters related to your use of our Services unless we elect, in our sole discretion, to provide support for other languages.

33.    **FEEDBACK**

You acknowledge and agree that any materials, including without limitation questions, comments, feedback, suggestions, ideas, plans, notes, drawings, original or creative materials or other information or commentary you provide to us or one of our social media accounts, regarding the Services (collectively, **"Feedback"**) that are provided by you, whether by email, posting to the Site or social channels, or otherwise, are non-confidential and will become the sole property of FTX Trading. FTX Trading will own exclusive rights, including all intellectual property rights, in and to such Feedback, and will be entitled to the unrestricted use and dissemination of such Feedback for any purpose, commercial or otherwise, without acknowledgment or compensation to you.

34.    **QUESTIONS AND CONTACT INFORMATION**

34.1    We often post notices and relevant Services information in our Telegram channel and on our Twitter account, so we advise You to check those channels before contacting support.

Telegram: https://t.me/FTX_Official

Twitter: https://twitter.com/FTX_Official

WeChat: ftexchange

Blog: https://blog.ftx.com/

34.2    To contact us, please visit one of the links or channels above. For support with your Account, you may submit a support ticket at https://ftx.com/support. For legal and media inquiries, please contact legal@ftx.com and media@ftx.com, respectively. Please provide all relevant information, including your Account username and transaction IDs of any related deposits. Although we make no representations or provide no warranties as to the speed of response, we will endeavour to get back to you as soon as possible.

35.    **PROMOTIONS**

FTX Trading does not, as a general rule, participate in promotions without an official pronouncement, either on the Site or elsewhere. You shall obtain prior written approval prior to releasing any statements, written media releases, public announcements and public disclosures, including promotional or marketing materials, relating to the Platform.

24

36. **FORCE MAJEURE AND RELIEF EVENTS**

36.1    FTX Trading shall not be responsible (and shall have no liability) for any failure, interruption or delay in relation to the performance of the Services or its obligations under the Terms that results from any abnormal or unforeseeable circumstances outside our reasonable control, including without limitation:

36.1.1    any Force Majeure Event; or

36.1.2    any failure by you to comply with your obligations under the Terms or Applicable Laws (**"Relief Event"**).

37. **ASSIGNMENT AND SUBCONTRACTING**

37.1    You may not assign, novate, or otherwise transfer, any of your rights or obligations under the Terms, or sub-contract the performance of any of your obligations under the Terms, without the prior written consent of FTX Trading. Any attempted assignment, novation, transfer or sub-contracting without our consent shall be void.

37.2    FTX Trading may assign, novate, or otherwise transfer any of its rights or obligations under the Terms to any other person, or sub-contract the performance of any of its obligations under the Terms (including the performance of the Services), at any time and without your consent, and you hereby consent to such assignment, novation, transfer or subcontracting, and agree to take all actions (including by way of executing documents) and other assistance required by FTX Trading to ensure that any such assignment, novation, transfer or subcontracting is effective and enforceable. If you object to such assignment, novation, transfer or sub-contracting you may stop using our Services and terminate the Terms by contacting us and requesting us to close your Account.

38. **GENERAL**

38.1    **Entire agreement**

38.1.1    You agree that the Terms constitute the entire agreement between you and FTX Trading with respect to the use of the Services.

38.1.2    You agree that in agreeing to and entering into the Terms you have not been induced to do so by, and have not relied on, any statement, representation, warranty, assurance, covenant, indemnity, undertaking or commitment (**"Representation"**) which is not expressly set out in the Terms.

38.1.3    You agree that your only right of action in relation to any innocent or negligent Representation set out in the Terms or given in connection with the Terms shall be for breach of contract. All other rights and remedies in relation to any such Representation (including those in tort or arising under statute) are excluded.

38.2    **Survival**

Upon the later of the closure of your Account and the termination of your access to and use of the Services the Terms shall terminate. All rights and obligations of the parties that by their nature are continuing will survive the termination of the Terms.

38.3    **Severability**

If any provision or part of the Terms is void or unenforceable due to any Applicable Laws, it shall be deemed to be deleted and the remaining provisions of the Terms shall continue in full force and effect. If any invalid, unenforceable or illegal provision of the Terms would be valid, enforceable and legal if some part of it were deleted, the provision shall apply with the minimum deletion necessary to make it valid, legal and enforceable.

38.4    **Successors and assigns**

The Terms shall be binding on, and enure to the benefit of, the parties to the Terms and their respective personal representatives, successors and permitted assigns, and references to any party shall include that party's personal representatives, successors and permitted

25

FTX_3AC_000013719

assigns.

38.5    **Variation and waiver**

38.5.1    Subject to Section 22, no variation of the Terms shall be effective unless it is in writing (which for this purpose, does not include email) and signed by, or on behalf of, each of the parties. The expression "variation" includes any variation, supplement, deletion or replacement however effected.

38.5.2    No waiver by FTX Trading of any right or remedy provided by the Terms or by law shall be effective unless it is in writing (which for this purpose, does not include email) and signed by, or on behalf of, FTX Trading. The failure by FTX Trading to exercise, or delay in exercising, any right or remedy provided by the Terms or by law does not: (i) constitute a waiver of that right or remedy; (ii) restrict any further exercise of that right or remedy; or (iii) affect any other rights or remedies. A single or partial exercise by FTX Trading of any right or remedy does not prevent any further or other exercise of that right or remedy or the exercise of any other right or remedy.

38.6    **No partnership or agency**

Nothing in the Terms or in any matter or any arrangement contemplated by it is intended to constitute a partnership, association, joint venture, fiduciary relationship or other co-operative entity between the parties for any purpose whatsoever. Except as expressly provided in the Terms, neither party has any power or authority to bind the other party or impose any obligations on it and neither party shall purport to do so or hold itself out as capable of doing so. Each party confirms it is acting on its own behalf and not for the benefit of any other person.

38.7    **Set off**

38.7.1    Notwithstanding that any amount is from time to time payable by FTX Trading to you under or by virtue of the Terms or otherwise, you shall not set off such amount against any amount payable by you to FTX Trading under the Terms.

38.7.2    FTX Trading may set off any amounts which from time to time are payable by FTX Trading to you under or by virtue of the Terms or otherwise against any amounts payable by you to FTX Trading under the Terms.

38.8    **Equitable remedies**

Without prejudice to any other rights or remedies that FTX Trading may have, you acknowledge and agree that damages alone may not be an adequate remedy for your breach of the Terms. The remedies of injunction and specific performance as well as any other equitable relief for any threatened or actual breach of such provisions of the Terms may be more appropriate remedies.

38.9    **Third party rights**

Save as otherwise expressly provided in the Terms (such as in Sections 29, 30 and 38.12.8):

38.9.1    the Terms are not intended and shall not be construed to create any rights or remedies in any parties other than you and FTX Trading and its Affiliates, which each shall be a third party beneficiary of the Terms; and

38.9.2    no other person shall assert any rights as a third party beneficiary hereunder (notwithstanding any legislation to the contrary anywhere in the world).

38.10    **Electronic signature**

The Terms may be entered into by electronic means.

26

CONFIDENTIAL

38.11   **Governing law**

The Terms and any Dispute shall be governed by, and construed in accordance with, English law.

38.12   **Arbitration**

38.12.1   Subject to Section 38.13 below, any Dispute shall be referred to and finally determined by arbitration administered by the Singapore International Arbitration Centre (**"SIAC"**) in accordance with the Arbitration Rules of the SIAC (**"SIAC Rules"**) for the time being in force.

38.12.2   This arbitration agreement shall be governed by English law.

38.12.3   The seat of the arbitration shall be Singapore.

38.12.4   The language of the arbitration shall be English.

38.12.5   The number of arbitrators shall be one.

38.12.6   Each party agrees that:

(A)   any Dispute shall be referred to arbitration in accordance with this Clause 38.12 on an individual basis only and not as a claimant or class member in a purported class or representative action;

(B)   combining or consolidating individual arbitrations into a single arbitration is not permitted without the consent of all parties.

38.12.7   This agreement to arbitrate shall:

(A)   be binding upon the parties, their successors and assigns;

(B)   survive the termination of these Terms.

38.12.8   Where a User alleges or claims that a Dispute has arisen between it and any of the Indemnified Parties who is not otherwise a party to these Terms, that Indemnified Party may require that the Dispute be finally settled by arbitration in accordance with this Section 38.12 (without prejudice to that Indemnified Party's right to make a jurisdictional challenge), provided that such Indemnified Party exercises its right to arbitration under this Section 38.12 by notice in writing to all parties to the Terms within 7 days of being notified in writing of the Dispute. For the avoidance of doubt, the User provides express consent to the joinder of such Indemnified Party to an arbitration commenced pursuant to this Section 38.12.

38.13   **Exception to arbitration**

If you are a resident of a jurisdiction where the law prohibits arbitration of Disputes, Section 38.12 above will not apply to you. Instead, each party irrevocably agrees that the Courts of England and Wales located in London, England shall have exclusive jurisdiction in relation to any Dispute and each party irrevocably waives any right that it may have to object to an action being brought in those Courts, to claim that the action has been brought in an inconvenient forum, or to claim that those Courts do not have jurisdiction.

27

CONFIDENTIAL

### SCHEDULE 1

### DEFINITIONS AND INTERPRETATION

1.  **DEFINITIONS**

1.1   As used throughout the Terms unless the context requires otherwise:

**"Affiliate"** means, in relation to a party, any person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such party. A person shall be deemed to control another person if such person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of such other person, whether through the ownership of voting securities, by contract or otherwise.

**"Applicable Laws"** means all laws, including rules of common law, principles of equity, statutes, regulations, directives, proclamations, ordinances, by-laws, rules, regulatory principles and requirements, mandatory codes of conduct, writs, orders, injunctions, judgments and any awards of other industrial instruments, which are applicable to the provision, receipt or use of the Services or any products or other deliverables provided, used or received in connection with the Services.

**"Assets"** means the Digital Assets, fiat currency and E-Money held in your Account.

**"BTC"** means the cryptocurrency Bitcoin.

**"Digital Assets"** means BTC, ETH, FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token, stablecoin, tokenised stock, volatility token, tokenised futures contract, tokenised option or other tokenised derivatives product that is supported by and made available from time to time to transact in using the Platform.

**"Dispute"** means any dispute, claim, controversy or difference arising out of or in connection with the Terms, including any question regarding its existence, validity, subject matter, interpretation, negotiation, termination or enforceability, and any dispute, claim, controversy or difference regarding any non-contractual obligations arising out of or in connection with the Services.

**"ETH"** means the cryptocurrency Ethereum.

**"Exchange"** means the trading platform operated by FTX Trading or its Affiliates through which the Services may be offered to Users to transact in Digital Assets with other Users.

**"fiat currency"** means any government issued national currency.

**"Force Majeure Event"** means any circumstance not within a party's reasonable control including:

(i)    acts of God, flood, drought, earthquake or other natural disaster;

(ii)   epidemic or pandemic;

(iii)  terrorist attack, civil war, civil commotion or riots, war, threat of or preparation for war, armed conflict, imposition of sanctions, embargo, or breaking off of diplomatic relations;

(iv)   nuclear, chemical or biological contamination or sonic boom;

(v)    any law or any action taken by a Regulatory Authority, including the imposition of an export or import restriction, quota or prohibition;

(vi)   collapse of buildings, fire, explosion or accident; and

(vii)  any labour or trade dispute, strikes, industrial action or lockouts (other than in each case by the party (or its Affiliates) seeking to rely on this clause).

**"FTT"** is the exchange token of the Exchange ecosystem and is not offered in the United States or to U.S. persons.

**"Mobile Application"** means any mobile application developed or provided by FTX Trading and/or any of its Affiliates through which Users can access the Platform.

**"Order"** means each instruction placed by you on the Order Book to purchase or sell a specified quantity of a Digital Asset at a specified price in the Digital Asset in which trading is denominated on the Order Book; the second Digital Asset in a trading pair (e.g. USD in the BTC/USD trading pair).

**"Order Book"** means the central limit order book operated by FTX Trading on the Platform.

**"parties"** means the parties to the Terms, being you and FTX Trading (or, where applicable, the Service Provider responsible for providing a Specified Service to you as specified in a Service Schedule, insofar as that Specified Service is concerned), and **"party"** shall mean any one of the foregoing (as the context requires).

**"Personnel"** means the directors, officers, employees, agents, joint venturers, and contractors or subcontractors of a person.

**"Regulatory Authority"** means any foreign, domestic, state, federal, cantonal, municipal or local governmental, executive, legislative, judicial, administrative, supervisory or regulatory authority, agency, quasi-governmental authority, court, commission, government organisation, self-regulatory organisation having regulatory authority, tribunal, arbitration tribunal or panel or supra-national organisation, or any division or instrumentality thereof, including any tax authority.

**"Service Provider"** means the entity specified in a Service Schedule as responsible for providing the Specified Service referred to in that Service Schedule.

**"Service Schedule"** means the Service Schedules set out in the Schedules (other than this Schedule 1) to the General Terms.

**"Specified Service"** means any service specified in a Service Schedule.

**"transaction"** or **"trade"** means each transaction or trade carried out (or to be carried out) via the Platform relating to buying, selling, exchanging, holding, staking, lending, borrowing, sending, receiving or otherwise transacting in a Digital Asset.

**"User"** means a user of the Services, including you.

2.    **INTERPRETATION**

2.1    **References to the Terms and other agreements**

In the Terms, except where the context otherwise requires:

2.1.1    a reference to the Terms includes a reference to the Service Schedules and any other Schedules to it, each of which forms part of the Terms;

2.1.2    a reference to a Section or Schedule (other than to a schedule to a statutory provision) is a reference to a Section or Schedule (as the case may be) of, or to, the Terms and reference to a paragraph is to a paragraph of the relevant Schedule;

2.1.3    the headings are for convenience only and shall not affect the interpretation of the Terms;

2.1.4    a reference to the Terms includes the Terms as amended or supplemented in accordance with its terms; and

2.1.5    a reference to any agreement or other instrument (other than an enactment or statutory provision) is to that agreement or instrument as from time to time amended, varied, supplemented, substituted, novated or assigned otherwise than in breach of the Terms.

2.2    **Singular, plural and gender**

Words in the singular include the plural and vice versa and a reference to one gender includes other genders.

29

2.3 **References to persons and companies**

In the Terms, except where the context otherwise requires:

2.3.1 a reference to a person includes a reference to any individual, firm, company, government, state or agency of a state, local or municipal authority or government body or any joint venture, association or partnership (whether or not having separate legal personality);

2.3.2 a reference to a company includes any company, corporation or other body corporate wherever and however incorporated or established; and

2.3.3 a reference to an individual includes that individual's estate and personal representatives.

2.4 **References to time periods**

In the Terms, except where the context otherwise requires, any reference to a date or time is a reference to that date or time in the principal financial centre of the country in which the registered office of FTX Trading (or the relevant Affiliate of FTX Trading) is located, unless otherwise agreed in writing. A reference to a day means a period of 24 hours ending at midnight. Any period of time shall be calculated exclusive of the day from which the time period is expressed to run or the day upon which the event occurs which causes the period to start running.

2.5 **References to legislation and legal terms**

In the Terms, except where the context otherwise requires, a reference to an enactment or statutory provision shall include a reference to any subordinate legislation made under the relevant enactment or statutory provision, and is a reference to that enactment, statutory provision or subordinate legislation as from time to time amended, modified, incorporated or reproduced and to any enactment, statutory provision or subordinate legislation that from time to time (with or without modifications) re-enacts, replaces, consolidates, incorporates or reproduces it.

2.6 **Includes and including**

In the Terms, except where the context otherwise requires:

2.6.1 the words and phrases "includes", "including", "in particular" (or any terms of similar effect) shall not be construed as implying any limitation; and

2.6.2 general words shall not be given a restrictive meaning because they are preceded or followed by particular examples.

2.7 **To the extent that**

In the Terms, except where the context otherwise requires, the phrase "to the extent that" is used to indicate an element of degree and shall mean "to the extent that" and not solely "if", and similar expressions shall be construed in the same way.

2.8 **Writing**

A reference to writing includes any modes of reproducing words in any legible form and, except where expressly stated otherwise, shall include email).

30

FTX_3AC_000013724

### SCHEDULE 2
### SERVICE SCHEDULE

| Specified Service | Spot Market |
|---|---|
| **Specified Service description** | The Spot Market is a trading platform through which you can spot trade certain Digital Assets with other Users in exchange for fiat currency (depending on your location) or Digital Assets. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | The Digital Assets that are available for spot trading on the Spot Market are listed on the Site. This list may be amended from time to time by the Service Provider at its sole discretion.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

CONFIDENTIAL                                        FTX_3AC_000013725

## SCHEDULE 3
## SERVICE SCHEDULE

| Specified Service | Spot Margin Trading |
|---|---|
| **Specified Service description** | Spot Margin Trading enables you to spot trade certain Digital Assets that you do not have by posting collateral in the form of fiat currency (depending on your location) or Digital Assets held in your Account and borrowing the required Digital Assets from other Users. You can then spot trade the borrowed Digital Assets through the Spot Market on the Platform.<br><br>You may also lend your Digital Assets to other Users who need them to spot trade.<br><br>Digital Asset borrowers pay a lending fee to Digital Asset lenders. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | **IMPORTANT**: Section 16 of the General Terms applies to this service.<br><br>You may be asked to sign other documents in some cases in relation to Spot Margin Trading, including but not limited to the FTX Institutional Customer Margin and Line of Credit Agreement.<br><br>The Service Provider and its Affiliates may, in its sole discretion, perform measures to mitigate potential losses to you on your behalf, or to other Users. Such measures include attempts by the Platform's risk engine to liquidate any Users before they could get a negative net Account balance. Using spot margin trading therefore opens you up to liquidation risk.<br><br>The Service Provider may impose margin position limits or decreasing collateral on large positions of illiquid coins.<br><br>The Digital Assets that are available for borrowing/lending are listed on the Site. This list may be amended from time to time by the Service Provider at its sole discretion.<br><br>Digital Assets that are lent to other Users are effectively locked, and cannot be withdrawn/sold/used as collateral/staked/etc. However, they can be used as maintenance margin to prevent liquidations.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

32

FTX_3AC_000013726

| **Risk disclosures** | Margin trading may not be suitable for all Users and should only be used by those who understand the risks. Also see Section 2.4 of the General Terms. |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR USE OF ANY MARGIN TRADING SERVICES OFFERED ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH MARGIN TRADING. |

33

CONFIDENTIAL

SCHEDULE 4

SERVICE SCHEDULE

| Specified Service | OTC / Off-exchange Portal (OEP Portal) |
|---|---|
| **Specified Service description** | The OEP Portal enables you to connect with other Users to request quotes for spot Digital Assets. In response to a request for a quote, other Users will return prices offered by them in respect of the Digital Assets and you may decide whether or not you wish to trade at the price offered by the other User. Affiliates of FTX Trading may participate on the OEP Portal as Users and execute trades (as principal) with other Users, on terms no more favourable to such Affiliate than terms offered to other similarly situated Users. If you agree, the trade is confirmed, and you will trade directly with the other User. The Service Provider will carry out post-trade clearing and settlement of the trade between you and the other User. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | The Service Provider shall have no liability in relation to your use of the OEP Portal or for any trades that you enter into with other Users that you connect with through the OEP Portal.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

CONFIDENTIAL

FTX_3AC_000013728

## SCHEDULE 5
### SERVICE SCHEDULE

| Specified Service | Futures Market |
|---|---|
| **Specified Service description** | The Futures Market is a trading platform on which you can trade Quarterly Futures Contracts and Perpetual Futures Contracts (collectively, **Futures Contracts**) on certain Digital Assets and Digital Asset indexes with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Quarterly Futures Contracts represent obligations to buy or sell a Digital Asset at a specific price, on a specified future date. Quarterly Futures Contracts expire to a time-weighted average price (**"TWAP"**) of their associated index on the last Friday of every quarter between 2am and 3am UTC. If you hold an expiring position, you will be credited with USD profit and loss equal to the expiration price shortly after. |
| | Perpetual Futures Contracts represent obligations to buy or sell a Digital Asset at a specific price, at any time while the contract remains open. Perpetual Futures Contracts do not have an expiry date but instead, continuously roll over, i.e. every hour, each perpetual futures contract has a funding payment where longs pay shorts equal to 1 hour TWAP of Premium / 24. |
| | You can trade Futures Contracts on the Futures Market by posting collateral in the form of fiat currency (depending on your jurisdiction) and Digital Assets to cover initial and maintenance margin. |
| | Instead of delivery of the underlying Digital Asset, your profit or loss is settled in stablecoins. |
| | **IMPORTANT:** Section 16 of the General Terms applies to this service. |
| | Futures Contracts are Complex Products and the trading of Futures Contracts is high risk. The market price of any Futures Contract may not reflect the price of spot markets in the applicable underlying Digital Assets and may fluctuate significantly in response to the value of the underlying Digital Asset's(s') price, supply and demand, and other market factors. |
| | In order to trade Futures Contracts on the Futures Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because Futures Contract trading can be highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset or index having a much greater value. For instance, a small price decrease on a 20x leveraged Futures Contact's underlying Digital Asset could result in 20x loss in your leveraged position in the Futures Contract. Further, short positions will lose money when the price of the underlying |

35

FTX_3AC_000013729

| | |
|---|---|
| | Digital Asset rises, a result that is opposite from holding the underlying Digital Asset. |
| | YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE SERVICE PROVIDER AND ITS AFFILIATES. |
| | By trading in Futures Contracts on the Futures Market on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from Futures Contract trading. You further agree to independently assume all the risks arising from conducting Futures Contract trading on your own account. If you are uncomfortable with this level of risk, you should not trade Futures Contracts. |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING FUTURES CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH FUTURES CONTRACT TRADING. |
| | The Service Provider reserves the right to final interpretation of this Specified Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

36

FTX_3AC_000013730

**SCHEDULE 6**

**SERVICE SCHEDULE**

| Specified Service | Volatility Market (Options Contacts) |
|---|---|
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade Call Options or Put Options (collectively, **Options Contracts**) on certain Digital Assets with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Options Contracts give you the option (i.e. the right, but not the obligation), to either buy (Call Option) or sell (Put Option) Digital Assets for a specific price (the strike or exercise price) on a specified expiry date. |
| | If, at the expiration of a Call Option, the market price of the underlying Digital Asset is higher than the strike price, the Service Provider will automatically exercise the option and credit your Account with the difference between the market price and the strike price. If the market price is lower, the option expires to USD 0.00. In the case of Put Options, the reverse applies. |
| | You can trade Options Contracts on the Volatility Market by posting collateral in fiat currency (depending on your location) and Digital Assets, to cover initial and maintenance margin. |
| | Instead of delivery of the underlying Digital Asset on the specified expiry date, your profit or loss is settled in stablecoins. |
| | **IMPORTANT**: Section 16 of the General Terms applies to this service. |
| | The Options Contracts on the Volatility Market are European style. This means that you will not be able to exercise the option before the specified expiry date. |
| | The Options Contracts auto-expire, which means that the Service Provider will automatically exercise all options "in the money" and no options "out of the money". |
| | The Options Contracts expire on their specified expiry date at 3:00:00AM UTC. The expiration price of the underlying Digital Asset is based on a 1-hour TWAP of the underlying index the hour before expiration. |
| | Options Contracts are Complex Products and the trading of Options Contracts is high risk. In order to trade Options Contracts on the Volatility Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because Options Contract trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset having a much greater value. |
| | If you are uncomfortable with this level of risk, you should not trade Options Contracts. |

37

| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING OPTIONS CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH OPTIONS CONTRACTS TRADING. |
|---|---|
| | The Service Provider reserves the right to final interpretation of this Specified Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

38

CONFIDENTIAL

FTX_3AC_000013732

## SCHEDULE 7

## SERVICE SCHEDULE

| **Specified Service** | **Volatility Market (MOVE Volatility Contracts)** |
|---|---|
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade Daily MOVE Volatility Contracts, Weekly MOVE Volatility Contracts and Quarterly MOVE Volatility Contracts (collectively, **MOVE Volatility Contracts**) with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | MOVE Volatility Contracts represent the absolute value of the amount a Digital Asset moves in a period of time, i.e. a day, week or quarter. |
|  | MOVE Volatility Contracts expire to the absolute value of the difference between the TWAP price of the underlying Digital Asset over the first hour and the TWAP price of the underlying Digital Asset over the last hour of their expiration time, measured in UTC. |
|  | 1.    Daily MOVE Volatility Contracts expire to the movement of BTC over a single day's period. Their ticker is [underlying]-MOVE-[expiration date]; e.g. BTC-MOVE-1116 is the BTC-MOVE Volatility Contract expiring at the end of 16 November UTC. |
|  | 2.    Weekly MOVE Volatility Contracts expire to the movement of BTC over a 7 day period. Their ticker is [underlying]-MOVE-WK-[expiration date]; e.g. BTC-MOVE-WK-1122 expires to the amount that BTC moves between the start of 16 November and the end of 22 November. |
|  | 3.    Quarterly MOVE Volatility Contracts expire to the move of BTC over a roughly 3 month period. Their ticker is [underlying]-MOVE-[expiration year]Q[quarter number]; e.g. BTC-MOVE-2020Q2 expires to the amount that BTC moves during Q2 2020, from 27 March 2020 to 25 June 2020. |
|  | You can trade Move Volatility Contracts on the Volatility Market by posting collateral in the form of fiat currency (depending on your location) and Digital Assets to cover initial and maintenance margin. |
|  | **IMPORTANT**: Section 16 of the General Terms applies to this service. |
|  | MOVE Volatility Contracts are Complex Products and the trading of MOVE Volatility Contracts is high risk. In order to trade MOVE Volatility Contracts on the Volatility Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because MOVE Volatility Contract trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset having a much greater value. |

39

| | |
|---|---|
| | If you are uncomfortable with this level of risk, you should not trade MOVE Volatility Contracts. |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING MOVE VOLATILITY CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH MOVE VOLATILITY CONTRACTS TRADING. |
| | The Service Provider reserves the right to final interpretation of this Specific Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

CONFIDENTIAL

FTX_3AC_000013734

SCHEDULE 8

SERVICE SCHEDULE

| Specified Service | Leveraged Tokens Spot Market |
|---|---|
| Specified Service description | The Leveraged Tokens Market is a trading platform on which you can spot trade Leveraged Tokens on certain Digital Assets with other Users. |
| Service Provider | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| Specified Service specific terms (in addition to the General Terms) | Leveraged Tokens are "ERC-20" digital tokens issued by LT Baskets Ltd, an Affiliate of FTX Trading. Each Leveraged Token has an associated account on the Platform that takes leveraged positions on Perpetual Futures Contracts on an underlying Digital Asset or Digital Asset index (collectively **"Underlying"**) and can be created or redeemed for its share of the Digital Assets of that account. |
| | Leveraged Tokens seek (but under no circumstances guarantee) daily results, before fees and expenses, that correspond to 300% or 3x ("BULL"), -100% or -1x ("HEDGE"), or -300% or -3x ("BEAR") of the daily return of the Underlying (in U.S. Dollars) for a single day, not for any other period. A Leveraged Token's returns for a period longer than a single day will be the result of its return for each day, compounded over that period, and could differ in amount and direction from the return of the Underlying over the same period. |
| | A Leveraged Token's returns may also deviate from expected returns in a period shorter than a single day for reasons including, but not limited to, scheduled or unscheduled rebalancing. Scheduled rebalancing occurs once daily in order to maintain the Leveraged Token's intended exposure to the market price of the Underlying. Unscheduled rebalancing may occur, for example, if the market price of the Underlying moves more than 10% in either direction within a single day in order to maintain the Leveraged Token's intended returns. |
| | Leverage Tokens are Complex Products, and the trading of Leveraged Tokens is high risk. The market price of any Leveraged Token may not reflect the price of spot markets in the applicable Underlying and may fluctuate significantly in response to the value of the Underlying's price, supply and demand, and other market factors. |
| | Leveraged Tokens reduce the risk of liquidation (as compared to Futures Contracts for example) but it is still possible that liquidation may occur; if markets instantaneously gap down 50%, there is nothing that can stop a +3x leveraged position from getting liquidated. |
| | YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, |

41

FTX_3AC_000013735

ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE PLATFORM.

By trading in Leveraged Tokens on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from Leveraged Tokens trading. You further agree to independently assume all the risks arising from conducting Leveraged Tokens trading on your own account.

If you are uncomfortable with this level of risk, you should not trade Leveraged Tokens.

THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING LEVERAGED TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH LEVERAGED TOKEN TRADING.

The Service Provider reserves the right to final interpretation of this Specific Service.

| | |
|---|---|
| Risk disclosures | Leveraged Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading Leveraged Tokens, including but not limited to: |

- **Market price variance risk:** Holders buy and sell Leveraged Tokens in the secondary market at market prices, which may be different from the value of the Underlying. The market price for a Leveraged Token will fluctuate in response to changes in the value of the Leveraged Token's holdings, supply and demand for the Leveraged Token and other market factors.

- **Inverse correlation risk:** Holders of Leveraged Tokens that target an inverse return will lose money when the price of the Underlying rises, a result that is opposite from holding the Underlying.

- **Portfolio turnover risk:** Leveraged Tokens may incur high portfolio turnover to manage the exposure to the Underlying. Additionally, active market trading of a Leveraged Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs. Each of these factors could have a negative impact on the performance of a Leveraged Token.

- **Interest rates:** Leveraged Tokens take positions in Perpetual Futures Contracts to achieve their desired leverage. These Perpetual Futures Contracts might trade at a premium or discount to spot markets in the applicable Underlying as a reflection of prevailing interest rates in cryptocurrency markets. Thus, a Leveraged Token could outperform or underperform the Underlying's spot market returns due to a divergence between the two markets.

CONFIDENTIAL

**SCHEDULE 9**

**SERVICE SCHEDULE**

| Specified Service | Volatility Market (BVOL/iBVOL Tokens) |
|---|---|
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade BVOL Tokens and iBVOL Tokens (collectively, **BVOL/iBVOL Tokens**) with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | BVOL/iBVOL Tokens are "ERC-20" digital tokens issued by LT Baskets Ltd, an Affiliate of FTX Trading. Each Affiliate of FTX Trading Ltd has an associated account on the Platform that holds MOVE Volatility Contracts and Perpetual Futures Contracts on BTC (collectively, **"Underlying"**), in an attempt to track the implied percent-based volatility of BTC. In particular, BVOL Tokens attempt to track the daily returns of being 1x long the implied volatility of BTC and iBVOL Tokens attempt to track the daily returns of being 1x short the implied volatility of BTC.

In order to get their volatility exposure, BVOL Tokens trade MOVE Volatility Contracts and Perpetual Futures on BTC. In particular, they aim to hold 1/6th each of each MOVE Volatility Contract that has not yet had its strike price determined as of each rebalance. That means 1/6th each of:

• Tomorrow's MOVE Volatility contract
• Next weeks' MOVE contract, and the two weeks after that
• Next Quarter's MOVE contract, and the quarter after that

and

• -1x BTC-PERP (Short)

IBVOL, conversely, aims to hold -1/6th each of those MOVE Volatility contracts and 1x Perpetual Futures Contract on BTC (Long).

BVOL targets +1x leverage, and iBVOL targets -1x leverage. As such, BVOL should not need to significantly alter its leverage at rebalance time (00:02:00 UTC every day): there may be small amounts of slippage but by and large its leverage should always be 1. IBVOL, however, will need to. If volatility is down, iBVOL will have gains and will reinvest them by selling more MOVE contracts; if volatility is up, iBVOL will have losses and will buy back MOVE contracts to reduce risk and attempt to avoid liquidation. Because of this BVOL almost completely avoids liquidation risk, but IBVOL is at risk if volatility doubles in a day. To mitigate this, iBVOL also has daily rebalances. If market moves cause iBVOL's leverage to reach -4/3, it will do an intraday rebalance to reduce risk.

YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION |

43

REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE PLATFORM.

BVOL/iBVOL Tokens are Complex Products and the trading of BVOL/iBVOL Tokens is high risk. The market price of any BVOL/iBVOL Token may not reflect the price of spot markets in BTC and may fluctuate significantly in response to the value of BTC's price, supply and demand, and other market factors.

By trading in BVOL/iBVOL Tokens on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from BVOL/iBVOL Tokens trading. You further agree to independently assume all the risks arising from conducting BVOL/iBVOL Tokens trading on your own account.

If you are uncomfortable with this level of risk, you should not trade BVOL/iBVOL Tokens.

THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING BVOL/iBVOL TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH BVOL/iBVOL TOKEN TRADING.

The Service Provider reserves the right to final interpretation of this Specified Service.

| | |
|---|---|
| **Risk disclosures** | BVOL/iBVOL Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading BVOL/iBVOL Tokens, including but not limited to: |

- **Market price variance risk:** Holders buy and sell BVOL/iBVOL Tokens in the secondary market at market prices, which may be different from the value of BTC. The market price for a BVOL/iBVOL Tokens will fluctuate in response to changes in the value of the BVOL/iBVOL Tokens holdings, supply and demand for the BVOL/iBVOL Tokens and other market factors.

- **Portfolio turnover risk:** BVOL/iBVOL Tokens may incur high portfolio turnover to manage the exposure to the Underlying. Additionally, active market trading of a BVOL/iBVOL Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs. Each of these factors could have a negative impact on the performance of a BVOL/iBVOL Tokens.

- **Interest rates:** BVOL/iBVOL Tokens take positions in MOVE Volatility Contracts and Perpetual Futures Contracts to achieve their desired implied volatility of BTC. These MOVE Volatility Contracts and Perpetual Futures Contracts might trade at a premium or discount to spot markets in BTC as a reflection of prevailing interest rates in cryptocurrency markets. Thus, a BVOL/iBVOL Token could

CONFIDENTIAL

| | outperform or underperform BTC's spot market returns due to a divergence between the two markets. |

CONFIDENTIAL

FTX_3AC_000013739

## SCHEDULE 10
## SERVICE SCHEDULE

| Specified Service | Issuing and redeeming Leveraged Tokens and BVOL/iBVOL Tokens |
|---|---|
| **Specified Service description** | The issuance and redemption of Leveraged Tokens and BVOL/iBVOL Tokens. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **LT Baskets Ltd**, a company incorporated in Antigua and Barbuda (company number 17336), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | Leveraged Tokens and BVOL/iBVOL Tokens are "ERC-20" digital tokens issued by the Service Provider. Each Leveraged Token has an associated account on the Platform that takes leveraged positions on Perpetual Futures Contracts on an underlying Digital Asset or Digital Asset index. Each BVOL/iBVOL Token has an associated account on the Platform that holds MOVE Volatility Contracts and Perpetual Futures Contracts on BTC, in an attempt to track the implied percent-based volatility of BTC. In particular, BVOL Tokens attempt to track the daily returns of being 1x long the implied volatility of BTC and iBVOL Tokens attempt to track the daily returns of being 1x short the implied volatility of BTC. You may place orders with the Service Provider to issue new Leveraged Tokens or BVOL/iBVOL Tokens by depositing stablecoins. You can redeem an existing Leveraged Token for its share of the Digital Assets of the Leveraged Token's associated account on the Platform. You can redeem existing BVOL/iBVOL Contracts for an equivalent amount of stablecoins. Creating or redeeming Leveraged Tokens and BVOL/iBVOL Tokens will have market impact and you won't know what price you ultimately get until after you have created or redeemed the Leveraged Token or BVOL/iBVOL Token (as applicable). THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR ORDERING OR REDEEMING LEVERAGED TOKENS OR BVOL/iBVOL TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH LEVERAGED TOKENS AND BVOL/iBVOL TOKENS. The Service Provider reserves the right to final interpretation of this Specified Service. |

46

**SCHEDULE 11**

**SERVICE SCHEDULE**

| Specified Service | NFT Market |
|---|---|
| **Specified Service description** | The NFT Market is a trading platform on which you can trade non-fungible tokens (**"NFT"**) with other Users for fiat currency or Digital Assets and offer to sell them by auction. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | NFTs are controllable electronic records recorded on the Ethereum and/or Solana blockchains, or any other blockchain(s) as determined by us in our sole discretion. |
| | Unlike most cryptocurrencies, there may be very few or only one of an NFT, and they might be indivisible, meaning it may not be fungible with any other tokens. |
| | NFTs can take a number of forms. Sometimes, they can be redeemed for a physical object. Sometimes the owner is entitled to an experience, like a movie or a phone call. Sometimes they are associated with a digital image. Sometimes they are associated with nothing at all. |
| | NFTs do not necessarily have any intrinsic value. They might also be illiquid. If you buy an NFT, you are not necessarily going to be able to sell it for much later or gain any specific utility from it. |
| | While the Service Provider may facilitate the ability to sell, re-sale, buy, transfer, withdraw, or otherwise engage in transactions involving the purchase, sale, or other transfer of a NFT through the NFT Market, this functionality is provided without any guarantees of uptime, functionality, or serviceability. The Service Provider reserves the right to remove or otherwise limit any and all functionality, or to require additional conditions of access, for all Users or any User or group of Users of the NFT Market, as determined by the Service Provider in its sole discretion. |
| | You are welcome to buy NFTs if it would make you happy to own them. But there is no implied economic return associated with doing so. |
| | There are no refunds for NFTs, and the Service Provider and its Affiliates will not field customer complaints. You should only buy NFTs if you understand that doing so does not necessarily give any direct economic value. |
| | NFTS ARE INTANGIBLE DIGITAL ASSETS. THEY EXIST ONLY BY VIRTUE OF THE OWNERSHIP RECORD MAINTAINED IN THE APPLICABLE BLOCKCHAIN NETWORK. ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY UNIQUE DIGITAL ASSET OCCURS ON THE DECENTRALISED LEDGER WITHIN SUCH BLOCKCHAIN NETWORK, WHICH WE DO NOT CONTROL. THE SERVICE |

47

FTX_3AC_000013741

PROVIDER DOES NOT GUARANTEE THAT IT CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY NFT.

THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING NFT ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH NFT TRADING.

CONFIDENTIAL

FTX_3AC_000013742

## SCHEDULE 12
### SERVICE SCHEDULE

| **Specified Service** | **NFT Listing** |
|---|---|
| **Specified Service description** | Creating an NFT on the portal located at https://ftx.com/nfts/list (the **"NFT Site"**) that, as of its genesis issuance, is linked to the artwork, digital content or other collectible that is provided by you to the Service Provider (**"Artwork"**). |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | By submitting a request and creating an NFT on the NFT Site, you acknowledge that you have carefully read and agree to the Terms. |

By submitting a request and creating an NFT on the NFT Site, you acknowledge that you have carefully read and agree to the Terms.

If there is a conflict between the General Terms and this Service Schedule with respect to your use of the NFT Site or your NFTs, this Service Schedule shall prevail.

Your access to and use of the NFT Site is also governed by the terms in the General Terms that apply to the Site and references in the General Terms to "Site" should be read as including the NFT Site, unless the context provides otherwise.

**Intellectual property**

You represent and warrant that you own and control all rights in and to your Artwork and have the right to grant licenses to the Service Provider and its Affiliates and respective licensees and successors. In submitting any Artwork, you must not include any third party intellectual property (such as copyrighted materials) unless you have explicit permission from that party or are otherwise legally entitled to do so. You are legally responsible for all Artwork submitted by you. The Service Provider reserves the right to review and analyse your Artwork to help detect infringement and abuse, such as spam, malware and illegal content.

By submitting any Artwork, you grant the Service Provider a worldwide, non-exclusive, royalty-free, perpetual, sublicensable and transferable license to use the Artwork for any purpose, including for the minting of the NFT linked to your Artwork and hosting such Artwork for you and future transferees of the NFT, as well as for the promotion of the Services provided by the Service Provider and its Affiliates.

You also grant all other Users and future holders of your NFT a worldwide, non-exclusive, perpetual, and royalty-free license to view and access your Artwork.

**Prohibited activities**

You will not:

49

FTX_3AC_000013743

- submit any Artwork that (a) violates or encourages any conduct that would violate any Applicable Law or regulation or would give rise to civil or criminal liabilities; (b) is fraudulent, false, misleading or deceptive; (c) is defamatory, obscene, vulgar, pornography or offensive; (d) promotes discrimination, bigotry, racism, hatred, harassment or harm against any individual or group; (e) is violent or threatening or promotes violence or actions that are threatening to any person or entity; or (f) promotes illegal or harmful activities or substantives;

- attack, hack, DDOS, interfere with, or otherwise tamper with the NFT or its underlying smart contract;

- access, tamper with or attempt to access the Service Provider and its Affiliates' computer systems or networks;

- attempt to probe, scan or test the vulnerability of the Service Provider and its Affiliates' system or network or breach any security or authentication measures;

- avoid, bypass, remove, deactivate, impair or otherwise circumvent any technological measures;

- interfere with, or attempt to interfere with, any other User or network, including without limitation sending a virus, overloading, flooding, spamming or mail-bombing;

- impersonate or misrepresent your identity or affiliation;

- use the NFT, the NFT Site or the Services, to conceal or transfer any proceeds relating to illegal or criminal activity;

- violate the Terms or any Applicable Law or regulation; or

- encourage or enable any third party to do any of the foregoing.

**No obligations**

The Service Provider and its Affiliates are not responsible for repairing, supporting, replacing or maintaining any website or network hosting your Artwork, nor do they have the obligation to maintain any connection or link between your NFT and the underlying Artwork. The Service Provider reserves the right to terminate, delete, take down or otherwise remove the Artwork and disconnect the link between the applicable NFT and the underlying Artwork at any time for any reason, including but not limited to if (a) you or any other NFT holder engage in any illegal or unlawful activity, (b) you or any other NFT holder are deemed to be in violation of the intellectual property rights of third parties, in each case as determined by the Service Provider in its sole discretion.

While the Service Provider may facilitate the ability to sell, re-sale, buy, transfer, withdraw, or otherwise engage in transactions involving the purchase, sale, or other transfer of a NFT, this functionality is provided without any guarantees of uptime, functionality, or serviceability. The Service Provider reserves the right to remove or otherwise limit any and all functionality, or to require additional conditions of access, for all Users or any User or group of Users, as determined by the Service Provider in its sole discretion.

**Disclaimers and risk disclosures**

NFTS ARE INTANGIBLE DIGITAL ASSETS. THEY EXIST ONLY BY VIRTUE OF THE OWNERSHIP RECORD MAINTAINED IN THE

CONFIDENTIAL

FTX_3AC_000013744

APPLICABLE BLOCKCHAIN NETWORK. ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY UNIQUE DIGITAL ASSET OCCURS ON THE DECENTRALISED LEDGER WITHIN SUCH BLOCKCHAIN NETWORK, WHICH WE DO NOT CONTROL. THE SERVICE PROVIDER DOES NOT GUARANTEE THAT IT CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY NFT.

ANY NFTS MINTED FOR YOU ARE PROVIDED "AS IS," WITHOUT WARRANTY OF ANY KIND. WITHOUT LIMITING THE FOREGOING, THE SERVICE PROVIDER EXPLICITLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUIET ENJOYMENT AND NON-INFRINGEMENT, AND ANY WARRANTIES ARISING OUT OF COURSE OF DEALING OR USAGE OF TRADE. THE SERVICE PROVIDER MAKES NO WARRANTY THAT THE NFTS WILL MEET YOUR REQUIREMENTS OR BE AVAILABLE ON AN UNINTERRUPTED, SECURE, OR ERROR-FREE BASIS. THE SERVICE PROVIDER MAKES NO WARRANTY REGARDING THE QUALITY, ACCURACY, TIMELINESS, TRUTHFULNESS, COMPLETENESS OR RELIABILITY OF ANY INFORMATION OR CONTENT ON THE NFT OR ITS UNDERLYING SMART CONTRACT OR BLOCKCHAIN NETWORK. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES IN CONTRACTS WITH CONSUMERS, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU.

THE SERVICE PROVIDER AND ITS AFFILIATES WILL NOT BE RESPONSIBLE OR LIABLE TO YOU FOR ANY LOSS AND TAKE NO RESPONSIBILITY FOR, AND WILL NOT BE LIABLE TO YOU FOR, ANY USE OF THE NFTS, INCLUDING BUT NOT LIMITED TO ANY LOSSES, DAMAGES OR CLAIMS ARISING FROM: (I) USER ERROR SUCH AS FORGOTTEN PASSWORDS, INCORRECTLY CONSTRUCTED TRANSACTIONS, OR MISTYPED WALLET ADDRESSES; (II) SERVER FAILURE OR DATA LOSS; (III) CORRUPTED CRYPTOCURRENCY WALLET FILES; (IV) UNAUTHORISED ACCESS; OR (V) ANY UNAUTHORISED THIRD PARTY ACTIVITIES, INCLUDING WITHOUT LIMITATION THE USE OF VIRUSES, PHISHING, BRUTEFORCING OR OTHER MEANS OF ATTACK AGAINST BLOCKCHAIN NETWORK UNDERLYING THE NFTS.

THE SERVICE PROVIDER AND ITS AFFILIATES ARE NOT RESPONSIBLE FOR ANY KIND OF FAILURE, ABNORMAL BEHAVIOR OF SOFTWARE (E.G., WALLET, SMART CONTRACT), BLOCKCHAINS OR ANY OTHER FEATURES OF THE NFTS.

**Indemnification; release**

You shall and agree to defend, indemnify and hold harmless the Service Provider, its Affiliates and service providers and, in each case, their Personnel (collectively, **"NFT Indemnified Parties"** and each an **"NFT Indemnified Party"**) from and against any and all claims and liabilities, costs, expenses, damages and losses (including any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal and other reasonable professional costs and expenses) (**"NFT Losses"** or **"NFT Loss"**) which any Indemnified Party may suffer or incur, arising directly or indirectly out of or in connection with: (a) your use of the NFT Site, including the minting and creation of your NFT, (b) your violation or anticipatory violation of any Applicable Laws in connection with your use of the NFT Site or the NFTs, (c) any actual or alleged infringement of the intellectual property rights of others

CONFIDENTIAL

FTX_3AC_000013745

by you, and (d) any act of gross negligence, willful or intentional conduct by you.

You will cooperate as fully required by the NFT Indemnified Parties in the defence of any such claims and NFT Losses. The NFT Indemnified Parties retain the exclusive right to assume the exclusive defence and control of any claims and NFT Losses. You will not settle any claims and NFT Losses without the Service Provider's prior written consent.

You hereby agree to release each of the NFT Indemnified Parties from any and all claims and demands (and waive any rights you may have against any of the NFT Indemnified Parties in relation to any NFT Losses you may suffer or incur), arising directly or indirectly out of or in connection with any dispute that you have with any other User or other third party in connection with the NFT Site or the NFTs.

**Limitation of liability**

TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER THE SERVICE PROVIDER NOR ITS AFFILIATES OR SERVICE PROVIDERS INVOLVED IN CREATING, PRODUCING, OR DELIVERING THE NFTS WILL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS, LOST REVENUES, LOST SAVINGS, LOST BUSINESS OPPORTUNITY, LOSS OF DATA OR GOODWILL, SERVICE INTERRUPTION, COMPUTER DAMAGE OR SYSTEM FAILURE OR THE COST OF SUBSTITUTE PRODUCTS OR SERVICES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THIS SERVICE SCHEDULE OR FROM THE USE OF OR INABILITY TO USE OR INTERACT WITH THE NFTS OR ACCESS THE ARTWORK, WHETHER BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT THE SERVICE PROVIDER, ITS AFFILIATES, OR ITS SERVICE PROVIDERS HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGE, EVEN IF A LIMITED REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

TO THE MAXIMUM EXTENT PERMITTED BY THE LAW OF THE APPLICABLE JURISDICTION, IN NO EVENT WILL THE SERVICE PROVIDER AND ITS AFFILIATES' TOTAL LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS SERVICE SCHEDULE, YOUR USE OF THE NFT SITE, OR YOUR USE OF OR INABILITY TO USE OR INTERACT WITH THE NFTS OR ACCESS THE ARTWORK EXCEED TEN U.S. DOLLARS (USD $10.00).

THE EXCLUSIONS AND LIMITATIONS OF DAMAGES SET FORTH ABOVE ARE FUNDAMENTAL ELEMENTS OF THE BASIS OF THE BARGAIN BETWEEN THE SERVICE PROVIDER AND YOU.

CONFIDENTIAL

FTX_3AC_000013746

## SCHEDULE 13
### SERVICE SCHEDULE
### TERMS APPLICABLE TO AUSTRALIAN USERS ONLY
#### (Updated September 18, 2022)

Appendix A will form part of the Terms and apply to you if you are using the Exchange to buy, sell, exchange hold or otherwise transact in Digital Assets that are being provided by FTX Australia.

---

1.    **FIAT CURRENCY TO DIGITAL ASSET (AND VICE VERSA) CONVERSION SERVICES**

If you are depositing fiat currency, or instructing the conversion of Digital Assets to fiat currency, the conversion of:

a)    your deposit of fiat currency to Digital Assets; and

b)    your withdrawal of Digital Assets to fiat currency,

will be processed by a third-party DCE provider. The name of the DCE provider is provided on the FTX Website at the time you enter into any transaction.

You agree that you only place orders to convert fiat currency to Digital Assets (and vice versa) with the DCE provider. You do not place orders with FTX Trading or FTX Australia for the conversion of fiat currency to Digital Assets or vice-versa.

If you send fiat currency to the DCE provider, the DCE provider shall convert your fiat currency to stablecoins automatically by default. FTX Trading does not hold client money or E-Money for clients of FTX Australia. Any account balances shown in fiat currency are provided for convenience only. All such balances are held by FTX Trading in stablecoins.

You also agree to accept any additional terms and conditions of the DCE provider relevant to the conversion services it is providing and disclosed to you at the time any

---

2.    **FINANCIAL SERVICES OR FINANCIAL PRODUCTS PROVIDED BY FTX AUSTRALIA**

Only FTX Australia will, or may, provide you with financial services or financial products under its Australian Financial Services Licence.

Neither FTX Trading or the DCE provider will, or may, provide you with financial services or financial products.

---

53

FTX_3AC_000013747

3.    **STANDING AUTHORISATION PROVIDED TO FTX AUSTRALIA**

As a pre-condition to you acquiring any service or product from FTX Australia, you acknowledge that you will provide FTX Australia with a 'Standing Authorisation' as set out in the FTX Australia Terms and Conditions ("**FTX Australia Terms**") to issue sell order(s) on your behalf to the DCE, which orders will impact the Digital Assets held in your FTX Digital Wallet.

4.    **YOUR DIGITAL ASSETS ARE ONLY HELD BY FTX TRADING**

Please note that you never provide Digital Assets to FTX Australia, and **FTX Australia does not hold any client property as defined in Part 7.8, Division 3 of the *Corporations Act 2001* (Cth).**

For the avoidance of doubt, you only provide Digital Assets to FTX Trading and it is only FTX Trading that will ever hold your Digital Assets.

FTX Australia only maintains a Standing Authorisation in relation your Digital Assets (as set out in the FTX Australia Terms).

5.    **DATA SHARING**

Both FTX Trading and FTX Australia will share your personal data with each other and with the DCE for the purposes of providing you with 'Services' set out in the FTX Terms, and DCE Terms and the FTX Australia Terms.

For the avoidance of doubt, FTX Trading will only collect, maintain, use and disclose personal information provided to us strictly in accordance with the Australian Privacy Principles in the *Privacy Act 1988* (Cth) and our Privacy Policy. You should carefully read the FTX Australia Privacy Policy, which provides details on how your personal information is collected, stored, protected and used by FTX Australia and any corresponding Privacy Policy provided by the DCE.

54

CONFIDENTIAL

**SCHEDULE 14**

**SERVICE SCHEDULE**

**TERMS APPLICABLE TO SOUTH AFRICAN USERS ONLY**

You acknowledge that any marketing, promotional, sales or similar activities contemplated in these Terms (**South African activities**) which take place in the Republic of South Africa are pursuant to FTX Trading being appointed as the juristic representative of Ovex FSP (Pty) Ltd (authorized FSP 50776) (**Ovex**) in terms of section 13(1)(b)(i)(aa) of the Financial Advisory and Intermediary Services Act, 2002 (**FAIS**) and that any such South African activities will not be performed by FTX Trading as principal.

Where you are domiciled in South Africa, you confirm that you have voluntarily elected, pursuant to any South African activities performed by FTX Trading as the juristic representative of and in the name of Ovex, to open an Account with, use the Services and trade on the Exchange of FTX Trading pursuant to these Terms. You acknowledge that any client support in relation to your Account, the Services and the Exchange which occur within South Africa will be effected by FTX Trading as the juristic representative of and in the name of Ovex.

You undertake to comply with any applicable exchange control regulations or any other applicable laws or regulations which may, from time to time, become applicable pursuant to you opening an Account, using the Services and the Exchange.

CONFIDENTIAL

## SCHEDULE 15
## SERVICE SCHEDULE
## TERMS APPLICABLE TO JAPAN USERS ONLY
### (Updated September 19, 2022)

The following terms will form part of the Terms and will apply to you if you are a resident of Japan who is using FTX Earn or has enabled Peer-to-Peer Crypto Borrowing and Lending ("**P2P Crypto Loans**") provided by FTX Trading.

FTX Trading provides and operates a peer-to-peer crypto asset borrowing and lending platform for matching Borrowers and Lenders of P2P Crypto Loans to users of FTX Japan Corporation (Cryptocurrency Exchange Business Kanto Finance Bureau Director No. 00002 and Type 1 Financial Instruments Business registrant) ("**FTX Japan**"). P2P Crypto Loans are available both via the Site as well as via the FTX Earn program on the Mobile Application.

By enabling and agreeing to borrow or lend P2P Crypto Loans (either via the Site or the FTX Earn program), you hereby acknowledge and agree that:

- you are an authorized and verified user of FTX Japan;

- P2P Crypto Loans are not provided by FTX Japan and all P2P Crypto Loan services are provided solely by FTX Trading;

- you have read and understood, and agree to the Terms of Service and FTX's Privacy Policy, each as amended from time to time;

- you authorize FTX Japan to share any information collected from you with FTX Trading as may be required under anti-money laundering laws or otherwise in compliance with applicable financial regulatory and other laws;

- if you're participating in the FTX Earn program, you are lending your crypto assets to third party borrowers in return for rewards which are variable for each crypto asset and changes hourly;

- you hereby authorize FTX Trading to instruct FTX Japan to borrow from and lend assets to Lenders and Borrowers, respectively, and to take all such actions as may be required to complete such P2P Crypto Loans on your behalf;

- you will only participate in P2P Crypto Loans for your own account and not for the account of others;

- you will not use P2P Crypto Loans for any illegal activities, unlawful conduct or other restricted purposes as set forth in the Terms;

- FTX Trading does not act as borrower or lender of any P2P Crypto Loans; and

Only FTX Japan users are eligible to participate in P2P Crypto Loans, either as a borrower or as a lender.

CONFIDENTIAL

**Lending**

To become a P2P Crypto Loan lender ("**Lender**"), you must have first deposited assets with FTX Japan into your FTX Japan account ("**Account**"). As a Lender, you can select "LEND" on the P2P Crypto Loans website or participate in the FTX Earn program on the Mobile Application, and specify the amount, minimum rate and type of crypto asset that you wish to lend out in order to become eligible to lend out your crypto assets. Your lending offer will then be submitted to FTX Trading's P2P Crypto Loan order book and automatically matched with borrowers, if any.

The amount of funds borrowed, funding rates and estimated funding rates are based solely on historical data, are not guaranteed and are subject to frequent change on an hourly basis. There is no assurance that you will be able to lend out your crypto assets, that there will be any borrowers available to you, that there will be any demand for crypto borrowing, or that any of the displayed lending rates are accurate. FTX Trading reserves the right, in its sole discretion, to determine the ordering and matching of Lenders and Borrowers. You further agree to pay any platform charges or fees that FTX Trading may provide from time to time.

You are not required to lend out any assets at any time. To stop lending out your assets, (a) go to the P2P Crypto Loans website and click on "STOP LENDING" at any time, or (b) if you are participating in the FTX Earn program on the Mobile Application, click on "Disable" in "Profile" → "Earn rewards on assets".

All loans of crypto assets via the P2P Crypto Loans website are non-recourse loans. You agree that your sole recourse in the event of default of a Borrower's P2P Crypto Loan is the seizure and/or liquidation of assets held in the Borrower's Account. You agree, and shall cause all of your agents, representatives and affiliates to agree, not to seek recourse or recompense against any funds, assets or properties owned by a Borrower outside of the Borrower's Account at any time.

LENDING CRYPTO ASSETS VIA P2P CRYPTO LOANS IS VERY HIGH RISK AND ARE NOT INSURED IN ANY WAY BY FTX TRADING, ANY GOVERNMENTAL AGENCY, OR ANY THIRD PARTY. AS A LENDER, YOU MAY SUSTAIN A TOTAL LOSS OF YOUR LENT CRYPTO ASSETS IF THE BORROWER DEFAULTS ON A P2P CRYPTO LOAN AND SEIZURE AND/OR LIQUIDATION OF THE BORROWER'S ACCOUNT FAIL TO REPAY SUFFICIENT CRYPTO ASSETS TO COVER THE BORROWER'S DEBT TO YOU OR OTHER LENDERS.

**Borrowing**

To become a P2P Crypto Loan borrower ("**Borrower**"), you must have first deposited crypto assets with FTX Japan into your Account as collateral. As a borrower, you can select "Enable Peer to Peer borrowing" on the P2P Crypto Loans website to enable borrowing of crypto assets from other FTX Japan users. The amount of crypto assets that you are entitled to borrow from time to time is determined based on a number of factors, including the amount of crypto assets made available by lenders for borrowing, the amount of crypto assets available in your Account as collateral, crypto asset market liquidity and volatility conditions, national, regional and global economic conditions, legal and regulatory requirements, as well as other factors that FTX Trading may consider from time to time.

All borrowed crypto assets using the P2P Crypto Loans website are **non-recourse** with respect to any assets held by the Borrower in the Borrower's Account. In other words, in the event of default, neither FTX Trading, any Lenders, nor any of their affiliates, agents or representatives may seek recourse or recompense against any funds, assets or properties owned by a Borrower outside of the Borrower's Account. In the event of default of a Borrower's P2P Crypto Loan, the sole recourse of any Lender is the seizure and/or liquidation of assets held in the Borrower's Account.

CONFIDENTIAL                                                            FTX_3AC_000013751

You agree to pay (a) any interest charges that may accrue on your P2P Crypto Loan, which you may view on the P2P Crypto Loans website, and (b) any platform charges or fees that FTX Trading may provide from time to time, which will be viewable on the P2P Crypto Loans website as well.

You are not required to borrow any crypto assets at any time. By enabling P2P Crypto Loan borrowing, you agree to do so at your own risk. You acknowledge and agree that any crypto assets borrowed from a Lender via a P2P Crypto Loan may be used for any purposes on the FTX Japan trading platform, including for trading, collateral and withdrawals, provided however, that you agree that FTX Trading may instruct FTX Japan to limit withdrawals of crypto assets borrowed under P2P Crypto Loans in the event that there is insufficient assets in your Account.

BORROWING P2P CRYPTO LOANS ON FTX TRADING IS VERY HIGH RISK. AS A BORROWER, YOU MAY SUSTAIN A TOTAL LOSS OF CRYPTO ASSETS IN YOUR ACCOUNT. THE HIGH VOLATILITY AND SUBSTANTIAL RISK OF ILLIQUIDITY IN THE MARKETS MEANS THAT YOU MAY NOT BE ABLE TO LIQUIDATE YOUR ACCOUNT ASSETS IN TIME, OR AT ALL. IF THE VALUE OF THE ASSETS HELD IN YOUR ACCOUNT FALLS BELOW THE MINIMUM BALANCE REQUIREMENT OR FTX TRADING DETERMINES IN ITS SOLE DISCRETION THAT YOUR ACCOUNT APPEARS TO BE IN DANGER OF DEFAULTING ON A P2P CRYPTO LOAN, FTX TRADING OR THE APPLICABLE LENDER(S) MAY, DIRECTLY OR INDIRECTLY, SEIZE AND LIQUIDATE ANY OR ALL OF YOUR POSITIONS AND ASSETS IN YOUR ACCOUNT TO REPAY YOUR BORROWED CRYPTO ASSETS.

CONFIDENTIAL

FTX_3AC_000013752

別紙 15

サービスに関する別紙

日本のユーザーにのみ適用される規約

以下の規約は、本約款等の一部を構成し、FTX Earn を利用しているか又は FTX トレーディングが提供する P2P 貸借暗号資産取引（以下「**P2P 貸借暗号資産取引**」といいます。）をご利用可能な日本国に居住するお客様に適用されます。

---

FTX トレーディングは、P2P 貸借暗号資産の貸付人及び借受人のマッチングのための P2P 貸借暗号資産取引プラットフォームを FTX Japan 株式会社（暗号資産交換事業者（登録番号関東財務局長第 00002 号）、第一種金融商品取引業登録業者）（以下「**当社**」といいます。）のユーザー向けに提供し、運営します。P2P 貸借暗号資産取引は当社ウェブサイトを通じて、また、モバイルアプリの FTX Earn プログラムを通じて利用可能です。

（当社ウェブサイト又は FTX Earn プログラムのいずれかを通じて）P2P 貸借暗号資産取引における借受け又は貸出しを可能とし及び合意することで、お客様は以下の事項を了承し、同意します。

- お客様は当社により認定・認証されたユーザーです。

- P2P 貸借暗号資産取引は当社が提供するのではなく、P2P 貸借暗号資産取引に係るサービスは全て FTX トレーディングが単独で提供しています。

- お客様は、ご利用規約及び FTX のプライバシーポリシー（それぞれ随時なされる修正を含みます。）を精読及び理解し、並びにこれらに同意しました。

- お客様は、当社がアンチマネーロンダリング法上必要な場合に又は適用ある金融規制その他の法律に従ってお客様から収集する情報を FTX トレーディングに共有することを認めます。

- FTX Earn プログラムに参加されているお客様の場合、お客様の暗号資産は、各暗号資産に応じて変更する可能性があり、1 時間単位で変動する報酬と引き換えに第三者借受人に貸し出されます。

- お客様は、FTX トレーディングが当社に対して本貸出人及び本借受人それぞれとの間で資産の借受け及び貸出しを行い、お客様に代わり P2P 貸借暗号資産取引を完了するために必要な全ての措置を講じるよう指図することを認めます。

- お客様は、ご本人の勘定でのみ P2P 貸借暗号資産取引に参加し、他人の勘定で参加しません。

- お客様は、P2P 貸借暗号資産を違法行為、不法行為、その他本約款等に定める制限された目的のために利用しません。

- FTX トレーディングが P2P 貸借暗号資産の借受人又は貸出人となることはありません。

当社のユーザーのみが、借受人又は貸出人のいずれかとして P2P 貸借暗号資産取引に参加する資格を有します。

59

CONFIDENTIAL

### 貸出し

お客様が P2P 貸借暗号資産取引の貸出人（以下「**本貸出人**」といいます。）となるには、まず資産をお客様が当社に開設した口座（以下「**お客様口座**」といいます。）に預託する必要があります。お客様は本貸出人として、P2P 貸借暗号資産取引ウェブサイトで「貸出し」を選択するか又はモバイルアプリの FTX Earn プログラムに参加し、貸出しを希望する暗号資産の数量、最低貸借料率及び暗号資産の種類を指定することで、お客様の暗号資産を貸し出す資格を得ます。お客様の貸出しオファーは FTX トレーディングの P2P 貸借暗号資産取引注文板に提出され、自動的に借受人（もしいれば）とのマッチングが行われます。

借受け額、資金調達率及び予想資金調達率は実績データのみに基づいており、保証されておらず、1 時間ごとに頻繁に変更されます。お客様の暗号資産を貸し出すことのできる借受人がいるか、お客様が貸し出すことのできる借受人がいるか、暗号資産の借受けの需要があるか、又は表示された貸借料率が正確であるかは、保証されません。FTX トレーディングは、単独の裁量において本貸出人及び本借受人の注文及びマッチングを決定する権利を留保します。お客様はさらに FTX トレーディングが随時定めるプラットフォーム手数料を支払うことに同意します。

お客様はいかなる時も資産を貸し出す必要はありません。お客様の資産の貸出しをストップするには、(a) 何時でも P2P 貸借暗号資産取引ウェブサイトにアクセスして「STOP LENDING」をクリックするか、又は(b) モバイルアプリ上で FTX Earn プログラムに参加しているお客様の場合、「プロフィール」の「無効にする」をクリックし、「資産で利益を得られます」をクリックします。

P2P 貸借暗号資産取引ウェブサイトを利用した貸し付けた暗号資産は全て**責任財産限定型**消費貸借です。お客様は、本借受人の P2P 貸借暗号資産取引で債務不履行となった場合にお客様が遡及できるのは本借受人の口座において保有されている資産の差押え及び／又は決済のみであることに同意します。お客様は何時でも本借受人の口座外に本借受人が所有する資金、資産若しくは財産からの償還又はこれらによる補償を求めないことに同意し、お客様の全ての代理人、代表者及び関連会社に同意させます。

*P2P 貸借暗号資産取引を通じた暗号資産の貸出しは、極めて高いリスクを伴い、FTX トレーディング、政府機関又は第三者によって何ら保証されていません。本借受人が P2P 貸借暗号資産取引で債務不履行となり、かつ本借受人の口座の差押え及び／又は決済ではお客様又は他の本貸出人に対する本借受人の負債の補填に十分な暗号資産の返済ができない場合、お客様は本貸出人として貸し出した暗号資産を全て失う可能性があります。*

### 借受け

P2P 貸借暗号資産の借受人（以下「**本借受人**」といいます。）になるには、まず暗号資産を担保としてお客様口座において当社に預託する必要があります。お客様は借受人として P2P 貸借暗号資産取引ウェブサイトで「P2P 借受けを有効とする」を選択することで当社の他のユーザーから暗号資産を借り受けることができます。お客様が借り受けることのできる暗号資産の数量は、貸出人が借受けに提供する暗号資産の数量、お客様口座で担保として利用可能な暗号資産の数量、暗号資産市場の流動性及びボラティリティの状況、国、地域及び世界の経済状況、法律上及び規制上の要件並びに FTX トレーディングが随時検討するその他の要因を含む多くの要因に基づいて決定されます。

60

FTX_3AC_000013754

P2P 貸借暗号資産取引ウェブサイトを利用して借り受けられた暗号資産全てについて、**責任財産は**本借受人の口座において本借受人が保有する資産**に限定されます**。言い換えると、債務不履行の場合、FTX トレーディング、本貸出人又はその関連会社、代理人若しくは代表者のいずれも本借受人の口座外に本借受人が所有する資金、資産若しくは財産からの償還又はこれらによる補償を求めることはできません。本借受人が P2P 貸借暗号資産取引で債務不履行となった場合、本貸出人が遡及できるのは本借受人の口座において保有される資産の差押及び／又は決済のみです。

お客様は、(a) P2P 貸借暗号資産に付される利息（P2P 貸借暗号資産取引ウェブサイトで閲覧できます。）、及び (b) FTX トレーディングが随時定めるプラットフォーム手数料（これも P2P 貸借暗号資産取引ウェブサイトで閲覧可能です。）を支払うことに同意します。

お客様はいかなる時も暗号資産を借り受ける必要はありません。P2P 貸借暗号資産の借受けを可能とすることで、お客様はご自身がリスクを負担して借受けを行うことに同意します。お客様は、P2P 貸借暗号資産取引を通じて本貸出人から借り受けた暗号資産が当社の取引プラットフォーム上で取引、担保及び引出を含むあらゆる目的で利用される可能性があることを了承し、同意します。但し、お客様は、お客様口座に十分な資産がない場合は FTX トレーディングが P2P 貸借暗号資産取引に基づき借り受けられた暗号資産の引出を制限するよう当社に指図する可能性があることに同意します。

*FTX トレーディングでの P2P 貸借暗号資産の借受けは極めて高いリスクを伴います。お客様は借受人として、お客様口座内の全ての暗号資産を失う可能性があります。マーケットにおける高いボラティリティ及び重大な非流動性リスクの存在は、お客様がお客様口座内の資産を期限内に決済できないか又は決済が全くできなくなる可能性があることを意味します。お客様口座において保有される資産の価額が最低必要残高を下回るか又は FTX トレーディングが単独の裁量でお客様口座の P2P 貸借暗号資産について債務不履行となるおそれがあると判断する場合、FTX トレーディング又は関連する本貸出人は、お客様が借り受けた暗号資産の返済のためにお客様口座内のポジション及び資産の全部又は一部を直接又は間接的に差し押え、決済する可能性があります。*

61

CONFIDENTIAL

FTX_3AC_000013755

**SCHEDULE 16**
**SERVICE SCHEDULE**
**TERMS APPLICABLE TO UK USERS ONLY**
**(Updated September 29, 2022)**

Products and services related to a specified investment for the purposes of the UK Financial Services and Markets Act 2000 (Regulated Activities) Order 2001 may not be promoted or offered to residents of the United Kingdom, unless they fall within the certain exemptions from the UK financial promotions regime under article 12 (Overseas Recipients), article 19 (Investment Professionals), article 48 (High Net Worth Individuals), article 49 (High Net Worth Companies, Unincorporated Associations), article 50 (Sophisticated Investors) and article 50A (Self-certified Sophisticated Investors) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, or they have otherwise be lawfully communicated in accordance with the Financial Services and Markets Act 2000 and the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005.

62

CONFIDENTIAL

# Exhibit 2

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

- - -

In re:  FTX Trading Ltd., et al.

Debtors.

Chapter 11

Case No.

22-11068 (JTD)

- - -

September 24, 2025

- - -


Videotaped deposition of

STEVEN P. COVERICK, conducted at Latham &

Watkins, 1271 Avenue of the Americas, New

York, New York, commencing at 10:00 a.m.

EDT, on the above date.

Magna Legal Services
866-624-6221
www.MagnaLS.com


Marie Foley
RMR, CRR



Page 82

1
2  intimately familiar?
3     A.   No, I've not spent a material
4  amount of time on any other specific
5  creditor litigation.  I'm aware that there
6  are still disputed claims, we still have a
7  disputed claim reserve on account of those
8  claims, but I have not become intimately
9  involved with any of those disputes to
10  date.
11     Q.   Do you consider yourself
12  intimately involved with the Three Arrows
13  litigation dispute?
14     A.   I do.
15     Q.   Okay.
16         What is the -- in terms of the
17  other creditor disputes, what is the one
18  that you are next most knowledgeable of?
19         MR. GLUECKSTEIN:  Object to the
20     form.
21     A.   There are large sponsorship
22  claims, for example, that I've had some
23  involvement in the -- in the negotiation
24  of the amount of those claims.  That's an
25  example.

Page 83

1
2     Q.   What's a sponsorship claim?
3     A.   This would be a claim for monies
4  related to sponsorship agreements with
5  FTX.  So for example, there were certain
6  celebrities that FTX had sponsorship
7  agreements with that have filed claims on
8  account of those sponsorship agreements,
9  and I've had some level of involvement in
10  the discussion about those claims.
11     Q.   Are you generally involved in
12  any other creditor litigation involving
13  preference claims?
14     A.   I am not intimately familiar
15  with any other preference claim dispute as
16  of today.
17     Q.   So, I suggested you keep your
18  original declaration on the side.  We'll
19  turn back to that for a moment.
20     A.   Okay.
21     Q.   When I'm saying "original
22  declaration," to be clear, I'm referring
23  to the one you filed on June 20th.
24         Is that understood?
25     A.   Understood.

Page 84

1
2     Q.   Okay.
3         So look at paragraph 7, for
4  example.
5     A.   Okay.
6     Q.   You define something in this
7  paragraph as the, quote, account balance.
8         Do you see that?
9     A.   Yes, sir.
10     Q.   How do you, in your own words,
11  or in FTX's words, define account balance?
12     A.   I would reference the language
13  used in my declaration, which is the
14  aggregate balance of all asset
15  entitlements associated with a customer
16  account.
17     Q.   What's an aggregate balance?
18     A.   It would represent the summation
19  of all credits and debits related to that
20  account made on the exchange letter --
21  ledger with applicable pricing applied.
22     Q.   What's the exchange ledger?
23     A.   The exchange ledger is a
24  database that is stored on an Amazon Web
25  Services server that was used to record

Page 85

1
2  every transaction conducted on the
3  exchange.
4     Q.   Is it still being stored there,
5  or was it served -- stored there at the
6  relevant time?
7     A.   The -- the exchange ledger is
8  still stored on an Amazon Web Services
9  environment.
10     Q.   Is that the same environment
11  that was used relative to the -- relative
12  to the pre-petition debtors and the
13  pre-petition FTX exchange?
14     A.   As a technical matter, the
15  original environment was preserved and
16  a -- a duplicate environment, a mirror
17  environment with the exact same data
18  was -- was created for purposes of
19  performing analysis, and the reason for
20  that is to ensure the preservation of the
21  original data as it existed on the
22  petition date.
23     Q.   And when did that duplication or
24  preservation occur?
25     A.   Sometime shortly after the

Page 90

1
2  question related to account balance, which
3  I defined as the aggregate balance of all
4  asset entitlements.  The account balance
5  when the exchange was operating was
6  expressed in U.S. dollars on the website
7  FTX.com.
8          As a part of the transactions or
9  credits and debits that I testified were
10  recorded on the exchange ledger, that
11  would include credits and debits related
12  to deposits, withdrawals, and other trades
13  that the customer may have made, as well
14  as transfers that the customer account may
15  have received or sent.
16      Q.   I'm not asking about the account
17  balance.  I'm just asking you about your
18  use of the word entitlements here.
19          Pre-petition, could an
20  entitlement include a entitlement to a
21  digital asset other than U.S. dollars?
22      A.   I'm sorry, I -- I answered that
23  question.  It included the value of the
24  asset you're -- whatever asset you're
25  referencing.  So for example, their

Page 91

1
2  entitlement -- if I can use an example, if
3  someone had one bitcoin in their account
4  balance on the exchange ledger, their
5  account balance or the entitlement to that
6  account balance would represent the
7  current value of one bitcoin.
8      Q.   In U.S. dollars?
9      A.   Correct, when it comes to the
10  account balance.
11          They could also withdraw that
12  value in a variety of different forms,
13  including, in that example, they could
14  withdraw a bitcoin.  Not all
15  cryptocurrency was available for
16  withdrawal, but bitcoin, FTX, was, or they
17  could withdraw that value in U.S. dollars.
18      Q.   Pre-petition then, just to make
19  sure I'm understanding correctly,
20  entitlements included the ability to
21  withdraw an asset that was credited to
22  that account?
23      A.   For certain assets, correct.
24      Q.   Which assets?
25      A.   I don't have the entire list

Page 92

1
2  memorized.  There were thousands of
3  cryptocurrencies that traded on the
4  exchange.
5      Q.   Let me ask it this way.
6          What kind of assets were traded
7  on the exchange that could not be
8  withdrawn as a customer entitlement
9  pre-petition?
10      A.   Again I don't have all of the
11  assets that traded on the exchange
12  memorized, but I could reference some
13  categories.  One category could be what
14  are referred to as locked tokens.  So
15  these are tokens that you -- a customer
16  could gain an entitlement to through a
17  trade or a transfer or other transactions
18  but could not trade themselves and could
19  not withdraw; they were locked in their
20  account balance.
21          Another category is there were
22  certain products that traded on the
23  exchange like what are referred to as
24  tokenized stocks that only existed on the
25  exchange ledger.  These are -- these are

Page 93

1
2  entitlements that traded on the exchange
3  ledger but were never minted on the
4  blockchain and therefore could not be
5  withdrawn from the account.
6          I'm sure there are other
7  examples.  I -- I do not have the entire
8  product list --
9      Q.   So --
10      A.   -- committed to memory.
11      Q.   I'm sorry, I didn't mean to
12  speak over you there.
13          So if a customer had a
14  pre-petition entitlement to one bitcoin,
15  to use your example, and wanted to
16  withdraw that one bitcoin, would their
17  entitlement also entitle them to the
18  value -- U.S. dollar value of that
19  bitcoin?
20      A.   Sure.  It depends on -- it
21  depends on how you want to view the
22  value -- value has to be expressed in a
23  denominator.  You can express value in
24  U.S. dollars.  Other people may express
25  value in another currency or even a

Page 94

```
1
2    cryptocurrency like bitcoin.
3         Q.   So was that pre-petition
4    entitlement, in the case of a customer who
5    had a positive one bitcoin balance, either
6    to the bitcoin itself or to the U.S.
7    dollar value of that bitcoin?
8         A.   A customer could extract the
9    value of that bitcoin subject to having
10   availability in their account.  When I
11   refer to availability in their account, it
12   depends on other factors as to how they
13   built that position in their account, but
14   they could extract that value from the
15   exchange in a variety of manners.  They
16   could withdraw the one bitcoin; they could
17   convert that bitcoin to U.S. dollars and
18   withdraw stable coin from the account, for
19   example, or receive a deposit in their
20   bank account of traditional fiat U.S.
21   dollars.
22        There's a variety of ways
23   customers could extract their available
24   balance from the exchange while this was
25   operating prior to a short period of time
```

Page 95

```
1
2    just before the petition date.
3         Q.   And subject to the limitations
4    you've just referenced, the customer
5    entitlement include -- included any
6    available method of extraction?
7         A.   I'm sorry, can you repeat the
8    question?
9         Q.   You said that a customer could
10   extract value in a variety of manners.
11        Did the customer entitlement
12   include each variety that was available to
13   them?
14        MR. GLUECKSTEIN:  Object to the
15   form.
16        A.   If a customer had asset value
17   available in their account that was
18   available to be withdrawn, there are
19   multiple ways they could extract that
20   value from the exchange.  The facts and
21   circumstances around the specific assets
22   they had available would -- would need to
23   apply to answer that question.  It depends
24   on the -- the remaining composition of
25   that customer account.
```

Page 96

```
1
2         Q.   And each of those available ways
3    was an entitlement that customer had?
4         MR. GLUECKSTEIN:  Object to the
5    form.
6         A.   Again, I -- I define
7    entitlements as the positions that
8    customers built in their accounts when
9    aggregated together defined as the account
10   balance.
11        I'm also testifying that
12   customers traditionally had the ability to
13   withdraw assets from the exchange in a
14   variety of manners subject to having an
15   available account balance.
16        Q.   Who -- when a customer had a
17   pre-petition asset entitlement as you're
18   using that term, who are they entitled to
19   receive something from?  FTX?
20        MR. GLUECKSTEIN:  Object to the
21   form.
22        A.   FTX held assets related to
23   customer accounts.  When a customer would
24   initiate a withdrawal, that withdrawal
25   would come from either bank accounts or
```

Page 97

```
1
2    cryptocurrency addresses in the possession
3    of FTX.
4         Q.   Did a customer entitlement
5    ever -- pre-petition, were customer
6    entitlements ever received from bank
7    accounts or crypto addresses owned by or
8    possessed by other customers?
9         A.   That's not how an exchange like
10   FTX operates.
11        An exchange connects customers
12   with one another.  The FTX exchange was in
13   possession of assets related to customer
14   deposits.  If a customer withdrew assets,
15   those assets would either come from FTX
16   bank accounts or cryptocurrency addresses
17   in the possession of the FTX Group.
18        Q.   Were customer entitlements, as
19   FTX is using that term, pre-petition,
20   tracked in some way by FTX?
21        A.   Yes.  As I mentioned before,
22   customer entitlements were recorded and
23   tracked on the exchange ledger.
24        Q.   And that exchange ledger, that
25   used the AWS service, for purposes of
```

**MAGNA** ▶
LEGAL SERVICES

Page 98

1
2  tracking, or is that --
3      A.   It was --
4      Q.   Is that a different
5  functionality?
6      A.   Sorry for speaking over you.
7          It was stored on a server hosted
8  by Amazon Web Services.
9      Q.   So the ledger is what did the
10 tracking, and it was stored on a server
11 maintained by AWS; is that correct?
12     A.   I think that's a correct
13 representation, yes.
14     Q.   Was QuickBooks used in any way
15 by FTX pre-petition for entitlement
16 tracking?
17     A.   QuickBooks was FTX -- the
18 accounting system that FTX used for
19 corporate accounting.  It was not used to
20 track account balances on the exchange.
21     Q.   Have you seen the master ledger?
22         MR. GLUECKSTEIN:  Object to the
23 form.
24     A.   I have seen extracts and I have
25 seen images of the exchange ledger, yes.

Page 99

1
2      Q.   Through a website?  How did you
3  see them?
4      A.   On one of my employee's
5  computers.  Throughout the pendency of the
6  case, there were different times that I
7  needed to view the ledger.
8      Q.   What software or service, if
9  any, was that employee using to present to
10 you the ledger?
11     A.   I'm not familiar with the exact
12 software that the exchange ledger would be
13 viewed on any point in time.
14     Q.   What types of transactions were
15 tracked via that ledger -- via that master
16 ledger?
17     A.   All transactions that were
18 conducted on the exchange.
19     Q.   I'm referring not to
20 transactions, but to asset entitlements.
21         So what type of asset
22 entitlements were tracked?
23     A.   Asset --
24         MR. GLUECKSTEIN:  Object to the
25 form.

Page 100

1
2      A.   Asset entitlements are comprised
3  of all transactions on the exchange.
4          So again, the ledger tracks all
5  transactions that comprise the account
6  balance.
7      Q.   Including futures transactions?
8      A.   The ledger tracks all futures
9  transactions, correct.
10     Q.   All digital assets such as
11 bitcoin transactions?
12     A.   The ledger tracks all bitcoin
13 transactions.  But just to make my
14 testimony clear, not all transactions
15 result in a change in the account balance.
16     Q.   What's an example of a
17 transaction that might not result in a
18 change to the account balance, as you
19 define it?
20     A.   Sure.  I -- I give quite a few
21 examples of this in my declaration, but a
22 very simple example would be if a customer
23 had an account balance comprised of one
24 bitcoin and at a given minute, that
25 bitcoin was worth let's just say $50,000.

Page 101

1
2  If they sold that bitcoin at that point,
3  that would be a transaction recorded on
4  the exchange ledger, but their account
5  balance would remain unchanged.  The
6  composition of that account balance would
7  change.  Prior to the transaction
8  occurring, it would reflect an entitlement
9  to one bitcoin valued at $50,000.  After
10 the transaction occurring, immediately
11 after, it would reflect U.S. dollars of
12 $50,000, but the account balance would not
13 change.
14         Similarly, futures on the
15 exchange did not have intrinsic value.
16 They were a contract of differences
17 between two customers.  So if a customer
18 opened a futures position, absent
19 relatively de minimis trading fees that
20 are incurred during every transaction that
21 are paid to the exchange, there would be
22 no change in the account balance for at
23 least 30 seconds until the first
24 settlement period for that future.  So
25 there are type -- those are the types of

**MAGNA**
LEGAL SERVICES

1
2    3AC.  I'm not saying that that is how it
3    was aggregated in the exchange ledger.
4        Q.    But just so I'm clear, for
5    purposes of your analysis, you're
6    considering other fiat currencies beyond
7    USD as within the USD balance as you're
8    defining it?
9        A.    Yes, for purposes of analysis
10   with regard to the 3AC claim, that's
11   correct.
12       Q.    You mentioned one way in which a
13   customer can increase their sub-balance of
14   fiat currency is to sell a bitcoin, for
15   example, if they're allowed and available
16   to do so?
17       A.    That is one way.
18       Q.    Once it's sold that one bitcoin,
19   what rights, if any -- what entitlements,
20   if any, does it have to that previously
21   sold bitcoin?
22       A.    Once again, a customer could
23   conduct a number of transactions.  They
24   could do another trade to be able to
25   withdraw a bitcoin if they wanted to.

1
2        But again, as I testified, to
3    withdraw a bitcoin from the exchange while
4    it was operating, you needed to have a
5    bitcoin in your account balance as -- as
6    recorded on the exchange ledger, and to
7    withdraw U.S. dollars, again absent all
8    the other considerations like margin
9    requirements, et cetera, you would need
10   a -- a U.S. dollar balance available to be
11   able to withdraw U.S. dollars.
12       Q.    Could a U.S. dollar balance be
13   negative?
14       A.    Yes.
15       Q.    Was that -- could a digital
16   asset balance such as bitcoin, could that
17   balance be negative?
18       A.    Yes, that's my understanding.
19       Q.    When a U.S. dollar balance was
20   negative, was that negative amount of that
21   sub-balance owed in any way?
22           MR. GLUECKSTEIN:  Object to the
23   form.
24       A.    There are different
25   circumstances that a U.S. dollar balance

1
2    could be negative.  One of the
3    circumstances is by participating in the
4    borrowing program on the exchange.  If a
5    customer participated in the borrowing
6    program, they would owe the other
7    customers that participated in the lending
8    pool of that program.
9        Q.    Is that a debt?
10           MR. GLUECKSTEIN:  Object to the
11   form; calls for a legal conclusion.
12       A.    I'm not a lawyer, so I can't
13   opine on the legal definition of debt.
14   The exchange defined these as borrowers,
15   and the terms of service, although I'm not
16   a lawyer and can't interpret the terms of
17   service, my businessperson understanding
18   specify that the lenders bore the risk of
19   defaults on those borrows.
20       Q.    But that balance was not allowed
21   to stay negative forever.  At some point,
22   it had to zero out or become positive?
23       A.    That would defend -- that would
24   depend on the facts and circumstances of
25   the customer account.

1
2        Q.    Are there ways to incur a
3    negative U.S. dollar balance other than
4    participation in a margin program?
5        A.    There are other ways to -- to
6    build a negative USD balance.
7        Q.    What's an example?
8        A.    An example would be that FTX
9    from time to time extended lines of credit
10   to customers, and it is possible that
11   utilizing a line of credit could cause a
12   customer to have a negative USD balance.
13       Q.    Was that negative USD balance in
14   that scenario owed by that customer?
15       A.    So, everything within an account
16   balance has to be taken in context of the
17   entire account.  You cannot have a
18   negative USD balance without positive
19   balances to other asset entitlements.  So,
20   the extent that it was owed is a legal
21   conclusion that I'm not qualified to -- to
22   weigh in on, but you could not develop a
23   negative balance in U.S. dollars without
24   having a positive balance in other asset
25   entitlements.  And one operating rule of

MAGNA
LEGAL SERVICES

Page 122

1
2  knowledge of how the exchange operated, my
3  knowledge of how future contracts are
4  structured on the FTX exchange, my team's
5  review of the code base of the FTX
6  exchange.
7      Q.   You referenced futures contracts
8  being presented to customers in some way
9  on the exchange earlier.
10         Do you recall that testimony?
11     A.   I do.
12     Q.   And that was in a Positions tab,
13  is it -- is that the term you used?
14     A.   Correct.
15     Q.   And what -- what -- how, if at
16  all, in that Positions tab was the value
17  of a futures contract presented to the
18  customer?
19     A.   I don't have the exact
20  composition of the website memorized.  I
21  understand that it listed out the
22  different futures positions that the
23  customer held, the quantity of those, and
24  the reference price of those contracts.
25  The reference price being the thing that

Page 123

1
2  determines the gain or loss on that
3  contract in every 30-second period.
4      Q.   When you say this presentation
5  to customers, quote, listed out the
6  different futures positions that the
7  customer held, is this simply listing out
8  the number of contracts they had in a
9  certain futures position, the value of
10  those contracts?  What did it list out
11  exactly?
12     A.   Again --
13         MR. GLUECKSTEIN:  Object to the
14     form.
15     A.   Again, as I just testified, I
16  don't have the image of what the website
17  looked like completely memorized.  That's
18  not something that my team expressly
19  relies on for any analysis.
20         I do know that the Positions tab
21  listed the tickers of the future contracts
22  that a customer had open.  It listed the
23  quantity of the customer contracts.  I
24  know it listed the reference price of
25  those future contracts.  I also recall

Page 124

1
2  that it had a couple of -- a button to
3  close the future contract position.
4      Q.   Did it list out the notional
5  value of the futures positions?
6      A.   I don't recall.
7      Q.   Have you seen that presentation
8  in that tab personally, examples of it?
9      A.   I have seen images of the FTX
10  website, yes.
11     Q.   And have you seen images
12  personally of that tab that you were just
13  testifying to?
14     A.   I have personally seen images of
15  that tab over the pendency of my
16  involvement with FTX.
17     Q.   Did a customer have a
18  sub-balance reflected on that tab as to
19  the futures positions?
20     A.   I -- I don't recall.
21     Q.   What other tabs were presented
22  to customers who logged in to the FTX
23  exchange?
24     A.   I don't recall every tab that
25  was displayed on -- on the interface.  I

Page 125

1
2  know there was a tab that displayed their
3  account balance.  I know there was a tab
4  that displayed -- I believe there was a
5  tab that displayed their borrowing or
6  lending positions.  I know there were
7  other tabs in addition to the -- the
8  Positions tab, but I do not have the
9  entire website committed to memory.
10     Q.   You referenced personally
11  reviewing a tab in preparation for this
12  deposition or litigation reflecting the
13  value of or other measurements with
14  respect to futures contracts.
15         We request that counsel produce
16  the images of that tab that Mr. Coverick
17  reviewed.
18         MR. GLUECKSTEIN:  That
19     completely misstates his testimony.
20     He testified very clearly that he
21     reviewed over the course of his
22     three-year engagement with FTX and not
23     specifically in connection with this
24     litigation.
25         Counsel, I would request that

MAGNA ▶
LEGAL SERVICES

Page 126

1
2      you stop mischaracterizing his
3      testimony.
4          MR. PROULX:  Well, let's make
5      sure the record is -- is clean.
6  BY MR. PROULX:
7      Q.   Mr. Coverick, when is the last
8  time that you reviewed that tab?
9      A.   I do not recall.
10     Q.   Was it within the last six
11 months?
12     A.   I do not recall.
13     Q.   Was it in connection with this
14 litigation?
15     A.   No.
16         MR. PROULX:  Counsel, the
17     request stands.
18 BY MR. PROULX:
19     Q.   Was the customer presented with
20 the amount, if any, of U.S. dollar
21 entitlements that it had on the exchange?
22     A.   I am generally aware that a
23 customer could view their USD balance on
24 the exchange.
25     Q.   Where was that reflected with

Page 127

1
2  respect to the interface the customer saw
3  on the exchange?
4      A.   That would be reflected on the
5  same page that reflected their entire
6  account balance as a subcomponent of their
7  account balance.
8      Q.   Where, if anywhere, was a
9  customer, to use a simple example,
10 presented with their bitcoin balance on
11 the exchange?
12     A.   As a subcomponent of their
13 account balance, I know at a minimum it
14 was included on that same page.
15     Q.   When you were before testifying
16 as to those different tabs and the
17 contents that the customer saw on them, is
18 that the same thing you're speaking about
19 in paragraph 8 of your declaration where
20 you refer to the, quote, user interface?
21     A.   When I refer to the user
22 interface in my declaration, I'm referring
23 to the FTX.com website in general.
24     Q.   And your testimony with respect
25 to the Futures tab and then the account

Page 128

1
2  balance information and sub-balance, is
3  that all within the, quote/unquote, user
4  interface that's within the confines of
5  your declaration here?
6      A.   I'm testifying that the -- the
7  tab or page that included positions was
8  part of the FTX website that I'm also
9  referring to as the user interface.
10     Q.   You talked about --
11         MR. PROULX:  Strike that.
12         (Coverick Exhibit 12, Objection
13     of the FTX Recovery Trust to the
14     Amended Proof of Claimed Filed By the
15     Joint Liquidators of Three Arrows
16     Capital, was marked for
17     identification, as of this date.)
18 BY MR. PROULX:
19     Q.   So, you've been handed what's
20 been marked as Exhibit Number 12.  This is
21 the Objection to the FTX Recovery Trust to
22 the Amended Proof of Claim Filed By the
23 Joint Liquidators of Three Arrows Capital
24 Ltd.
25         Are you familiar with this

Page 129

1
2  document?
3      A.   I am familiar with the objection
4  of the recovery trust to the claim filed
5  by 3AC.  I have not reviewed this entire
6  impact that's just been put in front of
7  me.  It looks to be consistent with that
8  claim objection.  I'm not sure if it has
9  all of the attachments to the objection,
10 but I -- I do recognize at a minimum
11 the -- the -- the cover page.
12     Q.   I appreciate that.  Just to make
13 sure the record is clean and I'm not
14 misstating any testimony here, is this a
15 document you reviewed in preparation for
16 your deposition?
17     A.   Yes, sir.
18     Q.   Thank you.
19     A.   I did.
20     Q.   Are you aware that this
21 objection cites your declaration, original
22 declaration, in a number of instances?
23     A.   I am aware of that, yes.
24     Q.   Paragraph 6 of this dec --
25 excuse me, of this objection refers to the

**MAGNA**
LEGAL SERVICES

Page 138

```
1
2       Q.   Did any customers on the FTX
3   exchange have entitlements to digital
4   assets in June of 2022?
5       A.   Many customers had account
6   balances in June of 2022.
7       Q.   Are you -- are you -- I'm asking
8   about entitlements to digital assets.
9            Is that your definition of
10  account balance?
11      A.   No, I believe I've answered
12  that, and it's reflected in my
13  declaration.  Let me reference that.
14      Q.   So then answer my question.
15           Are --
16           MR. GLUECKSTEIN:  Can you just
17      not interrupt the witness, please,
18      when he's answering the question.
19           MR. PROULX:  The question was
20      it.
21           MR. GLUECKSTEIN:  You can ask
22      another one when he's finished.
23  BY MR. PROULX:
24      Q.   The question was, did any
25  customers have entitlements to digital
```

Page 139

```
1
2   assets in June of 2022?
3       A.   And my answer was many customers
4   had account balances in June of 2022.
5           MR. PROULX:  Move to strike the
6      answer as nonresponsive.
7   BY MR. PROULX:
8       Q.   You've mentioned that
9   customer -- I think you testified that
10  Three Arrows digital asset entitlements
11  were not stored in Three Arrows accounts;
12  is that correct?
13      A.   I testified that digital assets
14  were not stored in customer accounts
15  because that's not possible.
16      Q.   And where were Three Arrows'
17  entitlements to digital assets stored --
18           MR. PROULX:  Excuse me.  Strike
19      that.
20      Q.   Where are the digital assets
21  underlying Three Arrows' entitlements to
22  those digital assets stored?
23           MR. GLUECKSTEIN:  Object to the
24      form; lack of function.
25      A.   So, all digital assets related
```

Page 140

```
1
2   to exchange activities were stored in
3   commingled wallets with other assets of
4   the FTX Group and other assets of the
5   exchange, other digital assets of the
6   exchange.
7       Q.   Are they -- I just want to make
8   sure I'm using the right terminology here.
9   You mentioned commingled wallets.
10           What's a wallet?
11      A.   I'm sorry, I -- I -- that's
12  technically incorrect.  That's a phrase
13  that's commonly used as something that
14  stores cryptocurrency.  Technically
15  wallets only store the private keys used
16  to access addresses on the blockchain
17  which store cryptocurrency.
18           The correct way to describe that
19  would have been, and is, commingled
20  addresses.
21      Q.   And in these commingled
22  addresses, did FTX pool digital assets
23  underlying other customers' beyond Three
24  Arrows' asset entitlements?
25      A.   When I say commingled addresses,
```

Page 141

```
1
2   I'm referencing the fact that many
3   customers deposited cryptocurrency into
4   addresses in the possession of the FTX
5   Group.  Those deposits were then
6   commingled with other deposits of
7   cryptocurrency from other customers.
8       Q.   Did FTX include in those
9   commingled addresses any assets other than
10  those deposited by customers on the FTX
11  exchange such as assets that FTX acquired
12  in its own name?
13      A.   It's the position of the estate
14  that all assets in the possession of the
15  FTX Group are -- are property of the
16  estate.  So it would be difficult for me
17  to -- to delineate between the two.  But
18  in general, cryptocurrency was commingled.
19      Q.   I'm asking a different question.
20           Factually, were there any assets
21  in those commingled addresses other than
22  those that customers deposited into the
23  FTX exchange?
24      A.   As I've just said, I -- it's not
25  possible for me to delineate between --
```

MAGNA
LEGAL SERVICES

Page 190

1
2  positions versus sell-side positions, or
3  do you keep them separate?
4       Help me understand that.
5       MR. GLUECKSTEIN:  Object to the
6   form.
7    A.   At the end of the day,
8  everything is netted out and aggregated to
9  reach the total account balance.  So a
10 dollar gain would increase -- on one
11 contract would increase the account
12 balance by a dollar, all else equal, and a
13 dollar loss would offset that dollar gain
14 in the account balance.
15    Q.   In which component of the
16 account balance do -- do gains or losses
17 from futures contract affect, in FTX's
18 view?
19    A.   The gains and losses were
20 credited to the user's USD balance.
21    Q.   Could a customer stand to
22 recover at some period in time the full
23 notional value of its futures contract?
24    A.   At any -- no.  At any point in
25 time, you could not recover the full

Page 191

1
2  notional value because it was not an asset
3  position.
4    Q.   I'm not asking about asset
5  positions.  I'm asking about the amount
6  from -- that a customer stood to receive
7  in value from holding a perpetual futures
8  contract, could that have equaled the
9  notional value of that futures contract?
10       MR. GLUECKSTEIN:  Object to the
11   form.
12    A.   No.  The only impact on an
13 account balance related to futures
14 contracts are the gains or losses off of
15 those positions calculated every 30
16 seconds and credited to the account every
17 30 seconds.
18       A customer cannot buy -- cannot
19 buy a future.  They enter into a future
20 contract or open a future contract
21 position.  At no point in time are they
22 entitled to receive the entire notional
23 value of the account balance, or of the --
24 I'm sorry, of the notional value.
25    Q.   So why, on page 1 of this

Page 192

1
2  document we have in front of us there's a
3  section called expiration, in the middle
4  of that section it says:  For instance,
5  say that you deposited ten thousand of
6  collateral and used it to buy 10 BC
7  quarterly futures.
8       Is that wrong?  Can you not buy
9  quarterly futures?
10       MR. GLUECKSTEIN:  Object to the
11   form.
12    A.   I don't know who wrote this
13 document or what the intent was.  All I
14 know, in -- and the FTX Trust's position
15 is that you cannot buy futures.  You open
16 futures contracts.  To the extent there's
17 confusing language in a pre-petition
18 document, I can't speak to that because I
19 don't know who the author was or what the
20 intent was.
21    Q.   So then if FTX isn't relying on
22 any of these explainer documents; is that
23 correct?
24       MR. GLUECKSTEIN:  Object to the
25   form; misstates the testimony; assumes

Page 193

1
2  facts not in evidence.
3    A.   I did not say that.
4    Q.   Is FTX relying on this
5  particular document to form its position
6  with respect to futures contracts?
7       MR. GLUECKSTEIN:  Object to the
8   form; calls for a legal conclusion.
9    A.   FTX is relying on the analysis
10 performed in -- with respect to futures
11 contracts and their impact on the account
12 balance, FTX is relying on the analysis in
13 my declaration which was predicated on a
14 review of the code base of the exchange
15 and how the change operated at the time it
16 was functional.
17       FTX did not do analysis
18 reflected in the claim objection or my
19 declaration that's entirely reliant on any
20 document in its -- in its isolation.
21    Q.   Is that true of your
22 supplemental declaration as well?
23       MR. GLUECKSTEIN:  Object to the
24   form.
25    A.   It is -- again, my supplemental

MAGNA
LEGAL SERVICES

Page 226

1
2    someone being willing to open the long
3    side and someone being able to open --
4    being willing to open the short side and
5    it would -- the matching engine algorithm
6    of the exchange would connect those two
7    counterparties together.
8        Q.   They -- they didn't proactively
9    find each other, but they used the FTX
10    exchange for that matching?
11        A.   That's correct.
12        Q.   The contract -- the -- are these
13    contracts governed by any sort of written
14    terms?
15        A.   I am not aware of the existence
16    of any separate legal agreements or
17    documentation regarding futures contracts.
18        Q.   Separate from what?  Are you
19    saying that there is some document that
20    speaks to these?
21        A.   Other than the economic
22    transaction that they were entering into
23    on the exchange.
24        Q.   So fair to say they couldn't be
25    negotiated, these futures contracts?

Page 227

1
2        A.   I wouldn't say that.
3        Q.   Could they be negotiated?
4        A.   Well, in effect, the reference
5    price of a future contract is the product
6    of the market's negotiation of that price.
7    There are people willing to open the
8    contract at certain prices, people
9    willing -- on the long side, people
10    willing to take the sell-side at different
11    prices.  So the reference price on the
12    exchange at any point in time reflects the
13    market -- the market's aggregate
14    negotiation of that price.
15        Q.   An individual customer who
16    entered -- who enters into a futures
17    contract, they can't set the reference
18    price; that's governed by the market?
19        A.   They can decide whether or not
20    they want to open the contract at the
21    prevailing price.
22        Q.   Do they have any other agency,
23    or does it stop there?
24        MR. GLUECKSTEIN:  Object to the
25    form.

Page 228

1
2        A.   As with -- as with any aspect
3    of -- of futures contracts, they can
4    decide whether they want to or do not want
5    to enter into the contract, but there are
6    this -- to answer your question more
7    specifically, I don't believe there's any
8    other specific terms other than the
9    quantity of contracts that they open that
10    they can specify.
11        Q.   When a customer enters into a
12    futures contract, do they know who their
13    counterparty is?  Is that disclosed to
14    them by FTX or otherwise in some way?
15        A.   No.  When the exchange was
16    functional, I am not aware of any
17    disclosure of who the counterparty to any
18    trade was, or any transaction that
19    occurred on the exchange, whether it be
20    opening futures contracts or buying or
21    selling cryptocurrency positions.
22        Q.   In paragraph 29 of your
23    declaration and otherwise in your
24    deposition today, you -- you indicate that
25    these contracts result in a credit or

Page 229

1
2    debit -- debit to the USD balance every 30
3    seconds.
4        Do you see that?
5        A.   I do.
6        Q.   What's the basis for asserting
7    that that crediting or debiting happens
8    every 30 seconds?
9        A.   A review of my team's review of
10    the exchange code base to confirm that is
11    how the account balance was updated.
12        Q.   And is that code base reflected
13    in any of the ten spreadsheets that you
14    describe in your original declaration as
15    underlying your analysis therein?
16        A.   No.  As I think I explained
17    earlier, but I -- I can clarify, the --
18    the documents I reference in my
19    declaration that were produced to 3AC are
20    extracts from the exchange database into
21    Excel or other readable formats.  I
22    believe one of them may have been produced
23    in a -- in a database format, but I'm not
24    certain.
25        The code used to operate the

Page 234

1
2  referenced in help pages that have been
3  produced. If it's not, then it would be
4  my testimony.
5      MR. PROULX: Well, we have
6  not -- been unable to, despite
7  diligent efforts to corroborate that
8  30-second interval based on any sort
9  of transactional data that A&M has
10  produced to us or FTX has produced to
11  us that A&M has relied on, and we do
12  request production of document --
13  document that corroborate that
14  position.
15      MR. GLUECKSTEIN: You don't need
16  to respond to that.
17      Your position is noted. We
18  disagree with it and the witness
19  testified to this issue. So we'll
20  write it down with the rest of your
21  requests that are going to be
22  rejected.
23      MR. PROULX: Are you rejecting
24  them now, or are you saying they're
25  going to be rejected? I don't know if

Page 235

1
2      I see a difference, Brian.
3      MR. GLUECKSTEIN: We'll take it
4  under advisement.
5  BY MR. PROULX:
6      Q. Is it FTX's position that
7  futures contracts had no value to those
8  who had opened them?
9      A. I wouldn't characterize future
10  positions as having no value because they
11  can generate gains or losses every 30
12  seconds, but at any point in time, they
13  have no intrinsic value due to how
14  frequently those gains and losses are
15  settled.
16      Q. Could a customer's futures
17  positions or contracts be liquidated or
18  seized by FTX?
19      A. You -- lic -- a customer's
20  futures positions could be liquidated in
21  the sense that they could be closed by
22  FTX.
23      Again, there's nothing to --
24  there's nothing to sell. It's simply
25  finding a counterparty to step in to

Page 236

1
2  the -- the side of the contract that the
3  liquidating account would have been in.
4      Q. Is that something that FTX, in
5  fact, did?
6      A. Yes --
7      MR. GLUECKSTEIN: Object to the
8  form.
9      A. FTX did close future positions
10  on customer accounts that were being
11  liquidated, yes, frequently.
12      Q. What are the general
13  circumstances in which that may have
14  occurred?
15      MR. GLUECKSTEIN: Object to the
16  form.
17      A. The circumstances where that
18  occurs is one of the fundamental aspects
19  of the exchange which is that accounts
20  were not permitted to have negative
21  balances. Due to the volatility of gains
22  and losses that could be generated from a
23  perpetual future position, the maintenance
24  margin requirement came into play and was
25  reflected in the code base as being the --

Page 237

1
2  the determination of whether an account
3  had sufficient collateral to maintain a --
4  a futures position or other levered
5  positions. To the extent an account did
6  not have -- did not sufficiently satisfy
7  the maintenance margin requirements, that
8  account would begin to be automatically
9  liquidated as -- as structured in the code
10  base of the exchange. If that account had
11  open future contracts, that liquidation
12  would involve the closing of future
13  contracts.
14      Q. When FTX closed a futures
15  contracts in the manner you've just
16  described, would they ever assume the
17  position of the customer that had the
18  contract closed on them, or would they
19  always find some other customer in the
20  market to assume that position?
21      A. The exchange itself, FTX, did
22  not step into the other side of the
23  contracts. It, again, used first the
24  matching engine, so depending on the
25  liquidity of the contract, for example,

Page 238

1
2    BTC perps, perpetual futures related to
3    bitcoin, were -- were very commonly
4    entered into and -- and closed, or, for a
5    simple term, traded much so if someone's
6    account was liquidated for a BTC perp
7    contract, it's likely, depending on the
8    point in time, but that's a more liquid,
9    if you will, market, and so there are more
10    willing counterparties for that product to
11    step into the other side.
12        For less frequently traded
13    futures and other coins, there may be less
14    market participants amongst the customer
15    base willing to step into the other side,
16    and there were a type of market maker on
17    the exchange that are often referred to as
18    backstop liquidity providers that opted
19    into a program where they agreed to step
20    into those positions if there wasn't an
21    ample market to otherwise take them.
22        Q.   What, if anything, did the FTX
23    exchange, I think you referred to it as
24    the user interface in your declaration,
25    present to customers regarding any

Page 239

1
2    realized or unrealized losses or gains on
3    their futures contracts and for what
4    duration?
5        I know that was a lot.  I'm
6    happy to take that step-by-step if
7    helpful.  If you understand the question,
8    please answer.
9        MR. GLUECKSTEIN:  Object to the
10    form.
11        A.   Can you repeat the question?  I
12    do not understand it.
13        Q.   I'll take this step-by-step.
14        Was a customer shown unrealized
15    gains for futures contracts in its user
16    interface on the FTX exchange?
17        A.   The realized gains were
18    reflected in their USD balance.  They
19    settled every 30 seconds, and so they
20    would see their realized gains every 30
21    seconds appear in their USD balance.
22        Q.   I was actually asking about the
23    unrealized gains.
24        What, if anything, are
25    customers -- were customers pre-petition

Page 240

1
2    shown about those?
3        A.   I cannot recall specifically
4    what information, if there was any
5    intermittent within the 30 seconds
6    displayed on the website.  I can't recall
7    that.
8        Q.   Are customers, understanding
9    your position that the realized gains are,
10    in some way, factored into the U.S. dollar
11    balance, are the total realized gains
12    arising from a particular futures
13    contracts or type of futures contracts
14    separately presented to the customer?
15        A.   Again, I cannot recall
16    everything that was presented to the
17    customer.  The website changed frequently.
18    So I can't speak to all of the information
19    they may have been able to see.  But they
20    could certainly see the change in their
21    USD balance at a certain point in time.
22        Q.   Let me ask you this.
23        How -- how, if at all, could a
24    customer tell whether its futures
25    positions were paying off or not for it?

Page 241

1
2        A.   They would see an increase in
3    their USD balance if they were profitable
4    positions.
5        Q.   But don't -- doesn't other
6    things affect the USD balance such as the
7    need to borrow for margin -- regular
8    margin trading, nonfutures margin trading?
9        A.   Sure, there are other --
10        Q.   Receipt of interest payments.
11    Just let me finish my question.  Receipt
12    of interest payments for participation in
13    a lender program, for example?
14        MR. GLUECKSTEIN:  Object to the
15    form.
16        A.   Yes, there are other factors
17    that impact the USD balance.
18        Q.   When, if ever, were Three
19    Arrows' futures positions on the exchange
20    closed?
21        A.   I believe they were closed --
22    well, I -- I believe -- I don't have the
23    entire transaction history committed to
24    memory, but I believe 3AC opened and
25    closed perpetual futures in the ordinary

**MAGNA ▶**
LEGAL SERVICES

1
2  course on a fairly regular basis
3  throughout the history of their account.
4        I do understand that positions
5  were closed after June 12th.
6        Q.    And you used the passive voice
7  there, were closed.
8        Is it your position that Three
9  Arrows closed those contracts after June
10 12th?
11       A.    Sorry, I just want to reference
12 one place in my declaration just to be
13 certain my testimony's accurate.
14       Q.    Perfectly fine.
15       A.    Yes, that -- that is correct
16 that -- said differently, the only
17 transactions that I'm aware of that 3AC
18 did not conduct within their account
19 relate to approximately $82 million of
20 value -- account balance neutral
21 transactions to close positions in spot
22 Ethereum FTT, GBTC and ETHE, to use the
23 abbreviations, as well as for $81 million
24 and another million dollars of additional
25 spot liquidations that were performed on

1
2  June 14th.  Every other transaction in the
3  history of 3AC's account, based on all
4  evidence I'm aware of or all knowledge I
5  have, was performed by 3AC.
6        Q.    And just so I'm clear, which
7  paragraph are you looking at or
8  referencing in your declaration at this
9  moment?
10       A.    I'm sorry.  I'm referencing
11 paragraph 77.
12       Q.    What entitlements, if any, did a
13 customer who realized gains pursuant to a
14 futures contract have?
15       A.    I'm -- I'm sorry, can you repeat
16 your question?
17       Q.    Sure.
18       What entitlements, if any, for a
19 customer who realized gains on a futures
20 contract, what, if any, what entitlements
21 did that customer have?
22       A.    The gain would result in an
23 increase to the USD balance within their
24 account.
25       Q.    So a customer would have an

1
2  entitlement to USD corresponding --
3        A.    The customer --
4        Q.    -- to the gain on that position?
5        A.    The customer, in the -- in my
6  view and the estate's position, had a
7  singular entitlement that was the account
8  balance.  The USD would have been a
9  component of that account balance.
10       Q.    Account balance, just to make
11 sure I -- I'm understanding your prior
12 testimony, that's -- that's always
13 reflected in U.S. dollars; is that -- that
14 is correct?
15       A.    That's correct, that is how it
16 was presented on the exchange.
17       Q.    So is it FTX's position that at
18 all times over the history of the entire
19 exchange pre-petition and post-petition,
20 customers never had entitlements to
21 underlying digital assets?
22       MR. GLUECKSTEIN:  Object to the
23 form.
24       A.    I believe I already testified to
25 this earlier.

1
2        It's the position of the estate
3  that FTX customers had an account balance,
4  and represented in U.S. dollars that was
5  their entitlement against the exchange.
6        I also testified that customers
7  had the ability to withdraw other assets
8  from the exchange sub -- subject to the
9  various circumstances and requirements
10 that we discussed earlier.
11       Q.    And you -- are you drawing a
12 distinction, is FTX drawing a distinction
13 between an ability to withdraw a digital
14 asset from an entitlement to that digital
15 asset?
16       A.    I am not drawing any
17 distinction.  I am just stating the facts
18 as I understand them.
19       I understand customers had the
20 ability to withdraw certain assets subject
21 to the facts and circumstances of that
22 case and the various requirements, and I
23 also understand that an account balance
24 rep -- represented in U.S. dollars the
25 singular entitlement a customer had

MAGNA ▶
LEGAL SERVICES

1
2      2020 is marked as Exhibit 16.  The one
3  dated January -- excuse me.  June 2nd,
4  2020 is marked as Exhibit 17.
5      THE WITNESS:  I'm sorry, am I --
6  are you waiting for me?
7      MR. PROULX:  I'm just -- let me
8  know when you've had a moment to
9  review them.
10     THE WITNESS:  I -- I -- I --
11  I've viewed them.
12  BY MR. PROULX:
13     Q.   Have you seen documents like
14  this before?
15     A.   This appears to be an email.
16  I've seen emails before.
17     Q.   That's a cute answer.
18     I'm asking about trade
19  confirmations.
20     Have you seen FTX issue trade
21  confirmations to its customers?
22     A.   I do not recall all of the
23  emails that I've seen.
24     Q.   Are you aware --
25     A.   I cannot -- I cannot

1
2  specifically recall a specific trade
3  confirmation.
4      Q.   Are you aware of whether, in
5  fact, FTX sent trade confirmations to its
6  customers on the exchange?
7      A.   I am aware that there are
8  different levels of communication to FTX
9  customers.  I am not specifically -- I do
10  not specifically recall every
11  communication or have memorized every
12  communication the debtors are in
13  possession of or the FTX Recovery Trust is
14  in possession of.  But I am aware that
15  there were circumstances in which trade
16  confirmations were sent via email.
17     Q.   And those circumstances, are
18  they consistent with the type of documents
19  you're seeing here?
20     A.   Again, I don't have them
21  memorized.  So I can't verify consistency
22  or inconsistency with other emails.
23     Q.   Each of the documents is from
24  FTX OTT portal beginnings:  Hello Three
25  Arrows Capital limited.  Taking Exhibit 16

1
2  first.
3      You sold -- actually, taking 17
4  first, excuse me.  You bought (FTX sold 5)
5  BTC at a certain price in U.S. dollars
6  with a total cash of USD.
7      Do you see all that?
8      A.   I do.
9      Q.   What does it mean for a customer
10  to buy BTC from FTX?
11     A.   In context of this email, or in
12  general?
13     Q.   In context of a trade
14  confirmation.
15     A.   In general, my -- my
16  understanding of the term "buying BTC"
17  means that within the context of a
18  customer's account, they purchased a
19  entitlement to bitcoin for U.S. dollar
20  consideration within their account.
21     Q.   This doesn't say that you
22  purchased an entitlement that FTX owned,
23  does it?
24     A.   No, but you asked me for my
25  understanding, I thought.  I'm sorry if I

1
2  misunderstood the question.
3      Q.   Your answer was buying BTC means
4  that within the context of a customer's
5  account they purchased a entitlement to
6  bitcoin for U.S. dollar consideration
7  within their account.
8      Is that fair?
9      A.   That sounds like what I said.
10     Q.   What's the difference between
11  purchasing an entitlement to bitcoin
12  versus purchasing the bitcoin itself?
13     A.   To the extent that question is
14  related to title to an asset or whose
15  property an asset is, once again, I've --
16  I've said repeatedly that the estate's
17  position is that the confirmation order
18  settles those matters.
19     Typically, if I buy something, I
20  would expect to be in possession of it.
21  When -- when I say it's within the context
22  of their account, I mean that they did not
23  receive a bitcoin at an address that they
24  controlled, they being 3AC.  They acquired
25  a digital asset entitlement or an

Page 290

```
 1
 2   entitlement to bitcoin as recorded on the
 3   exchange general ledger.
 4       Q.   Now to the U.S. dollar value of
 5   a bitcoin, correct?
 6       A.   The U.S. dollar value of a
 7   bitcoin would be a component of their
 8   total account balance, which as I've
 9   stated previously is the estate's position
10   represents the entirety of a customer's
11   entitlement against the exchange.
12       Q.   Did an asset exist described in
13   this confirmation we're looking at here in
14   Exhibit 17?
15           MR. GLUECKSTEIN:  Object to the
16       form.
17       A.   Are you asking me if this
18   specific bitcoin existed?
19       Q.   Yeah.  The 5 bitcoin referenced
20   in this Exhibit 17, did that in fact exist
21   in the real world?
22           MR. GLUECKSTEIN:  Object to the
23       form.
24       A.   So, that's the thing about the
25   exchange is transactions such as these
```

Page 291

```
 1
 2   occurred on the exchange ledger.  The
 3   movement or location of digital assets had
 4   no relation other than deposits and
 5   withdrawals to the exchange ledger.  So
 6   when one customer entered into a sell
 7   trade and the other side of that trade was
 8   a buy trade for a customer, there was no
 9   underlying movement or underlying bitcoin
10   that was identified for that transaction.
11       Q.   I'm not -- I'm not sure if that
12   was responsive to my question.
13           Understanding FTX's position
14   that there was no movement of that asset,
15   that that asset nevertheless exists, the 5
16   bitcoin described here?
17       A.   That speaks to the traceability
18   conversation that we had earlier to
19   confirm whether something exists would
20   require you to be able to trace it.  And
21   sop my answer to your question is that
22   there were no underlying movements of
23   assets corresponding trades within
24   exchange accounts, and so it is impossible
25   to trace the existence of a particular
```

Page 292

```
 1
 2   bitcoin for that reason.
 3       Q.   I'm not -- I'm not, Mr. Coverick, I'm not
 4   asking about tracing here at all.  I'm not
 5   trying to engage in a metaphysical
 6   conversation with you.  I'm just asking if
 7   the thing exists in the real world?
 8           MR. GLUECKSTEIN:  Objection;
 9       argumentative.
10   BY MR. PROULX:
11       Q.   Does a bitcoin exist at a
12   particular address, regardless much
13   whether that address moved or not in a
14   confirmation order like this?
15           MR. GLUECKSTEIN:  Objection;
16       argumentative.
17       A.   Cryptocurrency is a digital
18   asset.  So the existence of a digital
19   asset requires tracing of that digital
20   asset on the blockchain.
21           What I'm saying is that trades
22   on the exchange were conducted on the
23   ledger of the exchange as it existed
24   within Amazon Web Services server.  It did
25   not relate to, or there was no underlying
```

Page 293

```
 1
 2   identification or movement of a particular
 3   bitcoin when a customer entered into a
 4   trade like this.
 5       Q.   Somewhere at an address
 6   potentially controlled by FTX were there
 7   five bitcoins that existed to make this
 8   transaction result in an actual
 9   entitlement?
10           MR. GLUECKSTEIN:  Object to the
11       form.
12       A.   Again, the -- the transaction
13   itself only existed or occurred on the --
14   on the ledger of the exchange.  That can
15   occur whether there are or not bitcoin in
16   the possession of FTX Trading limited.
17   It's simply an entry on to a ledger in a
18   database.
19       Q.   Would FTX have conducted that
20   ledger entry that you're describing if it
21   had zero bitcoin at any addresses that it
22   controlled?
23       A.   I can't speculate as to what FTX
24   would have or would not have done in
25   hypothetical circumstances.
```

MAGNA
LEGAL SERVICES

Page 362

1
2      A.    Can you repeat the question?
3      Q.    Yeah.
4            Are there any other documents,
5    internal documents, FTX is aware of that
6    speak to the terms of the -- of the margin
7    program?
8      A.    I cannot recall any specific
9    internal documents.  There -- there may be
10   internal emails, but I -- I don't have all
11   those committed to memory.
12     Q.    You're not sure?
13     A.    It's possible there are internal
14   documents.  I just cannot recall them as I
15   do not have all the documents committed to
16   memory.
17     Q.    What FTX customers, if any, were
18   permitted to participate in the margin
19   program pre-petition?
20           MR. GLUECKSTEIN:  Object to the
21   form.
22     A.    In general, customers could opt
23   in to the margin program subject to their
24   account being in compliance with all other
25   requirements of the exchange.

Page 363

1
2      Q.    Customer didn't need to have a
3    minimum account balance or anything like
4    this to participate in the margin program?
5      A.    I cannot recall if there are
6    specific minimum balance requirements or
7    not.
8      Q.    Did the margin program involve
9    lending of digital assets?
10     A.    Customers could lend both U.S.
11   dollars and digital asset balances within
12   their account balance.  That's my
13   understanding, yes.
14     Q.    What do you mean digital assets
15   within their account balance?
16     A.    So for example, if an account
17   balance included some bitcoin and some
18   U.S. dollar balance, a customer could
19   choose to lend either the U.S. dollars or
20   the bitcoin.  I'm not sure that every
21   digital asset entitlement that could be a
22   part of an account balance could be lent,
23   but I know that there were digital assets
24   that could be lent.
25     Q.    So an account balance was, at

Page 364

1
2    least for purposes of lending, composed of
3    both digital assets and U.S. dollar
4    balances?
5      A.    That's my understanding,
6    correct.
7      Q.    A customer wasn't only lending
8    it out -- who was participating in the
9    margin program wasn't only lending out
10   U.S. dollars; they were also lending out
11   digital assets?
12           MR. GLUECKSTEIN:  Object to the
13   form; misstates the testimony.
14     A.    As I said, a cust -- customers
15   had the ability to lend digital assets,
16   and they also had the ability to lend fiat
17   balances within their account balance.
18     Q.    Did they need an entitlement to
19   those two types of assets to lend them out
20   pursuant to the lending program?
21           MR. GLUECKSTEIN:  Object to the
22   form.
23     A.    Those components of the account
24   balance had to be in the account balance
25   for the customer to be able to lend them

Page 365

1
2    on the exchange.  In other words, I -- I
3    cannot think of a scenario where a
4    customer could lend something that it did
5    not have in its account balance.
6      Q.    So a customer had digital assets
7    in its account balance but not in its
8    account.  Is that FTX's position?
9      A.    No.  As I said previously, the
10   position of the FTX Recovery Trust is that
11   an account balance is comprised of all
12   debits and credits related to trading
13   activities, deposits, withdrawals, and any
14   other relatives which sum together
15   represent its aggregate account balance
16   which is the singular entitlement against
17   the exchange.
18           As I also testified, it is not
19   possible for cryptocurrency to be in an
20   account because an account is solely
21   comprised of ledger entries of debits and
22   credits.
23     Q.    Is a customer lending, pursuant
24   to the margin program, lending out the
25   credits and debits in its account or the

MAGNA ▶
LEGAL SERVICES

Page 366

1
2    digital assets associated with its
3    account?
4        A.   Like all other activities on the
5    exchange other than deposits and
6    withdrawals, activity on the exchange did
7    not result in the movement of digital
8    assets.  So when a customer,
9    quote/unquote, lent to another customer,
10   what effectuated that transaction was an
11   entry on the ledger of the exchange.  It
12   did not result in the movement of fiat
13   currency or cryptocurrency on the
14   blockchain.
15       Q.   So the relationship between the,
16   quote/unquote, lending customer and the
17   underlying asset that is being lent out is
18   what?
19       A.   I'm sorry, can you --
20           MR. GLUECKSTEIN:  Object to the
21       form.
22   BY MR. PROULX:
23       Q.   Does the lending customer own
24   the digital assets that are being lent out
25   pursuant to the margin program?

Page 367

1
2        A.   As I've testified previously,
3    the FTX Recovery Trust's position is that
4    the FTX Recovery Trust and prior to the
5    effective date the FTX debtors own the
6    assets of the exchange.
7        Q.   So does that mean lending
8    customers were lending out FTX's assets to
9    borrowing customers?
10           MR. GLUECKSTEIN:  Object to the
11       form.
12       A.   It means that lending customers
13   entered into an on-ledger transaction to
14   change the composition of both their
15   account balance and the account balance --
16   the composition of the account balance of
17   the party it was lending to within the
18   context of the exchange.  As I just
19   testified, there were no movement of you
20   think underlying assets when ledger
21   entries were made on the exchange with the
22   exception of when can you see deposited
23   cryptocurrency onto the exchange and when
24   customers withdrew cryptocurrency or fiat
25   from the exchange.

Page 368

1
2        Q.   So lending -- lending -- does
3    that mean that lending customers weren't
4    actually lending any digital assets at
5    all; they were lending ledger credit or
6    debit?
7        A.   I -- I believe that calls for a
8    legal conclusion that I'm not qualified to
9    make.
10           My understanding and what I have
11   verified is that when a customer
12   transacted on the exchange, with the
13   exception of deposits and withdrawals, it
14   simply resulted in the entry of debits an
15   credits on the exchange and there was a
16   movement of underlying assets.
17       Q.   Let me ask it -- thank you for
18   that.  Let me ask it this way just to make
19   sure I'm understanding correctly.
20           When a lending customer wants to
21   lend one bitcoin to a borrowing customer
22   pursuant to the margin program and that
23   bitcoin is on the exchange, does the
24   lending customer first obtain title to
25   that bitcoin from FTX before lending it to

Page 369

1
2    the borrowing customer?
3            MR. GLUECKSTEIN:  Objection;
4        calls for a legal conclusion.
5        A.   Again, I'm not qualified to
6    opine on circumstances under which title
7    may or may not transfer to a specific
8    asset.
9            The lending and borrowing
10   relationships on the exchange are a
11   product of changing compositions of
12   aggregate entitlements against the
13   exchange.
14       Q.   Are lending customers then
15   lending out their entitlements to
16   borrowing customers?
17           MR. GLUECKSTEIN:  Objection;
18       calls for a legal conclusion.
19       A.   When a customer lends to another
20   customer, and -- and to be clear,
21   customers did not lend directly to one
22   another in a one-to-one sense.  As I go
23   through in my declaration, it -- there was
24   a pool system where total borrow demand
25   and total lend supply was matched using a

MAGNA ▶
LEGAL SERVICES

Page 370

1
2  certain algorithm, meaning one pool went
3  to another pool.  There were debits and
4  credits made to the associated accounts.
5  On the borrow side, there would be an
6  appropriate debit and credit to the
7  positions being borrowed, and the flip
8  side would happen to the customers
9  lending.  Those transactions occurred and
10  were recorded on the exchange ledger.
11      Q.   Did the digital assets stay at
12  the exact same address the entire time
13  during the lending and borrowing and
14  repayment process?
15      A.   Digital assets were moving
16  constantly amongst addresses, but the
17  entry of a transaction such as a lending
18  transaction or any other trade on the
19  exchange did not result in the movement of
20  an underlying asset unless that
21  transaction was a deposit on to the
22  exchange or withdrawal from the exchange.
23      Q.   Thank you for that
24  clarification.
25          When a borrowing customer

Page 371

1
2  borrowed a, quote/unquote, asset from a
3  lending customer, could that borrowing
4  customer withdraw that asset from the
5  exchange?
6      A.   It depends.
7      Q.   What is an example where it
8  could?  What is an example where it
9  couldn't?
10      A.   A customer could withdraw assets
11  from the exchange to the extent it
12  satisfied the margin requirements and had
13  a positive balance of that subcomponent of
14  their account balance.  So for example,
15  you could not withdraw U.S. dollars if
16  your U.S. dollar balance was negative, nor
17  could you withdraw bitcoin if your bitcoin
18  balance was negative absent entering into
19  other transactions to convert those
20  subcomponents of the account balance.
21          So an example of when someone
22  could withdraw is if they borrowed a
23  bitcoin position in their account or
24  borrowed a U.S. dollar position in their
25  account, maintained a positive position

Page 372

1
2  with respect to that ticker and satisfied
3  the margin requirements of the account,
4  they could withdraw assets from the
5  exchange if they satisfied those
6  requirements.
7      Q.   So, in the second scenario where
8  a customer obtains one, to use a very
9  simple example I think we've been using
10  together over the course of today, when a
11  customer borrows one bitcoin pursuant to
12  the margin program and has otherwise
13  satisfied all applicable margin or
14  collateral requirements to withdraw that
15  asset, it could in fact withdraw that
16  asset?
17      A.   To be clear, and if I -- if I
18  said this, I misspoke, that asset does
19  not -- is not identifiable because it's
20  simply a ledger transaction on the
21  exchange.
22          My testimony is that if an
23  account had a positive bitcoin balance
24  within its account balance at a point in
25  time and met the maintenance margin

Page 373

1
2  requirements, it could withdraw bitcoin
3  from the exchange to the extent it
4  maintained above that level.
5      Q.   And just to use the super
6  simplified example, subject to all those
7  caveats you just mentioned, if a borrowing
8  customer received one bitcoin pursuant to
9  the margin program, could it review --
10  could it withdraw a bitcoin from the
11  exchange?
12      A.   Subject to all of those other
13  requirements.  It's tough to do a
14  hypothetical that simple because the
15  account balance would likely have other
16  aspects and other subcomponents to it, but
17  subject to meeting the maintenance margin
18  requirements, having a positive account
19  balance, and having a positive balance
20  within their account balance to that
21  ticker, my understanding is they could
22  withdraw an asset with that ticker.
23      Q.   So then the lending customers
24  weren't lending out specific assets to the
25  borrowing customer, right?

MAGNA ▶
LEGAL SERVICES

Page 374

1
2      A.    Again there was no movement of
3  underlying assets, and assets cannot be
4  traced to a specific customer account once
5  they're deposited on to the exchange
6  and -- and because there's no underlying
7  movement of assets, you can't trace all of
8  the trades that occur on the exchange to
9  other assets, but assets could be
10 withdrawn from the exchange subject to the
11 applicable requirements.
12     Q.    What happens if a lending
13 customer lends a bitcoin and prior to
14 repayment of that bitcoin ceases
15 participation in the margin program?
16     A.    I'm just trying to understand
17 your question.  If a lender lends a
18 bitcoin and prior to the repayment of that
19 bitcoin they want to opt out of lending?
20 Is that -- is that what you're asking?
21     Q.    Yes.
22     A.    So, the way the -- the margin
23 program worked with regard to borrowing
24 and lending was that at the beginning of
25 every hour, there was a calculation the

Page 375

1
2  exchange performed automatically to
3  aggregate what was referred to as the
4  borrow demand, so all customers requesting
5  to borrow assets by whatever tickers they
6  were requesting to borrow.  That's what I
7  referred to as the aggregate borrow
8  demand.
9          There was also a calculation of
10 customers willing to lend those assets by
11 ticker and at what rate they were willing
12 to lend.
13         There was an algorithm that then
14 matched and -- and sorted the lending
15 offers by interest rate lowest to highest,
16 sort of if you can envision a spreadsheet
17 of --
18     Q.    Yeah, I think you summarized
19 this in your declaration; is that right?
20     A.    I do, but it's relevant to the
21 question you asked if --
22     Q.    Please feel free to answer.
23     A.    -- if you don't mind.
24     Q.    Yeah, of course.
25     A.    That -- that process sorts the

Page 376

1
2  lending offers by interest rate, adds up
3  the dollar amount or the value of those
4  offers to -- to get to the same number as
5  the borrow demand.  Whatever the highest
6  interest rate is is applied to all loans.
7  So the lenders receive that highest
8  interest rate within that calculation, the
9  borrowers pay that rate, and that
10 calculation is done every time.
11         So, if a customer decided that
12 they wanted to opt out after lending, they
13 could do so, and each hour as that
14 calculation was performed, there would be
15 a different customer willing to
16 participate in the pool to effectively top
17 off the pool to lend to those pool of
18 borrowers.  But again, there's no
19 one-to-one relationship between borrowers
20 and lenders, so it's not as if a borrower
21 still had a bitcoin from a specific
22 customer.  It was a pool-to-pool
23 relationship.
24     Q.    And how -- how would the FTX
25 exchange ensure that a different customer

Page 377

1
2  performs that top-off you referenced
3  dollar-for-dollar if -- if a lending
4  customer opts out or pulls out or
5  terminates its participation in the margin
6  program?
7          MR. GLUECKSTEIN:  Object to the
8      form and misstates the testimony.
9      A.    I can't possibly know the amount
10 of lending offers versus borrow offers at
11 every point in time the exchange operated,
12 but it's my general understanding that
13 there were always ample offers to satisfy
14 the borrow demand.  The -- the question
15 was one of rate.  At a certain rate, there
16 were borrowers willing to lend -- or there
17 were lenders willing to lend, and that
18 calculation would be done every hour.
19     Q.    A lender shall a lending
20 customer in the margin program who lends
21 out a certain amount of bitcoin subject to
22 compliance with any applicable collateral
23 or margin requirements, can it withdraw
24 from the exchange that same quantity of
25 bitcoin?

**MAGNA** ▶
LEGAL SERVICES

Page 382

1
2  follow that question. Can you repeat
3  that?
4      Q.   Why are you -- why are there
5  limitations on a customer's ability to
6  lend or withdraw or borrow or withdraw
7  bitcoin so long as the customer maintains
8  a sufficient overall net account balance?
9      A.   Because there are margin
10 requirements that relate to all levered
11 positions or oper -- open futures
12 positions within the account, and if they
13 don't meet those requirements, they are
14 not -- the exchange would not let a
15 customer conduct a withdrawal that would
16 cause them to go below the maintenance
17 margin requirement and therefore be
18 liquidated. It prevented customers from
19 doing that.
20     Q.   My scenario assumes compliance
21 with any applicable margin or collateral
22 requirements.
23         MR. GLUECKSTEIN: Object to the
24 form of the question.
25     A.   Then, I'm sorry, I don't know

Page 383

1
2  the question.
3      Q.   We'll come back to it.
4          When a customer who lents --
5  lends digital assets pursuant to the
6  margin program receives its principal
7  back, how is that mechanical -- how does
8  that mechanically happen? What happens on
9  the FTX exchange at that moment?
10     A.   The ledger entry, in the
11 simplest example, just to stick with U.S.
12 dollars, would be a customer that lent
13 cryptocurrency -- or, I'm sorry. U.S.
14 dollars when they lent the money or when
15 they -- when they lent that value, it
16 removed the -- there was a difference
17 between the customer's total balance and
18 their available balance, and so the -- the
19 exchange both tracked how much U.S.
20 dollars the customer had in their account
21 balance as well as what was available
22 within that balance. The available
23 balance if something was being lent in its
24 entirety would be zero, and once they
25 opted out of the program or were no longer

Page 384

1
2  matched based on the interest rate they
3  were offering, the available balance would
4  increase back to the full amount of their
5  USD balance under the assumption that
6  that's what they lent originally.
7      Q.   But this is all -- this is all
8  happening on the ledger and only on the
9  ledger; is that correct?
10     A.   Yes, sir. The -- the borrowing
11 and lending transactions that are part of
12 the -- margin program, as we define
13 it, were recorded on the ledger.
14     Q.   You talked about an algorithm, I
15 believe, in your declaration. This is in
16 paragraph 15, to connect pools of
17 borrowers and lenders.
18         Do you recall that?
19     A.   Yes, sir.
20     Q.   What do you mean by an
21 algorithm?
22     A.   When I use the word "algorithm"
23 I am talking about the -- the code used to
24 connect the pools of borrowers and lenders
25 and -- and the math associated with that

Page 385

1
2  connection.
3      Q.   And is this -- this reviewer of
4  this code, is this something that your
5  team at Alvarez and Marsal assisted you to
6  understand?
7      A.   That's correct.
8      Q.   Anyone at FTX or the FTX
9  Recovery Trust assist with that
10 understanding of the code as well?
11     A.   I understand my team has spoken
12 with FTX employees. As I testified to, I
13 believe, this morning, I have not spoken
14 with any FTX employees about the code base
15 of the exchange directly, but I understand
16 that part of my team's process to review
17 the code included speaking with FTX
18 employees.
19     Q.   And I'm specifically referring
20 here to this algorithm of connecting pools
21 of borrowers and lenders.
22         Is that -- is that true of -- of
23 connecting with FTX employees on that
24 particular subject as well?
25     A.   Yes, as part of the code base of

Page 386

1
2  the exchange, that same answer is true.
3      Q.   Is each pool, as you use that
4  term, of borrowers and lenders
5  asset-specific?
6      A.   Each pool included the demand
7  and supply by ticker by interest rate.
8  Together those were added up, and when I
9  refer to them in my declaration, they
10 were -- they were aggregated together, but
11 the calculation is done on a
12 ticker-specific level.
13     Q.   When you say ticker, is that
14 something different from asset in FTX's
15 view?
16     A.   It's a way of describing asset
17 entitlements or borrower -- borrows.  It's
18 a way of describing any position in the
19 account in the exchange ledger.
20         Ticker was a field that
21 specified which asset was being traded at
22 any -- for any transaction.  So for
23 example, bitcoin would have a ticker
24 versus Ethereum would be a different
25 ticker versus U.S. dollars.  Every

Page 387

1
2  different type of asset and product even
3  that was offered on the exchange had a
4  different ticker.
5      Q.   Any types of products that could
6  be lent out under the margin program other
7  than a digital asset or a fiat currency
8  asset?
9      A.   I cannot recall a non-fiat or
10 cryptocurrency ticker being able to be
11 lent.  I do not -- I don't believe so.
12     Q.   You say in paragraph 16 of your
13 declaration that, quote, there is no
14 one-to-one borrower/lender relationship
15 for any specific margin loan.
16         What do you mean by one-to-one
17 borrower/lender relationship?
18     A.   I just mean that one customer
19 does not lend to another directly.  As I
20 testified to, and as included in my
21 declaration, the program calculated
22 amounts of pools, one on the borrow side,
23 one on the lending side, and matched those
24 pools together.  So the lenders
25 represented a pool that lent to the pool

Page 388

1
2  of borrowers, but it was not as if you and
3  I were customers on the exchange and you
4  say, I'm lending to you.  It was a pool to
5  pool lending relationship.
6      Q.   Let me -- let me ask it this
7  way.
8          Let's say there are ten
9  customers in the lending pool and ten
10 customers in the borrowing pool for a
11 particular ticker or asset.  Could it be
12 the case that five of the lenders are
13 lending to four of the borrowers, or is it
14 always the case that ten of the lenders
15 are lending to ten of the borrowers, or
16 something else?
17         MR. GLUECKSTEIN:  Object to the
18    form.
19     A.   The entirety of the borrow pool
20 borrowed from the entirety of the lending
21 pool.  So in that matching process that I
22 described, also described as an algorithm
23 that sorts the lending offers, calculates
24 the highest interest rate once the borrow
25 demand is filled includes whatever number

Page 389

1
2  of lenders in your example, ten, if
3  there's ten lenders demanding to borrow,
4  all ten of the lenders -- and -- and it
5  doesn't -- to be clear, it doesn't have to
6  be the same number because it matches
7  dollar amounts, but all participating
8  lenders in the lender pool lend to all
9  borrowers in the borrower pool.
10     Q.   When you say it doesn't have to
11 be the same number, what are we talking
12 about, the same number of what?
13     A.   The same number of customers.
14 So for example, some customers could be
15 willing to lend large amounts.  Some
16 customers could be willing to lend small
17 amounts.  It's the -- it's the value or
18 the U.S. dollar value of the lending
19 offers that's matched with the U.S. dollar
20 value of the borrow demand.
21     Q.   If -- are there cases where the
22 lending pool for any particular lend --
23 excuse me.
24         Are there any cases where the
25 borrowing pool or any particular borrower

**MAGNA**
LEGAL SERVICES

Page 390

1
2 in it is receiving a fractional amount of
3 a particular asset from the lending pool?
4         MR. GLUECKSTEIN:  Object to the
5     form.
6     A.   I believe it's possible to
7 specify a borrow request that is not in a
8 full unit.  For example, I -- I believe
9 you could borrow to the decimal place an
10 amount of bitcoin that didn't have to be
11 only the entire bitcoin.  Same for U.S.
12 dollars.  I'm not certain, but I believe
13 if you wanted to borrow pennies on top of
14 the dollar amount you could do so.  I'm --
15 I'm not certain of that so.
16     Q.   Can a customer deposit a
17 fractional amount of bitcoin onto the
18 exchange?
19     A.   I believe so.
20     Q.   Withdraw a fractional amount
21 of -- of a bitcoin?
22     A.   I believe so.
23     Q.   When a customer withdraws a
24 fractional amount of bitcoin, assuming
25 they were able to do so, does the bitcoin

Page 391

1
2 then become their asset once it's off the
3 exchange completely?
4         MR. GLUECKSTEIN:  Object to the
5     form; calls for a legal conclusion.
6     A.   Again, I can't speak to property
7 rights because I'm not a lawyer.
8         If a customer has cryptocurrency
9 in a wallet to which they have the private
10 key, they have the ability to move that
11 cryptocurrency.
12     Q.   Can a customer have, or FTX for
13 that matter, have a private key to a
14 fractional amount of a bitcoin?
15     A.   I -- I am not certain, but my
16 understanding is that bitcoin wallets
17 could contain fractional amounts of
18 bitcoin, but I'm not -- I'm not certain of
19 that.
20         I'm sorry, I should have said
21 bitcoin addresses.
22     Q.   What pools of -- of assets or
23 tickers did Three Arrows borrow from in
24 the June 12th through June 14 period?
25     A.   I would need to review what I

Page 392

1
2 believe is, you know, the documents
3 produced to Three Arrows Capital to
4 confirm, but I believe they predominantly
5 borrowed U.S. dollars.
6     Q.   And in -- in that time period,
7 is that predominantly borrowed U.S.
8 dollars during that time period itself or
9 had outstanding borrowings in U.S. dollars
10 from earlier time periods?
11         MR. GLUECKSTEIN:  Object to the
12     form.
13     A.   I'm -- I'm sorry, I want to make
14 sure I get the answer right.  Can you
15 rephrase the question?
16     Q.   Of course, yeah.
17         As of June 12th -- between June
18 12th and June 13th, to FTX's knowledge,
19 did Three Arrows Capital engage in any
20 borrowing pursuant to the margin program?
21     A.   So, one way that we have not
22 discussed today that you can incur a
23 negative USD balance on the exchange
24 outside of acquiring spot asset positions
25 by borrowing is that losses on perpetual

Page 393

1
2 future contracts that are realized in the
3 U.S. dollar balance can cause the U.S.
4 dollar to go further negative, thus
5 necessitating borrowing from the -- the
6 lending pool.  That happened.  3AC had a
7 negative dollar balance as of June 12th
8 and then subsequently incurred perpetual
9 future related losses during those two
10 days.
11     Q.   And when a customer borrowed in
12 connection with the futures contract on
13 the exchange, when they borrowed under the
14 margin program, they were borrowing U.S.
15 dollars only?
16     A.   Gains and losses from perpetual
17 futures were realized in the U.S. dollar
18 balance of the account.  And so if a
19 perpetual future loss resulted in any
20 customer's account going negative, that
21 would require -- their USD balance going
22 negative, that would require them to pull
23 from the margin program.
24         MR. PROULX:  Let's take a very
25     short break here.  We don't have much

Page 394

1
2    more.  I recognize we're probably
3    almost at our runtime.
4        MR. GLUECKSTEIN:  We are over
5    time.
6        MR. PROULX:  We are overtime?
7        THE VIDEOGRAPHER:  6:53 p.m.
8        Off the record.
9        (Recess taken.)
10       THE VIDEOGRAPHER:  7:03 p.m.
11       Back on the record.
12   BY MR. PROULX:
13   Q.    Mr. Coverick, is FTX aware of
14   any instances in which a lending customer
15   under the margin program was not repaid
16   the print it lent under that program?
17   A.    Again, there wasn't a repayment
18   of assets in a physical sense because
19   these were on-ledger transactions that did
20   not result in the underlying movement of
21   any cryptocurrency or fiat currency.
22       While I don't have the facts and
23   circumstances of every customer account
24   committed to memory, I am not aware of an
25   instance where a -- loss was debited to

Page 395

1
2    a lending customer's account balance, but
3    that does not mean that it could not
4    happen.
5    Q.    You mentioned earlier, if I
6    recall your testimonial, that once digital
7    assets were swept into the pool of
8    addresses that FTX controlled that there
9    was, from that point in time forward,
10   thousands of further transactions
11   involving those same assets.
12       Did I understand your testimony
13   correctly?
14       MR. GLUECKSTEIN:  Object to the
15   form.
16   A.    I don't think that's exactly
17   what I said.  I said depending on the
18   specific address, anywhere from hundreds
19   to thousands of subsequent movements from
20   addresses occurred.
21   Q.    And under what circumstances
22   would hundreds to thousands of subsequent
23   movements of addresses occur?
24   A.    Once the cryptocurrency was
25   moved from deposit addresses into

Page 396

1
2    commingled addresses, it was viewed and
3    there were -- there were programs,
4    computer programs, that would identify the
5    location of cryptocurrency when a
6    withdrawal request was made, and that
7    differed for different cryptocurrencies.
8    For example, bitcoin withdrawals utilized
9    a software program called bitcoin core, I
10   believe.  I believe the exact name is
11   referenced in the Mosley declaration.  But
12   that logic would dictate the movement of
13   bitcoin associated with withdrawal
14   requests.
15       Similarly, an aspect of the
16   bitcoin blockchain is that any time a
17   component or some of the bitcoin at an
18   address is moved, but not all of it, a
19   change address for the change or the
20   residual is automatically created and
21   the -- the change or residual that was not
22   moved is transferred to that new change
23   address, and that occurred very
24   frequently.  So the combination of the
25   prevailing logic that identified the

Page 397

1
2    location of cryptocurrency when withdrawal
3    requests from made, as well as aspects of
4    the blockchain like the change addresses
5    resulted in hundreds, if not thousands, of
6    movements from addresses.
7    Q.    The change addresses, did -- did
8    the underlying cryptocurrency assets move
9    outside of addresses held the private keys
10   to in connection with those changes?
11       MR. GLUECKSTEIN:  Object to the
12   form.
13   A.    Can you repeat the question,
14   please?
15   Q.    Sure.
16       The -- the change address events
17   that you've just referred to, did that
18   result in any assets that FTX had the
19   private keys to leaving FTX's possession?
20       MR. GLUECKSTEIN:  Object to the
21   form.
22   A.    Well, FTX has private keys to
23   the addresses, not the underlying
24   cryptocurrency.  The private key is
25   effectively like the password to access

Page 406

1
2       INSTRUCTIONS TO WITNESS
3
4        Please read your deposition over
5    carefully and make any necessary
6    corrections.  You should state the
7    reason in the appropriate space on the
8    errata sheet for any corrections that
9    are made.
10       After doing so, please sign the
11   errata sheet and date it.  It will be
12   attached to your deposition.
13       It is imperative that you return
14   the original errata sheet to the
15   deposing attorney within thirty (30)
16   days of receipt of the deposition
17   transcript by you.  If you fail to do
18   so, the deposition transcript may be
19   deemed to be accurate and may be used
20   in court.
21
22
23
24
25

Page 407

1
2       A C K N O W L E D G M E N T
3
4    STATE OF          )
5                      :ss
6    COUNTY OF         )
7
8        I, STEVEN P. COVERICK, hereby
9    certify that I have read the transcript of
10   my testimony taken under oath in my
11   deposition of September 24, 2025; that the
12   transcript is a true and complete record
13   of my testimony, and that the answers on
14   the record as given by me are true and
15   correct.
16
17
18   _____
         STEVEN P. COVERICK
19
20   Signed and subscribed to before me this
21   _____ day of _____, 20__.
22
23   _____
24   Notary Public, State of
25

Page 408

1
2            E R R A T A
3    PAGE/LINE/   CHANGE   /   REASON
4    ____ / ____ / ____ / _____
5    ____ / ____ / ____ / _____
6    ____ / ____ / ____ / _____
7    ____ / ____ / ____ / _____
8    ____ / ____ / ____ / _____
9    ____ / ____ / ____ / _____
10   ____ / ____ / ____ / _____
11   ____ / ____ / ____ / _____
12   ____ / ____ / ____ / _____
13   ____ / ____ / ____ / _____
14   ____ / ____ / ____ / _____
15   ____ / ____ / ____ / _____
16   ____ / ____ / ____ / _____
17   ____ / ____ / ____ / _____
18   ____ / ____ / ____ / _____
19   ____ / ____ / ____ / _____
20   ____ / ____ / ____ / _____
21   ____ / ____ / ____ / _____
22   ____ / ____ / ____ / _____
23   ____ / ____ / ____ / _____
24   ____ / ____ / ____ / _____
25   ____ / ____ / ____ / _____

Page 409

1
2        C E R T I F I C A T E
3        I, MARIE FOLEY, Registered Merit
4    Reporter, Certified Realtime Reporter, and
5    Notary Public for the State of New York,
6    do hereby certify that prior to the
7    commencement of the examination, STEVEN P.
8    COVERICK, was duly remotely sworn by me to
9    testify to the truth, the whole truth and
10   nothing but the truth.
11       I DO FURTHER CERTIFY that the foregoing
12   is a verbatim transcript of the testimony
13   as taken stenographically by me at the time,
14   place and on the date hereinbefore set forth,
15   to the best of my ability.
16       I DO FURTHER CERTIFY that I am neither
17   a relative nor employee nor attorney nor
18   counsel of any of the parties to this action,
19   and that I am neither a relative nor employee
20   of such attorney or counsel, and that I am
21   not financially interested in the action.
22   _____
     COURT REPORTER
23   Registered Merit Reporter
     Certified Realtime Reporter
24   Notary Public
     Dated: September 30, 2025
25

**MAGNA ▶**
**LEGAL SERVICES**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |

**ERRATA SHEET OF STEVEN P. COVERICK**

      I, Steven P. Coverick, have reviewed the transcript of my deposition taken on September 24, 2025 in the above-referenced action, and certify that the same appears to be a correct transcript of the answers given by me to the questions therein propounded, except for the following corrections or changes in the errata below:

| Page | Line(s) | Change | Reason |
|---|---|---|---|
| 21 | 8 | Change "Neuberger's" to "Neuberger" | Clarification |
| 23 | 23 | Change "the FTX" to "FTX" | Clarification |
| 24 | 16 | Change "3AC" to "the 3AC" | Clarification |
| 27 | 3 | Change "He pre-plan effectiveness" to "Pre-plan effectiveness, he" | Clarification |
| 40 | 13–14 | Change "I'm not ruling that out" to "'I'm not ruling that out'?" | Clarification |
| 49 | 9 | Change "involve" to "involved" | Clarification |

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

| 54 | 16 | Change "in general" to "in general to" | Transcription Error |
|---|---|---|---|
| 62 | 22 | Change "holder" to "a holder" | Clarification |
| 67 | 3 | Change "operating room" to "operative rule" | Transcription Error |
| 70 | 8 | Change "is" to "was" | Clarification |
| 91 | 16 | Change "bitcoin, FTX, was" to "bitcoin on FTX was" | Clarification |
| 93 | 23 | Change "denominator" to "denomination" | Clarification |
| 94 | 24 | Change "this" to "it" | Clarification |
| 103 | 23 | Change "that" to "where" | Clarification |
| 108 | 18 | Change "specify" to "specifies" | Clarification |
| 111 | 18 | Change "the USD Balance." to "the USD Balance," | Transcription Error |
| 119 | 11 | Change "exchange" to "change" | Transcription Error |
| 129 | 6 | Change "impact" to "document" | Transcript Error |
| 151 | 5 | Change "if I am able" to "if I am to be able" | Clarification |
| 151 | 24 | Change "asset" to "estate" | Transcription Error |
| 153 | 14 | Change "Cignia" to "Sygnia" | Transcription Error |
| 155 | 7 | Change "wall" to "wallet" | Transcription Error |
| 158 | 13 | Change "headlight" to "hypothetical" | Transcription Error |
| 172 | 16 | Change "was" to "were" | Clarification |
| 180 | 7 | Change "dimple" to "simply" | Transcription Error |
| 182 | 22 | Change "specific" to "specifically" | Clarification |
| 193 | 15 | Change "change" to "exchange" | Transcription Error |
| 195 | 8-9 | Change "been" to "what has" | Clarification |

| 199 | 3 | Change "understanding" to "understanding is that" | Clarification |
| 199 | 3 | Change "a" to "an" | Transcription Error |
| 203 | 3 | Change "shaping" to "exchange" | Transcription Error |
| 205 | 7 | Change "Issued" to "Issue" | Clarification |
| 205 | 11 | Change "unsecured creditors committee" to "Unsecured Creditors Committee | Transcription Error |
| 217 | 23 | Change "at" to "of" | Clarification |
| 221 | 7 | Change "was" to "is" | Clarification |
| 221 | 10 | Change "are" to "were" | Clarification |
| 222 | 24 | Change "opts exchange" to "on the exchange were" | Transcription Error |
| 224 | 21 | Change "contract the future," to "contract—the future—" | Clarification |
| 247 | 7 | Change "is" to "as" | Clarification |
| 248 | 25 | Change "the what's" to "the—what's" | Clarification |
| 249 | 10 | Change "We" to "They" | Clarification |
| 255 | 16 | Change "willful" to "level" | Transcription Error |
| 258 | 13 | Change "product" to "subject" | Transcription Error |
| 259 | 10 | Change "general is understanding" to "general understanding" | Clarification |
| 260 | 6 | Change "able" to "unable" | Clarification |
| 262 | 5 | Change "disagreement" to "agreement" | Transcription Error |
| 262 | 20 | Change "relationships" to "relationships were" | Clarification |
| 263 | 3 | Change "disagreement" to "agreement" | Transcription Error |

| 263 | 8 | Change "disagreement" to "agreement" | Clarification |
|---|---|---|---|
| 272 | 2 | Change "accounts's" to "account's" | Transcription Error |
| 287 | 24 | Change "OTT" to "OTC" | Transcription Error |
| 291 | 18 | Change "earlier" to "earlier—" | Clarification |
| 291 | 21 | Change "sop" to "so" | Transcription Error |
| 291 | 23 | Change "corresponding" to "corresponding to" | Clarification |
| 293 | 16 | Change "limited" to "Ltd." | Clarification |
| 311 | 8 | Change "supporter to certain" to "certain outstanding" | Clarification |
| 332 | 6 | Change "one what" to "what" | Transcription error |
| 332 | 6 | Change "Dare" to "DARE" | Clarification |
| 337 | 11 | Change "were" to "'were" | Clarification |
| 337 | 12 | Change "assets." to "assets.'" | Clarification |
| 344 | 9 | Change "a trace" to "I can trace" | Clarification |
| 358 | 7 | Change "that" to "that neither" | Clarification |
| 358 | 20 | Change "difference" to "position" | Clarification |
| 358 | 20 | Change "is" to "is—" | Transcription Error |
| 367 | 19 | Change "were to "was" | Clarification |
| 367 | 20 | Change "think" to "know" | Clarification |
| 367 | 22 | Change "can you see" to "customers" | Transcription Error |
| 368 | 14 | Change "an" to "and" | Transcription Error |
| 376 | 17 | Change "those" to "that" | Clarification |
| 390 | 15 | Change "so" to "though" | Clarification |
| 396 | 9 | Change "bitcoin core" to "Bitcoin Core" | Transcription Error |

| 397 | 3 | Change "from" to "were" | Transcription Error |
| 400 | 19 | Change "less than" to "loan" | Transcription Error |

Dated: November 5, 2025

_/s/ Steven P. Coverick_

Steven P. Coverick

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

---------------------------------------X

IN RE:  FTX TRADING LTD, et al.

                 Debtors.

                         Chapter 11

                    Case No.  22-11068 (JTD)

---------------------------------------


         *** C O N F I D E N T I A L ***


         ** VIDEOTAPED DEPOSITION**

             NILS MOLINA

       Tuesday, September 30, 2025




Reported by:

Angela M. Shaw-Crockett, CCR, CRR, RMR, CSR

Job 1401103



1           N. Molina - Confidential
2    crypto deposits and withdrawals?
3        A.   Beyond 2022 pre-petition, I don't know
4    when.
5        Q.   And just so I'm clear, you started at FTX
6    in around 2021?
7        A.   Yes.
8        Q.   So somewhere between 2021 when you started
9    at FTX and pre-petition 2022?
10       A.   I think it was in 2022 because the work I
11   did -- I don't think the work I did in 2021 would
12   have elicited that sort of conversation so -- so I
13   would say probably in 2022.
14       Q.   What kind of work were you doing in 2021,
15   then, that this wouldn't have come up?
16       A.   I don't think I was working very much on
17   crypto deposits and withdrawals in 2021.
18       Q.   What were you working on?
19       A.   I was working on features for the
20   Exchange.
21       Q.   Okay.  I want to come back to kind of what
22   you were doing in 2021.  But, for now, just focusing
23   on the problems with crypto deposits and withdrawals
24   you were talking with Mr. Tackett about, do you
25   recall what specifically the issue was with -- I

1           N. Molina - Confidential
2    think you said a deposit or withdrawal not going
3    through?
4        A.   Not specifically.
5        Q.   Were they -- were the problems that you
6    were talking about specific to individual customers,
7    or were they sort of a more widespread problem?
8        MR. DUNNE:  Objection, lack of foundation.
9        A.   I don't remember which category.
10   BY MR. SACK:
11       Q.   How often were there problems with crypto
12   deposits and withdrawals that you recall?
13       A.   I would say every month there were --
14   there was probably at least a few issues.
15       Q.   And was it your responsibility to address
16   those issues?
17       A.   Addressing some of the issues was one
18   thing that I did.
19       Q.   I think you mentioned that the work you
20   did at FTX differed in 2021 versus in 2022; is that
21   right?
22       A.   To some extent.
23       Q.   Can you walk me through the kinds of
24   issues or features that you were working on,
25   starting when you first started at FTX?

1           N. Molina - Confidential
2        MR. DUNNE:  You're talking pre-petition
3    2022, I take it.
4        MR. SACK:  Yes, I'm sorry.
5    BY MR. SACK:
6        Q.   Pre-petition when you first started -- I
7    guess this is 2021 -- at FTX?
8        A.   I worked with some code related to KYC,
9    which means "Know Your Customer."  I did some work
10   related to US taxes.  I did some work related to
11   NFTs.  And that's -- those are the specific things I
12   remember from 2021.
13       Q.   So Know Your Customer, US taxes, and
14   non-fungible tokens?
15       A.   Yes.
16       Q.   At some point you suggested that the kinds
17   of things or focuses you had at FTX changed.
18           When was that change?
19       A.   I wouldn't say there was a specific point,
20   just -- I just think over time I would get -- I
21   would look at different new parts of the code
22   naturally.
23       Q.   Okay.  What other parts of the code did
24   you look at?
25       A.   Later on, or especially later on, I would

1           N. Molina - Confidential
2    look at crypto deposits and withdrawals, FTX US
3    stocks, or kind of stock trading-related code, and
4    transaction analysis code.
5        Q.   Besides those three that you mentioned,
6    crypto deposits and withdrawals, FTX US stocks, and
7    transaction analysis, anything else?
8        A.   Not that I recall right now.
9        Q.   What do you mean you did transaction
10   analysis?
11       A.   I wrote some code or -- and rewrote -- as
12   well as rewrote some code that enabled customers to
13   get information about their historical balance.
14       Q.   Can you tell me what a historical balance
15   is?
16       A.   Yes.  An historical balance would be
17   tokens associated with an account at a previous
18   point in time.
19       Q.   Do you recall why -- sorry.  Strike that.
20           How did it come to be that you wrote or
21   rewrote this code about historical account balance?
22       A.   Initially, I was looking at writing code
23   for US taxes, and in order to understand the taxes
24   associated with accounts in the U.S., I wanted to
25   understand transactions better.  So just in order to

1            N. Molina - Confidential
2    BY MR. SACK:
3        Q.   Okay.  And then what would happen after
4    those calculations were run, according to the code?
5        A.   There would be -- an interest rate would
6    be determined specific to a token and it would be
7    applied to members of both groups.
8        Q.   Okay.  And if someone wanted to borrow
9    money, or a digital asset, where would that digital
10   asset come from?
11           MR. DUNNE:  Objection to form.
12           A.   What do you mean by "come from"?
13   BY MR. SACK:
14       Q.   If someone wants to borrow one bitcoin,
15   through the margin trading program, in what way or
16   how do they receive that one bitcoin?
17           MR. DUNNE:  Objection.
18       A.   The code would describe the account as
19   borrowing one bitcoin and -- but it wouldn't specify
20   beyond that -- or, you know, more information beyond
21   that for that specific borrower.
22   BY MR. SACK:
23       Q.   And if someone were borrowing more than
24   one digital asset, is it possible that they would --
25   sorry, let me ask the full set of that question.

1            N. Molina - Confidential
2            Someone borrows one bitcoin, you say it's
3    marked in their account as having borrowed one
4    bitcoin.
5            Where, if anywhere, is it marked that
6    someone lent one bitcoin?
7        A.   The code that looks at borrowers and
8    lenders would -- would identify the borrows and
9    identify the lenders -- identify tokens being lent
10   by accounts, and it would mark certain tokens as
11   being lent.
12       Q.   Was there any way to tell which account
13   had lent the specific asset another account had
14   borrowed through the margin trading program?
15           MR. DUNNE:  Objection.
16       A.   I would say generally no, since -- yeah,
17   the groups -- it would be a group of borrows and a
18   group of lends.
19   BY MR. SACK:
20       Q.   What do you mean it would be a group of
21   borrows and a group of lends?
22           Could you say more on that?
23       A.   Yeah.  I was describing a group of borrows
24   and group of lends, and the question was kind of an
25   individual borrow.  So, yeah, I don't think I can

1            N. Molina - Confidential
2    speak to an individual borrow.
3        Q.   When you say "group of borrows" and "group
4    lends," are you referring to multiple accounts
5    borrowing and multiple accounts lending or something
6    else?
7        A.   Multiple accounts or potentially multiple
8    accounts borrowing and lending.
9        Q.   And you said -- when I asked you whether
10   there was a way to tell which account had lent a
11   specific asset, you said generally, no, there was no
12   way to tell which account had lent that specific
13   asset.
14           Was there something -- some circumstances
15   where you could?
16       A.   Well, you could see a list of accounts --
17   for a given asset, you could see a list of accounts
18   lending that asset or that token -- sorry.
19           For a given token, you could see a list of
20   accounts lending that token.  So I guess if there
21   were only one account there, then maybe you could
22   talk about -- you could talk about an individual
23   account.
24       Q.   To the best of your recollection, was
25   there ever only one account borrowing or lending a

1            N. Molina - Confidential
2    specific token?
3            MR. DUNNE:  Objection.
4        A.   I can't say.  I don't remember if there
5    was one way or the other.
6    BY MR. SACK:
7        Q.   So sitting here today, you think it's
8    possible that only one account might be borrowing or
9    lending a specific token at a time on the
10   FTX Exchange?
11           MR. DUNNE:  Object to form.
12       A.   Yeah.  I can't say if -- if that was -- if
13   that happened or not.  I think it was probably
14   possible for that to happen in theory.
15   BY MR. SACK:
16       Q.   Do you know how many users were trading on
17   the FTX Exchange at any given time?
18       A.   Not exactly.
19       Q.   Do you know how many accounts were
20   participating in the margin lending program at any
21   given time?
22       A.   Not exactly.
23       Q.   Did the code permit a lender on the margin
24   trading program to stop participating in the lending
25   program if they wanted to do so?

MAGNA
LEGAL SERVICES

Page 62

```
 1            N. Molina - Confidential
 2      A.  I think so.
 3      Q.  You think so.
 4          What makes you unsure?
 5      A.  I don't know if I looked specifically at
 6  the code where lenders could stop lending out.  So I
 7  just don't recall seeing that specific code.
 8      Q.  Okay.  If the code did permit a lender to
 9  stop participating in the lending program, did the
10  code then permit the lender to withdraw the specific
11  asset that they had lent in the program?
12          MR. DUNNE:  Objection to form.
13      A.  If a token was not being lent by a lender
14  then, in general, it could be used normally.
15  BY MR. SACK:
16      Q.  I think maybe I didn't frame my question
17  carefully enough because I'm not sure that that was
18  answering what I was getting at.
19          I'm saying if someone wanted to stop
20  participating in the lending program and said, "I
21  want to take back the assets I lent," would they be
22  able to withdraw the specific assets that they had
23  lent as part of the margin trading program?
24          MR. DUNNE:  Objection to form.
25      A.  From what I saw in the code, if -- if an
```

Page 63

```
 1            N. Molina - Confidential
 2  asset was not being lent -- was not marked as being
 3  lent, then in general, it would be able to be -- the
 4  code would not restrict it from being withdrawn.
 5  BY MR. SACK:
 6      Q.  I'm saying if I were -- if I were a lender
 7  and I lent ten bitcoin through the margin trading
 8  program, and the next day I said, "I want to stop
 9  participating in the margin lending program; I want
10  my ten bitcoin back," could I get those specific ten
11  bitcoin that I had lent back into my account?
12          MR. DUNNE:  Objection.
13      A.  Yeah.  I think you're describing a few
14  steps.  And I can say if the token is not marked as
15  lent, then I believe, in general, it could be
16  withdrawn.
17  BY MR. SACK:
18      Q.  I'm saying had the token been lent, could
19  I get that token back?
20          MR. DUNNE:  Objection.
21      A.  So my general understanding is that a
22  lender -- or I generally think that a lender can
23  stop lending.
24          MR. SACK:  Okay.
25      A.  And then if they were no longer then
```

Page 64

```
 1            N. Molina - Confidential
 2  lending the token, from what I can tell in the code,
 3  the token could be used normally.
 4  BY MR. SACK:
 5      Q.  Okay.  Maybe let's break it down a little
 6  bit.
 7          Sounds like someone could lend a token,
 8  right, through the margin trading program; is that
 9  right?
10      A.  Yes.
11      Q.  Let's say -- let me refer to it this way:
12  Imagine I were lending you $10 and I gave you a
13  $10-bill.  If I wanted to stop lending you the $10,
14  you could hand me back the $10-bill, right?
15      A.  Yes.
16      Q.  And I would have received back the exact
17  same set of $10 that I lent to you, right?
18      A.  Yes.
19      Q.  I'm asking about something similar on the
20  margin trading program.
21          If I had ten bitcoin into the margin
22  trading program, would I be able to get those same
23  exact ten bitcoin back if they had already been lent
24  out?
25          MR. DUNNE:  Objection.  Incomplete
```

Page 65

```
 1            N. Molina - Confidential
 2  hypothetical, and among other problems.
 3      A.  If a lender lends ten bitcoin and then the
 4  ten bitcoin is no longer lent, then the lender --
 5  then those ten bitcoin in the lender's -- associated
 6  with the lender's account, as far as I can tell from
 7  the code, could be used normally.
 8  BY MR. SACK:
 9      Q.  Would the lender get back the same bitcoin
10  that they had put in?
11          MR. DUNNE:  Objection.
12      A.  I don't really know what you mean by
13  "same."
14  BY MR. SACK:
15      Q.  Just like in my dollar bill example, I got
16  the same $10-bill back.  Would I get the same ten
17  bitcoin back if I had lent bitcoin?
18          MR. DUNNE:  Objection.
19      A.  I think in this example, there would be
20  ten bitcoin associated with the account, and from
21  what I can tell in the code, there would still be
22  ten bitcoin associated with the account.
23  BY MR. SACK:
24      Q.  Okay.  There would be -- so just to pick
25  up where we were just talking, there would still be
```

**MAGNA** ▶
LEGAL SERVICES

1          N. Molina - Confidential
2    objection to be used here.
3          MR. DUNNE:  Noted.
4          MR. SACK:  Thank you.
5      A.  I don't know what that means there or what
6    that refers to.
7    BY MR. SACK:
8      Q.  Based on your experience as a software
9    engineer at FTX, do you recall when or if trades
10   would be randomly created if something couldn't
11   finish?
12         MR. DUNNE:  Objection.
13     A.  I don't recall code that would -- or,
14   yeah, I don't really know what that means.  And I
15   don't recall code that would randomly create trades.
16   BY MR. SACK:
17     Q.  Earlier, we were talking about the margin
18   trading program.  Was it ever possible that a trade
19   couldn't finish because there weren't an
20   appropriate number of lenders for a particular
21   borrower's ask?
22         MR. DUNNE:  Objection.
23     A.  I don't -- I don't recall code that would
24   prevent a trade from happening because of that.
25

1          N. Molina - Confidential
2    BY MR. SACK:
3      Q.  So if there weren't a sufficient number of
4    lenders, the trade would still go through for a
5    particular ask from a borrower?
6          MR. DUNNE:  Objection.
7      A.  I don't -- I don't recall any code that
8    would prevent the trade from going through due to
9    lenders.
10   BY MR. SACK:
11     Q.  Just so I understand, a borrower then
12   could always borrow through the margin trading
13   program, even if there weren't necessarily lenders
14   who matched up to it; is that right?
15         MR. DUNNE:  Objection, lack of foundation.
16     A.  I wouldn't say a borrower could always
17   borrow.
18   BY MR. SACK:
19     Q.  And in your experience, most of the time
20   were there -- could a borrower ever borrow on the
21   FTX Exchange through the margin trading platform,
22   even if there weren't a lender who could supply the
23   tokens that they had asked for?
24         MR. DUNNE:  Objection, lack of foundation,
25     calls for speculation.

1          N. Molina - Confidential
2      A.  I wouldn't say a borrower could always
3    borrow.
4    BY MR. SACK:
5      Q.  Could they ever borrow in that
6    circumstance?
7          MR. DUNNE:  Same objections.
8          THE WITNESS:  Yeah.  I'm sorry.  I hope I
9    can take a break soon.  I'll answer the
10   question though.
11         MR. SACK:  Yeah, thank you.  Then we can
12   take a break.
13         MR. DUNNE:  Why don't we just deal with
14   this last question and then take a break.
15         MR. SACK:  Yeah.
16     A.  Yeah.  I don't see -- I didn't see any
17   restrictions in the code where it would look at
18   lenders in deciding whether a borrow or a trade
19   could be placed.
20         MR. SACK:  Okay.  Thank you.  I appreciate
21   that.  Sorry to have held you up.
22         THE WITNESS:  Sorry.  I had too much
23   coffee.
24         MR. SACK:  No, I understand.
25   Let's go off the record.

1          N. Molina - Confidential
2          THE VIDEOGRAPHER:  We are going off the
3    record.  The time is 11:29 a.m.
4          (Recess.)
5          THE VIDEOGRAPHER:  We are back on the
6    record.  The time is 11:42 a.m.
7    BY MR. SACK:
8      Q.  Welcome back, Mr. Molina.  I think where
9    we left off right before the break, we were talking
10   about the borrowing code in the margin trading
11   program.
12         Do you remember us talking about that?
13     A.  Yes.
14     Q.  Was the borrowing code separate from the
15   lending code in the margin trading program?
16         MR. DUNNE:  Objection to form.
17     A.  I'd say the code associating with
18   borrowing -- there was codes associated with borrows
19   and there was codes associating with lends.  And
20   some of it was in a similar place, and some of it
21   was in different places.
22   BY MR. SACK:
23     Q.  That makes sense.  I think before we left
24   off you were saying you didn't see any restrictions
25   in the borrowing code that would look at -- at the



1              N. Molina - Confidential
2    collectively see the borrows and the lends written
3    out into the database from that code.
4    BY MR. SACK:
5         Q.   That makes sense.  I think, earlier you
6    were saying that the borrowing code didn't have a
7    restriction related to lenders.
8              So I guess I want to know how those two
9    pieces connected according to the code.
10             MR. DUNNE:  Objection.
11   BY MR. SACK:
12        Q.   If they did at all.  Maybe they didn't.
13        A.   Yeah.  The code that checks if the
14   transaction is allowed, I don't recall it looking at
15   lenders.  And then there was other code which would
16   look at all the borrowers and all of the lenders.
17        Q.   What do you mean there's another code that
18   would look at all of the other borrowers and all the
19   other lenders?
20        A.   I'm saying that that code would kind of
21   run regularly, and that's different than the code
22   that looks at restrictions on the borrow.
23        Q.   I see.
24             And I'm just I'm trying to learn here
25   today.  So I'm sorry if I'm not getting it

1              N. Molina - Confidential
2    100 percent of the time.
3             So those two -- you described sort of like
4    two sets of code.  There was a code that would cause
5    a borrow -- or maybe three sets -- a code that would
6    cause a borrow, a code that would cause a lend, and
7    then sort of a separate code that would look at all
8    borrowers and lenders; is that right?
9             MR. DUNNE:  Objection.
10        A.   Generally, yes, I think -- yes, I think
11   cause a borrow -- we were talking about the
12   transaction that causes a borrow.
13             MR. SACK:  Yeah.
14   BY MR. SACK:
15        Q.   So about that third set of code that we
16   were just talking about that would look to all of
17   the borrowers or all of the lenders or all the pools
18   of borrowers and pools of lenders, how, if at all,
19   did that connect to the other two types of code we
20   were talking about?
21             MR. DUNNE:  Objection.
22        A.   So the code that validates the transaction
23   that causes a borrow, when a borrow is caused, the
24   database would indicate kind of a borrowed -- a
25   borrowed balance.  And then, separately, the code

1              N. Molina - Confidential
2    that looks at all of the borrows and all the lends
3    would look at borrowed balance.  So that's my memory
4    of the connection between the two pieces of code.
5             MR. SACK:  Thanks.
6    BY MR. SACK:
7         Q.   And I guess, about the timing of those two
8    pieces of code, it sounded like what you were
9    saying -- but I just want to be clear -- was that
10   the cause-to-borrow code would happen, and then how
11   soon or long after that would the pools of borrowers
12   and pools of lenders code kick in?
13        A.   The pools of borrowers, pools of lenders
14   code would kick in after -- afterwards.  And I
15   believe it would run regularly during the day.
16        Q.   Got it.
17             And how regularly?
18        A.   I think it was every hour is my memory of
19   it.
20        Q.   Okay.
21        A.   But I'm not totally sure.
22        Q.   Totally understood.
23             And I just want to make sure I get -- how
24   frequently would the code that would allow a
25   transaction to cause a borrow take place.

1              N. Molina - Confidential
2             MR. DUNNE:  Objection.
3         A.   That would be -- that would occur when the
4    transaction is made.
5             MR. SACK:  Got it.
6    BY MR. SACK:
7         Q.   Just so I'm clear, the code that allows
8    for a transaction to cause a borrow would happen
9    basically immediately, and the code that would match
10   the pools of lenders and the pools of borrowers
11   occurred every hour; is that right?
12             MR. DUNNE:  Objection.
13        A.   Yes.  As I remember.
14             MR. SACK:  Great.
15   BY MR. SACK:
16        Q.   I want to switch gears a little bit if
17   that's okay.
18             Were you involved in how and where FTX
19   stored digital assets deposited into or available
20   through the Exchange?
21             MR. DUNNE:  Objection.
22        A.   To some extent.  Not very much, but
23   indirectly, I would say.
24   BY MR. SACK:
25        Q.   Yeah.  What do you remember about that?



Page 94

N. Molina - Confidential

1          N. Molina - Confidential
2      A.   I wrote and looked at code that would do
3  some processing of deposits and withdrawals, which
4  involved identifying the deposit or withdrawal in
5  the context of crypto addresses owned by FTX.
6      Q.   Can you tell us what a crypto address is?
7      A.   For a given crypto token, a given crypto
8  token will be located on a given crypto block chain
9  specific to that token.  And the block chain will
10 contain addresses.  And each address would be
11 associated with a quantity of that token.
12     Q.   You said you wrote the code that would do
13 some processing of the deposits and withdrawals
14 relating to crypto addresses owned by FTX.
15         What in particular was the code that you
16 were writing about?
17         MR. DUNNE:  Objection.
18     A.   Yeah.  Just identifying when an address
19 kind of belonging to FTX received a crypto token as
20 a deposit and also writing code that, using a crypto
21 address managed by FTX, would cause a withdrawal to
22 be initiated or cause a withdrawal.
23 BY MR. SACK:
24     Q.   And when you say the crypto addresses
25 managed by FTX or belonging to FTX, what kinds of

Page 95

1          N. Molina - Confidential
2  addresses are you talking about there?
3      A.   I'm talking about certainly an address
4  managed by FTX that was specific to a customer for
5  deposits on one hand, and on the other hand,
6  addresses managed by FTX which were used for
7  withdrawals.
8      Q.   You said about an "address managed by FTX
9  that was specific to a customer for deposits."
10         I guess I want to know more about what
11 that means.
12         If a customer deposited an asset onto the
13 FTX platform, would a customer be managing that --
14 the account where that asset was deposited?
15         MR. DUNNE:  Objection to form.
16     A.   When a token was -- crypto token was
17 deposited to FTX, it would be deposited to an
18 address managed by FTX.
19 BY MR. SACK:
20     Q.   When you say "crypto deposited to FTX,"
21 what does that mean?
22     A.   A customer would be given instructions for
23 how to deposit to FTX, and that would mean that they
24 would send a token, using those instructions, to an
25 address managed by FTX.  And FTX would process that

Page 96

1          N. Molina - Confidential
2  as a deposit, which would affect the balances of
3  that account.
4      Q.   And what instructions would that customer
5  have been given?
6          MR. DUNNE:  Objection to form.
7      A.   I know for some tokens they would be given
8  an address generated by FTX's code, which they would
9  use as a destination for sending their token.  And
10 that address would be managed by FTX.  It may have
11 been slightly different for other tokens, but I
12 don't remember other kinds of instructions.
13 BY MR. SACK:
14     Q.   And like where do you remember seeing
15 these instructions?
16     A.   I have general recollection that there was
17 a button called "deposit" on the website next to the
18 name of the coin.  And when you clicked it, it would
19 show these instructions.
20     Q.   So generally from the website.
21         Anywhere else?
22     A.   Not that I recall.
23     Q.   Do you remember if there were any policies
24 or manuals that FTX had that talk about this kind of
25 thing?

Page 97

1          N. Molina - Confidential
2          MR. DUNNE:  Objection to form.
3      A.   Not that I recall.
4  BY MR. SACK:
5      Q.   As you were working on that -- as you were
6  working on that code, how did you know what may
7  be -- for lack of a better term, what rules to put
8  in place, or how did you know what you should be
9  doing, I guess?
10         MR. DUNNE:  Objection.
11         MR. SACK:  Let me reask the question if
12     that's okay.  I think that's fair.
13         THE WITNESS:  Yes.
14 BY MR. SACK:
15     Q.   What guidance, if any, did you receive on
16 how you should be implementing the code relating to
17 ownership on the FTX Exchange?
18         MR. DUNNE:  Objection.
19     A.   I don't know that ownership was really,
20 really explicit in any of the code that I worked
21 with, so I don't think I can say that.
22 BY MR. SACK:
23     Q.   I thought you said that your code related
24 to accounts that FTX managed or owned?
25     A.   Yes.

MAGNA
LEGAL SERVICES

Page 114

1        N. Molina - Confidential
2        MR. DUNNE:  Objection.
3        A.   The Exchange had a list of tokens.  Some
4  of these tokens were called "leverage tokens."  And
5  they would not be crypto tokens like bitcoin or
6  ethereum.  Instead, they would be tokens that I
7  believe were created by FTX and there was listed in
8  the databases, or it was indicated as being a
9  leveraged token.
10       So I just had some general understanding
11 of it.
12 BY MR. SACK:
13       Q.   And how do you understand a leveraged
14 token to be different from another token besides the
15 fact that they were created by FTX?
16       MR. DUNNE:  Objection.
17       A.   I think.  I think I had a general
18 recollection of maybe some of the names of them, but
19 I can't say with precision kind of how they worked.
20 But I think generally had some notion of, I guess,
21 leverage or kind of value was based on leverage in
22 some way, or price was based in some way on
23 leverage.
24 BY MR. SACK:
25       Q.   I notice another row.  It says

Page 115

1        N. Molina - Confidential
2  "Positions."
3        What does that show, as best you can
4  recall?
5        A.   I think that -- I don't recall that button
6  being there in that position when I worked on the
7  code.  It looks like it would display positions, but
8  when I was working on the code, there was not, as I
9  recall, a Positions button there, but there was a
10 Positions button elsewhere, which if you clicked on
11 it, it would show the account's positions.
12       Q.   Okay.  So you're saying to the best of
13 your understanding, they just moved the position --
14 sorry.  That was a bad use of the word "position."
15       They moved the location of the Positions
16 tab?
17       MR. DUNNE:  Objection, lack of foundation.
18       A.   Well, when I worked on the code, there was
19 a Positions button somewhere on the page, not there,
20 as I recall.
21 BY MR. SACK:
22       Q.   And what -- the Positions tab that you
23 remember, what kind of positions did it display?
24       A.   It would display the positions -- the
25 futures positions of an account.

Page 116

1        N. Molina - Confidential
2        Q.   I also see on that same image we were
3  looking at -- do you see -- it's a little bit grayed
4  out, just because of the black-and-white nature of
5  the photo, but do you see where it says "View all
6  account balances"?
7        A.   Yes.
8        Q.   And then, also, below that there's like a
9  tab that says "Balances."
10       Do you see that as well?
11       A.   Yes.
12       Q.   What would the -- let's start with the
13 all-capitalized-letters "Balances," what would a
14 user see if they were to click on that Balances tab?
15       MR. DUNNE:  Objection, lack of foundation.
16       A.   I think clicking on the Balances button
17 would show the balances associated with the account.
18 BY MR. SACK:
19       Q.   What would be, to the best of your
20 understanding, included in those balances?
21       Balances of what?
22       MR. DUNNE:  Objection.
23       A.   Token balances, where tokens could be
24 crypto token or if you got currency.
25

Page 117

1        N. Molina - Confidential
2  BY MR. SACK:
3        Q.   What about futures positions?  Would that
4  be reflected on the balances tab?
5        MR. DUNNE:  Objection.
6        A.   When I worked on the website --
7        MR. SACK:  Yeah.
8        A.   -- the positions, as I recall, were not
9  displayed on the balances tab, the positions
10 themselves.
11 BY MR. SACK:
12       Q.   Okay.  Were individual spot tokens
13 displayed on the balances tab?
14       A.   From what I remember, yes.
15       Q.   And how were they displayed?  Were they
16 displayed separately by token?
17       A.   From what I recall, yes.
18       Q.   Were they displayed separately by amount?
19       I'm just trying to figure out how -- what
20 details would have been given on that Balances page.
21       So would they have been displayed
22 separately by token?  By amount?
23       A.   There would be a list of tokens, and for
24 each token, an amount which is the amount of that
25 token associated with the account balance, and each

MAGNA ▸
LEGAL SERVICES

1                N. Molina - Confidential
2    token was displayed, I believe, as a row.
3        Q.   Okay.  Would the price also be reflected
4    on that Balances page?
5        A.   I don't remember.
6        Q.   Do you remember if the values of those
7    tokens were displayed on the Balances page?
8        MR. DUNNE:  Objection.
9        A.   I don't remember.
10   BY MR. SACK:
11       Q.   Looking to the View all Account Balances
12   button, it looks like, at the top, do you know what
13   a user would see if they clicked on the View All
14   Account Balances button?
15       A.   I don't remember that button, so I don't
16   think I can speculate -- I don't think I have much
17   of a basis to speculate on that button.  I don't
18   remember the button.
19       MR. SACK:  Okay.  I think we're right
20       about that -- oh, just kidding.  But in a
21       moment we will take lunch.
22   BY MR. SACK:
23       Q.   Do you know why FTX would display
24   individual token balances on that all-capitals
25   Balance button if it also displayed the overall net

1                N. Molina - Confidential
2    USD balance?
3        MR. DUNNE:  Objection.
4        A.   My general understanding of users using
5    the Exchange is that they would sometimes want to
6    know how much of each token was associated with
7    their account.  And that was not represented by the
8    total net USD value.
9        MR. SACK:  All right.  I think it's
10       probably a good time for us to take a break.
11       MR. DUNNE:  You did it to us again.
12       MR. SACK:  I know.  I really like tricking
13       you.  First the bathroom; now this.
14   BY MR. SACK:
15       Q.   Why would it be important for a user to
16   understand how much of each token was associated
17   with their account?
18       MR. DUNNE:  Objection.
19       A.   I mean, that's not necessarily something
20   I'm an expert in or kind of know more than anyone
21   else but, you know, base -- you could do -- the
22   transactions you could make depend on the balances
23   you have.  So that would help the user understand
24   what transactions it could make on their account.
25

1                N. Molina - Confidential
2    BY MR. SACK:
3        Q.   Just so I understand, then, is it the
4    balances of some tokens or assets might allow or
5    prevent a user from making other transactions --
6    sorry, yeah.
7        That's the end of the question.
8        MR. DUNNE:  Do you want to just ask it one
9        more time?
10       MR. SACK:  I'm going to ask it in the form
11       of a question this time, yeah.
12   BY MR. SACK:
13       Q.   Is it the case that the balances of some
14   assets or tokens might allow or prevent a user from
15   making other transactions on the 3AC platform -- I'm
16   sorry -- on the FTX platform?
17       I really need lunch.  I apologize.
18       A.   Yes.
19       Q.   Okay.  You said earlier you were
20   responsible for programming some of the user
21   interface.
22       If you programmed it, why did you add that
23   information?
24       MR. DUNNE:  Objection, mischaracterizes
25       his testimony.

1                N. Molina - Confidential
2        A.   Yeah.  I don't think I added that
3    information.  I don't think I added the information
4    of balances on the Balances tab.
5    BY MR. SACK:
6        Q.   Sorry.  Then maybe I misunderstood.
7        What information did you add to the
8    balances tab?
9        A.   I changed some of how it was displayed.
10   Some of the code for that interface I changed and
11   improved, but the balances were displayed there
12   before I started working on that.
13       Q.   Okay.  I understand now.
14       MR. SACK:  For real, I think we should
15       take a lunch break.
16       MR. DUNNE:  Agreed.
17       THE VIDEOGRAPHER:  We're going off the
18       record.  The time is 12:49 p.m.
19       (At 12:49 p.m. a luncheon recess was
20       taken.)
21       (At 1:35 p.m. the deposition resumes.)
22
23
24
25

MAGNA
LEGAL SERVICES

1    N. Molina - Confidential
2    ****************************************************
3        A F T E R N O O N   S E S S I O N
4    ****************************************************
5        THE VIDEOGRAPHER:  We are back on the
6    record the time is 1:35 p.m.  Thanks.
7    CONTINUED EXAMINATION
8    BY MR. SACK:
9        Q.  Welcome back, Mr. Molina.
10        I want to pick up very briefly where we
11   left off.  I think we were just talking about,
12   before the break, your discussion of why multiple
13   different balances were listed on the balances tab.
14        Do you remember that discussion we had?
15        A.  Yes.
16        Q.  And I think one of the things you said was
17   that that information might impact or be helpful for
18   someone trying to make certain transactions on the
19   FTX platform; is that right?
20        A.  Correct.
21        Q.  Why can't a customer always just look to
22   the overall account balance, to make certain types
23   of transactions?
24        A.  I would say it depends on the account and
25   the transaction.  For some accounts and

1        N. Molina - Confidential
2    transactions, the specific tokens the account has
3    affects whether the transaction can be done.
4        Q.  I now want to talk about some of the --
5    some of the data that might be on the FTX platform,
6    or I think you said there's someplace where the
7    data about all of the transactions is perhaps
8    stored.
9        What is that place?
10        A.  I could call it the FTX database.
11        Q.  Okay, perfect.  So I want to show you a
12   couple documents and you can tell me whether or not
13   they come from that database, and if they do, or
14   don't, what you understand them to reflect.
15        MR. SACK:  I'm now going to hand you
16   what's been marked as Exhibit 21.
17        (Exhibit 21 was PREVIOUSLY received and marked for
18   identification, as of this date.)
19   BY MR. SACK:
20        Q.  So why don't you go ahead and take a look
21   through it.  And you can tell me after you've had
22   enough time to review it.
23        MR. SACK:  And I'll just note for the
24   record that this document begins with Bates
25   number FTX_3AC_000000054.

1        N. Molina - Confidential
2        MR. DUNNE:  While Nils is looking at this,
3    this obviously was a native document.  Is this
4    an excerpt?  Do you want to explain what this
5    was?  Or is it the whole thing?
6        MR. SACK:  I think this might be the whole
7    thing for this particular document, yeah.
8        MR. DUNNE:  Okay.
9        A.  I've finished looking here.
10   BY MR. SACK:
11        Q.  Great.
12        Have you seen the data in this document
13   before?
14        A.  I think I have to some extent.
15        Q.  Yeah, what do you understand this document
16   to be?
17        A.  I understand it to be data derived -- or
18   two sets of data derived from the FTX database.
19        Q.  Do you know if you pulled this data from
20   the database?
21        A.  I think I've viewed data from this data in
22   the database, at least a good deal of it.
23        Q.  Okay.  Great.
24        I want to look at -- I think you'll see
25   there's a footer on the first page that says,

1        N. Molina - Confidential
2    "loc_changes."  And then, it looks like the rest of
3    the pages say "loc_interest_charges."
4        Do you see that?
5        A.  Yes.
6        Q.  So looking at the pages with that second
7    footer, can you tell me what the "principal" column
8    is reflecting?
9        MR. DUNNE:  Objection to form.
10        A.  I think I remember LOC interest charges
11   being a table in the FTX database, and I think that
12   was a column in the table, from what I remember.
13   BY MR. SACK:
14        Q.  Okay.  And just so I'm clear, what does
15   LOC stand for?
16        A.  In the context of loc_interest_charges
17   table in the FTX database?
18        Q.  Yeah.
19        A.  It would stand for line of credit.
20        Q.  Okay.
21        And are you familiar for what account or
22   accounts this document is relating to?
23        A.  It looks like the data on this document is
24   referring to the account with the account ID
25   2338882.

**MAGNA**
LEGAL SERVICES

1              N. Molina - Confidential
2    bottom of the page:
3             "A small bump.  Three Arrows is still on
4    the leaderboard."
5        A.  Yes.
6        Q.  Do you have an understanding of what the
7    leaderboard was?
8        A.  No.
9        Q.  Had you heard others at FTX use the term
10   "leaderboard"?
11       A.  I don't recall other people using that
12   term at FTX.
13       Q.  I think earlier we were talking about
14   high-volume traders on the FTX Exchange.  Are you
15   aware of any connection between the leaderboard and
16   that group of traders?
17          MR. DUNNE:  Objection.
18       A.  No, I mean I don't know really what
19   leaderboard refers to, so no.
20   BY MR. SACK:
21       Q.  Give me one second, I apologize.
22          I apologize.  I can't find the exhibit
23   number right now.
24          Earlier we were looking at some images
25   from the FTX platform.  They have this big

1              N. Molina - Confidential
2    black-and-white imagery.  I'm not trying to make you
3    fish, but if you can find it, it's an email.  It's a
4    document --
5          MS. ZHAO:  Exhibit 40.
6          MR. SACK:  Thank you so much.  Thank you
7    for that.
8    BY MR. SACK:
9        Q.  So looking at the images of the FTX
10   platform that we were looking at earlier, do you see
11   on the side there, one of the rows is labeled
12   "leaderboard"?
13       A.  Yes.
14       Q.  Please let me know what did that tab show?
15       A.  I don't remember that button being present
16   on the website, so I don't know.
17       Q.  Earlier you were telling me about the
18   pieces of source code you had maybe primary
19   involvement with.  Which FTX software engineer or
20   engineers had primary involvement of the source code
21   relating to collateral?
22       A.  I know Gary Wang had some involvement with
23   that.  I know he wrote some of that code.  I don't
24   know exactly who else wrote code for it, for
25   collateral.

1              N. Molina - Confidential
2        Q.  What about the software engineers at FTX
3    primarily responsible for the source code for
4    futures contracts, who were those people or person?
5        A.  I know Gary Wang wrote a lot of code
6    related to futures, including, you know, yeah just
7    generally.  I don't know exactly who else wrote code
8    for futures.
9        Q.  Who were the software engineers at FTX
10   primarily responsible for the source code related to
11   margin trading?
12       A.  That I don't know exactly which developers
13   wrote that code.
14          MR. SACK:  I think with that, I have no
15   further questions.  I just want to note that
16   counsel made a number of instructions to you as
17   a witness not to answer based on information
18   that you had.  The objection is noted.  I also
19   note there were some information that we talked
20   about that FTX has or has easy access to that
21   we have not yet received.  So I'm just -- we're
22   just going to reserve all rights with respect
23   to those two pieces.  Otherwise, no further
24   questions.
25          MR. DUNNE:  Likewise, with the reservation

1
2    of rights, and we have no questions either.
3          MR. SACK:  Great.
4          THE VIDEOGRAPHER:  This concludes today's
5    deposition of Nils Molina.  The time is
6    5:38 p.m.
7          MR. DUNNE:  And we'll read and sign.  I
8    guess I don't know if I should have designated
9    it while we were on the record, but we
10   designate it confidential.
11          MR. SACK:  Okay.  Fair enough.
12
13          (Time noted:  5:38 p.m.)
14
15
16      _____
17          NILS MOLINA
18
19   Subscribed and sworn to
20   before me this     day
21   of      2025.
22   _____
23
24
25

Page 234

```
 1
 2              CERTIFICATE
 3
 4   STATE OF NEW YORK )
 5               :  ss
 6          I, Angela M. Shaw-Crockett, a Certified Court
 7   Reporter, Registered Merit Reporter and Notary Public within
 8   and for the States of New York, New Jersey and Connecticut,
 9   do hereby certify:
10          That NILS MOLINA, the witness whose deposition is
11   herein before set forth, was duly sworn by me and that such
12   deposition is a true record of the testimony given by such
13   witness.
14          I further certify that I am not related to any of
15   the parties to this action by blood or marriage and that I
16   am in no way interested in the outcome of this matter.
17          In witness whereof, I have hereunto set my hand
18   this 2nd day of October, 2025.
19
20          ----------------------------------------
            ANGELA M. SHAW-CROCKETT, CCR, CRR, RMR, CSR
21          LICENSE NO. XI00218400
22
23
24
25
```

Page 235

```
 1
 2   NAME OF CASE:  In Re:  FTX Trading Limited, et al.
 3   DATE OF DEPOSITION:  September 30, 2025
 4   NAME OF WITNESS:  Nils Molina
 5   Reason Codes:
 6      1. To clarify the record.
        2. To conform to the facts.
 7      3. To correct transcription errors.
 8   Page _____ Line _____ Reason _____
     From _____ to _____
 9
10   Page _____ Line _____ Reason _____
     From _____ to _____
11
12   Page _____ Line _____ Reason _____
     From _____ to _____
13
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
16   Page _____ Line _____ Reason _____
     From _____ to _____
17
18   Page _____ Line _____ Reason _____
     From _____ to _____
19
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
22   Page _____ Line _____ Reason _____
     From _____ to _____
23
24   _____
            NILS MOLINA
25
```

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |

## ERRATA SHEET OF NILS MOLINA

I, Nils Molina, have reviewed the transcript of my deposition taken on September 30, 2025 in the above-referenced action, and certify that the same appears to be a correct transcript of the answers given by me to the questions therein propounded, except for the following corrections or changes in the errata below:

| Page | Line(s) | Change | Reason |
|---|---|---|---|
| 3 | 3 | Change "FTX TRADING LTD." to "THE FTX RECOVERY TRUST AND THE WITNESS" | Transcription Error |
| 3 | 10 | Change "DEFENDANTS: THREE ARROWS CAPITAL" to "THE JOINT LIQUIDATORS OF THREE ARROWS CAPITAL, LTD." | Transcription Error |
| 22 | 10 | Change "chat" to "chats" | Clarification |
| 29 | 16 | Change "An" to "A" | Clarification |

---

[1]  The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

| Page | Line(s) | Change | Reason |
|------|---------|--------|--------|
| 38 | 22 | Change "future positions" to "futures positions" | Transcription Error |
| 39 | 10 | Change "talking to" to "talking about" | Clarification |
| 55 | 15 | Change "KYC, Know Your Customer," to "KYC (Know Your Customer)," | Clarification |
| 59 | 8 | Change "borrows" to "borrowers" | Clarification |
| 59 | 24 | Change "and group" to "and a group" | Clarification |
| 71 | 6 | Change "tokens" to "'tokens'" | Clarification |
| 72 | 21 | Change "in" to "of" | Clarification |
| 73 | 17 | Change "future" to "futures" | Clarification |
| 75 | 7 | Change "each future" to "'each future'" | Clarification |
| 76 | 12 | Change "see notional" to "see the notional" | Clarification |
| 81 | 18 | Change "codes" to "code" | Clarification |
| 81 | 19 | Change "codes" to "code" | Clarification |
| 82 | 5 | Change "borrow" to "borrows" | Clarification |
| 85 | 2 | Change "borrow" to "borrows" | Clarification |
| 85 | 4 | Change "does" to "did" | Clarification |
| 90 | 22 | Change "borrow" to "borrows" | Clarification |
| 94 | 8 | Change "block chain" to "blockchain" | Transcription Error |
| 94 | 9 | Change "block chain" to "blockchain" | Transcription Error |
| 96 | 16 | Change "have" to "have a" | Clarification |
| 98 | 7 | Change "address" to "addresses" | Clarification |
| 99 | 24 | Change "It's" to "It" | Clarification |

| Page | Line(s) | Change | Reason |
|------|---------|--------|--------|
| 101 | 4 | Change "balances" to "'Balances'" | Clarification |
| 114 | 7 | Change "there was" to "were" | Clarification |
| 114 | 20 | Change "think" to "think they" | Clarification |
| 123 | 3 | Change "affects" to "affect" | Clarification |
| 124 | 21 | Change "from" to "from—" | Clarification |
| 125 | 10 | Change "LOC interest charges" to "loc_interest_charges" | Clarification |
| 128 | 12 | Change "then" to "than" | Transcription Error |
| 133 | 13 | Change "drawn," to "'drawn,'" | Clarification |
| 137 | 16 | Change "price, art," to "price" | Clarification |
| 140 | 16 | Change "who with made" to "who made" | Clarification |
| 143 | 15 | Change "which they have" to "which" | Clarification |
| 146 | 22 | Change "look likes" to "looks like" | Transcription Error |
| 147 | 10 | Change "balance in" to "balance of" | Clarification |
| 150 | 6–7 | Change "consultants including," to "consultants, including" | Transcription Error |
| 150 | 7 | Change "Peter Quan" to "Peter Kwan" | Transcription Error |
| 151 | 7 | Change "or I" to "or—I" | Clarification |
| 158 | 10 | Change "for" to "with" | Clarification |
| 163 | 4 | Change "so would" to "so one would" | Clarification |
| 163 | 5 | Change "fills" to "'fills'" | Clarification |
| 163 | 19 | Change "remember" to "remember—" | Clarification |
| 167 | 4 | Change "it's" to "it's the" | Clarification |

| Page | Line(s) | Change | Reason |
|------|---------|--------|--------|
| 167 | 11 | Change "likes" to "like" | Clarification |
| 182 | 22 | Change "way" to "way," | Clarification |
| 193 | 7 | Change "future." to "future?" | Clarification |
| 199 | 11 | Change "questions about" to "questions about—" | Clarification |
| 206 | 14 | Change "were" to "was" | Clarification |
| 208 | 12 | Change "describes" to "describes," | Clarification |
| 212 | 15 | Change "of a" to "of" | Clarification |
| 225 | 13 | Change "so" to "so it" | Clarification |
| 226 | 18 | Change "one, would" to "one that would" | Clarification |
| 227 | 7 | Change "page" to "pages" | Clarification |
| 232 | 12 | Change "That" to "That—" | Clarification |

Dated: November 5, 2025

_____ */s/ Nils Molina* _____

Nils Molina

# Exhibit 4

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

IN RE:                              )   CHAPTER 11

FTX TRADING LTD., et al.,           )

                    Debtors.        )

CASE NO. 22-11068 (KBO)             )

_____X

VIDEOTAPED STENOGRAPHIC DEPOSITION OF

EDGAR W. MOSELY II

SEPTEMBER 16, 2025

MAGNA LEGAL SERVICES

866.624.6211

www.MagnaLS.com

Job No. 1401097



Page 62

1   other entities.
2       Q.  So for -- from what I'm hearing, fiat --
3   for fiat currently you're saying Ala -- is it
4   Alameda Research LLC?
5       A.  Correct.
6       Q.  What about Alameda Research Ltd.?
7       A.  I'm sure that's just within the -- when
8   I'm speaking about Alameda, I'm speaking about the
9   whole silo.
10      Q.  The whole silo.  Okay.
11          So the fiat currency was generally held
12  by Alameda Research -- Alameda --
13          THE REPORTER:  I'm sorry,
14      repeat.
15      Q.  The fiat currency was generally held by
16  Alameda, North -- is it North Dimension?
17      A.  North Dimension.
18      Q.  -- and FTX Digital Markets.  Is that
19  correct?
20      A.  Correct.  Those were the -- the accounts
21  by which the customers deposited cash into FTX.
22  But it was -- it was moved around pretty
23  ubiquitously after it came in so...
24      Q.  And then crypto, where was the crypto
25  initially deposited?

Page 63

1       A.  As I said, they created customer deposit
2   wallets and then would sweep those wallets into
3   sweep accounts on a regular basis pretty
4   frequently.
5           Ownership of those wallets wasn't as
6   defined because you didn't have to set it up
7   through a bank.  And so you can't -- it isn't as
8   easy to -- to tag a specific wallet to a specific
9   entity.  You know, they viewed it as the exchange
10  wallets, but then they also put corporate funds in
11  there, cryptocurrency, and -- and funds of other
12  entities in there as well.
13      Q.  When those funds were initially
14  deposited -- let's talk about crypt -- the
15  cryptocurrencies were initially deposited by
16  clients, were they deposited in wallets associated
17  with Alameda, for instance, or were they deposited
18  with wallets associated with FTX Trading or the --
19  the exchange?
20      A.  The wallets I would say were owned by
21  FTX Group.  I don't think they were specific
22  Alameda wallets or FTX.com wallets.  They were
23  just the exchange wallets that the group viewed
24  as -- as the cryptocurrency of FTX Group.
25      Q.  And -- and FTX Group includes hundreds

Page 64

1   of --
2       A.  All the entities.
3       Q.  All the entities.  Okay.
4           Now, what steps did A & M take -- let's
5   talk about cryptocurrency for a second.
6           What steps did A & M take to trace those
7   assets that were deposited into wallets?
8       A.  My team with the other advisors spent a
9   long time trying to trace movements and the
10  activity of the exchanges and how it operated.
11  The movements of the -- the wallets, so the
12  transactions on the wallets, would be on-chain
13  activity.
14          Once -- you know, for example, as a
15  customer puts cryptocurrency into one of the
16  deposit wallets, that's on-chain.  When it's swept
17  to one of the sweep wallets, that's also on-chain.
18  From there all the transaction asso --
19  transactions associated with that customer's
20  cryptocurrency would be inside the exchanges and
21  so that wouldn't be on-chain anymore.
22          So at that point instead of looking at,
23  you know, on-chain transactions, you're looking at
24  exchange transactions, which would be housed in
25  the AWS system, the Amazon Web Services system,

Page 65

1   until, you know, withdrawals, which then becomes
2   on-chain again.  But everything inside the
3   exchange box, as we call it, would be housed in
4   Amazon Web Services.
5       Q.  Okay.  So just -- let's start from step
6   one.  A customer deposits cryptocurrency into
7   their FTX account and it goes to -- does it go to
8   a wallet associated with that account, or does it
9   go to just one wallet?  Everybody's assets go to
10  one wallet on the exchange?
11      A.  I'll try to be as specific as possible
12  on the nomenclature.  So when a customer's
13  depositing cryptocurrency with FTX --
14      Q.  Mm-hmm.
15      A.  -- they would be moving funds from their
16  cryptocurrency wallet that they personally have
17  control of into an FTX-controlled deposit wallet
18  that was set up for that specific customer.
19          Once that cryptocurrency enters that
20  FTX's deposit wallet, it's then swept to another
21  FTX-controlled wallet called the -- we called them
22  the -- the sweep wallets.  And then it stays in
23  the sweep wallets until there's some other
24  movement necessary to pull it off the exchange
25  completely or, you know, it's usually left in

1  place unless there's some other transaction with
2  it.
3        Transactions within the exchange do not
4  move cryptocurrency from the sweep wallets to the
5  other wallets.  Those are all just, you know,
6  transactions that were recorded on the AWS ledger,
7  not on the -- the -- the blockchain itself.
8        Does that answer your question?
9     Q.  Yeah.  And I was just getting at the
10 very first part of that --
11    A.  Okay.
12    Q.  -- which you answered very clearly.
13 They -- they go to a wall -- I'll take a step
14 back.
15       So when a customer first deposits from
16 outside into the exchange, it's going to a wallet
17 associated with their -- that specific customer,
18 correct?
19    A.  Correct.
20    Q.  Initially.
21    A.  It's set up as a customer-specific
22 wallet, but it's clear, though, that that isn't
23 designated as, like, some sort of custodial wallet
24 that is at all controlled by the customer or that
25 the customer has some sort of property right to.

1  Once it enters an FTX Group-controlled wallet,
2  it -- it's in the FTX Group's control at that
3  point.
4     Q.  Right.
5        So -- so every customer would have an
6  FTX wallet on the exchange that, your testimony
7  is, was controlled by the FTX Group?
8     A.  Well, you say that the customer has a
9  wallet.  The -- the customer doesn't have a
10 wallet.  The cust --
11    Q.  Let me rephrase it then.
12       There is a wallet on the FTX exchange
13 associated with each customer account?
14    A.  Usually it's more than one, right?
15 Because if -- if you -- if a customer is
16 depositing BTC and ETH, Ethereum, those are going
17 to be two wallets, two -- two deposit wallets set
18 up for that customer, and that's where they will
19 receive those -- the FTX Group will receive those
20 funds into the exchange ecosystem that then is
21 swept from those -- those wallets to the sweep
22 accounts.
23    Q.  And your testimony is that those wallets
24 on the F -- on the exchange are controlled by some
25 member of the FTX Group?

1     A.  The FTX Group controls those wallets.
2  They have the private keys.  They have full
3  control over it at that point.
4     Q.  And can you -- could you trace which
5  FTX entity in the FTX Group controlled those
6  wallets?
7     A.  I mean, we made a -- made an effort to
8  bifurcate which wallets were controlled by which
9  entities.  So some of them are easier than others.
10 The -- the -- if -- if you were an exchange
11 customer for the FTX.com exchange, there were a
12 whole set of wallets associated with -- with that
13 exchange.  And, in general, those wallets are kept
14 separate than the FTX U.S. wallets because that
15 was a different entity.
16       But this whole idea of commingling got
17 into it pretty quickly because Alameda's crypto
18 was also held in those -- in those sweep accounts.
19 And the -- the group would move -- would move
20 funds, cryptocurrency funds, between the exchanges
21 to -- for a myriad of reasons which, you know,
22 sometimes we couldn't even figure out why they
23 were doing it.
24    Q.  When you said Alameda's crypto was also
25 held, are you saying those were held in the

1  initial account wallets or in the sweep accounts?
2     A.  Alameda, to my knowledge, also had
3  deposit wallets when they put money on to the
4  exchange, but what funds I'm speaking of for the
5  commingling is at the sweep accounts, sweep
6  wallets.
7     Q.  And who controlled those sweep wallets?
8     A.  Not too many people, but all by the FTX
9  Group.  You know, it's the same group of people
10 that had ownership of -- of various entities,
11 namely Sam Bankman-Fried, Gary Wang, Nishod Singh.
12 Caroline Ellison is one of those people.  And then
13 there were others as well that were tasked with,
14 you know, the operation side of the exchanges that
15 also had access to passwords and the ability to
16 move cryptocurrency.
17    Q.  Going back to when a -- like the initial
18 customer account, so each customer has an account
19 on the exchange, correct?
20    A.  Each customer has an -- an account.  I
21 think it's important to make the difference
22 between an account and, like, a wallet, you know.
23 You know, it's not like the exchange had a wallet
24 for every customer account and that -- and that
25 wallet held all of the cryptocurrency that that

Page 70

1  customer had as their customer balance at any one
2  point in time.
3      Q.  But they did have a wallet for every
4  customer account initially, right?  All of the
5  deposits went into a customer wallet before they
6  were swept?
7      A.  Not necessarily.  You could make a fiat
8  deposit in -- in -- in cash and then you wouldn't
9  have a deposit account.  But if you were putting
10  crypto on the exchange, to accept the crypto you
11  had a -- a deposit wallet.
12      Q.  Okay.  So each -- each account had a
13  deposit wallet for crypto associated with when
14  they were giving or transferring cryptocurrency to
15  the exchange?
16      A.  If they were going to make a crypto
17  deposit, they set up a crypto deposit wallet.
18      Q.  And then crypto withdrawals, did those
19  withdrawals come from the sweep accounts or where
20  did those withdrawals come from?
21      A.  In general, the -- the -- the
22  withdrawals came from the sweep accounts directly
23  to an external account that the customer
24  designated as their wallet.
25      Q.  And then going to just the customer

Page 71

1  account, separate from wallets, the account would
2  include their various cryptocurrencies.  And if
3  they had five cryptocurrencies on the exchange,
4  that would have associated them -- there would
5  have been five associated wallets, correct, like
6  to enter the crypto to the exchange?  Not that
7  they're going to be held there, but there would be
8  five associated wallets, correct?
9      A.  It depends.  Certain cryptocurrencies,
10  if they were on the same blockchain, you'd only
11  need one -- one wallet for it.  But if you were
12  depositing bitcoin and ETH, you'd need two
13  separate wallets to send those into.  There are
14  certain ones that if it's on the same chain, you
15  could have three currencies going into one
16  wallet.
17      Q.  And then there would also be a fiat --
18  if they had fiat currency in their account, there
19  would be some accounts that they deposited that
20  fiat currency into, correct?
21      A.  So if they were depositing cash, that
22  would be going into a bank account.  And those are
23  the bank accounts we spoke about earlier.  If they
24  were depositing fiat in the form of stablecoins,
25  then those would need deposit wallets.

Page 72

1      Q.  Okay.  So stablecoins, cryptocurrency
2  would need deposit accounts.  Cash would have an
3  account associated with Alameda or North Dimension
4  or FTX DM?
5      A.  There were no customer cash accounts
6  that were held at the -- at the banks.  It would
7  just -- they would -- a customer would wire funds
8  from their account to the Alameda account or the
9  North Dimension account or the Digital Markets
10  account in cash.
11      Q.  Okay.  And -- and then that cash that
12  was transferred would be tracked in their account?
13  Like in -- in the FTX exchange accounts.
14      A.  So each customer had an account balance
15  where their account in AWS would keep track of at
16  one point in time how much cryptocurrency,
17  stablecoins.  Because once they deposited in
18  cash, that was considered an e-money at that point
19  and it could trade -- it was considered a
20  stablecoin at that point, as well as some of the
21  more exotic products like futures, perpetuities,
22  et cetera.
23      Q.  Those customer accounts, I think you say
24  in your declaration they tracked entitlements?
25  Each customer had assets?

Page 73

1      A.  Correct.  That's the term that I use, is
2  "entitlements."
3      Q.  What do you mean by that -- that term?
4      A.  Well, I try to stay away from the term
5  "customer assets" because of the nature of how FTX
6  held the assets of FTX, with all the commingling
7  and -- they definitely didn't custody customer
8  funds separately.  So I don't think of it as
9  customer assets.
10        I -- we needed to calculate entitlements
11  for the purposes of -- of a claim, you know,
12  customer claims, as part of the bankruptcy
13  process.  So I use that term "entitlements" as the
14  calculation of whatever would be due to a customer
15  as of the position date, due to the customer from
16  the exchanges.
17      Q.  And is this a term, "entitlements," is
18  that used -- is that ever used with customers?
19      A.  It is -- I don't think it is a term that
20  FTX used very often, if at all, because FTX was
21  not a very well-run organization.  They used
22  whatever terms were convenient for them.
23      Q.  Yeah.  So I think you had said you used
24  the term "entitlements."  I just want to
25  understand where this came from.



1    well.
2          So a person who had collateral could
3    have, like, a negative cash balance.  But you'd
4    need to -- to really get to the value of that
5    perpetuity or future, you'd need to net out the
6    cash side as -- as well to see what that was
7    really worth because there was a -- there was a
8    liability that they tracked via the cash
9    balances.
10          It's not like there was a separate cash
11   account for that person that went negative,
12   obviously, but it's for that person, for the
13   calculation of the value of that future or perp,
14   you had to take into account that future cash
15   piece.
16   Q.   You said the system tracked.  Are you
17   talking about the AWS system?
18   A.   AWS system.
19   Q.   And the AWS system was separate for
20   FTX.com and the FTX U.S. exchange?  There were
21   separate ledgers, separate systems?
22   A.   They operated differently, so there's
23   different instances on AWS.  There's a different
24   code associated with them.  The -- the -- the --
25   U.S. system obviously didn't have all of the --

1    the same tickers to be allowed to be traded as
2    the dot-com system.  So it ran differently.  It
3    was a different instance.  It was a different
4    exchange.
5    Q.   Does that -- does that system exist
6    today?
7    A.   You cannot trade on any of the -- on any
8    of the exchanges today.  They were shut down as of
9    the petition date.
10   Q.   But does the AWS system exist that you
11   could re-create the balances on a given time?
12   A.   All of the transaction data and data
13   associated with the exchanges was preserved and is
14   still being housed on AWS.
15   Q.   Have you reviewed that data personally?
16   A.   I --
17          MR. GLUECKSTEIN:  Object to the
18   form.
19   A.   I have not personally reviewed every
20   transaction.  There's, you know, trillions of
21   transactions on there.
22          I have -- through my team we've -- we've
23   looked at the data.  We've summarized it for
24   various purposes, and had cuts in, you know, what
25   we were looking at at any one period of time.

1    The -- the data was used very regularly.
2    Obviously the most important piece was for
3    customer entitlements to get to a claims process
4    and a claims reconciliation process.
5    Q.   We talked earlier about how a customer
6    would deposit cryptocurrency into their account,
7    right, from -- from their own or some external
8    wallet on to the exchange in a wallet associated
9    with that customer account.
10          What are the other ways a customer could
11   receive cryptocurrency or receive an entitlement
12   to a cryptocurrency, in your words, into their
13   account?
14   A.   So the only ways to -- to get, like,
15   debits or credits would be deposits, withdrawals,
16   trades or transfers within the exchange.  And then
17   obviously there's the perpetuities and stuff.  But
18   for initial -- for the initial, like, balance,
19   it's either a deposit or a transfer from another
20   account to that account within the exchange.
21   Q.   And any of these transactions, they
22   would be recorded in the AWS system?
23   A.   Yes.
24   Q.   Would there be any other communications
25   associated with those transactions?

1    A.   Describe for me what you're talking
2    about for communications.
3    Q.   The -- the -- the trade confirmation
4    email or anything like that.
5    A.   I'm not certain what the customers saw
6    for trade confirmations.  I'm sure experts on my
7    team know exactly that, but for purposes of
8    creating the report, I didn't review that.
9    Q.   So FT -- you're not aware if FTX sent
10   confirmation emails when deposits were made or
11   withdrawals were made or trades were made?
12   A.   I could neither confirm nor deny that.
13   I don't -- I don't know.
14   Q.   Okay.  In your report you state that,
15   you know, customers had a balance in their account
16   for each supported cryptocurrency, fiat currency,
17   and stablecoin.  So when a customer could review
18   their accounts, they could review each individual
19   asset class and their balance in that individual
20   asset class, correct?
21   A.   When you say "report," you're talking
22   about my declaration, right?
23   Q.   Yeah.  Sorry.
24   A.   Yeah.  It's my understanding that a
25   customer can see how much of each of the

1  cryptocurrency that they were entitled to in
2  their account via the -- the -- the -- the
3  interface or the web -- the web browser that they
4  had with FTX.
5      Q.  And then when -- going back to when
6  customer deposits -- let's start with
7  cryptocurrency.  It goes into their wallet
8  associated with their account and then it is
9  fairly quickly swept into a wallet that is
10  controlled by someone else in the FTX Group?
11      A.  I don't think of it as their wallet.  I
12  think of it as FTX's wallet.  FTX's wallet
13  associated with their account, yes, it's put in
14  there and it's very quickly swept into one of the
15  sweep accounts, the sweep wallets.
16      Q.  And that's the commingling in terms of
17  assets that you were talking about?  That was part
18  of the commingling of all of the assets on the
19  exchange?
20      A.  It's a big part of the commingling of
21  the assets on the exchange, yes.
22      Q.  And does the AWS system track those --
23  that sweeping transaction from when a deposit --
24  or from when a cryptocurrency is taken from a
25  wallet associated with the customer account into

1  the swept wallets?  Is there a transaction history
2  on the AWS system?
3      A.  AWS keeps -- it definitely kept a record
4  of all of the sweeps from the deposit wallets to
5  the sweep wallets.
6      Q.  How many sweep wallets were there?
7      A.  A lot.  I don't know the number, but
8  there are many, many.  Like -- I don't even know
9  how many thousands or millions there were.  There
10  were many.
11      Q.  And you stated in your declaration that
12  apart from cryptocurrency, fiat currency and
13  stablecoins were commingled either upon deposit or
14  shortly thereafter?
15      A.  Correct.
16      Q.  How were the stablecoins commingled?  Is
17  it on deposit or shortly thereafter?
18      A.  That's -- that's the -- it's the same
19  mechanism for the stablecoins.  When stablecoins
20  were deposited into the deposit wallets, they were
21  swept into the sweep accounts.  If I deposited
22  U.S. dollars via a bank wire, it immediately was
23  immediately into an account that held funds for
24  various entities.  Corporate funds, customer
25  funds, et cetera.

1      Q.  For the stablecoin and cryptocurrency
2  in the sweeping mechanism that you mentioned,
3  what's the basis for A & M's conclusion there?
4  Are there documents that you reviewed that show
5  this?
6      A.  The basis for the -- that the sweeps
7  happened?
8      Q.  Yeah.
9      A.  One, you can see the activity via the
10  transaction history on AWS.  But, two, you could
11  see that activity on-chain.  That's a movement
12  from one wallet on-chain to another wallet
13  on-chain.  So that's something that you could
14  see --
15      Q.  These were all --
16      A.  -- publicly as well.
17      Q.  Were these all hot wallets?
18      A.  In general, when speaking about FTX
19  wallets, you can -- you can use the worm -- the
20  term "hot wallets."  They -- they did have some
21  cold wallets in their control, but they were not
22  often used.
23      Q.  Did you -- when you spoke to any of the
24  executives at FTX --
25      A.  I'm sorry, can I get some more water?

1      Q.  Absolutely.
2      A.  Maybe just take a quick break or -- it's
3  up to you.
4          THE VIDEOGRAPHER:  11:08 a.m.,
5      off the record.
6          (Whereupon, a recess is
7      taken.)
8          THE VIDEOGRAPHER:  11:24 a.m.,
9      back on the record.
10  BY Mr. NIEMEYER:
11      Q.  Welcome back, Mr. Mosley.
12      Before the break we were talking about
13  the sweeping and what occurred when deposits were
14  made of cryptocurrency and stablecoins on the
15  exchange.  And I was asking right before the break
16  if -- if you spoke with any of the FTX executives
17  about the sweeping actions.
18      A.  I did not personally speak with any of
19  the employees about the -- the -- the sweeping
20  transactions.  Those were self-evident as the
21  records both publicly and within AWS.
22      Q.  When you say "publicly," what -- what
23  was public?
24      A.  The blockchain's public.
25      Q.  Oh.  Do you know what sweep wallet the

Page 154

```
1            Off the record.
2                  (Whereupon, the deposition
3     concluded at 12:58 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 156

```
1     DEPOSITION ERRATA SHEET
2     Case Name:  FTX TRADING LTD
3     Name of Witness:  EDGAR W. MOSLEY II
4     Date of Deposition:  September 16, 2025
5     Reason Codes:  1. To clarify the record.
6                       2. To conform to the facts.
7                       3. To correct transcription errors.
8     Page____Line____Reason_____
9     From_____to_____
10    Page____Line____Reason_____
11    From_____to_____
12    Page____Line____Reason_____
13    From_____to_____
14    Page____Line____Reason_____
15    From_____to_____
16    Page____Line____Reason_____
17    From_____to_____
18    Page____Line____Reason_____
19    From_____to_____
20    Page____Line____Reason_____
21    From_____to_____
22    Page____Line____Reason_____
23    From_____to_____
24
25
```

Page 155

```
1              REPORTER'S CERTIFICATION
2
3          I hereby certify that the witness in the
4     foregoing deposition, EDGAR W. MOSLEY II, was duly sworn
5     by me to testify to the truth, the whole truth and
6     nothing but the truth, in the within-entitled cause;
7     that said deposition was taken at the time and place
8     herein named; and that the deposition is a true record
9     of the witness's testimony as reported by me, a duly
10    certified shorthand reporter and a disinterested person,
11    and was thereafter transcribed into typewriting by
12    computer.
13         I further certify that I am not interested in
14    the outcome of the said action, nor connected with nor
15    related to any of the parties in said action, nor to
16    their respective counsel.
17         IN WITNESS WHEREOF, I have hereunto set my
18    hand this 21st day of September 2025.
19         Reading and Signing was:
20    ___ requested  ___ waived  _X__ not discussed.
21
22
23         _____
24         BRIDGET LOMBARDOZZI, CSR, RMR, CRR
25
```

Page 157

```
1     DEPOSITION ERRATA SHEET
2     Page____Line____Reason_____
3     From_____to_____
4     Page____Line____Reason_____
5     From_____to_____
6     Page____Line____Reason_____
7     From_____to_____
8     Page____Line____Reason_____
9     From_____to_____
10    Page____Line____Reason_____
11    From_____to_____
12    Page____Line____Reason_____
13    From_____to_____
14    Page____Line____Reason_____
15    From_____to_____
16    Page____Line____Reason_____
17    From_____to_____
18    Page____Line____Reason_____
19    From_____to_____
20
21    _____Subject to the above changes, I certify that
          the transcript is true and correct.
22    _____No changes have been made.  I certify that
          transcript is true and correct.
23
24         _____
25              EDGAR W. MOSELY II
```

MAGNA
LEGAL SERVICES

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |

## ERRATA SHEET OF EDGAR W. MOSLEY

I, Edgar W. Mosley, have reviewed the transcript of my deposition taken on September 16, 2025 in the above-referenced action, and certify that the same appears to be a correct transcript of the answers given by me to the questions therein propounded, except for the following corrections or changes in the errata below:

| Page | Line(s) | Change | Reason |
|---|---|---|---|
| 1 | Cover | Change "MOSELY" to "MOSLEY" | Transcription Error |
| 2 | Cover | Change "MOSELY" to "MOSLEY" | Transcription Error |
| 1 | 13 | Change "MOSELY" to "MOSLEY" | Transcription Error |
| 2 | 6 | Change "MOSELY" to "MOSLEY" | Transcription Error |
| 18 | 24 | Add "the" between "for" and "FTX" | Clarification |
| 25 | 11 | Change "Ray report" to "Coverick Declaration" | Clarification |
| 41 | 7 | Change "Kumadan" to "Kumanan" | Transcription Error |

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

| 52 | 9 | Change "Nordello" to "Nardello" | Transcription Error |
|---|---|---|---|
| 53 | 6 | Change "Nordello" to "Nardello" | Transcription Error |
| 58 | 14 | Change "Nishod" to "Nishad" | Transcription Error |
| 69 | 11 | Change "Nishod" to "Nishad" | Transcription Error |
| 83 | 23 | Change "immediately" to "swept" | Clarification |
| 84 | 19 | Change "worm" to "word" | Transcription Error |
| 89 | 7 | Change "Nishod" to "Nishad" | Transcription Error |
| 95 | 21 | Change "Nishod" to "Nishad" | Transcription Error |
| 96 | 13 | Change "one password" to "1Password" | Transcription Error |
| 124 | 25 | Change "Nishod" to "Nishad" | Transcription Error |
| 128 | 11 | Change "Nishod" to "Nishad" | Transcription Error |
| 132 | 9 | Change "Nishod" to "Nishad" | Transcription Error |
| 139 | 3 | Change "Nishod" to "Nishad" | Transcription Error |
| 152 | 5 | Change "bitcoin Core" to "Bitcoin Core" | Transcription Error |
| 157 | 24 | Change "MOSELY" to "MOSLEY" | Transcription Error |

Dated:  October 21, 2025

_____ /s/ Edgar W. Mosley II _____

Edgar W. Mosley II

# **Exhibit 5**





**FTX Trading Ltd.**
**Consolidated Financial Statements**
**As of December 31, 2021 and 2020 and for**
**the years ended December 31, 2021 and 2020**

**TABLE OF CONTENTS**

| | Page |
|---|---|
| Independent Auditor's Report | 2-3 |
| Consolidated Balance Sheets | 4 |
| Consolidated Statements of Comprehensive Income | 5 |
| Consolidated Statements of Shareholders' Equity | 6 |
| Consolidated Statements of Cash Flows | 7 |
| Notes to Consolidated Financial Statements | 8-28 |

Confidential

FTX_3AC_000046174



**Independent Auditor's Report**

To the Board of Directors and Shareholders
of FTX Trading Ltd.

*Prager Metis CPAs, LLC*

.......................

**401 HACKENSACK AVENUE
4TH FLOOR
HACKENSACK, NJ 07601**

T 201.342.7753
F 201.820.2691

www.pragermetis.com

## Opinion

We have audited the accompanying consolidated financial statements of FTX Trading Ltd. and subsidiaries, which comprise the consolidated balance sheets as of December 31, 2021 and 2020, and the related consolidated statements of comprehensive income, shareholders' equity, and cash flows for the years then ended, and the related notes to the financial statements, collectively referred to as "the financial statements".

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of FTX Trading Ltd. and subsidiaries as of December 31, 2021 and 2020, and the results of their operations and their cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

## Basis for Opinion

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section of our report. We are required to be independent of FTX Trading Ltd. and subsidiaries and to meet our other ethical responsibilities in accordance with the relevant ethical requirements relating to our audits. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

## Responsibilities of Management for the Financial Statements

Management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about FTX Trading Ltd. and subsidiaries' ability to continue as a going concern within one year after the date that the financial statements are available to be issued.

2



*An affiliate of Prager Metis International*        NORTH AMERICA        EUROPE        ASIA

Confidential



**Auditor's Responsibilities for the Audit of the Financial Statements**

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with generally accepted auditing standards will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the financial statements.

In performing an audit in accordance with generally accepted auditing standards, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.

- Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of FTX Trading Ltd. and subsidiaries' internal control. Accordingly, no such opinion is expressed.

- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the financial statements.

- Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about FTX Trading Ltd. and subsidiaries' ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control related matters that we identified during the audit.

*Prager Metis CPAs, LLC*

Prager Metis CPAs, LLC
Hackensack, New Jersey
April 2, 2022

3

## FTX Trading Ltd.

### Consolidated Balance Sheets

#### *(In thousands)*

| | December 31, 2021 | | December 31, 2020 | |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 510,507 | $ | 707 |
| U.S. dollar denominated stablecoins | | 303,142 | | 21,830 |
| Accounts receivable, net | | 1,513 | | 12 |
| Related party receivable | | 1,224,726 | | - |
| Interest receivable, related party | | - | | 2,402 |
| Prepaid expenses and other current assets | | 70,756 | | 640 |
| Loan receivable | | 99,442 | | - |
| Total current assets | | 2,210,086 | | 25,591 |
| Property and equipment, net | | 1,690 | | 23 |
| Intangible assets, net | | 176,058 | | 19,591 |
| Goodwill | | 311,898 | | 138,476 |
| Crypto assets held | | 5,226 | | 586 |
| BNB receivable, related party | | - | | 15,978 |
| Other non-current assets | | 73,095 | | 548 |
| Total assets | $ | 2,778,053 | $ | 200,793 |
| | | | | |
| **Liabilities and Shareholders' Equity** | | | | |
| Current liabilities: | | | | |
| Accounts payable and accrued expenses | $ | 17,772 | $ | 2,231 |
| Related party payable | | 361,868 | | 10,877 |
| Purchase consideration payable | | 101,214 | | - |
| Total current liabilities | | 480,854 | | 13,108 |
| Crypto assets owed | | 547,651 | | 121,515 |
| Other long-term liabilities | | 125,077 | | - |
| Total liabilities | | 1,153,582 | | 134,623 |
| | | | | |
| Shareholders' equity: | | | | |
| Preferred shares, Series A: $0.0000026 par value, 96,456,750 shares authorized, | | - | | - |
| 0 and 96,456,750 issued and outstanding | | | | |
| as of December 31, 2021 and 2020 | | | | |
| Preferred shares, Series B: $0.0000026 par value, 38,155,924 shares authorized, | | - | | - |
| 37,883,971 and 0 issued and outstanding | | | | |
| as of December 31, 2021 and 2020 | | | | |
| Preferred shares, Series B-1: $0.0000026 par value, 4,197,129 shares authorized, | | - | | - |
| 3,188,841 and 0 issued and outstanding | | | | |
| as of December 31, 2021 and 2020 | | | | |
| Common shares, $0.0000026 par value, 755,438,749 shares authorized, | | 1 | | 1 |
| 533,867,273 and 390,510,009 issued and outstanding | | | | |
| as of December 31, 2021 and 2020, respectively | | | | |
| Additional paid-in capital | | 1,623,636 | | 25,565 |
| Shares issuable | | 31,684 | | |
| Receivable, related party | | (496,401) | | (44,641) |
| Subscription receivable | | (6,270) | | - |
| Retained earnings | | 398,209 | | 9,747 |
| Accumulated other comprehensive loss | | (1,886) | | - |
| Total FTX Trading Ltd. shareholders' equity (deficit) | | 1,548,973 | | (9,328) |
| Non-controlling interest | | 75,498 | | 75,498 |
| Total shareholders' equity | | 1,624,471 | | 66,170 |
| Total liabilities and shareholders' equity | $ | 2,778,053 | $ | 200,793 |

The accompanying notes are an integral part of these consolidated financial statements.

4

**FTX Trading Ltd.**

**Consolidated Statements of Comprehensive Income**

*(In thousands, except per share data)*

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | | 2021 | | 2020 |
| Revenue: | | | | |
| Net revenue | $ | 1,016,740 | $ | 89,909 |
| Operating expenses: | | | | |
| Exchange software royalty, related party | | 250,424 | | 22,660 |
| Transaction expense | | 187,016 | | 24,824 |
| Engineering and product | | 5,680 | | 651 |
| Sales and marketing | | 152,702 | | 5,972 |
| Contractor services, related party | | 60,235 | | 5,571 |
| General and administrative | | 88,400 | | 15,821 |
| Total operating expenses | | 744,457 | | 75,499 |
| Operating income | | 272,283 | | 14,410 |
| Other income: | | | | |
| Interest income, net | | 1,156 | | - |
| Interest income, net, related party | | - | | 2,286 |
| Gain on crypto exchange, net | | 114,631 | | - |
| Other income, net | | 443 | | - |
| Income before provision for income tax | | 388,513 | | 16,696 |
| Provision for income tax | | 51 | | - |
| Net income | | 388,462 | | 16,696 |
| Other comprehensive income | | | | |
| Foreign currency translation adjustment | | (1,886) | | - |
| Total comprehensive income | $ | 386,576 | $ | 16,696 |
| | | | | |
| Net income per share: | | | | |
| Basic | $ | 0.76 | $ | 0.03 |
| Diluted | $ | 0.71 | $ | 0.03 |
| | | | | |
| Weighted-average number of common shares outstanding: | | | | |
| Basic | | 428,089 | | 387,859 |
| Diluted | | 463,596 | | 491,174 |

The accompanying notes are an integral part of these consolidated financial statements.

5

FTX_3AC_000046178

**FTX Trading Ltd.**

**Consolidated Statements of Shareholders' Equity**

*(In thousands)*

| | Preferred Shares | | | | | | Common Shares | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Series A Shares | Amount | Series B Shares | Amount | Series B-1 Shares | Amount | Shares | Amount | Additional Paid-in Capital | Shares Issuable | Receivable, Related Party | Subscription Receivable | (Accumulated Deficit) Retained Earnings | Accumulated Other Comprehensive Loss | Non-controlling Interest in Consolidated Subsidiary | Shareholders' Equity |
| **Balance at December 31, 2019** | 96,457 | $  - | - | $  - | - | $  - | 385,827 | $ 1 | $ 15,977 | $  - | $  - | $  - | $ (6,949) | $  - | $  - | $ 9,029 |
| Issuance of common shares | - | - | - | - | - | - | 4,683 | - | 9,366 | - | - | - | - | - | - | 9,366 |
| Acquisition of Blockfolio, Inc. | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 75,996 | 75,996 |
| Mark to market receivable, related party | - | - | - | - | - | - | - | - | - | - | (44,641) | - | - | - | - | (44,641) |
| Purchase of additional Blockfolio shares | - | - | - | - | - | - | - | - | - | - | 222 | - | - | - | (498) | (276) |
| Net income | - | - | - | - | - | - | - | - | - | - | - | - | 16,696 | - | - | 16,696 |
| **Balance at December 31, 2020** | 96,457 | $  - | - | $  - | - | $  - | 390,510 | $ 1 | $ 25,565 | $  - | $ (44,641) | $  - | $ 9,747 | $  - | $ 75,498 | $ 66,170 |
| Issuance of common shares | - | - | - | - | - | - | 46,900 | - | 487,467 | - | - | (6,270) | - | - | - | 481,197 |
| Issuance of preferred shares | - | - | 37,884 | - | 3,189 | - | - | - | 1,109,051 | - | - | - | - | - | - | 1,109,051 |
| Share issuance costs | - | - | - | - | - | - | - | - | (7,407) | - | - | - | - | - | - | (7,407) |
| Share-based compensation | - | - | - | - | - | - | - | - | 8,960 | - | - | - | - | - | - | 8,960 |
| Share-based marketing expense | - | - | - | - | - | - | - | - | - | 31,684 | - | - | - | - | - | 31,684 |
| Mark to market receivable, related party | - | - | - | - | - | - | - | - | - | - | (451,760) | - | - | - | - | (451,760) |
| Conversion of Series A shares to Common shares | (96,457) | - | - | - | - | - | 96,457 | - | - | - | - | - | - | - | - | - |
| Net income | - | - | - | - | - | - | - | - | - | - | - | - | 388,462 | - | - | 388,462 |
| Other comprehensive loss | - | - | - | - | - | - | - | - | - | - | - | - | - | (1,886) | - | (1,886) |
| **Balance at December 31, 2021** | - | $  - | 37,884 | $  - | 3,189 | $  - | 533,867 | $ 1 | $ 1,623,636 | $ 31,684 | $ (496,401) | $ (6,270) | $ 398,209 | $ (1,886) | $ 75,498 | $ 1,624,471 |

The accompanying notes are an integral part of these consolidated financial statements.

6

Confidential

FTX_3AC_000046179

**FTX Trading Ltd.**

**Consolidated Statements of Cash Flows**

*(In thousands)*

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2021 | | 2020 |
| **Cash flows from operating activities** | | | |
| Net income | $ | 388,462 | $ | 16,696 |
| Adjustments to reconcile net income to net cash used in operating activities: | | | |
| Depreciation and amortization | | 5,822 | | 722 |
| Share-based compensation | | 8,960 | | - |
| Share-based marketing expense | | 31,684 | | - |
| Changes in operating assets and liabilities: | | | |
| U.S. dollar denominated stablecoins | | (413,247) | | (20,724) |
| Accounts receivable, net | | (1,271) | | 243 |
| Interest receivable | | 2,402 | | (2,287) |
| Prepaid expenses and other assets | | (57,113) | | (350) |
| Other non-current assets | | (55,244) | | - |
| Accounts payable and accrued expenses | | 14,321 | | 1,831 |
| Net cash used in operating activities | | (75,224) | | (3,869) |
| **Cash flows from investing activities** | | | |
| Acquisitions, net of cash acquired | | (59,247) | | (4,443) |
| Purchase of website domain name | | - | | (330) |
| Purchase of property and equipment | | (4,022) | | (17) |
| Net cash used in investing activities | | (63,269) | | (4,790) |
| **Cash flows from financing activities** | | | |
| Issuance of common shares | | 481,197 | | 9,366 |
| Issuance of preferred shares, net of issuance costs | | 1,066,244 | | - |
| Related party receivable | | (1,224,726) | | - |
| Related party payable | | 325,367 | | - |
| Net cash provided by financing activities | | 648,082 | | 9,366 |
| Effect of exchange rates on cash | | 211 | | - |
| **Net increase in cash and cash equivalents** | | 509,589 | | 707 |
| Total cash and cash equivalents at beginning of period | | 707 | | - |
| Total cash and cash equivalents at end of period | $ | 510,507 | $ | 707 |
| | | | |
| **Noncash investing and financing activities:** | | | |
| Purchase consideration paid in U.S. dollar denominated stablecoins | $ | 167,335 | $ | - |
| Purchase consideration payable | $ | 101,214 | $ | - |
| Issuance of common shares receivable | $ | 6,270 | $ | - |
| Common shares issuable for marketing expense | $ | 31,684 | $ | - |
| Issuance of preferred shares for U.S. dollar denominated stablecoins | $ | 35,400 | $ | - |
| Non-controlling interest purchased in accounts payable | $ | - | $ | 276 |
| | | | |
| **Supplemental disclosure of cash flow information:** | | | |
| Cash paid for interest | $ | 2 | $ | - |
| Cash paid for income taxes | $ | 46 | $ | - |

The accompanying notes are an integral part of these consolidated financial statements.

7

Confidential                                          FTX_3AC_000046180

**FTX TRADING LTD.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2021 AND 2020**

**1. Nature of Operations**

FTX Trading Ltd. (together with its consolidated subsidiaries referred to herein as "the Company", "the Exchange", or "FTX") was incorporated in Antigua in 2019. The Company operates globally, primarily in the Bahamas, which is the Company's headquarters, and Antigua, while also maintaining operations in U.S., Switzerland, Turkey, and Australia. The Company is a leading provider of end-to-end financial infrastructure and technology for the cryptoeconomy, however it does not provide service to US customers and customers in other restricted jurisdictions.

The Company offers innovative products including industry-first derivatives, options, volatility products and leveraged tokens, on a platform utilized by professional trading firms and first-time users. The Company offers retail users the primary financial account for the cryptoeconomy, institutions a state-of-the-art marketplace with a deep pool of liquidity for transacting in crypto assets, and ecosystem partners technology and services that enable them to build crypto-based applications and securely accept crypto assets as payment.

**2. Summary of Significant Accounting Policies**

*Basis of presentation and principles of consolidation*

The accompanying consolidated financial statements have been prepared in accordance with United States generally accepted accounting principles ("GAAP") and include the accounts of the Company and its subsidiaries. The Company's subsidiaries are entities in which the Company holds, directly or indirectly, more than 50% of the voting rights or where it exercises control. All intercompany accounts and transactions have been eliminated. Non-controlling interest represents the value of the minority shareholders' equity at the fair value on the date of acquisition. The Company has elected to not reduce its reported income by allocating the non-controlling interest loss share to the minority interest balance because of the following substantive reasons: 1) the Company is funding 100% of the net losses of the acquired subsidiary, 2) the Company entered into a purchase option which sets the price of acquiring the non-controlling interest, regardless of continuing losses, and 3) the Company has control of and assumed substantially all of the risk and rewards of ownership of the acquired subsidiary as of the acquisition date. The Company's functional and reporting currency is the United States dollar ("U.S. dollar" or "USD").

*COVID-19 impact*

In March 2020, a novel strain of the coronavirus ("COVID-19") was characterized by the World Health Organization as a global pandemic. As a result of the COVID-19 pandemic, international governments implemented quarantine requirements and travel restrictions. For the years ended December 31, 2021 and 2020 and through the date the consolidated financial statements were available to be issued, the Company has experienced minimal operational effects due to being an e-commerce platform in a centralized exchange market. However, due to the widespread uncertainty over the macroeconomic factors and sovereign monetary policies which could impact consumer demand for the Company's services, the financial impact cannot be reasonably estimated at this time.

*Use of estimates*

The preparation of the consolidated financial statements in accordance with GAAP requires management to make estimates and assumptions in the Company's consolidated financial statements and notes. Significant estimates and assumptions include the useful lives of intangible assets; the useful lives of property and equipment; fair value estimates including valuation of assets acquired and liabilities assumed in business combinations and common share valuation for stock option compensation.

Actual results and outcomes may differ from management's estimates and assumptions due to risks and uncertainties, including uncertainty in the current economic environment due to COVID-19. To the extent that there are material differences between these estimates and actual results, the Company's consolidated financial statements may be materially affected. The Company bases its estimates on various assumptions that are believed to be reasonable, the result of which forms the basis for making judgments about the values of assets, liabilities, and results of operations.

8

FTX_3AC_000046181

*Foreign currency transactions*

The consolidated financial statements are reported in U.S. dollars. The Company has exposure to foreign currency translation gains and losses arising from the Company's net investment in foreign subsidiaries. The revenues, expenses, and financial results of these foreign subsidiaries are recorded in their respective functional currencies. The results of operations and the statement of cash flows denominated in foreign currency are translated at the average exchange rate during the reporting period. Assets and liabilities denominated in foreign currencies at the balance sheet date are translated at the applicable rates of exchange in effect at that date. The equity denominated in the functional currency is translated at the historical exchange rate. Because cash flows are translated based on the average translation rate, amounts related to assets and liabilities reported on the statement of cash flows will not necessarily agree with changes in the corresponding balances on the balance sheet. Translation adjustments arising from the use of different exchange rates from period to period are included as a separate component of other comprehensive income in the Consolidated Statements of Comprehensive Income. Gains and losses from foreign currency transactions are included in the Consolidated Statements of Comprehensive Income.

*Reclassification of prior year presentation*

Certain amounts for the year ended December 31, 2020 have been reclassified to conform to the current year presentation and there was no impact to the results of operations for the year ended December 31, 2020.

*Business combinations*

The results of operations of businesses acquired in a business combination are included in the Company's consolidated financial statements from the date of the acquisition. Purchase accounting requires that assets acquired and liabilities assumed of an acquired business be recorded at their estimated fair values on the acquisition date.

Any excess consideration paid over the fair value of assets acquired and liabilities assumed is recognized as goodwill. Acquisition related costs incurred by the Company are recognized as an expense in general and administrative expenses within the Consolidated Statements of Comprehensive Income.

The Company provides its best estimates and assumptions to valuation experts to assist with the calculation and allocation of fair value to the tangible and intangible assets acquired and liabilities assumed at the acquisition date. The Company's estimates are inherently uncertain and subject to refinement. During the measurement period, which may be up to one year from the acquisition date, the Company may record adjustments to the fair value of tangible and intangible assets acquired and liabilities assumed. Subsequent adjustments are recorded to the Consolidated Statements of Comprehensive Income.

*Fair value measurements*

The Company measures certain assets and liabilities at fair value. Fair value is defined as the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Fair value is estimated by applying the following hierarchy, which prioritizes the inputs used to measure fair value into three levels and bases the categorization within the hierarchy upon the level of input that is available and significant to the fair value measurement:

- Level 1: Unadjusted quoted prices in active markets that are accessible at the measurement date for identical, unrestricted assets or liabilities.
- Level 2: Observable inputs other than quoted prices in active markets for identical assets and liabilities, such as, quoted prices for identical or similar assets or liabilities in inactive markets, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.
- Level 3: Inputs that are generally unobservable and typically reflect management's estimate of assumptions that market participants would use in pricing the asset or liability.

*Cash and cash equivalents*

Cash and cash equivalents include cash and interest-bearing highly liquid investments held at financial institutions, cash on hand that is not restricted as to withdrawal or use with an initial maturity of three months or less.

*U.S. dollar denominated stablecoins*

The Company considers U.S. dollar denominated stablecoins with underlying U.S. dollar collateral to be a financial instrument with a fair value equivalent to the U.S. dollar. For operational purposes, the Company earns fees in crypto assets, which are converted into U.S. dollar denominated stablecoins when earned.

9

*Accounts receivable and allowance for doubtful accounts*

Accounts receivables are contractual rights to receive cash either on demand, fixed or determinable dates, and are recognized as an asset on the Company's Consolidated Balance Sheets.

The Company recognizes an allowance for doubtful accounts for receivables that are deemed uncollectible, which occurs once collection efforts have been exhausted. Uncollectible accounts are charged against the allowance for doubtful accounts when identified. As of December 31, 2021 and 2020, the Company has not recorded any bad debt expense or allowance.

*Concentration of credit risk*

The Company's cash, cash equivalents, and accounts receivable are potentially subject to concentration of credit risk. Cash and cash equivalents are placed with financial institutions which are of high credit quality.

*Crypto assets held*

Crypto assets, with no qualifying fair value hedge, are accounted for as intangible assets with indefinite useful lives and are initially measured at cost. The Company assigns costs to crypto asset transactions on a first-in, first-out basis. Any non U.S. dollar-denominated crypto assets received through transaction fee revenue, airdrops or forks would be recorded at their cost, however, as part of the Company's treasury management policy, these assets would be converted to U.S. dollar denominated stablecoins at the acquisition date. Crypto assets received through airdrops or forks for the benefit of exchange participants are distributed when received.

Crypto assets held are assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value, which is measured using the quoted price of the crypto asset at the time its fair value is being measured. Generally, the Company does not hold crypto assets for speculative purposes, however certain crypto assets are held for trading.

There was no impairment expense for the years ended December 31, 2021 and 2020, respectively. Crypto assets held were $5.2 million and $0.6 million as of December 31, 2021 and 2020, respectively.

Crypto assets held or Crypto assets owed as a hedged item in qualifying fair value hedges are initially measured at cost. Subsequent changes in fair value attributable to the hedged risk are adjusted to the carrying amount of these crypto assets held or owed, with changes in fair value recorded in other operating expense in the Consolidated Statements of Comprehensive Income.

*Property and equipment, net*

Property and equipment is stated at cost less accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful life of the asset. The estimated useful lives of the Company's different types of property and equipment are as follows:

- Computer equipment – three years
- Leasehold improvements – shorter of ten years or the life of the lease
- Properties – twenty-five years
- Vehicles – six years

*Goodwill and intangible assets, net*

The Company evaluates the recoverability of long-lived assets on an annual basis, or more frequently whenever circumstances indicate a long-lived asset may be impaired. When indicators of impairment exist, the Company estimates future undiscounted cash flows attributable to such assets. In the event future undiscounted cash flows do not exceed the carrying amount of the assets, the asset would be considered impaired. The impairment loss is measured based upon the difference between the carrying amount and the fair value of the assets

Goodwill represents the excess of the purchase price over the fair value of the net tangible and intangible assets acquired in a business combination. Goodwill is tested for impairment on an annual basis and between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value below the carrying value. For the periods presented, the Company recorded no impairment charges.

10

FTX_3AC_000046183

Intangible assets with a definite useful life are amortized over their estimated useful lives on a straight-line basis. Each period, the Company evaluates the estimated remaining useful life of its intangible assets and whether events or changes in circumstances warrant a revision to the remaining period of amortization. Intangible assets assessed as having indefinite lives are not amortized, but are assessed for indicators of impairment each period.

### *Derivative contracts*

Derivative contracts derive their value from underlying asset prices, other inputs or a combination of these factors.

As a result of an acquisition related liability, the Company entered into an equity for crypto option transaction to satisfy a crypto asset owed liability. The differences between the fair value of the amount owed, recognized on the borrowing effective date, and the fair value of the amount that will ultimately be repaid, based on changes in the spot price of the crypto asset over the term of the borrowing is recognized as a liability. This option is accounted for as a derivative forward contract to exchange at maturity the fixed amount of the crypto asset to be repaid for equity.

### *Derivatives accounted for as fair value hedges*

The Company may apply hedge accounting to a derivative executed for price risk management purposes. To qualify for hedge accounting, a derivative must be highly effective at reducing the risk associated with the exposure being hedged. The Company may use a fair value hedge primarily to hedge the fair value exposure of crypto asset price fluctuations for committed crypto assets owed. The changes in the fair value of the derivative and the fair value of the hedged item, the crypto assets owed, would be recognized in current-period earnings in other operating expense in the Consolidated Statements of Comprehensive Income. Derivative amounts affecting earnings would be recognized in the same line item as would the earnings effect of the hedged item thereby offsetting each other.

### *Revenue recognition*

See Note 4, Revenue, for information on the Company's accounting policies for revenue recognition.

### *Transaction expense*

Transaction expense includes costs incurred to operate the Company's platform, process trades, and perform exchange operations. These costs include account verification fees, fees to process transactions on a blockchain network and other financial institutions for customer transaction activity, fees paid to web service providers, and unrecovered liquidation expenses and customer accommodations due to network issues. Fixed-fee costs are expensed over the term of the contract and transaction-level costs are expensed as incurred.

### *Engineering and product*

Engineering and product expense includes costs incurred in operating, maintaining, and enhancing the FTX and FTX App (formerly referred to as Blockfolio) platforms, including network and infrastructure costs. Engineering and product expense also includes costs incurred in developing new products and services and the amortization of acquired and internally developed technology.

### *Sales and marketing*

Sales and marketing expense primarily includes costs related to sponsorship expenses, customer acquisition, advertising and marketing programs, and the amortization of acquired customer relationships, trademarks and tradename intangible assets. Sales and marketing costs are generally expensed as incurred.*Contract acquisition costs*

The Company has elected to apply the practical expedient to recognize the incremental costs of obtaining a contract as an expense when incurred if the amortization period of the asset that would otherwise have been recognized is one year or less. As a result, no contract acquisition costs were capitalized.

### *Contractor services, related party*

The Company sources personnel from related party entities. The costs included in the contractor services include personnel-related expenses such as salaries, bonuses, benefits, employer taxes, and share-based compensation as well as personnel administrative costs.

11

Confidential                                                                                          FTX_3AC_000046184

### *General and administrative*

General and administrative expenses include costs incurred to support the Company's business, including legal, finance, compliance, human resources, customer experience and support operations, and other administrative services. General and administrative expenses also include non-contractor services, personnel-related expenses, software subscriptions for support services, facilities and equipment costs, depreciation, and other general overhead. General and administrative costs are expensed as incurred.

### *Share-based compensation*

The Company recognizes share-based compensation expense using a fair-value based method for costs related to all equity awards granted under its equity incentive plans to employees for stock options granted under the Company's 2020 Equity Incentive Plan.

The Company estimates the fair value of stock options with only service-based conditions using the Black-Scholes-Merton option-pricing model. The model requires management to make a number of assumptions, including the fair value and expected volatility of the Company's underlying common share price, expected life of the option, risk-free interest rate, and expected dividend yield. The fair value of the underlying share is the fair value of the Company's common share on the date of grant. The expected share price volatility assumption for the Company's share is determined by using a weighted average of the historical share price volatility of comparable companies from a representative peer group, as sufficient trading history for the Company's common share is not available. The Company uses historical exercise information and contractual terms of options to estimate the expected term. The risk-free interest rate for periods within the expected life of the option is based on the U.S. Treasury zero coupon bonds with terms consistent with the expected term of the award at the time of grant. The expected dividend yield assumption is based on the Company's history and expectation of no dividend payouts.

Share-based compensation expense is recorded on a straight-line basis over the requisite service period. The Company has elected to account for forfeitures of awards as they occur, with previously recognized compensation reversed in the period that the awards are forfeited.

### *Income taxes*

The Company accounts for its taxes in accordance with the applicable laws and regulations in the jurisdictions in which it operates. The Company accounts for income taxes using the asset and liability method whereby deferred tax asset and liability account balances are determined based on temporary differences between the financial statement and tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to affect taxable income.

The Company and its subsidiaries may incur direct, value-added, payroll or withholding taxes at a range of tax rates from 0% to 30% rates of in the countries where they are domiciled. Such are reflected in the Consolidated Statements of Comprehensive Income, as a separate line item.

A valuation allowance is established when management estimates that it is more likely than not that deferred tax assets will not be realized. Realization of deferred tax assets is dependent upon future pre-tax earnings, the reversal of temporary differences between book and tax income, and the expected tax rates in future periods.

The Company is required to evaluate the tax positions taken in the course of preparing its tax returns to determine whether tax positions are more likely than not of being sustained by the applicable tax authority. Tax benefits of positions not deemed to meet the "more-likely-than-not" threshold would be recorded as a tax expense in the current year.

The amount recognized is subject to estimate and management judgment with respect to the likely outcome of each uncertain tax position. The amount that is ultimately sustained for an individual uncertain tax position or for all uncertain tax positions in the aggregate could differ from the amount that is initially recognized.

It is the Company's practice to recognize interest and penalties related to income tax matters in income tax expense.

### *Net income per share*

The Company computes net income per share using the two-class method required for participating securities. The two-class method requires income available to common shareholders for the period to be allocated between common shares and participating securities based upon their respective rights to receive dividends as if all income for the period had been distributed.

12

Basic net income per share is computed using the weighted-average number of outstanding shares of common shares during the period. Diluted net income per share is computed using the weighted-average number of outstanding common shares and, when dilutive, potential shares of common shares outstanding during the period. Potential shares of common shares consist of incremental shares issuable related to the exercise of the option discussed in Note 3, as well as the shares of participating convertible preferred shares and stock options.

### Recently adopted accounting pronouncements

On June 16, 2016, the FASB issued Accounting Standards Update No. 2016-13, Financial Instruments - Credit Losses (Topic 326), Measurement of Credit Losses on Financial Instruments ("ASU 2016-13"), which significantly changes how entities will measure credit losses for most financial assets and certain other instruments that are not measured at fair value through net income. ASU 2016-13 will replace today's "incurred loss" approach with an "expected loss" model for instruments measured at amortized cost. For available-for-sale debt securities, entities will be required to record allowances rather than reduce the carrying amount, as they do today under the other-than-temporary impairment model. It also simplifies the accounting model for purchased credit-impaired debt securities and loans. The Company adopted the amendment as of January 1, 2021. Adoption of the guidance did not have a material impact on the Company's consolidated financial statements.

On December 18, 2019, the FASB issued Accounting Standards Update No. 2019-12, Income Taxes: Simplifying the Accounting for Income Taxes ("ASU 2019-12"), as part of its overall simplification initiative to reduce costs and complexity of applying accounting standards while maintaining or improving the usefulness of the information provided to users of financial statements. Among other things, the new guidance simplifies intraperiod tax allocation and reduces the complexity in accounting for income taxes with year-to-date losses in interim periods. The Company adopted the amendment as of January 1, 2021. Adoption of the guidance did not have a material impact on the Company's consolidated financial statements.

### Accounting pronouncements pending adoption

In March 2020, the FASB issued ASU No. 2020-04, *Reference Rate Reform ("Topic 848"): Facilitation of the Effects of Reference Rate Reform on Financial Reporting.* ASU 2020-04 provides for temporary optional expedients and exceptions to the current guidance on certain contract modifications and hedging relationships to ease the burdens related to the expected market transition from the London Inter-bank Offered Rate ("LIBOR") or other reference rates to alternative reference rates. The guidance is effective upon issuance and can be applied through December 31, 2022. The Company does not have LIBOR-based transactions and is currently evaluating the impact of this standard on its consolidated financial statements.

### 3. Acquisitions

### Digital Assets DA AG

In November 2021, the Company purchased 100% of the outstanding share capital of Digital Assets DA AG ("DA AG"). DA AG is a Swiss technology and financial company that issues structured financial products, in particular, financial instruments whose price is derived from an underlying asset, in Switzerland and worldwide, and provides related services. DA AG was renamed FTX Europe AG after the acquisition. The fair value of the consideration transferred in the acquisition was $322.5 million. The following table breaks down the total purchase price (in thousands):

| Purchase Consideration | | Amount |
|---|---|---|
| Cash | $ | 229,167 |
| Contingent Consideration-Cash | | 33,333 |
| Contingent Consideration-Shares | | 50,000 |
| Contingent Consideration-Additional Cash | | 10,000 |
| Fair value of the consideration transferred | $ | 322,500 |

Contingent consideration of $33.3 million and 1,373,247 of the Company's common shares (valued at $50.0 million) are payable if a contract for differences (CFD) broker license is obtained within one year of the acquisition date. Further contingent consideration of $10.0 million is payable provided that a CFD broker license is obtained. The contingent consideration is estimated and recorded at fair value as of the acquisition date as part of the total consideration transferred. The contingent consideration contains a potential transfer of shares, and was evaluated for equity or liability classification. The Company determined that all of the contingent consideration should be recorded as "Purchase consideration payable" on the Consolidated Balance Sheets.

13

The following table summarizes the fair values of assets acquired and liabilities assumed as of the date of the acquisition (in thousands):

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 14,396 |
| Accounts receivable | | 165 |
| Related party receivable | | 200 |
| Prepaid expenses and other current assets | | 12,986 |
| Crypto assets held | | 4,942 |
| Loan receivable | | 99,442 |
| Property and equipment | | 421 |
| Intangible assets | | 153,500 |
| Goodwill | | 162,528 |
| Other non-current assets | | 739 |
| **Total assets** | | 449,319 |
| | | |
| Accounts payable and accrued expenses | | 1,195 |
| Related party payable | | 547 |
| Other long-term liabilities | | 125,077 |
| **Total liabilities** | | 126,819 |
| | | |
| **Net assets acquired** | $ | 322,500 |

The excess of purchase consideration over the fair value of net tangible and identifiable intangible assets acquired was recorded as goodwill of $162.5 million.

The following table sets forth the components of identifiable intangible assets acquired and their estimated useful lives as of the date of acquisition (in thousands, except useful life):

| | | | Useful Life in |
|---|---|---:|:---:|
| | | Amount | Years |
| Operating Licenses | $ | 152,100 | n/a |
| Trade Names | | 1,400 | 6 |
| | $ | 153,500 | |

The operating licenses and trade names were measured and recorded at fair value. Total acquisition costs of $0.2 million were incurred related to the acquisition, which were recorded in general and administrative expenses in the Consolidated Statements of Comprehensive Income.

### *IFS Group Limited*

In September 2021, the Company acquired 100% equity interest of IFS Group Limited ("IFS"). IFS and its subsidiaries operate IFS Markets, an online foreign exchange and CFD brokerage services licensed by the Australian Securities and Investments Commission. IFS was renamed FTX Australia Pty Ltd after the acquisition. The fair value of the consideration transferred in the acquisition was $5.8 million. The excess of purchase consideration over the fair value of net tangible assets acquired was recorded as goodwill of $5.0 million. As of December 31, 2021, there was $0.1 million of the total purchase price included in "Purchase consideration payable" on the Consolidated Balance Sheets.

### *Hive Empire Trading Pty Ltd*

In September 2021, the Company acquired 100% equity interest of Hive Empire Trading Pty Ltd. The fair value of the consideration transferred in the acquisition was $19.0 thousand. There was no excess of purchase consideration over the fair value of net tangible assets acquired, as such, no goodwill was recorded.

14

FTX_3AC_000046187

*Innovatia Limited*

In May 2021, the Company acquired 100% equity interest of Innovatia Limited, a company incorporated in Cyprus. Innovatia Limited wholly owns ZUBR Exchange Limited ("ZUBR"), a company incorporated in Gibraltar, which operates an online crypto assets derivatives exchange platform and is licensed by the Gibraltar Financial Services Commission. The fair value of the consideration transferred in the acquisition was $13.0 million. The excess of purchase consideration over the fair value of net tangible assets acquired was recorded as goodwill of $5.9 million. As of December 31, 2021, $7.7 million of the total purchase price will be paid in monthly installments over 17 months and is included in "Purchase consideration payable" on the Consolidated Balance Sheets.

*Blockfolio, Inc.*

On October 15, 2020, the Company completed the acquisition of Blockfolio, Inc ("Blockfolio") by purchasing 52% of its outstanding common shares. Blockfolio operates an app for mobile crypto asset portfolio tracking and management.

The fair value of the consideration transferred in the acquisition was $83.6 million, representing a 52% equity interest of Blockfolio. The fair market value of the Company as of the date of the transaction was $159.6 million and the fair value of the equity interest retained by Blockfolio (48%) was determined to be $76.0 million. The following table sets forth the total purchase price of $83.6 million (in thousands):

| Purchase Consideration | | Amount |
|---|---|---|
| Cash | $ | 4,894 |
| FTT Liability | | 78,699 |
| Total purchase price | $ | 83,593 |

The $78.7 million of FTT Liability represents the obligation to deliver 20 million FTT crypto asset tokens valued at the fair value of the tokens at the purchase date. FTT is an actively traded crypto asset with a market-quoted price. FTT was created by a related party to tokenize the royalty payments for the trading exchange technology platform licensed to FTX. The FTT tokens will be delivered in 24 equal monthly installments beginning May 1, 2021. The Company entered into an option with a related party, whereby the Company had the right to issue 32.5 million shares of the Company's common shares and $1 million in exchange for 20 million FTT tokens to be delivered in a manner concurrent with the Company's obligation to deliver FTT tokens to Blockfolio's selling shareholders. The Company immediately exercised this option and considers that the FTT Liability will be satisfied by the related party option in exchange for the FTX common shares. See Note 6 for further discussion.

The Company also entered into a call option with Blockfolio shareholders which allows the Company to purchase within 24 months the non-controlling minority interest (100% of the remaining outstanding shares of Blockfolio) for an agreed fixed number of FTX equity shares representing the original acquisition date transaction price. As of December 31, 2020, certain former Blockfolio shareholders requested to receive cash and the Company purchased their outstanding shares for $0.3 million, which reduced the non-controlling interest equity balance.

Confidential

FTX_3AC_000046188

The following table summarizes the fair values of assets acquired and liabilities assumed as of the date of the acquisition (in thousands):

| | | |
|---|---|---:|
| Cash | $ | 451 |
| Accounts receivable | | 255 |
| Prepaid and other current assets | | 290 |
| Crypto assets held | | 851 |
| Property and equipment, net | | 9 |
| Other assets | | 548 |
| Developed technology | | 8,780 |
| Customer list | | 4,200 |
| Trademarks and tradenames | | 7,000 |
| Goodwill | | 138,477 |
| **Total assets** | | 160,861 |
| | | |
| Accounts payable | | 132 |
| Accrued expenses | | 1,140 |
| **Total liabilities** | | 1,272 |
| | | |
| **Non controlling interest** | | 75,996 |
| | | |
| **Net assets acquired** | $ | 83,593 |

The excess of purchase consideration over the fair value of net tangible and identifiable intangible assets acquired was recorded as goodwill of $138.5 million.

The following table sets forth the components of identifiable intangible assets acquired and their estimated useful lives as of the date of acquisition (in thousands, except for useful life):

| | | Amount | Useful Life in Years |
|---|---|---:|:---:|
| Developed technology | $ | 8,780 | 5 |
| Customer list | | 4,200 | 10 |
| Trade names and trademarks | | 7,000 | 10 |
| | $ | 19,980 | |

The developed technology, customer list, and trade names and trademarks represent the estimated fair value of Blockfolio's trading platform, existing relationships with customers, and money transmitter licenses held, respectively. Total acquisition costs of $1.0 million were incurred related to the acquisition, which were recorded in general and administrative expenses in the Consolidated Statements of Comprehensive Income.

The following table sets forth supplemental Unaudited Pro forma Net Revenue and Unaudited Pro forma Net Income (Loss) of the combined entity had the acquisition date been January 1, 2019:

| | Year Ended December 31, | | | |
|---|---|---:|---|---:|
| | | 2020 | | 2019 |
| Pro forma revenue | $ | 90,116 | $ | 10,575 |
| Pro forma net income (loss) | $ | 11,423 | $ | (12,735) |

As it would be impractical to calculate Blockfolio's Proforma Net Revenue and Proforma Net Income (Loss) for the period of time in 2019 in which FTX was in operation, the full twelve months of Blockfolio's Net Revenue and Net Loss is included in the calculation of supplemental Unaudited Pro forma Net Revenue and Net Loss for the combined entity for the year ended December 31, 2019

16

FTX_3AC_000046189

**4. Revenue**

The Company determines revenue recognition from contracts with customers through the following steps:

- identification of the contract, or contracts, with the customer;
- identification of the performance obligations in the contract;
- determination of the transaction price;
- allocation of the transaction price to the performance obligations in the contract; and
- recognition of the revenue when, or as, the Company satisfies a performance obligation.

Revenue is recognized when control of the promised goods or services is transferred to the customers, in an amount that reflects the consideration the Company expects to be entitled to in exchange for those goods or services. The Company primarily generates revenue through transaction fees and interest fees charged on the platform earned from customers that are individuals, or institutional customers, such as hedge funds, family offices, principal trading firms, and financial institutions.

The Company's service is comprised of a single performance obligation to provide a matching service when customers buy and sell crypto assets, tokenized funds, options, or futures, in addition to providing a platform for the creation, management, and redemption of leveraged tokens. The Company is an agent in arranging transactions between customers and presents revenue for the fees earned on a net basis. Certain customers, depending on their fee tiers and trading volumes, can earn negative fees on the maker side of transactions, however there is always a positive taker fee and every transaction is required to have a minimum net positive fee earned.

The Company evaluates the presentation of revenue on a gross or net basis based on whether it controls the assets before they are transferred to the customers (gross) or whether it acts as an agent by arranging for customers on the platform to create and/or exchange the crypto assets, options or futures contracts between customers (net). The Company does not control the crypto assets, futures or option contracts before they are created and/or exchanged between the maker and taker, does not have inventory risk related to the crypto assets, and is not responsible for the contract fulfillment of the underlying crypto assets. The Company also does not set the prices for the crypto assets, options, or futures, as the price is a market rate established by the participants on the platform. As a result, the Company acts as an agent in facilitating the ability for a customer to purchase from another customer.

The Company considers its performance obligation satisfied, and recognizes revenue, at the point in time the transaction is processed. Contracts with customers are usually open-ended and can be terminated by either party without a termination penalty. Therefore, contracts are defined at the transaction level and for each completed transaction.

The Company charges a fee at the transaction level. The transaction price, represented by the trading fee, is calculated based on a rate schedule and may vary depending on certain criteria. The fee rate charged per transaction is adjusted up or down if the total volume of trades and crypto asset staked for a specific historical period meets established thresholds. Fee rate changes are prospective. The Company has concluded that this volume-based pricing approach does not constitute a future material right since the discount is within a range typically offered to a class of customers with similar volume. The transaction fee is collected from the customer at the time the transaction is executed. In certain instances, the transaction fee can be collected in crypto assets, with revenue measured based on the amount of crypto assets received and the fair value of the crypto assets at the time of the transaction. All fees collected in non-USD crypto are immediately converted to USDC at the rate and time of the transaction, thereby resulting in USD revenue at the time of transaction.

The following table presents the details of revenue by source (in thousands):

|  | Year Ended December 31, | | | |
|  | 2021 | | 2020 | |
|---|---|---|---|---|
| Future fill fees | $ | 674,032 | $ | 65,617 |
| Spot fill fees | | 160,500 | | 5,828 |
| Staking provider fees | | 58,084 | | - |
| Margin and credit related fees | | 45,846 | | 686 |
| Leveraged token fees | | 37,587 | | 14,452 |
| Unstake fees | | 15,456 | | - |
| Withdrawal fees | | 10,656 | | - |
| Insurance fund fees | | 10,446 | | 3,087 |
| Other | | 4,133 | | 239 |
| Total revenue | $ | 1,016,740 | $ | 89,909 |

*Future fill fees*

Future fill revenue represents fees charged for transactions of net USDC settled crypto-based futures contracts. These counterparty contracts can either be perpetual or have expiration dates.

*Spot fill fees*

Spot fill fees are generated when two parties on the Exchange agree to exchange crypto assets at an agreed price. The Company matches the orders and the assets are exchanged. The Company is not a principal to the transactions and the price is set by the customers. The Company receives fees based on the completion, or fill of each transaction.

*Staking provider fees*

The Company receives certain revenues from facilitating the staking and distribution of staking rewards of crypto assets. These revenues are earned when the crypto assets are received from the ecosystem administrators.

*Margin and credit related fees*

Spot margin - The Company earns fees and interest revenue for margin and credit-related activities. When customers lend funds to each other utilizing the spot margin function, the Exchange charges a transaction fee based on each hourly borrowing.

Cross collateral borrowing - The Company recognizes interest revenue when a customer utilizes non-USD collateral for futures trades and the trade requires collateral funding. If the customer retains the non-USD-based collateral, then an amount equal to the funding requirement is functionally borrowed in USD with interest charged to the customer on an hourly basis.

*Leveraged token fees*

The Company creates investment funds that are designed to track indexes, benchmarks or crypto tokens. The pools are actively managed with trading to continue to meet objectives. Investments in these pools can be tokenized and tokens traded or withdrawn from the exchange. The Company generates fee revenue for the creation of tokens, management of the investment funds, and the redemption of tokens. Revenue is measured based on the daily management fee percentage and token creation and redemption fees and earned when each transaction is completed.

*Unstake fees*

The Company charges fees related to the early redemption of staked crypto assets. Each staking transaction has a predetermined fee which will be charged if the customer redeems staked crypto assets prior to prespecified staking termination conditions. These revenues are earned when deducted from customer balances upon early redemptions.

*Withdrawal fees*

The Company charges withdrawal fees related to certain transaction expenses incurred for the remittance of crypto assets. The fees can vary depending on the customer relationship level, amount of transfer, and customer selection of blockchain utilized to complete the transaction. These revenues are earned when the transaction is executed and funds are deducted from the customer accounts.

*Insurance fund fees*

The Company provides the ability to leverage collateral for futures contacts. For certain contracts which are considered highly leveraged an additional fee is added to the transaction fee. This fee is earned at the time of the transaction and is generally representative of the increased liquidation risk associated with highly leveraged trades.

Liquidation risk losses are recorded when the exchange is unable to close a trade quickly enough to cover the losses with the available collateral. The Exchange will record uncovered losses related to these liquidations when it is certain that they have occurred and collection from customers is not available. Losses related to liquidation risks were $25.7 million and $4.6 million for the years ended December 31, 2021 and 2020, respectively, and are included as transaction expenses in the period they are considered non-recoverable.

18

*Other*

The Company charges fees related to certain transaction support and configuration services related to exchange functionality. Revenues are recognized when the performance obligations are completed and payment is collected or reasonably assured.

## 5. Income Taxes

For the years ended December 31, 2021 and 2020, FTX Trading Ltd., which is the primary revenue-generating entity, did not incur any income taxes. The Company's subsidiaries in the Bahamas, the U.S., Switzerland, Australia, Turkey, Gibraltar, and Singapore (2020: the U.S.) are subject to taxation in such jurisdictions as determined in accordance with relevant tax legislation, further discussed in Note 14 to these consolidated financial statements.

For the year ended December 31, 2021, the Company's consolidated provision for income taxes was $51 thousand. There was no provision for income taxes for the year ended December 31, 2020.

Management regularly assesses its deferred tax position recorded based upon the weight of available evidence. There were no deferred tax liabilities as of December 31, 2021 and 2020.

## 6. Related Parties

The Company's primary shareholder is also the primary shareholder of several related entities which do business with the Company.

*Liquidity provider, market maker and trading* – Certain related party entities were the initial liquidity providers and participated in a majority of the market making transactions at the inception of the Exchange. Over time other liquidity providers have joined the Exchange and the percentage of trades involving related parties has decreased as a percentage of total revenue. The related entities do trade for their own proprietary purposes on non-market making transactions.

*Exchange software royalty* – The Exchange software royalty was developed by entities and parties which are significant shareholders. The Exchange software was licensed from a related entity for a fee of approximately 25% of net exchange transaction revenues, depending on the revenue mix. The Company has licensed the rights to the software code and the rights to further develop the technology.

*Currency and treasury management* – Certain related parties have provided currency and treasury management activities to the Company. These services include that the related entities serve as conduits of fiat, or crypto transactions, maintaining an intercompany account for and on behalf of the Company that is repayable on demand, and the provision of the same day conversion of revenue and expense transactions of crypto to USD, all at the Company's direction. A significant percentage of the Company's bill-paying activities have been facilitated through these related party service transactions.

*Contractor services* – Many of the Company's personnel are employed by related party entities and contracted to the Company. Costs of related party employed personnel are based on an allocation of actual payroll charges and other personnel-related expenses and include an 8% administrative overhead mark-up. The majority of personnel related costs were paid to related parties for contracted services.

### Related party transactions

Liquidity provider, market making, and trading exchange transactions with a related party represented approximately 6% and 11% of total exchange transaction volume for the years ended December 31, 2021 and 2020, respectively. Because the related parties were primarily market makers which therefore generated negative commissions, net revenues (negative) for the years ended December 31, 2021 and 2020 were $(22.0) million and $(13.4) million, respectively, which represented approximately 2.2% and 14.9% of total exchange transaction revenue on an absolute basis.

Software royalties paid to a related party for the years ended December 31, 2021 and 2020 were $250.4 million and $22.7 million, respectively. These royalties are currently calculated based on 33% of net FTX exchange trading revenues, 10% of net additions to the insurance fund, and 5% of net fees earned from other uses of FTX platform.

19

Currency management transactions comprised a significant portion of the customer fiat transactions and expense payments to vendors in both fiat and crypto transactions. As part of the treasury management arrangements, the Company maintained an intercompany account with these related entities to facilitate certain corporate transactions. As of December 31, 2021, the intercompany account held under this arrangement amounted to $1.2 billion, with $600.0 million being remitted to the Company through to the date of this report. As of December 31, 2021, this balance is presented as "Related party receivable" on the Consolidated Balance Sheets.

As part of the currency management, these related companies also entered into an "FTX equity-for-FTT Crypto" option agreement related to the Blockfolio acquisition, whereby the Company agreed to exchange FTX equity for FTT crypto as described in the Blockfolio acquisition footnote. The FTT receivable and the FTT liability are settled in the same manner (24 equal installments), the Company has determined that the accounting for the assets and liabilities in this transaction should be marked to market. The FTT receivable and liability are marked to market based on the quoted price for the FTT tokens at the reporting date. As of December 31, 2021 and 2020, the receivable was $496.8 million and $44.6 million respectively, and is presented as "Receivable, related party" in the Shareholders' Equity section on the Consolidated Balance Sheets.

Contractor services for the years ended December 31, 2021 and 2020 were $93.6 million and $5.6 million, respectively. Of the $93.6 million and $5.6 million of contractor service expenses, 53% were allocated to sales and marketing, 12% were allocated to engineering and product, and 35% were allocated to general and administrative expenses for the years ended December 31, 2021 and 2020, respectively, based on the functional purpose of the personnel.

In October 2021, a related party sold 12.8 million of the Company's common shares to external investors in a secondary sale transaction for $301.8 million. The proceeds of the secondary sale were retained by the Company on behalf of the related party for operational expediency, and $301.8 million was included in "Related party payable" on the Consolidated Balance Sheets as of December 31, 2021. No Company assets or liabilities were affected by the transaction, and no gains and losses were recorded as a result of the transaction.

During the period ended December 31, 2019, the Company issued 96,456,750 shares of Series A preferred shares in exchange for 1,002,739 cryptographic BNB tokens. The BNB tokens were recorded at fair value as of the transaction date. The BNB tokens were subsequently loaned to a related party and are presented as "BNB receivable, related party" in the Assets section of the Consolidated Balance Sheet as of December 31, 2020. Interest is earned on the BNB receivable at a rate of 10% per year and the loan matures in November 2024. As of December 31, 2020, interest receivables from related parties were approximately $2.4 million. In February 2021, a related party purchased the BNB receivable for approximately $130.1 million.

## 7. Property and equipment, net

Property and equipment, net consisted of the following (in thousands):

|  | December 31, | | | |
| --- | --- | --- | --- | --- |
|  | 2021 | | 2020 | |
| Computer and office equipment | $ | 1,016 | $ | 54 |
| Vehicles |  | 1,031 |  | - |
| Leasehold improvements |  | 21 |  | - |
| Other |  | 548 |  | - |
|  |  | 2,616 |  | 54 |
| Less accumulated depreciation |  | (926) |  | (31) |
|  | $ | 1,690 | $ | 23 |

## 8. Goodwill and Intangible Assets

### *Goodwill*

The following table reflects the changes in the carrying amount of goodwill (in thousands):

|  | December 31, | | | |
| --- | --- | --- | --- | --- |
|  | 2021 | | 2020 | |
| Balance, beginning of period | $ | 138,476 | $ | - |
| Additions due to acquisitions |  | 173,422 |  | 138,476 |
| Balance, end of period | $ | 311,898 | $ | 138,476 |

20

*Intangible assets*

Intangible assets consisted of the following (in thousands):

| | | | | December 31, 2021 | | | | |
|---|---|---|---|---|---|---|---|---|
| | Useful Life in Years | Weighted Average Amortization Period in Years | | Gross Carrying Amount | | Accumulated Amortization | | Net Carrying Amount |
| Operating licenses | n/a | n/a | $ | 157,983 | $ | - | $ | 157,983 |
| Developed technology | 5 | 5 | | 8,780 | | 2,195 | | 6,585 |
| Customer list | 10 | 10 | | 4,200 | | 525 | | 3,675 |
| Trade name and trademarks | 6-10 | 10 | | 8,400 | | 875 | | 7,525 |
| Website domain name | 15 | 15 | | 330 | | 40 | | 290 |
| Total | | | $ | 179,693 | $ | 3,635 | $ | 176,058 |

| | | | | December 31, 2020 | | | | |
|---|---|---|---|---|---|---|---|---|
| | Useful Life in Years | Weighted Average Amortization Period in Years | | Gross Carrying Amount | | Accumulated Amortization | | Net Carrying Amount |
| Developed technology | 5 | 5 | $ | 8,780 | $ | 439 | $ | 8,341 |
| Customer list | 10 | 10 | | 4,200 | | 105 | | 4,095 |
| Trade name and trademarks | 10 | 10 | | 7,000 | | 175 | | 6,825 |
| Website domain name | n/a | n/a | | 330 | | - | | 330 |
| Total | | | $ | 20,310 | $ | 719 | $ | 19,591 |

Amortization expense of intangible assets was $2.9 million and $0.7 million for the years ended December 31, 2021 and 2020, respectively. During the year ended December 31, 2021, the Company determined the website domain name has a remaining useful life of 15 years. The Company estimates that there is no significant residual value related to its intangible assets.

21

Confidential

FTX_3AC_000046194

**9. Fair Value Measurements**

The following table sets forth by level, within the fair value hierarchy, the Company's assets and liabilities measured and recorded at fair value on a recurring basis (in thousands):

|  | December 31, 2021 | | | |
|  | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | $ 510,507 | $ - | $ - | $ 510,507 |
| **Total assets** | $ 510,507 | $ - | $ - | $ 510,507 |
| | | | | |
| **Liabilities** | | | | |
| Crypto assets owed | $ 547,651 | $ - | $ - | $ 547,651 |
| Contingent consideration-cash | 43,333 | - | - | 43,333 |
| Contingent consideration-shares | - | - | 50,000 | 50,000 |
| **Total liabilities** | $ 590,984 | $ - | $ 50,000 | $ 640,984 |
| | | | | |
| **Shareholders' Equity** | | | | |
| Receivable, related party | $ (496,401) | $ - | $ - | $ (496,401) |
| **Total shareholders' equity** | $ (496,401) | $ - | $ - | $ (496,401) |

|  | December 31, 2020 | | | |
|  | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | $ 707 | $ - | $ - | $ 707 |
| **Total assets** | $ 707 | $ - | $ - | $ 707 |
| | | | | |
| **Liabilities** | | | | |
| Crypto assets owed | $ 121,515 | $ - | $ - | $ 121,515 |
| **Total liabilities** | $ 121,515 | $ - | $ - | $ 121,515 |
| | | | | |
| **Shareholders' Equity** | | | | |
| Receivable, related party | $ (44,641) | $ - | $ - | $ (44,641) |
| **Total shareholders' equity** | $ (44,641) | $ - | $ - | $ (44,641) |

The fair values of cash, accounts receivable, accounts payable, and certain other accrued expenses approximate carrying values because of their short-term nature.

**10. Preferred Shares**

The Company is authorized to issue up to 138,809,803 preferred shares of $0.0000026 par value, of which 96,456,750 is designated as Series A Preferred Shares, 38,155,924 is designated as Series B Preferred Shares, and 4,197,129 is designated as Series B-1 Preferred Shares.

The Company's amended and restated articles of incorporation include the following terms and conditions for all classes of preferred shares, in addition to the rights and privileges shown below:

*Voting rights*

The holders of preferred shares are subject to the Company's restated articles of incorporation and are entitled to the number of votes equal to the voting power of the number of shares of common shares into which their shares of convertible preferred shares can be directly converted.

*Dividends*

The holders of preferred shares are entitled to receive dividends equal to the number of common shares into which their preferred shares can be directly converted as of the date of record. The dividends are non-cumulative and are payable when, as and if declared by the Board of Directors.

22

Confidential    FTX_3AC_000046195

### *Liquidation rights*

In the event of any liquidation event of the Company (a voluntary or involuntary liquidation, a merger where the holders of common shares and convertible preferred shares own less than a majority of the resulting voting power of the surviving entity, or a sale of substantially all the assets of the Company), before any distribution or payment shall be made to the holders of common shares, the holders of preferred shares shall be entitled to receive out of the assets legally available for distribution, liquidating distributions in the amount of the greater of (i) one times the original issue price, plus any dividends declared but unpaid, or (ii) such amount per share as would have been payable had all shares of preferred shares been converted into common shares immediately prior to such liquidation.

If upon any such liquidation of the Company or deemed liquidation event, the assets of the Company available for distribution to its shareholders shall be insufficient to pay the holders of preferred shares the full amount to which they shall be entitled, the holders of preferred shares shall share ratably in any distribution of the assets available for distribution in proportion to the respective amounts which would otherwise be payable in respect of the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid in full.

### *Conversion*

Each share of preferred shares shall be convertible, at the option of the holder at any time into such number of fully paid and nonassessable common shares as is determined by dividing the preferred shares original issue price by the conversion price in effect at the time of conversion. The conversion price is equal to the original issue price, which is $0.18972 per share for Series A, $26.21 per share for Series B, and $36.41 per share for Series B-1.

### *Redemption*

No shares of convertible preferred shares are unilaterally redeemable by either the shareholders or the Company.

### *Automatic Conversion Upon Qualifying Events*

The preferred stock automatically converts to common shares upon a qualified Initial Public Offering ("IPO"), Special Purpose Acquisition Company ("SPAC") transaction, or a qualified direct listing transaction.

The number of preferred shares issued during the year and outstanding at year end are as follows (in thousands):

|  | Series A | Series B | Series B-1 |
|---|---|---|---|
| Preferred shares outstanding at December 31, 2020 | 96,457 | - | - |
| Issuances | - | 37,884 | 3,189 |
| Conversions into common shares | (96,457) | - | - |
| Preferred shares outstanding at December 31, 2021 | - | 37,884 | 3,189 |
| Total shares authorized | 96,457 | 38,156 | 4,197 |

### *Series A*

In October 2021, the Company's outstanding Series A preferred shares were converted into common shares at a one-to-one ratio.

See Note 11 for a discussion of a share split which occurred during 2020. The number of Series A preferred shares and amounts per share reported in the Company's consolidated financial statements and notes have been retrospectively updated to 96,456,750 to reflect the impact of the share split.

### *Series B*

In July 2021, the Company initiated a Series B preferred share round of financing in which 37.8 million Series B preferred shares were issued for approximately $992.9 million.

Confidential

FTX_3AC_000046196

*Series B-1*

In October 2021, the Company initiated a Series B-1 preferred share round of financing in which 3.2 million Series B-1 preferred shares were issued for approximately $116.1 million.

## 11. Common Shares

The Company is authorized to issue up to 755,438,749 common shares of $0.0000026 par value.

Holders of the Company's common shares are entitled to dividends if and when declared by the Board of Directors. The holders of common shares shall have the right to one vote for each share and shall be entitled to elect directors of the Company.

The number of common shares issued during the year and outstanding at year end are as follows (in thousands):

|  | Common |
|---|---|
| Outstanding at December 31, 2020 | 390,510 |
| Issuances | 46,901 |
| Conversions from preferred shares | 96,457 |
| Outstanding at December 31, 2021 | 533,868 |
|  |  |
| Total shares authorized | 755,439 |

During the year ended December 31, 2020, the Company issued 4,683,009 common shares at $2.00 per share for total proceeds of $9.4 million.

In April 2020, the Company effected a share split, whereby each outstanding share of common shares and Series A preferred shares was split into 385,827 shares. The number of authorized shares were also increased to account for the additional outstanding shares. The number of shares and amounts per share reported in the Company's consolidated financial statements and notes have been retrospectively updated to reflect the impact of the share split.

As of December 31, 2021, $6.3 million of unpaid stock option exercises were recorded as "Subscription receivable" in the Consolidated Statements of Shareholders' Equity, and were fully paid as of the date of issuance of the consolidated financial statements.

24

FTX_3AC_000046197

**12. Net Income Per Share**

The computation of basic and diluted net income per share is as follows:

|  | Year Ended December 31, | |
|---|---|---|
|  | 2021 | 2020 |
| **Numerator:** | | |
| Net income | $ 388,462 | $ 16,696 |
| Less: Undistributed net income allocated | | |
| to participating convertible preferred shares | (63,228) | (3,307) |
| Net income, basic | $ 325,234 | $ 13,389 |
| Add: Undistributed net income allocated | | |
| to participating convertible preferred shares | 63,228 | 3,307 |
| Less: Undistributed net income reallocated | | |
| to participating convertible preferred shares | (59,433) | - |
| Add: Undistributed net income allocated | | |
| to participating convertible preferred shares | 59,433 | - |
| Less: Undistributed net income reallocated | | |
| to participating convertible preferred shares | (59,106) | - |
| Diluted net income | $ 329,356 | $ 16,696 |
| | | |
| **Denominator:** | | |
| Basic weighted-average shares outstanding | 428,089 | 387,859 |
| Add: Incremental shares for: | | |
| Dilutive effect of shares issuable to related party (Note 3) | 32,511 | 6,858 |
| Dilutive effect of stock options | 2,996 | - |
| Dilutive effect of participating convertible preferred shares | - | 96,457 |
| Diluted weighted-average shares outstanding | 463,596 | 491,174 |
| | | |
| **Net income per common share:** | | |
| Basic earnings per share | $ 0.76 | $ 0.03 |
| Diluted earnings per share | $ 0.71 | $ 0.03 |

Basic income per common share is computed by applying the two-class method, where the numerator is adjusted for undistributed net income allocated to participating convertible preferred shares. Diluted net income per share is calculated utilizing the more dilutive of the if-converted method or the two-class method. For the year ended December 31, 2021, the two-class method was utilized to calculate diluted earnings per share. The weighted average effect of 15,688,984 stock options were excluded from diluted net income per share as the effect would have been anti-dilutive.

To calculate the diluted weighted-average common shares outstanding for the year ended December 31, 2020, the number of incremental shares assumed outstanding from the shares issuable to a related party is calculated by applying the if-converted method. To calculate the incremental shares from the assumed conversion of participating convertible preferred shares, the Company applied the if-converted method. Under this method, the numerator is adjusted for undistributed net income allocated to participating convertible preferred shares for the year ended December 31, 2020. There were no excluded anti-dilutive securities for the year ended December 31, 2020.

**13. Share-Based Compensation**

The Company's 2020 Equity Incentive Plan, as adopted October 8, 2020 (the "Plan"), provides for the grant of incentive stock options and non-qualified stock options to employees, officers, directors and consultants of the Company or its subsidiaries to purchase common shares. Incentive and non-statutory stock options may be granted with exercise prices not less than the estimated fair value of the Company's common shares on the date of grant, which fair value is determined by the Board at its sole discretion. Options granted through December 31, 2021 generally vest over terms ranging from eighteen months to five years. The Company has authorized 88,582,500 shares of common shares under the Plan for issuance.

25

Options granted under the Plan expire no later than ten years from the date of grant. Incentive stock options granted under the Plan vest over periods determined by the Board. During the year ended December 31, 2021, the Company began granting options under the Plan, which included time-based vesting awards and one performance-based vesting award. The time-based awards generally vest over several different vesting schedules approved by the Board. Compensation expense is recognized straight line over the vesting period.

The fair value of each stock option granted during 2021 was estimated as of the date of grant using the Black-Scholes option valuation model with the following average assumptions:

|  | December 31, | |
| --- | --- | --- |
|  | **2021** | **2020** |
| Dividend yield | — | — |
| Expected life (years) | 6.0 | — |
| Risk-free interest rate | 0.95% | — |
| Estimated volatility | 54% | — |

Share-based compensation expense was $9.0 million for the year ended December 31, 2021.

Using the Black-Scholes option valuation model, the weighted-average estimated fair value of stock options granted during the year ended December 31, 2021 was $3.34. As of December 31, 2021, the total unamortized compensation expense related to share-based awards granted was approximately $140.2 million, which is expected to be amortized over the next 3.5 years.

*Summary of Activity (in thousands, except price and life)*

|  | Number of Shares | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (years) |
| --- | --- | --- | --- | --- |
| Outstanding at December 31, 2020 | - |  | - |  |
| Granted | 68,739 |  | 6.88 |  |
| Exercised | (46,786) |  | 10.36 |  |
| Forfeited | (1,015) |  | 2.28 |  |
| Outstanding at December 31, 2021 | 20,938 | $ | 8.74 | 9.7 |
| Exercisable at December 31, 2021 | 454 | $ | 7.66 | 9.3 |

*Early exercise feature of certain stock options*

The Plan permits certain option holders to exercise awarded options prior to vesting. Upon early exercise, the unvested options are subject to repurchase by the Company upon termination at the same price exercised. These unvested shares are reported as issued, but not outstanding while subject to repurchase by the Company and are also excluded from the basic and diluted net loss per share calculation until the repurchase right lapses upon vesting.

As of December 31, 2021, all stock options with early exercise features were immaterial if early exercised and the Company reported no corresponding liability in the Consolidated Balance Sheet.

The Company has made commitments to pay $63.3 million of certain promotional marketing expenses with common shares valued at the prevailing common share price as of the agreement date. Promotional expense related to these arrangements is recognized as sales and marketing expense over the period the services are provided which is the same as the period the shares are earned on a pro-rata basis, however, the shares will be issued at the end of the agreement period. As of December 31, 2021, 1,193,216 of shares out of a total of 2,415,259 shares committed were vested but unissued.

As of December 31, 2021, the Company has recognized $31.7 million of sales and marketing expenses related to these arrangements and recorded as Share-based marketing expenses in the Consolidated Statements of Shareholders' Equity.

26

### 14. Commitments and Contingencies

*Crypto asset wallets*

The Company has committed to securely store all crypto assets it holds on behalf of users. As such, the Company may be liable to its users for losses arising from theft. The Company has no reason to believe it will incur any expense associated with such potential liability because (i) it has no known or historical experience of claims to use as a basis of measurement, (ii) it accounts for and continually verifies the amount of crypto assets within its control, and (iii) it has established security around custodial private keys to minimize the risk of theft or loss. Since the risk of loss is remote, no liability is recorded as of December 31, 2021 and 2020, respectively.

*Legal proceedings*

The Company is subject to various litigations, regulatory investigations, and other legal proceedings that arise in the ordinary course of its business. The Company is also subject to regulatory oversight by numerous regulatory and other governmental agencies. The Company reviews its lawsuits, regulatory investigations, and other legal proceedings on an ongoing basis and provides disclosure and records loss contingencies in accordance with the loss contingencies accounting guidance. In accordance with such guidance, the Company establishes accruals for such matters when potential losses become probable and can be reasonably estimated. If the Company determines that a loss is reasonably possible and the loss or range of loss can be estimated, the Company discloses the possible loss in the consolidated financial statements.

*Tax regulation*

Current promulgated tax rules related to crypto assets are unclear and require significant judgments to be made in interpretation of the law, including but not limited to the areas of income tax, information reporting and the withholding of tax at source.

Additional guidance may be issued by the IRS, Department of the Treasury, or other governing bodies in the Company's or its subsidiaries jurisdictions that may significantly differ from the Company's interpretation of the law, which could have unforeseen effects on our financial condition and results of operations, and as a result, the related impact on our financial condition and results of operations is not estimable.

*Sponsorships*

During the year ended December 31, 2021, the Company initiated several long-term promotional relationships that either involve significant financial commitments or guarantees with various parties. Generally, the Company pays periodic fees in exchange for naming or sponsorship rights, and the length of the agreements' terms range from one to 20 years. The Company accounts for the sponsorship arrangements as advertising costs that will be expensed as incurred in accordance with ASC 720-35. The future payments for sponsorship commitments are as follows (in thousands):

| Years Ended December 31, | | |
|---|---|---:|
| 2022 | $ | 127,827 |
| 2023 | | 105,480 |
| 2024 | | 85,421 |
| 2025 | | 53,659 |
| 2026 | | 47,841 |
| Thereafter | | 80,783 |
| Total | $ | 501,011 |

*Property commitments*

During 2021, the Company entered into certain commitments to purchase real estate of approximately $112.2 million. As of December 31, 2021, deposits of $13.3 million were included in "Other non-current assets" on the Consolidated Balance Sheet, and the Company had unpaid real estate related commitments of $98.9 million which are expected to be paid within the next 12 months.

27

 FTX_3AC_000046200

## 15. Subsequent Events

The Company has evaluated subsequent events that occurred after the Consolidated Balance Sheet date through auditor's report date of April 2, 2022, which represents the date the consolidated financial statements were available to be issued. The Company is not aware of significant subsequent events that have not been disclosed herein that would have a material impact on these consolidated financial statements.

In January 2022, the Company initiated a Series C preferred share round of financing in which 9.4 million Series C preferred shares were issued for approximately $437.6 million.

In March 2022, the Company entered into a share purchase agreement to acquire a Luxembourg-based company, BTC Africa S.A., that operates AZA Finance, a pan-African digital foreign exchange and payments services platform (collectively referred to as "AZA"). AZA was acquired for approximately $222.0 million in cash with a holdback component. The acquisition of AZA is expected to be completed later in 2022.

In November 2021, the Company entered into an agreement with various parties to acquire 100% equity interest of Liquid Group Inc ("Liquid"), a Japanese company, for a purchase consideration of $151.9 million. Liquid operates a crypto asset exchange focusing on providing liquidity in the Japanese crypto asset market. The acquisition is expected to be completed by June 2022.

During 2022, prior to the date of issuance, the Company has initiated several long-term promotional relationships that either involve significant financial commitments or guarantees with various parties. The length of the agreements' terms ranges up to five years and the aggregate amount of these commitments is approximately $75.5 million.

28

FTX_3AC_000046201

# Exhibit 6

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


IN RE: FTX TRADING LTD, et al.,   )
                                  )
                    Debtors.      )
                                  ) CHAPTER 11
                                  )
Case No. 22-11068 (KBO)           )
_____)



C O N F I D E N T I A L


DEPOSITION OF SAM BANKMAN-FRIED

Thursday, October 16, 2025






Reported By:  Joanna B. Brown, CSR, RPR, CRR, RMR
              CSR No. 8570



1    Q   Okay.  We talked about an omnibus wallet.
2  Would that be specific to a particular kind of asset?
3  Like, one wallet would only hold Bitcoin, for instance,
4  Ethereum, or --
5    A   Morally speaking, the answer is yes.  I can
6  give you a more complicated answer if you wanted one.
7    Q   Sure.  What would the more complicated answer
8  be?
9    A   So an Ethereum address would hold not just
10  Ethereum but also potentially ERC-20 tokens, which are
11  tokens that were issued on the Ethereum blockchain but
12  are distinct from itself.
13    Q   Okay.
14    A   And we may have had multiple addresses.  We
15  have split out each (inaudible) year 20 tokens at
16  various points; but as a general matter, we would --
17  parties in general would often use these Ethereum
18  addresses to host multiple ERC-20 tokens.  You could
19  distinguish, obviously, how much of each token was at
20  such an address.
21    Q   Okay.  So what was the purpose of using an
22  omnibus wallet?
23    A   The basic answer is -- there are more
24  complicated answers.  Let me give you a scenario which
25  explains the basics of it.  Two customers, Alice and

1  Bob, Alice deposited 10 Ethereum, then sells three of
2  them to Bob, for instance, for who knows what, for
3  bitcoins, whatever.
4          Without an omnibus-type system, you would then
5  have to transfer those Ethereum tokens from Alice's
6  address to Bob's address, the three tokens, but they
7  are blockchain events when everyone does that.  Those
8  fees may be a penny.  They might be a dollar.  They
9  might be $5.  But, either way, for an exchange
10  processing millions to billions of trades every day, it
11  would be prohibitive costwise to do a wallet
12  transfer -- a blockchain transfer with every trade that
13  happened on the platform.  This is how all Bitcoin
14  exchanges work -- all centralized blockchains work.
15    Q   So a high-level purpose of these omnibus
16  wallets was to avoid these transaction fees?
17    A   Yes.
18    Q   Let me ask you this:  When Alice deposited
19  that 10 Ethereum --
20    A   Yep.
21    Q   -- at FTX, did FTX view that as her giving FTX
22  ownership of the Ethereum?
23        MR. MISHKIN:  Objection.  Form.
24        MR. GLUECKSTEIN:  Object to the form.
25        THE WITNESS:  It's a complicated question.

1  It depends on the specifics and especially when it
2  comes to margin trading and futures trading.
3  BY MR. HARRIS:
4    Q   Why does the involvement of margin trading
5  affect this question?
6    A   Because assets were frequently being borrowed.
7  And so the consistent principle that holds is the
8  liabilities between FTX and its customers in both
9  directions.  But when it came to margin and futures
10  trading, first of all, assets were often being lent out
11  between customers; and second of all, assets were often
12  being posted as collateral for a position rather than
13  held separately from it.
14    Q   To make sure I understand --
15    A   Yes.
16    Q   -- when you said the liabilities between FTX
17  and its customers in both directions, what did you mean
18  by that?
19    A   Well, for instance, someone's account balance
20  might be plus 10 bitcoins negative for Ethereum.  In
21  that case, there would be a liability from FTX to the
22  customer of 10 bitcoins and from the customer to FTX of
23  four Ethereum.
24    Q   Thank you.  All right.  I promised I would
25  show you the terms of service, but do you need a break?

1  We've been going a while.
2        MR. MISHKIN:  Let's take a couple of minutes.
3        THE WITNESS:  Yeah, maybe a couple of minutes.
4        MR. HARRIS:  All right.
5        (Off the record.)
6        (Deposition Exhibit 15 was previously
7        marked in the Coverick deposition, a copy
8        of which is attached hereto.)
9  BY MR. HARRIS:
10    Q   Okay.  You've been handed a document.  It's
11  called Exhibit 15, Coverick, because it's from another
12  deposition already.  Take a look at it.  It's called
13  "FTX Terms of Service," and we talked about terms of
14  service earlier, and this is what I was referring to
15  earlier when I said "terms of service."
16    A   Understood.
17    Q   Do you recognize this document, generally?
18    A   Generally, yes.
19    Q   Let me just ask, is there another terms of
20  service you are familiar with?
21    A   Yes.
22    Q   Is it just an earlier version of this, or is
23  there another terms of service out there that operated
24  at the same time?
25    A   The potential transition from one terms of



1  sentence.  It would help me if there is a word there
2  that you wanted me to define or something.
3  BY MR. HARRIS:
4     Q   All right.  Here's my -- how would a futures
5  position use collateral?
6     A   So, as a general matter, FTX wanted to be in a
7  position where if customers put on a futures position
8  and that position gets to that customer, FTX did not
9  think that there was a high likelihood of an ultimate
10  net loss for the Exchange.
11        As such, it wanted to be in a position where
12  if there was a negative -- if there was a loss realized
13  on that, there is some reason to think that that party
14  would be able to cover that loss, and the most
15  straightforward way of doing so would be by posting
16  collateral.
17     Q   So FTX required customers to post some
18  collateral in exchange for getting to do a futures
19  position?
20     A   I think that's a slightly stronger statement
21  than the one I made.  That was the most common way that
22  it would happen, though, yes.
23     Q   And why, again, was it important for a
24  customer -- why was it important to FTX that a customer
25  post collateral when they enter in the futures?

1     A   So what I would say is that FTX's ultimate
2  goal was to attempt to avoid a situation where it had a
3  significant ultimate loss.  If a customer put on a
4  futures position, had a loss on it, and there was no
5  reason for FTX to think that there were assets that it
6  could claim to cover that loss, then FTX and/or its
7  customers might end up having to carry that loss.
8        So, in an attempt to avoid such a situation,
9  one such method would have been the customer posting
10  collateral to cancel out potential losses on a futures
11  position.
12     Q   A futures position has a contingent liability
13  associated with it?
14     A   Depending on market moves.
15     Q   It has a contingent asset associated with it
16  also?
17     A   There are multiple ways to account for them.
18  The standard way people account for them, although
19  there is a difference of opinion on unreal payout, it's
20  generally treated as a futures position by not exactly
21  being an asset or a liability, per se, but, rather, a
22  possible future gain or loss of value depending on
23  market moves.
24     Q   Okay.
25     A   Sorry.  Just to be frank, if what I'm saying

1  is actually confusing, I am happy to go through
2  examples and be more specific on what it generally
3  means; but, like, there's no need to waste everyone's
4  time on that if you know what I'm saying.
5     Q   I think I understand what you are saying.  I'm
6  going to show you the futures explainer in a second --
7     A   Yep.
8     Q   -- and that may help get it more clear.
9     A   Much of my caveats have to do with corner
10  cases where I'm saying situations and things like that
11  and so giving a much more clear and concise one, if you
12  wanted, like, a hypothetical --
13     Q   Okay.
14     A   -- typical example, or something like that.
15     Q   Just to round out the term, the next
16  row has a term "Total collateral used by outstanding
17  spot margin borrows."
18        What do you make that term to mean?
19        MR. MISHKIN:  Object.  Form and foundation.
20        THE WITNESS:  Again, just speculating here --
21  and I have no idea the context of this, and I will note
22  that there are lots of pieces of context that would not
23  be apparent from this, even potentially to those who
24  had produced it.  And so it would take a thorough
25  review to become confident that one had included all

1  such contingencies; but if I were going through an
2  example account -- right? -- that I had created with no
3  complications associated with it and I knew that I
4  didn't have to worry about any of these contingencies,
5  I would say that that was effectively the amount of
6  assets that we required to ensure the negative asset
7  positions that an account had.
8  BY MR. HARRIS:
9     Q   What does that mean, the amount of assets
10  required to ensure the negative asset positions?
11     A   Let me give you an example, which I think will
12  clarify what I mean in a simple case.  And, again,
13  like, if you wanted a fully general answer to that, I
14  would have to get to lines of credit and a lot of other
15  things that would complicate this answer.
16     Q   Okay.
17     A   But -- and I can't do that here because I just
18  don't have that information in this -- whatever this
19  specific case is, but as a hypothetical case --
20  right? -- you could imagine a customer has a bitcoin
21  balance of negative 10 bitcoins when bitcoin is trading
22  at, say, $25,000 per token.  That would result in
23  negative 250,000 net value of that bitcoin position.
24        And we might ask for 300,000, for instance, of
25  assets to ensure against both the negative value of

Page 110

1      Q   Okay.
2      A   -- and maybe other things as well.  I'm not
3  sure exactly what you are wanting.
4      Q   Okay.  All right.  So let me ask some
5  questions about that --
6      A   Yep.
7      Q   -- so I understand how that works.
8          So if a customer wanted to borrow an asset, a
9  digital asset or U.S. dollars, it would need to enable
10 the margin lending feature in their account -- is that
11 right? -- or margin borrowing feature?
12     A   In most cases, yes.  There are things like
13 lines of credit, which are causing me to not
14 necessarily say that was true in all cases, but I
15 believe that's true in most cases.
16     Q   Okay.  So let's put aside line of credit now.
17 I'll get to that.
18     A   All right.
19     Q   So you don't have a line of credit.  And I'm
20 an FTX customer, and I want to borrow either fiat
21 currency or a digital asset.  I would need to enable
22 that feature on the account?
23     A   In most cases, yes.  There are still other
24 exceptions as well.
25     Q   Okay.  And I could then obtain a loan of that

Page 111

1  asset whether --
2          If I satisfied the margin requirements, I
3  could obtain a loan of that asset?
4      A   Potentially, yes.
5      Q   And this was run through the code base; is
6  that right?
7      A   In general.
8      Q   So if I'm a customer and I want to borrow
9  U.S. dollars, the code base does not identify a
10 particular customer lender that provided the dollars to
11 me; right?
12     A   Not to my knowledge, although I didn't write
13 the code base; so I'm not sure exactly.
14     Q   Likewise, if I wanted to borrow bitcoin, to
15 your knowledge, the code base didn't identify a
16 particular --
17     A   To my knowledge, that's right.
18     Q   -- lender?  Okay.  So if I borrowed $10 --
19 U.S. dollars on the margin lending program and I wanted
20 to pay it back, I could transfer $10 onto my FTX
21 account to repay the margin loan?
22     A   In general, yes.
23     Q   That $10 wouldn't, then, be transferred to the
24 account of a particular customer lender; right?
25         MR. MISHKIN:  Object to the form.

Page 112

1          THE WITNESS:  Not necessarily.
2  BY MR. HARRIS:
3      Q   It would not necessarily be transferred to it?
4      A   That's right.  I'm not sure how you are
5  defining that.
6      Q   How about if I borrowed one bitcoin and I
7  decided to repay the borrowing?
8      A   Right.
9      Q   Would that bitcoin then be allocated to a
10 particular user or lender?
11     A   To my knowledge, it wouldn't be specifically
12 that bitcoin allocated to specifically one lender.
13     Q   Okay.  Do you know whether -- again, if I want
14 to borrow, whether it's dollars or a digital asset,
15 whether that loan to me occurs before the margin
16 lenders have their account debited --
17         MR. MISHKIN:  Objection.
18 BY MR. HARRIS:
19     Q   -- to know which happens first or if they are
20 simultaneous or --
21     A   I don't think that's a well-defined question.
22 I will say that your account balances generally affect
23 you immediately, update to reflect a trade that you
24 did.  So, for instance, if you started out with
25 10 bitcoins and to no dollars and then you purchased an

Page 113

1  11th bitcoin for $100,000, your account balance would
2  quickly -- would, in general, quickly update to show
3  plus 11 bitcoins, negative $100,000.
4      Q   When that happened, did that necessarily mean
5  that there was a margin lender whose accounts went
6  negative -- went down by one bitcoin?
7          MR. MISHKIN:  Object to form.
8          THE WITNESS:  I'm not sure what you mean by
9  "went down by one bitcoin."  It would mean that the
10 total quantity of -- well, sorry.  Bitcoins are not
11 being lent.  They are dollars; right?
12 BY MR. HARRIS:
13     Q   Sorry.  You are right.  Yes.  I borrowed -- if
14 I'm the tenth person with 10 bitcoins, I borrowed the
15 dollars, yes.
16     A   Right.  It would mean that the total number of
17 dollars collectively borrowed by users would have
18 increased.  And that -- like, that doesn't lead to a
19 decrease in the net balance owed to any other customer;
20 right?
21         Like, it's not like any other customer sees
22 their net account value decrease --
23     Q   Okay.
24     A   -- as a result of that, either immediately or
25 eventually.  So, from a net account value perspective,

Page 114

1  borrowing did not ever lead to, yeah, a decreased
2  value, necessarily.
3      Q   If I am the one who borrowed the -- I guess it
4  was $10,000 in our example.
5      A   100,000, but whatever.
6      Q   If I borrowed $100,000 and then I repay it --
7      A   Yep.
8      Q   -- that doesn't -- that doesn't eliminate the
9  loan that a particular user provided; right?
10         MR. MISHKIN: Objection. Form.
11         THE WITNESS: It's not identified with a
12  particular user. It decreases the total amount of
13  dollars being borrowed; but it's not like we say that
14  is going to carry or something like that. It's done on
15  a net basis rather than a --
16  BY MR. HARRIS:
17      Q   Okay. All right. I'm going to ask you some
18  questions about the "Spot Margin Training Explainer,"
19  at least this version as of April 2022.
20      A   Yep.
21      Q   If you look on the second page, there's a
22  section that says "How does margin work for borrowing?"
23      A   All right.
24      Q   It says "Your spot margin positions are
25  cross-margined with your future positions; there is no

Page 115

1  separate spot margin requirement you have to monitor."
2         Do you see that?
3      A   Yep.
4      Q   Then it says: "Generally, the way the futures
5  margin works is that each contract has a margin
6  requirement (initial margin fraction to open a position
7  and maintenance margin fraction to avoid liquidation),
8  and you need a total collateral value which meets those
9  thresholds."
10         Do you see that?
11      A   Yes, ma'am.
12      Q   And that's -- I think you explained to us why
13  FTX wanted --
14      A   Yep.
15      Q   -- margin to allow the people to do future
16  trading?
17      A   Yep.
18      Q   Then you say "Spot" -- I'm sorry. Then the
19  explainer says "Spot margin is similar. The position
20  size of a spot margin position is the notional size of
21  any short (negative) balances you have."
22         Do you see that?
23         MR. MISHKIN: Let's go off the record for a
24  moment.
25         (Off the record.)

Page 116

1  BY MR. HARRIS:
2      Q   Forget the question. Let me go back to the
3  prior paragraph about futures margin.
4         Is that calculated based off the notional size
5  of the futures positions?
6         MR. GLUECKSTEIN: Object to the form.
7         THE WITNESS: As opposed to? That's an input
8  into it, yes.
9  BY MR. HARRIS:
10      Q   And why is the notional size relative to the
11  amount of margin FTX would want?
12      A   As a general matter -- and, again, there are
13  lots of details; but as a general matter, if one
14  customer had a $10,000 bitcoin futures long position
15  and some customer had a $100,000 bitcoin futures long
16  position, if bitcoin goes down 1 percent, that first
17  customer has just lost $100, and the second customer
18  has just lost $1,000.
19         So, all else equal, the size of the futures
20  positions is correlated to the amount that the account
21  might gain or lose if the markets move and lost the
22  amount of insurance that we would be holding for it.
23      Q   And let's -- could futures positions be lent
24  out under the margins program?
25      A   No. Futures positions are always just, like,

Page 117

1  one positive for one negative adding up to zero across
2  the platform.
3      Q   Okay. And if a customer borrowed an asset
4  under this program, could it withdraw the asset?
5      A   Potentially. It depends on the details of the
6  account, status, and things like that but, potentially,
7  yes.
8      Q   And you would withdraw it before it repaid the
9  asset program?
10      A   That's correct. As an example, as a general
11  matter, were there not anything blocking this and
12  marketing conditions permitting, a customer could have
13  deposited ten bitcoins and then withdrawn into a blank
14  account and then withdrawn one on that blank account
15  and ended up with negative 1.
16      Q   How about the lending customer?
17         Could they withdraw the loaned assets?
18      A   There are complications here; but as a general
19  matter, we attempted to allow withdrawals of lent
20  assets. Obviously, they would no longer be lending
21  them if they were withdrawn.
22      Q   So, if that happens, a customer had lent an
23  asset and then they withdrew it, would some borrowing
24  customer have the asset taken away from them?
25      A   There is also a risk of that happening.

**MAGNA**
LEGAL SERVICES

1  However, in general, when you looked at -- there's a
2  thing that we attempted and generally succeeded at
3  avoiding by having between interest-earning and
4  collateral-based customers more supply than borrowing
5  demand.
6      Q   All right.  If you go to -- there's a -- I
7  think it's the fourth page.  There's a section called
8  "Lending."
9      A   All right.
10     Q   Are you there?
11     A   Yep.
12     Q   It starts out "To lend an asset out you
13 specify the quantity you want to lend."
14     A   Uh-huh.
15     Q   So that first paragraph, the end of it, it
16 says "lenders bear no counterparty risk:  FTX
17 guarantees interest payments for however long your
18 funds are borrowed even if the borrower gets
19 liquidated."
20         Do you see that?
21     A   I see that.
22     Q   So what was FTX trying to convey with that
23 sentence?
24     A   So my interpretation of what whoever wrote
25 that sentence was attempting to convey was that the

1  lender does not bear a particular risk to a particular
2  borrower who happens to borrow.  Rather, all of the
3  risk is mediated by FTX.
4          And so long as FTX is able to cover any
5  losses, we wouldn't be socializing losses to, like, the
6  particular lenders who happen to lend to a particular
7  customer, who happened to blow out.
8      Q   If I'm understanding correctly, there weren't
9  particular lenders to particular customers; right?
10     A   That's right.
11     Q   And maybe this is related.  On the next page,
12 there's a section called "Risk."
13         Do you see that?
14     A   Yes.
15     Q   And it starts by saying "FTX's risk engine
16 will attempt to liquidate any users before they could
17 get negative net account balance."
18     A   Yep.
19     Q   And then it says "using spot margin opens you
20 up to liquidation risk."
21     A   Yep.
22     Q   So that's the risk to the margin borrower;
23 right?
24     A   Really, it's the risk to both.
25     Q   How is that?

1      A   So the first order one is what you said, to
2  the borrower.  However, if FTX is unable to backstop a
3  loss because it's too large, then there's always the
4  risk that it would be socialized to other users.  I
5  don't believe that was ever invoked, but ...
6      Q   And the next sentence -- and maybe this is
7  what you were getting to -- says "FTX and its backstop
8  fund will attempt to protect other users against other
9  accounts."
10     A   Yeah.
11     Q   And that's -- and the backstop fund, that's
12 the same thing as the insurance fund we were talked
13 about earlier?
14     A   Generally, yes.  At the very least, I don't
15 think there's duties that were specific to anything.
16     Q   Okay.  Do you recall if there was -- now my
17 questions are before November 2022.
18     A   Yep.
19     Q   Do you recall if there was an instance where a
20 customer borrower didn't repay its loans?
21     A   If a different borrower -- are you saying a
22 case where a customer got liquidated, basically?
23     Q   I guess so.
24     A   Yes, plenty.
25     Q   Are there any particular notable ones you

1  remember where there was a large-dollar one?
2      A   Any such case?
3      Q   What's the one you are thinking of?
4      A   No.  I'm sorry.  Three Arrows.
5      Q   Any others?
6      A   No.  We -- I can think of a few others; but
7  there were, I would guess, thousands.
8      Q   What was the next largest one after
9  Three Arrows?
10     A   The one I can think of right now, there was a
11 case involving MobileCoin and BTMX.
12         MR. HARRIS:  Why don't we take a break so you
13 can eat.
14         (Off the record.)
15 BY MR. HARRIS:
16     Q   So just to make sure we have the terms right,
17 you said MobileCoin, and then what was the name of the
18 currency?
19     A   BTMX.  Bravo, Tango, Mike, X-ray.
20     Q   BTMX.  Can you tell me what you remember about
21 that liquidation, like, what happened with that one?
22     A   Yeah.  There were a number of things going on.
23 Sure, it's the high summary of it.  There's a user on
24 FTX.  I say "user."  It was split between multiple
25 subaccounts -- ultimately multiple accounts, but

MAGNA
LEGAL SERVICES

Page 126

1       The second would actually be the -- in some
2   sense more generous to that original user.  It would be
3   delaying the liquidation as long as possible, which is
4   another way of saying only doing it when the account
5   barely has enough left to manage that risk.
6       Q   Okay.
7       A   So -- excuse me.  Sorry -- we would attempt to
8   liquidate as a general matter, usually, such that there
9   was still positive value left in the original account;
10  but if the position grew too large or the market moved
11  too quickly, sometimes that would not be possible.
12      Q   So if you liquidate at a time where there's
13  still positive value --
14      A   Yep.
15      Q   -- but you've transferred all of the assets
16  and liabilities --
17      A   Yep.
18      Q   -- to the BLP --
19      A   Yep.
20      Q   -- how exactly is -- just in terms of
21  accounts, how is there a positive value still?
22        Do they --
23      A   Oh, there might not.  Sorry.  If we transfer
24  all of the values, then there isn't; but we might, in
25  some cases, get away with transferring not quite all of

Page 127

1   the assets.  Leaving some value depends on the market
2   conditions besides the position and other things.
3       Q   Is there code written to automate this process
4   of transferring to a BLP?
5       A   There is code -- there was code for it, which
6   got modified periodically, which attempted to do so as
7   a default matter; but in large or unique cases, that
8   code was sometimes not sufficient.
9       Q   Why would it be not sufficient?
10      A   Well, to give one example, in the case of the
11  MobileCoin/BTMX case, ultimately, our conclusion was we
12  believed that the user had, in fact, been intentionally
13  influencing the price of the market so as to increase
14  the value market to market of their collateral, that it
15  was an artificial market price because of that and that
16  the code underestimated the risk of such a position and
17  there was a risk of loss to some other party if we did
18  not step in.
19        There are other cases where we go in the
20  opposite direction where I delay the liquidation on an
21  account longer than the code would say because, looking
22  at the specifics, we believe it to be overly
23  conservative.
24        There are cases where there's a bug in the
25  system where -- we've had cases where the liquidation

Page 128

1   engine got delayed just because there is too much
2   activity going on in the markets, and so we had to
3   intervene to -- I process liquidations more promptly.
4       Q   I think I remember that, in the MobileCoin
5   liquidation, that the BLP was Alameda; is that right?
6       A   Yeah.  I think -- I don't know if it was the
7   only BLP or the primary one, but yeah.
8       Q   I believe you explained it, you made that
9   decision because you didn't want the losses to be
10  socialized to the user community in general?
11      A   Or the other BLPs.  And another way of
12  phrasing that and how I thought about it in my mind at
13  the time was, by intervening myself, I had decided that
14  I was going to delay a liquidation on that account
15  longer than some of the other employees believed was
16  prudent and that I was going to monitor it from a risk
17  perspective so as to attempt to prevent any losses to
18  FTX or any of its customers, including its BLPs, while
19  allowing the account to remain on the hope that it was
20  both solvent and not a bad actor.
21      Q   Okay.
22      A   I screwed that up.  I missed a parameter,
23  which resulted in a position that was significantly
24  riskier than other BLPs would have been comfortable
25  accepting, and so because it was my screw-up that got

Page 129

1   it there and I had personally been -- made myself
2   responsible for ensuring that it went well, I decided
3   it was appropriate that, effectively, I personally, or
4   an entity that I owned, should have to deal with the
5   consequences of that, which is the taking over what was
6   a potentially toxic position.
7       Q   Okay.  Do you remember how much those losses
8   ultimately were on that position?
9       A   I'm not sure that's a very well-defined
10  question because markets move over time.  So it could
11  have been positive or negative depending on when you
12  mark to.  It was a, I believe, mid-90s account, and so
13  I think we were looking at low to mid-nine figures of
14  potential consequence from it.
15      Q   Was that potential loss ultimately liquidated
16  so Alameda or whoever it was took a loss on it or not?
17      A   I'm not sure exactly what, ultimately, Alameda
18  did.  I think Alameda did not consider it an attractive
19  position when it took it over, but I'm not sure.  Yeah,
20  I don't know.  I think, at that point, I passed it off
21  to other people to actually manage.
22      Q   All right.  We talked about margins.  We
23  talked about lines of credit.  So what was the purpose
24  of FTX issuing a line of credit to a customer?
25      A   There were a few different contexts which they

Page 130

1    were issued usually, or at least in the case, that most
2    quickly come to mind.  It was a case where there was
3    some -- at least some entrusted counterparty who I
4    would be able to do more volume on the Exchange if they
5    were to lend money.  And so we, sort of, gave them an
6    extra borrow in order -- and sometimes we would tie it
7    to them being an active participant on the Exchange.
8        Q    And for all of my questions about lines of
9    credit, you can put Alameda aside.  I'm just talking
10   about non-Alameda customers.
11       A    Yep.
12       Q    So the line of credit, was that effectively a
13   loan from FTX itself as opposed to the user margin
14   program?
15       A    What's the difference between those two
16   exactly?
17           It's an interesting question because,
18   ultimately, FTX was acting as the guaranteeing party
19   for peer-to-peer borrowers as well.  So it was a loan,
20   you know, which ultimately was guaranteed by FTX.  If
21   it was a loan -- FTX itself would only lend dollars.
22   So it didn't want to take the position of digital
23   assets.
24       Q    So FTX was -- so the lines of credit were only
25   for U.S. dollars?

Page 131

1        A    I think that's -- to my knowledge, yes.
2        Q    Is there a reason why a customer would prefer
3    to use a line of credit as opposed to a margin
4    borrowed?
5        A    I let customers effectively increase the
6    ledger on the Exchange.  It depends on the specific
7    account; but, in general, we would give lines of credit
8    that were often larger than the amount that they could
9    have borrowed on margin.  Another way to put that would
10   be let them put on a larger position than they
11   otherwise would have been able to.
12       Q    Do you know how FTX determined the size of the
13   line of credit they would grant a customer?
14       A    I'm not aware of any specific formula for it.
15   Factors that went into it included the creditworthiness
16   of the customer in question and the nature of their
17   activity on the Exchange.
18       Q    Do you remember that Three Arrows had a line
19   of credit?
20       A    I remember discussing one of Three Arrows.  I
21   don't remember the conclusion of those discussions.
22       Q    Were you involved in the decision whether to
23   give them a line of credit?
24       A    I'm not sure.  I may have been.
25       Q    Do you remember the Three Arrows line of

Page 132

1    credit increased over time?
2        A    No.  It doesn't surprise me, but ...
3        Q    Do you recall lines of credit came with an
4    interest rate?
5        A    Yep.
6        Q    Do you know if the interest rate on the line
7    of credit was different than the interest on a margin
8    borrowed?
9        A    My memory is that they were usually similar
10   but not identically the same.  I believe that, for a
11   line of credit, we typically would just stick a fixed
12   interest rate rather than a floating rate determined by
13   supply and demand.  But I believe that we often set it,
14   again, depending on the circumstances to somewhere in
15   the single-digit percents per year, which would be
16   consistent with like what the U.S. dollar peer-to-peer
17   interest rate generally was at that point in time.
18       Q    Again putting Alameda aside --
19       A    Yep.
20       Q    -- are lines of credit memorialized in a
21   document with each customer?
22       A    Usually.
23           MR. HARRIS:  I'm going to show you the
24   Three Arrows one and see if it strikes any memories.
25   ///

Page 133

1           (Deposition Exhibit 20 was previously
2    marked, a copy of which is attached hereto.)
3    BY MR. HARRIS:
4        Q    Okay.  So this was already marked Exhibit 20.
5    It's "FTX Line of Credit" on page 1.  It goes on to
6    page 2.  Then you'll see, kind of in the middle or
7    near the bottom of page 2, there's another heading that
8    says "FTX Institutional Customer Margin and LINE of
9    Credit Agreement."
10           Do you see that?
11       A    Uh-huh.
12       Q    So it looks to me like the first part of this,
13   the part called "FTX Line of Credit," the first page
14   and a half feels like a customized document between
15   FTX and Three Arrows.
16           Does that seem right?
17           MR. MISHKIN:  Objection.  Form.  Foundation.
18           MR. GLUECKSTEIN:  Form.
19           THE WITNESS:  I'm not sure how customized it
20   is.
21    BY MR. HARRIS:
22       Q    Is it based off of, like, a form?
23           MR. MISHKIN:  Objection.  Foundation.
24           THE WITNESS:  There were various templates at
25   various points in time.  It looks like it may have

MAGNA
LEGAL SERVICES

1    been.
2    BY MR. HARRIS:
3    Q   Do you recall having any role in determining
4    the terms of the "FTX Line of Credit"?
5    A   You mean --
6    Q   Like the size or the interest rate?
7    A   Sorry.  You mean for Three Arrows in
8    particular or --
9    Q   Yes, for Three Arrows.
10   A   I don't recall, but it wouldn't surprise me
11   either way.
12   Q   Okay.  If it wasn't you, do you have any idea
13   who would have been involved in whatever negotiations
14   there were over this?
15   A   Sorry.  I think I know you asked me.  Just
16   repeat it.  Did you say who would have been?
17   Q   (Inaudible response.)
18   A   You mean from FTX's side?
19   Q   Yes.
20   A   I'd give the same list of people that I did
21   earlier.  So Zane, Vince, Ryan are people who might
22   have been involved, and Burgess at earlier points in
23   time, but there are other people that could have been
24   as well.
25   Q   Okay.  If you see on the first page of this --

1    A   Yep.
2    Q   -- there's a paragraph 5.
3    A   Yep.
4    Q   "Throughout the lifetime of the Line of
5    Credit, at least 200% of the Line of Credit
6    ('Collateral') must be maintained in the Borrower's
7    FTX account," do you see that?
8    A   I do.
9    Q   Do you know what recourse FTX would have if
10   Three Arrows breached that requirement?
11         MR. MISHKIN:  Objection.  Form.
12         MR. GLUECKSTEIN:  Objection.  Calls for a
13   legal conclusion.
14         THE WITNESS:  I believe that liquidation of
15   Three Arrows' account and/or seizure of relevant assets
16   could potentially be involved.
17   BY MR. HARRIS:
18   Q   Do you know if that's what happened?
19         MR. MISHKIN:  Objection.  Form.
20         MR. GLUECKSTEIN:  Object to the form.
21         THE WITNESS:  My memory is that something in
22   that vein happened, but I honestly don't recall the
23   details.
24   BY MR. HARRIS:
25   Q   Okay.  Do you recall if FTX used, like, a

1    liquidation for any other customers when they didn't
2    satisfy the line of credit margin requirements?
3    A   I can't recall off the top of my head any
4    cases where's the solvency of -- any other cases where
5    the solvency of their receiver large line of credit was
6    falling precipitously, called into question, and their
7    account balance was -- fell precipitously.  I'm not
8    sure there are no other cases; but I can't recall any
9    other cases where the relevant conditions were
10   triggered to begin with.
11   Q   Okay.  The second half of this --
12   A   Yep.
13   Q   -- exhibit is this thing called "FTX
14   Institutional Customer Margin and LINE of Credit
15   Agreement."
16   A   Yep.
17   Q   Is that an FTX template?
18   A   It looks very much like one, but I can't state
19   confidently whether there are any modifications.
20   Q   Do you have any understanding what's the
21   relationship between these two parts or documents?
22         MR. MISHKIN:  Objection.  Form.
23         THE WITNESS:  I can give a decent guess, but I
24   can't tell you confidently because I don't remember
25   drafting this particular document.  But I know that, in

1    some similar cases, we would have a general template
2    that was often written in somewhat denser language and
3    were proceeded by some more plain English explainer of
4    particular terms sculpted to a particular case, and
5    this looks sort of like that to me.  Again, I can't
6    confidently say that's what's happening here.
7    BY MR. HARRIS:
8    Q   All right.  Let me ask a question about
9    futures.
10   A   Yep.
11   Q   So we've been trying to find what are, like,
12   the documents that, sort of, governed the terms of the
13   futures contracts that FTX offered.  I've seen a
14   complete futures specs explainer --
15   A   Yep.
16   Q   -- which I'm going to show this to you.
17         Is there anything else out there that we
18   should look at to determine the terms of the futures?
19   A   That's a good place to start.  I don't know
20   what you mean by "terms" exactly.  Legalese, you might
21   not find there.  Details, exceptions, you might not
22   find there.  I don't know what version you have, but
23   that is a decent place to start for a general overview
24   of it, yes.
25   Q   Were there any contracts signed, like, when

**MAGNA**
LEGAL SERVICES

1  you would buy a future? Was there --
2      A   There wasn't, like, a specific contract per
3  future.  You may -- I don't remember exactly when, but
4  you may have had to check a box to agree to various
5  terms once for your account to engage in futures
6  trading; and then, obviously, there are terms of
7  service and other documents like that.
8      Q   Was there a counterparty to each future?
9          Like, if I had that account and I say "I want
10  to get a bitcoin future" --
11      A   Right.
12      Q   -- is there a counterparty to my contract?
13      A   I just mediated them as the counterparty on
14  both sides but was not, in general, the ultimate
15  beneficiary, so to speak, on either side.
16          Usually, you have a buyer and a seller for any
17  futures trade with FTX sitting in between both of them;
18  but it would not usually end up mattering from whom you
19  had purchased or to whom you had sold the futures
20  contract.  It's not like it was a bilateral agreement.
21      Q   So it wasn't a particular -- if I buy a
22  bitcoin future, there's no one that sold me that
23  bitcoin future?
24      A   Well, there is someone who happens to sell on
25  that same transaction because every trade has to have a

1  buyer and a seller; but your futures contract is not
2  marked as, like, being a specific version of a bitcoin
3  futures contract, which is the version that was
4  purchased from this particular counterpart or anything
5  like that.  They were generally just marked as having
6  FTX as the intermediary counterparty for all of them.
7      Q   So there had to be an equivalent number of
8  futures sellers?
9      A   Or buyers or contracts sold as bought.  If you
10  added up all futures positions, you would get zero
11  across the Exchange.
12      Q   But there's no relationship between the
13  buyers -- the particular buyer and particular --
14      A   There's none preserved beyond the execution of
15  a trade.
16      Q   Okay.  And when -- I understand the contracts
17  generally were perpetuals.
18      A   There were two main types and then a long
19  string of others, perpetuals being the highest volume,
20  and then second to that were quarterly futures.
21      Q   When they were settled, the payments would go
22  to FTX?
23      A   Perpetuals or leases?
24      Q   Let's go to perpetuals for this.  How often
25  were they settled?

1      A   Do you know how perpetual features work as a
2  general matter?
3      Q   My understanding is they last perpetually, but
4  you mark to market with a payment of some number of
5  seconds.
6      A   It is financially similar, although not quite
7  identical, to as if 124th of it expired, and then it
8  was reopened, setting the market price every hour.
9      Q   Okay.
10      A   So, every hour, there would be an interest
11  payment between the longs and the shorts on the
12  perpetual futures related to the differences between
13  the futures price and underlying index price.  FTX
14  would mediate those payments, but the net paid and
15  received would be the same.
16      Q   When you say "FTX mediated the payments," the
17  payments went to FTX?
18      A   They went to FTX and then forwarded them on to
19  the other side.  I do not believe that FTX usually took
20  a cut of that fee payment -- or that interest payment.
21      Q   So the payment obligation was to FTX, not to a
22  particular other customer?
23          MR. GLUECKSTEIN:  Object to the form.
24          THE WITNESS:  Mechanically, that's how it
25  worked.  I'm not sure if you mean "obligation" in a

1  legal sense.
2  BY MR. HARRIS:
3      Q   In terms of the user interface, what could a
4  customer see about their futures contracts?
5      A   In general, they could see their position, the
6  trades that led to that position, the history of
7  interest payments.  They could see the underlying index
8  price, the current price of that futures contract,
9  maybe other things, but those are the primary ones.
10      Q   Perpetuals, can those -- can the perpetual
11  futures contracts be tokenized?
12      A   Not directly.  I don't know if you are asking
13  about, like, leverage tokens or something or if you are
14  asking about something else; but you couldn't, for
15  instance, withdraw a futures position as a token.
16      Q   Okay.  Do you know -- was the -- if I had a
17  futures position with the initial amount, was that
18  included in my U.S. dollar balance in some way?
19      A   There are two different but equivalent ways of
20  calculating the same ultimate U.S. dollar balance, and
21  the answer to that question depends on which internal
22  mnemonic you are using to calculate it.
23          So the U.S. dollar balance ultimately
24  reflected the net value of your account mark to market.
25  Sorry.  Do you mean specific U.S. dollars?

MAGNA
LEGAL SERVICES

Page 142

1    Q    Just U.S. dollars, excluding all of the other
2  assets.
3    A    So what's the best way to put this?
4        Excluding details like what's happened in the
5  last five seconds in the market, generally, your U.S.
6  dollar balance would reflect gains or losses on your
7  open futures positions.  I don't know if that's the
8  question you are asking or if you are asking something
9  else.
10   Q    A gain to loss, but it would not reflect the
11  notional value; is that right?
12   A    Let me give you an example.  If you were to
13  deposit 100 U.S. dollars, you buy one bitcoin future
14  with a notional value of $120,000, your account balance
15  at that point in time would be 100,000 U.S. dollars.
16  That purchase would not have -- that futures trade
17  would not have affected your U.S. dollar balance.
18   Q    Okay.
19   A    If bitcoin then went up to $130,000, your U.S.
20  dollar balance would increase to $110,000.
21   Q    That doesn't answer my question.
22   A    Great.
23   Q    Could futures contracts be liquidated by FTX?
24   A    Yes.
25   Q    Could they be taken over by FTX?

Page 143

1    A    By the backstop liquidity.
2    Q    By the backstop liquidated?
3    A    Mediated by FTX.
4        MR. HARRIS:  Okay.  I want to show you the
5  "Futures" -- "Complete Futures Specs" explainer.
6        (Deposition Exhibit Coverick 13 was previously
7        marked, a copy of which is attached hereto.)
8  BY MR. HARRIS:
9    Q    Okay.  So this one has already been marked
10  Coverick 13.  It's called "Complete Futures Specs."
11  This one is dated April 11, 2022.  Take a look at it.
12   A    All right.
13   Q    Is this document familiar to you?
14   A    As a general matter, yes.  There are many
15  versions of it, and I can't comment on this specific
16  version of it; but as a general matter, yes.
17   Q    Okay.  Do you see, the second page, there's a
18  section called "Contract Specifications"?
19        It's right near the top.
20   A    Yes.
21   Q    And then it says "See here," and it looks like
22  here a little grayed-out contract.
23   A    Yes.
24   Q    What do you think that's a link to?
25   A    Some other page on the help desk.

Page 144

1    Q    Okay.  So there would be some other page on
2  the help desk that would have the contract
3  specifications?
4    A    Or it could be a subset of this page.  It
5  could be (inaudible) revised.
6    Q    Okay.
7    A    Looking through this, I believe it was to a
8  different page.
9    Q    You think it's to --
10   A    Not to one -- not to any of them here.
11   Q    Okay.  All right.  So if we go back to the
12  first page --
13   A    Yep.
14   Q    -- there's a section called "Expiration."
15   A    Yep.
16   Q    And then the third paragraph says:  "For
17  instance, say that you deposited $10,000 of collateral
18  and used it to buy 10 BTC quarterly futures."
19   A    Yes.
20   Q    So customers understood they could buy futures
21  on the FTX exchange?
22   A    Yep.
23   Q    I wanted to ask about some of these terms
24  that are on page 2.  Right underneath "Contract
25  Specifications," there's a section called "Accounts,"

Page 145

1  and then it defines some terms.
2    A    Yes.
3    Q    The first is "Position notional"?
4    A    Yes.
5    Q    It says "Position size times MP"?
6    A    Yep.
7    Q    And "MP" is market price?
8    A    Mark price.  Similar, but --
9    Q    Okay.  Then there's one called "Zero price
10  (ZP)"?
11   A    Yes.
12   Q    What is that used for?  Do you recall?
13   A    That was generally the price set -- a future
14  would have to go to to set an account's net asset value
15  to zero.
16   Q    Was that price used when there was a
17  liquidation occurring?
18   A    It was one of the factors involved in
19  calculating the liquidation but not the only one.
20   Q    If you go to the fourth page, there's a
21  section called "Liquidations."
22   A    All right.  Yep.
23   Q    Under "Liquidations," it says here "See here
24  for more details"?
25   A    Yes.  It's a link to a different page.

MAGNA▶
LEGAL SERVICES

Page 146

```
 1      Q   You don't remember what that page was?
 2      A   Not the details of it, no.
 3      Q   So it describes in Step 1 automated
 4  liquidation of futures positions?
 5      A   Yep.
 6      Q   And a trigger for that is if the maintenance
 7  margin fraction is less than its maintenance margin; is
 8  that right?
 9      A   That the -- one second.  Yes.  If the margin
10  fraction is less than the maintenance margin.
11      Q   Okay.  And then there's Step 2.  It says "If
12  account falls even closer to bankruptcy, the backstop
13  liquidity provider system will kick in."
14          Do you see that?
15      A   Yep.
16      Q   And then the second paragraph under that says
17  "When an account is getting auto-closed, it will have
18  its position closed down at the bankruptcy price."
19      A   Yep.
20      Q   What did bankruptcy price refer to?
21      A   I believe -- give me one second.  I believe
22  that's the same as zero price.
23      Q   So the user --
24      A   Would be at zero at that point.
25      Q   -- would have a zero account?
```

Page 147

```
 1      A   That's right.
 2      Q   So if they previously had some positive net
 3  asset value, that would be wiped out?
 4      A   That's right.
 5      Q   And at the bottom of the page, it talks about,
 6  sort of, the speed at which this could happen.
 7      A   Yep.
 8      Q   It sounds like this is a very fast process.
 9      A   It depends.  In some cases, this would be a
10  fraction of a second.  In other cases, it would be
11  hours.
12      Q   Under -- I'm sorry.  Under Step 3, it says
13  "If an account does go bankrupt, the backstop liquidity
14  fund will pay out to bring the account balance back to
15  zero."
16          Do you see that?
17      A   Yep.
18      Q   When it says "payout," payout to whom?
19      A   To the user, basically.  So, in this example,
20  if a user's account ends up with a negative net asset
21  value, then -- and there's no other way for us to
22  collect on that, then something has to take that back
23  up to zero.  It still has to be paid into that user's
24  account until it is worth zero.  This is below zero,
25  and that would be the BLP one in this case.
```

Page 148

```
 1      Q   Okay.  You wouldn't actually make a payment to
 2  the user, but you wouldn't be attempting to collect the
 3  debt?
 4      A   That's effectively correct.
 5      Q   And FTX would be absorbing that loss?
 6      A   That's correct.
 7      Q   Is there a way for someone at FTX to manually
 8  tell the engine to start liquidating futures?
 9      A   A particular position, that is?
10      Q   (Inaudible response.)
11      A   For developers, yes.
12      Q   If you look at the next page, there's a
13  section that says "Specifically" --
14      A   Yes.
15      Q   -- and it has some numbers.
16          A couple of paragraphs under that, it says
17  "BLPs have a max capacity per minute and per hour."
18      A   Yep.
19      Q   It says "Position is closed against BLPs in
20  proportion to remaining capacity."
21          What is that referring to?
22      A   BLP backs off liquidity providers.  We are
23  allowed to set certain parameters related to their
24  account, which is, they were allowed to say, for
25  instance, "We are not willing to take on more than
```

Page 149

```
 1  $10 million per hour of a liquidating account."
 2          And so this is describing us liquidating an
 3  account without -- and passing on BLPs without
 4  overloading those fields.
 5      Q   And are they allowed to decline even if it's
 6  within their capacities?
 7      A   No.
 8      Q   Then the next sentence says "If BLP total
 9  capacity is insufficient, the remaining size is closed
10  against users with large opposing positions."
11          What does it mean "users with large opposing
12  positions"?
13      A   That this is something which I think was
14  rarely or never actually triggered, but this is saying
15  that, in theory, if you have a position of, say, a
16  $10 billion futures position and all of the BLPs put
17  together are willing to take $5 billion -- let's say
18  6 billion -- then the other 4 billion, we have the
19  right to close those down against other users who had
20  the positions in the opposite direction rather than
21  passing them to the BLPs.
22      Q   So what would that -- so, for that
23  4 billion --
24      A   Yes.
25      Q   -- what would it mean to "close down the
```

1 positions"?
2     A    Well, it would mean that if they were -- if,
3 for instance, the liquidating users were short bitcoin
4 users and the others were long, it would close down the
5 longs as if they were BLPs.
6     Q    Without getting payments made?
7     A    Well, when you say "payments," these are
8 futures positions.  So, as phrased here, it would be
9 closing them down at the market price, effectively --
10     Q    Okay.
11     A    -- or, rather, at something at least as good
12 as the market price to those other users.
13     Q    So the other users would at least be getting
14 the market price?
15     A    Yeah.
16     Q    You don't recall that ever happening; right?
17     A    That's right.  It's possible it happened for
18 small sides, an illiquid product.  And at this point,
19 I have forgotten; but I don't remember anywhere it
20 happened.
21     Q    Do you recall what kinds of futures positions
22 Three Arrows had in 2022?
23     A    I recall that it had significant Bitcoin and
24 ETH positions.  I'm not sure if it had others as well.
25 Sorry.  Let me take that back.  I recall that it had

1 significant futures or margins positions in Bitcoin or
2 ETH.  I don't recall whether they were spot margins or
3 whether they were futures.  I think they were
4 futures -- futures were involved, but I can't say that
5 confidently.
6     Q    Does the -- if we are in this step where BLPs
7 are insufficient --
8     A    Yep.
9     Q    -- and so you are going to close down
10 positions, how would that work for a spot position?
11     A    So this document is only about futures.
12     Q    Right.
13     A    The --
14     Q    There's a different process for spots?
15     A    Different but similar.  It would work sort of
16 analogously, but this document doesn't spell it out.
17     Q    I guess what I'm confused about is --
18     A    Yep.
19     Q    -- say I'm short Bitcoin --
20     A    Yep.
21     Q    -- and I have --
22     A    Sorry.  Spot or Bitcoin futures?
23     Q    Spot Bitcoin.
24     A    All right.
25     Q    -- and I'm going bankrupt and your BLPs won't

1 take it on --
2     A    Yep.
3     Q    -- and you -- instead of FTX absorbing the
4 loss, it's going to socialize them.
5         Who would it socialize this with?
6     A    You are conflating two different -- sorry.
7 This -- every one conflates different factors unless
8 you think of it.  Split out loss from position.  So one
9 question you can ask is let's say there's a position
10 which has zero net asset value mark to market or maybe
11 small positive, but it's a large futures position or a
12 large margins position, and there's risk with taking it
13 over.  What this is about here is that.  It's about the
14 size of the position, not about there being losses --
15     Q    Okay.
16     A    -- mark to market.
17         A separate concern one could have is, after
18 having completed this process, you end up with a
19 negative number of dollars left in the account, an
20 actual loss mark to market and how FTX would deal with
21 that.
22         So ask your question again, but clarify which
23 of those two concepts you are talking about.
24     Q    Okay.  I was talking about the second one
25 where there was an actual loss --

1     A    So that -- yep.  So that brings you back to
2 this Step 3 here --
3     Q    Okay.
4     A    -- which is, funds permitting, FTX and/or its
5 backstop liquidity fund would attempt to cover such a
6 loss.
7     Q    And if the backstop liquidity providers are
8 not willing to take on a position --
9     A    Take on a position?
10     Q    -- that would mean either the fund would
11 absorb it --
12     A    The fund wouldn't absorb the position.  So in
13 this -- sorry.  Which I don't know ever got triggered.
14     Q    Okay.
15     A    Other users would absorb the position, but
16 they'd absorb it at the current market price or better.
17     Q    So they are not taking on a loss as well?
18     A    A loss.  They are just having a forcible
19 position closure.
20     Q    Okay.
21     A    And then, after that process was completed, if
22 the requirement that the other users not began a losing
23 mark-to-market position meant there were a negative
24 number of dollars leftover in a liquidated account,
25 then FTX, with the backstop liquidity fund, funds

MAGNA
LEGAL SERVICES

Page 154

1    permitting, would cover that negative number of U.S.
2    dollars.
3        Q.   Okay.  So the goal was never to impose a loss
4    on other users?
5        A.   Yes.  Unless one had no choice.
6        Q.   So, if FTX could, it was going to avoid
7    imposing loss on other users?
8        A.   That's right, obviously could -- there are
9    questions of exactly how many dollars FTX would have
10   committed to do so.  I think it publicly committed to
11   at least north of a hundred million dollars.  In
12   practice, I think it would have been willing to admit
13   to significantly more than that.
14       Q.   Do you have a sense how much it would be
15   willing to admit?
16       A.   It depends on the nature of what happened.
17   In particular, if there was, like, an error that
18   occurred, a mistaken print or something that had to be
19   reversed, I wouldn't count that as a loss stuck onto
20   another user.  I would count that as a correction of an
21   erroneous gain.
22           Assuming that you think of things in those
23   terms, it depends on the circumstance; but I
24   anticipate -- I anticipated at the time that, you know,
25   the number was probably more like a billion.

Page 155

1        Q.   My understanding, it was important to FTX that
2    it hadn't had to socialize losses; is that right?
3        A.   That's right.
4        Q.   So you would have done what you could to avoid
5    that if you could?
6        A.   I -- in general, yes.
7            (Deposition Exhibit 8 was marked for
8            identification and is attached hereto.)
9    BY MR. HARRIS:
10       Q.   Okay.  You've been handed Exhibit 8, and I
11   imagine you've never seen this before.  It's a
12   declaration by an employee --
13       A.   I have never seen it before.
14       Q.   Okay.  It's an employee of Alvarez & Marsal,
15   which is a financial advisor to FTX when they were a
16   debtor and now the recovery trust.
17           Feel free to take all the time you want with
18   it.  I really just wanted to try to see if you agreed
19   with some statements you made in here.  The ones I'm
20   going to look at are paragraphs 34 to 37.  I don't know
21   if you need more time to familiarize yourself.
22       A.   Let me figure out the answer to that question.
23   Other than small quibbles with the phrasing of parts of
24   it, as far as I've, so far, processed -- you said
25   paragraphs 34 to 37?

Page 156

1        Q.   Yes.
2        A.   At a high level, I agree with -- well, I
3    can't, I guess, confidently say what the author
4    intended with them, but they seem broadly reasonable to
5    me.
6        Q.   Okay.  The quibbles you have in mind, what
7    were those?
8        A.   So "It could not be sold or otherwise
9    transferred for consideration" would be an example.
10   It's -- maybe one way of phrasing it is "It could be
11   sold for its duration of value of approximately zero."
12           There are a number of times where I think
13   there's ambiguity here between something not having a
14   concept of value or having a value, and that value is
15   close to zero --
16       Q.   Okay.
17       A.   -- or could be positive or negative.  Those
18   are the flavor of, like, ambiguities, I guess, in the
19   phrasing here.
20       Q.   Okay.  If I understand right, your view would
21   be that the perpetual futures could have a value, but
22   it was likely de minimus?
23       A.   That's -- to the extent that -- well, I don't
24   know.  It would depend on how you would define "value"
25   to begin with.  For instance, twice its value mark to

Page 157

1    market, I mean, I guess you could try to define it such
2    as to include the unorganized P&L over the last ten
3    seconds or something, which might be like a hundredth
4    of a percent or something like that, again definitional
5    issues here; but to the extent one tried to assign a
6    value to them, that value would generally be on a very
7    small scale like that.
8            If there's a very large, very recent market
9    move, then it becomes a more important consideration
10   whether one is baked, unrealized P&L, which is not
11   here.
12       Q.   Okay.  For that MobileCoin example you had,
13   are those --
14       A.   Well, those were not futures.
15       Q.   Can you think of any futures that moved very
16   quickly?
17       A.   Yeah.  I mean, I don't remember which current
18   we had futures on; but during the Terra Luna crash,
19   there were very, very large, rapid market movements.
20       Q.   Any other quibbles you have from this?
21       A.   As a general matter for describing how things
22   usually worked, no.  There are a number of statements
23   that, again, I think are generally and usually true;
24   but I could come up with weird corner cases where they
25   didn't apply.  And so I, sort of, don't want to say

MAGNA ▸
LEGAL SERVICES

Page 158

1  that, definitely, everything here is a hundred percent
2  true a hundred percent of the time, just that this is
3  generally consistent with how I would describe it.
4      Q   Okay.  I think we are done with that one.
5  All right.  I think we've discussed that a customer
6  could hold multiple different kinds of digital assets
7  on the Exchange; right?
8      A   Yep.
9      Q   And they could be long in one and short in
10  another?
11     A   Yep.
12     Q   They could be positive or negative in U.S.
13  dollars?
14     A   Yep.
15     Q   You could have a margin loan?
16     A   Yep.
17     Q   And for the most part, if you add the values
18  of all of those assets plus and minus, you would have a
19  net account value; right?
20     A   Uh-huh.
21     Q   Which was generally supposed to be positive
22  for customers?
23     A   Usually.  Again, things like line and stuff,
24  credit, make this complicated; but, usually, yes.
25     Q   Was it your understanding that all of those

Page 159

1  positions, the different digital assets, the margin
2  loan, was actually fictitious, and the only thing that
3  it actually -- the customer actually had was the net
4  account balance?
5      MR. MISHKIN:  Objection.  Form.
6      MR. GLUECKSTEIN:  Objection.  Form.
7      THE WITNESS:  I'm not sure what you mean by
8  that.
9  BY MR. HARRIS:
10     Q   Does that question make sense to you?
11     A   Sorry.  You are saying that the margin loan
12  was fictitious?
13     Q   Yes.  There was no loan.  There were no
14  assets.  All the customer had was a net account
15  balance.
16     MR. MISHKIN:  Objection.  Form.
17     MR. GLUECKSTEIN:  Object to the form.
18     THE WITNESS:  I have no idea what it would
19  mean for a loan to be fictitious.  Are you saying --
20  you are going to have to clarify what you mean by that.
21  BY MR. HARRIS:
22     Q   Okay.  When you set up this exchange, did you
23  intend to allow customers to hold assets, digital
24  assets?
25     A   What do you mean by "hold"?

Page 160

1      Q   Have an entitlement to a digital asset?
2      A   I'm not sure what you mean by "entitlement."
3  Maybe I can say it this way:  I intended for customers
4  to be able to deposit assets, that there would be a
5  representation of the assets that they would be owed by
6  the Exchange, that they could attempt to withdraw those
7  assets' liquidity permitting that they could, in some
8  cases, use them as collateral for futures trading or
9  later margin trading.  I don't know if that answers
10  your question.
11     Q   So if instead all a customer had was an
12  entitlement to whatever the net asset balance was --
13     A   And by "net" -- sorry -- do you mean split by
14  asset or --
15     Q   No.
16     A   -- do you mean just the overall U.S. number?
17     Q   Just the overall USD.  Is that your
18  understanding of how it worked, that the customer was
19  only entitled to the overall asset balance?
20     MR. MISHKIN:  Objection.
21     THE WITNESS:  That was not my understanding,
22  but I'm not sure how you are defining "entitlement."
23  BY MR. HARRIS:
24     Q   Would you agree with me that if a customer
25  didn't actually have an entitlement to any digital

Page 161

1  assets, it wouldn't be able to loan them out through
2  the margin program?
3      MR. MISHKIN:  Objection.  Form.
4      THE WITNESS:  You still have to define what
5  "entitlement" means.
6  BY MR. HARRIS:
7      Q   If, in fact, they have no --
8      A   Maybe I can ask you a question.
9      Q   Yes.
10     A   If I lend you a paper clip, do you have
11  entitlement to that paper clip?
12     Q   I think, at the time you loan it to me, I
13  would.  So that's what I would mean by "entitlement."
14     A   Sorry.  Would I have -- I lend you a paper
15  clip.  Do I then, after having handed it to you -- by a
16  loan, would you agree that, at some vague later time
17  you will return, are you defining me as having
18  entitlement to that paper clip?
19     Q   Possibly, I guess.
20     A   So how would you feel if I answered "possibly"
21  to all of your questions?
22     Q   I take it these are confusing questions;
23  right?
24     A   I think you are trying to use a word and to
25  avoid defining it.

MAGNA ▶
LEGAL SERVICES

1  would be helpful also.
2  A   When you say "inaccurate," do you mean
3  something which I think is, sort of, like, a poor
4  description of what usually happens or something which
5  does not carefully describe all possible things that
6  could happen?
7  Q   Mainly a poor description.
8  A   Of what usually happens?
9  Q   Of what usually happens.
10  A   Understood.  Okay.
11  Q   Okay.  If you can, look at the second page.
12  Under "Step 1" --
13  A   Yep.
14  Q   -- it says "If the account's margin fraction
15  is less than maintenance margin but above auto-close
16  margin fraction, then...."
17  A   Yep.
18  Q   Then it describes an automatic system.
19    So is that the typical trigger for the Step 1
20  automatic process?
21    MR. MISHKIN:  Objection.  Form.
22    THE WITNESS:  That is often -- sorry.  That
23  would often trigger -- be a trigger for liquidation.
24  BY MR. HARRIS:
25  Q   Are there other triggers for this that you can

1  remember happening for this automatic liquidation?
2  A   I can imagine cases where the margin fraction
3  jumps straight through Step 1 down below --
4    THE REPORTER:  I'm sorry.  "Down below" --
5    THE WITNESS:  -- auto-close margin fraction.
6  ACMF, yes, is the acronym for it.  Where, below, it
7  says "verify," it matches the situation to choose the
8  brand, or you can change -- it's the change in
9  parameters in the Exchange that shifts the status of
10  account.
11  BY MR. HARRIS:
12  Q   What does that mean, "change in parameters"?
13  A   Changing the amount of margin required --
14  Q   Okay.
15  A   -- for a position, for instance.  You can
16  imagine something involving a line of credit; but if
17  you, sort of, restrict this to, like, sort of, slow
18  moving markets, liquid assets, small account, no
19  unusual parameters, then this would be the common way
20  that it would be done.
21  Q   The common trigger is the margin fraction
22  falling below --
23  A   Falling below maintenance margin.
24  Q   You said something about a line of credit.
25  A   Yeah.

1  Q   What do you mean a line of credit could
2  trigger?
3  A   Let's say that there is an account that,
4  hypothetically speaking, had a line of credit of
5  $120 million, a net account value, including that line
6  of credit, of $180 million and required $100 million of
7  collateral to support its positions.  If that line of
8  credit were to be revoked, the account would jump from
9  above maintenance margin probably to being below
10  auto-close margin fraction by virtue of that
11  120 million line of credit no longer being applicable.
12  There are other examples.  That's one example one could
13  imagine.
14  Q   So, in that example, the trigger was still the
15  margin factor was too low?  The cause of the margin
16  factor being too low would be the elimination of the
17  line of credit?
18  A   That's right.
19  Q   So can you -- can you think of any examples
20  causing this automatic liquidation that don't involve
21  the margin factor being too low -- the margin fraction
22  being too low?
23    MR. MISHKIN:  Objection.  Form.
24    THE WITNESS:  Sorry.  Are you asking me about
25  hypothetical examples or about things that I can

1  remember happening?
2    MR. HARRIS:  Things you can remember
3  happening.
4    THE WITNESS:  If parameters are changing,
5  exchange parameters, then saying "What is the
6  maintenance margin requirement?" that's a notion that
7  changes over time.  So below what that parameter will
8  be, has become, should be something like "that may have
9  been the cause of some" --
10    I'm not sure I can think of a time off the top
11  of my head as of, say, July 2022 where that had
12  happened.  I'm not confident that there are no other
13  cases I'm forgetting, but ...
14  BY MR. HARRIS:
15  Q   In this Step 1 we are looking at?
16  A   Yep.
17  Q   When the auto liquidation happens, are these
18  being liquidated at the market price or some other
19  price?
20  A   They are being liquidated basically at the
21  market price.  They are being liquidated by actual
22  order sent to the order book and so at whatever the,
23  you know, fill price is on those trades.
24  Q   Okay.  Then Step 2 is triggered if the margin
25  fraction is less than the ACMF?

1    A   Yes.
2    Q   Okay.  And the third paragraph talks about
3    BLPs having a maximum capacity per minute an hour, and
4    you told me about that already.
5        And then it says "If BLPs total capacity is
6    insufficient, the remaining size is closed against
7    users with large opposing positions," and we talked
8    about what that meant for futures contracts.
9        What about for other kinds of assets?
10       How would that work for spot positions?
11       MR. GLUECKSTEIN:  Object to the form.
12       THE WITNESS:  I don't remember off the top of
13   my head.
14   BY MR. HARRIS:
15       Q   For someone who had a short position?
16       A   Yeah.  I write in either position, and I don't
17   remember the terms on that.
18       Q   Do you know if FTX already had policies in
19   place to determine how they would decide who were the
20   users that it would be closed against?
21       A   I'm not sure.  I don't know that this ever
22   happened.
23       Q   Okay.  The next paragraph says "Liquidated
24   account closes at ZP."  I think that's the term we
25   looked at.

1    A   Zero price.
2    Q   Zero price.  Okay.  And the zero price is
3    generally less than the market price?
4    A   If the account sells positive in that asset
5    value, yes.
6    Q   Okay.
7    A   Zero price is the price at which the account
8    would have zero net asset value.
9    Q   So we found a positive net asset value --
10   A   Then market price.
11   Q   So if the account is -- if an account that's
12   being closed in a positive value --
13   A   Yep.
14   Q   -- then the accountholder is going to be
15   set --
16   A   -- to zero.
17   Q   Okay.  Then Step 3 is "Whenever an account
18   hits the auto-close margin fraction, the backstop
19   liquidity fund steps in."
20       And it says "If the account isn't yet
21   bankrupt" -- and "bankrupt" means it has a --
22   A   -- zero asset value.
23   Q   So this is saying, if the account still has a
24   positive value, then the backstop liquidity fund gains
25   one-third of the remaining value?

1    A   Yes.
2    Q   And then the -- who gains the other
3    two-thirds?
4    A   The BLP.
5    Q   Okay.  And then the last paragraph says
6    "Customers will only have their positions auto-closed
7    if an account hits auto-close margin fraction and the
8    backstop liquidity providers are out of capacity."
9        When it's talking about customers here, it's
10   talking about other customers?
11   A   Other customers.  Other unrelated customers.
12   Q   Okay.  I'm flipping pages quickly.
13   A   Yep.
14       (Deposition Exhibit 9 was marked for
15       identification and is attached hereto.)
16   BY MR. HARRIS:
17   Q   Okay.  You were handed Exhibit 9, which is a
18   printout from an archive web page.  It says "FTX
19   Liquidation Process Flowchart."
20   A   Uh-huh.
21   Q   I don't know if this helps.  The very last
22   page of it has your name on it.
23   A   All right.
24   Q   So do you recognize what this is?
25   A   At a high level, yes.

1    Q   Okay.  What would you describe it as?
2    A   A series of flow charts of what happens in
3    very specific liquidation scenarios.
4    Q   Okay.  I want to talk about the last scenario.
5    A   Which?  The price gap, you mean?
6    Q   The price gap, yes.
7    A   All right.
8    Q   So is this referring to a scenario where the
9    account has -- the net account value has gone negative?
10   A   Give me a second.
11   Q   Sure.  You may need to go back and read the
12   whole scenario to understand.
13   A   All right.  Sorry.  Rephrase the question.
14   Q   Yeah.  And I misled you.  I actually want to
15   talk about the prior scenario first.
16   A   All right.  So this is "Orderly Liquidation."
17   Q   "Orderly Liquidation."  And I'm really
18   interested in the bottom of that page where it says
19   BTC drops another 2 percent.
20   A   All right.
21   Q   So, here, we are in the world where it says
22   "Account A has dropped below auto Close Margin
23   Fraction."
24   A   All right.  Got it.
25   Q   Okay.  And it says "The account's entire

1  position and balances are being sold to the Backstop
2  Liquidity Providers and Insurance Fund."
3       A   Yes.
4       Q   And then it has this chart.  It says
5  "Account A," and there's an arrow to "Backstop LP" and
6  an arrow to "Insurance Fund."
7       A   Yep.
8       Q   And then it says "Position," and then
9  two-thirds of assets to Backstop LP, one-third of
10  assets to Insurance Fund.  I just want to make sure I
11  understand.
12          Does this mean the entire position goes to the
13  backstop liquidity fund --
14       A   Yes.
15       Q   -- or one-third of the asset value?
16       A   Goes to the Insurance Fund, yes.
17       Q   I said that wrong.  The entire position is
18  going to the Backstop LP?
19       A   Sorry.  The entire position is going to the
20  backstop and two-thirds as well; but none of the
21  position goes to, whatever you want to call it,
22  insurance backstop fund.
23       Q   Then now I want to go to the last one, which
24  is "Price Gap."
25       A   All right.  Yep.

1       Q   And I just want to make sure I understand what
2  these arrows mean.
3       A   Yep.
4       Q   So there's an arrow from "Insurance Fund" to
5  "Account A," which is debt?
6       A   Yes.
7       Q   What is that referring to?
8       A   Account A now has a negative asset value,
9  negative $25,000 in particular, and at the end of the
10  day, something has to cover that.  And this scenario,
11  which is assuming we are not getting anything else from
12  Person A, and so, in this case, the Insurance Fund is
13  going to cover that $25,000 loss.
14       Q   Okay.  And then there's an arrow from
15  "Insurance Fund" to BLP that says "Hedging cost."
16       A   Yep.  That's right.  So the BLPs are supposed
17  to get this position that's better than zero price, in
18  other words, better than market price because,
19  otherwise, it's a losing proposition for them because
20  they still have to hedge out of this position that they
21  are being forcibly given.
22          And so in order to keep them incentivized to
23  be part of the BLP program, the Insurance Fund covers
24  this -- I don't know if it's exactly the two-thirds --
25  I don't remember exactly what it is, but it's some

1  amount maybe, like a percent or something.
2       Q   So the Insurance Fund would both have to
3  absorb the loss from the account and also have to pay a
4  hedging cost?
5       A   That's right.
6       Q   Is it fair to say FTX set up some extensive
7  procedures to try to avoid clawbacks?
8       A   Yes.
9       Q   Those included having margin requirements and
10  the liquidation engine with these various steps?
11       A   Yes.
12       Q   Remember, we asked you about this hypothetical
13  world where, in fact, users didn't have assets and
14  didn't loan their assets out and, instead, all they had
15  was a net account balance?
16       A   Yeah.
17       Q   Okay.  If that was the world, if the account
18  balance was getting to zero, couldn't FTX just close
19  the account and avoid any losses?
20          MR. MISHKIN:  Objection.  Form.
21          THE WITNESS:  I'm confused about this
22  hypothetical.  Maybe with some concrete, like,
23  hypothetical example because you are saying that they
24  don't have assets, does that mean they only have
25  dollars, or they don't have dollars?

1  BY MR. HARRIS:
2       Q   All they have is whatever the net asset value
3  is.
4       A   Which is a dollar figure?
5       Q   Which would be a dollar figure.
6       A   But then how is the net asset value changing
7  of the account if it doesn't have any positions or
8  tokens with market prices that deviate?
9       Q   Say what an FTX customer really had was some
10  synthetic derivative measured by whatever lever they
11  chose to pick by saying "Let's pretend I own bitcoin,
12  and let's pretend I own dollars"?
13          MR. MISHKIN:  Object to form.
14          THE WITNESS:  Are you saying a futures
15  contract?  That is how some people might define a
16  bitcoin futures contract.  A financial instrument with
17  a financial settlement depending on the price of a
18  bitcoin at a future point in time that does not involve
19  physical transference or withdraw ability or ownership
20  of any bitcoins, is that what you are talking about?
21  BY MR. HARRIS:
22       Q   So let's imagine that every single FTX user --
23       A   Yep.
24       Q   -- whether they said they are buying spot or
25  bitcoin or said they were doing a margin loan --

MAGNA
LEGAL SERVICES

Page 246

1    of what happened and why with the recourse.
2        Q   The last question, is there anything about
3    your views of Mr. Ray or Sullivan & Cromwell that would
4    cause you to favor Three Arrows Capital?
5        A   It depends what you mean by "favor" them.
6    What I will say is the following:  It would certainly
7    cause me, on the margin, to be much less excited for --
8    than I otherwise would be for funds to end up under the
9    control of the debt- --- the FTX debtors rather than
10   Three Arrows' debtors; but at the end of the day,
11   again, it doesn't change the truth of what happened,
12   and it doesn't change -- I don't think it changed any
13   of my answers.  I don't think that, like --
14       At the end of the day, it doesn't mean that I
15   want the FTX holders to use assets to fund altogether,
16   so not in a way that I think materially changed my
17   answers to the questions around Three Arrows.
18       MR. HARRIS:  Thank you, sir.
19       THE WITNESS:  Yep.
20       MR. MISHKIN:  We are going to reserve reading
21   and signing.  This deposition is complete.
22       MR. GLUECKSTEIN:  Yes.  We are going to mark
23   this "Confidential" under the terms of the protective
24   order in the case.
25       THE REPORTER:  And counsel both need copies?

Page 247

1        MR. GLUECKSTEIN:  Yes, ma'am.
2        MR. HARRIS:  Yes.
3        (Deposition session concluded at 2:32 p.m.)
4                   -oOo-
5
6
7        I certify (or declare) under penalty of
8    perjury under the laws of the State of California that
9    the foregoing is true and correct.
10
11   Executed at _____ on _____.
                (Place)           (Date)
12
13   _____
              (Signature of Deponent)
14
15
16
17
18
19
20
21
22
23
24
25

Page 248

1        DEPOSITION OFFICER'S CERTIFICATE
2    STATE OF CALIFORNIA )
                         ) ss.
3    COUNTY OF ORANGE    )
4
5        I, Joanna B. Brown, hereby certify:
6        I am a duly qualified Certified Shorthand
7    Reporter in the State of California, holder of
8    Certificate Number CSR 8570 issued by the Court
9    Reporters Board of California and which is in full
10   force and effect. (Fed. R. Civ. P. 28(a)).
11       I am authorized to administer oaths or
12   affirmations pursuant to California Code of Civil
13   Procedure, Section 2093(b) and prior to being examined,
14   the witness was first duly sworn by me.
15   (Fed R. Civ. P. 28(a), 30(f)(1)).
16       I am not a relative or employee or attorney or
17   counsel of any of the parties, nor am I a relative or
18   employee of such attorney or counsel, nor am I
19   financially interested in this action.
20   (Fed. R. Civ. P. 28).
21       I am the deposition officer that
22   stenographically recorded the testimony in the
23   foregoing deposition, and the foregoing transcript is a
24   true record of the testimony given by the witness.
25   (Fed. R. Civ. P. 30(f)(1)).

Page 249

1        Before completion of the deposition, review of
2    the transcript [ ] was [ ] was not requested.  If
3    requested, any changes made by the deponent (and
4    provided to the reporter) during the period allowed,
5    are appended hereto. (Fed. R. Civ. P. 30(e)).
6
7
8    Dated: _____
9
10
11          _____
12
13
14
15
16
17
18
19
20
21
22
23
24
25

MAGNA ▶
LEGAL SERVICES

# Exhibit 7

# FTX

FTX Exchange › FTX Derivatives › Futures

Search articles

# Collateral Management



FTX Crypto Derivatives Exchange
Updated 16 hours ago

**BROWSE**     ⌄

Collateral on FTX is calculated in USD value terms. We follow a multi-currency cross-margining methodology and thereby accept a variety of non-USD assets as collateral for derivatives and spot margin positions. The PnL is always settled in USD regardless of which type of collateral is used.

The user can choose whether to use FTT as collateral on the settings page. By default the account uses FTT as collateral.

## List of Non-USD Collateral

| Coin | Weight (total) | Weight (initial) | IMF factor |
| --- | --- | --- | --- |
| 1INCH | 0.9 | 0.85 | 0.0005 |
| AAPL | 0.9 | 0.85 | 0.00125 |
| AAVE | 0.9 | 0.85 | 0.0025 |
| ABNB | 0.9 | 0.85 | 0.005 |
| ACB | 0.9 | 0.85 | 0.0025 |
| ALGO | 0.95 | 0.9 | 0.00015 |
| ALPHA | 0.9 | 0.85 | 0.00025 |
| AMC | 0.9 | 0.85 | 0.0025 |
| AMD | 0.9 | 0.85 | 0.001 |
| AMZN | 0.9 | 0.85 | 0.003 |
| APE | 0.95 | 0.9 | 0.0005 |
| APHA | 0.9 | 0.85 | 0.001 |
| ARKK | 0.9 | 0.85 | 0.005 |
| ASD | 0.7 | 0.65 | 0.0001 |
| ATOM | 0.9 | 0.85 | 0.0005 |
| AUD | 0.99 | 0.98 | 0.00001 |
| AVAX | 0.9 | 0.85 | 0.0007 |
| BABA | 0.9 | 0.85 | 0.0025 |
| BAND | 0.85 | 0.8 | 0.001 |
| BB | 0.9 | 0.85 | 0.0025 |
| BCH | 0.95 | 0.9 | 0.0008 |
| BILI | 0.9 | 0.85 | 0.005 |
| BITW | 0.9 | 0.85 | 0.001 |
| BNB | 0.95 | 0.9 | 0.0005 |
| BNT | 0.9 | 0.85 | 0.0025 |

FTX_3AC_000013844



| | | |
|---|---|---|
| BNTX | 0.9 | 0.002 |
| | 0.85 | |
| BRZ | 0.99 | 0.98 | 0.00001 |
| BTC | 0.975 | 0.95 | 0.002 |
| BTMX | 0.7 | 0.65 | 0.0008 |
| BUSD | 1 | 1 | 0 |
| BVOL | 0.85 | 0.8 | 0.005 |
| BYND | 0.9 | 0.85 | 0.0075 |
| CAD | 0.99 | 0.98 | 0.00001 |
| CEL | 0.85 | 0.8 | 0.001 |
| CGC | 0.9 | 0.85 | 0.0025 |
| CHF | 0.99 | 0.98 | 0.00001 |
| COIN | 0.85 | 0.8 | 0.01 |
| COMP | 0.9 | 0.85 | 0.002 |
| CRON | 0.9 | 0.85 | 0.002 |
| CUSDT | 0.9 | 0.85 | 0.000005 |
| DAI | 0.9 | 0.85 | 0.00005 |
| DOGE | 0.95 | 0.9 | 0.00002 |
| DOT | 0.9 | 0.85 | 0.0002 |
| ETH | 0.95 | 0.9 | 0.0004 |
| ETHE | 0.9 | 0.85 | 0.0025 |
| EUR | 0.99 | 0.98 | 0.00001 |
| EURT | 0.975 | 0.95 | 0.0005 |
| FB | 0.9 | 0.85 | 0.002 |
| FIDA | 0.85 | 0.8 | 0.001 |
| FTM | 0.85 | 0.8 | 0.0005 |
| FTT | 0.95 | 0.95 | 0.0005 |
| GBP | 0.99 | 0.98 | 0.00001 |
| GBTC | 0.9 | 0.85 | 0.0025 |
| GDX | 0.9 | 0.85 | 0.0005 |
| GDXJ | 0.9 | 0.85 | 0.003 |
| GLD | 0.9 | 0.85 | 0.0005 |
| GLXY | 0.9 | 0.85 | 0.005 |
| GME | 0.9 | 0.85 | 0.005 |
| GOOGL | 0.9 | 0.85 | 0.01 |
| GRT | 0.9 | 0.85 | 0.00025 |
| HKD | 0.99 | 0.98 | 0.00001 |
| HOLY | 0.9 | 0.85 | 0.0005 |
| HOOD | 0.85 | 0.8 | 0.005 |
| HT | 0.9 | 0.85 | 0.0003 |
| IBVOL | 0.85 | 0.8 | 0.015 |
| KNC | 0.95 | 0.9 | 0.001 |
| LEO | 0.85 | 0.8 | 0.001 |
| LINK | 0.95 | 0.9 | 0.0003 |
| LRC | 0.85 | 0.8 | 0.0005 |
| LTC | 0.95 | 0.9 | 0.0004 |
| LUNC | 0.9 | 0.85 | 0.0001 |
| MATIC | 0.85 | 0.8 | 0.00004 |
| MKR | 0.9 | 0.85 | 0.007 |
| MOB | 0.6 | 0.55 | 0.005 |
| MRNA | 0.9 | 0.85 | 0.001 |
| MSTR | 0.9 | 0.85 | 0.008 |
| NEAR | 0.95 | 0.9 | 0.001 |
| NFLX | 0.9 | 0.85 | 0.0025 |
| NIO | 0.9 | 0.85 | 0.0008 |
| NOK | 0.9 | 0.85 | 0.001 |
| NVDA | 0.9 | 0.85 | 0.01 |
| OKB | 0.9 | 0.85 | 0.0003 |
| OMG | 0.85 | 0.8 | 0.001 |
| USDP | 1 | 1 | 0 |
| PAXG | 0.95 | 0.9 | 0.002 |
| PENN | 0.9 | 0.85 | 0.005 |

FTX_3AC_000013845

| | | |
|------|-------|---------|
| PFE | 0.9 | 0.001 |
| RAY | 0.85 | 0.8 | 0.0005 |
| REN | 0.9 | 0.85 | 0.00025 |
| RSR | 0.85 | 0.8 | 0.0001 |
| SECO | 0.9 | 0.85 | 0.0005 |
| SLV | 0.9 | 0.85 | 0.0005 |
| SNX | 0.85 | 0.8 | 0.001 |
| SOL | 0.9 | 0.85 | 0.0003 |
| STSOL | 0.9 | 0.85 | 0.0004 |
| MSOL | 0.9 | 0.85 | 0.0004 |
| SPY | 0.9 | 0.85 | 0.0005 |
| SQ | 0.9 | 0.85 | 0.002 |
| SRM | 0.9 | 0.85 | 0.0005 |
| SUSHI | 0.95 | 0.9 | 0.0004 |
| SXP | 0.9 | 0.85 | 0.0005 |
| TLRY | 0.9 | 0.85 | 0.001 |
| TOMO | 0.85 | 0.8 | 0.0005 |
| TRX | 0.9 | 0.85 | 0.00001 |
| TRY | 0.99 | 0.98 | 0.00001 |
| TRYB | 0.9 | 0.85 | 0.00001 |
| TSLA | 0.9 | 0.85 | 0.01 |
| TSM | 0.9 | 0.85 | 0.003 |
| TUSD | 1 | 1 | 0 |
| TWTR | 0.9 | 0.85 | 0.001 |
| UBER | 0.9 | 0.85 | 0.001 |
| UNI | 0.95 | 0.9 | 0.0005 |
| USD | 1 | 1 | 0 |
| USDC | 1 | 1 | 0 |
| USDT | 0.975 | 0.95 | 0.000005 |
| USO | 0.9 | 0.85 | 0.001 |
| USTC | 0.85 | 0.8 | 0.0005 |
| WBTC | 0.975 | 0.95 | 0.005 |
| WUSDC | 1 | 1 | 0 |
| WUSDT | 0.975 | 0.95 | 0.00001 |
| XAUT | 0.95 | 0.9 | 0.002 |
| XRP | 0.95 | 0.9 | 0.00002 |
| YFI | 0.9 | 0.85 | 0.015 |
| ZAR | 0.99 | 0.98 | 0.00001 |
| ZM | 0.9 | 0.85 | 0.002 |
| ZRX | 0.85 | 0.8 | 0.0003 |

*Note: Always use https://ftx.com/api/wallet/coins as the source of truth.*

## Definitions & Formulas

| Term | Definition | Formula |
|------|------------|---------|
| USD collateral | USD, and a selection of USD stablecoins that are valued 1:1 with USD. | Stablecoins valued 1:1 with USD: USDC, TUSD, USDP, BUSD. |
| Non-USD collateral | Alternative assets accepted as collateral. | See list of non-USD collateral accepted here. |
| Initial Weight | Factor used to determine the collateral value for the purpose of initial margin if spot margin is not enabled (i.e., opening new leverage positions) | See Non-USD collateral table above. |

FTX_3AC_000013846

| | | |
|---|---|---|
| Total Weight | for the purpose of maintenance margin calculation and opening new positions if spot margin is enabled. | See Non-USD collateral table above. |
| IMF factor | Multiplier assigned to each asset on FTX. It is set based on factors such as liquidity or market capitalization. | See Non-USD collateral table above. |
| Collateral Used | Total of collateral being used by all open derivatives or spot margin positions in the subaccount, as well as collateral tied up in open orders, including spot. | sum (Position1 Open Size Notional * Position1 IMF, Position2 Open Size Notional * Position2 IMF,...) + sum(Spot Order1 Size * Mark Price, Spot Order2 Size * Mark Price,...) |
| Free collateral | Total collateral available that can be used for opening new positions and withdrawn from the exchange, excluding collateral locked in open orders or open positions. | min(collateral, collateral + unrealized PNL) - (amount of collateral tied up in open orders) |
| Collateral Weight | Multiplier used to determine the total value of your collateral. | min (1.1 / [IMF Weight * {1.1 / Total Weight - 1} + 1] , 1.1 / [Spot Margin IMF Factor * sqrt{size} * IMF Weight + 1] )<br><br>If spot margin is enabled, Weight = Total Weight. Otherwise, Initial Weight. |
| Collateral Value | Collateral value of each asset in your inventory | For positive balances, the collateral value is calculated as follows:<br>= Size * Mark Price * Collateral Weight<br><br>For negative balances the collateral value is calculated as follows:<br>= Size * Mark Price |
| Total Account Collateral | Sum of positive and negative collateral values | Sum(Collateral Value 1, Collateral Value 2,..) |

## Examples

Let's assume you're currently holding the following balances and that spot margin is enabled in your account:

| Asset | Size | Mark Price | Notional USD | Initial Weight | Total Weight | IMF Factor |
|---|---|---|---|---|---|---|
| USD | 100,000 | $1 | $100,000 | 1 | 1 | - |
| BTC | 2.5 | $20,000 | $50,000 | 0.95 | 0.975 | 0.002 |
| ETH | 10 | $1,500 | $15,000 | 0.90 | 0.95 | 0.0004 |
| Total (USD) | | | $165,000 | | | |

## Calculating Total Collateral Value

To start, let's first calculate the Collateral Weight of the assets you're currently holding.

For BTC:

= min (1.1 / [IMF Weight * {1.1 / Total Weight – 1} + 1], 1.1 / [Spot Margin IMF Factor * sqrt{size} * IMF Weight + 1] )

= min (1.1 / [1 * {1.1 / 0.975 – 1} + 1], 1.1 / [0.002 * sqrt(2.5) * 1 + 1] )

= min (0.975, 1.09653246)

= 0.975

That means that the **Collateral Value** of your BTC will equal:

$50,000  * 0.975 = $48,750.

Applying the same formula to the rest of your assets:

| Asset | Notional USD | Collateral Weight | Total Collateral Value |
|-------|-------------|-------------------|------------------------|
| USD | $100,000 | 1 | $100,000 |
| BTC | $50,000 | 0.975 | $48,750 |
| ETH | $15,000 | 0.95 | $14,250 |
| Total | $165,000 | - | $163,000 |

**Note:** In the vast majority of cases, Collateral Weight will simply be either the asset's Initial Weight or Total Weight, depending on whether you have spot margin enabled or not. However, if you hold a significant balance of a single coin, its Collateral Weight may go down.

As an example, imagine that instead of 2.5 BTC, you're holding 10,000 BTC in your account, which would be equal to $200,000,000 assuming BTC is trading at $20,000. The Collateral Weight for your BTC would be as follows:

= min (1.1 / [1 * {1.1 / 0.975 – 1} + 1], 1.1 / [0.002 * sqrt(10,000) * 1 + 1] )

= min (0.975, 0.9167)

= 0.9167

Assuming BTC is trading at $20,000, the value of your collateral would be 0.9167 * 10,000 * $20,000 = $183,333,333.

Additionally, Collateral Weight can also change depending on the asset's IMF Weight and/or IMF Factor (as illustrated in the formula).

## Calculating Free Collateral

Now, let's calculate Free Collateral to understand how open positions and orders affect your collateral. Assume you have the following positions and open orders in your account:

| Market | Position Size | Mark Price | Position Notional | IMF % | MMF | Collateral Used |
|--------|--------------|-----------|-------------------|-------|-----|-----------------|
| SOL-PERP (Long) | 1,000 | $40 | $40,000 | 10% | 3% | $4,000 |
| LTC/USD (spot margin short) | 100 | $50 | $5,000 | 15.79% | 6% | $789 |

FTX_3AC_000013848

| | | | | | |
|---|---|---|---|---|---|
| USDT-PERP (Open Long) | | $1 | $16,00 | 20 | $1,000 |
| FTT/USD (Open Buy) | 1,000 | $30 | $30,000 | - | - | $30,000 |
| **Total (sum)** | - | - | **$85,000** | - | - | **$35,789** |

Note: "Open" in this context means that the order has not been filled yet.

Total Collateral Used is calculated by multiplying the Position Open Size Notional times its IMF. For open spot orders, the Collateral Used will be the full notional size of the order. When we add all of this up, the Total Collateral Used comes out to $35,789.

Before we calculate Free Collateral, keep in mind that the LTC/USD spot margin short position creates a negative LTC spot balance. In addition to requiring margin, negative spot positions also decrease your account collateral value.

In other words, our LTC/USD spot margin short is using $789 in Collateral, and on top of that, you will have a LTC balance of -$5,000. At the same time, your USD balance will increase by $5,000 as well.

To illustrate this, here's an updated overview of the Total Account Collateral:

| Total Account Collateral | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Asset | Size | Mark Price | Notional USD | Initial Weight | Total Weight | IMF Factor | Collateral Weight | Total Collateral |
| USD | 105,000 | $1 | $105,000 | 1 | 1 | - | 1 | $105,000 |
| BTC | 2.5 | $20,000 | $50,000 | 0.95 | 0.975 | 0.002 | 0.975 | $48,750 |
| ETH | 10 | $1,500 | $15,000 | 0.9 | 0.95 | 0.0004 | 0.95 | $14,250 |
| LTC | -100 | $50 | -$5,000 | - | - | - | NA | -$5,000 |
| **Total Collateral** | - | - | $165,000 | - | - | - | - | **$163,000** |

Now, to calculate Free Collateral, we simply need to subtract Total Account Collateral - Total Collateral Used:

| | |
|---|---|
| Total Collateral | $163,000 |
| Total Collateral Used | $35,789 |
| **Free Collateral** | **$127,211** |

In conclusion, you have $127,211 in Free Collateral, which can be used to open new positions, transferred, or lent.

# Handling Negative USD Balances

## Selling your non-USD collateral

FTX_3AC_000013849

Note: **IF YOU DO NOT WANT YOUR ASSETS TO BE CONVERTED TO COVER NEGATIVE USD BALANCES, PLEASE SEE THE TO THE NEXT SECTION.**

For accounts with spot-margin trading disabled, FTX will automatically send market orders to convert the non-USD collateral into USD if the USD balance is negative and any of the following conditions hold:

- You are close to liquidation: your account's margin fraction is less than 20bps + maintenance margin fraction requirement

- Your negative USD balance is over $30,000 in magnitude

- Your negative USD balance is over 4 times larger than your net account collateral

FTX will prioritize conversion to USD based on the collateral quality of the asset as measured by the Total Weight. For the assets that carry the same Total Weight, the asset with the higher notional USD value will be converted first. Note that FTT collateral is always used last.

For example, if both BTC and USDT are eligible choices, FTX will choose the larger balance in USD terms. As an illustration, if you have $1000 of USDT and $100 of BTC, the USDT will be traded into USD first.

Note that collateral conversions will potentially top you up so that you have slightly more than zero USD left by converting 10% more than is necessary in case of price movements.

## Charging interest instead of collateral converting

Instead of having your collateral converted into USD, you can enable spot margin trading on your account in order to automatically borrow the negative USD balance via the spot margin market and pay the prevailing USD borrow rate. To enable spot margin trading, go to the Margin section on your profile page and click "Enable spot margin trading".

As an example, assume you opened a long futures position and only had BTC as collateral. If your position goes against you, you would have a negative USD balance. At that point, instead of converting your BTC collateral, FTX will use the BTC as collateral to borrow USD from the spot margin market for the amount you're negative. You will be charged the prevailing USD borrow rate for any negative USD balance.

## How can your USD balance go negative?

Assume you have 110,000 USDT in your account and nothing else and USDT is trading at $1. Let's say BTC-PERP trading at $20,000 and you open a 50 BTC-PERP long position, making the total position notional equal $1,000,000.

A few minutes later, the price of BTC-PERP goes down. What happens? Remember that :

1. Your USD balance is $0 (because you used USDT as collateral to open your position)

2. Unrealized PnL affects your USD balance in real time:

   ○ Unrealized PnL from open futures positions is settled in USD every ~30 seconds. This means that debits or credits are happening on your account as your positions change in value, which ultimately affects your USD balance and collateral. Traders that have a positive PNL can withdraw it, use it to buy spot, lend it out, use it as collateral, etc. as soon as it's been credited to their account. Trading fees and funding payments also affect your PnL. Also, keep in mind that PnL isn't realized on spot trades, only derivatives.

   ○ To calculate your PnL on open positions:

     ○ if you bought = position size * (mark price - entry price)

     ○ if you sold = position size * (entry price - mark price)

So when the price of BTC-PERP goes down, you start accruing a negative USD balance.

To illustrate this, say BTC-PERP is now trading at $19,600 and USDT is still trading at $1:

FTX_3AC_000013850

= position size * (mark price - entry price)

= 50 * ($19,600 - $20,000) = -$20,000

So, your new account balance would be:

- **USD** = –$20,000

- **USDT** = 110,000 USDT

← Previous
Account Margin Management

Next →
Complete Futures Specs

**ARTICLES IN THIS SECTION**

FTX partners with Paradigm for one-click futures spreads trading

What Are Futures?

Account Margin Management

**Collateral Management**

Complete Futures Specs

Settlement & Delivery

Funding

Contracts Specs

Order Limits and Price Bands

Liquidations

**RELATED ARTICLES**

Account Margin Management

Index Calculation

Spot Margin Trading Explainer

Contracts Specs

PnL, Average Open Price, and Break-Even Price

**PROMOTED ARTICLES**

Deposit to your FTX account to earn VIP status

FTX Features Overview

Ratelimits on FTX

Introducing New Fee and Ratelimit Tiers to the FTX VIP & Market Maker Program

VIP Program and Market Maker Policy

FTX partners with Paradigm for one-click futures spreads trading

Deposit HBB to win up to 30,000 HBB!

Trade EUL to share a pool of 30,000 USD!

Trade SWEAT to share a pool of 30,000 USD!

**Didn't find what you were looking for?**

Create a support ticket

**Community**

   

FTX_3AC_000013851

Was this article helpful?

| Yes | No |
|-----|-----|

**2 out of 2** found this helpful



English (US) ⌄

FTX Services and FTX Token (FTT) are not available in the United States or other prohibited jurisdictions

# Exhibit 8

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

- - -

In re:  FTX Trading LTD, et al.

Debtors.

Chapter 11

Case No.

22-11068 (JTD)

- - -

September 19, 2024

- - -


Videotaped deposition of
ROBERT GORDON, conducted at Latham &
Watkins, 1271 Avenue of the Americas, New
York, New York, commencing at 9:00 a.m.
EDT, on the above date.

Magna Legal Services
866-624-6221
www.MagnaLS.com


Marie Foley
RMR, CRR



1
2        All right.  I need to walk
3 through each of those.
4        So, the first thing you said was
5 you reviewed documents that were produced.
6 You're referring to the document
7 production that the debtors made to 3AC;
8 is that right?
9    A.   That's correct.
10    Q.   Okay.
11        And you said you reviewed the
12 interrogatory responses.  That's the two
13 sets of interrogatory responses that the
14 debtors provided; is that right?
15    A.   That's correct.
16    Q.   Okay.  And then you said you
17 spoke to people at A&M.
18        Who did you speak with?
19    A.   I spoke with members of the team
20 that supported the informal discovery
21 process.
22    Q.   Okay.  Who are they?
23    A.   That was Laureen Ryan, Alexander
24 Canale, Patrick McGrath, Madison
25 Blanchard, and Kevin Carney.

1
2    Q.   Okay.
3        And was this one meeting with
4 them all together?
5    A.   This was a set of recurring
6 meetings.
7    Q.   Okay.
8    A.   To cover materials.
9    Q.   And you said they worked on the
10 informal discovery process.
11        Is that the process where when
12 Three Arrows sent an informal request for
13 documents, the debtors produced a set of
14 documents, or was it something else?
15    A.   My understanding was that there
16 was calls and communication prior to the
17 beginning of this process that took place
18 between A&M, S&C, and Latham and other
19 representatives.
20    Q.   Okay.
21    A.   I wasn't involved in those, but
22 I understand there was conversations and
23 information exchanged and discussed.
24    Q.   Okay.  So you weren't involved
25 in that process?

1
2    A.   Correct.
3    Q.   Just to get this out of the way,
4 did you have any involvement with 3AC
5 before preparing for this deposition?
6    A.   I did not.
7    Q.   Okay.
8        So, going back to your
9 discussions with A&M team members, how
10 long would you say in total you spent on
11 those discussions?
12    A.   I'd say between 30 and 40 hours.
13    Q.   Okay.
14        And what were the topics you
15 went over?
16    A.   Went over the background of 3AC,
17 the relationship with FTX pre-petition,
18 the account balance, the calculation of
19 the account balance and the supporting
20 files, legal agreements between 3AC and
21 FTX.
22    Q.   Okay.  Anything else?
23    A.   I believe that's exhaustive.
24    Q.   Okay.
25        When you say "account balance,"

1
2 what are you referring to?
3    A.   Account balance, I would define
4 that as the end-of-the-day balance that
5 exists in their account, assets minus
6 liabilities.
7    Q.   Okay.
8        Is there a document in the
9 debtors' possession that reflects that?
10    A.   Document 38 is the -- would show
11 account balance by day.
12    Q.   Your understanding is that
13 document 38 shows all the assets that
14 Three Arrows had in its account?
15    A.   Document 38 showed the assets
16 that were in Three Arrows' account with
17 the exception of perpetuals and futures.
18    Q.   Okay.
19        So, is there a document in the
20 debtors' possession that shows perpetuals,
21 the balance of perpetuals and futures at
22 the end of the day each day?
23    A.   We provided the fills data which
24 shows the -- the perpetuals and the
25 futures.  You would need to use that

MAGNA ▶
LEGAL SERVICES

1
2    document to come to end-of-the-day balance
3    for the value of those futures at end of
4    the day.
5        Q.   The fills data, is that document
6    number 2 in your production?  A huge
7    spreadsheet that crashes the computer when
8    you open it, is that the document that
9    you're referring to?
10           MR. GLUECKSTEIN:  Object to the
11   form.
12   BY MR. HARRIS:
13       Q.   Is it -- is it FTX production
14   document number Bates ending in 2?
15       A.   Yes.
16       Q.   Okay.  So, just to go back to my
17   question.
18           Is there a document in the
19   debtors' possession that shows the value
20   of the perpetuals and the futures at the
21   end of the day?
22           MR. GLUECKSTEIN:  Object to the
23   form.
24       A.   No.
25       Q.   So did the debtors know the

1
2    account balance of Three Arrows at the end
3    of each day?
4        A.   Yes.
5        Q.   So how did they know that if
6    there's no document that reflects it?
7        A.   To determine the account balance
8    end of each day, you have to look at both
9    this document number 2 and document 38
10   combined, but they have -- but it gets you
11   to an end-of-the-day balance, not a
12   position on a perpetual or a future of
13   those two documents combined.
14       Q.   So, is there a document that
15   shows the value of the account balance at
16   the end of each day for Three Arrows?
17       A.   No.
18       Q.   Okay.
19           So how do the debtors know what
20   the account balance was on a value basis
21   for Three Arrows at the end of each day?
22       A.   The debtors would -- would --
23   would need to combine document 38 and
24   document 2 in order to come up with an
25   account balance at the end of the day.

1
2        Q.   So did the debtors do that?
3        A.   We performed analysis.
4        Q.   No, no, not A&M.  Did the
5    debtors on a daily basis calculate the
6    account balance for Three Arrows?
7        A.   The exchange would produce a
8    account balance for the end-user that they
9    could see what their balance was end of
10   each day.
11       Q.   When you say "the exchange,"
12   what is that?
13       A.   The exchange is the -- the
14   software program that allowed people to
15   buy and sell crypto and other assets that
16   was owned by or held by FTX Trading
17   Limited.
18       Q.   So if a customer requested, the
19   customer could calculate the account
20   balance at the end of each day; is that
21   right?
22       A.   There's some example -- publicly
23   available examples of what this looked
24   like, but the customer would have a, think
25   of it as a dashboard that they could see

1
2    their balance, but this was dynamic and
3    not something that we, at this point, have
4    been able to recreate.
5        Q.   Okay, so my question is
6    different.  It's not about what the
7    customer could do.
8            My question is did Three Arrows
9    at the end of each day calculate the
10   account balance --
11           MR. HARRIS:  I'm sorry.  Let me
12   start that again.
13       Q.   At the end of each day, did
14   anyone at FTX calculate the account
15   balance for Three Arrows?
16       A.   The exchange would have
17   calculated it and would have been
18   available to both the administrators and
19   the customer.
20       Q.   So, I'm confused then because
21   you said there is no document in the
22   debtors' possession that shows the account
23   balance at the end of each day, but now
24   you're indicating that the exchange does
25   generate that at the end of each day.

**MAGNA**
LEGAL SERVICES

1
2          You see on the -- the column on
3    the far left there's a -- in the middle it
4    says:  Margin Fraction.
5          What does that refer to?
6      A.   I believe that is the current
7    market -- mar -- margin fraction for that
8    account.
9      Q.   And how is it calculated?
10     A.   I believe it is the position --
11   or, the collateral over the position.
12     Q.   Okay.
13          And MM -- MMF two rows down is
14   maintenance margin factor.  Is that right?
15     A.   That's correct.
16     Q.   Okay.
17          What was the range of
18   maintenance margin factors that the
19   debtors had for their customers in -- at
20   the beginning of June 2022?
21     A.   Are you asking about all
22   customers?
23     Q.   I'll start there, yes.
24     A.   I could not speak to ranges.
25   Only -- only examples that are in the --

1
2    only can speak to examples.
3      Q.   Do you know of any customers who
4    had an MMF above 5 percent in June 2022?
5      A.   I -- I cannot name a customer.
6      Q.   Okay.
7          Okay.  Why don't we go back to
8    Exhibit 8.
9          I'm sorry, I have a question
10   that doesn't relate to that, but do --
11   what's the highest MMF you're aware of for
12   a FTX customer?
13     A.   For a -- a customer it would be
14   the 3 percent.
15     Q.   Okay.
16          Okay.  Now on document
17   Exhibit 8, the FTX -- it's titled "FTX
18   Line of Credit" on the first page.
19          Is this based on a -- a standard
20   agreement or document that FTX used?
21     A.   So, it appears, based on my
22   understanding, that the part that starts
23   "FTX Institutional Customer Margin and
24   Line of Credit Agreement," pieces from
25   this are coming from other documents, but

1
2    I -- for the overall document, I -- I
3    don't know if this was a standard
4    template.
5      Q.   Okay.  You're saying pieces of
6    the part of this exhibit that start on the
7    second page and says "FTX Institutional
8    Customer Margin and Line of Credit
9    Agreement," pieces of that onwards come
10   from other standard FTX documents?
11     A.   Correct.
12     Q.   Okay.  And you don't know if the
13   first part of this document, the first
14   page and two-thirds, come from a standard
15   FTX document?
16     A.   Correct, I do not.
17     Q.   Okay.
18          Looking at the first part of the
19   document, the first page and two-thirds,
20   this establishes a line of credit of 120
21   million, right?
22     A.   That's correct.
23     Q.   Okay.  And then the second part
24   of the document that's the bottom part --
25   starts at the bottom part of the second

1
2    page, this -- well, the first part of the
3    document refers to a borrower.
4          Do you see that?
5      A.   Are you on -- what page are you
6    on?
7      Q.   Any part of page 1, that part of
8    the document.
9      A.   I see -- I see, yes, I see
10   borrower.
11     Q.   Okay.
12          And then the second part of the
13   document that starts at the bottom of 2
14   refers to a customer, right?
15     A.   Yes.
16     Q.   Okay.
17          The term "customer" is not
18   defined in this second part, right?  Or
19   anywhere, is that right?
20     A.   It doesn't have a -- a -- a
21   definition.
22     Q.   Okay.
23          Do the debtors have an
24   understanding who the customer is under
25   this second part of this exhibit?

MAGNA
LEGAL SERVICES

Page 186

```
1
2        form.
3        A.    Are you -- is -- is your
4    question is that the -- is your question
5    related to the ex -- the assets held
6    versus the customer positions on the
7    exchange?
8        Q.    That is relatively my question,
9    yes.
10            I'm trying to figure out 3AC's
11   digital assets were held in some wallet,
12   right?
13       A.    Correct.
14       Q.    Okay.  But the debtor don't know
15   which wallet it is, right?
16       A.    Correct.
17       Q.    And so they also don't know what
18   other customers, if any, also had their
19   assets in that wallet, right?
20       A.    That's correct.
21       Q.    So they don't know if there, in
22   fact, there were sufficient assets in that
23   wallet to cover the customers who had
24   assets in that wallet, right?
25       A.    That is correct.
```

Page 187

```
1
2        Q.    Are the debtors asserting they
3    had a security interest over the assets
4    that are listed in Request For Admission
5    Number 12, that list of assets that we
6    look at?
7            MR. GLUECKSTEIN:  Objection;
8    calls for a legal conclusion.
9        A.    The governing docket -- or,
10   the -- our view the governing document,
11   the line of credit agreement from March,
12   references -- references security
13   interest.
14       Q.    I understand there's those words
15   in the document.  And my question is a
16   little different is do the debtors -- are
17   the debtors asserting they had a security
18   interest in the document -- in the -- in
19   the assets that are listed in Request For
20   Admission No. 12?
21       A.    That's a legal question.  I
22   can't answer it.
23       Q.    You can't say whether the
24   debtors think they had a security
25   interest?
```

Page 188

```
1
2        A.    I do not know.
3        Q.    So sitting here today, the
4    debtors have not yet formed a view as to
5    whether they have a security interest over
6    these assets, right?
7            MR. GLUECKSTEIN:  Object to the
8    form.
9        A.    Not to my knowledge.
10       Q.    Okay.
11            You referred to language in the
12   margin agreement that discussed a security
13   interest, right?
14       A.    Yes.
15       Q.    Okay.  Was that document ever
16   registered with any authority?
17       A.    Not to my knowledge.
18       Q.    Or was it publicly filed in some
19   way ever?
20       A.    Can you be specific what you
21   mean by public file?
22       Q.    Was it filed with any government
23   authority such that other customers and
24   creditors could view it?
25       A.    Not to my knowledge.
```

Page 189

```
1
2        Q.    Was it displayed publicly in any
3    way?
4        A.    Not to my knowledge.
5        Q.    But it -- is it the debtors'
6    view that they had title to the -- to
7    those assets in that list in early June
8    2022 before they were sold?
9            MR. GLUECKSTEIN:  Objection;
10   calls for a legal conclusion.
11       A.    The debtor view is that we --
12   those were debtor -- the wallets had
13   debtor assets in them, were debtor assets.
14       Q.    But who held title to them?
15           MR. GLUECKSTEIN:  Objection;
16   calls for a legal conclusion.
17   BY MR. HARRIS:
18       Q.    If the debtors don't have a
19   view, you can tell me that.
20       A.    I don't know.
21       Q.    Are you aware of that margin
22   agreement being filed non-publicly with
23   any authority?
24       A.    Not to my knowledge.
25       Q.    Okay.
```

MAGNA ➤
LEGAL SERVICES

1
2  Time"?  If you -- if you highlight it and
3  then switch -- if you click on -- see the
4  drop arrow under "Funding Time"?
5        Yeah.
6        I'm sorry, no, up in -- up where
7  "General" is?  Is that what we're doing?
8        There it is, yeah.  Switch it
9  to --
10       MR. TAOUSSE:  Long date or short
11  date.
12  BY MR. HARRIS:
13     Q.   Okay.
14        So, do you see this?  Does this
15  reflect the spot margin balance for June
16  13th, 2022?
17     A.   It reflects one of the records
18  used to calculate interest on that date.
19     Q.   Okay.  I'm trying to figure out
20  what the spot margin balance was on that
21  date.
22        Is -- is this cell there an
23  accurate reflection of what the spot
24  margin balance was?
25     A.   I'm not sure I -- I understand

1
2  your question.
3     Q.   What was the spot margin balance
4  for 3AC on June 13th, 2022?
5     A.   I -- I still -- I'm not
6  following.
7        Which -- what are you --
8     Q.   Forget about the document.  If
9  you don't understand the document.
10    A.   Yeah, no, no.
11    Q.   I'm just trying to understand
12  the facts.
13    A.   I'm not following your -- the
14  way the question is phrased.
15    Q.   Okay.
16        Do you know what spot margin
17  borrowing is?
18    A.   Yes.
19    Q.   Okay.
20        How much had 3AC borrowed under
21  the spot margin program as of June 13th,
22  2022?
23    A.   We would need to look it -- we
24  would need to look at the summary
25  information to have the -- what their

1
2  borrowings were.
3     Q.   What's the summary information?
4     A.   Doc 38.
5     Q.   Okay.  I think we have it on
6  your laptop.  Maybe you could help me
7  understand then.
8        MR. HARRIS:  Just for the
9  record, that's Exhibit 2 that the
10  witness is looking in Excel format on
11  the laptop.
12        (Pause.)
13    A.   As of the end of the day on June
14  13th, their USD spot margin borrow is a
15  sum -- would be a summation of these
16  columns.
17    Q.   So it's column H and then you
18  sorted for date; is that right?
19        And this is per the end of the
20  day; is that right?
21    A.   This is midnight UTC.
22    Q.   Okay.  Does that mean it's end
23  of the day 2013 or end of the day 2012 --
24  12?
25    A.   This would be end of the day 13.

1
2     Q.   Okay.  And is this the USD
3  balance, or this is just the spot margin
4  trading balance?
5     A.   This is their -- what they have
6  borrowed USD in the spot margin borrow
7  program -- borrowing program.
8     Q.   So does that include borrowings
9  for futures and perpetuals?
10    A.   Yes.
11    Q.   So it's not just spot margin
12  borrowing; it's borrowing for any --
13    A.   So, to be able to purchase
14  something without having US -- without
15  having the USD in your account, you need
16  to borrow the USD to make the purchase.
17    Q.   Understood.  But it's not just
18  purchases on spot.  It's also purchases of
19  futures and perpetuals that are reflected
20  in what you highlighted here?
21    A.   Correct.
22    Q.   Okay.  So how would I find out
23  the components that add up the total USD,
24  negative US dollar balance on June 12th or
25  June 13th or any day?

Page 206

1
2      They just don't think it was done by the
3      debtors.  Is that right?
4          A.    What do you mean by "transferred"?
5          Q.    They're in the account on one
6      day and they weren't in the account on
7      another day, so they moved.  They're gone.
8      Something happened to them.
9              Debtors agree they were no
10     longer in the account by -- they were in
11     the account on June 12th and weren't in
12     the account on June 14th, right?
13         A.    The -- the tickers that were
14     listed in the account on the 12th were --
15     to -- to a changing extent where it's not
16     the same tickers on June 13th or 14th.
17         Q.    I don't understand what that
18     means.
19             Let me start it this way.  The
20     debtors agree that these assets were
21     listed in the account on June 12th, right?
22         A.    That's correct.
23         Q.    And the debtors agree that they
24     were not listed on the account by the end
25     of the day June 14th, right?

Page 207

1
2          A.    That's correct.
3          Q.    Okay.
4              And the debtors say only the
5      assets that are listed on Exhibit A were
6      transferred by the debtors, right?
7          A.    The Exhibit A references the
8      assets that were -- that were sold,
9      liquidated on the 14th by the debtor -- by
10     the debtors.
11         Q.    And the debtors' position, if I
12     understand what you said earlier today, is
13     that the other assets on this list were
14     sold at the direction of 3AC.  Is that
15     right?
16         A.    They were -- they were sold by
17     the -- by the -- by the 3AC account.
18         Q.    How does an account sell an
19     asset?
20         A.    An individual -- a individual or
21     a -- a tool would use the account to put
22     buy/sell orders in the market.
23         Q.    What do you mean by a tool?
24         A.    The crypto exchange is -- can be
25     run by both a person logging in and -- and

Page 208

1
2      some of them have where they can run on an
3      API or something similar.
4          Q.    Okay.
5              One way or another, the assets
6      that are not on Exhibit A were sold
7      through a direction either by a 3AC
8      individual or by a 3AC tool.  Is that the
9      debtors' view?
10         A.    Yes.
11         Q.    Okay.
12             Do you have any understanding
13     why it would make corporate sense for 3AC
14     to have liquidated those assets on June
15     12th and June 13th?
16             MR. GLUECKSTEIN:  Object to the
17     form.
18         A.    I -- I don't know what's --
19     3AC's thoughts were.
20         Q.    Okay.
21             When those assets were sold on
22     June 12th and 13th and 14th, what happened
23     to the proceeds generated?
24         A.    The proceeds stayed within the
25     account.

Page 209

1
2          Q.    What does that mean, they stayed
3      within the account?
4          A.    So, if -- can I give you a
5      conceptual answer?
6          Q.    Yes.
7          A.    So, if I sell one bitcoin for
8      $50,000, that bitcoin leaves my account
9      and $50,000 come in.
10         Q.    So where is there a document
11     that indicates the proceeds from these
12     asset sales on this list entering 3AC's
13     account?
14         A.    The -- the value of the proceeds
15     would be coming out of the document number
16     2 fills data provided and then the
17     balance, net of anything else that
18     happened that day, would be in the ending
19     balance for that day and doc 38.
20             So using my example, if I had a
21     minus hundred dollar USD balance at the
22     beginning of the day and nothing else
23     happened and I sold that one bitcoin, I
24     would have a negative $50,000 balance in
25     that account.

MAGNA
LEGAL SERVICES

1
2      Q.   So the proceeds are -- were --
3   were used to reduce the negative US dollar
4   balance in 3AC's account.  Is that right?
5      A.   That's right.
6      Q.   And the amounts reflected in the
7   negative US dollar balance were amounts
8   owed to other FTX customers, right?
9      A.   That's right.
10     Q.   Were -- was money transferred to
11  those other customers' accounts?
12     A.   Those customers would see their
13  lend position when it's paid back be
14  closed, or reduced.
15     Q.   Are they getting some positive
16  credit for as a result of that?
17     A.   In the lend program, you would
18  receive interest for what you lent and
19  then when the borrow repaid, that would
20  close out a portion or all of the --
21  lend.
22     Q.   So these -- the proceeds from
23  the asset sales between June 12th and June
24  14th closed out and repaid loans made by
25  other FTX customers?

1
2      A.   That's my understanding.
3      Q.   Which FTX customers had lent
4   money to 3AC as of June 12th?
5      A.   I have not seen the other side
6   of 3AC's borrows -- their borrows.
7      Q.   Would 3AC have any way of
8   knowing what user in FTX's view lent money
9   to it?
10     A.   No, and it could be multiple
11  users.
12     Q.   Does FTX have a document that
13  shows which users lent money to 3AC as of
14  June 12th, 2022?
15     A.   I'm not certain.
16     Q.   In the -- the way the lending
17  program works, do the lending users lend
18  money to a particular user?
19     A.   No.
20     Q.   So there -- if I understand,
21  there is no particular user who lent money
22  to 3AC?
23     A.   Not to my knowledge.
24     Q.   So, when the proceeds went
25  into -- the proceeds from the sales of

1
2   assets between June 12th and June 14th
3   were generated, what FTX users' lending
4   positions were paid off?
5      A.   It would be whoever held that
6   portion of the lend at that point in time.
7      Q.   But there is no particular user
8   who held that portion of the 3AC lend,
9   right?
10     A.   It would go to -- a particular
11  user would have a portion of their lend,
12  but there's -- they would -- there's --
13  they would just put their money out and
14  then their lend program would, if someone
15  borrowed, they would start to have -- see
16  that as a lend and earn interest and when
17  either side closed that transaction, it
18  would -- the -- the cash would be credited
19  back to their account.
20     Q.   I think we may be going in
21  circles.
22          Who is the particular user or
23  users who lent money to Three Arrows?
24     A.   It would be the other customers
25  on the exchange.

1
2      Q.   All of them?
3      A.   Those that have selected the
4   ability for their funds to be lent.
5      Q.   Every single user who
6   participated in the ability to loan money
7   lent money to Three Arrows?
8      A.   Theoretically.
9      Q.   And so there's no one particular
10  or set number of users who made that loan;
11  it was every single user, if I understand
12  the debtors' position?
13     A.   The -- the exchange would
14  determine, based upon who was lending --
15  who was offering lending at that point in
16  time, at what interest rate they were
17  lending at, and then it would
18  automatically select lend offers for your
19  borrow.  There -- in that public document,
20  there is an example of how that worked.
21     Q.   So there are particular users
22  that lend money to Three Arrows; is that
23  right?
24     A.   Yes.
25     Q.   Okay.  I just want to make sure

**MAGNA** ▶
LEGAL SERVICES

Page 258

```
 1
 2        INSTRUCTIONS TO WITNESS
 3
 4        Please read your deposition over
 5   carefully and make any necessary
 6   corrections.  You should state the
 7   reason in the appropriate space on the
 8   errata sheet for any corrections that
 9   are made.
10        After doing so, please sign the
11   errata sheet and date it.  It will be
12   attached to your deposition.
13        It is imperative that you return
14   the original errata sheet to the
15   deposing attorney within thirty (30)
16   days of receipt of the deposition
17   transcript by you.  If you fail to do
18   so, the deposition transcript may be
19   deemed to be accurate and may be used
20   in court.
21
22
23
24
25
```

Page 259

```
 1
 2        A C K N O W L E D G M E N T
 3
 4   STATE OF        )
 5                   :ss
 6   COUNTY OF       )
 7
 8        I, ROBERT GORDON, hereby certify
 9   that I have read the transcript of my
10   testimony taken under oath in my
11   deposition of September 19, 2024; that the
12   transcript is a true and complete record
13   of my testimony, and that the answers on
14   the record as given by me are true and
15   correct.
16
17
18   _____
          ROBERT GORDON
19
20   Signed and subscribed to before me this
21   _____ day of _____, 20__.
22
23   _____
24   Notary Public, State of
25
```

Page 260

```
 1
 2             E R R A T A
 3   PAGE/LINE/   CHANGE  /   REASON
 4      /    /              /
 5   _____/____/_____/_____
 6   _____/____/_____/_____
 7   _____/____/_____/_____
 8   _____/____/_____/_____
 9   _____/____/_____/_____
10   _____/____/_____/_____
11   _____/____/_____/_____
12   _____/____/_____/_____
13   _____/____/_____/_____
14   _____/____/_____/_____
15   _____/____/_____/_____
16   _____/____/_____/_____
17   _____/____/_____/_____
18   _____/____/_____/_____
19   _____/____/_____/_____
20   _____/____/_____/_____
21   _____/____/_____/_____
22   _____/____/_____/_____
23   _____/____/_____/_____
24   _____/____/_____/_____
25   _____/____/_____/_____
```

Page 261

```
 1
 2        C E R T I F I C A T E
 3        I, MARIE FOLEY, Registered Merit
 4   Reporter, Certified Realtime Reporter, and
 5   Notary Public for the State of New York,
 6   do hereby certify that prior to the
 7   commencement of the examination, ROBERT
 8   GORDON, was duly sworn by me to testify to
 9   the truth, the whole truth and nothing but
10   the truth.
11        I DO FURTHER CERTIFY that the foregoing
12   is a verbatim transcript of the testimony
13   as taken stenographically by me at the time,
14   place and on the date hereinbefore set forth,
15   to the best of my ability.
16        I DO FURTHER CERTIFY that I am neither
17   a relative nor employee nor attorney nor
18   counsel of any of the parties to this action,
19   and that I am neither a relative nor employee
20   of such attorney or counsel, and that I am
21   not financially interested in the action.
22   _____
     COURT REPORTER
23   Registered Merit Reporter
     Certified Realtime Reporter
24   Notary Public
     Dated: September 21, 2024
25
```

**MAGNA** ▶
LEGAL SERVICES

**66  (Pages 258 to 261)**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

### ERRATA SHEET OF ROBERT GORDON

I, Robert Gordon, have reviewed the transcript of my deposition taken on September 19, 2024 in the above-referenced action, and certify that the same appears to be a correct transcript of the answers given by me to the questions therein propounded, except for the following corrections or changes in the errata below:

| Page | Line(s) | Change | Reason |
|---|---|---|---|
| 23 | 12 | Change "of" to "with" | Transcription Error |
| 18 | 25 | Change "Carney" to "Kearney" | Spelling |
| 26 | 25 | Change "exists" to "exist" | Clarification |
| 29 | 11 | Change "right" to "correct" | Transcription Error |
| 32 | 18 | Change "between" to "approximately between" | Transcription Error |
| 34 | 19-20 | Change "perform -- performed by" to "performed by" | Clarification |
| 35 | 14-17 | Change "by the -- they were sold in the account, but out -- there's -- there's no communication of what, other than that the -- a sell order" to "in the account, but there's no | Clarification |

---

[1]  The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

| | | communication other than that a sell order" | |
|---|---|---|---|
| 35 | 21-23 | Change "the user of three -- the main -- or, sub -- main account for -- that's tied to the -- Kyle" to "the user of the main account that's tied to Kyle" | Clarification |
| 36 | 9-12 | Change "the sales were put through on that -- put through by that -- on that -- that use -- on -- by that user" to "the sales were put through by that user" | Clarification |
| 37 | 12-14 | Change "sales are -- are entered under standard -- under standard sale terms" to "sales were entered under standard sale terms" | Clarification |
| 38 | 17 | Change "exhibits." to "exhibits --" | Transcription Error |
| 38 | 20 | Change "And we" to "-- and we" | Transcription Error |
| 38 | 21 | Change "documents" to "the documents" | Transcription Error |
| 40 | 3 | Change "you've just been" to "you were just" | Transcription Error |
| 44 | 15 | Change "data" to "date of" | Transcription Error |
| 47 | 17 | Change "well" to "as well" | Transcription Error |
| 49 | 3 | Change "meeting" to "team meeting" | Transcription Error |
| 49 | 11 | Change "Lu" to "Liu" | Transcription Error |
| 51 | 20 | Change "ER" to "are" | Transcription Error |
| 57 | 14 | Change "debtor" to "debtors" | Clarification |
| 64 | 12 | Change "Ryan" to "Ryne" | Clarification |
| 67 | 12 | Change "question" to "question before you respond" | Transcription Error |
| 73 | 11 | Change "SOLs" to "SOALs" | Transcription Error |
| 75 | 19 | Change "knowledge" to "role" | Transcription Error |
| 77 | 16 | Change "going to instruct him" to "instructing him not to answer" | Transcription Error |
| 77 | 18 | Change "for" to "or" | Transcription Error |
| 78 | 12 | Change "to" to "to him about" | Transcription Error |
| 78 | 13 | Change "ask" to "talk to" | Transcription Error |
| 88 | 16 | Change "the" to "their" | Transcription Error |
| 97 | 6 | Change "negative US dollar" to "US negative dollar" | Transcription Error |
| 102 | 21 | Change "Here where to" to "In order to" | Transcription Error |
| 106 | 19 | Change "occurred" to "incurred" | Transcription Error |

| 106 | 21 | Change "occurred" to "incurred" | Transcription Error |
|---|---|---|---|
| 108 | 9 | Change "was" to "is" | Transcription Error |
| 114 | 9 | Change "a" to "the" | Transcription Error |
| 122 | 9 | Change "This here" to "There" | Transcription Error |
| 122 | 19 | Change "under" to "under it" | Transcription Error |
| 136 | 2 | Change "to" to "related to" | Transcription Error |
| 138 | 20 | Change "We looked" to "I think we looked" | Transcription Error |
| 138 | 25 | Change "Liquidate" to "Liquidation" | Transcription Error |
| 147 | 21 | Change "USD bitcoin" to "bitcoin" | Transcription Error |
| 148 | 18 | Change "Section" to "Schedule" | Transcription Error |
| 149 | 13 | Change "platform as" to "platform's" | Transcription Error |
| 154 | 25 | Change "paragraph" to "page" | Transcription Error |
| 155 | 4 | Change "come" to "comes" | Transcription Error |
| 159 | 13 | Change "ETC" to "UTC" | Transcription Error |
| 165 | 25 | Change "undated" to "is undated" | Transcription Error |
| 166 | 6 | Change "were" to "that were" | Transcription Error |
| 166 | 19 | Change "is" to "is this" | Transcription Error |
| 170 | 4 | Change "assets" to "assets listed" | Transcription Error |
| 171 | 3-4 | Change "That was provided in" to "The Debtors provided" | Transcription Error |
| 171 | 25 | Change "Pacific" to "specific" | Transcription Error |
| 172 | 10 | Change "by" to "in wallets" | Transcription Error |
| 172 | 10-11 | Change "under control" to "owned and controlled" | Transcription Error |
| 172 | 11 | Change "were accordingly" to "accordingly" | Transcription Error |
| 173 | 17 | Change "Don't" to "Please don't" | Transcription Error |
| 174 | 24 | Change "own" to "owned" | Transcription Error |
| 176 | 2 | Change "establish" to "establishes" | Clarification |
| 187 | 9-13 | Change "The governing docket – or, the -- our view the governing document" to "Our view is that the governing document" | Clarification |
| 190 | 15 | Change "we" to "it'd be" | Transcription Error |
| 192 | 2 | Change "hem" to "him" | Transcription Error |
| 194 | 7 | Change "what we're doing" to "where we're going" | Transcription Error |
| 196 | 19 | Change "per" to "for" | Transcription Error |
| 196 | 23 | Change "2013" to 13th | Clarification |
| 196 | 23 | Change "2012" to 12th | Clarification |
| 198 | 12 | Change "daily" to "detail" | Transcription Error |
| 206 | 15 | Change "where it's" to "was" | Transcription Error |

3

| 209 | 19 | Change "doc" to "document" | Transcription Error |
| 209 | 21 | Change "hundred" to "hundred thousand" | Transcription Error |
| 210 | 19 | Change "borrow" to "borrower" | Transcription Error |
| 211 | 20 | Change "understand" to "understand correctly" | Transcription Error |
| 212 | 16 | Change "when" to "then when" | Transcription Error |
| 214 | 12 | Change "in market" to "in the market" | Transcription Error |
| 216 | 21 | Change "that" to "what that" | Transcription Error |
| 217 | 6 | Change "would" to "it would" | Transcription Error |
| 217 | 10 | Change "This" to "That" | Transcription Error |
| 219 | 24 | Change "time" to "some time" | Transcription Error |
| 222 | 5 | Change "form" to "the form" | Transcription Error |
| 222 | 16 | Change "debtor" to "debtors" | Transcription Error |
| 225 | 4 | Change "you count" to "your account" | Transcription Error |
| 226 | 18 | Change "Richard's" to "Richard Chang's" | Transcription Error |
| 227 | 17 | Change "the" to "there's a" | Transcription Error |
| 231 | 6 | Change "market" to "markets" | Transcription Error |
| 233 | 2 | Change "is what came up in" to "would have been within" | Transcription Error |
| 233 | 4 | Change "documents" to "documents just because they're referenced" | Transcription Error |
| 233 | 6 | Change "It's quoting" to "I mean it's quoting" | Transcription Error |
| 234 | 7 | Change "letter/line" to "line/letter" | Transcription Error |
| 236 | 19 | Change "in" to "from" | Transcription Error |
| 237 | 12 | Change "automated" to "automated collateral" | Transcription Error |
| 237 | 22 | Change "creditor" to "credit for" | Transcription Error |
| 238 | 14 | Change "collateral" to "collateral conversion" | Transcription Error |
| 238 | 15 | Change "raises" to "raise" | Transcription Error |
| 240 | 7 | Change "managed" to "knows" | Transcription Error |
| 244 | 5 | Change "AC's" to "3AC's" | Transcription Error |
| 244 | 8 | Change "form" to "the form" | Transcription Error |
| 246 | 12 | Change "million" to "millions" | Transcription Error |
| 247 | 11 | Change "for" to "of" | Transcription Error |
| 249 | 6 | Change "500" to "500 million" | Transcription Error |
| 249 | 19 | Change "pay" to "peg" | Transcription Error |
| 249 | 7 | Change "twap" to "swap" | Transcription Error |
| 250 | 9 | Change "which" to "in which" | Transcription Error |

| 251 | 12 | Change "are" to "would've been" | Transcription Error |
| 251 | 14 | Change "public" to "the public" | Transcription Error |
| 251 | 20 | Change "sale" to "the sale" | Transcription Error |
| 253 | 8 | Change "resolution" to "row limit" | Transcription Error |
| 253 | 10 | Change "sort of" to "start to" | Transcription Error |
| 253 | 11 | Change "that are" to "over" | Transcription Error |
| 253 | 11 | Change "res" to "rows" | Transcription Error |
| 253 | 17 | Change "cull" to "pull" | Transcription Error |
| 255 | 21 | Change "the" to "from the" | Transcription Error |
| 256 | 16 | Change "with" to "without" | Clarification |

Dated: October 22, 2024

_Robert E. Gordon_

Robert Gordon

State of _Texas_   County of _Travis_
Subscribed and sworn before me on _10/23/24_
(Date)

_____
(Notary Signature)

CRISTIAN BUSTOS GARDUNO
Notary ID #135022669
My Commission Expires
August 6, 2028

5

# Exhibit 9

…

…

| Manage articles | Moderate content | Arrange content | Customize design | User permissions | Settings |

©Zendesk

Add

Help Center

Back

American English 

# Complete Futures Specs

Apr 11, 2022, 10:53:54 AM

*As the terms of service make clear, manipulative behavior is not tolerated on FTX. Any attempts to do so may result in account termination at FTX's sole discretion.*

## Indices

**Market price:** median of last, best bid, best offer

**Mark price [MP]:** market price of futures if future is not paused, otherwise index price + last premium

**Index: All elements of each index are equally weighted.**

**See here for index weights.**

**Index price [index]:** Market price of index.

**Premium:** MP - index

Indices are fetched every 5 seconds

## Expiration

The dated futures expire on the last Friday of every quarter to a 1 hour TWAP of the underlying index from 2am UTC to 3am UTC.

Shortly after expiration, each futures position will be marked to the expiration price of the contract.  All realized and unrealized PnL on quarterly futures will turn into collateral at this point.

For instance, say that you deposited $10,000 of collateral and used it to buy 10 BTC quarterly futures.  Say that prior to expiration your account had 10 BT quarterly futures with a realized PnL of $1,000, an unrealized PnL of $100, and a mark price of $5,000 for the BTC index.  If the average price of the BTC index over the expiration period (2am to 3am UTC) was $5,010, then after expiration ended your account would have:

USD collateral: $10,000 (old collateral) + $1,000 (realized PnL) + $100 (unrealized PnL) + 10 (number of BTC futures) * ($5,010 - $5,000) (difference between expiration and previous mark price) = $11,200

BTC quarterly futures: 0

Realized PnL: 0

Unrealized PnL: 0

## Funding payments

Every hour, each perpetual contract has a funding payment where longs pay shorts if perpetual is trading at a premium to the index, and shorts pay long:

Confidential

FTX_3AC_000045026

trading at a discount to the index. This funding payment is equal to TWAP ((Future - Index ) / Index) / 24. This payment is added/deducted to your account's USD balance.

You can find historical funding rates here.

## Contract specifications

See here for contract specifications.

## Accounts

**Position notional:** position size * MP

**IMF Factor:** multiplier on the margin required for a coin.

**Base IMF:** the minimum initial margin fraction needed.  This is 1 / maximum leverage.

**Position initial margin fraction:** max(Base IMF, IMF factor * sqrt(position open size))

**Position maintenance margin fraction:** max(3%, 0.6 * position initial margin fraction)

**Position unrealized PNL:**  size * (future mark price – position entry price)

**Collateral:** See here for more details.

**Free collateral**: amount of USD that can be withdrawn from exchange, =min(collateral, collateral + unrealized PNL) - [amount of collateral tied up in open orders]

**Total account value:** collateral + unrealized pnl

**Total position notional:** sum of abs(position notional) across all positions + sum of margin borrows

**Margin fraction [MF]:** total account value / total position notional

**Maintenance Margin Fraction Requirement [MMF]:** the minimum MF needed to avoid getting liquidated, equal to average of position MMF weighed position notional

**Auto Close Margin Fraction [ACMF]:** the minimum MF needed to avoid getting closed against the backstop liquidity provider or other users, = max (MMF / 2, MMF - 0.06)

**Zero Price (ZP):** MP * (1 - MF) if long, MP * (1 + MF) if short.  The mark price that would set an account's total account value to 0.

**Liquidation Distance:** % move in futures that would make MF = MMF.

**Position open size:** Max(abs(size if all buy orders get filled), abs(size if all sell orders get filled))

**Position open notional:** position open size * MP

**Total open position notional:** sum of abs(position open notional) across all positions

**Open margin fraction [OMF]:** min(total account value, collateral) / total open position notional

**Initial Margin Fraction Requirement [IMF]:** the minimum OMF needed to increase position size, equal to average of position IMF for all account positions weighed by position open notional

**Unused collateral:** max(OMF - IMF, 0) * total open position notional

**Backstop Liquidity Provider [BLP]:** an account that promises to take on liquidating accounts' positions

## Orders

### Order Limits

1.  Can't send orders more than 2% (for futures markets) or 25% (for spot markets) through opposite side of the book

FTX_3AC_000045027

1. Orders too far through the book get their prices capped at the limit price
2. Market orders have the same price cap applied -- this means that it's possible to get partially filled on a market order if liquidity is low relative the size of the order
2. Sum of open order sizes per side can't be greater than max($1m, 1% of an ADV of the underlying coin)
3. Can't increase position if OMF < IMF after the order is placed
4. Can't send any orders (including orders that would decrease position) if account is below MMF

## Price Bands

1. FTX also has price bands.  Users can't send orders if either:
   1. Price is more than:
      - 10% from the mean MP over the past 5 minutes if the futures' underlying is one of BTC, ETH, USDT, EOS, BCH, XRP, BNB, BSV, LEO, TRX, or AL
      - 20% from the mean MP over the past 5 minutes otherwise
   2. Absolute value of premium is more than 5% above the absolute value of the mean premium over the past 5 minutes

ADV: 30-day volume / 30 24h before the contract first trades

## Minimum Size

Minimum BTC-PERP Trade Size:

The minimum provide (maker) size for BTC-Perp is 0.01, this **only applies** when you make more than 10 orders per hour smaller than 0.01.

Limit orders sent that are larger than the market's quantity step but smaller than its minimum provide size are automatically turned into IOC orders.

This restriction is only applied at placement time, and only for the first 10 orders per hour (rolling). If a limit order is successfully placed, and then gets partially filled such that some amount under the minimum provide size is left, then that order remains out; the rest doesn't get cancelled.

If an account has a position whose size is smaller than the minimum provide size, reduce-only limit orders will still be rounded down to that size and successfully placed.

## PNL

Fills modify position sizes and cost. Fills only affect unrealized pnl, not realized pnl.

Position entry price = cost / size

**Unrealized pnl:** position size * mark price - cost

Every 30 seconds, all unrealized pnl turn into realized pnl if there are no accounts being auto-closed

(specifically, account collateral is modified by unrealized pnl and entry price is set to mark price)

FTX uses standard futures rather than inverted futures.  This means that ultimately you can calculate your final PnL from quarterly futures, assuming no liquidations, as: PnL = Number of Futures  * (exit price - entry price). So for instance if you bought 15 BTC futures at $5,000 and sold all 15 at $6,000, your USD collateral will increase by $15,000.  If you hold a position until expiration you can treat the expiration price of the contract as your exit price.

Note that if you put on a position in a perpetual future, your PnL will be increased/decreased by the total funding payments you pay while holding the position. Each hour, there is a funding payment from longs to shorts or vice versa of position notional * TWAP of ((future mark price – index) / index) / 24

Each hour there is a funding payment dependent on whether the perpetual is trading at a premium (longs pay shorts) or at a discount (shorts pay longs). The funding payment is calculated by position size * TWAP of ((future mark price – index) / index) / 24.

## Margin

Margin is posted in 'USD' in your wallet. USD can be funded by depositing TUSD, USDP, USDC, BUSD, and HUSD.

Each subaccount has one central collateral wallet and uses cross margining for the account. Each subaccount has separate margin and collateral from other subaccounts.

An account can only increase its position as long as its Margin Fraction is above its Initial Margin Fraction. For small positions, this means that the Margin Fraction must be at least 5%, meaning that accounts can only initialize positions to a maximum of 20x leverage. As your position size increases, so does your Initial Margin Fraction.

If you Margin Fraction falls below your Maintenance Margin Fraction, your account will begin to get liquidated.

## Non-USD Collateral:

**By default, collateral is posted in USD and pnl is paid out in USD.**

See Non-USD Collateral for more details.

## Liquidations

See here for more details.

FTX has a three step liquidation process.

Step 1:

An account begins to get liquidated if its margin fraction is less than its maintenance margin. So if its maintenance margin fraction is 3% then it would begin to get liquidated once it became 33x leveraged.

The liquidation engine will then periodically send orders in the market to close down the account's position. The goal of the liquidation engine is to carefully close down positions in the market while minimizing impact, keeping markets orderly. The liquidation engine just sends standard limit orders o behalf of the account getting liquidated.

The speed of the liquidation will depend on the position size but for small positions it will aim to fully close down the position in about one minute. If partially liquidating the account causes its leverage to drop back below the threshold, the liquidation will end.

Step 2:

If account falls even closer to bankruptcy, the backstop liquidity provider system will kick in. This happens if the account's margin drops below the auto-close margin fraction. So if the auto-close margin fraction is 2%, then if the account becomes 50x leveraged, the account will begin to close down again the backstop liquidity providers.

When an account is getting auto-closed, it will have its position closed down at the bankruptcy price, and backstop liquidity providers will take over the position. A portion of the remaining collateral goes to the backstop liquidity fund.

Step 3:

If an account does go bankrupt, the backstop liquidity fund will pay out to bring the account's balance back to 0.

The more technical explanation:

If the account's margin fraction is less than maintenance margin but above auto-close margin fraction, then:

Approximately every 6 seconds, we send 10% of the position size as a order on the market, between 1 and 5 basis points through the book, with the

FTX_3AC_000045029

constraint that the total sizes of liquidation orders is less than 0.0001 times the average daily volume of the underlying coin summed across all liquidatin positions.

Specifically:

1. Every second, for each future, with probability ⅙:
   1. Set order size to 10% of position size
   2. Bound order notional from below by min($1000, position size)
   3. Bound order size from above by max liquidation size remaining
   4. Multiply order size by uniform(0.5, 1.5)
   5. Bound order size from above by position size
   6. Decrease max liquidation size remaining by order size
   7. Send order uniform(1bp, 5bp) through the book, expiring 1 second later
   1. Set max liquidation size remaining to 0.0001 times the underlying ADV (note: this is a global max shared between all accounts)
   2. For each account whose margin fraction is between maintenance margin and auto-close margin fraction, in random order:

If the account's margin fraction is less than auto-close margin fraction, then:

Every second, auto-close (1 - margin fraction / auto-close margin fraction) * position size, bounded below by min($1000, position size). If margin fraction < 0, auto-close the entire position.

BLPs have a max capacity per minute and per hour.  Position is closed against BLPs in proportion to remaining capacity.  If BLP total capacity is insufficier the remaining size is closed against users with large opposing positions (starting with the top 10 opposing positions, more if their total is insufficient), in proportion to their position sizes.

Liquidated account closes at ZP.  The BLP takes over the position at ⅔ * ZP + ⅓ * MP, but not worse than MP plus MP * 10% * auto-close margin fraction. backstop liquidity fund covers the rest--i.e. it gets ⅓*abs(MP-ZP) if the account isn't yet bankrupt, and pays abs(MP-ZP) + 0.1 * MP * ACMF if it is.  If account is bankrupt and backstop liquidity fund is empty, the remaining is taken from positions with positive unrealized pnl (proportionally to pnl).

If a contract hits a circuit breaker, MP is the premium as of when the circuit breaker was enacted plus current index price.

## Withdrawals

Withdrawals can be made if open margin fraction after the withdrawal > total initial margin fraction.

See here for more information about deposits and withdrawals.

Daily withdrawal limit: for highest tier verified accounts, there is no withdrawal limit.  For other accounts, see here.

_____

Restore

☑ Show changes



FTX_3AC_000045030

PublishedAug 15, 2022, 4:58:42 PMFTX Crypto Derivatives Exchange



PublishedAug 1, 2022, 3:12:51 PMFTX Crypto Derivatives Exchange



Body updatedAug 1, 2022, 3:12:50 PMFTX Crypto Derivatives Exchange



PublishedJun 29, 2022, 2:54:12 PMFTX Crypto Derivatives Exchange



Body updatedJun 29, 2022, 2:54:10 PMFTX Crypto Derivatives Exchange



PublishedJun 27, 2022, 6:14:02 PMFTX Crypto Derivatives Exchange



Body updatedJun 27, 2022, 6:14:02 PMFTX Crypto Derivatives Exchange



PublishedJun 27, 2022, 6:13:21 PMFTX Crypto Derivatives Exchange



Body updatedJun 27, 2022, 6:13:21 PMFTX Crypto Derivatives Exchange

FTX_3AC_000045031



PublishedJun 24, 2022, 1:03:25 AMFTX Crypto Derivatives Exchange



Body updatedJun 24, 2022, 1:03:24 AMFTX Crypto Derivatives Exchange



PublishedJun 20, 2022, 6:23:22 PMFTX Crypto Derivatives Exchange



Body updatedJun 20, 2022, 6:23:21 PMFTX Crypto Derivatives Exchange



PublishedJun 20, 2022, 5:28:02 PMFTX Crypto Derivatives Exchange



Body updatedJun 20, 2022, 5:28:02 PMFTX Crypto Derivatives Exchange



PublishedJun 20, 2022, 4:37:21 PMFTX Crypto Derivatives Exchange



Body updatedJun 20, 2022, 4:37:21 PMFTX Crypto Derivatives Exchange



FTX_3AC_000045032

PublishedJun 20, 2022, 3:36:51 PMFTX Crypto Derivatives Exchange



Body updatedJun 20, 2022, 3:36:51 PMFTX Crypto Derivatives Exchange



PublishedJun 20, 2022, 1:31:43 PMFTX Crypto Derivatives Exchange



Body updatedJun 20, 2022, 1:31:42 PMFTX Crypto Derivatives Exchange



PublishedApr 11, 2022, 10:53:54 AMFTX Crypto Derivatives Exchange



Body updatedApr 11, 2022, 10:53:52 AMFTX Crypto Derivatives Exchange



PublishedApr 11, 2022, 10:43:59 AMFTX Crypto Derivatives Exchange



Body updatedApr 11, 2022, 10:43:56 AMFTX Crypto Derivatives Exchange



PublishedJan 19, 2022, 2:17:23 AMFTX Crypto Derivatives Exchange

FTX_3AC_000045033



Body updatedJan 19, 2022, 2:17:19 AMFTX Crypto Derivatives Exchange



PublishedJan 4, 2022, 1:56:01 AMFTX Crypto Derivatives Exchange



PublishedDec 3, 2021, 3:00:03 PMFTX Crypto Derivatives Exchange



Body updatedDec 3, 2021, 3:00:01 PMFTX Crypto Derivatives Exchange



PublishedNov 26, 2021, 3:41:28 PMFTX Crypto Derivatives Exchange



Body updatedNov 26, 2021, 3:41:27 PMFTX Crypto Derivatives Exchange



PublishedOct 26, 2021, 4:42:03 AMFTX Crypto Derivatives Exchange



Body updatedOct 26, 2021, 4:42:01 AMFTX Crypto Derivatives Exchange



FTX_3AC_000045034

PublishedOct 15, 2021, 6:25:50 PMFTX Crypto Derivatives Exchange



Body updatedOct 15, 2021, 6:25:49 PMFTX Crypto Derivatives Exchange



PublishedSep 10, 2021, 3:25:52 PMFTX Crypto Derivatives Exchange



Body updatedSep 10, 2021, 3:25:50 PMFTX Crypto Derivatives Exchange



PublishedSep 1, 2021, 2:48:10 PMFTX Crypto Derivatives Exchange



Body updatedSep 1, 2021, 2:48:08 PMFTX Crypto Derivatives Exchange



PublishedAug 26, 2021, 8:27:33 PMFTX Crypto Derivatives Exchange



Body updatedAug 26, 2021, 8:27:30 PMFTX Crypto Derivatives Exchange



PublishedJul 31, 2021, 6:50:35 AMFTX Crypto Derivatives Exchange

FTX_3AC_000045035



Body updatedJul 31, 2021, 6:50:30 AMFTX Crypto Derivatives Exchange



PublishedJul 31, 2021, 6:44:14 AMFTX Crypto Derivatives Exchange



Body updatedJul 31, 2021, 6:44:10 AMFTX Crypto Derivatives Exchange



PublishedJul 30, 2021, 4:21:31 PMFTX Crypto Derivatives Exchange



Body updatedJul 30, 2021, 4:21:29 PMFTX Crypto Derivatives Exchange



PublishedMay 21, 2021, 11:55:06 AMFTX Crypto Derivatives Exchange



Body updatedMay 21, 2021, 11:55:05 AMFTX Crypto Derivatives Exchange



PublishedApr 7, 2021, 11:20:02 AMFTX Crypto Derivatives Exchange



FTX_3AC_000045036

Ready for publishingApr 7, 2021, 11:20:02 AMFTX Crypto Derivatives Exchange



Body updatedApr 7, 2021, 11:20:00 AMFTX Crypto Derivatives Exchange



Submitted for reviewJan 19, 2021, 9:23:59 AMFTX Crypto Derivatives Exchange



Body updatedJan 19, 2021, 9:23:58 AMFTX Crypto Derivatives Exchange



PublishedJan 19, 2021, 6:14:01 AMFTX Crypto Derivatives Exchange



Body updatedJan 19, 2021, 6:14:00 AMFTX Crypto Derivatives Exchange



PublishedJan 19, 2021, 6:13:55 AMFTX Crypto Derivatives Exchange



Body updatedJan 19, 2021, 6:13:53 AMFTX Crypto Derivatives Exchange



Body updatedNov 2, 2020, 10:47:59 AMFTX Crypto Derivatives Exchange

FTX_3AC_000045037



PublishedOct 28, 2020, 7:04:15 PMFTX Crypto Derivatives Exchange



Body updatedOct 28, 2020, 7:03:40 PMFTX Crypto Derivatives Exchange



PublishedOct 13, 2020, 8:29:52 PMFTX Crypto Derivatives Exchange



Body updatedOct 13, 2020, 8:29:52 PMFTX Crypto Derivatives Exchange



PublishedAug 22, 2020, 9:50:47 PMFTX Crypto Derivatives Exchange



Body updatedAug 22, 2020, 9:50:46 PMFTX Crypto Derivatives Exchange



PublishedAug 19, 2020, 5:32:54 PMFTX Crypto Derivatives Exchange



Body updatedAug 19, 2020, 5:32:53 PMFTX Crypto Derivatives Exchange



FTX_3AC_000045038

PublishedJun 30, 2020, 5:06:43 PMFTX Crypto Derivatives Exchange



Body updatedJun 30, 2020, 5:06:41 PMFTX Crypto Derivatives Exchange



PublishedJun 25, 2020, 12:05:42 AMFTX Crypto Derivatives Exchange



Body updatedJun 25, 2020, 12:05:40 AMFTX Crypto Derivatives Exchange



PublishedJun 22, 2020, 5:34:37 AMFTX Crypto Derivatives Exchange



Body updatedJun 22, 2020, 5:34:36 AMFTX Crypto Derivatives Exchange



PublishedJun 18, 2020, 9:21:28 PMFTX Crypto Derivatives Exchange



Body updatedJun 18, 2020, 9:21:26 PMFTX Crypto Derivatives Exchange



PublishedJun 18, 2020, 2:19:11 PMFTX Crypto Derivatives Exchange

FTX_3AC_000045039



Body updatedJun 18, 2020, 2:19:09 PMFTX Crypto Derivatives Exchange



PublishedJun 15, 2020, 6:01:44 AMFTX Crypto Derivatives Exchange



Body updatedJun 15, 2020, 6:01:43 AMFTX Crypto Derivatives Exchange



PublishedJun 11, 2020, 11:10:57 PMFTX Crypto Derivatives Exchange



Body updatedJun 11, 2020, 11:10:55 PMFTX Crypto Derivatives Exchange



PublishedMay 26, 2020, 1:34:39 PMFTX Crypto Derivatives Exchange



Body updatedMay 26, 2020, 1:34:36 PMFTX Crypto Derivatives Exchange



PublishedMay 21, 2020, 11:42:16 PMFTX Crypto Derivatives Exchange



FTX_3AC_000045040

Body updatedMay 21, 2020, 11:42:15 PMFTX Crypto Derivatives Exchange



PublishedMay 10, 2020, 9:40:07 PMFTX Crypto Derivatives Exchange



Body updatedMay 10, 2020, 9:40:06 PMFTX Crypto Derivatives Exchange



PublishedMay 10, 2020, 5:18:05 AMFTX Crypto Derivatives Exchange



Body updatedMay 10, 2020, 5:18:03 AMFTX Crypto Derivatives Exchange



PublishedMay 7, 2020, 1:14:41 PMFTX Crypto Derivatives Exchange



Body updatedMay 7, 2020, 1:14:39 PMFTX Crypto Derivatives Exchange



PublishedMay 6, 2020, 11:01:13 PMFTX Crypto Derivatives Exchange



PublishedMay 1, 2020, 1:51:17 PMFTX Crypto Derivatives Exchange

FTX_3AC_000045041



Body updatedMay 1, 2020, 1:50:56 PMFTX Crypto Derivatives Exchange



PublishedApr 7, 2020, 4:30:25 AMFTX Crypto Derivatives Exchange



Body updatedApr 7, 2020, 4:30:24 AMFTX Crypto Derivatives Exchange



PublishedApr 7, 2020, 1:16:43 AMFTX Crypto Derivatives Exchange



Body updatedApr 7, 2020, 1:16:42 AMFTX Crypto Derivatives Exchange



PublishedMar 31, 2020, 6:58:51 AMFTX Crypto Derivatives Exchange



Body updatedMar 31, 2020, 6:58:50 AMFTX Crypto Derivatives Exchange



PublishedMar 29, 2020, 5:41:54 PMFTX Crypto Derivatives Exchange



FTX_3AC_000045042

Body updatedMar 29, 2020, 5:41:52 PMFTX Crypto Derivatives Exchange



PublishedMar 29, 2020, 4:20:18 PMFTX Crypto Derivatives Exchange



Body updatedMar 29, 2020, 4:20:16 PMFTX Crypto Derivatives Exchange



PublishedMar 28, 2020, 6:05:48 AMFTX Crypto Derivatives Exchange



Body updatedMar 28, 2020, 6:05:45 AMFTX Crypto Derivatives Exchange



PublishedMar 28, 2020, 5:50:16 AMFTX Crypto Derivatives Exchange



Body updatedMar 28, 2020, 5:50:14 AMFTX Crypto Derivatives Exchange



PublishedMar 27, 2020, 5:19:32 AMFTX Crypto Derivatives Exchange



Body updatedMar 27, 2020, 5:19:32 AMFTX Crypto Derivatives Exchange

FTX_3AC_000045043



PublishedMar 27, 2020, 5:08:53 AMFTX Crypto Derivatives Exchange



Body updatedMar 27, 2020, 5:08:53 AMFTX Crypto Derivatives Exchange



PublishedMar 27, 2020, 4:50:47 AMFTX Crypto Derivatives Exchange



Body updatedMar 27, 2020, 4:50:46 AMFTX Crypto Derivatives Exchange



PublishedMar 27, 2020, 4:49:53 AMFTX Crypto Derivatives Exchange



Body updatedMar 27, 2020, 4:49:51 AMFTX Crypto Derivatives Exchange



PublishedMar 27, 2020, 3:39:05 AMFTX Crypto Derivatives Exchange



Body updatedMar 27, 2020, 3:39:02 AMFTX Crypto Derivatives Exchange



FTX_3AC_000045044

PublishedMar 27, 2020, 2:33:02 AMFTX Crypto Derivatives Exchange



Body updatedMar 27, 2020, 2:33:00 AMFTX Crypto Derivatives Exchange



PublishedMar 15, 2020, 11:18:40 PMFTX Crypto Derivatives Exchange



Body updatedMar 15, 2020, 11:18:37 PMFTX Crypto Derivatives Exchange



PublishedMar 15, 2020, 1:48:51 PMFTX Crypto Derivatives Exchange



Body updatedMar 15, 2020, 1:48:49 PMFTX Crypto Derivatives Exchange



PublishedMar 11, 2020, 8:02:52 AMFTX Crypto Derivatives Exchange



Body updatedMar 11, 2020, 8:02:50 AMFTX Crypto Derivatives Exchange



PublishedMar 11, 2020, 8:02:40 AMFTX Crypto Derivatives Exchange

FTX_3AC_000045045



Body updatedMar 11, 2020, 8:02:38 AMFTX Crypto Derivatives Exchange



PublishedMar 11, 2020, 7:55:28 AMFTX Crypto Derivatives Exchange



Body updatedMar 11, 2020, 7:55:27 AMFTX Crypto Derivatives Exchange



PublishedMar 11, 2020, 7:38:06 AMFTX Crypto Derivatives Exchange



Body updatedMar 11, 2020, 7:37:26 AMFTX Crypto Derivatives Exchange



PublishedMar 7, 2020, 12:22:52 PMFTX Crypto Derivatives Exchange



Body updatedMar 7, 2020, 12:22:50 PMFTX Crypto Derivatives Exchange



PublishedMar 6, 2020, 6:36:41 AMFTX Crypto Derivatives Exchange



FTX_3AC_000045046

Body updatedMar 6, 2020, 6:36:34 AMFTX Crypto Derivatives Exchange



PublishedMar 6, 2020, 5:43:53 AMFTX Crypto Derivatives Exchange



Body updatedMar 6, 2020, 5:43:51 AMFTX Crypto Derivatives Exchange



PublishedMar 2, 2020, 4:14:36 AMFTX Crypto Derivatives Exchange



Body updatedMar 2, 2020, 4:14:35 AMFTX Crypto Derivatives Exchange



PublishedFeb 19, 2020, 11:53:07 PMFTX Crypto Derivatives Exchange



Body updatedFeb 19, 2020, 11:53:05 PMFTX Crypto Derivatives Exchange



PublishedFeb 14, 2020, 9:16:59 AMFTX Crypto Derivatives Exchange



Body updatedFeb 14, 2020, 9:16:57 AMFTX Crypto Derivatives Exchange

FTX_3AC_000045047



PublishedFeb 13, 2020, 9:59:20 AMFTX Crypto Derivatives Exchange



Body updatedFeb 13, 2020, 9:59:19 AMFTX Crypto Derivatives Exchange



PublishedFeb 13, 2020, 9:55:55 AMFTX Crypto Derivatives Exchange



Body updatedFeb 13, 2020, 9:55:54 AMFTX Crypto Derivatives Exchange



PublishedFeb 13, 2020, 9:54:36 AMFTX Crypto Derivatives Exchange



Body updatedFeb 13, 2020, 9:54:35 AMFTX Crypto Derivatives Exchange



PublishedFeb 13, 2020, 9:52:48 AMFTX Crypto Derivatives Exchange



Body updatedFeb 13, 2020, 9:52:47 AMFTX Crypto Derivatives Exchange



FTX_3AC_000045048

PublishedFeb 13, 2020, 8:32:10 AMFTX Crypto Derivatives Exchange



Body updatedFeb 13, 2020, 8:32:08 AMFTX Crypto Derivatives Exchange



PublishedFeb 10, 2020, 3:43:10 PMFTX Crypto Derivatives Exchange



Body updatedFeb 10, 2020, 3:43:07 PMFTX Crypto Derivatives Exchange



PublishedFeb 6, 2020, 12:51:48 PMFTX Crypto Derivatives Exchange



Body updatedFeb 6, 2020, 12:51:41 PMFTX Crypto Derivatives Exchange



PublishedFeb 6, 2020, 11:02:16 AMFTX Crypto Derivatives Exchange



Body updatedFeb 6, 2020, 11:02:15 AMFTX Crypto Derivatives Exchange



PublishedFeb 3, 2020, 9:44:04 AMFTX Crypto Derivatives Exchange

FTX_3AC_000045049



Body updatedFeb 3, 2020, 9:44:00 AMFTX Crypto Derivatives Exchange



PublishedFeb 3, 2020, 9:43:40 AMFTX Crypto Derivatives Exchange



Body updatedFeb 3, 2020, 9:43:36 AMFTX Crypto Derivatives Exchange



PublishedJan 14, 2020, 5:45:11 PMFTX Crypto Derivatives Exchange



Body updatedJan 14, 2020, 5:45:10 PMFTX Crypto Derivatives Exchange



PublishedDec 19, 2019, 4:11:38 PMFTX Crypto Derivatives Exchange



Body updatedDec 19, 2019, 4:11:36 PMFTX Crypto Derivatives Exchange



PublishedDec 19, 2019, 4:07:02 PMFTX Crypto Derivatives Exchange



FTX_3AC_000045050

Body updatedDec 19, 2019, 4:07:00 PMFTX Crypto Derivatives Exchange



PublishedDec 17, 2019, 11:17:48 AMFTX Crypto Derivatives Exchange



Body updatedDec 17, 2019, 11:17:47 AMFTX Crypto Derivatives Exchange



PublishedDec 17, 2019, 11:13:00 AMFTX Crypto Derivatives Exchange



Title updatedDec 17, 2019, 11:12:54 AMFTX Crypto Derivatives Exchange



Body updatedDec 17, 2019, 11:12:54 AMFTX Crypto Derivatives Exchange



PublishedDec 13, 2019, 2:39:23 AMFTX Crypto Derivatives Exchange



Body updatedDec 13, 2019, 2:39:18 AMFTX Crypto Derivatives Exchange



PublishedNov 30, 2019, 5:58:43 AMFTX Crypto Derivatives Exchange

FTX_3AC_000045051



Body updatedNov 30, 2019, 5:58:41 AMFTX Crypto Derivatives Exchange



PublishedNov 30, 2019, 5:57:15 AMFTX Crypto Derivatives Exchange



Body updatedNov 30, 2019, 5:57:13 AMFTX Crypto Derivatives Exchange



PublishedNov 29, 2019, 3:50:06 AMFTX Crypto Derivatives Exchange



Body updatedNov 29, 2019, 3:50:05 AMFTX Crypto Derivatives Exchange



PublishedNov 29, 2019, 3:49:45 AMFTX Crypto Derivatives Exchange



Body updatedNov 29, 2019, 3:49:45 AMFTX Crypto Derivatives Exchange



PublishedNov 29, 2019, 3:38:45 AMFTX Crypto Derivatives Exchange



FTX_3AC_000045052

Body updatedNov 29, 2019, 3:35:59 AMFTX Crypto Derivatives Exchange



PublishedNov 11, 2019, 9:55:45 PMFTX Crypto Derivatives Exchange



Body updatedNov 11, 2019, 9:55:43 PMFTX Crypto Derivatives Exchange



PublishedOct 29, 2019, 1:59:55 AMFTX Crypto Derivatives Exchange



Body updatedOct 29, 2019, 1:59:53 AMFTX Crypto Derivatives Exchange



PublishedOct 28, 2019, 11:23:08 PMFTX Crypto Derivatives Exchange



Body updatedOct 28, 2019, 11:23:06 PMFTX Crypto Derivatives Exchange



PublishedOct 28, 2019, 11:06:28 PMFTX Crypto Derivatives Exchange



Body updatedOct 28, 2019, 11:06:21 PMFTX Crypto Derivatives Exchange

Confidential



PublishedOct 23, 2019, 7:34:44 AMFTX Crypto Derivatives Exchange



Body updatedOct 23, 2019, 7:34:42 AMFTX Crypto Derivatives Exchange



PublishedOct 15, 2019, 1:19:17 AMFTX Crypto Derivatives Exchange



Body updatedOct 15, 2019, 1:19:14 AMFTX Crypto Derivatives Exchange



PublishedOct 11, 2019, 7:53:44 AMFTX Crypto Derivatives Exchange



Body updatedOct 11, 2019, 7:53:42 AMFTX Crypto Derivatives Exchange



PublishedOct 6, 2019, 2:26:58 PMFTX Crypto Derivatives Exchange



Body updatedOct 6, 2019, 2:26:57 PMFTX Crypto Derivatives Exchange



FTX_3AC_000045054

PublishedSep 5, 2019, 5:12:56 PMFTX Crypto Derivatives Exchange



Body updatedSep 5, 2019, 5:12:53 PMFTX Crypto Derivatives Exchange



PublishedSep 5, 2019, 5:12:08 PMFTX Crypto Derivatives Exchange



Body updatedSep 5, 2019, 5:12:03 PMFTX Crypto Derivatives Exchange



PublishedSep 5, 2019, 5:11:13 PMFTX Crypto Derivatives Exchange



Body updatedSep 5, 2019, 5:11:04 PMFTX Crypto Derivatives Exchange



PublishedSep 4, 2019, 5:14:12 AMFTX Crypto Derivatives Exchange



Body updatedSep 4, 2019, 5:14:10 AMFTX Crypto Derivatives Exchange



PublishedSep 3, 2019, 8:27:08 AMFTX Crypto Derivatives Exchange

FTX_3AC_000045055



Body updatedSep 3, 2019, 8:27:06 AMFTX Crypto Derivatives Exchange



PublishedSep 3, 2019, 2:24:34 AMFTX Crypto Derivatives Exchange



Body updatedSep 3, 2019, 2:24:31 AMFTX Crypto Derivatives Exchange



Body updatedSep 3, 2019, 2:24:06 AMFTX Crypto Derivatives Exchange



PublishedSep 1, 2019, 5:33:59 PMFTX Crypto Derivatives Exchange



Body updatedSep 1, 2019, 5:33:56 PMFTX Crypto Derivatives Exchange



PublishedAug 29, 2019, 6:59:13 AMFTX Crypto Derivatives Exchange



Body updatedAug 29, 2019, 6:59:10 AMFTX Crypto Derivatives Exchange



FTX_3AC_000045056

Body updatedAug 23, 2019, 12:25:36 PMFTX Crypto Derivatives Exchange



PublishedAug 23, 2019, 12:21:02 PMFTX Crypto Derivatives Exchange



Body updatedAug 23, 2019, 12:20:59 PMFTX Crypto Derivatives Exchange



PublishedAug 13, 2019, 10:23:38 AMFTX Crypto Derivatives Exchange



Ready for publishingAug 13, 2019, 10:12:24 AMFTX Crypto Derivatives Exchange



PublishedAug 9, 2019, 12:38:47 PMFTX Crypto Derivatives Exchange



Body updatedAug 9, 2019, 12:38:44 PMFTX Crypto Derivatives Exchange



PublishedAug 9, 2019, 12:32:27 PMFTX Crypto Derivatives Exchange



Body updatedAug 9, 2019, 12:32:24 PMFTX Crypto Derivatives Exchange

FTX_3AC_000045057



PublishedAug 1, 2019, 9:53:39 AMFTX Crypto Derivatives Exchange



Body updatedAug 1, 2019, 9:53:36 AMFTX Crypto Derivatives Exchange



PublishedJul 29, 2019, 10:25:57 PMFTX Crypto Derivatives Exchange



Body updatedJul 29, 2019, 10:25:55 PMFTX Crypto Derivatives Exchange



PublishedJul 28, 2019, 10:03:55 PMFTX Crypto Derivatives Exchange



Body updatedJul 28, 2019, 10:03:53 PMFTX Crypto Derivatives Exchange



PublishedJul 23, 2019, 8:29:53 PMFTX Crypto Derivatives Exchange



Body updatedJul 23, 2019, 8:28:02 PMFTX Crypto Derivatives Exchange



FTX_3AC_000045058

PublishedJul 23, 2019, 5:30:19 AMFTX Crypto Derivatives Exchange



Body updatedJul 23, 2019, 5:30:10 AMFTX Crypto Derivatives Exchange



PublishedJul 17, 2019, 5:40:26 AMFTX Crypto Derivatives Exchange



Body updatedJul 17, 2019, 5:40:24 AMFTX Crypto Derivatives Exchange



PublishedJul 17, 2019, 5:30:20 AMFTX Crypto Derivatives Exchange



Body updatedJul 17, 2019, 5:30:18 AMFTX Crypto Derivatives Exchange



PublishedJul 17, 2019, 3:41:17 AMFTX Crypto Derivatives Exchange



Body updatedJul 17, 2019, 3:41:15 AMFTX Crypto Derivatives Exchange



PublishedJul 15, 2019, 2:06:00 PMFTX Crypto Derivatives Exchange

FTX_3AC_000045059



Body updatedJul 15, 2019, 2:05:58 PMFTX Crypto Derivatives Exchange



PublishedJul 11, 2019, 5:29:26 AMFTX Crypto Derivatives Exchange



Body updatedJul 11, 2019, 5:29:25 AMFTX Crypto Derivatives Exchange



PublishedJul 9, 2019, 1:58:55 AMFTX Crypto Derivatives Exchange



Body updatedJul 9, 2019, 1:58:53 AMFTX Crypto Derivatives Exchange



PublishedJul 9, 2019, 1:25:40 AMFTX Crypto Derivatives Exchange



Body updatedJul 9, 2019, 1:25:38 AMFTX Crypto Derivatives Exchange



PublishedJul 4, 2019, 11:21:47 AMFTX Crypto Derivatives Exchange



FTX_3AC_000045060

Body updatedJul 4, 2019, 11:21:45 AMFTX Crypto Derivatives Exchange



PublishedJun 21, 2019, 11:32:23 AMFTX Crypto Derivatives Exchange



Body updatedJun 21, 2019, 11:32:19 AMFTX Crypto Derivatives Exchange



PublishedJun 20, 2019, 10:22:01 PMFTX Crypto Derivatives Exchange



Body updatedJun 20, 2019, 10:21:59 PMFTX Crypto Derivatives Exchange



PublishedJun 18, 2019, 3:25:27 PMFTX Crypto Derivatives Exchange



Body updatedJun 18, 2019, 3:25:27 PMFTX Crypto Derivatives Exchange



PublishedJun 18, 2019, 1:13:24 PMFTX Crypto Derivatives Exchange



Body updatedJun 18, 2019, 1:13:23 PMFTX Crypto Derivatives Exchange

FTX_3AC_000045061



PublishedJun 11, 2019, 11:48:46 PMFTX Crypto Derivatives Exchange



Body updatedJun 11, 2019, 11:48:44 PMFTX Crypto Derivatives Exchange



PublishedJun 9, 2019, 4:00:46 AMFTX Crypto Derivatives Exchange



Body updatedJun 9, 2019, 4:00:44 AMFTX Crypto Derivatives Exchange



PublishedMay 11, 2019, 3:00:36 AMFTX Crypto Derivatives Exchange



Body updatedMay 11, 2019, 3:00:32 AMFTX Crypto Derivatives Exchange



PublishedMay 10, 2019, 6:04:51 AMFTX Crypto Derivatives Exchange



Body updatedMay 10, 2019, 6:04:49 AMFTX Crypto Derivatives Exchange



FTX_3AC_000045062

PublishedMay 7, 2019, 9:25:06 AMFTX Crypto Derivatives Exchange



Body updatedMay 7, 2019, 9:25:04 AMFTX Crypto Derivatives Exchange



PublishedMay 7, 2019, 9:24:19 AMFTX Crypto Derivatives Exchange



Body updatedMay 7, 2019, 9:24:17 AMFTX Crypto Derivatives Exchange



PublishedMay 7, 2019, 6:50:24 AMFTX Crypto Derivatives Exchange



Body updatedMay 7, 2019, 6:50:21 AMFTX Crypto Derivatives Exchange



PublishedMay 6, 2019, 7:50:11 AMFTX Crypto Derivatives Exchange



Body updatedMay 6, 2019, 7:50:09 AMFTX Crypto Derivatives Exchange



Body updatedMay 4, 2019, 9:48:06 AMFTX Crypto Derivatives Exchange

Confidential



PublishedMay 4, 2019, 6:32:26 AMFTX Crypto Derivatives Exchange



Body updatedMay 4, 2019, 6:32:26 AMFTX Crypto Derivatives Exchange



Body updatedMay 4, 2019, 2:42:42 AMFTX Crypto Derivatives Exchange



Body updatedMay 4, 2019, 2:05:01 AMFTX Crypto Derivatives Exchange



Body updatedMay 4, 2019, 2:03:51 AMFTX Crypto Derivatives Exchange



Body updatedMay 4, 2019, 1:56:38 AMFTX Crypto Derivatives Exchange



Body updatedMay 4, 2019, 1:42:01 AMFTX Crypto Derivatives Exchange



Body updatedMay 4, 2019, 1:41:34 AMFTX Crypto Derivatives Exchange



FTX_3AC_000045064

Body updatedMay 4, 2019, 1:40:48 AMFTX Crypto Derivatives Exchange



PublishedMay 3, 2019, 7:33:11 PMFTX Crypto Derivatives Exchange



Title updatedMay 3, 2019, 7:33:11 PMFTX Crypto Derivatives Exchange



Body updatedMay 3, 2019, 7:33:11 PMFTX Crypto Derivatives Exchange



Body updatedMay 3, 2019, 1:42:29 AMFTX Crypto Derivatives Exchange



Body updatedApr 11, 2019, 1:44:53 AMFTX Crypto Derivatives Exchange



Body updatedMar 10, 2019, 9:25:49 AMFTX Crypto Derivatives Exchange



Body updatedMar 10, 2019, 9:24:04 AMFTX Crypto Derivatives Exchange



Body updatedMar 5, 2019, 10:45:32 PMFTX Crypto Derivatives Exchange

Confidential



Body updatedMar 5, 2019, 10:37:07 PMFTX Crypto Derivatives Exchange



Body updatedMar 5, 2019, 10:27:14 PMFTX Crypto Derivatives Exchange



Body updatedMar 5, 2019, 10:26:25 PMFTX Crypto Derivatives Exchange



Body updatedMar 5, 2019, 10:21:29 PMFTX Crypto Derivatives Exchange



Body updatedMar 5, 2019, 10:20:58 PMFTX Crypto Derivatives Exchange



Body updatedMar 5, 2019, 10:20:22 PMFTX Crypto Derivatives Exchange



Body updatedMar 5, 2019, 10:19:40 PMFTX Crypto Derivatives Exchange



PublishedMar 3, 2019, 5:49:36 AMFTX Crypto Derivatives Exchange



FTX_3AC_000045066

CreatedMar 3, 2019, 5:49:32 AMFTX Crypto Derivatives Exchange

CYBER**ARK**' Secure Web Sessions

## Mapping web page
**This web page is being mapped so that you can begin creating rules. This might take a few moments.**
Cancel

CYBER**ARK**' Secure Web Sessions

## Mapping web page
**This web page is being mapped so that you can begin creating rules. This might take a few moments.**
Cancel

Confidential

# Exhibit 10

Page 1

1    IN THE UNITED STATES BANKRUPTCY COURT

     FOR THE DISTRICT OF DELAWARE

2    Chapter 11

     Case No. 22-11068 (KBO)

3    (Jointly Administered)

     - - - - - - - - - - - - - - - - - - -x

4    In re:

5    FTX TRADING LTD., et al.,

6                  Debtors.

     - - - - - - - - - - - - - - - - - - -x

7

8                     October 31, 2025

                      6:03 a.m.

9

10

11       VIDEOTAPED ZOOM DEPOSITION of ZANE

12   TACKETT, a Non-Party Witness in the

13   above-entitled action, located in

14   Thailand, taken before Dawn Matera, a

15   Certified Shorthand Reporter and Notary

16   Public of the State of New York.

17

18

19                  *      *      *

20

21

22

23

24

25

Page 18

1     A.   I would say a somewhat standard
2 exchange/client relationship.  They
3 traded on the exchange.  So we wanted to
4 make sure they were well taken care of
5 and happy with the service and, yeah, and
6 treated like we would any other VIP or
7 institutional client or had the
8 relationship that we would have with any
9 other institutional client.
10    Q.   Was Three Arrows Capital
11 considered a VIP customer, as you use
12 that term, of FTX at the time you joined
13 in 2020?
14    A.   Yes.  Again, assuming that they
15 were onboarded, I am not sure exactly
16 when they were onboarded, but Three
17 Arrows Capital would solidly fall into
18 the VIP client base.
19    Q.   And why is it that you say that
20 they would fall into the VIP client base?
21    A.   So there is kind of a couple
22 different broad definitions for VIP.  One
23 is the fee tiers.  So we have fee tiers
24 that are based on volume.  If you do
25 enough volume to reach the VIP fee tiers,

Page 19

1 you are automatically a VIP.
2         Another would be how much FTT
3 you hold.  If you have large FTT
4 holdings, you could automatically get VIP
5 tiers.
6         And lastly, is funds on
7 exchange or if it's a big brand name.  So
8 even if, you know, you're, let's just for
9 the purpose of an example, say J.P.
10 Morgan, even if J.P. Morgan doesn't hold
11 a lot of FTT or trade a lot in volume,
12 they would still be considered a VIP just
13 because of who they are.
14         And so VIP is like a broader
15 term, but 3AC being a large player in the
16 crypto space definitely would be
17 considered a VIP client.
18    Q.   And what did being a VIP client
19 provide the customer?
20    A.   That would depend on how they
21 classify as a VIP.  Like I said, there
22 are multiple different things that could
23 get you VIP status.
24         So one would be lower fee
25 tiers.  If you are hitting the VIP tiers

Page 20

1 in volume or if you hold enough FTT, if
2 you're just a big name, we're not going
3 to give you discounted fees or anything
4 like that, you had to be doing enough
5 volume or hold the requisite amount of
6 FTT.  But basically, it would give you
7 better customer support, because instead
8 of having to go through the ticket system
9 or e-mails, we would great a Telegram
10 channel or, you know, depending on who
11 the client is, a group chat basically,
12 because it could be on Signal, it could
13 be on WhatsApp, it could be on Telegram.
14         And then we would add people
15 from multiple different time zones so we
16 have better coverage and that way we just
17 have, you know, a bit higher level
18 dedicated support than a client, a
19 non-VIP client would have.
20    Q.   And did you remain employed by
21 FTX up until the time of FTX's bankruptcy
22 filing in November of 2022?
23    A.   I quit FTX before bankruptcy
24 was officially filed.  I believe
25 bankruptcy was filed Friday morning -- it

Page 21

1 was filed on the 11th, which I believe
2 was a Friday.  And I quit two days before
3 then, if my memory is correct.  But I
4 quit before bankruptcy was officially
5 declared but after the fiasco was started
6 and was made clear.
7         Once I learned some of the --
8 some of the things that came out and how
9 I was lied to by Sam and Nishad, I put in
10 a group chat with both of them that I
11 officially resigned, but that I would
12 stick around to help my clients.
13    Q.   Understood.  You think that was
14 on or about November 9th, about two days
15 prior to the bankruptcy filing, after the
16 disclosure of some of the facts that had
17 previously been unknown regarding FTX at
18 that time?
19         MR. PROULX:  Objection to form.
20    A.   Yes.
21    Q.   Sorry, was that a yes, sir?
22    A.   I believe you're asking me and
23 I said correct.
24    Q.   Up until the time that you
25 resigned from FTX, did you work

6 (Pages 18 - 21)

1 asset. So let's say you are borrowing
2 USD with Bitcoin as collateral, it would
3 sell some of the Bitcoin in your account
4 to reduce the USD, the negative USD
5 amount. Again, if this could be done in
6 a manner that would keep them within
7 their maintenance margin requirements, it
8 would be done on a partial basis. If
9 that couldn't be done, then all of the
10 positive spot assets would be sold off to
11 try to cover the negative balances to
12 ensure that the lenders or the spot
13 margin system doesn't incur any losses.
14    Q.   If there is a spot margin
15 liquidation where positive assets are
16 sold to reduce negative, the overall
17 value of the account would remain
18 unchanged, correct?
19       MR. PROULX: Objection to form.
20    Leading.
21    A.   The overall -- if it's a
22 partial liquidation, overall value should
23 stay roughly the same. If it's an entire
24 liquidation, then, no, it would impact
25 the value as well, yeah.

1       But the way the FTX worked, is
2 we had realtime -- realtime P&L
3 settlement. So if I open a futures
4 position and I start to lose money on it,
5 that negative USD or the USD balance
6 would basically be updated tick by tick.
7 So as the price changes, the USD is
8 credited or debited from the account.
9       So if I opened a position that
10 went against me, I would see my USD value
11 changing and then once that USD value got
12 so negative that a liquidation would be
13 required, the futures position would be
14 closed down, but I would still have my --
15 the balance would remain largely
16 unchanged if it's a partial liquidation
17 because the P&L has already been
18 realized.
19    Q.   Were customers generally
20 allowed to have a negative overall
21 balance in their account?
22       MR. PROULX: Objection to form.
23    A.   No.
24    Q.   And why was that?
25    A.   Because that would hurt the

1 health of the exchange.
2    Q.   Can you elaborate on that?
3    A.   Yeah, if you have an overall
4 negative account balance, that means
5 those funds have to be coming from
6 somewhere. So if you are overall
7 negative, that means that whoever is on,
8 you know, whatever position you opened
9 that brought you that negative, let's say
10 it's futures, that means whoever the
11 winner is, there isn't enough funds to
12 pay off the winner when you're the loser.
13 They need to match up. And so you're not
14 allowed to go into an overall negative
15 balance.
16    Q.   And were the liquidation
17 triggers that we have been discussing
18 protections against a customer having a
19 negative balance?
20       MR. PROULX: Objection to form.
21    A.   Yeah.
22    Q.   Were there other protections
23 the exchange had in place to protect
24 against a customer going negative?
25    A.   Liquidation would definitely be

1 the main one. We did -- there were
2 like -- the exchange would look at, you
3 know, the position size of like we -- we
4 would look at how large positions were in
5 individual assets to see if there are any
6 outsized positions in particular assets,
7 and if there are, you know, make sure the
8 IMF or MMF of that asset is in line with
9 what it should be, market conditions
10 essentially, and make sure there aren't
11 any outsized positions that if the
12 occasion or if the necessity came up to
13 liquidate would hurt the exchange or
14 cause the exchange to have issues
15 liquidating those assets.
16       But the main way this was
17 enforced was through automated
18 liquidations.
19    Q.   As was mentioned, FTX provided
20 lines of credit to certain customers who
21 traded on the exchange, correct?
22    A.   Correct.
23    Q.   Any such line of credit would
24 increase a customer's ability to trade on
25 margin; is that right?

15 (Pages 54 - 57)

Page 62

1      MR. PROULX:  Objection to form.
2   A.   No.
3   Q.   What is your understanding of a
4  perpetual futures contract?
5   A.   Are you asking me how -- what
6  is my understanding of how a perpetual
7  futures contract works or you're asking
8  me how it would be represented in the
9  account?
10   Q.   Let's start with how it would
11  be represented in the account.
12   A.   It would be shown under a
13  position.  It would show the size.  It
14  would show the mark price of that trading
15  pair.  It would show the P&L.  It would
16  show the entry price.  And that's how it
17  would be displayed in the account.
18       And then on the collateral
19  explainer, you could also see what the
20  collateralization or the collateral
21  requirement and how much collateral that
22  position was taking up.
23   Q.   Perpetual future contracts
24  included a reference price, correct?
25   A.   You need to be more clear.  A

Page 63

1  reference price?  Are you referring to a
2  mark price or are you referring to an
3  index price?
4   Q.   Could you explain your
5  understanding of the difference?
6   A.   An index price would be based
7  on multiple -- well, it depends on the
8  asset, but the index would usually be
9  made up of multiple trading venues.  The
10  most liquid for that asset.  There are
11  times when FTX was the only venue.  So
12  the index, you know, kind of had to be
13  the FTX spot price.  But it would use a
14  median, I believe, of other venues or,
15  you know, the most traded pairs for that
16  particular pair.
17       And then the mark price was
18  solely based on FTX's market and that
19  would be the median of the bid/ask last,
20  I believe.
21   Q.   So to open a perpetual futures
22  position, the customer did not buy the
23  underlying digital asset, correct?
24       MR. PROULX:  Objection to form.
25   A.   Correct.

Page 64

1   Q.   The notional amount of the
2  asset of which a futures contract is
3  opened is not included in the total of a
4  customer's account balance, correct?
5       MR. PROULX:  Objection to form.
6  Leading again.
7   A.   That is correct.  The futures
8  position is not -- is not -- doesn't
9  contribute or isn't accounted for in the
10  account balance.  The only way that a
11  futures position impacts the account
12  balance is P&L.
13   Q.   Mr. Tackett, during your time
14  you were involved with the Three Arrows
15  account at FTX, Three Arrows benefited
16  from a line of credit issued by FTX,
17  correct?
18       MR. PROULX:  Objection to form.
19   A.   You would have to ask them.  A
20  line of credit is usually seen as
21  beneficial, yes.  Whether or not it was
22  beneficial to them, I guess that's
23  subjective.
24   Q.   That's fair.  A line of credit
25  was issued by FTX to Three Arrows

Page 65

1  Capital, correct?
2   A.   At their request, yes.
3   Q.   And there was a line of credit
4  issued by FTX to Three Arrows Capital
5  that was in effect in June of 2022,
6  correct?
7   A.   There was a line of credit in
8  effect throughout, until the 3AC account
9  was liquidated.
10   Q.   Do you recall how much 3AC's
11  line of credit was?
12   A.   120 million, I believe.
13       MR. GLUECKSTEIN:  Sam, can we
14  pull up tab 4.
15       MR. DARBY:  Sure.
16       (Tackett Exhibit 3, Document
17  Bates stamped Tackett_3AC 158, was so
18  marked for identification, as of this
19  date.)
20       MR. DARBY:  You all should have
21  that now.
22   A.   I am pulling it up now.  All
23  right.  I have it open.
24   Q.   Okay.  So Mr. Tackett, what's
25  visible, should be visible now, is what's

17 (Pages 62 - 65)

Page 82

1  explainer that kind of clarified a bit
2  more on how interest was charged for
3  lines of credit.  And that was done
4  around the same time when we did the,
5  when we did the repapering of the
6  agreements.
7      Q.  Was that with respect to
8  interest calculations generally or
9  specific to Three Arrows Capital?
10     A.  Generally.  I believe it would
11  be in one of the -- if you scroll down a
12  bit further on that page, there is an FTX
13  VIP both.  I believe it would be in one
14  of these announcements.
15     Q.  And that would have been a
16  document that was available to customers?
17  Would that have been on the FTX website?
18     A.  No.
19     Q.  Would that have been sent out
20  to customers on an individual basis?
21     A.  Correct.  It would have been
22  sent out through the FTX VIP bot, which
23  was a bot that we had in all the Telegram
24  channels for our VIP clients, and it
25  would have been accessible there.

Page 83

1      Q.  Is there anything else that you
2  remember in this time frame of March 2022
3  regarding a revised line of credit for
4  Three Arrows Capital?
5          MR. PROULX:  Objection to form.
6      A.  No, sir.
7          MR. GLUECKSTEIN:  Let's look at
8  tab 5, Sam, if we can pull that up.
9          MR. DARBY:  Yes, sir.
10         THE WITNESS:  While that's being
11  pulled up, do you mind if we take a
12  quick break?
13         MR. GLUECKSTEIN:  We have been
14  going for a while, why don't we take a
15  five minute or so break.  Go ahead and
16  we can pick back up.
17         THE VIDEOGRAPHER:  The time is
18  7:45 Eastern, we are off the record.
19         (Off the record.)
20         THE VIDEOGRAPHER:  The time is
21  7:55 a.m. Eastern, we are back on the
22  record.
23  BY MR. GLUECKSTEIN:
24     Q.  Thank you, Mr. Tackett.  We
25  were just, before the break, going to

Page 84

1  pull up what's now been marked as Exhibit
2  5 to your deposition, which is a document
3  that starts with Bates number Tackett 3AC
4  085.
5          (Tackett Exhibit 5, Document
6      Bates stamped Tackett 3AC 085, was so
7      marked for identification, as of this
8      date.)
9      Q.  Do you recognize this document,
10  sir?
11     A.  It's pulling up, one second.  I
12  do, this is the line of credit agreement.
13     Q.  I will represent to you that
14  this is the copy that was linked to that
15  chat that we were just looking at in
16  Exhibit 3 earlier.
17         MR. PROULX:  And just objecting
18      to the extent that we haven't seen
19      substantiation of that representation.
20     Q.  You do recognize this as the
21  line of credit that was entered into with
22  Three Arrows Capital in March of 2022,
23  sir, correct?
24     A.  I do.
25     Q.  Do you recall who prepared this

Page 85

1  agreement?
2      A.  You would have to be more clear
3  on who prepared this agreement.
4      Q.  Who at FTX, who at FTX drafted
5  and provided this form of agreement?
6          MR. PROULX:  Object to the form.
7      A.  There's two different aspects
8  of this.  One is the lawyers wrote the
9  boilerplate of it and then, two, I
10  believe it was Allison who would have
11  changed, you know, the specifics of this
12  agreement.  So that would be the size,
13  for example, the 120 million, that would
14  be the interest rate and that would be
15  the collateralization requirement.
16         And so I believe Allison
17  entered those specifics in and the
18  lawyers drafted the agreement as a whole,
19  which was then edited on a client-per-
20  client, case-by-case basis.
21     Q.  Is this document, which has
22  been marked as Exhibit 5, a format of a
23  line of credit that you saw with other
24  customers as well?
25         MR. PROULX:  Objection to form.

22 (Pages 82 - 85)

Page 90

1    A.   Yes, so it basically kept the
2  line of credit agreement roughly the same
3  as the previous versions on, you know,
4  the broad, the broad bit of how a line of
5  credit works.
6        So if you look at the top part
7  and compare it with the earlier line of
8  credit agreements, they are roughly the
9  same.  But then this also provides more
10  details and terms, exactly, on, you know,
11  on how the line of credit works and the
12  specific terms of them.  And this was
13  something that our lawyers wanted
14  included in the line of credit
15  agreements.
16        So as I mentioned earlier, when
17  we did -- when we did a review in early
18  2022 where we repapered a lot of the
19  agreements, this was basically, a large
20  part of that is to get the updated
21  agreement out and signed.  Even if we
22  didn't adjust any collateralization
23  requirements or interest rates or
24  anything like that, we still repapered
25  the agreements and had them sign this new

Page 91

1  updated agreement or extended agreement,
2  whatever you want to refer to it as.
3    Q.   And this format of the Three
4  Arrows repapered agreement, as you use
5  it, is consistent with the format that
6  you used for other customers at that
7  time?
8        MR. PROULX:  Objection it form.
9    A.   Yes, the exact same.
10    Q.   If you turn to the last page of
11  this document, which is Bates stamped 90
12  in the bottom right?
13    A.   Yes, I am there.
14    Q.   You see this document was
15  signed by Kyle Davies at Three Arrow
16  Capital?
17        MR. PROULX:  Objection to form.
18    A.   I do see that, yes.
19    Q.   And it appears that DocuSign
20  was used to sign this document; is that
21  right?
22    A.   Correct.
23    Q.   Are you familiar with DocuSign,
24  sir?
25    A.   Yes.

Page 92

1    Q.   Is that something that you used
2  in the past?
3    A.   Yes, we sometimes used it with
4  LOCs.
5    Q.   Do you see at the top of the
6  page, of each page, there is what's
7  identified as a DocuSign envelope ID; do
8  you see that?
9    A.   I do see that.
10    Q.   Do you have an understanding of
11  what that reflects?
12    A.   I assume -- well, no, actually,
13  no.  I can make an assumption, but I
14  don't know the specifics of how DocuSign
15  deals with ID'ing documents.
16    Q.   Have you -- you say DocuSign
17  was used for other LOC agreements with
18  FTX, correct?
19    A.   Correct.
20    Q.   Do you recall when someone
21  signs DocuSign that header appears on
22  every page of the document?
23    A.   No, I don't.
24    Q.   This version of LOC does not
25  have a signature for FTX Trading; do you

Page 93

1  see that?
2    A.   I do see that.
3    Q.   Do you have any understanding
4  of why this document was not executed, at
5  least this version of it is not executed
6  by FTX?
7        MR. KAST:  Objection to form.
8    A.   As far as I wouldn't be able to
9  countersign one of these.  Usually Sam
10  would be the person that our
11  counterparties would want a signature
12  from.  And so it may have been sent to
13  Sam, and he signed it.  And you know,
14  once Sam signed it, the DocuSign would
15  automatically e-mail the other parties of
16  the agreement.
17        And so this may have been sent
18  to Sam for signing.  And waiting for him
19  to sign it, but, you know, Sam wasn't the
20  quickest to respond to me.
21    Q.   Did FTX extend the line of
22  credit to Three Arrows Capital consistent
23  with the terms of this agreement?
24        MR. PROULX:  Objection to the
25  form.

24 (Pages 90 - 93)

Page 94

1    A.    The amount did not change.
2  They already had a $120 million line of
3  credit before, before the specific
4  agreement came into play.  But what was
5  updated was the collateralization
6  requirement and the interest rate.  The
7  interest rate was also updated in the
8  system.
9    Q.    What do you mean the interest
10  rate was updated in the system?
11    A.    Around this point, as I
12  explained earlier, we moved to a
13  different way of charging interest on
14  credit lines, so we could put in the
15  admin panel the interest rates for the
16  system to calculate that.
17    Q.    As the account manager for the
18  Three Arrows accounts for FTX, after
19  March 31st, 2022, did you understand this
20  agreement to be in effect?
21        MR. PROULX:  Objection to form
22  and to the extent it calls for a legal
23  conclusion.
24    A.    Yes.
25    Q.    And is it your understanding

Page 95

1  that after the date of this agreement,
2  interest was charged at Three Arrows
3  Capital at the lower rate of 5 percent?
4    A.    It would have been based on
5  their utilization, yes.  So if they
6  weren't -- if the credit line wasn't
7  being utilized, they wouldn't have been
8  charged anything.
9    Q.    Understood, but any drawn
10  amount of the line of credit would have
11  been drawn at the revised interest rate?
12    A.    Correct.
13    Q.    Do you have an understanding,
14  after this period of March 2022, how much
15  the line of credit was drawn by Three
16  Arrows Capital?
17    A.    It would depend on the date.
18  Near the end, they were overall red.  So
19  that would mean that the entirety of the
20  line of credit was being used.
21    Q.    When you say at the end, you
22  mean June of 2022?
23    A.    Correct.
24    Q.    So at least as of June of 2022
25  it was your understanding that the

Page 96

1  entirety of credit was drawn at 120
2  million?
3        MR. PROULX:  Objection to form.
4  Lack of foundation.
5    Q.    Is that correct, sir?
6    A.    You guys cut out real quick.
7  That seems like correct.  Can you repeat
8  the question?
9    Q.    Absolutely.  So at least as of
10  June of 2022, is it your understanding
11  that Three Arrows Capital had drawn the
12  entirety of the $120 million line of
13  credit?
14        MR. PROULX:  Same objections.
15    A.    Yes.  And I believe this would
16  have been -- this would have been
17  demonstrated by when we tried to reduce
18  the line of credit, the small amount that
19  said the system would liquidate them,
20  which would indicate that the line of
21  credit was being used in its entirety or
22  nearly in its entirety, because I think I
23  tried to decrease the LOC by 5 million or
24  something and I got warnings they would
25  be liquidated, which would indicate that

Page 97

1  the entire -- that the entire LOC was
2  being drawn upon, which would be drawn on
3  the account balances, yes.
4        (Tackett Exhibit 6, Document
5    Bates stamped FTX 3AC 13940, was so
6    marked for identification, as of this
7    date.)
8        (Tackett Exhibit 7, Document
9    Bates stamped FTX 3AC 13950, was so
10    marked for identification, as of this
11    date.)
12        MR. DARBY:  I have introduced
13  Exhibit 6 and 7, so they are both
14  loaded for you now.
15    A.    I have it.
16    Q.    This is an e-mail chain, top
17  e-mail is dated September 26th of 2022,
18  FTX 3AC 13940.  This appears to be an
19  e-mail chain between you and
20  representatives of an entity called 2
21  Sigma; do you see that?
22    A.    Yes.
23    Q.    Do you recall who 2 Sigma was?
24    A.    Yes, 2 Sigma is a trading firm.
25    Q.    Was 2 Sigma somebody that you

25 (Pages 94 - 97)

1 give them 24 hours to top up their
2 collateral without being liquidated.
3    Q.   And was that policy as conveyed
4 here to Two Sigma, a general policy of
5 FTX at the time?
6        MR. PROULX:  Objection to form.
7    A.   Yes.
8    Q.   Moving on to the e-mail,
9 another comment from a potential customer
10 here, "Liquidations of positions should
11 only occur after AOA has failed to meet a
12 margin call and upon notice, not simply
13 for failure to meet minimum maintenance
14 requirements."
15       Do you see that, sir?
16    A.   Yes.
17    Q.   And then is the paragraph that
18 follows your response to that suggestion?
19    A.   Yes.
20    Q.   And that begins with
21 "Liquidation of positions happens when
22 your maintenance margin read inclusive of
23 funds granted as part of the LOC, e.g.,
24 you have 1 million, your own capital
25 account, we give you 1 million LOC.  Your

1 maintenance margin would be 2 million
2 (goes below your maintenance margin
3 requirement) this is fully automated, we
4 do not have non-liquidating accounts so
5 we wouldn't be able to offer you a cure
6 period of the ability to top up before
7 getting liquidated."
8        Do you see that?
9    A.   Yes, I do.
10    Q.   And was your answer there
11 consistent with how the FTX exchange
12 operated at the time in 2022?
13    A.   Yes.  Every client abided by
14 these rules.
15    Q.   You go on to say, "Just to be
16 clear, this is separate from your
17 collateral requirements for the LOC.
18 This is regarding a liquidation due to
19 collateral for your open positions being
20 inefficient."
21       Do you see that?
22       MR. PROULX:  Objection.
23 Misstates the document.
24    Q.   I can try that sentence again,
25 just so the record is clear.

1        You go on to say, "Just to be
2 clear, this is separate from your
3 collateral requirements for the LOC.
4 This is regarding a liquidation due to
5 your collateral for your open positions
6 being insufficient."
7        Do you see that?
8    A.   Yes.
9    Q.   And as we discussed earlier,
10 the collateral requirements for the LOC
11 are separate and apart from the
12 maintenance margin requirements?
13    A.   Yes.
14    Q.   Can a customer be in a breach
15 of its LOC collateral requirements
16 without breaching its maintenance margin
17 requirements?
18       MR. PROULX:  Objection, calls
19    for a legal conclusion.
20    A.   For example, if we give you $1
21 million LOC and you don't have any
22 positions that you need to maintain, you
23 know, 25 percent collateral, that means
24 if you dipped below 1.25 million, you
25 would not be meeting your LOC margin

1 requirements even if you didn't have a
2 single position open.
3    Q.   Okay.  We can put that aside.
4        Mr. Tackett, do you have a
5 recollection of what happened generally
6 with the 3AC accounts on the FTX exchange
7 during the June 2022 time period?
8        MR. PROULX:  Objection to form.
9    A.   Yes.
10    Q.   Can you please describe your
11 recollection?
12    A.   Yes.  So Luna started melting
13 down.  It started like, USD started to
14 depeg.  There was a lot of volatility in
15 the markets.  Crypto as a whole started
16 to crash.  You know, obviously, as an
17 exchange operator, you need to be very
18 aware of what was happening at a time
19 like this.
20        And so we pay extra attention
21 to the monitoring tools that we have, for
22 example, the LOC Slackbot and making sure
23 that people are meeting their collateral
24 requirements.  And so all the mayhem that
25 was happening off of the back of Luna

27 (Pages 102 - 105)

1 collapsing, we were looking at our
2 clients basically, account balances and
3 the Slackbot that we had showed where
4 clients were on their LOC, if they were
5 meeting their collateral requirement, if
6 there was a -- if there was a gap, how
7 big that gap was, et cetera.
8       We noticed that 3AC was
9 massively below their collateral
10 requirement.  They were also withdrawing
11 more USD, so they weren't depositing,
12 they were withdrawing.  And then this
13 triggered, you know, a review basically.
14 And we started looking at their account.
15       Once we saw the state of the
16 account, that obviously gave us cause for
17 concern, especially with all the
18 different rumors that were out and
19 swirling in the market.  You know, it's a
20 very large player, obviously you have
21 access to a lot of information because
22 clients are, you know, hitting you up or
23 sharing what they are hearing and things
24 like that.
25       We were also hearing that 3AC

1 might be in trouble.  We looked at the
2 account.  We saw that it was massively
3 underwater.  And we were talking to them
4 about, you know, kind of reducing the LOC
5 or reducing their position sizes so that
6 they could free up their funds as they
7 were trying to withdraw more money.
8       And then they stopped
9 responding and we had to move forward in
10 liquidating their account.
11    Q.    Thank you, sir.  And we are
12 going to talk about some of those
13 details.
14       Can we pull back up Exhibit 3
15 to your deposition, which is that
16 Telegram chat that we started looking at?
17    A.    Okay.  We'll pull it up.
18 Exhibit 3, tab 4.
19    Q.    Exhibit 3, tab 4, correct.  Can
20 you turn to the Bates number 209 in the
21 right-hand corner?
22    A.    Got it.
23    Q.    In the middle of that page, the
24 chat starts on the 14th of June of 2022;
25 do you see that?

1    A.    Yes.
2    Q.    And again, as we established
3 earlier, the times that we see here would
4 be the times that were calculated or
5 changed as of the time of the export of
6 when to provide this file to us, correct?
7    A.    Yes.
8    Q.    And so at least for purposes of
9 the timeline here, we see there was a
10 message that comes in for Ningxin that
11 says, "Hi team, could we change the
12 credit line to 125 percent collat and 8
13 percent interest?"
14       Do you see that?
15    A.    Mmm-hmm.
16    Q.    And that was the original line
17 of credit terms that had been changed in
18 March of 2022, correct?
19       MR. PROULX:  Objection to form.
20    A.    Sorry, can you repeat the
21 question?
22    Q.    Was the request here seeking to
23 revert the Three Arrows line of credit
24 terms to the earlier terms prior to the
25 March 2022 document?

1       MR. PROULX:  Objection to form.
2    A.    Yes.
3    Q.    And the message goes on to say,
4 "Just checking why we can't withdraw
5 funds, we have 28 million of available
6 collateral."
7       Do you see that?
8    A.    I do.
9    Q.    And you respond there a couple
10 of minutes later saying, "Don't think it
11 would be LOC as the limit isn't applied
12 by the system."
13       Do you see that?
14    A.    Yes.
15    Q.    What did you mean by that
16 statement?
17    A.    If you have a -- sorry, would
18 you like to finish?
19    Q.    No, go ahead.
20    A.    If you have a 200 percent
21 collateralization requirement, that isn't
22 something that we input into the system,
23 and so, that isn't something to input
24 into the system, therefore barring you
25 from going below that, right?

Page 118

1 start to get larger, the IMF can start to
2 come into play, so it can be whatever is
3 higher, you know, 5 percent, or whatever
4 the formula outputs for, you know, that
5 position using the IMF. And if that, if
6 the output of that formula is higher than
7 5 percent, then you might have to have
8 the higher collateral ratio.
9    Q.   So continuing on in the chat,
10 you attempt to do a $10 million
11 reduction, and you say "You're getting an
12 error," correct?
13    A.   Yes.
14    Q.   And Ningxin says, "Can you
15 please try 5 million?" And you respond
16 at 7 o'clock saying, "So just FYI, your
17 account value collateral is
18 $113,438,132.47. You have an LOC of 120
19 million, which means you're underwater on
20 the LOC in general. The reason you can't
21 withdraw is because your account right
22 now is technically under water."
23       Do you see that?
24    A.   Mmm-hmm.
25    Q.   Can you please explain what you

Page 119

1 were conveying in that message?
2    A.   So you can't withdraw the LOC,
3 so even if you lose all of your money,
4 you couldn't withdraw beyond that ticket,
5 you know, the LOC itself. But you can go
6 negative through futures positions or
7 spot positions, spot margin positions.
8       So you looked at the account
9 value collateral, which was 113 million,
10 and with a line of credit of 120 million
11 that means they don't even have the
12 amount that the line -- like we gave them
13 120 million and I am seeing 113 million
14 in the account. They need to keep 200
15 percent of the line of credit in
16 collateral, so you would have 120 million
17 which is the LOC plus the 200 percent you
18 need to keep, so it's like, you know, 360
19 million you need to have in the account.
20       So I am saying even without
21 looking at the collateral requirement for
22 the LOC, you're under water overall.
23 Like they weren't even meeting their LOC
24 number, that's what I was saying in that
25 message.

Page 120

1    Q.   And as a result of that
2 position they were unable to withdraw any
3 assets from the account; is that right?
4       MR. PROULX: Objection to form.
5 Leading.
6    A.   That is my understanding,
7 correct. Because once you have a
8 negative balance overall, you can't
9 withdraw more.
10    Q.   Can you explain what you mean
11 by that?
12    A.   Yeah, so once the account goes
13 negative or is below what the LOC is, you
14 can't continue to pull down further than
15 that.
16       So, you know, anything under
17 120 million, the system would say no,
18 because it's looking at you have 120
19 million from our LOC, and you can't
20 withdraw from that, and so if you're
21 below that number, you're not going to be
22 able to withdraw because you're below,
23 like your account is essentially
24 negative.
25    Q.   So then in response to a

Page 121

1 suggestion that they seek the collateral
2 at 199 million, you respond, "That's the
3 collateral contributed by spot assets.
4 That's not the collateral value, though."
5       Do you see that?
6    A.   Yeah.
7    Q.   And can you explain what you
8 were conveying there?
9    A.   To be honest, I think I would
10 need to see that screenshot to be able to
11 fully understand, when he says, "I see
12 our collateral as 199 million," I'm not
13 sure if he's looking at or put the
14 collateral explainer or looking at the
15 net USD value. So I would need to see
16 specifically what is in that screenshot
17 to understand my response or to be able
18 to expand on what my response is in
19 reference to.
20    Q.   What you had conveyed above,
21 the numbers that you were seeing was not
22 199 at the time, it was the $113 million
23 number; is that right?
24       MR. PROULX: Objection to form.
25    A.   Yeah.

31 (Pages 118 - 121)

Page 122

1    Q.   Then you respond further to
2  this chain --
3    A.   Oh, sorry, I might -- okay.
4  Yeah, all right.  Never mind, I
5  understand.
6        So he's saying, "I see our
7  account collateral as 199 million."  So
8  if you looked at the collateral
9  explainer, you would see the total amount
10 contributed by spot assets, right.  And
11 he's saying that he's seeing that they
12 have 199 million contributed by spot
13 assets.  But that's ignoring any
14 negative.  They are negative 85 million.
15 So if you are 199 million worth of
16 collateral and you have negative $85
17 million balance, that would put you at
18 about 113 million.
19       So, sure, their spot assets,
20 the positive spot assets were
21 contributing $200 million worth of
22 collateral towards their balance, but
23 when you subtract the negative assets,
24 the 85 million spot margin borrow, plus
25 any additional, which I am not sure if

Page 123

1  they had or not, that gives you the total
2  collateral value of the account, right?
3  You take the positives minus the
4  negatives, and you end up with your
5  collateral value.  You can't just look at
6  the positives and ignore the negative
7  balances.
8    Q.   Thank you.  So after six
9  minutes later, you don't get any further
10 response, you then write, "Can someone
11 from your team give me a call.  We need
12 to discuss the situation."
13       Do you see that?
14   A.   Yeah.
15   Q.   Do you recall, did anybody call
16 you at that time?
17   A.   No.
18   Q.   In fact, it looks like more
19 than two hours go by and you then respond
20 again, "I need a response here guys, you
21 are now 20 million in a hole."
22       Do you see that?
23   A.   I do.
24   Q.   What are you conveying when you
25 say 20 million in the hole in this

Page 124

1  context?
2    A.   So if you look up above, I am
3  saying their account value is 113 million
4  and you have 120 million worth of LOC, so
5  they are already below that.
6        And then basically I am saying
7  right now I am seeing that your account
8  is $3 million short or negative 3
9  million.  It looks positive because you
10 have 120 LOC, but if we took out that
11 LOC, your account balance would be
12 negative 3 million.  When I say 20
13 million, you're now 20 million in the
14 hole, I mean, your shortfall, your
15 account balance is essentially negative
16 20 million right now.  Sure, with 120
17 million we gave you, you might be in the
18 green, but you owe us that money, so
19 inclusive of that, you're like negative
20 20 million.
21   Q.   Is that increase from 3 million
22 to 20 million negative a result of
23 continued deteriorations of their
24 positions in the account?
25       MR. PROULX:  Objection to form.

Page 125

1    A.   That's the only thing that
2  would make sense.  I don't remember
3  exactly what their positions were, but
4  the only way it could get worse is due to
5  the positions that they would be holding.
6    Q.   You further respond at 9:49, "I
7  would really recommend responding here at
8  Ningxin TAC, lack of response gives us
9  more cause for concern than anything."
10       Do you see that?
11   A.   Yup.
12   Q.   Do you recall getting any
13 response at that time from anybody on
14 behalf of Three Arrows Capital?
15   A.   No.
16   Q.   The next message in the chain
17 is much later in the day at 21:56, as
18 time stamped here; do you see that?
19   A.   Yup.
20   Q.   And you write a message and you
21 say "Ningxin TAC," that's Ningxin who you
22 have been corresponding with on behalf of
23 3AC, correct?
24   A.   Correct.
25   Q.   And @KyleD1, that's Kyle

32 (Pages 122 - 125)

Page 126

1 Davies, as you testified earlier,
2 correct?
3    A.   Yup.
4    Q.   And you write, "We have to turn
5 off withdrawals on your account until we
6 get a response from you.  You're
7 currently basically flat, you need to
8 increase your USD balance by a sizable
9 amount.  If we pull the LOC, you would be
10 negative 83 million or so, which would
11 likely cause you to be liquidated.  We
12 don't want to do that.  But the bare
13 minimum you can do is just respond to us
14 and provide an update, which you aren't
15 doing, which is a cause of for concern."
16        Do you see that?
17    A.   I do.
18    Q.   Do you recall why you sent that
19 message?
20    A.   Yes, because we weren't getting
21 a response.  We saw them trying to
22 withdraw money, but let's say they can't
23 withdraw because they are too negative.
24 Then the market goes up a tiny bit and
25 they withdraw more.  And then the market

Page 127

1 goes back down, now they are an even
2 worse position, so instead of allowing
3 them to do that, until we talk with them,
4 we had to turn withdrawals off entirely,
5 to make sure that in that scenario there
6 was a quick bounce or something like
7 that, they don't pull as much as they can
8 and leave the account in a worse state.
9        So we turned off withdrawals.
10 And I am just, you know, trying to get a
11 response.  And try to make clear that the
12 alternative is worse, them being
13 liquidated.  And we obviously don't want
14 to do something, like we want our clients
15 to be in the best health possible because
16 that causes them to trade as much as
17 possible.
18        So, yeah, really looking for
19 just communication here, but we couldn't
20 get that.
21    Q.   About an hour later, at 22:53,
22 you send a longer message that begins
23 "Your account is in an undesirable state.
24 We tried to reach you several times.
25 Consider this something as a final

Page 128

1 warning."
2        He then goes on to explain
3 certain circumstances with respect to the
4 account; is that right?
5        MR. PROULX:  Objection to form.
6    A.   Mmm-hmm.  That is right.
7    Q.   What were you conveying to 3AC
8 in this message?
9    A.   The earlier messages were being
10 nice and hi, guys, can we talk about
11 this, just want to have a chat.  Like we
12 have the right to do things, but we don't
13 want to do that and please just get back
14 to us.  And the lack of response is
15 worse, you know, that's causing more
16 concern than if you just talked to us.
17        Once they don't respond, we
18 really have to give them a final warning
19 and say, hey, like, look, because this is
20 getting so bad, we are going to have to
21 continue to move forward with other
22 options unless we hear from you.  This is
23 kind of, like I said, consider this
24 something like a final warning.
25        And you can see in this

Page 129

1 message, further, "We notice last night
2 around 4 a.m. Eastern Time you did not
3 respond to our inquiries and withdrew
4 even more from your account, thereby
5 actively becoming even more delinquent on
6 an obligation and acting against the
7 spirit of the agreement."
8        That goes to what I was talking
9 about with having to turn off the
10 withdrawals on the account.
11    Q.   So is it your understanding
12 that during the period of time that 3AC
13 was not responding to your messages, that
14 they were withdrawing assets from the
15 account?
16    A.   Correct.
17    Q.   And your next message then
18 appears at 4:15, six or so hours later,
19 and you say, "Would really prefer if you
20 can resolve via discussion.  We are not
21 left a lot of choices if we can't hear
22 back from you.  We will be pulling the
23 LOC in 45 minutes."
24        Do you see that?
25    A.   I do.

33 (Pages 126 - 129)

Page 138

1  record.
2      (Off the record.)
3      THE VIDEOGRAPHER:  The time is
4  9:21 a.m. Eastern and we are back on
5  the record.
6  BY MR. GLUECKSTEIN:
7      Q.   Mr. Tackett, I think we're
8  going to pull up tab 9, if we could, Sam.
9      (Tackett Exhibit 9, Document
10  Bates stamped FTX_3AC_000000764, was
11  so marked for identification, as of
12  this date.)
13      MR. GLUECKSTEIN:  We have the
14  native version of this also, Sam.
15      Q.   So if we could, we marked, just
16  so the record is clear, Mr. Tackett,
17  what's been marked as Exhibit 9 is an
18  e-mail, June 14th, 2022, from yourself to
19  kyle@threearrowscap.com; do you see that
20  header up there?
21      A.   Yes, Exhibit 9.
22      Q.   Is that Kyle Davies that this
23  e-mail was sent to, by you?
24      A.   Kyle at Three Arrows Capital to
25  zane@FTX.com, yes.

Page 139

1      (Tackett Exhibit 10, E-mail of
2  Exhibit 9 in native format, was so
3  marked for identification, as of this
4  date.)
5      Q.   If we go to what was marked as
6  Exhibit 10, just for completeness, that
7  e-mail the way it's produced is obviously
8  very hard to read, but we have the same
9  in its native form, which will be easier
10  for you to review which has been marked
11  as the record as Exhibit 10.
12      MR. PROULX:  Counsel, I am happy
13  to accept the representation that this
14  is a native.  No problem there.
15      MR. GLUECKSTEIN:  Thank you,
16  sir.
17      Q.   Mr. Tackett, I just want to
18  very quickly understand, looks to me that
19  this e-mail is very similar to the
20  messages that you had sent in a Telegram
21  chat that we reviewed earlier, is that
22  your understanding?
23      A.   Yes, sir.
24      Q.   And can you just explain why
25  you sent this e-mail to Kyle Davies via

Page 140

1  e-mail at this time on June 14th, 2022?
2      A.   Just to make sure that the
3  notice was delivered to the account
4  holder as well as the Telegram chat, to
5  remove any avoidance of doubt that we
6  notified them.
7      Q.   Thank you, sir.
8      A.   And the account was under that
9  e-mail, so that was the relevant e-mail
10  to reach out to.
11      Q.   So did you consider that to be
12  the formal notice to Three Arrows Capital
13  regarding the state of their account and
14  actions that you might take?
15      A.   Yes.  I consider it to be a
16  form of notice, I don't know if you said
17  an or the.
18      Q.   A form of notice?
19      A.   Yes.
20      MR. GLUECKSTEIN:  If we can move
21  now, I want to move things along here,
22  what will be Exhibit 11, but tab 10,
23  Sam, if you can pull it up.
24      MR. DARBY:  Yes, good to go.
25      (Tackett Exhibit 11, Document

Page 141

1  Bates stamped FTX 3AC 44619, was so
2  marked for identification, as of this
3  date.)
4      A.   It's loaded.
5      Q.   What has been marked as Exhibit
6  11 is an e-mail containing screenshots
7  that have been Bates marked and produced
8  in the case at FTX 3AC 44619.  Do you see
9  that?
10      A.   Mmm-hmm.
11      Q.   The next two pages is a
12  screenshot of what appears to be a Signal
13  chat; is that right?
14      A.   Correct.
15      Q.   And you provided counsel for
16  FTX the Signal chats screenshots,
17  correct?
18      A.   Yes, sir.
19      Q.   And was this the Signal chat
20  that you referred to earlier in your
21  testimony that you said occurred around
22  this time and others at FTX?
23      A.   Yes, sir.
24      Q.   Do you recall who was involved
25  in this Signal chat on June 14th, 2022,

36 (Pages 138 - 141)

Page 142

1 besides yourself?
2     A.   I see Nishad and Ryan and I
3 would assume Sam was in there.  I am not
4 seeing a message from him specifically,
5 but, yeah.
6     Q.    And this would have been a
7 group that you created in Signal.  Was it
8 creating for this purpose, to discuss the
9 3AC situation or were you already
10 corresponding on other matters in this
11 chat?
12       MR. PROULX:  Objection, form,
13    compound, leading.
14     A.   I believe it was created to
15 discuss the specific situation.
16     Q.   So after you start the chain,
17 there is a series of responses from NS;
18 is that Nishad?
19     A.   Yes.
20     Q.   And in his third message from
21 the top he says, "They'd end up very
22 levered long crypto (plus crypto minus
23 USD) if we took away their full LOC right
24 now: Minus 80 million USD, 10 million
25 USD in crypto collateral so if things

Page 143

1 moved they could get liquidated."
2       Do you see that?
3     A.   Mmm-hmm.
4     Q.   Do you have an understanding of
5 what exactly Nishad was conveying to you
6 in that message?
7       MR. PROULX:  Objection.  Calls
8    for speculation.
9     A.   I can respond?
10     Q.   Yes, please do.
11     A.   Yeah.  Basically saying that
12 the LOC that we gave provides positive
13 USD, so if we remove the LOC, that would
14 put them further in the red on the
15 negative USD balance, which could cause
16 them to get liquidated.
17     Q.   And Nishad goes on and asks,
18 "Can we ask them to bring the USD value
19 up to 120 million?"
20       Do you see that?
21     A.   Yes.
22     Q.   And you respond to that
23 message, "They aren't responding,"
24 meaning 3AC, correct?
25     A.   Correct.

Page 144

1     Q.    And then you then pose the
2 question, it looks like 9:50, "Should we
3 turn off withdrawals?"
4       Do you see that?
5     A.   Yes.
6     Q.   So was it your recommendation
7 at this time that withdrawals should be
8 turned off on the 3AC account?
9       MR. PROULX:  Objection to form.
10     A.   I don't know if this is me
11 recommending that, but, yes, at that time
12 I did, that was my position.
13     Q.   Then further down the chain,
14 Nishad responds "Disabled withdrawals."
15       Do you see that?
16     A.   Yup.
17     Q.   Is it your understanding that
18 Nishad is the person who actually
19 disabled the withdrawals on the Three
20 Arrows account?
21     A.   Yes.
22     Q.   And then further down in the
23 Signal chat you then say, "Should we take
24 further steps at 10 o'clock?"
25       Do you see that?

Page 145

1     A.   Mmm-hmm.
2     Q.   What were you contemplating or
3 suggesting as further steps at that time?
4       MR. PROULX:  Objection to form.
5     A.   Start to pull the LOC because
6 they had gone massively negative.  Hadn't
7 deposited.  Had withdrawn additional
8 funds when the opportunity presented
9 itself.  They are not trying to put their
10 account in a good state.  They are
11 actually doing the opposite.
12       And so at that point, are we
13 just waiting for the situation to get
14 worse and, you know, taking that risk or
15 should we start to be proactive in
16 minimizing our own risk and start to pull
17 the LOC.
18     Q.   Ultimately, was the Three
19 Arrows Capital LOC pulled?
20     A.   I don't know.  Yeah, I am not
21 sure if it ended up getting pulled or if
22 it was all just part of the liquidation.
23 I don't know if they were two separate
24 events or if they kind of got jumbled
25 into one.

37 (Pages 142 - 145)

1    Q.   Can you explain what you mean
2 by "part of the liquidation"?
3    A.   Well, I know that their account
4 was liquidated.
5    Q.   Okay.  What do you recall about
6 the liquidation of their account?
7    A.   I remember talking with Nishad
8 about it.  And that, yeah, without any --
9 without any input from 3AC or any, you
10 know, response letting us know that they
11 will bring their account in good health,
12 you know, their collateral was crypto,
13 their negative balances were USD, which
14 means that they are long crypto, short
15 dollar.  If the market keeps going down,
16 that means we are going to eat that.
17       They are clearly not
18 responding.  They are clearly not going
19 to top up.  So, you know, take actions to
20 protective ourselves from basically
21 having a massive hole.  So start to
22 liquidate their account and bring it into
23 good standing, if possible, or if not,
24 you know, follow liquidation.
25    Q.   Do you recall whether that

1 liquidation occurred manually by FTX?
2       MR. PROULX:  Objection to form.
3    A.   So this is something that,
4 again, I think the details matter on.
5 It's not automated in the sense that it
6 wasn't like the system saw they were
7 under their maintenance margin
8 requirement and it started to liquidate
9 them.
10       What I am not sure was a manual
11 process is when Nishad or Sam hit
12 whatever they hit to liquidate, I don't
13 know if the system then goes forward with
14 the liquidation and automated process or
15 if the entire process is then going,
16 okay, this position liquidate, next
17 position liquidate.  So I don't know if
18 the actual process of the liquidation was
19 manual or automated.  But I do know the
20 trigger for the account to be liquidated
21 was a manual process.
22    Q.   That liquidation occurred after
23 the discussion that had taken place on
24 June 14th, 2022 in Exhibit 11, correct?
25       MR. PROULX:  Objection to form.

1    A.   Yes.
2    Q.   Do you have a recollection of
3 generally how much was in the Three
4 Arrows account at the time of that
5 liquidation?
6       MR. PROULX:  Objection to form.
7    A.   No, I don't have specifics.  I
8 remember that a majority of their
9 collateral was in GBTC and FE.  And they
10 had a massive negative USD position.
11    Q.   Are you aware of FTX
12 liquidating any positions out of the
13 Three Arrows Capital's account prior to
14 the liquidation that occurred on or after
15 June 14th, 2022.
16    A.   No.  There may have been
17 automated liquidations.  I don't believe
18 there was any manual liquidations before
19 this date.
20    Q.   Are you aware of any automated
21 liquidations out of the 3AC account prior
22 to this date?
23    A.   No.  But like automated
24 liquidations are something very routine
25 and especially when clients have a lot of

1 sub-accounts.  You know, you can have 100
2 million in one of your sub-accounts and
3 5,000 in one of your sub-accounts and
4 that sub-account gets liquidated, so it's
5 not a big negative or anything on the
6 firm if they do have a liquidation.  So
7 it's not really something that we would
8 be particularly concerned about if they
9 did.
10    Q.   As you sit here today, you're
11 not aware of any such automated
12 liquidations, correct?
13    A.   Correct.
14    Q.   During the period we have been
15 talking about, June 12th, 13th, 14th of
16 2022, after you became aware of the state
17 of the Three Arrows account, were you
18 monitoring their account?
19    A.   Yes.
20    Q.   How were you monitoring the
21 Three Arrows account in this time frame?
22    A.   Looking through the admin panel
23 to see what their account balances were.
24 And checking to see the deposit and
25 withdrawal record.

38 (Pages 146 - 149)

Page 150

1    Q.    And the first thing you said is
2 looking through the admin panel; can you
3 please explain what that is?
4    A.    FTX employees, like myself,
5 that dealt with clients, were able to
6 access an admin panel, which would allow
7 us to see customer balances, positions.
8 Basically we could log in and see the
9 website as the user would be seeing it in
10 a read-only state.
11         And then we could do other
12 things on the admin panel, like disable
13 withdrawals, grant credit lines, remove
14 credits lines, so on and so forth.
15    Q.    With your access to the admin
16 panel, you know, read-only state, would
17 you only be able to execute trades out of
18 that account?
19    A.    No, that wouldn't be read-only.
20    Q.    And then you said you otherwise
21 were monitoring withdrawals; what did
22 that entail?
23    A.    So like I said before, when
24 their account, you know, popped up a bit
25 positive, they continued to withdraw

Page 151

1 money instead of 240 million short on the
2 collateral needed for the credit line, we
3 should be topping up.  The moment they
4 could withdraw, because they no longer
5 had a negative balance, excluding the
6 LOC, they continued to withdraw, which
7 isn't a sign of -- isn't a sign of trying
8 to, you know, bring your account back
9 into a healthy state.  It's the opposite.
10    Q.    Mr. Tackett, if you could just
11 very briefly turn back to Exhibit 3,
12 which was the Telegram chat.
13    A.    Okay.  I am there.
14    Q.    If you can turn to Bates number
15 221, let me see if I can turn you to the
16 page in document, part of the chat that
17 we looked at earlier.
18    A.    I am there.
19         MR. PROULX:  Counsel, I just
20 missed that, did you say 221?
21         MR. GLUECKSTEIN:  Bates 221,
22 yes, sir.
23         MR. PROULX:  Thank you for the
24 clarification.
25    Q.    This is part of the chat that

Page 152

1 we looked at earlier, I just wanted to
2 ask you one follow-up.  In the middle of
3 that page, in your discussion back to
4 3AC, you say, "Just to highlight the
5 issue here..."  Do you see the part of
6 the chat that starts there at 7:16?
7    A.    Yes.
8    Q.    "Just to highlight the issue
9 here, per the agreement we signed, you
10 need to keep 200 percent collateral for
11 the LOC.  Any shortfall of that which
12 isn't topped up within 24 hours is
13 charged 10 percent per day.  Not only are
14 you not within your collateral
15 requirements, you are negative
16 $3,145,735.41 under water as of right
17 now."
18         Do you see that?
19    A.    Yup.
20    Q.    And can you just explain when
21 you write there, the negative number, the
22 negative 3.1 million under water, what
23 you are referring to?
24    A.    It's essentially saying that if
25 we withdrew the 120 million LOC, their

Page 153

1 account balance would be negative
2 $3,145,735.41.
3    Q.    And at this time the LOC
4 remains in place, so they were negative 3
5 million to the 120 million, but their
6 overall account balance at this time
7 remained positive, correct?
8         MR. PROULX:  Objection to form.
9    A.    No, incorrect.  Their account
10 balance was positive because of the LOC,
11 is my understanding based on this
12 message.  Like it's saying that the only
13 reason they see a positive number when
14 they log into the platform is because we
15 gave them 120 million dollars.  Take away
16 that 120 million and they are negative.
17    Q.    Understood.  But at this time,
18 when they had logged in, they would have
19 seen a positive number as a result of the
20 FTX LOC being in place, correct?
21    A.    Correct.  But I also don't
22 believe for a minute that someone logging
23 in on the 3AC team would see 120 million
24 and they would think, oh, great, we have
25 $120 million.

1    Q.   And this is actually the same
2 document, I am happy to represent, we
3 were discussing earlier in the day.  This
4 is Tackett_3AC_000361.  Do you recall
5 looking at this earlier?
6    A.   Yes.
7    Q.   Do you know when the data in
8 this document was accurate as of?
9    A.   I don't know the exact date,
10 no.
11    Q.   Do you have an imprecise date
12 in mind for when this data is accurate as
13 of?
14    A.   I would guess sometime around
15 the collapse.
16    Q.   The collapse of FTX?
17    A.   Of 3AC.
18    Q.   When you say the collapse of
19 3AC, what time period are you referring
20 to then?
21    A.   That would be June 2022.
22    Q.   Okay.  You mentioned earlier
23 that if you were to scroll down in this
24 document, you would see more
25 asset-by-asset positions.  Do you recall

1 that testimony?
2    A.   No, I didn't say if you were to
3 scroll down on this document.  I said if
4 you were to scroll down on this web page.
5    Q.   That's a very fair
6 clarification.  I should have been more
7 precise about that.
8         What sort of asset by asset
9 positions would you see if you were to
10 scroll down on that web page?
11    A.   I don't know.  Well, I know
12 that you would have seen a massive
13 negative USD amount.  You would have seen
14 a large BTCE position and you would have
15 seen a large FE position.
16         Sorry, did I say DBTC or did I
17 say BTCE?  Scratch that.  You would have
18 seen a large negative USD.  You would
19 have seen a large GBTC position.  And you
20 would have seen a large FE position.
21    Q.   And when you refer to those
22 positions, do you have Three Arrows
23 specific positions in mind?
24    A.   Yes, yes.  This is specifically
25 related to the assets that 3AC held or

1 had a negative balance of.  The USD was
2 negative, GBTC and FE were positive.
3    Q.   And how do you know this
4 document relates to Three Arrows,
5 specifically?
6    A.   Well, when I took a picture and
7 sent it to them, I am pretty sure I got
8 it from one of the chats regarding 3AC.
9 Also, it does add up with my
10 recollection.
11         Total collateral used by
12 authentic futures position, not that big.
13 Total collateral used by outstanding spot
14 margin borrows, very large.  They had a
15 massive negative USD position.  So that
16 kind of adds up with that.  Yeah.
17    Q.   What is available collateral,
18 the last line item in this screen shot?
19    A.   The amount of collateral that's
20 available.
21    Q.   Available for what?
22    A.   For positions.
23    Q.   For positions under margin
24 requirements or for positions under other
25 requirements on the exchange?

1    A.   This would specifically relate
2 it to futures or spot margin positions.
3 And again, I do feel like it is necessary
4 to point out that this does not include
5 or that rather this is inclusive of the
6 $120 million.  So it doesn't reflect that
7 120 million LOC as a liability.  It shows
8 it as contributing to this balance and
9 contributing to the available.
10    Q.   Was the line of credit, in
11 fact, a liability?
12    A.   That's money that was in their
13 account that was debt, it's not their own
14 capital, so yes.
15    Q.   Why did you save this
16 particular document or the larger
17 document that contain this screen shot?
18    A.   Probably because I was sending
19 it to somebody internally showing them
20 what was going on with the 3AC account.
21    Q.   Did you just more generally
22 save, save documents that you still have
23 from your tenure at FTX?
24    A.   Yes.
25    Q.   Was that because you were

49 (Pages 190 - 193)

Page 194

1 instructed to do so or is it just your
2 personal practice?
3    A.    Both.
4    Q.    Who instructed you to do that?
5    A.    Well, when I was originally
6 served my subpoena by the FBI, SDNY, FTC,
7 CFTC, all those good three letter
8 agencies, part of it was not destroying
9 any evidence or deleting any of the fee
10 documents and information that I have.
11    Q.    And did you comply with that
12 instruction?
13    A.    Yes, although I believe that
14 Steptoe got the subpoena thrown out
15 because it was ordering me to appear in
16 Court in like three days when I lived in
17 Thailand and it was telling me to appear
18 in Court in the U.S.  So I don't believe
19 those were necessarily binding.  But I do
20 keep work-related things, anyways.
21    Q.    So the word "collateral" as
22 used in the line items here, what does
23 that consist of exactly?
24        MR. GLUECKSTEIN:  Object to the
25    form.

Page 195

1    A.    You need to be more clear on
2 what you're asking for.  Are you saying
3 what assets make up that collateral or
4 how are those numbers reached or can you
5 be specific on what you're asking?
6    Q.    Yeah, I appreciate that
7 clarification.  Happy to try to do so.
8 Thank you, Mr. Tackett.
9        So I understand, let's just
10 refer to the most recent testimony.  I
11 understand that some or all of these
12 balances are inclusive of the line of
13 credit amount; is that right?
14    A.    Yes, I believe so.
15    Q.    Which ones here are inclusive
16 of the line of credit amount?
17    A.    Total USD value of positive
18 spot balances.  Collateral contributed by
19 positive spot balances.  And available
20 collateral.
21    Q.    So let's just take the second
22 of that bunch, collateral contributed by
23 positive spot balances.  So 120 million
24 of that, roughly, is a component of that
25 199; is that right?

Page 196

1    A.    That would be my understanding,
2 yes.
3    Q.    And so the remaining 79 million
4 and change, what does that consist of?
5    A.    As I mentioned, I remember they
6 had a large GBTC and FE position or a
7 large GBTC and FE held in their account
8 as positive spot balances.
9    Q.    Does this collateral
10 contributed by positive spot balances
11 reflect any offsetting of any borrowing
12 of those BTC or other digital coins that
13 you mentioned?
14        MR. GLUECKSTEIN:  Object to the
15    form.
16    A.    Are what do you mean by
17 offsetting, are you asking if they were
18 borrowing GBTC?
19    Q.    Sure.  You know, in addition to
20 however many BTC positive spot Three
21 Arrows had at the time, it also had
22 exactly one BTC borrowed.  Would the
23 total amount of BTC that gets fed into
24 this positive spot balances be the
25 difference between those two or would

Page 197

1 they only consist of assets?
2    A.    The BTC and GBTC are totally
3 different assets.  BTC is bitcoin.  GBTC
4 was BTC that is part of the Grayscale
5 Trust.  So they have different collateral
6 contributions.  So if you have one BTC
7 positive, or that's one GBTC and minus
8 one bitcoin, that doesn't mean that it
9 just nets out to zero, because they are
10 treated as totally different assets on
11 the platform.
12    Q.    Why are they treated as totally
13 different assets on the platform?
14    A.    Because GBTC doesn't have the
15 same fungibility as BTC.  All BTC are
16 fungible.  BCC and GBTC aren't fungible.
17 GBTC is bitcoin that's held in a
18 Grayscale Trust.  Couldn't be redeemed.
19 You're much more limited than what you
20 can do with GBTC than you are with BTC.
21    Q.    So those particular assets
22 don't net off against each other for
23 purposes of some kind of overall?
24    A.    No.  FTX doesn't do any
25 portfolio margining where we would look

50 (Pages 194 - 197)

Page 198

1  at offsetting positions for the purpose
2  of collateral requirements.
3      Q.   Does collateral, as used in
4  this document, consist of any negative
5  balances?
6      MR. GLUECKSTEIN:  Object to the
7  form.
8      A.   So there is collateral used
9  multiple times here.  Total collateral
10  used by outstanding spot margin borrowed,
11  that would be related to the negative
12  balances that you're seeing.  So those
13  are the spot margin borrowed.
14      Q.   And to be clear, are we looking
15  at the second-to-last line item on this
16  document?
17      A.   Yes.
18      Q.   Is that the same thing as
19  saying that this customer had negative
20  121 million and change in spot margin
21  borrows?
22      A.   No.  That is not what that is
23  saying.
24      Q.   Sorry, help me understand the
25  difference.

Page 199

1      A.   So if you have a negative
2  balance, at minimum you need to have 110
3  percent collateral on that negative
4  balance.  So, you know, if I have
5  negative $100,000 worth of bitcoin, I
6  need to have at least $110,000 worth of
7  collateral on the exchange for that
8  borrow.  Spot margin was 10X leverage.
9  Because you're withdrawing it, you need
10  to have 110, otherwise you would be
11  negative.
12      And then also, the way that IMF
13  works, the larger particular spot margin
14  borrow, it can require a lot more
15  collateral.  As such, their requirement
16  could grow to 150 percent.  It's not
17  static at 110 percent.  So, no, that
18  number doesn't directly represent the
19  amount borrowed.  It represents the
20  amount of collateral required for those
21  outstanding borrows.
22      Q.   I think -- thank you for that
23  -- I think I understand.  Let me just
24  maybe just with your example, try to
25  drill down on that to make sure I do.

Page 200

1      So you said if you have a
2  negative 100,000 worth of bitcoin, you
3  would need to have at least 110,000 worth
4  of collateral for that borrow, correct?
5      A.   Correct.
6      Q.   That 110,000 worth of
7  collateral needed for that borrow, that
8  is, when you use the term "collateral"
9  there, that is only positive collateral,
10  right, in other words, that 110 isn't
11  offset by some kind of negative
12  collateral, right?
13      MR. GLUECKSTEIN:  Object to the
14  form.
15      A.   I am not sure what you mean by
16  offset.  So the way that it would work is
17  that you have $110,000 which means you
18  can borrow up to about 100,000.  They are
19  not necessarily offsetting.  You just
20  have a position and then you have the
21  collateral to back that position.
22      Q.   And the collateral backing that
23  position, let me try this again, that is
24  only positive assets, yes?
25      A.   Yes.

Page 201

1      Q.   Why did FTX collapse?
2      MR. GLUECKSTEIN:  Objection.
3      A.   For many reasons.  The biggest
4  one is that Sam misappropriated user
5  funds and put it into venture investments
6  and then paid back Genesis with user
7  funds.  That's basically the crux of it.
8  And then he decided to be an absolute
9  idiot and instead of talking and just
10  telling people, he went silent and again
11  silence is the worst thing that a client
12  or platform or anybody, silence is just
13  the ultimate bad thing, so everybody
14  thought the worst, and then, yeah.
15      Q.   When you refer to
16  misappropriation of user funds, what are
17  the user funds you're referring to there?
18      A.   The funds that users held on
19  the exchange.
20      Q.   That would include fiat
21  currency?
22      A.   Yes.
23      Q.   That would include digital,
24  positive digital assets?
25      A.   Yes.

51 (Pages 198 - 201)

Page 206

1    A.   That's specifically USD.
2    Q.   Why break it out to a
3  specifically USD values?
4    A.   I didn't say USD values.  I
5  said specifically USD.
6    Q.   I apologize, thank you for that
7  clarification.
8         Why break it down to
9  specifically USD and not include just an
10  overall USD value?
11    A.   Because you're on a BTC USD
12  order book.  So it shows your BTC and it
13  shows your USD.  The two sides of the
14  pair that you're trading.  If you were on
15  SBTC, it would show S and BTC.  It's the
16  relative assets for the pair that you're
17  trading.
18    Q.   Okay.  And were there similar
19  order forms for each digital asset that
20  the exchange made available for purchase?
21    A.   There were similar order forms
22  for every pair that was traded on the
23  exchange.
24    Q.   Going back to the user funds
25  that were misappropriated in the

Page 207

1  bankruptcy, did anyone ever tell you at
2  FTX that FTX had misappropriated those
3  funds in that way?
4         MR. GLUECKSTEIN:  Object to the
5    form.
6    A.   To clarify that, you said the
7  funds that were misappropriated during
8  the bankruptcy.  I don't know the funds
9  were misappropriated during the
10  bankruptcy.  I think you mean the funds
11  that were misappropriated leading to the
12  bankruptcy.
13    Q.   That's exactly what I meant,
14  thank you for that clarification.  All of
15  my questions unless I say otherwise are
16  going to be prior to the bankruptcy, we
17  might use the term "prepetition."  But,
18  yes, not the bankruptcy itself, prior to.
19         So did anyone at FTX tell you
20  that FTX was doing this?
21         MR. GLUECKSTEIN:  Object to the
22    form.
23    A.   No.
24    Q.   Did FTX tell its customers it
25  was doing this?

Page 208

1         MR. GLUECKSTEIN:  Object to the
2    form.
3    A.   No.
4    Q.   Did anyone at FTX invoke any
5  provisions of its terms of service as a
6  basis for doing this?
7         MR. GLUECKSTEIN:  Object to the
8    form.
9    A.   I wouldn't know.
10    Q.   No one told you that the reason
11  we did, we took these user funds is
12  because a terms of service allowed us to?
13    A.   No one told me they took user
14  funds, but it saves me a lot of money.
15    Q.   I think none of us would have
16  been here today.
17    A.   Yeah.
18    Q.   Did anyone tell you whether FTX
19  intended to hold user funds in custody
20  for the users?
21         MR. GLUECKSTEIN:  Objection.
22    Calls for a legal conclusion.
23    A.   Is this speaking generally?
24    Q.   Yeah.
25    A.   Yes, FTX would be custodying

Page 209

1  the assets that users deposited.
2    Q.   What is that understanding
3  based on?
4    A.   Why do I understand that FTX
5  would be custodying user funds?
6    Q.   Yeah.
7    A.   Because I am aware of the
8  wallet architecture and the way that
9  exchanges work.
10    Q.   What about the wallet
11  architecture supports the view that FTX
12  custodied the funds?
13    A.   We provide deposit addresses to
14  users on the platform that they would
15  send money to, because they are sending
16  money to us.  We would be custodying it.
17  I know we didn't use a custodian like
18  BitGo or Fireblocks or anything like
19  that -- sorry, Fireblocks isn't a
20  custodian.  And that we did, we custodied
21  in-house.
22    Q.   We talked about Ryan Salame a
23  few times over the course of the day.
24  Let me just first ask a silly question,
25  which is, am I pronouncing his last name

1 correctly, Salame?
2     A.   Nobody really knows.  Yeah.
3 Salame.  Some people say salami.  But,
4 yeah, Salame.
5     Q.   I want to use whatever you use.
6 You know him, I don't.  So what should we
7 go with today?
8     A.   Salame works.
9     Q.   Okay.  Perfect.  We will do
10 that.  You have a view about how Ryan
11 Salame was as an executive of FTX?
12     A.   Ryan was an exemplary employee.
13 He's an exemplary person.  I think what
14 happened to him is an absolute travesty
15 and a complete miscarriage of justice.
16 Absolutely horseshit.  He was an
17 excellent employee at FTX.  And he didn't
18 really work at FTX when it blew up.  But
19 yeah.
20     Q.   When did he stop working at
21 FTX?
22     A.   I think he stayed on for a bit
23 after he got to the Bahamas to help FTX
24 get to the Bahamas.  But by 2022, he
25 was -- by 2022, he was very much out the

1 door.  He wasn't very active with FTX.
2     Q.   And just to clarify, when
3 you're referring to leaving FTX and going
4 out the door of FTX, you're referring to
5 specifically FTX trading, right?
6     A.   No, I am using FTX broadly
7 here, as Ryan was still technically an
8 employee.  But he had tried to resign
9 several times.  And, you know, I would
10 often joke with him, and he would, you
11 know, ask me about something, hey, Ryan,
12 some of us still have to work here,
13 because he was essentially checked out --
14 and now that I answered it, I just
15 spilled some drink on the floor, do you
16 mind if I grab something.
17     Q.   Take the time.  Go off the
18 record.  We will stay on video.
19     THE VIDEOGRAPHER:  The time is
20 11:46 a.m. eastern and we are off the
21 record.
22     (Off the record.)
23     THE VIDEOGRAPHER:  The time is
24 11:47 a.m. Eastern, we are back on the
25 record.

1 BY MR. PROULX:
2     Q.   I think we were talking about
3 Ryan Salame's tenure at FTX trading
4 and/or FTX Digital Markets.  Did you
5 understand him to be affiliated with one
6 or both of those entities?
7     A.   He was affiliated with both.
8 He was more closely affiliated with FDM.
9     Q.   Why was that?
10     A.   Because he was the co-CEO of
11 FDM.
12     Q.   And I am sure I have this
13 somewhere, but maybe you recall quicker
14 than me, roughly when did he step into
15 that position with FDM.
16     A.   I believe he moved to the
17 Bahamas in September of 2021.  So it
18 would be about that.
19     Q.   And were you in the Bahamas
20 with him for some period of time after
21 that?
22     A.   Yes.
23     Q.   You guys had a good personal
24 relationship?
25     A.   He's a very close friend of

1 mine.
2     Q.   And professional, too?
3     A.   Yes, our relationship started
4 professionally.  I was at B2C2.  He was
5 at Circle.  He joined FTX.  He helped me
6 get my job at FTX.
7     Q.   We've uploaded a new exhibit
8 purely for labeling purposes.  It's
9 Exhibit 0.  But it's been premarked as
10 Exhibit 6, so I will refer to it as
11 Exhibit 6.
12     (Exh 6, Document Bates stamped
13 FTX_3AC_000044442, was previously
14 marked for identification.)
15     Q.   Feel free to take a look at
16 that and while it's loading, I will
17 represent this is a document titled "FTX
18 Digital Markets Limited Safeguarding of
19 Assets and Digital Token Management
20 Policy."
21     A.   Yeah.  I see it.
22     Q.   Produced by FTX ending in Bates
23 number 4442.  Are you familiar with this
24 document?  Take the minute to skim
25 through it.

54 (Pages 210 - 213)

Page 214

1    A.    I am.
2    Q.    Why are you familiar with it?
3    A.    Because this is something that
4    we often gave clients in the onboarding
5    process.
6    Q.    The IP clients or clients
7    across the board?
8    A.    Yeah, the IP clients.
9    Q.    Would you have given this one
10    to Three Arrows?
11    A.    Yes.  Are you saying
12    theoretically would I or are you saying
13    did I?
14    Q.    Let's start did you, if you can
15    recall.
16    A.    I don't remember giving this to
17    3AC, no.
18    Q.    But would you as a matter of
19    practice have given it to clients in
20    Three Arrows's shoes?
21    A.    Upon request, yes.
22    Q.    Any reason to doubt that you
23    gave this document to Three Arrows in
24    this case?
25        MR. GLUECKSTEIN:  Objection.

Page 215

1    Misstates the testimony.
2    A.    It's usually something that
3    happens during the onboarding process.
4    It's not oftentimes that, you know,
5    you're well in a relationship with a
6    client and then out of the blue they ask
7    for it.  So I didn't deal with the
8    onboarding of 3AC.  Also, I don't
9    remember 3AC asking for it, so.
10    Q.    Okay.  Possible you gave it to
11    them, but you're not sure?
12        MR. GLUECKSTEIN:  Object to the
13    form.
14    A.    Totally possible.  I don't
15    remember it happening, no.  There is no
16    reason why I wouldn't provide it upon
17    request.
18    Q.    On page 2 of this document
19    there is a section that says Review and
20    Approvals; do you see that?
21    A.    Yes.
22    Q.    And the name under Review and
23    Approvals is Ryan Salame, CEO and it says
24    "Date approved," I am guessing that's
25    August 16th, 2021.  Do you see all of

Page 216

1    that?
2    A.    Yup.
3    Q.    Did you work with Ryan in
4    reviewing or approving this document?
5    A.    No.
6    Q.    Did you speak with Ryan about
7    this document, just to understand what it
8    says?
9    A.    Nope.
10    Q.    But you reviewed it, of course,
11    before providing it to those clients that
12    it was provided to?
13    A.    Yup.
14    Q.    On page 4 of this document,
15    there is a section that says "Objective"
16    and under that "This policies objectives
17    are two," let me know when you're there?
18    A.    I am there.
19    Q.    Okay.  And it refers to one of
20    the policy objectives being to explain
21    how FDM will manage its digital tokens
22    under its custody?
23    A.    Yes.
24    Q.    On page 5, the next page, there
25    is a section that says "FDM's

Page 217

1    Responsibilities."
2    A.    Yup.
3    Q.    And under Key Roles and
4    Responsibilities, there are five or six
5    bullets.  The third of which says "All
6    third-party providers are aware that
7    customer assets are held in trust."  Do
8    you see that?
9    A.    Yup.
10    Q.    Did you understand that to be
11    accurate?
12        MR. GLUECKSTEIN:  Object to the
13    form.
14    A.    No.
15    Q.    Why not?
16    A.    So one is that -- well, to be,
17    actually, to be totally honest, I am not
18    even sure what that technically means,
19    held in trust.  Yeah, so I know that like
20    we were told that, you know, some client
21    accounts have funds in FBO, for benefit
22    of accounts, and they were trying to do
23    like segregated banking accounts for some
24    clients with, I believe, PrimeTrust.  I
25    don't know if that ever happened.  And

1 then the crypto assets, I was not aware
2 of them being held in trust.
3    Q.   The next -- I am sorry, the
4 bullet right above that one says,
5 "All third-party providers will be aware
6 that customer assets do not represent
7 assets of FDM."  Do you see that?
8    A.   Yes.
9    Q.   Was that your understanding of
10 the policy?
11        MR. GLUECKSTEIN:  Objection.
12    A.   Yes.
13    Q.   Was that accurate?
14        MR. GLUECKSTEIN:  Object to the
15 form.
16    A.   I don't know.  I don't know
17 if -- they did end up saying that
18 customer assets were assets of FDM.
19    Q.   Was that FTX's policy that they
20 were not, though, right?
21    A.   It was FTX's policy that they
22 were not, yeah.
23    Q.   Let's go back, please, to
24 Exhibit 80, this is the compilation of
25 Twitter posts that we had looked at

1 earlier.
2        And then on page 14 in here I
3 am referring to like the lower right-hand
4 pagination 14 of 26.
5    A.   Got you.
6    Q.   I'm trying to be better about
7 being clear about that.  Toward the
8 bottom of this page you have a tweet on
9 November 10th, 2022 that says "Per our
10 Bahamian HQ's regulation and regulators,
11 we have begun to facilitate withdrawals
12 of Bahamian funds."
13        Do you see that?
14    A.   Yes.
15    Q.   "As such, you may have seen
16 some withdrawals processed by FTX
17 recently, as we complied with the
18 regulators."  Do you see that?
19    A.   Yes.
20    Q.   Who were you writing to with
21 this tweet?
22    A.   Clients, users, anybody that
23 was affected by what was happening.
24    Q.   And was FTX regulated by
25 Bahamian regulations at this time?

1        MR. GLUECKSTEIN:  Object to the
2 form.
3    A.   As far as I am aware, yes.  I
4 was told that we were, yes.
5    Q.   Do you know when it began to be
6 regulated by those regulations in
7 Bahamas?
8        MR. GLUECKSTEIN:  Objection.
9 Calls for a legal conclusion.
10    A.   I believe it did from the onset
11 of FTX Digital Markets.  As to when those
12 users were moved over from facing FTX
13 trading to facing FTX Digital Markets,
14 that's a different question.
15    Q.   I appreciate that
16 clarification.  When you refer to the
17 onset of FTX Digital Markets, do you have
18 a very rough time period in mind for when
19 that onset was?
20    A.   Safeguarding digital assets was
21 for FDM and that shows that Ryan signed
22 it in August 2021.  So I would assume
23 sometime around there is when that
24 subpoena when, you know, the regulation
25 with the Bahamas came about.  Not that

1 those were applicable to our users,
2 because they were still facing FTX
3 trading at that time but.
4    Q.   And do you understand whether
5 the regulations put restrictions around
6 the way in which FTX was required to
7 treat customer assets?
8        MR. GLUECKSTEIN:  Objection.
9 Cause for a legal conclusion.
10    A.   No, I am not, I am not clear on
11 the specifics of what the requirements of
12 the Bahamas regulations or licensing was.
13    Q.   You're not a lawyer, right?
14    A.   Correct.  I am also ignorant as
15 to the specifics of the Bahamas
16 licensing.  If you wanted to ask me
17 about, you know, other specific licensing
18 requirements, I might know.  But as to
19 what the Bahamas requires, I do not.
20    Q.   Are you familiar with any other
21 licensing requirements that apply to FTX
22 in June of 2022?
23        MR. GLUECKSTEIN:  Objection.
24    A.   In the U.S., yes, the
25 requirements for money transmission

56 (Pages 218 - 221)

Page 222

1 licenses, and things like that.
2    Q.    Understood.  Understood.  We
3 may come back to that.
4    A.    Okay.
5    Q.    Earlier in the day you were
6 asked a couple of questions about FTX's
7 margin program and borrowing under that
8 program.  Do you recall that general
9 discussion?
10    A.    I do recall that discussion.
11    Q.    And just so I am using the same
12 language as you, and hopefully the same
13 pronunciation in some cases, what term do
14 you use to describe that program?
15    A.    The spot margin program?
16    Q.    Sure.
17    A.    Spot margin.
18    Q.    Okay.  So I will refer to spot
19 margin.
20    A.    Spot margin/margin lending.  If
21 you're on the lending side, you would
22 probably use margin lending.  If you're
23 on the trading side, you would probably
24 use spot margin.
25    Q.    I think I understand.  If I am

Page 223

1 ever saying it wrong, please just feel
2 free to correct me; okay?
3    A.    Will do.
4    Q.    And you were asked a question
5 by S&C about when a customer participated
6 in that program who they were borrowing
7 from; do you recall that question?
8    A.    I do.
9    Q.    Okay.  And you said it depends
10 on whether you're trading futures or
11 other types of positions; do you recall
12 that?
13        MR. GLUECKSTEIN:  Object to the
14    form.
15    A.    No, because we were speaking
16 specifically on spot margin.  From the
17 futures you're not borrowing from anybody
18 because it's derivative product.  In spot
19 margin you're borrowing from somebody.
20    Q.    And in your view that somebody
21 was another user of the exchange?
22    A.    I know that FTX/Alameda would
23 sometimes participate in the margin, spot
24 margin market itself.  But by and large,
25 yes, you're interacting with other spot

Page 224

1 margin market participants.
2    Q.    When you say interacting,
3 you're not interacting directly, are you?
4    A.    No.  They would look at the
5 lenders and you would look at what the
6 minimum rate would be to satisfy all
7 outstanding borrows.  And then that would
8 determine the borrow rate for that
9 period.  So it's done from a pool, not
10 individual from individual.
11    Q.    And do you understand the pool
12 process of margin, spot margin borrowing,
13 to involve code or architecture on the
14 exchange?
15        MR. GLUECKSTEIN:  Object to the
16    form.
17    A.    Yeah, I am not really clear
18 what you're asking.  Yes, obviously there
19 was code running on the exchange that was
20 operating in the spot margin market.
21    Q.    And were you familiar with
22 that, the code that operated those spot
23 margin market?
24    A.    I am not a developer, so I
25 wouldn't be familiar with any code of

Page 225

1 FTX.
2    Q.    You didn't run that code
3 personally?
4    A.    I am not quite sure what you're
5 asking, because if you go on FTX.com,
6 technically you're running code when you
7 use a website.
8    Q.    Right.  You didn't -- go ahead,
9 please.
10    A.    I was just going to say, I
11 engaged in the spot margin market.  I
12 went out.  I used it.  I have been on the
13 website.
14    Q.    Right.  You don't know what the
15 code provides in terms of identification
16 of lenders, do you?
17    A.    No, I don't.
18    Q.    Identification of borrowers?
19    A.    No.
20    Q.    Whether the lends and borrowers
21 were simultaneous?
22        MR. KAST:  Object to the form.
23    A.    What do you mean whether the
24 lends or borrowers are simultaneous?
25    Q.    If pursuant to the code that

57 (Pages 222 - 225)

Page 226

1 operated this spot margin program, the
2 lending and borrowing of assets in the
3 spot margin program were simultaneous
4 with one another.
5        MR. GLUECKSTEIN: Object to the
6 form.
7    A.   No, I am not clear, but I know
8 that the auction would basically occur
9 every hour, and that's when the rate was
10 determined.
11    Q.   Do you have an understanding of
12 whether assets move between wallets when
13 borrowed or lent pursuant to the spot
14 margin program?
15    A.   When you say wallets, do you
16 mean internal wallets within FTX or do
17 you mean within user account wallets or
18 user account balances on the platform?
19    Q.   Do you have an understanding of
20 whether it moved in either scenario?
21        MR. GLUECKSTEIN: Object to the
22 form.
23    A.   Well, they would move on the
24 exchange and how they are represented in
25 the accounts. So if I borrowed, I would

Page 227

1 get a negative in my account. If I lent,
2 it would show up as being lent. There
3 wasn't an on chain activity tied to the
4 borrow or borrower loans, so that it
5 wasn't tied to on-chain movements between
6 wallets.
7    Q.   That negative, that might
8 result in an account or a positive, as
9 the case may be, that was something
10 affected by FTX via its ledger, right?
11    A.   Yes, the debiting and crediting
12 would be done through the ledger on FTX.
13    Q.   Are you aware of any instance
14 where an individual who lent assets,
15 pursuant to the spot margin program, was
16 not repaid or recredited for the lending
17 of those assets?
18        MR. GLUECKSTEIN: Objection.
19    A.   No, I am not aware of any such
20 instances.
21    Q.   Even though I believe you
22 testified earlier that there were
23 occasions where customers accrued an
24 overall negative account balance that
25 participated in the spot margin program?

Page 228

1        MR. GLUECKSTEIN: Object to the
2 form. Misstates the testimony.
3    A.   I didn't say that it happened
4 to people specifically on the spot margin
5 market. I said that you're not allowed
6 to have negative balances on the
7 exchange. Yes, negative balances did
8 occur. In that instance, usually FTX
9 would just eat the loss.
10        MR. PROULX: Let's take a break
11 here. Five minutes, does that work
12 for you, Zane.
13        Off the record.
14        THE VIDEOGRAPHER: The time is
15 12:05 p.m. Eastern, we are off the
16 record.
17        (Off the record.)
18        THE VIDEOGRAPHER: The time is
19 12:15 p.m., Eastern, we are back on
20 the record.
21 BY MR. PROULX:
22    Q.   Mr. Tackett, earlier in the day
23 you were asked some questions about
24 futures contracts. Do you recall that
25 discussion, generally speaking?

Page 229

1    A.   You would have to be more
2 specific. We had a lot of conversations
3 around futures. But, yes, I do remember
4 discussing futures earlier today.
5    Q.   Happy to be more specific,
6 thank you for that. You were given some
7 testimony about something called the mark
8 price and something called the index
9 price, do you recall that, that specific
10 testimony?
11    A.   I do.
12    Q.   I am still struggling a little
13 bit to understand the difference between
14 the two. Can you help me better
15 understand it?
16    A.   Sure. To simplify it, the mark
17 price is the reference price on FTX. So
18 if you want to know what price we are
19 using at FTX for a specific asset, that's
20 the mark price. The index price is the,
21 what FTX, basically, considers to be the
22 price of this asset across exchanges,
23 across the industry as a whole. So the
24 FTX price is the price on FTX, on the FTX
25 market. The index price is the price

1 multiple users' lines of credit metrics?
2    A.    Yes.
3    Q.    Three Arrows being one of them?
4    A.    Correct.
5    Q.    Staying with this Exhibit 20,
6 are there any provisions in that second
7 part of the document beginning on page 2
8 and then continuing to the end that you
9 found unclear or ambiguous --
10    A.    No.
11    Q.    -- any that you raised with Can
12 Sun or Dan Friedberg?
13    A.    Not to my recollection, no.
14    Q.    There is this term
15 "indebtedness," I am on page 2. It's
16 like on the second paragraph under that
17 second heading of the document. Do you
18 see where I am looking?
19    A.    Yes. "Together the Indebtedness
20 is set forth herein"?
21    Q.    Exactly. The term capital I,
22 "Indebtedness"; do you see that?
23    A.    Yes.
24    Q.    This term is used in a couple
25 of places later on in the document, I am

1 wondering if you know what that means?
2        MR. GLUECKSTEIN: Objection.
3    Calls for a legal conclusion.
4    A.    I wouldn't be able to give you
5 the exact definition of it, no.
6    Q.    Do you know of any documents
7 that would have presented to Three Arrows
8 or another recipient of a line of credit,
9 the amount of the indebtedness as used in
10 this document?
11        MR. GLUECKSTEIN: Object to the
12    form.
13    A.    Can you repeat your question?
14    Q.    I know we have been going for a
15 while. I will try to keep the questions
16 even punchier.
17        Do you know of any documents
18 that would have told Three Arrows or
19 other recipients of a line of credit what
20 its indebtedness was?
21    A.    This document itself, no?
22    Q.    Numerically.
23    A.    Yes. This document itself, no?
24 This USD 120 amount, 120 million.
25    Q.    So that's you interpret

1 indebtedness to just refer to the face
2 amount of the line of credit?
3    A.    Well, I assume if they are
4 further short beyond that, then it could
5 be in excess of it.
6    Q.    When you say further short
7 beyond that, what does that mean?
8    A.    If you went negative beyond
9 your LOC, that it could be more than what
10 is just, more than just what is written
11 here.
12    Q.    And then to be precise, because
13 I know this is all confusing, but what
14 does it mean then when negative, how does
15 one when negative beyond a line of
16 credit?
17        MR. GLUECKSTEIN: Object to the
18    form.
19    A.    If your account balance is
20 below that of the line of credit, then
21 you would be short whatever the line, you
22 know, whatever the line of credit plus
23 that shortfall.
24        So if I put 120 million in your
25 account and you have 115 million then you

1 owe me 125 million.
2    Q.    You owe who?
3    A.    FTX.
4    Q.    Section 2 on the next page
5 here.
6    A.    Yes, payment upon demand?
7    Q.    Yes, this also uses that term
8 "Indebtedness" with a capital I.
9        I will just read it, "Customer
10 shall at all times be liable for the
11 payment upon demand of the principal, if
12 applicable, plus any debit balance or
13 other obligations owing under this
14 agreement. At any time FTX may 'hall'
15 the indebtedness upon notice to
16 customer."
17        Do you see that?
18    A.    Yeah, which is essentially what
19 I was just saying. The LOC principle
20 plus any further negative amounts.
21    Q.    And that's negative relative to
22 the face amount of the line of credit,
23 not negative overall account balance; is
24 that right?
25    A.    Well, it would include both,

Page 258

1 because if you're negative on your LOC,
2 that would mean you also have gone
3 negative on your account balance, because
4 that means the only funds that are
5 remaining is our funds and you're
6 negative. So your account balance is,
7 essentially, negative.
8    Q.   Did FTX make a demand in the
9 case of Three Arrows to haul its
10 indebtedness?
11   A.   Yes.
12   Q.   And when was that?
13   A.   I believe you were saying it
14 was on June 14th, no?
15   Q.   Any earlier point in time to
16 your knowledge in which FTX called any
17 indebtedness that Three Arrows may have
18 had?
19   A.   I mean I guess you could say
20 when we collected interest payments that
21 may be hauling some of the indebtedness,
22 which would have happened beforehand.
23   Q.   Well, the first line of this
24 provision refers to being liable for the
25 payment upon demand. Did FTX regularly

Page 259

1 send some kind of written demand notice
2 for interest payments?
3    A.   That's exactly what I am
4 saying. "Customer shall at all times be
5 liable for the payment upon demand of the
6 principal, if applicable, plus any debit
7 balance."
8       So we did reach out, we did
9 collect interest payments from clients,
10 as well. So the principal isn't
11 applicable, but the interest payment, I
12 believe, you could say any debit balance.
13   Q.   We talked a lot about the, what
14 happened on the 14th. We will come back
15 to that in a little bit.
16      But are you aware that a
17 substantial amount of assets were sold
18 out of 3AC's accounts on June 13th, 2022,
19 as well?
20   A.   So as we mentioned before, the
21 times that are based on this would be
22 Thailand times. So even though it shows
23 as June 14th, so like looking at it now,
24 it shows, you know, 6 a.m. on June 14th,
25 that would be June 13th, depending on

Page 260

1 were you are. So it's not clear what
2 you're saying is the same event or not.
3    Q.   Do you have a document up in
4 front of you right now that you're
5 looking at?
6    A.   We have the one we were looking
7 at earlier, what was it, the exhibit,
8 hold on, Exhibit Share is loading.
9    Q.   I just want to make sure we are
10 all looking at the same thing here.
11   A.   What's the first one they had
12 us do, the group chat, what was that,
13 Exhibit 3.
14   Q.   Okay.
15   A.   Page 15, right? This is the
16 earlier one. Exhibit 4. Which one is
17 it?
18   Q.   Why don't we put that aside. I
19 think I know what you are talking about.
20 We can come back to it if I ask you about
21 specific questions on it.
22      Let me ask you this: Prior to
23 the liquidation that FTX conducted of
24 Three Arrows' accounts, did FTX sell or
25 liquidate any of the assets that are

Page 261

1 associated with Three Arrows accounts?
2    A.   Sorry, can you repeat that?
3    Q.   Sure. Prior to the liquidation
4 that we are talking about here that FTX
5 conducted on Three Arrows' accounts that
6 was done manually, did FTX take any
7 action to sell or liquidate assets in
8 Three Arrows' accounts?
9    A.   I am not aware of any manual
10 procedures that happened. But as I
11 mentioned before, when you have many
12 sub-accounts, each sub-account acts as an
13 independent silo. So if they were short
14 of margin on any of those independent
15 sub-accounts, they could have faced
16 automated liquidations. And that
17 wouldn't surprise me at all considering
18 the state of the market and the state of
19 3AC on those days.
20   Q.   You're not sure what amount, if
21 any, of the assets that were sold out of
22 Three Arrows' accounts were
23 auto-liquidated prior to the manual
24 liquidation.
25      MR. GLUECKSTEIN: Objection.

66 (Pages 258 - 261)

Page 262

1    A.   Correct, I am unsure.
2    Q.   Now let's turn to the document
3  I think you were just referencing.  We
4  are going to introduce a new version of
5  it.  And this will be Exhibit 84.  I
6  believe it's an identical telegram
7  exchange to what was shown to you earlier
8  ending in Bates number 158.  Let me know
9  when you have that available.
10        (Tackett Exhibit 84, Document
11     Bates stamped ending in 158, was so
12     marked for identification, as of this
13     date.)
14    A.   I have it up.  What page number
15  do you want me to go to?
16    Q.   Sure.  Let's try 62.
17    A.   Okay, got it.
18    Q.   Make that 63.
19    A.   Okay.
20    Q.   Thanks for your patience, make
21  that 64, and we are good.
22    A.   All right.  Get to the good
23  stuff.
24    Q.   Yeah.  I'm skipping over stuff,
25  shortcutting this, I know we talked about

Page 263

1  this earlier, so trying to streamline
2  here.
3        At the top of this page, ending
4  in 221 --
5    A.   Yes.
6    Q.   -- you say "So I am getting an
7  error that says 'account does not have
8  enough balances.'  I can override that,
9  but it might liquidate you."
10        Do you see that?
11    A.   Yup.
12    Q.   Who had authority to override
13  those sort of errors, as a general
14  matter?
15    A.   I believe I could do it on my
16  end, if I am not mistaken.  But otherwise
17  Nishad definitely would have been able
18  to.
19    Q.   Is there a list somewhere of
20  the Three Arrows personnel that would
21  have been recipients of this Telegram
22  exchange?
23    A.   I wouldn't be surprised if it's
24  in the export that I gave, but I am not
25  sure.  I mean I can easily find out that

Page 264

1  information.  And I think this also shows
2  removals and additions to the chat, so
3  you would be able to, basically, be able
4  to rebuild it based on the removals.
5    Q.   We will not have you do that
6  here today for sure.  That methodology
7  that should have occurred to us, but
8  didn't.  So thank you for that.  All
9  right.  Let's put that aside for a
10  moment.
11        We are going to look at a
12  different version of a document
13  previously produced in half a second.
14  There's a new document available, it's
15  Exhibit 34.
16        (Tackett Exhibit 34, Document
17     Bates stamped FTX_3AC_000013568, was
18     so marked for identification, as of
19     this date.)
20    A.   Okay.  It's up.
21    Q.   And you have basically seen the
22  bottom part of this already, that was the
23  hard to read light text and I am happy to
24  represent that like S&C, we have
25  extracted the text so it's actually

Page 265

1  legible on the last two pages of this
2  document, which I am happy to look at
3  together.
4        So the question is, why did you
5  forward this exchange to Nishad, Dan
6  Friedberg, Sam and Can Sun?
7    A.   They probably asked me to, if I
8  had to guess.
9    Q.   Do you have an understanding of
10  what they said when they may have asked
11  you to?
12    A.   No, I don't have any direct
13  recollection.
14    Q.   Earlier you were asked why you
15  sent this e-mail to Kyle Davies at the
16  bottom of this portion of the chain.
17    A.   Mmm-hmm.
18    Q.   And you answered, I am quoting
19  from the rough transcript, "To remove any
20  avoidance of doubt that we notified
21  them."
22        Do you recall that testimony?
23    A.   Yeah.
24    Q.   Why was it important to you to
25  remove any doubt about whether Three

Page 266

1  Arrows received notice of FTX's
2  intentions?
3      A.   Because I didn't want them to
4  be able to say something along the lines
5  of, like, but it wasn't delivered to the
6  e-mail that the account is over or
7  something like that.  Or oh, I didn't see
8  that telegram message, you know.
9          You know, the formal
10  communication with an account should
11  happen through its, should at least be
12  posted to its e-mail.  And so I wanted to
13  make sure that the e-mail was sent to the
14  e-mail on file for that account.
15      Q.   And is that because you
16  understood that notice was required of
17  the intent to liquidate?
18      MR. GLUECKSTEIN:  Objection.
19  Calls for a legal conclusion.
20      A.   No, again, I believe according
21  to paragraph 5 or Section 3 of the LOC,
22  it says that we can pull it at any time
23  for any reason whatsoever.
24          So it wasn't my understanding
25  that notice needed to be provided.  But,

Page 267

1  you know, it's best to do your best to
2  give notice on large events such as that.
3      Q.   But this e-mail was to Kyle
4  Davies wasn't only about removing the
5  line of credit, it was also about a
6  potential liquidation of the account,
7  right?
8      A.   Well, the removing of line of
9  credit would trigger liquidation, because
10  it didn't have sufficient collateral to
11  maintain their positions.
12      MR. PROULX:  Let's take a short
13  break here.  Five minutes is fine with
14  us.
15      THE VIDEOGRAPHER:  The time is
16  1:05 p.m., Eastern and we are off the
17  record.
18      (Off the record.)
19      THE VIDEOGRAPHER:  The time is
20  1:16 p.m., Eastern, we are back on the
21  record.
22  BY MR. PROULX:
23      Q.   Thank you, go ahead.
24      A.   One thing I wanted to clear up,
25  at the end before we hopped off, you said

Page 268

1  this was the e-mail that was regarding
2  liquidating their account.  But I see in
3  the e-mail that we removed the line of
4  credit and because of that, that would
5  result in them in being levered loan
6  crypto and depending on the state of that
7  leverage, the account may be liquidated.
8      Q.   I appreciate that
9  clarification.  Yeah, you were providing
10  notice to Three Arrows, were you not,
11  that a possible outcome of this situation
12  was liquidation by FTX of Three Arrows'
13  accounts?
14      A.   Yes, that without the line of
15  credit that was sitting in their account,
16  they did not have sufficient funds to
17  maintain the positions that they held.
18  And so by liquidating their position, or
19  by pulling the LOC, that would, that
20  could very well result in liquidation of
21  their account.
22      Q.   Understood.  And when exactly
23  was the line of credit sitting in their
24  account until?
25      A.   Well, in the other chat, there

Page 269

1  you go, 6 p.m. Eastern time.
2      Q.   Up until that point in time,
3  the collateral available under the line
4  of credit was still available to Three
5  Arrows; is that correct?
6      A.   I believe so, yes.
7      Q.   Okay.  Looking back then at the
8  Exhibit 20, this is the line of credit
9  document.
10      A.   Let me pull that up.
11      Q.   Please.
12      A.   Okay.
13      Q.   Now I am not going to ask you
14  to interpret any of the provisions.  My
15  question is different.  My question is
16  simply:  Did you represent to anyone or
17  did anyone represent to you the provision
18  or provisions in this document pursuant
19  to which FTX liquidated Three Arrows'
20  account?
21      MR. GLUECKSTEIN:  Object to the
22  form.
23      A.   So you're saying was it made
24  clear to me what they were in breach of
25  in this contract that would lead to them

Page 274

1  85.  For the record in the meantime, this
2  is titled "Account Margin Management
3  Ending in 844488." Let me know when you
4  have that up in front of you.
5      A.   I do.
6          [Tackett Exhibit 85, Document
7      Bates stamped FTX_3AC_000044488, for
8      identification, as of this date.]
9      Q.    Zero price is defined -- well,
10 let me ask, are you familiar with this
11 document?
12     A.   Yes.
13     Q.    Do you recall at what point in
14 time or times that this document was in
15 effect?
16     A.    We did end up updating our help
17 desk over the summer, I believe, of 2022,
18 and I don't know when this was taken
19 from, if this would be -- let me look a
20 little bit more.
21     Q.    Just so you know where I am
22 going next.  I am going to point you to
23 page 6 and the definition of zero price
24 there.
25     A.    So I believe that this would

Page 275

1  have been the older one, because I
2  believe we ended up moving the position
3  zero price -- oh, no, so this might be
4  the new one, because there is position
5  zero price there.  The fill price of
6  bankrupted account would receive for a
7  particular position.  Yeah, this might be
8  the updated version.  I am not certain,
9  though.
10     Q.    Whatever this version was,
11 effective as of the definition of zero
12 price here is that the actual sale price,
13 even if not the market price, that
14 results in the relevant account's overall
15 account balance being zero?
16     A.    That is what that says, yes.
17     Q.    And do you have an
18 understanding of whether this one would
19 have been in effect in June of 2022?
20     A.    I can't remember if this is the
21 updated one or not.  To be honest, if I
22 had to guess, I think this is the updated
23 version, which wouldn't have been in
24 effect, because if my memory serves, we
25 moved away from just having zero price to

Page 276

1  also having position zero price.  And
2  that was after the Luna blowup, and so I
3  think -- hold on, I am pretty sure this
4  is the, this is the updated version that
5  would not have been in effect when 3AC
6  was liquidated.
7      Q.    Okay.  Let's try a different
8  document then.  So we'll show you Exhibit
9  22, instead.
10     A.    Okay.  Let me go grab that.
11         (Exhibit 22, Document Bates
12     stamped ending in 45167, was
13     previously marked for identification.)
14     Q.    And that is been previously
15 marked as Exhibit 22.  It's an FTX
16 produced document, ending in 45167 titled
17 "Liquidations."
18     A.    Okay.
19     Q.    Are you familiar with this
20 document?
21     A.    Yes.
22     Q.    Do you have an understanding of
23 whether this document was, in effect, in
24 the June 2022 time period?
25         MR. GLUECKSTEIN:  Object to the

Page 277

1      form.
2      A.    So I don't see this one
3  referencing PVP, so I believe that this
4  one --
5      Q.    Take a look at the bottom of
6  page -- I am sorry, please finish, I
7  didn't mean to cut you off.
8      A.    So I think this would have been
9  the one that was in effect, because I am
10 just seeing zero price and not PVP.
11     Q.    So then take a look at the
12 bottom of page 2.
13     A.    Yeah.
14     Q.    And under the heading step 2,
15 where step 2 refers to the, as I
16 understand it, the function provided by
17 the backstop liquidity providers or BLPs,
18 are you familiar with that term?
19     A.    Yes.
20     Q.    And then the third-to-last
21 paragraph in the bottom it says
22 "Liquidated account closes at ZP"; do you
23 see that?
24     A.    Yes.
25     Q.    And ZP is zero price there?

Page 278

1    A.   Mmm-hmm.
2    Q.   And then it provides
3  specifically the formula that ZP is
4  assuming; do you see that there?
5    A.   Yes.
6    Q.   And that is not two-thirds
7  market price plus one-third market price,
8  right?
9    A.   No.  That's not market price
10  that's mark price.  That's two liquid
11  times zero price plus one-third times
12  mark price.
13    Q.   Okay.  Do you have an
14  understanding of whether that would be,
15  given that we are factoring in the zero
16  price as a component of this, more or
17  less than the overall market price of the
18  assets sold?
19    A.   I believe it would depend if it
20  was long or short.
21    Q.   And if you're long?
22    A.   I think I would have to go back
23  to the previous document we were looking
24  at --
25    Q.   Okay.

Page 279

1    A.   -- because I think if you're
2  long, it would be below.  If you're
3  short, it would be above.
4    Q.   If you want to take a look at
5  the previous document, that's Exhibit 85.
6  By all means please feel free, but I just
7  want to make sure that understanding is
8  correct.
9       (Witness reviews document.)
10    A.   Yeah, I think that's right.
11    Q.   Thank you.  You can put that
12  document to the side for a moment.
13       Who are the backstop liquidity
14  providers?
15    A.   There are a number of backstop
16  liquidity providers.
17    Q.   Was Alameda Research one of
18  them?
19    A.   Yes.
20    Q.   Do you know if Alameda Research
21  was the backstop liquidity provider that
22  took over Three Arrows' accounts in
23  connection with its liquidation on June
24  14th?
25    A.   I do not.  However, the way

Page 280

1  that BLP usually works is it's done on a
2  pro rata basis, based on your share of
3  the overall backstop liquidity provider,
4  so let's see what I am looking for,
5  capacity, it's done pro rata based on the
6  BLP capacity.  So if you represent 5
7  percent of overall BLP capacity, you
8  would receive 5 percent of the
9  liquidation or BLP handoff.
10    Q.   Putting aside for the moment
11  who the backstop liquidity providers were
12  that received that handoff, do you have
13  an understanding of who the counterparty
14  to the FTX initiated liquidation was on
15  June 14th?
16    A.   No.
17    Q.   FTX has represented in this
18  litigation that it was also Alameda; do
19  you have any reason to dispute that?
20    A.   No.
21    Q.   FTX has also represented that
22  the approximate total actual value, not
23  necessarily market value, of the assets
24  sold by FTX on June 14th, was 82 million.
25  Do you any reason to doubt that?

Page 281

1    A.   I am curious what you mean by
2  actual value versus market value.
3    Q.   By actual value, I mean the
4  size of each position sold by the price
5  at which it was actually sold to the
6  counterparty.
7    A.   The price that each position
8  was sold -- sorry, repeat that?
9    Q.   Sure.  By actual value or price
10  sold, I mean the, you know, the quantity
11  of each position sold, multiplied by the
12  price at which that, that asset or
13  position was sold.
14       MR. GLUECKSTEIN:  Objection.
15    A.   And so you're saying that the
16  amount that, the amount of positions that
17  were closed were equal to $82 million?
18    Q.   Yes, I am saying FTX has
19  represented that.  And I am asking if
20  that strikes you as incorrect or correct?
21       MR. GLUECKSTEIN:  Objection.
22    A.   I would also say that sold is
23  probably not the right word here, because
24  if they were short, it would have been
25  bought back.  Just saying sold probably

71 (Pages 278 - 281)

Page 282

1 isn't the right term but the amount
2 liquidated. No, I don't have any reason
3 to dispute that.
4    Q.   Now, please turn back to
5 Exhibit 84. This is the lengthy telegram
6 in which we are just going to look at one
7 page here --
8    A.   Okay.
9    Q.   -- specifically, page 65 again.
10 6-5. And that same line, second line
11 from the top, "If you pulled the LOC, you
12 would be negative 83 million or so." Do
13 you see that again?
14    A.   Yes.
15    Q.   And I am just wondering if
16 there is any correlation or relationship
17 between the amount negative Three Arrows
18 would be here, as you represented, and
19 the 82 million that FTX has represented
20 were actually sold?
21        MR. GLUECKSTEIN: Object to the
22    form.
23    A.   So you're saying the 82 million
24 of positions was sold, but this message
25 is specifically about balance?

Page 283

1    Q.   Yes.
2    A.   So I am not sure how related
3 those are.
4    Q.   No reason to think they are
5 related?
6    A.   No. Not without more
7 information.
8    Q.   Do you have an understanding of
9 how FTX selected the specific assets that
10 it did to be liquidated on June 14th?
11        MR. GLUECKSTEIN: Object to the
12    form.
13    A.   I would assume just the
14 account, what assets are in the account.
15    Q.   Do you have a sense of who
16 would have made that decision, what
17 assets to liquidate?
18    A.   Nishad and Sam.
19    Q.   Do you recall any
20 communications around this time the price
21 at which Nishad or anyone else should
22 liquidate the assets?
23    A.   No.
24    Q.   Did the liquidation include the
25 closure of any futures contracts that

Page 284

1 Three Arrows had entered into by that
2 point and were open?
3    A.   If they had any open futures
4 contracts at the time of liquidation, it
5 would.
6    Q.   But you're not sure whether --
7    A.   I don't know their exact
8 position at the time of liquidation, no.
9    Q.   Okay. If any other customers
10 liquidated pursuant to a line of credit
11 issue, do you recall seeing specific
12 prices given to the person that
13 liquidated to liquidate those assets at?
14        MR. GLUECKSTEIN: Object to the
15    form.
16    A.   No. I do know that during the
17 Luna blowup, there were other clients who
18 had confusion around the zero price that
19 they were liquidated at.
20    Q.   I am going to show you Exhibit
21 86.
22        (Tackett Exhibit 86, Document
23        Bates stamped ending in 44622, was so
24        marked for identification, as of this
25        date.)

Page 285

1    Q.   This is an e-mail exchange
2 between yourself and Samuel Darby from
3 Sullivan and Cromwell. The top e-mail is
4 dated September 27th, 2025, ending in
5 44622, produced by FTX.
6    A.   Okay.
7    Q.   The first question is are you
8 familiar with this e-mail exchange?
9    A.   Yup.
10    Q.   Okay. And you are familiar
11 with it because you were a participant in
12 it?
13    A.   Yes.
14    Q.   Now, if you flip to page 3 --
15    A.   Yup.
16    Q.   -- and this is the same, what I
17 believe you testified was a Signal chat
18 that you had testified to earlier; do you
19 recognize this?
20    A.   Yup.
21    Q.   First question is, did this
22 Signal chat extend before June 14th,
23 2022?
24    A.   It doesn't appear that way. It
25 says June 14th, 2022 you created the

72 (Pages 282 - 285)

Page 286

1 group. You being me.
2   Q.   And like taking the other
3 bookend, do you recall any continuation
4 of this Signal chain after Ryan Salame's
5 last e-mail on the second page of it?
6   A.   No, not really.
7   Q.   The first line of this Signal
8 chat refers to hearing rumors about 3AC's
9 financial condition; do you see that?
10   A.   Yeah.
11   Q.   You testified earlier in the
12 day about other rumors. And my first
13 question is, when do you first start to
14 hear these rumors about 3AC's financial
15 condition?
16   A.   I don't have an exact date or
17 time. I would just say around the Luna
18 blowup.
19   Q.   And why is that?
20   A.   Because they had been very
21 involved in the Luna trade. And then,
22 you know, if you're not hearing any
23 responses from people, that's usually not
24 a good sign. And so then people start to
25 talk. And then counterparties reach out

Page 287

1 to other counterparties to get
2 information and rumors start to spread.
3   Q.   And do you understand that
4 other folks at FTX, by and large,
5 generally understood the connection
6 between the Luna crash and Three Arrows?
7   A.   You would have to be more
8 specific with what you're asking.
9   Q.   Sure. You said that Three
10 Arrows had been very involved in the Luna
11 trade, right?
12   A.   Mmm-hmm.
13   Q.   Did other folks at FTX have a
14 general understanding, to your
15 understanding, of the Three Arrows
16 involvement in the Luna trade?
17   A.   I would assume so. I can't
18 speak to other's knowledge. But, you
19 know, we were all active in the crypto
20 space. And we were all on Twitter. And
21 Su Zhu wasn't exactly a quiet person.
22   Q.   That's fair. Do you recall any
23 specific discussions prior to everything
24 that went down with the liquidation, any
25 specific discussions with people at FTX

Page 288

1 regarding Three Arrows' condition between
2 the Luna crash and June 14th?
3       MR. GLUECKSTEIN: Object to the
4   form.
5   A.   No.
6   Q.   Do you recall any Signal chats
7 with Nishad Singh, in particular, late
8 May/early June, about 3AC's financial
9 troubles?
10   A.   Other than the ones in the
11 chat, not really -- sorry, outside of the
12 one in the Exhibit Share, not really.
13   Q.   Let's turn back to, briefly, to
14 Exhibit 81.
15   A.   Okay.
16   Q.   Flip to page 7 of that
17 document, this is your e-mail exchange,
18 one of your e-mail exchanges with
19 Sullivan and Cromwell.
20   A.   Yes.
21   Q.   You were asked a question,
22 roughly in the middle of this page, with
23 a black bullet point that says "In early
24 June 3AC had approximately 1.5 billion of
25 assets on the account and then it

Page 289

1 decreases, essentially, to zero dollars.
2 What do you understand happened to those
3 assets?"
4       Do you see that question?
5   A.   Yes.
6   Q.   And your response, "They
7 withdrew a lot, they lost a lot on open
8 positions, they lost a lot from their
9 collateral-losing value (crypto dumped)."
10       Do you see that?
11   A.   Yes.
12   Q.   Did you understand that Three
13 Arrows had approximately 1.5 billion of
14 assets on its account in the early June
15 time period?
16       MR. GLUECKSTEIN: Object to the
17   form.
18   A.   It wouldn't surprise me. I
19 knew that they had a large balance on
20 FTX.
21   Q.   Okay. And in early June, then,
22 you understood Three Arrows' state to
23 have been deteriorated based on the
24 things you list on the next bullet point;
25 is that correct?

Page 290

1    A.   Yeah.  Yes.
2    Q.   Put this one aside and let's
3 turn then back, please, to Exhibit 86.
4 This is the other e-mail exchange you
5 have going with Sullivan and Cromwell.
6    A.   Okay.  What page?
7    Q.   Yeah, that's a good question.
8 Let's turn back to the Signal chat.
9    A.   All right.
10   Q.   Page 3.  The same Signal chat
11 we were looking at.  Looking at about
12 two-thirds of the way down there is a
13 message from Ryan Salame that says "Yah,
14 we have decent evidence it's real."  Do
15 you have an understanding of what he was
16 referring to there?
17   A.   I believe the next message
18 clarifies.
19   Q.   And what is your understanding
20 of that clarification?
21   A.   "Ben is friends with an
22 employee there who basically said even
23 internally they have no idea what's going
24 on.  Management not responding to them."
25   Q.   Had you heard about that

Page 291

1 situation before Ryan's message in this
2 chat?
3    A.   Not that I am aware of.  Like I
4 said there were rumors going around about
5 lack of response and things like that.
6    Q.   Understood.  The top of the
7 next page, "NS," Nishad Singh, says "The
8 extreme thing to do would be to liquidate
9 the account now, but I agree I think that
10 we shouldn't for now."
11      Do you have an understanding of
12 why he thought that was the extreme thing
13 to do?
14      MR. GLUECKSTEIN:  Object to the
15   form.
16   A.   Because it's a lot of money
17 with a very important client.
18   Q.   Any other reasons?
19   A.   No.  I mean, I think he
20 explains, it will leave them very levered
21 if we removed the LOC which would then
22 liquidate the account.  And that's a big
23 decision.
24   Q.   It's so big that towards the
25 bottom Ryan Salame refers to "I will

Page 292

1 leave it alone then, but since this
2 probably ends up in Court docs, we should
3 be strategic."
4      Do you see that?
5    A.   Yes.
6    Q.   Did you discuss with him
7 outside of the context of this chat, his
8 concerns in that regard?
9      MR. GLUECKSTEIN:  Object to the
10   form.
11   A.   No.
12   Q.   Do you have an understanding of
13 why he thought or at least wrote that
14 this probably ends up in Court?
15   A.   Because it's a lot of money at
16 stake.
17   Q.   Any other reason?
18   A.   Not that I am aware of.  Or one
19 other thing that I can think of is that
20 this is then blowing up, that it's going
21 to end up in bankruptcy and bankruptcy
22 involves a lot of Courts.
23   Q.   Do you mean bankruptcy of Three
24 Arrows Capital or bankruptcy of FTX?
25   A.   Three Arrows.

Page 293

1    Q.   Above on that same page Ryan,
2 likely or four down says "They moved all
3 of the collateral they could to an
4 account called Vault."
5      Do you know who --
6    A.   One more thing I just
7 remembered regarding the rumors is the
8 on-chain movements.  People like it was
9 clear that they were scrambling to get
10 crypto to repay their DeFi loans which
11 also, shows that something is up.  So I
12 just remembered that regarding the rumors
13 and that was one thing I saw a lot being
14 mentioned, is how much they were pulling
15 from different sources to repay DeFi
16 loans.
17   Q.   Okay.  I completely appreciate
18 the clarification.  Not a problem at all.
19 Thank you for confirming.
20      You said it was clear that they
21 were scrambling.  Was it clear to just
22 you or others as well?
23   A.   I believe others.
24   Q.   Others at FTX?
25   A.   Across the industry.

74 (Pages 290 - 293)

Page 314

```
 1              CERTIFICATION
 2
 3     I, DAWN MATERA, a Notary Public for
 4  and within the State of New York, do
 5  hereby certify:
 6     That the witness whose testimony as
 7  herein set forth, was duly sworn by me;
 8  and that the within transcript is a true
 9  record of the testimony given by said
10  witness.
11     I further certify that I am not
12  related to any of the parties to this
13  action by blood or marriage, and that I
14  am in no way interested in the outcome of
15  this matter.
16     IN WITNESS WHEREOF, I have hereunto
17  set my hand this 2nd day of November,
18  2025.
19
20
21     _____
22          DAWN MATERA
23          *   *   *
24
25
```

Page 316

```
 1  In re: FTX TRADING LTD., et al.
 2  10/31/2025 - ZANE TACKETT
 3     ACKNOWLEDGEMENT OF DEPONENT
 4     I, ZANE TACKETT, do hereby declare
 5  that I have read the foregoing transcript,
 6  I have made any corrections, additions, or
 7  changes I deemed necessary as noted on the
 8  Errata to be appended hereto, and that the
 9  same is a true, correct and complete
10  transcript of the testimony given by me.
11
12  _____  _____
13  ZANE TACKETT          Date
14  *If notary is required
15
16     SUBSCRIBED AND SWORN TO BEFORE ME THIS
17     _____ DAY OF _____, 20___.
18
19
20  _____
21  NOTARY PUBLIC
22
23
24
25
```

Page 315

```
 1  In re: FTX TRADING LTD., et al.
 2  10/31/2025 - ZANE TACKETT
 3     E R R A T A   S H E E T
 4  PAGE_____ LINE_____ CHANGE_____
 5  _____
 6  REASON_____
 7  PAGE_____ LINE_____ CHANGE_____
 8  _____
 9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  ZANE TACKETT          Date
25
```

80 (Pages 314 - 316)