# Exhibit 11

# FTX DIGITAL MARKETS LIMITED

# SAFEGUARDING OF ASSETS & DIGITAL TOKEN MANAGEMENT POLICY

Confidential

| Document History | | |
| --- | --- | --- |
| Date | Version | Description |
| **August 2021** | v1.0 | N/A. |
| | | |

**Confidentiality**

All information contained in this document shall be kept in confidence. No part of this document is to be altered or copied without the written agreement of FTX Digital Markets Limited (**FDM**). None of this information shall be divulged to persons other than to authorised employees and contractors of FDM on a need to know basis. The release of this document to other parties must be authorised by FDM, and only once an NDA has been signed with that party.

**Review & Approvals**

This document requires review and approval as it may be released to third parties as part of FDM's planning and decision management process. The following representatives of FDM have approved this document:

| Name | Title | Date Approved |
| --- | --- | --- |
| **Ryan Salame** | CEO | 16/08/2021 |
| | | |

2

## TABLE OF CONTENTS

INTRODUCTION                                                                    4

OBJECTIVE                                                                       4
SCOPE                                                                           4
POLICY COMPLIANCE                                                               4


APPORTIONMENT OF RESPONSIBILITIES                                               5

FDM'S RESPONSIBILITIES                                                          5
SENIOR MANAGEMENT RESPONSIBILITIES                                              5


SYSTEMS OF CONTROL                                                              6

ACCOUNTING STANDARDS                                                            6
IT AND SOFTWARE                                                                 6


SAFEGUARDING AND SEGREGATION                                                    7


RECONCILIATION                                                                  7

VIRTUAL ASSET RECONCILIATION                                                    7
FIAT ASSET RECONCILIATION                                                       8


DIGITAL TOKEN MANAGEMENT                                                        8


PRIVATE KEY MANAGEMENT                                                          9


RECORD KEEPING                                                                  9

Confidential                                                    FTX_3AC_000044444

## INTRODUCTION

This policy outlines FDM's approach to the safeguarding of assets. In developing this policy, FDM has considered the operational, technical, and organisational aspects of its approach to the safeguarding of assets. Furthermore, FDM has considered the best practice guidance issued for the virtual asset sector.

FDM fully acknowledges that its products and services are at risk from criminals and others seeking to steal and misappropriate assets belonging to FDM and its customers. FDM is committed to take appropriate measures to prevent potential loss of assets.

## OBJECTIVE

This policy's objective are to:

- Emphasise our stringent commitment to safeguarding assets belonging to both FDM and its customers;

- Summarise the main procedures, systems, and controls FDM has implemented to appropriately segregate its own assets and its customers' assets;

- Summarise the main procedures FDM has implemented to reconcile its own assets and its customers' assets; and

- Explain how FDM will manage the digital tokens under its custody.

## SCOPE

This policy, subject to any local or jurisdictional legal or regulatory requirements, applies to:

- FDM, its employees, consultants, contractors, temporary employees, or any person having access to FDM or customer assets;
- External third parties, through contract commitments; and
- All information systems owned by and/or managed by FDM including all computers, technical infrastructure, network devices, applications, and databases.

This policy defines the manual and electronic protection requirements for FDM and its customers' assets.

Where FDM authorises arrangements whereby a third party stores or transmits FDM or its customers' assets on its behalf, it is FDM's responsibility for the oversight of the third party's procedures and practices and ensuring that they meet the requirements of this policy and any applicable regulations.

## POLICY COMPLIANCE

Compliance with this policy is mandatory for all users that access (or have access to) FDM's or its customers' assets. Any internal or external business supporting processes or procedures that cannot comply with this policy or supporting policies and standards, must have an exception statement approved by the Compliance Officer (**CO**).

Users involved in the management of third-party suppliers and service providers are responsible for ensuring that all third-party contracts and agreements impose sufficient obligations on suppliers and service providers to support FDM's cybersecurity objectives as set by this policy.

4

FTX_3AC_000044445

Deliberate or persistent attempts to violate or actual violations of this policy will lead to disciplinary measures.

FDM is a company incorporated and registered in The Bahamas, as is therefore bound to comply with certain rules and regulations covering customer data.

## APPORTIONMENT OF RESPONSIBILITIES

FDM clearly defines the roles and responsibilities of all individuals with oversight of the company's safeguarding of assets strategy.

### FDM'S RESPONSIBILITIES

FDM is ultimately responsible for the safeguarding of its customers' assets.

FDM's key roles and responsibilities in relation to safeguarding of assets are outlined below:

- Appropriately account for the difference between its own assets and its customers' assets;

- All third-party providers will be aware that customer assets do not represent assets of FDM;

- All third-party providers are aware that customer assets are held in trust;

- FDM will have systems of control in place that are proportionate to its size, the assets in custody and the risks involved in its business, including the management of digital tokens in its custody;

- Developing and implementing procedures appropriate to the nature, size, and complexity of FDM's business and the risks it may reasonably face; and

- Ensure that the policies, controls, and procedures are regularly reviewed and updated according to the latest technology available, and that these are approved by senior management.

### SENIOR MANAGEMENT RESPONSIBILITIES

The CEO is the primary person responsible for the secure storage and implementation of certain financial and treasury procedures in place to protect FDM and its customers' assets.

To do so, the CEO will appoint a person(s) with sufficient seniority, skills, and experience to oversee the relevant procedures below:

- **Chief Technology Officer or equivalent:**
  - combating attacks on and attempts to steal funds and damage the infrastructure put in place to secure storage;
  - ensure that cryptography algorithms and hardware meet relevant security standards;
  - developing and releasing software ensuring security including, but not limited to, cryptography algorithms and hardware; and
  - performing regular security testing (pen-testing).

- **Chief Operating Officer or equivalent;**
  - ensuring FDM and customer assets segregation for accounting, operational and storage purposes;
  - maintaining regular reconciliation of FDM and customer assets; and
  - auditing record keeping system.

5

- **Chief Financial Officer or equivalent;** and
  - managing FDM assets; and
  - protecting customer assets from third-party creditor claims.

- **Compliance Officer and/or MLRO.**
  - ensuring FDM, its employees, consultants, contractors, temporary employees, or any person having access to FDM, or customer assets complies with this policy.

## SYSTEMS OF CONTROL

FDM will ensure that it has in place systems of control to manage customer assets that are proportionate to its size, the assets in custody and the risks involved in its business.

## ACCOUNTING STANDARDS

As part of its business operations, FDM will maintain reliable accounting records or cause reliable accounting records to be kept in relation to all sums of money received and expended, inclusive of all customer trading activity, trading revenue, and other transactions relating to FDM operations, and FDM will document the reason for such receipt or expenditure.

FDM will ensure that:

- accounting records are maintained in relation to all sums of money received and expended and indicate the reason for the receipt and expenditure accounting records establish the authorisation of transactions relating to expenditure;
- accounting records are reliable, in that the records:
  - explain all transactions by providing a record of the transaction along with an adequate summary of its details;
  - enable the financial position of the company to be determining with reasonable accuracy;
  - enable the preparation of financial statements; and include documentation underlying the transaction.
  - reconcile to cash positions held within banks or to blockchain balances
- there is a written statement included in the accounting records that the records are prepared to the directors' or officers' best knowledge, information and belief;
- the accounting records show the assets and liabilities of the company;
- in the case of Segregated Accounts Company, the accounting records must be maintained in relation to each segregated account as well as the general account of the company;

## IT AND SOFTWARE

Systems of control relating to IT and software will be kept up to date and will meet the latest industry protocols and standards. The systems of control that will be implemented and kept up to date will include, but it not restricted to:

- Multi factor authentication;
- Pattern analysis on internet traffic to servers;
- IP and device checking;
- Looking for brute force attacks on account passwords; and
- Multi-level security checks of customers that request access to their accounts.

6

## SAFEGUARDING AND SEGREGATION

FDM has a responsibility to ensure that customer assets are appropriately safeguarded and segregated from its own funds. This includes customer assets that may be held by third party service providers. FDM will ensure that:

- Customer assets (both fiat and virtual assets) are segregated from its own assets;

- Customer assets (both fiat and virtual assets) will be clearly designated and easily identifiable;

- All third-party service providers are aware that customer funds do not represent property of FDM and are therefore protected from third-party creditors; and

- All third-party providers are aware that customer assets are held in trust.

Regarding customer fiat assets, FDM will maintain customer accounts with a regulated credit, e-money or payment institution that is acceptable to the Securities Commission of The Bahamas (**SCB**). Customer accounts will be designated as such, and the monies contained therein will be appropriately ring-fenced and protected from claims against FDM.

Customer monies will be appropriately ring-fenced to protect from:

- The unlikely event FDM becomes insolvent;
- The use of customer monies being used to benefit others; and
- FDM using customer monies to finance its own operations.

Written notice will be provided to the relevant regulated credit, e-money, or payment institution to clarify that the assets contained are held by us on trust for our customers and they are not entitled to combine the account any other account, or to exercise any right of set-off or counterclaim against the money in those accounts, in respect of any debt owed by us.

All customer accounts will be under the dual signatory of two directors or of one director, together with a senior member of the management team.

## RECONCILIATION

FDM will take all reasonable steps to ensure that any value is applied to the correct accounts in good time.

### VIRTUAL ASSET RECONCILIATION

FDM must take all reasonable steps to ensure that any value is applied to the correct wallets in good time.

FDM has implemented an automated process which identifies differences between expected customer balances and virtual assets on the relevant blockchains. These amounts are then investigated and reconciled.

When reconciling virtual asset movements, FDM will ensure that any internally calculated balances are reconciled to the expected balance on the underlying blockchain in question. Any differences will be investigated. Any unidentified differences leading to a lower amount of virtual asset balances on the underlying distributed ledger when compared to the internal records, may be covered by the firm until these are investigated and cleared.

The company will look to apply an automated process due to the frequent movement in customer funds.

7

FTX_3AC_000044448

## FIAT ASSET RECONCILIATION

As a minimum, FDM will reconcile its customer fiat assets and its own assets on a monthly basis. Customer fund reconciliation requires FDM to carry out checks of its internal records and the amount of customer money that the company holds for each customer with its internal records and what the company should hold in customer bank accounts or has placed in customer transaction accounts. If there are resource constraints that prevent the company from performing customer reconciliation, senior management needs to be notified on that business day and a reconciliation must be performed as soon as possible.

In carrying out a customer funds reconciliation, FDM must use the values contained in its internal records and ledgers, rather than the values contained in the records it has obtained from banks and other third parties with whom it has placed customer monies. FDM uses the normal approach to segregate customer money, which means rather than the funds being first received into the company's corporate account and then segregated, customer money is deposited directly into the company's designated customer bank accounts.

A customer asset reconciliation should:

- Help FDM to have adequate protection for its customers' assets when the company is responsible for them; and
- Help minimise the risk of the loss or reduction of customer money, or of rights in connection with customer money, because of misuse of customer money, fraud, poor administration, inadequate record-keeping, or negligence.

If a discrepancy is found between FDM's total customer funds and its total customer fund requirement identified by reconciliations, FDM must determine the reason for the discrepancy and ensure that:

- Any shortfall identified after considering assets in transit, timing differences, or any other feasible reasoning not noted previously must be communicated to SMT as soon as possible and paid into a customer assets bank account;
- Any excess and revenues are clearly recorded and transferred out without delay;
- If any discrepancy is identified in the customer money reconciliation, FDM must investigate the reason for the discrepancy and take all reasonable steps to resolve it, without undue delay, unless the discrepancy arises solely because of timing differences between the accounting systems of the party providing the statement of confirmation and that of the company.

FDM must also inform the Board in writing, without delay if:

- Its internal records and accounts of customer assets are materially out of date, inaccurate or invalid, so that the company is no longer able to accurately reconcile customer assets; and
- If it will be unable to, or materially fails to, pay any shortfall into a customer bank account so that the company is unable to meet customer money requirements after carrying out reconciliation.

## DIGITAL TOKEN MANAGEMENT

FDM uses a best practice hot wallet and cold wallet standard solution for the custody of virtual assets. The firm aims to maintain sufficient virtual assets in the hot wallet to cover two days of trading activities, which means only a small proportion of assets held are exposed to the internet, the remaining assets are stored offline. The 2-day trading figure is continuously monitored and if the hot wallet exceeds this amount, it will overflow into the cold wallet. If the figure drops below the 2-day trading figure, the hot wallet will be topped up from the cold wallet.

8

The firm utilises a multi-sig signature process (2/3) to move funds between the hot and cold wallets.

## PRIVATE KEY MANAGEMENT

The key protocols FDM will implement for the management of private keys will include -

- utilising a multi-signature process (2/3) for hot and cold wallet storage and transfers;
- ensuring keys/seeds are created by FDM and are generated using a random process;
- implementing multi-sig arrangements to ensure there is no single point of failure or reliance on a single party to initiate transactions;
- ensure redundant keys are assigned;
- where possible, ensure multi-sig keys are distributed in different geographical locations and different organisational entities;
- where possible, storing back-up keys in different geographical locations and different organisational entities;
- transactions will be signed in a fully offline environment and only broadcast to the network when required;
- having strong physical measures in place to protect keys held offline;
- requiring signatories to undergo background checks, to ensure they are fit and proper; and
- implementing a key compromise protocol.

## RECORD KEEPING

FDM will securely store all customer asset records during the business relationship with a customer for a minimum of 5 years, following termination of a business relationship. The records will be kept in a manner and format that is accessible, retrievable and provides a clear audit trail to enable our auditors to sign off on our financial statements and our systems and controls.

9

FTX_3AC_000044450

# Exhibit 12

 FTX

Sign in

FTX Exchange > Trading > Spot Margin Trading

Search articles

# Spot Margin Trading Explainer

 FTX Crypto Derivatives Exchange
Updated 2 months ago

---

**BROWSE** ⌄



How to Borrow & Lend Crypto Using FTX

# <u>Overview</u>

With spot margin trading, users can trade with leverage and go short on spot markets by borrowing from other users (lenders) on FTX, who are looking to earn yield on their assets.

Rates are determined by lenders on the platform and paid every hour. Lenders have the ability to call back their loans at any point in time and receive their funds in an hour.

Similar to futures, spot margin positions are subject to collateral requirements and liquidation rules.

To see current and historical lending rates, visit https://ftx.com/spot-margin/lending.

FTX_3AC_000013862

## How do you enable spot margin trading?

To enable spot margin, visit your Profile page, click on the Margin section and select "Enable Spot Margin Trading". If you turn spot margin on, then your account will attempt to borrow any spot assets that it is short.

Keep in mind that with spot margin enabled, rather than selling your non-USD collateral whenever your USD balance dips below certain thresholds, your account will automatically borrow the negative USD balance via the spot margin market and pay the prevailing USD borrow rate. More details on this here.

## What assets are available for borrowing/lending?

You can find the current list on the borrow and lending pages, as well as via API. Most but not all spot assets available for deposit and withdrawal on FTX can be borrowed.

# Borrowing

## How FTX automates borrowing

There are a number of different ways to implement margin trading and borrow/lending. FTX's is the most automatic in the industry, though the user still has full control over their borrowing and lending. Rather than requiring discrete actions to request borrows, receive them, move the funds, open/close positions, etc., the entire process is abstracted away into net balances.

As long as you have sufficient margin, you can borrow spot tokens simply by spending beyond your account's balance of them.

So say that you have $50,000 (USD) in your account and nothing else. If you sold 1 BTC for $20,000 in the spot BTC/USD orderbook, your total balances would then be: +70,000 USD; -1 BTC. You didn't have the BTC and so had to borrow it in order to sell it. FTX does this automatically when you sell, sending an order to the funding book on your behalf to borrow 1 BTC.

You can even do this with withdrawals! If your account has 3 BTC and nothing else, you can request a withdrawal of 1 ETH (despite not having any ETH!). FTX will automatically request a borrow for 1 ETH for you, and you can then withdraw that ETH. Note, however, that you cannot borrow to withdraw for greater size than is available and unused in the borrow-lending book!

So there's no need to manage collateral vs margin positions vs withdrawable tokens vs margin trading vs spot trading. The same commands (buy/sell/deposit/withdraw) work normally and are allowed as long as your account has enough total collateral to support the necessary borrows.

# Spot Margin Trading

Your spot margin positions are cross-margined with your futures positions; there is no separate spot margin requirement you have to monitor.

Generally, the way that futures margin works is that each contract has a margin requirement (**initial margin fraction** to open a position and **maintenance margin fraction** to avoid liquidation), and you need a total collateral value which meets those thresholds.

Spot margin is similar.  The position size of a spot margin position is the notional size of any short (negative) balances you have.  So for instance if you have + $65,000; -2 BTC; and BTC is trading at $20,000, then the size of your spot margin position is $40,000 (2 BTC * $20,000 per BTC).  This is treated the same as if you had a $40,000 futures position on, and requires initial margin to increase and maintenance margin to avoid liquidation.

## Formulas

| Term | Formula |
|---|---|
| **Max account leverage** | Max account leverage available for spot margin positions is 10x. |
| **Spot Margin Base IMF** | If borrowing USD: <br><br> = 1 / max account leverage <br><br> If borrowing non-USD assets (e.g. BTC) <br><br> = max (1 / max account leverage, 1.1 / Total Weight - 1) |
| **Spot Margin IMF** <br><br> The minimum margin fraction required to open a spot margin position, applicable to positions of all sizes. | = max( Spot Margin Base IMF, IMF factor * sqrt [position size in tokens] ) * IMF Weight |
| **Spot Margin MMF** <br><br> The margin fraction in which our account would start getting liquidated. | If borrowing USD: <br><br> = 3% <br><br> If borrowing non-USD assets (e.g. BTC) <br><br> = max ( 1.03 / Total Weight - 1, 0.6 * IMF factor * sqrt [position size in tokens] ) * MMF Weight |
| **Spot Collateral Value** | If token quantity is positive |

| | |
|---|---|
| | Token quantity * token mark price * min(collateral weight, 1.1/(1 + imf factor * sqrt(token quantity))) |
| | *If token quantity is negative* |
| | Token quantity * token mark price |
| **Borrow Rate** <br><br> Net fee for borrowing assets, applied to the borrowed size. | (hourly lending rate) * ( 1 + 500 * borrower's taker fee) |
| **Total Weight** | See values here. |
| **Collateral Used** | Position notional * spot margin IMF |
| **Max amount you can borrow** | **Max USD you can borrow to buy other assets** <br><br> (collateral * [ 1 + 1/max leverage] ) / ( [1 + 1 /max leverage] - borrow asset's total weight) <br><br> **Max token you can borrow to sell** <br><br> Collateral / Spot Margin IMF / Mark Price |
| **Max borrowed amount you can withdraw** | Collateral / 1 + Spot Margin IMF |

## Examples

Assume that:

- You have $10,000 in collateral and nothing else
- Your account's max account leverage is set to 10x
- Your taker fee is 0.05%

Throughout this whole section, we will be opening and using the following positions:

| | ETH/USD | LTC/USD |
|---|---|---|
| Direction | Buy | Sell |
| Size | 10 | 100 |
| Price | $2,000 | $50 |

FTX_3AC_000013865

| | | |
|---|---|---|
| Total Weight | 0.95 | 0.95 |
| IMF Factor | 0.0004 | 0.0004 |
| IMF Weight | 1.0 | 1.0 |
| MMF Weight | 1.0 | 1.0 |

## Calculating Initial Margin Fraction (IMF)

Let's start with the ETH/USD long. Because the amount of ETH in notional USD terms you're trying to buy ($20,000) is greater than the amount of USD collateral you have ($10,000), your spot margin position will borrow $10,000 USD.

Since you will be borrowing USD, the initial margin fraction required to open your position will simply be 1 divided by your account's max leverage:

= 1 / 10

= 10%

On the other hand, to short LTC/USD, you will actually be borrowing LTC in order to sell it. As a result, the Base IMF formula for this spot margin position will be:

= max ( 1 / max account leverage, 1.1 / Total Weight - 1 )

= max (0.1, 1.1 / 0.95 - 1)

= 15.79%

Now, to calculate the actual Spot Margin IMF for your LTC/USD short, we use this formula:

= max( Spot Margin Base IMF, IMF factor * sqrt [position size in tokens] ) * IMF Weight

= max (15.79%, 0.0004 * sqrt [100] ) * 1

= max (15.79%, 0.4%)

= 15.79%

## Calculating Maintenance Margin Fraction (MMF)

For the ETH/USD long, since you're borrowing USD, your spot margin MMF will simply be 3%.

CONFIDENTIAL

For the LTC/USD short:

= max ( 1.03 / Total Weight - 1, 0.6 * IMF factor * sqrt [position size in tokens] ) * MMF Weight

= max (1.03 / 0.95 - 1, 0.6 * 0.0004 * sqrt [100] ) * 1

= max (0.842, 0.0024)

= 8.42%

Keep in mind that risk management on FTX is done at the account level, not at the position level. We look at the weighted average MMF across all of your spot margin and futures positions to determine your account MMF, which would dictate the margin fraction level in which your account would get liquidated. For more details on this, visit our account margin FAQ.

## Calculating Borrow Rate

The borrow rate is influenced by the lending rate, which is determined by the lenders who you're borrowing from, and your taker fee. Let's calculate it for each of your two spot margin positions.

<u>ETH/USD Long</u>

Assume that the current lending rate for USD is at 2% / year. The Borrow Rate formula uses hourly rates, so to convert the yearly rate to hourly we simply do the following:

= 0.02 / 365 / 24

= 0.000228%

Knowing that your taker fee is 0.05%, let's calculate your borrow rate for USD:

= (hourly lending rate) * ( 1 + 500 * borrower's taker fee)

= 0.000228% * (1 + 500 * 0.04%)

= 0.000285%

Interest is paid every hour in the currency you're borrowing. In this case, assuming USD rates stay at 2% and your taker fee doesn't change, you'd be paying $0.0285 every hour to maintain your $10,000 borrow.

<u>LTC/USD short</u>

In this case, you're borrowing LTC. Assume its yearly rate is 1%, which converted to hourly equals 0.000114%.

Same as above:

$$= 0.000114\% * (1 + 500 * 0.05\%)$$

$$= 0.000143\%$$

### Note about fees

The borrow rates displayed on the margin borrows page are the actual rates you'd be paying for that hour (i.e. your taker fee is already blended in).

Also, if funds are borrowed and withdrawn from the account the expected borrow rate for the next hour will be applied to the withdrawn funds

## Collateral Overview

Now that the two positions are open, let's see how they affect your account's collateral. Your borrows are considered negative spot balances, which decrease your account's collateral value and require additional collateral as well.

### How negative spot balances decrease your account's collateral value

With your ETH/USD spot margin long, you borrowed $10,000 USD in order to buy 10 ETH. This means that, just like a normal spot trade, the 10 ETH will show up as a positive balance in your account. However, because you used margin to borrow the $10,000 USD, the $10,000 will show up as -$10,000 in your account balance.

Similarly, with your LTC/USD short, you borrowed 100 LTC (which will show up as -100 LTC in your balance) and sold it for $5,000 USD (which will be added to your balance).

Now, using the formula below, let's see how your total account collateral looks:

### If token quantity is positive

Token quantity * token mark price * min (1.1 / [IMF Weight * {1.1 / Total Weight - 1} + 1] , 1.1 / [Spot Margin IMF Factor * sqrt{size} * IMF Weight + 1] )

### If token quantity is negative

Token quantity * token mark price

| Current Collateral Overview | | | | | |
|---|---|---|---|---|---|
| **Asset** | **Size** | **Mark Price** | **Total Weight** | **IMF Factor** | **Total Collateral** |
| USD | -5,000 | $1 | 1 | - | -$5,000 |
| ETH | 10 | $2,000 | 0.95 | 0.0004 | $19,000 |

FTX_3AC_000013868

| | | | | | |
|---|---|---|---|---|---|
| **Total Collateral** | - | - | - | - | $9,000 |

<u>Calculating how much collateral is being used by your spot margin positions</u>

Derivatives and spot margin positions require collateral. To know how much collateral each of your positions is using, use this formula:

= position notional * spot margin IMF

For your ETH/USD long position:

= $10,000 * 10%

= $1,000

That means that $1,000 of your collateral is currently being used for your ETH/USD position, which will be deducted from your total account collateral in order to determine your free collateral.

Doing the same for the LTC/USD short position:

= $5,000 * 15.79%

= $789

| Market | Position Size | Mark Price | Position Notional | IMF % | MMF | Collateral Used |
|---|---|---|---|---|---|---|
| ETH/USD | 10 | $2,000 | $20,000 | 10% | 3.00% | $2,000 |
| LTC/USD | 100 | $50 | $5,000 | 16% | 8.42% | $789 |
| **Total (sum)** | - | - | **$25,000** | - | - | **$2,789** |

| | |
|---|---|
| Total Collateral | $9,000 |
| Total Collateral Used | $2,789 |
| **Free Collateral** | **$6,211** |

## Stocks

FTX_3AC_000013869

Borrowing and lending stocks works identically to everything else, except that they all have an IMF of 20%. The max leverage you can achieve if exclusively borrowing stocks is 5x.

## How Interest Rates are Determined

Every hour, lenders are paid and borrowers are charged.  Rates are determined as follows:

1. All lenders specify a minimum borrow rate they must receive for that hour.

2. At the beginning of the hour, we calculate the total borrow demand for each coin between all users.

3. We have an auction: we sort the lending offers by minimum rate, and take the cheapest set that satisfies the borrow demand.  The borrow rate is set to the minimum borrow rate of the marginal (most expensive) loan that was required.

   - Alice: wants to borrow 2 BTC

   - Bob: wants to borrow 3 BTC

   - Charlie: lending 1 BTC, min 0.01%

   - Denise: lending 10 BTC, min 0.03%

   - Total borrow demand is 5 BTC.

   - This borrows Charlie's BTC and 4 of Denise's

   - The marginal loan is Denise's 4 BTC loaned out at 0.03% minimum

   - So all 5 BTC of borrows -- including the one against Charlie -- use an **interest rate of 0.03%**

So this means the following:

1. All borrow rates only last for one hour; each hour, they're re-determined.

2. Every borrower pays the same rate for an hour/coin; and every lender who does in fact lend their tokens receives the same interest rate for an hour/coin.

3. When you open up a borrow mid-hour, you end up paying for that hour's interest rate at the end during the auction.

4. Note that you will be charged interest on your borrows whether they're held on FTX, withdrawn, pending withdrawal, sold, or anything else.

# Lending

To lend an asset out, you specify the quantity you want to lend, and the minimum interest rate you'd require. If this loan ends up being borrowed (i.e. your interest rate is below the marginal rate), you will receive the marginal interest rate hourly.  By default your specified parameters (amount to try to lend, minimum interest rate) will persist from hour to hour.

FTX_3AC_000013870

Lenders bear no counterparty risk: FTX guarantees interest payments for however long your funds are borrowed, even if the borrower gets liquidated. Additionally, FTX charges no fees to lenders. Interest rates are paid by borrowers to lenders in full.

Assets that you are lending are effectively locked, and cannot be withdrawn/sold/used as collateral/staked/etc. However, they can be used as maintenance margin to prevent liquidations.

If you choose to stop lending your coins and they were in fact being borrowed, you will stop earning interest on them at the end of the hour and they will be unlocked in 1 hours. If you were offering to lend your coins but they were not actually borrowed (because there was not sufficient demand at your minimum interest rate), you are free to use the coins and stop trying to lend at any point.

You can manage your loans at ftx.com/spot-margin/lending.


# Risk

FTX's risk engine will attempt to liquidate any users before they could get negative net account balance; using spot margin opens you up to liquidation risk. In general, FTX and its backstop fund will attempt to protect other users against other accounts' bankruptcy risk.

For more information, visit our liquidations page.



*Disclaimers:*

- *FTX Token (FTT) is not available in the United States or other prohibited jurisdictions. If you are located in, incorporated or otherwise established in, or a resident of the United States of America, you are not permitted to transact in FTT.*

- *Trading on FTX is not available in the United States or other prohibited jurisdictions. If you are located in, incorporated or otherwise established in, or a resident of the United States of America, you are not permitted to trade on FTX.*

- *FTX retains the final right to interpretation of its rules and conditions on these and all contracts.*

- *FTX retains the final right to modify terms of its rules and conditions on these and all contracts.*

- *Much of this article is an approximation and ignores details, e.g. fees.*

- *When in doubt, feel free to contact us for clarifications.*

- *This post outlines the basics of the FTX spot margin system. It is not the only relevant resource, and may be overridden by other sources. Eligible parties may be asked to sign other documents in some cases, including but not limited to the FTX Institutional Customer Margin and Line of Credit Agreement.*

- *There are risk factors associated with margin trading, chiefly liquidation risk. Please decide whether margin trading is right for you.*

- *As the terms of service make clear, manipulative behavior is not tolerated on FTX. Any attempts to do so may result in account termination at FTX's sole discretion.*

**ARTICLES IN THIS SECTION**

**Spot Margin Trading Explainer**

**RELATED ARTICLES**

Account Margin Management

FTX Features Overview

FTT Staking

Hold FTT on FTX to Get SRM Airdrops Every Week!

Upcoming Change to Negative Balance Rules

**PROMOTED ARTICLES**

Deposit to your FTX account to earn VIP status

FTX Features Overview

Ratelimits on FTX

Introducing New Fee and Ratelimit Tiers to the FTX VIP & Market Maker Program

VIP Program and Market Maker Policy

FTX partners with Paradigm for one-click futures spreads trading

Trade GMX to share a pool of 30,000 USD!

Trade MYC to share a pool of 360,000 MYC!

Level up your fee tier when you trade through Paradigm!

Trade SYN to share a pool of 30,000 SYN!

Trade WAXL to share a pool of 30,000 WAXL!

Deposit HBB to win up to 30,000 HBB!

## Didn't find what you were looking for?

Create a support ticket

## Community

   

Was this article helpful?

| Yes | No |

1 out of 1 found this helpful



English (US) ⌄

FTX Services and FTX Token (FTT) are not available in the United States or other prohibited jurisdictions

# Exhibit 13

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

---oOo---

In re:                          :
FTX TRADING LTD., et al.,       :
                                :
          Debtors,              :
                                :
                                :
                                : Case No.
                                : 22-11068 (KBO)
_____ :


CONFIDENTIAL VIDEO-RECORDED

DEPOSITION OF NISHAD SINGH

October 28, 2025


Job No. 1426591

Stenographically reported by:
LAURA AXELSEN, CSR NO. 6173
     RMR, CCRR, CRR, CRC, RDR



Page 14

1   that you reviewed?
2     A.  There were documents that reflected some
3   emails, a Signal chat, Slack threads.
4     Q.  Okay.
5     A.  I think that's the whole universe of docs.
6     Q.  Were those documents that your counsel
7   collected and provided to us?
8     A.  I'm not sure what their process was.  I
9   just know I saw the docs from my counsel.
10     Q.  Okay.  Are you aware that your counsel
11   produced documents from your files to Three Arrows?
12     A.  I don't remember.
13     Q.  Okay.  Do you remember doing any kind of
14   collection on your end to try and find documents
15   about Three Arrows to hand over?
16     A.  Yes.  I can't remember if this was
17   recently or recently and in relationship to the
18   previous proffers I'd mentioned.
19     Q.  Okay.
20     A.  But I do remember looking for documents
21   relating to Three Arrows.
22     Q.  Okay.  But you don't remember if that was
23   in relation to the government information opposed to
24   Three Arrows looking for information.
25     A.  Right.

Page 15

1     Q.  Okay.
2     A.  May have been both, but I'm not sure.
3     Q.  Okay.  Do you recall what were the, like,
4   locations that you were searching to try and find
5   documents?
6     A.  Do you mean the system I was proximately
7   using or what locations those things would have been
8   populated from?
9     Q.  What they would have been populated from?
10     A.  Signal chats, email threads, exports of my
11   Google Drive from my FTX or Alameda Research
12   accounts -- G-suite accounts, that is, Slack
13   threads.
14     Q.  Okay.
15     A.  And there were also devices -- files on my
16   device that were uploaded to the system I was using
17   to query for these.  I don't know if that last
18   category had anything related to Three Arrows
19   Capital.
20     Q.  Okay.  So the ones that you do recall that
21   you mentioned, those were ones that were -- were
22   they stored on your laptop somehow or you were just
23   able to access them through systems and they were
24   stored elsewhere?
25     A.  The latter.

Page 16

1     Q.  Okay.  Am I right that you joined -- and
2   I'm going to put aside your prior role when you were
3   at Alameda.  My questions are all about FTX.  So am
4   I right that you joined FTX in mid 2019?
5     A.  Yes.
6     Q.  Okay.  And you were working for FTX
7   Trading; is that right?
8     A.  I'm not sure what the entity was I was
9   working for.
10     Q.  Okay.  What was your role at FTX?
11     A.  I started out as a software engineer, and
12   then I became an engineering manager where I had a
13   few engineers that were -- that reported to me, and
14   then the director of engineering, which the same was
15   basically true, just more engineers.
16     Q.  Okay.  So by early 2022, what was your
17   role?
18     A.  I believe by then I was the engineering
19   director.
20     Q.  Okay.
21     A.  Or director of engineering.
22     Q.  And what were your responsibilities as the
23   director of engineering?
24     A.  Managing other engineers and writing code
25   myself.

Page 17

1     Q.  Okay.
2     A.  And these are software engineers.
3     Q.  Were there particular aspects of
4   the FTX platform that you were responsible for the
5   code for?
6     A.  It was pretty broad spanning, but I was
7   rarely ever the key architect for anything.
8     Q.  Okay.  Was there another individual who
9   was the key architect?
10     A.  Yes.
11     Q.  And who was that?
12     A.  Gary Wang.
13     Q.  Okay.  Were there any -- were there any
14   areas where you were the key architect?
15     A.  Plenty.  Customer support system.  The
16   ticketing is one.  Some elements of authentication.
17   The list goes on.
18     Q.  Okay.  The customer support system, that's
19   a system where customers can ask questions or
20   register complaints.  Is that what that is?
21     A.  That's right.  An inbuilt version of
22   Zendesk.
23     Q.  Okay.  So who did you -- focusing on the
24   2022 time period, at that point, who did you report
25   to?

MAGNA
LEGAL SERVICES

Page 22

1    Q.   So what would trigger that?
2    A.   The canonical case that they have a
3 technical question or request.  They've observed
4 latency in an area of the system that's confusing to
5 them and they want to know how to avoid it.
6 Something like that.
7    Q.   What do you mean by latency?
8    A.   They might be querying FTX with using it
9 via API in a programmatic way as opposed to on the
10 website.  Performance in those areas mattered a lot
11 to -- VIP customers are highly technical customers.
12 They might have observed a performance issue on our
13 side or just been confused about something or might
14 have wanted to know what best practices are or have
15 suggestions.
16       So for any number of reasons in that realm
17 they may have ultimately ended up speaking with me
18 perhaps after speaking with Zane.
19    Q.   Were there any times that customers would
20 reach out directly to you as opposed to going
21 through Mr. Tackett or someone else first?
22    A.   Almost certainly, but instances aren't
23 jumping to mind.  It would have happened after we've
24 been well-acquainted and about technical topics.
25    Q.   Okay.  Do I have this right also in terms

Page 23

1 of equity ownership when you were at FTX I guess in
2 the 2022 time period you owned about 6 or 7 percent
3 of the equity of FTX; is that right?
4    A.   That sounds right.  I forget if this is
5 pre or post dilution and so on.
6    Q.   Okay.  Now, you're familiar that FTX had
7 public-facing policies that describe the exchange
8 platform?
9    A.   Right.  I remember there were policies and
10 I remember there were documents that described the
11 exchange.  I'm not sure the extent to which the
12 policies described the exchange.
13    Q.   Okay.  Did you have any role in designing
14 the policies?
15    A.   No.
16    Q.   Okay.  You mentioned documents that
17 described the exchange.  What do you have in mind by
18 those?
19    A.   There were help desk articles.  Articles
20 that would describe how technical elements of the
21 system worked.  The liquidation engine, for example.
22 That description -- I don't know how faithfully that
23 description ever showed up in policies.
24    Q.   Okay.  And when you said -- and I use the
25 word policies and you responded, what did you have

Page 24

1 in mind when I said policies?
2    A.   Ah, I was thinking about like a legal
3 documents as opposed to descriptive documents.  It
4 might be the case that from a legal perspective
5 there isn't a distinction.  I'm not sure.
6    Q.   Okay.  What -- what policies were you
7 thinking of?
8    A.   Terms of service comes to mind as a thing
9 that I'm not sure described the liquidation engine.
10    Q.   Okay.  Anything else that you would think
11 of as a policy besides the terms of service?
12    A.   I'm not a lawyer.  I'm not really sure
13 what constitutes a policy.
14    Q.   And you may know this.  Some of my
15 questions may sound very uninformed.  It's because
16 the -- at Three Arrows we don't have anyone left who
17 was at the company.  So we've been recreating all
18 this with no one who was actually there.  So some of
19 my questions may sound obvious to you, but we're
20 still trying to figure out how the system worked
21 from people who were there.
22    A.   I wish all bankruptcy companies would ask
23 questions like that.
24    Q.   And then in terms of the help desk
25 articles, I have seen things called explainers.  Is

Page 25

1 that what you're thinking of?
2    A.   That sounds like exactly what I'm talking
3 about, but I don't know if that was the heading
4 under which it was.
5    Q.   Okay.
6    A.   I don't know if that's what it was
7 classified as.
8    Q.   Okay.  In terms of the help desk articles,
9 did you have any role in preparing those or editing
10 those?
11    A.   Sometimes, yes.  I remember some specific
12 instances.
13    Q.   Okay.  What are the ones you remember?
14    A.   At times, a new coin listings or new
15 futures listings.  There were parameters that
16 related to those assets.  Things that described, for
17 instance, how much holdings of an asset would
18 contribute to collateral.  There were formulas for
19 that in the code.  They'll be parameterized per
20 coin.  Those parameters would get published on -- in
21 these help desk articles and technically over API,
22 and so after listing, I would sometimes go and edit
23 those documents.
24    Q.   So each coin could have a different
25 percentage by which it contributed to the total



1  collateral value; is that right?
2      A.  That's exactly right.  There were other
3  parameters too.  That's a very relevant one.
4      Q.  Would you be the person who would decide
5  what percentage of value for coins should be
6  contributed to total collateral?
7      A.  No.
8      Q.  Who would make that decision?
9      A.  Vary by the case and varied over time.  In
10 many cases ultimately Sam Bankman-Fried would okay
11 it.  There was a, like, listing team, and I don't
12 know what their internal processes were, but they
13 would often tell me when a coin was listing and what
14 its parameters should be.
15     Q.  Okay.  Why did FTX provide like a
16 different percentage of collateral value for each
17 kind of coin?
18     A.  Different assets have different liquidity
19 profiles.
20     Q.  So generally based on the liquidity
21 profile of the coin?
22     A.  That's my understanding, but I didn't make
23 up -- I didn't make the numbers.  So I'm not
24 entirely sure if there were other factors, too.
25     Q.  Okay.  Why would the liquidity profile

1  affect what collateral value a coin should be
2  allocated?
3      A.  A few other things need to be defined
4  first to make sense of that.
5      Q.  Okay.  What do you have in mind?
6      A.  It would be useful to define what
7  mark-to-market value is.
8      Q.  Okay.
9      A.  I'll pose a toy example.  If a customer
10 has 10 Bitcoin, reasonable people will disagree on
11 how much that's worth.  They may want to establish a
12 price by which to multiply by 10 to come up with the
13 value of that portfolio.  And one option for
14 deciding its price is to market-to-market, which
15 means looking at the current prices at which the
16 asset is trading right now, ignoring liquidity,
17 ignoring how much impact selling those 10 Bitcoin
18 may have.
19     Q.  Okay.  And were there any other terms you
20 thought would be helpful to describe before we go
21 back to my question?
22     A.  If we're okay with impact as a term, then
23 no.
24     Q.  By impact, do you mean that selling could
25 itself affect the price?

1      A.  That's right.
2      Q.  Okay.  So let's go back to why is it that
3  the liquidity profile of a coin would affect how
4  much collateral value FTX wants to attribute to that
5  coin.
6      A.  Selling a coin that is illiquid, using a
7  little bit of a tautology here, these things define
8  each other, would result in more impact on a market,
9  more of a price movement.  If somebody had a
10 large -- large holdings in the illiquid coin, it
11 would be reasonable to assume that after having sold
12 those assets they would be worth a smaller fraction
13 of their original value than if that coin was more
14 liquid.
15         To account for those kinds of dynamics,
16 when estimating the value of their current holdings,
17 you might want something like a collateral
18 fraction -- I forget the actual term used -- but
19 varied by the coin depending on its liquidity.
20     Q.  So if a customer owns an illiquid coin and
21 FTX needs to liquidate it, FTX might not recover the
22 full mark-to-market value of that coin?
23     A.  Right, or whoever is selling it.
24     Q.  Okay.  And the reason FTX had these
25 different collateral fractions was because of the

1  risk that in a liquidation, because they're selling
2  these assets to the market, it might drive down the
3  price?
4      A.  Yeah, I think that's the whole reason, but
5  there may also be other reasons.  It's at least a
6  large part of it.
7      Q.  Okay.  Just to go back to the help desk
8  articles, were there any other ones that you recall
9  having a role in editing or drafting besides ones
10 about the adding new coins?
11     A.  Help desk articles related to those two
12 systems I mentioned earlier I almost certainly
13 edited or helped describe to somebody who then go
14 craft the piece.
15     Q.  I'm going to show you a few of them as we
16 go through this.  So if these are ones you think
17 that you had some role in, it would be helpful to
18 let me know.
19     A.  I think I'll be able to remember, but
20 we'll see.
21     Q.  Okay.  We talked about policies.  We
22 talked about help desk articles.  Were there any
23 internal policies for FTX employees?
24     A.  Yes.
25     Q.  Okay.  What do you have in mind?



Page 50

1    Q.   So any -- can you think of any instances
2  before FTX filed for bankruptcy in which there were
3  customer losses?
4    A.   By which you mean a customer ends up like
5  net negative on the system?
6    Q.   Yes.
7    A.   That situation I described with Eth, I
8  remember -- I don't remember if it was a token Eth
9  that caused this, but I remember there was something
10  akin to it where there was a mechanism for
11  depositing a coin that FTX erroneously counted and
12  so overcredited a customer with.  I don't remember
13  if that's an instance in which the customer didn't
14  pay in the end or not.
15    Q.   I don't -- I don't think I understand the
16  situation why overcrediting would necessarily
17  mean -- would result in a customer loss.
18    A.   If you give me a $10 bill and I misread it
19  as a hundred, and then you go withdraw a hundred
20  dollars from the bank.  So by the time I recognize
21  it was actually $10, someone has a loss.
22    Q.   Okay.  Other than the Eth example, do you
23  remember any other instances where there was a
24  customer loss?
25    A.   Yes.

Page 51

1    Q.   What do you remember?
2    A.   It was a firm called Crypto Lotus.
3    Q.   Crypto Lotus?
4    A.   Yes.  I don't remember the details about
5  how they ended up in a state of loss, but I remember
6  that they did.
7    Q.   Okay.  When was this example?  Do you
8  remember what year?
9    A.   I don't remember.
10    Q.   Do you think it was 2022 or earlier?
11    A.   It's possible, but I don't remember.
12    Q.   Okay.  Do you remember the rough magnitude
13  of the loss?
14    A.   I think in the tens of millions, but I'm
15  not actually sure.
16    Q.   And who ended up absorbing that loss?
17    MR. DUNNE:  Objection.
18    THE WITNESS:  I am not sure.
19    MR. HARRIS:  Q.  Do you know if the
20  customer covered the loss?
21    A.   I don't know.
22    Q.   Is it possible that FTX absorbed the loss?
23    MR. DUNNE:  Objection.
24    MR. CAPONE:  Objection.
25    THE WITNESS:  It's possible, but I don't

Page 52

1  know.
2    MR. HARRIS:  Q.  Within FTX, who would --
3  who made the decision what -- how to handle a
4  customer loss?
5    A.   I'm not sure.  It wasn't my area.
6    Q.   Okay.  Ultimately flow up to
7  Mr. Bankman-Fried?
8    A.   In the sense that everything did, and I'm
9  not sure if in other senses, too.
10    Q.   Was there also an incident that some
11  account or accounts invested in MobileCoin?
12    A.   I -- definitely some accounts invested in
13  MobileCoin.
14    Q.   But was there an instance of customer
15  losses as a result of some accounts having invested
16  in MobileCoin?
17    A.   I think there are definitional ambiguities
18  there.
19    Q.   Okay.  What is ambiguous in my question?
20    A.   I don't know that any customer accounts
21  ended up negative.
22    Q.   Okay.  Was there a -- was there a
23  situation where there was a concern that some
24  customer accounts would go negative because they had
25  invested in MobileCoin?

Page 53

1    A.   Hmm, I don't know if that was a concern.
2    Q.   Okay.  I think you testified about some
3  instance at the criminal trial, right --
4    A.   Yeah.
5    Q.   -- about customer accounts with
6  MobileCoin?
7    A.   Yes.
8    Q.   So what do you remember about that
9  instance?
10    A.   I remember that there was either one
11  account or a suite of accounts that were engaging in
12  some form of exploitative spot margin trading that
13  took advantage of some bad parameters that Gary Wang
14  had set similar to the parameters we were talking
15  about before.  I don't remember the exact details.
16    The concern may not have been that the
17  accounts would end up under water.  It may have been
18  that in liquidating them markets -- like the
19  MobileCoin market would tank or something.
20    Q.   Okay.  And do you recall there was a
21  potential loss in the nine figures?
22    A.   I remember what Sam Bankman-Fried said the
23  loss was -- like I remember he was giving a ballpark
24  amount of loss that Alameda ended up absorbing
25  because of it.  I don't remember like if that was a

MAGNA
LEGAL SERVICES

Page 54

1 realized loss or unrealized loss or what absorbing
2 exactly meant.
3      Q.   What was the ballpark amount of loss that
4 he mentioned?
5      A.   I remember him saying either a billion or
6 high hundreds of millions of dollars.
7      Q.   And you remember that the decision was to
8 have Alameda absorb that loss rather than socialize
9 it among customers?
10     MR. DUNNE:   Objection.
11     THE WITNESS:   That's not exactly what I
12 remember.
13     MR. HARRIS:   Q.   Okay.   What do you
14 remember?
15     A.   I don't remember what the decision was.   I
16 know it resulted in Alameda shouldering something.
17 It's ambiguous to me whether or not that thing was a
18 loss or if it was just a lot of risk in the form of
19 a large MobileCoin position.
20     Q.   Okay.   Do you remember the decision was to
21 have Alameda shoulder that risk rather than have it
22 be allocated among the customer base?
23     A.   Yes.
24     MR. DUNNE:   Objection.
25     MR. HARRIS:   Q.   And I believe you said

Page 55

1 that was Mr. Bankman-Fried's decision as far as you
2 know?
3      A.   As far as I know.
4      Q.   And you don't recall any instance where
5 customer losses were socialized among the customer
6 base; is that right?
7      MR. DUNNE:   Objection.
8      THE WITNESS:   FTX's collapse.
9      MR. HARRIS:   Q.   Okay.   Before the
10 bankruptcy happened, do you recall any instances
11 where customer losses were socialized among the
12 customer base?
13     MR. DUNNE:   Objection.
14     THE WITNESS:   Don't recall any instances.
15     MR. HARRIS:   Q.   Am I right that FTX
16 called socialization of losses -- they used the term
17 clawbacks for that?
18     A.   I think that was a commonly used term for
19 it.   Clawbacks had a few different meanings in the
20 crypto world.   That's the most prominent of them, as
21 I remember.
22     Q.   Okay.   And using that term clawback, you
23 don't recall there ever being a clawback before the
24 bankruptcy, right?
25     A.   Correct.   I don't recall there being

Page 56

1 instances.
2      Q.   Okay.   Let me just look at some of the
3 things in these account statements.   See if you can
4 help me understand what may have been described in
5 them.   So if you look at I think it's 58, which is
6 the -- called profit and loss.   You see the top line
7 item under income there's something called backstop
8 fund revenue?
9      A.   Yes.
10     Q.   Is the backstop fund also sometimes called
11 the insurance fund at FTX?
12     A.   I'm not sure what this line item refers
13 to.
14     Q.   Okay.   Do you remember hearing about a
15 backstop fund?
16     A.   I remember hearing about an insurance
17 fund, and I know there was different terminology
18 used to refer to it.
19     Q.   Okay.
20     A.   Backstop fund makes sense to me as being
21 the same thing.
22     Q.   Okay.   And then if you look under
23 expenses, trading expenses, the first line item is
24 backstop fund expense.   Do you see that?
25     A.   Yes.

Page 57

1      Q.   Okay.   So what do you remember about why
2 the insurance fund or the backstop fund could
3 generate revenue or an expense for FTX?
4      MR. DUNNE:   Objection.
5      THE WITNESS:   I am not confident that this
6 is the insurance fund as I understand it.   So I can
7 speak to the insurance fund part of that question.
8      MR. HARRIS:   Q.   Okay.   So let's talk
9 about the insurance fund, then.   So what do you
10 remember about how the insurance fund could generate
11 expense or revenue for FTX?
12     A.   In the case of a specific form of
13 liquidation, one that went through the backstop
14 liquidity provider system, the insurance fund would
15 be one of three parties involved in a trade where
16 the three parties are the liquidating account, the
17 backstop liquidity provider, and the insurance fund.
18     In the case that an account did not have
19 sufficient collateral to give fair prices to the
20 backstop liquidity provider without itself remaining
21 underwater, the insurance fund would chip in.   In
22 case of where it did, the insurance fund might draw
23 some in the trade.
24     Q.   And you said fair prices, what do you mean
25 by that?

MAGNA ▶
LEGAL SERVICES

1     A.  Fair in the -- here is a technical
2  meaning.  The code established what -- what fair
3  might mean, which is some amount of distance from
4  the current price at which the liquidated asset is
5  trading such that the backstop liquidity provider
6  doesn't -- is not guaranteed to lose money upon
7  liquidating those funds.
8     Q.  So the backstop liquidity provider would
9  acquire the asset at some price that's better than
10  where asset's currently trading?
11     A.  That's right.  Better for them, worse for
12  the customer getting liquidated.  Though, in this
13  case, better is better mark-to-market, not
14  necessarily marked to where they can actually sell
15  it on average.
16     Q.  Okay.
17     A.  This amount of better aims to reflect
18  exactly how much they could -- how much impact would
19  then result from them selling on the market.
20     Q.  So the customer would get less than the
21  mark-to-market value for the asset in the event of a
22  liquidation?
23     A.  Slightly in the instances I can think of,
24  but I am not confident that's true of all instances.
25     Q.  Okay.  And how did the code determine what

1  was the discount that the customer would receive?
2     A.  I don't remember exactly.  I didn't write
3  this part of the code.  I strongly expect it relates
4  to some of the same factors we were talking about
5  earlier that parameterized different assets.  I
6  expect that there is a parameter or two that relate
7  to this.
8     Q.  Were the customer's assets liquidated at a
9  price that would essentially set the net asset value
10  to zero for the customer?
11     A.  Not in all cases.
12     Q.  In some cases?
13     A.  In some cases.  Though I don't remember if
14  that was a special target in the code or if that's
15  just an outcome that sometimes happened.
16     Q.  Okay.  Were there some cases where the
17  sales price for the assets were set at a -- at an
18  amount that left some net asset value for the
19  customer?
20     A.  Sometimes.  It depended on how liquid the
21  assets were and so on.
22     Q.  Okay.  And there was something in the code
23  that determined that, what price the assets would be
24  liquidated as; is that right?
25     A.  For the automatic liquidation engine, the

1  one that interacted with the insurance fund the way
2  that we're talking about, yes, a hundred percent in
3  the code.
4     Q.  Okay.  For manual liquidations, was that
5  not driven by the code?
6     A.  I -- ultimately, everything still was
7  driven by the code.
8     Q.  Okay.  So was the -- was there something
9  in the code that determined what the sales price
10  would be for manual liquidations?
11     A.  I'm not entirely sure what you're
12  referring to by manual liquidations.  It could mean
13  one of several things.
14     Q.  Okay.  What are the options, I guess?
15     A.  One option is when a customer and FTX
16  decide on a price outside of the -- what the
17  automatic liquidation engine would or one is
18  determined outside of that, but then the code is
19  used to sort of effectuate the trade.
20     Q.  What other options are there?
21     A.  A customer performing those trades
22  themselves.
23     Q.  Anything else?
24     A.  A customer doing so over something like
25  chat via OTC with Alameda.  Although, I don't know

1  if that overlapped with later years at FTX at all.
2     Q.  Could an FTX employee manually sell a
3  customer's assets?
4     A.  In almost all cases, no.
5     Q.  What is the exception or exceptions you
6  have in mind?
7     A.  Developers with access to do so.
8     Q.  Is there anyone besides the developer who
9  could do so?
10     A.  It might have been the case that there
11  were some admin pages on which -- through which
12  customers could do this.  I remember at least one.
13     Q.  What's the admin page you have in mind?
14     A.  The reason I created allow negative in its
15  first instance was for supporting trades of LOCs,
16  forms of FTT, and gave an admin page through which
17  FTX administrators could specify the counterparty
18  for an account and how much locked FTT they wanted
19  to buy and click a button that thereby spent the
20  customer's dollars and gave them locked forms of
21  FTT.
22     Q.  Do you know if Mr. Salame had this admin
23  access where he could manually cause sales of
24  customer's assets?
25     A.  I don't remember if he had access.  I also



Page 62

1  don't remember if this was unrestricted. It might
2  have only -- the thing I'm talking about now may
3  have only related to FTT.
4      Q.  Just to go back to the insurance fund,
5  if -- we were talking about how it might generate
6  revenue for the -- how a liquidation might generate
7  revenue for the insurance fund. Am I right the
8  reason it might generate revenue is because when
9  these assets are sold at a better than
10  mark-to-market price that would result in some sort
11  of gain for the insurance fund?
12     A.  Not necessarily.
13     Q.  Okay. So why is it might result in
14  revenue for the insurance fund?
15     A.  It would have to be sufficiently better.
16  I should say it differently. I don't remember the
17  code exactly. The code is extremely clear and
18  unambiguous on this. That will just answer the
19  question, whatever the code is. I have my best
20  recollection of it. Something like the code
21  determined what a minimal and maximal amount of edge
22  mark-to-market for each asset for the size of the
23  amount of assets getting liquidated was appropriate
24  to give the backstop liquidity provider.
25          If there was a difference between maximum

Page 63

1  amount of edge to charge the liquidated customer and
2  the amount to be given to the backstop liquidity
3  provider, that difference could be deposited to the
4  insurance fund, and I expect that's what we're
5  talking about is insurance fund revenue.
6          In the case that there was -- we
7  weren't -- there wasn't sufficient capital or excess
8  in the customer account to give the backstop
9  liquidity provider a fair price, where fair here
10  means determined by the code, without it going
11  underwater, the insurance fund might chip in for the
12  difference. Those would be the revenue and cost
13  sides of what -- what ultimately determined the
14  holdings of the insurance fund.
15     Q.  Okay.
16     MR. CAPONE:  Chris, can we take a break?
17     MR. HARRIS:  Sure. Let me finish this. I
18  have this one attachment, then we'll be --
19     MR. CAPONE:  Sure.
20     MR. HARRIS:  Q. Why don't we look at
21  Tab 59 or Exhibit 59, which is the balance sheet.
22  Okay. The question I had was on -- in the middle of
23  the page, there's a digital assets line item. Let
24  me know if you see that.
25     A.  I do.

Page 64

1      Q.  Okay. So these are -- these figures are
2  in millions if that helps you. And from looking at
3  it, it looks like the amount of digital assets on
4  FTX's balance sheet increased from about 38 million
5  at the beginning of the year to 414 million by June
6  2021. Do you see that?
7      A.  Yes, but I'm confused because there are
8  two things that say digital assets with different
9  values --
10     Q.  Yes, there are.
11     A.  -- in adjacent rows.
12     Q.  Well, do you know what the two different
13  line items are?
14     A.  I do not know.
15     Q.  Okay. And do you know why there might be
16  a negative amount for the first one?
17     A.  Do not know.
18     Q.  Okay. Do you have any -- from being at
19  FTX, can you think of any reasons why the amount of
20  digital assets that FTX owned would have increased
21  in the first half of 2021?
22     MR. DUNNE:  Objection.
23     THE WITNESS:  Plenty of possible reasons.
24  I'm not sure what -- what is reflected here.
25     MR. HARRIS:  Q. Like what are the

Page 65

1  possible reasons you're thinking of?
2      A.  Revenue.
3      Q.  Okay. Might generate revenue in the form
4  of digital assets?
5      A.  Yes. If USDC and Stablecoins count as
6  digital assets.
7      Q.  Anything else comes to mind?
8      A.  No.
9      MR. HARRIS:  Okay. All right. Why don't
10  we break.
11     VIDEOGRAPHER:  This is the end of Media
12  No. 1. We are off the record at 10:12 a.m.
13     (The deposition was in recess from 10:12
14  to 10:30.)
15     VIDEOGRAPHER:  This is the beginning of
16  Media No. 2. We are back on the record at
17  10:30 a.m.
18     MR. HARRIS:  Q. Before we broke, we had
19  been talking a little about clawbacks. I just want
20  to make sure I understood one thing. There was
21  nothing in the code that provided for clawbacks,
22  right?
23     A.  The code didn't implement clawbacks.
24     Q.  So if FTX only decided it wanted to do a
25  clawback, it would have to either create new code or

MAGNA
LEGAL SERVICES

1  do it manually; is that right?
2      A.  Right.
3      Q.  And so you're not aware of any rules that
4  said how they would implement a code if they decided
5  to do one?
6          MR. DUNNE:  Objection.
7          THE WITNESS:  I'm not aware of rules
8  outside of the code.
9          MR. HARRIS:  Q.  And you're not aware of
10  rules inside the code either about how to do a
11  clawback, right?
12      A.  Right -- or rather the code didn't
13  implement it.
14          (EXHIBIT 60 WAS MARKED FOR
15          IDENTIFICATION.)
16          MR. HARRIS:  Q.  Okay.  You were handed a
17  couple of new documents want to ask you about.  The
18  first one is marked Tab 60.  This is another
19  document provided by your counsel from this private
20  FTX accounting chat group.  And this was dated
21  March 26, 2021.  And this is one where you did
22  comment on, if you look on the second page.
23          MR. DUNNE:  May 26th I think you mean,
24  Chris.
25          MR. HARRIS:  Q.  Yes, thanks.  So if you

1  see right before you comment, Mr. Bankman-Fried
2  sends a message with sort of four paragraph number
3  items in it.  Do you see that?
4      A.  Uh-huh.
5      Q.  And then you respond, "Done with code
6  reviews.  Custody is next."
7          Do you see that?
8      A.  Yes.  It's not clear to me I'm responding
9  to him.  I do see my message.
10      Q.  Okay.  Do you remember this chat exchange
11  at all?
12      A.  Not particularly.
13      Q.  Okay.  What do you think you were
14  referencing when you said done with code reviews?
15      A.  I expect that related to revenue testing
16  in which the code would be reviewed.
17      Q.  I see.  And then you said, "Custody is
18  next."  What do you think that was -- you were
19  referring to?
20      A.  Likely about reviewing the code that
21  related to wallets with the same group.
22      Q.  What does that mean the code that related
23  to wallets?
24      A.  There was code that mediated depositing
25  and withdrawing and interacting with FTX's hot

1  wallets.
2      Q.  So depositing is when a customer has some
3  assets outside of the exchange and then they deposit
4  them onto the exchange?
5      A.  Exactly.
6      Q.  And what did you mean by hot wallets?
7      A.  Hot wallets are the -- were the industry
8  term for an omnibus wallet an exchange would have
9  from which customers could withdraw, but that they
10  did not directly deposit to.
11      Q.  Okay.  So you're talking about interacted
12  with FTX's hot wallets that would be the transfer
13  from the customer-specific wallet they deposited
14  into and then those digital assets were then
15  transferred to the FTX hot wallet.  Is that what
16  you're referring to?
17      A.  Sorry.  I lost the track of the question.
18      Q.  Okay.
19      A.  Do you mind restating it?
20      Q.  I was trying to understand when you were
21  talking about what you thought this custody is next
22  is referring to.  You said there was code that
23  referred to the hot wallets.
24      A.  Yes.
25      Q.  So there was code that dealt with FTX's

1  custody of customer assets; is that right?
2      A.  Insofar as it related to hot wallets and
3  deposit wallets, yes.
4      Q.  Okay.  And was this review of that code
5  something you were doing on behalf of the auditors
6  or at their request?
7      A.  I don't know if it was at their request or
8  at Jayesh or someone else's request internally.
9      Q.  Do you recall why they were having you
10  do -- someone was having you do this review of the
11  code that related to FTX's custody of customer
12  assets?
13      A.  Nothing more specific than that.  It was
14  part of the technical audit.
15      Q.  Part of the what?
16      A.  The technical audit.
17          (EXHIBIT 61 WAS MARKED FOR
18          IDENTIFICATION.)
19          MR. HARRIS:  Q.  If you can look at the
20  next document, which is Tab 61.  It's another
21  exchange in this chat group.  This one's from
22  January 21st, 2022.  Do you see that?
23      A.  Yes.
24      Q.  Okay.  And it looks like it starts with
25  Mr. Peswani directing a message to you and to

MAGNA ◆
LEGAL SERVICES

Page 82

1   MR. HARRIS: Okay. Why don't we do
2   Tab 11.
3   (EXHIBIT 63 WAS MARKED FOR
4   IDENTIFICATION.)
5   MR. HARRIS: And -- okay. You've been
6   handed what's marked Exhibit 62, which is an
7   email --
8   MR. DUNNE: 63, I think.
9   MR. HARRIS: Q. Oh, 63. Sorry. Thank
10  you. 63. It's an email from OTC@FTX.com address,
11  and this one's addressed to Kyle Davies at Three
12  Arrows Capital.
13  A. Yes.
14  Q. And the subject is trade confirmation
15  Three Arrows Capital.
16  A. Yeah.
17  Q. Is this an example of the kind of trade
18  confirmation that customer could choose to have
19  generated?
20  A. No, this is not an example of the ones I
21  had in mind.
22  Q. Okay. Let's start with what you had in
23  mind. What did you have in mind?
24  A. Ones issued by the HKG code repo related
25  to the FTX trading platform as opposed to the FTX

Page 83

1   OTC portal.
2   Q. That's a term I haven't heard of. What is
3   HKG code repo?
4   A. The GitHub repository under which most FTX
5   exchange code lived was called HKG.
6   Q. Okay. And so it was possible for trade
7   confirmations to be generated from that portal?
8   A. Right.
9   Q. Okay. Do you remember what they looked
10  like when they were generated?
11  A. The website had a little pop-up in one of
12  the corners that gave details about the trade. I
13  don't remember if there were other things it did.
14  Q. Okay. Did it -- do you know if it ever
15  generated like messages or emails or anything that
16  reflected the trade confirmation besides a pop-up?
17  A. Not that I remember.
18  Q. Okay. Okay. Now, looking at this one, do
19  you have an understanding what this Exhibit 63 is?
20  A. Yes.
21  Q. Okay. What is this?
22  A. This is a OTC trade notification given by
23  a different platform.
24  Q. Okay. And what's that platform?
25  A. The OTC portal.

Page 84

1   Q. And how did the OTC portal differ from the
2   trading platform?
3   A. Entirely different code. Predates FTX.
4   Q. Okay. Were you involved at all in the OTC
5   platform?
6   A. Minorly.
7   Q. Okay. When -- if people made -- if
8   customers made purchase on the OTC platform, was
9   that also custodied at FTX in the hot wallets?
10  A. I don't remember the exact custody set up.
11  Q. Okay. Do you remember what -- going back
12  to the HKG code portal and the confirmations that
13  could be generated, do you remember what they said?
14  A. No, but the -- like with most things, the
15  code is unambiguous on it. I just don't remember.
16  Q. Okay. I think you did have a role in
17  designing the code for the user interface; is that
18  right?
19  A. In many areas, yes.
20  Q. Okay. So I wanted to ask you some
21  questions about what the user interface showed.
22  This is an example of the ones where I don't have
23  someone who was there at the time. So I'm going to
24  ask you what you remember. Am I right that the user
25  interface would show for the customer a separate

Page 85

1   balance for each kind of digital asset?
2   A. Yes, though customer needs some defining.
3   Q. What's ambiguous about customer?
4   A. There are a couple different things that a
5   customer could mean.
6   Q. Okay.
7   A. Could mean the thing into which they log
8   in, which owns many sub accounts. Could be any
9   specific sub account and looking at it in
10  particular. Could mean, though, maybe in rare cases
11  a customer sort of configured way looking at
12  properties of many accounts each of which have many
13  sub accounts.
14  Q. Okay. You're saying a customer could
15  refer to just the owner of a particular sub account?
16  A. Right. Could.
17  Q. Or it could refer to someone who has
18  rights to a collection of accounts?
19  A. Right.
20  Q. Okay. So when a customer looks at a
21  particular sub account, they can see the balance for
22  a particular kind of digital asset; is that right?
23  A. Right.
24  Q. Okay. So they could view like a Bitcoin
25  balance for that account, right?

MAGNA ▶
LEGAL SERVICES

1    A.  Right.
2    Q.  And they could also view the -- like the
3   USD balance for that account?
4    A.  Right.
5    Q.  And any of those accounts could be
6   positive or negative; is that right?
7    A.  Yes, subject to constraints in their own
8   relationships.
9    Q.  Okay.  And they could also view a net
10  account balance; is that right?
11   A.  I believe that was shown both per sub
12  account and cross sub account under the same login
13  in places in the UI.
14   Q.  And is it right that unless the allow
15  negative feature was enabled the accounts were all
16  supposed to have a positive net account balance?
17   A.  I don't know what is supposed to, but I
18  can speak to what the code did or didn't allow.
19   Q.  Okay.  What did the code allow or not
20  allow on it?
21   A.  The liquidation engine attempted to
22  prevent accounts from ever being negative.
23   Q.  Okay.  Am I right that at times, though,
24  accounts did go negative?
25   A.  Yes.

1    Q.  Okay.  So it wasn't that the code
2   prevented an account from ever being negative,
3   right?
4    MR. DUNNE:  Objection.
5    THE WITNESS:  Prevent is a little
6   ambiguous.
7    MR. HARRIS:  Q.  It was possible for a
8   code to be negative, right?
9    A.  Possible --
10   MR. DUNNE:  Objection.
11   THE WITNESS:  -- for an account to be
12  negative, yes.
13   MR. HARRIS:  I'm sorry.  Possible for an
14  account to be negative.  The code didn't -- let me
15  strike that.
16   (EXHIBIT 39 PREVIOUSLY MARKED FOR
17   IDENTIFICATION)
18   MR. HARRIS:  Q.  You've been handed what
19  was already marked Exhibit 39, and this was produced
20  to us by the FTX Recovery Trust as a stand-alone
21  document, but it appears to me as a -- some sort of
22  screenshot of the exchange platform, and I'll
23  represent to you the file name suggests it was taken
24  on June 14th, 2022.
25   Does this look to you like a screenshot

1   from the user interface?
2    A.  Yes.
3    Q.  Okay.  And you see there's a number of
4   tabs at the top?
5    A.  Yes.
6    Q.  Okay.  And it looks to me like the one
7   selected here is collateral explainer, and what is
8   that?
9    A.  I can speak to what it says, but I didn't
10  write this.  I didn't write the code for this
11  particular frame.
12   Q.  Okay.  Have you ever interacted with the
13  code for this frame?
14   A.  It's possible, but I don't remember.
15   Q.  Okay.  Do you recall what the collateral
16  explainer was?
17   MR. DUNNE:  Objection.
18   THE WITNESS:  Similarly, I can make sense
19  of it from what's here, but I don't independently
20  remember --
21   MR. HARRIS:  Q.  Okay.
22   A.  -- what it was about.
23   Q.  All right.  Well, let me see if there's
24  anything in here that triggers a memory.  See it
25  begins by saying, "The page provides an overview of

1   how your open positions and balances contribute to
2   your collateral.  For more details on how trading on
3   margin works, see the" -- then it says spot margin
4   training explainer in blue.
5    Do you see that?
6    A.  Yes.
7    Q.  Okay.  Does that suggest that you could
8   click on that it would pull up that document, the
9   spot margin trading explainer?
10   MR. DUNNE:  Objection.
11   THE WITNESS:  I think so, but I'm not
12  sure.
13   MR. HARRIS:  Q.  Okay.  Okay.  Then let
14  me just ask you some questions about what's said in
15  here and see if you have an understanding of it.  Do
16  you see the first kind of numerical item it lists is
17  total USD value positive spot balances equals
18  239.8 million.
19   Do you see that?
20   A.  Yes.
21   Q.  So what do you think that's referring to?
22   MR. DUNNE:  Objection.
23   THE WITNESS:  I can speculate.
24   MR. HARRIS:  Q.  Okay.
25   A.  Yeah.  Flagging this as speculation

Page 90

1  because I didn't write the code.  This could be the
2  mark-to-market sum of non-negative holdings in the
3  sub account.
4      Q.   Okay.  Is the way the code worked that the
5  collateral value only used the positive sums of
6  assets?
7      A.   Collateral value is ambiguously defined.
8      Q.   Okay.  Was there a term total collateral
9  value in the code?
10     A.   Not by that name.
11     Q.   Is there a different name that was used
12 for it?
13     A.   The term collateral was used in the code
14 and had a precise technical definition.
15     Q.   So was -- did collateral only look at
16 positive asset values?
17     A.   No.
18          MR. DUNNE:  Objection.
19          MR. HARRIS:  Q.  So it also included
20 negative asset values?
21     A.   Yes.
22     Q.   Okay.  All right.  We'll get to that.  Do
23 you see under here it says collateral contributed by
24 positive spot balances equals 199.6 million.
25          Do you see that?

Page 91

1      A.   Yes.
2      Q.   What did that -- what's your understanding
3  of what that's talking about?
4          MR. DUNNE:  Objection.
5          THE WITNESS:  I can speculate.
6          MR. HARRIS:  Q.  Okay.
7      A.   My speculation is that it's the sum of all
8  the non-negative balances in the account, but not
9  mark-to-market, instead including things like the
10 collateral factor we spoke about earlier and some
11 non-linearity factors.
12     Q.   Why do you say the non-negative valuation
13 balance?
14     A.   Because it says positive spot balances.
15     Q.   All right.  Then it says total collateral
16 used by outstanding futures positions equals 12.2
17 million.  Do you see that?
18     A.   Yes.
19     Q.   Okay.  Do you have an understanding why a
20 futures position would use collateral?
21     A.   Yes.
22     Q.   Okay.  And how is that?
23     A.   One way to think about a futures position
24 is that it represents risk.  It's a bet placed.  A
25 bet placed that can lose money should have

Page 92

1  corresponding collateral associated with it such
2  that in the case of a loss there's something to
3  cover it.  So maintaining or opening such a bet
4  requires collateral.
5      Q.   Because a future has a -- owning a future
6  it has some associated risk with it, right?
7          MR. DUNNE:  Objection.
8          THE WITNESS:  One way to think about it is
9  that it is a risk.
10          MR. HARRIS:  Q.  Okay.  Like a contingent
11 liability?
12          MR. DUNNE:  Objection.
13          THE WITNESS:  Forgive me.  I don't know
14 the -- I'm not familiar with the terms.
15          MR. HARRIS:  Q.  Okay.  So what is the
16 risk that FTX is trying to address by requiring
17 collateral for a future position?
18     A.   The risk that the -- that the bet doesn't
19 pan out for the user and that they lose money.
20     Q.   And FTX wanted to have collateral to try
21 and prevent FTX or other users having to absorb that
22 lost --
23          MR. DUNNE:  Objection.
24          MR. HARRIS:  Q.  -- money?
25     A.   Right.

Page 93

1      Q.   Then just to go back to the user
2  interface, these -- you see these other tabs at the
3  top?
4      A.   Yes.
5      Q.   If I clicked on balances, what would that
6  pull up?
7      A.   I believe it would pull up a table of
8  balances for I believe sub account just to say
9  holdings of currencies and coins.
10     Q.   And would it pull up a balance for each
11 different kind of currency or coin?
12     A.   Yes.  That the account had some
13 non-negative holding of -- sorry -- non-zero holding
14 of.
15     Q.   Okay.  And is there somewhere on this page
16 where I could click to see my -- my net account
17 value?
18          MR. DUNNE:  Objection.
19          THE WITNESS:  I'm not sure which page this
20 pane we're looking at was located in.
21          MR. HARRIS:  Q.  Okay.  If I wanted to
22 see my U.S. dollar balance, would that be -- could I
23 find that under the balances tab?
24          MR. DUNNE:  Objection.
25          THE WITNESS:  For the sub account for

MAGNA
LEGAL SERVICES

Page 98

1    A.   The version of allow negative that I
2 originally wrote did not allow for the thing you're
3 describing, but eventually it did.
4    Q.   Okay.  So at some point the allow negative
5 feature allowed a customer to borrow another
6 customer's assets outside of the margin program?
7    A.   Yes.
8    Q.   Okay.
9    A.   Though I should clarify I don't know about
10 the definition of borrow here.  Be negative in
11 assets I should say.
12    Q.   Okay.  But you don't know if that
13 reflected borrowing other customer's assets as
14 opposed to something else?
15    MR. DUNNE:  Objection.
16    THE WITNESS:  Like title, borrow is a
17 really overloaded term.
18    THE REPORTER:  (Clarification.)
19    MR. HARRIS:  Q.   Okay.  We talked about
20 some of the help desk articles that explained how
21 the exchange worked.  I've seen a spot margin
22 trading explainer and a collateral management
23 explainer.  Are there any other help desk articles
24 that you can think of that describe the margin
25 program to customers?

Page 99

1    A.   Not that I can think of.  I expect there
2 might have been many.
3    Q.   Okay.  Do you think you had any role in
4 editing or helping with either of those two
5 documents?
6    A.   It's possible that one of those two
7 documents reflected those parameters that I
8 mentioned earlier that I might have edited directly.
9    Q.   All right.  I'm going to show them both to
10 you.  I just had a couple more questions before I
11 do.  Is it right that the code for the margin
12 program changed in July 2022?
13    A.   I'm not sure.
14    Q.   Okay.  Do you recall that there was some
15 change to the code that was -- occurred in the
16 months leading up to before the bankruptcy filing?
17    A.   Over FTX's history there were maybe tens
18 to thousands of updates to the code.
19    Q.   Okay.  Do you remember any change to the
20 margin program being triggered by Three Arrows
21 liquidation?
22    A.   Not that I recall.  It's possible.
23    MR. HARRIS:  Okay.  Why don't we do
24 Tab 52, the collateral management.
25    (EXHIBIT 64 WAS MARKED FOR

Page 100

1    IDENTIFICATION.)
2    THE REPORTER:  This is 64.
3    MR. HARRIS:  Q.   64.  Okay.  You were
4 handed Exhibit 64, which I understand to be -- I
5 guess it's a printout from the help.FTX.com page you
6 mentioned.  It's called collateral management.  Take
7 a look and see if it looks familiar to you as one of
8 the help desk pages.
9    A.   It does look familiar.
10    Q.   Do you think you had any role in reviewing
11 or editing this explainer?
12    A.   This table that shows on the first page
13 looks like the one that I would have edited when,
14 for instance, adding a new future.
15    Q.   Okay.  If you look at the third page, see
16 that definitions and formulas.  Did those formulas
17 track what was in the code?
18    MR. DUNNE:  Objection.
19    MR. HARRIS:  Q.   Or were they intended
20 to?
21    A.   I'm not sure.  I didn't write it.
22    Q.   Okay.  If you look at the bottom of the
23 fourth page, there's a -- there's a numbering system
24 at the bottom also.  Maybe that's easier.  If you
25 look at the --

Page 101

1    A.   Ah.
2    Q.   -- numbers that end -- the page that ends
3 in 47.  See that?  Okay.  All right.  So you see
4 there's a section heading bottom of that page says
5 calculating total collateral value?
6    A.   Yes.
7    Q.   Okay.  And then it says, "To start, let's
8 first calculate the collateral weight of the assets
9 you're currently holding."
10    Do you see that?
11    A.   Yes.
12    Q.   Okay.  And then -- then has an example for
13 BTC, and then it -- after a few lines it says, "That
14 means the collateral value of BTC will equal," and
15 it has a formula.  Do you see that?
16    A.   Yes.
17    Q.   So this collateral value, that's different
18 from the net account balance for an account, right?
19    A.   Possibly.
20    Q.   What are the times where it would be --
21 where it would be different or would be the same?
22    A.   I'm not sure what the definition of net
23 account balance is.
24    Q.   Okay.  That's not a term you've heard
25 before?

Page 102

1       A.  I have.  I just forget what it meant.
2       Q.  Okay.  So, I mean, earlier today we've
3   been talking about trying to ensure that a net
4   account balance doesn't go zero.  So that's what I'm
5   talking about when I say net account balance.
6       A.  Ah, in those conversations, when I was
7   referring to it then, I meant that -- I was speaking
8   like to a looser definition.
9       Q.  Okay.
10      A.  The precise way you might calculate it
11  could totally vary.
12      Q.  Okay.  So what does it -- so in terms of
13  the collateral value that's used in the code,
14  what -- is that different than the sum of the
15  positive and negative values for all of the
16  customers' assets.
17      A.  Yes.
18      Q.  And in what way is it different?
19      A.  Among other things, one of those
20  definitions may not include things like collateral
21  weight or the non-linearity introduced by these IMF
22  weights.
23      Q.  Okay.  What other differences can there
24  be?
25      A.  Collateral may only account for currencies

Page 103

1   that are collateral viable, and the other may
2   account for more, but the code makes this very
3   clear, and I'm going off of hazy memory here.
4       Q.  Okay.  If you look at the next section
5   here, so that same page ending in 48, there's a
6   section about calculating free collateral.  Do you
7   see that?  Okay.  And it kind of starts by saying,
8   "Let's calculate free collateral to understand how
9   open positions and orders affect your collateral.
10  Assume you have the following positions and open
11  orders in your account," and then it lists several
12  different assets, right?
13      A.  Some futures and some assets, yes.
14      Q.  And those are the assets that are
15  allocated the customer in their account.
16      A.  I'm reading this toy example for the first
17  time.  That's my read of it, but I'm not sure what
18  the author meant.
19      Q.  Just want to make sure I understand.  You
20  said couple of times toy example.  What does that
21  mean, toy?
22      A.  Ah, not reflective of an exact account and
23  its state in reality, but one used for the purpose
24  of demonstration.
25      Q.  Ah, okay.  And why was it important in

Page 104

1   order to understand collateral position to look at
2   each individual asset?
3           MR. DUNNE:  Objection.
4           THE WITNESS:  I don't understand the
5   alternative.
6           MR. HARRIS:  Q.  Why was it important to
7   look at each individual asset instead of just the
8   net account balance?
9       A.  The collateral is a reflection of a way to
10  calculate a net account balance.  So it must derive
11  its definition from something smaller.
12      Q.  So you couldn't determine collateral just
13  by looking at the net account balance?
14          MR. DUNNE:  Objection.
15          THE WITNESS:  Net account balance could be
16  defined in a few different ways.  Collateral is one
17  way to think about a net account balance in the
18  colloquial sense.  It must therefore be a function
19  of other things that comprise it.
20          MR. HARRIS:  Q.  Okay.  Do you know if,
21  when calculating collateral value, does the code
22  include a negative U.S. dollar balance?
23      A.  The -- the way that the code defined
24  collateral would have accounted for positive
25  balances in dollars or otherwise.

Page 105

1       Q.  Would it have accounted for a negative
2   U.S. dollar balance?
3       A.  Right.
4       Q.  So -- and I want to distinguish between
5   the collateral value and the collateral used.  Does
6   that distinction make sense?
7       A.  Yes.
8       Q.  Okay.  So just focusing on the collateral
9   value, was a negative U.S. dollar balance included
10  in the collateral value?
11          MR. DUNNE:  Objection.
12          THE WITNESS:  Yes.  To be clear, if a sub
13  account had different balances, including a negative
14  account balance, all of those would be considered in
15  determining their -- what the code called
16  collateral.
17          MR. HARRIS:  Q.  Okay.  Then there's a
18  section at the bottom of the next page called
19  handling negative USD balances.  Do you see that?
20      A.  Yes.
21      Q.  And do you understand what was meant by a
22  negative USD balance there?
23      A.  Yes.
24      Q.  Okay.  Okay.  So what's your understanding
25  of that?

MAGNA
LEGAL SERVICES

Page 110

1    THE WITNESS: The account collateral value
2 didn't account for futures positions directly, but
3 trading could affect it by virtue of P&L.
4    MR. HARRIS:  Q.  Okay.  Why is it the
5 account collateral value didn't account for futures
6 positions directly?
7    A.  Collateral is what supports positions, not
8 the positions themselves.
9    Q.  So future can't serve as a form of
10 collateral?
11   A.  Right.  A future is only risk.
12   Q.  Okay.  But spot assets can serve as a form
13 of collateral?
14   A.  Yes, can.
15   Q.  Okay.  And then looking at that same
16 paragraph, it says, "Your accounts total collateral
17 is a sum over all spot tokens of," and then it has a
18 formula, I guess, or a description.
19   A.  Sorry.  Do you mind pointing me to where
20 in the page this is?
21   Q.  Yeah, it's sort of the bottom portion
22 there's a -- there's a one and then a one and then a
23 two and then a one.  Do you see those?
24   A.  Yes.
25   Q.  Is that a accurate description of how the

Page 111

1 account's total collateral was calculated under the
2 code?
3    A.  Give me a moment.  It's not inconsistent
4 with my memory, but the code will be clear on this
5 one way or the other.
6    Q.  Okay.  Do you recall if the code allowed
7 futures to be lent out or borrowed?
8    A.  Not that I remember.
9    MR. DUNNE:  Objection.
10   THE REPORTER:  (Clarification.)
11   THE WITNESS:  Should clarify.  Borrow
12 paired with the term futures could mean a lot of
13 things.
14   MR. HARRIS:  Q.  Okay.  What are the
15 possibilities of what it might mean?
16   A.  I don't even know the full space of them.
17 I could imagine somebody construing a trade to mean
18 a borrow in the case of futures if you're going
19 short or something.  The exchange offered trade in
20 futures except for through trading and unlike with
21 spot balances you couldn't directly transfer
22 positions.
23   Q.  Okay.  You couldn't transfer your futures
24 position to another user?
25   A.  Except through trading.  That's my

Page 112

1 recollection.
2    Q.  Okay.  Do you -- if you look at the page
3 under -- it's ended with 98 at the bottom.  Section
4 called -- well, if you go to 97 first -- sorry --
5 the section called lending.
6    A.  Yes.
7    Q.  Okay.  If you look at the third line down,
8 there's a sentence that says, "Lenders bear no
9 counterparty risk."
10   Do you see that?
11   A.  Yes.
12   Q.  Okay.  Is there anything in the code in
13 which if a margin loan was not repaid that the
14 margin -- that would impose losses on margin
15 lenders?
16   MR. DUNNE:  Objection.
17   THE WITNESS:  If the loan is unrepaid,
18 it's charged interest and can only proximately pay
19 lenders.
20   MR. HARRIS:  Q.  You said proximately
21 pay.
22   A.  Clawbacks are an alternative through which
23 a lender could eventually lose money, but just by
24 virtue of not repaying a loan in the moment there
25 isn't something in the code that I remember that

Page 113

1 would then go and deduct any lender balances.
2    Q.  Okay.  And there was nothing in the code
3 that allocated one particular user lender with a
4 particular user borrower, right?
5    MR. DUNNE:  Objection.
6    THE WITNESS:  Not that I remember in the
7 spot margin program.
8    MR. HARRIS:  Q.  I want to talk about the
9 line of credit and how it's reflected in the code.
10 I think that was -- that is an area where you did
11 have some role in developing the code for line of
12 credit, right?
13   A.  Yes.
14   Q.  Okay.  What was your role?
15   A.  It predated me, and I made it a feature
16 that could apply to more accounts than just
17 Alameda's.  I believe I also wrote some code that
18 would charge interest based off of line of credit
19 usage and branding.
20   Q.  Okay.  So I think the two things you
21 mentioned was first was that you made it a feature
22 that could apply to more users than just Alameda?
23   A.  Right.
24   Q.  So before that happened, was a line of
25 credit only available to Alameda?



1    A.  I only mean it in the most general sense
2    that when thinking about how to price some asset you
3    might refer to other prices.
4    Q.  Okay.  Is there anywhere in the code that
5    shows the reference price for futures?
6    A.  My memory is not that reference price
7    itself as a term was used in the code base, but I
8    could be wrong about that.
9    Q.  Do you know, focusing on Three Arrows,
10   what kinds of futures positions Three Arrows had on
11   the FTX exchange in June 2020?
12   A.  I don't remember.
13   Q.  Okay.  Or how many futures contracts Three
14   Arrows had?
15   A.  I don't remember.
16   Q.  We talked a little bit about clawbacks and
17   liquidations.  Is it fair to say that FTX had
18   implemented kind of extensive procedures designed to
19   prevent losses?
20       MR. DUNNE:  Objection.
21       THE WITNESS:  It implemented some
22   procedures designed to prevent losses.
23       MR. HARRIS:  Q.  Okay.  Like what
24   procedures do you have in mind?
25   A.  The automated liquidation system comes to

1    mind.
2    Q.  Okay.  And the general concept of margin
3    requirements was also imposed to try and prevent
4    losses from being -- from occurring; is that right?
5        MR. DUNNE:  Objection.
6        THE WITNESS:  Yes, although here prevent
7    could take on two meanings, and it's true for one
8    and not the other.
9        MR. HARRIS:  Q.  Okay.  What are the two
10   meanings you have in mind?
11   A.  Doesn't make it an impossibility.  It
12   serves to make it less likely.
13   Q.  So the margin requirement and the
14   automatic liquidation were intended to make losses
15   less likely; is that right?
16   A.  That's my interpretation of why they were
17   there.
18   Q.  Okay.  If the way the FTX platform
19   operated was the customers didn't actually have any
20   assets or liabilities but just had a net account
21   balance, that was the only thing they had, would
22   you -- would there still be a reason to have an
23   automatic liquidation system?
24       MR. DUNNE:  Objection.
25       THE WITNESS:  It's hard for me to even

1    imagine such a case.  All you have are balances.
2    What are you doing?  Just giving people money?
3    That's no trading.
4        MR. HARRIS:  Q.  That's not how you
5    envision the system working?
6    A.  Correct.
7    Q.  Okay.  And it's not how it appeared to
8    operate from the code?
9        MR. DUNNE:  Objection.
10       THE WITNESS:  The code had more levels of
11   detail than just total account balance.
12       MR. HARRIS:  Q.  Okay.  All right.  I'm
13   going to ask questions that are just focused on
14   Three Arrows now and see what involvement you
15   remember or not.
16   A.  Sure.
17   Q.  So did you ever have direct interactions
18   with anyone at Three Arrows like Kyle Davies or Su
19   Zhu?
20   A.  Not Kyle Davies or Su Zhu.  I met one
21   trader who worked at Three Arrows Capital at a house
22   party in Chicago.
23   Q.  Who is the trader?
24   A.  I don't remember their name.
25   Q.  Other than that one interaction, did you

1    have any like professional interactions with anyone
2    at Three Arrows?
3    A.  Not that I remember.
4    Q.  Who do you recall being the point person
5    at FTX for the Three Arrows account?
6    A.  I don't -- I don't know who was for Three
7    Arrows in particular.  There are various teams and
8    personnel on those teams that generally spoke to
9    trading firms that operated on FTX.
10   Q.  Is there anyone you're thinking that you
11   know did have interactions with Three Arrows?
12   A.  Zane Tackett, I believe, did have
13   interactions with Three Arrows.
14   Q.  Anyone else you can think of?
15   A.  There were other non-trading activities at
16   Three Arrows and Alameda together, and for those
17   there are other personnel that come to mind still
18   that likely were in contact, but I don't know for
19   sure.
20   Q.  What were the non-trading activities you
21   have in mind?
22   A.  I believe that Three Arrows and Alameda or
23   FTX co-invested in various crypto projects.
24   Q.  What crypto projects are you thinking of?
25   A.  There's only one which I remember a name,

MAGNA
LEGAL SERVICES

Page 210

1    Q.  This is one of those you have to say yes
2  so she can --
3    A.  I'm sorry.  Yes, yes.
4    Q.  Why did you describe forcibly removing the
5  line of credit as the extreme thing?
6    A.  It was among the extremes available.  I
7  didn't mean extreme in a subjective sense.  I meant
8  it along the scale of possible actions.
9    Q.  Okay.  Then Mr. Tackett -- first, he
10  responds to Mr. Salame's comment call the block LOL,
11  and he writes, "No.  Start to pull excess collateral
12  out."
13         Does that give you any more ideas on what
14  Mr. Salame was referring to?
15    A.  I think they're talking past each other
16  here.
17    Q.  Okay.  And Mr. Tackett also, "They have
18  some buffer before liquidation.  We could just pull
19  that much out."
20         Do you see that?
21    A.  Yeah.
22    Q.  What do you think that's referring to?
23    A.  I think his proposal does not make sense.
24    Q.  Why not?
25    A.  He's proposing withdrawing lines from the

Page 211

1  line of credit on their account out.  I don't
2  understand what that achieves.
3    Q.  Okay.  He then further down writes, "Per
4  the collateral explainer, they have 107 million
5  available collateral initial in their account.  We
6  could pull out 20 million or 50 million."
7         Again, what do you think that's talking
8  about?
9    A.  I think he's not thinking clearly here.
10    Q.  Okay.  Mr. Salame says, "We should
11  definitely make a collateral call of them and note
12  we'll have to start doing something if they don't
13  reply.  I think that's bad to do that."  You see
14  that?
15    A.  Yeah.
16    Q.  Looks like he's saying it would be bad to
17  pull out 20 or 50 million from their account?
18    MR. DUNNE:  Objection.
19    THE WITNESS:  It's a little ambiguous.
20  I'm not sure.  That's my read, though.
21    MR. HARRIS:  Q.  Okay.  And then he says,
22  "Without warning.  Comments documented reason."
23         Do you think he's referring to reducing
24  the line of credit by that amount or selling assets
25  by that amount?

Page 212

1    MR. DUNNE:  Objection.
2    THE WITNESS:  I'm not sure.
3    MR. HARRIS:  Q.  Okay.  So is there a
4  different chat message where you recall being
5  instructed to do the manual liquidation?
6    A.  Yes.
7    Q.  Okay.  Is that something you've seen
8  recently?
9    A.  No.
10    Q.  You remember it, but it's not something
11  you've seen -- something you've seen since the
12  bankruptcy happened?
13    A.  No, not that I remember.
14    Q.  Okay.  Do you recall what system it was
15  on?
16    A.  I today have an understanding of what
17  types of chat it would have made sense to have
18  happened in.
19    Q.  Okay.
20    A.  But I don't know for certain which one it
21  was.
22    Q.  All right.  Well, let's start with that.
23  What is -- what's your understanding of what types
24  of chats it would have made sense to have happened
25  in?

Page 213

1    A.  Signal chats that included Alameda traders
2  and Sam and possibly lawyers and possibly Zane or
3  Ryan.
4    Q.  And why do you say Alameda traders?
5    A.  Because the trades I performed, the
6  counterparty of them would have been Alameda.  It
7  would have been important to tell them ahead of time
8  about positions they were about to take on that
9  would have been unexplained to their systems without
10  that.
11    Q.  Okay.  Do you recall why Alameda was the
12  counterparty?
13    A.  De facto counterparty of choice,
14  especially when giving bad prices to the
15  counterparty.
16    Q.  What do you mean by that, de facto
17  counterparty of choice?
18    A.  That I believe at this point in time even
19  the liquidation engine for spot margin treated them
20  as either the only or primary backstop of 30
21  provider.  All methods, except for selling to the
22  crypto assets directly on market -- of the ones
23  available, Alameda was the -- by practice, the
24  common choice for a counterparty.
25    Q.  Okay.  So when there were losses that

MAGNA
LEGAL SERVICES

Page 230

1      Q.   And that was -- that's a true statement,
2   correct?
3      A.   Remains true.
4      Q.   Yeah.  And you wrote in the next
5   paragraph, "And this was not just self delusion.  I
6   know that I acted in ways that were ultimately
7   criminal.  Putting myself ahead of customers and
8   using their money when they thought it was safe.
9   Helping Sam falsely claim FTX was more profitable
10  than it was.  Choosing to look away so I didn't have
11  to face the increasingly obvious truth, that I was
12  letting others use my name for their own interests.
13  I strayed so far from what I believe in.  There is
14  no excuse.  I will forever regret what I've done."
15       Do you see that?
16     A.   Yes.
17     Q.   I read that correctly, did I not?
18     A.   You did.
19     Q.   And that's -- that remains true, correct?
20     A.   Yes.
21       MR. DUNNE:  Okay.  Thank you, Mr. Singh.
22  You may set that aside.  I have no other questions,
23  but we will designate this confidential.
24       FURTHER EXAMINATION BY MR. HARRIS
25       MR. HARRIS:   Q.  I just had a couple

Page 231

1   follow-ups.  Just first on this document you were
2   just shown Exhibit 77, this last paragraph you were
3   just asked about, you were asked about this phrase
4   in your letter putting myself ahead of customers,
5   using their money when they thought it was safe.
6      A.   Yes.
7      Q.   By their money, you meant the
8   cryptocurrency and their VI currency; is that right?
9      A.   Right.
10     Q.   And by using it, what were you referring
11  to?
12     A.   That after I learned of a short fall in
13  customer funds in September 2022, I continued to
14  green light or directly make expenditures using
15  liquid funds, which necessarily deepened the hole in
16  liquid versus illiquid funds.
17     Q.   What did you mean when you said I guess
18  the customers thought their money was safe?
19     A.   It was my subjective and general
20  understanding that customers didn't believe that
21  there was a shortfall in customer funds.
22       MR. HARRIS:  Q.  Okay.  So they thought
23  their money that they had placed on the exchange was
24  safe?
25     A.   By that definition of safe.

Page 232

1      Q.   Okay.  And just to be clear, do you
2   believe you testified truthfully today, to the best
3   of your abilities?
4      A.   Yes.
5       MR. HARRIS:  Okay.  All right.  Thank you.
6       MR. DUNNE:  All right.  Go off the record.
7   No further questions for me.
8       VIDEOGRAPHER:  This concludes today's
9   testimony given by Nishad Singh.  We are off the
10  record at 3:45 p.m.
11       THE REPORTER:  Could you give me your
12  orders, please?
13       MR. HARRIS:  A rush and a rough.
14       THE REPORTER:  Rush to what day?
15       MR. HARRIS:  Two-day, I think we have
16  standing order.
17       MR. DUNNE:  And I would say the same
18  thing, Mr. Harris.
19       MR. CAPONE:  We don't need a rush.
20       THE REPORTER:  Just a regular copy?
21       MR. CAPONE:  Yeah.
22       (The deposition was concluded at 3:45
23  p.m.)
24  _____
25                NISHAD SINGH

Page 233

1             CERTIFICATE
2
3      I, the undersigned, a Certified Shorthand
4   Reporter, State of California, hereby certify that
5   the witness in the foregoing deposition was by me
6   first duly sworn to testify to the truth, the whole
7   truth, and nothing but the truth in the
8   within-entitled cause; that said deposition was
9   taken at the time and place therein stated; that the
10  testimony of the said witness was reported by me, a
11  disinterested person, and was thereafter transcribed
12  under my direction into typewriting; that the
13  foregoing is a full, complete, and true record of
14  said testimony; and that the witness did not request
15  an opportunity to read it and, if necessary, correct
16  said deposition and to subscribe the same.
17      I further certify that I am not of counsel
18  or attorney for either or any of the parties in the
19  foregoing deposition and caption named, nor in any
20  way interested in the outcome of the cause named in
21  said caption.
22      Executed this 30th day of October, 2023.
23
24  _____
25       LAURA AXELSEN, C.S.R. 6173

Page 234

```
 1          ERRATA SHEET FOR THE TRANSCRIPT OF:
 2          Case Name:  Ftx Trading Ltd
 3          Dep.  Date: 10/28/25
 4          Deponent: Nishad Singh
 5     Pg.  Ln.  Now reads     Should read    Reason
 6     ____ ____ _____  _____   _____
 7     ____ ____ _____  _____   _____
 8     ____ ____ _____  _____   _____
 9     ____ ____ _____  _____   _____
10     ____ ____ _____  _____   _____
11     ____ ____ _____  _____   _____
12     ____ ____ _____  _____   _____
13     ____ ____ _____  _____   _____
14     ____ ____ _____  _____   _____
15
16          _____
17              SIGNATURE OF DEPONENT
18     SUBSCRIBED AND SWORN BEFORE ME
19     THIS____DAY OF_____, 2025
20
21     _____
22      (Notary Public)
23      MY COMMISSION EXPIRES:_____
24
25
```



# Exhibit 14

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |

## THE FTX RECOVERY TRUST'S RESPONSES AND OBJECTIONS TO THE JOINT LIQUIDATORS OF THREE ARROWS CAPITAL, LTD.'S (I) EIGHTH SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS; (II) SEVENTH SET OF INTERROGATORIES AND (III) THIRD SET OF REQUESTS FOR ADMISSION

Pursuant to Rules 26, 30, 33 and 34 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to these chapter 11 proceedings by Rules 7026, 7030, 7033, 7034, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), and any other applicable law, rules, or orders of the Court (collectively, the "Applicable Rules"), the FTX Recovery Trust, by its undersigned attorneys, hereby submits these responses and objections (the "Responses") to *The Joint Liquidators of Three Arrows Capital, Ltd.'s (I) Eighth Set of Requests for the Production of Documents* (the "Document Requests")*; (II) Seventh Set of Interrogatories* (the "Interrogatories"); and *(III) Third Set of Requests for Admission Directed to the FTX Recovery Trust* (the "Requests for Admission," and together with the Document Requests and Interrogatories, the "Requests") dated August 19, 2025 and served by Russell Crumpler and Christopher Farmer, in their capacities as the joint liquidators (the "Joint Liquidators") of Three

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

Arrows Capital, Ltd. ("3AC"), in connection with the *Objection of the FTX Recovery Trust to the Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd.* [D.I. 30932] (the "Claim Objection").[2]

## GENERAL OBJECTIONS

1.     The general objections set forth below (the "General Objections") apply to the Requests generally and to each definition in the Requests (the "Definitions"), each instruction in the Requests (the "Instructions"), and each Request, and unless otherwise stated, shall have the same force and effect as if fully set forth in response to each Definition, Instruction, and Request. Any objection to a Definition or Instruction shall also apply to any other Definition, Instruction, or Request that incorporates that Definition or Instruction.  No response to any specific Request is, or shall be deemed to be, a waiver of the General Objections or the specific objections set forth below.  The fact that an objection is not listed herein does not, and shall not, constitute a waiver of that objection or otherwise preclude the FTX Recovery Trust from raising that objection at a later time.

2.     The FTX Recovery Trust objects to the Requests and accompanying Definitions and Instructions to the extent that they are vague and ambiguous, overly broad, unduly burdensome, lacking in particularity, unreasonable, or seek information that is neither relevant to nor proportional to the needs of the Claim Objection or any party's claim or defense in connection with the Claim Objection. The FTX Recovery Trust will construe the Requests and accompanying Definitions and Instructions in accordance with the FTX Recovery Trust's obligations under the Applicable Rules.

---

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Claim Objection.

3.      The FTX Recovery Trust objects to the Requests as untimely, unduly burdensome, unreasonable, and not proportional to the needs of the Claim Objection or any party's claim or defense in connection with the Claim Objection because the Requests were served over five months after the Court permitted the Joint Liquidators to file the Amended Claim, nearly two months after the Claim Objection, and with less than one week before the deadline for the completion of document productions in under the *Order Approving Stipulation Governing Litigation of the FTX Recovery Trust's Objection to Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital, Ltd.* [D.I. 31880].

4.      The FTX Recovery Trust objects to the Requests as overly broad, unduly burdensome, lacking in particularity, unreasonable, or seeking information that is neither relevant to nor proportional to the needs of the Claim Objection or any party's claim or defense in connection with the Claim Objection to the extent that they purport the FTX Recovery Trust to undertake any additional search or review of documents beyond the search and review already performed by the FTX Recovery Trust in connection with seven prior sets of document requests; six prior sets of interrogatories; and two prior sets of requests for admission.

5.      The FTX Recovery Trust objects to the Requests and accompanying Definitions and Instructions to the extent that they purport to impose on the FTX Recovery Trust any burden or obligation that is broader than, or inconsistent with, the permissible scope of discovery under the Applicable Rules, particularly given that the Requests were served merely six days prior to the agreed deadline for the completion of document production.  The FTX Recovery Trust will construe the Requests and accompanying Definitions and Instructions in accordance with the FTX Recovery Trust's obligations under the Applicable Rules.

6.     The FTX Recovery Trust objects to the Requests insofar as they purport to impose a response deadline of September 2, 2025 without any basis in the Applicable Rules.

7.     The FTX Recovery Trust objects to the Requests and accompanying Definitions and Instructions to the extent that they seek information that is protected from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege, or that is otherwise protected from disclosure under the Applicable Rules.  Nothing contained in these Responses is intended to be, nor shall in any way be, construed as a waiver of any such privilege, immunity, or protection. Specific Objections on the grounds of privilege, if any, are provided for clarity only, and the absence of a Specific Objection is neither intended to be, nor should be interpreted as, evidence that the FTX Recovery Trust does not object to a Request on the basis of an applicable privilege, immunity, or protection.

8.     The FTX Recovery Trust objects to the Requests and accompanying Definitions and Instructions to the extent that they seek production of information that is a matter of public record and/or information that is equally available to the Joint Liquidators, or otherwise more appropriately directed to another party or person.

9.     The FTX Recovery Trust objects to the Requests and accompanying Definitions and Instructions to the extent that they seek documents or information outside of the FTX Recovery Trust's possession, custody, or control.

10.     The FTX Recovery Trust objects to the Requests and accompanying Definitions and Instructions to the extent that they seek the production of information that is confidential, proprietary, commercially sensitive, or contains customer or personal information relating to the FTX Recovery Trust, the Debtors, their affiliates, and their current or former officers, directors,

employees and/or advisors, clients, customers, or counterparties.  The FTX Recovery Trust's production of any documents in response to the Requests shall be subject to the terms of the *Confidentiality Agreement and Stipulated Protective Order* [D.I. 832].

11.    The FTX Recovery Trust objects to the Requests and accompanying Definitions and Instructions to the extent that they purport to require the FTX Recovery Trust to conduct anything beyond a reasonable search of readily accessible sources where responsive documents or information, including electronically stored information, are reasonably expected to be found.

12.    The FTX Recovery Trust objects to the Requests and accompanying Definitions and Instructions to the extent that they purport to require the FTX Recovery Trust to draw legal or factual conclusions, or are predicated on legal or factual conclusions or arguments.  No response to any specific Request is, or shall be construed as, a legal or factual conclusion concerning any of the terms used in the Request.

13.    The FTX Recovery Trust objects to the Requests and accompanying Definitions and Instructions to the extent that they assume the existence of facts that do not exist or the occurrence of events that did not take place.  No response to any specific Request is, or shall be construed as, an admission that any factual predicate stated in the Request is accurate.

14.    No incidental or implied admissions are intended by the objections herein, nor shall the fact that the FTX Recovery Trust has objected or responded, or not objected or responded, to a particular Request be construed as an admission or indication that the FTX Recovery Trust possesses documents responsive to such Request, or any other Request.  Similarly, a statement that the FTX Recovery Trust will produce documents in a response to a Request does not constitute a representation that responsive documents exist, but only that responsive documents will be

produced if they exist, can be located through a reasonable search, and are not otherwise protected from disclosure.

15.    The FTX Recovery Trust reserves all objections that may be available to it at any hearing or trial or on any motion to the use or admissibility of any material produced.

16.    These Responses are based solely on facts reasonably known to the FTX Recovery Trust at the time of responding to the Responses.  The FTX Recovery Trust reserves the right, but do not assume the obligation, to amend, supplement, or otherwise modify the content of these Responses at any time.

## OBJECTIONS TO DEFINITIONS

17.    The FTX Recovery Trust objects to each of the Definitions, and to any Definition, Instruction, or Request that incorporates the Definition, to the extent that the Definition purports to define terms other than in accordance with the meanings typically ascribed to those terms in ordinary usage or pursuant to the Applicable Rules.

18.    The FTX Recovery Trust objects to the Definitions of "Account Balance" and "Negative U.S. Dollar Balance," and to any Definition, Instruction, or Request that incorporates one of those Definitions, as vague and ambiguous because the cited deposition testimony fails to provide adequate clarity as to the intended meanings of these terms.  The FTX Recovery Trust will construe "Account Balance" and "Negative U.S. Dollar Balance" in accordance with the meanings of "Account Balance" and "negative USD Balance," respectively, as used in the Coverick Declaration.

19.    The FTX Recovery Trust objects to the Definition of "Assets," and to any Definition, Instruction, or Request that incorporates that Definition, as factually inaccurate, misleading, and improper to the extent that it includes all "derivative product" including "futures

and perpetuals products." The FTX Recovery Trust will construe "Assets" in accordance with the definition in the FTX Terms of Service dated May 13, 2022.

20.     The FTX Recovery Trust objects to the Definitions of "Communication," "Document," and "relating to," and to any Definition, Instruction, or Request that incorporates one of those Definitions, to the extent that they purport to impose burdens or obligations on the FTX Recovery Trust that are broader than, inconsistent with, or not authorized by the Applicable Rules.

21.     The FTX Recovery Trust objects to the Definition of "Debtors," "FTX," "You" or "Your," and to any Definition, Instruction, or Request that incorporates that Definition, as overly broad, vague, and unduly burdensome to the extent that it includes "any agents, representatives, employees, attorneys, accountants, investigators, consultants, and any other person or entity acting Your behalf." The FTX Recovery Trust further objects to this Definition, and to any Definition, Instruction, or Request that incorporates that Definition, to the extent that it encompasses third parties and/or information that is not in the FTX Recovery Trust's possession, custody or control, as well as to the extent that the Definition purports to seek information that is protected from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege. The FTX Recovery Trust further objects to this definition to the extent it equates "FTX," which the FTX Recovery Trust considers to refer to FTX Trading Ltd., with all Debtors. The FTX Recovery Trust will construe "FTX" as FTX Trading Ltd.

22.     The FTX Recovery Trust objects to the Definition of "3AC" and to any Definition, Instruction, or Request that incorporates that Definition, as overly broad, vague, and unduly burdensome to the extent that the Definition includes "any affiliates, agents, representatives, employees, attorneys, accountants, investigators, consultants, and any other person or entity acting

on its behalf, including without limitation Three Arrows Capital Pte. Ltd., incorporated as a business under the laws of Singapore in 2012, Three AC Ltd., Kyle Davies, and Su Zhu." The FTX Recovery Trust further objects to this Definition, and to any Definition, Instruction, or Request that incorporates that Definition, to the extent that it encompasses third parties and/or information that is not in the FTX Recovery Trust's possession, custody or control, as well as to the extent that the Definition purports to seek information that is protected from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege.

23.     The FTX Recovery Trust objects to the Definition of "Person," and to any Definition, Instruction, or Request that incorporates that Definition, as overly broad, vague, and unduly burdensome to the extent that the Definition includes "any business or governmental entities, or associations, partnerships, firms, corporations, units, joint ventures, any other form of business organization or arrangement, or any other form of public, private, or legal entity." The FTX Recovery Trust further objects to this Definition, and to any Definition, Instruction, or Request that incorporates that Definition, to the extent that it encompasses third parties and/or information that is not in the FTX Recovery Trust's possession, custody or control, as well as to the extent that the Definition purports to seek information that is protected from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege.

## OBJECTIONS TO INSTRUCTIONS

24.     The FTX Recovery Trust objects to the following instructions to the Requests. The failure to object to any of the Instructions shall not be deemed a waiver of any objections, nor a concession that any of such instructions are appropriate.

25.     The FTX Recovery Trust objects to the Instructions to the extent that they seek to impose requirements on the FTX Recovery Trust that are unreasonable, unduly burdensome, non-customary or greater than those imposed by the Applicable Rules.

26.     The FTX Recovery Trust objects to Instruction Nos. 1, 4, 12-13, 16, and to each specific Request incorporating any such Instruction as overly broad and unduly burdensome.  The FTX Recovery Trust further objects to these Instructions, and to each specific Request incorporating any such Instructions, to the extent that they purport to impose burdens or obligations on the FTX Recovery Trust that are broader than, inconsistent with, or not authorized by the Applicable Rules.

27.     The FTX Recovery Trust further objects to Instruction Nos. 4 and 5 and to each specific Request incorporating any such Instructions, as vague and ambiguous, in particular its inclusion of "constructive possession," "superior right or practical ability," and "deletion, or redaction."

## SPECIFIC RESPONSES AND OBJECTIONS TO DOCUMENT REQUESTS

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions, which are hereby expressly incorporated into each of the following specific objections and responses as if fully set forth therein, the FTX Recovery Trust responds to the Document Requests as follows:

## DOCUMENT REQUEST NO. 1

Documents sufficient to show that "[d]ue to 3AC's account having an LOC, it may have been manually liquidated," as stated in FTX_3AC_000013874 at FTX_3AC_000013911, and sufficient to confirm whether (and if so which of) 3AC's Accounts were at any point "manually liquidated."

## RESPONSE TO DOCUMENT REQUEST NO. 1

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above.  The FTX Recovery Trust also objects to this Document Request to the extent that it is overbroad and unduly burdensome, and calls for the production of information or documents that are neither relevant to nor proportional to the needs of the Claim Objection.  The FTX Recovery Trust further objects to this Document Request to the extent that it seeks the production of information or documents that are protected by the attorney-client privilege or the work-product doctrine, or that are otherwise protected from disclosure.  The FTX Recovery Trust further objects to this Document Request to the extent that it is duplicative of Document Request No. 13 in the *Joint Liquidator's Seventh Set of Request for Production*, to which the FTX Recovery Trust has already provided responses and objections and produced documents.

Subject to and without waiver of its Objections, the FTX Recovery Trust states that it has already produced documents that are responsive to this Document Request, including FTX_3AC_000044526.  Column J of FTX_3AC_000044526 provides the fill_type for each transaction comprising the liquidation of certain assets associated with the 3AC Accounts for the info@alameda-research.com account (which was the counterparty to 3AC to the included transactions).  Certain of the included transactions are listed as having a fill-type of "otc" while others are listed as having a fill_type of "liquidation."  The FTX Recovery Trust understands that a fill_type of "otc" for the info@alameda-research.com account denotes a manual liquidation by FTX and that those transactions with a fill_type of "liquidation" were auto-liquidated by FTX.

## DOCUMENT REQUEST NO. 2

Documents sufficient to show that "[t]he Margin Program used an algorithm to connect the pools of borrowers and lenders," as contended by Coverick Declaration ¶ 15.

**RESPONSE TO DOCUMENT REQUEST NO. 2**

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above.  The FTX Recovery Trust also objects to this Document Request to the extent that it is overbroad and unduly burdensome, and calls for the production of information or documents that are neither relevant to nor proportional to the needs of the Claim Objection.  The FTX Recovery Trust further objects to this Document Request to the extent that it is duplicative of Document Request No. 19 in the *Joint Liquidator's Seventh Set of Request for Production*, to which the FTX Recovery Trust has already provided responses and objections and produced documents.

Subject to and without waiver of its Objections, the FTX Recovery Trust states that it has produced documents that are responsive to this Document Request, including FTX_3AC_000045694.

The FTX Recovery Trust has also reviewed the code base for the Exchange, which is consistent with the description of how the Margin Program connected pools of borrowers and lenders as described in FTX_3AC_000045694.  Production of the code base for the Exchange would be overbroad and unduly burdensome, not proportional to the needs of the Claim Objection, and likely not intelligible to the Joint Liquidators.

**DOCUMENT REQUEST NO. 3**

The "algorithm" referenced in Coverick Declaration ¶ 15.

**RESPONSE TO DOCUMENT REQUEST NO. 3**

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above.  The FTX Recovery Trust also objects to this Document Request to the extent that it is overbroad and unduly burdensome, and calls for the production of information or documents that are neither relevant to

nor proportional to the needs of the Claim Objection.  The FTX Recovery Trust further objects to this Document Request to the extent that it is duplicative of Document Request No. 19 in the *Joint Liquidator's Seventh Set of Request for Production*, to which the FTX Recovery Trust has already provided responses and objections and produced documents.

Subject to and without waiver of its Objections, the FTX Recovery Trust respectfully refers the Joint Liquidators to the FTX Recovery Trust's response to Document Request No. 2.

## DOCUMENT REQUEST NO. 4

Documents sufficient to show whether FTX operated as a borrower or lender under FTX's Margin Program or Lending Program, including without limitation any FTX policies, procedures, agreements, or terms confirming the same.

## RESPONSE TO DOCUMENT REQUEST NO. 4

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above.  The FTX Recovery Trust also objects to this Document Request to the extent that it is overbroad and unduly burdensome, and calls for the production of information or documents that are neither relevant to nor proportional to the needs of the Claim Objection.  The FTX Recovery Trust also objects to this Document Request because it assumes the existence of facts or documents that do not exist or the occurrence of events that did not take place.

Subject to and without waiver of its Objections, the FTX Recovery Trust states that it has already produced documents that are responsive to this Document Request, including FTX_3AC_000044524.  Because FTX did not operate "as a borrower or lender under FTX's Margin Program or Lending Program," the FTX Recovery Trust is not aware of "any FTX policies, procedures, agreements, or terms confirming the same."

## DOCUMENT REQUEST NO. 5

Documents sufficient to show any financial damages or losses incurred by FTX or any Customers as a result of the non-repayment of Assets borrowed by other Customers under FTX's Margin Program or Lending Program or of the default of such other Customers of their repayment obligations under such Programs.

## RESPONSE TO DOCUMENT REQUEST NO. 5

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above. The FTX Recovery Trust also objects to this Document Request to the extent that it is overbroad and unduly burdensome, and calls for the production of information or documents that are neither relevant to nor proportional to the needs of the Claim Objection. The FTX Recovery Trust also objects to this Document Request because it assumes the existence of facts or documents that do not exist or the occurrence of events that did not take place. The FTX Recovery Trust further objects to this Document Request to the extent that it seeks the production of information or documents that are protected by the attorney-client privilege or the work-product doctrine, or that are otherwise protected from disclosure. The FTX Recovery Trust further objects to this Document Request to the extent that it is duplicative of Document Request Nos. 23 and 27 in the *Joint Liquidator's Seventh Set of Request for Production*, to which the FTX Recovery Trust has already provided responses and objections and produced documents.

Subject to and without waiver of its Objections, the FTX Recovery Trust states that it has not identified additional non-privileged documents responsive to this Document Request.

## DOCUMENT REQUEST NO. 6

Documents sufficient to show whether, the extent to which, and the manner in which, FTX allocated (or would allocate) to Customers participating in FTX's Margin Program or Lending Program the financial damages or losses identified in the preceding Document Request.

-13-

## RESPONSE TO DOCUMENT REQUEST NO. 6

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above. The FTX Recovery Trust also objects to this Document Request to the extent that it is overbroad and unduly burdensome, and calls for the production of information or documents that are neither relevant to nor proportional to the needs of the Claim Objection. The FTX Recovery Trust also objects to this Document Request because it assumes the existence of facts or documents that do not exist or the occurrence of events that did not take place. The FTX Recovery Trust further objects to this Document Request to the extent that it seeks the production of information or documents that are protected by the attorney-client privilege or the work-product doctrine, or that are otherwise protected from disclosure. The FTX Recovery Trust further objects to this Document Request to the extent that it is duplicative of Document Request Nos. 23 and 27 in the *Joint Liquidator's Seventh Set of Request for Production*, to which the FTX Recovery Trust has already provided responses and objections and produced documents.

Subject to and without waiver of its Objections, the FTX Recovery Trust states that it has not identified additional non-privileged documents responsive to this Document Request.

## DOCUMENT REQUEST NO. 7

Documents sufficient to show whether Customers who, under FTX's Margin Program or Lending Program, loaned Assets that were in or allocated to such Customers' accounts on the FTX Exchange could, and did, withdraw, sell, or trade such Assets prior to repayment of such loans.

## RESPONSE TO DOCUMENT REQUEST NO. 7

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above. The FTX Recovery Trust also objects to this Document Request to the extent that it is overbroad and unduly

burdensome, and calls for the production of information or documents that are neither relevant to nor proportional to the needs of the Claim Objection.  The FTX Recovery Trust further objects to this Document Request to the extent that it seeks the production of information or documents that are protected by the attorney-client privilege or the work-product doctrine, or that are otherwise protected from disclosure.

Subject to and without waiver of its Objections, the FTX Recovery Trust states that it has already produced documents that are responsive to this Document Request, including FTX_3AC_000013695 and FTX_3AC_000045694.

The FTX Recovery Trust has also reviewed the code base for the Exchange, which is consistent with FTX's treatment of loaned assets under the Margin Program or Lending Program as described in FTX_3AC_000013695 and FTX_3AC_000045694.  Production of the code base for the Exchange would be overbroad and unduly burdensome, not proportional to the needs of the Claim Objection, and likely not intelligible to the Joint Liquidators.

**DOCUMENT REQUEST NO. 8**

Documents sufficient to show any "losses from [Customer] accounts" due to "a user account where the . . . assets could no longer repay the liabilities," that FTX "cover[ed]" via its "risk management system," as Sam Bankman-Fried testified during his October 27, 2023 trial examination in the action titled *United States v. Samuel Bankman-Fried*, No. 22-cr-673 (S.D.N.Y.) (at page 2369 of the transcript thereof).

**RESPONSE TO DOCUMENT REQUEST NO. 8**

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above.  The FTX Recovery Trust also objects to this Document Request to the extent that it is overbroad and unduly burdensome, and calls for the production of information or documents that are neither relevant to nor proportional to the needs of the Claim Objection.  The FTX Recovery Trust also objects to this Document Request because it assumes the existence of facts or documents that do not exist or the

-15-

occurrence of events that did not take place. The FTX Recovery Trust further objects to this Document Request to the extent that it seeks the production of information or documents that are protected by the attorney-client privilege or the work-product doctrine, or that are otherwise protected from disclosure. The FTX Recovery Trust further objects to this Document Request to the extent that it is duplicative of Document Request Nos. 15 and 26 in the *Joint Liquidator's Seventh Set of Request for Production*, to which the FTX Recovery Trust has already provided responses and objections and produced documents.

Subject to and without waiver of its Objections, the FTX Recovery Trust states that it has not identified additional non-privileged documents responsive to this Document Request.

## DOCUMENT REQUEST NO. 9

Documents sufficient to show the amount, nature, and circumstances of each "loss[]" identified in the preceding Document Request, which Person suffered such "loss[]," and FTX's "cover[age]" of such "loss[]."

## RESPONSE TO DOCUMENT REQUEST NO. 9

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above. The FTX Recovery Trust also objects to this Document Request to the extent that it is overbroad and unduly burdensome, and calls for the production of information or documents that are neither relevant to nor proportional to the needs of the Claim Objection. The FTX Recovery Trust also objects to this Document Request because it assumes the existence of facts or documents that do not exist or the occurrence of events that did not take place. The FTX Recovery Trust further objects to this Document Request to the extent that it seeks the production of information or documents that are protected by the attorney-client privilege or the work-product doctrine, or that are otherwise protected from disclosure. The FTX Recovery Trust further objects to this Document Request to the extent that it is duplicative of Document Request Nos. 15 and 26 in the *Joint Liquidator's*

*Seventh Set of Request for Production*, to which the FTX Recovery Trust has already provided responses and objections and produced documents.

Subject to and without waiver of its Objections, the FTX Recovery Trust states that it has not identified additional non-privileged documents responsive to this Document Request.

## DOCUMENT REQUEST NO. 10

Documents sufficient to show that "[p]erpetual futures contracts on the Exchange settled at least every 30 seconds, and then automatically reset," that "[e]very 30 seconds, the parties to the contract received a credit or a debit to their USD Balance in their Customer Accounts, depending on whether the reference price had gone up or down since the most recent settlement (*i.e.*, 30 seconds prior)," and that "the negative USD Balance in the 3AC Accounts increased because 3AC continued to make settlement payments in USD every 30 seconds under its long perpetual futures contracts," as contended by Coverick Declaration ¶¶ 29, 63.

## RESPONSE TO DOCUMENT REQUEST NO. 10

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above. The FTX Recovery Trust also objects to this Document Request to the extent that it is overbroad and unduly burdensome, and calls for the production of information or documents that are neither relevant to nor proportional to the needs of the Claim Objection. The FTX Recovery Trust further objects to this Document Request to the extent that it is duplicative of Document Request No. 6 in the *Joint Liquidator's Seventh Set of Request for Production*, to which the FTX Recovery Trust has already provided responses and objections and produced documents.

Subject to and without waiver of its Objections, the FTX Recovery Trust states that it has produced responsive, nonprivileged documents that are responsive to this Document Request, including FTX_3AC_000045026 and FTX_3AC_000045594.

The FTX Recovery Trust has also reviewed the code base for the Exchange, which is consistent with the elements of Mr. Coverick's declaration cited in Document Request No. 10.

Production of the code base for the Exchange would be overbroad and unduly burdensome, not proportional to the needs of the Claim Objection, and likely not intelligible to the Joint Liquidators.

## DOCUMENT REQUEST NO. 11

All Documents relating to the contentions in Claim Objection ¶¶ 162, 211 that "FTX was not a recipient of either the proceeds of the Liquidation or the assets liquidated [on June 14, 2022]" and that "FTX did not receive the proceeds of any sales by 3AC . . . between June 12 and June 14, 2022."

## RESPONSE TO DOCUMENT REQUEST NO. 11

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above.

Subject to and without waiver of its Objections, the FTX Recovery Trust states that it has already produced responsive, nonprivileged documents that are responsive to this Document Request, including FTX_3AC_000044526.  As represented in FTX_3AC_000044526, the 3AC Accounts received a credit for all of the U.S. Dollar "proceeds" of the Liquidation; Alameda Research LLC received for value entitlements to the digital assets which were the subject of the Liquidation.

## DOCUMENT REQUEST NO. 12

Documents sufficient to show all Persons who received the "proceeds" identified in the preceding Document Request, the date(s) each such Person received such "proceeds," and the amount of such "proceeds" that each such Person received.

## RESPONSE TO DOCUMENT REQUEST NO. 12

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above.

Subject to and without waiver of its Objections, the FTX Recovery Trust respectfully refers the Joint Liquidators to the FTX Recovery Trust's response to Document Request No. 11.

**DOCUMENT REQUEST NO. 13**

Documents sufficient to show the purpose, establishment, and terms of FTX's "insurance fund," as described by Sam Bankman-Fried during his October 27, 2023 trial examination in the action titled *United States v. Samuel Bankman-Fried*, No. 22-cr-673 (S.D.N.Y.) (at pages 2433-2434 of the transcript thereof), to show the existence and potential application of the insurance fund in June 2022, and to show the "amount of money FTX [had] pledged to use to cover customer account losses" in June 2022.

**RESPONSE TO DOCUMENT REQUEST NO. 13**

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above.  The FTX Recovery Trust also objects to this Document Request to the extent that it is overbroad and unduly burdensome, and calls for the production of information or documents that are neither relevant to nor proportional to the needs of the Claim Objection, including because Mr. Bankman-Fried would go on to explain that the "insurance fund" described was irrelevant to accounts with a "positive net asset value."  Trial Tr. at 2689, *United States* v. *Samuel Bankman-Fried*, No. 22-cr-673 (S.D.N.Y.).  The FTX Recovery Trust further objects to this Document Request to the extent that it is duplicative of Document Request No. 26 in the *Joint Liquidator's Seventh Set of Request for Production*, to which the FTX Recovery Trust has already provided responses and objections and produced documents.

Subject to and without waiver of its Objections, the FTX Recovery Trust states that it has produced documents that are responsive to this Document Request, including FTX_3AC_000045026, FTX_3AC_000044809, and FTX_3AC_000045167.

The FTX Recovery Trust has also reviewed the code base for the Exchange, which is consistent with the descriptions of the "insurance fund" included in FTX_3AC_000045026, FTX_3AC_000044809, and FTX_3AC_000045167 to which the FTX Recovery Trust interprets Mr. Bankman-Fried to be referring in the quoted portion of his October 27, 2023 trial examination

included in Document Request No. 13.  Production of the code base for the Exchange would be

overbroad and unduly burdensome, not proportional to the needs of the Claim Objection, and likely

not intelligible to the Joint Liquidators.

## DOCUMENT REQUEST NO. 14

All Documents and Communications relating to 8Blocks' assertion of "a beneficial interest in certain sub-accounts held by Three Arrows Capital Ltd" on the FTX Exchange, as set forth in FTX_3AC_000043660, and the resolution and/or settlement of such claim, including without limitation all Documents and Communications that 8Blocks provided to FTX or FTX Digital Markets Ltd "to demonstrate its claim to unencumbered beneficial ownership of the USDT Asset" and all Documents and Communications that FTX or FTX Digital Markets Ltd provided to8Blocks to "confirm" or "not confirm" its "accept[ance]" of such "Evidence."

## RESPONSE TO DOCUMENT REQUEST NO. 14

The FTX Recovery Trust incorporates by reference the General Objections,

Objections to Definitions, and Objections to Instructions as set forth above.  The FTX Recovery

Trust also objects to this Document Request to the extent that it is overbroad and unduly

burdensome, and calls for the production of information or documents that are neither relevant to

nor proportional to the needs of the Claim Objection.

Subject to and without waiver of its Objections, the FTX Recovery Trust states that

it has already conducted a review using broad search terms that would have identified discussions

about 3AC or the 3AC Accounts, including as they relate to 8Blocks, and that, to the extent any

responsive documents may exist in the FTX Recovery Trust's possession, custody, and control,

they have already been produced to the Joint Liquidators.

## DOCUMENT REQUEST NO. 15

All Documents and Communications relating to 8Blocks' "transfer [of] its rights to the USDT Asset to FTX," as set forth in FTX_3AC_000043660, including without limitation all Documents and Communications relating to any "appoint[ment] [of] the directors of FTX from time to time as [8Blocks'] attorneys."

## RESPONSE TO DOCUMENT REQUEST NO. 15

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above.  The FTX Recovery Trust also objects to this Document Request to the extent that it is overbroad and unduly burdensome, and calls for the production of information or documents that are neither relevant to nor proportional to the needs of the Claim Objection.

Subject to and without waiver of its Objections, the FTX Recovery Trust respectfully refers the Joint Liquidators to the FTX Recovery Trust's response to Document Request No. 14.

## DOCUMENT REQUEST NO. 16

Documents sufficient to show FTX's tax and accounting treatment of Customer deposits or withdrawals of Assets into or from the FTX Exchange in June 2022, including without limitation whether and the extent to which FTX treated such deposits or withdrawals as taxable events for (1) FTX and (2) the depositing or withdrawing Customers.

## RESPONSE TO DOCUMENT REQUEST NO. 16

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above.  The FTX Recovery Trust also objects to this Document Request to the extent that it is overbroad and unduly burdensome, and calls for the production of information or documents that are neither relevant to nor proportional to the needs of the Claim Objection.  The FTX Recovery Trust further objects to this Document Request on the grounds that it was provided to the FTX Recovery Trust less than a week before the deadline for the completion of document productions in under the *Order Approving Stipulation Governing Litigation of the FTX Recovery Trust's Objection to Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital, Ltd.* [D.I. 31880].

For the foregoing reasons, the FTX Recovery Trust will not search for or produce Documents responsive to this Document Request.

## DOCUMENT REQUEST NO. 17

Documents sufficient to show all information that the FTX Exchange provided or presented, or would have provided or presented, to 3AC relating to 3AC's Accounts in June 2022, including without limitation all information relating to the balance of each Asset and liability in or allocated to 3AC's Accounts as of such time, to 3AC's applicable collateral, margin, maintenance, or other requirements relating to 3AC's Accounts as of such time, and to 3AC's satisfaction or non-satisfaction of such requirements as of such time.

## RESPONSE TO DOCUMENT REQUEST NO. 17

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above. The FTX Recovery Trust also objects to this Document Request to the extent that it is overbroad and unduly burdensome, and calls for the production of information or documents that are neither relevant to nor proportional to the needs of the Claim Objection. The FTX Recovery Trust further objects to this Document Request on the grounds that it requests information already in the possession, custody, and control of the Joint Liquidators. The FTX Recovery Trust further objects to this Document Request on the grounds that it was provided to the FTX Recovery Trust less than a week before the deadline for the completion of document productions in under the *Order Approving Stipulation Governing Litigation of the FTX Recovery Trust's Objection to Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital, Ltd.* [D.I. 31880].

Subject to and without waiver of its Objections, the FTX Recovery Trust states that it has already conducted a review using broad search terms that would have identified communications from the Debtors to 3AC in June 2022, and that, to the extent any responsive documents may exist in the FTX Recovery Trust's possession, custody, and control, they have already been produced to the Joint Liquidators. The FTX Recovery Trust has also produced raw

data from the Exchange relating to the 3AC Accounts from which 3AC's Account Balance and other applicable metrics described in Document Request No. 17 were calculated.

## DOCUMENT REQUEST NO. 18

Any rulebooks or regulatory rules, from any jurisdiction, that applied to FTX Digital Markets Ltd or FTX Trading Ltd. in June 2022, and any regulatory applications submitted by or on behalf of FTX Digital Markets Ltd or FTX Trading Ltd. in any such jurisdiction in or prior to June 2022.

## RESPONSE TO DOCUMENT REQUEST NO. 18

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above. The FTX Recovery Trust also objects to this Document Request to the extent that it is overbroad and unduly burdensome, and calls for the production of information or documents that are neither relevant to nor proportional to the needs of the Claim Objection. The FTX Recovery Trust further objects to this Document Request on the grounds that it was provided to the FTX Recovery Trust less than a week before the deadline for the completion of document productions in under the *Order Approving Stipulation Governing Litigation of the FTX Recovery Trust's Objection to Amended Proof of Claim Filed by the Joint Liquidators of Three Arrows Capital, Ltd.* [D.I. 31880].

For the foregoing reasons, the FTX Recovery Trust will not search for or produce Documents responsive to this Document Request.

## DOCUMENT REQUEST NO. 19

All Documents relating to 3AC or 3AC's Accounts, provided to You at any time by any current or former director, officer, or employee of FTX Trading Ltd. or its debtor affiliates, or by any agents or representatives of such Persons, who You understand to have had any knowledge of 3AC's Accounts prior to the appointment of the Joint Liquidators.

## RESPONSE TO DOCUMENT REQUEST NO. 19

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above. The FTX Recovery

Trust also objects to this Document Request to the extent that it is overbroad and unduly burdensome, and calls for the production of information or documents that are neither relevant to nor proportional to the needs of the Claim Objection.

Subject to and without waiver of its Objections, the FTX Recovery Trust states that, on August 26, 2025, it received a limited number of additional documents from Zane Tackett. The FTX Recovery Trust is producing these documents, which are embedded in an email from Mr. Tackett to the FTX Recovery Trust previously produced, as part of its production of documents provided contemporaneously herewith.

## SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions, which are hereby expressly incorporated into each of the following specific objections and responses as if fully set forth therein, the FTX Recovery Trust responds to the Interrogatories as follows:

## INTERROGATORY NO. 1

Identify all bases for the differences, in quantity and composition, between 3AC's "Spot Margin Borrow" of approximately $631,287,133 as of the end of day on June 12, 2022, as reflected in FTX_3AC_000000008, and 3AC's purported Negative U.S. Dollar Balance of approximately $733 million as of the end of day on June 12, 2022, as contended by Coverick Declaration ¶¶ 61, 83, and all constituent liabilities and balances that comprise each of the foregoing figures.

## RESPONSE TO INTERROGATORY NO. 1

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above. The FTX Recovery Trust also objects to this Interrogatory to the extent that it is overbroad and unduly burdensome. In addition, the FTX Recovery Trust objects to this Interrogatory to the extent that it encompasses information already in the possession of the Joint Liquidators.

Subject to and without waiver of its Objections, the Negative U.S. Dollar Balance as of the end of the day on June 12, 2022 (UTC) included the aggregate of the U.S. Dollar Balance, both negative and positive, for all of the 3AC Accounts (including subaccounts) and the $120 million Line of Credit.  The Spot Margin Borrow cited in Interrogatory No. 1 appears to include only the 3AC Account's borrowing for subaccount number 2338882.  Further and as described in the Coverick Declaration, the Line of Credit allowed 3AC to trade using leverage up to the amount of the Line of Credit ($120 million) without resorting to borrowing from the Margin Program.

**INTERROGATORY NO. 2**

For each of FTX_3AC_000013844, FTX_3AC_000013853, FTX_3AC_000013862, FTX_3AC_000013689, and FTX_3AC_000013912, Identify (1) who authored the document, (2) when the document was authored, (3) whether the document was modified since originally authored, and if so by whom, (4) when the document was last updated and by whom, (5) how, if at all, the document was presented or made available to Customers in general and to 3AC in particular in or prior to June 2022, (6) whether, when, and where the document was made publicly available, and (7) how FTX obtained the document.

**RESPONSE TO INTERROGATORY NO. 2**

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above.  The FTX Recovery Trust also objects to this Interrogatory to the extent that it is overbroad and unduly burdensome, and calls for information that is neither relevant to nor proportional to the needs of the Claim Objection.

Subject to and without waiver of its Objections, as indicated at the top of FTX_3AC_000013844, FTX_3AC_000013853, FTX_3AC_000013862, each of these documents was captured by the Wayback Machine, an internet-based archive of the World Wide Web maintained by the Internet Archive, and then subsequently downloaded by the Debtors.  FTX_3AC_000013844 was captured by the Wayback Machine from the public webpage https://help.ftx.com/hc/en-us/articles/360031149632 on September 26, 2022.

FTX_3AC_000013853 was captured by the Wayback Machine from the public webpage https://help.ftx.com/hc/en-us/articles/360027668712-Liquidations on January 25, 2022. FTX_3AC_000013862 was captured by the Wayback Machine from the public webpage help.ftx.com/hc/en-us/articles/360053007671-Spot-Margin-Trading-Explainer on October 6, 2022.

Following an additional investigation, the FTX Recovery Trust identified images of these webpages on FTX's public website as of June 14, 2022 from records within its control, and is producing them to the Joint Liquidators, as part of its production of documents provided contemporaneously herewith. The Debtors' records do not identify the author of these webpages.

The FTX Recovery Trust refers the Joint Liquidators to the DAT file produced with FTX_3AC_000013689 for metadata available to the FTX Recovery Trust responsive to Interrogatory No. 2.

FTX_3AC_000013912 reflects "Preliminary & Tentative" and "Illustrative" estimates by the Debtors' financial advisers, Alvarez & Marsal, as of early 2024, regarding the collateral requirements of the 3AC Accounts. FTX_3AC_000013912 was produced to the Joint Liquidators at their request following the 30(b)(6) deposition of Robert Gordon. The FTX Recovery Trust does not endorse all elements of FTX_3AC_000013912 as the FTX Recovery Trust's understanding of the topics discussed in FTX_3AC_000013912 has materially developed over time with additional factual investigation and analysis.

## INTERROGATORY NO. 3

Identify all Customers, including any Customers affiliated with FTX, who, at any time between the inception of FTX's Margin Program or Lending Program and FTX's bankruptcy filings, had a negative Account Balance, and the circumstances in which such Customers acquired a negative Account Balance at such time.

## RESPONSE TO INTERROGATORY NO. 3

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above.  The FTX Recovery Trust has produced the Account Balance for 3AC at all times between the inception of FTX's Margin Program or Lending Program and FTX's bankruptcy filings.  The FTX Recovery Trust has also produced to the Joint Liquidators the applicable, binding, agreements which govern the Margin Program or Lending Program.  The FTX Recovery Trust has thus provided the Joint Liquidators all relevant materials to the Claim Objection and objects to this Interrogatory as overbroad and unduly burdensome, and calls for information that is neither relevant to nor proportional to the needs of the Claim Objection.

Subject to and without waiver of its Objections, the FTX Recovery Trust is unable to identify "all" Customers "at any time" who had a negative Account Balance.  This is, first, because such an exercise would be extraordinarily burdensome as it would require calculating the account balance for millions of customers an unspecified (but undoubtedly very large) number of times throughout the lifetime of the FTX.com Exchange; and, second, because the FTX Recovery Trust lacks reliable and verifiable pricing data for certain Digital Assets traded by all Customers at all times.

Subject to the above, in a good faith effort to respond to this Interrogatory, the FTX Recovery Trust has attempted to assess the approximate number of Customers with a negative Account Balance as of June 14, 2022, excluding those accounts identified in the spreadsheet bearing production number FTX_3AC_000044523.  Based on this preliminary assessment, which requires further diligence given the lack of reliable pricing for certain assets traded on the Exchange on June 14, 2022—particularly certain assets other than BTC, ETH, and FTT—the FTX Recovery Trust has identified that approximately 0.2% of Customer accounts, or 11,000 Customer

accounts in the aggregate, potentially had a negative Account Balance on that date. Such accounts were overwhelmingly negative by only a *de minimis* amount. Of those approximately 11,000 Customer accounts, 58% had a negative Account Balance of less than $1.00; and 99% had a negative Account Balance of less than $1,000.00.

Although customer accounts were not generally permitted to have a negative Account Balance, the FTX Recovery Trust understands that a small subset of customer accounts may have from time to time achieved a negative balance as the result of rapid movements in the prices of certain digital assets or related reference prices of certain futures contracts that resulted in customer losses which could not be fully mitigated by the Debtors' liquidation procedures before the account achieved a negative account balance. The Debtors' liquidation procedures were intended to (and generally did) prevent customers from having a negative account balance, in particular for accounts associated with more than *de minimis* amounts of highly traded digital assets like BTC, ETH, and FTT. Once an Account Balance for a customer became negative, the Debtors would generally only allow further trading by that customer if the customer deposited additional assets with the Exchange to address the negative Account Balance. The FTX Recovery Trust is not aware of any information suggesting that FTX ever realized any loss as a result of a negative Account Balance, and generally FTX continued to assess interest on negative Account Balances and leave such Customer accounts open until the Petition Date.

## SPECIFIC RESPONSES AND OBJECTIONS TO REQUESTS FOR ADMISSION

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions, which are hereby expressly incorporated into each of the following specific objections and responses as if fully set forth therein, the FTX Recovery Trust responds to the Requests for Admission as follows:

**REQUEST FOR ADMISSION NO. 1**

Admit that, as a result of the sales and/or liquidations (including the Liquidation) of the Assets in or allocated to 3AC's Account(s) between June 12, 2022 and June 14, 2022 (inclusive), the "USD" that 3AC had "drawn from the Line of Credit" with FTX, as referenced in Claim Objection ¶ 73, was repaid to FTX.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1**

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above.

Subject to and without waiver of its Objections, the FTX Recovery Trust denies Request for Admission No. 1.

**REQUEST FOR ADMISSION NO. 2**

Admit that FTX Trading Ltd. individually was solvent on each of June 12, 2022, June 13, 2022, and June 14, 2022, as the Debtors used the term "solvent" in the Disclosure Statement and the Ray Declaration.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2**

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above.

Subject to and without waiver of its Objections, the FTX Recovery Trust denies Request for Admission No. 2.

**REQUEST FOR ADMISSION NO. 3**

Admit that the Dotcom Silo collectively was solvent on each of June 12, 2022, June 13, 2022, and June 14, 2022, as the Debtors used the term "solvent" in the Disclosure Statement and the Ray Declaration.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3**

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above.

Subject to and without waiver of its Objections, the FTX Recovery Trust denies Request for Admission No. 3.

## REQUEST FOR ADMISSION NO. 4

Admit that FTX would have suffered financial damages or losses if 3AC's Negative U.S. Dollar Balance were not repaid. Admit that, if 3AC's Negative U.S. Dollar Balance were not repaid, FTX would have suffered financial damages or losses at least in the amount that 3AC's "Line of Credit" under LOC & Margin Document was utilized and/or drawn by 3AC..

## RESPONSE TO REQUEST FOR ADMISSION NO. 4

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above.

Subject to and without waiver of its Objections, the FTX Recovery Trust denies Request for Admission No. 4.

## REQUEST FOR ADMISSION NO. 5

Admit that, if 3AC's Negative U.S. Dollar Balance were not repaid, FTX would have suffered financial damages or losses at least in the amount that 3AC's "Line of Credit" under LOC & Margin Document was utilized and/or drawn by 3AC.

## RESPONSE TO REQUEST FOR ADMISSION NO. 5

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above.

Subject to and without waiver of its Objections, the FTX Recovery Trust denies Request for Admission No. 5.

## REQUEST FOR ADMISSION NO. 6

Admit that FTX did not and does not have a valid and enforceable security interest in any Assets in or allocated to 3AC's Accounts between June 12, 2022 and June 14, 2022 (inclusive).

## RESPONSE TO REQUEST FOR ADMISSION NO. 6

The FTX Recovery Trust incorporates by reference the General Objections, Objections to Definitions, and Objections to Instructions as set forth above.

Subject to and without waiver of its Objections, the FTX Recovery Trust admits that FTX did not have a security interest in any Assets associated with the 3AC Accounts between

June 12 and June 14, 2022 because FTX owned all Assets associated with the 3AC Accounts prior

to the Effective Date, at which point all assets of FTX were transferred to the FTX Recovery Trust.

Dated: September 9, 2025
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/  Matthew R. Pierce*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
       mcguire@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Benjamin S. Beller (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
       bromleyj@sullcrom.com
       gluecksteinb@sullcrom.com
       bellerb@sullcrom.com

*Counsel for the FTX Recovery Trust*

# **Exhibit 15**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

### DEBTORS' RESPONSES AND OBJECTIONS TO THE JOINT LIQUIDATORS OF THREE ARROWS CAPITAL, LTD.'S (I) FOURTH SET OF INTERROGATORIES AND (II) FOURTH SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS

Pursuant to Rules 26, 30, 33 and 34 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to these chapter 11 proceedings by Rules 7026, 7030, 7033, 7034, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), and any other applicable law, rules, or orders of the Court (collectively, the "Applicable Rules"), FTX Trading Ltd. ("FTX Trading") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"), by their undersigned attorneys, hereby submit these responses and objections (the "Responses") to (i) *The Joint Liquidators of Three Arrows Capital, Ltd.'s Fourth Set of Interrogatories Directed to the Debtors* (the "Interrogatories") and (ii) *The Joint Liquidators of Three Arrows Capital, Ltd.'s Fourth Set of Requests for the Production of Documents Directed to the Debtors* (the "Document Requests"), each dated November 1, 2024 and served by Russell Crumpler and Christopher Farmer, in their capacities as the duly authorized joint liquidators (the

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

"Joint Liquidators") of Three Arrows Capital, Ltd. ("3AC"), in connection with the *Debtors'*
*Objection to Proofs of Claim Filed by the Joint Liquidators of Three Arrows Capital Ltd.*
[D.I. 19797] (the "Claim Objection").[2]

## GENERAL OBJECTIONS

The general objections set forth below (the "General Objections") apply to the
Discovery generally and to each definition in the Discovery (the "Definitions"), each instruction
in the Discovery (the "Instructions"), Document Request, and Interrogatory, and unless otherwise
stated, shall have the same force and effect as if fully set forth in response to each Definition,
Instruction, Document Request, and Interrogatory.  Any objection to a Definition or Instruction
shall also apply to any other Definition, Instruction, Document Request, or Interrogatory that
incorporates that Definition or Instruction.  No response to any specific Document Request or
Interrogatory is, or shall be deemed to be, a waiver of the General Objections or the specific
objections set forth below.  The fact that an objection is not listed herein does not, and shall not,
constitute a waiver of that objection or otherwise preclude the Debtors from raising that objection
at a later time.

1.      The Debtors object to the Discovery on the basis that further discovery on the merits
is premature until after the Court decides the *Motion of the Joint Liquidators of Three Arrows
Capital, Ltd. (in Liquidation) for Leave to Amend Proof of Claim* [D.I. 27755] (the "Motion"), the
scope of the claims litigation is defined, and a litigation and discovery schedule is entered.

2.      The Debtors object to the Discovery and accompanying Definitions and
Instructions to the extent that they are vague and ambiguous, overly broad, unduly burdensome,

---

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Document
Requests.

lacking in particularity, unreasonable, or seek information that is neither relevant to nor proportional to the needs of the Claim Objection or any party's claim or defense in connection with the Claim Objection.  The Debtors will construe the Discovery and accompanying Definitions and Instructions in accordance with the Debtors' obligations under the Applicable Rules.

3.    The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they purport to impose on the Debtors any burden or obligation that is broader than, or inconsistent with, the permissible scope of discovery under the Applicable Rules.  The Debtors will construe the Discovery and accompanying Definitions and Instructions in accordance with the Debtors' obligations under the Applicable Rules.

4.    The Debtors object to the Discovery to the extent that it is duplicative of, or otherwise inconsistent with, the voluminous informal discovery provided by the Debtors to the Joint Liquidators of 3AC at significant burden and expense to the Debtors and their estates.  Certain Responses below include information that has already been provided by the Debtors to 3AC, but is included herein for completeness.

5.    The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they seek information that is protected from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege, or that is otherwise protected from disclosure under the Applicable Rules.  Nothing contained in these Responses is intended to be, nor shall in any way be, construed as a waiver of any such privilege, immunity, or protection.  Specific Objections on the grounds of privilege, if any, are provided for clarity only, and the absence of a Specific Objection is neither intended to be, nor should be interpreted as, evidence

that the Debtors do not object to a Document Request or Interrogatory on the basis of an applicable privilege, immunity, or protection.

6. The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they seek production of information that is a matter of public record and/or information that is equally available to the Joint Liquidators of 3AC, or otherwise more appropriately directed to another party or person.

7. The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they seek documents or information outside of the Debtors' possession, custody, or control.

8. The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they seek the production of information that is confidential, proprietary, commercially sensitive, or contains customer or personal information relating to the Debtors, their affiliates, and their current or former officers, directors, employees and/or advisors, clients, customers, or counterparties. The Debtors' production of any documents in response to the Requests shall be subject to the terms of the *Confidentiality Agreement and Stipulated Protective Order* [D.I. 832].

9. The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they purport to require the Debtors to conduct anything beyond a reasonable search of readily accessible sources where responsive documents or information, including electronically stored information, are reasonably expected to be found.

10. The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they purport to require the Debtors to draw legal or factual conclusions, or are predicated on legal or factual conclusions or arguments. No response to any

specific Document Request or Interrogatory is, or shall be construed as, a legal or factual conclusion concerning any of the terms used in the Document Request or Interrogatory.

11.     The Debtors object to the Discovery and accompanying Definitions and Instructions to the extent that they assume the existence of facts that do not exist or the occurrence of events that did not take place.  No response to any specific Document Request or Interrogatory is, or shall be construed as, an admission that any factual predicate stated in the Document Request or Interrogatory is accurate.

12.     No incidental or implied admissions are intended by the objections herein, nor shall the fact that the Debtors have objected or responded, or not objected or responded, to a particular Document Request or Interrogatory be construed as an admission or indication that the Debtors possess documents responsive to such Document Request or Interrogatory, or any other Document Request or Interrogatory.  Similarly, a statement that the Debtors will produce documents in a response to a Document Request does not constitute a representation that responsive documents exist, but only that responsive documents will be produced if they exist, can be located through a reasonable search, and are not otherwise protected from disclosure.

13.     The Debtors reserve all objections that may be available to them at any hearing or trial or on any motion to the use or admissibility of any material produced.

14.     These Responses are based solely on facts reasonably known to the Debtors at the time of responding to the Discovery.  The Debtors reserve the right, but do not assume the obligation, to amend, supplement, or otherwise modify the content of these Responses at any time.

## OBJECTIONS TO DEFINITIONS

15.     The Debtors object to each of the Definitions, and to any Definition, Instruction, Document Request or Interrogatory that incorporates the Definition, to the extent that the

Definition purports to define terms other than in accordance with the meanings typically ascribed to those terms in ordinary usage or pursuant to the Applicable Rules.

16.     The Debtors object to the Definitions of "Communication," "Document" or "Documents," and "relating to," and to any Definition, Instruction, Document Request or Interrogatory that incorporates one of those Definitions, to the extent that they purport to impose burdens or obligations on the Debtors that are broader than, inconsistent with, or not authorized by the Applicable Rules.

17.     The Debtors object to the Definition of "Debtors," "FTX," "You" or "Your," and to any Definition, Instruction, Document Request or Interrogatory that incorporates that Definition, as overly broad, vague, and unduly burdensome to the extent that it includes "any agents, representatives, employees, attorneys, accountants, investigators, consultants, and any other person or entity acting Your behalf" or purports to seek information regarding non-Debtors. The Debtors further object to this Definition, and to any Definition, Instruction, Document Request or Interrogatory that incorporates that Definition, to the extent that it encompasses third parties and/or information that is not in the Debtors' possession, custody or control, as well as to the extent that the Definition purports to seek information that is protected from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege.

18.     The Debtors object to the Definition of "3AC" and to any Definition, Instruction, Document Request or Interrogatory that incorporates that Definition, as overly broad, vague, and unduly burdensome to the extent that the Definition includes "any affiliates, agents, representatives, employees, attorneys, accountants, investigators, consultants, and any other person or entity acting on its behalf, including without limitation Three Arrows Capital Pte. Ltd.,

incorporated as a business under the laws of Singapore in 2012, Three AC Ltd., Kyle Davies, and Su Zhu." The Debtors further object to this Definition, and to any Definition, Instruction, Document Request or Interrogatory that incorporates that Definition, to the extent that it encompasses third parties and/or information that is not in the Debtors' possession, custody or control, as well as to the extent that the Definition purports to seek information that is protected from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege.

19.     The Debtors object to the Definition of "Person," and to any Definition, Instruction, Document Request or Interrogatory that incorporates that Definition, as overly broad, vague, and unduly burdensome to the extent that the Definition includes "any business or governmental entities, or associations, partnerships, firms, corporations, units, joint ventures, any other form of business organization or arrangement, or any other form of public, private, or legal entity." The Debtors further object to this Definition, and to any Definition, Instruction, Document Request or Interrogatory that incorporates that Definition, to the extent that it encompasses third parties and/or information that is not in the Debtors' possession, custody or control, as well as to the extent that the Definition purports to seek information that is protected from disclosure by any applicable privilege, immunity, or protection, including the attorney-client privilege, work product doctrine, joint-defense privilege, or the common-interest privilege.

## OBJECTIONS TO INSTRUCTIONS TO INTERROGATORIES

20.     The Debtors object to the following instructions to the Interrogatories (the "Interrogatory Instructions"). The failure to object to any of the Interrogatory Instructions shall not be deemed a waiver of any objections, nor a concession that any of such instructions are appropriate.

21.    The Debtors object to the Interrogatory Instructions, and to each Interrogatory incorporating any such Interrogatory Instructions, to the extent that they purport to impose burdens or obligations on the Debtors that are broader than, inconsistent with, or not authorized by the Applicable Rules.

22.    The Debtors object to Interrogatory Instruction Nos. 1, 3, 4, 6, and 10 and to each Interrogatory incorporating any such Interrogatory Instruction as overly broad and unduly burdensome.

23.    The Debtors object to Interrogatory Instruction Nos. 1 and 7, and to each Interrogatory incorporating any such Interrogatory Instructions, as vague and ambiguous, in particular its inclusion of "assisted in" and "reasonable."

## OBJECTIONS TO INSTRUCTIONS TO DOCUMENT REQUESTS

24.    The Debtors object to the following instructions to the Document Requests (the "RFP Instructions").  The failure to object to any of the RFP Instructions shall not be deemed a waiver of any objections, nor a concession that any of such instructions are appropriate.

25.    The Debtors object to the RFP Instructions to the extent that they seek to impose requirements on the Debtors that are unreasonable, unduly burdensome, non-customary or greater than those imposed by the Applicable Rules.

26.    The Debtors object to RFP Instruction Nos. 4, 8, and 10 and to each specific Document Request incorporating any such RFP Instruction as overly broad and unduly burdensome.  The Debtors further object to these RFP Instructions, and to each specific Request incorporating any such RFP Instructions, to the extent that they purport to impose burdens or obligations on the Debtors that are broader than, inconsistent with, or not authorized by the Applicable Rules.

27.     The Debtors further object to RFP Instruction No. 4 and 5 and to each specific Document Request incorporating any such RFP Instructions, as vague and ambiguous, in particular its inclusion of "constructive possession," "superior right or practical ability," and "deletion or redactions."

## SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories, which are hereby expressly incorporated into each of the following specific objections and responses as if fully set forth therein, the Debtors respond to the Interrogatories as follows:

## INTERROGATORY NO. 1

Identify all the "FTX Developers" as referenced in FTX_3AC_000013874 at FTX_3AC_000013911, including the name, title, and last known physical address, phone number, and email address for each current and former employee, and describe their personal knowledge relating to 3AC.

## RESPONSE TO INTERROGATORY NO. 1

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories as set forth above.  The Debtors also object to this Interrogatory to the extent that it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.  The Debtors further object to this Interrogatory on the basis that further discovery on the merits is premature until after the Court decides the Motion, the scope of the claims litigation is defined, and a litigation and discovery schedule is entered.

Subject to and without waiver of their Objections, the "FTX Developers" referenced in FTX_3AC_000013874 at FTX_3AC_000013911 refer to Nils Molina.  As the Debtors confirmed to counsel to the Joint Liquidators via email on November 4, 2024, Mr. Molina

is represented by counsel for the Debtors in this matter, and the Joint Liquidators should direct any correspondence to Mr. Molina through counsel for the Debtors.

## INTERROGATORY NO. 2

Identify all FTX users who loaned any amount to 3AC as of June 12, 2022, and the amount each individual FTX user loaned to 3AC.

## RESPONSE TO INTERROGATORY NO. 2

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Interrogatories as set forth above. The Debtors also object to this Interrogatory to the extent that it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit. The Debtors further object to this Interrogatory on the basis that further discovery on the merits is premature until after the Court decides the Motion, the scope of the claims litigation is defined, and a litigation and discovery schedule is entered.

Subject to and without waiver of their Objections, the Debtors understand that, as relevant here, borrowing from users on the FTX.com exchange occurred through the use of pooled funds, wherein borrowers could access a shared pool of funds to which a dynamic group of lenders contributed. The available data does not provide a means for identifying an individual lender as the source of specific funds borrowed by 3AC on any given date.

## SPECIFIC RESPONSES AND OBJECTIONS TO DOCUMENT REQUESTS

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions to Document Requests, which are hereby expressly incorporated into each of the following specific objections and responses as if fully set forth therein, the Debtors respond to the Requests as follows:

## DOCUMENT REQUEST NO. 1

All Documents and Communications relating to the September 20, 2020 meeting between 3AC and FTX as identified in FTX_3AC_000013874 at FTX_3AC_000013883.

## RESPONSE TO DOCUMENT REQUEST NO. 1

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Document Requests as set forth above. The Debtors also object to this Document Request to the extent that it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit. The Debtors further object to this Document Request on the basis that further discovery on the merits is premature until after the Court decides the Motion, the scope of the claims litigation is defined, and a litigation and discovery schedule is entered.

Subject to and without waiver of their Objections, the Debtors refer the Joint Liquidators to materials previously produced to the Joint Liquidators and in particular, four previously produced documents bearing production numbers FTX_3AC_000000054, FTX_3AC_000001566, FTX_3AC_000001567, and FTX_3AC_000005102. The Debtors understand that the reference to "9/20/2020" in FTX_3AC_000013874 at FTX_3AC_000013883 is a typo—the actual meeting date between FTX and 3AC was September 30, 2020, as reflected in the previously produced documents. The Debtors will produce any additional non-privileged documents responsive to this Document Request if any are identified by the Debtors after a reasonable search.

## DOCUMENT REQUEST NO. 2

All Documents and Communications between Ramnik Arora and Kyle Davies, including without limitation communications between Ramnik Arora and Kyle Davies between April 22, 2021 to April 30, 2021 as referenced in FTX_3AC_000013874 at FTX_3AC_000013883.

**RESPONSE TO DOCUMENT REQUEST NO. 2**

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Document Requests as set forth above.  The Debtors also object to this Document Request to the extent that it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.  The Debtors further object to this Document Request on the basis that further discovery on the merits is premature until after the Court decides the Motion, the scope of the claims litigation is defined, and a litigation and discovery schedule is entered.

Subject to and without waiver of their Objections, the Debtors refer the Joint Liquidators to materials previously produced to the Joint Liquidators, in particular FTX_3AC_000005955, FTX_3AC_000005957, FTX_3AC_000005960, FTX_3AC_000005962, and FTX_3AC_000006325 through FTX_3AC_000006335.  The Debtors will produce any additional non-privileged documents responsive to this Document Request if any are identified by the Debtors after a reasonable search.

**DOCUMENT REQUEST NO. 3**

All Documents and Communications relating to guarantees provided by FTX to any Person in connection with any loans made to 3AC, including without limitation any guarantees made to any user on the FTX platforms as described in the statement in FTX-3AC-000013862 that "Lenders bear no counterparty risk: FTX guarantees interest payments for however long your funds are borrowed, even if the borrower gets liquidated."

**RESPONSE TO DOCUMENT REQUEST NO. 3**

The Debtors incorporate by reference the General Objections, Objections to Definitions, and Objections to Instructions to Document Requests as set forth above.  The Debtors also object to this Document Request to the extent that it seeks information that is not relevant and/or because the burden or expense of the requested discovery outweighs its likely benefit.  The Debtors further object to this Document Request on the basis that further discovery on the merits

is premature until after the Court decides the Motion, the scope of the claims litigation is defined, and a litigation and discovery schedule is entered.

Subject to and without waiver of their Objections, the Debtors refer the Joint Liquidators to materials previously produced to the Joint Liquidators, in particular FTX_3AC_000013853 through FTX_3AC_000013861.  The Debtors will produce any non-privileged documents responsive to this Document Request if any are identified by the Debtors after a reasonable search.

Dated:  December 2, 2024
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
       mcguire@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Benjamin S. Beller (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
       bromleyj@sullcrom.com
       gluecksteinb@sullcrom.com
       bellerb@sullcrom.com

*Counsel for Debtors and Debtors-in-Possession*

# **Exhibit 16**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
----------------------------------------X
IN RE: FTX TRADING LTD., et al.,

                        Debtors.


                        CHAPTER 11


Case No. 22-11068


----------------------------------------X


                    DATE: September 25, 2025

                    TIME: 9:00 A.M.


        VIDEOTAPED DEPOSITION of STEVEN

COVERICK, held at Latham & Watkins, 1271

Avenue of the Americas, New York, New York,

before Rivka Trop, a Notary Public of the

State of New York.



                Magna Legal Services
                    866-624-6221
                    www.MagnaLS.com



Page 26

```
1              S. COVERICK
2     Q.  Let's -- let's first look at the
3  original declaration.  As you know, the
4  joint liquidators were only recently
5  provided with a supplemental declaration and
6  are still reviewing it.
7         Do you draw any assessment with
8  respect to maintenance margin requirement
9  compliance in your original declaration?
10    A.  I do.
11    Q.  Where is that?
12    A.  I begin, I believe it begins on --
13  in paragraph 74.
14    Q.  And what does the conclusion reach
15  with respect to maintenance margin
16  requirements in that paragraph?
17    A.  The margin trading account value
18  for the 3AC accounts fell below the
19  maintenance margin level absent the line of
20  credit at approximately 9:00 a.m. on
21  June 13, 2022.
22    Q.  What does the phrase absent the
23  line of credit mean in that statement?
24    A.  The line of credit is -- in any
25  line of credit on the FTX exchange is
```

Page 27

```
1              S. COVERICK
2  something that works in conjunction with the
3  margin trading -- the margin trading account
4  value.  The -- the purpose of the line of
5  credit is to increase an account's margin
6  trading account value effectively providing
7  it additional collateral so that it -- the
8  account has more -- more cushion or head
9  room over the requirement.
10    Q.  Is that functionality of the line
11  of credit you just referenced reflected in
12  paragraph 49 of your original declaration?
13    A.  Yes, sir.
14    Q.  So if a customer had a line of
15  credit that was operational, the margin
16  trading account value should be increased by
17  the -- is it face amount of that line of
18  credit to determine the margin trading
19  account value?
20    A.  For 3AC's account they were
21  utilizing the full amount of the line of
22  credit in the periods referenced in my -- in
23  my declaration.  But it would be the -- the
24  utilized amount of the line of credit.
25    Q.  When you say utilized amount of
```

Page 28

```
1              S. COVERICK
2  the line of credit, what do you mean by
3  utilized?
4     A.  So the line of credit effectively
5  functioned in a similar fashion with the --
6  as the peer to peer borrowing program
7  functioned.  And as I state in my
8  declaration it -- it allows -- it allows 3AC
9  or any customer with a line of credit to
10  first draw from the line of credit before
11  borrowing from the margin program.
12        So to the extent an account had a
13  line of credit, but did not have leverage
14  positions or was not needing to borrow, it
15  would not have any amount drawn on the line
16  of credit.  But once -- once there are
17  borrowings on the line of credit, that would
18  increase the margin trading account value by
19  that -- by that value.
20    Q.  So if -- if there was utilization
21  of a line of credit that the extent of that
22  utilization should be added to the margin --
23  margin trading account value to determine
24  the value of that definition; is that
25  correct?
```

Page 29

```
1              S. COVERICK
2         MR. GLUECKSTEIN:  Objection to the
3  form.
4     A.  The line of credit if -- to the
5  extent utilized would be added to the margin
6  trading account value for purposes of
7  calculating compliance with the mainten --
8  maintenance margin requirement.
9     Q.  And did FTX include the
10  added -- strike that.
11        Did FTX include the utilized
12  amount of the line of credit by Three Arrows
13  at all times in calculating the margin
14  trading account value?
15    A.  At periods in which it was
16  compliant with the requirements under the
17  line of credit.
18    Q.  At what point in time was it not
19  compliance -- compliant in FTX's view with
20  the requirements under the line of credit?
21    A.  As I state in paragraph 74 of my
22  declaration, the account balance for 3AC
23  accounts dropped below $240 million by
24  2:00 a.m. UTC on June 13, 2022 and
25  thereafter.
```

MAGNA▶
LEGAL SERVICES

Page 30

S. COVERICK

1
2    Q.  Is that -- strike -- sorry, go
3    ahead?
4    A.  The requirement on the line of
5    credit was to maintain 200 percent of the
6    amount of the line of credit or simply put,
7    $240 million, which was the threshold that
8    the total account balance had to remain
9    above.
10    Q.  Let me make sure I understand
11    this.
12        So is it FTX's position that even
13    if a customer had an operative line of
14    credit, the moment in time at which its
15    accounts fell below the collateral
16    requirements associated with the line of
17    credit, precludes the inclusion of the
18    utilized amount of the line of credit in the
19    margin trading account value?
20    A.  I am sorry, just to make sure I
21    got that, can you repeat that one time,
22    please.
23    Q.  Sure.  Is it your position that as
24    a -- looking at paragraph 74, is it your
25    position that at 2:01 a.m. UTC, June 13,

Page 31

S. COVERICK

1
2    2022, the utilized amount of the line of
3    credit could no longer be added to the
4    margin trading account value?
5    A.  It is my understanding that FTX no
6    longer was required to extend the line of
7    credit due to the non-compliance of the
8    account.
9    Q.  What did FTX, in fact, do in the
10    real world?
11    A.  In general, I was not there, so I
12    can't be certain of everything that they
13    did.  I am aware that FTX communicated with
14    3AC the -- I don't know what -- what it is
15    called in the 3AC proceeding, but
16    effectively the pre-petition or
17    pre-liquidation management team of 3AC that
18    their account was out of compliance, and
19    asked them to bring their account back into
20    compliance to avoid the line of credit being
21    pulled.  And my understanding is 3AC did not
22    do so, and FTX pulled the line of credit.
23    Q.  And did it pull the line of credit
24    at 2:01 a.m. on June 13, 2022?
25    A.  Mechanically in the exchange

Page 32

S. COVERICK

1
2    ledger, the time of the ledger entry to
3    remove the line of credit was entered was
4    10:29 p.m. on June 14.
5    Q.  Did it -- if it didn't pull the
6    line of credit until 10:21 p.m., June 14, it
7    certainly didn't pull it at 9:00 a.m.
8    June 13, looking at the second sentence of
9    paragraph 74; is that correct?
10    A.  The mechanical entry on the
11    exchange ledger was made at the time I just
12    referenced.
13    Q.  That's a yes?
14    MR. GLUECKSTEIN:  Objection,
15    misstates the answer.
16    A.  I am answering that the mechanical
17    entry for the removal of the line of credit
18    on the exchange ledger was made at
19    10:29 p.m.  That is in my opinion different
20    from when the line of credit no longer
21    applied to the maintenance margin
22    requirement.
23    Q.  You say that's your opinion, is it
24    also FTX's position?
25    A.  Yes.

Page 33

S. COVERICK

1
2    Q.  Is that reflected in any data on
3    the exchange, the line of credit no longer
4    being applied at any point in time earlier
5    than 10:21 p.m., June 14?
6    MR. GLUECKSTEIN:  Objection to the
7    form.
8    A.  That -- as I testified, the
9    mechanical entry on the exchange was made at
10    the time I -- I stated.  I am aware of the
11    requirements on the line of credit from both
12    reviewing the line of credit agreement as
13    well as seeing communications from FTX to
14    3AC.  Those are the -- those are the
15    documents that my team has uncovered.
16    Q.  Have you seen a single document
17    anywhere reflecting the pulling or removal
18    of the line of credit as of 9:00 a.m.,
19    June 13, 2022?
20    A.  Again, I believe that calls for a
21    legal interpretation as to when the line of
22    credit would be in compliance or continued
23    to be extended.  I can only speak to when I
24    know they were out of compliance on the line
25    of credit, as well as when the mechanical



Page 46

```
1              S. COVERICK
2    assumption my team used when performing the
3    analysis underlying my declaration.  But
4    once again, any other conclusions or legal
5    interpretations of this document can only be
6    provided by counsel.
7         Q.  FTX's position is that the only
8    interpretation of this document that can be
9    given by it is in a legal litigation
10   posture?
11             MR. GLUECKSTEIN:  Objection to the
12   form.
13        A.  FTX's position is that legal
14   interpretations must be conducted by
15   lawyers.
16        Q.  You talked about the 200 percent,
17   I think you used the term collateral
18   requirement, but correct me if that's wrong,
19   how do you define the 200 percent provision
20   in this document?  What words do you want to
21   use to describe that?
22        A.  I believe in my declaration I
23   refer to it as the account balance 3AC was
24   required to maintain as a condition to its
25   continued access to the line of credit.
```

Page 47

```
1              S. COVERICK
2         Q.  Where are you looking specifically
3    in your declaration?
4         A.  Paragraph 53, line 6 of paragraph
5    53, line 5 and 6.  If there is a more
6    succinct way defined in my declaration, I am
7    happy to use that.  But I believe --
8         Q.  I believe, I am happy to make a
9    representation that FTX uses the term in its
10   claim objection LOC or line of credit
11   requirement.  Is it fair to use that term in
12   referring to this provision 5 in the line of
13   credit document?
14        A.  I am happy to use that term when
15   referencing the way I describe it my
16   declaration, yes.
17        Q.  Okay.  What is FTX's
18   interpretation of the line of credit
19   requirement in this provision 5 of the FTX
20   line of credit?
21        A.  That the 3AC account balance was
22   required to maintain an amount equal to
23   200 percent of the amount of the line of
24   credit which is equal to $240 million.  The
25   simple interpretation is 3AC's account
```

Page 48

```
1              S. COVERICK
2    balance had to stay above $240 million to
3    continue accessing the line of credit.
4         Q.  And to get to 240 million, does
5    that mean you are multiplying 120 million by
6    two?
7         A.  That same math gets to
8    $240 million, yes.
9         Q.  And the reason you are using
10   120 million is because that was the face
11   value of the line of credit; is that
12   correct?
13        A.  That was the amount of the line of
14   credit.
15        Q.  Amount, do you -- when you say
16   amount and I say face -- face value, does
17   that mean something different in your view?
18        A.  Again, at the periods I analyzed,
19   the line of credit, the amount, the face
20   value the drawn amount were all synonymous,
21   they were all -- they were all $120 million.
22   The -- how do we define that, the LOC
23   collateral requirement?
24        Q.  LOC requirement or line of credit
25   requirement, that's okay with you?
```

Page 49

```
1              S. COVERICK
2         A.  Yes, sir, the line of credit
3    requirement would have been $240 million.
4         Q.  How do you know it is -- how does
5    FTX know it is 200 percent of the face
6    amount of the line of credit versus the
7    drawn amount of the line of credit?
8         A.  I would need to consult with my
9    team to understand the specific way that was
10   confirmed in the exchange database.  But
11   the -- again, my understanding is that
12   during the period in question that I
13   testified to in my declaration, the full
14   amount of the line of credit was fully
15   drawn.  So those two amounts would be the
16   same.
17        Q.  Was the line of credit fully drawn
18   at all points in time in -- in which it was
19   issued to Three Arrows?
20        A.  I believe there were periods,
21   although I cannot specifically recall them,
22   I don't have them committed to memory, where
23   3AC did not fully draw the line of credit.
24        Q.  And in those periods, would FTX
25   calculate the line of credit requirement by
```

Page 66

```
1              S. COVERICK
2    agreement and legal rights of both parties,
3    and that would require a lawyer to perform
4    that interpretation.
5         Q.   FTX has no position on that?
6         A.   FTX's position is that that answer
7    can only be provided by an attorney.
8         Q.   What is the -- what is the balance
9    change ID?  This is the final column of this
10   tab we are looking at, feel free to flip
11   back up to page 3 of the document, the same
12   document?
13        A.   The balance change ID is not
14   something -- is not a field that I believe I
15   explicitly use in my analysis.  Let me just
16   confirm that answer is true.
17             I do not believe that that column
18   is included in the calculation steps
19   required to derive the figures in my
20   declaration.  So I would need to consult
21   with my team.
22        Q.   And to be clear, that wasn't my
23   question, my question is does FTX have a
24   view on what this means independent of
25   whether it was used as part of the
```

Page 67

```
1              S. COVERICK
2    calculations as you had previously done?
3         A.   I would need to consult with my
4    team to answer that question.
5         Q.   Flip back to the previous page,
6    the LOC underscore changes tab, just one
7    page up from here?
8         A.   Okay.
9         Q.   Yes, perfect, okay.
10             This notes field, do you see that,
11   notes column?
12        A.   I do.
13        Q.   Is this something that was
14   manually entered by someone at FTX or was it
15   system generated or something else?
16        A.   I do not know specifically how
17   that field was populated at the time.
18        Q.   It was populated at the time,
19   though, and not at a later point in time?
20        A.   I don't have any information to
21   suggest it was created at a later point in
22   time.
23        Q.   The same question for this dest --
24   excuse me, destination not credited column,
25   second from the end, what is FTX's
```

Page 68

```
1              S. COVERICK
2    interpretation of that column?
3         A.   Again, I would need to consult
4    with my team to understand the utility of
5    that column in the context of the exchange
6    functionality.  I did not use this column or
7    rely on it expressly in my analysis.
8         Q.   What -- now jumping back to the
9    next page, the LOC interest charge's
10   document, one page down?
11        A.   Okay.
12        Q.   What, if any, role did the
13   principal amount listed in the third from
14   the final column play in a customer's, and
15   specifically Three Arrows, overall account
16   balance?
17        A.   The manner in which my team
18   calculated account balances is, as I have
19   testified to several times, was to use
20   Python scripts to calculate the figures in
21   my declaration, using -- querying the raw
22   exchange database directly.  I then used
23   these documents to verify, confirm the
24   accuracy.  That was one way I confirmed the
25   accuracy of those figures.  I did not use
```

Page 69

```
1              S. COVERICK
2    the principal column in the process of doing
3    that.
4         Q.   What role, if any, did the drawn
5    amount of Three Arrows line of credit play
6    in its overall account balance?
7         A.   The account balance would be net
8    of the utilized amount of the line of
9    credit.
10        Q.   What do you mean net of?
11        A.   You would subtract the utilized
12   amount of the line of credit.
13        Q.   From what to get to what?
14        A.   You would add up all of the
15   positions in the account, including any
16   borrow positions from the peer to peer
17   program and then subtract the utilized
18   amount of the line of credit.
19        Q.   To get to the overall account
20   balance?
21        A.   To get to the total account
22   balance.
23        Q.   The face value, total face amount
24   of the line of credit, does that factor into
25   the overall account balance or only the
```

MAGNA
LEGAL SERVICES

S. COVERICK

1           S. COVERICK
2   utilized amount of it?
3           MR. GLUECKSTEIN:  Objection to the
4   form.
5       A.   It is my understanding that it is
6   the utilized amount of the line of credit
7   that would be netted from the account
8   balance.
9       Q.   If you subtract the utilized
10  amount of line of credit from the account
11  balance, does that mean it is part of the
12  U.S. negative dollar amount, why are we
13  subtracting?
14      A.   It was separate from the negative
15  USD balance when the exchange was
16  functioning.  The exchange delineated
17  between the amount drawn from the line of
18  credit, as well as the negative USD balance
19  from the borrow program.
20      Q.   So then does -- does that mean it
21  is FTX's position that the overall account
22  balance is not a net sum of all the asset
23  entitlements, but also for those who have a
24  line of credit includes that?
25          MR. GLUECKSTEIN:  Object to the

1           S. COVERICK
2   form.
3       A.   As I state in my declaration, a
4   function of the line of credit is that it
5   allowed accounts to utilize the line of
6   credit prior to borrowing from the borrowing
7   program, from the margin program.  So it
8   would be treated the same way as the margin
9   program.  It is a borrow on the account that
10  needs to be included when calculating the
11  total customer entitlement which is the
12  total account balance.
13      Q.   But that borrow is not reflected
14  in the negative US dollar balance as you
15  have been using and as FTX has been using
16  that term?
17      A.   It is -- that is for purposes of
18  analysis.  It could be aggregated in a
19  number of different ways.  The line of
20  credit is a negative USD amount on the
21  account balance.
22      Q.   You testified yesterday that
23  customers were shown I believe a balances
24  for each fiat currency including the US
25  dollar balance; is that correct?

1           S. COVERICK
2       A.   I believe that sounds consistent
3   with what I said.
4       Q.   Does -- did Three Arrows US dollar
5   balance, as presented to it by the exchange
6   pre-petition, include a subtraction or an
7   addition of the absolute value of the drawn
8   amount of the line of credit?
9       A.   Well, for one, I don't know what
10  3AC saw on its API, which I understand
11  conducted the vast majority of the trades
12  that 3AC performed.  Like many institutional
13  traders, 3AC used an API to access the
14  exchange.  That was a -- a software that
15  allowed them to interrogate access to the
16  exchange with certain systems of theirs,
17  although I am not familiar specifically with
18  how 3AC's functioned.  So I cannot speak to
19  how the account balances were specifically
20  displayed within 3AC's API.
21          On the website the negative USD
22  balance and the line of credit negative USD
23  balance were displayed separately from one
24  another.
25      Q.   Let's turn to -- back to the line

1           S. COVERICK
2   of credit document which was I believe the
3   previous exhibit, Exhibit 20.
4           Are you there?
5       A.   I have the exhibit, yes.
6       Q.   Take a look again at that section
7   5 on the first page?
8       A.   Okay.
9       Q.   It says, Throughout the lifetime
10  of the line of credit, at least 200 percent
11  of the line of credit (Collateral) must be
12  maintained in the borrower's FTX account.
13          Do you see that?
14      A.   I do.
15      Q.   Collateral is capital C
16  collateral?
17          MR. GLUECKSTEIN:  Objection to the
18  form.
19      Q.   Is that a yes?
20      A.   Yes.
21      Q.   What does that mean in FTX's view?
22      A.   It is my understanding they are
23  referencing the account value, which they
24  refer to as maintained in the borrower's FTX
25  account.

MAGNA▸
LEGAL SERVICES

Page 94

1             S. COVERICK
2    I just wanted to make sure the record is
3    clear as to a point we were just discussing
4    on maintenance margin requirement that we
5    were -- we had just been looking at
6    paragraph 14 of your declaration.  Let's
7    turn back there for a brief moment.  This
8    was the supplemental declaration?
9         A.  Yes, sir.
10        Q.  If the line of credit requirements
11   had been complied with by Three Arrows on
12   the three dates you have set out in that
13   paragraph, would the face value or drawn
14   amount of the line of credit have been added
15   to the margin -- margin trading account
16   value?
17            MR. GLUECKSTEIN:  Objection.
18        Q.  Using the code?
19            MR. GLUECKSTEIN:  Object, calls
20        for a legal conclusion.
21        A.  From a financial perspective, to
22   analyze that hypothetical scenario I would
23   need to understand all of the various
24   aspects of the account that would cause the
25   account to be in compliance with the line of

Page 95

1             S. COVERICK
2    credit requirement, as many of those
3    components would also be factored into the
4    overall maintenance margin requirement.  So
5    it is not possible for me to answer that
6    hypothetical question.
7         Q.  And even if there is a stipulation
8    that the line of credit requirement was in
9    full compliance, you still -- FTX still has
10   no view of whether or not that should be --
11   that would be added properly to the margin
12   trading account value?
13            MR. GLUECKSTEIN:  Objection,
14        misstates the testimony, calls for a
15        legal conclusion.
16        A.  I would need to know all of the
17   aspects of what resulted in that stipulation
18   to be able to answer that question.
19        Q.  The drawn amount of the line of
20   credit on each of these dates was
21   120 million; is that correct?
22        A.  Mechanically in the exchange
23   database, the drawn amount on the line of
24   credit at 9:00 a.m. on 6/13 and 10:00 p.m.
25   on 6/14 was $120 million.

Page 96

1             S. COVERICK
2         Q.  If $120 million were added by
3    stipulation to each value in the margin
4    trading account value here, is the margin
5    trading account value above the maintenance
6    margin level?
7         A.  If absent all of the other caveats
8    that I just described, because there would
9    be other factors that must be different in
10   the account for that to be the case for --
11   for 120 million to be added.  But if you
12   simply added, for example, 120 million to
13   75 million, that would get you to, I
14   believe, 195.4 million, which is
15   mathematically higher than 86.8 million,
16   which is the calculated maintenance margin
17   requirement.  But again, there would be
18   other factors in the account that must be
19   different for FTX to have stipulated or for
20   the line of credit to otherwise be in
21   compliance.
22        Q.  If the line of credit were
23   complied with and the line of credit
24   document were in operation on each of these
25   dates, would Three Arrows be in compliance

Page 97

1             S. COVERICK
2    the maintenance margin requirement.
3            MR. GLUECKSTEIN:  Object to the
4        form.
5         A.  Can you repeat the question,
6    because it sounded like the same question I
7    just answered.  I am sorry if I am
8    misunderstanding.
9         Q.  If -- if the line of credit on
10   each of these three dates was not absent or
11   removed, would Three Arrows margin trading
12   account value be above its maintenance
13   margin level?
14            MR. GLUECKSTEIN:  Objection to the
15        form, asked and answered.
16        A.  Let me try my answer differently,
17   because I believe I just answered that.
18   Mechanically in the exchange database, the
19   removal of the line of credit simply caused
20   FTX -- or I am sorry, the 3AC accounts to
21   resort to borrowing from the peer to peer
22   borrowing program as opposed to borrowing
23   from the line of credit.  That is
24   mechanically what would have happened.
25            Had that removal mechanically

MAGNA
LEGAL SERVICES

S. COVERICK

1  happened prior to -- had it -- had the line
2  of credit been removed prior to series of
3  manual liquidations that were performed, it
4  would have triggered the risk engine or auto
5  liquidation engine that we were just
6  discussing immediately, because the account
7  would have immediately in the code been
8  recognized as out of compliance, which as I
9  testified, was the trigger point for that
10 occurring.
11     Q.  So the drawn amount of the line of
12 credit is not then borrowing from the peer
13 to peer margin program?
14     A.  No, as I state in my declaration,
15 a function of the line of credit is to
16 borrow from the line of credit prior to
17 borrowing from the peer to peer borrowing
18 program.
19     Q.  And that's borrowing from FTX as
20 the lender of the line of credit?
21     A.  I believe the borrower/lender
22 relationship from a legal perspective is a
23 legal question that I am not qualified to
24 answer.  Mechanically, though, it was not

S. COVERICK

1  borrowed from the pool of lenders in the
2  peer to peer borrowing program.  That amount
3  was not what the line of credit was -- was
4  in place.
5      Q.  Sure.  Let's turn back to Exhibit
6  20, this is the line of credit document.
7          Who were the parties to this
8  document, if any?
9      A.  It -- I am not a lawyer.  So I am
10 not qualified to interpret who the parties
11 are.  I can read the names on the top of the
12 page, but I don't know how to -- I am not
13 qualified to analyze who the parties may or
14 may not be.  But I can read the names at the
15 top of the page.
16     Q.  Yeah, why don't you do that for
17 the record, read the names at the top of the
18 page and how they are defined, please?
19     A.  The top of the page reads, This
20 line of credit agreement is made as of this
21 30th day of March 2022 defined as the "Line
22 of Credit Agreement" by and among Three
23 Arrows Capital Ltd. of ABM Chambers 2283,
24 Road Town, Tortola, BVI, VG1110, which is

S. COVERICK

1  defined as borrower, and FTX Trading Ltd.
2  which is defined as lender.
3      Q.  Any other parties to this
4  document?
5      A.  Again, I understand parties to a
6  document to constitute a legal term.  I am
7  not aware of any other parties that are
8  referenced in the document.
9      Q.  Any other parties that FTX takes
10 the view are parties to this document beyond
11 those referenced here?
12     MR. GLUECKSTEIN:  Objection, calls
13 for a legal conclusion.
14     A.  I am not aware of any additional
15 parties that are referenced in this
16 document, other than the only other name I
17 see in this document is the name on the
18 signature line.
19     Q.  Are you referring to Kyle Davies?
20     A.  Yes, sir.
21     Q.  And that's Three Arrows Ltd.?
22     A.  Under the Three Arrows Ltd.
23 signature block, yes, sir.
24     Q.  I should have said Three Arrows

S. COVERICK

1  Capital Ltd.
2      Let's turn back to Exhibit 22.
3          Have you seen this document
4  before?
5      A.  I have.
6      Q.  In connection to your deposition
7  preparation?
8      A.  Yes, sir.
9      Q.  And is this another one of those
10 informational or help pages you had spoken
11 about yesterday?
12     A.  Yes, sir, that's my understanding.
13     Q.  And what, if any, position does
14 FTX take on the presence of this document on
15 FTX's website as of April 4, 2022 or at any
16 other point in time?
17     A.  I have no reason to believe that
18 it wasn't posted on the website as of that
19 date it is listed.
20     Q.  But it doesn't -- but FTX doesn't
21 no for sure?
22     A.  I have no reason and no evidence
23 to believe that it was not posted on the
24 website as of that time.

MAGNA
LEGAL SERVICES

Page 102

S. COVERICK

1
2    Q.   So this document, is this -- does
3    this relate to the liquidation or risk
4    engine we were talking about earlier?
5        A.   Among other things, it appears
6    to -- to reference aspects of the
7    liquidation process, yes.
8        Q.   Are there other processes that
9    it -- that it references?
10       A.   Related processes.  There is a
11   reference in here to the back stop liquidity
12   provider program, which -- and then an
13   insurance fund, which are -- are other
14   aspects of the exchange that function in
15   relation to liquidation scenarios.
16       Q.   This document references a
17   three-step process for liquidations, do you
18   see that?
19       A.   Yes.
20       Q.   And the first step is, We, FTX,
21   first closed down positions with rate
22   limited liquidation orders in the market?
23       A.   I see that.
24       Q.   In the market, what does that
25   mean?

Page 103

S. COVERICK

1
2        A.   I don't know the intent of the
3    author that wrote this document.
4        Q.   On page 2 of this document, it
5    says, I am reading the second full sentence,
6    The goal of the liquidation engine is to
7    carefully close down positions in the market
8    while minimizing impact keeping markets
9    orderly?
10       A.   I am sorry, what -- where was
11   that?
12       Q.   Sure, the second full sentence, do
13   you want to read that?
14       A.   Of page 2?
15       Q.   Correct.
16       A.   Oh, I see.
17       Q.   Just let me know when you have had
18   a moment to read that.
19       A.   Okay, I have read it.
20       Q.   How did the liquidation engine
21   assist in keeping markets orderly?
22       A.   Well, while those are the words on
23   the page, again, I don't know the intent of
24   the author that wrote them.  My
25   understanding of how the liquidation

Page 104

S. COVERICK

1
2    algorithm worked is that once a account was
3    out of compliance with the maintenance
4    margin requirement, there was a process by
5    which positions that were available to be
6    sold within the context of the account,
7    liquidated in the account, would be sold to
8    bring the account back in compliance with
9    the maintenance margin requirement.
10       Q.   And FTX was the one doing that
11   selling?
12       A.   The underlying exchange base -- or
13   the underlying code base, sorry, of the
14   exchange, conducted those transactions in
15   the event of an auto liquidation.  Again,
16   these transactions are simply ledger entries
17   on the exchange ledger, and do not result in
18   the movement of any other assets, either
19   fiat or digital assets.
20       Q.   Why did FTX care if an account
21   dropped below its maintenance margin
22   requirement?
23       A.   I cannot speculate as to what the
24   pre-petition management team cared about.
25   As a practical matter, it is my

Page 105

S. COVERICK

1
2    understanding that the utility on the
3    exchange of the maintenance margin
4    requirement was intended to prevent accounts
5    from going negative and being a debtor
6    position to the exchange.
7        Q.   Is that something that FTX strived
8    to avoid?
9        A.   FTX -- the FTX exchange as it
10   operated pre-petition had measures in place
11   to avoid accounts from going negative.
12       Q.   Why did it care if accounts went
13   negative?
14       A.   I don't know why the pre-petition
15   management team would care about something
16   or not.
17       Q.   What is -- from a business person
18   perspective economically, what reason would
19   FTX have for taking certain measures to
20   prevent accounts from going negative?
21       A.   Again, I can't speculate as to the
22   intent of the pre-petition management team.
23   As a business person, I can speculate that
24   one reason conceivably that the exchange
25   would want to avoid customers incurring

S. COVERICK

1
2  occurring debt is because they wanted the
3  exchange to be an attractive place for
4  customers to trade.  And if customers were
5  routinely incurring debts on account of
6  levered positions, they would likely not
7  want to continue to trade in the exchange.
8  That's just one potential reason from a
9  business person's understanding.  But I
10  cannot speculate as to all the of the
11  reasons the pre-petition management team
12  might have considered when not wanting
13  accounts to go negative or not -- or putting
14  measures in place rather to prevent accounts
15  from going negative.
16     Q.  And just for the record, the same
17  answer on behalf of the FTX Recovery Trust?
18     A.  That answer is to the best of my
19  knowledge.
20     Q.  When you say debit --  strike
21  that.
22         When you said debts, wanted to
23  avoid customers incurring debts, are you
24  referring to debit balances or negative
25  account balances or something else?

S. COVERICK

1
2     A.  I think it is safe to say those
3  three things are the same.  A negative
4  account balance, as we discussed yesterday,
5  can also be described as a debit account
6  balance, which would also be a debt to the
7  exchange.
8     Q.  Any other reasons why from your
9  business person in FTX's position today the
10  exchange would have wanted to prevent those
11  things?
12         MR. GLUECKSTEIN:  Objection to the
13  form.
14     A.  Again, I can't speculate to all of
15  the reasons that might have been considered,
16  because I wasn't there at the time.
17     Q.  There may have been others?
18     A.  There may or may not have been
19  others.  And the one I referenced is my
20  speculation of a potential consideration.  I
21  certainly cannot testify that that is what
22  management was considering at the time.
23     Q.  Step two of this document, this is
24  on the bottom of the same page we are
25  looking at, refers to the back stop

S. COVERICK

1
2  liquidity provider system kicking in, or I
3  should say will kick in, let me know if you
4  see that?
5     A.  Yes, sir, I do see that.
6     Q.  What is the back stop
7  liquidity provide -- provider system?
8     A.  Sure.  I believe I touched on it a
9  bit yesterday, so apologies if -- if I am
10  being repetitive.  But the back stop
11  liquidity provider program involved a series
12  of market makers on the exchange that
13  specifically wanted to opt in to the back
14  stop liquidity provider program.  Their role
15  on the exchange was to effectively ensure
16  the -- the balance, if you will, of the
17  futures product on the exchange.  And they
18  stepped into certain transactions only with
19  regard to the closing of future contracts
20  during an account's liquidation.  When
21  accounts were liquidated by the liquidation
22  engine or risk engine, the algorithm, if you
23  will, that underlied that process on the
24  exchange, that included both sale
25  transactions of -- of assets in the account

S. COVERICK

1
2  or asset entitlements in the account, asset
3  positions in the account as well as
4  potentially closing open future positions on
5  the account.
6         As I mentioned yesterday, certain
7  future positions, certainly like the ones
8  that 3AC entered into, namely, bitcoin
9  perpetual futures, had a high volume of
10  trading on the exchange.  There were a lot
11  of market participants, and in most, if not
12  all, scenarios, there were typically willing
13  participants or other third-party customers
14  on the other side of -- of a transaction
15  that anyone wanted to perform.
16         So for example, if a long bitcoin
17  perpetual position was being closed as part
18  of a liquidation, it is likely that the
19  matching engine of the exchange would be
20  able to find another customer that wanted to
21  step into that position, so that whoever the
22  other counterparty to the original position
23  was, would not have to be, you know -- would
24  not have to have their contract closed out.
25  So that's what I talk about when I say the

MAGNA
LEGAL SERVICES

Page 118

S. COVERICK

1             S. COVERICK
2 of the exchange.
3     Q.   That's FTX's exchange we are
4 talking about?
5     A.   Yes, sir.
6     Q.   It is a fund, it is an FTX fund of
7 some kind?
8     A.   It was not a segregated fund like
9 all other things.  This was something that
10 was maintained on the exchange ledger in the
11 sense that the auto close transactions I am
12 discussing were recorded on the exchange
13 ledger.
14     Q.   How much did -- did the insurance
15 fund extend to cover customer account losses
16 pursuant to this process?
17       MR. GLUECKSTEIN:  Objection to the
18 form.
19     A.   Answering that question would
20 require my team to perform additional
21 analysis that I haven't performed.
22     Q.   It was some positive number?
23     A.   Again, that would require my team
24 to perform additional analysis that I
25 haven't performed.

Page 119

1             S. COVERICK
2     Q.   Did the insurance fund also have
3 a -- any sort of favorable pricing that they
4 received, fees that they received, other
5 economic incentives to act in that capacity?
6       MR. GLUECKSTEIN:  Objection to the
7 form.
8     A.   The insurance fund was funded as I
9 described it.  I am not aware of other
10 aspects that would be charged in those
11 liquidation scenarios.
12     Q.   How, if at all, was the insurance
13 fund related to the Alameda Research?
14     A.   Alameda Research was one of the
15 largest market makers on the exchange.  And
16 I believe they also participated as a back
17 stop liquidity provider.  It is -- it is
18 possible, but I do not know, because I
19 haven't analyzed every transaction on the
20 exchange and I haven't performed the
21 specific analysis.  But if Alameda was a
22 back stop liquidity provider in a
23 circumstance where there was not sufficient
24 account value to -- there was not sufficient
25 account value to pay the back stop liquidity

Page 120

1             S. COVERICK
2 provider fee, Alameda -- Alameda
3 theoretically would have been paid that fee
4 by the insurance fund.  But I cannot confirm
5 if there are circumstances where that
6 happened.  That's just theoretically how it
7 would work like any other back stop
8 liquidity provider.
9       MR. PROULX:  Let's give you a new
10 document, please.  This is 23.
11     (Whereupon, a document entitled
12 FTX Advisory Board Meeting for
13 September 19, 2022 was marked Coverick
14 Exhibit 23 for identification as of
15 this date.)
16     Q.   Mr. Coverick, you have been handed
17 what has been marked as Exhibit Number 23 it
18 is a document produced by FTX in this
19 litigation.  It is entitled FTX Advisory
20 Board Meeting for September 19, 2022.
21     Are you familiar with this
22 document?
23     A.   I believe I have seen it.  I have
24 not studies it to a level of detail that
25 would allow me to analyze it.

Page 121

1             S. COVERICK
2     Q.   Have you seen it in connection
3 with your deposition preparation?
4     A.   I believe I have seen it as a
5 document that was produced to 3AC.
6     Q.   If you can turn to page 3 of this
7 document, there are highlights, do you see
8 that?
9     A.   I do.
10     Q.   What is the FTX Advisory Board?
11     A.   I do not know.
12     Q.   Page 3 of this document, you will
13 see a reference to Three Arrows under item
14 number one, do you see that?
15     A.   I do.
16     Q.   Specifically under 1(a) Romanette
17 1, Three Arrows Capital was a large trader
18 on FTX.  The FTX risk and liquidation engine
19 liquidated them to close the account at zero
20 dollar exposure.
21     Do you see that?
22     A.   I do.
23     Q.   Zero dollar exposure to whom?
24     A.   I do not know the intent of the
25 author of this document nor have I verified

**MAGNA** ▶
**LEGAL SERVICES**

1            S. COVERICK
2        A.   Again, I am speaking of
3    third-party customer accounts, parties not
4    affiliated with FTX, like 3AC or other
5    third-party customers.  As a general policy,
6    and as I say in my declaration, FTX
7    generally did not permit accounts, the
8    operative word being "permit," to go
9    negative other than -- I know it is in the
10   declaration somewhere, other than certain
11   affiliated accounts or something to that
12   nature.
13       Q.   Do you have a sense of Alameda's
14   negative account balance as of the petition
15   date?
16       A.   I believe that's reflected in --
17   that's reflected in the plan.  I don't want
18   to misquote it, but it is somewhere.  It is
19   in the billions.
20       Q.   Some of that account balance, was
21   that accrued by virtue of borrowing from
22   lending customers in the margin program?
23       A.   I believe that's true, yes.
24       Q.   What happened with those lending
25   customers -- sorry, what happened with the

1            S. COVERICK
2    lending customers' entitlements or ledger
3    entries that had been lent out pursuant to
4    that program, how, if at all, were they
5    repaid?
6        A.   FTX filed for Chapter 11
7    bankruptcy and over the course of a couple
8    of years negotiated a plan pursuant to the
9    bankruptcy code.  And they are currently
10   being repaid by the FTX Recovery Trust.
11       Q.   I am going to turn back to a
12   document that we were discussing a moment
13   earlier, this is the line of credit document
14   at Exhibit 20?
15       A.   Okay.
16       Q.   I just want to understand, start
17   how interest payments work pursuant to this
18   document.  I see in section 4 on page 1, it
19   says, Funds advanced through the line of
20   credit will bear interest at a rate of
21   5 percent per annum payable daily at
22   approximately 30 UTC and calculated only in
23   respect of that portion of the line of
24   credit then being utilized.
25          I may have misread a portion of

1            S. COVERICK
2    that, but I hope that's largely correct?
3        A.   I -- I see that, yes.
4        Q.   Was Three Arrows, in fact, charged
5    interest on this line of credit?
6        A.   That's my understanding, yes.
7        Q.   Who, if anyone, did it pay that
8    interest to?
9        A.   It is my understanding that that
10   interest was paid.  I don't know the exact
11   account, but that interest was paid to an
12   FTX affiliated account on the exchange
13   ledger.
14       Q.   Do you -- do you see on page 2 of
15   this document, there is this term in this --
16   in this new -- new portion of this document
17   under the title FTX institutional customer
18   margin and line of credit agreement?
19       A.   I do.
20       Q.   There is this term indebtedness
21   that is defined formally, do you see that?
22       A.   I do.
23       Q.   What is FTX's view on the meaning
24   of the term indebtedness?
25          MR. GLUECKSTEIN:  Objection, calls

1            S. COVERICK
2    for a legal conclusion.
3        A.   I am not a lawyer, so I can't
4    opine on the meaning of a defined term in a
5    legal document.
6        Q.   We got an answer a lot from you
7    over the course of the last couple of days,
8    Mr. Coverick.  I am not asking you in your
9    individual capacity as a lawyer, I am asking
10   you as a representative of the FTX Recovery
11   Trust, same answer?
12       A.   I am sorry for providing that
13   answer so frequently, but I must provide it
14   because it is true.  I am not a lawyer and I
15   can't provide legal opinions or
16   interpretations.
17       Q.   The same answer as to the
18   interpretation of the interest rate as
19   applied to indebtedness on the next page,
20   looking at the section 5 on page 3?
21          MR. GLUECKSTEIN:  Object to the
22   form, calls for a legal conclusion.
23       A.   Yes, sir, the same answer.  And I
24   will supplement it with I can only verify
25   what my team has analyzed and seen on the

Page 206

S. COVERICK

1
2       A.  A locked token in the -- in the
3    traditional sense is a token that cannot be
4    sold.  It is similar to the concept of
5    something vesting, if you will.  Locked
6    tokens are often issued as part of early --
7    issued to early investors in a token
8    project.  But to prevent all of those
9    investors from immediately selling their
10   tokens and potentially decreasing the price
11   of those tokens, token issuers often provide
12   locking schedules whereby customers can't
13   sell those tokens for some period of time.
14       The FTX exchange also incorporated
15   a similar concept, although those -- those
16   were ledger only entries as opposed to
17   traditional locked tokens are actually
18   locked on the block chain.
19       Q.  Amended doc 38, was this prepared
20   by A & M as well?
21       A.  Amended dock 38 was prepared by A
22   & M as well.
23       Q.  When was it prepared by A & M?
24       A.  To my understanding, it was
25   prepared just prior to being produced to the

Page 207

S. COVERICK

1
2    joint liquidators.  I don't know the exact
3    date.
4       Q.  I am happy to make a
5    representation that it was August 25, 2025,
6    no reason to dispute that to your knowledge?
7       A.  I will take your word for it.
8       Q.  Had it been created at the time of
9    the claim objection filed by FTX on June 20
10   of 2025?
11       A.  The completion of amending doc 38,
12   I don't know exactly when that specific
13   document began being updated.  I understand
14   that it didn't happen instantaneously.  But
15   the creation or completion of doc 38 did not
16   have any bearing on the filing of the claim
17   objection in terms of the underlying
18   analysis.  I believe it is a clarifying
19   point that there were things in the original
20   doc 38 that the understanding of has evolved
21   since.
22       Q.  A clarifying point to the tune of
23   how -- how many -- how much of a difference
24   with respect to the negative US dollar
25   balance across the two documents?

Page 208

S. COVERICK

1
2       A.  I don't have a full reconciliation
3    committed to memory.  But the notional value
4    of futures was approximately $576 million, I
5    believe.  And then the negative or the
6    deposit in question was $24 million.  I am
7    not sure specifically how the other minor
8    changes impacted the change in USD balance,
9    but those would have been the biggest two
10   drivers.
11       Q.  Did you rely on amended doc 38 in
12   preparation of your original declaration?
13       A.  In preparation of my original
14   declaration I believe I reference the
15   amended doc 38.
16       I am sorry, I need to find the --
17   maybe I am -- maybe I am thinking about my
18   supplemental declaration.  I -- I cannot
19   recall specifically at what point in time
20   the amended doc 38 was completed.
21       Q.  Was it largely completed,
22   substantially completed at the time of your
23   June 20 2020 -- 21st declaration?
24       A.  In substance doc 38 is effectively
25   the output of all of the steps that I lay

Page 209

S. COVERICK

1
2    out in my supplemental declaration, which as
3    we have discussed, are consistent with how
4    my team derived the figures in my
5    declaration.  From that perspective the core
6    analysis that is reflected in doc 38 had
7    been done and the product of that was my
8    declaration.
9       I do not recall specifically when
10   the amended doc 38 was completed.  I am sure
11   I could -- that that information would be
12   attainable, but I don't have it committed to
13   memory.
14       Q.  Did amended doc 38 rely on any
15   underlying data that original doc 38 did
16   not?
17       A.  I am sorry, can you repeat the
18   question, just so I can try and answer
19   accurately.
20       Q.  Did amended doc 38 rely on any
21   underlying data that original doc 38 did
22   not?
23       A.  To my knowledge only with respect
24   to pricing information that I -- that I
25   mentioned.  I am not -- I can't immediately

MAGNA
LEGAL SERVICES

Page 214

```
1              S. COVERICK
2    the record, please.
3         THE VIDEOGRAPHER:  Off the record.
4    The time is 3:17 p.m.
5         (Whereupon, an off-the-record
6    discussion was held.)
7         THE VIDEOGRAPHER:  We are back on
8    the record, the time is 3:15 p.m.
9    Q.    Does FTX assert that it was, in
10   fact, a specific person at Three Arrows who
11   conducted these trades as opposed to some
12   sort of automated process implemented by
13   Three Arrows?
14   A.    Either are possible.  However, if
15   an automated process such as a trading
16   algorithm were involved in conducting those
17   trades, a person at some point would have
18   had to create that algorithm thereby being
19   the person traceable to those trades being
20   conducted if it had to be traced to a
21   person.
22   Q.    Does FTX have a view on whether at
23   a -- for the quantity of this number of
24   trades over 52,000, it would have been an
25   individual versus that kind of logarithm?
```

Page 215

```
1              S. COVERICK
2    A.    FTX, to the best of my knowledge,
3    does not have information regarding
4    specifics of the Three Arrows Capital API,
5    which would have been the aspect of their
6    access to the exchange that would conduct
7    algorithmic trading.  So FTX does not have a
8    view as to how much of the trading was done
9    via automated process versus manual process.
10   Q.    Who were the counterparties to the
11   trades referenced in this paragraph 68?
12   A.    The counterparties were likely
13   many different customers, certainly for this
14   number of trades.  I do not have an
15   accounting for the various counterparties by
16   hand.
17   Q.    Do you -- does FTX know the
18   identities of any particular customers who
19   were counterparties to these trades?
20   A.    For the 52,000 trades in question,
21   that would require further analysis that my
22   team has not done.
23   Q.    Further analysis or any analysis?
24   A.    I am sorry, can you clarify the
25   question?
```

Page 216

```
1              S. COVERICK
2    Q.    Yes, you referenced further
3    analysis, is that meant to imply that some
4    analysis has been done as to who the
5    counterparties of those trades were by Three
6    Arrows?
7    A.    I am not aware of specific
8    counterparty tracing analysis on these
9    52,000 trades.  I am not aware if that
10   specific analysis has been done.
11        (Whereupon, a document titled
12        Supporting Analysis for the Three
13        Arrows Capital Discussions was marked
14        Coverick Exhibit 30 for identification
15        as of this date.)
16   Q.    Mr. Coverick, you have been handed
17   Exhibit 30?
18   A.    Yes, sir.
19   Q.    This is titled Supporting Analysis
20   for the Three Arrows Capital Discussions,
21   dated draft October 25, 2023, with Alvarez &
22   Marsal and Sullivan & Cromwell identified on
23   the title page.
24        Do you recognize this document?
25   A.    I do.
```

Page 217

```
1              S. COVERICK
2    Q.    What is this?
3    A.    I would characterize this as a
4    very preliminary presentation as the header
5    of the document reflects, I believe, on
6    almost every page.  This was a presentation
7    created by junior members of the A & M team
8    during the verification analysis of the 3AC
9    claim.
10   Q.    Does that include Mr. Gordon?
11   A.    I do not know if Mr. Gordon
12   specifically participated in the preparation
13   of this document.  But it is my
14   understanding that it was referenced in his
15   deposition.
16   Q.    Jump to page 12, please.
17        There is a statement here, On
18   June 13, 2022, 3AC sold out of many spot and
19   futures positions totalling over
20   1.08 billion.  There were over 1,000
21   accounts on the buy side of Three Arrows'
22   trades, debtor accounts representing 8.0
23   percent of the total trade value.
24        Do you see all that?
25   A.    I do.
```

MAGNA
LEGAL SERVICES

1              S. COVERICK
2        Q.   What debtor accounts does this
3    refer to?
4        A.   I am not familiar, although I have
5    seen this document and reviewed it.  I am
6    not relying on it in any way.  As I
7    described, it was a very preliminary
8    analysis.  And I -- I base my testimony in
9    my declaration and all the preparation for
10   my deposition on our team's latest thinking
11   and understanding of the information
12   relating to 3AC's account, which this does
13   not reflect.
14       Q.   Yeah, I wasn't asking anything
15   about your declaration in preparation for
16   the deposition, I was simply asking if FTX
17   knows or has a position on whether debtors
18   accounts were counterparties to the trades
19   on June 13?
20       A.   Given I have not spent time
21   analyzing this preliminary draft and did not
22   review it at the time, I have not developed
23   any further understanding other than what
24   the words on the page say.  I have not
25   analyzed or supervised the analysis of

1              S. COVERICK
2    debtors accounts involved in 3AC's trades on
3    June 13.
4        Q.   Who has?
5        A.   Who has what?
6        Q.   Done that analysis, there are
7    numbers here 8.0 percent, yes?
8        A.   I understand this was completed by
9    members of Mr. Gordon's team.  Mr. Gordon
10   does report to me, but I was not involved at
11   the time this document was created.
12       Q.   You are aware, are you not, that
13   this document is referenced in the
14   deposition topics you were designated for
15   today?
16       A.   I am.
17       Q.   Is Alameda one of the debtor
18   accounts or debtor affiliated accounts that
19   was a counterparty to any trades prior to
20   the liquidation on June 14?
21       A.   I have not confirmed.  But I
22   believe based on conversations with my team
23   that from time to time Alameda would have
24   been the counterparty to certain trades
25   prior to June 14.

1              S. COVERICK
2        Q.   Certain trades with Three Arrows?
3        A.   Yes, sir.
4        Q.   Do you know the quantity of such
5    trades?
6        A.   I do not.
7        Q.   The value in dollar terms of such
8    trades?
9        A.   I do not.
10            MR. GLUECKSTEIN:  Objection to the
11       form.
12       A.   I do not have the specifics of
13   3AC's trading history with Alameda prior to
14   June 14 committed to memory.
15       Q.   Do you know if Alameda more
16   generally was a lender under the margin
17   program?
18       A.   While I am not aware and have not
19   committed to memory all specifics of Alameda
20   Research's account, I understand that they
21   were a borrower in the margin program.
22       Q.   My question was a little bit
23   different, it was whether they were a lender
24   in the margin program?
25       A.   I understood the question.  I am

1              S. COVERICK
2    saying I understand they were to be a
3    borrower and had a large borrow balance.
4    Whether or not they had certain tickers in
5    which they were lending, I do not have
6    committed to memory.
7            (Whereupon, a slipsheet was marked
8       Coverick Exhibit 31 for identification
9       as of this date.)
10       Q.   Mr. Coverick, you have been handed
11   Exhibit 31, this is what is called a ship
12   sheet.  It reflects a production by FTX of a
13   document in native format.  We are opening
14   up this document on the laptop, do you see
15   it?
16       A.   Yes, sir, I do.
17            MR. PROULX:  Opposing counsel, I
18       just want to make sure you can see it
19       as well?
20            MR. GLUECKSTEIN:  Yes, I can
21       counsel, thank you.
22       Q.   You will see there is a -- there
23   are two tabs in the bottom of this
24   spreadsheet, borrows and lends, do you see
25   those?

1          S. COVERICK
2  Arrows' accounts?
3          MR. GLUECKSTEIN:  Object to the
4  form.
5      A.   I am -- I have not reviewed or
6  committed to memory the entirety of 3AC's
7  account history, although I understand it is
8  in the documents that underlie my
9  declaration.  But I have not personally
10  examined every point in time.  I am not
11  personally aware of an auto liquidation
12  occurring on the 3AC accounts.  But I would
13  need my team to perform that analysis or
14  speak to my team to confirm that it never
15  happened.  I am not aware of it happening,
16  though.
17      Q.   Prior to 10:29 p.m. UTC we are
18  talking about, June 14?
19      A.   Correct.
20      Q.   What is FTX's position?  Any
21  different than what you just testified to?
22      A.   I suppose FTX's position would be
23  that I am personally not aware of those.
24  But the FTX position would be that whatever
25  the exchange ledger reflects is what

1          S. COVERICK
2  happened.
3      Q.   And so how much was liquidated
4  following LOC reversal in an auto
5  liquidation capacity in value, spot margin
6  asset value?
7          MR. GLUECKSTEIN:  Object to the
8  form.
9      A.   I am sorry, is that different than
10  what we just discussed?
11      Q.   You may have, and I am not looking
12  at your declaration, maybe I should, just to
13  -- I am just trying to do the math on the
14  fly here, looking at the same document that
15  we have open between 82 million and change
16  and 81 million and change.
17          Do you have -- does FTX have an
18  opinion as to the amount of the -- of
19  digital assets auto liquidated?
20      A.   Between the time periods
21  referenced in paragraph 77?
22      Q.   No, I am still looking at the same
23  document that we were discussing.  Let's
24  return to your declaration.
25          Okay, well, what does your

1          S. COVERICK
2  declaration say?
3          MR. GLUECKSTEIN:  Object to the
4  form.
5      A.   My declaration says an additional
6  1 million in assets were then auto
7  liquidated by FTX starting at 10:47 p.m.
8          And that is part of paragraph 77,
9  which references the 82 million of
10  liquidations that occurred on this -- on
11  this date, which seems consistent with the
12  figures on page 28, of this other document.
13      Q.   Is FTX aware of a method of
14  blocking the triggering of the automatic
15  liquidation process if it were to otherwise
16  be triggered?
17      A.   Yes.  As I testified earlier,
18  there were settings in the account that can
19  be turned on to prevent the auto liquidation
20  engine from being triggered.
21      Q.   Were those settings ever turned on
22  with respect to Three Arrows?
23      A.   Not to my knowledge.
24      Q.   Why -- why was 82 million
25  approximately liquidated in terms of the

1          S. COVERICK
2  value of digital assets, why not 70 million
3  or 90 million?
4      A.   Sure.  As I mentioned earlier,
5  the -- the general process that the auto
6  liquidation followed was to attempt to bring
7  an account balance back in compliance with
8  the maintenance margin requirement.  In my
9  supplemental declaration, the table we have
10  referenced a few times where I list the
11  three time periods, you will see that
12  following the auto liquidation, so at the
13  end of day on 6:14 or beginning of day,
14  6:15, 3AC's account remained out of
15  compliance with the margin maintenance
16  requirement.  This is due to the fact that
17  the remaining spot assets in 3AC's account
18  were locked as we discussed earlier and
19  could not be sold at the exchange via the
20  auto liquidation process.
21      Q.   At what point in time were Three
22  Arrows' accounts locked?
23      A.   What do you mean by accounts
24  locked?
25      Q.   That's a fair point.  Reading the

1              S. COVERICK
2    identification as of this date.)
3        Q.   Mr. Coverick, you have been handed
4    Exhibit Number 32.
5            This is a set of discovery
6    responses from the FTX Recovery Trust,
7    including certain responses to
8    interrogatories issued by the joint
9    liquidators.
10           Are you familiar with this
11   document?
12       A.   Yes, sir, I am.
13       Q.   And in fact, you verified the
14   interrogatories in this document --
15   interrogatory responses I should say?
16       A.   Yes, sir.
17       Q.   On page 39, there is an
18   interrogatory.  I am sorry I misspoke, on
19   page 39, yes, page 39, there is an
20   interrogatory, it is number 5, it is a bit
21   lengthy.  Feel free to read that question
22   and let me know when you have done so?
23       A.   Yes, sir I have read it.
24       Q.   Thank you, sir, I appreciate that.
25   You will see at the very end of FTX's

1              S. COVERICK
2    recovery trust response, it says, Liquidated
3    assets were sold to the applicable
4    counterparty at applicable prices.
5            Do you see that part?
6        A.   I do.
7        Q.   So let's take that in turn
8    starting with applicable prices, what does
9    that mean?
10       A.   The prices at which those
11   transactions were transacted at, so the
12   price for each of these tickers in the
13   transaction.
14       Q.   How was that price set for the
15   liquidation transactions?
16       A.   I do not know.
17       Q.   Do you know whether it was at fair
18   market value or not?
19       A.   To understand what fair market
20   value is would require me to be able to
21   analyze the current market for
22   cryptocurrency at the time, and take other
23   factors into account such as the size of the
24   positions being liquidated relative to the
25   liquidity of the market for each ticker.

1              S. COVERICK
2    And so -- as well as other -- other
3    considerations a counterparty might have
4    regarding taking size of that nature on top
5    of considerations on the speed in which the
6    transactions were intended to be conducted
7    in or the time period over which the
8    transactions were intended to be conducted
9    over.  So I do not know -- I am not able to
10   conduct an analysis of fair market value
11   without knowing those other factors.
12       Q.   Has FTX endeavored to assess the
13   price of the assets sold out of --
14   liquidated out of Three Arrows' accounts
15   relative to those of sales involving the
16   same digital assets in the same period?
17       A.   To -- I would characterize it
18   differently, there were no assets that were
19   sold out of 3AC's accounts.  Again, the
20   transactions were on ledger transactions
21   that were value neutral, meaning the -- the
22   value of the spot position was equal to the
23   value of the USD position that was received.
24   So the total account balance did not change
25   at the moment of those transactions.

1              S. COVERICK
2            Due to the limitations that I --
3    that I just discussed, FTX has not been able
4    to conduct an analysis of the fair market
5    value of the prices those transactions were
6    transacted at.
7        Q.   Who was applicable counterparty
8    for those transactions?
9        A.   It was Alameda Research.
10       Q.   They are among the FTX debtors?
11       A.   Yes, sir, they are.
12       Q.   And does -- in their capacity as
13   the counterparty, does that mean that
14   Alameda received the proceeds of those
15   liquidation transactions?
16       A.   No, again, there were no assets
17   exchanged in the real world as a process of
18   these liquidations.  In other words, there
19   was no underlying movement of GBTC -- GBTC
20   or ETHE, on account of neither of those
21   assets existing anywhere except the exchange
22   ledger.  And there was no underlying
23   movement of FTT or ETH on the block chain
24   related to those transactions.  So Alameda
25   Research did not receive a transfer of

Page 262

```
1              S. COVERICK
2    referenced a moment ago?
3        A.  Yes, sir, it is.
4        Q.  And I will -- this one I actually
5    won't take responsibility for.  This
6    document was produced to us in a very gray
7    format.  But we have conducted -- extracted
8    -- put in the extracted text right after
9    this, so it is clear and easier for everyone
10   to review it, verbatim rendition of an email
11   from Zane Tackett on June 14 to Kyle at
12   Three Arrows Capital.com.
13           Have you seen this document
14   before?
15       A.  Yes, sir, I have.
16           MR. GLUECKSTEIN:  I am not really
17       understanding what counsel said they
18       did here, but this is not the complete
19       document.
20           MR. PROULX:  Counsel, you are more
21       than welcome to go into your production
22       database and confirm whether or not
23       this is the complete document or not.
24           MR. GLUECKSTEIN:  Okay.
25       A.  I would just restate my testimony
```

Page 263

```
1              S. COVERICK
2    to clarify that I believe I have seen this
3    document, but I am not verifying it is the
4    complete document.
5        Q.  And I am not asking that question.
6        A.  Understood.
7        Q.  The production records will speak
8    for themselves?
9        A.  Okay.
10       Q.  Generally speaking, what is FTX's
11   understanding about what Zane Tackett was
12   doing in this communication to Kyle on
13   June 1.  And here it does say 11:53 a.m. a
14   bit different than some of the other time
15   times that we have been looking at, eastern
16   time frame, EDT, a bit different than UTC?
17       A.  Can I take a moment to read the
18   email --
19       Q.  Yes, of course.
20       A.  -- so I can familiarize myself to
21   it.
22       Q.  All the power to you, if you can
23   read that gray version.
24           Yes, sir, thank you for allowing
25   me to read it, and I have read it.  Of
```

Page 264

```
1              S. COVERICK
2    course, if you need to read a document at
3    any point, just let me know.
4            In this document, is Mr. Tackett
5    providing Three Arrows advance notice of
6    FTX's intent to liquidate potentially its
7    accounts?
8        A.  I don't know what Mr. Tackett's
9    intent was.  I don't know what constitutes
10   proper notice from a legal perspective given
11   my lack of qualifications in that area,
12   which I have repeatedly referenced.
13           I do understand from a business
14   person's perspective this would constitute a
15   warning to 3AC of their noncompliance with
16   various requirements and states different
17   things that can happen, including the
18   account potentially being liquidated.
19   That's the extent of my understanding of the
20   document that was discovered.
21       Q.  FTX, in fact, in its claim
22   objection, this was previously introduced as
23   Exhibit 12, refers to FTX's having provided
24   extensive prior notice to Three Arrows
25   before initiating the liquidation.  I would
```

Page 265

```
1              S. COVERICK
2    be happy to point you to that or you can
3    take my representation?
4        A.  Okay, I will take your word for
5    it.
6        Q.  Any reason -- does FTX have any
7    reason to dispute that characterization?
8        A.  I do not have any reason to
9    dispute the characterization that this is a
10   form of notice.  I was just clarifying that
11   I -- I am not a lawyer so I -- I am not
12   speaking to any form of legal notice.
13       Q.  What, if any, actions could Three
14   Arrows, based on this communication and any
15   others you have seen, taken to prevent a
16   liquidation by FTX on June 14?
17       A.  There are -- there are a number of
18   things that -- that could have happened.
19   The ones that come to mind most immediately
20   are they could have deposited additional
21   funds, either fiat or cryptocurrency, into
22   their account out of the exchange, they
23   could have de-levered themselves, in other
24   words, removing open spot ticker exposure.
25   Those things would have the effect of -- in
```

**MAGNA** ►
LEGAL SERVICES

S. COVERICK

1  did it again.  In general the assets held by
2  the FTX group, the FTX debtors were lower
3  than the aggregate value of claims estimated
4  as of the petition date.
5     Q.  At what other points in time was
6  that analysis conducted with respect to the
7  FTX group?
8     A.  The primary point in time that I
9  can recall was the petition date.  I cannot
10  recall specific analyses of prior shortfall
11  calculations as I sit here today.
12     Q.  Did FTX conduct any such analysis
13  again with respect to the FTX group in, for
14  example, June of 2021 -- strike that, I -- I
15  misspoke just then, I meant June of 2022?
16     A.  Okay, I am aware of analysis that
17  was done to look at entitlements in certain
18  coins as compared to assets in the
19  possession of FTX Trading Ltd. I am not
20  aware of an analysis of the comprehensive
21  holdings of assets in June of 2022 for the
22  entire FTX group.
23     Q.  Are you suggesting that you are
24  aware of such an analysis in June of 2022
25

S. COVERICK

1  specifically with respect to FTX Trading
2  Ltd.?
3     A.  I am aware that my team looked at
4  certain points in time.  And I am also aware
5  one of those points in time was June of 2022
6  with respect to certain coins or certain
7  tickers of customer entitlements as compared
8  to the holdings of FTX Trading Ltd.
9     Q.  What specific tickers, by way of
10  example only, were included in that
11  analysis?
12     A.  I am not aware of all tickers, as
13  I sit here today, that may or may not have
14  been analyzed.  I do know, for example, that
15  bitcoin was one of the tickers that was
16  analyzed and reviewed over different time
17  periods.  And I also understand that
18  ethereum was another coin that -- that my
19  team has looked at in terms of shortfalls at
20  different points in time.
21     Q.  And what did those analyses show
22  with respect to that comparison in June of
23  2022?
24     A.  Based on information my team has
25

S. COVERICK

1  conveyed to me, my understanding is that
2  aggregate customer entitlements in bitcoin
3  exceeded the bitcoin in the possession of
4  FTX Trading Ltd. in June of 2022 -- is that
5  the full question, just bitcoin?
6     Q.  I was asking for an example of a
7  ticker?
8     A.  So for bitcoin there was a
9  shortfall in June of 2022, according to my
10  team's review of the block chain and the --
11  the exchange ledger.
12     Q.  What about any other tickers, did
13  any of the analyses show that with respect
14  to those other tickers FTX Trading held a
15  surplus of such assets relative to the
16  corresponding customer entitlements?
17     A.  I am not aware of any such
18  surplus.  But again, I have not personally
19  reviewed any analysis of all tickers on any
20  such date other than the petition date.
21     Q.  Was ETH or ethereum, I may be
22  mispronouncing that, one of the tickers that
23  were reviewed in the June 2022 period with
24  respect to FTX Trading?
25

S. COVERICK

1     A.  Yes, I believe it was.
2     Q.  What did that analysis show, if
3  anything?
4     A.  My recollection is that that
5  analysis showed where my team's conclusion
6  reviewing the available information was that
7  there were a greater value of the customer
8  entitlements for ethereum than a ethereum in
9  the possession of FTX Trading Ltd.
10     Q.  As part of that analysis, did FTX
11  rely on documents showing the total quantity
12  and amount of customer assets in these
13  digital assets in the June 2022 time period?
14     MR. GLUECKSTEIN:  Object to the
15  form.
16     A.  My team and almost all analyses
17  they perform on the FTX exchange, the source
18  of that -- the source data for that analysis
19  would be the exchange ledger itself.
20     Q.  What other points in time, if any,
21  in April or May of 2022, did FTX conduct
22  these analyses you just referenced?
23     A.  I am not -- I can't recall every
24  specific point in time my team may or may
25

MAGNA
LEGAL SERVICES

S. COVERICK
D E C L A R A T I O N

I hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony.

I FURTHER CERTIFY that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified hereinbefore.

__________________________
STEVEN COVERICK

Subscribed and sworn to before me this _____ day of ________________ 20___.

__________________________
NOTARY PUBLIC

S. COVERICK
I N D E X

| EXAMINATION BY | PAGE |
|---|---|
| MR. PROULX | 5 |

E X H I B I T S

COVERICK EXHIBITS

| EXHIBIT LETTER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| 19 | Document | 8 |
| 20 | Line of credit document | 41 |
| 21 | Line of credit document produced in native format | 51 |
| 22 | Document | 93 |
| 23 | Document entitled FTX Advisory Board Meeting for September 19, 2022 | 120 |
| 24 | Transcript of testimony given by Samuel Bankman-Fried in his criminal proceeding on October 27, 2023 | 31 |
| 25 | Responses to the joint liquidators seventh set of interrogatories | 137 |

S. COVERICK
COVERICK EXHIBITS

| EXHIBIT LETTER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| 27 | Short message report, date range 6/29/2022 | 175 |
| 28 | Slip sheet | 181 |
| 29 | Document entitled Debtors Responses and Objections to the Foreign Representatives of Three Arrows Capital Ltd. | 194 |
| 30 | Document titled Supporting Analysis for the Three Arrows Capital Discussions | 216 |
| 31 | Slipsheet | 221 |
| 32 | Set of discovery responses from the FTX Recovery Trust | 250 |
| 33 | Native document | 256 |
| 34 | Document | 261 |
| 35 | Document | 276 |
| 36 | Document in native form | 298 |

S. COVERICK
C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF QUEENS )

I, RIVKA TROP, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 25th day of September, 2025.

__________________________
RIVKA TROP

MAGNA LEGAL SERVICES

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |

**ERRATA SHEET OF STEVEN P. COVERICK**

      I, Steven P. Coverick, have reviewed the transcript of my deposition taken on September 25, 2025 in the above-referenced action, and certify that the same appears to be a correct transcript of the answers given by me to the questions therein propounded, except for the following corrections or changes in the errata below:

| Page | Line(s) | Change | Reason |
|---|---|---|---|
| 12 | 18 | Change "BTC perp" to "BTC-PERP" | Transcription Error |
| 12 | 19 | Change "BTC perps" to "BTC-PERPs" | Transcription Error |
| 19 | 17 | Change "remain" to "remaining" | Clarification |
| 21 | 13 | Change "generally" to "general" | Clarification |
| 21 | 23 | Change "mimcoins" to "memecoins" | Transcription Error |
| 23 | 9 | Change "deminimis" to "de minimis" | Transcription Error |
| 29 | 22 | Change "for 3AC" to "for the 3AC" | Clarification |
| 37 | 20-21 | Change "understanding the" to "understanding that the" | Clarification |

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

| 40 | 2 | Change "wanted" to "and" | Transcription Error |
|---|---|---|---|
| 56 | 18-19 | Change "Amazon web services" to "Amazon Web Services" | Transcription Error |
| 64 | 25 | Change "30:51" to "13:51" | Transcription Error |
| 72 | 15 | Change "interrogate" to "integrate" | Transcription Error |
| 86 | 10 | Change "annualized" to "analyzed" | Transcription Error |
| 87 | 2 | Change "June 13 of 2022" to "9 AM on June 13 of 2022" | Clarification |
| 102 | 11 | Change "back stop" to "backstop" | Transcription Error |
| 104 | 2 | Change "a" to "an" | Transcription Error |
| 106 | 2 | Change "occurring" to "recurring" | Clarification |
| 106 | 10 | Change "all the of the" to "all of the" | Transcription Error |
| 108 | 6 | Change "back stop" to "backstop" | Transcription Error |
| 108 | 10 | Change "back stop" to "backstop" | Transcription Error |
| 108 | 13-14 | Change "back stop" to "backstop" | Transcription Error |
| 108 | 19 | Change "future" to "futures" | Transcription Error |
| 109 | 4 | Change "future" to "futures" | Transcription Error |
| 109 | 7 | Change "future" to "futures" | Transcription Error |
| 110 | 2 | Change "future" to "futures" | Transcription Error |
| 110 | 19 | Change "that" to "to that" | Transcription Error |
| 110 | 20 | Change "back stop" to "backstop" | Transcription Error |
| 111 | 4 | Change "teams" to "team's" | Transcription Error |
| 111 | 19 | Change "back stop" to "backstop" | Transcription Error |
| 112 | 10 | Change "trading" to "traded" | Transcription Error |
| 113 | 11 | Change "back stop" to "backstop" | Transcription Error |
| 113 | 11-12 | Change "back stop" to "backstop" | Transcription Error |
| 113 | 15 | Change "future" to "futures" | Transcription Error |

| 113 | 20 | Change "future" to "futures" | Transcription Error |
| 114 | 24 | Change "back stop" to "backstop" | Transcription Error |
| 115 | 7 | "fee would" to "fee that would" | Clarification |
| 115 | 10 | Change "back stop" to "backstop" | Transcription Error |
| 115 | 13-14 | Change "back stop" to "backstop" | Transcription Error |
| 115 | 19 | Change "nor" to "or" | Transcription Error |
| 115 | 23 | Change "back stop" to "backstop" | Transcription Error |
| 116 | 6 | Change "back stop" to "backstop" | Transcription Error |
| 116 | 10 | Change "back stop" to "backstop" | Transcription Error |
| 116 | 17 | Change "that because" to "because" | Transcription Error |
| 116 | 19 | Change "future" to "futures" | Transcription Error |
| 116 | 21 | Change "future" to "futures" | Transcription Error |
| 117 | 5 | Change "back stop" to "backstop" | Transcription Error |
| 117 | 14 | Change "back stop" to "backstop" | Transcription Error |
| 119 | 16-17 | Change "back stop" to "backstop" | Transcription Error |
| 119 | 22 | Change "back stop" to "backstop" | Transcription Error |
| 119 | 25 | Change "back stop" to "backstop" | Transcription Error |
| 120 | 7 | Change "back stop" to "backstop" | Transcription Error |
| 120 | 24 | Change "studies" to "studied" | Transcription Error |
| 125 | 15 | Change "on" to "in" | Clarification |
| 126 | 3 | Change "to be and" to "to" | Clarification |
| 126 | 5 | Change "loss" to "losses" | Clarification |
| 126 | 12 | Change "of" to "in" | Clarification |
| 126 | 20 | Change "back stop" to "backstop" | Transcription Error |
| 126 | 22 | Change "future" to "futures" | Transcription Error |
| 127 | 14 | Change "future" to "futures" | Transcription Error |

| 129 | 19 | Change "sir, sir" to "sir" | Clarification |
|---|---|---|---|
| 134 | 7 | Change "customers" to "customers' " | Clarification |
| 135 | 3 | Change "on account of" to "at" | Clarification |
| 135 | 4 | Change "of" to "if" | Transcription Error |
| 135 | 5 | Change "future" to "futures" | Transcription Error |
| 138 | 20 | Change "accounts" to "account" | Clarification |
| 139 | 7 | Change "amounts" to "accounts" | Transcription Error |
| 140 | 23 | Change "in" to "and" | Clarification |
| 142 | 18 | Change "teams" to "team" | Clarification |
| 143 | 21 | Change "debtors" to "debtors' " | Clarification |
| 144 | 5 | Change "debtors" to "debtors' " | Clarification |
| 145 | 25 | Change "debtors" to "debtors' " | Clarification |
| 147 | 22 | Change "on" to "in the" | Clarification |
| 147 | 25 | Change "you" to "we" | Clarification |
| 148 | 10 | Change "debtors" to "debtors'" | Transcription Error |
| 149 | 10 | Change "debtors" to "debtors' " | Clarification |
| 150 | 13 | Change "There are" to "There" | Transcription Error |
| 158 | 21 | Change "allowed" to "allow" | Clarification |
| 161 | 14 | Change "what" to "what—" | Clarification |
| 162 | 6 | Change "back stop" to "backstop" | Clarification |
| 163 | 5 | Change "researched" to "Research—" | Transcription Error |
| 163 | 5 – 6 | Change "info at Alameda Research" to "info@AlamedaResearch" | Transcription Error |
| 164 | 23 | Change "that that" to "that" | Clarification |
| 166 | 24 | Change "accounts" to "accounts'" | Clarification |
| 167 | 23 | Change "realized" to "Realized" | Clarification |

| 183 | 24 | Change "the Genesis cap" to "Genesis Cap" | Transcription Error |
| 184 | 23 | Change "an" to "and" | Transcription Error |
| 187 | 4 | Change "that" to "that on" | Clarification |
| 192 | 6 | Change "future" to "futures" | Transcription Error |
| 192 | 25 | Change "is" to "is—" | Clarification |
| 196 | 6 | Change "that that" to "that" | Clarification |
| 196 | 24 | Change "debtors" to "debtors—" | Clarification |
| 198 | 20 | Change "Three Arrows' capital" to "Three Arrows Capital" | Transcription Error |
| 199 | 12 | Change "level including" to "level, including " | Clarification |
| 201 | 7 | Change "to" to "to the" | Clarification |
| 201 | 11 | Change "diminimus" to "de minimis" | Transcription Error |
| 201 | 18 | Change "diminimus" to "de minimis" | Transcription Error |
| 202 | 4 | Change "lock" to "locked" | Clarification |
| 202 | 7 | Change "lock" to "locked" | Clarification |
| 206 | 21 | Change "dock" to "doc" | Transcription Error |
| 210 | 8 | Change "lock" to "locked" | Clarification |
| 215 | 15 | Change "by" to "on" | Clarification |
| 219 | 2 | Change "debtors" to "the debtors'" | Clarification |
| 227 | 16 | Change "That's" to "That's—" | Clarification |
| 227 | 25 | Change "account's" to "an accounts'" | Clarification |
| 233 | 2 | Change "reach" to "reach a" | Clarification |
| 245 | 13 | Change "6:14" to "6/14" | Transcription Error |
| 245 | 14 | Change "6:15" to "6/15" | Transcription Error |
| 248 | 11 | Change "the" to "then" | Clarification |

| 252 | 4 | Change "nature" to "transaction" | Clarification |
|-----|-----|-----|-----|
| 259 | 4 | Change "July" to "June" | Clarification |
| 259 | 6 | Change "July" to "June" | Clarification |
| 259 | 14 | Change "are" to "is" | Clarification |
| 260 | 13 | Change "is" to "are" | Clarification |
| 271 | 24-25 | Change "Three Arrows' capital'" to "Three Arrows Capital" | Transcription Error |
| 275 | 4 | Change "are" to "is" | Clarification |
| 275 | 17 | Change "were" to "is" | Clarification |
| 289 | 6 | Change "showed" to "showed—" | Clarification |
| 289 | 7 | Change "was" to "was:" | Clarification |
| 289 | 9 | Change "a ethereum" to "ethereum" | Clarification |
| 291 | 7 | Change "for a" to "for" | Clarification |
| 294 | 20 | Change "with 3AC" to "with the 3AC" | Clarification |
| 304 | 20 | Change "time" to "times" | Clarification |

Dated: November 5, 2025

<div align="right">

*/s/ Steven P. Coverick*
_____

Steven P. Coverick

</div>

# Exhibit 17

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
----------------------------------------X
IN RE: FTX TRADING LTD., et al.,

                              Debtors.


                              CHAPTER 11


Case No. 22-11068


----------------------------------------X


                    DATE: November 19, 2025

                    TIME: 9:00 A.M.


        VIDEOTAPED DEPOSITION of STEPHEN

HOUSEMAN, held at Latham & Watkins, 1271

Avenue of the Americas, New York, New York,

before Rivka Trop, a Notary Public of the

State of New York.




                Magna Legal Services
                   866-624-6221
                   www.MagnaLS.com



Page 18

1
2    A.  No.  But nor was anybody that I
3   know.
4    Q.   Did you conduct any specialized
5   training regarding finance law?
6         MR. GLUECKSTEIN:  Object to the
7    form.
8    A.   Any training specific to finance
9   law?
10    Q.   Coursework, anything like that?
11    A.   Yeah, I'm trying to think.  The --
12   I selected modules for my undergraduate
13   degree, and this is getting back a long,
14   long time, right, that involved aspects of
15   what you would call finance law.  So
16   international trade, letters of credit,
17   things like that, so that's undergraduate.
18   I did the postgraduate master's degree, the
19   bachelor's of civil law.  I'm trying to
20   remember what I chose to do on the BCL.  I
21   don't think it was finance related, no.
22    Q.   Was any of it the legal training
23   you had on secured transactions?
24    A.   No, with a slight caveat because
25   you choose modules when you are at Bar

Page 19

1
2   school, Barfication courses, it was nice, a
3   one-year course.  You do your post academic,
4   and I remember choosing modules to do
5   corporate, company law in corporate finance.
6    Q.   You indicate you were admitted to
7   the Eastern Caribbean Supreme Court for
8   Antigua in Barbuda and St. Lucia in 2018;
9   right?
10    A.   I believe so, yes.
11    Q.   And were you granted an ad hoc
12   practicing certificate or a full practicing
13   certificate?
14    A.   I'm not entirely sure.  I'm
15   assuming it was ad hoc for the case.  I
16   might be wrong about that, but I -- I think
17   so.
18    Q.   Okay.  And am I right that an ad
19   hoc certificate only allows you to practice
20   in that particular case?
21    A.   That would be my understanding,
22   but.
23    Q.   And are the requirements for an ad
24   hoc certificate different than for a full
25   practicing certificate?

Page 20

1
2    A.  I don't know.  And I actually
3   don't know if they -- if that particular
4   jurisdiction grants full, full license or
5   full registration.  I know I -- I practice
6   in various offshore jurisdictions and they
7   all vary.  So Singapore and Dubai, more
8   specifically the Singapore International
9   Commercial Court, SICC, and the Dubai
10   International Financial Center called DIFC,
11   they would have a rolling annual
12   registration, rather than ad hoc.  And as
13   long as you renew, then you got it for the
14   next year, which I did for those.  So I just
15   don't know.
16    Q.   As far as you are aware, your only
17   admission to an Antiguan court is through an
18   ad hoc practicing certificate?
19    A.   That -- that's my best guess.
20   Okay, I'm trying -- I'm trying to help you.
21   That's -- that's what I would guess is the
22   case.  I may be wrong and it may turn out
23   I'm still licensed to practice in Antigua, I
24   don't know.
25    Q.   And that -- that ad hoc admission

Page 21

1
2   was in 1Globe Capital?
3    A.   It was in Sinovac.
4    Q.   Okay.  And that matter was about
5   section 122 of the international business
6   corporation's act; right, sir?
7    A.   Well, there was an application
8   made under that.  My memory is that section
9   122 confers the rights to go to court, the
10   remedial right you might call.  So I would
11   be -- I would slightly hesitate to even
12   saying it concerned that section, and there
13   were other sections.  There were various
14   arguments in place including the validity of
15   a poison pill.
16    Q.   Do you recall that the case
17   largely involved that act?
18    A.   It -- it did and common-law and
19   the interplay between that act and
20   common-law principles in particular around
21   notice of shareholder meetings and the
22   ability to alter the -- the agenda for
23   voting at shareholder meetings which is
24   common-law.
25    Q.   And the International Business

MAGNA
LEGAL SERVICES

1
2    year later to the court of appeal to ask for
3    revocation of the final anti-suit relief
4    because the Russian defendant had gone to
5    the Russian court in the meantime to get an
6    anti -- anti-suit injunction of a mandatory
7    nature compelling revocation of the English
8    courts final anti-suit injunction.  So there
9    was a coder to that case which involved what
10   I regarded as intellectual sabotage to go
11   back and undo all the great work from the
12   previous year, but.
13       Q.  So at some point you were no
14   longer counsel; is that right?
15       A.  You never quite know when you are
16   or you aren't in England because you have an
17   independent Bar.  Some cases you think --
18   you don't hear from a case for six months
19   and you think it's settled.  It turns out it
20   hasn't settled and then they need you again
21   for something urgent.  So you don't ever get
22   told, you know, by the way, Mr. Houseman
23   this case is finished, they did a deal.
24   Sometimes you do.
25       Q.  And when was it that you came back

1
2    to the court of appeal?
3        A.  February of this year.
4        Q.  Okay, now let's talk about FTX.
5        A.  Okay.
6        Q.  How did you become, first become
7    engaged by FTX?
8        A.  For this declaration?
9        Q.  For any of the opinions you've
10   have provided.  So any of your engagements
11   for FTX, when did it first start?
12       A.  Yeah, I don't know precisely.  I
13   would put it the late part of -- if I can
14   get my years mixed up here, it's either the
15   late part of 2023 or 2024.  I remember it
16   being in the last quarter of the -- a year.
17       Q.  And what -- what was your first
18   engagement for FTX?
19       A.  They wished to -- Sullivan &
20   Cromwell working in conjunction with, I
21   think, Walkers in the BVI had then consulted
22   to try to find the right person to use the
23   offshore expertise, wanted to instruct me to
24   give what started out as one and then became
25   two expert declarations on aspects of the

1
2    IBCA.  I know specifically around fiduciary
3    duties directives.
4        Q.  Okay.  Were those engagements also
5    fixed fee engagements like the one we're
6    talking about today?
7        A.  I think, yeah, they must have
8    been, yeah.
9        Q.  Okay.  How did that engagement get
10   started?
11       A.  Similar contact from the -- from
12   the Sullivan & Cromwell team here, with the
13   Walkers BVI team, are you free, can you help
14   on this.
15       Q.  Do you recall when that outreach
16   happened?
17       A.  October, the second half of
18   October.
19       Q.  Of this year?
20       A.  Yes.  Mr. -- Mr. Webster's
21   declaration is 21 October, his original one,
22   wasn't it?
23       Q.  So was -- was the outreach after
24   Mr. Webster's declaration was issued?
25       A.  Yeah, it must have been.

1
2        Q.  Okay.  And what's your
3    understanding of the scope of your
4    engagement?
5        A.  My understanding is I am engaged
6    to give expert evidence on Antiguan law,
7    which for these purposes is the same as
8    English law, as to the principles applicable
9    to the attachment and perfection of
10   possessory and non-possessory security
11   interests over digital assets and rights to
12   participate in pools of them.  But there's a
13   very important premise that I've been asked
14   to assume, and that is that -- that the
15   primary debate, let's call it or the primary
16   fight over whether the customer, 3AC
17   retained any proprietary interest, digital
18   assets they put onto the Exchange.  I'm
19   asked to assume that that is being answered
20   in favor of 3AC for the purposes of my
21   analysis.  And my analysis is entirely
22   logically contingent on that outcome.  So
23   that primary issue.  So I don't opine on
24   that primary issue.  Nothing I say can have
25   any significance on that issue.

Page 74

1
2   debtor's operations?
3       A.   Sorry, I didn't -- I didn't catch
4   the last part, FTX.
5       Q.   With FTX's operations?
6       A.   When it was operating?
7       Q.   Yes.
8       A.   No.  I mean one is not immune to
9   what one sees in the news, for example.
10  But -- but I wouldn't say -- I'm just trying
11  to be fair here, I wouldn't say that has
12  impacted in any way my -- my understanding
13  of the specifics.
14      Q.   Okay.  Could you explain at a high
15  level your understanding of how the FTX
16  exchange operated?
17          MR. GLUECKSTEIN:  Object to the
18      form, outside the scope.
19      A.   The -- my understanding is
20  reflected in section D of my declaration.  I
21  can put that into pithier language now.  But
22  I'm inevitably not going to replicate
23  verbatim what it said in section D.  And the
24  way it worked as I understand it, was it was
25  an exchange.  So you -- you signed up as a

Page 75

1
2   customer in order to undertake financial
3   activities.  You had an account that showed
4   you your balance, as it were, for your --
5   for your activities, let's just call it your
6   trading activities.  But the -- the --
7   the -- the feature of it that jumps out more
8   than anything is that if you, you would hand
9   the private keys to your crypto assets to --
10  to FTX, to the Exchange operator.  And
11  anyone who knows anything about crypto
12  surely knows that once you hand over the
13  private key, it's gone, it's gone to the
14  other person.  So you have this account, and
15  your account just shows you, in a sense your
16  account shows you the value of your rights
17  and obligations with the -- with the
18  exchange, but it's not an account that has
19  anything in it, as it were.  Because this --
20  because things aren't in an account, the
21  account just shows you where you're at, as
22  it were.  That's very -- very broad, I know.
23      Q.   All right.  I'm just going to ask
24  about a couple of things you said.
25          You said your understanding is

Page 76

1
2   that customers would hand over the private
3   keys to their wallets?
4       A.   Yes.
5       Q.   And I think you said your
6   understanding is the account itself does not
7   have anything in it; is that right?
8       A.   Well, the account isn't a physical
9   thing, and its contents aren't physical.  So
10  one just has to be careful about the concept
11  of X being in Y, when neither X nor Y exist
12  in the real world.
13          But yeah, for me the feature that
14  stands out is the -- is the handing over of
15  the private key.
16      Q.   All right.  I just wanted to make
17  sure I understand what you meant when you
18  said the account itself doesn't have
19  anything in it.
20      A.   What it records, it's going to
21  record a -- a figure isn't it, an onset of
22  figures.  So -- so it has something in it in
23  that loose sense of the word.
24      Q.   But in what sense does it not have
25  anything in it?

Page 77

1
2       A.   Well, if you go to the -- the
3   person in the street and say what's in your
4   account, and they'll say X dollars.  The
5   dollars are in the account but it's layman's
6   speak in a sense.  It's -- it's "in" in a
7   sense that what "in" -- what "in" has to
8   mean in a -- in a set up like this is
9   it's -- you've posted digital assets, you
10  have an account that credits the value to
11  you and they are in your account in that
12  sense.  But you no longer control them
13  because you've handed over the private key
14  to them.  So they -- they're in your account
15  in the sense that their value is recorded or
16  reflected in your account.
17      Q.   Yeah, I'm not sure that answered
18  my question.  My question was in what sense
19  does the account have nothing in it?
20          MR. GLUECKSTEIN:  Object to the
21      form.
22      A.   Well, in the physical sense.  The
23  only reason I raise this is because --
24  because like I said, neither an account nor
25  its contents are physical, they're not

MAGNA ▶
LEGAL SERVICES

Page 126

1
2  come from?
3      A.  Well, it comes from my assumptions
4  as to how accounts worked in practice.
5  That's a -- that's a factual issue for the
6  trial judge, not for me.
7      Q.  I'm sorry, is the word credited a
8  word you suggested for your declaration or
9  someone else?
10     A.  It's -- it's the right word or
11  right phrase, credited to or credit to
12  describe the nature of an account held on
13  this exchange based on the assumptions that
14  I record in section D.  It goes back to that
15  little debate we had earlier in the morning
16  about the word "in."
17     Q.  So what did you mean by credited?
18     A.  It means what it says.  It's if
19  you -- if you hold an account and it shows a
20  value or a balance, a balance figure, then
21  that balance figure is the product of
22  amongst other things, digital assets
23  associated with your holding that account.
24  You don't own the private keys to them
25  anymore, you don't hold those private keys,

Page 127

1
2  I should say, and has legal implications
3  beyond my agreement.  But it's a fair and
4  accurate description of the functionality of
5  that account and what it -- what it is and
6  what it isn't to use the phrase "credited
7  to."
8      Q.  Credited means digital assets
9  associated withholding the account?
10     A.  I think those two phrases
11  associated with and credited to are
12  functionally interchangeable, yes.
13     Q.  All right.  Now, you're not giving
14  an opinion on whether there were assets
15  credited to 3AC's account at the end of any
16  particular day; right?
17     A.  No, I'm not.
18     Q.  Okay.  You're not giving an
19  opinion on which assets in the commingled
20  FTX wallets were credited to 3AC's accounts;
21  right?
22          MR. GLUECKSTEIN:  Object to the
23  form.
24     A.  No, I'm not.
25     Q.  You're not going an opinion on

Page 128

1
2  whether there were any assets in the FTX
3  accounts of 3AC at any particular day;
4  right?
5      A.  I'm not, no.
6      Q.  You're not giving an opinion on
7  what the phrase "All assets in all FTX
8  accounts of a customer" means; right, sir?
9      A.  Well, Mr. Webster does, doesn't
10  he?  And to some extent I think I do as a
11  result of giving an opinion that's
12  responsive to his.
13     Q.  Okay.  Can you show me where in
14  your declaration you give an opinion on what
15  the phrase "All assets in all FTX accounts
16  of a customer" means?
17     A.  I don't know if it crops up in a
18  discrete place.  Bear with me because again,
19  this isn't committed to memory.
20     Q.  You did review this yesterday;
21  right, sir?
22     A.  Yeah, of course.  But I mean, it
23  doesn't mean I know exactly where everything
24  is.
25          The -- where I deal with

Page 129

1
2  Mr. Webster on this, I think it's 93.  I
3  think mine -- I can't recall off the top of
4  my head which paragraph of the Webster
5  declaration this responds to.  So 93, and
6  then the whole section that follows on from
7  there.
8      Q.  So is there somewhere in your
9  declaration where you give an opinion on the
10  meaning of the phrase "All assets in all FTX
11  accounts of the customer"?
12     A.  I think -- I think it's baked into
13  my opinion that the word "in" agreed by
14  these parties in the context of how this
15  exchange works is taken to mean credited to
16  or associated with because if you -- if you
17  hand over the private key to crypto, you've
18  handed over the crypto.  And that's that.
19  So it's -- and that how this exchange works.
20  So a phrase like "all assets in all of the
21  FTX accounts of the customer" has to be
22  given a sensible meaning based on that --
23     Q.  Okay.  But you'd agree with me
24  that that phrase --
25     A.  Well, you just cut me off.

Page 130

1
2    Q.  Oh, I'm sorry.
3    A.  I was mid sentence but maybe I
4  wasn't making that clear.
5        Has to be given a sensible meaning
6  based on that immutable context.  That's
7  just -- that's just the reality of how this
8  exchange worked.  So, so yes, it's baked
9  into my -- it is baked into my opinion.  And
10  surfaces I would say probably most acutely
11  in paragraph 93 that "in" is the same thing
12  as credited to or associated with.
13    Q.  Do you agree that no where in the
14  words on the page do you say you're giving
15  an opinion on what the phrase "all assets in
16  all FTX accounts of the customer" means;
17  right, sir?
18    A.  No, I think -- I think I am.  But
19  I don't -- I don't deal with this as a
20  separate issue.  It's like I said, it's
21  baked into the reasoning.
22    Q.  Okay.  Show me -- show me where
23  the phrase that "all assets and all FTX
24  accounts to customer" appears in 93 or 94?
25        MR. GLUECKSTEIN:  Object to the

Page 131

1
2  form.
3    A.  It appears in 90 and then 93 with
4  the emphasis in bold in italics on the word
5  "in" in the first line of 93.  93 is dealing
6  with Mr. Webster's point on this, where he
7  says "there were no assets in."  And then 93
8  flows into 94, which is a summary of what's
9  about to follow, pledge lien on the one
10  hand, fixed or floating charge on the other
11  hand.
12        And then 95 to 100 is the pledge
13  lien analysis.  And then 101 to where ever
14  it ends, 104 -- no, 105, and then I guess to
15  106 is the fixed or floating charge
16  analysis.  And then 106 I make the point
17  which I've made elsewhere that it's not for
18  me to opine on perfection of a charge
19  because that's -- that's a BVI point.  So
20  it's that whole section, starting with 90.
21  And like I say that, that analysis is baked
22  into 93 really.
23    Q.  To make sure I understand, you're
24  saying you think you do have a view on what
25  the phrase "All assets in all FTX accounts

Page 132

1
2  to customer" means; is that right, sir?
3    A.  Well, I do in this sense, but I
4  think Mr. Webster has a view on that and I'm
5  responding to him and I disagree with him.
6    Q.  Okay, so what's your view on what
7  that phrase means?
8    A.  That the word "in" means credited
9  to or associated with.  Because it has to.
10  Because given the -- given the assumptions
11  as to how the -- the Exchange operates.
12    Q.  Are you giving an opinion on what
13  are the FTX accounts to the customer?
14    A.  I'm sorry?
15    Q.  Are you giving an opinion on what
16  are the FTX accounts of the customer?
17    A.  You mean on that phrase?
18    Q.  Yes.
19    A.  What I'm assuming that the
20  phrase -- hold on, I can't see it.  I'm
21  assuming the FTX accounts of the customer
22  are the same things as customer accounts.
23  Which I think is a phrase -- can I just
24  check my declaration when I deal with
25  structure.

Page 133

1
2        3AC account, sorry, is the phrase.
3  In paragraph 23, 3AC maintains certain
4  customer accounts.  I couldn't remember
5  whether they were defined as customer
6  accounts or 3AC accounts.
7        So yes, I'm -- I'm assuming that
8  the phrase FTX accounts of the customer in
9  the first line of clause 3 are the same
10  thing as 3AC accounts as defined in
11  paragraph 23 of my declaration.
12    Q.  All right.  A couple of things I
13  wanted to unpack there.
14        So first you're assuming that the
15  phrase "FTX accounts the customer" in clause
16  3 is the same thing as 3AC accounts as
17  defined in paragraph 3 of your declaration?
18    A.  I just assumed that, yes.
19    Q.  Okay.  You're not giving an
20  opinion on that; right, sir?
21    A.  No, I just assumed that.
22    Q.  Do you know exactly what are the
23  3AC customer accounts on the FTX.com
24  exchange that you mention on 23?
25    A.  I don't know what they are in

MAGNA
LEGAL SERVICES

Page 142

1
2      A.  -- extended by the -- the first
3  section of that agreement.
4          So the phrase contractual
5  entitlements is intended just to encapsulate
6  the package of rights and any conditions
7  attaching to them which flow from being a
8  customer.
9      Q.  Did you review the terms of
10  service that were at issue here?
11          MR. GLUECKSTEIN:  Object to the
12  form.
13      A.  I've looked at them, but not with
14  the same intensity that I've looked at the
15  Exhibit 20 that you handed to me.
16      Q.  Okay.  I take it you're not giving
17  an opinion on what the contractual
18  entitlements were?
19      A.  No, I'm -- No, I'm making
20  assumptions about those which you've seen
21  recorded in section D.
22      Q.  Okay.  In paragraph 26, one of the
23  assumptions you were given is the account
24  balance represented 3AC's total entitlement
25  with respect to the 3AC accounts.  Do you

Page 143

1
2  see that, sir?
3      A.  I do, yeah.
4      Q.  And that again is an assumption
5  you were given, not an opinion you were
6  providing?
7      A.  Correct.
8      Q.  Did that assumption have any
9  impact on any of your analyses?
10      A.  I don't think so.  I don't think
11  so.
12      Q.  If -- if 3AC's account balance
13  represented its total entitlement, how could
14  3AC have granted security over particular
15  digital assets?
16      A.  Because it can -- because someone
17  with a proprietary interest in an asset is
18  free to grant security in respect to it.
19      Q.  Okay.  So for 3AC to have a
20  proprietary interest as you were told to
21  assume, that must mean it has some interest
22  beyond the -- just the account balance;
23  right?
24      A.  It just means what it says, it's
25  got a proprietary interest in an asset.

Page 144

1
2      Q.  What asset?
3          MR. GLUECKSTEIN:  Object to the
4  form.
5      A.  The asset in respect of which it's
6  granting security.
7      Q.  And what is that asset here?
8      A.  I'm attempted to say it doesn't
9  matter because it -- because it doesn't.
10  Because my -- because the analysis is a
11  conceptual analysis.  It starts with the
12  premise that we've talked about at length,
13  which is that 3AC retained a proprietary
14  interest in an asset such as to enable it to
15  grant a security interest.  And then the
16  question is, did it?
17      Q.  Okay.  You see then starting on
18  paragraph 27 you discuss the margin trading
19  program?
20      A.  Well, margin lending program, but
21  yes, it's under the heading of margin
22  trading, yeah.
23      Q.  Okay.  What's your understanding
24  of how the margin lending program worked?
25      A.  That's set out in those two

Page 145

1
2  paragraphs.
3      Q.  Well, we have to have a record
4  here, so what is your understanding?  And if
5  you need to repeat words, it's fine.
6      A.  Well, I just don't want to use
7  words that aren't the same as I have there
8  so I'll read into the record paragraphs 27
9  and 28 of my -- my declaration.  That's the
10  quicker way of doing it, I think.
11      Q.  So you have no understanding other
12  than what's written in paragraphs 27 and 28?
13      A.  That -- that's fair, yes.
14      Q.  Okay.
15          Is it fair to say a customer could
16  only loan assets if they had assets to lend?
17      A.  I just don't, I don't express an
18  opinion on that.
19      Q.  Why do you mention the margin
20  lending program?
21      A.  Because it's part of the
22  contractual matrix here that I'm opining on,
23  because it's contemplated in the definition
24  of indebtedness in -- in Exhibit 20.
25      Q.  So one component of indebtedness

**MAGNA**
LEGAL SERVICES

Page 146

1
2    is any indebtedness as a result of the
3    margin lending program?
4        A.  It seems to be.
5        Q.  Okay.  Another component of
6    indebtedness is indebtedness as a result of
7    the line of credit?
8        A.  Yes, it seems to be.
9        Q.  In paragraph 28 you -- you say, In
10   mid May 2022, 3AC took long positions in BTC
11   and ETH via spot trading?
12       A.  Yeah.
13       Q.  What do you mean by long
14   positions?
15       A.  On buying.
16       Q.  Okay.  Is that -- is that
17   assumption relevant to any of your opinions?
18       A.  I'm not sure that is, no, because
19   that's about particular behavior.  I don't
20   think any of the assumptions that I recalled
21   about particular events matter for my
22   opinions.  I think the assumption -- they're
23   in there because they animate, as it were, a
24   set of otherwise quite sterile assumptions
25   about the structure and the operation of the

Page 147

1
2    Exchange.  But it's those -- it's those
3    structural and operational assumptions which
4    are the ones that matter for my opinions.
5        Q.  Okay.  Paragraph 30 you say, The
6    perpetual futures contract itself was not an
7    asset that has value.  It could not be sold
8    or otherwise transferred for consideration.
9           Do you see that?
10       A.  Yeah.
11       Q.  Okay.  And that again is an
12   assumption you were giving?
13       A.  Yes.
14       Q.  Okay.  Taking that assumption,
15   could a security interest be granted on the
16   perpetuals future contracts?
17       A.  Well, that's not something --
18   that's not something that matters for the
19   purposes of my analysis.
20       Q.  You're not giving an opinion on
21   whether a security interest was granted on
22   the futures contracts?
23       A.  No, or could be, and I wouldn't
24   want to speculate, quite frankly.  But the
25   reason that's in there is because it's --

Page 148

1
2    it's -- I guess because it feeds into the
3    margin requirements because the margin
4    requirements as you'll see from the first
5    sentence of 31 were referable both to spot
6    margin trading, which is the margin trading
7    in 27 and 28 and perpetual futures trading
8    as discussed in 29 and 30.
9        Q.  Right.
10       A.  And the margin requirements are
11   obviously of some relevance to the
12   conditionality or qualifications attaching
13   to a customer's right to withdraw.
14       Q.  So what is the relevance of the
15   margin requirements to your analysis?
16       A.  Again, it -- it forms part of the
17   structural or operational matrix as I would
18   call it.
19       Q.  Okay.  Do the particular
20   requirements matter to you?
21       A.  No, they don't to me.
22       Q.  Okay.  Starting in paragraph 41
23   you have an analysis of Antiguan law
24   section?
25       A.  Yes.

Page 149

1
2        Q.  Is it fair to say you don't cite
3    any Antiguan specific law on the substantive
4    issues in your report?
5        A.  No.  I don't believe Mr. Webster
6    does either.
7        Q.  And I believe your view is there
8    is no Antiguan specific law on these issues;
9    right?
10       A.  I agree with Mr. Webster on that,
11   yes.
12       Q.  Okay.  So can we turn to paragraph
13   48?
14       A.  Yes.
15       Q.  You have a section on rules of
16   contractual interpretation?
17       A.  Yes.
18       Q.  Okay.  And the first case you
19   mention is, let's see, the English Supreme
20   Court decision and Rainy Sky?  Do you see
21   that, sir?
22       A.  Yes.  It's the one I mentioned
23   that earlier.
24       Q.  Okay.  And I think you refer to
25   that as a notable decision?

MAGNA
LEGAL SERVICES

Page 198

1
2       A.   It comes in perfection.  It
3   depends -- it depends on the asset.  Again,
4   we are back to the debate about what is --
5   what is the premise that leads into my
6   analysis.  Because the premise could give
7   you the answer here.
8          If the premise is 3AC held a
9   proprietary interest in specific wallets,
10  then the control issue is more focused on
11  that.  And the perfection of any security
12  granted of the possessory kind, the annual
13  pledge would focus in on those assets, if
14  that's what the premise supplies.  But my
15  jumping point isn't -- isn't -- doesn't have
16  that determined for me.  My jumping point,
17  as I have made clear, is simply that 3AC has
18  a proprietary interest in assets that are
19  posted on the Exchange.
20      Q.   So you are not -- you are not
21  making a premise -- an assumption as to what
22  kind of proprietary interest 3AC has?
23      A.   No, I am not.
24      Q.   If the proprietary interest is in
25  an undivided and fluctuating percentage of a

Page 199

1
2   pool of assets in a particular wallet, you
3   would agree, sir, that that the degree of
4   perfection -- the control that may be
5   relevant to perfection would involve control
6   over the pool of assets; right?
7          MR. GLUECKSTEIN:  Object to the
8       form.
9       A.   Yeah, I am struggling with the
10  premise that you have posited because I am
11  struggling with what a proprietary interest
12  would be in that undivided -- what was the
13  formulation?  Percentage stake in an
14  undivided pool.  I don't know what that
15  looks like as a premise.  That's why for my
16  purposes it is -- it is not relevant to try
17  and speculate as to the precise nature of
18  the premise supplied.  The nature is more
19  generic, so the premise is more generic.  It
20  is simply that 3AC retained a proprietary
21  interest in assets that -- that enabled it
22  to grant security in relation to the assets.
23      Q.   You haven't considered whether you
24  grant a security interest over a percentage
25  stake in an undivided pool; right?

Page 200

1
2       A.   Well, I have considered it in the
3   sense that you can -- you could charge, you
4   could grant a charge, but so long as you had
5   a corresponding interest in the thing that
6   you were charging, if you see what I mean.
7   But I haven't -- I haven't independently
8   interrogated that as a legal premise.  It
9   doesn't arise from Mr. Webster's declaration
10  at all.
11      Q.   You would agree, sir, if what you
12  are analyzing is some form of interest in a
13  pool, then for perfection purposes you
14  should be looking at control over that pool;
15  right, sir?
16      A.   That feels broadly -- broadly
17  correct.
18      Q.   Okay.  Looking further on in
19  paragraph 93, and this may just be an
20  example of English, English as opposed to
21  American English?
22      A.   Yes.
23      Q.   But at the bottom, the second
24  sentence from the bottom you say,
25  Accordingly I proceed on the basis, what

Page 201

1
2   does that --
3       A.   Hold on, where are we?
4       Q.   Sorry, we are at 93 at the bottom
5   of page 4.
6       A.   Page 34.
7       Q.   Yes.  So what do you mean by "I
8   proceed on the basis"?  Is that an
9   assumption you are given?
10      A.   Where am I saying this?
11      Q.   On 93?
12      A.   Yes, sorry, your question.
13      Q.   I am trying to understand what the
14  phrase "I proceed on the basis" means.  In
15  particular, is that you saying this is an
16  assumption that you are making?
17      A.   Yes.
18      Q.   Okay.  And then -- then you have
19  two romanettes 1 and 2.  And so in romanette
20  1, the assumption for the lien and pledge is
21  that the secured assets were included, those
22  digital assets credited 3AC accounts.  And
23  then romanette 2 for a charge, you add the
24  assumption that it also included 3AC's
25  proprietary interest in the digital assets;

Page 230

1
2    provide it to the pledgee?
3         MR. GLUECKSTEIN:  Object to the
4    form.
5         A.  I am just going to give you the
6    same answer, the pledgor or the putative
7    pledgor needs to have a proprietary interest
8    at a legal moment in time in order to
9    grant -- in order to pledge and grant a
10   pledge to someone else.
11        Q.  But in order for that pledge to be
12   perfected, the grantee needs to have
13   exclusive control; right?
14        A.  Yes.
15        Q.  Do they need to obtain that
16   exclusive control from the grantor?
17        A.  They just need to obtain it.
18        Q.  So just to go back to my question,
19   then, does the grantor need to have
20   exclusive control in order -- in order for
21   the grantee to obtain that exclusive
22   control?
23        MR. GLUECKSTEIN:  Object to the
24   form.
25        A.  The grantor just -- the

Page 231

1
2    grantor/pledgor needs to have a proprietary
3    interest.
4         Q.  Is exclusive control affected by
5    the grantee's ability to transfer title?
6         A.  I don't know.
7         Q.  If the grantor can transfer
8    client, is that inconsistent with exclusive
9    control?
10        A.  Whose?
11        Q.  With the grantee's exclusive
12   control.  Let me put it all in one question
13   so it is clear to you, sorry.
14        A.  Yeah.
15        Q.  If the grantor can transfer title,
16   is that inconsistent with the grantee's
17   exclusive control?
18        A.  In respect of the same asset, it
19   would feel -- it would feel inconsistent.
20        Q.  Okay.  If the grantor can really
21   invest and trade an asset, is that
22   inconsistent with the grantee's exclusive
23   control of that same asset?
24        MR. GLUECKSTEIN:  Object to the
25   form.

Page 232

1
2         A.  If you are talking about the same
3    asset, then that feels inconsistent.  But I
4    have a sense this is quite esoteric.
5         Q.  If the grantor has the right to
6    lend an asset, is that inconsistent with the
7    grantee's exclusive control of that asset?
8         A.  Well, if by land you mean transfer
9    possession over it from the grantee to
10   someone else, that also would feel
11   inconsistent with the grantee's exclusive
12   control over it, yes.
13        Q.  If the grantee is prohibited from
14   transferring title, is that inconsistent
15   with the grantee's exclusive control?
16        MR. GLUECKSTEIN:  Object to the
17   form.
18        A.  Not necessarily, not necessarily.
19        Q.  Okay.  If the grantee is
20   prohibited from investing or trading or
21   profiting from property, is that
22   inconsistent with the grantee's exclusive
23   control?
24        MR. GLUECKSTEIN:  Object to the
25   form.

Page 233

1
2         A.  Not necessarily.
3         Q.  If the grantee is prohibited from
4    lending or using the property as security
5    for a loan, is that inconsistent with the
6    grantee's exclusive control?
7         A.  Not necessarily.
8         Q.  If the grantee is prohibited from
9    representing to others that is has ownership
10   of that -- of the asset, is that
11   inconsistent with its exclusive control?
12        A.  No, because that's just about what
13   people can say.
14        Q.  If you look at paragraph 753 of
15   your report, you discuss your response
16   decision, right?
17        A.  Yes, Court of Appeal.
18        Q.  And you have a quote from the
19   decision regarding the requirement of
20   exclusive control; right?
21        A.  Uh-huh.
22        Q.  I take it you found that case
23   instructive on this issue?
24        A.  It is analogous, it is about -- it
25   is about a database.

MAGNA
LEGAL SERVICES

Page 258

1
2  plain and unambiguous?
3      A.  Not really.  As I said, the
4  headings are just descriptive, aren't they.
5  I would rely more on the words in the second
6  sentence, The customer hereby pledges and
7  grants a continuing lien on and security
8  interest in, dot, dot, dot.
9      Q.  You view that language that you
10  just described as a plain and unambiguous
11  grant of a lien?
12      A.  A pledge and a lien, yes.
13      Q.  Okay.  You would agree that
14  nothing in this agreement explicitly states
15  that a charge is granted?
16      A.  It doesn't say grant a charge.
17  But what it does say is, Hereby pledges and
18  grants a continuing lien on and security
19  interest in, which is strongly suggestive of
20  the fact that the phrase "and security
21  interest in" is different from either a
22  pledge or a lien.
23          And it goes on later on to say
24  that, FTX shall have all the remedies of a
25  chargee under the laws of Antigua, and the

Page 259

1
2  customer shall not grant any other person a
3  lien.
4          My reading of these eight lines is
5  that the parties were going out of the way
6  to ensure that the customer granted as much
7  and as many types of consensual security,
8  possessory and non-possessory, over the
9  secured assets as it possibly could with the
10  words used, apart from the mortgage.
11      Q.  So I believe the two clauses that
12  you indicate -- suggest to you that a charge
13  is granted, the "security interest in"
14  clause and "all remedies of a chargee"
15  clause; is that right?
16      A.  Yes, all phrases within clauses,
17  yeah.
18      Q.  Okay.  What is it about the phrase
19  "and security interest" that you read to me
20  that a charge was granted?
21      A.  Well, I think you got to read the
22  two phrases together.  The stage one would
23  be to look at those words "and security
24  interest in."  They are doing nothing as
25  contractual words, if all they are doing is

Page 260

1
2  replicating or recapping a pledge or a lien,
3  because you just wouldn't need them.
4  Because you could grant your pledge and your
5  lien, but just saying hereby grants --
6  hereby pledges and grants a continuing lien
7  on the secure assets.
8          And what they are doing, what they
9  are doing later on, FTX shall have all the
10  remedies of a chargee.  If FTX is given all
11  the remedies of a chargee, that is strongly
12  suggestive to my mind, even if not
13  Mr. Webster's, that the words "and security
14  interest in" when they are doing something
15  different are granting an equitable charge.
16  That's how I would read this.
17      Q.  Okay.  So let me break down a
18  couple of things you said.  I think you said
19  that first phrase is doing nothing unless it
20  has some independent meaning; right?
21      A.  Yes, that's a working rule of
22  thumb or cannon of construction, that all
23  the words are doing something.
24      Q.  Is that the rule against
25  surplusage?

Page 261

1
2      A.  Yes, it is something called that,
3  yes.
4      Q.  So do you view the rule against
5  surplusage as through more than a make
6  weight point?
7          MR. GLUECKSTEIN:  Object to the
8  form.
9      A.  No, I don't.
10      Q.  Do you think it carries little
11  weight in the interpretation of commercial
12  contracts?
13          MR. GLUECKSTEIN:  Object to the
14  form.
15      A.  No, I don't.  I mean, this is --
16  you are looking at construing eight lines
17  here and they are important.  And if you are
18  going to use the specific pledge in the
19  specific lien and then go on to use more
20  generic language, that generic language is
21  going to be doing something, because it --
22  it just means nothing otherwise.
23          And if it stopped there, then I
24  would have more sympathy with Mr. Webster's
25  analysis, and no doubt yours.  But it goes

Page 262

1
2    on, doesn't it, to talk about remedies of a
3    chargee. And that to me tells us what these
4    contracting parties had in mind by the
5    phrase "and security interest in," i.e., an
6    equitable charge.
7        Q.   Do you think the rule against
8    surplusage is unlikely to be useful in
9    interpreting a standard form of a contract?
10        MR. GLUECKSTEIN:  Object to the
11    form.
12        A.   No. And I wouldn't be too hung up
13    on rules, it is just what are these parties
14    seeking to achieve through the words they
15    have used here. And as I read this, and as
16    I think an Antiguan Court would construe it,
17    that came before that at that Court, they
18    are trying to achieve a maximum numbers of
19    forms of security in favor of FTX as they
20    can.
21        Q.   Do you think -- is it possible
22    that the phrase "and security interest in"
23    is intended to clarify the prior words?
24        A.   I don't see how it does.
25        Q.   So you don't think it is possible

Page 263

1
2    that "security interest in" is -- refers
3    back to the prior phrase?
4        A.   That would be too autologous,
5    because a pledge is a security interest and
6    so is a lien.
7        Q.   Would you agree that if the
8    parties intended for "security interest in"
9    to grant a charge, it would have been
10    clearer to state "and other security
11    interest in"?
12        A.   I think that would have been
13    clearer.
14        Q.   Do you agree that the phrase "and
15    security interest in" could be referring to
16    a mortgage?
17        A.   No, because it would need to be
18    coupled with something making it clear that
19    the requisites for a mortgage were put in
20    place. And neither I nor Mr. Webster think
21    it means that.
22        Q.   Well, there is nothing in this
23    clause indicating that the requisites for a
24    pledge have been satisfied?
25        A.   Sorry?

Page 264

1
2        Q.   There is nothing in this clause
3    indicating that the requisites for a pledge
4    have been satisfied?
5        A.   Satisfied, it says here by
6    pledges.
7        Q.   Okay. Well, when I asked you
8    about whether this phrase could be referring
9    to a mortgage, you said no, because it would
10    need to be coupled with something making it
11    clear that the requisites for a mortgage
12    were put in place.
13        So is there something in this
14    clause that indicates that a requisite for a
15    pledge has been put in place?
16        A.   No, but you would -- in order for
17    the mortgage -- if you are going to mortgage
18    these things, assuming they are capable of a
19    mortgage, you would -- it is a more
20    draconian form of security, so you would
21    just be expected to say it.
22        And the other indication, of
23    course, we shouldn't lost sight of that
24    sentence, you would expect it to say FTX
25    shall have all the remedies of a chargee or

Page 265

1
2    mortgagee, or mortgagee instead of chargee,
3    but it doesn't say that. So I think you
4    have just got to run these words, you have
5    to, it is a an eight -- seven-line clause.
6    It works together, doesn't it.
7        Q.   Okay. Do I understand the reason
8    you say that it is impossible that "security
9    interest in" could be referring to a
10    mortgage is because it was impossible for
11    the parties to grant a mortgage in this
12    instance?
13        A.   I don't think I said impossible.
14    I think ultimately this is about
15    ascertaining intention, isn't it?
16        Q.   Well, let me ask. Is it possible
17    that the phrase "security interest in" is
18    referring to a mortgage?
19        A.   As bad language in isolation that
20    is possible. Viewed in context with the
21    rest of the clause and the rest of the
22    contract and particularly remedies of a
23    chargee, no references to remedies of a
24    mortgagee lien, I would say that that is not
25    what this clause means. And I -- and I am

MAGNA
LEGAL SERVICES

Page 274

1
2    "lien against." And then later in that line
3    at the bottom, in or in any right, title or
4    interest in. So they go on, in, against,
5    in, in, that's five.
6        Q. Sir, when you are describing a
7    charge, are you aware that you refer to a
8    charge over the secured assets?
9        A. Yeah, that's how I would do it,
10   but maybe I am a purist, and these guys
11   aren't.
12       Q. So purist would refer to it as a
13   charge over assets; right?
14       A. Well, I said maybe, maybe I am
15   not -- maybe that's not the purist approach.
16   But that's just how I would use language.
17       Q. Are you aware you never refer to a
18   "charge in the secured assets"?
19       A. I don't know if I ever have or
20   not.
21       Q. Are you aware that in this
22   declaration you never refer to a "charge in
23   the secured assets"?
24       A. I doubt I would, because I think
25   my choice of language would be "charge

Page 275

1
2    over." But that's my choice of language.
3        I think a better -- I think a
4    better phrase for all -- for all forms of
5    securities "in respect of." So it is just
6    that's a mouthful when you are trying to
7    write the shortest contract you can. But I
8    think the phrase "in respect of" is
9    technically the best one to use.
10       Q. If the parties meant security to
11   mean charge, wouldn't have been much more
12   natural for the parties to have used the
13   word "charge" instead?
14       MR. GLUECKSTEIN: Object to the
15   form.
16       A. I don't know what you mean by
17   "more natural."
18       Q. Would it have been clearer?
19       A. Well, I said -- I agreed with you
20   earlier it would be clearer if they had said
21   "and other security interest in," but that's
22   just -- but that's just relative to what
23   they have done. I -- I regard as what they
24   have done as clear.
25       Q. It would also be clearer if

Page 276

1
2    instead of "security interest in" they had
3    said "charge over;" right?
4        A. Yes, it would be clearer. But it
5    doesn't mean it isn't clear.
6        Q. And you would agree that the
7    parties seem to know what a charge is,
8    right, since they refer to a chargee later
9    on in this same sentence; right?
10       A. I never know the extent to which
11   one should attribute to commercial parties
12   knowledge of these things. But yeah, they
13   seem to be aware of a charge being something
14   different or at least a form of security
15   that they are intending to put in place.
16       Q. In your view, are there reasons
17   why the parties would not have just stated
18   "charge" if they intended to create a
19   charge?
20       A. Contracting parties use words to
21   convey meaning. And so I wouldn't want to
22   speculate. I know Mr. Webster speculates,
23   but I regard what he has done there as -- as
24   impermissible.
25       Q. So sitting here today, can you

Page 277

1
2    tell me any reason why if parties intended
3    to create a charge, they would not have just
4    stated charge?
5        A. Because they are not very good at
6    drafting, that's usually the answer to all
7    of these things.
8        Q. The only reason you can think of
9    why they would not have stated a charge is
10   because they are not good at drafting?
11       A. Yes, that's how we make our money.
12       Q. So under Antiguan law, is an
13   ambiguity in a contract construed against
14   the drafter?
15       A. You mean contra preferentum, I
16   don't know, but I don't regard this as
17   ambiguous, so.
18       Q. Well, before we get to whether it
19   is ambiguous, you don't know whether -- can
20   you say the Latin phrase again?
21       A. Contra preferentum.
22       Q. You don't know whether that
23   doctrine applies in Antiguan law?
24       A. Well, on the basis it follows
25   English common-law, the doctrine exists --

MAGNA
LEGAL SERVICES

Page 282

1
2  are many contracts, like I said, that's what
3  keeps the lawyers happy.  But just because
4  something is poorly drafted, it doesn't
5  means it contains a mistake.  It just means
6  it could be inarticulate or just imperfect.
7      Q.   If it you were a judge sitting in
8  Antigua attempting to interpret a contract,
9  you would attempt to make it -- interpret it
10  in a way that makes sense, rather than a way
11  that indicates it is imperfect or
12  inarticulate?
13      A.   Well, if we go back to Rainy Sky
14  and the Krys case.  If you are applying your
15  cannons of construction, you end up on that
16  junction, that dilemma.  If you have gone
17  through the exercise and you still end up a
18  junction in the road, a fork in the road,
19  and one -- one sign post says sensible and
20  the other sign post says not sensible, then
21  English, and therefore Antiguan contract
22  law, says you go down the sensible path.
23      Q.   Okay.  I believe the other phrase
24  you have highlighted in section 3 is the
25  phrase the "remedies of a chargee;" right,

Page 283

1
2  sir?
3      A.   Yeah.
4      Q.   And why would the reference to the
5  "remedies of a chargee" be necessary if the
6  previous phrase "and security interest in"
7  granted a charge?
8      A.   Just -- just gives some concrete
9  meaning to a phrase that didn't have on its
10  face concrete meaning.  So the phrase "and
11  security interest in" is capable of
12  including charge, and to go back to our
13  earlier discussion, is technically capable
14  of including mortgage.  It is just that you
15  find out what it actually means by you going
16  down three lines and seeing "remedies of a
17  chargee."  That's what these parties
18  understood they were conferring.
19      Q.   Okay.  So I understand that
20  explanation, you are saying that phrase,
21  "and security interest in," might be
22  ambiguous, but the phrase "remedies of a
23  chargee" clarifies it?
24      A.   No, I am not saying that.
25      I am saying it is a phrase,

Page 284

1
2  different things -- it is a generic phrase
3  that can contain more than one thing.  The
4  only two things that are left are mortgage
5  and charge.  And you find the answer to what
6  it does contain by going down three lines
7  and you see the phrase "remedies of a
8  chargee."  And so then you go, oh, so they
9  did make it clear after all.  It is a
10  charge.
11      Q.   Well, the third option is that it
12  is not intended to create a second security
13  interest at all, but rather just clarifying
14  the one security interest that is granted;
15  right, sir?
16      A.   Well, your question should really
17  be a third, not a second, because it has got
18  a pledge in the lien already, so you got
19  your two.  But that's just not how to read
20  that phrase, I am afraid, because then "and
21  security interest in" means nothing.  And
22  then the phrase "remedies of a chargee" make
23  no sense.  Why would you grant remedies of a
24  chargee to a pledgee or a lienee.
25      Q.   Sir, if the rest of the section

Page 285

1
2  already granted a charge, why would you need
3  to clarify that the remedies of chargee are
4  provided?
5      A.   Because it says all the remedies
6  of a chargee, not just some of them.  It is
7  making clear that they are all, all the
8  remedies of a chargee are available under
9  the laws of Antigua.
10      Q.   So just to make sure I understand,
11  if this section said a charge is granted,
12  are you saying that that would not
13  inherently mean all the remedies of a charge
14  are provided?
15      A.   That could be in there
16  for (unintelligible).  But now you have
17  moved to a different clause altogether.  If
18  this clause has said in terms grants an
19  equitable charge in, on, over, or whatever
20  your choice of preposition, it probably
21  wouldn't have gone on to say all the
22  remedies of chargee, because it wouldn't
23  have needed to, would it.
24      Q.   So if it has said grants a charge
25  upon or whatever word you would like, you

Page 286

1
2    would not need to then say all the remedies
3    of a chargee; correct?
4        A.  Well, who knows what "need" means
5    there.  I would just be surprised if the
6    parties had chosen the more direct language
7    of hereby grants a charge over or under,
8    whatever, that they would then say the next
9    thing.  But they might still say it, just to
10   clarify, that the charge -- that this
11   particular charge carries with it all the
12   remedies of a chargee under the relevant
13   law, I don't know.
14       Q.  You agree that remedies of a
15   charge can be different than the remedies of
16   a pledge or lien; right?
17       A.  The remedies of a chargee?
18       Q.  Chargee, yes.
19       A.  Yeah, yeah, they can.
20       Q.  So what are the remedies of a
21   chargee under Antiguan law?
22       A.  I don't know.
23       Q.  So you do not know how they might
24   differ from the remedies of a lien holder or
25   pledgee under Antiguan law?

Page 287

1
2        A.  I don't know.  But these parties
3    presumably thought that they were giving
4    something more by including the words "FTX
5    shall have all the remedies of a chargee"
6    under laws of Antiguan.
7        Q.  Do you agree there could be
8    reasons why a party might seek the remedies
9    of a chargee without seeking to become a
10   chargee?
11       A.  Well, Mr. Webster suggests that
12   there are.  But I didn't find that
13   particularly compelling.
14       Q.  You don't respond to that portion
15   in your declaration; right?
16       A.  Well, he says there was no charge
17   conferred.  And I say there was a charge
18   conferred.
19       Q.  That wasn't really my question.
20   Maybe my question wasn't clear.
21           You noted that Mr. Webster
22   indicated that there are reasons why a party
23   may seek to obtain the remedies of a chargee
24   without seeking to become a chargee.
25           Do you recall that?

Page 288

1
2        A.  Yes.
3        Q.  You don't respond to those reasons
4    in your declaration; right, sir?
5        A.  I don't think I specifically cover
6    that, no.
7        Q.  Okay.  Isn't it circular to say
8    that the phrase security interest in refers
9    to a charge because the clause later refers
10   to remedies of a chargee?
11           MR. GLUECKSTEIN:  Object to the
12   form.
13       A.  No, I don't think it is circular
14   at all.  I think at the risk of repetition.
15   I think the phrase "and security interest
16   in" is adding something to the phrase
17   "hereby pledges and grants a continuing lien
18   on."
19       Q.  What does it add?
20       A.  Well, I was going to say that.  It
21   is adding another form of security.  It is
22   doing it through that phrase, that
23   four-letter phrase in a way that is generic,
24   but can only include mortgage and charge.
25           And then the parties are

Page 289

1
2    clarifying that what it does mean, and the
3    only thing that it does include is a charge
4    by that phrase later on all the remedies of
5    a chargee must also, confirming you get the
6    full suit of remedies provided by Antiguan
7    law as a chargee.
8        Q.  To make sure I understand that,
9    you indicated that the phrase "and security
10   interest in" is generic, but can only
11   include mortgage and charge; is that right,
12   sir?
13       A.  Yeah, because it is -- they are
14   the only two remaining candidates for
15   consensual security.
16       Q.  And then your view is the phrase
17   "the remedies of a chargee" then is used to
18   inform what that prior generic phrase means?
19       A.  Yes, it tells you what it included
20   in that four-letter phrase.
21           THE WITNESS:  Am allowed to
22   request a break so I could have a cup
23   of tea, please.
24           THE VIDEOGRAPHER:  We are going
25   off the record.  The time is 3:32 p.m.

**MAGNA**
LEGAL SERVICES

1
2      Q.  What control does FTX exercise
3   over the percentage of 3AC's percentage of
4   digital assets in a wallet?
5          MR. GLUECKSTEIN:  Object to the
6      form.
7      A.  I think this is so hypothetical.
8   It just isn't helpful to engage on this
9   level.
10     Q.  You are not able to answer that
11  now?
12     A.  Well, you are describing an asset
13  as a percentage.  I didn't see it.  And
14  FTX's control as exchange operator wouldn't
15  be over a percentage, it would be over the
16  contents of the assets that could be
17  expressed as that percentage.  I don't think
18  you are comparing like with like, I think it
19  is apples and pears.
20         But in fairness to myself, that's
21  what 105 is in a sense hinting at, isn't it.
22  105 is saying a floating charge analysis
23  doesn't feel like the right fit here,
24  precisely because fixed charge does.  So
25  this -- this difficulty in a sense is

1
2   acknowledged in 105.
3      Q.  So you don't - you don't see the
4   secured asset as a percentage of the digital
5   assets in the wallet?
6          MR. GLUECKSTEIN:  Object to the
7      form.
8      A.  I can't speculate on what the
9   premise is going to be.  The generic premise
10  is that 3AC has a proprietary interest in
11  assets comprising the secured assets.
12     Q.  But you don't see that proprietary
13  interest being a percentage of the digital
14  assets in the wallet?
15     A.  I don't think it is for me to see
16  or not see it to be honest.
17     Q.  I am just trying to understand.
18         What you are saying there is a
19  security interest over and how you would
20  measure control over that secured asset?
21         So how would you measure -- if the
22  proprietary interest is a percentage of the
23  digital assets in the wallet, how would you
24  measure control over that proprietary
25  interest?

1
2      A.  I don't know how you would,
3   because I don't know how much sense it makes
4   to -- to describe that asset in that way to
5   start with.
6      Q.  Okay.  Sitting here today, you
7   can't tell me how you would measure control
8   over such an asset; right?
9      A.  No, I am not, I am not prepared to
10  speculate on that.
11         MR. HARRIS:  Okay.
12         (Whereupon, Excerpts from the
13     Goode and Gullifer treatise was marked
14     Houseman Exhibit 132 for identification
15     as of this date.)
16     Q.  Okay.  You have been handed
17  Excerpts from the Goode and Gullifer
18  treatise that you cite?
19     A.  Uh-huh.
20     Q.  Why is it that you cited that
21  treatise?
22     A.  For general statements about types
23  of security and the concept of an attachment
24  and the difference between attachment and
25  perfection, relatively -- relatively high

1
2   level.
3      Q.  Is it a well-regarded treatise
4   under English law on those issues?
5      A.  Yes.
6      Q.  If you could turn to section 4.21.
7         Do you see 4.21 is a heading
8   Current Assets Distinguished from Fixed
9   Assets?
10     A.  Yes.
11     Q.  And this section begins to discuss
12  the exercise of deciding whether a charge is
13  fixed or floating, do you see that?
14     A.  Uh-huh.
15     Q.  And one of the things the section
16  identifies is the question of whether the
17  chargor could dispose of the charged assets,
18  do you see that?
19     A.  Uh-huh.
20     Q.  So you would agree that is a
21  relevant inquiry into whether an asset -- a
22  charge is fixed or floating; right?
23     A.  Yes.
24     Q.  Okay.  And then in section 4.22,
25  that's a section under the heading of Legal

MAGNA
LEGAL SERVICES

Page 306

1
2   and Practical Control?
3       A.   Uh-huh.
4       Q.   And you see in the third line he
5   writes, It is clear that practical control
6   alone is not sufficient for a charge to be
7   fixed.  It is critical that the charge
8   agreement establishes the necessary legal
9   control.
10          Do you see that?
11      A.   Uh-huh.
12      Q.   Do you agree with that?
13      A.   It goes on, Although other matters
14  may also be relevant to its interpretation,
15  but yes.  But this is positing a charge
16  agreement.  But I suppose we are positing
17  that when we are saying clause 3 is a charge
18  agreement.
19      Q.   Then if you can turn to section
20  4.23?
21      A.   Yes.
22      Q.   It is under a heading Degree of
23  Control Necessary, do you see that?
24      A.   I do, yes.
25      Q.   And then if you look at the fourth

Page 307

1
2   or eighth line down to this treatise it
3   says, The House of Lords made it clear in
4   Spectrum where the chargor is able to remove
5   the assets from the scope of the charge, the
6   charge must be floated.
7          Do you see that?
8       A.   Uh-huh.
9       Q.   Do you agree with that statement
10  of law?
11      A.   I have got no reason to doubt
12  that.
13      Q.   And you would agree, sir, that
14  Three Arrows here is able, if the assets is
15  the percentage interest in the wallet, 3 --
16  Three Arrows was able to withdraw that
17  asset; right?
18      MR. GLUECKSTEIN:  Object to the
19  form.
20      A.   I mean, that's a hypothetical that
21  I have said I find a bit too esoteric to
22  speculate about.  What I have -- what I have
23  said in my assumptions is that it had a
24  qualified right of withdrawal.
25      Q.   Okay.  You are not going to

Page 308

1
2   speculate on the impact, if it turns out
3   that the relevant asset is just a percentage
4   right of the wallet?
5       A.   Yeah, I just -- I don't feel
6   comfortable speculating about that.  I have
7   got -- I have got difficulty with that --
8       Q.   Okay.
9       A.   -- as a concept.
10      Q.   Okay.  So just you are not giving
11  an opinion on what would happen if the
12  relevant asset is just a percentage of the
13  wallet; right, sir?
14      MR. GLUECKSTEIN:  Object to the
15  form.
16      A.   I am not -- I am not giving an
17  opinion as to whether the charge granted by
18  clause 3 would be fixed or floating on that
19  hypothetical premise.
20      Q.   Are there any other -- are there
21  opinions you are giving on that hypothetical
22  premise?
23      A.   Yes, the pledge in the lien
24  analysis remains intact.
25      Q.   How about the issue of exclusive

Page 309

1
2   control, are you giving an opinion on that
3   issue in the hypothetical world where the
4   relevant asset is just a percentage of the
5   wallet?
6       A.   I am just trying to think through
7   in terms of perfection of a pledgor,
8   perfection of a lien.  No, I don't think --
9   I don't think I am, because I find -- I find
10  the premise that you are positing is just
11  too esoteric.
12      Q.   In terms, assuming it is a charge?
13      A.   Uh-huh.
14      Q.   And I apologize if I asked you
15  this already, but are there -- you are not
16  giving any opinion on what the requirements
17  to perfect that charge are, either under
18  Antigua law applied or BVI law applied?
19      A.   No.  It is the thing we call the
20  private international law assumption.
21      Q.   Is it under the common law, so
22  not -- assuming there is no registration
23  requirements, so put those aside, I
24  understand those could vary by country, but
25  under the common law are there any

MAGNA
LEGAL SERVICES

Page 314

1
2  contract contemplates.  But it isn't -- it
3  isn't the issue raised by Mr. Webster that I
4  am dealing with.
5        Let me help you with the first
6  half of that, the definition of
7  "indebtedness" that you see in the recital
8  to what Mr. Webster called the second half
9  of this agreement -- sorry, what he would
10 call the second agreement, rather.  It says
11 Whereas customer is a customer of the
12 FTX.com cryptocurrency exchange.  And FTX
13 desires to afford customer with X as to
14 margin trading and potentially discretionary
15 line of credit facilities together the
16 indebtedness is set forth in.
17       And then when you read clause 3 in
18 other clauses, it is -- it is then
19 presupposed that security is granted in
20 favor of FTX to the extent of the
21 indebtedness as defined.
22       And FTX is identified in clause 3
23 as the creditor.  And therefore the
24 recipient or beneficiary of all of that
25 security.  And indeed in clause 10, I think

Page 315

1
2  it is, under lenders' remedies, you see FTX
3  is the person -- the person identified as
4  having all the range of lenders' remedies.
5        Now I am not sure what the extent
6  of all the debate is here.  My understanding
7  is what Mr. Webster said in his declaration
8  is that even if the liability is incurred in
9  a straightforward way from a customer to
10 FTX, nevertheless no security is granted by
11 clause 3, because FTX is not identified with
12 sufficient certainty as the lender/creditor.
13 And that is his opinion.  I forget what
14 paragraph that's in.
15       And I disagree with that.  Because
16 as far as I am concerned this contract, in
17 clause 3 in particular, is abundantly clear
18 that FTX is identified as the creditor and
19 therefore the rightful beneficiary of the
20 security interest granted thereunder.
21       So -- so the debate between me and
22 Mr. Webster seems quite narrow, and it seems
23 to be about whether or not FTX is identified
24 with sufficient certainty as the
25 lender/creditor/rightful beneficiary of

Page 316

1
2  security.
3        Q.  Let me follow up on a couple of
4  things you said.  One is that you believe
5  that under the margin agreement it is
6  abundantly clear that FTX is identified as
7  the creditor; is that right?
8        A.  Yes, in clause 3.
9        Q.  Okay.
10       A.  So look what it says.  It says,
11 The secure asset has continuing security for
12 the full and punctual payment, performance
13 and discharge of the indebtedness until the
14 satisfaction of all liabilities and of
15 performance of all obligations of customer
16 to FTX under this agreement.
17       Q.  Now looking at 109, the only
18 opinion you are giving is in the scenario
19 where liability is incurred by Three Arrows
20 to FTX?
21       A.  It is, yes.  And I am positing it,
22 because it starts with if, the operative
23 words start with if.
24       Q.  So you are not giving an opinion
25 in the world where the liability is instead

Page 317

1
2  incurred by 3AC to --
3        A.  Someone else.
4        Q.  -- other users?
5        A.  Someone else.
6        Q.  Okay.
7        A.  Well, I am not safe insofar as
8  that -- that is what clause 3 seems to say,
9  that the definition of indebtedness in the
10 recycle doesn't, it is a descriptive
11 definition.  But clause 3 does seem to
12 assume that those liabilities are owed to
13 FTX, which is why the security is granted to
14 FTX and why subsists until extinction of all
15 of those liabilities to FTX.  It just seems
16 to be what the clause says.  But I am not --
17 I don't need to go there, because
18 Mr. Webster wasn't talking about it.
19       So I start this whole section with
20 if, If the court should find that any
21 liability has been incurred by 3AC to FTX,
22 brackets, privity of contract, and then
23 whatever that may be, that must fall within
24 indebtedness.
25       And I disagree with Mr. Webster

1
2    when he says FTX is not identified as the
3    lender/creditor for those purposes.
4        Q.   Okay.  You are not giving an
5    opinion in the alternative world where Three
6    Arrow's liability is to other entities
7    besides FTX; right?
8        A.   No, I am positing -- positing it
9    with the word if.
10       Q.   Okay.  If you look at the
11   definition of indebtedness in the margin
12   agreement, if you have it?
13       A.   Yes, I just read it out to you.
14       Q.   Okay.  So it mentions two things,
15   access to margin trading and a potentially
16   discretionary line of credit facilities, do
17   you see that?
18       A.   Uh-huh.
19       Q.   Is it possible that this contract
20   contemplates that the user lenders are the
21   entity that is owed under the margin trading
22   and that FTX is the entity that is owed
23   under the lines of credit?
24           MR. GLUECKSTEIN:  Object to the
25       form.

1
2        A.   The recital might contemplate
3    that.  But like I said, clause 3 seems to
4    contemplate that all the liability is owed
5    to FTX.  Because those words I read you, the
6    words, As continuing security for the full
7    and punctual payment, performance and
8    discharge of the capital I, Indebtedness,
9    until the satisfaction of all liabilities
10   and performance of all obligations of
11   customer to FTX under this agreement.
12       Q.   Would you agree that under
13   Antiguan law a security interest can't be
14   granted to an amorphous, undefined class?
15       A.   I agree that there needs to be a
16   sufficient indication of the security
17   holder, the beneficiary of the security
18   interest, yes.
19       Q.   Okay.  And are you aware that
20   there is no way to identity who the
21   third-party lenders were who made loans to
22   Three Arrows under the margin trading
23   program?
24       A.   Well, I am either aware or not
25   aware of that in the sense that I just don't

1
2    think it matters.  Because I think what
3    matters, this is my point of disagreement
4    with Mr. Webster, is that clause 3 is
5    abundantly clear in identifying FTX as the
6    creditor and recipient of the security
7    interest.
8            MR. HARRIS:  I might be done, why
9        don't we take five minutes.
10           THE WITNESS:  Yes, sure.
11           THE VIDEOGRAPHER:  We are going
12       off the record.  The time is 4:25 p.m.
13           (Whereupon, a short recess was
14       taken.)
15           THE VIDEOGRAPHER:  We are back on
16       the record.  The time is 4:32 p.m.
17           MR. HARRIS:  We are done with our
18       questions, and thank you, sir.
19           MR. GLUECKSTEIN:  No questions.
20       So that will conclude today's
21       deposition.
22           THE COURT REPORTER:  Would you
23       like a copy?
24           MR. GLUECKSTEIN:  Rough and
25       three-day expedite.

1
2            THE VIDEOGRAPHER:  The time is
3        4:32.  This concludes today's
4        deposition.  Thank you.
5            (Whereupon, at 4:32 P.M., the
6        Examination of this witness was
7        concluded.)
8
9               o    o    o    o
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

MAGNA▶
LEGAL SERVICES

Page 322

1
2          D E C L A R A T I O N
3
4      I hereby certify that having been first
5  duly sworn to testify to the truth, I gave
6  the above testimony.
7
8      I FURTHER CERTIFY that the foregoing
9  transcript is a true and correct transcript
10 of the testimony given by me at the time and
11 place specified hereinbefore.
12
13
14
       _____
15        STEPHEN HOUSEMAN
16
17
18 Subscribed and sworn to before me
19 this _____ day of _____ 20___.
20
21
       _____
22        NOTARY PUBLIC
23
24
25

Page 324

1
2          C E R T I F I C A T E
3
4  STATE OF NEW YORK        )
                    : SS.:
5  COUNTY OF QUEENS         )
6
7      I, RIVKA TROP, a Notary Public for and
8  within the State of New York, do hereby
9  certify:
10     That the witness whose examination is
11 hereinbefore set forth was duly sworn and
12 that such examination is a true record of
13 the testimony given by that witness.
14     I further certify that I am not related
15 to any of the parties to this action by
16 blood or by marriage and that I am in no way
17 interested in the outcome of this matter.
18     IN WITNESS WHEREOF, I have hereunto set
19 my hand this 19th day of November, 2025.
20
21
22
       _____
23        RIVKA TROP
24
25

Page 323

1
2          E X H I B I T S
3
4  HOUSEMAN EXHIBITS
5
6  EXHIBIT      EXHIBIT
7  LETTER       DESCRIPTION      PAGE
8
9  120      CV            15
10 121      Decision Wang versus   25
           Darby
11
12 122      Declaration       50
13 123      Document         53
14 124      List of authorities   55
15 125      Law Commission report  65
16 126      Document Rainy Sky   150
           decision
17 127      Document         155
18 128      In Re Cosslett case   175
19 129      Mr. Webster's Report  206
20 130      Response decision    235
21 131      Antiguan and Barbuda  267
           Companies Act 1995
22
23 132      Excerpts from the Goode 04
           and Gullifer treatise
24
25

# **Exhibit 18**

**Filed Under Seal**

# Exhibit 19

# Filed Under Seal