# **Exhibit 20**

# Filed Under Seal

# Exhibit 21

Message

| | |
|---|---|
| **From**: | Darby, Samuel G. [darbys@sullcrom.com] |
| **Sent**: | 8/27/2025 7:12:22 PM |
| **To**: | Zane Tackett [tackett.zane@gmail.com] |
| **CC**: | Glueckstein, Brian D. [gluecksteinb@sullcrom.com]; Beller, Benjamin S. [bellerb@sullcrom.com]; Liu, Sienna [lius@sullcrom.com] |
| **Subject**: | RE: [EXTERNAL] Re: FTX - Call |

Hi Zane,

Thanks for sending the documents and confirming that you are not aware of any other relevant documents in your possession.

With respect to reimbursement of fees, given your status as a former employee, FTX is willing to pay the reasonable fees and expenses of your counsel incurred with your preparation and attendance at a deposition in the 3AC claims dispute if you appear voluntarily on the timeline proposed. That would apply to either a lawyer at Steptoe or Morrison & Cohen. But we need to lock in a firm deposition date – what days the week of September 29 in London are you available? Please confirm the dates that work.

Please let us know when you've made a decision on what lawyer you'd like to retain, and we can get in contact with them about logistics. It's important to finalize that engagement soon so that we can move forward.

Thanks!
Sam
(212-558-3129)

---

**From:** Zane Tackett <tackett.zane@gmail.com>
**Sent:** Tuesday, August 26, 2025 3:59 AM
**To:** Darby, Samuel G. <darbys@sullcrom.com>
**Cc:** Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Beller, Benjamin S. <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>
**Subject:** Re: [EXTERNAL] Re: FTX - Call

Hello Samuel,

Would FTX cover the costs of either Steptoe or Heath's representation? Since i've used Steptoe before in matters related to FTX i'd probably have a preference for them. I'm just not sure if you guys / FTX limit the firms/lawyers you would cover the costs for or not.

I'll send over the screenshots in a new thread. And i've done another check on my phone and didn't find anything else, these came from my computer which is why i think i missed it before (also did another look there and didn't see anything come up).

Cheers,
Zane Tackett

On Thu, Aug 21, 2025 at 6:53 AM Darby, Samuel G. <darbys@sullcrom.com> wrote:

Zane,

FTX_3AC_000044622

Thanks very much for your email. We appreciate your stated willingness to appear voluntarily for a deposition, which will save everyone involved significant time and effort. If you are unable to come to the US, doing the deposition in London remains the best option because we need to do it in person. We can certainly make a date the week of September 29 work in London, but it can't slip later than that. Please let us know days that week that work so we can lock something in with you and 3AC that is mutually agreeable.

As we have conveyed, you are certainly permitted to be represented by counsel in connection with the deposition. As a former employee, FTX has considered and is willing to pay the reasonable fees and expenses of your counsel in connection with your preparation and attendance at the deposition if you do so voluntarily. We had been contacted on your behalf by Heath Rosenblat at Morrison & Cohen, but if you prefer to use counsel at Steptoe that is also fine. Please let us know who the lawyer is that you decide to engage, and we can loop in that person.

Finally, thank you for sending the screen shot of the Signal chat you have located. We are going to need you to send that to us in a blank email as soon as you can. Please also review your phone as to whether there are other relevant messages or chains to the 3AC dispute. Thanks again.

Sam

(212-558-3129)

---

**From:** Zane Tackett <tackett.zane@gmail.com>
**Sent:** Monday, August 18, 2025 11:19 AM
**To:** Darby, Samuel G. <darbys@sullcrom.com>
**Cc:** Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Beller, Benjamin S. <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>
**Subject:** Re: [EXTERNAL] Re: FTX - Call

Hello Samuel,

> Such counsel would be a firm that has represented other former FTX employees and is familiar with the process for these bankruptcy proceedings

Can you please let me know which firm this is so I can get in touch. Or if I can retain a firm of my choosing, would i be able to get steptoe, who represented me in my deposition with the government?

The next time i'm in Europe would be Sep 20-27, and I could make it to England after that. Alternatively I would be happy to do this on a much quicker time scale if its possible to do it over zoom or in Thailand. I see this [x.com] and legitimately want to help you guys beat 3ac. It's unfortunate how things ended up last month, I'll do my best to assist moving forward.

Also, while searching for something unrelated earlier today I found a signal group that I had forgotten about that contains some more internal messages from around that time. I've put the screenshots below.



**3ac**
🕐 1 week

Jun 14, 2022

👥 You created the group.

> so i'm hearing rumors that 3ac is not faring so well
> they have a 120mm loc
> They're currently -$1,255,039.41 in the hole
> Yesterday it got to -20mm  9:37 PM

**N S**
I'm seeing them back positive

in account value

theyd end up very levered long crypto (+crypto, -USD) if we took away their full loc right now: -80m USD, 10m USD in crypto collateral. so if things moved they could get liquidated

can we ask them to bring their USD value up to 120m (so sell their crypto with the execution style they prefer (instead of liquidation)) and then we'll remove the loc?

this is assuming they still want the loc removed  9:41 PM

**N S**
> can we ask them to bring their USD value up to 120m (so sell their crypto with the execution style they prefer (instead of liquidation)) and then we'll remove the loc?
> they aren't responding

> but yeah, will ask them to do that
> and tell them we need to reduce the loc size  9:48 PM

**N S**
*This message was deleted.*  9:49 PM

> should we turn off withdrawals?  9:52 PM

**N S**
we could disable withdrawals if they dont get back to us  9:50 PM

> yep  9:50 PM

**3ac**
🕐 1 week

**N S**
seems a bit aggressive  9:50 PM

> I don't think so
> at all
> fucking respond
> it's not hard
> it's the baseline expectatino  9:52 PM

**N S**
sure, go for it then  9:50 PM

> kk. going to reach out to them
> and let them know  9:51 PM

**N S**
disabled wdrawals. things are locally not terrible. theyre net positive, but barely  9:53 PM

**Ryan Salame**
Yah we have decent evidence it's real

Ben is friends with an employee there

Who basically said even internally they have no idea what's going on

Management not responding to them  9:57 PM

**N S**
jeez  9:57 PM

> should we take further steps?  10:01 PM

**Ryan Salame**
Like what?

Call the block? Lol

Still could be rumors just feels real strong  10:00 PM

FTX_3AC_000044624



On Wed, Jul 9, 2025 at 9:21 PM Darby, Samuel G. <<u>darbys@sullcrom.com</u>> wrote:

Hi Zane,

Thank you for letting us know your position and that you will not be appearing for deposition on July 15. We proposed that date based on the limitations in the schedule you communicated to us and the understanding that you will not be as available after that date, and agreed to do it in London as an accommodation to your travel schedule with the FTX Recovery Trust reimbursing your travel costs. We are prepared to discuss other dates that would work, as we have noted throughout this process.

To clarify any confusion, you can of course be represented by counsel of your choosing at the deposition. We have never said otherwise, nor have you ever expressed a desire for counsel prior to this week. As we discussed on March 12 and June 24, and communicated in emails on April 10 and May 23, FTX has offered to discuss obtaining individual counsel for you at the FTX Recovery Trust's expense in light of your status as a former employee. Such counsel would be a firm that has represented other former FTX employees and is familiar with the process for these bankruptcy proceedings, and would represent you (not the FTX Recovery Trust). You did not respond to that offer at any point,

FTX_3AC_000044625

which together with the limited, near term potential deposition dates you offered, led us to understand that you were comfortable appearing at the deposition without counsel and were most focused on satisfying your deposition obligation.  While we had initially mentioned potential representation by S&C, we determined offering to provide you separate counsel made more sense and thus we did so.

The continued passage of time and your unresponsiveness for long stretches have created the current situation where the deposition needs to be promptly completed.  We are still prepared to discuss FTX providing you counsel, but cannot do so without your commitment to work with that counsel in a timely manner, and your commitment to appear at a deposition on a specific date in an agreed-upon location.  Please let us know if you would like to pursue this path.  Otherwise, if you decide to retain your own counsel, please advise as to the identify of that counsel and provide alternative dates for the deposition.

I remain available to discuss and look forward to hearing from you.

Best,

Sam

(212-558-3129)

---

**From:** Zane Tackett <tackett.zane@gmail.com>
**Sent:** Monday, July 07, 2025 10:17 PM
**To:** Darby, Samuel G. <darbys@sullcrom.com>
**Cc:** Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Beller, Benjamin S. <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>
**Subject:** Re: [EXTERNAL] Re: FTX - Call

Hello Samuel,

Ah, well unfortunately I need to find legal representation and engage with a lawyer, need to discuss this all with them, and find a time that works for them to fly out to London as well to be there with me during deposition. I'm not walking into a deposition with lawyers grilling me from both sides without legal representation. I had understood that S&C would be representing me, with that not being the case, I will have to make other arrangements. As such, i'm not sure I can make 7/15 work. I will begin looking for representation ASAP and see what dates would be workable.

Cheers,

Zane Tackett

On Tue, Jul 8, 2025 at 8:35 AM Darby, Samuel G. <darbys@sullcrom.com> wrote:

Thanks Zane.  We need to make 7/15 work if it is at all possible.  Please confirm that you can do the deposition in London on that date.  It appears there are flights from London to Bologna that leave at 7:40 and 8:35 p.m. on 7/15, and we are prepared to start the deposition earlier in the morning to ensure you will be done to make one of those flights.  As of now, 7/14 is not workable.

As to expenses, the Recovery Trust can reimburse your reasonably documented expenses (*e.g.*, flights and lodging for 7/14 in London) if you share the documentation after you book.

While we discussed potential legal representation much earlier in the process, Sullivan & Cromwell cannot represent you personally at this time, including because of the time that has passed to get to a deposition.  Based on our recent conversations, we had understood you intended to appear to get this deposition completed before there are any further efforts to serve you formal court process.  We think the best course at this point is to complete the deposition as discussed, now on 7/15.  Let us know if you have any questions or would like to discuss.

Best,

Sam

(212-558-3129)

---

**From:** Zane Tackett <tackett.zane@gmail.com>
**Sent:** Monday, July 07, 2025 12:37 PM
**To:** Darby, Samuel G. <darbys@sullcrom.com>
**Cc:** Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Beller, Benjamin S. <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>
**Subject:** Re: [EXTERNAL] Re: FTX - Call

Ok, i just checked flights and it would make it much more difficult to do it on the 15th. The 14th would be easy, the 15th would only be if i absolutely had to.

On Mon, Jul 7, 2025 at 11:25 PM Zane Tackett <tackett.zane@gmail.com> wrote:

Hello Sam,

Yes, Tuesday July 15th would work for me.

Cheers,

Zane Tackett

On Mon, Jul 7, 2025 at 11:14 PM Darby, Samuel G. <darbys@sullcrom.com> wrote:

Zane,

Thanks for the time earlier.  As discussed, we moved a lot around for the July 9 date for a deposition in London given your availability.  We still want to make a deposition work during this period when you are traveling to Europe.  We understand you need to be in Italy by the morning on Wednesday July 16, but can attend a deposition in London on Tuesday July 15.

Can you please confirm you will attend a deposition that begins early (8 a.m. local time) on **Tuesday July 15**?  There are flights from London to Italy on Tuesday night.

FTX_3AC_000044627

We need your confirmation as soon as possible.

Thank you,

Sam

(212-558-3129)

---

**From:** matthew.davs.02@gmail.com <matthew.davs.02@gmail.com> **On Behalf Of** Zane Tackett
**Sent:** Monday, July 07, 2025 8:51 AM
**To:** Darby, Samuel G. <darbys@sullcrom.com>
**Subject:** Re: [EXTERNAL] Re: FTX - Call

Hi Sam,

Could you please rehash for me the conversation you had with Zane regarding the date and time of his deposition as well as the reimbursement plans for hotels and flights.

Thanks,

Matt

On Mon, Jul 7, 2025 at 7:16 PM Darby, Samuel G. <darbys@sullcrom.com> wrote:

Zane & Matt,

We need to discuss this as soon as possible.  Can we do a zoom in the window 8:30 a.m. EST/7:30 p.m. ICT – 9:30 a.m. EST/8:30 p.m. ICT?  If not please tell us what time works.

Thank you,

Sam

(212-558-3129)

---

**From:** matthew.davs.02@gmail.com <matthew.davs.02@gmail.com> **On Behalf Of** Zane Tackett
**Sent:** Monday, July 07, 2025 6:03 AM
**To:** Darby, Samuel G. <darbys@sullcrom.com>
**Subject:** Re: [EXTERNAL] Re: FTX - Call

Hi Sam,

Zane has a health appointment on the 9th and would like to reschedule. He would like to setup a call with you guys this evening GMT+7.

Also to confirm on reimbursement for Zane's flights and hotels. We book those ourselves and then send over the details to get the reimbursement correct?

Thanks,

---

FTX_3AC_000044628

Matt

On Mon, Jul 7, 2025 at 10:10 AM Darby, Samuel G. <darbys@sullcrom.com> wrote:

Zane,

Can you please let us know your flight information for the deposition on Wednesday?  If you have any questions just let us know.

Thanks very much,

Sam

(212-558-3129)

---

**From:** matthew.davs.02@gmail.com <matthew.davs.02@gmail.com> **On Behalf Of** Zane Tackett
**Sent:** Thursday, July 03, 2025 2:03 AM
**To:** Darby, Samuel G. <darbys@sullcrom.com>
**Subject:** Re: [EXTERNAL] Re: FTX - Call

Hi,

Thank you. Well received. We will update you with flights when we get them.

Matt

On Thu, Jul 3, 2025 at 3:06 AM Darby, Samuel G. <darbys@sullcrom.com> wrote:

Hi Zane,

I am just checking on my note below re: the subpoena and flights.

Thank you!

Sam

(212-558-3129)

---

**From:** Darby, Samuel G.
**Sent:** Tuesday, July 01, 2025 8:14 PM
**To:** Zane Tackett <tackett.zane@gmail.com>
**Cc:** Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Beller, Benjamin S. <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>
**Subject:** RE: [EXTERNAL] Re: FTX - Call

Hi Zane,

FTX_3AC_000044629

Further to our discussion, please see attached for the subpoena setting the date, time, and location for the deposition. Can you please confirm your receipt?

Please let us know your flight information when you have it. You should plan to be at S&C's offices (1 New Fetter Lane in London) by 8:30 a.m. at the latest, so we can start at 9 a.m.

We would be happy to discuss any questions about the deposition (logistical or otherwise), just let us know and we will find a time that works for you.

Thank you,

Sam

(212-558-3129)

---

**From:** Darby, Samuel G.
**Sent:** Sunday, June 29, 2025 10:24 AM
**To:** 'Zane Tackett' <tackett.zane@gmail.com>
**Cc:** Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Beller, Benjamin S. <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>
**Subject:** RE: [EXTERNAL] Re: FTX - Call

Hi Matt,

The plan is for the deposition is to start at 9 a.m. on Wednesday, July 9, 2025 at S&C's London offices. The address is 1 New Fetter Lane, London EC4A 1AN, England.

Zane noted that July 9 works best for him, so we will accommodate.

Thank you,

Sam

(212-558-3129)

---

**From:** matthew.davs.02@gmail.com <matthew.davs.02@gmail.com> **On Behalf Of** Zane Tackett
**Sent:** Sunday, June 29, 2025 4:27 AM
**To:** Darby, Samuel G. <darbys@sullcrom.com>
**Cc:** Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Beller, Benjamin S. <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>
**Subject:** Re: [EXTERNAL] Re: FTX - Call

Hi Sam,

Just checking in to confirm the details of Zane's upcoming deposition in London related to the 3AC matter.

FTX_3AC_000044630

He mentioned it's likely on the 9th of July — could you please confirm the exact date, time, and location?

Once confirmed, I'll go ahead and help coordinate his travel accordingly.

Thanks,

Matt - Zane's assistant

On Sun, Jun 22, 2025 at 9:08 PM Darby, Samuel G. <darbys@sullcrom.com> wrote:

Thanks Zane. I will send a zoom.

Sam

(212-558-3129)

**From:** Zane Tackett <tackett.zane@gmail.com>
**Sent:** Sunday, June 22, 2025 7:05 AM
**To:** Darby, Samuel G. <darbys@sullcrom.com>
**Cc:** Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Beller, Benjamin S. <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>
**Subject:** Re: [EXTERNAL] Re: FTX - Call

Hello Samuel,

Tuesday 6/24 at 9am EDT / 8pm UTC +7 (where i'm currently located) would work well for me.

Cheers,
Zane Tackett

On Thu, Jun 19, 2025 at 11:16 PM Darby, Samuel G. <darbys@sullcrom.com> wrote:

Zane,

Please let us know if the windows below will work for a call. If not, please let us know some alternative times.

- Tuesday 6/24: 9-1:30 p.m. EST; after 6 p.m. EST
- Friday 6/27: after 1:30 p.m. EST

3AC recently filed a new appearance on the docket in Colorado in which they are attempting to serve you. It is important that we speak with you to discuss next steps.

Thank you,

Sam

FTX_3AC_000044631

(212-558-3129)

**From:** Darby, Samuel G.
**Sent:** Friday, June 06, 2025 12:05 PM
**To:** Zane Tackett <tackett.zane@gmail.com>
**Cc:** Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Beller, Benjamin S. <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>
**Subject:** RE: [EXTERNAL] Re: FTX - Call

Thank you.  Please let us know specific timing availability as soon as it is available.

Sam

(212-558-3129)

**From:** matthew.davs.02@gmail.com <matthew.davs.02@gmail.com> **On Behalf Of** Zane Tackett
**Sent:** Friday, June 06, 2025 11:48 AM
**To:** Darby, Samuel G. <darbys@sullcrom.com>
**Subject:** Re: [EXTERNAL] Re: FTX - Call

Hi Sam,

Zane won't be in contact with me until the 11th. I should hopefully have some date by then.

Thanks for understanding,

Matt

On Fri, Jun 6, 2025 at 12:31 AM Darby, Samuel G. <darbys@sullcrom.com> wrote:

Zane & Matt,

Can you please send some options for a call next week?

Thank you,

Sam

(212-558-3129)

**From:** Darby, Samuel G.
**Sent:** Wednesday, June 04, 2025 12:03 AM
**To:** Zane Tackett <tackett.zane@gmail.com>
**Cc:** Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Beller, Benjamin S. <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>
**Subject:** RE: [EXTERNAL] Re: FTX - Call

FTX_3AC_000044632

Matt,

Thank you for responding. We really need to speak to Zane as soon as possible—can you please let us know specific dates and times when he is available next week?

Thank you,

Sam

(212-558-3129)

---

**From:** matthew.davs.02@gmail.com <matthew.davs.02@gmail.com> **On Behalf Of** Zane Tackett
**Sent:** Wednesday, June 04, 2025 12:01 AM
**To:** Darby, Samuel G. <darbys@sullcrom.com>
**Subject:** Re: [EXTERNAL] Re: FTX - Call

Hi Samuel,

Apologies but Zane won't be available for this week. Would next week suffice?

Thanks,

Matt

On Mon, Jun 2, 2025 at 9:21 PM Darby, Samuel G. <darbys@sullcrom.com> wrote:

Zane/Matt:

I am following up again on this. We need to speak about next steps this week. Can you please let us know some times on Thursday or Friday that work for you?

Best,

Sam

(212-558-3129)

---

**From:** Darby, Samuel G.
**Sent:** Tuesday, May 27, 2025 3:54 PM
**To:** Zane Tackett <tackett.zane@gmail.com>
**Cc:** Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Beller, Benjamin S. <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>
**Subject:** RE: [EXTERNAL] Re: FTX - Call

Good Afternoon,

Please let us know whether any of these windows work for a call. If none will work, please let us know some alternatives for this week.

Best,

Sam

(212-558-3129)

---

**From:** Darby, Samuel G.
**Sent:** Monday, May 26, 2025 10:41 AM
**To:** Zane Tackett <tackett.zane@gmail.com>
**Cc:** Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Beller, Benjamin S. <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>
**Subject:** RE: [EXTERNAL] Re: FTX - Call

Thank you Matt & Zane.  Does a time in any of the windows below work?  Please let me know, and I can send a Zoom invite.

- Tuesday 5/27 (tomorrow):  Noon – 2 p.m.
- Wednesday 5/28:  9 a.m. – 12:30 p.m.; 2 p.m. – 4 p.m.

Best,

Sam

(212-558-3129)

---

**From:** matthew.davs.02@gmail.com <matthew.davs.02@gmail.com> **On Behalf Of** Zane Tackett
**Sent:** Sunday, May 25, 2025 9:13 AM
**To:** Darby, Samuel G. <darbys@sullcrom.com>
**Cc:** Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Beller, Benjamin S. <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>
**Subject:** Re: [EXTERNAL] Re: FTX - Call

Hi,

Apologizes on the delay.

Which dates would you be available to call?

Thanks,

Matt - Zane's Assistant

On Fri, May 23, 2025 at 10:39 PM Darby, Samuel G. <darbys@sullcrom.com> wrote:

Zane,

Please let us know when we can speak about the 3AC litigation, which now involves discovery.  We need to speak to you as soon as possible.

FTX_3AC_000044634

3AC's case in Colorado against you seeking to effectuate substituted service remains open. 3AC is required to provide an update to the court, and we expect that an inability to take your testimony will result in that action advancing. As we discussed, the Debtors will also need your testimony in this matter. We do not see any circumstances in which your testimony will not be required in this matter within the next few months.

Our goal is to address the need for your testimony in the most efficient and least burdensome manner. As part of that, the Debtors are prepared to discuss helping you obtain individual counsel and covering the costs due to your role as a former employee. But we can only proceed in that manner with your cooperation and agreement to dates for a deposition. We need to discuss the details with you within the next week. Please advise of your availability for a call next week.

Thank you,

Sam

(212-558-3129)

---

**From:** Darby, Samuel G.
**Sent:** Monday, April 21, 2025 11:48 AM
**To:** 'Zane Tackett' <tackett.zane@gmail.com>
**Cc:** Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Beller, Benjamin S. <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>
**Subject:** RE: [EXTERNAL] Re: FTX - Call

Zane:

I am reaching out again about the 3AC matter. The litigation is moving forward at this time. 3AC has renewed their efforts in Colorado to formally serve you via substituted service.

We continue think that the best approach will be for you to cooperate with us, which would allow us to facilitate your participation in a way that seeks to reduce the burdens on you. But we really need to speak with you to discuss specifics in order to make that happen.

Please let us know when we can speak, we think a call this week is necessary. If you no longer want to cooperate along the lines we discussed, then please let us know.

Thank you,

Sam

(212-558-3129)

---

**From:** Darby, Samuel G.
**Sent:** Tuesday, April 15, 2025 9:57 PM
**To:** Zane Tackett <tackett.zane@gmail.com>
**Cc:** Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Beller, Benjamin S. <bellerb@sullcrom.com>; Liu,

Sienna <lius@sullcrom.com>
**Subject:** RE: [EXTERNAL] Re: FTX - Call

Hi Zane & Matt,

I am checking in again on the below, as things are picking up in the 3AC litigation.  Please let us know some available times for a call to discuss—it is important that we are able to confirm next steps very soon.

Thank you,

Sam

(212-558-3129)

---

**From:** Darby, Samuel G.
**Sent:** Thursday, April 10, 2025 11:55 AM
**To:** 'Zane Tackett' <tackett.zane@gmail.com>
**Cc:** Glueckstein, Brian D. <gluecksteinb@sullcrom.com>; Beller, Benjamin S. <bellerb@sullcrom.com>; Liu, Sienna <lius@sullcrom.com>
**Subject:** RE: [EXTERNAL] Re: FTX - Call

Thanks.  FTX's litigation with 3AC is now moving forward.  We need to speak earlier than that about the deposition that is needed, and the possibility of providing Zane counsel at FTX's expense to guide that process.  If Zane intends to cooperate as previously agreed, he needs to make himself available for a call with us over the course of the next week or so.  Please let us know available time slots.

Best,

Sam

(212-558-3129)

---

**From:** matthew.davs.02@gmail.com <matthew.davs.02@gmail.com> **On Behalf Of** Zane Tackett
**Sent:** Thursday, April 10, 2025 4:16 AM
**To:** Darby, Samuel G. <darbys@sullcrom.com>
**Subject:** Re: [EXTERNAL] Re: FTX - Call

Hi Samuel,

Zane will most likely be free in May, as he is skiing for the next few weeks. I will probably have contact with him on the 12th and will relay your message.

Thank you for your patience,

Matt

On Thu, Apr 10, 2025 at 5:23 AM Darby, Samuel G. <darbys@sullcrom.com> wrote:

Hi Zane,

FTX_3AC_000044636

Can you please let us know when you'll be available for a discussion on updates/next steps?

Thanks!

Sam

(212-558-3129)

---

**From:** Darby, Samuel G.
**Sent:** Thursday, April 03, 2025 7:57 AM
**To:** Zane Tackett <tackett.zane@gmail.com>
**Subject:** RE: [EXTERNAL] Re: FTX - Call

Hi Matt & Zane,

Apologies these times don't work on our end.  When would Zane next be available?

Thank you!

Sam

---

**From:** matthew.davs.02@gmail.com <matthew.davs.02@gmail.com> on behalf of: Zane Tackett <tackett.zane@gmail.com>

**Date:** Wednesday, Apr 02, 2025 at 11:05 AM

**To:** Darby, Samuel G. <darbys@sullcrom.com>

**Subject:** [EXTERNAL] Re: FTX - Call

Hi Samuel,

Zane will be quite busy in Alaska from 4th onwards. Would you be available to take a call today or tomorrow? If so please leave us with some times. On a side note Zane is on MDT time.

Thanks,

Matt

On Tue, Apr 1, 2025 at 11:55 PM Darby, Samuel G. <darbys@sullcrom.com> wrote:

Hi Zane,

FTX_3AC_000044637

I hope you've been well. It would be helpful to have a call with you to discuss some developments and next steps. Can you please let us know if any times in the windows below work for you? If not, please let me know what would be better.

- **Tuesday 4/8**: 8:00 p.m. – 9:00 p.m. ICT / 9:00 a.m. – 10:00 a.m. EST
- **Wednesday 4/9:** 8:00 p.m. – 10:00 p.m. ICT / 9:00 a.m. – 11:00 a.m. EST

Thank you!

Sam

Samuel Darby

Sullivan & Cromwell LLP | 125 Broad Street | New York, NY  10004

T: (212) 558-3129 | C: (860) 918-8390

darbys@sullcrom.com | http://www.sullcrom.com

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

**\*\*This is an external message from:** tackett.zane@gmail.com **\*\***

FTX_3AC_000044638

# **Exhibit 22**

Message
_____

**From**:        Zane Tackett [tackett.zane@gmail.com]
**Sent**:        8/26/2025 8:01:08 AM
**To**:          Darby, Samuel G. [darbys@sullcrom.com]; Glueckstein, Brian D. [gluecksteinb@sullcrom.com]; Beller, Benjamin S.
                 [bellerb@sullcrom.com]; Liu, Sienna [lius@sullcrom.com]
**Subject**:     [EXTERNAL] Signal screenshots


Hello,

Please see the screenshots attached.



FTX_3AC_000044620



Cheers,
Zane Tackett

**This is an external message from: tackett.zane@gmail.com **

FTX_3AC_000044621

# Exhibit 23



Sign in

FTX Exchange  >  Trading  >  Futures

Search articles

# Liquidations



**FTX Crypto Derivatives Exchange**
Updated 21 days ago

---

**BROWSE** ⌄

*Notes:*
*1) While FTX aims to reduce the likelihood of clawbacks, they are still possible.*
*2) Estimated liquidation price is just an estimate.  When an account actually gets liquidated will depend on multiple factors including the performance of all contracts your account holds a position in, the currency your collateral is in, and other factors.*
*3) FTX is not offered to US customers.*
*4) None of this is investment advice.*

----------------

FTX significantly reduces the likelihood of clawbacks by using a three-tiered liquidation model:



We first close positions down carefully with rate-limited **liquidation orders** in the market.

We have a **unique backstop liquidity provider program** which jumps in to provide to accounts in danger of bankruptcy.

We leverage the **insurance fund** to prevent customer losses.

Step 1:

An account begins to get liquidated if its margin fraction is less than its maintenance margin.  So if its maintenance margin fraction is 3% then it would begin to get liquidated once it became 33x leveraged. During liquidation, users are unable to send orders on their account: the liquidation engine takes over.

The liquidation engine will then periodically send orders in the market to close down the account's position.  The goal of the liquidation engine is to carefully close down positions in the market while minimizing impact, keeping markets orderly.  The liquidation engine just sends standard limit orders on behalf of the account getting liquidated.

The speed of the liquidation will depend on the position size but for small positions it will aim to fully close down the position in about one minute.  If partially liquidating the account causes its leverage to drop back below the threshold, the liquidation will end.

Step 2:

If account falls even closer to bankruptcy, the backstop liquidity provider system will kick in.  This happens if the account's margin drops below the auto-close margin fraction.  So if the auto-close margin fraction is 2%, then if the account becomes 50x leveraged, the account will begin to close down against the backstop liquidity providers.

FTX_3AC_000013854

When an account is getting auto-closed, it will have its position closed down at the
bankruptcy price, and backstop liquidity providers will take over the position.  A portion
of the remaining collateral goes to the backstop liquidity fund.

Step 3:

If an account does go bankrupt, the backstop liquidity fund will pay out to bring the
account's balance back to 0.

The more technical explanation:

# Step 1:

If the account's margin fraction is less than maintenance margin but above auto-close
margin fraction, then:

Approximately every 6 seconds, we send 10% of the position size as a order on the
market, between 1 and 5 basis points through the book, with the constraint that the total
sizes of liquidation orders is less than 0.0001 times the average daily volume of the
underlying coin summed across all liquidating positions.

Specifically:

- Every second, for each future, with probability ⅙:
    - Set order size to 10% of position size
    - Bound order notional from below by min($1000, position size)
    - Bound order size from above by max liquidation size remaining
    - Multiply order size by uniform(0.5, 1.5)
    - Bound order size from above by position size
    - Decrease max liquidation size remaining by order size
    - Send order uniform(1bp, 5bp) through the book, expiring 1 second later
- Set max liquidation size remaining to 0.0001 times the underlying ADV (note:
  this is a global max shared between all accounts)
- For each account whose margin fraction is between maintenance margin
  and auto-close margin fraction, in random order:

If the account's margin fraction is less than auto-close margin fraction, then:

Every second, auto-close (1 - margin fraction / auto-close margin fraction) * position size, bounded below by min($1000, position size). If margin fraction < 0, auto-close the entire position.

Backstop Liquidity Providers (BLPs) have a max capacity per minute and per hour. Position is closed against BLPs in proportion to remaining capacity. If BLPs total capacity is insufficient, the remaining size is closed against users with large opposing positions (starting with the top 10 opposing positions, more if their total is insufficient), in proportion to their position sizes.

Liquidated account closes at ZP. The BLP takes over the account at ⅔ * ZP + ⅓ * MP, but not worse than MP plus MP * 10% * auto-close margin fraction. backstop liquidity fund covers the rest--i.e. it gets ⅓*abs(MP-ZP) if the account isn't yet bankrupt, and pays abs(MP-ZP) + 0.1 * MP * ACMF if it is. If account is bankrupt and backstop liquidity fund is empty, the remaining is taken from positions with positive unrealized pnl (proportionally to pnl).

BLP auto-closing orders do not print in the trade history.

If a contract hits a circuit breaker, MP is the premium as of when the circuit breaker was enacted plus current index price.


# Step 3:

Whenever an account hits the auto-close margin fraction, the backstop liquidity fund steps in. If the account isn't yet bankrupt, then the backstop liquidity fund **gains** 1/3 of the remaining value of the account. If the account *is* already bankrupt, then the backstop liquidity fund **pays** the negative value of the account (plus 10% of the auto-close margin fraction) to prevent clawbacks.


Customers will only have their positions auto-closed if an account hits auto-close margin fraction *and* the backstop liquidity providers are out of capacity. Customers only face clawbacks if an account goes bankrupt *and* the backstop liquidity fund is empty.

FTX_3AC_000013856

# How can I determine my liquidation risk?

There are two ways to determine when your account would get liquidated.

#1: Estimated Liquidation Price

If you go to any market page there will be an informational box on the right hand side. You can find an *Estimated liquidation price* there; if you don't have any other positions on then your position will start to get liquidated if the future's mark price gets there.



#2: Maintenance Margin Requirement

Once again look at the informational box on the right hand side.  You can also find your current amount of leverage used there, and your current m*argin fraction*, which is just 1/leverage.  Your account will begin to get liquidated if your margin fraction drops below the *maintenance margin requirement*, also displayed in the box.  Maintenance margin fraction starts at 3% and increases with position size, so you will begin to get liquidated if your account gets to ~33x leverage (or less depending on position size).

FTX_3AC_000013857

| | |
|---|---|
| Index price: | 10,415.26 |
| Mark price: | 10,406.25 |
| Open interest: | 485.9656 BTC |
| 24h volume: | 8,964.6697 BTC |
| Next funding time: | 10:00:00 AM |
| Predicted funding rate: | -0.0013% |
| Total collateral: | $808.73 |
| Free collateral: | $280.42 |
| Leverage: | 12.87x |
| Max allowed leverage: | 20x |
| Margin fraction: | 8% |
| Maintenance margin requirement: | 4% |
| BTC-PERP position: | Long 1.0000 BTC |
| Estimated liquidation price: | $10,013.77 |
| Unrealized PnL: | $0.00 |
| Realized PnL: | $188.62 |

In the example above the user has a margin fraction of 8%:

Position size = 1 BTC * 10,406.25 $/BTC = $10,406

Total collateral = $808.73

Margin fraction = 808.73/10406.25 = 8%.

They will get liquidated  if their margin drops down to the maintenance margin requirement of 4%.  That means they'll get liquidated if markets move 8% - 4% = 4% down.

In general, the formula for estimated liquidation price should be:

Estimated Liquidation Price = Mark Price * ( 1 + Maintenance margin requirement - Total Collateral / Total Notional Size ) if you are long

Estimated Liquidation Price = Mark Price * ( 1 - Maintenance margin requirement + Total Collateral / Total Notional Size ) if you are short

Note that Total Notional Size here refers to the sum of your open position size, measured in USD, across all positions in that subaccount.  Also note that estimated liquidation prices can be unintuitive, especially if you have positions in multiple contracts. **Depend on the relative performance of different positions you hold, the actual price your account would get liquidated at might be different from your estimated liquidation price**: it's impossible to show a perfect estimated liquidation price for BTC-PERP if you also have an XRP-PERP position on, because your account's margin will also depend on the performance of XRP-PERP.

FTX_3AC_000013858

Note that we try to liquidate accounts slowly, and we will stop if your account's margin
fraction gets above maintenance, so we might only have to liquidate part of your
position.  For more information see here.

If you are worried about liquidations and don't want to actively manage your margin,
consider trading leveraged tokens; they allow 3x leverage and automatically rebalance to
avoid liquidations.  For more information see here.


# Collateral

Collateral for the futures is in stablecoins.  The current set of accepted stablecoins is
USDC, TUSD, USDP, BUSD, or HUSD.

To deposit or withdraw collateral, go to your wallet page and deposit either USDC, TUSD,
USDP, BUSD, or HUSD.  Depositing either will credit your account with 'USD', which is
automatically used as collateral for all of your futures trades.

By default all margin is posted in 'USD' in your wallet.  USD can be funded by depositing
USDC, TUSD, USDP, BUSD, or HUSD.

See Non-USD Collateral for more details.

Any positive PnL will be paid out in USD regardless of which type of collateral you
use.See here for more details.

By default all positions use the same collateral pool, and all USD, non-USD fiat, and
above cryptocurrencies in your wallet count as collateral.  Each subaccount has one
central collateral wallet and uses cross margining for the account.  Each subaccount has
separate margin and collateral from other subaccounts.

If you want to use isolated margin create a subaccount for that position and move in
collateral.

_____

CONFIDENTIAL

**ARTICLES IN THIS SECTION**

What Are Futures?

Margin/Collateral

Non-USD Collateral

Complete Futures Specs

Settlement & Delivery

Funding

Contracts Specs

Order Limits and Price Bands

**Liquidations**

Backstop Liquidity Provider Program

---

**RELATED ARTICLES**

Margin/Collateral

Complete Futures Specs

Fees

Spot Margin Trading Explainer

Order Limits and Price Bands

---

**PROMOTED ARTICLES**

FTX Features Overview

How to participate in the PsyOptions Sale

Deposit to your FTX account to earn VIP status

VIP Program and Market Maker Policy

Sign up and trade to win 10 SAND each! A total of 100,000 SAND to be won!

## Didn't find what you were looking for?

Create a support ticket

CONFIDENTIAL

**Community**

   

## Was this article helpful?

| Yes | No |
|-----|-----|

1 out of 1 found this helpful



English (US) ⌄

FTX Services and FTX Token (FTT) are not available in the United States or other prohibited jurisdictions

FTX_3AC_000013861

# Exhibit 24

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                            22 CR 673 (LAK)

 5   SAMUEL BANKMAN-FRIED,

 6                  Defendant.               Trial
     ------------------------------x

 7
                                             New York, N.Y.
 8                                           October 16, 2023
                                             9:40 a.m.
 9

10   Before:

11
                          HON. LEWIS A. KAPLAN,
12
                                             District Judge
13
                             APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  DANIELLE R. SASSOON
          NICOLAS ROOS
17        DANIELLE KUDLA
          SAMUEL RAYMOND
18        THANE REHN
          Assistant United States Attorneys
19
     COHEN & GRESSER, LLP
20        Attorneys for Defendant
     BY:  MARK S. COHEN
21        CHRISTIAN R. EVERDELL
          SRI K. KUEHNLENZ
22        DAVID F. LISNER

23   Also Present:
     Luke Booth, FBI
24   Kristin Allain, FBI
     Arjun Ahuja, USAO Paralegal Specialist
25   Grant Bianco, USAO Paralegal Specialist
```

1    Q.   What are the parties listed to the agreement on the end of

2    the document?

3    A.   Incentive Ecosystem Foundation and FTX Trading Ltd.

4    Q.   Are you familiar with Incentive Ecosystem Foundation?

5    A.   Sort of.

6    Q.   Okay.  And FTX Trading Ltd.?

7    A.   Yes.

8    Q.   And who signed on behalf of FTX Trading Ltd.?

9    A.   Sam Bankman-Fried.

10   Q.   Okay.  Now let's go back to the first page.

11        Do you see here where it says the fee amount that

12   would be paid?

13   A.   Yes.

14   Q.   And what was the fee amount listed in this agreement?

15   A.   25 percent of the distributed rewards.

16   Q.   And what fee percentage did you discuss with the defendant

17   in December of 2021?

18   A.   25 percent.

19   Q.   Now do you see the date on this document——

20   A.   Yes.

21   Q.   ——at the top?  And what is the date of the document?

22   A.   January 1, 2021.

23   Q.   When was it that you first discussed fees for staking Serum

24   with the defendant?

25   A.   December 30th or 31st, 2021.

1   Q.  Let me just be clear about something.  Had you seen this

2   document back in 2021?

3   A.  No.

4        MR. ROOS:  We can take this down.

5   Q.  In addition to this——my questions to you about revenue,

6   what, if anything, was done at FTX to remove losses from the

7   company's expenses?

8   A.  In one instance, there were a bunch of accounts that found

9   an exploit in Gary's original version of the spot margin

10  system.  They had essentially borrowed a lot of dollars against

11  some MobileCoin, but if sold, the MobileCoin wasn't going to

12  actually cover the full amount.

13       MR. COHEN:  Objection, foundation.

14       THE COURT:  Try again, Mr. Roos.  The jury will

15  disregard it.

16  Q.  So just to take it in pieces, I asked you what, if

17  anything, was done at FTX to remove losses from the total

18  expenses.  Were there——so let me actually ask you instead:  In

19  2021, were you aware of any losses——just yes or no——associated

20  with problems in the margins of some?

21  A.  Yes.

22  Q.  And how did you come to learn about those losses?

23  A.  Ryan Salame and Sam Bankman-Fried sounded the alarms about

24  somebody exploiting the margin system.

25  Q.  Can you describe what you learned.

1   A.   I learned that there were a number of accounts that had

2   deposited a lot of MOB——or M-O-B, MobileCoin——as collateral,

3   and had withdrawn a lot of USD against it using the spot margin

4   system.  They had done so in a way such that the——in a way that

5   the FTX margin system essentially overvalued how much it could

6   get out of the MobileCoin, meaning that these accounts weren't

7   yet liquidated but really should have been much earlier.

8   Q.   And what, if any, losses resulted from this?

9   A.   I heard from Sam Bankman-Fried——he told me, after it was

10  addressed, that the losses would constitute a fraction of

11  Alameda's revenue that year, around $1 billion.

12  Q.   What, if anything, did the defendant say about what should

13  be done with the loss?

14  A.   He directed the reassigning of the accounts themselves that

15  had on these positions that should have been but were not

16  liquidated to Alameda, meaning that Alameda absorbed the losses

17  associated with those accounts.

18  Q.   And what, if anything, was the effect of moving those

19  losses to Alameda's account?

20  A.   It meant that because Alameda data is not publicly shared,

21  that these losses would not be publicly shared.

22  Q.   Okay.  I want to change topics.

23          Directing your attention to November of 2022.  Can

24  you, at a high level, describe what happened to FTX.

25  A.   Collapsed.  Customers tried to withdraw their money and FTX

 1   didn't have it.

 2   Q.  So let's break it down.

 3        Did there come a time in November 2022 when you

 4   learned about an increase in customer withdrawals?

 5   A.  Yes, November 5th.

 6   Q.  And what did you observe at the time?

 7   A.  Clients had moved a lot of FTT that they owned on chain to

 8   their exchange.  This signaled to the crypto industry that a

 9   lot of FTT was about to be sold.  This followed a leak of an

10   Alameda balance sheet that had been published a few days

11   earlier.  I was very concerned that this might spell doom and

12   the end of our attempts to make customers whole, and the end of

13   the ongoing fraud, and that the mechanism for the doom would

14   have been customers withdrawing.

15   Q.  And so can you explain why you were concerned that

16   withdrawals would be a problem for FTX.

17   A.  Because customers believed, were told that they had

18   balances that were not backed, and so if they withdrew more

19   than the limited funds that existed, it would become evident

20   that there was an enormous hole and that their funds had been

21   used.

22   Q.  Just to clarify your answer, you said customers were told

23   that they had funds that were not backed.  Did you mean

24   customers were told that they had funds and they were not

25   backed or customers were told they had funds but were not

# **Exhibit 25**

| Manage articles | Moderate content | Arrange content | Customize design | User permissions | Settings |

©Zendesk

Add

Help Center

Back

# Liquidations

Apr 4, 2022, 6:08:06 PM

*Notes:*
*1) While FTX aims to reduce the likelihood of clawbacks, they are still possible.*
*2) Estimated liquidation price is just an estimate. When an account actually gets liquidated will depend on multiple factors including the performance of all contracts your account holds a position in, the currency your collateral is in, and other factors.*
*3) FTX is not offered to US customers.*
*4) None of this is investment advice.*
*----------------*

FTX significantly reduces the likelihood of clawbacks by using a three-tiered liquidation model:

We first close positions down carefully with rate-limited **liquidation orders** in the market.



We have a **unique backstop liquidity provider program** which jumps in to provide to accounts in danger of bankruptcy.



We leverage the **insurance fund** to prevent customer losses.

Step 1:

An account begins to get liquidated if its margin fraction is less than its maintenance margin. So if its maintenance margin fraction is 3% then it would begin to get liquidated once it became 33x leveraged. During liquidation, users are unable to send orders on their account: the liquidation engine takes

Confidential

over.

The liquidation engine will then periodically send orders in the market to close down the account's position. The goal of the liquidation engine is to carefully close down positions in the market while minimizing impact, keeping markets orderly. The liquidation engine just sends standard limit orders o behalf of the account getting liquidated.

The speed of the liquidation will depend on the position size but for small positions it will aim to fully close down the position in about one minute. If partially liquidating the account causes its leverage to drop back below the threshold, the liquidation will end.

Step 2:

If account falls even closer to bankruptcy, the backstop liquidity provider system will kick in. This happens if the account's margin drops below the auto-close margin fraction. So if the auto-close margin fraction is 2%, then if the account becomes 50x leveraged, the account will begin to close down again the backstop liquidity providers.

When an account is getting auto-closed, it will have its position closed down at the bankruptcy price, and backstop liquidity providers will take over the position. A portion of the remaining collateral goes to the backstop liquidity fund.

Step 3:

If an account does go bankrupt, the backstop liquidity fund will pay out to bring the account's balance back to 0.

The more technical explanation:

# Step 1:

If the account's margin fraction is less than maintenance margin but above auto-close margin fraction, then:

Approximately every 6 seconds, we send 10% of the position size as a order on the market, between 1 and 5 basis points through the book, with the constraint that the total sizes of liquidation orders is less than 0.0001 times the average daily volume of the underlying coin summed across all liquidatin positions.

Specifically:

1. Every second, for each future, with probability ¼:
    1. Set order size to 10% of position size
    2. Bound order notional from below by min($1000, position size)
    3. Bound order size from above by max liquidation size remaining
    4. Multiply order size by uniform(0.5, 1.5)
    5. Bound order size from above by position size
    6. Decrease max liquidation size remaining by order size
    7. Send order uniform(1bp, 5bp) through the book, expiring 1 second later
    1. Set max liquidation size remaining to 0.0001 times the underlying ADV (note: this is a global max shared between all accounts)
    2. For each account whose margin fraction is between maintenance margin and auto-close margin fraction, in random order:

# Step 2:

If the account's margin fraction is less than auto-close margin fraction, then:

Every second, auto-close (1 - margin fraction / auto-close margin fraction) * position size, bounded below by min($1000, position size). If margin fraction < 0, auto-close the entire position.

Backstop Liquidity Providers (BLPs) have a max capacity per minute and per hour. Position is closed against BLPs in proportion to remaining capacity. If BLPs total capacity is insufficient, the remaining size is closed against users with large opposing positions (starting with the top 10 opposing positions, more if their total is insufficient), in proportion to their position sizes.

Liquidated account closes at ZP. The BLP takes over the account at ⅔ * ZP + ⅓ * MP, but not worse than MP plus MP * 10% * auto-close margin fraction. backstop liquidity fund covers the rest--i.e. it gets ⅓*abs(MP-ZP) if the account isn't yet bankrupt, and pays abs(MP-ZP) + 0.1 * MP * ACMF if it is. If accou is bankrupt and backstop liquidity fund is empty, the remaining is taken from positions with positive unrealized pnl (proportionally to pnl).

BLP auto-closing orders do not print in the trade history.

If a contract hits a circuit breaker, MP is the premium as of when the circuit breaker was enacted plus current index price.

FTX_3AC_000045168

Step 3:

Whenever an account hits the auto-close margin fraction, the backstop liquidity fund steps in.  If the account isn't yet bankrupt, then the backstop liquidity fund**gains** 1/3 of the remaining value of the account.  If the account *is* already bankrupt, then the backstop liquidity fund**pays** the negative value of the account (plus 10% of the auto-close margin fraction) to prevent clawbacks.

Customers will only have their positions auto-closed if an account hits auto-close margin fraction *and* the backstop liquidity providers are out of capacity.  Customers only face clawbacks if an account goes bankrupt *and* the backstop liquidity fund is empty.

## How can I determine my liquidation risk?

There are two ways to determine when your account would get liquidated.

#1: Estimated Liquidation Price

If you go to any market page there will be an informational box on the right hand side.  You can find an *Estimated liquidation price* there; if you don't have any other positions on then your position will start to get liquidated if the future's mark price gets there.



#2: Maintenance Margin Requirement

Once again look at the informational box on the right hand side.  You can also find your current amount of leverage used there, and your current m*argin fraction*, which is just 1/leverage.  Your account will begin to get liquidated if your margin fraction drops below the *maintenance margin requirement*, also displayed in the box.  Maintenance margin fraction starts at 3% and increases with position size, so you will begin to get liquidated if your account gets to ~33x leverage (or less depending on position size).

FTX_3AC_000045169

In the example above the user has a margin fraction of 8%:

Position size = 1 BTC * 10,406.25 $/BTC = $10,406

Total collateral = $808.73

Margin fraction = 808.73/10406.25 = 8%.

They will get liquidated  if their margin drops down to the maintenance margin requirement of 4%.  That means they'll get liquidated if markets move 8%
4% = 4% down.

In general, the formula for estimated liquidation price should be:

Estimated Liquidation Price = Mark Price * ( 1 + Maintenance margin requirement - Total Collateral / Total Notional Size ) if you are long

Estimated Liquidation Price = Mark Price * ( 1 - Maintenance margin requirement + Total Collateral / Total Notional Size ) if you are short

Note that Total Notional Size here refers to the sum of your open position size, measured in USD, across all positions in that subaccount.  Also note that estimated liquidation prices can be unintuitive, especially if you have positions in multiple contracts.  **Depend on the relative performance of different positions you hold, the actual price your account would get liquidated at might be different from your estimated liquidation price**: it's impossible show a perfect estimated liquidation price for BTC-PERP if you also have an XRP-PERP position on, because your account's margin will also depend on the performance of XRP-PERP.

Note that we try to liquidate accounts slowly, and we will stop if your account's margin fraction gets above maintenance, so we might only have to liquidate part of your position.  For more information see here.

If you are worried about liquidations and don't want to actively manage your margin, consider trading leveraged tokens; they allow 3x leverage and automatically rebalance to avoid liquidations.  For more information see here.

## Collateral

Collateral for the futures is in stablecoins.  The current set of accepted stablecoins is USDC, TUSD, USDP, BUSD, or HUSD.

To deposit or withdraw collateral, go to your wallet page and deposit either USDC, TUSD, USDP, BUSD, or HUSD.  Depositing either will credit your account with 'USD', which is automatically used as collateral for all of your futures trades.

By default all margin is posted in 'USD' in your wallet.  USD can be funded by depositing USDC, TUSD, USDP, BUSD, or HUSD.

See Non-USD Collateral for more details.

Any positive PnL will be paid out in USD regardless of which type of collateral you use.See here for more details.

By default all positions use the same collateral pool, and all USD, non-USD fiat, and above cryptocurrencies in your wallet count as collateral.  Each subaccount has one central collateral wallet and uses cross margining for the account.  Each subaccount has separate margin and collateral from other subaccounts.

If you want to use isolated margin create a subaccount for that position and move in collateral.

---

Restore

☑ Show changes



PublishedNov 2, 2022, 11:44:09 AMFTX Crypto Derivatives Exchange



Body updatedNov 2, 2022, 11:43:58 AMFTX Crypto Derivatives Exchange



PublishedNov 2, 2022, 11:39:17 AMFTX Crypto Derivatives Exchange



Body updatedNov 2, 2022, 11:39:12 AMFTX Crypto Derivatives Exchange



Body updatedNov 2, 2022, 11:35:27 AMFTX Crypto Derivatives Exchange



PublishedNov 2, 2022, 11:31:47 AMFTX Crypto Derivatives Exchange



Body updatedNov 2, 2022, 11:31:46 AMFTX Crypto Derivatives Exchange



Body updatedNov 2, 2022, 11:23:05 AMFTX Crypto Derivatives Exchange



FTX_3AC_000045171

PublishedOct 24, 2022, 1:05:05 PMFTX Crypto Derivatives Exchange



Body updatedOct 24, 2022, 1:05:04 PMFTX Crypto Derivatives Exchange



PublishedAug 15, 2022, 7:47:22 PMFTX Crypto Derivatives Exchange



PublishedAug 2, 2022, 1:13:21 AMFTX Crypto Derivatives Exchange



Body updatedAug 2, 2022, 1:13:21 AMFTX Crypto Derivatives Exchange



PublishedJun 21, 2022, 11:24:20 PMFTX Crypto Derivatives Exchange



Body updatedJun 21, 2022, 11:24:13 PMFTX Crypto Derivatives Exchange



PublishedJun 21, 2022, 11:22:56 PMFTX Crypto Derivatives Exchange



Body updatedJun 21, 2022, 11:22:55 PMFTX Crypto Derivatives Exchange

FTX_3AC_000045172



PublishedApr 4, 2022, 6:08:06 PMFTX Crypto Derivatives Exchange



Body updatedApr 4, 2022, 6:06:53 PMFTX Crypto Derivatives Exchange



PublishedJan 4, 2022, 2:00:24 AMFTX Crypto Derivatives Exchange



PublishedDec 3, 2021, 10:20:46 AMFTX Crypto Derivatives Exchange



Body updatedDec 3, 2021, 10:20:44 AMFTX Crypto Derivatives Exchange



PublishedSep 10, 2021, 3:18:46 PMFTX Crypto Derivatives Exchange



Body updatedSep 10, 2021, 3:18:44 PMFTX Crypto Derivatives Exchange



PublishedSep 1, 2021, 2:49:24 PMFTX Crypto Derivatives Exchange



FTX_3AC_000045173

Body updatedSep 1, 2021, 2:49:23 PMFTX Crypto Derivatives Exchange



PublishedAug 26, 2021, 8:57:09 PMFTX Crypto Derivatives Exchange



Body updatedAug 26, 2021, 8:57:05 PMFTX Crypto Derivatives Exchange



PublishedJul 30, 2021, 4:20:54 PMFTX Crypto Derivatives Exchange



Body updatedJul 30, 2021, 4:20:52 PMFTX Crypto Derivatives Exchange



PublishedMay 21, 2021, 11:58:06 AMFTX Crypto Derivatives Exchange



Body updatedMay 21, 2021, 11:58:05 AMFTX Crypto Derivatives Exchange



PublishedDec 8, 2020, 4:09:36 AMFTX Crypto Derivatives Exchange



Body updatedDec 8, 2020, 4:09:35 AMFTX Crypto Derivatives Exchange

FTX_3AC_000045174



PublishedOct 13, 2020, 8:36:52 PMFTX Crypto Derivatives Exchange



Body updatedOct 13, 2020, 8:36:52 PMFTX Crypto Derivatives Exchange



PublishedJul 29, 2020, 9:37:18 AMFTX Crypto Derivatives Exchange



Body updatedJul 29, 2020, 9:37:18 AMFTX Crypto Derivatives Exchange



PublishedJul 23, 2020, 6:48:22 AMFTX Crypto Derivatives Exchange



Body updatedJul 23, 2020, 6:48:19 AMFTX Crypto Derivatives Exchange



PublishedJun 8, 2020, 10:22:20 AMFTX Crypto Derivatives Exchange



Body updatedJun 8, 2020, 10:22:19 AMFTX Crypto Derivatives Exchange



FTX_3AC_000045175

PublishedJun 8, 2020, 10:19:56 AMFTX Crypto Derivatives Exchange



Body updatedJun 8, 2020, 10:19:56 AMFTX Crypto Derivatives Exchange



PublishedMay 10, 2020, 5:59:44 PMFTX Crypto Derivatives Exchange



Body updatedMay 10, 2020, 5:59:43 PMFTX Crypto Derivatives Exchange



PublishedMay 6, 2020, 11:01:13 PMFTX Crypto Derivatives Exchange



PublishedMay 1, 2020, 11:57:03 AMFTX Crypto Derivatives Exchange



Body updatedMay 1, 2020, 11:57:01 AMFTX Crypto Derivatives Exchange



PublishedApr 7, 2020, 4:31:15 AMFTX Crypto Derivatives Exchange



Body updatedApr 7, 2020, 4:31:15 AMFTX Crypto Derivatives Exchange

Confidential



PublishedApr 7, 2020, 1:02:51 AMFTX Crypto Derivatives Exchange



Body updatedApr 7, 2020, 1:02:51 AMFTX Crypto Derivatives Exchange



PublishedMar 31, 2020, 7:09:41 AMFTX Crypto Derivatives Exchange



Body updatedMar 31, 2020, 7:09:41 AMFTX Crypto Derivatives Exchange



PublishedMar 27, 2020, 5:09:59 AMFTX Crypto Derivatives Exchange



Body updatedMar 27, 2020, 5:09:58 AMFTX Crypto Derivatives Exchange



PublishedMar 27, 2020, 4:47:29 AMFTX Crypto Derivatives Exchange



Body updatedMar 27, 2020, 4:47:11 AMFTX Crypto Derivatives Exchange



PublishedMar 27, 2020, 4:06:54 AMFTX Crypto Derivatives Exchange



Body updatedMar 27, 2020, 4:06:53 AMFTX Crypto Derivatives Exchange



PublishedMar 18, 2020, 6:15:53 AMFTX Crypto Derivatives Exchange



Body updatedMar 18, 2020, 6:15:52 AMFTX Crypto Derivatives Exchange



PublishedMar 9, 2020, 8:52:58 PMFTX Crypto Derivatives Exchange



Body updatedMar 9, 2020, 8:52:56 PMFTX Crypto Derivatives Exchange



PublishedMar 6, 2020, 5:47:16 AMFTX Crypto Derivatives Exchange



Body updatedMar 6, 2020, 5:47:15 AMFTX Crypto Derivatives Exchange



PublishedFeb 15, 2020, 1:36:02 AMFTX Crypto Derivatives Exchange

FTX_3AC_000045178



Body updatedFeb 15, 2020, 1:36:00 AMFTX Crypto Derivatives Exchange



PublishedDec 13, 2019, 2:40:00 AMFTX Crypto Derivatives Exchange



Body updatedDec 13, 2019, 2:39:59 AMFTX Crypto Derivatives Exchange



PublishedNov 24, 2019, 6:51:34 PMFTX Crypto Derivatives Exchange



Body updatedNov 24, 2019, 6:51:33 PMFTX Crypto Derivatives Exchange



PublishedOct 12, 2019, 6:30:44 AMFTX Crypto Derivatives Exchange



Body updatedOct 12, 2019, 6:30:43 AMFTX Crypto Derivatives Exchange



PublishedOct 12, 2019, 6:29:41 AMFTX Crypto Derivatives Exchange



FTX_3AC_000045179

Body updatedOct 12, 2019, 6:29:20 AMFTX Crypto Derivatives Exchange



PublishedOct 12, 2019, 6:25:49 AMFTX Crypto Derivatives Exchange



Body updatedOct 12, 2019, 6:25:47 AMFTX Crypto Derivatives Exchange



PublishedOct 8, 2019, 9:06:16 PMFTX Crypto Derivatives Exchange



Body updatedOct 8, 2019, 9:06:14 PMFTX Crypto Derivatives Exchange



PublishedOct 3, 2019, 7:48:50 AMFTX Crypto Derivatives Exchange



Body updatedOct 3, 2019, 7:48:48 AMFTX Crypto Derivatives Exchange



PublishedAug 13, 2019, 10:23:37 AMFTX Crypto Derivatives Exchange



Ready for publishingAug 13, 2019, 10:12:39 AMFTX Crypto Derivatives Exchange

Confidential



PublishedAug 9, 2019, 12:39:16 PMFTX Crypto Derivatives Exchange



Body updatedAug 9, 2019, 12:39:15 PMFTX Crypto Derivatives Exchange



PublishedAug 9, 2019, 12:34:31 PMFTX Crypto Derivatives Exchange



Body updatedAug 9, 2019, 12:34:30 PMFTX Crypto Derivatives Exchange



PublishedAug 9, 2019, 12:34:09 PMFTX Crypto Derivatives Exchange



Body updatedAug 9, 2019, 12:34:07 PMFTX Crypto Derivatives Exchange



PublishedAug 9, 2019, 12:34:03 PMFTX Crypto Derivatives Exchange



Body updatedAug 9, 2019, 12:34:01 PMFTX Crypto Derivatives Exchange



FTX_3AC_000045181

PublishedAug 9, 2019, 12:33:49 PMFTX Crypto Derivatives Exchange



Body updatedAug 9, 2019, 12:33:48 PMFTX Crypto Derivatives Exchange



PublishedJul 28, 2019, 10:02:22 PMFTX Crypto Derivatives Exchange



Body updatedJul 28, 2019, 10:02:20 PMFTX Crypto Derivatives Exchange



PublishedJul 28, 2019, 10:04:15 AMFTX Crypto Derivatives Exchange



Body updatedJul 28, 2019, 10:04:13 AMFTX Crypto Derivatives Exchange



PublishedJul 21, 2019, 1:38:14 PMFTX Crypto Derivatives Exchange



Body updatedJul 21, 2019, 1:38:12 PMFTX Crypto Derivatives Exchange



PublishedJul 15, 2019, 12:09:16 PMFTX Crypto Derivatives Exchange

Confidential



Body updatedJul 15, 2019, 12:09:14 PMFTX Crypto Derivatives Exchange



PublishedJun 18, 2019, 2:56:41 PMFTX Crypto Derivatives Exchange



Body updatedJun 18, 2019, 2:56:41 PMFTX Crypto Derivatives Exchange



PublishedJun 5, 2019, 6:31:56 PMFTX Crypto Derivatives Exchange



Body updatedJun 5, 2019, 6:31:55 PMFTX Crypto Derivatives Exchange



PublishedMay 7, 2019, 9:24:44 AMFTX Crypto Derivatives Exchange



Body updatedMay 7, 2019, 9:24:41 AMFTX Crypto Derivatives Exchange



Body updatedMay 4, 2019, 9:47:39 AMFTX Crypto Derivatives Exchange



FTX_3AC_000045183

PublishedMay 4, 2019, 6:28:01 AMFTX Crypto Derivatives Exchange



Body updatedMay 4, 2019, 6:28:00 AMFTX Crypto Derivatives Exchange



PublishedMay 4, 2019, 2:56:01 AMFTX Crypto Derivatives Exchange



Body updatedMay 4, 2019, 1:45:28 AMFTX Crypto Derivatives Exchange



Body updatedMay 4, 2019, 1:42:01 AMFTX Crypto Derivatives Exchange



Body updatedMay 4, 2019, 1:40:56 AMFTX Crypto Derivatives Exchange



UnpublishedMay 3, 2019, 8:54:00 PMFTX Crypto Derivatives Exchange



PublishedMay 3, 2019, 8:53:58 PMFTX Crypto Derivatives Exchange



UnpublishedMay 3, 2019, 8:53:51 PMFTX Crypto Derivatives Exchange

FTX_3AC_000045184



PublishedMay 3, 2019, 8:37:29 PMFTX Crypto Derivatives Exchange



Body updatedMay 3, 2019, 8:37:28 PMFTX Crypto Derivatives Exchange



PublishedMay 3, 2019, 8:35:29 PMFTX Crypto Derivatives Exchange



CreatedMay 3, 2019, 8:35:29 PMFTX Crypto Derivatives Exchange



**CYBERARK**  Secure Web Sessions

## Mapping web page

**This web page is being mapped so that you can begin creating rules. This might take a few moments.**

Cancel

**CYBERARK**  Secure Web Sessions

## Mapping web page

**This web page is being mapped so that you can begin creating rules. This might take a few moments.**

Cancel

FTX_3AC_000045185

Confidential

FTX_3AC_000045186

# Exhibit 26

Page 1

1        IN THE UNITED STATES BANKRUPTCY COURT

2            FOR THE DISTRICT OF DELAWARE

3                  Chapter 11

4            CASE NO.: 22-11068 (KBO)

5

6    In re:

7    FTX TRADING LTD., et al.,

8    DEBTORS.

9    - - - - - - - - - - - - - - - - - - - - - -x

10

11

12          DEPOSITION OF RUSSELL CRUMPLER

13               NEW YORK, NEW YORK

14            TUESDAY, SEPTEMBER 23, 2025

15                   9:18 a.m.

16

17

18

19

20

21

22

23    REPORTED BY:  DANIELLE GRANT

24

25

Page 42

1  objective, bring it all back and bringing
2  in those funds.
3         So when we sit and litigate
4  against the founders, you know, we don't
5  do that out of malice despite, you know,
6  what we previously talked about and people
7  might think. We do that because we see
8  that they, after careful legal analysis --
9  and that's obviously the key -- we
10  don't -- we don't take spurious steps.
11        But after careful legal
12  analysis, we take a step to say: All
13  right. You, the founders, have caused
14  this damage. We -- you may not have, in
15  the case of the founders, over a billion
16  dollars. But that's the damage we assess
17  that you have caused.
18        I say "we," obviously, Teneo
19  has done the -- produced some work and
20  then the lawyers have worked out whether
21  or not what claims may or may not -- may
22  or may not exist with respect to those --
23  that financial information. You've caused
24  this damage to the fund. We think it's
25  worthwhile us pursuing that because of

Page 43

1  a -- the merits with respect to those
2  claims and the likely recoveries. You
3  need to bring assets back into the -- give
4  us assets to bring them back into the
5  estate to get the creditors to the best
6  position possible.
7         And that's -- you know, so --
8  and that is a process which is -- again,
9  that stage, that investigation,
10  litigation, recovery from non-asset
11  sources -- non-owned asset sources, if you
12  like, is ongoing. We have had a variety
13  of different bits of litigation that have
14  run their course or prelitigation that
15  have been resolved during the life of
16  Three Arrows, and there are a variety of
17  different claims and processes, you --
18  which are ongoing, some of which are part
19  of the courts, some of which are -- well,
20  I think the phrase is probably
21  prelitigation correspondence.
22        And we move forward. And,
23  indeed, we try and always do these things
24  very efficiently. We have got a quite
25  unique order out to the BVI court that

Page 44

1  allows us to settle disputes less than
2  $10 million in value effectively without
3  reference to the court. So that just --
4  again, it's about speeding up the process,
5  being efficient, getting to resolution.
6  And that's, you know, another bit that has
7  just allowed us to sort of move various
8  smaller disputes on with a -- with a bit
9  more pace. If that -- that's a -- that's
10  a explanation to your -- a long-winded
11  explanation to your question of what stage
12  we're at.
13     Q    That's very helpful.
14     A    I don't know if that help.
15     Q    Thank you. That's very
16  helpful.
17        With respect to the five
18  distributions that you have said have
19  occurred to date, approximately how much
20  of the principal amount of valid admitted
21  claims have been paid to date?
22     A    So there is a -- there's a --
23  it's important to sort of -- if one added
24  up the number we -- the headline numbers
25  we've said we've distributed, which I have

Page 45

1  feeling is about $330 million, that's
2  actually slightly less than we have
3  distributed, because when you do those
4  first distributions, I talk about their
5  being a reserve for claims that haven't
6  been -- that are still being disputed or
7  haven't been adjudicated.
8         You have to reserve for say,
9  you know, 27 mill -- the first
10  distribution I think was a hundred million
11  dollars. Of that, let's say, 27 million
12  was held back on the basis that -- we
13  didn't know if it would go to those
14  creditors. Those reserves dropped down,
15  so some of that money gets released back
16  to the estate. So I think cash out the
17  door, we're somewhere below $300 million.
18  That's from recollection.
19        I haven't checked that
20  percentage terms so -- or "cents on the
21  dollar" terms. We are just below 12 cents
22  on the dollars in terms of distributions
23  to date. And yeah. So the short answer,
24  12 cents on the dollar, just below -- just
25  below $300 million distributed out the

12 (Pages 42 - 45)

Page 46

1  door.
2      Q   Do you have -- you said
3  there's five -- less than five claims or
4  so still be allowed.
5          Do you have a projection of
6  the total claims pool ultimately of
7  allowed claims -- the amount of allowed
8  claims in dollars?
9      A   As things stands right now --
10  and it's important in the context of
11  claims where we are pursuing, in the
12  general sense, antecedent transaction, you
13  know, claims, so clearly FTX is in that
14  process, you know, and not knowing where
15  we get to with respect to the end of
16  our -- of our dispute.  I think our claims
17  pool is about 3.4 billion.  I -- be -- and
18  I don't wish to sound flippant, so I might
19  have that wrong by a hundred million
20  dollars or so.
21      Q   Does the -- do the joint
22  liquidators currently have a projection of
23  ultimate distributable value that will be
24  available out of the Three Arrows
25  liquidation?

Page 47

1      A   Sorry.
2          Could you just repeat the
3  question?
4      Q   Do the joint liquidators
5  currently have an estimate of total
6  distributable value that will come out of
7  the Three Arrows liquidation?
8      A   We do.  Yes.
9      Q   What is that estimate?
10      A   So it's very important to
11  stress that that -- we have an estimate.
12  It's clearly highly volatile, and it's not
13  volatile because, within that testament,
14  we are pricing in anything to do with
15  litigation.  So our estimate is based on
16  the assets we hold.  And where we hold
17  assets that people are maybe challenging
18  our ownership of those assets, but they're
19  in our hands.
20          We will normally value those
21  assets when we make our estimate unless we
22  really think we have a weak legal
23  argument.  But we don't use -- we don't
24  put in there the potential benefit of,
25  say, for example, recoveries from the

Page 48

1  founders.  So using that as a -- and
2  understanding the assets we hold and
3  cannot yet realize, cannot yet turn to
4  U.S. dollars are highly volatile because
5  they're either, you know, crypto tokens --
6  and we all -- we all know what can happen
7  to crypto tokens -- or they are assets
8  that are related to the -- to the digital
9  crypto environment.
10          So, yeah, we have -- I don't
11  know the exact number, but we have, you
12  know, several hundred million dollars'
13  worth of shares in coin -- in Coinbase.
14  They could drop to zero in six month's
15  times.  We are -- but based on the
16  values -- and I think the latest valuation
17  I have is of 11th of September.  Based on
18  the values then and with that potential
19  volatility in mind, we get to something
20  like 38 percent, 38 cents on the dollar to
21  use, I think that -- the terminology that
22  is typically used in the U.S.
23      Q   You said that 38 -- that
24  38 percent projection would not include
25  litigation claims such as against the

Page 49

1  founders, correct?
2      A   That's correct.  Yes.
3      Q   Would it include contested
4  claims such as your claim against FTX?
5      A   It does not, no.
6      Q   So any recovery from this
7  claim against FTX would be incremental to
8  those projections?
9      A   Yes.  That's correct.
10  Obviously depending -- and, again, one
11  can't over-project the outcomes, because
12  there is a variety of different claims
13  that have been put forward with respect to
14  FTX.  But some of those outcomes, as I've,
15  you know, alluded to, may result in FTX
16  being a creditor as well.
17          So there's a -- one would have
18  to -- it's quite a careful and difficult
19  analysis to say, Well, what would happen
20  here or there?
21          But as a general point, yes,
22  it's correct, it excludes any recoveries
23  or net recoveries from FTX.
24      Q   What is the current cash
25  position of the 3AC estate?

13 (Pages 46 - 49)

Page 218

```
1  ----------------------INDEX----------------------
2  WITNESS        EXAMINATION BY     PAGE
3  RUSSELL CRUMPLER  MR. GLUECKSTEIN      6
4
5  --------------------EXHIBITS----------------------
6  FOR IDENTIFICATION  DESCRIPTION     PAGE
   Exhibit No. 1    Notice of Deposition    9
7                   of Three Arrows
                    Capital, LTD.,
8                   Pursuant to Fed R.
                    Civ. P. 30(b)(6)
9
   Exhibit No. 2    Document,          79
10                  Bates-stamped
                    FTX_3AC_000013695
11
   Exhibit No. 3    Document,          82
12                  Bates-stamped
                    3AC_FTX_00558861
13
   Exhibit No. 4    Document,          95
14                  Bates-stamped
                    FTX_3AC_000045694
15
   Exhibit No. 5    Document,          121
16                  Bates-stamped
                    FTX-3AC_000000758
17
   Exhibit No. 6    Document,          126
18                  Bates-stamped
                    3AC_FTX_00551650
19
   Exhibit No. 7    Proof of Claim     143
20
   Exhibit No. 8    Declaration of Steven  205
21                  P. Coverick
22
23      ----  *****  ----
24
25
```

Page 220

```
1
2       INSTRUCTIONS TO WITNESS
3
4       Please read your deposition over
5   carefully and make any necessary
6   corrections.  You should state the reason
7   in the appropriate space on the errata
8   sheet for any corrections that are made.
9       After doing so, please sign the
10  errata sheet and date it.
11      You are signing same subject to
12  the changes you have noted on the errata
13  sheet, which will be attached to your
14  deposition.
15      It is imperative that you return
16  the original errata sheet to the deposing
17  attorney within thirty (30) days of
18  receipt of the deposition transcript by
19  you.  If you fail to do so, the deposition
20  transcript may be deemed to be accurate
21  and may be used in court.
22
23
24
25
```

Page 219

```
1           CERTIFICATE
2   STATE OF NEW YORK )
3               )ss:
4   COUNTY OF RICHMOND)
5       I, DANIELLE GRANT, a Certified
6   Shorthand Reporter and Notary Public
7   within and for the State of New York, do
8   hereby certify:
9       That RUSSELL CRUMPLER, the
10  witness whose deposition is hereinbefore
11  set forth, was duly sworn by me and that
12  such deposition is a true record of the
13  testimony given by such witness.
14      I further certify that I am not
15  related to any of the parties to this
16  action by blood or marriage and that I
17  am in no way interested in the outcome
18  of this matter.
19      In witness whereof, I have
20  hereunto set my hand this 23rd day of
21  September, 2025.
22
            Danielle Grant
23      _____
24          DANIELLE GRANT
25
```

Page 221

```
1   In re: FTX TRADING LTD., et al., DEBTORS.
2   9/23/2025 - RUSSELL CRUMPLER
3       ACKNOWLEDGEMENT OF DEPONENT
4   I, RUSSELL CRUMPLER, do hereby declare
5   that I have read the foregoing transcript,
6   I have made any corrections, additions, or
7   changes I deemed necessary as noted on the
8   Errata to be appended hereto, and that the
9   same is a true, correct and complete
10  transcript of the testimony given by me.
11
12  _____  _____
13  RUSSELL CRUMPLER        Date
14  *If notary is required
15
16      SUBSCRIBED AND SWORN TO BEFORE ME THIS
17  _____ DAY OF _____, 20___.
18
19
20  _____
21  NOTARY PUBLIC
22
23
24
25
```

56 (Pages 218 - 221)

Page 222

1   In re: FTX TRADING LTD., et al., DEBTORS.
2   9/23/2025 - RUSSELL CRUMPLER
3       E R R A T A  S H E E T
4   PAGE_____ LINE_____ CHANGE_____
5   _____
6   REASON_____
7   PAGE_____ LINE_____ CHANGE_____
8   _____
9   REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  RUSSELL CRUMPLER        Date
25

Page 223

1   In re: FTX TRADING LTD., et al., DEBTORS.
2   9/23/2025 - RUSSELL CRUMPLER
3       E R R A T A  S H E E T
4   PAGE_____ LINE_____ CHANGE_____
5   _____
6   REASON_____
7   PAGE_____ LINE_____ CHANGE_____
8   _____
9   REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  RUSSELL CRUMPLER        Date
25

57 (Pages 222 - 223)

**ERRATA SHEET FOR DEPOSITION TRANSCRIPT OF
RUSSELL CRUMPLER / JOINT LIQUIDATORS' RULE 30(b)(6) REPRESENTATIVE**

**Case:**            *In re FTX Trading Ltd., et al.*

**Witness:**         Russell Crumpler

**Deposition Date:** September 23, 2025

**Reporter:**        Danielle Grant

| Page | Line(s) | Transcript Text | Corrected Text | Reason for Change |
|------|---------|-----------------|----------------|-------------------|
| 11 | 13 | without | with | Transcription error |
| 11 | 14 | might be the | are my BVI | Transcription error |
| 14 | 15 | court in | court or in | Transcription error |
| 18 | 3 | Hong Kong for | Hong Kong lawyer for | Transcription error |
| 33 | 25 | we through | we are through | Transcription error |
| 34 | 5 | SAFUs | SAFEs | Transcription error |
| 37 | 21 | 2004 | 2024 | Correction |
| 39 | 17 | of | to | Transcription error |
| 44 | 14 | help | helps | Transcription error |
| 45 | 4 | their | there | Transcription error |
| 47 | 13 | testament | estimate | Transcription error |
| 48 | 15 | times | time | Transcription error |
| 57 | 23 | 2003 | 2023 | Correction |
| 58 | 7 | 2023 | 2022 | Correction |
| 60 | 19 | same | came | Transcription error |
| 64 | 10 | Q. | [omit] | Transcription error |
| 65 | 22 | Mack | Mak | Transcription error |
| 66 | 10 | Ninjing | Ningxin | Transcription error |
| 74 | 2 | Humana | whomever | Transcription error |
| 76 | 6 | the always | always the | Transcription error |
| 77 | 13 | lunar | Luna | Transcription error |
| 78 | 8 | which is a ETF | which is 'E' – 'T' – 'H' | Correction |
| 88 | 25 | FTX | 3AC | Correction |
| 102 | 22 | to | by | Correction |
| 107 | 9 | legal – illegal | legal – legal | Correction |

| Page | Line(s) | Transcript Text | Corrected Text | Reason for Change |
|------|---------|-----------------|----------------|-------------------|
| 112 | 18 | to do calculate | to do to calculate | Transcription error |
| 114 | 9 | is to | as to | Transcription error |
| 133 | 5 | Threee | Three | Transcription error |
| 156 | 25 | 2004 | 2024 | Correction |
| 157 | 1 | 2003 | 2023 | Correction |
| 166 | 2 | balls | balances | Transcription error |
| 172 | 6 | debt | net | Transcription error |
| 189 | 22 | knowledge | subject | Transcription error |
| 190 | 16 | Tackit | Tackett | Transcription error |
| 191 | 18 | some a | some | Transcription error |
| 195 | 11 | sourc | source | Transcription error |

I, Russell Crumpler, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct, and complete transcript of the testimony given by me.

Executed this 27th day of October, 2025.

Russell Crumpler

# **Exhibit 27**

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE


---------------------------------
                                )
In Re FTX TRADING LTD, et al    )
                                )
                    Debtors     )    CHAPTER 11
                                )
Case No. 22-11068 (KBO)         )
                                )
---------------------------------


Deposition of

THE RIGHT HONOURABLE
LORD NEUBERGER OF ABBOTSBURY


taken on behalf of the Joint Liquidators of
Three Arrows Capital Ltd


at the offices of

Latham & Watkins LLP,
99 Bishopsgate,
London EC2M 3XF


on

11 November 2025
beginning at 12.00 pm Greenwich Mean Time.


Reported by Nia Davidson MBIVR
Magna Legal Services



Page 30

1  a few comments, quite a few changes; he put in some
2  comments for me to answer.  I do not know whether I am
3  -- what I can say about the draft, but I can certainly
4  look at it and answer your question if you want me to
5  but I would have to look at the draft, I am afraid.
6          MR. GLUECKSTEIN:  We are not going to
7  answer questions about the specific versions of drafts
8  that were prepared, at the direction of counsel.
9  BY MR. HARRIS:
10      Q.    Do you think you had more or fewer
11  comments on the third report than you did on your first
12  report?
13      A.    I cannot -- I am sure, because the first
14  report is longer, I probably had more on the first
15  report.  Because the third report is shorter, and also
16  the basic principles I thought were established in the
17  first report, I probably had fewer comments.  On the
18  other hand, because we were reacting to Dame Elizabeth,
19  there may have been more comments.  I just cannot
20  answer.  In terms of pure number, I suspect there were
21  fewer because it is a shorter report.  In terms of "per
22  page", I really do not know.
23      Q.    Okay.  Do you recall each of your three
24  reports lists materials you considered?
25      A.    Yes.

Page 31

1      Q.    Okay, and who identified those?  Were
2  those materials you identified or that were provided to
3  you?
4          MR. GLUECKSTEIN:  Object to the form.
5      A.    I think as far as -- to be honest,
6  I cannot remember, because I will have looked at some
7  case law right at the beginning before I discussed it
8  and looked at the Law Commission report and so on before
9  I discussed it with my junior, if I can call them that,
10  and they will then have done their report which will
11  have looked at more cases.  So the ultimate list of
12  cases will have started with me looking at the cases and
13  talking to them.  They will have then looked at more
14  cases and I might well have added to the cases that they
15  identified.  Again, I cannot recall at this stage what,
16  if any, cases I added, but that is the way it would have
17  worked.
18  BY MR. HARRIS:
19      Q.    Whose idea was it to look at the Law
20  Commission report, for instance?
21      A.    That is going back -- I cannot answer
22  that question.  I just cannot answer that question.
23  I do not know.
24      Q.    Do you think you were aware of the Law
25  Commission report before this engagement?

Page 32

1      A.    Yes, I was.  I certainly was, yes.
2      Q.    How was it you were aware of it?
3      A.    Because I had been interested in digital
4  assets.
5      Q.    It is a well-known report in the legal
6  community; is that right?
7      A.    I think it is well known in the part of
8  the legal community that is interested in digital
9  assets.  I think the majority of the legal community
10  would probably run a mile.  It is quite technical and
11  the majority of lawyers in this country are not
12  naturally interested in that sort of thing.
13      Q.    For English courts that had to address an
14  issue regarding digital assets, is it an authority they
15  would consult?
16      A.    It is something that they would consult,
17  but the cases -- if one is going to be cynical, Law
18  Commission reports which support the view the judge
19  wants to arrive at are enthusiastically cited; Law
20  Commission reports which the judge disagrees with are
21  put rather on one side.
22      Q.    What is your view of the Law Commission
23  report on digital assets?
24      A.    I think it is an impressive document.
25      Q.    If you were a jurist at the time, you

Page 33

1  would consult it and find it persuasive?
2      A.    As a judge I always took Law Commission
3  reports seriously but I did not always agree with them,
4  and sometimes the laws that are brought about by the Law
5  Commission I do not think are very good, but generally
6  speaking they are good.
7      Q.    Do you agree with the analysis in this
8  Law Commission report?
9          MR. GLUECKSTEIN:  Object to the form.
10      A.    I mean, that is a very broad question.
11  I think I would go so far as to say that I regard --
12  because there is so much in it, it is a dangerous thing
13  for me to say, but there is nothing which I think is
14  indefensible in there on a number of aspects on which
15  they say further research needs to be done, a number of
16  aspects on which they express a view, and their view is,
17  in my opinion, always sensible.  Whether it is right or
18  not remains to be seen.
19      One of the big problems is that if the
20  Government legislates, if Parliament legislates along
21  the Law Commission report recommendations, because we
22  are at such an early stage, it may turn out that it is
23  not as clever an idea as it seems.  And there is a lot
24  to be said for letting the courts work it out before the
25  Law Commission reports are adopted, which is an



Page 34

1  important reason, in my mind, for the courts to consider
2  what the Law Commission is saying.  It is not quite an
3  answer to your question, I am sorry.  I have certainly
4  gone off at a tangent.
5  BY MR. HARRIS:
6      Q.   Focusing just on the questions of the Law
7  Commission report that deal with ownership of digital
8  assets, is there anything in those portions that you
9  think is incorrect?
10             MR. GLUECKSTEIN:  Object to form.
11     A.   I am very uncomfortable answering that
12  question because I cannot pretend to have gone through
13  everything they have said with a view to saying do
14  I agree or not.  I think the general thrust -- I cannot
15  really say more than the general thrust -- of what they
16  say seems to me to be pretty sensible and there is
17  nothing which I vehemently disagree with as far as I can
18  recollect.
19  MR. HARRIS:
20     Q.   So I take there is nothing, sitting here
21  today, about their analysis of ownership of digital
22  assets that strikes you as incorrect?
23             MR. GLUECKSTEIN:  Object to the form.
24     A.   There is nothing that strikes me as
25  obviously incorrect, but there are a number of things

Page 35

1  which could well be incorrect, and that is the problem.
2  BY MR. HARRIS:
3      Q.   By "could well" you mean depending on how
4  the law develops?
5      A.   Depending on how the law develops and
6  depending on experience.  I mean, the common law
7  develops by experience, as one great American judge
8  said, and that cannot be more true than in a totally new
9  area like digital assets.  So any view one expresses in
10  relation to what would be new law in relation to a new
11  type of asset has to be provisional and tentative, which
12  is why I am sounding provisional and tentative.
13     Q.   Is there anything about the Law
14  Commission's analysis of the current law regarding
15  digital assets that you view to be incorrect?
16             MR. GLUECKSTEIN:  Object to the form.
17     A.   As far as I can recollect, there is
18  nothing that I thought was plainly incorrect.  Again, as
19  I say, I have not been through the Law Commission report
20  marking each sentence with a tick or a cross or
21  a question mark.
22  BY MR. HARRIS:
23     Q.   Okay.  You also cited cases from both
24  English courts and other commonwealth jurisdictions,
25  right?  As an English jurist, are decisions from other

Page 36

1  commonwealth courts persuasive authority?
2      A.   I think it depends on the court and
3  depends on the reasoning.  As a judge, I was quite keen
4  to tend towards having a common view with Australia,
5  Singapore, New Zealand and Hong Kong courts, but there
6  are a number of occasions where the courts have differed
7  and I think that it will have persuasive value.  But
8  again, at the risk of sounding cynical, an English judge
9  who agrees with, say, an Australian case will cite it
10  enthusiastically in support of the conclusion he or she
11  has reached, whereas if the judge does not agree with
12  the Australian case it will be a footnote in the
13  judgment.
14     Q.   And if I have it right, I think you said
15  you, as a judge, try to be consistent with decisions by
16  Australian, Singapore, Hong Kong and New Zealand courts;
17  is that right?
18     A.   Mm-mh.
19             MR. GLUECKSTEIN:  You need to answer.
20     A.   Yes.  I did in general, but I think in
21  the end you have to decide what is right, and if you
22  think the decision of a particular court is wrong, you
23  say so.
24  MR. HARRIS:
25     Q.   Why do you mention those four particular

Page 37

1  jurisdictions?
2      A.   Because their common law tends to be
3  generally similar to that in this country.  So you would
4  expect, all things being equal, the law to be similar,
5  but there are a number of areas where we differ.
6      Q.   Do you recall any ways in which the law
7  concerning digital assets for those four countries
8  differs from the law in England?
9      A.   Again, on particulars, I think I would
10  have to look at the particular cases.  I certainly
11  remember, and I am slightly reluctant to answer, but
12  I think there is a New Zealand case one aspect of which
13  I do not agree with, but that may be misremembering.
14     Q.   Do you remember what the New Zealand case
15  was?
16     A.   No.  It is ----
17     Q.   You said New Zealand?
18     A.   I think New Zealand, yes.  I think that
19  is right, but, as I say, that is recollection.  I cannot
20  pretend to have gone through every case and remember
21  every case.
22     Q.   Okay.  What case of the ones you reviewed
23  do you find most factually similar to the FTX Three
24  Arrow situation we are dealing with today?
25             MR. GLUECKSTEIN:  Object to the form.



Page 38

1     A.    There were three or four English cases on
2 digital assets which I found quite useful, but they did
3 not bear that much on the issue. I think a comment in
4 the Piroozzadeh case did have some -- Trower J. That is
5 one that sticks in my mind, but I cannot pretend that
6 there is anything in particular that I remember.
7 I mean, the trouble is when it comes to some of the
8 issues here, one is concerned with established law
9 applied to a new asset and in other areas one is
10 concerned with making new law to deal with a new asset.
11 And when it comes to established law dealing with a new
12 asset, one is on much firmer ground and one can look
13 more broadly. When one is looking at possible new law
14 on a new asset, it is more difficult.
15     Q.    I just want to make sure my question was
16 clear. I wanted to see what case you felt was most
17 factually similar, so is there one that comes to mind
18 you think is factually similar to our situation?
19         MR. GLUECKSTEIN: Object to the form.
20     A.    I think I cannot be sure as to which of
21 the cases are the most similar. As I say, I have been
22 more concerned with principle, and one of the problems
23 about looking at cases is that we are ultimately
24 concerned with a contract here, whether it created
25 a trust, whether it created a quasi-bailment

Page 39

1 arrangement, if it exists, and in my experience looking
2 at other cases concerned with different contracts and
3 slightly different facts can be actually misleading. I
4 look at the cases more for principle rather than for
5 individual facts.
6         So, as I say, I cannot really with any
7 confidence, indeed I cannot actually say which cases
8 struck me as being most similar because I have been
9 looking at principles and looking at principles in
10 relation to our contracts and our facts.
11 MR. HARRIS:
12     Q.    So if I understand correctly, you were
13 focused more on deducing the principles than on finding
14 individual facts that might be similar to our situation?
15     A.    Yes, I think that is right. First of
16 all, our contract is a one-off contract which generally
17 has not got sort of standard forms, and even if it does
18 it is not the same, as far as I know, as it was in any
19 other case.
20         Secondly, the facts I am asked to assume,
21 I do not know whether they are going to be the same in
22 the other cases, and differences in fact could be quite
23 important, and differences in contractual terms could
24 obviously be important.
25     Q.    I take it you do not recall another case

Page 40

1 about whether a customer on a digital asset exchange has
2 an ownership interest in the digital assets held on that
3 exchange?
4     A.    I think the Piroozzadeh case got close to
5 that sort of point, but I need to look at it again. As
6 I say, I have been focusing on principle, not fact, when
7 I looked at other cases.
8     Q.    Are there any other cases beside
9 Piroozzadeh that you recall being similar to the factual
10 situation of whether a customer on a digital asset
11 exchange has an ownership interest in those digital
12 assets?
13     A.    If there are, I do not recollect
14 specifically any other cases, no. As I say, I have been
15 looking at principle, not fact.
16     Q.    In addition to authorities, you also
17 looked at a few documents specific to FTX; is that
18 right?
19     A.    I certainly looked at the Dotcom Terms,
20 yes, and I looked at the other document for my second
21 opinion, I think.
22     Q.    Okay. Who made the decision what
23 FTX-specific documents you would look at?
24     A.    I was free to ask for any more documents.
25 Sullivan & Cromwell did send me some other documents

Page 41

1 right at the beginning -- sent me quite a suite of
2 documents. Again, I cannot tell you what they are, but
3 I can easily find out. But I quickly came to the
4 conclusion that actually we were concerned with the
5 relationship between customers and FTX, and if there are
6 all sorts of other documents relating to FTX that the
7 customer has not seen, they do not really help in terms
8 of identifying the relationship between the customer and
9 the FTX because the customer has not seen them.
10     Q.    I want to make sure I understand. So you
11 were sent more documents about FTX than are listed in
12 your reports; is that right?
13     A.    I cannot remember what is listed in my
14 report.
15     Q.    If it is helpful, why don't I mark the
16 other two reports also so you can look at all of them.
17     A.    Yes. Yes, those are all the documents,
18 yes. They are listed there, thank you -- 1 to 15.
19 Those are indeed the other documents.
20     Q.    Okay, hold on. Let me make sure I am
21 ----
22     A.    But the great majority of those documents
23 seem to me to cover facts that were not known to the
24 customer, and when you are concerned with that, I did
25 not read them very carefully. One or two of these



Page 50

1    Q.    Do you recall a case where both parties
2  agreed that ownership of an asset would belong to one of
3  the parties but the courts found that instead the
4  ownership belonged to a different party?
5        MR. GLUECKSTEIN: Object to the form.
6    A.    There are certainly cases where parties
7  have thought that they had contracted to sell a property
8  from A to B and the court held the contract was invalid.
9  There are certainly lots of cases where parties think
10  that the property belongs to one person and it belongs
11  to another.  I cannot immediately identify cases where
12  both parties thought one thing and it was another.  Rose
13  v Pim is an example I have thought of, but it is not
14  unusual or surprising for both parties to think the
15  contract means X and for the court to conclude it means
16  Y.
17  BY MR. HARRIS:
18    Q.    I want to ask you about a few different
19  terms you use in your different reports.  The first one
20  "trust".  What is a trust?
21    A.    A trust is an arrangement whereby the
22  legal ownership is held by one person, but the
23  beneficial ownership is owned by someone else or by
24  a group of other people, and the person who owns it
25  legally is obliged to deal with it in a way that is not

Page 51

1  in his interests but is in the interests of the people
2  on behalf of whom he or she holds the asset.
3    Q.    In that instance, is the asset held by
4  the trustee on behalf of the beneficiary?
5    A.    That is a good, loose way of putting it,
6  yes -- a good, broad way of putting it.
7    Q.    Then what is a bailment?
8    A.    A bailment is where somebody who has
9  possession of property gives it to somebody else to look
10  after and the other person has control over it and has
11  a degree of legal title, but the superior legal title
12  remains with the person who gave it to the bailee,
13  namely the bailor.
14    Q.    Who has the beneficial ownership, the
15  equitable title in that instance?
16    A.    Equitable title does not exist then.  The
17  equitable title only exists when it separates from the
18  legal title.  If I own my house outright, to say I own
19  the equitable interest is a misconception.  It does not
20  exist.  The equitable interest only exists when it is
21  separated from the legal interest.
22    Q.    Does legal title exist before separation?
23    A.    Oh, yes, legal title always exists.
24    Q.    So, in your view, the concept of
25  equitable title does not exist until there is a split

Page 52

1  between the legal and ownership interests -- legal and
2  equitable interests?
3    A.    Yes, they basically merge -- the
4  equitable ownership.  It is like saying if I own the
5  freehold of my house I do not also own the leasehold
6  interest.  There is not a leasehold interest until it is
7  created, and similarly there is not an equitable
8  interest until it is separated from the legal interest.
9    Q.    In a bailment, the bailee also holds
10  assets on behalf of the bailor; is that right?
11    A.    Yes.  I mean, one of the curiosities of
12  the common law is that you have the two threads of
13  equity and common law running together and it is even
14  more complex because in one sense equity is part of the
15  common law.  But if you use common law in the sense of
16  distinct from equity, bailment is a common law concept,
17  whereas trust is an equitable concept.  Until the 1870s
18  you had the two strands running separately in English
19  law, and from the 1870s onwards they run together and
20  are sometimes slightly uncomfortable bed fellows.
21    Q.    Are the duties of a bailee different from
22  the duties of a trustee?
23    A.    It is an interesting question.  It
24  probably depends on the terms of the bailment and the
25  terms of the trust.

Page 53

1    Q.    So there is no "one size fits all"
2  definition of the duties of a trustee or a bailee?
3        MR. GLUECKSTEIN: Object to the form.
4    A.    I think that in terms of trust, there is
5  equity has developed some pretty strict rules about the
6  duties of a trustee and the common law has not developed
7  the same degree of strict law rules in relation to
8  a bailor -- a bailee relationship.
9  BY MR. HARRIS:
10    Q.    So what are the pretty strict rules about
11  the duties of a trustee that you have in mind?
12    A.    That the trustee is obliged to act in the
13  interests of the beneficiary, not at any time in his or
14  her own interests, the duties of good faith and in the
15  equitable sense.  It is well described in a case called
16  Armitage v Nurse, which Dame Elizabeth cites in her
17  proof, by Millet LJ, who was one of the great equity
18  lawyers of his generation.
19    Q.    Just to make sure I have this right,
20  I believe you mentioned two: one was to act in the
21  interests of the beneficiary and not in his own
22  interest; and the second was the duties of good faith?
23    A.    Acting in good faith.  I think that, in
24  practice, equity would probably regard the duty of
25  a trustee to be more strict than the common law would



Page 58

1    Q.    So your understanding is sometimes they
2   traded with FTX?
3    A.    And sometimes with each other, yes.
4    Q.    What is the basis for your understanding
5   that sometimes they traded with FTX?
6    A.    It may be impression or recollection.
7   I cannot put my finger on any precise fact that tells me
8   that is the case.
9    Q.    Did that factual issue matter to any of
10  your opinions?
11        MR. GLUECKSTEIN:  Object to the form.
12   A.    I do not think so, no.
13  BY MR. HARRIS:
14   Q.    What is your understanding about where
15  the digital assets that were held on the exchange came
16  from?
17   A.    Well, my understanding was that they
18  either were provided by the customers or they were
19  acquired by FTX.
20   Q.    So your understanding is that some of the
21  assets on the exchange were acquired by FTX?
22   A.    Yes.
23   Q.    What is the basis for that understanding?
24   A.    Again, I cannot tell you what my -- it is
25  an assumption or recollection.

Page 59

1    Q.    Does it matter to you where the assets
2   came from to your opinion?
3    A.    No, I do not think it does.  I think the
4   basic picture I had was that the assets were kept --
5   were swept into a pool and were then dealt with by
6   customers trading and FTX sometimes adding to the pool
7   and sometimes taking away from the pool.
8    Q.    I think you said your understanding was
9   that twice a day the digital assets were swept into
10  commingled accounts; is that right?
11   A.    That was my understanding.
12   Q.    Do you understand that each commingled
13  account only handled one particular kind of digital
14  asset?
15        MR. GLUECKSTEIN:  Object to the form.
16   A.    I think I must have assumed that was the
17  case because there would have to be a record of
18  individual assets.  So, yes, I think I probably assumed
19  that was the case.
20  BY MR. HARRIS:
21   Q.    Okay.  And is it your understanding that
22  customers were aware that their assets would be swept
23  into a commingled account?
24   A.    I am not sure about that.  Undoubtedly
25  I would have thought they must have become aware.  What

Page 60

1   they were told, I do not know.  I was not asked to
2   assume anything.  I just -- no, I did not make an
3   assumption about that.
4    Q.    But you would have thought that they must
5   have become aware that their assets were being swept to
6   a commingled account?
7    A.    I would have thought they must become
8   aware pretty quickly, but, again, that is a sort of
9   factual matter which I cannot speak of with any
10  confidence.
11   Q.    I take it that is not a factual question
12  you asked FTX's lawyers?
13   A.    No, no it was not.
14   Q.    Did it matter to your opinion?
15   A.    I think, really -- let me revisit that --
16  we may have discussed it, but it did not really matter
17  to my opinion, no.
18   Q.    What do you recall ----
19   A.    Clearly if the clients knew, if the
20  customers knew, it made it harder for them to object to
21  the fact that it happened or to say they did not know
22  about it, but, beyond that, I do not think it goes much
23  further.
24   Q.    So are any of your opinions affected by
25  the question of whether or not the customers were aware

Page 61

1   that their digital assets were being swept into
2   commingled accounts?
3    A.    I think the way I would put it is it
4   would not alter my opinion either way; but if they were
5   aware, it would probably strengthen my opinion.
6    Q.    Why would it strengthen your opinion?
7    A.    Because it would mean it was difficult
8   for them to say that they believed they had the asset in
9   their wallet or they had a specific asset, but, as
10  I say, it is not vital to my reasoning, but it would
11  strengthen it.
12   Q.    Did you ever ask FTX's attorneys what
13  evidence there was about whether the customers were
14  aware of the sweeping into commingled accounts?
15   A.    If I did, I do not remember.
16   Q.    Is there anything in terms of service
17  that indicates whether assets will be swept into
18  a commingled account?
19   A.    Not that I recall.
20   Q.    Is that relevant to you?
21        MR. GLUECKSTEIN:  Object to the form.
22   A.    When construing the contract, clearly the
23  fact that something is not there means it cannot be
24  taken into account.  When construing how the contract
25  works, then you have to look at what happens.

MAGNA
LEGAL SERVICES

Page 74

1  transfers to and from pooled addresses would have been
2  visible on publicly available blockchains?
3      A.    I answer that in (a), (b) and (c), as
4  I say, "As to the relevance of such matters", I think on
5  the following page, and that reflects my view.
6      Q.    Just to make sure we have a clean record
7  here, what is your view as to whether it is relevant
8  that it was visible that the transfers to and from
9  pooled assets were visible to users?
10     A.    I am sorry, it was a slightly flip
11  answer.  First of all, if that was a view, if that was
12  something which the public, a customer, would have known
13  about only after he or she started trading, then it is
14  irrelevant for the interpretation of the document -- of
15  the Dotcom Terms.  But if it is something they knew or
16  should reasonably be expected to know, then it could
17  form part of the factual matrix and be taken into
18  account.
19     Q.    So if someone had, for instance, traded
20  with FTX before the Dotcom Terms went into effect and
21  therefore were aware of the sweeping, that is something
22  that could form part of the factual matrix?
23     A.    Yes.  I mean, the problem is that I do
24  not pick up here, to be fair, and I pick up in my recent
25  rebuttal is the problem with asking what individual

Page 75

1  customers knew is that one is dealing with, as you say,
2  standard form on the website, and the idea that it has
3  different meanings for different customers is something
4  the court will not, if they had to, want to find.  So
5  what is known to some individual customers who have
6  dealt before but not to the majority, for example,
7  probably would not be relevant.
8      Q.    Do you know whether the majority of FTX
9  customers were in fact aware of the sweeping into
10  commingled accounts?
11     A.    I have absolutely no idea, I am afraid.
12     Q.    I take it your view is that in order for
13  it to be a relevant part of the factual matrix this
14  would need to be something that the majority of
15  customers were aware of?
16         MR. GLUECKSTEIN:  Object to the form.
17     A.    I think in view of what I have said, if
18  you are construing a standard agreement, then you would
19  look to see what was or should have been generally
20  known, yes.
21  BY MR. HARRIS:
22     Q.    But you did not ask FTX what was
23  generally known to FTX's customers about the sweeping,
24  correct?
25     A.    No, because, apart from anything else,

Page 76

1  I might then have got drawn into what do you mean by
2  generally known and all that sort of detailed fact.
3  I am concerned with the principle.
4      Q.    And you are not expressing for purposes
5  of your opinion what "generally known" would require?
6      A.    No.  I think that can be quite
7  a difficult question, and, to be fair, it is not a point
8  that has been gone into in detail in the cases.  All the
9  cases such as Sigma, which I refer to, say is that you
10  can only look at the most general sort of facts which
11  were available at the relevant time in a standard form
12  contract.  What I am not in a position to say was
13  whether for the sort of people who became customers of
14  FTX it would have been generally known that the
15  commingling occurred.  I just do not know.  That is
16  a question of fact for the US court, not for me.
17     Q.    In this 65.2, what do you mean that
18  a transfer from a pooled address "would have been
19  visible"?  I am sorry, 47.2.
20     A.    That it would have been visible that
21  there were being transfers of digital assets to and from
22  pooled addresses.  The public could have seen it
23  happening -- could have seen that it happened.
24     Q.    Is it relevant to any of your opinions
25  that a transfer from a pooled account was visible?

Page 77

1      A.    It depends where it went, but the overall
2  picture was money flowing, or digital assets, rather,
3  flowing to and from pooled accounts.  That is the
4  picture I was giving.  It is primarily relevant -- if
5  digital assets go into individual addresses, individual
6  customers' addresses or wallets, that would be of some
7  relevance.  If all customers' assets go into or remain
8  in the pool, that is also relevant.
9      Q.    So what is it you think was visible in
10  terms of transfers from a pooled account?
11     A.    What I am told -- and what I have assumed
12  -- is more or less what I have said, that it would have
13  been possible to see that individual accounts, any
14  deposit, any digital asset deposit into an individual
15  wallet was swept into the pool and that could be seen by
16  the public.
17     Q.    I was asking about a different assumption
18  you make here, which is that transfers from a pooled
19  account were visible.  What is it you think was visible
20  in terms of a transfer from a pooled account?
21     A.    That whatever left the pool could be
22  seen, or some of what left the pool could be seen.  As
23  I say, I did not go into great detail here.  All that
24  I was told is that you could see that digital assets
25  went out of the pool and came into the pool, that the



Page 82

1  have put in "factual", you are quite right.
2      Q.    And then in paragraph 10, this is
3  discussing GBTC and ETHE; do you see that?
4      A.    Yes.
5      Q.    And here also when you refer to sole
6  control you are talking about factual control?
7      A.    Yes, I am.
8      Q.    Could we look at your third report?
9      A.    Yes.
10     Q.    Paragraph 25 -- when you are there.
11     A.    Thank you, yes.
12     Q.    Do you see, I think it is the fifth line?
13     A.    Yes.
14     Q.    You say:  "While that analysis could be
15  applicable at the moment that the 100 Bitcoin are swept
16  into the pool or 'hot wallet', as I have been instructed
17  of the factual position, the analysis becomes more
18  problematic."
19         Just to make sure I understand, what is
20  it you were instructed in this sentence?
21     A.    I am instructed that, as a result of what
22  I am told -- it is again a fair point that it could be
23  better worded -- "the analysis becomes problematic
24  because, as I am instructed...".  I think it would have
25  been better if the words "as I have been instructed of

Page 83

1  the factual position" were placed after "the analysis
2  becomes problematic immediately thereafter, because, as
3  I have been instructed...".
4         I am sorry about that, it is a perfectly
5  fair point, but I am relying on the thousands of
6  deposits and so on being what I have been instructed.
7      Q.    So you were instructed that there were
8  thousands of deposits and withdrawals every hour in the
9  sweep address?
10     A.    Yes.
11     Q.    Were you instructed that, as a result,
12  FTX was unable to track the quantities of particular
13  digital assets in its wallets?
14     A.    No, I was looking at the facts and then
15  looking at what had been said about it in English cases.
16     Q.    So I take it you do not know whether or
17  not FTX was able to track the quantity of
18  a particular ----
19     A.    No.
20     Q.    ---- digital asset?
21     A.    You are right.
22     Q.    And just for the court reporter's
23  benefit, if you could pause, even though I am sure you
24  understand what I am going to ask, but it is hard for
25  her to record.

Page 84

1         MR. GLUECKSTEIN:  Just let him finish the
2  question, please, before you answer.
3  BY MR. HARRIS:
4      Q.    And then in the next sentence you wrote:
5         "Further, because I have been instructed
6  that the FTX Exchange continuously collected trading
7  fees in the form of Digital Assets like Bitcoin, not
8  only were a customer's assets commingled with other
9  customers' assets, they were commingled with the assets
10  of the FTX Exchange."  Do you see that?
11     A.    Mm-mh, yes.
12     Q.    So what you were instructed was that the
13  FTX Exchange collected trading fees in the form of
14  digital assets; is that right?
15     A.    Yes.
16     Q.    Were you instructed that as a result the
17  exchange could not determine what percentage of
18  a particular digital asset was owned by customers as
19  opposed to itself?
20     A.    No.  I was just taking these facts that I
21  was told and then applying what an English judge had
22  said about a similar situation in the Piroozzadeh case.
23     Q.    So as far as you were instructed, and as
24  far as you know, FTX was always able to determine how
25  many digital assets of a particular kind it had, what

Page 85

1  percentage of those were owned by customers and what
2  percentage of those were owned by itself?
3         MR. GLUECKSTEIN:  Object to the form.
4      A.    If that is the case, then it does dilute
5  what I have said, but I still think the idea of
6  a proprietary interest the nature of which changes
7  a thousand times an hour or more is something which
8  I find rather difficult to swallow.  But it is
9  a perfectly fair point, that if it is possible, then
10  that does weaken the point I am making, yes.
11  BY MR. HARRIS:
12     Q.    You have not been presented with any
13  evidence that FTX was unable to determine the amount of
14  digital assets and the percentage of those assets that
15  were owned by customers as opposed to itself at any
16  point in time, right?
17         MR. GLUECKSTEIN:  Object to the form.
18     A.    What I have been told is what is in
19  paragraph 25.  I have not been told they could and
20  I have not been told they could not.
21         MR. HARRIS:  Okay.  Why don't we take
22  a short break.
23         THE VIDEOGRAPHER:  We are going off the
24  record.  The time is 1.49 pm.
25         (A Short Break)

MAGNA ▶
LEGAL SERVICES

Page 86

1    THE VIDEOGRAPHER:  We are back on the
2 record.  The time is 2.06 pm.
3 BY MR. HARRIS:
4    Q.    Sir, it would not surprise you that
5 a computer could track thousands of trades per hour,
6 right?
7    A.    Nothing surprises me about computers, so,
8 no.
9    Q.    You would expect that in fact FTX's
10 systems were designed so that they could track all the
11 trades that occurred on their exchange, right?
12    A.    Yes.  I think that is fair, yes.
13    Q.    We talked about whether the views of the
14 parties could be relevant to interpreting a contract; do
15 you remember that?
16    A.    Yes, I do.
17    Q.    When I asked you about "views" I was not
18 very specific on what that might mean, so let me ask
19 a more particular question.
20    A.    Of course.
21    Q.    Could you look at and consider
22 circumstances that the market generally understood when
23 determining the meaning of contractual terms?
24    A.    There is certainly a principle that if an
25 expression or a term is understood in a particular area

Page 87

1 of the market to have a certain meaning, then the court
2 will, depending on the circumstances, but in principle,
3 be prepared to give it that meaning.  I think it is more
4 difficult in a case where you are dealing with members
5 of the public.
6    Q.    What if there is a factual background
7 that the market generally understood?  Could you
8 consider that as part of the factual matrix in
9 interpreting a contract?
10    MR. GLUECKSTEIN:  Object to the form.
11    A.    In principle, yes.
12 BY MR. HARRIS:
13    Q.    Okay.  I am going to hand you a document
14 that has already been marked in another deposition, and
15 you will see it has a handwritten scrawl at the bottom,
16 exhibit 6, but I believe this is one of the documents
17 that you reviewed.
18    A.    I have to confess I do not recall it, but
19 if you say it is, I am quite prepared to accept that.
20    Q.    Let me make sure I have the right
21 document then.  If you go back to your first declaration
22 and if you look at the appendix A or annex A?
23    A.    Background documents, yes.
24    Q.    And if you look at number 8?
25    A.    Yes, that seems to be that document, you

Page 88

1 are quite right.
2    Q.    But I take it this document does not look
3 familiar to you?
4    A.    I must admit I will have looked at it
5 before I did my first report, but I do not recall having
6 looked at it since.
7    Q.    Okay.  Do you believe you reviewed it in
8 its entirety at the time?
9    A.    I cannot answer that question with any
10 degree of confidence.  I would certainly have looked at
11 it to the extent I thought it appropriate, but I would
12 be guessing if I were to say any more than that.
13    Q.    Do you know what entity FTX Digital
14 Markets Limited is?
15    A.    No.
16    Q.    Do you think you asked that question?
17    A.    No.
18    Q.    Do you know if FTX Digital Markets
19 provided any services to FTX Trading's customers?
20    A.    If I knew, I do not recall.
21    Q.    Okay.  If you could look at the fifth
22 page of this document?
23    A.    Yes, I have it.
24    Q.    There is a section called "Apportionment
25 of Responsibilities" in a black heading at the top.  Do

Page 89

1 you have that?
2    A.    Yes, I see that.
3    Q.    And then the section that says, "FDM's
4 Responsibilities"; do you see that?
5    A.    Yes.
6    Q.    It says that FDM is ultimately
7 responsible for the safeguarding of its customers'
8 assets.  Do you see that?
9    A.    Yes.
10    Q.    Then it says that FDM's key roles and
11 responsibilities in relation to safeguarding of assets
12 are outlined below.  Do you see that, Sir?
13    A.    Yes.
14    Q.    And do you see the second bullet is "All
15 third-party providers will be aware that customer assets
16 do not represent assets of FDM"?  Do you see that?
17    A.    Yes.
18    Q.    Is that a fact that you took into account
19 in any of your reports?
20    MR. GLUECKSTEIN:  Object to form.
21    A.    I may have done, but it seems entirely
22 consistent with 8.2.6 I think.
23 BY MR. HARRIS:
24    Q.    So both this bullet and 8.2.6 state that
25 customer assets are not assets of FTX, right, Sir?

Page 90

1       A.    As I recall, so I may have, as it were,
2  mentally ticked it, but I cannot say I took it into
3  account.
4       Q.    Okay.  Do you see the third bullet says
5  that all third-party providers are aware that customer
6  assets are held in trust; do you see that, Sir?
7       A.    Yes.
8       Q.    Do you recall seeing that language
9  before?
10      A.    I do not recall that, no.
11      Q.    It is not something you mentioned in any
12 of your reports, right, Sir?
13      A.    No.
14      Q.    It is not something that FTX brought
15 specifically to your attention, right, Sir?
16      A.    Not as far as I recall, no.
17      Q.    Are you aware of what rules and
18 regulations would govern a company like FTX Digital
19 Markets that was incorporated in the Bahamas?
20      A.    No.
21      Q.    Okay.  So I take it you are not giving
22 any opinion on what regulations might govern
23 safeguarding of customer assets under the Bahamas,
24 right?
25      A.    No, I have no idea.

Page 91

1       Q.    Okay.  If you look at page 7, a section
2  at the top, "Safeguarding and Segregation", do you see
3  that?
4       A.    Yes.
5       Q.    And you see it says that FDM has a
6  responsibility to ensure that customer assets are
7  appropriately safeguarded and segregated from its own
8  funds.  Do you see that, Sir?
9       A.    Yes.
10      Q.    And do you see there are four bullets
11 under that?
12      A.    Yes.
13      Q.    And do you see the last one is that all
14 third-party providers are aware that customer assets are
15 held in trust; do you see that?
16      A.    Yes.
17      Q.    And likewise that statement was not
18 brought to your attention, right, Sir?
19      A.    Not as far as I recollect, no.
20      Q.    Do you agree that statement is at least
21 supportive of the idea that customer assets are held in
22 trust?
23            MR. GLUECKSTEIN:  Object to the form.
24      A.    On the face of it, yes; viewed in
25 isolation, yes.  I am not sure what third-party --

Page 92

1  I cannot remember what "third-party providers" are.
2  BY MR. HARRIS:
3       Q.    Okay, let me ask you about another
4  document that is listed in your report.  Actually, you
5  mentioned it already, which is the Law Commission
6  report.
7       A.    As I recall it, it certainly is.
8       (Exhibit 103 was marked for identification)
9       A.    Yes.
10      Q.    You have been handed exhibit 103 which is
11 a long document, hundreds of pages, from the Law
12 Commission entitled "Digital Assets: Final report".
13      A.    That is right.
14      Q.    Do you see that, Sir?
15      A.    Yes.
16      Q.    This is a document that you relied on in
17 your reports, right, Sir?
18      A.    Yes.
19      Q.    Okay.  If you turn to the fourth page,
20 and the numbering at the bottom is "i".
21      A.    Yes, I have that.
22      Q.    Okay.  This page lists the members of the
23 Law Commission; is that right?
24      A.    Yes.
25      Q.    Are you familiar with these individuals?

Page 93

1       A.    I am reasonably familiar with Green LJ,
2  I slightly know Sarah Green and I slightly know Nicholas
3  Paines.
4       Q.    How generally does one become a member of
5  the Law Commission?
6       A.    The Chair of the Law Commission is either
7  a High Court judge who immediately gets promoted to the
8  Court of Appeal or a Court of Appeal judge.  They are
9  selected by a committee, a panel consisting of judges.
10 I was on a panel once.  I think I was the only judge on
11 the panel.  There were various other people on the panel
12 from the law and from the Civil Service.  The other
13 members tend to be from -- there tends to be a family
14 law, a criminal law, a property/Chancery law and one
15 other law expert.  But they tend to have experts in
16 different areas of law.
17      Q.    I take it the people who are selected are
18 generally highly regarded in the legal community?
19      A.    Yes, I think that is fair enough.
20      Q.    And you said you are familiar with Lord
21 Green; is that right?
22      A.    Lord Justice Green, yes.
23      Q.    Is he a well respected jurist?
24      A.    Yes.
25      Q.    Are you familiar with the Law

Page 102

1  transfer of legal title to digital assets is not the
2  subject of any judicial authority in England, right?
3      A.   That is the point I was making about why
4  one cannot be confident about how quasi-bailment will
5  work.
6      Q.   Are there cases outside of England that
7  discuss the transfer of legal title to digital assets?
8      A.   I am afraid to say I do not recall now.
9      Q.   Would those cases be persuasive to an
10 English court if they ----
11     A.   They would certainly be looked at by the
12 English courts, yes.
13     Q.   You rely on the Law Commission's final
14 report and an article by Hin Liu; is that right?
15     A.   That is right.
16     Q.   And I take it you found those persuasive
17 and informative to you?
18     A.   What I say about them is in paragraph 28,
19 the Law Commission and Liu's conclusions, analyses
20 "support the following conclusions, which, while they
21 cannot be regarded as clear given the developing state
22 of the law, appear to me to be correct."
23     Q.   Okay.
24     A.   So, yes, as I say, that summarises my
25 understanding, my view.

Page 103

1      Q.   Okay, and your view is that a transfer of
2  legal title to digital assets would require both
3  a change of control and an intention to pass title?
4      A.   That is right.
5      Q.   So if there was a change of control but
6  not an intention to change control -- I am sorry.  If
7  there was a change in control but not an intention to
8  pass legal title, then both requirements would not be
9  met; right?
10     A.   Yes.
11     Q.   And therefore title would not pass;
12 right?
13     A.   That is right.
14     Q.   I want to walk through those two sources
15 then.
16     (Exhibit 104 was marked for identification)
17     Q.   You have been handed exhibit 104, which
18 I believe is the article by Hin Liu that you underline
19 in your report; is that right?
20     A.   Thank you.
21     Q.   And do you know who Hin Liu is?
22     A.   I do not.
23     Q.   Okay.  Is this article that you are
24 referred to one that is commonly relied upon and cited
25 in the profession?

Page 104

1      A.   No.  I think it was found by the junior
2  who was assisting me in this case as I recall, or I may
3  have found it from the Law Commission report, I am not
4  sure which.
5      Q.   But I take it you found it useful for
6  your purposes?
7      A.   Yes.
8      Q.   Just to be clear, did you review articles
9  from any other scholars concerning digital assets?
10     A.   I think anything I reviewed would have
11 been mentioned in my report.
12     Q.   Is it fair to say you followed the
13 reasoning of this report and adopted those two
14 requirements for title to pass; right?
15     A.   I think so, yes.
16     Q.   If you look at paragraph 2.1 of the
17 article, it is a section called 2.1 Ambiguity in the use
18 of 'transfer'"; do you see that?
19     A.   Yes.
20     Q.   And you see the first paragraph starts:
21 "Although this article's focus is on the transfer of
22 title to a digital asset ..."; do you see that, Sir?
23     A.   Mm-mh.
24     Q.   And then do you see the last sentence
25 says: "The final notion of transfer refers to the

Page 105

1  transfer of legal title." Do you see that?
2      A.   Yes.
3      Q.   And so this article is concerning how to
4  transfer legal title?
5      A.   Yes.
6      Q.   There is not a discussion in here about
7  equitable title?
8      A.   That is quite true.
9      Q.   Okay.  Do you agree with the reasoning in
10 this report that people generally expect or assume that
11 if someone has control over a digital asset he has title
12 to it?
13     A.   It seems to me as a general proposition
14 to have a lot of force, but I am being a bit cautious
15 because generalisation, but, yes, I can see that.
16     Q.   I want to show you another article.
17     (Exhibit 105 was marked for identification)
18     Q.   Do you recall this is another article
19 that you cite in your report?
20     A.   I do remember this in general terms.
21 I do not remember all the details, I have to admit.
22     Q.   You recall this was another useful
23 authority you relied upon?
24     A.   It was certainly one I cited, yes.
25     Q.   If you look at the authors on the first

MAGNA ▶
LEGAL SERVICES

Page 106

1    page ----
2        A.    Yes.
3        Q.    ---- first off the article is entitled:
4    "Client-Intermediary Relations in the Crypto-Asset
5    World"; do you see that?
6        A.    Yes, I do.
7        Q.    And the authors are Hin Liu, who authored
8    the previous article; right?
9        A.    That is right.
10       Q.    Louise Gullifer; do you see that?
11       A.    Yes.
12       Q.    And Henry Chong; do you see that?
13       A.    Yes.
14       Q.    Are you familiar with Louise Gullifer QC?
15       A.    I know her by name and reputation.
16       Q.    What is her reputation?
17       A.    She is meant to be good.
18       Q.    A respected QC or KC?
19       A.    She is largely an academic, yes, but she
20   is none the worse for that.
21       Q.    If you look at the second page, so the
22   end of the first section; do you see there is
23   essentially a decision tree?
24       A.    Yes.
25       Q.    Do you agree with this decision tree?

Page 107

1        A.    I have not thought about it in terms.  It
2    looks to me a perfectly sensible approach, but I, having
3    not thought about it specifically, I would not want to
4    go further than that.
5        Q.    Okay.  If you turn to the third page, do
6    you see there is a section discussing the scenario of
7    Outright Title Transfer; do you see that?
8        A.    Yes.
9        Q.    And it says: "The first possible legal
10   relationship between client and intermediary is that of
11   outright title transfer, i.e. where legal title is
12   vested absolutely in the intermediary"; do you see that,
13   Sir?
14       A.    Yes.
15       Q.    And then in the second paragraph, do you
16   see it says: "The effect of an outright title transfer
17   is that the intermediary can freely dispose of the
18   assets held in its custody; ...".
19       A.    Yes.
20       Q.    Do you see that?
21       A.    Yes.
22       Q.    Meaning that contractually, the
23   intermediary could decide to do whatever it wanted with
24   the assets; right?
25       A.    Yes.

Page 108

1        Q.    And do you see in the second sentence the
2    authors write: "This has consequences in terms of
3    insolvency and tax treatment"; do you see that?
4        A.    Yes.
5        Q.    And then I guess the fourth sentence, the
6    authors write: "In relation to tax, it is the
7    intermediary who will be subject to the applicable tax
8    regime, meaning that (for example) capital gains tax
9    would not be levied upon the client, but rather the
10   intermediary"; do you see that?
11       A.    Yes.
12       Q.    Do you know whether the -- and FTX in our
13   scenario is the intermediary; right?
14       A.    Possibly.  I would need to look at this
15   more carefully.  I am prepared to proceed on that
16   assumption, but I would need to look at this paper more
17   carefully to see how they define the intermediary.
18       Q.    Okay.  This is the paper you reviewed for
19   the purposes ----
20       A.    I know, but I have to say I cannot
21   remember what I said about it, but, as I say, it is,
22   I think I cite it for more specific points.
23       Q.    Do you know whether FTX paid capital
24   gains on gains and losses on the digital assets of its
25   customers?

Page 109

1        A.    I have no idea.
2        Q.    Is that something you asked FTX to tell
3    you?
4        A.    No.
5        Q.    Do you see in the next sentence the
6    authors write: "In addition, it would be expected that
7    the asset will show up on the intermediary's balance
8    sheet: the fact that the asset shows up on the
9    intermediary's balance sheet is a strong indicia of
10   intent to transfer title"; do you see that, Sir?
11       A.    I do.
12       Q.    Do you have any reason to disagree with
13   that analysis?
14       A.    Slightly, yes.
15       Q.    What is your reason?
16       A.    Well, it simply shows what the
17   intermediary thought.  It may be some evidence, but
18   I think -- I would not necessarily call it strong
19   indicia of intent.  But I think it is some evidence of
20   intent.
21       Q.    Okay.  Do you know whether customers'
22   assets show up on FTX's balance sheet?
23       A.    No, I do not.
24       Q.    It is not something you asked FTX to let
25   you know the facts of?

**MAGNA**
LEGAL SERVICES

Page 110

1    A.    No.
2    Q.    The next section in this article is about
3 the scenario of a trust.  Do you see that, Sir?
4    A.    Yes.
5    Q.    And do you see the end of the first
6 paragraph the authors write for a trust:  "What must be
7 intended is the intermediary will not have free use of
8 the asset."  Do you see that, Sir?
9    A.    Yes.
10    Q.    Do you agree with that statement?
11    A.    Yes, but it is not sufficient to create
12 a trust, but certainly it is a necessary ingredient of
13 a trust.
14    Q.    Okay.  There are a few other things
15 I want to ask about in here.  If you go to page 10 there
16 is another section, section C, "Trust"; do you see that?
17    A.    Yes.
18    Q.    And it discusses the obligations and
19 duties of a trustee; do you see that?
20    A.    Yes.
21    Q.    Okay.  And then in the third paragraph,
22 do you see there a discussion of the case Citibank v
23 MBIA?
24    A.    Yes.
25    Q.    Are you familiar with that case?

Page 111

1    A.    I do not recall it, I have to say.
2    Q.    Do you see that according to the authors
3 here that case indicates that a party can disclaim
4 fiduciary duties and still be a trustee?
5    A.    Yes.
6    Q.    And you agree with that general
7 principle; right?
8    A.    As we discussed earlier, rules of a trust
9 are such that there are certain principles of a trust
10 which will apply, but those principles, depending on the
11 terms of the actual trust, can be varied or reduced.  It
12 is an unusual trust which satisfies that test certainly
13 but I do not know whether that was all the beneficiaries
14 that were being referred to.
15    Q.    Can you go to page 15?
16    A.    1-5.
17    Q.    Yes.  You see there is a section 5:  "The
18 Redundancy of bailment in the crypto-asset context"?
19    A.    Yes.
20    Q.    And then do you see the authors write:
21 "As we have seen, the incidence of an English law trust
22 can be heavily modified by the parties' agreement.
23 Extensive exclusions of duties, even those that appear
24 to strike at the heart of the 'irreducible core' of
25 trusteeship, remain compatible with the existence of

Page 112

1 a trust"; do you see that?
2    A.    Yes, I do.
3    Q.    And you agree with that description of
4 the law; right?
5    A.    Yes.  I think the extent to which you can
6 strike at the irreducible core may be open to argument
7 but as a matter of principle, yes.
8    Q.    Okay.  And if you can turn to the last
9 page?
10    A.    Yes.
11    Q.    If you look at the -- I guess we can move
12 on.  Never mind.
13    A.    The last page is?
14    Q.    Page 18, I guess, sorry, if you look at
15 the -- there is a third paragraph?
16    A.    Yes.
17    Q.    That says:  "So far most digital assets
18 intermediaries ..."; do you see that?
19    A.    Yes.
20    Q.    If you look fifth line from the bottom
21 there is a sentence that starts:  "This"; do you see
22 that?
23    A.    Yes, the trust.
24    Q.    It says: "This, along with recent
25 judgements in the Quoine and Cryptopia cases ..." the

Page 113

1 is the Ruscoe v Cryptopia case:  "... clearly show a
2 trend towards regulators and courts deciding that the
3 proper and natural relationship between digital asset
4 intermediaries and their clients is one of a trust." Do
5 you see that, Sir?
6    A.    Yes.
7    Q.    Do you have any reason to disagree that
8 that is the trend?
9    A.    No, I do not think it is.  I think that
10 the conclusion of this paper, which I accidently looked
11 at because you talked about the last page puts it well
12 quasi-bailment is uncertain but possible.  The more
13 natural thing is trust, but it all depends on what the
14 parties have agreed.
15    Q.    Okay, and I just want to make sure my
16 question and answer are clear.  Do you have any reason
17 to disagree that the trend is for regulators and courts
18 to decide that the proper and natural relationship
19 between digital asset intermediaries and their clients
20 is one of a trust?
21    A.    I think that may be a very easy
22 conclusion to reach in some cases, but, as I say, it all
23 depends on the individual contract and facts, which is
24 why I am hedging.  It may well be that if there is no
25 contract and somebody simply places a digital asset on

MAGNA
LEGAL SERVICES

Page 122

1    interpret Hunter v Moss; do you see that?
2        A.    Yes.
3        Q.    And one is the intangible asset exception
4    approach and the other is the equitable co-ownership
5    approach; do you see that?
6        A.    Yes.
7        Q.    And then do you see in 7.53?
8        A.    Yes.
9        Q.    Do you see the Law Commission
10   provisionally said: "In our consultation ..." report:
11   "... we provisionally concluded that the best way to
12   characterise the interests of beneficiaries of
13   crypto-tokens or crypto-token entitlements held by a
14   custodial holding intermediary on a consolidated
15   unallocated basis for the benefit of multiple users is
16   as rights of co-ownership in an equitable tenancy in
17   common." Do you see that, Sir?
18       A.    Yes.
19       Q.    And you see that the report indicates
20   that: "Consultees agreed"; do you see that?
21       A.    Yes.
22       Q.    And just for the benefit of our US judge,
23   what does "consultees" refer to?
24       A.    They put it out for consultation and
25   anyone interested, whether an academic practising lawyer

Page 123

1    or financier or person with interests in digital assets,
2    can reply.  It is an open consultation.
3        Q.    Okay.  And then you see the Law
4    Commission report then continues: "The analysis has
5    received support from academic commentators and has been
6    endorsed by the courts in England and Wales." Do you see
7    that, Sir?
8        A.    I do.
9        Q.    And then the commission concludes: "We
10   adopt it as our preferred view"; do you see that?
11       A.    Yes.
12       Q.    Okay.  You do not disagree with their
13   view here, do you?
14       A.    No.  I think it is probably right, yes.
15       Q.    And then there is a box in the report
16   that says: "Conclusion 4"; do you see that on page 160.
17       A.    Sorry.  Yes.  So basically this is saying
18   that held on trust and the trust can be equitable
19   co-owners, equitable tenants in common of the mass of
20   coins, mass of digital assets.
21       Q.    Okay.  We can put that aside for now but
22   I am sure we will come back to it.  I want to keep
23   walking through your report.
24       In paragraph 39 of your report -- first
25   report -- in 39.1 it is still your position that:  "It

Page 124

1    would be possible for a person (or an exchange) to
2    declare a trust over all of its network addresses in
3    favour of a beneficiary in relation to a specific
4    proportion of the total holdings." Right, Sir?
5        A.    That is right.
6        Q.    And then in 39.3 it is still your opinion
7    that a court might hold that there was a trust overall
8    the pool addresses in respect of which all customers
9    were beneficiaries as tenants in common as long as it is
10   clear that such a trust relationship was intended?
11       A.    If the agreement made it clear a trust
12   relationship was intended and that there would be
13   sweeping and pooling, then, yes.
14       Q.    Do any of the authorities you cite say it
15   is necessary for the parties to explicitly state that
16   the trust is over a pool of assets?
17       A.    I do not know that they do, but they do
18   make it clear that a trust relationship is needed.
19   I cannot tell you whether they make it clear about the
20   pool.
21       Q.    If we can look back at the Law Commission
22   final report -- I did warn you we would be going back
23   and forth ----
24       A.    You did.
25       Q.    Are you familiar with what the Law

Page 125

1    Commission said about the impact of commingled wallets
2    on certainty of intention?
3        A.    I cannot pretend to remember at all
4    clearly, no.
5        Q.    If you can go to page 158.
6        A.    Thank you.  Yes.
7        Q.    Do you see in paragraph 7.48 ----
8        A.    I have it.
9        Q.    The Law Commission said: "In our view,
10   certainty of subject-matter can be satisfied
11   irrespective of whether assets are segregated or held in
12   commingled, unallocated holdings such as in omnibus
13   accounts." Do you see that, Sir?
14       A.    Yes.
15       Q.    Do you have any reason to disagree with
16   the Law Commission's view?
17       A.    No.  I quite accept that it can be
18   satisfied irrespective of that, yes.
19       Q.    And the Law Commission continues: "We do
20   not continue that statutory intervention or other  law
21   reform is necessary to clarify that point." Do you see
22   that, Sir?
23       A.    Yes, I do see that.
24       Q.    So they are indicating that is the
25   current state of English law.

**MAGNA**
LEGAL SERVICES

Page 126

1    A.    As I say, when it comes to trusts I think
2   the state of English law is fairly clear and I do not
3   disagree with that.
4    Q.    So this is indicating that even if the
5   assets are in a commingled omnibus wallet certainty of
6   subject-matter is still satisfied; right?
7    A.    Yes.  I mean, sorry to sound like
8   a scratched record but this is assuming, A, there is
9   a trust relationship and, B, everything inevitably
10  depends on the terms of the contract.
11   Q.    Okay.
12   A.    But, subject to that, yes, I do agree.
13   Q.    If you look at paragraph 7.45?
14   A.    Yes, I have it, thank you.
15   Q.    You see there is a section, it is in
16  a section called:  "Certainty of intention"; do you see
17  that?
18   A.    Yes.
19   Q.    Okay.  And the Law Commission says:
20  "Whether there is a requisite certainty of intention to
21  create a trust must be ascertained for the
22  user-intermediary agreement or relationship."  Do you
23  see that?
24   A.    Yes.
25   Q.    Okay.  And the Law Commission says: "We

Page 127

1   consider it likely that the courts will take
2   a purpose-based and commercially responsive approach to
3   identifying and giving effect to an intention to
4   establish trusts by crypto-token holding
5   intermediaries." Do you see that, Sir?
6    A.    Yes.
7    Q.    You agree with that statement; right?
8    A.    Well, giving effect to an intention means
9   looking at what the parties intended and that involves
10  looking at the contract.
11   Q.    But you agree that it is likely the
12  courts will take a purpose-based and commercially
13  responsive approach to identifying giving effect to that
14  intention; right, Sir?
15   A.    I would prefer to say they would adopt
16  the same approach as they adopt in the case of any other
17  contract.
18   Q.    Well, in most contracts, do courts take
19  up purpose-based and commercially responsive approach?
20   A.    Yes, but unless one adds, "having regard
21  to the overriding importance of the words used", one
22  could go wrong.
23   Q.    Okay.  And do you see at the end of
24  paragraph 7.45 there is a footnote 730; do you see that,
25  Sir?

Page 128

1    A.    Yes, I do.
2    Q.    There the commission is adopting the
3   discussion of indicative case law from the consultation
4   paper; do you see that, Sir?
5    A.    Yes.
6    Q.    Did you review the consultation paper?
7    A.    I think I did look at it, yes.  As far as
8   I recollect I looked at it.
9    Q.    It is listed on your list.
10   A.    I thought I looked at it.  Thank you.
11   Q.    Okay.
12   A.    I cannot pretend to remember what is in
13  those six paragraphs, or maybe it is seven.
14   Q.    I understand.
15   A.    But I imagine they go through the cases
16  on interpretation of contracts, but I may be wrong.
17   Q.    Why don't we take a look at those
18  paragraphs then.
19   A.    Okay.
20   (Exhibit 106 was marked for identification)
21   Q.    Why don't we go through this one slowly
22  because the pages will be a mess.  So take your time.
23   A.    As you like.
24   Q.    My questions are going to be about
25  Chapter 16, custody of crypto-tokens which starts on

Page 129

1   page 327?
2    A.    I have it, thank you.  I am afraid I have
3   taken off the rubber band, taking rather a risk.  Yes.
4    Q.    Okay.  So the reason I pulled this out
5   was the final report referred back to the interpretation
6   of case law in the ----
7    A.    I understand.
8    Q.    In this report, so that was at
9   paragraph 16.57 onwards they are referring to I believe?
10   A.    Page 342, yes.
11   Q.    And you see starting in paragraph 16.58
12  there is an extensive discussion of the Ruscoe v
13  Cryptopia case; do you see that?
14   A.    Yes.
15   Q.    That is a decision by the New Zealand
16  High Court; right?
17   A.    Yes.
18   Q.    That is one of the courts you indicated
19  you attempt to be consistent with when you were a judge?
20   A.    Yes.
21   Q.    And do you see at the end of -- in
22  paragraph 16.58 before the numbered paragraphs, the Law
23  Commission described the Ruscoe v Cryptopia's
24  conclusions as: "The court was satisfied that the
25  necessary certainty of intention was established by

MAGNA
LEGAL SERVICES

Page 130

1    a combination of ..." and then it lists four factors;
2    do you see that, Sir?
3        A.    Yes.
4        Q.    And the first was: "The structure and
5    content of the internal database maintained by Cryptopia
6    to track client account balances."  Do you see that,
7    Sir?
8        A.    I do.
9        Q.    And the second was:  "The content of
10   Cryptopia's internal financial accounts and its Goods
11   and Services Tax returns."  Do you see that, Sir?
12       A.    Yes.
13       Q.    And then the third was: "Cryptopia's
14   conduct in establishing the crypto-token exchange
15   'without allocating to account holders public and
16   private keys for the [crypto-tokens] it ... [held] for
17   them'."  Do you see that?
18       A.    Yes.
19       Q.    The fourth is:  "The fact that Cryptopia
20   did not intend to, and in fact never did, use the
21   crypto-tokens held on behalf of and in support of the
22   customer's trading balances to engage in trading for its
23   own principal benefit." Do you see that, Sir?
24       A.    I do.
25       Q.    Do you disagree with the Law Commission's

Page 131

1    interpretation of the holding of Ruscoe v Cryptopia
2    described here?
3        A.    I think I referred earlier to the fact
4    I thought there was a New Zealand case that I did not
5    entirely agree with rather early on in this meeting and
6    I think I am not sure that I agree with that decision.
7    I do not know that it matters in this case, but I am
8    doubtful.  It is a High Court decision, which is
9    a first-instance decision and I have my doubts about it,
10   but I certainly note that it is there and it is
11   a respected court and it is a decision, yes.
12       Q.    My question was a little different.
13       A.    I am sorry.
14       Q.    My question is, do you disagree with the
15   Law Commission's interpretation of the holding of Ruscoe
16   v Cryptopia?
17       A.    I would have to look at Ruscoe but
18   I would be surprised if the Law Commission had got it
19   wrong.
20       Q.    Your expectation would be they are
21   accurately describing the holding?
22       A.    Yes.
23       Q.    But I take it you do not recall if this
24   was the New Zealand decision you disagreed with?
25       A.    I think it was.  I had my doubts about

Page 132

1    it, yes.  I do not know that it matters for this case
2    but I am not convinced it is right.
3        Q.    Do you recall what it is you thought was
4    incorrect if that was the case?
5        A.    I think I thought that there was
6    insufficient to justify the conclusion they reached but
7    I cannot pretend to have given it detailed attention,
8    because in the end one is looking for principles and,
9    for the reasons I have tried to give, I take a pretty
10   firm view that there cannot be a trust here.
11           So if there cannot be a trust one does
12   not get to this stage of saying could it be a trust over
13   the pool where all the customers have the rights of
14   tenants in common.  Ruscoe v Cryptopia did not really
15   bear on the question, the main question as I saw it
16   under this head, which was whether there was a trust or
17   not.
18       Q.    So your view is that Ruscoe v Cryptopia
19   did not address the issue of whether there was an
20   intention to create a trust?
21       A.    That is not really what I am saying.
22   What I am saying is -- I am sorry if I appear not to be
23   answering -- I formed the strong view, which I adhere
24   to, that because of certain provisions in the Dotcom
25   Terms there was no intention to create a trust.

Page 133

1    Therefore, the trust issue was a non-starter.
2            Ruscoe v Cryptopia is relevant if there
3    is a trust.  So I did not give a great deal of careful
4    attention to Ruscoe v Cryptopia, but even if that was
5    not the case, it is a decision of one judge in New
6    Zealand and I cannot, without disrespect to that judge,
7    I do not find it awfully persuasive, but I cannot
8    pretend that I have thought about it in detail.
9        Q.    You would agree that the Law Commission
10   seemed to find it persuasive; right, Sir?
11           MR. GLUECKSTEIN:  Object to the form.
12       A.    I am not sure.  They say that it provides
13   some indication of the operational structures.  They
14   certainly do not disagree with it and you could say as
15   a very pallid implied approval but they certainly do not
16   disagree with it and they cite it.  So I think it is
17   fair to say it does not -- that you could argue that
18   they are agreeing with it but I would not go that far.
19   BY MR. HARRIS:
20       Q.    Are there certain facts about the FTX
21   situation that you view as different than the facts in
22   Ruscoe v Cryptopia?
23       A.    Again, without looking at Ruscoe v
24   Cryptopia it would be wrong for me to express a view but
25   I very much doubt in Ruscoe v Cryptopia that the

Page 138

1     Q.    It is fair to say despite the fact the
2  database was still being reconciled the Ruscoe court
3  found there to be sufficient certainty to find a trust
4  existed; right, Sir?
5     A.    Yes.  That would appear to be right.
6  I am not sure what was argued but, yes.
7     Q.    Okay.  If you can look at paragraph
8  [144], the next paragraph, do you see in the second part
9  of that sentence it notes: "... Cryptopia was itself
10  one of the beneficiaries of some trusts ..."?
11     A.    Yes.
12     Q.    Do you take that to mean that Cryptopia
13  owned some of the assets?
14     A.    Yes.  Again I cannot pretend to be an
15  expert on the facts but that itself looks likely, yes.
16     Q.    And the Ruscoe court found there to be
17  a trust despite the fact that the exchange, Cryptopia
18  owned some of the assets in commingled wallets; right,
19  Sir?
20     A.    It would seem to be the case.
21     Q.    If you look at paragraph [149].
22     A.    Yes, thank you.
23     Q.    Do you see it indicates that the
24  liquidators may have some difficulties finding out the
25  true identities of some of the account holders?

Page 139

1     A.    Yes.
2     Q.    And making contact with them.  But do you
3  see that Ruscoe court concludes that despite that, that
4  does not invalidate the trust for those whose precise
5  identities can be shown; do you see that, Sir?
6     A.    Yes, I do.
7     Q.    And the court observes:  "Evidential
8  uncertainty does not defeat a trust"; do you see that,
9  Sir?
10     A.    Yes, Baden's Deed Trusts, yes.
11     Q.    And you agree with that description of
12  the law; right?
13     A.    Yes.  I think the slight difficulty is
14  that if you know in advance from the facts at the time
15  the alleged trust is created that there will be obvious
16  difficulties, it is slightly different from saying they
17  are difficulties which transpire down the line.
18  Difficulties that transpire down the line should not
19  prevent the problem.
20     Q.    If you look at the next page, there is
21  a section called certainty of intention; do you see
22  that?
23     A.    Yes.
24     Q.    And this is a section that describes
25  whether there was sufficient certainty of intention to

Page 140

1  create a trust; right, Sir?
2     A.    Yes.
3     Q.    And if you look at paragraph [153].
4     A.    Yes.
5     Q.    Do you see the Ruscoe court said:  "On
6  this, I am satisfied that Cryptopia manifested its
7  intent through its conduct in creating the exchange
8  without allocating to accountholders public and private
9  keys for the digital assets it commenced to hold for
10  them." Do you see that, Sir?
11     A.    Yes.
12     Q.    So the Ruscoe court determined that by
13  creating an exchange without allocating to account
14  holders the keys for the digital assets, the Cryptopia
15  exchange manifested its intent for a trust; right, Sir?
16     A.    Yes.
17     Q.    And you would agree that FTX also created
18  an exchange without allocating to account holders the
19  keys for the digital assets; right, Sir?
20     A.    In the end, that is not a question for
21  me, but I have no reason to doubt it if you say that is
22  the position.
23     Q.    That is what you were told to assume;
24  right, Sir?
25     A.    Yes, exactly.

Page 141

1     Q.    If you look at paragraph [157] do you see
2  the judge writes:  "For completeness, I note also a
3  number of factors here which support the conclusions I
4  have reached ..."; do you see that, Sir?
5     A.    Mm-mh.
6     Q.    And sub-paragraph (a) indicates that an
7  express trust can be evidenced:  "... orally or as
8  result of conduct ..."; do you see that?
9     A.    Yes.
10     Q.    You agree with that as a statement of the
11  law; right, Sir?
12     A.    Yes.
13     Q.    Paragraph [157](c), the court writes:
14  "It is not a significant indicator against a trust that
15  the fungible property of one party is mixed with the
16  fungible property of another in a single pool ..."; do
17  you see that, Sir?
18     A.    Yes.  I do not agree with that.  That is
19  inconsistent with what Briggs J said, I think, in the
20  LBIE case which Dame Elizabeth cites.  I think, with all
21  due respect to the judge, it is wrong.
22     Q.    Okay.
23     A.    I am not saying it would be decisive, but
24  it is a significant indicator in English law.
25     Q.    In [157](c) you see the court also

MAGNA
LEGAL SERVICES

Page 146

1    the whole contract.  I am slightly uncomfortable about
2    expressing a view.
3        Q.    Okay.
4        A.    But I do think the crucial point is that
5    it referred to the existence of a trust in the document,
6    which we do not.
7        Q.    Let us look at that.  If you turn to
8    paragraph [179] ----
9        A.    I am sorry, of?
10       Q.    I am sorry, still of Ruscoe.
11       A.    Yes, [179], I am there, yes, thank you.
12       Q.    Let me know when you are there.
13       A.    I am there.
14       Q.    Do you see the court begins to discuss
15   the amended terms and conditions updated from August 7,
16   2018; do you see that?
17       A.    Mm-mh.
18       Q.    Okay.  And do you see that contains the
19   language you are referring to that: "Each user's entry
20   in the general ledger of ownership of coins is held by
21   us, on trust ..."; do you see that, Sir?
22       A.    Yes.
23       Q.    That is the reference to trust you
24   referred to in the footnote in your report; right, Sir?
25       A.    Mm-mh.  Yes, I do.  I think I may be

Page 147

1    wrong, but I think what he is saying is that trust is
2    important, it just is a nonsensical trust to interpret
3    it the way that is being done according to Ms. Cooper,
4    but I may be wrong.
5        Q.    Let us look at paragraph [181].  Do you
6    see the judge writes: "On these aspects, I disagree
7    with Mr Barker's interpretation here.  I have confirmed
8    above that I am satisfied no variation of trust was
9    involved in the amended terms.  Those terms merely
10   confirmed what were the existing trusts in operation."
11   Do you see that, Sir?
12       A.    Yes.
13       Q.    And then if you go to paragraph [183], do
14   you see the judge writes:  "It must follow, therefore,
15   that at no point in time were there separate sets of
16   trust assets on the one hand, for accountholders under
17   the historic terms and, on the other, for accountholders
18   who had accepted the amended terms."  Do you see that,
19   Sir?
20       A.    Yes.
21       Q.    So the court in Ruscoe concluded there
22   was a trust before this amendment existed; right?
23       A.    Yes.  That seems to be the case.  I think
24   you are right about that, yes.
25       Q.    So the court in Ruscoe found a trust

Page 148

1    despite there not being a contract at that point in time
2    saying that the ownership was held on trust; right, Sir?
3        A.    That would seem to be the case, yes.
4        Q.    Are you aware that the Law Commission
5    also noted in interpreting Ruscoe that the court found
6    was created before the trust language was put in
7    a contract?
8        A.    I have not checked, but I will take it,
9    if you say that is the position I am prepared to accept
10   it.
11       Q.    Okay.  Let me ask you about another of
12   the requirements which is certainty of object.
13       A.    Okay.
14       Q.    I believe you have agreed that there is
15   not a lack of uncertainty about object; right?
16       A.    I think I said that in paragraph 42, yes.
17       Q.    Why do we not take a brief break.  We
18   have been going about an hour and a half.
19            THE VIDEOGRAPHER:  We are going off the
20   record.  The time is 3.36 pm.
21            (A Short Break)
22            THE VIDEOGRAPHER:  We are back to
23   the record.  The time is 3.53 pm.
24            (Exhibit 108 was marked for identification)
25       Q.    You have been handed what we have marked

Page 149

1    as exhibit 108, which is the terms of service?
2        A.    Yes.
3        Q.    I am handing it to you because I am going
4    to ask you what section 8.2.6 means.  You might have it
5    memorised but I thought it could not hurt to take
6    a look.
7        A.    At my age I do not rely on my memory more
8    than I have to, but thank you.
9        Q.    When you are ready, Sir, my question is
10   what do you take 8.2.6 to mean?
11            MR. GLUECKSTEIN:  Object to the form.
12       A.    Well, what it means is that it is saying
13   that you legally own your digital assets and FTX trading
14   does not.
15   BY MR. HARRIS:
16       Q.    Anything else?
17       A.    Well, the implications can be quite
18   significant, but that is the basic message.  I am
19   slightly uncomfortable about re-phrasing a provision,
20   but I think the important point is that title to your
21   digital assets means legal title on the face of it and
22   none of the digital assets are the property of FTX
23   Trading means that FTX Trading do not own them.
24       Q.    So is it your view that it means that the
25   customer owns the assets at all points in time?

MAGNA
LEGAL SERVICES

Page 150

1    A.    That is what it would seem to mean, yes.
2    Q.    Okay. Now, do you recall that in your
3  rebuttal report you instead say that it means that legal
4  title to Three Arrows Digital Assets rest with 3AC at
5  least at the point that they are deposited; do you see
6  that, do you remember that, Sir?
7    A.    I do. There is a difference between what
8  the parties have agreed and the legal effect of what has
9  happened.
10    Q.    I understand and I am not asking about
11  the legal effect of what has happened. I am trying to
12  understand what you think 8.2.6 means. So do you think
13  it means that for all times the customer owns the assets or
14  it only means that at the time they are deposited into
15  the customer's specific account, the customer owns the
16  assets?
17        MR. GLUECKSTEIN: Object to the form.
18    A.    Why I am struggling with this slightly is
19  that in the end who owns property is a matter for the
20  court not a matter for the parties to agree. I can say
21  I own my house. We can almost, A and B can agree that
22  C owns your house, but it does not mean he owns your
23  house. So it means, what does it mean or what do the
24  parties think it means? What it clearly is intended to
25  mean is that legal title to the digital asset is

Page 151

1  intended to rest with the customer. And it is intended
2  that FTX has no interest in the digital assets owned by
3  the customer.
4    Q.    So legal and title is intended to rest
5  with the digital customer at all times?
6    A.    That, I think, is the natural meaning of
7  the clause, yes.
8    Q.    So the natural reading of the clause is
9  that legal title is intended to vest with the customer
10  at all times; right?
11    A.    Yes.
12    Q.    Can we look at your rebuttal report?
13    A.    Yes.
14    Q.    So if you look at page -- if you go to
15  page 11 in paragraph 21.a.iii.
16    A.    Yes.
17    Q.    You say that the natural meaning of 8.2.6
18  is: "... that legal title to 3AC's Digital Assets rests
19  with 3AC, at least at the point that they are deposited,
20  and then it leaves it to the courts to work out the
21  consequences of the dealings with those assets
22  thereafter." Do you see that, Sir?
23    A.    I do.
24    Q.    Is that still your view today?
25    A.    I think that, yes, in effect I am dealing

Page 152

1  with Dame Elizabeth's point there and what I am saying
2  is that this is saying how they intend legal title to be
3  dealt with, but, as I say, legal title is not purely
4  a question of what the parties intend.
5    Q.    I am just focusing on the -- You can put
6  Dame Elizabeth's report aside and I just want to know
7  your interpretation of what the parties intended under
8  8.2.6. Is it your interpretation that the parties
9  intended to clarify ownership at the time they were
10  deposited and then the parties intended to leave it to
11  the courts thereafter?
12    A.    Yes.
13    Q.    Okay. What do you mean by 3AC's Digital
14  Assets?
15    A.    I mean that the digital assets which are
16  recorded in their accounts.
17    Q.    What do you mean "recorded in their
18  accounts"?
19    A.    Well, they will have an account which
20  would presumably record what digital assets they have
21  bought or sold and what they hold at the moment.
22    Q.    You mean, the ledger system that FTX
23  created and updated?
24    A.    Yes. I mean the assets have to be
25  deposited. If they are not deposited then they have not

Page 153

1  been -- they have not got them. But this is their
2  intention.
3    Q.    In this paragraph we have been looking
4  at, which is 21.a.iii you say that 8.2.6 naturally means
5  that legal title to 3AC's Digital Assets, why do you say
6  "legal title" as opposed to ----
7    A.    Because when you talk about title you
8  mean legal title normally. If you want to say equitable
9  title or anything like that you qualify it.
10    Q.    You chose to qualify it, wrote the word
11  legal title here; right, Sir?
12    A.    That is because the natural meaning of,
13  "I have got title to this property" would be naturally
14  understood to mean, "I have got legal title". I agree
15  I am qualifying it but I am saying the natural meaning
16  is legal title.
17    Q.    You would agree that 8.2.6 does not say
18  legal title; right?
19    A.    I will agree that certainly.
20    Q.    It could have been written, just used
21  that phrase instead; right, Sir?
22    A.    It could have been written that way, yes.
23    Q.    You indicate that the natural reading of
24  8.2.6 only addresses legal title at the point they are
25  deposited; right?



Page 154

1          A.    I think again one has to distinguish
2    between what the parties may have thought and what the
3    effect is.
4          Q.    I am trying to figure out what you
5    believe the parties thought.  So you think the parties
6    only intended to address ownership at the time that
7    assets were deposited; is that right, Sir?
8          A.    No.  I think it means that legal title is
9    intended to be with the customer.
10         Q.    At all points in time.
11         A.    But the question is what is the effect of
12   what has happened?
13         Q.    Okay, I am not asking about the effect.
14   I am asking about the intent.  When people put words on
15   a page, right, so they had an intent when they did so;
16   right, Sir?
17         A.    Yes.
18         Q.    So I want to know what you think the
19   intent of this section was.  So do you think the intent
20   when the parties put these words on the page was only to
21   address ownership at the time of deposit?
22         A.    I am dealing -- it is right to say that
23   21.a.ii is dealing with a specific point made by
24   Dame Elizabeth Gloster when she talks about it being
25   surplusage because it would not mean anything.

Page 155

1          Q.    What do you think the meaning of 8.2.6
2    is?
3          A.    I think it means that legal title to the
4    digital assets is intended to be with the customer.
5          Q.    So is only intended to be with the
6    customer at the time of deposit?
7          A.    No.  I do not think -- that is not what
8    the natural meaning of this clause is.
9          Q.    Let me make sure the natural meaning of
10   8.2.6 is not that legal title to the digital assets is
11   intended to be with the customer solely at the time of
12   deposit; correct?
13            MR. GLUECKSTEIN:  Object to the form.
14         A.    What I have said is that 8.2.6 (A) and
15   (B) indicate that legal title is to be, according to the
16   parties, with the customer and the FTX is not intended
17   to have any meaning.  What Dame Elizabeth has said, as
18   I recall, in 8.2.6, I do not have it in front of me, is
19   that because the assets are all swept into the pool, if
20   I am right, 8.2.6 has no real meaning.  All I am saying
21   is that it does have a meaning at the moment any assets
22   are deposited in the customer's wallet.
23         Q.    Is the natural meaning of 8.2.6 solely
24   that legal title is intended to be with the customer at
25   the time of deposit?

Page 156

1            MR. GLUECKSTEIN:  Object to the form.
2          A.    As I say, I think it means that legal
3    title is to be with the customer.
4    BY MR. HARRIS:
5          Q.    At all times; right, Sir?
6          A.    Yes.
7          Q.    So the natural meaning is not that legal
8    intent, title is intended to be with the customer at the
9    time of deposit; right, Sir?
10            MR. GLUECKSTEIN:  Object to the form.
11         A.    It is to be at the time of deposit but
12   thereafter the expectation and intention is it remains
13   with the customer.
14   BY MR. HARRIS:
15         Q.    Okay.  There is no natural interpretation
16   of this clause that solely addresses legal title at the
17   time of deposit; right, Sir?
18            MR. GLUECKSTEIN:  Object to the form.
19         A.    I think that if you can take into account
20   the pooling and its consequences, you could argue that
21   it meant it only takes effect at that time, but I think
22   it is a bit of a stretch bearing in mind the natural
23   meaning.
24   BY MR. HARRIS:
25         Q.    Tell me one more time, what is the

Page 157

1    natural meaning?
2          A.    I think I have told you more than once.
3    I think it means title to the digital assets rests with
4    the customer.
5          Q.    At all points in time?
6          A.    Yes, provided the digital assets are in
7    the account.
8          Q.    What do you mean provided the digital
9    assets are in the account?
10         A.    I am reading from the clause: "As the
11   owner of Digital Assets in your Account ...".
12         Q.    So what do you view "your Account" to
13   mean?
14         A.    I think it means digital assets recorded
15   in the account.
16         Q.    What does "your Account" mean, Sir?
17         A.    The account means the overall account of
18   the client.  It is defined, I think, at the very
19   beginning of this agreement.
20         Q.    So it is not just the customer-specific
21   wallet you are talking about; right?
22         A.    No.
23         Q.    So the natural meaning of this clause is
24   that at all points in time, no matter where and in what
25   wallet the assets are held that the customer owns the

Page 158

1  digital assets; right, Sir?
2          MR. GLUECKSTEIN:  Object to the form.
3      A.   Yes.
4  BY MR. HARRIS:
5      Q.   You would agree that 8.2.6, the natural
6  meaning of it does not say that we are leaving it to the
7  court to determine the consequences of dealing with the
8  assets; right?
9      A.   No, I do not think you need to say that
10  in a law-abiding country.
11      Q.   Well, Sir, if the parties just wanted to
12  leave everything to the court they would not need to say
13  anything; right?
14      A.   No, all I am saying is parties can agree
15  what they like but certain agreements and the effect of
16  the agreement are subject to the law and whatever the
17  parties have agreed is taken into account by the courts
18  and the courts try to give effect to it.  But it is
19  a question of law who has title; not a question of what
20  the parties agree.
21      Q.   Is there something in 8.2.6 where the
22  parties say, "We are going to leave it to the court to
23  work out the consequences of the dealings with the
24  asset"?
25      A.   I ----

Page 159

1          MR. GLUECKSTEIN:  Object to the form.
2  Misstates testimony.
3      A.   There is not anything to that effect and
4  it would be remarkable if there was.
5  BY MR. HARRIS:
6      Q.   There is nothing in 8.2.6 that says that
7  after deposit the form of ownership changes; right?
8      A.   No.
9      Q.   There is nothing in 8.2.6 that says the
10  ownership changes depending on where the digital assets
11  are held; right?
12      A.   Right.
13      Q.   Okay.  In fact, there is language in
14  8.2.6 that indicates that the form of ownership at all
15  times stays with the owner; right, Sir?
16      A.   Well, I think we are agreed on that.
17      Q.   Okay.  For instance, 8.2.6(A) says:
18  "Title to your Digital Assets shall at all times remain
19  with you ..."; right?
20      A.   Yes.  We seem to be in vehement
21  agreement.
22      Q.   What does the term "held" in 8.2.6 mean?
23      A.   "... held in your Account."  Well, it
24  could either mean "held in your account" in the sense as
25  "recorded to your credit in your account" or it could

Page 160

1  mean "in your wallet".  I have interpreted it as meaning
2  "as held in your account" in the sense of "recorded in
3  your account".
4      Q.   So you interpret "held in your account"
5  to mean "credited to your account" as opposed to "held
6  in the customer-specific wallet"; right?
7      A.   I think so.  If you look at the
8  definition of account, that tends to support it.
9      Q.   If you look at 8.2.6(C), do you see it
10  says at the end that a user can send digital assets:
11  "... to a different blockchain address controlled by you
12  or a third party."
13      A.   Yes.
14      Q.   And that suggests that customers were
15  aware that the blockchain address that FTX were using
16  were not controlled by the user; right, Sir?
17      A.   I am not sure I agree with that, no.
18      Q.   Do you have any reason to think customers
19  thought that the blockchain addresses that FTX was using
20  were controlled by the user?
21      A.   Not that I can immediately think of, no.
22      Q.   Would you agree that this language in
23  8.2.6(C) tends to suggest that customers were aware that
24  the blockchain addresses FTX used were controlled by
25  FTX?

Page 161

1      A.   No.  All it refers to is a different
2  blockchain address controlled by you or a third party.
3  It does not mean they are casting any suggestions as to
4  how FTX's blockchain address or the customer's
5  blockchain address with FTX is controlled.
6      Q.   You see that 8.2.6 is in a section 8.2
7  Digital Assets; do you see that?
8      A.   Yes, I do.
9      Q.   And 8.2.1 is about depositing of digital
10  assets; right, Sir?
11      A.   Yes.
12      Q.   And 8.2.2 is about purchasing digital
13  assets; right?
14      A.   Yes.
15      Q.   And 8.3.5 talks about delivering digital
16  assets to your account; right, Sir?
17      A.   Yes.
18      Q.   Okay.  I am sorry, just to go back,
19  nothing in 8.2.6 says it is limited to either deposited
20  or purchased digital assets; right?
21      A.   No.
22      Q.   In fact, it refers to all digital assets;
23  right, Sir?
24      A.   Yes.
25      Q.   Up to 8.3.5, sorry, under a section

MAGNA
LEGAL SERVICES

Page 162

1  called "Fiat currency"?
2      A.   Yes.
3      Q.   And 8.3.5 talks about delivering digital
4  assets to your account; do you see that, Sir?
5      A.   Yes.
6      Q.   And 8.2.6 would cover digital assets that
7  were delivered to your account; right, Sir?
8      A.   Yes.
9      Q.   Can I ask you this, Sir.  If the parties
10 intended for 3AC to retain title, legal title, then on
11 what legal basis could FTX commingle the assets?
12     A.   I think one has to look at the facts.
13 They may have intended it but legal title does not pass.
14 It depends when talking about equity or whether talking
15 about trust or quasi-bailment, but as I see it if they
16 are digital assets in the pool and a customer acquires
17 them and they are credited to his account, there may be
18 an intention that he has title transferred to him under
19 8.2.6.  If he is not given control over the specific
20 assets title does not pass and that is a matter of law.
21          As you put to me earlier, in order to
22 transfer title it would seem (a) there has to be an
23 intention to transfer title, that seems to be achieved
24 in 8.2.6, but there also has to be a transfer of
25 control.  As I understand the facts that was not

Page 163

1  achieved.  I think that is where Dame Elizabeth and
2  I disagree, but that is the essential point.
3      Q.   So I believe you said you do not think
4  equitable title exists until equitable and legal title
5  are broken?
6      A.   Yes.
7      Q.   Okay.  So the intent was for -- in 8.2.6
8  was for the customer to retain both equitable and legal
9  title; right, Sir?
10     A.   The way I would prefer to put it is to
11 retain legal title because equitable title does not come
12 into the picture.
13     Q.   Okay.  They intended for the user -- for
14 the customer to be the owner in all aspects; right, Sir?
15     A.   Yes, that is right.
16     Q.   They did not intend any title to pass to
17 FTX; right, Sir?
18     A.   That is right, yes.
19     Q.   Are you aware of scenarios where parties
20 do not intend to pass title but title is none the less
21 passed?
22          MR. GLUECKSTEIN:  Object to the form.
23     A.   There must be plenty of cases where
24 parties have agreed things where they do not realise
25 that they have agreed them.  I cannot put my finger on

Page 164

1  a particular case.
2  BY MR. HARRIS:
3      Q.   You would agree for digital assets under
4  the criteria you have laid out there has to be an intent
5  to transfer title; right, Sir?
6      A.   Yes.
7      Q.   So if a customer deposits an asset on the
8  exchange you agree they did not intend to transfer title
9  to FTX; right, Sir?
10     A.   If they transfer it on to the exchange,
11 I agree.
12     Q.   Okay.  So there is no scenario in which
13 an asset that was deposited into the exchange would
14 become -- FTX would acquire title to it; right?
15          MR. GLUECKSTEIN:  Object to the form.
16     A.   No, but I mean if FTX were to sell it or
17 it were to disappear, then it would go and there would
18 be nothing to get title to.  But I think an asset which
19 the customer has and puts on to the, goes into the pool
20 is one thing, but an asset that -- a digital asset that
21 remains in the pool is another.
22 BY MR. HARRIS:
23     Q.   Well, let us just walk through a
24 scenario.  Customer A deposits a hundred bitcoins into
25 the exchange.  At that point, according to the terms of

Page 165

1  service, the customer has title; right?
2      A.   (Nodded)
3      Q.   That title, that asset is then swept into
4  the commingled account.  Are you with me so far?
5      A.   Yes.
6      Q.   But the parties did not intend for title
7  to pass to FTX; right?  Correct, Sir?
8      A.   Mm-mh.
9      Q.   So at that point the customer still has
10 title to that asset under your interpretation even
11 though it is in the commingled account; right, Sir?
12     A.   Arguably.  That is where you get into
13 problems about following and tracing assets.  If it is
14 a legal title.
15     Q.   I am just making sure here.  You agree
16 the parties did not intend to pass legal title; right,
17 Sir?
18     A.   I agree.
19     Q.   So therefore title did not pass; right,
20 Sir?
21     A.   If it was originally the property of the
22 customer, then -- and the customer had it and passed it
23 into the -- and it landed up in the pool, then I agree
24 8.2.6 means there was not an intention to pass title.
25 But then you get into vexed questions about following

Page 166

1  and tracing assets, which -- but subject to that, yes.
2      Q.    But just to make sure we are in agreement
3  here. In this scenario where a customer deposited an
4  asset into the exchange and then it was swept into the
5  commingled account, the customer retains legal title;
6  correct, Sir?
7      A.    Not necessarily, no. I think that there
8  is an intention that he does. I freely accept. But you
9  get into problems about following and tracing in law.
10 Then you have to get into a question of whether the
11 client has equitable title or legal title.
12     Q.    To make sure I understand. So this is
13 a scenario we just described where the parties did not
14 intend title to transfer; right, Sir? But your position
15 right here today is that despite lacking one of the two
16 requirements to pass legal title, that now you think
17 legal title did pass?
18     A.    It is not a question -- that is
19 a question of where parties -- that is dealing with
20 a situation of contract where parties agree to pass
21 title. What I am dealing with is a slightly little
22 different issue which is when my property gets
23 commingled with somebody else's and it remains "my
24 property", can I still claim it as being my property?
25 That is the question. And you get into difficulties

Page 167

1  about -- you then have to decide if it is "my property
2  in equity" or "my property in law".  Strangely enough,
3  on our system that we have, it is, you are better off if
4  it is your property in equity than if it is your
5  property in law.
6      Q.    Sir, if we are in this situation where
7  the customer has deposited bitcoin and they have legal
8  title and it is swept into a commingled account where
9  the party's intention was not to transfer title, there
10 was never an intention for FTX to become, to get the
11 legal title; right?
12          MR. GLUECKSTEIN:  Object to the form.
13 BY MR. HARRIS:
14     Q.    And the commingling would not grant FTX
15 ownership; right?
16     A.    The trouble is a commingling is
17 commingling with other assets.
18     Q.    Other user's assets?
19     A.    Maybe others user's assets and FTX's
20 assets but identifying whose is whose is quite difficult
21 and you then get into my discussion in my first evidence
22 -- my first statement as to following the legal estate
23 or are you following a legal estate or an equitable
24 estate.
25     Q.    So the commingling would not generate --

Page 168

1  create legal title in FTX, would it?
2      A.    I think if it is in FTX's name and under
3  FTX's control, in practice it would, not because of the
4  rule about transferring title contractually which is
5  what we are talking about when it comes to change of
6  intention to pass title and intention to change of
7  control. We are talking about commingling of assets and
8  that becomes problematic whether you can follow the
9  asset into -- like with bank and your money. If the
10 money in your account goes into the bank's assets ----
11     Q.    That is a different situation, Sir.
12     A.    Bitcoins and digital assets are fungible.
13 This is the problem about quasi-bailment for example.
14     Q.    Have you ever seen a bank account
15 agreement where it says title to the cash remains with
16 the customer?
17     A.    No, but if it did, you would still -- and
18 the cash went into the general bank's account, you could
19 not follow the cash through. It would be mingled with
20 the bank's cash. That is why there is no point in doing
21 it.
22     Q.    Explain to me again, how did title
23 transfer to FTX when the parties never intended it to ?
24     A.    It commingled with assets which were
25 partly FTX's, which were under FTX's control, which FTX

Page 169

1  in practice dealt with as if it were its own. And in
2  those circumstances, the argument is, and it seems to me
3  to be the case, that you cannot follow the asset.
4  Anyway, in due course the asset will have been
5  dissipated.
6      Q.    So is it your testimony today that if you
7  cannot trace an asset then legal ownership goes to the
8  intermediary?
9      A.    Yes.
10     Q.    Is that your testimony?
11     A.    In practice.
12     Q.    Is there a case that says that?
13     A.    I think if you cannot trace it and the
14 person who owns it cannot have it, then it must be in
15 the person who is in possession of it. The person in
16 possession of it, we recognise in English law prima
17 facie that the person in possession is the owner.
18     Q.    Is there anywhere in your report where
19 you said that if you cannot trace an asset then legal
20 ownership goes to the intermediary?
21     A.    I would ----
22     Q.    In your reports.
23     A.    I would have to look at my first
24 declaration but I deal with following. I am not sure
25 I quite put it in those terms.



1  relation to subsequent trades.
2      Q.    Imagine a scenario where all the assets
3  on the exchange were deposited by customers and then
4  traded among those customers.  Are you following that
5  scenario, Sir?
6      A.    Yes.
7      Q.    So the only way in which FTX might own
8  those assets were through this principle that you
9  described today of inability to trace those assets;
10  right?
11      A.    No, because those assets do not
12  necessarily remain the customer's.  If I own 20 bitcoin
13  and I put it in to the pool, then I see your point.  But
14  then if you acquire it from the pool and you never get
15  control of it, then I have lost it because I have got
16  rid of it and you have acquired it but you have never
17  got control of it, therefore you have never got it and
18  FTX have got it.
19      Q.    Why would not the first customer have
20  kept ownership?
21      A.    Because it has been passed on.  He has
22  sold it.  How could he claim he owns it if he has sold
23  it and got some Ethereum or some other coin.
24      Q.    If I understand right, your view is that
25  by commingling the assets FTX acquired title to them?

1      A.    It is more that once there is an asset
2  which is in the client's account which the client never
3  controlled, the client can never have acquired it --
4  title to it, that is the point.
5      Q.    Okay.  Let us talk about a few of the
6  other sections that you refer to.  One section you refer
7  to is section 2.2.3.  Let me know when you are there.
8      A.    Yes.  2.1.3, thank you.
9      Q.    What is the relevance of 2.1.3 to the
10  issue of whether Three Arrows has an ownership interest
11  in the digital assets?
12      A.    It is relevant to the question of whether
13  there is a trust relationship because it says:  "FTX ...
14  has no fiduciary relationship or obligation to you in
15  connection with any trades or other decisions or
16  activities affected by you using the Services." And that
17  seems to me to be flatly inconsistent with the idea that
18  FTX is a trustee because a trustee is a fiduciary
19  relationship.
20      Q.    You agree, however, that the parties can
21  modify the duties of a trustee through contract; right?
22      A.    They can, but if you modify the duties of
23  a trustee to saying there is no fiduciary relationship,
24  then you are saying there is no trusteeship.
25      Q.    Okay.  Is there a case that you are

1  familiar with that says if a contract has a provision
2  stating there is no fiduciary relationship that it means
3  that there is no trust?
4      A.    No.  It seems to me blindingly obvious to
5  be the case, to be quite honest with you.
6      Q.    You see this provision about fiduciary
7  relationship is limited to trades or other decisions or
8  activities affected by you; do you see that, Sir?
9      A.    "... in connection with any trades or
10  other decisions or activities affected by you using the
11  Services."  We have to look at the definition of
12  services.  As I say in my rebuttal, "in connection with"
13  is wide and "the Services" is a wide decision.
14      Q.    Would you agree that the section 2.1
15  generally seems to be about trading; right, Sir?
16      A.    No.  It comes under "Risk Disclosures"
17  and "No advice and no reliance".
18      Q.    Okay.
19      A.    I do not think there is anything that
20  links it specifically to trading.
21      Q.    You would at least agree 2.1.3 is limited
22  to decisions or activities affected by you; right, Sir?
23      A.    In connection with decisions or:  "...
24  trades or other decisions or activities effected by you
25  ...", yes, "... using the Services."  Yes.

1      Q.    Sir, you would agree that the decision to
2  move a digital asset from a segregated wallet to
3  a commingled wallet was a decision made by FTX; right,
4  Sir?
5      A.    Yes.
6      Q.    And likewise the movement itself was an
7  activity by FTX, not the customer; right, Sir?
8      A.    Yes.
9      Q.    So you would agree that both the decision
10  to move the asset and the movement of the asset were not
11  decisions or activities done by the customer; right,
12  Sir?
13          MR. GLUECKSTEIN:  Object to the form.
14      A.    I agree, but we are concerned with the
15  meaning of the expression:  "... in connection with any
16  trades or other decisions or activities effected by you
17  using the Services."  One has to look at that as
18  a composite provision and it looks intended pretty
19  clearly to be pretty wide.  "In connection with" is
20  recognised as being a wide terms and "the Services" are
21  given a wide definition on the first page.
22  BY MR. HARRIS:
23      Q.    I see.  Do you view the term:  "...
24  effected by you ..." to be meaningless?
25      A.    No.  It is:  "... in connection with any

1  trades or other decisions or activities effected by you
2  ...", but it is not limited, it does not say obligation,
3  "arising in relation to any trades"; it is "in
4  connection with".
5      Q.   Could it be that 2.1.3 is trying to
6  ensure that FTX has no liability for the decisions made
7  by a customer?
8      A.   No, because it talks about trades and
9  activities as well as decisions.
10     Q.   Could it be that 2.1.3 is trying to
11 ensure that FTX has no liability for the decisions and
12 actions made by a customer?
13     A.   It talks about activities.  Again, I come
14 back to the fact it is in connection with.  If it was
15 purely limited to the trades and decisions and
16 activities of the customer, that would be one thing.
17 But it is no obligation in connection with.  Again, you
18 have got to look at the definition of the services.
19     Q.   So would you -- are you saying that 2.1.3
20 covers all actions by FTX itself even if they are not
21 decisions or activities by the customer?
22     A.   No, they have got to be in connection
23 with.
24     Q.   Is there any action by FTX that would not
25 be in connection with an action of a customer?

1      A.   Yes, I am sure there would be, like
2  paying tax.
3      Q.   Do you think customers were aware that
4  FTX would be moving the digital assets into commingled
5  accounts?
6      A.   I do not know.  Dame Elizabeth has made
7  certain assumptions.  I cannot comment.  I do not know.
8      Q.   Okay.  Let us look at 2.2.2, that is the
9  second section you refer to; right?
10     A.   It is really the last part of 2.2
11 I think.
12     Q.   Okay.  You are referring to the last
13 sentence: "We provide no warranty as to the suitability
14 of the Digital Assets traded under the Terms and assume
15 no fiduciary duty to you in connection with such use of
16 the Services."  Do you see that?
17     A.   Yes.
18     Q.   You agree it does not say in connection
19 with use of the services; it says: "... in connection
20 with such use of the Services."
21     A.   I agree "such" makes it slightly more
22 opaque.
23     Q.   And "such" refers presumably to the
24 preceding text, right, which is the digital assets
25 traded under the terms; right, Sir?

1      A.   Yes, the trouble is it is: "... in
2  connection with such use of the Services."  Services
3  includes any other services offered through the FTX
4  website.  I would have thought that part of the trading
5  is how the trading is recorded and so on.
6      Q.   You would agree that the preceding part
7  of 2.2.2 is talking about trading, not holding; right,
8  Sir.
9      A.   Yes.  It does refer to trading; you are
10 quite right, yes.  But in a sense it emphasises the
11 width of 2.1.3, which is clearly wider.
12     Q.   Let us look at 2.10?
13     A.   This is a much less powerful point, in my
14 view.
15     Q.   2.10 is less powerful?
16     A.   Yes, it is merely an indication.  I do
17 not pretend it has the force of the previous two
18 clauses.
19     Q.   Okay.
20     A.   It is an indication.  It is a "straw in
21 the wind" expression some judges use.
22     Q.   Is it your view that trusts held -- that
23 assets held in a trust are never at risk in a trustee's
24 insolvency?
25     A.   My understanding is they are not eligible

1  for public or private deposit insurance protection.  If
2  that is wrong, then my point on 2.10 is wrong.  It is
3  that simple.  As I say, I do not want to make too much
4  of it.  It is, if I am right in what I understand to be
5  the case, then it is an indication that there is no
6  trust, but on its own it is a much less powerful point.
7      Q.   I just want to make sure I understand.
8  You said: "If that is wrong, then my point on 2.10 is
9  wrong" and I just was not sure what you were saying, if
10 what is wrong?
11     A.   If I am wrong in my understanding.  My
12 understanding is that if the money is held on trust,
13 then eligibility for public or private deposit insurance
14 protection is not available.  If I am wrong about that,
15 then my reliance on 2.10 goes.  That is all I am saying.
16     Q.   I see.
17     A.   As I say, 2.10 is something of
18 a thrown-in point.  It is not central to my reasoning.
19     Q.   You are familiar with section 9.2 that
20 talks about a trust?
21     A.   Yes.
22     Q.   For unclaimed assets; right?
23     A.   Yes, I am.
24     Q.   Could not deposit insurance have been
25 useful in that instance?

MAGNA
LEGAL SERVICES

Page 186

1   the customer; is that right?
2       A.   Yes.
3       Q.   And why would those terms be meaningful
4   to you in determining whether a trust exists?
5       A.   They deal with title here, both saying it
6   is with FTX and saying that no property -- that the
7   digital assets are not the property of FTX.  So they are
8   saying the digital assets are the property of the
9   customer and none of the digital assets are the property
10  of FTX.  On my reading that is perfectly clear, they are
11  just saying FTX does not own the digital assets.  The
12  customer does.  If it means that the customer has the
13  equitable interest, which is not the natural reading of
14  (A), then it also does not seem to work with (B) because
15  (B) would be inconsistent with that because FTX would be
16  the owner because it would be the property of FTX as
17  legal owner.  So if it was going to have some sort of
18  equitable arrangement it is quite remarkable that it is
19  not covered there.
20      Q.   So if 8.2.6 had said: "All Digital
21  Assets are held in your account on your behalf on the
22  following basis ...", would that support that there was
23  a trust?
24      A.   It could do.  Again you get into
25  difficulty because of (B) which says FTX does not own

Page 187

1   them.
2       Q.   Well, the fact that they are held on
3   behalf of a user would be consistent with FTX not owning
4   them; right?
5       A.   No, because then FTX would be the legal
6   owner.  As I say, having a different hypotheses as what
7   these clauses might say what one conclusion would be if
8   they said something different, is always a little
9   difficult because what other -- if you amend (A) do you
10  amend (B) and so on.  But all I am able to do is to say
11  how, what it means to me as presently drafted.
12      Q.   Okay.  Another section that you focus on
13  is section 9.2.  Do you have that?
14      A.   Yes.
15      Q.   And 9.2 that provides there is a trust
16  for unclaimed or abandoned property; is that right, Sir?
17      A.   Yes, that is right.
18      Q.   So this indicates that when property
19  becomes unclaimed or abandoned then FTX Trading or an
20  affiliate of FTX Trading will serve as the trustee for
21  that property; is that right?
22      A.   That is right.
23      Q.   In your view this is an example of the
24  parties using clear terms to create a trust beneficiary
25  relationship; right, Sir?

Page 188

1       A.   Yes, it is.
2       Q.   Sections 9.1 and 9.2 both deal with the
3   scenario that unclaimed or abandoned property; right, Sir?
4       A.   Yes.
5       Q.   And section 9.1 says what happens if the
6   local laws require FTX to turn the property over to
7   authorities; right?
8       A.   Yes.
9       Q.   And section 9.2 deals with the situation
10  of what happens if FTX is not required to turn the
11  property over; right, Sir.
12      A.   Yes.
13      Q.   If the property was previously owned by
14  FTX, how could it then be held on trust for the customer
15  just because it is unclaimed?
16      A.   I think -- well, that is what they have
17  agreed.  They have agreed that if it is unclaimed and
18  abandoned, then there is a trust.
19      Q.   So is it your -- it is your view that
20  a user's failure to use the services or respond to
21  requests therefore creates a property interest of the
22  user in the digital property?
23           MR. GLUECKSTEIN:  Object to the form.
24      A.   That is how it works.
25  BY MR. HARRIS:

Page 189

1       Q.   Why would the parties agree that leaving
2   a property unclaimed and failing to respond to requests
3   gives that customer more rights than if they had claimed
4   the property?
5       A.   I suppose that some -- it is a matter of
6   speculation on my part but it may be felt that some
7   customers may die and their heirs may be unaware of what
8   assets they have.  Some may be trading from countries
9   where they are in difficulties in declaring their rights
10  and doing things legally.  In those circumstances they
11  have the protection of knowing, or their estates have
12  the protection of knowing that there will be a trust.
13  This is pure speculation on my part -- I do not know --
14  but the provision of 9.2 is very clear.  It undoubtedly
15  creates a trust in these circumstances and the main
16  point is, A, why is there a need to create a trust if
17  there already is a trust and, B, this shows that the
18  parties know full well how to create a trust if they
19  want to.  Why they have done it, I agree, it is slightly
20  odd, but they have done it.  And it is odd whoever is
21  right about interpreting the contract.
22      Q.   So you agree it would be odd to give
23  non-responsive customers more rights than responsive
24  customers; right, Sir?
25           MR. GLUECKSTEIN:  Object to the form.

Page 190

1      A.    I do not necessarily agree that, no.
2  I think that you might find a non-responsive customer is
3  non-responsive because he is dead or she is dead or
4  because they have got put in prison or been dealt with
5  in some repressive country.  I just do not know.  But
6  they might like to know they have got the comfort of the
7  property or their survivors have the property then held
8  on trust.  This is speculation on my part, but the truth
9  is whoever is right about this contract, this is what
10  9.2 says.
11  BY MR. HARRIS:
12      Q.    Okay.  Well, so you view 9.2 as clearly
13  creating a trust for unclaimed or abandoned property;
14  right, Sir?
15      A.    Yes, it does.
16      Q.    And you believe it is odd that they give
17  equitable ownership interests to users who do not
18  respond to FTX's attempts to contact them; right?
19          MR. GLUECKSTEIN:  Object to the form.
20      A.    It could be said to be even odder to give
21  it to people who already have an equitable interest.
22  BY MR. HARRIS:
23      Q.    Is it possible that these sections are
24  saying that FTX may have to deliver the property to
25  a relevant jurisdiction but otherwise it will be held on

Page 191

1  trust?
2          MR. GLUECKSTEIN:  Object to the form.
3      A.    I am not sure.  All it seems to be saying
4  is what it says.  And 9.1 suggests that there is not
5  a trust until you get to 9.2.
6  BY MR. HARRIS:
7      Q.    Does anything in 9.1 or 2 say there was
8  not a pre-existing trust?
9      A.    If there was then it was a bit odd that
10  when you get to 9.2 they create one.
11      Q.    Is it possible that these sections were
12  clarifying that if it is transferred to another FTX
13  entity that FTX entity will still hold it on trust?
14      A.    Yes, except for the fact that FTX Trading
15  is specifically covered as a party as FTX or the
16  affiliate as applicable.
17      Q.    Is it possible it is clarifying that even
18  if a user fails to respond or abandons property that FTX
19  will still hold it on trust?
20      A.    Well, it is very odd that it does that,
21  if it does, because it spells it out as trustee, whereas
22  before it said nothing about trustee and has expressly
23  disclaimed a fiduciary relationship.
24      Q.    Is it possible that the parties wanted to
25  make clear that no ownership interests were lost as a

Page 192

1  result of failing to respond or abandoning property?
2      A.    It is possible that that is what they
3  wanted, but they had a very odd way of expressing it if
4  that is what they did because that is not what one
5  gathers from 9.2.  9.2, read naturally, suggests that
6  there is not a trustee beneficiary relationship but if
7  the circumstances in 9.2 arise, they will be created.
8      Q.    Okay, but you would agree it is possible
9  that this section 9.2 is clarifying that users do not
10  lose an ownership interest just by having not responding
11  or abandoning property; right, Sir?
12          MR. GLUECKSTEIN:  Object to the form.
13      A.    All I can do is to say how I interpret
14  this, and I interpret it as clearly indicating that
15  a trust is created in certain circumstances as spelt out
16  in 9.2 and that suggests strongly that a trust prior to
17  that did not exist.
18  BY MR. HARRIS:
19      Q.    But another ----
20      A.    And it shows that the parties were able
21  to make it very clear when they intended to create
22  a trust.
23      Q.    You would agree that another possible
24  interpretation is that 9.2 is clarifying that ownership
25  interest is not destroyed by the fact that property is

Page 193

1  unclaimed or abandoned; right, Sir?
2      A.    I am playing with words slightly.  Of
3  course it can be argued, one has heard, and as
4  a barrister I argued, weak points, so it could be
5  argued, but I have to say I think it is a very weak
6  argument.
7      Q.    You would agree that 9.2 grants certain
8  powers that would not otherwise be available to
9  a trustee; right?
10      A.    Yes, but of course that does not really
11  deal with the point.  It does grant those rights; yes.
12      Q.    So is it possible the purpose of 9.2 was
13  to expand the rights that FTX otherwise had?
14      A.    Well, I do not think so because it talks
15  about maybe transferred to FTX and if FTX were the legal
16  owner and there was a trust, they would not need to be
17  transferred.
18      Q.    Well, I am sorry, I think you just said
19  if FTX was the legal owner then the property would not
20  need to be transferred to FTX?
21      A.    Yes, yes.  The theory, if we are dealing
22  with the question of, "Is there a trust?"  The trust is
23  FTX as a legal owner and the customer is the equitable
24  owner.
25      Q.    But your view is that FTX was the legal

Page 198

1  and 38.6 says nothing is meant to create a trust, yes.
2      Q.    It does not say there is nothing meant to
3  create a trust.  It says there are no fiduciary duties;
4  right?
5      A.    No, there is no fiduciary relationship
6  and a trust relationship is the archetypal fiduciary
7  relationship.
8      Q.    So the inconsistency, if I understand
9  right, is that 9.2 explicitly creates a trust and 38.6
10 disclaims any fiduciary relationship?
11     A.    Yes.
12     Q.    And you reconcile that issue by referring
13 to the well-known rule that one gives effect to the
14 particular; is that right?
15     A.    Yes.  If you have a general provision, it
16 yields to a particular provision.  But that does not
17 mean to say you cross it out.
18     Q.    So the rule you are referring to is that
19 if you have a general provision it yields to the
20 particular provision?
21     A.    Yes.  You cannot use 38.6 to negative
22 9.2.
23     Q.    And you view 38.6 as a general provision?
24     A.    Relatively general; yes, I do.
25     Q.    Would you agree section 8.2.6 is more

Page 199

1  particular to the issue of ownership than 38.6?
2      A.    Yes.
3      Q.    And would you agree therefore 38.6 should
4  yield to 8.2.6 on the issue of ownership?
5      A.    I think it would be remarkable if there
6  was no intention generally to create a fiduciary
7  relationship if one ended up with a conclusion that all
8  digital assets held by FTX in customers' accounts were
9  subject to a fiduciary relationship.  I do not find it
10 remotely surprising to find that in one very exceptional
11 case, 9.2, they do have a fiduciary relationship,
12 although generally they exclude it.
13     Q.    That was certainly more than I asked.
14 I was just asking would you agree that 38.6 should yield
15 to 8.2.6 on the issue of ownership of digital assets?
16         MR. GLUECKSTEIN:  Object to form; asked
17 and answered.
18     A.    No.  I do not see an inconsistency.  So
19 I do not think it should, no.  But, as I say, it would
20 be odd if it did because it would mean that the
21 reference to fiduciary relationship in 38.6 had no point
22 because 8.2.6 would govern all assets held by customers.
23 BY MR. HARRIS:
24     Q.    Okay.  In 22.n, the prior paragraph, you
25 say ignoring the effect of a term flies in the face of

Page 200

1  Dame Elizabeth's rejection of surplusage; do you see
2  that?
3      A.    Yes, yes, I do.
4      Q.    You would agree that 38.6 can have many
5  meanings other than determining ownership; right, Sir?
6      A.    38.6 is certainly a general provision,
7  yes.  It can have -- it is quite wide in what it covers,
8  yes.
9      Q.    Can we go back to your original report,
10 keep marching through a few sections in it.  I think we
11 are up to paragraph 46 now.  So in 46 you write: "It
12 appears to me to be clear that whatever defects there
13 may be said to suffer from, the Dotcom Terms are drafted
14 with some care with the benefit of legal assistance."
15 Do you see that?
16     A.    Mm-mh, yes.
17     Q.    What were you referring to when you
18 talked about defects they may be said to suffer from?
19     A.    I have no particular defects in mind.  It
20 did not seem to me a particularly good bit of drafting
21 but I did not really go through it marking it for
22 drafting.  All I was really saying is whether you think
23 it was a good document or not it was clearly drafted
24 with some care and by lawyers, that is all the point
25 I am making.  I am sorry if I did not express myself

Page 201

1  more clearly.
2      Q.    What do you mean it was not
3  a particularly good bit of drafting?
4      A.    I just thought it was rather long and not
5  always as clear as it might be in certain places, but
6  I did not have in mind any particular criticism of it.
7  The important point is that whatever defects they may be
8  said to suffer from, just in case people are saying,
9  they are not very well drafted.  All I am saying is they
10 were drafted with care and with the benefit of legal
11 assistance.
12     Q.    What is your basis for saying they were
13 drafted with care and the benefit of legal assistance?
14     A.    I think lawyers -- experienced lawyers
15 are pretty used to looking at documents and seeing
16 whether they were drafted with care and legal
17 assistance.  As the English cases show, the courts have
18 to decide whether a contract has been drafted with care
19 and legal assistance because that will influence the
20 court's view of how to construe it.  You do not normally
21 have evidence about how a document was drafted.  You
22 draw conclusions from reading it.  That is what all
23 judges will do when faced with a contract.
24     Q.    Did you review any documents or testimony
25 that would cause you to believe this was drafted with

Page 206

1  assets legal title generally follows factual control, is
2  it possible that in 8.2.6 the customer is therefore
3  intended to say that equitable title would stay with the
4  customers?
5      A.    I just do not think you can get the words
6  out of 8.2.6.  I see the logic of trying to do that, but
7  you cannot rewrite the contract simply because it
8  produces a better result, a more sensible result.  The
9  cases -- there have been a number of cases recently
10 which are littered with judges saying -- not "littered"
11 -- but there have been a number of cases where judges
12 have said, "If the parties had thought about this, they
13 would not have provided this" or "If the parties had
14 appreciated the situation, they would have written
15 something different."  But you have the language and
16 I am afraid you have got to follow the language.
17     Q.    The rewriting that would need to occur
18 would be changing the term "title" to "equitable title";
19 right Sir?
20     A.    No, it would go further than that.
21     Q.    What else would need to be done?
22     A.    You would need to say FTX has property in
23 it because it is the legal owner.  You would need to
24 alter 8.2(A) and -- do I mean 8.2 or 8.6?  But you need
25 to alter (A) and (B).

Page 207

1      Q.    I see.  So we need to change all the
2  references to "title" and "ownership" to "beneficial
3  title" and "beneficial ownership"; right, Sir?
4      A.    You would need to say -- It would be very
5  odd because it nowhere defines who has legal title.  It
6  defines -- you read title in 8.2.6(A) as being
7  beneficial title.
8      Q.    Mm-hm.
9      A.    And then you would have to read 8.2.6(B)
10 as being a reference to equitable property.
11     Q.    Mm-hm.
12     A.    And you would have to use belonging in
13 equity at the end of 8.2.6(B) and then would you have to
14 say it is a bit strange that it does not tell us who is
15 the legal owner.
16     Q.    Okay.
17     A.    It becomes a rather -- a very strange
18 provision.  It is just not what it says.
19     Q.    The scenario I had asked you to consider
20 was one where the users understood that title would pass
21 -- that legal title would pass to FTX because FTX would
22 have control of the keys.  So in that scenario, you
23 would agree it might make sense for all these references
24 to be to beneficial ownership and title; right, Sir?
25     A.    Two points: one is assuming that the

Page 208

1  parties knew the facts about pooling does not mean they
2  understood the legal consequences of control passing and
3  so on, namely that the law of quasi-bailment might
4  develop in the way in which Dame Elizabeth and/or
5  I suggest.  So that is a big leap.  We cannot assume the
6  parties would have understood the law, I do not think.
7  And even if we can, I just think you are stretching the
8  words beyond what -- the meaning they naturally bear.
9  And even though I see why it might be said to be
10 a commercially sensible result, you cannot get there on
11 the words and under English law the fact that you get
12 a commercially sensible result by changing the contract
13 does not entitle you to change the contract.
14     Q.    Let me just walk through a couple of
15 things you just said.  So the law as it currently exists
16 is that legal title follows who has control of the keys;
17 right?
18     A.    Yes.
19     Q.    Okay.  So the law does not have to
20 develop for legal title to follow ownership of the keys;
21 right, Sir?
22     A.    It is a question of whether people know
23 about legal title and what "control of the keys" means.
24     Q.    I just want to break this up.  It is not
25 that the law has to develop for legal ownership to

Page 209

1  follow the keys; right, Sir?
2      A.    I see your point.  I am sorry, are we
3  dealing with 8.2.6(B), what that means or are we dealing
4  with following assets?  I am sorry, I am not quite clear
5  what we are dealing with.
6      Q.    First, I am trying to understand the
7  legal framework in England.  The current legal framework
8  is that legal title to digital assets follows control of
9  the keys; right, Sir?
10     A.    That would seem to be the law, yes.
11     Q.    Okay.  So if we have a world where users
12 of FTX generally understood that legal title would
13 follow ownership -- control of the keys, in that world
14 there would not be a need to express, explicitly mention
15 legal title; correct, Sir?
16     A.    If that is the case, yes, but I am far
17 from persuaded that the average customer had the
18 faintest idea about legal title and the keys and what it
19 meant.
20     Q.    This is a standard contract; correct,
21 Sir?
22     A.    It is a standard contract.
23     Q.    Would you agree the people who drafted
24 this presumably understood that legal title would follow
25 the keys?



1  not giving opinion whether the customer's contractual
2  rights were limited to just being paid their account
3  balance; right, Sir?
4         A.    I am not giving evidence of what they
5  were or were not just limited to that, yes.
6         Q.    Do you see in 8.2.6(B) ----
7         A.    Yes.
8         Q.    ---- it says:  "None of the Digital
9  Assets in your Account are the property of, or shall or
10  may be loaned to, FTX Trading ...".
11         A.    Yes.
12         Q.    So that prevents FTX Trading from loaning
13  those assets to itself; right?
14               MR. GLUECKSTEIN:  Object to the form.
15         A.    That is what it does.
16  BY MR. HARRIS:
17         Q.    So that is at least one contractual right
18  that the customers had to the digital assets?
19         A.    Yes, I suppose the only question which
20  I cannot say I have fully considered is, if I am right
21  about the digital assets in the account not being their
22  property because they have not got control, whether (B)
23  would still apply.  Because it is a bit of a nonsense if
24  they are not theirs and they are FTX's to talk about
25  them being "loaned".  So I cannot say I thought that

1  through, but -- So my answer is slightly in the air I am
2  afraid, but it seems to me that if I am right -- and
3  I know you say I am not -- but if I am right and the
4  assets are FTX's, then the idea of them being loaned to
5  FTX is an obvious problem.
6         Q.    I think you are saying that the
7  provisions saying that they may not be loaned to FTX is
8  inconsistent with the view that FTX is the owner; is
9  that right?
10         A.    I think it may be.  As I say, I am
11  thinking on my -- I was going to say on my feet but on
12  my backside because I have not quite thought through
13  that particular provision in the circumstances that we
14  are discussing.
15               THE COURT REPORTER:  If it is okay, could
16  we break here?
17               MR. HARRIS:  Sure.  You need a break.
18  Why do we not break now?
19               THE VIDEOGRAPHER:  We are going off the
20  record.  The time is 5.21 pm.
21               (A Short Break)
22               THE VIDEOGRAPHER:  We are back on the
23  record.  The time is 5.22 pm.
24  BY MR. HARRIS:
25         Q.    Okay, can we look at your first report,

1  paragraph 48 within a section called "Prior statements"?
2         A.    Yes.  Thank you.
3         Q.    So in paragraph 48 you indicate that:
4  "... prior statements and prior declarations of trust
5  can in principle form part of the factual matrix against
6  which any subsequent contract is to be interpreted."  Do
7  you see that?
8         A.    Mm-mh.
9         Q.    Okay.  Then in 50, you discuss statements
10  made by Mr. Bankman-Fried to the US Senate.  Do you see
11  that, Sir?
12         A.    Yes, I do.
13         Q.    Okay.  And then you say:  "It seems ...
14  implausible that general statements made in that context
15  were intended to constitute declarations of trust by FTX
16  Trading (as opposed to representations as to what it had
17  in fact been doing, or statements as to its
18  understanding as to what it had been, or (possibly) was,
19  obliged) to do."  Do you see that?
20         A.    Yes, I do.
21         Q.    Okay.  I am just trying to make sure
22  I understand what those statements mean.  What do you
23  mean by representations as to what FTX in fact had been
24  doing?
25         A.    Well, what I mean is that what he was

1  saying was -- We need to get the statements up I think
2  but you may not want to, may not help -- is that
3  I thought he was saying what FTX had been doing,
4  statements as to what he thought it was obliged to do or
5  statements as to what it had been obliged to do.  But
6  they were not statements assuring people what it was to
7  do.  In other words, he was saying, "We do X" or "We are
8  obliged to do X" or "We were -- I thought we were
9  obliged to do X" or "I thought we are obliged to do X".
10  But he is not saying, "I hereby take on a liability,
11  which I have not had before, to do X."  That is the
12  point I am making.  Can I rephrase that?  I rather
13  bumbled it.
14         Q.    Yes, sure.
15         A.    He is saying, "We have done X" or "We
16  have said X".  And my view is that
17  Mr. Bankman-Fried said "X" what he was saying was
18  either, "That is actually what has happened" or he was
19  saying, "My understanding is that is what we have
20  to do" or he was saying, "That is my understanding of
21  what we currently have to do."  What he was not saying,
22  in my view, or should be not taken as saying, was,
23  "Even if we had not had to do this now, I am now taking
24  on this responsibility".  Because if he was saying what
25  he understood to be the case, it is not relevant for

1    Commission's analysis; right?
2        A.    Yes.
3        Q.    Okay.  Do you know if the Law Commission
4    formed a view as to what degree of control on the part
5    of the customer is required?
6        A.    My recollection, and I am afraid it is no
7    better than what is in 60.5, is that they thought it
8    should be needed -- a body of experts to consider.
9        Q.    Okay.
10       A.    Particularly as there is quite a strong
11   difference of opinion between the academics.
12       Q.    Okay.
13       A.    As I say, I express a view which is
14   somewhat tentative in light of that in 60.5.
15       Q.    So if I understand correctly, in your
16   view FTX had sufficient legal title for there to be
17   a bailment but the Three Arrows did not have sufficient
18   legal title for there to be a bailment.  Is that right?
19       A.    I think if the assets were always in the
20   pool FTX never -- the Three Arrows never had legal
21   title, yes.
22       Q.    I had asked you two things, I want to
23   make sure they are both correct.  In your view FTX had
24   had sufficient legal title for there to be a bailment
25   but Three Arrows did not have sufficient legal title for

1    there to be a bailment.  Is that right?
2        A.    Three Arrows did not have sufficient
3    legal title.  FTX having sufficiently legal title is an
4    interesting way of putting it.  If FTX did not have --
5    if Three Arrows did not have sufficient legal title then
6    FTX did.
7        Q.    Okay.  So in your view FTX had legal
8    title but Three Arrows did not have sufficient legal
9    title for there to be a bailment.  Is that right?
10       A.    I would not put it that way.  I would
11   just say FTX -- that Three Arrows did not have any title
12   so that is the end quasi-bailment.
13       Q.    But you do agree FTX did have legal
14   title; right, Sir?
15       A.    They certainly had possession and in the
16   absence of anyone else having title, yes.
17       Q.    So is your view that FTX had legal title?
18       A.    Yes, think it is.
19            MR. HARRIS:  Why do we not take a break?
20   I'm sure it will be here soon.  I think our Court
21   Reporter needs a break.
22            THE COURT REPORTER:  Thank you.
23            THE VIDEOGRAPHER:  We are going off the
24   record.  The time is 5.38 pm.
25            (A Short break)

1            THE VIDEOGRAPHER:  We are back on the
2    record.  The time is 6.20 pm.
3    BY MR. HARRIS:
4        Q.    Just to make sure I understood one piece
5    of your prior testimony ----
6        A.    Of course.
7        Q.    ---- I believe you indicated that if a
8    customer deposited assets on the exchange and then they
9    were swept into the commingled account the customer
10   would therefore lose title to those assets; is that
11   right?
12       A.    Yes.  I think -- it depends what you say
13   the client had to begin with.  If he had legal title
14   I think it would be difficult because of the rule of
15   following.  If he had only equitable title then he could
16   be okay.  Because the rules for following and tracing
17   are different for reasons that many people think are
18   absurd but, none the less, they are different for legal
19   and equitable interests, I am afraid.
20       Q.    So if the customer only had equitable
21   title then the customer might be able to retain that
22   equitable title?
23       A.    Yes.
24       Q.    Okay.  Am I right that your view that
25   Three Arrows does not have a tenancy in common is

1    dependent on that sweeping having happened; right?
2        A.    I think we have to go back a little.  It
3    does not have a tenancy in common in equity because we
4    do not -- because there is no trust and therefore you
5    cannot get to a tenancy in common that way.  As for
6    quasi-bailment, the difficulty is that (a) the client
7    has no -- the customer has no title to the asset once
8    the original asset has been replaced and he has never
9    had control of it.  And anyway there is a problem that
10   all he has the right to is the asset, not to an interest
11   in an unspecified group of assets which seems to me to
12   give rise to problems for various reasons.
13       Q.    Would you agree that if Three Arrows's
14   assets were always held in a segregated wallet then
15   Three Arrows might have an ownership interest ----
16       A.    Yes.
17       Q.    Okay.  So Three Arrows failure to have an
18   ownership interest depends on the facts of how the
19   assets were actually held; right?
20       A.    Yes.  Yes, think that is right.
21       Q.    Okay.  So it is not -- your opinion is
22   not based solely on the terms of the terms of service
23   but include the actual facts of what occurred?
24       A.    Assumptions as to facts, that is a fair
25   point.

**MAGNA**
LEGAL SERVICES

Page 234

1      A.    I think, sorry, just to go back on the
2   previous answer, where we disagree is both on the point
3   you mentioned and on the effect of the contractual
4   arrangement between the parties.
5      Q.    Okay.
6      A.    I think that is another point where -- a
7   reason I disagree with her.  I am sorry to interrupt.
8      Q.    You see in 7.113 the Law Commission says:
9   "We do not consider that the recognition of a limited
10  control-based legal proprietary interest would
11  necessarily be precluded where crypto-tokens are
12  commingled or mixed so that specific entitlements can no
13  longer be identified."  Do you see that?
14     A.    Mm-mh.
15     Q.    And you see, "Conclusion 5" and 7.115
16  ----
17     A.    Yes.
18     Q.    ---- likewise indicates you could have,
19  they expect there could be: "... a control-based
20  proprietary interest in held crypto-token entitlements
21  that is subject to a superior legal title retained by
22  users".  Do you see that, Sir?
23     A.    Yes, I do.
24     Q.    So the Law Commission is recognising that
25  there could be a quasi-bailment where the intermediary

Page 235

1   holds the keys but the customer has some level of
2   control that gives it a superior legal title; is that
3   right, Sir?
4      A.    Yes.  What they are covering is that is
5   a possibility, but, (a) they have not dealt with, as far
6   as I can see, and we read this recently, the question of
7   whether the customer has to have a superior legal title
8   as is normally needed for bailment, and what effect the
9   terms of the contract have.
10     Q.    Right.  Well you would agree, Sir, that
11  the kind of control that the customer would need to have
12  under the Law Commission's analysis is not factual
13  control, it is not control of the keys; right?
14     A.    I think that is what the Law Commission
15  is laying down as a possibility, yes.
16     Q.    Okay.  And so that would leave the other
17  type of control that -- the remaining type of control
18  would be legal control; right?
19     A.    I think that is what they are getting at,
20  yes.
21     Q.    Okay.  So the scenario they are
22  envisioning is that a quasi-bailment would be created by
23  the intermediary having the factual control through the
24  keys and the customer having some sort of legal control
25  based on the contract; is that right, Sir?

Page 236

1      A.    It could be that.  I slightly -- I do not
2   want to say it definitely is, but that is a possibility.
3   But they are raising that as a possibility and it could
4   well be that what you say is right.
5      Q.    And you see there is nothing in the Law
6   Commission's analysis that requires that the customer
7   previously had legal title?
8      A.    No, interestingly.  And whether that
9   would be an appropriate principle to adopt in relation
10  to quasi-bailment seems to me to be highly questionable.
11     Q.    Okay.
12     A.    We are trying to develop -- This is where
13  we really get into the realms of speculation:  how far
14  will the law develop the idea of quasi-bailment to make
15  it even easier to get a bailment for cryptocurrency and
16  so on.  I think that is a very open question, but I am
17  dubious whether the fundamental principles of bailment
18  would be relaxed to that extent, but they do not
19  actually deal with that point.
20     Q.    Okay.  All right.  A few more questions
21  on your original declaration.
22     A.    Yes, of course.
23     Q.    If we could go to paragraph 81.
24     A.    Yes.
25     Q.    So this is a section on "Fiat currency,

Page 237

1   E-Money".
2      A.    Yes.
3      Q.    And at the end of 81 you say: "... the
4   parties cannot realistically have intended that
5   impossibility" of retaining legal title to the fiat
6   currency.  Do you see that, Sir?
7      A.    Yes.
8      Q.    And so you are saying here the parties
9   cannot intend an impossibility?
10     A.    Yes.
11     Q.    Okay.
12     A.    As I understand it, this is familiar
13  debtor, creditor, this is a familiar banking-type
14  operation effectively.
15     Q.    So the parties cannot have intended
16  something that any market participant would know is an
17  impossibility; right?
18     A.    In connection with a bank account, yes,
19  because this is familiar territory now.
20     Q.    Then if you go to section 83.3 of your
21  report ----
22     A.    Yes.
23     Q.    ---- you say: "... 8.3 ... stands in
24  stark contrast with section 8.2 ...".  Do you see that?
25     A.    Yes.

MAGNA ▶
LEGAL SERVICES

---

Page 250

1  Elizabeth's view is that it assumes that legal title is
2  vested?
3      A.   No.  She either says it vests legal title
4  or she says it assumes legal title is vested.
5      Q.   I see, okay.  If Three Arrows did have
6  legal title to the digital assets, what exactly did it
7  have legal title to given that it did not have the
8  private keys?
9      A.   When it put the assets in the wallets,
10  which it did not have private keys to, it had legal
11  title at that point.  And if it was not intending to
12  pass legal -- if it was intending to keep legal title
13  then for the moment it kept legal title.  But if quasi-
14  baileeship works, query, which I think it probably does
15  and so does Dame Elizabeth, but it remains to be seen,
16  then a quasi-baileeship arose.
17      Q.   Just to make sure I understood, for
18  digital assets the Three Arrows purchased on the
19  exchange?
20      A.   They are purchased on the exchange then
21  if they do not go into the wallet they do not get legal
22  title because although there is an intention for them to
23  get legal title (see 8.2.6(a)) they never get control.
24      Q.   So for assets purchased on the exchange
25  it was not possible for Three Arrows to get legal title?

---

Page 251

1      A.   Unless it was put in their wallets in
2  some way.
3      Q.   Okay.
4      A.   But they just did not have control, yes.
5      Q.   So for assets that were -- that Three
6  Arrows purchased on the exchange where the assets
7  replaced into the commingled wallet it was not possible
8  for Three Arrows to get legal title?
9      A.   On the facts as I understand them, yes.
10      Q.   Okay.  Now as a factual matter in terms
11  of factual control, you agree that FTX had the practical
12  ability to sell customers' assets at any time given its
13  control of the keys?
14      A.   I understand that is the case, yes.
15      Q.   Okay.  So in that context why is it your
16  view that the parties intended to agree that 3AC held
17  legal title to the digital assets?
18      A.   Sorry, where are you reading from?
19      Q.   Well, I am just -- I think you have said
20  it is your view that the parties intended that 3AC have
21  legal title to the digital assets; right?
22      A.   Because if it is a quasi-baileeship, they
23  did not give up the legal title.  Title did pass to FTX
24  but it was -- while it was a baileeship it was an
25  inferior title.

---

Page 252

1      Q.   But you agree that 8.2.6 covered assets
2  that were purchased on the exchange also; right?
3      A.   I agree with intended to.
4      Q.   So how could the parties have intended
5  for assets that 3AC purchased on the exchange that 3AC
6  would hold legal title to them?
7      A.   Well, it is what they thought would
8  happen, but it was not the law.
9      Q.   Okay.  They just misunderstood the law?
10      A.   Yes.  It is not the first and will not be
11  by any means be the first time it happens that parties
12  enter into contracts which ----
13      Q.   Okay.
14      A.   ---- assume the law is different from
15  what it is and it is particularly unsurprising in this
16  new area where, you know, with quasi-bailment to some
17  extent it can be said we cannot be sure what the law is.
18      Q.   Going on to 14(e) ----
19      A.   Yes, of course.
20      Q.   ---- you are discussing whether it was
21  intended for the parties -- the parties intended to
22  split the title?
23      A.   Yes.
24      Q.   And you say that:  "The notion that legal
25  title is vested in FTX while equitable title vested in

---

Page 253

1  3AC ... is flatly contrary to the ... [parties'
2  intention] as revealed in a number of [terms] ...";
3  right, Sir?
4      A.   Yes, that is right, we discussed that
5  earlier.
6      Q.   And you mention 2.1.3; 2.2.2; 38.6; 2.10;
7  8.2.6 and 9.2, do you see that?
8      A.   Yes, I do.
9      Q.   Other than 8.2.6, none of them actually
10  mentions title; right?
11      A.   No, that is true.
12      Q.   Okay.  None of them say you cannot split
13  title; correct?
14      A.   Absolutely; except they say there is no
15  intention to create a fiduciary relationship which
16  involves a split of title.
17      Q.   Okay.  Would you agree that a fiduciary
18  relationship is an effect, not the cause, of a trustee
19  relationship?
20      A.   In many circumstances, yes.  If you
21  create a trust you create a fiduciary relationship.
22      Q.   Okay.
23      A.   That would be the normal situation, that
24  a fiduciary relationship arises from a trust or from
25  certain other relationships, yes.

Page 254

1     Q.   Okay.  If you look at 14(f)?
2     A.   I have it.
3     Q.   You cite the case LBIE ----
4     A.   Yes.
5     Q.   ---- as holding that the absence of an
6 obligation to keep the property separate, if a trustee
7 -- "... keep the property separate from [a trustee's]
8 own property is a powerful indicator of the ... absence
9 of a ... trustee and beneficiary [relationship] ...".
10    A.   Yes.
11    Q.   LBIE is not in the context of digital
12 assets; right?
13    A.   No, it is not.  It is a general
14 proposition.
15    Q.   Okay.  What if the party was required to
16 avoid taking steps that would interfere with ownership?
17 Would that be a helpful factor?
18    A.   In terms of what was the intention, it
19 could be.  Again, one would have to look at the
20 particular clause in its context.
21    Q.   Okay.
22    A.   It could be uncomfortable -- I would be
23 uncomfortable about asking a question about a sort of
24 generic clause.
25    Q.   Are you aware of any cases about whether

Page 255

1 a trust was created over digital assets at an exchange
2 that involved the factual situation where the exchange
3 held some of its own assets in the commingled digital
4 wallets?
5    A.   I think we looked at Ruscoe where that
6 happened, did it not?
7    Q.   In Ruscoe the court found a trust was
8 established despite that?
9    A.   It did.
10    Q.   Okay.
11    A.   Ruscoe, I looked it up during the break.
12 It has been cited in two English cases, not with any
13 great approval.
14    Q.   Did those cases criticise Ruscoe?
15    A.   I think they were pretty neutral about it
16 but it is fair to say it was cited; just picking your
17 point up earlier about whether it was cited.
18    Q.   At 14(h) ----
19    A.   Yes.
20    Q.   ---- you indicate, you refer to, "the
21 natural meaning of section 8.2.6"?
22    A.   I do.
23    Q.   And just to be clear again, what is that
24 natural meaning?
25    A.   The natural meaning is that the digital

Page 256

1 assets are intended to be the property of the customer
2 and that FTX is intended to have no interest in those
3 assets.
4    Q.   Okay, and that is true at all periods of
5 time; right?
6    A.   That is what would seem to be the
7 intention, yes.
8    Q.   Okay.  At 14(i) ----
9    A.   Yes.
10    Q.   ---- you said there is not: "... the
11 requisite certainty of subject matter ... [because] it
12 would be extraordinarily difficult, if not impossible,
13 task for any customer to [identify] the actual Digital
14 Assets"?
15    A.   Yes.
16    Q.   Why would a customer need to identify the
17 actual digital assets as opposed to the percentage of
18 digital assets in a wallet?
19    MR. GLUECKSTEIN:  Object to the form.
20    A.   I think again this is possibly a factual
21 question but if the client says, "I have got 100
22 bitcoins, my account shows 100 bitcoins and there are
23 20,000 bitcoins in the pool"; before you can work out
24 what the client has got I would have thought would you
25 have to look at what other customers have got and then

Page 257

1 would you have to work out a proportion.
2 BY MR. HARRIS:
3    Q.   And if the exchange's systems are
4 sufficient to identify those percentages, then you could
5 establish sufficient certainty over the pool of digital
6 assets; right, Sir?
7    A.   I think it (a) depends whether it is
8 possible and (b) depends how difficult it is.  I notice
9 that in one case here it was said that it was near
10 impossible.  In another case it was said it might be
11 possible.  In Ruscoe they were taking a long time
12 sorting it out.  To my mind all that is a bit uncertain.
13    Q.   Okay.
14    A.   And then you have got the other point
15 that given what FTX were able to do, there might be
16 nothing in the pool.  They may take an intense --
17 bearing in mind the sort of risks that I understand the
18 FTX were taking, they might have, sort of, gone short of
19 bitcoin or got rid of all the bitcoin in which case
20 there would have been nothing left for anyone to have an
21 interest in.
22    Q.   You do not know factually what FTX was
23 able to determine; right?
24    A.   No, you are absolutely right, I do not.
25    Q.   In paragraph 17 you see you offer an

Page 266

1       A.   Yes.
2       Q.   Why did you rely on Pearson here?
3       A.   It is Dame Elizabeth I think who relied
4   on Pearson.
5       Q.   Did you find it an informative case on
6   this issue?
7       A.   Well, anything Briggs J says is worth
8   considering.
9       Q.   In 25 you indicate that you: "...
10  consider that the requirements ... in Pearson are not
11  satisfied"?
12      A.   Yes.
13      Q.   Right.  Do you recall that in Pearson
14  there was no contractual certainty as to how losses
15  would be shared?
16      A.   I think that is right.
17      Q.   But despite that, the court still found
18  the subject sufficiently certain; right?
19      A.   Yes.  It is illustrative of the point
20  that it all depends on the facts.
21      Q.   Okay.  And in Pearson the court held that
22  law does not lightly allow contracting parties' purposes
23  and intentions to be defeated by supposed uncertainty.
24  Does that sound right to you, Sir?
25      A.   Yes.

Page 267

1       Q.   And the court also said that in all such
2   cases the law fills the consequential gap by implication
3   and by importation of generally accepted principles.
4   Does that sound right to you, Sir?
5       A.   I do not think "in all such cases".
6   I think it tries to do that and sometimes cannot but if
7   it can it will.
8       Q.   Okay.  Do you recall that we looked at
9   one of the research papers where you see the client
10  intermediary relations in the crypto asset world?
11      A.   Yes, I remember.
12      Q.   Do you recall that those authors noted
13  that in Pearson even the right to use the asset would
14  not negate the existence of a trust?
15      A.   Yes.  One has to look at all the
16  circumstances.  In some circumstances it would, but
17  I quite accept, if you say, "I hereby intend to create
18  a trust" and then have three provisions that are
19  completely inconsistent with normal trust law, you have
20  still created a trust.
21      Q.   Do you recall Pearson held that even if
22  an intermediary could take the asset, as long as it had
23  replaced them then that would just be a right to swap
24  which is still consistent with a trust?
25           MR. GLUECKSTEIN:  Object to the form.

Page 268

1       A.   I think one has to look at all the facts.
2   The fact that you can deal with the asset as you like is
3   an indication against there being a trust, but if you
4   spell out there is a trust then the court will try and
5   give effect to that.
6   BY MR. HARRIS:
7       Q.   Do you say a right to swap is not
8   inconsistent with a trust under Pearson?
9       A.   I think that a right to deal with assets
10  as you want is not inconsistent with a trust if the
11  trust permits you to do that.  But unless the trust
12  specifically permits you to do that it is completely
13  antithetical to a trust.  So I think that, yes, a trust
14  can be set up which permits the trustee to do almost
15  anything and it is still a trust provided the parties
16  agree it is a trust.  A point might come where the
17  rights of the trustee are so inconsistent with the
18  concept of a trust that the court will say, "Well, you
19  might call it a trust but I am sorry it is not one."
20  But I am afraid that the problem is it is hard to answer
21  a question like that without specific examples.  But if
22  everything points in favour of a trust except the fact
23  that the trustee can replace assets at will, if that is
24  inconsistent with a trust, then there is a trust.
25      Q.   Okay.  So in the abstract at least the

Page 269

1   parties could set up a trust which permits the trustee
2   to do almost anything as long as the parties agreed that
3   there is a trust?
4       A.   I think "almost anything" may be a bit
5   high but you can have a trust which permits the trustee
6   and indeed the beneficiary to do things which a normal
7   trust lawyer would regard as very inconsistent with
8   a trust.  But, as I say, the point comes where it is so
9   inconsistent the court would say, "This cannot be
10  a trust."
11      Q.   Okay.  At the beginning of 25 you say:
12  "While I hesitate to step into the facts ..."; do you
13  see that?
14      A.   Yes.
15      Q.   What do you mean by "the facts" here?
16      A.   What the precise facts are in terms of
17  the sweep addresses and the point you raised about
18  whether it was possible or nigh on impossible to work
19  out what proportion of a particular pool, a particular
20  customer had.  Those are the sorts of facts which you
21  very fairly put to me.  I do not know.
22      Q.   Okay.  At the end of 25 you refer to the
23  Piroozzadeh case ----
24      A.   Yes.
25      Q.   ---- and you say:  "In those

**MAGNA** ▶
LEGAL SERVICES

1  circumstances, it must be an 'essentially futile and
2  close to impossible and possibly impossible exercise' to
3  identify 3AC's proportionate share of the Bitcoin ...".
4  Do you see that?
5      A.    Yes.
6      Q.    Okay.  By "in those circumstances" are
7  you referring to the facts that you were told to assume
8  in the prior sentences?
9      A.    Effectively, yes.  You made the fair
10 point to me that I do not know precisely what FTX can
11 and cannot do about their assets and they told -- and
12 they have not told me what they can and cannot do.
13     Q.    So you do not know whether factually it
14 is futile and impossible to identify 3AC's proportionate
15 share; correct?
16           MR. GLUECKSTEIN:  Object to the form.
17     A.    That is fair.  It strikes me from reading
18 that case and reading Ruscoe that it is clearly quite
19 difficult in, futile, close to impossible, possibly
20 impossible in one case and in another it was clearly
21 difficult to do because in Ruscoe the judge referred to
22 that in the passage you took me to.
23     Q.    Do you recall in the Piroozzadeh case
24 that was an interlocutory case?
25     A.    That is a fair point.

1      Q.    So it was not a final decision; correct?
2      A.    No.  Correct.
3      Q.    And it was about an asset that had been
4  stolen from the claimant; right?
5      A.    That is true.
6      Q.    And the claimant itself was not a user of
7  the exchange; right?
8      A.    No.
9      Q.    So the case was not before whether a user
10 of the exchange was in a trust relationship with the
11 exchange; right?
12     A.    That is perfectly fair, but the truth is
13 that what the judge was looking at -- and it is
14 perfectly fair it is an interlocutory decision -- what
15 the judge was looking at was whether it could be done,
16 not whether somebody was entitled to do it or anything
17 like that and I think it was the same sort of exercise.
18     Q.    Well, the court in Piroozzadeh ----
19     A.    I am glad you are having the same
20 problem.
21     Q.    I am having a lot of problem ----
22     A.    It was Trower J's case.
23     Q.    What the court in Piroozzadeh was looking
24 at was whether the digital assets could be traced;
25 right?

1      A.    Yes.
2      Q.    The court was not trying to determine
3  whether a percentage of digital assets could be
4  determined; right?
5      A.    That is true but it was the same sort of
6  exercise of masses of different front actions going on
7  over a relatively short period, but it was.  When I say
8  it was the same exercise, you are right, it was
9  a slightly different one.
10     Q.    Okay.  Do you believe that an
11 interlocutory decision such as Piroozzadeh would be
12 strong authority on the issues that it discusses?
13     A.    It is not as good authority as a final
14 decision.
15     Q.    And do you recall that the issue in this
16 case was about whether the plaintiff had properly
17 presented potential defences in an ex parte hearing?
18     A.    You are right, that was an issue, yes.
19     Q.    And in particular the defence that was
20 not properly raised was that a bona fide purchaser will
21 destroy the customer's beneficial property interest;
22 right?
23     A.    Yes.
24     Q.    And that issue is not at play in our
25 case; right ?

1      A.    Well, I suppose only to the extent that
2  if somebody purchases the bitcoins that belong to one
3  customer, they are a bona fide purchaser for value.  So
4  to that extent it does apply.
5      Q.    Okay, but that is not the analysis that
6  either you or Dame Elizabeth was going through to
7  determine ownership here; right?
8      A.    No, but if you do go down particular
9  specific assets, the bona fide purchaser for value is
10 the answer.
11     Q.    Okay.  Looking back at your report in
12 paragraph 36.
13     A.    Of my first report?
14     Q.    Sorry, we are in your rebuttal report.
15     A.    36, yes.
16     Q.    So in 36(a) you mention the issue that
17 3AC's digital assets -- "... the value of the
18 unsegregated sweep addresses containing 3AC's Digital
19 Assets may at any time have decreased to zero ...".  Do
20 you see that?
21     A.    Yes.
22     Q.    Do you have some reason to believe that
23 is factually true?
24     A.    No, I have to say that is purely, as
25 I understand it, a possibility.

**MAGNA**
LEGAL SERVICES

Page 286

1    A.    I think what I mean is that in practice
2  it seems to me that the effect of section 16.2 is to
3  look at the assets in the account as a whole and see if
4  it falls below -- they fall below the margin maintenance
5  requirements.  That involves looking at all the assets
6  because they are all in one account.
7    Q.    In 16.2 the customer consented to FTX
8  selling its assets if the customer falls below the
9  margin requirement; right?
10    A.    Yes.
11    Q.    So that means there are assets of the
12  customer to sell; right?
13    A.    Yes.  Well, if there are no assets they
14  cannot sell them.
15    Q.    Okay.
16    A.    So within the account there may be
17  a deficit on one lot of digital assets and a credit on
18  another.
19    Q.    In 43(c) you agree that a customer is
20  entitled to trade its asset if the customer does not
21  have a negative balance; right?
22    A.    Yes.
23    Q.    And by "negative balance" you mean a net
24  account balance?
25    A.    That is exactly right.

Page 287

1    Q.    Okay.  But if they fall into a negative
2  balance they no longer have the right to trade their
3  assets; correct?
4    A.    Well, they have the obligation under
5  16.2.
6    Q.    Okay.  Now the fact that they may lose
7  certain rights if they go into a negative balance, that
8  does not mean that until then they never had those
9  rights; correct?
10    A.    Yes.  I mean, the single asset theory
11  only becomes relevant once they have a negative balance.
12    Q.    Okay.  Let us look at 16.2.
13    A.    Yes, of course.  Page 16.
14    Q.    So 16.2 says: "Margin trading is HIGH
15  RISK."
16    A.    Yes.
17    Q.    And then it says: "As a borrower, you
18  may sustain a total loss of Assets or owe Assets beyond
19  what you have deposited to your Account."  Do you see
20  that?
21    A.    Yes.
22    Q.    So as we discussed this, 16.2 assumes
23  that there are in fact assets that the customer has
24  deposited to the account; right, Sir?
25    A.    Yes, it is looking at a single account

Page 288

1  and saying you may have a loss on one part and assets on
2  the other.
3    Q.    Okay.  And do you see in -- maybe it is
4  the fourth sentence that starts, "If the value of the
5  assets".  Do you see that sentence: "If the value of
6  the Assets in your Account falls below the margin
7  maintenance requirement ...".
8    A.    Yes, I have that.
9    Q.    Okay.  And then it says: "... we may
10  seize and/or liquidate any or all of your positions and
11  Assets on any balance in your Account in order to reduce
12  your leverage or settle your debts to other Users ...";
13  do you see that?
14    A.    Yes.
15    Q.    So this contemplates that one customer
16  could have a debt to another user; right?
17    A.    Well, it is to reduce your leverage or
18  settle your debt to other users.
19    Q.    Okay.
20    A.    So there are two alternatives there,
21  I think.
22    Q.    One of the alternatives it contemplates
23  is that a user has a debt to other users?
24    A.    That is one of the things it assumes,
25  yes.

Page 289

1    Q.    Okay.  So 16.2 suggests that customers
2  both have assets and can also have debts; right?
3    A.    Yes.
4    Q.    If instead of that the only contractual
5  arrangement between a user and the FTX was the
6  requirement for one party or the other to pay the net
7  account value, there would be no need for 16.2; right?
8    A.    Well, what they are saying is they have
9  the right to walk in effectively and effect a stop loss
10  by selling assets if the borrower sustains a loss or his
11  assets are below deposit.
12    Q.    If the customer actually had no
13  contractual rights to any assets, there would be no need
14  for FTX to sell the assets; right?
15    A.    There would be no assets to sell, agreed.
16    Q.    Okay.  If you look at 16.3 it talks about
17  when a user can lend assets to other users; right?
18    A.    Yes.
19    Q.    So that is the user being the lender in
20  the margin programme?
21    A.    That is right.
22    Q.    Okay.  And that suggests that the
23  customer does have assets to lend; right?
24    A.    Yes.
25    Q.    Okay.  So if instead all the customer had

MAGNA ▸
LEGAL SERVICES

Page 290

1  was a net account value, they would not have assets that
2  they could lend; right?
3       A.   No, but they could direct assets to be
4  lent to somebody effectively, yes.
5       Q.   Well, if they did not have any assets and
6  all they had was their net account value, they could not
7  lend assets out; correct?
8       A.   It would depend on the facts, but if they
9  had 20 bitcoin they could lend 20 bitcoin.
10       Q.   Okay.  But if they did not have 20
11  bitcoin and all they had was a $4 entitlement of the net
12  asset value to make FTX pay at $4, they could not lend
13  out 20 bitcoin; right?
14       A.   No, but if they had 20 bitcoin in their
15  account then they could lend 20 bitcoin.
16       Q.   Okay.
17       A.   But if they had a pure margin then there
18  would be nothing to lend, I suppose.
19       Q.   Looking back at your report again in 45,
20  your paragraph 45, at the end of 45, before (a) you say:
21  "I disagree with Dame Elizabeth's construction of the
22  phrase 'debit balance' for the following reasons."  Do
23  you see that?
24       A.   I do.
25       Q.   What do you think the term "debit

Page 291

1  balance" means?
2       A.   I think it means a debit balance on the
3  account as a whole.
4       Q.   Okay.  You would agree section 10 is
5  about amounts that the user owes to FTX; is that right,
6  Sir?
7       A.   I think it does, yes.
8       Q.   And section 16.2 is amounts that the user
9  owes to other users; right?
10       A.   It is the amount they owe to other users
11  or leverage, deficit.
12       Q.   Okay.  So what are the liabilities that
13  the customer owes to FTX under section 10?
14       A.   Under section 10, if there is a debit
15  balance, the customer has to pay the fees set out in the
16  schedule, the total debit balance, and whatever else is
17  provided for in the terms.  If they do not, then it is
18  open to FTX to suspend the ability under -- to use the
19  services under 10.2 and so on.
20       Q.   What does it mean in your view to recover
21  the debit balance?
22       A.   It means to do its best to recover what
23  it can get.
24       Q.   I think that was a circular answer.  What
25  does it mean to recover the debit balance?

Page 292

1       A.   It means to recover as much as -- If
2  there is a debit, it means it can recover to reduce or
3  extinguish the debit balance.
4       Q.   Okay.  So recovering the debit balance
5  means to reduce or extinguish the debit balance?
6       A.   Yes.  I mean, I see Dame Elizabeth's
7  point that if it is in debit overall and you sell the
8  assets, you are not going to be able to reduce the debit
9  to nothing if it leaves the account because by
10  definition it is in debit.  I see that point.  But
11  I think that that gives a totally artificial meaning to
12  it if at any time your account has a debit balance.
13  I think it is looking at the account and seeing if it
14  has a debit balance.  And "recover", I accept it may not
15  be its primary meaning, but basically it is to get back
16  what we can.
17       Q.   So if assets are sold for fair value,
18  then the net account balance would not change; right?
19       A.   Then the net position would not change
20  but would you have stopped the loss.
21       Q.   You would not have reduced the debit
22  balance; right?
23       A.   You probably would not have reduced the
24  debit balance, no.
25       Q.   Okay.  At paragraph 46, there is

Page 293

1  a discussion about section 38.7.2.
2       A.   Yes.
3       Q.   And then that section is about
4  a contractual right of set-off?
5       A.   That is right, yes.
6       Q.   Okay.  Now if a customer does not have
7  any digital assets or liabilities there would be no need
8  to set them off; right?
9       A.   I agree.
10       Q.   And you are not giving an opinion whether
11  or not the customer had assets and liabilities; right?
12       A.   You are quite right.
13       Q.   Okay.  So you are not giving an opinion
14  whether the single asset theory is correct or not;
15  right?
16       A.   I find the single asset theory, I have
17  always found it quite difficult to understand.  I am --
18  perhaps it is my fault, I am somebody who tends to work
19  out what the parties' rights are by reference to what
20  they have agreed rather than to some theory.  But it
21  seems to me that FTX's rights under the two clauses
22  which we have been considering, section 16 and section
23  10, mean that if the client -- if the customer gets into
24  a negative situation, then there is effectively a right
25  of set-off in which case I think that is inconsistent

MAGNA
LEGAL SERVICES

Page 294

1  with the single asset theory.  But I accept that if the
2  client is not in debit then the single asset theory does
3  not apply.  But I would rather just analyse what the
4  parties' rights are under clause 16 or section 16 and
5  section 10 rather than getting into an argument about
6  what the single asset theory means.
7      Q.    Okay.  I just want to make sure I have
8  your testimony correctly.  I think you said you find the
9  single asset theory difficult to understand.  Is that
10  right?
11      A.    I just find it slightly difficult because
12  to some extent it may mean different things to different
13  people.  What I prefer do is to decide what the parties
14  rights are.
15      Q.    Okay.
16      A.    And I think the single asset theory may
17  not apply in this case while the client is in credit but
18  I think it may apply when the client is in debit because
19  of clauses 16 and 10.
20      Q.    Okay.  So if I understand right, you
21  think it probably does not apply when the client has
22  a positive net asset value; is that right?
23          MR. GLUECKSTEIN:  Object to the form.
24      A.    I think that is right, yes.
25  BY MR. HARRIS:

Page 295

1      Q.    And when the client has a negative asset
2  value, then you believe that essentially FTX has the
3  right to offset the debit, the liabilities ----
4      A.    Exactly.
5      Q.    ---- and assets?
6      A.    Yes.
7          MR. GLUECKSTEIN:  Object to the form.
8      A.    So in a sense I am saying that the single
9  asset theory, if I understand it correctly, does not
10  apply while the client is in credit but it does apply
11  when he is in debit overall.
12  BY MR. HARRIS:
13      Q.    So up until the trigger of going into
14  a debit overall balance, you read the terms of service
15  to mean that the customer can have assets and
16  liabilities?
17          MR. GLUECKSTEIN:  Object to the form;
18  misstates testimony.
19      A.    I think so.
20  BY MR. HARRIS:
21      Q.    The last topic I want to go through is
22  the -- well, I do not believe a lawyer -- do not believe
23  a lawyer who ever says that!
24      A.    I know the feeling!
25      Q.    I have more topics than that.  I am going

Page 296

1  to go to what you call, "The Remaining Questions" which
2  starts on paragraph 48.
3      A.    Okay.
4      Q.    In paragraph 49 you say: "... dismissal
5  of Dame Elizabeth's primary case would, in many senses,
6  be determinative of these remaining [issues] ...".  Do
7  you see that?
8      A.    Yes.
9      Q.    Which issues would it be determinative
10  of?
11      A.    Well, I put a note in that Question 7 is
12  an example.  What I am really saying is that her -- if
13  she is wrong in there being an equitable interest then
14  at least Question 7 goes.  I am not absolutely sure
15  which other questions go.  I think it may well be that
16  the exclusion clause is not relevant because at least
17  that goes in part ----
18      Q.    Okay.
19      A.    ---- because it refers to equity and if
20  there is no trust then equity does not matter.
21      Q.    Does your report contain all of the
22  meaningful disagreements you have with Dame Elizabeth on
23  the remaining issues?
24      A.    Yes, I think it does, yes.
25      Q.    Okay.

Page 297

1      A.    I have tried to limit it to what
2  I disagree with.  There may be one or two little things
3  that do not matter which I do not agree with but
4  I concentrated on things, on disagreements that I think
5  matter.
6      Q.    Okay.  On Question 4, am I right that the
7  only issue you address is the construction of section
8  16.2 and section 10?
9      A.    I think you are right, yes.
10      Q.    Okay.  You say that you interpret 16.2 to
11  mean that FTX can sell assets to reduce leverage?
12      A.    Yes.
13      Q.    Not simply to settle the customer's debts
14  to other users?
15      A.    That is right.
16      Q.    So what implication, if any, does that
17  clarification you make have on whether the terms
18  authorises FTX to appropriate customer assets?
19      A.    Sorry, where are we looking?
20      Q.    Well, Question 4 says: "If FTX had
21  carried out or permitted action(s) that resulted in the
22  sale, transfer, or liquidation of some or all of the 3AC
23  Assets between 12 June and June 14, 2022, would the
24  terms have authorised such action(s)?"
25          I am just wondering what is the relevance

MAGNA
LEGAL SERVICES

1    of the fact that you give the opinion that section 16.2
2    allows FTX to sell assets to reduce leverage?
3        A.    Well, "In danger of defaulting on a loan
4    we may seize and/or liquidate any of our positions and
5    assets on any balance in your account in order to reduce
6    your leverage."  That is the provision I had in mind.
7        Q.    So you are saying if the assets were sold
8    to reduce leverage then it not be in violation of the
9    terms of service?
10       A.    Absolutely, yes.
11       Q.    Okay.  You do not say that you disagree
12   with Dame Elizabeth that there is no general
13   authorisation for FTX to sell a user's assets; right?
14       A.    I think the three provisions of relevance
15   are the ones I identified at clause 10, clause 16 and
16   clause 37.6, or whatever it was.
17       Q.    Okay, other than the authorisations if
18   any in those ----
19       A.    38.  Sorry, can I just correct what
20   I said?
21       Q.    Yes.
22       A.    I do beg your pardon, 38.7.2 was what
23   I meant, sorry to interrupt.
24       Q.    No.  So to the extent there is an
25   authorisation of FTX to sell a customer's assets it

1    would be what is described in those three provisions?
2        A.    Yes.
3        Q.    There is no free-standing authorisation
4    for FTX to sell customer assets other than as you just
5    described in those three provisions?
6        A.    Those are the three provisions I rely on
7    and there are not -- if there are others I have not
8    found them so, yes, those are the three.
9        Q.    Okay.  Do you disagree with Dame
10   Elizabeth's opinion that her contractual analysis does
11   not depend on whether 8.2.6 created a trust over the 3AC
12   digital assets?
13       A.    In relation to that point?  Yes, I think
14   I do, yes.  In relation to Question 4, yes.
15       Q.    You do disagree?
16       A.    No, I do not disagree.  Sorry.
17       Q.    Sorry.
18       A.    My fault, my fault.
19       Q.    Do you agree with her opinion that if FTX
20   appropriated the digital assets without authorisation
21   that would amount to a breach of clause 8.2.6?
22       A.    I have not fully considered that.  That
23   depends.  I am not sure it would.
24       Q.    Are you giving an opinion one way or
25   another?

1        A.    I am not giving an opinion one way or the
2    other because I have not thought about it.
3        Q.    Okay.  Are you giving an opinion whether,
4    assuming Dame Elizabeth is correct that a trust has been
5    created, then are you giving an opinion that if that is
6    the case that FTX's actions in appropriating assets
7    would be a breach of trust?
8        A.    I have not checked all the terms of the
9    contract to see whether that is so.
10       Q.    So you are not giving an opinion one way
11   or another?
12       A.    I am not giving an opinion on it.
13       Q.    Okay.  Let us go on to Question 5 then,
14   which is: "To the extent that FTX's conduct deprived
15   3AC of, or removed, 3AC's ownership rights (if any) ...
16   would such conduct ... give rise, as against FTX, a
17   breach of contract claim, a claim in restitution, a
18   claim in conversion, a breach of trust claim, and/or a
19   breach of fiduciary duty claim?"
20           You are not giving an opinion regarding
21   her Question number 5; right?
22       A.    I do not think so.  I mean, I think it is
23   section 30.2 but I am not sure that comes into -- I am
24   afraid I have not identified which questions I am
25   dealing with, which is not very clever of me.  I have

1    just identified which points I am making, (a) (b) and
2    (c).  I am not sure whether Question 5 deals with the
3    exclusion cause in section 30.
4        Q.    Okay.  Other than what impact 30.2 has,
5    you do not recall any other opinion you are giving
6    regarding Question 5?
7        A.    I think that is a fair question.
8        Q.    Okay.
9        A.    There is the Attorney General v Blake
10   point, that is the only other one.
11       Q.    Right.  In terms of sections 30.1 and
12   30.2, you say 30.1 will not exclude loss or damage
13   resulting from actual fraud; right?
14       A.    Absolutely.
15       Q.    What does "actual fraud" mean?
16       A.    It means fraud.
17       Q.    Okay.
18       A.    Fraud:  sometimes people talk about
19   equitable fraud which I do not think is covered by fraud
20   here.  It is arguable.  I have not considered that.  But
21   certainly actual fraud is certainly covered.
22       Q.    Could a court find the misappropriation
23   of customer assets constituted actual fraud?
24       A.    That would depend on facts, but it could
25   do.

Page 302

1    Q.    Okay.
2    A.    It would have to find effectively
3  dishonesty.
4    Q.    Would you agree you cannot have
5  a provision to allow one party to misappropriate the
6  property of another party?
7    A.    No.  I think in general you cannot have
8  -- basically you cannot have a provision which excludes
9  liability for anything that involves ultimately
10  dishonesty or personal injury or death.  But I think
11  misappropriation is too wide and innocent
12  misappropriation -- I mean, trusts which we have
13  discussed regularly have provisions which exclude
14  liability for a trustee who misappropriated assets in
15  good faith.
16    Q.    Okay.
17    A.    But anything involving dishonest
18  misappropriation I would agree with you.
19    Q.    So you would agree this provision does
20  not relieve the trustee from liability for
21  misappropriating property that does not belong to the
22  trustee; right?
23    A.    I think it does not exclude it from being
24  liable for dishonest misappropriation.
25    Q.    What do you mean by "dishonest"?

Page 303

1    A.    Well, that is a question which judges
2  have struggled with in this country from time to time.
3  I am not entirely happy, I am not prepared really to
4  define it.  On the whole, most judges know it when they
5  see it.  I think taking money you know is not yours and
6  with a view to not returning it could easily be
7  dishonest.  But it depends so much on the particular
8  facts of the case and the mind of the person doing the
9  misappropriation.
10    Q.    Okay.  You also give an interpretation of
11  section 30.2; right?
12    A.    That is right.
13    Q.    You would agree 30.2 only limits the kind
14  of damages that can be incurred; right?
15    A.    It says it cannot be liable and then it
16  sets out various areas.  It is hard to think of
17  a broader provision, contract, tort, equity, statute or
18  any other cause, arising out of or in connection with
19  your use or inability to use the services.
20    Q.    But do you see at the end of that it then
21  says "4" and then it has a colon and then a list of
22  damages you cannot be liable for?
23    A.    Yes.
24    Q.    So it is not saying you cannot be liable.
25  It is just saying you cannot have those particular kinds

Page 304

1  of damages; right, Sir?
2    A.    That is a fair point.  If you have -- if
3  you can find damage which is not within 30.2.1, then
4  I accept it is not excluded by 30.2.  That is fair
5  point.
6    Q.    And you are not giving an opinion as to
7  what kinds of damages would or would not be excluded by
8  30.2.1 or 30.2.2; right?
9    A.    That is right.  I think the problem is
10  that unless one has the facts relating to the alleged
11  damage, one cannot really say whether it falls within
12  30.2.1 or 2 or does not fall within it.
13    Q.    Okay.  It would not exclude, for
14  instance, direct damage from a breach of contract;
15  right?
16    A.    I think -- calling it "direct" does not
17  necessarily help.  If it is loss of goodwill or loss of
18  revenue or loss of profit, that could be direct, but
19  that seems to be excluded.
20    Q.    Okay.  You are not saying that this
21  contract provision excludes all breach of contract
22  claims; right?
23    A.    I could not possibly say that, but what
24  I can say is if you had a particular claim for breach of
25  contract you would have to see whether it falls within

Page 305

1  30.2.1 or 30.2.2.  And if your point, as I understand
2  it, is if it would not fall within that, then I accept
3  it would not be excluded.
4    Q.    Okay.  Do you see, if this is helpful, if
5  you go back to paragraph 48 of your rebuttal report?
6    A.    Sorry, yes.
7    Q.    You see Question 6 has an (a) and a (b)?
8    A.    Yes.
9    Q.    And you do not address or provide an
10  opinion regarding Question 6(b); right?
11    A.    You are right.
12    Q.    And then Question 7, the only commentary
13  you make on it is what we discussed in Footnote 9;
14  right?
15    A.    That is right.
16    Q.    Let me make sure I understand that,
17  though.  You agree that a party can have contractual
18  rights that it owns; correct?
19    A.    Yes.
20    Q.    Okay.  It does not require -- and you do
21  not disagree that Three Arrows in fact owned the
22  contractual rights associated with the futures contracts
23  that it entered into; right?
24    A.    Yes.  It is unusual language to say "own
25  contractual rights", but we normally talk about having

**MAGNA**
LEGAL SERVICES

Page 306

1   contractual rights but that is a rather pernickety
2   point.
3       Q.    Okay.  Just a few more points, sorry.
4   These are on the proper standards for contractual
5   interpretation.  Do you recall that you have indicated
6   that clear words are necessary in order to create
7   property rights?
8       A.    In general, yes.
9       Q.    Okay.  I assume that standard applies to
10  FTX as well as to Three Arrows; right?
11      A.    Yes.  If you want to say your rights
12  arise under a contract, you have to point to the
13  contract and be able to show that the contractual right
14  arises in that way, yes.
15      Q.    So for FTX to have property rights there
16  must be clear words granting FTX property rights?
17      A.    If they are said to arise under contract,
18  yes.
19      Q.    Okay.  But I take it your view is that
20  FTX's property rights in the digital assets did not
21  arise under contract but rather by operation of the
22  sweeping of the digital assets?
23      A.    Effectively, yes.  They had control and
24  possession of the assets.
25      Q.    Okay.  You also discussed the rule

Page 307

1   against surplusage; right?
2       A.    Yes.
3       Q.    Do you know if Dame Elizabeth said she
4   was relying on that rule?
5       A.    In practice she was because she was --
6   I do not have her statement in front of me, but in
7   practice she was because she was saying something was
8   unnecessary if it was saying the same thing.
9       Q.    Is there a difference between relying on
10  the rule of surplusage versus indicating that
11  a contractual provision needs to have meaning?
12      A.    They are different things.  Surplusage is
13  saying you have got two provisions in the contract which
14  appear to mean the same thing.  So you say one of them
15  must mean something different because you cannot have
16  two provisions saying the same thing; whereas giving
17  a provision meaning is saying, "You have one provision
18  and I cannot work out what it means, but if I can give
19  it a meaning I will."  But ----
20      Q.    So the rule against surplusage does not
21  apply when there is only one provision in the contract
22  addressing a particular topic?
23      A.    That is perfectly true.
24      Q.    Okay.
25          MR. GLUECKSTEIN:  Can you tell us where

Page 308

1   we are in time, please?
2          THE VIDEOGRAPHER:  We have done 6.52.
3          MR. HARRIS:  I am going to stop now.
4          MR. GLUECKSTEIN:  All right.  Let us go
5   off the record.
6          THE VIDEOGRAPHER:  We are going off the
7   record.  The time is 8.19 pm.
8          (The deposition was concluded)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 309

1                   ERRATA
2       11TH NOVEMBER 2025 - DEPOSITION OF
3     THE RT. HON. LORD NEUBERGER OF ABBOTSBURY
4
5   PAGE/LINE     FROM          TO
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

MAGNA
LEGAL SERVICES

Page 310

```
 1
 2              CERTIFICATE OF WITNESS
 3
 4
 5        I, THE RT. HON. LORD NEUBERGER OF
 6   ABBOTSBURY, have read the foregoing deposition and
 7   hereby affix my signature that the same is true
 8   and correct, except as noted above.
 9
10
11
12
13
14   ..........................
15   THE RT. HON. LORD NEUBERGER OF ABBOTSBURY.
16
17
18
19   ..........................
20   DATE
21
22
23
24
25
```

Page 311

```
 1
 2             CERTIFICATE OF REPORTER
 3
 4   I, Nia Davidson, a reporter certified by the British
 5   Institute of Verbatim Reporters, hereby certify to the
 6   following:
 7        That the witness, The Rt. Hon. Lord Neuberger of
 8   Abbotsbury, was duly sworn by me and that the transcript
 9   of the oral deposition is a true and accurate record of
10   the testimony given by the witness, transcribed to the
11   best of my skill and ability.
12        I further certify that I am neither counsel for,
13   related to, nor employed by any of the parties or
14   attorneys in the action in which this proceeding was
15   taken and further that I am not financially or otherwise
16   interested in the outcome of the action.
17
21   ....................
22   Nia Davidson
23
24   Date:  13 November 2025
25
```

# **Exhibit 28**

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*
_____

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

August 25, 2025

<u>Via E-mail</u>

Adam Goldberg
Christopher Harris,
    Latham & Watkins LLP,
        1271 Avenue of the Americas,
           New York, New York 10020.

      Re:    <u>*In re: FTX Trading, Ltd. et al.*</u>, Case No. 22-11068 (Bankr. D. Del.)

Dear Adam and Chris:

      I write on behalf of the FTX Recovery Trust[1] (the "<u>Recovery Trust</u>"). Documents bearing production numbers FTX_3AC_000044305 through FTX_3AC_000044618 and FTX_3AC_000000038_Amended are being transmitted to you today via Box in response to your requests for documents in connection with the Amended Proof of Claim filed by the Joint Liquidators of Three Arrows Capital Ltd. ("<u>3AC</u>") in the above-referenced bankruptcy proceedings.

      *First*, in further response to your sixth set of requests for documents, dated July 2, 2025, documents bearing production numbers FTX_3AC_000044305 through FTX_3AC_000044441 contain additional communications between Mr. Tackett and the Recovery Trust from July 7, 2025 through August 20, 2025 relating to 3AC, the Amended Proof of Claim, the Claim Objection, or the Colorado Proceeding, following a reasonable review of the Recovery Trust's records.

      *Second*, documents bearing production numbers FTX_3AC_000044442 through FTX_3AC_000044573 are responsive to your seventh set of document requests (the "<u>Seventh RFPs</u>"), dated July 16, 2025, that were identified through a reasonable search and not previously produced to you.

---

[1]    The FTX Recovery Trust was established on January 3, 2025, the effective date of the confirmed *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* [D.I. 26404] of FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "<u>Debtors</u>").

Adam Goldberg
Christopher Harris

-2-

*Third*, enclosed as FTX_3AC_000000038_Amended is an amended version of a document previously produced to you as FTX_3AC_000000038, reflecting certain updates and clarifications consistent with information provided to you in March 2024.

*Fourth*, documents bearing production numbers FTX_3AC_000044574 through FTX_3AC_000044618 are responsive to the inquiry in your August 19, 2025 letter related to 8blocks.

The production of documents as described in this letter is subject to and without waiver of any objections in *The Recovery Trust's Responses and Objections to the Joint Liquidators of Three Arrows Capital, Ltd.'s Sixth Set of Requests for the Production of Documents*, dated July 6, 2025, and *The FTX Recovery Trust's Responses and Objections to the Joint Liquidators of Three Arrows Capital, Ltd.'s Seventh Set of Requests for the Production of Documents*, dated August 15, 2025, and all other rights, defenses, and arguments of the Recovery Trust concerning future discovery and all other matters. The Recovery Trust does not intend to disclose any documents or information that are protected from disclosure by the attorney-client privilege, the attorney work product protection, or any other applicable privilege or protection. Any inclusion of information subject to any such privilege or protection is inadvertent, and shall not be deemed a waiver of any such privilege or protection. All documents in this production have been designated either as "HIGHLY CONFIDENTIAL" or "CONFIDENTIAL" pursuant to the terms of the Confidentiality Agreement and Stipulated Protective Order [D.I. 832]. The documents have been encrypted. The password will be sent separately via e-mail.

With this production, the Recovery Trust's responses to the Joint Liquidators' Seventh RFPs are now substantially complete. The Recovery Trust continues to assess the letter and the requests that you provided late on August 19, 2025.

Sincerely,

*/s/ Brian D. Glueckstein*

Brian D. Glueckstein

# **Exhibit 29**

1 W.L.R.

A

[COURT OF APPEAL]

* PAUL v. CONSTANCE

1976   July 8                                        Cairns, Scarman and Bridge L.JJ.

B   Trusts—Declaration of trust—Oral—Deceased paying damages
received for personal injuries into deposit account—Facilities
for plaintiff to draw on account—Further sums belonging to
deceased and plaintiff deposited—One withdrawal and moneys
divided between them—Deceased's frequent statement that
moneys in account belonging to both of them — Whether
amounting to declaration of trust

C          The deceased and the defendant were married and co-
habited until their separation in 1965.  In 1967 the deceased
began to live with the plaintiff and they continued to live
together as man and wife until the deceased's death in 1974.
In 1969 the deceased was injured at his place of work and
eventually received damages of £950.  The deceased and the
plaintiff then decided to deposit the money in a bank account
and, in the course of a discussion with the local bank manager,
D   revealed that they were not in fact married.  It was then
decided to place the money in a deposit account in the
deceased's name, with special arrangements enabling the
plaintiff to draw on it, after producing a note from the deceased
authorising her to do so.  Further amounts of money were
paid into the account, including certain sums representing
winnings at "bingo" which the deceased and the plaintiff
played as a joint venture.  On one occasion, the sum of £150
E   was withdrawn and after part of it had been spent on presents
and food the deceased and the plaintiff divided the remainder
between them.  At different times, the deceased, when referring
to the account, said to the plaintiff, "The money is as much
yours as mine."  On the deceased's death, the balance con-
sisted largely of the original amount representing the deceased's
damages for personal injuries.  The deceased having died
intestate, the defendant as his widow took out letters of
F   administration of his estate.  The plaintiff brought an action
against the defendant, claiming the money in the account or
such part of it as the court thought right on the ground that
it had been held on express trust by the deceased for the
benefit of the plaintiff and himself.  The judge, after finding
that the deceased and the plaintiff had intended to create a
trust for the benefit of both of them, held that the deceased's
frequent use of the words, "The money is as much yours as
G   mine," amounted to an express declaration of trust for the
benefit of both of them and awarded the plaintiff a half share
of the trust fund.
          On the defendant's appeal : —
          Held, dismissing the appeal, that to create a trust by an
express declaration, the disponent's words and actions had to
show a clear intention to dispose of property or funds so that
someone else should acquire a beneficial interest; that taking
H   into account all the facts, the deceased's words, "The money
is as much yours as mine," often repeated to the plaintiff,
constituted a clear declaration of trust for the benefit of him-
self and the plaintiff; and that therefore the judge was right
in awarding the plaintiff a half share of the fund.
          Jones v. Lock (1865) L.R. 1 Ch.App 25 and Richards v.
Delbridge (1874) L.R. 18 Eq. 11 distinguished.

[Reported by MISS HENRIETTA STEINBERG, Barrister-at-Law]

528

The following cases are referred to in the judgments:    A

*Jones* v. *Lock* (1865) L.R. 1 Ch.App. 25; 13 L.T. 514.

*Richards* v. *Delbridge* (1874) L.R. 18 Eq. 11.

The following additional case was cited in argument:

*Paradise Motor Co. Ltd., In re* [1968] 1 W.L.R. 1125; [1968] 2 All E.R. 625, C.A.    B

APPEAL from Judge Rawlins sitting at Cheltenham County Court.

The deceased, Dennis Albert Constance, and the defendant, Bridget Frances Constance, were married, cohabiting until June 1965 when their marriage broke down and they separated. From 1967 the deceased and the plaintiff, Doreen Grace Paul, lived together as man and wife until the deceased's death in March 1974. The deceased having died intestate, the    C
defendant, as his widow, took out letters of administration for his estate. The plaintiff brought an action against the defendant, claiming the sum of £897·39 plus interest or such part of it as the court should determine, on the ground that the money which was deposited in a bank account in the deceased's name at a branch of Lloyd's Bank, Cheltenham, had been held by the deceased on express trust for the benefit of himself and    D
the plaintiff jointly. In August 1975, the judge, holding that the facts supported an intention by the deceased to create a trust for the benefit of himself and the plaintiff jointly, ordered that the defendant should pay the plaintiff £499·21 being her half share in the trust fund.

The defendant appealed on the ground, inter alia, that the judge was wrong in law in deciding that the sum in the account had been held by the deceased on trust for the plaintiff and himself jointly and should    E
have decided that the sum belonged to the deceased alone.

The facts are stated in the judgment of Scarman L.J.

*Mark Blythe* for the defendant.

*Nicholas Wilson* for the plaintiff.

F

CAIRNS L.J. I will ask Scarman L.J. to deliver the first judgment.

SCARMAN L.J. The deceased, Dennis Albert Constance was a wage earner living in Cheltenham until he died on March 9, 1974. He was married to Bridget Frances Constance, the defendant in this action. But they parted in June 1965. In 1967 the deceased met Mrs. Doreen Grace Paul who is the plaintiff in this action. The two of them set up house    G
together in December 1967 and they lived to all appearances as man and wife up to the date of the deceased's death. The house in which they lived was 42, Larput Place, St. Pauls, Cheltenham and it was the property of the plaintiff.

In August 1969, the deceased, who was employed as a fitter in or near Cheltenham, was injured at his work. He claimed damages against    H
his employers and ultimately, in early 1973, after he had initiated legal proceedings, his claim was disposed of by the payment to him of a sum of £950. This money he received by cheque early in 1973. He discussed with the plaintiff what to do with the money, and the evidence is clear that they decided that it was to go into a bank account. The two of them went to see the manager of the St. George's Square branch of Lloyds Bank in Cheltenham, and there they had a discussion about open-

A  ing a bank account. According to the notes of evidence which the judge made, the two of them had a discussion with the bank manager. He explained to them the different sorts of accounts which they could open and the decision was taken to open a deposit account. At that stage the deceased revealed that they were not married. It is perhaps of some significance in understanding this interview if one recalls the evidence that was given by a Mr. Thomas, a fellow employee of the deceased, who

B  said that he knew that the deceased and the plaintiff were not married, but most people did not. After the deceased had told the manager that they were not married, the manager said, " Well, it will be in your name only then? " The deceased then said, " Yes," and asked the manager what was to happen if the plaintiff wanted to draw on the account, or if he wanted her to draw on it. The manager said that that could be

C  done if the plaintiff used a note with the deceased's signature on it, authorising her to draw on the account.

    The account that was opened on that day in February 1973 is at the very heart of this case. The account was maintained in the deceased's name from that date until the date of his death. Over the period between 1973 and his death, some 13 months later in 1974, further sums were paid into the account, including, in particular, some sums which repre-

D  sented " bingo " winnings. It is clear from the evidence that the deceased and the plaintiff did play " bingo " and they played it really as a joint venture. They did have winnings from time to time and at any rate three of such winnings,—none of them very great—were paid into the account. It is clear from the plaintiff's evidence that they thought of those winnings as " their winnings ": neither hers nor his alone, but theirs. Nevertheless,

E  when the account was closed on the deceased's death, the ultimate balance, after the addition of interest, consisted largely of the initial sum of £950 representing the deceased's damages as a result of his injury at work. There was one withdrawal during this period, a sum of £150, and the evidence is that that money was divided between the two of them after part of it had been used for buying Christmas presents and some food.

F    The plaintiff began her action after the deceased's death against his lawful wife, the defendant, who took out letters of administration for his estate, since he died intestate. The plaintiff claims in the action that the bank account in the deceased's name, to which I have referred, was held by him on trust for the benefit of himself and the plaintiff jointly. She claims that it was an express trust declared orally by him on numerous

G  occasions. The defendant, as administratrix, closed the account and she maintains that the whole fund contained in the account was the beneficial property of the deceased at the time of his death and, as such, became part of his estate after death.

    The matter came on for trial before Judge Rawlins in August 1975 and on August 12 the judge found in favour of the plaintiff. He found

H  the existence of an express trust, a trust for the benefit of the plaintiff and the deceased jointly, and he ordered that the sum of £499·21 be paid to the plaintiff as representing one half-share of the fund to which she was beneficially entitled.

    A number of issues were canvassed at the trial, but the only point taken by the defendant on her appeal to this court goes to the question whether or not there was, in the circumstances of this case, an express declaration of trust. It is conceded that, if there was, the trust would

be enforceable.  The one question is whether there was an express   A
declaration of trust.

The case has been argued with great skill and ability by counsel on
both sides and I should like to express my appreciation for the way in
which Mr. Blythe, for the defendant, opened the appeal and the way in
which Mr. Wilson very shortly and vigorously, put his contentions on
behalf of the plaintiff.

Mr. Blythe drew the attention of the court to the so-called three   B
certainties that have to be established before the court can infer the
creation of a trust.  He referred us to *Snell's Principles of Equity*, 27th
ed. (1973), p. 111, in which the three certainties are set out.  We are
concerned only with the first of the three certainties and it is this:

> " The words "—that is the words of the declaration relied on—
> " must be so used that on the whole they ought to be construed as   C
> imperative. . . .  No particular form of expression is necessary for
> the creation of a trust, if on the whole it can be gathered that a
> trust was intended.  ' A trust may well be created, although there
> may be an absence of any expression of terms imposing confidence.'
> A trust may thus be created without using the word ' trust,' for what
> the court regards is the substance and effect of the words used."   D

Mr. Blythe has taken the court through the detailed evidence and
submits that one cannot find anywhere in the history of events a declara-
tion of trust in the sense of finding the deceased saying: " I am now dis-
posing of my interest in this fund so that you, Mrs. Paul, now have a
beneficial interest in it."  Of course, the words which I have just used
are stilted lawyers' language and Mr. Wilson, for the plaintiff, was right   E
to remind the court that we are dealing with simple people, unaware of
the subtleties of equity, but understanding very well indeed their own
domestic situation.  It is, of course, right that one should consider the
various things that were said and done by the plaintiff and the deceased
during their time together against their own background and in their own
circumstances.

Mr. Blythe drew our attention to two cases, both of them well enough   F
known, (at any rate in Lincoln's Inn, since they have been in the law
reports for over 100 years), and he relies on them as showing that, though
a man may say in clear and unmistakable terms that he intends to make
a gift to some other person, for instance, his child or some other member
of his family, yet that does not necessarily disclose a declaration of trust.
Indeed, in the two cases to which we have been referred the court held   G
that, though there was a plain intention to make a gift, it was not right
to infer any intention to create a trust.

In the first of the two cases, *Jones* v. *Lock* (1865) L.R. 1 Ch.App. 25,
Mr. Jones, returning home from a business trip to Birmingham, was scolded
for not having brought anything back for his baby son.  He went upstairs
and came down with a cheque made out in his own name for £900 and   H
said in the presence of his wife and the nurse: " Look you here, I give
this to baby," and he then placed the cheque in the baby's hand.  It was
obvious that he was intending to make a gift of the cheque to his baby
son, but it was clear, as Lord Cranworth L.C. held, that there was no
effective gift then and there made of the cheque: it was in his name and
had not been endorsed over to the baby.  Other evidence showed that
Mr. Jones had in mind to go and see his solicitor, Mr. Lock, to make

A proper provision for the baby boy, but unfortunately he died before he could do so. *Jones* v. *Lock* was a classic case where the intention to make a gift failed because the gift was imperfect. So an attempt was made to say: " Well, since the gift was imperfect, nevertheless, one can infer the existence of a trust." But Lord Cranworth L.C. would have none of it.

B    In the second case to which Mr. Blythe referred us, *Richards* v. *Delbridge* (1874) L.R. 18 Eq. 11, the facts were that Mr. Richards, who employed a member of his family called Edward in his business, was minded to give the business to the young man. He evidenced his intention to make this gift by endorsing on the lease of the business premises a short memorandum to the effect:

C    " This deed "—that is the deed of leasehold—" and all thereto belonging I give to Edward from this time forth with all the stock in trade."

Sir George Jessel M.R., who decided the case, said that there was in that case the intention to make a gift, but the gift failed because it was imperfect; and he refused to draw from the circumstances of the imperfect gift the inference of the existence of a declaration of trust or the
D intention to create one. The ratio decidendi appears clearly from the report. It is a short passage and because of its importance I quote it. Sir George Jessel M.R. said, at p. 15:

" In *Milroy* v. *Lord* (1862) 4 De G.F. & J. 264 Turner L.J. after referring to the two modes of making a voluntary settlement valid and effectual, adds these words: 'The cases, I think, go further, to
E this extent, that if the settlement is intended to be effectuated by one of the modes to which I have referred, the court will not give effect to it by applying another of those modes. If it is intended to take effect by transfer, the court will not hold the intended transfer to operate as a declaration of trust, for then every imperfect instrument would be made effectual by being converted into a perfect
F trust.' It appears to me that that sentence contains the whole law on the subject."

There is no suggestion of a gift by transfer in the present case. The facts of the two cases do not, therefore, very much help the submission of Mr. Blythe but he was able to extract from them this principle: that
G there must be a clear declaration of trust and that means there must be clear evidence from what is said or done of an intention to create a trust —or, as Mr. Blythe put it, " an intention to dispose of a property or a fund so that somebody else to the exclusion of the disponent acquires the beneficial interest in it." He submitted that there was no such evidence.

When one looks at the detailed evidence to see whether it goes as
H far as that—and I think that the evidence does have to go as far as that —one finds that from the time that the deceased received his damages right up to his death he was saying, on occasions, that the money was as much the plaintiff's as his. When they discussed the damages, how to invest them or what to do with them and when they discussed the bank account, he would say to her: " The money is as much yours as mine."

The judge, rightly treating the basic problem in the case as a question of fact, reached this conclusion. He said:

" I have read through my notes and I am quite satisfied that it was   A
the intention of Mrs. Paul and Mr. Constance to create a trust in
which both of them were interested."

In this court the issue becomes: was there sufficient evidence to justify
the judge in reaching that conclusion of fact? In submitting that there was,
Mr. Wilson draws attention first and foremost to the words used. When
one bears in mind the unsophisticated character of the deceased and his   B
relationship with the plaintiff during the last few years of his life, Mr.
Wilson submits that the words that he did use on more than one occasion,
" This money is as much yours as mine," convey clearly a present declara-
tion that the existing fund was as much the plaintiff's as his own. The
judge accepted that conclusion. I think that he was well justified in   C
doing so and, indeed, I think that he was right to do so. There are, as
Mr. Wilson reminded us, other features in the history of the relationship
between the plaintiff and the deceased which support the interpretation
of those words as an express declaration of trust. I have already
described the interview with the bank manager when the account was
opened. I have mentioned also the putting of the " bingo " winnings into   D
the account and the one withdrawal for the benefit of both of them.

It might, however, be thought that this was a borderline case, since
it is not easy to pin-point a specific moment of declaration, and one must
exclude from one's mind any case built upon the existence of an implied
or constructive trust, for this case was put forward at the trial and is
now argued by the plaintiff as one of express declaration of trust. It was   E
so pleaded and it is only as such that it may be considered in this court.
The question, therefore, is whether, in all the circumstances, the use of
those words on numerous occasions as between the deceased and the
plaintiff constituted an express declaration of trust. The judge found that
they did. For myself, I think that he was right so to find. I therefore
would dismiss the appeal.
                                                                        F

BRIDGE L.J.   I agree. In delivering his judgment in *Richards* v.
*Delbridge*, L.R. 18 Eq. 11, 14, Sir George Jessel M.R., discussing the
requisities of a valid declaration of trust, said:

" It is true he need not use the words ' I declare myself a trustee,'
but he must do something which is equivalent to it, and use ex-   G
pressions which have that meaning, for, however anxious the court
may be to carry out a man's intentions, it is not at liberty to construe
words otherwise than according to their proper meaning."

The plaintiff gave evidence, which the judge accepted, that on frequent
occasions the deceased told her that the money in his deposit account at   H
Lloyds Bank was as much her money as his. In the last analysis, accord-
ingly, the whole question in this case, as it seems to me, is whether the
judge was right, construing those words according to their proper meaning
and in the context in which the words were spoken as disclosed by the
evidence, to conclude that, by using those words, the deceased had done
something which was equivalent to declaring himself a trustee of the
moneys in the account for himself and the plaintiff in equal shares.

1 W.L.R.                    Paul v. Constance (C.A.)                    Bridge L.J.

A     For the reasons given by Scarman L.J., I think that the judge was right in coming to that conclusion and I too would dismiss the appeal.

CAIRNS L.J.   I agree.

*Appeal dismissed with costs in Court of Appeal and below.*
*Assessment under Legal Aid and Advice Act to be made in county court.*

B

Solicitors: *Oswald Hickson, Collier & Co.* for *Stannard & Moss, Cheltenham; Elgoods, Cheltenham.*

C
                              _____

[FAMILY DIVISION]

\* *In re* K. (A MINOR) (ACCESS ORDER: BREACH)

D
                                NOTE

1976 Oct. 11                              Sir George Baker P. and Latey J.

*Minor—Custody—Access order—Mother's refusal to comply with part of order — Appeal pending — Power of justices to stay order—Powers to enforce compliance with order—Magistrates' Courts Act 1952 (15 & 16 Geo. 6 & 1 Eliz. 2, c. 55), s. 54 (3)*

E

Justices do have power to make an order under section 54 (3) of the Magistrates' Courts Act 1952 [1] in a case of non-compliance with an order for access made by a magistrates' court; an order under that section is inappropriate where the access order is under appeal.

F     Justices may at any time grant a stay of execution of a guardianship order made by them, but, where an appeal has been lodged, it would, in the majority of cases, be preferable for the matter of a stay to be dealt with by a judge of the Family Division.

The following case is referred to in the judgment of Sir George Baker P.:

*B. (B. P. M.)* v. *B. (M. M.)* [1969] P. 103; [1969] 2 W.L.R. 862; [1969] 1 All E.R. 891, D.C.

G

No additional cases were cited in argument.

APPEAL from Dorking justices.

The mother of a very young child appealed from part of an order of the justices allowing the father access to the child away from the mother's home. The mother having refused meanwhile to comply with that part of the order and no stay having been sought, the father made an application to the justices to enforce her compliance by means of section 54 (3) of the Magistrates' Courts Act 1952 which was adjourned sine die.

The Divisional Court allowed the appeal and amended the access

H

_____
[1] Magistrates' Courts Act 1952, s. 54 (3): see post, p. 535B.
VOL. 1                                                                    29